**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**AMBASE CORPORATION AND**
**CARTERET BANCORP, Inc.**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES OF AMERICA**

---

# GOVERNMENT RESPONSE TO AMBASE'S STATEMENT OF ISSUES

---

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309
Fax: (202) 514-7969

OF COUNSEL:
TIMOTHY ABRAHAM
ARLENE PIANKO GRONER
MELINDA HART
F. JEFFERSON HUGHES
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

Date: August 30, 2006

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . iv

INTRODUCTION . . . . . 1

STATEMENT OF ISSUES . . . . . 6

STATEMENT OF FACTS . . . . . 7

ARGUMENT . . . . . 11

I. THIS COURT LACKS JURISDICTION OVER CLAIMS IN THE SOI . . . . . 11

II. BAILEY PRECLUDES AMBASE'S CLAIMS RELATING TO THE PAYMENT OF INTEREST ON THE DEBT AND THE LIABILITY TO THE IRS . . . . . 13

III. THE RTC'S/FDIC'S MANAGEMENT OF CARTERET WAS CONSISTENT WITH LAW AND REGULATION . . . . . 15

A. NEITHER THE ALLEGED DELAY IN FUNDING NOR THE MINORITY PREFERENCE PROGRAM CONTRIBUTED TO ANY REDUCTION IN PREMIUM RECEIVED FOR CARTERET'S BRANCH DEPOSITS . . . . . 16

B. THE ENACTMENT OF FIRREA DID NOT ENLARGE THE RECEIVERSHIP DEFICIT BY ELIMINATING THE VALUE OF SUPERVISORY GOODWILL . . . . . 22

1. PROFESSOR CALOMIRIS'S ASSUMPTION THAT THE GOODWILL ACCOUNT SURVIVED CARTERET'S SEIZURE IS INVALID . . . . . 22

2. EVEN ASSUMING THE GOODWILL COULD HAVE BEEN TRANSFERRED, PROFESSOR CALOMIRIS'S VALUATION MODELS ARE FLAWED . . . . . 26

C. THE MINORITY PREFERENCE PROGRAM DID NOT INCREASE THE RECEIVERSHIP DEFICIT . . . . . 31

1. CARTERET WAS NOT PRECLUDED BY AN "ASSET FREEZE" FROM SELLING ASSETS TO FUND THE TRANSFERS OF THE DEPOSITS . . . . . 33

2. CARTERET'S PERFORMING MORTGAGES WERE SOLD AT MARKET PRICES TO MINORITY BIDDERS AND THE DEPOSIT PREMIUM WAS ENHANCED AS A RESULT OF THE MINORITY PREFERENCE PROGRAM . . . . . 36

3. BIDS WOULD NOT HAVE BEEN HIGHER IN THE ABSENCE OF THE MINORITY PREFERENCE PROGRAM . . . . . 43

D. THE RTC PROPERLY SHUT DOWN THE MORTGAGE ORIGINATION UNIT TO REDUCE THE RISK OF LOSS TO THE RECEIVERSHIP . . . . . 45

E. THE FDIC PROPERLY APPLIED THE FEDERAL JUDGMENT INTEREST RATE TO ITS LOANS TO CARTERET . . . . . 52

1. THE FDIC WAS LEGALLY REQUIRED TO CHARGE PII AND THE RATES WERE NOT "EXCESSIVE" . . . . . 53

2. THE FDIC DID NOT SELECT THE FEDERAL JUDGMENT RATE TO INCREASE RECEIVERSHIP COSTS . . . . . 58

3. THE FEDERAL JUDGMENT RATE WAS ECONOMICALLY APPROPRIATE . . . . . 63

F. AMBASE HAS PRESENTED NO PERSUASIVE EVIDENCE THAT THE FEDERAL INCOME TAX LIABILITY IS LESS THAN $93.7 MILLION AS OF DECEMBER 31, 2005 . . . . . 68

1. A FIRM CAN REPORT FINANCIAL LOSSES WHILE AT THE SAME TIME REPORTING TAXABLE INCOME . . . . . 70

2. THERE IS NO EVIDENCE FFA WAS IMPROPERLY CALCULATED . . . . . 72

3. THE 1995 TAX RETURN SHOULD NOT HAVE AND COULD NOT HAVE REFLECTED POST-INSOLVENCY INTEREST . . . . . 75

4. THE EVIDENCE DOES NOT DEMONSTRATE THE AVAILABILITY OF A $73.9 MILLION TAX LOSS CARRYFORWARD FOR 1992 . . . . . . . . . . 80

5. THERE IS NO EVIDENCE OF OTHER ERRORS IN THE 1995 RETURN . . . . . . . . . . 81

6. THERE IS NO EVIDENCE THAT MISCELLANEOUS TAX-RELATED CLAIMS SHOULD REDUCE THE RECEIVERSHIP DEFICIT . . . . . . . . . . 83

7. THE TAX RECALCULATION ADVANCED BY AMBASE IS INCONSISTENT WITH PROFESSOR CALOMIRIS'S ANALYSIS OF THE RECEIVERSHIP DEFICIT . . . . . . . . . . 85

G. THERE IS NO EVIDENCE THE FDIC HAS MISALLOCATED CORPORATE COSTS TO CARTERET . . . . . . . . . . 88

IV. THIS COURT LACKS JURISDICTION TO ENTERTAIN THE CONSTITUTIONAL CHALLENGES AND THEY ARE INVALID . . . . . . . . . . 92

A. THIS COURT LACKS JURISDICTION OVER THE DUE PROCESS CHALLENGE . . . . . . . . . . 93

B. AMBASE LACKS CONSTITUTIONAL STANDING . . . . . . . . . . 94

C. THE ALLEGED FAILURE OF FUNDING WAS NOT A "TAKING" AND THE MINORITY PREFERENCE PROGRAM DID NOT VIOLATE DUE PROCESS . . . . . . . . . . 97

CONCLUSION . . . . . . . . . . 99

## TABLE OF AUTHORITIES

### CASES

Adarand Constructors, Inc. v. Pena,
515 U.S. 200 (1995) ........ 5, 94, 98

Alfa Laval Separation, Inc. v. United States,
175 F.3d 1365 (Fed. Cir. 1999) ........ 95

Am. Fed'n of Gov't Employees v. United States,
258 F.3d 1294 (Fed. Cir. 2001) ........ 95

Ambase Corporation v. United States,
58 Fed. Cl. 32 (2003) ........ 10, 14

Ambase Corporation v. United States,
61 Fed. Cl. 794 (2004) ........ *passim*

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) ........ 97

Bailey v. United States,
341 F.3d 1342 (Fed. Cir. 2003) ........ 6, 13, 14

Bannum, Inc. v. United States,
56 Fed. Cl. 453 (2003) ........ 61

Berkovitz v. United States,
486 U.S. 531 (1988) ........ 70, 71

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995) ........ 97

Carteret v. Office of Thrift Supervision,
963 F.2d 567 (3d Cir. 1992) ........ 3, 24

Citibank v. Nyland,
1990 WL 138958 (SDNY 1990) ........ 92

Collins v. United States,
67 F.3d 284 (Fed. Cir. 1995) ........ 94

Corbin v. Federal Reserve Bank of New York,
475 F. Supp. 1060 (S.D.N.Y. 1979),
aff'd 629 F.2d 233 (2d Cir. 1980) .......... 55, 56, 57

Eastport S.S. Corp. v. United States,
372 F.2d 1002 (Ct. Cl. 1967) .......... 93

FDIC v. Citizens State Bank of Niangua,
130 F.2d 102 (8th Cir. 1942) .......... 55

First Hartford Corporation Pension Plan & Trust v. United States,
194 F.3d 1279 (Fed. Cir. 1999) .......... 94

Fleischer v. Resolution Trust Corporation,
882 F. Supp. 999 (D.Kan. 1995) .......... 12

Gladstone Realtors v. Village of Bellwood,
441 U.S. 91 (1979) .......... 94, 96

Glass v. United States,
47 Fed. Cl. 316 (2000),
vacated on other grounds and remanded, 258 F.3d 1349 (Fed. Cir.),
amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001) .......... 3

Golden Pac. Bancorp v. Federal Deposit Insurance Corporation,
1997 WL 626374 (S.D.N.Y. 1997) .......... *passim*

Golden Pac. Bancorp v. Federal Deposit Insurance Corporation,
2002 WL 31875395 (S.D.N.Y. 2002),
aff'd 375 F.3d 196 (2nd Cir. 2004) .......... 2, 55, 57

Hanford v. United States,
63 Fed. Cl. 111 (2004),
aff'd, 154 Fed.Appx. 216 (Fed. Cir. 2005) .......... 93

In re Hartsdale Associates,
452 F. Supp. 67 (S.D.N.Y. 1978) .......... 56

Home Savings of America, FSB v. United States,
399 F.3d 1341 (Fed. Cir.),
on remand, 69 Fed. Cl. 187 (2005),
on remand, 70 Fed. Cl. 303 (Feb 21, 2006) .......... 24

Impressa Construgioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 61

Longshore v. United States,
77 F.3d 440 (Fed. Cir. 1996) ........................................................................... 6, 95, 98

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) ........................................................................................................ 94

Maher v. United States,
314 F.3d 600 (Fed. Cir. 2002) ........................................................................................ 12

Meriden Trust & Safe Deposit Co., v. Federal Deposit Ins. Corp.,
62 F.3d 449 (2nd Cir. 1995) ........................................................................................... 96

Mid Jersey National Bank v. Fidelity-Mortgage Investors,
518 F.2d 640 (3rd Cir. 1975) .......................................................................................... 56

National Bank of Commonwealth v. Mechanics' National Bank,
94 U.S. U.S. 437 (1876) ................................................................................................. 67

O'Melveny & Myers v. United States,
512 U.S. 79 (1994) .......................................................................................................... 12

Plaintiffs in All Winstar-Related Cases at the Court v. United States,
44 Fed. Cl. 3 (1999) ........................................................................................................ 11

Ralston Steel Corp. v. United States,
340 F.2d 663 (Ct. Cl. 1965) ............................................................................................ 92

In Re Receivership Of First Nat'l Bank in Humboldt,
523 N.W.2d 591 (Iowa 1994) ......................................................................................... 55

Rothe Dev. Corp. v. United States Department of Defense,
262 F.3d 1306 (Fed. Cir. 2001) ...................................................................................... 98

Simon v. Eastern Kentucky Welfare Rights Org.,
426 U.S. 26 (1976) .......................................................................................................... 94

Stephenson v. United States,
58 Fed. Cl. 186 (2003) .................................................................................................... 93

Sumter v. United States,
61 Fed. Cl. 517 (2004) .................................................................................................... 94

United States v. King,
395 U.S. 1 (1969) ............................................................................................................ 93

United States v. Sperry Corp.,
493 U.S. 52 (1989) .......... 97

W. McAllister, III v. Resolution Trust Corporation,
201 F.3d 570 (5th Cir. 2000) .......... 12

Walter E. Heller & Co. v. Cox,
343 F. Supp. 519 (S.D.N.Y. 1972),
aff'd mem. sub nom. Walter E. Heller & Co. v. Ocean Air Tradeways,
486 F.2d 1398 (2d Cir.),
cert. denied, 414 U.S. 827 (1973) .......... 56

**STATUTES**

12 C.F.R. § 360.3(d) (2005 ed) .......... 59

12 C.F.R. § 360.3 (1988) .......... 58, 59, 60

12 C.F.R. § 360.7 .......... 67

5 U.S.C. § 701(a)(2) .......... 70

12 U.S.C. § 144a(w)(17)(A) .......... 15

12 U.S.C. § 1821(d)(6) .......... 13

12 U.S.C. § 1821(d)(11) .......... 13, 58

12 U.S.C. § 1821(d)(11)(A)(v) .......... 13

12 U.S.C. § 1821(d)(13)(D) .......... 13

12 U.S.C. § 1831o(a) .......... 66

12 U.S.C. § 1831o( c) .......... 66

28 U.S.C. § 1346(b) .......... 70

28 U.S.C. § 1491 .......... 94

28 U.S.C. § 1961 .......... 66

40 U.S.C. § 258e-1 .......... 66

139 Cong. Rec. H10897-02,
1993 WL 48936 .......... 99

Revenue Ruling 70-367,
1970-2 C.B. 37 (1970) .......... 77

Financial Institution Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101-73, 103 Stat. 183 (1989) .......... 33

Resolution Trust Completion Act, Pub. L. No. 103-204, § 3(a),
107 Stat. 2369, 2375-76 (1993) .......... 4

**MISCELLANEOUS**

Lon Fuller, The Morality of Law 60 (1964) .......... 98

IN THE UNITED STATES COURT OF Federal CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.<br><br>Plaintiffs,<br><br>and<br><br>Federal DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 93-531<br>(Judge Loren Smith) |

GOVERNMENT RESPONSE TO
AMBASE'S STATEMENT OF ISSUES

INTRODUCTION

Pursuant to this Court's order dated May 23, 2005, defendant, the United States, respectfully submits this response to the Corrected Statement of Issues ("SOI"), filed by Ambase Corporation ("Ambase"). While Ambase levies a broad based attack upon the estimation of the receivership deficit ($278 million as of December 31, 2005) by the Federal Deposit Insurance Corporation ("FDIC"), it primarily argues that this Court should "recalculate" the deficit by deducting from the balance asserted by the FDIC the amount of post insolvency interest ("PII") ($156.6 million), taxes ($93.7 million),, supervisory goodwill ($40.7 million), the alleged value of Carteret Mortgage Company ("CMC") ($18.4 million), and FDIC/Resolution Trust Corporation ("RTC") corporate overhead allegedly misallocated to Carteret (undefined amount).

Although the SOI is long on rhetoric and hyperbole, it is short on citation to authority and substance. After completing the SOI and digesting the highly rhetorical accusations, one is moved to inquire "Where's the beef?"

As we demonstrate in detail in this response, the SOI rests upon a misinterpretation of evidence and relevant legal authority. For example, with respect to PII, while Ambase's spirited opposition contends the RTC/FDIC was not authorized to charge PII against the loans to Carteret in 1994 and 1995, SOI at 48-71, Ambase neither cites nor discusses the plethora of authority which establishes that PII was required by the FDIC Act and RTC/FDIC policy which applied at the time of the loans. See e.g., Golden Pac. Bancorp v. FDIC, 2002 WL 31875395 (S.D.N.Y. 2002), aff'd 375 F.3d 196 (2d Cir. 2004) (PII must be charged to preserve the fiscal integrity of the insurance fund). Ambase's contention that the receivership deficit should be "recalculated" by deducting the PII is unsupported and contrary to the relevant authority.

Likewise, with respect to taxes, Ambase contends PII should have been taken as a deduction on Carteret's 1995 tax return and the failure to do so constituted a tort and breach of fiduciary duty by the RTC/FDIC. However, as Ambase concedes in the SOI, the RTC/FDIC did not take a deduction for PII against income in 1995 because of a policy to accrue PII on the receivership's books only after 95 percent of the principal claims had been paid. SOI at 37-43. This policy was applied to all receiverships and was based upon the relevant provisions of the Internal Revenue Code ("IRC") and regulations as interpreted at the time. While Ambase contends fourteen years after the fact that the policy "artificially created" a tax liability because the RTC/FDIC could have taken the deduction without a challenge from the Internal Revenue Service ("IRS"), there is no evidence that Carteret was singled out or that the policy did not apply

to all receiverships. There is also no evidence that the IRS would not have challenged the deduction or that it was consistent with law. The fact that Ambase now believes Carteret would have been better off if a different policy had been applied is irrelevant because, in the absence of animus against Carteret, of which Ambase concedes there was none, the RTC/FDIC policy on how to interpret the IRC for operating receiverships is simply not subject to judicial review. See, e.g., Golden Pac. Bancorp v. FDIC, 1997 WL 626374, *2 (S.D.N.Y. 1997) ("permissible exercises of policy judgments" are not amenable to judicial review).

Ambase argues, again without citation to authority, that, in the absence of the Financial Institution Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"), the receivership would have been able to sell supervisory goodwill in 1993 when, according to its expert, it would have sold Carteret as a whole bank if the RTC had funding to resolve insolvent thrifts. Again, Ambase's contention simply misunderstands receivership accounting and the transferability of goodwill. Under RTC policy, goodwill had to be written off and was written off when the conservatorship was created. March 1993 Revised Manual, at 62, App. 490. Furthermore, even if it had not been written off in 1992, the goodwill was not transferable to a buyer. See Carteret v, Office of Thrift Supervision, 963 F.2d 567, 585 n.8 (3d Cir. 1992) (goodwill did not transfer to a buyer but had to be written off the seller's books); Glass v. United States, 47 Fed. Cl. 316, 327-28 (2000) ("because goodwill is not negotiable or transferable, it cannot be invested and has no potential to increase"), vacated on other grounds and remanded, 258 F.3d 1349 (Fed. Cir.), amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001). There is simply no merit to the claim that the receivership deficit should be reduced by the alleged value of supervisory goodwill.

With respect to CMC, overwhelming contemporaneous evidence demonstrates that the decision to close the mortgage origination function was fully consistent with the RTC's policy to maximize the value of the receivership. Closing down the origination unit advanced the objective because the pipeline of new loan applications had shut down and expenses were mounting. In the absence of self-dealing, which Ambase does not allege, the RTC decision to close down the origination unit constituted a completely discretionary act that cannot be overturned or second-guessed fourteen years after the fact by this Court. Golden Pac., 1997 WL 626374 at *2 .

Finally, with respect to the alleged misallocation of corporate overhead, the RTC/FDIC attributed direct costs to the receiverships that caused the costs, and allocated indirect costs upon the basis of direct costs or in proportion to recoveries upon outstanding claims such as goodwill contract claims against the United States. There is no evidence that the method used by the RTC/FDIC to allocate corporate overhead and indirect costs related to the litigation of Winstar-related claims prejudiced Carteret or was inconsistent with any relevant principle of accounting. Accordingly, there is no merit to Ambase's challenge to the allocation of RTC/FDIC expenses to the beneficiary receiverships, including Carteret.

At the outset of the SOI, Ambase revisits the jurisdictional issue and argues, as it has in the past, that this Court possesses jurisdiction to "recalculate" the receivership deficit because "the bulk of the receivership deficit is a direct result of Congress's own actions" and, therefore, does not involve tortious acts or claims against private parties. SOI at 24. According to Ambase two Congressional actions, namely the alleged failure to provide adequate funding to the RTC and the passage of the minority preference statute, Resolution Trust Completion Act, Pub. L. No.

103-204, § 3(a), 107 Stat. 2369, 2375-76 (1993), deprived Ambase of property without due process of law by inflating the receivership deficit. Ambase argues that, if this Court reviews the receivership deficit in this proceeding as it previously understood it had the jurisdiction to do, it will, in large part, be exercising classic Tucker Act jurisdiction to review takings claims against the United States.

As with its misguided and unsupported claims relating to a "recalculation" of the receivership deficit, Ambase's jurisdictional arguments are false and seriously off the mark. Indeed, the discussion in the SOI, rather than advancing the argument that a "recalculation" of the receivership deficit involves a classic exercise of Tucker Act jurisdiction demonstrates precisely the opposite. There is simply no jurisdiction in this Court to "recalculate" the receivership deficit. Contrary to Ambase's jurisdictional contention, the vast majority of Ambase's argument alleges that the RTC/FDIC committed tortious acts or breaches of fiduciary duty against Carteret, and, therefore, the receivership deficit must be "recalculated."[1] The argument relating to a "taking" or denial of due process is at most tangential to the claims in the SOI and, as we demonstrate below, Ambase lacks standing to assert these claims in any event (as we demonstrate, they also lack merit). See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995) (no standing in the absence of an identifiable injury to a particularized protected

[1] For example, Ambase calls the RTC's first managing agent "a crook who was fired after he was caught stealing from Carteret." SOI at 5. The succeeding managing agent emphasized at his deposition that the alleged "offense" was simply that the previous agent allegedly filled his car with gas supplied by Carteret and hired people whom the RTC believed were not qualified or overpaid and that these acts immediately were remediated by the succeeding managing agent. Deposition of Edward Griffin ("Griffin Dep.") at 20, App. 258. Ambase does not seek a "recalculation" of the receivership deficit based upon these alleged acts. Nevertheless the rhetoric in the SOI demonstrates that the predominant claims attacking the receivership deficit relate to alleged wrongdoing by the RTC/FDIC.

legal interest); Longshore v. United States, 77 F.3d 440, 444 (Fed. Cir. 1996) (the judicial branch may not second guess Congressional funding decisions). Therefore, as we demonstrated previously and as is now validated by the discussion in the SOI, the SOI advances tort and breach of fiduciary claims against a non-Government entity, the FDIC as receiver, and this Court lacks subject matter jurisdiction

In short, while Ambase presents 117 pages of hyperbole attacking the RTC/FDIC administration of the receivership estate, none of it remotely justifies disturbing the balance on the books as calculated by the RTC/FDIC. Further, as Ambase conceded, as of December 31, 2005, the receivership deficit was $278 million or more than $12 million more than the amount even Ambase calculates as the value of Carteret as of the date of the breach ($266 million). Ambase Corp. v. United States, 61 Fed. Cl. 794, 795 (2004) (Ambase II). Therefore, any recovery upon Carteret's contract claim will flow to the United States and the case is moot. Bailey v. United States, 341 F.3d 1342 (Fed. Cir. 2003). In short, because the receivership deficit is not overstated and the case is moot, the amended complaint should be dismissed.

## STATEMENT OF ISSUES

1. Whether This Court Has Jurisdiction To Entertain Ambase's Claims.
2. Whether The Receivership Deficit Should Include The Alleged Value of Supervisory Goodwill.
3. Whether PII Is Required By Law And Calculated Properly.
4. Whether Taxes Are Required By Law And Calculated Properly.
5. Whether The Receivership Deficit Should Include The Alleged Value Of CMC.

6 Whether The RTC/FDIC Wrongly Charged Corporate Expenses To Carteret.

7. Whether Ambase Has Standing To Assert Takings and Due Process Claims And Whether They Have Merit.

STATEMENT OF FACTS

While Ambase's expert, Professor Charles W. Calomiris, contends that Carteret was "one of the healthier institutions resolved [between 1980 and 2004]," July 14, 2006 Corrected Calomiris Declaration, at ¶ 69, App. 160, in fact, Carteret was far from "healthy" at the time it was taken over by the RTC. Due to massive credit losses in its high-risk real estate investment portfolio, Carteret posted a net loss of $131.8 million for 1990 and a net loss of $154.9 million for the first six months of 1991. June 17, 1991 Report Of Examination at 2, App. 344. Carteret acknowledged insolvency in the second quarter of 1991 and was seized by the Government on December 4, 1992. While Ambase emphasizes that Carteret was modestly profitable in the eleven months prior to the seizure, this indicates little if anything about the financial condition of the thirft. As noted by Professor Anthony Saunders, two years prior to seizure, the Federal Home Loan Bank of New York ("FHLB") agreed to lend Carteret approximately $1 billion to replace 40 percent of its deposits, which resulted in a dramatic reduction in the cost of funds. Declaration of Anthony Saunders dated August 7, 2006 at ¶¶ 46-49, App. 22-24.[2] These loans both precluded a commercial bank merger or acquisition of Carteret and provided an indirect subsidy to Carteret.

---

[2] Professor Saunders' Declaration is set forth in the Government's Appendix In Support Of Response To Ambase's Statement of Issues ("Government Appendix"). All documents referenced in this Response and not included in Ambase's Appendix In Support Of Statement Of Issues are provided in the Government Appendix.

These funds were replaced by approximately $2 billion in RTC advances after the seizure, and these advances were priced below the FHLB advances with the benefit accruing to Carteret for some time. Saunders Decl. ¶ 47, App. 22-23. These Government subsidies "declined slowly and still exceeded $1 billion in the first quarter of 1994." But for this Government assistance, the receivership deficit would have been larger than it currently is (approximately 5.8 percent of assets as of the time of seizure), and demonstrates the modest income prior to seizure was not sustainable. Conservatorship Strategic Plan, at 2, App. 457; see Saunders Decl. at ¶ 49 , App. 23-24 ("1992 low interest expense ratio and positive ROA were due to funding support and subsidies provided by bank regulatory bodies such as the FHLB and RTC").

Further, while Ambase claims that "congressional actions . . . systematically destroyed Carteret's franchise value," as the financial ratios of Carteret prior to the seizure and the efforts to recapitalize the institution demonstrate, Carteret had no franchise value to destroy. As Professor Saunders observes, Carteret and other thrifts exploited the moral hazard implicit in underpriced deposit insurance by undertaking "excessive levels of risk in their asset portfolios . . . with knowledge that if their asset investments paid off, they would reap windfall gains, and if their investments failed, the FSLIC deposit insurance system (or ultimately the U.S. taxpayer) would pay their losses." Saunders Decl. at ¶ 19, App. 7-8. Any franchise value Carteret might have had prior to this excessive risk-taking by management was long gone by the time OTS seized the thrift in 1992.

The lack of franchise value is demonstrated by the relevant financial ratios at the time of seizure. For example, following an examination in June 1992, OTS gave Carteret a composite examination rating of "5," indicating an institution "with an extremely high immediate or near-

term probability of failure." June 15, 1992 OTS ROE at 3, App. 421. OTS concluded that the primary responsibility for Carteret's unsafe and unsound condition was the inability or unwillingness of prior management to "fulfill its fiduciary responsibility." Id. at App. 419.

Moreover, the deterioration of Carteret occurred well prior to the enactment of FIRREA. Saunders Decl. at ¶ 112, App. 47. As reflected in the May 22, 1989 OTS Report of Examination ("1989 ROE"), poor underwriting caused Carteret to experience a tremendous increase in the amount of criticized assets which, at the time of the examination, represented 6.7 percent of assets and 154.2 percent of regulatory capital. 1989 ROE, App. 339; Saunders Decl. at ¶ 108, App. 45-46. Further, between December 31, 1987 and December 31, 1989, the level of Carteret's classified assets increased from $9.9 million to $307.0 million. As Professor Saunders notes, this was "a phenomenal increase in just a two-year period." Saunders Decl. at ¶ 108, App. 45-46. By the end of 1989, Carteret's problem assets had reached a level of close to 11 percent of its total assets.

At the same time, Carteret experienced precipitous declines in capital. As Professor Saunders observes, operating ratios and trends depicted in the 1989 ROE show that the regulatory capital/total assets ratio for Carteret declined from 5.7 percent to 4.4 percent from December 31, 1987 to June 30, 1989. Saunders Decl. at ¶ 109, App. 46. Similarly, the estimated GAAP capital/total assets ratio for Carteret declined from 5.1 percent to 3.7 percent. Id. Although some of these declines may have been attributable to a slow down in national and regional economic performance, the declines in Carteret's financial ratios far exceeded those of peer institutions. Saunders Decl. at ¶ 109, App. 46.

Carteret became economically insolvent in 1991 when its tangible capital turned negative, declining from $49.6 million in June 1989 to a negative $72.8 million in June 1992. Saunders Decl. at ¶ 110, App. 46. Indeed, by June 30, 1991, despite counting all supervisory goodwill as regulatory capital, Carteret fell out of regulatory capital compliance. Ambase Corp. v. United States , 58 Fed. Cl. 32 (2003) ("Ambase I") at 29; See Ambase, Form 10-Q, June 30, 1991 at 12, App. 357. As of June 30, 1991, Carteret's tangible, core and risk-based capital measures were $78 million, $81 million and $130 million, respectively, while the required levels of tangible, core and risk-based capital were $82 million, $164 million and $233 million, respectively. Id. In other words, even counting the goodwill as regulatory capital, Carteret failed all three of its capital requirements by approximately $4 million (tangible), $83 million (core), and $103 million (risk based). Id. As this Court has observed, the fact that Carteret was economically insolvent as of June 1991 even considering all goodwill as a form of tangible capital, indicates that Carteret could not have "suffered [any] damage from the alleged breach of contract." Ambase I, 58 Fed. Cl. at 39.

In April 1991, Carteret installed new management to clean up its asset portfolio and seek to recapitalize. However, its efforts to raise capital failed. While Carteret/Ambase submitted a plan to Office of Thrift Supervision ("OTS") on March 2, 1992 to raise $200 million in new equity, it was unable to do so. See Saunders Decl., App. 56 at ¶ 126, App. 56; Ambase I, 58 Fed. Cl. at 39 (investors withdrew their offers to invest upon examining the institution). A year later, on December 4, 1992, OTS "placed Carteret into conservatorship" because it was unable to satisfy regulatory requirements for capital. Id. As Ambase acknowledges, "[o]n that day, Carteret's assets and liabilities were placed into a 'pass-through receivership,' which in turn

[transferred them] . . . to Carteret Federal Savings Bank [a mutual thrift managed in conservatorship by the RTC]." SOI at 7.[3]

## ARGUMENT

### I. THIS COURT LACKS JURISDICTION OVER CLAIMS IN THE SOI

In Ambase II, this Court rejected our contention that Ambase had presented tort claims against the FDIC that this Court lacked jurisdiction to entertain. It concluded, instead, that it possessed equitable jurisdiction to review the receivership deficit incidental to the power to award damages for breach of contract by the Government. 61 Fed. Cl. at 796-798. Although the Court conceded that "the Tucker Act does not grant this Court jurisdiction over tortious claims, nor does it permit this Court to hear claims between private parties," Id. at 796, it believed that Ambase's claims were neither tort claims nor claims between private parties. Id. at 796-98.

Now that Ambase has fully disclosed its claims in the SOI, this decision should be revisited. The SOI unabashedly argues that the RTC/FDIC committed torts and breaches of fiduciary duty against Carteret. The claims are tort claims and involve private parties. See, e.g., Plaintiffs in All Winstar-Related Cases at the Court v. United Staes, 44 Fed. Cl. 3, 7 (1999) ("when acting as receiver, the FDIC is not the United States"); See also O'Melveny & Myers v. United States, 512 U.S. 79, 85 (1994) (same). For example, Ambase asserts that the RTC/FDIC

---

[3] The "pass-through receivership," was the normal procedure used by the RTC to resolve insolvent thrifts. According to the Office of Research and Statistics of the RTC, upon the creation of a pass-through receivership, "[a] separate Federal mutual association (de novo) is then created and all of the assets and substantially all of the liabilities pass-through the initial receivership into the de novo." Policy and Procedures for Computation of Dividend Payments of Pass Through Receiverships, at 1-2, App. 387-388. The purchase and assumption agreement between the "pass-through" receivership and the de novo thrift guarantees that, if there is a surplus from the resolution, the stockholders receive the surplus as their share of the equity of the thrift.

engaged in self-dealing by charging high interest rates on the receivership debt. SOI at 1-7. Likewise, Ambase asserts that the RTC/FDIC violated its fiduciary duty to Carteret by mis-calculating Carteret's Federal tax liability, closing CMC, and mis-allocating corporate overhead expenses to Carteret. Id.

These claims are not against the United States and do not involve alleged property seizures or breaches of contracts. See, e.g., Maher v. United States, 314 F.3d 600, 607 n.2 (Fed. Cir. 2002) ("To the extent Maher and Gravee have a claim for breach of their employment contracts, including a claim for payment of the proceeds of the deferred compensation trust established for them by Horizon, such a claim would be directly against Horizon, through its receiver, not indirectly through the government"); W. McAllister, III v. RTC, 201 F.3d 570 (5th Cir. 2000) (action by former officers and directors of failed thrift seeking retirement funds sounded in tort); Fleischer v. RTC, 882 F. Supp. 999 (D. Kan. 1995) (same). Further, while the remedy sought is a reduction in the receivership deficit, this is tantamount to having the FDIC add funds to the receivership. Cf. Ambase II, 61 Fed. Cl. at 797 ("A deficit, of course, is the flip side of a surplus"). This is a classic remedy in tort. Finally, while this Court believed Ambase's claims were incident to the damage action because they could be "kep[t] . . . within judicially manageable bounds," Id. at 802, this is belied by the complexity of the claims set forth in the SOI.

In light of the SOI, we respectfully urge that the Court reconsider its decision to assert jurisdiction over the receivership deficit. As we have pointed out, these detailed claims regarding the administration of the receivership relate to alleged breaches of fiduciary duty by the FDIC. While the Tucker Act authorizes suits against the United States, claims against the FDIC

in its receivership capacity must be brought in district courts pursuant to the FDIC's power to sue-and-be-sued. 12 U.S.C. §§ 1821(d)(6). This jurisdiction is exclusive and precludes the exercise of jurisdiction by this Court. See 12 U.S.C. § 1821(d)(13)(D); 1821(j). If the Court continues to assert jurisdiction, we respectfully request that the prior decision be certified and the proceeding stayed so we can seek a ruling by the Federal Circuit upon our request for interlocutory review.

## II. BAILEY PRECLUDES AMBASE'S CLAIMS RELATING TO THE PAYMENT OF INTEREST ON THE DEBT AND THE LIABILITY TO THE IRS

Ambase incorrectly contends Bailey does not foreclose claims based upon alleged malfeasances by the RTC/FDIC. Although this Court stated that it did not believe Bailey required that the Government "be compensated for [opportunity costs lost in the administration of the receivership]," Ambase II, 61 Fed. Cl. at 74, this is simply untrue.

The receivership in Bailey, as in this case, primarily resulted from the accrual of interest on loans from the FDIC to the receiver and the liability for taxes. See Bailey, 341 F.3d at 1344-45. Yet, the Federal Circuit rejected the stockholder's claim to recover the receivership deficit and determined that the order of priority in 12 U.S.C. § 1821(d)(11), which foreclosed the recovery, did not constitute a "taking." See Bailey, 341 F.3d at 1347. While Ambase argues that the enactment of the minority preference statute and the alleged failure to fund the RTC resulted in a taking of its property in a potential liquidation surplus, the stockholder in Bailey made a similar argument and was unable to carry the day.

In Bailey, the stockholder contended that "his inability to recover the receivership deficit in combination with the statutory depositor preference priority scheme takes his contractual

remedy to any surplus recovery." Bailey, 341 F.3d at 1347. The Court of Appeals for the Federal Circuit ruled, however, that "the application of the statutory priority scheme does not take his property interest in the surplus or his right to pursue the remedy. To the contrary, the statute preserved the right of the shareholders to a potential recovery, 12 U.S.C. § 1821(d)(11)(A)(v), and the FDIC has avidly pursued contract damages on behalf of Security Savings." Id. The reasoning of Bailey applies with equal force to this case. Indeed, as this Court has observed:

> There is bitter truth in this logic [i.e., that there is no regulatory taking of a contract if there is a potential for legal redress for breach of contract]. Very few if any legal judgments put the party injured in the same position as if the injury had never occurred. A man who has lost his leg in an auto accident will never be the same no matter how much money he receives in compensation. An opportunity lost can never be regained years later. A money judgment years later is always speculative. And yet that is all that legal redress is about.

Ambase Corp. v. United States, 58 Fed. Cl. 32, 52 (2003). The argument that a failure to achieve reimbursement of the receivership deficit "takes" a property interest is simply false. It was rejected in Bailey and must be rejected in this case as well. Contrary to Ambase, there is simply no authority that the Government may not collect taxes, interest, or other expenses related to administering a receivership.

Even assuming Bailey permits a stockholder to recover portions of the deficit relating to unconstitutional actions or breaches of fiduciary duty, as we demonstrate below, Ambase has failed to provide any evidence of unconstitutional actions or breaches of fiduciary duty which inflated the receivership deficit. As for the alleged unconstitutional act of failing to fund the

RTC, there has been no showing of a connection between congressional funding decisions for the RTC and the level of Carteret's receivership deficit. Further, Ambase has cited no authority that a stockholder of an insolvent thrift has standing to challenge a failure of congressional funding and we are aware of none.

Likewise, there is no authority for the contention that the minority preference statute, 12 U.S.C. § 144a(w)(17)(A), violated Ambase's right to equal protection. Even if the premiums would have been greater if minority bidders had not been allowed to match the highest non-minority bid, because Ambase was not a bidder and, therefore, was not subject to the minority bidding rules, its right to equal protection could not have been and was not affected by the minority bidding rules.

In short, the takings and equal protection claims are precluded by Bailey and, as discussed more fully below, lack merit in any event.

## III. THE RTC'S/FDIC'S MANAGEMENT OF CARTERET WAS CONSISTENT WITH LAW AND REGULATION

While Ambase contends the RTC/FDIC mismanaged Carteret's resolution in part because of congressional funding and the minority bidding rules, and in part because of self-dealing, there is no legal or factual merit to these claims. In the discussion that follows, we examine Ambase's claims on a point-by-point basis and demonstrate that the RTC/FDIC followed all relevant accounting conventions and policies in resolving Carteret and realized the highest values possible from the resolution of Carteret. We also demonstrate that Ambase's analysis, which depends upon Professor Calomiris's hypothetical "but for" world and selective peer data analysis, fails to

demonstrate any deficiencies in the resolution of Carteret. Therefore, there is no basis for reducing the receivership deficit.

### A. NEITHER THE ALLEGED DELAY IN FUNDING NOR THE MINORITY PREFERENCE PROGRAM CONTRIBUTED TO ANY REDUCTION IN PREMIUM RECEIVED FOR CARTERET'S BRANCH DEPOSITS

Ambase contends that, in the absence of an alleged delay in RTC funding and the minority preference statute, Carteret could have realized approximately $43 million in additional premiums from the sale of its deposits. SOI at 8. As Professor Saunders demonstrates, however, there is no credible evidence to support this claim. Indeed, even accounting for the deposit runoff that occurred between the time Professor Calomiris alleges the deposits would have been sold in the but-for world (i.e., December 1993) and the actual sale of the branches, Carteret realized a higher premium by selling the branches in late 1994 and early 1995 than it could possibly have achieved by selling them in 1993 (when Professor Calomiris presumed the sale would have occurred). Saunders Decl. at ¶ 57, App. 29. Therefore, Carteret was not injured by the alleged delay in funding or the minority preference statute.

According to Professor Calomiris, "[a]s of December 31, 1993, Carteret had $1.787 billion in deposits. I assume that, but-for the delay, Carteret would have sold its branches at the same 10.5 percent deposit premium as it actually sold its deposits for in the second resolution (the first 14 New Jersey branches sold subject to the minority preference program)." July 14, 2006 Calomiris Dec. at ¶ 83, App. 42-42A. In other words, Professor Calomiris's claim is that Carteret would have realized an additional $43 million in premiums because the deposit premium in December 1993 would have been the same as it was in January 1995.

Despite the importance of this assumption to his opinion and the ready availability of transaction based premium data, Professor Calomiris made no attempt to ascertain whether deposit premiums that buyers were willing to pay had changed between December 1993 and January 1995. Saunders Decl. at ¶ 57, App. 29. Professor Calomiris ignored the market data for good reason. As Professor Saunders points out, the evidence demonstrates that Carteret would not have and could not have received a higher deposit premium if it had sold its deposits and branches in December 1993 than it received by selling the deposits in November 1994 and January and March 1995. Saunders Decl. at ¶¶ 57, 80-81, App. 29, 41-42.

In 1993, when Professor Calomiris claims Carteret would have sold its deposits in a "but for" world at a 10.5 percent premium, on a national level, the mean, median, and weighted mean deposit premiums from sale transactions were 3.45 percent, 2.55 percent, and 4.46 percent, respectively. Saunders Decl. at ¶ 73, App. 37-38. In 1994, however, when Carteret sold the Florida branch deposits, the three premiums (mean, median and weighted mean) had risen to 6.33 percent, 6.31 percent and 6.99 percent, respectively. Id. These premiums were 1.5 times greater than 1993 and more than 2 times greater than 1992. Id. In 1995, moreover, when Carteret sold the bulk of its deposits, the three premiums were even higher at 7.94 percent, 9.18 percent, and 8.35 percent, respectively. Id.

Comparing 1995, when the bulk of the deposits were sold, to 1993 when Professor Calomiris claims they would have been sold in the "but for" world, the mean percentage premium was 2.3 times higher, the median percentage premium was 3.6 times higher, and the deposit (size) weighted mean premium was 1.9 times higher. Id. Further, as Professor Saunders demonstrates, the same dramatic increase in the market for premiums exists if one compares the

data for RTC branch sales in the New Jersey and Florida markets individually over the relevant years and if one compares the premiums received by Carteret with the premiums received in other branch sales by size of deposits over the relevant period (1992-1995). Saunders Decl. at ¶¶ 74-79, App. 38-41.

Ambase further contends that "'[t]he piecemeal sale [of] Carteret necessitated by the MPP prevented the RTC from resolving Carteret in the more economically beneficial form of a whole institution.'" SOI at 97 (quoting Calomiris Dec. ¶ 90). Based upon Professor Calomiris's analysis, Ambase argues that "the average expected premium value of a whole-institution purchase and assumption of assets and liabilities was 20 percent, and the average expected premium value for a purchase and assumption of assets and liabilities with branch sale was 14 percent." SOI at 97-98. According to Ambase, since Carteret was resolved as a purchase and assumption with branch sales rather than a whole-institution transaction, the "MPP reduced the premium value that Carteret would recover. Indeed, the actual premiums obtained through Carteret's three resolutions ranged from 6 percent to 11 percent." Id.

The plaintiff's assertion that the so-called "expected premium" calculated by Professor Calomiris suggests that Carteret would have received a *higher deposit premium* if it had been resolved as a whole-bank instead of on a piecemeal basis is grossly misleading and, quite simply, incorrect. First and foremost, both the academic and empirical evidence, discussed by Professor Saunders, suggest that a whole bank sale of Carteret would not have resulted in a higher premium as Professor Calomiris alleges. A 1997 academic study by Sudhir Nanda, James Owers and Ronald Rogers, for example, found negative returns for whole bank transfers while branch acquisitions were insignificantly different from zero. This caused the authors to conclude that

"'branch P & As are typically more focused acquisitions than whole institution P & As and, therefore, generated greater proceeds for the RTC, not lower proceeds as contended by Professor Calomiris.'" Saunders Decl. at ¶ 82, App. 42, (quoting Sudhir Nanda, et al., "An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing," Real Estate Economics, vol. 25, no. 2, App. 566-588).

Consistent with the findings of the 1997 study, *Managing the Crisis: The FDIC and RTC Experience*, a document frequently cited by Professor Calomiris, the FDIC concluded that "[b]ecause a whole bank bid constitutes a one-time payment from the FDIC, bidders tend to be very conservative to cover all potential losses. Conservative whole bank bids could not compete with other transactions on a least cost basis." *Managing the Crisis: The FDIC and RTC Experience* , App. 591; Saunders Decl. at ¶ 67, App. 34-35. In other words, whole bank bids did not result in higher premiums as Professor Calomiris alleges.

Further, the empirical evidence from actual whole bank sales in 1993 shows that the weighted mean deposit premium in 1993 was 2.29 percent nationally, 5.25 percent in New Jersey, and 4.48 percent in Florida. Saunders Decl. at ¶ 83, App. 42-42A. If the national average of 2.29 percent is applied to Professor Calomiris's calculation of Carteret's deposits in December 1993 ($1.787 billion), this would result in a premium of only $40.9 million, which is considerably less than the receivership actually achieved ($143.8 million). Even taking the highest of the three premiums, the 5.25 percent in New Jersey, the Carteret receiver still would have commanded a premium of only $93.8 million which is still considerably less than the $143.8 million premium actually received. Thus, both the academic literature and empirical evidence belie Professor Calomiris's speculative and unsupported claim that Carteret would have

received a greater premium had it been resolved in a whole bank transaction in December 1993. As succinctly stated by Professor Saunders: "There is simply no evidence to support Professor Calomiris' assertion that the receivership would have received more in proceeds if Carteret had been sold as a whole bank in December 1993." Saunders Decl. at ¶ 84, App. 42A.

Given that neither the academic nor the empirical evidence supports the plaintiff's assertion that the receivership would have realized a higher premium if Carteret had been resolved in a whole-bank transaction, Professor Calomiris had to construct an analysis that would support such a conclusion. That analysis, however, is deeply flawed and misleading. As Professor Saunders explains, comparing Professor Calomiris's so-called "expected premium" to the market-determined deposit premium the receivership actually realized "is like comparing apples to oranges simply because they measure two different things." Professor Calomiris's "expected premium" is equal to the difference between the estimated deposit payout cost and the resolution cost divided by the resolution cost. In other words, his so-called expected premium "reflects the costs to a not-for-profit government agency with the mandate to resolve a failed bank at the lowest possible cost." The deposit premium Carteret actually realized, which Professor Calomiris attempts to compare to his "expected premium," "reflects a buyer's evaluation, from a profit-maximizing perspective, of the value of the selling bank's or thrift's deposits." Saunders Decl. at ¶ 61, App. 31-32. Professor Calomiris's conclusion that the so-called "expected premium" for whole bank transactions was higher than his "expected premium" for branch sales is of no relevance to the question of whether or not the market-determined deposit premium that Carteret actually received would have been higher if it had been resolved in

a whole bank transaction and, in fact, both the academic and empirical evidence suggest the exact opposite is true. Saunders Decl. at ¶¶ 58-62, App. 29-32.

Ambase further asserts that, while "[t]he best method of resolution would have been a merger or reprivatization, which has an average expected premium value of 48 percent . . . [b]y the time Congress adequately funded the RTC a year after Carteret was seized, its financial health had declined such that it was no longer a viable candidate for a merger or reprivatization." SOI at 98, n. 31. The conclusion that Carteret would have been resolved as a merger or reprivatization is based upon a deeply flawed and grossly misleading analysis prepared by Professor Calomiris. Professor Calomiris reached this conclusion by simply analyzing bank and thrift failures between 1980 and 2004 without making any allowance for regulatory or economic changes that may have occurred over that 25-year period. Saunders Decl. at ¶ 63, App. 32-33. By only analyzing the bank and thrift failure data in the aggregate, Professor Calomiris missed the obvious fact that nearly all of his co-called "merger or reprivatizations" occurred prior to FIRREA and the establishment of the RTC. Id., App. 33-34 at ¶ 64.[4]

More specifically, there were a total of 1,506 bank and thrift failures that were resolved between 1980 and 2004 that had a so-called "expected premium," 973 of which occurred after 1988. Professor Calomiris's so-called "mergers or reprivatizations" accounted for 450 of the 1,506 total bank and thrift failures between 1980 and 2004. However, only three of the 450 were

---

[4] In addition to failing to differentiate between pre-FIRREA and post-FIRREA resolutions in his analysis, Professor Calomiris did not interpret the data in the Failure Transaction Database consistently. In fact, over the course of three iterations of his expert report, he interpreted the data in varying ways which casts doubt upon the credibility of the analysis. We provide a detailed analysis of Professor Calomiris's manipulation of the Failure Transaction Database in Exhibit I to this response.

resolved after 1988 and only one after 1989. Id. In other words, 970 of the 973 thrifts and banks resolved after 1988 (with a so-called "expected premium") were resolved as either a purchase and assumption or an insured deposit transfer. Professor Calomiris's opinion that Carteret would have been resolved as a so-called "merger or reprivatization" absent the delay in funding is just not supported by the evidence regarding the method by which banks and thrifts were resolved after FIRREA. Id.

## B. THE ENACTMENT OF FIRREA DID NOT ENLARGE THE RECEIVERSHIP DEFICIT BY ELIMINATING THE VALUE OF SUPERVISORY GOODWILL

### 1. PROFESSOR CALOMIRIS'S ASSUMPTION THAT THE GOODWILL ACCOUNT SURVIVED CARTERET'S SEIZURE IS INVALID

In his assessment of the value of Carteret assuming the assets and liabilities had been sold in a whole bank resolution in December 1993, Professor Calomiris assumes that (1) the receivership's books would have included the goodwill; (2) the goodwill would have been transferable to an acquiring institution; and, (3) the buyer's regulators (whether it be the OTS, Office of Comptroller of the Currencey ("OCC"), Federal Reserve, FDIC, or the state banking agencies) would allow the goodwill to count as regulatory capital. Calomiris Dec. at ¶¶ 103-106, App. 184-187; SOI at 72. Because none of these assumptions is correct, Ambase's claim that goodwill would have reduced the receivership deficit lacks merit.

First, the goodwill on Carteret's books did not survive the seizure. As reflected on the balance sheet of the pass-through receivership, the good will was written off by the RTC when Carteret was seized by OTS and placed in a "pass-through" receivership. See SOI App. at 01082. As noted in the Conservatorship Strategic Plan, at 13, App. 468, "The goodwill of the

bank [was] . . . written off [at the commencement of the receivership]." This was consistent with policy which recognized that, under GAAP, when a firm no longer functioned as a continuing business, assets such as goodwill must be written off. Revised RTC Manual at 62, App. 490. Because, by definition, Carteret was no longer a going concern following the seizure, GAAP required that the goodwill be written off and it was. See Accounting Principles Board Opinion 17, App. 316-322. "Estimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income." Id. at ¶ 31, App. 321.

Given that the goodwill was written-off at the time of seizure, it follows that goodwill could only have remained on Carteret's books in December 1993 if Carteret had not been placed in receivership absent the breach. Ambase, however, has offered no evidence that Carteret would not have been seized by the Government absent the breach. In fact, Professor Calomiris did not study that issue and has not offered an opinion on it. July 14, 2006 Calomiris Dec. at ¶¶ 51-52, 102 , App. 147-148, 184. Therefore, the only evidence available to the Court is that Carteret was placed in receivership and would have been placed in receivership absent the breach and that its goodwill was written off when it was placed in receivership.

Notwithstanding these facts, Ambase contends that Carteret, in a "but for" world, would have been able to transfer goodwill to an acquiring institution for cash. Even assuming, contrary to fact, that goodwill existed on the balance sheet of the receivership, there is no legal authority supporting the contention that the receiver was entitled to transfer the goodwill. Although in Home Savings of America, FSB v. United States, 399 F.3d 1341, 1351-53 (Fed. Cir. 2005), on remand, 69 Fed Cl. 187 (2005), on remand, 70 Fed. Cl. 303 (Feb. 21, 2006), the Court of

Appeals for the Federal Circuit affirmed this Court's ruling that the thrift's balance sheet was not required to reflect a goodwill write-off related to the transfer of branches, the Court of Appeals for the Third Circuit ruled that the goodwill related to branch transfers of Carteret in 1991 was not available as regulatory capital. Carteret v. Office of Thrift Supervision, 963 F.2d 567, 585 n. 8 (3d Cir. 1992). Although neither Home Savings nor the previous decision in Carteret addressed whether goodwill associated with prior acquisitions survived the imposition of a receivership and could be amortized thereafter, because the contracts between Carteret and the Federal Savings and Loan Insurance Corporation ("FSLIC") did not preserve goodwill following the transfer of branches, a fortiori they did not preserve goodwill after the imposition of the receivership.

Moreover, even if the goodwill had survived the seizure and had been reported on the books of the receivership, it could not have been transferred to an acquiring company in the course of resolving Carteret. Because Professor Calomiris assumes Carteret would have been resolved in a whole bank resolution, the transaction would have had to be accounted for under the purchase accounting method.[5] Under GAAP, none of the costs of an acquisition by an entity that might acquire Carteret as a whole bank or in branch clusters from the receiver could be allocated to goodwill because once Carteret was no longer an independent entity, the goodwill had no value. See Saunders Decl., App. 42K-42L at ¶ 100 ("the value of the goodwill of a failed

---

[5] "The combination of existing voting common stock interests by the exchange of stock is the essence of a business combination accounted for by the pooling of interests method." APB 16 at ¶ 47, App. 302-305. See also APB 16 at ¶¶ 12 and 45, App. 297 and 302. Clearly, the whole bank acquisition of a thrift in receivership would not meet this standard because the receivership would have no common stock interest to exchange. Therefore, the whole bank acquisition would have to be accounted for under the purchase method.

institution must be less than the value of the goodwill of a surviving institution"). Indeed, as Accounting Principles Board Opinion 16 ("APB 16") specifically notes: "[In a combination satisfying the conditions for purchase method accounting], fair values should be ascribed to specific assets; identifiable assets should not be included in goodwill." Id. at ¶ 88, App. 311-312.

Further, although Professor Calomiris understood that goodwill could be transferred in pieces if Carteret were resolved through the sale of branch clusters, Calomiris Deposition at 660-662, App. 248-250. This is specifically contradicted by GAAP which provides that, "[o]rdinarily goodwill and similar intangible assets cannot be disposed of apart from the enterprise as a whole." APB 17 at ¶ 3, App. 317. Finally, even if, contrary to fact, the Assistance Agreements were deemed to supercede GAAP for purposes of determining whether goodwill survived the imposition of the receivership and was transferable to an acquiring entity at the time of resolution, they provide that the benefits and obligations of the contracts between Carteret and FSLIC were not transferable to third parties. 1982 Assistance Agreement at 38, App. 325; 1986 Assistance Agreement at 75, App. 332. Therefore, even if the goodwill had survived the imposition of the receivership, it could not have been transferred under GAAP or the Assistance Agreements to a third party. Id.

Finally, while Professor Calomiris assumes the goodwill would have been valuable to an acquiring entity, Professor Saunders points out that this is extremely unlikely to have happened. Saunders Decl. at ¶ 101, App. 42L-42M. Even if the goodwill would not have been written off by the time of the receivership and was transferable to an acquiring entity, the RTC would only have been likely to offer the thrift to substantially capitalized institutions to avoid moving from the resolution of Carteret to the resolution of an undercapitalized acquiring entity. As Professor

Saunders observes, "any institution in need of supervisory goodwill would not have been an acceptable bidder." Saunders Decl. at ¶ 102, App. 42M-42N. Thus, "[i]t is unclear why an acquirer with considerable tangible capital would pay anything much to acquire the supervisory goodwill of a failed bank like Carteret." Id.

In short, in the absence of FIRREA, goodwill would not have survived the imposition of the receivership and, even if it would have, could not have been transferred to an acquiring entity in the course of resolving Carteret. Professor Calomiris's assumptions to the contrary are simply inconsistent with the facts and relevant law. Even if goodwill could have survived the seizure and been transferred in the course of resolving Carteret, no potential acquiring entity would have paid anything substantial because it would have been well-capitalized and would have had no need for an intangible asset like goodwill. Accordingly, the availability of goodwill in December 1993 would have made no difference to the level of the receivership deficit.

### 2. EVEN ASSUMING THE GOODWILL COULD HAVE BEEN TRANSFERRED, PROFESSOR CALOMIRIS'S VALUATION MODELS ARE FLAWED

Relying upon valuation analyses performed by Professor Calomiris, Ambase contends that, in the absence of FIRREA, the book balance of Carteret's supervisory goodwill as of December 1993 and December 1994 would have been $128,266,000 and $127, 637,000, respectively, and that Carteret could have received between $41 million and $49 million from transferring the goodwill to an acquirer in a whole bank transaction. See, e.g., SOI at 8; Corrected Calomiris Decl. at Tables A4; A5; A6; A7; A8; and A9, App. 225-230. According to Professor Calomiris, this would have reduced the principal of the loans from the FDIC to fund the branch transfers and would have reduced interest expense on the loans.

As we have already demonstrated, the goodwill was written off when the conservatorship was imposed and there was no goodwill to transfer. Even assuming contrary to fact and law that the goodwill had not been written off and could have been transferred, critical flaws in the inputs upon which Professor Calomiris relies destroy the credibility of his models and invalidate his valuations.

First, as Professor Saunders points out, Professor Calomiris's calculation of the beginning balance of the goodwill in December 1992 ($136.8 million as shown in Corrected Calomiris Decl. at Appendix A, App. 222), fails to take account of the $51.6 million reduction in the balance required by the sale of branches in Florida in October, as well as the December 1990 goodwill write-offs for the Barton, Mountain, and Blacksburg branches. Saunders Decl. at ¶ 105, App. 44. Because the balance of Carteret's goodwill in November 1992 was $85.2 million, which is significantly below Professor Calomiris's claimed amount as of December 1992 of $136.8 million, the balances from which he calculates the market value of the goodwill in December 1993 and December 1994 are materially inflated and, consequently, inflate the values he attributes to the goodwill. Id.

Second, even assuming the balance Professor Calomiris attributes to the goodwill as of December 1992 is correct, he assumes the book balances one year and two years later, when Carteret is no longer a going concern, can be calculated by simply applying straight line amortization to the goodwill balance as of December 1992. As Professor Saunders observes, however, "[t]his is clearly logically and economically inconsistent since the goodwill of a failed institution must be less than the value of the goodwill of a surviving institution." Saunders Decl. at ¶ 100, App. 42K-42L. Indeed, because Carteret's financial position and solvency had

materially worsened since the goodwill had been reported after the acquisitions of troubled thrifts in 1982 and 1986, "it is highly probable that if a market valuation of goodwill had been done, then the outstanding market values of goodwill as of 1993 and 1994 (or 1989) would have been far less than the simple amortized book values as presented by Professor Calomiris." Id. at ¶ 106, App. 44. In fact, the GAAP rules in existence in 1989 would have required Carteret to write-down the goodwill if the carrying value of the goodwill was less than the value of Carteret, which is precisely why the goodwill was written-off when Carteret was placed in conservatorship.

Third, in valuing the cash flows achieved by substituting cash for goodwill on the receiver's balance sheet, Professor Calomiris, in his "cash equivalent" model, assumes that the cash would be invested in risk free 20 year Treasury securities (6.31 percent as of December 6, 1993), whereas the investors' expected return on the cash investment would be at the discount rate for preferred stock, which he estimates to be between 11.59 percent and 13.32 percent for December 1993 and December 1994. Id. at ¶ 115, App. 49-50. Yet, as Professor Saunders observes, this assumption is "clearly illogical" because it assumes "a situation in which the thrift intentionally sets up a guaranteed negative spread on its assets of between 5.28 percent per annum (6.31 percent minus 11.59 percent) and 7.01 percent per annum (6.31 percent minus 13.32 percent)." Id. According to Professor Saunders, this assumption "is in violation of the basic principals of financial intermediation . . . " Id. at ¶ 115, App. 49-50.

Fourth, according to Professor Saunders, there are significant methodological flaws in Professor Calomiris's calculation of the investors' expected rate of return on the invested capital in both the "cash equivalent' and "cost of replacement" models for valuing the goodwill. Id. at

¶¶ 117-128, App. 50-58. These relate to the use of incorrect peer group samples for the regression analysis to calculate the expected rate of return on preferred stock for the "cash equivalent" model and the calculation of systemic risk (or beta) used to calculate the discount rate for the "cost of replacement" model. Id.

Fifth, in his calculation of transaction costs for issuing the preferred stock, Professor Calomiris relies upon data relating to transaction costs for the issuance of secondary equity offerings over the 1990-1994 period. Id. at ¶ 129, App. 58. However, as Professor Saunders points out, "the few studies that have been conducted about the relative transaction costs of issuing preferred stock have found that its transaction costs are lower than those of common stock issues." Id. at ¶ 131, App. 59-60. A 2002 study by Mukesh Bajaj, Sumon C. Mazumdar, and Atulya Sarin of the transaction costs of issuing 3,042 preferred stocks over the 1980-1999 time period found that the average total cost to financial companies of issuing straight preferred stock was 2.75 percent of the total proceeds of the offering. Id. According to Professor Saunders, "[g]iven the non-convertible and short-term nature of his hypothetical preferred stock, this suggests that transaction costs should be closer to the 2.75% found by Bajaj et.al for straight preferred issued by financial companies than the 4.73% (5.18%) costs Professor Calomiris finds for his hypothetical 1993 (1994) issue based on the Lee et al study of common stock issuance." Because the transaction costs in Professor Calomiris's "cash equivalent" and "replacement cost" models are additions to the value of the goodwill, the lower these transaction costs, the smaller is any purported loss of goodwill in Professor Calomiris's but-for world. Id.

Finally, Professor Calomiris's alternative "event study" to value the goodwill based upon changes in market valuation following the announcement that goodwill could not be counted as

regulatory capital is, as Professor Saunders points out, simply based upon a misunderstanding of when a public announcement concerning the changes in accounting for Carteret's goodwill was made. Id. at ¶ 133-135, App. 60-62. Although Professor Calomiris understood that OTS had made a public announcement on May 22, 1989 that the removal of goodwill from the calculation of regulatory capital would leave Carteret critically undercapitalized, in fact, there was no such announcement; OTS simply began an examination on that date (which concluded in November 1989). While the warning regarding capital levels was contained in the examination report provided to Carteret at or near the end of the examination, this would not have been public and would have been provided some months after the commencement of the examination. Therefore, the warning "is irrelevant to AmBase's stock price behavior around May 22 . . . and his estimated losses [from the "event study"] should be given no credibility at all." Id. at ¶ 135, App. 61-62.

While Professor Calomiris conceded in his July 14, 2006 Corrected Declaration that the OTS actions would not have been revealed officially to the public, he nonetheless now alleges - without any evidence - that "it is quite possible that news of the OTS's actions reached the marketplace" and that "additional news about the evolution of FIRREA and its treatment of supervisory goodwill as it worked its way through Congress occurred in the same week as the date of the OTS report." Calomiris Dec. at ¶ 141, App. 205. Setting aside Professor Calomiris's unsupported allegation that OTS regulators leaked information regarding Carteret, not one of three newspaper articles cited by Professor Calomiris actually referenced Carteret. Furthermore, according to Professor Calomiris "in the weeks leading up to [FIRREA's] passage, there was substantial uncertainty about whether FIRREA would pass and what provisions it would contain." Id. at ¶ 101, App. 182-184. Given the uncertainty surrounding FIRREA, which the

newspaper articles he cites highlight, these articles alone are "non concrete enough to constitute an event." Saunders Decl. at ¶ 135, App. 61-62.

Finally, after we pointed out his obvious error regarding the alleged OTS announcement -- which was the "event" that formed the basis for his entire "event study" -- Professor Calomiris had no choice but to find any publicly available information that might even remotely be considered an event regardless of how it relates to Carteret or how that so-called event actually affected Carteret's market value -- and that is exactly what he did. Professor Calomiris's event study should be given no weight at all.

In short, even assuming contrary to fact and law, that the receivership would have retained goodwill balances as of December 1993 and December 1994 and that Professor Calomiris's models for determining the value of goodwill are relevant for purposes of determining the receivership deficit, the inputs and premises of the models are fatally flawed and they simply do not establish the market value of any goodwill .

## C. THE MINORITY PREFERENCE PROGRAM DID NOT INCREASE THE RECEIVERSHIP DEFICIT

Ambase contends that there was a freeze on the sale of Carteret's assets necessitated by the minority preference statute which resulted in the need to borrow $1.369 billion from the FDIC to fund the transfers of deposits in November 1994 and January and March 1995. SOI at 7-9; 17. Further, Ambase contends that, because of the minority preference statute, Carteret failed to receive a fair price for performing mortgage loans that were transferred to minority purchasers, Id. at 17-18, and that Carteret received $19.4 million less in deposit premiums than it would have received if the deposits could have been sold without minority participation. Id. at 8;

102. Finally, Ambase contends that the amount of premium would have been higher in the absence of minority participation because non-minority bidders would have submitted higher bids and combining the deposits with performing mortgages would have resulted in higher market prices for the deposits. Id. at 17-18; 93-98. As we demonstrate, however, the facts indicate that the minority preference statute did not injure Carteret in any way.

### 1. CARTERET WAS NOT PRECLUDED BY AN "ASSET FREEZE" FROM SELLING ASSETS TO FUND THE TRANSFERS OF THE DEPOSITS

According to Ambase, "[b]ecause of the MPP, Carteret's performing assets were not released for its own resolution. Instead, Carteret had to borrow from the RTC $1.18 billion in order to finance its resolution." Id. at 94. The amount of assets subject to the MPP, however, was substantially less than the $1.18 billion loan needed to finance the Carteret resolution. In fact, the assets subject to the MPP totaled $686.8 million as of September 1994 - one month before the first resolution occurred.[6] September 30, 1994 Monthly Conservatorship Reports at 2 App. 510. Therefore, the evidence clearly demonstrates that Carteret's resolution would have required a loan from the RTC because, even if the assets subject to the MPP could have been transferred to the acquirer (i.e., $686.8 million), they clearly would not have been sufficient to cover the $1.18 billion needed to finance the sale of deposits.

Ambase further argues that "[m]any minority acquirers of institutions other than Carteret exercised their option under the MPP to purchase performing assets under the control of the RTC

---

[6] The total book value of Carteret's assets as of September 1994 was $1.6 billion. However, the non-mortgage loans and non-residential mortgage loans (which were not part of the MPP) totaled approximately $458.3 million and $318.4 million, respectively. September 30, 1994 Monthly Conservatorship Reports, App. 510 & 517.

to offset the liabilities of the institution they were acquiring." SOI at 93. Therefore, in order to "preserve Carteret's cache of performing assets for minority acquirers of other institutions, the RTC 'froze' Carteret's performing assets" and prevented them from being sold. Id. at 93-94. The majority of evidence Ambase cites as support for its argument that the minority preference statute created an "asset freeze" pre-dates the enactment of the MPP in December 1993, however. More specifically, Ambase cites the following documents -- all of which predate the MPP -- as support: (1) April 13, 1993 e-mail (SOI App. at 30004); (2) August 23, 1993 RTC memorandum (SOI App. at 30005); (3) August 24, 1993 e-mail (SOI App. at 30006-07); (4) September 13, 1993 e-mail (SOI App. at 30008); (5) September 15, 1993 e-mail (SOI App. at 30009); (6) the November 1993 Stratification of Assets Report (SOI App. at 30010-11); and (7) a December 3, 1993 e-mail (SOI App. at 30012-13). Ambase fails to explain how documents that were created prior to the enactment and implementation of the MPP actually support its argument that the MPP "froze" the sale of Carteret's performing assets.

While certain of these documents do reference a "freeze" upon the sale of Carteret's performing assets, there is simply no evidence that the "freeze" was due to the enactment of the MPP. In fact, the RTC's decision to freeze the sale of Carteret's performing assets was made well before the passage of the MPP and was apparently done because of concerns regarding the profitability of conservatorships. For example, prior to March 1993, it was the RTC's policy to liquidate both performing and non-performing assets. In March 1993, however, the RTC apparently changed its direction regarding asset sales and decided that, in general, while it would continue to liquidate non-performing assets, it would no longer sell performing assets. The reason cited for the change was a "concern for how net interest margins have dwindled as a result

of selling-off higher yielding assets and redeploying sales proceeds into low-yielding liquidity oriented assets . . . These declining net interest margins and resulting unprofitable or only marginal profitable operations are deemed to not be in the best interests of taxpayers or the RTC." Email from Haley to Smedley, 3/19/93, App. 484-485. Consist with this policy shift, Carteret's performing assets were apparently frozen as early as April 1993 or well before the MPP was enacted in December 1993.[7] SOI App. at 30004.

One of the pre-MPP documents cited by Ambase refers to an exchange between Jay A. Jupiter, Assistant Director, Resolutions, RTC, and J. Paul Ramey, Vice President for Resolutions, RTC, in which Mr. Jupiter asks for a waiver to release $811 million of performing single-family residential mortgage loans from securitization, and Mr. Ramey responds that the securitization effort may be sidelined "because they are pulling loans to furnish on the minority acquisitions." SOI at 94; SOI App. at 30005. Even if there was a plan to hold some performing mortgages for minority purchasers, under the MPP these would be offered and sold at market prices for the benefit of Carteret which would eventually receive the proceeds. Furthermore, according to this memorandum, Carteret had approximately $2.2 billion in deposits, whereas the performing assets that were not allowed to be released totaled only $811 million. Therefore, even if these assets were sold, an RTC loan to fund the sale of the deposits would have still been required because the proceeds from the asset sale clearly would not have been sufficient to fund a $2.2 billion deposit transfer.

---

[7] Consistent with its revised policy, the RTC continued to sell non-performing assets throughout 1993. See, for example, August 31, 1993 Executive Summary Stratification of Assets Remaining Report at 2, App. 493; SOI App. at 30011.

The only evidence cited by Ambase that actually post-dates the enactment of the MPP is an exchange between Ann Richards of the Funding Division of the RTC and Herbert J. Held of the Resolutions Division of the RTC in which Ms. Richards refers to a desire to sell Carteret "securities," and asks whether "they still remain frozen," and Mr. Held indicates they can be sold so long as "Sandra has the loans and does not need the securities . . . " SOI at 94; SOI App. at 30055-56. However, it is not clear that the reference to "securities" in Ms. Richards' memo is a reference to performing mortgages or that there was a freeze on such mortgages. Indeed, Mr. Held's response suggests there was no freeze because he observes that Carteret's "securities" can be "sold so long as there are loans available to offer minority bidders." Id. Further, the fact that the loans are being held to sell to minority bidders for Carteret's deposits means that the proceeds will be used to fund the transfers. Id. Therefore, while the exchange refers to "securities," there is nothing to suggest that Carteret was prevented from funding the sale of deposits with proceeds from the sale of assets. Finally, as Mr. Ramey testified, prior to resolution "[a]t times the [RTC] would freeze the assets because the purchasers might want them to pass [to themselves]." April 12, 2005 Deposition Transcript of J. Paul Ramey at 151, App. 276.

Finally, while Ambase builds its case upon shreds of ambiguous internal exchanges, the incontrovertible financial facts demonstrate there was no freeze which prevented Carteret from financing deposit transfers through asset sales. As Professor Saunders observes in his report, there was a decline of approximately $2 billion in Carteret's net assets from December 1992 to January 1994 and a decline of about $1.7 billion from January 1994 to March 1995, including a decline in residential mortgages of approximately $850 million between December 1992 and March 1995. Saunders Decl. at ¶ 92, App. 42F-42H.

Therefore, Carteret was not prevented from funding the deposit transfers with the proceeds of asset sales. Further, even if there had been a whole bank resolution in December 1993, under Professor Calomiris's calculation, there still would have been a need for Carteret to borrow approximately $400 million from the RTC/FDIC to finance the sale of the deposits. (In Paragraph 84 of his July 14, 2006 Declaration, App. 171, Professor Calomiris argues that Carteret would have sold $1.787 billion in deposits and realized $1.393 billion in asset sale proceeds and deposit premiums, leaving a $400 million deficit). Since Professor Calomiris believes Carteret would have received more for its assets in a whole bank resolution in December 1993 than it would have received for a whole bank resolution in December 1994, Corrected Calomiris Declaration, App. 150 (Table 4), the receiver would have had to borrow money to finance the deficit even if the bank had been sold as a whole bank in December 1994. Accordingly, the need to hold loans in reserve for minority purchasers did not give rise to interest expense as Professor Calomiris contends. Rather, the insolvent condition of the institution necessitated the financing of the deficit by the RTC. In short, Ambase's contention that the loan principal and interest would have been avoided in the absence of a minority preference program is belied by the facts.

### 2. CARTERET'S PERFORMING MORTGAGES WERE SOLD AT MARKET PRICES TO MINORITY BIDDERS AND THE DEPOSIT PREMIUM WAS ENHANCED AS A RESULT OF THE MINORITY PREFERENCE PROGRAM

Citing an academic article from the Journal of Legal Studies, SOI at 17, one transaction involving the sale of 111 mortgages (approximate sale price of $5.9 million) from Dryades Savings Bank to Gulf Coast Bank on February 22, 1995, SOI App. at 30083-85, and a sale of 111

loans ($13 million book value) from United Bank to Chemical Mortgage Company of Ohio in early 1994, SOI App. at 30029-30, Ambase contends that, because there was no competitive bidding on performing mortgages offered for sale to minority purchasers, these mortgages were "inherently" underpriced and Carteret was deprived of revenue it would have received in the absence of the minority preference statute. SOI at 17-18; 95. The evidence does not support Ambase's claim.

First, the article from the Journal of Legal Studies does not examine the RTC's experience in pricing mortgage loans to minority purchasers but, instead, examines the historical experience of bankrupt firms with respect to obtaining maximum value for their assets. SOI at 18, 95. Thus, it does not demonstrate that Carteret suffered a disadvantage because the RTC priced mortgage loans offered to minority purchasers.

Indeed, a study conducted by the General Accounting Office on the precise issue of whether the minority preference program deprived insolvent thrifts of appropriate premiums on their mortgage loans concluded the opposite of Ambase's contention -- namely that "'the RTC had established a reasonable process anchored to agency and mortgage securities market standards,'" and that it "'was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total returns on the disposition of assets as required by law.'" Saunders Decl. at ¶ 89, App. 42D-42E (quoting "Resolution Trust Corporation: Performing Assets Sold to Acquirers of Minority Thrifts," General Accounting Office, GAO/GGD-96-44, December 1995). Indeed, as Professor Saunders points out, of the 4,000 loans purchased by minority acquirers for $289.6 million, 64 percent were sold for between 91 percent and 100 percent of book value. Saunders Decl. at ¶ 89, App.

42D-42E. This evidence suggests Carteret did not receive insufficient value for its performing mortgages under the minority preference program but, instead, received fair market value.

Second, the transactions Ambase cites do not demonstrate Carteret was disadvantaged in the sale of performing mortgages due to the minority preference program. Because there were no sales of performing mortgages under the minority preference program until fiscal year 1995, Saunders Decl. at ¶ 89, App. 42D-42E, United Bank, which acquired its loans from Carteret in December 1993 in a transaction that was in the works well before the MPP was enacted, could not have acquired these loans as a result of the minority preference program.[8] SOI App. at 30008 and 30029. Further, while it appears Dryades Savings Bank earned a 6 percent premium on the 111 mortgage loans sold to Gulf Coast Bank, SOI at 30083-84, the transfer occurred in a falling interest rate environment (Saunders Report, App. 94 at Exhibit 3), and Ambase presents no evidence that the loans were below fair market value when transferred to Dryades (i.e., falling interest rates rather than below market sales may well have occasioned the premium received by Dryades from the sale to Gulf Coast Bank). In addition, as Ambase acknowledges, the loans that were purchased by Dryades included non-Carteret assets. SOI at 95, n. 29. Since the information on the loans that were sold by Dryades and the corresponding gains do not differentiate between Carteret and non-Carteret loans, it is impossible to conclude how much, if

---

[8] Moreover, United Bank's sale to Chemical Mortgage apparently occurred in February 1994 or a couple of months after United had acquired the loans. Compare the January 1994 Monthly Conservatorship Report, at App. 501-502 to SOI App. at 30030. In addition, the evidence cited by Ambase provides no indication as to whether or not these loans were actually sold at a gain or loss. The evidence simply notes that "111 loans with a book value of approximately $13,000,000" were acquired. SOI App. at 30030.

any, of the 6 percent premium realized by Dryades was attributable to Carteret loans versus non-Carteret loans. SOI App. at 30083.

Finally, even if there were evidence the RTC underpriced these 111 mortgage loans acquired by Dryades, this would hardly suggest an inherent bias by the RTC to underprice mortgage loans offered to minority purchasers. The total book value of Carteret's performing mortgage loans at the time of the Dryades transaction was approximately $713 million, id. at 01070, while the sale of the loans from Dryades to Gulf Coast totaled only $6.1 million, not all of which involved loans Dryades had acquired from Carteret. Id. at 30083. Even assuming the entire $6.1 million in loans sold by Dryades to Gulf Coast had been acquired from Carteret, therefore, the mortgages that Ambase contends were "flipped" constituted at most a small fraction (0.8 percent) of the Carteret performing loan portfolio and the transaction is not indicative of the value the RTC received for the overall portfolio. Indeed, Ambase's failure to provide any evidence that other loans were sold at less than market prices strongly suggests that the RTC received full value in the collection and sale of Carteret's assets.

Ambase argues, nevertheless, that there were other disadvantages caused by the minority preference program such as the loss of a $19.4 million premium resulting from the fact that the sale of the Carteret branches was delayed from November 1994 to March 1995 because of the minority preference program. SOI at 8, 19-20, 95-103. While it is true that the amount originally bid for the Carteret branches was $19.4 million greater than the amount eventually received, Ambase assumes that the same high initial bids would have been received in the absence of the minority preference program and that the run-off in deposits, which resulted in the

lower dollar amount of deposit premium, would not have occurred in the absence of the minority preference program. Id.

As Professor Saunders demonstrates, however, neither of these assumptions is supported by either the academic literature or the empirical evidence surrounding the sale of the deposits. With respect to the effect upon deposit premiums of the minority preference program, the General Accounting Office did a study of thrifts that were resolved between January 1, 1993 and December 31, 1994 and "was generally positive about the manner in which [the minority preference program] was conducted." Saunders Decl. at ¶ 88, App. 42C-42D. As Professor Saunders notes, "[t]o the extent that the minority preference program allowed minority purchasers to 'win' if they matched (after the auction) the bid of a non-minority bidder, the GAO did not view this as either delaying the sale process/resolution or producing lower premiums." Id.

Further, contrary to the claim of Professor Calomiris who relies upon data concerning common value auctions rather than sealed bid private value auctions involving the sale of RTC property, the academic literature suggests that higher bids, rather than lower bids, are submitted when there is an expansion of the potential number of bidders. Saunders Decl. at ¶¶ 90-91, App. 42E-42F. The empirical data show that "the larger the number of serious bidders (attending the pre-bid due diligence conference), the more each bidder raises his/her bid in order to exceed the RTC reservation level." Id. at ¶ 91, App. 42E-42F. In addition, the contemporaneous evidence suggests that the presence of the minority bidders resulted in higher bids. For example, in an August 24, 1994 letter from TCB Holdings to John Ryan, Glen Sergeon, the CEO of TCB,

complained that, because "non-minority bidders are motivated by a long term goal to reduce competition . . . they are willing to pay above today's market." App. 506-507.

The RTC also believed that delaying the closing would result in a better premium. App. 505; Ramey Dep. Trans. at App. 275A-275B. Thus, while Carteret received $19.4 million less than the initial high bids because of a delay in closing the sale, there is no evidence the initial bids would have been as high as they were in the absence of competitive bidding conforming to the minority preference program. Therefore, the loss of the $19.4 million cannot be attributed to the minority preference program.

Likewise, Ambase's assumption that the duration of the receivership affected the rate of deposit run-off and that the rate of deposit run-off, which occasioned the lower overall premium, would not have occurred in the absence of the minority preference program, is belied by the empirical data. As Professor Saunders points out, in the year prior to the seizure (December 31, 1991 to December 31, 1992), Carteret's deposits declined from $2.932 billion to $2.393 billion. This is generally comparable to the amount of deposit decline in the one-year period between the seizure (December 1992) and the time Professor Calomiris claims Carteret's branches would have been sold in the absence of alleged funding shortfalls (from $2.393 billion on December 31, 1992 to $1.778 billion on December 31, 1993). Saunders Decl., App. 42A-42B at ¶ 86. Based upon the empirical evidence, therefore, the seizure did not cause or accelerate the decline in deposits: this was happening at an equivalent rate well before the seizure, and the speed of decline did not materially change as a result of the seizure. Id.

With respect to the alleged effect of the minority preference statute upon the rate of deposit run-off, moreover, in his May 23, 2006 corrected declaration, Professor Calomiris

claimed that the minority preference program enacted in August 1993 accelerated the rate of decline. Calomiris Dec., App. 165-166 at ¶ 79. As Professor Saunders points out, however, the claim is not supported by the evidence. Indeed, in making the claim, Professor Calomiris relied upon the erroneous assumption that the sale of the Florida branches, which was not part of the deposit run-off, should be included as part of the deposit runoff. Saunders Decl., 42-42A at ¶ 83. Following the revelation of this error at his deposition, Professor Calomiris acknowledged that the "rate of decline in deposits was fairly constant over time." Calomiris Dec., App. 165-166 at ¶ 79. However, he never specifically corrected this error. See Calomiris Dec., App. 165-167 at ¶¶ 79 and 80. Further, while Professor Calomiris acknowledged at his deposition that the sale of the Florida branches did not contribute to the deposit run-off, he failed to correct the misleading statement that there was 54 percent decline due to deposit run-off which continues to assume (falsely) that the sale of the Florida branches contributed to the deposit run-off. Calomiris Dec., App. 170 at ¶ 82.

Indeed, if the sale of the Florida branches is excluded from the measurement of deposit runoff, the evidence indicates the rate of runoff declined rather than increased after the enactment of the minority preference statute. As Professor Saunders states, "the rate of decline in deposits actually slowed after the passage of the minority preference program." Saunders Decl., App. 42B-42C at ¶ 87. For example, while the rate of deposit decline was 26 percent between the fourth quarter of 1992 and the fourth quarter of 1993, it declined to 21 percent between the fourth quarter of 1993 and the fourth quarter of 1994. Id. at ¶ 87. Therefore, the decline that resulted in the lower dollar premium at the time of the resolution of the New Jersey branches may well have occurred with or without the minority preference program. According to Professor Saunders,

"Professor Calomiris's assertion that the minority preference program had a dire impact here is simply wrong." Saunders Decl., App. 42C-42D at ¶ 88. In short, the evidence fails to support Ambase's claim relating to the alleged $19.4 million loss of deposit premium from the sale of Carteret branches under the MPP.

### 3. BIDS WOULD NOT HAVE BEEN HIGHER IN THE ABSENCE OF THE MINORITY PREFERENCE PROGRAM

Ambase argues that the minority preference program lowered the bids of non-minority bidders both because the RTC could not combine performing mortgages with deposits for non-minority bidders and because these bidders would face a right of first refusal from minority bidders which would tend to result in a disincentive to expend the time and effort to prepare an aggressive bid. SOI at 17-19; 95-98. With respect to the dynamics of bidding, as we indicated above, the evidence does not support the claim that bidding was hindered by the minority preference program. As Professor Saunders has pointed out, the only support for this position is an academic model which addresses open outcry, common value auctions of the type used to understand the bidding among firms competing in the open market for a takeover rather than sealed bid, private value auctions of the type used to sell the Carteret branches. Saunders Decl., App. 42E-42F at ¶¶ 90-91.

Indeed, the academic literature on RTC sealed auctions suggests the contrary of what Professor Calomiris contends, namely that when programs induce more bidders to enter a sealed bid auction than might otherwise be the case, the presence of extra bidders tends to increase the winning bid amount by a statistically significant margin at the 95 percent confidence level. Id. Therefore, contrary to Professor Calomiris, the minority preference program, by inducing

minorities to enter the pool of qualified bidders, tended to increase, rather than decrease, the likely highest bids for the deposits.

Further, while Professor Calomiris contends that the value of deposits increases if performing mortgages are offered with the deposits, according to Professor Saunders "the economics and the facts do not support his conjecture." Saunders Decl., App. 42F-42H at ¶ 92. As Professor Saunders observes, since it is a common practice for banks to package mortgage loans and sell them off to third-party purchasers, it is unlikely to be the case that the sale of mortgage loans reduces the value of the deposits. Saunders Decl., App. 42F-42H at ¶ 92. Likewise, because mortgagors can easily refinance and do so when rates fall, any synergistic or "customer relationship" effect between mortgages and deposits can at best only be transitory. Id. Furthermore, 60 percent of the mortgage loans originated by Carteret came from external mortgage brokers or correspondents, which would suggest that a majority of Carteret's borrowers did not have a deposit customer relationship with Carteret. March 10, 1993 Memorandum from Janes Mindnich to George Gross, App. 483. Finally, the RTC received 101 bids from 40 different entities, including some from large banks, when it auctioned the Carteret branches, most of which were non-minority bidders. As Professor Saunders observes, "There was no dearth of bidders for Carteret's branches, due to the MPP, potential restrictions on asset sales, or any other reason." Saunders Decl., App. 42F-42H at ¶ 92. In short, the evidence is contrary to Ambase's contention that the minority preference program would likely result in smaller bids by non-minority bidders.

## D. THE RTC PROPERLY SHUT DOWN THE MORTGAGE ORIGINATION UNIT TO REDUCE THE RISK OF LOSS TO THE RECEIVERSHIP

While Ambase contends that the RTC squandered assets worth in excess of $18.4 million by making the "snap judgment" to shut down, rather than sell, Carteret's mortgage origination business, see, e.g., SOI at 20-21, 24, 71, & 114, this is belied by the facts. As the contemporaneous financial and regulatory evidence indicates, the RTC preserved rather than squandered value by thoroughly evaluating the viability of the mortgage origination unit before reaching the conclusion that closing the business would preserve the value of the franchise.

A June 20, 1990 RTC memorandum, citing the RTC's Strategic Plan, stated that it was "the RTC's mission to downsize and maximize recovery" of institutions in conservatorship. App. 340. James Mindnich, who was the credit specialist charged with downsizing the assets of Carteret, confirmed that this was the "policy of conservatorships" and that it was "automatic." at Mindnich Dep. Tr., App. 269-274. Consistent with its mission to "downsize and maximize recovery," in January 1992, the RTC adopted a new "policy for continued lending in conservatorship." App. 367-384. This policy made it possible for the mortgage banking subsidiaries of thrifts in conservatorships to continue making "new loans/new origination[s] . . . as a means of preserving franchise value of these subsidiaries while attempts are made to sell them as going concerns." Id. The RTC, however, was required to make an evaluation to "determine (first) the marketability of the subsidiary and (second) if continued origination would likely serve to preserve or increase the subsidiary's franchise value." App. 370. This is exactly what the RTC did.

On the date Carteret was placed into conservatorship, the RTC made the decision that "Carteret would fund the [existing] pipeline and requested additional information in order to look at the possibility of funding/extending continuing originations . . ." March 10, 1993 memorandum from James Mindnich to George Gross, App. 482. Further, during the week of December 11, 1993, the RTC would be provided an update on the "flow of applications and overall effect on the correspondents." Id. In other words, rather than making a "snap judgment," the RTC wanted to assess the viability of CMC and the potential for it to help "maximize [the RTC's] recovery."

Donna Cribbs, an RTC asset specialist, was tasked with the assignment of evaluating CMC. SOI App. 01206 (Cribbs Tr. at 36-37).[9] On December 7, 1992, Ms. Cribbs summarized the results of her evaluation of CMC in a memorandum to Mr. Mindnich. Id. at 02146-48. Since a decision had been "made to fully fund the existing pipeling and consideration is being made to continue operations," Ms. Cribbs' memo contained several recommendations for improving operations. Id. at 01247-48. Ms. Cribbs, however, concluded her memo by noting that "extensive effort" would be required to maintain the business and minimize the "inherent risks" of continued operation. Id. at 01248. Ms. Cribbs cited a "heavy reliance upon the correspondent network for production" of new business and further warned that "[a]ny significant attrition [of

---

[9] At the time she performed her assessment of CMC, Ms. Cribbs was the CEO of Cowger & Miller Mortgage Company, which was a subsidiary of the failed savings and loan John Hanson. SOI App. at 01201 (Cribbs Dep. Tr. at 15-16). Ms. Cribbs was also tasked with the responsibility of assessing the viability of Cowger & Miller and then marketing it for sale. SOI App. at 01201-01203 (Cribbs Dep. Tr. at 16, 21-22). The fact that the RTC had previously decided to allow a mortgage company similar to CMC to continue to operate in order to "maximize recovery" is further evidence that the RTC did not make a "snap judgment" to shut down CMC but, rather, made the determination after it concluded it was no longer viable and shutting it down would in fact "maximize recovery."

CMC personnel or the correspondent network] would limit viability of CMC continuance in the origination market place." Id. at 01246; 01248. She testified that it was imperative to preserve these relationships for the business's success. Id. at 10215 (Cribbs Dep. Tr. at 70-71).

Soon thereafter, on December 10, 1992, an assessment showed that "applications generated from the date of conservatorship [were] less than $10 million; an indication that the correspondent relationship (60 % of volume) had already moved.". 3/10/93 Memo from Mindnich to Gross), App. 482. Mr. Mindnich testified that once the RTC took over Carteret, this correspondent network of brokers "automatically took their mortgages someplace else." Mindnich Dep. Tr., App. 274A . Mr. Mindnich also testified that the "bulk" of the $10 million in applications were from the brokers because the retail origination at the bank branches "were not that strong." Id. at 274C. This was a clear indication to the RTC that CMC had already lost most of its franchise value and should be closed. Therefore, a "decision was made on December 11th to cease all further acceptance of mortgage applications." App. 483.

Ambase contends that, because Carteret originated approximately $1 billion in mortgages in the year prior to the seizure, July 14, 2006 Calomiris Report at ¶ 146, App. 207, the RTC could have sold the origination business at the same time Professor Calomiris claims the thrift would have been resolved in the absence of alleged RTC funding shortfalls, namely December 1993. Id. at ¶ 161, App. 217. This assumes, however, that Carteret could have maintained the origination business as a profitable business for at least a year after the seizure of the bank. This assumption is directly belied by the undisputed evidence that, in the week following the seizure, the volume of new applications was reduced by approximately $12 million (from approximately $22 million to approximately $10 million) which indicated that correspondent brokers who had

provided approximately 60 percent of the volume in the eleven months prior to seizure had moved their affiliations to other institutions in the first week following the seizure. SOI App. at 01246; 3/10/93 memo from Mindnich to Gross, App. 482-483.

The implication of these prompt defections was that Carteret could not make a profit on the business on a forward looking basis. Id. As Professor Saunders has observed: "The loss of many of the correspondent relationships was a clear indication to the RTC that CMC [Carteret Mortgage Company] had already lost its franchise value and should be closed." Saunders Decl. ¶ 141, App. 65. Given the defections of the correspondent brokers and the desire to downsize unprofitable or potentially unprofitable portions of the business, the RTC, after due deliberation, decided to close the business and allow the in-house brokers to take new jobs with a California-based mortgage company (Imperial Credit Industries, Inc.). July 14, 2006 Calomiris Decl. at ¶ 146, App. 68-69.

Although Professor Calomiris claimed at his deposition that, based upon his personal experience as the CEO of a family-owned bank, he was certain the RTC could have sold the origination business if it had been offered with the processing business, Calomiris Dep. Tr. at 759-61, App. 251-253, he offered no evidence of what the level of originations would have been in the year following the seizure. Further, he offered no evidence that the origination business would have been profitable in the year following the seizure. His only support for the alleged value of the business was an alleged event study which purported to show that Imperial gained $31.8 million in market value following the announcement on December 28, 1992 that it had hired approximately 90 in-house mortgage originators from Carteret. July 14, 2006 Calomiris Decl. ¶ 153, App. 211-212.

As Professor Saunders has pointed out, however, Professor Calomiris's event study does not demonstrate that the mortgage origination business had value or could have been sold for a number of reasons. First, all Imperial did was hire former Carteret employees who then could be integrated into its business rather than continuing to operate within the context of Carteret's business. Carteret's business, on the other hand, was found by the RTC, based upon a post-closing investigation, to lack adequate record-keeping systems and was infected by excessive rates of poorly documented applications. SOI App. at 01247-48; 3/10/93 memo from Mindnich to Gross, App. 483. The RTC also noted that there was "an apparent lack of control regarding the hands-on management of the pipeline and market sales." Id.

Ms. Cribbs stated that there was no "hands-on" pipeline management to manage the delivery of closed loans and that the reporting did not accurately reflect the status of these loans. SOI App. at 01247. Ms. Cribbs also cited problems with the hedging of the pipeline which resulted in CMC having to pay penalties. Id.; SOI App. at 01207, 01214 (Cribbs Dep. Tr. at 40-41, 69). These imperfections in the business, which detracted from its value, were not transferred when Imperial retained former Carteret in-house originators. As Professor Saunders observed:

> [Calomiris's finding of positive stock market returns by Imperial] may not be surprising, given that Imperial [Credit Industries, Inc.] was hiring CMC's staff *without* acquiring any of the firm's troubled assets and liabilities. Thus, Imperial had no downside risk exposure. They did not pay a takeover premium and had no obligation to continue to employ CMC's staff or to absorb its assets. Thus, the finding of positive abnormal returns upon the hiring of CMC's staff has no implications for the value of the company

> as a going concern or for the value of CMC's portfolio of real estate assets.

Saunders Decl. ¶ 137, App. 63.

Second, the event study looked at the increase in the price of Imperial's stock in the seven days following the announcement of the acquisition of the Carteret employees. However, Imperial's stock was thinly traded and this made it quite volatile. Id. at ¶ 139, App. 64. Further, Imperial had gone public only six months prior to the announcement and this added to the volatility of the stock. Id. Because the stock was inherently volatile, according to Professor Saunders, Professor Calomiris's event study could not and did not identify causal relationships between the hiring of Carteret's in-house originators and movement in the price of the stock. Id. Further, while Ambase contends the increase in the market value of Imperial's stock in the seven days after the announcement of the hiring of Carteret ex employees demonstrates the value of Carteret's mortgage origination unit, over the longer term, Imperial's stock did not increase in value but instead decreased in value. For example, over the first quarter of the year following the hiring of the employees (1993), Imperial's stock price actually fell by 21 percent, which was three percentage points more than the 18 percent increase Professor Calomiris cites as evidence of the value of the hiring of the ex-Carteret employees. Id. at ¶ 138, App. 63-64.

Professor Calomiris also provides a comparability study which examines the sales of two mortgage companies which he regards as comparable, namely the sale of Sears Mortgage Corp. to PNC Bank Corp. in November 1993 ($328 million) and the sale of Maryland National Mortgage Corp. to First Tennessee National Corp. in October 1993 ($114 million). July 14, 2006 Calomiris Report, ¶¶ 154-156, App. 212-13. Based upon a ratio consisting of the

transaction prices as a percentage of the servicing portfolios for these two transactions, he concludes that CMC would have engendered a sale price if it had been sold in December 1993 of $87.5 million if compared to the Sears Mortgage transaction and $119.5 million if compared to the Maryland National Morgage Corp. transaction. Subtracting the amount the RTC received for CMC's servicing portfolio when it was actually sold in 1994 ($61.7 million), Professor Calomiris concludes that CMC's origination business could have been sold for either $25.8 million or $57.8 million in 1993. Id., at¶ 161, App. 217 .

As Professor Saunders points out, however, the comparability study does not demonstrate the mortgage unit would have had any value as of December 1993, let alone a value of $25.8 million or $57.8 million. Saunders Decl., ¶¶ 142-143, App. 66. As for the study comparing the sale of CMC to the sale of Sears Mortgage Corp., as Professor Saunders points out, in addition to the origination and servicing rights, the Seals sale included $7.6 billion in other assets including over 100 mortgage offices plus a savings bank, assets that CMC did not have and could not sell, none of which Professor Calomiris accounts for in his analysis. Id., at¶ 143, App. 66 . Therefore, the sale of Sears Mortgage Corp. is not comparable to a hypothetical sale of CMC. Further, because the study compares the transaction prices of the "comparable" transactions to the servicing portfolios of the companies being sold, it does not value the mortgage origination units of the companies being sold, which is the "asset" Professor Calomiris purports to want to value. As Professor Saunders points out, Professor Calomiris "appears to be valuing the wrong 'asset.'" Id., at App. 66 ¶ 143.

Further, there is no reason to believe the valuation of the origination unit of CMC would be comparable to those of Sears Mortgage Corp. or Maryland National Mortgage Corp. because

Professor Calomiris provides no information concerning the level of originations at CMC compared to the level of originations at Sears Mortgage Corp. or Maryland National Mortgage Corp. Id. In fact, in 1993 Maryland National Mortgage Corp. originated $3.1 billion in loans or more than three times the volume of CMC, yet Professor Calomiris makes no adjustment for this huge difference in volume. First Tennessee National 1993 10-K, App. 94. Finally, the comparability study cannot provide relevant information on the alleged value of CMC because "he only analyzes two sales-one erroneously (Sears, due to his failure to account for asset sales)," and two data points is insufficient to establish a meaningful comparability study. Saunders Decl. App. 66 ¶ 143.

In short, the evidence suggests the RTC acted consistently with policy, and advanced the economic interests of the thrift, when it made the determination to close down the mortgage origination unit, allow the employees to transfer to Imperial, and reduce the expenses of the thrift. Had this decision not been made, the down-trending mortgage originations would have continued, expenses would have increased, and the receivership deficit would have been significantly enlarged.

**E. THE FDIC PROPERLY APPLIED THE FEDERAL JUDGMENT INTEREST RATE TO ITS LOANS TO CARTERET**

Ambase contends that it was improper for the FDIC to charge interest on loans it made to the receiver because the Government did not and could not pay prejudgment interest on Carteret's breach of contract claim against the Government. SOI at 9, 53-54. Even if it was proper for Carteret to pay interest to the FDIC, Ambase contends the federal judgment rate (i.e., the 52 week Treasury Bill rate) was too high. Further, Ambase contends the Government

breached its fiduciary duty to Carteret by applying dividend payments to the loans on a pro rata basis instead of paying them down according to the level of interest charges. Finally, Ambase contends it was a breach of fiduciary duty to pay less interest on the escrow accounts holding deposit premiums than on the loans to fund the deposit transfers. Id. at 67-61.

As we demonstrate, the FDIC Act required the FDIC to charge interest and charging interest based on a 52-week T-Bill rate did not violate law or regulation. Further, the FDIC did not "artificially" manipulate interest rates, but, instead, there was and is a clear economic rationale for basing interest rates on a fixed 52-week T-Bill rate. Finally, the FDIC did not violate a fiduciary duty by differentiating between the loans and escrow account payments or paying down the loans on a pro rata basis.

### 1. THE FDIC WAS LEGALLY REQUIRED TO CHARGE PII AND THE RATES WERE NOT "EXCESSIVE"

Based upon Professor Calomiris's economic analysis, Ambase argues that it was unjustified for the FDIC to charge interest on its loans to the receivership because Carteret is unable to collect prejudgment interest on its claims against the United States. SOI at 9-11, 53-54. According to Ambase, the RTC/FDIC incurred no costs on its loans to Carteret and, therefore, should recover no interest on these loans. Id. Further, even if the RTC/FDIC was justified in charging interest on the loans, Ambase contends that the rates charged (6.06 percent, 7.34 percent, and 6.57 percent, respectively) were excessive. Id. According to Ambase, these rates exceeded the average three-month T-Bill rates over the course of the receivership which reflected an appropriate return on the loans from the receiver to Carteret. Id. As we demonstrate, Ambase's contentions are belied by the undisputed facts and the relevant law.

First, as Professor Saunders has observed, the FDIC incurred real costs in making these loans whether or not Congress agreed to waive the sovereign immunity of the United States with respect to prejudgment interest on goodwill claims asserted by the receiver. Saunders Decl. App. 12 ¶ 27. As stated by Professor Saunders:

> This legal prohibition [against prejudgment interest] has no relevance to calculating the RTC's deficit (or surplus) relating to its seizure of Carteret. In economic terms, there was a real cost to the government of having to use tax-payer funds, as well as funds borrowed through issuing Treasury bonds, bills, and other government securities, to help resolve Carteret. Indeed, every $1.00 borrowed to finance Carteret's loans added $1.00 (plus interest) to the national debt. As a result of these financing costs, it is economically rational to compute and include interest in assessing the cost of loans made in resolving Carteret (i.e. the receiver-ship deficit).

Id. As a matter of economic principle, therefore, the charging of interest on the loans was entirely justified. As Professor Saunders further observes, not charging interest on the loans "would be equivalent to a direct subsidy and would have an effect very much like paying prejudgment interest on the damages caused by the government, apparently contrary to law." Id.

Contrary to Professor Calomiris, moreover, relevant legal authority requires charging PII on loans to the receiver. In Golden Pac. Bancorp, 2002 WL 31875395 at **4-6, for example, the court held that the FDIC was required to charge interest on the loans to the receiver because the FDIC had a fiduciary duty to maintain the integrity of the insurance fund. As the Court noted, "'money in the deposit insurance fund [must] bear interest in order to protect the fiscal integrity of the fund . . ." Id. at *6; see In Re Receivership Of First Nat'l Bank in Humboldt, 523 N.W.2d

591 (Iowa 1994) (interest must be charged on loans from the FDIC to the receiver); FDIC v. Citizens State Bank of Niangua, 130 F.2d 102 (8th Cir. 1942) (same). Thus, Ambase is wrong in contending that it was unjustified to charge interest on loans from the FDIC to the receiver. According to the relevant statute, interest had to be charged to "protect the fiscal integrity of the fund." Even if the Court believed there was an asymmetry between the loans from the FDIC to Carteret and Carteret's Winstar-related claim because of the unavailability of pre-judgement interest, the statute requires that interest be charged on the loans to Carteret. Indeed, as the Court of Appeals for the Eighth Circuit has noted, one cannot find a "philanthropic intent, in a situation such as this, to allow the use of the [FDIC's] funds to become a source of profit to stockholders of a defaulting bank, at the expense of the [FDIC]." Niangua, 130 F.2d at 104 n.6; see Corbin v. Federal Reserve Bank of New York, 475 F. Supp. 1060, 1065-68 (S.D.N.Y. 1979), aff'd 629 F.2d 233 (2nd Cir. 1980) (the Federal Reserve Bank of New York ("FRB-NY") was required to charge interest on the loans in order to protect the fiscal integrity of the national banking system). There is no authority of which we are aware, and Ambase has cited none, that permits the RTC/FDIC to make interest free loans, and the prevailing authorities indicate the opposite.

In addition to contending that charging PII is not justified under the circumstances, Ambase argues that the rates charged on the loans are excessive because the average three-month T-Bill rate over the duration of the receivership was lower than the rates charged on the Carteret loans. SOI at 9-11, 54-60. Ambase argues that the rate of interest should have been the floating three-month T-Bill rate rather than the fixed Federal judgment rate which is based upon the 12-month (52 week) T-Bill rate. As we demonstrate in the section below, as a matter of economic

principle, even the 12-month T-Bill rate was too low, and provided an explicit subsidy to Carteret, because the loans were made against risky assets and do not reflect the average duration of FDIC receiverships, which typically take three to six years to resolve and may take considerably longer. See Saunders Decl. App. 13-14 ¶¶ 30-31.

On the question of whether legal authority supports the Federal judgment rate as the rate for the loans to Carteret, it clearly does. As Judge Pollack has observed: "In determining the fairness of interest rates, courts have looked to the rates set by contract between the parties, prevailing market rates and legal lending rates." Corbin, 475 F. Supp. at 0169-70; see also Mid Jersey National Bank v. Fidelity-Mortgage Investors, 518 F.2d 640 (3rd Cir. 1975); In re Hartsdale Associates, 452 F. Supp. 67 (S.D.N.Y. 1978); Walter E. Heller & Co. V. Cox, 434 F. Supp. 519 (S.D.N.Y. 1972), aff'd mem. sub nom. Walter E. Heller & Co. v. Ocean Air Tradeways, 486 F.2d 1398 (2nd Cir.). If these factors are applied to this case, it becomes evident that the Federal judgment rate was and is the appropriate rate for the loans to Carteret.

For example, the RTC advances to pay off the FHLB loans in 1992 were priced to subsidize the resolution (i.e., the three month floating T-Bill rate plus 25 basis points) and therefore are not relevant in determining an appropriate rate for the later advances. Moreover, the rates charged on the loans from the RTC/FDIC to the receiver were generally under under the prevailing market rates for prime rate commercial loans and 30 year conventional mortgage loans, both of which are comparable to the loans to Carteret because they involve market risk. Saunders Decl. App. 13 ¶ 30. Further, the rates charged on the Carteret loans were legal because they were established by the Federal judgment rate. Therefore, the loans from the FDIC/RTC to

Carteret satisfied the judicially identified criteria for the validity of rates and were less than might have been charged under full economic risk-based pricing.

Further, the rates are consistent with judicial decisions examining the validity of rates in particular circumstances. In Golden Pac. Bancorp, for example, the Court found that the New York State judgment rate (nine percent) was acceptable and noted that the effective rate (4.3 percent) for the loans at issue was lower than the average 12-month T-Bill rate, which suggested that the 12-month T-Bill rate was a valid benchmark for determining an acceptable rate. 2002 WL 31875395 at *7. If this is the case, the rates on the FDIC loans to Carteret were acceptable because they were based upon the 12-month T-Bill rate. Likewise, in Corbin, the court ruled that a rate of from 7.52 percent to 8.5 percent on loans from the FRB-NY to the receiver was "more than fair to the receivership estate" because it "afforded a yield below the relevant market rates, the contract rates of the FNB notes (8.5 percent, later 10 percent), and the legal lending rate set by the New York Banking Board under N.Y.Gen.Oblig.Law § 5-501(1) (8.5 percent)." 475 F. Supp. at 1070. If these rates, which were higher than the Federal judgment rates were valid, the rates in this case are valid as well.

Two of three rates in this case were well below the average rates on prime commercial loans and 30 year conventional mortgage loans and the rate on the third loan was only slightly above these commercial rates. Saunders Decl. App. 14 ¶ 31. Further, the rates applied to judgments issued by Federal courts and were established by Federal law. Accordingly, the rates were and are valid and are not subject to revision by this Court and Ambase's contentions to the contrary lack merit.

### 2. THE FDIC DID NOT SELECT THE FEDERAL JUDGMENT RATE TO INCREASE RECEIVERSHIP COSTS

While Ambase argues that there is no economic rationale for charging a 12-month fixed T-Bill rate on loans to the receiver, the primary basis for attacking the rate is the contention that it was selected upon a retrospective basis. SOI at 8-10, 54-56. This contention is belied by the facts. The FDIC did not impose a fixed 12-month T-Bill rate because it concluded, based upon a retrospective examination, that the FDIC, as subrogated claimant, would receive more interest based upon a 12-month fixed rate than upon a three-month floating rate. It imposed the rate ex ante in 1995 because of legal and policy considerations relevant to the calculation of PII for Federally insured depository institutions. Saunders Decl. App. 16-18 ¶¶ 34-39.

While, as Ambase points out, the RTC/FDIC made its loans in November 1994, January 1995 and March 1995 and originally applied 12 C.F.R. § 360.3 (1988) (a floating rate based upon the three-month T-Bill) to calculate interest, this regulation was superceded by the National Depositor Preference Act ("NDPA"), 12 U.S.C. § 1821(d)(11), which accorded depositors a higher priority on distributions than general creditors. Because 12 C.F.R. § 360.3, which was issued by the Federal Home Loan Bank Board ("FHLLB") in 1988, did not accord depositors this higher priority, it was inapplicable following the enactment of the NDPA. Thus, the three-month T-Bill rate, which was the rate for PII for all Federally insured S&Ls under the FHLBB regulation, was inapplicable to receiverships created after the NDPA. This included Carteret whose receivership was created in January 1995. In the absence of 12 C.F.R. § 360.3, the FDIC had to determine what rate of interest to apply to post-NDPA Federally insured thrifts. Id.

In 1995, the FDIC engaged in an analysis of legal and policy issues relating to the rates of PII imposed upon various types of financial institutions. See Memorandum To Operating Committee From Director, DAS, General Counsel, and Director, DOF, dated September 18, 1996, AM00097047-97065. It concluded that, with respect to Federally insured S&Ls, because 12 C.F.R. § 360.3 did not survive the NDPA, it applied only if the receiver was appointed prior to August 10, 1993 (the date of enactment of the NDPA). In July 1995, this was made explicit by the addition of a provision to 12 C.F.R. §360.3 indicating that it did not apply to post-NDPA thrifts. 12 C.F.R. § 360.3(d) (2005 ed.).

After considering the issue, the FDIC concluded that the Federal judgment rate should be applied to post-NDPA receiverships because (a) it was publicly available; (b) it reflected applicable Supreme Court precedents applying the Federal judgment rate to national banks; (c) it was consistent with legal precedents in bankruptcy proceedings which analogized an approved claim to a Federal court judgment; and (d) it would not favor or disfavor any particular class of creditor. Id.

The FDIC examined whether the rate should be fixed or floating and determined that its policy at the time required a fixed rate. The FDIC had always applied a fixed rate to PII calculations for national banks. Id. While it recognized that the FHLBB had chosen a floating rate for S&Ls, it concluded that recalculating the rate could be complex and involve a risk of error. Id. at APP 551-52. Further, the FDIC believed it would be impossible to make reasonable financial projections if the rate was floating and this would be inconsistent with the receiverships' interests. Id.

In July 1995, the FDIC issued a memorandum requiring that, for savings and loan receiverships created after August 10, 1993, the 12-month T-Bill rate existing when the receivership was created would be the applicable rate. Memorandum From Associate Director, DAS, Deputy Director, DOF and Deputy General Counsel to All Regional Directors, Financial Officers and Regional Counsel Concerning Post Insolvency Interest, App. 521. While it considered establishing the rate through a rulemaking, it decided that this was unwise because of pending litigation. September 18, 1996 Memorandum at App. 544. Accordingly, it advised the operating divisions of the policy through a joint memorandum.

As Ambase points out, through 1998, PII was reported on the Carteret receivership's financial statements in accordance with 12 C.F.R. § 360.3. SOI App. at 01098. This was incorrect as the operating divisions had been advised on June 8, 1995 that the PII should be based upon the Federal judgment rate. The division responsible for reporting the calculation failed to comply with the directive. While the record does not reveal the cause of the error, it was discovered between the preparation of Carteret's December 31, 1998 and December 31, 1999 financial statements when it became necessary to report PII because 95 percent of the principal claims had been satisfied. Id. at 20154. The 1999 financial statement acknowledged the error and reported that the Federal judgment rate was the applicable rate. Id. at 01098.

At that time, the yield on 90-day T-Bills was trending upward and, at times, over the following year exceeded the one year T-Bill rate, which was the basis for the Federal judgment rate. Saunders Decl. App. 18 ¶ 39. Between November 1994, when the FDIC made its first loan to Carteret and December 1999 when PII was calculated upon the basis of the Federal judgment rate, the average yield of 90-day T-Bills was less than the average yield for one year Treasuries.

Ambase suggests that the FDIC calculated PII upon the basis of the Federal judgment rate because it wished to insure a higher payout to the FDIC. However, in 1999, it was impossible to know which rates would be higher or lower over the future course of the receivership.

Further, as indicated by FDIC senior accountant Wayne S. Green, the Finance Staff examined the rates when the dividend processing software was being revised to accommodate PII payouts. Rather than being concerned with the level of rates, the issue of the applicable rate was raised because the dividend system could not apply different rates to different loans and the staff questioned how PII should be calculated in these circumstances. Green Dep. Tr. at App. 255-56.

The Finance Staff asked attorneys for Carteret to examine what rate of interest to apply to goodwill receivership loans. Michael Saran, a senior attorney, advised that, on the basis of the June 8, 1995 directive, the PII should be calculated upon the basis of the Federal judgment rate. Saran Dep. Tr. at App. 278-93. He testified that he made the determination based upon his reading of the June 8, 1995 memorandum. Id. at App. 282. Mr. Saran testified that, at the time he rendered the advice, he did not know how PII was calculated for Carteret. Id. at App. 293. Nor did he know if changing the calculation would increase or decrease interest expense to the receivership. Id. Accordingly, neither Mr. Saran nor the FDIC adjusted the rate to obtain a higher rate on the loans to Carteret. Their actions are presumed to be consistent with law and Ambase has provided no evidence to the contrary. See, e.g., Impressa Construgioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1337 (2001) (agency decisions are "entitled to a presumption of regularity"); Bannum, Inc. V. United States, 56 Fed. Cl. 453, 457-58 (2003) ("government officials are presumed to act conscientiously and in good faith discharge of their duties"). Mr. Saran, who made the determination, did not know and could not have known

whether the FDIC would be advantaged or disadvantaged by the use of the Federal judgment rate. Saran Dep. Tr. At 88.

While Professor Calomiris suggests in his expert report that the FDIC made an ex post determination, the determination was made ex ante based upon the June 8, 1995 memorandum. At the time of the June 8, 1995 memorandum, no one could know whether a fixed Federal judgment rate or a floating 90-day T-bill rate would result in greater or lesser interest accruals over the course of the receivership. Mr. Saran applied the same logic he applied to Carteret to the remainder of the post-NDPA receiverships and there has been no showing that the FDIC received more interest from those receiverships than it would have received applying the three-month T-Bill rate. Despite Ambase's insinuation to the contrary, therefore, the FDIC did not engage in self-enrichment when it adjusted the rate in 1999. See Saunders Decl. App. 18 ¶ 39 ("There appears to be no discussion of the level of or trends in interest rates or how the government might somehow maximize the interest owed to receiverships . . . ") .

Although Professor Calomiris argues that the change in the methodology for calculating PII increased total interest costs by $64.7 million, SOI at 49-50; Calomiris Dec. App. 142, ¶ 41, he is using 20-20 hindsight in order to paint the FDIC in as negative a light as possible. When the decision was made in 1999 to correct the PII calculation to conform to the 1995 policy, the increase in amount was only $20.2 million which was less than one-third of the $64.7 million that Professor Calomiris calculates as excessive. Moreover, in 1995, when the FDIC changed its policy, there is no possible way that the FDIC or anyone else could have known whether, over the long term, that change would result in more or less PII being charged to the receivership. Saunders Decl. App. 18 ¶ 40. In short, because the FDIC merely applied a pre-existing policy to

the calculation of PII for the Carteret loans, there is not basis upon which to adjust the receivership deficit. See Golden Pac. Bancorp, 1997 WL 626374 at *3 (no judicial review of the applications of established policy to receivership operations).

### 3. THE FEDERAL JUDGMENT RATE WAS ECONOMICALLY APPROPRIATE

Relying upon the analysis of Professor Calomiris, Ambase contends there was no economic justification for basing interest rates on the 12-month T-Bill rate rather than the three-month T-Bill rate because the latter yielded lower returns and more accurately reflected the anticipated duration of the receivership. SOI at 9-12, 53-67. According to Professor Calomiris, there is an implicit premium on 12-month rates over three-month rates and the FDIC was not justified in imposing the 12-month rate when it could not know, ex ante, that the receivership would extend for this duration. July 14, 2006 Calomiris Declaration App. 134 ¶ 25. Furthermore, according to Professor Calomiris, floating rates are more likely to reflect economic conditions than fixed rates: "[B]ecause the possibility of the transfer and timing of the transfer are not known in advance (i.e., the outcome and timing of the Court's decision is not known in advance), the ex post imputed interest cost associated with the deficit should be computed on a continuous basis." Id. Finally, Professor Calomiris contends that it is "illogical and inconsistent" for the FDIC to charge a 12-month T-Bill rate on its loans to the receiver while providing a lesser rate on loans in the escrow accounts, id, at App. 140, 145 ¶ 38, 46-48, and that "there is no economic justification" for paying down the loans pro rata instead of in order of the largest interest charges on the loans. Id. at App. 143 ¶ 43.

While one can know, ex post, that the accruals on floating 3-month T-Bill rates were lower than the accruals on fixed 12-month T-Bill rates, one could not know this in advance. There was as great a possibility that the fixed 12-month T-Bill rate would yield a lesser accrual than that it would yield a greater accrual. As Professor Saunders has pointed out: "Sitting in November 1999 [when the financial statements were revised to conform to the July 1995 directive regarding PII], the government would not have known whether T-Bill rates would continue to head higher (perhaps to a level well above the Federal judgment rates on the Carteret loans), stabilize, or decline. Thus, the government did not know, in 1999, whether these decisions ultimately would increase or decrease the amount of interest due it on loans to the Carteret receivership." Saunders Decl. App. 18 ¶ 39. The question is not whether one rate or the other rate proved disadvantageous to the receiver ex post but, rather, whether the FDIC, based upon prior experience, was justified in selecting a fixed 12-month T-Bill rate when it did not know and could not know what the future portended.

As Professor Saunders explains, the choice of a 12-month T-Bill fixed rate not only reflected a rational economic and policy judgment but also on an ex-ante basis advanced the interests of the receivership. First, the rate, which reflected only the time value of money, did not take into account of the risk implicit in the receivership's assets being unable to repay the loan. Thus, the rate involved an implicit subsidy from the FDIC to the receiver as measured by the risk of default on the loan. As noted by Professor Saunders:

> Since the loans at issue here were extended to a receivership holding risky assets with uncertain returns, a risk premium above the risk-free Treasury rate might have been added to price such loans. It is common sense that if the FDIC/RTC loans

> to the Carteret receivership were risky - and they were in terms of resolution payoffs - then a risk premium should be charged by the government, or else a subsidy is provided. That is, to the extent that the government loaned any funds to the Carteret receivership at any risk-free Treasury rate, it was providing an explicit subsidy.

Id., at App. 13 ¶ 30. Therefore, rather than charging Carteret rates that were too high, the FDIC actually charged Carteret rates that were too low. Id.

Second, as Professor Saunders points out, "by advocating the use of a three-month Treasury yield as the floating rate, Professor Calomiris ignores the long-term nature of the loans at issue here, even though he acknowledges, 'the repayment of the loans lasted longer than one year . . .'" Id., at App. 15 ¶ 33. In fact, the FDIC was justified in basing interest on a 12-month rate because "[the] receivership's average life is six years [and] some may require longer time frames . . . ." SOI App. at 01156. Therefore, even assuming the rate should be based upon the anticipated duration of the receivership, as Professor Calomiris contends, July 14, 2006 Calomiris Declaration at App. 136-39 ¶¶ 30-36, the 12-month rate dramatically understates the duration.

Third, as Professor Saunders observes, Professor Calomiris offers no justification for insisting that only a floating rate is economically justified. Saunders Decl. App. 19 ¶¶ 41-42. Without knowing the trend in interest rates in advance, one cannot know whether the lender or the borrower will be advantaged by a fixed or floating rate. Importantly, as Professor Saunders observes, by paying a fixed as opposed to a floating rate, the receiver knows in advance that the level of interest rate charges will remain constant: it is therefore hedged against rising interest

rates. Id. By hedging the rate, the FDIC transfers the risk of unanticipated increases from the receiver to the lender. Id. As Professor Saunders observes, there is no economic rationale for assuming the hedge will be unfavorable to the receiver unless the analysis is made with the benefit of hindsight, which is never the case in the real world. As Professor Saunders observes, "If rates had risen instead [of falling] over this period [i.e., the duration of the receivership], . . . I very much doubt that Professor Calomiris would be making the same 'floating rate' argument, and instead find it likely that he would be a strong advocate of the fixed Federal judgment rate." Id.

Professor Calomiris also contends that it was inappropriate to charge a fixed 12-month T-Bill rate because the Federal judgment rate reprices on a 12-month basis, the RTC's 1991 advances to the receivership were based upon three-month floating rates, and the current regulation, enacted in 2002 for prospective application, imposes a floating three-month T-Bill rate. July 14, 2006 Calomiris Declaration App. 139-40 ¶¶ 29-36. As for the contention that the Federal judgment rate reprices at 12-month intervals, this is simply untrue: while Professor Calomiris understood the Federal judgment rate to be based upon 40 U.S.C. § 258e-1 (the eminent domain statute), in fact it is based upon 28 U.S.C. § 1961 (the Federal judgment statute). This statute does not provide for recalculations after the date of judgment. SOI App. at 00153.

Further, the economic conditions relating to FDIC advances to post-2002 receiverships might well differ from the circumstances relating to earlier receiverships. Indeed, because of the prompt corrective action provisions of the Federal Deposit Insurance Corporation Improvement Act, 12 U.S.C. § 1831o(a), (c) ("FDICIA"), it is reasonable to expect that post-2002

receiverships will be of shorter duration on average than resolutions in the 1980s and early 1990s.

While Professor Calomiris contends that it was economically irrational not to pay down the higher interest rate loans first and that this resulted in increased interest expense (approximately $51 million), July 14, 2006 Calomiris Declaration App. 144 ¶45, Professor Saunders observes that this "would be inconsistent with normal practice in banking." Saunders App. 20 Decl. ¶ 43. Further, even if an exception could have been made for the loans to Carteret, the savings would have been far less than Professor Calomiris estimates. Contrary to his assumption, interest did not discontinue accruing upon the repayment of principal. July 14, 2006 Calomiris App. 144 Dec. ¶ 45. To the contrary, it accrued "on the outstanding balance of a proven claim." 12 C.F.R. § 360.7; See, e.g., Commonwealth v. Mechanics Nat. Bank, 94 U.S. 437 (1876) (the principal balance of a loan to a receiver includes outstanding interest); July 14, 2006 Calomiris Dec. App. 141 ¶ 40 ("the appropriate measure of the time value of money would continue to accrue interest on unpaid interest even after the principal is completely repaid"). Because the alleged $51 million cost assumes such interest did not accrue, there is no evidence of any savings if, in fact, it did accrue.

Finally, Professor Calomiris contends that it was "illogical and inconsistent" to charge a higher interest rate on the loans to Carteret than the receiver received on the loans in the escrow accounts. Id. ,at App. 139-40 ¶ 37-38. However, the escrow accounts were not subject to the general claims of FDIC creditors, whereas the loans to the receiver were. Saunders Decl. App. 21 ¶ 44. As Professor Saunders notes: "Normal lending practice suggests that when there is uncertainty in the value of assets (collateral) underlying a loan, the lender should charge an

additional risk premium on the loan over and above the risk-free rate." Id. Unlike with respect to the escrow account, there was a substantial risk the FDIC would never recover the principal on the loans advanced to the receiver. Id. Accordingly, as Professor Saunders points out, "it is entirely consistent with fundamental concepts in financial economics that the rate on the risky loans made by the RTC to the receivership would be higher than the rate paid on cash balances held by the receivership in an escrow account." Id.

### F. AMBASE HAS PRESENTED NO PERSUASIVE EVIDENCE THAT THE FEDERAL INCOME TAX LIABILITY IS LESS THAN $93.7 MILLION AS OF DECEMBER 31, 2005

Based upon tax returns and Internal Revenue Service ("IRS") transcripts, the FDIC calculates that, as of December 31, 2005, Carteret owes Federal income tax liability in the amount of $93.7 million consisting of $29.9 million for 1995 tax, $53.5 million in accrued interest, and $10.4 million in penalties. March 31, 2006 Goodwill Financial Reporting Package, Report 3, n.[b]. According to Ambase, if the FDIC had calculated Carteret's tax liability properly, nothing would now be owed and the receivership deficit would be smaller. SOI at 12-16, 29-48.

Ambase contends that the FDIC could have deducted post-insolvency interest in 1995 or 1997 and that this deduction would have resulted in offsets to the 1995 taxable income. If this had been done, according to Ambase, there would have been little if any taxable income in 1995. SOI at 38-43. Further, according to Ambase, the FDIC did not correctly calculate Federal financial assistance ("FFA") for 1993, 1994, or 1996. According to Ambase, if it had properly calculated the FFA, approximately $21 million in losses for 1994 and 1996 could have been available to reduce Carteret's taxable income in 1995. Id. at 33-36. Finally, Ambase contends

the FDIC could have taken a net operating loss carryforward of $72.3 million for an alleged 1992 loss against taxable income in 1995. Id. at 44.

Ambase contends that the FDIC violated its fiduciary duty to Carteret by failing to recognize these alleged offsets against 1995 taxable income. Further, even if the deadline for filing amended returns has now passed, according to Ambase, the IRS will allow Carteret to recalculate the tax to account for these errors. Finally, Ambase contends that the FDIC made a series of smaller errors in preparing the 1995 tax return such as neglecting to deduct $3.1 million in interest expense and failing to deduct the value of goodwill associated with the transfers of branches in 1994 and 1995. Id. at 37-38, & 45. Ambase contends that correcting these errors will reduce the receivership deficit.

While Ambase cites tax returns, deposition testimony, and internal documents to support its position, it has not presented expert testimony that the 1995 return did not properly present the income for that year. Further, it presents no evidence that the IRS would accept the recalculation it now proposes when and if funds are available for the payment of tax. While Ambase contends that the documents and testimony demonstrate that Carteret owed no tax in 1995, as we demonstrate, the analysis contains significant errors and there is no evidence that the IRS would now agree to a recalculation of the tax. Accordingly, there is no basis in this record for recomputing the receivership deficit based upon alleged errors in the 1995 tax return.

### 1. A FIRM CAN REPORT FINANCIAL LOSSES WHILE AT THE SAME TIME REPORTING TAXABLE INCOME

Ambase contends that "[i]t is self-evident that a receiver that claims to have a non-tax deficit of more than $160 million cannot also have been wildly profitable and owe tens of millions of dollars in taxes." SOI at 29. The reason there is a non-tax deficit and a tax liability, however, is also "self-evident" -- namely that the rules regarding the carryback of net operating losses were changed prospectively in 1997 to allow for only a two-year, rather than a three-year, carryback for subsequent tax years. Id. at 39: SOI App. at 01043 (Vortreide Dep. Tr. at 411). This change adversely affected Carteret because, when the FDIC accrued PII in 1998 after 95 percent of the principal claims had been paid, the tax law revision prevented it from offsetting the 1995 income with the 1998 loss.

Ambase objects to the FDIC's policy of not accruing PII until 95 percent of the principal balance of the loan from the FDIC/RTC had been repaid. However, it offers no evidence that the policy is not subject to the discretionary act exception to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and the "committed to agency discretion" provision of the Administrative Procedure Act. 5 U.S.C. § 701(a)(2); see Golden Pac. Bancorp, 1997 WL 626374, *2 (citing Berkovitz v. United States, 486 U.S. 531, 537 (1988)). The FDIC's 95 percent rule was "applied across the board." SOI App. at 00988 (Vortreide Dep. at 279). Ambase has cited no evidence the rule was inconsistent with the Internal Revenue Code ("IRC") or applicable regulation. Accordingly, the decision not to accrue PII until 1998 cannot be second-guessed in this court. Golden Pac. Bancorp, 1997 WL 626374 at *2.

Ambase argues that the FDIC admitted that its 95 percent policy "artificially created" the tax liability. SOI at 13, 40. However, in reality, Ambase's argument is the only "chimera" in the case. Id. at 12. As Mr. Vortreide testified, it was not appropriate to recognize PII for tax purposes prior to its accrual on the financial statements because it was not "fixed" prior to this time. SOI App. At 00988, 00992, 01036-37 (Vortreide Dep. Tr. at 279, 294, 296, 385-87, & 413).[10] The only way that PII could have been deducted for tax purposes in 1995, 1996, or 1997 would have been for the FDIC to change its policy regarding the 95 percent rule. However, the FDIC believed the policy served the interests of receiverships and Ambase has offered no evidence to the contrary. Accordingly, the rule constitutes a valid policy judgment and must be upheld. See Golden Pac. Bancorp, 1997 WL 626374 at *2 ("permissible exercises of policy judgments" are not amenable to judicial review), (quoting Berkovitz, 486 U.S. at 539).

Finally, while Mr. Vortreide believed it might be possible to recalculate taxable income to reflect PII from inception, he emphasized that this would depend upon an as yet non-existent agreement between the IRS and the FDIC. SOI App. at 01036-01037. Only if an understanding were reached did he advocate "set[ting] aside the theory" and to consider reducing the tax. Id. While Ambase contends Mr. Vortreide acknowledged that the 1995 tax liability was "artificial," he only acknowledged the *possibility* that the IRS might allow PII to be deducted if and when the claim was paid and there were also funds to pay the tax. Id. Thus, Mr. Vortreide never

---

[10] Ambase argues that this testimony from Mr. Vortreide "should be utterly disregarded." SOI at 41, n. 10. However, Mr. Vortreide offered the exact same testimony when he was asked further questions by Ambase after he had been cross-examined and did not alter his view in any way. SOI App. at 00992 (Vortreide Dep. Tr. at 294) ("My opinion is that we should follow the books for tax purposes"); ("Let's just say that it's our policy for the tax unit to follow the books and we don't want to deviate from it"); see also SOI App. at 01036-01037 (Vortreide Dep. Tr. at 384-88).

acknowledged that the 1995 tax liability was merely a "chimera" but that it is an established liability.[11]

### 2. THERE IS NO EVIDENCE FFA WAS IMPROPERLY CALCULATED

Mr. Vortreide testified that, under Section 597 of the IRC, a portion of FDIC advances to a receivership are considered taxable income (Federal Financial Assistance or "FFA") if they exceed the tax basis of the assets in the receivership. SOI App. at 00983-00984 (Vortreide Dep. Tr. at 259-61). For example, if a thrift raised equity and deposits and acquired assets for $100 million but became insolvent because of operating losses, it could not repay the liabilities without an advance from the FDIC. Part of that advance, measured by the amount that exceeded the tax basis in the assets, would be considered taxable income (i.e., a permanent loan from the FDIC to the receiver). Id. As Ambase points out, the objective of Section 597 was to limit deductible losses to the amount of net tax basis in the assets of the thrift. SOI at 33-34.

Mr. Vortreid testified that, in 1993, he created a model to determine FFA based upon

[11] In claiming that the 1995 tax liability was "artificially created," Ambase fails to account for the fact that, under deferred tax accounting, the differences between book income and taxable income may require the reporting of deferred tax assets which reflect the "prepayment" of taxes relative to tax expense. See generally Statement of Financial Accounting Standards No. 109, ¶ 8. In fact, because of the sale of the New Jersey branches and the transition from the accrual method of accounting to the modified cash method of accounting, Carteret reported financial losses of approximately $61.2 million in 1995 but still reported taxable gain on the sale of deposits and various adjustments to equity of approximately $153.4 million. SOI App. at 10034. Ambase has provided no authority that it was incorrect to report the deposit premiums or equity adjustments as taxable income and we are aware of none. Indeed, Mr.Vortreide testified that the gains resulting from the sales of deposits were taxable income. Id. at 00982 (Vortreide Dep. at 253). Under principles of deferred tax accounting, therefore, the approximately $29 million in tax liability for the 1995 tax year should have been considered a prepayment of income tax and, therefore, a deferred tax asset. SOI App. at 10162.

proposed regulations that were issued in 1992. SOI App. at 00815-816 (Vortreide Dep. Tr. at 9-11). While the IRS never questioned the application of the model, in 2003, based upon discussions between the IRS and the FDIC, Mr. Vortreide revised the model. SOI App. at 00815-816; 00983-984 (Vortreide Dep. Tr. at 9-11, 259-61). At his RCFC 30(b)(6) deposition, Mr. Vortreide presented a spreadsheet which purported to recalculate FFA for Carteret for the tax years 1992 through 2005. SOI App at 10347-48. The spread sheet indicates that the FDIC reported negative FFA of $51,402,763 in 1993 which reduced the taxable income to zero. Id. According to the spreadsheet, however, no FFA should have been reported and the taxable income should have been $51,402,763. Id. For 1994, however, the spreadsheet indicates that no FFA should have been recognized whereas the FDIC reported $66,331,861 in FFA. Therefore, while no taxable income was reported on the 1994 return, according to the spreadsheet, the return should have reported a $66,331,861 loss. Id. According to Ambase, the 1994 loss would have offset the 1993 gain and there would be a $14.9 million loss carryforward to 1995. SOI at 34-35.

Ambase does not question the FFA on the 1995 return (no FFA was reported). For 1996, however, the FDIC reported $6,302,903 in FFA whereas, according to the spreadsheet, there was no FFA and the return should have reported a $6,302,903 loss rather than zero income. According to Ambase, this loss as well could have reduced the 1995 reported income. According to Ambase, the adjustments reduce Carteret's 1995 taxable income by $21.9 million.[12] SOI at 35.

While Ambase contends the tax liability for the receivership would be "at least $20 million lower" if adjustments were made upon the basis of the Vortreide spreadsheet, SOI at 36,

---

[12] It appears that Ambase miscalculated the amount available to offset the 1995 taxable income. The actual number should be $21.2 million ($51.4 million minus $66.3 million minus $6.3 million), not $21.9 million.

it provides no explanation for the recalculation of FFA reflected in the spreadsheet. There are no work papers comparing the reported FFA with Mr. Vortreide's calculations and no independent expert to verify the accuracy of the spreadsheet. Most importantly, as Mr. Vortreide himself pointed out, no one at the FDIC or elsewhere "has formally reviewed [the new model or the calculations in the spreadsheet]." SOI App. at 00985 (Vortreide Dep. Tr. at 266). Further, with respect to the FFA reported on Carteret's returns, Mr. Vortreide testified that the model used to prepare the returns "was used from 1993 through 2003 and it survived many audits, and no revenue agent ever made a complaint about it until 2003." Id. Indeed, according to Mr. Vortreide, the IRS "has accepted the FFA calculations [reflected in the tax returns]." SOI App. at 00986 (Vortreide Dep. Tr. at 269). Further, if there were to be discussions between the FDIC and the IRS about the calculation of FFA, Mr. Vortreide acknowledged that the IRS model is "much simpler than [his] model" and "might be taking a more conservative approach than I am." Id. In other words, there is no reason to believe the IRS would accept the model even if there were funds to pay the tax liability and the IRS and FDIC revisited the amount sometime in the future.

In short, there is no evidence in the record to validate the recalculated FFA or to demonstrate that the IRS would permit a redetermination of the 1995 tax liability based upon Mr. Vortreide's latest model for calculating FFA. Accordingly, the receivership deficit cannot be adjusted to reflect a recalculation of FFA.

### 3. THE 1995 TAX RETURN SHOULD NOT HAVE AND COULD NOT HAVE REFLECTED POST-INSOLVENCY INTEREST

Ambase contends that it was improper not to reflect post insolvency interest deductions for 1994 through 1997 on the 1995 tax return and that doing so would have reduced the 1995 taxable income by $80.5 million. SOI at 39. While acknowledging that the "all events test" established by Section 461 of the IRC allows an expense to be recognized under the accrual basis of accounting only when "the liability is fixed and the amount is ascertainable," SOI App. at 00835 (Vortreide Dep. Tr. at 88), Ambase contends that the PII meets this description and that the IRS has recognized that PII can be deducted from the inception of the receivership. SOI at 38-40. Ambase contends that, even if the test is not met until 95 percent of the principal claims are paid, the FDIC could have achieved this threshold in 1997 by paying a dividend of $712,000, which would then have allowed losses relating to PII to be carried back to 1995. Id.

Ambase argues that the only reason the FDIC did not deduct PII from the inception of the receivership was that it determined not to accrue the expense for book purposes until 95 percent of the principal claims had been paid. Ambase argues that the liability was fixed and determinable at the time of the advances, and that it was incorrect not to report PII from the inception of the receivership. Ambase argues that the administrative convenience of not reporting the liability until 95 percent of the principal claims were paid did not justify not reporting the PII as a deduction on the tax returns. Ambase points out that, even if the FDIC chose not to report expense on the receivership's books, it could have reported the expense as a deduction on the 1995 tax return.

While the FDIC might have taken the position that the liability was fixed and determinable at the inception of the advances, it did not do so because interest would not be paid until the principal claims were resolved and most receiverships never got to this point. As Karen Hughes, the FDIC's Deputy Director and Controller, Division of Finance, explained at her deposition:

> [O]ur issue here was at what point do we reflect that, do we show that in the receivership books and records. We could have reflected it starting day 1 and every day thereafter until the receivership was terminated, recalculate postinsolvency interest and make the adjustment, and have that be on the face of the financial statements and in the accounting records of the receivership, but there's a huge administrative cost associated with doing that. And for most of the receiverships, they never got through the deposit claims or other claims such that they would pay postinsolvency interest, so it was an unnecessary burden. What we were trying to do here is setting some kind of a threshold to make the receivership financial statements more meaningful was to come up with the right time frame to recognize and reflect on the face of the statements the liability that had been accruing since day I.

Hughes Dep. Tr. App. 262.

Ambase contends this was not an aggressive enough reading of the "all events" test for purposes of application of the tax code. However, there is no evidence that the IRS permitted PII to be recognized for tax purposes from the inception of the receivership at the time the FDIC adopted its policy. Indeed, as Mr. Vortreide observed: "They [the IRS] haven't issued a policy

statement in that regard." SOI App 01037 (Vortreide Dep. Tr. at 387). Moreover, while Ambase contends Steven J. Johnston, a tax accountant employed by the FDIC, testified that the IRS permits the deduction from the inception of the receivership, SOI at 40, this is not so. To the contrary, Mr. Johnston testified that, other than allowing the deduction to settle the tax claim in the Ben Franklin Savings and Loan case, "I am not aware of any other cases . . . where it was an issue or where it was challenged." Johnston Dep. Tr. at App. 264. Indeed, Mr. Johnston testified he could not recall "any other instances in which the IRS took a position on that issue." Id.

Ambase contends PII is fixed and determinable from the inception of the receivership because there is an advance with a fixed or variable rate of interest.[13] However, while the advance and the rate of interest may be fixed and determinable, the liability is not because the vast majority of receiverships cannot satisfy their principal claims. As Mr. Vortreide observed: "I guess I'm thinking in terms of the liability for the interest not being triggered until there's a certainty of the claims being paid off in full." SOI App. at 00907 (Vortreide Dep. Tr. at 90); see also SOI App. at 01036 (Vortreide Dep. Tr. at 385) ("in theory a contingency exists"); SOI App. at 00906 (Vortreide Dep. Tr. at 88) ("Whether this deduction meets that standard is arguable"); SOI App. at 00907 (Vortreide Dep. Tr. at 90) ("You can argue that it was - you could argue that the liability for the interest wasn't fixed at that time. You could argue it was too contingent").

Ambase believes that the FDIC should have incurred the administrative burden of calculating and deducting PII from the date of inception. However, there is no evidence that the tax law required this or that the FDIC lacked sufficient ground for adopting the 95 percent test

---

[13] Remarkably, Ambase argues that PII is a legitimate expense for tax purposes but "does not represent an actual cost to the FDIC" for purposes of computing the receivership deficit. SOI at 9. These are utterly irreconcilable positions and Ambase cannot have it both ways.

for accruing the liability. While Ambase cites Revenue Ruling 70-367, 1970-2 C.B. 37 (1970) and two tax decisions for the proposition that expenses may be recognized even if they may never be paid, SOI at 42, these authorities do not address receiverships in which contingent claims are by law relegated to a lower priority than depositor and general creditor claims.

Ambase contends, however, that because the IRS allowed PII to be recognized from the inception of the receivership to settle the tax claim in Ben Franklin, this Court should assume the IRS will permit the deduction when the PII is paid and funds are available to address the tax liability. This is pure conjecture: there is no evidence the situation of Ben Franklin and the situation of Carteret are the same or remotely similar. As Mr. Vortreide has pointed out, while individual field agents may have allowed PII to be deducted from the receivership's inception in certain circumstances, the IRS has not taken a formal position on the issue. SOI App. at 01037. Therefore, the settlement in Ben Franklin does not suggest the IRS would assume the same or a similar position for other receiverships. Indeed, Mr. Gill, the attorney for the FDIC, made it clear that the deduction was "just for purposes of the settlement." Id. at 10396. Moreover, he emphasized that "obviously if we're back in the litigation arena, all bets are off and the IRS and the Department of Justice will certainly pursue the maximum tax case possible." Id. Therefore, even assuming the settlement was successful in Ben Franklin, there is no reason to believe the IRS's position will be applicable to this or other receiverships.

Even if one could know the IRS would allow the deduction, moreover, this would not justify reducing the receivership deficit. There is no evidence the FDIC acted improperly when it prepared the returns. At that time, there had been no settlement in Ben Franklin and, as Mr. Vortreide has pointed out, applying the "all events" test to the PII raised unresolved and

ambiguous issues. Id. at 00907 (Vortreide Dep. Tr. at 90). Accordingly, the FDIC did not breach a duty to the thrift by adopting the 95 percent rule. While Ambase contends that the FDIC should have taken the deduction from the inception of the receivership irrespective of the 95 percent rule's applicability to financial reporting, as Mr. Vortreide has pointed out, "if something is considered to be a contingent liability pursuant to a statement of financial accounting . . . [it] should . . . also be considered that for tax purposes . . ." Id. at 01043 (Vortreide Dep. Tr. at 413).

Finally, Ambase argues that the FDIC should have increased the dividend by $717,000 to bring the principal repayments to 95 percent of the original balance or regard the amount that had been repaid as of December 1997 (94.498 percent of the principal claim) as complying with the 95 percent accrual threshold. SOI at 43. There is no evidence in the record suggesting that the money could have been used for this purpose at the time. While it is easy to say in retrospect the solution Ambase would have liked, there is no evidence the receiver was aware of, or could have been aware of, the tax advantages of making the payment. In the absence of such evidence, one cannot fault the receiver for not transferring additional funds to satisfy the loan principal amount. Likewise, there is no evidence that deviations from the 95 percent policy could be implemented when the percentage of repayment approached 95 percent. The dividend payment processing system may not have triggered the deductibility of PII until the 95 percent threshold was reached. In the absence of evidence indicating a deviation from policy, there is no basis for reducing the deficit.

### 4. THE EVIDENCE DOES NOT DEMONSTRATE THE AVAILABILITY OF A $73.9 MILLION TAX LOSS CARRYFORWARD FOR 1992

Ambase contends that the receiver was entitled to a $73.9 million tax loss based upon a 1992 tax return prepared by Carteret. SOI App. at 10001. According to Ambase, this 1992 tax loss carryforward could have been and should have been used to reduce 1995 taxable income. SOI at 44.

While the 1992 return prepared by Carteret indicates a tax loss of $73.9 million, the data in the return is inconsistent with the consolidated 1992 return filed by Ambase on behalf of Carteret and the remainder of its subsidiaries. App. 472-81. Indeed, the consolidated return shows a net loss of $12,847,065 for the consolidated group, which is far lower than the net loss of $73.9 million on the Carteret return. Id. Further, the difference is approximately accounted for by virtue of $61 million in bad debt deductions. On the Carteret return, these deductions are $118.2 million, SOI App. at 10001, whereas, on the Ambase consolidated return, these deductions are $58 million. App. 472. There is no evidence in the record to explain the difference. Further, if the loss taken by Carteret on its stand-alone return was valid, it presumably would have been reported on the Ambase consolidated return (both returns cover the same reporting period). Therefore, the representation in the consolidated return casts doubt upon the availability of a $73.9 million loss carryforward reflected in the stand alone return. Id.

The record does not address whether Ambase might have utilized the carryforward in calculating its liability, thereby precluding the receiver from doing so. Indeed, as indicated, Carteret was included in the consolidated return filed by Ambase in 1992. In addition, according

to Ambase's 1997 10-K at 30, Ambase made a decision "not to disaffiliate Carteret from [its] consolidated federal income tax returns as of December 4, 1992 [and as a result it] will amend its 1992 through 1996 consolidated federal income tax returns to include the federal income tax effects of Carteret and Carteret FSB." Furthermore, in its 1999 10-K at n. 9, Ambase stated that "[b]ased on [its] recent filing of its amended 1992 consolidated federal income tax return to include the federal tax effects of Carteret FSB, approximately $56 million of NOL carryforwards [were] generated for tax year 1992." These filings indicate the NOL carryforwards for 1992 were approximately $56 million rather than $73.9 million. This casts further doubt upon the validity of the tax loss presented in the 1992 stand-alone return. Further, because the NOLs cannot be taken by both Ambase and the FDIC, assuming Ambase's election not to disaffiliate from Carteret portends its intention to utilize the NOLs, that election presumably would preclude the FDIC from utilizing any of the NOLs generated during the conservatorship and receivership.

Finally, Ambase contends that Mr. Vortreide "acknowledged that this NOL [the 1992 NOL] was available to shield Carteret's income in 1995." SOI at 44. This is simply untrue. Not only was Mr. Vortreide not asked whether he acknowledged the availability of the 1992 NOL but the passage cited by Ambase does not even address the alleged 1992 NOL. SOI App. at 00895-96. In short, the evidence upon whether there was a 1992 NOL available to Carteret is at best ambiguous and does not support revising the receivership deficit.

### 5. **THERE IS NO EVIDENCE OF OTHER ERRORS IN THE 1995 RETURN**

Ambase argues the FDIC failed to obtain permission to use a cash-based method of accounting for the 1995 return and this invalidated the equity adjustment of $19 million which

was reported as income.[14] SOI at 45. Further Ambase argues that the FDIC failed to take a deduction for the goodwill associated with the sale of the branches in 1994 and 1995. Ambase contends that the FDIC lacked relevant information on depreciation and other expenses when it calculated the 1995 tax liability and that this indicates the calculation was unlikely to be accurate. Id.

As for not obtaining IRS permission to use cash-basis accounting once the receivership was imposed, Mr. Vortreide testified he did not believe permission was necessary because conditions had changed, namely the resolution of the thrift had commenced. SOI App. at 00912 (Vortreide Dep. Tr. at 112-113). Assuming this was a valid analysis, there was no need to obtain the IRS's permission to modify Carteret's basis of accounting. Even assuming the IRS's permission was required, Mr. Vortreide indicated that the IRS had agreed to grant automatic permission for changes in accounting once the resolution of a thrift had begun. SOI App. at 10381-82. While that did not involve a change to the modified cash basis of accounting, there is no reason to believe the IRS would not have granted permission if the FDIC had sought it prior to the change. Id.

As for the goodwill accumulated in the course of acquiring branches, that goodwill was written off at the commencement of the conservatorship and there was no goodwill to amortize in 1995. Indeed, as the RTC Supervisory Review Manual points out:

> FIRREA mandates that conservatorships account for their operations in accordance with GAAP.

[14] While Ambase complains about this $19 million "post resolution equity adjustment," it has no problem with it being used to reduce the receivership deficit. SOI App. at 01070 (Line Item Labeled "Non-Cash Adjustments (Note 8)"). These positions are irreconcilable and both cannot be true as Ambase would have the Court believe.

> Accordingly, the reviewer should be alert to instances where assets are carried on the books at an amount that exceeds their appraised value. Furthermore, the Act requires that certain items . . . must be written off. The most prominent of these are, deferred losses on the sale of loans and goodwill.

March 1993 Revised Manual, App. 490. Carteret's goodwill was written off in 1992. Conservatorship Strategic Plan, App. 468. Therefore, there was no balance to amortize in 1995.

Finally, while the 1995 tax return indicates the FDIC did not have complete information on depreciation, there is no evidence that this information would have altered the 1995 tax liability. Accordingly, the lack of information is not a reason to revise the receivership deficit.

### 6. THERE IS NO EVIDENCE THAT MISCELLANEOUS TAX-RELATED CLAIMS SHOULD REDUCE THE RECEIVERSHIP DEFICIT

Ambase contends that this Court should reduce the receivership deficit in an amount equal to the interest and penalties related to the 1995 tax liability[15] and also to reflect the fact that approximately $3.7 million in interest paid to depositors in 1995 should have been, but allegedly was not, deducted from the 1995 tax return. SOI at 38, 46-48. With respect to the interest paid to depositors, Ambase claims that the 1995 tax return reflects that the interest was not deducted even though the financial records demonstrate the interest was paid. Id. at 37-38.

With respect to the interest on the tax claim, Ambase claims that the tax could have been and would have been timely paid if the resolution had not been delayed, thereby obviating

[15] As of December 31, 2005, Carteret had been assessed penalties in the amount of $10,363,216 and accrued interest in the amount of $53,482,421. March 31, 2006 Goodwill Financial Reporting Package, Report 3, n. [b].

interest accruals. Further, Ambase contends that the interest is invalid because Carteret cannot collect prejudgment interest on its Winstar-related claim and that the IRS will not seek to collect the interest once the tax claim is settled. Id. at 46-48. With respect to the penalties for non-payment of tax, Ambase claims that the penalties should be eliminated because Carteret cannot pay the tax until the claims of prior creditors have been paid. Id. If the IRS is also asserting a penalty for the untimely filing of the 1995 tax return,[16] Ambase claims that there was good cause based upon staffing shortages during the relevant filing periods. See SOI App. at 10455-56. As we demonstrate, Ambase's arguments do not justify reducing the receivership deficit at this stage of the proceeding.

As for the interest paid to depositors, while the 1995 tax return reflects a lesser interest deduction than the accounting records suggest was paid to depositors, the 1995 return refers to Statement 19 for details on the amount taken for the deduction. Id. at 10014. Statement 19, however, is not part of the record. Until the basis for the interest deduction, as presented in Statement 19, is disclosed for review, it is speculative to assume that the interest paid to depositors was not recognized as a deduction on the 1995 return.

As for the assessment of interest and penalties on the 1995 tax liability, the only evidence relating to the interest and penalty assessment at the present time is that the IRS has failed to respond affirmatively to the FDIC's multiple requests for tax abatement. See SOI App. at 10455-56; 10459. In spite of not responding affirmatively to the abatement of post-resolution interest and penalty claims, the IRS has agreed to waive pre-closing assessments of interest and penalties.

[16] While Ambase contends the penalty assessment relates in part to the untimely filing of the 1995 return, the evidence in the record indicates the penalty is only for the failure to pay the tax. See SOI App. at 10460-62.

See SOI App. at 10457-58. It is thus at best an open question whether the interest and penalty claims for post resolution tax liabilities will be settled. Id.

With respect to whether it is "unfair" to collect interest and penalties on the claim, as we have already demonstrated, resolving the thrift in 1993 would have resulted in fewer rather than additional proceeds, thus invalidating the claim that the interest and penalties stem from Congress's alleged failure to fund the RTC rather than actions of the receiver. Further, as we have demonstrated, not charging interest because of the unavailability of prejudgment interest is tantamount to according prejudgment interest on Carteret's claim against the United States, which is contrary to law. Saunders Dec. App. 12, ¶ 27. Only if IRS settles the tax claim against Carteret and the receivership shows a lesser deficit than now appears on the books, should this fact be brought to the Court's attention. Until that time, however, it is pure speculation to assume the IRS will waive the assessment of interest and penalties or that there will be any settlement of the tax claim against Carteret.

### 7. THE TAX RECALCULATION ADVANCED BY AMBASE IS INCONSISTENT WITH PROFESSOR CALOMIRIS'S ANALYSIS OF THE RECEIVERSHIP DEFICIT

Ambase contends that the receivership deficit should be recalculated based upon a hypothetical 1993 resolution and a recalculation of the 1995 tax liability. However, as the most cursory examination of Ambase's "recalculation" indicates, there are internal inconsistencies between Professor Calomiris's analysis of the receivership deficit and the 1995 tax "recalculation." Because of these inconsistencies, Ambase has provided no plausible basis upon which to recalculate the receivership deficit. For example:

According to Ambase, absent congressional actions and the RTC's "snap judgment" to shut down CMC, Carteret would have realized a total of $108.4 million in additional premiums ($90 million due to congressional actions and $18.4 million for CMC). SOI at 8, 21, 114. Ambase, however, makes no attempt to measure the effect of this additional income upon Carteret's tax liability.

Ambase contends that the FDIC failed to utilize $80 million in post insolvency interest deductions to offset the $85 million in taxable income reported in 1995. Id. at 32, 37. According to Ambase, however, absent the enactment of the minority preference program, Carteret would not have needed a loan from the RTC/FDIC. Id. at 17; Calomiris Dec., App. 170, ¶¶ 82-83. If there had never been a loan from the RTC/FDIC, however, there would never have been any post insolvency interest and, thus, no offset for the $85 million in taxable income. Further, the taxable income would have increased by $108.4 million if any credence is given to the but-for world created by Professor Calomiris in which the resolution occurs in December 1993.

Due to what Ambase alleges was the improper application of FFA, $21.9 million in NOLS were eliminated from the combined tax years of 1993, 1994, and 1996. However, the $21.9 million NOLs calculated by Ambase assumes that Carteret's $51.4 million of taxable income in 1993 would be offset by the $66.3 million and $6.3 million tax losses reported in 1994 and 1996, respectively. SOI at 35-36. Since Ambase argues that, absent the Congressional funding delays, Carteret would have been resolved in December 1993, the 1994 and 1996 NOLs would not have been available to offset the 1993 taxable income (i.e., under Professor Calomiris's but-for world, the receivership is fully resolved in December 1993). Id. at App. 162 Calomiris Dec. App. 148, 170 ¶¶ 52, 82-83. Ambase has failed to measure what Carteret's 1993

tax liability would have been if Carteret had received the additional $108.4 million in premium income and the 1994 and 1996 NOLs were not available to shelter that income.

Carteret's initial 1995 taxable income was $91.5 million. However, the FDIC used Carteret's 1997 net operating loss of $6.1 million to reduce 1995 taxable income to $85.4 million. SOI App. at 10160-63 (1995 Amended Return); 10193 (1997 Tax Return). If, as Ambase alleges, Carteret would have been resolved in 1993, then the 1997 NOL would not be available to offset taxable income in 1993. Ambase makes no adjustment in its "reconstruction" to account for the loss of the 1997 NOL.

Between March 10, 1995 and December 31, 2005, Carteret reported interest income of $80.9 million versus operating expenses of $55.9 million resulting in income from operations of $25 million. August 24, 2006 Goodwill Reporting Package - Statement of Operations Report. This $25 million represents additional cash available to the receivership to reduce the deficit. If Carteret had been resolved in 1993, as Ambase alleges, then this $25 million in cash would not have been available to reduce the deficit. Ambase offers no explanation as to how this $25 million in post-1995 cash would have been replaced.

Ambase contends that the FDIC failed to include $3.7 million in deposit interest expense as a deduction on the 1995 tax return and, therefore, overstated taxable income. SOI at 37-38. Since the FDIC's tax returns followed its book financial statements, the $3.7 million in additional interest expense was not accounted for in the receivership deficit either. SOI App. at 01072 (shows interest expense of a negative $6,359 for 1995). Ambase, however, has failed to account for this additional $3.7 million in its alleged reconstruction of the receivership deficit.

In short, there are obvious inconsistencies in Ambase's analysis of Carteret's alleged 1995 tax liability which obviate the reliability of Ambase's "recalculation." Further, given these inconsistencies in Ambase's tax analysis, there is no basis upon which to conclude that any tax recalculation would render Carteret's contract claim justiciable under Bailey.

### G. THERE IS NO EVIDENCE THE FDIC HAS MISALLOCATED CORPORATE COSTS TO CARTERET

Ambase contends this Court should anticipate that the receivership deficit will be inflated once the contract claim is resolved because 10 percent of the recovery, minus direct litigation costs, will be allocated to repay the FDIC-corporate the indirect costs it incurred to litigate goodwill claims on behalf of Carteret and eight other receiverships. SOI at 103-106. Ambase argues that the indirect costs should be apportioned proportionally to the direct costs and that the direct costs the FDIC expended to litigate Carteret's contract claims are less than four percent of the direct costs expended on all receivership claims. According to Ambase, if Carteret receives a substantial recovery on its contract claim (above $300 million), it will be forced to pay the indirect litigation costs of other *active* receiverships if 10 percent of the recovery is absorbed by the FDIC.[17] Id. at 106 (emphasis added).

Ambase also argues that the FDIC has provided little if any documentation to validate approximately $19 million in overhead charged to Carteret. Id. at 107; SOI App. at 01155. It contends these expenses should be scrutinized carefully and, unless further documentation is

[17] In fact, Ambase insinuates that the FDIC could also use an award to "reimburse the Government for indirect goodwill litigation expenses for *inactive* goodwill receiverships" despite the FDIC having already written off all of the indirect expenses allocated to these inactive receiverships. SOI at 106, n. 36; SOI App. at 40002. Ambase cites absolutely no evidence to support this accusation and, as such, it should be disregarded.

forthcoming, not be allowed to increase the receivership deficit. Id. Finally, Ambase claims that a "contracting hub" established by the RTC, which operated out of Carteret's headquarters, benefitted 19 receiverships, yet all the occupancy expenses related to the facility were charged to Carteret alone. SOI at 107-08. According to Ambase, "this episode illustrates the need to examine the methods employed by the FDIC to estimate and allocate administrative expenses to Carteret." Id. at 108. Although Ambase purports to identify costs the FDIC will attempt to charge to Carteret which should be charged to other receiverships, in fact, the evidence does not establish that the FDIC has attempted to allocate any costs to Carteret alone which were caused by other receiverships. Ambase's contention that the receivership deficit should be reduced to reflect these alleged costs lacks merit.

First, with respect to the allocation of indirect litigation costs, Ambase dislikes the 10 percent allocation methodology and, instead, believes these indirect litigation costs should be allocated in proportion to direct litigation costs. Id. at 103-07. Ambase does not point to any accounting convention that requires this and we are aware of none. Instead, Ambase simply opines that it believes that the 10 percent methodology might be unfair because all of the indirect expenses might be underwritten by Carteret if it receives a substantial recovery on its contract claim even though Carteret gave rise to less than four percent of the direct litigation costs for receivership goodwill claims.

Should Carteret receive a substantial recovery (in excess of $300 million) on its contract claim, as Ambase points out, the possibility exists that it will pay the indirect litigation costs of other *active* receiverships as well as its own. However, it is equally true that, if the contract claim is dismissed, Carteret will pay none of the indirect litigation costs even though it caused

some of these costs. Further, if another currently active receivership receives a large recovery before Carteret, 10 percent of that recovery might eliminate the indirect costs on the FDIC's books, thereby allowing Carteret to forego paying any indirect litigation costs. Because there is no reason to believe, ex ante, that any receivership, including Carteret, is either advantaged or disadvantaged by the FDIC's method of allocating these costs, there is no merit to the claim that the allocation methodology prejudices Carteret at the expense of other receiverships.[18]

Second, with respect to the allocation of the FDIC general corporate overhead to manage the receiverships, Ambase contends that the FDIC has not provided documentation to specify the precise costs. This is untrue. In a footnote to the 2004 Statement of Operations for the Carteret receivership, approximately $19 million identified as "indirect costs" is explained as follows:

> FDIC personnel, assigned to FDIC's field marketing staffs and field offices, are responsible for the asset management and financial transactions generated from multiple receiverships assigned to the location. Therefore, each receivership incurs indirect liquidation cost in addition to costs charged directly. Such indirect costs include employee benefit, occupancy, and other receivership operating expenses. Indirect expenses are allocated and billed to active receiverships based upon liquidation activity as reflected, primarily, by each receivership's direct and indirect salary charges. Other

[18] While Ambase claims that the direct costs incurred by the FDIC to litigate Carteret's goodwill claim were less than four percent of the total direct litigation costs, this is incorrect. In fact, the FDIC expended approximately 12 percent of such costs on Carteret, not less than four percent (the four percent relates to the percentage of total costs the FDIC expended on 42 receiverships and not the nine that remain active). See SOI App. at 40001-08. Thus, even if Carteret absorbs all indirect litigation costs, which only includes costs allocable to the remaining active receiverships, it will not have done so without having incurred a substantial percentage of direct costs of the active receiverships as well. Thus, there is no persuasive evidence that the indirect costs will be improperly allocated if the 10 percent methodology is employed by the FDIC and results in a payoff of most indirect litigation costs as a result of a recovery by Carteret on the contract claim.

> indirect, Corporate level costs directly related to the liquidation program (such as information processing, occupancy expenses, and management costs) are aggregated on a national basis and are also billed to receiverships on the basis of the receivership's activity as reflected by direct and indirect salary charges.

SOI App. at 01156. The nature of the FDIC's overhead costs is clearly specified. Moreover, the methodology for allocating the general overhead to the beneficiary receiverships is precisely the same as Ambase claims to favor with respect to indirect litigation costs. Not only does Ambase fail to demonstrate that general overhead expenses have not been documented, but the allocation of general overhead appears to coincide with the method it advocates for the allocation of indirect litigation costs to the various receiverships.[19] Id.

Finally, Ambase complains that, for the last quarter of 1993, the RTC charged $21,000 in office occupancy expense for a contracting hub, whereas none of the office occupancy expenses were allocated to other receiverships that allegedly benefitted from the hub. SOI at 108-109. The total estimated cost for the contracting hub (occupancy expenses and other general expenses) in the last quarter of 1993 was $173,000. Of this amount, $51,000, or 29 percent of the total, was allocated to other receiverships. The FDIC's financial statement discloses that office occupancy expenses were charged to Carteret alone because the costs would have been incurred in the

---

[19] As Mr. Vortreide testified, it was the FDIC's policy for tax reporting to be consistent with book reporting. SOI App. at 00992 (Vordtreide Dep. Tr. at 294, 296). As such, the $19 million in indirect costs that Ambase complains of would have also been deducted as an expense on Carteret's tax return. The reason Ambase does not object to this expense being deducted for tax purposes is simple. Since the $19 million deduction helped reduce the 1995 taxable income and contributed to the NOL created in 1996, it helps Ambase's argument that there would have been no taxable income in 1995. This is yet another example of the inconsistencies inherent in Ambase's arguments.

absence of the contracting hub. SOI App. at 10026-27. Therefore, the reason for the allocation was disclosed and is based upon the continuing nature of the costs with or without the contracting hub.

Even if it would have been preferable to allocate some of the occupancy expenses to other receiverships in recognition that other receiverships benefitted form the hub, only approximately 29 percent would have been so allocated because this was the percentage of other costs related to the hub allocated generally to other receiverships. Thus, instead of Carteret absorbing $21,000 in the quarter for occupancy costs, it would have absorbed approximately $15,000 in the quarter. Thus, the "misallocation" consists of approximately $6,000. Given that Carteret was paying occupancy costs anyway and that the occupancy costs attributable to other receiverships were small, the RTC was perfectly justified in failing to allocate a fraction of the expense to the other receiverships. See, e.g., Citibank v. Nyland, 1990 WL 138958 S.D.N.Y. , 1990 (a receiver's expense allocations, if disclosed and based upon reasonable cause, should not be disturbed). Accordingly, Ambase's contentions concerning the misallocation of indirect litigation costs and contracting hub occupancy costs lack merit

## IV. THIS COURT LACKS JURISDICTION TO ENTERTAIN THE CONSTITUTIONAL CHALLENGES AND THEY ARE INVALID

Ambase contends that the minority preference program violates the Fifth Amendment's Due Process Clause because the evidence fails to demonstrate a compelling national interest to increase diversity in the ownership of financial institutions and the provision was not narrowly tailored to meet this objective. SOI at 74-103. Further, Ambase contends that Congress's alleged failure to fund the RTC at an adequate level constitutes a regulatory taking of its property

interest in a potential liquidation surplus without just compensation. Id. at 8-9, 74. As we demonstrate, this court lacks jurisdiction over the due process challenge and Ambase lacks standing to contest the constitutionality of the minority preference program or the level of Congress's funding of the RTC. Further, even if these programs were subject to judicial review, the evidence demonstrates a strict adherence to constitutional requirements.

### A. THIS COURT LACKS JURISDICTION OVER THE DUE PROCESS CHALLENGE

It is hornbook law that this Court "is a court of 'limited jurisdiction.'" Hanford v. United States, 63 Fed. Cl. 111, 118 (2004), aff'd, 154 Fed. Appx. 216 (Fed. Cir. 2005) (quoting United States v. King, 395 U.S. 1, 3 (1969)). This Court has jurisdiction over a claim only if a claimant makes a non-frivolous allegation that he is "entitled to money from the United States because a statute or regulation grants him that right," or because a contract or constitutional provision creates an equivalent right. Ralston Steel Corp. v. United States, 340 F.2d 663, 667 (1965); see also Stephenson v. United States, 58 Fed. Cl. 186, 192 (2003) ("[W]e are not empowered by Congress to recognize '*every* claim [against the United States] involving or invoking the Constitution, a federal statute, or a regulation.' Rather, [we] may only hear claims seeking primarily *monetary relief* against the United States government based upon 'money-mandating' provisions of the Constitution, acts of Congress, or executive regulations, to which the plaintiff alleges a specific entitlement." (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (1967) (emphasis added) (footnote and citations omitted)).

Ambase contends that Carteret is entitled to a reduction in the receivership deficit because the minority bidding rules administered by the RTC violated its right to due process

under the Fifth Amendment. However, as with Ambase's tort and breach of fiduciary duty claims, this Court lacks jurisdiction to entertain Ambase's due process claim. As the Court of Appeals for the Federal Circuit has made clear, the Court of Federal Claims does "not have jurisdiction over money claims that are based upon an alleged violation by the government of the due process clause . . . because the due process clause does not obligate the government to pay money damages." Collins v. United States, 67 F.3d 284, 288 (Fed. Cir. 1995); see also Sumter v. United States, 61 Fed. Cl. 517, 524 (2004) ("[T]his court is not vested with jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to hear [Fifth Amendment due process] claims."). Accordingly, this court lacks subject matter jurisdiction over Ambase's due process claim.

## B. **AMBASE LACKS CONSTITUTIONAL STANDING**

As the Court of Appeals for the Federal Circuit has noted, a party seeking to litigate a claim must demonstrate that it has "'personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . .' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be addressed by a favorable decision.'" First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1179, 1290 (Fed. Cir. 2000), (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979), and Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38 (1976)). Further, the injury must be "'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" Adarand Constructors, 515 U.S. at 211, (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Unless a claimant can satisfy these requirements, it fails to present a "case or controversy" under Article III of the Constitution. Hartford Corp., 194 F.3d at 1290.

Contrary to these requirements, Ambase has failed to demonstrate a concrete and particularized legally protected interest that it suffered or could suffer as a result of Congress's alleged failure to fund the RTC or because of the minority preference program. With respect to the alleged failure to fund the RTC, as we have demonstrated, Ambase suffered no deposit premium injury because of the timing of the resolution. As Professor Saunders has noted, the average deposit premium was much higher in 1994 and 1995 than it was in 1993.

Further, even if Carteret could have received greater proceeds from an earlier resolution, Ambase has cited no authority, and we are aware of none, that creates a "legally protected interest" in a particular level of public funding to ensure the successful resolution of an insolvent thrift. By definition, no entity has a "particularized interest" in public funding or the timely resolution of an insolvent thrift. As the Federal Circuit has noted in analogous circumstances, "[t]o suggest that a court should undertake an inquiry into whether Congress, in [legislating a ] fee . . . , did its sums correctly, is to invite an intrusion of the judiciary into the work of Congressional committees and staff, and into the minds of Congress itself, which would be nothing but an invitation to mischief." Longshore v. United States, 77 F.3d 440, 444 (Fed. Cir. 1996). Thus, it is not the Court's place to question the level of funding Congress deems appropriate for particular programs and, therefore, there is no "legally protected interest" in congressional funding of the resolution process for insolvent thrifts. Id.

Likewise, Ambase has failed to demonstrate an "injury" to any "particularized legal interest" as a result of the minority preference program. While Ambase argues that it has a "particularized legal interest" in a potential liquidation surplus from the resolution of Carteret, it cites no authority, and we are aware of none, that this contingent right to share in the surplus,

assuming there is a surplus, constitutes a "particularized legal interest." Indeed, Ambase was not even a bidder but simply the stockholder of Carteret. Given the fact that Ambase was not an actual or potential bidder for Carteret's assets, it lacks the requisite "particularized interest" to challenge the bidding rules for those assets. Cf. Alfa Laval Separation v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (a party has no standing to challenge bidding procedures if it is not a plausible candidate for the contract); Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001) (an "interested party" is one who "is an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by the failure to award the contract)."

Further, even assuming Ambase could qualify as an interested party because of a contingent interest in Carteret's resolution surplus, unless the minority preference program injured Carteret, it did not and could not have injured Ambase. As we have already demonstrated, however, the enlargement of the potential bidding universe through the minority preference program tended to increase rather than reduce the number of bids and there was little if any loss as a result of offering the deposits without offering performing conventional mortgage loans as well. Saunders Dec. App. 42A-42F ¶¶ 85-92. Further, there was more value in offering the thrift through branch clusters than there would have been as a whole bank. Id. Therefore, the minority preference program did not give rise to "actual or threatened injury," and Ambase lacks standing. Gladstone Realtors, 441 U.S. at 99.

C. **THE ALLEGED FAILURE OF FUNDING WAS NOT A "TAKING"**

As the Federal Circuit has noted: "In analyzing a takings claim, a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1996). Ambase claims the alleged failure to fund the RTC "took" its contingent interest in a potential liquidation surplus because the recovery would have been greater had the thrift been resolved at an earlier time. However, it is well established that laws which result in assessments against property do not "take" property within the meaning of the Fifth Amendment. Id. at 1576-77 ("even though taxes or special municipal assessments indisputably 'take' money from individuals or businesses, assessments of that kind are not treated as per se takings under the Fifth Amendment"). In effect, Ambase argues that Congress's failure to fund the RTC resulted in an assessment against the value Carteret could have realized from an earlier resolution. Under the holding of Branch, however, such an "assessment" is not a taking. See, e.g., United States v. Sperry Corp., 493 U.S. 52, 62. n. 9 (1989) (a congressionally mandated deduction from the sums awarded by a claims tribunal cannot be characterized as a physical appropriation of property); Meriden Trust & Safe Deposit Co., v. FDIC, 62 F.3d 449, 455 (2nd Cir. 1995) (per se takings analysis is inapplicable to congresssional imposition of monetary liability); Atlas Corp. v. United States, 895 F.2d 745, 756 (Fed. Cir. 1990) ("Requiring money to be spent is not a taking of property").

Further, as the Federal Circuit has observed, it is necessary to "pinpoint what step in the sequence of events resulting in the [alleged taking of the contingent property interest in the liquidation surplus] . . . constituted conduct that the government could not engage in without paying compensation." Branch, 69 F.3d at 1575. According to Ambase, it was Congress's

failure to fund the RTC that resulted in harm to Carteret. This suggests that Ambase had a property interest in congressional appropriation decisions that was "taken" when the funds Ambase contends should have been advanced were not spent. As the Federal Circuit has observed, however, "no one is considered to have a property interest in a rule of law." Id. at 1577-78. Indeed, "'if every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever.'" Id. (quoting Lon Fuller, The Morality of Law 60 (1964)).

In advocating the existence of a property right in a congressional appropriation, however, Ambase in effect contends that it is not within the exclusive purview of Congress to determine how to spend public funds. This is simply wrong. As the Federal Circuit has noted: "Congress has undoubted capacity to oversee the performance of Executive Branch agencies, consistent with its constitutional authority. It is not for this court to instruct Congress on how to oversee and manage its creations." Longshore, 77 F.3d at 443. Id. Thus, the decision on how to fund the RTC was Congress's alone and Ambase has no constitutional basis upon which to challenge the pace of the resolution.

With respect to Ambase's due process claim, as we have demonstrated, this Court lacks subject matter jurisdiction and Ambase lacks standing. If this Court should decide to entertain the claim, however, we would request a further opportunity to brief the question of whether the minority preference program is consistent with due process and relevant Supreme Court authority at a subsequent time. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. at 224 (strict scrutiny is the standard to be applied to classifications based upon race); Rothe Dev. Corp. v.

Department of Defense, 262 F.3d 1306, 1318-20 (Fed. Cir. 2001) (applying strict scrutiny standard to Department of Defense bidding rules).

While we are not aware of any Court that has upheld a challenge to the minority preference program and that the contemporaneous data appears to demonstrate a compelling national interest in expanding minority ownership in the financial services industry, a full briefing of the issue is only necessary if this Court accepts jurisdiction and Ambase's standing. We believe this will not be the case and, therefore, defer until a later time full briefing on the issue. If this Court accepts jurisdiction and standing, we respectfully respect an opportunity to provide a supplemental brief addressing the merits of Ambase's challenge to the minority preference program as administered by the RTC.[20]

CONCLUSION

For these reasons, the order granting Ambase's motion to define the measure of Carteret's receivership deficit should be reconsidered and Ambase's First Amended Complaint should be dismissed. In the alternative, the Court should certify the order for interlocutory review.

---

[20] Notwithstanding Ambase's contention that there was no evidence before Congress to support the program, when Congress enacted the program minorities were grossly under-represented as owners of financial institutions. For example, as Congressman Mfume observed on the floor of the House of Representatives: "Only one percent of the financial institutions in the United States are owned by minorities." 139 Cong. Rec. H10897-02, 1993 WL 48936 at *8.

Respectfully submitted,
STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

/s/ William F. Ryan
WILLIAM F. RYAN
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-307-0309

OF COUNSEL:

TIMOTHY ABRAHAM
ARLENE PIANKO GRONER
MELINDA HART
F. JEFFERSON HUGHES

Date: August 30, 2006

# EXHIBIT I

**EXHIBIT**

**ANALYSIS OF PROFESSOR CALOMRIS'S CALCULATION OF CARTERET'S RELATIVE FINANCIAL HEALTH AND THE EXPECTED DURATION OF ITS RESOLUTION IN A BUT-FOR WORLD**

Purporting to rely upon the FDIC's Failure Transaction Database, Professor Calomiris estimates that, in a but-for world in which sufficient funding was available to the RTC to resolve insolvent thrifts, Carteret would have been resolved in 365 days rather than the 826 days it actually took in the real world. Professor Calomiris believes Carteret was a "relatively healthy" thrift compared to other thrifts that were resolved between 1980 and 2004. As we demonstrate however, Professor Calomiris's estimates of the financial condition of Carteret relative to other thrifts resolved between 1980 and 2004 and the magnitude of alleged delays in Carteret's resolution are erroneous and highly speculative.

First, Professor Calomiris presents an untenable and misleading assessment of Carteret's financial health at the time of failure by his selective and inappropriate use of three purportedly "key measures" of financial performance. Second, Professor Calomiris's attempted use of a simple average to predict Carteret's resolution time in a but-for world must be rejected as it is based upon an artificially limited sub-sample that ignores the actual factors that affect and determine a thrift's resolution time. Third, his linear regression analysis in Figure 2, July 14 Calomris Dec. ¶ 81, App. 167, involves such a small sub-sample of thrifts and limited number of observational factors, that no inferences of any value can be drawn from the results. Finally, the data tables relied upon by Professor Calomiris are at best unreliable, at worst incomprehensible, and do not support the analyses and ultimate conclusions that he seeks to extract from them.

### A. Professor Calomiris's Estimate Of Carteret's Relative Financial Health Is Incorrect And Misleading

To assess "Carteret's relative position at the time of failure," Professor Calomiris compiles three purportedly "key measures of financial health" using an ever changing sub-sample of failed thrifts from 1984 through 2005. July 14 Calomiris Dec. ¶ 67, App. 157. He summarizes this data in Table 5, App. 158, which provides the following financial comparisons:

- Past Due and Nonaccrued Loans / Total Loans
- Net Income / Total Assets (i.e., Return on Assets or ROA)
- Interest Expense / Total Deposits

See July 14 Calomiris Dec. ¶67, Table 5, App. 157-158. Each of the above comparisons is based upon financial data from the single quarter preceding a thrift's failure date. The population set for Table 5 consists exclusively of failed thrifts for which Professor Calomiris claims Thrift Financial Report data was available.

Since Professor Calomiris submitted his original declaration on May 19, 2006, the data and related analyses associated with Table 5 have continually changed in significant and incomprehensible ways. Professor Calomiris presented his first changes to Table 5 in the corrected declaration he submitted on May 24, 2006. However, during his deposition, Professor Calomiris produced a new version of Table 5 (Exhibit 11 to the deposition) "to help show how the conclusions of Table 5 are robust to [sic] anyway you slice or dice it." Calomiris Dep. Tr. at 573, 586-87, App. 247A-247C. Nevertheless, Professor Calomiris's revisions to Table 5 continued even after these purportedly "robust" Exhibit 11 revisions. Indeed, significant additional changes were made to his Table 5 data in his corrected declaration dated July 14, 2006. Id. While the explanations provided by Professor Calomiris cannot explain all the

changes, they clearly demonstrate the unreliability of his underlying (and undisclosed) Table 5 calculations.

### 1. Table 5 Calculations Have Changed Significantly And Repeatedly

Each and every "key measure" presented in Table 5 from Professor Calomiris' original declaration dated May 19, 2006, has changed substantially. The following tables illustrate these changes with respect to the 1990 through 1995 period:

| Number of Institutions Included in Professor Calomiris's Table 5 "*Past Due and Nonaccruals/Total Loans*" Calculation | | | | |
|---|---|---|---|---|
| | May 19th Declaration | May 24th Declaration | Deposition Exhibit 11 | July 14th Declaration |
| 1990 | 508 | 328 | 122 | 88 |
| 1991 | 362 | 121 | 136 | 86 |
| 1992 | 63 | 53 | 60 | 28 |
| 1993 | 56 | 13 | 2 | 3 |
| 1994 | 53 | 5 | 2 | 0 |
| 1995 | 8 | 4 | 1 | 2 |

| Number of Institutions Included in Professor Calomiris's Table 5 "*ROA and Interest Expense/Deposits*" Calculation | | | | |
|---|---|---|---|---|
| | May 19th Declaration | May 24th Declaration | Deposition Exhibit 11 | July 14th Declaration |
| 1990 | 508 | 328 | 207 | 156 |
| 1991 | 362 | 121 | 136 | 86 |
| 1992 | 63 | 53 | 60 | 28 |
| 1993 | 56 | 13 | 6 | 3 |
| 1994 | 53 | 5 | 2 | 0 |

| Number of Institutions Included in Professor Calomiris's Table 5 "*ROA and Interest Expense/Deposits*" Calculation | | | | |
|---|---|---|---|---|
| | May 19th Declaration | May 24th Declaration | Deposition Exhibit 11 | July 14th Declaration |
| 1995 | 8 | 4 | 2 | 2 |

| Professor Calomiris's Table 5 Calculation of "*Past Due and Nonaccruals/Total Loans*" | | | | |
|---|---|---|---|---|
| | May 19th Declaration | May 24th Declaration | Deposition Exhibit 11 | July 14th Declaration |
| 1990 | 9.053% | 8.622% | 7.731% | 14.267% |
| 1991 | 10.415% | 6.037% | 6.016% | 10.982% |
| 1992 | 6.813% | 5.674% | 6.067% | 10.882% |
| 1993 | 12.556% | 3.787% | 4.271% | 10.061% |
| 1994 | 14.619% | 3.532% | 5.567% | NA |
| 1995 | 5.003% | 5.842% | 10.252% | 20.337% |

| Professor Calomiris's Table 5 Calculation of "*ROA*" | | | | |
|---|---|---|---|---|
| | May 19th Declaration | May 24th Declaration | Deposition Exhibit 11 | July 14th Declaration |
| 1990 | -5.067% | -5.262% | -2.035% | -2.142% |
| 1991 | -4.916% | -1.848% | -0.571% | -0.527% |
| 1992 | -1.410% | -1.111% | -0.974% | -0.848% |
| 1993 | -7.483% | -0.112% | 0.128% | 0.325% |
| 1994 | -3.429% | -2.504% | -3.776% | NA |
| 1995 | -1.042% | 0.005% | -0.322% | -0.322% |

| Professor Calomiris's Table 5 Calculation of "*Interest Expense/Deposits*" | | | | |
|---|---|---|---|---|
| | May 19th Declaration | May 24th Declaration | Deposition Exhibit 11 | July 14th Declaration |
| 1990 | 4.130% | 4.270% | 1.977% | 1.993% |
| 1991 | 3.800% | 3.893% | 1.821% | 1.824% |
| 1992 | 6.720% | 2.914% | 1.461% | 1.516% |
| 1993 | 3.222% | 2.351% | 1.072% | 1.173% |
| 1994 | 1.517% | 2.107% | 1.030% | NA |
| 1995 | 31.613% | 2.035% | 1.168% | 1.176% |

As noted above, one of the more dramatic changes was the 1995 reported measure of interest expense divided by deposits, which dropped significantly from 31.613 percent per Professor Calomiris's May 19, 2006 declaration to 1.176 percent per the July 14th corrected declaration. However, this is only one example of the numerous changes reflected in his reports and documented above.

To explain these dramatic and significant changes in his Table 5 data, Professor Calomiris stated in his deposition that the initial Table 5 calculations included improper comparisons of thrift financial data. More specifically, when thrifts in any given year failed at different times of the year, their respective year to date financial data was improperly compared without adjustment. Calomiris Dep. Tr. at 572-73, App. 247A-247B.

To illustrate, if one thrift failed in April 1990, while another failed in October 1990, income statement data such as net income or interest expense was simply compared despite the fact that one thrift's data was based upon four months of income and expense while the other was based upon ten months. Such a comparison, of course, is not only nonsensical, but provides a

distorted picture of relative financial performance. Professor Calomiris explained that his revisions to Table 5, as presented in Exhibit 11 of his deposition, were adjusted to correct for this error. Since Professor Calomiris has never disclosed the specific financial data upon which his Table 5 calculations are derived, we must presume that the exclusion of thrifts failing during the course of any given year accounts for the initial drop in the total number of thrifts tabulated each year in Exhibit 11. Nevertheless, given Professor's Calomiris's admission during his deposition that he was "not really sure" about the reduced number of thrifts included in his Table 5 revisions presented in Exhibit 11, we can only speculate. Calomiris Dep. Tr. at 584-85.

However, the selection criteria for thrifts, included in Table 5 of his second corrected report dated July 14, 2006 appear to have changed yet again. In this most recent iteration of Table 5, Professor Calomiris states that his "key measures" of financial health are based upon the financial data from the single quarter immediately preceding a thrift's failure date. Although this concept was used in his revisions presented in Exhibit 11, for unknown reasons, the total number of thrifts and every "key measure" except one, has since changed in this latest iteration of Table 5. See Calomiris Dec. ¶ 67, Table 5, App 157-158. Thus, Professor Calomiris's numerous and significant changes to Table 5 demonstrate the unreliability of Table 5 and its underlying calculations. This unreliability also explains Professor Calomiris's failure to disclose in his declaration the financial data and calculations supporting his frequent and significant changes to Table 5.

One of the more baffling revisions to Table 5 includes the changes to Carteret's "key measures." Because Carteret's income and expense numbers, as well as its failure and resolution dates, could not have changed during the various iterations of Table 5, the explanation provided

by Professor Calomiris at his deposition does not account for these changes to Carteret's numbers, which are as follows:

**``Carteret Numbers Per Table 5 Presented In Professor Calomiris's May 19, 2006 Declaration and Corrected Declaration Dated May 24, 2006**

| Carteret | Number of Thrifts | Past Due and Nonaccruals / Total Loans | Return on Assets (ROA) | Interest Expense / Deposits |
|---|---|---|---|---|
| 1992 | 1 | 4.447% | 0.189% | 3.829% |

Calomiris Report (May 19, 2006 and May 24, 2006), Page 40, Table 5, App. 620 .

**Carteret Numbers Per Exhibit 11 Presented At Professor Calomiris's Deposition**

| Carteret | Number of Thrifts | Past Due and Nonaccruals / Total Loans | Return on Assets (ROA) | Interest Expense / Deposits |
|---|---|---|---|---|
| 9/30/92 | 1 | 4.447% | 0.069% | 1.129% |

Deposition of Professor Calomiris, Exhibit 11, Page 1, App. 621.

**Carteret Amounts Per Table 5 Presented In Professor Calomiris's Second Corrected Report Dated July 14, 2006**

| Carteret | Number of Thrifts | Past Due and Nonaccruals / Total Loans | Return on Assets (ROA) | Interest Expense / Deposits |
|---|---|---|---|---|
| 1992 | 1 | 8.310% | 0.069% | 1.168% |

Calomiris Report (July 14, 2006), Page 41, Table 5.

These significant and perplexing changes only further demonstrate the unreliability of Table 5. Consequently, Table 5 and its underlying (and undisclosed) calculations cannot reasonably substantiate Professor Calomiris's conclusions regarding Carteret's "relative position at the time of failure."

**2. Financial Ratios Must Be Analyzed In the Context Of Appropriately Comparable Numbers**

In calculating the three "key measures" included in Table 5 of his second corrected report dated July 14, 2006, Professor Calomiris bases his calculations solely upon a thrift's financial

data from the single quarter preceding a thrift's failure date. Notwithstanding the baselessness of assuming that a single quarter of financial data is a reasonable basis for assessing absolute and comparative financial health, Professor Calomiris proceeds to make general conclusions about Carteret's financial health relative to a sub-sample of "thrifts failing in 1992 and over the entire [Table 5] period, i.e. from 1984-2005." July 14 Calomiris Dec. ¶ 67, App. 157. However, it is inappropriate and untenable to draw such sweeping conclusions about Carteret, individually and in comparison to other thrifts, over a multiple year period based upon financial data from a single quarter.

Instead, a proper analysis of financial health must be based upon trends in financial data. Otherwise, unusual or seasonal variations in financial performance will not be detected, resulting in distorted measurements and a misleading analysis. Such distortions are fatal to any comparative analysis between different entities. To illustrate, notwithstanding the existence of numerous other financial ratios that in tandem could present a more complete financial picture of Carteret and the other failed thrifts included in his analysis, Professor Calomiris selects a single profitability ratio, Return on Assets, and two other self-termed "key measures" from a single quarter as a de facto gauge of Carteret's financial health relative to other thrifts that failed over a 20-year period. See Saunders Dec., ¶¶ 50-52, App. 24-26.

By limiting Carteret's "key measures" to a single quarter in 1992, Professor Calomiris conveniently highlights a quarter when Carteret had a small amount of net income of $3.3 million. However a simple review of Carteret's financial data from his selected quarter in 1992, and the two preceding years, discloses a different and more accurate picture of Carteret's true financial performance and health. Cartret had annual losses of -$131.8 million and -$160.3

million in 1990 and 1991, respectively. See June 15, 1992 Report of Examination, Page A-6.2, App. 452A. Similarly, Carteret's return on average period assets for the twelve month period ending December 31, 1990 and 1991 was -2.2 percent and -3.0 percent, respectively, which is substantially lower than Carteret's return on end of period assets for the single 1992 quarter selected by Professor Calomiris. Moreover, the return on average assets for an OTS designated "peer" group of thrifts was -0.9 percent in 1990 and -0.1 percent in 1991, which is better than Carteret's return on average period assets for these years. Id. at A-7.1, App. 452B.

As Professor Saunders points out in his declaration, Carteret's small amount of net income for 1992 was "in part due to funding support and subsidies provided by bank regulatory bodies such as the FHLB[B] and the RTC," which lowered its interest expense, improved its interest margin and had a positive effect upon income. Saunders Dec. at ¶49. Regulators made the same determination and reported in Carteret's 1992 Report of Examination ("ROE") that net income of $4.7 million for the five month period ending May 31, 1992 was due to "improved net interest margins, lower loss provisions and reduced operating expenses." June 15 1992 ROE at 2, App. 420.

Moreover, the reason that the loss provisions were lower in 1992 was because Carteret recorded a staggering $125 million and $170.8 million in loan loss provisions in 1990 and 1991, respectively. Id. at 29, App. 447. The regulators also noted that the improvement in Carteret's net interest margin was not a reflection of Carteret's financial health, but rather was due in part to the "favorable interest rate environment," which could change at any moment. Id. Professor Calomiris makes no attempt to account for the different interest rate environments that would have impacted the profitability of the thrifts he is comparing to Carteret. Thus, Professor

Calomiris's conclusion that Carteret "was one of the . . . healthiest institutions resolved between 1980 and 2004" simply glosses over the fact that Carteret incurred nearly $300 million in loan losses in the two years prior to seizure and fails to control for a key variable - interest rates - that affects the profitability of a thrift. July 14 Calomiris Dec. ¶73, App. 162. Indeed, the magnitude of Carteret's loan losses alone clearly indicates that Carteret was not a healthy institution, and it further demonstrates the significant asset quality problems faced by Carteret.

Thus, Carteret's small amount of quarterly income of $3.3 million in the quarter prior to failure was not an indicator of relative financial health. In fact, regulators noted in Carteret's 1992 ROE that, "[n]otwithstanding the improvement noted in operations, Carteret's viability is in serious doubt without a sufficient equity capital infusion." June 15, 1992 ROE at 2, App. 420. As Professor Saunders explains:

> [I]f Professor Calomiris had expanded his search to include other key financial ratios, Carteret would not have appeared to be "in a stronger position than a typical failed thrift.". . . Specifically, Carteret' s tangible capital ratio, which is the litmus test of financial health, was *negative,* with a tangible capital to tangible assets ratio of -1.29%, as shown in Exhibit 7 [of this declaration]. .. A better measure of Professor Calomiris's "typical" unhealthy bank would be the median of his sample. In this case, for failures in 1992, the median was -0.73%. Thus, Carteret had a tangible capital ratio that was worse than that of the median unhealthy bank one quarter prior to failure. In addition, Carteret' s core capital to adjusted tangible asst ratio of -0.29% was also slightly below the median of -0.28%, as shown in Exhibit 8 [of this declaration].

Saunders Dec. ¶ 51, App. 25-26 (internal citations omitted).

Carteret's poor tangible capital, as well as its less favorable financial measures, are simply ignored by Professor Calomiris' highly selective and ever changing Table 5 calculations. Nevertheless, he expects this Court to simply dismiss Carteret's financial performance (and that

of all the other thrifts included in his Table 5 analysis) beyond a single quarter, and accept his unsubstantiated, yet sweeping, conclusion that Carteret was "one of the . . . healthiest institutions resolved between 1980 and 2004." July 14 Calomiris Dec. ¶ 73, App. 162.

### 3. Table 5 Cannot Support Professor Calomiris's Conclusions As To Carteret's Asset Quality Relative To Other Thrifts

Based upon Table 5, Professor Calomiris concludes that "Carteret had a sound financial structure (better than average asset quality as shown in Table 5) relative to other failed institutions of the era, which would have made it relatively attractive to acquirers, and which would have expedited its sale." July 14 Calomiris Dec. ¶ 68, App. 159. However, contrary to this assertion, Table 5 does not, and cannot, provide a reasonable assessment of Carteret's asset quality, or that of any other thrift included in Table 5.

Return on assets or ROA, which he calculates as income divided by total assets, cannot detail an institution's asset mix or indicate how profits are being generated. For example, if net income was identical for two thrifts but the profits from one were the result of a non-recurring accounting adjustment that masked poorly performing assets, while net income from the other was the result of evenly dispersed profits generated by a high quality loan portfolio, the ROA ratio would not reveal the deficiencies in asset quality present in the first thrift. When considered in tandem with Professor Calomiris's other two "key measures" of financial health, a more accurate picture of asset quality is still not reliably achieved by Table 5.

Significantly, Professor Calomiris excludes any meaningful measure of Carteret's real estate owned assets, which caused significant exposure for the institution in the quarter prior to its failure. As Professor Saunders explains:

> [S]ince Carteret was heavily reliant on real estate assets at the time of its failure, Professor Calomiris should have examined a measure of non-performing assets that included real estate exposure. Importantly, later in his report while generating his hypothetical cost of Carteret's preferred stock, he says: "The ratio of non-performing assets to total assets was calculated in this context as the sum of nonaccrual loans plus REO divided by total assets.". . . If one looks at this ratio for Carteret and for the other 28 unhealthy thrifts one quarter prior to failure, one finds that Carteret's ratio compares unfavorably to the rest of the group (indicating that Carteret was less healthy than other failed thrifts). As shown in Exhibit 9 [of this declaration], Carteret's ratio was equal to 7.00%, which was higher than both the mean (6.92%) and median (5.94%) of the group of thrifts [selected by Professor Calomiris] plus Carteret.

Saunders Dec. ¶ 52, App. 26. Gloria Maligaya, an RTC Operations Specialist who worked regularly with failed institutions, stated during her deposition that:

> [h]aving seen some of the conservatorships that went under because of other things rather than operational, in resolving a bank, it's REOs that will take longer. . . if there's bad REOs, that takes longer to turn around.

Deposition of Gloria Maligaya at 86-87, App. 629-630. Consequently, Professor Calomiris' exclusion of REO assets fatally undermines the utility of his analysis.

In Carteret's September 1992 Report of Examination, notwithstanding Carteret's small amount of net income, the following observations were made concerning asset quality:

> [T]he problems facing Carteret have stabilized since the June 17, 1991 examination, when a composite '5' was assigned , however, **significant asset quality and regulatory capital problems persist**.

June 15 1992 ROE at 2 (emphasis added), App. 420. Thus, Professor Calomiris's simplistic ratio analysis in Table 5, which is based upon a few bits of selective financial data from a single quarter, does not, and cannot, accurately reflect Carteret's significant asset quality problems. However, a potential bidder or acquirer would certainly be aware of these infirmities in Carteret's financial profile, thus making the resolution of Carteret a more difficult and lengthier matter.

**B. Professor Calomiris's Calculation Of An Average 365-Day Resolution Time For Carteret In The But-For World Is Statistically Unsound And Ignores The Actual Factors Affecting A Thrift's Resolution Time**

Using the FDIC's failure transaction database, which is a listing of failed financial institutions and accompanying financial information from 1980 through 2005, Professor Calomiris calculates a simple average resolution time for a very small and specially selected sub-sample of thrifts. Professor Calomiris's only criterion for selecting his thrift sub-sample is asset size at the time of failure, and no other criteria such as failure date, financial condition, or operational complexity is considered in choosing this sub-sample. Nevertheless, based upon this selective sub-sample of purportedly "peer" thrifts -- a group consisting of a mere 10 thrifts out of an alleged population of 2,989 failed thrifts and banks from 1980 through 2004 -- he makes the sweeping conclusion that Carteret's resolution period in the but-for world would equal 365 days.

As we demonstrate below, Professor Calomiris's calculation of a 365-day average resolution time for Carteret is statistically unsound and easily manipulated. Moreover, Professor Calomiris's simple average calculation is an inappropriate basis for assessing a thrift's resolution period, because it ignores the actual factors that affect and determine a thrift's resolution time.

**1. Professor Calomiris's Estimate of a 365-Day Average Resolution Time For Carteret Is Statistically Unsound**

As discussed previously, Professor Calomiris calculates a 365-day average resolution time for a selective sub-sample of purportedly "peer" thrifts. Using his calculated 365-day average resolution time, Professor Calomiris concludes that "given Carteret's quality and the timing of its resolution, it is conservative to assume that in the but-for world it would have been resolved in 365 days, which is the average resolution period for the other 10 large thrifts that failed in the late 1980's and early 1990's. . ." July 14 Calomiris Dec. ¶ 82, App. 170. However, Professor Calomiris's flawed methodology fails to support this conclusion.

A review of the FDIC's failure transaction database reveals that, from 1980 through 2005, only 16 (including Cartrert) of the purportedly 2,989 failing banks and thrifts were within the $4 to $6 billion asset range at the time of failure, which is the sole criterion for Professor Calomiris' thrift sub-sample. Of this small group, none of the thrifts failed in 1992 except Carteret. Indeed, five of the ten failures selected by Professor Calomiris in his "peer" sub-sample preceded FIRREA and the creation of the RTC, and only Carteret was based in Florida and New Jersey. Saunders Dec. ¶ 94, App. 42E. These factors, which are all highly relevant to a thrift's resolution time, are conveniently ignored by Professor Calomiris in his supposedly "peer" sub-sample.

In addition, the combined effect of a very small sub-sample with a wide variation in individual resolution times, renders his calculated average a useless predictor of resolution times in a but-for world. As Professor Saunders explains:

> [T]he resolution times shown in Table 9 are subject to substantial variation. Non-Carteret resolution times in this small sample vary from 0 days to 693 days, and the standard deviation of the sample of 10 cohort thrifts is 214 days around a mean of 365 days. This

> means that, from a purely statistical point of view (not taking into account relevant economic factors), the "normal" time to resolve a thrift is highly uncertain. Taking into account relevant economic and financial factors, the range of "normal" or "reasonable" resolution times could be even greater. Thus, statistically, Professor Calomiris cannot credibly claim to have established a meaningful but-for resolution date for Carteret. He simply chooses one year (365 days) — and thus the December 4, 1993 date — without any credible statistical or economic justification.

Id. at ¶ 97, App. 42J. Thus, Professor Calomiris's failure to consider these factors not only affects the comparability of his selective "peer" sub-sample, but makes his 365-day calculated average unreliable and statistically unsound. Thus, his Table 9 calculations cannot substantiate his conclusions regarding Carteret's expected resolution time in a but-for world.

### 2. Professor Calomiris's Reliance Upon A Purportedly Simple Average Resolution Time Ignores The Factors That Actually Affect A Thrift's Resolution Period

A thrift's resolution period is determined by multiple factors. Those factors include its size, operational complexity, asset quality, financial performance and economic environment. Maligaya Dep. Tr. at 86-88; Deposition of George Fadil ("Fadil Dep. Tr.") at 28. At the time of Carteret's seizure, it had a multi-state branch network and $4.8 billion in assets, including $519.9 million of non-performing loans, restructured loans and real estate that had been foreclosed on or was in the process of being foreclosed. Carteret Conservatorship Strategic Plan, Pages 2-3, 30, App. 457-458, . Carteret's assets also included $770.4 million in commercial, corporate, consumer and "Premium finance" loans. Id. at 7, App. 462. Furthermore, Carteret had 39 active subsidiaries - including one (Imperial Premium Finance) for which Carteret had recently signed a three year agreement to purchase up to $400 million of the subsidiary's receivables - and was

servicing $6.2 billion in loans for other entities. Id. at 2, 9, App. 457, 464. Carteret was anything but an ordinary plain vanilla institution when it was seized. Professor Calomiris simply ignores this fact and incorrectly assumes that his focus upon a simple average resolution time, which is statistically unsound, is a reasonable method for estimating Carteret's resolution period in the but-for world.

The fallacy of this assumption is demonstrated by the FDIC's failure transaction database. Included within this database are approximately 70 thrifts with resolution periods equal to or exceeding Carteret 826-day resolution period. The failure dates associated with these thrifts occurred throughout the 11-year period from 1981 to 1992, and the total amount of assets for these thrifts varies as much as the total number of thrifts included within this group. Moreover, numerous thrifts have resolution periods exceeding 1,000 days. Thus, resolution length is not simply a function of asset size, although this factor is certainly important. Maligaya Dep. Tr. at 86-88, App. 629-631; Fadil Dep. Tr. at 28, App. 627. Consequently, Professor Calomiris's calculation of a 365-day resolution period for Cartret in the but-for world is far too simplistic, as it ignores such factors as asset quality, operational complexity and economic conditions.

**C. Professor Calomiris's Linear Regression Analysis Fails To Prove Any Statistical Relationship Between Carteret's Deposit Levels And Its Purported Resolution Delays**

In Figure 2 of his report, July 14 Calomiris Dec. ¶ 81, App. 167. Professor Calomiris attempts to find a linear relationship between resolution duration, asset size, and percentage decline in deposits. However, he artificially limits his observational factors and sample size to merely 11 thrifts (including Carteret), by simply selecting thrifts with a four to six billion asset

size at the time of failure. These limitations fatally compromise the utility of his analysis. As Professor Saunders explains:

> If one wants to test for a relationship between a failed thrift's percentage deposit runoff during resolution and time to resolution, this is not the way to do it. The generally accepted statistical approach would be to use the entire sample of all RTC-assisted thrifts that were sold, and then estimate a regression that included resolution time, asset size, closure date and other relevant factors as explanatory variables. Professor Calomiris's simplistic regression of deposit decline on resolution time for a very limited sub-sample of data, for a disparate period of time, is inappropriate and cannot be used to draw inferences of any value.

Saunders Dec. ¶ 94, App. 42hH-42I. However, the fatal infirmities inherent in Professor Calomiris's regression analysis are not confined to the above factors, as explained by Professor Saunders below:

> Professor Calomiris's assumed linear relationship between percentage deposit change and time to resolution and his limited observation set are not comparable to Carteret in other ways. In particular, Professor Calomiris does not present sufficient financial data to show that the financial condition of his ten cohort failed thrifts was similar to that of Carteret. Indeed, his discussion in paragraph 81 of his report suggests that some of the thrifts in his chosen cohort were quite different from Carteret. Moreover, Professor Calomiris's reliance on a simplistic single-variable regression analysis precludes the use of financial data about each thrift's condition prior to failure as controls in the analysis. In addition, Professor Calomiris fails to take into account the substantial decline in interest rates over the 1989 to 1992 period. Such a decline would clearly affect the deposit flows at failed banks differently according to their year of failure. Thus, Professor Calomiris has failed to perform a properly controlled regression analysis that takes into account all relevant factors. Consequently,

one cannot draw any reasonable inferences from Professor Calomiris's regression results (in Figure 2) regarding the relationship between resolution time and deposit losses.

Id. at ¶ 95, App. 42I-42J. Professor Calomiris's simplistic linear regression analysis must be rejected.

**D. SUMMARY OF DEFICIENCIES IN PROFESSOR CALOMIRIS'S ANALYSIS**

In sum, Professor Calomiris's estimate of the magntude of purported delays in Carteret's resolution is erroneous and not substantiated by his calculations and data analyses. First, Professor Calomiris's "key measures," which amount to selected bits of financial data from a single quarter, do not depict Carteret's relative and absolute financial health. As Federal regulators noted during Carteret's 1992 examination, the institution had serious asset quality problems and lacked sufficient tangible capital. Nevertheless, Professor Calomiris's selective and simplistic Table 5 analysis does not reveal Carteret's less favorable financial measures and performance indicators. Moreover, the Table 5 calculations upon which Professor Calomiris relies have changed repeatedly and substantially. Even though four different versions of Table 5 have been presented by Professor Calomiris, his calculations and the underlying (and undisclosed) data supporting those calculations remain wholly unreliable.

In addition, Professor Calomiris's calculation of a simple average resolution time for a purported "peer" thrift sub-sample is similarly unreliable and statistically unsound. His calculation is derived from such a small and highly selective sub-sample, that the standard deviation for his calculated average is an incredible 214 days around a 365-day mean. Moreover, Professor Calomiris's focus upon a simple average resolution time completely ignores the factors that affect and determine the duration of a thrift's resolution.

Finally, Professor Calomiris' simplistic regression analysis included in Figure 2 of his report, involves such a small thrift sub-sample and narrow range of variables over a disparate, multi-year period, that no inferences of any statistical value can be drawn from it. Taken together, these infirmities in Professor Calomiris's report make his conclusions regarding the magnitude of Carteret's purported resolution delays, both erroneous and speculative. Therefore, his conclusions must be rejected.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of August 2006, a copy of the foregoing "GOVERNMENT RESPONSE TO AMBASE'S STATEMENT OF ISSUES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt
David A. Levitt

**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**AMBASE CORPORATION AND**
**CARTERET BANCORP, Inc.**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES OF AMERICA**

---

# APPENDIX TO THE GOVERNMENT RESPONSE TO AMBASE'S STATEMENT OF ISSUES

---

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309
Fax: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:
TIMOTHY ABRAHAM
ARLENE PIANKO GRONER
MELINDA HART
F. JEFFERSON HUGHES
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

Date: August 30, 2006

# APPENDIX INDEX

## VOLUME I

Declaration of Professor Anthony Saunders, Aug. 7, 2006 .......................... App. 1

Declaration of Charles W. Calomiris of July 14, 2006 .......................... App. 118

Deposition of Charles W. Calomiris, Vol. 3, July 7, 2006 (Excerpt) ............... App. 247

Deposition of Wayne S. Green, February 28, 2006 (Excerpt) ..................... App. 254

Deposition of Edward Griffin, March 30, 2006 (Excerpt) ........................ App. 257

Deposition of Karen Jean Hughes, April 7, 2006 (Excerpt) ..................... App. 260

Deposition of Steven Johnston, April 5, 2006 (Excerpt) ........................ App. 263

Deposition of Jay A. Jupiter, June 10, 2005 (Excerpt) ......................... App. 265

Deposition of James R. Mindnich, March 16, 2006 (Excerpt) .................... App. 268

Deposition of J. Paul Ramey, April 12, 2005 (Excerpt) ........................ App. 275

Deposition of Michael Saran, March 31, 2006 (Excerpt) ....................... App. 277

APB Opinion No. 16, August 1970 ........................................ App. 294

APB Opinion No. 17, August 1970 ........................................ App. 316

Assistance Agreement between FSLIC and Carteret Savings and Loan
Association, F.A., September 29, 1982 (Excerpt) ............................ App. 323

Assistance Agreement between FSLIC and Carteret Savings Bank, FA,
June 6, 1986 (Excerpt) .................................................. App. 326

OTS Report of Examination for Carteret Savings Bank, F.A.,
May 22, 1989 (Excerpt) ................................................. App. 334

Memo from William M. Dudley, RTC, to All Directors - Consolidated
Offices, Managing Agents, Liquidation Site Managers, and Supervisory
Managing Agents re: Prepayment Interest/Penalty, June 20, 1990 ................. App. 340

OTS Report of Examination for Carteret Savings Bank, F.A., June 17, 1991 (Excerpt) . . . . . . . . . . App. 341

Form 10-Q for Ambase Corp., for the quarterly period ended June 30, 1991 . . . . . . . . . App. 345

Memorandum from Stephen A. Haley and Kenneth C. Herrmann, RTC, to Supervisory Managing Agents, Assistant Supervisory Managing Agents, Managing Agents, and Assistant Managing Agents though Sandra A. Waldrop, re: Policy for Continued Lending in Conservatorship, January 14, 1992 . . . . . . . . . . App. 367

Policy and Procedures for Computation of Dividend Payments of Pass Through Receiverships, January 31, 1992 (Excerpt) . . . . . . . . . . App. 385

Statement of Financial Accounting Standards No. 109, February 1992 . . . . . . . . . . App. 389

OTS Examination Comment Status Report for Carteret Savings Bank, FA, June 15, 1992 . . . . . . . . . . App. 414

Conservatorship Strategic Plan for Carteret Federal Savings Bank, December 4, 1992 (Excerpt) . . . . . . . . . . App. 453

U.S. Corporation Income Tax Return for AmBase Corporation & Subsidiaries (Form 1120), 1992 . . . . . . . . . . App. 472

Memorandum from James R. Mindnich, Carteret Savings Bank, FA, to George M. Gross, Jr., re: Uncommitted Pipeline, March 10, 1993 . . . . . . . . . . App. 482

E-mail from Stephen A. Haley to Robert O. Smedley and W. Robert Haley re: Asset Sales from Conservatorships, March 19, 1993 . . . . . . . . . . App. 484

Resolution Trust Corporation Supervisory Review Manual (Revised), March 1993 (Excerpt) . . . . . . . . . . App. 486

Executive Summary for Carteret Federal Savings Bank, August 31, 1993 . . . . . . . . . . App. 492

Form 10-K for First Tennessee National Corporation, for the fiscal year ended December 31, 1993 (Excerpt) . . . . . . . . . . App. 494

Memorandum from Tanya L. Robertshaw, Carteret Savings Bank, FA, to Distribution re: Monthly Conservatorship Reports with attachment, February 18, 1994 (Excerpt) . . . . . . . . . . App. 499

E-mail from James R. Hambric to J. Paul Ramsey re: Better Premium by Delaying, August 16, 1994 . . . . . . . . . . App. 505

Letter from Glen R. Sergeon, TCB Holdings, Inc., to John E. Ryan, RTC, re: Minority Preference in Acquisition Effort, August 24, 1994 . . . . . . . . . . App. 506

Memorandum from Tanya L. Robertshaw, Carteret Savings Bank, FA, to Distribution re: Monthly Conservatorship Reports with attachment, October 27, 1994 . . . . . . . . . . App. 508

Memorandum from Stephen N. Graham, Alvin E. Kitchen, and Thomas A. Rose to All Regional Directors, All Regional Financial Officers, and All Regional Counsel re: Receiverships - Post-Insolvency Interest, June 8, 1995 . . . . . . . . App. 521

Resolution Trust Corporation Performing Assets Sold to Acquirers of Minority Thrifts, General Accounting Office, GAO/GGD-96-44, December 1995 . . . . . . . . . . App. 523

Memorandum from John F. Bovenzi, William F. Kroener, III, and Paul L. Sachtleben to Operating Committee re: Options Memorandum - Post-Insolvency Interest Regulation and Amendments to 12 C.F.R. § 360.3, September 18, 1996 . . . . . App. 542

Form 10-K for AmBase Corporation, for the fiscal year ended December 31, 1997 (Excerpt) . . . . . . . . . . App. 559

"An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing," Sudhir Nanda, James E. Owers, and Ronald C. Rogers, Real Estate Economics, vol. 25, no. 2, pp. 271-294, 1997 . . . . . . . . App. 566

Managing the Crisis: The FDIC and RTC Experience 1980-1994, August 1998 (Excerpt) . . . . . . . . . . App. 589

Form 10-K for AmBase Corporation, for the fiscal year ended December 31, 1999 (Excerpt) . . . . . . . . . . App.592

Memorandum from Senior Technician Reviewer, IRS, for Industry Director re: Denial of Consent for Change in Method of Accounting, January 18, 2002 . . . . . . . . . . App. 599

Reissued - Goodwill Financial Reporting Package - Carteret Federal Savings Bank, August 24, 2006 . . . . . . . . . . App. 609

Page 40, Table 5, Calomiris Report (May 19, 2006 and May 24, 2006) . . . . . . . . . . . . . App. 620

Exhibit 11, Page 1, Deposition of Charles W. Calomiris, Vol. 3, July 7, 2006 ....... App. 621

Deposition of George Fadil, March 22, 2006 (Excerpt) ........................ App. 626

Deposition of Gloria Maligaya, March 23, 2006 (Excerpt) ...................... App. 628

Confidential Materials - Subject to Protective Order

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC.<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | ) | No. 93-531<br><br>Judge Loren Smith |

**Declaration of Professor Anthony Saunders**

August 7, 2006

## I. QUALIFICATIONS AND ASSIGNMENT

### A. QUALIFICATIONS

1. My name is Anthony Saunders. I am the John M. Schiff Professor of Finance and Chairman of the Department of Finance at the Stern School of Business at New York University. I hold a B.Sc. in Monetary Economics, an M.Sc. in Money and Finance, and a Ph.D. in Economics, all from the London School of Economics.

2. Throughout my academic career, my teaching and research have focused on financial institutions in general and banking in particular. I have taught both undergraduate and graduate courses in banking at New York University since 1978. I also have served as a visiting professor at universities throughout the world, including the Stockholm School of Economics, the University of Melbourne, INSEAD (Fountainebleau, France), the University of Otago (New Zealand), the University of Bocconi (Milan, Italy), the University of St. Andres (Argentina), ISEAS (Singapore) and Hong Kong University of Science and Technology.

3. I am on the Board of Academic Consultants of the Federal Reserve Board of Governors. I have served as a research consultant, advisor, or scholar to the Office of the Comptroller of the Currency, the Research Department of the Federal Reserve Bank of Philadelphia, the Research Department of the Federal Reserve Bank of New York, the World Bank, the Federal National Mortgage Association, and the International Monetary Fund. I have been a consultant to numerous private and governmental banking institutions, including J.P. Morgan, Citicorp, the World Bank, and the Inter-American Development Bank.

4. My research on financial markets and financial institutions has been published in all of the leading finance journals and money and banking journals.[1] I am the author or co-author of a number of books on various aspects in banking, including two widely used textbooks, *Financial Markets and Institutions*, now in its third edition, and *Financial Institutions Management: A Risk Management Approach*, now in its fifth edition. I am a co-editor of the *Journal of Banking and Finance* and editor of the *Journal of Financial Markets, Instruments and Institutions*, and serve as an associate editor of eight other journals.

5. Exhibit 1 to this report is a copy of my resume, which lists my publications, as well as my expert reports and trial testimony over the past five years.

**B. ASSIGNMENT**

6. I have been retained by the U.S. Department of Justice to review and respond to the declaration of Professor Charles W. Calomiris submitted in this matter on behalf of the plaintiff.[2] The Calomiris Declaration analyzes the receivership deficit calculations for Carteret prepared by the Federal Deposit Insurance Corporation ("FDIC") and adjusts those calculations for alleged computational and conceptual errors and alleged delays and mismanagement in the government's resolution of the thrift.

7. Exhibit 2 to this report is a list of materials and data I reviewed and considered, or which others working at my direction reviewed and considered, in the course of preparing this report.

---

[1] P.L. Cooley and J.L. Heck, "Prolific Authors in the Finance Literature: A Half Century of Contributions," *Journal of Financial Literature*, Vol. 1, Winter 2005, pp.46-69.

[2] The Calomiris Declaration was originally submitted on May 19, 2006, then corrected on May 23, 2006, and then submitted again on July 14, 2006.

Confidential Materials - Subject to Protective Order

8. This report contains my findings and opinions as of August 7, 2006. My analysis is ongoing, however, and my opinions may change if additional information related to the receivership deficit and the resolution of Carteret come to my attention, or in response to deposition testimony by others, or in response to issues that may be raised in my own deposition. I note that Professor Calomiris first submitted his declaration on May 19, 2006, corrected it on May 23, 2006, and then submitted it again approximately three weeks ago on July 14, 2006, partially in response to issues raised in his deposition on July 5-7, 2006. Some of the changes associated with Professor Calomiris's re-submitted declaration have been significant, as noted in a number of places below. Professor Calomiris has also supplemented his list of materials relied upon, most recently following his July 14, 2006 re-submitted declaration. In addition, if I am asked to testify at trial, I may prepare additional supporting materials related to my findings and opinions, such as summaries, illustrations, tables, charts, and other expository exhibits.

## II. SUMMARY OF OPINIONS

9. As will be discussed in detail throughout my report, I find serious flaws, both statistical and conceptual, in Professor Calomiris's analyses. In particular:

10. Professor Calomiris has provided no persuasive basis for reducing the size of the Carteret receivership deficit, which was $278.1 million as of December 31, 2005.

11. The resolution of Carteret/AmBase by the Resolution Trust Corporation ("RTC") was reasonable and fair. The resolution effectively implemented the objectives legislated by Congress to reduce the economic and social costs of a crisis brought on by the excessive risk-taking of Carteret/AmBase and other aggressive thrifts.

12. Professor Calomiris's assertions relating to the interest costs levied on the government/RTC loans to Carteret/AmBase are *not* supported by principles of economics and finance.

13. Professor Calomiris does not demonstrate that the market value of Carteret/AmBase's supervisory goodwill was different from zero.

14. Professor Calomiris's assertions about the cost of delay and potential resale value of Carteret's deposits, its mortgage subsidiary, and other assets are not supported by the facts.

15. Section III of this report places the thrift crisis and the creation of the RTC into the context of the theory and practice of banking and general economic situation at that time. In Section IV, I address Professor Calomiris's erroneous claims regarding the government's calculation of interest on the RTC's funding of Carteret's branch sales. In Section V, I rebut Professor Calomiris's counter-factual assertions regarding the consequences of the alleged delay in resolving and selling Carteret's branches. Professor Calomiris's erroneous calculations regarding the value of supervisory goodwill are addressed in Section VI. Section VII analyzes the problems in Professor Calomiris's valuation of the Carteret mortgage subsidiary, as well as other asset sales. Section VIII summarizes my conclusions.

## III. RTC's Response to the Collapse of the U.S. Thrift Industry

16. The impact of the thrift crisis on savings and loan associations ("S&Ls") rivaled the banking collapse during the Great Depression and led to the insolvency of the insurer of thrift deposits, the Federal Savings and Loan Insurance Corporation ("FSLIC"). A crisis of such immense proportions was certainly not foreseen in 1982,

when Congress passed the Garn-St. Germain Depository Institutions Act allowing federally chartered thrifts more extensive lending and deposit-taking powers. Nor was such a crisis anticipated when the Federal Home Loan Bank Board ("FHLBB") and the FSLIC approved Carteret's acquisition of Barton and Delray, which according to the Plaintiff's First Amended Complaint, constitute "approximately ninety percent of the goodwill at issue in this suit."[3] Despite its massive and unforeseen impact, the RTC was remarkably effective in resolving the thrift crisis at a cost that is now estimated to be less than a quarter of the $500 billion estimates[4] that were forecast at the time of the enactment of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA") in 1989.

### A. THE ROLE OF THRIFTS IN BANKING

17. Banks and thrifts are critical participants in the capital formation process that drives free market economies. Without banks, thrifts, or other financial institutions, households and businesses with investment opportunities would have little or no access to financing and households with savings would have few opportunities to invest their excess funds. The special role of banks and thrifts is to facilitate the flow of funds from savers to investors. Most often they accomplish this by transforming the liquidity and risk characteristics of asset investments to make them more palatable to risk-averse investors (depositors), a process referred to as asset transformation. One aspect of this asset transformation process is the ability of banks to diversify their asset risks, thereby allowing lower-risk deposits to be offered to the public and savers at large. Because of

---

[3] Plaintiff's First Amended Complaint, April 18, 1997, paragraph 21.

[4] K.D. Vandell and T.J. Riddiough, "The Impact of RTC Dispositions on Local Housing and Real Estate Markets," *Housing Policy Debate*, Vol. 2, Issue 1, pp 49-68.

the special role that banks and thrifts play in the financial system, and because of the systemic risks associated with banks and thrifts, they are regulated.[5]

18. For many years, thrifts have been subject to special regulation in recognition of their traditional role in providing banking services (such as deposit-taking and mortgage lending) to households – services deemed to have a particularly important social, as well as economic, impact. As a condition of their charters, thrifts received special competitive advantages in their deposit rates. For example, until 1980, they were allowed to offer deposit rates that were 25 basis points higher than those offered by commercial banks; this helped thrifts gain access to low-cost sources of funds.[6] Thrifts also were protected by FSLIC deposit insurance and charter-entry barriers, and received favorable tax treatment as well. In the post-World War II period, thrifts were the dominant driver of home mortgage lending in the U.S. In exchange for these regulatory protections, thrifts were required by regulators to undertake relatively low-risk investments (i.e., focus on residential mortgage loans to homeowners), thereby earning a conservative positive spread or return that mainly consisted of mortgage interest rates minus deposit sources of funds.

### B. THE THRIFT CRISIS AND THRIFT BEHAVIOR IN THE POST-1980 PERIOD

19. In the wake of a changing regulatory system, Carteret/AmBase and other thrifts chose to ignore the traditional model of the thrift industry and to increase their asset risk exposures aggressively. It is a basic tenet of financial markets that the greater an asset's risk exposure, the greater the uncertainty regarding its returns. After the

[5] Some public utility suppliers, such as gas, electric, telephone, and water companies, are also singled out for regulation because of the special nature of their services and the costs imposed on society if they fail.

[6] So called Regulation "Q" was phased-out over the 1980-86 period.

passage of the Depository Institutions Deregulation and Monetary Control Act of 1980 and the Garn-St. Germain Depository Institutions Act of 1982, which both deregulated deposit interest rates and allowed thrifts to expand their activities into areas such as commercial real estate, consumer lending, and commercial lending, many thrifts actively and aggressively expanded into these more risky activities. In particular, in an attempt to increase their spreads above the conservative levels implicit in the traditional thrift business and regulatory model, firms like Carteret/AmBase undertook excessive levels of credit and interest risk in their asset portfolios. They did so with the knowledge that if their asset investments paid off, they would reap windfall gains, and if their investments failed, the FSLIC deposit insurance system (or ultimately the U.S. taxpayer) would pay their losses. This "heads I win, tails you lose" policy created a classic "moral hazard" problem.[7]

20. The thrift crisis of the 1980s developed as the risk mismatch between the aggressive thrifts' risky assets and the low risk deposit liabilities in their portfolios overwhelmed their tangible capital reserves. In banking in general, a bank's (or thrift's) tangible capital is its ultimate protection against unexpected losses. In particular, if a thrift's asset portfolio losses exceed its tangible capital buffer, the thrift becomes economically insolvent. As a result, the increasingly risky strategies and activities of aggressive thrifts create enormous costs. For example, insolvent thrifts create liquidity crises that may hamper individuals' and businesses' access to deposited funds and potentially spill over to other thrifts and banking institutions, leading to financial instability. Governments have a stake in preserving the stability of the banking system in

[7] "Moral hazard" refers to circumstances in which insurance changes behavior in such a way as to increase the likelihood that the insured event or condition will occur.

order to promote economic growth and avoid financial crises. Thus, the passage of FIRREA and the creation of the RTC were necessary and prudent responses to the negative externalities imposed on the economy due to excessive risk-taking by many thrifts.

21. This excessive risk-taking by Carteret/AmBase and other aggressive thrifts, which was undertaken in part to exploit the deposit insurance system and the "heads I win, tails you lose" situation created by its provision, directly threatened the financial system and the capital formation process in the U.S. In order to rectify some of the damage imposed by Carteret/AmBase and other aggressive thrifts on the financial system and the economy, Congress passed FIRREA in 1989. The passage of FIRREA brought about the restructuring of the deposit insurance system, limited the highly risky asset investments adopted by many thrifts, and established the RTC to help the FDIC resolve the large number of failed and failing thrifts outstanding at the time.

### C. THE RTC EFFECTIVELY RESOLVES THE THRIFT CRISIS AT LOW COST TO THE U.S. TAXPAYER

22. Upon its creation in 1989, the RTC was faced with a crisis of monumental proportions. Between 1980 and 1994, 1,617 federally insured banks (with $302.6 billion in assets) and 1,295 thrifts (with $621 billion in assets) – or "one in six federally insured depository institutions" controlling "20.5% of the assets in the banking system" – were subject to regulatory closure and/or intervention; this rate of failure was "equivalent to one failure every other day over the 15-year period."[8] This actually understates the magnitude of the government's challenge since the failures were not evenly distributed

[8] *Managing the Crisis: The FDIC and RTC Experience*, Executive Summary, pages 4-5.

over the fifteen year period. The largest number of failures (533 out of a total 2,912 FSLIC, FDIC and RTC failures, or more than 18% of the total) occurred in 1989 alone, with almost 50% occurring between 1989 and 1992.[9] This huge wave of failures made it even more difficult for the RTC to resolve the failure of Carteret/AmBase in December 1992. Indeed, at the end of 1992 the RTC was managing 699 conservatorships and/or receiverships and total assets of $104.5 billion.[10]

23. Despite this, the General Accounting Office ("GAO"), often critical of the targets of its investigations, concluded in a May 1995 study that the "RTC's resolution process [was] generally adequate to determine least costly resolutions."[11] In general, the RTC acted fairly and promptly to clean up the thrift crisis using least cost resolution methods whenever possible in what has been called "the largest transfer of real estate assets since the Louisiana Purchase."[12] The same article concludes that the RTC did more good than bad:

> "Given the outlaw legacy of the thrift crisis, where villains were everywhere, it's probably inevitable that any agency charged with mopping up after such a mess would itself be stained. Judging the RTC's work is a bit like trying to get a reasoned judgment from a lynch mob: It's hard to filter out the noise, and there's very little objectivity....
>
> 'If there was no RTC, I'm not sure what would have happened to the real estate industry,' says [Andrew] Albert, the newsletter editor [of *Liquidation Alert* and *Commercial Mortgage Alert* newsletters]. He adds that while the FDIC's loss-sharing arrangements on its seizures have worked well, 'the RTC had so many (failures) to deal with at the beginning that it would have been hard to market them one by one, and the real estate market was in a free fall. They had to stop the hemorrhaging.'"[13]

---

[9] *Ibid.*

[10] RTC *Statistical Abstract, August 1989/September 1995*, Table I-S, p. 15.

[11] "1993 Thrift Resolutions: RTC's Resolution Process Generally Adequate to Determine Least Costly Resolutions," General Accounting Office, GAO/GGD-95-119, May 1995.

[12] "Learning from the RTC," *U.S. Banker*, September 1993, p. 28.

[13] *Ibid.*

24. The RTC faced enormous challenges in handling the economic and social aspects of the crisis created by the overly aggressive activities of the thrifts. Indeed, since there was so much fraud and mismanagement inherent in the failed thrifts, it was difficult for potential acquirers to assess the value of thrift assets accurately. This in itself was sufficient to delay the resolution process. Despite the enormity of the problem, Curry and Shibut[14] estimate the cost of the RTC resolution from 1989 through 1995 as $82.7 billion, with $7.1 billion (almost 9%) borne by the private sector. Thus, over the 1990-1995 period, the RTC was generally successful in accomplishing the goals of resolving the economic and social costs of the thrift crisis at a relatively low cost to the American taxpayer and helping to lay the foundation for one of the most successful and profitable periods in U.S. banking that has followed these resolutions.

## IV. THE GOVERNMENT'S CALCULATION OF INTEREST ON THE RTC FUNDING OF CARTERET BRANCH SALES HAS BEEN APPROPRIATE

### A. INTRODUCTION

25. As of December 31, 2005, the projected size of the Carteret receivership deficit, after adjusting for pass-through liabilities, was $278.1 million.[15] The largest component of this deficit was the estimated interest of $156.6 million on the claims of the FDIC.[16] This interest resulted from the funds the receivership had to borrow from the RTC to finance the sales of its Florida branches and its New Jersey branches, given the perilous state of Carteret's assets at the time of its closure and transfer to the RTC. As

[14] Timothy Curry and Lynn Shibut, "The Cost of the Savings and Loan Crisis: Truth and Consequences," *FDIC Banking Review*, vol. 13, no. 2, 2000, pp. 26-35.

[15] FDIC Goodwill Financial Reporting Package for 12/31/2005 dated March 31, 2006 (not Bates stamped).

[16] *Ibid.* Special FSLIC funds were set aside to help the FDIC/RTC handle receiverships (so-called resolution funds).

discussed below, Professor Calomiris argues that this $156.6 million should be reduced to zero based on his assertion that it is inappropriate to compute interest on the principal borrowed from the RTC to fund the Carteret branch sales. While Professor Calomiris asserts that it is inappropriate to include interest at all, he also claims that the interest rates used by the government to compute the interest costs on these loans were inappropriate.[17]

### B. THERE IS NO LINK BETWEEN INTEREST ON DAMAGES AND COMPUTING INTEREST WHEN COMPUTING THE RECEIVERSHIP DEFICIT

26. Professor Calomiris argues that because the government does not pay interest on any damages awarded in goodwill breach-of-contract cases, the government should not be able to accrue interest on the funds it loaned the receivership to finance the sale of the Carteret branches. Alleging that this "inconsistency" is the most fundamental error in the government's calculation of interest, Professor Calomiris notes that Congress has made the United States immune from an interest award as a matter of law.

27. Professor Calomiris has put his finger on the heart of the matter: Congress, as a matter of law, has prohibited the payment of prejudgment interest on any damages caused by the U.S. government. This legal prohibition has no relevance to calculating the RTC's deficit (or surplus) relating to its seizure of Carteret. In economic terms, there was a real cost to the government of having to use taxpayer funds, as well as funds borrowed through issuing Treasury bonds, bills, and other government securities, to help resolve Carteret. Indeed, every $1.00 borrowed to finance Carteret's loans added $1.00 (plus interest) to the national debt. As a result of these financing costs, it is

[17] Calomiris Declaration of July 14, 2006, paragraphs 12-15.

economically rational to compute and include interest in assessing the cost of loans made in resolving Carteret (i.e., the receivership deficit). Indeed, forgiving the interest cost of the government's funding of the Carteret resolution would be equivalent to a direct subsidy and would have an effect very much like paying prejudgment interest on the damages caused by the government, apparently contrary to law.

### C. RTC/FDIC Choice of Interest Rates

28. Professor Calomiris not only criticizes the imposition of any interest charge at all, he also argues that if interest is charged, it should have been computed at a three-month Treasury bill floating rate, especially over the August 10, 1993 through 2002 period when the government (RTC) applied a fixed rate to new resolutions.[18]

#### 1. Interest Rates During the 1994-2005 Time Period

29. While it is true that interest rates began to fall significantly towards the end of the 1994-2005 period – for example, the three-month Treasury bill rate fell from 5.15% in January 2001 to 1.69% in December 2001[19] – the three-month Treasury bill rate does not measure the risk of the loan transaction to the RTC.

30. Exhibit 3 shows the behavior of interest rates over the October 1994 through December 2005 period. The rate on three-month Treasury bills is clearly an outlier, substantially lower than the other rates. (This may be the reason it was chosen, ex-post, by Professor Calomiris for the purposes of his analysis.[20]) For reference, the three federal judgment rates of 6.06% (on the October 1994 loan), 7.34% (on the January

[18] Calomiris Declaration of July 14, 2006, paragraphs 22-36.

[19] TBM3 series available from the Federal Reserve Bank.

[20] In fact, in paragraph 28 of his July 14, 2006 declaration, Professor Calomiris proposes a short-term variable Treasury rate for a week, a month, or a quarter.

1995 loan), and 6.57% (on the March 1995 loan) are also shown in Exhibit 3 (as horizontal dashed lines). The federal judgment rate "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."[21] Since the loans at issue here were extended to a receivership holding risky assets with uncertain returns, a risk premium above the risk-free Treasury rate might have been added to price such loans.[22] It is common sense that if the FDIC/RTC loans to the Carteret receivership were risky – and they were in terms of resolution payoffs – then a risk premium should be charged by the government, or else a subsidy is provided. That is, to the extent that the government loaned any funds to the Carteret receivership at a risk-free Treasury rate, it was providing an explicit subsidy. Indeed, the FDIC/RTC actually incurred losses of $106.2 million in connection with disposal of Carteret assets.[23]

31. Exhibit 3 shows the monthly US bank prime lending rate to commercial borrowers and the rate on 30-year conventional mortgages. These are better proxies for the appropriate interest rate to be assessed on risky receivership loans, given receivership risk characteristics. Over the entire period, from October 1994 through December 2005, the average rate on prime loans was 7.06% and the average rate for 30-year mortgages

---

[21] 28 U.S.C. § 1961, p. 13 and www.uscourts.gov/postjud/postjud.html.

[22] A risk premium is appropriate even though the government raises funds at Treasury rates. To illustrate this point, if I borrow money on a low-rate home-equity loan and then lend it to a relative with a very low credit rating, the rate I charge on the loan should not be my low interest rate, but instead should be a much higher rate reflecting the riskiness of the loan.

[23] FDIC Goodwill Financial Reporting Package for 12/31/2005 dated March 31, 2006, Statement of Operations (not Bates stamped).

was 7.03% per annum. By comparison, the three-month Treasury bill rate averaged only 3.79% per annum over the period.

32. One reason that Professor Calomiris seems to reject the use of a risk-sensitive interest rate is his conjecture that the loans made by the RTC loans (funded largely by the "Federal Financing Bank") have a "zero beta."[24] In simple terms, he seems to be implying that the value of these loans was impervious to underlying economic conditions or, in the parlance of finance, had no "systematic risk." Almost certainly, the value of a portfolio of Carteret assets in receivership, containing a number of non-performing loans and commercial real estate assets, would have systematically moved up and down with the economy, implying that such loans had a "positive" beta (or in the parlance of finance, positive systematic risk). When this is recognized, the use of a risk-free Treasury rate to compute and assess interest – as was done in this case – clearly provided an economic subsidy to the Carteret receivership.

33. Finally, by advocating the use of a three-month Treasury yield as the floating rate, Professor Calomiris ignores the long-term nature of the loans at issue here, even though he acknowledges, "...the repayment of the loans has lasted longer than one year..."[25] Not only were these long-term loans, but, as will be discussed later, the variability in the time-to-resolution for failed banks was very large. Professor Calomiris's proposed three-month Treasury rate does not take this into account. Also,

---

[24] Calomiris Deposition, July 5, 2006, p. 202.

[25] Calomiris Declaration of July 14, 2006, paragraphs 30-36.

while a receivership's average lifespan is three to six years, some may require longer time frames to conclude."[26]

### 2. Professor Calomiris Mischaracterizes the Facts about the FDIC Change in Interest Calculation Methodology

34. Professor Calomiris mischaracterizes the events surrounding the FDIC's change from calculating post-insolvency interest using a "floating" Treasury bill rate to using the fixed federal judgment rate for receiverships with inception dates after August 1993. He appears to imply that the FDIC was somehow engaged in a conscious scheme to increase the interest owed by the Carteret receivership, as well as other receiverships resolved during this time period.

35. Exhibit 4 is a timeline of events surrounding the change in interest calculation methodology. As indicated in the figure, the FDIC's Deputy General Counsel, Associate Director of DAS [Depositor and Asset Services] Operations, and Deputy Director of DOF [Division of Finance] jointly issued a policy memo in June 1995 that specified that the federal judgment rate should be applied to institutions that entered receivership after the passage of the National Depositor Preference Statute on August 10, 1993.[27] The memo, which was issued to all FDIC Regional Directors, Regional Financial Officers, and Regional Counsel stated, "Based upon our discussions we are providing the following directions to assure that the Corporation's procedures and positions in this area are clear and uniform."[28] This represented a change from calculating the interest based on a floating rate (the moving average of the 90-day T-Bill rate). The effective date of

[26] FDIC Goodwill Financial Reporting Package for 12/31/2005 dated March 31, 2006, note 1 (not Bates stamped).

[27] AM00096532-AM00096534.

[28] *Op. Cit.* at AM0096533.

the calculation change clearly included Carteret, which entered receivership from conservatorship in January 1995.

36. Professor Calomiris implies that the National Depositor Preference Statute was an excuse for the FDIC to change the interest calculation methodology, presumably to lock-in higher interest rates.[29] Yet he provides no documentary evidence to support this contention about the FDIC's behavior.

37. While the June 1995 FDIC memo was roughly contemporaneous with the Carteret branch sales in November 1994, January 1995, and March 1995, the accounting staff at the FDIC apparently did not change the interest calculation methodology for Carteret (as well as other receiverships) for some time. Indeed, a November 12, 1999 email authored by the FDIC's Elaine Tama asks about how interest should be calculated (if Carteret's interest should be calculated using floating rates or the fixed federal judgment rate).[30]

38. On December 1, 1999, FDIC attorney Michael Saran responded to the Tama message.[31] Citing the 1995 policy memo, he requested the use of the federal judgment rate for the Carteret receivership, as well as four other receiverships where similar calculation issues had been raised. Importantly, Carteret was not singled out for any special treatment. The December 1999 Carteret Goodwill Reporting Package prepared in July 2000 then stated that the method for interest calculation for Carteret had been changed from floating to fixed as of December 31, 1999.[32]

---

[29] Calomiris Declaration of July 14, 2006, paragraph 35.

[30] Green Deposition Exhibit 23.

[31] AM00096535-AM00096537.

[32] FAM071 0001-9 at FAM071 0005, note (a).

39. All of these documents indicate that the FDIC discussion was in terms of the law and appropriate regulatory policy. There appears to be no discussion of the level of or trends in interest rates or how the government might somehow maximize the interest owed by receiverships, as is implied by Professor Calomiris. Indeed, Exhibit 5 shows that average three-month Treasury bill rates were actually *rising* in November 1999 when Elaine Tama raised the issue of whether to use the fixed federal judgment rate. Further, by the latter half of 2000, the average three-month Treasury bill rate rose above 6.0% and even *exceeded* the federal judgment rate on one of the loans for a short period. Rates did not begin to fall until 2001, before rising again after 2004. Sitting in November 1999, the government would not have known whether Treasury bill rates would continue to head higher (perhaps to a level well above the federal judgment rates on the Carteret loans), stabilize, or decline. Thus, the government did not know, in 1999, whether these decisions ultimately would increase or decrease the amount of interest due it on loans to the Carteret receivership.

40. Professor Calomiris further states that the FDIC's change in interest calculation methodology increased the amount of post-insolvency interest owed by the Carteret receivership by $64.7 million. Exhibit 6 shows how that interest accrued on an annual basis from 1994-2005 using a fixed federal judgment rate versus using Professor Calomiris's floating rate, which is a monthly moving average of the three-month T-Bill rate. Most of the difference between the two accrual methods occurred after 1999, when FDIC accounting personnel changed the method to conform to long-standing FDIC policy, as discussed above. Indeed, in early 1999, the year the change was made, the cumulative difference in the fixed versus floating methods stood at $20.2 million, less

than one-third of the $64.7 million that Professor Calomiris calculates as excessive. By calculating the additional $44.5 million in cumulative interest after 1999, Professor Calomiris is clearly engaging in 20-20 hindsight. Moreover, the $20.2 million cumulative difference as of early 1999 was the result of a change that merely conformed to a FDIC policy that had been enacted in 1995 when the FDIC had no idea what rates would be like between 1995 and 1999. I suspect that if Treasury bill rates had continued to rise (rather than fall) in 2001, the plaintiff would willingly accept today the application of the federal judgment rate over the entire period.

41. By providing a fixed interest rate loan (at the federal judgment rate) to the Carteret receivership, the government guaranteed the long-term cost of financing a loan to the borrower. In simple terms, under a fixed-rate contract, the government was exposed to interest rate risk, while the borrower (Carteret receivership) was hedged against the risk of interest rate changes.

42. Importantly, the reverse is true if the interest rate charged on a loan is floating with market rates, as Professor Calomiris advocates in his declaration. In this case, the lender bears little interest rate risk or uncertainty, since its lending rate will fluctuate with its borrowing costs. By contrast, the borrower (here the receivership) is exposed to interest rate risk, especially the risk of rising rates. That is, in the case at hand, by shifting to a floating interest rate, interest rate risk is borne by the Carteret receivership and not by the government. Looking backwards with 20/20 hindsight, one knows what actually happened to rates between October 2001 and mid-2004 – they declined steadily. So, in hindsight, one knows that, if the interest charged on the receivership loan had been computed using a floating rate, total interest costs would be

lower. But if interest rates had risen instead over this period, then total interest costs would be higher than under a fixed rate. If rates had risen, I very much doubt that Professor Calomiris would be making the same "floating rate" argument, and instead find it likely that he would be a strong advocate of the fixed federal judgment rate.

### D. PRO-RATA REPAYMENT OF DEBT WAS APPROPRIATE

43. As Professor Calomiris notes, the loans to the receivership were made at three different fixed rates at three different dates. Specifically, the interest rate on the $256 million October 1994 loan was set at 6.06% per annum; the interest rate on the $616 million January 1995 loan was set at 7.34% per annum; and the interest rate on the $598 million March 1995 loan was set at 6.57% per annum.[33] Professor Calomiris argues that the RTC should have used any available receivership proceeds to pay down the higher rate loans first. However, such an action would be inconsistent with normal practice in banking. In particular, since the three loans that were made were of equal seniority – in terms of their claim to the receivership's assets – then they would be *pari passu*; as such, it was appropriate that the proceeds of the receivership should be used to pay down the principal of the three loans in a pro rata fashion. Indeed, in his deposition, Professor Calomiris appears to agree that, in general, for loans of equal seniority (as is the case here) one would expect pro-rata payoff.[34] According to the record, this is precisely what the FDIC did (and has done) with its three loans to Carteret.

[33] Calomiris Declaration, July 14, 2006, paragraph 26.

[34] Calomiris Deposition, July 5, 2006, pp. 228-231.

Confidential Materials - Subject to Protective Order

### E. The Escrow Interest Calculation Was Not Inconsistent

44. Professor Calomiris also argues that the government was inconsistent in levying a short-term risk-free rate ("pegged to the earnings that the receivership was receiving on its cash at the Federal Home Loan Bank on a monthly basis"[35]) on the escrow balance containing receivership proceeds, such as deposit premiums received on branch sales, while charging higher federal judgment rates on the government/RTC loans to the Carteret receivership. Professor Calomiris ignores the difference in risk between the proceeds actually received (ex post) by the receivership and placed into an escrow account, as opposed to the uncertain proceeds the government hoped (ex ante) to receive on the three loans made to the Carteret receivership in the 1994/1995 period. That is, once in hand, the principal in the escrow accounts balance is virtually risk-free since by definition funds in an escrow account are held at arms length from the general assets of the receivership. By contrast, the principal (and interest) that the government could expect to receive on its loans to the receivership depended very much on the uncertain value they believed (ex-ante) would be generated from the sale of Carteret's assets. Normal lending practice suggests that when there is uncertainty in the value of assets (collateral) underlying a loan, the lender should charge an additional risk premium on the loan over and above the risk-free rate. Indeed, this concept drives a substantial portion of the spread profitability of banks and thrifts described in Section I of this report. Thus, it is entirely consistent with fundamental concepts in financial economics that the rate on the risky loans made by the RTC to the receivership would be higher than the rate paid on cash balances held by the receivership in an escrow account.

[35] Deposition of Wayne Green, April 5, 2006, page 435.

## V. THE LENGTH OF TIME REQUIRED TO RESOLVE CARTERET DID NOT REDUCE THE PREMIUM REALIZED FROM THE SALE OF THE BRANCHES

### A. INTRODUCTION

45. Professor Calomiris spends a great deal of time arguing how the supposed "delay" in the RTC's sale of the Carteret branches until 1994/1995 resulted in a loss for the receivership. This delay was purportedly due to a lag in Congressional funding, over which the RTC had absolutely no control. In doing so, Professor Calomiris argues that the RTC could have received a "higher price" if the sale of Carteret's branches had been concluded earlier. He claims that, since Carteret was a relatively "healthy" failed thrift, i.e., "one of the healthier institutions resolved in that time period," the RTC should have resolved Carteret in a more timely fashion.[36]

### B. WAS CARTERET A HEALTHIER INSTITUTION?

46. In evaluating Carteret's health, its attractiveness to acquirers, and the role of the RTC, it is important to step back and look at the overall indebtedness and liability structure of Carteret over the post-1990 period and the degree of funding subsidies provided by the Federal Home Loan Bank of New York ("FHLB") and the RTC to keep the bank afloat and thus to improve its "apparent" performance.

47. In 1990, well before its December 1992 seizure, Carteret sold 21 branches in Florida, Maryland, and New Jersey. These transactions were funded principally by additional loans or borrowings from the FHLB. As a result, Carteret's deposits declined by about $1.1 billion while its advances from the FHLB increased by a comparable amount, by approximately $1.0 billion. The FHLB's loans to Carteret were a considerable risk for the FHLB, with the FHLB's debt exposure approaching 40% of

[36] Calomiris Declaration of July 14, 2006, paragraph 69.

Carteret's liabilities. Despite this exposure, most of the FHLB borrowing was on a variable rate basis tied to LIBOR rates.[37] In 1991 and 1992, short-term rates declined considerably, as did the cost of FHLB lending to Carteret. In 1992, at the time of its failure, Carteret's net profits were slightly positive;[38] this was in part due to the decline in the cost of, and Carteret's reliance on, FHLB borrowings rather than deposits. On December 31, 1990, the weighted average cost of deposits was 7.48% and the weighted average rate for FHLB advances was 8.05%. On December 31, 1991, the weighted average cost of deposits was 6.12% and the weighted average rate for FHLB advances was 5.73%. By December 31, 1992, the weighted average cost of deposits was 4.36% and the maximum rate on FHLB advances to Carteret was 3.67%.[39]

48. When Carteret was taken over by the RTC in December 1992, FHLB advances began to be replaced with RTC advances. Indeed, advances from the RTC of about $1.8 billion were substituted for the FHLB advances. The rate charged by the RTC was the three-month Treasury bill rate plus 25 basis points and the rate was adjusted weekly.[40] The RTC rate appears to have been below the rate on the FHLB advances, which were based on three-month and six-month LIBOR rates. Thus, the benefit of these lower rates to Carteret continued for some time.

49. Overall, it is clear that the extensive and relatively cheap funding by the FHLB over the 1990-1992 period, as well as the continued (assumed) funding by the

[37] Carteret Savings Bank 1991 Annual Report (FAM002 2373-2403 at FAM002 2375) and OTS Report of Examination dated June 17, 1991 (WOQ690 1401-1448 at WOQ690 1441).

[38] See Calomiris Declaration of July 14, 2006, Table 5.

[39] Carteret Savings Bank 1991 Annual Report (FAM002 2373-2403 at FAM002 2391-2392). Conservatorship Strategic Plan (AM5087 2862-2947 at AM5087 2870 and 2879).

[40] Conservatorship Strategic Plan (AM5087 2862-2947 at AM5087 2879).

RTC after 1992, contributed positively to Carteret's performance (both before and during the receivership). It facilitated a favorable interest margin on Carteret's performing assets and continued the situation whereby a large share of Carteret's cost of funds was not burdened by normal branch operating expenses, a situation highly uncommon among banks of this size. The historical evolution of Carteret's unusual funding and the thrift's reliance on regulator-supplied non-deposit funds in the 1990-1994 period suggests that the low interest expense ratio and positive 1992 ROA cited by Professor Calomiris to support his view that Carteret was a relatively "healthy failure" were, at least in part, due to funding support and subsidies provided by the FHLB and the RTC.

### C. Financial Ratio Measures of Health

50. In his corrected and re-corrected Table 5, Professor Calomiris cherry-picks three financial ratios – past-due and nonaccruals to total loans, return on assets, and deposit interest expense to deposits – that purportedly show the relative health of Carteret at the time of its failure. In actuality he looks at these three Carteret financial ratios one-quarter prior to failure, on September 30, 1992. He then compares these ratios with those of other thrifts one-quarter prior to failure. First, I would note that whether Carteret compared favorably with other failed thrifts did not matter that much. Carteret was insolvent, its liabilities were heavily interest rate sensitive, its closure was consistent with FDICIA, and it was given ample time to recapitalize, but there were no takers. Second, I would note that his interest expense ratio focuses only on the cost of deposits, and ignores other sources of interest expense. Third, I would note that Professor Calomiris has repeatedly revised Table 5, making his analysis a moving target. For example, he originally reported Carteret's interest expense over deposits as 3.829%. At his deposition

on July 7, 2006, he handed out a revised table in which this same Carteret interest expense ratio was revised downward to 1.129%.[41] Then on July 14, 2006, he re-filed his declaration, revising this same Carteret ratio in Table 5 to 1.168%. Similarly, the counts of his 1992 "comparables" group have gone from 63 institutions to 53 institutions to 28 institutions. The 28 institutions he now includes for 1992 are comprised of institutions in the FDIC Failure Transaction Database classified as "state stock savings and loans" that could be matched with historical TFR data.[42] These are just two examples of the number and magnitude of Table 5 changes, which have made it difficult to interpret his analysis.

51. In any case, based on his analysis of three financial ratios of Carteret one quarter prior to its failure in early December 1992, Professor Calomiris concludes that Carteret was healthier than 28 other failed S&Ls. As noted above, however, Carteret's ROA and interest expenses were favorably affected by its heavy reliance on FHLB borrowings in the 1990-1992 period. For example, because of its lesser reliance on deposits, due to its heavy reliance on low-cost FHLB/RTC funding, Carteret could afford to be less competitive in the deposit market than other thrifts that had less availability to FHLB/RTC borrowings and were more reliant on "hot money" deposits offered at higher interest rates. Indeed, Professor Calomiris's own figures show that Carteret's need to rely on hot money deposits was relatively low. Moreover, if Professor Calomiris had expanded his search to include other key financial ratios, Carteret would not have appeared to be "in a stronger position than a typical failed thrift."[43] Specifically, Carteret's tangible capital ratio, which is the litmus test of financial health, was *negative*,

[41] Calomiris Deposition, Exhibit 11, p. 1.

[42] Calomiris Declaration of July 14, 2006, note to Table 5.

[43] Calomiris Declaration of July 14, 2006, paragraph 67.

with a tangible capital to tangible assets ratio of -1.29%, as shown in Exhibit 7. While the mean ratio for Professor Calomiris's "comparables" group of 28 banks plus Carteret was -2.18%, the mean is adversely affected by two or three very large (negative) outliers. For example, the Pelican Homestead SA tangible capital ratio was -22.87%. A better measure of Professor Calomiris's "typical" unhealthy bank would be the median of his sample. In this case, for failures in 1992, the median was -0.73%. Thus, Carteret had a tangible capital ratio that was worse than that of the median unhealthy bank one quarter prior to failure. In addition, Carteret's core capital to adjusted tangible asset ratio of -0.29% was also slightly below the median of -0.28%, as shown in Exhibit 8.

52. Further, since Carteret was heavily reliant on real estate assets at the time of its failure, Professor Calomiris should have examined a measure of non-performing assets that included real estate exposure. Importantly, later in his report while generating his hypothetical cost of Carteret's preferred stock, he says: "The ratio of non-performing assets to total assets was calculated in this context as the sum of nonaccrual loans plus REO divided by total assets."[44] If one looks at this ratio for Carteret and for the other 28 unhealthy thrifts one quarter prior to failure, one finds that Carteret's ratio compares unfavorably to the rest of the group (indicating that Carteret was less healthy than other failed thrifts). As shown in Exhibit 9, Carteret's ratio was equal to 7.00%, which was higher than both the mean (6.92%) and median (5.94%) of the group of thrifts plus Carteret.

[44] Calomiris Declaration of July 14, 2006, footnote 116.

D. THE ECONOMICS OF BANK AND BRANCH SALES

53. When a branch or bank is sold, the selling bank (or thrift) will normally receive a deposit premium that reflects the privately assessed value of the deposits that are transferred to the acquiring bank (or thrift). There are a number of reasons why such a premium is paid. These reasons include the absorption of long-term customer relationships established by the target bank (or branch) and potential geographic or demographic synergies from acquiring a bank outside an acquirer's current business area, including the potential diversification of local/geographic risk. In dollar terms, the premium will reflect the price per dollar (or percentage dollar premium) that the acquirer is willing to pay times the dollar amount of deposits to be transferred. For example, suppose an acquiring bank was willing to pay a percentage premium of 10 cents per $1 of deposits of a branch it seeks to acquire and that branch had $100 million of transferable deposits. Then the seller bank (or the RTC/FDIC in the case of a failed bank sale) will receive a dollar premium of $10 million (i.e., $0.10 x $100 million = $10 million).

54. Both the percentage premium and the dollar amount of deposits could vary over time. For example, suppose that the same branch were to be sold two years later, but during that time its deposits had declined from $100 million to $50 million, or by 50 percent. At the same time, however, suppose that an acquirer is now willing to pay the higher percentage premium of 25 cents per dollar because of changing economic and regulatory conditions. Either the local economy, the national economy, or both economies could have expanded over that two-year period, making entry into the bank's business area more attractive. In this case, the target (or the RTC/FDIC in the case of a failed bank sale) would actually receive a *higher* dollar premium than when the deposit base had been twice as high. The seller would receive $0.25 x $50 million = $12.5

million now, which is larger than the $10 million the selling bank (or RTC/FDIC receivership) would have received in the weaker economic period.

55. This simple example has significant implications for Carteret. Professor Calomiris asserts throughout his declaration (e.g., at paragraphs 49-51 and 75-84) that the Carteret receivership would have received a greater dollar premium had the sale of Carteret's nine Florida branches and 30 New Jersey branches occurred earlier than they actually did. According to Professor Calomiris, Carteret would have been sold as a whole bank in December 1993, rather than in three pieces in October 1994, for the Florida branches, and in January 1995 and March 1995, for the New Jersey branches.

56. Over and over again, Professor Calomiris asserts this greater dollar premium, but with little supporting evidence. Specifically, in various places, Professor Calomiris alludes to the percentage deposit premiums associated with the sale of the Carteret branches, but provides no hard evidence about what was happening to deposit premiums in the marketplace generally. Indeed, in one place he explicitly acknowledges that he will not provide direct evidence on premiums in the marketplace: "Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence that these losses were significant economically."[45] Thus, instead of providing direct evidence of actually realized deposit premiums, Professor Calomiris defines an "expected premium" associated with each resolution (as calculated using payout and resolution cost data from the FDIC) which he then uses to assert that premium losses were significant for Carteret.

[45] Calomiris Declaration of July 14, 2006, paragraph 88.

57. Transaction-based premium data (from actual marketplace branch sales) are readily available and could have been analyzed by Professor Calomiris had he chosen to do so. An analysis of these premium data show that percentage premiums were considerably *higher*, on average, in 1994 and 1995 than they were on average in either 1992 (when Carteret failed) or 1993 (when Professor Calomiris presumes the sale would have occurred absent purported Congressional funding delays for the RTC). Thus, while there may have been a deposit run-off at Carteret over the 1993 to 1994/1995 period, this was offset by an increase in percentage deposit premiums actually observed in the marketplace during this same period, as I describe below. Before discussing my analysis of actual deposit premium data, however, I analyze the hypothetical world of Professor Calomiris's "expected premiums" described in his declaration.

### E. PROFESSOR CALOMIRIS'S CONCEPT OF "EXPECTED PREMIUMS" IS SERIOUSLY FLAWED AND MISLEADING

58. Professor Calomiris calculates an expected premium value equal to the "percent difference between resolution cost and payout cost."[46] He states that Carteret's expected premium value was 37.38%, which he then compares with actual realized deposit premiums for Carteret in the range of 6% to 10%. He asserts that if Carteret had been resolved as a whole bank institution in December 1993 rather than as three branch transactions in late 1994 and early 1995, the realized premium would have been higher, as indicated by its high expected premium value.

59. Professor Calomiris calculates his expected premiums using data contained in the FDIC's Failure Transaction Database. Specifically, this database

[46] Calomiris Declaration of July 14, 2006, footnote 97.

includes two variables, Payout Cost and Resolution Cost, which he then uses to derive his expected premium.[47] Professor Calomiris's formula (Formula 1) and its application to Carteret are as follows:

Formula 1: Expected Premium (Professor Calomiris)

Expected Premium % = (Payout Cost – Resolution Cost)/Resolution Cost

Carteret's Expected Premium % = ($359,771,000 – $225,304,000)/$359,771,000

= 37.38%

60. In using this concept of expected premiums, Professor Calomiris confuses expected premiums with market-determined actual premiums via the standard formula for the deposit premium shown in Formula 2 below:

Formula 2: Deposit Premium (Market Determined)

Deposit Premium % = (Premium Paid for Deposits)/Deposits Transferred

The exact Cost of Payout and Cost of Resolution figures for Carteret ($359,771,000 and $225,304,000, respectively) that Professor Calomiris obtains from the FDIC Failure Transaction database and uses in calculating his expected premium can be found on the one-page RTC document, "Cost of Resolution (projected) to Anticipated Thrift Closing," prepared for Carteret as of October 31, 1994.[48] The document also presents the difference between the two numbers, $134,467,000, as the "Projected Savings after Adjustment for Operating Expenses." This difference is very close to the deposit

---

[47] The first variable is PO_COST, which database documentation defines as the "estimated cost of payout, as of the time shortly before resolution. This is done on a present value basis." The second variable is RESCOST, which is defined as the "estimate[d] cost of resolution, usually as of the time shortly before resolution. This is done on a present value basis." (Failure Transaction Database User Documentation, FDIC Division of Insurance and Research, December 2004, p. 6).

[48] FAM079 0101-0320 at FAM079 0179.

(franchise) premium of $134 million associated with the sale of the New Jersey branches in January and March 1995. Indeed, documents surrounding the one-page RTC document make it clear that the Cost of Payout and Cost of Resolution figures are for the New Jersey portion of the deal *only,* and do not include the Florida branch sales in October 1994. The fact that the Florida transaction is *not* included in the numbers that Professor Calomiris uses to calculate his expected premium casts doubt on the accuracy and meaning of his hypothetical measure.

61. Based on the New Jersey branch transactions of 1995 that received a 10.5% deposit premium, Professor Calomiris assumes that the "but-for" whole bank sale of Carteret in December 1993 would have achieved a 10.5% deposit premium using the deposit premium formula (Formula 2) above. On the face of it, a 10.5% deposit premium derived from Formula 2 is significantly lower than an expected premium of 37.38% derived from Formula 1, but as conceded by Professor Calomiris at his deposition when asked about their comparative equivalence:

> "No, it doesn't, because I wouldn't be surprised if there was an extent of difference, or to use the term I used in the footnote, bias, between the expected premium and the realized premium because they are measured in not perfectly comparable units."[49]

Precisely – this comparison is like comparing apples and oranges simply because they measure very different things. In particular, what is important for the marketplace is the deposit premium (Formula 2) and not Professor Calomiris's so-called expected premium (Formula 1) derived from the FDIC Failure Transaction Database. The market-determined deposit premium (Formula 2) reflects a private buyer's evaluation, from a profit-maximizing perspective, of the value of the selling bank's or thrift's deposits. The

[49] Calomiris Deposition, July 6, 2006, p. 504.

so-called expected premium (Formula 1) – on which Professor Calomiris relies – reflects the cost to a not-for-profit government agency with the mandate to resolve a failed bank at the lowest cost possible. That is, Professor Calomiris's measure is an expected cost saving from a regulatory perspective while the deposit premium measure used in my analysis (below) reflects the private acquirer's (bank's or thrift's) view of the value of the purchased deposits.

62. Finally, the FDIC's expected premium measure is based on forward-looking estimates. At his deposition, in discussing a question involving the forward-looking opinions of an associated regulatory body, the Office of Thrift Supervision ("OTS"), Professor Calomiris acknowledges the following:

> A: "Well it's valid for OTS to express its forward-looking opinions. I would re-emphasize that its forward-looking opinions on exactly those points were wrong."
> Q: "You mean with respect to the resolution of thrifts in general."
> A: "Correct with respect especially to real estate portfolio valuation and prospects for recovery."[50]

63. Professor Calomiris also relates his expected premium to resolution type, stating that the "expected premium is a good predictor of the resolution type, and . . . it is likely that far less value would have been lost had Carteret been resolved through a Merger or Reprivatization under the Accelerated Resolution Program ("ARP") program as originally intended. Instead, ... Carteret was resolved by Purchase and Assumption instead of Merger/Reprivatization, a style difference that is associated with a 28.8 percent lower average expected premium value of 19.0 percent."[51] In obtaining this result, Professor Calomiris looks at bank and thrift failures in the FDIC Failure Transaction

[50] Calomiris Deposition, July 6, 2006, pp. 387-388.

[51] Calomiris Declaration of July 14, 2006, paragraph 94.

Database over the entire 1980-2004 period, making no allowance for regulatory or economic changes that may have occurred over that 25-year period.

64. In performing his 1980-2004 expected premium analysis, Professor Calomiris groups bank and thrift failures into three categories using the nine resolution types contained in the FDIC Failure Transaction Database. Professor Calomiris's three categories are: (1) Mergers and Reprivatizations, (2) Purchases and Assumptions, and (3) Insured Deposit Transactions and Payoffs.[52] I also obtained the FDIC Failure Transaction Database and grouped the nine resolution types contained therein into Professor Calomiris's three categories, accepting for the purposes of this discussion Professor Calomiris's categorization of the underlying data. There are a total of 450 so-called "Merger and Reprivatizations" included in the FDIC Failure Transaction database over the 1980-2004 period that have an "expected premium." However, examining these 450 transactions in Professor Calomiris's Merger and Reprivitization category on a year-by-year basis reveals that 447 of them were resolved between 1980 and 1988 (i.e, before FIRREA), as shown in Exhibit 10.[53] In other words, between 1989 and 2004, the RTC/FDIC resolved all but three of the 973 bank and thrift failures (with premium data) as one of the following two Professor Calomiris categories: (1) Purchases and Assumptions, or (2) Insured Deposit Transactions and Payoffs. Therefore, even if

[52] Calomiris Declaration of July 14, 2006, Figure 3. I would note that his analysis places FDIC resolution type PI, Purchase and Assumption of the Insured Deposits Only, in his category of Insured Deposit Transactions and Payoffs. The description of this resolution type in the user documentation for the FDIC Failure Transaction Database states: "PI = purchase and assumption of the insured deposits only, where the traditional P&A was modified so that only the insured deposits were assumed by the acquiring institution" (p. 9). This FDIC definition indicates this resolution type may well belong in the Purchase and Assumption category. Nevertheless, for the purposes of this discussion, I have left the PI resolution type where Professor Calomiris has placed it.

[53] Of the three institutions resolved after 1988, two were resolved in 1989 and one was resolved in 1992. The entity resolved in 1992 had total assets of $20.9 million (Freedom Bank, per the FDIC Failure Transaction Database).

Carteret could have been resolved as an ARP, it is highly probable that it would been resolved as a Purchase and Assumption, not a Merger and Reprivatization.

65. Professor Calomiris also states that Merger and Reprivatization transactions enjoyed the highest expected premiums, based on his analysis of the entire 1980-2004 time period. Exhibit 11, however, focuses on the period after 1988 and uses the same expected premium value groupings that Professor Calomiris used in his Figure 3. Transactions exhibiting the highest expected premiums in the more relevant post-1988 period were overwhelmingly in Professor Calomiris's Purchase and Assumption category, not his Mergers and Reprivatization category.

66. It is also important to note that of Professor Calomiris's 450 Merger and Reprivatization transactions, 433 were what the FDIC Failure Transaction Database terms "Assisted Acquisition" transactions.[54] These transactions involved assistance provided by the government to the acquirer, who purchased the entire institution. Therefore, the expected premium that Professor Calomiris calculates for Mergers and Reprivatizations does not reflect the deposit premium that an acquiring publicly-owned financial institution is willing to pay, but rather it reflects the cost savings the government was expecting to realize by providing direct assistance to the buyer instead of liquidating the bank or thrift and paying off its depositors.

67. Professor Calomiris's assertion that Carteret should have been sold as a whole institution in December 1993 (regardless of specific resolution type) does not reflect the reality of the resolution process by the early 1990s. In *Managing the Crisis:*

---

[54] Failure Transaction Database User Documentation, p. 9.

*The FDIC and RTC Experience*, a document frequently cited by Professor Calomiris, the FDIC states:

> "In selecting the resolution method, the FDIC has changed procedures over the years. Before 1991, the FDIC could effect any resolution transaction that was less costly than a deposit payoff. While the estimated cost of the resolution method has always been important, the FDIC at times considered other factors before making its final selection. Deposit payoffs were at time discouraged because of the effect that type of resolution method had; it reduced the availability of local banking services in smaller communities... In 1991, because of a change in the law [FDICIA], the FDIC amended its failure resolution procedures to accept the 'least cost' bid.[55]
>
> "FDICIA also requires that if the FDIC does not liquidate a failing institution (conduct a deposit pay-off), then it must pick the least costly alternative, All bids must be considered together and evaluated on the basis of comparative cost; other policy considerations, regarding which regulators previously had some discretion, cannot be factored into the determination of the appropriate transaction. FDICIA compelled the FDIC to consider more transaction options than in the past to make certain that all feasible least cost structures were offered.[56]
>
> "Whole bank transactions represent the most dramatic attempt by the FDIC to pass assets from failed banks quickly back into the private sector...In 1988, 69 of the 279 failed bank resolutions were whole bank transactions. Whole bank transactions were also widely used in 1989, 1990, and 1991, when they constituted 20.3, 25.4, and 18.9 percent of all resolutions, respectively. With the introduction of the least cost test, however, the number of successful whole bank bids declined. Because a whole bank bid constitutes a one-time payment from the FDIC, bidders tend to be very conservative to cover all potential losses. Conservative whole bank bids could not compete with other transactions on a least cost basis."[57]

68. In sum, Professor Calomiris's expected premium analysis is unreliable, inconsistent with the historical facts, and inferior to an approach that uses actual market-based transaction data.

---

[55] *Managing the Crisis: The FDIC and RTC Experience*, p.60.

[56] *Managing the Crisis: The FDIC and RTC Experience*, p.12.

[57] *Managing the Crisis: The FDIC and RTC Experience*, p. 88. It should be noted that these three quotations pertain to the implementation of FDICIA, not FIRREA.

### F. Analysis of Deposit Premium Data Show Market-Based Premiums Increased Significantly During the 1992-1995 Period

69. In this section, I analyze the percentage deposit premiums (as in Formula 2) that *actually* were observed in the marketplace over the 1992-1995 time period, both in general and in Florida and New Jersey in particular. I also analyze the premiums received by the RTC for Carteret's Florida and New Jersey sales relative to similar sales. I show that the percentage deposit premiums that the RTC actually achieved from the Carteret branch sales in the more favorable market conditions that existed in 1994 and 1995 significantly *increased* the revenue received by the RTC for the deposits sold.

70. To start, it is important to distinguish between transactions among healthy banks and thrifts and government-assisted transactions, i.e., those implemented by the RTC/FDIC selling branches and banks. Since Professor Calomiris does not dispute that the transactions at the center of his report were government-assisted, the remainder of my analysis will focus on such transactions.

71. Exhibit 12, using transaction data from the SNL database,[58] clearly shows that government-assisted transactions achieved considerably higher premiums in 1994-1995 than in 1992-1993. This result holds true whether one looks at national median premiums, mean premiums, or deposit-weighted mean premiums, or at deposit premiums in the New Jersey and Florida markets individually. (I note that Exhibit 12 includes both whole bank and branch transactions; I analyze whole bank transactions separately at the end of this subsection.)

[58] Data on transactions are from SNL Securities of Charlottesville, VA. Transactions involve a unique buyer and seller on a given date. Thus, because the nine Carteret branches in Florida sold on October 28, 1994 involved three different buyers, this sale is represented by three transactions in the SNL data.

72. Exhibit 12 shows the percentage deposit premium for all government-assisted transactions (Column 1), all New Jersey (government-assisted) transactions (Column 2), and all Florida (government-assisted) transactions (Column 3). For each year of data, the first row shows the number of transactions; the second row presents the number of transactions with deposit premium data; the third row shows the mean percentage deposit premium; the fourth row presents the median percentage deposit premium; and the fifth row shows the deposit-weighted mean percentage deposit premium.

73. On a national level in 1992, the mean, median, and weighted mean deposit premiums were 1.63%, 1.17%, and 1.88%, respectively. This was the year that Carteret failed. In 1993, the same premiums were 3.45%, 2.55%, and 4.46%, respectively. 1993 was the year when Professor Calomiris argues that the RTC should (and would) have sold Carteret absent RTC delays and Congressional funding delays. These relatively low premiums can be compared with those that were reported in 1994 and 1995. In 1994, the three premiums – mean, median, and weighted mean – had risen to 6.33%, 6.31%, and 6.99%, respectively. In each case, the 1994 premiums are more than 1.5 times greater than 1993 premiums, and more than two times greater than 1992 premiums. In 1995, the three premiums were even higher at 7.94%, 9.18%, and 8.35% respectively. Thus, comparing 1995 with 1993, the mean percentage premium was 2.3 times higher, the median percentage premium was 3.6 times higher, and the deposit-weighted mean premium was 1.9 times higher. It is very clear from these figures that both 1994 and 1995 were better markets in which to conduct government-assisted transactions than was

the 1993 market, the year chosen by Professor Calomiris for his "but-for" Carteret bank sale.

74. Columns 2 and 3 show the relative sizes for the same three percentage premium metrics for New Jersey transactions alone and for Florida transactions alone, respectively. First, looking at New Jersey, these data show that Florida and New Jersey premiums mirrored the sharp upward trend in premiums nationally. In 1995, the year in which Carteret branches were the only reported New Jersey branch sales, the premiums were far higher than the high national averages described above. Specifically, mean, median, and weighted mean percentage deposit premiums for New Jersey in 1992 were 1.42%, 1.08%, and 1.91%, respectively. These rose to 5.25%, 5.25%, and 5.25% in 1993, the year Professor Calomiris claimed that the RTC should (would) have sold the New Jersey branches.[59] In 1994, the three (New Jersey) premium metrics rose again to 5.43%, 5.97%, and 6.90%. In 1995, there were 12 branch sale transactions in New Jersey, all of which involved Carteret branches. The three premium values were 10.59%, 11.30%, and 10.82%, respectively. Thus, 1995 New Jersey premiums – for Carteret – were more than double those observed in 1993, and were at least 5.7 times higher than those observed in 1992. Contrary to Professor Calomiris's claims, actual market-based evidence suggests that, in disposing of Carteret's New Jersey branches, the RTC did its job well.

75. With respect to Florida, the nine Carteret branches were sold in three transactions in 1994. Like New Jersey and the nation, deposit premiums for government-assisted transactions in Florida rose dramatically over the three-year period 1992-1994.

[59] Only one New Jersey transaction occurred in 1993.

(There were no government-assisted Florida transactions in 1995.) In 1992, the year of Carteret's failure, the mean, median, and weighted mean for assisted transactions in Florida were 1.36%, 0.79%, and 2.23%, respectively. In 1993, the year Professor Calomiris argues that the sale should (would) have occurred, the Florida premiums were 4.48%, 4.48%, and 4.48%.[60] In 1994, these three Florida metrics increased to 6.70%, 5.12%, and 10.85%, respectively. Of the 15 Florida transactions in 1994, three involved sales of Carteret branches. In the case of these three transactions, the mean, median, and weighted mean premiums were 8.06%, 5.55%, and 6.08%, respectively.[61] (In 1994, the Carteret branch sale premiums were above the Florida mean and median premiums, but below the deposit weighted mean premium.) Again, contrary to Professor Calomiris's claims, the RTC did a far better job, in terms of the percentage deposit premium achieved, by selling the Florida branches in 1994 rather than in 1992 or 1993.

76. As noted above, the Carteret branch sales involved three different transactions and nine branches in Florida, and 12 different transactions and 30 branches in New Jersey. To further investigate the performance of the RTC in selling the Carteret branches, I analyzed whether the RTC achieved relatively high deposit premiums on a per branch basis over the 1992-1995 period. Also, because many of the branch sales involved a relatively low level of deposits, I also analyzed the effect of the size of deposits on the premium size for Carteret transactions as compared to other transactions.

77. Exhibit 13 presents the premiums generated on a per branch basis in New Jersey, taking into account the average size of the deposits in the branch system being

[60] Only one transaction is involved.

[61] The first transaction involved deposits of $119 million and a premium of $6.6 million (5.55%). The second transaction involved deposits of $30 million and a premium of $1.3 million (4.33%). The third transaction involved deposits of $14 million and a premium of $2 million (14.29%).

sold (e.g., if a package of three branches is sold in a transaction with $100 million in deposits in total, the average deposits per branch are $33.33 million). Exhibit 13 shows a scatter plot of the percentage premium achieved (vertical axis) versus the deposits per branch in the branch system sold over the 1992-1995 period (horizontal axis). As can be seen in both a relative and absolute fashion, Carteret's New Jersey branches were sold at high premiums.

78. Exhibit 14 presents the same data as Exhibit 13 for Florida. While the deposit premium performance is not as impressive as that for the New Jersey branches, of the 16 transactions with average deposits per branch of $20 million or less, one of the Carteret transactions is among the three with the highest premiums. Of the 15 transactions with average deposits per branch of $20 million to $40 million, the Carteret transaction is one of the two with the highest premiums.

79. While Exhibits 13 and 14 show the premiums achieved by deposits-per-branch in the transaction, Exhibits 15 and 16 show the premiums achieved by the total deposits associated with each transaction over the 1992-1995 period, for New Jersey and Florida, respectively. As can be seen in Exhibit 15, in New Jersey there was one very large non-Carteret transaction that biases the weighted average premium measure. In this one case, the deposits transferred exceeded $3 billion. All other transactions had deposit sizes of less than $500 million. As can be seen for the Carteret observations in the scatter plot, controlling for transaction size, the RTC's sales of Carteret branches (branch systems) achieved both high absolute and relative premiums. Exhibit 16 shows a similar plot for Carteret's Florida transactions. As can be seen there, Carteret's Florida

transactions were narrowly clustered in the under $200 million deposit range. As was the case in New Jersey, the RTC achieved relatively favorable premiums in Florida.

80. Thus, whether looking at the data on a transaction basis, on a per branch basis, or on a per year basis, the RTC's timing of branch sales clearly increased, rather than decreased, the premium earned per dollar of deposits sold for the Carteret branches. Any such enhanced premium, e.g, for 1994/1995 versus 1993, should be viewed as an offset to any decline in deposits over the 1993-1995 period.

81. Professor Calomiris asserts that but for the delay resulting from Congressional actions and other alleged causes, Carteret would have sold its $1.787 billion in deposits in December 1993 at a percentage deposit premium of 10.5%, which is the percentage deposit premium (per Formula 2) associated with the sale of the New Jersey branches in January 1995. This would have resulted in a deposit premium of $187.6 million ($1.787 x .105). This but-for premium is $43.8 million more than the $143.8 million deposit premium the branches actually sold for.[62] The problem with his assumption is that percentage deposit premiums were nowhere near this 10.5% level in 1993. As reported in Exhibit 12, the weighted mean deposit premium in 1993 was 4.46% nationally, 5.25% in New Jersey (one transaction), and 4.48% in Florida (one transaction). Taking the national average premium of 4.46% and applying it to the $1.787 billion in deposits in December 1993 would result in a dollar premium of only $79.7 million, considerably *less* than the RTC actually achieved in 1995. Taking the *highest* of the three premiums – the 5.25% premium in New Jersey – would result in a

[62] Calomiris Declaration of July 14, 2006, paragraph 83.

dollar premium of only $93.8 million, still considerably *less* than the premium actually achieved by the RTC.

82. Professor Calomiris asserts, without proof, that the proceeds to the receivership would have been greater if Carteret would have been sold as a whole bank, rather than separately as (clusters of) branches. Academic evidence suggests otherwise. Sudhir, Nanda et al. examine 58 RTC auctions of S&Ls over the 1989-1990 period and test the hypothesis that whole institution transactions generate higher returns than branch transfers.[63] They reject this hypothesis, finding significantly negative returns for the whole bank transfers, while the returns for branch acquisitions were insignificantly different from zero. They conclude that "branch P&As are typically more focused acquisitions than whole-institution P&As"[64] and therefore generate greater proceeds for the RTC, not lower proceeds as contended by Professor Calomiris.

83. SNL data on whole-bank transactions support this academic evidence. Exhibit 17 presents the data shown in Exhibit 12, but for whole bank transactions only. As shown there, the weighted mean deposit premium for whole bank transactions in 1993 was 2.29% nationally. Taking this national average whole-bank premium of 2.29% and applying it to the $1.787 billion in deposits in December 1993 would result in a premium of only $40.9 million, once again considerably *less* than the RTC actually achieved in selling Carteret in clusters of branches.[65] Moreover, as noted above, the FDIC concluded

---

[63] Sudhir Nanda, James Owens and Ronald Rogers, "An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing," *Real Estate Economics*, vol. 25, no. 2, 1997, pp. 271-294.

[64] *Op. Cit.*, page 284.

[65] For New Jersey, the weighted mean deposit premium was 5.25%, based on the same one transaction as Exhibit 12. For Florida, the weighted mean deposit premium was 4.48%, based on the same one transaction as Exhibit 12.

in *Managing the Crisis* that whole bank bids could not compete with other transactions on a least cost basis (after 1991).[66]

84. In sum, there simply is no evidence to support Professor Calomiris's assertion that the receivership would have received more in proceeds if Carteret had been sold as a whole bank in December 1993.

### G. PROFESSOR CALOMIRIS'S CHARACTERIZATION OF CARTERET DEPOSIT DECLINES IS MISLEADING AND HIS ANALYSIS OF THE IMPACT OF THE MINORITY PREFERENCE PROGRAM IS ERRONEOUS

85. Professor Calomiris calculates that Carteret lost 54 percent of its $2.7 billion deposit base between the date of its last quarterly TFR prior to failure and the date of its last quarterly TFR prior to resolution.[67] He attributes this run-off to delays in Carteret's resolution, including the delay resulting from the introduction of the minority preference program ("MPP") in December 1993. His analysis is misleading and mischaracterizes the reasons for Carteret's deposit declines.

86. Exhibit 18 presents Carteret's total deposits over the 1987-1994 period.[68] The chart clearly shows that Carteret's deposits were in decline well before the thrift was seized in December 1992. In the year preceding Carteret's failure, deposits declined by $539 million (total deposits of $2.932 billion on December 31, 1991 versus $2.393 billion on December 31, 1992). In the year following Carteret's failure, deposits decreased by a

---

[66] *Managing the Crisis: The FDIC and RTC Experience*, p. 88.

[67] Calomiris Declaration of July 14, 2006, paragraph 81.

[68] Professor Calomiris's measure of deposits appears to include both the TFR line item for "Deposits" and the line item for "Escrows" in the "Other Liabilities" section of the form. In this comparison, I use just the figure reported as "Deposits" in the "Liabilities" section of the TFR form.

larger, but roughly comparable $615 million amount (total deposits of $2.393 billion on December 31, 1992 versus $1.778 billion on December 31, 1993).[69]

87. In his Figure 1, Professor Calomiris also presents Carteret's deposit changes from December 1992 through December 1994, but in percentage terms rather than absolute dollar terms as shown in my Exhibit 18. Contrary to his assertion that the minority preference program caused delay that resulted in deposit runoff, his Figure 1 actually shows a slower rate of decline in Carteret's deposits in the quarters *following* passage of this program in December 1993. In his May 23, 2006, Corrected Declaration, Professor Calomiris asserted that his Figure 1 showed that the most drastic deposit declines occurred relatively late in Carteret's resolution. However, this assertion was based on his *erroneous* inclusion of deposits transferred in the sale of the Florida branches in his deposit run-off analysis. In his July 6, 2006, deposition, Professor Calomiris acknowledged that his run-off analysis should not include deposits transferred in the sale of the Florida branches, and he corrected this error in his declaration dated July 14, 2006, where he stated that the rate of decline in deposits was fairly constant over the time period covered by Figure 1.[70] However, his correction also should have affected his view about the impact of the minority preference program. Indeed, restoring the deposits associated with the Florida branches makes the percentage decline in Carteret's deposits from Q4 1993 to Q4 1994 approximately 21% (from $1.778 billion on December 31, 1993 to $1.401 billion on December 31, 1994). This compares with a percentage decline in deposits of 26% from Q4 1992 to Q4 1993 (deposits of $2.393 billion on December 31, 1992 versus $1.778 billion on December 31, 1993). Thus, the

---

[69] Source is the Veribanc TFR data.

[70] Calomiris Declaration of July 14, 2006, paragraph 79.

rate of decline in deposits actually *slowed* after the passage of the minority preference program.[71]

88. Professor Calomiris's assertion that the minority preference program had a dire impact here is simply wrong. In addition, Congress's enactment of this program is not a matter for academic speculation in a litigation context. Rather, it was a public policy decision designed to achieve important public and/or social welfare policy goals.[72] The Government Accounting Office ("GAO") – the government's watchdog – in its analysis of the RTC's 1993 resolution experience was generally positive about the manner in which it was conducted.[73] The GAO specifically analyzed three thrifts that were resolved between January 1, 1993 and June 30, 1994. In each case, the GAO found that the RTC had followed the appropriate procedures and guidelines. To the extent that the 1993 resolutions were delayed, this was because the RTC was actively following a "least cost resolution" policy as required by Congress, as well as implementing the depositor preference requirements under the 1993 Depositor Preference Act (essentially giving depositors a higher preference in future resolution proceeds than other creditors, e.g., money market lenders). To the extent that the minority preference program allowed minority purchasers to "win" if they matched (after the auction) the bid of a non-minority

[71] As in my Exhibit 18, these deposit figures correspond to the line item for "Deposits" on the TFR and do not include "Escrows," which appear to be included by Professor Calomiris in his analysis of deposits (and deposit premiums). I would note that the inclusion or exclusion of Escrows does not alter the conclusion here. In addition, Professor Calomiris adds back to the December 1994 deposit amount the loan principal from the October 1994 resolution ($155.7 million), rather than the $163 million in deposits transferred. If I use Professor Calomiris's $155.7 million instead of the $163 million figure, deposits would decline from $1.778 billion on December 31, 1993 to $1.394 on December 31, 1994, a 23 percent decline that is still smaller than the rate of decline in the year prior to the enactment of the Minority Preference Program.

[72] In fact, there is an extensive academic and other literature that demonstrates the role of non-minority banks in red-lining mortgage and other loans in minority neighborhoods.

[73] "1993 Thrift Resolutions: RTC's Resolution Process Generally Adequate to Determine Least Costly Resolutions," General Accounting Office, GAO/GGD-95-119, May 1995.

bidder, the GAO did not view this as either delaying the sale process/resolution or producing lower premiums. Carteret received neither preferential nor detrimental treatment. The GAO concluded that the "…RTC's implementation of a policy to extend a preference to minority bidders when making resolution decisions appeared consistent with FDCIA's least-cost requirements."[74]

89. A second GAO report prepared near the end of 1995 focused specifically on the minority preference program.[75] The 1993 RTC Completion Act required the GAO to annually assess the RTC's efforts to sell performing assets to acquirers of failed thrifts under the minority preference program. Since there were no transfers of assets under the minority preference program in fiscal year 1994 and the RTC ceased to exist at the end of 1995, the GAO prepared only this one report, covering fiscal year 1995. (Fiscal year 1995 was the year that some of Carteret's assets were sold under the program.) The report stated, "On the basis of our discussions with firms experienced in pricing large volumes of mortgage loans and our review of mortgage loan valuation literature, we found that the RTC had established a reasonable process anchored to agency and mortgage securities market standards."[76] In the context of pricing mortgage loans, the study also found that the RTC "was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total returns on the disposition of assets as required by law."[77] By October 1995, 11

---

[74] *Op. Cit.*, p.5.

[75] "Resolution Trust Corporation: Performing Assets Sold to Acquirers of Minority Thrifts," General Accounting Office, GAO/GGD-96-44, December 1995.

[76] *Op. Cit.*, page 1. In the quote, agency refers to the Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Association (Freddie Mac), and Government National Mortgage Association (Ginnie Mae).

[77] *Op. Cit.*, page 2.

minority acquirers had purchased more than 4,000 loans for $289.6 million, and 64% of those assets were sold for between 91% and 100% of book value.[78]

90. In addition to arguing that a failed minority bid delayed the Carteret resolution, Professor Calomiris also uses an inappropriate auction model from the economics literature to argue that the presence of such bidders lowers deposit premiums.[79] Open outcry auctions were sometimes used by the RTC in the National Loan Auction Program. However, a desire to increase the amount of competitive bidding, level the playing field, and move large amounts of assets and deposits caused the RTC to switch to sealed bid auctions (of the type used in the Carteret branch sales). In discussing this issue, Professor Calomiris cites only the results of a theoretical paper by Bulow, Huang and Klemperer (1998) regarding common value auctions, not directly applicable to the circumstances of Carteret. Gardner and Stover (1998) explicitly test whether the RTC auctions conformed with the conditions for a common value auction and reject the hypothesis. They concluded that "The evidence suggests that these [RTC auction] transactions are best described as individual private value auctions…" (page 209). Thus, the theoretical model and results of Bulow, Huang, and Klemperer (1998) are irrelevant to the RTC auctions and to the Carteret branch sales.

91. Further, Professor Calomiris provides no evidence that the presence of an (additional) minority bidder in sealed bid auctions worked to lower deposit premiums. Indeed, an August 24 letter from a minority bidder to the RTC stated that non-minority bidders "are motivated by a long term goal to reduce competition" and "[t]oward that

---

[78] *Op. Cit.*, pages 11-12.

[79] Calomiris Declaration of July 14, 2006, paragraphs 98-99, which cites the article *Toeholds and Takeovers* by Jeremy Bulow, Ming Huang & Paul Klemperer, *Journal of Political Economy*, 1998.

end…are willing to pay above today's market."[80] Moreover, there is academic evidence suggesting that expanding the potential number of bidders (e.g., by encouraging the entry of minority bidders) increased the deposit premiums of bids. Gardner and Stover (1998)[81] show that all bidders raise their bids when there is more competition, thereby increasing the winning bid and increasing the proceeds to the receivership. Their results, using RTC sealed bid auctions similar to the Carteret auctions, show that an extra potential bidder (that attended the pre-bid due diligence conference) increased the winning bid amount by a statistically significant amount (at the 95% confidence level). Their results also show that the larger the number of serious bidders (attending the pre-bid due diligence conference), the more each bidder raises his/her bid in order to exceed the RTC reservation level. Moreover, sealed bid auctions enabled the RTC to sell the properties more quickly, particularly "for larger, higher profile assets for which the target market [was] primarily national in scope…"[82]

92. Professor Calomiris also appears to argue that because the MPP imposed a freeze on the sale of Carteret's assets, so as to keep valuable assets to attract minority bidders, the program discouraged non-minority bidders. He further argues that such a freeze added to the receivership deficit. Professor Calomiris appears to reason that if residential mortgage assets, in particular, were sold, this would destroy those valuable customer relationships established in residential mortgage lending, making Carteret branch sales less attractive to minority bidders under the MPP.[83] The economics and the

[80] C-AM-A-0125162-3.

[81] R. Gardner and R. Stover, "The Role of Information in Resolution Trust Corporation Auctions of Failed Thrifts," *Journal of Financial Services Research*, 14:3, 1998, pp. 209-221.

[82] *Managing the Crisis: The FDIC and RTC Experience*, page 328.

[83] See, for example, Calomiris Deposition of July 5, 2006 (pp.148-149) and of July 6, 2006 (pp. 518-520).

facts do not support Professor Calomiris's conjecture. First, it is very common for banks to package and sell mortgages – especially under FNMA/GNMA/FNLMC securitization programs. Indeed, over 50% of all residential mortgages are packaged and sold, suggesting that any customer relationship effect must be small. Second, since it is relatively easy for a mortgagee to refinance a mortgage and to switch banks in what is a national mortgage market, it is unclear what the value is (if any) of relationships built on the residential mortgage asset portfolio of a bank. Third, 60% of Carteret's originations and lending relationships were generated by mortgage brokers, not Carteret.[84] Fourth, as even Professor Calomiris conceded at his deposition, there was a shrinkage of Carteret assets, rather than a freeze, around the time of MPP, although according to him, of only around $40 million.[85] A closer look at the book value of Carteret's net assets over this period indicates a decline of approximately $2 billion from December 1992 to January 1994 and a decline of about $1.7 billion from January 1994 to March 1995. Further, residential mortgages (1-4 dwelling units) declined close to $400 million between December 1992 and January 1994 and further fell about $450 million between January 1994 and March 1995.[86] Fifth, to the extent that (performing) mortgages stayed in the receivership, they produced income that would have actually reduced the receivership deficit. Finally and perhaps most compelling, the Carteret receivership received 101 bids from 40 different entities, including some from big banks, in the 1994 and 1995 branch

---

[84] AM5067 0546-0557 at AM5067 0547.

[85] Calomiris Deposition, July 5, 2006, p. 130.

[86] AM5392 1397 and CAM028 0146-0162 at 0162.

auctions.[87] This was no dearth of bidders for Carteret's branches, due to the MPP, potential restrictions on asset sales, or any other reasons.

### H. PROFESSOR CALOMIRIS INCORRECTLY ESTIMATES THE MAGNITUDE OF DELAY IN CARTERET'S RESOLUTION

93. To analyze the alleged "delay" in the resolution of Carteret, Professor Calomiris performs a cohort analysis in his Figure 2 and his Table 9 in which he "cherry-picks" ten large thrifts that failed between December 30, 1988 and January 25, 1991 (which he designates Carteret "peers"). Despite the fact that these thrifts all failed well before Carteret (the closest being almost two years prior to Carteret's December 4, 1992 failure), Professor Calomiris claims that this small sample can be used to make sweeping generalizations about the cost of the delay of the resolution of the Carteret receivership and the optimal time for the Carteret resolution. Specifically, Professor Calomiris claims that his regression analysis (presented in his Figure 2) establishes a relationship between the percentage decline in a thrift's deposits and the length of time between a thrift's failure and its resolution.

94. Professor Calomiris's regression analysis is seriously flawed, and does not provide meaningful support for his claims, for a number of reasons. First, Professor Calomiris's dataset contains very few observations -- only eleven including Carteret – and these few observations span a two-year period. Second, five of the eleven failures selected by Professor Calomiris occurred *before* the passage of FIRREA and the creation of the RTC, and none, other than Carteret, were based in Florida or New Jersey. In fact, his Table 9 shows four Texas thrifts and three California thrifts. Third, he artificially

[87] C-AM-A-008740-8743 at C-AM-A-008742.

restricts his sample size by limiting the thrifts under consideration to those with between $4 billion and $6 billion in assets. If one wants to test for a relationship between a failed thrift's percentage deposit runoff during resolution and time to resolution, this is not the way to do it. The generally accepted statistical approach would be to use the entire sample of all RTC-assisted thrifts that were sold, and then estimate a regression that included resolution time, asset size, closure date and other relevant factors as explanatory variables. Professor Calomiris's simplistic regression of deposit decline on resolution time for a very limited subsample of data, for a disparate period of time, is inappropriate and cannot be used to draw inferences of any value.

95. Professor Calomiris's assumed linear relationship between percentage deposit change and time to resolution and his limited observation set are not comparable to Carteret in other ways. In particular, Professor Calomiris does not present sufficient financial data to show that the financial condition of his ten cohort failed thrifts was similar to that of Carteret. Indeed, his discussion in paragraph 81 of his report suggests that some of the thrifts in his chosen cohort were quite different from Carteret. Moreover, Professor Calomiris's reliance on a simplistic single-variable regression analysis precludes the use of financial data about each thrift's condition prior to failure as controls in the analysis. In addition, Professor Calomiris fails to take into account the substantial decline in interest rates over the 1989 to 1992 period. Such a decline would clearly affect the deposit flows at failed banks differently according to their year of failure. Thus, Professor Calomiris has failed to perform a properly controlled regression analysis that takes into account all relevant factors. Consequently, one cannot draw any

reasonable inferences from Professor Calomiris's regression results (in Figure 2) regarding the relationship between resolution time and deposit losses.

96. Despite these many shortcomings, Professor Calomiris simply takes the mean number of days to resolution for the 10 observations of cohort firms listed in Table 9 (excluding Carteret), and asserts that this mean of 365 days would have been the optimal resolution time for Carteret, but for allegedly inappropriate delays.[88] Many of Professor Calomiris's subsequent calculations regarding receivership "losses" for Carteret hinge on this presumption. This analysis is entirely inappropriate because, as stated above, the sample selection approach is biased and inappropriate.

97. Importantly, the resolution times shown in Table 9 are subject to substantial variation. Non-Carteret resolution times in this small sample vary from 0 days to 693 days, and the standard deviation of the sample of 10 cohort thrifts is 214 days around a mean of 365 days. This means that, from a purely statistical point of view (not taking into account relevant economic factors), the "normal" time to resolve a thrift is highly uncertain. Taking into account relevant economic and financial factors, the range of "normal" or "reasonable" resolution times could be even greater. Thus, statistically, Professor Calomiris cannot credibly claim to have established a meaningful but-for resolution date for Carteret. He simply chooses one year (365 days) – and thus the December 4, 1993 date – without any credible statistical or economic justification.

98. With respect to resolution delays, it should be noted that the 365-day resolution time proposed by Professor Calomiris is for a very unusual "but-for" world, namely, a world "but-for," or without, Congressional funding delays. The funding delays

[88] Calomiris Declaration of July 14, 2006, paragraph 82.

at issue here already existed by the time Carteret was placed in receivership, with Congressional funding for the RTC expiring on April 1, 1992. Given these circumstances, Professor Calomiris fails to explain how this April 1992 funding delay would have been resolved in his December 1993 but-for world. I would also note that *The Wall Street Journal* reported on November 19, 1993 that earlier in 1993 the RTC was able to use some money from reserves to resolve the case of 23 thrifts.[89] Finally, government funding delays are a fact of life. There is no "right" to prompt government action in any regard, so far as I know. As an economist, it is hard to understand how congressional delays can be the basis for a claim that the receivership deficit should be reduced.

## VI. PROFESSOR CALOMIRIS GREATLY OVERSTATES THE VALUE OF CARTERET'S SUPERVISORY GOODWILL

### A. INTRODUCTION

99. Professor Calomiris argues that had Congress not passed FIRREA and had the receiver realized "full value" from Carteret's supervisory goodwill, the size of the RTC's resolution loans to the receivership would have been lower, as would the receivership's interest costs for those loans, thereby decreasing the size of Carteret's receivership deficit.[90] However, Professor Calomiris commits a number of errors of logic and computation in assessing the "lost" value of supervisory goodwill.

100. The errors in logic arise in part from a mixing-up of arguments relating to the difference in the value of goodwill of a going concern versus that of a failed

[89] "Conferees Clear Compromise Bill for RTC Funds – Vote Followed Resolution of Issue of Authority to Sue S&L Officials," *The Wall Street Journal*, November 19, 1993, p. A2.

[90] Calomiris Declaration of July 14, 2006, paragraph 102.

institution like Carteret. Specifically, the issue of the value of Carteret's supervisory goodwill comes up in two different contexts to this litigation. The first is the loss of value or damages to Carteret, if any, caused by the phase out of supervisory goodwill enacted through the 1989 passage of FIRREA. The computation of the value of goodwill in this context assumes that, absent the phase out of supervisory goodwill, Carteret would have survived. The second context in which this issue arises -- and the focus of the Calomiris Declaration – is the value, if any, of Carteret's supervisory goodwill *in receivership*, i.e., the value *recognizing* Carteret's failure. In the first context, the issue is the value of supervisory goodwill to a *surviving* thrift; in the second context, the issue is the value of supervisory goodwill to a failed institution. Inexplicably, Professor Calomiris uses a goodwill measure based on a simple amortization of goodwill outstanding for a *non-failed* bank (Carteret) at the time FIRREA became effective, not the value of goodwill to a *failed* Carteret in receivership/conservatorship. That is, he uses a goodwill measure that assumes no failure or conservatorship as a measure of goodwill in a conservatorship post-failure world. This is clearly logically and economically inconsistent since the value of the goodwill of a failed institution must be less than the value of the goodwill of a surviving institution.

101. What Professor Calomiris should have asked in the matter at hand is the following: For the post-1992 Carteret receivership (conservatorship), what, if anything, was the value of the thrift's remaining supervisory goodwill? There can be little doubt that the value of supervisory goodwill would be lower for a failed bank than a surviving bank. As discussed above, Carteret was a very unhealthy bank. Given Carteret's bad loan portfolio, its poor profitability, and the erosion of its deposit base prior to its failure

in 1992, it is unlikely that any potential acquirer would have placed much value on any remaining supervisory goodwill of a failed Carteret and its branches. Indeed, Professor Calomiris offers no evidence that a potential acquirer would have placed a value on any remaining supervisory goodwill associated with Carteret's Florida and New Jersey branches in 1993 or 1994, even if the RTC had allowed supervisory goodwill to be transferred in such a transaction. Further, Professor Calomiris is assuming that the goodwill would not have been written-off at the time of conservatorship, that the buyer would not have had to write-off the supervisory goodwill as was required by GAAP purchase accounting rules, and that the buyer's regulator would have allowed the acquirer to count Carteret's goodwill as capital, all of which require quite a few leaps of logic.

102. In his deposition, Professor Calomiris echoed the errors in logic found in his declaration, seeming to imply that supervisory goodwill was something that could be bought or sold in the marketplace, like theater tickets or pollution rights. He offered no examples of this actually occurring in the real world, either before or after FIRREA. Professor Calomiris also suggested in his deposition that Carteret could have been acquired as a whole bank in December 1993 and that supervisory goodwill could have carried over in that transaction.[91] I disagree. First, the idea of Carteret being acquired as an ongoing entity more than a year after going through receivership is unrealistic. Second, as I noted above, supervisory goodwill would have already been written off. Finally, RTC standards imposed much higher than minimal capital requirements on potential acquirers so that any institution in need of supervisory goodwill would not have been an acceptable bidder. Indeed, it is unclear why an acquirer with considerable

---

[91] Calomiris Deposition, July 5, 2006, p. 49.

tangible capital would pay anything much to acquire the supervisory goodwill of a failed bank like Carteret. Interestingly, in his deposition, in discussing the transference of pre-existing goodwill, Professor Calomiris states:

> "If it turns out that my presumption is wrong based on legal analysis, then, one would have to reach a conclusion that I was wrong. But I am doing a calculation based on a presumption."[92]

103. Despite these errors in logic (and regulatory interpretation), Professor Calomiris then utilizes three different methodologies to calculate the purported value of this remaining goodwill as of the end of 1993 (and the end of 1994). Importantly, he recognizes that $1 of an intangible asset such as supervisory goodwill is not equal to $1 of cash. In his model construct, to calculate the dollar value of lost goodwill, one must deduct the appropriate dollar value of the return on investment that could be made with $1 of cash, compared to the absence of such returns on a dollar of intangible goodwill. Thus, in his first methodology, he posits that the supervisory goodwill could be hypothetically replaced by a cash infusion of an equal amount and then deducts the returns on this cash from the amortized starting value of hypothetical "going concern" Carteret goodwill (as of either December 6, 1993 or December 5, 1994) in order to generate annual imputed cash flows from the investment of goodwill. He then discounts these annual cash flows to both the December 6, 1993 and December 5, 1994 starting dates for valuing supervisory goodwill and deducts the total from the initial value of goodwill. Finally, he adds back the transaction costs associated with an issuance of common stock. For example, in his Table A4, Professor Calomiris obtains a value for the total lost goodwill value of $45.070 million as follows: Estimated face value of

---

[92] Calomiris Deposition, July 7, 2006, p. 659.

goodwill ($128.266 million), minus the discounted present value of future cash flows from investing this amount of cash ($83.195 million), plus the transaction costs of issuing common stock ($3.935 million).[93] In the following sections, I rebut each of these questionable steps individually. First, I show that the face value of Carteret's goodwill was much less than $128.266 million as of December 6, 1993 (for reasons in addition to those already discussed above relating to the goodwill value of an insolvent bank in conservatorship). Second, I show that the discounted present value of investment cash flows would be far in excess of Professor Calomiris's $83.195 million. Third, I show that Professor Calomiris's transaction costs estimate of $3.935 million is overstated. The impact of these corrections is to reduce dramatically the lost value of supervisory goodwill.

104. Professor Calomiris proposes a second alternative method that estimates the cost of replacing supervisory goodwill with tangible capital in the form of a common stock issue. As with the first method, this second method estimates the value of supervisory goodwill as of both December 1993 and December 1994.[94] Finally, Professor Calomiris proposes a third alternative method that uses an event study to compute the impact of the loss of goodwill on the market value of Carteret/AmBase's equity. I discuss the problems with each of these three methodologies below.

[93] I use the values shown in Table A4 for illustrative purposes. My criticisms apply equally to the values presented in Tables A5 through A9.

[94] Calomiris Declaration of July 14, 2006, paragraph 106.

### B. PROFESSOR CALOMIRIS OVERSTATES THE VALUE OF GOODWILL AT DECEMBER 6, 1993

105. In calculating the cost of the loss of goodwill, Professor Calomiris uses straight line depreciation of the December 1989 goodwill amortization schedule for the "Barton," "Delray," "Mountain," and "Blacksburg" branches to calculate the value of goodwill as of December 6, 1993 and December 5, 1994.[95] In doing so, he fails to take into account the $48.7 million reduction in supervisory goodwill associated with the sale of Delray branches in October 1990, as well as the December 1990 goodwill write-offs of $3.0 million, $6.7 million, and $1.3 million for the Barton, Mountain, and Blacksburg branches, respectively. As a result, Carteret's supervisory goodwill was approximately $85.2 million as of November 1992, significantly below Professor Calomiris's claimed amount of $136.8 million as of December 1992.[96]

106. Moreover, Professor Calomiris fails to recognize that Carteret's financial position and solvency materially worsened over the period after the acquisition of the troubled thrifts in 1982 and 1986, thereby reducing the inherent market value of any remaining goodwill. That is, it is highly probable that if a market valuation of goodwill had been done, then the outstanding market values of goodwill as of 1993 and 1994 (or 1989) would have been far less than the simple amortized book values as presented by Professor Calomiris.

107. More importantly, in positing his goodwill figure, Professor Calomiris fails to acknowledge the precarious financial position that Carteret was in even before FIRREA took effect in December 1989. The Office of Thrift Supervision (OTS)

[95] Calomiris Declaration of July 14, 2006, paragraph 107.

[96] AM00050541 and AM00050544. The $85.2 million is comprised of $22,863,727 for "Barton" and $62,315,176 for "Delray," per AM00050567.

commenced an examination of Carteret on May 22, 1989, concluding it on November 14, 1989. In its summary, the OTS Report of Examination (ROE) stated, "Some of these areas [of concern] included the takeover of the institution by AmBase, Inc., formerly the Home Group, a noted deterioration in the quality of the loan portfolio and the adequacy of loan loss reserves, net operating losses in the four previous quarters, and the adequacy of CSB's capital position particularly in light of the recent legislation (FIRREA)." The ROE concluded that, "Carteret has serious financial problems, with core operating losses over the last four quarters and declining asset quality resulting in a strained capital position. Inadequate loan loss reserves and changes in the regulations mandated by FIRREA place additional strains on the bank." The ROE assigned Carteret a composite rating of "4." This is the second worst rating on a scale of 1 to 5 and denotes a problem banking institution.[97]

108. The May 22, 1989 ROE, completed on November 14, 1989, contains additional findings documenting Carteret's poor financial condition pre-FIRREA. It stated, "Carteret has experienced a tremendous increase in the amount of criticized assets, now representing 6.7% of assets and 154.2% of regulatory capital. This problem is somewhat the result of a general decline in the real estate market in the bank's main lending area of Florida and recently New Jersey. However, a considerable part of the problem is also caused by poor underwriting."[98] The level of Carteret's total classified assets (those classified as substandard, doubtful, or loss) increased from $9.9 million on December 31, 1987 to $174.9 million on December 31, 1988 to $307.0 million on

---

[97] WOQ668 1975-2222 at WOQ668 1981 and 1987.

[98] *Op. Cit* at WOQ668 1984.

December 31, 1989, a phenomenal increase in just a two-year period.[99] Exhibit 19 presents the growth in Carteret's classified assets as a percent of total assets over this time period, documenting the dramatic increase in its problem assets as a percent of its total assets – reaching close to 11% by the end of 1990.

109. The same ROE also stated that Carteret experienced declining levels of capital since 1987, well in advance of any FIRREA legislation.[100] Operating ratios and trends presented in the report show the ratio of regulatory capital to total assets for Carteret declining from 5.7% to 4.4% from December 31, 1987 to June 30, 1989. The ratio for Carteret's peer group also declined over this time period, but less precipitously (from 5.3% to 4.7%). Similarly, the estimated ratio of GAAP capital to total assets for Carteret declined from 5.1% to 3.7% from December 31, 1987 to June 30, 1989. As before, the ratio for the peer group also declined, but again less precipitously (from 4.3% to 3.3%).[101]

110. Carteret's level of tangible capital was calculated for the first time by the examiners in the same ROE. The deterioration in Carteret's tangible capital position in subsequent periods is shown in Exhibit 20; as shown there, Carteret's tangible capital declined from a *positive* $49.6 million in June 1989 to a *negative* $72.8 million in June 1992. In June 1989, the ratio of classified assets to tangible capital at Carteret was already dangerously high, with classified assets over 500% larger than tangible capital. In 1991, Carteret became economically insolvent when its tangible capital turned negative.

---

[99] WOQ690 2449-WOQ690 2653 at WOQ690 2501.

[100] *Op. Cit.* at WOQ668 2025.

[101] *Op. Cit.* at WOQ668 2047.

111. Carteret's deteriorating financial condition before FIRREA resulted in part from worsening economic conditions, both nationally and in Carteret's primary markets. While the recession officially began in 1990, economic activity slowed well before then, as indicated by the percentage changes in real Gross Domestic Product presented in Exhibit 21. In New Jersey and Florida, this slowdown was pronounced. In Florida, the number of single family housing permits issued fell every year from 1986 through 1989, as shown in Exhibit 22. In New Jersey, the decline in housing permits was even more severe. The year-over-year percentage change in single family permits turned sharply negative in 1988 (-34.2%), with an additional substantial decline (-25.8%) in 1989. Increasing unemployment rates provide additional evidence of worsening economic conditions facing Carteret *before* FIRREA. As shown in Exhibit 23, Florida's unemployment rate was below the national average until late 1988 when it rose above the national average, where it remained through 1990. New Jersey's unemployment rate was well below the national average until early 1989 when it started to increase at a much faster rate than the national average. By mid-1990, the New Jersey rate was quite close to the national rate.

112. Carteret's weak financial condition and the deteriorating local market and national economic conditions during this time are completely ignored by Professor Calomiris (except for his intimation that Carteret's weak condition was caused by the government's breach). Carteret's weak financial condition in advance of the passage of FIRREA – as exhibits to this declaration show – indicates that Carteret's remaining supervisory goodwill had little value, if any, as of 1993 and 1994, *even without FIRREA* and should not be added to the receivership as a "missing" asset.

### C. PROFESSOR CALOMIRIS'S ESTIMATE OF THE CASH EQUIVALENT VALUE OF GOODWILL IS FLAWED AND UNRELIABLE

113. Professor Calomiris presents a confused blend of the actual and the hypothetical as he attempts to determine the cash equivalent present value of goodwill as of December 6, 1993 and December 5, 1994. As noted above, he argues that Carteret's remaining goodwill should be amortized using an amortization schedule as of December 1989, the last schedule unaffected by the breach. This gives him an amortization value but-for the breach as of December 6, 1993 and December 5, 1994. The remainder of his analysis is done using actual 1993/1994 data. As noted above, Professor Calomiris correctly recognizes that one simply cannot calculate $1 loss of goodwill as being equivalent to $1 of cash since the former earns no income while the latter does. As a result, he has to deduct from the outstanding book value of goodwill that he estimates as of 1993 (1994), an estimated present value of the stream of income that cash could have generated if it had replaced goodwill, an intangible non-interest earning asset. In short, his goodwill loss is equal to his estimate of the book value of goodwill lost as of 1993 (1994) minus the present value of the return on cash.

114. Professor Calomiris's calculations of the present value of the return on his cash-equivalent goodwill capital infusion are flawed in at least two ways: (1) the imputed after-tax return on cash investments is dramatically understated, and (2) the discount factor is dramatically overstated. Correction of each of these flaws yields a much larger estimate of the present value of the return on investing cash (rather than goodwill) and therefore a much larger deduction from the initial amount of supervisory goodwill face value amount, thereby reducing Professor Calomiris's estimates of lost goodwill damage to the receivership.

### 1. PROFESSOR CALOMIRIS'S ERRORS IN EVALUATING AFTER-TAX CASH EARNINGS

115. Professor Calomiris assumes that twenty-year Treasury securities "most accurately replicate the risk characteristics of the contractual goodwill that I am replacing."[102] Thus, he assumes that supervisory goodwill (if replaced by cash) would be invested only in risk-free (i.e., government-issued) assets. This is in violation of the basic principals of financial intermediation. First, as described above, the market value of supervisory goodwill *was not* a risk-free (intangible asset) that is best replicated by a Treasury security since any book value of goodwill upon failure would have a lower market value than the goodwill of a going concern. Second, thrifts and other financial intermediaries choose their portfolios to generate positive spreads between the return on assets and the cost of funds. If Carteret/AmBase had restricted itself to a 6.31% per annum 20-year Treasury yield (the rate on December 6, 1993) for the investment of its cash equivalent capital proceeds (i.e. cash capital replacing goodwill capital), then the spread would have been *negative*. This is because Professor Calomiris himself estimates (erroneously as it turns out) that the cost of capital for Carteret/AmBase was between 11.59% to 13.32% per annum, using different methodologies for 1993 and 1994.[103] Thus, his own assumptions are internally inconsistent. He hypothesizes a situation in which the thrift intentionally sets up a guaranteed *negative* spread on its assets of between 5.28% per annum (6.31% minus 11.59%) and 7.01% per annum (6.31% minus 13.32%), a clearly illogical proposition and a strategy which no financial intermediary could survive. To be consistent, Professor Calomiris should have acknowledged that the "cash

[102] Calomiris Declaration of July 14, 2006, paragraph 109.

[103] Calomiris Declaration of July 14, 2006, paragraphs 128-129.

equivalent earnings" of the supervisory goodwill would have been invested in assets that yield a positive spread. Then the yield on the investment of cash from supervisory goodwill would have exceeded the 6.31% per annum cost assumed by Professor Calomiris, so as to compensate Carteret/AmBase for the high amounts of risk in their portfolio investments.

116. Even given the poor performance of Carteret and its abysmal record over the period from December 1989 through December 1992, Professor Calomiris assumes that any earnings on these cash investments would have been taxed at a 35% rate. A marginal tax rate of 35% on the goodwill cash equivalent earnings on hypothetical Treasury security investments is far from credible over the time period of interest. Indeed, Carteret/AmBase generated losses during much of the period from 1990 through 1992.[104] This suggests that the firm would not have paid the full 35% statutory tax rate, but rather a lower effective tax rate, perhaps zero. Incorporating appropriate changes to both the investment profile (and hence returns) and the tax rate would generate present values of the cash "proceeds" from the lost supervisory goodwill far in excess of the values shown by Professor Calomiris in his Tables A4 and A5. Since these cash-equivalent values are *deducted* from his estimates of the starting book value of supervisory goodwill, this would reduce his estimates of goodwill loss.

### 2. PROFESSOR CALOMIRIS'S ERRORS IN EVALUATING THE DISCOUNT FACTOR

117. To calculate the present value of a flow of future (after-tax) cash returns, one has to account for the time value of money. This requires discounting future cash

[104] Veribanc TFR database.

flows back to the present at a discount rate that reflects the investor's appropriate time value of money on the investment at hand. A centerpiece of Professor Calomiris's analysis is his determination of the discount rate he uses for valuing the after-tax cash flows derived from investing the goodwill in Treasury securities on either December 6, 1993 or December 5, 1994. First, he asserts that an investor interested in acquiring such cash flows would have valued them based on the risk of a preferred stock offering at that time. He claims that preferred stock is the security that most closely matches the characteristics of those cash flows. He simply assumes that a weak Carteret could have issued preferred stock in the first place, which is not clear. However, I see no basis for his selection of a preferred stock rate or yield as a discount rate on cash flows, under his assumption that all replacement cash is invested in risk-free U.S. Treasury securities. As discussed above, this assumption is totally at variance with the riskless nature of the cash-flow investments and with financial theory; it produces a negative spread for the thrift, with its cost of funds exceeding its investment yields. Thus, Professor Calomiris's model is internally inconsistent, or assumes a basically irrational thrift investor that behaves as if risk-free cash flows are actually risky.

118. One possible reason for this confusion is that Professor Calomiris wants his discount rate to reflect the *average* cost of capital of Carteret's whole portfolio rather than the *marginal* cost of capital (which in Professor Calomiris's world of investing in Treasuries, would be a risk-free rate, as argued above). In spite of this, Professor Calomiris appears to be using (inappropriate as it may be) an average cost of capital. However, the cost of issuing preferred stock is not that average cost. Rather, a thrift's weighted average cost of capital reflects the cost of both its debt funds, such as deposits,

and its equity funds.[105] Indeed, the very reason that financial institutions generate positive spreads is that they use low-cost borrowed funds in the form of deposits (i.e. leverage) in addition to equity to finance their asset investments.[106] Professor Calomiris seems to assume that all but-for cash equivalent funds are those that result from a stock issue, thereby ignoring the low cost of funds that banks and thrifts can access through the deposit market. Of course, recognizing the leverage effect lowers the weighted average cost of capital – the weighted average of deposit costs and equity costs – and hence the discount rate that should be used in discounting cash-flows.

119. Moreover, I have serious doubts as to whether Carteret would have been in a position to issue preferred stock in the first place given its long-term weakness. As I discuss below, Professor Calomiris's valuation of goodwill is highly sensitive to whether the discount rate is based on a preferred stock offering or some other security or securities. The effect of Professor Calomiris's choice of a high discount rate is transparent: By assuming a very high speculative discount rate equal to a yield of some hypothetical preferred stock that hypothetically could have been issued by Carteret, he reduces the present value of the riskless after-tax cash flows.

120. To calculate the hypothetical yield on Carteret's hypothetical preferred stock, Professor Calomiris uses regression analysis. He employs a linear regression model using a sample of 33 preferred stock and high-yield debt offerings by thrifts and savings banks over the 1993-1994 time period. Specifically, of the 33 offerings, 21 are preferred stock offerings and 12 are high-yield offerings. Moreover, 12 out of the 21

[105] Calomiris Deposition, July 7, 2006, pp. 685-686.

[106] It should be noted that preferred stock can be levered under the Basel risk-based capital requirements.

preferred stock offerings are convertible to common stock while the remainder are what are commonly called straight preferred stock.

121. Professor Calomiris predicts the preferred stock discount rate for Carteret on December 6, 1993 as equal to 11.85% and on December 5, 1994 as equal to 13.06%. He gets these rates by using 12 coefficients from his regression model multiplied by the respective hypothetical values he calculates for twelve financial variables relating to Carteret's hypothetical preferred stock offering.[107] I would first note that by combining both preferred stock and high-yield debt offerings in the same sample, Professor Calomiris is mixing apples and oranges. In particular, preferred stock and high-yield debt have very different risk and taxation characteristics. First, preferred stock has a higher risk than corporate debt, since the latter has a stronger claim over the assets of a firm in bankruptcy. Second, while the interest cost of a corporate debt issue can be expensed for tax purposes, producing a so-called "tax shield", no issuer specific tax-shield exists for preferred on its dividend payments. By contrast, the tax-shield is transferred to a corporate purchaser of preferred who can deduct up to 70% of the dividend received against taxes. Thus, while higher risk tends to make preferred stock yields higher than corporate bond yields, the tax-shield effect tends to make them lower, since a corporate investor is willing to accept a lower yield because of its tax savings.

122. In Exhibit 24, I show how heterogenous the sample chosen by Professor Calomiris is over the 1993-94 period and how the average yields across high-yield debt, straight preferred stock, and convertible preferred stock differ. First, it can be noted that his straight preferred offerings have a higher required yield than his high-yield debt

[107] Calomiris Declaration of July 14, 2006, Table A2 of Appendix A.

sample, an unweighted average of 9.347% (weighted average of 10.069%) versus 8.436% (8.641%); his convertible preferred offerings, which have a valuable option that allow them to be converted into common stock, have a lower yield than high-yield bonds, 7.361% (7.862%) versus 8.436% (8.641%). Clearly, even a cursory examination of the yield data suggests that convertible and straight preferred stock are very different instruments and should not be combined together or with debt in a hodge-podge of a sample.

123. Moreover, the highly selective nature of his sample of 9 straight and 12 convertible preferred issues for 1993 and 1994 should be viewed in the context of the actual number of new preferred issues in those years. Specifically, Bajaj et al. (1992) report 72 convertible and 299 straight issues in 1993, and 39 convertible and 75 straight issues of preferred stock in 1994. Morever, Bajaj et al. report that 1485 straight and 218 convertible preferred stock issues were undertaken by financial institutions over the 1980-1999 period.[108] Clearly, Professor Calomiris's sample is very small compared to this universe.

124. I would also note that three of the 12 coefficients for the variables Professor Calomiris includes in this regression model to estimate Carteret's hypothetical preferred stock yield are insignificant at the 95% confidence level, a common standard in statistical analysis.[109] The three statistically insignificant coefficients are: (1) rating, which is surprising since one would expect an instrument's credit-risk rating to affect its yield, (2) the log of the principal amount of the offering, also surprising since one would

---

[108] Mukash Bajaj, Sumon C. Mazumdar, and Atulya Sarin, "The Costs of Issuing Preferred Stock," *The Journal of Financial Research,* Vol. XXV, No. 4, Winter 2002, pp. 577-592.

[109] It is unclear from Table A3 whether the Merrill Lynch high-yield debt index is also statistically significant since it has a t-statistic of 2.06, but is not marked with an *.

expect smaller offerings to pay higher yields, and (3) duration of the offering, surprising once again since one would expect longer maturity (duration) offerings to pay a higher yield because of the market's preference for liquidity and default risk avoidance. The fact that these three key coefficients are statistically insignificant creates considerable doubt that the model has been properly specified or even estimated, which is not surprising given the small size and hybrid and heterogeneous nature of the sample of preferred stock and corporate debt, as discussed above.

125. Even more troubling is how Professor Calomiris uses his model's coefficients to estimate Carteret's hypothetical preferred stock yield. He states that his method is to apply the relevant Carteret values as of December 1993 to his corresponding regression coefficients, but he then chooses to ignore this method for two model coefficients: (1) Carteret's equity-to-assets ratio, and (2) the square of its equity-to-assets ratio. He states, "Given the distressed condition of Carteret as a result of the breach, its equity was negative, and therefore its ratio of equity to assets was negative. To avoid using an extremely low equity-to-assets ratio that would be outside the range of the sample used to construct these estimates, I calculate my forecast of Carteret's preferred yield using the lowest equity-to-assets ratio in the regression sample in lieu of Carteret's negative ratio."[110] When Professor Calomiris substitutes another company's financial statement values for Carteret's into his model, he is no longer estimating Carteret's cost of preferred stock. Indeed, he has a jerry-built "but-for" model of preferred stock cost based on a sample of companies who are unlike Carteret in at least one crucial respect,

---

[110] Calomiris Declaration of July 14, 2006, paragraph 117.

i.e., companies that are outside the range of Carteret's actual financial performance and insolvency risk.

### D. PROFESSOR CALOMIRIS'S ESTIMATE OF THE COST OF REPLACEMENT IS FLAWED AND UNRELIABLE

126. The second method used by Professor Calomiris to calculate the lost value of supervisory goodwill is the cost of replacement approach. He assumes that the lost supervisory goodwill would have been replaced by a common stock issuance. In doing so, he performs a flawed analysis of the cost of the common stock issue. However, Professor Calomiris never addresses the fundamental question whether Carteret could have issued common stock in either December 1993 or December 1994. Indeed, the Plaintiff's First Amended Complaint *admits* that Professor Calomiris's assumption that Carteret/Ambase could have raised substantial amounts of equity capital[111] at any time subsequent to its takeover by the RTC is counter-factual (see paragraphs 66 and 68 of the Plaintiff's First Amended Complaint). Paragraph 68 of the Complaint also implies that any Carteret/Ambase attempts to issue equity were unsuccessful in the 1992 period. Why does Professor Calomiris believe that the equity capital issue would have been any more successful in December 1993 or December 1994 for a bank in such a perilous state? Indeed, Professor Calomiris's analysis shows that the financial condition of Carteret/AmBase continued to decline over the 1993-1994 period, as compared to 1992. This would make it even less likely that Carteret/AmBase could have issued common stock to replace the supervisory goodwill.

[111] Common stock needed to replace disallowed supervisory goodwill per Calomiris Tables A6 and A8.

127. The premise of Professor Calomiris's cost of replacement analysis is even more shaky given the large volume of failed or failing thrifts during the 1990–1993 crisis period. It would be irrational for investors to contribute new equity to a troubled thrift (and implicitly support its assets) when they could acquire selected thrift assets directly from the RTC. The latter acquisition process results in asset purchases that are easier to value on an asset-by-asset basis (because of greater transparency and more comprehensive due diligence) and also offers smaller and more narrowly-defined packaging of assets. Equity investors (such as a hypothetical equity investor in Carteret) bear the first risk of loss on the thrift's assets in general and thus are most likely to be impaired by fraud and mismanagement. By contrast, the RTC offered investors the opportunity to invest in relatively sanitized portfolios of thrift assets. Given the above, it is extremely unlikely that Carteret/AmBase could have issued common stock in either 1993 or 1994.

128. Professor Calomiris also makes errors in the implementation of the methodology of pricing a common stock issue. Specifically, in his alternative cost of replacement model, he uses discount factors derived using the so-called Capital Asset Pricing Model (CAPM). Aside from the literature that casts doubt on the veracity of a simple CAPM (see for example, Fama and French (1992)[112]), Professor Calomiris's implementation is incorrect. He utilizes a median beta (or systematic risk measure) for depository institutions in 1994 of 0.88.[113] However, the systematic risk of an equity investment in insolvent Carteret/AmBase was not comparable to the median risk

[112] E. Fama and K. French, "The Cross-Section of Expected Stock Returns," *Journal of Finance,* June 1992, Vol. XLVII, No. 2, June 1992, pp. 427-465.

[113] Calomiris Declaration of July 14, 2006, paragraph 127. In simple terms, beta is the measure of volatility of a given stock relative to the overall market. A beta below 1 is less volatile than the overall market.

exposure of a sample of solvent depository institutions. Using this haphazard approach, Professor Calomiris arrives at estimates of required common equity returns for Carteret/AmBase of 11.59% per annum in 1993 and 13.32% per annum in 1994. As it happens, the model generates estimates similar to those obtained using Professor Calomiris's flawed preferred stock regression model in his alternative cash-equivalent approach.

### E. Professor Calomiris's Errors in Calculating Transaction Costs in Both the Cash Equivalent and Cost of Replacement Approaches

129. In addition to cash flow and discount rate estimates, Professor Calomiris also estimates a percentage transaction cost of issuing preferred stock. In his model, the *lower* the transaction costs, the *higher* is the cash equivalent value and the *lower* is his estimated goodwill loss. In order to estimate the cost of issuing hypothetical preferred stock in the cash equivalent approach (and of issuing common stock in his cost of replacement approach), Professor Calomiris uses the empirical results from a 1996 article by Immoo Lee, et al.[114] In particular, he uses the averages of total direct costs presented in Lee, et al.'s Table 1 for seasoned equity offerings of *common equity* over the 1990 – 1994 period. However, the cost of issuing preferred stock (as in Professor Calomiris's cash equivalent model) is very different from the cost of a secondary offering of common stock.

130. Preferred stock is in many ways lower risk than common stock and the "transactions cost" that underwriters charge to bring a preferred stock issue to market reflects the relative lower risk of the issue. Specifically, preferred stock holders have

[114] Immoo Lee, Scott Lochhead, and Jay Ritter, "The Cost of Raising Capital," *Journal of Financial Research*, vol. XIX, Spring 1996, pp. 59-74.

priority over common stock holders if an issuer goes bankrupt. Perhaps more importantly, preferred stock offers a promised dividend return (something like the coupon on a bond). On the other hand, the hybrid nature of preferred stock is captured by the fact that corporate bondholders have priority over preferred stockholders in bankruptcy, and that promised dividends on preferred stock often can be deferred if the firm has cash-flow problems. In addition, the maturity of preferred stock is usually open-ended like a common stock.

131. The few studies that have been conducted about the relative transaction costs of issuing preferred stock have found that its transaction costs are lower than those of common stock issues. In a 2002 study, Bajaj, et al.[115] examined the cost of issuing 3,042 preferred stocks over the 1980-1999 time period, using the Securities Data Company database on issuing costs. They found that the average total cost to financial companies of issuing straight preferred stock was 2.75% of the total proceeds of the offering, while the cost of issuing convertible preferred stock for financial companies was 5.537%. In his deposition, Professor Calomiris appears to have had in mind a straight preferred stock offering of a relatively short duration (since it is re-issued every year in his but-for model). Given the non-convertible and short-term nature of his hypothetical preferred stock, this suggests that transaction costs should be closer to the 2.75% found by Bajaj et al. for straight preferred issued by financial companies than the 4.73% (5.18%) costs Professor Calomiris finds for his hypothetical 1993 (1994) issue based on the Lee et al. study of common stock issuance. In addition, Professor Calomiris assumes issue sizes of $83.2 million in 1993 (Table A4) and $79.8 million in 1994 (Table A5).

[115] Mukesh Bajaj, Sumon C. Mazumdar, and Atulya Sarin, "The Costs of Issuing Preferred Stock," *The Journal of Financial Research*, Vol. XXV, No. 4, Winter 2002, pp. 577-592.

The Bajaj study shows the total cost of issuance for straight preferred in the $80.0-99.9 million range was 2.802% and was 3.856% for *convertible* preferred stock. Clearly, both of these transaction costs are well below the 4.73% and 5.18% of net proceeds Professor Calomiris used in his estimates of the cash-equivalent replacement costs. Finally, the Bajaj et al. study shows that for below-investment-grade preferred stock in the same size range, the respective transaction costs were 3.533% for straight preferred and 4.161% for convertible preferred, again less than the costs posited by Professor Calomiris. Importantly, and as noted above, because of the way his model calculates the value of lost supervisory goodwill, the lower these transaction costs, the smaller is any purported loss of goodwill in Professor Calomiris's but-for world.

132. Of course, this entire exercise is predicated on the assumption that Carteret/AmBase could have issued preferred stock in 1993 or 1994. In my opinion, this was extremely unlikely, as I discussed in previous sections.

### F. PROFESSOR CALOMIRIS'S EVENT STUDY APPROACH TO THE VALUE OF SUPERVISORY GOODWILL IS BASED ON A FATAL FLAW

133. To further investigate the cost of eliminating Carteret's supervisory goodwill, Professor Calomiris performed an event study to determine the effect on Ambase's market value of "news" eliminating goodwill. As he states, "Evidence from event studies must be interpreted carefully. For one to be able to draw a connection between an announcement and a stock price reaction, it must be clear that the announcement represents news (i.e., that it was not known in advance)."[116] I agree

[116] Calomiris Declaration of July 14, 2006, paragraph 135.

completely. However, Professor Calomiris should have added that the "news" must be material and *publicly* available to investors at large.[117]

134. Professor Calomiris states that the key event relating to the elimination of supervisory goodwill occurred on May 22, 1989 when the OTS warned Carteret that the removal of goodwill from its regulatory capital would leave it critically undercapitalized. He describes the warning: "Regulators concluded that Carteret was 'not likely to meet the tangible, leverage ratio, and risk-based minimum capital requirements required by FIRREA.'"[118] He builds his event study around the impact of this OTS announcement on May 22, 1989.

135. Professor Calomiris appears to have misinterpreted what happened on May 22, 1989. May 22, 1989 was not an *announcement* date of any warning to the public about Carteret. Instead, it was simply the date that the OTS commenced an examination of Carteret that it subsequently completed in November of that year. Indeed, the OTS did not announce anything on May 22, 1989; it simply began an examination, which would be furnished subsequently to Carteret for its own *private*, *confidential*, non-public use. Although this *non-public* report of examination contained the warning that Professor Calomiris quotes, it was issued confidentially (i.e, privately and not publicly) several months after May 22 and is irrelevant to AmBase's stock price behavior around May 22. In fact, in his *revised* report of July 14, 2006 (and in response to questioning about the date at his deposition), Professor Calomiris seems to implicitly acknowledge this problem by discussing other possible news events around that time that may have

[117] A statistically significant reaction in a firm's market-risk-adjusted stock return to material, publicly available news is indicative of so-called semi-strong form market efficiency. Tests of semi-strong form efficiency are called event studies.

[118] Calomiris Declaration of July 14, 2006, paragraph 101.

affected thrifts with supervisory goodwill in general, such as news reports of Congressional debates about the potential treatment of supervisory goodwill. Indeed, since he is unsure which, if any, events are important, at one place in his post-deposition Declaration of July 14, 2006, Professor Calomiris simply looks at the excess returns of Ambase's stock relative to the market over a *one-month* period, from May 15 to June 15, 1989. Using a one-month window is clearly outside the practice typically used in event studies published in credible academic journals. In sum, whatever Professor Calomiris is measuring in his event study has nothing to do with any May 22, 1989 OTS warning to Carteret about the elimination of supervisory goodwill, and many of the announcements he mentions are not specific to Carteret and not concrete enough to constitute an event. For example, he cites a *New York Times* article that reports on an amendment related to FIRREA that was defeated in a House committee.[119] Consequently, this section of Professor Calomiris's report, and his estimated losses, should be given no credibility at all.

## VII. SALE OF CARTERET MORTGAGE COMPANY AND OTHER ASSETS

### A. CARTERET MORTGAGE COMPANY (CMC)

136. Professor Calomiris claims that the RTC failed to sell "a thriving mortgage origination subsidiary, the Carteret Mortgage Company (CMC),"[120] choosing instead to simply shut it down on December 14, 1992. Of course, this raises the fundamental question: If CMC was such a thriving entity, why didn't Carteret sell it privately to raise tangible capital and avoid seizure by the RTC in 1992? During the

[119] Calomiris Declaration of July 14, 2006, paragraph 101.

[120] Calomiris Declaration of July 14, 2006, paragraphs 144-145.

period from 1990 to 1992, Carteret/AmBase struggled to meet its regulatory capital requirements, even closing or selling a number of branches. (See paragraph 56 in the First Amended Complaint.) If CMC really was such a valuable asset, it is likely that AmBase would have sold it in order to return the thrift to capital solvency.

137. Nevertheless, Professor Calomiris performs an event study around the date of the announcement of Imperial Credit Industries Inc.'s hiring of CMC's staff on December 28, 1992, following CMC's closure. He finds positive cumulative abnormal returns for Imperial's stock when the hirings of CMC's staff were announced. Such a finding may not be surprising, given that Imperial was hiring CMC's staff *without* acquiring any of the firm's troubled assets and liabilities. Thus, Imperial had no downside risk exposure. They did not pay a takeover premium and had no obligation to continue to employ CMC's staff or to absorb its assets. Thus, the finding of positive abnormal returns upon the announcement of the hiring of CMC's staff has no implications for the value of the company as a going concern or for the value of CMC's portfolio of real estate assets.

138. Moreover, there is evidence, not cited by Professor Calomiris, that CMC's staff may not have been that value-adding. For example, only three months after Imperial hired CMC's staff, the *Orange County Register* reported that the firm was having difficulty meeting its first quarter 1993 earnings target, citing fewer loan originations and its recent expansion into the Northeast, Florida, and Colorado for the disappointing results. The company said that its first quarter performance would have been worse had

it not been for a $3.8 million gain from the sale of loan-servicing rights.[121] Indeed, Imperial's stock fell by $3.75, from $18.00 to $14.25 per share, the day it announced its disappointing earnings forecast. This 21% decline was about the same size as the 18% increase that Professor Calomiris cites following Imperial's announcement on December 24, 1992 of the hiring of CMC's staff.[122]

139. Imperial Credit had gone public on the NASDAQ exchange in May 1992, just a few months before hiring the Carteret mortgage employees. On December 24, 1992, the day before announcing the hiring, Imperial was a thinly traded stock with a market cap of about $107 million (8.7 million shares outstanding at a price of $12.25 per share). Thinly traded, newly issued stocks can be especially volatile, making it hard to isolate abnormal returns using event study methodology. Indeed, Professor Calomiris measured Imperial's beta at 2.32,[123] which is very high for a financial services firm.

140. In his analysis of CMC, Professor Calomiris also ignores the fact that shutting down Carteret's mortgage origination operation was consistent with RTC policy. An October 25, 1989 RTC memo on conservatorship procedures stated that the RTC's "fundamental concern regarding new lending is that it generally contributes to the massive losses already being experienced by the institution. Because the volume of interest bearing liabilities generally exceeds the volume of interest earning assets, a negative spread results…Thus, essentially every loan that is extended is made at a loss to

---

[121] "Imperial Credit stock falls 21% on earnings news," Orange County Register (California), Business Section, page E02, March 30, 1993. The stock price on Friday, March 26, 1993 was $18.00 and was $14.25 on Monday, March 29, 1993, the day the company announced its first quarter earnings estimate.

[122] Calomiris Declaration of July 14, 2006, paragraph 151.

[123] Calomiris Declaration of July, 14, 2006, paragraph 150.

the institution."[124] A June 20, 1990 RTC memo, citing the RTC's Strategic Plan, stated that it was "the RTC's mission to downsize and maximize recovery" of institutions in conservatorship/receivership.[125] Thus, in shutting down CMC, the RTC was not acting capriciously, but instead was implementing a policy to avoid increased and continuing losses.

141. When Carteret was placed into conservatorship in December 1992, its ability to fund new mortgages was in question, and there were indications that its correspondent relationships – which accounted for a majority of its loan originations – had already moved onto other institutions. At a meeting held on December 4, 1992, the date of conservatorship, employees raised concerns about Carteret's "ability to fund its current pipeline."[126] Six days later, an assessment showed that "applications generated from the date of conservatorship [were] less than $10 million; an indication that the correspondent relationship (60% of volume) had already moved."[127] Carteret was heavily reliant on its correspondent network for loan origination; its origination system consisted of about 100 employees plus over 200 correspondents.[128] A December 7, 1992 memo prepared by an RTC team had also stated that "any significant attrition [of the correspondent network] would limit viability of CMC continuance in the origination marketplace."[129] The loss of many of the correspondent relationships was a clear indication to the RTC that CMC had already lost its franchise value and should be closed.

---

[124] AM5001 0631-0640 at AM5001 0632.

[125] AM5001 0641.

[126] AM5067 0546-0557 at AM5067 0546.

[127] *Op. Cit.* at AM5067 0547.

[128] *Op. Cit.* at AM5067 0546.

[129] CAM320 0530-0532 at CAM320 0532.

142. Professor Calomiris also conducts a second valuation experiment by seeking to analyze the price that mortgage units comparable to CMC would go for in the market place. He assumes that in 1993 "but-for" Carteret would have been servicing a mortgage loan portfolio of $7.2 billion, the same as at the end of 1992. He then analyses – as his comparables – two mortgage business transactions in his Table 18. The first is the sale of Sears Mortgage Corp. to PNC Bank Corp. in November 1993 and the second is the sale of Maryland National Mortgage Corp. to First Tennessee National Corp. in October 1993. He calculates ratios of the market value of these two transactions to the underlying value of the unit's servicing portfolio and then multiplies those ratios by Carteret's servicing rights at the end of 1992 ($7.2 billion) to achieve two but-for comparable sale values. He then nets out $61.7 million of servicing-rights value received in Carteret's actual 1994 sale to arrive at a loss of $25.8 million using the Sears sale, and a loss of $57.8 million using the Maryland National sale.[130]

143. There are a number of problems with this "comparables" analysis. First, since he is focusing on the mortgage servicing rights portfolio only, Professor Calomiris fails to account for the fact that the Sears sale, in addition to servicing rights, also included $7.6 billion in other assets including over 100 mortgage production offices plus a savings bank.[131] By contrast, he appears to have done such an adjustment for the Maryland National Mortgage Corp. Second, Professor Calomiris's hypothetical CMC loss analysis is based on the loss of mortgage originations, not on the loss of servicing rights, which is the multiplying factor and base for this comparable transactions analysis. Thus, Professor Calomiris appears to be valuing the wrong "asset". Third, he ignores the

[130] Calomiris Declaration of July 14, 2006, paragraphs 154-161.

[131] PNC's March 1994 10-K Report, p.1.

size differences in originations between the Sears and Maryland transactions and the hypothetical CMC. Ultimately, it is the volume of originations (along with fee levels) that generate a mortgage unit's origination profitability. Fourth, while Professor Calomiris recognizes that in-house originations are more valuable than correspondent originations, he makes no attempt to account for the fact that 60% of Carteret's originations came from correspondents, while Sears and Maryland had more production offices than Carteret.[132] Finally, Professor Calomiris only analyzes two sales – one erroneously (Sears, due to his failure to account for asset sales). Indeed, at this deposition, he appears to acknowledge the limited aspects of his comparability study:

> "I proceeded in the way that I described in the report, because I looked for all possible comparables using very loose criteria to try to find within the net of possible transactions as many as I could. I only found two…"[133]

### B. Sale of Other Carteret/AmBase Assets

144. Professor Calomiris contends that the proceeds from the sales of Carteret's portfolio "that consisted largely of fixed-income mortgages,"[134] was harmed by the delay from December 1993 to 1995 because of the ensuing increase in mortgage rates. Indeed, it is unclear whether this was the case in light of data on fixed-rate mortgages. In particular, fixed mortgage rates were approximately at the same level in December 1995 as they were in December 1993 (7.20% in December 1995 and 7.17% in December 1993).[135]

---

[132] Calomiris Deposition, July 7, 2006, pp. 814-815.

[133] Calomiris Deposition, July 7, 2006, p. 817.

[134] Calomiris Declaration of July 14, 2006, paragraph 163.

[135] "Contract rate on 30-year fixed-rate conventional home mortgage commitments" (MORTGNA series), Federal Reserve Bank.

145. Residential mortgage rates are only one component of the market valuation of Carteret's asset portfolio. In particular, Carteret had a significant proportion of its assets in commercial rather than residential mortgages. Many of these were classified assets and non-interest earning. As such, any return on these assets was dependent on the trend in underlying commercial property prices. A good proxy for the "equity" return on a portfolio of commercial real estate assets is the FTSE NAREIT Equity REITs index, a market capitalization weighted index that includes all tax-qualified REITs listed in the New York Stock Exchange, American Stock Exchange, and NASDAQ National Market. As can be seen in Exhibit 25, while the index rose in 1993, it was very volatile around that new higher level, closing the year down from its September 1993 high. Indeed, the index reaches values greater than its December 1993 value (Professor Calomiris's preferred resolution date) at several points in 1994 and 1995, including December 1995. In addition, Exhibit 26 presents the National Council of Real Estate Investment Fiduciaries (NCREIF) Indices for both the East and South regions. These indices track the investment performance of a very large pool of individual commercial properties acquired in the private market for investment purposes only. Beginning in 1993, prices continually rise through 1995. Therefore, market conditions suggest that the RTC increased, not decreased, the resale value of Carteret's asset portfolio -- especially its troubled commercial portfolio.

## VIII. CONCLUSIONS

146. Based on the analyses set forth above, I find no evidence that the FDIC/RTC's actions caused the receivership losses claimed by Professor Calomiris. In particular, Professor Calomiris has provided no compelling evidence that the receivership

deficit of $278.1 million (as of December 31, 2005) should be reduced. Among my many other conclusions are the following:

147. The FDIC/RTC faced enormous difficulties in resolving many hundreds of failed or failing thrifts during the 1990-1995 period. On the whole (as the GAO acknowledges), the FDIC/RTC did a good job in completing the resolution at "least cost" to the deposit insurance fund and to taxpayers at large.

148. There was no inordinate delay in the resolution of Carteret, given its time of failure, size, and complexity.

149. The premiums received in the sales of the Carteret branches in 1994 and 1995 were likely higher than those that would have been achieved had they been sold in 1992 and 1993 (when Professor Calmoris says they should have been sold). Moreover, there is no evidence that the sale of Carteret as a "whole bank" in 1993 would have produced greater proceeds than the sale of three clusters of Carteret branches in 1994 and 1995.

150. Professor Calomiris exaggerates the effects of Carteret's failure on the erosion of its deposit base. The decline in Carteret's deposits in the year preceding Carteret's failure ($539 million) was generally comparable to the decline in Carteret's deposits in the year following the failure ($615 million).

151. All in all, the receivership's sale of the Florida branches in 1994 and the New Jersey branches in 1995 enhanced the receivership's revenues, compared with what might have been achieved from earlier sales into a market overloaded with failing thrifts.

152. The switch from floating to fixed rates in calculating interest on receivership loans was entirely appropriate, given FDIC policy following the passage of

the Depositor Preference Act in 1993. Further, fixed rates were applied in general to all thrift receiverships created after the Depositor Preference Statute was enacted and not just to Carteret. Moreover, Professor Calomiris ignores the fact that by fixing interest rates when it did in 1999, the FDIC could not have known whether Treasury rates would continue to head higher, stabilize, or decline. There is no basis for claiming, and no evidence, that the FDIC chose to lock-in high fixed rates in 1999, based on knowledge or belief that interest rates would decline in the future. Had the FDIC not adopted fixed rates and had interest rates increased over time, the plaintiffs might well be arguing today that the FDIC acted against the receivership's interest by choosing to remain with a floating rate for computing interest charges.

153. It is entirely appropriate that funds in a risk-free escrow account should earn an interest rate lower than the interest rate on risky loans to a receivership whose asset returns were highly uncertain.

154. There is no evidence that the minority preference program reduced receivership revenues by either lowering deposit premiums, or reducing the number of bidders, or inducing a freeze on mortgage asset distribution.

155. The case for including lost supervisory goodwill as a receivership deficit offset is untenable. The value of such goodwill for a failed bank in receivership is likely to be minimal, and the transfer of any such goodwill to an acquiring bank or thrift would not be permitted by regulators. Indeed, no such transaction occurred over the relevant time period.

156. Professor Calomiris's preferred stock, common stock, and event study models of goodwill value have so many errors of logic and financial economics that they should be dismissed and given no credence.

157. Similarly, Professor Calomiris's attempts to determine the in-house value of Carteret's closed mortgage banking unit through an event study and a two-firm-based comparability study are equally speculative and should be given no credence.

158. There is no evidence that delaying the sale of Carteret's assets, such as its commercial real estate portfolio, harmed Carteret's receivership. Indeed, there is some evidence that suggests that commercial real estate increased in value over the 1993-1995 period.

Confidential Materials - Subject to Protective Order

Anthony Saunders
Dated: August 7, 2006

Confidential Materials - Subject to Protective Order

**Exhibit 1**
**Curriculum Vitae of Professor Anthony Saunders**

**Office**
Department of Finance
Kaufman Management Center
Stern School of Business, New York University
44 West 4th St., Rm. 9-91
New York, N.Y. 10012
(212) 998-0711 (office)
(212) 998-0312 (office/secretary)
(212) 995-4232 (fax)
E-mail: asaunder@stern.nyu.edu
Web site: http://www.stern.nyu.edu/~asaunder

**Primary Areas of Interest**
Financial institutions, international finance/banking and financial economics.

**Education**
London School of Economics, 1968-71, BS, 1971, Monetary Economics
London School of Economics, 1971-72, MS, 1972, Money and Finance
London School of Economics, 1976-81, Ph.D., 1981, Thesis title:
"The Behavior and Performance of the London Clearing Banks, 1965-1977"

**Current Position**
Stern School of Business, New York University
John M. Schiff, Professor of Finance
and Chairman of the Department of Finance (1995-96 and 97- )

**Previous Positions**
Stern School of Business, New York University
Assistant Professor of Finance (1978-1982)
Associate Professor of Finance (1982-1987)
Professor of Finance (1987- )
Professor of International Business and Finance (1988 -)
Director of Undergraduate Studies in Finance (1983-1985)
Acting Director of the Salomon Brothers Center for the Study of Financial Institutions (September 1984-85)
Associate Director of the Salomon Brothers Center for the Study of Financial Institutions (1985- )

**Courses taught:**

| | |
|---|---|
| Money and Banking: BS | Introduction to Finance: MBA |
| Risk Management in Financial Institutions: MBA | Credit Risk: EMBA |
| NYU Executive Programs on Risk Management | Seminar in Banking: Ph.D. |

**Advisory Positions**
Nobel Prize in Economics, Nomination Committee (2000- )
Investment Advisory Board, Zurich Financial Services (2003- )
Research Advisor, FDIC – Center for Financial Research (2004- )
Research Advisor, Federal Reserve Bank of Philadelphia, (1984-1989).
Board of Academic Consultants, Federal Reserve Bank of New York, (2000-2002).
Board of Academic Consultants, Federal Reserve Board of Governors, (1989- ).
Council of Research Advisors, Federal National Mortgage Association, (1989- ).
Council of Advisors, Italian Bankers Association (ABI), (1994- ).

**Consulting Experience (selected)**
2005 Debevoise Plimpton Valuation of Life Insurance Contracts (consultant)
2005 Pepe and Hazard ENRON and the rating agencies (consultant)
2005 King and Spalding Report on Restructuring of HYNIX (expert report)
2005 Department of Justice Goodwill and FIRREA, Carteret Savings Bank (expert)
2004 Department of Justice ENRON: Three criminal cases relating to investor losses (expert witness)
2004 Milberg-Weiss Asia Pulp and Paper: Fraud on the Market (expert witness)
2003 - Department of Justice Goodwill and FIRREA, Perpetual Savings Bank 2004 (expert)
2003 Milberg, Weiss Nortel: "Fraud on the Market" (expert report)
2003 Hale and Dorr Hynix dumping of DRAMS (expert report)
2001-2003 Department of Justice Losses Related to the Goodwill Provisions of the Financial Institutions, Reform and Recovery Act (expert witness), 5th-3rd D and N Banks
2000 JP Morgan Emerging Market Securities as an Asset Class (report)
2000 World Bank Financial System Crisis in Thailand (report)
1999 World Bank Deposit Insurance in Mexico (advisory)
1998 Central Bank of Argentina Credit Risk Measurement (advisory)
1998 -2000 Oliver Wyman Oliver Wyman Institute (advisory)
1997 JP Morgan Restrictions on Pension Fund Managers (report)
1997 Latham and Watkins Financial Condition of Korean Banks (expert witness)
1997 World Bank Financial Sector Reform in Ethiopia (report)
1997 Perkins Coie Securitization of Aircraft Finance (report)
1997 J.P. Morgan Modeling Credit Risk (report)
1997 Inter-American Development Bank Interest Rate Margin Determination (report)
1996 -1997 Decof and Grimm Failure of Rhode Island Savings Bank (expert witness)
1996 Milberg-Weiss Losses on Swap Contracts by NY Banks (advisory)
1996 World Bank Bank Capital Structures in Developing and Developed Countries (report)
1995 World Bank Financial Sector Restructuring in Uganda (report)
1995 European Capital Markets Inst. Clearance and Settlement Integration in the European Community (report)
1994 NY State Bankers Assoc. The Effects of Local Taxation on Bank Location and Activities (report)
1994 World Bank/Govt. of China Reform of Equity Markets in the Peoples

Confidential Materials - Subject to Protective Order

Republic of China (report)
1994 Aetna Life Concentration Risk Measurement in Insurance Co. (report)
1994 Strock, Strock and Lavan Ellerman Arbitration (Securitization) (expert witness)
1994 Patterson, Belknap, Webb and Tyler Gotthalf v. Telerate (Futures Markets and Derivatives) (expert witness)
1994 Milberg, Weiss, *etal* Salomon Inc. Litigation (Treasury Auctions) (expert witness)
1994 NY State Bankers Association Financial Regulation and Bank Profitability (report)
1993 World Bank Financial Sector Reform in Kenya (report)
1992 EBRD Bank Restructuring in Eastern Europe (advisory)
1992 Euroclear Settlement and clearance Issues in Global Securities Markets (report)
1992 EBRD/Govt. of Poland Chief Consultant in Charge of Designing the Polish Deposit Insurance System (advisory)
1991 City of New York National and Global Competitiveness of New York City as a Financial Center (report)
1991 Litwin and Holsinger Haas *etal* v. Bankers Trust (expert witness)
1990 Citicorp Universal Banking (advisory)
1989 The World Bank Venture Capital in LDC's (report)
1989 The World Bank Financial Liberalization in Tanzania (report)
1989 Citicorp Strategy Over the Next Five Years for the Institutional Banking Group (report)
1989 Office of Technology Assessment Banks and Securities Markets U.S. Congress
1988 World Bank-IFC Financial Liberalization in Mauritius (report)
1988 Oxford Analytica U.S. Bank Developments (advisory)
1987 World Bank-IFC Modeling Optimal Debt Rescheduling for Bank (report)
1987 Parker-Chapin, Flattau and Klimpl ESM v. Grant Thornton (expert witness)
1986 Budd Larner Legality of Deposit Brokerage (expert witness)
1986-89 Philadelphia Fed Research Advisor on Matters Concerning Bank Structure, Competition and Deregulation (advisory)
1986 World Bank-IFC Financial Deregulation in Kenya (advisory)
1986 Skandaviska Enskilada Strategy for International Banking Banken Operations in Scandinavia (advisory)
1986 Office of Technology Regulation of Foreign Banks Entering the Assessment/U.S. Congress U.S. and *vice-versa* in the Context of Technology and International Bank Services(advisory)
1985 Association of Italian The Use of Futures Contracts for Hedging Banks Bank Risk (report)
1985 World Bank-IFC The Theoretical Foundations for Securities Markets as Facilitators of Economic Growth (report)
1985 World Bank-IFC The Underpricing of Unseasoned New Issues:Theory and U.S. Evidence 1978-1983 (report)
1985 Morgan Guaranty The Glass-Steagall Act: Safety and Soundness and Conflicts of Interest Issues (report)
Executive Teaching:
Credit Suisse, Deutsche Bank, Morgan Guaranty, Chase Manhattan, Australian Merchant Bankers Association, Morgan Stanley, Euromoney, B.P., Swiss National Bank, Malaysian Bankers Assoc., KPMG, Lehman Bros., Citicorp, Smith Barney,

Arthur Andersen, Union Bank of Switzerland, IBMEC, (Brazil), INSEAD, PGB/PAGIF (Portugal), Dianos, Swiss National Bank Foundation, and others

**Research**
Ranked No 1 as the "Most Prolific Author" in 16 core Finance Journals; See P.L. Cooley and J.L. Heck "Prolific Authors in the Finance Literature: A Half Century of Contributions" *Journal of Finance Literature*, Vol 1, Winter 2005, pp 46-69.

**Publications (selected)**
**(i) Journals**
"So What Do I Get? The Bank's View of Lending Relationships" (with S. Bharath, S. Dahiya and A. Srinivasan), *Journal of Financial Economics* (forthcoming).
"The Use of ATMs in Bank Strategy: Is There a Customer Relationship Effect?" (with N. Massoud and B. Scholnick), *Journal of Business* (forthcoming).
"Should Banks Be Diversified? Evidence from Individual Bank Loan Portfolios" (with V. Acharya and I. Hasan), *Journal of Business* (forthcoming).
"Bank Borrowers and Loan Sales: New Evidence on the Uniqueness of Bank Loans" (with S. Dahiya and M. Puri), *Journal of Business*, 2004.
"Commercial Bank Underwriting of Credit - Enhanced Bonds: Are There Benefits to the Issuer" (with R. Stover), *Journal of International Money and Finance*, 2004.
"Incorporating Systematic Influences into Risk Measurement: A Survey of the Literature" (with L. Allen), *Journal of Financial Services Research*, 2004.
"The Role of Financial Advisors in Mergers and Acquisitions" (with L. Allen and J. Jagtiani and S. Peristiani), *Journal of Money, Credit and Banking*, 2004.
"Issues in the Credit Risk Modeling of Retail Markets" (with L. Allen and G. Delong), *Journal of Banking and Finance*, 2003.
"Financial Distress and Bank Lending Relationships" (with S. Dahiya and A. Srinivasan), *Journal of Finance*, 2003.
"The Effects of Cross-Border Bank Mergers on Bank Risk and Value" (with Y. Amihud and G. DeLong), *Journal of International Money and Finance*, 2003.
"Are Emerging-Market Equities a Separate Asset Class?" (with I. Walter), *Journal of Portfolio Management*, Spring 2002
"Credit Ratings and the BIS Capital Adequacy Reform Agenda" (with E. Altman), *Journal of Banking and Finance*, May 2002.
"Price Formation in the OTC Corporate Bond Markets: A Field Study of the Inter-Dealer Market" (with A. Srinivasan and I. Walter), *Journal of Economics and Business*, January/February 2002.
"An Analysis of Bank Charter Value and Its Risk Constraining Incentives," *Journal of Financial Services Research*, 2001.
"An Analysis and Critique of the BIS Proposal on Capital Adequacy and Ratings," *Journal of Banking and Finance*, 2001.
"The Determinants of Bank Interest Margins: An International Study" (with L. Schumacher), *Journal of International Money and Finance*, 2000.

"Low Inflation: The Behavior of Financial Markets and Institutions," *Journal of Money, Credit and Banking,* 2000.
"Financial Fragility and Mexico 1994 Peso Crisis: An Event Window Analysis of Market Valuation Effects" (with B.Wilson and G. Caprio), *Journal of Money, Credit and Banking*, 2000.
"A Theory of Bank Regulation and Management Compensation" (with K. John and L. Senbet), *Review of Financial Studies*, 2000.
"Mexico's 'Tequila' Bank Crisis: Devaluation or Diversification Problems" (with B. Wilson and G. Caprio), *The Economic Journal,* 2000.
"Bank Entry Competition and the Market for Corporate Securities Underwriting" (with A. Gande and M. Puri), *Journal of Financial Economics*, 1999. (Winner of the Fama - DFA award for the best paper in Corporate Finance and Asset Pricing in the JFE for 1999).
"Bank Capital Structure: A Comparative Analysis of US, UK, and Canada" (with B. Wilson), *Journal of Banking and Finance*, 1999.
"Highly Leveraged Loan Transaction Spreads" (with L. Angbazo and J.P. Mei), *Journal of Banking and Finance*, 1998.
"The Effects of Bank Mergers and acquisitions on small business Lending" (with A. Berger, etal), *Journal of Financial Economics*, 1998.
"Credit Risk Measurement: Developments over the last 20 years" (with E. Altman), *Journal of Banking and Finance,* 1998.
"Bank Underwriting of Debt Securities: Modern Evidence," (with A. Gande, M. Puri and I. Walter), *Review of Financial Studies*, 1997.
"An Investigation of the Performance of the U.S. Property-Casualty Insurance Industry" (with N.K. Chidambaran and T. Pugel), *Journal of Risk and Insurance*, 1997.
"Contagious Bank Runs and Panics: Evidence from the 1929-33 Period" (with B. Wilson), *Journal of Financial Intermediation*, 1997.
"Excessive Gambling with Unfavorable Odds: Financial Institutions and Real Estate Investments" (with J.P. Mei), *Review of Economics and Statistics,* 1997.
"Alternative Models for Clearance and Settlement: The Case of the Single European Capital Market" (with I. Giddy and I. Walter), *Journal of Money, Credit and Banking,* 1996.
"Bank Equity Stakes in Borrowing Firms and Financial Distress" (with M. Berlin and K. John), *Review of Financial Studies*, 1996.
"If History Could be Re-run: Pricing Deposit Insurance in 1933" (with B. Wilson), *Journal of Financial Intermediation*, 1995.
"Bank Risk and Too Big to Fail Guarantees: An Asset Pricing Perspective" (with J.P. Mei), *Journal of Real Estate Finance and Economics*, 1995.
"The Effect of Bank Capital Requirements on Bank Off-Balance Sheet Financial Innovations," *Journal of Banking and Finance,* 1995.
"When Does the Prime Rate Change" (with L. Mester), *Journal of Banking and Finance*, 1995.
"Deposit Insurance and Regulatory Forbearance: Are Caps on Insured Deposits Optimal?" (with J.F. Dreyfus and L. Allen), *Journal of Money, Credit and Banking*, 1994.
"Universal Banking and Firm Risk Taking" (with K. John and T. John),

*Journal of Banking and Finance*, 1994.
"Banking and Commerce: An Overview of the Policy Issues," *Journal of Banking and Finance*, 1994.
"Time Variation of Risk Premiums for Insurance Companies" (with J.P. Mei), *Journal of Risk and Insurance*, 1994.
"Managers, Owners and the Pricing of Risky Debt: An Empirical Analysis" (with E. Bagnani, N. Milonas, and N. Travlos), *Journal of Finance*, 1994.
"Banking Sector and Restructuring in Eastern Europe" (with A. Sommariva), *Journal of Banking and Finance*, 1993.
"Forbearance and Valuation of Deposit Insurance as a Callable Put" (with L. Allen), *Journal of Banking and Finance*, 1993.
"Prime Rate Changes: Is There An Advantage in Being First?" (with P. Nabar and S. Park), *Journal of Business*, 1993.
"Bank Window-Dressing: Theory and Evidence" (with L. Allen), *Journal of Banking and Finance*, 1992.
"The Pricing of Retail Deposits: Concentration and Information" (with Allen and Udell), *Journal of Financial Intermediation*, 1992.
"Deposit Insurance Reform" (with Berlin, Udell), *Journal of Banking and Finance*, August 1991.
"Additions to Bank Loan-Loss Reserves: Good News or Bad New?" (with T. Grammatikos), *Journal of Monetary Economics*, 1990.
"Ownership Control, Regulation and Bank Risk-Taking" (with Strock and Travlos), *Journal of Finance*, 1990.
"Are Banks Special: The Separation of Banking from Commerce and Interest Rate Risk" (with Yourougou), *Journal of Economics and Business, 1990.*
"The Underpricing of New Issues in Singapore" (with J. Lim), *Journal of Banking and Finance*, 1990.
"Bank Size, Collateral and Net Purchase Behavior in the Federal Funds Market: Empirical Evidence (with Allen and Peristiani), *Journal of Business*, 1989.
"The Effects of Shifts in Monetary Policy and Reserve Accounting Regimes on Bank Reserve Management in the Federal Funds Market" (with T. Urich), *Journal of Banking and Finance*, 1989.
"The Effects of DIDMCA on the Profitability and Risk of Large Commercial Banks and Thrift Institutions' (with J. Aharony and I. Swary), *Journal of Banking and Finance,* 1988.
"The Hedging Performance of ECU Futures" (with S. Sienkiewicz), *Journal of Futures Markets,* 1988.
"Intra- and Inter-Industry Effects of Bank Securities Market Activities: The Case of Discount Brokerage" (with M. Smirlock), *Journal of Financial and Quantitative Analysis*, 1987.
"New Tests of the Parity Hypothesis and Fiscal Policy Effects" (with J. Merrick), *Journal of Monetary Economics,* 1986.
"The Returns and Risks of U.S. Banks' Foreign Currency Activities" (with T. Grammatikos and I. Swary), *Journal of Finance,* 1986.
"The Determinants of Country Risk: A Selective Survey of the Literature," *Journal of Banking and Finance (Supplement)*, 1986.

"An Examination of the Contagion Effect in the International Loan Market," *Journal of Banking and Finance (Supplement)*, 1986.
"The Effects of a Shift in Monetary Policy Regime on the Profitability and Risk of Commercial Banks" (with J. Aharony and I. Swary), *Journal of Monetary Economics*, 1986.
"The Large-Small Bank Dichotomy in the Federal Funds Market" (with L. Allen), *Journal of Banking and Finance*, 1986.
"Futures Price Variability: A Test of Maturity and Volume Effects" (with T. Grammatikos), *Journal of Business*, 1986.
"A Micro-Model of the Federal Funds Market" (with T. Ho), *Journal of Finance*, 1985.
"The Effects of the International Banking Act on Domestic Bank Profitability and Risk" (with J. Aharony and I. Swary), *Journal of Money, Credit and Banking*, 1985.
"Bank Regulation and Monetary Policy," *Journal of Money, Credit and Banking*, 1985.
"On Constructing the Group Utility Function of a Loan Syndicate" (with D. Gandhi and R. Hausman), *Journal of Banking and Finance*, 1985.
"On the Constancy of the International Real Rate of Interest" (with R. Tress), *Journal of Monetary Economics*, 1984.
"Fixed Rate Loan Commitments, Takedown Risk and the Dynamics of Hedging with Futures" (with T. Ho), *Journal of Financial and Quantitative Analysis*, 1983.
"Asymmetric Information, Regulatory Lag and the Value of Incentive Contracts" (with K. John), *Journal of Finance*, 1983.
"Stability and the Hedging Performance of Foreign Exchange Futures (with T. Grammatikos), *Journal of Futures Markets*, 1983.
"The Determinants of Bank Interest Margins: Theory and Empirical Evidence" (with T. Ho), *Journal of Financial and Quantitative Analysis*, November 1981.
"The Growth of Organizational Forms of Foreign Banks in the U.S." (with L. Goldberg), *Journal of Money, Credit and Banking*, August 1981.
"The Investors' Gains from International Portfolio Investment" (with D. Gandhi, *et al.*), *Journal of Banking and Finance*, June 1981.
"A Catastrophe Model of Bank Failure" (with T. Ho), *Journal of Finance*, December 1980.
"Determinants of Foreign Bank Activity in the United States," *Journal of Banking and Finance*, December 1980.
"The Causes of U.S. Bank Expansion Overseas: The Case of Great Britain" (with L. Goldberg), *Journal of Money, Credit and Banking*, November 1980.
"A Stochastic Dominance Analysis of Unit Trust Performance" (with R. Woodward and C. Ward), *Journal of Financial And Quantitative Analysis*, June 1980.
"Bid Behavior and the Determination of Treasury Bill Rates" (with C. Ward), *Oxford Bulletin of Economics and Statistics*, August 1979.
"Risk, Regulation and Performance of Clearing Banks, 1965-1975" (with C. Ward), *Journal of Industrial Economics*, December 1976.

**(ii) Books/Monographs**
*Technology and the Regulation of Financial Markets* (with L. White), Lexington Books, 1985 (reprinted by Beard Books, 2003).
*Off Balance Sheet Activities* (with J. Ronen and A. Sondhi), Dow-Jones, 1990.

*IPO's and Venture Capitalists: A Test of the Dynamic Strategy Hypothesis* (with J. Lim), ICFA, 1990.
*The Management and Regulation of Banks:* A Book of Reading (with G. Udell and L. White), Bristlecone Books, 1992.
*Universal Banking in the U.S.?* (with I. Walter), Oxford University Press, 1994.
*Financial Institutions Management: A Risk Management Approach*, Irwin/McGraw-Hill, (1st edition), 1994 (2nd edition), 1996 (3rd edition), 1999 (4th edition), 2002 (5th edition), 2005.
*Financial System Design: Universal Banking Considered* (with I. Walter), Irwin, 1996.
*China's Emerging Capital Markets* (with A. Kumar, etal), Financial Times Publishing, 1997.
*Fundamentals of Financial Institutions Management* (with M. Cornett), Irwin/McGraw-Hill, (1st edition), 1999.
*Credit Risk Measurement: Value at Risk and Other New Paradigms*, John Wiley and Sons, (1st edition), 1999 (2nd edition), 2002.
*Financial Markets and Institutions: A Modern Perspective* (with M. Cornett), Irwin/McGraw-Hill, (1st edition), 2000 (2nd edition), 2003, (3rd edition) 2006.
*Understanding Market, Credit and Operational Risk* (with K. Boudoukh and L. Allen) Blackwell, (1st edition), 2003.

**(iii) Articles in Books (selected)**
"The Effect of a Dual Exchange Market on Spot and Commodity Prices in the US and UK"(with D. Emanual), *Proceedings of the International Research Seminar on Futures Markets*, Chicago Board of Trade, 1981.
"A Catastrophe Theory in Banking and Finance" (with T. Ho) in G. Szego and A. Cellina (eds.), *New Techniques for Economic Analysis,* Academic Press, 1982.
"Conflicts of Interest: The Case of Commercial *Bank* and Their Corporate Securities Underwriting Affiliates" in I. Walter (ed.), *Deregulating Wall Street*, John Wiley and Sons, 1985.
"An Economic Perspective on Bank Uniqueness and Corporate Securities Activities" in I. Walter (ed.), *Deregulating Wall Street*, John Wiley and Sons, 1985.
"Conflicts of Interest: The Case of Securities Activities of Commercial Banks," *Federal Reserve Bank of Philadelphia Review*, August/September, 1985.
"Seasonality in the Federal Funds Market: The Weekend Game and Other Effect" (with T. Urich) in E. Dimson (ed.), Evidence *on Stock Market Anomalies*, North-Holland, 1987.
"Bank Holding Companies: Structure, Performance and Reform" in W. Haraf (ed.), *Restructuring the Financial System*, AEI: Washington, D.C. 1989.
"The Inter Bank-Market, Contagion Effects and Financial Crisis" in Portes and Swaboda (ed.), *Threats to International Financial stability*, CEPR and CUP, 1987.
"LDC Debt Rescheduling" (with M. Subrahmanyam), *Federal Reserve Bank of Philadelphia Review*, November/December, 1988.
"SESDAQ: The Early Evidence" (with J. Lim) in Chang and Rhee (eds.), *Pacific Basin Capital Markets Research,* Elsevier, 1989.
"Forward Foreign Exchange Markets in Developing Countries" in R. O'Brien and T. Datta (eds.), *International Economics and Financial Markets,* O.U.P., 1989.

"Why Are So Many New Issues Underpriced?" *Federal Reserve Bank of Philadelphia Review,* 1990.
"German Banking and Monetary Policy" in C. Barfied and M. Perlman (eds.) *Capital Markets and Trade: The U.S. Faces a United Europe,* AEI: Washington, D.C. 1992.
"Bank Deregulation and Monetary Policy" and "Discount Brokers" in the *New Palgrave Dictionary of Money and Finance,* 1993.
"The Reconfiguration of Banking and Capital Markets in Eastern Europe" (with I. Walter) in *The Transformation of the Socialist Economies,* H. Siebert (ed.) J.C.B. Mohr, Tubingen, Germany, 1992.
"Clearance and Settlement (with I. Giddy and I. Walter) in *The European Equity Markets*, B. Steil (ed), RIIA, London, 1996.
"A Survey of Cyclical Effects in Credit Risk Models in *Credit Ratings* (M. Ong (ed.)), Risk Books: London, 2003.

**(iv) Working Papers**
"Investment Banking Relationships and Merger Fees" (with A. Srinivasan).
"The Long Run Behavior of Debt and Equity Underwriting Spreads" (with D. Kim and D. Palia).
"Informational Efficiency of Loans Versus Bonds: Evidence from Secondary Market Prices" (with E. Altman and A. Gande).
"The Role of Banks in Takeovers" (with V. Ivashina et al).
"Are Initial Returns and Underwriting Spreads Complements or Substitutes?" (with D. Palia).

**Editorial Positions**
Editor, Journal of Banking and Finance (1994 -)
Editor, Financial Markets, Instruments and Institutions (1992 -)
Editor, Salomon Brothers Center Monograph in Finance and Economics (1984-91)
Advisory Editor, Journal of Money, Credit and Banking (2001 -)
Associate Editor, Journal of Money, Credit and Banking (1995-2001)
Associate Editor, Financial Management (1993 -)
Associate Editor, Journal of Financial Services Research (1986 -)
Associate Editor, Asia Pacific Journal of Management (1990 -)
Associate Editor, International Review of Financial Analysis (1990 -)
Associate Editor, Journal of Housing Research (1991 -)
Associate Editor, Review of Business Studies (1990 -)
Associate Editor, Journal of International Financial Management and Accounting (1991-)
Associate Editor, Journal of Banking and Finance (1986-1994)
Associate Editor, The Financier (1996 -)
Associate Editor, Review of Financial Markets (1996 -)
Associate Editor, Journal of Multinational Finance (1997 -)

**Research Fellowships**
Yamaichi Senior Research Fellow in Finance 1988-1991
Salomon Brothers Center Research Fellow 1986-1987
Bank and Financial Analysts Research Fellow 1987-1988

Confidential Materials - Subject to Protective Order

**Journal Referee (selected)**
American Economic Review
Financial Management
Financial Review
Journal of Banking and Finance
Journal of Business
Journal of Economics and Business
Journal of Economics and Organizational Behavior
Journal of Finance
Journal of Financial Economics
Journal of Financial Intermediation
Journal of Financial and Quantitative Analysis
Journal of Financial Research
Journal of Futures Markets
Journal of International Business Studies
Journal of International Money and Finance
Journal of Money, Credit and Banking
Journal of Monetary Economics
Journal of Portfolio Management
Journal of Real Estate Finance and Economics
Management Science
Public Finance Quarterly
Southern Economic Journal
Review of Financial Studies

**Keynote Speaker (last 4 years)**
Spanish Finance Association, Santiago, Spain (2002)
Multinational Finance Association, Cyprus (2002)
Symposium on Finance, Banking and Insurance, Karlsruhe, Germany (2002)
Spanish Finance Association, Segovia, Spain (2001)
Australasian Finance Association, Sydney, Australia (2004, 2003, 2002, 2000)
Pacific Basin Finance, Accounting and Economics Conference, Taiwan (2003)
Italian Quantitative Economics and Finance Association (AMESAS), Italy (2004)

## Expert Witness History: Professor Anthony Saunders

1. 2001-2005 Expert Reports on Fifth Third Bank, D and N Bank, and Perpetual Savings Bank for the Department of Justice. Testified in court on Fifth Third Bank case.

2. 2005 Expert Report on "Market Efficiency of Asia Pulp and Paper Securities," for Milberg, Weiss.

3. 2003-2006 Expert Reports on "Hynix and Microchip Dumping" for Hale and Dorr/ King and Spalding.

4. 2005 Expert Report on "Enron and the Nigerian Barges," Bagley, et al. criminal case for the Department of Justice. Testified in court.

5. 2005 Expert Report on "Insurance Contract Valuation," for Debvoise and Plimpton.

6. March 2006 Expert Report, "Bank of New Zealand General Re 1 Structured Finance Transaction (IRD 035/2055)," Report for the New Zealand Internal Revenue Division.

7. April 2006 Expert Report, "Westpac and Koch Structured Finance Transaction," Report for the New Zealand Internal Revenue Division.

8. June 2006 Expert Report, "Westpac and CSFB Structured Finance Transaction," Report for the New Zealand Internal Revenue Division.

9. 2003 Expert Report, "Nortel and Fraud on the Market," for Milberg Weiss.

10. 1997 Expert Report, "JP Morgan v. Korean Bank," for Latham and Watkins.

11. November 1996 Expert Report, "Fleet's Loans to Heritage and to Mallicone," Report for DEPCO and Edward D. Pare, Receiver of Heritage Loan and Investment Company.

12. May 1994 Expert Report, "A Report on Commodex," Equidex v. Telerate, for Patterson, Belknap, Webb and Tyler.

13. 1994 Expert Report, "Ellerman Securitization," for Strock, Strock and Lavan. Testified in court.

14. 1994 Expert Report, "Salomon Brothers and Treasury Auctions," for Milberg Weiss.

15. 1991 Expert Report, Haas v. Bankers Trust, "A Report on Hass Loans," for Litwin and Holsinger. Testified in court.

16. 1988 Expert Report, "Security Pacific v. Delco Wire," for Blank, Rome, Comisky and McCauley.

17. 1987 Expert Report, "ESM v. Grant Thornton," for Parker, Chapin, Flattau and Klimpl.

18. 1986 Expert Report, "Legality of Deposit Brokerage," for Budd, Larner.

Confidential Materials - Subject to Protective Order

## Exhibit 2
## Materials Considered

| | |
|---|---|
| | **Court Documents in Case No. 93-531** |
| 8/25/1993 | Complaint. Ambase Corporation and Carteret Bancorp, Inc., Plaintiffs vs. United States, Defendant. Case No. 93-531 |
| 3/20/1997 | Complaint in Intervention of Plaintiff FDIC |
| 4/28/1997 | First Amended Complaint |
| 9/17/2003 | Ambase's Motion to Dismiss the FDIC and to Define the Measure of Carteret's Contract Damages |
| 9/17/2003 | Memorandum in Support of Ambase's Motion to Dismiss the FDIC and to define the Appropriate Measure of Carteret's Contract Damages |
| 9/30/2003 | Defendants Response to Ambase's Motion to Dismiss the FDIC and to Define the Appropriate Measure of Carteret's Contract Damages |
| 9/30/2003 | Response of Plaintiff Federal Deposit Insurance Corporation to Ambase's Motion to Dismiss the FDIC |
| 10/16/2003 | Order (briefing on Plaintiff's Motion to Dismiss the FDIC and other issues) |
| 10/31/2003 | Ambase's Reply Brief in Support of its Motion to Define the Measure of Carteret's Contract Damages |
| 11/13/2003 | Defendant's Surreply in Opposition to Ambase's Motion to Define the Measure of Carteret's Contract Damages |
| 11/14/2003 | Plaintiff's FDIC's Sur-reply brief in further response ot Ambase's Motion to Dismiss the FDIC and to define the Measure of Caterct's Contract Damages |
| 11/19/2003 | Ambase's Motion for Leave to respond to New Statutory Argument Set Forth in FDIC's Surreply and Incorporate Memorandum |
| 8/31/2004 | Order and Opinion, Ambase Corporation and Carteret Bancorp, Inc., Plaintiffs vs. United States, Defendant, Case No. 93-531 |
| 9/15/2004 | Defendant's Motion for Reconsideration of the August 31, 2004 Ruling and, in the Alternative, to Dismiss the Stockholder Derivative Claim and the Complaint-in-intervention. |
| 9/22/2004 | Order (Stay of Defendant Motion) |
| 1/12/2005 | Order (Denied Defendant's Motion, Stay for Appeal, and Schedule) |
| 3/15/2005 | Defendant's Motion to Certify Order Dated August 31, 2004 for Interlucutory Review and to Stay Discovery |
| 3/15/2005 | Plaintiff-Intervenor FDIC's Request for Certification of an Immediate Interlocutory Appeal and Motion for Renewed Stay |
| 3/29/2005 | Ambase's Opposition to Motions to Certify Order Dated August 31, 2004 for Interlocutory Review |
| 4/25/2005 | Reply to Ambase's Opposition to Motions to Ceritfy Order Dated August 31, 2004 and for Interlocutory Review |
| 6/16/2006 | Plaintiff's Statement of Issues, including Volume III of Appendix |
| | **Depositions** |
| | Deposition and Exhibits of Charles W. Calomiris, July 5-7, 2006 |
| | Deposition and Exhibits of Karen Hughes, April 7 & 17, 2006 |
| | Deposition and Exhibits of Elaine Tama, March 31, 2006 |
| | Deposition and Exhibits of Edward Griffen, March 30, 2006 |
| | Deposition and Exhibits of James Vortriede, March 2-3 & April 14, 2006 |
| | Deposition and Exhibits of Wayne Green, February 28, March 1 & April 5, 2006 |

## Exhibit 2
## Materials Considered

**Declarations**

Declaration of Charles W. Calomiris of May 19, 2006, corrected on May 23, 2006, and re-submitted on July 14, 2006 (and all documents relied upon)

**Documents Related to Conservatorhips/Receivership Accounting, Minority Bidding, Mortgage Banking Operations, and Cartert's Financial Condition**

| | | Bates Range |
|---|---|---|
| 2/1/1988 | FHLB Report of Examination | OAM001 0693 - 0796 |
| 5/22/1989 | OTS Report of Examination | WOQ668 1979 - 2222 |
| 10/25/1989 | RTC memo entitled "Lending Procedures - Third Revision" | AM5001 0631 - 0641 |
| 10/25/1989 | RTC memo entitled "Lending Procedures - Third Revision" | AM5001 0631 - 0641 |
| 6/4/1990 | OTS Report of Examination | WOQ690 2449 - 2653 |
| 6/21/1990 | Letter from FHLB to Carteret | AM5180 0931 - 0932 |
| 6/30/1990 | Carteret "Regulatory Capital Ratios" Schedule | AM5180 1043 - 1047 |
| 7/20/1990 | Carteret Board of Directors Meeting Minutes | AM4044 0374 - 0386 |
| 6/17/1991 | OTS Report of Examination | WOQ690 1401 - 1448 |
| 11/27/1991 | Mortgage Servicing Appraisal | AM4530 0185 - 0203 |
| 1/14/1992 | Policy for Continued Lending in Conservatorship | AM5067 0312 - 0329 |
| 5/14/1992 | Federal Register Notice on Post-Insolvency Interest | RAM050 1616 - 1618 |
| 6/5/1992 | "Loan Servicing Portfolio Evaluation" - Draft | AM5437 0319 - 0347 |
| 6/5/1992 | Calculation of Net Proceeds on Sale | AM5437 0315 - 0318 |
| 6/15/1992 | OTS Report of Examination | WOP317 0002 - 0118 |
| 6/19/1992 | FDIC Report of Examination | AM4259 0360 - 0382 |
| 7/22/1992 | "Purchased Mortgage Servicing Rights Evaluation" | AM5437 0032 - 0058 |
| 7/22/1992 | "Originated Loan Servicing Rights Evaluation" | AM5437 0004 - 0031 |
| 8/30/1992 | Summary of Clearwater Servicing Center | AM5437 0677 |
| 10/19/1992 | Letter from Hamilton to Carteret | AM5437 0001 - 0003 |
| 12/4/1992 | Credit Committee Review memo entitled "Redelegations of Authority" | AM5290 0032 - 0039 |
| 12/4/1992 | Conservatorship Strategic Plan | AM5087 2862 - 2947 |
| 12/4/1992 | Exiting Memorandum | AM5287 1007 - 1039 |
| 12/7/1992 | Summary of Mortgage Banking Operations | CAM320 0530 - 0532 |
| 12/7/1992 | Summary of Findings - Documentation | CAM320 0535 - 0536 |
| 12/31/1992 | OTS Thrift Financial Report | AM4188 1950 - 1982 |
| 12/31/1992 | Carteret's Consolidated Statements of Financial Condition | CAM708 0789 |
| 12/31/1992 | Carteret's Executive Summary of Intervention | AM5689 0021 - 0023 |
| 12/31/1992 | Carteret's "Other Borrowings" Schedule | AM5690 0064 - 0074 |
| 3/10/1993 | Carteret memo entitled "Uncommitted Pipeline" | AM5067 0546 - 0557 |
| 5/14/1993 | OTS Weekly Managing Agent Report | AM5711 0004 - 0005 |
| 6/10/1993 | OTS Weekly Managing Agent Report | AM5711 0006 - 0008 |
| 6/30/1993 | Discussion Items for Conservatorship Meetings | AM5706 0199 - 0220 |
| 8/4/1993 | "Valuation of Carteret Savings Bank's Mortgage Servicing Portfolio" | AM5290 0324 - 0350 |
| 8/27/1993 | Memo regarding the "Sale of Consumer Servicing Rights" | AM5290 0365 - 0368 |
| 9/24/1993 | Memo to Dissolution Review Committee | CAM553 0873 - 0877 |
| 10/1/1993 | "Projected Actions for Pre & Post Resolution Carteret" | AM5394 2089 - 2091 |
| 10/1993 | Clearwater Functional Chart | AM5344 0519 |
| 10/19/1993 | Solicitation of Services Agreement | AM5344 0642 - 0865 |
| 10/25/1993 | Memo re: "Issues Related To The Sale Of The Loan Servicing Operation" | AM5394 1952 - 2007 |
| 12/9/1993 | RTC e-mail entitled "Carteret Servicing Center Sale Update" | AM5290 0351 - 0352 |
| 12/13/1993 | OTS Report of Examination (field visit) | CAM050 0224 - 0236 |

**Exhibit 2**
**Materials Considered**

| | | | | | |
|---|---|---|---|---|---|
| 12/31/1993 | Carteret's Bidder Information Package | AM4292 | 0579 | - | 0915 |
| 12/31/1993 | "Issues Related To The Sale Of The Loan Servicing Operation" | AM5344 | 0435 | - | 0446 |
| 1/31/1994 | "Issues Related To The Sale Of The Loan Servicing Operation" | CAM405 | 1056 | - | 1072 |
| 2/16/1994 | Asset Review Committee Case Summary Sheet | AM5290 | 0403 | | |
| 2/17/1994 | Credit Review Committee memo | AM5290 | 0404 | - | 0410 |
| 2/28/1994 | Carteret's Addendum to Bid Package | AM4292 | 0916 | - | 1103 |
| 2/28/1994 | RTC Circular 9150.4 | WOP299 | 0733 | - | 0738 |
| 2/28/1994 | Summary of RTC Minority Preference Resolution Programs | WOP299 | 0739 | - | 0800 |
| 2/28/1994 | RTC memo attaching "Mortgage Servicing Rights Disposition" directive | CAM405 | 1350 | - | 1422 |
| 2/28/1994 | Carteret's monthly "Stratification of Assets Remaining" | AM5290 | 0132 | - | 0138 |
| 3/7/1994 | RTC Memo with New York Times "Tombstone" | AM4292 | 0115 | - | 0116 |
| 3/10/1994 | RTC email | AM4292 | 0114 | | |
| 3/14/1994 | Carteret letter entitled "Operational Issues Related to the Sale of Clearwater" | AM5344 | 0056 | - | 0065 |
| 3/29/1994 | Addendum to Offering Prospectus | CAM405 | 1073 | - | 1082 |
| 3/31/1994 | Operational Issues Related to the Sale of Clearwater | CAM405 | 0757 | - | 0775 |
| 4/7/1994 | Carteret memo entitled "Clearwater Servicing Center" | CAM405 | 0750 | - | 0756 |
| 4/8/1994 | Carteret memo re: Impact of Sale of Mortgage Servicing (CMS) | CAM405 | 1220 | - | 1222 |
| 4/12/1994 | Carteret memo entitled "Conservatorship Objectives/Mission Statement" | AM5290 | 0173 | - | 0176 |
| 4/28/1994 | Reserve Financial Prospectus for the Clearwater Servicing Center | AM5344 | 0066 | - | 0120 |
| 5/4/1994 | Carteret memo seeking authority to establish a Schedule C bank account | CAM405 | 0441 | - | 0447 |
| 5/4/1994 | Carteret memo | CAM405 | 0484 | - | 0492 |
| 5/16/1994 | Letter from RTC to American Financial Services Corp | C-AM-A-001 | 4502 | - | 4503 |
| 5/31/1994 | Carteret's monthly "Stratification of Assets Remaining" | AM5411 | 1181 | - | 1197 |
| 6/9/1994 | Letter from Chase Manhattan to Reserve Financial | AM5344 | 0146 | - | 0158 |
| 6/24/1994 | "Sale of Clearwater Servicing Center" | AM5394 | 1611 | - | 1615 |
| 6/30/1994 | Transitional Services Agreement | CAM405 | 0269 | - | 0279 |
| 7/6/1994 | RTC Bid Overview | AM4292 | 0392 | - | 0407 |
| 7/7/1994 | Carteret memo attaching "Ginnie Mae Servicing Assignment Agreement" | AM5394 | 1629 | - | 1632 |
| 7/8/1994 | RTC revised "Bid Form" for Carteret | AM4292 | 0408 | - | 0424 |
| 8/1/1994 | Transitional Services Agreement | CAM405 | 0253 | - | 0264 |
| 8/8/1994 | Letter from F.D. Terrell to RTC | C-AM-A-013 | 1607 | - | 1608 |
| 8/15/1994 | RTC memo entitled "Delay of Bid Date for Carteret" | C-AM-A-001 | 4374 | | |
| 8/15/1994 | RTC email | C-AM-A-013 | 0314 | | |
| 8/15/1994 | RTC email | C-AM-A-013 | 0315 | | |
| 8/16/1994 | Investors Savings Bank bid for six branch offices known as Clusters 5 and 7 | AM4333 | 1506 | - | 1512 |
| 8/16/1994 | RTC email | C-AM-A-014 | 4370 | | |
| 8/24/1994 | Letter from TCB Holdings to RTC | C-AM-A-012 | 5162 | - | 5163 |
| 8/25/1994 | Midlantic National Bank's ("Midlantic") bid | AM4333 | 1276 | - | 1341 |
| 8/25/1994 | Letter from Carteret Acquisition to RTC | C-AM-A-000 | 2838 | - | 2841 |
| 8/30/1994 | RTC email | C-AM-A-007 | 7122 | | |
| 8/30/1994 | FDIC Accounting Bulletin - National Depositor Preference | AM0009 | 6528 | - | 6531 |
| 8/31/1994 | RTC correspondence entitled "Update on Carteret FSB Bids" | C-AM-A-007 | 7126 | - | 7128 |
| 9/2/1994 | RTC correspondence entitled "Rejection of F.D. Terrell Bid" | C-AM-A-007 | 7141 | | |
| 9/2/1994 | Letter from RTC to F.D. Terrell | C-AM-A-013 | 1583 | | |
| 9/7/1994 | Letter from F.D. Terrell to RTC entitled "F.D. Terrell Group Bid" | C-AM-A-012 | 5150 | - | 5153 |
| 9/7/1994 | Letter from RTC to International Advisory Group | C-AM-A-013 | 1553 | - | 1554 |
| 9/9/1994 | Letter from Bahia Partners to RTC | C-AM-A-012 | 5140 | - | 5141 |
| 9/13/1994 | Carteret memo re: Final Cash Settlement for Clearwater Servicing | CAM405 | 0150 | - | 0154 |

**Exhibit 2**
**Materials Considered**

| | | | |
|---|---|---|---|
| 9/14/1994 | Letter from Midlantic to RTC | C-AM-A-012 | 5133 - 5134 |
| 9/15/1994 | RTC email | C-AM-A-001 | 4281 - 4282 |
| 9/22/1994 | RTC email | C-AM-A-007 | 7233 |
| 9/27/1994 | Letter from RTC to Peter T. King | C-AM-A-013 | 1544 - 1545 |
| 9/28/1994 | Carteret memo re: Clearwater Servicing Sale | CAM405 | 0104 - 0108 |
| 9/30/1994 | Mortgage Servicing Sale Transaction Summary | CAM405 | 0001 - 0002 |
| 10/3/1994 | Letter from Charles B. Rangel to RTC | C-AM-A-013 | 1543 |
| 10/3/1994 | Letter from Midlantic to RTC | C-AM-A-001 | 4236 - 4239 |
| 10/14/1994 | RTC correspondence | C-AM-A-008 | 8740 - 8743 |
| 10/14/1994 | Newspaper article reporting TCB Holding's successful bid | C-AM-A-012 | 5112 |
| 10/17/1994 | Letter from TCB Holdings to RTC | C-AM-A-002 | 8150 - 8152 |
| 10/18/1994 | Letter from First Savings Bank to RTC | C-AM-A-007 | 7396 |
| 10/18/1994 | RTC Decisional Memorandum regarding FL branch sales | C-AM-A-013 | 0578 |
| 10/26/1994 | RTC email | C-AM-A-007 | 7379 |
| 10/28/1994 | Net deposit calculation for Hamilton Bank ("Hamilton") settlement | AM5267 | 0001 - 0004 |
| 11/2/1994 | RTC letter to Carteret regarding "Initial Reserve Funding" | AM5344 | 0307 - 0324 |
| 11/7/1994 | Letter from BanPonce to RTC | C-AM-A-013 | 1492 |
| 11/10/1994 | Letter from Hamilton to RTC entitled "Carteret Federal Savings Bank" | AM5555 | 2008 - 2009 |
| 11/28/1994 | Letter from Carteret to RTC | AM5344 | 0129 - 0130 |
| 11/28/1994 | RTC Memo seeking authority to hire | AM5394 | 1848 - 1851 |
| 12/7/1994 | RTC email | C-AM-A-002 | 8088 |
| 12/14/1994 | Letter from RTC to Hamilton | AM5555 | 2010 |
| 12/14/1994 | RTC correspondence | C-AM-A-002 | 8076 |
| 12/29/1994 | RTC email | C-AM-A-002 | 8037 |
| 1/9/1995 | Net deposit calculation for Banco Popular | C-AM-A-012 | 9717 |
| 1/12/1995 | Letter from Bahia Partners to RTC Oversight Board | WOP299 | 1724 - 1725 |
| 1/17/1995 | Letter from RTC to Hamilton | AM5555 | 2011 |
| 1/18/1995 | RTC email | C-AM-A-007 | 7742 |
| 1/27/1995 | Letter from RTC to Bahia Partners | C-AM-A-012 | 5066 - 5069 |
| 1/31/1995 | Carteret's Consolidation Plan | CAM666 | 0013 - 0080 |
| 2/9/1995 | Letter from RTC to Bahia Partners | C-AM-A-012 | 5035 - 5037 |
| 2/14/1995 | Bank of New York bid for several clusters | AM4333 | 0669 - 0685 |
| 2/14/1995 | Chase Manhattan Bank of New Jersey bid | AM4333 | 1063 - 1080 |
| 2/14/1995 | Boiling Springs Savings Bank bid | AM4333 | 0312 - 0320 |
| 2/16/1995 | RTC correspondence entitled "Summary of Bids for Carteret FSB" | C-AM-A-002 | 7853 - 7854 |
| 3/1/1995 | RTC Decisional Memorandum | C-AM-A-001 | 3420 |
| 3/8/1995 | RTC correspondence entitled "Carteret Issue Paper" | C-AM-A-002 | 7774 - 7781 |
| 3/9/1995 | RTC document "Carteret FSB Acquirers, Deposits and Premiums" | C-AM-A-002 | 8258 - 8260 |
| 3/10/1995 | Failing Thrift Case recommending RTC to accept bids | C-AM-A-001 | 3421 - 3425 |
| 3/10/1995 | Attachment to Failing Thrift Case document | C-AM-A-008 | 8039 - 8040 |
| 3/10/1995 | Attachment to Failing Thrift Case document | C-AM-A-008 | 8074 - 8102 |
| 4/7/1995 | Memo to Dissolution Review Committee | CAM553 | 0853 - 0858 |
| 6/14/1995 | Internal FDIC memo entitled "Post-Insolvency Interest Memorandum" | AM0009 | 6532 - 6534 |
| 12/31/1995 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1653 - 1655 |
| 9/18/1996 | Options Memo, Post-Insolvency Interest | RAM051 | 0006 - 0022 |
| 12/31/1996 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1690 - 1692 |
| 3/13/1997 | Letter from FDIC to IRS (Austin, TX) | AM5231 | 0266 - 0267 |
| 6/17/1997 | Post-insolvency Interest Procedures Analysis | RAM063 | 0270 - 0272 |

**Exhibit 2**
**Materials Considered**

| | | | |
|---|---|---|---|
| 6/26/1997 | Post-insolvency Interest Procedures Analysis | RAM063 | 0184 - 0186 |
| 12/9/1997 | Memo from Tama re: Accrual of Interest | CAM958 | 0669 - 0674 |
| 12/31/1997 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1727 - 1729 |
| 5/4/1998 | FDIC Discussion Memorandum re: Post-insolvency Interest | AM001 | 0297 - 0305 |
| 5/4/1998 | Accounting and Tax Policy Section Memorandum: Post-insolvency Interest | RAM063 | 0169 - 0175 |
| 9/30/1998 | 1997 FDIC Goodwill Financial Reporting Package | RAM050 | 2048 - 2056 |
| 11/30/1998 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1758 - 1760 |
| 12/31/1998 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1761 - 1763 |
| 1/26/1999 | FDIC Calculation of Interest on loans through 12/31/97 | AM0009 | 2190 - 2205 |
| 4/13/1999 | 1998 FDIC Goodwill Financial Reporting Package | RAM050 | 2039 - 2047 |
| 12/1/1999 | E-mail from M. Saran "Post-Insolvency Interest Rates and Priority of Interest" | AM0009 | 6535 - 6537 |
| 12/22/1999 | Chart about Post Insolvency Interest | AM001 | 0350 |
| 12/31/1999 | 1999 Statement of Operations, Assets and Liabilities | RAM050 | 1798 - 1800 |
| 2/18/2000 | Inception-to-date Net Change Balance Sheet | AM6107 | 0045 - 0074 |
| 5/15/2000 | FDIC memo "Tax Issues related to the Goodwill Litigation" | RAM058 | 0036 - 0041 |
| 5/17/2000 | "Tax Issues related to the Goodwill Litigation" [Finalized] | RAM063 | 0337 - 0342 |
| 7/28/2000 | 1999 FDIC Goodwill Financial Reporting Package | FAM071 | 0001 - 0009 |
| 11/20/2000 | FDIC memo entitled "Post-Insolvency Interest Rate for State Receiverships" | AM0009 | 6538 - 6541 |
| 12/31/2000 | 2000 Statement of Operations, Assets and Liabilities | RAM050 | 1835 - 1837 |
| 2/22/2001 | FDIC memo re: Priority of Post-insolvency Interest | AM0009 | 6542 - 6550 |
| 5/21/2001 | 2000 FDIC Goodwill Financial Reporting Package | FAM070 | 0001 - 0010 |
| 12/10/2001 | E-mail "News from the Chariman's Office." | RAM063 | 0145 - 0146 |
| 12/18/2001 | Proposed Rule on Post-Insolvency Interest | RAM050 | 1609 - 1615 |
| 4/10/2002 | Memo re: Final Regulation Regarding Payment of Post-Insolvency Interest | RAM050 | 1579 - 1583 |
| 5/1/2002 | Memo re: Final Regulation Regarding Payment of Post-Insolvency Interest | RAM063 | 0119 - 0123 |
| 5/7/2002 | E-mail re: final rule | RAM063 | 0118 |
| 6/3/2002 | 2001 FDIC Goodwill Financial Reporting Package | FAM073 | 0001 - 0010 |
| 11/13/2002 | Chart concerning Post-Insolvency interest | RAM050 | 1564 |
| 4/18/2003 | 2002 FDIC Goodwill Financial Reporting Package | FAM074 | 0002 - 0011 |
| 6/16/2003 | Memo from Tama entitled "Summary of Meeting on PII"; Green Exhibit 30 | | |
| 1/12/2004 | FDIC Position on "Accounting for Post-Insolvency Interest" | AM001 | 0386 - 0392 |
| 3/16/2004 | E-mail from James F. Voitriede | RAM063 | 0308 - 0310 |
| 4/7/2004 | 2003 FDIC Goodwill Financial Reporting Package | RAM050 | 1990 - 1999 |
| 6/30/2004 | "Purchase and Sale Agreement" between RTC and Chase | AM5344 | 0199 - 0305 |
| 12/6/2004 | RTC correspondence entitled "Carteret FSB Resolution" | C-AM-A-012 | 5205 - 5206 |
| 12/6/2004 | RTC email | C-AM-A-002 | 8100 - 8100 |
| 5/10/2005 | 2004 FDIC Goodwill Financial Reporting Package | RAM051 | 0351 - 0360 |
| 3/31/2006 | 2005 FDIC Goodwill Financial Reporting Package | | |
| 9/87-11/92 | Goodwill Amortization Schedules | AM0005 | 0504 - 0567 |
| | Failing Thrift Case recommending RTC accept current bids | C-AM-A-013 | 0611 - 0617 |
| | "Loan Servicing Offering" | AM5437 | 0234 - 0314 |
| | Clearwater Servicing Center Overview | AM5344 | 0526 - 0641 |
| | "RTC Letter of Intent for Purchase and Sale of Mortgage Servicing Rights" | CAM405 | 0776 - 0900 |
| | Carteret Cost Test Documents | FAM079 | 0101 - 0320 |
| | Goodwill File Memorandum | AM1007 | 0075 - 0077 |
| | Chapter 6 Dividends | FAM078 | 0038 - 0067 |
| | Analysis of Post-insolvency Interest Procedure Proposals | RAM063 | 0202 - 0203 |
| | Resolution | RAM050 | 1577 - 1578 |
| | "Exhibit "A"" FDIC Final Rule | RAM063 | 0124 - 0132 |

**Exhibit 2**
**Materials Considered**

| | | |
|---|---|---|
| | "Exhibit B"" Resolution | RAM063 0133 - 0134 |
| | FDIC Statement of Position | RAM063 0209 - 0213 |
| | "Exhibit "A"" FDIC Final Rule | RAM050 1584 - 1592 |
| | FDIC Notice of proposed rulemaking | RAM050 1597 - 1608 |
| | Carteret Savings Bank 1989 Annual Report | WOT671 1260 - 1287 |
| | Carteret Savings Bank 1990 Annual Report | WOP291 1527 - 1557 |
| | Carteret Savings Bank 1991 Annual Report | FAM002 2373 - 2403 |
| | Ambase Form 10-K for the year ended December 31, 1992 | RAM012 0002 - 0098 |
| | Carteret TFR, Quarter of Dec 1991 | FAM002 0919 - 0952 |
| | Carteret TFR, March 1992 | WOQ698 1265 - 1270 |
| | Carteret TFR, March 1992 | FAM002 0953 - 0986 |
| | Carteret TFR, June 1992 | FAM002 0996 - 1043 |
| | Carteret TFR, September 1992 | WOP316 1469 - 1491 |
| | Carteret TFR, December 1992 | CAM320 0641 - 0659 |
| | Statements of Assets and Liabilities in Liquidation, 1995 | AM0009 6610 - 6627 |
| | **Asset Summary Reports** | |
| 5/4/1993 | Conservatorship Asset Summary Report for March 31, 1993 | AM5415 0141 - 0147 |
| | Conservatorship Asset Summary Report for March 31, 1993 | AM5415 0180 |
| | Conservatorship Asset Summary Report for March 31, 1993 | CAM830 2288 - 2295 |
| | Conservatorship Asset Summary Report | CAM830 2277 - 2278 |
| 5/19/1993 | Conservatorship Asset Summary Report for April 30, 1993 | AM5415 0033 - 0045 |
| | Conservatorship Asset Summary Report for April 30, 1993 | CAM830 2282 - 2287 |
| 6/22/1993 | Conservatorship Asset Summary Report for May 31, 1993 | AM5415 0297 - 0337 |
| | Conservatorship Asset Summary Report for May 31, 1993 | CAM830 2279 - 2281 |
| 7/30/1993 | Conservatorship Asset Summary Report for June 30, 1993 | AM5415 0342 - 0357 |
| 7/16/1993 | Conservatorship Asset Summary Report for June 1993 | AM5415 0472 - 0479 |
| 7/16/1993 | Conservatorship Asset Summary Report for June 30, 1993 | AM5415 0493 - 0505 |
| | Conservatorship Asset Summary Report for June 30, 1993 | CAM830 2266 - 2274 |
| 8/20/1993 | Conservatorship Asset Summary Report for July 1993 | AM5415 0480 - 0492 |
| 8/11/1993 | Conservatorship Asset Summary Report for July 1993 | AM5415 0506 - 0517 |
| 9/21/1993 | Conservatorship Asset Summary Report for August 31, 1993 | AM5415 0690 - 0732 |
| 10/18/1993 | Conservatorship Asset Summary Report for September 30, 1993 | AM5415 0115 - 0140 |
| 10/18/1993 | Conservatorship Asset Summary Report for September 30, 1993 | CAM830 2299 - 2300 |
| 11/18/1993 | Conservatorship Asset Summary Report for October 31, 1993 | AM4188 0776 - 0837 |
| 12/21/1993 | Stratification of Assets Remaining November 30, 1993 | AM5290 0156 - 0161 |
| 12/2/1993 | Conservatorship Asset Summary Report for November 1993 | CAM830 2192 - 2207 |
| | Stratification of Assets Remaining November 30, 1993 | AM5290 0162 - 0166 |
| 1/10/1994 | Conservatorship Asset Summary Report for December 31, 1993 | CAM830 2182 - 2191 |
| 2/18/1994 | Conservatorship Asset Summary Report for January 31, 1994 | CAM028 0146 - 0162 |
| | Conservatorship Asset Summary Report for January 1994 | AM5004 0154 - 0162 |
| 3/18/1994 | Conservatorship Asset Summary Report for February 28, 1994 | AM5079 1253 - 1267 |
| 3/2/1994 | Conservatorship Asset Summary Report for February 1994 | CAM830 2164 - 2172 |
| 4/22/1994 | Conservatorship Asset Summary Report for March 31,1994 | AM5242 0337 - 0354 |
| 4/4/1994 | Conservatorship Asset Summary Report for March 1994 | CAM830 2156 - 2160 |
| 5/23/1994 | Conservatorship Asset Summary Report for April 30, 1994 | AM5242 0318 - 0336 |
| 5/1/1994 | Conservatorship Asset Summary Report for April 1994 | CAM830 2150 - 2155 |
| 6/21/1994 | Conservatorship Asset Summary Report for May 31, 1994 | AM5242 0300 - 0317 |
| 6/2/1994 | Conservatorship Asset Summary Report for May 1994 | CAM830 2143 - 2149 |
| 7/21/1994 | Conservatorship Asset Summary Report for June 30, 1994 | AM5242 0281 - 0299 |

**Exhibit 2**
**Materials Considered**

| | | |
|---|---|---|
| 7/5/1994 | Conservatorship Asset Summary Report for June 1994 | CAM830 2137 - 2142 |
| 8/23/1994 | Conservatorship Asset Summary Report for July 31, 1994 | AM5242 0263 - 0280 |
| 8/2/1994 | Conservatorship Asset Summary Report for July 1994 | CAM830 2131 - 2136 |
| 9/26/1994 | Conservatorship Asset Summary Report for August 31, 1994 | AM5242 0227 - 0244 |
| 9/6/1994 | Conservatorship Asset Summary Report for August 1994 | CAM830 2125 - 2130 |
| 10/27/1994 | Conservatorship Asset Summary Report for September 30, 1994 | AM5242 0245 - 0262 |
| 10/6/1994 | Conservatorship Asset Summary Report for September 1994 | CAM830 2118 - 2124 |
| 11/23/1994 | Conservatorship Asset Summary Report for October 31, 1994 | AM5242 0209 - 0226 |
| 11/2/1994 | Conservatorship Asset Summary Report for October 1994 | CAM830 2113 - 2117 |
| 12/27/1994 | Conservatorship Asset Summary Report for November 30, 1994 | AM5242 0191 - 0208 |
| 12/1/1994 | Conservatorship Asset Summary Report for November 1994 | CAM830 2108 - 2112 |
| 1/23/1995 | Conservatorship Asset Summary Report for December 31, 1994 | AM5242 0173 - 0190 |
| | Conservatorship Asset Summary Report for December 1994 | AM5392 0115 - 0121 |
| 4/13/1995 | Conservatorship Asset Disposition Report for March 10, 1995 | CAM666 0380 |
| 4/13/1995 | Conservatorship Asset Disposition Report for March 10, 1995 | AM5392 1397 |
| 4/18/1995 | Conservatorship Asset Summary Report for March 10, 1995 | AM5392 1388 - 1396 |

**Journal Articles**

Babu G. Baradwaj, David A. Dubovsky and Donald R. Fraser, "Bidder Returns in Interstate and Intrastate Acquisitions," *Journal of Financial Services Research*, 5:261-273 (1991).

Edward J. Kane and Min-Teh Yu, "Opportunity Cost of Capital Forbearance during the Final Years of the FSLIC Mess," *The Quarterly Review of Economics and Finance*, Fall 1996 (pp. 271-290).

Edward J. Kane and Min-Teh Yu, "Measuring the true profile of taxpayer losses in the S & L insurance mess," *Journal of Banking & Finance* 19 (1995), pp. 1459-1477.

Inmoo Lee, Scott Lochhead, Jay Ritter, and Quanshui Zhao, "The Cost of Raising Capital," *The Journal of Financial Research*, Vol. XIX, No. 1, Spring 1996 (pp. 59-74).

Timothy Curry and Lynn Shibut, "The Cost of the Savings and Loan Crisis: Truth and Consequences," *FDIC Banking Review*, Vol. 13, No. 2, 2000.

David P. Ely and Nikhil P. Varaiya, "Opportunity Costs Incurred by the RTC in Cleaning Up S&L Insolvencies," *The Quarterly Review of Economics and Finance,* Vol. 36, No. 3, Fall 1996 (pp. 291-310).

David P. Ely and Nikhil P. Varaiya, "Asessing the Resolution of Insolvent Thrift Institutions post FIRREA: The Impact of Resolution Delays," *Journal of Financial Services Research,* 11:3 1997, (pp. 255-282).

Kerry D. Vandell and Timothy J. Riddiough, "The Impact of RTC Dispositions on Local Housing and Real Estate Markets," *Housing Policy Debate*, Vol. 2, Issue 1 (pp. 49-68).

Lee Davison, "Politics and Policy: The Creation of the Resolution Trust Corporation." *FDIC Banking Review,* 2005, Vol 17, No. 2, (pp. 17-44).

Bert Ely, "The Resolution Trust Corporation in Historical Perspective," *Housing Policy Debate*, Vol. 1, Issue 1 (pp. 53-78).

George J. Benston, and George G. Kaufman, "FDICIA After Five Years," *The Journal of Economic Perspectives*, Vol. 11, No. 3, Summer 1997 (pp. 139-158).

Roger D. Stover, "Early resolution of troubled financial institutions: An examination of the accelerated resolution program," *Journal of Banking & Finance,* 21, 1997 (pp. 1179-1194).

## Exhibit 2
## Materials Considered

Mukesh Bajaj, Sumon C. Mazumdar, and Atulya Sarin, "The Costs of Issuing Preferred Stock," *The Journal of Financial Research,* Vol. XXV, No. 4, Winter 2002 (pp. 577-592).

Sudhir Nanda, James E. Owens, and Ronald C. Rogers, "An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing, *Real Estate Economics*, 1997, V25 (pp. 271-294).

Joseph B. Blalock, Timothy J. Curry, and Peter J. Elmer, "Resolution Costs of Thrift Failures," *FDIC Banking Review*, Spring/Summer 1991, Vol. 4, No. 1 (pp. 15-26).

Roy Gardner and Roger D. Stover, "The Role of Information in Resolution Trust Corporation Auctions of Failed Thrifts," *Journal of Financial Services Research*, 14:3, 1998 (pp. 209-221).

Eugene F. Fama and Kenneth R. French, "The Cross-Section of Expected Stock Returns," *The Journal of Finance,* Vol. XLVII, No. 2, June 1992, (pp. 427-465).

P.L. Cooley and J. I. Heck, "Prolific Authors in the Finance Literature: A Half Century of Contributions," *Journal of Financial Literature*, Vol. 1, Winter 2005 (pp. 46-49).

**Periodicals, GAO Reports, and Other**

"Statement No. 90: An Open Letter to President Clinton," Shadow Financial Regulatory Committee, December 14, 1992.

"Statement No. 55: RTC Thrift Resolution Policies," S-105, Shadow Financial Regulatory Committee, May 7, 1990.

"The RTC's Epitaph: It Worked," *Business Week,* January 15, 1996, p. 29.

"Learning from the RTC," *U.S. Banker*, September 1993, p. 28.

"Imperial Credit Industries Inc. Announces Major East Coast Expansion," *PR Newswire*, December 28, 1992.

"Imperial Expands to E. Coast," *National Mortgage News*, January 11, 1993, p. 1.

"Imperial Bancorp reports 1992 year-end and fourth-quarter results," *Business Wire*, January 21, 1993.

"Imperial Credit Industries Inc. Announces Recent Developments," *PR Newswire*, March 29, 1993.

"Imperial Credit stock falls 21% on earnings news," *Orange County Register*, March 30, 1993, p. E-02.

"Conferees Clear Compromise Bill For RTC Funds -- Vote Followed Resolution of Issue of Authority To Sue S&L Officials," *Wall Street Journal*, November 19, 1993, p. A2.

RTC Statistical Abstract, August 1989/September 1995

*Managing the Crisis: The FDIC and RTC Experience*, prepared by the FDIC.

5/1995 1993 Thrift Resolutions: RTC's Resolution Process Generally Adequate to Determine Least Costly Resolutions, GAO, GAO/GGD-95-119

12/1995 Resolution Trust Corporation: Performing Assets Sold to Acquirers of Minority Thrifts, GAO, GAO/GGD-96-44

12/2004 FDIC Failure Transaction Database User Documentation

12/9/2003 "Audit of the Federal Financing Bank's Fiscal Years 2003 and 2002 Financial Statements," Office of the Inspector General, Department of the Treasury

## Exhibit 2
## Materials Considered

**Databases and Exhibit Back-up**

FDIC Failure Transaction Database

Veribanc TFR Database

SNL Securities Database

TBMS series; Federal Reserve Bank

TCMNOMY20 series; Federal Reserve Bank

MORTGNA series; Federal Reserve Bank

PRIMENA series; Federal Reserve Bank

Post-Judgment Interest Rate Table (www.uscourts.gov/postjud/rate2001.html)

Bureau of Economic Analysis, Table 1.1.6. Real Gross Domestic Product (http://www.bea.gov/bea/dn/nipaweb/index.asp)

http://www.census.gov/const/C40/Table2/tb2u8599.txt
http://www.census.gov/const/C40/Table2/tb2u8699.txt
http://www.census.gov/const/C40/Table2/tb2u8799.txt
http://www.census.gov/const/C40/Table2/tb2u8899.txt
http://www.census.gov/const/C40/Table2/tb2u8999.txt

Series LNS14000000; Bureau of Labor Statistics

Series LASST34000003; Bureau of Labor Statistics

Series LASST12000003; Bureau of Labor Statistics

FNER Index (FTSE NAREIT Equity REITs Index)

NPRQEAST Index (NCREIF Regional Property Index East)

NPRQSOUT Index (NCREIF Regional Property Index South)

**Other Cases**

9/15/2002 The Long Island Savings Bank, FSB et al. v. The United States, Opinion and Order, U.S. Court of Federal Claims, No. 92-517-C.

Confidential Materials - Subject to Protective Order

**Exhibit 3**
**Interest Rates: October 1994 - December 2005**




Sources: TBM3 series, TCMNOMY20 series, MORTGNA series, and PRIMENA series from the Federal Reserve Bank;
Post Judgment Interest Rate Table from www.uscourts.gov/postjud/rate2001.html

Confidential Materials - Subject to Protective Order

## Exhibit 4
## Timeline of FDIC Interest Calculation Method




Sources: AM00096528, AM00096532-4, Green Exhibit 23, AM00096535-7, FAM0710001-9 at FAM0710005 (note a).

Confidential Materials - Subject to Protective Order

**Exhibit 5**
**Post-Insolvency Interest Rates**
**September 1994 - December 2004**




Sources: TBM3 series from the Federal Reserve Bank;
Post Judgment Interest Rate Table from www.uscourts.gov/postjud/rate2001.html

Confidential Materials - Subject to Protective Order

## Exhibit 6

### Fixed Interest Rate v. Floating Interest Rate Calculation Methodology
### Comparison of Interest Accrued

| As of | Annual Interest Accrued: FDIC Fixed | Annual Interest Accrued: Calomiris Floating | Annual Interest Accrued: Difference | Total Interest Accrued: FDIC Fixed | Total Interest Accrued: Calomiris Floating | Total Interest Accrued: Difference |
|---|---|---|---|---|---|---|
| December 31, 1994 | $1,680,033 | $1,336,162 | $343,871 | $1,680,033 | $1,336,162 | $343,871 |
| December 31, 1995 | $48,913,035 | $40,922,367 | $7,990,668 | $50,593,068 | $42,258,529 | $8,334,538 |
| December 31, 1996 | $18,525,370 | $13,614,034 | $4,911,336 | $69,118,438 | $55,872,564 | $13,245,874 |
| December 31, 1997 | $11,378,887 | $7,899,021 | $3,479,866 | $80,497,324 | $63,771,584 | $16,725,740 |
| December 31, 1998 | $9,946,759 | $6,484,752 | $3,462,008 | $90,444,084 | $70,256,336 | $20,187,748 |
| December 31, 1999 | $8,402,837 | $4,712,573 | $3,690,264 | $98,846,920 | $74,968,909 | $23,878,011 |
| December 31, 2000 | $8,127,377 | $5,516,641 | $2,610,736 | $106,974,298 | $80,485,550 | $26,488,748 |
| December 31, 2001 | $8,633,721 | $4,122,253 | $4,511,468 | $115,608,019 | $84,607,803 | $31,000,216 |
| December 31, 2002 | $9,229,503 | $1,770,484 | $7,459,019 | $124,837,522 | $86,378,287 | $38,459,235 |
| December 31, 2003 | $9,866,611 | $1,131,030 | $8,735,581 | $134,704,133 | $87,509,316 | $47,194,817 |
| December 31, 2004 | $10,576,829 | $1,264,058 | $9,312,771 | $145,280,962 | $88,773,374 | $56,507,588 |
| December 31, 2005 | $11,278,540 | $3,114,776 | $8,163,764 | $156,559,502 | $91,888,150 | $64,671,352 |

Sources:
Calomiris Back-up Calculation for Row (2) of Table 2.
Calomiris Back-up Calculation for FDIC's calculation of interest
Green Exhibit 36.

Confidential Materials - Subject to Protective Order

## Exhibit 7
## Carteret's Performance Relative to Other Failed Thrifts: Tangible Capital to Tangible Asset Ratio

| Bank Name | One Quarter Before Failure: Tangible Capital to Tangible Assets Ratio[1] |
|---|---|
| PELICAN HOMESTEAD SA | -22.8692% |
| ALPHA INDIAN ROCK FS&LA | -8.2963% |
| SECURITY FS&LA | -6.3227% |
| CRESTLINE FS&LA | -5.7257% |
| HANSEN FSB | -4.9904% |
| LEMONT FSA | -4.4516% |
| SECURITY 1ST FS&LA | -3.4635% |
| COLUMBIA BANKING FSA | -2.8438% |
| HOME UNITY FS&LA | -2.4814% |
| UNITED SAVINGS OF AMERICA | -2.4747% |
| LIBERTY FSB | -1.9913% |
| FLAGLER FS&LA | -1.7094% |
| **CARTERET FSB** | **-1.2947%** |
| SECURITY FSB | -1.0984% |
| IRVINGTON FSB | -0.3581% |
| UKRANIAN FS&LA | -0.2590% |
| HANSEN FSA | 0.0526% |
| SOUTHERN FSA OF GA | 0.2106% |
| VOLUNTEER FSA | 0.5093% |
| BIRMINGHAM FSB | 0.5372% |
| POLIFLY FS&LA | 0.6481% |
| FIRST STATE SA | 0.7392% |
| HOMESTEAD FSA | 0.7743% |
| CARROLLTON HOMESTEAD ASSN., FA | 0.8952% |
| FIRST HOME FSA | 1.1816% |
| THE OVERLAND PARK FS&LA | 1.2340% |
| FIRST SOUTH FSB | 1.3221% |
| FIRST FS&LA OF RUSSELL CO, FA | 1.4853% |
| VALLEY FS&LA | NA |
| | |
| Mean | -2.1800% |
| Median | -0.7283% |

[1]Quarter Before Failure TFR line CCR10/TFR line CCR15
Note: As in Professor Calomiris's note to his Table 5, "the sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as 'state stock savings and loans' that could be matched with historical TFR data."

Sources: Veribanc TFR Data, FDIC Failure Transaction Database

## Exhibit 8
## Carteret's Performance Relative to Other Failed Thrifts: Core Capital to Adjusted Tangible Asset Ratio

| Bank Name | One Quarter Before Failure: Core Capital to Adjusted Tangible Assets Ratio[1] |
|---|---|
| PELICAN HOMESTEAD SA | -21.3692% |
| ALPHA INDIAN ROCK FS&LA | -8.2963% |
| CRESTLINE FS&LA | -5.7257% |
| SECURITY FS&LA | -5.3226% |
| LEMONT FSA | -4.4516% |
| HANSEN FSB | -3.4908% |
| COLUMBIA BANKING FSA | -2.8438% |
| HOME UNITY FS&LA | -2.4814% |
| UNITED SAVINGS OF AMERICA | -2.4747% |
| LIBERTY FSB | -1.9913% |
| SECURITY 1ST FS&LA | -1.9634% |
| FLAGLER FS&LA | -0.5873% |
| IRVINGTON FSB | -0.3581% |
| **CARTERET FSB** | **-0.2947%** |
| UKRANIAN FS&LA | -0.2590% |
| SECURITY FSB | -0.0984% |
| HANSEN FSA | 0.0526% |
| SOUTHERN FSA OF GA | 0.2106% |
| VOLUNTEER FSA | 0.5093% |
| BIRMINGHAM FSB | 0.5372% |
| FIRST STATE SA | 0.7392% |
| HOMESTEAD FSA | 0.7743% |
| CARROLLTON HOMESTEAD ASSN., FA | 0.8952% |
| FIRST HOME FSA | 1.1816% |
| THE OVERLAND PARK FS&LA | 1.2340% |
| FIRST SOUTH FSB | 1.3221% |
| FIRST FS&LA OF RUSSELL CO, FA | 1.4853% |
| POLIFLY FS&LA | 1.6481% |
| VALLEY FS&LA | N/A |
| | |
| Mean | -1.8364% |
| Median | -0.2768% |

[1]Quarter Before Failure TFR line CCR20/TFR line CCR25
Note: As in Professor Calomiris's note to his Table 5, "the sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as 'state stock savings and loans' that could be matched with historical TFR data."

Sources: Veribanc TFR Data, FDIC Failure Transaction Database

Confidential Materials - Subject to Protective Order

# Exhibit 9
## Carteret's Performance Relative to Other Failed Thrifts: Non Accrual Loans + REO to Total Assets Ratio

| Bank Name | One Quarter Before Failure Non Accrued Loans + REO to Total Assets Ratio[1] |
|---|---|
| FIRST STATE SA | 1.8902% |
| CRESTLINE FS&LA | 1.8940% |
| FIRST HOME FSA | 2.1559% |
| BIRMINGHAM FSB | 2.7493% |
| SECURITY FSB | 2.7660% |
| HANSEN FSA | 3.5430% |
| HOME UNITY FS&LA | 3.5972% |
| HOMESTEAD FSA | 3.7542% |
| SECURITY 1ST FS&LA | 3.8664% |
| IRVINGTON FSB | 4.3111% |
| THE OVERLAND PARK FS&LA | 4.3723% |
| LEMONT FSA | 4.7464% |
| VALLEY FS&LA | 5.3060% |
| UNITED SAVINGS OF AMERICA | 5.6587% |
| SECURITY FS&LA | 5.9426% |
| POLIFLY FS&LA | 6.6807% |
| PELICAN HOMESTEAD SA | 6.9068% |
| **CARTERET FSB** | **7.0036%** |
| CARROLLTON HOMESTEAD ASSN., FA | 7.0839% |
| VOLUNTEER FSA | 7.3731% |
| FLAGLER FS&LA | 7.7160% |
| ALPHA INDIAN ROCK FS&LA | 8.6987% |
| COLUMBIA BANKING FSA | 10.3426% |
| HANSEN FSB | 10.5836% |
| SOUTHERN FSA OF GA | 11.8376% |
| UKRANIAN FS&LA | 12.7785% |
| FIRST FS&LA OF RUSSELL CO, FA | 14.1584% |
| LIBERTY FSB | 15.4361% |
| FIRST SOUTH FSB | 17.4802% |
| | |
| Mean | 6.9184% |
| Median | 5.9426% |

[1]One Quarter Before Failure TFR lines: (SC40 + PD30 - SC430)/SC60
Note: As in Professor Calomiris's note to his Table 5, "the sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as 'state stock savings and loans' that could be matched with historical TFR data."

Sources: Veribanc TFR Data, FDIC Failure Transaction Database

Confidential Materials - Subject to Protective Order

**Exhibit 10**
**Number of Failures by Resolution Type in the FDIC Failure Transaction Database and by Professor Calomiris's Resolution Category**

| | | Mergers and Reprivatizations | | | | Purchase and Assumption | | | IDT and Payoffs | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Resolution Year | Total | A/A | MGR | REP | Total | P&A | PA | Total | ABT | IDT | PO | PI | Total |
| 1980 | 11 | 11 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1981 | 28 | 27 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1982 | 70 | 69 | 0 | 0 | 69 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1983 | 51 | 45 | 0 | 0 | 45 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 6 |
| 1984 | 24 | 20 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 4 |
| 1985 | 35 | 27 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 6 | 2 | 0 | 8 |
| 1986 | 47 | 28 | 0 | 1 | 29 | 0 | 0 | 0 | 9 | 7 | 2 | 0 | 18 |
| 1987 | 47 | 27 | 0 | 0 | 27 | 0 | 0 | 0 | 5 | 12 | 3 | 0 | 20 |
| 1988 | 220 | 176 | 16 | 0 | 192 | 0 | 0 | 0 | 2 | 20 | 6 | 0 | 28 |
| 1989 | 46 | 2 | 0 | 0 | 2 | 0 | 7 | 7 | 0 | 31 | 6 | 0 | 37 |
| 1990 | 315 | 0 | 0 | 0 | 0 | 0 | 172 | 172 | 0 | 95 | 48 | 0 | 143 |
| 1991 | 232 | 0 | 0 | 0 | 0 | 0 | 157 | 157 | 0 | 25 | 46 | 4 | 75 |
| 1992 | 166 | 1 | 0 | 0 | 1 | 0 | 90 | 90 | 0 | 15 | 15 | 45 | 75 |
| 1993 | 87 | 0 | 0 | 0 | 0 | 0 | 43 | 43 | 0 | 0 | 6 | 38 | 44 |
| 1994 | 75 | 0 | 0 | 0 | 0 | 0 | 62 | 62 | 0 | 1 | 3 | 9 | 13 |
| 1995 | 9 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 1 | 0 | 3 | 4 |
| 1996 | 6 | 0 | 0 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 2 | 2 |
| 1997 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 |
| 1999 | 6 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 1 | 1 |
| 2000 | 7 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 5 | 5 |
| 2001 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 2 | 2 |
| 2002 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 9 |
| 2003 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 |
| 2004 | 4 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 1 | 1 | 2 |
| Total | 1,506 | 433 | 16 | 1 | 450 | 1 | 553 | 554 | 16 | 222 | 144 | 120 | 502 |

Note: The nine resolution types, e.g. A/A, are defined in the FDIC Failure Transaction Database User Documentation at p. 9. The counts for each of the nine types by year are tabulated directly from the Failure Transaction Database using failures that have a resolution date and the data needed to calculate Professor Calomiris's expected premium. The three categorizations -- Merger and Reprivatizations, Purchase and Assumption, and IDT and Payoffs -- are from Professor Calomiris's analysis.

Sources: FDIC Failure Transaction Database, Calomiris worksheet "Turnover FDIC/TFR Data, July 14, 2006."

Confidential Materials - Subject to Protective Order

**Exhibit 11**
**Distribution of Professor Calomiris's Expected Premiums by his Resolution Category: Resolutions After 1988**




Sources: FDIC Failure Transaction Database, Calomiris worksheet "Turnover FDIC/TFR Data, July 14, 2006."

Confidential Materials - Subject to Protective Order

## Exhibit 12
## All Government Assisted Transactions - 1992 through 1995

| | [1] US | [2] New Jersey | [3] Florida |
|---|---|---|---|
| **1992** | | | |
| # of Transactions | 279 | 8 | 16 |
| # of Transactions with Deposit Premium Data | 238 | 8 | 16 |
| Mean Deposit Premium | 1.63 | 1.42 | 1.36 |
| Median Deposit Premium | 1.17 | 1.08 | 0.79 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 1.88 | 1.91 | 2.23 |
| **1993** | | | |
| # of Transactions | 118 | 1 | 1 |
| # of Transactions with Deposit Premium Data | 88 | 1 | 1 |
| Mean Deposit Premium | 3.45 | 5.25 | 4.48 |
| Median Deposit Premium | 2.55 | 5.25 | 4.48 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 4.46 | 5.25 | 4.48 |
| **1994** | | | |
| # of Transactions | 194 | 12 | 15 |
| # of Transactions with Deposit Premium Data | 184 | 11 | 15 |
| Mean Deposit Premium | 6.33 | 5.43 | 6.70 |
| Median Deposit Premium | 6.31 | 5.97 | 5.12 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 6.99 | 6.90 | 10.85 |
| **1995** | | | |
| # of Transactions | 22 | 12 | 0 |
| # of Transactions with Deposit Premium Data | 21 | 12 | 0 |
| Mean Deposit Premium | 7.94 | 10.59 | . |
| Median Deposit Premium | 9.18 | 11.30 | . |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 8.35 | 10.82 | . |

Source: SNL Securities

Confidential Materials - Subject to Protective Order

**Exhibit 13**
**Deposit Premium by Deposits Per Branch**
**All New Jersey Government Assisted Transactions, 1992 - 1995**




Source: SNL Securities

Confidential Materials - Subject to Protective Order

## Exhibit 14
## Deposit Premium by Deposits Per Branch
## All Florida Government Assisted Transactions, 1992 - 1995




Source: SNL Securities

Confidential Materials - Subject to Protective Order

**Exhibit 15**
**Deposit Premium by Total Deposits**
**All New Jersey Government Assisted Transactions, 1992 - 1995**




Source: SNL Securities

**Exhibit 16**
**Deposit Premium by Total Deposits**
**All Florida Government Assisted Transactions, 1992 - 1995**




Source: SNL Securities

## Exhibit 17
## Entire Bank Government Assisted Transactions - 1992 through 1995

| | [1] | [2] | [3] |
|---|---|---|---|
| 1992 | US | New Jersey | Florida |
| # of Transactions | 122 | 8 | 8 |
| # of Transactions with Deposit Premium Data | 100 | 8 | 8 |
| Mean Deposit Premium | 1.68 | 1.42 | 1.68 |
| Median Deposit Premium | 1.14 | 1.08 | 1.14 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 2.16 | 1.91 | 2.37 |
| 1993 | | | |
| # of Transactions | 52 | 1 | 1 |
| # of Transactions with Deposit Premium Data | 45 | 1 | 1 |
| Mean Deposit Premium | 2.60 | 5.25 | 4.48 |
| Median Deposit Premium | 1.44 | 5.25 | 4.48 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 2.29 | 5.25 | 4.48 |
| 1994 | | | |
| # of Transactions | 44 | 5 | 8 |
| # of Transactions with Deposit Premium Data | 43 | 5 | 8 |
| Mean Deposit Premium | 5.04 | 6.86 | 8.46 |
| Median Deposit Premium | 3.88 | 6.37 | 8.15 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 7.91 | 7.58 | 12.05 |
| 1995 | | | |
| # of Transactions | 7 | 0 | 0 |
| # of Transactions with Deposit Premium Data | 6 | 0 | 0 |
| Mean Deposit Premium | 3.14 | . | . |
| Median Deposit Premium | 2.31 | . | . |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 4.41 | . | . |

Source: SNL Securities

Confidential Materials - Subject to Protective Order

**Exhibit 18**
**Carteret Total Deposits, Q1 1987 - Q4 1994**




Source: Veribanc TFR data

Confidential Materials - Subject to Protective Order

**Exhibit 19**
**Total Classified Assets to Total Assets Ratio**
**Carteret Savings Bank**
**(1987 - 1990)**




Sources: WOQ690 2449-2653 at WOQ690 2501. WOP317 0002-0118 at WOP317 0050 and 0054, where the ratio is: $530,567 (substandard assets) + $7,410 (doubtful assets) + $64,215 (loss assets) / $5,576,023 (total assets), or 10.8%.

**Exhibit 20**
**Carteret Savings Bank**
**Level of Tangible Capital (in 000s)[1]**

| As of 30-Jun-1989 | As of 30-Jun-1990[2] | As of 30-Jun-1991 | As of 30-Jun-1992 |
|---|---|---|---|
| $49,600 | $35,947 | ($71,739) | ($72,777) |

Notes:

[1] Calculated in the Reports of Examination in accordance with the Financial Institutions Recovery, Reform, and Enforcement Act of 1989 ("FIRREA"). Excludes supervisory goodwill.

[2] Includes examiner-recommended loan loss allowances.

Sources:

OTS Reports of Examination commenced 15-Jun-1992 (WOP317 0002-0118 at WOP317 0022), commenced 17-Jun-1991 (WOQ690 1401-1448 at WOQ690 1430), commenced 04-Jun-1990 (WOQ690 2449-2653 at WOQ690 2474) and commenced 22-May-1989 (WOQ668 1979-2222 at WOQ668 2027).

Confidential Materials - Subject to Protective Order

**Exhibit 21**
**Growth in Real Gross Domestic Product, 1988 - 1990**
**(Real GDP Measured in Billions of Fixed 2000 Dollars, Seasonally Adjusted Annual Rate)**




Source: Table 1.1.6 from the Bureau of Economic Analysis, U.S. Department of Commerce

Confidential Materials - Subject to Protective Order

## Exhibit 22
## New Privately Owned Housing Units Authorized

| | New Jersey | | Florida | |
|---|---|---|---|---|
| Year | Units | Change | Units | Change |
| 1985 | 55,027 | | 202,615 | |
| 1986 | 57,352 | 4.23% | 195,525 | -3.50% |
| 1987 | 62,186 | 8.43% | 178,764 | -8.57% |
| 1988 | 40,909 | -34.22% | 170,597 | -4.57% |
| 1989 | 30,337 | -25.84% | 164,985 | -3.29% |

Source: http://www.census.gov (Table 2u)

Confidential Materials - Subject to Protective Order

**Exhibit 23**
**Unemployment Rate, 16 Years and Over**
**(Seasonally Adjusted)**
**1988-1990**




Sources: Bureau of Labor Statistics, Series LNS14000000, LASST34000003, and LASST12000003.

Confidential Materials - Subject to Protective Order

**Exhibit 24**
**Average Yields for Offerings in Professor Calomiris's Table 11**

| | Name | Yield (%) | Principal ($ millions) |
|---|---|---|---|
| | **High-Yield Debt Offerings** | | |
| 1 | St Paul Bancorp | 8.250 | 30.00 |
| 2 | Sterling Financial Corp | 8.750 | 15.00 |
| 3 | Sovereign Bancorp | 8.051 | 50.00 |
| 4 | Coast Savings Financial | 10.000 | 57.50 |
| 5 | Security First Corp | 6.250 | 8.50 |
| 6 | First Republic Bancorp | 8.500 | 12.00 |
| 7 | Western Financial Savings Bank | 8.625 | 125.00 |
| 8 | CitFed Bancorp | 8.250 | 35.00 |
| 9 | Soverign Bancorp | 6.855 | 50.00 |
| 10 | Anchor Bancorp | 8.401 | 100.00 |
| 11 | Chevy Chase Savings | 9.302 | 150.00 |
| 12 | FMS Financial Corp | 10.000 | 10.00 |
| | | | 643.00 |
| | **Average Yield** | **8.436** | |
| | **Weighted Average Yield** | **8.641** | |
| | **Convertible Preferred Stock Offerings** | | |
| 1 | First Liberty Financial Corp | 7.750 | 10.00 |
| 2 | Roosevelt Financial Grp | 6.500 | 40.00 |
| 3 | California Federal Bank | 7.750 | 85.00 |
| 4 | People's Bank of Bridgeport | 8.500 | 50.00 |
| 5 | Bank United Financial Corp | 8.000 | 7.00 |
| 6 | Conservative Savings Corp | 6.080 | 10.00 |
| 7 | Rochester Community Savings Bank | 7.000 | 65.00 |
| 8 | Suncoast S&L | 8.000 | 12.00 |
| 9 | H.F. Ahmanson & Company | 6.000 | 250.00 |
| 10 | Glendale Federal Bank | 8.750 | 175.00 |
| 11 | RepublicSecurity Financial | 7.500 | 3.11 |
| 12 | Firstfederal Financial Services Corp | 6.500 | 10.88 |
| | | | 717.99 |
| | **Average Yield** | **7.361** | |
| | **Weighted Average Yield** | **7.262** | |
| | **Straight Preferred Stock Offerings** | | |
| 1 | H.F. Ahmanson & Company | 8.400 | 175.00 |
| 2 | Citizens Federal Bank | 8.750 | 25.00 |
| 3 | Citizens Federal Bank | 8.750 | 30.00 |
| 4 | Washington Mutual Savings Bank | 7.600 | 50.00 |
| 5 | Dime Savings Bank | 10.500 | 100.00 |
| 6 | Coastal Savings Bank | 9.000 | 25.00 |
| 7 | Bank United Financial Corp | 9.000 | 5.25 |
| 8 | California Federal Bank | 10.625 | 150.00 |
| 9 | First Madison Bank | 11.500 | 275.00 |
| | | | 835.25 |
| | **Average Yield** | **9.347** | |
| | **Weighted Average Yield** | **10.069** | |

Source: Professor Calomiris's Back-Up to Table 11 and A3.

Confidential Materials - Subject to Protective Order

**Exhibit 25**
**Performance of FTSE NAREIT Equity REITs Index**
**1992-1995**




Source: FNER Index (FTSE NAREIT Equity REITs Index), data from Bloomberg

Confidential Materials - Subject to Protective Order

**Exhibit 26**
**NCREIF Regional Property Indexes**
**1992 - 1995**




Source: NPRQEAST Index (NCREIF Regional Property Index East), NPRQSOUT Index (NCREIF Regional Property Index South), data from Bloomberg

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs, | ) | |
| and | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervener, | ) | No. 93-531<br>Judge Loren Smith |
| v. | ) | |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**DECLARATION OF CHARLES W. CALOMIRIS OF JULY 14, 2006**


Qualifications

Introduction

I. Inappropriate Interest Calculations Inflated the Receivership Deficit After the Resolution
   A. Because the Government Does Not Pay the Time Value of Money for Damages, It Is Inconsistent and Incorrect for the Government to Impute Interest When Calculating the Receivership Deficit
   B. The Time Value of Money Used for Computing Imputed Interest Costs for a Receivership Deficit Should Be Calculated Using Short-Term Floating U.S. Treasury Interest Rates for the Period of the Receivership

- C. The Interest Rates Charged by the FDIC Are Not Appropriate Measures of the Time Value of Money
  - 1. Permanently Locking the Interest Rate at the Time of Carteret's Resolutions Has No Economic Rationale
  - 2. Other Resolutions Have Used Shorter-Term Interest Rates to Calculate Cost
    - a. The Interest Rate Charged for Funding the Pass-Through Resolution in 1992 Was Based on a Floating Rate
    - b. Resolutions Before August 10, 1993 and After 2002 Are Funded Using a Three-Month Treasury Yield
    - c. The Escrow Account that Held the Premiums from the Branch Sales Earned an Interest Rate Based on a Short-Term Treasury Yield
  - 3. The Interest Rates Charged by the Government Are Too High
  - 4. The Government's Inappropriate Interest Rates Substantially Inflated the Receivership Deficit through December 2005
- D. The Government Did Not Credit Payments to the Highest Cost Debt
  - 1. The FDIC Applied Payments Pro-Rata Among the Three Resolutions, Even Though Each Resolution Had a Different Fixed Interest Rate Under the FDIC's Faulty Methodology
  - 2. Assuming the Government's Faulty Interest Rates Are Not Corrected, the Government's Failure to Allocate Payments to the Highest-Cost Resolutions First Substantially Inflated the Receivership Deficit through December 2005
- E. The RTC/FDIC Failed to Credit Sales Premium to the Loan Principal Using a Consistent Measure of the Time Value of Money

II. Delays and Value Destruction During Carteret's Conservatorship Inflated the Receivership Deficit by Reducing the Premium Realized from the Sale of the Branches, Requiring a Larger Loan Principal to Fund the Resolutions

- A. The Government Delayed and Mismanaged Carteret's Resolution
  - 1. Congress Delayed Funding for the RTC, Which Delayed Carteret's Resolution
  - 2. As a Condition of Funding, Congress Required a Minority Preference Program, Which Further Delayed Carteret's Resolution
- B. The Consequences of the Government's Delay and Value Destruction on the Principal Required in Carteret's Resolution
  - 1. Delay Led to Deposit Runoff
    - a. Estimating the Magnitude of the Delay in Carteret's Resolution
      - i. Carteret's Relative Position at the Time of Failure
      - ii. Carteret's Relative Experience in Resolution
    - b. Delaying the Resolution Resulted in Deposit Runoffs, Which Reduced Prices for the Branch Sales
    - c. Isolating the Consequences of Delay and Deposit Runoff from the Minority Preference Program
  - 2. The Minority Preference Program Resulted in Lower Deposit Premiums from the Branch Sales

a. The Minority Preference Program Forced Carteret to Be Sold in Pieces, Rather Than on a Whole-Bank Basis
b. The Minority Preference Program Discouraged Non-Minority Bidders from Participating in the Auction for Carteret's Branches
c. The Minority Preference Program Induced Non-Minority Bidders to Bid Less Aggressively Than They Otherwise Would Have Conditional on Entering the Auction

III. The Government's Unexpected Elimination of Supervisory Goodwill Inflated the Receivership Deficit and Decreased the Value of Carteret
A. Lost Value of Supervisory Goodwill Under Carteret's Receivership
1. Cash Equivalent Value of Goodwill
2. Cost of Replacement Based on a Common Stock Issuance
3. Summary
B. The Government's Unexpected Elimination of Supervisory Goodwill Corresponds with a Decrease in the Value of AmBase
1. Using the Capital Asset Pricing Model to Value Goodwill
2. AmBase Experienced a Significant Abnormal Return During the Time Period of the OTS's Warning that Removal of Goodwill from Carteret's Regulatory Capital Would Leave It Critically Undercapitalized

IV. The RTC's Mishandling of Carteret's Mortgage Origination Unit Inflated the Receivership Deficit
A. Valuing Carteret Mortgage Company Using the Abnormal Returns for Imperial Credit Industries
B. Using Comparable Sales to Estimate the Value Destroyed by the Government's Shutdown of Carteret's Mortgage Origination Unit
1. Sales of Comparable Mortgage Businesses During the Time of Carteret's But-for Resolution
2. Estimating the Value of Clearwater's Servicing Portfolio at the Time Carteret Mortgage Company Should Have Been Sold
2. Estimating the Value of Carteret Mortgage Company at the Time It Should Have Been Sold Using Clearwater's Sales Value and Comparable Mortgage Businesses
C. The Sale of Carteret's Mortgage Origination Unit Would Have Decreased the Receivership Deficit

V. The Government's Delay and Value Destruction of Carteret's Resolution Resulted in Lower Proceeds from Asset Sales, Which Inflated the Receivership Deficit

Conclusion

Appendix A: Valuing Supervisory Goodwill

Appendix B: Materials Relied Upon

Appendix C: Curriculum Vitae

## QUALIFICATIONS

1. I, Charles W. Calomiris, am the Henry Kaufman Professor of Financial Institutions at the Columbia University Graduate School of Business and a Professor at Columbia's School of International and Public Affairs. I am the Academic Director of Columbia Business School's Jerome Chazen Institute of International Business and the Director of Columbia University's Center for International Business Education and Research. I co-direct the Project on Financial Deregulation at the American Enterprise Institute (AEI) and am the Arthur Burns Scholar in International Economics at AEI. I am a member of the Shadow Financial Regulatory Committee, a Research Associate of the National Bureau of Economic Research, and was a Senior Fellow at the Council on Foreign Relations.

2. I am Chairman of the Board of Greater Atlantic Financial Corporation, a publicly traded bank based in the Washington D.C. metropolitan area, and a Managing Partner of Gauss Fund, LP. I served on the International Financial Institution Advisory Commission, a Congressional commission to advise the U.S. government on the reform of the IMF, the World Bank, the regional development banks, and the WTO. My research spans several areas, including banking, corporate finance, financial history, and monetary economics.

3. My recent publications include: "Bank Capital and Portfolio Management: The 1930s 'Capital Crunch' and Scramble to Shed Risk" (with Berry Wilson), in the *Journal of Business* (July 2004); "Credit Card Securitization and Regulatory Arbitrage" (with Joseph Mason), in the *Journal of Financial Services Research* (August 2004); "Consequences of Bank Distress During the Great Depression" (with Joseph Mason), in the *American Economic Review* (June 2003); *U.S. Bank Deregulation in Historical Perspective* (Cambridge University Press, 2000); *Emerging Financial Markets* (with David Beim, Irwin-McGraw Hill, 2001); "Blueprints

for a New Global Financial Architecture" in *International Financial Markets: The Challenge of Globalization* (Leonardo Auernheimer, ed., University of Chicago Press, 2000); and "Is the Bank Merger Wave of the 1990s Efficient?" (with Jason Karceski) in *Mergers and Productivity* (Steven Kaplan, ed., University of Chicago Press, 2000).

4. I am the recipient of research grants or awards from the National Science Foundation, the World Bank, the Japanese Government, the Herbert V. Prochnow Foundation, and the Garn Institute of Finance. In 1995, I was named a University Scholar at the University of Illinois, where I served as Associate Professor of Finance and Co-Director of the Office for Banking Research. I am, or have been, a member of the editorial boards of the *Journal of Banking and Finance*, the *Journal of Financial Services Research*, the *Journal of Financial Intermediation*, the *Journal of Economic History*, the *Journal of Economics and Business*, and *Explorations in Economic History*. I serve or have served as a consultant or visiting scholar for the Federal Reserve Banks of New York, Chicago, Cleveland, and St. Louis, the Federal Reserve Board, the World Bank, and the governments of Mexico, Argentina, Japan, China, El Salvador, Connecticut and Massachusetts. My private sector clients have included AIG, Ameriquest, Astoria Savings, Bank of America, Citicorp, Credit Suisse, Fleet Bank, The Limited, Lloyds, UBS Securities, U.S. Trust Corporation, and Xilinx.

5. I designed (with David Beim) and teach a new MBA and Executive MBA case course on emerging market finance, which won the 1997-1998 Chazen International Innovation Prize at Columbia Business School. I have taught international banking, emerging financial markets, and advanced corporate finance at the MBA and Ph.D. levels at Columbia, as well as the MBA core course in Business Values and Ethics. I have taught Ph.D.-level courses at the World Bank and the IMF, including a course at the IMF on Emerging Financial Markets.

6. I earned a Ph.D. in economics from Stanford University and a B.A. in economics, *magna cum laude*, from Yale University.

## INTRODUCTION

7. This report considers the receivership deficit calculations for Carteret prepared by the FDIC, and adjusts those calculations to take account of computational and conceptual errors in the calculation of interest, Congressional actions that caused delays in Carteret's resolution, the failure to realize any value from Carteret Mortgage Company, and contractual breach in the treatment of goodwill, which together substantially inflated Carteret's receivership deficit.

8. Section I of the report considers necessary adjustments that correct computational and conceptual errors in the accounting for interest charges in the receivership deficit. Section II measures the effect on the principal and interest of the receivership deficit of the shortfall in the premium received from the sale of branches, which resulted from the protracted delays and mishandling of the branch sales caused by Congress. I show that but-for the Congressional delays in the resolution, Carteret would have been sold as a whole bank, in which branches and assets would have been sold simultaneously as part of a single entity. Hence, there would have been no need for a loan to fund the resolution in the but-for world because the value of Carteret's assets would have more than covered the value of Carteret's liabilities at the time of the but-for resolution. Section III calculates the impact on the principal and interest of the receivership deficit from the value lost in liquidation as the result of Congress's elimination of supervisory goodwill. Supervisory goodwill was a valuable asset that could have been sold along with the rest of the bank to a purchaser but for the breach. Restoring supervisory goodwill decreases the principal required for funding the resolutions. Section IV calculates the impact on the principal and interest of the receivership deficit from the RTC's failure to market and sell Carteret's

mortgage brokerage business during the liquidation. Section V considers the additional inflation of the receivership deficit that resulted from the delayed sale of some financial assets, which resulted in lower sales prices for those financial assets.

9. Table 1 summarizes my findings that the adjustments described in each of the five sections have a significant effect on the principal and interest balance ("P&I balance") of the receivership deficit. Rows (I) through (IV) of Table 1 show the effects of each set of changes in isolation. The last row of Table 1 shows the effect on the receivership deficit P&I balance of combining all the proper adjustments discussed in Sections I, II, III, and IV.[1] When all the appropriate adjustments are made, the receivership would have a surplus P&I balance of $87.4 million. This is a conservative estimate, which does not fully take into account all of the factors I identify that would have added to the receivership surplus.

TABLE 1: RECEIVERSHIP DEFICIT BUT-FOR COMPUTATIONAL AND CONCEPTUAL ERRORS, CONGRESSIONAL INJURY, CLOSURE OF CARTERET MORTGAGE COMPANY, AND CONTRACTUAL BREACH IN THE TREATMENT OF GOODWILL

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) |
|---|---|---|---|
| (I) Charge no interest on receivership deficit & charge no interest on escrow | 20.7 | 154.7 | 156.6 |
| (II) Impact of Congressional delay on sale of branches | (23.1)* | 198.5 | 156.6 |
| (III) Supervisory goodwill restored | 59.6 | 115.8 | 97.0 |
| (IV) Mortgage origination unit sold | 138.0 | 37.4 | 19.0 |
| **Corrections (I), (II), (III), & (IV) Combined** | **(87.4)*** | **262.8** | **156.6** |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

1. Although I do not attempt to quantify the effects on the receivership deficit from the adjustments discussed in Section V, these adjustments would decrease the receivership deficit when considered in isolation from any other adjustments and when combined with any other adjustments.

## I. INAPPROPRIATE INTEREST CALCULATIONS INFLATED THE RECEIVERSHIP DEFICIT AFTER THE RESOLUTION

10. Carteret's branches were sold by the Resolution Trust Corporation ("RTC") in three waves: the Florida branches were sold on October 28, 1994 for a premium of approximately $9 million, some 14 New Jersey branches were sold on January 20, 1995 for a premium of approximately $65 million, and the remaining 16 branches in New Jersey were sold on March 10, 1995 for a premium of approximately $68 million.[2] At the time of these branch sales, the receivership did not have cash to completely fund the branch sales because of Congress's imposition of the minority preference program. Carteret's assets had been frozen, and the sale of these assets was needed to fund the sale of the branch deposits.[3] Because the assets were not sold at the same time as the branches, the receivership borrowed funds from the RTC to fund the three sets of branch sales. The October 1994 sale was funded with a $156 million loan.[4]

---

2. Carteret Federal Savings Bank, Consolidated Florida Branch Resolution Summary (AM54120696); Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120691); Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120693).

3. Soon after seizing Carteret, in March 1993, the RTC shifted its policy regarding asset sales. "For the past couple of years or so, the general direction has been to liquidate and liquefy the asset side of our conservatorship balance sheets. GENERALLY SPEAKING, THE EVOLVING NEW DIRECTION IS TO HOLD AND NOT LIQUIDATE PERFORMING ASSETS -- BUT TO CONTINUE TO LIQUIDATE NONPERFORMING ASSETS." E-mail from Stephen A. Haley, RTC, to Robert O. Smedley & W. Robert Haley, RTC, (Mar. 19, 1993, 11:28:11 EST) (AM5290 0211) (emphasis in original). In August 1993, RTC Resolutions Assistant Director Jay Jupiter requested a waiver on the asset freeze for Carteret, recognizing that it would improve Carteret's attractiveness as a franchise to sell its mortgage assets along with its branches. "There are approximately $517 million and $294 million of performing single family residential mortgage loans at Carteret originated in New Jersey and Florida respectively, that we believe are integral to both the franchise value and the marketability of this institution in a Purchase and Assumption transaction." Memorandum from Jay A. Jupiter, Assistant Director of Resolutions, RTC, to Thomas Horton, Vice President of Field Activities, RTC (Aug. 23, 1993) (C-AM-A-0130544). J. Paul Ramey, vice president of Resolutions for the RTC, responded in a handwritten note that the assets could not be released because of their anticipated use in funding other sales related to implementation of the minority preference program. Memo from Jay A. Jupiter, Assistant Director, Resolutions, RTC, to Thomas Horton, Vice President Field Activities, RTC (Aug. 23, 1993) (C-AM-A-0130544). Upon Congress's passage of the RTC Completion Act of 1993, which released funds to the RTC, the RTC's policy continued to be to hold the performing assets of institutions subject to the minority preference program. Memorandum from Edward D. Mahaney, Vice President of Department of Operations, RTC, to Thomas P. Horton, Vice President of Field Activities, RTC, Dec. 21, 1993 (AM5067 0499 – 0500).

4. The initial principal for the three loan amounts does not reflect any premium from the branch sales, which were credited to an interest-bearing escrow account. Several months after the initial branch sales, the sales proceeds and interest earned from the escrow account was credited to the receivership, as I discuss below.

The January 1995 sale was funded with a $616 million loan. The March 1995 sale was funded with a $598 million loan. The most recent payment towards the total $1.370 billion principal on these three loans was made in May 2000.[5] The remaining principal balance since that most recent payment is $18.8 million.

11. In addition to the remaining principal balance in the receivership deficit, interest on these loans accruing since the time the loans were made in 1994 and 1995 have added to the receivership deficit. In this section, I discuss how the interest on these loans should be calculated, and I show that the FDIC's improper methodology of calculating interest has inflated Carteret's receivership deficit.

12. First, the government's asymmetric and inconsistent use of the time value of money in the calculation of damages makes no sense economically. Specifically, it makes no sense to adjust the receivership deficit for the time value of money (thereby effectively reducing damages ultimately paid to Carteret's owners) when, as the result of legal rules for the calculation of government payments of damages, the government's payment of damages to AmBase and Carteret cannot be adjusted for the time value of money. To be consistent with the legal prohibition on the payment of interest on damages caused by the government, the government should not be able to credit itself for the time value of money on those same damages. A consistent treatment would be to exclude all imputed interest from the receivership deficit. The inconsistent treatment advanced by the FDIC will have the economic effect of allowing the government to expropriate some (or perhaps all) of AmBase's and Carteret's damages.

---

5. Calculation of Accrued Interest on Priority 6 Claimants, Exhibit Green 36A (AM0097219-97377).

13. Second, even if one were to inconsistently include imputed interest, the interest rates charged by the government do not have any economic rationale. The rates chosen at the time of the resolutions were appropriate. But the rates retroactively selected in 1999 were too high, as measures of the time value of money actually incurred during the relevant period. Specifically, the loan interest rates selected in 1999 were initially set at too high a level and should not have been frozen at those high levels for the duration of the resolutions.

14. Third, even if one were to inconsistently include imputed interest, and use the inappropriate interest rates that are used by the government when doing so, then the FDIC has misallocated payments across the various balances due; specifically, the FDIC should have assumed, but did not assume, that the principal balance of the highest cost loan was paid down first.

15. Fourth, even if one were to inconsistently include imputed interest, and use the inappropriate interest rates that are used by the government when doing so, then the FDIC has inflated the receivership deficit by charging a higher interest rate on the resolution loans than the interest rate credited to the escrow account holding Carteret sales premiums until the premiums were transferred to the receivership. The RTC held the proceeds from Carteret's branch sales for several months after the resolutions in an interest-bearing escrow account, but the interest income earned in this account was smaller than the offsetting interest expenses on the matching funds borrowed in the resolution. Once the RTC credited the sales proceeds and interest from the escrow account to the receivership several months after the first resolution, the transferred interest was not enough to offset the interest accrued on the matching principal.

16. Table 2 summarizes the effects of these four adjustments, which are not additive. Some of the adjustments are only appropriate and relevant in the absence of the other

adjustments. Most importantly, consistency in the application of adjustment for the time value of money would eliminate any imputed interest in the receivership deficit, and thus would render the other adjustments irrelevant. In row (1) of Table 2, I report the size of the receivership deficit's P&I balance as $18.8 million (the remaining unpaid principal) when no interest charges are included in the receivership deficit. This estimate is $156.6 million lower than the P&I balance calculated using the FDIC's methodology.

17. For purposes of comparison, however, I provide additional estimates in the other rows of Table 2. Row (2) includes a measure of interest charges in the receivership deficit under the FDIC's inconsistent treatment of the time value of money (including imputed interest in the receivership deficit), but corrects the interest rates used to compute those interest charges; in row (2) I use the appropriate measure of the time value of money, namely a short-term floating Treasury yield. The adjustment in Row (2) decreases the receivership deficit's P&I balance by $64.7 million from the FDIC's calculations. Row (3) includes imputed interest in the receivership deficit, and uses the FDIC's inappropriate interest rate assumptions, but assumes that high-cost debt is paid off first. Under this scenario, the P&I balance decreases by $51.1 million. FDIC witnesses have testified that interest stops accruing in the receivership deficit when the principal amount of the receivership deficit is paid.[6] However, the deposition testimony is unclear as to whether interest in a given loan account would stop accruing once the principal in just that loan account was completely paid, or once the principal in all three loan accounts were paid. I assume in row (3) that when the principal in an individual loan account is completely paid, interest in that individual loan account stops accruing. Row (4) is identical to row (3)

6. Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006); "Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499); E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).

except that the row (4) scenario uses the alternate interest accrual assumption: the assumption that interest in an individual loan account stops accruing only once the principal balances in all loan accounts are paid. Row (4)'s P&I balance is $13.5 million smaller than the P&I balance calculated by the FDIC. Row (5) includes imputed interest in the receivership deficit, uses the FDIC's inappropriate interest rate assumptions, and does not assume that high-cost debt is paid off first, but corrects for the FDIC's inconsistent treatment of the interest rate on the escrow account, which results in a decrease in P&I balance of $1.0 million. Row (1)' combines the adjustments made in rows (1) and (4); it increases the receivership deficit (as compared to the calculation in row (1)) by eliminating a time value of money adjustment for the escrow account (to be consistent with the lack of time value of money adjustments in that computation). Row (1)' provides my preferred estimate of the corrected receivership deficit P&I balance ($20.7 million) for use in damages calculations when correcting *only* for the problems relating to the government's interest calculations. Row (2)' combines my corrections to the time value of money calculation in row (2) with the row (4) consistency correction; the slight difference between rows (2) and (2)' results entirely from equating the interest rates used to account for interest charges and interest credited in the escrow account. Row (3)' combines the adjustment in row (3) with an adjustment that sets the escrow interest rate equal to the interest rate used by the government on its interest charges. Row (4)' combines the adjustment in row (4) with an adjustment that sets the escrow interest rate equal to the interest rate used by the government on its interest charges.

18. For scenarios that include a time value of money, I also consider scenarios in which interest continues to accrue after principal is paid down. Although the FDIC's policy is to stop interest accrual after principal is completely paid, this practice does not reflect a consistent

application of the time value of money (if one were to inappropriately use the time value of money concept when calculating the receivership deficit).[7] Row (2)" reflects the assumptions used for row (2)', but interest continues to accrue even after the principal across all loans is paid down. Similarly, Row (3)" reflects the assumptions used for row (3)', but interest continues to accrue even after the principal across all loans is paid down.

7. On the other hand, one could argue that estimates reported here based on the FDIC's practice of stopping the accrual of interest once principal was completely paid (as in the estimates reported in rows (2), (3), (4), (5), (2)', (3)', and (4)', in Table 2) are more accurate than the estimates reported in rows (2)" and (3)". For the reasons discussed below, it is inappropriate for any interest to be credited to the government as an offset to its damages. The FDIC's policy of stopping interest accrual after principal is paid down at least ameliorates the impact of this error.

TABLE 2: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE WHEN CORRECTING THE GOVERNMENT'S INAPPROPRIATE INTEREST CALCULATIONS

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) Charge no interest on receivership deficit | 18.8 | 156.6 | 156.6 |
| (2) Use monthly moving average short-term interest rate only | 110.7 | 64.7 | 64.7 |
| (3) Pay off high-cost debt first only (interest stops accruing in a single account when that account's principal is paid) | 124.3 | 51.1 | 51.1 |
| (4) Pay off high-cost debt first only (interest stops accruing when principal across all accounts is paid) | 161.9 | 13.5 | 13.5 |
| (5) Charge same interest rate on escrow | 174.4 | 0.5 | 1.0 |
| **(1)' Charge no interest on receivership deficit & charge no interest on escrow** | **20.7** | **156.6** | **154.7** |
| (2)' Use monthly moving average short-term interest rate & charge same interest rate on escrow | 110.7 | 64.7 | 64.7 |
| (3)' Pay off high-cost debt first (interest stops accruing in a single account when that account's principal is paid) & charge same interest rates on escrow | 123.5 | 51.5 | 51.9 |
| (4)' Pay off high-cost debt first (interest stops accruing when principal across all accounts is paid) & charge same interest rates on escrow | 161.1 | 13.9 | 14.3 |
| (2)" Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest accrues even after principal is completely paid | 110.7 | 64.7 | 64.7 |
| (3)" Pay off high-cost debt first, charge same interest rate on escrow, & interest accrues even after principal is completely paid | 161.1 | 13.9 | 14.3 |

### A. Because the Government Does Not Pay the Time Value of Money for Damages, It Is Inconsistent and Incorrect for the Government to Impute Interest When Calculating the Receivership Deficit

19. The loans to fund the branch sales were backed by Carteret's assets. Once the assets were sold, the asset proceeds were used to pay off the loan principals. Any remaining unpaid principal and accrued interest from the preceding period is rolled forward, and continues to accrue interest as part of the receivership deficit.

20. The most fundamental error in the government's calculation of interest is the inclusion of *any* interest component in the receivership deficit. It makes no sense to adjust the receivership deficit for the time value of money (thereby reducing damages paid to Plaintiffs) when, as the result of legal rules for calculating government payments of damages, the government's payment of damages to Plaintiffs cannot be adjusted for the time value of money.[8]

21. As a matter of economic logic, adjustments for the time value of money should be consistent for the purpose of computing damages. The interest charges in the receivership deficit effectively reduce damages by taking account of the time over which the receivership deficit has remained unpaid. My understanding is that the receivership deficit serves in this case as a partial offset to the damages owed to the plaintiff. But it makes no sense to include the time value of money in the receivership deficit if the government itself is barred from paying the time value of money on the damages it owes to the plaintiffs. By including the time value of money as a cost in the receivership deficit, **the government effectively is asking to be reimbursed for a cost that it does not bear**. To be consistent with the legal prohibition on the payment of interest on damages caused by the government, the government should not be able to credit itself for the time value of money on those same damages. A consistent treatment would be to exclude all imputed interest from the receivership deficit. In this case, when one excludes interest charges, the P&I balance of the receivership deficit becomes $18.8 million—the remaining unpaid principal—as of December 2005. When interest credits on the escrow account are also excluded from the calculation of the receivership deficit, as they should be for the sake of consistency in

---

8. Library of Congress v. Shaw, 478 U.S. 310, 314 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award.")

this calculation, the P&I balance of the receivership deficit becomes $20.7 million (which appears in row (1)' of Table 2).

### B. The Time Value of Money Used for Computing Imputed Interest Costs for a Receivership Deficit Should Be Calculated Using Short-Term Floating U.S. Treasury Interest Rates for the Period of the Receivership

22. If the government were to award interest with damages, then it would be appropriate for both the interest on the damages awarded and the interest charged in the receivership deficit to be based on the time value of money.

23. The interest rate used in the calculation of the interest component of the receivership deficit is an ex post rate, imputed to account for the realized cost associated with the time value of money for the period between the time when the branches were sold (which defines the initial balance of the loan) and the date at which the receivership deficit is retired (in this case, the date at which damages awarded by the Court are paid). Although the FDIC's methodology is to cease interest accrual once the loan principal is paid off, a time value of money concept that corresponds to the hypothetical interest payments on damages would ordinarily require that interest continue accruing on the receivership deficit until the balance of principal *and* interest is completely paid.

24. The receivership deficit in the circumstances of this case defines the amount of the prospective transfer from one government account to another. Due to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), special Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Funds ("FRFs") were set up for the FDIC and RTC to handle Winstar-type receiverships. The only remaining asset of any consequence in the Carteret receivership is the goodwill lawsuit. Any unpaid P&I in Carteret's receivership would be paid off only if AmBase's lawsuit is successful and to the extent that damages are found to exceed the receivership deficit.

25. Because the possibility of the transfer and timing of the transfer are not known in advance (i.e., the outcome and timing of the Court's decision is not known in advance), the ex post imputed interest cost associated with the deficit should be computed on a continuous basis. Interest cost should roll forward at the short-term Treasury rate of interest. At the date the transfer occurs, therefore, the interest cost associated with the receivership deficit should represent a concatenation of short-term Treasury interest rates multiplied by the outstanding balance at each point in time over the life of the receivership deficit.

### C. The Interest Rates Charged by the FDIC Are Not Appropriate Measures of the Time Value of Money

26. In previous calculations of interest submitted by the government in 1999, the government used the average of the Treasury bill secondary market 3-month quoted yield for the three preceding months to calculate daily interest.[9] This variable interest rate changes over time, and is the same for all three loans on any given day. In 2005, however, the government produced a spreadsheet that showed the post-insolvency interest calculations for the three loans taken out by Carteret upon the sale of its bank branches with a different interest rate for each loan.[10] The interest rate used for each loan was equal to the federal post-judgment interest rate – a one-year rate determined at the time the loan was initiated. The loan for the October 28, 1994 sale was given a 6.06 percent fixed interest rate. The interest rate on the loan for the January 20, 1995 sale was 7.34 percent. The interest rate for the March 10, 1995 sale was 6.57 percent. Interest on these loans compounded daily, and each loan's initial interest rate was used *throughout the entire period* in calculating daily interest charges.

---

9. Exhibit Green 33 (AM00092190-92205; AM0009222-9224).
10. Exhibits Green 36A, 36B, & 36C (AM0097219-97377).

27. As I discussed above, the appropriate interest charge, if any, should reflect the time value of money, based on an ex post imputed rate calculation. Instead, in the interest calculations from its 2005 spreadsheets, the FDIC's interest rate measure is arbitrary and has no economic justification as a measure of the realized time value of money during the receivership period.

28. The federal post-judgment rates as of the dates of loan initiations do not represent the time value of money on the loans over the period of the receivership. At the time of the loans, the post-judgment rate was equal to the average accepted auction price for the latest auction of 52-week treasury bills preceding the loan origination date. This rate is frozen for the receivership period and does not take into account information about interest rate changes after that date. Furthermore, even as an initial interest rate for the receivership, a 52-week interest rate period is longer than would be appropriate. A short-term, variable Treasury rate (for a week, month, or quarter), updated regularly during the duration of the receivership, is the appropriate way to track the realized cost of the time value of money for the receivership. As discussed below, there is no economic rationale for using a fixed one-year yield from the inception date of the loans. Furthermore, in deposition, the FDIC was unable to offer any economic rationale for its flawed methodology.[11]

**1. Permanently Locking the Interest Rate at the Time of Carteret's Resolutions Has No Economic Rationale**

29. No matter what the appropriate maturity of the short-term Treasury bill one uses to calculate the time value of money, that interest rate should be updated continuously over time. In situations in which the post-judgment rate applied at the time of Carteret's resolutions, federal

---

11. Deposition of Karen J. Hughes at 101-102 (Apr. 7, 2006); Deposition of Wayne S. Green at 190-191 (Feb. 28, 2006).

regulations stipulated that the post-judgment interest rate would be equal to the average accepted auction price for the latest auction of 52-week treasury bills preceding the date of the relevant event (here, the receipt of RTC funding) *if* the period for which interest was owed did not exceed one year.[12] For periods exceeding one year, the interest rate for the first year would be calculated as described above, and the interest rate for each subsequent year would be updated to be equal to the average accepted auction price for the latest auction of 52-week treasury bills preceding the beginning of each additional year.

30. Even though the repayment of the loans has lasted longer than one year, the FDIC inappropriately continues to use the same post-judgment rates set in the resolution, rather than updating them every year as was intended by the rule behind the post-judgment rate. Using a single 52-week interest rate to calculate the time value of money for the whole period introduces important errors into the computations.

31. One of the FDIC's justifications for using a fixed interest rate was to "simplify" calculations. Government memos state, and FDIC personnel have testified, that one of the advantages to using a fixed interest rate throughout the life of the loan was to minimize errors in calculating post-insolvency interest.[13] That is nonsense. An incorrect and arbitrary interest rate assumption cannot be justified on the basis of simplicity. And, in any event, it would be very straightforward to use a floating interest rate. In fact, as noted above, the FDIC did so until 1999.

12. 40 U.S.C. § 258e-1 (1994) (amended 2000). The post judgment interest rate was amended in 2000 such that the weekly average one-year constant maturity Treasury yield is used instead of the average accepted auction price for the latest auction of 52-week treasury bills.

13. Exhibit Green 22 at 11 (AM00097057) (stating that one of the advantages to using a locked interest rate was that the "[i]nterest rate remains constant throughout life of receivership making calculation of post-insolvency interest claim easily determinable for the public, receivership creditors, and shareholders. Reduced possibility of calculation errors because rate is ascertained retrospectively and adjustments to principal balance of claims are all that must be considered to ascertain amount of claim."); Deposition of Karen J. Hughes at 142-144.

## 2. Other Resolutions Have Used Shorter-Term Interest Rates to Calculate Cost

32. As I discussed above, the calculations of interest submitted by the FDIC in 1999 used a short-term floating interest rate.[14] This variable interest rate changes over time, and is the same for all three loans on any given day. Only later did the FDIC change the calculations of interest on these resolutions to be equal to the federal judgment rate as of the dates of the resolutions. There are numerous examples where the government has used variable short-term interest rates in similar situations.

### a. The Interest Rate Charged for Funding the Pass-Through Resolution in 1992 Was Based on a Floating Rate

33. At the time it seized Carteret in December 1992, the RTC advanced $1.75 billion to Carteret at a short-term floating interest rate.[15] According to the Carteret's Consolidated Financial Statement monthly reports, this rate changed at least once per month until the loan was paid off in January 1995.[16] There is no economic rationale for charging a short-term floating rate on a loan to the conservatorship in 1992, but then charging an arbitrarily fixed and frozen interest rate on similar types of loans made in 1994 and 1995.

### b. Resolutions Before August 10, 1993 and After 2002 Are Funded Using a Three-Month Treasury Yield

34. For resolutions before August 10, 1993, when the National Depositor Preference ("NDP") law—a provision of the Omnibus Budget Reconciliation Act of 1993—took effect, the interest rate used to calculate interest in receiverships for federal and state chartered thrifts was

---

14. Exhibit Green 33 (AM00092190-92205; AM0009222-9224).
15. Carteret Financial Report, December 31, 1992, at 2-3 (AM00086965, -64, -65, -70)
16. Carteret Financial Reports (AM00086965, -68, -70; CAM406 0567, -70, -72; C-AM-A-0133760, -63, -65; CAM406 1338, -41, -43; CAM404 0198, -0201, -0203; CAM406 2852, -55, -57; CAM4600037, -40, -42; CAM4062200, -03, -05; CAM4950836, -38, 040; CAM4040040, -43, -45; CAM4062550, -53, -55; CAM4840188, -91, 93; CAM4951698, -01, -03; CAM4951867, -70, -72; CAM4952111, -14, -17; CAM5070059, -62, -64; CAM4180008, -11, -13; CAM4181752, -55, -57; CAM4180238, -41, -43; CAM3821952, -55, -57; CAM3821890, -94, -96; CAM3821800, -03, -05; CAM3821800, -03, -05; CAM3821770, -73, -75; CAM3820674, -77, -79).

"adjusted monthly to reflect the average rate for U.S. Treasury bills with maturities of not more than ninety-one (91) days during the preceding three (3) months."[17] Wayne Green, an FDIC financial manager involved in the calculation of interest for Carteret's receivership deficit, testified that if Carteret's resolution had occurred before August 10, 1993, then post-insolvency interest would have been calculated using this short-term floating interest rate.[18]

35. Even though the NDP did not address post-insolvency interest rates,[19] the FDIC chose to apply the post-judgment interest rate on post-NDP resolutions[20] until 2002. In 2002, the methodology for calculating post-insolvency interest changed because Congress had ordered the FDIC in 2000 to create a uniform method for calculating interest that would be codified, rather than based on internal FDIC memos.[21] Post-insolvency interest on receivership surpluses since 2002 has been based on floating short-term interest rates, using a simple interest calculation, which is codified in the FDIC's rulemaking:

> (3) Post-insolvency interest rate. For any calendar quarter, the coupon equivalent yield of the average discount rate set on the three-month Treasury bill at the last auction held by the United States Treasury Department during the preceding calendar quarter, and adjusted each quarter thereafter.[22]

The FDIC's rationale for rejecting the post-judgment rate and adopting the three-month Treasury bill rate was described in the Notice for Proposed Rulemaking:

---

17. Exhibit Green 22 at 18 (AM00097064); Exhibit Green 27 (AM00096551); Receivership Rules, Priorities, 12 C.F.R. § 360.2(b) (1993). Note that this three-month Treasury yield is slightly different from the concept used before August 1993, since it does not contain a moving average component in the formula, but rather uses the last three-month yield experienced during the preceding quarter as the measure of that quarter's interest cost. The slight difference in the formula used prior to August 1993 and after 2002 does not lead to any material difference in interest charge computations. For example, Table 1 reports computations using the methodology used in the FDIC's pre-1999 spreadsheets, which appear to correspond to the pre-August 1993 method. If, instead, I had used the post-2002 method, the computations would differ by no more than 2 percent of any of the reported values.

18. Deposition of Wayne S. Green at 234-235, 260.

19. Exhibit Green 22 at 8 (AM00097054).

20. Exhibit Green 22 (AM00097047-97065).

21. Deposition of Karen J. Hughes at 93-96 (Apr. 7, 2006)

22. Resolution and Receivership Rules, Post-Insolvency Interest, 12 C.F.R. § 360.7 (2006).

> The FDIC believes a publicly available, market-based rate would be preferable to a single numerical interest rate because the market-based rate should be **more reflective of the interest rate environment in existence during the life of future receiverships.** In addition, as indicated earlier, the FDIC has utilized the federal judgment rate in receiverships of federally chartered institutions and in federalized receiverships of state institutions to calculate post-insolvency interest payments. In the proposed rule, however, the post-insolvency interest rate for all FDIC-administered receiverships would be based on the coupon equivalent yield of the average discount rate set on the three-month Treasury bill, rather than the federal judgment rate. This rate was selected, instead of the federal judgment rate, because the three-month Treasury bill is considered to be widely recognized as a cash management investment performance benchmark and its yield has historically tracked, to some degree, changes in the rate of inflation.[23]

The FDIC also switched from using a fixed rate to a floating rate in its 2002 rule:

> Whether the interest rate should be fixed or "float" is also an issue addressed in the proposed rule. Presently, when a new receivership is established, if assets ultimately become available for post-insolvency interest payments, the rate that exists on the date the receivership is established is fixed for purposes of calculating post-insolvency interest. This approach is consistent with the way the federal judgment rate is applied to judgments entered by the federal courts because the allowance of a claim against a receivership estate has been viewed as the general equivalent of a judgment being entered against the receivership estate. **This approach may not be reflective, however, of the economic conditions and interest rate environment in existence during the life of the receivership. Therefore, the proposed rule provides that the post-insolvency interest rate would be adjusted quarterly.** This is being proposed to mitigate interest rate risk due to changes in economic conditions during the life of the receivership.[24]

36. FDIC personnel confirmed that post-insolvency interest could be calculated in a completely different way based solely upon the date of the resolution,[25] and no witness could provide an *economic* (as opposed to legal) justification as to why the methodologies should change over time.[26]

#### c. The Escrow Account that Held the Premiums from the Branch Sales Earned an Interest Rate Based on a Short-Term Treasury Yield

37. The borrowings that were necessary for the Carteret branch sales in 1994 and 1995 equaled the amount of deposits less the deposit premium realized in the transactions.

---

23. Payment of Post-insolvency Interest in Receiverships with Surplus Funds, 66 Fed. Reg. 65,144, 65,145 (proposed Dec. 18, 2001) (to be codified at 12 C.F.R. § 360). (Emphasis added.)

24. *Id.* (Emphasis added.)

25. Deposition of Karen J. Hughes at 60-62 (Apr. 7, 2006).

26. Deposition of Karen J. Hughes at 59-60, 65-66 (Apr. 7, 2006); Deposition of Wayne S. Green at 190-191 (Feb. 28, 2006).

However, the principal amount used by the government includes the full amount of the deposits without any recognition of the premiums. The premiums were credited to an escrow account until nearly all of the premiums were credited to the receivership as part of a $377 million "dividend" on April 20, 1995.[27] The premiums held in the escrow account earned interest, but apparently the interest credited to the escrow account was based on a short-term Treasury yield.

38. Wayne Green, an FDIC witness, testified that the interest earned in the escrow account was "pegged to the earnings that the receivership was earning on its cash at the Federal Home Loan Bank on a monthly basis."[28] Another FDIC witness, Karen Hughes, testified that the interest charged to the receivership could be different than the interest credited to the escrow account.[29] Whereas the interest charged on the loan to the receivership was based on "the statutory or regulatory or whatever appropriate guidance existed that mandated post-insolvency interest," the interest credited to the escrow account was based on "internal indicators" that were not necessarily the same as the post-insolvency interest rates.[30] No government witness could provide an economic justification for why the interest credited to the receivership in the escrow account should be different from the interest charged to the receivership through the loan.[31] Clearly, it is illogical and inconsistent to use one interest rate measure to calculate the time value of money for credits and a different interest rate to measure the time value of money for debits.

### 3. The Interest Rates Charged by the Government Are Too High

39. The interest rates charged by the FDIC to the receivership are historically excessive. Since the interest rates on the loans were locked in 1994 and 1995, the post-judgment

---

27. Deposition of Wayne Green at 166, 175 (Feb. 28, 2006); Exhibit Green 15.
28. Deposition of Wayne Green at 435 (Apr. 5, 2006).
29. Deposition of Karen J. Hughes at 190-191, 223-224 (Apr. 17, 2006).
30. Deposition of Karen J. Hughes at 191 (Apr. 17, 2006).
31. Deposition of Karen J. Hughes at 84-85 (Apr. 7, 2006).

rate has yet to reach those locked levels again. If the interest rates for each loan were updated annually to match the post-judgment rate, then Table 3 would have been used.

TABLE 3: POST-JUDGMENT INTEREST RATES AT ONE-YEAR INTERVALS FOR EACH RESOLUTION

| Year | Resolution #1 (10/28/1994) | Resolution #2 (1/20/1995) | Resolution #3 (3/10/1995) |
|---|---|---|---|
| 1994/95 (the rate used by the government) | 6.06 | 7.34 | 6.57 |
| 1995/96 | 5.62 | 5.16 | 5.25 |
| 1996/97 | 5.64 | 5.61 | 5.67 |
| 1997/98 | 5.49 | 5.34 | 5.41 |
| 1998/99 | 4.24 | 4.55 | 4.92 |
| 1999/00 | 5.41 | 6.00 | 6.20 |
| 2000/01 | 6.24 | 4.85 | 4.47 |
| 2001/02 | 2.31 | 2.03 | 2.41 |
| 2002/03 | 1.79 | 1.38 | 1.22 |
| 2003/04 | 1.30 | 1.19 | 1.23 |
| 2004/05 | 2.22 | 2.85 | 3.20 |
| 2005/06 | 4.19 | 4.41 | 4.74 |

*Sources*: Administrative Office of the U.S. Courts, Post Judgment Rate 2001 (*available at* http://www.uscourts.gov/postjud/rate2001.html); Federal Reserve Statistical Release H.15, 1-year Treasury constant maturities (nominal) (*available at* http://www.federalreserve.gov/releases/h15/data.htm).

As Table 3 shows, if the interest rates on the three loans had been updated every year in a manner consistent with the one-year term used for the federal judgment rate, rates would have fallen from the initial levels of between 6.06 percent and 7.34 percent to rates as low as 1.19 percent in 2004.

### 4. The Government's Inappropriate Interest Rates Substantially Inflated the Receivership Deficit through December 2005

40. Based on the nature of the resolution loans and the comparable costs of lending, calculating interest based on the methodology used in the FDIC's 1999 spreadsheets, using a three-month moving average of the three-month Treasury bill secondary market rate for the previous three months, with daily compounding of interest, is an appropriate way of calculating the time value of money for the receivership. Therefore, to adjust for the correct time value of money, I calculate the interest charged on any given day $t$ ($I_t$) to be equal to:

[1] $$I_t = \left(Bal_{t-1} + Add_t - Div_t\right)\frac{r_t}{365},$$

where $I_t$ is the interest charged on day t, $Bal_{t-1}$ is the ending balance on day $t$-1, $Add_t$ is equal to total additions (debits) to the loan principal on day $t$ (such as the original loan principal on day $t$=1), $Div_t$ is equal to the total dividends (credits) paid to the loan on day $t$, and $r_t$ is the average annualized discount rate for the 3-month Treasury bill secondary market rate over the three calendar months preceding day $t$.[32] According to the FDIC's interest accrual rules, $I_t$ would be set equal to zero if the principal balance on the loan is zero.[33] However, the appropriate measure of the time value of money would continue to accrue interest on unpaid interest even after the principal is completely paid. As shown in equation [2], the ending balance on any day $t$ is equal to the cumulative sum of all additions to the loan principal and all accrued interest on every day on or before day $t$, less the cumulative dividends credited to the loan balance on every day on or before day $t$.

[2] $$Bal_t = \sum_{i=1}^{t} Add_t + I_t - Div_t$$

41. Under the FDIC's practice of ceasing interest accrual after the principal balance is paid, where the interest rate is adjusted monthly and compounded daily, and no other adjustments are made, the P&I balance of the receivership deficit would be $110.7 million as of December 31, 2005 (row (2) of Table 2). This deficit is $64.7 million lower than the receivership deficit P&I balance in which the fixed post-judgment rate is used by the FDIC to measure interest cost. This approach is similar to my understanding of the FDIC's approach to calculating post-insolvency interest for receiverships established after its 2002 rule change, in which the interest rate updates quarterly instead of monthly. If, instead, following the FDIC's post-2002

32. Federal Reserve Statistical Release H.15 (http://www.federalreserve.gov/releases/h15/data/Monthly/H15_TB_M3.txt).

33. Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006).

method, the floating rate methodology used were the coupon equivalent yield of the average discount rate set on the three-month Treasury bill at the last auction held during the calendar quarter preceding day *t*, and simple interest calculation is used,[34] the interest calculation would result in a receivership deficit P&I balance that is $63.5 million lower than the P&I balance calculated by the FDIC.

**D. The Government Did Not Credit Payments to the Highest Cost Debt**

42. In Sections A, B, and C, I have shown that the FDIC's interest rate measure in its receivership deficit computations is incorrect as a measure of the relevant time value of money, and that the FDIC's calculations should not have included time value of money adjustments in the receivership deficit, which is deducted from losses in the computation of damages due from the government (which is statutorily constrained not to take account of the time value of money). In this section, I show that, even if interest were included in the receivership deficit, and even if the government's incorrect measures of interest rates were used, the government's method for computing interest cost err for another reason – the failure to use proceeds to pay down high-cost debt first.

**1. The FDIC Applied Payments Pro-Rata Among the Three Resolutions, Even Though Each Resolution Had a Different Fixed Interest Rate Under the FDIC's Faulty Methodology**

43. In the FDIC's initial spreadsheets showing interest calculations, all three loans from each of the three branch sales had the same interest rate, which varied with the three-month Treasury yield. However, once the FDIC switched to a fixed rate methodology, each of the three loans had different interest rates yielding 6.06 percent, 6.57 percent, and 7.34 percent. In its

34. I interpret the FDIC's use of "simple interest" in its 2002 rulemaking to mean that interest compounds quarterly instead of compounding daily. If, instead, the FDIC's use of "simple interest" means that interest is never charged on interest, then the estimates of interest accrued using my interpretation of the FDIC's post-2002 methodology are overstated.

computations, the FDIC applies the debt repayments on a pro-rata basis to all three loans. Presumably, the FDIC's rationale is that some creditors of the thrift should not be paid off before others. Although that approach might make sense when crediting various private parties who are creditors, here the identity of the creditor for all three loans is the same: the government. In this case, there are no preferences or conflicts among creditors because the loans are all from the same entity. Thus, payments should be allocated first on the highest cost loans, regardless of the timing of their resolutions. There is no economic justification for a pro rata pay down of the debt.

44. FDIC witness Wayne Green testified in a deposition that the three loans had the same priority, that dividends for all three loans were paid into the same FRF RTC resolution fund, and that the receivership-maximizing allocation of dividends would be to allocate dividends to the highest rate liability.[35] He testified that the payments were allocated across all three liabilities rather than to any particular liability.[36] He admitted that allocating payments to the claims on a pro-rata basis rather than to the highest cost claims resulted in increasing the cost of the receivership.[37]

**2. Assuming the Government's Faulty Interest Rates Are Not Corrected, the Government's Failure to Allocate Payments to the Highest-Cost Resolutions First Substantially Inflated the Receivership Deficit through December 2005**

45. If payments are allocated to the highest-cost resolution until its principal is paid down,[38] and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $124.3 million as of December 31, 2005 if

35. Deposition of Wayne S. Green at 291-294 (Mar. 1, 2006).
36. *Id.* at 294-295.
37. *Id.*
38. The principal for the three resolutions should be paid down first, because once the principal is paid down, interest stops accruing according to the FDIC accrual rules. *See* Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006); "Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499); E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).

interest stops accruing in an individual loan once the principal in that loan is paid. This deficit is $51.1 million lower than the $175.4 million deficit's P&I balance calculated using the FDIC's faulty methodology. If payments are allocated to the highest-cost resolution until its principal is paid down, and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $161.9 million as of December 31, 2005 if interest stops accruing in an individual loan once the principal amounts in *all* loans are paid (row (4) of Table 2). This deficit is $13.5 million lower than the $175.4 million receivership deficit P&I balance calculated using the FDIC's faulty methodology. Of course, if one properly excludes interest from the receivership calculations, or if one includes interest but uses floating short-term Treasury yields instead of the frozen 52-week rates, then the receivership deficit calculations would not be affected by the allocation of payments among the three loans. Thus, correcting the FDIC's assumed allocation of payments is only relevant if one inappropriately includes interest in the receivership deficit, and if one uses the FDIC's incorrect interest rate concept in those calculations.

**E. The RTC/FDIC Failed to Credit Sales Premium to the Loan Principal Using a Consistent Measure of the Time Value of Money**

46. As noted above, the RTC credited the sales premium from branch sales to an escrow account and did not credit the resolution loans by the amount of the sales premium until April 1995. That delay mattered because the RTC used a lower interest rate when calculating accrued interest on the escrow account than the rate it used when calculating interest costs of the receivership. According to FDIC spreadsheets, the interest earned in the escrow account was

$1.9 million.[39] Although this escrow account interest was credited to the receivership on April 20, 1995, the interest that had accrued through April 19, 1995 on the corresponding unpaid premium portion of the receivership loans was $2.4 million according to the FDIC's faulty methodology. Because the escrow account interest did not cover the accrued interest in the receivership deficit, this $0.5 million difference between the two amounts has increased through time by accruing interest. I estimate this difference to have increased to $1.0 million as of December 31, 2005.[40]

47. By over-inflating the principal of the loans and charging the receivership interest on that portion of the loan principal that was guaranteed to be repaid later by an escrow fund earning interest at a lower rate, the FDIC overcharged the receivership by $1.0 million. There is no economic justification for charging the receivership a higher interest rate on the loan than the interest rate credited to the receivership through the escrow account of the sales premiums.

48. The effect of setting the two interest rates equal when computing the receivership deficit depends on which interest rate one picks as the appropriate measure of the time value of money. In rows (2) and (2)' of Table 2, I show that there is only a small effect on the receivership deficit from setting the two rates equal. The reason for that result is that the loan interest rate assumed in row (2) is already quite similar to the rate used in the escrow account calculation. As shown in rows (3) and (3)' and in rows (4) and (4)' of Table 2, however, the effect of setting the escrow account interest rate equal to the post-judgment rate is greater because the post-judgment rate is quite different from the floating rate used in the escrow account calculation.

39. Deposition of Wayne Green at 297-298 (Mar. 1, 2006); Exhibit Green 37.

40. I assume that the interest from the escrow account would be credited to each loan on a pro rata basis, based on the total amount of the sales premium transferred from the escrow account to the receivership on April 20, 1995.

## II. Delays and Value Destruction During Carteret's Conservatorship Inflated the Receivership Deficit by Reducing the Premium Realized from the Sale of the Branches, Requiring a Larger Loan Principal to Fund the Resolutions

49. Having completed my discussion of the interest rate calculations in the receivership deficit, I now turn to discuss how various actions by the government substantially reduced the value received from the liquidation of Carteret, resulting in an inflation of the principal of the receivership deficit. Damages due to Plaintiffs should not be reduced as a consequence of government decisions that reduced the liquidation value of Carteret. When I adjust for the government-induced reductions in the value received for Carteret, the adjusted P&I balance of the receivership deficit is negative (there is a receivership surplus). The government's harmful actions divide into four categories, each of which is considered separately in Section II-V below: Congressional actions that reduced the premium received from the sale of Carteret's branches (discussed in Section II), Congress's destruction of valuable supervisory goodwill (discussed in Section III), the failure to realize the value of the mortgage brokerage operation during the liquidation (discussed in Section IV), and delays in the sale of some of Carteret's financial assets of long duration that resulted in reduced liquidation values because of the rising interest rate environment (discussed in Section V).

50. First, I consider the failure to realize the full potential value of the premiums from the sale of branches, which resulted in a higher loan principal required to fund the resolution, which in turn had the effect of inflating the receivership deficit and the interest charges associated with the receivership deficit.

51. Losses in premium were the direct consequence of government policies that produced substantial delays and other government-induced problems in the bidding process for the branches, which resulted in a substantial runoff of deposits on which premium would have been paid and a reduced premium per dollar on deposits that were sold. The government actions

that created delay, promoted deposit runoff, and limited the number and quality of bids included: (1) the initial failure of Congress to fund thrift liquidation, which created an initial delay in resolution, and (2) the creation by Congress of a minority preference program. Absent the funding problem and the minority preference program, the branches would have sold for a much higher amount. Not only would deposit runoff have been avoided; in the absence of the minority preference program, the structure of the sale of the bank's assets likely would have resulted in a higher premium per dollar of deposits, because it would have been likely that the branches would have been sold together, and therefore, could have commanded a higher premium per deposit dollar (because the sale would have preserved the franchise value of the bank as a network of branches). Finally, in the absence of the minority preference program, the bidding process for those assets likely would have been more successful (because bidders would have been encouraged to participate and to bid more aggressively).

52. Table 4 summarizes my conservative estimates of the but-for receivership deficit, correcting only for the multiple delays and value destruction caused by the government in the sale of branches. In Section I above, I described various alternative sets of assumptions about the proper treatment of interest in calculating the P&I balance of the receivership deficit for purposes of calculating any offset to damages due from the government. In Table 4 there is no reason to consider various alternative treatments of interest charges when adjusting for all Congressional delays. If delays and value destruction in the sale of branches had been avoided, then the bank would have been sold in its entirety by December 1993, and there would have been no need for the receivership to borrow, since there would have been a receivership surplus of $23.1 million. Thus, the calculations for all delays in Table 4 do not consider alternative possibilities for the treatment of interest on the loan to the receivership, since there would have been no loan.

53. For purposes of comparison, I provide calculations in Table 4 that consider the combined effect of all Congressional actions that produced delays in Carteret's resolution, and that isolate the effect of the minority preference program in delaying resolution. Even if one only considers the effect of the minority preference program on delaying the resolution of the bank, the bank would still have been sold in its entirety by October 1994, and the most conservative estimate of the receivership deficit's P&I balance at the time of the resolution would have been $1.4 million. Other factors whose effects I discuss below but do not attempt to quantify in this report would have brought the receivership P&I balance into surplus at the time of the resolution, and there would have been no need for the receivership to borrow. However, in Table 4, I use the most conservative estimate of a borrowing need of $1.4 million at the time of the resolutions but-for the minority preference program only. For purposes of comparison, I provide several calculations in Table 4. Row (2) corrects for the delays from the minority preference program only and excludes all adjustments for the time value of money from the receivership deficit calculation. Row (3) corrects for the minority preference program delay, includes interest charges in the receivership deficit under the government's inconsistent treatment of the time value of money (including imputed interest in the receivership deficit), but uses the appropriate measure of the time value of money (a short-term floating Treasury yield) for the interest charges. Row (4) corrects for delays and value destruction, but incorporates no corrections to the government's inappropriate interest calculation methodology.

TABLE 4: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE BUT-FOR THE GOVERNMENT'S DELAY AND VALUE DESTRUCTION OF CARTERET'S RESOLUTION

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) All delays and value destruction removed | (23.1)* | 156.6 | 198.5 |
| Only minority preference program delay removed** | | | |
| (2) Charge no interest on receivership deficit | 1.4 | 156.6 | 174.0 |
| (3) Use monthly moving average short-term interest rate | 2.1 | 155.8 | 173.3 |
| (4) No interest calculation methodology changes | 2.6 | 155.3 | 172.8 |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.
** Results analogous to rows (2)' and (3)' from Table 2 are not reported here because the loan principal under the adjustment for only the delay from the minority preference program is never completely paid down.

## A. The Government Delayed and Mismanaged Carteret's Resolution

### 1. Congress Delayed Funding for the RTC, Which Delayed Carteret's Resolution

54. The RTC initially attempted to market Carteret prior to failure through the Accelerated Resolution Program ("ARP") process. The FDIC, in its own account of the period, writes, "[i]nitially, institutions selected for sale through the ARP process were perceived to have a high franchise value and already had attracted viable, cost-effective proposals from prospective acquirers, which indicated substantial private sector interest. Also, the troubled institutions' management had to agree to participate in the process by signing consent agreements and cooperating with the RTC and the regulators."[41] Although Carteret was taken into the ARP on February 27, 1992, the FDIC also notes that, "[t]he ARP usefulness was limited, however, because it could not be fully used in 1992 and 1993 when the RTC had no funding."[42] Hence, it

41. FEDERAL DEPOSIT INSURANCE CORPORATION, MANAGING THE CRISIS: THE FDIC AND RTC EXPERIENCE, 1980-1994 132 (1998). [hereinafter MANAGING THE CRISIS].
42. *Id.*

is not surprising Carteret was not successfully marketed as a going concern through the RTC ARP program in early 1992.

55. Carteret was placed in conservatorship on December 4, 1992. However, at this time the RTC still had no funding and was unable to successfully market Carteret. In 1991, Congress had delayed funding for the RTC amid allegations that the agency was awash in overspending.[43] Congress spent months arguing over who would be responsible for the costly government rescue until it finally passed the RTC Completion Act of 1993, enacted December 1993.[44] That act released $18.3 billion in new funding to the RTC.[45] This funding, the first cash infusion to the RTC in two years, enabled the RTC to begin disposing of the remaining 61 thrifts still controlled by the government at the time, including Carteret.[46]

56. By the FDIC's account:

> **The funding process and the related delays increased the cost of resolving the troubled savings and loan associations. The pace of resolutions had to conform to the availability of funds.** When funding was available, the number of resolutions increased and kept pace with the establishment of new conservatorships. Sometimes the pace of the resolution process was fast. Other times, the pace was painfully slow. **The longest delay was a 21-month period from March 31, 1992, to December 17, 1993, when the RTC was without loss funding and resolution activity was severely reduced.** The pace of resolutions followed the availability of funding, and resolution delays kept thrifts in conservatorship longer, which increased conservatorship operating losses. Those losses were $5.4 billion in 1989 and decreased steadily each year. In 1992, they were $669 million, but because of the reduced resolution activity from the lack of funding, in 1993, conservatorship operating losses increased that year to $1.3 billion. Resolution delays and conservatorship operating losses led to increased resolution costs because of the relatively high carrying cost of maintaining assets in failed thrifts.[ RTC, Office of Research and Statistics, "The History of RTC Funding." Unpublished document.] **Funding delays had a significant effect on how long an institution remained in conservatorship.** Before FIRREA's passage, when no conservatorships were resolved, thrifts averaged 454 days in the conservatorship program. After the

43. *Four Thrifts Under RTC Cost Taxpayers $153 Million*, BALTIMORE BUS. J., Dec. 31, 1993, at *1.

44. Jerry Knight, *Government Holds Fire Sale on S&Ls; Ten Area Thrifts Will Go to Highest Bidders*, WASH. POST, Dec. 23, 1993, at D09.

45. David Conn, *Thrift-y Shoppers' Catalog*, BALTIMORE SUN, Dec. 23, 1993, at 9C.

46. Knight, *supra* note 44, at D09.

> passage of FIRREA, with the exception of 1991 and 1992, the average time until resolution for thrifts put into conservatorship was less than a year.[47]

As a result, the FDIC's account maintains that:

> The RTC Completion Act (Completion Act) of 1993 became the most significant banking statute of the year to affect the FDIC and RTC. **From April 1, 1992, through December 17, 1993, the RTC would not have had sufficient funding to resolve additional failed savings and loan institutions.** The Completion Act removed the April 1, 1992, deadline for the use of funds that had previously been established, which permitted the RTC to use up to $18.3 billion authorized under RTCRRIA to resolve the remaining insolvent thrifts.[48]

### 2. As a Condition of Funding, Congress Required a Minority Preference Program, Which Further Delayed Carteret's Resolution

57. The Federal Home Loan Bank Act, in 12 U.S.C. § 1441a(w)(17)(A), provides for minority preferences in the acquisition of institutions in predominantly minority neighborhoods. The RTC Completion Act amended the minority preference provisions for marketing the RTC assets of minority owned institutions. Prior to the RTC Completion Act of December 1993, The Resolution Trust Corporation Refinancing, Restructuring, and Improvement Act (RTCRRIA) of November 1991 required only "...the RTC to reoffer failed nonminority owned institutions, or branches thereof, to minority owned institutions if it received no other acceptable offers through the conventional marketing efforts."[49]

58. The RTC Completion Act of December 1993, however, changed minority resolution practices considerably.

> In December 1993, the RTC Completion Act of 1993 amended section 21 of the Federal Home Loan Bank Act and revised the manner in which institutions were structured for sale, as well as the initial bid analysis process. The statute required that the RTC give "bidding preference" to an offer from a minority owned depository institution to acquire any failed depository institution, or any branch thereof, located in a neighborhood in which 50 percent or more of the residents were minorities, as part of the Predominantly Minority Neighborhoods (PMN) Program. Because the bidding preference was subject to the least cost test, it was limited. Minority bidders were permitted to submit a second bid

---

47. MANAGING THE CRISIS, *supra* note 41, at 124. (emphasis added)
48. *Id.* at 748. (emphasis added)
49. *Id.* at 134.

> if their initial bid was within 10 percent of the otherwise winning lowest bid by a nonminority bidder. The option to purchase performing loans at market value and ICA were also available to the minority acquirers.
>
> The RTC executed the special PMN Program by simultaneously offering institutions and branch offices to all potential acquirers through normal marketing efforts and specifically identifying all PMN institutions and branch offices. As a result, the RTC offered institutions having branch offices located in PMN neighborhoods under individual branch and cluster branch transactions. Additionally, under separate provisions of the FHLB Act, section 21(A)(s), the RTC made owned [sic] banking facilities located in predominately minority neighborhoods available to minority owned financial institutions on a rent-free basis for five years. The cost of that separate provision of the law was not included in the least cost test completed for the resolution transaction.[50]

Those new provisions, which were not in effect for the entire first year that Carteret was in resolution, served to further delay Carteret's resolution by subjecting it to a host of new regulatory requirements.

59. The general minority-preference bidding procedure was originally set up as follows: A second round of limited bidding involving the relevant bidders was conducted if a minority bidder submitted a bid within 10 percent of the highest non-minority bidder. The second round of bidding was supposed to be scheduled on a short time-frame so as to not delay the scheduled closing.[51] Regardless of the winner, the RTC had no authorization to sell the loans at less than market price.[52] However, over the course of time, it appears that the second round of bidding was dropped in favor of allowing the minority bidder an opportunity to match the highest non-minority bidder in order to win the purchase.[53] This practice tends to result in lower accepted bids, as discussed in detail below.

60. Carteret, with 30 branches in New Jersey and 9 branches in Florida, was designated as a whole institution located in a predominantly minority neighborhood.[54]

---

50. *Id.* at 136.
51. Exhibit Ramey 1 at 4 (WOP2990736).
52. Exhibit Ramey 2 at 3 (WOP2990742).
53. Ramey Exhibit 38 at 1 (C-AM-A-0088740).
54. Ramey Exhibit 49 at 6 (C-AM-A-0130616).

Accordingly, the RTC used its minority-preference guidelines in conducting the bidding and set out to price the loans and branches at market value.[55] Some minority bidders, however, complained that they were being priced out of bidding.[56]

61. The RTC put Carteret's 39 branches up for bid in 16 clusters.[57] On August 25, 1994, 101 bids were received from 40 entities for the insured deposits of Carteret's 39 branches.[58] Carteret's nine Florida branches were sold on October 28, 1994, separately from the rest of Carteret's branches in New Jersey. The RTC resolved the Florida branches because the deposit runoff rate for those branches was slightly higher than the runoff rate for the New Jersey branches.[59] The RTC could not sell the New Jersey branches at the same time as the Florida branches because of issues related to evaluating de novo minority bidders on the New Jersey branches and continuing efforts to identify a minority acquiror.[60]

62. On September 19, 1994, minority bidder TCB Holdings was given a chance to match the high bid for the New Jersey branches as it was within 10 percent of the high bid.[61] After lengthy negotiations, TCB Holdings was unable to meet the statutory definition of a minority institution because, among other things, more than 50 percent of the profits would have

55. C-AM-A-0014399, C-AM-A-0076008.
56. WOP2991722, C-AM-A-0027918, C-AM-A-0125162.
57. Ramey Exhibit 49 at 3 (C-AM-A-0130613).
58. *Id.*
59. Exhibit Ramey 38 at 2 (C-AM-A-0088741).
60. *Id.* at 1 (C-AM-A-0088740)
61. Exhibit Ramey 49 at 4 (C-AM-A-0130614). The High Bid for the New Jersey branches was submitted by a combination of bidders: four Midlantic bids totaling $96.7 million for 6 clusters with 18 branches; two Banco Popular bids totaling $17 million for 2 clusters with 4 branches; Investor's bid for $11.7 million for 1 cluster with 3 branches; United's bid of $7.2 million for 1 branch; First Saving's bid of $17 million for 1 cluster with 3 branches and Sovereign's bid of $3.5 million for 1 branch. C-AM-A-0130613 – 14. The High Bid for the Florida branches included: Commercial Bank's bid of $6.3 million for 1 cluster with 5 branches; Hamilton Bank's bid of $2 million for 2 clusters with 2 branches; and Life Savings' bid of $1.3 million for 1 cluster with 2 branches. C-AM-A-0130614. The nine branches and $163 million in deposits in Florida were sold on October 28, 1994 to three bidders (Commercial Bank, Life Savings, and minority-owned Hamilton Bank) for $9.79 million in premiums. Ramey Exhibit 38 at 1 (C-AM-A-0088740); C-AM-A-0130612.

been distributed to wealthy white backers.[62] Another minority bidder, Bahia Partners, was within 10 percent of the High Bid for the New Jersey branches and given a chance to match it.[63] On December 7, 1994, the RTC notified Bahia Partners that its matching bid was no longer under consideration because it did not have the required necessary capital.[64]

63. The same day, December 7, 1994, the RTC requested the bidders in the High Bid for the New Jersey branches to reaffirm their bids.[65] Five of the six bidders reaffirmed seven of their ten bids.[66] The reaffirmation accounted for 14 out of the 30 branches with approximately $622 million in deposits.[67] The RTC accepted the reaffirmed High Bids on 14 of the New Jersey branches for a total premium of $65,602,350 or approximately 10.5 percent of the $622,402,000 in deposits in the 14 branches as of November 30, 1994.[68]

64. As to the remaining 16 branches, no conforming bids were received.[69] The RTC, however, recognized that there was a distinct possibility that one of the high bidders might not reaffirm because of the runoff of $200 million in deposits since the bid date.[70] The RTC determined that the least cost alternative for the 16 branches with $621 million in deposits was to rebid them.[71] Minority preference was not a concern for the remaining 16 branches because none of them was in predominantly a minority neighborhood.[72] On February 14, 1995, sixty-one bids were received from 22 bidders.[73] The High Bid for the 16 remaining branches included seven

---

62. *Id.*
63. *Id.* at C-AM-A-0130615.
64. *Id.*
65. *Id.*
66. *Id.*
67. *Id.*
68. Exhibit Ramey 49 at 2 (C-AM-A-0130612).
69. *Id.* at 5 (C-AM-A-0130615).
70. WOP3300026.
71. Exhibit Ramey 49 at 6 (C-AM-A-0130616).
72. Exhibit Ramey 54 at 4 (C-AM-A-0013424).
73. *Id.* at 3 (C-AM-A-0013423).

bidders for a total premium of $68,429,000 representing 11.09 percent of the total deposits.[74] On March 1, 1995, the High Bid by the seven bidders (Penn, Chase Manhattan, The Bank of NY, Investors, Provident, Trenton, Boiling Springs) was accepted by the RTC.[75]

## B. The Consequences of the Government's Delay and Value Destruction on the Principal Required in Carteret's Resolution

### 1. Delay Led to Deposit Runoff

65. The primary problems affecting the resolution of Carteret were the RTC's own financial condition and its inability to sell an institution as large as Carteret for full value under the constraints of the minority preference program.

#### a. Estimating the Magnitude of the Delay in Carteret's Resolution

66. There are four key influences to resolving failed business assets noted in the financial literature: firm size, asset quality, asset specificity, and industry performance.[76] First, all other influences being equal, larger firms are more difficult to break up and sell, incurring more time and effort for resolution. It should be noted, however, that in a regulated industry like banking, the deposit base of a bank is a valuable commodity. Federal and state regulations limit entry into local deposit markets, so the ability to purchase that entry through purchasing failed bank deposit liabilities may be of benefit to the purchaser. Hence, banks with larger deposit bases should be quicker and easier to resolve. Second, firms with higher quality assets require less time and effort for resolution. Third, assets that are unique to a particular industry may be hard to sell, prolonging resolution. Finally, firms are more difficult to break up and sell during industry-wide or economy-wide downturns.

---

74. *Id.* at 2-3 (C-AM-A-0013423, -24).

75. Exhibit Ramey 52 (C-AM-A-0013420).

76. This section analyzes Carteret's position relative to the 2,989 other bank and thrift failures that occurred between 1980 and 2004. Data to support the analysis is from the FDIC Failure Transaction Database, updated through December 2004.

### i. Carteret's Relative Position at the Time of Failure

67. The exclusion of regulatory goodwill from Carteret's capital after the enactment of FIRREA in August 1989 rendered Carteret below minimum capital guidelines enforced by the Office of Thrift Supervision ("OTS"). Evidence of Carteret's asset and liability composition relative to other failed thrifts can be found in the Thrift Financial Reports ("TFRs") filed by failed thrifts in the quarter prior to failure. Table 5 reproduces several key measures of financial health of Carteret in the quarter prior to failure and relates Carteret's condition to other failed thrifts in the quarters prior to their respective failures.

TABLE 5: CARTERET'S PERFORMANCE RELATIVE TO OTHER FAILED THRIFTS

| Year | N | Past Due and Nonaccruals/ Total Loans | N | Return on Assets (ROA) | Interest Expense/ Deposits |
|---|---|---|---|---|---|
| 1984 | 0 | NA | 22 | -0.919% | 2.658% |
| 1985 | 0 | NA | 56 | -1.938% | 2.523% |
| 1986 | 0 | NA | 53 | -3.866% | 2.195% |
| 1987 | 0 | NA | 52 | -3.001% | 1.841% |
| 1988 | 0 | NA | 168 | -4.503% | 1.889% |
| 1989 | 0 | NA | 273 | -3.572% | 1.994% |
| 1990 | 88 | 14.267% | 156 | -2.142% | 1.993% |
| 1991 | 86 | 10.982% | 86 | -0.527% | 1.824% |
| **1992** | **28** | **10.882%** | **28** | **-0.848%** | **1.516%** |
| 1993 | 3 | 10.061% | 3 | 0.325% | 1.173% |
| 1994 | 0 | NA | 0 | NA | NA |
| 1995 | 2 | 20.337% | 2 | -0.322% | 1.176% |
| 1996 | 0 | NA | 0 | NA | NA |
| 1997 | 0 | NA | 0 | NA | NA |
| 1998 | 0 | NA | 0 | NA | NA |
| 1999 | 0 | NA | 0 | NA | NA |
| 2000 | 0 | NA | 0 | NA | NA |
| 2001 | 0 | NA | 0 | NA | NA |
| 2002 | 0 | NA | 0 | NA | NA |
| 2003 | 0 | NA | 0 | NA | NA |
| 2004 | 0 | NA | 0 | NA | NA |
| **Total** | **207** | **12.442%** | **899** | **-2.919%** | **1.991%** |
| **Carteret** | **1** | **8.310%** | | **0.069%** | **1.168%** |

*Note*: The sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as "state stock savings and loans" that could be matched with historical TFR data. Return on assets is equal to quarterly net income in the quarter prior to failure divided by assets at the end of the quarter prior to failure. Interest expense is quarterly interest expense on total deposits only in the quarter prior to failure. Total Loans is equal to loans and lease financing receivables, net of unearned income, on a consolidated basis at the end of the quarter prior to failure. Carteret, which failed in 1992, is not included in the 1992 results sample in order to make the comparison clearer.
*Source*: Thrift Financial Report data; FDIC Failure Transaction Database.

Table 5 shows that Carteret was in a stronger position than a typical failed thrift. Carteret had a lower ratio of past due and nonaccrual loans to total loans than the average for thrifts failing in 1992 and over the entire period. One problem with failed thrifts was the preponderance of "hot money," which is exhibited by a very high average deposit expense. Table 5 shows that hot money was not likely to be unusually large a concern with Carteret, as the ratio of deposit interest expense to total deposits in Carteret was lower than the ratio for other thrifts failing both

in 1992 and throughout the period (I provide more evidence on this point below). Finally, unlike average failed thrifts in 1992, Carteret was earning a positive return on assets ("ROA").[77]

68. Carteret was a large thrift with one of the largest deposit bases among failed banks and thrifts resolved between 1980 and 2004. It is appropriate to compare its resolution experience with those of other thrifts, and especially with other large thrifts that failed during the late 1980s and early 1990s. Carteret had a sound financial structure (better than average asset quality, as shown in Table 5) relative to other failed institutions of the era, which would have made it relatively attractive to acquirers, and which would have expedited its sale. Furthermore, Carteret was resolved during a business cycle expansion, not during a recession, so the economic environment in which the resolution took place should have favored a relatively speedy and efficient sale. Table 6 compares Carteret's relative size position against all 2,989 other banks and thrifts that failed between 1980 and 2004, just the 1,074 other thrifts that failed during that period, the 28 other thrifts that failed in 1992, and the 10 other thrifts between $4 billion and $6 billion that failed any time between 1980 and 2004 (all of which actually failed between 1988 and 1991). As Table 6 shows, Carteret's deposits and assets were among the largest of failed thrifts.

77. Carteret's ratio of past due and nonaccruals to total loans, ROA, and interest expense ratio also compared favorably to the average of the corresponding ratios for other failed thrifts in 1992 and in the entire period when using sample definitions different than the sample definition used in Table 5 (for example, using a broader sample of all TFR filers) and when using annual measures instead of the quarterly measures used in Table 5.

TABLE 6: CARTERET'S RELATIVE POSITION AT TIME OF FAILURE

| | Deposits at Quarterly Call Report Prior to Failure | Assets at Quarterly Call Report Prior to Failure |
|---|---|---|
| **Carteret's Level** | **$2.716 billion** | **$4.827 billion** |
| *How Carteret's Level Ranks Among Comparables*: | | |
| 2,989 Other Failed Banks and Thrifts, 1980-2004 | 98.6% | 99.1% |
| 1,074 Other Failed Thrifts, 1980-2004 | 98.2% | 99.0% |
| 28 Other Thrifts failing in 1992 | 100.0% | 100.0% |
| 10 Other Thrifts of $4 Billion – $6 Billion Assets Failed 1988-1991 | 10.0% | 50.0% |

*Source*: FDIC Failure Transaction Database.

69. In summary, Carteret was one of the largest institutions resolved between 1980 and 2004, and it was also one of the healthier institutions resolved in that time period. Furthermore, resolution took place in a business cycle expansion, so few market difficulties should have impeded a speedy and efficient resolution. Hence, the RTC should have been able to easily resolve Carteret in a timely manner so as to retain the majority of the charter value for prospective purchasers. Instead, Carteret's resolution was an unnecessarily drawn-out and wasteful process.

### ii. Carteret's Relative Experience in Resolution

70. Carteret spent 826 days in resolution, during which time it lost 54 percent of its deposits.[78] According to the FDIC, Carteret's total resolution cost to the FDIC (including combined administrative expenses and receivership deficit) was just under $159 million as of the

78. The 54 percent decline in deposits is measured from September 30, 1992 (the last quarterly TFR prior to failure) and December 31, 1994 (the last quarterly TFR prior to resolution). This measure is not adjusted for the October 1994 branch sales, nor does it include any deposit runoff from January 1995 to the final resolution in March 1995. If the deposits sold in the October 1994 branch sales are added to the remaining deposits as of December 31, 1994, then the decrease in deposits from September 1992 to December 1994 would be 49 percent. If the deposit decline is measured from the date of Carteret's failure on December 4, 1992 instead of September 1992, then the deposit decline through December 1994 (adjusted for the October 1994 branch sales) was 45 percent. For purposes of comparing Carteret to other failed institutions in this section, I use the 54 percent decline for Carteret because this is the measure of deposit decline reported in FDIC Failure Transaction database for all failed institutions.

end of 2004,[79] or about 3 percent of bank assets prior to failure. Table 7 compares Carteret's resolution experience to the experiences of other banks and thrifts resolved during the period.

TABLE 7: TIME SPENT IN RESOLUTION FOR CARTERET AND SIMILARLY SITUATED FAILED INSTITUTIONS

| | Avg Days in Resolution | Carteret's Relative Position |
|---|---|---|
| 2,989 Other Failed Banks and Thrifts, 1980-2004 | 120 | 97.7% |
| 1,074 Other Failed Thrifts, 1980-2004 | 245 | 94.9% |
| 28 Other Thrifts failing in 1992 | 438 | 92.9% |
| 10 Other Thrifts of $4 billion – $6 billion Assets Failed 1988-1991 | 365 | 100.0% |
| **Carteret** | **826** | - |

*Source*: FDIC Failure Transaction Database.

71. Table 7 shows that, by any standard of comparison, Carteret's resolution was unusually protracted. Carteret's lengthy resolution placed its experience either at the very top (the 100th percentile) or near the very top of every one of these samples. **There were virtually no thrifts or banks, of any size, at any time, that experienced the protracted resolution delay of Carteret.**

72. As I have shown, the delays in resolving Carteret cannot be reasonably attributed to any unusual weakness in the quality of its assets at the time it was seized. Furthermore, its resolution cost (as measured by the FDIC) relative to its assets was quite low. Although the alleged absolute dollar cost of Carteret's resolution was a relatively high $159 million, this cost was low when compared to the value of Carteret's assets prior to failure. Despite its favorable circumstances, Carteret experienced a protracted delay, which resulted in a substantial decline in its deposit base. Table 8 shows Carteret's deposit decline and the alleged cost of its resolution to the RTC as a fraction of its assets prior to failure, and compares these values to those of similarly situated failed institutions. As Table 8 shows, Carteret's 54 percent deposit decline between the date of its last TFR prior to failure and the date of its last TFR prior to resolution was greater

79. FDIC Failure Transaction Database. The cost was initially projected to be $225 million.

than the deposit declines of the vast majority of similarly situated institutions, regardless of the sample used, although its resolution cost as a fraction of assets was very low in comparison to other institutions.

TABLE 8: CARTERET'S RELATIVE EXPERIENCE IN RESOLUTION

| | Deposit Decline | Resolution Cost to RTC | Resolution Cost to RTC as a % of Assets Prior to Failure |
|---|---|---|---|
| **Carteret's Level** | **54%** | **$159 million** | **3.3%** |
| *How Carteret's Level Ranks Among Comparables*: | | | |
| 2,989 Other Failed Banks and Thrifts, 1980-2004 | 98.1% | 92.0% | 10.6% |
| 1,074 Other Failed Thrifts, 1980-2004 | 97.6% | 83.7% | 9.9% |
| 28 Other Thrifts failing in 1992 | 75.0% | 96.4% | 21.4% |
| 10 Other Thrifts of $4 Billion – $6 Billion Assets Failed 1988-1991 | 100.0% | 20.0% | 20.0% |

*Note*: All figures as of end of 2004. Deposit decline is measured from the date of the last call report or TFR prior to failure to the date of the last call report or TFR prior to resolution.
*Source*: FDIC Failure Transaction Database.

73. In summary, Carteret was one of the largest and healthiest institutions resolved between 1980 and 2004. Furthermore, resolution took place in a business cycle expansion, so few market difficulties should have impeded a speedy and efficient resolution. Hence, it should have been relatively easy to resolve Carteret in a timely manner so as to retain the majority of the charter value for prospective purchasers.

74. Contrary to expectations, however, the Carteret resolution had one of the worst outcomes among bank and thrift institution failures over the past 25 years. Large percentages of assets, deposits, and charter value were wasted during Carteret's resolution.

**b. Delaying the Resolution Resulted in Deposit Runoffs, Which Reduced Prices for the Branch Sales**

75. Deposits flee during resolution for two main reasons. Some deposits may be "hot money," which merely chases abnormally high interest rates offered by weak or insolvent institutions in their gamble for resurrection. In lengthy resolutions, another explanation for deposit runoff becomes much more important: depositors may withdraw their deposits because

they no longer see the value of maintaining a relationship with a crippled institution, especially if that institution is restricted by regulators from offering customers loan products and other related services that are part of the normal business of banking.

76. Hot money deposits were not uncommon in the thrift industry in the late 1980s and early 1990s. It was not uncommon during the thrift crisis for thrifts to offer extremely high interest rates to attract deposits that could be used to gamble on resurrection. "For example, before August 9, 1989, the average yield on a one-year CD at an S&L was 71 basis points higher than the yield on a bank CD. By March 1990, however, that difference had been reduced to 22 basis points, which translated into an industry savings that could exceed $1 billion per year."[80] Some CD rates soared to more than 1,000 basis points above market averages. Hence, the RTC consciously attempted to "run off" high interest rate deposits early in the resolution by lowering CD rates. That way, "hot money" depositors who were merely chasing high CD yields would flee willingly, and the RTC would lower interest expenses in the resolution. But there is no evidence that Carteret's deposit reductions arose from hot money.

77. Carteret began cutting deposit rates in early 1992, well before the RTC took over at the end of that year. The *New York Times* reported in August 1992, that "[f]or New York-area yields, the largest adjustments were at Carteret Savings in New Jersey, which pared 27 basis points from its money-market account, to 3.29 percent, and at Astoria Federal Savings, which cut the three-month C.D. 11 basis points, to 3.19 percent, and the six-month C.D. 15 basis points, to 3.25 percent."[81]

78. On February 17, 1993, well after the RTC took control of Carteret in resolution, Carteret's money market account rate was 2.94 percent, its three-month CD rate was 3.00

80. MANAGING THE CRISIS, *supra* note 41, at 123.
81. Robert Hurtado, *Bank Yields On Accounts Decrease*, N.Y. TIMES, Aug. 26, 1992, at D10.

percent, and its six-month CD rate was 3.25 percent. Compared with New York regional thrifts, five other thrifts (Hudson City SB (N.J.), First Fed (Rochester), Green Point Savings, River Bank America, and Astoria Fed Savings) offered higher money market rates, one (Hudson City SB (N.J.)) offered higher three-month CD rates, and three (Hudson City SB (N.J.), Anchor Savings, and Green Point Savings) offered higher six-month CD rates.[82] The RTC noted that Carteret offered "competitive" interest rates on deposits, but rather than viewing that fact as reflecting a weak retail banking franchise, the RTC argued that Carteret's competitive deposit interest rates reflected its high quality of retail banking relationships and effective marketing strategy:

> In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.
>
> CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.[83]
>
> The CFSB retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution. During the past five years, the Bank's consumer banking efforts have been focused upon optimization of the retail office network. Each retail office was evaluated on its financial performance compared to the potential of the branch market area. Many of the offices which were determined to be substandard were closed, consolidated or sold to another financial institution. Operations at the remaining offices were streamlined and marketing efforts focused on acquisition/retention of high-balance deposit households.
>
> CFSB retail offices in New Jersey and Florida are located in some of the top performing market areas in each respective state. The New Jersey markets tend to be suburban and upper middle class in nature, but also include some stable and ethnic blue-collar neighborhoods in urban areas. In Florida, the markets also tend to be suburban and upper middle class, and are characterized by a preponderance of senior citizens.

---

82. *Bank Money Accounts*, N.Y. TIMES, Feb. 17, 1993, at D14.
83. Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 4 (C-AM-A-0400792).

> Based upon total deposits, CFSB ranks as the second largest SAIF-insured institution headquartered in New Jersey. While considerably smaller in scope, the Bank's Florida retail office network nevertheless affords a possible acquiring institution of these CFSB branches the opportunity to be a significant player, specifically in South Florida.
>
> In recent years, CSB has made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty. Retail office managers are also encouraged to be active in their respective local communities. The "outstanding" rating which CSB received for its Community Reinvestment Act activities is further evidence of the Bank's commitment to the individual communities it servcs.
>
> In its New Jersey market areas, CFSB is second only to First Fidelity Bank in terms of retail deposit market share. The Bank is the market share leader in eight of its New Jersey market areas and among the top three in over half of the markets. In Florida, CFSB faces much more competition, but nevertheless is among the top ten institutions in over half of its markets.
>
> The Bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office presence. Average account balances for each product type at CFSB exceed industry averages. These characteristics, combined with a relatively stable deposit base, further enhance the valuation of the Bank's franchise.[84]

79. Carteret's interest rate decreases cannot explain its protracted deposit flight. By March 1993, the TFRs show that money market accounts were an inconsequential portion of Carteret's deposits.[85] About 20 percent of Carteret's deposits fled in the six months following the failure announcement on December 4, 1992.[86] Figure 1 shows that the deposit declines continued during the resolution. Despite some variation from quarter to quarter, the rate of decline in deposits was fairly constant over time.

---

84. Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 26-27 (C-AM-A-0400815 – 16).

85. The TFR reports zero MMDA balances in March 1993.

86. The initial decline in deposits was linked to specific actions by the RTC. "Since the date of conservatorship, CFSB has restricted certain products and significantly reduced interest rates on others. As a result, the Bank has experienced an outflow of $138.4 million in retail deposits through December 31, 1992. For the 27 days following the December 4, 1992 date of conservatorship, net certificate outflows totaled $63.4 million or 51.1 % of scheduled maturities. In addition, tax-deferred annuities and brokerage services which were previously sold in New Jersey retail offices are no longer offered." Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 26 (C-AM-A-0400815).

FIGURE 1: PERCENT CHANGE IN CARTERET'S TOTAL DEPOSITS DURING RESOLUTION, DECEMBER 1992-DECEMBER 1994




*Note*: Percent change in deposits are quarter-over-quarter, except for the first observation (December 31, 1992), which is the "quarterly" percent change in deposits from the date Carteret was seized (December 4, 1992) to December 31, 1992. "Quarterly" percent change is defined as three times the observed movement from December 4, 1992 to December 31, 1992. In order to adjust for the October 1994 branch sales, I add the loan principal from the October 1994 resolution ($155.7 million) to the total deposits reported by the December 1994 Carteret TFR before estimating the percent change in total deposits from September 1994 to December 1994.
*Source*: Thrift Financial Reports; Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 2 (C-AM-A-0400790); Carteret Federal Savings Bank, Consolidated Florida Branch Resolution Summary (AM54120696).

80. A simple diagram relating deposit losses to time spent in resolution for the sample of 11 large failed thrifts (including Carteret) is presented in Figure 2. Figure 2 illustrates a simple ordinary least squares regression of the percent change in deposits from the quarter prior to failure to the quarter prior to resolution as a function of time in resolution for those eleven institutions. **Figure 2 shows that Carteret's substantial deposit loss was the predictable consequence of its protracted resolution.**

FIGURE 2: NEGATIVE RELATIONSHIP BETWEEN RESOLUTION TIME AND DEPOSIT LOSSES, 11 THRIFTS FAILING WITH $4 BILLION TO $6 BILLION IN ASSETS, 1980-2004




81. As shown in Table 8, Carteret lost 54 percent of its $2.7 billion deposit base between the date of its last quarterly TFR prior to failure and the date of its last quarterly TFR prior to resolution. If the RTC had been funded by late 1992, while Carteret was in the ARP program, Carteret would have been resolved at least as quickly as the average resolution period of the other ten large failed thrift institutions shown in Figure 2. A list of the eleven large thrifts that failed in the late 1980s and early 1990s is provided in Table 9.

TABLE 9: ELEVEN THRIFTS FAILING WITH $4 BILLION TO $6 BILLION IN ASSETS IN LATE 1980S AND EARLY 1990S

| Name | City | Date of Failure | Assets Preceding Failure ($billion) | Days to Resolution |
|---|---|---|---|---|
| United Savings Association of Texas | Houston, TX | 12/30/1988 | 4.645 | 0 |
| Bright Banc SA | Dallas, TX | 2/10/1989 | 4.388 | 357 |
| University FSA | Houston, TX | 2/14/1989 | 4.480 | 241 |
| Lincoln Savings | Irvine, CA | 4/14/1989 | 4.857 | 693 |
| Western S&LA, FA | Phoenix, AZ | 6/14/1989 | 5.655 | 351 |
| Atlantic Financial Savings | Bala Cynwyd, PA | 1/11/1990 | 5.299 | 673 |
| The Benjamin Franklin FS&LA | Portland, OR | 2/21/1990 | 4.617 | 198 |
| Santa Barbara FS&LA | Santa Barbara, CA | 4/27/1990 | 4.292 | 469 |
| Southwest FSA | Dallas, TX | 5/18/1990 | 5.325 | 434 |
| Columbia S&LA | Beverly Hills, CA | 1/25/1991 | 5.359 | 231 |
| Carteret FSB | Madison, NJ | 12/4/1992 | 4.827 | 826 |

*Source:* FDIC Failure Transaction Database.

Table 9 indicates that of the eleven large failed thrifts shown in Figure 2, there were two failed thrifts that experienced resolution delays substantially greater than one year. Those were Lincoln Savings and Atlantic Financial Savings. Lincoln Savings was the institution owned by Charles Keating, famous for appealing to five senators for regulatory relief in order to keep his "high flying and economically insolvent S&L" from being closed by regulators.[87] Lincoln was one of the most costly S&L failures of the thrift crisis. Atlantic Financial Savings is less well-known, although Atlantic was Pennsylvania's largest savings institution.[88] These two institutions failed much earlier than Carteret, before the business cycle trough in 1991. That is important, because resolutions tend to proceed slowest during business cycle downturns.[89] Carteret, however, failed well after the business cycle trough. Furthermore, Atlantic and Lincoln were weaker than Carteret, exhibiting ROA's in the quarter before failure of -0.5 percent for Atlantic and -1.1

87. Edward Kane, *The Incentive Compatibility of Government-Sponsored Deposit-Insurance Funds*, *in* THE REFORM OF FEDERAL DEPOSIT INSURANCE: DISCIPLINING THE GOVERNMENT AND PROTECTING TAXPAYERS 164 (James Barth & R. Dan Brumbaugh, Jr., eds. 1992).

88. *Savings Unit Seized by U.S.*, N.Y. TIMES, Jan. 12, 1990, at D4.

89. Joseph R. Mason, *A Real Options Approach to Bankruptcy Costs: Evidence from Failed Commercial Banks during the 1990s*, 79 J. BUSINESS 1523 (2005).

percent for Lincoln, compared to 0.1% for Carteret.[90] Lincoln and Atlantic also relied substantially on hot money deposits, posting interest expense ratios in the quarter before failure of 2.1 percent for Atlantic and 2.4 percent for Lincoln, compared to only 1.2 percent for Carteret.[91] Lincoln and Atlantic also engaged in risky commercial lending, which contributed 3.0 percent earnings for Atlantic and 2.5 percent for Lincoln, compared to only 0.5 percent for Carteret.[92] In resolution, regulators observed the lack of franchise value in Atlantic and Lincoln, which is reflected in their forecast of the potential going concern value of those institutions. This going concern value, as measured by the forecasted payoff cost minus resolution cost, divided by payoff cost, was only 1.9 percent for Atlantic and 0.4 percent for Lincoln, compared to 37.4 percent for Carteret.[93] Regulator's expectations were borne out in receivership, as Atlantic's receivership deficit amassed a loss through 2004 of over $1 billion (20.3 percent of assets in the quarter before failure), and Lincoln's amassed a loss of over $2.5 billion through 2004 (53.0 percent of assets in the quarter before failure), while Carteret's loss, according to the FDIC, amounted to only $159 million through 2004 (3.3 percent of assets in the quarter before failure). Nonetheless, Carteret still spent more time being resolved than either of those two problem

90. ROAs are measured as quarterly net income in the quarter prior to failure divided by total assets in the quarter prior to failure. The comparison among Carteret, Atlantic, and Lincoln is similar if annual ROAs using the net income in the four quarters prior to failure and the average of assets in the four quarters prior to failure are used instead. Carteret's annual ROA was 0.2 percent, which was significantly higher than Atlantic's annual ROA of –9.4 percent and Lincoln's annual ROA of –6.7 percent.

91. The interest expense ratio is equal to the quarterly deposit interest expense in the quarter prior to failure divided by total deposits in the quarter prior to failure. The comparison among Carteret, Atlantic, and Lincoln is similar if annual interest expense ratios using the deposit interest expense in the four quarters prior to failure and the average of deposits in the four quarters prior to failure are used instead. Carteret's annual interest expense ratio was 5.3 percent, which was less than Atlantic's annual interest expense ratio of 8.5 percent and Lincoln's annual interest expense ratio of 8.9 percent.

92. I estimate commercial lending's percent earnings by dividing the institution's commercial and industrial loan income in the quarter prior to failure by the sum of commercial and industrial loans and domestic lease financing receivables in the quarter prior to failure. The comparison among Carteret, Atlantic, and Lincoln is similar if I use the commercial loan income in the four quarters prior to failure and the average of commercial and industrial loans and domestic lease financing receivables in the four quarters prior to failure. Using this annual measure, commercial lending contributed 7.2 percent earnings for Carteret, which was less than Atlantic's 11.8 percent earnings and Lincoln's 12.5 percent earnings.

93. Further discussion of this ratio is provided below.

institutions: Carteret spent 826 days in resolution, compared to 673 for Atlantic and 693 for Lincoln. Given Carteret's quality and the timing of its resolution, it is conservative to assume that in the but-for world it would have been resolved in 365 days, which is the average resolution period for the other 10 large thrifts that failed in the late 1980s and early 1990s, including Atlantic and Lincoln.

82. Had Carteret been resolved in the average time period in which thrifts of comparable size in the late 1980s and early 1990s were resolved, then Carteret's resolution would have occurred on or before December 4, 1993—365 days after it was seized. But-for the Congressional funding delays to the RTC, the RTC could have marketed Carteret as a whole bank, thus enabling it to sell Carteret's deposits and assets simultaneously at the time of resolution. In addition, the absence of the minority preference program would have lifted another obstacle to selling Carteret as a single entity. In this but-for world, if the value of Carteret's assets plus the deposit premium were greater than or equal to the value of Carteret's deposits, then no loan would be required to fund the resolution, and there never would have been a receivership deficit.

83. As of December 31, 1993, Carteret had $1.787 billion in deposits. I assume that, but-for the delay, Carteret would have sold its branches at the same 10.5 percent deposit premium as it actually sold its branches in the second resolution (the first 14 New Jersey branches sold subject to the minority preference program). This is a conservative assumption, as the deposit premium likely would have been higher but-for the minority preference program, as I explain below. Given its deposits of $1.787 billion and a 10.5 percent deposit premium, I estimate that but-for the delay resulting from Congressional actions, the Carteret branches would have sold for a total deposit premium of $187.6 million—$43.8 million greater than the $143.8

million deposit premium the branches actually sold for. I assume that the sales proceeds from Carteret's assets in December 1993 would have been $1.205 billion—equal to the sum of actual dividends paid toward the resolution loans ($1.351 billion), minus the actual interest earned from the escrow account of $1.9 million, minus the actual deposit premiums of $143.8 million from the resolutions. This is a highly conservative approach to valuing the but-for market value of Carteret's assets, as I explain in the remainder of this section and in Section V. I estimate the total sales proceeds (equal to deposit premium plus assets sold, minus settlement interest[94]) but-for the delay to be $1.393 billion at the time of the but-for resolution (versus the $187.3 million in sales proceeds at the time of the actual resolutions).

84. Because the but-for sales proceeds of $1.393 billion exceed the actual resolution loan principal of $1.370 billion,[95] no loan would be required to fund the resolution when correcting for the delay and value destruction of Carteret's receivership, and the receivership's P&I balance would be $23.1 million in surplus. As shown in row (1) of Table 4, this balance would have been $198.5 million lower than the government's inappropriate estimate of that balance as of the end of 2005.

---

94. When calculating the but-for receivership deficit's P&I balance under any scenario throughout my report, I use the actual value of settlement interest without adjusting it. The settlement interest paid by the RTC to the acquirors reflected the two to three day delay between closing the sale and wiring the funds equal to the difference between the amount of deposits assumed less premium paid and assets purchased. The value of actual settlement interest, which was less than $500,000, or 0.26 percent of total sales proceeds, is inconsequential to the results of the analysis.

95. The deposit runoff between the time Carteret should have been sold in December 1993 and the time its branches were actually sold was funded dollar for dollar by earnings and asset sales. Therefore, the difference between the but-for sales proceeds, including the earnings and asset sales that funded the deposit runoff, and the balance of deposits in December 1993 is equal to the difference between my measure of the but-for sales proceeds of $1.393 billion and the actual resolution funding requirement of $1.37 billion.

### c. Isolating the Consequences of Delay and Deposit Runoff from the Minority Preference Program

85. The minority preference program delayed the sale of 16 Carteret branches. This delay resulted in deposit runoff, which in turn contributed to the lowered amounts bidders were willing to pay for those branches.

86. The initial bids submitted for the 16 branches would have yielded a premium of $87.8 million—the amount of premium that Midlantic and Sovereign would have offered for those branches before the re-auction.[96] However, the RTC ultimately realized a premium of only $68.4 million on those 16 branches when they were sold in March 1995. Absent the delay caused by the minority preference program, but without taking account of the prior delay associated with the lack of Congressional funding, the branches would have likely been sold for $87.8 million at the same time as the other group of branches were sold in October 1994. In addition, the branches that were actually sold in the January 1995 resolution would have also been sold in October 1994 but-for the minority preference program. Although those branches did not require reauctioning like the branches that sold in March 1995, and therefore did not result in lower deposit premiums from the delay, their sale was still delayed by the problems with the initial disqualified minority bidders. In addition, Carteret would have been sold as a whole bank without the constraints of the minority preference program that forced it to be sold in pieces. Therefore, Carteret's assets and deposits would have been sold simultaneously in 1994, and a loan would have only been required if the sales proceeds from assets and deposits sold did not exceed the resolution funding requirement, approximately equal to the book value of the deposits.

---

96. Ramey Exhibit 49, at 4-5 (C-AM-A-0130614 – 15); Midlantic National Bank, Bid Form for Carteret National Savings Bank, at C-AM-A-0129998 - 0130000, 0130010 - 12.

87. As I discuss in Section V, the value of Carteret's assets would have been higher but-for the minority preference program delay. I use the conservative assumption that the proceeds from selling all of Carteret's assets in October 1994 would have been at least as high as the actual proceeds from selling Carteret's assets in pieces from 1994 through 2000. Therefore, the only difference between the total sales proceeds in the actual world and the but-for total sales proceeds is the difference between the actual deposit premium and the but-for deposit premium ($19.4 million), less the $1.9 million in actual interest earned from the escrow account that would not have existed had the receivership immediately received the sales proceeds in a single resolution transaction in October 1994. As I have discussed above, the actual principal balance of the receivership deficit after all asset and deposit sales was $18.8 million. But for only the minority preference program delay, the principal balance after all deposit and asset sales in October 1994 would have been $1.4 million—$17.5 million lower than the actual principal balance. As I discuss below, other consequences of the minority preference program would have eliminated this shortfall and put the receivership deficit's P&I balance into surplus. However, Table 4 reflects the conservative estimate that the receivership deficit's P&I balance would have been $1.4 million at the time of the resolution when adjusting only for the effects of the minority preference program. Because, as I showed above, it would not be appropriate to charge interest on this principal balance, in row (2) of Table 4, the receivership deficit's P&I balance remains at $1.4 million as of the end of 2005. Even if none of my corrections to the government's inappropriate interest calculations are used, then the receivership deficit's P&I balance is $2.6 million as of the end of 2005 when adjusting only for the delay from the minority preference program (row (4) of Table 4).

### 2. The Minority Preference Program Resulted in Lower Deposit Premiums from the Branch Sales

88. The delays and value destruction by the government not only reduced the deposits available for sale, they likely reduced the premium received per deposit dollar for the sale of the branches. The premium per deposit dollar likely was reduced by two factors: (1) the value-destroying structuring of the transactions through which the bank was sold, and (2) the rules of the bidding process for its assets, which likely further reduced the value received. Both the value-destroying structure of the sale and the value-destroying bidding rules were direct consequences of the minority preference program. Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence suggesting that these losses were significant economically. Thus, my quantitative estimates in Table 4, which do not adjust for the reduced premium per deposit dollar, should be viewed as highly conservative (low) estimates of the reduction in the receivership surplus that resulted from government value destruction.

#### a. The Minority Preference Program Forced Carteret to Be Sold in Pieces, Rather Than on a Whole-Bank Basis

89. Carteret was sold in pieces rather than as a whole, which tends to reduce the premium received. The piecemeal sale of Carteret reflected the constraints imposed by the minority preference program, which favored smaller bank bidders for whom Carteret's large size would otherwise have been prohibitive.

90. Recall that Carteret initially qualified for the Accelerated Resolution Program (ARP) in 1992. ARP resolutions, which are typically reserved for banks with high potential sale premiums, are similar to "Reprivatizations" (save that banks resolved through ARP were not always formally in receivership). According to the standard RTC/FDIC measure of going concern value (the estimated difference between "resolution cost" and "payoff cost" of the

institution, which the agencies compute as part of their analysis of least cost resolution, expressed here in percent terms as payoff cost minus resolution cost divided by payoff cost), Carteret had a high going concern value. Intuitively, that going concern value represents the incremental value of having a going concern make depositors whole versus having the RTC/FDIC do so instead (and then sell the bank assets piecemeal in order to cover the present value of the outlay). If the expected cost of resolution is close to the expected cost of payoff then there is not much perceived value in preserving the institution through creative marketing programs. If, on the other hand, the expected costs are very different, that indicates that the RTC/FDIC believes that an acquiring institution will pay a premium to acquire the resolved bank's assets and liabilities as a package. Because neither the RTC/FDIC nor an acquiring institution should fail to recognize potential value, the going concern value is closely related to the expected premium from sale as a going concern rather than in pieces. Carteret's least cost resolution forecast indicates an expected premium value that compares favorably with other bank and thrift failures, no matter how measured.[97]

91. Judging from the RTC/FDIC measure of going concern value, Carteret's expected premium value of 37.4 percent was better than (that is, above) 75.7 percent of all other banks and thrifts that failed between 1980 and 2004, meaning that Carteret should have commanded a higher transaction premium, *ceteris paribus*, than more than 75 percent of other institutions that failed in the past two decades. Carteret's expected premium value was higher than 73.7 percent of the other thrifts that failed between 1980 and 2004, higher than 75.0 percent of the other thrifts that failed in 1992, and higher than 90.0 percent of the other thrifts with assets between $4

97. I refer to the estimated percent difference between resolution cost and payoff cost as the "expected" premium value, although it is not clear whether this measure is an unbiased forecast of the realized premium. Nevertheless, the estimated percent difference between resolution cost and payoff cost should be highly correlated with realized premiums.

billion and $6 billion that failed between 1980 and 2004 (all of which failed between 1988 and 1991). Hence, Carteret should have commanded a much higher sale premium than most other institutions.

92. Because the RTC was not sufficiently funded to assist Carteret to reprivatize in the ARP program, Carteret ended up being marketed as a Purchase and Assumption more than two years later under the newly-amended minority preference program, which was carried out as a "Branch Sale." Statistically, for thrifts being resolved in the 1990s, the change from a "Reprivatization" to a "Branch Sale" is associated with substantially lower premium received per deposit dollar.

93. How did Carteret's marketing as a Purchase and Assumption (instead of a Reprivatization under the ARP in early 1992) affect its resolution outcome? Figure 3 shows the propensity for resolutions of different types based upon the institution's particular expected premium value. It is clear from Figure 3 that Merger and Reprivatization transactions enjoy higher expected premium value from resolution, followed by Purchase and Assumption transactions, and Insured Deposit Transfer and Payoff transactions. Mergers and Reprivatizations are the typical means of resolutions when expected premium values lie above 25 percent (Carteret's expected premium value was 37.4 percent) while Insured Deposit Transfers and Payoffs are far more common when premium values approach 0 percent (the cost of resolution is not very different from a payoff, i.e., there is little going concern value to be preserved).

94. The expected premium value is a good predictor of the resolution type, and institutions with high going concern value are resolved through methods that preserve that value. Judging from Carteret's expected premium in 1992 and its status as an ARP transaction, it is likely that far less value would have been lost had Carteret been resolved through a Merger or

Reprivatization under the ARP program as originally intended. Instead, as a consequence of the minority preference program, Carteret was resolved by Purchase and Assumption instead of Merger/Reprivatization, a style difference that is associated with a 28.8 percent lower average expected premium value of 19.0 percent. The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[98]

FIGURE 3: VALUE AND RESOLUTION STRATEGY: PRIMARY RESOLUTION TYPES




98. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

95. How did the Branch Sale structure, arising from the implementation of the minority preference program, further affect the outcome? Figure 4 shows the frequency of branch sales based upon different premium values of different institutions. Again, branch sales are typically used where there is less expected premium value to be preserved through more value-preserving resolution techniques. Branch Sales are uncommon when premium values lie above 25 percent (recall, again, Carteret is 37.4 percent) while Branch Sales are very common when premium values approach 0 percent (since the cost of resolution is not very different from a payoff, i.e., there is little value to be preserved). Again, the main point is that a low expected premium value is a good predictor of a Branch Sale, while other institutions with high expected premium values are resolved through different methods that preserve their franchise values. It is likely that far less value would have been lost had Carteret been resolved through a Merger or Reprivatization under the ARP program as originally intended. Instead, Carteret was resolved by Branch Sale, a style difference that is associated with an average 15.1 percent lower value premium on deposit sales over non-branch sale resolutions.

96. The average expected value premium on Mergers and Reprivatizations was 47.9 percent, whereas the average expected premium for a standalone Purchase and Assumption was 20.1 percent, the average expected premium for a Purchase and Assumption with a Branch Sale was 14.3 percent, the average expected premium for a standalone Insured Deposit Transfer was 7.6 percent, and the average expected premium for an Insured Deposit Transfer with a Branch Sale was 2.1 percent. The lack of Congressional funding and increased minority preference restrictions imposed by Congress during the wait for funding resulted in Carteret being resolved as a Purchase and Assumption with a Branch Sale, implying an average expected premium value of 14.3 percent rather than a Mergers and Reprivatization transaction with an average expected

premium value of 47.9 percent, an absolute difference of 33.6 percent (or viewed alternatively, a 70.1 percent drop in expected premium value). The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[99]

FIGURE 4: VALUE AND RESOLUTION STRATEGY: BRANCH SALES




b. **The Minority Preference Program Discouraged Non-Minority Bidders from Participating in the Auction for Carteret's Branches**

97. Controlling for other factors, the bidding rules of the minority preference program reduced the number of bids and created disincentives for high bids. The preference program

---

99. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

amounted to the granting (for free) of a valuable option to minorities to match the high bid of others who had invested resources to value Carteret's branches. The effect of such a grant is to discourage entry by non-minority bidders, which in turn, depresses auction prices. Indeed, an internal government memo confirms that the minority preference program likely discouraged non-minority bidders from participating in the auction. In a memo dated October 26, 1995, J. Paul Ramey, Vice President, Division of Resolutions of the RTC, considered whether "[p]re-screening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received." His complete response was as follows:

> Although the statement may be true, I believe apples and oranges have been mixed here; what do "pre-screening of bidders" and "minority bidder preference programs" have in common? The pre-screening, if you are talking about up-front disqualification from bidding, would likely result in a lesser number of initial attendees at a bidders' meeting and theoretically decrease the competition. As for any type of bidding preferences, it has been my personal opinion that this is a deterrent to the competitive aspect of the bidding process; however, this has not been definitively proven to be the case.[100]

Mr. Ramey reasons correctly that non-preferred entities would not want to make the investment necessary to value a series of branches if they thought that their efforts would be futile or could be utilized by a preferred bidder. The cost of preparing a bid is not trivial. Given this significant cost of participation, it is reasonable to conclude that a non-minority bidder would not incur such an expense if it knew that its high bid could be matched and thus the likelihood of winning was close to zero.

### c. The Minority Preference Program Induced Non-Minority Bidders to Bid Less Aggressively Than They Otherwise Would Have Conditional on Entering the Auction

98. Unfortunately, the price-depressing effect of the minority preference program was not limited to deterring entry. By creating a "toehold" advantage for certain bidders, the minority

---

100. Memo of J. Paul Ramey, Oct. 26, 1995, Exhibit Ramey 12 at 4 (C-AM-A0125188).

preference program could have depressed prices in ways not contemplated in the Ramey memo. In particular, the minority preference program may have induced non-minority bidders to bid less aggressively than they otherwise would have conditional on entering the auction. In a seminal auction paper, Professors Bulow, Huang and Klemperer show that even a slight toehold advantage to one bidder can have a significant impact on auction revenues in a common-value ascending (English) auction.[101] Hence, the minority program could have depressed the deposit premium for Carteret in two separate yet complementary ways: (1) by discouraging entry by non-minority bidders, and (2) by inducing non-minority bidders to bid less aggressively during the auction.

99. To understand the intuition behind a toehold advantage, consider a very simple example in which two bidders compete for a prize equal to the sum of the money in bidder 1's wallet (which is unknown to bidder 2) plus the money in bidder 2's wallet (which is unknown to bidder 1). For ease of exposition, assume that the most money in either bidder's wallet is \$1. If bidder 1 wins the auction, he gets paid the sum of the money in the two wallets less his bid. If bidder 2 wins, he gets paid the sum of the money in the two wallets less 95 percent of his bid. In the language of Bulow, Huang and Klemperer, bidder 2 has a "toehold advantage" equal to 5 percent. When the auction is symmetric—that is, when neither bidder has a toehold advantage, each bidder remains in the auction until the price for the content of the two wallets reaches roughly two times the content of his own wallet.[102] When bidder 2 has a slight toehold equal to 5 percent, bidder 1 remains in the auction until the price for the content of the two wallets reaches

101. Jeremy Bulow, Ming Huang & Paul Klemperer, *Toeholds and Takeovers*, 107 J. POL. ECON. 427 (1998).
102. *Id.* at 438–439.

roughly one times the content of his own wallet.[103] Hence, a slight toehold advantage can produce a dramatic reduction in the winning bid.

## III. THE GOVERNMENT'S UNEXPECTED ELIMINATION OF SUPERVISORY GOODWILL INFLATED THE RECEIVERSHIP DEFICIT AND DECREASED THE VALUE OF CARTERET

100. Supervisory goodwill was a crucial condition enabling Carteret to purchase distressed thrifts from FSLIC. On several occasions, Carteret acquired insolvent institutions from the FSLIC to help the insolvent FSLIC avoid the cost of liquidating those institutions outright. In doing so, Carteret absorbed substantial amount of book-value assets, deposits, and negative tangible equity onto its own balance sheet, and relieved federal regulators from substantial liability in those failed institutions. Supervisory goodwill satisfied crucial regulatory capital requirements for thrifts like Carteret, and thereby provided thrifts the ability to maintain larger amounts of deposits and assets with lower amounts of tangible capital than they otherwise could have maintained.

101. FIRREA eliminated the use of supervisory goodwill for meeting regulatory capital requirements, and thus breached the agreements between the government and Carteret regarding the treatment of supervisory goodwill as part of Carteret's agreements to purchase failed thrifts. FIRREA passed the House of Representatives on June 15, 1989, and the Senate on June 21, 1989, but in the weeks leading up to its passage, there was substantial uncertainty about whether FIRREA would pass and what provisions it would contain. During the spring of 1989, as Congress debated FIRREA, the Office of Thrift Supervision (OTS), thrifts potentially affected by FIRREA, and market participants responded to its prospective passage. The costliness of FIRREA to thrifts that maintained supervisory goodwill depended not only on whether supervisory goodwill would be phased out but on the details of how such a phaseout would be

103. *Id.*

enforced. Those details, in turn, were not known in advance but rather evolved during the Congressional debate. An important example was an amendment offered by Congressman Henry Hyde on May 24, 1989 in the House Judiciary Committee.[104] Had it passed, this amendment would have required a lengthy regulatory review process before preventing an institution from counting supervisory goodwill towards regulatory capital. As reported on the front page of the New York Times, this amendment was defeated on May 24 by a 17-17 tie as FIRREA passed through the House Judiciary Committee on its way to the floor.[105] At the same time, the OTS was taking action. In anticipation of FIRREA's passage, in its examination report dated May 22, 1989, the Office of Thrift Supervision (OTS) warned Carteret that removal of goodwill from its regulatory capital would leave it critically undercapitalized. Regulators concluded that Carteret was "not likely to meet the tangible, leverage ratio, and risk-based minimum capital levels required by FIRREA."[106] The OTS recommended that AmBase should "be required to infuse capital in Carteret Savings to bring the institution into compliance with FIRREA."[107] By December 19, 1989, Carteret determined that $19.6 million in additional capital was necessary for Carteret to comply with FIRREA's regulatory capital requirements.[108] Under the obligations set forth in the Regulatory Capital Maintenance/Dividend Agreement ("RCMA"),[109] AmBase

---

104.Matt Yancey, *Some House GOP Members Want S&L Bill Changes*, ASSOCIATED PRESS, May 23, 1993; Kathleen Day, "S&L Supporters Plan Offensive To Retain 'Goodwill' as Capital," WASH. POST, May 24, 1989, at F1.

105.Nathaniel C. Cash, *Some in G.O.P. Deserting Bush On Savings Plan*, N.Y. TIMES, May 25, 1989, at A1.

106.AmBase Corp. v. United States, 58 Fed.Cl. 32, 38 (2003).

107.*Id.*

108.*Id.*

109.In seeking approval to acquire Carteret, AmBase and the Federal Home Loan Bank Board ("FHLBB") agreed to the RCMA in November 1988. The RCMA stated that AmBase was obligated to contribute up to $50 million in additional capital to Carteret in order to maintain Carteret's required level of regulatory capital for as long as AmBase controlled Carteret. *Id.* at 37.

then contributed $20 million to Carteret to bring the bank into capital compliance by the end of 1989.[110]

102. On December 4, 1992, Carteret was seized and placed under the control of a receiver. Following this event, the RTC sold Carteret's assets. However, the receiver did not realize any value from the supervisory goodwill that Carteret lost due to the breach. Had Congress not passed FIRREA and the receiver realized value from the supervisory goodwill, the resolution loan principal would have been lower, thus decreasing the receivership deficit.

103. Table 10 summarizes my conservative estimates of the but-for receivership deficit P&I balance, correcting (1) only for the elimination of supervisory goodwill, and (2) for the combination of the goodwill effect and the multiple delays and value destruction caused by the government in the sale of branches. Table 10 provides my estimates of the correct P&I balance of the receivership deficit for use in damages calculations under various alternative assumptions about the inclusion and method for calculation of interest rate charges (discussed in Section I), correcting for the problems with the government's interest calculations (discussed in Section I), the necessity of a loan that resulted from Congress's delay and value destruction of Carteret's resolution (discussed in Section II), and the elimination of supervisory goodwill (discussed in detail in this section, below). For purposes of comparison, I provide several calculations in Table 10 that combine these various adjustments. Row (1) corrects for the elimination of supervisory goodwill and corrects for the delays and value destruction caused by Congress. As in Section II, under these assumptions, the P&I balance is in surplus and there is no receivership loan, and therefore, no interest computation to consider. This is my preferred estimate of the effect of correcting simultaneously only for delays and value destruction in the sale of branches, and the

110 *Id.* at 38.

elimination of supervisory goodwill. This estimate of the P&I balance is $244.3 lower than the balance estimated using the government's inappropriate methodology.

104. Row (2) is the same as row (1), but only corrects goodwill and the delays from the minority preference program, rather than correcting goodwill and all delays and value destruction by the government conservatively estimated in Section II. Again, the receivership P&I balance is in surplus and there is no resolution loan, and therefore, no interest computation to consider. Rows (3) through (7) only correct goodwill, making no corrections for the delay and value destruction. Row (3) corrects for goodwill, and includes no interest charges on the receivership deficit or interest income on the escrow account. Row (4) corrects for goodwill, uses the short-term monthly moving average Treasury rate to calculate interest on the receivership deficit and on the escrow account, and continues to accrue interest even after principal is completely paid down. Row (5) corrects for goodwill, includes imputed interest in the receivership deficit, uses the government's inappropriate interest rate assumptions, but permits high-cost debt to be paid off first, sets the escrow interest rate at the post-judgment rate, and continues interest accrual in a loan account even after total principal across all loan accounts is completely paid. Row (6) considers the effects of the goodwill adjustment in isolation of all other adjustments discussed above. Row (6) shows that the goodwill adjustment alone, when not combined with any adjustments of interest computations or Congressional delays and value destruction in the resolution, reduces the P&I balance of the receivership deficit by $115.8 million at the end of 2005. For purposes of comparison, rows (7), (8), and (9) present results constructed using the same assumptions as rows (2)', (3)', and (4)' in Table 2.

TABLE 10: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE BUT-FOR THE GOVERNMENT'S ELIMINATION OF SUPERVISORY GOODWILL

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) *Supervisory goodwill restored, and all delays and value destruction removed* | (69.0)* | 156.6 | 244.3 |
| (2) *Supervisory goodwill restored, and minority preference program delay removed* | (39.4)* | 156.6 | 214.8 |
| *Supervisory goodwill restored only* | | | |
| (3) Charge no interest on receivership deficit & charge no interest on escrow | (20.0)* | 156.6 | 195.4 |
| (4) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest continues to accrue after principal paydown | 49.3 | 107.3 | 126.1 |
| (5) Pay off high-cost debt first, charge same interest rates on escrow, & interest continues to accrue after principal paydown | 78.3 | 95.5 | 97.1 |
| (6) No interest calculation methodology changes | 59.6 | 97.0 | 115.8 |
| (7) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest stops accruing when principal across all accounts is paid | 40.5 | 116.0 | 134.8 |
| (8) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing in a single account when that account's principal is paid | 45.1 | 111.4 | 130.3 |
| (9) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing when principal across all accounts is paid | 53.5 | 103.1 | 121.9 |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

## A. Lost Value of Supervisory Goodwill Under Carteret's Receivership

105. I have assessed the value of Carteret's lost supervisory goodwill at two points in time: one year following Carteret's seizure and two years following Carteret's seizure. The receiver required time to realize value from the disposal of Carteret's assets. I measure lost value under two different timing assumptions for how long it would have taken the receiver to do that: December 6, 1993 (the first trading day one year after the seizure), and December 5, 1994 (the first trading day two years after the seizure).

106. I estimate the dollar cost to the receivership of the loss of supervisory goodwill as the result of the government's breach of its agreements with Carteret using two approaches: First, I estimate a cash equivalent value of lost supervisory goodwill, which measures the amounts of cash that, if transferred to the Carteret in December 1993 or December 1994, would have compensated it for the loss of supervisory goodwill as of those dates. Second, I estimate the cost of replacing the lost supervisory goodwill with tangible capital in the form of a common stock offering, either in December 1993 or in December 1994.

**1. Cash Equivalent Value of Goodwill**

107. Based on the goodwill amortization schedule for December 1989 (the last schedule unaffected by the breach), Carteret had \$164,342,326 in unamortized goodwill. (See Table A1 in Appendix A) Under the schedule, by December 6, 1993 Carteret would have had \$128,265,521 in goodwill (using straight-line amortization). Had Carteret received an equivalent amount of cash on that date, it would have had its capital position restored and the receiver would have been able to realize additional value.

108. Unlike goodwill, cash would have provided Carteret with income generating opportunities that goodwill could not have offered. Specifically, the cash could have been invested to generate additional income. Also, unlike goodwill, the cash would not amortize. These two features make cash preferable to goodwill of an equal amount on a savings and loan's balance sheet. The value of these features is an estimate of the value that cash has in excess of supervisory goodwill assuming that the cash was provided at the time of the breach.

109. My analysis of the value of Carteret's supervisory goodwill begins with the contractually promised goodwill balances for the life of the contract through 2011. I estimate that cash principal invested in U.S. Treasury securities would have generated an expected yield of 6.31 percent over the length of the contract based on the yield of 20-year Treasury securities on

December 6, 1993. I choose to invest the principal in U.S. Treasury securities to most accurately replicate the risk characteristics of the contractual goodwill that I am replacing. The ability to use goodwill to count as regulatory capital constituted a promise from the U.S. government. Investing the cash principal in U.S. Treasury securities most clearly matches that promise.

110. The earnings on the invested cash principal I assume would be taxed at a rate of 35 percent. It is my understanding that this is the marginal federal tax rate during the relevant period.[111] In addition to the after-tax earnings, the cash principal could have been offered to investors. The repayment of the cash principal in my model matches the planned amortization of the contractual goodwill. This ensured that Carteret had cash principal only in an amount equal to the amount of contractual goodwill that would have counted towards its capital requirements.

111. In my analysis of the harm suffered by Carteret, I valued the cash flows from the after-tax earnings and the return of principal as of each of the two dates mentioned earlier. An investor interested in acquiring such cash flows would have valued them based on the risk of a preferred stock offering of Carteret at those times (the security which most closely matches the characteristics of those cash flows). My analysis requires an estimate of Carteret's discount rate on preferred stock for valuing the cash flows.

112. I use the tool of regression analysis to quantify how the risk characteristics of savings institutions that raised preferred stock and other fixed-income capital affected their interest costs on that capital around the dates that I wish to measure Carteret's discount rate. The parameters estimated from the regression analysis are then applied to the particulars of Carteret's breached situation to arrive at forecasts of the cost of preferred stock capital. This regression

111. This is conservative to the extent a higher tax rate would have been paid due to local and state taxes.

forecast controls for Carteret's particular risk situation to forecast preferred stock yields at two dates.

113. A number of published academic papers have used regression analysis to understand how a firm's risk situation influences its cost of raising funds from various alternative financial instruments. In this context, regression analysis is a statistical method used to measure the relative contribution of various determinants ("variables") to the overall risk of a given financial instrument as perceived by the capital markets. The theory behind the published research is called the contingent claims pricing theory. I have written or co-written several empirical papers on the pricing of risk in various bank financial instruments.[112] Using the principles and techniques in the published economics literature to determine Carteret's cost of preferred stock capital is a straightforward application of a well-accepted scientific methodology in the profession.

114. In order to have a sufficient number of observations to perform statistical analysis, and since regression analysis can control for many differences, I include in my sample high-yield debt offerings as well as preferred stock offerings issued by savings institutions, resulting in a sample of 33 offerings by thrifts and savings banks in the 1993-1994 period. SDC downloads, SEC filings, and the offering prospectuses provided the financial data on the offerings and the offering institutions.[113]

115. I used regression analysis to estimate (essentially, to "explain") the yield on the 33 offerings. I included several variables to explain the offer yields:

---

112.See, *e.g.*, Charles W. Calomiris and Joseph R. Mason, *Credit Card Securitization and Regulatory Arbitrage*, 26 J. FIN. SERVICES RES. 5 (2004); Charles W. Calomiris and Berry Wilson, *Bank Capital and Portfolio Management: The 1930s Capital Crunch and Scramble to Shed Risk*, 77 J. BUSINESS 421 (2004).

113.For those offerings where prospectuses were unavailable, SEC filings prior to the offering date were used.

a) 20 observations had a debt rating from either Moody's or Standard and Poor's at the time of the offering. Using a pair of variables (one indicating whether the issuer was rated at the time of offering, the other a coded variable of the rating received,[114] if it exists), I accounted for the effect of the issuer's rating on the offer yield;

b) The size of the offering, because smaller offerings should, other things equal, pay higher yields, to compensate for lower liquidity and higher transactions costs per dollar when trading them;

c) The ratio of equity to assets for the offering institution, because a higher ratio (implying lower leverage) should, other things equal, reduce the risk of default on the new offering. The square of this ratio was also used to allow for a non-linear relationship between the ratio and the offering yield (which, in theory, should exist);[115]

d) The ratio of nonperforming assets to total assets,[116] because a thrift with more nonperforming assets is, other things equal, less profitable and more risky and should therefore have to offer higher yields. The square of this ratio (as for the ratio of equity to assets) was also used to allow for a non-linear relationship between the ratio and the offering yield (which, in theory, should exist);

---

114.The "indicating" variable is equal to 1 for rated issues and 0 otherwise. For the coded variable, higher values denote poorer ratings, except for zero, which denotes an unrated issue. In the range of high-yield ratings, the values are: 11 for BBB/baa2 issues, 14 for BB/ba2 issues, 17 for B/b2 issues, 20 for CCC/caa2 issues, 23 for CC/ca2 issues, 26 for C/c2 issues, and 28 for D rated issues. Intermediate ratings (e.g., "+" or "-") fill in the series.

115.A non-linear relationship between the explanatory variable and the yield is one where the effect of changes in the value of the variable on changes in the value of the yield may be different at the high and low ends of the range of the variable.

116.The ratio of nonperforming assets to total assets was calculated in this context as the sum of nonaccrual loans plus REO divided by total assets.

e) A variable[117] indicating whether or not the issue was a convertible preferred offering, because a convertible offering, other things equal, should offer a lower yield, as the investor is otherwise compensated through the option value of an upside return if the enterprise does very well;

f) The duration of the offering (i.e., years to maturity) to account for the fact that longer maturity offerings must compensate investors for making a long-term investment;

g) The Merrill Lynch high-yield debt index, a price index for bonds rated BB and lower,[118] to capture market-wide changes through time in yields (which are inversely related to bond prices) that are unrelated to the specifics of these particular offerings;

h) A variable[119] indicating whether the issuer is a holding company.

The regression results are reported below in Table 11:

117.This variable assumes a value of 1 if the issue is convertible and 0 otherwise. It estimates the average effect of convertibility on the offer yield controlling for the other variables in the model.

118.This rating refers to ratings performed by Standard & Poor's, a ratings agency, which ranks the risk of a given financial instrument at the time of issue from AAA through CC, with AAA being the least risky. Issues with ratings closer to the beginning of the alphabet and containing more letters are less risky, so that, for example, an issue with a rating of BB is considered less risky than one with a rating of B.

119.This variable assumes a value of 1 if the issuer is a holding company and 0 otherwise. It estimates the average effect of an issuer being a holding company on the offer yield controlling for the other variables in the model.

TABLE 11: REGRESSION OF OFFER YIELD

| Variable | Coefficients | Absolute Value of T Statistics | |
|---|---|---|---|
| Issuer is rated | -1.596 | 2.16 | [a] |
| Rating | 0.06 | 1.70 | |
| Log of principal amount | -0.332 | 1.90 | |
| Equity-to-asset ratio | -2.998 | 4.97 | [b] |
| Equity-to-asset ratio squared | 0.215 | 4.79 | [b] |
| Non-performing assets-to-total assets | 0.533 | 3.68 | [b] |
| Non-performing assets-to-total assets squared | -0.034 | 2.18 | [a] |
| Convertible issue | -2.574 | 9.38 | [b] |
| Duration of offering (in years) | 0.024 | 1.81 | |
| Merrill Lynch high-yield debt index | -0.133 | 2.06 | |
| Issuer is holding company | -0.722 | 2.64 | [a] |
| Constant | 32.973 | 5.01 | [b] |
| Number of observations | 33 | | |
| Adjusted R2 | 0.84 | | |

*Notes*:
[a] Significant at 5%.
[b] Significant at 1%.

116. The model explained the offer yields quite well, with an adjusted R-squared[120] of 84 percent. The coefficients have the kind of explanatory effects that one would expect according to economic theory. Rated issuers offer lower yields relative to unrated issuers reflecting the superior information available to investors. Higher rated issuers (i.e., those with lower coded values in my rating variable) offer lower yields. Better-capitalized institutions (with higher equity to assets ratios) can offer lower yields. Convertible offerings offer lower yields. A thrift with more non-performing assets (as a percentage of its total assets) has to offer higher yields. When market yields rise, so do the yields in this sample. Larger offerings have lower yields.

120.A statistical measure of how well the regression fits the data.

117. To predict the preferred stock discount rate for Carteret on December 6, 1993, I took the coefficient estimates from the regression model and multiplied them by the respective values I calculate for Carteret on that date, as shown in Table A2 of Appendix A. Given the distressed condition of Carteret as a result of the breach, its equity was negative, and therefore its ratio of equity to assets was negative. To avoid using an extremely low equity-to-assets ratio that would be outside the range of the sample used to construct these estimates, I calculate my forecast of Carteret's preferred yield using the lowest equity-to-assets ratio in the regression sample in lieu of Carteret's negative ratio. Because a lower equity to assets ratio raises the forecasted yield, bounding Carteret's equity ratio from below by using the lowest value observed in the sample is a conservative procedure. The simulation gives a predicted preferred stock yield of 11.85 percent as a conservative estimate of Carteret's cost of preferred stock capital. As I have described, this is a conservative (low) measure of Carteret's preferred stock discount rate.

118. I ran several other regressions to further check the sensitivity of the results. Including indicator variables for preferred offerings and for cumulative preferred offerings had small effects on the model, their coefficients were imprecisely estimated, and the inclusion of these variables had a small effect on my forecast for Carteret. Modifying the model presented above by excluding some variables tended to explain the data less well and those exclusions had small effects on the forecasted offer yields. The regression reported above had a higher adjusted R-squared than any of the alternatives, as shown in Table A3 in Appendix A. Based on the preceding analyses and the underlying data, I believe the forecasts generated by the model in Table 11 are reasonable and conservative estimates of the appropriate discount rate for my cash equivalents model.

119. In the model shown in Table A4, I use a discount rate of 11.85 percent to calculate the present value of the cash flows available to an investor (which must be subtracted from the opening goodwill balance as of December 6, 1993) would be $83,195,233 at December 6, 1993. That amount can be compared with the amount of the goodwill at the same date ($128,265,521) that, absent the breach, would have been contractually allowed to count as capital at the same point in time. As noted above, this reflects value not available from goodwill, hence the value of goodwill at the time of the breach is the face amount of the goodwill less the value of the cash flows. This amount is $45,070,288.

120. To arrive at a lost value estimate from the firm's perspective under this method, it is appropriate to add any transaction costs from the issuance of a security to investors. I have relied on an article published in the finance literature, as well as my own empirical work in this area, to estimate the cost of issuing such a security.[121] I estimate that the transaction costs would be $3,935,135. Accordingly, the lost value estimated by the model in Table A4, is $49,005,422 ($45,070,288 plus $3,935,135).

121. I estimate the lost value as of December 5, 1994 (two years after the seizure of Carteret) in a similar manner. As shown in Table A2, I estimate a discount rate for Carteret of 13.06 percent (based on the regression forecast) for December 5, 1994. This rate gives a lost value as of December 5, 1994 of $43,450,872 (as shown in Table A5).

**2. Cost of Replacement Based on a Common Stock Issuance**

122. As a separate method for evaluating the lost value of the supervisory goodwill to Carteret, I have constructed a model that is based on the issuance of common stock to replace the contractual goodwill. Common stock issued by Carteret in an amount equal to the contractual

121. Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

goodwill would have counted toward the new capital standards imposed by FIRREA. The common stock would have allowed Carteret to maintain its desired asset and liability mix and achieve the earnings that those assets and liabilities would have generated. The cost of the common stock issued to replace the goodwill is a measure of the lost value.

123. The primary element of the cost is that common stock would require that the issuer provide a return (that I model in the form of dividends) to the stockholders. Contractual goodwill had no such requirement. Also the issuance of common stock would entail transaction costs that the existing contractual goodwill would not incur.

124. Several adjustments are necessary to ensure that the common stock most closely replicates the benefits of the contractual goodwill. First the contractual goodwill was scheduled to amortize so it is necessary to estimate common stock dividends only on the amount of common stock equal to the unamortized balance of contractual goodwill that would have been on Carteret's balance sheet. Second, the proceeds from the common stock could be invested in earning assets. The income from these earning assets is a benefit of the preferred stock, which reduces the costs of common stock vis-à-vis contractual goodwill.

125. Given the amount of common stock that must be issued to replace the entirety of the contractual goodwill, I have again relied on the finance article mentioned previously that provides empirical evidence of the transaction costs of issuing capital. To the transaction costs I add the dividend costs of the common stock. The dividends that would be paid on the hypothetical common stock need to reflect the returns that an investor in Carteret would require.

126. The proceeds from the hypothetical common stock issuance can be invested in earning assets, but they need to be invested in assets with similar risk as contractual goodwill. U.S. Treasury securities are an asset with risk characteristics that are consistent with contractual

goodwill. Consequently, I invest the proceeds from the hypothetical common stock in U.S. Treasury securities, the earnings from which reflect the benefit of the common stock relative to contractual goodwill. These earnings though would be taxed at the marginal rate of Carteret, which as noted earlier, I have estimated to be 35 percent. Taxing the earnings from the invested proceeds is also appropriate because the dividend payments on the hypothetical common stock must be paid from the after-tax net income of the bank. Deducting the benefit associated with the pre-tax earnings of the invested proceeds from an after-tax cost figure would be inconsistent. The after-tax earnings from U.S. Treasury securities partially offset the dividend and transaction costs of the hypothetical common stock. Finally, to value the net costs as of December 6, 1993 and December 5, 1994, I discount the annual net costs at the required return of the hypothetical common stock.

127. I measure the required return that holders of Carteret common stock would demand in two ways. One measure of Carteret's discount rate for equity capital is the rate implied by the standard capital asset pricing model (CAPM). That model computes the return required on equity capital as the sum of the risk-free rate of return and an equity risk premium that takes into account the extent to which the firm's stock value moves with the market (beta). The required return on equity, according to this model, is the sum of the risk-free rate of return plus beta times the equity risk premium for the overall market. According to Ibbotson Associates, the median required rate of return on equity, using this formulation, for depository institutions in 1994 was 14.39 percent, and the median beta for depository institutions in 1994 was 0.88.[122]

---

122. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1994 YEARBOOK 6-4.

128. Ibbotson calculates an overall market equity risk premium in 1994 of 7.2 percent, which is based on historical experience and may be larger than the forward-looking equity risk premium.[123] In my opinion, based on my experience as a financial economist, a 6 percent equity risk premium would be a conservative forward-looking estimate for 1994. Combining that conservative equity risk premium with a conservative estimate for beta of 0.88 implies a conservative estimated required rate of return on equity for savings institutions in December of 1993 of 11.59 percent. That is the result of adding 6.31 percent (the risk-free rate of interest, which I define as the yield on a 20-year Treasury bond) and the requisite risk premium, which I estimate at (0.88) x 6 percent. I consider 11.59 percent to be a highly conservative measure of the cost of equity capital (and thus the discount rate) for Carteret in December 1993.

129. I also apply CAPM to Carteret's situation on December 5, 1994. In 1995, the first year in which Ibbotson reports a separate figure for savings institutions, Ibbotson reports a median beta for savings institutions of 1.44, and a median beta for depository institutions of 1.03.[124] These values of beta would result in higher estimated discount rates for Carteret, so to be conservative I continue to use the beta of 0.88 reported for 1994. Combining this with the conservative equity risk premium of 6 percent and a risk-free rate of 8.04 percent (based on a 20-year Treasury rate for December 5, 1994) implies a conservative discount rate for Carteret's equity of 13.32 percent.[125]

---

123. IBBOTSON ASSOCIATES, STOCKS BONDS BILLS AND INFLATION, 1994 YEARBOOK 146.

124. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1995 YEARBOOK 6-4, 6-12.

125. This estimate is highly conservative relative to other plausible estimates of the cost of capital. In 1995, the first year in which Ibbotson reports a separate figure for savings institutions, the median required rate of return for savings institutions was 17.61 percent, and for depository institutions as a whole, it was 14.75 percent. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1995 YEARBOOK 6-4, 6-12.

130. The costs of replacement that result using these values are $45,894,763 for December 6, 1993 (shown in Table A6) and $41,607,791 for December 5, 1994 (shown in Table A7).

131. I also estimate the required return for holders of Carteret common stock a second way. I conservatively equate the cost of common stock issuance with the cost of preferred stock issuance. Common stock, as a less senior capital instrument, would be more expensive to issue than preferred stock because of its higher risk, higher underwriting costs, and adverse-selection costs.[126] Therefore, the results from the common stock model using the preferred stock yield as the measure of the required return for common equity provide conservative measures of replacement costs incurred from the lost goodwill. I forecast the conservative measure of the cost of common stock for Carteret using the regression model developed in the cash equivalence value estimates above, and use the resulting yields of 11.85 percent (for December 6, 1993) and 13.06 percent (for December 5, 1994) in the cost of replacement model. The replacement cost values that result using these assumptions are $46,902,294 for December 6, 1993 (shown in Table A8) and $40,747,845 for December 5, 1994 (shown in Table A9).

### 3. Summary

132. Table 12 summarizes the results of my analysis. As of December 6, 1993, the value of Carteret's lost supervisory goodwill was between $45.9 million and $49.0 million. As of December 5, 1994, the value of Carteret's lost supervisory goodwill was between $40.7 million

---

126. For a theoretical proof that adverse-selection costs (in the form of adverse pricing effects for new issues) are more severe for common stock than for preferred stock, see Stewart C. Myers & Nicholas S. Majluf, *Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have*, 13 J. FIN. ECON. 187 (1984); for evidence see Christopher M. James & Peggy Wier, *An Analysis of FDIC Failed Bank Auctions*, 20 J. MONETARY ECON. 141 (1987). For evidence on the underwriting costs of the two types of securities, see Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996), and Charles W. Calomiris & Charles P. Himmelberg, *Investment Banking Costs as a Measure of the Cost of External Finance*, Working Paper, Columbia Business School, revised May 2001.

and $43.5 million. I emphasize that my estimates of the value of lost supervisory goodwill depend upon assumptions about the cost of raising preferred stock and equity. In calculating the cost of raising preferred stock I assume a higher net worth for Carteret than its actual net worth, which conservatively lowers the estimated cost. My calculations for the cost of equity capital in the replacement cost models either conservatively equate the cost of equity capital with the cost of raising preferred stock or assume a low market equity premium and a low value of beta. Furthermore, market conditions for raising equity or preferred stock for thrifts in the U.S. in the late 1980s and early 1990s were very challenging. The severe losses experienced by many thrifts made many investors wary of investing in thrifts. My conservative estimates of the value of Carteret's lost supervisory goodwill do not constitute an opinion that it would have been possible for Carteret to raise preferred stock or equity capital at the low costs assumed in my calculations.

TABLE 12: ESTIMATES OF CARTERET'S LOST VALUE FROM THE LOSS OF GOODWILL

| | 12/6/1993 | | |
|---|---|---|---|
| Method for Estimating Cost of Capital | Cost of Capital | Lost Value Amount using Cash Equivalents Model | Lost Value Amount using Cost of Replacement Model |
| CAPM [1] | 11.59% | – | $45,894,763 |
| Regression-Based Estimate [2] | 11.87% | $49,005,422 | $46,902,294 |

| | 12/5/1994 | | |
|---|---|---|---|
| Method for Estimating Cost of Capital | Cost of Capital | Lost Value Amount using Cash Equivalents Model | Lost Value Amount using Cost of Replacement Model |
| CAPM [3] | 13.32% | – | $41,607,791 |
| Regression-Based Estimate [2] | 13.09% | $43,450,872 | $40,747,845 |

*Notes*:
[1] The 20-Year Treasury Rate on 12/6/93 is 6.31%. According to Ibbotson Associates, the median beta for depository institutions in 1994 was 0.88. Using this beta and an equity risk premium of 6% the cost of equity capital was calculated using the CAPM.
[2] Q3 1993 Carteret Bancorp financial data was used for 12/6/93 and Q4 1993 Carteret Bancorp financial data was used for 12/5/94. Note that the values for the total equity to total assets ratio was set to the minimum of the sample.
[3] The 20-Year Treasury Rate on 12/5/94 is 8.04%. According to Ibbotson Associates, the median beta for depository institutions in 1994 was 0.88. Using this beta and an equity risk premium of 6% the cost of equity capital was calculated using the CAPM.

133. To be conservative, in estimating the effect on the receivership deficit from the elimination of goodwill, I add the lowest estimates of goodwill from my models ($45.9 million as of December 6, 1993 and $40.7 million as of December 5, 1994) to the total sales proceeds (deposit premium plus assets sold, minus settlement interest) for Carteret's branch sales, which makes additional funds available to the receivership for the resolution. I use the December 1993 estimate of goodwill when estimating the combined effect of goodwill and all delays and value destruction by the government on the receivership deficit. I use the December 1994 estimate of goodwill when estimating the effect of goodwill alone, and when estimating the combined effect of goodwill and the delay resulting only from the minority preference program. Under the

assumption that goodwill is the only adjustment that is made, I assume that branch sales would have occurred at the time they actually occurred. Because the branch sales actually occurred in October 1994, January 1995, and March 1995, the timing of the December 1994 estimate of goodwill occurs in the middle of the actual dates of the branch sales. When estimating the effect of goodwill alone, I allocate the value of goodwill to each of the three resolutions on the date of the first dividend to the loans (April 20, 1995) on a pro rata basis based on the total sales proceeds from the resolutions.[127] The reason that I use the December 1994 estimate of goodwill when estimating the combined effect of goodwill and only the delays in sales from the minority preference program is that all branch sales would have occurred in October 1994 but-for the minority preference program, as I discussed in Section II. I assume that the additional adjustment to goodwill would not have changed the timing of those branch sales. Likewise, the reason that I use the December 1993 estimate of goodwill when measuring the combined effect of goodwill and all delays and value destruction is that all branches would have been sold together in December 1993 but for the delays and value destruction.

134. As shown in row (6) of Table 10, the receivership deficit's P&I balance would have been $59.6 million lower than the FDIC's inappropriate estimate of that balance as of the end of 2005 when correcting for the elimination of supervisory goodwill and without making any

---

127.Given the goodwill adjustments and the actual dividends to the receivership, the principal is paid down at different points in time for each of the three loans. Because principal is never paid down in the actual loans, I made certain assumptions about how the dividends would have been allocated to the loans with remaining principal balances in order to measure the effects in the but-for world considering only the effects of goodwill. (No loan is required when goodwill adjustments are combined with delay adjustments). In the scenario in row (5) of Table 10, I assume that once the highest-cost loan's principal and interest balance is completely paid, dividends that were allocated to that loan in the actual scenario would be allocated to the next highest-cost loan with remaining principal and interest balance. In the scenario in row (6) of Table 10, I assume that once a loan's principal balance is completely paid, dividends that were allocated to that loan in the actual scenario would be divided among the loans with remaining principal balances on a pro rata basis based on the initial principal balances for those loans with remaining principal balances. Rows (3) and (4) do not require any similar assumptions because interest rates do not vary across the three loan accounts within the assumptions of each of those rows. In the scenario in row (8) of Table 10, I assume that once the highest-cost loan's principal balance is completely paid, dividends that were allocated to that loan in the actual scenario would be allocated to the next highest-cost loan with remaining principal balance.

interest calculation or delay adjustments. When the appropriate interest calculation adjustments are made, the receivership deficit's P&I balance is negative and is $195.4 million lower than the government's estimates (row (3) of Table 10). But-for the elimination of supervisory goodwill, all delays and value destruction of the receivership, and the inappropriate interest calculations, Carteret's receivership deficit would have been $244.3 million lower than the government's estimate as of the end of 2005.

## B. The Government's Unexpected Elimination of Supervisory Goodwill Corresponds with a Decrease in the Value of AmBase

135. To further investigate the cost of the elimination of goodwill, I performed an event study of the effect on the market value of AmBase of the news relating to the elimination of supervisory goodwill. Evidence from event studies must be interpreted carefully. For one to be able to draw a connection between an announcement and a stock market reaction, it must be clear that the announcement represents news (i.e., that it was not known in advance). Furthermore, announcements do not always indicate the certainty of an outcome, but rather its increased or decreased likelihood. Both of these facts imply that observed stock market returns around the announcement of news will tend to understate the true consequence of that news for market value. That is, only if the announcement were entirely unanticipated, and if the outcome were certain, would the observed reaction provide a full measure of market consequence. Nevertheless, event studies can be useful to corroborate other estimates, particularly in the instant case, where news about the effects of FIRREA on Carteret can be dated with reasonable certainty.

### 1. Using the Capital Asset Pricing Model to Value Goodwill

136. Supervisory goodwill is an intangible asset. The values of both tangible and intangible assets are reflected in the market value of stock. Effects on market value related to

news events are measured through an event study, which uses CAPM to predict the "normal" return of a stock based on observed risk-free rates and current market performance. The difference between the estimated normal return and the actual return is defined as an "abnormal" return, which can therefore be attributed to unique events experienced by the firm.

137. The first step in the event study is estimating the CAPM for AmBase's stock returns, adjusted for dividends. The CAPM is given by the following equation:

[3] $R_t = R_{ft} + \alpha + \beta(R_{mt} - R_{ft}) + \varepsilon_{it}$,

where $R_t$ represents the return to AmBase[128] on day $t$, $R_{mt}$ represents the return to the S&P 500 Index on day $t$, $R_{ft}$ represents the risk-free rate, as measured by the nominal 30-year Treasury bond rate[129] on day $t$, and $\varepsilon_{it}$ represents the residual, or the "abnormal return." The estimate of $\alpha$, or "alpha," is the average rate of return AmBase's stock would expect on a day when the S&P 500 index realized a zero return. The estimate of $\beta$, or "beta," represents the sensitivity of AmBase's returns to general market movements, or its "systematic risk."

138. Using the CAPM model, I estimate an alpha of 0.0020 and a beta of 0.3478 using the ordinary least squares method for Equation 1 over a 100-trading-day estimation period (which is $t = -150$ to $-50$, where $t = 0$ is May 22, 1989, the date of the OTS report warning that removal of goodwill from Carteret's regulatory capital would leave it critically undercapitalized).

139. Consider now an unexpected announcement on an event day. I consider three windows in which to measure the market's reaction to the announcement. The first is a one-day window that considers the abnormal returns solely on the event day itself. The second is a

128.Dividend payments are counted as returns to a particular stock on the ex-dividend date.

129.The CAPM model used in calculating the value of goodwill earlier in this section uses the 20-year Treasury rate as the risk-free rate. However, the 20-year Treasury bond rate is not available for the dates on which the CAPM model is estimated for this event study or for the event study discussed later in my report. Therefore, I use the 30-year Treasury rate as the risk-free rate in my event study calculations.

window of three days, from one day before the announcement to a day after the announcement. The third is a window of eleven days, from five days before the announcement to five days after the announcement. For each window, I compute the cumulative abnormal returns for that period. Finally, for each window, I compute the standard errors of the abnormal returns by using information covering the 100-day estimation period.

### 2. AmBase Experienced a Significant Abnormal Return During the Time Period of the OTS's Warning that Removal of Goodwill from Carteret's Regulatory Capital Would Leave It Critically Undercapitalized

140. The OTS warning was the first clear indication that Carteret would be substantially negatively affected by the anticipated implementation of FIRREA on August 9 of that year. Table 13 shows the cumulative abnormal returns of AmBase over the one, three, five, seven, and eleven-day windows surrounding the OTS announcement event on May 22, 1989.

TABLE 13: CUMULATIVE ABNORMAL RETURNS FOR AMBASE FOR OTS WARNING ABOUT REMOVAL OF GOODWILL

| Event Window | Cumulative Abnormal Daily Stock Returns | Z-Statistic | (Cumulative Abnormal Return) x (Market Value on Day Preceding Event Window) |
|---|---|---|---|
| 1-Day | –1.2% | –0.71 | –$5.6 million |
| 3-Day | –6.4%** | –1.98 | –29.1 million |
| 5-Day | –8.0%* | –1.81 | –$36.2 million |
| 7-Day | –12.1%*** | –2.28 | –$56.0 million |
| 11-Day | –14.0%*** | –2.07 | –$65.3 million |

*Note*: * Significant at 10 percent level ; ** Significant at 5 percent level; *** Significant at 1 percent level.
*Sources*: Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal); CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006. Used with permission. All rights reserved. www.crsp.chicagogsb.edu.

As Table 13 shows, AmBase's stock price had an abnormal return of -1.2 percent on May 22, 1989, the date of the OTS warning. However, the warning may have occurred after the market closed. The actual stock price decreased from $13.125 on May 19 to $13 on May 22, but then decreased to $12.5 on May 23. Therefore, market participants may not have been aware of the warning until after the market closed on May 22. The cumulative abnormal returns over longer event windows show a substantial reaction by the market to the warning. In the three days

preceding and following the OTS warning, AmBase experienced a negative abnormal return of -12.1 percent, which, at an initial share price of $13.5 with 34,192,000 shares outstanding, amounts to a market value loss of $56.0 million. Extending the window to eleven days (five days before and after the announcement), AmBase experienced a negative abnormal return of -14.0 percent, which, at an initial share price of $13.625 with 34,192,000 shares outstanding, amounts to a market value loss of $65.3 million.

141. Apparently, the May 22, 1989 OTS examination report date marks the beginning of the OTS's action regarding Carteret's supervisory goodwill. While that action was not revealed officially, to my knowledge, nonetheless it is quite possible that news of the OTS's action reached the marketplace. Furthermore, additional news about the evolution of FIRREA and its treatment of supervisory goodwill as it worked its way through Congress occurred in the same week as the date of the OTS report. On May 24, the date of the defeat of the House Judiciary Committee amendment discussed above, AmBase experienced a negative abnormal return of –1.3 percent (a $5.6 million reduction in market value). In the eleven-day window around May 24, AmBase experienced a negative abnormal return of –10.2 percent (a $47.0 million reduction in market value). And, subsequent news about FIRREA's evolution prior to its passing the House of Representatives likely affected AmBase's market value. To take these factors into account, I consider an expanded event window which begins on May 15 and ends on June 15, 1989 (the day FIRREA passed the House of Representatives). Cumulative abnormal returns over this extended window totaled -8.6 percent, implying a loss of value of $40.0 million.

142. Thus, the estimated losses based on the various event windows considered above range from $5.6 million to $65.3 million. Note, however, that even the approximately $65 million market value loss during the eleven-day window surrounding May 22, 1989 reflected

only the *probable* implementation of the full weight of the FIRREA supervisory goodwill restrictions. The reason the market did not yet fully anticipate the full weight of the goodwill restrictions is that there existed a number of lawsuits already challenging the goodwill reduction, and several banks and thrifts were officially excluded from the provisions during (at least) the period of implementation. In the case of Carteret, on May 3, 1991, "...the New Jersey court issued a preliminary injunction barring the OTS from removing supervisory goodwill from Carteret's capital calculation pending a hearing on the merits of the suit."[130]

143. Thus, the market reaction to the apparent risk of the loss of Carteret's supervisory goodwill in May and June 1989 represents a lower bound estimate of the value of supervisory goodwill to Carteret in 1989. The large magnitude of the market reaction around the OTS warning provides corroborating evidence for the conservative estimates provided in Table 13, especially in light of the considerable uncertainty about the implementation of FIRREA in mid-1989.[131]

## IV. THE RTC'S MISHANDLING OF CARTERET'S MORTGAGE ORIGINATION UNIT INFLATED THE RECEIVERSHIP DEFICIT

144. Prior to the government's seizure of Carteret, Carteret maintained a thriving mortgage origination subsidiary, the Carteret Mortgage Company ("CMC"). Specifically, in

130. *OTS Employs New Approach To Enforce Net Worth Pacts; It Uses Administrative Procedures*, THE THRIFT REGULATOR, May 3, 1991, at *1.

131. While Carteret's injunction was overturned in an appellate court ruling May 7, 1992, by March 1, 1993, "...Office of Thrift Supervision officials [said] they've let thrifts count supervisory goodwill as capital on eight previous occasions and therefore a similar break they've given a Virginia thrift now is nothing special." "The eight thrifts the OTS pointed to as having been allowed to count their goodwill as capital are: Olympia Federal Savings and Loan in Berwyn, Ill.; Security Federal Savings and Loan in Albuquerque, N.M.; Security Savings and Loan Assn. in Jackson, Miss.; Guaranty Federal Savings Bank in Warner Robins, Ga.; Carteret Savings Bank FA in Newark, N.J.; Security Federal Savings Bank of Florida in Panama City, Fla.; Hanson Savings Bank SLA in Hammonton, N.J.; and Sterling Savings Assn. of Spokane, Wash., an OTS spokesman said." *OTS Let Goodwill Be Capital 8 Times Before Charter Case*, THE THRIFT REGULATOR, Mar. 1, 1993, at *1.

November 1992, CMC originated more than $100 million of loans.[132] In the eleven months immediately prior to seizure, CMC had originated almost a billion dollars of loans.[133]

145. Inexplicably, the RTC simply shut down this operation. On December 14, 1992, Carteret announced that it was no longer accepting applications for home mortgages.[134] Later that month, Imperial Credit Industries Inc., a mortgage banker in Newport Beach, CA, hired most of CMC's staff in order to expand its business to New Jersey and Florida without acquiring any of CMC's assets or debts.[135] As of December 1993, CMC had no operating assets, no employees, and no known assets outside of its inter-company receivables.[136]

146. Had the RTC sold the mortgage origination business instead of shutting it down, and thereby inducing its employees to walk out the door, the proceeds from that sale would have added to the liquidation value of Carteret. I estimate the value of CMC as of the date it should have been sold using two approaches. First, I consider the value that the stock market attached to the hiring of almost all of CMC's origination staff by Imperial, which I show was substantial. Second, I estimate the value of Carteret's origination business in light of the market value of comparable sales in 1993.

147. The failure to sell CMC inflated the receivership deficit by depriving the receivership of funds that would have reduced the need to borrow from the government or accelerated the repayment of any loans. CMC could have been marketed and could have been part of a whole bank sale at the end of 1993. Table 14 summarizes my estimates of the effect of

---

132.Carteret Mortgage Company, Monthly Production Report, Nov. 30, 1992 (CAM4350395).

133.Memorandum from Donna Cribbs & William Bailey to James Mindnich, Dec. 7, 1992 (C-AM-A-0399086).

134.*Mortgage Cutoff at Bank*, N.Y. TIMES, Dec. 14, 1992, at *1.

135.*Imperial Credit Expands Easy Way Lending: Newport Beach mortgage banker diversifies by taking on 90 staff members of a failed New Jersey thrift*, L.A. TIMES, Dec. 29, 1992, at D7; *Imperial Credit Hires Most of Failed Carteret's Originations Staff*, AM. BANKER, Jan. 15, 1993, at 7; E-Mail from Carol L. Weatherly, RTC, to Susan V. Hamilton, RTC, (Jan. 12, 1993, 14:52:32 EST) (C-AM-A-0061391).

136.C-AM-A-0068230, 68172, 68201.

this failure to sell CMC on the receivership deficit. Table 14 shows both the isolated effect on the receivership of shutting down CMC, and the effect of the shutdown combined with the other adjustments I have described above (interest calculations, government delay and value destruction, and elimination of supervisory goodwill.) Row (1) corrects for the shutdown of CMC, the elimination of supervisory goodwill, the delays and value destruction, and the inappropriate inclusion of the time value of money from the receivership deficit calculation. This is my preferred estimate of the effect of correcting simultaneously for interest rate errors, delays and value destruction in the sale of branches, the elimination of supervisory goodwill, and the shutdown of CMC. Under these but-for adjustments, the receivership would have never required a loan, and would have been in surplus by $87.4 million as of the end of 2005. The other rows consider alternate combinations of corrections similar to the combinations performed in Table 10. The isolated effect of the RTC's failure to sell CMC on the receivership deficit was at least $37.3 million (row (12)). For purposes of comparison, rows (13), (14), and (15) present results constructed using the same assumptions as rows (2)', (3)', and (4)' in Table 2 under the but-for scenario correcting for both the elimination of supervisory goodwill and the failure to sell CMC. In addition, rows (16), (17), and (18) present results constructed using the same assumptions as rows (2)', (3)', and (4)' in Table 2 under the but-for scenario correcting for only the failure to sell CMC.

TABLE 14: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE BUT-FOR THE GOVERNMENT'S SHUTDOWN OF CARTERET MORTGAGE COMPANY

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) *Mortgage origination unit sold, supervisory goodwill restored, and all delays and value destruction removed* | (87.4)* | 156.6 | 262.8 |
| (2) *Mortgage origination unit sold, supervisory goodwill restored, and minority preference program delay removed* | (57.8)* | 156.6 | 233.2 |
| *Mortgage origination unit sold and supervisory goodwill restored* | | | |
| (3) Charge no interest on receivership deficit & charge no interest on escrow | (38.4)* | 156.6 | 213.8 |
| (4) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest continues to accrue after principal paydown | 21.6 | 135.0 | 153.8 |
| (5) Pay off high-cost debt first, charge same interest rates on escrow, & interest continues to accrue after principal paydown | 43.0 | 113.5 | 132.4 |
| (6) No interest calculation methodology changes | 33.0 | 123.6 | 142.4 |
| (7) *Mortgage origination unit sold and all delays and value destruction removed* | (41.5)* | 156.6 | 216.9 |
| (8) *Mortgage origination unit sold and only minority preference program delay removed* | (17.1)* | 156.6 | 192.4 |
| *Mortgage origination unit sold only* | | | |
| (9) Charge no interest on receivership deficit & charge no interest on escrow | 2.3 | 156.6 | 173.1 |
| (10) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest continues to accrue after principal paydown | 83.0 | 73.8 | 92.4 |
| (11) Pay off high-cost debt first, charge same interest rates on escrow, & interest continues to accrue after principal paydown | 121.2 | 77.9 | 54.2 |
| (12) No interest calculation methodology changes | 138.1 | 18.9 | 37.3 |
| *Mortgage origination unit sold and supervisory goodwill restored* | | | |
| (13) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest stops accruing when principal across all accounts is paid | 16.6 | 140.0 | 158.8 |
| (14) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing in a single account when that account's principal is paid | 20.8 | 135.8 | 154.6 |
| (15) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing when principal across all accounts is paid | 27.4 | 129.1 | 148.0 |
| *Mortgage origination unit sold only* | | | |
| (16) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest stops accruing when principal across all accounts is paid | 83.0 | 73.8 | 92.4 |
| (17) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing in a single account when that account's principal is paid | 75.6 | 81.0 | 99.8 |
| (18) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing when principal across all accounts is paid | 87.0 | 69.6 | 88.4 |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

## A. Valuing Carteret Mortgage Company Using the Abnormal Returns for Imperial Credit Industries

148. The stock market's reaction to Imperial's hiring of CMC's staff gives significant insight to the market value of CMC. Because the value of a mortgage origination company consists almost entirely of intangible assets associated with the knowledge, efficiency, and

teamwork of its staff, the increase in Imperial's market value upon hiring CMC staff is a reasonable measure of the value of CMC.

149. Imperial's hiring of CMC staff was expected to add $1 billion to Imperial's annual originations (which were $3.2 billion in 1992) and about 90 production employees.[137] Imperial claimed at the time of the hiring that the staff had "business relationships that would have taken us years to develop" and would enable Imperial to diversify its business by moving into areas of the country in which it lacked presence.[138] An analysis of Imperial's abnormal returns surrounding the date of the hiring announcement reveals that the market perceived the hiring to substantially increase the value of Imperial. I estimate this impact using an event study of Imperial's stock price.

150. Using the CAPM model, I estimate an alpha of 0.0004 and a beta of 2.3203 using the ordinary least squares method for Equation 1 over a 100-trading-day estimation period (which is $t = -150$ to $-50$, where $t = 0$ is December 28, 1992, the date of the announcement of Imperial's hiring of CMC's staff).[139]

151. On the trading day preceding Imperial's announcement, December 24, 1992, Imperial's stock closed at an adjusted price of $3.374. At the end of trading on December 28, Imperial's stock closed at an adjusted price of $3.994—an increase of 18 percent. Table 15 shows the cumulative abnormal returns of Imperial over the one, three, and five-day windows surrounding the hiring announcement event on December 28.

137. *Imperial Credit Expands Easy Way Lending: Newport Beach mortgage banker diversifies by taking on 90 staff members of a failed New Jersey thrift*, L.A. TIMES, Dec. 29, 1992, at D7.
138. *Id.*
139. *Id.*

TABLE 15: CUMULATIVE ABNORMAL RETURNS FOR IMPERIAL CREDIT INDUSTRIES FOR HIRING CARTERET MORTGAGE COMPANY'S STAFF

| Event Window | Cumulative Abnormal Daily Stock Returns | Z-Statistic | (Cumulative Abnormal Return) x (Market Value on Day Preceding Event Window) |
|---|---|---|---|
| 1-Day | 18.7%*** | 5.65 | $20.0 million |
| 3-Day | 16.9%*** | 2.98 | $18.4 million |
| 5-Day | 28.1%*** | 3.98 | $29.5 million |
| 7-Day | 29.2%*** | 3.59 | $31.8 million |
| 11-Day | 19.5%* | 2.10 | $20.8 million |

*Note*: * Significant at 10 percent level ; ** Significant at 5 percent level; *** Significant at 1 percent level.
*Sources*: Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal); Compustat.

152. As Table 15 shows, all of the cumulative abnormal returns were statistically significant. The effect of the hiring announcement on Imperial's market value on the announcement date was $20.0 million. If one considers that the market adjusted for the effects of the hiring announcement throughout the seven trading days surrounding the announcement of the hiring, then the hiring of CMC's staff increased Imperial's market value by $31.8 million. If the market valued Imperial's hiring of CMC's staff and accompanying business relationships as being worth between $18 million and $32 million, as Table 15 shows, then the RTC could have sold CMC for a similar amount had it not chosen to simply shut down the unit after seizing Carteret.

**B. Using Comparable Sales to Estimate the Value Destroyed by the Government's Shutdown of Carteret's Mortgage Origination Unit**

**1. Sales of Comparable Mortgage Businesses During the Time of Carteret's But-for Resolution**

153. In addition to the event study above, I analyze the value of Carteret's mortgage origination business by comparing the value of Carteret's entire mortgage business to the observed value of other comparable mortgage businesses acquired in the second half of 1993, the period when a sale of Carteret's mortgage business might have been executed had the receiver taken steps to do so. By estimating the value of Carteret's whole mortgage business, and knowing that the realized value from the sale of its servicing business in 1994 was $61.7

million,[140] I can infer the value lost to the receivership by failing to sell the origination business by subtracting $61.7 million from the estimated value of the combined origination and servicing business.

154. To collect a sample of comparable transactions, I considered acquisitions of mortgage banking institutions that occurred in the second half of 1993 and for which a public filing (in the form of a 10-K filing with the SEC) was available that contained servicing portfolio and mortgage origination information related to the transaction. This was to confirm that the acquired institutions, like Carteret, performed both activities. I examined acquisitions where the transaction value was greater then $25 million.[141] Two acquisitions satisfied these criteria: First Tennessee National Corp.'s acquisition of Maryland National Mortgage Corp. on October 1, 1993 (for $114 million) and PNC Bank Corp.'s acquisition of Sears Mortgage Corp. (and related entities) on November 30, 1993 (for $328 million).

155. To use these transactions to calculate the value of Carteret's mortgage business, I first calculate the ratios of the transaction values to the sizes of the servicing portfolios of the acquired institutions. (See Table 16) When acquired, Maryland National Mortgage Corp. included $41 million in tangible net assets.[142] I exclude this amount from the acquisition value ($114 million) to arrive at a valuation figure ($73 million) that reflects the value of the underlying servicing and origination businesses. Using this adjusted value, and the value for the acquisition of Sears Mortgage Corp., I calculate the valuation ratios.[143]

---

140.CAM766 1599-1609.

141.I used a search of the SDC (Securities Data Company) database to identify acquisitions for my sample. I identify "mortgage banking" institutions by selecting transactions whose primary SIC code was 6162 ("Mortgage Bankers and Loan Correspondents").

142.First Tennessee National Corp. 1993 10-K, at 43.

143.PNC's acquisition of Sears included $7.6 billion in consumer assets in addition to Sears's mortgage origination business and servicing portfolio. *See* PNC Bank Corp. 1993 10-K, at 1. I do not adjust the transaction

TABLE 16: MORTGAGE BANKING ACQUISITIONS WITH KNOWN SERVICING PORTFOLIO SIZES AND ORIGINATION FLOWS SECOND HALF OF 1993

| Date Effective | Acquisition | Value of Transaction ($ millions) [a] | | Servicing Portfolio ($ billions) [b] | | Transaction Value / Servicing Portfolio [c] = [a] / [b] |
|---|---|---|---|---|---|---|
| November 30, 1993 | Sears Mortgage Corp. (acquired by PNC Bank Corp.) | $328.0 | | $27.0 | [1] | 1.21% |
| October 1, 1993 | Maryland National Mortgage Corp. (MNC Financial Inc.) (acquired by First Tennessee National Corp.) | $73.0 | [2] | $4.4 | [3] | 1.66% |

*Notes*:
[1] PNC Bank Corp. 1993 10-K, at 1.
[2] First Tennessee National Corp.'s acquisition of Maryland National Mortgage Corp. included $41 million in tangible net assets. See First Tennessee National Corp. 1993 10-K, at 43. I exclude this amount from the acquisition value ($114 million) to arrive at a valuation figure ($73 million) that reflects the value of the underlying servicing and origination businesses.
[3] First Tennessee National Corp. 1993 10-K, at 43.
*Sources*: SDC; SEC filings.

**2. Estimating the Value of Clearwater's Servicing Portfolio at the Time Carteret Mortgage Company Should Have Been Sold**

156. Carteret operated a separate division, located in Clearwater, Florida, that handled Carteret's mortgage portfolio servicing operation.[144] From 1990 to 1992, the Clearwater Operation handled new loan production volumes of nearly $1 billion per year, as well as sales of servicing originated loans totaling $1.5 billion.[145] By December 31, 1992, the Clearwater Operation was servicing 115,000 loans with an outstanding principal balance of $7.2 billion.[146] Because Clearwater obtained almost all of its loan servicing business from mortgages originated by CMC, its portfolio shrank significantly upon the shutdown of CMC.

value of the Sears acquisition to account for these assets, though, because the acquisition had no effect on PNC's net worth due to PNC's assumption of Sears's liabilities. *See* PNC Bank Corp., Sept. 30, 1993 10-Q, Exhibit 28.2, at 2.

144. C-AM-A-0285916.

145. CAM3990266.

146. C-AM-A-0026931.

157. Upon seizing Carteret and the Clearwater Operation, the RTC was bound to follow Circular 9322.3 "Mortgage Servicing Rights Disposition."[147] The directive applied when the association in conservatorship or receivership, or one of its subsidiaries, owned servicing rights for third party investors.[148] Pursuant to the policy set out in the Circular, the RTC set out to dispose of the Clearwater Operation "in the most efficient and expeditious manner possible."[149] The Circular, in setting out the time frame for disposition, dictated that bids on the "portfolios must be received within 135 days from the date of the conservatorship."[150] However, due to a "contracting holdup," the timeline for the Clearwater Operation disposition was revised.[151]

158. Table 17 is a chronological chart of the outstanding loans and principal balance of the Clearwater Operation.

147.RTC Directive System, Circular 9322.3, Sept. 20, 1991 (CAM4051352 – 71).
148.*Id.* at CAM4051352.
149.*Id.*; CAM5380820.
150.*Id.* at CAM4051357.
151.C-AM-A-0090193.

TABLE 17: CLEARWATER OPERATION OUTSTANDING LOANS AND PRINCIPAL BALANCE

| Month | Number of Loans | Principal Balance (000) |
|---|---|---|
| Feb-93 | 112,884 | $7,082,648 |
| Apr-93 | 108,747 | $6,779,406 |
| Jun-93 | 102,749 | $6,364,745 |
| Aug-93 | 97,609 | $5,985,762 |
| Sep-93 | 94,438 | $5,727,298 |
| Oct-93 | 80,687 | $4,548,865 |
| Nov-93 | 77,940 | $4,347,216 |
| Dec-93 | 74,933 | $4,134,942 |
| Jan-94 | 72,920 | $3,996,122 |
| Feb-94 | 71,246 | $3,879,023 |
| Mar-94 | 70,392 | $3,829,107 |
| Apr-94 | 67,581 | $3,643,354 |
| May-94 | 66,258 | $3,562,550 |
| Jun-94 | 65,234 | $3,498,424 |

*Sources*: CAM4350579, C-AM-A-0134548, C-AM-A-0026662, C-AM-A-0172648, CAM4180090, CAM3991741, CAM3991743, CAM4350677, CAM3991768, CAM3991342, CAM3991393, CAM3991361, CAM3991368, CAM3991370, CAM3991391, C-AM-A-0134769, C-AM-A-0172650, CAM4350675.

Among other reasons, the attrition rate of the staff appears to have hampered the effectiveness of the Clearwater Operation.[152] In addition, CMC's closure shut down a primary source of loans for servicing.

159. Reserve Financial concluded, on January 20, 1994, that a reasonable market value expectation of the unpaid principal balance of Clearwater's servicing portfolio would be between 0.75 percent and 0.85 percent.[153] Four bids, which were based upon the March 1994 portfolio numbers, were received by May 1, 1994.[154] Chase Home Mortgage Company was the highest bidder out of the four bidders with a total purchase price of $63,835,851.[155] On the week of June 13, 1994, Chase performed due diligence on the Clearwater Operation.[156] On June 30, 1994, Clearwater was sold to Chase for 1.12 percent of the servicing portfolio, valued then at $3.3

152. C-AM-A-0026449, C-AM-A-0285916.
153. C-AM-A-0027402.
154. C-AM-A-0027032.
155. C-AM-A-0027032.
156. CAM4080730.

billion (a handful of loans appear not to have been sold).[157] On July 1, 1994, Chase wired $59,995,527.65 to Carteret for the purchase of the Clearwater Operation.[158] Net proceeds for the sale were $61,717,185.[159]

### 2. Estimating the Value of Carteret Mortgage Company at the Time It Should Have Been Sold Using Clearwater's Sales Value and Comparable Mortgage Businesses

160. By the end of 1992, Carteret was servicing a loan portfolio of $7.2 billion.[160] Had CMC not been shuttered, Carteret's servicing portfolio would have likely been near the same level at the time Carteret should have been resolved at the end of 1993. Using the ratios I calculated in Table 16, I derive values for Carteret's entire mortgage business by applying those ratios to the size of Carteret's servicing portfolio. I take the resulting values and subtract the known value of Carteret's servicing business (from its sale in 1994 at $61.7 million) to arrive at the value lost to the receivership from not selling Carteret's mortgage origination business in the second half of 1993. As shown in Table 18, the estimated value for the origination business is in the range of $25.8 million to $57.8 million.

---

157.C-AM-A-0362965, CAM4492307.

158.CAM4080836. However, Carteret ended up with a net loss of $4,509,863 on the sale. *See* C-AM-A-0362965.

159.CAM766 1599-1609

160. C-AM-A-0026931

TABLE 18: IMPLIED VALUATIONS FOR CARTERET'S MORTGAGE BUSINESS USING VALUATION RATIOS FROM MORTGAGE BANKING ACQUISITIONS FROM SECOND HALF OF 1993

| Date Effective | Acquisition | Transaction Value / Servicing Portfolio [a] | Carteret Servicing Portfolio, End of 1992 ($ billions) [b] | Implied Value for Carteret Mortgage Business ($ millions) [c] = [a] * [b] | Implied Value for Carteret Origination Business ($ millions) [d] = [c] - $61.7 million |
|---|---|---|---|---|---|
| November 30, 1993 | Sears Mortgage Corp. (acquired by PNC Bank Corp.) | 1.21% | $7.2 | $87.5 | $25.8 |
| October 1, 1993 | Maryland National Mortgage Corp. (MNC Financial Inc.) (acquired by First Tennessee National Corp.) | 1.66% | $7.2 | $119.5 | $57.8 |

161. These results corroborate the analysis of Imperial's abnormal stock returns that showed that CMC had substantial value when the RTC shut it down. The implied values for Carteret's mortgage business shown in Table 18, which range from $87.5 million to $119.5 million, appear conservative in light of Carteret's actual and projected income for its mortgage banking activities. According to Carteret's own analysis, apparently performed sometime in 1992, Carteret expected to continue earning roughly $30 million a year in 1992 and 1993 in cash flow from its mortgage banking activities.[161] Those cash flow projections make the implied values from Table 18 appear conservative because the ratio of implied value to annual cash flow is low (between 3-to-1 and 4-to-1).

161.Carteret Savings Bank, Mortgage Banking Activities Income for the Year 1991, 1992, 1993 (CAM4030009- 13; CAM4030035 -38).

### C. The Sale of Carteret's Mortgage Origination Unit Would Have Decreased the Receivership Deficit

162. I estimate the effect on the receivership deficit of not selling CMC by assuming that the receivership would have had $18 million more (the most conservative estimate of CMC's value estimated above) to immediately fund the branch sales. When I do not correct for delays caused by Congress, I assume that this $18 million would have been credited to the receivership deficit with the first dividend paid on April 20, 1995.[162] As shown in row (12) of Table 14, the effect of selling CMC rather than shutting it down decreases the receivership deficit P&I balance by $37.3 million through December 2005. If the other appropriate adjustments are made (inclusion of supervisory goodwill, more prompt resolution, and no interest charged to the receivership or credited to the escrow account), then the receivership deficit P&I balance decreases by $262.8 million (row (1) of Table 14).

## V. The Government's Delay and Value Destruction of Carteret's Resolution Resulted in Lower Proceeds from Asset Sales, Which Inflated the Receivership Deficit

163. In addition to the delays associated with branch sales, the disposition of the financial assets was also significantly delayed during the resolution as a result of the minority preference program. The delay of the sale of the assets likely depressed the value of the assets that were eventually sold. Although I do not quantify this effect in this report, the combination of rising market interest rates during the period of delay and a Carteret portfolio that consisted largely of fixed-income mortgages[163] implies that there must have been a decline in the market

162. I make similar assumptions about but-for dividend allocations among the three loans when measuring the effect of different interest rate assumptions with only the shutdown of CMC, and when measuring the combined effect of different interest rate assumptions with the shutdown of CMC and the elimination of supervisory goodwill, as I made about dividend allocations among the three loans when measuring the effect of only the elimination of supervisory goodwill with different interest rate assumptions. See footnote 127.

163. CAM4351141 – 146.

value of Carteret's portfolio as a result of the delay. Adjusting for the value destruction resulting from the delay would reduce the principal in the receivership deficit, and in turn, would reduce the interest accruing on any deficit balances.

164. As I have shown, in the but-for world Carteret would have been sold in its entirety at a date near December 1993. As shown in Figure 5, mortgage interest rates were quite low at that time compared to the levels of mortgage interest rates when Carteret actually sold most of its mortgage portfolio in 1995.[164] Thus, if Carteret had been sold in its entirety around December 1993, the value the market would have attached to its mortgage portfolio would have been higher than its market value at the time of the actual sales. This consideration adds to the list of reasons to believe that my adjustments to the receivership deficit are conservative.

FIGURE 5: MORTGAGE RATES ACROSS CARTERET'S RESOLUTION




*Source*: Federal Reserve Statistical Release H.15, Contract interest rates on 30-year, fixed-rate conventional home mortgage commitments published by Federal Home Loan Mortgage Corp.

164.Multiple Carteret Monthly Financial Statements for 1995 (AM00096608, -10-17, -19-27, -40); Financial Data Warehouse – RSS Balance Sheet Drill Down Report, Carteret FSB For Period Ending December 31, 1995.

## CONCLUSION

165. The government's inappropriate calculations of post-insolvency interest substantially inflated Carteret's receivership deficit. The government's value destruction of Carteret's resolution, including Congressional delays in funding and the minority preference requirements, further inflated the receivership deficit by lowering the value of branch sales and asset sales. Potential acquirors were deprived of the use of Carteret's supervisory goodwill towards regulatory capital by the implementation of FIRREA. The government shut down Carteret's mortgage origination unit, whose potential sales value would have decreased the receivership deficit.

166. In isolation, each adjustment for the government's inappropriate actions substantially reduces the receivership deficit. Multiple combinations of these factors would have made the P&I balance in the receivership deficit negative.

I declare that the foregoing opinion is to the best of my knowledge a fully true and correct one. I reserve the right to update opinions in the report based on continuing research.

Dated: July 14, 2006

Charles W. Calomiris

## APPENDIX A: VALUING SUPERVISORY GOODWILL

### TABLE A1: GOODWILL AMORTIZATION SCHEDULE

| Year (12/31) | Barton [1] | Delray [2] | Mountain [3] | Blacksburg [4] | Total Goodwill Amortized [5] = [1]+[2]+[3]+[4] | Total Amortized | Goodwill Balance |
|---|---|---|---|---|---|---|---|
| 1989 | | | | | | | $164,342,326 |
| 1990 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $9,176,330 | $155,165,996 |
| 1991 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $18,352,661 | $145,989,665 |
| 1992 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $27,528,991 | $136,813,335 |
| 1993 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $36,705,322 | $127,637,004 |
| 1994 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $45,881,652 | $118,460,674 |
| 1995 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $55,057,982 | $109,284,344 |
| 1996 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $64,234,313 | $100,108,013 |
| 1997 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $73,410,643 | $90,931,683 |
| 1998 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $82,586,974 | $81,755,352 |
| 1999 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $91,763,304 | $72,579,022 |
| 2000 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $100,939,634 | $63,402,692 |
| 2001 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $110,115,965 | $54,226,361 |
| 2002 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $119,292,295 | $45,050,031 |
| 2003 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $128,468,626 | $35,873,700 |
| 2004 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $137,644,956 | $26,697,370 |
| 2005 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $146,821,286 | $17,521,040 |
| 2006 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $155,997,617 | $8,344,709 |
| 2007 | $1,293,280 | $5,297,982 | $326,232 | $61,748 | $6,979,243 | $162,976,859 | $1,365,467 |
| 2008 | | | $326,232 | $61,748 | $387,980 | $163,364,839 | $977,487 |
| 2009 | | | $326,232 | $61,748 | $387,980 | $163,752,819 | $589,507 |
| 2010 | | | $326,232 | $61,748 | $387,980 | $164,140,799 | $201,527 |
| 2011 | | | $170,656 | $30,871 | $201,527 | $164,342,326 | $0 |
| Total: | $30,607,642 | $125,385,580 | $7,021,521 | $1,327,583 | $164,342,326 | | |

*Source*: December 1989 Goodwill Amortization Schedule (AM050531).

TABLE A2: COST OF PREFERRED STOCK CAPITAL FOR CARTERET BANCORP

| | Dollars in Millions | Regression Coefficients | Carteret Input Values 12/6/1993 [1] | Carteret Input Values 12/5/1994 [2] |
|---|---|---|---|---|
| [3] | Principal amount ($) | | 128.27 | 119.11 |
| [4] = LN [3] | Natural log of principal amount | -0.3321 | 4.85 | 4.78 |
| [5] | Equity-to-asset ratio (%) | -2.9981 | 3.90 | 3.90 |
| [6] | Convertible issue | -2.5743 | 0 | 0 |
| [7] | Duration of offering (In years) | 0.0241 | 18.00 | 17.00 |
| [8] | Non-performing assets ($) | | 284.61 | 154.41 |
| [9] | Total Assets ($) | | 3345.67 | 2885.83 |
| [10] = [8] / [9] | Non-performing assets-to-total assets ratio (%) | 0.5326 | 8.51 | 5.35 |
| [11] | Merrill Lynch high-yield debt index | -0.1335 | 101.95 | 91.37 |
| [12] | Issuer is holding company | -0.7222 | 0 | 0 |
| [13] = [5]$^2$ | Equity-to-asset ratio squared | 0.2152 | 15.21 | 15.21 |
| [14] = [10]$^2$ | Non-performing assets-to-total assets squared | -0.0338 | 72.37 | 28.62 |
| [15] | Rating | 0.0599 | 0 | 0 |
| [16] | Issuer is rated | -1.5959 | 0 | 0 |
| [17] | Constant | 32.9728 | | |
| | | [18] Forecasted Yield | 11.85% | 13.06% |

*Notes*:
[1] Applicable data for Carteret Bancorp from Q3 1993 financial statements. Values are as of 12/6/93.
[2] Applicable data for Carteret Bancorp from Q4 1993 financial statements. Values are as of 12/5/94.
[5] For Q3 1993 and Q4 1993, Carteret Bancorp equity is negative. The worst-in-sample equity-to-asset ratio is used instead.
[7] The duration of the offering is set to match the the number of years until the supervisory goodwill is completely amoritized as indicated on the 1989 Goodwill Amortization Schedule. For 12/6/93 the duration is set to 18 years (2011-1993) and for 12/5/94 the duration is set to 17 years (2011-1994).
[8] Non-performing Assets are comprised of Nonaccrual Loans, Repossessed Assets & Real Estate Held for Investment, and Foreclosures. (Source: Thrift Financial Report)
[9] Source: Thrift Financial Reports
[11] Merrill Lynch high-yield debt index data is from Bloomberg.
[18] Forecasted Yield is equal to the sum of the product of regression coefficients and the corresponding Carteret input value.

*Sources*: Prospectuses; SEC Filings; SDC Database; Bloomberg; Ibbotson Associates; The Federal Reserve Bank of St. Louis.

## TABLE A3: CARTERET BANCORP REGRESSIONS OF OFFER YIELD

| | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 | Model 6 |
|---|---|---|---|---|---|---|
| Log of principal amount | -0.596 | -0.327 | -0.332 | -0.315 | -0.113 | -0.298 |
| | (4.62)** | (1.70) | (1.90) | (1.72) | (0.52) | (1.55) |
| Equity-to-asset ratio | -3.310 | -2.970 | -2.998 | -2.982 | -2.988 | -2.863 |
| | (5.36)** | (4.15)** | (4.97)** | (4.70)** | (3.81)** | (4.31)** |
| Convertible issue | -2.423 | -2.568 | -2.574 | -2.333 | -2.335 | -2.242 |
| | (8.91)** | (8.61)** | (9.38)** | (9.26)** | (7.63)** | (8.62)** |
| Duration of offering (in years) | 0.026 | 0.028 | 0.024 | | | |
| | (1.83) | (0.36) | (1.81) | | | |
| Non-performing assets-to-total assets | 0.540 | 0.538 | 0.533 | 0.494 | 0.294 | 0.237 |
| | (3.63)** | (3.42)** | (3.68)** | (3.28)** | (4.17)** | (3.82)** |
| Merrill Lynch high-yield debt index | -0.169 | -0.134 | -0.133 | -0.123 | -0.051 | -0.143 |
| | (2.68)* | (1.96) | (2.06) | (1.82) | (0.67) | (2.03) |
| Issuer is holding company | -0.817 | -0.683 | -0.722 | -0.930 | | -0.894 |
| | (2.86)** | (1.81) | (2.64)* | (3.56)** | | (3.26)** |
| Equity-to-asset ratio squared | 0.234 | 0.213 | 0.215 | 0.216 | 0.224 | 0.206 |
| | (5.08)** | (4.09)** | (4.79)** | (4.58)** | (3.86)** | (4.17)** |
| Non-performing assets-to-total assets squared | -0.032 | -0.034 | -0.034 | -0.030 | | |
| | (1.95) | (2.07) | (2.18)* | (1.86) | | |
| Preferred stock issue | | -0.041 | | | | |
| | | (0.03) | | | | |
| Cumulative preferred stock issue | | -0.067 | | | | |
| | | (0.16) | | | | |
| Rating | | 0.058 | 0.060 | 0.057 | 0.069 | 0.060 |
| | | (1.29) | (1.70) | (1.54) | (1.51) | (1.54) |
| Issuer is rated | | -1.564 | -1.596 | -1.633 | -2.049 | -1.568 |
| | | (1.76) | (2.16)* | (2.11)* | (2.16)* | (1.92) |
| Constant | 38.096 | 32.856 | 32.973 | 32.450 | 24.000 | 34.185 |
| | (6.13)** | (4.68)** | (5.01)** | (4.70)** | (3.13)** | (4.75)** |
| Observations | 33 | 33 | 33 | 33 | 33 | 33 |
| R-Squared | 0.87 | 0.90 | 0.90 | 0.88 | 0.80 | 0.86 |
| Adjusted R-Squared | 0.82 | 0.82 | 0.84 | 0.82 | 0.73 | 0.81 |
| **Carteret preferred stock offer yield forecast December 6, 1993 (%)** | **11.43** | **11.80** | **11.85** | **12.03** | **12.49** | **12.15** |
| **Carteret preferred stock offer yield forecast December 5, 1994 (%)** | **12.92** | **13.02** | **13.06** | **13.11** | **12.11** | **12.94** |

*Notes*: Absolute value of t-statistics are in parentheses. * Significant at 5%. ** Significant at 1%.

## TABLE A4: CASH EQUIVALENT MODEL
## ESTIMATED VALUE OF CARTERET GOODWILL AT 12/6/93
## DISCOUNTED USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | Assumptions | |
|---|---|---|
| [1] | Cash earning rate: | 6.31% |
| [2] | Discount Rate: | 11.85% |
| [3] | Discount Date: | 12/6/1993 |
| [4] | Tax Rate: | 35.00% |
| [5] | Transaction Cost: | 4.73% |

Present Value of Foregone Cash Flows

| | [6] | [7] | [8] | [8a] | [9]=[6]-[7] | [10]=[8a]+[9] | [11] | |
|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Balance | Ending Balance | Pre-tax cash earnings | After-tax cash earnings | Re-payment of principal | Net cash flow | Present value at 12/6/93 | |
| 12/6/93 - 12/31/93 | 128,266 | 127,637 | 553 | 359 | 629 | 988 | 980 | |
| 1994 | 127,637 | 118,461 | 7,764 | 5,047 | 9,176 | 14,223 | 12,619 | |
| 1995 | 118,461 | 109,284 | 7,185 | 4,670 | 9,176 | 13,847 | 10,984 | |
| 1996 | 109,284 | 100,108 | 6,606 | 4,294 | 9,176 | 13,470 | 9,553 | |
| 1997 | 100,108 | 90,932 | 6,027 | 3,918 | 9,176 | 13,094 | 8,302 | |
| 1998 | 90,932 | 81,755 | 5,448 | 3,541 | 9,176 | 12,718 | 7,209 | |
| 1999 | 81,755 | 72,579 | 4,869 | 3,165 | 9,176 | 12,341 | 6,255 | |
| 2000 | 72,579 | 63,403 | 4,290 | 2,789 | 9,176 | 11,965 | 5,422 | |
| 2001 | 63,403 | 54,226 | 3,711 | 2,412 | 9,176 | 11,589 | 4,695 | |
| 2002 | 54,226 | 45,050 | 3,132 | 2,036 | 9,176 | 11,212 | 4,061 | |
| 2003 | 45,050 | 35,874 | 2,553 | 1,660 | 9,176 | 10,836 | 3,509 | |
| 2004 | 35,874 | 26,697 | 1,974 | 1,283 | 9,176 | 10,460 | 3,028 | |
| 2005 | 26,697 | 17,521 | 1,395 | 907 | 9,176 | 10,083 | 2,610 | |
| 2006 | 17,521 | 8,345 | 816 | 530 | 9,176 | 9,707 | 2,246 | |
| 2007 | 8,345 | 1,365 | 306 | 199 | 6,979 | 7,178 | 1,485 | |
| 2008 | 1,365 | 977 | 74 | 48 | 388 | 436 | 81 | |
| 2009 | 977 | 590 | 49 | 32 | 388 | 420 | 69 | |
| 2010 | 590 | 202 | 25 | 16 | 388 | 404 | 60 | |
| 2011 | 202 | 0 | 6 | 4 | 202 | 206 | 27 | |
| | | | | | | Total Value of Cash Flows: | 83,195 | |
| | | | | | | Face Value of GW: | 128,266 | [12] |
| | | | | | | Less Value of Cash Flows: | 83,195 | |
| | | | | | | Value of Goodwill: | 45,070 | |
| | | | | | | Plus Transaction Costs: | 3,935 | [13] |
| | | | | | | Total Lost Value: | 49,005 | |

*Notes*:
[1] Interest earned at the 12/6/93 20-year Treasury rate of 6.31%. Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[2] 11.85% is the required dividend rate.
[3] Cash Flows discounted to 12/6/93.
[4] Tax rate is 35%.
[5] Total direct costs as a percentage of total proceeds cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[6] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[7] Contractual supervisory goodwill at respective year ends.
[8] Cash earnings (6.31%) on the average goodwill amount for that year.
[8a] Equals cash earnings on an after-tax basis. Equals [7] * (1 - 35%).
[9] Amount of goodwill amortized in each period.
[10] Net cash flows for the year.
[11] Cash flows discounted back to 12/6/93 at 11.85%.
[12] Amount of goodwill at the period beginning 12/6/93.
[13] Cost of one-time seasoned offering of common stock in the amount of total value of cash flows ($83.2 million), based on 4.73% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

## TABLE A5: CASH EQUIVALENT MODEL
## ESTIMATED VALUE OF CARTERET GOODWILL AT 12/5/94
## DISCOUNTED USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | Assumptions | |
|---|---|---|
| [1] | Cash earning rate: | 8.04% |
| [2] | Discount Rate: | 13.06% |
| [3] | Discount Date: | 12/5/1994 |
| [4] | Tax Rate: | 35.00% |
| [5] | Transaction Cost: | 5.18% |

Present Value of Foregone Cash Flows

| | [6] | [7] | [8] | [8a] | [9]=[6]-[7] | [10]=[8a]+[9] | [11] |
|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Balance | Ending Balance | Pre-tax cash earnings | After-tax cash earnings | Re-payment of principal | Net cash flow | Present value at 12/6/93 |
| 12/5/94 - 12/31/94 | 119,114 | 118,461 | 680 | 442 | 654 | 1,096 | 1,086 |
| 1995 | 118,461 | 109,284 | 9,155 | 5,951 | 9,176 | 15,127 | 13,263 |
| 1996 | 109,284 | 100,108 | 8,418 | 5,471 | 9,176 | 14,648 | 11,359 |
| 1997 | 100,108 | 90,932 | 7,680 | 4,992 | 9,176 | 14,168 | 9,718 |
| 1998 | 90,932 | 81,755 | 6,942 | 4,512 | 9,176 | 13,689 | 8,304 |
| 1999 | 81,755 | 72,579 | 6,204 | 4,033 | 9,176 | 13,209 | 7,088 |
| 2000 | 72,579 | 63,403 | 5,466 | 3,553 | 9,176 | 12,730 | 6,041 |
| 2001 | 63,403 | 54,226 | 4,729 | 3,074 | 9,176 | 12,250 | 5,142 |
| 2002 | 54,226 | 45,050 | 3,991 | 2,594 | 9,176 | 11,770 | 4,370 |
| 2003 | 45,050 | 35,874 | 3,253 | 2,115 | 9,176 | 11,291 | 3,708 |
| 2004 | 35,874 | 26,697 | 2,515 | 1,635 | 9,176 | 10,811 | 3,140 |
| 2005 | 26,697 | 17,521 | 1,778 | 1,155 | 9,176 | 10,332 | 2,654 |
| 2006 | 17,521 | 8,345 | 1,040 | 676 | 9,176 | 9,852 | 2,239 |
| 2007 | 8,345 | 1,365 | 390 | 254 | 6,979 | 7,233 | 1,454 |
| 2008 | 1,365 | 977 | 94 | 61 | 388 | 449 | 80 |
| 2009 | 977 | 590 | 63 | 41 | 388 | 429 | 67 |
| 2010 | 590 | 202 | 32 | 21 | 388 | 409 | 57 |
| 2011 | 202 | 0 | 8 | 5 | 202 | 207 | 25 |

| | | |
|---|---|---|
| Total Value of Cash Flows: | 79,797 | |
| Face Value of GW: | 119,114 | [12] |
| Less Value of Cash Flows: | 79,797 | |
| Value of Goodwill: | 39,317 | |
| Plus Transaction Costs: | 4,133 | [13] |
| Total Lost Value: | 43,451 | |

*Notes*:
[1] Interest earned at the 12/5/94 20-year Treasury rate of 8.04%. Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[2] 13.06% is the required dividend rate.
[3] Cash Flows discounted to 12/5/94.
[4] Tax rate is 35%.
[5] Total direct costs as a percentage of total proceeds cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[6] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[7] Contractual supervisory goodwill at respective year ends.
[8] Cash earnings (8.04%) on the average goodwill amount for that year.
[8a] Equals cash earnings on an after-tax basis. Equals [7] * (1 - 35%).
[9] Amount of goodwill amortized in each period.
[10] Net cash flows for the year.
[11] Cash flows discounted back to 12/5/94 at 13.06%.
[12] Amount of goodwill at the period beginning 12/5/94.
[13] Cost of one-time seasoned offering of common stock in the amount of total value of cash flows ($79.8 million), based on 5.18% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

TABLE A6: CARTERET BANCORP COMMON STOCK MODEL
RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
AFTER-TAX BASIS AND DISCOUNTED TO 12/6/93 USING CAPM-BASED RATE
(FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Contractual Supervisory Goodwill | Ending Contractual Supervisory Goodwill | Average Common Stock to Replace Disallowed Supervisory Goodwill | Transaction Cost | Dividend Cost of Common | Pre-Tax "Benefit" of Capital | After-Tax "Benefit" of Capital | Net Cost of Common | Present Value at 12/6/93 of Common Discounted at 11.59% |
| 12/6/93 - 12/31/93 | 128,266 | 127,637 | 127,951 | 5,413 | 1,016 | 553 | 359 | 6,069 | 6,024 |
| 1994 | 127,637 | 118,461 | 123,049 | | 14,261 | 7,764 | 5,047 | 9,215 | 8,196 |
| 1995 | 118,461 | 109,284 | 113,873 | | 13,198 | 7,185 | 4,670 | 8,527 | 6,797 |
| 1996 | 109,284 | 100,108 | 104,696 | | 12,134 | 6,606 | 4,294 | 7,840 | 5,600 |
| 1997 | 100,108 | 90,932 | 95,520 | | 11,071 | 6,027 | 3,918 | 7,153 | 4,579 |
| 1998 | 90,932 | 81,755 | 86,344 | | 10,007 | 5,448 | 3,541 | 6,466 | 3,709 |
| 1999 | 81,755 | 72,579 | 77,167 | | 8,944 | 4,869 | 3,165 | 5,779 | 2,970 |
| 2000 | 72,579 | 63,403 | 67,991 | | 7,880 | 4,290 | 2,789 | 5,091 | 2,345 |
| 2001 | 63,403 | 54,226 | 58,815 | | 6,817 | 3,711 | 2,412 | 4,404 | 1,818 |
| 2002 | 54,226 | 45,050 | 49,638 | | 5,753 | 3,132 | 2,036 | 3,717 | 1,375 |
| 2003 | 45,050 | 35,874 | 40,462 | | 4,690 | 2,553 | 1,660 | 3,030 | 1,004 |
| 2004 | 35,874 | 26,697 | 31,286 | | 3,626 | 1,974 | 1,283 | 2,343 | 696 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,562 | 1,395 | 907 | 1,656 | 441 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,499 | 816 | 530 | 968 | 231 |
| 2007 | 8,345 | 1,365 | 4,855 | | 563 | 306 | 199 | 364 | 78 |
| 2008 | 1,365 | 977 | 1,171 | | 136 | 74 | 48 | 88 | 17 |
| 2009 | 977 | 590 | 783 | | 91 | 49 | 32 | 59 | 10 |
| 2010 | 590 | 202 | 396 | | 46 | 25 | 16 | 30 | 5 |
| 2011 | 202 | 0 | 101 | | 12 | 6 | 4 | 8 | 1 |
| Total Cost | | | | | | | | | 45,895 |

*Notes*:
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/6/93 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($128.3 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 11.59% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 6.31%, the 20-year Treasury rate at 12/6/93.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/6/93 - 12/31/93 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/6/93 at 11.59%, the required dividend on the common stock.

## TABLE A7: CARTERET BANCORP COMMON STOCK MODEL
## RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
## AFTER-TAX BASIS AND DISCOUNTED TO 12/5/94 USING CAPM-BASED RATE
## (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| **Year Ending Dec. 31** | **Beginning Contractual Supervisory Goodwill** | **Ending Contractual Supervisory Goodwill** | **Average Common Stock to Replace Disallowed Supervisory Goodwill** | **Transaction Cost** | **Dividend Cost of Common** | **Pre-Tax "Benefit" of Capital** | **After-Tax "Benefit" of Capital** | **Net Cost of Common** | **Present Value at 12/5/94 of Common Discounted at 13.32%** |
| 12/5/94 - 12/31/94 | 119,114 | 118,461 | 118,788 | 5,027 | 1,127 | 680 | 442 | 5,712 | 5,661 |
| 1995 | 118,461 | 109,284 | 113,873 | | 15,168 | 9,155 | 5,951 | 9,217 | 8,061 |
| 1996 | 109,284 | 100,108 | 104,696 | | 13,946 | 8,418 | 5,471 | 8,474 | 6,541 |
| 1997 | 100,108 | 90,932 | 95,520 | | 12,723 | 7,680 | 4,992 | 7,731 | 5,266 |
| 1998 | 90,932 | 81,755 | 86,344 | | 11,501 | 6,942 | 4,512 | 6,989 | 4,200 |
| 1999 | 81,755 | 72,579 | 77,167 | | 10,279 | 6,204 | 4,033 | 6,246 | 3,313 |
| 2000 | 72,579 | 63,403 | 67,991 | | 9,056 | 5,466 | 3,553 | 5,503 | 2,576 |
| 2001 | 63,403 | 54,226 | 58,815 | | 7,834 | 4,729 | 3,074 | 4,760 | 1,966 |
| 2002 | 54,226 | 45,050 | 49,638 | | 6,612 | 3,991 | 2,594 | 4,018 | 1,464 |
| 2003 | 45,050 | 35,874 | 40,462 | | 5,390 | 3,253 | 2,115 | 3,275 | 1,053 |
| 2004 | 35,874 | 26,697 | 31,286 | | 4,167 | 2,515 | 1,635 | 2,532 | 719 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,945 | 1,778 | 1,155 | 1,790 | 448 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,723 | 1,040 | 676 | 1,047 | 231 |
| 2007 | 8,345 | 1,365 | 4,855 | | 647 | 390 | 254 | 393 | 77 |
| 2008 | 1,365 | 977 | 1,171 | | 156 | 94 | 61 | 95 | 16 |
| 2009 | 977 | 590 | 783 | | 104 | 63 | 41 | 63 | 10 |
| 2010 | 590 | 202 | 396 | | 53 | 32 | 21 | 32 | 4 |
| 2011 | 202 | 0 | 101 | | 13 | 8 | 5 | 8 | 1 |
| Total Cost | | | | | | | | | 41,608 |

*Notes*:
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/5/94 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($119.1 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 13.32% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 8.04%, the 20-year Treasury rate at 12/5/94.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/5/94 - 12/31/94 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/5/94 at 13.32%, the required dividend on the common stock.

## TABLE A8: CARTERET BANCORP COMMON STOCK MODEL
## RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
## AFTER-TAX BASIS AND DISCOUNTED TO 12/6/93 USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Contractual Supervisory Goodwill | Ending Contractual Supervisory Goodwill | Average Common Stock to Replace Disallowed Supervisory Goodwill | Transaction Cost | Dividend Cost of Common | Pre-Tax "Benefit" of Capital | After-Tax "Benefit" of Capital | Net Cost of Common | Present Value at 12/6/93 of Common Discounted at 11.85% |
| 12/6/93 – 12/31/93 | 128,266 | 127,637 | 127,951 | 5,413 | 1,039 | 553 | 359 | 6,092 | 6,045 |
| 1994 | 127,637 | 118,461 | 123,049 | | 14,581 | 7,764 | 5,047 | 9,535 | 8,459 |
| 1995 | 118,461 | 109,284 | 113,873 | | 13,494 | 7,185 | 4,670 | 8,824 | 6,999 |
| 1996 | 109,284 | 100,108 | 104,696 | | 12,407 | 6,606 | 4,294 | 8,113 | 5,753 |
| 1997 | 100,108 | 90,932 | 95,520 | | 11,319 | 6,027 | 3,918 | 7,402 | 4,693 |
| 1998 | 90,932 | 81,755 | 86,344 | | 10,232 | 5,448 | 3,541 | 6,690 | 3,793 |
| 1999 | 81,755 | 72,579 | 77,167 | | 9,144 | 4,869 | 3,165 | 5,979 | 3,030 |
| 2000 | 72,579 | 63,403 | 67,991 | | 8,057 | 4,290 | 2,789 | 5,268 | 2,387 |
| 2001 | 63,403 | 54,226 | 58,815 | | 6,970 | 3,711 | 2,412 | 4,557 | 1,846 |
| 2002 | 54,226 | 45,050 | 49,638 | | 5,882 | 3,132 | 2,036 | 3,846 | 1,393 |
| 2003 | 45,050 | 35,874 | 40,462 | | 4,795 | 2,553 | 1,660 | 3,135 | 1,015 |
| 2004 | 35,874 | 26,697 | 31,286 | | 3,707 | 1,974 | 1,283 | 2,424 | 702 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,620 | 1,395 | 907 | 1,713 | 443 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,533 | 816 | 530 | 1,002 | 232 |
| 2007 | 8,345 | 1,365 | 4,855 | | 575 | 306 | 199 | 376 | 78 |
| 2008 | 1,365 | 977 | 1,171 | | 139 | 74 | 48 | 91 | 17 |
| 2009 | 977 | 590 | 783 | | 93 | 49 | 32 | 61 | 10 |
| 2010 | 590 | 202 | 396 | | 47 | 25 | 16 | 31 | 5 |
| 2011 | 202 | 0 | 101 | | 12 | 6 | 4 | 8 | 1 |
| Total Cost | | | | | | | | | 46,902 |

*Notes:*
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/6/93 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($128.3 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 11.85% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 6.31%, the 20-year Treasury rate at 12/6/93.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/6/93 - 12/31/93 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/6/93 at 11.85%, the required dividend on the common stock.

## TABLE A9: CARTERET BANCORP COMMON STOCK MODEL
## RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
## AFTER-TAX BASIS AND DISCOUNTED TO 12/5/94 USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Contractual Supervisory Goodwill | Ending Contractual Supervisory Goodwill | Average Common Stock to Replace Disallowed Supervisory Goodwill | Transaction Cost | Dividend Cost of Common | Pre-Tax "Benefit" of Capital | After-Tax "Benefit" of Capital | Net Cost of Common | Present Value at 12/5/94 of Common Discounted at 13.06% |
| 12/5/94 - 12/31/94 | 119,114 | 118,461 | 118,788 | 5,027 | 1,105 | 680 | 442 | 5,690 | 5,640 |
| 1995 | 118,461 | 109,284 | 113,873 | | 14,873 | 9,155 | 5,951 | 8,922 | 7,822 |
| 1996 | 109,284 | 100,108 | 104,696 | | 13,674 | 8,418 | 5,471 | 8,203 | 6,361 |
| 1997 | 100,108 | 90,932 | 95,520 | | 12,476 | 7,680 | 4,992 | 7,484 | 5,133 |
| 1998 | 90,932 | 81,755 | 86,344 | | 11,277 | 6,942 | 4,512 | 6,765 | 4,104 |
| 1999 | 81,755 | 72,579 | 77,167 | | 10,079 | 6,204 | 4,033 | 6,046 | 3,244 |
| 2000 | 72,579 | 63,403 | 67,991 | | 8,880 | 5,466 | 3,553 | 5,327 | 2,528 |
| 2001 | 63,403 | 54,226 | 58,815 | | 7,682 | 4,729 | 3,074 | 4,608 | 1,934 |
| 2002 | 54,226 | 45,050 | 49,638 | | 6,483 | 3,991 | 2,594 | 3,889 | 1,444 |
| 2003 | 45,050 | 35,874 | 40,462 | | 5,285 | 3,253 | 2,115 | 3,170 | 1,041 |
| 2004 | 35,874 | 26,697 | 31,286 | | 4,086 | 2,515 | 1,635 | 2,451 | 712 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,888 | 1,778 | 1,155 | 1,732 | 445 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,689 | 1,040 | 676 | 1,013 | 230 |
| 2007 | 8,345 | 1,365 | 4,855 | | 634 | 390 | 254 | 380 | 76 |
| 2008 | 1,365 | 977 | 1,171 | | 153 | 94 | 61 | 92 | 16 |
| 2009 | 977 | 590 | 783 | | 102 | 63 | 41 | 61 | 10 |
| 2010 | 590 | 202 | 396 | | 52 | 32 | 21 | 31 | 4 |
| 2011 | 202 | 0 | 101 | | 13 | 8 | 5 | 8 | 1 |
| Total Cost | | | | | | | | | 40,748 |

*Notes*:
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/5/94 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($119.1 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 13.06% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 8.04%, the 20-year Treasury rate at 12/5/94.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/5/94 - 12/31/94 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/5/94 at 13.06%, the required dividend on the common stock.

## APPENDIX B: MATERIALS RELIED UPON

***Depositions***

Deposition of Karen J. Hughes
Deposition of Wayne S. Green

***Deposition Exhibits***
Exhibit Green 15.
Exhibit Green 22 (AM00097057, AM00097054, AM00097064, AM00097047-97065)
Exhibit Green 27 (AM00096551)
Exhibit Green 33 (AM00092190-92205; AM0009222-9224).
Exhibits Green 36A, 36B, & 36C (AM0097219-97377).
Exhibit Green 37.
Exhibit Ramey 1 (WOP2990736).
Exhibit Ramey 2 (WOP2990742).
Exhibit Ramey 34 at 4 (C-AM-A-0013424; C-AM-A-0013423; C-AM-A-0013423, -24).
Exhibit Ramey 38 (C-AM-A-0088740; C-AM-A-0130612; C-AM-A-0130615; C-AM-A-0088741).
Exhibit Ramey 49 (C-AM-A-0130612; C-AM-A-0130616; C-AM-A-0130615; C-AM-A-0130613; C-AM-A-0130614).
Exhibit Ramey 52 (C-AM-A-0013420).
Exhibit Ramey 54 at 2 (C-AM-A-0013422).

***SEC Filings***

***10-K***
American Express Comp. 1993 10-K.
Bankamerica Corp. 1993 10-K.
California Federal Bank 1993 10-K/A.
Coast Savings Financial, Inc. 1992 10-K.
Coast Savings Financial, Inc. 1993 10-K.
Coastal Banc Savings Association 1993 10-K.
Conservative Savings Corporation 1993 10-K.
First Republic Bancorp Inc. 1992 10-K.
First Tennessee National Corp. 1993 10-K,
Glendale Federal Bank 1993 10-K.
H.F. Ahmanson & Company 1992 10-K.
North American Mortgage Company 1993 10-K.
PNC Bank Corp. 1993 10-K
Roosevelt Financial Group, Inc. 1992 10-K.
Sovereign Bancorp, Inc. 1992 10-K.
St. Paul Bancorp Inc. 1992 10-K.
Sterling Financial Corporation 1993 10-K.
Sun Coast Savings and Loan Association 1993 10-K.
The Dime Savings Bank of New York 1993 10-K.
United Asset Management Corporation 1993 10-K.

***10-Q***
Coastal Banc Savings Association Jun. 30, 1993 10-Q.
First Republic Bancorp Inc. Mar. 31, 1993 10-Q.
H.F. Ahmanson & Company Jun. 30, 1993 10-Q.
H.F. Ahmanson & Company Sept. 30, 1992 10-Q.
PNC Bank Corp., Sept. 30, 1993 10-Q.
Republic Security Financial Corporation, 10-Q, Jun. 30, 1993.
Roosevelt Financial Group, Inc. Mar. 31, 1992 10-Q.
Sovereign Bancorp, Inc. Jun. 30, 1993 10-Q.

St. Paul Bancorp Inc. Sept. 30, 1992 10-Q,.
Sun Coast Savings and Loan Association Dec. 31, 1993 10-Q.
Sun Coast Savings and Loan Association Mar. 31, 1993 10-Q.
The Dime Savings Bank of New York Jun. 30, 1993 10-Q.
Western Financial Savings Bank Jun. 30, 1993 10-Q.
Western Financial Savings Bank Mar. 31, 1993 10-Q.

*Prospectus*
Bank United Financial Corporation Jun. 3, 1993 Prospectus.
Bank United Financial Corporation Dec. 21, 1993 Prospectus.
Citfed Bancorp, Inc. Aug. 12, 1993 Prospectus.
Coast Savings Financial, Inc. April 1, 1993 Prospectus Supplement.
Conservative Savings Corporation Jun. 18, 1993 Prospectus.
First Liberty Financial Corp. Feb. 8, 1993 Prospectus.
First Republic Bancorp Inc. May 21, 1993 Prospectus.
Firstfederal Financial Services Corp. Jun. 17 1994 Prospectus.
H.F. Ahmanson & Co, Prospectus Jul. 30, 1993 Supplement.
Roosevelt Financial Group, Inc. Feb. 23, 1993 Prospectus.
Security First Corp. Apr. 28, 1993 Prospectus.
Sovereign Bancorp, Inc. Mar. 16, 1993 Prospectus.
St. Paul Bancorp Inc. Jan. 26, 1993 Prospectus.
Sterling Financial Corporation Feb. 4, 1993 Prospectus.
Washington Mutual Savings Bank Sep. 17, 1993 Prospectus.

*Other SEC Filings*
California Federal Bank Mar. 15, 1994 Offering Circular.
California Federal Bank Mar. 16, 1993 Offering Circular.
Chevy Chase Savings Bank Nov. 17, 1993 Offering Circular.
Citizens Federal Bank Jul. 22, 1993 Offering Circular.
Citizens Federal Bank May 28, 1993 Offering Circular.
First Madison Bank Jul. 21, 1994 Offering Circular.
FMS Financial Corporation Jul. 21, 1994 Amendment No. 3 to Form S-2.
Glendale Federal Bank Sep. 30, 1994 Offering Circular.
H.F. Ahmanson & Company Feb. 8, 1993 Prospectus Supplement.
People's Bank, F-4 Mar. 31, 1993.
People's Bank May 1993 Offering Circular.
Republic Security Financial Corporation Sep. 15 1993 Post-Effective Amendment No. 2 to Form S-2.
Rochester Community Savings Bank Jun. 24, 1993 Offering Circular.
Sovereign Bancorp, Inc. Aug. 24, 1993 Prospectus Supplement.
The Dime Savings Bank of New York Sep. 23, 1993 Offering Circular.
Washington Mutual Savings Bank Sep. 30, 1993 F-4.
Western Financial Savings Bank Jun. 17, 1993 Offering Circular.

*Databases*
1989 Goodwill Amortization Schedule (AM0505031).
1993 Preferred Stock Issuances, Security Data Corporation
20-Year Treasury Constant Maturity Rate, Board of Governors of the Federal Reserve System, H.15 Selected Interest Rates, DGS20, May 15, 2006.
Administrative Office of the U.S. Courts, Post Judgment Rate
Bloomberg (Merrill Lynch US High Yield Debt Index)
CARTERET FEDERAL SAVINGS BANK, 10505, 1993 Quarter Data
Carteret Savings Bank, Mortgage Banking Activities Income for the Year 1991, 1992, 1993 (CAM4030009- 13; CAM4030035 -38).
Imperial Credit Industries event study (Compustat data)

CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006.
FDIC Failure Transaction Database, updated through December 2004.
Federal Reserve Statistical Release H.15, 3-month Treasury Bills (secondary market)
Federal Reserve Statistical Release H.15, 3-month Treasury constant maturities (nominal)
Federal Reserve Statistical Release H.15, 1-year Treasury constant maturities (nominal)
Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal)
Financial Data Warehouse – RSS Balance Sheet Drill Down Report, Carteret FSB For Period Ending December 31, 2005.
Ibbotson Associates, Cost of Capital Quarterly, 1994 Yearbook.
Ibbotson Associates, Cost of Capital Quarterly, 1995 Yearbook.
Ibbotson Associates, Stocks Bonds Bills and Inflation, 1994 Yearbook.
Multiple Carteret Monthly Financial Statements for 1995 (AM00096608, -10-17, -19-27, -40)
Securities Data Company database
Thrift Financial Reports
Treasury Bill, Note, Bond, and TIPS Auction History

***Academic Writings***

Charles W. Calomiris & Charles P. Himmelberg, Investment Banking Costs as a Measure of the Cost of External Finance, Working Paper, Columbia Business School, revised May 2001.
Charles W. Calomiris and Berry Wilson, Bank Capital and Portfolio Management: The 1930s Capital Crunch and Scramble to Shed Risk, 77 J. Business 421 (2004).
Charles W. Calomiris and Joseph R. Mason, Credit Card Securitization and Regulatory Arbitrage, 26 J. Fin. Services Res. 5 (2004)
Christopher M. James & Peggy Wier, An Analysis of FDIC Failed Bank Auctions, 20 J. Monetary Econ. 141 (1987).
Edward Kane, The Incentive Compatibility of Government-Sponsored Deposit-Insurance Funds, in The Reform of Federal Deposit Insurance: Disciplining the Government and Protecting Taxpayers 164 (James Barth & R. Dan Brumbaugh, Jr., eds. 1992).
Federal Deposit Insurance Corporation, Managing the Crisis: The FDIC and RTC Experience, 1980-1994 (1998).
Four Thrifts Under RTC Cost Taxpayers $153 Million, Baltimore Bus. J., Dec. 31, 1993.
Inmoo Lee et al., The Cost of Raising Capital, 19 J. Fin. Res. 59 (1996).
Jeremy Bulow, Ming Huang & Paul Klemperer, Toeholds and Takeovers, 107 J. Pol. Econ. 427 (1998).
Joseph R. Mason, A Real Options Approach to Bankruptcy Costs: Evidence from Failed Commercial Banks during the 1990s, 79 J. Business 1523 (2005).
Mukesh Bajaj et. al. The Costs of Issuing Preferred Stock, J. Fin. Res. 25, (2002).
Stewart C. Myers & Nicholas S. Majluf, Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have, 13 J. Fin. Econ. 187 (1984)

***Periodicals***

Bank Money Accounts, N.Y. Times, Feb. 17, 1993.
David Conn, Thrift-y Shoppers' Catalog, Baltimore Sun, Dec. 23, 1993.
Imperial Credit Expands Easy Way Lending: Newport Beach mortgage banker diversifies by taking on 90 staff members of a failed New Jersey thrift, L.A. Times, Dec. 29, 1992.
Imperial Credit Hires Most of Failed Carteret's Originations Staff, Am. Banker, Jan. 15, 1993.
Jerry Knight, Government Holds Fire Sale on S&Ls; Ten Area Thrifts Will Go to Highest Bidders, Wash. Post, Dec. 23, 1993.
Kathleen Day, "S&L Supporters Plan Offensive To Retain 'Goodwill' as Capital," Wash. Post, May 24, 1989
Matt Yancey, Some House GOP Members Want S&L Bill Changes, Associated Press, May 23, 1993.
Mortgage Cutoff at Bank, N.Y. Times, Dec. 14, 1992.
Nathaniel C. Cash, Some in G.O.P. Deserting Bush On Savings Plan, N.Y. Times, May 25, 1989.
OTS Employs New Approach To Enforce Net Worth Pacts; It Uses Administrative Procedures, The Thrift Regulator, May 3, 1991.
OTS Let Goodwill Be Capital 8 Times Before Charter Case, The Thrift Regulator, Mar. 1, 1993.
Robert Hurtado, Bank Yields On Accounts Decrease, N.Y. Times, Aug. 26, 1992.

Savings Unit Seized by U.S., N.Y. Times, Jan. 12, 1990.

*Courtcases*
Library of Congress v. Shaw, 478 U.S. 310, 314 (1986).
AmBase Corp. v. United States, 58 Fed.Cl. 32, 38 (2003).
40 U.S.C. § 258e-1 (1994) (amended 2000).

*E-mails, Letters and Memorandum*
E-mail from Carol L. Weatherly, RTC, to Susan V. Hamilton, RTC, (Jan. 12, 1993, 14:52:32 EST) (C-AM-A-0061391).
E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).
E-mail from Stephen A. Haley, RTC, to Robert O. Smedley & W. Robert Haley, RTC, (Mar. 19, 1993, 11:28:11 EST) (AM5290 0211 – 12)
Memo of J. Paul Ramey, Oct. 26, 1995, Exhibit Ramey 12 at 4 (C-AM-A0125188).
Memorandum from Donna Cribbs & William Bailey to James Mindnich, Dec. 7, 1992 (C-AM-A-0399086).
Memorandum from Edward D. Mahaney, Vice President of Department of Operations, RTC, to Thomas P. Horton, Vice President of Field Activities, RTC, Dec. 21, 1993 (AM5067 0499 – 0500).
Memorandum from Jay A. Jupiter, Assistant Director of Resolutions, RTC, to Thomas Horton, Vice President of Field Activities, RTC (Aug. 23, 1993) (C-AM-A-0130544).

*Financial Reports*
Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993) (C-AM-A-0400781 – 869)
Carteret Federal Savings Bank, Consolidated Florida Branch Resolution Summary (AM54120696)
Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120691)
Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120693)
Carteret Financial Report, December 31, 1992 (AM00086965, -64, -65, -70)
Carteret Financial Reports (AM00086965, -68, -70; CAM406 0567, -70, -72; C-AM-A-0133760, -63, -65; CAM406 1338, -41, -43; CAM404 0198, -0201, -0203; CAM406 2852, -55, -57; CAM4600037, -40, -42; CAM4062200, -03, -05; CAM4950836, -38, 040; CAM4040040, -43, -45; CAM4062550, -53, -55; CAM4840188, -91, 93; CAM4951698, -01, -03; CAM4951867, -70, -72; CAM4952111, -14, -17; CAM5070059, -62, -64; CAM4180008, -11, -13; CAM4181752, -55, -57; CAM4180238, -41, -43; CAM3821952, -55, -57; CAM3821890, -94, -96; CAM3821800, -03, -05; CAM3821770, -73, -75; CAM3820674, -77, -79).
Carteret Mortgage Company, Monthly Production Report, Nov. 30, 1992 (CAM4350395).
Midlantic National Bank, Bid Form for Carteret National Savings Bank (C-AM-A-0129998 – 0130000; 0130010 – 12).
RTC Directive System, Circular 9322.3, Sept. 20, 1991 (CAM4051352 – 71; CAM4051352; CAM5380820; CAM4051357).

*Receivership Rules*
"Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499)
Payment of Post-insolvency Interest in Receiverships with Surplus Funds, 66 Fed. Reg. 65,144, 65,145 (proposed Dec. 18, 2001) (to be codified at 12 C.F.R. § 360).
Receivership Rules, Priorities, 12 C.F.R. § 360.2(b) (1993).
Resolution and Receivership Rules, Post-Insolvency Interest, 12 C.F.R. § 360.7 (2006).

*Miscellaneous*
C-AM-A-0285916.
CAM3990266.
C-AM-A-0026931.
CAM766 1599-1609.
C-AM-A-0014399.
C-AM-A-0076008.
WOP2991722.
C-AM-A-0027918.
C-AM-A-0125162.

WOP3300026.
C-AM-A-0068230
C-AM-A-0068172.
C-AM-A-0068201.
C-AM-A-0090193.
C-AM-A-0026449.
C-AM-A-0285916.
C-AM-A-0027402.
C-AM-A-0027032.
CAM4080730.
C-AM-A-0362965.
CAM4492307.
CAM4080836.
C-AM-A-0362965.
CAM766 1599-1609.
CAM4351141 – 146.
CAM4350579.
C-AM-A-0134548.
C-AM-A-0026662.
C-AM-A-0172648.
CAM4180090.
CAM3991741.
CAM3991743.
CAM4350677.
CAM3991768.
CAM3991342.
CAM3991393.
CAM3991361.
CAM3991368.
CAM3991370.
CAM3991391.
C-AM-A-0134769.
C-AM-A-0172650.
CAM4350675.

## APPENDIX C: CURRICULUM VITAE

**OFFICE ADDRESS AND PHONE:**
Division of Finance and Economics
Graduate School of Business, Columbia University
3022 Broadway, 601 Uris Hall
New York, NY 10027
(212) 854-8748
(212) 316-9219 (fax)
cc374@columbia.edu

**EDUCATION**
Ph.D., Economics, Stanford University, June 1985.
Dissertation: Historical Perspectives on the Tax-Based Theory of Money.
B.A., Economics, Yale University, Magna Cum Laude, May 1979.

**CURRENT ACADEMIC POSITIONS:**
Henry Kaufman Professor of Financial Institutions (beginning March 2003; previously Paul M. Montrone Professor, 1996-March 2003), Division of Finance and Economics, Graduate School of Business, Columbia University, and Professor of International and Public Affairs, Columbia School of International and Public Affairs, 1996-present.

Academic Director, Jerome Chazen Institute of International Business, Columbia Business School, October 1, 2004-present, and Director, Center for International Business and Education Research, Columbia University, October 1-present. Research Associate, National Bureau of Economic Research, October 1996-present. (Faculty Research Fellow, October 1991-October 1996).

Member, Shadow Financial Regulatory Committee, December 1997-December 2004.

Arthur Burns Fellow in International Economics, American Enterprise Institute, December 2001-present, and Co-Director, AEI Project on Financial Deregulation, January 1997-present (Adjunct Scholar, American Enterprise Institute, January 1995-December 2001).

**PREVIOUS ACADEMIC POSITIONS**
Associate Professor, Department of Finance, and Co-Director, Office for Banking Research, University of Illinois, August 1992-June 1996.

Fellow, Council on Foreign Relations, May 2000-December 2000

Visiting Associate Professor, Department of Finance, The Wharton School, August 1991-July 1992.

Assistant Professor, Department of Economics, Northwestern University, September 1984-July 1991.

Visiting Assistant Professor, Department of Economics, Stanford University, January 1989-June 1989.

**BOARD MEMBERSHIPS**
Chairman of the Board, Greater Atlantic Financial Corp., December 2000-present.

Member, Advisory Board, Hillman Capital Management, 2001-present.

Member, Advisory Panel to the Conference Board/Group of Thirty Exchange Rate Project, 2000-2003.

Member, Board of Directors, Mercia Corporation, September 2004-present.

Principal, CHP Asset Management LLC, 2004-present.

**OTHER AFFILIATIONS**
Consultant, Comision Bancaria y de Valores, Mexico, May 1999-2000.

Consultant, Federal Reserve Bank of New York, July 1996-1999.

Visiting Scholar, Federal Reserve Bank of New York, June 1995.

Consultant, Banco Central de la Republica Argentina, September 1996-1998.

Consultant, Banco Central de la Reserva, El Salvador, October 1996-1998.

Consultant, World Bank mission on Argentine financial sector, February 1998.

Consultant, International Comparative Study of Term Finance, The World Bank, March 1995-May 1996.

Member, Federation of American Scientists Committee on Systemic Risk, October 1995-January 1996.

Consultant, World Bank mission on Mexican banking reform, November 1995.

Consultant, Federal Reserve Bank of St. Louis, May 1993-June 1995

Consultant, Board of Governors of the Federal Reserve System, Division of Research and Statistics, November 1993.

Consultant, project to evaluate Japan's industrial credit programs, The World Bank, November 1991-February 1995.

Consultant, Federal Reserve Bank of Chicago, July 1989-July 1991.Visiting Economist, Federal Reserve Bank of Chicago, June 1988-December 1988.

Economist, International Monetary Fund, Summer 1981.

**MEMBERSHIP IN ACADEMIC ORGANIZATIONS**
American Economic Association
Cliometric Society
Economic History Association
American Finance Association
Financial Management Association
American Law and Economics Association
National Association of Scholars

**GOVERNMENT SERVICE**
Congressional Appointee to the International Financial Institution Advisory Commission (IMF Commission), September 1999-March 2000.

Member, Ad Hoc Task Force on International Finance to Advise Senators Lieberman and Roth and Congressmen Dreir and Matsui, 1999.

Adviser to Senator John McCain's Presidential Campaign, 1999-2000.

**ACADEMIC PROGRAM COMMITTEES:**
Program Committee, American Finance Association Annual Meetings, 2000
Program Committee, Economic History Association Meetings, September 1996
Program Committee, Financial Management Association Meetings, October 1995.
Program Committee, Econometric Society Meetings, ASSA, January 1992.
Program Committee, Economic History Association Meetings, September 1991.

**EDITORIAL SERVICE**

Editorial Boards

Annals of Finance, beginning 2004
Journal of Economics and Business, beginning 9/98
Journal of Financial Intermediation, 12/97-2001.
Journal of Economic History, 9/97-2001.
Journal of Financial Services Research, 1995-present.
Journal of Banking and Finance, 1994-present.
Economic Policy Review, Federal Reserve Bank of New York, 1994-present.
Explorations in Economic History, 1993-2003.

Refereeing

National Science Foundation
American Economic Review
Bulletin of Economic Research
Business History Review
Economic Inquiry
The Economic Journal
Economic History Review
Explorations in Economic History
International Review of Economics and Finance
Journal of Applied Econometrics
Journal of Development Economics
Journal of Banking and Finance
Journal of Econometrics
Journal of Economic History
Journal of Economic Literature
Journal of Economics and Business
Journal of Finance
Journal of Financial Services Research
Journal of Financial Intermediation
Journal of International Money and Finance
Journal of Macroeconomics
Journal of Monetary Economics
Journal of Money, Credit, and Banking
Journal of Political Economy
Journal of Public Economics
Journal of Small Business Finance
Oxford Economic Papers
Quarterly Journal of Economics
Review of Economic Studies
Review of Economics and Statistics
Real Estate Economics

**PUBLICATIONS**

Articles in Refereed Journals

"Bank Capital and Portfolio Management: The 1930s 'Capital Crunch' and Scramble to Shed Risk" (with Berry Wilson), NBER Working Paper No. 6649, July 1998, Journal of Business, July 2004, 421-56.

"Credit Card Securitization and Regulatory Arbitrage" (with Joseph Mason), Journal of Financial Services Research, August 2004, 5-27.

"Consequences of U.S. Bank Distress During the Depression," (with Joseph Mason), American Economic Review 93, June 2003, 937-47.

"Fundamentals, Panics and Bank Distress During the Depression" (with Joseph Mason), NBER Working Paper No. 7919, September 2000, American Economic Review, 93, December 2003, 1615-47.

"The Role of ROSCAs: Lumpy Durables or Event Insurance?" (with Indira Rajaraman), Journal of Development Economics 56 (1998), 207-216.

"Contagion and Bank Failures During the Great Depression: The June 1932 Chicago Banking Panic" (with Joseph Mason), , American Economic Review 87, December 1997, 863-883. National Bureau of Economic Research Working Paper 4934, November 1994. Republished in The Regulation and Supervision of Banks, edited by Maximilian J. B. Hall, Edward Elgar Publishing, 2001.

"The Efficiency of Self-Regulated Payments Systems: Learning from the Suffolk System" (with Charles M. Kahn). Journal of Money, Credit and Banking, 28, November 1996, 766-797.

"Internal Finance and Investment: Evidence from the Undistributed Profits Tax of 1936-1937" (with R. Glenn Hubbard), NBER Working Paper No. 4288 (March 1993), Journal of Business , October 1995, 443-482.

"Financial Fragility: Issues and Policy Implications," in Coping with Financial Fragility: A Global Perspective, Harald Benink and George Kaufman, eds., Journal of Financial Services Research, 9, 1995, 241-257.

"Housing-Finance Interventions and Private Incentives: Helping Minorities and the Poor" (with Charles M. Kahn and Stanley D. Longhofer), Journal of Money, Credit and Banking, August 1994, 634-674.

"Consistent Measures of Output for the Antebellum and Postbellum Periods: Issues and Preliminary Results" (with Christopher Hanes), Journal of Economic History, June 1994, 409-422. Republished as

"Consistent Output Series for the Antebellum and Postbellum Periods: Issues and Preliminary Results," in Business Cycles since 1820, edited by Trevor J.O. Dick, Edward Elgar, 1998, 15-27.

"The Panic of 1857: Origins, Transmission, and Containment" (with Larry Schweikart), Journal of Economic History, December 1991, 807-34.

"The Role of Demandable Debt in Structuring Optimal Banking Arrangements" (with Charles M. Kahn), American Economic Review, June 1991, 497-513. Republished in The Regulation and Supervision of Banks, edited by Maximilian J. B. Hall, Edward Elgar Publishing, 2001.

"The Motives of U.S. Debt-Management Policy, 1790-1880: Efficient Discrimination and Time Consistency," Research in Economic History, 13, 1991, 67-105.

"Is Deposit Insurance Necessary? A Historical Perspective," Journal of Economic History, June 1990, 283-95.

"Firm Heterogeneity, Internal Finance, and Credit Rationing" (with R. Glenn Hubbard), Economic Journal, March 1990, 90-104.

"Price Flexibility, Credit Availability and Economic Fluctuations: Evidence from the U.S., 1894-1909" (with R. Glenn Hubbard), Quarterly Journal of Economics, August 1989, 429-52.

"The Motivations for Loan Commitments Backing Commercial Paper," Journal of Banking and Finance, May 1989, 271-77.
"The Effects of Asset Substitutes on Money Demand and the Inflation Process in Brazil" (with Ian Domowitz), Journal of Money, Credit, and Banking, February 1989, 78-89.

"Price and Exchange Rate Determination During the Greenback Suspension," Oxford Economic Papers, December 1988, 719-50.

"Institutional Failure, Monetary Scarcity, and the Depreciation of the Continental," Journal of Economic History, March 1988, 47-68.

"The Depreciation of the Continental: A Reply," Journal of Economic History, September 1988, 693-98.
Articles in Other Journals

"Marginal Tax Rate Cuts and the Public Tax Debate" (with Kevin Hassett), National Tax Journal, forthcoming 2002. Also appeared in part as "Searching for Sense in the Tax Cut Debate" in On the Issues, American Enterprise Institute, December 2001.

"Banking Approaches the Modern Era," Regulation, 25th Anniversary Special Report, Summer 2002, 14-21.

"Lessons from Argentina and Brazil" Cato Journal, 23 (Spring/Summer) 2003, 33-46.

"The Regulation of Operational Risk in Investment Management Companies (with Richard Herring), Perspective, Investment Co. Institute, September 2002, Vol. 8, No. 2.

"Emerging Market Banks: The Achilles Heel of Liberalization," Economic Directions, Vol 12, No. 2, 2002.

"Safety Nets, Bailouts, and Market Discipline: An Interview," The Financial Regulator, Vol. 7, No. 1, June 2002.

"Financial Regulation in a Global Marketplace" (with Robert E. Litan), Brookings-Wharton Papers on Financial Services 2000.

"When Will Economics Guide IMF and World Bank Reforms?" The Cato Journal 20 (Spring/Summer) 2000, 85-103.

"Fixing the IMF" (with Allan Meltzer), The National Interest, Summer 1999, 88-96. "The Impending Collapse of the European Monetary Union," The Cato Journal 18 (Winter) 1999, 445-452.

"Runs on Banks and the Lessons of the Great Depression," Regulation 22 (1) 1999, 4-7.

"How To Invent a New IMF," The International Economy, January/February 1998, 32-35, 67. Reprinted in On the Issues, American Enterprise Institute, May 1999.

"Market-Based Banking Supervision," The Financial Regulator 4 (March) 1999, 33-36.

"The IMF's Imprudent Role As Lender of Last Resort," The Cato Journal 17 (Winter) 1998, 275-294.

"Universal Banking 'American-Style'," Journal of Institutional and Theoretical Economics 154, March 1998, 43-60.

"High Loan-To-Value Mortgages: Problem or Cure," The Journal of Lending and Credit Risk Management, September 1998, 39-43.

"Reducing Moral Hazard: Introducing Market Signals into Banking Supervision," Economic Perspectives, U.S. Information Agency, August 1998.
"Historical and Contemporary Perspectives on Banking Instability, Deposit Insurance, and Prudential Regulation and Supervision," Review of Monetary and Financial Studies 16 (January) 2000, 8-16 (Japan).

"The Role of Financial Relationships in the History of American Corporate Finance" (with Carlos Ramirez), The Bank of America Journal of Applied Corporate Finance, Summer 1996, 52-73.

"Commercial Paper, Corporate Finance, and the Business Cycle: A Microeconomic Approach" (with Charles Himmelberg and Paul Wachtel), Carnegie-Rochester Series on Public Policy, 42, 1995, 203-250.

"Pricing Margins: Competition Is the Driver," Journal of Retail Banking Services, Autumn 1995, 59-62.

"Valuing a Cash Flow Mortgage," Illinois Real Estate Letter, Winter/Spring 1995, 5-6.

"Is the Discount Window Necessary? A Penn-Central Perspective," NBER Working Paper No. 4573 (December 1993), Federal Reserve Bank of St. Louis Review, May-June 1994, 31-55.

"Financial Factors and the Great Depression," Journal of Economic Perspectives, Spring 1993, 61-85.

"Cooperative Arrangements for the Regulation of Banking by Banks" (with Charles M. Kahn), Illinois Business Review, Summer 1990, 8-13.

"Deposit Insurance: Lessons from the Record," Economic Perspectives, Federal Reserve Bank of Chicago, May/June 1989, 10-30.

"The Farm Debt Crisis and Public Policy" (with R. Glenn Hubbard and James Stock), Brookings Papers on Economic Activity 2 (1986), 441-85.

"Comment on 'Devaluation Risk and the Business Cycle Implications of Exchange Rate Management'" (by Enrique G. Mendoza and Martin Uribe), Carnegie-Rochester Series on Public Policy, 2000.

"Comment on 'Sound Money' by Michael Bordo and 'Lessons from Financial Crises' by Randall Kroszner," in Anna J. Schwartz: The Policy Influence, special issue of the Journal of Financial Services Research 18 (December) 2000, 173-177.

"Comment on 'An Historical Perspective on the Federal Reserve's Monetary Aggregates: Definition, Construction, and Targeting'" (by Richard Anderson and Kenneth Kavajecz), Federal Reserve Bank of St. Louis Review, March/April 1994, 67-71.

"Comment on 'The Decline of Private Deposit Insurance in the U.S.'" (by William English), Carnegie-Rochester Series on Public Policy, 38, June 1993, 129-142.

<u>Parts of Books (Chapters)</u>

"Capital Flows, Financial Crises, and Public Policy," in <u>Globalization: What's New?</u>, edited by Michael Weinstein, Columbia University Press, 2005, 36-76.

"A Taxonomy of Financial Crisis Restructuring Mechanisms: Cross-Country Experience and Policy Implications" (with Daniela Klingebiel and Luc Laeven), World Bank Policy Research Paper WPS3379, August 2004 in <u>Systemic Financial Distress: Containment and Resolution</u>, edited by Patrick Honohan and Luc Laeven, World Bank, forthcoming.

"Reestablishing Market Discipline as Part of Bank Regulation," in Claudio Borio, William C. Hunter, George Kaufman, and Costas Tsatsaronis, eds., <u>Market Discipline: The Evidence across Countries and Industries</u>, MIT Press, 2004, 407-16.

"Financial History and the Long Reach of the Second Thirty Years War," in <u>History Matters: Economic Growth, Technology, and Population</u>, T. Guinnane, W. Sundstrom, and W. Whatley, eds., Stanford University Press, 2004, 115-41.

"Banking and Financial Intermediation," in <u>Technological Innovation and Economic Performance</u>, Benn Steil, David Victor, and Richard Nelson, eds., Princeton University Press, 2002, 285-313.

"Financial History and the Long Reach of the Second Thirty Years War," in <u>History Matters: Economic Growth, Technology, and Population</u>, T. Guinnane, W. Sundstrom, and W. Whatley, eds., 2004, 115-41.

"Banking: Modern Period," <u>The Oxford Encyclopedia of Economic History</u>, Joel Mokyr, ed., Volume 1 2003, 226-35.

"Jonathan Hughes," The Oxford Encyclopedia of Economic History, Joel Mokyr, ed., forthcoming 2002.

"How to Restructure Failed Banking Systems: Lessons from the U.S. in the 1930s and Japan in the 1990s" (with Joseph Mason), in Privatization, Corporate Governance, and Transition Economies, Takatoshi Ito and Anne Krueger, eds., National Bureau of Economic Research, University of Chicago Press, 2004, 375-420.

"An Economist's Case for GSE Reform," in Serving Two Masters, Yet Out of Control, Peter J. Wallison, ed., AEI Press, 2001, 85-106. Originally published as "Are Fannie and Freddie Optimal Mechanisms? An Economist's Case for GSE Reform," in Fannie Mae and Freddie Mac: Mixing Private Interest and Public Purpose, Peter J. Wallison, ed., American Enterprise Instituite, 2000.

"Can Emerging Market Bank Regulators Establish Credible Discipline?", in Prudential Supervision: What Works and What Doesn't, Frederic S. Mishkin, ed., National Bureau of Economic Research, University of Chicago Press, 2001, 147-196. Also appeared as NBER Working Paper, June 2000.

"Blueprints for a New Global Financial Architecture," in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer, ed., University of Chicago Press, 2003, 259-90. Earlier version appeared in Joint Economic Committee of the U.S. Congress, Compendium of Studies on International Economic Issues, 105th Congress, Second Session, October 1998.

"Is the Bank Merger Wave of the 90s Efficient?" (with Jason Karceski), in Mergers and Productivity, Steven Kaplan, ed., National Bureau of Economic Research, University of Chicago Press, 2000, 93-161. Also published in the series, AEI Studies on Financial Market Deregulation as Is the Bank Merger Wave of the 90s Efficient, American Enterprise Institute, 1998.

"Building an Incentive-Compatible Safety Net," in Lessons from the Tequila Crisis for Successful Financial Liberalization, edited by Charles W. Calomiris, special issue of the Journal of Banking and Finance, October 1999.

"Universal Banking and the Financing of Industrial Development," in Reforming Financial Systems: Historical Implications for Policy, Gerard Carpio, Jr., and Dimitri Vittas, eds., Cambridge University Press, 1997, 113-127.

"Was the Great Depression a Watershed in American Monetary Policy?" (with David Wheelock), in The Defining Moment: The Great Depression and the American Economy in the Twentieth Century, Michael Bordo, Claudia Goldin, and Eugene White, eds., National Bureau of Economic Research, University of Chicago Press, 1998, 23-66.

"Designing the Post-Modern Safety Net: Lessons from Developed and Developing Economies," in Money, Prices, and the Real Economy, edited by Geoffrey Wood, Edward Elgar, 1998, 94-120. Also published in the series, AEI Studies on Financial Market Deregulation as The Postmodern Bank Safety Net, American Enterprise Institute, 1997.

"The Financing of the American Corporation, 1800-1990" (with Carlos Ramirez), in The American Corporation Today, Carl Kaysen, ed., Oxford University Press, 1996, 128-186. Winner of the 1996 American Publishers' Award for Best Book in the Area of Business and Management.

"Leverage as a State Variable for Employment, Inventory Accumulation, and Fixed Investment" (with Athanasios Orphanides and Steven Sharpe), NBER Working Paper No. 4800 (July 1994), in Asset Prices and the Real Economy, Forrest Capie and Geoffrey Wood, eds., Macmillan, 1997, 169-193.

"Historical Macroeconomics and American Macroeconomic History" (with Christopher Hanes), NBER Working Paper No. 4935 (November 1994), in Macroeconometrics: Developments, Tensions, and Prospects, Kevin D. Hoover, ed., Kluwer Academic Press, 1995, 351-416.

"The Evolution of Market Structure, Information, and Spreads in American Investment Banking" (with Daniel M.G. Raff), in Anglo-American Finance: Financial Markets and Institutions in 20th-Century North America and the U.K., Richard Sylla and Michael Bordo, eds., New York University Solomon Center, Business One Irwin, 1995, 103-160.

"International Adjustment Under the Classical Gold Standard: Evidence for the U.S. and Britain, 1879-1914" (with R. Glenn Hubbard), NBER Working Paper No. 2206 (April 1987), in Modern Perspectives on the Gold Standard, Tamim Bayoumi, Barry Eichengreen, and Mark Taylor, eds., Cambridge University Press, 1996, 189-217.

"The Costs of Rejecting Universal Banking: American Finance in the German Mirror, 1870-1914," in The Coordination of Economic Activity Within and Between Firms, Naomi Lamoreaux and Daniel Raff, eds., National Bureau of Economic Research, University of Chicago Press, 1995, 257-321.

"The Origins of Federal Deposit Insurance" (with Eugene N. White), in The Regulated Economy: A Historical Approach to Political Economy, Claudia Goldin and Gary Libecap, eds., National Bureau of Economic Research, University of Chicago Press, 1994, 145-188.

"Greenback Resumption and Silver Risk: The Economics and Politics of Monetary Regime Change in the United States, 1862-1900," NBER Working Paper No. 4166, in Monetary Regime Transformations, Michael D. Bordo and Forrest Capie, eds., Cambridge University Press, 1993, 86-132.

"Regulation, Industrial Structure, and Instability in U.S. Banking: An Historical Perspective," in Structural Change in Banking, Michael Klausner and Lawrence J. White, eds., New York University Solomon Center, Business One Irwin, 1993, 19-115.

"Greenbacks," in the New Palgrave Dictionary of Money and Finance, Peter Newman, Murray Wilgate, and John Eatwell, eds., Macmillan, 1992, Volume 2: 281-284.

"Do 'Vulnerable' Economies Need Deposit Insurance?: Lessons from the U.S. Agricultural Boom and Bust of the 1920s," in If Texas Were Chile: A Primer on Banking Reform, Philip Brock, ed., ICS Press, 1992, 237-314, 319-28, 450-58.

"Getting the Incentives Right in the Current Deposit Insurance System: Successes from the Pre-FDIC Era," in The Reform of Federal Deposit Insurance: Disciplining the Government and Protecting Taxpayers, James R. Barth and R. Dan Brumbaugh, Jr., eds., Harper Business, 1992, 13-35.

"Agricultural Capital Markets," in The Agricultural Transition in East/Central Europe and the USSR, Avishay Braverman, Karen Brooks, and Csaba Csaki, eds., The World Bank, 1992, 161-86.

"The Origins of Banking Panics: Models, Facts, and Bank Regulation" (with Gary Gorton), in Financial Markets and Financial Crises, R. Glenn Hubbard, ed., National Bureau of Economic Research, University of Chicago Press, 1991, 109-73.

"Comment" on Antitrust Merger Policy: Lessons from the Australian Experience (by Philip Williams and Graeme Woodbridge), in volume on East Asia economic performance, edited by Takatoshi Ito and Anne Krueger, University of Chicago Press, 2004, 67-70.

"International Financial Standards," Conference Volume produced by Institute for International Economics, forthcoming.

"Comment on 'Financial and Monetary Policies in an Economy with Balance Sheet Effects' (by Aaron Tornell)," in Preventing Currency Crises in Emerging Markets, Sebastian Edwards and Jeffrey A. Frankel, eds., National Bureau of Economic Research, University of Chicago Press, 2002, 732-38.

"Comment on 'Financial Systems, Economic Growth, and Globalization' (by Peter L. Rousseau and Richard Sylla)," in Globalization in Historical Perspective, M.D. Bordo, A.M. Taylor, and J.G. Williamson, eds., National Bureau of Economic Research, University of Chicago Press, 2003, 413-15.

"Comment on 'The Performance of the Federal Reserve in Pursuing International Monetary Objectives'" (by Anna J. Schwartz), in George Edward Durell Foundation, Money and Banking: The American Experience, George Mason University Press, 1995, 265-75.

"The History of Ownership and Control in New England Banking: Comment on Lamoreaux," in Getting Inside the Business Enterprise: The Use and Transformation of Information, Peter Temin, ed., National Bureau of Economic Research, University of Chicago Press, 1991, 195-203.

"Alexander Hamilton," in Encyclopedia of American Business History and Biography, Larry Schweikart, ed., Bruccoli Clark Layman, 1990, 239-248.

Published Proceedings

"Credit Card Securitization, Recourse, and Regulatory Arbitrage" (with Eric J. Higgins and Joseph R. Mason) Proceedings of the 37th Annual Conference on Bank Structure and Competition, May 2003, Federal Reserve Bank of Chicago, forthcoming.

"Harnessing Market Discipline in Bank Regulation," The Financial Crisis and Beyond, Korea Deposit Insurance Corporation, 2002.

"Comments on 'Refocusing the Role of the International Monetary Fund' by David Lipton," in Reforming the International Monetary and Financial System, Peter B. Kenen and Alexander Swoboda, eds., International Monetary Fund, 2000.

"Moral Hazard is Avoidable," The Asian Financial Crisis: Origins, Implications, and Solutions, William C. Hunter, George G. Kaufman, and Thomas H. Krueger, eds., Kluwer Academic Publishers, 1999, 379-384.

"The Causes of U.S. Bank Distress During the Depression," Proceedings of the 37th Annual Conference on Bank Structure and Competition, May 2001, Federal Reserve Bank of Chicago, 2002.

"Reforming the Global Financial System," in Global Financial Crises: Implications for Banking and Regulation, Proceedings of the 35th Annual Conference on Bank Structure and Competition, May 1999, Federal Reserve Bank of Chicago, 553-560.

"Gauging the Efficiency of Bank Consolidation during a Merger Wave," Journal of Banking and Finance 23, February 1999, 615-622.

"Comments on Papers by Steinherr, Kroszner, and Benston," in Universal Banking, Anthony Saunders and Ingo Walter, eds., Business One-Irwin, 1996, 109-117.

"Bank Failures, Panics, and Public Policy During the Great Depression" (with Joseph Mason), Proceedings of the 31st Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1995, 110-122.

"Directed Credit Programs for Agriculture and Industry: Arguments from Theory and Fact" (with Charles P. Himmelberg), Proceedings: Annual World Bank Conference on Development Economics 1993, 1994, 113-137.

"Loan Market Competition Between Foreign and Domestic Banks: Some Facts About Loans and Borrowers" (with Mark Carey), Proceedings of the 30th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1994, 331-351.

"Corporate-Finance Benefits from Universal Banking: Germany and the United States, 1870-1914," NBER Working Paper No. 4408 (September 1993), in Proceedings of the 29th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1993, 450-464.

"Comment: Three Papers on Inside Information in Banking," Proceedings of the 28th Annual Conference of Bank Structure and Competition, Federal Reserve Bank of Chicago, 1992.

"Comment on 'International Bank Capital Standards'" (by George Benston), in Emerging Challenges for the International Financial Services Industry, James Barth, ed., Research in International Business and Finance, 9, 1992, 75-81.

"Demandable Debt as the Optimal Banking Contract" (with Charles M. Kahn), Proceedings: Symposium on Deposit Insurance, The Garn Institute of Finance, University of Utah, 1989, 35–44.

Books, Monographs, Reports and Pamphlets

U.S. Bank Deregulation in Historical Perspective (in Chinese), China Financial Publishing House, forthcoming 2004.

A Globalist Manifesto for Public Policy. Institute for Economic Affairs, London, 2002.

Emerging Financial Markets (with David O. Beim), McGraw Hill, 2001.

U.S. Bank Deregulation in Historical Perspective, Cambridge University Press, 2000.

Reforming Bank Capital Regulation: A Proposal by the U.S. Shadow Financial Regulatory Committee (with other members of the Committee), American Enterprise Institute, AEI Studies on Financial Market Deregulation, 2000.

Lessons from the Tequila Crisis for Successful Financial Liberalization, edited by Charles W. Calomiris, Special Issue of the Journal of Banking and Finance, forthcoming 1999.

High Loan-To-Value Mortgage Lending: Problem or Cure? (with Joseph R. Mason), American Enterprise Institute Press, AEI Studies on Financial Market Deregulation series, 1999.

"The IMF and International Policy," Statement before the Joint Economic Committee of Congress, February 24, 1998, Joint Economic Committee, U.S. Government Printing Office.

Argentina: Financial Sector Review, The World Bank, September 1998 (with G. Caprio, R. Cull, J. Gutierrez, P. Levy, M. Miller, D. Vittas, and S. Schmukler).

"Promoting Financial Development in El Salvador," Commissioned by the Government of El Salvador, December 1997.

Readings in Money, Financial Institutions, and Markets, Addison-Wesley, 1994. This is a customized, annotated reader. Instructors may choose which of the possible 18 chapters they wish to use in their course. The book is intended for use in undergraduate and MBA courses on money and banking, financial markets, commercial bank management, and international finance.

The Bank Merger Wave of the 90s (Co-Edited with Jason Karceski). Office for Banking Research, University of Illinois, 1996.

Competing Bank Strategies in Chicago: An Illinois MBA Project Report (Co-Edited with Jason Karceski). Office for Banking Research, University of Illinois, 1995.

Book Reviews

Review of Intervention to Save Hong Kong, by Charles Goodhart and Lu Dai, Central Banking, XIV (4), May 2004, 96-100.

Review of Stock Market Crashes and Speculative Manias, edited by Eugene N. White, Journal of Economic History, September 1998, 614-617.

Review of Universal Banking in the United States: What Could We Gain? What Could We Lose? by Anthony Saunders and Ingo Walter, Journal of Economic Literature, September 1995, 1357-1359.

Review of The Rise of Financial Capitalism: International Capital Markets in the Age of Reason by Larry Neal, Journal of Economic Literature, December 1993, 2008-2010.

Review of Financial Failure and Confederate Defeat by Douglas B. Ball, Journal of American History, 1992.

Review of Lessons from the Great Depression by Peter Temin, Journal of Economic Literature, December 1991, 1779-82.

Review of Premodern Financial Systems by Raymond Goldsmith, Journal of Economic Literature, March 1989, 88-89.

Review article on A Retrospective on the Classical Gold Standard, 1821-1931, Michael D. Bordo and Anna J. Schwartz, eds, Journal of Economic History, December 1985, 965-68.

**CONGRESSIONAL TESTIMONY**

"Regulatory Policy, Predatory Lending, and Subprime Lending," U.S. House of Representatives Committee on Banking and Financial Services, March 31, 2004.

"The Policy Response to the September 11 Attack," U.S. House Ways and Means Committee, September 20, 2001, Closed door session.

"What to Do, and What not to Do, About Predatory Lending," Statement Before the U.S. Senate Committee on Banking, Housing and Urban Affairs, July 26, 2001.

"How New Is the New IMF?" Statement Before the Joint Economic Committee of the U.S. Congress, March 8, 2001.

"When Will Economics Guide IMF and World Bank Reforms," Statement Before the U.S. Senate Committee on Foreign Relations, May 23, 2000.

"Statement Before the Joint Economic Committee of the U.S. Congress," April 12, 2000.

"Statement Before the U.S. House of Representatives Committee on Banking and Financial Services," March 23, 2000.

"Statement Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs," March 9, 2000.

"Blueprints for a New Global Financial Architecture," Statement Before the Joint Economic Committee of the U.S. Congress, February 24, 1998.

"Firewalls and Universal Banks," Statement Before the Senate Subcommittee on Financial Institutions and Regulatory Relief, March 20, 1997.

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs, and FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff/Intervener, vs. THE UNITED STATES OF AMERICA, Defendant. | No. 93-531<br>Judge Loren Smith |

DEPOSITION OF CHARLES W. CALOMIRIS

VOLUME 3

New York, New York

Friday, July 7, 2006

REPORTED BY:

DONALD R. THACKER

incorrectly added.

Q Thank you.

A And then I will, if you want to have questions about it that will save us any trouble from having to reconvene.

Q Good.

A But I am not opining that I know that.

Q I understand.

A My final point today --

MR. THOMPSON: Off the record.

THE WITNESS: My final response to you is a detailed one, it is going to take us a little bit of time.

Table 5, you had asked about -- I had asked a lot of questions about Table 5.

BY MR. LEVITT:

Q Okay, I see.

A And you had asked whether that was quarterly data which I had said I thought it was quarterly data for those last two columns of Table 5. In other words, quarterly ROA at the last TFR prior to the date of seizure --

Q Date of resolution -- date of seizure, right.

A -- and so I went back because I said I was going to go back and double check and that was the intention. I found that there was a coding error, actually, and that the coding error meant that instead of it being the quarter ROA and the quarter interest expense, that the research assistant's coding error had brought into the database the earnings up to that point for the fiscal year, and the interest expense up to that point for the fiscal year, which is not the correct way to do it.

Now, let me tell you what I have done so that we can remove any confusion about this.

What I did was I have produced for you over night new versions of Table 5. And I have a lot of new information here to help show how the conclusions of Table 5 are robust to anyway you slice or dice it.

So what did I do? I will go through it with you in detail but let me just summarize for you. So I first defined Table 5 using every

Q In 1990?

A 1992.

Q I was just using as an example 1990.

A So the count --

Q Well, that is not the count of -- of failures, is it, or is it?

A It is the count for which I could find data, so when you -- I am using all TFR filers but remember I am also using -- so I have to identify the failure and then I have to look for the TFR. So this is, there may be slight differences in numbers of firms for which data was available for one reason or another but I am giving you the entire universe that I could come up with the corrected coding for finding the ROA concepts, so there may be slight differences in numbers of observations but this is the universe, I haven't excluded anything.

Q So in '92 you were able to get data on 60 failures?

A For the purposes of this table.

Q And in the other, in the original Table 5 when you were using that data you were able to

locate 53 failures?

A It could be that some of those didn't have data, some of the 60 may not have had data in the coding category of fiscal year to date, I am not really sure why there is a slight difference here in the sample. But this old Table 5 is not correct, it's not the right concept.

This is, the new table is the correct concept, and this is a universe, I haven't excluded any.

I am showing you that when you take a sample and you construct for that sample as best one can, based on the data that are available, this is for each of these pages all the data that exist, that I am able to find.

Let me go on because there is another page. Now, the last page is the failure transaction database maintained by the FDIC also has its own code of savings and loan. Notice that, as I mentioned yesterday to you, we were surprised that there was a very slight difference, and you can see it here. If you looked at the first page called

savings and loans only, according to the Federal Reserve's charter type code of 310 for a savings and loan, we have 32 observations in 1992. But according to the financial -- I am sorry, the failure transaction database from the FDIC there are 29. The FDIC was surprised when this was brought to their attention, they didn't, couldn't give us an answer of exactly why that was the case.

So let me just say, I have tried to explain to you, there are many different concepts that are illustrated here, there are many different samples, but the key conclusion is as I summarized it is, which is when you now use the correct concept rather than the concept that was contaminated by the coding error of fiscal year to date, you get a robust conclusion that Carteret's performance measured either by higher return on assets, lower interest expense, or lower bad loans ratio was superior, and that is a conclusion that is true for each of those three categories, for any of the concepts that any of the versions of defining those concepts and for any of the samples used so it is an

extremely robust conclusion.

That concludes my summary of the various answers to your questions from yesterday.

Q Let me just -- let me reserve questioning until we have had a better chance to review the revised exhibit, just a couple of facial things now.

On interest expense to deposits, the -- in your old Table 5 for 1992 for the thrifts that failed other than Carteret it was 2.914 percent; is that right?

A That is what the old, incorrect Table 5 number.

Q So what is the -- give me the analogous figure from the corrected version.

A So remember that the concept that was being illustrated in Table 5 was the quarterly number for all TFR filers for the quarter, prior to seizure.

So that would be the second to last page of Exhibit 11, and it would be the two columns labeled -- well, you asked that interest expense for deposits.

funding delays for the RTC and in the absence of the minority preference rules, Carteret would have been sold as a whole thrift. When you value the supervisory goodwill, are you assuming it would have been sold as part of the sale of the whole thrift?

A Yes, my but-for scenarios are whole bank sales. I am not sure, as I said I guess on Wednesday, I am not sure whether that matters for the transferability of supervisory goodwill, but it never came up in my thinking because my scenarios are whole bank transfers.

So that would be another legal issue that one would want to consult with the legal expert about. I am not sure why the FDIC couldn't transfer supervisory goodwill in pieces particularly because remember that the transferring of supervisory goodwill, when it has been done, has been done because it suits the interests of the government, because it reduces the government's resolution cost.

So I am trying to understand who would contest, again I am not a legal expert, I am just an economist, but if the FDIC says there is no FIRREA

around to stop us and just as we did in the '80s, we find that it is useful from the standpoint of minimizing our costs to transfer supervisory goodwill, even if we are going to sell this in three pieces, well, certainly the banks that are acquiring these pieces that are getting the supervisory goodwill aren't going to complain, the government is not going to complain because the government is doing it for its own interests. So I am trying to understand why it wouldn't happen.

Now that is just a simple economist's points of view, maybe there would be somebody out there who would bring suit but I am trying to imagine who it would be.

Q What I don't understand is why any potential acquiring thrift with substantial tangible capital would want to pay the RTC for Carteret's supervisory goodwill.

A Supervisory goodwill is valuable.

Q And is that because it counts as regulatory capital or it did prior to FIRREA?

A Yes.

Q But if you have more than enough tangible capital, why do you need that?

A Actually there was an issue that occupied a great deal of the Long Island Savings Bank case --

Q I recall your testimony in that case.

A So I can go through this in detail with you. But the answer is banks don't want to be right at the edge of their supervisory -- of their total minimum capital requirement, and banks want to have a buffer of extra capital.

Now, in my testimony before I have gone through this in detail --

Q I understand --

A If you want me to do it again I can do it.

Q No, I understand the basis.

A But what is interesting is, I will just give you the conclusion, that what we know is that it is appropriate to value because banks will always use capital from a regulatory standpoint, that it is appropriate to value regulatory capital that -- from a supervisory goodwill or tangible capital that satisfies that same capital requirement as having

Q What if it was a large -- what if you assume that there is no, you know, the size of the mortgages are randomly distributed between in-house and brokerage, so there is no reason not to assume that I would think.

A It is not just the size of the mortgages it is the size of the mortgages that you make.

Q Even if the margins are a point less you know half the business is from the brokerage, over half?

A This is -- I only know my own experience of having managed a business not too dissimilar from this, so I know that I am not willing to make that assumption.

Q Did your business have brokered originations?

A We operated several offices and I think that we did have some. As I said, we had an office in Florida, I am not sure if I would describe that as a brokerage, but I would say that in looking -- in looking at this, just based on my own very limited experience and managing an entity like this,

let's just say I wouldn't jump to the conclusion that the revenues were, and more importantly the profits, were the same, coming from different parts of this business. And, in fact, I would tend to view the wholesale network, if it weren't -- if these aren't employees of Carteret, if these are brokers that are working with five different or six different ultimate buyers or providers or whatever you want to call them, allies, in the mortgages brokerage network that they are operating, that Carteret is not a unique relationship with them, I am not sure, but I am not sure what these relationships are like exactly, but if these are independent brokers who are calling Carteret up as well as two or three other banks, I am not really seeing this as a big value driver for Carteret. And the way I would expect is that Carteret makes more money per dollar that they originate in-house than per dollar they get from some brokerage relationship, but I don't know, because I don't know the exact breakdown there.

Q I mean just so we don't get the judge a

wrong impression, you are speculating on this. In this last statement it was speculation because you don't know about what you are talking about on this particular thing?

MR. THOMPSON: Objection.

THE WITNESS: Here is the thing, you are asking me a question, I am trying to give you an answer.

BY MR. LEVITT:

Q Right.

A There is a list of five recommendations here and all I have in front of me is this document and what I can remember.

Q All right.

A And I am saying if I read this document and you had blanked out the recommendations and you had asked me to put myself in the shoes of the person making the recommendations, I would have said something more -- I would have guessed one through three, more or less, that is something along those lines. I am not even sure what five means, exactly. And four looked to me like a little bit of I can

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :

CARTERET BANCORP, INC., :

Plaintiffs, : No. 93-531

and : Judge Loren Smith

FEDERAL DEPOSIT INSURANCE :

CORPORATION, :

Plaintiff-Intervenor, :

vs. :

THE UNITED STATES OF AMERICA :

Defendant. :

- - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Tuesday, February 28, 2006

Deposition of WAYNE S. GREEN, a 30(b)(6) witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 Eleventh Street, NW, Washington, D.C., at 9:43 a.m., Tuesday, February 28, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Certified Copy

Q. Who made the determination that post-insolvency interest for Carteret needed to be recomputed and reprioritized?

A. Well, in 1999, we determined that or we questioned whether or not the methodology of calculating post-insolvency interest of Carteret for the years '97 and '98 was correct.

We then, we being the goodwill team sent an E-Mail to the legal division counsel and requesting their opinion on what was the proper methodology for calculating post-insolvency interest. As a result of their response to the goodwill team, the PII in 1999 was recalculated using a different rate and compounding methodology that had been used in 1997 and 1998.

Q. You said that we questioned in 1999 whether the PII methodology was correct. What caused you to question that then as opposed to earlier?

A. I think in the fall of 1999 when the dividend processing system was being modified to calculate post-insolvency interest that we looked into the different methodologies of calculating PII to confirm that the system would be able to handle the calculation.

I think as a result of that inquiry when

we were comparing the way we had done it on Carteret and other receiverships that we questioned whether or not the prior methodologies that had been used was the correct methodology.

Q. Okay. But what specifically caused you to raise that question. I understand in what context it was raised, but what caused to you say, gee, are we doing this correctly?

A. I don't remember.

Q. And was this a question that was raised with respect to just Carteret receivership, with respect to all receiverships, with respect to a subset of receiverships?

A. I believe there was a certain subset of receiverships that we questioned the validity of the method of calculating post-insolvency interest.

Q. And what was that subset?

A. Well, that subset included Carteret in addition to four or five our receiverships that we ultimately made adjustments on by changing the methodology.

Q. Was there something about these -- the subset of receiverships that distinguished it from other receiverships that caused to you question how it was calculated for the subset?

Page 1

UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------------x
AMBASE CORPORATION and CARTERET BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.

---------------------------------------x

600 Fifth Avenue
New York, New York
March 30, 2006
9:40 a.m.

Deposition of EDWARD GRIFFIN, pursuant to Subpoena, before Sophie Nolan, a Notary Public of the State of New York.

CERTIFIED COPY

Q. And what were your responsibilities? Were they consistent in these various assignments?

A. They changed after Masalon to become a managing agent for each institution while in conservatorship.

Q. Was the managing agent the equivalent of a CEO in the private sector?

A. Yes, it was.

Q. And do you recall that George Gross was your predecessor --

A. Yes.

Q. Do you recall whether Mr. Gross was relieved of his responsibilities?

A. Yes.

Q. And do you recall whether Mr. Gross was charged with having or was thought to have stolen from Carteret?

A. Yes.

Q. What is your understanding of what the accusations against Mr. Gross were?

A. There were two accusations, one of which was what you might term stealing. He was filling his personal car with the gas tank -- the gas supplies from Carteret.

The second was purely internal. It

was how he brought certain people into the conservatorship who, in the opinion of the management of RTC, were not qualified to perform the job and who were overpaid.

Q. Okay. Do you recall who the individuals who were deemed to be unqualified were?

A. I recall one. Her name was Debra Thornton.

Q. Do you recall what Ms. Thornton's responsibilities were?

A. I am going to say control of asset management now.

Q. It says on your resume under the "FDIC/RTC," the second bullet point is, "Organized residential and commercial loans, securitizations."

Do you see that?

A. Yes.

Q. And what is a securitized sale?

A. A securitized sale is a group of loans anywhere from 5 to 500, secured by notes, government notes.

Q. And did the securitization make the loans more attractive to acquirers?

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
\- - - - - - - - - - - - - - - - - - )

CERTIFIED COPY

Washington, D.C.
Friday, April 7, 2006

Deposition of KAREN JEAN HUGHES, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:39 a.m., Friday, April 7, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

that 95 was maybe more probably than something at 90 percent.

Q. Okay. Is there general accounting -- are there general accounting principles for whether -- for when a recovery is considered probable?

A. It's not specific.

There's accounting guidance that identifies when you have a contingent liability that meets the criteria of probable -- both probable and reasonably estimable, you want to book it in your accounting records.

Q. And what is your understanding of what that general accounting guidance is with respect to when the liability is probable?

A. Depends on the nature of the liability. A liability that was on the books and records of the receivership estate is not a contingent liability. It is a liability in fact.

And so it doesn't really fall within those parameters. The contingent liability concept is more for things that are unknown. The issue with postinsolvency interest from our perspective, that is the liability that starts on day 1.

And so our issue here was at what point do we reflect that, do we show that in the receivership

books and records. We could have reflected it starting day 1 and every day thereafter until the receivership was terminated, recalculate postinsolvency interest, and make the adjustment, and have that be on the face of the financial statements and in the accounting records of the receivership, but there's a huge administrative cost associated with doing that.

And for most of the receiverships, they never got through the deposit claims or other claims such that they would pay postinsolvency interest, so it was an unnecessary burden. What we were trying to do here is setting some kind of a threshold to make the receivership financial statements more meaningful was to come up with the right time frame to recognize and reflect on the face of the statements the liability that had been accruing since day 1.

Q. And in the discussions leading up to the adoption of this policy, were any tax implications of the policy considered?

A. I don't remember.

MR. COLATRIANO: Have this document marked as exhibit 23, please.

(Hughes Exhibit No. 23 was marked for

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

AMBASE CORPORATION, ET AL. :

Plaintiffs :

and : No. 93-531

FDIC :

Plaintiff-Intervenor :

-vs-

:

UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - - - x

April 5, 2006

Washington, D.C.

DEPOSITION OF:

STEVEN JOHNSTON

was called for examination by counsel for the Plaintiffs, pursuant to notice, taken at Cooper & Kirk, 555 11th Street, N.W., Suite 750, Washington, D.C., commencing at 9:37 a.m., before Misty Klapper, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

Certified Copy

deduction available from the date of closing.

Isn't it true that that's the position that the IRS has now taken in the Ben Franklin case, they've allowed the deduction of post-insolvency interest from the date of closing?

A. That's my understanding.

Q. Okay. And are you familiar with any instances in which the IRS has not allowed the deduction of post-insolvency interest from the date of closing?

A. I'm not aware of any other cases of where it was an issue or where it was challenged.

Q. Okay. When you wrote that the IRS agrees that this is a valid tax deduction, do you recall why you had formed that belief? Was it because of Ben Franklin or some other reason?

A. I can't recall any other reason, other than, possibly, the Ben Franklin case. I'm not aware of any other instance where the IRS, you know, specifically agreed to that position.

Q. Okay. And just so the record is clear, you can't recall any other instances in which the IRS took a position on that issue; is that right?

A. That's correct.

Q. Okay. Do you recall whether there was

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - X
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :
\- - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 10, 2005

Deposition of JAY A. JUPITER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, 200, Washington, D.C., at 9:39 a.m., Friday, June 10, 2005, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

CERTIFIED COPY

you know, in creating the RTC's Minority Resolution Preference Program, Congress' intent was clear. The first goal was to resolve failed institutions in an expeditious manner."

Do you think you have an opinion as to whether the Minority Preference Program served that interest of expeditiously failed resolving failed institutions?

A. Do I have an opinion -- I don't have an opinion now and I don't recall what my opinion was at the time.

Q. With respect to the second goal, do you have an opinion as to whether it promoted that goal?

A. Same answer, I don't have an opinion now and I don't recall what my opinion was at the time.

Q. During your time at the FDIC and the RTC -- and was it the Federal Home Loan Bank?

A. Federal Savings Insurance Corporation.

Q. FSLIC?

A. Yes.

Q. In the 1980s.

A. Yes.

Q. Were you aware of any discrimination by the federal government in the selling of branches or institutions, any racial discrimination against

minorities?

A. Well, certainly the level of participation of minorities in those acquisitions was minimal. In some people's mind the effects tests indicated discrimination.

Q. I'm not asking about whether there was a disparate impact, I'm asking about whether you're aware of any intentional discrimination by you or any of your colleges at the federal government in assessing bids by minorities?

A. Certainly not on my behalf.

Q. Are you aware of any racially discriminatory conduct by anyone else at the federal government in considering bids by minority bidders?

A. Not that I was aware of.

Q. Do you recall what the test was for determining whether an institution would be covered by the Minority Preference Program?

A. I don't have a current recollection, no.

(Jupiter Exhibit No. 14 was marked for identification.)

BY MR. THOMPSON:

Q. Now, in the second paragraph of this memo from Mr. Ramey, it says, the first sentence says: "Mr. Sergeon has an interest in approximately 12

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :
- - - - - - - - - - - - - - - - - - X

**Certified Copy**

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

ago you said in theory when you closed the bank all lending was to stop immediately. Why -- what -- why was that, what was the basis for that policy?

A. The bank was closed.

Q. That's true even though the bank was in conservatorship, that was still the policy?

A. It was the policy of a conservatorship.

Q. To stop lending?

A. (Indicating)

Q. I'm sorry, that's a yes?

A. Yes.

(Mindnich Exhibit No. 3 was marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Mindnich, Exhibit 3 are Managing Agents Meeting Hints from January 27, 1993 and they list you as being present at that meeting. I'm only going to ask questions about a couple of things on the first page and then one paragraph on the second page. And I will be showing you a lot, unfortunately a lot of meeting minutes today, so I'll try every time to tell you where I'm going to focus. Obviously you can review as much as you need to to put it into context.

But on the second paragraph of this

Q. And this decision was made, Carteret was seized on December the 4th so this decision was made fairly quickly after Carteret was seized, ten days later, correct?

A. It was made on I believe the day we went in, on the 4th.

Q. And who made that decision, was it a decision from Washington or --

A. It was our decision and it was approved.

Q. And why was that the decision, why was the decision made to shut down the origination activities?

A. That was an automatic. I mean when the RTC went in all -- everything stopped, all lending stopped, all anything stopped, okay? That was across the board, okay?

We went in here. There were I think I said there were 100 people referring mortgages in a pipeline of. In process was 100 million, the approved to close was another 100 -- they are talking 360 million; that was pretty close to my original comments.

We told Washington, we said, you know, you're going to create havoc if you don't fund these mortgages that were approved. I mean you're not --

you're screwing with people, literally, these people are waiting to get their money and buy their houses, we don't want to be -- we don't want to be part of this, because it's not fair. As simple as that, you know, and we made that case and they said fine, go ahead and fund anything that's approved and we wrote a case to do that and that was signed off in Washington.

Q. Okay.

A. Now, on the other side the loans that were in processing and had not been approved, we encouraged the originators to take their loans back, take them to another bank, which they did. So those -- so that -- both sides of that -- that was taken care of that weekend.

Q. Okay. I want to leave aside for purposes of these questions the handling of mortgages that had already been approved or ones that were being processed. I want to focus on the decision to stop any additional origination activities. Were those origination activities done out of a subsidiary, a mortgage company subsidiary?

A. They had a hundred people working all over the state, they were brokers, they were -- you know, they were getting paid by the deals they brought in.

Q. When you say all over the state, are you referring to New Jersey or Florida or --

A. No, they were all over, okay?

Q. Were any efforts made to at any point to market for sale the function at Carteret or any of its subsidiaries that was involved in mortgages origination?

A. It really wasn't a function. I think for all the institutions that I was involved with, that was the only one that was really in that position.

Q. What do you mean?

A. Only because of its size.

Q. What do you mean that was the only one that was in that position?

A. That had $120 million of mortgages in processing.

Q. Okay.

A. And another $250 million ready to close, there weren't too many banks in the country that had that kind of a situation.

Q. Again, I want to leave those out of this, I'm not talking about what's in process or what's been in the pipeline. I'm talking about there's an origination capacity at the bank, an infrastructure for that, correct? Was there any efforts made to

market that infrastructure, to market -- whether it was in a separate, sub or separate function, were there any efforts made to market that function, that origination capacity, that origination infrastructure, market that for sale?

A. No.

Q. Why not?

A. It was something that wasn't done. All lending stopped, okay and we convinced Washington to fund what was approved, okay, and that was stopped.

Q. All right. So is it fair to state and please correct me if I'm misstating it, that it was RTC policy to stop all originations --

A. It's documented, yes, there's documentation.

Q. And not to try to market any of that infrastructure for origination for sale?

A. Of the in process you're talking about?

Q. No. I'm talking whatever infrastructure there was to originate mortgages, was that marketed in any way, I think you said no. I'm asking you is that RTC policy?

A. Well, what are you marketing, are you marketing -- are you -- are you talking about marketing the ability to make mortgages, the

structure that they had set up?

Q. Right.

A. I mean if the structure was set up, that -- if you brought mortgages in you got paid. If you didn't bring any in you didn't get paid. So you know, it was a question of -- it wasn't something that was marketable is I guess what I'm saying. Because everybody -- everybody that was involved on that end of the bank was leaving anyway, the bank was closed.

Q. When you say everybody --

A. They were out of a job, the people who were origination -- the origination people were out of a job because there was no -- no bank to send the mortgage to anymore.

Q. They are out of a job because the decision was made to shut it down --

A. No, they were out of a job because the bank was closed.

Q. And was part of that decision was to shut down lending, correct?

A. Yes.

Q. Was any attempt made to value that aspect of the business?

A. If it was, I wasn't involved.

not funded.

Q. With respect to that next to last paragraph on page 2 of Exhibit 49, where the applications generated from apparently the fourth to the 11th were less than $10 million, where were those applications coming from?

A. I don't know. Where did they come from?

Q. Were they come from branches and the correspondents?

A. Yeah, probably, yeah. I mean I -- if you asked me if I looked at them, no, I didn't look at them.

Q. But that drop off in volume --

A. As soon as -- as soon as the word went out that Carteret had been taken over by the RTC, 90 percent of those guys never showed up again or whatever, you know, but they knew, you know, they'd been down that road before with several of the other institutions around that had been closed and there's nothing coming out of here. So they automatically took their mortgages someplace else. We didn't have to tell them that.

Q. So in effect there was, as far as the mortgages origination business there was nothing to sell?

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.

Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?

A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.

Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?

A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

indication that correspondent relationships had already moved. Meaning that the 10 million could have been in there that week from the correspondents and I would say that probably the bulk of that was correspondents, and the branches as I recall were not that, were not that strong in developing the mortgages.

Q. If you look at Exhibit 47 --

A. I said just the opposite.

Q. Not at all. I don't want to characterize what you said. But there are numbers on Exhibit 47 and I look at those numbers saying that the retail branches generated approximately 45 percent of the origination, of the mortgage loan closings year to date?

A. Well, since we were in the beginning of the month I would say that the greater portion would have been the wholesale office.

Q. The greater proportion of what, the $10 million?

A. Yes.

Q. What did that have to do with the beginning of the month versus the end of the month?

A. Because I would say, you know, these guys generated 5 to 4, 5 for every 4. So if you wanted to

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------x
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
:
Plaintiff :
:
vs. : NO. 93-531
:
THE UNITED STATES OF AMERICA :
:
Defendant :
----------------------------------x

The deposition of J. PAUL RAMEY, JR., was held on Tuesday, April 12, 2005, commencing at 10:00 a.m., at the Radisson Hotel, 210 Holiday Lane, Annapolis, Maryland, before Ronald E. Bennett, Notary Public.

APPEARANCES:
DAVID THOMPSON, ESQUIRE
On behalf of Ambase Corporation

DAVID C. HOFFMAN, ESQUIRE
On behalf of U.S.A.

ALSO PRESENT: LESLIE A. CONOVER, ESQUIRE
GARY A. KUIPER, ESQUIRE

Certified Copy

unfair or is this just another delaying tactic for
some who probably won't be able to do a deal anyway.
Do you see that?
A. Yes.
Q. Was the concern that you were expressing here about a potential delaying tactic by those who wouldn't be able to do a deal anyway, was that based on your experience that the minority bidders who were de novo had a harder time closing deals than established financial institutions?
A. I don't recall.
Q. Is that a reasonable inference from this?
A. Not knowing who the other groups were. I probably wouldn't know who they were if you told me. It could have been someone that I was familiar with that had possibly tried a delaying tactic some other time and it was not able to consummate a transaction. It could have been something like that.. But I don't know.
Q. You were concerned with delay? You didn't want a delaying tactic. Is that fair?
A. Not for the sake of delaying, when we had everyone ready to go. It was in the form of a question. I was asking them what did they think.
Q. Sure. The next document that I would like

to have marked as Ramey 27 is a document that bears the Bates number C-AM-A- 0014370.

(Deposition Exhibit Number 27 marked for purposes of identification.)

BY MR. THOMPSON:

Q. Mr. Ramey, the original message is from Mr. Hambric to yourself, dated August 16, 1994. You can see that at the bottom. Then you make some comments to Mr. Hambric. Rather than reading this into the record, if you wouldn't mind taking a moment to read this, I'll ask you a question or two.

(Pause)

A. Okay. Go ahead.

Q. In your comments you are making the point that putting the bid off from August 15th to August 26th is going to be beneficial because it will allow potential acquirers to focus on the northern and southern franchises separately. Is that the point you are making in this e.mail?

A. Give me your question again.

Q. Let me strike that and ask the question this way. Are you explaining in your comments in this e.mail that one of the reasons, and the quote real problem, close quote, was that a minority group working either alone or with non-minorities would

have a freeze on the sale of assets of a conservatorship?

A. I'm not familiar with this. I don't know why there would have been or why there would not have been. I just don't know -- unless they were needed for other things. I just don't know.

Q. Do you know why they would have been asking your department resolutions whether it was okay?

A. What date is this? September 15th. '94.

Q. So it's about a month after the bids?

A. It's before the resolution.

Q. Yes. Exactly right.

A. At times we would freeze the assets because the purchasers might want them to pass.

Q. The minority purchasers?

A. Any purchasers. Some purchasers earning assets as opposed to cash. If we had earning assets that were of good quality, we may hold on to them to pass that resolution.

Q. Would you have been involved in that decision?

A. It's possible.

Q. Okay. Do you have any recollection as to the reasons why Carteret's assets were frozen or

UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------------x
AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.
---------------------------------------x

600 Fifth Avenue
New York, New York
March 31, 2006
9:35 a.m.

Deposition of MICHAEL SARAN, pursuant to Notice, before Sophie Nolan, a Notary Public of the State of New York.

Certified Copy

subsequent motion.

MR. COLATRIANO: Okay. As I did the last time this was mentioned, I'll reserve all of our rights to claim that any privilege or other protection has been waived and make any other arguments regarding this e-mail.

Q. But Exhibit 17 is a printout of a series of e-mails, one of which begins in the middle of the first page. It's an e-mail from you to Barbara Stark Tishuk, with CCs to three people dated December 1, 1999, "Subject, post-insolvency interest rates and priority of interest." It's Bates stamped AM through and including 537.

Is this the e-mail you were referring to a moment ago when you said you reviewed a document regarding an opinion you had put together regarding post-insolvency interest?

A. Yes, my counsel faxed to me a copy of this e-mail, that is correct.

Q. Okay. The e-mail is from you to Barbara Stark Tishuk. Who is she?

A. I do not recall.

Q. There are three CCs. Let's go over each of them. Who is Peter McDonald?

A. To my recollection Peter McDonald was -- I believe -- my recollection is he was the department head for claims.

Q. Okay.

A. In December of 1999.

Q. Department head for claims within the Hartford --

A. Yes, yes, I'm sorry. Within the Hartford Northeast Service Center, that is correct.

Q. Okay. I think you referred earlier as Thomas Hewitt as your supervisor; is that correct?

A. I believe at that time he was my section chief, my immediate supervisor.

Q. Who was John Vartelas?

A. He was another senior attorney in the corporate affairs, corporate operations. I don't recall exactly what my department was called at that time. I think it was called corporate affairs, corporate receivership operations in Hartford. He was a colleague. He was another senior attorney.

Q. All right. And was your -- this is an e-mail. Was there any other document that reflected your analysis of this issue or your opinion on this issue?

A. I do not know, although the first line of the e-mail says, "As a follow-up to my e-mail yesterday." I don't know or recall what that e-mail references. So, there may have been, but I do not recall any other involvement or analysis on this point other than what may have been contained or may be contained in an e-mail. I assume it would have been dated November 30, 1999.

Q. Okay. I think you said a moment ago that you don't recall why you were asked to perform this analysis; correct?

A. I don't recall, that is correct.

Q. Okay. Do you know why this request was coming at this time in late 1999?

A. No, I do not.

Q. Okay. There's discussion on these pages of post-insolvency interest as it affects, I think, five different institutions; correct?

A. That is correct.

Q. Okay. And there are dates in parenthesis after each one of them and they're all from either 1994 or 1995; correct?

A. That is correct.

Q. So, do you know why, if these institutions had failed or had been resolved years before, why this question was coming up in 1999?

A. I don't recall. I can speculate. I will assume or -- I assume these were the dates of the receivership, but I don't recall other than that's what I suspect it is, but I don't recall as to what the dates indicate.

Q. Okay, but whether it's the date of receivership or date of resolution or whatever, they were all from 1994 to 1995.

A. Right.

Q. And, so, what I'm trying to get a sense of is why if they had -- if that had happened four to five year previous, why this question regarding post-insolvency interest was coming up in 1999.

A. I don't have any recollection as to why.

Q. Okay. How did you go about

analyzing the issue of post-insolvency
interest?
A. My e-mail makes reference to a memo
titled "Receiverships Post-insolvency Interest"
dated. It says -- it indicates the date as
August 8, 1995, which I referred to as the
policy memo and I also indicate that apparently
it was authored by Tom Rose, and Steven Graham
and Alvin Kitchen.
Relying upon that memo, I made a
determination as to what the appropriate
interest rate to be utilized to accrue interest
on post-insolvency -- or post-insolvency
interest of various receiverships.
Q. Did you base your opinion on any
other documents or any other source?
A. I don't recall. I doubt it, but I
don't recall with specificity.
Q. Okay. Do you recall whether you
had discussions with anyone involving this
issue while you were analyzing it?
A. I assume because John Vartelas'
name is provided as a CC, I probably discussed
it with John, but I don't recall any specific
conversation.

Q. Ok. The same paragraph of your e-mail which refers to the Rose, Graham, Kitchen memo also refers to a Rodney Ray/Christine Bradley memo dated April 17, 1995.

Do you recall whether that was something that you consulted in performing your analysis?

A. I don't recall -- I can speculate, but I don't know, I don't recall whether or not I saw the Rodney Ray, but I don't recall with specificity.

Q. Do you know who Rodney Ray was or Christine Bradley?

A. I know who he is now. I don't -- Rodney Ray is an attorney with the FDIC, and I believe he's in Washington. I do not know what his responsibilities were in December of 1999 or, rather, April of 1995.

I do not know and have no recollection of a Christine Bradley.

Q. So, you don't know which division she worked in?

A. I do not.

Q. I take it that you had been

specifically asked about post-insolvency
interest for only about the five institutions
referenced in this e-mail; correct?

A. I don't recall any other inquiries
regarding post-insolvency interest. I
addressed five various receiverships. That's
the only recollection and only based upon my
review of the e-mail provided.

Q. Do you know why the inquiries
related to just those five?

A. I do not.

Q. Do you know whether those five
institutions are all institutions involved in
goodwill litigation?

A. I do not know.

Q. I've got some more questions about
that document, but while we're at it I'd like
to have this document marked as Exhibit 18.

(Saran Exhibit 18, document Bates
stamped AM 00096532 through AM 00096534,
marked for identification.)

Q. Exhibit 18 is two memos really.
The first one is dated June 14, 1995. It's
from Sharon Powers Sivertsen, to regional
counsel, subject post-insolvency interest

memorandum, and the attachment is a memo dated June 8, 1995 from Steven Graham, Alvin Kitchen and Thomas Rose to various regional officials of the FDIC, "Subject, receiverships post-insolvency interest." The Bates stamp for the exhibit is AM 00096532 through and including 534.

My questions are all going to be about the attachment, but you may -- is this June 8th memo that is part of Exhibit 18, is that the memo referred to in your e-mail, and I see that the date is not the same but --

A. I believe -- to the best of my recollection, it is the same memo and that I probably mistyped. I wasn't the best typist. I meant 6/8/95 and I typed 8/8/95.

Q. And I think at the outset of this deposition you mentioned that you reviewed, in preparing for this deposition, a memo prepared by Tom Rose.

Is the attachment to Exhibit 18 the memo you were referring to?

A. A copy of Exhibit 18 was provided to me on Thursday evening about 4 o'clock, that is correct.

Q. Is it fair to say, and please correct me if I'm wrong, that what you did in 1999 in analyzing this post-insolvency interest issue was you looked at the June 8, 1995 memo and made a determination about which of the categories listed in the June 8, 1995 memo Carteret fell into for purposes of calculating post-insolvency interest?

A. It would be a fair assessment. The 1995 memo refers to -- depending on the type of institution and receivership, it identifies four different types of institutions and, yes, I relied upon the 1995 policy memo, to the best of my recollection, yes.

Q. Okay. The 1995 policy memo has four categories. The first is "Prenational depositor preference state banks and savings associations which were not regulated by the Federal Home Loan Bank board."

The second is "Prenational depositor preference national banks." The third, is "National depositor preference state banks and savings associations," and the fourth is national depositor preference national banks and federal savings associations."

Do you see that?
A. I do.
Q. There's not a category on here that I can see about prenational depositor preference savings associations that were regulated by the Federal Home Loan Bank board; is that right?
A. I -- I guess it is. I really don't -- I guess I would have to agree. I don't know if it fits into one not regulated and -- I guess that would be right. I don't really know.
Q. When you analyzed this issue in, did you analyze it with the assumption that these four categories covered the universe of potential categories in which an institution could be placed?
A. I think that would be a fair statement, yes.
Q. The 1995 memo in the second paragraph of the first page of the June 8th memo says, "The interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the

jurisdiction it was in, and whether it had a
state or federal charter."
What was your understanding about
why these were the relevant factors?
A. I -- I don't recall. The memo
was -- states -- you know, the memo was
prepared by deputy general counsel and I didn't
read beyond it.
Q. Okay. What was your understanding
of what the memo meant when it said "when the
institution failed"?
A. I don't recall.
Q. And are you aware of any other
document or policy statement or any other
source that defines what failure means for
purposes of categorizing an institution for
purposes of calculating post-insolvency
interest?
A. I don't recall any other document.
Q. Okay.
A. Other than possibly the Rodney
Ray/Christine Bradley memo which I don't
recall -- you know, I don't recall if I
consulted it or not or if it had been provided,
but that may, but I don't recall.

Q. Okay. For each of these categories listed on the June 8 memo, there's a particular rate chosen. In some cases it's the state judgment rate and in other cases the treasury bill rate.

On what basis was it decided which rate to use for each of these categories?

A. I do not know.

Q. Okay. How was the RTC's or the FDIC's cost of resolving an institution affected by whether the institution was federally chartered or state chartered?

A. I do not know.

Q. Do you know how the cost of resolution was affected by the date of failure?

A. I do not know.

Q. If you look at your e-mail which is Exhibit 17, on the third page for your discussion of Carteret, go ahead and read that to yourself and let me know when you're ready to proceed, those four paragraphs discussing Carteret.

A. (Reviewing.)

Okay, I've read it.

Q. Is it fair to say that what you did

is look at the date of resolution for each of the three pieces of Carteret and used that date as the operative date for categorizing Carteret for purposes of post-insolvency interest calculations?

A. I don't recall specifically, but it appears to be that was the basis, that is correct.

Q. And why did you use the date of resolution of those three pieces as opposed to, for example, the December 1992 date for when Carteret was initially placed into receivership?

A. I don't recall.

Q. Do you recall having discussions with anyone regarding that issue?

A. I do not recall.

Q. Did you have any follow-up discussions with anyone regarding the post-insolvency issue after providing this opinion that's reflected in Exhibit 17?

A. Not that I recall.

Q. And since that time have you been involved in any other context with analysis of issues regarding how to calculate

post-insolvency interest for receiverships?
A. I want to say no, but I don't recall since I transferred to Open Bank in June of 2000, so I -- I'll say no, not to my recollection.
Q. Okay. So, is it fair to say that at least by your recollection, this was the only occasion in which you were asked to analyze --
A. To the best of my recollection, it is correct.
Q. Just so I finish the question, this is the only occasion, to the best of your recollection, which you were asked to analyze how to determine or calculate post-insolvency interest for a receivership; is that correct?
A. That appears to be correct, yes.
Q. In Exhibit 70 you actually state for each of the three pieces of Carteret what the interest rate should be.
How did you go about determining what the actual rate was? What source did you consult?
A. I don't recall. I can speculate, but I'd rather not.

MR. COLATRIANO: I'd like this marked as Exhibit 19.

MR. KUIPER: I'd like to note that Exhibit 18 on the third page a line is nearly blacked out. I believe it's referring to -- saying, "The rate is utilized to make post-insolvency interest."

I just note for the record because when we get copies I'm sure we won't be able to read it.

MR. COLATRIANO: That's how I read it as well.

MR. KUIPER: It's a line in footnote one.

MS. HART: I concur.

(Saran Exhibit 19, table from internet, marked for identification.)

Q. Exhibit 19 is a table that I will represent that we pulled off the internet on postjudgment interest rates and so I'm not representing to you that this is something that you've seen before because we pulled it off the internet, but I'm wondering if it would spark any recollection for how you went about

actually pinpointing the interest rate that should be used for Carteret.

A. No, it does not.

Q. Is it fair to say that when you prepared your opinion that's reflected in Exhibit 17, you had some source of information which told you whether the federal judgment rate was over the relevant time period; correct?

A. That would be a fair statement.

Q. Okay. Do you know how post-insolvency interest was calculated for Carteret before you prepared your opinion that's reflected in Exhibit 17?

A. No.

MR. KUIPER: Could counsel advise us as to where this came from? Is it state or federal rates or any idea?

MR. COLATRIANO: I think we -- what I can represent is we pulled it off the internet. We were searching for the federal judgment rate and I think this is a federal judgment rate table and I think if you look for the relevant dates, it matches the rates reflected in Exhibit.

# APB Opinion No. 16
# Business Combinations

## STATUS

Issued: August 1970

Effective Date: For business combinations initiated after October 31, 1970

Affects: Supersedes prospectively ARB 43, Chapter 5, paragraph 10
Supersedes ARB 48
Supersedes ARB 51, paragraphs 7 and 8
Amends ARB 51, footnote 1
Supersedes APB 6, paragraphs 12(c) and 22
Supersedes APB 10, paragraph 5 and footnote 6
Amends APB 11, paragraph 49

Affected by: Paragraph 6 superseded by FAS 71
Paragraphs 87 and 88 amended by FAS 96
Paragraph 88 amended by FAS 38 and FAS 87
Footnote 13 superseded by FAS 87
Paragraph 89 superseded by FAS 96
Paragraph 96 amended by FAS 79
Paragraph 99 amended by FAS 10

## APB Opinion No. 16
## Business Combinations

**CONTENTS**


| | Paragraph Numbers |
|---|---|
| Summary | 1— 8 |
| Problem | 1— 3 |
| Scope and Effect of Opinion | 4— 7 |
| Conclusions | 8 |
| Background | 9—41 |
| Present Accounting and Its Development | 9—14 |
| Development of Two Methods | 9—10 |
| Purchase Method | 11 |
| Pooling of Interests Method | 12—14 |
| Appraisal of Accepted Methods of Accounting | 15—41 |
| Purchase Method | 17—26 |
| An acquisition | 18 |
| A bargained transaction | 19—20 |
| Reporting economic substance | 21 |
| Defects attributed to purchase method | 22—26 |
| Pooling of Interests Method | 27—41 |
| Validity of the concept | 28—30 |
| Consistency with other concepts | 31 |
| Usefulness of the concept | 32 |
| Application of the concept | 33—34 |
| Defects attributed to pooling of interests method | 35—41 |
| Opinion | 42—96 |
| Applicability of Accounting Methods | 42—49 |
| Conditions for Pooling of Interests Method | 45—48 |
| Combining companies | 46 |
| Combining of interests | 47 |
| Absence of planned transactions | 48 |
| Subsidiary Corporation | 49 |
| Application of Pooling of Interests Method | 50—65 |
| Assets and Liabilities Combined | 51—52 |
| Stockholders' Equity Combined | 53—55 |
| Reporting Combined Operations | 56—57 |
| Expenses Related to Combination | 58 |
| Disposition of Assets After Combination | 59—60 |
| Date of Recording Combination | 61—62 |
| Disclosure of a Combination | 63—65 |
| Application of Purchase Method | 66—96 |
| Principles of Historical-Cost Accounting | 66—69 |
| Acquiring assets | 67 |
| Allocating cost | 68 |
| Accounting after acquisition | 69 |
| Acquiring Corporation | 70—71 |
| Determining Cost of an Acquired Company | 72—76 |
| Costs of acquisition | 76 |
| Contingent Consideration | 77—86 |
| Contingency based on earnings | 80 |
| Contingency based on security prices | 81—83 |
| Interest or dividends during contingency period | 84 |
| Tax effect of imputed interest | 85 |
| Compensation in contingent agreements | 86 |

Recording Assets Acquired and Liabilities Assumed .......... 87—89
Amortization of Goodwill .......... 90
Excess of Acquired Net Assets Over Cost .......... 91—92
Acquisition Date .......... 93—94
Disclosure in Financial Statements .......... 95—96
Effective Date .......... 97—99

## SUMMARY

### Problem

1. A business combination occurs when a corporation and one or more incorporated or unincorporated businesses are brought together into one accounting entity. The single entity carries on the activities of the previously separate, independent enterprises.

2. Two methods of accounting for business combinations—"purchase" and "pooling of interests"—have been accepted in practice and supported in pronouncements of the Board and its predecessor, the Committee on Accounting Procedure. The accounting treatment of a combination may affect significantly the reported financial position and net income of the combined corporation for prior, current, and future periods.

3. The Director of Accounting Research of the American Institute of Certified Public Accountants has published two studies on accounting for business combinations and the related goodwill: Accounting Research Study No. 5, *A Critical Study of Accounting for Business Combinations*, by Arthur R. Wyatt and Accounting Research Study No. 10, *Accounting for Goodwill*, by George R. Catlett and Norman O. Olson.[1] The two studies describe the origin and development of the purchase and pooling of interests methods of accounting for business combinations. The studies also cite the supporting authoritative pronouncements and their influences on accounting practices and evaluate the effects of practices on financial reporting.

### Scope and Effect of Opinion

4. The Board has considered the conclusions and recommendations of Accounting Research Studies Nos. 5 and 10, the discussions of the need for and appropriateness of the two accepted methods of accounting for business combinations, and proposals for alternative accounting methods. It has also observed the present treatments of combinations in various forms and under differing conditions. The Board expresses in this Opinion its conclusions on accounting for business combinations.

5. This Opinion covers the combination of a corporation and one or more incorporated or unincorporated businesses; both incorporated and unincorporated enterprises are referred to in this Opinion as companies. The conclusions of this Opinion apply equally to business combinations in which one or more companies become subsidiary corporations, one company transfers its net assets to another, and each company transfers its net assets to a newly formed corporation. The acquisition of some or all of the stock held by minority stockholders of a subsidiary is not a business combination, but paragraph 43 of this Opinion specifies the applicable method of accounting. The term business combination in this Opinion excludes a transfer by a corporation of its net assets to a newly formed substitute corporate entity chartered by the existing corporation and a transfer of net assets or exchange of shares between companies under common control (control is described in paragraph 2 of ARB No. 51), such as between a parent corporation and its subsidiary or between two subsidiary corporations of the same parent. This Opinion does not specifically discuss the combination of a corporation and one or more unincorporated businesses or of two or more unincorporated businesses, but its provisions should be applied as a general guide.

6. This Opinion applies to regulated companies in accordance with the provisions of the Addendum to APB Opinion No. 2, *Accounting for the "Investment Credit,"* 1962.

7. The conclusions of this Opinion modify previous views of the Board and its predecessor committee. This Opinion therefore supersedes the following Accounting Research Bulletins (ARB) and Opinions of the Accounting Principles Board (APB):

- ARB No. 43, Chapter 5, *Intangible Assets*, paragraph 10.
- ARB No. 48, *Business Combinations*.
- ARB No. 51, *Consolidated Financial Statements*, paragraphs 7 and 8.
- APB Opinion No. 6, *Status of Accounting Research Bulletins*, paragraphs 12c and 22.
- APB Opinion No. 10, *Omnibus Opinion—1966*, paragraph 5.

[1]Accounting research studies are not pronouncements of the Board or of the Institute but are published for the purpose of stimulating discussion on important accounting matters.

Since this Opinion supersedes those existing pronouncements, paragraph 87 of this Opinion should be substituted for the reference to ARB No. 51 in paragraph 49 of APB Opinion No. 11.

Conclusions

8. The Board concludes that the purchase method and the pooling of interests method are both acceptable in accounting for business combinations, although not as alternatives in accounting for the same business combination. A business combination which meets specified conditions requires accounting by the pooling of interests method. A new basis of accounting is not permitted for a combination that meets the specified conditions, and the assets and liabilities of the combining companies are combined at their recorded amounts. All other business combinations should be accounted for as an acquisition of one or more companies by a corporation. The cost to an acquiring corporation of an entire acquired company should be determined by the principles of accounting for the acquisition of an asset. That cost should then be allocated to the identifiable individual assets acquired and liabilities assumed based on their fair values; the unallocated cost should be recorded as goodwill.

## BACKGROUND

### Present Accounting and Its Development

*Development of Two Methods*

9. Most business combinations before World War II were classified either as a "merger," the acquisition of one company by another, or as a "consolidation," the formation of a new corporation. Accounting for both types of combinations generally followed traditional principles for the acquisition of assets or issuance of shares of stock. The accounting adopted by some new corporations was viewed as a precedent for the combining of retained earnings and of amounts of net assets recorded by predecessor corporations as retained earnings and net assets of a new entity.

10. Emphasis shifted after World War II from the legal form of the combination to distinctions between "a continuance of the former ownership or a new ownership" (ARB No. 40, paragraph 1). New ownership was accounted for as a purchase; continuing ownership was accounted for as a pooling of interests. Carrying forward the stockholders' equity, including retained earnings, of the constituents became an integral part of the pooling of interests method. Significant differences between the purchase and pooling of interests methods accepted today are in the amounts ascribed to assets and liabilities at the time of combination and income reported for the combined enterprise.

*Purchase Method*[2]

11. The purchase method accounts for a business combination as the acquisition of one company by another. The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill. The reported income of an acquiring corporation includes the operations of the acquired company after acquisition, based on the cost to the acquiring corporation.

*Pooling of Interests Method*[2]

12. The pooling of interests method accounts for a business combination as the uniting of the ownership interests of two or more companies by exchange of equity securities. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting are retained. The recorded assets and liabilities of the constituents are carried forward to the combined corporation at their recorded amounts. Income of the combined corporation includes income of the constituents for the entire fiscal period in which the combination occurs. The reported income of the constituents for prior periods is combined and restated as income of the combined corporation.

13. The original concept of pooling of interests as a fusion of equity interests was modified in practice as use of the method expanded.[3] The method was first applied in accounting for combinations of affiliated corporations and then extended to some combinations of unrelated corporate ownership interests of comparable size. The method was later accepted for most business combinations in which common

[2] This Opinion refers to the "purchase method of accounting" for a business combination because the term is widely used and generally understood. However, the more inclusive terms "acquire" (to come into possession of) and "acquisition" are generally used to describe transactions rather than the more narrow term "purchase" (to acquire by the payment of money or its equivalent). The broader terms clearly encompass obtaining assets by issuing stock as well as by disbursing cash and thus avoid the confusion that results from describing a stock transaction as a "purchase." This Opinion does not describe a business combination accounted for by the pooling of interests method as an "acquisition" because the meaning of the word is inconsistent with the method of accounting.

[3] The origin, development, and application of the pooling of interests method of accounting are traced in Accounting Research Study No. 5 and summarized in Accounting Research Study No. 10.

stock was issued. New and complex securities have been issued in recent business combinations and some combination agreements provide for additional securities to be issued later depending on specified events or circumstances. Most of the resulting combinations are accounted for as poolings of interests. Some combinations effected by both disbursing cash and issuing securities are now accounted for as a "part purchase, part pooling."

14. Some accountants believe that the pooling of interests method is the only acceptable method for a combination which meets the requirements for pooling. Others interpret the existing pronouncements on accounting for business combinations to mean that a combination which meets the criteria for a pooling of interests may alternatively be accounted for as a purchase.

**Appraisal of Accepted Methods of Accounting**

15. The pooling of interests method of accounting is applied only to business combinations effected by an exchange of stock and not to those involving primarily cash, other assets, or liabilities. Applying the purchase method of accounting to business combinations effected by paying cash, distributing other assets, or incurring liabilities is not challenged. Thus, those business combinations effected primarily by an exchange of equity securities present a question of choice between the two accounting methods.

16. The significantly different results of applying the purchase and pooling of interests methods of accounting to a combination effected by an exchange of stock stem from distinct views of the nature of the transaction itself. Those who endorse the pooling of interests method believe that an exchange of stock to effect a business combination is in substance a transaction between the combining stockholder groups and does not involve the corporate entities. The transaction therefore neither requires nor justifies establishing a new basis of accountability for the assets of the combined corporation. Those who endorse the purchase method believe that the transaction is an issue of stock by a corporation for consideration received from those who become stockholders by the transaction. The consideration received is established by bargaining between independent parties, and the acquiring corporation accounts for the additional assets at their bargained—that is, current—values.

*Purchase Method*

17. The more important arguments expressing the advantages and disadvantages of the purchase method and some of the practical difficulties experienced in implementing it are summarized in paragraphs 18 to 26.

18. *An acquisition.* Those who favor the purchase method of accounting believe that one corporation acquires another company in almost every business combination. The acquisition of one company by another and the identities of the acquiring and acquired companies are usually obvious. Generally, one company in a business combination is clearly the dominant and continuing entity and one or more other companies cease to control their own assets and operations because control passes to the acquiring corporation.

19. *A bargained transaction.* Proponents of purchase accounting hold that a business combination is a significant economic event which results from bargaining between independent parties. Each party bargains on the basis of his assessment of the current status and future prospects of each constituent as a separate enterprise and as a contributor to the proposed combined enterprise. The agreed terms of combination recognize primarily the bargained values and only secondarily the costs of assets and liabilities carried by the constituents. In fact, the recorded costs are not always known by the other bargaining party.

20. Accounting by the purchase method is essentially the same whether the business combination is effected by distributing assets, incurring liabilities, or issuing stock because issuing stock is considered an economic event as significant as distributing assets or incurring liabilities. A corporation must ascertain that the consideration it receives for stock issued is fair, just as it must ascertain that fair value is received for cash disbursed. Recipients of the stock similarly appraise the fairness of the transaction. Thus, a business combination is a bargained transaction regardless of the nature of the consideration.

21. *Reporting economic substance.* The purchase method adheres to traditional principles of accounting for the acquisition of assets. Those who support the purchase method of accounting for business combinations effected by issuing stock believe that an acquiring corporation accounts for the economic substance of the transaction by applying those principles and by recording:

a. All assets and liabilities which comprise the bargained cost of an acquired company, not merely those items previously shown in the financial statements of an acquired company.
b. The bargained costs of assets acquired less liabilities assumed, not the costs to a previous owner.
c. The fair value of the consideration received for stock issued, not the equity shown in the financial statements of an acquired company.

d. Retained earnings from its operations, not a fusion of its retained earnings and previous earnings of an acquired company.

e. Expenses and net income after an acquisition computed on the bargained cost of acquired assets less assumed liabilities, not on the costs to a previous owner.

22. *Defects attributed to purchase method.* Applying the purchase method to business combinations effected primarily by issuing stock may entail difficulties in measuring the cost of an acquired company if neither the fair value of the consideration given nor the fair value of the property acquired is clearly evident. Measuring fair values of assets acquired is complicated by the presence of intangible assets or other assets which do not have discernible market prices. Goodwill and other unidentifiable intangible assets are difficult to value directly, and measuring assets acquired for stock is easier if the fair value of the stock issued is determinable. The excess of the value of stock issued over the sum of the fair values of the tangible and identifiable intangible assets acquired less liabilities assumed indicates the value of acquired unidentified intangible assets (usually called goodwill).

23. However, the fair value of stock issued is not always objectively determinable. A market price may not be available for a newly issued security or for securities of a closely held corporation. Even an available quoted market price may not always be a reliable indicator of fair value of consideration received because the number of shares issued is relatively large, the market for the security is thin, the stock price is volatile, or other uncertainties influence the quoted price. Further, the determinable value of one security may not necessarily indicate the fair value of another similar, but not identical, security because their differences affect the value—for example, the absence of registration or an agreement which restricts a holder's ability to sell a security may significantly affect its value.

24. Those who oppose applying the purchase method to some or most business combinations effected by stock also challenge the theoretical merits of the method. They contend that the goodwill acquired is stated only by coincidence at the value which would be determined by direct valuation. The weakness is attributed not to measurement difficulties (direct valuation of goodwill is assumed) but to the basis underlying an exchange of shares of stock. Bargaining in that type of transaction is normally based on the market prices of the equity securities. Market prices of the securities exchanged are more likely to be influenced by anticipated earning capacities of the companies than by evaluations of individual assets. The number of shares of stock issued in a business combination is thus influenced by values attributed to goodwill of the acquirer as well as goodwill of the acquired company. Since the terms are based on the market prices of both stocks exchanged, measuring the cost of an acquired company by the market price of the stock issued may result in recording acquired goodwill at more or less than its value determined directly.

25. A related argument is that the purchase method is improper accounting for a business combination in which a relatively large number of shares of stock is issued because it records the goodwill and fair values of only the acquired company. Critics of purchase accounting say that each group of stockholders of two publicly held and actively traded companies evaluates the other stock, and the exchange ratio for stock issued is often predicated on relative market values. The stockholders and management of each company evaluate the goodwill and fair values of the other. Purchase accounting is thus viewed as illogical because it records goodwill and values of only one side of the transaction. Those who support this view prefer that assets and liabilities of both companies be combined at existing recorded amounts, but if one side is to be stated at fair values, they believe that both sides should be recorded at fair values.

26. Criticism of the purchase method is directed not only to the theoretical and practical problems of measuring goodwill in combinations effected primarily by stock but also to accounting after the combination for goodwill recorded by the purchase method. Present accounting for goodwill, which often has an indeterminate useful life, is cited as an example of lack of uniformity because selecting among alternative methods of accounting is discretionary.

### *Pooling of Interests Method*

27. The more important arguments expressing the advantages and disadvantages of the pooling of interests method and some of the practical difficulties experienced in implementing it are summarized in paragraphs 28 to 41.

28. *Validity of the concept.* Those who support the pooling of interests method believe that a business combination effected by issuing common stock is different from a purchase in that no corporate assets are disbursed to stockholders and the net assets of the issuing corporation are enlarged by the net assets of the corporation whose stockholders accept common stock of the combined corporation. There is no newly invested capital nor have owners withdrawn assets from the group since the stock of a corporation is not one of its assets. Accordingly, the net assets of the constituents remain intact but com-

bined; the stockholder groups remain intact but combined. Aggregate income is not changed since the total resources are not changed. Consequently, the historical costs and earnings of the separate corporations are appropriately combined. In a business combination effected by exchanging stock, groups of stockholders combine their resources, talents, and risks to form a new entity to carry on in combination the previous businesses and to continue their earnings streams. The sharing of risks by the constituent stockholder groups is an important element in a business combination effected by exchanging stock. By pooling equity interests, each group continues to maintain risk elements of its former investment and they mutually exchange risks and benefits.

29. A pooling of interests transaction is regarded as in substance an arrangement among stockholder groups. The fractional interests in the common enterprise are reallocated—risks are rearranged among the stockholder groups outside the corporate entity. A fundamental concept of entity accounting is that a corporation is separate and distinct from its stockholders. Elected managements represent the stockholders in bargaining to effect a combination, but the groups of stockholders usually decide whether the proposed terms are acceptable by voting to approve or disapprove a combination. Stockholders sometimes disapprove a combination proposed by management, and tender offers sometimes succeed despite the opposition of management.

30. Each stockholder group in a pooling of interests gives up its interests in assets formerly held but receives an interest in a portion of the assets formerly held in addition to an interest in the assets of the other. The clearest example of this type of combination is one in which both groups surrender their stock and receive in exchange stock of a new corporation. The fact that one of the corporations usually issues its stock in exchange for that of the other does not alter the substance of the transaction.

31. *Consistency with other concepts.* Proponents of pooling of interests accounting point out that the pooling concept was developed within the boundaries of the historical-cost system and is compatible with it. Accounting by the pooling of interests method for business combinations arranged through the issuance of common stock is based on existing accounting concepts and is not an occasion for revising historical costs. Both constituents usually have elements of appreciation and of goodwill which are recognized and offset, at least to some extent, in setting a ratio of exchange of stock. The bargaining which occurs usually reflects the relative earning capacities (measured by historical-cost accounts) of the constituents and frequently recognizes the relative market values of the two stocks, which in turn reflect earning capacity, goodwill, or other values. Accounting recognizes the bargaining by means of the new number of shares outstanding distributed in accordance with the bargained ratio, which has a direct effect on earnings per share after the combination.

32. *Usefulness of the concept.* Those who favor the pooling of interests method of accounting believe that the economic substance of a combination is best reflected by reporting operations up to the date of the exchange of stock based on the same historical-cost information used to develop the separate operating results of each constituent. Also, informative comparison with periods prior to the business combination is facilitated by maintaining historical costs as the basis of reporting combined operations subsequent to the combination.

33. *Application of the concept.* It has been observed that criteria for distinguishing between a pooling and a purchase have eroded over the years and that present interpretations of criteria have led to abuse. However, most accountants who support the pooling concept believe that criteria can be redefined satisfactorily to eliminate abuses. It is their view that the pooling of interests method of accounting for business combinations is justifiable on conceptual grounds and is a useful technique and therefore should be retained.

34. Some proponents of pooling of interests accounting support a restriction on the difference in size of combining interests because a significant sharing of risk cannot occur if one combining interest is minor or because a meaningful mutual exchange does not occur if the combination involves a relatively small number of shares. Most, however, believe that there is no conceptual basis for a size restriction and that establishing a size restriction would seriously impair pooling of interests accounting.

35. *Defects attributed to pooling of interests method.* Those who oppose the pooling of interests method of accounting doubt that the method is supported by a concept. In their view it has become essentially a method of accounting for an acquisition of a company without recognizing the current costs of the assets, including goodwill, underlying the transaction. The concept of a pooling of interests was described in general terms in the past—for example, as a continuity of equity interests or as a combination of two or more interests of comparable size. The descriptions tend to be contradictory. For example, accountants do not agree on whether or not relative size is part of the pooling of interests concept. Attempts to define the concept in terms of broad criteria for applying the method have also been unsuccessful.

36. Indeed, many opponents of the pooling of interests method of accounting believe that effective criteria cannot be found. The concept of a uniting or fusing of stockholder groups on which pooling of interests accounting is based implies a broad application of the method because every combination effected by issuing stock rather than by disbursing cash or incurring debt is potentially a pooling of interests unless the combination significantly changes the relative equity interests. However, so broad an application without effective criteria results in applying the pooling of interests method to numerous business combinations which are clearly in economic substance the acquisition of one company by another.

37. Some critics point out that the method was first applied to combining interests of comparable size and that pronouncements on business combinations have never sanctioned applying pooling of interests accounting to all or almost all business combinations effected by exchanging stock. All pronouncements have indicated that a large disparity in the size of the combining interests is evidence that one corporation is acquiring another.

38. Other criteria restricting application of pooling of interests accounting, such as those prohibiting future disposals of stock received and providing for continuity of management, were added to the size restriction. Those criteria have, however, tended to strengthen the view that one corporation acquires another because they are unilateral, that is, they are applied only to the stockholders and management of the "acquired" company.

39. The most serious defect attributed to pooling of interests accounting by those who oppose it is that it does not accurately reflect the economic substance of the business combination transaction. They believe that the method ignores the bargaining which results in the combination by accounting only for the amounts previously shown in accounts of the combining companies. The acquiring corporation does not record assets and values which usually influence the final terms of the combination agreement with consequent effects on subsequent balance sheets and income statements. The combined earnings streams, which are said to continue after a pooling of interests, can continue unchanged only if the cost of the assets producing those earnings is identical for the acquiring corporation and the acquired company. That coincidence rarely occurs because the bargaining is based on current values and not past costs.

40. Pooling of interests accounting is also challenged because the amount of assets acquired less liabilities assumed is recorded without regard to the number of shares of stock issued. The result does not reflect the presumption that a corporation issues stock only for value received and, in general, the greater the number of shares issued, the larger the consideration to be recorded.

41. Traditional principles of accounting for acquisitions of assets encompass all business combinations because every combination is effected by distributing assets, incurring liabilities, issuing stock, or some blend of the three. Those who oppose the pooling of interests method believe that a departure from the traditional principles is justified only if evidence shows that financial statements prepared according to other principles better reflect the economic significance of a combination. In their opinion, the characteristics of a business combination do not justify departing from traditional principles of accounting to accommodate the pooling of interests method.

## OPINION

### Applicability of Accounting Methods

42. The Board finds merit in both the purchase and pooling of interests methods of accounting for business combinations and accepts neither method to the exclusion of the other. The arguments in favor of the purchase method of accounting are more persuasive if cash or other assets are distributed or liabilities are incurred to effect a combination, but arguments in favor of the pooling of interests method of accounting are more persuasive if voting common stock is issued to effect a combination of common stock interests. Therefore, the Board concludes that some business combinations should be accounted for by the purchase method and other combinations should be accounted for by the pooling of interests method.

43. The Board also concludes that the two methods are not alternatives in accounting for the same business combination. A single method should be applied to an entire combination; the practice now known as part-purchase, part-pooling is not acceptable. The acquisition after the effective date of this Opinion of some or all of the stock held by minority stockholders of a subsidiary—whether acquired by the parent, the subsidiary itself, or another affiliate—should be accounted for by the purchase method rather than by the pooling of interests method.

44. The Board believes that accounting for business combinations will be improved significantly by specifying the circumstances in which each method should be applied and the procedures which should be followed in applying each method. The distinctive conditions which require pooling of interests

accounting are described in paragraphs 45 to 48, and combinations involving all of those conditions should be accounted for as described in paragraphs 50 to 65. All other business combinations should be treated as the acquisition of one company by another and accounted for by the purchase method as described in paragraphs 66 to 96.

*Conditions for Pooling of Interests Method*

45. The pooling of interests method of accounting is intended to present as a single interest two or more common stockholder interests which were previously independent and the combined rights and risks represented by those interests. That method shows that stockholder groups neither withdraw nor invest assets but in effect exchange voting common stock in a ratio that determines their respective interests in the combined corporation. Some business combinations have those features. A business combination which meets *all* of the conditions specified and explained in paragraphs 46 to 48 should be accounted for by the pooling of interests method. The conditions are classified by (1) attributes of the combining companies, (2) manner of combining interests, and (3) absence of planned transactions.

46. *Combining companies.* Certain attributes of combining companies indicate that independent ownership interests are combined in their entirety to continue previously separate operations. Combining virtually all of existing common stock interests avoids combining only selected assets, operations, or ownership interests, any of which is more akin to disposing of and acquiring interests than to sharing risks and rights. It also avoids combining interests that are already related by substantial intercorporate investments.

The two conditions in this paragraph define essential attributes of combining companies.

a. Each of the combining companies is autonomous and has not been a subsidiary or division of another corporation within two years before the plan of combination is initiated.

A plan of combination is initiated on the earlier of (1) the date that the major terms of a plan, including the ratio of exchange of stock, are announced publicly or otherwise formally made known to the stockholders of any one of the combining companies or (2) the date that stockholders of a combining company are notified in writing of an exchange offer. Therefore, a plan of combination is often initiated even though consummation is subject to the approval of stockholders and others.

A new company incorporated within the preceding two years meets this condition unless the company is successor to a part of a company or to a company that is otherwise not autonomous for this condition. A wholly owned subsidiary company which distributes voting common stock of its parent corporation to effect the combination is also considered an autonomous company provided the parent corporation would have met all conditions in paragraphs 46 to 48 had the parent corporation issued its stock directly to effect the combination.

Divestiture of assets to comply with an order of a governmental authority or judicial body results in an exception to the terms of this condition. Either a subsidiary divested under an order or a new company which acquires assets disposed of under an order is therefore autonomous for this condition.

b. Each of the combining companies is independent of the other combining companies.

This condition means that at the dates the plan of combination is initiated and consummated the combining companies hold as intercorporate investments no more than 10 percent in total of the outstanding voting common stock of any combining company.[4] For the percentage computation, intercorporate investments exclude voting common stock that is acquired after the date the plan of combination is initiated in exchange for the voting common stock issued to effect the combination. Investments of 10 percent or less are explained in paragraph 47-b.

47. *Combining of interests.* The combining of existing voting common stock interests by the exchange of stock is the essence of a business combination accounted for by the pooling of interests method. The separate stockholder interests lose their identities and all share mutually in the combined risks and rights. Exchanges of common stock that alter relative voting rights, that result in preferential claims to distributions of profits or assets for some common stockholder groups, or that leave significant minority interests in combining companies are incompatible with the idea of mutual sharing. Similarly, acquisitions of common stock for assets or debt, reacquisitions of outstanding stock for the purpose of exchanging it in a business combination, and other transactions that reduce the common stock interests are contrary to the idea of combining existing stockholder interests. The seven conditions in this paragraph relate to the exchange to effect the combination.

a. The combination is effected in a single transac-

[4]An exception for common stock held on October 31, 1970 is explained in paragraph 99.

tion or is completed in accordance with a specific plan within one year after the plan is initiated.

Altering the terms of exchange of stock constitutes initiation of a new plan of combination unless earlier exchanges of stock are adjusted to the new terms.[5]

A business combination completed in more than one year from the date the plan is initiated meets this condition if the delay is beyond the control of the combining companies because proceedings of a governmental authority or litigation prevents completing the combination.

b. A corporation offers and issues only common stock with rights identical to those of the majority of its outstanding voting common stock[6] in exchange for substantially all of the voting common stock interest of another company at the date the plan of combination is consummated.

The plan to issue voting common stock in exchange for voting common stock may include, within limits, provisions to distribute cash or other consideration for fractional shares, for shares held by dissenting stockholders, and the like but may not include a pro rata distribution of cash or other consideration.

Substantially all of the voting common stock means 90 percent or more for this condition. That is, after the date the plan of combination is initiated, one of the combining companies (issuing corporation) issues voting common stock in exchange for at least 90 percent of the voting common stock of another combining company that is outstanding at the date the combination is consummated. The number of shares exchanged therefore excludes those shares of the combining company (1) acquired before and held by the issuing corporation and its subsidiaries at the date the plan of combination is initiated, regardless of the form of consideration,[7] (2) acquired by the issuing corporation and its subsidiaries after the date the plan of combination is initiated other than by issuing its own voting common stock, and (3) outstanding after the date the combination is consummated.

*An investment in stock of the issuing corporation* held by a combining company may prevent a combination from meeting this condition even though the investment of the combining company is not more than 10 percent of the outstanding stock of the issuing corporation (paragraph 46-b). An investment in stock of the issuing corporation by another combining company is the same in a mutual exchange as an investment by the issuing corporation in stock of the other combining company—the choice of issuing corporation is essentially a matter of convenience. An investment in stock of the issuing corporation must be expressed as an equivalent number of shares of the investor combining company because the measure of percent of shares exchanged is in terms of shares of stock of the investor company. An investment in 10 percent or less of the outstanding voting common stock of the issuing corporation affects the measure of percent of shares exchanged in the combination as follows:

> The number of shares of voting common stock of the issuing corporation held by the investor combining company at the date the plan is initiated plus shares it acquired after that date are restated as an equivalent number of shares of voting common stock of the investor combining company based on the ratio of exchange of stock in the combination.
>
> The equivalent number of shares is deducted from the number of shares of voting common stock of the investor combining company exchanged for voting common stock of the issuing corporation as part of the plan of combination.
>
> The reduced number of shares is considered the number exchanged and is compared with 90 percent of the outstanding voting common stock of the investor combining company at the date the plan is consummated to determine whether the terms of condition 47-b are met.

Since the number of shares of voting common stock exchanged is reduced for an intercorporate investment in voting common stock of the issuing corporation, the terms of condition 47-b may not be met even though 90 percent or more of the outstanding common stock of a combining company is exchanged to effect a combination.

*A combination of more than two companies* is evaluated essentially the same as a combination of two companies. The percent of voting common stock exchanged is measured separately for each combining company, and condition 47-b is met if 90 percent

[5] However, an adjustment after the effective date of this Opinion in the terms of exchange in a plan of combination initiated before and consummated after the effective date always constitutes initiation of a new plan. The one year specified in this condition is measured, therefore, from the date of adjustment of terms and all other conditions are evaluated for the new plan. (Paragraph 97 describes the application of this Opinion to a plan of combination initiated before the effective date of this Opinion and consummated later in accordance with the terms of exchange prevailing on the effective date.)

[6] A class of stock that has voting control of a corporation is the majority class.

[7] An exception for common stock held on October 31, 1970 is explained in paragraph 99.

or more of the voting common stock of each of the several combining companies is exchanged for voting common stock of the issuing corporation. The number of shares exchanged for stock of the issuing corporation includes only shares exchanged by stockholders other than the several combining companies themselves. Thus, intercorporate investments in combining companies are included in the number of shares of stock outstanding but are excluded from the number of shares of stock exchanged to effect the combination.

*A new corporation formed to issue its stock* to effect the combination of two or more companies meets condition 47-b if (1) the number of shares of each company exchanged to effect the combination is not less than 90 percent of its voting common stock outstanding at the date the combination is consummated and (2) condition 47-b would have been met had any one of the combining companies issued its stock to effect the combination on essentially the same basis.

*Condition 47-b relates to issuing common stock for the common stock interests in another company.* Hence, a corporation issuing stock to effect the combination may assume the debt securities of the other company or may exchange substantially identical securities or voting common stock for other outstanding equity and debt securities of the other combining company. An issuing corporation may also distribute cash to holders of debt and equity securities that either are callable or redeemable and may retire those securities. However, the issuing corporation may exchange only voting common stock for outstanding equity and debt securities of the other combining company that have been issued in exchange for voting common stock of that company during a period beginning two years preceding the date the combination is initiated.

*A transfer of the net assets of a combining company* to effect a business combination satisfies condition 47-b provided all net assets of the company at the date the plan is consummated are transferred in exchange for stock of the issuing corporation. However, the combining company may retain temporarily cash, receivables, or marketable securities to settle liabilities, contingencies, or items in dispute if the plan provides that the assets remaining after settlement are to be transferred to the corporation issuing the stock to effect the combination. Only voting common stock may be issued to effect the combination unless both voting common stock and other stock of the other combining company are outstanding at the date the plan is consummated. The combination may then be effected by issuing all voting common stock or by issuing voting common and other stock in the same proportions as the outstanding voting common and other stock of the other combining company. An investment in 10 percent or less of the outstanding voting common stock of a combining company held by another combining company requires special computations to evaluate condition 47-b. The computations and comparisons are in terms of the voting common stock of the issuing corporation and involve:

> *Stock issued for common stock interest.* The total number of shares of voting common stock issued for all of the assets[8] is divided between those applicable to outstanding voting common stock and those applicable to other outstanding stock, if any, of the combining company which transfers assets (transferor company).
>
> *Reduction for intercorporate investments.* The number of issued shares of voting common stock applicable to the voting common stock interests of the transferor combining company is reduced by the sum of (1) the number of shares of voting common stock of the issuing corporation held by the transferor combining company at the date the plan of combination is initiated plus shares it acquired after that date and (2) the number of shares of voting common stock of the transferor combining company held by the issuing corporation at the date the plan of combination is initiated plus shares it acquired after that date. The shares of the transferor combining company are restated as the equivalent number of shares of voting common stock of the issuing corporation for this purpose. Restatement is based on the ratio of the number of shares of voting common stock of the transferor combining company which are outstanding at the date the plan is consummated to the number of issued shares of voting common stock applicable to the voting common stock interests.

*Comparison with 90 percent.* The reduced number of shares of stock issued is compared with 90 percent of the issued number of shares of voting common stock applicable to voting common stock interests to determine if the transfer of assets meets the terms of condition 47-b.

c. None of the combining companies changes the equity interest of the voting common stock in contemplation of effecting the combination either within two years before the plan of combination is initiated or between the dates the combination is initiated and consummated; changes in contemplation of effecting the combination may include distributions to stockholders and additional issuances, exchanges, and retirements of securities.

[8] Including (for this computation) stock of the issuing corporation held by the transferor combining company.

Distributions to stockholders which are no greater than normal dividends are not changes for this condition. Normality of dividends is determined in relation to earnings during the period and to the previous dividend policy and record. Dividend distributions on stock of a combining company that are equivalent to normal dividends on the stock to be issued in exchange in the combination are considered normal for this condition.

d. Each of the combining companies reacquires shares of voting common stock only for purposes other than business combinations, and no company reacquires more than a normal number of shares between the dates the plan of combination is initiated and consummated.

Treasury stock acquired for purposes other than business combinations includes shares for stock option and compensation plans and other recurring distributions provided a systematic pattern of reacquisitions is established at least two years before the plan of combination is initiated. A systematic pattern of reacquisitions may be established for less than two years if it coincides with the adoption of a new stock option or compensation plan. The normal number of shares of voting common stock reacquired is determined by the pattern of reacquisitions of stock before the plan of combination is initiated.

Acquisitions by other combining companies of voting common stock of the issuing corporation after the date the plan of combination is initiated are essentially the same as if the issuing corporation reacquired its own common stock.

e. The ratio of the interest of an individual common stockholder to those of other common stockholders in a combining company remains the same as a result of the exchange of stock to effect the combination.

This condition means that each individual common stockholder who exchanges his stock receives a voting common stock interest exactly in proportion to his relative voting common stock interest before the combination is effected. Thus no common stockholder is denied or surrenders his potential share of a voting common stock interest in a combined corporation.

f. The voting rights to which the common stock ownership interests in the resulting combined corporation are entitled are exercisable by the stockholders; the stockholders are neither deprived of nor restricted in exercising those rights for a period.

This condition is not met, for example, if shares of common stock issued to effect the combination are transferred to a voting trust.

g. The combination is resolved at the date the plan is consummated and no provisions of the plan relating to the issue of securities or other consideration are pending.

This condition means that (1) the combined corporation does not agree to contingently issue additional shares of stock or distribute other consideration at a later date to the former stockholders of a combining company or (2) the combined corporation does not issue or distribute to an escrow agent common stock or other consideration which is to be either transferred to common stockholders or returned to the corporation at the time the contingency is resolved.

An agreement may provide, however, that the number of shares of common stock issued to effect the combination may be revised for the later settlement of a contingency at a different amount than that recorded by a combining company.

48. *Absence of planned transactions.* Some transactions after a combination is consummated are inconsistent with the combining of entire existing interests of common stockholders. Including those transactions in the negotiations and terms of the combination, either explicitly or by intent, counteracts the effect of combining stockholder interests. The three conditions in this paragraph relate to certain future transactions.

a. The combined corporation does not agree directly or indirectly to retire or reacquire all or part of the common stock issued to effect the combination.
b. The combined corporation does not enter into other financial arrangements for the benefit of the former stockholders of a combining company, such as a guaranty of loans secured by stock issued in the combination, which in effect negates the exchange of equity securities.
c. The combined corporation does not intend or plan to dispose of a significant part of the assets of the combining companies within two years after the combination other than disposals in the ordinary course of business of the formerly separate companies and to eliminate duplicate facilities or excess capacity.

*Subsidiary Corporation*

49. Dissolution of a combining company is not a condition for applying the pooling of interests method of accounting for a business combination. One or more combining companies may be subsidiaries of the issuing corporation after the combination is consummated if the other conditions are met.

**Application of Pooling of Interests Method**

50. A business combination which meets all of the

conditions in paragraphs 45 to 48 should be accounted for by the pooling of interests method. Appropriate procedures are described in paragraphs 51 to 65.

*Assets and Liabilities Combined*

51. The recorded assets and liabilities of the separate companies generally become the recorded assets and liabilities of the combined corporation. The combined corporation therefore recognizes those assets and liabilities recorded in conformity with generally accepted accounting principles by the separate companies at the date the combination is consummated.

52. The combined corporation records the historical-cost based amounts of the assets and liabilities of the separate companies because the existing basis of accounting continues. However, the separate companies may have recorded assets and liabilities under differing methods of accounting and the amounts may be adjusted to the same basis of accounting if the change would otherwise have been appropriate for the separate company. A change in accounting method to conform the individual methods should be applied retroactively, and financial statements presented for prior periods should be restated.

*Stockholders' Equity Combined*

53. The stockholders' equities of the separate companies are also combined as a part of the pooling of interests method of accounting. The combined corporation records as capital the capital stock and capital in excess of par or stated value of outstanding stock of the separate companies. Similarly, retained earnings or deficits of the separate companies are combined and recognized as retained earnings of the combined corporation (paragraph 56). The amount of outstanding shares of stock of the combined corporation at par or stated value may exceed the total amount of capital stock of the separate combining companies; the excess should be deducted first from the combined other contributed capital and then from the combined retained earnings. The combined retained earnings could be misleading if shortly before or as a part of the combination transaction one or more of the combining companies adjusted the elements of stockholders' equity to eliminate a deficit; therefore, the elements of equity before the adjustment should be combined.

54. A corporation which effects a combination accounted for by the pooling of interests method by distributing stock previously acquired as treasury stock (paragraph 47-d) should first account for those shares of stock as though retired. The issuance of the shares for the common stock interests of the combining company is then accounted for the same as the issuance of previously unissued shares.

55. Accounting for common stock of one of the combining companies which is held by another combining company at the date a combination is consummated depends on whether the stock is the same as that which is issued to effect the combination or is the same as the stock which is exchanged in the combination. An investment of a combining company in the common stock of the issuing corporation is in effect returned to the resulting combined corporation in the combination. The combined corporation should account for the investment as treasury stock. In contrast, an investment in the common stock of other combining companies (not the one issuing stock in the combination) is an investment in stock that is exchanged in the combination for the common stock issued. The stock in that type of intercorporate investment is in effect eliminated in the combination. The combined corporation should account for that investment as stock retired as part of the combination.

*Reporting Combined Operations*

56. A corporation which applies the pooling of interests method of accounting to a combination should report results of operations for the period in which the combination occurs as though the companies had been combined as of the beginning of the period. Results of operations for that period thus comprise those of the separate companies combined from the beginning of the period to the date the combination is consummated and those of the combined operations from that date to the end of the period. Eliminating the effects of intercompany transactions from operations before the date of combination reports operations before and after the date of combination on substantially the same basis. The effects of intercompany transactions on current assets, current liabilities, revenue, and cost of sales for periods presented and on retained earnings at the beginning of the periods presented should be eliminated to the extent possible. The nature of and effects on earnings per share of nonrecurring intercompany transactions involving long-term assets and liabilities need not be eliminated but should be disclosed. A combined corporation should disclose in notes to financial statements the revenue, extraordinary items, and net income of each of the separate companies from the beginning of the period to the date the combination is consummated (paragraph 64-d). The information relating to the separate companies may be as of the end of the interim period nearest the date that the combination is consummated.

57. Similarly, balance sheets and other financial information of the separate companies as of the

beginning of the period should be presented as though the companies had been combined at that date. Financial statements and financial information of the separate companies presented for prior years should also be restated on a combined basis to furnish comparative information. All restated financial statements and financial summaries should indicate clearly that financial data of the previously separate companies are combined.

*Expenses Related to Combination*

58. The pooling of interests method records neither the acquiring of assets nor the obtaining of capital. Therefore, costs incurred to effect a combination accounted for by that method and to integrate the continuing operations are expenses of the combined corporation rather than additions to assets or direct reductions of stockholders' equity. Accordingly, all expenses related to effecting a business combination accounted for by the pooling of interests method should be deducted in determining the net income of the resulting combined corporation for the period in which the expenses are incurred. Those expenses include, for example, registration fees, costs of furnishing information to stockholders, fees of finders and consultants, salaries and other expenses related to services of employees, and costs and losses of combining operations of the previously separate companies and instituting efficiencies.

*Disposition of Assets After Combination*

59. A combined corporation may dispose of those assets of the separate companies which are duplicate facilities or excess capacity in the combined operations. Losses or estimated losses on disposal of specifically identified duplicate or excess facilities should be deducted in determining the net income of the resulting combined corporation. However, a loss estimated and recorded while a facility remains in service should not include the portion of the cost that is properly allocable to anticipated future service of the facility.

60. Profit or loss on other dispositions of assets of the previously separate companies may require special disclosure unless the disposals are part of customary business activities of the combined corporation. Specific treatment of a profit or loss on those dispositions is warranted because the pooling of interests method of accounting would have been inappropriate (paragraph 48-c) if the combined corporation were committed or planned to dispose of a significant part of the assets of one of the combining companies. The Board concludes that a combined corporation should disclose separately a profit or loss resulting from the disposal of a significant part of the assets or a separable segment of the previously separate companies, provided

the profit or loss is material in relation to the net income of the combined corporation, and

the disposition is within two years after the combination is consummated.

The disclosed profit or loss, less applicable income tax effect, should be classified as an extraordinary item.

*Date of Recording Combination*

61. A business combination accounted for by the pooling of interests method should be recorded as of the date the combination is consummated. Therefore, even though a business combination is consummated before one or more of the combining companies first issues its financial statements as of an earlier date, the financial statements issued should be those of the combining company and not those of the resulting combined corporation. A combining company should, however, disclose as supplemental information, in notes to financial statements or otherwise, the substance of a combination consummated before financial statements are issued and the effects of the combination on reported financial position and results of operations (paragraph 65). Comparative financial statements presented in reports of the resulting combined corporation after a combination is consummated should combine earlier financial statements of the separate companies.

62. A corporation may be reasonably assured that a business combination which has been initiated but not consummated as of the date of financial statements will meet the conditions requiring the pooling of interests method of accounting. The corporation should record as an investment common stock of the other combining company acquired before the statement date. Common stock acquired by disbursing cash or other assets or by incurring liabilities should be recorded at cost. Stock acquired in exchange for common stock of the issuing corporation should, however, be recorded at the proportionate share of underlying net assets at the date acquired as recorded by the other company. Until the pooling of interests method of accounting for the combination is known to be appropriate, the investment and net income of the investor corporation should include the proportionate share of earnings or losses of the other company after the date of acquisition of the stock. The investor corporation should also disclose results of operations for all prior periods presented as well as the entire current period as they will be reported if the combination is later accounted for by the pooling of interests

method. After the combination is consummated and the applicable method of accounting is known, financial statements issued previously should be restated as necessary to include the other combining company.

*Disclosure of a Combination*

63. A combined corporation should disclose in its financial statements that a combination which is accounted for by the pooling of interests method has occurred during the period. The basis of current presentation and restatements of prior periods may be disclosed in the financial statements by captions or by references to notes.

64. Notes to financial statements of a combined corporation should disclose the following for the period in which a business combination occurs and is accounted for by the pooling of interests method.

a. Name and brief description of the companies combined, except a corporation whose name is carried forward to the combined corporation.
b. Method of accounting for the combination—that is, by the pooling of interests method.
c. Description and number of shares of stock issued in the business combination.
d. Details of the results of operations of the previously separate companies for the period before the combination is consummated that are included in the current combined net income (paragraph 56). The details should include revenue, extraordinary items, net income, other changes in stockholders' equity, and amount of and manner of accounting for intercompany transactions.
e. Descriptions of the nature of adjustments of net assets of the combining companies to adopt the same accounting practices and of the effects of the changes on net income reported previously by the separate companies and now presented in comparative financial statements (paragraph 52).
f. Details of an increase or decrease in retained earnings from changing the fiscal year of a combining company. The details should include at least revenue, expenses, extraordinary items, net income, and other changes in stockholders' equity for the period excluded from the reported results of operations.
g. Reconciliations of amounts of revenue and earnings previously reported by the corporation that issues the stock to effect the combination with the combined amounts currently presented in financial statements and summaries. A new corporation formed to effect a combination may instead disclose the earnings of the separate companies which comprise combined earnings for prior periods.

The information disclosed in notes to financial statements should also be furnished on a pro forma basis in information on a proposed business combination which is given to stockholders of combining companies.

65. Notes to the financial statements should disclose details of the effects of a business combination consummated before the financial statements are issued but which is either incomplete as of the date of the financial statements or initiated after that date (paragraph 61). The details should include revenue, net income, earnings per share, and the effects of anticipated changes in accounting methods as if the combination had been consummated at the date of the financial statements (paragraph 52).

**Application of Purchase Method**

*Principles of Historical-Cost Accounting*

66. Accounting for a business combination by the purchase method follows principles normally applicable under historical-cost accounting to recording acquisitions of assets and issuances of stock and to accounting for assets and liabilities after acquisition.

67. *Acquiring assets.* The general principles to apply the historical-cost basis of accounting to an acquisition of an asset depend on the nature of the transaction:

a. An asset acquired by exchanging cash or other assets is recorded at cost—that is, at the amount of cash disbursed or the fair value of other assets distributed.
b. An asset acquired by incurring liabilities is recorded at cost—that is, at the present value of the amounts to be paid.
c. An asset acquired by issuing shares of stock of the acquiring corporation is recorded at the fair value of the asset[9]—that is, shares of stock issued are recorded at the fair value of the consideration received for the stock.

The general principles must be supplemented to apply them in certain transactions. For example, the fair value of an asset received for stock issued may not be reliably determinable, or the fair value of an asset acquired in an exchange may be more reliably determinable than the fair value of a noncash asset given up. Restraints on measurement have led to the practical rule that assets acquired for other than cash, including shares of stock issued, should be stated at "cost" when they are acquired and "cost

[9] An asset acquired may be an entire entity which may have intangible assets, including goodwill.

may be determined either by the fair value of the consideration given or by the fair value of the property acquired, whichever is the more clearly evident."[10] "Cost" in accounting often means the amount at which an entity records an asset at the date it is acquired whatever its manner of acquisition, and that "cost" forms the basis for historical-cost accounting.

68. *Allocating cost.* Acquiring assets in groups requires not only ascertaining the cost of the assets as a group but also allocating the cost to the individual assets which comprise the group. The cost of a group is determined by the principles described in paragraph 67. A portion of the total cost is then assigned to each individual asset acquired on the basis of its fair value. A difference between the sum of the assigned costs of the tangible and identifiable intangible assets acquired less liabilities assumed and the cost of the group is evidence of unspecified intangible values.

69. *Accounting after acquisition.* The nature of an asset and not the manner of its acquisition determines an acquirer's subsequent accounting for the cost of that asset. The basis for measuring the cost of an asset—whether amount of cash paid, fair value of an asset received or given up, amount of a liability incurred, or fair value of stock issued—has no effect on the subsequent accounting for that cost, which is retained as an asset, depreciated, amortized, or otherwise matched with revenue.

*Acquiring Corporation*

70. A corporation which distributes cash or other assets or incurs liabilities to obtain the assets or stock of another company is clearly the acquirer. The identities of the acquirer and the acquired company are usually evident in a business combination effected by the issue of stock. The acquiring corporation normally issues the stock and commonly is the larger company. The acquired company may, however, survive as the corporate entity, and the nature of the negotiations sometimes clearly indicates that a smaller corporation acquires a larger company. The Board concludes that presumptive evidence of the acquiring corporation in combinations effected by an exchange of stock is obtained by identifying the former common stockholder interests of a combining company which either retain or receive the larger portion of the voting rights in the combined corporation. That corporation should be treated as the acquirer unless other evidence clearly indicates that another corporation is the acquirer. For example, a substantial investment of one company in common stock of another before the combination may be evidence that the investor is the acquiring corporation.

71. If a new corporation is formed to issue stock to effect a business combination to be accounted for by the purchase method, one of the existing combining companies should be considered the acquirer on the basis of the evidence available.

*Determining Cost of an Acquired Company*

72. The same accounting principles apply to determining the cost of assets acquired individually, those acquired in a group, and those acquired in a business combination. A cash payment by a corporation measures the cost of acquired assets less liabilities assumed. Similarly, the fair values of other assets distributed, such as marketable securities or properties, and the fair value of liabilities incurred by an acquiring corporation measure the cost of an acquired company. The present value of a debt security represents the fair value of the liability, and a premium or discount should be recorded for a debt security issued with an interest rate fixed materially above or below the effective rate or current yield for an otherwise comparable security.

73. The distinctive attributes of preferred stocks make some issues similar to a debt security while others possess common stock characteristics, with many gradations between the extremes. Determining cost of an acquired company may be affected by those characteristics. For example, the fair value of a nonvoting, nonconvertible preferred stock which lacks characteristics of common stock may be determined by comparing the specified dividend and redemption terms with comparable securities and by assessing market factors. Thus although the principle of recording the fair value of consideration received for stock issued applies to all equity securities, senior as well as common stock, the cost of a company acquired by issuing senior equity securities may be determined in practice on the same basis as for debt securities.

74. The fair value of securities traded in the market is normally more clearly evident than the fair value of an acquired company (paragraph 67). Thus, the quoted market price of an equity security issued to effect a business combination may usually be used to approximate the fair value of an acquired company after recognizing possible effects of price fluctuations, quantities traded, issue costs, and the like (paragraph 23). The market price for a reasonable period before and after the date the terms of the acquisition are agreed to and announced should be considered in determining the fair value of securities issued.

75. If the quoted market price is not the fair value of stock, either preferred or common, the consideration received should be estimated even though

[10] ARB No. 24; the substance was retained in slightly different words in Chapter 5 of ARB No. 43 and ARB No. 48.

measuring directly the fair values of assets received is difficult. Both the consideration received, including goodwill, and the extent of the adjustment of the quoted market price of the stock issued should be weighed to determine the amount to be recorded. All aspects of the acquisition, including the negotiations, should be studied, and independent appraisals may be used as an aid in determining the fair value of securities issued. Consideration other than stock distributed to effect an acquisition may provide evidence of the total fair value received.

76. *Costs of acquisition.* The cost of a company acquired in a business combination accounted for by the purchase method includes the direct costs of acquisition. Costs of registering and issuing equity securities are a reduction of the otherwise determinable fair value of the securities. However, indirect and general expenses related to acquisitions are deducted as incurred in determining net income.

*Contingent Consideration*

77. A business combination agreement may provide for the issuance of additional shares of a security or the transfer of cash or other consideration contingent on specified events or transactions in the future. Some agreements provide that a portion of the consideration be placed in escrow to be distributed or to be returned to the transferor when specified events occur. Either debt or equity securities may be placed in escrow, and amounts equal to interest or dividends on the securities during the contingency period may be paid to the escrow agent or to the potential security holder.

78. The Board concludes that cash and other assets distributed and securities issued unconditionally and amounts of contingent consideration which are determinable at the date of acquisition should be included in determining the cost of an acquired company and recorded at that date. Consideration which is issued or issuable at the expiration of the contingency period or which is held in escrow pending the outcome of the contingency should be disclosed but not recorded as a liability or shown as outstanding securities unless the outcome of the contingency is determinable beyond reasonable doubt.

79. Contingent consideration should usually be recorded when the contingency is resolved and consideration is issued or becomes issuable. In general, the issue of additional securities or distribution of other consideration at resolution of contingencies based on earnings should result in an additional element of cost of an acquired company. In contrast, the issue of additional securities or distribution of other consideration at resolution of contingencies based on security prices should not change the recorded cost of an acquired company.

80. *Contingency based on earnings.* Additional consideration may be contingent on maintaining or achieving specified earnings levels in future periods. When the contingency is resolved and additional consideration is distributable, the acquiring corporation should record the current fair value of the consideration issued or issuable as additional cost of the acquired company. The additional costs of affected assets, usually goodwill, should be amortized over the remaining life of the asset.

81. *Contingency based on security prices.* Additional consideration may be contingent on the market price of a specified security issued to effect a business combination. Unless the price of the security at least equals the specified amount on a specified date or dates, the acquiring corporation is required to issue additional equity or debt securities or transfer cash or other assets sufficient to make the current value of the total consideration equal to the specified amount. The securities issued unconditionally at the date the combination is consummated should be recorded at that date at the specified amount.

82. The cost of an acquired company recorded at the date of acquisition represents the entire payment, including contingent consideration. Therefore, the issuance of additional securities or distribution of other consideration does not affect the cost of the acquired company, regardless of whether the amount specified is a security price to be maintained or a higher security price to be achieved. On a later date when the contingency is resolved and additional consideration is distributable, the acquiring corporation should record the current fair value of the additional consideration issued or issuable. However, the amount previously recorded for securities issued at the date of acquisition should simultaneously be reduced to the lower current value of those securities. Reducing the value of debt securities previously issued to their later fair value results in recording a discount on debt securities. The discount should be amortized from the date the additional securities are issued.

83. Accounting for contingent consideration based on conditions other than those described should be inferred from the procedures outlined. For example, if the consideration contingently issuable depends on both future earnings and future security prices, additional cost of the acquired company should be recorded for the additional consideration contingent on earnings, and previously recorded consideration should be reduced to current value of the consideration contingent on security prices. Similarly, if the consideration contingently issuable depends on later settlement of a contingency, an increase in the cost of acquired assets, if any, should be amortized over the remaining life of the assets.

84. *Interest or dividends during contingency period.* Amounts paid to an escrow agent representing interest and dividends on securities held in escrow should be accounted for according to the accounting for the securities. That is, until the disposition of the securities in escrow is resolved, payments to the escrow agent should not be recorded as interest expense or dividend distributions. An amount equal to interest and dividends later distributed by the escrow agent to the former stockholders should be added to the cost of the acquired assets at the date distributed and amortized over the remaining life of the assets.

85. *Tax effect of imputed interest.* A tax reduction resulting from imputed interest on contingently issuable stock reduces the fair value recorded for contingent consideration based on earnings and increases additional capital recorded for contingent consideration based on security prices.

86. *Compensation in contingent agreements.* The substance of some agreements for contingent consideration is to provide compensation for services or use of property or profit sharing, and the additional consideration given should be accounted for as expenses of the appropriate periods.

*Recording Assets Acquired and Liabilities Assumed*

87. An acquiring corporation should allocate the cost of an acquired company to the assets acquired and liabilities assumed. Allocation should follow the principles described in paragraph 68.

> First, all identifiable assets acquired, either individually or by type, and liabilities assumed in a business combination, whether or not shown in the financial statements of the acquired company, should be assigned a portion of the cost of the acquired company, normally equal to their fair values at date of acquisition.
>
> Second, the excess of the cost of the acquired company over the sum of the amounts assigned to identifiable assets acquired less liabilities assumed should be recorded as goodwill. The sum of the market or appraisal values of identifiable assets acquired less liabilities assumed may sometimes exceed the cost of the acquired company. If so, the values otherwise assignable to noncurrent assets acquired (except long-term investments in marketable securities) should be reduced by a proportionate part of the excess to determine the assigned values. A deferred credit for an excess of assigned value of identifiable assets over cost of an acquired company (sometimes called "negative goodwill") should not be recorded unless those assets are reduced to zero value.

Independent appraisals may be used as an aid in determining the fair values of some assets and liabilities. Subsequent sales of assets may also provide evidence of values. The effect of taxes may be a factor in assigning amounts to identifiable assets and liabilities (paragraph 89).

88. General guides for assigning amounts to the individual assets acquired and liabilities assumed, except goodwill, are:

a. Marketable securities at current net realizable values.
b. Receivables at present values of amounts to be received determined at appropriate current interest rates, less allowances for uncollectibility and collection costs, if necessary.
c. Inventories:
   (1) Finished goods and merchandise at estimated selling prices less the sum of (a) costs of disposal and (b) a reasonable profit allowance for the selling effort of the acquiring corporation.
   (2) Work in process at estimated selling prices of finished goods less the sum of (a) costs to complete, (b) costs of disposal, and (c) a reasonable profit allowance for the completing and selling effort of the acquiring corporation based on profit for similar finished goods.
   (3) Raw materials at current replacement costs.
d. Plant and equipment: (1) to be used, at current replacement costs for similar capacity[11] unless the expected future use of the assets indicates a lower value to the acquirer, (2) to be sold or held for later sale rather than used, at current net realizable value, and (3) to be used temporarily, at current net realizable value recognizing future depreciation for the expected period of use.
e. Intangible assets which can be identified and named, including contracts, patents, franchises, customer and supplier lists, and favorable leases, at appraised values.[12]
f. Other assets, including land, natural resources, and nonmarketable securities, at appraised values.
g. Accounts and notes payable, long-term debt, and other claims payable at present values of amounts to be paid determined at appropriate current interest rates.
h. Liabilities and accruals—for example, accruals

[11]Replacement cost may be determined directly if a used asset market exists for the assets acquired. Otherwise, the replacement cost should be approximated from replacement cost new less estimated accumulated depreciation.

[12]Fair values should be ascribed to specific assets; identifiable assets should not be included in goodwill.

for pension cost,[13] warranties, vacation pay, deferred compensation—at present values of amounts to be paid determined at appropriate current interest rates.

i. Other liabilities and commitments, including unfavorable leases, contracts, and commitments and plant closing expense incident to the acquisition, at present values of amounts to be paid determined at appropriate current interest rates.

An acquiring corporation should record periodically as a part of income the accrual of interest on assets and liabilities recorded at acquisition date at the discounted values of amounts to be received or paid. An acquiring corporation should not record as a separate asset the goodwill previously recorded by an acquired company and should not record deferred income taxes recorded by an acquired company before its acquisition. An acquiring corporation should reduce the acquired goodwill retroactively for the realized tax benefits of loss carryforwards of an acquired company not previously recorded by the acquiring corporation.

89. The market or appraisal values of specific assets and liabilities determined in paragraph 88 may differ from the income tax bases of those items. Estimated future tax effects of differences between the tax bases and amounts otherwise appropriate to assign to an asset or a liability are one of the variables in estimating fair value. Amounts assigned to identifiable assets and liabilities should, for example, recognize that the fair value of an asset to an acquirer is less than its market or appraisal value if all or a portion of the market or appraisal value is not deductible for income taxes. The impact of tax effects on amounts assigned to individual assets and liabilities depends on numerous factors, including imminence or delay of realization of the asset value and the possible timing of tax consequences. Since differences between amounts assigned and tax bases are not timing differences (APB Opinion No. 11, *Accounting for Income Taxes*, paragraph 13), the acquiring corporation should not record deferred tax accounts at the date of acquisition.

*Amortization of Goodwill*

90. Goodwill recorded in a business combination accounted for by the purchase method should be amortized in accordance with the provisions in paragraphs 27 to 31 of APB Opinion No. 17, *Intangible Assets*.

*Excess of Acquired Net Assets Over Cost*

91. The value assigned to net assets acquired should not exceed the cost of an acquired company because the general presumption in historical-cost based accounting is that net assets acquired should be recorded at not more than cost. The total market or appraisal values of identifiable assets acquired less liabilities assumed in a few business combinations may exceed the cost of the acquired company. An excess over cost should be allocated to reduce proportionately the values assigned to noncurrent assets (except long-term investments in marketable securities) in determining their fair values (paragraph 87). If the allocation reduces the noncurrent assets to zero value, the remainder of the excess over cost should be classified as a deferred credit and should be amortized systematically to income over the period estimated to be benefited but not in excess of forty years. The method and period of amortization should be disclosed.

92. No part of the excess of acquired net assets over cost should be added directly to stockholders' equity at the date of acquisition.

*Acquisition Date*

93. The Board believes that the date of acquisition of a company should ordinarily be the date assets are received and other assets are given or securities are issued. However, the parties may for convenience designate as the effective date the end of an accounting period between the dates a business combination is initiated and consummated. The designated date should ordinarily be the date of acquisition for accounting purposes if a written agreement provides that effective control of the acquired company is transferred to the acquiring corporation on that date without restrictions except those required to protect the stockholders or other owners of the acquired company—for example, restrictions on significant changes in the operations, permission to pay dividends equal to those regularly paid before the effective date, and the like. Designating an effective date other than the date assets or securities are transferred requires adjusting the cost of an acquired company and net income otherwise reported to compensate for recognizing income before consideration is transferred. The cost of an acquired company and net income should therefore be reduced by imputed interest at an appropriate current rate on assets given, liabilities incurred, or preferred stock distributed as of the transfer date to acquire the company.

94. The cost of an acquired company and the values assigned to assets acquired and liabilities assumed should be determined as of the date of acquisition. The statement of income of an acquiring corpora-

[13] An accrual for pension cost should be the greater of (1) accrued pension cost computed in conformity with the accounting policies of the acquiring corporation for one or more of its pension plans or (2) the excess, if any, of the actuarially computed value of vested benefits over the amount of the pension fund.

tion for the period in which a business combination occurs should include income of the acquired company after the date of acquisition by including the revenue and expenses of the acquired operations based on the cost to the acquiring corporation.

*Disclosure in Financial Statements*

95. Notes to the financial statements of an acquiring corporation should disclose the following for the period in which a business combination occurs and is accounted for by the purchase method.

a. Name and a brief description of the acquired company.
b. Method of accounting for the combination—that is, by the purchase method.
c. Period for which results of operations of the acquired company are included in the income statement of the acquiring corporation.
d. Cost of the acquired company and, if applicable, the number of shares of stock issued or issuable, and the amount assigned to the issued and issuable shares.
e. Description of the plan for amortization of acquired goodwill, the amortization method, and period (APB Opinion No. 17, paragraphs 27 to 31).
f. Contingent payments, options, or commitments specified in the acquisition agreement and their proposed accounting treatment.

Information relating to several relatively minor acquisitions may be combined for disclosure.

96. Notes to the financial statements of the acquiring corporation for the period in which a business combination occurs and is accounted for by the purchase method should include as supplemental information the following results of operations on a pro forma basis:

a. Results of operations for the current period as though the companies had combined at the beginning of the period, unless the acquisition was at or near the beginning of the period.
b. Results of operations for the immediately preceding period as though the companies had combined at the beginning of that period if comparative financial statements are presented.

The supplemental pro forma information should as a minimum show revenue, income before extraordinary items, net income, and earnings per share. To present pro forma information, income taxes, interest expense, preferred stock dividends, depreciation and amortization of assets, including goodwill, should be adjusted to their accounting bases recognized in recording the combination. Pro forma presentation of results of operations of periods prior to the combination transaction should be limited to the immediately preceding period.

## EFFECTIVE DATE

97. The provisions of this Opinion shall be effective to account for business combinations initiated[14] after October 31, 1970. Business combinations initiated before November 1, 1970 and consummated on or after that date under the terms prevailing on October 31, 1970 (paragraph 47-a) may be accounted for in accordance with this Opinion or the applicable previous pronouncements of the Board and its predecessor committee.

98. The provisions of this Opinion should not be applied retroactively for business combinations consummated before November 1, 1970.

99. If a corporation holds as an investment on October 31, 1970 a minority interest in or exactly 50 percent of the common stock of another company and the corporation initiates after October 31, 1970 a plan of combination with that company, the resulting business combination may be accounted for by the pooling of interests method provided

the combination is completed within five years after October 31, 1970 and

the combination meets all conditions specified in paragraphs 45 to 48, except that

(i) the minority interest in the voting common stock of the combining company held on October 31, 1970 may exceed 10 percent of the outstanding voting common stock of the combining company (paragraph 46-b), and
(ii) the corporation which effects the combination issues voting common stock for at least 90 percent of the outstanding voting common stock interest, as described in paragraph 47-b, of the other combining company not already held on October 31, 1970 (rather than 90 percent of all of the common stock interest of the combining company).

The investment in common stock held on October 31, 1970 should not be accounted for as treasury stock or retired stock at the date of the combination. Instead, the excess of cost over the investor corporation's proportionate equity in the net assets of the combining company at or near the date the stock investment was acquired should be allocated to identifiable assets of the combining company at the

[14]Initiated is defined in paragraph 46-a whether the combination is accounted for by the pooling of interests method or by the purchase method.

date the combination is consummated on the basis of the fair values of those assets at the combination date. The unallocated portion of the excess should be assigned to an unidentified intangible asset (goodwill) and should be accounted for according to applicable previous pronouncements of the Board and its predecessor committee. The cost of goodwill should not be amortized retroactively but may be amortized prospectively under the provision of APB Opinion No. 17, paragraph 35. If the cost of the investment is less than the investor's equity in the net assets of the combining company, that difference should reduce proportionately the recorded amounts of noncurrent assets (except long-term investments in marketable securities) of the combining company.

*The Opinion entitled "Business Combinations" was adopted by the assenting votes of twelve members of the Board. Messrs. Broeker, Burger, Davidson, Horngren, Seidman, and Weston dissented.*

Messrs. Broeker, Burger, and Weston dissent to issuance of this Opinion because they believe that it is not a sound or logical solution of the problem of accounting for business combinations. They believe that, except for combinations of companies whose relative size is such as to indicate a significant sharing of ownership risks and benefits, business combinations represent the acquisition or purchase of one company by another and that accounting should reflect that fact. While they agree that the criteria specified in this Opinion for the pooling of interests method represent, in most cases, an improvement over present criteria in practice, this action does not, in their opinion, represent a substantive response by the Accounting Principles Board to the overall problem.

Messrs. Davidson, Horngren, and Seidman dissent to the Opinion because it seeks to patch up some of the abuses of pooling. The real abuse is pooling itself. On that, the only answer is to eliminate pooling. Paragraphs 35 to 41 set forth some of the defects of pooling. The fundamental one is that pooling ignores the asset values on which the parties have traded, and substitutes a wholly irrelevant figure—the amount on the seller's books. Such nonaccounting for bargained acquisition values permits the reporting of profits upon subsequent disposition of such assets when there really may be less profit or perhaps a loss. Had the assets been acquired from the seller for cash, the buyer's cost would be the amount of the cash. Acquisition for stock should make no difference. The accounting essence is the amount of consideration, not its nature. Payment in cash or stock can be a matter of form, not substance. Suppose the seller wants cash. The buyer can first sell stock and turn over the proceeds to the seller, or the seller can take stock and promptly sell the stock for cash.

The following deal with some arguments made in the Opinion for pooling: (1) Pooling is described in paragraph 28 as a fusion resulting from "pooling equity interests". But it is the sort of fusion where a significant exchange transaction takes place. The seller parts with control over its assets and operations. In return the buyer issues stock representing an interest in its assets and operations. That interest has value and is a measure of the cost of the acquisition to the buyer. (2) Paragraph 29 declares that pooling is really a transaction among the stockholders. That just is not the fact. The buyer is always a company. (3) Paragraph 25 decries purchase accounting because it results in a write-up of only seller's assets. There is no write-up. There is only a recording of cost to the buyer. That cost is measured by the value of the assets acquired from the seller. (4) Pooling is said to avoid the difficulty of valuing assets or stock (paragraph 22). Difficulty of valuation should not be permitted to defeat fair presentation. Besides, the parties do determine values in their bargaining for the amount of stock to be issued.

Some say that to eliminate pooling will impede mergers. Mergers were prevalent before pooling, and will continue after. Accounting does not exist to aid or discourage mergers, but to account for them fairly. Elimination of pooling will remove the confusion that comes from the coexistence of pooling and purchase accounting. Above all, the elimination of pooling would remove an aberration in historical-cost accounting that permits an acquisition to be accounted for on the basis of the seller's cost rather than the buyer's cost of the assets obtained in a bargained exchange.

**NOTES**

*Opinions of the Accounting Principles Board present the conclusions of at least two-thirds of the members of the Board, which is the senior technical body of the Institute authorized to issue pronouncements on accounting principles.*

*Board Opinions are considered appropriate in all circumstances covered but need not be applied to immaterial items.*

*Covering all possible conditions and circumstances in an Opinion of the Accounting Principles Board is usually impracticable. The substance of transactions and the principles, guides, rules, and criteria described in Opinions should control the accounting for transactions not expressly covered.*

*Unless otherwise stated, Opinions of the Board are not intended to be retroactive.*

*Council of the Institute has resolved that Institute members should disclose departures from Board Opinions in their reports as independent auditors when the effect of the departures on the financial*

*statements is material or see to it that such departures are disclosed in notes to the financial statements and, where practicable, should disclose their effects on the financial statements (Special Bulletin,* Disclosure of Departures from Opinions of the Accounting Principles Board, *October 1964). Members of the Institute must assume the burden of justifying any such departures.*

**Accounting Principles Board (1970)**

| | | |
|---|---|---|
| LeRoy Layton, *Chairman* | George R. Catlett | Charles B. Hellerson |
| Kenneth S. Axelson | Joseph P. Cummings | Charles T. Horngren |
| Donald J. Bevis | Sidney Davidson | Oral L. Luper |
| Milton M. Broeker | Philip L. Defliese | J. S. Seidman |
| Leo E. Burger | Newman T. Halvorson | George C. Watt |
| | Robert Hampton, III | Frank T. Weston |
| | Emmett S. Harrington | |

# APB Opinion No. 17
# Intangible Assets

## STATUS

Issued: August 1970

Effective Date: For intangible assets acquired after October 31, 1970

Affects: Supersedes prospectively ARB 43, Chapter 5, paragraphs 1 through 9
Supersedes APB 6, paragraph 15

Affected by: Paragraph 6 amended by FAS 2
Paragraph 7 superseded by FAS 71
Paragraphs 29 through 31 amended by FAS 72
Paragraph 30 amended by FAS 96 and FAS 109
Paragraph 31 amended by APB 30 and FAS 121

Other Interpretive Pronouncements: AIN-APB 17, Interpretations No. 1 and 2
FIN 9

# APB Opinion No. 17
# Intangible Assets

**CONTENTS**


| | Paragraph Numbers |
|---|---|
| Summary | 1–9 |
| Problem | 1–3 |
| Scope and Effect of Opinion | 4–8 |
| Conclusions | 9 |
| Background | 10–23 |
| Bases of Classification | 10 |
| Present Accounting | 11–14 |
| Accounting for Costs at Acquisition | 11 |
| Accounting for Deferred Costs After Acquisition | 12–13 |
| Criticism of Present Practice | 14 |
| Appraisal of Alternative Procedures | 15–23 |
| Cost of Intangible Assets | 15 |
| Treatment of Costs | 16–20 |
| Arguments for nonamortization | 18–20 |
| Accounting on the Historical-Cost Basis | 21–22 |
| A Practical Solution | 23 |
| Opinion | 24–32 |
| Acquisition of Intangible Assets | 24–26 |
| Cost of intangible assets | 25–26 |
| Amortization of Intangible Assets | 27–31 |
| Method of amortization | 30 |
| Subsequent review of amortization | 31 |
| Disposal of Goodwill | 32 |
| Effective Date | 33–35 |


## SUMMARY

### Problem

1. An enterprise may acquire intangible assets from others or may develop them itself. Many kinds of intangible assets may be identified and given reasonably descriptive names, for example, patents, franchises, trademarks, and the like. Other types of intangible assets lack specific identifiability. Both identifiable and unidentifiable assets may be developed internally. Identifiable intangible assets may be acquired singly, as a part of a group of assets, or as part of an entire enterprise, but unidentifiable assets cannot be acquired singly. The excess of the cost of an acquired company over the sum of identifiable net assets, usually called goodwill, is the most common unidentifiable intangible asset.

2. Accounting for an intangible asset involves the same kinds of problems as accounting for other long-lived assets, namely, determining an initial carrying amount, accounting for that amount after acquisition under normal business conditions (amortization), and accounting for that amount if the value declines substantially and permanently. Solving the problems is complicated by the characteristics of an intangible asset: its lack of physical qualities makes evidence of its existence elusive, its value is often difficult to estimate, and its useful life may be indeterminable.

3. The Director of Accounting Research of the American Institute of Certified Public Accountants has published Accounting Research Study No. 10, *Accounting for Goodwill*, by George R. Catlett and Norman O. Olson.[1] The study emphasizes accounting for goodwill acquired in a business combination but also discusses accounting for goodwill developed internally. The study cites the supporting authoritative pronouncements and their influences on accounting practices and evaluates the effects of practices on financial reporting.

### Scope and Effect of Opinion

4. The Board has considered the conclusions and

[1]Accounting research studies are not pronouncements of the Board or of the Institute but are published for the purpose of stimulating discussion on important accounting matters.

recommendations of Accounting Research Study No. 10, the discussions of the appropriateness of accepted methods of accounting for intangible assets, and proposals for alternative accounting procedures. The Board expresses in this Opinion its conclusions on accounting for intangible assets.

5. This Opinion covers the accounting for both identifiable and unidentifiable intangible assets that a company acquires, including those acquired in business combinations. "Company" in this Opinion refers to both incorporated and unincorporated enterprises. The conclusions of the Opinion apply to intangible assets recorded, if any, on the acquisition of some or all of the stock held by minority stockholders of a subsidiary company. This Opinion also covers accounting for costs of developing goodwill and other unidentifiable intangible assets with indeterminate lives.

6. The provisions of this Opinion apply to costs of developing identifiable intangible assets that a company defers and records as assets. Some companies defer costs incurred to develop identifiable intangible assets while others record the costs as expenses as incurred. Certain costs, for example, [redacted] preoperating costs, present problems which need to be studied separately. The question of deferral of those costs is beyond the scope of this Opinion.

[redacted]

8. The conclusions of this Opinion modify previous views of the Board and its predecessor, the Committee on Accounting Procedure. This Opinion therefore supersedes the following Accounting Research Bulletin (ARB) and Opinion of the Accounting Principles Board (APB):

ARB No. 43, Chapter 5, *Intangible Assets*, except paragraph 10 which is superseded by APB Opinion No. 16, *Business Combinations*.

APB Opinion No. 6, *Status of Accounting Research Bulletins*, paragraph 15.

**Conclusions**

The Board concludes that a company should record as assets the costs of intangible assets acquired from others, including goodwill acquired in a business combination. A company should record as expenses the costs to develop intangible assets which are not specifically identifiable. The Board also concludes that the cost of each type of intangible asset should be amortized by systematic charges to income over the period estimated to be benefited. The period of amortization should not, however, exceed forty years.

**BACKGROUND**

**Bases of Classification**

10. Various intangible assets differ in their characteristics, their useful lives, their relations to operations, and their later dispositions. Intangible assets may be classified on several different bases:

Identifiability—separately identifiable or lacking specific identification.

Manner of acquisition—acquired singly, in groups, or in business combinations or developed internally.

Expected period of benefit—limited by law or contract, related to human or economic factors, or indefinite or indeterminate duration.

Separability from an entire enterprise—rights transferable without title, salable, or inseparable from the enterprise or a substantial part of it.

**Present Accounting**

*Accounting for Costs at Acquisition*

11. Present principles of accounting for intangible assets are generally similar to those for tangible, long-lived assets such as property, plant, and equipment. Intangible assets acquired from other entities are recorded at cost when acquired. Costs incurred to develop specifically identifiable intangible assets are often recorded as assets if the periods of expected future benefit are reasonably determinable. Costs of developing other intangible assets are usually recorded as expenses when incurred.

*Accounting for Deferred Costs After Acquisition*

12. Intangible assets have been divided into two classes for purposes of accounting for their costs: (a) those with a determinable term of existence because it is limited by law, regulation, or agreement, or by the nature of the asset, and (b) those having no limited term of existence and no indication of limited life at the time of acquisition. The cost of a type (a) intangible asset is amortized by systematic charges to income over the term of existence or other period expected to be benefited. The cost of a type (b) intangible asset may be treated in either of two ways: (1) the cost may be retained until a limit on the term of existence or a loss of value is evident, at which time the cost is amortized systematically over the estimated remaining term of existence or, if

worthless, written off as an extraordinary item in the income statement, or (2) the cost may be amortized at the discretion of management by charges to income even though no present evidence points to a limited term of existence or a loss of value.

13. The cost of an intangible asset, including goodwill acquired in a business combination, may not be written off as a lump sum to capital surplus or to retained earnings nor be reduced to a nominal amount at or immediately after acquisition (ARB No. 43, Chapter 5, and APB Opinion No. 9).

*Criticism of Present Practice*

14. Present accounting for goodwill and other unidentifiable intangible assets is often criticized because alternative methods of accounting for costs are acceptable. Some companies amortize the cost of acquired intangible assets over a short arbitrary period to reduce the amount of the asset as rapidly as practicable, while others retain the cost as an asset until evidence shows a loss of value and then record a material reduction in a single period. Selecting an arbitrary period of amortization is criticized because it may understate net income during the amortization period and overstate later net income. Retaining the cost as an asset is criticized because it may overstate net income before the loss of value is recognized and understate net income in the period of write-off.

**Appraisal of Alternative Procedures**

*Cost of Intangible Assets*

15. The cost of intangible assets acquired either singly or in groups, including intangible assets acquired in a business combination, from other businesses or individuals is determined by general principles of the historical-cost basis of accounting. The costs of developing goodwill and other intangible assets with indeterminate lives are ordinarily not distinguishable from the current costs of operations and are thus not assignable to specific assets.

*Treatment of Costs*

16. Costs of intangible assets which have fixed or reasonably determinable terms of existence are now amortized by systematic charges to income over their terms of existence. Differences of opinion center on the amortization of acquired intangible assets with lives which cannot be estimated reliably either at the date of acquisition or perhaps long after, for example, goodwill and trade names.

17. The literature on business combinations and goodwill, including Accounting Research Study No. 10, *Accounting for Goodwill*, contains at least four possible accounting treatments of goodwill and similar intangible assets:

a. Retain the cost as an asset indefinitely unless a reduction in its value becomes evident.
b. Retain the cost as an asset but permit amortization as an operating expense over an arbitrary period.
c. Retain the cost as an asset but require amortization as an operating expense over its estimated limited life or over an arbitrary but specified maximum and minimum period.
d. Deduct the cost from stockholders' equity at the date acquired.

18. *Arguments for nonamortization.* The two of the four accounting proposals which do not involve amortization of goodwill as an operating expense are based in part on the contention that goodwill value is not consumed or used to produce earnings in the same manner as various property rights, and therefore net income should not be reduced by amortization of goodwill. Further, net income should not be reduced by both amortization of goodwill and current expenditures that are incurred to enhance or maintain the value of the acquired intangible assets. All methods of amortizing goodwill are criticized as arbitrary because the life of goodwill is indefinite and an estimated period of existence is not measurable.

19. The basis for proposing that the cost of goodwill be retained as an asset until a loss in value becomes evident is that the cost incurred for acquired goodwill should be accounted for as an asset at the date acquired and in later periods. The cost should not be reduced as long as the value of the asset is at least equal to that cost.

20. The basis for proposing that the cost of goodwill be deducted from stockholders' equity at the date acquired is that the nature of goodwill differs from other assets and warrants special accounting treatment. Since goodwill attaches only to a business as a whole and its value fluctuates widely for innumerable reasons, estimates of either the terms of existence or current value are unreliable for purposes of income determination.

*Accounting on the Historical-Cost Basis*

21. All assets which are represented by deferred costs are essentially alike in historical-cost based accounting. They result from expenditures or owners' contributions and are expected to increase revenue or reduce costs to be incurred in future periods. If future benefit or the period to be benefited is questionable, the expenditure is usually treated as a current expense and not as a deferred cost. Associating deferred costs with the revenue or

period to which they are expected to relate is a basic problem in historical-cost based accounting both in measuring periodic income and in accounting for assets. The basic accounting treatment does not depend on whether the asset is a building, a piece of equipment, an element of inventory, a prepaid insurance premium, or whether it is tangible or intangible. The cost of goodwill and similar intangible assets is therefore essentially the same as the cost of land, buildings, or equipment under historical-cost based accounting. Deducting the cost of an asset from stockholders' equity (either retained earnings or capital in excess of par or stated value) at the date incurred does not match costs with revenue.

22. Accounting for the cost of a long-lived asset after acquisition normally depends on its estimated life. The cost of assets with perpetual existence, such as land, is carried forward as an asset without amortization, and the cost of assets with finite lives is amortized by systematic charges to income. Goodwill and similar intangible assets do not clearly fit either classification; their lives are neither infinite nor specifically limited, but are indeterminate. Thus, although the principles underlying present practice conform to the principles of accounting for similar types of assets, their applications have led to alternative treatments. Amortizing the cost of goodwill and similar intangible assets on arbitrary bases in the absence of evidence of limited lives or decreased values may recognize expenses and decreases of assets prematurely, but delaying amortization of the cost until a loss is evident may recognize the decreases after the fact.

*A Practical Solution*

23. A solution to this dilemma is to set minimum and maximum amortization periods. This accounting follows from the observation that few, if any, intangible assets last forever, although some may seem to last almost indefinitely. Allocating the cost of goodwill or other intangible assets with an indeterminate life over time is necessary because the value almost inevitably becomes zero at some future date. Since the date at which the value becomes zero is indeterminate, the end of the useful life must necessarily be set arbitrarily at some point or within some range of time for accounting purposes.

## OPINION

**Acquisition of Intangible Assets**

24. The Board concludes that a company should record as assets the costs of intangible assets acquired from other enterprises or individuals. Costs of developing, maintaining, or restoring intangible assets which are not specifically identifiable, have indeterminate lives, or are inherent in a continuing business and related to an enterprise as a whole—such as goodwill—should be deducted from income when incurred.

25. *Cost of intangible assets.* Intangible assets acquired singly should be recorded at cost at date of acquisition. Cost is measured by the amount of cash disbursed, the fair value of other assets distributed, the present value of amounts to be paid for liabilities incurred, or the fair value of consideration received for stock issued as described in paragraph 67 of APB Opinion No. 16.

26. Intangible assets acquired as part of a group of assets or as part of an acquired company should also be recorded at cost at date of acquisition. Cost is measured differently for specifically identifiable intangible assets and those lacking specific identification. The cost of identifiable intangible assets is an assigned part of the total cost of the group of assets or enterprise acquired, normally based on the fair values of the individual assets. The cost of unidentifiable intangible assets is measured by the difference between the cost of the group of assets or enterprise acquired and the sum of the assigned costs of individual tangible and identifiable intangible assets acquired less liabilities assumed. Cost should be assigned to all specifically identifiable intangible assets; cost of identifiable assets should not be included in goodwill. Principles and procedures of determining cost of assets acquired, including intangible assets, are discussed in detail in paragraphs 66 to 89 of APB Opinion No. 16, *Business Combinations.*

**Amortization of Intangible Assets**

27. The Board believes that the value of intangible assets at any one date eventually disappears and that the recorded costs of intangible assets should be amortized by systematic charges to income over the periods estimated to be benefited. Factors which should be considered in estimating the useful lives of intangible assets include:

a. Legal, regulatory, or contractual provisions may limit the maximum useful life.
b. Provisions for renewal or extension may alter a specified limit on useful life.
c. Effects of obsolescence, demand, competition, and other economic factors may reduce a useful life.
d. A useful life may parallel the service life expectancies of individuals or groups of employees.
e. Expected actions of competitors and others may restrict present competitive advantages.
f. An apparently unlimited useful life may in fact be indefinite and benefits cannot be reasonably projected.

g. An intangible asset may be a composite of many individual factors with varying effective lives.

The period of amortization of intangible assets should be determined from the pertinent factors.

28. The cost of each type of intangible asset should be amortized on the basis of the estimated life of that specific asset and should not be written off in the period of acquisition. Analysis of all factors should result in a reasonable estimate of the useful life of most intangible assets. A reasonable estimate of the useful life may often be based on upper and lower limits even though a fixed existence is not determinable.

29. The period of amortization should not, however, exceed forty years. Analysis at the time of acquisition may indicate that the indeterminate lives of some intangible assets are likely to exceed forty years and the cost of those assets should be amortized over the maximum period of forty years, not an arbitrary shorter period.

30. *Method of amortization.* The Board concludes that the straight-line method of amortization—equal annual amounts—should be applied unless a company demonstrates that another systematic method is more appropriate. The financial statements should disclose the method and period of amortization. Amortization of acquired goodwill and of other acquired intangible assets not deductible in computing income taxes payable does not create a timing difference, and allocation of income taxes is inappropriate.

31. *Subsequent review of amortization.* A company should evaluate the periods of amortization continually to determine whether later events and circumstances warrant revised estimates of useful lives. If estimates are changed, the unamortized cost should be allocated to the increased or reduced number of remaining periods in the revised useful life but not to exceed forty years after acquisition. Estimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income (APB Opinion No. 9, paragraph 21). However, a single loss year or even a few loss years together do not necessarily justify an extraordinary charge to income for all or a large part of the unamortized cost of intangible assets. The reason for an extraordinary deduction should be disclosed.

**Disposal of Goodwill**

32. Ordinarily goodwill and similar intangible assets cannot be disposed of apart from the enterprise as a whole. However, a large segment or separable group of assets of an acquired company or the entire acquired company may be sold or otherwise liquidated, and all or a portion of the unamortized cost of the goodwill recognized in the acquisition should be included in the cost of the assets sold.

**EFFECTIVE DATE**

33. The provisions of this Opinion shall be effective to account for intangible assets acquired after October 31, 1970. Intangible assets recognized in business combinations initiated before November 1, 1970 and consummated on or after that date under the terms prevailing on October 31, 1970[2] may be accounted for in accordance with this Opinion or Chapter 5 of ARB No. 43 and APB Opinion No. 9.

34. The provisions of this Opinion should not be applied retroactively to intangible assets acquired before November 1, 1970, whether in business combinations or otherwise.

35. The Board encourages the application on a prospective basis to all intangible assets held on October 31, 1970 of the provisions in paragraphs 27 to 31 of this Opinion which require amortization of all intangible assets. Unless the provisions of this Opinion are applied prospectively, the accounting for intangible assets held on October 31, 1970 should be in accordance with Chapter 5 of ARB No. 43 as modified by APB Opinion No. 9.

*The Opinion entitled "Intangible Assets" was adopted by the assenting votes of thirteen members of the Board. Messrs. Burger, Catlett, Davidson, Hellerson, and Horngren dissented.*

Mr. Catlett dissents to this Opinion because he believes that goodwill should never be shown as an asset in the balance sheet and should never be amortized as a charge to income. In his view, goodwill, regardless of the form of consideration paid for it, reflects values brought about by investor expectations attributable to a multitude of factors. Such values fluctuate frequently and widely, and the changes do not occur in any rational, predictable manner. Thus, there is no continuing relationship between the value of goodwill and its cost. Goodwill does not have a demonstrable useful life; and its expiration, if any, cannot be related on any logical basis to the operating revenues of particular periods. If goodwill values from an earlier date and for only a portion of a combined company, and the arbitrary

[2] Paragraphs 46-a and 47-a of APB Opinion No. 16, *Business Combinations*, define date initiated and describe the effect of changes in terms of a plan of combination.

amortization of such values, are reflected in financial statements, an unwarranted responsibility is placed upon investors to make proper allowance for this misstatement of assets and distortion of earnings in appraising the earning power and the value of the combined company, including all of its goodwill, on a current basis. Mr. Catlett believes that the lack of recognition by the Accounting Principles Board of the true nature of goodwill, as discussed in Accounting Research Study No. 10, has resulted in conclusions which adversely affect the development of sound accounting principles far beyond the accounting for goodwill. He also believes this Opinion demonstrates in a dramatic manner the urgent need for the Accounting Principles Board to define clearly the objectives of financial statements if it is to deal successfully with basic accounting problems.

Messrs. Burger, Davidson, Hellerson, and Horngren dissent to the required amortization of goodwill and other intangible assets (for example, perpetual franchises) having indeterminate lives. Whether amortization is appropriate depends on the particular circumstances of each case, including the evidence of increases or decreases in the value of such assets. In some cases, the facts may indicate maintenance or enhancement rather than diminution of value of the intangibles. In such cases, amortization is inappropriate. In other cases, the useful life may be determinable; then the cost should be amortized by systematic charges to income over the estimated period of usefulness. In all cases, the amortization of intangible assets should be based on professional judgment, rather than arbitrary rules.

**NOTES**

*Opinions of the Accounting Principles Board present the conclusions of at least two-thirds of the members of the Board, which is the senior technical body of the Institute authorized to issue pronouncements on accounting principles.*

*Board Opinions are considered appropriate in all circumstances covered but need not be applied to immaterial items.*

*Covering all possible conditions and circumstances in an Opinion of the Accounting Principles Board is usually impracticable. The substance of transactions and the principles, guides, rules, and criteria described in Opinions should control the accounting for transactions not expressly covered.*

*Unless otherwise stated, Opinions of the Board are not intended to be retroactive.*

*Council of the Institute has resolved that Institute members should disclose departures from Board Opinions in their reports as independent auditors when the effect of the departures on the financial statements is material or see to it that such departures are disclosed in notes to the financial statements and, where practicable, should disclose their effects on the financial statements. (Special Bulletin,* Disclosure of Departures from Opinions of the Accounting Principles Board, *October 1964). Members of the Institute must assume the burden of justifying any such departures.*

**Accounting Principles Board (1970)**

| | | |
|---|---|---|
| LeRoy Layton, *Chairman* | George R. Catlett | Charles B. Hellerson |
| Kenneth S. Axelson | Joseph P. Cummings | Charles T. Horngren |
| Donald J. Bevis | Sidney Davidson | Oral L. Luper |
| Milton M. Broeker | Philip L. Defliese | J. S. Seidman |
| Leo E. Burger | Newman T. Halvorson | George C. Watt |
| | Robert Hampton, III | Frank T. Weston |
| | Emmett S. Harrington | |

24

# ASSISTANCE AGREEMENT

between

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

and

CARTERET SAVINGS AND LOAN ASSOCIATION, F.A.

NEWARK, NEW JERSEY

ASSISTANCE AGREEMENT

TABLE OF CONTENTS


§ 1 Definitions....................................2
- (a) Book Value....................................2
- (b) Covered Asset....................................4
- (c) Credit/Credit Item....................................5
- (d) Debit/Debit Item....................................5
- (e) Effective Date....................................5
- (f) Foreclosure....................................5
- (g) Inital Audit....................................5
- (h) Insurance Regulations....................................6
- (i) Liquidation....................................6
- (j) Merger....................................6
- (k) Mortgage....................................6
- (l) Net Proceeds Received....................................6
- (m) Real Estate Owned (REO)....................................7
- (n) Special Reserve Account....................................7

§ 2 Special Reserve Account....................................7
- (a) Establishment....................................7
- (b) Opening Balance....................................7
- (c) Debits....................................7
- (d) Exclusions from Debits....................................10
- (e) Credits....................................11

§ 3 Inventory and Initial Audit....................................15

§ 4 Contributions....................................16

§ 5 Reports, Records, and Audits....................................18

§ 6 Covenants of the RESULTING ASSOCIATION....................................20

§ 7 Representations and Warranties....................................25

§ 8 Sale and Repair of Real Estate Owned....................................25

§ 9 Foreclosures....................................28

§ 10 Corporation's Right to Purchase Covered Assets; Assignments....................................31

§ 11 Termination of Agreement....................................32

§ 12 Instruments of Sale and Assignment....................................33

§ 13 Accounting Principles....................................34

§ 14 Conditions....................................34

§ 15 Notices....................................35

§ 16 Rights and Forbearance....................................36

§ 17 Entire Agreement, Modification, Headings....................................36

§ 18 Counterparts....................................37

§ 19 Governing Law....................................37

§ 20 Continuing Cooperation....................................37

§ 21 Successors and Assigns....................................38

§ 22 Sole Benefit....................................38

§ 23 Litigation; Power of Attorney....................................38

§ 24 Acknowledgement....................................39

§ 25 Severability....................................39

§ 26 Immediate Effect....................................39

an unreasonable financial burden on the RESULTING ASSOCIATION. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described herein.

§ 21 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective transferees, successors, and assigns, but this Agreement may not be assigned to any other party nor may any rights hereunder be transferred to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

§ 22 Sole Benefit. Nothing expressed or referred to herein is intended or shall be construed to give any person other than the CORPORATION or the RESULTING ASSOCIATION any legal or equitable right, remedy, or claim under or in respect to this Agreement, or any of its provisions, it being the intention of the parties hereto that this Agreement, the assumption of obligations and statements of responsibilities hereunder, and all conditions and provisions hereof, are for the sole benefit of the CORPORATION and the RESULTING ASSOCIATION and for the benefit of no other person.

§ 23 Litigation; Power of Attorney. In the event any action at law or in equity shall be instituted by any person against the RESULTING ASSOCIATION or the RESULTING ASSOCIATION and the CORPORATION as co-defendants, or in which action the CORPORATION joins or is joined as co-defendant, the RESULTING ASSOCIATION agrees to

# ASSISTANCE AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

AND

CARTERET SAVINGS BANK, FA
Morristown, New Jersey

Dated: June 6, 1986

## SUMMARY OF SUBSTANTIVE PROVISIONS

| ASSISTANCE PROVIDED | SECTION IN AGREEMENT |
|---|---|
| 1. Negative Net Worth Contributions | §§ 3, 5 |
| 2. Indemnification for Undisclosed Liabilities, Challenges to the Acquisitions Transaction and Unreserved for Claims | §§ 3, 6 |
| 3. Covered Assets | §§ 3, 4, 5, 10, 11 |

ASSISTANCE AGREEMENT
BETWEEN
THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
AND
CARTERET SAVINGS BANK, FA

TABLE OF CONTENTS


| | Page |
|---|---|
| Recitals | 1 |
| § 1 Definitions | 3 |
| (a) "Acquisitions" | 3 |
| (b) "Acquisition of FIRST FEDERAL" | 3 |
| (c) "Acquisition of MSSB" | 3 |
| (d) "Merger Agreement for FIRST FEDERAL" | 3 |
| (e) "Acquisition Agreement" | 3 |
| (f) "Affiliate" | 3 |
| (g) "Bank Board" | 3 |
| (h) "Books of MSSB" or "MSSB's Books" | 4 |
| (i) "Books of FIRST FEDERAL" or "FIRST FEDERAL's Books" | 4 |
| (j) "Book Value" | 4 |
| (k) "Covered Asset" | 8 |
| (l) "Covered Asset Claim" | 10 |
| (m) "Credit" or "Credit Item" | 10 |
| (n) "Debit" or "Debit Item" | 10 |
| (o) "Effective Date" | 11 |
| (p) "Fair Market Value" | 11 |
| (q) "Foreclosure" | 11 |
| (r) "Initial Audit" | 11 |
| (s) "Liquidation" | 11 |
| (t) "Mortgage" | 12 |
| (u) "Negative Net Worth" | 12 |
| (v) "Net Proceeds Received" | 13 |
| (w) "Non-Performing Asset" | 13 |
| (x) "Non-Controlled Subsidiary" | 13 |
| (y) "Quarter" | 14 |
| (z) "Real Estate in Judgment" or "REJ" | 14 |




WOF011 0542 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

ASSISTANCE AGREEMENT

Table of Contents


| | Page |
|---|---|
| (aa) "Real Estate Owned" or "REO" | 14 |
| (bb) "Related Claim" | 14 |
| (cc) "Special Reserve Account" | 14 |
| (dd) "Controlled Subsidiary" | 14 |
| (ee) "MSSB Claims" | 15 |
| (ff) "FIRST FEDERAL Claims" | 15 |
| (gg) "Claim" | 16 |
| § 2 Conditions | 16 |
| § 3 Special Reserve Account | 18 |
| (a) Debits | 18 |
| (1) Negative Net Worth | 18 |
| (2) Capital Losses on Covered Assets | 19 |
| (3) Covered Asset Claim Expenses | 19 |
| (4) Appraisal Costs | 19 |
| (5) Write Down of a Covered Asset | 19 |
| (6) Indemnification | 20 |
| (7) Related Claim Expenses | 20 |
| (8) MSSB Claim Expenses or FIRST FEDERAL Claim Expenses | 20 |
| (9) April, Inc. Adjustment | 20 |
| (10) Covered Asset Purchase | 20 |
| (11) Payment of Credits | 20 |
| (12) Expense to Cure | 21 |
| (13) Tax Benefit Adjustment Payments | 21 |
| (14) Assignment of Covered Asset Claim, Related Claim, MSSB Claim, or FIRST FEDERAL Claim | 21 |
| (15) Uncollected Interest | 21 |
| (16) Net Worth Adjustment | 22 |
| (b) Exclusions from Debits | 22 |
| (c) Credits to Special Reserve Account | 23 |
| (1) Reserved | 23 |
| (2) Recoveries on Covered Assets | 23 |
| (3) Refunds | 24 |
| (4) Pre-Effective Date Interest | 24 |
| (5) Other Recoveries on Covered Assets | 24 |
| (6) Offset Gains | 24 |




WOF011 0543 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

ASSISTANCE AGREEMENT

Table of Contents

| | | Page |
|---|---|---|
| | (7) Tax Refunds | 24 |
| | (8) Tax Benefits | 25 |
| | (9) Uncollected Interest | 27 |
| | (10) Recoveries on MSSB Claims or First Federal Claims and Recoveries by CORPORATION on Covered Asset Claims and Related Claims | 28 |
| | (11) CORPORATION's Contribution | 28 |
| | (12) Net Worth Adjustment | 28 |
| | (13) April, Inc. Adjustment | 28 |
| § 4 | Write Down of a Covered Asset | 29 |
| | (a) Approval of Write Down | 29 |
| | (b) Limitation on Amount of Write Down | 30 |
| | (c) Determination of Write Down | 30 |
| | (f) Required Sale | 32 |
| | (g) Further Investment | 32 |
| § 5 | Contributions by the CORPORATION | 33 |
| | (a) Debit Balance | 33 |
| | (b) Deductible | 33 |
| | (c) Reimbursement of Credit Balances | 33 |
| | (d) Adjustments | 34 |
| § 6 | Indemnification for Undisclosed Liabilities, Unreserved for Claims, and Litigation Challenging the Acquisitions | 34 |
| | (a) Indemnifications | 34 |
| | (1) Undisclosed Liabilities | 35 |
| | (2) Unreserved for Claims | 37 |
| | (3) Challenges to the Transactions | 37 |
| § 7 | Pursuit of Related Claims | 38 |
| § 8 | MSSB Claims or FIRST FEDERAL Claims | 39 |
| § 9 | Liquidation and Repair of Real Estate Owned | 41 |

ASSISTANCE AGREEMENT

Table of Contents


Page

§ 10 Foreclosures .................................... 45

§ 11 CORPORATION's Right to Purchase Covered Assets Other Than Covered Asset Claims .................................... 47

§ 12 Duplicate Payments .................................... 49

§ 13 Non-Reimbursable Expenses .................................... 49

§ 14 Reports, Records .................................... 49
- (a) Quarterly Reports .................................... 49
- (b) Reports on Covered Assets .................................... 51
- (c) Final Accounting .................................... 52
- (d) Access to Books and Records .................................... 52
- (e) Audits and Examinations .................................... 52
- (f) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities .................................... 53
- (g) Other Reports .................................... 56

§ 15 Covenants of the RESULTING ASSOCIATION .................................... 56
- (a) Tax Benefits .................................... 56
- (b) Administration of Assets and Liabilities .................................... 57
  - (1) Management Standard .................................... 58
  - (2) Pursuit of Claims .................................... 58
  - (3) Conduct of Litigation .................................... 59
  - (4) Covered Asset Restrictions .................................... 62
  - (5) Covered Asset Requirements .................................... 63
  - (6) Controlled Subsidiaries .................................... 64
- (c) Compliance with Law .................................... 66
- (d) Disclosure of Agreement .................................... 67




WOF011 0545 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one and the same instrument, and any party may execute this Agreement by signing any such counterpart.

(b) No amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

Section 25. Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

Section 26. Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement

is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

Section 27. Continuing Cooperation. It is the purpose of this Agreement to provide a means by which the failures of MSSB and FIRST FEDERAL may be prevented, the savers and other creditors of MSSB and FIRST FEDERAL may be protected against losses, the thrift and financing needs of the communities in which MSSB's and FIRST FEDERAL's offices are located may be served, the RESULTING ASSOCIATION may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described in this section.



WOF011 0622 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# OFFICE OF THRIFT SUPERVISION

## DEPARTMENT OF THE TREASURY

## REPORT OF EXAMINATION

NAME OF INSTITUTION CARTERET SAVINGS BANK, F.A.

DOCKET NUMBER 04702 DISTRICT NUMBER 02

DATE OF EXAMINATION May 22, 1989

August 1989

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | 02 | 04702 |
| | Type of Examination<br><br>Federal Regular | |

Examination commenced: May 22, 1989
Examination concluded: November 14, 1989

Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the District Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 505 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.

0 15065

REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | 02<br><br>Type of Examination<br><br>Federal Regular | 04702 |

Examination commenced: May 22, 1989

Members of the Board:

As required by the Rules and Regulations for Insurance of Accounts, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends which impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate.

/s/ Russell J. Meyer
Examiner-in-Charge
Office of Thrift Supervision

0 15066

Date: May 22, 1989 Docket No.: 04702

INDEX AND ABBREVIATIONS


| | | Page |
|---|---|---|
| Report Summary and Composite Rating | | 1 - 7 |
| Management, Asset Quality, Capital, Risk Management, Operating Results, and Miscellaneous | | 8 - 64 |

APPENDIX

| | | Page |
|---|---|---|
| Outstanding Enforcement Actions | Omitted | A - 1.1 |
| Directors, Principal Officers and Attorneys | | A - 2.1 |
| Principal Operating Committees | Omitted | A - 3.1 |
| Statement of Condition | | A - 4.1 |
| Statement of Operations | | A - 5.1 |
| Key Ratios | | A - 6.1 |
| Deposit/Liability Page | Omitted | A - 7.1 |
| Deposit from Other Financial Institutions | Omitted | A - 8.1 |
| Summary of Criticized Assets | | A - 9.1 |
| Summary of Scheduled Items | (NO LONGER REQUIRED) | A - 10.1 |
| Summary of Action Required by Criticized Assets | | A - 11.1 |
| Classified Assets | | A - 12.1 |
| Assets Subject to Special Mention | | A - 13.1 |
| Loans in Process and Commitments | Omitted | A - 14.1 |
| Concentrations | Omitted | A - 15.1 |
| Gap Report Assumptions | Omitted | A - 16.1 |

Date: May 22, 1989 Docket No.: 04702

Gap Analysis - Hedged GAP (Graphic) . . . . . . . . . . . Omitted . . A - 17.1

Gap Analysis - Cumulative Hedged GAP (Graphic) . . . . . Omitted . . A - 18.1

Numerical GAP Analysis..Assets (0-5 years) . . . . . . . . Omitted . . A - 19.1

Numerical GAP Analysis..Assets (over 5 years) . . . . . . Omitted . . A - 20.1

Numerical GAP Analysis..Liabilities (0-5 years) . . . . Omitted . . A - 21.1

Numerical GAP Analysis..Liabilities (over 5 years) . . . Omitted . . A - 22.1

Service Corporations . . . . . . . . . . . . . . . . . . . . . . . . . A - 23.1

Other Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 24.1

Financial Reporting Errors . . . . . . . . . . . . . . . . . . . . . A - 25.1

Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . A - 26.1

ABBREVIATIONS USED IN THIS REPORT

P = President
EVP = Executive Vice President
VP = Vice President
CB = Chairman of the Board
MO = Managing Officer
CEO = Chief Executive Officer
COO = Chief Operations Officer
SVP = Senior Vice President
AVP = Assistant Vice President
S = Secretary
AS = Assistant Secretary
T = Treasurer
AT = Assistant Treasurer
C = Controller
D = Director
AD = Advisory Director
DE = Director Emeritus
A = Attorney
IVP = First Vice President
SO = Savings Officer
CSB = Carteret Savings Bank
CBC = Carteret BanCorp



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ668 1979

Date: May 22, 1989 Docket No.: 04702

REPORT SUMMARY (Continued)

The examiners' findings are highlighted as follows:

Capital

Although CSB has met the RAP capital requirements as of June 30, 1989, the implementation of FIRREA, continuing operating losses and the substantial increase in classified assets requiring the establishment of additional reserves, indicate that the bank will not meet future regulatory capital requirements.

Drastic changes in operations, a return to core operating profits, as well as overall asset shrinkage will be needed. Otherwise, additional capital contributions of $50 million committed by AmBase will not be sufficient to meet the future capital needs of the bank.

Operations

Carteret must return to core operating profits and not continue to rely on non-operating gains resulting from asset sales. As of the quarter ending June 30, 1989, Carteret has booked operating losses for four straight quarters. Operating losses for July and August 1989 were also booked.

Speculative as well as trading activities must stop until all the proper policies and controls are in place and an adequate capital position is attained. This will have an adverse effect on net income. Operating expenses must be reduced and loan products properly priced so as to maintain a profitable margin.

Assets

Carteret has experienced a tremendous increase in the amount of criticized assets, now representing 6.7% of assets and 154.2% of regulatory capital. This problem is somewhat the result of a general decline in the real estate market in the bank's main lending areas of Florida and recently New Jersey. However, a considerable part of the problem is also caused by poor underwriting. In particular, secured and unsecured commercial loans, commercial real estate loans and commercial construction loans all exhibited underwriting weaknesses which are contributing to the increasing amount of classified assets. Moreover, management failed to react to the softening real estate market in a timely manner and continued to invest in these areas through June, 1989.

The examiners have determined that the loan loss reserves established by the bank are inadequate and have requested that an additional $77.2 million in general valuation allowances be established. In addition, those assets classified "Loss", totaling $24,604,029 must be written off or a specific reserve established immediately.

ERO #447

RTC
Resolution Trust Corporation

loans procedures

MEMO TO: All Directors - Consolidated Offices
Managing Agents
Liquidation Site Managers
Supervisory Managing Agents

FROM: William M. Dudley
Regional Director
Eastern Region

WMD

DATE: June 20, 1990

SUBJECT: Prepayment Interest/Penalty

The Resolution Trust Corporations's Strategic Plan discloses in detail the RTC's mission to downsize and maximize recovery. In this vein, RTC is seeking to have loans moved to other institutions and/or paid off early to address the immediate liquidity needs. To facilitate this endeavor, RTC in this region during its Conservatorships and Receiverships interventions will waive prepayment interest/penalties on any obligation that is paid off early.

Should you have any questions regarding this matter, please contact the Regional Office Credit Staff.

WMD:gm

245 Peachtree Center Avenue, NE • Atlanta, Georgia 30303

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
| --- | --- | --- |
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Jersey City | 04702 |
| | **Type of Examination** | |
| | Federal Regular | |

Examination commenced: June 17, 1991
Examination concluded: November 7, 1991

Service Corporations and Other Affiliates Which Are a Part of This Report:

AmBase Corporation (See separate report)
Carteret Communities, Inc.
Carteret Premium Finance, Inc. aka Imperial Premium Finance, Inc.
Carteret Realty Corporation
Carteret Service Corporation

### Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor. Independent auditors may be provided access to this report only after providing a written statement that they will not disclose the Report of Examination or any portion thereof.

If a subpoena or other legal process is received calling for production of this document, the Regional Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 510 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, must review this report thoroughly and provide a response to the Regional Office, signed by each member of the Board of Directors, within 30 days of receipt of this report. This report should not be considered an audit report.

REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Jersey City | 04702 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: June 17, 1991

Members of the Board:

As required by Section 563.170 of the Rules and Regulations, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends that impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate. All matters of criticism, violations of laws or regulations, and other matters of concern identified within this Report of Examination require the Board of Directors and management's prompt corrective action.

/s/ Thomas J. O'Rourke, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

Date: June 17, 1991 Docket No.: 04702

## INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Report Summary and Composite Rating | 1 - 4 |
| Management, Asset Quality, Capital, Risk Management, Operating Results, and Miscellaneous | 5 - 44 |

APPENDIX

| | | Page |
|---|---|---|
| Outstanding Enforcement Actions | | A - 1.1 |
| Violations of Laws or Regulations | | A - 2.1 |
| Directors, Principal Officers and Attorneys | | A - 3.1 |
| Principal Operating Committees | Omitted | A - 4.1 |
| Statement of Condition | | A - 5.1 |
| Statement of Operations | | A - 6.1 |
| Key Ratios | | A - 7.1 |
| Deposit/Liability Page | | A - 8.1 |
| Deposit from Other Financial Institutions | Omitted | A - 9.1 |
| Summary of Criticized Assets | | A - 10.1 |
| Summary of Action Required by Criticized Assets | | A - 11.1 |
| Classified Assets and Assets Designated Special Mention | | A - 12.1 |
| Loans in Process and Commitments | Omitted | A - 13.1 |
| Concentrations | Omitted | A - 14.1 |
| Interest Rate Risk Exposure Report | | A - 15.1 |

Date: June 17, 1991 Docket No.: 04702

REPORT SUMMARY (Continued)

Carteret is also operating with an unsafe level of interest rate risk in its balance sheet. The OTS Market Value of Portfolio Equity (MVPE) model reveals that an increase in interest rates from existing levels will deplete any remaining capital, on a market value basis, and compound the existing capital shortfall. In addition, Carteret's asset and liability management strategies during the examination period have added to already unacceptable levels of interest-rate risk. These strategies included selling adjustable-rate mortgage loans, at a $19 million net profit, and purchasing fixed rate mortgage securities. (See RISK MANAGEMENT comments).

Carteret posted a net loss of $131.8 million for 1990 and a net loss of $154.9 million for the six-month period ended June 30, 1991. Losses are due primarily to continued significant provisions for loan losses, however, core operations are also producing losses which appear irreversible thus rendering Carteret's viability is serious doubt absent an equity infusion. (See OPERATING RESULTS comments).

In summary, the problems facing Carteret have progressively worsened since the June 4, 1990 examination, when a Composite "5" was assigned. At this point the OTS believes that without substantial outside equity capital, government intervention appears to be the only available remedy.

The board is directed to certify that it has taken corrective action with regard to the following matters and that the following reports are forwarded to the Regional Director. Submission of these reports does not relieve Carteret of its reporting requirements under both the outstanding Supervisory Agreement and the Capital Directive:

1. Before November 30, 1991, submit a certified resolution of the board that addresses the board's disposition of the compensation claims of Robert Walsh.

2. Before November 30, 1991, submit all TFR amendments listed at Appendix A - 18.1 and ensure that accurate reports are forwarded in future periods.

3. Before December 31, 1991, submit a certified resolution that describes what specific actions the board intends to take in regard to the unauthorized advance to Robert B. O'Brien, and which also describes the actions taken to collect from AmBase a portion of the costs borne solely by Carteret in the Termination Agreements extended to Messrs. Gilgar and McCabe.

4. Before December 31, 1991, Carteret shall institute a comprehensive internal loan review program, which will provide for regular review and classification of all loan types as required pursuant to the terms of the outstanding Supervisory Agreement. In addition, Carteret shall supply a report to OTS that outlines the scope of the overall ILR function, plus the results of the ILR of the Western FS&LA multi-family loan pools and residential loans in excess of $500,000, and the resumes of the individuals who will carry out the reviews.

# FORM 10-Q

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

[X] Quarterly Report Pursuant to Section 13 of the Securities Exchange Act of 1934

For the quarterly period ended June 30, 1991

[ ] Transition Report Pursuant to Section 13 of the Securities Exchange Act of 1934

Commission file number 1-7265

## AMBASE CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE | 95-2962743 |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| 200 South Street, Morristown, New Jersey | 07960 |
| (Address of principal executive offices) | (Zip Code) |
| Registrant's telephone number, including area code | (201) 326-1034 |
| 59 Maiden Lane, New York, New York | 10038-4548 |
| (Former address of principal executive offices) | (Zip Code) |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes _X_ No __

At June 30, 1991 there were 38,279,459 shares of registrant's common stock, $.01 par value per share, outstanding, excluding 1,405,548 treasury shares.

TRANSMITTED FROM 201 2850530 08.14.91 17:45 P.03 *CARTERET

Item 1. Financial Statements

## AMBASE CORPORATION AND SUBSIDIARIES
### Consolidated Statement of Income
### Second Quarter and Six Months ended June 30

| *(in millions, except per share data)* | Second Quarter 1991 | Second Quarter 1990 | Six Months 1991 | Six Months 1990 |
|---|---|---|---|---|
| **Interest income:** | | | | |
| First mortgage loans | $ 59 | $ 92 | $ 122 | $ 191 |
| Mortgage–backed securities | 39 | 22 | 74 | 41 |
| Other loans | 12 | 18 | 27 | 37 |
| Investments | 8 | 9 | 18 | 19 |
| | 118 | 141 | 241 | 288 |
| **Interest expense:** | | | | |
| Deposits | 52 | 79 | 106 | 162 |
| Advances from the Federal Home Loan Bank | 35 | 15 | 74 | 31 |
| Other borrowed funds | 5 | 17 | 12 | 30 |
| | 92 | 111 | 192 | 223 |
| **Net interest income** | 26 | 30 | 49 | 65 |
| Provision for losses on loans and real estate | 150 | 6 | 161 | 27 |
| Net interest income after provision for losses | (124) | 24 | (112) | 38 |
| **Non–interest income:** | | | | |
| Mortgage banking activities: | | | | |
| Gain on sales of securities and loans | – | 1 | 2 | 4 |
| Gain on sale of servicing | 6 | 2 | 6 | 7 |
| Gain on value of servicing | – | 1 | 3 | 1 |
| Servicing and other fees | 5 | 5 | 10 | 11 |
| Income from mortgage banking activities | 11 | 9 | 21 | 23 |
| Gain on sales of securities and loans | 2 | 5 | 9 | 7 |
| Loss from real estate operations | (3) | (1) | (5) | (2) |
| Other loan fees, service charges and other income | 1 | 4 | 5 | 8 |
| Non–interest income | 11 | 17 | 30 | 36 |
| Net interest and non–interest income | (113) | 41 | (82) | 74 |
| **Other expenses:** | | | | |
| Compensation and employee benefits | 14 | 15 | 27 | 32 |
| Occupancy | 8 | 9 | 16 | 18 |
| Federal and other insurance | 3 | 3 | 6 | 6 |
| Outside services and professional fees | 3 | 3 | 7 | 6 |
| Core deposit value and goodwill amortization | 1 | 4 | 2 | 8 |
| Other operating expenses | 7 | 7 | 13 | 14 |
| | 36 | 41 | 71 | 84 |
| Loss before corporate expenses | (149) | – | (153) | (10) |
| Corporate interest expense | – | 22 | 10 | 41 |
| Corporate expenses and other operations | 1 | 15 | 4 | 24 |
| **Loss from continuing operations before income taxes** | (150) | (37) | (167) | (75) |
| Income taxes | (3) | – | (6) | (3) |
| **Loss from continuing operations** | (153) | (37) | (173) | (78) |
| Loss from discontinued operations | – | (69) | – | (70) |
| **Loss before extraordinary item** | (153) | (106) | (173) | (148) |
| Extraordinary gain on extinguishment of debt, net of income taxes | – | – | 56 | – |
| **Net loss** | $ (153) | $ (106) | $ (117) | $ (148) |
| **Per share data:** | | | | |
| Loss from continuing operations | $ (4.01) | $ (1.11) | $ (4.58) | $ (2.31) |
| Loss from discontinued operations | – | (2.01) | – | (2.05) |
| Loss before extraordinary item | (4.01) | (3.12) | (4.58) | (4.36) |
| Extraordinary gain on extinguishment of debt, net of income taxes | – | – | 1.49 | – |
| **Net loss** | $ (4.01) | $ (3.12) | $ (3.09) | $ (4.36) |
| Dividends | – | – | – | $ 0.05 |
| Average shares outstanding | 38.1 | 34.1 | 37.8 | 34.1 |

*See notes to consolidated financial statements.*

**Consolidated Balance Sheet**

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| **Assets** | | |
| Cash | $ 102 | $ 84 |
| Loans of federal funds | 112 | 172 |
| Cash and cash equivalents | 214 | 256 |
| Investment securities, at amortized cost (market $149 and $106), including held for sale of $20 (market $20) at June 30, 1991 | 151 | 105 |
| Mortgage-backed securities (market $1,702 and $1,418), including held for sale of $163 and $302 (market $163 and $305) | 1,716 | 1,423 |
| Loans receivable, including held for sale of $258 and $250 | 2,740 | 3,098 |
| Investment in real estate | 175 | 232 |
| Interest and dividends receivable | 45 | 61 |
| Federal Home Loan Bank stock, at cost | 99 | 99 |
| Capitalized costs of future servicing | 89 | 102 |
| Net assets of discontinued operations | – | 769 |
| Other assets | 186 | 175 |
| Total assets | $ 5,415 | $ 6,320 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Deposits | $ 3,033 | $ 3,032 |
| Advances from the Federal Home Loan Bank | 1,903 | 1,963 |
| Other borrowed funds | 163 | 182 |
| Corporate and nonbanking indebtedness | – | 728 |
| Escrow | 139 | 143 |
| Other liabilities | 226 | 204 |
| Total liabilities | 5,464 | 6,252 |
| Stockholders' equity: | | |
| Common stock | – | 40 |
| Paid-in capital | 574 | 576 |
| Accumulated deficit | (595) | (478) |
| Treasury stock | (28) | (70) |
| Total stockholders' equity | (49) | 68 |
| Total liabilities and stockholders' equity | $ 5,415 | $ 6,320 |

*See notes to consolidated financial statements.*

**Consolidated Statements of Cash Flow**
**Six Months ended June 30**

| *(in millions)* | 1991 | 1990 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Loss from continuing operations | $ (173) | $ (78) |
| Adjustments to reconcile loss from continuing operations to net cash provided by (used for) continuing operations: | | |
| Gains on sales of securities, loans and servicing by banking subsidiaries | (20) | (19) |
| Provision for losses on loans and real estate | 161 | 27 |
| Accretion of loan fees, premiums and discounts | (8) | (17) |
| Depreciation and amortization | 20 | 25 |
| Interest and dividends receivable | 16 | 4 |
| Interest payable | (17) | (4) |
| Other | 36 | (23) |
| Net cash provided by (used for) continuing operations | 15 | (85) |
| Loss from discontinued operations | – | (70) |
| Adjustments to reconcile loss from discontinued operations to net cash used for discontinued operations: | | |
| Realized losses on investments of insurance subsidiaries | – | 86 |
| Deferred policy acquisition costs | – | (19) |
| Unpaid insurance losses and loss adjustment expenses | – | 38 |
| Insurance premiums and net reinsurance balances receivables | – | (150) |
| Unearned insurance premiums | – | 128 |
| Investments of investment services subsidiaries | – | (43) |
| Investment services receivables, net of loans and payables | – | (6) |
| Securities sold, not yet purchased | – | 55 |
| Other | – | (41) |
| Net cash used for discontinued operations | – | (22) |
| Net cash provided by (used for) operating activities | 15 | (107) |
| **Cash flows from investing activities:** | | |
| Proceeds on fixed maturities and equity securities, principally sales | 63 | 822 |
| Purchases of fixed maturities and equity securities | (108) | (894) |
| Short–term investments, net | – | (46) |
| Payments on mortgage–backed securities | 116 | 51 |
| Loan payments and originations, net | (449) | (778) |
| Mortgage–backed securities sold | 717 | 641 |
| Sales of loans | 434 | 417 |
| Mortgage–backed securities purchased | (768) | (277) |
| Loans purchased | (67) | (50) |
| Proceeds from sale of discontinued operations | 541 | – |
| Investments services loans to customers | – | 47 |
| Investment transactions in the course of settlement | 7 | (47) |
| Other | – | (4) |
| Net cash provided by (used for) investing activities | 486 | (118) |
| **Cash flows from financing activities:** | | |
| Certificates of deposit, net | (79) | (219) |
| Excess of deposit receipts over withdrawals | 80 | 75 |
| Securities sold under agreements to repurchase, net | – | 130 |
| Increases in indebtedness | 118 | 631 |
| Reductions in indebtedness | (607) | (640) |
| Payments to repurchase indebtedness | (52) | – |
| Escrow | (4) | 34 |
| Dividends | – | (2) |
| Other | 1 | (9) |
| Net cash used for financing activities | (543) | – |
| Net decrease in cash and equivalents | (42) | (225) |
| Cash and equivalents at beginning of period | 256 | 427 |
| **Cash and equivalents at end of period** | $ 214 | $ 202 |

*See notes to consolidated financial statements.*

# AMBASE CORPORATION AND SUBSIDIARIES

## Notes to Consolidated Financial Statements

1. The accompanying June 30, 1991 and 1990 consolidated financial statements of AmBase Corporation (the "Company") are unaudited and may be subject to year-end adjustments. In the opinion of management, the interim financial statements reflect all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the Company's financial position and results of operations. Results for interim periods are not necessarily indicative of results for the full year. In preparing the financial statements, management makes certain assumptions and estimates, which it deems reasonable, that affect certain reported amounts. Future results could differ from such estimates. In addition, the accompanying consolidated financial statements have been prepared on a "going concern" basis and, accordingly, do not include adjustments to the carrying value of assets and liabilities which might be necessary should the Company or Carteret Bancorp Inc. ("Carteret Bancorp"), or Carteret Bancorp's principal subsidiary, Carteret Savings Bank, FA ("Carteret Savings"), not continue in operation. Pursuant to the designation of the operations of The Home Insurance Company ("The Home") and its subsidiaries as discontinued operations and The Home's subsequent sale, certain prior year amounts have been reclassified to conform to the 1991 presentation (see Note 2). The unaudited interim financial statements presented herein should be read in conjunction with the Company's consolidated financial statements included in its Annual Report on Form 10-K for the year ended December 31, 1990.

   At a special meeting of the stockholders of the Company held on February 12, 1991, a charter amendment resolution was approved reducing the par value of the Company's cumulative preferred stock and common stock from $1.00 to $.01 per share.

2. On February 13, 1991, the Company sold all the outstanding common stock of The Home and its subsidiaries, including US International Re, Inc., Gruntal Financial Corp. and Sterling Forest Corporation, and certain other subsidiaries of the Company, together with 6,277,180 shares of The Home's $2.95 Cumulative Preferred Stock, Series A, held by the Company, to Home Holdings Inc. (formerly TVH Acquisition Corporation) ("Home Holdings"), a Delaware corporation owned by an investment group consisting of Trygg-Hansa SPP Holding AB, a major Swedish insurer, Industrial Mutual Insurance Co., a major Finnish insurer, and certain other investors, pursuant to a stock purchase agreement dated as of September 28, 1990, as amended, among the Company, The Home and Home Holdings.

   The Company received approximately $541 million in cash in connection with the sale of The Home. In addition, Home Holdings assumed approximately (i) $102 million aggregate principal amount of the Company's 11 3/4% sinking fund debentures due April 15, 2008, (ii) the $60 million aggregate principal amount of the $150 million aggregate principal theretofore outstanding of the Company's 14 7/8% senior subordinated notes due 1998 not purchased by the Company in its tender offer therefor and (iii) the $57 million aggregate principal amount of the $76 million aggregate principal theretofore outstanding of the 14 7/8% debentures due 1999 of Home Group Funding Corporation ("Home Funding") (one of the subsidiaries sold to Home Holdings) not purchased by the Company in its tender offer therefor. The Home Funding debentures were guaranteed on a subordinated basis by the Company. Home Holdings also agreed to make $48 million in cash available to the Company, of which approximately $3 million had been received as of June 30, 1991, to meet certain specified future obligations of the Company relating to litigation, taxes and the Company's ongoing general and administrative expenses after the closing. The cash proceeds of the sale were used to repay the Company's bank indebtedness of $410 million, to pay for securities purchased in the Company's tender offers and to pay expenses associated with the sale of The Home. The Company also contributed $30 million to the capital of Carteret Savings. Prior to the sale, The Home held 593,931 shares of the Company's common stock which were classified as treasury stock prior to the sale. These shares have been included in the Company's outstanding shares subsequent to the sale.

   Accordingly, the consolidated operations of The Home have been designated as discontinued operations and the consolidated statement of income for the 1990 periods has been reclassified to report the loss from discontinued operations separately from the results of continuing operations by excluding the operating revenues and expenses of discontinued operations from the respective statement captions. The amount of income taxes allocated to continuing operations reflects the tax consequences of the pretax loss from continuing operations exclusive of the pretax loss from discontinued operations and the effects of an extraordinary item (see Note 5). The amount of income taxes allocated to discontinued operations reflects the incremental effect on income taxes that resulted from such operations.

# AMBASE CORPORATION AND SUBSIDIARIES

## Notes to Consolidated Financial Statements

Condensed information relating to loss from discontinued operations for the second quarter and six months ended June 30, 1990 is as follows:

| *(in millions)* | Second Quarter | Six Months |
|---|---|---|
| **Revenues:** | | |
| **Insurance:** | | |
| Earned premiums | $513 | $1,010 |
| Net investment income | 78 | 164 |
| Realized losses on investments | (44) | (86) |
| | 547 | 1,088 |
| Investment services | 63 | 131 |
| | $610 | $1,219 |
| **Loss from discontinued operations:** | | |
| **Insurance:** | | |
| Underwriting loss | $(68) | $(122) |
| Net investment income | 78 | 164 |
| Realized losses on investments | (44) | (86) |
| | (34) | (44) |
| Investment services | (1) | 1 |
| Other | (3) | (10) |
| Loss before income taxes | (38) | (53) |
| Income taxes | (25) | (5) |
| Preferred dividends of The Home, net of amounts paid to the Company | (6) | (12) |
| | $(69) | $ (70) |

The net assets of discontinued operations, including the Company's investment in preferred stock of The Home, are presented in the consolidated balance sheet at December 31, 1990 as a single amount as follows:

| *(in millions)* | |
|---|---|
| Investments | $3,850 |
| Premiums and investment services receivables | 1,587 |
| Deferred policy acquisition costs | 131 |
| Goodwill | 263 |
| Unpaid losses and loss adjustment expenses | (3,171) |
| Unearned premiums | (753) |
| Payable to brokers, dealers and customers | (524) |
| Subsidiary indebtedness | (113) |
| Other, net | 97 |
| Stockholders' equity of The Home | 1,367 |
| Preferred stock of The Home, net shares held by the Company | (161) |
| Unrealized equity accounts of The Home | 25 |
| Reserve for loss on disposition | (462) |
| Net assets of discontinued operations at realizable value | $ 769 |

**AMBASE CORPORATION AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

3. **Loans receivable consist of the following:**

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $2,323 | $2,553 |
| Commercial real estate loans | 520 | 628 |
| Total first mortgage loans | 2,843 | 3,181 |
| Corporate loans | 226 | 259 |
| Consumer loans | 134 | 168 |
| Premium finance loans | 80 | 47 |
| Total other loans | 440 | 474 |
| | 3,283 | 3,655 |
| Loan participations sold | (249) | (393) |
| Loans in process | (10) | (30) |
| Unearned discounts and deferred loan fees | (143) | (34) |
| Allowance for losses on loans | (141) | (100) |
| | $2,740 | $3,098 |

The decrease in commercial real estate loans is primarily attributable to the transfer of loans to investment in real estate due to foreclosure or in-substance foreclosure.

Components of the allowance for losses on loans by major category follow:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $12 | $ 8 |
| Commercial real estate loans | 68 | 49 |
| Total first mortgage loans | 80 | 57 |
| Corporate loans | 54 | 39 |
| Consumer loans | 5 | 3 |
| Premium finance loans | 2 | 1 |
| Total other loans | 61 | 43 |
| | $141 | $100 |

# AMBASE CORPORATION AND SUBSIDIARIES

Notes to Consolidated Financial Statements

The following table sets forth information on nonaccrual loans, past due loans which are still accruing and restructured loans.

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $ 83 | $ 47 |
| Commercial real estate loans | 51 | 14 |
| Corporate loans | 56 | 54 |
| Total nonaccrual loans | 190 | 115 |
| Residential first mortgage loans - 90 days past due | 34 | 27 |
| Consumer loans - 90 days past due | 4 | 4 |
| Premium finance loans - 180 days past due | 3 | 3 |
| Total 90 or more days past due, still accruing | 41 | 34 |
| Total nonperforming loans | 231 | 149 |
| Restructured loans | 120 | 123 |
| Total nonperforming and restructured loans | $351 | $272 |

4. Investment in real estate consists of the following:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Real estate held for development and sale | $ 39 | $ 41 |
| Real estate owned | 175 | 100 |
| In-substance foreclosed loans | 133 | 151 |
| | 347 | 292 |
| Allowance for losses on real estate: | | |
| Real estate held for development and sale | (18) | (6) |
| Real estate owned | (77) | (20) |
| In-substance foreclosed loans | (77) | (34) |
| | (172) | (60) |
| | $175 | $232 |

Loss from real estate operations as reflected in the consolidated statement of income is comprised of the net loss from operations of real estate held for development and sale, and real estate owned ("REO"). Costs associated with in-substance foreclosed loans are included in other expenses in the consolidated statement of income until the loan becomes REO. Any provision for possible losses is included in provision for losses on loans and real estate and the interest cost to carry REO is included in interest expense in the consolidated statement of income.

**AMBASE CORPORATION AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

5. Corporate and other nonbanking indebtedness is as follows:

| *(dollars in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| AmBase Corporation: | | |
| Notes payable to banks under bridge loan facility | - | $410 |
| 11 3/4% sinking fund debentures, including $55 principal amount held by The Home, net of unamortized discount of $3 | - | 99 |
| 14 7/8% senior subordinated notes, net of unamortized discount of $5 | - | 145 |
| Home Group Funding Corporation 14 7/8% debentures, net of unamortized discount of $2 | - | 74 |
| | - | $728 |

As further described in Note 2, in connection with the sale of The Home on February 13, 1991, Home Holdings assumed all of the Company's 14 7/8% senior subordinated notes not purchased in a tender offer in which the Company purchased, at $520 per $1,000 principal amount, approximately $90 million of such notes; and also assumed all of the 14 7/8% debentures of Home Funding not purchased in a tender offer in which the Company purchased, at $250 per $1,000 principal amount, approximately $19 million of such debentures. As a result of these tender offers, the Company purchased such indebtedness at substantial discounts to face amount and recorded an extraordinary gain, before income taxes, of $57 million on the extinguishment of debt in the first quarter of 1991. In connection with the sale of The Home all indebtedness of the Company and Home Funding has either been repaid, purchased in tender offers or assumed by Home Holdings.

6. At June 30, 1991, due to a significant increase in the provision for losses on loans and real estate brought about by new management's thorough review of reserves, Carteret Savings failed to meet the minimum capital requirements of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") after giving effect to all supervisory goodwill claimed by Carteret Savings in its suit against the Office of Thrift Supervision ("OTS"). See Part II, Item 1 – "Legal Proceedings" for a description of these legal proceedings. Including all supervisory goodwill claimed by Carteret Savings at June 30, 1991, Carteret Savings' tangible, core and risk-based capital were $78 million, $81 million and $130 million, respectively, or 1.4%, 1.5% and 4.0%, respectively. The required levels of tangible, core and risk-based capital were $82 million, $164 million and $233 million, respectively, or 1.5%, 3.0% and 7.2%, respectively. Giving effect to the treatment of supervisory goodwill under the OTS' interpretation of FIRREA would have resulted in tangible, core and risk-based capital of ($73) million, $10 million and $58 million, respectively, or (1.4%), 0.2% and 1.8%, respectively. The required levels of tangible, core and risk-based capital under the OTS' interpretation of FIRREA were $80 million, $159 million and $228 million, respectively or 1.5%, 3.0% and 7.2%, respectively. In the determination of regulatory capital requirements, Carteret Savings' accounts have not been adjusted to reflect the purchase accounting adjustments arising from the acquisition of Carteret Bancorp by the Company.

Failure to meet one or more of the capital requirements subjects a savings association to various regulatory limitations and sanctions. Carteret Savings is likely to be subject to the issuance of a Capital Directive by the OTS. The Capital Directive, among other things, would likely (i) require Carteret Savings to secure and thereafter maintain a higher level of core capital, (ii) require Carteret Savings to submit a capital plan demonstrating achievement and maintenance of regulatory capital, (iii) prohibit asset growth, (iv) prohibit capital declarations or distributions and (v) impose significant restrictions on Carteret Savings' operations.

## AMBASE CORPORATION AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

Management is unable to determine the effect on Carteret Savings' future operations of its failure to meet minimum regulatory capital requirements and is uncertain whether Carteret Savings has the ability to attract the capital necessary to achieve and maintain minimum regulatory capital requirements. As previously mentioned, failure to meet minimum regulatory capital requirements and other regulatory requirements exposes Carteret Savings to an entire range of regulatory sanctions. In addition, Carteret Savings has incurred losses for the year ended December 31, 1990 and the first and second quarters of 1991 primarily due to increases in nonperforming assets and significant additions to the allowance for losses on loans and real estate. These circumstances raise substantial doubt about Carteret Savings' ability to continue as a going concern. Carteret Savings' ability to meet regulatory capital requirements in the future and to continue as a going concern will depend to a large extent upon future earnings, regulatory action and securing additional capital. Earnings will be affected by the level of reserves for losses on loans and real estate which is dependent upon conditions in the economy and real estate market and new management's ability to attract new capital, further control expenses and enhance the profitability of Carteret Savings' core business of mortgage and consumer banking.

Regulations have been proposed by the OTS which, if adopted, would increase the existing core capital requirement of 3.0% of assets for all but the most highly rated savings associations. Capital requirements would be established based upon the supervisory process on a case-by-case basis and range from 1.0% to 2.0% greater than the current 3.0% core capital requirement. Any increase in required regulatory capital levels would likely have an adverse effect on Carteret Savings' ability to meet such capital requirements.

7. On April 29, 1991, Carteret Savings entered into a Supervisory Agreement with the OTS. Under the Supervisory Agreement, Carteret Savings has agreed to take certain actions, including, in some cases, establishing additional policies and procedures relating to, among other things, internal asset review and establishment of valuation allowances, problem asset workout, trading activities, mortgage derivative securities activities, accounting for loan servicing, liquidity, Imperial Premium Finance, Inc. ("Imperial"), a business plan and budget, transactions with affiliates, compensation, and the Board of Directors. Most of the described actions required by the Supervisory Agreement have been addressed. The remaining items will be addressed promptly.

8. In connection with the settlement of certain OTS proceedings against directors and officers of the Company, described elsewhere herein (see Part II, Item 1 -- "Legal Proceedings"), the Company entered into a Stock Purchase Agreement dated as of April 25, 1991, with Carteret Savings, pursuant to which the Company agreed to purchase the capital stock of Carteret Premium Finance, Inc. ("Premium Finance"), the parent of Imperial, from Carteret Savings prior to August 9, 1991, for a cash price equal to the greater of $65 million or the appraised value of Premium Finance, such obligation being subject to, among other things, the Company's obtaining financing in an amount which, in the Company's sole discretion, is sufficient to permit it to complete such purchase. Pending the closing of the transaction, the Company deposited in escrow with Carteret Savings $12.5 million in cash which together with the earnings thereon, was to be applied to the purchase price of Premium Finance or, in the event the sale was not closed by August 9, 1991, as a contribution to the capital of Carteret Savings. Carteret Savings regulatory capital at June 30, 1991 includes a $12.5 million benefit relating to the Company's deposit with Carteret Savings regarding the potential IPF purchase. Since the sale of Premium Finance to the Company did not occur by August 9, 1991, the Stock Purchase Agreement may be terminated by either party. On August 9, 1991, the Company delivered to the OTS a proposed agreement, subject to certain conditions, providing for (i) the purchase of Premium Finance at the original price of $65 million, which would include the previous deposit of $12.5 million, compared to a recent appraised value of $45 million and (ii) a deferral of the closing. Such agreement provides for acquisition financing of $42.5 million and would require additional cash from the the Company of approximately $12 million, including transaction fees. The sale of Premium Finance would increase Carteret Savings' regulatory capital levels by approximately $17 million as a result of the gain on the sale and the elimination of certain intangible assets.

## AMBASE CORPORATION AND SUBSIDIARIES

### Notes to Consolidated Financial Statements

9. The Company is a defendant in certain claims and legal actions arising in the oridinary course of its business. After review with its legal counsel, the Company's management is of the opinion that the ultimate disposition of these matters will not have a material adverse effect on the Company's consolidated financial condition or results of operations. In addition, the Company and certain of its officers are defendants in various lawsuits alleging, among other things, violations of Federal securities laws and of the corporate laws of the State of Delaware. These actions are in their preliminary stages. See Part II, Item 1 -- "Legal Proceedings" for a further details of these lawsuits.

The Company and Carteret Savings have been involved in certain administrative and judicial proceedings with the OTS. See Notes 6,7 and 8 and Part II, Item 1 -- "Legal Proceedings" for a further description of these proceedings.

10. Other assets consist of the following:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Premises and equipment | $ 39 | $ 43 |
| Receivables from FHA/VA | 31 | 33 |
| Core deposit value | 20 | 22 |
| Other assets | 96 | 77 |
| | $186 | $175 |

Other liabilities consist of the following:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Deferred income taxes payable | $ 43 | $ 17 |
| Accrued interest payable | 35 | 52 |
| Undisbursed premiums | 24 | 22 |
| Other liabilities | 124 | 113 |
| | $226 | $204 |

11. Additional information regarding cash flow for the six months ended June 30 is as follows:

| *(in millions)* | 1991 | 1990 |
|---|---|---|
| Cash paid (received) during the period: | | |
| Interest expense | $213 | $271 |
| Income taxes | (19) | 10 |
| Noncash investing and financing activities: | | |
| Transfer of loans receivable to mortgage-backed securities due to securitization | $ 344 | $ 840 |
| Transfer of loans receivable to investment in real estate due to foreclosure or in-substance foreclosure | 71 | 20 |
| Indebtedness assumed by Home Holdings | 219 | - |
| Extraordinary gain on extinguishment of debt, net of income taxes | 56 | - |

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The Company's continuing operations consist primarily of the operations of Carteret Savings. As a result of the sale of The Home as described in Note 2 to the Company's consolidated financial statements, the Company's administrative organization has been significantly downsized and its principal executive offices have been relocated to existing office facilities at Carteret Savings. During the second quarter of 1991 the Company's senior management was significantly changed. On May 22, 1991, Richard A. Bianco was named President and Chief Executive Officer of the Company and Chairman, President and Chief Executive Officer of Carteret Bancorp and Carteret Savings. Additionally, in July 1991 Donald Kramer was nominated Vice Chairman - Finance of Carteret Savings pending approval by the Board of Directors of Carteret Savings. Further, J. Wayne Moor was appointed Executive Vice President of Carteret Savings in charge of the Commercial Asset Management Division.

This group, together with existing management, has undertaken a thorough review of operations. This includes a review of reserves for losses on loans and real estate, in which management was assisted by a new public accounting firm. In addition the review of operations includes an evaluation of operating expenses, investments and other banking functions. The results of this review have had a material effect on reported results for the quarter ended June 30, 1991.

## FINANCIAL CONDITION

### Banking

At June 30, 1991 consolidated assets and liabilities of Carteret Bancorp were $5.3 billion and $5.4 billion, respectively, down slightly from December 31, 1990. Following a thorough review by new management, Carteret Savings recorded an additional $150 million to the allowance for losses on loans and real estate in the second quarter of 1991. This reserve review was not fully completed at the time of the filing of this report. The reserve amount recorded reflects management's current estimates of potential losses at this time. Further adjustments may be required as additional data is developed. The June 1991 Thrift Financial Report filed in July 1991 by Carteret Savings with the OTS is being appropriately amended to adjust for the recording of additional reserves.

Carteret Savings is continuing its efforts to restructure its balance sheet to emphasize assets favored under the risk-weighted capital requirement of FIRREA, particularly mortgage-backed securities. In accordance with FIRREA, assets are assigned risk weight factors in a manner that favors assets which are the most liquid and the least subject to interest rate and credit risk. The increase in mortgage-backed securities of $293 million and the decrease in residential first mortgage loans receivable of $230 million primarily reflect the restructuring of the balance sheet achieved by the securitization of mortgage loans and the related transfer to the mortgage-backed securities portfolio.

*Asset and Liability Management*

The objectives of Carteret Savings' asset and liability management strategy are to maximize net interest income over the course of an entire interest rate cycle, maintain stable earnings and control credit risk. Carteret Savings' asset and liability management process balances rate sensitive assets and liabilities to maintain rate volatility, net interest income and the market value of portfolio equity within the established limits of Carteret Savings' Interest Rate Risk policy. At June 30, 1991, Carteret had interest earning assets maturing or repricing within one year of $3.3 billion. Adjusted for the impact of hedging, Carteret Savings had $4.2 billion of interest bearing liabilities maturing or repricing during the same period. This created a liability sensitive cumulative one-year GAP of negative $952 million, or negative 17.56% of total assets. This compares with a negative $982 million, or negative 17.74% cumulative one-year GAP position at December 31, 1990. The balance sheet is less rate sensitive, the closer maturity GAPs are to zero. The June 30, 1991 cumulative one-year GAP of negative 17.56% reflects management's opinion that short term rates will remain stable during the second half of 1991. When the consensus develops that rates will rise, asset and liability strategy will be shifted to close maturity mismatches by increasing rate sensitive assets and extending liabilities, moving the cumulative one year GAP closer to zero.

*Liquidity*

The standard measure of liquidity for the savings and loan industry is the ratio of cash and eligible investments ("liquid assets") to the sum of net withdrawable savings and borrowings due within one year ("liquidity base").

Federally-insured savings associations are currently required to maintain a minimum liquidity ratio of 5.0%. The liquidity ratio of Carteret Savings was 5.40% at June 30, 1991 and 6.13% at December 31, 1990.

Carteret Savings' principal sources of liquidity have traditionally been deposits, principal and interest payments, advances from the Federal Home Loan Bank (the "FHLB") and collateralized borrowings, particularly reverse repurchase agreements. Sales and securitizations of loans have also been utilized as a source of liquidity.

At June 30, 1991, advances from the FHLB of New York aggregated $1,903 million compared to $1,963 million at December 31, 1990. Carteret Savings is currently required to deliver specific collateral to the FHLB of New York to secure its advances. Under current policies of the FHLB of New York, member institutions which meet regulatory capital requirements are required to maintain collateral in an amount not less than 110% of outstanding advances. Institutions which fall below minimum capital requirements are currently required to maintain collateral with the FHLB of New York in an amount not less than 125% of outstanding advances. Carteret Savings currently has sufficient available collateral to secure current advances at the 125% level.

On April 29, 1991, Carteret Savings entered into a Supervisory Agreement with the OTS which requires, among other things, that Carteret Savings submit a detailed liquidity plan under which it would demonstrate plans to achieve and maintain sufficient unpledged assets (giving effect to the applicable margin or "haircut" requirements), which may include assets used to satisfy regulatory liquidity requirements, that will enable Carteret Savings to secure advances from the FHLB of New York or borrowings from the Federal Reserve Bank of New York in an amount not less than 10% of the average balance of its liquidity base for the previous month. Carteret Savings currently has sufficient unpledged assets to satisfy such criterion. The liquidity plan must also include strategies to prudently reduce Carteret Savings' overall reliance on wholesale borrowed funds.

Based upon Carteret Savings' internal projected cash flow analysis which considers its liquid investments and other sources of funds, Carteret Savings believes there are, and will be, sufficient resources to fund outstanding and projected commitments for the remainder of 1991.

*Capital*

At June 30, 1991, due to a significant increase in the provision for losses on loans and real estate brought about by new management's intensive review of reserves, Carteret Savings failed to meet the minimum capital requirements of FIRREA after giving effect to all supervisory goodwill claimed by Carteret Savings in its suit against the OTS. See Part II, Item 1 -- "Legal Proceedings" for a description of these legal proceedings.

Failure to meet one or more of the capital requirements subjects a savings association to various regulatory limitations and sanctions. Carteret Savings is likely to be subject to the issuance of a Capital Directive by the OTS. The Capital Directive, among other things, would likely (i) require Carteret Savings to secure and thereafter maintain a higher level of core capital, (ii) require Carteret Savings to submit a capital plan demonstrating achievement and maintenance of regulatory capital, (iii) prohibit asset growth, (iv) prohibit capital declarations or distributions and (v) impose significant restrictions on Carteret Savings' operations.

Management is unable to determine the effect on Carteret Savings' future operations of its failure to meet minimum regulatory capital requirements and is uncertain whether Carteret Savings has the ability to attract the capital necessary to achieve and maintain minimum regulatory capital requirements. As previously mentioned, failure to meet minimum regulatory capital requirements and other regulatory requirements exposes Carteret Savings to an entire range of regulatory sanctions. In addition, Carteret Savings has incurred losses for the year ended December 31, 1990 and the first and second quarters of 1991 primarily due to increases in nonperforming assets and significant additions to the allowance for losses on loans and real estate. These circumstances raise substantial doubt about Carteret Savings' ability to continue as a going concern. Carteret Savings' ability to meet regulatory capital requirements in the future and to continue as a going concern will depend to a large extent upon future earnings, regulatory action and securing additional capital. Earnings will be affected by the level

of reserves for losses on loans and real estate which is dependent upon conditions in the economy and real estate market and new management's ability to attract new capital, further control expenses and enhance the profitability of Carteret Savings' core business of mortgage and consumer banking.

Carteret Savings was examined by the OTS and the FDIC for the period ended June 1990 and received the related OTS report of examination in December 1990. For further discussion see Item 7 -- "Management's Discussion and Analysis of Financial Condition and Results of Operations - Financial Condition - Banking Capital" in the Company's Annual Report on Form 10-K. In August 1991, Carteret Savings received the report from New York Regional Office of the FDIC on its June 1990 examination. The FDIC report of examination expressed concerns similar to those indicated in the OTS report of examination. The OTS examination indicated that Carteret Savings required close regulatory supervision. A similar finding was made by the FDIC. Both agencies are considering the level of supervision currently required.

*Credit Risk*

The following table sets forth information on nonaccrual loans, past due loans which are still accruing, REO, in-substance foreclosed loans and restructured loans at the dates indicated:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $83 | $47 |
| Commercial real estate loans | 51 | 14 |
| Corporate loans | 56 | 54 |
| Total nonaccrual loans | 190 | 115 |
| Residential first mortgage loans - 90 days past due | 34 | 27 |
| Consumer loans - 90 days past due | 4 | 4 |
| Premium finance - loans - 180 days past due | 3 | 3 |
| Total 90 or more days past due, still accruing | 41 | 34 |
| Total nonperforming loans | 231 | 149 |
| REO, net of allowances of $77 and $20 | 98 | 80 |
| In-substance foreclosed loans, net of allowances of $77 and $34 | 56 | 117 |
| Total nonperforming loans, REO and in-substance foreclosed loans | 385 | 346 |
| Restructured loans | 120 | 123 |
| Total nonperforming loans, REO, in-substance foreclosed loans and restructured loans | $505 | $469 |

Carteret employs a loan review system whereby potential problem loans and real estate are classified and closely monitored if uncertainty exists as to the future collectibility. Classified assets, which includes assets rated substandard, doubtful or loss, but excludes assets rated special mention, are as follows:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Substandard | $689 | $531 |
| Doubtful | 21 | 7 |
| Loss | 110 | 64 |
| | $820 | $602 |

Classified assets by asset type are as follows:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $117 | $ 74 |
| Commercial real estate loans | 250 | 147 |
| Total first mortgage loans | 367 | 221 |
| Corporate loans | 106 | 93 |
| Consumer loans | 15 | 17 |
| Premium finance loans | 3 | 3 |
| Total other loans | 124 | 113 |
| Total loans | 491 | 334 |
| Real estate held for development and sale | 21 | 17 |
| REO | 175 | 100 |
| In-substance foreclosed loans | 133 | 151 |
| Total investment in real estate | 329 | 268 |
| | $820 | $602 |

Assets rated special mention were $166 million and $245 million at June 30, 1991 and December 31, 1990, respectively. Classified assets and special mention assets at June 30, 1991 and December 31, 1990 include all nonperforming loans, REO and in-substance foreclosed loans.

A majority of Carteret Savings' residential and commercial real estate loans are secured by properties located in the states of New Jersey and Florida which have experienced a significant downturn in demand for such properties. Carteret Savings' management regularly analyzes each portfolio and records appropriate additions to the allowance for losses on loans and real estate. If conditions in the real estate markets in New Jersey and Florida worsen, there is no assurance that Carteret Savings will be able to collect its loans or liquidate real estate at amounts equal to their current carrying value.

The increase in nonperforming loans and REO is primarily due to the continued deterioration of the real estate markets, particularly the commercial real estate markets in the northeast and southeast regions, Carteret Savings' primary operating markets. Carteret Savings has responded to this rapidly changing environment in various ways. Consultants with a specialization in credit quality were retained to examine the internal review procedures. Credit review procedures were developed to strengthen and enhance the evaluation, identification and early recognition of potential losses on loans and investments in real estate. Such procedures include adoption of an internal portfolio evaluation program which includes the establishment of a detailed risk rating matrix system for loans and REO and the preparation of business plans for REO properties. Furthermore, Carteret Savings has recently retained additional qualified, experienced loan management personnel. New management has initiated a thorough review of Carteret Savings' portfolios and the related classifications and reserves. The review included site visits, interviews with respective account officers and examination of various documentation. The resolution process for problem assets is also receiving considerable attention from new management. Carteret Savings' aggressive approach has resulted in the addition of $150 million of reserves in the second quarter of 1991 and $161 million for the six months ending June 30, 1991.

The following table details the activity of the combined allowance for losses on loans and real estate for the second quarter and six months ended June 30:

| *(in millions)* | Second Quarter 1991 | Second Quarter 1990 | Six Months 1991 | Six Months 1990 |
|---|---|---|---|---|
| Allowance for losses on loans and real estate at beginning of period | $169 | $ 60 | $160 | $ 41 |
| Chargeoffs, net of recoveries | (6) | (1) | (8) | (3) |
| Total additions to allowance for losses on loans and real estate during period | 150 | 6 | 161 | 27 |
| Allowance for losses on loans and real estate at end of period | $313 | $ 65 | $313 | $ 65 |

Components of the allowance for losses on loans and real estate by major category follow:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $ 12 | $ 8 |
| Commercial real estate loans | 68 | 49 |
| Total first mortgage loans | 80 | 57 |
| Corporate loans | 54 | 39 |
| Consumer loans | 5 | 3 |
| Premium finance loans | 2 | 1 |
| Total other loans | 61 | 43 |
| Allowance for losses on loans | 141 | 100 |
| Real estate held for development and sale | 18 | 6 |
| REO | 77 | 20 |
| In-substance foreclosed loans | 77 | 34 |
| Allowance for losses on real estate | 172 | 60 |
| | $313 | $160 |

Management believes that a weakened overall economy and the depressed real estate market may result in future increases in Carteret Savings' nonperforming loans and REO levels and future decreases in the value of certain properties securing loans and REO. As previously mentioned, management's reserve review was not fully completed at the time of the filing of this report. The reserve amount recorded reflects management's current estimates of potential losses at this time. Further adjustments may be required as additional data is developed. Future adjustments to reserves will be recorded, as required, to reflect conditions existing at each reporting date.

**General**

On February 13, 1991 the Company sold all the outstanding common stock of The Home and its subsidiaries and certain other subsidiaries of the Company, together with 6,277,180 shares of The Home's $2.95 Cumulative Preferred Stock, Series A held by the Company, to Home Holdings pursuant to a stock purchase agreement dated as of September 28, 1990, as amended, among the Company, The Home and Home Holdings. For a further description see Note 2 to the Company's consolidated financial statements.

**RESULTS OF OPERATIONS**

*CONTINUING OPERATIONS*

**Banking**

The Company recorded a pretax loss before corporate expenses relating to its banking operations of $149 million and $153 million for the second quarter and six months ended June 30, 1991, respectively, compared with breakeven results and a pretax loss of $10 million for the same periods in 1990. As further described under "Financial Condition – Credit Risk," such losses include provisions for losses on loans and real estate of $150 million and $161 million for the second quarter and six months ended June 30, 1991, respectively, compared with $6 million and $27 million for the same periods in 1990. New management continues to focus on reserve strengthening, expense control and enhancement of core business profitability.

*Interest Income, Interest Expense and Net Interest Income*

| | Quarter ended June 30, 1991 | | | Quarter ended June 30, 1990 | | |
|---|---|---|---|---|---|---|
| *(dollars in millions)* | Average Balance | Interest | Average Rate | Average Balance | Interest | Average Rate |
| First mortgage loans | $2,605 | $ 59 | 9.06% | $3,565 | $92 | 10.41% |
| Mortgage-backed securities | 1,687 | 39 | 9.10 | 946 | 22 | 9.40 |
| Other loans | 505 | 12 | 10.41 | 564 | 18 | 12.92 |
| Investments | 394 | 8 | 7.58 | 409 | 9 | 8.59 |
| Total interest earning assets | $5,191 | $118 | 9.09% | $5,484 | $141 | 10.36% |
| Deposits | $3,043 | $ 52 | 6.85% | $4,148 | $ 79 | 7.66% |
| Advances from the FHLB | 1,946 | 35 | 7.24 | 671 | 15 | 9.13 |
| Other borrowed funds | 171 | 5 | 11.65 | 708 | 17 | 9.22 |
| Total interest bearing liabilities | $5,160 | $ 92 | 7.15% | $5,527 | $111 | 8.04% |
| Net interest income and margin | | $ 26 | 1.94% | | $ 30 | 2.32% |

| | Six Months ended June 30, 1991 | | | Six Months ended June 30, 1990 | | |
|---|---|---|---|---|---|---|
| *(dollars in millions)* | Average Balance | Interest | Average Rate | Average Balance | Interest | Average Rate |
| First mortgage loans | $2,672 | $122 | 9.22% | $3,603 | $191 | 10.70% |
| Mortgage-backed securities | 1,603 | 74 | 9.28 | 877 | 41 | 9.35 |
| Other loans | 520 | 27 | 10.78 | 569 | 37 | 13.22 |
| Investments | 463 | 18 | 7.66 | 444 | 19 | 8.53 |
| Total interest earning assets | $5,258 | $241 | 9.26% | $5,493 | $288 | 10.57% |
| Deposits | $3,039 | $106 | 7.05% | $4,213 | $162 | 7.75% |
| Advances from the FHLB | 1,940 | 74 | 7.67 | 682 | 31 | 9.20 |
| Other borrowed funds | 249 | 12 | 9.91 | 662 | 30 | 9.09 |
| Total interest bearing liabilities | $5,228 | $192 | 7.42% | $5,557 | $223 | 8.08% |
| Net interest income and margin | | $ 49 | 1.84% | | $ 65 | 2.49% |

The 1991 decrease in interest income was primarily due to a decreased asset base and decreased overall yield. The decrease in yield in 1991 reflects a near doubling of average nonperforming assets as compared with the prior year, investment in lower yielding products due to the concentration in assets favored under FIRREA's risk-based capital requirement, and a decrease in market investment interest rates. Interest expense decreased due to a decrease in the average balance of interest-bearing liabilities and a decrease in the overall cost of funds. The decrease in cost of funds is primarily attributable to a reduction in the cost of consumer deposits and advances from the FHLB.

*Non-interest Income*

Non-interest income for the second quarter of 1991 was $11 million versus $17 million for the same period in 1990. Non-interest income for the six months of 1991 decreased to $30 million from $36 million during the same period of 1990. The decrease was attributable to decreased other loan fees, service charges and other income due to the sale of branches in the fourth quarter of 1990 and a decreased emphasis on non-core businesses. In addition, increased losses from real estate operations due to increased REO contributed to the overall decrease in non-interest income.

*Other Expenses*

Other expenses in the second quarter of 1991 decreased to $36 million from $41 million in the same period of 1990. For the six months ended June 30, 1991 and 1990 other expenses were $69 million and $71 million, respectively. Despite 1991 including certain accruals relating to continued downsizing, compensation and employee benefits and occupancy expenses showed declines principally due to retail branch sales which occurred during the fourth quarter of 1990 and additional staff reductions attributable to downsizing. In addition, core deposit value and goodwill amortization in the second quarter and six months of 1991 decreased to $1 million and $2 million, respectively from $4 million and $8 million for the comparable periods of 1990, reflecting the write-off of goodwill in the fourth quarter of 1990. New management continues to focus on expense control.

**Corporate and Other Operations**

As further described under "Financial Condition – General," all indebtedness of the Company and Home Funding was either repaid, purchased in tender offers or assumed by Home Holdings in connection with the sale of The Home. As a consequence, no corporate interest expense was incurred in the 1991 second quarter compared with $22 million in the respective 1990 period. For the six months corporate interest expense was $10 million in 1991 compared with $41 million in 1990.

Corporate expenses and other operations decreased to $1 million in the second quarter of 1991 compared with $15 million in 1990. For the six months, corporate expenses and other operations decreased to $4 million in 1991 from $24 million in the 1990 period. Decreased expenses in the 1991 periods reflect the costs incurred in the prior year to downsize the Company's administrative organization as well as the related benefits of downsizing in the 1991 periods.

Income taxes on continuing operations were $3 million and $6 million in the second quarter and six months of 1991. Income taxes during these periods were principally comprised of state taxes and Internal Revenue Service interest. The loss from continuing operations before income taxes did not result in a federal income tax benefit in these periods.

*DISCONTINUED OPERATIONS*

For a discussion of discontinued operations refer to Note 2 to the Company's consolidated financial statements, the Company's quarterly reports on Form 10-Q for the quarterly periods ended June 30, 1990 and March 31, 1991, and the Company's Annual Report on Form 10-K for the year ended December 31, 1990.

## PART II. OTHER INFORMATION

### Item 1. Legal Proceedings

(a) The Company itself is a defendant in a number of lawsuits or proceedings including the following:

*Consolidated Securities and Stockholder Derivative Actions.* Fifteen complaints purporting to be class actions or stockholder derivative actions involving the Company have been filed in or transferred to the United States District Court for the Southern District of New York. Those actions have been consolidated under the caption *"In re AmBase Corporation Securities Litigation"* (the "Consolidated Actions"). The Consolidated Amended Class Action and Derivative Complaint (the "Consolidated Complaint") in the Consolidated Actions names as defendants the Company, The Home, Home Funding and certain of the directors and officers of the Company, as well as certain other parties.

The Consolidated Complaint asserts causes of action under the Securities Exchange Act of 1934 and the Securities Act of 1933, as well as causes of action based on common law negligent misrepresentation. Plaintiffs seek damages in an amount to be determined, plus certain declaratory and injunctive relief, costs and attorneys' fees. The Consolidated Complaint alleges that defendants published false and misleading information and wrongfully failed to disclose material information concerning the Company and its financial condition. The Consolidated Complaint also asserts derivatively on behalf of the Company claims against certain directors and officers of the Company based on alleged breach of fiduciary duty, gross mismanagement and corporate waste.

No class has been certified in the Consolidated Actions. On March 4, 1991, defendants moved to dismiss the Consolidated Complaint or, in the alternative, for summary judgment on all of plaintiffs' claims. That motion has now been fully briefed.

A new securities law action making allegations similar to those in the Consolidated Actions was commenced in the United States District Court for the Southern District of New York on July 12, 1991. Unlike the Consolidated Actions, this action is not filed as a class action, but rather is asserted individually on behalf of each of the plaintiffs.

*Delaware Derivative Action.* In June 1990, a stockholder derivative action was filed in Delaware Chancery Court. The allegations in this action are similar to the stockholder derivative allegations in the Consolidated Complaint.

*New York State Derivative Actions.* In January 1991, a stockholder derivative action was commenced in New York State Supreme Court. Plaintiff in this action alleges derivatively on behalf of the Company a cause of action for breach of fiduciary duty, waste of corporate assets and various claims and allegations relating to Marshall Manley, the Company's former President and Chief Executive Officer. Plaintiff requests damages against certain current and former Company directors and restitution and damages from Mr. Manley. After defendants moved to dismiss the complaint on the ground that plaintiff failed to make a demand on the Company's Board of Directors prior to commencing this action, plaintiff served an amended complaint including certain additional allegations concerning compensation received by officers and directors of the Company. On June 17, 1991, defendants renewed their motion to dismiss on essentially the same grounds.

On July 8, 1991, a new stockholder derivative action was commenced in New York State Supreme Court. Plaintiff in this action asserts derivatively on behalf of the Company claims against certain directors and officers of the Company and against Chase Manhattan Bank, N.A.

*Rolo and Tenerelli vs. City Investing Company Liquidating Trust et al..* This is a purported class action filed in the United States District Court for the District of New Jersey and asserting a variety of federal and state causes of action in connection with an alleged fraudulent scheme involving the marketing and sale of homesites and houses by General Development Corporation ("GDC"). Plaintiffs have named as defendants the Company and Carteret Savings, as well as a number of other financial institutions that had business dealings with GDC. By order dated December 12, 1990, the District Court administratively terminated the action. On

April 26, 1991, plaintiff's motion for reconsideration of that order was denied and the action was stayed pending the adjudication of plaintiff's claims against GDC in bankruptcy proceedings pending in Florida and the conclusion of criminal proceedings against two former GDC officers also named as defendants in the action.

In early April 1991, prior to the decision on plaintiff's motion for reconsideration, plaintiffs moved for a temporary restraining order and preliminary injunction seeking to restrain the Company and City Investing Company Liquidating Trust from paying dividends or liquidating. The District Court denied plaintiffs' application for a temporary restraining order and took no action on their request for a preliminary injunction in light of the stay entered in the action. AmBase has agreed not to pay dividends or make a liquidating dividend prior to September 30, 1991. This agreement may be extended from time to time.

Plaintiffs have appealed and requested a writ of mandamus from the United States Court of Appeals for the Third Circuit seeking to overturn the stay entered by the District Court. The appeal and request for mandamus have been fully briefed and oral argument, if granted, will take place in September.

The actions identified above are in their preliminary stages. In certain instances, the Company is not yet required to respond to the complaint. Nevertheless, the allegations are serious and, if proven, could result in substantial judgments against the Company. To the extent the aggregate of any such judgments were to exceed the litigation liability assumed by Home Holdings and the amounts of directors and officers insurance available therefor, these matters could have a material adverse effect on the Company's financial condition. The Company's counsel in these proceedings, by reason of the preliminary nature of these proceedings, have been unable to express any opinion as to their probable outcome.

*Consensual Cease and Desist Order.* On February 13, 1991, the Board of Directors of the Company approved the Company's entry into a Stipulation and Consent to Issuance of Order to Cease and Desist (the "Consent") with the OTS confirming the Company's obligation to contribute $30 million to Carteret Savings. That contribution was made by the Company to Carteret Savings on the same date.

*Arbitration Demand by Marshall Manley.* On August 9, 1991, Marshall Manley, former President and Chief Executive Officer of the Company, submitted a demand for arbitration against the Company to the American Arbitration Association. In his arbitration demand, Mr. Manley asserts claims for accrued or vested benefits, rights and entitlements owing to him in connection with past services, including but not limited to benefits under the Company's Long Term Incentive Compensation Plan and Supplemental Employee Pension Plan which, it is asserted, were not released as part of Mr. Manley's January 1991 settlement with the Company. No specific amount is claimed, however, Mr. Manley has previously claimed an amount in excess of $20 million.

(b) The Company is not itself a defendant in, but may be affected by the outcome of, the following proceedings:

*Settlement of OTS Proceedings Against Directors and Officers.* On February 14, 1991, the OTS initiated administrative cease and desist proceedings against twenty current and former directors and officers of the Company pursuant to Section 8(b) of the Federal Deposit Insurance Act ("FDIA") and Section 5(d) (1) (A) of the Home Owner's Loan Act ("HOLA") by issuing a Notice of Charges and Hearing for an Order to Cease and Desist and to Direct Restitution and other Affirmative Corrective Relief ("Notice"), and issued a Temporary Order to Cease and Desist ("Temporary Order") directed at the named directors and named officers. On February 15, 1991, the OTS filed a complaint for prejudgement attachment against the named officers (the "Action") in the United States District Court for the District of New Jersey, styled *OTS v. Plaxe, et al.*, Civ. Action No. 91-669 (Bissell, J.). In the Notice, Temporary Order and Action, the OTS alleged that certain incentive payments and the settlement of an employment dispute were unlawful because the agreements pursuant to which they were made were entered into when Carteret Savings was not in capital compliance and the payments themselves were made while the Company had an outstanding obligation of $30 million to Carteret Savings under a capital maintenance agreement and an outstanding contingent obligation to reimburse Carteret Savings if it were to sell Imperial prior to August 9, 1991, for less than $65 million. On April 25, 1991, the Company and the OTS entered into a settlement agreement pursuant to which (i) these proceedings have been dismissed by the OTS with prejudice, (ii) the OTS has agreed to refrain from initiating future proceedings against the Company, its officers and directors based on claims that severance agreements and payments thereunder were unreasonable, excessive or should not have been paid and (iii) the OTS has agreed to refrain from initiating any future proceedings based on any claims that the Company, its officers and directors have any further

obligations to infuse or contribute capital to Carteret Savings under either the capital maintenance agreement or the contingent obligation with respect to the sale of Imperial. Pursuant to the settlement, the Company agreed to purchase Imperial from Carteret Savings by August 9, 1991, for $65 million in cash, subject to certain conditions, and placed $12.5 million in escrow with Carteret Savings which was to be contributed to the capital of Carteret Savings if the transaction was not consummated. See Note 8 to the Company's consolidated financial statements.

*Carteret Savings Proceeding Against the Office of Thrift Supervision.* On February 14, 1991, Carteret Savings filed a complaint for injunctive, declaratory and other equitable relief in the United States District Court for the District of New Jersey against the OTS, in its own capacity and a successor in interest to the Federal Home Loan Bank Board ("FHLBB"), T. Timothy Ryan, Jr., individually and in his official capacity as Director, OTS, and the FDIC in its own capacity and a successor in interest to the FSLIC. The complaint asserts, among other things, that regulations issued pursuant to FIRREA erroneously interpret FIRREA to exclude from Carteret Savings' regulatory capital, certain goodwill recorded by Carteret Savings in acquisitions of several failing or failed thrift institutions in 1982 and 1986. On February 19, 1991, the Court entered an order that, among other things, (i) ordered the defendants to show cause why an order should not be entered preliminarily enjoining defendants from the enforcement of any capital regulation or any other action inconsistent with specified provisions of FIRREA, including any determination of regulatory capital deficiency and any regulatory sanctions, and (ii) pending determination of Carteret Savings' motion for a preliminary injunction enjoined and restrained defendants from taking any action against Carteret Savings by reason of defendants' failure to count as capital the total amount of supervisory goodwill recorded by Carteret Savings (amortized in accordance with Carteret Savings' agreements with the defendants' predecessor agencies), for all supervisory and regulatory capital determinations and purposes. At a hearing on April 12, 1991, the Court issued a preliminary injunction against the OTS continuing the restraints contained in the order to show cause. The preliminary injunction also continued the prohibition in the order to show cause on payments by Carteret Savings to the Company or its officers and directors in excess of $25,000 without prior OTS or Court approval. On April 19, 1991, the defendants appealed the Court's decision to the United States Court of Appeals for the Third Circuit. The FDIC, which was not made subject to the restraints of the preliminary injunction, has withdrawn its appeal. A subsequent opinion of the District Court dated July 8, 1991 also permits Carteret Savings to include for regulatory capital compliance purposes, supervisory goodwill written-off for GAAP purposes pursuant to the sale of branches.

*Office of Thrift Supervision Administrative Proceedings Regarding Carteret Savings.* By letter dated February 4, 1991, the OTS transmitted to Carteret Savings a proposed Stipulation and Consent to the Issuance of a Capital Directive and a proposed Capital Directive for execution by Carteret Savings and its Board of Directors no later than February 28, 1991. The preliminary injunction issued by the United States District Court for the District of New Jersey on April 12, 1991 and the final order issued on July 8, 1991 have enjoined and restrained the OTS from taking any action, including requiring Carteret Savings to consent to or otherwise comply with restrictions or requirements contained in the proposed Capital Directive, by reason of the OTS' failure to count as capital the full amount of supervisory goodwill in accordance with Carteret Savings' agreements with the OTS and FDIC's predecessor agencies. On February 21, 1991, subsequent to the entry of a temporary restraining order by that United States District Court regarding the proposed Capital Directive, the OTS presented to Carteret Savings a proposed Stipulation and Consent to the Issuance of an Order to Cease and Desist and a proposed Order to Cease and Desist relating to, among other things, certain matters raised in Carteret Savings' 1990 regulatory examination. Following extensive negotiations with the OTS, and in lieu of the issuance of such an Order to Cease and Desist, on April 29, 1991, Carteret Savings entered into a Supervisory Agreement with the OTS. Under the Supervisory Agreement, Carteret Savings has agreed to take certain actions, including, in some cases, establishing additional policies and procedures relating to, among other things, internal asset review and establishment of valuation allowances, problem asset workout, trading activities, mortgage derivative securities activities, accounting for loan servicing, liquidity, Imperial, a business plan and budget, transactions with affiliates, compensation, and the Board of Directors. Most of the described actions required by the Supervisory Agreement have already been addressed.

The OTS has initiated a formal examination and investigation concerning Carteret Savings, Carteret Bancorp, the Company and their affiliates and institution-affiliated parties. The Company and Carteret Savings became aware of the investigation in March 1991. The purpose and scope of the examination and investigation were not stated in the OTS Resolution initiating the investigation. The Company believes that a focus of the investigation is on any relationship that may have existed between the Company and its directors, officers and affiliates on the one hand, and GDC and its directors and affiliates on the other hand, in connection with the purchase by Carteret Savings of mortgage loans from an affiliate of GDC during the periods 1985 and 1989, of which approximately $64 million remained outstanding at June 30, 1991. Subpoenas have been served on certain of the Company's current and former directors and depositions of those persons have been taken by the OTS. The Company understands that subpoenas have also been served on GDC and certain of its affiliates.

The OTS commenced an examination of Carteret Savings on June 17, 1991. Certain issues relating to prior compensation, including bonuses paid December 1990 and advances paid in April 1990 to an officer of Carteret Savings, have been identified by the OTS. By letter dated July 24, 1991, the OTS has requested the Company and Carteret Savings provide extensive documentation relating to certain past compensation matters. The Company and Carteret Savings are currently involved in responding to the document request. The Company is unable to predict what action, if any, the OTS contemplates with respect to the subject of its document request.

*Proceedings with Drexel Burnham Lambert Group, Inc.* In February 1990, Drexel Burnham Lambert Group, Inc. ("Drexel") filed for protection under Chapter 11 of the Federal Bankruptcy Code. Prior to the date of filing, various customers of Home Capital Services, Inc. ("Capital Services"), a wholly owned subsidiary of the Company, had, through their agent Capital Services, from time to time made advances to Drexel under an unsecured demand note. Pending an overall resolution of the Drexel bankruptcy proceedings, the Company is unable to determine whether certain substantial pre-filing payments by Drexel under such note could be recoverable by Drexel as preferences, and from whom.

**Item 2. Changes in Securities**

Does not apply.

**Item 3. Defaults Upon Senior Securities**

Does not apply.

**Item 4. Submission of Matters to a Vote of Security Holders**

Does not apply.

**Item 5. Other Information**

Effective August 1, 1991, the Company surrendered its principal lease at 59 Maiden Lane, New York, New York 10038, and consolidated its remaining offices and personnel with those of Carteret Savings at 200 South Street, Morristown, New Jersey 07960. The Company continues to maintain a small office at 59 Maiden Lane, New York, New York.

FILE: 1) ERO-1118
2) RTC Lending

RESOLUTION TRUST CORPORATION
245 Peachtree Center Avenue
Suite 1400
Atlanta, GA 30303

**M E M O R A N D U M**

TO: Supervisory Managing Agents
Assistant Supervisory Managing Agents
Managing Agents
Assistant Managing Agents

THROUGH: Sandra A. Waldrop
Deputy Regional Director

FROM: Stephen A. Haley
Senior Conservatorship Specialist

Kenneth C. Herrmann
Asset Marketing Coordinator

DATE: January 14, 1992

SUBJECT: **POLICY FOR CONTINUED LENDING IN CONSERVATORSHIP**

---

## RESCISSION OF 1989 LENDING POLICY/ESTABLISHMENT OF UPDATED POLICY

This memorandum rescinds and replaces the lending policy memo of 10/25/89 and subsequent memoranda regarding Eastern Region policy on origination of new loans and disbursements against existing loans and commitments by institutions in conservatorship. This memorandum establishes a contemporary 1992 update of Eastern Region conservatorship policy with respect to credit and lending.

## APPROACH USED TO DEVELOP THIS POLICY UPDATE

The approach to the 1989 version of this policy, by necessity, was more faceted than this update. In late 1989, Eastern Region conservatorships were still encouraged to preserve franchise value via continued new origination -- in addition to addressing the funding of preexisting legally binding commitments. A little over two years later, however, several factors including, but not necessarily limited to, RTC liquidity pressures, dwindling resolution premiums, and the emphasis on downsizing have served to limit lending activities, for the most part, to dealing with pre-intervention commitments, share loans, seller financing, workouts, compromises, and restructures -- but little, if any, on new origination.

Further, the initial 1989 policy was more difficult to author because of the then uncertainties (just two short months subsequent to the passage of FIRREA) with respect to the operations of conservatorships. While by no means a snap, this update, however, has been a time-consuming yet much simpler document to author because the knowns are greater, the uncertainties are fewer, and there are almost two and one-half years of field experience hopefully shedding light on what will and will not work and what does and does not make sense. And quite frankly, there is also the issue of public policy, i.e. what the administration, the Congress, borrowers and their lawyers, and taxpayers expect and/or will reasonably put up with with respect to credit and lending activities in conservatorship.

This memorandum establishes lending and credit policy and eliminates what was perceived to be but never was a formal requirement of submitting a "lending plan" within 60 days of intervention. The notion that such a "lending plan" was required was a result of the approach initially taken beginning in May 1991, but never implemented, to updating the 1989 policy. The "lending plan" approach served not only to update policy but to also tighten regional control over lending and credit activities. The "lending plan" approach was not adopted for two reasons. First, it was determined that additional control at the regional level served no utilitarian purpose. Second, it was determined that the "lending plan" approach was redundant. RTC policies, procedures, and other requirements (i.e. delegations of authority, reporting requirements, the Integrated Marketing Plan, the Downsizing Plan, the Conservatorship Operating Plan, cash flow and liquidity projections, and the like) have evolved over time such that the elements to have been included in the "lending plan" are already in place. Additionally, control and accountability with respect to credit and lending are already integral parts of the conservatorship process. In short, nothing was broken, and nothing needed fixing all that badly; things just needed updating. Accordingly, the "lending plan" approach was abandoned in November 1991 in favor of the approach found in this document.

Finally, the authors have endeavored to make this document "field friendly" by simplifying direction, providing guidance and examples where deemed appropriate, and allowing for more decision-making and creativity in the field subject to the parameters provided herein.

The following is a discussion of general policy, followed by more specific comments by loan category.

## GENERAL POLICY

### A. Review at Intervention

During intervention weekend and during the period immediately following intervention, a comprehensive review of the conservator-

ship's lending and credit activities should be completed as expeditiously as possible. The following list is intended to be representative rather than all-inclusive and is the minimum that should be done in such a review:

(a) Identify any category of loan/lending that requires full or remaining funding of either closed (i.e. loan documents already executed) or unclosed (i.e. pipeline) closed-end commitments <u>and/or</u> revolving funding of either closed or unclosed open-end commitments;

(b) Identify any category of loan/lending where there are loan applications in process, i.e. not yet committed to nor denied;

(c) Identify any category of loan/lending where it is deemed desirable to continue new loan origination activities in conservatorship (situations should be rare, if any);

(d) Identify any subsidiaries which are involved in loan origination;

(e) Assess existing lending policy, underwriting criteria, loan documentation, staffing, servicing capabilities and delinquency;

(f) Have RTC Legal review existing commitments including, where deemed necessary, the right to repudiate;

(g) Anticipate sources of funds, cash flow and liquidity;

(h) Identify applicable loan disposition alternatives including use of the secondary market, whole loan sales, securitization and swaps, and other asset sale alternatives. Such disposition alternatives should be reviewed concurrently by an Asset Marketing Specialist for inclusion in the Integrated Marketing Plan.

B. <u>New Loans/Origination in "Conservatorship"</u>

With the exception of seller financing, share loans, and possibly some isolated rare exceptions, no "new lending/new loan origination" should occur <u>at a conservatorship</u> upon and after its intervention. Definitionally, "new lending/new loan origination" as used in the previous sentence <u>does not mean to preclude</u> the full or remaining funding of preexisting legally binding pipeline commitments and executed loans. Said another way, full or remaining funding on preexisting legally binding pipeline commitments and executed loans <u>should not</u> be construed as "new lending/new loan origination". All things held equal, full or remaining funding should be allowed to occur on preexisting non-onerous, legally binding pipeline commitments and executed loans



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0314
App. 369

(including revolving credit). Stated again, with the aforementioned exceptions, "new credit commitments/new loan origination/new lending" in a conservatorship should cease upon intervention.

C. New Loans/Origination in "Subsidiaries"

With respect to wholly-owned subsidiary corporations of conservatorships which are involved in credit and lending activities (e.g. mortgage banking subsidiaries, consumer finance companies, insurance premium financing companies, and the like), it is possible that "new loans/new origination" will be allowed to continue in certain subsidiaries as a means of preserving franchise value of these subsidiaries while attempts are made to sell them as going concerns.

With respect to post-intervention continued new loan origination in mortgage banking subsidiaries, the Regional Conservatorship Mortgage Banking Coordinator should be contacted during intervention weekend or at the latest during the period immediately following intervention. The Mortgage Banking Coordinator will enlist the involvement of the RTC's national mortgage banking advisor. The advisor will coordinate an evaluation of the subsidiary in question to determine (first) the marketability of the subsidiary and (second) if continued origination would likely serve to preserve or increase the subsidiary's franchise value. If so, a case (citing the A-4 delegation) will be prepared by the conservatorship with assistance from the advisor recommending continued origination, and the case will be sent (depending of asset size of the subsidiary) to either the Eastern Regional Office Conservatorship Review Committee or the appropriate Washington committee for decision. See RTC Circular 9322.2 dated 9/20/91 for additional guidance with respect to mortgage banking subsidiaries.

With respect to post-intervention continued new loan origination in all other types of subsidiaries, the Regional Conservatorship Subsidiaries Coordinator should be contacted for guidance during intervention weekend or at the latest during the period immediately following intervention. The Subsidiaries Coordinator (with the assistance of the Managing Agent and RTC and association staff at the conservatorship) will seek "business" input concerning the loan subsidiary from knowledgeable subsidiary and conservatorship personnel, "franchise value" input from Washington or Regional Resolutions (depending on which will be coordinating the conservatorship's resolution), and "legal" input from assigned RTC counsel with respect to the nature of continued operations of such a subsidiary. Regardless of whether the resulting recommendation will be to continue to originate or to cease loan origination, a case (citing the A-4 delegation) supporting that recommendation should be forwarded to the Eastern Regional Conservatorship Review Committee for approval. The case should include a history and description of the company and how and where it operates, and discuss how franchise value will be impacted, how the subsidiary




App. 370

will fund existing commitments and new originations, how such loans are being and will be serviced, secondary marketing activities, staffing and how compensated, and the like. Pro forma sources and uses, profit and loss, and balance sheet statements should also be included.

While the "final" cases as described in the preceding two paragraphs are being developed, the Managing Agent (via a short, terse memorandum to the case log citing this policy memorandum and the A-4 delegation) is authorized to continue funding for up to 30 days beyond intervention with the concurrence of the Supervisory Managing Agent or designee. During this initial 30 days, and regardless of type of lending and to provide additional temporary authority while such recommendations and "final" cases are being developed, an "interim" case (citing the A-4 delegation) for each subsidiary in question to (1) continue new loan origination activities and to (2) provide intercompany warehouse funding (i.e. cash to fund originations), if necessary, to the subsidiary should be developed and forwarded to the Eastern Region Conservatorship Review Committee, with substantiation, requesting operating authority for the first 90 days following intervention.

D. Prior/Existing Commitments

The A-3 delegation provides the authority and guidance for funding with respect to preintervention prior/existing commitments.

Where commitments have been issued prior to intervention, the alleged commitments with respect to some types of (mostly closed-end) lending (e.g. residential permanent, commercial permanent, construction, and the like) should be reviewed on a case by case basis by RTC Legal to determine if each is legally binding. If deemed legally binding, each such commitment should then be reviewed to determine if creditworthiness of the borrower, pricing, other terms, etc. would, if funded, produce a loan that is onerous to the conservatorship and ultimately the taxpayer. If legally committed but deemed onerous enough, repudiation should be considered as a possible alternative. This paragraph is directly applicable to unclosed (not executed by the borrower) commitments. This paragraph is generally applicable to closed (executed by the borrower) commitments where full or some remaining funding has not occurred. Generally speaking, once a commitment is partially funded, the conservatorship should normally fund the remainder and use repudiation in only the most extreme and onerous situations. See General Policy E for guidance on repudiation.

With respect to other (mostly open-end) types of loans (e.g. revolving lines of credit, proprietary credit card, etc.) with generic terms and documentation and where commitments have been issued (and in most cases already closed) prior to intervention, existing accounts can be reviewed at the portfolio level for the purposes of determining if legally binding commitments exist and/or



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0316
App. 371

if pricing, terms, etc. are onerous. If legally committed but also deemed onerous enough, mass portfolio repudiation should be considered as a possible alternative. Before using the repudiation alternative, the possibility of amending terms and conditions at the portfolio level to cure onerous situations should be pursued. See General Policy E for guidance on repudiation.

Where commitments have been issued prior to intervention but remain unclosed (i.e. not executed by the borrower) on open-end type credit such as those categories described in the preceding paragraph, each such alleged commitment should be reviewed on a case by base basis by RTC Legal to determine if each is legally binding. If deemed legally binding, each such commitment should then be reviewed to determine if creditworthiness of the borrower, pricing, other terms, etc. would, if funded, produce a loan that is onerous to the conservatorship and ultimately the taxpayer. If legally committed but deemed onerous enough, repudiation should be considered as a possible alternative. See General Policy E for guidance on repudiation.

<u>As a single criterion, a conservatorship's lack of liquidity to fund a loan or a group of loans is not an acceptable reason to repudiate a commitment or to determine that a legally binding commitment is onerous</u>.

Maintaining or improving the marketability of generic revolving credit portfolios (i.e. performing credit card, other performing revolving lines of credit, etc.) is an acceptable reason to continue funding preexisting committed lines after determination that legally binding commitments for continued funding exist.

E. <u>Repudiation</u>

The general policy on funding vs. repudiation is to "err on the side of funding" where there is a preexisting legally binding commitment and when there are no <u>significantly</u> onerous, detrimental, or deleterious features or elements -- particularly when dealing with individual residential mortgage loans $500,000 or less, collateralized consumer loans/lines $100,000 or less, and business/commercial loans $1 million or less. Funding "bankable" and committed loans which are within these thresholds is advisable for several reasons including acquisition of a good and hopefully marketable asset, litigation avoidance (i.e. potential resulting litigation not being cost-effective at these lower threshold levels), and public and community relations. The funding vs. repudiation question on commitments above these thresholds must be decided on a case by case basis. When determining whether to fund commitments above these guideline thresholds, the Managing Agent and/or the committee with terminal delegated authority must weigh and consider any onerous, detrimental, or deleterious elements or features of the loan; the likely value of the loan in the secondary market; the likelihood of lender liability litigation if not

funded and the probable litigation outcome; the impact on the total credit relationship with that borrower; public policy; and so on.

GENERALLY SPEAKING, IF THERE IS NO LEGALLY BINDING COMMITMENT, DO NOT FUND!! It is recognized, however, that there will be situations in which good business judgment and/or common sense will support funding even when there is no legally binding commitment -- but the spirit and intent of this policy is that funding a loan request in the absence of a preexisting legally binding commitment should be a rarity. When such funding occurs, the A-4 delegation should be used.

Timeliness of repudiation is critical. Generally speaking, and because of recent court rulings concerning the time within which RTC can reasonably use its repudiation powers, all loan/lending/credit-related repudiations should occur by no later than the ninetieth (90th) day subsequent to intervention.

Each repudiation should be done with advice, consent, guidance of RTC Legal.

Repudiation of commitments should be selectively utilized for the most onerous situations, when a detrimental situation exists, or the results of such lending are judged to be deleterious. Representative examples of onerous, detrimental, and deleterious situations include, but are not limited to, loan pricing which is significantly below current market or not on a industry-standard basis; an amortization period which is too lengthy (e.g. 84 months on an auto loan secured by an average used automobile); loans which when sold in the secondary market will be sold at a significant discount to par (e.g. real estate and non-real estate commercial loans, unsecured loans, nonconforming loans with non-industry standard or non-agency standard terms or elements, and the like); and loans not properly collateralized, endorsed, or guaranteed.

Maintaining or improving the marketability of generic revolving credit portfolios (i.e. performing credit card, other performing revolving lines of credit, etc.) is an acceptable reason to continue funding existing commitments after determination that a legally binding commitment for continued funding exists.

F. Liquidity Issues

Continued lending is a matter of credit policy and such decisions, to fund or continue funding, should be based on sound credit policy and not on the basis of the conservatorship's liquidity. Liquidity is a function of operations and is a funding issue separate from the decision of credit. It is not prudent to ease liquidity problems by approaching credit decisions with a bias not to lend.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0318
App. 373

Liquidity can be dealt with, as lending is, in the conservatorship's budget, cash flow projections, Downsizing Plan, and the like.

As a single criterion, a conservatorship's lack of liquidity to fund a loan or a group of loans is not an acceptable reason to repudiate a commitment or to determine that a legally binding commitment is onerous.

G. Pricing

In those instances where continued lending occurs or when existing loans are subject to repricing, pricing must be at a "market rate" for each particular loan product. Continued lending for these purposes includes, for example, revolving credit portfolios in which the conservatorship has the flexibility to change pricing via amendments to program terms and conditions. Another example would be an expired legally binding commitment to provide a residential mortgage loan and on which the conservatorship wishes to extend the commitment but at a different rate than the original commitment. Another example would be a loan with a balloon maturity and on which the conservatorship wishes to renew or extend the maturity or amortization but at a different rate. Also included here are those rare instances in which the conservatorship finds it necessary or desirable to issue a postintervention commitment to make a new loan.

Considering the variety of markets RTC operates in (e.g. differences of geography, agrarian vs. urban communities, and so on), the diversity of loan types, and the difficulty in developing utilitarian "regional" boiler plate formulas for each category of lending, pricing will be at the discretion of the Managing Agent with the following guidelines:

(a) Any case for continued lending or funding must indicate, in sufficient detail, recommended pricing methodology.

(b) Local surveys and generic pricing indices used on a national level (FNMA, one-year T-bill, etc.) must be an exhibit to the case and support the recommended pricing methodology.

(c) If an index is used, it must be readily recognizable, information about it and changes to it must be readily accessible to both borrower and the conservatorship, and such that the individual conservatorship or the RTC has no control nor influence to set the index.

(d) Resulting rate pricing should not be at the low end of market surveys but should be at mid point or higher. In no event, however, should loan pricing be lower than the conservatorship's current marginal cost of funds.




App. 374

(e) To the extent that the conservatorship's cost of funds is used as at least a partial basis for determining asset pricing, <u>the marginal cost of funds (for these purposes, the conservatorship's current nominal rate pricing for a 6-month C/D) should be used</u> rather than average cost of deposits or weighted average cost of funds.

(f) Local loan pricing surveys should not be limited to thrift institutions but instead should include all viable competitors for the loan product being surveyed.

H. <u>Balloon Maturities</u>

Balloon maturities most often occur on amortizing commercial real estate and commercial non-real estate loans. They are generally used to provide the lender (and in some cases the borrower) periodic opportunities to review pricing, other terms, loan to value of collateral, and so on, and to make adjustments that will be in effect over the next or remaining amortization period. While there is ordinarily no commitment to provide continued amortization, it is generally understood that continued amortization will occur -- subject to whatever pricing, payment level, etc. modifications are deemed necessary and appropriate.

In today's environment, there are fewer alternatives for commercial loan financing. One primary reason is the greater risk factor assigned to commercial loans in arriving at an institution's required regulatory net worth, i.e. the greater the risk weight assigned to an asset, the more capital the institution has to have to support that asset. As a result, many lenders have begun to eschew that type of lending -- even to the most creditworthy borrowers.

When dealing with balloon maturities (regardless of type of loan), the first effort of the conservatorship should be to encourage the borrower to move the loan to another lender. If, however, this proves to be impossible, and if the loan has otherwise performed, it is in the best interest of the conservatorship and the RTC to establish another amortization period rather than to seek legal remedies -- particularly when the inability to acquire financing elsewhere is beyond the control of an otherwise good and performing borrower. The RTC would rather have a reamortized balloon loan than the collateral securing it.

I. <u>Nonamortizing, Single-Maturity Loans</u>

Not intending to encourage "evergreens", and for the same reasons, the same general approach as described above for balloon loans should be applied to nonamortizing, single-maturity loans. When such a loan comes due, the first effort should be to encourage the borrower to move the loan to another lender. If this fails, the



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0320
App. 375

next approach should be to attempt to establish at least a minimal repayment or amortization schedule. The use of compromise and/or restructure may also be applicable here. Only in the most onerous situations should legal remedies be sought. The RTC would rather have a newly amortizing loan, a renewed or extended single-maturity loan, or a compromised/restructured loan than the collateral securing it.

## LOAN CATEGORIES

### A. Residential 1-4 Family Mortgages

No new loans should be committed to or originated in conservatorship. (See General Policy C for guidance on origination of residential mortgage loans in subsidiaries of conservatorships.) Commitment extensions may be issued subject to site case approval and with legal concurrence that there existed a legally binding commitment. With respect to preexisting legally binding commitments, the general policy on funding vs. repudiation is to "err on the side of funding" if there are no significantly onerous, detrimental, or deleterious features or elements -- particularly when dealing with individual residential mortgage loans $500,000 or less. See General Policy for guidance with respect to funding vs. repudiation. At intervention, and as an alternative to funding or repudiation, originators and/or original borrowers should be encouraged to move/transfer applications and unfunded commitments to other lenders -- this effort to be accomplished with the full support and cooperation of the conservatorship but moved/transferred "as is" without any representations or warranties.

The Managing Agent and the CFO Asset Marketing Specialist with concurrence from RTC Legal should jointly determine as quickly as possible after intervention if any forward commitments exist and if these should be honored or repudiated.

### B. Construction/Development Outstanding Commitments

No new construction or development loans may be originated in conservatorship. See the General Policy section of this memorandum for overall guidelines and direction. During the initial review, disbursements against commitments outstanding at the time of intervention and extensions of same may only be funded subject to case approval at the appropriate delegation level with RTC Legal concurrence that there exists a legally binding commitment. Rights of repudiation should not be used as a basis to refuse to fund creditworthy projects. At the discretion of the Managing Agent, case approval can be either at the loan or the disbursement level. If at the loan level, the Managing Agent must ensure that there are sufficient controls over the disbursement process so that disbursements are in line with progress completed and/or, if present, the disbursement schedule agreed upon between the borrower and the




App. 376

ments, the lots remaining in Phase I are now worth 30% less than when the raw land was purchased by the developer. The raw land comprising Phases II-V is now worth 50% less than the original purchase price. Further, each of the 5 model homes (also financed by the institution) was appraised on a "typical unit" basis, and the appraised value of each declined on average 30% since the prior year. There are no environmental problems, and clear title to the underlying land and residential structures can be conveyed -- subject only to lender and contractor liens. The local area has 9% unemployment, and residential real estate values have been declining over the last 5 years and are expected to continue to decline for the next 5 years. A local manufacturing plant employing 5,000 has just announced it is relocating out of state.

Managing Agents, Credit Specialists, and conservatorship lending staffs in the Eastern Region face just this type situation every day. The initial inclination at intervention when confronted with the preceding scenario might be to repudiate the remainder of the commitment to the developer (which would shut down the development) and to concurrently repudiate committed permanent mortgage financing to homebuyers on the "presolds" -- under the decision-making assumption that additional "good" money should not follow "bad". **Normally, however, that is probably the wrong combination of decisions.**

As was suggested in the case of "single unit" projects, where for whatever reason(s) the amount disbursed or to be disbursed is of greater book value than the anticipated market value of the structure or project, it is generally in the best interests of the RTC to workout/restructure/compromise in such a way that funding can continue for completion of at least those units under construction, i.e. the 65 units under construction in Phase I in the example above. In most instances and in this example, the RTC is better off to have completed structures collateralizing its loan (or completed rather than in-construction REO, as the case may ultimately be). Completed units are simply easier to market and sell. All things held equal, the net realizable, utilitarian, and market values of these residential units will be dramatically greater once completed vis a vis left in an uncompleted state. Further, such uncompleted units generally become deteriorating eyesores over time as weeds grow, unpainted/untreated raw lumber grays, and so on. Not only is it poor public relations for RTC to leave uncompleted structures in such a state, such eyesores have a negative impact on the perceived, eye-appeal value of not just individual units but the entire development -- which ultimately manifests itself in less net realizable value to RTC and the taxpayer. Such uncompleted construction might also yield vandalism and liability problems, particularly if left unattended, as children and others play at or explore the site. In this example, the conservatorship is not only at risk on the 65 units under construction and the 5 models, but is also at risk on the 10 units already closed and financed by the institution. Should any or all of the units collateralizing these 10 permanent mortgage loans come



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0322

back to the conservatorship as REO, each is worth more if the development of which it is a part is perceived to be healthy and vibrant (i.e. without deteriorating uncompleted units casting a pale on the development).

With respect to the 10 units which have been sold but on which no construction has begun, the conservatorship must consider all factors and make a business decision regarding (1) whether to finance the construction for the builder/developer and (2) whether to repudiate the commitments to provide permanent mortgage financing. In some cases it will be prudent to finance the construction and provide end financing to the homebuyer. In other cases, it will not be prudent. Factors to consider are possible litigation from the developer, subcontractors, and/or the homebuyers; book vs. anticipated market value of the unit upon completion and occupancy; the value of Phase I (and possibly on the remaining phases) as more units are completed; and the like.

With respect to the remaining lots in Phase I on which there has been no activity, it would likely be in the best interest of the conservatorship and the RTC to not continue development financing. Assuming this is the decision arrived at, the conservatorship should workout via compromise or restructure in such a way that the developer is encouraged to market the remaining lots to other developers, builders, or investors or to agree to a deed in lieu of foreclosure or a friendly foreclosure so the conservatorship can have title. In some instances, another alternative for the conservatorship is to compromise in such a way that the developer can go to another lender for financing of the remainder of Phase I.

With respect to undeveloped Phases II-V, it would most likely be in the best interest of the conservatorship and the RTC to not provide continued development and construction financing. In this example, the development is deeply "under water" with respect to the institution's book investment compared to the current market value of the underlying collateral -- and the developer has no other assets and no other sources of cash or capital and is litigious. Given these assumptions, and to avoid costly and protracted litigation with a borrower who has no assets with which to satisfy a deficiency anyway, the likely best courses of action each involve compromise. One alternative would be to compromise in such a way that the developer provides a deed in lieu of foreclosure or allows an uncontested friendly foreclosure -- the outcomes being that the (1) conservatorship acquires title to the property and can begin immediately marketing it, and (2) the developer is relieved of any future liability. Another alternative would be to compromise the loan in such a way that the borrower can find financing elsewhere. For example, if the conservatorship's book value related to Phases II-V is $10 million, the market value of the property is $4 million, and another lender is willing and able to take over the remaining development lending at $3.2 million, it is in the best interest of the conservatorship to compromise the $6.8 million difference. While a significant loss in this example, this




App. 378

compromise precludes possible costly and protracted litigation, allows for the most expeditious liquidation of an asset, does so at an easily defendable net recovery to value percentage -- in this case 80%, and frees management time to deal with other matters.

The key elements to be derived from the extensive use of examples in this section of this memorandum are that:

* Loans collateralized by completed real estate structures (whether residences, office buildings, shopping centers, apartment buildings, or whatever) are normally in the better interest of the RTC than are uncompleted structures. Completed structures generally provide greater net realizable, utilitarian, and market values to the RTC than do uncompleted, in-construction structures; and

* Repudiation is not ordinarily the tool to use with respect to remaining unfunded construction and development commitments. Repudiation should be a last resort after all other alternatives have been exhausted -- with particular emphasis on the workout alternatives of restructure and compromise.

C. Home Equity Loans/Lines of Credit

No new home equity lines and loans may be originated in conservatorship. However, because discontinuance of disbursements on executed lines which existed prior to intervention will likely have an adverse effect on the overall value of this product (which typically sells in the secondary market at par or better), and because home equity lines are often accessed by negotiable instruments held by the borrower, it is generally in the best interest of the RTC to continue funding on such preexisting accounts. Analysis of the underwriting and historical performance of the portfolio should be performed during intervention weekend as outlined in General Policy A of this memorandum. The continuation of disbursements for a home equity portfolio is permitted during the period of review and RTC policy implementation for a period not to exceed 30 days while the A-3 analysis and case writing are being performed. Once an A-3 funding case is approved, reasonable and sound lending practices should be in place to minimize risk and maintain marketability. Controls should be in place or put in place to analyze individual draws to preclude funding lines which are delinquent and to preclude "over line" situations. The original notes should be reviewed to determine what options the lender has to discontinue funding of delinquent lines and what notifications must be provided to the borrower. Declaration of default and refusal to fund delinquent accounts should be in accordance with the terms of the note and mortgage. The Managing Agent and the CFO Asset Marketing Specialist should determine what is necessary to maintain the marketability of these loans.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0324
App. 379

D. Credit Cards

No new credit card loans which will result in outstanding balances on the books of the institution (proprietary relationships) may be originated in conservatorship. A proprietary relationship is defined as one in which the conservatorship is an "issuing" institution, has full ownership of the receivables, and is at risk with respect to disbursements, collections, and so on. An agency relationship is one in which the association is acting on behalf of another "issuing" institution, does not own the receivables, has no or limited risk, and earns fee income from the issuing institution. If a conservatorship has a proprietary credit card program, it should be marketed and sold as soon as possible after intervention. Only agency relationships which pose no unusual risk to the institution may be continued without marketing attempts.

Funding for proprietary credit card lines should continue once it has been determined that a legally binding commitment exists and that such lending is not otherwise onerous with respect to portfolio creditworthiness, pricing, other terms, and the like. The continuation of funding for credit card purchases and advances is permitted during the period of review and RTC policy implementation for a period not to exceed 30 days while the A-3 analysis and case writing are being performed. Once an A-3 funding case is approved, reasonable and sound lending practices should be in place to minimize risk and maintain marketability. Controls should be in place or put in place to analyze individual draws to preclude funding lines which are delinquent and to preclude "over line" situations. Outstanding proprietary commitments at time of intervention should be monitored for serious delinquencies, and problem accounts should be addressed. Outstanding proprietary commitments must be carefully reviewed to determine what obligations exist in the original documents and what options or alternatives may be possible. RTC Legal must review the generic documentation and agreements. If the decision is to repudiate or to cease funding, any required notice period should be provided to the borrowers.

To reiterate, the Managing Agent and the CFO Asset Marketing Specialist should address a plan for disposition of this portfolio as expeditiously as possible after intervention, and any changes to the credit card plan must include an analysis as to secondary marketing implications and a review by RTC Legal.

E. Unsecured Overdraft Loans

Excluding formalized, well-underwritten, creditworthy overdraft accounts tied to a NOW or demand account at the institution, the creation of all other unsecured book balance overdrafts should not occur during conservatorship. While day to day NSF/overdraft

monitoring and decisions may be delegated to conservatorship staff or other RTC employees, the Managing Agent is responsible for overdraft management.

No new formalized overdraft accounts should be opened during conservatorship. With respect to existing performing formalized overdraft products, and with the assistance of RTC Legal, steps should be taken to unwind such arrangements as soon after intervention as possible. Should the Managing Agent or Resolutions, however, feel there is a compelling reason (such as maintaining franchise value) to continue funding such existing performing accounts rather than unwinding the product, then a case proposing such should be forwarded to the Eastern Region Conservatorship Review Committee for decision. Such a case should demonstrate that the conservatorship has sufficient controls and data processing linkages with demand accounts and other capabilities to support continuation of these arrangements and at the same time limit and mitigate risk. In no event, however, should new overdraft accounts be opened after intervention.

F. Share Loans

New share loans (maximum 90% LTV) may be originated and renewed in conservatorship. The interest rate should be at least 200 basis points greater than the nominal collateral account rate. If the collateral is a Certificate of Deposit, the CD collateral should be held in safekeeping. Holds or flags should be utilized to ensure the loan is repaid or is offset against the account prior to withdrawal of the Certificate funds.

Only C/D's and savings accounts of the conservatorship shall be used as collateral for share loans. Deposit accounts from other institutions cannot be used.

New and renewing share loans should have a maximum maturity of 1 year, but in no event can a share loan be set to mature after the maturity of the CD. Because of control problems and the difficulty sometimes with flags and holds, it is preferred that savings accounts not be used as collateral for share loans. The preference is to have the customer withdraw sufficient funds from savings and create a C/D which will act as collateral for the share loan. If, however, a share loan is made against a passbook account, the passbook should be held in the possession of the institution. If, however, the collateral account is a statement savings account, adequate controls (including but not necessarily limited to flags and holds) and procedures should exist or be implemented to ensure adequate collateral is sequestered until repayment of the loan.

G. Unsecured Loans

No new unsecured loans will be originated in conservatorship. Disbursements against preexisting legally binding commitments with respect to applications for unsecured credit will not be made without specific case approval under the A-3 commitment authority at the appropriate level of delegated authority. If the decision is to repudiate commitments to provide unsecured credit, RTC Legal should be asked to review such commitments and to provide letters of repudiation and notification to the borrowers, where necessary. Reread General Policy, Section E of this memorandum with respect to repudiation.

H. Consumer Loans/Autos, Boats, Etc.

No new consumer loans may be originated in conservatorship. During the initial days of conservatorship, preexisting legally binding commitments may have disbursements with approval on an A-3 case by case basis by the appropriate level of delegated authority and upon concurrence by RTC Legal. Consumer loans include auto, mobile home, boat, and other such categories. As suggested in General Policy, Section A of this memorandum, a careful review of policies and procedures should be undertaken to ensure prudent collection capabilities and continued servicing.

Generally these portfolios have received a good response by interested buyers but have required significant data preparation and file work in order to present a viable marketing package and to be prepared for sale and transfer. The review of these portfolios should start early and have a priority in the Integrated Marketing Plan. Significant policy changes to these portfolios should be reviewed with Asset Marketing so that their marketability is not diminished.

I. Student Loans

No new student loans may be originated in conservatorship. Generally speaking, preexisting commitments for federally and state guaranteed student loans should be honored. At the discretion of the Managing Agent, funding of preexisting commitments on loans which have lost their federal or state guarantee may be made if the situation causing the loss of guarantee is "cured" and the guarantee reinstated. Generally speaking, existing commitments on nonguaranteed loans and on loans where the guarantee has been lost and cannot be reinstated should be repudiated with the review and assistance of RTC Legal. Carefully considered exceptions to the last sentence can be made at the discretion of the Managing Agent.

J. Commercial Real Estate Loans

No new commercial real estate loans may be originated or committed during conservatorship. Disbursements against preexisting legally binding commitments outstanding and extensions may only be funded by A-3 case approval at the appropriate level and after concurrence by RTC Legal that there exists a legally binding commitment. Special review and decision-making is needed for these loans since they are very difficult to sell. Experience has shown that these are undesirable assets in that such loans typically sell at significant discounts to par and are collateralized by property with declining values. Against these negative characteristics and to arrive at a prudent business decision, Managing Agents must weigh the probability and anticipated outcome of protracted lender liability litigation if repudiation is used. Borrowers should be contacted and encouraged to move existing loans and unfunded requests to other lenders, and every effort to control and downsize should be implemented.

Furthermore, these loans could be in at least four end-loan statuses which will have a significant influence on a final decision. These statuses are:

(a) Construction with a permanent third party take-out. All things held equal, this type commitment should be funded provided that the end loan lender is still willing and able, and that RTC Legal advises that there is a legally binding commitment from the third party.

(b) Construction/Permanent with the conservatorship having the end loan commitment. This is a much more complex situation as many factors must be weighed before a decision is made. These decisions must be made on an individual loan-by-loan basis weighing the effect of repudiation vs. completion and what effect that decision has on the overall gain/loss to the RTC. See the General Policy sections of this memorandum for overall guidance with respect to funding vs. repudiation.

(c) Construction with no permanent take out. This obviously is a most undesirable situation and one in which, in effect, the conservatorship is the end lender whether it wishes to be or not. This situation is similar to (b) above but requires even greater deliberation.

(d) Permanent take out only. This decision will probably be more guided by RTC Legal and what impact protracted litigation and lender liability would have on the project. This is one instance in which repudiation may be the most desirable avenue. See the General Policy sections of this memorandum for overall guidance with respect to funding vs. repudiation.

institution. Repudiation is an alternative solution and should be used prudently after all factors and the consequences of a decision to repudiate have been considered. See General Policy E for guidance on repudiation.

With respect to nonfraudulent situations where for whatever reason(s) the amount disbursed is of greater book value than the market value of the uncompleted structure or project, it is generally in the best interests of the RTC to workout/restructure/compromise in such a way that funding can continue for completion of the project -- particularly when the project is 40% or more completed. In most instances, the RTC is better off to have a completed structure or project collateralizing its loan (or a completed rather than in-construction REO, as the case may ultimately be). All things held equal, the utilitarian and market values of the structure or project are dramatically greater once completed. On the other hand, common sense needs to prevail to preclude a hard and fast dictum. For example, if the conservatorship has funded only the first $100,000 of a $2 million office building project, it is probably not best to fund the remainder. In short, the economics of each project will need to be examined to arrive at a decision of whether to complete or not complete a project through continued funding of a construction loan or additional capital investment in an uncompleted REO.

The preceding paragraph dealt in content and example with "single unit" type projects. The same general direction, however, holds for "multiple unit" and possibly "multiple phase" projects. For example, at intervention an "acquisition, development, and construction" loan (an "ADC" loan) is brought to the attention of the Managing Agent and the site Credit Review Committee. It is a nonperforming loan in that the interest reserve has been depleted, interest payments for 5 months are due, and the developer has no other assets and has no other sources for cash or capital. The developer is litigious. This particular credit facility was committed by the institution to support a contiguous 5-phase residential development with 100 units to be developed in each sequential phase. The land for all 5 phases has been purchased. However, the horizontal infrastructure development (i.e. streets, utilities, etc.) has been completed only for Phase I. In Phase I, 65 units are under construction -- some with the slab foundation having just been poured, some 30% complete, some 50% complete, and some 80% complete. Of these 65, 35 are "presolds" (with permanent financing committed by the institution on all 35), and 30 are "specs". Another 10 units have already been completed and sold and are owner-occupied -- all having been financed by the institution. In addition, the builder/developer has an additional 10 legally binding contracts with 10% "at risk" down payments held in escrow on units not yet under construction.

The land was reappraised 4 months prior to intervention, and the appraisal was reviewed and concurred with by OTS review appraisers. Even with the addition of the horizontal infrastructure improve-



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0329
App. 384

# POLICY and PROCEDURES
for
COMPUTATION of DIVIDEND PAYMENTS
of
PASS THROUGH RECEIVERSHIPS

Resolution Trust Corporation
Office of Research and Statistics
January 31, 1992

AM0010019

# POLICY and PROCEDURES for COMPUTATION of DIVIDEND PAYMENTS of PASS THROUGH RECEIVERSHIPS

## Table of Contents


| Section | | Page |
|---|---|---|
| | INTRODUCTION | 1 |
| I. | THEORY | 1 |
| | A. Background | 1 |
| | B. Legal Requirements | 3 |
| | C. Depositor Preference | 5 |
| | D. Formula for the Pro Rata Distribution | 6 |
| | E. Formula for the Interest Calculation | 7 |
| II. | METHODOLOGY | 9 |
| | A. Sources of Data | 9 |
| | B. Calculation of Variables | 14 |
| | C. Documentation | 25 |
| III. | AGGREGATE RESULTS | 29 |

Appendices:

| | | |
|---|---|---|
| 1. | Article V of the Purchase and Assumption Agreement | 33 |
| 2. | Sample CADSR Report | 35 |
| 3. | Sample TFR Statement of Condition | 37 |
| 4. | Annual Yields for 91-Day Treasury Bills | 42 |
| 5. | Rates Used to Discount AVR Market Value Data | 43 |
| 6. | Dividend Percentage Report | 44 |
| 7. | Fair Market Value Report | 46 |
| 8. | Indirect Expense Report | 49 |
| 9. | TFR Liabilities Report | 51 |


AM0010020

# POLICY and PROCEDURES for COMPUTATION of DIVIDEND PAYMENTS of PASS THROUGH RECEIVERSHIPS

## I. INTRODUCTION

This study: (a) summarizes RTC policy regarding payment of general unsecured creditors of pass-through purchase and assumption receiverships (PTRs); (b) describes the methodology used to compute the dividend payment due general unsecured creditors with proven claims; and (c) presents the results of the dividend payment analyses for 394 PTRs. The 394 PTRs constitute all PTRs that have occurred from the inception of the conservatorship program in February 1989 through March 31, 1991.

The analyses provide the <u>pro rata</u> percentage of claims due general creditors for each of the 394 PTRs. It includes workpapers for each thrift plus a summary of the aggregate results for all 394 thrifts. These results should be considered preliminary, pending review by RTC field staff.

## I. THEORY

### A. Background

Once an institution is determined to be insolvent by the Office of Thrift Supervision, the RTC is normally appointed receiver of the failed association and all of the assets and

liabilities are transferred to an initial receivership. This transaction is also called a pass-through purchase and assumption receivership (PTR). A separate federal mutual association (de novo) is then created and all of the assets and substantially all of the liabilities "pass-through" the initial receivership into the de novo. The initial receivership retains a claim on the assets of the de novo institution plus stockholders equity (if any) and selected liabilities; the liabilities include most general unsecured claims other than deposits and subordinated claims. The de novo association is then placed into conservatorship, and the RTC is appointed conservator. The procedures for these transactions are defined in a standardized "Purchase and Assumption Agreement" between the RTC as Receiver and both the initial receivership and the de novo association.[1]

When the Office of Thrift Supervision declares an institution insolvent, the RTC may elect to place an institution in conservatorship without the initial PTR step. If this occurs, the institution generally undergoes a PTR and becomes a de novo institution at some point prior to resolution. The procedures in the standardized "Purchase and Assumption Agreement" are used in either case.

---

[1] Note that the terms "receivership", "liquidation" and "purchase and assumption" are also used to describe institutions and transactions before or during resolution. In this study, these terms refer only to the earliest step or conversion of an insolvent institution to an initial receivership estate and then to a de novo association.

# Statement of Financial Accounting Standards No. 109

FAS109 Status Page
FAS109 Summary

## Accounting for Income Taxes

February 1992

Financial Accounting Standards Board
of the Financial Accounting Foundation
401 MERRITT 7, P.O. BOX 5116, NORWALK, CONNECTICUT 06856-5116

Copyright © 1992 by Financial Accounting Standards Board. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the Financial Accounting Standards Board.

**Statement of Financial Accounting Standards No. 109**

**Accounting for Income Taxes**

**February 1992**

**CONTENTS**

Paragraph Numbers


Introduction .......... 1–2
Standards of Financial Accounting and Reporting:
 Scope .......... 3–5
 Objectives and Basic Principles .......... 6–15
  Temporary Differences .......... 10–15
 Recognition and Measurement .......... 16–34
  Annual Computation of Deferred Tax Liabilities and Assets .......... 17–25
  A Change in the Valuation Allowance .......... 26
  An Enacted Change in Tax Laws or Rates .......... 27
  A Change in the Tax Status of an Enterprise .......... 28
  Regulated Enterprises .......... 29
  Business Combinations .......... 30
  Opinion 23 and U.S. Steamship Enterprise Temporary Differences .......... 31–34
 Intraperiod Tax Allocation .......... 35–39
  Certain Quasi Reorganizations .......... 39
 Separate Financial Statements of a Subsidiary .......... 40
 Financial Statement Presentation .......... 41–42
 Financial Statement Disclosure .......... 43–49
 Effective Date and Transition .......... 50–59
  Prior Business Combinations .......... 53–56
  Assets of Regulated Enterprises Reported on a Net-of-Tax
   or After-Tax Basis .......... 57–59
Appendix A: Basis for Conclusions .......... 60–222
Appendix B: Application of the Standards to Specific
 Aspects of Accounting for Income Taxes .......... 223–276
Appendix C: Background Information .......... 277–285
Appendix D: Amendments to Existing Pronouncements .......... 286–288
Appendix E: Glossary .......... 289

# FAS 109: Accounting for Income Taxes

## FAS 109 Summary

This Statement establishes financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities during the current and preceding years. It requires an asset and liability approach for financial accounting and reporting for income taxes. This Statement supersedes FASB Statement No. 96, *Accounting for Income Taxes,* and amends or supersedes other accounting pronouncements listed in Appendix D.

### Objectives of Accounting for Income Taxes

The objectives of accounting for income taxes are to recognize (a) the amount of taxes payable or refundable for the current year and (b) deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an enterprise's financial statements or tax returns.

### Basic Principles of Accounting for Income Taxes

The following basic principles are applied in accounting for income taxes at the date of the financial statements:

a. A current tax liability or asset is recognized for the estimated taxes payable or refundable on tax returns for the current year.
b. A deferred tax liability or asset is recognized for the estimated future tax effects attributable to temporary differences and carryforwards.
c. The measurement of current and deferred tax liabilities and assets is based on provisions of the enacted tax law; the effects of future changes in tax laws or rates are not anticipated.
d. The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

### Temporary Differences

The tax consequences of most events recognized in the financial statements for a year are

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

included in determining income taxes currently payable. However, tax laws often differ from the recognition and measurement requirements of financial accounting standards, and differences can arise between (a) the amount of taxable income and pretax financial income for a year and (b) the tax bases of assets or liabilities and their reported amounts in financial statements.

APB Opinion No. 11, *Accounting for Income Taxes, used the term timing differences* for differences between the years in which transactions affect taxable income and the years in which they enter into the determination of pretax financial income. Timing differences create differences (sometimes accumulating over more than one year) between the tax basis of an asset or liability and its reported amount in financial statements. Other events such as business combinations may also create differences between the tax basis of an asset or liability and its reported amount in financial statements. All such differences collectively are referred to as *temporary differences* in this Statement.

**Deferred Tax Consequences of Temporary Differences**

Temporary differences ordinarily become taxable or deductible when the related asset is recovered or the related liability is settled. A deferred tax liability or asset represents the increase or decrease in taxes payable or refundable in future years as a result of temporary differences and carryforwards at the end of the current year.

**Deferred Tax Liabilities**

A deferred tax liability is recognized for temporary differences that will result in taxable amounts in future years. For example, a temporary difference is created between the reported amount and the tax basis of an installment sale receivable if, for tax purposes, some or all of the gain on the installment sale will be included in the determination of taxable income in future years. Because amounts received upon recovery of that receivable will be taxable, a deferred tax liability is recognized in the current year for the related taxes payable in future years.

**Deferred Tax Assets**

A deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carryforwards. For example, a temporary difference is created between the reported amount and the tax basis of a liability for estimated expenses if, for tax purposes, those estimated expenses are not deductible until a future year. Settlement of that liability will result in tax deductions in future years, and a deferred tax asset is recognized in the current year for the reduction in taxes payable in future years. A valuation allowance is recognized if, based on the weight of available evidence, it is *more likely than not* that some portion or all of the deferred tax asset will not be realized.

**Measurement of a Deferred Tax Liability or Asset**

This Statement establishes procedures to (a) measure deferred tax liabilities and assets

Copyright © 1992, Financial Accounting Standards Board

Not for redistribution

using a tax rate convention and (b) assess whether a valuation allowance should be established for deferred tax assets. Enacted tax laws and rates are considered in determining the applicable tax rate and in assessing the need for a valuation allowance.

All available evidence, both positive and negative, is considered to determine whether, based on the weight of that evidence, a valuation allowance is needed for some portion or all of a deferred tax asset. Judgment must be used in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed.

**Changes in Tax Laws or Rates**

This Statement requires that deferred tax liabilities and assets be adjusted in the period of enactment for the effect of an enacted change in tax laws or rates. The effect is included in income from continuing operations.

**Effective Date**

This Statement is effective for fiscal years beginning after December 15, 1992. Earlier application is encouraged.

## INTRODUCTION

1. This Statement addresses financial accounting and reporting for the effects of income taxes [1] that result from an enterprise's activities during the current and preceding years.

2. FASB Statement No. 96, *Accounting for Income Taxes,* which was issued in December 1987, superseded APB Opinion No. 11, *Accounting for Income Taxes.* The effective date of Statement 96 was delayed to fiscal years that begin after December 15, 1992. In March 1989, the Board began consideration of requests to amend Statement 96 to (a) change the criteria for recognition and measurement of deferred tax assets and various other requirements of Statement 96 and (b) reduce complexity. This Statement is the result of that reconsideration.

## STANDARDS OF FINANCIAL ACCOUNTING AND REPORTING

**Scope**

3. This Statement establishes standards of financial accounting and reporting for income taxes

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

that are currently payable and for the tax consequences of:

a. Revenues, expenses, gains, or losses that are included in **taxable income** of an earlier or later year than the year in which they are recognized in financial income
b. Other events that create differences between the tax bases of assets and liabilities and their amounts for financial reporting
c. Operating loss or tax credit **carrybacks** for refunds of taxes paid in prior years and **carryforwards** to reduce taxes payable in future years.

This Statement supersedes Statement 96 and supersedes or amends other accounting pronouncements listed in Appendix D.

4. The principles and requirements of this Statement are applicable to:

a. Domestic federal (national) income taxes (U.S. federal income taxes for U.S. enterprises) and foreign, state, and local (including franchise) taxes based on income
b. An enterprise's [2] domestic and foreign operations that are consolidated, combined, or accounted for by the equity method
c. Foreign enterprises in preparing financial statements in accordance with U.S. generally accepted accounting principles.

5. This Statement does not address:

a. The basic methods of accounting for the U.S. federal investment tax credit (ITC) and for foreign, state, and local investment tax credits or grants (The deferral and flow-through methods as set forth in APB Opinions No. 2 and No. 4, *Accounting for the "Investment Credit,"* continue to be acceptable methods to account for the U.S. federal ITC.)
b. Discounting (Paragraph 6 of APB Opinion No. 10, *Omnibus Opinion—1966,* addresses that subject.)
c. Accounting for income taxes in interim periods (other than the criteria for recognition of tax benefits and the effect of enacted changes in tax laws or rates and changes in valuation allowances. (APB Opinion No. 28, *Interim Financial Reporting,* and other accounting pronouncements address that subject.)

**Objectives and Basic Principles**

6. One objective of accounting for income taxes is to recognize the amount of taxes payable or refundable for the current year. A second objective is to recognize **deferred tax liabilities and assets** for the future **tax consequences** of events [3] that have been recognized in an enterprise's financial statements or tax returns.

7. Ideally, the second objective might be stated more specifically to recognize the *expected* future tax consequences of events that have been recognized in the financial statements or tax

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

returns. However, that objective is realistically constrained because (a) the tax payment or refund that results from a particular tax return is a joint result of all the items included in that return, (b) taxes that will be paid or refunded in future years are the joint result of events of the current or prior years and events of future years, and (c) information available about the future is limited. As a result, attribution of taxes to individual items and events is arbitrary and, except in the simplest situations, requires estimates and approximations.

8. To implement the objectives in light of those constraints, the following basic principles (the only exceptions are identified in paragraph 9) are applied in accounting for income taxes at the date of the financial statements:

a. A current tax liability or asset is recognized for the estimated taxes payable or refundable on tax returns for the current year.
b. A deferred tax liability or asset is recognized for the estimated future tax effects attributable to **temporary differences** and carryforwards.
c. The measurement of current and deferred tax liabilities and assets is based on provisions of the enacted tax law; the effects of future changes in tax laws or rates are not anticipated.
d. The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

9. The only exceptions in applying those basic principles are that this Statement:

a. Continues certain exceptions to the requirements for recognition of deferred taxes for the areas addressed by APB Opinion No. 23, *Accounting for Income Taxes—Special Areas*, as amended by this Statement (paragraphs 31-34)
b. Provides special transitional procedures for temporary differences related to deposits in statutory reserve funds by U.S. steamship enterprises (paragraph 32)
c. Does not amend accounting for leveraged leases as required by FASB Statement No. 13, *Accounting for Leases*, and FASB Interpretation No. 21, *Accounting for Leases in a Business Combination* (paragraphs 256-258)
d. Prohibits recognition of a deferred tax liability or asset related to goodwill (or the portion thereof) for which amortization is not deductible for tax purposes (paragraph 30)
e. Does not amend Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, for income taxes paid on intercompany profits on assets remaining within the group, and prohibits recognition of a deferred tax asset for the difference between the tax basis of the assets in the buyer's tax jurisdiction and their cost as reported in the consolidated financial statements
f. Prohibits recognition of a deferred tax liability or asset for differences related to assets and liabilities that, under FASB Statement No. 52, *Foreign Currency Translation*, are remeasured from the local currency into the functional currency using historical exchange rates and that result from (1) changes in exchange rates or (2) indexing for tax purposes.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

**Temporary Differences**

10. **Income taxes currently payable**[4] for a particular year usually include the tax consequences of most events that are recognized in the financial statements for that year. However, because tax laws and financial accounting standards differ in their recognition and measurement of assets, liabilities, equity, revenues, expenses, gains, and losses, differences arise between:

a. The amount of taxable income and pretax financial income for a year
b. The tax bases of assets or liabilities and their reported amounts in financial statements.

11. An assumption inherent in an enterprise's statement of financial position prepared in accordance with generally accepted accounting principles is that the reported amounts of assets and liabilities will be recovered and settled, respectively. Based on that assumption, a difference between the tax basis of an asset or a liability and its reported amount in the statement of financial position will result in taxable or deductible amounts in some future year(s) when the reported amounts of assets are recovered and the reported amounts of liabilities are settled. Examples follow:

a. *Revenues or gains that are taxable after they are recognized in financial income.* An asset (for example, a receivable from an installment sale) may be recognized for revenues or gains that will result in future taxable amounts when the asset is recovered.
b. *Expenses or losses that are deductible after they are recognized in financial income.* A liability (for example, a product warranty liability) may be recognized for expenses or losses that will result in future tax deductible amounts when the liability is settled.
c. *Revenues or gains that are taxable before they are recognized in financial income.* A liability (for example, subscriptions received in advance) may be recognized for an advance payment for goods or services to be provided in future years. For tax purposes, the advance payment is included in taxable income upon the receipt of cash. Future sacrifices to provide goods or services (or future refunds to those who cancel their orders) will result in future tax deductible amounts when the liability is settled.
d. *Expenses or losses that are deductible before they are recognized in financial income.* The cost of an asset (for example, depreciable personal property) may have been deducted for tax purposes faster than it was depreciated for financial reporting. Amounts received upon future recovery of the amount of the asset for financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.
e. *A reduction in the tax basis of depreciable assets because of tax credits.*[5] Amounts received upon future recovery of the amount of the asset for financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.
f. *ITC accounted for by the deferral method.* Under Opinion 2, ITC is viewed and accounted for as a reduction of the cost of the related asset (even though, for financial statement presentation, deferred ITC may be reported as deferred income). Amounts received upon

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

future recovery of the reduced cost of the asset for financial reporting will be less than the tax basis of the asset, and the difference will be tax deductible when the asset is recovered.

g. *An increase in the tax basis of assets because of indexing whenever the local currency is the functional currency.* The tax law for a particular tax jurisdiction might require adjustment of the tax basis of a depreciable (or other)asset for the effects of inflation. The inflation-adjusted tax basis of the asset would be used to compute future tax deductions for depreciation or to compute gain or loss on sale of the asset. Amounts received upon future recovery of the local currency historical cost of the asset will be less than the remaining tax basis of the asset, and the difference will be tax deductible when the asset is recovered.

h. *Business combinations accounted for by the purchase method.* There may be differences between the assigned values and the tax bases of the assets and liabilities recognized in a business combination accounted for as a purchase under APB Opinion No. 16, *Business Combinations.* Those differences will result in taxable or deductible amounts when the reported amounts of the assets and liabilities are recovered and settled, respectively.

12. Examples (a)-(d) in paragraph 11 illustrate revenues, expenses, gains, or losses that are included in taxable income of an earlier or later year than the year in which they are recognized in pretax financial income. Those differences between taxable income and pretax financial income also create differences (sometimes accumulating over more than one year) between the tax basis of an asset or liability and its reported amount in the financial statements. Examples (e)-(h) in paragraph 11 illustrate other events that create differences between the tax basis of an asset or liability and its reported amount in the financial statements. For all eight examples, the differences result in taxable or deductible amounts when the reported amount of an asset or liability in the financial statements is recovered or settled, respectively.

13. This Statement refers collectively to the types of differences illustrated by those eight examples and to the ones described in paragraph 15 as *temporary differences.* Temporary differences that will result in taxable amounts in future years when the related asset or liability is recovered or settled are often referred to in this Statement as **taxable temporary differences** (examples (a), (d), and (e) in paragraph 11 are taxable temporary differences). Likewise, temporary differences that will result in deductible amounts in future years are often referred to as **deductible temporary differences** (examples (b), (c), (f), and (g) in paragraph 11 are deductible temporary differences). Business combinations accounted for by the purchase method (example (h)) may give rise to both taxable and deductible temporary differences.

14. Certain basis differences may not result in taxable or deductible amounts in future years when the related asset or liability for financial reporting is recovered or settled and, therefore, may not be temporary differences for which a deferred tax liability or asset is recognized. One example under current U.S. tax law is the excess of cash surrender value of life insurance over premiums paid. That excess is a temporary difference if the cash surrender value is expected to be recovered by surrendering the policy, but is not a temporary difference if the asset is expected to be recovered without tax consequence upon the death of the insured (there will be no taxable amount if the insurance policy is held until the death of the insured).

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

15. Some temporary differences are deferred taxable income or tax deductions and have balances only on the income tax balance sheet and therefore cannot be identified with a particular asset or liability for financial reporting. That occurs, for example, when a long-term contract is accounted for by the percentage-of-completion method for financial reporting and by the completed-contract method for tax purposes. The temporary difference (income on the contract) is deferred income for tax purposes that becomes taxable when the contract is completed. Another example is organizational costs that are recognized as expenses when incurred for financial reporting and are deferred and deducted in a later year for tax purposes. In both instances, there is no related, identifiable asset or liability for financial reporting, but there is a temporary difference that results from an event that has been recognized in the financial statements and, based on provisions in the tax law, the temporary difference will result in taxable or deductible amounts in future years.

## Recognition and Measurement

16. An enterprise shall recognize a deferred tax liability or asset for all temporary differences[6] and operating loss and tax credit carryforwards in accordance with the provisions of paragraph 17. **Deferred tax expense or benefit** is the change during the year in an enterprise's deferred tax liabilities and assets.[7] For deferred tax liabilities and assets acquired in a purchase business combination during the year, it is the change since the combination date. Total income tax expense or benefit for the year is the sum of deferred tax expense or benefit and income taxes currently payable or refundable.

### Annual Computation of Deferred Tax Liabilities and Assets

17. Deferred taxes shall be determined separately for each tax-paying component (an individual entity or group of entities that is consolidated for tax purposes) in each tax jurisdiction. That determination includes the following procedures:

a. Identify (1) the types and amounts of existing temporary differences and (2) the nature and amount of each type of operating loss and tax credit carryforward and the remaining length of the carryforward period
b. Measure the total deferred tax liability for taxable temporary differences using the applicable tax rate (paragraph 18)
c. Measure the total deferred tax asset for deductible temporary differences and operating loss carryforwards using the applicable tax rate
d. Measure deferred tax assets for each type of tax credit carryforward
e. Reduce deferred tax assets by a **valuation allowance** if, based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance should be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

18. The objective is to measure a deferred tax liability or asset using the enacted tax rate(s) expected to apply to taxable income in the periods in which the deferred tax liability or asset is expected to be settled or realized. Under current U.S. federal tax law, if taxable income exceeds a specified amount, all taxable income is taxed, in substance, at a single flat tax rate. That tax rate shall be used for measurement of a deferred tax liability or asset by enterprises for which graduated tax rates are not a significant factor. Enterprises for which graduated tax rates are a significant factor shall measure a deferred tax liability or asset using the average graduated tax rate applicable to the amount of estimated annual taxable income in the periods in which the deferred tax liability or asset is estimated to be settled or realized (paragraph 236). Other provisions of enacted tax laws should be considered when determining the tax rate to apply to certain types of temporary differences and carryforwards (for example, the tax law may provide for different tax rates on ordinary income and capital gains). If there is a phased-in change in tax rates, determination of the applicable tax rate requires knowledge about when deferred tax liabilities and assets will be settled and realized.

19. In the U.S. federal tax jurisdiction, the applicable tax rate is the regular tax rate, and a deferred tax asset is recognized for alternative minimum tax credit carryforwards in accordance with the provisions of paragraph 17(d) and (e) of this Statement. If alternative tax systems exist in jurisdictions other than the U.S. federal jurisdiction, the applicable tax rate is determined in a manner consistent with the tax law after giving consideration to any interaction (that is, a mechanism similar to the U.S. alternative minimum tax credit) between the two systems.

20. All available evidence, both positive and negative, should be considered to determine whether, based on the weight of that evidence, a valuation allowance is needed. Information about an enterprise's current financial position and its results of operations for the current and preceding years ordinarily is readily available. That historical information is supplemented by all currently available information about future years. Sometimes, however, historical information may not be available (for example, start-up operations) or it may not be as relevant (for example, if there has been a significant, recent change in circumstances) and special attention is required.

21. Future realization of the tax benefit of an existing deductible temporary difference or carryforward ultimately depends on the existence of sufficient taxable income of the appropriate character (for example, ordinary income or capital gain) within the carryback, carryforward period available under the tax law. The following four possible sources of taxable income may be available under the tax law to realize a tax benefit for deductible temporary differences and carryforwards:

a. Future reversals of existing taxable temporary differences
b. Future taxable income exclusive of reversing temporary differences and carryforwards
c. Taxable income in prior carryback year(s) if carryback is permitted under the tax law
d **Tax-planning strategies** (paragraph 22) that would, if necessary, be implemented to, for

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

example:

(1) Accelerate taxable amounts to utilize expiring carryforwards
(2) Change the character of taxable or deductible amounts from ordinary income or loss to capital gain or loss
(3) Switch from tax-exempt to taxable investments.

Evidence available about each of those possible sources of taxable income will vary for different tax jurisdictions and, possibly, from year to year. To the extent evidence about one or more sources of taxable income is sufficient to support a conclusion that a valuation allowance is not necessary, other sources need not be considered. Consideration of each source is required, however, to determine the amount of the valuation allowance that is recognized for deferred tax assets.

22. In some circumstances, there are actions (including elections for tax purposes) that (a) are prudent and feasible, (b) an enterprise ordinarily might not take, but would take to prevent an operating loss or tax credit carryforward from expiring unused, and (c) would result in realization of deferred tax assets. This Statement refers to those actions as *tax-planning strategies*. An enterprise shall consider tax-planning strategies in determining the amount of valuation allowance required. Significant expenses to implement a tax-planning strategy or any significant losses that would be recognized if that strategy were implemented (net of any recognizable tax benefits associated with those expenses or losses) shall be included in the valuation allowance. Refer to paragraphs 246-251 for additional guidance.

23. Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Other examples of negative evidence include (but are not limited to) the following:

a. A history of operating loss or tax credit carryforwards expiring unused
b. Losses expected in early future years (by a presently profitable entity)
c. Unsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years
d. A carryback, carryforward period that is so brief that it would limit realization of tax benefits if (1) a significant deductible temporary difference is expected to reverse in a single year or (2) the enterprise operates in a traditionally cyclical business.

24. Examples (not prerequisites) of positive evidence that might support a conclusion that a valuation allowance is not needed when there is negative evidence include (but are not limited to) the following:

a. Existing contracts or firm sales backlog that will produce more than enough taxable income to realize the deferred tax asset based on existing sales prices and cost structures
b. An excess of appreciated asset value over the tax basis of the entity's net assets in an amount sufficient to realize the deferred tax asset

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

c. A strong earnings history exclusive of the loss that created the future deductible amount (tax loss carryforward or deductible temporary difference) coupled with evidence indicating that the loss (for example, an unusual, infrequent, or extraordinary item) is an aberration rather than a continuing condition.

25. An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset.

**A Change in the Valuation Allowance**

26. The effect of a change in the beginning-of-the-year balance of a valuation allowance that results from a change in circumstances that causes a change in judgment about the realizability of the related deferred tax asset in future years ordinarily shall be included in income from continuing operations. The only exceptions are the initial recognition (that is, by elimination of the valuation allowance) of certain tax benefits that are allocated as required by paragraph 30 and paragraph 36 (items (c) and (e)-(g)). The effect of other changes in the balance of a valuation allowance are allocated among continuing operations and items other than continuing operations as required by paragraph 35.

**An Enacted Change in Tax Laws or Rates**

27. Deferred tax liabilities and assets shall be adjusted for the effect of a change in tax laws or rates. The effect shall be included in income from continuing operations for the period that includes the enactment date.

**A Change in the Tax Status of an Enterprise**

28. An enterprise's tax status may change from nontaxable to taxable or from taxable to nontaxable. An example is a change from a partnership to a corporation and vice versa. A deferred tax liability or asset shall be recognized for temporary differences in accordance with the requirements of this Statement at the date that a nontaxable enterprise becomes a taxable enterprise. A deferred tax liability or asset shall be eliminated at the date an enterprise ceases to be a taxable enterprise. In either case, the effect of (a) an election for a voluntary change in tax status is recognized on the approval date or on the filing date if approval is not necessary and (b) a change in tax status that results from a change in tax law is recognized on the enactment date. The effect of recognizing or eliminating the deferred tax liability or asset shall be included in income from continuing operations.

**Regulated Enterprises**

29. Regulated enterprises that meet the criteria for application of FASB Statement No. 71,

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

*Accounting for the Effects of Certain Types of Regulation*, are not exempt from the requirements of this Statement. Specifically, this Statement:

a. Prohibits net-of-tax accounting and reporting
b. Requires recognition of a deferred tax liability (1) for tax benefits that are flowed through to customers when temporary differences originate and (2) for the equity component of the allowance for funds used during construction
c. Requires adjustment of a deferred tax liability or asset for an enacted change in tax laws or rates.

If, as a result of an action by a regulator, it is probable that the future increase or decrease in taxes payable for items (b) and (c) above will be recovered from or returned to customers through future rates, an asset or liability is recognized for that probable future revenue or reduction in future revenue pursuant to paragraphs 9-11 of Statement 71. That asset or liability also is a temporary difference for which a deferred tax liability or asset shall be recognized.

**Business Combinations**

30. A deferred tax liability or asset shall be recognized in accordance with the requirements of this Statement for differences between the assigned values and the tax bases of the assets and liabilities (except the portion of goodwill for which amortization is not deductible for tax purposes, unallocated "negative goodwill," leveraged leases, and acquired Opinion 23 differences [8]) recognized in a purchase business combination (refer to paragraphs 259-272 for additional guidance). If a valuation allowance is recognized for the deferred tax asset for an acquired entity's deductible temporary differences or operating loss or tax credit carryforwards at the acquisition date, the tax benefits for those items that are first recognized (that is, by elimination of that valuation allowance) in financial statements after the acquisition date shall be applied (a) first to reduce to zero any goodwill related to the acquisition, (b) second to reduce to zero other noncurrent intangible assets related to the acquisition, and (c) third to reduce income tax expense.

**Opinion 23 and U.S. Steamship Enterprise Temporary Differences**

31. A deferred tax liability is not recognized for the following types of temporary differences unless it becomes apparent that those temporary differences will reverse in the foreseeable future:

a. An excess of the amount for financial reporting over the tax basis of an investment in a foreign subsidiary or a foreign corporate joint venture as defined in APB Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock*, that is essentially permanent in duration
b. Undistributed earnings of a domestic subsidiary or a domestic corporate joint venture that is essentially permanent in duration that arose in fiscal years beginning on or before December 15, 1992 [9]

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

c. "Bad debt reserves" for tax purposes of U.S. savings and loan associations (and other "qualified" thrift lenders) that arose in tax years beginning before December 31, 1987 (that is, the base-year amount)
d. "Policyholders' surplus" of stock life insurance companies that arose in fiscal years beginning on or before December 15, 1992.

The indefinite reversal criterion in Opinion 23 shall not be applied to analogous types of temporary differences.

32. A deferred tax liability shall be recognized for the following types of taxable temporary differences:

a. An excess of the amount for financial reporting over the tax basis of an investment in a domestic subsidiary that arises in fiscal years beginning after December 15, 1992
b. An excess of the amount for financial reporting over the tax basis of an investment in a 50-percent-or-less-owned investee except as provided in paragraph 31(a) and (b) for a corporate joint venture that is essentially permanent in duration
c. "Bad debt reserves" for tax purposes of U.S. savings and loan associations (and other "qualified" thrift lenders) that arise in tax years beginning after December 31, 1987 (that is, amounts in excess of the base-year amount).

The tax effects of temporary differences related to deposits in statutory reserve funds by U.S. steamship enterprises that arose in fiscal years beginning on or before December 15, 1992 and that were not previously recognized shall be recognized when those temporary differences reverse or in their entirety at the beginning of the fiscal year for which this Statement is first applied.

33. Whether an excess of the amount for financial reporting over the tax basis of an investment in a more-than-50-percent-owned domestic subsidiary is a taxable temporary difference must be assessed. It is not a taxable temporary difference if the tax law provides a means by which the reported amount of that investment can be recovered tax-free and the enterprise expects that it will ultimately use that means. For example, under current U.S. federal tax law:

a. An enterprise may elect to determine taxable gain or loss on the liquidation of an 80-percent-or-more-owned subsidiary by reference to the tax basis of the subsidiary's net assets rather than by reference to the parent company's tax basis for the stock of that subsidiary.
b. An enterprise may execute a statutory merger whereby a subsidiary is merged into the parent company, the minority shareholders receive stock of the parent, the subsidiary's stock is cancelled, and no taxable gain or loss results if the continuity of ownership, continuity of business enterprise, and certain other requirements of the tax law are met.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

Some elections for tax purposes are available only if the parent company owns a specified percentage of the subsidiary's stock. The parent company sometimes may own less than that specified percentage, and the price per share to acquire a minority interest may significantly exceed the per share equivalent of the amount reported as minority interest in the consolidated financial statements. In those circumstances, the excess of the amount for financial reporting over the tax basis of the parent's investment in the subsidiary is not a taxable temporary difference if settlement of the minority interest is expected to occur at the point in time when settlement would not result in a significant cost. That could occur, for example, toward the end of the life of the subsidiary, after it has recovered and settled most of its assets and liabilities, respectively. The fair value of the minority interest ordinarily will approximately equal its percentage of the subsidiary's net assets if those net assets consist primarily of cash.

34. A deferred tax asset shall be recognized for an excess of the tax basis over the amount for financial reporting of an investment in a subsidiary or corporate joint venture that is essentially permanent in duration only if it is apparent that the temporary difference will reverse in the foreseeable future. The need for a valuation allowance for that deferred tax asset and other deferred tax assets related to Opinion 23 temporary differences (for example, a deferred tax asset for foreign tax credit carryforwards or for a savings and loan association's bad-debt reserve for financial reporting) shall be assessed. Paragraph 21 identifies four sources of taxable income to be considered in determining the need for and amount of a valuation allowance for those and other deferred tax assets. One source is future reversals of temporary differences. Future reversals of taxable differences for which a deferred tax liability has not been recognized based on the exceptions cited in paragraph 31, however, shall not be considered. Another source is future taxable income exclusive of reversing temporary differences and carryforwards. Future distributions of future earnings of a subsidiary or corporate joint venture, however, shall not be considered except to the extent that a deferred tax liability has been recognized for existing undistributed earnings or earnings have been remitted in the past.

**Intraperiod Tax Allocation**

35. Income tax expense or benefit for the year shall be allocated among continuing operations, discontinued operations, extraordinary items, and items charged or credited directly to shareholders' equity (paragraph 36). The amount allocated to continuing operations is the tax effect of the pretax income or loss from continuing operations that occurred during the year, plus or minus income tax effects of (a) changes in circumstances that cause a change in judgment about the realization of deferred tax assets in future years (paragraph 26), (b) changes in tax laws or rates (paragraph 27), (c) changes in tax status (paragraph 28), and (d) tax-deductible dividends paid to shareholders (except as set forth in paragraph 36 for dividends paid on unallocated shares held by an employee stock ownership plan [ESOP] or any other stock compensation arrangement). The remainder is allocated to items other than continuing operations in accordance with the provisions of paragraph 38.

36. The tax effects of the following items occurring during the year are charged or credited

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

directly to related components of shareholders' equity:

a. Adjustments of the opening balance of retained earnings for certain changes in accounting principles or a correction of an error
b. **Gains and losses included in comprehensive income but excluded from net income** (for example, translation adjustments under Statement 52 and changes in the carrying amount of marketable securities under FASB Statement No. 12, *Accounting for Certain Marketable Securities*)
c. An increase or decrease in contributed capital (for example, deductible expenditures reported as a reduction of the proceeds from issuing capital stock)
d. An increase in the tax basis of assets acquired in a taxable business combination accounted for as a pooling of interests and for which a tax benefit is recognized at the date of the business combination
e. Expenses for employee stock options recognized differently for financial reporting and tax purposes (refer to paragraph 17 of APB Opinion No. 25, *Accounting for Stock Issued to Employees*)
f. Dividends that are paid on unallocated shares held by an ESOP and that are charged to retained earnings
g. Deductible temporary differences and carryforwards that existed at the date of a quasi reorganization (except as set forth in paragraph 39).

37. The tax benefit of an operating loss carryforward or carryback (other than those carryforwards referred to at the end of this paragraph) shall be reported in the same manner as the source of the income or loss in the current year and not in the same manner as (a) the source of the operating loss carryforward or taxes paid in a prior year or (b) the source of expected future income that will result in realization of a deferred tax asset for an operating loss carryforward from the current year. The only exceptions are as follows:

a. Tax effects of deductible temporary differences and carryforwards that existed at the date of a purchase business combination and for which a tax benefit is initially recognized in subsequent years in accordance with the provisions of paragraph 30
b. Tax effects of deductible temporary differences and carryforwards that are allocated to shareholders' equity in accordance with the provisions of paragraph 36 (items (c) and (e)-(g)).

38. If there is only one item other than continuing operations, the portion of income tax expense or benefit for the year that remains after the allocation to continuing operations is allocated to that item. If there are two or more items other than continuing operations, the amount that remains after the allocation to continuing operations shall be allocated among those other items in proportion to their individual effects on income tax expense or benefit for the year. When there are two or more items other than continuing operations, the sum of the separately calculated, individual effects of each item sometimes may not equal the amount of income tax expense or benefit for the year that remains after the allocation to continuing operations. In

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

those circumstances, the procedures to allocate the remaining amount to items other than continuing operations are as follows:

a. Determine the effect on income tax expense or benefit for the year of the total net loss for all net loss items
b. Apportion the tax benefit determined in (a) ratably to each net loss item
c. Determine the amount that remains, that is, the difference between (1) the amount to be allocated to all items other than continuing operations and (2) the amount allocated to all net loss items
d. Apportion the tax expense determined in (c) ratably to each net gain item.

Refer to paragraphs 273-276 for additional guidance.

**Certain Quasi Reorganizations**

39. The tax benefits of deductible temporary differences and carryforwards as of the date of a quasi reorganization as defined and contemplated in ARB No. 43, Chapter 7, "Capital Accounts," ordinarily are reported as a direct addition to contributed capital if the tax benefits are recognized in subsequent years. The only exception is for enterprises that have previously both adopted Statement 96 and effected a quasi reorganization that involves only the elimination of a deficit in retained earnings by a concurrent reduction in contributed capital prior to adopting this Statement. For those enterprises, subsequent recognition of the tax benefit of prior deductible temporary differences and carryforwards is included in income and reported as required by paragraph 37 (without regard to the referenced exceptions) and then reclassified from retained earnings to contributed capital. Those enterprises should disclose (a) the date of the quasi reorganization, (b) the manner of reporting the tax benefits and that it differs from present accounting requirements for other enterprises and (c) the effect of those tax benefits on income from continuing operations, income before extraordinary items, and on net income (and on related per share amounts).

**Separate Financial Statements of a Subsidiary**

40. The consolidated amount of current and deferred tax expense for a group that files a consolidated tax return shall be allocated among the members of the group when those members issue separate financial statements. This Statement does not require a single allocation method. The method adopted, however, shall be systematic, rational, and consistent with the broad principles established by this Statement. A method that allocates current and deferred taxes to members of the group by applying this Statement to each member as if it were a separate taxpayer [10] meets those criteria. Examples of methods that are not consistent with the broad principles established by this Statement include:

a. A method that allocates only current taxes payable to a member of the group that has taxable temporary differences

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

b. A method that allocates deferred taxes to a member of the group using a method fundamentally different from the asset and liability method described in this Statement (for example, the Opinion 11 deferred method)
c. A method that allocates no current or deferred tax expense to a member of the group that has taxable income because the consolidated group has no current or deferred tax expense.

Certain disclosures are also required (paragraph 49).

**Financial Statement Presentation**

41. In a classified statement of financial position, an enterprise shall separate deferred tax liabilities and assets into a current amount and a noncurrent amount. Deferred tax liabilities and assets shall be classified as current or noncurrent based on the classification of the related asset or liability for financial reporting. A deferred tax liability or asset that is not related to an asset or liability for financial reporting (paragraph 15), including deferred tax assets related to carryforwards, shall be classified according to the expected reversal date of the temporary difference pursuant to FASB Statement No. 37, *Balance Sheet Classification of Deferred Income Taxes*. The valuation allowance for a particular tax jurisdiction shall be allocated between current and noncurrent deferred tax assets for that tax jurisdiction on a pro rata basis.

42. For a particular tax-paying component of an enterprise and within a particular tax jurisdiction, (a) all current deferred tax liabilities and assets shall be offset and presented as a single amount and (b) all noncurrent deferred tax liabilities and assets shall be offset and presented as a single amount. However, an enterprise shall not offset deferred tax liabilities and assets attributable to different tax-paying components of the enterprise or to different tax jurisdictions.

**Financial Statement Disclosure**

43. The components of the net deferred tax liability or asset recognized in an enterprise's statement of financial position shall be disclosed as follows:

a. The total of all deferred tax liabilities measured in procedure (b) of paragraph 17
b. The total of all deferred tax assets measured in procedures (c) and (d) of paragraph 17
c. The total valuation allowance recognized for deferred tax assets determined in procedure (e) of paragraph 17.

The net change during the year in the total valuation allowance also shall be disclosed. A **public enterprise** shall disclose the approximate tax effect of each type of temporary difference and carryforward that gives rise to a significant portion of deferred tax liabilities and deferred tax assets (before allocation of valuation allowances). A **nonpublic enterprise** shall disclose the types of significant temporary differences and carryforwards but may omit disclosure of the tax effects of each type. A public enterprise that is not subject to income taxes because its income is

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

taxed directly to its owners shall disclose that fact and the net difference between the tax bases and the reported amounts of the enterprise's assets and liabilities.

44. The following information shall be disclosed whenever a deferred tax liability is not recognized because of the exceptions to comprehensive recognition of deferred taxes for any of the areas addressed by Opinion 23 (as amended by this Statement) or for deposits in statutory reserve funds by U.S. steamship enterprises:

a. A description of the types of temporary differences for which a deferred tax liability has not been recognized and the types of events that would cause those temporary differences to become taxable
b. The cumulative amount of each type of temporary difference
c. The amount of the unrecognized deferred tax liability for temporary differences related to investments in foreign subsidiaries and foreign corporate joint ventures that are essentially permanent in duration if determination of that liability is practicable or a statement that determination is not practicable
d. The amount of the deferred tax liability for temporary differences other than those in (c) above (that is, undistributed domestic earnings, the bad-debt reserve for tax purposes of a U.S. savings and loan association or other qualified thrift lender, the policyholders' surplus of a life insurance enterprise, and the statutory reserve funds of a U.S. steamship enterprise) that is not recognized in accordance with the provisions of paragraphs 31 and 32.

45. The significant components of income tax expense attributable to continuing operations for each year presented shall be disclosed in the financial statements or notes thereto. Those components would include, for example:

a. **Current tax expense or benefit**
b. Deferred tax expense or benefit (exclusive of the effects of other components listed below)
c. Investment tax credits
d. Government grants (to the extent recognized as a reduction of income tax expense)
e. The benefits of operating loss carryforwards
f. Tax expense that results from allocating certain tax benefits either directly to contributed capital or to reduce goodwill or other noncurrent intangible assets of an acquired entity
g. Adjustments of a deferred tax liability or asset for enacted changes in tax laws or rates or a change in the tax status of the enterprise
h. Adjustments of the beginning-of-the-year balance of a valuation allowance because of a change in circumstances that causes a change in judgment about the realizability of the related deferred tax asset in future years.

46. The amount of income tax expense or benefit allocated to continuing operations and the amounts separately allocated to other items (in accordance with the provisions of paragraphs 35-39) shall be disclosed for each year for which those items are presented.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

47. A public enterprise shall disclose a reconciliation using percentages or dollar amounts of (a) the reported amount of income tax expense attributable to continuing operations for the year to (b) the amount of income tax expense that would result from applying domestic federal statutory tax rates to pretax income from continuing operations. The "statutory" tax rates shall be the regular tax rates if there are alternative tax systems. The estimated amount and the nature of each significant reconciling item shall be disclosed. A nonpublic enterprise shall disclose the nature of significant reconciling items but may omit a numerical reconciliation. If not otherwise evident from the disclosures required by this paragraph and paragraphs 43-46, all enterprises shall disclose the nature and effect of any other significant matters affecting comparability of information for all periods presented.

48. An enterprise shall disclose (a) the amounts and expiration dates of operating loss and tax credit carryforwards for tax purposes and (b) any portion of the valuation allowance for deferred tax assets for which subsequently recognized tax benefits will be allocated to reduce goodwill or other noncurrent intangible assets of an acquired entity or directly to contributed capital (paragraphs 30 and 36).

49. An entity that is a member of a group that files a consolidated tax return shall disclose in its separately issued financial statements:

a. The aggregate amount of current and deferred tax expense for each statement of earnings presented and the amount of any tax-related balances due to or from affiliates as of the date of each statement of financial position presented
b. The principal provisions of the method by which the consolidated amount of current and deferred tax expense is allocated to members of the group and the nature and effect of any changes in that method (and in determining related balances to or from affiliates) during the years for which the disclosures in (a) above are presented.

**Effective Date and Transition**

50. This Statement shall be effective for fiscal years beginning after December 15, 1992. Earlier application is encouraged. Financial statements for any number of consecutive fiscal years before the effective date may be restated to conform to the provisions of this Statement. Initial application of this Statement shall be as of the beginning of an enterprise's fiscal year (that is, if the Statement is adopted prior to the effective date and during an interim period other than the first interim period, all prior interim periods of that fiscal year shall be restated). Application of the requirements for recognition of a deferred tax liability or asset for a restated interim or annual period shall be based on the facts and circumstances as they existed at that prior date and without the benefit of hindsight.

51. The effect of initially applying this Statement shall be reported as the effect of a change in accounting principle in a manner similar to the cumulative effect of a change in accounting principle (APB Opinion No. 20, *Accounting Changes,* paragraph 20) except for initially

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

recognized tax benefits of the type required by this Statement to be excluded from comprehensive income. If the earliest year restated is not presented in the financial statements, the beginning balance of retained earnings and, if necessary, any other components of shareholders' equity for the earliest year presented shall be adjusted for the effect of the restatement as of that date. Paragraph 30 addresses the manner of reporting acquired tax benefits initially recognized subsequent to a business combination and paragraph 36 identifies five items ((c)-(g)) for which tax benefits are excluded from comprehensive income and allocated directly to contributed capital or retained earnings. Pro forma effects of retroactive application (Opinion 20, paragraph 21) are not required if statements of earnings presented for prior years are not restated.

52. When initially presented, the financial statements for the year this Statement is first adopted shall disclose:

a. The effect, if any, of adopting this Statement on pretax income from continuing operations (for example, the effect of adjustments for prior purchase business combinations and for regulated enterprises) for the year of adoption if restated financial statements for the prior year are not presented
b. The effect of any restatement on income from continuing operations, income before extraordinary items, and net income (and on related per share amounts) for each year for which restated financial statements are presented.

**Prior Business Combinations**

53. If financial statements for prior years are restated, all purchase business combinations that were consummated in those prior years shall be remeasured in accordance with the requirements of this Statement.

54. For a purchase business combination consummated prior to the beginning of the year for which this Statement is first applied, any balance remaining as of that date for goodwill or negative goodwill shall not be adjusted to equal the amount it would be if financial statements for the year of the combination and subsequent years were restated. However, except for leveraged leases and except as provided in paragraph 55, (a) remaining balances as of the date of initially applying this Statement for assets and liabilities acquired in that combination shall be adjusted from their net-of-tax amounts to their pretax amounts and (b) any differences between those adjusted remaining balances and their tax bases are temporary differences. A deferred tax liability or asset shall be recognized for those temporary differences pursuant to the requirements of this Statement as of the beginning of the year for which this Statement is first applied.

55. If, for a particular business combination, determination of the adjustment for any or all of the assets and liabilities referred to in paragraph 54 is impracticable, either because the necessary information is no longer available or because the cost to develop that information is excessive, none of the remaining balances of any assets and liabilities acquired in that combination shall be adjusted to pretax amounts, that is, all remaining amounts that were originally assigned on a

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

net-of-tax basis pursuant to paragraph 89 of Opinion 16 shall not be adjusted. Any differences between those unadjusted remaining balances and their tax bases are temporary differences, and a deferred tax liability or asset shall be recognized for those temporary differences pursuant to the requirements of this Statement as of the beginning of the year for which this Statement is first applied.

56. The net effect of the adjustments required by paragraphs 54 and 55 shall be included in the effect of initially applying this Statement and reported in accordance with the provisions of paragraph 51.

**Assets of Regulated Enterprises Reported on a Net-of-Tax or After-Tax Basis**

57. Some regulated enterprises that apply Statement 71 have accounted for certain components of construction in progress on either a net-of-tax or after-tax basis, or both. Upon initial application of this Statement, those enterprises shall make appropriate adjustments required by this Statement to account for the net-of-tax and after-tax components of construction in progress as if the requirements of this Statement were applied to that construction in progress in all prior years. Except as provided in paragraph 58, the reported amount of plant in service at the beginning of the year for which this Statement is first applied shall be similarly adjusted.

58. If determination of the adjustment to plant in service referred to in paragraph 57 is impracticable, either because the necessary information is no longer available or because the cost to develop that information is excessive, any difference between the reported amount and the tax basis of that plant in service is a temporary difference, and a deferred tax liability shall be recognized for that temporary difference. If, as a result of an action by a regulator, it is probable that amounts required for settlement of that deferred tax liability will be recovered from customers through future rates, an asset and the related deferred tax liability for that additional temporary difference shall be recognized for that probable future revenue.

59. The net effect of the adjustments required by paragraphs 57 and 58 shall be included in the effect of initially applying this Statement and reported in accordance with the provisions of paragraph 51.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

**The provisions of this Statement need not be applied to immaterial items.**

*This Statement was adopted by the unanimous vote of the six members of the Financial Accounting Standards Board:*

Dennis R. Beresford, *Chairman*
Joseph V. Anania
Victor H. Brown
James J. Leisenring
A. Clarence Sampson
Robert J. Swieringa

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

OFFICE OF THRIFT SUPERVISION

EXAMINATION COMMENT STATUS REPORT

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| Carteret Savings Bank, FA<br>200 South Street<br>Morristown, New Jersey | Northeast | 04702 |

Type of Examination
Regular

Date of Examination: June 15, 1992

RESPONSE(S) OF:>

| | CORRECTIVE/PREVENTIVE ACTION (BY WHOM/DATE) | AUDIT VERIFICATION (BY WHOM/DATE) |
|---|---|---|

COMMENTS

The board is directed to certify that it has taken corrective action with regard to the following matters and that the following reports are forwarded to the Regional Director. Submission of these reports does not relieve Carteret of its reporting requirements under the outstanding Consent Agreement, Supervisory Agreement and the Capital Directive:

1. Submit a report from counsel no later than September 30, 1992, on the role of former CEO Robert C. Walsh in the purchase of $100 million (Pool #591) in low quality multi-family mortgage loans originated by Western FS&LA and sold to Carteret by DLJ Mortgage Capital, Inc. (DLJ). In addition, beginning on September 30, 1992, and monthly thereafter, Carteret must keep the Regional Director advised in writing as to the status of the litigation contemplated against Western and/or DLJ.

2. Charge off or establish specific reserves for the losses of $44.9 million identified in this report.

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Northeast | 04702 |
| | **Type of Examination** | |
| | Federal Regular | |

Examination commenced: June 15, 1992
Examination concluded: July 31, 1992

Service Corporations and Other Affiliates Which Are a Part of This Report:

Carteret Communities, Inc.
Carteret Premium Finance, Inc. aka Imperial Premium Finance, Inc.
Carteret Realty Corporation
Carteret Service Corporation

### Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor. Independent auditors may be provided access to this report only after providing a written statement that they will not disclose the Report of Examination or any portion thereof.

If a subpoena or other legal process is received calling for production of this document, the Regional Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 510 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, must review this report thoroughly and provide a response to the Regional Office, signed by each member of the Board of Directors, within 30 days of receipt of this report. This report should not be considered an audit report.

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Jersey City | 04702 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: June 15, 1992

Members of the Board:

As required by Section 563.170 of the Rules and Regulations, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends that impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate. All matters of criticism, violations of laws or regulations, and other matters of concern identified within this Report of Examination require the Board of Directors and management's prompt corrective action.

/s/ Thomas J. O'Rourke, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

INDEX AND ABBREVIATIONS


Page

Report Summary and Composite Rating. . . . . . . . . . . . . . . . . . . 1 – 6

Regulatory Chronology, Management, Asset Quality, Capital, Risk Management, and Operating Results . . . . . . . . . . . . . . . . . . . . . . . 7 – 34

APPENDIX

Outstanding Enforcement Actions . . . . . . . . . . . . . . . . . . . . . . A – 1.1

Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . . . A – 2.1

Directors, Principal Officers and Attorneys . . . . . . . . . . . . . . A – 3.1

Principal Operating Committees . . . . . . . . . . . . . . . . . . . . Omitted A – 4.1

Statement of Condition . . . . . . . . . . . . . . . . . . . . . . . . . . A – 5.1

Statement of Operations. . . . . . . . . . . . . . . . . . . . . . . . . . A – 6.1

Key Ratios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A – 7.1

Deposit/Liability Page . . . . . . . . . . . . . . . . . . . . . . . . . . A – 8.1

Deposit from Other Financial Institutions . . . . . . . . . . .Omitted A – 9.1

Summary of Criticized Assets . . . . . . . . . . . . . . . . . . . . . . . A – 10.1

Summary of Action Required by Criticized Assets . . . . . . . . . . . A – 11.1

Classified Assets and Assets Designated Special Mention . . . . . . A – 12.1

Loans in Process and Commitments . . . . . . . . . . . . . . . . . .Omitted A – 13.1

Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Omitted A – 14.1

Interest Rate Risk Exposure Report . . . . . . . . . . . . . . . . . . . A – 15.1




CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0040

INDEX AND ABBREVIATIONS

| | Page |
|---|---|
| Service Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . | A - 16.1 |
| Other Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . .Omitted | A - 17.1 |
| Financial Reporting Errors . . . . . . . . . . . . . . . . . . . . . . . . | A - 18.1 |

ABBREVIATIONS USED IN THIS REPORT

P = President
EVP = Executive Vice President
VP = Vice President
CB = Chairman of the Board
MO = Managing Officer
CEO = Chief Executive Officer
COO = Chief Operations Officer
SVP = Senior Vice President
AVP = Assistant Vice President
S = Secretary
AS = Assistant Secretary
T = Treasurer
AT = Assistant Treasurer
C = Controller
D = Director
AD = Advisory Director
DE = Director Emeritus
A = Attorney
IVP = First Vice President
SO = Savings Officer
CSB = Carteret Savings Bank
ISF = In-Substance Foreclosure
TDR = Troubled Debt Restructuring
GVA = General Valuation Allowance
SVA = Specific Valuation Allowance



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0041

Date: 06/15/92 Docket No.: 04702

REPORT SUMMARY

A regular federal examination commenced on June 15, 1992, utilizing financial data as of May 31, 1992 for asset classifications, with June 30, 1992, and March 31, 1992 information utilized for capital calculations and operations assessment purposes. The examination was performed in an expeditious manner and under rigid timetables due to the current recapitalization efforts being undertaken by management. The examination encompassed an analysis of the effectiveness of executive management and the Board of Directors with particular emphasis given to asset quality, capital adequacy, risk management, and operating results.

Carteret is a critically undercapitalized institution with little or no prospect of meeting either its current or prospective capital requirements without a substantial equity capital infusion. As calculated under FIRREA-imposed capital requirements, (adjusted for additions to GVAs indicated in this ROE) Carteret is insolvent as of June 30, 1992, by $72.7 million on a tangible basis and faces regulatory capital shortfalls of approximately $150.1 million on its existing minimum tangible requirement, $175.8 million on its core capital requirement and $233.2 million on its risk-based capital requirement.

Absent an immediate and sufficient infusion of equity capital, Carteret is expected to continue to experience minimal net operating profitability, at best, that will be insufficient to meet the current or fully phased-in capital requirements of FIRREA. It was noted that during this examination a letter of intent was executed between AmBase Corporation and Kohlberg & Co. that may result in the recapitalization of Carteret with $200 million.

Current management has taken swift remedial action in many areas of Carteret's operations and has implemented many overdue reforms. Compliance with the April 29, 1991, Supervisory Agreement, the October 7, 1991, Capital Directive and the February 27, 1992, Consent Agreement has been achieved. In addition, management has actively pursued a recapitalization of Carteret and has demonstrated acceptable progress in these efforts to date.

The previous senior management team was composed of Messrs. Robert O'Brien, Robert Walsh, Richard Braun, Robert McCarthy and Charles McCabe. This former management team is primarily responsible for the unsafe and unsound condition of Carteret and did not adequately fulfill its fiduciary responsibility. In another example (ie - in addition to those cited in prior examinations) of previous management's failure to exercise fiduciary responsibility the examiners have found that former CEO Walsh unilaterally approved Carteret's purchase of $100 million in multi-family mortgage loans originated and serviced by Western FS&LA, Marina Del Rey, California. This portfolio was poorly underwritten by Western and Carteret failed to perform proper due diligence prior to purchase. This portfolio will likely result in substantial credit losses to Carteret.

Carteret's asset quality has improved due to an intensive effort by management to liquidate non-performing assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructurings.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0042

Date: 06/15/92 Docket No.: 04702

REPORT SUMMARY (Continued)

Criticized assets have decreased by 20.9 percent since the June 17, 1991 examination with assets classified "Substandard" down by $28.9 million (4.7%), assets classified "Doubtful" down by $46.5 million (84%) and assets classified "Loss" down by $154.6 million (77.4%). Notwithstanding this improvement in the level and trend in criticized assets Carteret is in need of an additional $8 million in general valuation allowances to account for the residual risk inherent in its commercial assets portfolio and certain segments of its residential portfolio.

Administration of the approximately $763 million ($562 million net of $146 million in chargeoffs and $55 million in GVAs) commercial loan and REO portfolios has also improved dramatically and this has facilitated Carteret's efforts to dispose of this portfolio. The addition of EVP - Commercial Assets J. Wayne Moor has resulted in substantial improvement in the management and workout of the commercial asset portfolio. Mr. Moor has been responsible for reducing gross commercial assets by $238 million, augmenting total valuation allowances by more than $150 million, restructuring the loan workout department to a smaller yet more effective staffing level and initiating the implementation of aggressive asset workout plans.

Carteret is operating with an unsafe level of interest rate risk in its balance sheet. The OTS Market Value of Portfolio Equity (MVPE) model reveals that any increase in interest rates from existing levels will deplete any remaining capital, on a market value basis, and compound the existing capital shortfall. Carteret has performed internal MVPE calculations with an assumed recapitalization of $200 million in lieu of its present capital position. Because a significant portion of the volatility of Carteret's interest-rate risk is due to its low base level of MVPE, this calculation reduces Carteret's indicated MVPE exposure significantly.

Carteret posted a net loss of $160 million for 1991 and a net profit before taxes of $4.7 million for the five month period ended May 31, 1992. Losses in 1991 were due primarily to continued significant provisions for loan losses. However, core operations are improving as evidenced by the profit for the five month period ended May 31, 1992, which was due to improved net interest margins, lower loss provisions and reduced operating expenses. Carteret management projects a $13.7 million profit for 1992, however, the $8 million in additional GVAs required by this ROE will require a re-evaluation of that projection. Notwithstanding the improvement noted in operations Carteret's viability is in serious doubt without a sufficient equity capital infusion.

In summary, the problems facing Carteret have stabilized since the June 17, 1991 examination, when a Composite "5" was assigned, however, significant asset quality and regulatory capital problems persist. At this point the OTS believes that management must effect a substantial outside equity capital infusion in order to augment the rehabilitative process that commenced in June of 1991.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0043

Date: 06/15/92 Docket No.: 04702

COMPOSITE EXAMINATION RATING

The Composite Rating assigned to Carteret Savings Bank is "5".

Composite "5" - This category is reserved for institutions with an extremely high immediate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from the shareholders or other sources. Such institutions require immediate corrective action and constant supervisory attention. Obviously, formal administrative action is presumed necessary. The probability of failure is high for these institutions. Institutions with negative regulatory capital and those with negative generally accepted accounting principles (GAAP) capital and experiencing operating losses would normally be assigned this rating.

The board is directed to certify that it has taken corrective action with regard to the following matters and that the following reports are forwarded to the Regional Director. Submission of these reports does not relieve Carteret of its reporting requirements under the outstanding Consent Agreement, Supervisory Agreement and the Capital Directive:

1. Submit a report from counsel no later than September 30, 1992, on the role of former CEO Robert C. Walsh in the purchase of $100 million (Pool #591) in low quality multi-family mortgage loans originated by Western FS&LA and sold to Carteret by DLJ Mortgage Capital, Inc. (DLJ). In addition, beginning on September 30, 1992, and monthly thereafter, Carteret must keep the Regional Director advised in writing as to the status of the litigation contemplated against Western and/or DLJ.

2. Charge off or establish specific reserves for the losses of $44.9 million identified in this report.

3. After charging off the losses cited in No. 2 above, increase general valuation allowances by $8 million to the required level of $53.7 million.

4. Submit evidence that the financing agreement between Carteret and IPF has been put into place and that the terms of this agreement are comparable to what Carteret and IPF would engage in if they were unaffiliated parties.

5. Obtain an independent third party review of the PMSR portfolio as of September 30, 1992. This review must incorporate the specific terms outlined in the CAPITAL comments section of this report. The engagement letter between Carteret and the prospective third party must be submitted for OTS review and non-objection prior to execution.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0044

Date: 06/15/92 Docket No.: 04702

COMPOSITE EXAMINATION RATING (Continued)

6. Submit, no later than September 30, 1992, a report on the staffing levels of the Internal Loan Review Department in relation to the need to promptly and accurately identify both problem assets and potential problem assets.

7. Submit, no later than September 30, 1992, evidence that Carteret has recorded the TFR adjustments listed in Appendix A - 18.1 of this report.

To the extent that any of the above requests conflict with the requirements of either the Consent Agreement, Supervisory Agreement or Capital Directive, priority shall be given to the Agreements and/or Directive.

The 1991 Credit Crunch policy and guidance issued by the Office of Thrift Supervision are to be discussed with Senior management and the Board of Directors in a meeting to be held on August 26, 1992. The discussion will include a review of the "Joint Supervisory Notice" issued on March 1, 1991, and the "Interagency Policy Statement on the Review and Classification of Commercial Real Estate Loans" issued in November of 1991. The examiners will answer questions regarding the policies.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0045

Date: 06/15/92

Docket No.: 04702

REGULATORY CHRONOLOGY

The following is a summary of supervisory/regulatory events involving Carteret over the last two years:

In response to the findings of the ROE of June 4, 1990, Carteret was issued a proposed Stipulation and Consent to the Issuance of a Capital Directive on February 4, 1991. Carteret's response to this supervisory action was registered on February 14, 1991, when it filed for injunctive, declaratory and other equitable relief against the OTS and the FDIC in the United States District Court for the District of New Jersey. On April 12, 1991, the Court issued a ruling in favor of Carteret and placed an injunction upon the OTS precluding the enforcement of the regulatory capital regulations as they pertain to Carteret's inclusion of supervisory goodwill. This decision was appealed to the U.S. Third Circuit Court of Appeals which reversed the ruling of the district court on May 7, 1992, and allowed the OTS to apply the regulatory capital provisions of FIRREA to Carteret.

Throughout the period between the 1990 and 1991 examinations, numerous meetings were held with the board and management at which significant supervisory concern was communicated with regard to Carteret's deficient capital; high level of problem assets, internal loan review, and negative operating results.

On April 29, 1991, Carteret entered into a Supervisory Agreement in lieu of a Consent Cease and Desist Order presented to it on February 21, 1991. The Supervisory Agreement mandated the implementation of corrective action with regard to Carteret's internal asset review, the establishment of adequate valuation allowances, problem asset resolution, mortgage-backed securities trading activity, mortgage derivative securities activity, accounting for loan servicing assets, liquidity, Imperial Premium Finance, Inc., and the compensation of former Chairman Robert B. O'Brien.

On May 22, 1991, at an annual meeting of the shareholders of AmBase Corporation, Mr. Richard A. Bianco was named Chairman, President and Chief Executive Officer of Carteret and Mr. Ronald Burns was named a Director. In July of 1991 Donald Kramer was named a Director. Shortly after the annual meeting Chairman Robert B. O'Brien resigned from Carteret's board and Robert Walsh resigned from his position as President/CEO.

On May 24, 1991, a Supervisory Directive was issued in response to pre-examination (on-site scoping) findings that $875 thousand in Executive Performance Bonuses were paid on September 30, 1990, despite a fiscal year loss in 1990 in excess of $100 million. This directive ordered Carteret to cease all compensation payments, other than regular payroll, until such time as OTS could complete a review of all compensation arrangements in effect at Carteret.

In June of 1991, EVP Leo McCabe was appointed to the board to replace former AmBase officer Theodore Babcock. In July of 1991, Mr. Bianco supplemented Carteret's management with Vice Chairman - CFO, Donald Kramer and EVP - Commercial Assets, J. Wayne Moor.

Date: 06/15/92 Docket No.: 04702

REGULATORY CHRONOLOGY (Continued)

In August of 1991, Richard Braun resigned from the board and was replaced by C. Austin Fitts. In September of 1991, Mr. Walsh resigned from the board and has not been replaced.

On September 9, 1991, in response to Carteret reporting a failure to meet its capital requirements at June 30, 1991, due to the recording of an additional $150 million in loan loss allowances, the OTS presented Carteret with another Stipulation and Consent to the Issuance of a Capital Directive which called for the submission of a Capital Plan. This reported capital failure at June 30, 1991 was determined after giving rise to Carteret's inclusion of all supervisory goodwill as allowed under the amended order. The Capital Plan was submitted on September 30, 1991, and Carteret signed the Stipulation and Consent on October 7, 1991.

During the period between the 1991 and 1992 examinations, OTS continued to meet regularly with Carteret management to review capital raising efforts, progress with regard to the resolution of previous management's compensation practices and to monitor operations.

On February 27, 1992, Carteret signed a Consent Agreement with the OTS which provides, among other things, that Carteret demonstrate acceptable progress toward an unassisted recapitalization or risk being placed in the Accelerated Resolution Program of the RTC. To date, progress has been demonstrated and Carteret has received an extension until August 28, 1992 to progress towards a definitive recapitalization commitment.

On March 2, 1992, Carteret received contingent approval of its Capital Plan provided that it raise sufficient capital to meet the fully phased in capital requirements mandated by FIRREA.

On July 20, 1992, AmBase Corporation signed a letter of intent for a group of investors led by Kohlberg & Co. to invest $200 million in Carteret. The investment contemplated in the letter of intent was conditioned upon the satisfactory completion of due diligence, completion of the OTS examination, the reaching of a definitive agreement with AmBase and other customary closing conditions such as regulatory and corporate approvals.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0047

Date: 06/15/92

Docket No.: 04702

MANAGEMENT

Scope

The scope in this area consisted of an evaluation of the current executive management group composed of Messrs. Bianco, Kramer, Moor and McCabe. Current management was evaluated with regard to compliance with the April 29, 1991 Supervisory Agreement, the October 7, 1991 Capital Directive and the February 27, 1992 Consent Agreement the timely identification and proper establishment of valuation allowances for problem assets and efforts toward addressing severe capital and operating deficits.

Findings relative to previous management's role in matters of excessive compensation, the understatement of problem asset levels and valuation allowances, the treatment of goodwill for GAAP purposes, poor operating results and inadequate regulatory capital levels has forced current management and the OTS to focus a significant amount of attention on these issues. Previous management's actions continue to be reviewed as part of an ongoing OTS formal enforcement investigation as noted below.

Management Overview

Current management is considered to be both capable and effective in dealing with Carteret's significant problems. Messrs. Bianco and Kramer are spending most of their time in search of equity capital investors. However, they have also been responsible for quickly addressing Carteret's problems by reorganizing management, setting up adequate loss reserves, aggressively disposing of Carteret's problem assets and paring operating expenses at a substantial rate. EVP Moor has been leading the effort to control and dispose of problem commercial assets. EVP McCabe manages the mortgage origination and retail branch functions and is also actively involved with the effort to pare down the operating expenses. Management is still significantly burdened by the asset quality and capital problems created by previous management and in addition, has had to undertake actions to pursue former management for improperly awarded bonuses and severance payments, which in the aggregate exceed $3 million.

Current management is capable of prudently managing Carteret through the recapitalization period. However, subsequent changes in the business plan of the institution must include a re-evaluation of management resources. This prospective re-evaluation is not reflective of current management's abilities, but rather a prudent measure to ensure that new activities are adequately planned, controlled and managed.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0048

MANAGEMENT (Continued)

Compliance with Outstanding Enforcement Actions

Carteret is considered to be in compliance with the Supervisory Agreement, Capital Directive and Consent Agreement. All applicable sections of each enforcement action have been addressed with corrective action having been implemented in key areas such as loan workout, the establishment of more realistic loan loss allowances, the cessation of mortgage trading activities, the submission of an approved capital plan and the demonstration of acceptable progress toward an unassisted recapitalization. (See Appendix A - 1.1)

Compliance with the Supervisory Directive of May 24, 1991

This directive was issued in response to the examiners becoming aware of $875 thousand in "Executive Performance Bonuses" that were authorized by the Compensation Committee of the board on September 30; 1990. This committee was formed by the board on the same day that it acted to approve these bonuses and was composed of three AmBase officers (Bean, Babcock and Feil). It should also be noted that two recipients of these bonuses, Robert Walsh and Richard Braun, voted affirmatively, as Carteret directors, to establish the committee. One of the provisions within the Directive ordered Carteret to cease payments of any additional funds for (a) bonus awards, (b) incentive compensation arrangements, (c) severance/termination pay-outs, (d) employment contracts, and (e) any other monetary enhancement arrangements made in addition to base salary and benefits available to all employees without the prior written non-objection of the OTS. Current Carteret management has made good faith efforts to abide by the terms of this directive and has independently sought restitution from the recipients of the aforementioned bonuses.

In response to prior management's compensation practices relating to executive performance bonus payments, cash advances on severance agreements that had yet to be validated and the awarding of so-called "stay bonuses", an OTS-Washington enforcement investigation (Resolution No. WA-91-03 dated September 4, 1991) was opened to review these matters and to determine whether restitution for payments made in contravention of OTS Regulation and/or safety and soundness principles is warranted. This investigation is still in progress and is focusing on the activities of AmBase and it former board of directors, including current AmBase Chairman Schaifenberger as well as former Carteret officers O'Brien, Walsh, Braun, McCarthy.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0049

Date: 06/15/92 Docket No.: 04702

MANAGEMENT (Continued)

Claims of Robert B. O'Brien

Pursuant to his perceived entitlement of accelerated retirement benefits under a May 11, 1983 Employment Agreement, amended as of January 18, 1988, former Chairman O'Brien has submitted claims against Carteret for amounts ranging between $8 million and $12 million, (less the $2.4 million previously advanced). Prior to the commencement of the June 17, 1991 examination, Carteret made a settlement proposal to O'Brien that offered to let him retain the $2.4 million already advanced and pay him three additional $150 thousand annual payments in return for a release of Carteret from the amended contract claims. O'Brien did not accept the offer. This action by Carteret's board was deemed unsound given that no analysis of Mr. O'Brien's 1990 and 1991 performance was undertaken prior to tendering the settlement offer. An analysis obtained in connection with the enforcement investigation by OTS of a draft report titled "Report Regarding Duties and Responsibilities of Robert B. O'Brien, Jr." documented that despite drawing full-time pay and benefits after leaving the CEO post in March 1990, Mr. O'Brien spent very little of his working time on Carteret matters. His activities appeared to be a blend of social and political events, along with AmBase related matters. In fairness to Carteret's current board, this matter was thrust upon them by former management during the transition period from former management to current management. The current board has now assessed Mr. O'Brien's tenure at Carteret and Carteret has initiated civil litigation to secure repayment of the $2.4 million advance.

Terminations of Robert C. Walsh, Richard L. Braun and Robert E. McCarthy

In July of 1991 Robert Walsh resigned from his post as CEO of Carteret. In August of 1991 and December of 1991 Messrs. Braun and McCarthy were respectively separated from Carteret. All three of these individuals are currently in the process of seeking $5 million (collectively) in severance payments from AmBase pursuant to what they perceive as the triggering of specific clauses contained within their respective severance agreements. Mr. McCarthy has proceeded the furthest along this track by obtaining a judgement against AmBase under an arbitration proceeding for $1.3 million. Mr. Braun has commenced litigation to seek an amount comparable to that awarded to Mr. McCarthy, while Mr. Walsh has communicated his intention to commence litigation for $2.4 million.

While no action has been taken against Carteret by these three individuals, the board has been considering Carteret's potential exposure under these severance agreements since Carteret was a co-signatory to these agreements. In addition, the board has sought $625 thousand in restitution collectively from these three individuals, relating to their receipt of executive performance bonuses in 1990.

The board is encouraged to continue with these efforts and to continue reporting to the OTS any material development in Carteret's efforts to secure these repayments.

MANAGEMENT (Continued)

Actions of Robert C. Walsh

In the course of reviewing transactions that have had an adverse impact upon Carteret the examiners noted that in October of 1989, the purchase of a $100 million pool (Pool #591) of multi-family mortgage loans underwritten by Western FS&LA, Marina Del Rey, California and sold to Carteret by DLJ Mortgage Capital, Inc., was authorized by Robert C. Walsh, in direct contravention of the bank's credit policy. At the time of purchase Mr. Walsh did not have the authority to purchase loan packages in excess of $15 million without having obtained prior credit committee or board approval. Such approvals were not obtained. Furthermore, Mr. Walsh did not exercise his fiduciary responsibility to ensure that these loans were underwritten to acceptable standards, such as those promulgated by FNMA. Due to Mr. Walsh's actions and critical omissions Carteret is currently faced with an $84 million portfolio of loans in which 17 percent of the unpaid balances are either in excess of 90 days past due, in foreclosure or in bankruptcy. Carteret faces the risk of significant losses within this portfolio due to the poor underwriting and monitoring of these high risk loans. (See ASSET QUALITY comment - Multi-Family Loans Purchased from Western FS&LA)

Management is directed to have counsel fully investigate Mr. Walsh's role in the purchase of these low quality assets and to report to the OTS no later than September 30, 1992, its findings in this regard.

Codification of IPF/Carteret InterCompany Relationship

Since the acquisition of IPF in 1988 Carteret has provided funding of IPF's premium finance receivables on a consistent basis without benefit of a written agreement. These fundings have reached as high as $254 million and constitute a material portion of Carteret's lending activities. On June 1, 1992, the OTS issued a supervisory letter to Carteret in which it was directed to execute a written agreement with IPF that would preserve Carteret's interests in the financing of IPF's receivables and to submit an analysis of the specific terms of all previous fundings of IPF receivables by Carteret since the acquisition of IPF.

On June 15, 1992, Carteret submitted draft documents that would codify the intercompany relationship between Carteret and IPF. These documents would provide for the establishment of a financing facility of up to $400 million that would be conducted through a bankruptcy remote subsidiary on market terms. On June 23, 1992, Carteret supplied the aforementioned analysis of the specific terms relating to previous IPF fundings.

Date: 06/15/92 Docket No.: 04702

MANAGEMENT (Continued)

Codification of IPF/Carteret InterCompany Relationship (Continued)

The board is reminded that Carteret must maintain separate corporate identities for its subsidiaries and must observe the formalities of the separate corporate procedures of each subsidiary. Failure to do so, as may be the case with regard to the financing of IPF's receivables without a written agreement, constitutes noncompliance with Section 571.21 of the OTS Regulations and could lead to potential exposure to Carteret for the actions of its subsidiaries. In light of the concerns noted above the board is requested to implement the agreements with IPF as soon as possible. These agreements have been reviewed by the examiners and do not raise any supervisory objections.

Summary

The new management team has aggressively pursued corrective action in key areas such as capital raising efforts, commercial asset management and disposal, operating expense reduction, preservation of Carteret's core lending and deposit taking functions and generally overcoming the poor management practices of past Carteret management. While it is commended for such actions, management is still confronted with the deep-seated problems left by previous management and will be further tested in dealing with the critical needs of capital augmentation, improved core earnings, and the residual problems attendant to Carteret's current weakened condition.

Close supervisory monitoring of Carteret will continue until such time as all of the aforementioned problems are remedied.

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY

The primary scope of this examination review was to determine the adequacy of CSB's general valuation allowances (GVAs), the level and trend of classified assets, the adequacy of the internal loan review and the effectiveness of management's efforts to reduce the level of classified assets. A risk focused, minimum scope approach was taken toward the asset review. The initial review focused only on those assets with outstanding balances greater than $5 million. This was expanded to include those assets commented on in the previous report of examination. The review penetration level achieved was in excess of 60 percent of total gross commercial assets.

Composition of Classified Assets
(As of May 31, 1992)
(000's Omitted)

| | (1) Total Amount | % of Assets | Amount Classified | % of Total |
|---|---|---|---|---|
| Cash and Investments | $ 1,697,842 | 32.2 | $ 0 | 0.0 |
| Mortgage Loans | 2,700,110 | 51.2 | 199,069 | 7.4 |
| Consumer Loans | 113,422 | 2.2 | 3,365 | 3.0 |
| Commercial Loans | 18,178 | 0.3 | 61,179 | 336.6 |
| Real Estate Owned | 183,315 | 3.5 | 368,416 | 202.8 |
| Other Assets | 558,592 | 10.6 | 10,508 | 10.6 |
| Totals | $5,271,459 | 100.0% | $642,931 | 12.2% |

(1) Breakdown of assets as of March 31, 1992. Classifications are as of May 31, 1992. Commercial loans classified includes those loans redesignated as commercial by the Commercial Assets Division, therefore the figures do not reconcile to the TFR. Classified REO includes loans reclassified as ISF.

Although declining, the level of classified assets continues to threaten the viability of the institution thus making it impossible for Carteret to rebuild capital on its own. The ratio of classified assets to tangible capital plus GVAs before examiner adjustments was well in excess of 100 percent.

Level and Trend of Classified Assets

The level of classified assets has decreased significantly, 26.4 percent since the previous examination, as Carteret continues its efforts to dispose of classified and nonearning assets, as well as reduce total assets. The level of classified assets as a percentage of total assets has declined from 16.3 percent at the previous examination to 12.2 percent during this examination.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0053

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

The decline in overall totals can be clearly seen in this chart which reflects the level of classified assets as determined by the examiners for the past four examinations including this one.

| Classification | June 1992 | June 1991 | June 1990 | May 1989 |
|---|---|---|---|---|
| Substandard | $ 589,126 | $ 618,064 | $ 581,212 | $ 360,137 |
| Doubtful | 8,873 | 55,434 | 40,736 | 19,496 |
| Loss | 44,938 | 199,575 | 53,066 | 24,602 |
| Total Classified | $ 642,937 | $ 873,073 | $ 675,014 | $ 404,235 |
| Special Mention | $ 251,075 | $ 256,861 | $ 186,956 | $ 74,705 |
| Total Criticized | $ 894,012 | $1,129,934 | $ 861,970 | $ 478,940 |

Since the previous examination, the Commercial Assets Division has foreclosed on 15 major properties with a book value of over $40.2 million and sold 12 REO parcels on the books for $46.9 million, receiving $17.4 million cash and recognizing losses of $29.5 million covered by previously established reserves.

Over 33 loans totaling approximately $140 million have been liquidated. These included discounted poufs (compromised sales) of 18 loans with book values totaling approximately $114 million, where Carteret received over $52 million in cash while absorbing $62 million in losses covered by previously established reserves.

General Valuation Allowances

The examiners have determined that an additional $8 million will have to be set aside in GVAs as a result of this examination. This level was derived with full recognition of the fact that the examiners consider the methodology and review process utilized by Carteret to be very reasonable.

There was a problem however, regarding loans internally identified as in-substance foreclosed. A fair value was determined as required by GAAP, however, the asset was not consistently written down to that fair value as required. The amount which should have been written-off at that time was instead allocated a portion of the GVAs.

The examiners have identified $44.9 million in Loss classifications, of which all but approximately $6 million were properly identified by Carteret and should have been written-off. In effect, Carteret avoided recognizing these losses, thus GVAs were effectively overstated. (See page A - 11 for the effect on GVAs of these Loss classifications.)

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

General Valuation Allowances (Continued)

The minimum level of GVAs required was determined as in the previous examinations, by requiring various levels of reserves for the different types of assets and loans. Additional reserves are required for classified assets with individual consideration given to some of the more material classified assets. A copy of the asset classification work sheet and reserve requirement calculation have been given to management.

Asset Management

The new asset management team commenced its efforts in July of 1991 and has been effectively reducing the portfolio, with particular emphasis on the classified assets. No new major lending has taken place. The current emphasis is on getting not only the level of classified assets reduced, but also the total amount of assets, in an effort to improve capital ratios.

The team has worked well, both at the main office in New Jersey, as well as the Florida office. There is no one remaining on the staff who might feel compelled to defend a loan that they had originated. Further, the initial $150 million in reserves that were established in June of 1991, gave management the flexibility to pare down the portfolio.

The Corporate Asset Division provides a multitude of reports to assist in the management of the portfolio. The examiners noted however, that the proper controls may not be in place to ensure the accuracy of the reports produced. For example, the accuracy of a report on the status of real estate taxes due on the loans secured by real estate as well as REO, could not be verified through the asset managers or the individual asset files.

Internal Loan Review

In March 1992, William T. Brennan was hired as Loan Review Manager. The loan review function is structured as part of the Audit Department. Mr. Brennan is currently the only member of the ILR staff. On April 22, 1992, the Audit Committee adopted a general policy to selectively evaluate commercial, consumer and residential mortgage loans. The creation of the ILR function is attributed to the concerns noted in the previous report of examination, regarding multi-family loans serviced by Western FS & LA and in-house mortgage loans over $500 thousand.

As of this examination date, the department has completed a review of the loan portfolio serviced by Western. This review was found to be generally adequate and informative.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0055

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

Internal Loan Review (Continued)

Although the committee has adopted a general loan review policy, it has not approved a detailed policy and procedures for the ILR function. The Audit Committee must establish a policy which should include a system for targeting loans for review on a continuing basis and classifying troubled assets. In addition, the policy should provide guidance for setting up general and specific valuation allowances, consistent with the overall methodology for maintaining loan loss reserves.

Management should also assess staffing needs for the ILR department. Presently, CSB has approximately $460 million in mortgage loans serviced by 102 different servicers in addition to the Western loans. Some of the portfolios have high rates of delinquencies and are scheduled to be reviewed. Additional staffing may be required so that problem loans are identified within a reasonable time period. The level of staffing was also a matter of concern noted in the previous report of examination.

Appraisals

The appraisal policies and procedures appear to be adequate and satisfy the needs of Carteret in relation to the proper valuation of assets. Although a specific review of the appraisal function was not performed, the examiners noted that current appraisals were available in just about every instance, were reviewed by an in-house review appraiser and then utilized by the asset managers. The asset managers are familiar with what is required in a good appraisal as well as with discounted cash flows including NRV and FV calculations.

Multi-Family Loans Purchased from Western FS & LA

As of May 31, 1992, Carteret owned two pools (#591 and #745) of multi-family mortgage loans totaling $150.6 million that were originated and are presently serviced by Western FS&LA, Marina Del Rey, California, OTS No. 3865.

Pool #591 (purchased in 1989 from DLJ Mortgage Capital) has demonstrated significant performance problems with $17.3 million or 20.5% of the pool balance either delinquent or in REO as of March 31, 1992. Of the $17.3 million in problem assets within pool #591, $4.9 million was in REO, $6.6 million was past due over 60 days and $5.8 million was past due over 30 days. Pool #745 (purchased in 1991 from Goldman Sachs) has performed better with only $2.5 million or 3.8% in problem assets.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0056

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

Multi-Family Loans Purchased from Western FS & LA (Continued)

In March of 1992 Carteret engaged the services of an outside consulting firm, The Sterling Advisory Group, Inc., to evaluate these loan pools and to specifically determine whether or not representations and warranties made at the time of purchase were consistent with the characteristics of the underlying portfolio. The consultant's report concluded that the loans sold to Carteret were not underwritten in accordance with the representations and warranties contained in the commitment letter, which were based on FNMA guidelines, and that as a result, Carteret could potentially seek a portfolio buyback of the loans from either DLJ or Western.

The specific breaches of the representations and warranties cited by the consultant center around Western's use of the first year discounted (teaser) interest rate in the debt service coverage calculations, the existence of negative amortization, and the failure of Western to require tax and insurance escrows. In addition, the consultant also points out various servicing breaches by Western that could serve as a basis for Carteret to pull the servicing from Western.

Carteret has demanded that Western repurchase 55 loans totaling $60 million that were improperly represented as being underwritten in accordance with FNMA guidelines. To date, the only response received from Western indicates that they do not acknowledge any of the breaches of representations and warranties communicated by Carteret. At this point Carteret is trying to schedule a meeting between the two institutions to focus on the underwriting problems noted in the consultant's report. In addition, Carteret management is exploring the prospect of pursuing litigation against DLJ and/or Western to force a buyback of the misrepresented loans.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0057

Date: 06/15/92 Docket No.: 04702

## CAPITAL ADEQUACY

### Scope

The review of capital adequacy included an assessment of the accuracy of Carteret's regulatory capital calculations. The adequacy of Carteret's capital position was evaluated as of March 31, 1992 and June 30, 1992. Consideration was given to the potential impact of the current recapitalization efforts on Carteret's capital position. OTS also assessed the adequacy of Carteret's capital position relative to the level of asset quality exposure, regulatory capital requirements and other market exposures such as interest rate risk and prepayment risk.

Capital Requirements (1)
(As of June 30, 1992)
(000's Omitted)

| | Capital | Requirement | Deficiency | Capital Ratio |
|---|---|---|---|---|
| Tangible Capital | ($ 72,777) | $ 77,369 | ($150,146) | (1.41%) |
| Core Capital | ($ 21,198) | $154,738 | ($175,936) | (0.41%) |
| Risk-Based Capital | ($ 21,910) | $211,335 | ($233,244) | (0.80%) |
| Fully Phased-In Risk-Based Capital | ($ 78,260) | $232,879 | ($311,139) | (2.86%) |

(1) After adjustments for losses and required additional general valuation allowances identified in this report. (See Appendix page A - 11.1.)

### Summary of Findings

Carteret is operating with an unsafe and unsound level of capital relative to its asset size and the level of risk in its balance sheet. Tangible, core and risk based capital levels are significantly below the current regulatory minimum capital requirements for healthy institutions. Further capital erosion has been halted largely due to management's efforts in reducing operating costs, balance sheet restructuring and the disposition of problem assets. Even with the improvements noted in the management of the institution, Carteret will not be able to cure its regulatory capital deficiencies through internal capital formation within any reasonable time frame.

Carteret's commercial real estate and REO portfolios have been significantly reduced from the previous examination, but remain a threat to Carteret's short term viability. Unidentified losses on real estate of a moderate magnitude could cause potential investors to reassess the recapitalization of Carteret. OTS has not identified a significant amount of additional exposure in the area of commercial real estate and REO, however there is no assurance that future events will not lead to additional losses. GVAs totaling $53.8 million after provisions required in this examination should provide for at least a partial cushion for any unidentified specific losses at this time.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0058

Summary of Findings (Continued)

Total classified assets potentially threaten Carteret's capital position under any measure. Even under the assumption that Carteret is recapitalized with a $200 million capital infusion, as is currently proposed, classified assets would represent 365 percent of tangible capital plus remaining general valuation allowances. Carteret must continue to aggressively reduce its level of classified assets.

Management's efforts to stem operating losses and stabilize earnings have been effective in limiting further capital erosion. Balance sheet restructuring has aided in limiting the level of risk-based capital that Carteret is required to maintain. Additionally, management has been successful in soliciting investor interest in the form of a letter of intent by Kohlberg and Co. ("Kohlberg"). The proposed capital infusion of $200 million, which is subject to certain conditions, would apparently cure Carteret's capital deficiencies as of June 30, 1992 on a pro forma basis. Risk-based capital would likely need to be further augmented beyond the initial $200 million investment to bring Carteret into compliance with the fully phased in risk-based capital requirements, assuming that Carteret's balance sheet structure and composition remains unchanged.

The Kohlberg letter of intent between AmBase and Kohlberg indicates that Kohlberg will lead a group of private investors in the acquisition of a majority interest in Carteret subject to due diligence, the execution of a definitive agreement, regulatory and corporate approvals and the satisfactory disposition of potential regulatory issues and liability claims relating to AmBase. AmBase would likely retain a 10 percent equity interest in Carteret. The acquisition of Carteret by Kohlberg as currently proposed would include a $200 million (before fees/expenses) capital infusion into Carteret. On a pro forma basis utilizing Carteret's current balance sheet, the proposed capital infusion would cure Carteret's current regulatory capital deficiencies, but would not ensure compliance with fully phased-in risk-based capital requirements without further augmentation or balance sheet restructuring.

Management states that Kohlberg's proposed acquisition of Carteret would be accounted for using the purchase method of accounting. Carteret projects that there will be no goodwill created in the proposed transaction. Management is further assuming that the market value of assets will exceed the market value of liabilities by enough of a margin to offset the write-off of all goodwill and other intangible assets currently held by Carteret. In essence, the market value of Carteret would be zero at acquisition and the $200 million capital infusion would then elevate the "new" Carteret into compliance with fully phased in regulatory capital requirements. OTS's fully phased in capital calculation did not consider the purchase accounting adjustments that are being considered by management due to the lack of balance sheet mark to market estimates.

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital

Carteret's capital position includes certain components which will be negatively impacted by FIRREA regulatory capital phase-out requirements and other market factors such as interest rate risk and prepayment risk. A review of these items is presented below.

(a) Supervisory Goodwill

Carteret included $51.7 million (1 percent of tangible assets before deduction for non-qualifying purchased mortgage servicing rights ("PMSR")) in supervisory goodwill as core capital as of June 30, 1992. The inclusion of supervisory goodwill as core capital will decrease to 0.75 percent and 0.375 percent of tangible assets before PMSR deduction for the years ending December 31, 1993 and December 31, 1994, respectively. Supervisory goodwill will not be permitted as a component of core capital after December 31, 1994. Although goodwill is an amortized asset, it is unlikely that the current rate of amortization of supervisory goodwill would reduce the balance to a level less than that fully includable per phase-outs.

Additionally, from an accounting perspective, OTS expressed concern in the previous examination regarding the appropriateness of the carrying value of goodwill. Carteret retains significant amounts of goodwill relating to acquisitions where the majority of assets and liabilities originally acquired have either matured or been sold. Carteret claims that its continued market presence in the subject geographic areas justifies the carrying value of goodwill. Neither Carteret, nor its accountants, have provided documentation that adequately supports the carrying value of goodwill.

(b) Non-includable Subsidiaries

As of June 30, 1992, Carteret had $3.5 million in investments in subsidiaries that are engaged in activities not permissible for national banks. FIRREA requires that institutions deduct an increasing percentage of their investments in non-includable subsidiaries from tangible capital.

Carteret deducted 25 percent of such investments from equity capital as of June 30, 1992 for tangible capital calculations. It will have to deduct 40 percent and 60 percent of its non-includable subsidiary investments from tangible capital for the periods July 1, 1992 to June 30, 1993 and July 1, 1993 to June 30, 1994, respectively. After June 30, 1994, Carteret will be required to deduct 100 percent of its investment in non-includable subsidiaries from equity capital for purposes of determining tangible capital.

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(c) General Valuation Allowances ("GVAs")

GVAs on loans and leases are currently includable in supplementary capital up to 1.5 percent of total risk-based assets, except that supplementary capital can not exceed 100 percent of core capital, until December 31, 1992. Thereafter, GVAs are included in supplementary capital up to 1 percent of total risk-based assets, subject to not exceeding 100% of core capital. Carteret's risk-based assets of $2.7 billion would allow for the inclusion of $40.5 million in GVAs for risk-based capital. However, since core capital is negative as of June 30, 1992, GVAs can not be utilized for risk-based capital. GVAs would be available as a component of risk-based capital if the proposed capital infusion materializes.

(d) Core Deposit Value ("CDV")

CDV is includable in core capital up to a maximum of 25 percent of tangible capital plus qualifying supervisory goodwill. Due to Carteret's negative tangible and core capital positions, $2.0 million in CDV is prohibited from being included in its core capital calculation. CDV would be available for inclusion should the proposed capital infusion come to fruition.

(e) Non-deducted Equity Investments

Carteret has $2.9 million in unconsolidated equity investments which are required to be deducted from risk-based capital in accordance with regulatory phase-out requirements. As of June 30, 1992, Carteret deducted 25 percent of its investments from risk-based capital. The regulatory deduction increases to 40 percent, 60 percent, and 100 percent as of July 1, 1992, July 1, 1993 and July 1, 1994, respectively.

(f) Risk-based Capital Requirements

The risk-based capital requirement will be raised from the current 7.2 percent to 8 percent effective December 31, 1992. Based on the level of total risk assets as of June 30, 1992, Carteret's risk-based capital requirement would be increased by $21.8 million at year end 1992.

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR")

The book balance of Carteret's PMSR was $58.9 million as of June 30, 1992. Carteret can include, for regulatory capital purposes, the lesser of: (i) 90 percent of fair market value, (ii) 90 percent of original cost or (iii) current amortized book value. Carteret reported "non-qualifying" PMSR of $4.9 million as of June 30, 1992, which represents 90 percent of Carteret's fair market value estimate, $54.0 million, less the current amortized book value, $58.9 million. Carteret is amortizing its PMSR at a rate of $1.3 million per month, $15.6 million annually. At this rate, PMSR will be fully amortized by June, 1996.

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR") (Continued)

Carteret utilizes the services of Hamilton, Carter, Smith & Co. ("HCS") to conduct its quarterly fair market value analysis of PMSR for regulatory capital purposes. Carteret presents HCS with its portfolio data and estimates of market assumptions, which HCS then analyzes in its PMSR market value model. The market value of PMSR is highly dependent on assumptions used in estimating the loan servicing cash flows. OTS, via letter dated July 22, 1991, expressed concern regarding the assumptions that HCS utilized in determining the value of Carteret's PMSR. Many of the concerns previously expressed by OTS regarding HCS's valuation assumptions have not been satisfactorily addressed.

Carteret's PMSR portfolio is comprised of 83.6 percent GNMA servicing, 10.5 percent FNMA servicing, 4.6 percent FHLMC servicing and 1.2 percent private servicing. Aggregate detail on Carteret's PMSR portfolio as reported by HCS is presented in further detail below:

PMSR Portfolio Characteristics
$000s omitted

| | 6/30/92 | 3/31/92 | 12/31/91 | 9/30/91 | 6/30/91 |
|---|---|---|---|---|---|
| Principal Balance | 4,318,909 | 4,592,194 | 4,859,330 | 5,051,298 | 5,196,450 |
| Qtly Ptflo Run-off | 273,285 | 267,136 | 191,968 | 145,152 | 178,971 |
| Prin. Reduction as % | 5.95% | 5.50% | 3.80% | 2.79% | 3.33% |
| Average Balance | 52,455 | 53,009 | 53,546 | 53,978 | 54,243 |
| Delinquency Rate | 6.54% | 5.87% | 7.27% | 8.02% | 6.74% |
| Foreclosure Rate | 1.42% | 1.57% | 1.57% | 0.84% | 1.37% |
| Wtd Avg Coupon | 9.88% | 9.91% | 9.94% | 9.96% | 9.97% |
| Wtd Avg Servicing Fee | .445% | .444% | .445% | .444% | .444% |
| Prepayment Speed (1) | 210PSA | 223PSA | 225PSA | 183PSA | 168PSA |
| Fair Mkt. Value | 138bps | 147bps | 138bps | 152bps | 156bps |

(1) Forecasted

HCS performs its PMSR valuation utilizing a four scenario model: (1) $75 cost to service, 17 percent internal rate of return ("$75/17%"), (2) $50/15%, (3) $75/15%, and (4) $50/17%. The valuation as of June 30, 1992 yielded the following fair market value estimates:

Valuation Analysis
$000s omitted

| Fair Market Value @ | $75/17% | $50/17% | $75/15% | $50/15% |
|---|---|---|---|---|
| ($000's) | $47,866 | $57,473 | $50,956 | $61,403 |
| Basis Points | 111bps | 133bps | 118bps | 142bps |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0062

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR") (Continued)

The fair market value of 138 basis points or $59.4 million assigned by HCS is not adequately supported in its valuation. It appears that HCS's value represents the average of scenarios 2 and 4 above, thus discarding consideration to the $75 average cost to service portion of the analysis. The blended average of the four scenarios would result in a fair market value estimate of 126 basis points or $54.4 million. This adjustment alone would increase Carteret's PMSR regulatory capital deduction from $4.9 million to $10.0 million. HCS does not support why it eliminated the $75 cost of service component from its consideration of market value.

Prepayments have obviously accelerated in Carteret's PMSR portfolio due to lower interest rates as is evident in the portfolio run-off experienced in the last year. Carteret has not analyzed actual prepayment experience by pool in the past, but is now attempting to compile this data. Similarly, HCS's market value analysis does not consider Carteret's historical prepayment experience in the various segments of Carteret's PMSR portfolio in determining the appropriate prepayment assumption to use in its model. HCS uses prepayment assumptions based on a generic servicing portfolio. HCS's prepayment assumptions may or may not be acceptable, but without historical prepayment information, this is impossible to assess.

HCS also states in its valuation assumptions that PMSR purchasers normally pay the percentage value on loans not 90 days or greater delinquent, in foreclosure or bankruptcy. HCS applies the percentage value (i.e. 138 bps) to the entire outstanding principal for Carteret's valuation, thus generating value from the $130.9 million of Carteret's servicing portfolio which is past due 90 days or more or in foreclosure. Eliminating the aforementioned $130.9 million section of the PMSR portfolio would result on a further market value decline of $1.7 million from the $54.4 million value referenced above assuming a 126 basis point percentage value.

GNMA servicing makes up 84 percent of Carteret's entire PMSR portfolio. HCS's market value analysis indicates that the pre-tax internal rate of return utilized in valuing GNMA servicing would be between 19 and 21 percent. However, HCS's market value spreadsheet appears to utilize pre-tax internal rates of return of 15 and 17 percent for GNMA servicing. The use of the lower internal rates of return in discounting the GNMA servicing cash flows will artificially indicate higher market values. OTS was unable to quantify the impact of this component due to the lack of supporting data.

Lastly, HCS provided a range of value estimates from 111 basis points ($47.9 million to 142 basis points ($61.4 million), indicating that the most probable value was 138 basis points ($59.4 million). HCS did not explain its rationale for selecting a value that was at the highest end of the range.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0063

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR") (Continued)

Carteret is directed to request that HCS update its valuation to address the issues raised above. Any adjustments necessary for regulatory capital purposes must be recorded internally and in amended June 30, 1992 TFR filings. Furthermore, Carteret is directed to retain the services of an outside firm, acceptable to OTS, to perform a fair market value analysis of its PMSR portfolio for the period ended September 30, 1992. The valuation must specifically address the concerns outlined in OTS's letter to Carteret dated July 22, 1991 and the concerns detailed in the preceding paragraphs. A summary of the items contained in OTS's letter which must be addressed in the valuation, both qualitatively and quantitatively, is presented below:

(i) mortgage pools must be segregated by type and coupon for each fifty basis point coupon range,

(ii) prepayment assumptions must be expressed to the nearest hundredth percent for each segregated portfolio,

(iii) the valuation must give consideration to the potential market value impact of VA no-bid exposure,

(iv) the market value must be calculated using pre-tax cash flows discounted by pre-tax discount rates,

(v) the valuation should address items 1 through 10 presented in the July 22, 1991 letter from OTS relating to (a) servicing costs, (b) the treatment of delinquent loans and fees generated on delinquent loans, (c) the amortization of principal, and (d) discount rates.

Compliance with Capital Plan Projections

Carteret has remained in material compliance with all components of the Capital Plan approved by OTS on March 2, 1992. The cornerstone of the Plan is the successful attraction of $200 million in outside capital into Carteret. Management is confident that Carteret will achieve full regulatory capital compliance through the currently proposed recapitalization from investors headed by Kohlberg & Co. by December 31, 1992.

Capital Reporting Errors

OTS discovered several errors in Carteret's regulatory capital calculations. Revisions have been made to the March 31, 1992 and June 30, 1992 capital calculations and are reflected in the data disclosed in this report. The reporting errors were detected primarily in the risk weighting of certain assets and off-balance sheet items. The revisions, which have been discussed with management, increase Carteret's risk based capital requirement by $5 million above the requirement reported on TFR schedule CCR as of March 31, 1992.

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT

Scope

The scope consisted of an overview of interest rate risk (IRR) management and Carteret's IRR measurement model, assuming a $200 million capital infusion. Carteret's retail and wholesale funding sources were also reviewed, in addition to investment activity and liquidity management.

Based on a comprehensive review of the underlying assumptions of Carteret's MVPE model in the previous examination, and management's response to OTS criticisms by implementing corrective measures, a full analysis of the current assumptions was not performed and the assumptions used are presumed to be valid.

Interest Rate Risk Management

Management was required in the June 17, 1991 ROE to address the disparities between OTS' model and its internal model. Several items, including the impact of all off-balance sheet activity and the recognition that the market value of nonperforming assets (delinquent loans, REO) is impacted when interest rates change, were corrected by Carteret. OTS also required Carteret to address its apparent inability to meet board-established limits given its deficient capital position. Management responded that limits established by the board, as required by Thrift Bulletin 13, cannot be met without a capital infusion. Thus board limits remain set at levels which would indicate maximum exposure allowable whereby MVPE would not fall below Carteret's tangible capital requirement.

Market Value of Portfolio Equity (MVPE)
(000's Omitted)

1. OTS Model

| | 03/31/92 | | | 03/31/91 | | |
|---|---|---|---|---|---|---|
| BP Chg Rates | $ Chg MVPE | % Chg MVPE | MVPE | $ Chg MVPE | % Chg MVPE | MVPE |
| +200 | $-85,275 | -925 | $-76,056 | $-174,874 | -607 | -146,140 |
| +100 | -29,845 | -324 | -20,626 | -75,672 | -263 | -46,938 |
| 0 | 0 | 0 | 9,219 | 0 | 0 | 28,734 |
| -100 | 15,710 | 170 | 24,929 | 44,212 | 154 | 72,946 |
| -200 | 21,834 | 237 | 31,053 | 51,344 | -179 | 80,078 |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0065

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT (Continued)

2. Carteret Model (the ALBUM model)
   Using consolidated financial data.
   Based on anticipated $200 million capital infusion.

| BP Chg Rates | $ Chg MVPE | 03/31/92 % Chg MVPE | Board's TB-13 Limits | MVPE |
|---|---|---|---|---|
| +200 | $-75,826 | -44 | -34 | $97,475 |
| +100 | -36,060 | -21 | -17 | 137,241 |
| 0 | 0 | 0 | 0 | 173,301 |
| -100 | 27,231 | 16 | 17 | 200,532 |
| -200 | 38,785 | 22 | 34 | 212,086 |

The models indicate significantly different results due to the inclusion of the anticipated $200 million capital infusion in Carteret's model. With the capital infusion assumption, an instantaneous interest rate shock of plus 200 basis points would result in MVPE of $97.5 million as of that date, which indicates that Carteret would be able to maintain MVPE above its tangible capital requirement of $78.3 million as of March 31, 1992. Conversely, the lack of a capital infusion would result in a MVPE of -$76 million with a 200 basis points rise in interest rates as of March 31, 1992, as indicated in the OTS model.

The board-established MVPE limit is plus or minus 34 percent in an up or down 200 basis point scenario. This was derived by determining acceptable levels of decreases in MVPE while still remaining above Carteret's tangible capital requirement. Although the simulation indicates that even with the capital infusion Carteret would not meet the board established limits, management anticipates it would also restructure a significant portion of its rate sensitive liabilities to lengthen their repricing.

The major strategy would likely be to convert a large portion of the $1.7 billion (as of March 31, 1992) in variable rate FHLB Advances to fixed rate borrowings. A simulation performed as of December 31, 1991, assuming the capital infusion and the conversion of $650 million in FHLB advances to two and three year fixed rate borrowings, resulted in MVPE levels within all board-approved exposure levels: a minus 62 percent change in MVPE as compared to the board limit of minus 68 percent, at a maximum 400 basis point rise in interest rates. Under this scenario MVPE would be $87.6 million. The change in MVPE would be reduced to minus 28 percent at an up 200 basis point level.

Both models indicate Carteret's negative exposure to rising rates. After a capital infusion, however, the exposure to rising rates is somewhat lessened, as the increased capital level enhances Carteret's ability to fund assets with a lesser reliance on interest sensitive liabilities. Carteret will continue to be highly exposed to interest rate changes on the liability side of its balance sheet. The ability to improve Carteret's asset/liability mismatch and achieve a



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0066

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT (Continued)

Interest Rate Risk Management (Continued)

healthy net interest margin is largely based on its ability to successfully convert nonperforming assets to earning assets. Management does not anticipate significant fluctuations in net interest income due to interest rate risk; nevertheless Carteret will not be able to sustain core profitability until the level of earning assets achieves a healthy level in relation to costing liabilities. (See comment - Operating Results).

A comparison of the OTS base case MVPE from March 31, 1991 to March 31, 1992 demonstrates Carteret's inability to sustain sufficient market value equity even in a falling interest rate environment. An increase in the market value of assets when rates fell was offset by accelerated prepayments in mortgage loans and mortgage-backed securities. Carteret's low level of capital also contributes to the extreme sensitivity of MVPE.

Carteret remains significantly exposed to rising interest rates, and the previously mentioned unhedged position on the substantial level of FHLB advances repricing off LIBOR at three and six month intervals will be negatively impacted if short term interest rates rise. Until December 1991 Carteret had a portion of its risk hedged with short Eurodollar futures contracts, however an unhedged position is currently maintained based on management's perception that short term rates will continue to fall or remain flat through 1992.

Analysis of Asset/Liability Changes

Retail deposits declined from $3 billion at June 30, 1991 to $2.8 billion as of March 31, 1992. For the quarter ending March 31, 1992, the net outflow was $101.2 million, which was replaced with a $170 million increase in reverse repurchase agreements over the three month period.

Total assets decreased between examinations by 1.5 percent, to $5.3 billion as of March 31, 1992. The majority of the loan and investment porfolios declined in size over the review period, although investment in U.S. Treasuries (predominantly five year Notes) increased from $59.7 million as of June 30, 1991 to $264.7 million as of March 31, 1992. The increase can be partially attributed to Carteret's need to increase its liquidity level as required by OTS.

Investment Activity

Management stated that excess cash has been invested in Treasuries (maintained in the "Held for Sale" portfolio) in preference over Federal Funds Sold to achieve a higher return without increased credit risk. A review of purchase and sale activity indicates that Carteret recognized $643 thousand in gains on the sale of Treasuries during the nine months ending March 31, 1992, $542 thousand of which was realized in a single transaction involving the sale of $70 million in five year Treasuries in September 1991.

RISK MANAGEMENT (Continued)

Investment Activity (Continued)

The predominant activity in sale of investment securities resulted from the sale of purchased and originated mortgage backed securities (MBS) from Carteret's "Held for Sale" portfolio. For the nine months ending March 31, 1992, the net gain on the sale of purchased MBS was $1.1 million, while the net gain on the sale of originated MBS was $2.1 million. As of March 31, 1992 Carteret reported $123.6 million total MBS in its "Held for Sale" portfolio.

In addition, Carteret realized a gain of $1.1 million on the sale of four Z-bond securities in its "Held for Investment" portfolio, resulting from management's decision to eliminate the entire high-risk mortgage derivative security portfolio. In addition to $176 million notional principal amount in swap positions (off-balance sheet), Carteret has three CMO Residuals with a book value of $11.1 million as of March 31, 1992.

The March 31, 1992 market value of the CMO Residuals was $7.8 million, resulting in an unrealized loss of $3.3 million. Although the securities continue to be accounted for in the "Held for Investment" portfolio, management should examine the need to increase the amortization speed of these securities, as a substantial portion of the indicated loss is likely to be permanent, given the extremely high level of mortgage prepayments recently experienced, coupled with continued falling interest rates.

Liquidity Management

As part of the Supervisory Agreement executed on April 29, 1991, Carteret was required to maintain sufficient liquid assets and unpledged assets available for borrowings at a level of at least ten percent of the previous month's liquidity base. Additionally, as part of the Capital Directive executed on October 7, 1991, Carteret was required to submit a liquidity contingency plan that would raise the level of available liquidity to 15 percent if its Capital Plan was denied by the OTS. Since the Capital Plan was approved on March 2, 1992, Carteret now must abide by the 10 percent requirement.

Carteret has reported consistent compliance with its minimum regulatory liquidity requirements throughout the current review period. As of July 1, 1992, Carteret had liquid assets equal to approximately 22.7 percent of its liquidity base and was projecting to have an average liquidity ratio of 24.8 percent for the month of July. This ratio is projected to decrease given the need to fund IPF receivables, estimated at $65 million per month for the months of July, August and September, and the continued outflow of deposits, estimated at $122 million for the same three months. This outflow is due primarily to the historically low short term interest rates prevailing in the market. Carteret projects that it will continue to meet the required liquidity ratio by a comfortable margin. Uninsured deposits were estimated at $42 million as of June 30, 1992.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0068

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT (Continued)

Liquidity Management (Continued)

Carteret produces comprehensive internal cash flow projection reports on a weekly, monthly and quarterly basis, in addition to submitting weekly and monthly liquidity updates to the OTS. The liquidity reporting systems utilized by Carteret are considered satisfactory.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0069

Date: 06/15/92

Docket No.: 04702

OPERATING RESULTS

Scope

The Operating Results review encompassed a detailed analysis of CSB's earnings performance for the quarter ended March 1992, and the years ended December 31, 1991 and 1990. Special emphasis was placed on the savings bank's ability to generate core profits. In addition, a review of budgets and other internal reports prepared by management for the board was performed, and a limited test check was performed to assess the accuracy of schedules SC and SO of the bank's Thrift Financial Reports.

Comparative Operating Results
(000's Omitted)

| | 03/31/92 | Percent to Avg (1) Assets | 12/31/91 | Percent to Avg Assets | 12/31/90 | Percent to Avg Assets |
|---|---|---|---|---|---|---|
| Net Interest Income | $18,833 | 1.4 | $ 68,230 | 1.3 | $ 87,966 | 1.5 |
| Less: Prov for Loss | 2,575 | 0.2 | 170,767 | 3.2 | 124,983 | 2.1 |
| Net Int Marg after Prov | $16,258 | 1.2 | -102,537 | -1.9 | -37,017 | -0.6 |
| Plus: Noninterest Inc | 7,666 | 0.6 | 41,371 | 0.8 | 32,722 | 0.6 |
| Less: Operating Exp | 22,147 | 1.7 | 115,033 | 2.1 | 155,112 | 2.6 |
| Net Operating Income | 1,777 | 0.1 | -176,199 | -3.2 | -159,407 | -2.6 |
| Plus: Net Nonoper Inc | 458 | 0.0 | 13,922 | 0.2 | 21,254 | 0.3 |
| Net Income before Taxes | 2,235 | 0.1 | -162,277 | -3.0 | -138,153 | -2.3 |
| Less: Taxes | -556 | -0.1 | -2,026 | -0.0 | -6,310 | -0.1 |
| Net Income | 2,791 | 0.2 | -160,251 | -3.0 | -131,843 | -2.2 |

(1) Annualized

Conclusion

CSB's poor asset quality continues to hinder its ability to generate strong core earnings. This condition has persisted for the past two examinations and includes both problem commercial and residential real estate assets. Annualized net interest income for the quarter ended March 1992, as compared to the year ended 1991 has improved modestly. This is attributable to a favorable interest rate environment and progress in reducing non-performing loans. Positive net income for the quarter is attributable to the improved net interest position, combined with a decline in operating expense. However, this level of net income is insufficient to raise capital levels to regulatory requirements within a reasonable time period. Therefore, in order for the savings bank to remain a viable institution, a significant capital infusion is needed.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0070

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Net Income

As noted above, net income for the quarter ended March 1992 has improved over the prior year's results. The primary cause for the improvement in net income as contrasted with previous periods is attributable to a significant reduction in provision for loan loss. In addition, CSB experienced a marginal improvement in net interest income over 1991, and a decline in non-interest expense.

Subsequent to this review, the bank reported preliminary net income of $3.0 million for the quarter ended June 1992. As noted in the Asset Quality section of this report, an additional provision for loan loss of $8 million is required. The effect of the additional loss provisions will more than likely lead to a net loss for the six month period ended December 1992.

Net Interest Margin

Net interest margin (NIM) before provision for loan loss continues to be weak due to the CSB's large percentage of non-performing and non-interest earning assets. The following table depicts the severity of the level of these assets:

Summary of Non-Performing
and Non-Interest Earning Assets
(000's Omitted)

| | 03/31/92 | Percent to total Assets | 12/31/91 | Percent to total Assets | 12/31/90 | Percent to total Assets |
|---|---|---|---|---|---|---|
| Nonaccrual loans | $126,171 | 2.4 | $139,439 | 2.7 | $117,875 | 2.1 |
| Real Estate Owned (1) | 183,315 | 3.5 | 186,687 | 3.6 | 157,809 | 2.8 |
| Investment in Subs (2) | 210,071 | 4.0 | 196,327 | 3.8 | 102,359 | 1.8 |
| Goodwill/intangibles | 93,097 | 1.8 | 94,907 | 1.8 | 102,581 | 1.8 |
| Other Assets | 128,049 | 2.4 | 114,282 | 2.2 | 176,504 | 3.3 |
| Cash & Non-int Deps | 102,838 | 2.0 | 85,839 | 1.6 | 54,457 | 1.0 |
| Total non-interest earning assets | $843,541 | 16.1 | $817,481 | 15.7 | $711,585 | 12.8 |

(1) Net of valuation allowances.
(2) Includes REO held by subsidiaries of $137.7 million, $126.6 million and $0, respectively.

As noted above, non-performing and non-interest earning assets remain at high levels. Management has been successful in disposing of a substantial portion of commercial REO since the previous examination dated June 17, 1991. However, residential REO (including in-substance foreclosures) has significantly increased from $11.8 million as of June 30, 1991, to $135.6 million as of March 1992.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0071

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Net Interest Margin (Continued)

The ability to continue to convert REO and other non-interest earning assets into interest earning assets within a reasonable time period will have a material impact on the NIM going forward.

The severity of the association's asset quality problems is more evident when noting that over the past 15 months, CSB has been operating in a favorable interest rate environment. NIM (before provision for loan loss) for the annualized quarter ended March 1992 revealed only a marginal improvement over 1991, and remains below the performance of 1990. As long as short-term rates remain favorable and asset quality does not deteriorate further, NIM should remain stable. However, a sudden upward movement in short term interest rates could erode NIM below its current level.

As of March 1992 the ratio of interest bearing assets to interest bearing liabilities was 84.0 percent. The average yield on interest earning assets for the quarter ended March 1992 was 8.4 percent, as compared to 9.2 percent for the year ended 1991.

CSB reported interest expense of $71.6 million ($286.3 million annualized) for the three month period ended March 31, 1992. This compares to $356.4 million for the year ended December 1991. The reduction of interest expense is primarily the result of a decline in the bank's cost of funds due to falling short term rates. The average cost of deposits as of March 1992 was 5.6 percent as compared to 7.3 percent one year ago, while the average cost of FHLB advances was 5.5 percent compared to 7.8 percent. Overall CSB's average cost of funds rate was 5.6 percent.

The cost of funds includes costs related to hedging activities. For the period ended March 1992, the bank amortized $424 thousand in net deferred losses on liability hedges, and recorded a net loss of $2.0 million on matched interest rate swaps. In December 1991 CSB disposed of two floating rate swap positions, which resulted in a net deferred gain of $4.9 million. This gain is currently being amortized into income at $215 thousand per month, over a 23 month period.

Provision for Loan Loss

As noted earlier, the additional provision for loan loss requirement of $8 million will result in a net loss for the six month period ended December 1992. Although loan loss provisions for the current year are not expected to be at 1990 and 1991 levels, the impact of continued provisions could materially affect future net income.

As of June 1992, actual provisions were $10.0 million versus budgeted projections of $6 million. Budgeted provisions for loan loss for the last six months of the year ended 1992 are $6.0 million.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0072

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Non-Interest Income

Non-interest income primarily consists of mortgage servicing fees, other charges and net gains associated with the securitization and sale of mortgage loans. During the quarter ended March 1992, CSB reported income of $6.5 million from mortgage banking activities. The March 1992 quarter's annualized income from mortgage banking activities of $26.0 million is below 1991 results of $39.9 million. The cause for the decline is attributable to a reduction in profits from the sale of securities and loans in Carteret's mortgage banking activities.

Non-interest income also includes a net loss of $1.2 million ($4.8 million annualized) from REO operations for the quarter ended March 1992. The net loss is primarily attributed to the payment of real estate taxes and maintenance. For the year ended 1991 the bank expensed $4.9 million in REO related costs. The cost of maintaining REO assets will be a continuing burden on operating results.

Non-Interest Expense

Non-interest expense for the annualized March 1992 quarter has declined 23 percent as compared to 1991. The improvement is primarily attributable to a reduction in personnel and office expenses. Goodwill and other intangibles are amortized at $7.2 million annually.

Presently the bank operates from two partially vacant facilities in Morristown, New Jersey and Parsippany, New Jersey. Due to the decline in staff, either location could accommodate the combined operations. The costs related to operating from both locations will continue to negatively impact net income. Management is attempting to sell the Morristown office and currently plans to combine the staffs at the Parsippany facility.

Actual vs. Budgeted Operating Results

OTS reviewed Carteret's consolidated actual operating results for the year to date May 31, 1992 and assessed the reasonableness of the budgeted operating results for the period beginning June 1, 1992 through December 31, 1992. Carteret experienced a net operating profit for each of the first five months of 1992. The following chart highlights Carteret's actual performance in comparison to budget projections, including the favorable or unfavorable variance from budget ($000's):



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0073

Date: 06/15/92

Docket No.: 04702

OPERATING RESULTS (Continued)

Actual vs. Budgeted Operating Results (Continued)

For the five month period ending May 31, 1992

| | Actual | Budget | Fav/(Unfav) Variance |
|---|---|---|---|
| Interest Income | $ 157,135 | $ 159,886 | ($2,751) |
| Interest Expense | -114,205 | -115,562 | 1,357 |
| Net Interest Margin (NIM) | $ 42,930 | $ 44,324 | ($1,394) |
| Less: Provision for Loan Losses | - 6,788 | - 5,000 | ( 1,788) |
| NIM after Provision | $ 36,142 | $ 39,324 | ($3,182) |
| Non-Interest Income | + 15,384 | +14,856 | 528 |
| Non-Interest Expenses | - 46,823 | -48,401 | 1,578 |
| Income before Taxes | $ 4,703 | $ 5,779 | ($1,076) |

Declining interest rates and an increasing level of liquidity caused Carteret to fall short of its interest income projections. The lost interest income was partially offset by the reduced liability costs associated with Carteret's LIBOR based FHLB advances and deposit accounts. Carteret also recorded $1.8 million in valuation allowances above the $5 million that was budgeted for the period. Management deemed the valuation allowances necessary against an increase in residential mortgage loans transferred to ISF and the Western Federal multi-family mortgage portfolio. Carteret exceeded its budgeted projections for non-interest income and expenses through a cash settlement (Restitution) with former employees, gain on the sale of IPF loans and greater than planned expense reductions relating to advertising and marketing.

Management stated that it made up the net negative budget variance in the month of June with earnings of $1.5 million after additional provision for loan losses of $2.8 million. Strong earnings at IPF drove earnings above June's projections.

Assessment of Projections for the Second Half of 1992

Carteret projects net income of $8 million for the remaining six months of 1992. Management has not substantially altered its budgeted operating expenses and has consistently met or exceeded its expense reduction projections. Additional provisions for loan losses recommended in this examination will cause Carteret to exceed the level of reserves originally projected for 1992, reducing projected net income.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0074

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Assessment of Projections for the Second Half of 1992 (Continued)

Interest earnings will also not meet budgeted projections due to Carteret's increased holdings in lower yielding liquid assets. Management has stated that the higher liquidity level will most likely decrease third quarter earning estimates by more than $1 million. Carteret will gradually reduce its liquidity position and increase net yield as it begins to fund IPF receivables. (See Comment - Risk Management.)

Interest expense has remained below budget projections as a result of the continued decline in interest rates. Carteret was not hedging its $1.9 billion in FHLB advances as of June 30, 1992. A marked increase in short term interest rates would have a significant adverse impact on the cost of Carteret's advances. Management has stated that it is ready to put on a hedge if the market appears to being moving against the institution. OTS does not consider Carteret's strategy prudent considering the minimal amount of interest rate risk that the institution can afford to take.

In summary, it appears that Carteret will be unable to meet its original budget projections for the second half of 1992 due to the need for additional valuation allowances and lower interest earnings resulting from the higher than anticipated level of liquid assets. Management is currently considering alternative strategies to increase earnings to the level originally projected. Overall, management has been able to operate Carteret within a reasonable range of its budget projections. Carteret's budget projections for the second half appear to be reasonable and attainable, with the exception of the items discussed above.

Financial Reporting

A review of mortgage banking activity disclosed that net profits related to the sale of mortgage loans were erroneously reported as non-operating income for the periods ended March 1992 and December 1991. The net profits, which amounted to $1.3 million and $6.8 million, respectively, were subsequently moved from net non-operating income to net non-interest income. The adjustments are reflected in the Comparative Operating Results above and in the Appendix pages A - 6.1 to A - 7.1.

Date: >06/15/92 Docket: 04702

COMPARATIVE STATEMENTS OF OPERATIONS (12)

| (In Thousands) | Period Ended 31-MAR-1992 | Year Ended 31-DEC-1991 | Year Ended 31-DEC-1990 |
|---|---|---|---|
| Net Provision For Losses on Noninterest-Bearing Assets.......... | 0 | 350 | 0 |
| TOTAL NONINTEREST EXPENSE (9)....... | 22,147 | 115,033 | 155,112 |
| Income (Loss) Before Gain (Loss) on Sale of Assets.................. | 1,777 | -176,199 | -159,407 |
| Gain/Loss On Sale of Assets (6) | | | |
| Gain on Sale of Assets.............. | 714 | 15,900 | 50,527 |
| Loss on Sale of Assets.............. | 256 | 1,978 | 29,273 |
| NET GAIN/LOSS ON SALE OF ASSETS..... | 458 | 13,922 | 21,254 |
| Net Income Before Taxes and Adjustments to Net Income.......... | 2,235 | -162,277 | -138,153 |
| Income Taxes....................... | -556 | -2,026 | -6,310 |
| Income (Loss) Before Extraordinary Items and Effects of Accounting Changes.......................... | 2,791 | -160,251 | -131,843 |
| NET INCOME (LOSS).................. | 2,791 | -160,251 | -131,843 |
| Net Change in Stock Issued/Retained: | | | |
| Perpetual Preferred Stock.......... | 0 | 0 | 0 |
| Common Stock...................... | 0 | 0 | 0 |
| Common Stock - Other Adjustments... | 0 | 12,500 | 30,000 |
| Less Cash Dividends on: | | | |
| Perpetual Preferred Stock....... | 0 | 0 | 0 |
| Common Stock................... | 0 | 0 | 0 |
| Net Change in Unrealized Losses on Marketable Equity Securities....... | 0 | 0 | 0 |
| Other Adj. To Retained Earnings..... | 0 | 0 | -9,508 |
| NET CHANGE IN EQUITY CAPITAL........ | 2,791 | -147,751 | -111,351 |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0088

Date: >06/15/92 Docket: 04702

SUMMARY OF KEY OPERATING RATIOS AND TRENDS ( ) (2) (12)

| (In Thousands) | Period Ended 31-MAR-1992 | | Year Ended 31-DEC-1991 | | Year Ended 31-DEC-1990 | |
|---|---|---|---|---|---|---|
| | INST. | PEER GROUP | INST. | PEER GROUP | INST. | PEER GROUP |
| Asset Growth *............. | 5.2 | NA | -6.7 | -10.8 | -8.4 | -7.5 |
| Liability Growth *......... | 5.1 | NA | -4.2 | -11.4 | -7.1 | -7.2 |
| Net Income / Average Assets *......... | 0.2 | NA | -3.0 | -0.1 | -2.2 | -0.9 |
| Net Income / Gross Income ........... | 2.8 | NA | -33.2 | -1.4 | -21.7 | -8.9 |
| Gross Income / Average Assets *......... | 7.6 | NA | 9.0 | 9.5 | 10.3 | 9.6 |
| Gross Operating Income / Average Assets *......... | 7.5 | NA | 8.6 | 9.2 | 9.4 | 9.3 |
| Net Operating Income / Gross Operating Income .. | 1.8 | NA | -37.8 | -0.4 | -28.6 | -9.8 |
| Net Interest Income (unhedged) / Average Assets * (7)..... | 1.3 | NA | -1.9 | 1.4 | -0.6 | 0.7 |
| Net Int. Income After Provision for Losses on Int.-Bearing Assets / Avg. Assets *..... | 1.2 | NA | -1.9 | 1.3 | -0.6 | 0.7 |
| Total Interest Expense / Gross Operating Income (8) | 73.0 | NA | 76.5 | 70.4 | 78.4 | 80.4 |
| Total Interest Expense / Average Deposits and Borrowed Money * (8)... | 5.6 | NA | 6.8 | 6.9 | 7.8 | 7.9 |
| Interest-Earning Assets / Interest-Bearing Liabilities | 84.0 | NA | 84.6 | 92.1 | 89.9 | 90.5 |
| Noninterest Expense / Average Assets * (9)..... | 1.7 | NA | 2.1 | 2.1 | 2.6 | 2.0 |
| Noninterest Expenses / Gross Operating Income (9)...... | 22.6 | NA | 24.7 | 22.8 | 27.8 | 21.8 |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0089

# CARTERET FEDERAL SAVINGS BANK

# *Conservatorship Strategic Plan*

**Carteret Federal Savings Bank / Morristown, NJ 07960**

**FIN #8602 / Date of Conservatorship 12/04/92**

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0103999

# Carteret Federal Savings Bank
## Conservatorship Strategic Plan
## Table of Contents


| | | Page |
|---|---|---|
| I. | Description | |
| | A. Overview | 1 |
| | B. Retail Banking and Deposit Information | 3 |
| | C. Cash and Securities | 5 |
| | D. Loans Receivable | 6 |
| | E. Investment in Real Estate | 9 |
| | F. Loan Servicing Portfolio | 10 |
| | G. Other Interest-Bearing Liabilities | 11 |
| | H. Other Assets and Other Liabilities | 13 |
| | I. Subsidiaries | 17 |
| | J. Litigation | 20 |
| | K. Organization | 20 |
| | L. Information Systems and Computer Resources | 20 |
| | M. Other Support Functions | 24 |
| II. | Evaluation | |
| | A. Problems of the Institution | 26 |
| | B. Retail Branch Network | 26 |
| | C. Liquidity | 27 |
| | D. Asset Quality | 27 |
| | E. Loan Servicing Portfolio | 31 |
| | F. Occupancy Issues | 32 |
| | G. Candidacy for Combination with Another Institution | 33 |
| | H. Subsidiaries | 33 |
| | I. Pending Litigation Evaluation | 33 |
| | J. Management Levels and Salary Justification | 34 |
| | K. Quality and Cost Efficiency of Backroom Operations | 34 |
| | L. Indications of Fraud | 34 |
| III. | Recommendations | 35 |
| IV. | Operational Issues | |
| | A. Retail Banking | 36 |
| | B. Managed Downsizing | 36 |
| | C. Funding Strategy | 36 |
| | D. Loan Workout | 36 |
| | E. Sale or Discontinuation of Subsidiary Operations | 37 |
| | F. Loan Servicing | 37 |
| | G. Repudiation of Lease Obligations | 37 |
| | H. Discontinuance of Residential Lending | 38 |
| | I. Controller's Division Staffing | 38 |
| | J. Accuracy of Books and Records | 38 |
| | K. Marketing at Resolution | 38 |
| V. | Integrated Marketing Plan | 39 |
| VI. | Operating Plan Budget | 41 |


CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104000

**Carteret Federal Savings Bank**
**Conservatorship Strategic Plan**
**List of Exhibits**

I. Thrift Financial Report (11/30/92)

II. Thrift Financial Report (9/30/92)

III. Deposit Information

- Deposits by County and State
- Retail Certificate Maturity by Term
- Retail Certificate by Interest Rate

IV. Retail Branch Information

- Branch Locations
- Branch Cost Analysis
- Branch Fact Sheets

V. Information Systems

VI. Facilities

VII. Loan Servicing Information

VIII. Organization Charts

IX. Employee Compensation

X. Litigation Listing

XI. Flowchart of Corporate Structure

XII. Subsidiary Listing

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104001

## Part I. Description

### A. Overview

*Intervention*

On December 4, 1992, Date of Conservatorship, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the Office of Thrift Supervision (OTS) placed Carteret Savings Bank, FA (CSB) into receivership and chartered a new federal mutual association, Carteret Federal Savings Bank (CFSB). OTS appointed the Resolution Trust Corporation (RTC) as Receiver of the old institution and as Conservator of the new institution.

References to CSB or the Bank contained in this section refer to Carteret Savings Bank, FA prior to December 5, 1992 and to Carteret Federal Savings Bank thereafter.

*Background*

CSB was incorporated in September 1939 as Carteret Building and Loan Association of Newark, New Jersey, a state-chartered thrift. CSB converted to a federally chartered mutual association – Carteret Savings and Loan Association – in 1982 and to a federally chartered stock association in 1983. In 1986, the institution changed its name to Carteret Savings Bank, FA.

In 1987, CSB created a holding company, Carteret Bancorp Inc., for the purpose of expanding its business activities. A year later, The Home Group, Inc., which subsequently changed its name to AmBase Corp., acquired Carteret Bancorp, and thus, CSB, for $266 million. AmBase shareholders retain no interest in CFSB.

CSB is one of the largest New Jersey thrifts insured by the FDIC through the Savings Association Insurance Fund. CSB is a member of both the Federal Home Loan Bank of New York (FHLB) and the Federal Reserve Bank of New York. CSB has 39 active subsidiaries of which the largest operating subsidiary is Imperial Premium Finance, Inc. (IPF), a California based company specializing in financing premiums for commercial lines of insurance. Other subsidiaries are primarily engaged in real estate development, property management and retail financial services. Refer to *Section I. Subsidiaries* for a brief description of the subsidiaries and to *Exhibit XI. - Flowchart of Corporate Structure* and *Exhibit XII. - Subsidiary Listing*. At the date of conservatorship, CSB and its subsidiaries employed approximately 1,100 people. The core businesses of CSB were retail banking and mortgage banking.

CFSB conducts business from 41 retail banking offices primarily located in New Jersey and Florida. CFSB is currently engaged in the business of maintaining savings, time and demand deposits. In 1990 CSB implemented a program to restructure its retail branch network. As part of this program, several less efficient branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. Certain of the branches sold had been acquired by CSB. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB was extensively involved in mortgage banking activities including the origination, servicing, securitization and sales of one-to-four family residential mortgage loans. At December 4, 1992 residential mortgage loans receivable, net were $1.563 billion. CSB was servicing $7.3 billion of loans, which included $6.2 billion of loans serviced for others. Effective December 14, 1992 the RTC decided to discontinue residential loan origination activities. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

CSB also offered consumer loans and other financial products which were intended to broaden its source of income, reduce its exposure to interest rate fluctuations and position CSB to compete more effectively in the retail financial services industry. All consumer lending has ceased with CFSB processing approved applications as of December 4, 1992. In addition, shortly after the date of conservatorship the offering of other financial services has been discontinued.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104002

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0055

CSB ceased all new corporate and commercial real estate loan originations pursuant to a policy established in the second half of 1989. This policy was established in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions have been experienced since 1989. At December 4, 1992, the corporate and commercial real estate loans receivable totalled $365.0 million ($311.9 million net of reserves). The corporate and commercial real estate owned and in-substance foreclosed loans were $100.4 million and $118.6 million, respectively.

At December 4, 1992, CSB remained out of compliance with minimum regulatory capital requirements promulgated by the OTS pursuant to FIRREA. CSB consented to the issuance of a Capital Directive by the OTS on October 8, 1991. In accordance with the Capital Directive, on September 30, 1991 CSB submitted a capital plan to the OTS with subsequent updates to the capital plan being filed during continuing discussions. On March 2, 1992, the OTS approved the capital plan which required the infusion of sufficient equity capital through a private placement to achieve a fully phased-in regulatory capital position. CSB and the OTS entered into an agreement, dated February 27, 1992 which provided, among other things, that, upon the earlier of (i) May 27, 1992 or (ii) the date on which the Regional Director of the OTS concludes acceptable progress is not being made and the recapitalization program is unlikely to be successful, CSB would be included in the Accelerated Resolution Program (ARP) of the government. CSB received several extensions of the original May 27, 1992 date. Due to lack of RTC funding for ARP, CSB was unable to be included in that program. After nine months, CSB was unsuccessful in its efforts to raise the required additional equity capital.

Total nonperforming assets decreased from $484.9 million at December 31, 1991 to $416.9 million at December 31, 1992. Nonperforming assets include nonaccrual loans, loans 90 or more days past due and still accruing, REO and in-substance foreclosed loans. Restructured loans increased from $64.0 million at December 31, 1991 to $103.1 million at December 31, 1992. As discussed further in *Part II. Evaluation - Section D. Asset Quality*, a majority of CFSB's residential and commercial real estate loans are secured by properties located in the states of New Jersey, Florida and California which have experienced a significant downturn in demand for such properties. CFSB regularly analyzes and closely monitors each portfolio. Potential problem loans are classified if uncertainty exists as to future collectibility.

At December 4, 1992, CSB had total assets of $4.770 billion. Mortgage-backed securities (MBS) and investments, net were $1.233 billion. Total deposits were $2.535 billion and FHLB advances and other borrowings totaled $1.968 billion.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104003

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0056

**B. Retail Banking and Deposit Information**

As of December 31, 1992, the Bank had retail deposits of $2.391 billion. CFSB maintains 41 full-service retail ba..ki.. offices in New Jersey, Florida and the District of Columbia. Based upon its total deposits of $2.934 billion at ye 1991, Carteret was the fiftieth largest thrift in the United States.

CFSB offers a full range of retail deposit products including passbook and statement savings accounts, regular and interest-bearing checking accounts, money market accounts and certificates of deposit. Included among these programs are individual retirement accounts and Keogh accounts. Interest on products currently offered is established by CFSB as market conditions warrant. At year-end 1992, the Bank had approximately 66,000 savings accounts, 56,000 checking accounts and 133,000 certificate of deposit accounts.

Deposits at December 31, 1992 are comprised of the following:

| *(in thousands)* | Deposits | Average Cost of Funds |
|---|---|---|
| Regular savings | $114,350 | 3.24% |
| Money market savings | 316,611 | 3.27 |
| Total savings | 430,961 | 3.26 |
| 91 day certificate | 39,248 | 3.28 |
| 182 day certificate | 409,859 | 3.63 |
| 9 month certificate | 17,192 | 3.59 |
| 12 - 23 month certificate | 602,943 | 4.38 |
| 24 - 35 month certificate | 234,822 | 5.93 |
| 36 - 47 month certificate | 73,509 | 7.11 |
| 48 - 59 month certificate | 23,363 | 6.96 |
| 5 - 10 year certificate | 203,324 | 8.06 |
| Total certificates | 1,604,260 | 5.01 |
| Interest checking | 151,764 | 2.41 |
| Non-interest checking | 13,286 | |
| Money market demand | 184,226 | 3.24 |
| Commercial checking | 74 | |
| Total demand accounts | 349,350 | 2.76 |
| Total retail deposits | 2,384,571 | 4.36 |
| Negotiable rate certificates | 4,856 | 3.05 |
| As agent deposits | | |
| Accrued interest | 1,190 | |
| Total deposits | $2,390,617 | 4.36% |

Refer to *Exhibit III. - Deposit Information* for additional detail on deposits.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104004

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0057

In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.

CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.

Since the late 1980's, CSB has pursued a retail office network optimization strategy which has resulted in the sale or consolidation of those offices which were poor performers or which were geographically unacceptable. As part of this program, several branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB currently has 31 offices in New Jersey, 9 offices in Florida and one office in the District of Columbia. The New Jersey offices are located in the northern half of the State. In Florida, CSB offices are generally clustered in the south Florida and Tampa/Clearwater regions. CSB also affords its customers electronic access to certain accounts through its participation in various regional and national EFT networks. Refer to *Exhibit IV. - Retail Branch Information* for additional details on individual retail branches.

Prior to the date of conservatorship, CSB also originated residential mortgage loans and consumer loans through its retail office network. A variety of residential mortgage loans were offered to meet the needs of those who were purchasing a home or refinancing. Consumer lending efforts primarily focused on adjustable rate home equity lines of credit, overdraft lines of credit, fixed-rate home equity, auto loans and student loans. These loans are no longer offered, although existing lines of credit may still be accessed.

As of December 31, 1992, CSB had approximately $213 million of uninsured deposits. This figure was determined through a computer analysis of taxpayer identification numbers and combination of account data.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104005

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0058

**C. Cash and Securities**

CFSB's portfolios at December 31, 1992 are detailed in this section.

*Cash and cash equivalents*

Cash and cash equivalents at December 31, 1992 is comprised of the following:

| *(in thousands)* | |
|---|---|
| Overnight Federal funds | $1,244,147 |
| Non-interest and interest bearing cash | 162,078 |
| | $1,406,225 |

*Investments*

The investment portfolio at December 31, 1992 consists of the following:

| *(in thousands)* | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| U.S. Government obligations | $0 | $500 | $500 |
| Corporate bonds | | 250 | 250 |
| Collateralized mortgage obligations | | 22,840 | 22,840 |
| Partnership investment | | 2,721 | 2,721 |
| Preferred stock | | 128 | 128 |
| Investments, book value | $0 | $26,439 | $26,439 |
| Investments, market value | $0 | $26,291 | $26,291 |

*Federal Home Loan Bank Stock*

The stock of the FHLB is carried at a cost of $44,265,000 at December 31, 1992. CSB is required to own and in fact does own capital stock in the FHLB in an amount determined generally by its outstanding home mortgage loans and advances from the FHLB. For the year ended December 31, 1992 the FHLB stock yielded 8.37%.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104006

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0059

*Mortgage-backed Securities*

MBS, net are summarized as follows:

| | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| Governmental National Mortgage Association ("GNMA") | $ 81,292 | $96,038 | $177,330 |
| Federal National Mortgage Association ("FNMA") | 63,811 | 11,663 | 75,474 |
| Federal Home Loan Mortgage Corporation ("FHLMC") | 744 | 40,870 | 41,614 |
| Pass-through securities | 3,636 | 636,269 | 639,905 |
| Other mortgage-backed securities (1) | | 9,926 | 9,926 |
| Mortgage-backed securities, book value | $149,483 | $794,766 | $944,249 |
| Mortgage-backed securities, market value | $150,119 | $806,279 | $956,398 |

(1) Other mortgage-backed securities consist of residual securities.

At December 31, 1992 CFSB had assets pledged to FHLB advances with a book value of $2.479 billion and to Medium Term Notes (MTN's) with a book value of $111.6 million. These pledged assets included Federal funds, mortgage-backed securities, whole loan participations and whole loans. On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's in October 1993.

**D. Loans Receivable**

Loans receivable, net, at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Gross loans: | |
| Residential first mortgage loans | $1,810,000 |
| Commercial real estate loans | 244,058 |
| Total first mortgage loans | 2,054,058 |
| Corporate loans | 108,112 |
| Consumer loans | 100,430 |
| Premium finance loans | 383,550 |
| Total other loans | 592,092 |
| Total loans receivable, gross | 2,646,150 |
| Loan participations sold | (228,115) |
| Loans in process | |
| Unearned discounts and deferred loan fees | (9,365) |
| Allowance for losses on loans | (59,597) |
| Total loans receivable, net | $2,349,073 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104007

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0060

Loans receivable, net, at December 31, 1992 by type are as follows:

| *(in thousands)* | |
|---|---|
| Residential first mortgage loans | $1,578,679 |
| Commercial real estate loans | 215,726 |
| Total first mortgage loans | 1,794,405 |
| Corporate loans | 75,190 |
| Consumer loans | 98,248 |
| Premium finance loans | 381,230 |
| Total other loans | 554,668 |
| Total loans receivable, net | $2,349,073 |

The following discussion provides further information on the various loan portfolios.

*Residential First Mortgage Loans*

CSB was extensively involved in mortgage banking activities including the origination, securitization, sale and servicing of one-to-four family residential mortgage loans. CSB originated first mortgage loans through retail and wholesale mortgage production offices. Wholesale loans were originated by third parties and were primarily closed in the name of CSB or assigned to CSB subsequent to closing. The originated loans have traditionally been retained in CSB's portfolio or sold in the national secondary market on either a servicing-released or servicing-retained basis. It had been CSB's policy to originate fixed rate product for sale and adjustable rate product for portfolio. As of December 14, 1992, all new mortgage loan origination ceased. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

Throughout 1990, 1991 and 1992 CSB, continued to refine its composition of mortgage production offices. This was achieved through the closing of unprofitable offices and the consolidation of offices located in the same territories. At December 4, 1992 CSB had six mortgage production offices located in New Jersey and Florida.

CSB's portfolio of residential first mortgage loans at December 31, 1992 are geographically concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| In-house portfolio | $597,099 | $352,645 | $143,423 | $1,093,167 |
| Loans serviced by others portfolio | 86,020 | 150,535 | 480,278 (1) | 716,833 |
| | $683,119 | $503,180 | $623,701 | $1,810,000 |

(1) Loans serviced by others are primarily located in states other than New Jersey and Florida in an effort to diversify CSB's significant geographical concentration. A significant portion of these loans are located in California.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104008

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0061

*Commercial Real Estate and Corporate Loans*

As previously mentioned, pursuant to a policy established in the second half of 1989, CSB ceased all new corporate and commercial real estate loan originations. This policy was in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions were experienced resulting from the economic downturn and deterioration of the real estate markets served, particularly in commercial real estate.

The commercial real estate and corporate loan portfolios, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $ 7,816 | $ 6,051 | $ 10,990 | $ 24,857 |
| Apartments | 6,415 | 10,709 | 25,388 | 42,512 |
| Hotel | 15,834 | 32,992 | 24,283 | 73,109 |
| Retail | 9,489 | 9,221 | | 18,710 |
| Corporate loans | 17,082 | | 27,989 (1) | 45,071 |
| Warehouse | 8,173 | | 4,740 | 12,913 |
| Single family | 7,598 | 1,424 | 1,594 | 10,616 |
| Nursing homes | 13,146 | | 11,112 | 24,258 |
| Land & development | 3,717 | 967 | 2,997 | 7,681 |
| Mini storage | 6,552 | 12,111 | | 18,663 |
| Other | 4,097 | 7,052 | 1,377 | 12,526 |
| Commercial real estate and corporate loans, net | $99,919 | $80,527 | $110,470 | $290,916 |

(1) A majority of the corporate loans represent corporate lines of credit and are not identified with a particular state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104009

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0062

*Consumer Loans*

Prior to the date of conservatorship, CSB made various types of consumer loans, including home equity loans, auto lo student loans, unsecured personal loans, and loans to depositors secured by their deposit accounts. The shorter-ter.: normally higher interest rates charged on various types of consumer loans contribute to the maintenance of a positive spread between loan yields and CSB's cost of funds.

The consumer loan portfolio at December 31, 1992 by type of loan is geographically concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Home equity line of credit | $32,028 | $11,746 | $710 | $44,484 |
| Fixed equity | 21,719 | 14,998 | 1,604 | 38,321 |
| Unsecured line of credit | 3,724 | 1,070 | 88 | 4,882 |
| Savings account loans | 3,139 | 263 | | 3,402 |
| Student loans | 2,458 | 3 | | 2,461 |
| Auto loans | 1,823 | 451 | 39 | 2,313 |
| Other | 3,982 | 566 | 19 | 4,567 |
| | $68,873 | $29,097 | $2,460 | $100,430 |

*Premium Finance Loans*

Premium finance loans are originated by IPF. IPF has operated in the premium finance business since 1972, providing loans to small and medium sized businesses to finance premiums payable on property and casualty insurance policies. All loans made by IPF are collateralized by the unearned premium refundable by the insurer upon cancellation. The portfolio is well diversified by geography, loan size, business of the insureds and, also, diversified by insurer.

On September 30, 1992 CSB and IPF executed an agreement for the purchase of IPF receivables by CSB. This agreement represents a 3 year commitment to purchase up to $400 million of receivables. IPF would continue to service the receivables for a fee. A reserve fund to cover losses resulting from defaults is maintained for the benefit of CSB. The funding cost is passed through monthly based upon the higher of: a) CSB's average cost of funds for the previous month; or b) 30 day LIBOR plus 75 basis points. This cost is applied to the average monthly principal balance of receivables purchased.

**E. Investment in Real Estate**

Investment in real estate, net, at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Real estate held for development and sale | $5,799 |
| Real estate owned ("REO") - Commercial | 98,341 |
| - Mortgage | 39,490 |
| - Consumer | 1,878 |
| Total REO | 139,709 |
| In-substance foreclosed loans - Commercial | 118,359 |
| - Mortgage | 59,000 |
| Total in-substance foreclosed loans | 177,359 |
| | $322,867 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104010

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0063

*Real Estate Owned*

The commercial real estate owned portfolio, net, at December 31, 1992 consists of the following:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office | $3,461 | $4,165 | $5,617 | $13,243 |
| Apartments | | 18,212 | 2,899 | 21,111 |
| Hotel | 2,088 | 18,174 | 8,277 | 28,539 |
| Retail | | 11,367 | | 11,367 |
| Warehouse | | | 2,427 | 2,427 |
| Single family | 168 | 2,989 | 2,002 | 5,159 |
| Land development | 5,773 | 10,677 | | 16,450 |
| Other | | 48 | | 48 |
| | $11,490 | $65,632 | $21,222 | $98,344 |

*In-substance Foreclosed Loans*

The commercial in-substance foreclosed loans, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $26,960 | $3,377 | $16,100 (1) | $46,437 |
| Apartments | 4,035 | | 26,134 (2) | 30,169 |
| Hotel | 5,000 | | | 5,000 |
| Retail | 143 | 3,648 | | 3,791 |
| Corporate loans | | | | |
| Warehouse | 5,611 | 914 | | 6,525 |
| Single family | 1,422 | | | 1,422 |
| Nursing homes | | 2,979 | | 2,979 |
| Land & development | 12,328 | 4,359 | 699 | 17,386 |
| Mini storage | 2,526 | | | 2,526 |
| Other | | 1,719 | 405 | 2,124 |
| | $58,025 | $16,996 | $43,338 | $118,359 |

(1) Includes $13,900 located in the state of Ohio.
(2) Includes $20,100 located in the state of Ohio.

**F. Loan Servicing**

*Residential Mortgage Loan Servicing*

CFSB has a stand-alone residential mortgage loan servicing division operating in Clearwater, Florida. The Clearwater Servicing Center was acquired in 1989 from Numerica Financial Services, Inc. with almost 30,000 loans and related assets, plus an existing staff. To improve efficiencies and customer service, CSB consolidated its entire portfolio, most of which had been serviced from its New Jersey headquarters, into the Clearwater operation by the end of 1990. At its peak, the Center serviced 146,000 loans totalling almost $10 billion with over 900 loans per employee serviced at an average core cost of approximately $60 per loan.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104011

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0064

Among thrift servicers, CSB's portfolio serviced for others of $6.6 billion was the ninth largest as of June 30, 1992. Consisting almost equally of originated and purchased servicing, (47% and 53%, respectively), the entire portfolio contained 115,000 loans totalling $7.2 billion as of December 31, 1992. Of this total, 11,500 loans or $1.1 billion are asset loans owned in full by CFSB. The Bank also had a small participation interest in 3,000 loans with a total principal balance of $87 million. The remainder were primarily FNMA/FHLMC/GNMA.

The book value of capitalized costs of future servicing at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Purchased mortgage servicing rights | $51,078 |
| Excess servicing rights: | |
| Mortgage loans | 11,364 |
| Home equity loans | 1,661 |
| | 13,025 |
| | $64,103 |

*Consumer Loan Servicing*

During 1989 and 1990 CSB sold segments of its Consumer Loan portfolio to a variety of investors, retaining the right to earn recurring fee income by continuing to service the loans. The table that follows details the types of loans, names of investors and shows the balances outstanding together with the servicing spread for each portfolio:

| *(dollars in thousands)* | Number of Accounts | Credit Limit | Current Balance | Servicing Fee |
|---|---|---|---|---|
| Revolving: | | | | |
| United Jersey Bank | 1,991 | $109,916 | $ 64,751 | .65% |
| First Valley Bank | 3,420 | 180,369 | 106,916 | .55 |
| Massachusetts Company | 789 | 34,302 | 19,498 | .50 |
| Total revolving | 6,200 | 324,587 | 191,165 | |
| Fixed: | | | | |
| First Fidelity | 856 | 22,612 | 1,139 | .25 |
| West Jersey | 125 | 2,564 | 44 | .50 |
| Total fixed | 981 | 25,176 | 1,183 | |
| | 7,181 | $349,763 | $192,348 | |

At December 31, 1992 CFSB carried $1.66 million in excess servicing rights attributed to these portfolios on its books. Of the portfolios noted above only the First Valley (a subsidiary of UJB Financial in New Jersey) loans have a recourse liability which, at December 31, 1992 was about $2.26 million.

## G. Other Interest Bearing Liabilities

*Advances from the Federal Home Loan Bank*

CSB borrowed funds from the FHLB. The borrowings are collateralized by CSB's FHLB stock holdings and certain mortgage loans and other assets, principally mortgage-backed securities.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104012

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0065

At December 31, 1992, advances from the FHLB aggregated $885 million. CSB is currently required to physically deliver specific collateral to the FHLB to secure its advances. Under current policies of the Federal Home Loan Bank, member institutions are required to maintain collateral with market values in an amount ranging from 100% to 125% of outstanding advances, depending on the type of collateral pledged and the member's financial condition. CSB has delivered to the FHLB the required level of collateral necessary to secure its outstanding advances.

CSB's advances from the FHLB are primarily variable rate indexed to the London Interbank Offering Rate (LIBOR) with quarterly and semi-annual resets. At December 31, 1992, maturities of the advances from the FHLB ranged from June 1994 to January 1996.

Advances from the FHLB at December 31, 1992 are as follows:

| Date of Note | Principal Balance (000's) | Next Reset Date | Due Date of Note | Interest Rate |
|---|---|---|---|---|
| *Variance Rate Advances (3 Month LIBOR)* | | | | |
| June, 1989 | 50,000 | December, 1992 | June, 1994 | 3.33% |
| June, 1990 | 3,560 | December, 1992 | June, 1995 | 3.09% |
| August, 1990 | 1,750 | February, 1993 | August, 1995 | 3.61% |
| October, 1990 | 30,000 | December, 1992 | September, 1995 | 3.22% |
| | 85,310 | | | |
| *Variable Rate Advances (6 Month LIBOR)* | | | | |
| August, 1990 | 100,000 | February, 1993 | August, 1995 | 3.42% |
| October, 1990 | 300,000 | March, 1993 | September, 1995 | 3.34% |
| December, 1990 | 200,000 | December, 1992 | December, 1995 | 3.67% |
| December, 1990 | 200,000 | January, 1993 | January, 1996 | 3.58% |
| | 800,000 | | | |
| | $885,310 | | | |

On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Prepayment penalties through December 31, 1992 totalled $6.2 million.

*RTC Advances*

RTC Advances are being utilized to replace the advances from the FHLB. As of December 31, 1992, CFSB had $1.75 billion of RTC Advances. Interest expense on these advances is based upon the 13 week Treasury Bill plus 25 basis points. The rate adjusts weekly.

*Other Borrowed Funds*

CFSB's other borrowed funds consist of fixed rate MTN's. At December 31, 1992, the MTN's had maturities ranging from May 1993 to October 1993 and interest rates ranging from 8.00% to 9.34%, with interest payable semiannually on March 15 and November 15. The MTN's are not redeemable at the option of CFSB. The MTN's are primarily collateralized by mortgage-backed securities with current face values of approximately $115 million. As previously discussed, arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104013

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0066

*Hedges*

CSB periodically used interest rate futures and entered into options on future contracts to reduce exposure to fluctuations in interest rates. There were no open positions in either of these instruments on December 31, 1992.

CSB used interest rate swap agreements to adjust the repricing of certain assets and liabilities to minimize exposure to interest rate changes. Interest rate swaps outstanding at December 31, 1992 are as follows:

| *(dollars in thousands)* | Notional Amount | Weighted Average Fixed Rate | Weighted Average Floating Rate |
|---|---|---|---|
| Fixed Rate Payor | $151,000 | 8.94% | 3.63% |
| Floating Rate Payor | $10,000 | 8.16% | 3.58% |

The current swap contracts are with six dealers. The agreements outstanding at December 31, 1992 have expiration dates between January 1993 and August 1995.

The cost to unwind the interest rate swap agreements is currently estimated to be in excess of $6 million.

## H. Other Assets and Other Liabilities

Non-interest earning assets at December 31, 1992 are as follows:

| *(in thousands)* | |
|---|---|
| Interest and dividends receivable | $18,540 |
| Other assets | 86,026 |
| | $104,566 |

*Interest and Dividends Receivable*

Interest and dividends receivable represents the income earned on all interest earning assets but not yet received in cash.

*Goodwill of the Bank*

Goodwill of the Bank was originally recorded in connection with supervisory and nonsupervisory acquisitions in the 1980's and represents the excess of cost over fair value of assets acquired. A portion of goodwill was written off in connection with branch sales in 1990. The goodwill was being amortized to expense on a straight line basis over periods ranging from nine to 25 years. The goodwill of the Bank has been written off.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104014

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0067

*Other Assets*

Other assets at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| | $25,108 |
| Premises and equipment, net | 22,820 |
| FHA/VA receivables | 17,047 |
| Mortgage escrow advance | 1,410 |
| Core deposit value | 2,009 |
| Goodwill - IPF | 14,420 |
| Purchased distribution system - IPF | 2,706 |
| Tradename and Covenant Not To Compete - IPF | 506 |
| Other assets, net | |
| | $86,026 |

Premises and equipment, net at December 31, 1992 is comprised of the following:

| *(in thousands)* | Gross | Accumulated Depreciation | Net |
|---|---|---|---|
| Land | $4,118 | | $4,118* |
| Buildings and improvements | 19,508 | ($8,370) | 11,138* |
| Leasehold improvements | 7,777 | (5,284) | 2,493 |
| Furniture, equipment and automobiles | 23,289 | (17,280) | 6,009 |
| | 54,692 | (30,934) | 23,758 |
| Subsidiaries | | | 1,350 |
| | $54,692 | ($30,934) | $25,108 |

* Land and buildings and improvements include, among others, the following facilities:

| *(in thousands)* | Gross | Accumulated Depreciation | Net(1) |
|---|---|---|---|
| South Street, Morristown, New Jersey - administrative offices | $7,748 | ($2,697) | $5,051 |
| Delray Beach, Florida - retail branch (2) and office | 3,098 | (1,099) | 1,999 |
| Phillipsburg, New Jersey - retail branch | 819 | (412) | 407 |
| West Delray Beach, Florida - retail branch (2) | 1,226 | (307) | 919 |
| Caldwell, New Jersey - retail branch | 940 | (262) | 678 |
| Newark, New Jersey - retail branch | 749 | (418) | 331 |

(1) Excludes furniture, fixtures and equipment.

(2) Owned by CFSB - leased to Great Western.

Refer to *Exhibit VI. - Facilities* for a complete listing of owned and leased premises.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104015

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0068

Non-interest bearing liabilities at December 31, 1992 are composed of the following:

| (in thousands) | |
|---|---|
| Escrow - Bank | $78,015 |
| Escrow - IPF | 2,078 |
| Other liabilities | 119,536 |
| | $199,629 |

*Escrow-Bank*

CFSB, as of December 31, 1992, services $7.3 billion of mortgage loans, of which $6.2 billion are loans serviced for others and $1.1 billion are CFSB asset loans. Earnings are generated from service fees, late charges and insurance income. Escrow funds include mortgagors' deposits for taxes and insurance ("T&I") and the float from the remittance of principal and interest ("P&I") to the investors for which CFSB services loans.

Included in CFSB's balance sheet at December 31, 1992 is a $78.0 million escrow liability which relates to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | X | |
| GNMA | X | |
| Other (private) | X | X |
| Asset loans | X | |

The T&I funds are insured for each mortgagor. The P&I funds are owned by the investors. For investment purposes, these funds are commingled with the Bank's assets and earn interest accordingly. Such interest is included in "interest income".

Additionally, escrow funds of approximately $120 million at December 31, 1992 which is not included in CFSB's balance sheet, are on deposit at the FHLB. These funds relate to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | | X |
| GNMA | | X |
| FNMA | X | X |

The above government agencies for which CFSB services loans require that these funds be maintained in custodial accounts in an eligible depository.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104016

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0069

*Other Liabilities*

Other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued interest payable | $12,534 |
| Undisbursed premiums - IPF | 22,823 |
| Outstanding payments to producers - IPF | 8,363 |
| Overdrawn cash | 25,755 |
| Custodial suspense (due to investors) | 17,148 |
| Construction loan - Midlantic | 4,166 |
| Other liabilities, net | 28,840 |
| | $119,629 |

Other - other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued liabilities: | |
| Pension liability | $1,859 |
| Supplemental retirement plan liability | 1,200 |
| Other accrued liabilities | 5,047 |
| | 8,106 |
| Accrued liabilities on the books of IPF | 1,330 |
| Intercompany payable to CSB Bancorp | 2,884 |
| Due to investors - principal and interest (HER loans serviced for others) | 3,940 |
| Deferred gain futures contract settlement | 1,874 |
| Accrued liability - interest rate swaps | 2,385 |
| Accruals for contingencies, warranty costs and Mt. Laurel units on the books of real estate development subsidiaries | 1,740 |
| Unclaimed property (a) | 1,070 |
| Other | 5,511 |
| | $28,840 |

(a) Represents unclaimed checks which are held for up to six years prior to escheatment to the state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104017

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0070

Form **1120** Department of the Treasury Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 1992 or tax year beginning ________, 1992, ending ________, 19__

▶ Instructions are separate. See page 1 for Paperwork Reduction Act Notice.

OMB No. 1545-0123

1992

A Check if a: (1) Consolidated return (attach Form 851) [X] (2) Personal holding co. (attach Sch. PH) [ ] (3) Personal service corp. (as defined in Temporary Regs. sec. 1.441-4T—see instructions) [ ]

Use IRS label. Otherwise, please print or type.

AmBase Corporation & Subsidiaries
99 University Place, 9th Floor
New York, New York 10003

B Employer identification number: 95-2962743

C Date incorporated: 11/22/75

D Total assets (see Specific Instructions): 75,345,760.

E Check applicable boxes: (1) [ ] Initial return (2) [ ] Final return (3) [X] Change in address

**Income**

| | | | |
|---|---|---|---|
| 1a Gross receipts or sales 95,765,552. b Less returns and allowances ____ c Bal ▶ | | 1c | 95,765,552. |
| 2 Cost of goods sold (Schedule A, line 8) | | 2 | 63,327,258. |
| 3 Gross profit. Subtract line 2 from line 1c | | 3 | 32,438,294. |
| 4 Dividends (Schedule C, line 19) | | 4 | 6,336,053. |
| 5 Interest | | 5 | 303,665,277. |
| 6 Gross rents | | 6 | 13,100,221. |
| 7 Gross royalties | | 7 | |
| 8 Capital gain net income (attach Schedule D (Form 1120)) | | 8 | |
| 9 Net gain or (loss) from Form 4797, Part II, line 20 (attach Form 4797) | | 9 | 7,168,434. |
| 10 Other income (see instructions—attach schedule) | | 10 | 52,528,054. |
| 11 Total income. Add lines 3 through 10 ▶ | | 11 | 415,236,333. |

**Deductions (See instructions for limitations on deductions.)**

| | | | |
|---|---|---|---|
| 12 Compensation of officers (Schedule E, line 4) | | 12 | 13,446,887. |
| 13a Salaries and wages 26,345,087. b Less jobs credit ____ c Balance ▶ | | 13c | 26,345,087. |
| 14 Repairs | | 14 | 1,555,540. |
| 15 Bad debts | | 15 | 58,020,685. |
| 16 Rents | | 16 | 6,207,232. |
| 17 Taxes | | 17 | 8,053,261. |
| 18 Interest | | 18 | 234,550,360. |
| 19 Charitable contributions (see instructions for 10% limitation) | | 19 | |
| 20 Depreciation (attach Form 4562) | 20: 3,018,513. | | |
| 21 Less depreciation claimed on Schedule A and elsewhere on return | 21a | 21b | 3,018,513. |
| 22 Depletion | | 22 | |
| 23 Advertising | | 23 | 1,834,957. |
| 24 Pension, profit-sharing, etc., plans | | 24 | 561,340. |
| 25 Employee benefit programs | | 25 | 3,193,963. |
| 26 Other deductions (attach schedule) | | 26 | 71,285,573. |
| 27 Total deductions. Add lines 12 through 26 ▶ | | 27 | 428,073,398. |
| 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | 28 | -12,837,065. |
| 29 Less: a Net operating loss deduction (see instructions) | 29a | | |
| b Special deductions (Schedule C, line 20) | 29b | 29c | |

**Tax and Payments**

| | | | |
|---|---|---|---|
| 30 Taxable income—Subtract line 29c from line 28 | | 30 | -12,837,065. |
| 31 Total tax (Schedule J, line 10) | | 31 | |
| 32 Payments: a 1991 overpayment credited to 1992 | 32a | | |
| b 1992 estimated tax payments | 32b | | |
| c Less 1992 refund applied for on Form 4466 | 32c | d Bal ▶ 32d | |
| e Tax deposited with Form 7004 | 32e | | |
| f Credit from regulated investment companies (attach Form 2439) | 32f | | |
| g Credit for Federal tax on fuels (attach Form 4136). See instructions | 32g | 32h | |
| 33 Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ [ ] | | 33 | |
| 34 Tax due. If line 32h is smaller than the total of lines 31 and 33, enter amount owed | | 34 | 0. |
| 35 Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | | 35 | |
| 36 Enter amount of line 35 you want: Credited to 1993 estimated tax ▶ | Refunded ▶ | 36 | |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ L. Mantell | 8/30/93 ▶ Senior Vice President

Signature of officer | Date | Title

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed [ ] | Preparer's social security no.

Firm's name (or yours, if self-employed) and address ▶ | E.I. No. ▶ | ZIP code ▶

AmBase Corporation & Subsidiaries 95-2962743

Form 1120 (1992) Page 2

## Schedule A Cost of Goods Sold (See instructions.)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 41,434,214. |
| 2 | Purchases | 2 | 9,581,853. |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) | 5 | 24,676,169. |
| 6 | Total. Add lines 1 through 5. | 6 | 75,692,236. |
| 7 | Inventory at end of year | 7 | 12,364,978. |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 63,327,258. |

SEE SUBSIDIARIES' SCHEDULES

9 a Check all methods used for valuing closing inventory:
(i) ☐ Cost (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4
(iii) ☐ Writedown of "subnormal" goods as described in Regulations section 1.471-2(c)
(iv) ☐ Other (Specify method used and attach explanation.) ➤

b Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ➤ ☐

c If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO 9c

d Do the rules of section 263A (for property produced or acquired for resale) apply to the corporation? ☐ Yes ☐ No

e Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation ☐ Yes ☐ No

## Schedule C Dividends and Special Deductions (See instructions.)

SEE SUBSIDIARIES' SCHEDULES

| | | (a) Dividends received | (b) % | (c) Special deductions: (a) × (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations that are subject to the 70% deduction (other than debt-financed stock) | | 70 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations that are subject to the 80% deduction (other than debt-financed stock) | | 80 | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 41.176 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 47.059 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs that are subject to the 70% deduction | | 70 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs that are subject to the 80% deduction | | 80 | |
| 8 | Dividends from wholly owned foreign subsidiaries subject to the 100% deduction (section 245(b)) | | 100 | |
| 9 | Total. Add lines 1 through 8. See instructions for limitation | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from certain FSCs that are subject to the 100% deduction (section 245(c)(1)) | | 100 | |
| 12 | Dividends from affiliated group members subject to the 100% deduction (section 243(b)(3)) | | 100 | |
| 13 | Other dividends from foreign corporations not included on lines 3, 6, 7, 8 or 11 | | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | | | |
| 15 | Foreign dividend gross-up (section 78) | | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 (section 246(d)) | | | |
| 17 | Other dividends | 6,336,053. | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities (see instructions) | | | |
| 19 | Total dividends. Add lines 1 through 17. Enter here and on line 4, page 1 ➤ | 6,336,053. | | |
| 20 | Total deductions. Add lines 9, 10, 11, 12, and 18. Enter here and on line 29b, page 1 ➤ | | | |

## Schedule E Compensation of Officers (See instructions for line 12, page 1.)

Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1, Form 1120) are $500,000 or more.

| | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned (d) Common | (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| 1 | SEE SUBSIDIARIES' SCHEDULES | | % | % | % | 13,446,887. |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |

| | | |
|---|---|---|
| 2 | Total compensation of officers | 13,446,887. |
| 3 | Compensation of officers claimed on Schedule A and elsewhere on return | |
| 4 | Subtract line 3 from line 2. Enter the result here and on line 12, page 1 | 13,446,887. |

For Paperwork Reduction Act Notice, see instr. Copyright (c) 1992 form software only CenterPiece Software, Inc. Form 1120 (1992)

## Schedule J Tax Computation (See instructions.)

1 Check if the corporation is a member of a controlled group (see sections 1561 and 1563) . . . ▶ [X]

2 If the box on line 1 is checked:

a Enter the corporation's share of the $50,000 and $25,000 taxable income bracket amounts (in that order):
(i) 0. (ii) 0.

b Enter the corporation's share of the additional 5% tax (not to exceed $11,750) ▶

3 Income tax. Check this box if the corporation is a qualified personal service corporation as defined in section 448(d)(2) (see instructions). . . ▶ [ ] | 3 | 0.

4a Foreign tax credit (attach Form 1118) . . . 4a

b Possessions tax credit (attach Form 5735) . . . 4b

c Orphan drug credit (attach Form 6765) . . . 4c

d Credit for fuel produced from a nonconventional source . . . 4d

e General business credit. Enter here and check which forms are attached:
[ ] Form 3800 [ ] Form 3468 [ ] Form 5884 [ ] Form 6478
[ ] Form 6765 [ ] Form 8586 [ ] Form 8830 [ ] Form 8826 . . . 4e

f Credit for prior year minimum tax (attach Form 8827) . . . 4f

5 Total credits. Add lines 4a through 4f . . . 5

6 Subtract line 5 from line 3 . . . 6

7 Personal holding company tax (attach Schedule PH (Form 1120)) . . . 7

8 Recapture taxes. Check if from: [ ] Form 4255 [ ] Form 8611 . . . 8

9a Alternative minimum tax (attach Form 4626) . . . 9a

b Environmental tax (attach Form 4626) . . . 9b

10 Total tax. Add lines 6 through 9b. Enter here and on line 31, page 1 . . . 10 | 0.

## Schedule K Other Information (See instructions.)

| | Yes | No |
|---|---|---|
| 1 Check method of accounting: a [ ] Cash b [X] Accrual c [ ] Other (specify) ▶ | | |
| 2 Refer to the list in the instructions and state the principal: a Business activity code no. ▶ 6749 b Business activity ▶ See Subsidiaries c Product or service ▶ Schedules | | |
| 3 Did the corporation at the end of the tax year own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) . . . | X | |
| If "Yes," attach a schedule showing: (a) name and identifying number; (b) percentage owned; and (c) taxable income or (loss) before NOL and special deductions of such corporation for the tax year ending with or within your tax year. | | |
| 4 Did any individual, partnership, corporation, estate, or trust at the end of the tax year own, directly or indirectly, 50% or more of the corporation's voting stock? (For rules of attribution, see section 267(c).) If "Yes," complete a, b, and c below . . . | | X |
| a Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? | | |
| b Enter the name and identifying number of the parent corporation or other entity with 50% or more ownership ▶ | | |
| c Enter percentage owned ▶ | | |
| 5 During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See secs. 301 and 316.) | | X |
| If "Yes", file Form 5452. If this is a consolidated return, answer here for the parent corporation and on Form 851, Affiliations Schedule, for each subsidiary. | | |

| | Yes | No |
|---|---|---|
| 6 Was the corporation a U.S. shareholder of any controlled foreign corporation? (See sections 951 and 957.) . . . | | X |
| If "Yes", attach Form 5471 for each such corporation. Enter number of Forms 5471 attached ▶ | | |
| 7 At any time during the 1992 calendar year, did the corporation have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . . | | X |
| If "Yes", the corporation may have to file Form TDF 90-22.1. If "Yes," enter name of foreign country ▶ | | |
| 8 Was the corporation the grantor of, or transferor to, a foreign trust that existed during the current tax year, whether or not the corporation has any beneficial interest in it? . . . | | X |
| If "Yes," the corporation may have to file Forms 926, 3520, or 3520-A. | | |
| 9 Did one foreign person at any time during the tax year own, directly or indirectly, at least 25% of: (a) the total voting power of all classes of stock of the corporation entitled to vote, or (b) the total value of all classes of stock of the corporation? . . . | | X |
| If "Yes," see instructions and a Enter percentage owned ▶ b Enter owner's country ▶ c The corporation may have to file Form 5472. (See instructions for penalties that may apply.) Enter number of Forms 5472 attached ▶ | | |
| 10 Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . ▶ [ ] If so, the corporation may have to file Form 8281. | | |
| 11 Enter the amount of tax-exempt interest received or accrued during the tax year ▶ 213,463. | | |
| 12 If there were 35 or fewer shareholders at the end of the tax year, enter the number ▶ | | |
| 13 If the corporation has an NOL for the tax year and is electing under sec. 172(b)(3) to forego the carryback period, check here . . . ▶ [ ] | | |

For Paperwork Reduction Act Notice, see Instr.

Copyright (c) 1992 form software only CenterPiece Software, Inc.



CONFIDENTIAL MATERIAL – SUBJECT TO PROTECTIVE ORDER RAM064 0335

AmBase Corporation & Subsidiaries 95-2962743

Form 1120 (1992) Page 4

## Schedule L Balance Sheets

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | 347,357,918 | | 36,013,489. |
| 2a Trade notes and accounts receivable | 76,336,365. | | 100,000. | |
| b Less allowance for bad debts | -1,908,111. | 74,428,254. | | 100,000. |
| 3 Inventories | | 41,434,214. | | |
| 4 U.S. government obligations | | 199,888,486 | | |
| 5 Tax-exempt securities (see instructions) | | | | |
| 6 Other current assets (attach schedule) | | 44,169,408. | | 65,765. |
| 7 Loans to stockholders | | | | |
| 8 Mortgage and real estate loans | | 2255,799,327 | | |
| 9 Other investments (attach schedule) | | 1629,542,738 | | 39,384. |
| 10a Buildings and other depreciable assets | 56,905,719. | | | |
| b Less accumulated depreciation | 29,972,266. | 26,933,453. | | |
| 11a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 12 Land (net of any amortization) | | 4,161,780. | | |
| 13a Intangible assets (amortizable only) | 61,969,069. | | | |
| b Less accumulated amortization | 39,154,589. | 22,814,480. | | |
| 14 Other assets (attach schedule) | | 746,786,167 | | 39,127,122. |
| 15 Total assets | | 5393,316,225 | | 75,345,760. |
| **Liabilities and Stockholders' Equity** | | | | |
| 16 Accounts payable | | 1,517,055. | | 82,396. |
| 17 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 Other current liabilities (attach schedule) | | 142,664,432 | | 44,895,328. |
| 19 Loans from stockholders | | | | |
| 20 Mortgages, notes, bonds payable in 1 year or more | | 153,332,694 | | |
| 21 Other liabilities (attach schedule) | | 5171,817,317 | | 82,330,681. |
| 22 Capital stock a Preferred stock | | | | |
| b Common stock | 396,850. | 396,850. | 406,850. | 406,850. |
| 23 Paid-in or capital surplus | | 546,700,718 | | 547,315,718. |
| 24 Retained earnings – Appropriated (attach schedule) | | | | |
| 25 Retained earnings – Unappropriated | | -622,495,66 | | -599,037,838. |
| 26 Less cost of treasury stock | | -617,179. | | -647,375. |
| 27 Total liabilities and stockholders' equity | | 5393,316,225 | | 75,345,760. |

Note: You are not required to complete Schedules M-1 and M-2 below if the total assets on line 15, column (d) of Schedule L are less than $25,000.

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income per Return (See instructions.)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | 23,457,824. | 7 Income recorded on books this year not included on this return (itemize): Tax-exempt interest 213463; SEE SUBS. 56830275; SCHEDULES | 57,043,738. |
| 2 Federal income tax | 4,219,100. | | |
| 3 Excess of capital losses over capital gains | 99,993,000. | | |
| 4 Income subject to tax not recorded on books this year (itemize) SEE SUBS. SCHEDULES | 44,487,507. | 8 Deductions on this return not charged against book income this year (itemize): a Depreciation; b Contributions carryover; SEE SUBSIDIARIES SCHEDULES | 183,208,301. |
| 5 Expenses recorded on books this year not deducted on this return (itemize): a Depreciation; b Contributions carryover; c Travel and entertainment; SEE SUBSIDIARIES SCHEDULES | 55,257,543. | 9 Add lines 7 and 8 | 240,252,039. |
| 6 Add lines 1 through 5 | 227,414,974 | 10 Income (line 28, page 1) – line 6 less line 9 | -12,837,065. |

## Schedule M-2 Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year | -622,495,66 | 5 Distributions: a Cash | |
| 2 Net income (loss) per books | 23,457,824. | b Stock | |
| 3 Other increases (itemize): SEE SUBSIDIARIES SCHEDULES | | c Property | |
| | | 6 Other decreases (itemize): | |
| | | 7 Add lines 5 and 6 | 0. |
| 4 Add lines 1, 2, and 3 | -599,037,838 | 8 Balance at end of year (line 4 less line 7) | -599,037,838. |

For Paperwork Reduction Act Notice, see instr.

Copyright (c) 1992 form software only Center Piece Software, Inc.

Form 1120 (1992)

[redacted]

[illegible] Corporation & Subsidiaries

Consolidated Taxable Income

Year [illegible]

FEIN [illegible]

Schedule [illegible]

| Gross Income | (1) Total (C + D) | (2) Elimination Adjustments | (3) Subtotal | (4) [illegible] Corporation | (5) [illegible] Corporation of New York Group | (6) [illegible] Group | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a) Gross receipts or gross sales/revenue earned | [illegible] | | [illegible] | | [illegible] | [illegible] | | | | | | |
| b) Less Returns and Allowances/Dividends on policyholders | 0 | | 0 | | 0 | 0 | | | | | | |
| c) Balance | [illegible] | 0 | [illegible] | 0 | [illegible] | [illegible] | | | | | | |
| Cost of goods sold and/or operations * | [illegible] | | [illegible] | 0 | 0 | [illegible] | | | | | | |
| Gross profit (line 1(c) less 2) | [illegible] | 0 | [illegible] | 0 | [illegible] | [illegible] | | | | | | |
| Dividends * | [illegible] | | [illegible] | 0 | 0 | [illegible] | | | | | | |
| Interest | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| Gross rents | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| Gross royalties | 0 | | 0 | | 0 | 0 | | | | | | |
| 9a) Short-term capital gain or (loss) * | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| b) Long-term capital gain or (loss) * | 0 | [illegible] | ([illegible]) | ([illegible]) | 0 | 0 | | | | | | |
| 10a) Casualty and theft * | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| b) Sales or exch. of other Sec. 1231 prop. * | ([illegible]) | | ([illegible]) | [illegible] | 0 | ([illegible]) | | | | | | |
| c) Ordinary gain or (loss) * | [illegible] | | [illegible] | 0 | 0 | [illegible] | | | | | | |
| Other income * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| | | | | | | | | | | | | |
| Total income (lines 3 thru 10) | [illegible] | [illegible] | [illegible] | ([illegible]) | [illegible] | [illegible] | | | | | | |
| DEDUCTIONS | | | | | | | | | | | | |
| Compensation of officers * | [illegible] | | [illegible] | [illegible] | 0 | [illegible] | | | | | | |
| 13a) Salaries and wages | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| b) Less Jobs Credit * | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| c) Net Salaries and Wages | [illegible] | 0 | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| Repairs | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| Bad debts * | [illegible] | | [illegible] | 0 | [illegible] | [illegible] | | | | | | |
| Rents | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| Taxes * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| Interest | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| Contributions * | 0 | ([illegible]) | [illegible] | 0 | 0 | [illegible] | | | | | | |
| Depreciation * | [illegible] | | [illegible] | [illegible] | 0 | [illegible] | | | | | | |
| 21a) Less Depr. claimed elsewhere in return * | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| b) Net Depreciation (line 20 less 21(a)) * | [illegible] | 0 | [illegible] | [illegible] | 0 | [illegible] | | | | | | |
| Depletion * | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| Advertising | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| Pension & Profit-Sharing plans * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER RAM064 0337

| | [illegible] | TOTAL ([illegible]) | ELIMINATION ADJUSTMENT | [illegible] ([illegible]) | Corporation | Corporation of [illegible] | [illegible], Inc. Group |
|---|---|---|---|---|---|---|---|
| (a) | Gross receipts or gross sales [illegible] | [illegible] | | [illegible] | | 1,[illegible] | [illegible] |
| (b) | Less Returns and Allowances/[illegible] to policyholders | 0 | | 0 | | 0 | 0 |
| (c) | Balance | [illegible] | 0 | [illegible] | 0 | [illegible] | [illegible] |
| | Cost of goods sold and/or operations * | [illegible] | - | [illegible] | 0 | 0 | 43,[illegible] |
| | Gross profit (line 1(c) less 2) | [illegible] | 0 | [illegible] | 0 | [illegible] | [illegible] |
| | Dividends* | 4,[illegible] | | 4,[illegible] | -0 | 0 | 4,[illegible] |
| | Interest | [illegible] | | [illegible] | 7,[illegible] | [illegible] | [illegible] |
| | Gross rents | [illegible] | | [illegible] | | 0 | [illegible] |
| | Gross royalties | 0 | | 0 | | 0 | 0 |
| (a) | Short-term capital gain or (loss) * | 0 | | 0 | 0 | 0 | -0 |
| (b) | Long-term capital gain or (loss) * | 0 | [illegible] | -([illegible]) | ([illegible]) | 0 | 0 |
| (e) | Casualty and theft * | 0 | | 0 | 0 | 0 | 0 |
| (b) | Sales of [illegible], or other than 1231 prop. * | ([illegible]) | | ([illegible]) | [illegible] | 0 | (1,[illegible]) |
| (c) | Ordinary gain or (loss) * | [illegible] | | [illegible] | 0 | 0 | [illegible] |
| | Other income * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | | | |
| | Total income (lines 3 thru 10) | ([illegible]) | [illegible] | [illegible] | ([illegible]) | ([illegible]) | ([illegible]) |
| | DEDUCTIONS | | | | | | |
| | Compensation of officers * | [illegible] | | [illegible] | 1,[illegible] | 0 | [illegible] |
| (a) | Salaries and wages | [illegible] | | [illegible] | 2,[illegible] | [illegible] | [illegible] |
| (b) | Less Jobs Credit * | 0 | | 0 | 0 | 0 | 0 |
| (c) | Net Salaries and Wages | [illegible] | 0 | [illegible] | 2,[illegible] | [illegible] | [illegible] |
| | Repairs | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| | Bad debts * | [illegible] | | [illegible] | 0 | [illegible] | [illegible] |
| | Rents | 4,[illegible] | | 4,[illegible] | [illegible] | [illegible] | [illegible] |
| | Taxes * | [illegible] | | [illegible] | [illegible] | [illegible] | 2,[illegible] |
| | Interest | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| | Contributions * | 0 | ([illegible]) | [illegible] | 0 | 0 | [illegible] |
| | Depreciation * | [illegible] | | [illegible] | [illegible] | 0 | [illegible] |
| (a) | Less depr. claimed elsewhere on return * | 0 | | 0 | 0 | 0 | 0 |
| (b) | Net depreciation (line 20 less 21(a)) * | [illegible] | 0 | [illegible] | [illegible] | 0 | [illegible] |
| | Depletion * | 0 | | 0 | 0 | 0 | 0 |
| | Advertising | [illegible] | | [illegible] | | 0 | [illegible] |
| | Pension & profit-sharing plans * | [illegible] | | [illegible] | [illegible] | 2,[illegible] | [illegible] |
| | Employee benefit programs | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| | Other deductions * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | | | |
| | Tot deductions (add lines 12 thru 26 [illegible]) | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | | | |
| | Taxable income (loss) (line 11 less 27) | ([illegible]) | [illegible] | ([illegible]) | ([illegible]) | ([illegible]) | [illegible] |

* See "[illegible]" schedule for details

[illegible]
[illegible]

Page 1 [illegible]

Page 2 [illegible]

[illegible]

[redacted]

[illegible] CORPORATION & SUBSIDIARIES

CONSOLIDATED BALANCE SHEET – [illegible]

YEAR 1997

| | ASSETS | (1) TOTAL (2 + 3) | (2) ELIMINATIONS | (3) SUBTOTAL (4 thru 13) | (4) [illegible] CONSOLIDATOR | (5) [illegible] CORP. OF NEW YORK | (6) [illegible] INC. [illegible] | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Cash | 347,337,339 | | 337,317,918 | [illegible] | 232,[illegible] | 334,813,347 | | | | | | |
| 2 | Trade notes and accounts receivable | 79,334,343 | | 79,333,348 | 100,000 | 9,503 | 79,336,[illegible] | | | | | | |
| (a) | (a) Allowance for bad debts | (1,906,111) | | (1,906,111) | ( ) | 0 | (1,906,111) | | | | | | |
| 3 | Inventories | 41,434,314 | | 41,434,314 | | 0 | 41,434,314 | | | | | | |
| 4 | U.S. obligations (a) U.S. and instrumentalities | 199,346,144 | | 199,[illegible],144 | | 0 | 199,[illegible],144 | | | | | | |
| (b) | (b) State, municipal, [illegible] | 0 | | 0 | | 0 | 0 | | | | | | |
| 5 | Other current assets * | 44,110,120 | | 44,110,130 | 222,393 | 3,343,477 | 40,320,331 | | | | | | |
| 6 | Loans to stockholders | 0 | (79,903,310) | 79,903,300 | | 79,903,330 | 0 | | | | | | |
| 7 | Mortgage and real estate loans | 2,334,779,337 | | 2,333,779,327 | | 0 | 2,333,779,327 | | | | | | |
| 8 | Other investments * | 1,447,342,130 | (37,073,434) | 1,454,415,344 | (29,073,023) | 0 | 1,[illegible],[illegible],712 | | | | | | |
| 9 | Buildings and other fixed depreciable assets | 34,[illegible],737 | | 34,903,749 | 0 | 7,337 | 34,903,[illegible] | | | | | | |
| (a) | (a) Accumulated depreciation | (29,372,361) | | (29,372,361) | 0 | 0 | (29,372,361) | | | | | | |
| 10 | Depletable assets | 0 | | 0 | | 0 | 0 | | | | | | |
| (a) | (a) Accumulated depletion | 0 | | 0 | ( ) | 0 | 0 | | | | | | |
| 11 | Land (net of any amortization) | 6,[illegible],700 | | 4,333,300 | | 0 | 4,[illegible],700 | | | | | | |
| 12 | Intangible assets (amortizable only) | 41,[illegible],347 | | 41,340,[illegible] | 0 | 2,119,322 | 39,[illegible],747 | | | | | | |
| (a) | (a) Accumulated amortization | (39,334,300) | | (39,334,300) | 0 | (7,119,322) | (32,[illegible],307) | | | | | | |
| 13 | Other assets * | 334,334,327 | | 334,334,337 | 36,444,509 | 6,[illegible],734 | 292,[illegible],304 | | | | | | |
| | | | | | | | | | | | | | |
| 14 | Total assets (lines 1 thru 13) | 3,[illegible],[illegible],[illegible] | (37,[illegible],[illegible]) | 3,[illegible],[illegible],[illegible] | 34,[illegible],725 | [illegible],[illegible],329 | 3,327,[illegible],[illegible] | | | | | | |
| | | | | | | | | | | | | | |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 15 | Accounts payable | 3,317,[illegible] | | 2,317,071 | 1,347,[illegible] | 0 | 347,003 | | | | | | |
| 16 | Mortgages, notes, bonds payable in less than 1 year | 0 | | 0 | | 0 | 0 | | | | | | |
| 17 | Other current liabilities * | 103,[illegible],437 | | 142,444,[illegible] | 13,[illegible],[illegible] | 37,[illegible],[illegible] | 77,[illegible],716 | | | | | | |
| 18 | Loans from stockholders | 0 | (34,340,340) | 34,340,340 | | 34,340,340 | 0 | | | | | | |
| 19 | Mortgages, notes, bonds payable in 1 year or more | 122,337,[illegible] | | 122,[illegible],[illegible] | | 0 | 122,337,[illegible] | | | | | | |
| 20 | Other liabilities * | 3,[illegible],[illegible],317 | | 3,[illegible],[illegible],317 | 33,[illegible],[illegible] | 3,[illegible],[illegible] | 3,[illegible],[illegible],[illegible] | | | | | | |
| 21 | Capital stock: (a) Preferred stock | 0 | | 0 | | 0 | 0 | | | | | | |
| (b) | (b) Common stock | 304,[illegible] | (1,[illegible],[illegible]) | 2,3[illegible],[illegible] | 304,304 | [illegible],[illegible],[illegible] | 100 | | | | | | |
| 22 | Paid-in or capital surplus * | 3[illegible],[illegible],[illegible] | (334,[illegible],[illegible]) | [illegible],[illegible],[illegible] | 144,[illegible],[illegible] | 3,[illegible],[illegible] | 333,[illegible],[illegible] | | | | | | |
| 23 | Retained earnings appropriated * | 0 | | 0 | | 0 | 0 | | | | | | |
| 24 | Retained earnings unappropriated | [illegible] | [illegible] | [illegible] | [illegible] | 3[illegible],[illegible] | ([illegible],[illegible],[illegible]) | | | | | | |

1309/1720
2-20-2006

Estimated beg equity (book)
Carteret Bancorp, Inc. 1-1-92

& normal
< contra >

Total assets (A) 5377902891
Total liabilities (B) 5340088564
Total equity - BV 37814327 ✓x

Equity balances
CS 100
Addl PIC 332915547
RE <295101320>
Total equity (BV) 37814327 ✓x

✓ to 1992 SMI-2.3A
e.1(c)

Beg BS (Consolidating)

| No. | ASSETS | (1 + 2) | [illegible] | (4 thru ...) | [illegible] | ... GROUP | ... GROUP |
|---|---|---|---|---|---|---|---|
| 1 | Cash | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| 2 | Trade notes and accounts receivable | [illegible] | | [illegible] | [illegible] | 7,385 | [illegible] |
| 2(a) | (a) Allowance for bad debts | ([illegible]) | | ([illegible]) | ( ) | 0 | ([illegible]) |
| 3 | Inventories | [illegible] | | [illegible] | | 0 | [illegible] |
| 4 | Gov't obligations (a) U.S. and instrumentalities | [illegible] | | [illegible] | | 0 | [illegible] |
| 4(b) | (b) State, subdivisions thereof, etc. | 0 | | 0 | | 0 | 0 |
| 5 | Other current assets * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| 6 | Loans to stockholders | 0 | ([illegible]) | [illegible] | | [illegible] | 0 |
| 7 | Mortgage and real estate loans | [illegible] | | [illegible] | | 0 | [illegible] |
| 8 | Other investments * | [illegible] | ([illegible]) | [illegible] | ([illegible]) | 0 | [illegible] |
| 9 | Buildings and other fixed depreciable assets | [illegible] | | [illegible] | 0 | [illegible] | [illegible] |
| 9(a) | (a) Accumulated depreciation | ([illegible]) | | ([illegible]) | 0 | 0 | ([illegible]) |
| 10 | Depletable assets | 0 | | 0 | | 0 | 0 |
| 10(a) | (a) Accumulated depletion | 0 | | 0 | ( ) | 0 | 0 |
| 11 | Land (net of any amortization) | [illegible] | | [illegible] | | 0 | [illegible] |
| 12 | Intangible assets (amortizable only) | [illegible] | | [illegible] | 0 | [illegible] | [illegible] |
| 12(a) | (a) Accumulated amortization | ([illegible]) | | ([illegible]) | 0 | ([illegible]) | ([illegible]) |
| 13 | Other assets * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| 14 | Total assets (lines 1 thru 13) | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] (A) |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | |
| 15 | Accounts payable | [illegible] | | [illegible] | [illegible] | 0 | [illegible] |
| 16 | Mortgages, notes, bonds payable in less than 1 year | 0 | | 0 | | 0 | 0 |
| 17 | Other current liabilities * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| 18 | Loans from stockholders | 0 | ([illegible]) | [illegible] | | [illegible] | 0 |
| 19 | Mtgs, notes, bonds payable in 1 year or more | [illegible] | | [illegible] | | 0 | [illegible] |
| 20 | Other liabilities * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| 21 | Capital stock (a) Preferred stock | 0 | | 0 | | 0 | 0 |
| 21(b) | (b) Common stock | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | 100 |
| 22 | Paid-in or capital surplus * | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] |
| 23 | Retained earnings - Appropriated * | 0 | | 0 | | 0 | 0 |
| 24 | Retained earnings - Unappropriated | ([illegible]) | [illegible] | ([illegible]) | ([illegible]) | [illegible] | ([illegible]) |
| 25 | Cost of treasury stock | ([illegible]) | | ([illegible]) | ([illegible]) | 0 | 0 |
| 26 | Total liabilities and stockholders' equity (15 thru 25) | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] |

← Σ = 5340088564 (B)

See stockholders' schedule for details

Page 1 SCHEDULE 29

Page 2 SCHEDULE 29

| | | | | | |
|---|---|---|---|---|---|
| 1 | Cash | [illegible] | | [illegible] | [illegible] |
| 2 | Trade notes and accounts receivable | [illegible] | | [illegible] | [illegible] |
| (a) | (a) Allowance for bad debts | 0 | | 0 | ( ) |
| 3 | Inventories | 0 | | 0 | |
| 4 | Gov't obligations (a) U.S. and instrumentalities | 0 | | 0 | |
| (b) | (b) State, subdivisions thereof, etc. | 0 | | 0 | |
| 5 | Other current assets * | [illegible] | | [illegible] | [illegible] |
| 6 | Loans to stockholders | 0 | 0 | 0 | |
| 7 | Mortgage and real estate loans | 0 | | 0 | |
| 8 | Other investments * | [illegible] | [illegible] | ([illegible]) | ([illegible]) |
| 9 | Buildings and other fixed depreciable assets | 0 | | 0 | 0 |
| (a) | (a) Accumulated depreciation | 0 | | 0 | 0 |
| 10 | Depletable assets | 0 | | 0 | |
| (a) | (a) Accumulated depletion | 0 | | 0 | ( ) |
| 11 | Land (net of any amortization) | 0 | | 0 | |
| 12 | Intangible assets (amortizable only) | 0 | | 0 | 0 |
| (a) | (a) Accumulated amortization | 0 | | 0 | 0 |
| 13 | Other assets * | [illegible] | | [illegible] | [illegible] |
| | | | | | |
| 14 | Total assets (lines 1 thru 13) | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | |
| | | | | | |
| 15 | Accounts payable | [illegible] | | [illegible] | [illegible] |
| 16 | Mort., notes, bonds payable in less than 1 year | 0 | | 0 | |
| 17 | Other current liabilities * | [illegible] | | [illegible] | [illegible] |
| 18 | Loans from stockholders | 0 | 0 | 0 | |
| 19 | Mtgs., notes, bonds payable in 1 year or more | 0 | | 0 | |
| 20 | Other liabilities * | [illegible] | | [illegible] | [illegible] |
| 21 | Capital stock (a) Preferred stock | 0 | | 0 | |
| (b) | (b) Common stock | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 22 | Paid-in or capital surplus * | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 23 | Retained earnings Appropriated * | 0 | | 0 | |
| 24 | Retained earnings Unappropriated | ([illegible]) | [illegible] | ([illegible]) | ([illegible]) |
| 25 | Cost of treasury stock | ([illegible]) | | ([illegible]) | ([illegible]) |
| | | | | | |
| 26 | Total liabilities and stockholders' equity (lines 15 thru 25) | [illegible] | [illegible] | [illegible] | [illegible] |

* see subsidiaries' schedule for details

[illegible] 12/31/[illegible]
[illegible]

Page 1
SCHEDULE 38

Page 2
SCHEDULE 38

[redacted]

[illegible] CORPORATION & [illegible] [illegible]

CONSOLIDATED BALANCE SHEET - END OF TAXABLE YEAR

[illegible] SCHEDULE [illegible]

| | ASSETS | (1) TOTAL (2 + 3) | (2) ELIMINATIONS | (3) SUBTOTAL (4 thru 13) | (4) [illegible] Corporation | (5) [illegible] Corporation of [illegible] | (6) [illegible] Group | (7) | (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Cash | [illegible] | | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 2 | Trade notes and accounts receivable | [illegible] | | [illegible] | [illegible] | 0 | 0 | | | | | | |
| (a) | (a) Allowance for bad debts | 0 | | 0 | ( ) | 0 | 0 | | | | | | |
| 3 | Inventories | 0 | | 0 | | 0 | 0 | | | | | | |
| 4 | Gov't obligations (a) U.S. and instrumentalities | 0 | | 0 | | 0 | 0 | | | | | | |
| (b) | (b) State, subdivisions thereof, etc. | 0 | | 0 | | 0 | 0 | | | | | | |
| 5 | Other current assets * | [illegible] | | [illegible] | [illegible] | 0 | 0 | | | | | | |
| 6 | Loans to stockholders | 0 | 0 | 0 | | 0 | 0 | | | | | | |
| 7 | Mortgage and real estate loans | 0 | | 0 | | 0 | 0 | | | | | | |
| 8 | Other investments * | [illegible] | [illegible] | ([illegible]) | ([illegible]) | [illegible] | 0 | | | | | | |
| 9 | Buildings and other fixed depreciable assets | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| (a) | (a) Accumulated depreciation | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| 10 | Depletable assets | 0 | | 0 | | 0 | 0 | | | | | | |
| (a) | (a) Accumulated depletion | 0 | | 0 | ( ) | 0 | 0 | | | | | | |
| 11 | Land (net of any amortization) | 0 | | 0 | | 0 | 0 | | | | | | |
| 12 | Intangible assets (amortizable only) | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| (a) | (a) Accumulated amortization | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| 13 | Other assets * | [illegible] | | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 14 | Total Assets (lines 1 thru 13) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | | | | | | | |
| 15 | Accounts payable | [illegible] | | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 16 | Mtges, notes, bonds payable in less than 1 year | 0 | | 0 | | 0 | 0 | | | | | | |
| 17 | Other current liabilities * | [illegible] | | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 18 | Loans from stockholders * | 0 | 0 | 0 | | 0 | 0 | | | | | | |
| 19 | Mtges, notes, bonds payable in 1 year or more | 0 | | 0 | | 0 | 0 | | | | | | |
| 20 | Other liabilities * | [illegible] | | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 21 | Capital stock: (a) Preferred stock | 0 | | 0 | | 0 | 0 | | | | | | |
| | (b) Common stock | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 22 | Paid-in or capital surplus * | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | 0 | | | | | | |
| 23 | Retained earnings - Appropriated * | 0 | | 0 | | 0 | 0 | | | | | | |

CARTERET SAVINGS BANK FA

# MEMORANDUM

DATE: March 10, 1993

TO: George M. Gross, Jr., Managing Agent

FROM: James R. Mindnich, Credit Specialist

SUBJECT: UNCOMMITTED PIPELINE

On December 4, 1992, the day of intervention, the initial meeting held with the association employees raised many concerns regarding Carteret's ability to fund its current pipeline committed 1-4's totalling $245MM+ and uncommitted pipeline (APS in process) of another $175MM. This origination system consisted of approximately 100 association employees plus over 200 correspondents. A major concern was that elimination of the origination mortgage area would require the conservatorship to lay off employees.

Messrs. Smedley, Ford, Gross, Hallenbach, Bowers, DiGiondomenico, in concert with Steve Haley and Carol Wetherly, (telephonically) determined early Friday evening that Carteret would fund the pipeline and requested additional information in order to look at the possibility of funding/extending/continuing originations based on Mr. Ford's statement that failure to do so would create a significant void in mortgage dollars available based on Carteret's $100MM per month production.

At the team leaders' meeting on Saturday morning December 5, Messrs. Smedley, Ford, Gross, et al, with verbal concurrences from Carol Wetherley, reaffirmed the funding of the committed mortgages. Based on information regarding a case to continue funding 1-4's in process from Home Federal in California, Mr. Ford requested that Carteret continue to act in an ongoing fashion accepting applications for at least the next week ending Friday, December 11. During that period of time, Mr. DiGiondomenico was instructed to update all parties regarding the flow of applications and overall effect on the correspondents. Mr. Ford stated he would supply a copy of the California case.

In conjunction with this decision, was the study of Carteret's secondary marketing program operated in the Treasury area by Greg Fuhrmann. These transactions are consummated through creation of Fannie Mae mortgage-backed securities sold to Wall Street brokers or through whole loan sales to City Mae, GMAC,/RFC, GE Capital and other investors. The secondary marketing efforts and strategies are dependent upon the mortgage pipeline for product. At the time of intervention, we were told that Carteret had $500 million in commitments outstanding and had funded approximately $236MM requiring the difference to be generated from the current pipeline. Donna Cribbs and Bill Bailey were preparing an analysis of Carteret's position which we [illegible] no later than

Monday, December 7. Further discussion continued and Mr. Haley closed requesting Mr. Ford's concurrence on the matter.

On Tuesday, December 8, a conference call from Bob Smedley, Carol Wetherly, Donna Pillard, involving George Gross, John Walsh, Dean DiGiondomenico and myself was quick to point out that there was an apparent lack of control regarding the hands-on management of the pipeline and market sales. Mr. DiGiondomenico was requested to provide additional reports for a review by Donna Pillard and Jim Powers, et al at a meeting held on Thursday, December 10 in Parsippany.

On Thursday morning, December 10, Donna Cribbs presented her findings to Donna Pillard, Jim Powers, Bob Smedley, Gene Yalicki, and those present. Interviews with various association staff members in conjunction with the funding and secondary market situation were held. It was determined that the applications generated from date of conservatorship was less than $10 million; an indication that the correspondent relationship (60% of volume) had already moved. This combined with the interviews taken, the decision was made on December 11 to cease all further acceptance of mortgage applications.

All APS in the bank as of December 11 would be processed in accordance with the established standards of Carteret and would be approved and funded having met those guidelines.

Concur:

Dean DiGiondomenico

JRH:mc

To: Robert O. Smedley@CONSERVE-CAR@RTCATL
W. Robert Haley@FSC-CONSERVE@RTCATL

Cc: Edward Mahaney@Oper@RTCDC
David J. Wisnewski@FSC-EXEC@RTCATL
Sally C. McCormick@Oper@RTCDC
Daryl M. Burton@FSC-CLOSING@RTCATL
Thomas A. Steinmetz@FSC-CONSERVE@RTCATL
Richard J. Mullen@ASSETS-FRAM@RTCATL
Dennis J Lauria@AREM@RTCVF
James K. Baebel@OPER-FLD@RTCDC

Bcc:
From: Stephen A. Haley@FSC-EXEC@RTCATL
Subject: ASSET SALES FROM CONSERVATORSHIPS
Date: Friday, March 19, 1993 11:28:11 EST ← note
Attach:
Certify: N
Forwarded by: Stephen A. Haley@FSC-EXEC@RTCATL

---

*****************************************************************************
PLEASE DISTRIBUTE THIS COMMUNICATION TO ALL ASSISTANT SMAs, MANAGING AGENTS, AND OTHER KEY RTC STAFF IMMEDIATELY.
*****************************************************************************

I am forwarding to you an email from Ed Mahaney (Vice President, Department of Operations, Washington) which deals with asset sales from conservatorships.

It appears we are in the midst of a shift in policy. For the past couple of years or so, the general direction has been to liquidate and liquefy the asset side of our conservatorship balance sheets. GENERALLY SPEAKING, THE EVOLVING NEW DIRECTION IS TO HOLD AND NOT LIQUIDATE PERFORMING ASSETS -- BUT TO CONTINUE TO LIQUIDATE NONPERFORMING ASSETS. Once prepared, a more definitive and detailed policy statement will follow.

The reason for this change in direction is a concern for how net interest margins have dwindled as a result of selling-off higher yielding assets and redeploying sale proceeds into low-yielding liquidity oriented assets -- these declines in spreads and margins even in light of conservatorships having been very successful in reducing their weighted average cost of funds. These declining net interest margins and resulting unprofitable or only marginally profitable operations are deemed to not be in the best interests of taxpayers or the RTC.

The attached email from Mr. Mahaney addresses major asset categories and to some extent addresses some types of asset marketing initiatives and the way each should be viewed for the future. Managing Agents should act accordingly. TO THE EXTENT THERE ARE CONFLICTING INTERPRETATIONS OR DISAGREEMENTS WITH RESPECT TO THIS POLICY SHIFT, THESE ISSUES SHOULD BE ELEVATED THROUGH YOU TO ME, AND ANY SUCH ISSUES WE CANNOT SUCCESSFULLY WORK-OUT WILL BE ELEVATED BY ME TO MR. MAHANEY OR MS. MCCORMICK IN WASHINGTON.

To: Michael A. Jungman@Assets-mkl@RTCDC
Barry S. Kolatch@EXEC@RTCDC,J. Paul Ramey@FRB@RTCDC
CC: William H. Roelle@EXEC@RTCDC,Meg I. Joyner@EXEC@RTCDC
Marsh McJunkin@EXEC@RTCDC,Gary Bowen@Assets-ad@RTCDC
Thomas P. Horton@Assets-fa@RTCDC
Bcc:
From: Edward Mahaney@Oper@RTCDC
Subject: Asset Sales From Conservatorships
Date: Friday, March 12, 1993 14:57:56 EST ← note
Attach:
Certify: N
Forwarded by: Stephen A. Haley@FSC-EXEC@RTCATL

---

Comments by: Stephen A. Haley@FSC-EXEC@RTCATL
Forwarded to: Allan J. Morehead@Conserv@RTCATLSOM
Comments:

For our discussion.

---

Comments by: Stephen A. Haley@FSC-EXEC@RTCATL
Forwarded to: Robert O. Smedley@Conserv@RTCATLSOM
W. Robert Haley@FSC-CONSERVE@RTCATL,djw,sah

Comments:

To: Bobs (cc: Dave) --
Let's the 3 of us have a conference call on this Friday am. How about 8:30? Thanks.

---

Comments by: David J. Wisnewski@FSC-EXEC@RTCATL
Forwarded to: Stephen A. Haley@FSC-EXEC@RTCATL
Comments:

This is the e-mail that I was so vague about that everyone on the national conference call was aware of. I still have to review it. Your thoughts?

---

Comments by: Edward Mahaney@Oper@RTCDC
Forwarded to: James Densmore@Executive@RTCDEN
James Densmore@Exec-Rep@RTCDEN
Jim R. Messer@FSC-EXEC@RTCDAL
James G. Thompson@CONSERVE@RTCKC
David J. Wisnewski@FSC-EXEC@RTCATL
Sally C. McCormick@Oper@RTCDC
Comments:

Here's a heads up of a slight shift in policy. Please do not get into any serious disagreement with others in the field over what

# RESOLUTION TRUST CORPORATION

## ATLANTA FINANCIAL SERVICE CENTER
## ATLANTA, GEORGIA

## SUPERVISORY REVIEW MANUAL
## REVISED
## MARCH 1993

"PRIVILEGED AND CONFIDENTIAL"

ATLANTA OFFICE
800-628-4362

SUPERVISORY REVIEW
CONTRACTOR ORIENTATION & ENTRANCE BRIEFING

General Comments

1. The main objective of the review is to provide constructive criticism and point out deficiencies that could be problematic for the Managing Agent (hereinafter MA) and the institution.

2. If corrections to exceptions/deficiencies can be initiated and effectuated, or problems can be resolved during your visit, a comment on your final report is not necessary; however it should still be documented in your work papers.

3. The institution may have previously received (or you may have provided) a copy of the program and has already prepared answers and documentation for your use. This is not a problem; however, it is your responsibility to review, test, and sample the underlying records and procedures to substantiate your responses.

4. Reference materials other than the memos and directives which we have provided are various manuals that the MA should have in his possession.

5. Some of the questions overlap; therefore make sure that your answers are consistent. Additionally, provide sufficient detail for answers in the negative or N/A (not applicable).

6. The following timelines apply to the Supervisory Review Report completion:

a) Field Site Work Completion- 10 Business Days.

b) Contractor Report Delivery Date- 10 Business Days after Field Site Work Completion.

c) Program Office Initial Acceptance Date- 20 Business Days after Receipt of Report.

d) Program Office Revision Acceptance Date- 10 Business Days after Receipt of Revised Report.



AM5067 0159 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

7. At the end of the field site work an exit interview will be conducted by the contractor utilizing a "draft" of the final report. Attendance will include the MA, representatives from the Program Oversight Office (mandatory, either in person or by conference call) and any other institution or RTC employee considered necessary by the MA. The MA must also notify his SMA so that he (or his designee) has the opportunity to attend or participate either personally or by conference call.

8. If the Supervisory Review contracted for is a return engagement, the review should begin from the prior review date and not from the institution's intervention date.

9. The final Supervisory Review report must be in the exact format as dictated by the applicable Yellow Book (GAS) and AICPA standards. Failure to do so will result in the report being returned to the Contractor as unacceptable.

10. The Program Office reserves the right to change, modify or remove any exception(s) that it deems necessary at its own discretion without prior written approval.

11. The Contractor is responsible to contact the Oversight Manager within the RTC Supervisory Review and Oversight Department on the first day of work at the RTC field site. The RTC Oversight Manager is as follows:

Supervisory Review -
Joseph J. Curcio (215) 631-3877

12. The final Supervisory Review report (signed by the Contractor) and supporting work paper files are to be mailed to the address below:

RTC - Valley Forge Consolidated Office
ATTN: Joseph J. Curcio
1000 Adams Avenue or P.O. Box 1500
Norristown, PA 19403 Valley Forge, PA 19482

CONTRACTOR ACKNOWLEDGEMENT:

The undersigned Contractor Representative acknowledges receiving and reading this Orientation/Briefing Letter and the related program summary. (Please list field site team members below.)

[signature] 10/18/93
Contractor Representative Date

Field Site Team Members:

CRAIG RONHOVDE

TOM FLYNTZ

Revised 03/93



AM5067 0160 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Conclusion:

Where an item that was previously considered an intangible asset, such as goodwill, but can no longer be recorded as such remains on the books after intervention, a substantive exception in the area of control exists. If the item is immaterial in amount, and the deficiency is corrected during the review, no exception need be taken.

6. Have appraisals or other value estimates been obtained for buildings (facilities owned) and all tangible "other assets" of material value that may reasonably be assumed to have market values differing significantly from their book values?

Conclusion:

Departures from the appraisal procedures prescribed in section VI-C of RTC's Asset Management and Disposition Manual (AMDM) should be treated as technical exceptions in the area of downsizing. Failure to obtain value estimates of material assets represents a substantive exception. If the exception is noted at a stage of the conservatorship's life cycle when the sale of the asset prior to resolution remains a realistic alternative, the exception should appear in the downsizing area. If the exception is noted at a time when further asset sales are "on hold" due to pending resolution, the exception pertains to the preparation for resolution section of the report.

Discussions, References, and Work Papers
Question 4, 5, and 6:

Sections IVc and IVd of the AMDM provide guidelines for obtaining appraisals of other assets, including works of art.

The reviewer should determine if the conservatorship has complied with the requirements of Memorandum ERO-459 (08/01/90 by Waldrop). This memorandum requires that an appraisal of conservatorship owned facilities be conducted within sixty days of intervention, unless an acceptable appraisal, not more than one year old, was acquired prior to intervention.

Such appraisals should also be obtained for leasehold interests, where the institution holds a long term lease on the property.

Appraisals should be obtained on furniture, fixtures, and equipment (FF&E). In the event that a sale of the entire institution by the Resolutions Department using a Total Asset Purchase Agreement is considered probable, the appraisal would be helpful in the evaluation be conducted as part of the institution's preparation for resolution. Works of art, that

may be carried on the books as a component of FF&E, should be appraised. Memorandum WDC-982 (09/27/91 by Kelly) details Resolution Trust Corporation policy with reference to the valuation, appraisal and disposition of all Furniture, Fixtures and Equipment.

The reviewer need not provide documentation of compliance with these procedures in the work papers. The institution's failure to obtain required appraisals need only be referenced in the report. In the event the appraisals are not in conformance with Resolution Trust Corporation guidelines, the specific nature of the deficiencies should be listed in the work papers, along with photocopies of examples of the deficiencies. If the appraisals were not acquired in the prescribed manner, such exceptions should be discussed in the chapter dealing with Asset Marketing and Contracting.

FIRREA mandates that conservatorships account for their operations in accordance with GAAP. Accordingly, the reviewer should be alert to instances where assets are carried on the books at an amount that exceeds their appraised value. Furthermore, the Act requires that certain items (considered other assets under RAP) must be written off. The most prominent of these are, deferred losses on the sale of loans and goodwill. Other items that are considered assets under GAAP are so considered with the understanding that the business in question is a "going concern." Such assets have no market value and must be written off by a conservatorship. Unamortized organizational costs is one example of other assets that should be written off.

7. Has the conservatorship implemented Memorandum WDC-1259 (05/04/92 by Kelly) with reference to self insurance for RTC controlled properties including property that secures loans in default for non-payment of insurance?

Conclusion:

Memorandum WDC-1259 establishes a Risk Management Policy of self insurance for all property controlled by The Resolution Trust Corporation. The memorandum directs the Managing Agent to review the insurance coverage on all RTC controlled assets. If existing coverage exists it should be canceled. If the Managing Agent has not implemented WDC-1259 the exception will be substantive. If implementation has begun and has not been completed the exception will be technical in the area of control.

8. Does each asset file contain sufficient documentation to substantiate the institution's ownership of the asset?



AM5067 0207 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Conclusion:

Exceptions to this question will generally be technical, relating to the area of control. If the institution has been scheduled for resolution, and such documentation deficiencies exist with respect to a major asset, a substantive exception in the resolutions preparation for area should be taken. In cases where the institution's ownership of a major asset is subject to a serious challenge, a critical exception exists in the control area.

Discussions, References, and Work papers:

Documentation of ownership should be maintained for each material asset in the other assets category. The standards applied to determine proof of ownership will generally parallel those used to document a lien position in a lending relationship. Ownership of real estate will be evidenced by a deed, of an automobile by a title, and other types of assets by a bill of sale or other customary indication of ownership.

This documentation should be in a six-part or two-part file in accordance with RTC policy.

9. Have those other assets for which a market exists been listed with a broker or exposed to the market in some other appropriate manner?

10. Does the conservatorship have a Strategic Plan including the marketing plan to facilitate the sale, redemption, liquidation, or write off of substantially all of its other assets prior to resolution?

Conclusion
Question 9 and 10:

The failure to include material elements of "other assets" in a downsizing plan, or to implement the downsizing process with respect to such assets, represents a substantive exception in the area of downsizing.

In cases where the institution has been scheduled for resolution, and where no process has been established to dispose of surplus fixed assets or to charge off stale or dubious reconciling items, a substantive exception in the area of preparation for resolution may be appropriate.

Discussions, References, and Work Papers
Questions 9 and 10:

Most of the components of other assets are subject to the same general mandate with respect to downsizing as are the loan and



AM5067 0208 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**Stratification of Assets Remaining (Report M48A)**

Change for Month of August 1993:

At August 31, 1993 Carteret had 127,620 loan and real estate owned (REO) assets (assets) with a book value of $2,431,301,000, a decrease of 107 assets and $47,457,000 in book value from 127,727 assets* with a book value of $2,478,758,000 at July 31, 1993.

The decrease in the number of loans was offset by loans purchased from Imperial Premium Finance ("IPF") an insurance premium finance subsidiary of Carteret. IPF had a net increase of 710 loans, but a net decrease of $1,947,000 in book value in the Commercial Unsecured category (line 303) from July 31 to August 31.
Also, Carteret received approval to increase the credit line available to IPF to $425,000,000 from $400,000,000 at June 30, 1993. With the increased credit line in place, the outstanding balance will likely increase from the actual balance of $376,306,555 with 86,346 loans at August 31, 1993.

Exclusive of IPF, Carteret's assets decreased by 817 from 42,091 to 41,274 with a corresponding book value decrease of $45,510,000 from $2,100,504,000 at July 31, 1993 to $2,054,994,000 at August 31, 1993.

Carteret continued to experience significant and positive paydown/ payoff activity in the performing portfolios. Approximately $8,692,000 was collected on the commercial loan portfolio, while approximately $25,000,000 was collected on the residential loan portfolio and REO.

In addition to the above, the institution serviced 93,887 loans and REO for others with a book value of $5,253,877,000 at August 31, 1993. This is a decrease of 1,959 assets and a decrease of $102,047,000 of book value from 95,846 assets with book value of $5,355,924,000 at July 31, 1993.

*Please note that there was a change in the number of loan assets for July 31, 1993 and prior, due to the incorrect number of IPF loans, as reported to Carteret by IPF. The number of non-mortgage loans will change, affecting the total loan and real estate owned asset totals, but the principle balances were not affected. Adjustments will be forwarded for previous reports.

Changes for the month are summarized on the attached Exhibit 1.

## Stratification of Assets Remaining (Report M48A)

Change since Date of Conservatorship (DOC) - December 4, 1992:

Since intervention on December 4, 1992, the number of assets has increased 30,110 from 97,510 to 127,620 at August 31, 1993. Assets have downsized $320,364,000 from a high of $2,751,665,000 to $2,431,301,000 at August 31, 1993. The increase in the number of loans is again due to the funding of the IPF loans as explained in the discussion of the monthly change.

Exclusive of IPF, the number of assets has decreased by 9,146 from 50,420 at DOC to 41,274 at August 31, 1993 and the book value of assets has decreased $390,332,000 from $2,445,326,000 at DOC to $2,054,994,000 at August 31, 1993.

In addition to the above, the book value of assets serviced for others downsized $1,132,595,000 from $6,386,472,000 to $5,253,877,000. The number of assets serviced for others decreased 18,247 from 112,134 at DOC to 93,887 at August 31, 1993.

Changes since DOC are also summarized on the attached Exhibit 1.

## SAMA/SAMDA - SALES Initiative Stratification (Report M48B)

The First Boston 1-4 Family Securitizations, for $809,927,000, have been put on hold indefinitely, as well as the Consumer loan sale for $78,156,744.

Three non-performing loan sales and one non-performing auction took place during this month, for which we are awaiting proceeds. They are as follows: S-1 on August 19th for $16,129,742; S-2 on August 19th for $71,868,559; N-3 on August 18th for $25,824,935; and the Non-Performing 1-4 Auction III on August 24-25 for $62,556,792.

At present time, Carteret is preparing to sell $120,000,000 in 1-4 Family mortgages for the Home Unity Resolution. This sale is to close by October 29, 1993.

The status of SAMA/SAMDA - Sales initiatives are included on the attached Exhibit 2.

Also, 19 subsidiaries have been dissolved, as of August 23, 1993.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: keymaster@town.hall.org
Originator-Key-Asymmetric:
 MFkwCgYEVQgBAQICAgADSwAwSAJBALeWW4xDV4i7+b6+UyPn5RtObb1cJ7VkACDq
 pKb9/DClgTKIm08lCfoilvi9Wl4SODbR1+1waHhiGmeZO8OdgLUCAwEAAQ==
MIC-Info: RSA-MD5,RSA,
 EqAdNBM8smLwRC3OKlp5Pt0ldVCuAm/FKea9nbfFb2YC83R2foNnd9RbxObCn02M
 Ul9z06KGllAZ5mZo+LGbeg==

<IMS-DOCUMENT>0000950144-94-000569.txt : 19940309
<IMS-HEADER>0000950144-94-000569.hdr.sgml : 19940309
ACCESSION NUMBER: 0000950144-94-000569
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT: 7
CONFORMED PERIOD OF REPORT: 19931231
FILED AS OF DATE: 19940308

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: FIRST TENNESSEE NATIONAL COR
CENTRAL INDEX KEY: 0000036966
STANDARD INDUSTRIAL CLASSIFICATION: 6021
IRS NUMBER: 620803242
STATE OF INCORPORATION: TN
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K
SEC ACT: 34
SEC FILE NUMBER: 000-04491
FILM NUMBER: 94514957

BUSINESS ADDRESS:
STREET 1: 165 MADISON AVE
CITY: MEMPHIS
STATE: TN
ZIP: 38103
BUSINESS PHONE: 9015234027

MAIL ADDRESS:
STREET 1: P O BOX 84
CITY: MEMPHIS
STATE: TN
ZIP: 38101-0084

FORMER COMPANY:
FORMER CONFORMED NAME: FIRST TENNESSEE BANKS INC
DATE OF NAME CHANGE: 19600201
</IMS-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FIRST TENNESSEE 10-K
<TEXT>

<PAGE> 1

SECURITIES AND EXCHANGE COMMISSION

Washington, D. C. 20549

FORM 10-K

(Mark One)
/x/ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [FEE REQUIRED]
For the fiscal year ended December 31, 1993
- or -

/ / TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (NO FEE REQUIRED)
For the Transition period from __________ to __________

Commission File Number 0-4491

FIRST TENNESSEE NATIONAL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| TENNESSEE | 62-0803242 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| 165 Madison Avenue, Memphis, Tennessee | 38103 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including Area Code: 901-523-5630

Securities registered pursuant to Section 12(b) of the Act:

NONE

Securities registered pursuant to Section 12(g) of the Act:

$2.50 Par Value Common Capital Stock
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. X YES ----- NO -----

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. -----



<PAGE> 2

At February 23, 1994, the aggregate market value of the voting stock of the registrant held by non-affiliates of the registrant was approximately $1,116,000,000.

At February 23, 1994, the registrant had 30,175,456 shares of common stock

outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

1. Annual Report To Shareholders for the year ended 12/31/93 - Parts I, II, and IV.

2. Proxy Statement furnished to shareholders in connection with Annual Meeting of Shareholders scheduled for 04/19/94 - Part III (to be provided by amendment not later than 120 days after the end of the 1993 fiscal year per General Instruction G(3) to Form 10-K).





PART I

ITEM 1
BUSINESS

General.

First Tennessee National Corporation (the "Corporation") is a Tennessee corporation incorporated in 1968 and registered as a bank holding company under the Bank Holding Company Act of 1956, as amended. At December 31, 1993, the Corporation had total assets of $9.6 billion and ranked first in terms of total assets among Tennessee-headquartered bank holding companies and ranked in the top 65 nationally.

Through its principal subsidiary, First Tennessee Bank National Association (the "Bank"), and its other banking and banking-related subsidiaries, the Corporation provides a broad range of financial services. The Corporation derives substantially all of its consolidated total pre-tax operating income and consolidated revenues from the banking business. As a bank holding company, the Corporation coordinates the financial resources of the consolidated enterprise and maintains systems of financial, operational and administrative control that allows coordination of selected policies and activities. The Corporation assesses the Bank and its subsidiaries for services they receive on a formula basis it believes to be reasonable.

The Bank is a national banking association with principal offices in Memphis, Tennessee. It received its charter in 1864 and operates primarily on a regional basis. During 1993 it generated gross revenue of approximately $841 million and contributed 96.1% of consolidated net income from continuing operations. At December 31, 1993, the Bank had $9.4 billion in total assets, $7.0 billion in total deposits, and $5.8 billion in net loans. Within the State of Tennessee on December 31, 1993, it ranked first among banks in terms of total assets and deposits. Nationally, it ranked in the top 100 in terms of total assets and deposits as of December 31, 1993. On December 31, 1993, the Corporation's subsidiary banks had 214 banking locations in 20 Tennessee counties, including all of the major metropolitan areas of the state, and 4 banking locations in Mississippi.

An element of the Corporation's business strategy is to seek acquisitions that would enhance long-term shareholder value. The Corporation has an acquisitions department charged with this responsibility which is

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the report of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of First Tennessee National Corporation and subsidiaries as of December 31, 1993 and 1992, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1993, in conformity with generally accepted accounting principles.

As discussed in Note 14 to the consolidated financial statements, effective January 1, 1993, the Company changed its method of accounting for postretirement benefits other than pensions.

Memphis, Tennessee,
January 18, 1994

Arthur Andersen & Co.

<PAGE> 43

MANAGEMENT DISCUSSION & ANALYSIS

CONSOLIDATED FINANCIAL REVIEW

First Tennessee National Corporation (FTNC) is the largest Tennessee-based bank holding company. FTNC offers a wide range of financial services to consumers, businesses, financial institutions, and governments.

On October 1, 1993, First Tennessee Bank National Association (FTBNA), a subsidiary of FTNC, completed the acquisition of Maryland National Mortgage Corporation (MNMC) for approximately $114 million in cash. The total purchase price included value for purchased mortgage servicing rights and approximately $41 million for tangible net assets. MNMC, which became a subsidiary of FTBNA at the close of the transaction, was the wholly owned mortgage banking subsidiary of MNC Financial, Inc., a Baltimore-based bank holding company. MNMC and its subsidiary, Atlantic Coast Mortgage Company, originate and service residential mortgage loans through a network of 31 offices primarily in Maryland, Virginia, Pennsylvania, Delaware, New Jersey, and Colorado. In 1993, MNMC originated $3.1 billion in mortgage loans and at year-end serviced $4.4 billion in mortgage loans. MNMC will continue to operate from its current headquarters in Baltimore.

On December 31, 1993, FTNC completed its acquisition of New South Bancorp (NSB) by merging into FTNC, NSB, the parent of New South Bank which has offices in Southaven, Como, and Crenshaw, Mississippi. Simultaneously, New South Bank merged into First Tennessee Bank National Association Mississippi. At December 31, 1993, NSB had $35 million in total assets, $32 million in total deposits, and $3 million in capital.

On January 4, 1994, FTNC completed the acquisition of SNMC Management Corporation (SNMC) for approximately $68 million in FTNC common stock. SNMC, which became a subsidiary of FTBNA at the close of the transaction, is the parent of Sunbelt National Mortgage Corporation (Sunbelt), both of which are headquartered in Dallas. Sunbelt originates and services residential mortgage

loans primarily through a network of 40 offices in 14 states, with most of the originations occurring in the Southwest, Florida, and North Carolina. In 1993, Sunbelt originated $3.3 billion in mortgage loans and at year-end serviced $6.1 billion in mortgage loans. SNMC will continue to operate from its current headquarters in Dallas.

On March 1, 1994, Highland Capital Management Corp. (HCMC) merged with First Tennessee Investment Management, Inc. (FTIM), a wholly owned subsidiary of FTNC. The combined organization became a subsidiary of FTNC with the name Highland Capital Management Corp. and manages $2.6 billion in fixed income and equity securities.

On July 28, 1993, FTNC and Cleveland Bank and Trust Company (CBT) of Cleveland, Tennessee, announced the execution of a definitive agreement providing for the acquisition of CBT by FTNC. CBT had $227 million in assets, $200 million in deposits, and $23 million in capital at December 31, 1993. This transaction is expected to close in the first quarter of 1994.

In addition to expanding the core banking franchise in Tennessee markets, FTNC's strategy is to extend its market presence into attractive markets outside of Tennessee. Further expansion of other key business lines, such as the bond division, mortgage banking, credit card, merchant credit card processing, check processing, and trust services is expected to occur as appropriate opportunities are identified.

This section provides a narrative discussion and analysis intended to cover the significant factors that affected FTNC's financial condition and results of operations for the last three years. The consolidated financial statements and accompanying notes should be read in conjunction with this discussion and the tables and graphs which are set forth immediately following this Consolidated Financial Review.

FINANCIAL PERFORMANCE SUMMARY

FTNC reported record earnings for 1993. Net income per share for 1993 was $4.26 compared to $3.19 per share for 1992 and $2.63 per share for 1991. Net income totaled $120.7 million in 1993 versus $89.2 million in 1992 and $73.0 million in 1991.

<PAGE> 44

Two key measures of profitability in the banking industry are return on average equity (ROE) and return on average assets (ROA). ROE was 18.99 percent in 1993 versus 15.44 percent in 1992 and 14.14 percent in 1991. ROA rose to 1.35 percent in 1993 from 1.07 percent in 1992 and .95 percent in 1991.

The 1992 earnings were impacted by the one-time acquisition expenses of Home Financial Corporation (HFC) during the fourth quarter. These expenses reduced earnings per share by 56 cents, and after adjusting for this impact, the return on equity would have been 18.14 percent and the return on assets would have been 1.26 percent.

In addition, higher net interest income (NII), a lower provision for loan losses, and strong growth in noninterest income contributed to the improved profitability. Increased noninterest expense partially offset the improvement in earnings. Supporting the growth in NII was a higher level of average earning assets. The net interest margin (NIM) remained stable at 4.35 percent in 1993 compared to 4.37 percent in 1992. The decline in the loan loss provision reflected the continued improvement in asset quality which has occurred over the last three years. Noninterest income provided a significant contribution to 1993 earnings, reaching approximately 44 percent of total revenues. Growth in noninterest income was led by a substantial increase in mortgage banking revenues, primarily related to the MNMC acquisition followed

RTC Reports

CARTERET SAVINGS BANK FA

# MEMORANDUM

DATE: February 18, 1994

TO: Distribution

FROM: Tanya L. Robertshaw TLR

SUBJECT: Monthly Conservatorship Reports

Please find attached a copy of the January Conservatorship Asset Summary Reports. If you have any questions, please contact me at extension 6006.

Distribution:
L. Redwanowski
E. Griffin
D. DiGiondomenico
G. Scott
J. Mindnich
E. McGuire
J. Santos
R. Ennis
L. Gomez
D. Olsen
G. Cannarozzi
K. Miller
G. Radell

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0021607



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM028 0146
App. 499

## Stratification of Assets Remaining (Report M48A)

**Change for Month of January 1994:**

At January 31, 1994 Carteret had 115,552 loan and real estate owned ("REO") assets ("assets") with a book value of $1,915,235,000, a decrease of 2,699 assets and $20,219,000 in book value from 118,251 assets with a book value of $1,935,454,000 at December 31, 1993.

The number of Imperial Premium Finance (IPF) loans, an insurance premium finance subsidiary, decreased again this month to 80,126 loans. However, the book value increased to $359,022,000. This resulted in a decrease of 1,948 loans and an increase of $818,000 in book value for the month, from 82,074 loans with a book value of $358,204,000 at December 31, 1993. Exclusive of IPF, Carteret's assets decreased by 751 from 36,177 to 35,426 with a corresponding book value decrease of $21,037,000 from $1,577,250,000 at December 31, 1993 to $1,556,213,000 at January 31, 1994.

One commercial mortgage loan for $1,950,000 was recorded in the Permanent Non-Residential portfolio (line 260) for a RTC-VFO seller-financing sale of a subsidiary-owned REO property. This loan is being serviced by 1st Fidelity Mtg. Corp. The note is held by RTC as Conservator/ Receiver for CFSB.

The institution also serviced 76,609 loans and REO for others with a book value of $4,214,379,000 at January 31, 1994. This is a decrease of 2,096 assets and a decrease of $144,616,000 book value from 78,705 assets with a book value of $4,358,995,000 at December 31, 1993.

Changes for the month are summarized on the attached Exhibit 1.

**Change since Date of Conservatorship (DOC) - December 4, 1992:**

Since intervention on December 4, 1992, the number of assets has increased 20,205 from 95,347 to 115,552 at January 31, 1994. Assets have downsized $836,430,000 from a high of $2,751,665,000 to $1,915,235,000 at January 31, 1994. The increase in the number of loans is due to Carteret honoring a commitment to purchase loans from IPF.

Exclusive of IPF, the number of assets has decreased by 14,994 from 50,420 at DOC to 35,426 at January 31, 1994 and the book value of assets has decreased $889,113,000 from $2,445,326,000 at DOC to $1,556,213,000 at January 31, 1994.

In addition to the above, the book value of assets serviced for

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021608

others downsized $2,172,093,000 from $6,386,472,000 to $4,214,379,000. The number of assets serviced for others decreased 35,525 from 112,134 at DOC to 76,609 at January 31, 1994.

Changes since DOC are also summarized on the attached Exhibits 1 and 2.

SAMA/SAMDA - SALES Initiative Stratification (Report H48B)* & Other Asset Activity (Exhibit 3)

Loan Servicing Operation
The marketing package for the Clearwater Loan Servicing Operation is being prepared by Reserve Financial. The sales document and offering memorandum are to be completed by mid-February and sent out by the end of February. This sale includes the servicing rights for 72,920 1-4 family mortgage loans, totalling approximately $4 billion, and REO Claims Receivables in the amount of $27.8 million. The sale is scheduled for May, 1994.

Clearwater Fallout
In preparation for the sale of the Clearwater Loan Servicing Operation, the following portfolios have been identified as "fallout." The servicing and/or disposition options have been reviewed by Valley Forge RTC (VFO) and Carteret personnel. Knutson Mortgage Corporation was awarded the servicing contract by VFO Contracts Department. The servicing transfer will consist of two separate transfers. The performing 1-4 mortgage loans, including those designated for the Dryades Resolution sale and the Supplemental Loan Pool will be transferred on March 1, as will the Citimae SWAP loans, also. This first transfer encompasses approximately 82% of the "Clearwater Fallout." The remaining portfolios will be transferred on April 1. These items are identified within exhibit 3.

-Performing Residential
Performing 1-4 Family mortgages were previously scheduled for securitization. However, a freeze has been placed on sales of performing assets in conservatorship. Exclusive of the Dryades and the Supplemental loan pools, Carteret has 5,871 performing 1-4 loans, with a book value of $550,260,538, to be offered to the acquirer(s).

-Home Unity/Chase Resolution Residential Loan Sale
The sale of 1,056 1-4 family mortgages for the Home Unity/Chase Resolution closed on December 22, 1993. As of January 31, Carteret was interim servicing 1,029 loans, with a book value of $93,688,218. The sale was segregated into two pools. Servicing of the first pool was transferred to Commercial Federal on February 1,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021609



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM028 0148
App. 501

1994. Servicing of the second pool will be transferred to Knutson on April 1, if not transferred to United Bank of Philadelphia prior.

-Dryades Resolution/Residential Loan Sale
Carteret has prepared approximately 912 1-4 family mortgages, with a book value of $64,304,325, of which an estimated $40 million will be used to facilitate the Dryades Resolution sale. Due diligence was performed by Real Estate Recovery/ Nationwide Mortgage in January. There is no closing date scheduled at this time.

-Non-Performing Residential
To date, 102 loans with a book value of $13,002,062 have been tagged for the National Non-Performing 1-4 Auction IV to be held in April, 1994 (*Included in M48B, line 250,253). An additional 325 loans, with a book value of $28,441,904, are not eligible for Auction IV and remain to be marketed as non-performing.

-Citimae SWAP Loans\CFSB Certificates
Carteret received a termination agreement from Citibank, which would allow CFSB to unwind 699 Citimae SWAP loans, with a book value of $57,572,470. RTC legal is presently reviewing and revising the agreement. Carteret also owns 7 other certificates, securitized by 494 loans, with a book value of $23,697,927. The legal department will review the procedures necessary to collapse these securitizations, also.

-Custer Federal WRAP Loans
These 4 loans, with a book value of $113,649, were excluded from the Smith Barney Package due to the fact that they are commercial loans. The case to unwind these loans will be presented to CFSB CRC in February. Once approved, the servicing will be transferred to Custer Federal.

-John Alden Commercial Loans
These 2 loans, with a book value of $1,605,326, were also excluded from the Smith Barney Package due to the fact that they are commercial loans. The case to unwind these loans will be presented to CFSB CRC in February. Once approved, the servicing will be transferred to John Alden.

-CFSB-Owned Participation Loans
The servicing for 127 CFSB-Owned participation loans, with a book value of $3,051,449, will be included in the April 1 transfer to Knutson, unless the participants pay off the Carteret portion and assume servicing.

FHLMC Participations
The sale of approximately 2,974 residential mortgages, with a book

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021610

value of $3,545,976, to FHLMC, in which Carteret holds only minimum participations, is currently in process. The servicing of these loans was transferred to Wendover in December. Sale is scheduled to close March, 1994.

GDV Financial Corporation
The GDV Financial Corporation portfolio, made up of 1,040 loans with a book value of $52,503,337 was being managed by SWAT. Subsequent to January 31, SWAT released this portfolio. Carteret is currently in the process of obtaining an estimated valuation for the portfolio, which is expected to be completed by the end of February. Once a valuation has been determined, a meeting with counsel will be scheduled to determine disposition.
The servicing of these loans was transferred to Wendover in December, with the remaining LSBO portfolios.

Western Federal
The servicing agreement for the Western Federal Multi-family mortgage portfolio is being restructured by SWAT. This portfolio consists of 176 loans, with a book value of $101,955,858. Disposition has not yet been determined.

Midland Compromises
Carteret currently has 24 commercial assets, with a book value of approximately $87,627,105, where the borrower has been offered a discounted pay-off by Midland Loan Services.

Weingarten
The Weingarten relationship consists of 6 loans with a book value of $30,784,548. SWAT is requiring Weingarten to pay off the $1,500,000 line of credit and the $80,000 loan to Ron Lichtenberger before they will negotiate a final settlement on the remaining portfolio. (*Included in M48B, lines 240,250,253,260,265)

HLT's
Carteret has 3 HLT loans, with a book value of $10,897,376, which remain scheduled for the National Sales Center auction, tentatively scheduled for March. Southern Bakeries was previously scheduled for this sale, but has recently been excluded due to the company's unwillingness to provide due diligence information to prospective buyers. This sale is being coordinated by Steve Guy in Washington. (*Included in M48B, line 300)

Imperial Premium Finance (IPF)
The IPF portfolio (unsecured commercial loans to finance insurance premiums) and subsidiary, made up of 80,126 loans with a book value of $359,022,000, was under agreement at January 31, 1994. This sale was being coordinated by James Powers of the Valley Forge RTC office. Subsequent to January 31, the sales agreement was

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021611

rescinded. (*Included in M48B, line 303)

JDC Program
To date, Carteret has 125 consumer charge-offs for a book value of $537,048 which have been reported to the Valley Forge RTC office for inclusion in the Judgements, Deficiencies, and Charge-offs (JDC) Program. We will continue to review and build our inventory.

REO
An additional 12 residential REO assets were shipped to Verex Mortgage Corporation. To date, 278 residential and commercial real estate owned assets with a book value of $43,689,000 have been sent to SAMA/SAMDA contractors. Exhibit 4 contains a reconciliation between the M48A and M48B for real estate owned assets. Of the 13 residential not currently at a SAMDA, 5 are new (less than 2 mths); the remaining 8 involve title problems or difficulty in obtaining documents from the servicer. Included in the 11 commercial are 10 assets serviced and marketed by Western Federal and one which is scheduled to close in February.

Subsidiaries
Carteret had 85 subsidiaries at date of conservatorship. As of January 31, 1994, 24 have been dissolved or sold, and 27 mergers have been completed.

RPC/Mitchell-Titus manages 19 of the 34 remaining subsidiaries, of which 6 continue to hold real properties (REO). Bridge Asset Management manages 5 subsidiaries which are related to Imperial Premium Finance (see IPF above). RTC Valley Forge Office manages the remaining 10, including 5 that have been approved for dissolution. DRC is voting on 2 additional dissolutions and 1 merger.

Reconciliation Between TFR/CADSTAR and Conservatorship Asset Summary Report (M48A)

Reclassifications for in-substance foreclosures, totalling $42,048,000, were made this month in mortgage loans and real estate.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0021612

To: J. Paul Ramey@FRB@RTCDC
Cc:
Bcc:
n: James R Hambric@EXEC@RTCVF
ject:
Date: Tuesday, August 16, 1994 15:34:34 EDT
Attach:
Certify: Y
Forwarded by: J. Paul Ramey@FRB@RTCDC

---

Forwarded to: James R Hambric@EXEC@RTCVF
cc:
Forwarded date: Tuesday, August 16, 1994 16:21:23 EDT
Comments by: J. Paul Ramey@FRB@RTCDC
Comments:

Thanks for your support, as usual.

There's no doubt in our mind that we will get a better premium by delaying. The delay was necessitated by a restructure of the transaction whereby we will allow minority bidders to bid on the northern and southern portions as if they were independent franchises, and offer the regular minority preferences. There was a real problem with minority groups getting together or getting with a non-minority group to put in a bid on the entire franchise. We felt that, if someone had to take the entire thing, the northern bidders would discount their bid because they didn't really want the southern part, vice versa. No matter what we do, we'll catch hell. We are having plaints from those that want to go ahead (because they don't want the competition to have time to get their act together) and we caught hell prior to the delay because of the restructure and the complainers said they didn't have time to get their act together. Some things never change.

By the way, I did not have a message that you called and there was no message on my audix. Maybe it's in this stack of sh.. on my desk.

Bonnie Tyler wears combat boots.

-------------------------- [Original Message] --------------------------

I called you this am but no returned call, you never call anymore!

I guess the delay in Carteret will result in a much higher premium to offset the staffing cost due to delay! Are we getting a lot of intrest? Does if have a chance as a whole bank purchase by minority?

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER
C-AM-A-0014370

# TCB Holdings, Inc.

420 Lexington Avenue, Suite 300 • New York, NY 10170 • (212) 297-6200

*Glen R. Sergeon*
*CEO*

August 24, 1994

Sent via facsimile

Mr. John E. Ryan
Deputy Chief Executive Officer
Resolution Trust Corporation
801 Seventeenth Street, N.W.
Washington, D.C. 20434

Dear Jack:

As we approach tomorrow's bidding on Carteret, I'd like to add my thoughts to the many which you must have already received on why the minority preference in acquisition effort has not and is not likely to yield the desired results.

The motive of the Congressional Black Caucus and others who were involved in drafting and passage of the preference provisions of the RTC Completion Act was to make it possible and practical for minorities to compete for entry into the financial services industry. As you know, the barriers to entry are extremely high and despite many changes in the competitive and regulatory landscape, the banking industry continues with only token minority participation. It was hoped that these provisions would level the playing field.

Unfortunately, the marketplace and the majority banks have raised the barrier again. Because of the dearth of capital in minority communities, minority acquirers must go to the traditional (Wall Street) sources of funding and offer "alternative investment" rates of return to attract investors. All knowledgeable market participants, including the majority bidders know the required rates of return and the maximum associated deposit premiums that can, therefore, be paid by a de novo.

Bidding for non-minority acquirers is as much a strategic event as it is economic and in some cases it is more strategic than economic. The non-minority bidders are motivated by a long term goal to reduce competition. Toward that end, they are willing to pay above today's market. They do this by stepping in front of the minority competitors who

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0125162

are constrained by investor driven internal rate of return considerations. The strategic approach is only possible for established market competitors. This is a fact that has been proven in recent minority eligible resolutions and I fear it will prove true here also.

I have raised in excess of $100 million of equity capital. If there were sufficient returns available, I could raise considerably more. But every additional dollar of capital represents a dilution of returns unacceptable in the investment community. My equity capital, regulatory approvals and management team are in place; yet the odds of acquisition appear nearly impossible.*

Consequently, in addition to two standard bids, I intend to submit two non-conventional bids which I trust you will consider. The first is a bid where we assume the use of a portion of the Interim Capital Assistance toward the purchase price, the second is a formula based bid. These bids are meant to provide RTC with the means to creatively and affirmatively respond to the two Congressional mandates: to achieve the "least cost" and to "prefer" a minority bid over all other bids.

Since you have displayed leadership and commitment to a fair promulgation of rules for this program, I appeal to you to give positive consideration to my non-conventional bidding approach.

The sale of Carteret is the last opportunity to introduce substantive minority ownership into the banking industry. It is a goal of the Congress, the Administration and, I believe, you to make every effort to realize that opportunity. It's now or never.

*A similar situation occurred recently with the FCC auctions which prompted that agency to revise the minority program to better assure meaningful minority participation.

Sincerely,

Glen R. Sergeon

Glen R. Sergeon

cc: Congressman Floyd H. Flake
Rosemary Shaw
Johnnie B. Booker

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0125163

CARTERET SAVINGS BANK FA

MEMORANDUM

DATE: October 27, 1994

TO: Distribution

FROM: Tanya L. Robertshaw

SUBJECT: Monthly Conservatorship Reports

Please find attached a copy of the September Conservatorship Asset Summary Reports. If you have any questions, please contact me at extension 6006.

Distribution:
- L. Redwanowski
- C. McPhail
- E. Griffin
- D. DiGiondomenico
- G. Scott
- J. Mindnich
- J. Tyburski
- J. Santos
- R. Ennis
- L. Gomez
- K. Duckworth
- G. Cannarozzi
- S. Croghan
- R. Beck
- C. Verhaegen
- B. Campbell
- M. Zubicki



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5242 0250

App. 508

<u>Stratification of Assets Remaining (Report M48A)</u>

Change for Month of September 1994:

At September 30, 1994 Carteret had 102,491 loan and real estate owned ("REO") assets ("assets") with a book value of $1,641,400,000, a decrease of 2,494 assets and $120,767,000 in book value from 104,985 assets with a book value of $1,762,167,000 at August 31, 1994.

The number of Imperial Premium Finance (IPF) loans, an insurance premium finance subsidiary, decreased again this month to 75,762 loans with a book value of $374,657,000. This is a decrease of 1,259 loans and $6,124,000 in book value, from 77,021 loans for $380,781,000 at August 31, 1994. Exclusive of IPF, Carteret's assets decreased by 1,235 from 27,964 to 26,729, with a corresponding book value decrease of $114,643,000 from $1,381,386,000 at August 31, 1994 to $1,266,743,000 at September 30, 1994.

Two major transactions account for the largest decrease in volume for the month. The first transaction, LSBO Bulk Sale #4, included approximately 665 residential loans with a book value of $62,849,000. This resulted in proceeds to Carteret in the amount of $59,747,000. The second transaction, RTC 1994-S5VF Securitization, included 31 multi-family and commercial loans with a book value of $30,827,000. This transaction closed September 14 and funded September 22, resulting in gross proceeds to Carteret in the amount of $5,403,000, a Class B Certificate for $5,624,000 and Bond for $10,840,000.

As of September 30, 1994, Carteret had 94,193 assets for $1,561,967,000 serviced by others. The only assets which remain in-house are one Shared National Credit, of which Carteret's interest is $5,752,000, on line 300 (LSFO Participation) and is scheduled for the national HLT auction, and approximately $58,845,000 in consumer loans. Of the consumer loans, the closed-end are scheduled for an upcoming sales initiative being coordinated by the Valley Forge RTC office. The open-end, in order to continue operating post-resolution, are scheduled for sale to the core cluster acquirer. This is being coordinated with Sharon Dunn Yore of Resolutions, Washington, D.C.

Exhibit 3 provides a stratification of Carteret assets by servicer. Assets are predominantly serviced by RTC designated servicers, or a master servicer, in the case of Wendover.

As of September 30, 1994, the institution serviced 9 loans for others, with a book value of $9,250,000. This is an increase of 2

assets, but a decrease of $176,000 in book value, from 7 assets with a book value of $9,426,000 at August 31, 1994. The only remaining LSFO assets are 1 HLT participation and 8 REO with claims in process, which were not included in the Clearwater Servicing Operation sale.

Changes for the month are summarized on the attached Exhibit 1.

**Change since Date of Conservatorship (DOC) - December 4, 1992:**

Since intervention on December 4, 1992, the number of assets has increased 7,144 from 95,347 to 102,491 at September 30, 1994. However, assets have downsized $1,110,265,000 in book value, from $2,751,665,000 at DOC to $1,641,400,000 at September 30, 1994. The increase in the number of loans is due to Carteret honoring a commitment made prior to DOC to purchase loans from IPF.

Exclusive of IPF, the number of assets has decreased by 23,691 from 50,420 at DOC to 26,729 at September 30, 1994, while the book value of assets has decreased $1,178,583,000 from $2,445,326,000 at DOC to $1,266,743,000 at September 30, 1994.

In addition to the above, the book value of assets serviced for others has downsized $6,377,222,000 from $6,386,472,000 to $9,250,000. The number of assets serviced for others has decreased 112,125 from 112,134 at DOC to 9 at September 30, 1994.

Changes since DOC are also summarized on the attached Exhibits 1 and 2.

**SAMA/SAMDA - SALES Initiative Stratification (Report M48B)* & Other Asset Activity (Exhibit 4)**

**Loan Servicing Operation**
The final settlement on the Clearwater Mortgage Servicing Operation was made as of September 30, 1994. Chase received all necessary investor approvals, with the exception of one denial, and servicing was transferred on October 1, 1994. Carteret will continue to work with Chase under the "Transitional Services Agreement" to complete tasks necessary for Carteret's resolution and a uniform servicing transfer.

**Performing Residential Mortgage Loans**
The performing residential mortgage portfolio has been designated by Washington to be offered to minority acquirers of RTC-controlled institutions. Exclusive of the Dryades and the Supplemental loan pools, Carteret has approximately 5,794 performing residential

loans, with a book value of $525,295,000, available for minority acquirer(s). Kenneth Leventhal & Company and subcontractor, Data Management Network, completed due diligence on the bulk of this portfolio in August.

<u>Dryades Resolution/Residential Loan Sale</u>
Carteret has 830 performing residential mortgages, with a book value of approximately $56,841,000, which were due diligenced by Real Estate Recovery/Nationwide Mortgage in January. An estimated $40 million of these loans will be used to facilitate the Dryades Resolution sale. Washington continues the process of pricing the loans. A January closing date is anticipated.

<u>Supplemental Residential Loan Pool</u>
Due diligence was performed on this pool of residential mortgages by Real Estate Recovery/Nationwide Mortgage in January. The pool consists of 966 loans, with a book value of $78,181,000, also designated for minority acquirers of RTC-controlled institutions. These loans are located primarily in the state of New Jersey, with some also located in Pennsylvania, Delaware, Maryland, and New York.

To date, approximately 331 loans for $26,522,000 have been allocated to the Polifly minority sale. Due diligence has been completed by City National Bank of New Jersey for the Polifly acquirer. The loans are being priced again by Washington. A December closing is anticipated.

<u>National Non-Performing Auction V</u>
Auction V was held September 29-30 in Kansas City. Funding is anticipated in early November. Carteret is awaiting the final loan list. As of the last update, Carteret had 146 residential loans for $12,432,000 designated for the auction. (*Included in M48B, line 250,253).

<u>National Non-Performing Auction VI</u>
Due diligence is in process for those loans designated for Auction VI. Additional loans have been tagged for the auction, increasing Carteret's contribution to 89 residential loans, with a book value of $7,497,000. The auction is tentatively scheduled for December 13-15, 1994. (*Included in M48B, line 250,253)

<u>Remaining Non-Performing Residential</u>
An additional 118 loans, with a book value of $10,204,000, remain to be marketed as non-performing. It is anticipated that a number of these loans will become eligible for non-performing auctions.

<u>CFSB-Owned Certificates</u>
Carteret owns 7 certificates, securitized by 454 loans, with a

gross book value of $21,623,000. The legal department is reviewing the procedures necessary to collapse these securitizations.

<u>LSBO Bulk Sales</u>
The RTC Valley Forge office is in the process of selling all Carteret wholly-owned LSBO portfolios. The LSBO portfolios have been segregated into 4 transactions, Bulk Sales #4, #5, #6 and #7.

In September, LSBO Bulk Sale #4 commenced with the sale of Carteret's 4 largest LSBO portfolios, including approximately 1,330 loans (reported as 665 loans by Wendover*) for $62,849,000. The closings on the four portfolios took place September 19-30. Carteret received $59,747,000 in proceeds. We are currently awaiting final closing information to apply the funds.

The bid date for Bulk Sale #5 was September 29, 1994. It consisted of approximately 1,235 Carteret loans for $79,137,000. Closings were scheduled October 7-26. Carteret is awaiting final funds and closing information.

A number of small LSBO portfolios originally scheduled for LSBO Bulk Sale #5, were moved to Bulk Sale #6. This includes approximately 148 loans for $2,815,000. The bid date was scheduled for October 20, with closings scheduled November 1-8.

Hanover Capital has been approved as loan sale adviser and due diligence firm for Bulk Sale #7. The GDV portfolio, made up of approximately 1,010 loans for $50,318,000, accounts for the largest volume in Bulk Sale #7. Also included will be a number of smaller portfolios which have fallen out of previous sales. To date, Carteret has scheduled a total of 1,227 loans for $59,263,000 (including GDV). Bulk Sale #7 is tentatively scheduled for December.

(*All LSBO residential loans included in M48B, line 250,253)

<u>LSBO Participated Loans</u>
Carteret has minority interests in participations of 7,356 loans master serviced by Wendover. The gross principal balance at September 30, 1994 was $100,533,000, for which Carteret's interest is only $4,400,000. Cases are being prepared for the funding of "Guaranteed Remittances" which will be required post-resolution. Valley Forge Legal personnel are reviewing agreements. The Asset Marketing Department is reviewing possible disposition strategies.

<u>Western Federal</u>
Negotiations continue between Carteret and Western Federal regarding the proposed SWAT action plan to be implemented by the Alternate Dispute Resolution Group. Chris Yates of Valley Forge

SWAT is acting as arbitrator.

The portfolio consists of 144 multi-family loans, with a book value of $79,849,000. The majority of the portfolio, 125 loans for approximately $63,300,000, was included in the 1994-C1 Securitization. This securitization closed September 29, but did not fund until October 6. Carteret is awaiting the final closing memorandum and loan list.

The remainder of the portfolio has been tagged for the upcoming 1994-N2, 1994-N3, or 1995-C1. Carteret has been advised by Valley Forge that fallout loans will be tagged for other upcoming initiatives. (*All included in M48B, line 256)

**Commercial Securitizations**
As of September 30, 1994, Carteret had 51 commercial loans (excluding the Western Federal portfolio) for approximately $98,883,000 tagged for upcoming securitizations. They are allocated as follows: 39 loans for $73,398,000 for 1994-C1, which funded on Ocober 6; 1 loan for $5,060,000 for 1994-N2, scheduled for December 6; 1 loan for $310,000 for 1994-C2, scheduled for November 22; and 10 loans for $20,115,000 for 1994-N3, scheduled for December 20. (*Included in M48B, lines 250,253,256,260,265)

**Non-Performing Auction V**
In addition to the 146 residential loans noted above, 8 commercial loans for $469,000 were included in the Non-performing Auction V held in Kansas City on September 29-30. (*Included in M48B, line 260,265)

**RTC Field Initiatives**
Carteret has 6 additional commercial loans for $19,892,000 which have been designated for various RTC initiatives other than securitizations and non-performing auctions. Disposition dates are yet to be determined. (*Included in M48B, lines 260,265,and 300)

**Midland Compromises**
Excluding assets presently designated for securitization or other initiatives, Carteret has 13 commercial assets, with a book value of $67,581,000, which are pending compromised payoffs offered by Midland Loan Services. The $20.7 million compromised payoff of the Sand Key Relationship loans, book value of $22.8 million, closed in September (will be reflected in October).

**Weingarten**
The Weingarten global settlement was executed in August. As a result, 3 assets were paid off. The fourth loan in the settlement, book value $867,000, was also later paid off and will be reflected in October's report. It is anticipated that Carteret's interest in

the remaining Woodbridge asset, book value of $19,524,000, will be tagged for an upcoming sales initiative. (*Both included in M48B, lines 260 & 265)

Remaining Commercial Portfolio
Carteret has been advised by Valley Forge that all commercial assets will be tagged for one of the upcoming commercial securitizations or sales initiatives. Carteret has 22 commercial loans for approximately $26,666,000 yet to be tagged. These loans are excluded from the M48B sales initiatives, pending further notification.

HLT National Auction
The National HLT Auction remains on hold, as RTC continues to contract for a new loan sale adviser. Carteret has 4 loans, with a book value of $17,923,000, scheduled for the auction. Carteret is the lead participant for one HLT loan, requiring continued remittances to other investors post-resolution. Two of the three remaining HLT loans, for which Carteret is a participant, require funding of draws on revolving credit lines. Cases were approved by CFSB CRC for continued funding of the 3 HLTs in receivership and have been forwarded to Valley Forge RTC for approval. The fourth HLT does not require funding. (*Included in M48B, line 300)

Imperial Premium Finance (IPF)
The Asset Sales Agreement for the purchase of the IPF portfolio (unsecured commercial loans to finance insurance premiums) and subsidiary was signed by SunAmerica on May 18, 1994. The portfolio is made up of 75,762 loans, with a book value of $374,657,000. The sale is being coordinated by James Powers of the Valley Forge RTC office. The sale of the portfolio and the equity of the company is expected to generate approximately $450,000,000 gross proceeds. The buyer is awaiting licensing from four states. The sale is expected to close in November. (*Included in M48B, line 303)

Consumer Loan Sale
Carteret's consumer closed-end loan portfolio has been reserved for sale by the Valley Forge Asset Marketing Department. To date, this includes approximately 1,383 loans for $21,180,000. RTC due diligence was completed by Asset Strategies in August and marketing has begun. The bid date is tentatively set for December 13. The Consumer Loan Department will continue to service these loans post-resolution through the sale date and deconversion. (*Included in M48B, lines 323,326,330)

Revolving Consumer Loans
As of September 30, 1994, Carteret had 4,068 revolving loans with a balance of $35,647,000. Due to Carteret's inability to fund in receivership, these loans are being offered for sale to the

acquirer of the core cluster (Parsippany Branch).

Loans Secured by Deposit/Overdraft Checking
Loans tied to deposit liability accounts will pass to the acquirer(s). To date, Carteret has approximately 2,846 loans, with a book value of 2,018,000, which are tied to deposits.

JDC Program
The Valley Forge Office is currently coordinating JDC Transfer #7. This transfer is to include the bulk of Carteret's JDC inventory, including approximately 1,313 charge-offs for $13,704,000. Excluding charge-offs previously purchased, Carteret has a total of 1,355 with a book value of $13,803,000 which have been sent to Valley Forge. We continue to build our inventory, as this is an on-going program.

REO
To date, a total of 295 residential and commercial real estate owned assets with a book value of $45,282,000 have been sent to SAMA/SAMDA contractors. Exhibit 5 contains a reconciliation between the M48A and M48B for real estate owned assets. As of September 30, 1994, Carteret has only 5 commercial assets which are not under a SAMDA/SAMA contract. These assets are serviced and marketed by Western Federal. Of these, two have been sold and the remaining three are under contract.

Subsidiaries
There were no new mergers or dissolutions to report for September. To date, 26 of the original 85 subsidiaries have been dissolved or sold, and 28 have been merged into others. RPC/Mitchell-Titus manages 21 of the remaining 31 subsidiaries. Bridge Asset Management manages 2 subsidiaries, which are in the process of being sold (see "Imperial Premium Finance" above). RTC Valley Forge manages the remaining 8 subsidiaries, including 6 that have been approved for dissolution.

Reconciliation Between TFR/CADSTAR and Conservatorship Asset Summary Report (M48A)

No reclassifications were made this month.

INSTITUTION NAME: CARTERET FEDERAL SAVINGS BANK
FIN: 8602
DATE: October 17, 1994
PREPARED BY: Tanya L. Robertshaw
PHONE #: (201) 263-3011 ext. 6006

# CONSERVATORSHIPS ASSET SUMMARY REPORTS – Report Number M48 A
## STRATIFICATION OF ASSETS REMAINING
## FOR MONTH ENDED: September 30, 1994
(In Thousands [000])

PAGE 1

| [redacted] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MORTGAGE LOANS (23)** | | | | | | | | | | | | |
| 1–4 Dwelling Construction (230) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5+ Dwelling Construction (235) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nonres Construction (240) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1–4 Dwelling Units (250,253) | 0 | 0 | 197 | 714 | 17,915 | 847,671 | 0 | 0 | 0 | 0 | 18,112 | 848,385 |
| 5+ Dwelling Units (256) | 0 | 0 | 0 | 0 | 171 | 154,775 | 0 | 0 | 0 | 0 | 171 | 154,775 |
| Farm Non-Res, Land (260,265) | 0 | 0 | 0 | 0 | 65 | 153,271 | 0 | 0 | 0 | 0 | 65 | 153,271 |
| All Other Mortgage Loans (272,275) | 0 | 0 | 0 | 0 | 0 | 10,374 | 0 | 0 | 0 | 0 | 0 | 10,374 |
| (LIP, Unamort Yield Adjt) (280,281) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *TOTAL* | 0 | 0 | 197 | 714 | 18,151 | 1,166,091 | 0 | 0 | 0 | 0 | 18,348 | 1,166,805 |
| **NONMORTGAGE LOANS (30)** | | | | | | | | | | | | |
| Commercial Loans (32) | | | | | | | | | | | | |
| Secured, Other than Mortgages (300) | 1 | 8,630 | 1 | 5,732 | 7 | 14,210 | 0 | 0 | 0 | 0 | 8 | 19,962 |
| Unsecured (303) | 0 | 0 | 0 | 0 | 75,764 | 377,920 | 0 | 0 | 0 | 0 | 75,764 | 377,920 |
| Financing Leases (306) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *SUBTOTAL COMMERCIAL LOANS* | 1 | 8,630 | 1 | 5,732 | 75,771 | 392,130 | 0 | 0 | 0 | 0 | 75,772 | 397,882 |
| Consumer (Closed End) (34) | | | | | | | | | | | | |
| Loans on Deposit (310) | 0 | 0 | 0 | 0 | 0 | 0 | 228 | 1,201 | 0 | 0 | 228 | 1,201 |
| Home Improvement Loans (316) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Education Loans (320) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Loans (323) | 0 | 0 | 0 | 0 | 0 | 0 | 127 | 321 | 0 | 0 | 127 | 321 |
| Mobile Home Loans (326) | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 8 | 0 | 0 | 2 | 8 |
| Other, Including Leases (330) | 0 | 0 | 0 | 0 | 0 | 0 | 1,254 | 20,851 | 0 | 0 | 1,254 | 20,851 |
| Consumer (Open End) (34) | | | | | | | | | | | | |
| Revlvg Loans Secured/1–4 Dwling Units(340) | 0 | 0 | 0 | 0 | 0 | 0 | 2,074 | 33,010 | 0 | 0 | 2,074 | 33,010 |
| Unsecured, Incl. Credit Cards & Other(345) | 0 | 0 | 0 | 0 | 0 | 0 | 4,612 | 3,454 | 0 | 0 | 4,612 | 3,454 |
| *SUBTOTAL CONSUMER LOANS* | 0 | 0 | 0 | 0 | 0 | 0 | 8,297 | 58,845 | 0 | 0 | 8,197 | 58,845 |
| Accrued Interest Receivable (348) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,621 | 0 | 0 | 0 | 1,621 |
| (LIP, Unamort Yield Adjt) (350,353) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *SUBTOTAL OTHER LOANS* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,621 | 0 | 0 | 0 | 1,621 |
| *TOTAL NONMORTGAGE LOANS (30)* | 1 | 8,630 | 1 | 5,732 | 75,771 | 392,130 | 8,297 | 60,466 | 0 | 0 | 84,069 | 458,348 |
| **REPOSSESSED ASSETS** | | | | | | | | | | | | |
| Real Estate [Res] (415) | 8 | 620 | 0 | 0 | 12 | 621 | 55 | 4,192 | 0 | 0 | 67 | 4,813 |
| Real Estate [Com] (405,425,426,428) | 0 | 0 | 0 | 0 | 5 | 6,339 | 2 | 2,234 | 0 | 0 | 7 | 8,593 |
| Other Repossessed Assets (430) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,841 | 0 | 0 | 0 | 2,841 |
| *TOTAL* | 8 | 620 | 0 | 0 | 17 | 6,960 | 57 | 9,267 | 0 | 0 | 74 | 16,247 |
| *GRAND TOTAL* | 9 | 9,250 | 198 | 6,466 | 93,939 | 1,565,201 | 8,354 | 69,733 | 0 | 0 | 102,491 | 1,641,400 |

COMMENTS:

1. The servicing for the 1–4 Dwelling Units (250,253) LSFO Participations was transferred to Knutson Mortgage Corp. on 4/1/94.
2. The Non-mortgage Secured (Line 300) LSFO Participation consists of an SNC asset, for which CFSB is the lead participant. The asset is tagged for the national HLT auction, currently on hold, and is presently under Washington management.
3. All In-house REO assets are under SAMDA contracts.

DUE DATE: THE 21st OF EACH MONTH

CATEGORY DESCRIPTIONS

LSFO

LSFO Participations

LSSO

In-house

Off-line

Total

INSTITUTION: CARTERET FEDERAL SAVINGS BANK
FIN: 8602
PREPARED BY: Tanya L. Robertshaw
DATE: October 17, 1994
PHONE: (201) 263-3011 ext. 6006

# CONSERVATORSHIP ASSET SUMMARY REPORT – Report Number M48 B
## SAMA/SAMDA – SALES INITIATIVES STRATIFICATION
## FOR MONTH ENDED: SEPTEMBER 30, 1994
(In Thousands [000])



| | UNLIQUIDATED ASSETS | | LIQUIDATED ASSETS | | TOTAL ASSETS | | [illegible] | |
|---|---|---|---|---|---|---|---|---|
| | # | BOOK VALUE | # | BOOK VALUE | # | BOOK VALUE | # | BOOK VALUE |
| MORTGAGE LOANS (23) | | | | | | | | |
| 1-4 Dwelling Construction (230) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5+ Dwelling Construction (240) | 0 | 0 | 4 | 4,266 | 4 | 4,266 | 0 | 0 |
| Nonres Construction (240) | 0 | 0 | 7 | 6,326 | 7 | 6,326 | 0 | 0 |
| 1-4 Dwelling Units (250,253) | | | | | | | 2,846 | 161,190 |
| 5+ Dwelling Units (256) | 20 | 56,334 | 18 | 29,010 | 38 | 85,344 | 158 | 111,710 |
| Perm Non-Res., Land (260,265) | 55 | 128,822 | 83 | 179,002 | 138 | 307,824 | 50 | 103,266 |
| TOTAL | 80 | 185,590 | 115 | 220,934 | 195 | 406,524 | 3,054 | 376,166 |
| NONMORTGAGE LOANS (30) | | | | | | | | |
| Commercial Loans (32) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Secured, Other than Mortgages (300) | 4 | 2,039 | 0 | 2,998 | 4 | 5,037 | 6 | 19,153 |
| Unsecured (303) | 2 | 3,262 | 4 | 2,074 | 6 | 5,336 | 75,763 | 377,889 |
| Financing Leases (306) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUBTOTAL COMMERCIAL LOANS | 6 | 5,301 | 4 | 5,072 | 10 | 10,373 | 75,769 | 397,042 |
| Consumer (Closed End) (34) | | | | | | | | |
| Loans on Deposit (310) | | | | | | | 0 | 0 |
| Home Improvement Loans (316) | | | | | | | 0 | 0 |
| Education Loans (320) | | | | | | | 0 | 0 |
| Auto Loans (323) | | | | | | | 127 | 321 |
| Mobile Home Loans (326) | | | | | | | 2 | 8 |
| Other, Including Leases (330) | | | | | | | 1,254 | 20,851 |
| Consumer (Open End) (34) | | | | | | | | |
| Revlvg Loans Secured/1-4 Dwlng Units(340) | | | | | | | 0 | 0 |
| Unsecured, Incl. Credit Cards & Other(345) | | | | | | | 0 | 0 |
| SUBTOTAL CONSUMER LOANS | | | | | | | 1,383 | 21,180 |
| TOTAL NONMORTGAGE LOANS (30) | 6 | 5,301 | 4 | 5,072 | 10 | 10,373 | 77,152 | 418,222 |
| REPOSSESSED ASSETS (40) | | | | | | | | |
| Real Estate [Res] (415) | 67 | 4,813 | 223 | 31,813 | 290 | 36,626 | | |
| Real Estate [Com] (405,425,426,428) | 2 | 2,233 | 3 | 6,423 | 5 | 8,656 | | |
| Other Repossessed Assets (430) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| TOTAL | 69 | 7,046 | 226 | 38,236 | 295 | 45,282 | | |
| INVESTMENTS IN SER CORPS & SUBS(50) | | | | | | | | |
| Equity Invest & Unsecured Loans (522,524) | 17 | 16,779 | 36 | 5,419 | 53 | 22,198 | | |
| TOTAL | 17 | 16,779 | 36 | 5,419 | 53 | 22,198 | | |
| GRAND TOTAL | 172 | 214,716 | 381 | 269,661 | 553 | 484,377 | 80,206 | 794,388 |

COMMENTS:

[shaded] N/A for that category

DUE DATE: THE 21ST OF EACH MONTH
Send Report to: Lisa [illegible] via Mailbox E-mail
Phone (215) [illegible]
Fax (215) [illegible]
Valley Forge Office

CATEGORY DESCRIPTIONS

Unliquidated Assets – Number and dollar amount of those assets that the conservatorship has on their books that are in a SAMA/SAMDA contract.

Liquidated Assets – Number and dollar amount of those loans that the conservatorship had in a SAMA/SAMDA contract, but were liquidated.

Total – This is the total number and dollar amount of those assets that the conservatorship ever had in a SAMA/SAMDA contract.

Sales Initiatives – Total number and dollar amount of assets that the conservatorship has presently tagged for a sales initiative (assets not started, but actually tagged.)

[illegible]

EXHIBIT 1

CARTERET FEDERAL SAVINGS BANK 25-Oct-94

SUMMARY OF STRATIFICATION OF ASSETS REMAINING (REPORT M48A)

SEPTEMBER 30, 1994

| | Change for the month of September 1994 | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 1994 | | August 31, 1994 | | Change for month | |
| Portfolio | # | ($000) | # | ($000) | # | ($000) |
| Mortgage Loans | 18,348 | $1,166,805 | 19,461 | $1,269,224 | (1,113) | ($102,419) |
| Non-Mortgage Loans | 84,069 | $458,348 | 85,445 | $470,281 | (1,376) | ($11,933) |
| REO | 74 | $16,247 | 79 | $22,662 | (5) | ($6,415) |
| Total | 102,491 | $1,641,400 | 104,985 | $1,762,167 | (2,494) | ($120,767) |
| Less: IPF | 75,762 | $374,657 | 77,021 | $380,781 | (1,259) | ($6,124) |
| Total, excl. IPF | 26,729 | $1,266,743 | 27,964 | $1,381,386 | (1,235) | ($114,643) |
| LSFO Portfolio | 9 | $9,250 | 7 | $9,426 | 2 | ($176) |

| | Change since Date of Conservatorship – December 4, 1992 | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 1994 | | December 4, 1992 | | Change since DOC | |
| Portfolio | # | ($000) | # | ($000) | # | ($000) |
| Mortgage Loans | 18,348 | $1,166,805 | 34,445 | $2,223,097 | (16,097) | ($1,056,292) |
| Non-Mortgage Loans | 84,069 | $458,348 | 60,471 | $444,549 | 23,598 | $13,799 |
| REO | 74 | $16,247 | 431 | $84,019 | (357) | ($67,772) |
| Total | 102,491 | $1,641,400 | 95,347 | $2,751,665 | 7,144 | ($1,110,265) |
| Less: IPF | 75,762 | $374,657 | 44,927 | $306,339 | 30,835 | $68,318 |
| Total, excl. IPF | 26,729 | $1,266,743 | 50,420 | $2,445,326 | (23,691) | ($1,178,583) |
| LSFO Portfolio | 9 | $9,250 | 112,134 | $6,386,472 | (112,125) | ($6,377,222) |

C:\TLR\M48\SUDOC.WK3

CARTERET FEDERAL SAVINGS BANK
SEPTEMBER 30, 1994

SUMMARY OF STRATIFICATION OF ASSETS REMAINING (Report M4A)
CHANGE SINCE DATE OF CONSERVATORSHIP = DECEMBER 4, 1992

EXHIBIT 2
26-Oct-94

| PORTFOLIO | December 4, 1992 # | December 4, 1992 ($000) | March 31, 1993 # | March 31, 1993 ($000) | April 30, 1993 # | April 30, 1993 ($000) | May 31, 1993 # | May 31, 1993 ($000) | June 30, 1993 # | June 30, 1993 ($000) | July 31, 1993 # | July 31, 1993 ($000) | August 31, 1993 # | August 31, 1993 ($000) | September 30, 1993 # | September 30, 1993 ($000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | 34,445 | $2,223,097 | 33,132 | $2,149,118 | 32,392 | $1,980,805 | 30,333 | $1,966,851 | 29,640 | $1,902,431 | 29,136 | $1,927,220 | 28,710 | $1,884,830 | 28,249 | $1,778,009 |
| Non-Mortgage Loans | 60,471 | $444,549 * | 100,910 | $473,762 | 91,804 | $471,341 | 93,358 | $480,797 | 94,280 | $470,325 | 98,356 | $484,420 | 98,722 | $480,455 | 98,436 | $467,918 |
| RFO | 431 | $84,019 | 381 | $76,276 | 338 | $78,610 | 353 | $77,795 | 253 | $67,339 | 237 | $67,114 | 188 | $63,016 | 174 | $56,457 |
| Total | 95,347 | $2,751,665 | 134,543 | $2,699,156 | 124,544 | $2,531,756 | 124,063 | $2,525,443 | 124,183 | $2,440,295 | 127,727 | $2,478,754 | 127,620 | $2,431,301 | 126,859 | $2,302,384 |
| Less: IPF | 44,927 | $306,339 | 87,209 | $358,123 | 78,422 | $352,536 | 80,376 | $362,915 | 81,383 | $363,554 | 85,636 | $378,354 | 86,346 | $376,307 | 86,283 | $365,516 |
| Total, excl. IPF | 50,420 | $2,445,326 | 47,154 | $2,341,033 | 46,122 | $2,179,220 | 43,699 | $2,162,533 | 42,812 | $2,137,741 | 42,091 | $2,100,504 | 41,274 | $2,054,994 | 40,576 | $1,934,868 |
| LS/O Portfolio | 112,134 | $4,366,472 | 104,751 | $4,692,564 | 101,844 | $5,901,472 | 101,448 | $5,753,019 | 97,404 | $5,525,734 | 95,846 | $5,315,924 | 93,867 | $5,253,877 | 90,703 | $5,006,772 |

| PORTFOLIO | October 31, 1993 # | October 31, 1993 ($000) | November 30, 1993 # | November 30, 1993 ($000) | December 31, 1993 # | December 31, 1993 ($000) | January 31, 1994 # | January 31, 1994 ($000) | February 28, 1994 # | February 28, 1994 ($000) | March 31, 1994 # | March 31, 1994 ($000) | April 30, 1994 # | April 30, 1994 ($000) | May 31, 1994 # | May 31, 1994 ($000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | 27,402 | $1,694,602 | 26,443 | $1,572,509 | 24,664 | $1,451,503 | 24,239 | $1,433,734 | 23,609 | $1,421,867 | 23,750 | $1,401,173 | 23,265 | $1,379,374 | 20,134 | $1,362,670 |
| Non-Mortgage Loans | 96,534 | $455,500 | 95,111 | $447,780 | 93,441 | $444,160 | 91,201 | $442,933 | 88,348 | $437,252 | 87,005 | $440,441 | 87,501 | $450,702 | 87,263 | $467,726 |
| RFO | 152 | $53,498 | 136 | $48,837 | 125 | $39,742 | 112 | $38,568 | 103 | $33,981 | 94 | $28,413 | 66 | $27,635 | 66 | $22,233 |
| Total | 124,288 | $2,205,600 | 121,690 | $2,069,126 | 118,231 | $1,935,454 | 115,552 | $1,915,235 | 113,050 | $1,893,101 | 110,849 | $1,870,466 | 110,832 | $1,864,947 | 107,505 | $1,852,647 |
| Less: IPF | 84,627 | $364,159 | 83,464 | $358,143 | 82,074 | $358,204 | 80,126 | $358,022 | 78,714 | $355,015 | 77,338 | $344,426 | 78,309 | $368,955 | 78,309 | $372,771 |
| Total, excl. IPF | 39,661 | $1,841,442 | 38,231 | $1,710,257 | 36,177 | $1,577,250 | 35,426 | $1,556,213 | 34,336 | $1,538,087 | 33,511 | $1,522,038 | 32,543 | $1,497,992 | 29,196 | $1,479,876 |
| LS/O Portfolio | 83,110 | $4,427,859 | 80,753 | $4,461,518 | 78,305 | $4,350,095 | 76,809 | $4,254,379 | 72,763 | $3,971,340 | 71,443 | $3,857,827 | 68,910 | $3,702,225 | 67,563 | $3,619,575 |

| PORTFOLIO | June 30, 1994 # | June 30, 1994 ($000) | July 31, 1994 # | July 31, 1994 ($000) | August 31, 1994 # | August 31, 1994 ($000) | September 30, 1994 # | September 30, 1994 ($000) | Change since DOC # | Change since DOC ($000) |
|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | 19,770 | $1,329,289 | 19,428 | $1,258,374 | 19,461 | $1,269,724 | 18,340 | $1,166,805 | (16,097) | ($1,056,292) |
| Non-Mortgage Loans | 87,180 | $471,607 | 87,795 | $480,356 | 85,445 | $470,281 | 84,069 | $458,348 | 23,598 | $13,799 |
| RFO | 82 | $23,511 | 82 | $23,549 | 79 | $22,662 | 74 | $16,247 | (357) | ($67,772) |
| Total | 107,032 | $1,824,407 | 107,305 | $1,795,479 | 104,985 | $1,762,667 | 102,491 | $1,641,400 | 7,144 | ($1,110,265) |
| Less: IPF | 78,385 | $379,094 | 79,143 | $392,933 | 77,021 | $380,781 | 75,762 | $374,657 | 30,835 | $68,518 |
| Total, excl. IPF | 28,647 | $1,445,393 | 28,162 | $1,402,546 | 27,964 | $1,381,386 | 26,729 | $1,266,743 | (23,691) | ($1,178,583) |
| LS/O Portfolio | 606 | $23,246 | 437 | $20,324 | 7 | $9,426 | 9 | $9,250 | (112,125) | ($4,377,222) |

*The large increase in the number of non-mortgage loans from DOC to March, 1993, is due to the phasing in of a loan sale with Imperial Premium Finance. The commitment to fund this program was made prior to DOC. RTC has continued to honor this commitment, in order to enhance the salability of IPF as a going concern.

Exhibit 3

SL-8802: CARTERET FSB, PARSIPPANY, NJ
ASSET PORTFOLIO
AS OF SEPTEMBER 30, 1994
($000)

TOTAL MORTGAGES:

MEMO: STRATIFICATION OF LOAN SERVICERS

| | COL A TTL PORTFOLIO | | COL B NONPERFORMING | | A-B TTL REMAINING | | KNUTSON MORTGAGE CORP | | WENDOVER | | MIDLAND SAMA/SAMDA | | FIRST FIDELITY MORTGAGE CORP | | GLEICHMAN SAMDA | | OTHER SERVICERS | | TOTAL LSBO's | | REMAINING IN-HOUSE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL | # LNS | BOOK VAL |
| 1 - 4 FAMILY RESIDENTIAL | | | | | | | | | | | | | | | | | | | | | | |
| | 16,112 | 848,383 | 589 | 43,156 | 17,523 | 805,229 | 6,140 | 691,164 | 9,967 | 156,787 | 5 | 434 | 0 | 0 | 0 | 0 | 0 | 0 | 16,112 | 848,385 | 0 | 0 |
| MULTI FAMILY | | | | | | | | | | | | | | | | | | | | | | |
| | 171 | 154,775 | 11 | 13,234 | 160 | 141,541 | 1 | 51 | 0 | 0 | 20 | 58,334 | 6 | 16,641 | 0 | 0 | 144 | 79,649 * Western Federal | 171 | 154,775 | 0 | 0 |
| COMMERCIAL | | | | | | | | | | | | | | | | | | | | | | |
| | 54 | 137,105 | 14 | 50,106 | 40 | 86,999 | 0 | 0 | 0 | 0 | 48 | 116,696 | 6 | 20,209 | 0 | 0 | 0 | 0 | 54 | 137,105 | 0 | 0 |
| LAND | | | | | | | | | | | | | | | | | | | | | | |
| | 11 | 16,165 | 4 | 11,649 | 7 | 4,516 | 0 | 0 | 0 | 0 | 7 | 11,945 | 3 | 3,213 | 0 | 0 | 1 | 1,008 * Aldrich Eastman Waltch | 11 | 16,166 | 0 | 0 |
| TOTAL MORTGAGES | | | | | | | | | | | | | | | | | | | | | | |
| | 18,348 | 1,156,431 | 618 | 118,144 | 17,730 | 1,038,287 | 6,141 | 691,215 | 9,967 | 156,787 | 80 | 188,609 | 15 | 41,963 | 0 | 0 | 143 | 80,857 | 18,348 | 1,156,431 | 0 | 0 |
| TOTAL NON-MORTGAGES: | | | | | | | | | | | | | | | | | | | | | | |
| NON-MORTGAGE COMMERCIAL | | | | | | | | | | | | | | | | | | | | | | |
| | 75,772 | 397,882 | 1,727 | 12,692 | 74,045 | 385,190 | 0 | 0 | 0 | 0 | 6 | 6,302 | 0 | 0 | 0 | 0 | 75,762 * UPF | 374,657 | 75,771 | 392,130 | 1 | 5,752 *HLT w/Washington |
| | | | | | | | | | | | | | | | | | 3 | 12,171 *HLT Part. w/Washington | | | | |
| CONSUMER | | | | | | | | | | | | | | | | | | | | | | |
| | 8,297 | 58,845 | 171 | 3,690 | 8,126 | 55,155 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,297 | 58,845 |
| TOTAL REAL ESTATE OWNED: | | | | | | | | | | | | | | | | | | | | | | |
| | 74 | 13,406 | 0 | 0 | 74 | 13,406 | 0 | 0 | 0 | 0 | 2 | 2,234 | 0 | 0 | 67 | 4,613 | 5 | 6,559 * Western Federal | 74 | 13,406 | 0 | 0 |
| GRAND TOTAL | | | | | | | | | | | | | | | | | | | | | | |
| TOTALS | 102,491 | 1,626,564 | 2,518 | 134,526 | 99,975 | 1,492,038 | 6,141 | 691,215 | 9,967 | 156,787 | 88 | 193,145 | 15 | 41,963 | 67 | 4,613 | 75,915 | 474,044 | 84,160 | 1,581,967 | 8,298 | 64,597 |

June 8, 1995

MEMORANDUM TO: All Regional Directors (DAS)
All Regional Financial Officers (DOF)
All Regional Counsel (Liquidation)

FROM: Stephen N. Graham
Associate Director (DAS-Operations)

Alvin E. Kitchen
Deputy Director (DOF)

Thomas A. Rose
Deputy General Counsel

SUBJECT: Receiverships - Post-Insolvency Interest

The DAS Operations Section, DOF Financial Reporting Branch and Liquidation Branch of the Legal Division have reviewed and discussed the appropriate interest rate to utilize in making post-insolvency interest distributions from receivership estates. Based upon our discussions we are providing the following directions to assure that the Corporation's procedures and positions in this area are clear and uniform.

The interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the jurisdiction it was in, and whether it had a state or federal charter. Post-insolvency interest should be dealt with, depending on the type of institution in receivership, as follows:

1. Pre-National Depositor Preference State Banks and Savings Associations Which Were Not Regulated by the FHLBB - In the absence of a rate specifically provided in the applicable state's liquidation scheme or the adoption of the state contract rate by the state's supreme court, the FDIC should utilize the state judgment rate existing on the date the institution failed to calculate the payment of post-insolvency interest to creditors with allowed claims;

2. Pre-National Depositor Preference National Banks - For national banks that failed prior to the amendment of the federal judgment rate statute in 1982, the FDIC should apply the same rate applicable to a state bank in the same jurisdiction. For national banks failing after the amendment of the federal judgment rate statute, the applicable rate should be the 52 week Treasury bill rate specified in the statute on the date the bank

AM0010339

failed; [1]

3. National Depositor Preference State Banks and Savings Associations - Unless the state's supreme court for the jurisdiction where the institution did business has adopted the state contract rate, post-insolvency interest distributions should be based on the state judgment rate; and

4. National Depositor Preference National Banks and Federal Savings Associations - Post-insolvency interest distributions should be based on the federal judgment rate.

Although we believe that these directions should adequately address the majority of the institutions where the FDIC is acting as receiver, the Closed Bank Litigation and Policy Section of the Legal Division should be consulted if your staff have any additional questions in this area.

---

[1] The applicable rate of interest can generally be obtained from personnel in the U.S. District Courts by inquiring as to the rate applicable to federal court judgments on the date that the institution failed. Information obtained in this manner, however, should be independently verified by DOF before the rate is utilized to make post-insolvency interest distributions.

United States General Accounting Office

GAO

Report to Congressional Committees

December 1995

# RESOLUTION TRUST CORPORATION

# Performing Assets Sold to Acquirers of Minority Thrifts



GAO/GGD-96-44

[redacted]

GAO

United States
General Accounting Office
Washington, D.C. 20548

General Government Division

B-260116

December 22, 1995

The Honorable Alfonse M. D'Amato
Chairman
The Honorable Paul S. Sarbanes
Ranking Minority Member
Committee on Banking, Housing, and
Urban Affairs
United States Senate

The Honorable James A. Leach
Chairman
The Honorable Henry B. Gonzalez
Ranking Minority Member
Committee on Banking and
Financial Services
House of Representatives

As required by the Resolution Trust Corporation (RTC) Completion Act,[1] we have reviewed RTC's efforts to sell performing assets to acquirers of failed thrifts under the minority preference resolutions program. The act required us to annually assess RTC's determination of fair market value of performing assets and determine the number and type of assets sold under the program.

During fiscal year 1994, there were no transfers of assets under the minority preference resolutions program. This report covers asset transfers occurring in fiscal year 1995. This will be our only report on this subject since RTC has resolved all of the failed thrifts it received and all thrifts taken over in the future will be resolved by the Federal Deposit Insurance Corporation (FDIC). FDIC is not required by law to establish a similar asset transfer program.

## Results in Brief

On the basis of our discussions with firms experienced in pricing large volumes of mortgage loans and our review of mortgage loan valuation literature, we found that RTC had established a reasonable process anchored to agency[2] and mortgage securities markets standards. This process allowed for the independent valuation of 1- to 4-family residential mortgage loans that were offered for sale to minority acquirers. RTC

[1]The Resolution Trust Corporation Completion Act, P. L. 103-204, 107 Stat. 2369, 2378 (1993).

[2]Agency refers to the Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), and Government National Mortgage Association (Ginnie Mae).

contracted with two independent valuation contractors, experienced in mortgage securities markets, to provide separate prices for each loan, which RTC then averaged and offered to the minority acquirer as the final price. By removing itself from the initial phase of the loan pricing process, RTC demonstrated that it was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total return on the disposition of assets as required by law. Under this program, 11 of the 14 minorities who bought thrifts from RTC purchased 4,063 1- to 4-family residential mortgage loans.

Moreover, to price the loans, the two valuation contractors appeared to have established a reasonable methodology that considered and adjusted for movements in interest rates, credit risk sensitivity, and the fact that these were RTC loans. Further, officials at Fannie Mae and Freddie Mac found the pricing methodology used by the valuation contractors to be generally consistent with their approaches.

In commenting on a draft of this report, RTC's Vice President for Asset Management and Sales stated that RTC agreed with our findings, as well as with our description of its program to sell performing assets to acquirers of minority thrifts.

## Background

RTC was required by law to assist minorities to acquire failed thrifts. Specifically, the RTC Completion Act required RTC to give preference to any offer from minority bidders for acquiring failed thrifts located in predominantly minority neighborhoods (PMN) that would result in the same cost to RTC as determined under section 13(c)(4) of the Federal Deposit Insurance Act, as amended by the Federal Deposit Insurance Corporation Improvement Act of 1991. This section of the act requires RTC to choose the alternative for resolving a failed thrift that results in the least cost to RTC. Additionally, a minority acquirer of a thrift in a PMN was to have first priority in the deposition of performing assets of failed thrifts.

To satisfy these requirements, RTC established its minority preference resolutions program in February 1994. Under this multifaceted program, RTC was to offer a failed minority-owned thrift to investors of the same minority group before offering it to others. Additionally, bidding preferences were to be given to offers from minority-owned financial institutions to acquire any failed thrift whose home office was located in a PMN or that had 50 percent or more of its offices in PMNS, provided that this preference would not increase the cost to RTC. Specifically, under the

preference, if a minority bidder was within 10 percent of the highest bid made by a nonminority bidder, then a "best and final" round of bidding was to take place between them.

As part of this program, RTC was also to provide a winning minority bidder with (1) interim capital assistance of up to two-thirds of the required regulatory capital and (2) branch facilities, located in a PMN and owned by RTC, on a rent-free basis for 5 years. In July 1994, RTC issued procedures for selling 1- to 4-family residential mortgage loans to acquirers of whole thrifts or branches under this program. In essence, after the sale of a thrift, RTC was to have 45 days to develop the preliminary pricing of the loans to be sold, and the minority acquirer was to have up to 90 days to review the loans. When this review was completed, RTC was to give the acquirer the final sales prices for the loans. The acquirer was then to have 3 days to decide which loans to purchase and a fourth day to notify RTC of its choice. Minority acquirers could purchase loans of up to 100 percent of the net deposits assumed from RTC in the acquisition of the failed thrift.

The process RTC established to sell performing 1- to 4-family residential mortgage loans to minority acquirers has undergone several changes, in part because of concerns raised by a group of seven minority acquirers. This group believed (1) that RTC should not be responsible for pricing the loans, (2) that RTC's current methodology resulted in the loans being overpriced, and (3) that the resale provision was unfair. In March 1994, RTC stated that it would have its own staff price the loans. However, to ensure that the pricing was done in an equitable manner, in June 1994 RTC hired two asset valuation contractors to independently price the mortgage loans, thus removing itself from the pricing process. To ensure objectivity, RTC awarded fixed-fee contracts whereby neither the sales price established for the loans nor the price paid by the purchaser was a factor in determining the fee paid to the asset valuation contractors.

Additionally, RTC's March 1994 pricing procedures and mortgage loan sales agreement stated that RTC would be entitled to receive 50 percent of the acquirer's profit if the acquirer sold any of the mortgage loans prior to 181 days after the closing of the sales agreement. However, by June 1994, RTC had decided to eliminate this resale provision based on concerns raised by the minority group.

Finally, under the provisions of the mortgage loan sale agreement, RTC was expected to credit, to the minority acquirers who exercised their option to purchase the mortgage loans, the interest accrued on the loans selected.

The period of accrual was to begin 45 days after the signing of the agreement and end on the day preceding the closing date of the transaction. The accrued interest is defined in RTC's minority loan pricing procedures as the coupon interest rate on the loans less the average federal funds' rate during the accrual period.[3] However, to resolve a contract dispute regarding the final pricing of the mortgage loans, RTC provided the minority acquirers who decided not to purchase the mortgage loans with the following option—the acquirer could choose not to exercise the agreement on the loan portfolio, but rather receive the interest accrued on the respective portfolio. Under this option, the acquirer waived the right to purchase any 1- to 4-family residential mortgage loans through the minority resolutions preference program.

## Objectives, Scope, and Methodology

The RTC Completion Act required that we submit an annual report to Congress on transfers of performing assets by RTC to any acquirer. In discussions with the oversight committees, it was agreed that our report would focus on assets sold to minority acquirers. Specifically, the objectives of our review were to (1) assess how RTC determined the fair market value for the loans transferred and (2) ascertain the number and description of performing loans transferred to minority thrifts.

Although the act required us to assess RTC's determination of fair market value for the loans transferred, we were unable to evaluate RTC's determination for the following reasons. First, fair market value is commonly measured through competitive sales. Second, loans not purchased by minority acquirers were sold in bulk, and sales prices were not assigned to individual loans. Third, there were no data available to compare the prices of the mortgage loans sold to minority acquirers with the prices of other loans sold by RTC, because fewer whole loans were available for sale once RTC's securitization program started showing results around June 1991.[4] Therefore, we focused on assessing the reasonableness of the process RTC established to price the mortgage loans, including the methodology used by RTC's valuation contractors. To assess reasonableness, we discussed the methodology and models used to price the 1- to 4-family residential mortgage loans with RTC officials and the two valuation contractors. While both valuation contractors were cooperative in discussing the methodology in general, they were reluctant to discuss their pricing models in detail. The valuation contractors considered the

[3]The federal funds' rate is the interest rate charged by banks to other banks in need of overnight loans.

[4]Securitization is the process of assembling similar assets into pools that are used to collateralize newly-issued securities, which are referred to as mortgage-backed securities.

specifics of these models to be proprietary because each firm has individually and confidentially developed its own model. This did not affect our determination of the reasonableness of the these models because we were able to determine what factors were considered in the models.

We also interviewed two of RTC's three due diligence contractors to understand their role and responsibilities.[5] Further, we reviewed RTC's policies and procedures and the valuation contractors' operating guidelines. To obtain additional perspectives on RTC's process, we interviewed officials of Freddie Mac and Fannie Mae who were involved in valuing asset portfolios similar in type to RTC's assets. To better understand how mortgage loans are valued, we also reviewed academic literature on mortgage loan valuation.

Finally, we were contacted by seven minority acquirers and their advisers after they met with RTC and learned of our review. We subsequently met with them to understand their experiences in purchasing loans from RTC under the minority preference resolutions program. As a follow-up to that meeting, we also interviewed their valuation contractor to obtain information on the methodology used to assess the price of the loans.

To accomplish our second objective, which was to determine the number and type of loans sold to minority acquirers, we obtained and analyzed, but did not independently verify, RTC transaction reports showing asset sales through the minority preference resolutions program. These reports identify the type and number of loans sold, as well as their quality, price, and purchaser. In addition, we also interviewed RTC officials regarding the reliability of the reports.

We requested comments on a draft of this report from the Deputy and Acting Chief Executive Officer of RTC or his designee. On November 28, 1995, RTC's Vice President for Asset Management and Sales provided a written response in which he concurred with our findings. These comments are reprinted in appendix I.

We did our work between August 1994 and October 1995 in accordance with generally accepted government auditing standards.

[5]Due diligence is the process of evaluating information on the assets to fully assess their value.

## RTC Established a Reasonable Process for Pricing Mortgage Loans

The pricing of mortgage loans is a difficult and complex process requiring the use of a sophisticated and technical methodology. RTC established a reasonable process to price mortgage loans that was anchored to agency and mortgage securities markets standards. This process provided for an independent valuation of 1- to 4-family residential mortgage loans that were offered for sale to minority acquirers of failed thrifts located in PMNs. It is first important to note that RTC did not price the loans itself; instead, in June 1994 it hired two independent valuation contractors experienced in mortgage securities markets to determine the price of each mortgage loan. Each valuation contractor was required to price the mortgage loans on an individual basis, rather than at a portfolio level, because the acquirers were allowed to purchase some, all, or none of the loans under the minority preference resolutions program.

RTC also hired three due diligence contractors to preliminarily review each loan to determine whether it was eligible for sale under the minority preference resolutions program. To be eligible for sale under the program, the loan had to be a performing 1- to 4-family residential mortgage type. The purpose of RTC's due diligence loan file review was to secure essential information that could be used to evaluate the loans for sale. Some of the essential documents included the loan note, mortgage insurance certificate, title, appraisal, and credit and verification forms. The due diligence contractors were not required to make judgments about credit decisions or the loan's salability. According to RTC's valuation contractors, the pricing of the mortgage loans began upon receipt of the loan data files from RTC's due diligence contractors. The valuation contractors were to review these data files for completeness and accuracy and to notify RTC of any errors or missing documents in the loan file.

RTC told us that it generally resolved these deficiencies by requiring the due diligence contractors to update the loan file. The valuation contractors said that the loans were then stratified to determine whether individual loans conformed to secondary market standards.[6] Using RTC's stratification criteria, the two valuation contractors were to group the loans into three levels, referred to as "strats." According to RTC, its stratification criteria were based on agency and secondary market standards and reflected the minority preference resolutions program guidelines. See table 1 for RTC's criteria for the strat categories.

[6] The secondary mortgage market standards as recognized by Fannie Mae, Freddie Mac, and other investment firms include the rules for buying and selling mortgages that have already been originated or issued.

Table 1: RTC's Strat Criteria

| Strat category | Criteria |
|---|---|
| Strat one | Currently performing with no more than one 30-day delinquency in the last 12 months<br><br>Immaterial document deficiency |
| Strat two | Currently may be 30-days delinquent or may have two 30-day late payments in the last 12 months<br><br>Immaterial document deficiency |
| Strat three | Currently may have one 60-day or three 30-day late payments in the last 12 months<br><br>Significant document deficiency |

Note: Strat four loans are more than 60 days past due and are generally not offered under the program.

Source: RTC Division of Asset Management and Sales.

Under stratification, the two valuation contractors assigned strat codes based on the loan data provided by the due diligence contractors. The valuation contractors' pricing reports showed that they assigned the same strat for the majority of the loans. The two valuation contractors said that, in cases where there were missing loan data, the loans were considered to be of lower quality and were therefore assigned to a higher strat category.

After loan stratification, both valuation contractors used standard mortgage-backed security methodologies to price each RTC mortgage loan. This was done to determine the mortgage loan's market value as objectively as possible. The initial step under this approach was to assign each loan a benchmark price, which approximated the market value of a mortgage loan at a given point in time. For example, Freddie Mac's 1-year adjustable rate mortgage price was generally used as the benchmark for adjustable rate mortgages. According to one valuation contractor, selecting an appropriate benchmark price is a critical step in this methodology.

According to the valuation contractors, the agency benchmark price assigned to each mortgage loan was first determined by matching a loan's characteristics to the most closely similar agency mortgage-backed security.[7] Second, after the loan servicing fee was subtracted from the

[7]Loan characteristics include such factors as collateral type, geographic location, and interest rate.

current rate on RTC's mortgage loan,[8] the loan's interest rate and the agency's interest rate were matched. For example, a RTC fixed rate mortgage loan with an 8-percent interest rate net of loan servicing would be matched with an agency mortgage-backed security with an 8-percent fixed rate. Next, an equivalent benchmark price from the mortgage-backed security price database was selected. The two valuation contractors stated that, when determining the preliminary and final prices, they were required by RTC to use secondary market data from the close of business of the Wednesday prior to their receiving the loan data files. This pricing data, obtained from Knight-Ridder, was a composite of prices from seven different sources,[9] updated daily. Thus, the pricing reflected the actual market value of the mortgage loans purchased at that time. According to one valuation contractor, consistently using one date in time minimized subjectivity.

Once the agency benchmark price was determined, adjustments for movement in interest rates and credit risk sensitivity were made. To determine the adjustments for interest rate risk, both valuation contractors said they used an analytical technique known as option-adjusted spread model. This model priced a mortgage loan or mortgage-backed security by simulating many different future patterns of interest rates. The model then used these simulations and the specific characteristics of the mortgage loan to predict prepayments, which determined the cash flow of the mortgage. Finally, the model matched the predicted cash flow to the current mortgage prices, to determine the price for the mortgage in question.

In addition to the adjustments made for interest rate risks, assessments for credit risk were done to estimate the probability of default. To determine the discounts for credit risk, both contractors analyzed each loan and assigned it a risk weight based on characteristics that affect risk. These risk characteristics include loan-to-value (LTV) ratio, geographic location, mortgage insurance, and delinquency status.[10] Both valuation contractors agreed that an important variable in determining the severity of risk was the current LTV ratio, because it provided a reliable valuation of the collateral. In general, the higher the LTV the greater the risk. After the risk weights were assigned, they were multiplied together to obtain the total

[8]Loan servicing was initially removed so that the model would be on a par with the agency benchmark, since Fannie Mae and Freddie Mac were not involved in loan servicing. However, after the benchmark was determined, loan servicing was added back to RTC's mortgage loan benchmark.

[9]These seven sources included Fannie Mae, Freddie Mac, and Ginnie Mae mortgage securities.

[10]Loan-to-value ratio refers to the amount borrowed compared to the cost or value of the property purchased.

credit risk. The contractors acknowledged that this part of the process was slightly subjective, but they agreed that this was an accepted technique in the secondary market.

The final adjustments were for the strat category, unusual loan types (such as balloon mortgages where the balance of the loan was due in one lump sum on a specified date), and the fact that these were RTC loans from a failed thrift. The two valuation contractors also said that determining these adjustments was a subjective matter, but both believed that correct assessments of these discounts depended heavily on previous experience in valuing and marketing RTC assets—experience which both contractors possessed.

Each valuation contractor provided RTC with each loan's final price and strat category. After receiving the two reports, RTC averaged the two loan prices. The averaged price was offered to the minority acquirers as the final price. RTC's data showed that, although the two contractors worked independently to price the 4,063 mortgage loans, there were fewer than 100 cases in which they differed on the final price of the mortgage loan. The difference in price was usually less than half a percent. However, in cases where they differed significantly, RTC required both valuation contractors to reprice the loans.

We discussed the mortgage-backed securities approach used by RTC's contractors with officials from Fannie Mae and Freddie Mac, who said that the methodology appeared to be reasonable. Specifically, the officials said that the methodology was similar to the approach they used to value mortgage loans and contained the elements necessary to value mortgage loans. For example, although officials at Fannie Mae and Freddie Mac would not discuss the specifics of their models because they are considered proprietary, they explained that measuring interest rate movement and credit risk sensitivity are very important steps in valuing mortgage loans.

## Alternative Pricing Methodology Proposed by Some Minority Acquirers

Seven minority acquirers and RTC were unable to agree on the mortgage loan prices. These acquirers believed that the mortgage loans were overpriced. They also believed that RTC's pricing methodology did not establish the fair market value of the mortgage loans. They therefore discussed with RTC the possibility of using an alternative methodology to price the loans. RTC decided not to use the alternative methodology proposed by the minority acquirers because it believed that the

methodology being used established a fair market value for the loans and that none of the mortgage loans were overpriced.

The alternative methodology proposed by the minority acquirers was similar to the asset valuation reviews (AVR) used by RTC in 1992. Under the AVR process, RTC hired independent contractors to review samples of assets to estimate the potential loss for each asset category held by failed thrifts. AVR computes the present value of such assets using a discount rate based on secondary markets and adjusted for risk-related factors such as loan documentation. The estimated recovery values were not determined for individual loans in a portfolio, but rather for the category as a whole.

In their efforts to demonstrate that the mortgage loans were overpriced, the seven minority acquirers contracted with a firm to complete an analysis of the mortgage loans RTC made available for sale under the minority preference resolutions program. While the approach of the minority acquirers' contractor was somewhat similar to that used by RTC's contractors, there were also fundamental differences. For example, RTC's contractors stratified and assigned benchmarks to each loan, while the minority acquirers' contractor stated that benchmarks were not determined for individual loans, but rather for the portfolio as a whole. Additionally, RTC's contractors and the minority acquirers' contractor also differed on the coefficients, which are risk weight factors used in calculating the loan price.

As previously stated, the approach of the minority acquirers' contractor was similar to RTC's AVR process. In summary, to determine the mortgage loan price, the minority acquirers' contractor said it used a discounted cash flow methodology based on the assets' expected income and yields on mortgage trading in the secondary market. The price was then adjusted for risk-related factors, such as the probability of default, loan quality, and document deficiencies. To determine the adjustments for movement in interest rates, prepayment speeds were estimated using the Wall Street consensus speeds for like mortgage loan rates. Cash flows for each loan type were calculated using loan characteristics and prepayment speeds. These cash flows were discounted to determine the market value of the loans. Finally, the minority acquirers' contractor believed that a yield premium, to account for the fact that the loans were being provided in conjunction with an acquisition of marginal quality deposit liabilities, was also appropriate.

The seven minority acquirers and their contractor contended that the AVR approach was an acceptable methodology to price the assets because RTC had used it in the past. However, an RTC official stated that their process for pricing mortgage loans had evolved over the years and that they no longer used the AVR approach. RTC believed that the current mortgage-backed security approach resulted in a better determination of fair market value and attempted to maximize total return on the disposition of a failed thrift's assets, as required by law.

## Loans Sold to Minority Acquirers

RTC set aside about $3 billion in residential mortgage loans for possible sale to minority acquirers through its minority preference resolutions program. Between January 1994 and September 1995, RTC offered 16 pools of performing 1- to 4-family residential mortgage loans to the 14 minority acquirers who purchased failed thrifts located in PMNS. As of October 11, 1995, 11 minority acquirers had purchased 4,063 mortgage loans for $289.6 million. Table 2 provides detailed information on their 13 transactions.

Table 2: RTC Mortgage Loan Sales to Minority Acquirers

| Transaction | Date of sale | Number of loans | Purchase price (percent) | Purchase price (millions) |
|---|---|---|---|---|
| One | 10-31-94 | 446 | 94.61% | $30.6 |
| Two | 10-31-94 | 475 | 94.52 | 34.6 |
| Three | 11-08-94 | 161 | 95.83 | 11.0 |
| Four | 12-07-94 | 9 | 98.97 | 0.9 |
| Five | 12-20-94 | 1,132 | 82.68 | 45.1 |
| Six | 01-18-95 | 126 | 96.82 | 11.1 |
| Seven | 01-31-95 | 140 | 96.49 | 21.5 |
| Eight | 02-17-95 | 237 | 96.99 | 17.3 |
| Nine | 02-21-95 | 726 | 94.12 | 45.4 |
| Ten | 02-28-95 | 197 | 95.13 | 30.2 |
| Eleven | 05-31-95 | 354 | 96.87 | 32.3 |
| Twelve | 08-30-95 | 33 | 96.74 | 5.6 |
| Thirteen | 09-28-95 | 27 | 97.44 | 4.0 |
| Total | | 4,063 | | $289.6 |

Note: Two minority acquirers exercised two loan sales transactions each.

Source: RTC Division of Asset Management and Sales.

Additionally, our analysis of the final loan prices showed that, of the 4,063 mortgage loans, 64 percent, or 2,606, were sold for between 91 and 100 percent of the book value, as shown in figure 1.

Figure 1: Final Mortgage Loan Pricing Distribution




Note: The total number of loans sold was 4,063.

Source: RTC Division of Asset Management and Sales.

Finally, as of October 11, 1995, RTC had paid $4 million in accrued interest to the 11 minority acquirers who purchased mortgage loans and $1.4 million in accrued interest to 3 minority acquirers who decided not to exercise their option to purchase mortgage loans. RTC officials believe that paying the $1.4 million in accrued interest was the best alternative to resolving a contract dispute with the minority acquirers over the final pricing of the mortgage loans. We did not determine whether this practice was the best alternative to resolving the contract dispute because it was outside the scope of our assignment.

We are sending copies of this report to other interested congressional committees and subcommittees, RTC's Deputy and Acting Chief Executive Officer, and the Chairman of the Thrift Depositor Protection Oversight Board. Copies will be made available to others upon request.

This report was prepared under the direction of Ronald L. King, Assistant Director, Government Business Operations Issues. Other major contributors to this report are listed in appendix II. If you have any questions, please contact me on (202) 736-0479.

Gaston L. Gianni

Gaston L. Gianni, Jr.
Associate Director, Government
Business Operations Issues

# Contents


Letter 1

Appendix I Comments From the Resolution Trust Corporation 16

Appendix II Major Contributors to This Report 17

Tables
Table 1: RTC's Strat Criteria 7
Table 2: RTC Mortgage Loan Sales to Minority Acquirers 11

Figure
Figure 1: Final Mortgage Loan Pricing Distribution 12


**Abbreviations**

| | |
|---|---|
| AVR | Asset Valuation Review |
| FDIC | Federal Deposit Insurance Corporation |
| LTV | loan-to-value |
| PMN | predominantly minority neighborhood |
| RTC | Resolution Trust Corporation |

# Comments From the Resolution Trust Corporation

RTC
RESOLUTION TRUST CORPORATION
Resolving The Crisis
Restoring The Confidence

November 28, 1995

TO: Gaston L. Gianni, Jr.
Associate Director
Government Business Operations Issues
U.S. General Accounting Office

FROM: Thomas P. Horton TPH
Vice President for
Asset Management and Sales

RE: Draft Report: Performing Assets Sold to Acquirers of Minority Thrifts

This is in response to your draft report dated November 1995 which examined the sale of performing single family mortgage loan assets to minority thrift acquirers.

We have reviewed your report and agree with your findings and description of the aforementioned program.

Please do not hesitate to contact me if you require any further information.

cc: John E. Ryan
Hu Benton
Sandra Nobles

801 17th Street, N.W. Washington, D.C. 20434

# Major Contributors to This Report

## General Government Division, Washington, D.C.

Tammy R. Conquest, Senior Evaluator, Government Business Operations Issues
Michael M. Yacura, Evaluator

## Office of the Chief Economist, Washington, D.C.

William McNaught, Economist

September 18, 1996

MEMORANDUM TO: Operating Committee

FROM: John F. Bovenzi
Director, Division of Depositor and Asset Services

William F. Kroener, III
General Counsel

Paul L. Sachtleben
Director, Division of Finance

SUBJECT: Options Memorandum - Post-Insolvency Interest Regulation and Amendments to 12 C.F.R. § 360.3

*PROPOSALS*

Establish, by regulation, a uniform interest rate and priority for all prospective post-insolvency interest [1] distributions from FDIC administered receiverships, regardless of the failed institution's charter.

Amend 12 C.F.R. § 360.3 (section 360.3), governing the priority for distribution of assets from former FSLIC and RTC receiverships to eliminate inconsistencies between section 360.3 and the proposed regulation. [2]

---

[1] Post-insolvency interest is the interest paid on allowed receivership claims, under certain circumstances, after a receiver is appointed.

[2] Section 360.3 generally provides for the payment of interest to creditors in the depositor and general creditor class (category 6) on a ratable basis with claims that are not fixed on the date of the receiver's appointment (category 7). Under the regulation, interest on category 6 claims must be paid in full before distributions can be made to creditors in classes below category 7.



AM00097047

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER RAM051 0006

RECOMMENDATION

The proposed regulation will:

- establish the Federal Judgment Rate as the post-insolvency interest rate for all FDIC administered receiverships.

  This will include:

  1) all savings association receiverships transferred from the FSLIC and the RTC;

  2) all savings association receiverships, not otherwise subject to section 360.3, and state and national bank receiverships commenced prior to the enactment of national depositor preference (NDP), in August, 1993; and

  3) all receiverships commenced after the enactment of NDP.

- establish that prospective post-insolvency interest distributions will be made ratably to all creditors with allowed claims, regardless of class, after paying of the principal amount of all allowed claims, by class. The priority for payment of post-insolvency interest distributions will be subject, however, to any valid contractual or statutory subordination provision [3] governing a creditor's entitlement to post-insolvency interest.

- establish that the post-insolvency interest rate "locks" on the date an institution is declared insolvent and remains fixed until the receivership terminates.

- make the proposed regulation applicable only to prospective post-insolvency interest distributions, thereby avoiding the need to recalculate the amounts of previous post-insolvency interest distributions paid to creditors with allowed claims. Where partial distributions have already been made, the amount of such distributions will be applied to reduce the total

---

[3] A cross-guaranty assessment by the FDIC, pursuant to 12 U.S.C. §1815(e), is an example of a statutory subordination provision.

amount which will otherwise be distributable under the regulation.

JUSTIFICATION

Background. At various times in its history, the FDIC has administered receivership estates where receivership assets, after liquidation, have yielded sufficient proceeds to pay the principal amount of all proven creditor claims and some amount of post-insolvency interest. Because this situation rarely arose, issues related to the rate and priority of payment of post-insolvency interest were dealt with by the FDIC and the judicial system on a case by case basis. Therefore, divergent judicial decisions and, in some instances, state laws exist addressing the issues. Additionally, section 360.3, which was transferred to the FDIC when the Federal Home Loan Bank Board was abolished in 1989, contains an interest rate provision which only applies to the depositor and general creditor class and requires payment to that class, at the rate specified in the regulation, before payments are made on the principal amount of the allowed claims in lower creditor classes.

The FDIC's attention became focused on these issues in 1993 when the FDIC became involved in various shareholder suits challenging the right of the FDIC, as a subrogated deposit creditor, and other creditors holding allowed claims, to receive post-insolvency interest distributions. The suits also raised issues regarding the interest rate that should be used to make post-insolvency interest distributions. The FDIC's Legal Division, Division of Depositor and Asset Services, and Division of Finance reviewed the issues and existing law and found a surprising lack of consistency in positions taken in litigation. They also found a wide variation in potential outcomes, based upon the type of institution being liquidated, i.e., whether it was a savings association subject to section 360.3, or whether it was a state bank or savings association, or national bank. Additionally, the situation was further complicated, in August, 1993, when the FDI Act was amended to provide for distribution of assets from all institutions failing after August 9, 1993, pursuant to a NDP distribution scheme.

While staff recognized the complexity and need for guidance on the issues, there was concern that a policy statement or regulation addressing the issues may not be given effect by the

courts.[4] Therefore, DAS, DOF and the Legal Division issued a joint memorandum, which was merely intended to be a distillation of existing law, to all affected division staff providing direction and guidance on the interest rate issue. Since the issuance of the memorandum on June 8, 1995, the FDIC has paid post-insolvency interest in the manner set forth in Exhibit A.

Subsequent meetings and discussions with the Chief Financial Officer's staff and a recent decision by the United States Supreme Court[5] renewed interest in addressing various post-insolvency interest issues in a uniform manner by regulation.

Business Rationale. The FDIC's current practice of paying post-insolvency interest results in a significant administrative burden because post-insolvency interest issues must be researched by Legal Division and handled on a case by case basis. There is also a degree of risk involved in proceeding without a regulation because most state liquidation schemes do not address the issue of post-insolvency interest distributions or their priority. While the current guidance has provided a consistency regarding the interest rate issue, assuming sufficient assets exist to make post-insolvency interest distributions, it can potentially be challenged by any affected creditor or shareholder of an affected receivership and reviewed de novo by a court of competent jurisdiction.

Due to existing state and federal law ambiguities, it is difficult for the public, receivership creditors, and shareholders to determine with any degree of certainty the amount of post-insolvency interest payable to receivership creditors. This also may lend a degree of uncertainty to financial disclosures that the FDIC provides in receivership accountings

---

[4] See e.g. Irving Independent School District v. Packard Properties, 970 F.2d 58 (5th Cir. 1992) (Legal Memorandum, published after litigation was commenced on an issue, which was issued in connection with FDIC policy statement, was not entitled to deference, among other things, because timing of publication led court to conclude that it was the product of "biased opportunism").

[5] In Smiley v. Citibank, N.A., -- U.S. --, 116 S.Ct. 1730 (June 3, 1996) the Court overruled challenges to a regulation promulgated by the Comptroller of the Currency, pursuant to the notice-and-comment procedures of the Administrative Procedure Act, even though the regulation was prompted by the litigation, including the suit at issue. The Court found, "That it was litigation which disclosed the need for the regulation is irrelevant." Id., 1733.

which are required by the FDI Act. The proposed regulation will serve as a public notice and reference regarding the applicable interest rate and payment priority.

FDIC's current guidance merely follows applicable state and federal law and judicial precedents. This may result in potentially significant differences in post-insolvency interest distributions between receiverships, based solely upon the failed institution's charter. Reliance upon state judgment rates may also result in significant differences in outcomes between similarly situated state bank receiverships that are subject to differing state laws. Additionally, reliance upon state judgment rates, depending upon the circumstances involved, may result in what may appear to be over-compensation of creditors to the detriment of an institution's shareholders.

Legal Rationale. A regulation addressing the interest rate and priority issues is needed because instances have increasingly arisen over the past 2-3 years where receiverships have had sufficient assets to make post-insolvency interest distributions. This may occur more frequently in the future because of certain Prompt Corrective Action requirements enacted in the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), litigation regarding various contingent claims presently being pursued by FDIC receivers, and as receivers' commitments under various loss sharing agreements with failed institution acquirors expire.

There also is a lack of uniformity regarding the rate and priority of payment of post-insolvency interest in the various types of receiverships the FDIC is administering, making this a potentially fertile area for disputes and litigation. Therefore, uniform and consistent rules will be beneficial to the public, creditors and equity holders of affected institutions. A regulation governing these issues also should reduce the burden upon the court system and receivership resources by resolving issues addressed in the regulation without the need for court intervention.

While the FDI Act does not clearly address the Corporation's ability to supplant state laws relating to post-insolvency interest in liquidations of state chartered institutions, the Corporation has the authority to prescribe regulations which it may deem necessary to carry out the provisions of the FDI Act or any other laws it has responsibility for administering. 12 U.S.C. §1819 Tenth. Additionally, section 1821(d)(1) authorizes the Corporation to prescribe such regulations as it determines are appropriate regarding the conduct of receiverships. Post-insolvency interest payments are not addressed in the FDI Act,



AM00097051

however, providing for their payment is a necessary incident of the FDIC's express statutory responsibilities of administering a receivership claims process, paying dividends to creditors, and returning any remaining assets to the failed institution's shareholders. Under the circumstances, the Corporation will be provided reasonable discretion in interpreting the scope of its authority to regulate in this area. The Corporation's action should, therefore, be upheld even if not within explicit statutory authority, when and if it represents a legitimate, reasonable, and direct adjunct to the power explicitly conferred. United States v. Chesapeake & Ohio Railroad Co., 426 U.S. 500 (1976).

ANALYSIS - OPTIONS AND ALTERNATIVES CONSIDERED [6]

A. Interest Rate

The FDIC may maintain its current practice with or without a regulation. While the FDIC may obtain various benefits from a regulation, such as the ability to bind the public and obtain judicial deference to its administrative pronouncement, a regulation may limit FDIC's flexibility on the interest rate issue and render any deviation from the regulation's requirements invalid.

- Maintaining the current practice:
  - Provides creditors of estate with maximum amount of interest to which they are legally entitled;
  - Recognizes impact of varying state laws and judicial decisions;
  - Does not resolve rate disparities between receiverships for different types of institutions; and
  - Makes this the most labor intensive option due to revisions to state laws, new court decisions, and need to calculate interest (as often as monthly for some savings associations under section 360.3).

---

[6] Recommended options appear in bold print for the reader's convenience.

1. <u>Maintain Status Quo - Without Regulation</u>

Advantage - No action required.

Disadvantage - Without interest rate regulation, in the absence of a rate specified by statute or controlling court precedent, rate applied is subject to court challenge and *de novo* judicial review.

2. <u>Maintain Status Quo - With Regulation</u>

Advantages - Minimal rationalization required to support regulation because it essentially implements existing law or reasonable extensions thereof. Reduces probability of an effective challenge by receivership creditors and shareholders, assuming appropriate Administrative Procedure Act processes are followed.

Disadvantages - None, other than those stated in the introduction to this section.

- Uniform Rate

The FDIC also can attempt to establish a uniform rate for all receiverships, regardless of their charter. The following items apply equally to all uniform rate options:

- Utilization of a uniform rate for all receiverships will reduce internal administrative burdens;
- Because section 360.3 only provides for interest to be paid to creditors in category 6, and assuming no other modifications to that regulation, general creditors of the receivership (including the FDIC, as a subrogated deposit claimant) will receive the majority of any financial advantage or disadvantage; [7]
- FDIC's ability to supplant state laws by regulation may

[7] This may increase potential litigation risks for FDIC in certain savings association receiverships if significant recoveries are obtained on contingent claims.


App. 548

be challenged;[8].

- Utilization of a uniform rate, in some circumstances, may potentially conflict with requirements established in NDP provision of FDI Act where a rate has been established by state statute or judicial precedent;[9] and

- Uniform rate may be greater or less than the rate currently specified under section 360.3, for savings associations subject to that regulation.

Additional advantages and disadvantages of each option are listed below.

1. <u>Uniform Rate for All Receiverships - U.S. Treasury Financial Manual Rate</u>

Advantage - Publicly available rate charged on obligations owed to and from the Federal government.

Disadvantages - Focuses only on the FDIC's entitlement, as opposed to the entitlement of all creditors. Rate is only updated annually, in January. Rate is based upon average investment rates for the 12-month period ending every September of the preceding year. FDIC Board of Directors approved discontinuing use of this rate for calculating interest on over- and underpayments of deposit insurance assessments, in Federal Register notice, dated September 29, 1995, in favor of the 90-day T-Bill rate, adjusted quarterly, because the data is significantly aged by date of publication and may not be reflective of current market rates in volatile interest rate environments. Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate for some receiverships. Difficult to rationalize

---

8 However, the number of receiverships where this could pose a serious issue are negligible and the position could be bolstered by the Corporation exercising its statutory right of self-appointment.

9 NDP does not address the issue of rate, payment or priority of post-insolvency interest distributions. The statute indicates that state law is superseded by NDP, but only to the extent state law is inconsistent with NDP. NDP authorizes FDIC to make inconsistency determinations, subject to Administrative Procedure Act review, upon the request of the FDIC, any creditor, or a State.

legal justification for utilization of this rate for all creditors.

2. <u>Uniform Rate for All Receiverships - Federal Judgment Rate</u>

Advantages - Publicly available rate.[10] <u>Rate has been applied to national bank receiverships by U.S. Supreme Court.</u> Analogy of allowed claim to a judgment, for purposes of determining applicable rate, is <u>widely recognized by judicial precedents.</u> U.S. Supreme Court precedent concerning Federal Judgment Rate provides basis, by analogy, for "locking" rate at date of receiver's appointment, which compliments other judicial precedents holding that creditors' rights must be "fixed" at the point of insolvency. Application of this rate will bring all receiverships in line with current standard being applied to national bank receiverships, thereby eliminating rate disparity between receiverships for different types of institutions.

Disadvantages - Federal Judgment Rate may be greater or less than rate which may otherwise be applicable under state law[11] for some receiverships. The same is true for the rate currently specified under section 360.3, for savings associations subject to that regulation.

3. <u>Uniform Rate for All Receiverships - FDIC Investment Rate</u>

Advantages - If rate floats, assures that FDIC - which usually holds 95-98% of claims against receivership estate - earns rate it could otherwise have earned on invested funds. Rate may be greater or less than rate established using other federal rates considered.

Disadvantages - Utilization of this rate is considered likely to embroil the FDIC in litigation over the calculation of its investment rate because the FDIC is the only source from which rate can be obtained. Focuses primarily on the FDIC's entitlement, as opposed to the entitlement of all creditors. Rate will vary with the mix of maturities for U.S. government obligations held in the FDIC's investment portfolio at any given time. Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate

---

[10] This rate is the 1 Year T-Bill rate established pursuant to 28 U.S.C. § 1961.

[11] Rates under state laws vary but are generally between 6 to 12% per annum.

for some receiverships. Difficult to rationalize viable legal justification for utilization of this rate.

4. <u>Uniform Rate for All Receiverships - Three Month Treasury Bill Rate</u>

Advantage - Publicly available rate.

Disadvantages - Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate for some receiverships. Difficult to rationalize viable legal justification for utilization of this rate.

7. <u>Federal Financing Bank Borrowings Rate (FDIC Cost of Funds Rate)</u>

Advantage - Publicly available rate.

Disadvantages - Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate for some receiverships. Difficult to rationalize viable legal justification for utilization of this rate.

B. Floating or Locked Interest Rate

The FDIC's current guidance does not address whether the interest rate should "float" throughout the life of the receivership or "lock" on the date of insolvency. The FDIC's practice is to lock the rate on the date of insolvency, other than for institutions subject to section 360.3. [12]

1. <u>Floating Interest Rate</u>

Advantages - Allows interest rate to be adjusted on a periodic basis to compensate for increases or decreases in applicable interest rate over time. Rate should never be greater or less than the index to which it is tied.

Disadvantages - Experience with floating rate currently provided in section 360.3, applicable to certain savings associations, indicates that constant recalculations based upon floating rates are a complex task. Calculation requires periodic recalculation of principal and application of appropriate interest rates to outstanding principal balance to ascertain the amount of post-

---

[12] The regulation mandates a floating rate.

insolvency interest owed at any particular time. Existing legal precedents do not appear to provide support for floating rate because most courts analogize allowed claims against receiverships to judgments and judgments generally "lock" when a judgment is entered. Increased possibility of calculation errors due to constant recalculations. Difficult for creditors and shareholders to calculate post-insolvency interest claim because of need to prospectively adjust rate. Deviates from current practice for receiverships which are not subject to section 360.3. May potentially affect the accuracy of receivership financial statement disclosures issued by FDIC due to prospective nature of required adjustments. May result in litigation from certain creditors of institutions, not subject to section 360.3, if floating rate results in smaller post-insolvency interest distributions than are required if rate locks on date of insolvency. May result in litigation from shareholders of institutions, not subject to section 360.3, if floating rate results in greater post-insolvency interest distributions than are required if rate locks on date of insolvency.

2. <u>Locked Interest Rate</u>

Advantages - Interest rate remains constant throughout life of receivership making calculation of post-insolvency interest claim easily determinable for the public, receivership creditors, and shareholders. Reduced possibility of calculation errors because rate is ascertained retrospectively and adjustments to principal balance of claims are all that must be considered to ascertain amount of claim. Existing judicial precedents and the National Bank Act's ratability requirement lend support to the concept of locking the rate as of the date of the receiver's appointment. Consistent with current FDIC practice, for institutions other than those subject to section 360.3, regarding calculation of post-insolvency interest.

Disadvantages - Locked rate may be significantly greater or less than index to which it is tied. Deviates from current practice for receiverships subject to section 360.3. Locked rate may result in litigation from certain savings association creditors, subject to section 360.3, if floating rate currently provided in the regulation results in greater post-insolvency interest distributions to creditors than are required if rate locks on date of insolvency. Locked rate may result in litigation from certain savings association shareholders, subject to section 360.3, if floating rate currently provided in the regulation results in smaller post-insolvency interest distributions to creditors than are required if rate locks on date of insolvency.


App. 552

C. Priority of Payment for Post-Insolvency Interest

The FDIC's current guidance does not address the priority of payment of post-insolvency interest. FDIC's current practice is to make a ratable distribution of post-insolvency interest, without regard to the class of the underlying claim, when the issue is not specifically addressed by federal regulation [13] or state statute. Thus, each class of claims shares equally in interest distributions after the payment of principal to each class.

If the FDIC makes the priority of post-insolvency interest distributions uniform, the following items will be common to all options:

- Utilization of a uniform distribution priority for all receiverships will reduce internal administrative burdens significantly;
- FDIC's ability to supplant state laws specifying distribution priority for post-insolvency interest by regulation may be subject to challenge; [14]
- Utilization of a uniform distribution priority, in some circumstances, may potentially conflict with requirements established in NDP provision of FDI Act where a distribution priority has been established by state statute or judicial precedent; [15]
- NDP amendment to the FDI Act does not specify distribution method for priority of post-

---

[13] Because section 360.3 specifically addresses the priority of interest distributions, the FDIC pays interest in the manner specified in the regulation, i.e., only to category 6 creditors, ratably with category 7 creditor distributions.

[14] However, the number of receiverships where this could pose a serious issue are negligible and the position could be bolstered by the Corporation exercising its statutory right of self-appointment.

[15] NDP does not address the issue of rate, payment or priority of post-insolvency interest distributions. The statute indicates that state law is superseded by NDP, but only to the extent state law is inconsistent with NDP. NDP authorizes FDIC to make inconsistency determinations, subject to Administrative Procedure Act review, upon the request of the FDIC, any creditor, or a State.

insolvency interest payments;

- Utilization of uniform distribution priority may alter distributions to creditors of certain savings association creditors subject to section 360.3, assuming application of regulation to prospective receivership distributions, because the regulation currently provides only for the ratable payment of interest to category 6 creditors, with distributions to category 7 creditors;

- Utilization of uniform distribution priority arguably expands the number of classes of creditors, under section 360.3, receiving post-insolvency interest distributions from a single class to all classes, which may adversely impact general creditor and shareholder distributions;[16] and

- Utilization of a uniform distribution priority may reduce the total payments to depositors and general creditors in receiverships subject to section 360.3 and under some state laws.

---

[16] An argument exists that post-insolvency interest distributions can be made to all creditors before making shareholder distributions because the regulation does not specifically refer to "post-insolvency" interest distributions. In similar situations, when courts have interpreted statutes that are silent on the issue of post-insolvency interest distributions, virtually all of the courts have been willing to read the requirement into the distribution scheme as an incident to the creditors' claims. The regulation's failure to specifically provide for the payment of post-insolvency interest prior to making shareholder distributions and its inclusion of an interest payment requirement in favor of category 6 claimants, however, may weaken the effectiveness of this argument.

An alternative the FDIC could consider would be to amend the regulation to specifically provide for the payment of post-insolvency interest to all classes of creditors, prior to making shareholder distributions, and provide credit for distributions previously received by the category 6 creditors under the existing regulation against their post-insolvency interest distribution under an amended regulation.

1. <u>Payment of Interest to All Creditors Within a Class Prior to Principal Payments to Creditors in Lower Classes</u>

Advantages - Provides the most favorable treatment to depositors, in depositor preference distribution scheme, and general creditors in non-depositor preference distribution schemes. This payment method is consistent with a few existing state distribution schemes.

Disadvantages - Allows higher priority creditors to obtain payment of the principal amount of their claims and all post-insolvency interest while the lower classes may receive no distribution on their claims. Distribution method appears to be contrary to court interpretations of the National Bank Act's ratable distribution requirement, with regard to national bank liquidations. Distribution method represents a minority position on the issue with regard to state liquidation schemes.

2. <u>Payment of Interest by Class After Payment of the Principal Amount of All Proven Creditor Claims</u>

Advantages - Allows all creditors to recover principal amount of their claims before any post-insolvency interest distributions are made. Provides favorable treatment to depositors, in depositor preference distribution scheme, and general creditors in non-depositor preference distribution schemes.

Disadvantages - Allows higher priority creditors to obtain all of their post-insolvency interest payments before any interest distributions are made to creditors in lower classes. Distribution method appears to be contrary to court interpretations of the National Bank Act's ratable distribution requirement, with regard to national bank liquidations. Although this distribution method may have been adopted in one or two state distribution schemes, legal justification and support for its utilization on a nationwide basis is considered weak.

3. <u>Ratable Payment of Post-Insolvency Interest to All Creditors, Regardless of Class, After Payment of the Principal Amount of All Proven Creditor Claims</u>

Advantages - Appears to be the majority rule established by the few judicial precedents addressing the issue. Is the position most likely to be favored by the states because of judicial preference for ratability in the absence of other controlling standards. Method is consistent with the National Bank Act's ratable distribution requirement. Allows all creditors to share equally in post-insolvency interest distributions, unless they

have contracted to have their claims subordinated to those of other creditors or their claims are subordinated by statute.

Disadvantages - None, other than those stated in the introduction to this section.

D. Applicability of the Regulation to Existing Receiverships

FDIC's current guidance does not address the issue of the law to be applied if the distribution scheme changes while an institution is being liquidated. The FDIC's practice, however, has been to apply the law as it existed at the time of the receiver's appointment and only apply changes in applicable law to future receiverships. Legal precedents exist, however, upholding prospective alterations of dividend distributions due to intervening changes in law. [17] Additionally, the FDIC and RTC properly altered distributions in receiverships pending in Florida when that state amended its receivership priority scheme and made the changes applicable to dividend distributions occurring after the date of the amendment of the statute. [18]

1. Retroactive Application of Regulation

NOT AN OPTION. U.S. Supreme Court has indicated that federal agencies exceed their authority by promulgating retroactive regulations, unless such authority has been expressly provided by Congress. [19]

2. Prospective Application to Future Receiverships Established After Regulation Becomes Effective

Advantages - Option poses the fewest legal problems and will be the easiest to administer because it will affect only

---

[17] See e.g. In re Advisory Opinion To The Governor, 593 A.2d 943 (RI 1991); Maryland Insurance Guaranty Association v. Muhl, 504 A.2d 637 (Md. Ct. Spec. App. 1986)(Claims against receiverships constitute a mere expectancy of a distribution and the claimant does not acquire vested rights to particular modes of distribution (including priorities), such that the legislature cannot change them).

[18] See Stattin v. RTC, 883 F. Supp. 678, aff'd, 74 F.3d 1252 (11th Cir. 1995).

[19] Bowen v. Georgetown Univ. Hospital, 488 U.S. 204 (1988).

receiverships established after regulation becomes effective. Provides maximum notice to the public of how FDIC will deal with issues addressed in the regulation when an institution goes into receivership. Poses no issues with regard to creditors or shareholder of institutions subject to section 360.3 because that regulation is inapplicable to any receivership established after August 9, 1993, the date NDP was enacted.

Disadvantage - Does not resolve any of the issues arising, or which may arise in the future, out of existing receiverships.

3. <u>Prospective Application to Future Dividend Distributions From Existing Receiverships and to Receiverships Established After Regulation Becomes Effective</u>

Advantages - Prospective application to future dividend distributions can be supported by existing judicial precedents because it does not affect vested rights. Addresses issues arising or which may arise in the future in existing receiverships. Should provide judicial deference to FDIC concerning issues addressed by the regulation, if all required Administrative Procedure Act procedures are followed. May significantly reduce burden on staff and financial resources of FDIC and receiverships required to defend legal disputes over issues addressed by the regulation.

Disadvantages - Public perception concerning FDIC changing rules after receiverships have been established, particularly with regard to institutions subject to section 360.3. Although the Administrative Procedure Act generally provides the public with an opportunity for notice and comment before a regulation can be implemented, a sympathetic court may attempt to find ways to avoid providing the FDIC deference normally provided for formal agency action, if a challenge is raised by a creditor or shareholder of an existing receivership, because of the promulgation of the regulation after the receivership was established.

FINANCIAL IMPACT

This analysis addresses the use of the Federal Judgment Rate as the applicable interest rate to calculate interest payments to creditors of receiverships in instances where the funds available for the payment of interest on proven receivership claims. The impact of the recommendation to change the priority in which

these payments are made is not reflected below.[20]

- Of the 1015 active receiverships, an estimated 28 receiverships, comprised of 8 FDIC institutions and 20 former RTC institutions, will have funds available for interest payments to creditors.

- Approximately 20 receiverships (5 FDIC and 15 former RTC) of the total 28 receiverships will not be affected by a change in the interest rate due to the insufficient value of the assets remaining in the receiverships. Regardless of the rate utilized, any excess recoveries will be designated as interest payments.

- Another 5 RTC receiverships will have funds available to make distributions to lower priority creditors, regardless of the rate utilized. Adopting the Federal Judgment Rate will reduce funds available for lower priority creditors of one of these receiverships by $150,000. In the other 4 RTC receiverships, total funds available for distribution to lower priority creditors will be reduced by approximately $18.3 million.

- The remaining 3 receiverships (FDIC) may have funds available for distribution to equity holders. These receiverships are national banks a federal association and the amounts distributed will not be affected by a change in the rates because the FDIC is already applying the Federal Judgment Rate.

[20] This information has not been prepared because the change in interest priorities under section 360.3 will require payment of the principal amounts of certain U.S. government tax claims before the payment of interest to general creditors. Information regarding the amount of these tax claims was not readily available at the time this memorandum was prepared.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
LfyX4bFaI2mJojlo5du3rtDawRoYofewGA7MrXkDfg940nJzqGdRklJmlrtVWrL6
IOrWcn/CTP9DyxQ4/UlJew==

<SEC-DOCUMENT>0000020639-98-000006.txt : 19980401
<SEC-HEADER>0000020639-98-000006.hdr.sgml : 19980401
ACCESSION NUMBER: 0000020639-98-000006
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT: 4
CONFORMED PERIOD OF REPORT: 19971231
FILED AS OF DATE: 19980331
SROS: NONE

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: AMBASE CORP
CENTRAL INDEX KEY: 0000020639
STANDARD INDUSTRIAL CLASSIFICATION: INVESTMENT ADVICE [6282]
IRS NUMBER: 952962743
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K
SEC ACT:
SEC FILE NUMBER: 001-07265
FILM NUMBER: 98583765

BUSINESS ADDRESS:
STREET 1: GREENWICH OFFICE PARK BLDG 2
STREET 2: 51 WEAVER STREET
CITY: GREENWICH
STATE: CT
ZIP: 06831-5155
BUSINESS PHONE: 2035322000

MAIL ADDRESS:
STREET 1: GREENWICH OFFICE PARK, BLDG 2
STREET 2: 51 WEAVER STREET
CITY: GREENWICH
STATE: CT
ZIP: 06831-5155

FORMER COMPANY:
FORMER CONFORMED NAME: HOME GROUP INC
DATE OF NAME CHANGE: 19890608

FORMER COMPANY:
FORMER CONFORMED NAME: CITYHOME CORP
DATE OF NAME CHANGE: 19780917

</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K FOR YEAR ENDED 12/31/97
<TEXT>

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

(Mark One)
|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (fee required)

For the fiscal year ended December 31, 1997

|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (no fee required)

For the Transition Period From ________ To ________

Commission file Number 1-7265

AMBASE CORPORATION
(Exact name of registrant as specified in its charter)

| DELAWARE | 95-2962743 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

51 Weaver Street, Building 2, Greenwich, CT 06831-5155
(Address of principal executive offices)

Registrant's telephone number, including area code (203) 532-2000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($0.01 par value) | None |
| Rights to Purchase Common Stock | None |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to the Form 10-K. X

At January 30, 1998, there were 44,533,519 shares of registrant's Common Stock outstanding. At January 30, 1998 the aggregate market value of registrant's voting securities (consisting of its Common Stock) held by nonaffiliates of the registrant, based on the average bid and asking price on such date of the Common Stock of $3.56 per share, was approximately $128 million. The Common Stock constitutes registrant's only outstanding security.

Portions of the registrant's definitive Proxy Statement for its 1998 Annual Meeting of Stockholders, which Proxy Statement registrant intends to file with the Securities and Exchange Commission not later than 120 days after the close of its fiscal year, is incorporated by reference with respect to certain information contained therein, in Part III of this Annual Report.

The Exhibit Index is located in Part IV, Item 14, Page 37.

<PAGE>

AmBase Corporation

Annual Report on Form 10-K
December 31, 1997

CROSS REFERENCE SHEET FOR
PARTS I, II, III and IV — Page


PART I

Item 1. Business....1

Item 2. Properties....2

Item 3. Legal Proceedings....2

Item 4. Submission of Matters to a Vote of Security Holders....3

Executive Officers of the Registrant....3

PART II

Item 5. Market for Registrant's Common Equity and Related Stockholder Matters....4

Item 6. Selected Financial Data....5

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations....5

Item 8. Financial Statements and Supplementary Data....12

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure....36

PART III

Item 10. Directors and Executive Officers of the Registrant....36

Item 11. Executive Compensation....................................36

Item 12. Security Ownership of Certain Beneficial
Owners and Management.............................................36

Item 13. Certain Relationships and Related Transactions...............36

PART IV

Item 14. Exhibits, Financial Statement Schedules and
Reports on Form 8-K...............................................37

<PAGE>

PART I

ITEM 1. BUSINESS

Corporate Profile

AmBase Corporation (the "Company") was incorporated in 1975 by the City Investing Company ("City") as the holding company for The Home Insurance Company, a New Hampshire insurance corporation, and its affiliated property and casualty insurance companies ("The Home"). In 1985, City, which prior to that date owned all the outstanding shares of the Common Stock of the Company, distributed the Company's shares to City's common stockholders. The Home was sold on February 13, 1991 to Home Holdings, Inc. ("Home Holdings").

In December 1997, the Company formed a new wholly-owned subsidiary, SDG Financial Corp. ("SDG Financial"), to pursue merchant banking activities. SDG Financial purchased an approximate 6.3% equity interest in SDG, Inc. for $1,250,000 and was granted the exclusive right to act as the investment banker/financial advisor to SDG, Inc. and all of its subsidiaries and affiliates.

SDG, Inc. is a development stage company which specializes in creating new technology-specific companies that are dedicated to the clinical and commercial development of proprietary, targeted liposomal delivery systems for pharmaceutical therapies and consumer product ingredients. SDG, Inc.'s lipid vesicles are protected by numerous U.S. and related foreign patents.

Also in December 1997, the Company purchased $100,000 of convertible preferred stock in AMDG, Inc. ("AMDG"), a majority owned subsidiary of SDG, Inc. AMDG is a development stage pharmaceutical company focused on the clinical development of new therapies for the treatment of both Type I and Type II diabetes and has received from SDG, Inc. a worldwide, exclusive, royalty-free license to certain patented technology. AMDG raised $3.7 million of equity through a private placement in December 1997.

In November 1993, the Company acquired 51% of the issued and outstanding common stock of Augustine Asset Management, Inc. ("Augustine"), a Florida based investment advisory firm. On October 4, 1996, the Company sold its entire interest in Augustine, to Augustine. See Item 8 - Note 6 to the Company's consolidated financial statements for further information.

In August 1988, the Company acquired Carteret Bancorp Inc. Carteret Bancorp

The Company anticipates that, as a result of filing a consolidated federal income tax return with Carteret FSB, approximately $170 million of tax NOL carryforwards will be generated from the Company's tax basis in Carteret/Carteret FSB as tax losses are incurred by Carteret FSB. The NOL carryforwards generated from the Company's tax basis in Carteret/Carteret FSB would expire no earlier than 2007, and would be available to offset future taxable income, in addition to the $30 million of NOL carryforwards as further detailed below.

In connection with the completion of the federal tax audit years (excluding Fresh Start) through 1992 (excluding the $170 million of tax NOL carryforwards from the Company's tax basis in Carteret/Carteret FSB), as noted above and the Company's federal income tax returns as filed from 1993 to 1996 (subject to IRS audit adjustments), at December 31, 1997 the Company has NOL carryforwards available to reduce future federal taxable income, which expire if unused, as follows:

| | |
|---|---|
| 2006 | $ 3,000,000 |
| 2007 | 12,000,000 |
| 2008 | 3,000,000 |
| 2009 | 7,000,000 |
| 2010 | 5,000,000 |
| | --------- |
| | $30,000,000 |

The utilization of certain carryforwards is subject to limitations under U.S. federal income tax laws. In addition, the Company has approximately $21 million of alternative minimum tax credit carryforwards, which are not subject to expiration.

Under Statement 109, the Company has calculated a net deferred tax asset of $33 million as of December 31, 1997 and 1996, arising primarily from NOL's, the excess of book over tax reserves and alternative minimum tax credits (not including the anticipated tax effects of the approximately $170 million of NOL's expected to be generated from the Company's tax basis in Carteret, resulting from the election decision, as more fully described above). A valuation allowance has been established for the entire net deferred tax asset, as management, at the current time, has no basis to conclude that realization is more likely than not.



<PAGE>



During 1995, the Company recorded as additional income tax expense a $1,800,000 increase in the income tax reserves. The increase in the income tax reserves was the result of the continuing review of the income tax reserves including additional reserves for amounts considered unrealizable. In addition, included in income tax expense is a state tax provision of $197,000 in 1995.

Note 12 - Commitments and Contingencies

Future minimum rental payments, principally for office space, under noncancellable operating leases at December 31, 1997, are: 1998, $74,000; 1999, $79,000; 2000, $80,000; 2001, $20,000; 2002, $0 and thereafter, $0. Rent expense charged to earnings was $67,000, $46,000 and $142,000 for the years ended December 31, 1997, 1996, and 1995, respectively.

Note 13 - Legal Proceedings

(a) The Company is a defendant in a number of lawsuits or proceedings, including the following:

Rolo and Tenerelli v. City Investing Company Liquidating Trust, et al. This is a purported class action filed in the United States District Court for the District of New Jersey (the "District Court"). Plaintiffs assert a variety of Federal and state causes of action in connection with an alleged fraudulent scheme involving the marketing and sale of homesites and houses by General Development Corporation ("GDC"), a former subsidiary of City. Plaintiffs have named as defendants the Company and Carteret, as well as a number of directors and other financial institutions that had business dealings with GDC. On December 27, 1993, the District Court entered an Order and Opinion dismissing the action against all parties (amended on January 17, 1994, to include the dismissal of Carteret Bancorp, Inc. and Carteret). Plaintiffs appealed the order to the United States Court of Appeals for the Third Circuit which affirmed the order and subsequently remanded the case for reconsideration in light of an intervening decision. Upon remand, the District Court again dismissed plaintiffs' complaint on August 24, 1995 and denied plaintiffs' petition for reconsideration. Plaintiffs have appealed the District Court's most recent order to the Court of Appeals where the case remains pending. The parties have completed briefing and argument and are awaiting a decision by the Court of Appeals on the plaintiffs' appeal of the dismissal of the case by the District Court.

In United States v. Brown, an action commenced in the United States District Court for the Southern District of Florida, certain officers of GDC, none of whom were officers of the Company, were convicted of violating the Federal Mail Fraud Statute and certain other related statutes. This development led two of GDC's insurers, National Union Fire Insurance Co. and Pacific Insurance Co., to seek to terminate their directors and officers' insurance coverage in two actions pending in the United States District Court for the Southern District of Florida, Pacific Insurance Co. v. Brown, et al. and National Union Fire Ins. Co. v. Brown, et al. During the fourth quarter of 1996, the U.S. Court of Appeals for the 11th Circuit reversed the conviction of the officers of GDC. Although the Company is not a party to these actions, certain individuals who were directors of GDC and the Company are defendants. Should the insurers be successful in the termination of their coverage, it is anticipated that the Company would be exposed to claims for indemnification. The parties to this litigation are currently engaged in settlement negotiations.

Marshall Manley v. AmBase Corporation. On November 14, 1996, Marshall Manley ("Manley"), a former President, Chief Executive Officer and Director of the Company, commenced an action against the Company, seeking indemnification from the Company pursuant to a May 27, 1993 employment settlement agreement between Manley and the Company. Manley seeks reimbursement of certain alleged payments he made to the Trustee in the bankruptcy proceedings of the law firm of Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey (the "Manley action"), arguing that he served at such firm at the request of the Company. The Manley action is pending in the United States District Court for the Southern District of New

York. The Company filed its answer on January 21, 1997, raising substantial affirmative defenses which the Company intends to vigorously pursue. On October 30, 1997, AmBase amended its Answer and Counterclaims to include a claim of fraud against Manley. In December 1997, Manley moved for summary judgment in his favor. The Company raised substantial opposition to the motion and moved to strike certain of Manley's affirmative defenses which Manley raised in connection with the Company's fraud claim against Manley. Oral argument on the motions is set for May 15, 1998.



<PAGE>



Disputes with Internal Revenue Service. The Company contractually assumed the tax liabilities of City, which, prior to September 1985, owned all the outstanding shares of Common Stock of the Company. The Company also contractually assumed certain tax liabilities of The Home and its subsidiaries from September 1985 through 1989. For all periods through 1991, the IRS and the Company do not agree with respect to only two issues; (1) withholding taxes in connection with a Netherlands Antilles finance subsidiary of City, and (2) "Fresh Start", an insurance industry issue.

(1) Withholding Taxes (Netherlands Antilles). On May 11, 1995, the IRS issued a Notice of Deficiency for withholding taxes on interest payments for the years 1979 through 1985. In the Notice of Deficiency, the IRS contends that City's wholly owned Netherlands Antilles finance subsidiary should be disregarded for tax purposes. The Company vigorously contested the IRS's position in accordance with the IRS's internal appeals procedures. In January 1992, the National Office of the IRS issued technical advice supporting the auditing agent's position. In October 1992, the Company appealed this technical advice to the National Office. The National Office advised the Company that it expected to issue technical advice supporting the auditing agent's position, whereupon, the Company advised the IRS that it was withdrawing its technical advice request.

On June 30, 1995, the Company filed a petition in the United States Tax Court contesting the Notice of Deficiency. The IRS filed its answer on August 23, 1995. The Company filed a motion for summary judgment in its favor on February 13, 1996. On April 17, 1996, the IRS filed a Notice of Objection to the Company's motion for summary judgment. The Tax Court requested, and the Company filed on July 3, 1996, a reply to the IRS's Notice of Objection. On September 19, 1996, the Tax Court denied the Company's motion for summary judgment without prejudice. Based on the Tax Court's examination of the record and the status of the discovery process, the Tax Court concluded that summary adjudication at this time was inappropriate. The Tax Court directed the parties to engage in full and complete discovery as expeditiously as possible. A trial was held in this case on March 24, 1997, after which the Judge asked the IRS and the Company to submit post-trial briefs, which have subsequently been submitted to the Tax Court. If the IRS were to prevail on this issue, the Company would be liable for taxes and interest in excess of the Company's financial resources.

In a case dealing with a similar withholding tax issue, the Tax Court ruled in

1997 V25 2: pp. 271–294
REAL ESTATE
ECONOMICS

NOTICE: THIS MATERIAL MAY
BE PROTECTED BY COPYRIGHT
LAW TITLE 17 U.S. CODE.

# An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing

Sudhir Nanda,* James E. Owers** and Ronald C. Rogers***

This article describes the operations of the Resolution Trust Corporation (RTC), examines the procedures it employs to resolve distressed Savings and Loan scenarios and investigates the pricing of transactions undertaken by the RTC. The RTC has been criticized for allegedly transferring properties to acquirers at "bargain" prices. The transactions involving publicly traded acquirers in RTC sales are examined from an auction theory perspective. Overall, there is little evidence that winning bidders experience stock price gains. There are, however, subsets of bidders for which the outcomes are predominantly negative. The only category of transactions which provide statistically significant gains to acquirers are Insured Deposit Transfers.

The Resolution Trust Corporation (RTC) is a significant institution in the recent history of the United States financial system. It has had as many as 7,000 employees and has been considered to be the largest real estate owner in the country. During the first three and a half years of its existence it took control of 737 failed thrifts and acquired assets with a book value of $434 billion. The RTC took over the role of resolving the problems of insolvent Savings and Loans (S&Ls) from the Federal Savings and Loan Insurance Corporation (FSLIC) in August 1989, after its creation by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

Several "sales" of failed thrifts by the FSLIC in late 1988 became controversial. The S&L insurance fund had few resources, and "regulators could only promise future assistance payments and tax breaks to attract buyers."[1] The future assistance primarily took the form of assured returns to buyers. Specified or covered assets carried a "yield maintenance" provision, and an assured return, often in the form of management fees. This structure of returns provided little incentive to improve (or even complete

*Pennsylvania State University, Harrisburg, PA 17057
**Georgia State University, Atlanta, GA 30303
***University of South Carolina, Columbia, SC 29208

[1] *The Wall Street Journal*, July 10, 1991.

the development of) covered assets.[2] Additionally, as has been found in some of the S&L controversy, there were interesting political intonations.[3]

The RTC is charged with the management and disposition of assets, liabilities and operations assumed from failed S&Ls. This role is critical because of its influence on the ultimate cost of the S&L industry's problems to taxpayers, and the degree of efficiency in the redeployment of assets and operations from distressed thrifts. The importance of pricing outcomes of RTC asset sales is apparent from the scale of operations. Approximately $500 billion of assets came to be involved in RTC operations.

Sales practices employed by the RTC have generated considerable controversy in the areas of sales mechanisms, pricing outcomes and administrative processes.[4] The RTC has been harshly criticized for practices such as the random selection of eligible bidders and inadvertent sales of particular properties to more than one bidder. The level of attention paid to the RTC's practices and pricing of transactions is not surprising given the public policy issues associated with an operation of this scale and the controversy surrounding a number of large transactions undertaken by the FSLIC in the period preceding the creation of the RTC.

The purpose of this article is to systematically review the operations of the institution and to examine the pricing outcomes for subsets of resolutions where another party acquires business interests from the RTC. The analysis provides evidence on the pricing of RTC transactions in both auction and merger and acquisitions contexts.

The paper is structured as follows: The following section reviews the acquisitions literature related to this paper and then the selling practices of the RTC are related to auction theory. After the sample, data and methodology are described, research findings are presented and discussed. The final section presents the conclusion.

---

[2] A review of some of these acquisitions revealed that in many cases, ". . . '88 thrifts seem to have decided to play it safe and just collect their fees. " *The Wall Street Journal*, p.1, July 10, 1991.

[3] *The Wall Street Journal*, July 10, 1991, "Buyers of Thrifts Made Big Gifts to Candidates," p. A6.

[4] For example, an article in *Forbes* magazine on October 29, 1990 contended that the RTC was transferring assets at prices reflecting "fire sale" levels.

**Background**

The background literature for this study includes the *whole-firm acquisitions* literature (*e.g.*, Jensen and Ruback 1983: Jarrell, Brickley and Netter 1988; and Black 1989). The literature indicates that in recent transactions there is little evidence of systematic gains to acquirers, and some evidence of negative results. For particular subsets of bidders, the outcome is predominantly negative.

Another set of related literature is that pertaining to *acquirers in sell-off divestiture transactions*. The findings in studies such as Hite, Owers and Rogers (1987) are that both sellers and acquirers, on average, experience gains and that some of the aggregate increase in value accrues to the acquiring firm, reflected in an increase in their stock price. In the specific case of real estate assets, Glascock, Davidson and Sirmans (1991) investigated the impact of the number of bidders, frequency of acquisition and type of assets transferred for buyers and sellers. Overall, they found that both sellers and buyers gain, but the latter only in the case of infrequent acquisitions. A positive reaction for both parties was more likely when property, rather than a business unit, was being transacted.

Thus, the findings from the general literature on acquisition of whole-firms and business units are varied and do not portend a specific pattern of outcomes for acquirers in RTC transactions. If there is competition among bidders, then, as in the case of whole-firm acquisitions, there may be little if any gain in value for acquirers. In contrast, if the RTC transactions more closely resemble the market process for acquisitions of business *units*, then the process may be anticipated to generate gains to buyers. From the acquirer's perspective, some RTC transactions are similar to whole-firm acquisitions, while others are similar to sell-off divestitures of business units.

Much of the work of the RTC involves the transfer of distressed real estate assets. Crockett (1990) considers the process of managing distressed real estate assets, noting the distinction between distressed assets and distressed markets, and the roles of information asymmetry and incentive structures. Curry, Blalock and Cole (1991) find that the average rate of recovery on distressed commercial real estate assets under FSLIC receiverships in the late 1980s is 64%. The particular rate of recovery for given types of assets was influenced by the local market conditions, difficulty of management and disposition and write-downs prior to the FSLIC takeover. Recognizing the complexity of the process involved in efficiently managing and disposing of large quantities of distressed real estate, Benveniste, Capozza, Kormendi and

Wilhelm (1994) model the process in a principal/agent framework. They examine the standard asset and management agreement (SAMDA), a specific RTC contract, within their general framework for asset and management contracts.

Previous empirical research into the *acquisition of distressed financial institutions* has produced mixed findings. Several studies examine the use of the Purchase and Assumption strategy by the FDIC in the case of failed commercial banks. Giliberto and Varaiya (1989) consider such transactions as first-price, sealed bid auctions and find evidence of winner's curse.[5] Pettway and Trifts (1985) examine the abnormal returns to acquirers in these transactions. They find positive abnormal returns around the merger, followed by a persistent decline over the following 45 days. James and Wier (1987) conclude that prevailing bidders experience gains. Bertin, Ghazanfari and Torabzadeh (1989) examine 37 FDIC transactions over the interval 1983–1987 and find significant positive abnormal returns for acquirers. Balbirer, Jud and Lindahl (1992) examine abnormal return outcomes for acquirers of failed S&Ls in the pre-RTC 1980s, and find evidence of gains to acquirers. Gosnell, Hudgins and MacDonald (1993) compare acquirer outcomes under FSLIC and RTC assisted thrift mergers. They find little evidence of gains to acquirers.

Thus, while there is variation in the findings regarding acquiring firms in these distressed-institution transactions, there is a predominance of positive consequences for acquirers. A primary goal of this article is to investigate whether the valuation outcome for acquirers in RTC-resolution transactions varies with the specific nature and details of the transaction.

Ely and Varaiya (1992) examine the relationship between the structural attributes of RTC transactions and other bids to investigate pricing outcomes. Their analysis "utilizes predictions linking the magnitudes of winning and losing bids with the number of participating bidders and the degree of uncertainty of the thrift's franchise value" to address the issue of whether bidders overpay. They do not find evidence of underpricing by the RTC. This article investigates similar issues to Ely and Varaiya by examining abnormal returns associated with subsets of acquirers rather than relative bid levels as the key metric.

---

[5] "Winner's curse" refers to the outcome in which the prevailing/acquiring bidder has paid more that the value of the object acquired. The "winner" is thus "cursed."

[redacted]



## The Auction Market Nature of RTC Transactions

Many RTC transactions can be categorized as auctions. Potential bidders attend due diligence informational meetings, and then submit sealed bids for the target assets. In pursuit of its "minimum cost" charter, the RTC has primarily used variants of the English auction and first-price, sealed-bid auction.[6] The transactions analyzed are typically first-price, sealed bid auctions.

Auction theory emphasizes the significance for the outcome of whether the *object* of the auction has the same value to all potential bidders (the *common value* assumption), or whether the object has potentially different values for various bidders (the *independent private value* assumption). McAffee and McMillan (1987) note that these may be interpreted as polar cases. The early formal work in auctions (*e.g.*, Vickrey 1961) assumed independent values between agents. Milgrom and Weber (1982) developed the notion of affiliated/common values and noted the significance of this versus independent private values. Kagel and Levin (1986) note the significant implications of common value auctions, particularly in the context of auctions by federal government agencies. The "winner's curse" has been discussed in the context of mineral lease and oil lease rights auctions where, just as with RTC resolutions, there is a transfer of property rights from government to private sector ownership.

When the assets and/or operations of an insolvent S&L are considered, it is possible that the object of the auction has different value to various bidders. For example, a particular set of S&L operations might have greater *private* value to an acquirer in close geographical proximity. In contrast, a larger, more complete set of operations may have a *common value* to all potential acquirers.[7] Such larger sets of operations likely have fewer attributes uniquely of value to any one potential acquirer. Additionally, the

---

[6] See McAffee and McMillan (1987) and Smith (1987) for analysis of the formal structure of auctions.

[7] For example, the common value characteristics of oil leases have frequently been said to generate winner's curse scenarios for prevailing bidders. If this anticipation is applied to acquirers in RTC resolutions, the expectation of NEGATIVE valuation consequences would follow, a prognostication clearly at odds with the claims of "fire sale" prices found in some press reports. For a detailed description of underlying values assumptions in auctions see McAffee and McMillan, p. 720. For a more complete application of these considerations to the RTC, see Ely and Varaiya (1992).

number of bidders and their game theoretic behaviors can affect the outcome.[8]

Given the uncertainty about whether RTC transactions involve private or common value objects and the related bidding strategies, the valuation outcome for bidders is an issue for empirical determination. The pricing outcomes are investigated by examining stock price reactions to announcements of completed transactions.

*Risk and Auctions*

Uncertainty regarding the value of what is being sold impacts bidding strategies. This intuition has been formalized in the auction literature. Ely and Varaiya (1992), drawing from Capen, Clapp and Campbell (1971) and Kagel and Levin (1986), consider the role of variance of value estimates in formulation of optimal bidding strategy. In developing a model for the asset disposal process by the RTC, Lea and Thygerson (1994) conclude that sale proceeds will be inversely related to the uncertainty of both the value of the property and the sales practices used by the RTC in its disposition. These models all conclude that the greater uncertainty regarding the true value of what is being auctioned, the lower the optimal bid.

The implications for RTC transactions are substantial. Some RTC resolutions are hypothesized to involve assets with a *common value* to all bidders, while others potentially have *private values* across the set of potential bidders. This is depicted in the two columns in Figure 1. For cases where the "object of the auction" has low or zero variance of intrinsic value (row 1), bidders will experience little/no gain if the object has a *common value* to all potential bidders. Conversely, where there is little uncertainty of intrinsic worth, but that worth varies from one bidder to another (Independent Private Value), the bidder for whom intrinsic worth is greatest will experience gains.[9]

[8] McAfee and McMillan note that a first-price, sealed-bid auction (as typically employed by the RTC) does not have a *dominant equilibrium*, wherein the optimal strategy for each bidder is well-defined regardless of how high he anticipated competing bidders will go. The *Nash equilibrium* (a weaker criterion than the dominant equilibrium) then obtains. In determining his optimal bid, each bidder anticipates as best he can the strategies of competing bidders.

[9] This will follow from a strategy of bidding in the range bounded (below) by the value to the second-highest worth bidder and (above) by the value to the highest private-value bidder.

[redacted]

[redacted]



**Figure 1** ■ Implications of the nature and risk of S&L assets transacted for the abnormal return of acquirers.

Implications of the nature (Common Value or Independent Private Value) and risk level of S&L assets transacted for the Abnormal Returns of Acquirers. If there is little risk and uncertainty regarding the value of the target assets, when that value is the same for all bidders (Quadrant I) all will bid close to that common intrinsic value, and no bidder will create value by acquiring the assets. If values differ by acquirer (Quadrant II), the bidder for whom the assets have highest value can make a positive NPV acquisition. When there is considerable uncertainty regarding target asset values (row 2), then if the assets are of the same value to all acquirers (Quadrant IV), winner's curse will likely be experienced by the prevailing bidder. The implications for Quadrant III are indeterminate.

| | Common Value | Private Value |
|---|---|---|
| Low Risk | *Quadrant I*<br>0 | *Quadrant II*<br>>0 |
| High Risk | <0<br>*Quadrant IV* | ≥0<br>*Quadrant III* |

The implications for acquirers of common value and private value assets where there is high uncertainty regarding their intrinsic value is depicted in row 2 of Figure 1. With high variance in estimating intrinsic worth, when the object has a common value nature bidders will employ strategies to "win" which might lead to overpayment and "winner's curse," and associated declines in stock price as analysts and investors identify the overpayment. While the acquirer prevails in terms of acquiring the object property, it does not win in terms of value creation. Hence, the potential for negative acquirer outcomes in Quadrant IV of Figure 1. In Quadrant III, the outcome is indeterminate, depending on the magnitude of variance of intrinsic worth, the size of the differential values and strategies employed by bidders in order to prevail.

## Sample and Methodology

### *Sample*

The sample for the empirical work in this article was identified in the rosters in the quarterly *Mergers and Acquisitions*. Its listing of all activity includes identification of the selling party and specifically identifies the RTC when it is the seller. The sample includes all publicly traded acquirers in RTC transactions with the RTC in 1989 and 1990 subject to minimum data requirements for the methodology.

The RTC provided details of the sale transactions. This includes attributes of the bids and identification of both winning and losing bidders. To be included in the final sample, it was required that firms have complete daily return series for the period −200 to +100 days relative to the date of the outcome announcement (day 0) in *The Wall Street Journal*. A number of firms bid in multiple auctions, and when a firm was involved in two transactions within ten trading days, only the first transaction was included. This screen resulted in the exclusion of two transactions.

The event dates were identified by an examination of *The Wall Street Journal* and its *Index* and the *Dow Jones News Retrieval Service*. When necessary, additional announcement details were obtained from *The American Banker*. These sources were also used to screen for the presence of confounding events.

The resulting sample includes 58 successful acquirers and 46 losing bidders. The analysis of the abnormal returns is restricted to these samples. Descriptive statistics for the winning bidders are provided in Table 1. The differences between Exchange-Listed and OTC firms is marked in Panel B, which refers to the absolute size of the transactions. In contrast, the auction attributes and relative sizes reported in Panel A are generally similar for both Exchange-Listed and OTC firms.[10] For some items in Table 1, the averages reported accommodate a wide range of individual outcomes. For example, for Insured Deposit Transfer transactions, the percentage of bids relative to the core deposits being acquired had an average of 2.5% (as in Table 1, Panel A), a median of 1.2%, and a range from 0.0% to 16.6%.

[10] The Exchange-Listed and OTC subsets were examined separately. There is little differences in abnormal returns between the two subsets, and these findings are not otherwise reported here. The results are available from the authors.

[redacted]



**Table 1** ■ Descriptive statistics for auctions of S&Ls by the Resolution Trust Corporation.

| Variables | Combined ($n$ = 58) | Exchange ($n$ = 30) | OTC $n$ = 28 |
|---|---|---|---|
| Panel A: Attributes | | | |
| Number of Bidders | 4.5 | 4.9 | 4.3 |
| Number of Bids | 5.6 | 5.7 | 5.5 |
| Bidders Attending[1] | 25.8 | 21.8 | 29.4 |
| Bidders Conducting Due Diligence | 4.7 | 5.6 | 3.9 |
| Percentage Bidding (%)[2] | 38.2 | 23.1 | 51.7 |
| Months S&L was with RTC[3] | 9.7 | 11.0 | 8.6 |
| Relative Size (%)[4] | 11.4 | 7.5 | 15.1 |
| Percentage of Assets Acquired (%)[5] | 51.4 | 42.9 | 59.6 |
| Winning Bid to Core Deposits (%)[6] | 2.5 | 2.1 | 2.9 |
| Second-highest Winning Bid (%)[7] | 43.6 | 44.1 | 43.1 |
| Panel B: Size (millions of dollars) | | | |
| Winner's Equity | 1,857 | 3,241 | 373 |
| Assets Acquired | 486 | 717 | 264 |
| Assets Retained by RTC | 771 | 1,136 | 406 |
| Winner's Deposits | 19,309 | 35,920 | 3,884 |
| Total Deposits of S&L | 1,313 | 1,915 | 710 |
| Deposits Acquired by Winner | 955 | 1,422 | 454 |
| Core Deposits | 980 | 1,405 | 555 |
| Liabilities Retained by RTC | 280 | 430 | 130 |
| RTC Funding[8] | 717 | 1,061 | 372 |
| Cost of Resolution to RTC[9] | 367 | 556 | 177 |

Numbers are means for all winners, Exchange Listed winners and OTC winners (respectively).

[1] Number attending bid conference or requesting a bid package.
[2] Number of Bidders/Bidders Attending × 100.
[3] Data was available for only 38 firms.
[4] Deposits Acquired/Winner's Deposits × 100.
[5] Proportion of S&L's assets acquired by the winner.
[6] Excludes transactions with one bid and in which one or both of the two highest bids were negative.
[7] Only 43 cases where both bids were positive are included.
[8] Estimated cash infusion by the RTC adjusted by bid amount and including RTC advances.
[9] Estimated resolution cost to the RTC after recovery on retained assets and payment to other creditors (net or bid).

*Methodology*

The Appendix describes the empirical methods. For transactions involving OTC firms the issue of infrequent trading is a concern. A methodology that is similar to Handjinicolaou and Kalay's (1984) was used and multi-day returns calculated for missing return intervals and a returns series for the firm developed. Any firm that had missing returns for five consecutive days in the interval (−200, +100) was removed, resulting in three firms being excluded.[11]

## Analysis: Motivation and Findings

*Overall Hypotheses: Winners and Losers*

In the context of the RTC environment, an important question is whether the sales are effectively more like financial asset transactions (with essentially zero NPV attributes)[12] or real-asset transactions (with non-zero NPVs).[13] As developed in the section on auctions, this will be influenced by whether the assets and/or operations being sold are of common or private value to bidders, and the uncertainty of their value.

The following null hypothesis is posited to investigate the pricing outcomes of RTC transactions for bidders:

*Hypothesis*: For the successful bidders, acquisitions from the RTC represent zero-NPV outcomes as measured by the stock market response to outcome announcements.

*Corollary*: In the context of prices such that the acquisitions would have been zero-NPV transactions, losing/unsuccessful bidders experience zero valuation consequences.

[11] All the tests were also carried out using a bank index as a proxy for the market index. The bank index is a value-weighted index of all exchange-listed banks which were continuously traded in 1989 and 1990. Since the use of the bank index did not result in materially different conclusions, the results are presented only for the CRSP value-weighted index.

[12] For a review of literature pertaining to the risk/return and pricing attributes of financial securities, see Fama (1991).

[13] McConnell and Muscarella examine the valuation consequences of real-asset investment decisions in the context of capital budgeting. The overall conclusion is that, for non-regulated firms, real asset markets systematically generate positive NPV investments which are associated with increases in firm value.

[redacted]

**Table 2** ■ Returns to winners and losers in sales of S&Ls by the RTC.

| | Winners ($n$ = 58) | | | Losers ($n$ = 46) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| −5 to 0 | −0.2 | 52 | −1.2 | −0.3 | 48 | −0.8 |
| −2 to 0 | −0.4 | 53 | −1.9* | −0.1 | 48 | −0.3 |
| −1 to 0 | −0.2 | 48 | −0.8 | 0.4 | 54 | 1.0 |
| −2 | −0.2 | 45 | −2.2** | −0.4 | 43 | −1.9* |
| −1 | −0.4 | 47 | −1.3 | −0.2 | 46 | −0.0 |
| 0 | 0.2 | 53 | 0.1 | 0.5 | 48 | 1.4 |
| +1 to +5 | −0.5 | 40 | 1.6 | −0.5 | 54 | −1.4 |
| −5 to +5 | −0.7 | 43 | −2.0* | −0.8 | 41 | −1.5 |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date. The CRSP value-weighted index was used as a proxy for the market.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

*The Findings.* Table 2 reports the results for the 58 successful bidders ("winners") and the 46 unsuccessful bidders ("losers"). In Table 2 there is no evidence that the winning bidders have acquired the assets at bargain prices. The abnormal return (AR) over (−2,0) is −0.4% ($Z$ = −1.9). Table 2 reports a significant negative reaction on day −2. There was considerable discussion about anticipated auction results, and it appears that the market anticipated on day −2 the outcome reported on day −1.[14]

The hypothesis of zero abnormal returns for winning bidders is therefore rejected. Although the AR over (−2,0) is significantly different from zero only at the 10% level, there is an indication that prevailing bidders experience negative valuation consequences.[15] This contrasts with references

[14] This pattern motivated a close examination of the information dissemination process associated with the transactions, but we did not identify anything other than the day −2 market reaction. However, the pervasiveness of the day −2 reaction leads to the focus on the interval (−2,0) for interpreting the results.

[15] This bears an interesting similarity to another public policy scenario. With safe harbor leasing, there were many claims (including Congressional Reports) of windfalls to acquirers of tax shields. In contrast to these claims, Owers and Rogers (1985) found empirical evidence of negative valuation outcomes for prevailing buyers. The market considered that acquirers of tax shields were paying more for them than their worth.

**Figure 2 ■ Subsamples of bidders in RTC transactions.**

The specified partitions are based on the different characteristics of the resulting subsets.




to "fire sale" press reports, and the empirical findings of some earlier studies of non-RTC government resolutions.[16] However, it is consistent with the results of studies examining the recent experience of acquirers in whole-firm acquisitions and those of Gosnell, Hudgins and MacDonald (1993).

Presumably the failure to succeed in acquiring assets from the RTC will have no negative effect if the acquisition did not represent a positive NPV opportunity. Table 2 shows little evidence that losers incurred a significant opportunity cost as a result of failing to prevail in the S&L acquisition. These findings generally support the corollary of zero valuation consequences for losing bidders.

In combination, the negative returns for "winners" and zero abnormal returns for losers does not support the notion that RTC transactions offered acquirers windfall gains. There is no overall evidence that the RTC systematically transacts at prices which generate significant gains for acquirers. The RTC has a "least cost" mandate for executing its transactions, and the findings indicate that goal was achieved for the *overall* sample. Next, that result is examinded to see if it holds for the various subsamples of prevailing bidders identified in Figure 2. This figure shows the relationship between the various subsamples of bidders, and the partitions of acquirers are motivated by the characteristics of the resulting subsets of transactions.[17]

---

[16] See Pettway and Trifts (1985), James and Weir (1987), and Bertin, Ghazanfari and Torabzadeh (1989), which are referenced in the literature review.

[17] Chi-square tests established that the various (specified) partitioning attributes are not systematically related.

[redacted]

[redacted]



*IDTs versus P&As*

RTC resolutions can take one of three primary forms: (1) the sale of assets (purchase and assumption or P&A); (2) the transfer of insured deposits (IDT); and (3) payouts to insured depositors. The analysis in this article provides evidence on the valuation impact for acquirers in the P&A and IDT transactions.

The most complex resolution transactions are P&As, wherein an acquirer (typically another financial institution) assumes operations from the failed thrift. The P&A strategy can be implemented in different ways:

1. The "whole institution" disposition whereby the acquirer takes on essentially all assets and liabilities. Such a transaction typically requires a payment from the RTC to the acquirer. Initially at least, these leave few assets for the RTC's balance sheet.
2. In a "clean institution" transfer, acquirers assume depositor liabilities and primarily sound assets, and the other (low quality) assets remain on the RTC balance sheet.
3. "Branch sales" have many of the attributes of selective, clean institution" type transfers. They are in effect partial acquisitions of clean institutions, often reflecting geographical proximity.

When there is no material transfer of assets, the resolution is termed an IDT. This typically results from a lack of "acceptable" bids in offered P&A resolutions. Qualified acquirers bid a premium for the franchise according to the percentage of core deposits and other attributes of the deposit base and franchise.[18]

The IDT and P&A transactions are quite distinct. IDTs are low risk in terms of the value of the deposits and franchise and may have different *private value* to geographically dispersed acquirers. As suggested in Quadrant II of Figure 1, this suggests they will generate positive abnormal returns for the winner. In contrast, it is posited here that P&As are more likely be *common value* objects with a high variance of intrinsic value, and are likely to be

[18] For an example of such a transaction, see *The Wall Street Journal*, Feb. 5, 1990, p. A6. "Ohio's Bank One acquires Bright Bank in Dallas: U.S. cost put at $1.4 billion." Bank One paid $45 million to acquire $2.7 billion in deposits. In reviewing these transactions, the *WSJ* noted that such arrangements could ". . . strip out most of the bad assets and leaves them with the government (RTC) for later disposal."

SENT BY:BOALT EXSPRESS ; 2-23- 0 ;11:20AM ; BOALT EXPRESS→ +2124508289;#15/25



associated with "winners curse."[19] The IDT and P&As are structurally different transactions as characterized by Quadrants II and IV in Figure 1. Acquirers of the former will experience value gains, and of the latter, losses.

The evidence supports this hypothesis. Table 3, Panel A reports a difference in results for winners in IDT and P&A auctions. The difference in CARs over days (−2,0) is 2.2%: +1.5% ($Z = 2.0$) for the IDT packages, −0.7% ($Z = -2.8$) for the P&A category overall. They are respectively significant positive and negative outcomes.[20]

IDTs are associated with significant gains to acquirers. If IDTs are low-variance, private value objects, then the winning bidder should experience positive abnormal returns. In such cases, the winning bid is below the full value to the winner. This is similar to divestitures, where buyers systematically experience gains.

*Whole-Institution versus Branch Transfers*

As indicated earlier, there are two distinct types of P&A transactions. The whole-institution P&A is a larger transaction, while a branch P&A involves more specialized assets, often based on geographical proximity and the corresponding private value attributes. The implications of this are formalized as:

Whole-institution versus branch P&As are distinct. Whole-institution acquisitions are *Common Value*, high variance purchases, with negative implications for winners. Branch P&As are *Private Value*, high variance objects, with zero or positive abnormal returns.

In Table 3, Panel B reports the results for these two subsamples of P&As. In the event window (−2,0), whole firm P&As are significantly negative, while branch acquisitions are not significantly different from zero. This supports the hypothesis. Within the overall category of Common Value, high variance P&As, there is a subset (of branch P&As) that have many of the attributes of Private Value objects, but do not experience significant negative valuation consequences. The branch P&As are typically more focused acquisitions than whole-institution P&As.

[19] They are represented by Quadrant 4 in Figure 1.

[20] The non-parametric Binomial Test was also conducted for the proportion of positive abnormal returns. Over (−5,0) and (−2,0) the number of positive returns to acquirers in IDT transactions were significant at the 12.5% level.

[redacted]

[redacted]



**Table 3** ■ Returns to winners in insured deposit transfers (IDT) and purchase and assumption (P&A) transactions (Panel A) with a partition for whole-institution and branch P&As (Panel B).

| | IDT ($n$ = 7) | | | P&A ($n$ = 51) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| Panel A: Returns to Winners in IDT and All PAA Transactions | | | | | | |
| −5 to 0 | 2.1 | 86 | 1.9* | −0.5 | 47 | −1.9* |
| −2 to 0 | 1.5 | 86 | 2.0** | −0.7 | 49 | −2.8*** |
| −1 to 0 | 0.4 | 71 | 0.6 | −0.3 | 45 | −1.1 |
| −2 | 1.1 | 57 | 2.5** | −0.4 | 43 | −3.3*** |
| −1 | −0.1 | 43 | 0.2 | −0.5 | 47 | −1.4 |
| 0 | 0.4 | 57 | 0.7 | 0.2 | 53 | −0.1 |
| +1 to +5 | −2.4 | 0 | −2.4** | −0.2 | 45 | −0.8 |
| −5 to +5 | −0.3 | 43 | −0.3 | 0.8 | 43 | −2.0** |
| Panel B: Comparison of Returns to Winners in Whole-Institution and Branch P&A Transactions | | | | | | |
| −5 to 0 | −0.3 | 46 | −1.5 | −1.1 | 50 | −1.3 |
| −2 to 0 | −0.8 | 51 | −3.2*** | −0.4 | 44 | −0.4 |
| −1 to 0 | −0.7 | 43 | −2.4** | 0.6 | 50 | 1.7* |
| −2 | −0.2 | 43 | −1.9* | −1.0 | 44 | −3.0*** |
| −1 | 1.0 | 43 | −2.9*** | 0.6 | 56 | 1.8* |
| 0 | 0.3 | 54 | −0.6 | −0.0 | 50 | 0.6 |
| +1 to +5 | −0.6 | 37 | −1.5 | 0.7 | 63 | 0.7 |
| −5 to +5 | −0.9 | 40 | −2.2** | −0.5 | 50 | −0.5 |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

*Options*

A notable feature of the RTC's operations is that it can write both put and call options on some transferred assets. The exercise of a put by the acquirer will return pre-specified poor quality assets to the RTC's portfolio.[21] These

[21] In its Statement No. 55 ("RTC Thrift Resolution Policies") the Shadow Financial Regulatory Committee (SRFC) notes that the option features of RTC transactions can result in an outcome which ". . . subjects the RTC to interim declines in value." and contributes to policies where ". . . transactions privatize only favorable outcomes." The complete text of the Statement No. 55 is found in the *Journal of Financial Research Supplement* 1992.

options mean that there is uncertainty at the time of the initial closing of a given S&L transaction regarding which assets will eventually be left on the RTC's balance sheet.

The puts and/or calls sold by the RTC have potentially considerable value to buyers. Given the variance of quality of underlying assets, the value of the options may be substantial. Such options materially reduce the risk for the acquirers.[22] This dimension is captured by column one in Figure 1. These option attributes and their associated pricing implications suggest that whole-institution P&As with options represent Common Value, low risk acquisitions. With competition, such transactions would approach the zero NPV attributes of financial market transactions. This corresponds to Quadrant I in Figure 1. Conversely, whole-institution P&As without options are characterized by Common Value, high variance attributes and lead to "winner's curse" (Quadrant IV, Figure 1).

The sample of whole-institution P&As includes 27 transactions without options and 8 with options, and the partition has substantial valuation implications. Table 4 reports consistently significant negative (at the 1% level) abnormal returns for acquirers in transactions without options.

These findings support the anticipated overbidding in the high variance *common value* scenario of whole-institution P&As without options. The anticipated zero-valuation implications of the low variance, with-options transactions were also borne out. The with-options acquirers have positive abnormal returns, but over (−2,0) they are not significantly different from zero.[23]

### *Stock versus Mutual Targets*

The first of two sets of results for subsamples where the partition is not based on characteristics of the transactions are presented next. These two analyses consider the impact of stock versus mutual form of the pre-RTC organization (of the acquired S&L), and regional variations.

---

[22] The nature of options in RTC transactions is somewhat variable. Clearly they play no role in IDTs, and a potentially significant role in P&As. In some transactions, the same bidder submitted both with-options and without-options bids for evaluation by the RTC.

[23] The non-parametric Binomial test indicated that the with-options acquirers had significant positive returns at the 7% level for the interval (−2,0) and day 0.

[redacted]

**Table 4** ■ Returns to winners in whole-institution P&A transactions with and without options.

| | P&A with Option ($n$ = 8) | | | P&A w/o Option ($n$ = 27) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| −5 to 0 | 0.3 | 50 | 0.1 | −0.4 | 44 | −1.7* |
| −2 to 0 | 1.2 | 88 | 1.3 | −1.5 | 41 | −4.2*** |
| −1 to 0 | 0.1 | 63 | 0.1 | −0.9 | 37 | −2.9*** |
| −2 | 1.1 | 63 | 2.1*** | −0.6 | 37 | −3.3*** |
| −1 | −1.0 | 50 | −1.5 | −0.9 | 41 | −2.5*** |
| 0 | 1.1 | 88 | 1.7* | 0.0 | 44 | −1.6 |
| +1 to +5 | −1.5 | 25 | −1.5 | −0.4 | 41 | −0.9 |
| −5 to +5 | −1.2 | 50 | −0.9 | −0.8 | 37 | −1.8* |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date. The CRSP value-weighted index was used as a proxy for the market.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

Issues associated with stock versus mutual form of thrift organization have been examined in papers such as Masulis (1987) which analyzed the conversion process and performance differences. Cordell, MacDonald and Wohar (1993) provide evidence of different investment and risk taking behavior by mutual and stock S&Ls.

To investigate whether pre-RTC form of organization was reflected in acquirer outcomes, the CARs for subsets were compared based on this attribute of the assets acquired. Table 5 reports results when the winners are partitioned according to the pre-RTC ownership organization (stock or mutual) of the target S&L and reports outcomes for 56 acquirers, since the form of organization could not be determined for two S&Ls. They acquired the assets of 40 formerly mutual, and 16 formerly stock, institutions.

The (−2,0) event window shows significant losses to acquirers of mutual-organization S&Ls, with a CAR of −0.9% and a test statistic of −2.9. In contrast, there is a CAR of +1.1% over (−2,0) for acquirers of previously stock S&L assets, yet the gain is not significant ($Z$ = 1.5). There is a marked difference between the two subsets.

**Table 5** ■ Returns to winners broken down by the type of organization of the S&L.

| | Stock S&L ($n = 16$) | | | Mutual S&L ($n = 49$) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| −5 to 0 | 2.3 | 69 | 1.9* | −0.8 | 48 | −2.1** |
| −2 to 0 | 1.1 | 63 | 1.5 | −0.9 | 53 | −2.9*** |
| −1 to 0 | −0.1 | 50 | −0.2 | −0.1 | 50 | −0.6 |
| −2 | 1.3 | 69 | 2.9*** | −0.8 | 35 | −4.2*** |
| −1 | −0.3 | 38 | −0.6 | −0.4 | 53 | −0.9 |
| 0 | 0.2 | 50 | 0.4 | 0.3 | 55 | 0.0 |
| +1 to +5 | −1.5 | 31 | −1.7* | −0.3 | 43 | −1.0 |
| −5 to +5 | 0.7 | 50 | 0.3 | −1.1 | 40 | −2.2** |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date. The CRSP value-weighted index was used as a proxy for the market.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

*Regional Variations*

The final partition of acquirers addresses the substantial variation in the regional attributes of the RTC's operations. The RTC classifies transactions into one of four geographic regions: East, Central, Southwest and West. The early transactions were disproportionately in the West. To examine whether the regional attributes of the properties had any implications on bidder returns, the abnormal returns findings were examined for acquirers of properties in each of the four regions.

Table 6 shows considerable regional variation in results. There are no abnormal returns for the Central and Southwest regions, while the results for the 11 transactions in the West are significantly negative. Over days (−2,0) the CAR is −2.5%, significant at the 1% level. A significant negative CAR of −1.8% (Z = −2.8) is also observed over (−1,0). In contrast, over (−1,0) winners in the East had positive abnormal returns of 0.9% (Z = 2.1).

There have been debates regarding the efficacy of various RTC offices and functional divisions.[24] These results indicate that the Western office was able

[24] See, for example, *The Wall Street Journal*, "RTC Legal staff faces Senate Probe on hiring practices," August 12, 1992.

[redacted]



**Table 6** ■ Comparison of winners by RTC regions.

| Interval | East ($n$ = 25) | Central ($n$ = 17) | Southwest ($n$ = 5) | West ($n$ = 11) |
|---|---|---|---|---|
| −5 to 0 | 0.8 (56)<br>0.4 | −0.3 (47)<br>−0.4 | −1.1 (60)<br>−0.6 | −1.8 (45)<br>−2.5** |
| −2 to 0 | 0.5 (64)<br>0.5 | −0.6 (53)<br>−1.0 | −0.0 (60)<br>0.4 | −2.5 (27)<br>−4.1*** |
| 1 to 0 | 0.9 (56)<br>2.1** | −0.7 (53)<br>−1.6 | −0.6 (40)<br>−0.3 | −1.8 (27)<br>−2.8*** |
| −2 | −0.4 (44)<br>−2.1** | 0.1 (47)<br>0.5 | 0.5 (80)<br>1.1 | −0.7 (27)<br>−3.2*** |
| −1 | −0.3 (48)<br>0.4 | −0.3 (53)<br>−1.3 | 0.2 (80)<br>0.7 | −1.2 (18)<br>−2.3** |
| 0 | 1.2 (68)<br>2.6** | −0.4 (59)<br>−0.9 | −0.8 (40)<br>−1.2 | −0.6 (18)<br>−1.6 |
| +1 to +5 | −1.3 (36)<br>−2.3** | −0.8 (41)<br>−0.9 | −0.0 (40)<br>−0.3 | 1.5 (45)<br>1.1 |
| −5 to +5 | −0.5 (36)<br>−1.2 | −1.1 (47)<br>−0.9 | −1.1 (40)<br>−0.6 | −0.3 (55)<br>−1.2 |

Mean cumulative abnormal returns (CARs), percentage of positive returns (given in parentheses) and the Z-statistic (given below the cumulative abnormal return) over various intervals around the announcement date.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

to extract systematically higher offers from bidders. This outcome is not explained by differences in the number of bidders, where regional averages were as follows: West 2.7, Southwest 2.0, Central 6.1 and East 4.7.

## Conclusion

This article provides a review of the institutional background of the RTC and considers the market characteristics of RTC asset and operations sales from an auction perspective. The RTC has been a major financial institution, and there have been claims that it has sold some S&L assets at "fire sale" prices. However, the findings indicate that the RTC auction system appears to have performed quite well given the policy goals of "least cost" resolutions.

The findings do not support the hypothesis that transactions are systematically favorable to acquirers, and most subsets of winning bidders have predominantly negative valuation outcomes. In particular, acquirers of

whole-institution P&As, formerly mutual institutions and properties in the Western region experience persistently negative abnormal returns. These findings are consistent with those of general whole-firm acquirers in recent times, and in contrast to most of the previous studies of acquirers of distressed financial institutions cited in the literature review.

The RTC's pricing of the options it writes has an impact on the valuation outcomes for acquirers. Bidders who do not receive options experience losses. Those who do receive options experience some gains from the perspective of the equity markets, but they are not significantly different from zero. When the patterns of abnormal returns are related to attributes of the acquired properties it transpires that the auction motivated insights are generally reflected in pricing outcomes.

In summary, there is little evidence of underpricing or positive abnormal returns for the sample of publicly traded acquirers examined. To the contrary, several subsets of transactions were found where acquirers experienced negative abnormal returns. The only subsample with significant positive returns to winning bidders is with IDT transactions. Auction theory predicts that such low variance, private value transactions can be expected to result in acquirer gains.

The policy implications of the issues associated with the RTC are substantial. The problems which led to its creation, and their aftermath, have had such a profound effect that the U.S. Treasury and the regulators of both S&Ls and commercial banks proposed on July 28, 1995 to abolish the S&L industry. While the RTC became controversial for many reasons, the analysis finds that it was not systematically transferring assets and operations at "fire sale" prices. Given the scale of its activities, some examples of mispricing might be expected, but the findings here are consistent with the notion that they were limited subsets of transactions rather than profiles of typical outcomes.

*We gratefully acknowledge input from two anonymous referees, Dennis Capozza (the editor), colleagues at our respective institutions, and participants in seminars at the University of South Carolina, Texas A&M University, Washington State University and the 1993 American Real Estate and Urban Economics Association meeting in Anaheim, CA. Ufuk Ince provided excellent research assistance. The support of the Georgia State University College of Business Administration Research Grant Program Council is gratefully acknowledged.*

[redacted]

[redacted]



## References


Balbirer, S.D., G.D. Jud and F.W. Lindahl. 1992. Regulation, Competition, and Abnormal Returns in the Market for Failed Thrifts. *Journal of Financial Economics* 31(1): 107–131.

Benveniste, L.M., D.R. Capozza, R. Kormendi and W.J. Wilhelm. 1994. Contract Design for Problem Asset Disposition. *Journal of the American Real Estate and Urban Economics Association* 22(1): 149–167.

Bertin, W.J., F. Ghazanfari and K.M. Torabzadeh. 1989. Failed Bank Acquisitions and Successful Bidders' Returns. *Financial Management* 18(2): 93–100.

Black, B. 1989. Bidder Overpayment in Takeovers. *Stanford Law Review* 41: 597–660.

Capen, E.C., R.V. Clapp and W.M. Campbell. 1971. Competitive Bidding in High-Risk Situations. *Journal of Petroleum Technology* 23: 641–653.

Cordell, L., G.D. MacDonald and M.E. Wohar. 1993. Corporate Ownership and the Thrift Crisis. *Journal of Law and Economics* 36(2): 719–756.

Crockett, J.H. 1990. Workouts, Deep Pockets, and Fire Sales: An Analysis of Distressed Real Estate. *Journal of the American Real Estate and Urban Economics Association* 18(1): 76–90.

Curry, T., J. Blalock and R. Cole. 1991. Recoveries on Distressed Real Estate and Relative Efficiency of Public versus Private Management. *Journal of the American Real Estate and Urban Economics Association* 19(4): 495–515.

Dodd, P. and J.B. Warner. 1983. On Corporate Governance: A Study of Proxy Contests. *Journal of Financial Economics* 11: 401–438.

Ely, D.P. and N.P. Varaiya. 1992. Assessing the Assistance Policies of the Resolution Trust Corporation. Working paper. San Diego State University.

Fama, E. 1991. Efficient Capital Markets II. *Journal of Finance* 46(5): 1575–1617.

Giliberto, M. and N. Varaiya. 1989. The Winner's Curse and Bidder Competition in Acquisitions: Evidence from Failed Bank Auctions. *Journal of Finance* 44(1): 59–75.

Glascock, J.L., W.N. Davidson III and C.F. Sirmans. 1991. The Gains from Corporate Selloffs: The Case of Real Estate Assets. *Journal of the American Real Estate and Urban Economics Association* 19(4): 567–583.

Gosnell, T.F., S.C. Hodgins and J.A. MacDonald. 1993. The Acquisition of Failing Thrifts: Returns to Acquirers. *Financial Management* 22: 58–68.

Handjinicolaou, G. and A. Kalay. 1984. Wealth Redistribution or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders around Dividend Announcements. *Journal of Financial Economics* 13(1): 35–63.

Hite, G.L., J.E. Owers and R.C. Rogers. 1987. The Market for Interfirm Asset Sales: Partial Sell-offs and Total Liquidations. *Journal of Financial Economics* 18(2): 229–252.

James, C.M. and P. Wier. 1987. Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking. *Journal of Political Economy* 95(2): 355–370.

Jarrell, G.A., J.A. Brickley and J.M. Netter. 1988. The Market for Corporate Control: The Empirical Evidence Since 1980. *Journal of Economic Perspectives* 2: 49–68.

Jensen, M.C. and R.S. Ruback. 1983. The Market for Corporate Control: The Scientific Evidence. *Journal of Financial Economics* 11(1–4): 5–50.

Kagel, J.H. and D. Levin. 1986. The Winner's Curse and Public Information in Common Value Auctions. *American Economic Review* 76(5): 894–920.

Lea, M. and K.J. Thygerson. 1994. A Model of the Asset Disposition Decision of the RTC. *Journal of the American Real Estate and Urban Economics Association* 22(1): 117–133.

Masulis, R.W. 1987. Changes in Ownership Structure: Conversions of Mutual Savings and Loans to Stock Charter. *Journal of Financial Economics* 18(1): 27–60.

McAfee, R.P. and J. McMillan. 1987. Auctions and Bidding. *Journal of Economic Literature* 25(2): 699–738.

McConnell, J. and C. Muscarella. 1985. Corporate Capital Expenditure Decisions and the Market Value of the Firm. *Journal of Financial Economics* 14(3): 399–422.

*Mergers & Acquisitions Quarterly*. 1989–91. 24(1–4)–26(1–4).

Milgrom, P. 1989. Auctions and Bidding: A Primer. *Journal of Economic Perspectives* 3(3): 3–22.

Milgrom, P. and R.J. Weber. 1982. A Theory of Auctions and Competitive Bidding. *Econometrica* 50(5): 1089–1122.

Owers, J.E. and R.C. Rogers. 1985. The Windfall of Safe Harbor Leasing: Evidence from Capital Markets. *National Tax Journal* 38(4): 561–565.

Pettway, R.H. and J.W. Trifts. 1985. Do Banks Overbid when Acquiring Failed Banks? *Financial Management* 14(2): 5–15.

Resolution Trust Corporation. 1989–91. *Transaction Records.*

Schifrin, M. 1990. Fire Sale. *Forbes* 146(10): 39–40.

Smith, V. 1987. Auctions. J. E. Eatwell, M. Milgate and P. Newman (eds.), *The New Palgrave: A Dictionary of Economics*. The Macmillan Press Limited.

Varaiya, N. and K.R. Ferris. 1987. Overpaying in Corporate Takeovers: The Winner's Curse. *Financial Analysts Journal* 43(3): 64–70.

Vickrey, W. 1961. Counterspeculation, Auctions and Competitive Sealed Tenders. *Journal of Finance* 16(1): 8–37.

## Appendix

### Methodology

For each security $j$, the market model is used to calculate an abnormal return ($AR$) for event day $t$ as follows:

$$AR_{jt} = R_{jt} - (\alpha_j + \beta_j R_{mt}) \tag{1}$$

where $R_{jt}$ is the rate of return security $j$ for event day $t$, and $R_{mt}$ is the rate of return on the CRSP value-weighted index on event day $t$. The coefficients $\alpha_j$ and $\beta_j$ are the ordinary least squares estimates of the intercept and slope, respectively, of the market model regression, which is run over an estimation period from $t = -200$ to $t = -51$, relative to the initial event date $t = 0$.

The cumulative abnormal return ($CAR$) from day $T_1$, to day $T_2$, is defined as:

[redacted]

$$CAR_j = \sum_{t=T_{1j}}^{T_{2j}} AR_j \quad (2)$$

Various intervals are cumulated around the announcement date. For a sample of $N$ securities, the mean $CAR$ is defined as:

$$\overline{CAR} = \sum_{j=1}^{N} CAR_j / N \quad (3)$$

The expected value of $CAR$ is zero in the absence of abnormal performance.

The test statistic described by Dodd and Warner (1983) is the mean standardized cumulative abnormal return. To compute this statistic, the abnormal return $AR_{jt}$ is standardized by its estimated standard deviation $s_{jt}$,[25] *i.e.*,

$$SAR_{jt} = AR_{jt} / S_{jt} \quad (4)$$

The standardized cumulative abnormal return $SCAR_j$ over the interval $t = T_{1j}, \ldots, T_{2j}$ is:

$$\overline{SCAR_j} = \sum_{t=T_{1j}}^{T_{2j}} SAR_{jt} / \sqrt{(T_{2j} - T_{1j} + 1)} \quad (5)$$

The test statistic for a sample of $N$ securities is

---

[25] The value of $S_{jt}^2$ is:

$$S_{jt}^2 = S_j^2 \left(1 + \frac{1}{D_j} + (R_{mt} - \bar{R}_m)^2 \Big/ \sum_{\tau=1}^{D_j} (R_{m\tau} - \bar{R}_m)^2\right)$$

where
$S_j^2$ = residual variance for security $j$ from the market model regression
$D_j$ = number of observations during the estimation period
$R_{mt}$ = rate of return on the market index for date $t$ of the event period
$\bar{R}_m$ = mean rate of return on the market index during the estimation period
$R_{m\tau}$ = rate of return on the market of day $\tau$ of the estimation period

$$Z = \sum_{j=1}^{N} \overline{SCAR_j} / \sqrt{N} \tag{6}$$

Each $SAR_{jt}$ is assumed to be distributed unit normal in the absence of abnormal performance. Under this assumption, $Z$ is also unit normal.

[redacted]

# Managing the Crisis:

## The FDIC and RTC Experience 1980–1994

Federal Deposit Insurance Corporation
Washington, D.C.
August 1998

SW-BJ-0000316

First, the FDIC became concerned that the accumulation of assets would have a disastrous effect on the insurance fund. Former Chairman L. William Seidman, noting that before this time, emphasis had not been placed on the sale of assets at resolution, wrote:

> This was not a serious problem in an agency with very few failed banks, and when the FDIC insurance fund had lots of cash . . . But it could be disastrous as the number of bank failures increased . . . The strategy of holding on to assets would swallow up all our cash very quickly . . . Cash had never been a problem at the FDIC, with billions in premium income on deposit at the Treasury. But my calculations showed that on the basis of the way we were doing things, if you took the FDIC forecast of bank failures from 1985 to 1990, our cash reserve of $16 billion would be wiped out well before the end of the decade.[23]

Second, although there is no empirical evidence, it was generally believed that after an asset from a failing bank was transferred to a receivership, the asset would suffer a loss in value.[24] Loans have unique characteristics, and prospective purchasers need to gather information about the loans to properly evaluate them. Such "information cost" is factored into the price that the outside parties are willing to pay for the loans. That cost tends to be greater on assets from failed banks. In addition, a loss in value can occur because of the break in the bank-customer relationship. When a customer values a banking relationship, the customer is willing to work with the bank. However, when a customer merely has an obligation to pay and anticipates no continuance of a business relationship, that customer may not be as willing to pay his debt in full.

Third, as the FDIC began having to manage an extremely large portfolio of failed bank assets caused by the growing number of bank failures in the late 1980s, several logistical problems began to develop, and it therefore became more desirable to pass assets to acquirers rather than incur the added costs of acquiring, maintaining, and subsequently remarketing those assets.

Fourth, the FDIC simply considered it more appropriate for private assets to remain within the private marketplace.

Finally, the FDIC saw the sale of higher percentages of assets at resolution as a way to minimize disruption in the communities in which failing banks were located.

*Whole Bank Transactions*

The whole bank purchase and assumption transaction is a variation of the P&A transaction, distinguished by the fact that virtually all the failed bank's assets are passed to the

23. L. William Seidman, *Full Faith and Credit: The Great S&L Debacle and Other Washington Sagas* (New York: Times Books, 1993), 100.

24. This loss of value is known as the "liquidation differential." Frederick S. Carns and Lynn A. Nejezchleb, "Bank Failure Resolution: The Cost Test and the Entry and Exit of Resources in the Banking Industry." *The FDIC Banking Review* 5 (fall/winter 1992), 1-14.

Chart I.3-11

**Number of Whole Bank Transactions 1987–1992**




*Source:* FDIC Division of Resolutions and Receiverships.

acquirer with the institution's liabilities for a one-time cash payment. Whole bank transactions represent the most dramatic attempt by the FDIC to pass assets from failed banks quickly back into the private sector. Whole bank transactions were perceived to offer certain important advantages over other methods of transactions. Because loan customers of the failed institution continued to be serviced by an ongoing bank, the effect on the local community was minimized. In addition, whole bank transactions slowed the growth in the volume of assets held by the FDIC for liquidation. Starting in 1987, when the FDIC implemented 19 whole bank transactions, the whole bank P&A joined the clean bank P&A, the insured deposit transfer, and the straight deposit payoff as the FDIC's standard methods for resolving failures. In 1988, 69 of the 279 failed bank resolutions were whole bank transactions. Whole bank transactions were also widely used in 1989, 1990, and 1991, when they constituted 20.3, 25.4, and 18.9 percent of all resolutions, respectively.[25] With the introduction of the least cost test, however, the number of successful whole bank bids declined. Because a whole bank bid constitutes a one-time payment from the FDIC, bidders tended to bid very conservatively to cover all potential losses. Conservative whole bank bids could not compete with other transactions on a least cost basis. Overall, the FDIC completed 202 whole bank transactions between 1987 and 1992, or 18.2 percent of the total number of transactions during that period. (See chart I.3-11.) The failed banks handled as whole bank transactions had $8.2 billion in total assets.

Whole bank bids were almost always offered on an all-deposit basis, requiring any winning bidder to agree to assume both the insured and the uninsured deposits.

*Other Variations of Transaction Structures*

Other variations of P&A transactions existed between the clean bank P&A that passed few assets to the acquirer and the whole bank P&A that passed virtually all assets. The modified P&A required the winning bidder to purchase the cash and securities, and usually the installment loans as well as all or a portion of the mortgage loan portfolio.

25. FDIC Division of Finance.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
N8oZh8SjT30b9Ia9s0YQ1xAsofImVww/hugOlwgLZOFv7EkjJpa7pQmzhZpvNcyq
5Zef7fpuHV6t7sbhwN/lUA==


<SEC-DOCUMENT>0000020639-00-000004.txt : 20000327
<SEC-HEADER>0000020639-00-000004.hdr.sgml : 20000327
ACCESSION NUMBER: 0000020639-00-000004
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT: 4
CONFORMED PERIOD OF REPORT: 19991231
FILED AS OF DATE: 20000324

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: AMBASE CORP
CENTRAL INDEX KEY: 0000020639
STANDARD INDUSTRIAL CLASSIFICATION: INVESTMENT ADVICE [6282]
IRS NUMBER: 952962743
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K
SEC ACT:
SEC FILE NUMBER: 001-07265
FILM NUMBER: 577715

BUSINESS ADDRESS:
STREET 1: GREENWICH OFFICE PARK BLDG 2
STREET 2: 51 WEAVER STREET
CITY: GREENWICH
STATE: CT
ZIP: 06831-5155
BUSINESS PHONE: 2035322000

MAIL ADDRESS:
STREET 1: GREENWICH OFFICE PARK, BLDG 2
STREET 2: 51 WEAVER STREET
CITY: GREENWICH
STATE: CT
ZIP: 06831-5155

FORMER COMPANY:
FORMER CONFORMED NAME: HOME GROUP INC
DATE OF NAME CHANGE: 19890608

FORMER COMPANY:
FORMER CONFORMED NAME: CITYHOME CORP
DATE OF NAME CHANGE: 19780917
</SEC-HEADER>

<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>YEAR END 12/31/99
<TEXT>

<PAGE>

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

(Mark One)
|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1999

OR

|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ________ To ________

Commission file number 1-7265

AMBASE CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE | 95-2962743 |
| (State of incorporation) | (I.R.S. EmployerIdentification No.) |

51 Weaver Street, Building 2, Greenwich, CT 06831-5155
(Address of principal executive offices)

Registrant's telephone number, including area code (203) 532-2000

Securities registered pursuant to Section 12(b)of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($0.01 par value) | None |
| Rights to Purchase Common Stock | None |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the

best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to the Form 10-K. X

At January 31, 2000, there were 46,208,519 shares of registrant's Common Stock outstanding. At January 31, 2000 the aggregate market value of registrant's voting securities (consisting of its Common Stock) held by nonaffiliates of the registrant, based on the average bid and asking price on such date of the Common Stock of $0.93 per share, was approximately $34 million. The Common Stock constitutes registrant's only outstanding security.

Portions of the registrant's definitive Proxy Statement for its 2000 Annual Meeting of Stockholders, which Proxy Statement registrant intends to file with the Securities and Exchange Commission not later than 120 days after the close of its fiscal year, is incorporated by reference with respect to certain information contained therein, in Part III of this Annual Report.

The Exhibit Index is located in Part IV, Item 14, Page 34.

<PAGE>

AmBase Corporation

Annual Report on Form 10-K
December 31, 1999
<TABLE>
<CAPTION>

CROSS REFERENCE SHEET FOR
PARTS I, II, III and IV
Page
- --------------------------------------------
------
<S> <C>
<C>

PART I

Item 1.
Business..............................................................................1

Item 2.
Properties..........................................................................2

Item 3. Legal
Proceedings..................................................................2

Item 4. Submission of Matters to a Vote of Security
Holders..............................................3

(in thousands, except per share data) 1999
1998 1997
====
==== ====
<S> <C>
<C> <C>

Net income (loss)
As reported.......................................................... $
(4,515) $ 181 $ (1,084)
Proforma..............................................................
(4,651) 61 (1,171)

===== ===== =====
Per share data
As reported.......................................................... $
(0.10) $ - $ (0.02)
Proforma..............................................................
(0.10) - (0.02)

===== ===== =====
</TABLE>

<PAGE>

AMBASE CORPORATION AND SUBSIDIARIES
Notes to Consolidated Financial Statements (continued)

Note 9 - Income Taxes

The components of income tax (expense) benefit for the years ended December 31 are as follows:
<TABLE>
<CAPTION>
(in thousands) 1999
1998 1997
====
==== ====
<S> <C>
<C> <C>
Income tax (expense) benefit $
(235) $ (242) $ 191
=====
===== =====
</TABLE>

The components of pretax income (loss) and the difference between income taxes computed at the statutory federal rate of 35% in 1999, 1998 and 1997, and the provision for income taxes for the years ended December 31 follows:
<TABLE>
<CAPTION>
(in thousands) 1999
1998 1997

```
                                                                                ====
====               ====
<S>                                                                         <C>
<C>               <C>
Net income (loss) before income taxes..........................             $
(4,515)           $    423            $  (1,275)
                                                                               =====
=====              =====

Tax (expense) benefit:
Tax at statutory federal rate..................................             $   1,580
$   (148)         $     446
Prior year tax refund..........................................                     -
-                475
Accounting loss benefit not recognized.........................
(1,580)                 -                    (446)
Accounting loss benefit recognized.............................                     -
148                -
State income taxes.............................................
(235)              (242)              (284)
                                                                            --------
--------           --------


                                                                            $
(235)           $  (242)           $     191
                                                                               =====
=====              =====
</TABLE>
<TABLE>
<CAPTION>

The  composition of income tax (expense)  benefit for the year ended December 31
is as follows:

(in thousands)                                                                  1999
1998               1997
                                                                                ====
====               ====
<S>                                                                         <C>
<C>                <C>
Current:
Federal........................................................             $      -
$      -          $      -
State..........................................................
(235)              (242)              (284)
                                                                            --------
--------           --------

(235)              (242)              (284)
                                                                            --------
--------           --------
Deferred (primarily federal):
Prior year tax refund..........................................                     -
-                475
                                                                            --------
--------           --------
```

-

| | | | |
|---|---|---|---|
| - | 475 | | |
| | | | -------- |
| -------- | -------- | | |
| | | | $ |
| (235) | $ (242) | $ 191 | |
| ===== | ===== | ===== | |

</TABLE>

<PAGE>

The Company contractually assumed the tax liabilities of City, which, prior to September 1985, owned all the outstanding shares of Common Stock of the Company. For all periods through 1992, the Internal Revenue Service ("IRS") and the Company disagree only with respect to withholding taxes in connection with a Netherlands Antilles finance subsidiary of City. See Note 11, Legal Proceedings, Disputes with Internal Revenue Service over Withholding Taxes (Netherlands Antilles), for additional details.

In June 1998, the Company paid $12,700,000 to the IRS for tax and estimated interest to be applied to the Company's Fresh Start tax liability, which related to a 1987 tax dispute with the IRS. Based on a proposed Final Stipulation between the Company and the IRS on the Fresh Start issue, the Company is presently awaiting the IRS's final calculation of interest on the Fresh Start issue. In connection with the proposed Final Stipulation, the Company anticipates utilizing approximately $29 million of NOL's. A summary of the Company's NOL carryforwards remaining after the utilization of the $29 million NOL's applied to Fresh Start is provided below.

During the first quarter of 1997, $475,000 of income taxes were refunded as the result of an overpayment to the IRS for 1988 through 1991 tax years. This amount was recorded as an income tax benefit in the first quarter of 1997. The Company's federal income tax returns for years subsequent to 1992 have not been reviewed by the IRS.

As a result of the OTS's December 4, 1992 placement of Carteret in receivership, under the management of the Resolution Trust Corporation ("RTC")/Federal Deposit Insurance Corporation ("FDIC"), and proposed Treasury Reg. ss.1.597-4(g), the Company had previously filed its 1992 and subsequent federal income tax returns with Carteret disaffiliated from the Company's consolidated federal income tax return. Based upon the impact of Treasury Reg. ss.1.597-4(g), which was issued in final form on December 20, 1995, a continuing review of the Company's tax basis in Carteret, and the impact of prior year tax return adjustments on the Company's 1992 federal income tax return as filed, the Company decided not to make an election pursuant to final Treasury Reg. ss.1.597-4(g) to disaffiliate Carteret from the Company's consolidated federal income tax return effective as of December 4, 1992 (the "election decision").

The Company has made numerous requests to the RTC/FDIC for tax information pertaining to Carteret and the resulting successor institution, Carteret Federal Savings Bank ("Carteret FSB"); however all of the information still has not been received. Based on the Company not making the election decision, as described above, and the receipt of some of the requested information from the RTC/FDIC, the Company has amended its 1992 consolidated federal income tax return to include the federal income tax effects of Carteret and Carteret FSB. The Company

is still in the process of amending its consolidated federal income tax returns for 1993 and subsequent years.

The Company anticipates that, as a result of filing a consolidated federal income tax return with Carteret FSB, a total of approximately $170 million of tax NOL carryforwards will be generated from the Company's tax basis in Carteret/Carteret FSB as tax losses are incurred by Carteret FSB of which $158 million are still available for future use. Based on the Company's recent filing of its amended 1992 consolidated federal income tax return to include the federal income tax effects of Carteret FSB, approximately $56 million of NOL carryforwards are generated for tax year 1992 which expire in 2007, with the remaining approximate $102 million of NOLs carryforwards to be generated, expiring no earlier than 2008. These NOL carryforwards would be available to offset future taxable income, in addition to the NOL carryforwards as further detailed below.

Based upon the Company's federal income tax returns as filed from 1993 to 1998 (subject to IRS audit adjustments), after utilizing $29 million of NOL carryforwards in connection with Fresh Start; and excluding the NOL carryforwards generated from the Company's tax basis in Carteret/Carteret FSB, as noted above, at December 31, 1999 the Company has NOL carryforwards available to reduce future federal taxable income, which expire if unused, as follows:

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| 2008 | $ 1,000,000 |
| 2009 | 7,000,000 |
| 2010 | 5,500,000 |
| 2012 | 1,000,000 |
| 2018 | 5,500,000 |
| | ------------ |
| | $20,000,000 |
| | ============ |

</TABLE>

The utilization of certain carryforwards is subject to limitations under U.S. federal income tax laws. In addition, the Company has approximately $21 million of alternative minimum tax credit carryforwards, which are not subject to expiration.

<PAGE>

Under Statement 109, the Company has calculated a net deferred tax asset of $28 million and $25 million as of December 31, 1999 and 1998, respectively, arising primarily from NOL's, alternative minimum tax credits and the excess of book over tax reserves (not including the anticipated tax effects of the NOL's expected to be generated from the Company's tax basis in Carteret, resulting from the election decision, as more fully described above). A valuation allowance has been established for the entire net deferred tax asset, as management, at the current time, has no basis to conclude that realization is more likely than not.

Note 10 - Commitments and Contingencies

Future minimum rental payments, principally for office space, under noncancellable operating leases at December 31, 1999, are: 2000, $80,000; 2001,

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

OFFICE OF
CHIEF COUNSEL

January 18, 2002

Number: **200216016**
Release Date: 4/19/2002
CC:PSI:6/CAM-100908-00
UILC: 167.14-11; 446.04-17

INTERNAL REVENUE SERVICE NATIONAL OFFICE CHIEF COUNSEL ADVICE

MEMORANDUM FOR INDUSTRY DIRECTOR, FINANCIAL SERVICES
LMSB:F

FROM: Senior Technician Reviewer, Branch 6, Office of Associate Chief Counsel (Passthroughs and Special Industries), CC:PSI:6

SUBJECT: Denial of consent for change in method of accounting

In accordance with section 8.07(2)(a) of Rev. Proc. 2002-1, 2002-1 I.R.B. 1, this Chief Counsel Advice advises you that consent for a change in accounting method has been denied to a taxpayer within your jurisdiction. Pursuant to § 6110(k)(3) of the Internal Revenue Code, this Chief Counsel Advice should not be cited as precedent.

LEGEND:

Taxpayer =

Parent =

Predecessor =

A =

B =

Taxpayer filed a Form 3115, Application for Change in Accounting Method, to request permission to change its treatment of supervisory goodwill from a non-depreciable asset to a depreciable asset, beginning with the taxable year beginning A ("year of change").

Predecessor acquired several failing thrift institutions in tax-free reorganizations pursuant to § 368(a)(1) of the Code, using a carryover basis in the assets acquired. Predecessor acquired the thrifts through supervisory mergers, induced and arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Banking Board ("FHLBB"). The FSLIC permitted Predecessor to account for the acquisitions using the purchase method of

accounting. Pursuant to this method, Predecessor valued each asset acquired at fair market value. As a result, the acquired thrifts had a negative net worth. The excess of the purchase price (which included liabilities assumed) over the fair market value of the acquired assets was referred to as "supervisory goodwill" and was reported on Predecessor's balance sheet for regulatory purposes. Pursuant to the FSLIC's regulatory policies and procedures in effect at the time of acquisition of the failing thrifts, Predecessor was permitted to (1) amortize the supervisory goodwill over a specified period for regulatory purposes, and (2) count the supervisory goodwill towards its regulatory capital reserve requirements. On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which phased out, over a five-year period, the ability to count supervisory goodwill for the purposes of meeting regulatory capital requirements. At the time of the acquisition of the failing thrifts, Predecessor did not assign any tax basis to the supervisory goodwill.

For federal income tax purposes, Predecessor excluded the supervisory goodwill from its gross income pursuant to § 597(a) of the Code, as such section applied at the time of the acquisitions. Also, Predecessor never amortized the supervisory goodwill.

Under the proposed method, Taxpayer, as the successor corporation to Predecessor, will depreciate under § 167 of the Code the tax basis of the supervisory goodwill over its useful life. Hereinafter, any reference to Taxpayer includes Predecessor. Taxpayer took the fair market value of the supervisory goodwill as its tax basis.

Taxpayer takes the position that the contractual "right to use" the purchase method of accounting, along with the resultant purchased goodwill, results in an asset on its books properly identified as supervisory goodwill. Taxpayer believes that this supervisory goodwill qualifies as other property for purposes of § 597 of the Code and is a form of financial assistance provided by the FSLIC under § 406(f) of the National Housing Act. And, as such, the asset was properly excluded from gross income pursuant to § 597(a). Relying on Newark Morning Ledger Co. v. United States, 507 U.S. 546 (1993), Taxpayer further believes that it, as a result of the application of § 597, has an ascertainable tax basis in its supervisory goodwill and that this asset, with the enactment of the FIRREA, had a limited useful life.

We cannot accept this view based on our analysis as set forth below. Accordingly, Taxpayer's requested change in method of accounting for supervisory goodwill was denied in a letter ruling dated B.

Law and Analysis

Issue (1): Whether "supervisory goodwill" qualifies as "money or other property" for purposes of § 597 of the Code?

Supervisory goodwill is a creature of regulatory accounting principles although it bears a nexus to the generally accepted accounting principles ("GAAP") asset of "purchased goodwill" that results under the purchase method of accounting upon the acquisition of one corporation by another.

For federal income tax purposes, Taxpayer's acquisition of the failing thrifts qualified (and were accounted for) as tax-free reorganizations under § 368(a)(1) of the Code. Thus, Taxpayer took a carryover basis in the assets and liabilities from the acquired institutions at their financial book basis and recognized no gain or loss on the acquisitions.

As a general matter, for federal income tax purposes, purchased goodwill is not an acquired asset in a tax-free reorganization. The value otherwise ascribed to purchased goodwill under GAAP (the excess of purchase price (including liabilities assumed) over the fair market value of the assets acquired) is already reflected in the book basis of the assets and liabilities acquired from the failing thrifts. Taxpayer, at the time of its acquisition of the failing thrifts, correctly did not recognize a separate intangible asset for federal income tax purposes comparable to its regulatory asset of supervisory goodwill that was booked on its acquisitions of the failing thrifts, as that regulatory asset was derived from the GAAP asset of purchased goodwill. Moreover, even where goodwill is recognized as a tax asset, it is not subject to recovery by depreciation or amortization. See United States v. Winstar Corporation, 518 U.S. 839, 849 at n.5 (1996) quoting Newark Morning Ledger Co. v. United States, 507 U.S. 546, 556 (1993), and Winstar, supra at 851, n.7.

As discussed more fully in Winstar, supra, during the years Taxpayer acquired the failing thrifts, the savings and loan industry was in crisis, and the FSLIC lacked the funds necessary to liquidate all of the failing thrifts. Accordingly, the FSLIC arranged mergers between healthy thrifts and failing thrifts. As an inducement for these mergers, the FSLIC allowed the acquiring thrifts to count supervisory goodwill toward regulatory capital reserve requirements set forth in 12 C.F.R. § 563.13 and to amortize the goodwill over as much as 40 years. In 1989, Congress enacted FIRREA which impacted a thrift's ability to count supervisory goodwill towards satisfaction of its capital reserve requirements.

At the time Taxpayer acquired the failing thrifts, § 597 of the Code, as added by § 244 of the Economic Recovery Tax Act of 1981, Pub. L. 97-34 (Aug. 13, 1981) (the "Act"), provided that the gross income of a domestic building and loan association did not include any amount of money or other property received from the FSLIC pursuant to § 406(f) of the National Housing Act (12 U.S.C. § 1729(f)), regardless of whether any note or other instrument was issued in exchange. Further, § 597(b) provided that no reduction in the basis of assets of a domestic building and loan association shall be made on account of such money or other property received.

Section 246(c) of the Act made § 597 of the Code applicable to payments made on or after January 1, 1981. The use of the word "payments" in § 246(c) of the Act, along with the statutory language of § 597 of the Code and § 406(f) of the National Housing Act, clearly indicates the congressional intent to limit § 597 to forms of financial assistance provided by the FSLIC.

Although the legislative history to § 244 of the Act is somewhat sparse, what legislative history there is also supports a conclusion that § 597 of the Code covers only financial assistance provided by the FSLIC. Section 597, as enacted, appears to have been first added in the version of H.R. 4242 that was passed by the House on July 29, 1981. See 127 Cong. Rec. at H5259 and H5279 (daily ed. July 29, 1981). The legislative history also indicates that this tax provision was initially agreed to in the Senate as a floor amendment (captioned "Section 604 FSLIC Financial Assistance") on July 23, 1981. See 127 Cong. Rec. at S8287 (daily ed. July 23, 1981).

In support of the Senate amendment, the congressional record reflects that the "amendment would facilitate the infusion of capital to a failing savings and loan, or the merger of a savings and loan with another financial institution by clarifying that these transactions are nontaxable events." Id, at S8288. Further, the use of terms such as "payment," "capital infusion," and "repayment" during the legislative process are further indications of a congressional intent to limit § 597 of the Code solely to forms of financial assistance. See, e.g., Letter from Richard T. Pratt (then-Chairman of the FHLBB, 127 Cong. Rec. at S8288. The conference report, moreover, indicates that this amendment was intended to resolve the question of whether financial assistance from the FSLIC was to be included in income or treated as a non-shareholder contribution to capital (with a consequential reduction in the tax basis of assets) by the taxpayer. H.R. Conf. Rep. No. 97-215, 97th Cong., 1st Sess. 284 (1981). See also Staff of the Joint Committee on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Tax Act of 1981 (H.R. 4242, 97th Cong; Pub. L. No. 97-34) (1981), at 152 ("to facilitate providing of financial assistance by the FSLIC") and 153 (referring to the FSLIC's "financial assistance program" and the proper treatment under prior law of such "assistance payments" from the FSLIC).

The FSLIC was created in 1934 with the passage of the National Housing Act chiefly to insure deposits made by the public. See Winstar, 518 U.S. at 844. In addition to providing deposit insurance, the FSLIC generally was authorized to make loans to, to make deposits in, to purchase the assets or securities of, to assume the liabilities of, or to make contributions to, any insured institution. See §406(f) of the National Housing Act, 12 U.S.C. § 1729(f).

As a result, supervisory goodwill does not resemble any type of financial assistance listed in § 406(f) of the National Housing Act. Rather, the concept of supervisory goodwill was merely part of an accounting regime designed to induce healthy thrifts to acquire failing thrifts. See Winstar, 518 U.S. at 849-856. The nature of

supervisory goodwill is one of regulatory forbearance rather than financial assistance.

Further, based on the types of assistance that the FSLIC was authorized to render under § 406(f) of the National Housing Act, the FSLIC assistance given under this provision was intended to increase the capital of an institution so that the institution could meet its obligations to depositors. Supervisory goodwill does not enhance the capital of an institution. Rather, it is the antithesis of capital as it relieves the institution and its shareholders of their obligations to meet otherwise applicable capital requirements. Nothing in the legislative history to § 597 of the Code indicates it was intended to apply to forms of assistance other than financial assistance. Under these circumstances, supervisory goodwill is not assistance within the meaning of § 597.

Moreover, both the statutory language and the legislative history of § 597 of the Code limit application of § 597 to financial assistance provided by the FSLIC. Under Title 12 of the United States Code, the regulatory forbearance that Taxpayer claims created supervisory goodwill was not provided by the FSLIC.

Generally, the clear meaning of a statute will control its application unless it is established that congressional intent would require a different result. Congress clearly differentiated between the FHLBB and the FSLIC for purposes of applying various contemporaneously enacted provisions of the Internal Revenue Code. Compare §§ 243 and 244 of the Act (in which Congress spoke only to actions by the FSLIC) with § 241 of the Act (in which Congress spoke to actions by either the FHLBB or the FSLIC). The FSLIC, although working with the FHLBB in such matters, was a separate corporation for tax purposes. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Further, the FSLIC had no authority to allow supervisory goodwill to be counted toward regulatory capital requirements under the rules of the FHLBB. Given the clear statutory reference in § 597 of the Code, we cannot expand the meaning of the FSLIC to encompass actions of the FHLBB.

We do not agree that because the FSLIC and the FHLBB have been treated as indistinguishable for purposes of determining a breach of contract with respect to the use of supervisory goodwill to meet regulatory capital requirements, the same result applies here. We note that the Supreme Court in Winstar, supra, did not hold that supervisory goodwill was provided by the FSLIC under § 406(f) of the National Housing Act within the meaning of § 597 of the Code.

We also do not agree that § 597 of the Code extends to the "right to use" supervisory goodwill to meet regulatory capital requirements and that the FSLIC, on Taxpayer's behalf, obtained that "right" from the FHLBB and then conveyed it to Taxpayer in connection with the acquisitions of the failing thrifts. For the reasons set forth above, we conclude that the "right to use" supervisory goodwill is not assistance provided by the FSLIC under § 597.

Issue (2): Whether Taxpayer properly established a tax basis in the book asset identified as supervisory goodwill?

For federal income tax purposes, a taxpayer's basis in property is generally established by reference to the taxpayer's cost. See § 1012 of the Code. The taxpayer's cost is usually measured by the amount the taxpayer paid (in cash or kind) for the property. See § 1.1012-1(a) of the Income Tax Regulations. When a taxpayer incurs no cost in connection with the acquisition of the property, the taxpayer's basis in that property may be established under other provisions of the Code. However, absent the application of a special provision that provides for the tax-free receipt of property, a taxpayer generally must include the fair market value of the property received in income in order to obtain a tax basis in such property. See, e.g., § 1.61- 2(d) of the regulations; Strong v. Commissioner, 91 T.C. 627 (1988). Thus, generally, when a taxpayer acquires property without incurring any cost, the amount of the taxpayer's basis in that property is equal to the amount included in income (that is, the property's fair market value).

Taxpayer Has No Tax Basis in Supervisory Goodwill

For federal income tax purposes, Taxpayer's acquisition of the failing thrifts qualified as tax-free reorganizations under § 368(a)(1) of the Code. Special basis rules apply in connection with assets and liabilities acquired by means of tax-free reorganizations. Under these rules, for federal income tax purposes, a taxpayer (such as Taxpayer) generally steps into the shoes of the transferor corporation (such as the failing thrifts acquired by Taxpayer) with respect to basis. See § 362(b). Because supervisory goodwill was not a pre-existing asset on the books of the failing thrifts acquired by Taxpayer, Taxpayer could not obtain a carryover basis in that asset. See also §§ 357(a) and 1032(a).

As Taxpayer could not obtain a carryover basis for supervisory goodwill under § 362(b) of the Code, Taxpayer must identify a fresh source from which basis can be obtained. Taxpayer takes the position that § 597 applies to provide a tax-free source of income from which this fresh basis can be said to derive. For the reasons set forth above under Issue 1, § 597 is not applicable to the acquisition of supervisory goodwill by Taxpayer. Consequently, Taxpayer was not entitled to exclude the value of supervisory goodwill from gross income under § 597(a). As Taxpayer did not separately pay for the purported asset and did not include the fair market value of that asset in gross income, Taxpayer cannot now claim that it had a tax basis in that asset. See § 1.61-2(d) of the regulations; Strong v. Commissioner, supra.

Taxpayer Has No Tax Basis in the "Right to Use" Goodwill

Even assuming that Taxpayer received an asset from the regulators that is recognizable for federal income tax purposes, this asset can only be the "right to use" purchased goodwill to meet regulatory capital requirements. Further, for federal income tax purposes, this right is considered "other property" and any tax

basis attributable to the acquisition of this right would be determined under rules applicable to the receipt of property. See § 1012 of the Code.

As a general matter, the creation of rights under governmental regulatory and licensing arrangements ("property rights") will usually not result in the recognition of gross income to the recipient of those property rights. See, e.g., Rev. Rul. 92-16, 1992-1 C.B. 15 (holding that the issuance of emission allowance by the Environmental Protection Agency does not result in gross income to the taxpayer (a utility) that receives it). Moreover, not even the excess of the fair market value of the property right over the cost of acquisition of that right will be income. See, e.g., Rev. Rul. 67-135, 1967-1 C.B. 20 (holding that the excess of the fair market value over the cost of a lease obtained by a taxpayer in a lottery conducted by the United States Bureau of Land Management is not includable in gross income).

Even where a tax basis in such a property right is properly determined under § 1012 of the Code, that basis is generally limited to the taxpayer's cost of acquiring the property right (not the fair market value of the right itself). The Service's position with respect to the proper determination of any tax basis to be accorded to the acquisition of these types of property rights has been implicitly adopted by a number of courts in cases holding that taxpayers' bases in similar property rights were the respective taxpayers' costs of obtaining those rights. See, e.g., Nachman v. Commissioner, 191 F.2d 934 (5th Cir. 1951); Nicolazzi v. Commissioner, 79 T.C. 109 (1982), aff'd per curiam, 722 F.2d 324 (6th Cir. 1983); Radio Station WBIR, Inc. v. Commissioner, 31 T.C. 803 (1959). Thus, as Taxpayer incurred no additional cost in order to obtain the "right to use" purchased goodwill for regulatory purposes, its cost basis in such an asset would be zero.

Issue (3): Whether Taxpayer is entitled to claim a deduction for depreciation of supervisory goodwill under § 167 of the Code?

Section 167(a) of the Code provides, as a depreciation deduction, a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or of property held for the production of income.

Section 167(c)(1) of the Code generally provides that the basis on which exhaustion, wear and tear, and obsolescence are allowed shall be the adjusted basis provided in § 1011, for the purpose of determining the gain on the sale or other disposition of the property. Section 1.167(g)-1 of the regulations provides that the basis upon which the allowance for depreciation is computed with respect to any property shall be the adjusted basis provided in § 1011 for the purpose of determining gain on the sale or other disposition of the property. Section 1.1011-1 provides the adjusted basis for determining gain or loss from the disposition of property is the cost or other basis prescribed in § 1012 or other applicable provisions of subtitle A of the Code.

Section 1.167(a)-1(a) of the regulations provides that the allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or held for the production of income is that amount which should be set

aside for the taxable year in accordance with a reasonably consistent plan, so that the aggregate of the amounts set aside will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of that property. The allowance shall not reflect amounts representing a mere reduction in market value.

Section 1.167(a)-1(b) of the regulations provides that the estimated useful life of an asset is not necessarily the useful life inherent in the asset but the period over which the asset may reasonably be expected to be useful to the taxpayer in its trade or business or in the production of the taxpayer's income. This period shall be determined by reference to the taxpayer's experience with similar property taking into account present conditions and probable future developments.

Section 1.167(a)-3 of the regulations provides that an intangible asset that is known from experience or other factors to be of use in the business or the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, may be the subject of a depreciation allowance. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance for depreciation will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

Section 1.167(a)-10 of the regulations provides that the period for depreciation shall begin when the asset is placed in service and shall end when the asset is retired from service.

In order to claim a depreciation deduction under § 167 of the Code, a taxpayer is required to: (1) have a determinable tax basis in the asset; (2) use the asset in the taxpayer's trade or business, or hold the asset for the production of income; and (3) have a useful life determinable with reasonable accuracy.

For the reasons set forth above under Issue 2, Taxpayer does not have a tax basis in the claimed intangible asset regardless of whether that asset is considered to be the regulatory asset of supervisory goodwill or merely the "right to use" such supervisory goodwill to meet regulatory capital requirements. Without a tax basis in that intangible asset, even if we were to conclude that such asset was a depreciable asset, Taxpayer's depreciable basis would be zero pursuant to § 167(c)(1) of the Code and § 1.167(g)-1 of the regulations. Thus, the amount of the depreciation deduction that would be allowable in any taxable year would be zero.

Even assuming that Taxpayer had established a tax basis in the claimed intangible asset (regardless of whether that asset is considered to be the regulatory asset of supervisory goodwill or merely the "right to use" such supervisory goodwill to meet regulatory capital requirements), that asset is not depreciable under § 167 of the Code. For GAAP, Taxpayer's acquisitions of the failing thrifts were accounted for under the purchase method for business combinations. The amount by which the

fair market value of the liabilities assumed by Taxpayer (the "acquisition price") exceeded the fair market value of the assets received by Taxpayer as a result of these acquisitions was recognized on Taxpayer's books as purchased goodwill. For regulatory purposes, this purchased goodwill corresponded to Taxpayer's regulatory asset identified as supervisory goodwill.

If the acquisitions of the failing thrifts created tax basis as Taxpayer alleges, then the calculation of the excess acquisition costs would be consistent with the residual method of determining tax accounting goodwill. See, e.g., Banc One v. Commissioner, 84 T.C. 476 (1985), aff'd, 815 F.2d 75 (6th Cir. 1986). In order to be depreciable, an identified asset requires a determination of value (basis) and a reasonably determinable useful life. Newark Morning Ledger Co. v. United States, 507 U.S. 546 (1993). These two requirements are to be met based on information available as of the transaction date. See Banc One, supra.

At most, Taxpayer received a "right to use" supervisory goodwill to meet regulatory capital requirements. Even assuming that such a right resulted in a recognizable asset for federal income tax purposes at the time of acquisition, this right is not clearly severable from the residual tax asset of goodwill. The mere fact that enactment of FIRREA eliminated Taxpayer's right to use its supervisory goodwill for regulatory purposes does not establish that its tax asset now also has a separately ascertainable value and a reasonably determinable useful life. Taxpayer has failed to substantiate that the fair market value of the right to use supervisory goodwill is equal to the residual amount. Likewise, the remaining useful life determined by the Taxpayer is for the right to use and not necessarily for the residual amount. Therefore, Taxpayer has failed to distinguish the right to use supervisory goodwill from nondepreciable goodwill.

Further, most of the value assigned to the regulatory/book asset of supervisory goodwill was likely derived from loans and other assets that had declined in value because of rising interest rates. See Winstar, 518 U.S. at 851-52. For federal income tax purposes, because Taxpayer took the loans and other assets (from which the regulatory/book asset of supervisory goodwill was derived) at their historic (that is, unreduced) book values, tax basis was properly reflected directly in these loans and other assets, rather than indirectly in a separately booked tax asset comparable to supervisory goodwill. Even if Taxpayer had tax basis in supervisory goodwill, such basis would be the fair market value of the right to use the supervisory goodwill toward regulatory capital requirements, not the full amount of the regulatory forbearance claimed by Taxpayer. While supervisory goodwill was used to meet regulatory capital requirements, the value is not equivalent to its capital cost and does not have a dollar for dollar value. See California Federal Bank v. United States, 43 Fed. Cl. 445, 449 (1999), aff'd in part and vacated in part, 245 F.3d 1342 (2001). Thus, Taxpayer has failed to substantiate the basis in its right to use supervisory goodwill.

Consequently, Taxpayer has not met its burden of separately identifying, valuing, and lifing the right to use as required by the Supreme Court in Newark Morning

Ledger, supra, in order for such right to be subject to a depreciation deduction under § 167 of the Code. Even assuming that the asset recognizable for federal income tax purposes is the regulatory asset of supervisory goodwill, Taxpayer also has not met its burden of separately valuing and lifing such asset as required by the Supreme Court in Newark Morning Ledger, supra. Therefore, the claimed intangible asset (regardless of whether that asset is considered to be the regulatory asset of supervisory goodwill or merely the "right to use" such supervisory goodwill to meet regulatory capital requirements) is not depreciable under § 167 and Taxpayer is not entitled to a deduction for depreciation or amortization under § 167 for this asset.

Conclusion

For the reasons set forth above, Taxpayer's requested change in method of accounting with respect to its supervisory goodwill has been denied.

If you have any questions on this matter, do not hesitate to call (202) 622-3110.

KATHLEEN REED

FDIC

**Federal Deposit Insurance Corporation**
801 17th Street, N.W.
Washington, D.C. 20434 Division of Finance

August 24,2006

TO: Floyd Robinson, General Counsel
Legal Division

FROM: Craig R. Jarvill, Chief
Accounting Operations Section

SUBJECT: REISSUED - Goodwill Financial Reporting Package – Carteret Federal Savings Bank

The December 31,2005 Goodwill Financial Reporting Package for Carteret Federal Savings Bank, that was initially issued on March 31,2006, was inadvertently distributed with a **draft** version of the receivership balance sheet. This oversight does not impact the projected deficit of the receivership as reported in the initial package, since the receivership balance sheet was included as a supplemental report. Please note that this reissued goodwill reporting package is identical to the initial package except for the replacement of the **draft** Carteret receivership balance sheet with the **final** version as of December 31,2005.

Attached is the Division of Finance's Goodwill Financial Reporting Package, depicting results as of December 31,2005, for Carteret Federal Savings Bank (Receivership Fund Code 1309).

Included in this package are four reports prepared specifically in support of the goodwill litigation:

| | |
|---|---|
| Report 1 | Inception Pro Forma Recap |
| Report 1-A | Mapping of Total Asset Inception Balances from Report 1 to Report 2 |
| Report 2 | Statement of Assets and Liabilities in Liquidation (unaudited) - Adjusted 1213112005 Balances |
| Report 3 | Projected Receivership Results using Adjusted 1213112005 Balances |

In addition, included is DOF's standard set of receivership financial statements for Carteret Federal Savings Bank as of December 31,2005. DOF releases these statements to the public upon FOIA or other requests.

Attachments

cc: Susan Bank, Legal Division
John V. Thomas, Legal Division

**CARTERET FEDERAL SAVINGS BANK**
**Receivership Fund Code: 1309**
**Inception Date: 01/20/1995**

## Goodwill Package as of December 31,2005

**REPORT 1: Inception Pro Forma Recap**

This report summarizes the inception balances of this receivership per the Pro Forma package prepared by the Closing team. Adjustments are made to the failed institution's balance sheet in order to reflect the proven balances through the date of closing, as well as convert those asset and liability balances retained by the FDIC/RTC to a cash basis of accounting.

**REPORT 1-A: Mapping of Total Asset Inception Balances from Report 1 to Report 2**

This report provides a mapping of how the Pro Forma inception balances in Report 1 were combined and/or reclassified to record the inception balances on the receivership's general ledger, as presented in Report 2.

**REPORT 2: Statement of Assets and Liabilities in Liquidation (unaudited) – Adjusted 12/31/2005 Balances**

This report presents the financial position of this receivership as of December 31,2005 based on actual and adjusted general ledger results. The total asset, liability, and net assets/(deficit) balances at inception are carried forward from Report 1.

**REPORT 3: Projected Receivership Results using Adjusted 12/31/2005 Balances**

This report projects the financial position of this receivership after application of estimated liabilities based on assumed priority. The focus of this report is the underlying net assets/(deficit) position at various stages of claim distribution. Refer to Report 3 footnotes for additional information.

**Receivership Financial Statements**

The Statement of Assets and Liabilities in Liquidation (unaudited) and Statement of Operations (unaudited) for the period ended December 31,2005, and related footnotes are produced from the FDIC general ledger accounting system and present both year-to-date and inception-to-date activity for the receivership.

**CARTERET FEDERAL SAVINGS BANK**
**INCEPTION PRO FORMA RECAP**
**(Rounded in Dollars)**

**REPORT 1**
**Pro Forma Recap**

**Receivership Fund Code:** *1309*
**Inception Date:** *01120195*

| | Pro Forma Unadjusted Balance | Pro Forma Adjustments [a] | Inception Balances (Per Pro Forma) (Adjusted by RTC) |
|---|---|---|---|
| **Assets** | | | |
| Cash and Non-Interest Earning Deposits | 10,063,050 | (3,275) | 10,059,775 |
| Interest Earning Deposits with FHLB | 2,658,733 | | 2,658,733 |
| Securitization Reserve | 71,312,507 | (7,684,100) | 63,628,407 |
| Other Investment Securities | 7,389,821 | 7,077,893 | 14,467,714 |
| Subtotal Cash and Due From Balances | 91,424,111 | (609,482) | 90,814,629 |
| MBS Guar/Insur U.S. Government | 10,015,197 | | 10,015,197 |
| Other Mtg Backed Securities | 80,858,664 | | 80,858,664 |
| Equity Securities - Except FHLB Stock | 1,125 | | 1,125 |
| Federal Funds Sold | 294,184,760 | | 294,184,760 |
| Subtotal Securities & Obligations | 385,059,746 | | 385,059,746 |
| Mortgage Loans | 590,381,195 | 122,544,525 | 712,925,720 |
| Commercial Loans | | 14,181,058 | 14,181,058 |
| Consumer Loans | 34,705,402 | (637,355) | 34,068,047 |
| Construction Loans | 128,737,346 | (128,737,346) | |
| Subtotal Loans | 753,823,943 | 7,350,882 | 761,174,825 |
| Furniture/Fixtures/Autos | 2,320,854 | | 2,320,854 |
| Other Real Estate Owned | 2,782,443 | | 2,782,443 |
| Investments in Subsidiaries | 5,541,773 | 3,925,801 | 9,467,574 |
| Office Premises and Equipment | 5,013,564 | | 5,013,564 |
| Postage - Stamps/Meter | 2,452 | 4,273 | 6,725 |
| FHLB Stock | 7,860,200 | | 7,860,200 |
| Allowance for Loan Losses - Mtg. Loans | (60,019,396) | 60,019,396 | |
| Valuation Allowance - Securities | (154,525) | 154,525 | |
| Valuation Allowance - Mtg. Pool Securities | (7,562,671) | 7,562,671 | |
| Valuation Allowance - REO | (1,375,000) | 1,375,000 | |
| Valuation Allowance - Subsidiaries | (2,323,950) | 2,323,950 | |
| Accrued Interest - Securities | 56,349 | (56,349) | |
| Accrued Interest - Mtg. Pool Securities | 509,139 | (509,139) | |
| Accrued Interest - Mtg. Loans | 4,212,092 | (4,212,092) | |
| Accrued Interest Commer./Consum. Loans | 743,953 | (492,812) | 251,141 |
| Prepaid Expenses | 1,498,395 | (1,495,134) | 3,261 |
| Other Assets | 299,194 | (469,355) | (170,161) |
| Advances LSO | 1,296,238 | | 1,296,238 |
| Accrued Interest on FHLB Stock | 130,180 | (130,180) | |
| Valuation Allowance - Other Assets | (142,844) | 142,844 | |
| Subtotal Other Assets | (39,311,560) | 68,143,399 | 28,831,839 |
| **Total Assets** | 1,190,996,240 | 74,884,799 | 1,265,881,039 |
| **Liabilities** | | | |
| Demand Deposits | 231,244,658 | (49,767) | 231,194,891 |
| Savings Deposits | 344,836,845 | | 344,836,845 |
| Time Deposits | 793,321,472 | | 793,321,472 |
| Unearned Safe Deposit Box Income | 11,387 | 10,331 | 21,718 |
| Taxes Payable | 557 | (557) | |
| Other Liabilities | 8,703,838 | (1,745,390) | 6,958,448 |
| Suspense Liabilities | 67,949 | (67,677) | 272 |
| Total Liabilities | 1,378,186,706 | (1,853,060) | 1,376,333,646 |
| **Net Assets/(Deficit)** | | | |
| Undivided Profits/Acquired Equity | (187,190,466) | 76,737,859 | (110,452,607) |
| **Total Net Assets/(Deficit)** | (187,190,466) | 76,737,859 | (110,452,607) |
| **Total** Liabilities and Net Equity | 1,190,996,240 | 74,884,799 | 1,265,881,039 |

[a] Pro Forma Adjustments are commonly prepared by the FDIC/RTC to record unprocessed work, non-booked items, corrections of posting errors, and resolved reconciling items, in order to reflect the proven balance of the balance sheet accounts of the Failed Institution through the date of closing. Adjustments also include the conversion from an accrual basis of accounting to a cash basis of accounting for assets and liabilities retained by the FDIC/RTC.

REPORT 1 - A

Carteret Federal Savings Bank
Receivership Fund Code 1309
Mapping of Total Asset Inception Balances from Report#1 to Report #2

| Per Report #1 - Inception Pro Forma Recap | | | Per Report #2 - Statement of Assets and Liabilities | |
|---|---|---|---|---|
| Line Item Descriptions | Inception Balances | | Inception Balances | Line Item Descriptions |
| Assets: | | | | |
| Interest Earning Deposits with FHLB | 2,658,733 | | | |
| Securitization Reserve | 63,628,407 | | | |
| Other Investment Securities | 14,467,714 | | | |
| MBS Guar/Insur U.S. Government | 10,015,197 | | | |
| Other Mtg Backed Securities | 80,858,664 | | | |
| Equity Securities - Except FHLB Stock | 1,125 | | | |
| Rounding | 1 | | | |
| | 171,629,841 | | 171,629,841 | Securities |
| Consumer Loans | 34,068,047 | | 34,068,047 | Consumer Loans |
| Commercial Loans | 14,181,058 | | 14,181,058 | Commercial Loans |
| Mortgage Loans | 712,925,720 | | 712,925,720 | Real Estate Mortgages |
| Cash and Non-Interest Earning Deposits | 10,059,775 | | | |
| Federal Funds Sold | 294,184,760 | | | |
| FHLB Stock | 7,860,200 | | | |
| Postage Stamps/Meters | 6,725 | | | |
| Advances LSO | 1,296,238 | | | |
| Accrued interest - Commer/Consumer Loa | 251,141 | | | |
| Prepaid Expenses | 3,261 | | | |
| Other Assets | (170,161) | | | |
| Reclass from Investments in Subsidiaries | 7,911,088 | [a] | | |
| Rounding | (1) | | | |
| | 321,403,026 | | 321,403,026 | Other Assets/Judgments |
| Other Real Estate Owned | 2,782,443 | | | |
| Furniture/Fixtures/Autos | 2,320,854 | | | |
| Office Premises and Equipment | 5,013,564 | | | |
| | 10,116,861 | | 10,116,861 | Owned Assets |
| Investments in Securities | 9,467,574 | | | |
| Reclass to Other Assets | (7,911,088) | [a] | | |
| | 1,556,486 | | 1,556,486 | Net Investments in Subsidiaries |
| Total Assets | 1,265,881,039 | | 1,265,881,039 | Total Assets |

[a] For purposes of recording inception balances to the FDIC general ledger, the Loan Receivable from Subsidiaries balance in the Investments in Subsidiaries category was reclassified to the Other Assets category.

**CARTERET FEDERAL SAVINGS BANK** — Report 2

**Statement of Assets and Liabilities in Liquidation (Unaudited)** — **Adjusted 1213112005 Balances**

**INCEPTION TO *1213112005***

**(Rounded in Dollars)**

**Receivership Fund Code:** ***1309***
**Inception Date:** ***01120195***

| | Inception Balances (Per RTC General Ledger) | Net Change In Balances | 12/31/2005 Actual G/L Balances | Adjustments to 1213112005 Actual G/L Balances | Adjusted 1213112005 Balances |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | | |
| **Assets:** | | | | | |
| Cash and Investments | - | 115,756 | 115,756 | | 115,756 |
| Receivables | - | - | - | | - |
| Assets in Liquidation | | | | | |
| Securities | 171,629,841 | (171,629,841) | - | | - |
| Consumer Loans | 34,068,047 | (34,068,047) | - | | - |
| Commercial Loans | 14,181,058 | (14,181,058) | - | | - |
| Real Estate Mortgages | 712,925,720 | (712,925,720) | - | | - |
| Other Assets/Judgments | 321,403,026 | (321,403,026) | - | | - |
| Owned Assets | 10,116,861 | (10,116,861) | - | | - |
| Net Investments in Subsidiaries | 1,556,486 | (1,556,486) | - | | - |
| Subtotal: Assets in Liquidation | 1,265,881,039 | (1,265,881,039) | - | | - |
| Less: Estimated Loss on Assets | - | - | - | | - |
| Advances on Assets | | | | | |
| **Total Assets** | 1,265,881,039 | (1,265,765,283) | 115,756 | | 115,756 |
| **Liabilities:** | | | | | |
| **Administrative Liabilities** | | | | | |
| Accounts/Notes Payable | - | - | - | | |
| Suspense/Escrow Accounts | - | 15,378 | 15,378 | | 15,378 |
| Due to FDIC for Service - Billed Expenses | - | 20,281 | 20,281 | | 20,281 |
| Due to FDIC for Borrowed Funds | - | 6,087,767 | 6,087,767 | | 6,087,767 |
| Estimated Litigation Losses - Probable | - | - | | | |
| Other Contingent Liabilities | - | - | - | | |
| SubTotal - Administrative Liabilities | | 6,123,426 | 6,123,426 | | 6,123,426 |
| Proven Depositor/Creditor Claims | | | | | |
| Due to FDIC Subrogated Deposit Claims | | 18,520,362 | 18,520,362 | | 18,520,362 |
| Unisured Deposit Claims Due Others | 1,376,333,646 | (1,376,333,646) | | | |
| Other Creditor Claims | | 303,496 | 303,496 | | 303,496 |
| Estimated Interest on Claims | | 156,559,502 | 156,559,502 | | 156,559,502 |
| Subtotal - Proven Depositor/Creditor Claims | 1,376,333,646 | (1,200,950,286) | 175,383,360 | | 175,383,360 |
| Other Claims | | | | | |
| Estimated Federal Income Tax Liability | - | - | - | | - |
| Other Subordinated Obligations | - | - | - | | - |
| Liabilities at Inception - Unproven | - | - | - | | |
| Subtotal Other Claims | | | | | |
| **Total Liabilities** | 1,376,333,646 | (1,194,826,860) | 181,506,786 | | 181,506,786 |
| Net Assets / (Deficit): | | | | | |
| Net Assets/(Deficit) At Inception | (110,452,607) | - | (110,452,607) | | (110,452,607) |
| Premiums Received / (Paid) at Resolution | - | 143,821,654 | 143,821,654 | | 143,821,654 |
| Asset - Related Equity Adjustments | - | 25,488,825 | 25,488,825 | | 25,488,825 |
| Liability/Claims-Related Equity Adjustments | - | (157,796,452) | (157,796,452) | | (157,796,452) |
| Income/(Loss) of the Liquidation | | (82,452,450) | (82,452,450) | | (82,452,450) |
| **Total Net Assets/(Deficit)** | (110,452,607) | (70,938,423) | (181,391,030) | | (181,391,030) |
| **Total Liabilities and Net Assets/(Deficit)** | 1,265,881,039 | (1,265,765,283) | 115,756 | | 115,756 |

Estimated additional litigation losses considered reasonably possible: 1,410,000

[a] The inception balances per the General Ledger agree in total with the adjusted inception balances on Report 1 - Inception Pro Forma Recap. Refer to Report 1 - A for the mapping of total asset line items on Report 1 to the corresponding asset categories on Report 2.

[b] The amounts in this column reflect the net change in balances reported at inception (column entitled "Inception Balances") versus those as of the report date (column entitled "12/31/2005 Actual G/L Balances").

[c] These balances reflect amounts reported on the receivership's Statement of Assets and Liabilities in Liquidation. Refer to the accompanying footnotes applicable to the Statement of Assets and Liabilities in Liquidation, as these notes are an integral part of this statement.

THIS REPORT CONTAINS 12/31/2005 ESTIMATES BASED ON THE BEST INFORMATION AVAILABLE AS OF 12/31/2005. AS WITH ALL ESTIMATES AND PROJECTIONS, ACTUAL RESULTS MAY DIFFER.

CARTERET FEDERAL SAVINGS BANK
Projected Receivership Results Using Adjusted 1213112005 Balances
(Rounded In Dollars)

REPORT 3
Projected Receivership Results
Using Adjusted 12/31/2005 Balances

Receivership Fund Code: 1309
Inception Date: 01/20/95

| | Adjusted 12/31/2005 Balances | Post Insolvency Interest | Federal Income Tax | Projected Receivership Results (using Adj 12/31/2005 Bal) | Pass Through Receivership (Fund Code 8602) [d]: Outstanding Claims Priority 6 | Post Insolvency Interest Priority 7 | Claims Not Fixed on Day of Default Priority 7 | Federal Income Tax Priority 8 | Subordinated Debt Priority 9 | Projected Receivership Results Adjusted for Pass-Through Liab | Stockholders' Claims Priority 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | [b] | [c] | | | | | | | [e] |
| **Assets:** | | | | | | | | | | | |
| Cash and Investments | 115,756 | | | 115,756 | | | | | | 115,756 | |
| Receivables | - | | | - | | | | | | - | |
| Assets in Liquidation | | | | | | | | | | | |
| Securities | - | | | - | | | | | | - | |
| Consumer Loans | - | | | - | | | | | | - | |
| Commercial Loans | - | | | - | | | | | | - | |
| Real Estate Mortgages | - | | | - | | | | | | - | |
| Other Assets/Judgments | - | | | - | | | | | | - | |
| Owned Assets | - | | | - | | | | | | - | |
| Net Investments in Subsidiaries | - | | | - | | | | | | - | |
| Subtotal: Assets in Liquidation | - | | | - | | | | | | - | |
| Less: Estimated Loss on Assets | - | | | - | | | | | | - | |
| Advances on Assets | | | | | | | | | | - | |
| **Total Assets** | 115,756 | | | 115,756 | | | | | | 115,756 | - |
| **Liabilities:** | | | | | | | | | | | |
| Administrative Liabilities | | | | | | | | | | | |
| Accounts/Notes Payable | - | | | | | | | | | | |
| Suspense/Escrow Accounts | 15,378 | | | 15,378 | | | | | | 15,378 | |
| Due to FDIC for Service - Billed Expenses | 20,281 | | | 20,281 | | | | | | 20,281 | |
| Due to FDIC for Borrowed Funds | 6,087,767 | | | 6,087,767 | | | | | | 6,087,767 | |
| Estimated Litigation Losses - Probable | - | | | | | | | | | | |
| Other Contingent Liabilities | - | | | | | | | | | | |
| SubTotal - Administrative Liabilities | 6,123,426 | | | 6,123,426 | | | | | | 6,123,426 | |
| Proven Depositor/Creditor Claims | | | | - | | | | | | - | |
| Due to FDIC Subrogated Deposit Claims | 18,520,362 | | | 18,520,362 | | | | | | 18,520,362 | |
| Uninsured Deposit Claims Due Others | | | | - | 1,578,552 | | 292 | | | 1,578,844 | |
| Other Creditor Claims | 303,496 | | | 303,496 | | | | | | 303,496 | |
| Estimated Interest on Claim | 158,559,502 | [a] | | 158,559,502 | | 1,422,704 | | | | 157,982,206 | |
| Subtotal - Proven Depositor/Creditor Claims | 175,383,360 | | | 175,383,360 | 1,578,552 | 1,422,704 | 292 | | | 178,384,906 | |
| Other Claims | | | | | | | | | | | |
| Estimated Federal Income Tax Liability | - | | 93,748,141 | 93,748,141 | | | | | | 93,748,141 | |
| Other Subordinated Obligations | - | | | - | | | | | | - | |
| Liabilities at Inception - Unproven | - | | | - | | | | | | - | |
| Subtotal Other Claims | - | | 93,748,141 | 93,748,141 | - | - | - | - | - | 93,748,141 | |
| **Total Liabilities** | 181,506,786 | | 93,748,141 | 275,254,927 | 1,578,552 | 1,422,704 | 292 | | | 278,256,475 | |
| **Net Assets / (Deficit):** | | | | | | | | | | | |
| Net Assets/(Deficit) At Inception | (110,452,607) | | | (110,452,607) | | | | | | (110,452,607) | |
| Premium Received/ (Paid)at Resolution | 143,821,654 | | | 143,821,654 | | | | | | 143,821,654 | |
| Asset - Related Equity Adjustments | 25,488,825 | | | 25,488,825 | | | | | | 25,488,825 | |
| Liability/Claims-Related Equity Adjustments | (157,796,452) | | (93,748,141) | (251,544,593) | (1,578,552) | (1,422,704) | (292) | | | (254,546,141) | |
| Income/(Loss) of the Liquidation | (82,452,450) | | | (82,452,450) | | | | | | (82,452,450) | |
| **Total Net Assets/(Deficit)** | (181,391,030) | - | (93,748,141) | (275,139,171) | (1,578,552) | (1,422,704) | (292) | - | - | (278,140,719) | - |

The accompanying notes are an integral part of this Report 3.

## Footnotes to Report 3 - Fund Code 1309

[a] Fund Code 1309 is subject to the order of claims priority contained in 12 U.S.C. § 1821(d)(11), which applies to RTC receiverships commenced after 08/10/1993. The post insolvency interest estimate is computed on unpaid proven claims balance by applying the applicable federal judgement rate immediately prior to this receivership's inception date, consistent with 28 U.S.C. § 1961. The interest compounds annually and continues to accrue until the unpaid proven claims have been satisfied.

[b] Tax returns and IRS transcripts for this receivership reflect federal income taxes due in the amount of $29,902,504. Another $53,482,421 in accrued interest and $10,363,216 in penalties have been estimated through 12/31/05. An agreement signed between the IRS and the former RTC provides for a deferral of these tax liabilities as long as there are insufficient assets to pay depositor claims in full. Once deposit claims are paid in full, the tax liability becomes due and will be paid in accordance with the order of priority contained in 12 U.S.C. § 1821(d)(11). The potential tax effect of any pending litigation settlement has not been considered at this time.

[c] Pursuant to the contract of sale documents that conveyed the goodwill claims to the FSLIC Resolution Fund - RTC (the Fund), the Fund agreed to advance the costs of litigation, and to remit to the receiver any amounts collected on such claims after deduction of these costs. The Fund has accumulated $5.9 million in expenses incurred on this receiver's goodwill litigation efforts through 12/31/2005, and may continue to accumulate additional litigation expenses. There are no goodwill litigation expenses reflected on this receivership's general ledger as of 12/31/2005. If the final resolution of the goodwill litigation results in a monetary award to the receivership, accumulated goodwill litigation expenses will be deducted from any proceeds distributed to the receivership. If the final resolution of the goodwill litigation does not result in a monetary award to the receivership, the Fund will absorb the expenses.

[d] During the resolution process, a Pass-Through Receivership (Fund Code 8602) was established on 12/04/92. The estimated Pass-Through Receivership deficit as of 12/31/05 is estimated above and should be considered in any distribution. Total Pass-Through Receivership liabilities were $4.7 million of which $3.1 million has been paid to arrive at the $1.6 million in Priorities 1 through 6 and $292 in Priority 7 "Claims Not Fixed on Day of Default" shown above, in accordance with the order of claims priority contained in 12 C.F.R. § 360.3 (a). Post insolvency interest on Priority 6 claims, which was computed in accordance with 12 C.F.R. § 360.3 (b), is the $1.4 million shown as Priority 7 above. Note that this post insolvency interest estimate is compounded daily and continues to accrue until unpaid Priority 6 claims have been satisfied.

[e] This column is presented to indicate that stockholders' claims are subordinate to all other unpaid claims reported in the preceding columns.

CARTERET FSB
NEWARK, NJ
Fund Number: 1309
Inception Date: 03/10/1995
Statement of Assets & Liabilities in Liquidation (unaudited)
For Period Ending: December 31, 2005
(Rounded in Dollars)

| | Current Balance | Inception Balance |
|---|---|---|
| **Assets** | | |
| Cash and Investments | $ 115,756 | $ 0 |
| Receivables | $ 0 | $ 0 |
| Assets in Liquidation | | |
| Securities | $ 0 | $ 171,629,841 |
| Consumer Loans | $ 0 | $ 34,068,047 |
| Commercial Loans | $ 0 | $ 14,181,058 |
| Real Estate Mortgages | $ 0 | $ 712,925,720 |
| Other Assets/Judgments | $ 0 | $ 321,403,026 |
| Owned Assets | $ 0 | $ 10,116,861 |
| Net Investments in Subsidiaries | $ 0 | $ 1,556,486 |
| Subtotal - Assets in Liquidation | $0 | $1,265,881,039 |
| Less: Estimated Loss on Assets in Liquidation (Note 3) | $ 0 | $ 0 |
| Advances on Assets | $ 0 | $ 0 |
| Total Assets | $115,756 | $1,265,881,039 |
| | | |
| **Liabilities (Note 5)** | | |
| Administrative Liabilities | | |
| Accounts/Notes Payable | $ 0 | $ 0 |
| Suspense/Escrow Accounts | $ 15,378 | $ 0 |
| Due to FDIC for Service - Billed Expenses | $ 20,281 | $ 0 |
| Due to FDIC for Borrowed Funds | $ 6,087,767 | $ 0 |
| Estimated Litigation Losses - Probable (Note 7) | $ 0 | $ 0 |
| Other Contingent Liabilities (Note 5) | $ 0 | $ 0 |
| Subtotal - Administrative Liabilities | $6,123,426 | $0 |
| Proven Depositor/Creditor Claims | | |
| Due to FDIC for Subrogated Deposit Claims | $ 18,520,362 | $ 0 |
| Uninsured Deposit Claims Due Others | $ 0 | $ 0 |
| Other Creditor Claims | $ 303,496 | $ 0 |
| Estimated Interest on Claims (Note 6) | $ 156,559,502 | $ 0 |
| Subtotal - Proven Depositor/Creditor Claims | $175,383,360 | $0 |
| Other Claims | | |
| Estimated Federal Income Tax Liability (Note 10) | $ 0 | $ 0 |
| Other Subordinated Obligations | $ 0 | $ 0 |
| Liabilities at Inception - Unproven | $ 0 | $ 1,376,333,646 |
| Subtotal - Other Claims | $0 | $1,376,333,646 |
| Total Liabilities | $181,506,786 | $1,376,333,646 |
| | | |
| **Net Assets/(Deficit)** | | |
| Net Assets / (Deficit) At Inception | ($ 110,452,607) | ($ 110,452,607) |
| Premiums Received / (Paid) at Resolution | $ 143,821,654 | $ 0 |
| Asset - Related Equity Adjustments | $ 25,488,825 | $ 0 |
| Liability/Claims-Related Equity Adjustments | ($ 157,796,452) | $ 0 |
| Income / Loss of the Liquidation Since Inception | ($ 82,452,450) | $ 0 |
| Total Net Assets/(Deficit) | ($181,391,030) | ($110,452,607) |
| Total Liabilities and Net Assets/(Deficit) | $115,756 | $1,265,881,039 |
| Estimated additional litigation losses considered reasonably possible: (Note 7) | $1,410,000 | |

The accompanying notes are an integral part of these financial statements.

Last Month Closed: January, 2006 (Period 01)

CARTERET FSB
NEWARK, NJ
Fund Number: 1309
Inception Date: 03/10/1995
Statement of Operations (unaudited)
For Period Ending: 12/31/2005
(Rounded in Dollars)

| | Year-to-Date | Inception-to-Date |
|---|---|---|
| Liquidation Revenues | | |
| Interest on Cash and Investments | $ 4,134 | $ 25,071,509 |
| Interest and Late Fee Income on: | | |
| Securities | $ 0 | $ 5,409,738 |
| Consumer Loans | $ 0 | $ 70,788 |
| Commercial Loans | $ 0 | $ 1,208,389 |
| Real Estate Mortgages | $ 0 | $ 30,852,852 |
| Other Assets and Judgments | $ 0 | $ 10,099 |
| Recoveries from Charged-Off Assets | $ 0 | $ 59,428 |
| Professional Liability / Litigation Recoveries | $ 42,910 | $ 1,742,205 |
| Other Miscellaneous Income | $ 770 | $ 16,433,757 |
| Total - Liquidation Revenues | $47,815 | $80,858,765 |
| Liquidation Expenses | | |
| Operations | | |
| FDIC Service-Billed Expenses for: (Note 9) | | |
| Marketing / Closing / Settlement | $ 0 | $ 0 |
| Oversight / Claims / Accounting | $ 16,200 | $ 88,261 |
| Asset Marketing / Management | $ 0 | $ 13,163 |
| Investigation and Others | $ 1,085 | $ 112,433 |
| Salaries and Indirect Costs (Note 9) | $ 0 | $ 20,081,886 |
| Asset Servicing-Related Expenses | $ 300 | $ 15,253,315 |
| Asset Sales-Related Expenses | $ 0 | $ 4,715,122 |
| Legal and Other Professional Fees | $ 3,549 | $ 4,224,657 |
| Travel and Other Liquidation Expenses | $ 90 | $ 8,001,887 |
| Subtotal - Operating Expenses | $21,224 | $52,490,724 |
| Interest on FDIC Borrowed Funds | $ 0 | ($ 7,469) |
| Other Interest Expense | $ 0 | $ 594,646 |
| Litigation Losses | $ 0 | $ 229,546 |
| Loss on Contingent Liabilities | $ 0 | $ 2,547,088 |
| Total Liquidation Expenses | $21,224 | $55,854,536 |
| Net Income/(Loss) from Operations | $26,591 | $25,004,229 |
| Net Income/(Loss)on Managed Assets | | |
| Owned Assets | $ 0 | ($ 82,176) |
| Net Investments in Subsidiaries | $ 0 | ($ 1,155,505) |
| Total Net Income/(Loss)on Managed Assets | $0 | ($1,237,681) |
| Gain/(Loss) on Disposition of Assets | | |
| Securities | $ 0 | ($ 32,405,294) |
| Consumer Loans | $ 0 | ($ 1,137,020) |
| Commercial Loans | $ 0 | ($ 4,495,093) |
| Real Estate Mortgages | $ 0 | ($ 61,247,406) |
| Other Assets / Judgments | $ 0 | ($ 11,662,298) |
| Owned Assets | $ 0 | $ 736,157 |
| Net Investments in Subsidiaries | $ 0 | $ 3,991,956 |
| Total - Gain/(Loss) on Disposition of Assets | $0 | ($106,218,999) |
| Income/(Loss) of the Liquidation | $26,591 | ($82,452,450) |

The accompanying notes are an integral part of these financial statements.

Last Month Closed: January, 2006 (Period 01)

# *Notes to Financial Statements:*

1. ***Basis of Accounting*** : The FDI Act authorizes the FDIC, as receiver for a failed insured depository institution ("Receivership"), to administer and conclude the affairs of such institution. Financial statement presentations are based on the premise that the assets of the receivership will be liquidated and proceeds distributed to the institution's creditors over time as provided by applicable laws and regulations. While a receivership's average lifespan is three to six years, some may require longer time frames to conclude. At the onset of a receivership, the failed institution's financial records are reviewed and restated to establish a new basis of accounting. The assets and liabilities of the failed institution are adjusted to remove all estimated losses, accruals, and deferrals. These adjustments include loss allowances; partial write downs; prepaid, deferred or accrued expenses having no recovery value; and accrued or deferred income. Restated balances are shown under the Inception Balance heading of the Statement of Assets and Liabilities in Liquidation. After inception, FDIC's liquidation valuation and measurement practices, as described more fully in the paragraphs that follow, are adopted for all assets and liabilities. In general, transactions are recorded when cash is received or disbursed. Accruals may be used when prospective cash flows are probable and reasonably estimated.

2. ***Use of Estimates*** : As appropriate, estimates of asset values, liabilities, revenues, and expenses are reflected in the financial statements. These amounts are updated over time to compensate for uncertainties inherent in the estimation process. As with the use of all estimates, actual results may differ.

3. ***Valuation of Assets/Loss Allowances*** : Assets of the receivership are shown at values representing cash on deposit or the book value of amounts invested; the principal balance of loans, notes, other debt instruments or receivables (note that interest on these assets is not accrued after failure but is recognized when received); the foreclosed value of real and/or personal property or the book value of assets (cost less depreciation or amortization through date of the institution's failure); and the historical cost of the net investment in subsidiaries, partnerships, or joint ventures, adjusted where appropriate to reflect the receivership's portion of the underlying net earnings or losses.

An Estimated Loss on Assets is provided when anticipated future asset disposition proceeds, including associated expenses, are less than recorded amounts. Future asset disposition proceeds are generally estimated by determining, via sampling or recent disposition activity, the recovery rates for similar assets across all receiverships. However, actual recovery rates for this receivership may differ according to the quality and type of individual asset, as well as over time with changing market conditions. Accordingly, the gains or losses ultimately realized for this receivership will likely vary from amounts estimated.

4. ***Contingent Recoveries*** : Assets of the receivership generally exclude potential collections from activities such as professional liability or other types of pending legal actions. Significant uncertainties prevent reasonable estimation of the amounts ultimately collectible. Instead, these recoveries are generally recognized when cash is received, or when the collection is probable and the amount collectible can be reasonably estimated.

5. ***Actual and Estimated Liabilities*** : The FDIC, as receiver, determines (allows/disallows) claims and distributes proceeds derived from the disposition of the failed institution's assets according to applicable state and federal law governing the payment of creditor claims. Recorded liabilities comprise 1) proven or pending (unproven) claims against the receivership estate, 2) various operating liabilities, and 3) estimates of other probable losses such as pending defensive litigation. Applicable law governing the payment priority of distributions may vary depending on the inception date of the receivership. Therefore, liabilities of the receivership estate are not ranked in order of preference or payment priority on the Statement of Assets and Liabilities in Liquidation.

6. ***Estimated Interest on Claims*** : Applicable law governs or directs the payment of post-insolvency interest to creditors holding proven claims against the receivership estate, including the claim(s) held by the FDIC in its Corporate capacity. Post-insolvency interest is the interest

calculated and paid on proven creditor claims, under certain circumstances, after a receiver is appointed. Uncertainties exist as to the universe of creditors whose claims will ultimately be allowed and whether creditors will receive the full principal amount of proven claims against the receivership estate or any post-insolvency interest. No distribution will be made to holders of equity interests until allowed creditor claims have been paid principal and post-insolvency interest in full. Generally, the estimated liability for the total amount of post-insolvency interest payable respective to creditor claims is recognized in these financial statements when at least 95% of the principal of proven creditor claims has been paid.

*7. __Reasonably Possible Litigation Losses__* : In addition to the amounts recorded for probable litigation liabilities, the FDIC Legal Division has determined that the receivership may be subject to reasonably possible losses from unresolved litigation. Reasonably possible losses differ from those which are probable in that there is a lesser likelihood of loss and payment from the receivership. As such, reasonably possible losses are not accrued in the accounts until the FDIC, through periodic review, determines either that the litigation settlement expense has been incurred or that the likelihood of loss has become probable. While not recognized in the *Statement of Assets and Liabilities in Liquidation,* FDIC management may use all or part of the estimate of reasonably possible litigation losses to determine the assets that must be retained by the receivership to satisfy these potential obligations. The amount of reasonably possible losses is shown at the bottom of the receivership's *Statement of Assets and Liabilities in Liquidation* as a separate disclosure. Further, receiverships may be subject to significant losses from cases where uncertainties prevent a reasonable assessment of the ultimate outcome and/or an estimate of the amount of loss which could result.

*8. __Non-Cash Equity Adjustments__* : Unrecorded assets and claims determined to have existed as of the institution's failure are deemed discovered assets and liabilities, respectively, and are recorded as non-cash equity adjustments. Other non-cash equity adjustments include the Estimated Loss on Assets in Liquidation, the Estimated Interest on Claims, as well as the write-off of remaining unpaid liabilities prior to the inactivation of a receivership. Note that certain non-cash equity adjustments such as the estimated loss on assets and probable litigation are reversed when they are recognized as liquidation transactions in the *Statement of Operations.*

9. *__FDIC Service-Billed Expenses (Statement of Operations)__* : FDIC personnel, who are employed by the FDIC in its Corporate capacity, are responsible for conducting all liquidation-related activities for FDIC receiverships. The FDIC in its Corporate capacity bills the receiverships for various liquidation services provided on their behalf. Since 2002, these receivership billings are calculated by multiplying the actual workload volume attributable to an individual receivership by the benchmark rate for the service provided. Benchmark rates are developed and periodically reviewed by FDIC management after considering empirical and industry data relevant to the service provided as well as an overhead component. These expenses are presented by service type under the *"FDIC Service-Billed Expenses"* section in the *Statement of Operations.*

Prior to 2002, the costs of FDIC-provided services were billed to receiverships in two components comprising 1) employee salaries based on actual labor hours directly attributable to an individual receivership and 2) indirect costs allocated amongst active receiverships based on liquidation activity, as reflected by each receivership's salary charges. Where applicable, these billed expenses are reflected as *"Salaries and Indirect Costs"* in the *Statement of Operations.*

*10. __Income Taxes__* : Federal tax law requires that receivers of corporations, including depository institutions for which the FDIC serves as receiver, continue to file federal income tax returns for the receiverships they manage. A receivership may therefore incur a federal income tax liability from activities that occur during the life of the receivership, as well as during pre-receivership periods. Payment of federal income taxes is deferred until higher priority claims are satisfied, but prior to any payment made to equity holders of the failed institution. Because of the contingent nature of these tax claims, federal income tax liabilities are generally not recognized in these financial statements unless circumstances indicate that there is a high probability that they will be paid. Federal law provides an exemption from income taxes imposed by any State or local taxing authority once FDIC is appointed as receiver.

TABLE 5: CARTERET'S PERFORMANCE RELATIVE TO OTHER FAILED THRIFTS

| Year | N | Past Due and Nonaccruals/ Total Loans | Return on Assets (ROA) | Interest Expense/ Deposits |
|---|---|---|---|---|
| 1984 | 22 | N/A | -2.399% | 10.531% |
| 1985 | 50 | N/A | -4.219% | 7.121% |
| 1986 | 79 | N/A | -6.606% | 5.511% |
| 1987 | 65 | N/A | -7.363% | 4.640% |
| 1988 | 193 | N/A | -10.119% | 4.439% |
| 1989 | 273 | N/A | -6.376% | 5.607% |
| 1990 | 508 | 9.053% | -5.067% | 4.130% |
| 1991 | 362 | 10.415% | -4.916% | 3.800% |
| **1992** | **63** | **6.813%** | **-1.410%** | **6.720%** |
| 1993 | 56 | 12.556% | -7.483% | 3.222% |
| 1994 | 53 | 14.619% | -3.429% | 1.517% |
| 1995 | 8 | 5.003% | -1.042% | 31.613% |
| 1996 | 5 | 1.769% | -1.037% | 3.360% |
| 1997 | 2 | 1.304% | 0.747% | 2.865% |
| 1998 | 2 | 1.247% | 0.357% | 2.544% |
| 1999 | 4 | 3.408% | -2.305% | 3.650% |
| 2000 | 1 | 0.159% | -1.265% | 1.937% |
| 2001 | 1 | 3.233% | -5.710% | 2.587% |
| 2002 | 1 | 0.776% | 0.186% | 0.859% |
| 2003 | 1 | 3.199% | 0.880% | 1.040% |
| 2005 | 3 | 3.259% | 0.781% | 1.626% |
| **Total** | **1752** | **9.683%** | **-5.722%** | **4.668%** |
| **Carteret** | | **4.447%** | **0.189%** | **3.829%** |

*Source*: Thrift Financial Report data; FDIC Failure Transaction Database.

Table 5 shows that Carteret was in a stronger position than a typical failed thrift. Carteret had a lower ratio of past due and nonaccrual loans to total loans than the average for thrifts failing in 1992 and over the entire period. One problem with failed thrifts was the preponderance of "hot money," which is exhibited by a very high average deposit expense. Table 5 shows that hot money was not a concern with Carteret, as the ratio of deposit interest expense to total deposits in Carteret was extremely low relative to other thrifts failing both in 1992 and throughout the period. Finally, unlike average failed thrifts in 1992, Carteret was earning a positive return on assets ("ROA").

| | Old Bad Loans | Four-quarter earnings divided by end of period assets | Four-quarter interest expense divided by end of period deposits | One-quarter earnings divided by end of period assets | One-quarter interest expense divided by end of period deposits | Four-quarter earnings divided by average four-quarter assets | Four-quarter Interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|
| | badloans | ROA | intexp | QROA | QIntexp | AVGQROA | AVGQintexp |
| **CARTERET FSB** | | | | | | | |
| 9/30/1992 | 4.447% | 0.234% | 5.471% | 0.069% | 1.129% | 0.220% | 5.174% |
| 12/31/1992 * | 5.323% | -0.201% | 0.302% | -0.375% | -3.921% | -0.205% | 0.273% |

* Appears that new books were opened on Carteret under conservatorship. Fourth quarter results look more like typical first quarter results, so that typical quarter over quarter change does not make sense.

DEPOSITION EXHIBIT 11
PENGAD-Bayonne, N. J.

Savings and Loans ONLY (Structure Data-defined, CHTR_TYPE_CD=310)

| | | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Data | | | | | | | | | | | | | |
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQintexp | Average of AVGQIntexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 15 | -1.003% | 15 | 2.646% | | | | |
| 1985 | | | 43 | -4.259% | 43 | 12.269% | 43 | -2.008% | 43 | 2.531% | 43 | -3.948% | 43 | 10.568% |
| 1986 | | | 51 | -6.196% | 51 | 9.058% | 51 | -3.981% | 51 | 2.181% | 51 | -4.619% | 51 | 8.966% |
| 1987 | | | 42 | -10.896% | 42 | 7.923% | 42 | -3.585% | 42 | 1.856% | 42 | -9.945% | 42 | 7.804% |
| 1988 | | | 129 | -16.356% | 129 | 7.418% | 129 | -4.144% | 129 | 1.877% | 129 | -14.932% | 129 | 7.421% |
| 1989 | | | 261 | -11.863% | 261 | 7.713% | 263 | -3.653% | 263 | 1.981% | 261 | -10.710% | 261 | 7.564% |
| 1990 | 85 | 7.409% | 152 | -5.030% | 152 | 8.112% | 152 | -2.195% | 152 | 1.987% | 152 | -4.482% | 152 | 7.899% |
| 1991 | 91 | 5.827% | 91 | -2.948% | 91 | 7.849% | 91 | -0.584% | 91 | 1.842% | 91 | -2.730% | 91 | 7.456% |
| 1992 | 32 | 6.122% | 32 | -2.933% | 32 | 6.745% | 32 | -0.889% | 32 | 1.481% | 32 | -2.620% | 32 | 6.375% |
| 1993 | 3 | 5.027% | 3 | -6.881% | 3 | 5.369% | 3 | 0.325% | 3 | 1.168% | 3 | -6.088% | 3 | 4.925% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| 2003 | | | | | | | | | | | | | | |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 213 | 6.533% | 806 | -9.080% | 806 | 8.040% | 823 | -2.874% | 823 | 1.973% | 806 | -8.169% | 806 | 7.788% |

| | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Savings Banks and Savings and Loans ONLY (Structure Data-defined, CHTR_TYPE_CD=300 and 310)**

| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQintexp | Average of AVGQintexp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 15 | -1.003% | 15 | 2.646% | | | | |
| 1985 | | | 43 | -4.259% | 43 | 12.269% | 43 | -2.008% | 43 | 2.531% | 43 | -3.948% | 43 | 10.568% |
| 1986 | | | 56 | -6.055% | 56 | 9.067% | 56 | -3.719% | 56 | 2.169% | 56 | -4.580% | 56 | 8.943% |
| 1987 | | | 45 | -10.912% | 45 | 7.933% | 45 | -3.924% | 45 | 1.856% | 45 | -9.952% | 45 | 7.806% |
| 1988 | | | 145 | -15.700% | 145 | 7.391% | 145 | -4.089% | 145 | 1.869% | 145 | -14.344% | 145 | 7.388% |
| 1989 | | | 303 | -12.116% | 303 | 7.714% | 305 | -3.545% | 305 | 1.976% | 303 | -10.881% | 303 | 7.561% |
| 1990 | 121 | 7.758% | 206 | -4.854% | 206 | 8.090% | 206 | -2.044% | 206 | 1.978% | 206 | -4.352% | 206 | 7.878% |
| 1991 | 135 | 6.028% | 135 | -2.913% | 135 | 7.787% | 135 | -0.567% | 135 | 1.822% | 135 | -2.671% | 135 | 7.424% |
| 1992 | 60 | 6.067% | 60 | -3.265% | 60 | 6.853% | 60 | -0.974% | 60 | 1.461% | 60 | -2.858% | 60 | 6.409% |
| 1993 | 6 | 4.271% | 6 | -4.244% | 6 | 5.033% | 6 | 0.128% | 6 | 1.072% | 6 | -3.800% | 6 | 4.742% |
| 1994 | 2 | 5.567% | 2 | -6.189% | 2 | 4.299% | 2 | -3.776% | 2 | 1.030% | 2 | -5.828% | 2 | 4.160% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| 1996 | 1 | 0.310% | 1 | -8.291% | 1 | 5.876% | 1 | -6.044% | 1 | 1.487% | 1 | -7.973% | 1 | 5.971% |
| 1999 | | | | | | | | | | | | | | |
| 2000 | 1 | 6.198% | 1 | -10.105% | 1 | 4.599% | 1 | -5.203% | 1 | 1.052% | 1 | -8.718% | 1 | 4.210% |
| 2001 | 1 | 3.233% | 1 | -6.007% | 1 | 5.436% | 1 | -1.746% | 1 | 1.288% | 1 | -5.370% | 1 | 5.631% |
| 2002 | 1 | 0.776% | 1 | 0.542% | 1 | 3.831% | 1 | 0.186% | 1 | 0.859% | 1 | 0.558% | 1 | 3.900% |
| 2003 | | | | | | | | | | | | | | |
| 2004 | 1 | 3.199% | 1 | 0.880% | 1 | 1.040% | 1 | 0.164% | 1 | 0.274% | 1 | 0.976% | 1 | 1.167% |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 331 | 6.609% | 1008 | -8.551% | 1008 | 7.935% | 1025 | -2.670% | 1025 | 1.936% | 1008 | -7.681% | 1008 | 7.683% |

All TFR Filers (Used in report): Revised version from FTDB match on faildate

| | | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Data | | | | | | | | | | | | | |
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQIntexp | Average of AVGQIntexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 22 | -0.919% | 22 | 2.640% | | | | |
| 1985 | | | 57 | -4.126% | 57 | 11.660% | 57 | -1.844% | 57 | 2.518% | 57 | -3.892% | 57 | 10.452% |
| 1986 | | | 57 | -6.042% | 57 | 9.028% | 57 | -3.668% | 57 | 2.170% | 57 | -4.587% | 57 | 8.903% |
| 1987 | | | 49 | -11.748% | 49 | 7.900% | 49 | -3.652% | 49 | 1.845% | 49 | -10.565% | 49 | 7.783% |
| 1988 | | | 157 | -14.901% | 157 | 7.360% | 157 | -3.920% | 157 | 1.863% | 157 | -13.623% | 157 | 7.357% |
| 1989 | | | 306 | -12.050% | 306 | 7.712% | 308 | -3.528% | 308 | 1.974% | 306 | -10.794% | 306 | 7.529% |
| 1990 | 122 | 7.731% | 207 | -4.835% | 207 | 8.086% | 207 | -2.035% | 207 | 1.977% | 207 | -4.336% | 207 | 7.875% |
| 1991 | 136 | 6.016% | 136 | -2.909% | 136 | 7.780% | 136 | -0.571% | 136 | 1.821% | 136 | -2.668% | 136 | 7.417% |
| 1992 | 60 | 6.067% | 60 | -3.265% | 60 | 6.853% | 60 | -0.974% | 60 | 1.461% | 60 | -2.858% | 60 | 6.409% |
| 1993 | 6 | 4.271% | 6 | -4.244% | 6 | 5.033% | 6 | 0.128% | 6 | 1.072% | 6 | -3.800% | 6 | 4.742% |
| 1994 | 2 | 5.567% | 2 | -6.189% | 2 | 4.299% | 2 | -3.776% | 2 | 1.030% | 2 | -5.828% | 2 | 4.160% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| 1996 | 1 | 0.310% | 1 | -8.291% | 1 | 5.876% | 1 | -6.044% | 1 | 1.487% | 1 | -7.973% | 1 | 5.971% |
| 1997 | | | | | | | | | | | | | | |
| 1998 | | | | | | | | | | | | | | |
| 1999 | | | | | | | | | | | | | | |
| 2000 | 1 | 6.198% | 1 | -10.105% | 1 | 4.599% | 1 | -5.203% | 1 | 1.052% | 1 | -8.718% | 1 | 4.210% |
| 2001 | 1 | 3.233% | 1 | -6.007% | 1 | 5.436% | 1 | -1.746% | 1 | 1.288% | 1 | -5.370% | 1 | 5.631% |
| 2002 | 1 | 0.776% | 1 | 0.542% | 1 | 3.831% | 1 | 0.186% | 1 | 0.859% | 1 | 0.558% | 1 | 3.900% |
| 2003 | | | | | | | | | | | | | | |
| 2004 | 1 | 3.199% | 1 | 0.880% | 1 | 1.040% | 1 | 0.164% | 1 | 0.274% | 1 | 0.976% | 1 | 1.167% |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 333 | 6.596% | 1044 | -8.471% | 1044 | 7.944% | 1068 | -2.615% | 1068 | 1.944% | 1044 | -7.603% | 1044 | 7.695% |

Savings and Loans (FTDB-defined as SL)

| | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Data | | | | | | | | | | | | |
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of Intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQintexp | Average of AVGQintexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 22 | -0.919% | 22 | 2.640% | | | | |
| 1985 | | | 53 | -4.331% | 53 | 11.816% | 53 | -1.962% | 53 | 2.516% | 53 | -4.079% | 53 | 10.460% |
| 1986 | | | 52 | -6.190% | 52 | 9.050% | 52 | -3.926% | 52 | 2.189% | 52 | -4.637% | 52 | 8.959% |
| 1987 | | | 45 | -11.986% | 45 | 7.919% | 45 | -3.373% | 45 | 1.848% | 45 | -10.774% | 45 | 7.812% |
| 1988 | | | 136 | -15.777% | 136 | 7.392% | 136 | -4.047% | 136 | 1.873% | 136 | -14.402% | 136 | 7.397% |
| 1989 | | | 259 | -11.940% | 259 | 7.714% | 261 | -3.643% | 261 | 1.980% | 259 | -10.732% | 259 | 7.530% |
| 1990 | 83 | 7.395% | 151 | -4.912% | 151 | 8.090% | 151 | -2.135% | 151 | 1.985% | 151 | -4.376% | 151 | 7.880% |
| 1991 | 78 | 5.865% | 78 | -2.823% | 78 | 7.759% | 78 | -0.515% | 78 | 1.825% | 78 | -2.610% | 78 | 7.359% |
| 1992 | 29 | 5.671% | 29 | -2.598% | 29 | 6.773% | 29 | -0.817% | 29 | 1.489% | 29 | -2.310% | 29 | 6.409% |
| 1993 | 3 | 5.027% | 3 | -6.881% | 3 | 5.369% | 3 | 0.325% | 3 | 1.168% | 3 | -6.088% | 3 | 4.925% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 195 | 6.520% | 808 | -9.153% | 808 | 8.051% | 832 | -2.845% | 832 | 1.984% | 808 | -8.215% | 808 | 7.799% |

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -

AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs : Civil Action No. 93-531

and :

FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervenor :

vs :

THE UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - -

Wednesday, March 22, 2006
Allentown, Pennsylvania

Oral deposition of GEORGE FADIL, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:35 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

**Certified Copy**

A. My only role would have been purely from an accounting standpoint to calculate monies due to or from an acquiring bank based on the sale agreement.

Q. Okay.

MR. COLATRIANO: I'd like to have this marked as Exhibit 2, please.

(Whereupon, a document was marked for identification as Exhibit Fadil-2.)

MR. COLATRIANO: Exhibit 2 is a printout of an E-mail dated November 18th, 1992, which you're listed as a CC. The Bates stamp, the number at the bottom of the page, is C-AM-A-0018588. It's a very short E-mail. It just says, "None of you are affected by intervention activity this weekend. As you probably already know, the big one which was a last minute surprise, has been deferred to December 4."

BY MR. COLATRIANO:

Q. First of all, I'd like, if you could -- this E-mail is from Harry Smeck. I think you mentioned him earlier. He was your supervisor; is that correct?

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - x

AMBASE CORPORATION and : Civil Action
CARTERET BANCORP, INC., :
Plaintiffs :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor :
vs :
THE UNITED STATES OF AMERICA, :
Defendant : No. 93-531

\- - - - - - - - - - - - - - - - - -x

Thursday, March 23, 2006
Allentown, Pennsylvania

\- - -

Oral deposition of GLORIA MALIGAYA, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:30 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

CERTIFIED COPY

\- - -

placed in conservatorship?
A. This is probably one of the bigger ones.
Q. One of the bigger ones?
A. Yes. City Federal was the biggest in the Northeast. Next, I guess, is Carteret. City Federal was in the 10, 10 billion.
Q. Okay. Well, in comparison --
A. But a lot of the others are very small.
Q. Okay. So Carteret you would consider to be one of the larger institutions placed in conservatorship?
A. Yes.
Q. Do you know if the asset size of a conservatorship or institution would affect the duration of the conservatorship?
A. My opinion, I would think so.
Q. Okay. What about the quality of the assets that an institution possesses, would that also impact the duration of a conservatorship?
A. Having seen some of the conservatorships that went under because of

other things rather than operational, in
resolving a bank, it's REOs that will take
longer. The loans, you'll always have a
market for those, but if there's bad REOs,
that takes longer to turn around.
Q. Okay. Let's say if you have a
thrift that has multiple branches in
multiple states, is that another factor
that would impact the duration of a
conservatorship?
A. I think so, yeah. You're right.
Q. Can you think of any other factors
that would impact the duration of a
conservatorship?
A. Maybe the locations could also --
the locations of some of the branches could
also.
Q. Okay. Could you explain that
further, what you mean by that?
A. Maybe some of their branches are
not in prime locations.
Q. And also, do you know that if a
conservatorship had a more complex
financial condition or had more complex
operations --

A. Meaning lot of subsidiaries.
Q. Right. Subsidiaries, multiple operations, subsidiaries, would that also impact the duration of a conservatorship?
A. I think so.
Q. Okay. How often were operating budgets prepared for conservatorships?
A. Once a year. Once a year. And in cases where there are material change, then they would do a revision.
Q. Okay. And you mentioned earlier that there are also variance reports that were done on a quarterly basis; is that correct?
A. Yes.
Q. Now, were these operating budgets and variance reports a tool for monitoring and controlling --
A. For managing and controlling expenses.
Q. I'm going to say it one more time. Just so we have it clear for the record, I'll ask the question one more time.
Were these operating budgets and variance reports used as a tool to

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of August 2006, a copy of the foregoing "APPENDIX TO THE GOVERNMENT RESPONSE TO AMBASE'S STATEMENT OF ISSUES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt
David A. Levitt