**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**AMBASE CORPORATION AND**
**CARTERET BANCORP, Inc.**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES OF AMERICA**

---

# APPENDIX TO THE GOVERNMENT RESPONSE TO AMBASE'S STATEMENT OF ISSUES

---

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309
Fax: (202) 514-7969

OF COUNSEL:
TIMOTHY ABRAHAM
ARLENE PIANKO GRONER
MELINDA HART
F. JEFFERSON HUGHES
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice

Date: August 30, 2006

Attorneys for Defendant

# APPENDIX INDEX

**VOLUME I**

Declaration of Professor Anthony Saunders, Aug. 7, 2006 .......................... App. 1

Declaration of Charles W. Calomiris of July 14, 2006 .......................... App. 118

Deposition of Charles W. Calomiris, Vol. 3, July 7, 2006 (Excerpt) ............... App. 247

Deposition of Wayne S. Green, February 28, 2006 (Excerpt) ..................... App. 254

Deposition of Edward Griffin, March 30, 2006 (Excerpt) ........................ App. 257

Deposition of Karen Jean Hughes, April 7, 2006 (Excerpt) ...................... App. 260

Deposition of Steven Johnston, April 5, 2006 (Excerpt) ......................... App. 263

Deposition of Jay A. Jupiter, June 10, 2005 (Excerpt) .......................... App. 265

Deposition of James R. Mindnich, March 16, 2006 (Excerpt) ................... App. 268

Deposition of J. Paul Ramey, April 12, 2005 (Excerpt) ......................... App. 275

Deposition of Michael Saran, March 31, 2006 (Excerpt) ........................ App. 277

APB Opinion No. 16, August 1970 ........................................ App. 294

APB Opinion No. 17, August 1970 ........................................ App. 316

Assistance Agreement between FSLIC and Carteret Savings and Loan
Association, F.A., September 29, 1982 (Excerpt) .............................. App. 323

Assistance Agreement between FSLIC and Carteret Savings Bank, FA,
June 6, 1986 (Excerpt) ................................................ App. 326

OTS Report of Examination for Carteret Savings Bank, F.A.,
May 22, 1989 (Excerpt) ................................................ App. 334

Memo from William M. Dudley, RTC, to All Directors - Consolidated
Offices, Managing Agents, Liquidation Site Managers, and Supervisory
Managing Agents re: Prepayment Interest/Penalty, June 20, 1990 ................. App. 340

OTS Report of Examination for Carteret Savings Bank, F.A., June 17, 1991 (Excerpt) . . . . . . . . . . App. 341

Form 10-Q for Ambase Corp., for the quarterly period ended June 30, 1991 . . . . . . . . . App. 345

Memorandum from Stephen A. Haley and Kenneth C. Herrmann, RTC, to Supervisory Managing Agents, Assistant Supervisory Managing Agents, Managing Agents, and Assistant Managing Agents though Sandra A. Waldrop, re: Policy for Continued Lending in Conservatorship, January 14, 1992 . . . . . . . . . . App. 367

Policy and Procedures for Computation of Dividend Payments of Pass Through Receiverships, January 31, 1992 (Excerpt) . . . . . . . . . . App. 385

Statement of Financial Accounting Standards No. 109, February 1992 . . . . . . . . . . App. 389

OTS Examination Comment Status Report for Carteret Savings Bank, FA, June 15, 1992 . . . . . . . . . . App. 414

Conservatorship Strategic Plan for Carteret Federal Savings Bank, December 4, 1992 (Excerpt) . . . . . . . . . . App. 453

U.S. Corporation Income Tax Return for AmBase Corporation & Subsidiaries (Form 1120), 1992 . . . . . . . . . . App. 472

Memorandum from James R. Mindnich, Carteret Savings Bank, FA, to George M. Gross, Jr., re: Uncommitted Pipeline, March 10, 1993 . . . . . . . . . . App. 482

E-mail from Stephen A. Haley to Robert O. Smedley and W. Robert Haley re: Asset Sales from Conservatorships, March 19, 1993 . . . . . . . . . . App. 484

Resolution Trust Corporation Supervisory Review Manual (Revised), March 1993 (Excerpt) . . . . . . . . . . App. 486

Executive Summary for Carteret Federal Savings Bank, August 31, 1993 . . . . . . . . . . App. 492

Form 10-K for First Tennessee National Corporation, for the fiscal year ended December 31, 1993 (Excerpt) . . . . . . . . . . App. 494

Memorandum from Tanya L. Robertshaw, Carteret Savings Bank, FA, to Distribution re: Monthly Conservatorship Reports with attachment, February 18, 1994 (Excerpt) . . . . . . . . . . App. 499

E-mail from James R. Hambric to J. Paul Ramsey re: Better Premium by Delaying, August 16, 1994 . . . . . . . . . . App. 505

Letter from Glen R. Sergeon, TCB Holdings, Inc., to John E. Ryan, RTC, re: Minority Preference in Acquisition Effort, August 24, 1994 . . . . . . . . . . App. 506

Memorandum from Tanya L. Robertshaw, Carteret Savings Bank, FA, to Distribution re: Monthly Conservatorship Reports with attachment, October 27, 1994 . . . . . . . . . . App. 508

Memorandum from Stephen N. Graham, Alvin E. Kitchen, and Thomas A. Rose to All Regional Directors, All Regional Financial Officers, and All Regional Counsel re: Receiverships - Post-Insolvency Interest, June 8, 1995 . . . . . . . . App. 521

Resolution Trust Corporation Performing Assets Sold to Acquirers of Minority Thrifts, General Accounting Office, GAO/GGD-96-44, December 1995 . . . . . . . . . . App. 523

Memorandum from John F. Bovenzi, William F. Kroener, III, and Paul L. Sachtleben to Operating Committee re: Options Memorandum - Post-Insolvency Interest Regulation and Amendments to 12 C.F.R. § 360.3, September 18, 1996 . . . . . App. 542

Form 10-K for AmBase Corporation, for the fiscal year ended December 31, 1997 (Excerpt) . . . . . . . . . . App. 559

"An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing," Sudhir Nanda, James E. Owers, and Ronald C. Rogers, Real Estate Economics, vol. 25, no. 2, pp. 271-294, 1997 . . . . . . . . App. 566

Managing the Crisis: The FDIC and RTC Experience 1980-1994, August 1998 (Excerpt) . . . . . . . . . . App. 589

Form 10-K for AmBase Corporation, for the fiscal year ended December 31, 1999 (Excerpt) . . . . . . . . . . App.592

Memorandum from Senior Technician Reviewer, IRS, for Industry Director re: Denial of Consent for Change in Method of Accounting, January 18, 2002 . . . . . . . . . . App. 599

Reissued - Goodwill Financial Reporting Package - Carteret Federal Savings Bank, August 24, 2006 . . . . . . . . . . App. 609

Page 40, Table 5, Calomiris Report (May 19, 2006 and May 24, 2006) . . . . . . . . . . . . . App. 620

Exhibit 11, Page 1, Deposition of Charles W. Calomiris, Vol. 3, July 7, 2006 ....... App. 621

Deposition of George Fadil, March 22, 2006 (Excerpt) ........................ App. 626

Deposition of Gloria Maligaya, March 23, 2006 (Excerpt) ...................... App. 628

Confidential Materials - Subject to Protective Order

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC. | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | ) | No. 93-531 |
| Plaintiff-Intervenor, | ) | Judge Loren Smith |
| v. | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**Declaration of Professor Anthony Saunders**

August 7, 2006

Confidential Materials - Subject to Protective Order

# I. QUALIFICATIONS AND ASSIGNMENT

## A. QUALIFICATIONS

1. My name is Anthony Saunders. I am the John M. Schiff Professor of Finance and Chairman of the Department of Finance at the Stern School of Business at New York University. I hold a B.Sc. in Monetary Economics, an M.Sc. in Money and Finance, and a Ph.D. in Economics, all from the London School of Economics.

2. Throughout my academic career, my teaching and research have focused on financial institutions in general and banking in particular. I have taught both undergraduate and graduate courses in banking at New York University since 1978. I also have served as a visiting professor at universities throughout the world, including the Stockholm School of Economics, the University of Melbourne, INSEAD (Fountainebleau, France), the University of Otago (New Zealand), the University of Bocconi (Milan, Italy), the University of St. Andres (Argentina), ISEAS (Singapore) and Hong Kong University of Science and Technology.

3. I am on the Board of Academic Consultants of the Federal Reserve Board of Governors. I have served as a research consultant, advisor, or scholar to the Office of the Comptroller of the Currency, the Research Department of the Federal Reserve Bank of Philadelphia, the Research Department of the Federal Reserve Bank of New York, the World Bank, the Federal National Mortgage Association, and the International Monetary Fund. I have been a consultant to numerous private and governmental banking institutions, including J.P. Morgan, Citicorp, the World Bank, and the Inter-American Development Bank.

Confidential Materials - Subject to Protective Order

4. My research on financial markets and financial institutions has been published in all of the leading finance journals and money and banking journals.[1] I am the author or co-author of a number of books on various aspects in banking, including two widely used textbooks, *Financial Markets and Institutions*, now in its third edition, and *Financial Institutions Management: A Risk Management Approach*, now in its fifth edition. I am a co-editor of the *Journal of Banking and Finance* and editor of the *Journal of Financial Markets, Instruments and Institutions*, and serve as an associate editor of eight other journals.

5. Exhibit 1 to this report is a copy of my resume, which lists my publications, as well as my expert reports and trial testimony over the past five years.

**B. ASSIGNMENT**

6. I have been retained by the U.S. Department of Justice to review and respond to the declaration of Professor Charles W. Calomiris submitted in this matter on behalf of the plaintiff.[2] The Calomiris Declaration analyzes the receivership deficit calculations for Carteret prepared by the Federal Deposit Insurance Corporation ("FDIC") and adjusts those calculations for alleged computational and conceptual errors and alleged delays and mismanagement in the government's resolution of the thrift.

7. Exhibit 2 to this report is a list of materials and data I reviewed and considered, or which others working at my direction reviewed and considered, in the course of preparing this report.

---

[1] P.L. Cooley and J.L. Heck, "Prolific Authors in the Finance Literature: A Half Century of Contributions," *Journal of Financial Literature*, Vol. 1, Winter 2005, pp.46-69.

[2] The Calomiris Declaration was originally submitted on May 19, 2006, then corrected on May 23, 2006, and then submitted again on July 14, 2006.

8. This report contains my findings and opinions as of August 7, 2006. My analysis is ongoing, however, and my opinions may change if additional information related to the receivership deficit and the resolution of Carteret come to my attention, or in response to deposition testimony by others, or in response to issues that may be raised in my own deposition. I note that Professor Calomiris first submitted his declaration on May 19, 2006, corrected it on May 23, 2006, and then submitted it again approximately three weeks ago on July 14, 2006, partially in response to issues raised in his deposition on July 5-7, 2006. Some of the changes associated with Professor Calomiris's re-submitted declaration have been significant, as noted in a number of places below. Professor Calomiris has also supplemented his list of materials relied upon, most recently following his July 14, 2006 re-submitted declaration. In addition, if I am asked to testify at trial, I may prepare additional supporting materials related to my findings and opinions, such as summaries, illustrations, tables, charts, and other expository exhibits.

## II. SUMMARY OF OPINIONS

9. As will be discussed in detail throughout my report, I find serious flaws, both statistical and conceptual, in Professor Calomiris's analyses. In particular:

10. Professor Calomiris has provided no persuasive basis for reducing the size of the Carteret receivership deficit, which was $278.1 million as of December 31, 2005.

11. The resolution of Carteret/AmBase by the Resolution Trust Corporation ("RTC") was reasonable and fair. The resolution effectively implemented the objectives legislated by Congress to reduce the economic and social costs of a crisis brought on by the excessive risk-taking of Carteret/AmBase and other aggressive thrifts.

12. Professor Calomiris's assertions relating to the interest costs levied on the government/RTC loans to Carteret/AmBase are *not* supported by principles of economics and finance.

13. Professor Calomiris does not demonstrate that the market value of Carteret/AmBase's supervisory goodwill was different from zero.

14. Professor Calomiris's assertions about the cost of delay and potential resale value of Carteret's deposits, its mortgage subsidiary, and other assets are not supported by the facts.

15. Section III of this report places the thrift crisis and the creation of the RTC into the context of the theory and practice of banking and general economic situation at that time. In Section IV, I address Professor Calomiris's erroneous claims regarding the government's calculation of interest on the RTC's funding of Carteret's branch sales. In Section V, I rebut Professor Calomiris's counter-factual assertions regarding the consequences of the alleged delay in resolving and selling Carteret's branches. Professor Calomiris's erroneous calculations regarding the value of supervisory goodwill are addressed in Section VI. Section VII analyzes the problems in Professor Calomiris's valuation of the Carteret mortgage subsidiary, as well as other asset sales. Section VIII summarizes my conclusions.

## III. RTC's Response to the Collapse of the U.S. Thrift Industry

16. The impact of the thrift crisis on savings and loan associations ("S&Ls") rivaled the banking collapse during the Great Depression and led to the insolvency of the insurer of thrift deposits, the Federal Savings and Loan Insurance Corporation ("FSLIC"). A crisis of such immense proportions was certainly not foreseen in 1982,

when Congress passed the Garn-St. Germain Depository Institutions Act allowing federally chartered thrifts more extensive lending and deposit-taking powers. Nor was such a crisis anticipated when the Federal Home Loan Bank Board ("FHLBB") and the FSLIC approved Carteret's acquisition of Barton and Delray, which according to the Plaintiff's First Amended Complaint, constitute "approximately ninety percent of the goodwill at issue in this suit."[3] Despite its massive and unforeseen impact, the RTC was remarkably effective in resolving the thrift crisis at a cost that is now estimated to be less than a quarter of the $500 billion estimates[4] that were forecast at the time of the enactment of the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA") in 1989.

### A. THE ROLE OF THRIFTS IN BANKING

17. Banks and thrifts are critical participants in the capital formation process that drives free market economies. Without banks, thrifts, or other financial institutions, households and businesses with investment opportunities would have little or no access to financing and households with savings would have few opportunities to invest their excess funds. The special role of banks and thrifts is to facilitate the flow of funds from savers to investors. Most often they accomplish this by transforming the liquidity and risk characteristics of asset investments to make them more palatable to risk-averse investors (depositors), a process referred to as asset transformation. One aspect of this asset transformation process is the ability of banks to diversify their asset risks, thereby allowing lower-risk deposits to be offered to the public and savers at large. Because of

[3] Plaintiff's First Amended Complaint, April 18, 1997, paragraph 21.

[4] K.D. Vandell and T.J. Riddiough, "The Impact of RTC Dispositions on Local Housing and Real Estate Markets," *Housing Policy Debate*, Vol. 2, Issue 1, pp 49-68.

the special role that banks and thrifts play in the financial system, and because of the systemic risks associated with banks and thrifts, they are regulated.[5]

18. For many years, thrifts have been subject to special regulation in recognition of their traditional role in providing banking services (such as deposit-taking and mortgage lending) to households – services deemed to have a particularly important social, as well as economic, impact. As a condition of their charters, thrifts received special competitive advantages in their deposit rates. For example, until 1980, they were allowed to offer deposit rates that were 25 basis points higher than those offered by commercial banks; this helped thrifts gain access to low-cost sources of funds.[6] Thrifts also were protected by FSLIC deposit insurance and charter-entry barriers, and received favorable tax treatment as well. In the post-World War II period, thrifts were the dominant driver of home mortgage lending in the U.S. In exchange for these regulatory protections, thrifts were required by regulators to undertake relatively low-risk investments (i.e., focus on residential mortgage loans to homeowners), thereby earning a conservative positive spread or return that mainly consisted of mortgage interest rates minus deposit sources of funds.

### B. THE THRIFT CRISIS AND THRIFT BEHAVIOR IN THE POST-1980 PERIOD

19. In the wake of a changing regulatory system, Carteret/AmBase and other thrifts chose to ignore the traditional model of the thrift industry and to increase their asset risk exposures aggressively. It is a basic tenet of financial markets that the greater an asset's risk exposure, the greater the uncertainty regarding its returns. After the

---

[5] Some public utility suppliers, such as gas, electric, telephone, and water companies, are also singled out for regulation because of the special nature of their services and the costs imposed on society if they fail.

[6] So called Regulation "Q" was phased-out over the 1980-86 period.

passage of the Depository Institutions Deregulation and Monetary Control Act of 1980 and the Garn-St. Germain Depository Institutions Act of 1982, which both deregulated deposit interest rates and allowed thrifts to expand their activities into areas such as commercial real estate, consumer lending, and commercial lending, many thrifts actively and aggressively expanded into these more risky activities. In particular, in an attempt to increase their spreads above the conservative levels implicit in the traditional thrift business and regulatory model, firms like Carteret/AmBase undertook excessive levels of credit and interest risk in their asset portfolios. They did so with the knowledge that if their asset investments paid off, they would reap windfall gains, and if their investments failed, the FSLIC deposit insurance system (or ultimately the U.S. taxpayer) would pay their losses. This "heads I win, tails you lose" policy created a classic "moral hazard" problem.[7]

20. The thrift crisis of the 1980s developed as the risk mismatch between the aggressive thrifts' risky assets and the low risk deposit liabilities in their portfolios overwhelmed their tangible capital reserves. In banking in general, a bank's (or thrift's) tangible capital is its ultimate protection against unexpected losses. In particular, if a thrift's asset portfolio losses exceed its tangible capital buffer, the thrift becomes economically insolvent. As a result, the increasingly risky strategies and activities of aggressive thrifts create enormous costs. For example, insolvent thrifts create liquidity crises that may hamper individuals' and businesses' access to deposited funds and potentially spill over to other thrifts and banking institutions, leading to financial instability. Governments have a stake in preserving the stability of the banking system in

[7] "Moral hazard" refers to circumstances in which insurance changes behavior in such a way as to increase the likelihood that the insured event or condition will occur.

order to promote economic growth and avoid financial crises. Thus, the passage of FIRREA and the creation of the RTC were necessary and prudent responses to the negative externalities imposed on the economy due to excessive risk-taking by many thrifts.

21. This excessive risk-taking by Carteret/AmBase and other aggressive thrifts, which was undertaken in part to exploit the deposit insurance system and the "heads I win, tails you lose" situation created by its provision, directly threatened the financial system and the capital formation process in the U.S. In order to rectify some of the damage imposed by Carteret/AmBase and other aggressive thrifts on the financial system and the economy, Congress passed FIRREA in 1989. The passage of FIRREA brought about the restructuring of the deposit insurance system, limited the highly risky asset investments adopted by many thrifts, and established the RTC to help the FDIC resolve the large number of failed and failing thrifts outstanding at the time.

## C. THE RTC EFFECTIVELY RESOLVES THE THRIFT CRISIS AT LOW COST TO THE U.S. TAXPAYER

22. Upon its creation in 1989, the RTC was faced with a crisis of monumental proportions. Between 1980 and 1994, 1,617 federally insured banks (with $302.6 billion in assets) and 1,295 thrifts (with $621 billion in assets) – or "one in six federally insured depository institutions" controlling "20.5% of the assets in the banking system" – were subject to regulatory closure and/or intervention; this rate of failure was "equivalent to one failure every other day over the 15-year period."[8] This actually understates the magnitude of the government's challenge since the failures were not evenly distributed

[8] *Managing the Crisis: The FDIC and RTC Experience*, Executive Summary, pages 4-5.

over the fifteen year period. The largest number of failures (533 out of a total 2,912 FSLIC, FDIC and RTC failures, or more than 18% of the total) occurred in 1989 alone, with almost 50% occurring between 1989 and 1992.[9] This huge wave of failures made it even more difficult for the RTC to resolve the failure of Carteret/AmBase in December 1992. Indeed, at the end of 1992 the RTC was managing 699 conservatorships and/or receiverships and total assets of $104.5 billion.[10]

23. Despite this, the General Accounting Office ("GAO"), often critical of the targets of its investigations, concluded in a May 1995 study that the "RTC's resolution process [was] generally adequate to determine least costly resolutions."[11] In general, the RTC acted fairly and promptly to clean up the thrift crisis using least cost resolution methods whenever possible in what has been called "the largest transfer of real estate assets since the Louisiana Purchase."[12] The same article concludes that the RTC did more good than bad:

> "Given the outlaw legacy of the thrift crisis, where villains were everywhere, it's probably inevitable that any agency charged with mopping up after such a mess would itself be stained. Judging the RTC's work is a bit like trying to get a reasoned judgment from a lynch mob: It's hard to filter out the noise, and there's very little objectivity....
>
> 'If there was no RTC, I'm not sure what would have happened to the real estate industry,' says [Andrew] Albert, the newsletter editor [of *Liquidation Alert* and *Commercial Mortgage Alert* newsletters]. He adds that while the FDIC's loss-sharing arrangements on its seizures have worked well, 'the RTC had so many (failures) to deal with at the beginning that it would have been hard to market them one by one, and the real estate market was in a free fall. They had to stop the hemorrhaging.'"[13]

---

[9] *Ibid.*

[10] RTC *Statistical Abstract, August 1989/September 1995*, Table I-S, p. 15.

[11] "1993 Thrift Resolutions: RTC's Resolution Process Generally Adequate to Determine Least Costly Resolutions," General Accounting Office, GAO/GGD-95-119, May 1995.

[12] "Learning from the RTC," *U.S. Banker*, September 1993, p. 28.

[13] *Ibid.*

24. The RTC faced enormous challenges in handling the economic and social aspects of the crisis created by the overly aggressive activities of the thrifts. Indeed, since there was so much fraud and mismanagement inherent in the failed thrifts, it was difficult for potential acquirers to assess the value of thrift assets accurately. This in itself was sufficient to delay the resolution process. Despite the enormity of the problem, Curry and Shibut[14] estimate the cost of the RTC resolution from 1989 through 1995 as $82.7 billion, with $7.1 billion (almost 9%) borne by the private sector. Thus, over the 1990-1995 period, the RTC was generally successful in accomplishing the goals of resolving the economic and social costs of the thrift crisis at a relatively low cost to the American taxpayer and helping to lay the foundation for one of the most successful and profitable periods in U.S. banking that has followed these resolutions.

## IV. THE GOVERNMENT'S CALCULATION OF INTEREST ON THE RTC FUNDING OF CARTERET BRANCH SALES HAS BEEN APPROPRIATE

### A. INTRODUCTION

25. As of December 31, 2005, the projected size of the Carteret receivership deficit, after adjusting for pass-through liabilities, was $278.1 million.[15] The largest component of this deficit was the estimated interest of $156.6 million on the claims of the FDIC.[16] This interest resulted from the funds the receivership had to borrow from the RTC to finance the sales of its Florida branches and its New Jersey branches, given the perilous state of Carteret's assets at the time of its closure and transfer to the RTC. As

[14] Timothy Curry and Lynn Shibut, "The Cost of the Savings and Loan Crisis: Truth and Consequences," *FDIC Banking Review*, vol. 13, no. 2, 2000, pp. 26-35.

[15] FDIC Goodwill Financial Reporting Package for 12/31/2005 dated March 31, 2006 (not Bates stamped).

[16] *Ibid.* Special FSLIC funds were set aside to help the FDIC/RTC handle receiverships (so-called resolution funds).

discussed below, Professor Calomiris argues that this $156.6 million should be reduced to zero based on his assertion that it is inappropriate to compute interest on the principal borrowed from the RTC to fund the Carteret branch sales. While Professor Calomiris asserts that it is inappropriate to include interest at all, he also claims that the interest rates used by the government to compute the interest costs on these loans were inappropriate.[17]

### B. THERE IS NO LINK BETWEEN INTEREST ON DAMAGES AND COMPUTING INTEREST WHEN COMPUTING THE RECEIVERSHIP DEFICIT

26. Professor Calomiris argues that because the government does not pay interest on any damages awarded in goodwill breach-of-contract cases, the government should not be able to accrue interest on the funds it loaned the receivership to finance the sale of the Carteret branches. Alleging that this "inconsistency" is the most fundamental error in the government's calculation of interest, Professor Calomiris notes that Congress has made the United States immune from an interest award as a matter of law.

27. Professor Calomiris has put his finger on the heart of the matter: Congress, as a matter of law, has prohibited the payment of prejudgment interest on any damages caused by the U.S. government. This legal prohibition has no relevance to calculating the RTC's deficit (or surplus) relating to its seizure of Carteret. In economic terms, there was a real cost to the government of having to use taxpayer funds, as well as funds borrowed through issuing Treasury bonds, bills, and other government securities, to help resolve Carteret. Indeed, every $1.00 borrowed to finance Carteret's loans added $1.00 (plus interest) to the national debt. As a result of these financing costs, it is

---

[17] Calomiris Declaration of July 14, 2006, paragraphs 12-15.

economically rational to compute and include interest in assessing the cost of loans made in resolving Carteret (i.e., the receivership deficit). Indeed, forgiving the interest cost of the government's funding of the Carteret resolution would be equivalent to a direct subsidy and would have an effect very much like paying prejudgment interest on the damages caused by the government, apparently contrary to law.

### C. RTC/FDIC CHOICE OF INTEREST RATES

28. Professor Calomiris not only criticizes the imposition of any interest charge at all, he also argues that if interest is charged, it should have been computed at a three-month Treasury bill floating rate, especially over the August 10, 1993 through 2002 period when the government (RTC) applied a fixed rate to new resolutions.[18]

#### 1. Interest Rates During the 1994-2005 Time Period

29. While it is true that interest rates began to fall significantly towards the end of the 1994-2005 period – for example, the three-month Treasury bill rate fell from 5.15% in January 2001 to 1.69% in December 2001[19] – the three-month Treasury bill rate does not measure the risk of the loan transaction to the RTC.

30. Exhibit 3 shows the behavior of interest rates over the October 1994 through December 2005 period. The rate on three-month Treasury bills is clearly an outlier, substantially lower than the other rates. (This may be the reason it was chosen, ex-post, by Professor Calomiris for the purposes of his analysis.[20]) For reference, the three federal judgment rates of 6.06% (on the October 1994 loan), 7.34% (on the January

---

[18] Calomiris Declaration of July 14, 2006, paragraphs 22-36.

[19] TBM3 series available from the Federal Reserve Bank.

[20] In fact, in paragraph 28 of his July 14, 2006 declaration, Professor Calomiris proposes a short-term variable Treasury rate for a week, a month, or a quarter.

1995 loan), and 6.57% (on the March 1995 loan) are also shown in Exhibit 3 (as horizontal dashed lines). The federal judgment rate "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."[21] Since the loans at issue here were extended to a receivership holding risky assets with uncertain returns, a risk premium above the risk-free Treasury rate might have been added to price such loans.[22] It is common sense that if the FDIC/RTC loans to the Carteret receivership were risky – and they were in terms of resolution payoffs – then a risk premium should be charged by the government, or else a subsidy is provided. That is, to the extent that the government loaned any funds to the Carteret receivership at a risk-free Treasury rate, it was providing an explicit subsidy. Indeed, the FDIC/RTC actually incurred losses of $106.2 million in connection with disposal of Carteret assets.[23]

31. Exhibit 3 shows the monthly US bank prime lending rate to commercial borrowers and the rate on 30-year conventional mortgages. These are better proxies for the appropriate interest rate to be assessed on risky receivership loans, given receivership risk characteristics. Over the entire period, from October 1994 through December 2005, the average rate on prime loans was 7.06% and the average rate for 30-year mortgages

---

[21] 28 U.S.C. § 1961, p. 13 and www.uscourts.gov/postjud/postjud.html.

[22] A risk premium is appropriate even though the government raises funds at Treasury rates. To illustrate this point, if I borrow money on a low-rate home-equity loan and then lend it to a relative with a very low credit rating, the rate I charge on the loan should not be my low interest rate, but instead should be a much higher rate reflecting the riskiness of the loan.

[23] FDIC Goodwill Financial Reporting Package for 12/31/2005 dated March 31, 2006, Statement of Operations (not Bates stamped).

was 7.03% per annum. By comparison, the three-month Treasury bill rate averaged only 3.79% per annum over the period.

32. One reason that Professor Calomiris seems to reject the use of a risk-sensitive interest rate is his conjecture that the loans made by the RTC loans (funded largely by the "Federal Financing Bank") have a "zero beta."[24] In simple terms, he seems to be implying that the value of these loans was impervious to underlying economic conditions or, in the parlance of finance, had no "systematic risk." Almost certainly, the value of a portfolio of Carteret assets in receivership, containing a number of non-performing loans and commercial real estate assets, would have systematically moved up and down with the economy, implying that such loans had a "positive" beta (or in the parlance of finance, positive systematic risk). When this is recognized, the use of a risk-free Treasury rate to compute and assess interest – as was done in this case – clearly provided an economic subsidy to the Carteret receivership.

33. Finally, by advocating the use of a three-month Treasury yield as the floating rate, Professor Calomiris ignores the long-term nature of the loans at issue here, even though he acknowledges, "...the repayment of the loans has lasted longer than one year..."[25] Not only were these long-term loans, but, as will be discussed later, the variability in the time-to-resolution for failed banks was very large. Professor Calomiris's proposed three-month Treasury rate does not take this into account. Also,

---

[24] Calomiris Deposition, July 5, 2006, p. 202.

[25] Calomiris Declaration of July 14, 2006, paragraphs 30-36.

while a receivership's average lifespan is three to six years, some may require longer time frames to conclude."[26]

### 2. Professor Calomiris Mischaracterizes the Facts about the FDIC Change in Interest Calculation Methodology

34. Professor Calomiris mischaracterizes the events surrounding the FDIC's change from calculating post-insolvency interest using a "floating" Treasury bill rate to using the fixed federal judgment rate for receiverships with inception dates after August 1993. He appears to imply that the FDIC was somehow engaged in a conscious scheme to increase the interest owed by the Carteret receivership, as well as other receiverships resolved during this time period.

35. Exhibit 4 is a timeline of events surrounding the change in interest calculation methodology. As indicated in the figure, the FDIC's Deputy General Counsel, Associate Director of DAS [Depositor and Asset Services] Operations, and Deputy Director of DOF [Division of Finance] jointly issued a policy memo in June 1995 that specified that the federal judgment rate should be applied to institutions that entered receivership after the passage of the National Depositor Preference Statute on August 10, 1993.[27] The memo, which was issued to all FDIC Regional Directors, Regional Financial Officers, and Regional Counsel stated, "Based upon our discussions we are providing the following directions to assure that the Corporation's procedures and positions in this area are clear and uniform."[28] This represented a change from calculating the interest based on a floating rate (the moving average of the 90-day T-Bill rate). The effective date of

[26] FDIC Goodwill Financial Reporting Package for 12/31/2005 dated March 31, 2006, note 1 (not Bates stamped).

[27] AM00096532-AM00096534.

[28] *Op. Cit.* at AM0096533.

the calculation change clearly included Carteret, which entered receivership from conservatorship in January 1995.

36. Professor Calomiris implies that the National Depositor Preference Statute was an excuse for the FDIC to change the interest calculation methodology, presumably to lock-in higher interest rates.[29] Yet he provides no documentary evidence to support this contention about the FDIC's behavior.

37. While the June 1995 FDIC memo was roughly contemporaneous with the Carteret branch sales in November 1994, January 1995, and March 1995, the accounting staff at the FDIC apparently did not change the interest calculation methodology for Carteret (as well as other receiverships) for some time. Indeed, a November 12, 1999 email authored by the FDIC's Elaine Tama asks about how interest should be calculated (if Carteret's interest should be calculated using floating rates or the fixed federal judgment rate).[30]

38. On December 1, 1999, FDIC attorney Michael Saran responded to the Tama message.[31] Citing the 1995 policy memo, he requested the use of the federal judgment rate for the Carteret receivership, as well as four other receiverships where similar calculation issues had been raised. Importantly, Carteret was not singled out for any special treatment. The December 1999 Carteret Goodwill Reporting Package prepared in July 2000 then stated that the method for interest calculation for Carteret had been changed from floating to fixed as of December 31, 1999.[32]

---

[29] Calomiris Declaration of July 14, 2006, paragraph 35.

[30] Green Deposition Exhibit 23.

[31] AM00096535-AM00096537.

[32] FAM071 0001-9 at FAM071 0005, note (a).

39. All of these documents indicate that the FDIC discussion was in terms of the law and appropriate regulatory policy. There appears to be no discussion of the level of or trends in interest rates or how the government might somehow maximize the interest owed by receiverships, as is implied by Professor Calomiris. Indeed, Exhibit 5 shows that average three-month Treasury bill rates were actually *rising* in November 1999 when Elaine Tama raised the issue of whether to use the fixed federal judgment rate. Further, by the latter half of 2000, the average three-month Treasury bill rate rose above 6.0% and even *exceeded* the federal judgment rate on one of the loans for a short period. Rates did not begin to fall until 2001, before rising again after 2004. Sitting in November 1999, the government would not have known whether Treasury bill rates would continue to head higher (perhaps to a level well above the federal judgment rates on the Carteret loans), stabilize, or decline. Thus, the government did not know, in 1999, whether these decisions ultimately would increase or decrease the amount of interest due it on loans to the Carteret receivership.

40. Professor Calomiris further states that the FDIC's change in interest calculation methodology increased the amount of post-insolvency interest owed by the Carteret receivership by $64.7 million. Exhibit 6 shows how that interest accrued on an annual basis from 1994-2005 using a fixed federal judgment rate versus using Professor Calomiris's floating rate, which is a monthly moving average of the three-month T-Bill rate. Most of the difference between the two accrual methods occurred after 1999, when FDIC accounting personnel changed the method to conform to long-standing FDIC policy, as discussed above. Indeed, in early 1999, the year the change was made, the cumulative difference in the fixed versus floating methods stood at $20.2 million, less

than one-third of the $64.7 million that Professor Calomiris calculates as excessive. By calculating the additional $44.5 million in cumulative interest after 1999, Professor Calomiris is clearly engaging in 20-20 hindsight. Moreover, the $20.2 million cumulative difference as of early 1999 was the result of a change that merely conformed to a FDIC policy that had been enacted in 1995 when the FDIC had no idea what rates would be like between 1995 and 1999. I suspect that if Treasury bill rates had continued to rise (rather than fall) in 2001, the plaintiff would willingly accept today the application of the federal judgment rate over the entire period.

41. By providing a fixed interest rate loan (at the federal judgment rate) to the Carteret receivership, the government guaranteed the long-term cost of financing a loan to the borrower. In simple terms, under a fixed-rate contract, the government was exposed to interest rate risk, while the borrower (Carteret receivership) was hedged against the risk of interest rate changes.

42. Importantly, the reverse is true if the interest rate charged on a loan is floating with market rates, as Professor Calomiris advocates in his declaration. In this case, the lender bears little interest rate risk or uncertainty, since its lending rate will fluctuate with its borrowing costs. By contrast, the borrower (here the receivership) is exposed to interest rate risk, especially the risk of rising rates. That is, in the case at hand, by shifting to a floating interest rate, interest rate risk is borne by the Carteret receivership and not by the government. Looking backwards with 20/20 hindsight, one knows what actually happened to rates between October 2001 and mid-2004 – they declined steadily. So, in hindsight, one knows that, if the interest charged on the receivership loan had been computed using a floating rate, total interest costs would be

lower. But if interest rates had risen instead over this period, then total interest costs would be higher than under a fixed rate. If rates had risen, I very much doubt that Professor Calomiris would be making the same "floating rate" argument, and instead find it likely that he would be a strong advocate of the fixed federal judgment rate.

### D. PRO-RATA REPAYMENT OF DEBT WAS APPROPRIATE

43. As Professor Calomiris notes, the loans to the receivership were made at three different fixed rates at three different dates. Specifically, the interest rate on the $256 million October 1994 loan was set at 6.06% per annum; the interest rate on the $616 million January 1995 loan was set at 7.34% per annum; and the interest rate on the $598 million March 1995 loan was set at 6.57% per annum.[33] Professor Calomiris argues that the RTC should have used any available receivership proceeds to pay down the higher rate loans first. However, such an action would be inconsistent with normal practice in banking. In particular, since the three loans that were made were of equal seniority – in terms of their claim to the receivership's assets – then they would be *pari passu*; as such, it was appropriate that the proceeds of the receivership should be used to pay down the principal of the three loans in a pro rata fashion. Indeed, in his deposition, Professor Calomiris appears to agree that, in general, for loans of equal seniority (as is the case here) one would expect pro-rata payoff.[34] According to the record, this is precisely what the FDIC did (and has done) with its three loans to Carteret.

---

[33] Calomiris Declaration, July 14, 2006, paragraph 26.

[34] Calomiris Deposition, July 5, 2006, pp. 228-231.

## E. THE ESCROW INTEREST CALCULATION WAS NOT INCONSISTENT

44. Professor Calomiris also argues that the government was inconsistent in levying a short-term risk-free rate ("pegged to the earnings that the receivership was receiving on its cash at the Federal Home Loan Bank on a monthly basis"[35]) on the escrow balance containing receivership proceeds, such as deposit premiums received on branch sales, while charging higher federal judgment rates on the government/RTC loans to the Carteret receivership. Professor Calomiris ignores the difference in risk between the proceeds actually received (ex post) by the receivership and placed into an escrow account, as opposed to the uncertain proceeds the government hoped (ex ante) to receive on the three loans made to the Carteret receivership in the 1994/1995 period. That is, once in hand, the principal in the escrow accounts balance is virtually risk-free since by definition funds in an escrow account are held at arms length from the general assets of the receivership. By contrast, the principal (and interest) that the government could expect to receive on its loans to the receivership depended very much on the uncertain value they believed (ex-ante) would be generated from the sale of Carteret's assets. Normal lending practice suggests that when there is uncertainty in the value of assets (collateral) underlying a loan, the lender should charge an additional risk premium on the loan over and above the risk-free rate. Indeed, this concept drives a substantial portion of the spread profitability of banks and thrifts described in Section I of this report. Thus, it is entirely consistent with fundamental concepts in financial economics that the rate on the risky loans made by the RTC to the receivership would be higher than the rate paid on cash balances held by the receivership in an escrow account.

---

[35] Deposition of Wayne Green, April 5, 2006, page 435.

## V. THE LENGTH OF TIME REQUIRED TO RESOLVE CARTERET DID NOT REDUCE THE PREMIUM REALIZED FROM THE SALE OF THE BRANCHES

### A. INTRODUCTION

45. Professor Calomiris spends a great deal of time arguing how the supposed "delay" in the RTC's sale of the Carteret branches until 1994/1995 resulted in a loss for the receivership. This delay was purportedly due to a lag in Congressional funding, over which the RTC had absolutely no control. In doing so, Professor Calomiris argues that the RTC could have received a "higher price" if the sale of Carteret's branches had been concluded earlier. He claims that, since Carteret was a relatively "healthy" failed thrift, i.e., "one of the healthier institutions resolved in that time period," the RTC should have resolved Carteret in a more timely fashion.[36]

### B. WAS CARTERET A HEALTHIER INSTITUTION?

46. In evaluating Carteret's health, its attractiveness to acquirers, and the role of the RTC, it is important to step back and look at the overall indebtedness and liability structure of Carteret over the post-1990 period and the degree of funding subsidies provided by the Federal Home Loan Bank of New York ("FHLB") and the RTC to keep the bank afloat and thus to improve its "apparent" performance.

47. In 1990, well before its December 1992 seizure, Carteret sold 21 branches in Florida, Maryland, and New Jersey. These transactions were funded principally by additional loans or borrowings from the FHLB. As a result, Carteret's deposits declined by about $1.1 billion while its advances from the FHLB increased by a comparable amount, by approximately $1.0 billion. The FHLB's loans to Carteret were a considerable risk for the FHLB, with the FHLB's debt exposure approaching 40% of

[36] Calomiris Declaration of July 14, 2006, paragraph 69.

Carteret's liabilities. Despite this exposure, most of the FHLB borrowing was on a variable rate basis tied to LIBOR rates.[37] In 1991 and 1992, short-term rates declined considerably, as did the cost of FHLB lending to Carteret. In 1992, at the time of its failure, Carteret's net profits were slightly positive;[38] this was in part due to the decline in the cost of, and Carteret's reliance on, FHLB borrowings rather than deposits. On December 31, 1990, the weighted average cost of deposits was 7.48% and the weighted average rate for FHLB advances was 8.05%. On December 31, 1991, the weighted average cost of deposits was 6.12% and the weighted average rate for FHLB advances was 5.73%. By December 31, 1992, the weighted average cost of deposits was 4.36% and the maximum rate on FHLB advances to Carteret was 3.67%.[39]

48. When Carteret was taken over by the RTC in December 1992, FHLB advances began to be replaced with RTC advances. Indeed, advances from the RTC of about $1.8 billion were substituted for the FHLB advances. The rate charged by the RTC was the three-month Treasury bill rate plus 25 basis points and the rate was adjusted weekly.[40] The RTC rate appears to have been below the rate on the FHLB advances, which were based on three-month and six-month LIBOR rates. Thus, the benefit of these lower rates to Carteret continued for some time.

49. Overall, it is clear that the extensive and relatively cheap funding by the FHLB over the 1990-1992 period, as well as the continued (assumed) funding by the

---

[37] Carteret Savings Bank 1991 Annual Report (FAM002 2373-2403 at FAM002 2375) and OTS Report of Examination dated June 17, 1991 (WOQ690 1401-1448 at WOQ690 1441).

[38] See Calomiris Declaration of July 14, 2006, Table 5.

[39] Carteret Savings Bank 1991 Annual Report (FAM002 2373-2403 at FAM002 2391-2392). Conservatorship Strategic Plan (AM5087 2862-2947 at AM5087 2870 and 2879).

[40] Conservatorship Strategic Plan (AM5087 2862-2947 at AM5087 2879).

RTC after 1992, contributed positively to Carteret's performance (both before and during the receivership). It facilitated a favorable interest margin on Carteret's performing assets and continued the situation whereby a large share of Carteret's cost of funds was not burdened by normal branch operating expenses, a situation highly uncommon among banks of this size. The historical evolution of Carteret's unusual funding and the thrift's reliance on regulator-supplied non-deposit funds in the 1990-1994 period suggests that the low interest expense ratio and positive 1992 ROA cited by Professor Calomiris to support his view that Carteret was a relatively "healthy failure" were, at least in part, due to funding support and subsidies provided by the FHLB and the RTC.

### C. Financial Ratio Measures of Health

50. In his corrected and re-corrected Table 5, Professor Calomiris cherry-picks three financial ratios – past-due and nonaccruals to total loans, return on assets, and deposit interest expense to deposits – that purportedly show the relative health of Carteret at the time of its failure. In actuality he looks at these three Carteret financial ratios one-quarter prior to failure, on September 30, 1992. He then compares these ratios with those of other thrifts one-quarter prior to failure. First, I would note that whether Carteret compared favorably with other failed thrifts did not matter that much. Carteret was insolvent, its liabilities were heavily interest rate sensitive, its closure was consistent with FDICIA, and it was given ample time to recapitalize, but there were no takers. Second, I would note that his interest expense ratio focuses only on the cost of deposits, and ignores other sources of interest expense. Third, I would note that Professor Calomiris has repeatedly revised Table 5, making his analysis a moving target. For example, he originally reported Carteret's interest expense over deposits as 3.829%. At his deposition

on July 7, 2006, he handed out a revised table in which this same Carteret interest expense ratio was revised downward to 1.129%.[41] Then on July 14, 2006, he re-filed his declaration, revising this same Carteret ratio in Table 5 to 1.168%. Similarly, the counts of his 1992 "comparables" group have gone from 63 institutions to 53 institutions to 28 institutions. The 28 institutions he now includes for 1992 are comprised of institutions in the FDIC Failure Transaction Database classified as "state stock savings and loans" that could be matched with historical TFR data.[42] These are just two examples of the number and magnitude of Table 5 changes, which have made it difficult to interpret his analysis.

51. In any case, based on his analysis of three financial ratios of Carteret one quarter prior to its failure in early December 1992, Professor Calomiris concludes that Carteret was healthier than 28 other failed S&Ls. As noted above, however, Carteret's ROA and interest expenses were favorably affected by its heavy reliance on FHLB borrowings in the 1990-1992 period. For example, because of its lesser reliance on deposits, due to its heavy reliance on low-cost FHLB/RTC funding, Carteret could afford to be less competitive in the deposit market than other thrifts that had less availability to FHLB/RTC borrowings and were more reliant on "hot money" deposits offered at higher interest rates. Indeed, Professor Calomiris's own figures show that Carteret's need to rely on hot money deposits was relatively low. Moreover, if Professor Calomiris had expanded his search to include other key financial ratios, Carteret would not have appeared to be "in a stronger position than a typical failed thrift."[43] Specifically, Carteret's tangible capital ratio, which is the litmus test of financial health, was *negative*,

---

[41] Calomiris Deposition, Exhibit 11, p. 1.

[42] Calomiris Declaration of July 14, 2006, note to Table 5.

[43] Calomiris Declaration of July 14, 2006, paragraph 67.

with a tangible capital to tangible assets ratio of -1.29%, as shown in Exhibit 7. While the mean ratio for Professor Calomiris's "comparables" group of 28 banks plus Carteret was -2.18%, the mean is adversely affected by two or three very large (negative) outliers. For example, the Pelican Homestead SA tangible capital ratio was -22.87%. A better measure of Professor Calomiris's "typical" unhealthy bank would be the median of his sample. In this case, for failures in 1992, the median was -0.73%. Thus, Carteret had a tangible capital ratio that was worse than that of the median unhealthy bank one quarter prior to failure. In addition, Carteret's core capital to adjusted tangible asset ratio of -0.29% was also slightly below the median of -0.28%, as shown in Exhibit 8.

52. Further, since Carteret was heavily reliant on real estate assets at the time of its failure, Professor Calomiris should have examined a measure of non-performing assets that included real estate exposure. Importantly, later in his report while generating his hypothetical cost of Carteret's preferred stock, he says: "The ratio of non-performing assets to total assets was calculated in this context as the sum of nonaccrual loans plus REO divided by total assets."[44] If one looks at this ratio for Carteret and for the other 28 unhealthy thrifts one quarter prior to failure, one finds that Carteret's ratio compares unfavorably to the rest of the group (indicating that Carteret was less healthy than other failed thrifts). As shown in Exhibit 9, Carteret's ratio was equal to 7.00%, which was higher than both the mean (6.92%) and median (5.94%) of the group of thrifts plus Carteret.

[44] Calomiris Declaration of July 14, 2006, footnote 116.

## D. THE ECONOMICS OF BANK AND BRANCH SALES

53. When a branch or bank is sold, the selling bank (or thrift) will normally receive a deposit premium that reflects the privately assessed value of the deposits that are transferred to the acquiring bank (or thrift). There are a number of reasons why such a premium is paid. These reasons include the absorption of long-term customer relationships established by the target bank (or branch) and potential geographic or demographic synergies from acquiring a bank outside an acquirer's current business area, including the potential diversification of local/geographic risk. In dollar terms, the premium will reflect the price per dollar (or percentage dollar premium) that the acquirer is willing to pay times the dollar amount of deposits to be transferred. For example, suppose an acquiring bank was willing to pay a percentage premium of 10 cents per $1 of deposits of a branch it seeks to acquire and that branch had $100 million of transferable deposits. Then the seller bank (or the RTC/FDIC in the case of a failed bank sale) will receive a dollar premium of $10 million (i.e., $0.10 x $100 million = $10 million).

54. Both the percentage premium and the dollar amount of deposits could vary over time. For example, suppose that the same branch were to be sold two years later, but during that time its deposits had declined from $100 million to $50 million, or by 50 percent. At the same time, however, suppose that an acquirer is now willing to pay the higher percentage premium of 25 cents per dollar because of changing economic and regulatory conditions. Either the local economy, the national economy, or both economies could have expanded over that two-year period, making entry into the bank's business area more attractive. In this case, the target (or the RTC/FDIC in the case of a failed bank sale) would actually receive a *higher* dollar premium than when the deposit base had been twice as high. The seller would receive $0.25 x $50 million = $12.5

million now, which is larger than the $10 million the selling bank (or RTC/FDIC receivership) would have received in the weaker economic period.

55. This simple example has significant implications for Carteret. Professor Calomiris asserts throughout his declaration (e.g., at paragraphs 49-51 and 75-84) that the Carteret receivership would have received a greater dollar premium had the sale of Carteret's nine Florida branches and 30 New Jersey branches occurred earlier than they actually did. According to Professor Calomiris, Carteret would have been sold as a whole bank in December 1993, rather than in three pieces in October 1994, for the Florida branches, and in January 1995 and March 1995, for the New Jersey branches.

56. Over and over again, Professor Calomiris asserts this greater dollar premium, but with little supporting evidence. Specifically, in various places, Professor Calomiris alludes to the percentage deposit premiums associated with the sale of the Carteret branches, but provides no hard evidence about what was happening to deposit premiums in the marketplace generally. Indeed, in one place he explicitly acknowledges that he will not provide direct evidence on premiums in the marketplace: "Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence that these losses were significant economically."[45] Thus, instead of providing direct evidence of actually realized deposit premiums, Professor Calomiris defines an "expected premium" associated with each resolution (as calculated using payout and resolution cost data from the FDIC) which he then uses to assert that premium losses were significant for Carteret.

[45] Calomiris Declaration of July 14, 2006, paragraph 88.

57. Transaction-based premium data (from actual marketplace branch sales) are readily available and could have been analyzed by Professor Calomiris had he chosen to do so. An analysis of these premium data show that percentage premiums were considerably *higher*, on average, in 1994 and 1995 than they were on average in either 1992 (when Carteret failed) or 1993 (when Professor Calomiris presumes the sale would have occurred absent purported Congressional funding delays for the RTC). Thus, while there may have been a deposit run-off at Carteret over the 1993 to 1994/1995 period, this was offset by an increase in percentage deposit premiums actually observed in the marketplace during this same period, as I describe below. Before discussing my analysis of actual deposit premium data, however, I analyze the hypothetical world of Professor Calomiris's "expected premiums" described in his declaration.

## E. PROFESSOR CALOMIRIS'S CONCEPT OF "EXPECTED PREMIUMS" IS SERIOUSLY FLAWED AND MISLEADING

58. Professor Calomiris calculates an expected premium value equal to the "percent difference between resolution cost and payout cost."[46] He states that Carteret's expected premium value was 37.38%, which he then compares with actual realized deposit premiums for Carteret in the range of 6% to 10%. He asserts that if Carteret had been resolved as a whole bank institution in December 1993 rather than as three branch transactions in late 1994 and early 1995, the realized premium would have been higher, as indicated by its high expected premium value.

59. Professor Calomiris calculates his expected premiums using data contained in the FDIC's Failure Transaction Database. Specifically, this database

---

[46] Calomiris Declaration of July 14, 2006, footnote 97.

includes two variables, Payout Cost and Resolution Cost, which he then uses to derive his expected premium.[47] Professor Calomiris's formula (Formula 1) and its application to Carteret are as follows:

Formula 1: Expected Premium (Professor Calomiris)

Expected Premium % = (Payout Cost – Resolution Cost)/Resolution Cost

Carteret's Expected Premium % = ($359,771,000 – $225,304,000)/$359,771,000

= 37.38%

60. In using this concept of expected premiums, Professor Calomiris confuses expected premiums with market-determined actual premiums via the standard formula for the deposit premium shown in Formula 2 below:

Formula 2: Deposit Premium (Market Determined)

Deposit Premium % = (Premium Paid for Deposits)/Deposits Transferred

The exact Cost of Payout and Cost of Resolution figures for Carteret ($359,771,000 and $225,304,000, respectively) that Professor Calomiris obtains from the FDIC Failure Transaction database and uses in calculating his expected premium can be found on the one-page RTC document, "Cost of Resolution (projected) to Anticipated Thrift Closing," prepared for Carteret as of October 31, 1994.[48] The document also presents the difference between the two numbers, $134,467,000, as the "Projected Savings after Adjustment for Operating Expenses." This difference is very close to the deposit

---

[47] The first variable is PO_COST, which database documentation defines as the "estimated cost of payout, as of the time shortly before resolution. This is done on a present value basis." The second variable is RESCOST, which is defined as the "estimate[d] cost of resolution, usually as of the time shortly before resolution. This is done on a present value basis." (Failure Transaction Database User Documentation, FDIC Division of Insurance and Research, December 2004, p. 6).

[48] FAM079 0101-0320 at FAM079 0179.

(franchise) premium of $134 million associated with the sale of the New Jersey branches in January and March 1995. Indeed, documents surrounding the one-page RTC document make it clear that the Cost of Payout and Cost of Resolution figures are for the New Jersey portion of the deal *only,* and do not include the Florida branch sales in October 1994. The fact that the Florida transaction is *not* included in the numbers that Professor Calomiris uses to calculate his expected premium casts doubt on the accuracy and meaning of his hypothetical measure.

61. Based on the New Jersey branch transactions of 1995 that received a 10.5% deposit premium, Professor Calomiris assumes that the "but-for" whole bank sale of Carteret in December 1993 would have achieved a 10.5% deposit premium using the deposit premium formula (Formula 2) above. On the face of it, a 10.5% deposit premium derived from Formula 2 is significantly lower than an expected premium of 37.38% derived from Formula 1, but as conceded by Professor Calomiris at his deposition when asked about their comparative equivalence:

> "No, it doesn't, because I wouldn't be surprised if there was an extent of difference, or to use the term I used in the footnote, bias, between the expected premium and the realized premium because they are measured in not perfectly comparable units."[49]

Precisely – this comparison is like comparing apples and oranges simply because they measure very different things. In particular, what is important for the marketplace is the deposit premium (Formula 2) and not Professor Calomiris's so-called expected premium (Formula 1) derived from the FDIC Failure Transaction Database. The market-determined deposit premium (Formula 2) reflects a private buyer's evaluation, from a profit-maximizing perspective, of the value of the selling bank's or thrift's deposits. The

[49] Calomiris Deposition, July 6, 2006, p. 504.

so-called expected premium (Formula 1) – on which Professor Calomiris relies – reflects the cost to a not-for-profit government agency with the mandate to resolve a failed bank at the lowest cost possible. That is, Professor Calomiris's measure is an expected cost saving from a regulatory perspective while the deposit premium measure used in my analysis (below) reflects the private acquirer's (bank's or thrift's) view of the value of the purchased deposits.

62. Finally, the FDIC's expected premium measure is based on forward-looking estimates. At his deposition, in discussing a question involving the forward-looking opinions of an associated regulatory body, the Office of Thrift Supervision ("OTS"), Professor Calomiris acknowledges the following:

> A: "Well it's valid for OTS to express its forward-looking opinions. I would re-emphasize that its forward-looking opinions on exactly those points were wrong."
> Q: "You mean with respect to the resolution of thrifts in general."
> A: "Correct with respect especially to real estate portfolio valuation and prospects for recovery."[50]

63. Professor Calomiris also relates his expected premium to resolution type, stating that the "expected premium is a good predictor of the resolution type, and . . . it is likely that far less value would have been lost had Carteret been resolved through a Merger or Reprivatization under the Accelerated Resolution Program ("ARP") program as originally intended. Instead, ... Carteret was resolved by Purchase and Assumption instead of Merger/Reprivatization, a style difference that is associated with a 28.8 percent lower average expected premium value of 19.0 percent."[51] In obtaining this result, Professor Calomiris looks at bank and thrift failures in the FDIC Failure Transaction

---

[50] Calomiris Deposition, July 6, 2006, pp. 387-388.

[51] Calomiris Declaration of July 14, 2006, paragraph 94.

Database over the entire 1980-2004 period, making no allowance for regulatory or economic changes that may have occurred over that 25-year period.

64. In performing his 1980-2004 expected premium analysis, Professor Calomiris groups bank and thrift failures into three categories using the nine resolution types contained in the FDIC Failure Transaction Database. Professor Calomiris's three categories are: (1) Mergers and Reprivatizations, (2) Purchases and Assumptions, and (3) Insured Deposit Transactions and Payoffs.[52] I also obtained the FDIC Failure Transaction Database and grouped the nine resolution types contained therein into Professor Calomiris's three categories, accepting for the purposes of this discussion Professor Calomiris's categorization of the underlying data. There are a total of 450 so-called "Merger and Reprivatizations" included in the FDIC Failure Transaction database over the 1980-2004 period that have an "expected premium." However, examining these 450 transactions in Professor Calomiris's Merger and Reprivitization category on a year-by-year basis reveals that 447 of them were resolved between 1980 and 1988 (i.e, before FIRREA), as shown in Exhibit 10.[53] In other words, between 1989 and 2004, the RTC/FDIC resolved all but three of the 973 bank and thrift failures (with premium data) as one of the following two Professor Calomiris categories: (1) Purchases and Assumptions, or (2) Insured Deposit Transactions and Payoffs. Therefore, even if

[52] Calomiris Declaration of July 14, 2006, Figure 3. I would note that his analysis places FDIC resolution type PI, Purchase and Assumption of the Insured Deposits Only, in his category of Insured Deposit Transactions and Payoffs. The description of this resolution type in the user documentation for the FDIC Failure Transaction Database states: "PI = purchase and assumption of the insured deposits only, where the traditional P&A was modified so that only the insured deposits were assumed by the acquiring institution" (p. 9). This FDIC definition indicates this resolution type may well belong in the Purchase and Assumption category. Nevertheless, for the purposes of this discussion, I have left the PI resolution type where Professor Calomiris has placed it.

[53] Of the three institutions resolved after 1988, two were resolved in 1989 and one was resolved in 1992. The entity resolved in 1992 had total assets of $20.9 million (Freedom Bank, per the FDIC Failure Transaction Database).

Carteret could have been resolved as an ARP, it is highly probable that it would been resolved as a Purchase and Assumption, not a Merger and Reprivatization.

65. Professor Calomiris also states that Merger and Reprivatization transactions enjoyed the highest expected premiums, based on his analysis of the entire 1980-2004 time period. Exhibit 11, however, focuses on the period after 1988 and uses the same expected premium value groupings that Professor Calomiris used in his Figure 3. Transactions exhibiting the highest expected premiums in the more relevant post-1988 period were overwhelmingly in Professor Calomiris's Purchase and Assumption category, not his Mergers and Reprivatization category.

66. It is also important to note that of Professor Calomiris's 450 Merger and Reprivatization transactions, 433 were what the FDIC Failure Transaction Database terms "Assisted Acquisition" transactions.[54] These transactions involved assistance provided by the government to the acquirer, who purchased the entire institution. Therefore, the expected premium that Professor Calomiris calculates for Mergers and Reprivatizations does not reflect the deposit premium that an acquiring publicly-owned financial institution is willing to pay, but rather it reflects the cost savings the government was expecting to realize by providing direct assistance to the buyer instead of liquidating the bank or thrift and paying off its depositors.

67. Professor Calomiris's assertion that Carteret should have been sold as a whole institution in December 1993 (regardless of specific resolution type) does not reflect the reality of the resolution process by the early 1990s. In *Managing the Crisis:*

[54] Failure Transaction Database User Documentation, p. 9.

*The FDIC and RTC Experience*, a document frequently cited by Professor Calomiris, the FDIC states:

> "In selecting the resolution method, the FDIC has changed procedures over the years. Before 1991, the FDIC could effect any resolution transaction that was less costly than a deposit payoff. While the estimated cost of the resolution method has always been important, the FDIC at times considered other factors before making its final selection. Deposit payoffs were at time discouraged because of the effect that type of resolution method had; it reduced the availability of local banking services in smaller communities... In 1991, because of a change in the law [FDICIA], the FDIC amended its failure resolution procedures to accept the 'least cost' bid.[55]
>
> "FDICIA also requires that if the FDIC does not liquidate a failing institution (conduct a deposit pay-off), then it must pick the least costly alternative, All bids must be considered together and evaluated on the basis of comparative cost; other policy considerations, regarding which regulators previously had some discretion, cannot be factored into the determination of the appropriate transaction. FDICIA compelled the FDIC to consider more transaction options than in the past to make certain that all feasible least cost structures were offered.[56]
>
> "Whole bank transactions represent the most dramatic attempt by the FDIC to pass assets from failed banks quickly back into the private sector...In 1988, 69 of the 279 failed bank resolutions were whole bank transactions. Whole bank transactions were also widely used in 1989, 1990, and 1991, when they constituted 20.3, 25.4, and 18.9 percent of all resolutions, respectively. With the introduction of the least cost test, however, the number of successful whole bank bids declined. Because a whole bank bid constitutes a one-time payment from the FDIC, bidders tend to be very conservative to cover all potential losses. Conservative whole bank bids could not compete with other transactions on a least cost basis."[57]

68. In sum, Professor Calomiris's expected premium analysis is unreliable, inconsistent with the historical facts, and inferior to an approach that uses actual market-based transaction data.

---

[55] *Managing the Crisis: The FDIC and RTC Experience*, p.60.

[56] *Managing the Crisis: The FDIC and RTC Experience*, p.12.

[57] *Managing the Crisis: The FDIC and RTC Experience*, p. 88. It should be noted that these three quotations pertain to the implementation of FDICIA, not FIRREA.

Confidential Materials - Subject to Protective Order

### F. ANALYSIS OF DEPOSIT PREMIUM DATA SHOW MARKET-BASED PREMIUMS INCREASED SIGNIFICANTLY DURING THE 1992-1995 PERIOD

69. In this section, I analyze the percentage deposit premiums (as in Formula 2) that *actually* were observed in the marketplace over the 1992-1995 time period, both in general and in Florida and New Jersey in particular. I also analyze the premiums received by the RTC for Carteret's Florida and New Jersey sales relative to similar sales. I show that the percentage deposit premiums that the RTC actually achieved from the Carteret branch sales in the more favorable market conditions that existed in 1994 and 1995 significantly *increased* the revenue received by the RTC for the deposits sold.

70. To start, it is important to distinguish between transactions among healthy banks and thrifts and government-assisted transactions, i.e., those implemented by the RTC/FDIC selling branches and banks. Since Professor Calomiris does not dispute that the transactions at the center of his report were government-assisted, the remainder of my analysis will focus on such transactions.

71. Exhibit 12, using transaction data from the SNL database,[58] clearly shows that government-assisted transactions achieved considerably higher premiums in 1994-1995 than in 1992-1993. This result holds true whether one looks at national median premiums, mean premiums, or deposit-weighted mean premiums, or at deposit premiums in the New Jersey and Florida markets individually. (I note that Exhibit 12 includes both whole bank and branch transactions; I analyze whole bank transactions separately at the end of this subsection.)

---

[58] Data on transactions are from SNL Securities of Charlottesville, VA. Transactions involve a unique buyer and seller on a given date. Thus, because the nine Carteret branches in Florida sold on October 28, 1994 involved three different buyers, this sale is represented by three transactions in the SNL data.

72. Exhibit 12 shows the percentage deposit premium for all government-assisted transactions (Column 1), all New Jersey (government-assisted) transactions (Column 2), and all Florida (government-assisted) transactions (Column 3). For each year of data, the first row shows the number of transactions; the second row presents the number of transactions with deposit premium data; the third row shows the mean percentage deposit premium; the fourth row presents the median percentage deposit premium; and the fifth row shows the deposit-weighted mean percentage deposit premium.

73. On a national level in 1992, the mean, median, and weighted mean deposit premiums were 1.63%, 1.17%, and 1.88%, respectively. This was the year that Carteret failed. In 1993, the same premiums were 3.45%, 2.55%, and 4.46%, respectively. 1993 was the year when Professor Calomiris argues that the RTC should (and would) have sold Carteret absent RTC delays and Congressional funding delays. These relatively low premiums can be compared with those that were reported in 1994 and 1995. In 1994, the three premiums – mean, median, and weighted mean – had risen to 6.33%, 6.31%, and 6.99%, respectively. In each case, the 1994 premiums are more than 1.5 times greater than 1993 premiums, and more than two times greater than 1992 premiums. In 1995, the three premiums were even higher at 7.94%, 9.18%, and 8.35% respectively. Thus, comparing 1995 with 1993, the mean percentage premium was 2.3 times higher, the median percentage premium was 3.6 times higher, and the deposit-weighted mean premium was 1.9 times higher. It is very clear from these figures that both 1994 and 1995 were better markets in which to conduct government-assisted transactions than was

the 1993 market, the year chosen by Professor Calomiris for his "but-for" Carteret bank sale.

74. Columns 2 and 3 show the relative sizes for the same three percentage premium metrics for New Jersey transactions alone and for Florida transactions alone, respectively. First, looking at New Jersey, these data show that Florida and New Jersey premiums mirrored the sharp upward trend in premiums nationally. In 1995, the year in which Carteret branches were the only reported New Jersey branch sales, the premiums were far higher than the high national averages described above. Specifically, mean, median, and weighted mean percentage deposit premiums for New Jersey in 1992 were 1.42%, 1.08%, and 1.91%, respectively. These rose to 5.25%, 5.25%, and 5.25% in 1993, the year Professor Calomiris claimed that the RTC should (would) have sold the New Jersey branches.[59] In 1994, the three (New Jersey) premium metrics rose again to 5.43%, 5.97%, and 6.90%. In 1995, there were 12 branch sale transactions in New Jersey, all of which involved Carteret branches. The three premium values were 10.59%, 11.30%, and 10.82%, respectively. Thus, 1995 New Jersey premiums – for Carteret – were more than double those observed in 1993, and were at least 5.7 times higher than those observed in 1992. Contrary to Professor Calomiris's claims, actual market-based evidence suggests that, in disposing of Carteret's New Jersey branches, the RTC did its job well.

75. With respect to Florida, the nine Carteret branches were sold in three transactions in 1994. Like New Jersey and the nation, deposit premiums for government-assisted transactions in Florida rose dramatically over the three-year period 1992-1994.

[59] Only one New Jersey transaction occurred in 1993.

(There were no government-assisted Florida transactions in 1995.) In 1992, the year of Carteret's failure, the mean, median, and weighted mean for assisted transactions in Florida were 1.36%, 0.79%, and 2.23%, respectively. In 1993, the year Professor Calomiris argues that the sale should (would) have occurred, the Florida premiums were 4.48%, 4.48%, and 4.48%.[60] In 1994, these three Florida metrics increased to 6.70%, 5.12%, and 10.85%, respectively. Of the 15 Florida transactions in 1994, three involved sales of Carteret branches. In the case of these three transactions, the mean, median, and weighted mean premiums were 8.06%, 5.55%, and 6.08%, respectively.[61] (In 1994, the Carteret branch sale premiums were above the Florida mean and median premiums, but below the deposit weighted mean premium.) Again, contrary to Professor Calomiris's claims, the RTC did a far better job, in terms of the percentage deposit premium achieved, by selling the Florida branches in 1994 rather than in 1992 or 1993.

76. As noted above, the Carteret branch sales involved three different transactions and nine branches in Florida, and 12 different transactions and 30 branches in New Jersey. To further investigate the performance of the RTC in selling the Carteret branches, I analyzed whether the RTC achieved relatively high deposit premiums on a per branch basis over the 1992-1995 period. Also, because many of the branch sales involved a relatively low level of deposits, I also analyzed the effect of the size of deposits on the premium size for Carteret transactions as compared to other transactions.

77. Exhibit 13 presents the premiums generated on a per branch basis in New Jersey, taking into account the average size of the deposits in the branch system being

[60] Only one transaction is involved.

[61] The first transaction involved deposits of $119 million and a premium of $6.6 million (5.55%). The second transaction involved deposits of $30 million and a premium of $1.3 million (4.33%). The third transaction involved deposits of $14 million and a premium of $2 million (14.29%).

sold (e.g., if a package of three branches is sold in a transaction with $100 million in deposits in total, the average deposits per branch are $33.33 million). Exhibit 13 shows a scatter plot of the percentage premium achieved (vertical axis) versus the deposits per branch in the branch system sold over the 1992-1995 period (horizontal axis). As can be seen in both a relative and absolute fashion, Carteret's New Jersey branches were sold at high premiums.

78. Exhibit 14 presents the same data as Exhibit 13 for Florida. While the deposit premium performance is not as impressive as that for the New Jersey branches, of the 16 transactions with average deposits per branch of $20 million or less, one of the Carteret transactions is among the three with the highest premiums. Of the 15 transactions with average deposits per branch of $20 million to $40 million, the Carteret transaction is one of the two with the highest premiums.

79. While Exhibits 13 and 14 show the premiums achieved by deposits-per-branch in the transaction, Exhibits 15 and 16 show the premiums achieved by the total deposits associated with each transaction over the 1992-1995 period, for New Jersey and Florida, respectively. As can be seen in Exhibit 15, in New Jersey there was one very large non-Carteret transaction that biases the weighted average premium measure. In this one case, the deposits transferred exceeded $3 billion. All other transactions had deposit sizes of less than $500 million. As can be seen for the Carteret observations in the scatter plot, controlling for transaction size, the RTC's sales of Carteret branches (branch systems) achieved both high absolute and relative premiums. Exhibit 16 shows a similar plot for Carteret's Florida transactions. As can be seen there, Carteret's Florida

transactions were narrowly clustered in the under $200 million deposit range. As was the case in New Jersey, the RTC achieved relatively favorable premiums in Florida.

80. Thus, whether looking at the data on a transaction basis, on a per branch basis, or on a per year basis, the RTC's timing of branch sales clearly increased, rather than decreased, the premium earned per dollar of deposits sold for the Carteret branches. Any such enhanced premium, e.g, for 1994/1995 versus 1993, should be viewed as an offset to any decline in deposits over the 1993-1995 period.

81. Professor Calomiris asserts that but for the delay resulting from Congressional actions and other alleged causes, Carteret would have sold its $1.787 billion in deposits in December 1993 at a percentage deposit premium of 10.5%, which is the percentage deposit premium (per Formula 2) associated with the sale of the New Jersey branches in January 1995. This would have resulted in a deposit premium of $187.6 million ($1.787 x .105). This but-for premium is $43.8 million more than the $143.8 million deposit premium the branches actually sold for.[62] The problem with his assumption is that percentage deposit premiums were nowhere near this 10.5% level in 1993. As reported in Exhibit 12, the weighted mean deposit premium in 1993 was 4.46% nationally, 5.25% in New Jersey (one transaction), and 4.48% in Florida (one transaction). Taking the national average premium of 4.46% and applying it to the $1.787 billion in deposits in December 1993 would result in a dollar premium of only $79.7 million, considerably *less* than the RTC actually achieved in 1995. Taking the *highest* of the three premiums – the 5.25% premium in New Jersey – would result in a

---

[62] Calomiris Declaration of July 14, 2006, paragraph 83.

dollar premium of only $93.8 million, still considerably *less* than the premium actually achieved by the RTC.

82. Professor Calomiris asserts, without proof, that the proceeds to the receivership would have been greater if Carteret would have been sold as a whole bank, rather than separately as (clusters of) branches. Academic evidence suggests otherwise. Sudhir, Nanda et al. examine 58 RTC auctions of S&Ls over the 1989-1990 period and test the hypothesis that whole institution transactions generate higher returns than branch transfers.[63] They reject this hypothesis, finding significantly negative returns for the whole bank transfers, while the returns for branch acquisitions were insignificantly different from zero. They conclude that "branch P&As are typically more focused acquisitions than whole-institution P&As"[64] and therefore generate greater proceeds for the RTC, not lower proceeds as contended by Professor Calomiris.

83. SNL data on whole-bank transactions support this academic evidence. Exhibit 17 presents the data shown in Exhibit 12, but for whole bank transactions only. As shown there, the weighted mean deposit premium for whole bank transactions in 1993 was 2.29% nationally. Taking this national average whole-bank premium of 2.29% and applying it to the $1.787 billion in deposits in December 1993 would result in a premium of only $40.9 million, once again considerably *less* than the RTC actually achieved in selling Carteret in clusters of branches.[65] Moreover, as noted above, the FDIC concluded

---

[63] Sudhir Nanda, James Owens and Ronald Rogers, "An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing," *Real Estate Economics*, vol. 25, no. 2, 1997, pp. 271-294.

[64] *Op. Cit.*, page 284.

[65] For New Jersey, the weighted mean deposit premium was 5.25%, based on the same one transaction as Exhibit 12. For Florida, the weighted mean deposit premium was 4.48%, based on the same one transaction as Exhibit 12.

in *Managing the Crisis* that whole bank bids could not compete with other transactions on a least cost basis (after 1991).[66]

84. In sum, there simply is no evidence to support Professor Calomiris's assertion that the receivership would have received more in proceeds if Carteret had been sold as a whole bank in December 1993.

### G. Professor Calomiris's Characterization of Carteret Deposit Declines is Misleading and His Analysis of the Impact of the Minority Preference Program is Erroneous

85. Professor Calomiris calculates that Carteret lost 54 percent of its $2.7 billion deposit base between the date of its last quarterly TFR prior to failure and the date of its last quarterly TFR prior to resolution.[67] He attributes this run-off to delays in Carteret's resolution, including the delay resulting from the introduction of the minority preference program ("MPP") in December 1993. His analysis is misleading and mischaracterizes the reasons for Carteret's deposit declines.

86. Exhibit 18 presents Carteret's total deposits over the 1987-1994 period.[68] The chart clearly shows that Carteret's deposits were in decline well before the thrift was seized in December 1992. In the year preceding Carteret's failure, deposits declined by $539 million (total deposits of $2.932 billion on December 31, 1991 versus $2.393 billion on December 31, 1992). In the year following Carteret's failure, deposits decreased by a

---

[66] *Managing the Crisis: The FDIC and RTC Experience*, p. 88.

[67] Calomiris Declaration of July 14, 2006, paragraph 81.

[68] Professor Calomiris's measure of deposits appears to include both the TFR line item for "Deposits" and the line item for "Escrows" in the "Other Liabilities" section of the form. In this comparison, I use just the figure reported as "Deposits" in the "Liabilities" section of the TFR form.

larger, but roughly comparable $615 million amount (total deposits of $2.393 billion on December 31, 1992 versus $1.778 billion on December 31, 1993).[69]

87. In his Figure 1, Professor Calomiris also presents Carteret's deposit changes from December 1992 through December 1994, but in percentage terms rather than absolute dollar terms as shown in my Exhibit 18. Contrary to his assertion that the minority preference program caused delay that resulted in deposit runoff, his Figure 1 actually shows a slower rate of decline in Carteret's deposits in the quarters *following* passage of this program in December 1993. In his May 23, 2006, Corrected Declaration, Professor Calomiris asserted that his Figure 1 showed that the most drastic deposit declines occurred relatively late in Carteret's resolution. However, this assertion was based on his *erroneous* inclusion of deposits transferred in the sale of the Florida branches in his deposit run-off analysis. In his July 6, 2006, deposition, Professor Calomiris acknowledged that his run-off analysis should not include deposits transferred in the sale of the Florida branches, and he corrected this error in his declaration dated July 14, 2006, where he stated that the rate of decline in deposits was fairly constant over the time period covered by Figure 1.[70] However, his correction also should have affected his view about the impact of the minority preference program. Indeed, restoring the deposits associated with the Florida branches makes the percentage decline in Carteret's deposits from Q4 1993 to Q4 1994 approximately 21% (from $1.778 billion on December 31, 1993 to $1.401 billion on December 31, 1994). This compares with a percentage decline in deposits of 26% from Q4 1992 to Q4 1993 (deposits of $2.393 billion on December 31, 1992 versus $1.778 billion on December 31, 1993). Thus, the

---

[69] Source is the Veribanc TFR data.

[70] Calomiris Declaration of July 14, 2006, paragraph 79.

rate of decline in deposits actually *slowed* after the passage of the minority preference program.[71]

88. Professor Calomiris's assertion that the minority preference program had a dire impact here is simply wrong. In addition, Congress's enactment of this program is not a matter for academic speculation in a litigation context. Rather, it was a public policy decision designed to achieve important public and/or social welfare policy goals.[72] The Government Accounting Office ("GAO") – the government's watchdog – in its analysis of the RTC's 1993 resolution experience was generally positive about the manner in which it was conducted.[73] The GAO specifically analyzed three thrifts that were resolved between January 1, 1993 and June 30, 1994. In each case, the GAO found that the RTC had followed the appropriate procedures and guidelines. To the extent that the 1993 resolutions were delayed, this was because the RTC was actively following a "least cost resolution" policy as required by Congress, as well as implementing the depositor preference requirements under the 1993 Depositor Preference Act (essentially giving depositors a higher preference in future resolution proceeds than other creditors, e.g., money market lenders). To the extent that the minority preference program allowed minority purchasers to "win" if they matched (after the auction) the bid of a non-minority

[71] As in my Exhibit 18, these deposit figures correspond to the line item for "Deposits" on the TFR and do not include "Escrows," which appear to be included by Professor Calomiris in his analysis of deposits (and deposit premiums). I would note that the inclusion or exclusion of Escrows does not alter the conclusion here. In addition, Professor Calomiris adds back to the December 1994 deposit amount the loan principal from the October 1994 resolution ($155.7 million), rather than the $163 million in deposits transferred. If I use Professor Calomiris's $155.7 million instead of the $163 million figure, deposits would decline from $1.778 billion on December 31, 1993 to $1.394 on December 31, 1994, a 23 percent decline that is still smaller than the rate of decline in the year prior to the enactment of the Minority Preference Program.

[72] In fact, there is an extensive academic and other literature that demonstrates the role of non-minority banks in red-lining mortgage and other loans in minority neighborhoods.

[73] "1993 Thrift Resolutions: RTC's Resolution Process Generally Adequate to Determine Least Costly Resolutions," General Accounting Office, GAO/GGD-95-119, May 1995.

bidder, the GAO did not view this as either delaying the sale process/resolution or producing lower premiums. Carteret received neither preferential nor detrimental treatment. The GAO concluded that the "...RTC's implementation of a policy to extend a preference to minority bidders when making resolution decisions appeared consistent with FDCIA's least-cost requirements."[74]

89. A second GAO report prepared near the end of 1995 focused specifically on the minority preference program.[75] The 1993 RTC Completion Act required the GAO to annually assess the RTC's efforts to sell performing assets to acquirers of failed thrifts under the minority preference program. Since there were no transfers of assets under the minority preference program in fiscal year 1994 and the RTC ceased to exist at the end of 1995, the GAO prepared only this one report, covering fiscal year 1995. (Fiscal year 1995 was the year that some of Carteret's assets were sold under the program.) The report stated, "On the basis of our discussions with firms experienced in pricing large volumes of mortgage loans and our review of mortgage loan valuation literature, we found that the RTC had established a reasonable process anchored to agency and mortgage securities market standards."[76] In the context of pricing mortgage loans, the study also found that the RTC "was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total returns on the disposition of assets as required by law."[77] By October 1995, 11

---

[74] *Op. Cit.*, p.5.

[75] "Resolution Trust Corporation: Performing Assets Sold to Acquirers of Minority Thrifts," General Accounting Office, GAO/GGD-96-44, December 1995.

[76] *Op. Cit.*, page 1. In the quote, agency refers to the Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Association (Freddie Mac), and Government National Mortgage Association (Ginnie Mae).

[77] *Op. Cit.*, page 2.

minority acquirers had purchased more than 4,000 loans for $289.6 million, and 64% of those assets were sold for between 91% and 100% of book value.[78]

90. In addition to arguing that a failed minority bid delayed the Carteret resolution, Professor Calomiris also uses an inappropriate auction model from the economics literature to argue that the presence of such bidders lowers deposit premiums.[79] Open outcry auctions were sometimes used by the RTC in the National Loan Auction Program. However, a desire to increase the amount of competitive bidding, level the playing field, and move large amounts of assets and deposits caused the RTC to switch to sealed bid auctions (of the type used in the Carteret branch sales). In discussing this issue, Professor Calomiris cites only the results of a theoretical paper by Bulow, Huang and Klemperer (1998) regarding common value auctions, not directly applicable to the circumstances of Carteret. Gardner and Stover (1998) explicitly test whether the RTC auctions conformed with the conditions for a common value auction and reject the hypothesis. They concluded that "The evidence suggests that these [RTC auction] transactions are best described as individual private value auctions…" (page 209). Thus, the theoretical model and results of Bulow, Huang, and Klemperer (1998) are irrelevant to the RTC auctions and to the Carteret branch sales.

91. Further, Professor Calomiris provides no evidence that the presence of an (additional) minority bidder in sealed bid auctions worked to lower deposit premiums. Indeed, an August 24 letter from a minority bidder to the RTC stated that non-minority bidders "are motivated by a long term goal to reduce competition" and "[t]oward that

---

[78] *Op. Cit.*, pages 11-12.

[79] Calomiris Declaration of July 14, 2006, paragraphs 98-99, which cites the article *Toeholds and Takeovers* by Jeremy Bulow, Ming Huang & Paul Klemperer, *Journal of Political Economy*, 1998.

end…are willing to pay above today's market."[80] Moreover, there is academic evidence suggesting that expanding the potential number of bidders (e.g., by encouraging the entry of minority bidders) increased the deposit premiums of bids. Gardner and Stover (1998)[81] show that all bidders raise their bids when there is more competition, thereby increasing the winning bid and increasing the proceeds to the receivership. Their results, using RTC sealed bid auctions similar to the Carteret auctions, show that an extra potential bidder (that attended the pre-bid due diligence conference) increased the winning bid amount by a statistically significant amount (at the 95% confidence level). Their results also show that the larger the number of serious bidders (attending the pre-bid due diligence conference), the more each bidder raises his/her bid in order to exceed the RTC reservation level. Moreover, sealed bid auctions enabled the RTC to sell the properties more quickly, particularly "for larger, higher profile assets for which the target market [was] primarily national in scope…"[82]

92. Professor Calomiris also appears to argue that because the MPP imposed a freeze on the sale of Carteret's assets, so as to keep valuable assets to attract minority bidders, the program discouraged non-minority bidders. He further argues that such a freeze added to the receivership deficit. Professor Calomiris appears to reason that if residential mortgage assets, in particular, were sold, this would destroy those valuable customer relationships established in residential mortgage lending, making Carteret branch sales less attractive to minority bidders under the MPP.[83] The economics and the

[80] C-AM-A-0125162-3.

[81] R. Gardner and R. Stover, "The Role of Information in Resolution Trust Corporation Auctions of Failed Thrifts," *Journal of Financial Services Research*, 14:3, 1998, pp. 209-221.

[82] *Managing the Crisis: The FDIC and RTC Experience*, page 328.

[83] See, for example, Calomiris Deposition of July 5, 2006 (pp.148-149) and of July 6, 2006 (pp. 518-520).

facts do not support Professor Calomiris's conjecture. First, it is very common for banks to package and sell mortgages – especially under FNMA/GNMA/FNLMC securitization programs. Indeed, over 50% of all residential mortgages are packaged and sold, suggesting that any customer relationship effect must be small. Second, since it is relatively easy for a mortgagee to refinance a mortgage and to switch banks in what is a national mortgage market, it is unclear what the value is (if any) of relationships built on the residential mortgage asset portfolio of a bank. Third, 60% of Carteret's originations and lending relationships were generated by mortgage brokers, not Carteret.[84] Fourth, as even Professor Calomiris conceded at his deposition, there was a shrinkage of Carteret assets, rather than a freeze, around the time of MPP, although according to him, of only around $40 million.[85] A closer look at the book value of Carteret's net assets over this period indicates a decline of approximately $2 billion from December 1992 to January 1994 and a decline of about $1.7 billion from January 1994 to March 1995. Further, residential mortgages (1-4 dwelling units) declined close to $400 million between December 1992 and January 1994 and further fell about $450 million between January 1994 and March 1995.[86] Fifth, to the extent that (performing) mortgages stayed in the receivership, they produced income that would have actually reduced the receivership deficit. Finally and perhaps most compelling, the Carteret receivership received 101 bids from 40 different entities, including some from big banks, in the 1994 and 1995 branch

[84] AM5067 0546-0557 at AM5067 0547.

[85] Calomiris Deposition, July 5, 2006, p. 130.

[86] AM5392 1397 and CAM028 0146-0162 at 0162.

auctions.[87] This was no dearth of bidders for Carteret's branches, due to the MPP, potential restrictions on asset sales, or any other reasons.

### H. PROFESSOR CALOMIRIS INCORRECTLY ESTIMATES THE MAGNITUDE OF DELAY IN CARTERET'S RESOLUTION

93. To analyze the alleged "delay" in the resolution of Carteret, Professor Calomiris performs a cohort analysis in his Figure 2 and his Table 9 in which he "cherry-picks" ten large thrifts that failed between December 30, 1988 and January 25, 1991 (which he designates Carteret "peers"). Despite the fact that these thrifts all failed well before Carteret (the closest being almost two years prior to Carteret's December 4, 1992 failure), Professor Calomiris claims that this small sample can be used to make sweeping generalizations about the cost of the delay of the resolution of the Carteret receivership and the optimal time for the Carteret resolution. Specifically, Professor Calomiris claims that his regression analysis (presented in his Figure 2) establishes a relationship between the percentage decline in a thrift's deposits and the length of time between a thrift's failure and its resolution.

94. Professor Calomiris's regression analysis is seriously flawed, and does not provide meaningful support for his claims, for a number of reasons. First, Professor Calomiris's dataset contains very few observations -- only eleven including Carteret -- and these few observations span a two-year period. Second, five of the eleven failures selected by Professor Calomiris occurred *before* the passage of FIRREA and the creation of the RTC, and none, other than Carteret, were based in Florida or New Jersey. In fact, his Table 9 shows four Texas thrifts and three California thrifts. Third, he artificially

[87] C-AM-A-008740-8743 at C-AM-A-008742.

restricts his sample size by limiting the thrifts under consideration to those with between $4 billion and $6 billion in assets. If one wants to test for a relationship between a failed thrift's percentage deposit runoff during resolution and time to resolution, this is not the way to do it. The generally accepted statistical approach would be to use the entire sample of all RTC-assisted thrifts that were sold, and then estimate a regression that included resolution time, asset size, closure date and other relevant factors as explanatory variables. Professor Calomiris's simplistic regression of deposit decline on resolution time for a very limited subsample of data, for a disparate period of time, is inappropriate and cannot be used to draw inferences of any value.

95. Professor Calomiris's assumed linear relationship between percentage deposit change and time to resolution and his limited observation set are not comparable to Carteret in other ways. In particular, Professor Calomiris does not present sufficient financial data to show that the financial condition of his ten cohort failed thrifts was similar to that of Carteret. Indeed, his discussion in paragraph 81 of his report suggests that some of the thrifts in his chosen cohort were quite different from Carteret. Moreover, Professor Calomiris's reliance on a simplistic single-variable regression analysis precludes the use of financial data about each thrift's condition prior to failure as controls in the analysis. In addition, Professor Calomiris fails to take into account the substantial decline in interest rates over the 1989 to 1992 period. Such a decline would clearly affect the deposit flows at failed banks differently according to their year of failure. Thus, Professor Calomiris has failed to perform a properly controlled regression analysis that takes into account all relevant factors. Consequently, one cannot draw any

reasonable inferences from Professor Calomiris's regression results (in Figure 2) regarding the relationship between resolution time and deposit losses.

96. Despite these many shortcomings, Professor Calomiris simply takes the mean number of days to resolution for the 10 observations of cohort firms listed in Table 9 (excluding Carteret), and asserts that this mean of 365 days would have been the optimal resolution time for Carteret, but for allegedly inappropriate delays.[88] Many of Professor Calomiris's subsequent calculations regarding receivership "losses" for Carteret hinge on this presumption. This analysis is entirely inappropriate because, as stated above, the sample selection approach is biased and inappropriate.

97. Importantly, the resolution times shown in Table 9 are subject to substantial variation. Non-Carteret resolution times in this small sample vary from 0 days to 693 days, and the standard deviation of the sample of 10 cohort thrifts is 214 days around a mean of 365 days. This means that, from a purely statistical point of view (not taking into account relevant economic factors), the "normal" time to resolve a thrift is highly uncertain. Taking into account relevant economic and financial factors, the range of "normal" or "reasonable" resolution times could be even greater. Thus, statistically, Professor Calomiris cannot credibly claim to have established a meaningful but-for resolution date for Carteret. He simply chooses one year (365 days) – and thus the December 4, 1993 date – without any credible statistical or economic justification.

98. With respect to resolution delays, it should be noted that the 365-day resolution time proposed by Professor Calomiris is for a very unusual "but-for" world, namely, a world "but-for," or without, Congressional funding delays. The funding delays

[88] Calomiris Declaration of July 14, 2006, paragraph 82.

at issue here already existed by the time Carteret was placed in receivership, with Congressional funding for the RTC expiring on April 1, 1992. Given these circumstances, Professor Calomiris fails to explain how this April 1992 funding delay would have been resolved in his December 1993 but-for world. I would also note that *The Wall Street Journal* reported on November 19, 1993 that earlier in 1993 the RTC was able to use some money from reserves to resolve the case of 23 thrifts.[89] Finally, government funding delays are a fact of life. There is no "right" to prompt government action in any regard, so far as I know. As an economist, it is hard to understand how congressional delays can be the basis for a claim that the receivership deficit should be reduced.

## VI. PROFESSOR CALOMIRIS GREATLY OVERSTATES THE VALUE OF CARTERET'S SUPERVISORY GOODWILL

### A. INTRODUCTION

99. Professor Calomiris argues that had Congress not passed FIRREA and had the receiver realized "full value" from Carteret's supervisory goodwill, the size of the RTC's resolution loans to the receivership would have been lower, as would the receivership's interest costs for those loans, thereby decreasing the size of Carteret's receivership deficit.[90] However, Professor Calomiris commits a number of errors of logic and computation in assessing the "lost" value of supervisory goodwill.

100. The errors in logic arise in part from a mixing-up of arguments relating to the difference in the value of goodwill of a going concern versus that of a failed

[89] "Conferees Clear Compromise Bill for RTC Funds – Vote Followed Resolution of Issue of Authority to Sue S&L Officials," *The Wall Street Journal*, November 19, 1993, p. A2.

[90] Calomiris Declaration of July 14, 2006, paragraph 102.

institution like Carteret. Specifically, the issue of the value of Carteret's supervisory goodwill comes up in two different contexts to this litigation. The first is the loss of value or damages to Carteret, if any, caused by the phase out of supervisory goodwill enacted through the 1989 passage of FIRREA. The computation of the value of goodwill in this context assumes that, absent the phase out of supervisory goodwill, Carteret would have survived. The second context in which this issue arises -- and the focus of the Calomiris Declaration – is the value, if any, of Carteret's supervisory goodwill *in receivership*, i.e., the value *recognizing* Carteret's failure. In the first context, the issue is the value of supervisory goodwill to a *surviving* thrift; in the second context, the issue is the value of supervisory goodwill to a failed institution. Inexplicably, Professor Calomiris uses a goodwill measure based on a simple amortization of goodwill outstanding for a *non-failed* bank (Carteret) at the time FIRREA became effective, not the value of goodwill to a *failed* Carteret in receivership/conservatorship. That is, he uses a goodwill measure that assumes no failure or conservatorship as a measure of goodwill in a conservatorship post-failure world. This is clearly logically and economically inconsistent since the value of the goodwill of a failed institution must be less than the value of the goodwill of a surviving institution.

101. What Professor Calomiris should have asked in the matter at hand is the following: For the post-1992 Carteret receivership (conservatorship), what, if anything, was the value of the thrift's remaining supervisory goodwill? There can be little doubt that the value of supervisory goodwill would be lower for a failed bank than a surviving bank. As discussed above, Carteret was a very unhealthy bank. Given Carteret's bad loan portfolio, its poor profitability, and the erosion of its deposit base prior to its failure

in 1992, it is unlikely that any potential acquirer would have placed much value on any remaining supervisory goodwill of a failed Carteret and its branches. Indeed, Professor Calomiris offers no evidence that a potential acquirer would have placed a value on any remaining supervisory goodwill associated with Carteret's Florida and New Jersey branches in 1993 or 1994, even if the RTC had allowed supervisory goodwill to be transferred in such a transaction. Further, Professor Calomiris is assuming that the goodwill would not have been written-off at the time of conservatorship, that the buyer would not have had to write-off the supervisory goodwill as was required by GAAP purchase accounting rules, and that the buyer's regulator would have allowed the acquirer to count Carteret's goodwill as capital, all of which require quite a few leaps of logic.

102. In his deposition, Professor Calomiris echoed the errors in logic found in his declaration, seeming to imply that supervisory goodwill was something that could be bought or sold in the marketplace, like theater tickets or pollution rights. He offered no examples of this actually occurring in the real world, either before or after FIRREA. Professor Calomiris also suggested in his deposition that Carteret could have been acquired as a whole bank in December 1993 and that supervisory goodwill could have carried over in that transaction.[91] I disagree. First, the idea of Carteret being acquired as an ongoing entity more than a year after going through receivership is unrealistic. Second, as I noted above, supervisory goodwill would have already been written off. Finally, RTC standards imposed much higher than minimal capital requirements on potential acquirers so that any institution in need of supervisory goodwill would not have been an acceptable bidder. Indeed, it is unclear why an acquirer with considerable

[91] Calomiris Deposition, July 5, 2006, p. 49.

tangible capital would pay anything much to acquire the supervisory goodwill of a failed bank like Carteret. Interestingly, in his deposition, in discussing the transference of pre-existing goodwill, Professor Calomiris states:

> "If it turns out that my presumption is wrong based on legal analysis, then, one would have to reach a conclusion that I was wrong. But I am doing a calculation based on a presumption."[92]

103. Despite these errors in logic (and regulatory interpretation), Professor Calomiris then utilizes three different methodologies to calculate the purported value of this remaining goodwill as of the end of 1993 (and the end of 1994). Importantly, he recognizes that $1 of an intangible asset such as supervisory goodwill is not equal to $1 of cash. In his model construct, to calculate the dollar value of lost goodwill, one must deduct the appropriate dollar value of the return on investment that could be made with $1 of cash, compared to the absence of such returns on a dollar of intangible goodwill. Thus, in his first methodology, he posits that the supervisory goodwill could be hypothetically replaced by a cash infusion of an equal amount and then deducts the returns on this cash from the amortized starting value of hypothetical "going concern" Carteret goodwill (as of either December 6, 1993 or December 5, 1994) in order to generate annual imputed cash flows from the investment of goodwill. He then discounts these annual cash flows to both the December 6, 1993 and December 5, 1994 starting dates for valuing supervisory goodwill and deducts the total from the initial value of goodwill. Finally, he adds back the transaction costs associated with an issuance of common stock. For example, in his Table A4, Professor Calomiris obtains a value for the total lost goodwill value of $45.070 million as follows: Estimated face value of

---

[92] Calomiris Deposition, July 7, 2006, p. 659.

goodwill ($128.266 million), minus the discounted present value of future cash flows from investing this amount of cash ($83.195 million), plus the transaction costs of issuing common stock ($3.935 million).[93] In the following sections, I rebut each of these questionable steps individually. First, I show that the face value of Carteret's goodwill was much less than $128.266 million as of December 6, 1993 (for reasons in addition to those already discussed above relating to the goodwill value of an insolvent bank in conservatorship). Second, I show that the discounted present value of investment cash flows would be far in excess of Professor Calomiris's $83.195 million. Third, I show that Professor Calomiris's transaction costs estimate of $3.935 million is overstated. The impact of these corrections is to reduce dramatically the lost value of supervisory goodwill.

104. Professor Calomiris proposes a second alternative method that estimates the cost of replacing supervisory goodwill with tangible capital in the form of a common stock issue. As with the first method, this second method estimates the value of supervisory goodwill as of both December 1993 and December 1994.[94] Finally, Professor Calomiris proposes a third alternative method that uses an event study to compute the impact of the loss of goodwill on the market value of Carteret/AmBase's equity. I discuss the problems with each of these three methodologies below.

[93] I use the values shown in Table A4 for illustrative purposes. My criticisms apply equally to the values presented in Tables A5 through A9.

[94] Calomiris Declaration of July 14, 2006, paragraph 106.

### B. PROFESSOR CALOMIRIS OVERSTATES THE VALUE OF GOODWILL AT DECEMBER 6, 1993

105. In calculating the cost of the loss of goodwill, Professor Calomiris uses straight line depreciation of the December 1989 goodwill amortization schedule for the "Barton," "Delray," "Mountain," and "Blacksburg" branches to calculate the value of goodwill as of December 6, 1993 and December 5, 1994.[95] In doing so, he fails to take into account the $48.7 million reduction in supervisory goodwill associated with the sale of Delray branches in October 1990, as well as the December 1990 goodwill write-offs of $3.0 million, $6.7 million, and $1.3 million for the Barton, Mountain, and Blacksburg branches, respectively. As a result, Carteret's supervisory goodwill was approximately $85.2 million as of November 1992, significantly below Professor Calomiris's claimed amount of $136.8 million as of December 1992.[96]

106. Moreover, Professor Calomiris fails to recognize that Carteret's financial position and solvency materially worsened over the period after the acquisition of the troubled thrifts in 1982 and 1986, thereby reducing the inherent market value of any remaining goodwill. That is, it is highly probable that if a market valuation of goodwill had been done, then the outstanding market values of goodwill as of 1993 and 1994 (or 1989) would have been far less than the simple amortized book values as presented by Professor Calomiris.

107. More importantly, in positing his goodwill figure, Professor Calomiris fails to acknowledge the precarious financial position that Carteret was in even before FIRREA took effect in December 1989. The Office of Thrift Supervision (OTS)

---

[95] Calomiris Declaration of July 14, 2006, paragraph 107.

[96] AM00050541 and AM00050544. The $85.2 million is comprised of $22,863,727 for "Barton" and $62,315,176 for "Delray," per AM00050567.

commenced an examination of Carteret on May 22, 1989, concluding it on November 14, 1989. In its summary, the OTS Report of Examination (ROE) stated, "Some of these areas [of concern] included the takeover of the institution by AmBase, Inc., formerly the Home Group, a noted deterioration in the quality of the loan portfolio and the adequacy of loan loss reserves, net operating losses in the four previous quarters, and the adequacy of CSB's capital position particularly in light of the recent legislation (FIRREA)." The ROE concluded that, "Carteret has serious financial problems, with core operating losses over the last four quarters and declining asset quality resulting in a strained capital position. Inadequate loan loss reserves and changes in the regulations mandated by FIRREA place additional strains on the bank." The ROE assigned Carteret a composite rating of "4." This is the second worst rating on a scale of 1 to 5 and denotes a problem banking institution.[97]

108. The May 22, 1989 ROE, completed on November 14, 1989, contains additional findings documenting Carteret's poor financial condition pre-FIRREA. It stated, "Carteret has experienced a tremendous increase in the amount of criticized assets, now representing 6.7% of assets and 154.2% of regulatory capital. This problem is somewhat the result of a general decline in the real estate market in the bank's main lending area of Florida and recently New Jersey. However, a considerable part of the problem is also caused by poor underwriting."[98] The level of Carteret's total classified assets (those classified as substandard, doubtful, or loss) increased from $9.9 million on December 31, 1987 to $174.9 million on December 31, 1988 to $307.0 million on

---

[97] WOQ668 1975-2222 at WOQ668 1981 and 1987.

[98] *Op. Cit* at WOQ668 1984.

December 31, 1989, a phenomenal increase in just a two-year period.[99] Exhibit 19 presents the growth in Carteret's classified assets as a percent of total assets over this time period, documenting the dramatic increase in its problem assets as a percent of its total assets – reaching close to 11% by the end of 1990.

109. The same ROE also stated that Carteret experienced declining levels of capital since 1987, well in advance of any FIRREA legislation.[100] Operating ratios and trends presented in the report show the ratio of regulatory capital to total assets for Carteret declining from 5.7% to 4.4% from December 31, 1987 to June 30, 1989. The ratio for Carteret's peer group also declined over this time period, but less precipitously (from 5.3% to 4.7%). Similarly, the estimated ratio of GAAP capital to total assets for Carteret declined from 5.1% to 3.7% from December 31, 1987 to June 30, 1989. As before, the ratio for the peer group also declined, but again less precipitously (from 4.3% to 3.3%).[101]

110. Carteret's level of tangible capital was calculated for the first time by the examiners in the same ROE. The deterioration in Carteret's tangible capital position in subsequent periods is shown in Exhibit 20; as shown there, Carteret's tangible capital declined from a *positive* $49.6 million in June 1989 to a *negative* $72.8 million in June 1992. In June 1989, the ratio of classified assets to tangible capital at Carteret was already dangerously high, with classified assets over 500% larger than tangible capital. In 1991, Carteret became economically insolvent when its tangible capital turned negative.

---

[99] WOQ690 2449-WOQ690 2653 at WOQ690 2501.

[100] *Op. Cit.* at WOQ668 2025.

[101] *Op. Cit.* at WOQ668 2047.

111. Carteret's deteriorating financial condition before FIRREA resulted in part from worsening economic conditions, both nationally and in Carteret's primary markets. While the recession officially began in 1990, economic activity slowed well before then, as indicated by the percentage changes in real Gross Domestic Product presented in Exhibit 21. In New Jersey and Florida, this slowdown was pronounced. In Florida, the number of single family housing permits issued fell every year from 1986 through 1989, as shown in Exhibit 22. In New Jersey, the decline in housing permits was even more severe. The year-over-year percentage change in single family permits turned sharply negative in 1988 (-34.2%), with an additional substantial decline (-25.8%) in 1989. Increasing unemployment rates provide additional evidence of worsening economic conditions facing Carteret *before* FIRREA. As shown in Exhibit 23, Florida's unemployment rate was below the national average until late 1988 when it rose above the national average, where it remained through 1990. New Jersey's unemployment rate was well below the national average until early 1989 when it started to increase at a much faster rate than the national average. By mid-1990, the New Jersey rate was quite close to the national rate.

112. Carteret's weak financial condition and the deteriorating local market and national economic conditions during this time are completely ignored by Professor Calomiris (except for his intimation that Carteret's weak condition was caused by the government's breach). Carteret's weak financial condition in advance of the passage of FIRREA – as exhibits to this declaration show – indicates that Carteret's remaining supervisory goodwill had little value, if any, as of 1993 and 1994, *even without FIRREA* and should not be added to the receivership as a "missing" asset.

### C. PROFESSOR CALOMIRIS'S ESTIMATE OF THE CASH EQUIVALENT VALUE OF GOODWILL IS FLAWED AND UNRELIABLE

113. Professor Calomiris presents a confused blend of the actual and the hypothetical as he attempts to determine the cash equivalent present value of goodwill as of December 6, 1993 and December 5, 1994. As noted above, he argues that Carteret's remaining goodwill should be amortized using an amortization schedule as of December 1989, the last schedule unaffected by the breach. This gives him an amortization value but-for the breach as of December 6, 1993 and December 5, 1994. The remainder of his analysis is done using actual 1993/1994 data. As noted above, Professor Calomiris correctly recognizes that one simply cannot calculate $1 loss of goodwill as being equivalent to $1 of cash since the former earns no income while the latter does. As a result, he has to deduct from the outstanding book value of goodwill that he estimates as of 1993 (1994), an estimated present value of the stream of income that cash could have generated if it had replaced goodwill, an intangible non-interest earning asset. In short, his goodwill loss is equal to his estimate of the book value of goodwill lost as of 1993 (1994) minus the present value of the return on cash.

114. Professor Calomiris's calculations of the present value of the return on his cash-equivalent goodwill capital infusion are flawed in at least two ways: (1) the imputed after-tax return on cash investments is dramatically understated, and (2) the discount factor is dramatically overstated. Correction of each of these flaws yields a much larger estimate of the present value of the return on investing cash (rather than goodwill) and therefore a much larger deduction from the initial amount of supervisory goodwill face value amount, thereby reducing Professor Calomiris's estimates of lost goodwill damage to the receivership.

### 1. PROFESSOR CALOMIRIS'S ERRORS IN EVALUATING AFTER-TAX CASH EARNINGS

115. Professor Calomiris assumes that twenty-year Treasury securities "most accurately replicate the risk characteristics of the contractual goodwill that I am replacing."[102] Thus, he assumes that supervisory goodwill (if replaced by cash) would be invested only in risk-free (i.e., government-issued) assets. This is in violation of the basic principals of financial intermediation. First, as described above, the market value of supervisory goodwill *was not* a risk-free (intangible asset) that is best replicated by a Treasury security since any book value of goodwill upon failure would have a lower market value than the goodwill of a going concern. Second, thrifts and other financial intermediaries choose their portfolios to generate positive spreads between the return on assets and the cost of funds. If Carteret/AmBase had restricted itself to a 6.31% per annum 20-year Treasury yield (the rate on December 6, 1993) for the investment of its cash equivalent capital proceeds (i.e. cash capital replacing goodwill capital), then the spread would have been *negative*. This is because Professor Calomiris himself estimates (erroneously as it turns out) that the cost of capital for Carteret/AmBase was between 11.59% to 13.32% per annum, using different methodologies for 1993 and 1994.[103] Thus, his own assumptions are internally inconsistent. He hypothesizes a situation in which the thrift intentionally sets up a guaranteed *negative* spread on its assets of between 5.28% per annum (6.31% minus 11.59%) and 7.01% per annum (6.31% minus 13.32%), a clearly illogical proposition and a strategy which no financial intermediary could survive. To be consistent, Professor Calomiris should have acknowledged that the "cash

[102] Calomiris Declaration of July 14, 2006, paragraph 109.

[103] Calomiris Declaration of July 14, 2006, paragraphs 128-129.

equivalent earnings" of the supervisory goodwill would have been invested in assets that yield a positive spread. Then the yield on the investment of cash from supervisory goodwill would have exceeded the 6.31% per annum cost assumed by Professor Calomiris, so as to compensate Carteret/AmBase for the high amounts of risk in their portfolio investments.

116. Even given the poor performance of Carteret and its abysmal record over the period from December 1989 through December 1992, Professor Calomiris assumes that any earnings on these cash investments would have been taxed at a 35% rate. A marginal tax rate of 35% on the goodwill cash equivalent earnings on hypothetical Treasury security investments is far from credible over the time period of interest. Indeed, Carteret/AmBase generated losses during much of the period from 1990 through 1992.[104] This suggests that the firm would not have paid the full 35% statutory tax rate, but rather a lower effective tax rate, perhaps zero. Incorporating appropriate changes to both the investment profile (and hence returns) and the tax rate would generate present values of the cash "proceeds" from the lost supervisory goodwill far in excess of the values shown by Professor Calomiris in his Tables A4 and A5. Since these cash-equivalent values are *deducted* from his estimates of the starting book value of supervisory goodwill, this would reduce his estimates of goodwill loss.

### 2. Professor Calomiris's Errors in Evaluating the Discount Factor

117. To calculate the present value of a flow of future (after-tax) cash returns, one has to account for the time value of money. This requires discounting future cash

[104] Veribanc TFR database.

flows back to the present at a discount rate that reflects the investor's appropriate time value of money on the investment at hand. A centerpiece of Professor Calomiris's analysis is his determination of the discount rate he uses for valuing the after-tax cash flows derived from investing the goodwill in Treasury securities on either December 6, 1993 or December 5, 1994. First, he asserts that an investor interested in acquiring such cash flows would have valued them based on the risk of a preferred stock offering at that time. He claims that preferred stock is the security that most closely matches the characteristics of those cash flows. He simply assumes that a weak Carteret could have issued preferred stock in the first place, which is not clear. However, I see no basis for his selection of a preferred stock rate or yield as a discount rate on cash flows, under his assumption that all replacement cash is invested in risk-free U.S. Treasury securities. As discussed above, this assumption is totally at variance with the riskless nature of the cash-flow investments and with financial theory; it produces a negative spread for the thrift, with its cost of funds exceeding its investment yields. Thus, Professor Calomiris's model is internally inconsistent, or assumes a basically irrational thrift investor that behaves as if risk-free cash flows are actually risky.

118. One possible reason for this confusion is that Professor Calomiris wants his discount rate to reflect the *average* cost of capital of Carteret's whole portfolio rather than the *marginal* cost of capital (which in Professor Calomiris's world of investing in Treasuries, would be a risk-free rate, as argued above). In spite of this, Professor Calomiris appears to be using (inappropriate as it may be) an average cost of capital. However, the cost of issuing preferred stock is not that average cost. Rather, a thrift's weighted average cost of capital reflects the cost of both its debt funds, such as deposits,

and its equity funds.[105] Indeed, the very reason that financial institutions generate positive spreads is that they use low-cost borrowed funds in the form of deposits (i.e. leverage) in addition to equity to finance their asset investments.[106] Professor Calomiris seems to assume that all but-for cash equivalent funds are those that result from a stock issue, thereby ignoring the low cost of funds that banks and thrifts can access through the deposit market. Of course, recognizing the leverage effect lowers the weighted average cost of capital – the weighted average of deposit costs and equity costs – and hence the discount rate that should be used in discounting cash-flows.

119. Moreover, I have serious doubts as to whether Carteret would have been in a position to issue preferred stock in the first place given its long-term weakness. As I discuss below, Professor Calomiris's valuation of goodwill is highly sensitive to whether the discount rate is based on a preferred stock offering or some other security or securities. The effect of Professor Calomiris's choice of a high discount rate is transparent: By assuming a very high speculative discount rate equal to a yield of some hypothetical preferred stock that hypothetically could have been issued by Carteret, he reduces the present value of the riskless after-tax cash flows.

120. To calculate the hypothetical yield on Carteret's hypothetical preferred stock, Professor Calomiris uses regression analysis. He employs a linear regression model using a sample of 33 preferred stock and high-yield debt offerings by thrifts and savings banks over the 1993-1994 time period. Specifically, of the 33 offerings, 21 are preferred stock offerings and 12 are high-yield offerings. Moreover, 12 out of the 21

[105] Calomiris Deposition, July 7, 2006, pp. 685-686.

[106] It should be noted that preferred stock can be levered under the Basel risk-based capital requirements.

preferred stock offerings are convertible to common stock while the remainder are what are commonly called straight preferred stock.

121. Professor Calomiris predicts the preferred stock discount rate for Carteret on December 6, 1993 as equal to 11.85% and on December 5, 1994 as equal to 13.06%. He gets these rates by using 12 coefficients from his regression model multiplied by the respective hypothetical values he calculates for twelve financial variables relating to Carteret's hypothetical preferred stock offering.[107] I would first note that by combining both preferred stock and high-yield debt offerings in the same sample, Professor Calomiris is mixing apples and oranges. In particular, preferred stock and high-yield debt have very different risk and taxation characteristics. First, preferred stock has a higher risk than corporate debt, since the latter has a stronger claim over the assets of a firm in bankruptcy. Second, while the interest cost of a corporate debt issue can be expensed for tax purposes, producing a so-called "tax shield", no issuer specific tax-shield exists for preferred on its dividend payments. By contrast, the tax-shield is transferred to a corporate purchaser of preferred who can deduct up to 70% of the dividend received against taxes. Thus, while higher risk tends to make preferred stock yields higher than corporate bond yields, the tax-shield effect tends to make them lower, since a corporate investor is willing to accept a lower yield because of its tax savings.

122. In Exhibit 24, I show how heterogenous the sample chosen by Professor Calomiris is over the 1993-94 period and how the average yields across high-yield debt, straight preferred stock, and convertible preferred stock differ. First, it can be noted that his straight preferred offerings have a higher required yield than his high-yield debt

[107] Calomiris Declaration of July 14, 2006, Table A2 of Appendix A.

sample, an unweighted average of 9.347% (weighted average of 10.069%) versus 8.436% (8.641%); his convertible preferred offerings, which have a valuable option that allow them to be converted into common stock, have a lower yield than high-yield bonds, 7.361% (7.862%) versus 8.436% (8.641%). Clearly, even a cursory examination of the yield data suggests that convertible and straight preferred stock are very different instruments and should not be combined together or with debt in a hodge-podge of a sample.

123. Moreover, the highly selective nature of his sample of 9 straight and 12 convertible preferred issues for 1993 and 1994 should be viewed in the context of the actual number of new preferred issues in those years. Specifically, Bajaj et al. (1992) report 72 convertible and 299 straight issues in 1993, and 39 convertible and 75 straight issues of preferred stock in 1994. Morever, Bajaj et al. report that 1485 straight and 218 convertible preferred stock issues were undertaken by financial institutions over the 1980-1999 period.[108] Clearly, Professor Calomiris's sample is very small compared to this universe.

124. I would also note that three of the 12 coefficients for the variables Professor Calomiris includes in this regression model to estimate Carteret's hypothetical preferred stock yield are insignificant at the 95% confidence level, a common standard in statistical analysis.[109] The three statistically insignificant coefficients are: (1) rating, which is surprising since one would expect an instrument's credit-risk rating to affect its yield, (2) the log of the principal amount of the offering, also surprising since one would

---

[108] Mukash Bajaj, Sumon C. Mazumdar, and Atulya Sarin, "The Costs of Issuing Preferred Stock," *The Journal of Financial Research*, Vol. XXV, No. 4, Winter 2002, pp. 577-592.

[109] It is unclear from Table A3 whether the Merrill Lynch high-yield debt index is also statistically significant since it has a t-statistic of 2.06, but is not marked with an *.

expect smaller offerings to pay higher yields, and (3) duration of the offering, surprising once again since one would expect longer maturity (duration) offerings to pay a higher yield because of the market's preference for liquidity and default risk avoidance. The fact that these three key coefficients are statistically insignificant creates considerable doubt that the model has been properly specified or even estimated, which is not surprising given the small size and hybrid and heterogeneous nature of the sample of preferred stock and corporate debt, as discussed above.

125. Even more troubling is how Professor Calomiris uses his model's coefficients to estimate Carteret's hypothetical preferred stock yield. He states that his method is to apply the relevant Carteret values as of December 1993 to his corresponding regression coefficients, but he then chooses to ignore this method for two model coefficients: (1) Carteret's equity-to-assets ratio, and (2) the square of its equity-to-assets ratio. He states, "Given the distressed condition of Carteret as a result of the breach, its equity was negative, and therefore its ratio of equity to assets was negative. To avoid using an extremely low equity-to-assets ratio that would be outside the range of the sample used to construct these estimates, I calculate my forecast of Carteret's preferred yield using the lowest equity-to-assets ratio in the regression sample in lieu of Carteret's negative ratio."[110] When Professor Calomiris substitutes another company's financial statement values for Carteret's into his model, he is no longer estimating Carteret's cost of preferred stock. Indeed, he has a jerry-built "but-for" model of preferred stock cost based on a sample of companies who are unlike Carteret in at least one crucial respect,

---

[110] Calomiris Declaration of July 14, 2006, paragraph 117.

i.e., companies that are outside the range of Carteret's actual financial performance and insolvency risk.

### D. PROFESSOR CALOMIRIS'S ESTIMATE OF THE COST OF REPLACEMENT IS FLAWED AND UNRELIABLE

126. The second method used by Professor Calomiris to calculate the lost value of supervisory goodwill is the cost of replacement approach. He assumes that the lost supervisory goodwill would have been replaced by a common stock issuance. In doing so, he performs a flawed analysis of the cost of the common stock issue. However, Professor Calomiris never addresses the fundamental question whether Carteret could have issued common stock in either December 1993 or December 1994. Indeed, the Plaintiff's First Amended Complaint *admits* that Professor Calomiris's assumption that Carteret/Ambase could have raised substantial amounts of equity capital[111] at any time subsequent to its takeover by the RTC is counter-factual (see paragraphs 66 and 68 of the Plaintiff's First Amended Complaint). Paragraph 68 of the Complaint also implies that any Carteret/Ambase attempts to issue equity were unsuccessful in the 1992 period. Why does Professor Calomiris believe that the equity capital issue would have been any more successful in December 1993 or December 1994 for a bank in such a perilous state? Indeed, Professor Calomiris's analysis shows that the financial condition of Carteret/AmBase continued to decline over the 1993-1994 period, as compared to 1992. This would make it even less likely that Carteret/AmBase could have issued common stock to replace the supervisory goodwill.

[111] Common stock needed to replace disallowed supervisory goodwill per Calomiris Tables A6 and A8.

127. The premise of Professor Calomiris's cost of replacement analysis is even more shaky given the large volume of failed or failing thrifts during the 1990–1993 crisis period. It would be irrational for investors to contribute new equity to a troubled thrift (and implicitly support its assets) when they could acquire selected thrift assets directly from the RTC. The latter acquisition process results in asset purchases that are easier to value on an asset-by-asset basis (because of greater transparency and more comprehensive due diligence) and also offers smaller and more narrowly-defined packaging of assets. Equity investors (such as a hypothetical equity investor in Carteret) bear the first risk of loss on the thrift's assets in general and thus are most likely to be impaired by fraud and mismanagement. By contrast, the RTC offered investors the opportunity to invest in relatively sanitized portfolios of thrift assets. Given the above, it is extremely unlikely that Carteret/AmBase could have issued common stock in either 1993 or 1994.

128. Professor Calomiris also makes errors in the implementation of the methodology of pricing a common stock issue. Specifically, in his alternative cost of replacement model, he uses discount factors derived using the so-called Capital Asset Pricing Model (CAPM). Aside from the literature that casts doubt on the veracity of a simple CAPM (see for example, Fama and French (1992)[112]), Professor Calomiris's implementation is incorrect. He utilizes a median beta (or systematic risk measure) for depository institutions in 1994 of 0.88.[113] However, the systematic risk of an equity investment in insolvent Carteret/AmBase was not comparable to the median risk

[112] E. Fama and K. French, "The Cross-Section of Expected Stock Returns," *Journal of Finance,* June 1992, Vol. XLVII, No. 2, June 1992, pp. 427-465.

[113] Calomiris Declaration of July 14, 2006, paragraph 127. In simple terms, beta is the measure of volatility of a given stock relative to the overall market. A beta below 1 is less volatile than the overall market.

exposure of a sample of solvent depository institutions. Using this haphazard approach, Professor Calomiris arrives at estimates of required common equity returns for Carteret/AmBase of 11.59% per annum in 1993 and 13.32% per annum in 1994. As it happens, the model generates estimates similar to those obtained using Professor Calomiris's flawed preferred stock regression model in his alternative cash-equivalent approach.

### E. PROFESSOR CALOMIRIS'S ERRORS IN CALCULATING TRANSACTION COSTS IN BOTH THE CASH EQUIVALENT AND COST OF REPLACEMENT APPROACHES

129. In addition to cash flow and discount rate estimates, Professor Calomiris also estimates a percentage transaction cost of issuing preferred stock. In his model, the *lower* the transaction costs, the *higher* is the cash equivalent value and the *lower* is his estimated goodwill loss. In order to estimate the cost of issuing hypothetical preferred stock in the cash equivalent approach (and of issuing common stock in his cost of replacement approach), Professor Calomiris uses the empirical results from a 1996 article by Immoo Lee, et al.[114] In particular, he uses the averages of total direct costs presented in Lee, et al.'s Table 1 for seasoned equity offerings of *common equity* over the 1990 – 1994 period. However, the cost of issuing preferred stock (as in Professor Calomiris's cash equivalent model) is very different from the cost of a secondary offering of common stock.

130. Preferred stock is in many ways lower risk than common stock and the "transactions cost" that underwriters charge to bring a preferred stock issue to market reflects the relative lower risk of the issue. Specifically, preferred stock holders have

[114] Immoo Lee, Scott Lochhead, and Jay Ritter, "The Cost of Raising Capital," *Journal of Financial Research*, vol. XIX, Spring 1996, pp. 59-74.

priority over common stock holders if an issuer goes bankrupt. Perhaps more importantly, preferred stock offers a promised dividend return (something like the coupon on a bond). On the other hand, the hybrid nature of preferred stock is captured by the fact that corporate bondholders have priority over preferred stockholders in bankruptcy, and that promised dividends on preferred stock often can be deferred if the firm has cash-flow problems. In addition, the maturity of preferred stock is usually open-ended like a common stock.

131. The few studies that have been conducted about the relative transaction costs of issuing preferred stock have found that its transaction costs are lower than those of common stock issues. In a 2002 study, Bajaj, et al.[115] examined the cost of issuing 3,042 preferred stocks over the 1980-1999 time period, using the Securities Data Company database on issuing costs. They found that the average total cost to financial companies of issuing straight preferred stock was 2.75% of the total proceeds of the offering, while the cost of issuing convertible preferred stock for financial companies was 5.537%. In his deposition, Professor Calomiris appears to have had in mind a straight preferred stock offering of a relatively short duration (since it is re-issued every year in his but-for model). Given the non-convertible and short-term nature of his hypothetical preferred stock, this suggests that transaction costs should be closer to the 2.75% found by Bajaj et al. for straight preferred issued by financial companies than the 4.73% (5.18%) costs Professor Calomiris finds for his hypothetical 1993 (1994) issue based on the Lee et al. study of common stock issuance. In addition, Professor Calomiris assumes issue sizes of $83.2 million in 1993 (Table A4) and $79.8 million in 1994 (Table A5).

[115] Mukesh Bajaj, Sumon C. Mazumdar, and Atulya Sarin, "The Costs of Issuing Preferred Stock," *The Journal of Financial Research*, Vol. XXV, No. 4, Winter 2002, pp. 577-592.

The Bajaj study shows the total cost of issuance for straight preferred in the $80.0-99.9 million range was 2.802% and was 3.856% for *convertible* preferred stock. Clearly, both of these transaction costs are well below the 4.73% and 5.18% of net proceeds Professor Calomiris used in his estimates of the cash-equivalent replacement costs. Finally, the Bajaj et al. study shows that for below-investment-grade preferred stock in the same size range, the respective transaction costs were 3.533% for straight preferred and 4.161% for convertible preferred, again less than the costs posited by Professor Calomiris. Importantly, and as noted above, because of the way his model calculates the value of lost supervisory goodwill, the lower these transaction costs, the smaller is any purported loss of goodwill in Professor Calomiris's but-for world.

132. Of course, this entire exercise is predicated on the assumption that Carteret/AmBase could have issued preferred stock in 1993 or 1994. In my opinion, this was extremely unlikely, as I discussed in previous sections.

### F. PROFESSOR CALOMIRIS'S EVENT STUDY APPROACH TO THE VALUE OF SUPERVISORY GOODWILL IS BASED ON A FATAL FLAW

133. To further investigate the cost of eliminating Carteret's supervisory goodwill, Professor Calomiris performed an event study to determine the effect on Ambase's market value of "news" eliminating goodwill. As he states, "Evidence from event studies must be interpreted carefully. For one to be able to draw a connection between an announcement and a stock price reaction, it must be clear that the announcement represents news (i.e., that it was not known in advance)."[116] I agree

[116] Calomiris Declaration of July 14, 2006, paragraph 135.

completely. However, Professor Calomiris should have added that the "news" must be material and *publicly* available to investors at large.[117]

134. Professor Calomiris states that the key event relating to the elimination of supervisory goodwill occurred on May 22, 1989 when the OTS warned Carteret that the removal of goodwill from its regulatory capital would leave it critically undercapitalized. He describes the warning: "Regulators concluded that Carteret was 'not likely to meet the tangible, leverage ratio, and risk-based minimum capital requirements required by FIRREA.'"[118] He builds his event study around the impact of this OTS announcement on May 22, 1989.

135. Professor Calomiris appears to have misinterpreted what happened on May 22, 1989. May 22, 1989 was not an *announcement* date of any warning to the public about Carteret. Instead, it was simply the date that the OTS commenced an examination of Carteret that it subsequently completed in November of that year. Indeed, the OTS did not announce anything on May 22, 1989; it simply began an examination, which would be furnished subsequently to Carteret for its own *private*, *confidential*, non-public use. Although this *non-public* report of examination contained the warning that Professor Calomiris quotes, it was issued confidentially (i.e, privately and not publicly) several months after May 22 and is irrelevant to AmBase's stock price behavior around May 22. In fact, in his *revised* report of July 14, 2006 (and in response to questioning about the date at his deposition), Professor Calomiris seems to implicitly acknowledge this problem by discussing other possible news events around that time that may have

---

[117] A statistically significant reaction in a firm's market-risk-adjusted stock return to material, publicly available news is indicative of so-called semi-strong form market efficiency. Tests of semi-strong form efficiency are called event studies.

[118] Calomiris Declaration of July 14, 2006, paragraph 101.

affected thrifts with supervisory goodwill in general, such as news reports of Congressional debates about the potential treatment of supervisory goodwill. Indeed, since he is unsure which, if any, events are important, at one place in his post-deposition Declaration of July 14, 2006, Professor Calomiris simply looks at the excess returns of Ambase's stock relative to the market over a *one-month* period, from May 15 to June 15, 1989. Using a one-month window is clearly outside the practice typically used in event studies published in credible academic journals. In sum, whatever Professor Calomiris is measuring in his event study has nothing to do with any May 22, 1989 OTS warning to Carteret about the elimination of supervisory goodwill, and many of the announcements he mentions are not specific to Carteret and not concrete enough to constitute an event. For example, he cites a *New York Times* article that reports on an amendment related to FIRREA that was defeated in a House committee.[119] Consequently, this section of Professor Calomiris's report, and his estimated losses, should be given no credibility at all.

## VII. SALE OF CARTERET MORTGAGE COMPANY AND OTHER ASSETS

### A. CARTERET MORTGAGE COMPANY (CMC)

136. Professor Calomiris claims that the RTC failed to sell "a thriving mortgage origination subsidiary, the Carteret Mortgage Company (CMC),"[120] choosing instead to simply shut it down on December 14, 1992. Of course, this raises the fundamental question: If CMC was such a thriving entity, why didn't Carteret sell it privately to raise tangible capital and avoid seizure by the RTC in 1992? During the

---

[119] Calomiris Declaration of July 14, 2006, paragraph 101.

[120] Calomiris Declaration of July 14, 2006, paragraphs 144-145.

period from 1990 to 1992, Carteret/AmBase struggled to meet its regulatory capital requirements, even closing or selling a number of branches. (See paragraph 56 in the First Amended Complaint.) If CMC really was such a valuable asset, it is likely that AmBase would have sold it in order to return the thrift to capital solvency.

137. Nevertheless, Professor Calomiris performs an event study around the date of the announcement of Imperial Credit Industries Inc.'s hiring of CMC's staff on December 28, 1992, following CMC's closure. He finds positive cumulative abnormal returns for Imperial's stock when the hirings of CMC's staff were announced. Such a finding may not be surprising, given that Imperial was hiring CMC's staff *without* acquiring any of the firm's troubled assets and liabilities. Thus, Imperial had no downside risk exposure. They did not pay a takeover premium and had no obligation to continue to employ CMC's staff or to absorb its assets. Thus, the finding of positive abnormal returns upon the announcement of the hiring of CMC's staff has no implications for the value of the company as a going concern or for the value of CMC's portfolio of real estate assets.

138. Moreover, there is evidence, not cited by Professor Calomiris, that CMC's staff may not have been that value-adding. For example, only three months after Imperial hired CMC's staff, the *Orange County Register* reported that the firm was having difficulty meeting its first quarter 1993 earnings target, citing fewer loan originations and its recent expansion into the Northeast, Florida, and Colorado for the disappointing results. The company said that its first quarter performance would have been worse had

it not been for a $3.8 million gain from the sale of loan-servicing rights.[121] Indeed, Imperial's stock fell by $3.75, from $18.00 to $14.25 per share, the day it announced its disappointing earnings forecast. This 21% decline was about the same size as the 18% increase that Professor Calomiris cites following Imperial's announcement on December 24, 1992 of the hiring of CMC's staff.[122]

139. Imperial Credit had gone public on the NASDAQ exchange in May 1992, just a few months before hiring the Carteret mortgage employees. On December 24, 1992, the day before announcing the hiring, Imperial was a thinly traded stock with a market cap of about $107 million (8.7 million shares outstanding at a price of $12.25 per share). Thinly traded, newly issued stocks can be especially volatile, making it hard to isolate abnormal returns using event study methodology. Indeed, Professor Calomiris measured Imperial's beta at 2.32,[123] which is very high for a financial services firm.

140. In his analysis of CMC, Professor Calomiris also ignores the fact that shutting down Carteret's mortgage origination operation was consistent with RTC policy. An October 25, 1989 RTC memo on conservatorship procedures stated that the RTC's "fundamental concern regarding new lending is that it generally contributes to the massive losses already being experienced by the institution. Because the volume of interest bearing liabilities generally exceeds the volume of interest earning assets, a negative spread results...Thus, essentially every loan that is extended is made at a loss to

[121] "Imperial Credit stock falls 21% on earnings news," Orange County Register (California), Business Section, page E02, March 30, 1993. The stock price on Friday, March 26, 1993 was $18.00 and was $14.25 on Monday, March 29, 1993, the day the company announced its first quarter earnings estimate.

[122] Calomiris Declaration of July 14, 2006, paragraph 151.

[123] Calomiris Declaration of July, 14, 2006, paragraph 150.

the institution."[124] A June 20, 1990 RTC memo, citing the RTC's Strategic Plan, stated that it was "the RTC's mission to downsize and maximize recovery" of institutions in conservatorship/receivership.[125] Thus, in shutting down CMC, the RTC was not acting capriciously, but instead was implementing a policy to avoid increased and continuing losses.

141. When Carteret was placed into conservatorship in December 1992, its ability to fund new mortgages was in question, and there were indications that its correspondent relationships – which accounted for a majority of its loan originations – had already moved onto other institutions. At a meeting held on December 4, 1992, the date of conservatorship, employees raised concerns about Carteret's "ability to fund its current pipeline."[126] Six days later, an assessment showed that "applications generated from the date of conservatorship [were] less than $10 million; an indication that the correspondent relationship (60% of volume) had already moved."[127] Carteret was heavily reliant on its correspondent network for loan origination; its origination system consisted of about 100 employees plus over 200 correspondents.[128] A December 7, 1992 memo prepared by an RTC team had also stated that "any significant attrition [of the correspondent network] would limit viability of CMC continuance in the origination marketplace."[129] The loss of many of the correspondent relationships was a clear indication to the RTC that CMC had already lost its franchise value and should be closed.

---

[124] AM5001 0631-0640 at AM5001 0632.

[125] AM5001 0641.

[126] AM5067 0546-0557 at AM5067 0546.

[127] *Op. Cit.* at AM5067 0547.

[128] *Op. Cit.* at AM5067 0546.

[129] CAM320 0530-0532 at CAM320 0532.

142. Professor Calomiris also conducts a second valuation experiment by seeking to analyze the price that mortgage units comparable to CMC would go for in the market place. He assumes that in 1993 "but-for" Carteret would have been servicing a mortgage loan portfolio of $7.2 billion, the same as at the end of 1992. He then analyses – as his comparables – two mortgage business transactions in his Table 18. The first is the sale of Sears Mortgage Corp. to PNC Bank Corp. in November 1993 and the second is the sale of Maryland National Mortgage Corp. to First Tennessee National Corp. in October 1993. He calculates ratios of the market value of these two transactions to the underlying value of the unit's servicing portfolio and then multiplies those ratios by Carteret's servicing rights at the end of 1992 ($7.2 billion) to achieve two but-for comparable sale values. He then nets out $61.7 million of servicing-rights value received in Carteret's actual 1994 sale to arrive at a loss of $25.8 million using the Sears sale, and a loss of $57.8 million using the Maryland National sale.[130]

143. There are a number of problems with this "comparables" analysis. First, since he is focusing on the mortgage servicing rights portfolio only, Professor Calomiris fails to account for the fact that the Sears sale, in addition to servicing rights, also included $7.6 billion in other assets including over 100 mortgage production offices plus a savings bank.[131] By contrast, he appears to have done such an adjustment for the Maryland National Mortgage Corp. Second, Professor Calomiris's hypothetical CMC loss analysis is based on the loss of mortgage originations, not on the loss of servicing rights, which is the multiplying factor and base for this comparable transactions analysis. Thus, Professor Calomiris appears to be valuing the wrong "asset". Third, he ignores the

[130] Calomiris Declaration of July 14, 2006, paragraphs 154-161.

[131] PNC's March 1994 10-K Report, p.1.

size differences in originations between the Sears and Maryland transactions and the hypothetical CMC. Ultimately, it is the volume of originations (along with fee levels) that generate a mortgage unit's origination profitability. Fourth, while Professor Calomiris recognizes that in-house originations are more valuable than correspondent originations, he makes no attempt to account for the fact that 60% of Carteret's originations came from correspondents, while Sears and Maryland had more production offices than Carteret.[132] Finally, Professor Calomiris only analyzes two sales – one erroneously (Sears, due to his failure to account for asset sales). Indeed, at this deposition, he appears to acknowledge the limited aspects of his comparability study:

> "I proceeded in the way that I described in the report, because I looked for all possible comparables using very loose criteria to try to find within the net of possible transactions as many as I could. I only found two…"[133]

### B. SALE OF OTHER CARTERET/AMBASE ASSETS

144. Professor Calomiris contends that the proceeds from the sales of Carteret's portfolio "that consisted largely of fixed-income mortgages,"[134] was harmed by the delay from December 1993 to 1995 because of the ensuing increase in mortgage rates. Indeed, it is unclear whether this was the case in light of data on fixed-rate mortgages. In particular, fixed mortgage rates were approximately at the same level in December 1995 as they were in December 1993 (7.20% in December 1995 and 7.17% in December 1993).[135]

---

[132] Calomiris Deposition, July 7, 2006, pp. 814-815.

[133] Calomiris Deposition, July 7, 2006, p. 817.

[134] Calomiris Declaration of July 14, 2006, paragraph 163.

[135] "Contract rate on 30-year fixed-rate conventional home mortgage commitments" (MORTGNA series), Federal Reserve Bank.

145. Residential mortgage rates are only one component of the market valuation of Carteret's asset portfolio. In particular, Carteret had a significant proportion of its assets in commercial rather than residential mortgages. Many of these were classified assets and non-interest earning. As such, any return on these assets was dependent on the trend in underlying commercial property prices. A good proxy for the "equity" return on a portfolio of commercial real estate assets is the FTSE NAREIT Equity REITs index, a market capitalization weighted index that includes all tax-qualified REITs listed in the New York Stock Exchange, American Stock Exchange, and NASDAQ National Market. As can be seen in Exhibit 25, while the index rose in 1993, it was very volatile around that new higher level, closing the year down from its September 1993 high. Indeed, the index reaches values greater than its December 1993 value (Professor Calomiris's preferred resolution date) at several points in 1994 and 1995, including December 1995. In addition, Exhibit 26 presents the National Council of Real Estate Investment Fiduciaries (NCREIF) Indices for both the East and South regions. These indices track the investment performance of a very large pool of individual commercial properties acquired in the private market for investment purposes only. Beginning in 1993, prices continually rise through 1995. Therefore, market conditions suggest that the RTC increased, not decreased, the resale value of Carteret's asset portfolio -- especially its troubled commercial portfolio.

## VIII. CONCLUSIONS

146. Based on the analyses set forth above, I find no evidence that the FDIC/RTC's actions caused the receivership losses claimed by Professor Calomiris. In particular, Professor Calomiris has provided no compelling evidence that the receivership

deficit of $278.1 million (as of December 31, 2005) should be reduced. Among my many other conclusions are the following:

147. The FDIC/RTC faced enormous difficulties in resolving many hundreds of failed or failing thrifts during the 1990-1995 period. On the whole (as the GAO acknowledges), the FDIC/RTC did a good job in completing the resolution at "least cost" to the deposit insurance fund and to taxpayers at large.

148. There was no inordinate delay in the resolution of Carteret, given its time of failure, size, and complexity.

149. The premiums received in the sales of the Carteret branches in 1994 and 1995 were likely higher than those that would have been achieved had they been sold in 1992 and 1993 (when Professor Calmoris says they should have been sold). Moreover, there is no evidence that the sale of Carteret as a "whole bank" in 1993 would have produced greater proceeds than the sale of three clusters of Carteret branches in 1994 and 1995.

150. Professor Calomiris exaggerates the effects of Carteret's failure on the erosion of its deposit base. The decline in Carteret's deposits in the year preceding Carteret's failure ($539 million) was generally comparable to the decline in Carteret's deposits in the year following the failure ($615 million).

151. All in all, the receivership's sale of the Florida branches in 1994 and the New Jersey branches in 1995 enhanced the receivership's revenues, compared with what might have been achieved from earlier sales into a market overloaded with failing thrifts.

152. The switch from floating to fixed rates in calculating interest on receivership loans was entirely appropriate, given FDIC policy following the passage of

the Depositor Preference Act in 1993. Further, fixed rates were applied in general to all thrift receiverships created after the Depositor Preference Statute was enacted and not just to Carteret. Moreover, Professor Calomiris ignores the fact that by fixing interest rates when it did in 1999, the FDIC could not have known whether Treasury rates would continue to head higher, stabilize, or decline. There is no basis for claiming, and no evidence, that the FDIC chose to lock-in high fixed rates in 1999, based on knowledge or belief that interest rates would decline in the future. Had the FDIC not adopted fixed rates and had interest rates increased over time, the plaintiffs might well be arguing today that the FDIC acted against the receivership's interest by choosing to remain with a floating rate for computing interest charges.

153. It is entirely appropriate that funds in a risk-free escrow account should earn an interest rate lower than the interest rate on risky loans to a receivership whose asset returns were highly uncertain.

154. There is no evidence that the minority preference program reduced receivership revenues by either lowering deposit premiums, or reducing the number of bidders, or inducing a freeze on mortgage asset distribution.

155. The case for including lost supervisory goodwill as a receivership deficit offset is untenable. The value of such goodwill for a failed bank in receivership is likely to be minimal, and the transfer of any such goodwill to an acquiring bank or thrift would not be permitted by regulators. Indeed, no such transaction occurred over the relevant time period.

156. Professor Calomiris's preferred stock, common stock, and event study models of goodwill value have so many errors of logic and financial economics that they should be dismissed and given no credence.

157. Similarly, Professor Calomiris's attempts to determine the in-house value of Carteret's closed mortgage banking unit through an event study and a two-firm-based comparability study are equally speculative and should be given no credence.

158. There is no evidence that delaying the sale of Carteret's assets, such as its commercial real estate portfolio, harmed Carteret's receivership. Indeed, there is some evidence that suggests that commercial real estate increased in value over the 1993-1995 period.

Anthony Saunders
Dated: August 7, 2006

Confidential Materials - Subject to Protective Order

**Exhibit 1**
**Curriculum Vitae of Professor Anthony Saunders**

**Office**
Department of Finance
Kaufman Management Center
Stern School of Business, New York University
44 West 4th St., Rm. 9-91
New York, N.Y. 10012
(212) 998-0711 (office)
(212) 998-0312 (office/secretary)
(212) 995-4232 (fax)
E-mail: asaunder@stern.nyu.cdu
Web site: http://www.stern.nyu.edu/~asaunder

**Primary Areas of Interest**
Financial institutions, international finance/banking and financial economics.

**Education**
London School of Economics, 1968-71, BS, 1971, Monetary Economics
London School of Economics, 1971-72, MS, 1972, Money and Finance
London School of Economics, 1976-81, Ph.D., 1981, Thesis title:
"The Behavior and Performance of the London Clearing Banks, 1965-1977"

**Current Position**
Stern School of Business, New York University
John M. Schiff, Professor of Finance
and Chairman of the Department of Finance (1995-96 and 97- )

**Previous Positions**
Stern School of Business, New York University
Assistant Professor of Finance (1978-1982)
Associate Professor of Finance (1982-1987)
Professor of Finance (1987- )
Professor of International Business and Finance (1988 -)
Director of Undergraduate Studies in Finance (1983-1985)
Acting Director of the Salomon Brothers Center for the Study of Financial Institutions (September 1984-85)
Associate Director of the Salomon Brothers Center for the Study of Financial Institutions (1985- )

**Courses taught:**

| | |
|---|---|
| Money and Banking: BS | Introduction to Finance: MBA |
| Risk Management in Financial Institutions: MBA | Credit Risk: EMBA |
| NYU Executive Programs on Risk Management | Seminar in Banking: Ph.D. |