**Advisory Positions**
Nobel Prize in Economics, Nomination Committee (2000- )
Investment Advisory Board, Zurich Financial Services (2003- )
Research Advisor, FDIC – Center for Financial Research (2004- )
Research Advisor, Federal Reserve Bank of Philadelphia, (1984-1989).
Board of Academic Consultants, Federal Reserve Bank of New York, (2000-2002).
Board of Academic Consultants, Federal Reserve Board of Governors, (1989- ).
Council of Research Advisors, Federal National Mortgage Association, (1989- ).
Council of Advisors, Italian Bankers Association (ABI), (1994- ).

**Consulting Experience (selected)**
2005 Debevoise Plimpton Valuation of Life Insurance Contracts (consultant)
2005 Pepe and Hazard ENRON and the rating agencies (consultant)
2005 King and Spalding Report on Restructuring of HYNIX (expert report)
2005 Department of Justice Goodwill and FIRREA, Carteret Savings Bank (expert)
2004 Department of Justice ENRON: Three criminal cases relating to investor losses (expert witness)
2004 Milberg-Weiss Asia Pulp and Paper: Fraud on the Market (expert witness)
2003 - Department of Justice Goodwill and FIRREA, Perpetual Savings Bank 2004 (expert)
2003 Milberg, Weiss Nortel: "Fraud on the Market" (expert report)
2003 Hale and Dorr Hynix dumping of DRAMS (expert report)
2001-2003 Department of Justice Losses Related to the Goodwill Provisions of the Financial Institutions, Reform and Recovery Act (expert witness), 5th-3rd D and N Banks
2000 JP Morgan Emerging Market Securities as an Asset Class (report)
2000 World Bank Financial System Crisis in Thailand (report)
1999 World Bank Deposit Insurance in Mexico (advisory)
1998 Central Bank of Argentina Credit Risk Measurement (advisory)
1998 -2000 Oliver Wyman Oliver Wyman Institute (advisory)
1997 JP Morgan Restrictions on Pension Fund Managers (report)
1997 Latham and Watkins Financial Condition of Korean Banks (expert witness)
1997 World Bank Financial Sector Reform in Ethiopia (report)
1997 Perkins Coie Securitization of Aircraft Finance (report)
1997 J.P. Morgan Modeling Credit Risk (report)
1997 Inter-American Development Bank Interest Rate Margin Determination (report)
1996 -1997 Decof and Grimm Failure of Rhode Island Savings Bank (expert witness)
1996 Milberg-Weiss Losses on Swap Contracts by NY Banks (advisory)
1996 World Bank Bank Capital Structures in Developing and Developed Countries (report)
1995 World Bank Financial Sector Restructuring in Uganda (report)
1995 European Capital Markets Inst. Clearance and Settlement Integration in the European Community (report)
1994 NY State Bankers Assoc. The Effects of Local Taxation on Bank Location and Activities (report)
1994 World Bank/Govt. of China Reform of Equity Markets in the Peoples

Republic of China (report)
1994 Aetna Life Concentration Risk Measurement in Insurance Co. (report)
1994 Strock, Strock and Lavan Ellerman Arbitration (Securitization) (expert witness)
1994 Patterson, Belknap, Webb and Tyler Gotthalf v. Telerate (Futures Markets and Derivatives) (expert witness)
1994 Milberg, Weiss, *etal* Salomon Inc. Litigation (Treasury Auctions) (expert witness)
1994 NY State Bankers Association Financial Regulation and Bank Profitability (report)
1993 World Bank Financial Sector Reform in Kenya (report)
1992 EBRD Bank Restructuring in Eastern Europe (advisory)
1992 Euroclear Settlement and clearance Issues in Global Securities Markets (report)
1992 EBRD/Govt. of Poland Chief Consultant in Charge of Designing the Polish Deposit Insurance System (advisory)
1991 City of New York National and Global Competitiveness of New York City as a Financial Center (report)
1991 Litwin and Holsinger Haas *etal* v. Bankers Trust (expert witness)
1990 Citicorp Universal Banking (advisory)
1989 The World Bank Venture Capital in LDC's (report)
1989 The World Bank Financial Liberalization in Tanzania (report)
1989 Citicorp Strategy Over the Next Five Years for the Institutional Banking Group (report)
1989 Office of Technology Assessment Banks and Securities Markets U.S. Congress
1988 World Bank-IFC Financial Liberalization in Mauritius (report)
1988 Oxford Analytica U.S. Bank Developments (advisory)
1987 World Bank-IFC Modeling Optimal Debt Rescheduling for Bank (report)
1987 Parker-Chapin, Flattau and Klimpl ESM v. Grant Thornton (expert witness)
1986 Budd Larner Legality of Deposit Brokerage (expert witness)
1986-89 Philadelphia Fed Research Advisor on Matters Concerning Bank Structure, Competition and Deregulation (advisory)
1986 World Bank-IFC Financial Deregulation in Kenya (advisory)
1986 Skandaviska Enskilada Strategy for International Banking Banken Operations in Scandinavia (advisory)
1986 Office of Technology Regulation of Foreign Banks Entering the Assessment/U.S. Congress U.S. and *vice-versa* in the Context of Technology and International Bank Services(advisory)
1985 Association of Italian The Use of Futures Contracts for Hedging Banks Bank Risk (report)
1985 World Bank-IFC The Theoretical Foundations for Securities Markets as Facilitators of Economic Growth (report)
1985 World Bank-IFC The Underpricing of Unseasoned New Issues:Theory and U.S. Evidence 1978-1983 (report)
1985 Morgan Guaranty The Glass-Steagall Act: Safety and Soundness and Conflicts of Interest Issues (report)
Executive Teaching:
Credit Suisse, Deutsche Bank, Morgan Guaranty, Chase Manhattan, Australian Merchant Bankers Association, Morgan Stanley, Euromoney, B.P., Swiss National Bank, Malaysian Bankers Assoc., KPMG, Lehman Bros., Citicorp, Smith Barney,

Arthur Andersen, Union Bank of Switzerland, IBMEC, (Brazil), INSEAD, PGB/PAGIF (Portugal), Dianos, Swiss National Bank Foundation, and others

**Research**
Ranked No 1 as the "Most Prolific Author" in 16 core Finance Journals; See P.L. Cooley and J.L. Heck "Prolific Authors in the Finance Literature: A Half Century of Contributions" *Journal of Finance Literature*, Vol 1, Winter 2005, pp 46-69.

**Publications (selected)**
**(i) Journals**
"So What Do I Get? The Bank's View of Lending Relationships" (with S. Bharath, S. Dahiya and A. Srinivasan), *Journal of Financial Economics* (forthcoming).
"The Use of ATMs in Bank Strategy: Is There a Customer Relationship Effect?" (with N. Massoud and B. Scholnick), *Journal of Business* (forthcoming).
"Should Banks Be Diversified? Evidence from Individual Bank Loan Portfolios" (with V. Acharya and I. Hasan), *Journal of Business* (forthcoming).
"Bank Borrowers and Loan Sales: New Evidence on the Uniqueness of Bank Loans" (with S. Dahiya and M. Puri), *Journal of Business*, 2004.
"Commercial Bank Underwriting of Credit - Enhanced Bonds: Are There Benefits to the Issuer" (with R. Stover), *Journal of International Money and Finance*, 2004.
"Incorporating Systematic Influences into Risk Measurement: A Survey of the Literature" (with L. Allen), *Journal of Financial Services Research*, 2004.
"The Role of Financial Advisors in Mergers and Acquisitions" (with L. Allen and J. Jagtiani and S. Peristiani), *Journal of Money, Credit and Banking*, 2004.
"Issues in the Credit Risk Modeling of Retail Markets" (with L. Allen and G. Delong), *Journal of Banking and Finance*, 2003.
"Financial Distress and Bank Lending Relationships" (with S. Dahiya and A. Srinivasan), *Journal of Finance*, 2003.
"The Effects of Cross-Border Bank Mergers on Bank Risk and Value" (with Y. Amihud and G. DeLong), *Journal of International Money and Finance*, 2003.
"Are Emerging-Market Equities a Separate Asset Class?" (with I. Walter), *Journal of Portfolio Management*, Spring 2002
"Credit Ratings and the BIS Capital Adequacy Reform Agenda" (with E. Altman), *Journal of Banking and Finance*, May 2002.
"Price Formation in the OTC Corporate Bond Markets: A Field Study of the Inter-Dealer Market" (with A. Srinivasan and I. Walter), *Journal of Economics and Business*, January/February 2002.
"An Analysis of Bank Charter Value and Its Risk Constraining Incentives," *Journal of Financial Services Research*, 2001.
"An Analysis and Critique of the BIS Proposal on Capital Adequacy and Ratings," *Journal of Banking and Finance*, 2001.
"The Determinants of Bank Interest Margins: An International Study" (with L. Schumacher), *Journal of International Money and Finance*, 2000.

"Low Inflation: The Behavior of Financial Markets and Institutions," *Journal of Money, Credit and Banking,* 2000.
"Financial Fragility and Mexico 1994 Peso Crisis: An Event Window Analysis of Market Valuation Effects" (with B.Wilson and G. Caprio), *Journal of Money, Credit and Banking*, 2000.
"A Theory of Bank Regulation and Management Compensation" (with K. John and L. Senbet), *Review of Financial Studies*, 2000.
"Mexico's 'Tequila' Bank Crisis: Devaluation or Diversification Problems" (with B. Wilson and G. Caprio), *The Economic Journal,* 2000.
"Bank Entry Competition and the Market for Corporate Securities Underwriting" (with A. Gande and M. Puri), *Journal of Financial Economics*, 1999. (Winner of the Fama - DFA award for the best paper in Corporate Finance and Asset Pricing in the JFE for 1999).
"Bank Capital Structure: A Comparative Analysis of US, UK, and Canada" (with B. Wilson), *Journal of Banking and Finance*, 1999.
"Highly Leveraged Loan Transaction Spreads" (with L. Angbazo and J.P. Mei), *Journal of Banking and Finance*, 1998.
"The Effects of Bank Mergers and acquisitions on small business Lending" (with A. Berger, etal), *Journal of Financial Economics*, 1998.
"Credit Risk Measurement: Developments over the last 20 years" (with E. Altman), *Journal of Banking and Finance,* 1998.
"Bank Underwriting of Debt Securities: Modern Evidence," (with A. Gande, M. Puri and I. Walter), *Review of Financial Studies*, 1997.
"An Investigation of the Performance of the U.S. Property-Casualty Insurance Industry" (with N.K. Chidambaran and T. Pugel), *Journal of Risk and Insurance*, 1997.
"Contagious Bank Runs and Panics: Evidence from the 1929-33 Period" (with B. Wilson), *Journal of Financial Intermediation*, 1997.
"Excessive Gambling with Unfavorable Odds: Financial Institutions and Real Estate Investments" (with J.P. Mei), *Review of Economics and Statistics,* 1997.
"Alternative Models for Clearance and Settlement: The Case of the Single European Capital Market" (with I. Giddy and I. Walter), *Journal of Money, Credit and Banking,* 1996.
"Bank Equity Stakes in Borrowing Firms and Financial Distress" (with M. Berlin and K. John), *Review of Financial Studies*, 1996.
"If History Could be Re-run: Pricing Deposit Insurance in 1933" (with B. Wilson), *Journal of Financial Intermediation*, 1995.
"Bank Risk and Too Big to Fail Guarantees: An Asset Pricing Perspective" (with J.P. Mei), *Journal of Real Estate Finance and Economics*, 1995.
"The Effect of Bank Capital Requirements on Bank Off-Balance Sheet Financial Innovations," *Journal of Banking and Finance,* 1995.
"When Does the Prime Rate Change" (with L. Mester), *Journal of Banking and Finance*, 1995.
"Deposit Insurance and Regulatory Forbearance: Are Caps on Insured Deposits Optimal?" (with J.F. Dreyfus and L. Allen), *Journal of Money, Credit and Banking*, 1994.
"Universal Banking and Firm Risk Taking" (with K. John and T. John),

*Journal of Banking and Finance*, 1994.
"Banking and Commerce: An Overview of the Policy Issues," *Journal of Banking and Finance*, 1994.
"Time Variation of Risk Premiums for Insurance Companies" (with J.P. Mei), *Journal of Risk and Insurance*, 1994.
"Managers, Owners and the Pricing of Risky Debt: An Empirical Analysis" (with E. Bagnani, N. Milonas, and N. Travlos), *Journal of Finance*, 1994.
"Banking Sector and Restructuring in Eastern Europe" (with A. Sommariva), *Journal of Banking and Finance*, 1993.
"Forbearance and Valuation of Deposit Insurance as a Callable Put" (with L. Allen), *Journal of Banking and Finance*, 1993.
"Prime Rate Changes: Is There An Advantage in Being First?" (with P. Nabar and S. Park), *Journal of Business*, 1993.
"Bank Window-Dressing: Theory and Evidence" (with L. Allen), *Journal of Banking and Finance*, 1992.
"The Pricing of Retail Deposits: Concentration and Information" (with Allen and Udell), *Journal of Financial Intermediation*, 1992.
"Deposit Insurance Reform" (with Berlin, Udell), *Journal of Banking and Finance*, August 1991.
"Additions to Bank Loan-Loss Reserves: Good News or Bad New?" (with T. Grammatikos), *Journal of Monetary Economics*, 1990.
"Ownership Control, Regulation and Bank Risk-Taking" (with Strock and Travlos), *Journal of Finance*, 1990.
"Are Banks Special: The Separation of Banking from Commerce and Interest Rate Risk" (with Yourougou), *Journal of Economics and Business, 1990.*
"The Underpricing of New Issues in Singapore" (with J. Lim), *Journal of Banking and Finance*, 1990.
"Bank Size, Collateral and Net Purchase Behavior in the Federal Funds Market: Empirical Evidence (with Allen and Peristiani), *Journal of Business*, 1989.
"The Effects of Shifts in Monetary Policy and Reserve Accounting Regimes on Bank Reserve Management in the Federal Funds Market" (with T. Urich), *Journal of Banking and Finance*, 1989.
"The Effects of DIDMCA on the Profitability and Risk of Large Commercial Banks and Thrift Institutions' (with J. Aharony and I. Swary), *Journal of Banking and Finance,* 1988.
"The Hedging Performance of ECU Futures" (with S. Sienkiewicz), *Journal of Futures Markets,* 1988.
"Intra- and Inter-Industry Effects of Bank Securities Market Activities: The Case of Discount Brokerage" (with M. Smirlock), *Journal of Financial and Quantitative Analysis*, 1987.
"New Tests of the Parity Hypothesis and Fiscal Policy Effects" (with J. Merrick), *Journal of Monetary Economics,* 1986.
"The Returns and Risks of U.S. Banks' Foreign Currency Activities" (with T. Grammatikos and I. Swary), *Journal of Finance,* 1986.
"The Determinants of Country Risk: A Selective Survey of the Literature," *Journal of Banking and Finance (Supplement)*, 1986.

"An Examination of the Contagion Effect in the International Loan Market," *Journal of Banking and Finance (Supplement)*, 1986.
"The Effects of a Shift in Monetary Policy Regime on the Profitability and Risk of Commercial Banks" (with J. Aharony and I. Swary), *Journal of Monetary Economics*, 1986.
"The Large-Small Bank Dichotomy in the Federal Funds Market" (with L. Allen), *Journal of Banking and Finance*, 1986.
"Futures Price Variability: A Test of Maturity and Volume Effects" (with T. Grammatikos), *Journal of Business*, 1986.
"A Micro-Model of the Federal Funds Market" (with T. Ho), *Journal of Finance*, 1985.
"The Effects of the International Banking Act on Domestic Bank Profitability and Risk" (with J. Aharony and I. Swary), *Journal of Money, Credit and Banking*, 1985.
"Bank Regulation and Monetary Policy," *Journal of Money, Credit and Banking*, 1985.
"On Constructing the Group Utility Function of a Loan Syndicate" (with D. Gandhi and R. Hausman), *Journal of Banking and Finance*, 1985.
"On the Constancy of the International Real Rate of Interest" (with R. Tress), *Journal of Monetary Economics*, 1984.
"Fixed Rate Loan Commitments, Takedown Risk and the Dynamics of Hedging with Futures" (with T. Ho), *Journal of Financial and Quantitative Analysis*, 1983.
"Asymmetric Information, Regulatory Lag and the Value of Incentive Contracts" (with K. John), *Journal of Finance*, 1983.
"Stability and the Hedging Performance of Foreign Exchange Futures (with T. Grammatikos), *Journal of Futures Markets*, 1983.
"The Determinants of Bank Interest Margins: Theory and Empirical Evidence" (with T. Ho), *Journal of Financial and Quantitative Analysis*, November 1981.
"The Growth of Organizational Forms of Foreign Banks in the U.S." (with L. Goldberg), *Journal of Money, Credit and Banking*, August 1981.
"The Investors' Gains from International Portfolio Investment" (with D. Gandhi, *et al.*), *Journal of Banking and Finance*, June 1981.
"A Catastrophe Model of Bank Failure" (with T. Ho), *Journal of Finance*, December 1980.
"Determinants of Foreign Bank Activity in the United States," *Journal of Banking and Finance*, December 1980.
"The Causes of U.S. Bank Expansion Overseas: The Case of Great Britain" (with L. Goldberg), *Journal of Money, Credit and Banking*, November 1980.
"A Stochastic Dominance Analysis of Unit Trust Performance" (with R. Woodward and C. Ward), *Journal of Financial And Quantitative Analysis*, June 1980.
"Bid Behavior and the Determination of Treasury Bill Rates" (with C. Ward), *Oxford Bulletin of Economics and Statistics*, August 1979.
"Risk, Regulation and Performance of Clearing Banks, 1965-1975" (with C. Ward), *Journal of Industrial Economics*, December 1976.

**(ii) Books/Monographs**
*Technology and the Regulation of Financial Markets* (with L. White), Lexington Books, 1985 (reprinted by Beard Books, 2003).
*Off Balance Sheet Activities* (with J. Ronen and A. Sondhi), Dow-Jones, 1990.

*IPO's and Venture Capitalists: A Test of the Dynamic Strategy Hypothesis* (with J. Lim), ICFA, 1990.
*The Management and Regulation of Banks:* A Book of Reading (with G. Udell and L. White), Bristlecone Books, 1992.
*Universal Banking in the U.S.?* (with I. Walter), Oxford University Press, 1994.
*Financial Institutions Management: A Risk Management Approach,* Irwin/McGraw-Hill, (1st edition), 1994 (2nd edition), 1996 (3rd edition), 1999 (4th edition), 2002 (5th edition), 2005.
*Financial System Design: Universal Banking Considered* (with I. Walter), Irwin, 1996.
*China's Emerging Capital Markets* (with A. Kumar, etal), Financial Times Publishing, 1997.
*Fundamentals of Financial Institutions Management* (with M. Cornett), Irwin/McGraw-Hill, (1st edition), 1999.
*Credit Risk Measurement: Value at Risk and Other New Paradigms*, John Wiley and Sons, (1st edition), 1999 (2nd edition), 2002.
*Financial Markets and Institutions: A Modern Perspective* (with M. Cornett), Irwin/McGraw-Hill, (1st edition), 2000 (2nd edition), 2003, (3rd edition) 2006.
*Understanding Market, Credit and Operational Risk* (with K. Boudoukh and L. Allen) Blackwell, (1st edition), 2003.

**(iii) Articles in Books (selected)**
"The Effect of a Dual Exchange Market on Spot and Commodity Prices in the US and UK"(with D. Emanual), *Proceedings of the International Research Seminar on Futures Markets*, Chicago Board of Trade, 1981.
"A Catastrophe Theory in Banking and Finance" (with T. Ho) in G. Szego and A. Cellina (eds.), *New Techniques for Economic Analysis,* Academic Press, 1982.
"Conflicts of Interest: The Case of Commercial *Bank* and Their Corporate Securities Underwriting Affiliates" in I. Walter (ed.), *Deregulating Wall Street*, John Wiley and Sons, 1985.
"An Economic Perspective on Bank Uniqueness and Corporate Securities Activities" in I. Walter (ed.), *Deregulating Wall Street*, John Wiley and Sons, 1985.
"Conflicts of Interest: The Case of Securities Activities of Commercial Banks," *Federal Reserve Bank of Philadelphia Review*, August/September, 1985.
"Seasonality in the Federal Funds Market: The Weekend Game and Other Effect" (with T. Urich) in E. Dimson (ed.), Evidence *on Stock Market Anomalies*, North-Holland, 1987.
"Bank Holding Companies: Structure, Performance and Reform" in W. Haraf (ed.), *Restructuring the Financial System*, AEI: Washington, D.C. 1989.
"The Inter Bank-Market, Contagion Effects and Financial Crisis" in Portes and Swaboda (ed.), *Threats to International Financial stability*, CEPR and CUP, 1987.
"LDC Debt Rescheduling" (with M. Subrahmanyam), *Federal Reserve Bank of Philadelphia Review*, November/December, 1988.
"SESDAQ: The Early Evidence" (with J. Lim) in Chang and Rhee (eds.), *Pacific Basin Capital Markets Research,* Elsevier, 1989.
"Forward Foreign Exchange Markets in Developing Countries" in R. O'Brien and T. Datta (eds.), *International Economics and Financial Markets,* O.U.P., 1989.

"Why Are So Many New Issues Underpriced?" *Federal Reserve Bank of Philadelphia Review,*1990.
"German Banking and Monetary Policy" in C. Barfied and M. Perlman (eds.) *Capital Markets and Trade: The U.S. Faces a United Europe,* AEI: Washington, D.C. 1992.
"Bank Deregulation and Monetary Policy" and "Discount Brokers" in the *New Palgrave Dictionary of Money and Finance,* 1993.
"The Reconfiguration of Banking and Capital Markets in Eastern Europe" (with I. Walter) in *The Transformation of the Socialist Economies,* H. Siebert (ed.) J.C.B. Mohr, Tubingen, Germany, 1992.
"Clearance and Settlement (with I. Giddy and I. Walter) in *The European Equity Markets*, B. Steil (ed), RIIA, London, 1996.
"A Survey of Cyclical Effects in Credit Risk Models in *Credit Ratings* (M. Ong (ed.)), Risk Books: London, 2003.

**(iv) Working Papers**
"Investment Banking Relationships and Merger Fees" (with A. Srinivasan).
"The Long Run Behavior of Debt and Equity Underwriting Spreads" (with D. Kim and D. Palia).
"Informational Efficiency of Loans Versus Bonds: Evidence from Secondary Market Prices" (with E. Altman and A. Gande).
"The Role of Banks in Takeovers" (with V. Ivashina et al).
"Are Initial Returns and Underwriting Spreads Complements or Substitutes?" (with D. Palia).

**Editorial Positions**
Editor, Journal of Banking and Finance (1994 -)
Editor, Financial Markets, Instruments and Institutions (1992 -)
Editor, Salomon Brothers Center Monograph in Finance and Economics (1984-91)
Advisory Editor, Journal of Money, Credit and Banking (2001 -)
Associate Editor, Journal of Money, Credit and Banking (1995-2001)
Associate Editor, Financial Management (1993 -)
Associate Editor, Journal of Financial Services Research (1986 -)
Associate Editor, Asia Pacific Journal of Management (1990 -)
Associate Editor, International Review of Financial Analysis (1990 -)
Associate Editor, Journal of Housing Research (1991 -)
Associate Editor, Review of Business Studies (1990 -)
Associate Editor, Journal of International Financial Management and Accounting (1991-)
Associate Editor, Journal of Banking and Finance (1986-1994)
Associate Editor, The Financier (1996 -)
Associate Editor, Review of Financial Markets (1996 -)
Associate Editor, Journal of Multinational Finance (1997 -)

**Research Fellowships**
Yamaichi Senior Research Fellow in Finance 1988-1991
Salomon Brothers Center Research Fellow 1986-1987
Bank and Financial Analysts Research Fellow 1987-1988

**Journal Referee (selected)**
American Economic Review
Financial Management
Financial Review
Journal of Banking and Finance
Journal of Business
Journal of Economics and Business
Journal of Economics and Organizational Behavior
Journal of Finance
Journal of Financial Economics
Journal of Financial Intermediation
Journal of Financial and Quantitative Analysis
Journal of Financial Research
Journal of Futures Markets
Journal of International Business Studies
Journal of International Money and Finance
Journal of Money, Credit and Banking
Journal of Monetary Economics
Journal of Portfolio Management
Journal of Real Estate Finance and Economics
Management Science
Public Finance Quarterly
Southern Economic Journal
Review of Financial Studies

**Keynote Speaker (last 4 years)**
Spanish Finance Association, Santiago, Spain (2002)
Multinational Finance Association, Cyprus (2002)
Symposium on Finance, Banking and Insurance, Karlsruhe, Germany (2002)
Spanish Finance Association, Segovia, Spain (2001)
Australasian Finance Association, Sydney, Australia (2004, 2003, 2002, 2000)
Pacific Basin Finance, Accounting and Economics Conference, Taiwan (2003)
Italian Quantitative Economics and Finance Association (AMESAS), Italy (2004)

# Expert Witness History: Professor Anthony Saunders

1. 2001-2005 Expert Reports on Fifth Third Bank, D and N Bank, and Perpetual Savings Bank for the Department of Justice. Testified in court on Fifth Third Bank case.

2. 2005 Expert Report on "Market Efficiency of Asia Pulp and Paper Securities," for Milberg, Weiss.

3. 2003-2006 Expert Reports on "Hynix and Microchip Dumping" for Hale and Dorr/ King and Spalding.

4. 2005 Expert Report on "Enron and the Nigerian Barges," Bagley, et al. criminal case for the Department of Justice. Testified in court.

5. 2005 Expert Report on "Insurance Contract Valuation," for Debvoise and Plimpton.

6. March 2006 Expert Report, "Bank of New Zealand General Re 1 Structured Finance Transaction (IRD 035/2055)," Report for the New Zealand Internal Revenue Division.

7. April 2006 Expert Report, "Westpac and Koch Structured Finance Transaction," Report for the New Zealand Internal Revenue Division.

8. June 2006 Expert Report, "Westpac and CSFB Structured Finance Transaction," Report for the New Zealand Internal Revenue Division.

9. 2003 Expert Report, "Nortel and Fraud on the Market," for Milberg Weiss.

10. 1997 Expert Report, "JP Morgan v. Korean Bank," for Latham and Watkins.

11. November 1996 Expert Report, "Fleet's Loans to Heritage and to Mallicone," Report for DEPCO and Edward D. Pare, Receiver of Heritage Loan and Investment Company.

12. May 1994 Expert Report, "A Report on Commodex," Equidex v. Telerate, for Patterson, Belknap, Webb and Tyler.

13. 1994 Expert Report, "Ellerman Securitization," for Strock, Strock and Lavan. Testified in court.

14. 1994 Expert Report, "Salomon Brothers and Treasury Auctions," for Milberg Weiss.

Confidential Materials - Subject to Protective Order

15. 1991 Expert Report, Haas v. Bankers Trust, "A Report on Hass Loans," for Litwin and Holsinger. Testified in court.

16. 1988 Expert Report, "Security Pacific v. Delco Wire," for Blank, Rome, Comisky and McCauley.

17. 1987 Expert Report, "ESM v. Grant Thornton," for Parker, Chapin, Flattau and Klimpl.

18. 1986 Expert Report, "Legality of Deposit Brokerage," for Budd, Larner.

# Exhibit 2
# Materials Considered

| | |
|---|---|
| | **Court Documents in Case No. 93-531** |
| 8/25/1993 | Complaint. Ambase Corporation and Carteret Bancorp, Inc., Plaintiffs vs. United States, Defendant. Case No. 93-531 |
| 3/20/1997 | Complaint in Intervention of Plaintiff FDIC |
| 4/28/1997 | First Amended Complaint |
| 9/17/2003 | Ambase's Motion to Dismiss the FDIC and to Define the Measure of Carteret's Contract Damages |
| 9/17/2003 | Memorandum in Support of Ambase's Motion to Dismiss the FDIC and to define the Appropriate Measure of Carteret's Contract Damages |
| 9/30/2003 | Defendants Response to Ambase's Motion to Dismiss the FDIC and to Define the Appropriate Measure of Carteret's Contract Damages |
| 9/30/2003 | Response of Plaintiff Federal Deposit Insurance Corporation to Ambase's Motion to Dismiss the FDIC |
| 10/16/2003 | Order (briefing on Plaintiff's Motion to Dismiss the FDIC and other issues) |
| 10/31/2003 | Ambase's Reply Brief in Support of its Motion to Define the Measure of Carteret's Contract Damages |
| 11/13/2003 | Defendant's Surreply in Opposition to Ambase's Motion to Define the Measure of Carteret's Contract Damages |
| 11/14/2003 | Plaintiff's FDIC's Sur-reply brief in further response ot Ambase's Motion to Dismiss the FDIC and to define the Measure of Cateret's Contract Damages |
| 11/19/2003 | Ambase's Motion for Leave to respond to New Statutory Argument Set Forth in FDIC's Surreply and Incorporate Memorandum |
| 8/31/2004 | Order and Opinion, Ambase Corporation and Carteret Bancorp, Inc., Plaintiffs vs. United States, Defendant, Case No. 93-531 |
| 9/15/2004 | Defendant's Motion for Reconsideration of the August 31, 2004 Ruling and, in the Alternative, to Dismiss the Stockholder Derivative Claim and the Complaint-in-intervention. |
| 9/22/2004 | Order (Stay of Defendant Motion) |
| 1/12/2005 | Order (Denied Defendant's Motion, Stay for Appeal, and Schedule) |
| 3/15/2005 | Defendant's Motion to Certify Order Dated August 31, 2004 for Interlucutory Review and to Stay Discovery |
| 3/15/2005 | Plaintiff-Intervenor FDIC's Request for Certification of an Immediate Interlocutory Appeal and Motion for Renewed Stay |
| 3/29/2005 | Ambase's Opposition to Motions to Certify Order Dated August 31, 2004 for Interlocutory Review |
| 4/25/2005 | Reply to Ambase's Opposition to Motions to Ceritfy Order Dated August 31, 2004 and for Interlocutory Review |
| 6/16/2006 | Plaintiff's Statement of Issues, including Volume III of Appendix |

**Depositions**

Deposition and Exhibits of Charles W. Calomiris, July 5-7, 2006

Deposition and Exhibits of Karen Hughes, April 7 & 17, 2006

Deposition and Exhibits of Elaine Tama, March 31, 2006

Deposition and Exhibits of Edward Griffen, March 30, 2006

Deposition and Exhibits of James Vortriede, March 2-3 & April 14, 2006

Deposition and Exhibits of Wayne Green, February 28, March 1 & April 5, 2006

## Exhibit 2
## Materials Considered

**Declarations**

Declaration of Charles W. Calomiris of May 19, 2006, corrected on May 23, 2006, and re-submitted on July 14, 2006 (and all documents relied upon)

**Documents Related to Conservatorhips/Receivership Accounting, Minority Bidding, Mortgage Banking Operations, and Cartert's Financial Condition**

| | | Bates Range |
|---|---|---|
| 2/1/1988 | FHLB Report of Examination | OAM001 0693 - 0796 |
| 5/22/1989 | OTS Report of Examination | WOQ668 1979 - 2222 |
| 10/25/1989 | RTC memo entitled "Lending Procedures - Third Revision" | AM5001 0631 - 0641 |
| 10/25/1989 | RTC memo entitled "Lending Procedures - Third Revision" | AM5001 0631 - 0641 |
| 6/4/1990 | OTS Report of Examination | WOQ690 2449 - 2653 |
| 6/21/1990 | Letter from FHLB to Carteret | AM5180 0931 - 0932 |
| 6/30/1990 | Carteret "Regulatory Capital Ratios" Schedule | AM5180 1043 - 1047 |
| 7/20/1990 | Carteret Board of Directors Meeting Minutes | AM4044 0374 - 0386 |
| 6/17/1991 | OTS Report of Examination | WOQ690 1401 - 1448 |
| 11/27/1991 | Mortgage Servicing Appraisal | AM4530 0185 - 0203 |
| 1/14/1992 | Policy for Continued Lending in Conservatorship | AM5067 0312 - 0329 |
| 5/14/1992 | Federal Register Notice on Post-Insolvency Interest | RAM050 1616 - 1618 |
| 6/5/1992 | "Loan Servicing Portfolio Evaluation" - Draft | AM5437 0319 - 0347 |
| 6/5/1992 | Calculation of Net Proceeds on Sale | AM5437 0315 - 0318 |
| 6/15/1992 | OTS Report of Examination | WOP317 0002 - 0118 |
| 6/19/1992 | FDIC Report of Examination | AM4259 0360 - 0382 |
| 7/22/1992 | "Purchased Mortgage Servicing Rights Evaluation" | AM5437 0032 - 0058 |
| 7/22/1992 | "Originated Loan Servicing Rights Evaluation" | AM5437 0004 - 0031 |
| 8/30/1992 | Summary of Clearwater Servicing Center | AM5437 0677 |
| 10/19/1992 | Letter from Hamilton to Carteret | AM5437 0001 - 0003 |
| 12/4/1992 | Credit Committee Review memo entitled "Redelegations of Authority" | AM5290 0032 - 0039 |
| 12/4/1992 | Conservatorship Strategic Plan | AM5087 2862 - 2947 |
| 12/4/1992 | Exiting Memorandum | AM5287 1007 - 1039 |
| 12/7/1992 | Summary of Mortgage Banking Operations | CAM320 0530 - 0532 |
| 12/7/1992 | Summary of Findings - Documentation | CAM320 0535 - 0536 |
| 12/31/1992 | OTS Thrift Financial Report | AM4188 1950 - 1982 |
| 12/31/1992 | Carteret's Consolidated Statements of Financial Condition | CAM708 0789 |
| 12/31/1992 | Carteret's Executive Summary of Intervention | AM5689 0021 - 0023 |
| 12/31/1992 | Carteret's "Other Borrowings" Schedule | AM5690 0064 - 0074 |
| 3/10/1993 | Carteret memo entitled "Uncommitted Pipeline" | AM5067 0546 - 0557 |
| 5/14/1993 | OTS Weekly Managing Agent Report | AM5711 0004 - 0005 |
| 6/10/1993 | OTS Weekly Managing Agent Report | AM5711 0006 - 0008 |
| 6/30/1993 | Discussion Items for Conservatorship Meetings | AM5706 0199 - 0220 |
| 8/4/1993 | "Valuation of Carteret Savings Bank's Mortgage Servicing Portfolio" | AM5290 0324 - 0350 |
| 8/27/1993 | Memo regarding the "Sale of Consumer Servicing Rights" | AM5290 0365 - 0368 |
| 9/24/1993 | Memo to Dissolution Review Committee | CAM553 0873 - 0877 |
| 10/1/1993 | "Projected Actions for Pre & Post Resolution Carteret" | AM5394 2089 - 2091 |
| 10/1993 | Clearwater Functional Chart | AM5344 0519 |
| 10/19/1993 | Solicitation of Services Agreement | AM5344 0642 - 0865 |
| 10/25/1993 | Memo re: "Issues Related To The Sale Of The Loan Servicing Operation" | AM5394 1952 - 2007 |
| 12/9/1993 | RTC e-mail entitled "Carteret Servicing Center Sale Update" | AM5290 0351 - 0352 |
| 12/13/1993 | OTS Report of Examination (field visit) | CAM050 0224 - 0236 |

**Exhibit 2**
**Materials Considered**

| | | | | | |
|---|---|---|---|---|---|
| 12/31/1993 | Carteret's Bidder Information Package | AM4292 | 0579 | - | 0915 |
| 12/31/1993 | "Issues Related To The Sale Of The Loan Servicing Operation" | AM5344 | 0435 | - | 0446 |
| 1/31/1994 | "Issues Related To The Sale Of The Loan Servicing Operation" | CAM405 | 1056 | - | 1072 |
| 2/16/1994 | Asset Review Committee Case Summary Sheet | AM5290 | 0403 | | |
| 2/17/1994 | Credit Review Committee memo | AM5290 | 0404 | - | 0410 |
| 2/28/1994 | Carteret's Addendum to Bid Package | AM4292 | 0916 | - | 1103 |
| 2/28/1994 | RTC Circular 9150.4 | WOP299 | 0733 | - | 0738 |
| 2/28/1994 | Summary of RTC Minority Preference Resolution Programs | WOP299 | 0739 | - | 0800 |
| 2/28/1994 | RTC memo attaching "Mortgage Servicing Rights Disposition" directive | CAM405 | 1350 | - | 1422 |
| 2/28/1994 | Carteret's monthly "Stratification of Assets Remaining" | AM5290 | 0132 | - | 0138 |
| 3/7/1994 | RTC Memo with New York Times "Tombstone" | AM4292 | 0115 | - | 0116 |
| 3/10/1994 | RTC email | AM4292 | 0114 | | |
| 3/14/1994 | Carteret letter entitled "Operational Issues Related to the Sale of Clearwater" | AM5344 | 0056 | - | 0065 |
| 3/29/1994 | Addendum to Offering Prospectus | CAM405 | 1073 | - | 1082 |
| 3/31/1994 | Operational Issues Related to the Sale of Clearwater | CAM405 | 0757 | - | 0775 |
| 4/7/1994 | Carteret memo entitled "Clearwater Servicing Center" | CAM405 | 0750 | - | 0756 |
| 4/8/1994 | Carteret memo re: Impact of Sale of Mortgage Servicing (CMS) | CAM405 | 1220 | - | 1222 |
| 4/12/1994 | Carteret memo entitled "Conservatorship Objectives/Mission Statement" | AM5290 | 0173 | - | 0176 |
| 4/28/1994 | Reserve Financial Prospectus for the Clearwater Servicing Center | AM5344 | 0066 | - | 0120 |
| 5/4/1994 | Carteret memo seeking authority to establish a Schedule C bank account | CAM405 | 0441 | - | 0447 |
| 5/4/1994 | Carteret memo | CAM405 | 0484 | - | 0492 |
| 5/16/1994 | Letter from RTC to American Financial Services Corp | C-AM-A-001 | 4502 | - | 4503 |
| 5/31/1994 | Carteret's monthly "Stratification of Assets Remaining" | AM5411 | 1181 | - | 1197 |
| 6/9/1994 | Letter from Chase Manhattan to Reserve Financial | AM5344 | 0146 | - | 0158 |
| 6/24/1994 | "Sale of Clearwater Servicing Center" | AM5394 | 1611 | - | 1615 |
| 6/30/1994 | Transitional Services Agreement | CAM405 | 0269 | - | 0279 |
| 7/6/1994 | RTC Bid Overview | AM4292 | 0392 | - | 0407 |
| 7/7/1994 | Carteret memo attaching "Ginnie Mae Servicing Assignment Agreement" | AM5394 | 1629 | - | 1632 |
| 7/8/1994 | RTC revised "Bid Form" for Carteret | AM4292 | 0408 | - | 0424 |
| 8/1/1994 | Transitional Services Agreement | CAM405 | 0253 | - | 0264 |
| 8/8/1994 | Letter from F.D. Terrell to RTC | C-AM-A-013 | 1607 | - | 1608 |
| 8/15/1994 | RTC memo entitled "Delay of Bid Date for Carteret" | C-AM-A-001 | 4374 | | |
| 8/15/1994 | RTC email | C-AM-A-013 | 0314 | | |
| 8/15/1994 | RTC email | C-AM-A-013 | 0315 | | |
| 8/16/1994 | Investors Savings Bank bid for six branch offices known as Clusters 5 and 7 | AM4333 | 1506 | - | 1512 |
| 8/16/1994 | RTC email | C-AM-A-014 | 4370 | | |
| 8/24/1994 | Letter from TCB Holdings to RTC | C-AM-A-012 | 5162 | - | 5163 |
| 8/25/1994 | Midlantic National Bank's ("Midlantic") bid | AM4333 | 1276 | - | 1341 |
| 8/25/1994 | Letter from Carteret Acquisition to RTC | C-AM-A-000 | 2838 | - | 2841 |
| 8/30/1994 | RTC email | C-AM-A-007 | 7122 | | |
| 8/30/1994 | FDIC Accounting Bulletin - National Depositor Preference | AM0009 | 6528 | - | 6531 |
| 8/31/1994 | RTC correspondence entitled "Update on Carteret FSB Bids" | C-AM-A-007 | 7126 | - | 7128 |
| 9/2/1994 | RTC correspondence entitled "Rejection of F.D. Terrell Bid" | C-AM-A-007 | 7141 | | |
| 9/2/1994 | Letter from RTC to F.D. Terrell | C-AM-A-013 | 1583 | | |
| 9/7/1994 | Letter from F.D. Terrell to RTC entitled "F.D. Terrell Group Bid" | C-AM-A-012 | 5150 | - | 5153 |
| 9/7/1994 | Letter from RTC to International Advisory Group | C-AM-A-013 | 1553 | - | 1554 |
| 9/9/1994 | Letter from Bahia Partners to RTC | C-AM-A-012 | 5140 | - | 5141 |
| 9/13/1994 | Carteret memo re: Final Cash Settlement for Clearwater Servicing | CAM405 | 0150 | - | 0154 |

Confidential Materials - Subject to Protective Order

**Exhibit 2**
**Materials Considered**

| | | | | | |
|---|---|---|---|---|---|
| 9/14/1994 | Letter from Midlantic to RTC | C-AM-A-012 | 5133 | - | 5134 |
| 9/15/1994 | RTC email | C-AM-A-001 | 4281 | - | 4282 |
| 9/22/1994 | RTC email | C-AM-A-007 | 7233 | | |
| 9/27/1994 | Letter from RTC to Peter T. King | C-AM-A-013 | 1544 | - | 1545 |
| 9/28/1994 | Carteret memo re: Clearwater Servicing Sale | CAM405 | 0104 | - | 0108 |
| 9/30/1994 | Mortgage Servicing Sale Transaction Summary | CAM405 | 0001 | - | 0002 |
| 10/3/1994 | Letter from Charles B. Rangel to RTC | C-AM-A-013 | 1543 | | |
| 10/3/1994 | Letter from Midlantic to RTC | C-AM-A-001 | 4236 | - | 4239 |
| 10/14/1994 | RTC correspondence | C-AM-A-008 | 8740 | - | 8743 |
| 10/14/1994 | Newspaper article reporting TCB Holding's successful bid | C-AM-A-012 | 5112 | | |
| 10/17/1994 | Letter from TCB Holdings to RTC | C-AM-A-002 | 8150 | - | 8152 |
| 10/18/1994 | Letter from First Savings Bank to RTC | C-AM-A-007 | 7396 | | |
| 10/18/1994 | RTC Decisional Memorandum regarding FL branch sales | C-AM-A-013 | 0578 | | |
| 10/26/1994 | RTC email | C-AM-A-007 | 7379 | | |
| 10/28/1994 | Net deposit calculation for Hamilton Bank ("Hamilton") settlement | AM5267 | 0001 | - | 0004 |
| 11/2/1994 | RTC letter to Carteret regarding "Initial Reserve Funding" | AM5344 | 0307 | - | 0324 |
| 11/7/1994 | Letter from BanPonce to RTC | C-AM-A-013 | 1492 | | |
| 11/10/1994 | Letter from Hamilton to RTC entitled "Carteret Federal Savings Bank" | AM5555 | 2008 | - | 2009 |
| 11/28/1994 | Letter from Carteret to RTC | AM5344 | 0129 | - | 0130 |
| 11/28/1994 | RTC Memo seeking authority to hire | AM5394 | 1848 | - | 1851 |
| 12/7/1994 | RTC email | C-AM-A-002 | 8088 | | |
| 12/14/1994 | Letter from RTC to Hamilton | AM5555 | 2010 | | |
| 12/14/1994 | RTC correspondence | C-AM-A-002 | 8076 | | |
| 12/29/1994 | RTC email | C-AM-A-002 | 8037 | | |
| 1/9/1995 | Net deposit calculation for Banco Popular | C-AM-A-012 | 9717 | | |
| 1/12/1995 | Letter from Bahia Partners to RTC Oversight Board | WOP299 | 1724 | - | 1725 |
| 1/17/1995 | Letter from RTC to Hamilton | AM5555 | 2011 | | |
| 1/18/1995 | RTC email | C-AM-A-007 | 7742 | | |
| 1/27/1995 | Letter from RTC to Bahia Partners | C-AM-A-012 | 5066 | - | 5069 |
| 1/31/1995 | Carteret's Consolidation Plan | CAM666 | 0013 | - | 0080 |
| 2/9/1995 | Letter from RTC to Bahia Partners | C-AM-A-012 | 5035 | - | 5037 |
| 2/14/1995 | Bank of New York bid for several clusters | AM4333 | 0669 | - | 0685 |
| 2/14/1995 | Chase Manhattan Bank of New Jersey bid | AM4333 | 1063 | - | 1080 |
| 2/14/1995 | Boiling Springs Savings Bank bid | AM4333 | 0312 | - | 0320 |
| 2/16/1995 | RTC correspondence entitled "Summary of Bids for Carteret FSB" | C-AM-A-002 | 7853 | - | 7854 |
| 3/1/1995 | RTC Decisional Memorandum | C-AM-A-001 | 3420 | | |
| 3/8/1995 | RTC correspondence entitled "Carteret Issue Paper" | C-AM-A-002 | 7774 | - | 7781 |
| 3/9/1995 | RTC document "Carteret FSB Acquirers, Deposits and Premiums" | C-AM-A-002 | 8258 | - | 8260 |
| 3/10/1995 | Failing Thrift Case recommending RTC to accept bids | C-AM-A-001 | 3421 | - | 3425 |
| 3/10/1995 | Attachment to Failing Thrift Case document | C-AM-A-008 | 8039 | - | 8040 |
| 3/10/1995 | Attachment to Failing Thrift Case document | C-AM-A-008 | 8074 | - | 8102 |
| 4/7/1995 | Memo to Dissolution Review Committee | CAM553 | 0853 | - | 0858 |
| 6/14/1995 | Internal FDIC memo entitled "Post-Insolvency Interest Memorandum" | AM0009 | 6532 | - | 6534 |
| 12/31/1995 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1653 | - | 1655 |
| 9/18/1996 | Options Memo, Post-Insolvency Interest | RAM051 | 0006 | - | 0022 |
| 12/31/1996 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1690 | - | 1692 |
| 3/13/1997 | Letter from FDIC to IRS (Austin, TX) | AM5231 | 0266 | - | 0267 |
| 6/17/1997 | Post-insolvency Interest Procedures Analysis | RAM063 | 0270 | - | 0272 |

**Exhibit 2**
**Materials Considered**

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/26/1997 | Post-insolvency Interest Procedures Analysis | RAM063 | 0184 | - | 0186 |
| 12/9/1997 | Memo from Tama re: Accrual of Interest | CAM958 | 0669 | - | 0674 |
| 12/31/1997 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1727 | - | 1729 |
| 5/4/1998 | FDIC Discussion Memorandum re: Post-insolvency Interest | AM001 | 0297 | - | 0305 |
| 5/4/1998 | Accounting and Tax Policy Section Memorandum: Post-insolvency Interest | RAM063 | 0169 | - | 0175 |
| 9/30/1998 | 1997 FDIC Goodwill Financial Reporting Package | RAM050 | 2048 | - | 2056 |
| 11/30/1998 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1758 | - | 1760 |
| 12/31/1998 | Carteret Statement of Assets and Liabilities and Statement of Operations | RAM050 | 1761 | - | 1763 |
| 1/26/1999 | FDIC Calculation of Interest on loans through 12/31/97 | AM0009 | 2190 | - | 2205 |
| 4/13/1999 | 1998 FDIC Goodwill Financial Reporting Package | RAM050 | 2039 | - | 2047 |
| 12/1/1999 | E-mail from M. Saran "Post-Insolvency Interest Rates and Priority of Interest" | AM0009 | 6535 | - | 6537 |
| 12/22/1999 | Chart about Post Insolvency Interest | AM001 | 0350 | | |
| 12/31/1999 | 1999 Statement of Operations, Assets and Liabilities | RAM050 | 1798 | - | 1800 |
| 2/18/2000 | Inception-to-date Net Change Balance Sheet | AM6107 | 0045 | - | 0074 |
| 5/15/2000 | FDIC memo "Tax Issues related to the Goodwill Litigation" | RAM058 | 0036 | - | 0041 |
| 5/17/2000 | "Tax Issues related to the Goodwill Litigation" [Finalized] | RAM063 | 0337 | - | 0342 |
| 7/28/2000 | 1999 FDIC Goodwill Financial Reporting Package | FAM071 | 0001 | - | 0009 |
| 11/20/2000 | FDIC memo entitled "Post-Insolvency Interest Rate for State Receiverships" | AM0009 | 6538 | - | 6541 |
| 12/31/2000 | 2000 Statement of Operations, Assets and Liabilities | RAM050 | 1835 | - | 1837 |
| 2/22/2001 | FDIC memo re: Priority of Post-insolvency Interest | AM0009 | 6542 | - | 6550 |
| 5/21/2001 | 2000 FDIC Goodwill Financial Reporting Package | FAM070 | 0001 | - | 0010 |
| 12/10/2001 | E-mail "News from the Chariman's Office." | RAM063 | 0145 | - | 0146 |
| 12/18/2001 | Proposed Rule on Post-Insolvency Interest | RAM050 | 1609 | - | 1615 |
| 4/10/2002 | Memo re: Final Regulation Regarding Payment of Post-Insolvency Interest | RAM050 | 1579 | - | 1583 |
| 5/1/2002 | Memo re: Final Regulation Regarding Payment of Post-Insolvency Interest | RAM063 | 0119 | - | 0123 |
| 5/7/2002 | E-mail re: final rule | RAM063 | 0118 | | |
| 6/3/2002 | 2001 FDIC Goodwill Financial Reporting Package | FAM073 | 0001 | - | 0010 |
| 11/13/2002 | Chart concerning Post-Insolvency interest | RAM050 | 1564 | | |
| 4/18/2003 | 2002 FDIC Goodwill Financial Reporting Package | FAM074 | 0002 | - | 0011 |
| 6/16/2003 | Memo from Tama entitled "Summary of Meeting on PII"; Green Exhibit 30 | | | | |
| 1/12/2004 | FDIC Position on "Accounting for Post-Insolvency Interest" | AM001 | 0386 | - | 0392 |
| 3/16/2004 | E-mail from James F. Voitriede | RAM063 | 0308 | - | 0310 |
| 4/7/2004 | 2003 FDIC Goodwill Financial Reporting Package | RAM050 | 1990 | - | 1999 |
| 6/30/2004 | "Purchase and Sale Agreement" between RTC and Chase | AM5344 | 0199 | - | 0305 |
| 12/6/2004 | RTC correspondence entitled "Carteret FSB Resolution" | C-AM-A-012 | 5205 | - | 5206 |
| 12/6/2004 | RTC email | C-AM-A-002 | 8100 | - | 8100 |
| 5/10/2005 | 2004 FDIC Goodwill Financial Reporting Package | RAM051 | 0351 | - | 0360 |
| 3/31/2006 | 2005 FDIC Goodwill Financial Reporting Package | | | | |
| 9/87-11/92 | Goodwill Amortization Schedules | AM0005 | 0504 | - | 0567 |
| | Failing Thrift Case recommending RTC accept current bids | C-AM-A-013 | 0611 | - | 0617 |
| | "Loan Servicing Offering" | AM5437 | 0234 | - | 0314 |
| | Clearwater Servicing Center Overview | AM5344 | 0526 | - | 0641 |
| | "RTC Letter of Intent for Purchase and Sale of Mortgage Servicing Rights" | CAM405 | 0776 | - | 0900 |
| | Carteret Cost Test Documents | FAM079 | 0101 | - | 0320 |
| | Goodwill File Memorandum | AM1007 | 0075 | - | 0077 |
| | Chapter 6 Dividends | FAM078 | 0038 | - | 0067 |
| | Analysis of Post-insolvency Interest Procedure Proposals | RAM063 | 0202 | - | 0203 |
| | Resolution | RAM050 | 1577 | - | 1578 |
| | "Exhibit "A"" FDIC Final Rule | RAM063 | 0124 | - | 0132 |

**Exhibit 2**
**Materials Considered**

| | | |
|---|---|---|
| | "Exhibit B"" Resolution | RAM063 0133 - 0134 |
| | FDIC Statement of Position | RAM063 0209 - 0213 |
| | "Exhibit "A"" FDIC Final Rule | RAM050 1584 - 1592 |
| | FDIC Notice of proposed rulemaking | RAM050 1597 - 1608 |
| | Carteret Savings Bank 1989 Annual Report | WOT671 1260 - 1287 |
| | Carteret Savings Bank 1990 Annual Report | WOP291 1527 - 1557 |
| | Carteret Savings Bank 1991 Annual Report | FAM002 2373 - 2403 |
| | Ambase Form 10-K for the year ended December 31, 1992 | RAM012 0002 - 0098 |
| | Carteret TFR, Quarter of Dec 1991 | FAM002 0919 - 0952 |
| | Carteret TFR, March 1992 | WOQ698 1265 - 1270 |
| | Carteret TFR, March 1992 | FAM002 0953 - 0986 |
| | Carteret TFR, June 1992 | FAM002 0996 - 1043 |
| | Carteret TFR, September 1992 | WOP316 1469 - 1491 |
| | Carteret TFR, December 1992 | CAM320 0641 - 0659 |
| | Statements of Assets and Liabilities in Liquidation, 1995 | AM0009 6610 - 6627 |
| | **Asset Summary Reports** | |
| 5/4/1993 | Conservatorship Asset Summary Report for March 31, 1993 | AM5415 0141 - 0147 |
| | Conservatorship Asset Summary Report for March 31, 1993 | AM5415 0180 |
| | Conservatorship Asset Summary Report for March 31, 1993 | CAM830 2288 - 2295 |
| | Conservatorship Asset Summary Report | CAM830 2277 - 2278 |
| 5/19/1993 | Conservatorship Asset Summary Report for April 30, 1993 | AM5415 0033 - 0045 |
| | Conservatorship Asset Summary Report for April 30, 1993 | CAM830 2282 - 2287 |
| 6/22/1993 | Conservatorship Asset Summary Report for May 31, 1993 | AM5415 0297 - 0337 |
| | Conservatorship Asset Summary Report for May 31, 1993 | CAM830 2279 - 2281 |
| 7/30/1993 | Conservatorship Asset Summary Report for June 30, 1993 | AM5415 0342 - 0357 |
| 7/16/1993 | Conservatorship Asset Summary Report for June 1993 | AM5415 0472 - 0479 |
| 7/16/1993 | Conservatorship Asset Summary Report for June 30, 1993 | AM5415 0493 - 0505 |
| | Conservatorship Asset Summary Report for June 30, 1993 | CAM830 2266 - 2274 |
| 8/20/1993 | Conservatorship Asset Summary Report for July 1993 | AM5415 0480 - 0492 |
| 8/11/1993 | Conservatorship Asset Summary Report for July 1993 | AM5415 0506 - 0517 |
| 9/21/1993 | Conservatorship Asset Summary Report for August 31, 1993 | AM5415 0690 - 0732 |
| 10/18/1993 | Conservatorship Asset Summary Report for September 30, 1993 | AM5415 0115 - 0140 |
| 10/18/1993 | Conservatorship Asset Summary Report for September 30, 1993 | CAM830 2299 - 2300 |
| 11/18/1993 | Conservatorship Asset Summary Report for October 31, 1993 | AM4188 0776 - 0837 |
| 12/21/1993 | Stratification of Assets Remaining November 30, 1993 | AM5290 0156 - 0161 |
| 12/2/1993 | Conservatorship Asset Summary Report for November 1993 | CAM830 2192 - 2207 |
| | Stratification of Assets Remaining November 30, 1993 | AM5290 0162 - 0166 |
| 1/10/1994 | Conservatorship Asset Summary Report for December 31, 1993 | CAM830 2182 - 2191 |
| 2/18/1994 | Conservatorship Asset Summary Report for January 31, 1994 | CAM028 0146 - 0162 |
| | Conservatorship Asset Summary Report for January 1994 | AM5004 0154 - 0162 |
| 3/18/1994 | Conservatorship Asset Summary Report for February 28, 1994 | AM5079 1253 - 1267 |
| 3/2/1994 | Conservatorship Asset Summary Report for February 1994 | CAM830 2164 - 2172 |
| 4/22/1994 | Conservatorship Asset Summary Report for March 31,1994 | AM5242 0337 - 0354 |
| 4/4/1994 | Conservatorship Asset Summary Report for March 1994 | CAM830 2156 - 2160 |
| 5/23/1994 | Conservatorship Asset Summary Report for April 30, 1994 | AM5242 0318 - 0336 |
| 5/1/1994 | Conservatorship Asset Summary Report for April 1994 | CAM830 2150 - 2155 |
| 6/21/1994 | Conservatorship Asset Summary Report for May 31, 1994 | AM5242 0300 - 0317 |
| 6/2/1994 | Conservatorship Asset Summary Report for May 1994 | CAM830 2143 - 2149 |
| 7/21/1994 | Conservatorship Asset Summary Report for June 30, 1994 | AM5242 0281 - 0299 |

## Exhibit 2
## Materials Considered

| | | |
|---|---|---|
| 7/5/1994 | Conservatorship Asset Summary Report for June 1994 | CAM830 2137 - 2142 |
| 8/23/1994 | Conservatorship Asset Summary Report for July 31, 1994 | AM5242 0263 - 0280 |
| 8/2/1994 | Conservatorship Asset Summary Report for July 1994 | CAM830 2131 - 2136 |
| 9/26/1994 | Conservatorship Asset Summary Report for August 31, 1994 | AM5242 0227 - 0244 |
| 9/6/1994 | Conservatorship Asset Summary Report for August 1994 | CAM830 2125 - 2130 |
| 10/27/1994 | Conservatorship Asset Summary Report for September 30, 1994 | AM5242 0245 - 0262 |
| 10/6/1994 | Conservatorship Asset Summary Report for September 1994 | CAM830 2118 - 2124 |
| 11/23/1994 | Conservatorship Asset Summary Report for October 31, 1994 | AM5242 0209 - 0226 |
| 11/2/1994 | Conservatorship Asset Summary Report for October 1994 | CAM830 2113 - 2117 |
| 12/27/1994 | Conservatorship Asset Summary Report for November 30, 1994 | AM5242 0191 - 0208 |
| 12/1/1994 | Conservatorship Asset Summary Report for November 1994 | CAM830 2108 - 2112 |
| 1/23/1995 | Conservatorship Asset Summary Report for December 31, 1994 | AM5242 0173 - 0190 |
| | Conservatorship Asset Summary Report for December 1994 | AM5392 0115 - 0121 |
| 4/13/1995 | Conservatorship Asset Disposition Report for March 10, 1995 | CAM666 0380 |
| 4/13/1995 | Conservatorship Asset Disposition Report for March 10, 1995 | AM5392 1397 |
| 4/18/1995 | Conservatorship Asset Summary Report for March 10, 1995 | AM5392 1388 - 1396 |

**Journal Articles**

Babu G. Baradwaj, David A. Dubovsky and Donald R. Fraser, "Bidder Returns in Interstate and Intrastate Acquisitions," *Journal of Financial Services Research*, 5:261-273 (1991).

Edward J. Kane and Min-Teh Yu, "Opportunity Cost of Capital Forbearance during the Final Years of the FSLIC Mess," *The Quarterly Review of Economics and Finance*, Fall 1996 (pp. 271-290).

Edward J. Kane and Min-Teh Yu, "Measuring the true profile of taxpayer losses in the S & L insurance mess," *Journal of Banking & Finance* 19 (1995), pp. 1459-1477.

Inmoo Lee, Scott Lochhead, Jay Ritter, and Quanshui Zhao, "The Cost of Raising Capital," *The Journal of Financial Research*, Vol. XIX, No. 1, Spring 1996 (pp. 59-74).

Timothy Curry and Lynn Shibut, "The Cost of the Savings and Loan Crisis: Truth and Consequences," *FDIC Banking Review*, Vol. 13, No. 2, 2000.

David P. Ely and Nikhil P. Varaiya, "Opportunity Costs Incurred by the RTC in Cleaning Up S&L Insolvencies," *The Quarterly Review of Economics and Finance*, Vol. 36, No. 3, Fall 1996 (pp. 291-310).

David P. Ely and Nikhil P. Varaiya, "Asessing the Resolution of Insolvent Thrift Institutions post FIRREA: The Impact of Resolution Delays," *Journal of Financial Services Research*, 11:3 1997, (pp. 255-282).

Kerry D. Vandell and Timothy J. Riddiough, "The Impact of RTC Dispositions on Local Housing and Real Estate Markets," *Housing Policy Debate*, Vol. 2, Issue 1 (pp. 49-68).

Lee Davison, "Politics and Policy: The Creation of the Resolution Trust Corporation." *FDIC Banking Review*, 2005, Vol 17, No. 2, (pp. 17-44).

Bert Ely, "The Resolution Trust Corporation in Historical Perspective," *Housing Policy Debate*, Vol. 1, Issue 1 (pp. 53-78).

George J. Benston, and George G. Kaufman, "FDICIA After Five Years," *The Journal of Economic Perspectives*, Vol. 11, No. 3, Summer 1997 (pp. 139-158).

Roger D. Stover, "Early resolution of troubled financial institutions: An examination of the accelerated resolution program," *Journal of Banking & Finance*, 21, 1997 (pp. 1179-1194).

## Exhibit 2
## Materials Considered

Mukesh Bajaj, Sumon C. Mazumdar, and Atulya Sarin, "The Costs of Issuing Preferred Stock," *The Journal of Financial Research,* Vol. XXV, No. 4, Winter 2002 (pp. 577-592).

Sudhir Nanda, James E. Owens, and Ronald C. Rogers, "An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing, *Real Estate Economics*, 1997, V25 (pp. 271-294).

Joseph B. Blalock, Timothy J. Curry, and Peter J. Elmer, "Resolution Costs of Thrift Failures," *FDIC Banking Review*, Spring/Summer 1991, Vol. 4, No. 1 (pp. 15-26).

Roy Gardner and Roger D. Stover, "The Role of Information in Resolution Trust Corporation Auctions of Failed Thrifts," *Journal of Financial Services Research*, 14:3, 1998 (pp. 209-221).

Eugene F. Fama and Kenneth R. French, "The Cross-Section of Expected Stock Returns," *The Journal of Finance,* Vol. XLVII, No. 2, June 1992, (pp. 427-465).

P.L. Cooley and J. I. Heck, "Prolific Authors in the Finance Literature: A Half Century of Contributions," *Journal of Financial Literature*, Vol. 1, Winter 2005 (pp. 46-49).

**Periodicals, GAO Reports, and Other**

"Statement No. 90: An Open Letter to President Clinton," Shadow Financial Regulatory Committee, December 14, 1992.

"Statement No. 55: RTC Thrift Resolution Policies," S-105, Shadow Financial Regulatory Committee, May 7, 1990.

"The RTC's Epitaph: It Worked," *Business Week,* January 15, 1996, p. 29.

"Learning from the RTC," *U.S. Banker*, September 1993, p. 28.

"Imperial Credit Industries Inc. Announces Major East Coast Expansion," *PR Newswire*, December 28, 1992.

"Imperial Expands to E. Coast," *National Mortgage News*, January 11, 1993, p. 1.

"Imperial Bancorp reports 1992 year-end and fourth-quarter results," *Business Wire*, January 21, 1993.

"Imperial Credit Industries Inc. Announces Recent Developments," *PR Newswire*, March 29, 1993.

"Imperial Credit stock falls 21% on earnings news," *Orange County Register*, March 30, 1993, p. E-02.

"Conferees Clear Compromise Bill For RTC Funds -- Vote Followed Resolution of Issue of Authority To Sue S&L Officials," *Wall Street Journal*, November 19, 1993, p. A2.

RTC Statistical Abstract, August 1989/September 1995

*Managing the Crisis: The FDIC and RTC Experience*, prepared by the FDIC.

5/1995 1993 Thrift Resolutions: RTC's Resolution Process Generally Adequate to Determine Least Costly Resolutions, GAO, GAO/GGD-95-119

12/1995 Resolution Trust Corporation: Performing Assets Sold to Acquirers of Minority Thrifts, GAO, GAO/GGD-96-44

12/2004 FDIC Failure Transaction Database User Documentation

12/9/2003 "Audit of the Federal Financing Bank's Fiscal Years 2003 and 2002 Financial Statements," Office of the Inspector General, Department of the Treasury

## Exhibit 2
## Materials Considered

**Databases and Exhibit Back-up**

FDIC Failure Transaction Database

Veribanc TFR Database

SNL Securities Database

TBMS series; Federal Reserve Bank

TCMNOMY20 series; Federal Reserve Bank

MORTGNA series; Federal Reserve Bank

PRIMENA series; Federal Reserve Bank

Post-Judgment Interest Rate Table (www.uscourts.gov/postjud/rate2001.html)

Bureau of Economic Analysis, Table 1.1.6. Real Gross Domestic Product (http://www.bea.gov/bea/dn/nipaweb/index.asp)

http://www.census.gov/const/C40/Table2/tb2u8599.txt
http://www.census.gov/const/C40/Table2/tb2u8699.txt
http://www.census.gov/const/C40/Table2/tb2u8799.txt
http://www.census.gov/const/C40/Table2/tb2u8899.txt
http://www.census.gov/const/C40/Table2/tb2u8999.txt

Series LNS14000000; Bureau of Labor Statistics

Series LASST34000003; Bureau of Labor Statistics

Series LASST12000003; Bureau of Labor Statistics

FNER Index (FTSE NAREIT Equity REITs Index)

NPRQEAST Index (NCREIF Regional Property Index East)

NPRQSOUT Index (NCREIF Regional Property Index South)

**Other Cases**

9/15/2002 The Long Island Savings Bank, FSB et al. v. The United States, Opinion and Order, U.S. Court of Federal Claims, No. 92-517-C.

Confidential Materials - Subject to Protective Order

**Exhibit 3**
**Interest Rates: October 1994 - December 2005**




Sources: TBM3 series, TCMNOMY20 series, MORTGNA series, and PRIMENA series from the Federal Reserve Bank;
Post Judgment Interest Rate Table from www.uscourts.gov/postjud/rate2001.html

Confidential Materials - Subject to Protective Order

## Exhibit 4
## Timeline of FDIC Interest Calculation Method




Sources: AM00096528, AM00096532-4, Green Exhibit 23, AM00096535-7, FAM0710001-9 at FAM0710005 (note a).

Confidential Materials - Subject to Protective Order

## Exhibit 5
## Post-Insolvency Interest Rates
## September 1994 - December 2004




Sources: TBM3 series from the Federal Reserve Bank;
Post Judgment Interest Rate Table from www.uscourts.gov/postjud/rate2001.html

Confidential Materials - Subject to Protective Order

**Exhibit 6**

**Fixed Interest Rate v. Floating Interest Rate Calculation Methodology**
**Comparison of Interest Accrued**

| | Annual Interest Accrued | | | Total Interest Accrued | | |
|---|---|---|---|---|---|---|
| As of | FDIC Fixed | Calomiris Floating | Difference | FDIC Fixed | Calomiris Floating | Difference |
| December 31, 1994 | $1,680,033 | $1,336,162 | $343,871 | $1,680,033 | $1,336,162 | $343,871 |
| December 31, 1995 | $48,913,035 | $40,922,367 | $7,990,668 | $50,593,068 | $42,258,529 | $8,334,538 |
| December 31, 1996 | $18,525,370 | $13,614,034 | $4,911,336 | $69,118,438 | $55,872,564 | $13,245,874 |
| December 31, 1997 | $11,378,887 | $7,899,021 | $3,479,866 | $80,497,324 | $63,771,584 | $16,725,740 |
| December 31, 1998 | $9,946,759 | $6,484,752 | $3,462,008 | $90,444,084 | $70,256,336 | $20,187,748 |
| December 31, 1999 | $8,402,837 | $4,712,573 | $3,690,264 | $98,846,920 | $74,968,909 | $23,878,011 |
| December 31, 2000 | $8,127,377 | $5,516,641 | $2,610,736 | $106,974,298 | $80,485,550 | $26,488,748 |
| December 31, 2001 | $8,633,721 | $4,122,253 | $4,511,468 | $115,608,019 | $84,607,803 | $31,000,216 |
| December 31, 2002 | $9,229,503 | $1,770,484 | $7,459,019 | $124,837,522 | $86,378,287 | $38,459,235 |
| December 31, 2003 | $9,866,611 | $1,131,030 | $8,735,581 | $134,704,133 | $87,509,316 | $47,194,817 |
| December 31, 2004 | $10,576,829 | $1,264,058 | $9,312,771 | $145,280,962 | $88,773,374 | $56,507,588 |
| December 31, 2005 | $11,278,540 | $3,114,776 | $8,163,764 | $156,559,502 | $91,888,150 | $64,671,352 |

Sources:
Calomiris Back-up Calculation for Row (2) of Table 2.
Calomiris Back-up Calculation for FDIC's calculation of interest
Green Exhibit 36.

## Exhibit 7
## Carteret's Performance Relative to Other Failed Thrifts: Tangible Capital to Tangible Asset Ratio

| Bank Name | One Quarter Before Failure: Tangible Capital to Tangible Assets Ratio[1] |
|---|---|
| PELICAN HOMESTEAD SA | -22.8692% |
| ALPHA INDIAN ROCK FS&LA | -8.2963% |
| SECURITY FS&LA | -6.3227% |
| CRESTLINE FS&LA | -5.7257% |
| HANSEN FSB | -4.9904% |
| LEMONT FSA | -4.4516% |
| SECURITY 1ST FS&LA | -3.4635% |
| COLUMBIA BANKING FSA | -2.8438% |
| HOME UNITY FS&LA | -2.4814% |
| UNITED SAVINGS OF AMERICA | -2.4747% |
| LIBERTY FSB | -1.9913% |
| FLAGLER FS&LA | -1.7094% |
| **CARTERET FSB** | **-1.2947%** |
| SECURITY FSB | -1.0984% |
| IRVINGTON FSB | -0.3581% |
| UKRANIAN FS&LA | -0.2590% |
| HANSEN FSA | 0.0526% |
| SOUTHERN FSA OF GA | 0.2106% |
| VOLUNTEER FSA | 0.5093% |
| BIRMINGHAM FSB | 0.5372% |
| POLIFLY FS&LA | 0.6481% |
| FIRST STATE SA | 0.7392% |
| HOMESTEAD FSA | 0.7743% |
| CARROLLTON HOMESTEAD ASSN., FA | 0.8952% |
| FIRST HOME FSA | 1.1816% |
| THE OVERLAND PARK FS&LA | 1.2340% |
| FIRST SOUTH FSB | 1.3221% |
| FIRST FS&LA OF RUSSELL CO, FA | 1.4853% |
| VALLEY FS&LA | NA |
| | |
| Mean | -2.1800% |
| Median | -0.7283% |

[1]Quarter Before Failure TFR line CCR10/TFR line CCR15
Note: As in Professor Calomiris's note to his Table 5, "the sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as 'state stock savings and loans' that could be matched with historical TFR data."

Sources: Veribanc TFR Data, FDIC Failure Transaction Database

## Exhibit 8
## Carteret's Performance Relative to Other Failed Thrifts: Core Capital to Adjusted Tangible Asset Ratio

| Bank Name | One Quarter Before Failure: Core Capital to Adjusted Tangible Assets Ratio[1] |
|---|---|
| PELICAN HOMESTEAD SA | -21.3692% |
| ALPHA INDIAN ROCK FS&LA | -8.2963% |
| CRESTLINE FS&LA | -5.7257% |
| SECURITY FS&LA | -5.3226% |
| LEMONT FSA | -4.4516% |
| HANSEN FSB | -3.4908% |
| COLUMBIA BANKING FSA | -2.8438% |
| HOME UNITY FS&LA | -2.4814% |
| UNITED SAVINGS OF AMERICA | -2.4747% |
| LIBERTY FSB | -1.9913% |
| SECURITY 1ST FS&LA | -1.9634% |
| FLAGLER FS&LA | -0.5873% |
| IRVINGTON FSB | -0.3581% |
| **CARTERET FSB** | **-0.2947%** |
| UKRANIAN FS&LA | -0.2590% |
| SECURITY FSB | -0.0984% |
| HANSEN FSA | 0.0526% |
| SOUTHERN FSA OF GA | 0.2106% |
| VOLUNTEER FSA | 0.5093% |
| BIRMINGHAM FSB | 0.5372% |
| FIRST STATE SA | 0.7392% |
| HOMESTEAD FSA | 0.7743% |
| CARROLLTON HOMESTEAD ASSN., FA | 0.8952% |
| FIRST HOME FSA | 1.1816% |
| THE OVERLAND PARK FS&LA | 1.2340% |
| FIRST SOUTH FSB | 1.3221% |
| FIRST FS&LA OF RUSSELL CO, FA | 1.4853% |
| POLIFLY FS&LA | 1.6481% |
| VALLEY FS&LA | N/A |
| | |
| Mean | -1.8364% |
| Median | -0.2768% |

[1]Quarter Before Failure TFR line CCR20/TFR line CCR25
Note: As in Professor Calomiris's note to his Table 5, "the sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as 'state stock savings and loans' that could be matched with historical TFR data."

Sources: Veribanc TFR Data, FDIC Failure Transaction Database

Confidential Materials - Subject to Protective Order

## Exhibit 9
## Carteret's Performance Relative to Other Failed Thrifts: Non Accrual Loans + REO to Total Assets Ratio

| Bank Name | One Quarter Before Failure Non Accrued Loans + REO to Total Assets Ratio[1] |
|---|---|
| FIRST STATE SA | 1.8902% |
| CRESTLINE FS&LA | 1.8940% |
| FIRST HOME FSA | 2.1559% |
| BIRMINGHAM FSB | 2.7493% |
| SECURITY FSB | 2.7660% |
| HANSEN FSA | 3.5430% |
| HOME UNITY FS&LA | 3.5972% |
| HOMESTEAD FSA | 3.7542% |
| SECURITY 1ST FS&LA | 3.8664% |
| IRVINGTON FSB | 4.3111% |
| THE OVERLAND PARK FS&LA | 4.3723% |
| LEMONT FSA | 4.7464% |
| VALLEY FS&LA | 5.3060% |
| UNITED SAVINGS OF AMERICA | 5.6587% |
| SECURITY FS&LA | 5.9426% |
| POLIFLY FS&LA | 6.6807% |
| PELICAN HOMESTEAD SA | 6.9068% |
| **CARTERET FSB** | **7.0036%** |
| CARROLLTON HOMESTEAD ASSN., FA | 7.0839% |
| VOLUNTEER FSA | 7.3731% |
| FLAGLER FS&LA | 7.7160% |
| ALPHA INDIAN ROCK FS&LA | 8.6987% |
| COLUMBIA BANKING FSA | 10.3426% |
| HANSEN FSB | 10.5836% |
| SOUTHERN FSA OF GA | 11.8376% |
| UKRANIAN FS&LA | 12.7785% |
| FIRST FS&LA OF RUSSELL CO, FA | 14.1584% |
| LIBERTY FSB | 15.4361% |
| FIRST SOUTH FSB | 17.4802% |
| | |
| Mean | 6.9184% |
| Median | 5.9426% |

[1]One Quarter Before Failure TFR lines: (SC40 + PD30 - SC430)/SC60
Note: As in Professor Calomiris's note to his Table 5, "the sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as 'state stock savings and loans' that could be matched with historical TFR data."

Sources: Veribanc TFR Data, FDIC Failure Transaction Database

Confidential Materials - Subject to Protective Order

**Exhibit 10**
**Number of Failures by Resolution Type in the FDIC Failure Transaction Database and by Professor Calomiris's Resolution Category**

| | | Mergers and Reprivatizations | | | | Purchase and Assumption | | | IDT and Payoffs | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Resolution Year | Total | A/A | MGR | REP | Total | P&A | PA | Total | ABT | IDT | PO | PI | Total |
| 1980 | 11 | 11 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1981 | 28 | 27 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1982 | 70 | 69 | 0 | 0 | 69 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1983 | 51 | 45 | 0 | 0 | 45 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 6 |
| 1984 | 24 | 20 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 4 |
| 1985 | 35 | 27 | 0 | 0 | 27 | 0 | 0 | 0 | 0 | 6 | 2 | 0 | 8 |
| 1986 | 47 | 28 | 0 | 1 | 29 | 0 | 0 | 0 | 9 | 7 | 2 | 0 | 18 |
| 1987 | 47 | 27 | 0 | 0 | 27 | 0 | 0 | 0 | 5 | 12 | 3 | 0 | 20 |
| 1988 | 220 | 176 | 16 | 0 | 192 | 0 | 0 | 0 | 2 | 20 | 6 | 0 | 28 |
| 1989 | 46 | 2 | 0 | 0 | 2 | 0 | 7 | 7 | 0 | 31 | 6 | 0 | 37 |
| 1990 | 315 | 0 | 0 | 0 | 0 | 0 | 172 | 172 | 0 | 95 | 48 | 0 | 143 |
| 1991 | 232 | 0 | 0 | 0 | 0 | 0 | 157 | 157 | 0 | 25 | 46 | 4 | 75 |
| 1992 | 166 | 1 | 0 | 0 | 1 | 0 | 90 | 90 | 0 | 15 | 15 | 45 | 75 |
| 1993 | 87 | 0 | 0 | 0 | 0 | 0 | 43 | 43 | 0 | 0 | 6 | 38 | 44 |
| 1994 | 75 | 0 | 0 | 0 | 0 | 0 | 62 | 62 | 0 | 1 | 3 | 9 | 13 |
| 1995 | 9 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 1 | 0 | 3 | 4 |
| 1996 | 6 | 0 | 0 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 2 | 2 |
| 1997 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 |
| 1999 | 6 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 1 | 1 |
| 2000 | 7 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 5 | 5 |
| 2001 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 2 | 2 |
| 2002 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 6 | 9 |
| 2003 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 |
| 2004 | 4 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 1 | 1 | 2 |
| Total | 1,506 | 433 | 16 | 1 | 450 | 1 | 553 | 554 | 16 | 222 | 144 | 120 | 502 |

Note: The nine resolution types, e.g. A/A, are defined in the FDIC Failure Transaction Database User Documentation at p. 9. The counts for each of the nine types by year are tabulated directly from the Failure Transaction Database using failures that have a resolution date and the data needed to calculate Professor Calomiris's expected premium. The three categorizations -- Merger and Reprivatizations, Purchase and Assumption, and IDT and Payoffs -- are from Professor Calomiris's analysis.

Sources: FDIC Failure Transaction Database, Calomiris worksheet "Turnover FDIC/TFR Data, July 14, 2006."

Confidential Materials - Subject to Protective Order

**Exhibit 11**
**Distribution of Professor Calomiris's Expected Premiums by his Resolution Category: Resolutions After 1988**




Sources: FDIC Failure Transaction Database, Calomiris worksheet "Turnover FDIC/TFR Data, July 14, 2006."

Confidential Materials - Subject to Protective Order

## Exhibit 12
## All Government Assisted Transactions - 1992 through 1995

| | [1] | [2] | [3] |
|---|---|---|---|
| 1992 | US | New Jersey | Florida |
| # of Transactions | 279 | 8 | 16 |
| # of Transactions with Deposit Premium Data | 238 | 8 | 16 |
| Mean Deposit Premium | 1.63 | 1.42 | 1.36 |
| Median Deposit Premium | 1.17 | 1.08 | 0.79 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 1.88 | 1.91 | 2.23 |
| 1993 | | | |
| # of Transactions | 118 | 1 | 1 |
| # of Transactions with Deposit Premium Data | 88 | 1 | 1 |
| Mean Deposit Premium | 3.45 | 5.25 | 4.48 |
| Median Deposit Premium | 2.55 | 5.25 | 4.48 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 4.46 | 5.25 | 4.48 |
| 1994 | | | |
| # of Transactions | 194 | 12 | 15 |
| # of Transactions with Deposit Premium Data | 184 | 11 | 15 |
| Mean Deposit Premium | 6.33 | 5.43 | 6.70 |
| Median Deposit Premium | 6.31 | 5.97 | 5.12 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 6.99 | 6.90 | 10.85 |
| 1995 | | | |
| # of Transactions | 22 | 12 | 0 |
| # of Transactions with Deposit Premium Data | 21 | 12 | 0 |
| Mean Deposit Premium | 7.94 | 10.59 | . |
| Median Deposit Premium | 9.18 | 11.30 | . |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 8.35 | 10.82 | . |

Source: SNL Securities

Confidential Materials - Subject to Protective Order

**Exhibit 13**
**Deposit Premium by Deposits Per Branch**
**All New Jersey Government Assisted Transactions, 1992 - 1995**




Source: SNL Securities

Confidential Materials - Subject to Protective Order

**Exhibit 14**
**Deposit Premium by Deposits Per Branch**
**All Florida Government Assisted Transactions, 1992 - 1995**




Source: SNL Securities

Confidential Materials - Subject to Protective Order

## Exhibit 15
## Deposit Premium by Total Deposits
## All New Jersey Government Assisted Transactions, 1992 - 1995




Source: SNL Securities

**Exhibit 16**
**Deposit Premium by Total Deposits**
**All Florida Government Assisted Transactions, 1992 - 1995**




Source: SNL Securities

Confidential Materials - Subject to Protective Order

## Exhibit 17
## Entire Bank Government Assisted Transactions - 1992 through 1995

| | [1] | [2] | [3] |
|---|---|---|---|
| 1992 | US | New Jersey | Florida |
| # of Transactions | 122 | 8 | 8 |
| # of Transactions with Deposit Premium Data | 100 | 8 | 8 |
| Mean Deposit Premium | 1.68 | 1.42 | 1.68 |
| Median Deposit Premium | 1.14 | 1.08 | 1.14 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 2.16 | 1.91 | 2.37 |
| 1993 | | | |
| # of Transactions | 52 | 1 | 1 |
| # of Transactions with Deposit Premium Data | 45 | 1 | 1 |
| Mean Deposit Premium | 2.60 | 5.25 | 4.48 |
| Median Deposit Premium | 1.44 | 5.25 | 4.48 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 2.29 | 5.25 | 4.48 |
| 1994 | | | |
| # of Transactions | 44 | 5 | 8 |
| # of Transactions with Deposit Premium Data | 43 | 5 | 8 |
| Mean Deposit Premium | 5.04 | 6.86 | 8.46 |
| Median Deposit Premium | 3.88 | 6.37 | 8.15 |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 7.91 | 7.58 | 12.05 |
| 1995 | | | |
| # of Transactions | 7 | 0 | 0 |
| # of Transactions with Deposit Premium Data | 6 | 0 | 0 |
| Mean Deposit Premium | 3.14 | . | . |
| Median Deposit Premium | 2.31 | . | . |
| Weighted Mean of Deposit Premium (Weighted by Deposits) | 4.41 | . | . |

Source: SNL Securities

Confidential Materials - Subject to Protective Order

**Exhibit 18**
**Carteret Total Deposits, Q1 1987 - Q4 1994**




Source: Veribanc TFR data

Confidential Materials - Subject to Protective Order

## Exhibit 19
## Total Classified Assets to Total Assets Ratio
## Carteret Savings Bank
## (1987 - 1990)




Sources: WOQ690 2449-2653 at WOQ690 2501. WOP317 0002-0118 at WOP317 0050 and 0054, where the ratio is: $530,567 (substandard assets) + $7,410 (doubtful assets) + $64,215 (loss assets) / $5,576,023 (total assets), or 10.8%.

Confidential Materials - Subject to Protective Order

**Exhibit 20**
**Carteret Savings Bank**
**Level of Tangible Capital (in 000s)[1]**

| As of 30-Jun-1989 | As of 30-Jun-1990[2] | As of 30-Jun-1991 | As of 30-Jun-1992 |
|---|---|---|---|
| $49,600 | $35,947 | ($71,739) | ($72,777) |

Notes:

[1] Calculated in the Reports of Examination in accordance with the Financial Institutions Recovery, Reform, and Enforcement Act of 1989 ("FIRREA"). Excludes supervisory goodwill.

[2] Includes examiner-recommended loan loss allowances.

Sources:

OTS Reports of Examination commenced 15-Jun-1992 (WOP317 0002-0118 at WOP317 0022), commenced 17-Jun-1991 (WOQ690 1401-1448 at WOQ690 1430), commenced 04-Jun-1990 (WOQ690 2449-2653 at WOQ690 2474) and commenced 22-May-1989 (WOQ668 1979-2222 at WOQ668 2027).

Confidential Materials - Subject to Protective Order

**Exhibit 21**
**Growth in Real Gross Domestic Product, 1988 - 1990**
**(Real GDP Measured in Billions of Fixed 2000 Dollars, Seasonally Adjusted Annual Rate)**




Source: Table 1.1.6 from the Bureau of Economic Analysis, U.S. Department of Commerce

Confidential Materials - Subject to Protective Order

## Exhibit 22
## New Privately Owned Housing Units Authorized

| | New Jersey | | Florida | |
|---|---|---|---|---|
| **Year** | **Units** | **Change** | **Units** | **Change** |
| 1985 | 55,027 | | 202,615 | |
| 1986 | 57,352 | 4.23% | 195,525 | -3.50% |
| 1987 | 62,186 | 8.43% | 178,764 | -8.57% |
| 1988 | 40,909 | -34.22% | 170,597 | -4.57% |
| 1989 | 30,337 | -25.84% | 164,985 | -3.29% |

Source: http://www.census.gov (Table 2u)

Confidential Materials - Subject to Protective Order

**Exhibit 23**
**Unemployment Rate, 16 Years and Over**
**(Seasonally Adjusted)**
**1988-1990**




Sources: Bureau of Labor Statistics, Series LNS14000000, LASST34000003, and LASST12000003.

Confidential Materials - Subject to Protective Order

## Exhibit 24
## Average Yields for Offerings in Professor Calomiris's Table 11

| | Name | Yield (%) | Principal ($ millions) |
|---|---|---|---|
| | **High-Yield Debt Offerings** | | |
| 1 | St Paul Bancorp | 8.250 | 30.00 |
| 2 | Sterling Financial Corp | 8.750 | 15.00 |
| 3 | Sovereign Bancorp | 8.051 | 50.00 |
| 4 | Coast Savings Financial | 10.000 | 57.50 |
| 5 | Security First Corp | 6.250 | 8.50 |
| 6 | First Republic Bancorp | 8.500 | 12.00 |
| 7 | Western Financial Savings Bank | 8.625 | 125.00 |
| 8 | CitFed Bancorp | 8.250 | 35.00 |
| 9 | Soverign Bancorp | 6.855 | 50.00 |
| 10 | Anchor Bancorp | 8.401 | 100.00 |
| 11 | Chevy Chase Savings | 9.302 | 150.00 |
| 12 | FMS Financial Corp | 10.000 | 10.00 |
| | | | 643.00 |
| | **Average Yield** | **8.436** | |
| | **Weighted Average Yield** | **8.641** | |
| | | | |
| | **Convertible Preferred Stock Offerings** | | |
| 1 | First Liberty Financial Corp | 7.750 | 10.00 |
| 2 | Roosevelt Financial Grp | 6.500 | 40.00 |
| 3 | California Federal Bank | 7.750 | 85.00 |
| 4 | People's Bank of Bridgeport | 8.500 | 50.00 |
| 5 | Bank United Financial Corp | 8.000 | 7.00 |
| 6 | Conservative Savings Corp | 6.080 | 10.00 |
| 7 | Rochester Community Savings Bank | 7.000 | 65.00 |
| 8 | Suncoast S&L | 8.000 | 12.00 |
| 9 | H.F. Ahmanson & Company | 6.000 | 250.00 |
| 10 | Glendale Federal Bank | 8.750 | 175.00 |
| 11 | RepublicSecurity Financial | 7.500 | 3.11 |
| 12 | Firstfederal Financial Services Corp | 6.500 | 10.88 |
| | | | 717.99 |
| | **Average Yield** | **7.361** | |
| | **Weighted Average Yield** | **7.262** | |
| | | | |
| | **Straight Preferred Stock Offerings** | | |
| 1 | H.F. Ahmanson & Company | 8.400 | 175.00 |
| 2 | Citizens Federal Bank | 8.750 | 25.00 |
| 3 | Citizens Federal Bank | 8.750 | 30.00 |
| 4 | Washington Mutual Savings Bank | 7.600 | 50.00 |
| 5 | Dime Savings Bank | 10.500 | 100.00 |
| 6 | Coastal Savings Bank | 9.000 | 25.00 |
| 7 | Bank United Financial Corp | 9.000 | 5.25 |
| 8 | California Federal Bank | 10.625 | 150.00 |
| 9 | First Madison Bank | 11.500 | 275.00 |
| | | | 835.25 |
| | **Average Yield** | **9.347** | |
| | **Weighted Average Yield** | **10.069** | |

Source: Professor Calomiris's Back-Up to Table 11 and A3.

Confidential Materials - Subject to Protective Order

**Exhibit 25**
**Performance of FTSE NAREIT Equity REITs Index**
**1992-1995**




Source: FNER Index (FTSE NAREIT Equity REITs Index), data from Bloomberg

Confidential Materials - Subject to Protective Order

**Exhibit 26**
**NCREIF Regional Property Indexes**
**1992 - 1995**




Source: NPRQEAST Index (NCREIF Regional Property Index East), NPRQSOUT Index (NCREIF Regional Property Index South), data from Bloomberg

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs, and FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervener, v. THE UNITED STATES OF AMERICA, Defendant. | ) | No. 93-531 Judge Loren Smith |

**DECLARATION OF CHARLES W. CALOMIRIS OF JULY 14, 2006**


Qualifications

Introduction

I. Inappropriate Interest Calculations Inflated the Receivership Deficit After the Resolution

A. Because the Government Does Not Pay the Time Value of Money for Damages, It Is Inconsistent and Incorrect for the Government to Impute Interest When Calculating the Receivership Deficit

B. The Time Value of Money Used for Computing Imputed Interest Costs for a Receivership Deficit Should Be Calculated Using Short-Term Floating U.S. Treasury Interest Rates for the Period of the Receivership

- C. The Interest Rates Charged by the FDIC Are Not Appropriate Measures of the Time Value of Money
    - 1. Permanently Locking the Interest Rate at the Time of Carteret's Resolutions Has No Economic Rationale
    - 2. Other Resolutions Have Used Shorter-Term Interest Rates to Calculate Cost
        - a. The Interest Rate Charged for Funding the Pass-Through Resolution in 1992 Was Based on a Floating Rate
        - b. Resolutions Before August 10, 1993 and After 2002 Are Funded Using a Three-Month Treasury Yield
        - c. The Escrow Account that Held the Premiums from the Branch Sales Earned an Interest Rate Based on a Short-Term Treasury Yield
    - 3. The Interest Rates Charged by the Government Are Too High
    - 4. The Government's Inappropriate Interest Rates Substantially Inflated the Receivership Deficit through December 2005
- D. The Government Did Not Credit Payments to the Highest Cost Debt
    - 1. The FDIC Applied Payments Pro-Rata Among the Three Resolutions, Even Though Each Resolution Had a Different Fixed Interest Rate Under the FDIC's Faulty Methodology
    - 2. Assuming the Government's Faulty Interest Rates Are Not Corrected, the Government's Failure to Allocate Payments to the Highest-Cost Resolutions First Substantially Inflated the Receivership Deficit through December 2005
- E. The RTC/FDIC Failed to Credit Sales Premium to the Loan Principal Using a Consistent Measure of the Time Value of Money

II. Delays and Value Destruction During Carteret's Conservatorship Inflated the Receivership Deficit by Reducing the Premium Realized from the Sale of the Branches, Requiring a Larger Loan Principal to Fund the Resolutions

- A. The Government Delayed and Mismanaged Carteret's Resolution
    - 1. Congress Delayed Funding for the RTC, Which Delayed Carteret's Resolution
    - 2. As a Condition of Funding, Congress Required a Minority Preference Program, Which Further Delayed Carteret's Resolution
- B. The Consequences of the Government's Delay and Value Destruction on the Principal Required in Carteret's Resolution
    - 1. Delay Led to Deposit Runoff
        - a. Estimating the Magnitude of the Delay in Carteret's Resolution
            - i. Carteret's Relative Position at the Time of Failure
            - ii. Carteret's Relative Experience in Resolution
        - b. Delaying the Resolution Resulted in Deposit Runoffs, Which Reduced Prices for the Branch Sales
        - c. Isolating the Consequences of Delay and Deposit Runoff from the Minority Preference Program
    - 2. The Minority Preference Program Resulted in Lower Deposit Premiums from the Branch Sales

a. The Minority Preference Program Forced Carteret to Be Sold in Pieces, Rather Than on a Whole-Bank Basis
b. The Minority Preference Program Discouraged Non-Minority Bidders from Participating in the Auction for Carteret's Branches
c. The Minority Preference Program Induced Non-Minority Bidders to Bid Less Aggressively Than They Otherwise Would Have Conditional on Entering the Auction

III. The Government's Unexpected Elimination of Supervisory Goodwill Inflated the Receivership Deficit and Decreased the Value of Carteret
A. Lost Value of Supervisory Goodwill Under Carteret's Receivership
1. Cash Equivalent Value of Goodwill
2. Cost of Replacement Based on a Common Stock Issuance
3. Summary
B. The Government's Unexpected Elimination of Supervisory Goodwill Corresponds with a Decrease in the Value of AmBase
1. Using the Capital Asset Pricing Model to Value Goodwill
2. AmBase Experienced a Significant Abnormal Return During the Time Period of the OTS's Warning that Removal of Goodwill from Carteret's Regulatory Capital Would Leave It Critically Undercapitalized

IV. The RTC's Mishandling of Carteret's Mortgage Origination Unit Inflated the Receivership Deficit
A. Valuing Carteret Mortgage Company Using the Abnormal Returns for Imperial Credit Industries
B. Using Comparable Sales to Estimate the Value Destroyed by the Government's Shutdown of Carteret's Mortgage Origination Unit
1. Sales of Comparable Mortgage Businesses During the Time of Carteret's But-for Resolution
2. Estimating the Value of Clearwater's Servicing Portfolio at the Time Carteret Mortgage Company Should Have Been Sold
2. Estimating the Value of Carteret Mortgage Company at the Time It Should Have Been Sold Using Clearwater's Sales Value and Comparable Mortgage Businesses
C. The Sale of Carteret's Mortgage Origination Unit Would Have Decreased the Receivership Deficit

V. The Government's Delay and Value Destruction of Carteret's Resolution Resulted in Lower Proceeds from Asset Sales, Which Inflated the Receivership Deficit

Conclusion

Appendix A: Valuing Supervisory Goodwill

Appendix B: Materials Relied Upon

Appendix C: Curriculum Vitae

## QUALIFICATIONS

1. I, Charles W. Calomiris, am the Henry Kaufman Professor of Financial Institutions at the Columbia University Graduate School of Business and a Professor at Columbia's School of International and Public Affairs. I am the Academic Director of Columbia Business School's Jerome Chazen Institute of International Business and the Director of Columbia University's Center for International Business Education and Research. I co-direct the Project on Financial Deregulation at the American Enterprise Institute (AEI) and am the Arthur Burns Scholar in International Economics at AEI. I am a member of the Shadow Financial Regulatory Committee, a Research Associate of the National Bureau of Economic Research, and was a Senior Fellow at the Council on Foreign Relations.

2. I am Chairman of the Board of Greater Atlantic Financial Corporation, a publicly traded bank based in the Washington D.C. metropolitan area, and a Managing Partner of Gauss Fund, LP. I served on the International Financial Institution Advisory Commission, a Congressional commission to advise the U.S. government on the reform of the IMF, the World Bank, the regional development banks, and the WTO. My research spans several areas, including banking, corporate finance, financial history, and monetary economics.

3. My recent publications include: "Bank Capital and Portfolio Management: The 1930s 'Capital Crunch' and Scramble to Shed Risk" (with Berry Wilson), in the *Journal of Business* (July 2004); "Credit Card Securitization and Regulatory Arbitrage" (with Joseph Mason), in the *Journal of Financial Services Research* (August 2004); "Consequences of Bank Distress During the Great Depression" (with Joseph Mason), in the *American Economic Review* (June 2003); *U.S. Bank Deregulation in Historical Perspective* (Cambridge University Press, 2000); *Emerging Financial Markets* (with David Beim, Irwin-McGraw Hill, 2001); "Blueprints

for a New Global Financial Architecture" in *International Financial Markets: The Challenge of Globalization* (Leonardo Auernheimer, ed., University of Chicago Press, 2000); and "Is the Bank Merger Wave of the 1990s Efficient?" (with Jason Karceski) in *Mergers and Productivity* (Steven Kaplan, ed., University of Chicago Press, 2000).

4. I am the recipient of research grants or awards from the National Science Foundation, the World Bank, the Japanese Government, the Herbert V. Prochnow Foundation, and the Garn Institute of Finance. In 1995, I was named a University Scholar at the University of Illinois, where I served as Associate Professor of Finance and Co-Director of the Office for Banking Research. I am, or have been, a member of the editorial boards of the *Journal of Banking and Finance*, the *Journal of Financial Services Research*, the *Journal of Financial Intermediation*, the *Journal of Economic History*, the *Journal of Economics and Business*, and *Explorations in Economic History*. I serve or have served as a consultant or visiting scholar for the Federal Reserve Banks of New York, Chicago, Cleveland, and St. Louis, the Federal Reserve Board, the World Bank, and the governments of Mexico, Argentina, Japan, China, El Salvador, Connecticut and Massachusetts. My private sector clients have included AIG, Ameriquest, Astoria Savings, Bank of America, Citicorp, Credit Suisse, Fleet Bank, The Limited, Lloyds, UBS Securities, U.S. Trust Corporation, and Xilinx.

5. I designed (with David Beim) and teach a new MBA and Executive MBA case course on emerging market finance, which won the 1997-1998 Chazen International Innovation Prize at Columbia Business School. I have taught international banking, emerging financial markets, and advanced corporate finance at the MBA and Ph.D. levels at Columbia, as well as the MBA core course in Business Values and Ethics. I have taught Ph.D.-level courses at the World Bank and the IMF, including a course at the IMF on Emerging Financial Markets.

6. I earned a Ph.D. in economics from Stanford University and a B.A. in economics, *magna cum laude*, from Yale University.

## INTRODUCTION

7. This report considers the receivership deficit calculations for Carteret prepared by the FDIC, and adjusts those calculations to take account of computational and conceptual errors in the calculation of interest, Congressional actions that caused delays in Carteret's resolution, the failure to realize any value from Carteret Mortgage Company, and contractual breach in the treatment of goodwill, which together substantially inflated Carteret's receivership deficit.

8. Section I of the report considers necessary adjustments that correct computational and conceptual errors in the accounting for interest charges in the receivership deficit. Section II measures the effect on the principal and interest of the receivership deficit of the shortfall in the premium received from the sale of branches, which resulted from the protracted delays and mishandling of the branch sales caused by Congress. I show that but-for the Congressional delays in the resolution, Carteret would have been sold as a whole bank, in which branches and assets would have been sold simultaneously as part of a single entity. Hence, there would have been no need for a loan to fund the resolution in the but-for world because the value of Carteret's assets would have more than covered the value of Carteret's liabilities at the time of the but-for resolution. Section III calculates the impact on the principal and interest of the receivership deficit from the value lost in liquidation as the result of Congress's elimination of supervisory goodwill. Supervisory goodwill was a valuable asset that could have been sold along with the rest of the bank to a purchaser but for the breach. Restoring supervisory goodwill decreases the principal required for funding the resolutions. Section IV calculates the impact on the principal and interest of the receivership deficit from the RTC's failure to market and sell Carteret's

mortgage brokerage business during the liquidation. Section V considers the additional inflation of the receivership deficit that resulted from the delayed sale of some financial assets, which resulted in lower sales prices for those financial assets.

9. Table 1 summarizes my findings that the adjustments described in each of the five sections have a significant effect on the principal and interest balance ("P&I balance") of the receivership deficit. Rows (I) through (IV) of Table 1 show the effects of each set of changes in isolation. The last row of Table 1 shows the effect on the receivership deficit P&I balance of combining all the proper adjustments discussed in Sections I, II, III, and IV.[1] When all the appropriate adjustments are made, the receivership would have a surplus P&I balance of $87.4 million. This is a conservative estimate, which does not fully take into account all of the factors I identify that would have added to the receivership surplus.

TABLE 1: RECEIVERSHIP DEFICIT BUT-FOR COMPUTATIONAL AND CONCEPTUAL ERRORS, CONGRESSIONAL INJURY, CLOSURE OF CARTERET MORTGAGE COMPANY, AND CONTRACTUAL BREACH IN THE TREATMENT OF GOODWILL

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) |
|---|---|---|---|
| (I) Charge no interest on receivership deficit & charge no interest on escrow | 20.7 | 154.7 | 156.6 |
| (II) Impact of Congressional delay on sale of branches | (23.1)* | 198.5 | 156.6 |
| (III) Supervisory goodwill restored | 59.6 | 115.8 | 97.0 |
| (IV) Mortgage origination unit sold | 138.0 | 37.4 | 19.0 |
| **Corrections (I), (II), (III), & (IV) Combined** | **(87.4)*** | **262.8** | **156.6** |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

1. Although I do not attempt to quantify the effects on the receivership deficit from the adjustments discussed in Section V, these adjustments would decrease the receivership deficit when considered in isolation from any other adjustments and when combined with any other adjustments.

## I. INAPPROPRIATE INTEREST CALCULATIONS INFLATED THE RECEIVERSHIP DEFICIT AFTER THE RESOLUTION

10. Carteret's branches were sold by the Resolution Trust Corporation ("RTC") in three waves: the Florida branches were sold on October 28, 1994 for a premium of approximately $9 million, some 14 New Jersey branches were sold on January 20, 1995 for a premium of approximately $65 million, and the remaining 16 branches in New Jersey were sold on March 10, 1995 for a premium of approximately $68 million.[2] At the time of these branch sales, the receivership did not have cash to completely fund the branch sales because of Congress's imposition of the minority preference program. Carteret's assets had been frozen, and the sale of these assets was needed to fund the sale of the branch deposits.[3] Because the assets were not sold at the same time as the branches, the receivership borrowed funds from the RTC to fund the three sets of branch sales. The October 1994 sale was funded with a $156 million loan.[4]

---

2. Carteret Federal Savings Bank, Consolidated Florida Branch Resolution Summary (AM54120696); Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120691); Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120693).

3. Soon after seizing Carteret, in March 1993, the RTC shifted its policy regarding asset sales. "For the past couple of years or so, the general direction has been to liquidate and liquefy the asset side of our conservatorship balance sheets. GENERALLY SPEAKING, THE EVOLVING NEW DIRECTION IS TO HOLD AND NOT LIQUIDATE PERFORMING ASSETS -- BUT TO CONTINUE TO LIQUIDATE NONPERFORMING ASSETS." E-mail from Stephen A. Haley, RTC, to Robert O. Smedley & W. Robert Haley, RTC, (Mar. 19, 1993, 11:28:11 EST) (AM5290 0211) (emphasis in original). In August 1993, RTC Resolutions Assistant Director Jay Jupiter requested a waiver on the asset freeze for Carteret, recognizing that it would improve Carteret's attractiveness as a franchise to sell its mortgage assets along with its branches. "There are approximately $517 million and $294 million of performing single family residential mortgage loans at Carteret originated in New Jersey and Florida respectively, that we believe are integral to both the franchise value and the marketability of this institution in a Purchase and Assumption transaction." Memorandum from Jay A. Jupiter, Assistant Director of Resolutions, RTC, to Thomas Horton, Vice President of Field Activities, RTC (Aug. 23, 1993) (C-AM-A-0130544). J. Paul Ramey, vice president of Resolutions for the RTC, responded in a handwritten note that the assets could not be released because of their anticipated use in funding other sales related to implementation of the minority preference program. Memo from Jay A. Jupiter, Assistant Director, Resolutions, RTC, to Thomas Horton, Vice President Field Activities, RTC (Aug. 23, 1993) (C-AM-A-0130544). Upon Congress's passage of the RTC Completion Act of 1993, which released funds to the RTC, the RTC's policy continued to be to hold the performing assets of institutions subject to the minority preference program. Memorandum from Edward D. Mahaney, Vice President of Department of Operations, RTC, to Thomas P. Horton, Vice President of Field Activities, RTC, Dec. 21, 1993 (AM5067 0499 – 0500).

4. The initial principal for the three loan amounts does not reflect any premium from the branch sales, which were credited to an interest-bearing escrow account. Several months after the initial branch sales, the sales proceeds and interest earned from the escrow account was credited to the receivership, as I discuss below.

The January 1995 sale was funded with a $616 million loan. The March 1995 sale was funded with a $598 million loan. The most recent payment towards the total $1.370 billion principal on these three loans was made in May 2000.[5] The remaining principal balance since that most recent payment is $18.8 million.

11. In addition to the remaining principal balance in the receivership deficit, interest on these loans accruing since the time the loans were made in 1994 and 1995 have added to the receivership deficit. In this section, I discuss how the interest on these loans should be calculated, and I show that the FDIC's improper methodology of calculating interest has inflated Carteret's receivership deficit.

12. First, the government's asymmetric and inconsistent use of the time value of money in the calculation of damages makes no sense economically. Specifically, it makes no sense to adjust the receivership deficit for the time value of money (thereby effectively reducing damages ultimately paid to Carteret's owners) when, as the result of legal rules for the calculation of government payments of damages, the government's payment of damages to AmBase and Carteret cannot be adjusted for the time value of money. To be consistent with the legal prohibition on the payment of interest on damages caused by the government, the government should not be able to credit itself for the time value of money on those same damages. A consistent treatment would be to exclude all imputed interest from the receivership deficit. The inconsistent treatment advanced by the FDIC will have the economic effect of allowing the government to expropriate some (or perhaps all) of AmBase's and Carteret's damages.

---

5. Calculation of Accrued Interest on Priority 6 Claimants, Exhibit Green 36A (AM0097219-97377).

13. Second, even if one were to inconsistently include imputed interest, the interest rates charged by the government do not have any economic rationale. The rates chosen at the time of the resolutions were appropriate. But the rates retroactively selected in 1999 were too high, as measures of the time value of money actually incurred during the relevant period. Specifically, the loan interest rates selected in 1999 were initially set at too high a level and should not have been frozen at those high levels for the duration of the resolutions.

14. Third, even if one were to inconsistently include imputed interest, and use the inappropriate interest rates that are used by the government when doing so, then the FDIC has misallocated payments across the various balances due; specifically, the FDIC should have assumed, but did not assume, that the principal balance of the highest cost loan was paid down first.

15. Fourth, even if one were to inconsistently include imputed interest, and use the inappropriate interest rates that are used by the government when doing so, then the FDIC has inflated the receivership deficit by charging a higher interest rate on the resolution loans than the interest rate credited to the escrow account holding Carteret sales premiums until the premiums were transferred to the receivership. The RTC held the proceeds from Carteret's branch sales for several months after the resolutions in an interest-bearing escrow account, but the interest income earned in this account was smaller than the offsetting interest expenses on the matching funds borrowed in the resolution. Once the RTC credited the sales proceeds and interest from the escrow account to the receivership several months after the first resolution, the transferred interest was not enough to offset the interest accrued on the matching principal.

16. Table 2 summarizes the effects of these four adjustments, which are not additive. Some of the adjustments are only appropriate and relevant in the absence of the other

adjustments. Most importantly, consistency in the application of adjustment for the time value of money would eliminate any imputed interest in the receivership deficit, and thus would render the other adjustments irrelevant. In row (1) of Table 2, I report the size of the receivership deficit's P&I balance as $18.8 million (the remaining unpaid principal) when no interest charges are included in the receivership deficit. This estimate is $156.6 million lower than the P&I balance calculated using the FDIC's methodology.

17. For purposes of comparison, however, I provide additional estimates in the other rows of Table 2. Row (2) includes a measure of interest charges in the receivership deficit under the FDIC's inconsistent treatment of the time value of money (including imputed interest in the receivership deficit), but corrects the interest rates used to compute those interest charges; in row (2) I use the appropriate measure of the time value of money, namely a short-term floating Treasury yield. The adjustment in Row (2) decreases the receivership deficit's P&I balance by $64.7 million from the FDIC's calculations. Row (3) includes imputed interest in the receivership deficit, and uses the FDIC's inappropriate interest rate assumptions, but assumes that high-cost debt is paid off first. Under this scenario, the P&I balance decreases by $51.1 million. FDIC witnesses have testified that interest stops accruing in the receivership deficit when the principal amount of the receivership deficit is paid.[6] However, the deposition testimony is unclear as to whether interest in a given loan account would stop accruing once the principal in just that loan account was completely paid, or once the principal in all three loan accounts were paid. I assume in row (3) that when the principal in an individual loan account is completely paid, interest in that individual loan account stops accruing. Row (4) is identical to row (3)

6. Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006); "Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499); E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).

except that the row (4) scenario uses the alternate interest accrual assumption: the assumption that interest in an individual loan account stops accruing only once the principal balances in all loan accounts are paid. Row (4)'s P&I balance is $13.5 million smaller than the P&I balance calculated by the FDIC. Row (5) includes imputed interest in the receivership deficit, uses the FDIC's inappropriate interest rate assumptions, and does not assume that high-cost debt is paid off first, but corrects for the FDIC's inconsistent treatment of the interest rate on the escrow account, which results in a decrease in P&I balance of $1.0 million. Row (1)' combines the adjustments made in rows (1) and (4); it increases the receivership deficit (as compared to the calculation in row (1)) by eliminating a time value of money adjustment for the escrow account (to be consistent with the lack of time value of money adjustments in that computation). Row (1)' provides my preferred estimate of the corrected receivership deficit P&I balance ($20.7 million) for use in damages calculations when correcting *only* for the problems relating to the government's interest calculations. Row (2)' combines my corrections to the time value of money calculation in row (2) with the row (4) consistency correction; the slight difference between rows (2) and (2)' results entirely from equating the interest rates used to account for interest charges and interest credited in the escrow account. Row (3)' combines the adjustment in row (3) with an adjustment that sets the escrow interest rate equal to the interest rate used by the government on its interest charges. Row (4)' combines the adjustment in row (4) with an adjustment that sets the escrow interest rate equal to the interest rate used by the government on its interest charges.

18. For scenarios that include a time value of money, I also consider scenarios in which interest continues to accrue after principal is paid down. Although the FDIC's policy is to stop interest accrual after principal is completely paid, this practice does not reflect a consistent

application of the time value of money (if one were to inappropriately use the time value of money concept when calculating the receivership deficit).[7] Row (2)" reflects the assumptions used for row (2)', but interest continues to accrue even after the principal across all loans is paid down. Similarly, Row (3)" reflects the assumptions used for row (3)', but interest continues to accrue even after the principal across all loans is paid down.

7. On the other hand, one could argue that estimates reported here based on the FDIC's practice of stopping the accrual of interest once principal was completely paid (as in the estimates reported in rows (2), (3), (4), (5), (2)', (3)', and (4)', in Table 2) are more accurate than the estimates reported in rows (2)" and (3)". For the reasons discussed below, it is inappropriate for any interest to be credited to the government as an offset to its damages. The FDIC's policy of stopping interest accrual after principal is paid down at least ameliorates the impact of this error.

TABLE 2: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE WHEN CORRECTING THE GOVERNMENT'S INAPPROPRIATE INTEREST CALCULATIONS

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) Charge no interest on receivership deficit | 18.8 | 156.6 | 156.6 |
| (2) Use monthly moving average short-term interest rate only | 110.7 | 64.7 | 64.7 |
| (3) Pay off high-cost debt first only (interest stops accruing in a single account when that account's principal is paid) | 124.3 | 51.1 | 51.1 |
| (4) Pay off high-cost debt first only (interest stops accruing when principal across all accounts is paid) | 161.9 | 13.5 | 13.5 |
| (5) Charge same interest rate on escrow | 174.4 | 0.5 | 1.0 |
| **(1)' Charge no interest on receivership deficit & charge no interest on escrow** | **20.7** | **156.6** | **154.7** |
| (2)' Use monthly moving average short-term interest rate & charge same interest rate on escrow | 110.7 | 64.7 | 64.7 |
| (3)' Pay off high-cost debt first (interest stops accruing in a single account when that account's principal is paid) & charge same interest rates on escrow | 123.5 | 51.5 | 51.9 |
| (4)' Pay off high-cost debt first (interest stops accruing when principal across all accounts is paid) & charge same interest rates on escrow | 161.1 | 13.9 | 14.3 |
| (2)" Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest accrues even after principal is completely paid | 110.7 | 64.7 | 64.7 |
| (3)" Pay off high-cost debt first, charge same interest rate on escrow, & interest accrues even after principal is completely paid | 161.1 | 13.9 | 14.3 |

## A. Because the Government Does Not Pay the Time Value of Money for Damages, It Is Inconsistent and Incorrect for the Government to Impute Interest When Calculating the Receivership Deficit

19. The loans to fund the branch sales were backed by Carteret's assets. Once the assets were sold, the asset proceeds were used to pay off the loan principals. Any remaining unpaid principal and accrued interest from the preceding period is rolled forward, and continues to accrue interest as part of the receivership deficit.

20. The most fundamental error in the government's calculation of interest is the inclusion of *any* interest component in the receivership deficit. It makes no sense to adjust the receivership deficit for the time value of money (thereby reducing damages paid to Plaintiffs) when, as the result of legal rules for calculating government payments of damages, the government's payment of damages to Plaintiffs cannot be adjusted for the time value of money.[8]

21. As a matter of economic logic, adjustments for the time value of money should be consistent for the purpose of computing damages. The interest charges in the receivership deficit effectively reduce damages by taking account of the time over which the receivership deficit has remained unpaid. My understanding is that the receivership deficit serves in this case as a partial offset to the damages owed to the plaintiff. But it makes no sense to include the time value of money in the receivership deficit if the government itself is barred from paying the time value of money on the damages it owes to the plaintiffs. By including the time value of money as a cost in the receivership deficit, **the government effectively is asking to be reimbursed for a cost that it does not bear**. To be consistent with the legal prohibition on the payment of interest on damages caused by the government, the government should not be able to credit itself for the time value of money on those same damages. A consistent treatment would be to exclude all imputed interest from the receivership deficit. In this case, when one excludes interest charges, the P&I balance of the receivership deficit becomes $18.8 million—the remaining unpaid principal—as of December 2005. When interest credits on the escrow account are also excluded from the calculation of the receivership deficit, as they should be for the sake of consistency in

---

8. Library of Congress v. Shaw, 478 U.S. 310, 314 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award.")

this calculation, the P&I balance of the receivership deficit becomes $20.7 million (which appears in row (1)' of Table 2).

**B. The Time Value of Money Used for Computing Imputed Interest Costs for a Receivership Deficit Should Be Calculated Using Short-Term Floating U.S. Treasury Interest Rates for the Period of the Receivership**

22. If the government were to award interest with damages, then it would be appropriate for both the interest on the damages awarded and the interest charged in the receivership deficit to be based on the time value of money.

23. The interest rate used in the calculation of the interest component of the receivership deficit is an ex post rate, imputed to account for the realized cost associated with the time value of money for the period between the time when the branches were sold (which defines the initial balance of the loan) and the date at which the receivership deficit is retired (in this case, the date at which damages awarded by the Court are paid). Although the FDIC's methodology is to cease interest accrual once the loan principal is paid off, a time value of money concept that corresponds to the hypothetical interest payments on damages would ordinarily require that interest continue accruing on the receivership deficit until the balance of principal *and* interest is completely paid.

24. The receivership deficit in the circumstances of this case defines the amount of the prospective transfer from one government account to another. Due to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), special Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Funds ("FRFs") were set up for the FDIC and RTC to handle Winstar-type receiverships. The only remaining asset of any consequence in the Carteret receivership is the goodwill lawsuit. Any unpaid P&I in Carteret's receivership would be paid off only if AmBase's lawsuit is successful and to the extent that damages are found to exceed the receivership deficit.

25. Because the possibility of the transfer and timing of the transfer are not known in advance (i.e., the outcome and timing of the Court's decision is not known in advance), the ex post imputed interest cost associated with the deficit should be computed on a continuous basis. Interest cost should roll forward at the short-term Treasury rate of interest. At the date the transfer occurs, therefore, the interest cost associated with the receivership deficit should represent a concatenation of short-term Treasury interest rates multiplied by the outstanding balance at each point in time over the life of the receivership deficit.

### C. The Interest Rates Charged by the FDIC Are Not Appropriate Measures of the Time Value of Money

26. In previous calculations of interest submitted by the government in 1999, the government used the average of the Treasury bill secondary market 3-month quoted yield for the three preceding months to calculate daily interest.[9] This variable interest rate changes over time, and is the same for all three loans on any given day. In 2005, however, the government produced a spreadsheet that showed the post-insolvency interest calculations for the three loans taken out by Carteret upon the sale of its bank branches with a different interest rate for each loan.[10] The interest rate used for each loan was equal to the federal post-judgment interest rate – a one-year rate determined at the time the loan was initiated. The loan for the October 28, 1994 sale was given a 6.06 percent fixed interest rate. The interest rate on the loan for the January 20, 1995 sale was 7.34 percent. The interest rate for the March 10, 1995 sale was 6.57 percent. Interest on these loans compounded daily, and each loan's initial interest rate was used *throughout the entire period* in calculating daily interest charges.

9. Exhibit Green 33 (AM00092190-92205; AM0009222-9224).
10. Exhibits Green 36A, 36B, & 36C (AM0097219-97377).

27. As I discussed above, the appropriate interest charge, if any, should reflect the time value of money, based on an ex post imputed rate calculation. Instead, in the interest calculations from its 2005 spreadsheets, the FDIC's interest rate measure is arbitrary and has no economic justification as a measure of the realized time value of money during the receivership period.

28. The federal post-judgment rates as of the dates of loan initiations do not represent the time value of money on the loans over the period of the receivership. At the time of the loans, the post-judgment rate was equal to the average accepted auction price for the latest auction of 52-week treasury bills preceding the loan origination date. This rate is frozen for the receivership period and does not take into account information about interest rate changes after that date. Furthermore, even as an initial interest rate for the receivership, a 52-week interest rate period is longer than would be appropriate. A short-term, variable Treasury rate (for a week, month, or quarter), updated regularly during the duration of the receivership, is the appropriate way to track the realized cost of the time value of money for the receivership. As discussed below, there is no economic rationale for using a fixed one-year yield from the inception date of the loans. Furthermore, in deposition, the FDIC was unable to offer any economic rationale for its flawed methodology.[11]

### 1. Permanently Locking the Interest Rate at the Time of Carteret's Resolutions Has No Economic Rationale

29. No matter what the appropriate maturity of the short-term Treasury bill one uses to calculate the time value of money, that interest rate should be updated continuously over time. In situations in which the post-judgment rate applied at the time of Carteret's resolutions, federal

---

11. Deposition of Karen J. Hughes at 101-102 (Apr. 7, 2006); Deposition of Wayne S. Green at 190-191 (Feb. 28, 2006).

regulations stipulated that the post-judgment interest rate would be equal to the average accepted auction price for the latest auction of 52-week treasury bills preceding the date of the relevant event (here, the receipt of RTC funding) *if* the period for which interest was owed did not exceed one year.[12] For periods exceeding one year, the interest rate for the first year would be calculated as described above, and the interest rate for each subsequent year would be updated to be equal to the average accepted auction price for the latest auction of 52-week treasury bills preceding the beginning of each additional year.

30. Even though the repayment of the loans has lasted longer than one year, the FDIC inappropriately continues to use the same post-judgment rates set in the resolution, rather than updating them every year as was intended by the rule behind the post-judgment rate. Using a single 52-week interest rate to calculate the time value of money for the whole period introduces important errors into the computations.

31. One of the FDIC's justifications for using a fixed interest rate was to "simplify" calculations. Government memos state, and FDIC personnel have testified, that one of the advantages to using a fixed interest rate throughout the life of the loan was to minimize errors in calculating post-insolvency interest.[13] That is nonsense. An incorrect and arbitrary interest rate assumption cannot be justified on the basis of simplicity. And, in any event, it would be very straightforward to use a floating interest rate. In fact, as noted above, the FDIC did so until 1999.

---

12. 40 U.S.C. § 258e-1 (1994) (amended 2000). The post judgment interest rate was amended in 2000 such that the weekly average one-year constant maturity Treasury yield is used instead of the average accepted auction price for the latest auction of 52-week treasury bills.

13. Exhibit Green 22 at 11 (AM00097057) (stating that one of the advantages to using a locked interest rate was that the "[i]nterest rate remains constant throughout life of receivership making calculation of post-insolvency interest claim easily determinable for the public, receivership creditors, and shareholders. Reduced possibility of calculation errors because rate is ascertained retrospectively and adjustments to principal balance of claims are all that must be considered to ascertain amount of claim."); Deposition of Karen J. Hughes at 142-144.

**2. Other Resolutions Have Used Shorter-Term Interest Rates to Calculate Cost**

32. As I discussed above, the calculations of interest submitted by the FDIC in 1999 used a short-term floating interest rate.[14] This variable interest rate changes over time, and is the same for all three loans on any given day. Only later did the FDIC change the calculations of interest on these resolutions to be equal to the federal judgment rate as of the dates of the resolutions. There are numerous examples where the government has used variable short-term interest rates in similar situations.

**a. The Interest Rate Charged for Funding the Pass-Through Resolution in 1992 Was Based on a Floating Rate**

33. At the time it seized Carteret in December 1992, the RTC advanced $1.75 billion to Carteret at a short-term floating interest rate.[15] According to the Carteret's Consolidated Financial Statement monthly reports, this rate changed at least once per month until the loan was paid off in January 1995.[16] There is no economic rationale for charging a short-term floating rate on a loan to the conservatorship in 1992, but then charging an arbitrarily fixed and frozen interest rate on similar types of loans made in 1994 and 1995.

**b. Resolutions Before August 10, 1993 and After 2002 Are Funded Using a Three-Month Treasury Yield**

34. For resolutions before August 10, 1993, when the National Depositor Preference ("NDP") law—a provision of the Omnibus Budget Reconciliation Act of 1993—took effect, the interest rate used to calculate interest in receiverships for federal and state chartered thrifts was

---

14. Exhibit Green 33 (AM00092190-92205; AM0009222-9224).

15. Carteret Financial Report, December 31, 1992, at 2-3 (AM00086965, -64, -65, -70)

16. Carteret Financial Reports (AM00086965, -68, -70; CAM406 0567, -70, -72; C-AM-A-0133760, -63, -65; CAM406 1338, -41, -43; CAM404 0198, -0201, -0203; CAM406 2852, -55, -57; CAM4600037, -40, -42; CAM4062200, -03, -05; CAM4950836, -38, 040; CAM4040040, -43, -45; CAM4062550, -53, -55; CAM4840188, -91, 93; CAM4951698, -01, -03; CAM4951867, -70, -72; CAM4952111, -14, -17; CAM5070059, -62, -64; CAM4180008, -11, -13; CAM4181752, -55, -57; CAM4180238, -41, -43; CAM3821952, -55, -57; CAM3821890, -94, -96; CAM3821800, -03, -05; CAM3821800, -03, -05; CAM3821770, -73, -75; CAM3820674, -77, -79).

"adjusted monthly to reflect the average rate for U.S. Treasury bills with maturities of not more than ninety-one (91) days during the preceding three (3) months."[17] Wayne Green, an FDIC financial manager involved in the calculation of interest for Carteret's receivership deficit, testified that if Carteret's resolution had occurred before August 10, 1993, then post-insolvency interest would have been calculated using this short-term floating interest rate.[18]

35. Even though the NDP did not address post-insolvency interest rates,[19] the FDIC chose to apply the post-judgment interest rate on post-NDP resolutions[20] until 2002. In 2002, the methodology for calculating post-insolvency interest changed because Congress had ordered the FDIC in 2000 to create a uniform method for calculating interest that would be codified, rather than based on internal FDIC memos.[21] Post-insolvency interest on receivership surpluses since 2002 has been based on floating short-term interest rates, using a simple interest calculation, which is codified in the FDIC's rulemaking:

> (3) Post-insolvency interest rate. For any calendar quarter, the coupon equivalent yield of the average discount rate set on the three-month Treasury bill at the last auction held by the United States Treasury Department during the preceding calendar quarter, and adjusted each quarter thereafter.[22]

The FDIC's rationale for rejecting the post-judgment rate and adopting the three-month Treasury bill rate was described in the Notice for Proposed Rulemaking:

---

17. Exhibit Green 22 at 18 (AM00097064); Exhibit Green 27 (AM00096551); Receivership Rules, Priorities, 12 C.F.R. § 360.2(b) (1993). Note that this three-month Treasury yield is slightly different from the concept used before August 1993, since it does not contain a moving average component in the formula, but rather uses the last three-month yield experienced during the preceding quarter as the measure of that quarter's interest cost. The slight difference in the formula used prior to August 1993 and after 2002 does not lead to any material difference in interest charge computations. For example, Table 1 reports computations using the methodology used in the FDIC's pre-1999 spreadsheets, which appear to correspond to the pre-August 1993 method. If, instead, I had used the post-2002 method, the computations would differ by no more than 2 percent of any of the reported values.

18. Deposition of Wayne S. Green at 234-235, 260.

19. Exhibit Green 22 at 8 (AM00097054).

20. Exhibit Green 22 (AM00097047-97065).

21. Deposition of Karen J. Hughes at 93-96 (Apr. 7, 2006)

22. Resolution and Receivership Rules, Post-Insolvency Interest, 12 C.F.R. § 360.7 (2006).

> The FDIC believes a publicly available, market-based rate would be preferable to a single numerical interest rate because the market-based rate should be **more reflective of the interest rate environment in existence during the life of future receiverships.** In addition, as indicated earlier, the FDIC has utilized the federal judgment rate in receiverships of federally chartered institutions and in federalized receiverships of state institutions to calculate post-insolvency interest payments. In the proposed rule, however, the post-insolvency interest rate for all FDIC-administered receiverships would be based on the coupon equivalent yield of the average discount rate set on the three-month Treasury bill, rather than the federal judgment rate. This rate was selected, instead of the federal judgment rate, because the three-month Treasury bill is considered to be widely recognized as a cash management investment performance benchmark and its yield has historically tracked, to some degree, changes in the rate of inflation.[23]

The FDIC also switched from using a fixed rate to a floating rate in its 2002 rule:

> Whether the interest rate should be fixed or "float" is also an issue addressed in the proposed rule. Presently, when a new receivership is established, if assets ultimately become available for post-insolvency interest payments, the rate that exists on the date the receivership is established is fixed for purposes of calculating post-insolvency interest. This approach is consistent with the way the federal judgment rate is applied to judgments entered by the federal courts because the allowance of a claim against a receivership estate has been viewed as the general equivalent of a judgment being entered against the receivership estate. **This approach may not be reflective, however, of the economic conditions and interest rate environment in existence during the life of the receivership. Therefore, the proposed rule provides that the post-insolvency interest rate would be adjusted quarterly.** This is being proposed to mitigate interest rate risk due to changes in economic conditions during the life of the receivership.[24]

36. FDIC personnel confirmed that post-insolvency interest could be calculated in a completely different way based solely upon the date of the resolution,[25] and no witness could provide an *economic* (as opposed to legal) justification as to why the methodologies should change over time.[26]

### c. The Escrow Account that Held the Premiums from the Branch Sales Earned an Interest Rate Based on a Short-Term Treasury Yield

37. The borrowings that were necessary for the Carteret branch sales in 1994 and 1995 equaled the amount of deposits less the deposit premium realized in the transactions.

---

23. Payment of Post-insolvency Interest in Receiverships with Surplus Funds, 66 Fed. Reg. 65,144, 65,145 (proposed Dec. 18, 2001) (to be codified at 12 C.F.R. § 360). (Emphasis added.)

24. *Id.* (Emphasis added.)

25. Deposition of Karen J. Hughes at 60-62 (Apr. 7, 2006).

26. Deposition of Karen J. Hughes at 59-60, 65-66 (Apr. 7, 2006); Deposition of Wayne S. Green at 190-191 (Feb. 28, 2006).

However, the principal amount used by the government includes the full amount of the deposits without any recognition of the premiums. The premiums were credited to an escrow account until nearly all of the premiums were credited to the receivership as part of a $377 million "dividend" on April 20, 1995.[27] The premiums held in the escrow account earned interest, but apparently the interest credited to the escrow account was based on a short-term Treasury yield.

38. Wayne Green, an FDIC witness, testified that the interest earned in the escrow account was "pegged to the earnings that the receivership was earning on its cash at the Federal Home Loan Bank on a monthly basis."[28] Another FDIC witness, Karen Hughes, testified that the interest charged to the receivership could be different than the interest credited to the escrow account.[29] Whereas the interest charged on the loan to the receivership was based on "the statutory or regulatory or whatever appropriate guidance existed that mandated post-insolvency interest," the interest credited to the escrow account was based on "internal indicators" that were not necessarily the same as the post-insolvency interest rates.[30] No government witness could provide an economic justification for why the interest credited to the receivership in the escrow account should be different from the interest charged to the receivership through the loan.[31] Clearly, it is illogical and inconsistent to use one interest rate measure to calculate the time value of money for credits and a different interest rate to measure the time value of money for debits.

### 3. The Interest Rates Charged by the Government Are Too High

39. The interest rates charged by the FDIC to the receivership are historically excessive. Since the interest rates on the loans were locked in 1994 and 1995, the post-judgment

---

27. Deposition of Wayne Green at 166, 175 (Feb. 28, 2006); Exhibit Green 15.
28. Deposition of Wayne Green at 435 (Apr. 5, 2006).
29. Deposition of Karen J. Hughes at 190-191, 223-224 (Apr. 17, 2006).
30. Deposition of Karen J. Hughes at 191 (Apr. 17, 2006).
31. Deposition of Karen J. Hughes at 84-85 (Apr. 7, 2006).

rate has yet to reach those locked levels again. If the interest rates for each loan were updated annually to match the post-judgment rate, then Table 3 would have been used.

TABLE 3: POST-JUDGMENT INTEREST RATES AT ONE-YEAR INTERVALS FOR EACH RESOLUTION

| Year | Resolution #1 (10/28/1994) | Resolution #2 (1/20/1995) | Resolution #3 (3/10/1995) |
|---|---|---|---|
| 1994/95 (the rate used by the government) | 6.06 | 7.34 | 6.57 |
| 1995/96 | 5.62 | 5.16 | 5.25 |
| 1996/97 | 5.64 | 5.61 | 5.67 |
| 1997/98 | 5.49 | 5.34 | 5.41 |
| 1998/99 | 4.24 | 4.55 | 4.92 |
| 1999/00 | 5.41 | 6.00 | 6.20 |
| 2000/01 | 6.24 | 4.85 | 4.47 |
| 2001/02 | 2.31 | 2.03 | 2.41 |
| 2002/03 | 1.79 | 1.38 | 1.22 |
| 2003/04 | 1.30 | 1.19 | 1.23 |
| 2004/05 | 2.22 | 2.85 | 3.20 |
| 2005/06 | 4.19 | 4.41 | 4.74 |

*Sources*: Administrative Office of the U.S. Courts, Post Judgment Rate 2001 (*available at* http://www.uscourts.gov/postjud/rate2001.html); Federal Reserve Statistical Release H.15, 1-year Treasury constant maturities (nominal) (*available at* http://www.federalreserve.gov/releases/h15/data.htm).

As Table 3 shows, if the interest rates on the three loans had been updated every year in a manner consistent with the one-year term used for the federal judgment rate, rates would have fallen from the initial levels of between 6.06 percent and 7.34 percent to rates as low as 1.19 percent in 2004.

**4. The Government's Inappropriate Interest Rates Substantially Inflated the Receivership Deficit through December 2005**

40. Based on the nature of the resolution loans and the comparable costs of lending, calculating interest based on the methodology used in the FDIC's 1999 spreadsheets, using a three-month moving average of the three-month Treasury bill secondary market rate for the previous three months, with daily compounding of interest, is an appropriate way of calculating the time value of money for the receivership. Therefore, to adjust for the correct time value of money, I calculate the interest charged on any given day $t$ ($I_t$) to be equal to:

[1] $$I_t = \left(Bal_{t-1} + Add_t - Div_t\right)\frac{r_t}{365},$$

where $I_t$ is the interest charged on day t, $Bal_{t-1}$ is the ending balance on day $t$-1, $Add_t$ is equal to total additions (debits) to the loan principal on day $t$ (such as the original loan principal on day $t$=1), $Div_t$ is equal to the total dividends (credits) paid to the loan on day $t$, and $r_t$ is the average annualized discount rate for the 3-month Treasury bill secondary market rate over the three calendar months preceding day $t$.[32] According to the FDIC's interest accrual rules, $I_t$ would be set equal to zero if the principal balance on the loan is zero.[33] However, the appropriate measure of the time value of money would continue to accrue interest on unpaid interest even after the principal is completely paid. As shown in equation [2], the ending balance on any day $t$ is equal to the cumulative sum of all additions to the loan principal and all accrued interest on every day on or before day $t$, less the cumulative dividends credited to the loan balance on every day on or before day $t$.

[2] $$Bal_t = \sum_{i=1}^{t} Add_t + I_t - Div_t$$

41. Under the FDIC's practice of ceasing interest accrual after the principal balance is paid, where the interest rate is adjusted monthly and compounded daily, and no other adjustments are made, the P&I balance of the receivership deficit would be $110.7 million as of December 31, 2005 (row (2) of Table 2). This deficit is $64.7 million lower than the receivership deficit P&I balance in which the fixed post-judgment rate is used by the FDIC to measure interest cost. This approach is similar to my understanding of the FDIC's approach to calculating post-insolvency interest for receiverships established after its 2002 rule change, in which the interest rate updates quarterly instead of monthly. If, instead, following the FDIC's post-2002

32. Federal Reserve Statistical Release H.15 (http://www.federalreserve.gov/releases/h15/data/Monthly/H15_TB_M3.txt).

33. Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006).

method, the floating rate methodology used were the coupon equivalent yield of the average discount rate set on the three-month Treasury bill at the last auction held during the calendar quarter preceding day *t*, and simple interest calculation is used,[34] the interest calculation would result in a receivership deficit P&I balance that is $63.5 million lower than the P&I balance calculated by the FDIC.

**D. The Government Did Not Credit Payments to the Highest Cost Debt**

42. In Sections A, B, and C, I have shown that the FDIC's interest rate measure in its receivership deficit computations is incorrect as a measure of the relevant time value of money, and that the FDIC's calculations should not have included time value of money adjustments in the receivership deficit, which is deducted from losses in the computation of damages due from the government (which is statutorily constrained not to take account of the time value of money). In this section, I show that, even if interest were included in the receivership deficit, and even if the government's incorrect measures of interest rates were used, the government's method for computing interest cost err for another reason – the failure to use proceeds to pay down high-cost debt first.

**1. The FDIC Applied Payments Pro-Rata Among the Three Resolutions, Even Though Each Resolution Had a Different Fixed Interest Rate Under the FDIC's Faulty Methodology**

43. In the FDIC's initial spreadsheets showing interest calculations, all three loans from each of the three branch sales had the same interest rate, which varied with the three-month Treasury yield. However, once the FDIC switched to a fixed rate methodology, each of the three loans had different interest rates yielding 6.06 percent, 6.57 percent, and 7.34 percent. In its

34. I interpret the FDIC's use of "simple interest" in its 2002 rulemaking to mean that interest compounds quarterly instead of compounding daily. If, instead, the FDIC's use of "simple interest" means that interest is never charged on interest, then the estimates of interest accrued using my interpretation of the FDIC's post-2002 methodology are overstated.

computations, the FDIC applies the debt repayments on a pro-rata basis to all three loans. Presumably, the FDIC's rationale is that some creditors of the thrift should not be paid off before others. Although that approach might make sense when crediting various private parties who are creditors, here the identity of the creditor for all three loans is the same: the government. In this case, there are no preferences or conflicts among creditors because the loans are all from the same entity. Thus, payments should be allocated first on the highest cost loans, regardless of the timing of their resolutions. There is no economic justification for a pro rata pay down of the debt.

44. FDIC witness Wayne Green testified in a deposition that the three loans had the same priority, that dividends for all three loans were paid into the same FRF RTC resolution fund, and that the receivership-maximizing allocation of dividends would be to allocate dividends to the highest rate liability.[35] He testified that the payments were allocated across all three liabilities rather than to any particular liability.[36] He admitted that allocating payments to the claims on a pro-rata basis rather than to the highest cost claims resulted in increasing the cost of the receivership.[37]

**2. Assuming the Government's Faulty Interest Rates Are Not Corrected, the Government's Failure to Allocate Payments to the Highest-Cost Resolutions First Substantially Inflated the Receivership Deficit through December 2005**

45. If payments are allocated to the highest-cost resolution until its principal is paid down,[38] and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $124.3 million as of December 31, 2005 if

---

35. Deposition of Wayne S. Green at 291-294 (Mar. 1, 2006).
36. *Id.* at 294-295.
37. *Id.*
38. The principal for the three resolutions should be paid down first, because once the principal is paid down, interest stops accruing according to the FDIC accrual rules. *See* Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006); "Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499); E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).

interest stops accruing in an individual loan once the principal in that loan is paid. This deficit is $51.1 million lower than the $175.4 million deficit's P&I balance calculated using the FDIC's faulty methodology. If payments are allocated to the highest-cost resolution until its principal is paid down, and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $161.9 million as of December 31, 2005 if interest stops accruing in an individual loan once the principal amounts in *all* loans are paid (row (4) of Table 2). This deficit is $13.5 million lower than the $175.4 million receivership deficit P&I balance calculated using the FDIC's faulty methodology. Of course, if one properly excludes interest from the receivership calculations, or if one includes interest but uses floating short-term Treasury yields instead of the frozen 52-week rates, then the receivership deficit calculations would not be affected by the allocation of payments among the three loans. Thus, correcting the FDIC's assumed allocation of payments is only relevant if one inappropriately includes interest in the receivership deficit, and if one uses the FDIC's incorrect interest rate concept in those calculations.

**E. The RTC/FDIC Failed to Credit Sales Premium to the Loan Principal Using a Consistent Measure of the Time Value of Money**

46. As noted above, the RTC credited the sales premium from branch sales to an escrow account and did not credit the resolution loans by the amount of the sales premium until April 1995. That delay mattered because the RTC used a lower interest rate when calculating accrued interest on the escrow account than the rate it used when calculating interest costs of the receivership. According to FDIC spreadsheets, the interest earned in the escrow account was

$1.9 million.[39] Although this escrow account interest was credited to the receivership on April 20, 1995, the interest that had accrued through April 19, 1995 on the corresponding unpaid premium portion of the receivership loans was $2.4 million according to the FDIC's faulty methodology. Because the escrow account interest did not cover the accrued interest in the receivership deficit, this $0.5 million difference between the two amounts has increased through time by accruing interest. I estimate this difference to have increased to $1.0 million as of December 31, 2005.[40]

47. By over-inflating the principal of the loans and charging the receivership interest on that portion of the loan principal that was guaranteed to be repaid later by an escrow fund earning interest at a lower rate, the FDIC overcharged the receivership by $1.0 million. There is no economic justification for charging the receivership a higher interest rate on the loan than the interest rate credited to the receivership through the escrow account of the sales premiums.

48. The effect of setting the two interest rates equal when computing the receivership deficit depends on which interest rate one picks as the appropriate measure of the time value of money. In rows (2) and (2)' of Table 2, I show that there is only a small effect on the receivership deficit from setting the two rates equal. The reason for that result is that the loan interest rate assumed in row (2) is already quite similar to the rate used in the escrow account calculation. As shown in rows (3) and (3)' and in rows (4) and (4)' of Table 2, however, the effect of setting the escrow account interest rate equal to the post-judgment rate is greater because the post-judgment rate is quite different from the floating rate used in the escrow account calculation.

---

39. Deposition of Wayne Green at 297-298 (Mar. 1, 2006); Exhibit Green 37.

40. I assume that the interest from the escrow account would be credited to each loan on a pro rata basis, based on the total amount of the sales premium transferred from the escrow account to the receivership on April 20, 1995.

## II. Delays and Value Destruction During Carteret's Conservatorship Inflated the Receivership Deficit by Reducing the Premium Realized from the Sale of the Branches, Requiring a Larger Loan Principal to Fund the Resolutions

49. Having completed my discussion of the interest rate calculations in the receivership deficit, I now turn to discuss how various actions by the government substantially reduced the value received from the liquidation of Carteret, resulting in an inflation of the principal of the receivership deficit. Damages due to Plaintiffs should not be reduced as a consequence of government decisions that reduced the liquidation value of Carteret. When I adjust for the government-induced reductions in the value received for Carteret, the adjusted P&I balance of the receivership deficit is negative (there is a receivership surplus). The government's harmful actions divide into four categories, each of which is considered separately in Section II-V below: Congressional actions that reduced the premium received from the sale of Carteret's branches (discussed in Section II), Congress's destruction of valuable supervisory goodwill (discussed in Section III), the failure to realize the value of the mortgage brokerage operation during the liquidation (discussed in Section IV), and delays in the sale of some of Carteret's financial assets of long duration that resulted in reduced liquidation values because of the rising interest rate environment (discussed in Section V).

50. First, I consider the failure to realize the full potential value of the premiums from the sale of branches, which resulted in a higher loan principal required to fund the resolution, which in turn had the effect of inflating the receivership deficit and the interest charges associated with the receivership deficit.

51. Losses in premium were the direct consequence of government policies that produced substantial delays and other government-induced problems in the bidding process for the branches, which resulted in a substantial runoff of deposits on which premium would have been paid and a reduced premium per dollar on deposits that were sold. The government actions

that created delay, promoted deposit runoff, and limited the number and quality of bids included: (1) the initial failure of Congress to fund thrift liquidation, which created an initial delay in resolution, and (2) the creation by Congress of a minority preference program. Absent the funding problem and the minority preference program, the branches would have sold for a much higher amount. Not only would deposit runoff have been avoided; in the absence of the minority preference program, the structure of the sale of the bank's assets likely would have resulted in a higher premium per dollar of deposits, because it would have been likely that the branches would have been sold together, and therefore, could have commanded a higher premium per deposit dollar (because the sale would have preserved the franchise value of the bank as a network of branches). Finally, in the absence of the minority preference program, the bidding process for those assets likely would have been more successful (because bidders would have been encouraged to participate and to bid more aggressively).

52. Table 4 summarizes my conservative estimates of the but-for receivership deficit, correcting only for the multiple delays and value destruction caused by the government in the sale of branches. In Section I above, I described various alternative sets of assumptions about the proper treatment of interest in calculating the P&I balance of the receivership deficit for purposes of calculating any offset to damages due from the government. In Table 4 there is no reason to consider various alternative treatments of interest charges when adjusting for all Congressional delays. If delays and value destruction in the sale of branches had been avoided, then the bank would have been sold in its entirety by December 1993, and there would have been no need for the receivership to borrow, since there would have been a receivership surplus of $23.1 million. Thus, the calculations for all delays in Table 4 do not consider alternative possibilities for the treatment of interest on the loan to the receivership, since there would have been no loan.

53. For purposes of comparison, I provide calculations in Table 4 that consider the combined effect of all Congressional actions that produced delays in Carteret's resolution, and that isolate the effect of the minority preference program in delaying resolution. Even if one only considers the effect of the minority preference program on delaying the resolution of the bank, the bank would still have been sold in its entirety by October 1994, and the most conservative estimate of the receivership deficit's P&I balance at the time of the resolution would have been $1.4 million. Other factors whose effects I discuss below but do not attempt to quantify in this report would have brought the receivership P&I balance into surplus at the time of the resolution, and there would have been no need for the receivership to borrow. However, in Table 4, I use the most conservative estimate of a borrowing need of $1.4 million at the time of the resolutions but-for the minority preference program only. For purposes of comparison, I provide several calculations in Table 4. Row (2) corrects for the delays from the minority preference program only and excludes all adjustments for the time value of money from the receivership deficit calculation. Row (3) corrects for the minority preference program delay, includes interest charges in the receivership deficit under the government's inconsistent treatment of the time value of money (including imputed interest in the receivership deficit), but uses the appropriate measure of the time value of money (a short-term floating Treasury yield) for the interest charges. Row (4) corrects for delays and value destruction, but incorporates no corrections to the government's inappropriate interest calculation methodology.

TABLE 4: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE BUT-FOR THE GOVERNMENT'S DELAY AND VALUE DESTRUCTION OF CARTERET'S RESOLUTION

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) All delays and value destruction removed | (23.1)* | 156.6 | 198.5 |
| Only minority preference program delay removed** | | | |
| (2) Charge no interest on receivership deficit | 1.4 | 156.6 | 174.0 |
| (3) Use monthly moving average short-term interest rate | 2.1 | 155.8 | 173.3 |
| (4) No interest calculation methodology changes | 2.6 | 155.3 | 172.8 |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.
** Results analogous to rows (2)' and (3)' from Table 2 are not reported here because the loan principal under the adjustment for only the delay from the minority preference program is never completely paid down.

## A. The Government Delayed and Mismanaged Carteret's Resolution

### 1. Congress Delayed Funding for the RTC, Which Delayed Carteret's Resolution

54. The RTC initially attempted to market Carteret prior to failure through the Accelerated Resolution Program ("ARP") process. The FDIC, in its own account of the period, writes, "[i]nitially, institutions selected for sale through the ARP process were perceived to have a high franchise value and already had attracted viable, cost-effective proposals from prospective acquirers, which indicated substantial private sector interest. Also, the troubled institutions' management had to agree to participate in the process by signing consent agreements and cooperating with the RTC and the regulators."[41] Although Carteret was taken into the ARP on February 27, 1992, the FDIC also notes that, "[t]he ARP usefulness was limited, however, because it could not be fully used in 1992 and 1993 when the RTC had no funding."[42] Hence, it

41. FEDERAL DEPOSIT INSURANCE CORPORATION, MANAGING THE CRISIS: THE FDIC AND RTC EXPERIENCE, 1980-1994 132 (1998). [hereinafter MANAGING THE CRISIS].
42. *Id.*

is not surprising Carteret was not successfully marketed as a going concern through the RTC ARP program in early 1992.

55. Carteret was placed in conservatorship on December 4, 1992. However, at this time the RTC still had no funding and was unable to successfully market Carteret. In 1991, Congress had delayed funding for the RTC amid allegations that the agency was awash in overspending.[43] Congress spent months arguing over who would be responsible for the costly government rescue until it finally passed the RTC Completion Act of 1993, enacted December 1993.[44] That act released $18.3 billion in new funding to the RTC.[45] This funding, the first cash infusion to the RTC in two years, enabled the RTC to begin disposing of the remaining 61 thrifts still controlled by the government at the time, including Carteret.[46]

56. By the FDIC's account:

> **The funding process and the related delays increased the cost of resolving the troubled savings and loan associations. The pace of resolutions had to conform to the availability of funds.** When funding was available, the number of resolutions increased and kept pace with the establishment of new conservatorships. Sometimes the pace of the resolution process was fast. Other times, the pace was painfully slow. **The longest delay was a 21-month period from March 31, 1992, to December 17, 1993, when the RTC was without loss funding and resolution activity was severely reduced.** The pace of resolutions followed the availability of funding, and resolution delays kept thrifts in conservatorship longer, which increased conservatorship operating losses. Those losses were $5.4 billion in 1989 and decreased steadily each year. In 1992, they were $669 million, but because of the reduced resolution activity from the lack of funding, in 1993, conservatorship operating losses increased that year to $1.3 billion. Resolution delays and conservatorship operating losses led to increased resolution costs because of the relatively high carrying cost of maintaining assets in failed thrifts.[ RTC, Office of Research and Statistics, "The History of RTC Funding." Unpublished document.] **Funding delays had a significant effect on how long an institution remained in conservatorship.** Before FIRREA's passage, when no conservatorships were resolved, thrifts averaged 454 days in the conservatorship program. After the

---

43. *Four Thrifts Under RTC Cost Taxpayers $153 Million*, BALTIMORE BUS. J., Dec. 31, 1993, at *1.
44. Jerry Knight, *Government Holds Fire Sale on S&Ls; Ten Area Thrifts Will Go to Highest Bidders*, WASH. POST, Dec. 23, 1993, at D09.
45. David Conn, *Thrift-y Shoppers' Catalog*, BALTIMORE SUN, Dec. 23, 1993, at 9C.
46. Knight, *supra* note 44, at D09.

> passage of FIRREA, with the exception of 1991 and 1992, the average time until resolution for thrifts put into conservatorship was less than a year.[47]

As a result, the FDIC's account maintains that:

> The RTC Completion Act (Completion Act) of 1993 became the most significant banking statute of the year to affect the FDIC and RTC. **From April 1, 1992, through December 17, 1993, the RTC would not have had sufficient funding to resolve additional failed savings and loan institutions.** The Completion Act removed the April 1, 1992, deadline for the use of funds that had previously been established, which permitted the RTC to use up to $18.3 billion authorized under RTCRRIA to resolve the remaining insolvent thrifts.[48]

### 2. As a Condition of Funding, Congress Required a Minority Preference Program, Which Further Delayed Carteret's Resolution

57. The Federal Home Loan Bank Act, in 12 U.S.C. § 1441a(w)(17)(A), provides for minority preferences in the acquisition of institutions in predominantly minority neighborhoods. The RTC Completion Act amended the minority preference provisions for marketing the RTC assets of minority owned institutions. Prior to the RTC Completion Act of December 1993, The Resolution Trust Corporation Refinancing, Restructuring, and Improvement Act (RTCRRIA) of November 1991 required only "...the RTC to reoffer failed nonminority owned institutions, or branches thereof, to minority owned institutions if it received no other acceptable offers through the conventional marketing efforts."[49]

58. The RTC Completion Act of December 1993, however, changed minority resolution practices considerably.

> In December 1993, the RTC Completion Act of 1993 amended section 21 of the Federal Home Loan Bank Act and revised the manner in which institutions were structured for sale, as well as the initial bid analysis process. The statute required that the RTC give "bidding preference" to an offer from a minority owned depository institution to acquire any failed depository institution, or any branch thereof, located in a neighborhood in which 50 percent or more of the residents were minorities, as part of the Predominantly Minority Neighborhoods (PMN) Program. Because the bidding preference was subject to the least cost test, it was limited. Minority bidders were permitted to submit a second bid

---

47. MANAGING THE CRISIS, *supra* note 41, at 124. (emphasis added)
48. *Id.* at 748. (emphasis added)
49. *Id.* at 134.

> if their initial bid was within 10 percent of the otherwise winning lowest bid by a nonminority bidder. The option to purchase performing loans at market value and ICA were also available to the minority acquirers.
>
> The RTC executed the special PMN Program by simultaneously offering institutions and branch offices to all potential acquirers through normal marketing efforts and specifically identifying all PMN institutions and branch offices. As a result, the RTC offered institutions having branch offices located in PMN neighborhoods under individual branch and cluster branch transactions. Additionally, under separate provisions of the FHLB Act, section 21(A)(s), the RTC made owned [sic] banking facilities located in predominately minority neighborhoods available to minority owned financial institutions on a rent-free basis for five years. The cost of that separate provision of the law was not included in the least cost test completed for the resolution transaction.[50]

Those new provisions, which were not in effect for the entire first year that Carteret was in resolution, served to further delay Carteret's resolution by subjecting it to a host of new regulatory requirements.

59. The general minority-preference bidding procedure was originally set up as follows: A second round of limited bidding involving the relevant bidders was conducted if a minority bidder submitted a bid within 10 percent of the highest non-minority bidder. The second round of bidding was supposed to be scheduled on a short time-frame so as to not delay the scheduled closing.[51] Regardless of the winner, the RTC had no authorization to sell the loans at less than market price.[52] However, over the course of time, it appears that the second round of bidding was dropped in favor of allowing the minority bidder an opportunity to match the highest non-minority bidder in order to win the purchase.[53] This practice tends to result in lower accepted bids, as discussed in detail below.

60. Carteret, with 30 branches in New Jersey and 9 branches in Florida, was designated as a whole institution located in a predominantly minority neighborhood.[54]

---

50. *Id.* at 136.
51. Exhibit Ramey 1 at 4 (WOP2990736).
52. Exhibit Ramey 2 at 3 (WOP2990742).
53. Ramey Exhibit 38 at 1 (C-AM-A-0088740).
54. Ramey Exhibit 49 at 6 (C-AM-A-0130616).

Accordingly, the RTC used its minority-preference guidelines in conducting the bidding and set out to price the loans and branches at market value.[55] Some minority bidders, however, complained that they were being priced out of bidding.[56]

61. The RTC put Carteret's 39 branches up for bid in 16 clusters.[57] On August 25, 1994, 101 bids were received from 40 entities for the insured deposits of Carteret's 39 branches.[58] Carteret's nine Florida branches were sold on October 28, 1994, separately from the rest of Carteret's branches in New Jersey. The RTC resolved the Florida branches because the deposit runoff rate for those branches was slightly higher than the runoff rate for the New Jersey branches.[59] The RTC could not sell the New Jersey branches at the same time as the Florida branches because of issues related to evaluating de novo minority bidders on the New Jersey branches and continuing efforts to identify a minority acquiror.[60]

62. On September 19, 1994, minority bidder TCB Holdings was given a chance to match the high bid for the New Jersey branches as it was within 10 percent of the high bid.[61] After lengthy negotiations, TCB Holdings was unable to meet the statutory definition of a minority institution because, among other things, more than 50 percent of the profits would have

55. C-AM-A-0014399, C-AM-A-0076008.
56. WOP2991722, C-AM-A-0027918, C-AM-A-0125162.
57. Ramey Exhibit 49 at 3 (C-AM-A-0130613).
58. *Id.*
59. Exhibit Ramey 38 at 2 (C-AM-A-0088741).
60. *Id.* at 1 (C-AM-A-0088740)
61. Exhibit Ramey 49 at 4 (C-AM-A-0130614). The High Bid for the New Jersey branches was submitted by a combination of bidders: four Midlantic bids totaling $96.7 million for 6 clusters with 18 branches; two Banco Popular bids totaling $17 million for 2 clusters with 4 branches; Investor's bid for $11.7 million for 1 cluster with 3 branches; United's bid of $7.2 million for 1 branch; First Saving's bid of $17 million for 1 cluster with 3 branches and Sovereign's bid of $3.5 million for 1 branch. C-AM-A-0130613 – 14. The High Bid for the Florida branches included: Commercial Bank's bid of $6.3 million for 1 cluster with 5 branches; Hamilton Bank's bid of $2 million for 2 clusters with 2 branches; and Life Savings' bid of $1.3 million for 1 cluster with 2 branches. C-AM-A-0130614. The nine branches and $163 million in deposits in Florida were sold on October 28, 1994 to three bidders (Commercial Bank, Life Savings, and minority-owned Hamilton Bank) for $9.79 million in premiums. Ramey Exhibit 38 at 1 (C-AM-A-0088740); C-AM-A-0130612.