been distributed to wealthy white backers.[62] Another minority bidder, Bahia Partners, was within 10 percent of the High Bid for the New Jersey branches and given a chance to match it.[63] On December 7, 1994, the RTC notified Bahia Partners that its matching bid was no longer under consideration because it did not have the required necessary capital.[64]

63. The same day, December 7, 1994, the RTC requested the bidders in the High Bid for the New Jersey branches to reaffirm their bids.[65] Five of the six bidders reaffirmed seven of their ten bids.[66] The reaffirmation accounted for 14 out of the 30 branches with approximately $622 million in deposits.[67] The RTC accepted the reaffirmed High Bids on 14 of the New Jersey branches for a total premium of $65,602,350 or approximately 10.5 percent of the $622,402,000 in deposits in the 14 branches as of November 30, 1994.[68]

64. As to the remaining 16 branches, no conforming bids were received.[69] The RTC, however, recognized that there was a distinct possibility that one of the high bidders might not reaffirm because of the runoff of $200 million in deposits since the bid date.[70] The RTC determined that the least cost alternative for the 16 branches with $621 million in deposits was to rebid them.[71] Minority preference was not a concern for the remaining 16 branches because none of them was in predominantly a minority neighborhood.[72] On February 14, 1995, sixty-one bids were received from 22 bidders.[73] The High Bid for the 16 remaining branches included seven

62. *Id.*
63. *Id.* at C-AM-A-0130615.
64. *Id.*
65. *Id.*
66. *Id.*
67. *Id.*
68. Exhibit Ramey 49 at 2 (C-AM-A-0130612).
69. *Id.* at 5 (C-AM-A-0130615).
70. WOP3300026.
71. Exhibit Ramey 49 at 6 (C-AM-A-0130616).
72. Exhibit Ramey 54 at 4 (C-AM-A-0013424).
73. *Id.* at 3 (C-AM-A-0013423).

bidders for a total premium of $68,429,000 representing 11.09 percent of the total deposits.[74] On March 1, 1995, the High Bid by the seven bidders (Penn, Chase Manhattan, The Bank of NY, Investors, Provident, Trenton, Boiling Springs) was accepted by the RTC.[75]

## B. The Consequences of the Government's Delay and Value Destruction on the Principal Required in Carteret's Resolution

### 1. Delay Led to Deposit Runoff

65. The primary problems affecting the resolution of Carteret were the RTC's own financial condition and its inability to sell an institution as large as Carteret for full value under the constraints of the minority preference program.

#### a. Estimating the Magnitude of the Delay in Carteret's Resolution

66. There are four key influences to resolving failed business assets noted in the financial literature: firm size, asset quality, asset specificity, and industry performance.[76] First, all other influences being equal, larger firms are more difficult to break up and sell, incurring more time and effort for resolution. It should be noted, however, that in a regulated industry like banking, the deposit base of a bank is a valuable commodity. Federal and state regulations limit entry into local deposit markets, so the ability to purchase that entry through purchasing failed bank deposit liabilities may be of benefit to the purchaser. Hence, banks with larger deposit bases should be quicker and easier to resolve. Second, firms with higher quality assets require less time and effort for resolution. Third, assets that are unique to a particular industry may be hard to sell, prolonging resolution. Finally, firms are more difficult to break up and sell during industry-wide or economy-wide downturns.

---

74. *Id.* at 2-3 (C-AM-A-0013423, -24).
75. Exhibit Ramey 52 (C-AM-A-0013420).
76. This section analyzes Carteret's position relative to the 2,989 other bank and thrift failures that occurred between 1980 and 2004. Data to support the analysis is from the FDIC Failure Transaction Database, updated through December 2004.

### i. Carteret's Relative Position at the Time of Failure

67. The exclusion of regulatory goodwill from Carteret's capital after the enactment of FIRREA in August 1989 rendered Carteret below minimum capital guidelines enforced by the Office of Thrift Supervision ("OTS"). Evidence of Carteret's asset and liability composition relative to other failed thrifts can be found in the Thrift Financial Reports ("TFRs") filed by failed thrifts in the quarter prior to failure. Table 5 reproduces several key measures of financial health of Carteret in the quarter prior to failure and relates Carteret's condition to other failed thrifts in the quarters prior to their respective failures.

TABLE 5: CARTERET'S PERFORMANCE RELATIVE TO OTHER FAILED THRIFTS

| Year | N | Past Due and Nonaccruals/ Total Loans | N | Return on Assets (ROA) | Interest Expense/ Deposits |
|---|---|---|---|---|---|
| 1984 | 0 | NA | 22 | -0.919% | 2.658% |
| 1985 | 0 | NA | 56 | -1.938% | 2.523% |
| 1986 | 0 | NA | 53 | -3.866% | 2.195% |
| 1987 | 0 | NA | 52 | -3.001% | 1.841% |
| 1988 | 0 | NA | 168 | -4.503% | 1.889% |
| 1989 | 0 | NA | 273 | -3.572% | 1.994% |
| 1990 | 88 | 14.267% | 156 | -2.142% | 1.993% |
| 1991 | 86 | 10.982% | 86 | -0.527% | 1.824% |
| **1992** | **28** | **10.882%** | **28** | **-0.848%** | **1.516%** |
| 1993 | 3 | 10.061% | 3 | 0.325% | 1.173% |
| 1994 | 0 | NA | 0 | NA | NA |
| 1995 | 2 | 20.337% | 2 | -0.322% | 1.176% |
| 1996 | 0 | NA | 0 | NA | NA |
| 1997 | 0 | NA | 0 | NA | NA |
| 1998 | 0 | NA | 0 | NA | NA |
| 1999 | 0 | NA | 0 | NA | NA |
| 2000 | 0 | NA | 0 | NA | NA |
| 2001 | 0 | NA | 0 | NA | NA |
| 2002 | 0 | NA | 0 | NA | NA |
| 2003 | 0 | NA | 0 | NA | NA |
| 2004 | 0 | NA | 0 | NA | NA |
| **Total** | **207** | **12.442%** | **899** | **-2.919%** | **1.991%** |
| **Carteret** | **1** | **8.310%** | | **0.069%** | **1.168%** |

*Note*: The sample of failed thrifts is comprised of institutions in the FDIC Failure Transaction Database classified as "state stock savings and loans" that could be matched with historical TFR data. Return on assets is equal to quarterly net income in the quarter prior to failure divided by assets at the end of the quarter prior to failure. Interest expense is quarterly interest expense on total deposits only in the quarter prior to failure. Total Loans is equal to loans and lease financing receivables, net of unearned income, on a consolidated basis at the end of the quarter prior to failure. Carteret, which failed in 1992, is not included in the 1992 results sample in order to make the comparison clearer.
*Source*: Thrift Financial Report data; FDIC Failure Transaction Database.

Table 5 shows that Carteret was in a stronger position than a typical failed thrift. Carteret had a lower ratio of past due and nonaccrual loans to total loans than the average for thrifts failing in 1992 and over the entire period. One problem with failed thrifts was the preponderance of "hot money," which is exhibited by a very high average deposit expense. Table 5 shows that hot money was not likely to be unusually large a concern with Carteret, as the ratio of deposit interest expense to total deposits in Carteret was lower than the ratio for other thrifts failing both

in 1992 and throughout the period (I provide more evidence on this point below). Finally, unlike average failed thrifts in 1992, Carteret was earning a positive return on assets ("ROA").[77]

68. Carteret was a large thrift with one of the largest deposit bases among failed banks and thrifts resolved between 1980 and 2004. It is appropriate to compare its resolution experience with those of other thrifts, and especially with other large thrifts that failed during the late 1980s and early 1990s. Carteret had a sound financial structure (better than average asset quality, as shown in Table 5) relative to other failed institutions of the era, which would have made it relatively attractive to acquirers, and which would have expedited its sale. Furthermore, Carteret was resolved during a business cycle expansion, not during a recession, so the economic environment in which the resolution took place should have favored a relatively speedy and efficient sale. Table 6 compares Carteret's relative size position against all 2,989 other banks and thrifts that failed between 1980 and 2004, just the 1,074 other thrifts that failed during that period, the 28 other thrifts that failed in 1992, and the 10 other thrifts between $4 billion and $6 billion that failed any time between 1980 and 2004 (all of which actually failed between 1988 and 1991). As Table 6 shows, Carteret's deposits and assets were among the largest of failed thrifts.

77. Carteret's ratio of past due and nonaccruals to total loans, ROA, and interest expense ratio also compared favorably to the average of the corresponding ratios for other failed thrifts in 1992 and in the entire period when using sample definitions different than the sample definition used in Table 5 (for example, using a broader sample of all TFR filers) and when using annual measures instead of the quarterly measures used in Table 5.

TABLE 6: CARTERET'S RELATIVE POSITION AT TIME OF FAILURE

| | Deposits at Quarterly Call Report Prior to Failure | Assets at Quarterly Call Report Prior to Failure |
|---|---|---|
| **Carteret's Level** | **$2.716 billion** | **$4.827 billion** |
| *How Carteret's Level Ranks Among Comparables*: | | |
| 2,989 Other Failed Banks and Thrifts, 1980-2004 | 98.6% | 99.1% |
| 1,074 Other Failed Thrifts, 1980-2004 | 98.2% | 99.0% |
| 28 Other Thrifts failing in 1992 | 100.0% | 100.0% |
| 10 Other Thrifts of $4 Billion – $6 Billion Assets Failed 1988-1991 | 10.0% | 50.0% |

*Source*: FDIC Failure Transaction Database.

69. In summary, Carteret was one of the largest institutions resolved between 1980 and 2004, and it was also one of the healthier institutions resolved in that time period. Furthermore, resolution took place in a business cycle expansion, so few market difficulties should have impeded a speedy and efficient resolution. Hence, the RTC should have been able to easily resolve Carteret in a timely manner so as to retain the majority of the charter value for prospective purchasers. Instead, Carteret's resolution was an unnecessarily drawn-out and wasteful process.

### ii. Carteret's Relative Experience in Resolution

70. Carteret spent 826 days in resolution, during which time it lost 54 percent of its deposits.[78] According to the FDIC, Carteret's total resolution cost to the FDIC (including combined administrative expenses and receivership deficit) was just under $159 million as of the

78. The 54 percent decline in deposits is measured from September 30, 1992 (the last quarterly TFR prior to failure) and December 31, 1994 (the last quarterly TFR prior to resolution). This measure is not adjusted for the October 1994 branch sales, nor does it include any deposit runoff from January 1995 to the final resolution in March 1995. If the deposits sold in the October 1994 branch sales are added to the remaining deposits as of December 31, 1994, then the decrease in deposits from September 1992 to December 1994 would be 49 percent. If the deposit decline is measured from the date of Carteret's failure on December 4, 1992 instead of September 1992, then the deposit decline through December 1994 (adjusted for the October 1994 branch sales) was 45 percent. For purposes of comparing Carteret to other failed institutions in this section, I use the 54 percent decline for Carteret because this is the measure of deposit decline reported in FDIC Failure Transaction database for all failed institutions.

end of 2004,[79] or about 3 percent of bank assets prior to failure. Table 7 compares Carteret's resolution experience to the experiences of other banks and thrifts resolved during the period.

TABLE 7: TIME SPENT IN RESOLUTION FOR CARTERET AND SIMILARLY SITUATED FAILED INSTITUTIONS

| | Avg Days in Resolution | Carteret's Relative Position |
|---|---|---|
| 2,989 Other Failed Banks and Thrifts, 1980-2004 | 120 | 97.7% |
| 1,074 Other Failed Thrifts, 1980-2004 | 245 | 94.9% |
| 28 Other Thrifts failing in 1992 | 438 | 92.9% |
| 10 Other Thrifts of $4 billion – $6 billion Assets Failed 1988-1991 | 365 | 100.0% |
| **Carteret** | **826** | - |

*Source*: FDIC Failure Transaction Database.

71. Table 7 shows that, by any standard of comparison, Carteret's resolution was unusually protracted. Carteret's lengthy resolution placed its experience either at the very top (the 100th percentile) or near the very top of every one of these samples. **There were virtually no thrifts or banks, of any size, at any time, that experienced the protracted resolution delay of Carteret.**

72. As I have shown, the delays in resolving Carteret cannot be reasonably attributed to any unusual weakness in the quality of its assets at the time it was seized. Furthermore, its resolution cost (as measured by the FDIC) relative to its assets was quite low. Although the alleged absolute dollar cost of Carteret's resolution was a relatively high $159 million, this cost was low when compared to the value of Carteret's assets prior to failure. Despite its favorable circumstances, Carteret experienced a protracted delay, which resulted in a substantial decline in its deposit base. Table 8 shows Carteret's deposit decline and the alleged cost of its resolution to the RTC as a fraction of its assets prior to failure, and compares these values to those of similarly situated failed institutions. As Table 8 shows, Carteret's 54 percent deposit decline between the date of its last TFR prior to failure and the date of its last TFR prior to resolution was greater

79. FDIC Failure Transaction Database. The cost was initially projected to be $225 million.

than the deposit declines of the vast majority of similarly situated institutions, regardless of the sample used, although its resolution cost as a fraction of assets was very low in comparison to other institutions.

TABLE 8: CARTERET'S RELATIVE EXPERIENCE IN RESOLUTION

| | Deposit Decline | Resolution Cost to RTC | Resolution Cost to RTC as a % of Assets Prior to Failure |
|---|---|---|---|
| **Carteret's Level** | **54%** | **$159 million** | **3.3%** |
| *How Carteret's Level Ranks Among Comparables*: | | | |
| 2,989 Other Failed Banks and Thrifts, 1980-2004 | 98.1% | 92.0% | 10.6% |
| 1,074 Other Failed Thrifts, 1980-2004 | 97.6% | 83.7% | 9.9% |
| 28 Other Thrifts failing in 1992 | 75.0% | 96.4% | 21.4% |
| 10 Other Thrifts of $4 Billion – $6 Billion Assets Failed 1988-1991 | 100.0% | 20.0% | 20.0% |

*Note*: All figures as of end of 2004. Deposit decline is measured from the date of the last call report or TFR prior to failure to the date of the last call report or TFR prior to resolution.
*Source*: FDIC Failure Transaction Database.

73. In summary, Carteret was one of the largest and healthiest institutions resolved between 1980 and 2004. Furthermore, resolution took place in a business cycle expansion, so few market difficulties should have impeded a speedy and efficient resolution. Hence, it should have been relatively easy to resolve Carteret in a timely manner so as to retain the majority of the charter value for prospective purchasers.

74. Contrary to expectations, however, the Carteret resolution had one of the worst outcomes among bank and thrift institution failures over the past 25 years. Large percentages of assets, deposits, and charter value were wasted during Carteret's resolution.

**b. Delaying the Resolution Resulted in Deposit Runoffs, Which Reduced Prices for the Branch Sales**

75. Deposits flee during resolution for two main reasons. Some deposits may be "hot money," which merely chases abnormally high interest rates offered by weak or insolvent institutions in their gamble for resurrection. In lengthy resolutions, another explanation for deposit runoff becomes much more important: depositors may withdraw their deposits because

they no longer see the value of maintaining a relationship with a crippled institution, especially if that institution is restricted by regulators from offering customers loan products and other related services that are part of the normal business of banking.

76. Hot money deposits were not uncommon in the thrift industry in the late 1980s and early 1990s. It was not uncommon during the thrift crisis for thrifts to offer extremely high interest rates to attract deposits that could be used to gamble on resurrection. "For example, before August 9, 1989, the average yield on a one-year CD at an S&L was 71 basis points higher than the yield on a bank CD. By March 1990, however, that difference had been reduced to 22 basis points, which translated into an industry savings that could exceed $1 billion per year."[80] Some CD rates soared to more than 1,000 basis points above market averages. Hence, the RTC consciously attempted to "run off" high interest rate deposits early in the resolution by lowering CD rates. That way, "hot money" depositors who were merely chasing high CD yields would flee willingly, and the RTC would lower interest expenses in the resolution. But there is no evidence that Carteret's deposit reductions arose from hot money.

77. Carteret began cutting deposit rates in early 1992, well before the RTC took over at the end of that year. The *New York Times* reported in August 1992, that "[f]or New York-area yields, the largest adjustments were at Carteret Savings in New Jersey, which pared 27 basis points from its money-market account, to 3.29 percent, and at Astoria Federal Savings, which cut the three-month C.D. 11 basis points, to 3.19 percent, and the six-month C.D. 15 basis points, to 3.25 percent."[81]

78. On February 17, 1993, well after the RTC took control of Carteret in resolution, Carteret's money market account rate was 2.94 percent, its three-month CD rate was 3.00

80. MANAGING THE CRISIS, *supra* note 41, at 123.
81. Robert Hurtado, *Bank Yields On Accounts Decrease*, N.Y. TIMES, Aug. 26, 1992, at D10.

percent, and its six-month CD rate was 3.25 percent. Compared with New York regional thrifts, five other thrifts (Hudson City SB (N.J.), First Fed (Rochester), Green Point Savings, River Bank America, and Astoria Fed Savings) offered higher money market rates, one (Hudson City SB (N.J.)) offered higher three-month CD rates, and three (Hudson City SB (N.J.), Anchor Savings, and Green Point Savings) offered higher six-month CD rates.[82] The RTC noted that Carteret offered "competitive" interest rates on deposits, but rather than viewing that fact as reflecting a weak retail banking franchise, the RTC argued that Carteret's competitive deposit interest rates reflected its high quality of retail banking relationships and effective marketing strategy:

> In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.
>
> CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.[83]
>
> The CFSB retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution. During the past five years, the Bank's consumer banking efforts have been focused upon optimization of the retail office network. Each retail office was evaluated on its financial performance compared to the potential of the branch market area. Many of the offices which were determined to be substandard were closed, consolidated or sold to another financial institution. Operations at the remaining offices were streamlined and marketing efforts focused on acquisition/retention of high-balance deposit households.
>
> CFSB retail offices in New Jersey and Florida are located in some of the top performing market areas in each respective state. The New Jersey markets tend to be suburban and upper middle class in nature, but also include some stable and ethnic blue-collar neighborhoods in urban areas. In Florida, the markets also tend to be suburban and upper middle class, and are characterized by a preponderance of senior citizens.

---

82. *Bank Money Accounts*, N.Y. TIMES, Feb. 17, 1993, at D14.
83. Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 4 (C-AM-A-0400792).

Based upon total deposits, CFSB ranks as the second largest SAIF-insured institution headquartered in New Jersey. While considerably smaller in scope, the Bank's Florida retail office network nevertheless affords a possible acquiring institution of these CFSB branches the opportunity to be a significant player, specifically in South Florida.

In recent years, CSB has made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty. Retail office managers are also encouraged to be active in their respective local communities. The "outstanding" rating which CSB received for its Community Reinvestment Act activities is further evidence of the Bank's commitment to the individual communities it serves.

In its New Jersey market areas, CFSB is second only to First Fidelity Bank in terms of retail deposit market share. The Bank is the market share leader in eight of its New Jersey market areas and among the top three in over half of the markets. In Florida, CFSB faces much more competition, but nevertheless is among the top ten institutions in over half of its markets.

The Bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office presence. Average account balances for each product type at CFSB exceed industry averages. These characteristics, combined with a relatively stable deposit base, further enhance the valuation of the Bank's franchise.[84]

79. Carteret's interest rate decreases cannot explain its protracted deposit flight. By March 1993, the TFRs show that money market accounts were an inconsequential portion of Carteret's deposits.[85] About 20 percent of Carteret's deposits fled in the six months following the failure announcement on December 4, 1992.[86] Figure 1 shows that the deposit declines continued during the resolution. Despite some variation from quarter to quarter, the rate of decline in deposits was fairly constant over time.

---

84. Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 26-27 (C-AM-A-0400815 – 16).

85. The TFR reports zero MMDA balances in March 1993.

86. The initial decline in deposits was linked to specific actions by the RTC. "Since the date of conservatorship, CFSB has restricted certain products and significantly reduced interest rates on others. As a result, the Bank has experienced an outflow of $138.4 million in retail deposits through December 31, 1992. For the 27 days following the December 4, 1992 date of conservatorship, net certificate outflows totaled $63.4 million or 51.1 % of scheduled maturities. In addition, tax-deferred annuities and brokerage services which were previously sold in New Jersey retail offices are no longer offered." Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 26 (C-AM-A-0400815).

FIGURE 1: PERCENT CHANGE IN CARTERET'S TOTAL DEPOSITS DURING RESOLUTION, DECEMBER 1992-DECEMBER 1994




*Note*: Percent change in deposits are quarter-over-quarter, except for the first observation (December 31, 1992), which is the "quarterly" percent change in deposits from the date Carteret was seized (December 4, 1992) to December 31, 1992. "Quarterly" percent change is defined as three times the observed movement from December 4, 1992 to December 31, 1992. In order to adjust for the October 1994 branch sales, I add the loan principal from the October 1994 resolution ($155.7 million) to the total deposits reported by the December 1994 Carteret TFR before estimating the percent change in total deposits from September 1994 to December 1994.
*Source*: Thrift Financial Reports; Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 2 (C-AM-A-0400790); Carteret Federal Savings Bank, Consolidated Florida Branch Resolution Summary (AM54120696).

80. A simple diagram relating deposit losses to time spent in resolution for the sample of 11 large failed thrifts (including Carteret) is presented in Figure 2. Figure 2 illustrates a simple ordinary least squares regression of the percent change in deposits from the quarter prior to failure to the quarter prior to resolution as a function of time in resolution for those eleven institutions. **Figure 2 shows that Carteret's substantial deposit loss was the predictable consequence of its protracted resolution.**

FIGURE 2: NEGATIVE RELATIONSHIP BETWEEN RESOLUTION TIME AND DEPOSIT LOSSES, 11 THRIFTS FAILING WITH $4 BILLION TO $6 BILLION IN ASSETS, 1980-2004




81. As shown in Table 8, Carteret lost 54 percent of its $2.7 billion deposit base between the date of its last quarterly TFR prior to failure and the date of its last quarterly TFR prior to resolution. If the RTC had been funded by late 1992, while Carteret was in the ARP program, Carteret would have been resolved at least as quickly as the average resolution period of the other ten large failed thrift institutions shown in Figure 2. A list of the eleven large thrifts that failed in the late 1980s and early 1990s is provided in Table 9.

TABLE 9: ELEVEN THRIFTS FAILING WITH $4 BILLION TO $6 BILLION IN ASSETS IN LATE 1980S AND EARLY 1990S

| Name | City | Date of Failure | Assets Preceding Failure ($billion) | Days to Resolution |
|---|---|---|---|---|
| United Savings Association of Texas | Houston, TX | 12/30/1988 | 4.645 | 0 |
| Bright Banc SA | Dallas, TX | 2/10/1989 | 4.388 | 357 |
| University FSA | Houston, TX | 2/14/1989 | 4.480 | 241 |
| Lincoln Savings | Irvine, CA | 4/14/1989 | 4.857 | 693 |
| Western S&LA, FA | Phoenix, AZ | 6/14/1989 | 5.655 | 351 |
| Atlantic Financial Savings | Bala Cynwyd, PA | 1/11/1990 | 5.299 | 673 |
| The Benjamin Franklin FS&LA | Portland, OR | 2/21/1990 | 4.617 | 198 |
| Santa Barbara FS&LA | Santa Barbara, CA | 4/27/1990 | 4.292 | 469 |
| Southwest FSA | Dallas, TX | 5/18/1990 | 5.325 | 434 |
| Columbia S&LA | Beverly Hills, CA | 1/25/1991 | 5.359 | 231 |
| Carteret FSB | Madison, NJ | 12/4/1992 | 4.827 | 826 |

*Source:* FDIC Failure Transaction Database.

Table 9 indicates that of the eleven large failed thrifts shown in Figure 2, there were two failed thrifts that experienced resolution delays substantially greater than one year. Those were Lincoln Savings and Atlantic Financial Savings. Lincoln Savings was the institution owned by Charles Keating, famous for appealing to five senators for regulatory relief in order to keep his "high flying and economically insolvent S&L" from being closed by regulators.[87] Lincoln was one of the most costly S&L failures of the thrift crisis. Atlantic Financial Savings is less well-known, although Atlantic was Pennsylvania's largest savings institution.[88] These two institutions failed much earlier than Carteret, before the business cycle trough in 1991. That is important, because resolutions tend to proceed slowest during business cycle downturns.[89] Carteret, however, failed well after the business cycle trough. Furthermore, Atlantic and Lincoln were weaker than Carteret, exhibiting ROA's in the quarter before failure of -0.5 percent for Atlantic and -1.1

87. Edward Kane, *The Incentive Compatibility of Government-Sponsored Deposit-Insurance Funds*, *in* THE REFORM OF FEDERAL DEPOSIT INSURANCE: DISCIPLINING THE GOVERNMENT AND PROTECTING TAXPAYERS 164 (James Barth & R. Dan Brumbaugh, Jr., eds. 1992).

88. *Savings Unit Seized by U.S.*, N.Y. TIMES, Jan. 12, 1990, at D4.

89. Joseph R. Mason, *A Real Options Approach to Bankruptcy Costs: Evidence from Failed Commercial Banks during the 1990s*, 79 J. BUSINESS 1523 (2005).

percent for Lincoln, compared to 0.1% for Carteret.[90] Lincoln and Atlantic also relied substantially on hot money deposits, posting interest expense ratios in the quarter before failure of 2.1 percent for Atlantic and 2.4 percent for Lincoln, compared to only 1.2 percent for Carteret.[91] Lincoln and Atlantic also engaged in risky commercial lending, which contributed 3.0 percent earnings for Atlantic and 2.5 percent for Lincoln, compared to only 0.5 percent for Carteret.[92] In resolution, regulators observed the lack of franchise value in Atlantic and Lincoln, which is reflected in their forecast of the potential going concern value of those institutions. This going concern value, as measured by the forecasted payoff cost minus resolution cost, divided by payoff cost, was only 1.9 percent for Atlantic and 0.4 percent for Lincoln, compared to 37.4 percent for Carteret.[93] Regulator's expectations were borne out in receivership, as Atlantic's receivership deficit amassed a loss through 2004 of over $1 billion (20.3 percent of assets in the quarter before failure), and Lincoln's amassed a loss of over $2.5 billion through 2004 (53.0 percent of assets in the quarter before failure), while Carteret's loss, according to the FDIC, amounted to only $159 million through 2004 (3.3 percent of assets in the quarter before failure). Nonetheless, Carteret still spent more time being resolved than either of those two problem

---

90. ROAs are measured as quarterly net income in the quarter prior to failure divided by total assets in the quarter prior to failure. The comparison among Carteret, Atlantic, and Lincoln is similar if annual ROAs using the net income in the four quarters prior to failure and the average of assets in the four quarters prior to failure are used instead. Carteret's annual ROA was 0.2 percent, which was significantly higher than Atlantic's annual ROA of –9.4 percent and Lincoln's annual ROA of –6.7 percent.

91. The interest expense ratio is equal to the quarterly deposit interest expense in the quarter prior to failure divided by total deposits in the quarter prior to failure. The comparison among Carteret, Atlantic, and Lincoln is similar if annual interest expense ratios using the deposit interest expense in the four quarters prior to failure and the average of deposits in the four quarters prior to failure are used instead. Carteret's annual interest expense ratio was 5.3 percent, which was less than Atlantic's annual interest expense ratio of 8.5 percent and Lincoln's annual interest expense ratio of 8.9 percent.

92. I estimate commercial lending's percent earnings by dividing the institution's commercial and industrial loan income in the quarter prior to failure by the sum of commercial and industrial loans and domestic lease financing receivables in the quarter prior to failure. The comparison among Carteret, Atlantic, and Lincoln is similar if I use the commercial loan income in the four quarters prior to failure and the average of commercial and industrial loans and domestic lease financing receivables in the four quarters prior to failure. Using this annual measure, commercial lending contributed 7.2 percent earnings for Carteret, which was less than Atlantic's 11.8 percent earnings and Lincoln's 12.5 percent earnings.

93. Further discussion of this ratio is provided below.

institutions: Carteret spent 826 days in resolution, compared to 673 for Atlantic and 693 for Lincoln. Given Carteret's quality and the timing of its resolution, it is conservative to assume that in the but-for world it would have been resolved in 365 days, which is the average resolution period for the other 10 large thrifts that failed in the late 1980s and early 1990s, including Atlantic and Lincoln.

82. Had Carteret been resolved in the average time period in which thrifts of comparable size in the late 1980s and early 1990s were resolved, then Carteret's resolution would have occurred on or before December 4, 1993—365 days after it was seized. But-for the Congressional funding delays to the RTC, the RTC could have marketed Carteret as a whole bank, thus enabling it to sell Carteret's deposits and assets simultaneously at the time of resolution. In addition, the absence of the minority preference program would have lifted another obstacle to selling Carteret as a single entity. In this but-for world, if the value of Carteret's assets plus the deposit premium were greater than or equal to the value of Carteret's deposits, then no loan would be required to fund the resolution, and there never would have been a receivership deficit.

83. As of December 31, 1993, Carteret had $1.787 billion in deposits. I assume that, but-for the delay, Carteret would have sold its branches at the same 10.5 percent deposit premium as it actually sold its branches in the second resolution (the first 14 New Jersey branches sold subject to the minority preference program). This is a conservative assumption, as the deposit premium likely would have been higher but-for the minority preference program, as I explain below. Given its deposits of $1.787 billion and a 10.5 percent deposit premium, I estimate that but-for the delay resulting from Congressional actions, the Carteret branches would have sold for a total deposit premium of $187.6 million—$43.8 million greater than the $143.8

million deposit premium the branches actually sold for. I assume that the sales proceeds from Carteret's assets in December 1993 would have been $1.205 billion—equal to the sum of actual dividends paid toward the resolution loans ($1.351 billion), minus the actual interest earned from the escrow account of $1.9 million, minus the actual deposit premiums of $143.8 million from the resolutions. This is a highly conservative approach to valuing the but-for market value of Carteret's assets, as I explain in the remainder of this section and in Section V. I estimate the total sales proceeds (equal to deposit premium plus assets sold, minus settlement interest[94]) but-for the delay to be $1.393 billion at the time of the but-for resolution (versus the $187.3 million in sales proceeds at the time of the actual resolutions).

84. Because the but-for sales proceeds of $1.393 billion exceed the actual resolution loan principal of $1.370 billion,[95] no loan would be required to fund the resolution when correcting for the delay and value destruction of Carteret's receivership, and the receivership's P&I balance would be $23.1 million in surplus. As shown in row (1) of Table 4, this balance would have been $198.5 million lower than the government's inappropriate estimate of that balance as of the end of 2005.

---

94. When calculating the but-for receivership deficit's P&I balance under any scenario throughout my report, I use the actual value of settlement interest without adjusting it. The settlement interest paid by the RTC to the acquirors reflected the two to three day delay between closing the sale and wiring the funds equal to the difference between the amount of deposits assumed less premium paid and assets purchased. The value of actual settlement interest, which was less than $500,000, or 0.26 percent of total sales proceeds, is inconsequential to the results of the analysis.

95. The deposit runoff between the time Carteret should have been sold in December 1993 and the time its branches were actually sold was funded dollar for dollar by earnings and asset sales. Therefore, the difference between the but-for sales proceeds, including the earnings and asset sales that funded the deposit runoff, and the balance of deposits in December 1993 is equal to the difference between my measure of the but-for sales proceeds of $1.393 billion and the actual resolution funding requirement of $1.37 billion.

### c. Isolating the Consequences of Delay and Deposit Runoff from the Minority Preference Program

85. The minority preference program delayed the sale of 16 Carteret branches. This delay resulted in deposit runoff, which in turn contributed to the lowered amounts bidders were willing to pay for those branches.

86. The initial bids submitted for the 16 branches would have yielded a premium of $87.8 million—the amount of premium that Midlantic and Sovereign would have offered for those branches before the re-auction.[96] However, the RTC ultimately realized a premium of only $68.4 million on those 16 branches when they were sold in March 1995. Absent the delay caused by the minority preference program, but without taking account of the prior delay associated with the lack of Congressional funding, the branches would have likely been sold for $87.8 million at the same time as the other group of branches were sold in October 1994. In addition, the branches that were actually sold in the January 1995 resolution would have also been sold in October 1994 but-for the minority preference program. Although those branches did not require reauctioning like the branches that sold in March 1995, and therefore did not result in lower deposit premiums from the delay, their sale was still delayed by the problems with the initial disqualified minority bidders. In addition, Carteret would have been sold as a whole bank without the constraints of the minority preference program that forced it to be sold in pieces. Therefore, Carteret's assets and deposits would have been sold simultaneously in 1994, and a loan would have only been required if the sales proceeds from assets and deposits sold did not exceed the resolution funding requirement, approximately equal to the book value of the deposits.

---

96. Ramey Exhibit 49, at 4-5 (C-AM-A-0130614 – 15); Midlantic National Bank, Bid Form for Carteret National Savings Bank, at C-AM-A-0129998 - 0130000, 0130010 - 12.

87. As I discuss in Section V, the value of Carteret's assets would have been higher but-for the minority preference program delay. I use the conservative assumption that the proceeds from selling all of Carteret's assets in October 1994 would have been at least as high as the actual proceeds from selling Carteret's assets in pieces from 1994 through 2000. Therefore, the only difference between the total sales proceeds in the actual world and the but-for total sales proceeds is the difference between the actual deposit premium and the but-for deposit premium ($19.4 million), less the $1.9 million in actual interest earned from the escrow account that would not have existed had the receivership immediately received the sales proceeds in a single resolution transaction in October 1994. As I have discussed above, the actual principal balance of the receivership deficit after all asset and deposit sales was $18.8 million. But for only the minority preference program delay, the principal balance after all deposit and asset sales in October 1994 would have been $1.4 million—$17.5 million lower than the actual principal balance. As I discuss below, other consequences of the minority preference program would have eliminated this shortfall and put the receivership deficit's P&I balance into surplus. However, Table 4 reflects the conservative estimate that the receivership deficit's P&I balance would have been $1.4 million at the time of the resolution when adjusting only for the effects of the minority preference program. Because, as I showed above, it would not be appropriate to charge interest on this principal balance, in row (2) of Table 4, the receivership deficit's P&I balance remains at $1.4 million as of the end of 2005. Even if none of my corrections to the government's inappropriate interest calculations are used, then the receivership deficit's P&I balance is $2.6 million as of the end of 2005 when adjusting only for the delay from the minority preference program (row (4) of Table 4).

### 2. The Minority Preference Program Resulted in Lower Deposit Premiums from the Branch Sales

88. The delays and value destruction by the government not only reduced the deposits available for sale, they likely reduced the premium received per deposit dollar for the sale of the branches. The premium per deposit dollar likely was reduced by two factors: (1) the value-destroying structuring of the transactions through which the bank was sold, and (2) the rules of the bidding process for its assets, which likely further reduced the value received. Both the value-destroying structure of the sale and the value-destroying bidding rules were direct consequences of the minority preference program. Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence suggesting that these losses were significant economically. Thus, my quantitative estimates in Table 4, which do not adjust for the reduced premium per deposit dollar, should be viewed as highly conservative (low) estimates of the reduction in the receivership surplus that resulted from government value destruction.

#### a. The Minority Preference Program Forced Carteret to Be Sold in Pieces, Rather Than on a Whole-Bank Basis

89. Carteret was sold in pieces rather than as a whole, which tends to reduce the premium received. The piecemeal sale of Carteret reflected the constraints imposed by the minority preference program, which favored smaller bank bidders for whom Carteret's large size would otherwise have been prohibitive.

90. Recall that Carteret initially qualified for the Accelerated Resolution Program (ARP) in 1992. ARP resolutions, which are typically reserved for banks with high potential sale premiums, are similar to "Reprivatizations" (save that banks resolved through ARP were not always formally in receivership). According to the standard RTC/FDIC measure of going concern value (the estimated difference between "resolution cost" and "payoff cost" of the

institution, which the agencies compute as part of their analysis of least cost resolution, expressed here in percent terms as payoff cost minus resolution cost divided by payoff cost), Carteret had a high going concern value. Intuitively, that going concern value represents the incremental value of having a going concern make depositors whole versus having the RTC/FDIC do so instead (and then sell the bank assets piecemeal in order to cover the present value of the outlay). If the expected cost of resolution is close to the expected cost of payoff then there is not much perceived value in preserving the institution through creative marketing programs. If, on the other hand, the expected costs are very different, that indicates that the RTC/FDIC believes that an acquiring institution will pay a premium to acquire the resolved bank's assets and liabilities as a package. Because neither the RTC/FDIC nor an acquiring institution should fail to recognize potential value, the going concern value is closely related to the expected premium from sale as a going concern rather than in pieces. Carteret's least cost resolution forecast indicates an expected premium value that compares favorably with other bank and thrift failures, no matter how measured.[97]

91. Judging from the RTC/FDIC measure of going concern value, Carteret's expected premium value of 37.4 percent was better than (that is, above) 75.7 percent of all other banks and thrifts that failed between 1980 and 2004, meaning that Carteret should have commanded a higher transaction premium, *ceteris paribus*, than more than 75 percent of other institutions that failed in the past two decades. Carteret's expected premium value was higher than 73.7 percent of the other thrifts that failed between 1980 and 2004, higher than 75.0 percent of the other thrifts that failed in 1992, and higher than 90.0 percent of the other thrifts with assets between $4

97. I refer to the estimated percent difference between resolution cost and payoff cost as the "expected" premium value, although it is not clear whether this measure is an unbiased forecast of the realized premium. Nevertheless, the estimated percent difference between resolution cost and payoff cost should be highly correlated with realized premiums.

billion and $6 billion that failed between 1980 and 2004 (all of which failed between 1988 and 1991). Hence, Carteret should have commanded a much higher sale premium than most other institutions.

92. Because the RTC was not sufficiently funded to assist Carteret to reprivatize in the ARP program, Carteret ended up being marketed as a Purchase and Assumption more than two years later under the newly-amended minority preference program, which was carried out as a "Branch Sale." Statistically, for thrifts being resolved in the 1990s, the change from a "Reprivatization" to a "Branch Sale" is associated with substantially lower premium received per deposit dollar.

93. How did Carteret's marketing as a Purchase and Assumption (instead of a Reprivatization under the ARP in early 1992) affect its resolution outcome? Figure 3 shows the propensity for resolutions of different types based upon the institution's particular expected premium value. It is clear from Figure 3 that Merger and Reprivatization transactions enjoy higher expected premium value from resolution, followed by Purchase and Assumption transactions, and Insured Deposit Transfer and Payoff transactions. Mergers and Reprivatizations are the typical means of resolutions when expected premium values lie above 25 percent (Carteret's expected premium value was 37.4 percent) while Insured Deposit Transfers and Payoffs are far more common when premium values approach 0 percent (the cost of resolution is not very different from a payoff, i.e., there is little going concern value to be preserved).

94. The expected premium value is a good predictor of the resolution type, and institutions with high going concern value are resolved through methods that preserve that value. Judging from Carteret's expected premium in 1992 and its status as an ARP transaction, it is likely that far less value would have been lost had Carteret been resolved through a Merger or

Reprivatization under the ARP program as originally intended. Instead, as a consequence of the minority preference program, Carteret was resolved by Purchase and Assumption instead of Merger/Reprivatization, a style difference that is associated with a 28.8 percent lower average expected premium value of 19.0 percent. The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[98]

FIGURE 3: VALUE AND RESOLUTION STRATEGY: PRIMARY RESOLUTION TYPES




98. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

95. How did the Branch Sale structure, arising from the implementation of the minority preference program, further affect the outcome? Figure 4 shows the frequency of branch sales based upon different premium values of different institutions. Again, branch sales are typically used where there is less expected premium value to be preserved through more value-preserving resolution techniques. Branch Sales are uncommon when premium values lie above 25 percent (recall, again, Carteret is 37.4 percent) while Branch Sales are very common when premium values approach 0 percent (since the cost of resolution is not very different from a payoff, i.e., there is little value to be preserved). Again, the main point is that a low expected premium value is a good predictor of a Branch Sale, while other institutions with high expected premium values are resolved through different methods that preserve their franchise values. It is likely that far less value would have been lost had Carteret been resolved through a Merger or Reprivatization under the ARP program as originally intended. Instead, Carteret was resolved by Branch Sale, a style difference that is associated with an average 15.1 percent lower value premium on deposit sales over non-branch sale resolutions.

96. The average expected value premium on Mergers and Reprivatizations was 47.9 percent, whereas the average expected premium for a standalone Purchase and Assumption was 20.1 percent, the average expected premium for a Purchase and Assumption with a Branch Sale was 14.3 percent, the average expected premium for a standalone Insured Deposit Transfer was 7.6 percent, and the average expected premium for an Insured Deposit Transfer with a Branch Sale was 2.1 percent. The lack of Congressional funding and increased minority preference restrictions imposed by Congress during the wait for funding resulted in Carteret being resolved as a Purchase and Assumption with a Branch Sale, implying an average expected premium value of 14.3 percent rather than a Mergers and Reprivatization transaction with an average expected

premium value of 47.9 percent, an absolute difference of 33.6 percent (or viewed alternatively, a 70.1 percent drop in expected premium value). The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[99]

FIGURE 4: VALUE AND RESOLUTION STRATEGY: BRANCH SALES




### b. The Minority Preference Program Discouraged Non-Minority Bidders from Participating in the Auction for Carteret's Branches

97. Controlling for other factors, the bidding rules of the minority preference program reduced the number of bids and created disincentives for high bids. The preference program

99. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

amounted to the granting (for free) of a valuable option to minorities to match the high bid of others who had invested resources to value Carteret's branches. The effect of such a grant is to discourage entry by non-minority bidders, which in turn, depresses auction prices. Indeed, an internal government memo confirms that the minority preference program likely discouraged non-minority bidders from participating in the auction. In a memo dated October 26, 1995, J. Paul Ramey, Vice President, Division of Resolutions of the RTC, considered whether "[p]re-screening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received." His complete response was as follows:

> Although the statement may be true, I believe apples and oranges have been mixed here; what do "pre-screening of bidders" and "minority bidder preference programs" have in common? The pre-screening, if you are talking about up-front disqualification from bidding, would likely result in a lesser number of initial attendees at a bidders' meeting and theoretically decrease the competition. As for any type of bidding preferences, it has been my personal opinion that this is a deterrent to the competitive aspect of the bidding process; however, this has not been definitively proven to be the case.[100]

Mr. Ramey reasons correctly that non-preferred entities would not want to make the investment necessary to value a series of branches if they thought that their efforts would be futile or could be utilized by a preferred bidder. The cost of preparing a bid is not trivial. Given this significant cost of participation, it is reasonable to conclude that a non-minority bidder would not incur such an expense if it knew that its high bid could be matched and thus the likelihood of winning was close to zero.

**c. The Minority Preference Program Induced Non-Minority Bidders to Bid Less Aggressively Than They Otherwise Would Have Conditional on Entering the Auction**

98. Unfortunately, the price-depressing effect of the minority preference program was not limited to deterring entry. By creating a "toehold" advantage for certain bidders, the minority

---

100.Memo of J. Paul Ramey, Oct. 26, 1995, Exhibit Ramey 12 at 4 (C-AM-A0125188).

preference program could have depressed prices in ways not contemplated in the Ramey memo. In particular, the minority preference program may have induced non-minority bidders to bid less aggressively than they otherwise would have conditional on entering the auction. In a seminal auction paper, Professors Bulow, Huang and Klemperer show that even a slight toehold advantage to one bidder can have a significant impact on auction revenues in a common-value ascending (English) auction.[101] Hence, the minority program could have depressed the deposit premium for Carteret in two separate yet complementary ways: (1) by discouraging entry by non-minority bidders, and (2) by inducing non-minority bidders to bid less aggressively during the auction.

99. To understand the intuition behind a toehold advantage, consider a very simple example in which two bidders compete for a prize equal to the sum of the money in bidder 1's wallet (which is unknown to bidder 2) plus the money in bidder 2's wallet (which is unknown to bidder 1). For ease of exposition, assume that the most money in either bidder's wallet is $1. If bidder 1 wins the auction, he gets paid the sum of the money in the two wallets less his bid. If bidder 2 wins, he gets paid the sum of the money in the two wallets less 95 percent of his bid. In the language of Bulow, Huang and Klemperer, bidder 2 has a "toehold advantage" equal to 5 percent. When the auction is symmetric—that is, when neither bidder has a toehold advantage, each bidder remains in the auction until the price for the content of the two wallets reaches roughly two times the content of his own wallet.[102] When bidder 2 has a slight toehold equal to 5 percent, bidder 1 remains in the auction until the price for the content of the two wallets reaches

---

101. Jeremy Bulow, Ming Huang & Paul Klemperer, *Toeholds and Takeovers*, 107 J. POL. ECON. 427 (1998).
102. *Id.* at 438–439.

roughly one times the content of his own wallet.[103] Hence, a slight toehold advantage can produce a dramatic reduction in the winning bid.

## III. THE GOVERNMENT'S UNEXPECTED ELIMINATION OF SUPERVISORY GOODWILL INFLATED THE RECEIVERSHIP DEFICIT AND DECREASED THE VALUE OF CARTERET

100. Supervisory goodwill was a crucial condition enabling Carteret to purchase distressed thrifts from FSLIC. On several occasions, Carteret acquired insolvent institutions from the FSLIC to help the insolvent FSLIC avoid the cost of liquidating those institutions outright. In doing so, Carteret absorbed substantial amount of book-value assets, deposits, and negative tangible equity onto its own balance sheet, and relieved federal regulators from substantial liability in those failed institutions. Supervisory goodwill satisfied crucial regulatory capital requirements for thrifts like Carteret, and thereby provided thrifts the ability to maintain larger amounts of deposits and assets with lower amounts of tangible capital than they otherwise could have maintained.

101. FIRREA eliminated the use of supervisory goodwill for meeting regulatory capital requirements, and thus breached the agreements between the government and Carteret regarding the treatment of supervisory goodwill as part of Carteret's agreements to purchase failed thrifts. FIRREA passed the House of Representatives on June 15, 1989, and the Senate on June 21, 1989, but in the weeks leading up to its passage, there was substantial uncertainty about whether FIRREA would pass and what provisions it would contain. During the spring of 1989, as Congress debated FIRREA, the Office of Thrift Supervision (OTS), thrifts potentially affected by FIRREA, and market participants responded to its prospective passage. The costliness of FIRREA to thrifts that maintained supervisory goodwill depended not only on whether supervisory goodwill would be phased out but on the details of how such a phaseout would be

103. *Id.*

enforced. Those details, in turn, were not known in advance but rather evolved during the Congressional debate. An important example was an amendment offered by Congressman Henry Hyde on May 24, 1989 in the House Judiciary Committee.[104] Had it passed, this amendment would have required a lengthy regulatory review process before preventing an institution from counting supervisory goodwill towards regulatory capital. As reported on the front page of the New York Times, this amendment was defeated on May 24 by a 17-17 tie as FIRREA passed through the House Judiciary Committee on its way to the floor.[105] At the same time, the OTS was taking action. In anticipation of FIRREA's passage, in its examination report dated May 22, 1989, the Office of Thrift Supervision (OTS) warned Carteret that removal of goodwill from its regulatory capital would leave it critically undercapitalized. Regulators concluded that Carteret was "not likely to meet the tangible, leverage ratio, and risk-based minimum capital levels required by FIRREA."[106] The OTS recommended that AmBase should "be required to infuse capital in Carteret Savings to bring the institution into compliance with FIRREA."[107] By December 19, 1989, Carteret determined that $19.6 million in additional capital was necessary for Carteret to comply with FIRREA's regulatory capital requirements.[108] Under the obligations set forth in the Regulatory Capital Maintenance/Dividend Agreement ("RCMA"),[109] AmBase

---

104.Matt Yancey, *Some House GOP Members Want S&L Bill Changes*, ASSOCIATED PRESS, May 23, 1993; Kathleen Day, "S&L Supporters Plan Offensive To Retain 'Goodwill' as Capital," WASH. POST, May 24, 1989, at F1.

105.Nathaniel C. Cash, *Some in G.O.P. Deserting Bush On Savings Plan*, N.Y. TIMES, May 25, 1989, at A1.

106.AmBase Corp. v. United States, 58 Fed.Cl. 32, 38 (2003).

107.*Id.*

108.*Id.*

109.In seeking approval to acquire Carteret, AmBase and the Federal Home Loan Bank Board ("FHLBB") agreed to the RCMA in November 1988. The RCMA stated that AmBase was obligated to contribute up to $50 million in additional capital to Carteret in order to maintain Carteret's required level of regulatory capital for as long as AmBase controlled Carteret. *Id.* at 37.

then contributed $20 million to Carteret to bring the bank into capital compliance by the end of 1989.[110]

102. On December 4, 1992, Carteret was seized and placed under the control of a receiver. Following this event, the RTC sold Carteret's assets. However, the receiver did not realize any value from the supervisory goodwill that Carteret lost due to the breach. Had Congress not passed FIRREA and the receiver realized value from the supervisory goodwill, the resolution loan principal would have been lower, thus decreasing the receivership deficit.

103. Table 10 summarizes my conservative estimates of the but-for receivership deficit P&I balance, correcting (1) only for the elimination of supervisory goodwill, and (2) for the combination of the goodwill effect and the multiple delays and value destruction caused by the government in the sale of branches. Table 10 provides my estimates of the correct P&I balance of the receivership deficit for use in damages calculations under various alternative assumptions about the inclusion and method for calculation of interest rate charges (discussed in Section I), correcting for the problems with the government's interest calculations (discussed in Section I), the necessity of a loan that resulted from Congress's delay and value destruction of Carteret's resolution (discussed in Section II), and the elimination of supervisory goodwill (discussed in detail in this section, below). For purposes of comparison, I provide several calculations in Table 10 that combine these various adjustments. Row (1) corrects for the elimination of supervisory goodwill and corrects for the delays and value destruction caused by Congress. As in Section II, under these assumptions, the P&I balance is in surplus and there is no receivership loan, and therefore, no interest computation to consider. This is my preferred estimate of the effect of correcting simultaneously only for delays and value destruction in the sale of branches, and the

110 *Id.* at 38.

elimination of supervisory goodwill. This estimate of the P&I balance is $244.3 lower than the balance estimated using the government's inappropriate methodology.

104. Row (2) is the same as row (1), but only corrects goodwill and the delays from the minority preference program, rather than correcting goodwill and all delays and value destruction by the government conservatively estimated in Section II. Again, the receivership P&I balance is in surplus and there is no resolution loan, and therefore, no interest computation to consider. Rows (3) through (7) only correct goodwill, making no corrections for the delay and value destruction. Row (3) corrects for goodwill, and includes no interest charges on the receivership deficit or interest income on the escrow account. Row (4) corrects for goodwill, uses the short-term monthly moving average Treasury rate to calculate interest on the receivership deficit and on the escrow account, and continues to accrue interest even after principal is completely paid down. Row (5) corrects for goodwill, includes imputed interest in the receivership deficit, uses the government's inappropriate interest rate assumptions, but permits high-cost debt to be paid off first, sets the escrow interest rate at the post-judgment rate, and continues interest accrual in a loan account even after total principal across all loan accounts is completely paid. Row (6) considers the effects of the goodwill adjustment in isolation of all other adjustments discussed above. Row (6) shows that the goodwill adjustment alone, when not combined with any adjustments of interest computations or Congressional delays and value destruction in the resolution, reduces the P&I balance of the receivership deficit by $115.8 million at the end of 2005. For purposes of comparison, rows (7), (8), and (9) present results constructed using the same assumptions as rows (2)', (3)', and (4)' in Table 2.

TABLE 10: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE BUT-FOR THE GOVERNMENT'S ELIMINATION OF SUPERVISORY GOODWILL

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) *Supervisory goodwill restored, and all delays and value destruction removed* | (69.0)* | 156.6 | 244.3 |
| (2) *Supervisory goodwill restored, and minority preference program delay removed* | (39.4)* | 156.6 | 214.8 |
| *Supervisory goodwill restored only* | | | |
| (3) Charge no interest on receivership deficit & charge no interest on escrow | (20.0)* | 156.6 | 195.4 |
| (4) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest continues to accrue after principal paydown | 49.3 | 107.3 | 126.1 |
| (5) Pay off high-cost debt first, charge same interest rates on escrow, & interest continues to accrue after principal paydown | 78.3 | 95.5 | 97.1 |
| (6) No interest calculation methodology changes | 59.6 | 97.0 | 115.8 |
| (7) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest stops accruing when principal across all accounts is paid | 40.5 | 116.0 | 134.8 |
| (8) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing in a single account when that account's principal is paid | 45.1 | 111.4 | 130.3 |
| (9) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing when principal across all accounts is paid | 53.5 | 103.1 | 121.9 |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

## A. Lost Value of Supervisory Goodwill Under Carteret's Receivership

105. I have assessed the value of Carteret's lost supervisory goodwill at two points in time: one year following Carteret's seizure and two years following Carteret's seizure. The receiver required time to realize value from the disposal of Carteret's assets. I measure lost value under two different timing assumptions for how long it would have taken the receiver to do that: December 6, 1993 (the first trading day one year after the seizure), and December 5, 1994 (the first trading day two years after the seizure).

106. I estimate the dollar cost to the receivership of the loss of supervisory goodwill as the result of the government's breach of its agreements with Carteret using two approaches: First, I estimate a cash equivalent value of lost supervisory goodwill, which measures the amounts of cash that, if transferred to the Carteret in December 1993 or December 1994, would have compensated it for the loss of supervisory goodwill as of those dates. Second, I estimate the cost of replacing the lost supervisory goodwill with tangible capital in the form of a common stock offering, either in December 1993 or in December 1994.

**1. Cash Equivalent Value of Goodwill**

107. Based on the goodwill amortization schedule for December 1989 (the last schedule unaffected by the breach), Carteret had $164,342,326 in unamortized goodwill. (See Table A1 in Appendix A) Under the schedule, by December 6, 1993 Carteret would have had $128,265,521 in goodwill (using straight-line amortization). Had Carteret received an equivalent amount of cash on that date, it would have had its capital position restored and the receiver would have been able to realize additional value.

108. Unlike goodwill, cash would have provided Carteret with income generating opportunities that goodwill could not have offered. Specifically, the cash could have been invested to generate additional income. Also, unlike goodwill, the cash would not amortize. These two features make cash preferable to goodwill of an equal amount on a savings and loan's balance sheet. The value of these features is an estimate of the value that cash has in excess of supervisory goodwill assuming that the cash was provided at the time of the breach.

109. My analysis of the value of Carteret's supervisory goodwill begins with the contractually promised goodwill balances for the life of the contract through 2011. I estimate that cash principal invested in U.S. Treasury securities would have generated an expected yield of 6.31 percent over the length of the contract based on the yield of 20-year Treasury securities on

December 6, 1993. I choose to invest the principal in U.S. Treasury securities to most accurately replicate the risk characteristics of the contractual goodwill that I am replacing. The ability to use goodwill to count as regulatory capital constituted a promise from the U.S. government. Investing the cash principal in U.S. Treasury securities most clearly matches that promise.

110. The earnings on the invested cash principal I assume would be taxed at a rate of 35 percent. It is my understanding that this is the marginal federal tax rate during the relevant period.[111] In addition to the after-tax earnings, the cash principal could have been offered to investors. The repayment of the cash principal in my model matches the planned amortization of the contractual goodwill. This ensured that Carteret had cash principal only in an amount equal to the amount of contractual goodwill that would have counted towards its capital requirements.

111. In my analysis of the harm suffered by Carteret, I valued the cash flows from the after-tax earnings and the return of principal as of each of the two dates mentioned earlier. An investor interested in acquiring such cash flows would have valued them based on the risk of a preferred stock offering of Carteret at those times (the security which most closely matches the characteristics of those cash flows). My analysis requires an estimate of Carteret's discount rate on preferred stock for valuing the cash flows.

112. I use the tool of regression analysis to quantify how the risk characteristics of savings institutions that raised preferred stock and other fixed-income capital affected their interest costs on that capital around the dates that I wish to measure Carteret's discount rate. The parameters estimated from the regression analysis are then applied to the particulars of Carteret's breached situation to arrive at forecasts of the cost of preferred stock capital. This regression

111. This is conservative to the extent a higher tax rate would have been paid due to local and state taxes.

forecast controls for Carteret's particular risk situation to forecast preferred stock yields at two dates.

113. A number of published academic papers have used regression analysis to understand how a firm's risk situation influences its cost of raising funds from various alternative financial instruments. In this context, regression analysis is a statistical method used to measure the relative contribution of various determinants ("variables") to the overall risk of a given financial instrument as perceived by the capital markets. The theory behind the published research is called the contingent claims pricing theory. I have written or co-written several empirical papers on the pricing of risk in various bank financial instruments.[112] Using the principles and techniques in the published economics literature to determine Carteret's cost of preferred stock capital is a straightforward application of a well-accepted scientific methodology in the profession.

114. In order to have a sufficient number of observations to perform statistical analysis, and since regression analysis can control for many differences, I include in my sample high-yield debt offerings as well as preferred stock offerings issued by savings institutions, resulting in a sample of 33 offerings by thrifts and savings banks in the 1993-1994 period. SDC downloads, SEC filings, and the offering prospectuses provided the financial data on the offerings and the offering institutions.[113]

115. I used regression analysis to estimate (essentially, to "explain") the yield on the 33 offerings. I included several variables to explain the offer yields:

---

112.See, *e.g.*, Charles W. Calomiris and Joseph R. Mason, *Credit Card Securitization and Regulatory Arbitrage*, 26 J. FIN. SERVICES RES. 5 (2004); Charles W. Calomiris and Berry Wilson, *Bank Capital and Portfolio Management: The 1930s Capital Crunch and Scramble to Shed Risk*, 77 J. BUSINESS 421 (2004).

113.For those offerings where prospectuses were unavailable, SEC filings prior to the offering date were used.

a) 20 observations had a debt rating from either Moody's or Standard and Poor's at the time of the offering. Using a pair of variables (one indicating whether the issuer was rated at the time of offering, the other a coded variable of the rating received,[114] if it exists), I accounted for the effect of the issuer's rating on the offer yield;

b) The size of the offering, because smaller offerings should, other things equal, pay higher yields, to compensate for lower liquidity and higher transactions costs per dollar when trading them;

c) The ratio of equity to assets for the offering institution, because a higher ratio (implying lower leverage) should, other things equal, reduce the risk of default on the new offering. The square of this ratio was also used to allow for a non-linear relationship between the ratio and the offering yield (which, in theory, should exist);[115]

d) The ratio of nonperforming assets to total assets,[116] because a thrift with more nonperforming assets is, other things equal, less profitable and more risky and should therefore have to offer higher yields. The square of this ratio (as for the ratio of equity to assets) was also used to allow for a non-linear relationship between the ratio and the offering yield (which, in theory, should exist);

---

114.The "indicating" variable is equal to 1 for rated issues and 0 otherwise. For the coded variable, higher values denote poorer ratings, except for zero, which denotes an unrated issue. In the range of high-yield ratings, the values are: 11 for BBB/baa2 issues, 14 for BB/ba2 issues, 17 for B/b2 issues, 20 for CCC/caa2 issues, 23 for CC/ca2 issues, 26 for C/c2 issues, and 28 for D rated issues. Intermediate ratings (e.g., "+" or "-") fill in the series.

115.A non-linear relationship between the explanatory variable and the yield is one where the effect of changes in the value of the variable on changes in the value of the yield may be different at the high and low ends of the range of the variable.

116.The ratio of nonperforming assets to total assets was calculated in this context as the sum of nonaccrual loans plus REO divided by total assets.

e) A variable[117] indicating whether or not the issue was a convertible preferred offering, because a convertible offering, other things equal, should offer a lower yield, as the investor is otherwise compensated through the option value of an upside return if the enterprise does very well;

f) The duration of the offering (i.e., years to maturity) to account for the fact that longer maturity offerings must compensate investors for making a long-term investment;

g) The Merrill Lynch high-yield debt index, a price index for bonds rated BB and lower,[118] to capture market-wide changes through time in yields (which are inversely related to bond prices) that are unrelated to the specifics of these particular offerings;

h) A variable[119] indicating whether the issuer is a holding company.

The regression results are reported below in Table 11:

117.This variable assumes a value of 1 if the issue is convertible and 0 otherwise. It estimates the average effect of convertibility on the offer yield controlling for the other variables in the model.

118.This rating refers to ratings performed by Standard & Poor's, a ratings agency, which ranks the risk of a given financial instrument at the time of issue from AAA through CC, with AAA being the least risky. Issues with ratings closer to the beginning of the alphabet and containing more letters are less risky, so that, for example, an issue with a rating of BB is considered less risky than one with a rating of B.

119.This variable assumes a value of 1 if the issuer is a holding company and 0 otherwise. It estimates the average effect of an issuer being a holding company on the offer yield controlling for the other variables in the model.

TABLE 11: REGRESSION OF OFFER YIELD

| Variable | Coefficients | Absolute Value of T Statistics | |
|---|---|---|---|
| Issuer is rated | -1.596 | 2.16 | [a] |
| Rating | 0.06 | 1.70 | |
| Log of principal amount | -0.332 | 1.90 | |
| Equity-to-asset ratio | -2.998 | 4.97 | [b] |
| Equity-to-asset ratio squared | 0.215 | 4.79 | [b] |
| Non-performing assets-to-total assets | 0.533 | 3.68 | [b] |
| Non-performing assets-to-total assets squared | -0.034 | 2.18 | [a] |
| Convertible issue | -2.574 | 9.38 | [b] |
| Duration of offering (in years) | 0.024 | 1.81 | |
| Merrill Lynch high-yield debt index | -0.133 | 2.06 | |
| Issuer is holding company | -0.722 | 2.64 | [a] |
| Constant | 32.973 | 5.01 | [b] |
| Number of observations | 33 | | |
| Adjusted R2 | 0.84 | | |

*Notes*:
[a] Significant at 5%.
[b] Significant at 1%.

116. The model explained the offer yields quite well, with an adjusted R-squared[120] of 84 percent. The coefficients have the kind of explanatory effects that one would expect according to economic theory. Rated issuers offer lower yields relative to unrated issuers reflecting the superior information available to investors. Higher rated issuers (i.e., those with lower coded values in my rating variable) offer lower yields. Better-capitalized institutions (with higher equity to assets ratios) can offer lower yields. Convertible offerings offer lower yields. A thrift with more non-performing assets (as a percentage of its total assets) has to offer higher yields. When market yields rise, so do the yields in this sample. Larger offerings have lower yields.

120.A statistical measure of how well the regression fits the data.

117. To predict the preferred stock discount rate for Carteret on December 6, 1993, I took the coefficient estimates from the regression model and multiplied them by the respective values I calculate for Carteret on that date, as shown in Table A2 of Appendix A. Given the distressed condition of Carteret as a result of the breach, its equity was negative, and therefore its ratio of equity to assets was negative. To avoid using an extremely low equity-to-assets ratio that would be outside the range of the sample used to construct these estimates, I calculate my forecast of Carteret's preferred yield using the lowest equity-to-assets ratio in the regression sample in lieu of Carteret's negative ratio. Because a lower equity to assets ratio raises the forecasted yield, bounding Carteret's equity ratio from below by using the lowest value observed in the sample is a conservative procedure. The simulation gives a predicted preferred stock yield of 11.85 percent as a conservative estimate of Carteret's cost of preferred stock capital. As I have described, this is a conservative (low) measure of Carteret's preferred stock discount rate.

118. I ran several other regressions to further check the sensitivity of the results. Including indicator variables for preferred offerings and for cumulative preferred offerings had small effects on the model, their coefficients were imprecisely estimated, and the inclusion of these variables had a small effect on my forecast for Carteret. Modifying the model presented above by excluding some variables tended to explain the data less well and those exclusions had small effects on the forecasted offer yields. The regression reported above had a higher adjusted R-squared than any of the alternatives, as shown in Table A3 in Appendix A. Based on the preceding analyses and the underlying data, I believe the forecasts generated by the model in Table 11 are reasonable and conservative estimates of the appropriate discount rate for my cash equivalents model.

119. In the model shown in Table A4, I use a discount rate of 11.85 percent to calculate the present value of the cash flows available to an investor (which must be subtracted from the opening goodwill balance as of December 6, 1993) would be $83,195,233 at December 6, 1993. That amount can be compared with the amount of the goodwill at the same date ($128,265,521) that, absent the breach, would have been contractually allowed to count as capital at the same point in time. As noted above, this reflects value not available from goodwill, hence the value of goodwill at the time of the breach is the face amount of the goodwill less the value of the cash flows. This amount is $45,070,288.

120. To arrive at a lost value estimate from the firm's perspective under this method, it is appropriate to add any transaction costs from the issuance of a security to investors. I have relied on an article published in the finance literature, as well as my own empirical work in this area, to estimate the cost of issuing such a security.[121] I estimate that the transaction costs would be $3,935,135. Accordingly, the lost value estimated by the model in Table A4, is $49,005,422 ($45,070,288 plus $3,935,135).

121. I estimate the lost value as of December 5, 1994 (two years after the seizure of Carteret) in a similar manner. As shown in Table A2, I estimate a discount rate for Carteret of 13.06 percent (based on the regression forecast) for December 5, 1994. This rate gives a lost value as of December 5, 1994 of $43,450,872 (as shown in Table A5).

**2. Cost of Replacement Based on a Common Stock Issuance**

122. As a separate method for evaluating the lost value of the supervisory goodwill to Carteret, I have constructed a model that is based on the issuance of common stock to replace the contractual goodwill. Common stock issued by Carteret in an amount equal to the contractual

121. Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

goodwill would have counted toward the new capital standards imposed by FIRREA. The common stock would have allowed Carteret to maintain its desired asset and liability mix and achieve the earnings that those assets and liabilities would have generated. The cost of the common stock issued to replace the goodwill is a measure of the lost value.

123. The primary element of the cost is that common stock would require that the issuer provide a return (that I model in the form of dividends) to the stockholders. Contractual goodwill had no such requirement. Also the issuance of common stock would entail transaction costs that the existing contractual goodwill would not incur.

124. Several adjustments are necessary to ensure that the common stock most closely replicates the benefits of the contractual goodwill. First the contractual goodwill was scheduled to amortize so it is necessary to estimate common stock dividends only on the amount of common stock equal to the unamortized balance of contractual goodwill that would have been on Carteret's balance sheet. Second, the proceeds from the common stock could be invested in earning assets. The income from these earning assets is a benefit of the preferred stock, which reduces the costs of common stock vis-à-vis contractual goodwill.

125. Given the amount of common stock that must be issued to replace the entirety of the contractual goodwill, I have again relied on the finance article mentioned previously that provides empirical evidence of the transaction costs of issuing capital. To the transaction costs I add the dividend costs of the common stock. The dividends that would be paid on the hypothetical common stock need to reflect the returns that an investor in Carteret would require.

126. The proceeds from the hypothetical common stock issuance can be invested in earning assets, but they need to be invested in assets with similar risk as contractual goodwill. U.S. Treasury securities are an asset with risk characteristics that are consistent with contractual

goodwill. Consequently, I invest the proceeds from the hypothetical common stock in U.S. Treasury securities, the earnings from which reflect the benefit of the common stock relative to contractual goodwill. These earnings though would be taxed at the marginal rate of Carteret, which as noted earlier, I have estimated to be 35 percent. Taxing the earnings from the invested proceeds is also appropriate because the dividend payments on the hypothetical common stock must be paid from the after-tax net income of the bank. Deducting the benefit associated with the pre-tax earnings of the invested proceeds from an after-tax cost figure would be inconsistent. The after-tax earnings from U.S. Treasury securities partially offset the dividend and transaction costs of the hypothetical common stock. Finally, to value the net costs as of December 6, 1993 and December 5, 1994, I discount the annual net costs at the required return of the hypothetical common stock.

127. I measure the required return that holders of Carteret common stock would demand in two ways. One measure of Carteret's discount rate for equity capital is the rate implied by the standard capital asset pricing model (CAPM). That model computes the return required on equity capital as the sum of the risk-free rate of return and an equity risk premium that takes into account the extent to which the firm's stock value moves with the market (beta). The required return on equity, according to this model, is the sum of the risk-free rate of return plus beta times the equity risk premium for the overall market. According to Ibbotson Associates, the median required rate of return on equity, using this formulation, for depository institutions in 1994 was 14.39 percent, and the median beta for depository institutions in 1994 was 0.88.[122]

---

122. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1994 YEARBOOK 6-4.

128. Ibbotson calculates an overall market equity risk premium in 1994 of 7.2 percent, which is based on historical experience and may be larger than the forward-looking equity risk premium.[123] In my opinion, based on my experience as a financial economist, a 6 percent equity risk premium would be a conservative forward-looking estimate for 1994. Combining that conservative equity risk premium with a conservative estimate for beta of 0.88 implies a conservative estimated required rate of return on equity for savings institutions in December of 1993 of 11.59 percent. That is the result of adding 6.31 percent (the risk-free rate of interest, which I define as the yield on a 20-year Treasury bond) and the requisite risk premium, which I estimate at (0.88) x 6 percent. I consider 11.59 percent to be a highly conservative measure of the cost of equity capital (and thus the discount rate) for Carteret in December 1993.

129. I also apply CAPM to Carteret's situation on December 5, 1994. In 1995, the first year in which Ibbotson reports a separate figure for savings institutions, Ibbotson reports a median beta for savings institutions of 1.44, and a median beta for depository institutions of 1.03.[124] These values of beta would result in higher estimated discount rates for Carteret, so to be conservative I continue to use the beta of 0.88 reported for 1994. Combining this with the conservative equity risk premium of 6 percent and a risk-free rate of 8.04 percent (based on a 20-year Treasury rate for December 5, 1994) implies a conservative discount rate for Carteret's equity of 13.32 percent.[125]

123. IBBOTSON ASSOCIATES, STOCKS BONDS BILLS AND INFLATION, 1994 YEARBOOK 146.

124. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1995 YEARBOOK 6-4, 6-12.

125. This estimate is highly conservative relative to other plausible estimates of the cost of capital. In 1995, the first year in which Ibbotson reports a separate figure for savings institutions, the median required rate of return for savings institutions was 17.61 percent, and for depository institutions as a whole, it was 14.75 percent. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1995 YEARBOOK 6-4, 6-12.

130. The costs of replacement that result using these values are $45,894,763 for December 6, 1993 (shown in Table A6) and $41,607,791 for December 5, 1994 (shown in Table A7).

131. I also estimate the required return for holders of Carteret common stock a second way. I conservatively equate the cost of common stock issuance with the cost of preferred stock issuance. Common stock, as a less senior capital instrument, would be more expensive to issue than preferred stock because of its higher risk, higher underwriting costs, and adverse-selection costs.[126] Therefore, the results from the common stock model using the preferred stock yield as the measure of the required return for common equity provide conservative measures of replacement costs incurred from the lost goodwill. I forecast the conservative measure of the cost of common stock for Carteret using the regression model developed in the cash equivalence value estimates above, and use the resulting yields of 11.85 percent (for December 6, 1993) and 13.06 percent (for December 5, 1994) in the cost of replacement model. The replacement cost values that result using these assumptions are $46,902,294 for December 6, 1993 (shown in Table A8) and $40,747,845 for December 5, 1994 (shown in Table A9).

**3. Summary**

132. Table 12 summarizes the results of my analysis. As of December 6, 1993, the value of Carteret's lost supervisory goodwill was between $45.9 million and $49.0 million. As of December 5, 1994, the value of Carteret's lost supervisory goodwill was between $40.7 million

---

126.For a theoretical proof that adverse-selection costs (in the form of adverse pricing effects for new issues) are more severe for common stock than for preferred stock, see Stewart C. Myers & Nicholas S. Majluf, *Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have*, 13 J. FIN. ECON. 187 (1984); for evidence see Christopher M. James & Peggy Wier, *An Analysis of FDIC Failed Bank Auctions*, 20 J. MONETARY ECON. 141 (1987). For evidence on the underwriting costs of the two types of securities, see Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996), and Charles W. Calomiris & Charles P. Himmelberg, *Investment Banking Costs as a Measure of the Cost of External Finance*, Working Paper, Columbia Business School, revised May 2001.

and $43.5 million. I emphasize that my estimates of the value of lost supervisory goodwill depend upon assumptions about the cost of raising preferred stock and equity. In calculating the cost of raising preferred stock I assume a higher net worth for Carteret than its actual net worth, which conservatively lowers the estimated cost. My calculations for the cost of equity capital in the replacement cost models either conservatively equate the cost of equity capital with the cost of raising preferred stock or assume a low market equity premium and a low value of beta. Furthermore, market conditions for raising equity or preferred stock for thrifts in the U.S. in the late 1980s and early 1990s were very challenging. The severe losses experienced by many thrifts made many investors wary of investing in thrifts. My conservative estimates of the value of Carteret's lost supervisory goodwill do not constitute an opinion that it would have been possible for Carteret to raise preferred stock or equity capital at the low costs assumed in my calculations.

TABLE 12: ESTIMATES OF CARTERET'S LOST VALUE FROM THE LOSS OF GOODWILL

| | 12/6/1993 | | |
|---|---|---|---|
| Method for Estimating Cost of Capital | Cost of Capital | Lost Value Amount using Cash Equivalents Model | Lost Value Amount using Cost of Replacement Model |
| CAPM [1] | 11.59% | – | $45,894,763 |
| Regression-Based Estimate [2] | 11.87% | $49,005,422 | $46,902,294 |

| | 12/5/1994 | | |
|---|---|---|---|
| Method for Estimating Cost of Capital | Cost of Capital | Lost Value Amount using Cash Equivalents Model | Lost Value Amount using Cost of Replacement Model |
| CAPM [3] | 13.32% | – | $41,607,791 |
| Regression-Based Estimate [2] | 13.09% | $43,450,872 | $40,747,845 |

*Notes*:
[1] The 20-Year Treasury Rate on 12/6/93 is 6.31%. According to Ibbotson Associates, the median beta for depository institutions in 1994 was 0.88. Using this beta and an equity risk premium of 6% the cost of equity capital was calculated using the CAPM.
[2] Q3 1993 Carteret Bancorp financial data was used for 12/6/93 and Q4 1993 Carteret Bancorp financial data was used for 12/5/94. Note that the values for the total equity to total assets ratio was set to the minimum of the sample.
[3] The 20-Year Treasury Rate on 12/5/94 is 8.04%. According to Ibbotson Associates, the median beta for depository institutions in 1994 was 0.88. Using this beta and an equity risk premium of 6% the cost of equity capital was calculated using the CAPM.

133. To be conservative, in estimating the effect on the receivership deficit from the elimination of goodwill, I add the lowest estimates of goodwill from my models ($45.9 million as of December 6, 1993 and $40.7 million as of December 5, 1994) to the total sales proceeds (deposit premium plus assets sold, minus settlement interest) for Carteret's branch sales, which makes additional funds available to the receivership for the resolution. I use the December 1993 estimate of goodwill when estimating the combined effect of goodwill and all delays and value destruction by the government on the receivership deficit. I use the December 1994 estimate of goodwill when estimating the effect of goodwill alone, and when estimating the combined effect of goodwill and the delay resulting only from the minority preference program. Under the

assumption that goodwill is the only adjustment that is made, I assume that branch sales would have occurred at the time they actually occurred. Because the branch sales actually occurred in October 1994, January 1995, and March 1995, the timing of the December 1994 estimate of goodwill occurs in the middle of the actual dates of the branch sales. When estimating the effect of goodwill alone, I allocate the value of goodwill to each of the three resolutions on the date of the first dividend to the loans (April 20, 1995) on a pro rata basis based on the total sales proceeds from the resolutions.[127] The reason that I use the December 1994 estimate of goodwill when estimating the combined effect of goodwill and only the delays in sales from the minority preference program is that all branch sales would have occurred in October 1994 but-for the minority preference program, as I discussed in Section II. I assume that the additional adjustment to goodwill would not have changed the timing of those branch sales. Likewise, the reason that I use the December 1993 estimate of goodwill when measuring the combined effect of goodwill and all delays and value destruction is that all branches would have been sold together in December 1993 but for the delays and value destruction.

134. As shown in row (6) of Table 10, the receivership deficit's P&I balance would have been $59.6 million lower than the FDIC's inappropriate estimate of that balance as of the end of 2005 when correcting for the elimination of supervisory goodwill and without making any

127.Given the goodwill adjustments and the actual dividends to the receivership, the principal is paid down at different points in time for each of the three loans. Because principal is never paid down in the actual loans, I made certain assumptions about how the dividends would have been allocated to the loans with remaining principal balances in order to measure the effects in the but-for world considering only the effects of goodwill. (No loan is required when goodwill adjustments are combined with delay adjustments). In the scenario in row (5) of Table 10, I assume that once the highest-cost loan's principal and interest balance is completely paid, dividends that were allocated to that loan in the actual scenario would be allocated to the next highest-cost loan with remaining principal and interest balance. In the scenario in row (6) of Table 10, I assume that once a loan's principal balance is completely paid, dividends that were allocated to that loan in the actual scenario would be divided among the loans with remaining principal balances on a pro rata basis based on the initial principal balances for those loans with remaining principal balances. Rows (3) and (4) do not require any similar assumptions because interest rates do not vary across the three loan accounts within the assumptions of each of those rows. In the scenario in row (8) of Table 10, I assume that once the highest-cost loan's principal balance is completely paid, dividends that were allocated to that loan in the actual scenario would be allocated to the next highest-cost loan with remaining principal balance.

interest calculation or delay adjustments. When the appropriate interest calculation adjustments are made, the receivership deficit's P&I balance is negative and is $195.4 million lower than the government's estimates (row (3) of Table 10). But-for the elimination of supervisory goodwill, all delays and value destruction of the receivership, and the inappropriate interest calculations, Carteret's receivership deficit would have been $244.3 million lower than the government's estimate as of the end of 2005.

### B. The Government's Unexpected Elimination of Supervisory Goodwill Corresponds with a Decrease in the Value of AmBase

135. To further investigate the cost of the elimination of goodwill, I performed an event study of the effect on the market value of AmBase of the news relating to the elimination of supervisory goodwill. Evidence from event studies must be interpreted carefully. For one to be able to draw a connection between an announcement and a stock market reaction, it must be clear that the announcement represents news (i.e., that it was not known in advance). Furthermore, announcements do not always indicate the certainty of an outcome, but rather its increased or decreased likelihood. Both of these facts imply that observed stock market returns around the announcement of news will tend to understate the true consequence of that news for market value. That is, only if the announcement were entirely unanticipated, and if the outcome were certain, would the observed reaction provide a full measure of market consequence. Nevertheless, event studies can be useful to corroborate other estimates, particularly in the instant case, where news about the effects of FIRREA on Carteret can be dated with reasonable certainty.

#### 1. Using the Capital Asset Pricing Model to Value Goodwill

136. Supervisory goodwill is an intangible asset. The values of both tangible and intangible assets are reflected in the market value of stock. Effects on market value related to

news events are measured through an event study, which uses CAPM to predict the "normal" return of a stock based on observed risk-free rates and current market performance. The difference between the estimated normal return and the actual return is defined as an "abnormal" return, which can therefore be attributed to unique events experienced by the firm.

137. The first step in the event study is estimating the CAPM for AmBase's stock returns, adjusted for dividends. The CAPM is given by the following equation:

[3] $R_t = R_{ft} + \alpha + \beta(R_{mt} - R_{ft}) + \varepsilon_{it}$,

where $R_t$ represents the return to AmBase[128] on day $t$, $R_{mt}$ represents the return to the S&P 500 Index on day $t$, $R_{ft}$ represents the risk-free rate, as measured by the nominal 30-year Treasury bond rate[129] on day $t$, and $\varepsilon_{it}$ represents the residual, or the "abnormal return." The estimate of $\alpha$, or "alpha," is the average rate of return AmBase's stock would expect on a day when the S&P 500 index realized a zero return. The estimate of $\beta$, or "beta," represents the sensitivity of AmBase's returns to general market movements, or its "systematic risk."

138. Using the CAPM model, I estimate an alpha of 0.0020 and a beta of 0.3478 using the ordinary least squares method for Equation 1 over a 100-trading-day estimation period (which is $t = -150$ to $-50$, where $t = 0$ is May 22, 1989, the date of the OTS report warning that removal of goodwill from Carteret's regulatory capital would leave it critically undercapitalized).

139. Consider now an unexpected announcement on an event day. I consider three windows in which to measure the market's reaction to the announcement. The first is a one-day window that considers the abnormal returns solely on the event day itself. The second is a

---

128. Dividend payments are counted as returns to a particular stock on the ex-dividend date.

129. The CAPM model used in calculating the value of goodwill earlier in this section uses the 20-year Treasury rate as the risk-free rate. However, the 20-year Treasury bond rate is not available for the dates on which the CAPM model is estimated for this event study or for the event study discussed later in my report. Therefore, I use the 30-year Treasury rate as the risk-free rate in my event study calculations.

window of three days, from one day before the announcement to a day after the announcement. The third is a window of eleven days, from five days before the announcement to five days after the announcement. For each window, I compute the cumulative abnormal returns for that period. Finally, for each window, I compute the standard errors of the abnormal returns by using information covering the 100-day estimation period.

### 2. AmBase Experienced a Significant Abnormal Return During the Time Period of the OTS's Warning that Removal of Goodwill from Carteret's Regulatory Capital Would Leave It Critically Undercapitalized

140. The OTS warning was the first clear indication that Carteret would be substantially negatively affected by the anticipated implementation of FIRREA on August 9 of that year. Table 13 shows the cumulative abnormal returns of AmBase over the one, three, five, seven, and eleven-day windows surrounding the OTS announcement event on May 22, 1989.

TABLE 13: CUMULATIVE ABNORMAL RETURNS FOR AMBASE FOR OTS WARNING ABOUT REMOVAL OF GOODWILL

| Event Window | Cumulative Abnormal Daily Stock Returns | Z-Statistic | (Cumulative Abnormal Return) x (Market Value on Day Preceding Event Window) |
|---|---|---|---|
| 1-Day | –1.2% | –0.71 | –$5.6 million |
| 3-Day | –6.4%** | –1.98 | –29.1 million |
| 5-Day | –8.0%* | –1.81 | –$36.2 million |
| 7-Day | –12.1%*** | –2.28 | –$56.0 million |
| 11-Day | –14.0%*** | –2.07 | –$65.3 million |

*Note*: * Significant at 10 percent level ; ** Significant at 5 percent level; *** Significant at 1 percent level.
*Sources*: Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal); CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006. Used with permission. All rights reserved. www.crsp.chicagogsb.edu.

As Table 13 shows, AmBase's stock price had an abnormal return of -1.2 percent on May 22, 1989, the date of the OTS warning. However, the warning may have occurred after the market closed. The actual stock price decreased from $13.125 on May 19 to $13 on May 22, but then decreased to $12.5 on May 23. Therefore, market participants may not have been aware of the warning until after the market closed on May 22. The cumulative abnormal returns over longer event windows show a substantial reaction by the market to the warning. In the three days

preceding and following the OTS warning, AmBase experienced a negative abnormal return of -12.1 percent, which, at an initial share price of $13.5 with 34,192,000 shares outstanding, amounts to a market value loss of $56.0 million. Extending the window to eleven days (five days before and after the announcement), AmBase experienced a negative abnormal return of -14.0 percent, which, at an initial share price of $13.625 with 34,192,000 shares outstanding, amounts to a market value loss of $65.3 million.

141. Apparently, the May 22, 1989 OTS examination report date marks the beginning of the OTS's action regarding Carteret's supervisory goodwill. While that action was not revealed officially, to my knowledge, nonetheless it is quite possible that news of the OTS's action reached the marketplace. Furthermore, additional news about the evolution of FIRREA and its treatment of supervisory goodwill as it worked its way through Congress occurred in the same week as the date of the OTS report. On May 24, the date of the defeat of the House Judiciary Committee amendment discussed above, AmBase experienced a negative abnormal return of –1.3 percent (a $5.6 million reduction in market value). In the eleven-day window around May 24, AmBase experienced a negative abnormal return of –10.2 percent (a $47.0 million reduction in market value). And, subsequent news about FIRREA's evolution prior to its passing the House of Representatives likely affected AmBase's market value. To take these factors into account, I consider an expanded event window which begins on May 15 and ends on June 15, 1989 (the day FIRREA passed the House of Representatives). Cumulative abnormal returns over this extended window totaled -8.6 percent, implying a loss of value of $40.0 million.

142. Thus, the estimated losses based on the various event windows considered above range from $5.6 million to $65.3 million. Note, however, that even the approximately $65 million market value loss during the eleven-day window surrounding May 22, 1989 reflected

only the *probable* implementation of the full weight of the FIRREA supervisory goodwill restrictions. The reason the market did not yet fully anticipate the full weight of the goodwill restrictions is that there existed a number of lawsuits already challenging the goodwill reduction, and several banks and thrifts were officially excluded from the provisions during (at least) the period of implementation. In the case of Carteret, on May 3, 1991, "...the New Jersey court issued a preliminary injunction barring the OTS from removing supervisory goodwill from Carteret's capital calculation pending a hearing on the merits of the suit."[130]

143. Thus, the market reaction to the apparent risk of the loss of Carteret's supervisory goodwill in May and June 1989 represents a lower bound estimate of the value of supervisory goodwill to Carteret in 1989. The large magnitude of the market reaction around the OTS warning provides corroborating evidence for the conservative estimates provided in Table 13, especially in light of the considerable uncertainty about the implementation of FIRREA in mid-1989.[131]

## IV. THE RTC'S MISHANDLING OF CARTERET'S MORTGAGE ORIGINATION UNIT INFLATED THE RECEIVERSHIP DEFICIT

144. Prior to the government's seizure of Carteret, Carteret maintained a thriving mortgage origination subsidiary, the Carteret Mortgage Company ("CMC"). Specifically, in

---

130. *OTS Employs New Approach To Enforce Net Worth Pacts; It Uses Administrative Procedures*, THE THRIFT REGULATOR, May 3, 1991, at *1.

131. While Carteret's injunction was overturned in an appellate court ruling May 7, 1992, by March 1, 1993, "...Office of Thrift Supervision officials [said] they've let thrifts count supervisory goodwill as capital on eight previous occasions and therefore a similar break they've given a Virginia thrift now is nothing special." "The eight thrifts the OTS pointed to as having been allowed to count their goodwill as capital are: Olympia Federal Savings and Loan in Berwyn, Ill.; Security Federal Savings and Loan in Albuquerque, N.M.; Security Savings and Loan Assn. in Jackson, Miss.; Guaranty Federal Savings Bank in Warner Robins, Ga.; Carteret Savings Bank FA in Newark, N.J.; Security Federal Savings Bank of Florida in Panama City, Fla.; Hanson Savings Bank SLA in Hammonton, N.J.; and Sterling Savings Assn. of Spokane, Wash., an OTS spokesman said."*OTS Let Goodwill Be Capital 8 Times Before Charter Case*, THE THRIFT REGULATOR, Mar. 1, 1993, at *1.

November 1992, CMC originated more than $100 million of loans.[132] In the eleven months immediately prior to seizure, CMC had originated almost a billion dollars of loans.[133]

145. Inexplicably, the RTC simply shut down this operation. On December 14, 1992, Carteret announced that it was no longer accepting applications for home mortgages.[134] Later that month, Imperial Credit Industries Inc., a mortgage banker in Newport Beach, CA, hired most of CMC's staff in order to expand its business to New Jersey and Florida without acquiring any of CMC's assets or debts.[135] As of December 1993, CMC had no operating assets, no employees, and no known assets outside of its inter-company receivables.[136]

146. Had the RTC sold the mortgage origination business instead of shutting it down, and thereby inducing its employees to walk out the door, the proceeds from that sale would have added to the liquidation value of Carteret. I estimate the value of CMC as of the date it should have been sold using two approaches. First, I consider the value that the stock market attached to the hiring of almost all of CMC's origination staff by Imperial, which I show was substantial. Second, I estimate the value of Carteret's origination business in light of the market value of comparable sales in 1993.

147. The failure to sell CMC inflated the receivership deficit by depriving the receivership of funds that would have reduced the need to borrow from the government or accelerated the repayment of any loans. CMC could have been marketed and could have been part of a whole bank sale at the end of 1993. Table 14 summarizes my estimates of the effect of

---

132.Carteret Mortgage Company, Monthly Production Report, Nov. 30, 1992 (CAM4350395).

133.Memorandum from Donna Cribbs & William Bailey to James Mindnich, Dec. 7, 1992 (C-AM-A-0399086).

134.*Mortgage Cutoff at Bank*, N.Y. TIMES, Dec. 14, 1992, at *1.

135.*Imperial Credit Expands Easy Way Lending: Newport Beach mortgage banker diversifies by taking on 90 staff members of a failed New Jersey thrift*, L.A. TIMES, Dec. 29, 1992, at D7; *Imperial Credit Hires Most of Failed Carteret's Originations Staff*, AM. BANKER, Jan. 15, 1993, at 7; E-Mail from Carol L. Weatherly, RTC, to Susan V. Hamilton, RTC, (Jan. 12, 1993, 14:52:32 EST) (C-AM-A-0061391).

136.C-AM-A-0068230, 68172, 68201.

this failure to sell CMC on the receivership deficit. Table 14 shows both the isolated effect on the receivership of shutting down CMC, and the effect of the shutdown combined with the other adjustments I have described above (interest calculations, government delay and value destruction, and elimination of supervisory goodwill.) Row (1) corrects for the shutdown of CMC, the elimination of supervisory goodwill, the delays and value destruction, and the inappropriate inclusion of the time value of money from the receivership deficit calculation. This is my preferred estimate of the effect of correcting simultaneously for interest rate errors, delays and value destruction in the sale of branches, the elimination of supervisory goodwill, and the shutdown of CMC. Under these but-for adjustments, the receivership would have never required a loan, and would have been in surplus by $87.4 million as of the end of 2005. The other rows consider alternate combinations of corrections similar to the combinations performed in Table 10. The isolated effect of the RTC's failure to sell CMC on the receivership deficit was at least $37.3 million (row (12)). For purposes of comparison, rows (13), (14), and (15) present results constructed using the same assumptions as rows (2)', (3)', and (4)' in Table 2 under the but-for scenario correcting for both the elimination of supervisory goodwill and the failure to sell CMC. In addition, rows (16), (17), and (18) present results constructed using the same assumptions as rows (2)', (3)', and (4)' in Table 2 under the but-for scenario correcting for only the failure to sell CMC.

TABLE 14: RECEIVERSHIP DEFICIT PRINCIPAL & INTEREST BALANCE BUT-FOR THE GOVERNMENT'S SHUTDOWN OF CARTERET MORTGAGE COMPANY

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) |
|---|---|---|---|
| (1) *Mortgage origination unit sold, supervisory goodwill restored, and all delays and value destruction removed* | (87.4)* | 156.6 | 262.8 |
| (2) *Mortgage origination unit sold, supervisory goodwill restored, and minority preference program delay removed* | (57.8)* | 156.6 | 233.2 |
| *Mortgage origination unit sold and supervisory goodwill restored* | | | |
| (3) Charge no interest on receivership deficit & charge no interest on escrow | (38.4)* | 156.6 | 213.8 |
| (4) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest continues to accrue after principal paydown | 21.6 | 135.0 | 153.8 |
| (5) Pay off high-cost debt first, charge same interest rates on escrow, & interest continues to accrue after principal paydown | 43.0 | 113.5 | 132.4 |
| (6) No interest calculation methodology changes | 33.0 | 123.6 | 142.4 |
| (7) *Mortgage origination unit sold and all delays and value destruction removed* | (41.5)* | 156.6 | 216.9 |
| (8) *Mortgage origination unit sold and only minority preference program delay removed* | (17.1)* | 156.6 | 192.4 |
| *Mortgage origination unit sold only* | | | |
| (9) Charge no interest on receivership deficit & charge no interest on escrow | 2.3 | 156.6 | 173.1 |
| (10) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest continues to accrue after principal paydown | 83.0 | 73.8 | 92.4 |
| (11) Pay off high-cost debt first, charge same interest rates on escrow, & interest continues to accrue after principal paydown | 121.2 | 77.9 | 54.2 |
| (12) No interest calculation methodology changes | 138.1 | 18.9 | 37.3 |
| *Mortgage origination unit sold and supervisory goodwill restored* | | | |
| (13) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest stops accruing when principal across all accounts is paid | 16.6 | 140.0 | 158.8 |
| (14) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing in a single account when that account's principal is paid | 20.8 | 135.8 | 154.6 |
| (15) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing when principal across all accounts is paid | 27.4 | 129.1 | 148.0 |
| *Mortgage origination unit sold only* | | | |
| (16) Use monthly moving average short-term interest rate, charge same interest rate on escrow, & interest stops accruing when principal across all accounts is paid | 83.0 | 73.8 | 92.4 |
| (17) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing in a single account when that account's principal is paid | 75.6 | 81.0 | 99.8 |
| (18) Pay off high-cost debt first, charge same interest rates on escrow, & interest stops accruing when principal across all accounts is paid | 87.0 | 69.6 | 88.4 |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

## A. Valuing Carteret Mortgage Company Using the Abnormal Returns for Imperial Credit Industries

148. The stock market's reaction to Imperial's hiring of CMC's staff gives significant insight to the market value of CMC. Because the value of a mortgage origination company consists almost entirely of intangible assets associated with the knowledge, efficiency, and

teamwork of its staff, the increase in Imperial's market value upon hiring CMC staff is a reasonable measure of the value of CMC.

149. Imperial's hiring of CMC staff was expected to add $1 billion to Imperial's annual originations (which were $3.2 billion in 1992) and about 90 production employees.[137] Imperial claimed at the time of the hiring that the staff had "business relationships that would have taken us years to develop" and would enable Imperial to diversify its business by moving into areas of the country in which it lacked presence.[138] An analysis of Imperial's abnormal returns surrounding the date of the hiring announcement reveals that the market perceived the hiring to substantially increase the value of Imperial. I estimate this impact using an event study of Imperial's stock price.

150. Using the CAPM model, I estimate an alpha of 0.0004 and a beta of 2.3203 using the ordinary least squares method for Equation 1 over a 100-trading-day estimation period (which is $t = -150$ to $-50$, where $t = 0$ is December 28, 1992, the date of the announcement of Imperial's hiring of CMC's staff).[139]

151. On the trading day preceding Imperial's announcement, December 24, 1992, Imperial's stock closed at an adjusted price of $3.374. At the end of trading on December 28, Imperial's stock closed at an adjusted price of $3.994—an increase of 18 percent. Table 15 shows the cumulative abnormal returns of Imperial over the one, three, and five-day windows surrounding the hiring announcement event on December 28.

---

137. *Imperial Credit Expands Easy Way Lending: Newport Beach mortgage banker diversifies by taking on 90 staff members of a failed New Jersey thrift*, L.A. TIMES, Dec. 29, 1992, at D7.

138. *Id.*

139. *Id.*

TABLE 15: CUMULATIVE ABNORMAL RETURNS FOR IMPERIAL CREDIT INDUSTRIES FOR HIRING CARTERET MORTGAGE COMPANY'S STAFF

| Event Window | Cumulative Abnormal Daily Stock Returns | Z-Statistic | (Cumulative Abnormal Return) x (Market Value on Day Preceding Event Window) |
|---|---|---|---|
| 1-Day | 18.7%*** | 5.65 | $20.0 million |
| 3-Day | 16.9%*** | 2.98 | $18.4 million |
| 5-Day | 28.1%*** | 3.98 | $29.5 million |
| 7-Day | 29.2%*** | 3.59 | $31.8 million |
| 11-Day | 19.5%* | 2.10 | $20.8 million |

*Note*: * Significant at 10 percent level ; ** Significant at 5 percent level; *** Significant at 1 percent level.
*Sources*: Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal); Compustat.

152. As Table 15 shows, all of the cumulative abnormal returns were statistically significant. The effect of the hiring announcement on Imperial's market value on the announcement date was $20.0 million. If one considers that the market adjusted for the effects of the hiring announcement throughout the seven trading days surrounding the announcement of the hiring, then the hiring of CMC's staff increased Imperial's market value by $31.8 million. If the market valued Imperial's hiring of CMC's staff and accompanying business relationships as being worth between $18 million and $32 million, as Table 15 shows, then the RTC could have sold CMC for a similar amount had it not chosen to simply shut down the unit after seizing Carteret.

## B. Using Comparable Sales to Estimate the Value Destroyed by the Government's Shutdown of Carteret's Mortgage Origination Unit

### 1. Sales of Comparable Mortgage Businesses During the Time of Carteret's But-for Resolution

153. In addition to the event study above, I analyze the value of Carteret's mortgage origination business by comparing the value of Carteret's entire mortgage business to the observed value of other comparable mortgage businesses acquired in the second half of 1993, the period when a sale of Carteret's mortgage business might have been executed had the receiver taken steps to do so. By estimating the value of Carteret's whole mortgage business, and knowing that the realized value from the sale of its servicing business in 1994 was $61.7

million,[140] I can infer the value lost to the receivership by failing to sell the origination business by subtracting $61.7 million from the estimated value of the combined origination and servicing business.

154. To collect a sample of comparable transactions, I considered acquisitions of mortgage banking institutions that occurred in the second half of 1993 and for which a public filing (in the form of a 10-K filing with the SEC) was available that contained servicing portfolio and mortgage origination information related to the transaction. This was to confirm that the acquired institutions, like Carteret, performed both activities. I examined acquisitions where the transaction value was greater then $25 million.[141] Two acquisitions satisfied these criteria: First Tennessee National Corp.'s acquisition of Maryland National Mortgage Corp. on October 1, 1993 (for $114 million) and PNC Bank Corp.'s acquisition of Sears Mortgage Corp. (and related entities) on November 30, 1993 (for $328 million).

155. To use these transactions to calculate the value of Carteret's mortgage business, I first calculate the ratios of the transaction values to the sizes of the servicing portfolios of the acquired institutions. (See Table 16) When acquired, Maryland National Mortgage Corp. included $41 million in tangible net assets.[142] I exclude this amount from the acquisition value ($114 million) to arrive at a valuation figure ($73 million) that reflects the value of the underlying servicing and origination businesses. Using this adjusted value, and the value for the acquisition of Sears Mortgage Corp., I calculate the valuation ratios.[143]

---

140. CAM766 1599-1609.

141. I used a search of the SDC (Securities Data Company) database to identify acquisitions for my sample. I identify "mortgage banking" institutions by selecting transactions whose primary SIC code was 6162 ("Mortgage Bankers and Loan Correspondents").

142. First Tennessee National Corp. 1993 10-K, at 43.

143. PNC's acquisition of Sears included $7.6 billion in consumer assets in addition to Sears's mortgage origination business and servicing portfolio. *See* PNC Bank Corp. 1993 10-K, at 1. I do not adjust the transaction

TABLE 16: MORTGAGE BANKING ACQUISITIONS WITH KNOWN SERVICING PORTFOLIO SIZES AND ORIGINATION FLOWS SECOND HALF OF 1993

| Date Effective | Acquisition | Value of Transaction ($ millions) [a] | | Servicing Portfolio ($ billions) [b] | | Transaction Value / Servicing Portfolio [c] = [a] / [b] |
|---|---|---|---|---|---|---|
| November 30, 1993 | Sears Mortgage Corp. (acquired by PNC Bank Corp.) | $328.0 | | $27.0 | [1] | 1.21% |
| October 1, 1993 | Maryland National Mortgage Corp. (MNC Financial Inc.) (acquired by First Tennessee National Corp.) | $73.0 | [2] | $4.4 | [3] | 1.66% |

*Notes*:
[1] PNC Bank Corp. 1993 10-K, at 1.
[2] First Tennessee National Corp.'s acquisition of Maryland National Mortgage Corp. included $41 million in tangible net assets. See First Tennessee National Corp. 1993 10-K, at 43. I exclude this amount from the acquisition value ($114 million) to arrive at a valuation figure ($73 million) that reflects the value of the underlying servicing and origination businesses.
[3] First Tennessee National Corp. 1993 10-K, at 43.
*Sources*: SDC; SEC filings.

### 2. Estimating the Value of Clearwater's Servicing Portfolio at the Time Carteret Mortgage Company Should Have Been Sold

156. Carteret operated a separate division, located in Clearwater, Florida, that handled Carteret's mortgage portfolio servicing operation.[144] From 1990 to 1992, the Clearwater Operation handled new loan production volumes of nearly $1 billion per year, as well as sales of servicing originated loans totaling $1.5 billion.[145] By December 31, 1992, the Clearwater Operation was servicing 115,000 loans with an outstanding principal balance of $7.2 billion.[146] Because Clearwater obtained almost all of its loan servicing business from mortgages originated by CMC, its portfolio shrank significantly upon the shutdown of CMC.

value of the Sears acquisition to account for these assets, though, because the acquisition had no effect on PNC's net worth due to PNC's assumption of Sears's liabilities. *See* PNC Bank Corp., Sept. 30, 1993 10-Q, Exhibit 28.2, at 2.

144.C-AM-A-0285916.

145.CAM3990266.

146.C-AM-A-0026931.

157. Upon seizing Carteret and the Clearwater Operation, the RTC was bound to follow Circular 9322.3 "Mortgage Servicing Rights Disposition."[147] The directive applied when the association in conservatorship or receivership, or one of its subsidiaries, owned servicing rights for third party investors.[148] Pursuant to the policy set out in the Circular, the RTC set out to dispose of the Clearwater Operation "in the most efficient and expeditious manner possible."[149] The Circular, in setting out the time frame for disposition, dictated that bids on the "portfolios must be received within 135 days from the date of the conservatorship."[150] However, due to a "contracting holdup," the timeline for the Clearwater Operation disposition was revised.[151]

158. Table 17 is a chronological chart of the outstanding loans and principal balance of the Clearwater Operation.

147.RTC Directive System, Circular 9322.3, Sept. 20, 1991 (CAM4051352 – 71).
148.*Id.* at CAM4051352.
149.*Id.*; CAM5380820.
150.*Id.* at CAM4051357.
151.C-AM-A-0090193.

TABLE 17: CLEARWATER OPERATION OUTSTANDING LOANS AND PRINCIPAL BALANCE

| Month | Number of Loans | Principal Balance (000) |
|---|---|---|
| Feb-93 | 112,884 | $7,082,648 |
| Apr-93 | 108,747 | $6,779,406 |
| Jun-93 | 102,749 | $6,364,745 |
| Aug-93 | 97,609 | $5,985,762 |
| Sep-93 | 94,438 | $5,727,298 |
| Oct-93 | 80,687 | $4,548,865 |
| Nov-93 | 77,940 | $4,347,216 |
| Dec-93 | 74,933 | $4,134,942 |
| Jan-94 | 72,920 | $3,996,122 |
| Feb-94 | 71,246 | $3,879,023 |
| Mar-94 | 70,392 | $3,829,107 |
| Apr-94 | 67,581 | $3,643,354 |
| May-94 | 66,258 | $3,562,550 |
| Jun-94 | 65,234 | $3,498,424 |

*Sources*: CAM4350579, C-AM-A-0134548, C-AM-A-0026662, C-AM-A-0172648, CAM4180090, CAM3991741, CAM3991743, CAM4350677, CAM3991768, CAM3991342, CAM3991393, CAM3991361, CAM3991368, CAM3991370, CAM3991391, C-AM-A-0134769, C-AM-A-0172650, CAM4350675.

Among other reasons, the attrition rate of the staff appears to have hampered the effectiveness of the Clearwater Operation.[152] In addition, CMC's closure shut down a primary source of loans for servicing.

159. Reserve Financial concluded, on January 20, 1994, that a reasonable market value expectation of the unpaid principal balance of Clearwater's servicing portfolio would be between 0.75 percent and 0.85 percent.[153] Four bids, which were based upon the March 1994 portfolio numbers, were received by May 1, 1994.[154] Chase Home Mortgage Company was the highest bidder out of the four bidders with a total purchase price of $63,835,851.[155] On the week of June 13, 1994, Chase performed due diligence on the Clearwater Operation.[156] On June 30, 1994, Clearwater was sold to Chase for 1.12 percent of the servicing portfolio, valued then at $3.3

152.C-AM-A-0026449, C-AM-A-0285916.
153.C-AM-A-0027402.
154.C-AM-A-0027032.
155.C-AM-A-0027032.
156.CAM4080730.

billion (a handful of loans appear not to have been sold).[157] On July 1, 1994, Chase wired $59,995,527.65 to Carteret for the purchase of the Clearwater Operation.[158] Net proceeds for the sale were $61,717,185.[159]

### 2. Estimating the Value of Carteret Mortgage Company at the Time It Should Have Been Sold Using Clearwater's Sales Value and Comparable Mortgage Businesses

160. By the end of 1992, Carteret was servicing a loan portfolio of $7.2 billion.[160] Had CMC not been shuttered, Carteret's servicing portfolio would have likely been near the same level at the time Carteret should have been resolved at the end of 1993. Using the ratios I calculated in Table 16, I derive values for Carteret's entire mortgage business by applying those ratios to the size of Carteret's servicing portfolio. I take the resulting values and subtract the known value of Carteret's servicing business (from its sale in 1994 at $61.7 million) to arrive at the value lost to the receivership from not selling Carteret's mortgage origination business in the second half of 1993. As shown in Table 18, the estimated value for the origination business is in the range of $25.8 million to $57.8 million.

---

157.C-AM-A-0362965, CAM4492307.

158.CAM4080836. However, Carteret ended up with a net loss of $4,509,863 on the sale. *See* C-AM-A-0362965.

159.CAM766 1599-1609

160. C-AM-A-0026931

TABLE 18: IMPLIED VALUATIONS FOR CARTERET'S MORTGAGE BUSINESS USING VALUATION RATIOS FROM MORTGAGE BANKING ACQUISITIONS FROM SECOND HALF OF 1993

| Date Effective | Acquisition | Transaction Value / Servicing Portfolio [a] | Carteret Servicing Portfolio, End of 1992 ($ billions) [b] | Implied Value for Carteret Mortgage Business ($ millions) [c] = [a] * [b] | Implied Value for Carteret Origination Business ($ millions) [d] = [c] - $61.7 million |
|---|---|---|---|---|---|
| November 30, 1993 | Sears Mortgage Corp. (acquired by PNC Bank Corp.) | 1.21% | $7.2 | $87.5 | $25.8 |
| October 1, 1993 | Maryland National Mortgage Corp. (MNC Financial Inc.) (acquired by First Tennessee National Corp.) | 1.66% | $7.2 | $119.5 | $57.8 |

161. These results corroborate the analysis of Imperial's abnormal stock returns that showed that CMC had substantial value when the RTC shut it down. The implied values for Carteret's mortgage business shown in Table 18, which range from $87.5 million to $119.5 million, appear conservative in light of Carteret's actual and projected income for its mortgage banking activities. According to Carteret's own analysis, apparently performed sometime in 1992, Carteret expected to continue earning roughly $30 million a year in 1992 and 1993 in cash flow from its mortgage banking activities.[161] Those cash flow projections make the implied values from Table 18 appear conservative because the ratio of implied value to annual cash flow is low (between 3-to-1 and 4-to-1).

161.Carteret Savings Bank, Mortgage Banking Activities Income for the Year 1991, 1992, 1993 (CAM4030009- 13; CAM4030035 -38).

### C. The Sale of Carteret's Mortgage Origination Unit Would Have Decreased the Receivership Deficit

162. I estimate the effect on the receivership deficit of not selling CMC by assuming that the receivership would have had $18 million more (the most conservative estimate of CMC's value estimated above) to immediately fund the branch sales. When I do not correct for delays caused by Congress, I assume that this $18 million would have been credited to the receivership deficit with the first dividend paid on April 20, 1995.[162] As shown in row (12) of Table 14, the effect of selling CMC rather than shutting it down decreases the receivership deficit P&I balance by $37.3 million through December 2005. If the other appropriate adjustments are made (inclusion of supervisory goodwill, more prompt resolution, and no interest charged to the receivership or credited to the escrow account), then the receivership deficit P&I balance decreases by $262.8 million (row (1) of Table 14).

## V. The Government's Delay and Value Destruction of Carteret's Resolution Resulted in Lower Proceeds from Asset Sales, Which Inflated the Receivership Deficit

163. In addition to the delays associated with branch sales, the disposition of the financial assets was also significantly delayed during the resolution as a result of the minority preference program. The delay of the sale of the assets likely depressed the value of the assets that were eventually sold. Although I do not quantify this effect in this report, the combination of rising market interest rates during the period of delay and a Carteret portfolio that consisted largely of fixed-income mortgages[163] implies that there must have been a decline in the market

---

162. I make similar assumptions about but-for dividend allocations among the three loans when measuring the effect of different interest rate assumptions with only the shutdown of CMC, and when measuring the combined effect of different interest rate assumptions with the shutdown of CMC and the elimination of supervisory goodwill, as I made about dividend allocations among the three loans when measuring the effect of only the elimination of supervisory goodwill with different interest rate assumptions. See footnote 127.

163. CAM4351141 – 146.

value of Carteret's portfolio as a result of the delay. Adjusting for the value destruction resulting from the delay would reduce the principal in the receivership deficit, and in turn, would reduce the interest accruing on any deficit balances.

164. As I have shown, in the but-for world Carteret would have been sold in its entirety at a date near December 1993. As shown in Figure 5, mortgage interest rates were quite low at that time compared to the levels of mortgage interest rates when Carteret actually sold most of its mortgage portfolio in 1995.[164] Thus, if Carteret had been sold in its entirety around December 1993, the value the market would have attached to its mortgage portfolio would have been higher than its market value at the time of the actual sales. This consideration adds to the list of reasons to believe that my adjustments to the receivership deficit are conservative.

FIGURE 5: MORTGAGE RATES ACROSS CARTERET'S RESOLUTION




*Source*: Federal Reserve Statistical Release H.15, Contract interest rates on 30-year, fixed-rate conventional home mortgage commitments published by Federal Home Loan Mortgage Corp.

164.Multiple Carteret Monthly Financial Statements for 1995 (AM00096608, -10-17, -19-27, -40); Financial Data Warehouse – RSS Balance Sheet Drill Down Report, Carteret FSB For Period Ending December 31, 1995.

## CONCLUSION

165. The government's inappropriate calculations of post-insolvency interest substantially inflated Carteret's receivership deficit. The government's value destruction of Carteret's resolution, including Congressional delays in funding and the minority preference requirements, further inflated the receivership deficit by lowering the value of branch sales and asset sales. Potential acquirors were deprived of the use of Carteret's supervisory goodwill towards regulatory capital by the implementation of FIRREA. The government shut down Carteret's mortgage origination unit, whose potential sales value would have decreased the receivership deficit.

166. In isolation, each adjustment for the government's inappropriate actions substantially reduces the receivership deficit. Multiple combinations of these factors would have made the P&I balance in the receivership deficit negative.

I declare that the foregoing opinion is to the best of my knowledge a fully true and correct one. I reserve the right to update opinions in the report based on continuing research.

Dated: July 14, 2006

Charles W. Calomiris

## APPENDIX A: VALUING SUPERVISORY GOODWILL

### TABLE A1: GOODWILL AMORTIZATION SCHEDULE

| Year (12/31) | Barton [1] | Delray [2] | Mountain [3] | Blacksburg [4] | Total Goodwill Amortized [5] = [1]+[2]+[3]+[4] | Total Amortized | Goodwill Balance |
|---|---|---|---|---|---|---|---|
| 1989 | | | | | | | $164,342,326 |
| 1990 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $9,176,330 | $155,165,996 |
| 1991 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $18,352,661 | $145,989,665 |
| 1992 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $27,528,991 | $136,813,335 |
| 1993 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $36,705,322 | $127,637,004 |
| 1994 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $45,881,652 | $118,460,674 |
| 1995 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $55,057,982 | $109,284,344 |
| 1996 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $64,234,313 | $100,108,013 |
| 1997 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $73,410,643 | $90,931,683 |
| 1998 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $82,586,974 | $81,755,352 |
| 1999 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $91,763,304 | $72,579,022 |
| 2000 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $100,939,634 | $63,402,692 |
| 2001 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $110,115,965 | $54,226,361 |
| 2002 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $119,292,295 | $45,050,031 |
| 2003 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $128,468,626 | $35,873,700 |
| 2004 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $137,644,956 | $26,697,370 |
| 2005 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $146,821,286 | $17,521,040 |
| 2006 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $155,997,617 | $8,344,709 |
| 2007 | $1,293,280 | $5,297,982 | $326,232 | $61,748 | $6,979,243 | $162,976,859 | $1,365,467 |
| 2008 | | | $326,232 | $61,748 | $387,980 | $163,364,839 | $977,487 |
| 2009 | | | $326,232 | $61,748 | $387,980 | $163,752,819 | $589,507 |
| 2010 | | | $326,232 | $61,748 | $387,980 | $164,140,799 | $201,527 |
| 2011 | | | $170,656 | $30,871 | $201,527 | $164,342,326 | $0 |
| Total: | $30,607,642 | $125,385,580 | $7,021,521 | $1,327,583 | $164,342,326 | | |

*Source*: December 1989 Goodwill Amortization Schedule (AM050531).

## TABLE A2: COST OF PREFERRED STOCK CAPITAL FOR CARTERET BANCORP

| | Dollars in Millions | Regression Coefficients | Carteret Input Values 12/6/1993 [1] | Carteret Input Values 12/5/1994 [2] |
|---|---|---|---|---|
| [3] | Principal amount ($) | | 128.27 | 119.11 |
| [4] = LN [3] | Natural log of principal amount | -0.3321 | 4.85 | 4.78 |
| [5] | Equity-to-asset ratio (%) | -2.9981 | 3.90 | 3.90 |
| [6] | Convertible issue | -2.5743 | 0 | 0 |
| [7] | Duration of offering (In years) | 0.0241 | 18.00 | 17.00 |
| [8] | Non-performing assets ($) | | 284.61 | 154.41 |
| [9] | Total Assets ($) | | 3345.67 | 2885.83 |
| [10] = [8] / [9] | Non-performing assets-to-total assets ratio (%) | 0.5326 | 8.51 | 5.35 |
| [11] | Merrill Lynch high-yield debt index | -0.1335 | 101.95 | 91.37 |
| [12] | Issuer is holding company | -0.7222 | 0 | 0 |
| [13] = $[5]^2$ | Equity-to-asset ratio squared | 0.2152 | 15.21 | 15.21 |
| [14] = $[10]^2$ | Non-performing assets-to-total assets squared | -0.0338 | 72.37 | 28.62 |
| [15] | Rating | 0.0599 | 0 | 0 |
| [16] | Issuer is rated | -1.5959 | 0 | 0 |
| [17] | Constant | 32.9728 | | |
| | | **[18] Forecasted Yield** | 11.85% | 13.06% |

*Notes*:
[1] Applicable data for Carteret Bancorp from Q3 1993 financial statements. Values are as of 12/6/93.
[2] Applicable data for Carteret Bancorp from Q4 1993 financial statements. Values are as of 12/5/94.
[5] For Q3 1993 and Q4 1993, Carteret Bancorp equity is negative. The worst-in-sample equity-to-asset ratio is used instead.
[7] The duration of the offering is set to match the the number of years until the supervisory goodwill is completely amoritized as indicated on the 1989 Goodwill Amortization Schedule. For 12/6/93 the duration is set to 18 years (2011-1993) and for 12/5/94 the duration is set to 17 years (2011-1994).
[8] Non-performing Assets are comprised of Nonaccrual Loans, Repossessed Assets & Real Estate Held for Investment, and Foreclosures. (Source: Thrift Financial Report)
[9] Source: Thrift Financial Reports
[11] Merrill Lynch high-yield debt index data is from Bloomberg.
[18] Forecasted Yield is equal to the sum of the product of regression coefficients and the corresponding Carteret input value.

*Sources*: Prospectuses; SEC Filings; SDC Database; Bloomberg; Ibbotson Associates; The Federal Reserve Bank of St. Louis.

# TABLE A3: CARTERET BANCORP REGRESSIONS OF OFFER YIELD

| | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 | Model 6 |
|---|---|---|---|---|---|---|
| Log of principal amount | -0.596 | -0.327 | -0.332 | -0.315 | -0.113 | -0.298 |
| | (4.62)** | (1.70) | (1.90) | (1.72) | (0.52) | (1.55) |
| Equity-to-asset ratio | -3.310 | -2.970 | -2.998 | -2.982 | -2.988 | -2.863 |
| | (5.36)** | (4.15)** | (4.97)** | (4.70)** | (3.81)** | (4.31)** |
| Convertible issue | -2.423 | -2.568 | -2.574 | -2.333 | -2.335 | -2.242 |
| | (8.91)** | (8.61)** | (9.38)** | (9.26)** | (7.63)** | (8.62)** |
| Duration of offering (in years) | 0.026 | 0.028 | 0.024 | | | |
| | (1.83) | (0.36) | (1.81) | | | |
| Non-performing assets-to-total assets | 0.540 | 0.538 | 0.533 | 0.494 | 0.294 | 0.237 |
| | (3.63)** | (3.42)** | (3.68)** | (3.28)** | (4.17)** | (3.82)** |
| Merrill Lynch high-yield debt index | -0.169 | -0.134 | -0.133 | -0.123 | -0.051 | -0.143 |
| | (2.68)* | (1.96) | (2.06) | (1.82) | (0.67) | (2.03) |
| Issuer is holding company | -0.817 | -0.683 | -0.722 | -0.930 | | -0.894 |
| | (2.86)** | (1.81) | (2.64)* | (3.56)** | | (3.26)** |
| Equity-to-asset ratio squared | 0.234 | 0.213 | 0.215 | 0.216 | 0.224 | 0.206 |
| | (5.08)** | (4.09)** | (4.79)** | (4.58)** | (3.86)** | (4.17)** |
| Non-performing assets-to-total assets squared | -0.032 | -0.034 | -0.034 | -0.030 | | |
| | (1.95) | (2.07) | (2.18)* | (1.86) | | |
| Preferred stock issue | | -0.041 | | | | |
| | | (0.03) | | | | |
| Cumulative preferred stock issue | | -0.067 | | | | |
| | | (0.16) | | | | |
| Rating | | 0.058 | 0.060 | 0.057 | 0.069 | 0.060 |
| | | (1.29) | (1.70) | (1.54) | (1.51) | (1.54) |
| Issuer is rated | | -1.564 | -1.596 | -1.633 | -2.049 | -1.568 |
| | | (1.76) | (2.16)* | (2.11)* | (2.16)* | (1.92) |
| Constant | 38.096 | 32.856 | 32.973 | 32.450 | 24.000 | 34.185 |
| | (6.13)** | (4.68)** | (5.01)** | (4.70)** | (3.13)** | (4.75)** |
| Observations | 33 | 33 | 33 | 33 | 33 | 33 |
| R-Squared | 0.87 | 0.90 | 0.90 | 0.88 | 0.80 | 0.86 |
| Adjusted R-Squared | 0.82 | 0.82 | 0.84 | 0.82 | 0.73 | 0.81 |
| **Carteret preferred stock offer yield forecast December 6, 1993 (%)** | **11.43** | **11.80** | **11.85** | **12.03** | **12.49** | **12.15** |
| **Carteret preferred stock offer yield forecast December 5, 1994 (%)** | **12.92** | **13.02** | **13.06** | **13.11** | **12.11** | **12.94** |

*Notes*: Absolute value of t-statistics are in parentheses. * Significant at 5%. ** Significant at 1%.

## TABLE A4: CASH EQUIVALENT MODEL
## ESTIMATED VALUE OF CARTERET GOODWILL AT 12/6/93
## DISCOUNTED USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | Assumptions | |
|---|---|---|
| [1] | Cash earning rate: | 6.31% |
| [2] | Discount Rate: | 11.85% |
| [3] | Discount Date: | 12/6/1993 |
| [4] | Tax Rate: | 35.00% |
| [5] | Transaction Cost: | 4.73% |

Present Value of Foregone Cash Flows

| | [6] | [7] | [8] | [8a] | [9]=[6]-[7] | [10]=[8a]+[9] | [11] |
|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Balance | Ending Balance | Pre-tax cash earnings | After-tax cash earnings | Re-payment of principal | Net cash flow | Present value at 12/6/93 |
| 12/6/93 - 12/31/93 | 128,266 | 127,637 | 553 | 359 | 629 | 988 | 980 |
| 1994 | 127,637 | 118,461 | 7,764 | 5,047 | 9,176 | 14,223 | 12,619 |
| 1995 | 118,461 | 109,284 | 7,185 | 4,670 | 9,176 | 13,847 | 10,984 |
| 1996 | 109,284 | 100,108 | 6,606 | 4,294 | 9,176 | 13,470 | 9,553 |
| 1997 | 100,108 | 90,932 | 6,027 | 3,918 | 9,176 | 13,094 | 8,302 |
| 1998 | 90,932 | 81,755 | 5,448 | 3,541 | 9,176 | 12,718 | 7,209 |
| 1999 | 81,755 | 72,579 | 4,869 | 3,165 | 9,176 | 12,341 | 6,255 |
| 2000 | 72,579 | 63,403 | 4,290 | 2,789 | 9,176 | 11,965 | 5,422 |
| 2001 | 63,403 | 54,226 | 3,711 | 2,412 | 9,176 | 11,589 | 4,695 |
| 2002 | 54,226 | 45,050 | 3,132 | 2,036 | 9,176 | 11,212 | 4,061 |
| 2003 | 45,050 | 35,874 | 2,553 | 1,660 | 9,176 | 10,836 | 3,509 |
| 2004 | 35,874 | 26,697 | 1,974 | 1,283 | 9,176 | 10,460 | 3,028 |
| 2005 | 26,697 | 17,521 | 1,395 | 907 | 9,176 | 10,083 | 2,610 |
| 2006 | 17,521 | 8,345 | 816 | 530 | 9,176 | 9,707 | 2,246 |
| 2007 | 8,345 | 1,365 | 306 | 199 | 6,979 | 7,178 | 1,485 |
| 2008 | 1,365 | 977 | 74 | 48 | 388 | 436 | 81 |
| 2009 | 977 | 590 | 49 | 32 | 388 | 420 | 69 |
| 2010 | 590 | 202 | 25 | 16 | 388 | 404 | 60 |
| 2011 | 202 | 0 | 6 | 4 | 202 | 206 | 27 |
| | | | | | | **Total Value of Cash Flows:** | **83,195** |

| | | |
|---|---|---|
| **Face Value of GW:** | **128,266** | **[12]** |
| **Less Value of Cash Flows:** | **83,195** | |
| **Value of Goodwill:** | **45,070** | |
| **Plus Transaction Costs:** | **3,935** | **[13]** |
| **Total Lost Value:** | **49,005** | |

*Notes*:
[1] Interest earned at the 12/6/93 20-year Treasury rate of 6.31%. Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[2] 11.85% is the required dividend rate.
[3] Cash Flows discounted to 12/6/93.
[4] Tax rate is 35%.
[5] Total direct costs as a percentage of total proceeds cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[6] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[7] Contractual supervisory goodwill at respective year ends.
[8] Cash earnings (6.31%) on the average goodwill amount for that year.
[8a] Equals cash earnings on an after-tax basis. Equals [7] * (1 - 35%).
[9] Amount of goodwill amortized in each period.
[10] Net cash flows for the year.
[11] Cash flows discounted back to 12/6/93 at 11.85%.
[12] Amount of goodwill at the period beginning 12/6/93.
[13] Cost of one-time seasoned offering of common stock in the amount of total value of cash flows ($83.2 million), based on 4.73% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

CONFIDENTIAL MATERIALS – SUBJECT TO PROTECTIVE ORDER

# TABLE A5: CASH EQUIVALENT MODEL
# ESTIMATED VALUE OF CARTERET GOODWILL AT 12/5/94
# DISCOUNTED USING REGRESSION FORECAST
# (FIGURES IN THOUSAND DOLLARS)

| | Assumptions | |
|---|---|---|
| [1] | Cash earning rate: | 8.04% |
| [2] | Discount Rate: | 13.06% |
| [3] | Discount Date: | 12/5/1994 |
| [4] | Tax Rate: | 35.00% |
| [5] | Transaction Cost: | 5.18% |

Present Value of Foregone Cash Flows

| | [6] | [7] | [8] | [8a] | [9]=[6]-[7] | [10]=[8a]+[9] | [11] | |
|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Balance | Ending Balance | Pre-tax cash earnings | After-tax cash earnings | Re-payment of principal | Net cash flow | Present value at 12/6/93 | |
| 12/5/94 - 12/31/94 | 119,114 | 118,461 | 680 | 442 | 654 | 1,096 | 1,086 | |
| 1995 | 118,461 | 109,284 | 9,155 | 5,951 | 9,176 | 15,127 | 13,263 | |
| 1996 | 109,284 | 100,108 | 8,418 | 5,471 | 9,176 | 14,648 | 11,359 | |
| 1997 | 100,108 | 90,932 | 7,680 | 4,992 | 9,176 | 14,168 | 9,718 | |
| 1998 | 90,932 | 81,755 | 6,942 | 4,512 | 9,176 | 13,689 | 8,304 | |
| 1999 | 81,755 | 72,579 | 6,204 | 4,033 | 9,176 | 13,209 | 7,088 | |
| 2000 | 72,579 | 63,403 | 5,466 | 3,553 | 9,176 | 12,730 | 6,041 | |
| 2001 | 63,403 | 54,226 | 4,729 | 3,074 | 9,176 | 12,250 | 5,142 | |
| 2002 | 54,226 | 45,050 | 3,991 | 2,594 | 9,176 | 11,770 | 4,370 | |
| 2003 | 45,050 | 35,874 | 3,253 | 2,115 | 9,176 | 11,291 | 3,708 | |
| 2004 | 35,874 | 26,697 | 2,515 | 1,635 | 9,176 | 10,811 | 3,140 | |
| 2005 | 26,697 | 17,521 | 1,778 | 1,155 | 9,176 | 10,332 | 2,654 | |
| 2006 | 17,521 | 8,345 | 1,040 | 676 | 9,176 | 9,852 | 2,239 | |
| 2007 | 8,345 | 1,365 | 390 | 254 | 6,979 | 7,233 | 1,454 | |
| 2008 | 1,365 | 977 | 94 | 61 | 388 | 449 | 80 | |
| 2009 | 977 | 590 | 63 | 41 | 388 | 429 | 67 | |
| 2010 | 590 | 202 | 32 | 21 | 388 | 409 | 57 | |
| 2011 | 202 | 0 | 8 | 5 | 202 | 207 | 25 | |
| | | | | | | Total Value of Cash Flows: | 79,797 | |
| | | | | | | Face Value of GW: | 119,114 | [12] |
| | | | | | | Less Value of Cash Flows: | 79,797 | |
| | | | | | | Value of Goodwill: | 39,317 | |
| | | | | | | Plus Transaction Costs: | 4,133 | [13] |
| | | | | | | Total Lost Value: | 43,451 | |

*Notes:*
[1] Interest earned at the 12/5/94 20-year Treasury rate of 8.04%. Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[2] 13.06% is the required dividend rate.
[3] Cash Flows discounted to 12/5/94.
[4] Tax rate is 35%.
[5] Total direct costs as a percentage of total proceeds cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[6] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[7] Contractual supervisory goodwill at respective year ends.
[8] Cash earnings (8.04%) on the average goodwill amount for that year.
[8a] Equals cash earnings on an after-tax basis. Equals [7] * (1 - 35%).
[9] Amount of goodwill amortized in each period.
[10] Net cash flows for the year.
[11] Cash flows discounted back to 12/5/94 at 13.06%.
[12] Amount of goodwill at the period beginning 12/5/94.
[13] Cost of one-time seasoned offering of common stock in the amount of total value of cash flows ($79.8 million), based on 5.18% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

### TABLE A6: CARTERET BANCORP COMMON STOCK MODEL
### RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
### AFTER-TAX BASIS AND DISCOUNTED TO 12/6/93 USING CAPM-BASED RATE
### (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Contractual Supervisory Goodwill | Ending Contractual Supervisory Goodwill | Average Common Stock to Replace Disallowed Supervisory Goodwill | Transaction Cost | Dividend Cost of Common | Pre-Tax "Benefit" of Capital | After-Tax "Benefit" of Capital | Net Cost of Common | Present Value at 12/6/93 of Common Discounted at 11.59% |
| 12/6/93 - 12/31/93 | 128,266 | 127,637 | 127,951 | 5,413 | 1,016 | 553 | 359 | 6,069 | 6,024 |
| 1994 | 127,637 | 118,461 | 123,049 | | 14,261 | 7,764 | 5,047 | 9,215 | 8,196 |
| 1995 | 118,461 | 109,284 | 113,873 | | 13,198 | 7,185 | 4,670 | 8,527 | 6,797 |
| 1996 | 109,284 | 100,108 | 104,696 | | 12,134 | 6,606 | 4,294 | 7,840 | 5,600 |
| 1997 | 100,108 | 90,932 | 95,520 | | 11,071 | 6,027 | 3,918 | 7,153 | 4,579 |
| 1998 | 90,932 | 81,755 | 86,344 | | 10,007 | 5,448 | 3,541 | 6,466 | 3,709 |
| 1999 | 81,755 | 72,579 | 77,167 | | 8,944 | 4,869 | 3,165 | 5,779 | 2,970 |
| 2000 | 72,579 | 63,403 | 67,991 | | 7,880 | 4,290 | 2,789 | 5,091 | 2,345 |
| 2001 | 63,403 | 54,226 | 58,815 | | 6,817 | 3,711 | 2,412 | 4,404 | 1,818 |
| 2002 | 54,226 | 45,050 | 49,638 | | 5,753 | 3,132 | 2,036 | 3,717 | 1,375 |
| 2003 | 45,050 | 35,874 | 40,462 | | 4,690 | 2,553 | 1,660 | 3,030 | 1,004 |
| 2004 | 35,874 | 26,697 | 31,286 | | 3,626 | 1,974 | 1,283 | 2,343 | 696 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,562 | 1,395 | 907 | 1,656 | 441 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,499 | 816 | 530 | 968 | 231 |
| 2007 | 8,345 | 1,365 | 4,855 | | 563 | 306 | 199 | 364 | 78 |
| 2008 | 1,365 | 977 | 1,171 | | 136 | 74 | 48 | 88 | 17 |
| 2009 | 977 | 590 | 783 | | 91 | 49 | 32 | 59 | 10 |
| 2010 | 590 | 202 | 396 | | 46 | 25 | 16 | 30 | 5 |
| 2011 | 202 | 0 | 101 | | 12 | 6 | 4 | 8 | 1 |
| Total Cost | | | | | | | | | 45,895 |

*Notes*:
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/6/93 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($128.3 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 11.59% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 6.31%, the 20-year Treasury rate at 12/6/93.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/6/93 - 12/31/93 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/6/93 at 11.59%, the required dividend on the common stock.

## TABLE A7: CARTERET BANCORP COMMON STOCK MODEL RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL AFTER-TAX BASIS AND DISCOUNTED TO 12/5/94 USING CAPM-BASED RATE (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Contractual Supervisory Goodwill | Ending Contractual Supervisory Goodwill | Average Common Stock to Replace Disallowed Supervisory Goodwill | Transaction Cost | Dividend Cost of Common | Pre-Tax "Benefit" of Capital | After-Tax "Benefit" of Capital | Net Cost of Common | Present Value at 12/5/94 of Common Discounted at 13.32% |
| 12/5/94 - 12/31/94 | 119,114 | 118,461 | 118,788 | 5,027 | 1,127 | 680 | 442 | 5,712 | 5,661 |
| 1995 | 118,461 | 109,284 | 113,873 | | 15,168 | 9,155 | 5,951 | 9,217 | 8,061 |
| 1996 | 109,284 | 100,108 | 104,696 | | 13,946 | 8,418 | 5,471 | 8,474 | 6,541 |
| 1997 | 100,108 | 90,932 | 95,520 | | 12,723 | 7,680 | 4,992 | 7,731 | 5,266 |
| 1998 | 90,932 | 81,755 | 86,344 | | 11,501 | 6,942 | 4,512 | 6,989 | 4,200 |
| 1999 | 81,755 | 72,579 | 77,167 | | 10,279 | 6,204 | 4,033 | 6,246 | 3,313 |
| 2000 | 72,579 | 63,403 | 67,991 | | 9,056 | 5,466 | 3,553 | 5,503 | 2,576 |
| 2001 | 63,403 | 54,226 | 58,815 | | 7,834 | 4,729 | 3,074 | 4,760 | 1,966 |
| 2002 | 54,226 | 45,050 | 49,638 | | 6,612 | 3,991 | 2,594 | 4,018 | 1,464 |
| 2003 | 45,050 | 35,874 | 40,462 | | 5,390 | 3,253 | 2,115 | 3,275 | 1,053 |
| 2004 | 35,874 | 26,697 | 31,286 | | 4,167 | 2,515 | 1,635 | 2,532 | 719 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,945 | 1,778 | 1,155 | 1,790 | 448 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,723 | 1,040 | 676 | 1,047 | 231 |
| 2007 | 8,345 | 1,365 | 4,855 | | 647 | 390 | 254 | 393 | 77 |
| 2008 | 1,365 | 977 | 1,171 | | 156 | 94 | 61 | 95 | 16 |
| 2009 | 977 | 590 | 783 | | 104 | 63 | 41 | 63 | 10 |
| 2010 | 590 | 202 | 396 | | 53 | 32 | 21 | 32 | 4 |
| 2011 | 202 | 0 | 101 | | 13 | 8 | 5 | 8 | 1 |
| Total Cost | | | | | | | | | 41,608 |

*Notes*:

[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/5/94 and the end of the fiscal year.

[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.

[2] Contractual supervisory goodwill at respective year ends.

[3] Average of [1] and [2].

[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($119.1 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

[5] Dividend cost of common stock. Assumes a 13.32% required dividend.

[6] Benefit of incremental tangible capital. Assumed to equal 8.04%, the 20-year Treasury rate at 12/5/94.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)

[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).

[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/5/94 - 12/31/94 figure includes the transaction cost. ([7] = [5] - [6a] + [4])

[8] Equals [7], discounted to 12/5/94 at 13.32%, the required dividend on the common stock.

## TABLE A8: CARTERET BANCORP COMMON STOCK MODEL
## RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
## AFTER-TAX BASIS AND DISCOUNTED TO 12/6/93 USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| Year Ending Dec. 31 | Beginning Contractual Supervisory Goodwill | Ending Contractual Supervisory Goodwill | Average Common Stock to Replace Disallowed Supervisory Goodwill | Transaction Cost | Dividend Cost of Common | Pre-Tax "Benefit" of Capital | After-Tax "Benefit" of Capital | Net Cost of Common | Present Value at 12/6/93 of Common Discounted at 11.85% |
| 12/6/93 – 12/31/93 | 128,266 | 127,637 | 127,951 | 5,413 | 1,039 | 553 | 359 | 6,092 | 6,045 |
| 1994 | 127,637 | 118,461 | 123,049 | | 14,581 | 7,764 | 5,047 | 9,535 | 8,459 |
| 1995 | 118,461 | 109,284 | 113,873 | | 13,494 | 7,185 | 4,670 | 8,824 | 6,999 |
| 1996 | 109,284 | 100,108 | 104,696 | | 12,407 | 6,606 | 4,294 | 8,113 | 5,753 |
| 1997 | 100,108 | 90,932 | 95,520 | | 11,319 | 6,027 | 3,918 | 7,402 | 4,693 |
| 1998 | 90,932 | 81,755 | 86,344 | | 10,232 | 5,448 | 3,541 | 6,690 | 3,793 |
| 1999 | 81,755 | 72,579 | 77,167 | | 9,144 | 4,869 | 3,165 | 5,979 | 3,030 |
| 2000 | 72,579 | 63,403 | 67,991 | | 8,057 | 4,290 | 2,789 | 5,268 | 2,387 |
| 2001 | 63,403 | 54,226 | 58,815 | | 6,970 | 3,711 | 2,412 | 4,557 | 1,846 |
| 2002 | 54,226 | 45,050 | 49,638 | | 5,882 | 3,132 | 2,036 | 3,846 | 1,393 |
| 2003 | 45,050 | 35,874 | 40,462 | | 4,795 | 2,553 | 1,660 | 3,135 | 1,015 |
| 2004 | 35,874 | 26,697 | 31,286 | | 3,707 | 1,974 | 1,283 | 2,424 | 702 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,620 | 1,395 | 907 | 1,713 | 443 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,533 | 816 | 530 | 1,002 | 232 |
| 2007 | 8,345 | 1,365 | 4,855 | | 575 | 306 | 199 | 376 | 78 |
| 2008 | 1,365 | 977 | 1,171 | | 139 | 74 | 48 | 91 | 17 |
| 2009 | 977 | 590 | 783 | | 93 | 49 | 32 | 61 | 10 |
| 2010 | 590 | 202 | 396 | | 47 | 25 | 16 | 31 | 5 |
| 2011 | 202 | 0 | 101 | | 12 | 6 | 4 | 8 | 1 |
| Total Cost | | | | | | | | | 46,902 |

*Notes*:
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/6/93 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($128.3 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 11.85% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 6.31%, the 20-year Treasury rate at 12/6/93.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/6/93 - 12/31/93 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/6/93 at 11.85%, the required dividend on the common stock.

## TABLE A9: CARTERET BANCORP COMMON STOCK MODEL
## RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
## AFTER-TAX BASIS AND DISCOUNTED TO 12/5/94 USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| Year Ending Dec. 31 | [1] Beginning Contractual Supervisory Goodwill | [2] Ending Contractual Supervisory Goodwill | [3] Average Common Stock to Replace Disallowed Supervisory Goodwill | [4] Transaction Cost | [5] Dividend Cost of Common | [6] Pre-Tax "Benefit" of Capital | [6a] After-Tax "Benefit" of Capital | [7] Net Cost of Common | [8] Present Value at 12/5/94 of Common Discounted at 13.06% |
|---|---|---|---|---|---|---|---|---|---|
| 12/5/94 - 12/31/94 | 119,114 | 118,461 | 118,788 | 5,027 | 1,105 | 680 | 442 | 5,690 | 5,640 |
| 1995 | 118,461 | 109,284 | 113,873 | | 14,873 | 9,155 | 5,951 | 8,922 | 7,822 |
| 1996 | 109,284 | 100,108 | 104,696 | | 13,674 | 8,418 | 5,471 | 8,203 | 6,361 |
| 1997 | 100,108 | 90,932 | 95,520 | | 12,476 | 7,680 | 4,992 | 7,484 | 5,133 |
| 1998 | 90,932 | 81,755 | 86,344 | | 11,277 | 6,942 | 4,512 | 6,765 | 4,104 |
| 1999 | 81,755 | 72,579 | 77,167 | | 10,079 | 6,204 | 4,033 | 6,046 | 3,244 |
| 2000 | 72,579 | 63,403 | 67,991 | | 8,880 | 5,466 | 3,553 | 5,327 | 2,528 |
| 2001 | 63,403 | 54,226 | 58,815 | | 7,682 | 4,729 | 3,074 | 4,608 | 1,934 |
| 2002 | 54,226 | 45,050 | 49,638 | | 6,483 | 3,991 | 2,594 | 3,889 | 1,444 |
| 2003 | 45,050 | 35,874 | 40,462 | | 5,285 | 3,253 | 2,115 | 3,170 | 1,041 |
| 2004 | 35,874 | 26,697 | 31,286 | | 4,086 | 2,515 | 1,635 | 2,451 | 712 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,888 | 1,778 | 1,155 | 1,732 | 445 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,689 | 1,040 | 676 | 1,013 | 230 |
| 2007 | 8,345 | 1,365 | 4,855 | | 634 | 390 | 254 | 380 | 76 |
| 2008 | 1,365 | 977 | 1,171 | | 153 | 94 | 61 | 92 | 16 |
| 2009 | 977 | 590 | 783 | | 102 | 63 | 41 | 61 | 10 |
| 2010 | 590 | 202 | 396 | | 52 | 32 | 21 | 31 | 4 |
| 2011 | 202 | 0 | 101 | | 13 | 8 | 5 | 8 | 1 |
| Total Cost | | | | | | | | | 40,748 |

*Notes*:
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/5/94 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 12/6/93 ($119.1 million), based on 4.22% of offering size cited in Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).
[5] Dividend cost of common stock. Assumes a 13.06% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 8.04%, the 20-year Treasury rate at 12/5/94.
Source: (http://research.stlouisfed.org/fred2/data/DGS20.txt)
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 12/5/94 - 12/31/94 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 12/5/94 at 13.06%, the required dividend on the common stock.

## APPENDIX B: MATERIALS RELIED UPON

*Depositions*

Deposition of Karen J. Hughes
Deposition of Wayne S. Green

*Deposition Exhibits*
Exhibit Green 15.
Exhibit Green 22 (AM00097057, AM00097054, AM00097064, AM00097047-97065)
Exhibit Green 27 (AM00096551)
Exhibit Green 33 (AM00092190-92205; AM0009222-9224).
Exhibits Green 36A, 36B, & 36C (AM0097219-97377).
Exhibit Green 37.
Exhibit Ramey 1 (WOP2990736).
Exhibit Ramey 2 (WOP2990742).
Exhibit Ramey 34 at 4 (C-AM-A-0013424; C-AM-A-0013423; C-AM-A-0013423, -24).
Exhibit Ramey 38 (C-AM-A-0088740; C-AM-A-0130612; C-AM-A-0130615; C-AM-A-0088741).
Exhibit Ramey 49 (C-AM-A-0130612; C-AM-A-0130616; C-AM-A-0130615; C-AM-A-0130613; C-AM-A-0130614).
Exhibit Ramey 52 (C-AM-A-0013420).
Exhibit Ramey 54 at 2 (C-AM-A-0013422).

*SEC Filings*

*10-K*
American Express Comp. 1993 10-K.
Bankamerica Corp. 1993 10-K.
California Federal Bank 1993 10-K/A.
Coast Savings Financial, Inc. 1992 10-K.
Coast Savings Financial, Inc. 1993 10-K.
Coastal Banc Savings Association 1993 10-K.
Conservative Savings Corporation 1993 10-K.
First Republic Bancorp Inc. 1992 10-K.
First Tennessee National Corp. 1993 10-K,
Glendale Federal Bank 1993 10-K.
H.F. Ahmanson & Company 1992 10-K.
North American Mortgage Company 1993 10-K.
PNC Bank Corp. 1993 10-K
Roosevelt Financial Group, Inc. 1992 10-K.
Sovereign Bancorp, Inc. 1992 10-K.
St. Paul Bancorp Inc. 1992 10-K.
Sterling Financial Corporation 1993 10-K.
Sun Coast Savings and Loan Association 1993 10-K.
The Dime Savings Bank of New York 1993 10-K.
United Asset Management Corporation 1993 10-K.

*10-Q*
Coastal Banc Savings Association Jun. 30, 1993 10-Q.
First Republic Bancorp Inc. Mar. 31, 1993 10-Q.
H.F. Ahmanson & Company Jun. 30, 1993 10-Q.
H.F. Ahmanson & Company Sept. 30, 1992 10-Q.
PNC Bank Corp., Sept. 30, 1993 10-Q.
Republic Security Financial Corporation, 10-Q, Jun. 30, 1993.
Roosevelt Financial Group, Inc. Mar. 31, 1992 10-Q.
Sovereign Bancorp, Inc. Jun. 30, 1993 10-Q.

St. Paul Bancorp Inc. Sept. 30, 1992 10-Q,.
Sun Coast Savings and Loan Association Dec. 31, 1993 10-Q.
Sun Coast Savings and Loan Association Mar. 31, 1993 10-Q.
The Dime Savings Bank of New York Jun. 30, 1993 10-Q.
Western Financial Savings Bank Jun. 30, 1993 10-Q.
Western Financial Savings Bank Mar. 31, 1993 10-Q.

*Prospectus*
Bank United Financial Corporation Jun. 3, 1993 Prospectus.
Bank United Financial Corporation Dec. 21, 1993 Prospectus.
Citfed Bancorp, Inc. Aug. 12, 1993 Prospectus.
Coast Savings Financial, Inc. April 1, 1993 Prospectus Supplement.
Conservative Savings Corporation Jun. 18, 1993 Prospectus.
First Liberty Financial Corp. Feb. 8, 1993 Prospectus.
First Republic Bancorp Inc. May 21, 1993 Prospectus.
Firstfederal Financial Services Corp. Jun. 17 1994 Prospectus.
H.F. Ahmanson & Co, Prospectus Jul. 30, 1993 Supplement.
Roosevelt Financial Group, Inc. Feb. 23, 1993 Prospectus.
Security First Corp. Apr. 28, 1993 Prospectus.
Sovereign Bancorp, Inc. Mar. 16, 1993 Prospectus.
St. Paul Bancorp Inc. Jan. 26, 1993 Prospectus.
Sterling Financial Corporation Feb. 4, 1993 Prospectus.
Washington Mutual Savings Bank Sep. 17, 1993 Prospectus.

*Other SEC Filings*
California Federal Bank Mar. 15, 1994 Offering Circular.
California Federal Bank Mar. 16, 1993 Offering Circular.
Chevy Chase Savings Bank Nov. 17, 1993 Offering Circular.
Citizens Federal Bank Jul. 22, 1993 Offering Circular.
Citizens Federal Bank May 28, 1993 Offering Circular.
First Madison Bank Jul. 21, 1994 Offering Circular.
FMS Financial Corporation Jul. 21, 1994 Amendment No. 3 to Form S-2.
Glendale Federal Bank Sep. 30, 1994 Offering Circular.
H.F. Ahmanson & Company Feb. 8, 1993 Prospectus Supplement.
People's Bank, F-4 Mar. 31, 1993.
People's Bank May 1993 Offering Circular.
Republic Security Financial Corporation Sep. 15 1993 Post-Effective Amendment No. 2 to Form S-2.
Rochester Community Savings Bank Jun. 24, 1993 Offering Circular.
Sovereign Bancorp, Inc. Aug. 24, 1993 Prospectus Supplement.
The Dime Savings Bank of New York Sep. 23, 1993 Offering Circular.
Washington Mutual Savings Bank Sep. 30, 1993 F-4.
Western Financial Savings Bank Jun. 17, 1993 Offering Circular.

*Databases*
1989 Goodwill Amortization Schedule (AM0505031).
1993 Preferred Stock Issuances, Security Data Corporation
20-Year Treasury Constant Maturity Rate, Board of Governors of the Federal Reserve System, H.15 Selected Interest Rates, DGS20, May 15, 2006.
Administrative Office of the U.S. Courts, Post Judgment Rate
Bloomberg (Merrill Lynch US High Yield Debt Index)
CARTERET FEDERAL SAVINGS BANK, 10505, 1993 Quarter Data
Carteret Savings Bank, Mortgage Banking Activities Income for the Year 1991, 1992, 1993 (CAM4030009- 13; CAM4030035 -38).
Imperial Credit Industries event study (Compustat data)

CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006.
FDIC Failure Transaction Database, updated through December 2004.
Federal Reserve Statistical Release H.15, 3-month Treasury Bills (secondary market)
Federal Reserve Statistical Release H.15, 3-month Treasury constant maturities (nominal)
Federal Reserve Statistical Release H.15, 1-year Treasury constant maturities (nominal)
Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal)
Financial Data Warehouse – RSS Balance Sheet Drill Down Report, Carteret FSB For Period Ending December 31, 2005.
Ibbotson Associates, Cost of Capital Quarterly, 1994 Yearbook.
Ibbotson Associates, Cost of Capital Quarterly, 1995 Yearbook.
Ibbotson Associates, Stocks Bonds Bills and Inflation, 1994 Yearbook.
Multiple Carteret Monthly Financial Statements for 1995 (AM00096608, -10-17, -19-27, -40)
Securities Data Company database
Thrift Financial Reports
Treasury Bill, Note, Bond, and TIPS Auction History

***Academic Writings***

Charles W. Calomiris & Charles P. Himmelberg, Investment Banking Costs as a Measure of the Cost of External Finance, Working Paper, Columbia Business School, revised May 2001.
Charles W. Calomiris and Berry Wilson, Bank Capital and Portfolio Management: The 1930s Capital Crunch and Scramble to Shed Risk, 77 J. Business 421 (2004).
Charles W. Calomiris and Joseph R. Mason, Credit Card Securitization and Regulatory Arbitrage, 26 J. Fin. Services Res. 5 (2004)
Christopher M. James & Peggy Wier, An Analysis of FDIC Failed Bank Auctions, 20 J. Monetary Econ. 141 (1987).
Edward Kane, The Incentive Compatibility of Government-Sponsored Deposit-Insurance Funds, in The Reform of Federal Deposit Insurance: Disciplining the Government and Protecting Taxpayers 164 (James Barth & R. Dan Brumbaugh, Jr., eds. 1992).
Federal Deposit Insurance Corporation, Managing the Crisis: The FDIC and RTC Experience, 1980-1994 (1998).
Four Thrifts Under RTC Cost Taxpayers $153 Million, Baltimore Bus. J., Dec. 31, 1993.
Inmoo Lee et al., The Cost of Raising Capital, 19 J. Fin. Res. 59 (1996).
Jeremy Bulow, Ming Huang & Paul Klemperer, Toeholds and Takeovers, 107 J. Pol. Econ. 427 (1998).
Joseph R. Mason, A Real Options Approach to Bankruptcy Costs: Evidence from Failed Commercial Banks during the 1990s, 79 J. Business 1523 (2005).
Mukesh Bajaj et. al. The Costs of Issuing Preferred Stock, J. Fin. Res. 25, (2002).
Stewart C. Myers & Nicholas S. Majluf, Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have, 13 J. Fin. Econ. 187 (1984)

***Periodicals***

Bank Money Accounts, N.Y. Times, Feb. 17, 1993.
David Conn, Thrift-y Shoppers' Catalog, Baltimore Sun, Dec. 23, 1993.
Imperial Credit Expands Easy Way Lending: Newport Beach mortgage banker diversifies by taking on 90 staff members of a failed New Jersey thrift, L.A. Times, Dec. 29, 1992.
Imperial Credit Hires Most of Failed Carteret's Originations Staff, Am. Banker, Jan. 15, 1993.
Jerry Knight, Government Holds Fire Sale on S&Ls; Ten Area Thrifts Will Go to Highest Bidders, Wash. Post, Dec. 23, 1993.
Kathleen Day, "S&L Supporters Plan Offensive To Retain 'Goodwill' as Capital," Wash. Post, May 24, 1989
Matt Yancey, Some House GOP Members Want S&L Bill Changes, Associated Press, May 23, 1993.
Mortgage Cutoff at Bank, N.Y. Times, Dec. 14, 1992.
Nathaniel C. Cash, Some in G.O.P. Deserting Bush On Savings Plan, N.Y. Times, May 25, 1989.
OTS Employs New Approach To Enforce Net Worth Pacts; It Uses Administrative Procedures, The Thrift Regulator, May 3, 1991.
OTS Let Goodwill Be Capital 8 Times Before Charter Case, The Thrift Regulator, Mar. 1, 1993.
Robert Hurtado, Bank Yields On Accounts Decrease, N.Y. Times, Aug. 26, 1992.