Savings Unit Seized by U.S., N.Y. Times, Jan. 12, 1990.

*Courtcases*

Library of Congress v. Shaw, 478 U.S. 310, 314 (1986).
AmBase Corp. v. United States, 58 Fed.Cl. 32, 38 (2003).
40 U.S.C. § 258e-1 (1994) (amended 2000).

*E-mails, Letters and Memorandum*

E-mail from Carol L. Weatherly, RTC, to Susan V. Hamilton, RTC, (Jan. 12, 1993, 14:52:32 EST) (C-AM-A-0061391).
E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).
E-mail from Stephen A. Haley, RTC, to Robert O. Smedley & W. Robert Haley, RTC, (Mar. 19, 1993, 11:28:11 EST) (AM5290 0211 – 12)
Memo of J. Paul Ramey, Oct. 26, 1995, Exhibit Ramey 12 at 4 (C-AM-A0125188).
Memorandum from Donna Cribbs & William Bailey to James Mindnich, Dec. 7, 1992 (C-AM-A-0399086).
Memorandum from Edward D. Mahaney, Vice President of Department of Operations, RTC, to Thomas P. Horton, Vice President of Field Activities, RTC, Dec. 21, 1993 (AM5067 0499 – 0500).
Memorandum from Jay A. Jupiter, Assistant Director of Resolutions, RTC, to Thomas Horton, Vice President of Field Activities, RTC (Aug. 23, 1993) (C-AM-A-0130544).

*Financial Reports*

Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993) (C-AM-A-0400781 – 869)
Carteret Federal Savings Bank, Consolidated Florida Branch Resolution Summary (AM54120696)
Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120691)
Carteret Federal Savings Bank, Consolidated New Jersey Branch Resolution Summary (AM54120693)
Carteret Financial Report, December 31, 1992 (AM00086965, -64, -65, -70)
Carteret Financial Reports (AM00086965, -68, -70; CAM406 0567, -70, -72; C-AM-A-0133760, -63, -65; CAM406 1338, -41, -43; CAM404 0198, -0201, -0203; CAM406 2852, -55, -57; CAM4600037, -40, -42; CAM4062200, -03, -05; CAM4950836, -38, 040; CAM4040040, -43, -45; CAM4062550, -53, -55; CAM4840188, -91, 93; CAM4951698, -01, -03; CAM4951867, -70, -72; CAM4952111, -14, -17; CAM5070059, -62, -64; CAM4180008, -11, -13; CAM4181752, -55, -57; CAM4180238, -41, -43; CAM3821952, -55, -57; CAM3821890, -94, -96; CAM3821800, -03, -05; CAM3821770, -73, -75; CAM3820674, -77, -79).
Carteret Mortgage Company, Monthly Production Report, Nov. 30, 1992 (CAM4350395).
Midlantic National Bank, Bid Form for Carteret National Savings Bank (C-AM-A-0129998 – 0130000; 0130010 – 12).
RTC Directive System, Circular 9322.3, Sept. 20, 1991 (CAM4051352 – 71; CAM4051352; CAM5380820; CAM4051357).

*Receivership Rules*

"Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499)
Payment of Post-insolvency Interest in Receiverships with Surplus Funds, 66 Fed. Reg. 65,144, 65,145 (proposed Dec. 18, 2001) (to be codified at 12 C.F.R. § 360).
Receivership Rules, Priorities, 12 C.F.R. § 360.2(b) (1993).
Resolution and Receivership Rules, Post-Insolvency Interest, 12 C.F.R. § 360.7 (2006).

*Miscellaneous*

C-AM-A-0285916.
CAM3990266.
C-AM-A-0026931.
CAM766 1599-1609.
C-AM-A-0014399.
C-AM-A-0076008.
WOP2991722.
C-AM-A-0027918.
C-AM-A-0125162.

WOP3300026.
C-AM-A-0068230
C-AM-A-0068172.
C-AM-A-0068201.
C-AM-A-0090193.
C-AM-A-0026449.
C-AM-A-0285916.
C-AM-A-0027402.
C-AM-A-0027032.
CAM4080730.
C-AM-A-0362965.
CAM4492307.
CAM4080836.
C-AM-A-0362965.
CAM766 1599-1609.
CAM4351141 – 146.
CAM4350579.
C-AM-A-0134548.
C-AM-A-0026662.
C-AM-A-0172648.
CAM4180090.
CAM3991741.
CAM3991743.
CAM4350677.
CAM3991768.
CAM3991342.
CAM3991393.
CAM3991361.
CAM3991368.
CAM3991370.
CAM3991391.
C-AM-A-0134769.
C-AM-A-0172650.
CAM4350675.

CONFIDENTIAL MATERIALS – SUBJECT TO PROTECTIVE ORDER

## APPENDIX C: CURRICULUM VITAE

**OFFICE ADDRESS AND PHONE:**
Division of Finance and Economics
Graduate School of Business, Columbia University
3022 Broadway, 601 Uris Hall
New York, NY 10027
(212) 854-8748
(212) 316-9219 (fax)
cc374@columbia.edu

**EDUCATION**
Ph.D., Economics, Stanford University, June 1985.
Dissertation: Historical Perspectives on the Tax-Based Theory of Money.
B.A., Economics, Yale University, Magna Cum Laude, May 1979.

**CURRENT ACADEMIC POSITIONS:**
Henry Kaufman Professor of Financial Institutions (beginning March 2003; previously Paul M. Montrone Professor, 1996-March 2003), Division of Finance and Economics, Graduate School of Business, Columbia University, and Professor of International and Public Affairs, Columbia School of International and Public Affairs, 1996-present.

Academic Director, Jerome Chazen Institute of International Business, Columbia Business School, October 1, 2004-present, and Director, Center for International Business and Education Research, Columbia University, October 1-present. Research Associate, National Bureau of Economic Research, October 1996-present. (Faculty Research Fellow, October 1991-October 1996).

Member, Shadow Financial Regulatory Committee, December 1997-December 2004.

Arthur Burns Fellow in International Economics, American Enterprise Institute, December 2001-present, and Co-Director, AEI Project on Financial Deregulation, January 1997-present (Adjunct Scholar, American Enterprise Institute, January 1995-December 2001).

**PREVIOUS ACADEMIC POSITIONS**
Associate Professor, Department of Finance, and Co-Director, Office for Banking Research, University of Illinois, August 1992-June 1996.

Fellow, Council on Foreign Relations, May 2000-December 2000

Visiting Associate Professor, Department of Finance, The Wharton School, August 1991-July 1992.

Assistant Professor, Department of Economics, Northwestern University, September 1984-July 1991.

Visiting Assistant Professor, Department of Economics, Stanford University, January 1989-June 1989.

**BOARD MEMBERSHIPS**
Chairman of the Board, Greater Atlantic Financial Corp., December 2000-present.

Member, Advisory Board, Hillman Capital Management, 2001-present.

Member, Advisory Panel to the Conference Board/Group of Thirty Exchange Rate Project, 2000-2003.

Member, Board of Directors, Mercia Corporation, September 2004-present.

Principal, CHP Asset Management LLC, 2004-present.

**OTHER AFFILIATIONS**
Consultant, Comision Bancaria y de Valores, Mexico, May 1999-2000.

Consultant, Federal Reserve Bank of New York, July 1996-1999.

Visiting Scholar, Federal Reserve Bank of New York, June 1995.

Consultant, Banco Central de la Republica Argentina, September 1996-1998.

Consultant, Banco Central de la Reserva, El Salvador, October 1996-1998.

Consultant, World Bank mission on Argentine financial sector, February 1998.

Consultant, International Comparative Study of Term Finance, The World Bank, March 1995-May 1996.

Member, Federation of American Scientists Committee on Systemic Risk, October 1995-January 1996.

Consultant, World Bank mission on Mexican banking reform, November 1995.

Consultant, Federal Reserve Bank of St. Louis, May 1993-June 1995

Consultant, Board of Governors of the Federal Reserve System, Division of Research and Statistics, November 1993.

Consultant, project to evaluate Japan's industrial credit programs, The World Bank, November 1991-February 1995.

Consultant, Federal Reserve Bank of Chicago, July 1989-July 1991.Visiting Economist, Federal Reserve Bank of Chicago, June 1988-December 1988.

Economist, International Monetary Fund, Summer 1981.

**MEMBERSHIP IN ACADEMIC ORGANIZATIONS**
American Economic Association
Cliometric Society
Economic History Association
American Finance Association
Financial Management Association
American Law and Economics Association
National Association of Scholars

**GOVERNMENT SERVICE**
Congressional Appointee to the International Financial Institution Advisory Commission (IMF Commission), September 1999-March 2000.

Member, Ad Hoc Task Force on International Finance to Advise Senators Lieberman and Roth and Congressmen Dreir and Matsui, 1999.

Adviser to Senator John McCain's Presidential Campaign, 1999-2000.

**ACADEMIC PROGRAM COMMITTEES:**
Program Committee, American Finance Association Annual Meetings, 2000
Program Committee, Economic History Association Meetings, September 1996
Program Committee, Financial Management Association Meetings, October 1995.
Program Committee, Econometric Society Meetings, ASSA, January 1992.
Program Committee, Economic History Association Meetings, September 1991.

**EDITORIAL SERVICE**

Editorial Boards

Annals of Finance, beginning 2004
Journal of Economics and Business, beginning 9/98
Journal of Financial Intermediation, 12/97-2001.
Journal of Economic History, 9/97-2001.
Journal of Financial Services Research, 1995-present.
Journal of Banking and Finance, 1994-present.
Economic Policy Review, Federal Reserve Bank of New York, 1994-present.
Explorations in Economic History, 1993-2003.

Refereeing

National Science Foundation
American Economic Review
Bulletin of Economic Research
Business History Review
Economic Inquiry
The Economic Journal
Economic History Review
Explorations in Economic History
International Review of Economics and Finance
Journal of Applied Econometrics
Journal of Development Economics
Journal of Banking and Finance
Journal of Econometrics
Journal of Economic History
Journal of Economic Literature
Journal of Economics and Business
Journal of Finance
Journal of Financial Services Research
Journal of Financial Intermediation
Journal of International Money and Finance
Journal of Macroeconomics
Journal of Monetary Economics
Journal of Money, Credit, and Banking
Journal of Political Economy
Journal of Public Economics
Journal of Small Business Finance
Oxford Economic Papers
Quarterly Journal of Economics
Review of Economic Studies
Review of Economics and Statistics
Real Estate Economics

**PUBLICATIONS**

Articles in Refereed Journals

"Bank Capital and Portfolio Management: The 1930s 'Capital Crunch' and Scramble to Shed Risk" (with Berry Wilson), NBER Working Paper No. 6649, July 1998, Journal of Business, July 2004, 421-56.

"Credit Card Securitization and Regulatory Arbitrage" (with Joseph Mason), Journal of Financial Services Research, August 2004, 5-27.

"Consequences of U.S. Bank Distress During the Depression," (with Joseph Mason), American Economic Review 93, June 2003, 937-47.

"Fundamentals, Panics and Bank Distress During the Depression" (with Joseph Mason), NBER Working Paper No. 7919, September 2000, American Economic Review, 93, December 2003, 1615-47.

"The Role of ROSCAs: Lumpy Durables or Event Insurance?" (with Indira Rajaraman), Journal of Development Economics 56 (1998), 207-216.

"Contagion and Bank Failures During the Great Depression: The June 1932 Chicago Banking Panic" (with Joseph Mason), , American Economic Review 87, December 1997, 863-883. National Bureau of Economic Research Working Paper 4934, November 1994. Republished in The Regulation and Supervision of Banks, edited by Maximilian J. B. Hall, Edward Elgar Publishing, 2001.

"The Efficiency of Self-Regulated Payments Systems: Learning from the Suffolk System" (with Charles M. Kahn). Journal of Money, Credit and Banking, 28, November 1996, 766-797.

"Internal Finance and Investment: Evidence from the Undistributed Profits Tax of 1936-1937" (with R. Glenn Hubbard), NBER Working Paper No. 4288 (March 1993), Journal of Business , October 1995, 443-482.

"Financial Fragility: Issues and Policy Implications," in Coping with Financial Fragility: A Global Perspective, Harald Benink and George Kaufman, eds., Journal of Financial Services Research, 9, 1995, 241-257.

"Housing-Finance Interventions and Private Incentives: Helping Minorities and the Poor" (with Charles M. Kahn and Stanley D. Longhofer), Journal of Money, Credit and Banking, August 1994, 634-674.

"Consistent Measures of Output for the Antebellum and Postbellum Periods: Issues and Preliminary Results" (with Christopher Hanes), Journal of Economic History, June 1994, 409-422. Republished as

"Consistent Output Series for the Antebellum and Postbellum Periods: Issues and Preliminary Results," in Business Cycles since 1820, edited by Trevor J.O. Dick, Edward Elgar, 1998, 15-27.

"The Panic of 1857: Origins, Transmission, and Containment" (with Larry Schweikart), Journal of Economic History, December 1991, 807-34.

"The Role of Demandable Debt in Structuring Optimal Banking Arrangements" (with Charles M. Kahn), American Economic Review, June 1991, 497-513. Republished in The Regulation and Supervision of Banks, edited by Maximilian J. B. Hall, Edward Elgar Publishing, 2001.

"The Motives of U.S. Debt-Management Policy, 1790-1880: Efficient Discrimination and Time Consistency," Research in Economic History, 13, 1991, 67-105.

"Is Deposit Insurance Necessary? A Historical Perspective," Journal of Economic History, June 1990, 283-95.

"Firm Heterogeneity, Internal Finance, and Credit Rationing" (with R. Glenn Hubbard), Economic Journal, March 1990, 90-104.

"Price Flexibility, Credit Availability and Economic Fluctuations: Evidence from the U.S., 1894-1909" (with R. Glenn Hubbard), Quarterly Journal of Economics, August 1989, 429-52.

"The Motivations for Loan Commitments Backing Commercial Paper," Journal of Banking and Finance, May 1989, 271-77.

"The Effects of Asset Substitutes on Money Demand and the Inflation Process in Brazil" (with Ian Domowitz), Journal of Money, Credit, and Banking, February 1989, 78-89.

"Price and Exchange Rate Determination During the Greenback Suspension," Oxford Economic Papers, December 1988, 719-50.

"Institutional Failure, Monetary Scarcity, and the Depreciation of the Continental," Journal of Economic History, March 1988, 47-68.

"The Depreciation of the Continental: A Reply," Journal of Economic History, September 1988, 693-98.
Articles in Other Journals

"Marginal Tax Rate Cuts and the Public Tax Debate" (with Kevin Hassett), National Tax Journal, forthcoming 2002. Also appeared in part as "Searching for Sense in the Tax Cut Debate" in On the Issues, American Enterprise Institute, December 2001.

"Banking Approaches the Modern Era," Regulation, 25th Anniversary Special Report, Summer 2002, 14-21.

"Lessons from Argentina and Brazil" Cato Journal, 23 (Spring/Summer) 2003, 33-46.

"The Regulation of Operational Risk in Investment Management Companies (with Richard Herring), Perspective, Investment Co. Institute, September 2002, Vol. 8, No. 2.

"Emerging Market Banks: The Achilles Heel of Liberalization," Economic Directions, Vol 12, No. 2, 2002.

"Safety Nets, Bailouts, and Market Discipline: An Interview," The Financial Regulator, Vol. 7, No. 1, June 2002.

"Financial Regulation in a Global Marketplace" (with Robert E. Litan), Brookings-Wharton Papers on Financial Services 2000.

"When Will Economics Guide IMF and World Bank Reforms?" The Cato Journal 20 (Spring/Summer) 2000, 85-103.

"Fixing the IMF" (with Allan Meltzer), The National Interest, Summer 1999, 88-96. "The Impending Collapse of the European Monetary Union," The Cato Journal 18 (Winter) 1999, 445-452.

"Runs on Banks and the Lessons of the Great Depression," Regulation 22 (1) 1999, 4-7.

"How To Invent a New IMF," The International Economy, January/February 1998, 32-35, 67. Reprinted in On the Issues, American Enterprise Institute, May 1999.

"Market-Based Banking Supervision," The Financial Regulator 4 (March) 1999, 33-36.

"The IMF's Imprudent Role As Lender of Last Resort," The Cato Journal 17 (Winter) 1998, 275-294.

"Universal Banking 'American-Style'," Journal of Institutional and Theoretical Economics 154, March 1998, 43-60.

"High Loan-To-Value Mortgages: Problem or Cure," The Journal of Lending and Credit Risk Management, September 1998, 39-43.

"Reducing Moral Hazard: Introducing Market Signals into Banking Supervision," Economic Perspectives, U.S. Information Agency, August 1998.
"Historical and Contemporary Perspectives on Banking Instability, Deposit Insurance, and Prudential Regulation and Supervision," Review of Monetary and Financial Studies 16 (January) 2000, 8-16 (Japan).

"The Role of Financial Relationships in the History of American Corporate Finance" (with Carlos Ramirez), The Bank of America Journal of Applied Corporate Finance, Summer 1996, 52-73.

"Commercial Paper, Corporate Finance, and the Business Cycle: A Microeconomic Approach" (with Charles Himmelberg and Paul Wachtel), Carnegie-Rochester Series on Public Policy, 42, 1995, 203-250.

"Pricing Margins: Competition Is the Driver," Journal of Retail Banking Services, Autumn 1995, 59-62.

"Valuing a Cash Flow Mortgage," Illinois Real Estate Letter, Winter/Spring 1995, 5-6.

"Is the Discount Window Necessary? A Penn-Central Perspective," NBER Working Paper No. 4573 (December 1993), Federal Reserve Bank of St. Louis Review, May-June 1994, 31-55.

"Financial Factors and the Great Depression," Journal of Economic Perspectives, Spring 1993, 61-85.

"Cooperative Arrangements for the Regulation of Banking by Banks" (with Charles M. Kahn), Illinois Business Review, Summer 1990, 8-13.

"Deposit Insurance: Lessons from the Record," Economic Perspectives, Federal Reserve Bank of Chicago, May/June 1989, 10-30.

"The Farm Debt Crisis and Public Policy" (with R. Glenn Hubbard and James Stock), Brookings Papers on Economic Activity 2 (1986), 441-85.

"Comment on 'Devaluation Risk and the Business Cycle Implications of Exchange Rate Management'" (by Enrique G. Mendoza and Martin Uribe), Carnegie-Rochester Series on Public Policy, 2000.

"Comment on 'Sound Money' by Michael Bordo and 'Lessons from Financial Crises' by Randall Kroszner," in Anna J. Schwartz: The Policy Influence, special issue of the Journal of Financial Services Research 18 (December) 2000, 173-177.

"Comment on 'An Historical Perspective on the Federal Reserve's Monetary Aggregates: Definition, Construction, and Targeting'" (by Richard Anderson and Kenneth Kavajecz), Federal Reserve Bank of St. Louis Review, March/April 1994, 67-71.

"Comment on 'The Decline of Private Deposit Insurance in the U.S.'" (by William English), Carnegie-Rochester Series on Public Policy, 38, June 1993, 129-142.

Parts of Books (Chapters)

"Capital Flows, Financial Crises, and Public Policy," in Globalization: What's New?, edited by Michael Weinstein, Columbia University Press, 2005, 36-76.

"A Taxonomy of Financial Crisis Restructuring Mechanisms: Cross-Country Experience and Policy Implications" (with Daniela Klingebiel and Luc Laeven), World Bank Policy Research Paper WPS3379, August 2004 in Systemic Financial Distress: Containment and Resolution, edited by Patrick Honohan and Luc Laeven, World Bank, forthcoming.

"Reestablishing Market Discipline as Part of Bank Regulation," in Claudio Borio, William C. Hunter, George Kaufman, and Costas Tsatsaronis, eds., Market Discipline: The Evidence across Countries and Industries, MIT Press, 2004, 407-16.

"Financial History and the Long Reach of the Second Thirty Years War," in History Matters: Economic Growth, Technology, and Population, T. Guinnane, W. Sundstrom, and W. Whatley, eds., Stanford University Press, 2004, 115-41.

"Banking and Financial Intermediation," in Technological Innovation and Economic Performance, Benn Steil, David Victor, and Richard Nelson, eds., Princeton University Press, 2002, 285-313.

"Financial History and the Long Reach of the Second Thirty Years War," in History Matters: Economic Growth, Technology, and Population, T. Guinnane, W. Sundstrom, and W. Whatley, eds., 2004, 115-41.

"Banking: Modern Period," The Oxford Encyclopedia of Economic History, Joel Mokyr, ed., Volume 1 2003, 226-35.

"Jonathan Hughes," The Oxford Encyclopedia of Economic History, Joel Mokyr, ed., forthcoming 2002.

"How to Restructure Failed Banking Systems: Lessons from the U.S. in the 1930s and Japan in the 1990s" (with Joseph Mason), in Privatization, Corporate Governance, and Transition Economies, Takatoshi Ito and Anne Krueger, eds., National Bureau of Economic Research, University of Chicago Press, 2004, 375-420.

"An Economist's Case for GSE Reform," in Serving Two Masters, Yet Out of Control, Peter J. Wallison, ed., AEI Press, 2001, 85-106. Originally published as "Are Fannie and Freddie Optimal Mechanisms? An Economist's Case for GSE Reform," in Fannie Mae and Freddie Mac: Mixing Private Interest and Public Purpose, Peter J. Wallison, ed., American Enterprise Instítiute, 2000.

"Can Emerging Market Bank Regulators Establish Credible Discipline?", in Prudential Supervision: What Works and What Doesn't, Frederic S. Mishkin, ed., National Bureau of Economic Research, University of Chicago Press, 2001, 147-196. Also appeared as NBER Working Paper, June 2000.

"Blueprints for a New Global Financial Architecture," in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer, ed., University of Chicago Press, 2003, 259-90. Earlier version appeared in Joint Economic Committee of the U.S. Congress, Compendium of Studies on International Economic Issues, 105th Congress, Second Session, October 1998.

"Is the Bank Merger Wave of the 90s Efficient?" (with Jason Karceski), in Mergers and Productivity, Steven Kaplan, ed., National Bureau of Economic Research, University of Chicago Press, 2000, 93-161. Also published in the series, AEI Studies on Financial Market Deregulation as Is the Bank Merger Wave of the 90s Efficient, American Enterprise Institute, 1998.

"Building an Incentive-Compatible Safety Net," in Lessons from the Tequila Crisis for Successful Financial Liberalization, edited by Charles W. Calomiris, special issue of the Journal of Banking and Finance, October 1999.

"Universal Banking and the Financing of Industrial Development," in Reforming Financial Systems: Historical Implications for Policy, Gerard Carpio, Jr., and Dimitri Vittas, eds., Cambridge University Press, 1997, 113-127.

"Was the Great Depression a Watershed in American Monetary Policy?" (with David Wheelock), in The Defining Moment: The Great Depression and the American Economy in the Twentieth Century, Michael Bordo, Claudia Goldin, and Eugene White, eds., National Bureau of Economic Research, University of Chicago Press, 1998, 23-66.

"Designing the Post-Modern Safety Net: Lessons from Developed and Developing Economies," in Money, Prices, and the Real Economy, edited by Geoffrey Wood, Edward Elgar, 1998, 94-120. Also published in the series, AEI Studies on Financial Market Deregulation as The Postmodern Bank Safety Net, American Enterprise Institute, 1997.

"The Financing of the American Corporation, 1800-1990" (with Carlos Ramirez), in The American Corporation Today, Carl Kaysen, ed., Oxford University Press, 1996, 128-186. Winner of the 1996 American Publishers' Award for Best Book in the Area of Business and Management.

"Leverage as a State Variable for Employment, Inventory Accumulation, and Fixed Investment" (with Athanasios Orphanides and Steven Sharpe), NBER Working Paper No. 4800 (July 1994), in Asset Prices and the Real Economy, Forrest Capie and Geoffrey Wood, eds., Macmillan, 1997, 169-193.

"Historical Macroeconomics and American Macroeconomic History" (with Christopher Hanes), NBER Working Paper No. 4935 (November 1994), in Macroeconometrics: Developments, Tensions, and Prospects, Kevin D. Hoover, ed., Kluwer Academic Press, 1995, 351-416.

"The Evolution of Market Structure, Information, and Spreads in American Investment Banking" (with Daniel M.G. Raff), in Anglo-American Finance: Financial Markets and Institutions in 20th-Century North America and the U.K., Richard Sylla and Michael Bordo, eds., New York University Solomon Center, Business One Irwin, 1995, 103-160.

"International Adjustment Under the Classical Gold Standard: Evidence for the U.S. and Britain, 1879-1914" (with R. Glenn Hubbard), NBER Working Paper No. 2206 (April 1987), in Modern Perspectives on the Gold Standard, Tamim Bayoumi, Barry Eichengreen, and Mark Taylor, eds., Cambridge University Press, 1996, 189-217.

"The Costs of Rejecting Universal Banking: American Finance in the German Mirror, 1870-1914," in The Coordination of Economic Activity Within and Between Firms, Naomi Lamoreaux and Daniel Raff, eds., National Bureau of Economic Research, University of Chicago Press, 1995, 257-321.

"The Origins of Federal Deposit Insurance" (with Eugene N. White), in The Regulated Economy: A Historical Approach to Political Economy, Claudia Goldin and Gary Libecap, eds., National Bureau of Economic Research, University of Chicago Press, 1994, 145-188.

"Greenback Resumption and Silver Risk: The Economics and Politics of Monetary Regime Change in the United States, 1862-1900," NBER Working Paper No. 4166, in Monetary Regime Transformations, Michael D. Bordo and Forrest Capie, eds., Cambridge University Press, 1993, 86-132.

"Regulation, Industrial Structure, and Instability in U.S. Banking: An Historical Perspective," in Structural Change in Banking, Michael Klausner and Lawrence J. White, eds., New York University Solomon Center, Business One Irwin, 1993, 19-115.

"Greenbacks," in the New Palgrave Dictionary of Money and Finance, Peter Newman, Murray Wilgate, and John Eatwell, eds., Macmillan, 1992, Volume 2: 281-284.

"Do 'Vulnerable' Economies Need Deposit Insurance?: Lessons from the U.S. Agricultural Boom and Bust of the 1920s," in If Texas Were Chile: A Primer on Banking Reform, Philip Brock, ed., ICS Press, 1992, 237-314, 319-28, 450-58.

"Getting the Incentives Right in the Current Deposit Insurance System: Successes from the Pre-FDIC Era," in The Reform of Federal Deposit Insurance: Disciplining the Government and Protecting Taxpayers, James R. Barth and R. Dan Brumbaugh, Jr., eds., Harper Business, 1992, 13-35.

"Agricultural Capital Markets," in The Agricultural Transition in East/Central Europe and the USSR, Avishay Braverman, Karen Brooks, and Csaba Csaki, eds., The World Bank, 1992, 161-86.

"The Origins of Banking Panics: Models, Facts, and Bank Regulation" (with Gary Gorton), in Financial Markets and Financial Crises, R. Glenn Hubbard, ed., National Bureau of Economic Research, University of Chicago Press, 1991, 109-73.

"Comment" on Antitrust Merger Policy: Lessons from the Australian Experience (by Philip Williams and Graeme Woodbridge), in volume on East Asia economic performance, edited by Takatoshi Ito and Anne Krueger, University of Chicago Press, 2004, 67-70.

"International Financial Standards," Conference Volume produced by Institute for International Economics, forthcoming.

"Comment on 'Financial and Monetary Policies in an Economy with Balance Sheet Effects' (by Aaron Tornell)," in Preventing Currency Crises in Emerging Markets, Sebastian Edwards and Jeffrey A. Frankel, eds., National Bureau of Economic Research, University of Chicago Press, 2002, 732-38.

"Comment on 'Financial Systems, Economic Growth, and Globalization' (by Peter L. Rousseau and Richard Sylla)," in Globalization in Historical Perspective, M.D. Bordo, A.M. Taylor, and J.G. Williamson, eds., National Bureau of Economic Research, University of Chicago Press, 2003, 413-15.

"Comment on 'The Performance of the Federal Reserve in Pursuing International Monetary Objectives'" (by Anna J. Schwartz), in George Edward Durell Foundation, Money and Banking: The American Experience, George Mason University Press, 1995, 265-75.

"The History of Ownership and Control in New England Banking: Comment on Lamoreaux," in Getting Inside the Business Enterprise: The Use and Transformation of Information, Peter Temin, ed., National Bureau of Economic Research, University of Chicago Press, 1991, 195-203.

"Alexander Hamilton," in Encyclopedia of American Business History and Biography, Larry Schweikart, ed., Bruccoli Clark Layman, 1990, 239-248.

Published Proceedings

"Credit Card Securitization, Recourse, and Regulatory Arbitrage" (with Eric J. Higgins and Joseph R. Mason) Proceedings of the 37th Annual Conference on Bank Structure and Competition, May 2003, Federal Reserve Bank of Chicago, forthcoming.

"Harnessing Market Discipline in Bank Regulation," The Financial Crisis and Beyond, Korea Deposit Insurance Corporation, 2002.

"Comments on 'Refocusing the Role of the International Monetary Fund' by David Lipton," in Reforming the International Monetary and Financial System, Peter B. Kenen and Alexander Swoboda, eds., International Monetary Fund, 2000.

"Moral Hazard is Avoidable," The Asian Financial Crisis: Origins, Implications, and Solutions, William C. Hunter, George G. Kaufman, and Thomas H. Krueger, eds., Kluwer Academic Publishers, 1999, 379-384.

"The Causes of U.S. Bank Distress During the Depression," Proceedings of the 37th Annual Conference on Bank Structure and Competition, May 2001, Federal Reserve Bank of Chicago, 2002.

"Reforming the Global Financial System," in Global Financial Crises: Implications for Banking and Regulation, Proceedings of the 35th Annual Conference on Bank Structure and Competition, May 1999, Federal Reserve Bank of Chicago, 553-560.

"Gauging the Efficiency of Bank Consolidation during a Merger Wave," Journal of Banking and Finance 23, February 1999, 615-622.

"Comments on Papers by Steinherr, Kroszner, and Benston," in Universal Banking, Anthony Saunders and Ingo Walter, eds., Business One-Irwin, 1996, 109-117.

"Bank Failures, Panics, and Public Policy During the Great Depression" (with Joseph Mason), Proceedings of the 31st Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1995, 110-122.

"Directed Credit Programs for Agriculture and Industry: Arguments from Theory and Fact" (with Charles P. Himmelberg), Proceedings: Annual World Bank Conference on Development Economics 1993, 1994, 113-137.

"Loan Market Competition Between Foreign and Domestic Banks: Some Facts About Loans and Borrowers" (with Mark Carey), Proceedings of the 30th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1994, 331-351.

"Corporate-Finance Benefits from Universal Banking: Germany and the United States, 1870-1914," NBER Working Paper No. 4408 (September 1993), in Proceedings of the 29th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, 1993, 450-464.

"Comment: Three Papers on Inside Information in Banking," Proceedings of the 28th Annual Conference of Bank Structure and Competition, Federal Reserve Bank of Chicago, 1992.

"Comment on 'International Bank Capital Standards'" (by George Benston), in Emerging Challenges for the International Financial Services Industry, James Barth, ed., Research in International Business and Finance, 9, 1992, 75-81.

"Demandable Debt as the Optimal Banking Contract" (with Charles M. Kahn), Proceedings: Symposium on Deposit Insurance, The Garn Institute of Finance, University of Utah, 1989, 35–44.

Books, Monographs, Reports and Pamphlets

U.S. Bank Deregulation in Historical Perspective (in Chinese), China Financial Publishing House, forthcoming 2004.

A Globalist Manifesto for Public Policy. Institute for Economic Affairs, London, 2002.

Emerging Financial Markets (with David O. Beim), McGraw Hill, 2001.

U.S. Bank Deregulation in Historical Perspective, Cambridge University Press, 2000.

Reforming Bank Capital Regulation: A Proposal by the U.S. Shadow Financial Regulatory Committee (with other members of the Committee), American Enterprise Institute, AEI Studies on Financial Market Deregulation, 2000.

Lessons from the Tequila Crisis for Successful Financial Liberalization, edited by Charles W. Calomiris, Special Issue of the Journal of Banking and Finance, forthcoming 1999.

High Loan-To-Value Mortgage Lending: Problem or Cure? (with Joseph R. Mason), American Enterprise Institute Press, AEI Studies on Financial Market Deregulation series, 1999.

"The IMF and International Policy," Statement before the Joint Economic Committee of Congress, February 24, 1998, Joint Economic Committee, U.S. Government Printing Office.

Argentina: Financial Sector Review, The World Bank, September 1998 (with G. Caprio, R. Cull, J. Gutierrez, P. Levy, M. Miller, D. Vittas, and S. Schmukler).

"Promoting Financial Development in El Salvador," Commissioned by the Government of El Salvador, December 1997.

Readings in Money, Financial Institutions, and Markets, Addison-Wesley, 1994. This is a customized, annotated reader. Instructors may choose which of the possible 18 chapters they wish to use in their course. The book is intended for use in undergraduate and MBA courses on money and banking, financial markets, commercial bank management, and international finance.

The Bank Merger Wave of the 90s (Co-Edited with Jason Karceski). Office for Banking Research, University of Illinois, 1996.

Competing Bank Strategies in Chicago: An Illinois MBA Project Report (Co-Edited with Jason Karceski). Office for Banking Research, University of Illinois, 1995.

Book Reviews

Review of Intervention to Save Hong Kong, by Charles Goodhart and Lu Dai, Central Banking, XIV (4), May 2004, 96-100.

Review of Stock Market Crashes and Speculative Manias, edited by Eugene N. White, Journal of Economic History, September 1998, 614-617.

Review of Universal Banking in the United States: What Could We Gain? What Could We Lose? by Anthony Saunders and Ingo Walter, Journal of Economic Literature, September 1995, 1357-1359.

Review of The Rise of Financial Capitalism: International Capital Markets in the Age of Reason by Larry Neal, Journal of Economic Literature, December 1993, 2008-2010.

Review of Financial Failure and Confederate Defeat by Douglas B. Ball, Journal of American History, 1992.

Review of Lessons from the Great Depression by Peter Temin, Journal of Economic Literature, December 1991, 1779-82.

Review of Premodern Financial Systems by Raymond Goldsmith, Journal of Economic Literature, March 1989, 88-89.

Review article on A Retrospective on the Classical Gold Standard, 1821-1931, Michael D. Bordo and Anna J. Schwartz, eds, Journal of Economic History, December 1985, 965-68.

**CONGRESSIONAL TESTIMONY**

"Regulatory Policy, Predatory Lending, and Subprime Lending," U.S. House of Representatives Committee on Banking and Financial Services, March 31, 2004.

"The Policy Response to the September 11 Attack," U.S. House Ways and Means Committee, September 20, 2001, Closed door session.

"What to Do, and What not to Do, About Predatory Lending," Statement Before the U.S. Senate Committee on Banking, Housing and Urban Affairs, July 26, 2001.

"How New Is the New IMF?" Statement Before the Joint Economic Committee of the U.S. Congress, March 8, 2001.

"When Will Economics Guide IMF and World Bank Reforms," Statement Before the U.S. Senate Committee on Foreign Relations, May 23, 2000.

"Statement Before the Joint Economic Committee of the U.S. Congress," April 12, 2000.

"Statement Before the U.S. House of Representatives Committee on Banking and Financial Services," March 23, 2000.

"Statement Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs," March 9, 2000.

"Blueprints for a New Global Financial Architecture," Statement Before the Joint Economic Committee of the U.S. Congress, February 24, 1998.

"Firewalls and Universal Banks," Statement Before the Senate Subcommittee on Financial Institutions and Regulatory Relief, March 20, 1997.

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - x
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
:
and :
:
FEDERAL DEPOSIT INSURANCE : No. 93-531
CORPORATION, : Judge Loren Smith
Plaintiff/Intervener, :
:
vs. :
:
THE UNITED STATES OF :
AMERICA, :
Defendant. :
- - - - - - - - - - - - - - x

DEPOSITION OF CHARLES W. CALOMIRIS

VOLUME 3

New York, New York

Friday, July 7, 2006

REPORTED BY:

DONALD R. THACKER

incorrectly added.

Q Thank you.

A And then I will, if you want to have questions about it that will save us any trouble from having to reconvene.

Q Good.

A But I am not opining that I know that.

Q I understand.

A My final point today --

MR. THOMPSON: Off the record.

THE WITNESS: My final response to you is a detailed one, it is going to take us a little bit of time.

Table 5, you had asked about -- I had asked a lot of questions about Table 5.

BY MR. LEVITT:

Q Okay, I see.

A And you had asked whether that was quarterly data which I had said I thought it was quarterly data for those last two columns of Table 5. In other words, quarterly ROA at the last TFR prior to the date of seizure --

Q Date of resolution -- date of seizure, right.

A -- and so I went back because I said I was going to go back and double check and that was the intention. I found that there was a coding error, actually, and that the coding error meant that instead of it being the quarter ROA and the quarter interest expense, that the research assistant's coding error had brought into the database the earnings up to that point for the fiscal year, and the interest expense up to that point for the fiscal year, which is not the correct way to do it.

Now, let me tell you what I have done so that we can remove any confusion about this.

What I did was I have produced for you over night new versions of Table 5. And I have a lot of new information here to help show how the conclusions of Table 5 are robust to anyway you slice or dice it.

So what did I do? I will go through it with you in detail but let me just summarize for you. So I first defined Table 5 using every

Q In 1990?

A 1992.

Q I was just using as an example 1990.

A So the count --

Q Well, that is not the count of -- of failures, is it, or is it?

A It is the count for which I could find data, so when you -- I am using all TFR filers but remember I am also using -- so I have to identify the failure and then I have to look for the TFR. So this is, there may be slight differences in numbers of firms for which data was available for one reason or another but I am giving you the entire universe that I could come up with the corrected coding for finding the ROA concepts, so there may be slight differences in numbers of observations but this is the universe, I haven't excluded anything.

Q So in '92 you were able to get data on 60 failures?

A For the purposes of this table.

Q And in the other, in the original Table 5 when you were using that data you were able to

locate 53 failures?

A It could be that some of those didn't have data, some of the 60 may not have had data in the coding category of fiscal year to date, I am not really sure why there is a slight difference here in the sample. But this old Table 5 is not correct, it's not the right concept.

This is, the new table is the correct concept, and this is a universe, I haven't excluded any.

I am showing you that when you take a sample and you construct for that sample as best one can, based on the data that are available, this is for each of these pages all the data that exist, that I am able to find.

Let me go on because there is another page. Now, the last page is the failure transaction database maintained by the FDIC also has its own code of savings and loan. Notice that, as I mentioned yesterday to you, we were surprised that there was a very slight difference, and you can see it here. If you looked at the first page called

savings and loans only, according to the Federal Reserve's charter type code of 310 for a savings and loan, we have 32 observations in 1992. But according to the financial -- I am sorry, the failure transaction database from the FDIC there are 29. The FDIC was surprised when this was brought to their attention, they didn't, couldn't give us an answer of exactly why that was the case.

So let me just say, I have tried to explain to you, there are many different concepts that are illustrated here, there are many different samples, but the key conclusion is as I summarized it is, which is when you now use the correct concept rather than the concept that was contaminated by the coding error of fiscal year to date, you get a robust conclusion that Carteret's performance measured either by higher return on assets, lower interest expense, or lower bad loans ratio was superior, and that is a conclusion that is true for each of those three categories, for any of the concepts that any of the versions of defining those concepts and for any of the samples used so it is an

extremely robust conclusion.
That concludes my summary of the various answers to your questions from yesterday.
Q Let me just -- let me reserve questioning until we have had a better chance to review the revised exhibit, just a couple of facial things now.
On interest expense to deposits, the -- in your old Table 5 for 1992 for the thrifts that failed other than Carteret it was 2.914 percent; is that right?
A That is what the old, incorrect Table 5 number.
Q So what is the -- give me the analogous figure from the corrected version.
A So remember that the concept that was being illustrated in Table 5 was the quarterly number for all TFR filers for the quarter, prior to seizure.
So that would be the second to last page of Exhibit 11, and it would be the two columns labeled -- well, you asked that interest expense for deposits.

funding delays for the RTC and in the absence of the minority preference rules, Carteret would have been sold as a whole thrift. When you value the supervisory goodwill, are you assuming it would have been sold as part of the sale of the whole thrift?

A Yes, my but-for scenarios are whole bank sales. I am not sure, as I said I guess on Wednesday, I am not sure whether that matters for the transferability of supervisory goodwill, but it never came up in my thinking because my scenarios are whole bank transfers.

So that would be another legal issue that one would want to consult with the legal expert about. I am not sure why the FDIC couldn't transfer supervisory goodwill in pieces particularly because remember that the transferring of supervisory goodwill, when it has been done, has been done because it suits the interests of the government, because it reduces the government's resolution cost.

So I am trying to understand who would contest, again I am not a legal expert, I am just an economist, but if the FDIC says there is no FIRREA

around to stop us and just as we did in the '80s, we find that it is useful from the standpoint of minimizing our costs to transfer supervisory goodwill, even if we are going to sell this in three pieces, well, certainly the banks that are acquiring these pieces that are getting the supervisory goodwill aren't going to complain, the government is not going to complain because the government is doing it for its own interests. So I am trying to understand why it wouldn't happen.

Now that is just a simple economist's points of view, maybe there would be somebody out there who would bring suit but I am trying to imagine who it would be.

Q What I don't understand is why any potential acquiring thrift with substantial tangible capital would want to pay the RTC for Carteret's supervisory goodwill.

A Supervisory goodwill is valuable.

Q And is that because it counts as regulatory capital or it did prior to FIRREA?

A Yes.

Q But if you have more than enough tangible capital, why do you need that?

A Actually there was an issue that occupied a great deal of the Long Island Savings Bank case --

Q I recall your testimony in that case.

A So I can go through this in detail with you. But the answer is banks don't want to be right at the edge of their supervisory -- of their total minimum capital requirement, and banks want to have a buffer of extra capital.

Now, in my testimony before I have gone through this in detail --

Q I understand --

A If you want me to do it again I can do it.

Q No, I understand the basis.

A But what is interesting is, I will just give you the conclusion, that what we know is that it is appropriate to value because banks will always use capital from a regulatory standpoint, that it is appropriate to value regulatory capital that -- from a supervisory goodwill or tangible capital that satisfies that same capital requirement as having

Q What if it was a large -- what if you assume that there is no, you know, the size of the mortgages are randomly distributed between in-house and brokerage, so there is no reason not to assume that I would think.

A It is not just the size of the mortgages it is the size of the mortgages that you make.

Q Even if the margins are a point less you know half the business is from the brokerage, over half?

A This is -- I only know my own experience of having managed a business not too dissimilar from this, so I know that I am not willing to make that assumption.

Q Did your business have brokered originations?

A We operated several offices and I think that we did have some. As I said, we had an office in Florida, I am not sure if I would describe that as a brokerage, but I would say that in looking -- in looking at this, just based on my own very limited experience and managing an entity like this,

let's just say I wouldn't jump to the conclusion that the revenues were, and more importantly the profits, were the same, coming from different parts of this business. And, in fact, I would tend to view the wholesale network, if it weren't -- if these aren't employees of Carteret, if these are brokers that are working with five different or six different ultimate buyers or providers or whatever you want to call them, allies, in the mortgages brokerage network that they are operating, that Carteret is not a unique relationship with them, I am not sure, but I am not sure what these relationships are like exactly, but if these are independent brokers who are calling Carteret up as well as two or three other banks, I am not really seeing this as a big value driver for Carteret. And the way I would expect is that Carteret makes more money per dollar that they originate in-house than per dollar they get from some brokerage relationship, but I don't know, because I don't know the exact breakdown there.

Q I mean just so we don't get the judge a

wrong impression, you are speculating on this. In this last statement it was speculation because you don't know about what you are talking about on this particular thing?

MR. THOMPSON: Objection.

THE WITNESS: Here is the thing, you are asking me a question, I am trying to give you an answer.

BY MR. LEVITT:

Q Right.

A There is a list of five recommendations here and all I have in front of me is this document and what I can remember.

Q All right.

A And I am saying if I read this document and you had blanked out the recommendations and you had asked me to put myself in the shoes of the person making the recommendations, I would have said something more -- I would have guessed one through three, more or less, that is something along those lines. I am not even sure what five means, exactly. And four looked to me like a little bit of I can

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

\- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Tuesday, February 28, 2006

Deposition of WAYNE S. GREEN, a 30(b)(6) witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 Eleventh Street, NW, Washington, D.C., at 9:43 a.m., Tuesday, February 28, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Certified Copy

Q. Who made the determination that post-insolvency interest for Carteret needed to be recomputed and reprioritized?

A. Well, in 1999, we determined that or we questioned whether or not the methodology of calculating post-insolvency interest of Carteret for the years '97 and '98 was correct.

We then, we being the goodwill team sent an E-Mail to the legal division counsel and requesting their opinion on what was the proper methodology for calculating post-insolvency interest. As a result of their response to the goodwill team, the PII in 1999 was recalculated using a different rate and compounding methodology that had been used in 1997 and 1998.

Q. You said that we questioned in 1999 whether the PII methodology was correct. What caused you to question that then as opposed to earlier?

A. I think in the fall of 1999 when the dividend processing system was being modified to calculate post-insolvency interest that we looked into the different methodologies of calculating PII to confirm that the system would be able to handle the calculation.

I think as a result of that inquiry when

we were comparing the way we had done it on Carteret and other receiverships that we questioned whether or not the prior methodologies that had been used was the correct methodology.

Q. Okay. But what specifically caused you to raise that question. I understand in what context it was raised, but what caused to you say, gee, are we doing this correctly?

A. I don't remember.

Q. And was this a question that was raised with respect to just Carteret receivership, with respect to all receiverships, with respect to a subset of receiverships?

A. I believe there was a certain subset of receiverships that we questioned the validity of the method of calculating post-insolvency interest.

Q. And what was that subset?

A. Well, that subset included Carteret in addition to four or five our receiverships that we ultimately made adjustments on by changing the methodology.

Q. Was there something about these -- the subset of receiverships that distinguished it from other receiverships that caused to you question how it was calculated for the subset?

Page 1

UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------------------x
AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.

----------------------------------------x

600 Fifth Avenue

New York, New York

March 30, 2006

9:40 a.m.

Deposition of EDWARD GRIFFIN, pursuant to Subpoena, before Sophie Nolan, a Notary Public of the State of New York.

CERTIFIED COPY

Q. And what were your responsibilities? Were they consistent in these various assignments?
A. They changed after Masalon to become a managing agent for each institution while in conservatorship.
Q. Was the managing agent the equivalent of a CEO in the private sector?
A. Yes, it was.
Q. And do you recall that George Gross was your predecessor --
A. Yes.
Q. Do you recall whether Mr. Gross was relieved of his responsibilities?
A. Yes.
Q. And do you recall whether Mr. Gross was charged with having or was thought to have stolen from Carteret?
A. Yes.
Q. What is your understanding of what the accusations against Mr. Gross were?
A. There were two accusations, one of which was what you might term stealing. He was filling his personal car with the gas tank -- the gas supplies from Carteret.
The second was purely internal. It

was how he brought certain people into the conservatorship who, in the opinion of the management of RTC, were not qualified to perform the job and who were overpaid.

Q. Okay. Do you recall who the individuals who were deemed to be unqualified were?

A. I recall one. Her name was Debra Thornton.

Q. Do you recall what Ms. Thornton's responsibilities were?

A. I am going to say control of asset management now.

Q. It says on your resume under the "FDIC/RTC," the second bullet point is, "Organized residential and commercial loans, securitizations."

Do you see that?

A. Yes.

Q. And what is a securitized sale?

A. A securitized sale is a group of loans anywhere from 5 to 500, secured by notes, government notes.

Q. And did the securitization make the loans more attractive to acquirers?

UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - -  )
AMBASE CORPORATION and CARTERET    )
BANCORP, INC.,                     )
           Plaintiffs,             )
           and                     ) No. 93-531
FEDERAL DEPOSIT INSURANCE          )
CORPORATION,                       )
           Plaintiff-Intervenor,   )
           v.                      )
UNITED STATES OF AMERICA,          )
           Defendant.              )
- - - - - - - - - - - - - - - - -  )
```

CERTIFIED COPY

Washington, D.C.

Friday, April 7, 2006

Deposition of KAREN JEAN HUGHES, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:39 a.m., Friday, April 7, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

that 95 was maybe more probably than something at 90 percent.

Q. Okay. Is there general accounting -- are there general accounting principles for whether -- for when a recovery is considered probable?

A. It's not specific.

There's accounting guidance that identifies when you have a contingent liability that meets the criteria of probable -- both probable and reasonably estimable, you want to book it in your accounting records.

Q. And what is your understanding of what that general accounting guidance is with respect to when the liability is probable?

A. Depends on the nature of the liability. A liability that was on the books and records of the receivership estate is not a contingent liability. It is a liability in fact.

And so it doesn't really fall within those parameters. The contingent liability concept is more for things that are unknown. The issue with postinsolvency interest from our perspective, that is the liability that starts on day 1.

And so our issue here was at what point do we reflect that, do we show that in the receivership

books and records. We could have reflected it starting day 1 and every day thereafter until the receivership was terminated, recalculate postinsolvency interest, and make the adjustment, and have that be on the face of the financial statements and in the accounting records of the receivership, but there's a huge administrative cost associated with doing that.

And for most of the receiverships, they never got through the deposit claims or other claims such that they would pay postinsolvency interest, so it was an unnecessary burden. What we were trying to do here is setting some kind of a threshold to make the receivership financial statements more meaningful was to come up with the right time frame to recognize and reflect on the face of the statements the liability that had been accruing since day 1.

Q. And in the discussions leading up to the adoption of this policy, were any tax implications of the policy considered?

A. I don't remember.

MR. COLATRIANO: Have this document marked as exhibit 23, please.

(Hughes Exhibit No. 23 was marked for

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

AMBASE CORPORATION, ET AL. :

Plaintiffs :

and : No. 93-531

FDIC :

Plaintiff-Intervenor :

-vs-

:

UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - - - x

April 5, 2006

Washington, D.C.

DEPOSITION OF:

STEVEN JOHNSTON

was called for examination by counsel for the Plaintiffs, pursuant to notice, taken at Cooper & Kirk, 555 11th Street, N.W., Suite 750, Washington, D.C., commencing at 9:37 a.m., before Misty Klapper, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

Certified Copy

deduction available from the date of closing.
Isn't it true that that's the position that the IRS has now taken in the Ben Franklin case, they've allowed the deduction of post-insolvency interest from the date of closing?
A. That's my understanding.
Q. Okay. And are you familiar with any instances in which the IRS has not allowed the deduction of post-insolvency interest from the date of closing?
A. I'm not aware of any other cases of where it was an issue or where it was challenged.
Q. Okay. When you wrote that the IRS agrees that this is a valid tax deduction, do you recall why you had formed that belief? Was it because of Ben Franklin or some other reason?
A. I can't recall any other reason, other than, possibly, the Ben Franklin case. I'm not aware of any other instance where the IRS, you know, specifically agreed to that position.
Q. Okay. And just so the record is clear, you can't recall any other instances in which the IRS took a position on that issue; is that right?
A. That's correct.
Q. Okay. Do you recall whether there was

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - X
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :
\- - - - - - - - - - - - - - - - X

Washington, D.C.

Friday, June 10, 2005

Deposition of JAY A. JUPITER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, 200, Washington, D.C., at 9:39 a.m., Friday, June 10, 2005, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

CERTIFIED COPY

you know, in creating the RTC's Minority Resolution Preference Program, Congress' intent was clear. The first goal was to resolve failed institutions in an expeditious manner."

Do you think you have an opinion as to whether the Minority Preference Program served that interest of expeditiously failed resolving failed institutions?

A. Do I have an opinion -- I don't have an opinion now and I don't recall what my opinion was at the time.

Q. With respect to the second goal, do you have an opinion as to whether it promoted that goal?

A. Same answer, I don't have an opinion now and I don't recall what my opinion was at the time.

Q. During your time at the FDIC and the RTC -- and was it the Federal Home Loan Bank?

A. Federal Savings Insurance Corporation.

Q. FSLIC?

A. Yes.

Q. In the 1980s.

A. Yes.

Q. Were you aware of any discrimination by the federal government in the selling of branches or institutions, any racial discrimination against

minorities?

A. Well, certainly the level of participation of minorities in those acquisitions was minimal. In some people's mind the effects tests indicated discrimination.

Q. I'm not asking about whether there was a disparate impact, I'm asking about whether you're aware of any intentional discrimination by you or any of your colleges at the federal government in assessing bids by minorities?

A. Certainly not on my behalf.

Q. Are you aware of any racially discriminatory conduct by anyone else at the federal government in considering bids by minority bidders?

A. Not that I was aware of.

Q. Do you recall what the test was for determining whether an institution would be covered by the Minority Preference Program?

A. I don't have a current recollection, no.

(Jupiter Exhibit No. 14 was marked for identification.)

BY MR. THOMPSON:

Q. Now, in the second paragraph of this memo from Mr. Ramey, it says, the first sentence says: "Mr. Sergeon has an interest in approximately 12

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

- - - - - - - - - - - - - - - - - - X

**Certified Copy**

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

ago you said in theory when you closed the bank all lending was to stop immediately. Why -- what -- why was that, what was the basis for that policy?

A. The bank was closed.

Q. That's true even though the bank was in conservatorship, that was still the policy?

A. It was the policy of a conservatorship.

Q. To stop lending?

A. (Indicating)

Q. I'm sorry, that's a yes?

A. Yes.

(Mindnich Exhibit No. 3 was marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Mindnich, Exhibit 3 are Managing Agents Meeting Hints from January 27, 1993 and they list you as being present at that meeting. I'm only going to ask questions about a couple of things on the first page and then one paragraph on the second page. And I will be showing you a lot, unfortunately a lot of meeting minutes today, so I'll try every time to tell you where I'm going to focus. Obviously you can review as much as you need to to put it into context.

But on the second paragraph of this

Q. And this decision was made, Carteret was seized on December the 4th so this decision was made fairly quickly after Carteret was seized, ten days later, correct?

A. It was made on I believe the day we went in, on the 4th.

Q. And who made that decision, was it a decision from Washington or --

A. It was our decision and it was approved.

Q. And why was that the decision, why was the decision made to shut down the origination activities?

A. That was an automatic. I mean when the RTC went in all -- everything stopped, all lending stopped, all anything stopped, okay? That was across the board, okay?

We went in here. There were I think I said there were 100 people referring mortgages in a pipeline of. In process was 100 million, the approved to close was another 100 -- they are talking 360 million; that was pretty close to my original comments.

We told Washington, we said, you know, you're going to create havoc if you don't fund these mortgages that were approved. I mean you're not --

you're screwing with people, literally, these people are waiting to get their money and buy their houses, we don't want to be -- we don't want to be part of this, because it's not fair. As simple as that, you know, and we made that case and they said fine, go ahead and fund anything that's approved and we wrote a case to do that and that was signed off in Washington.

Q. Okay.

A. Now, on the other side the loans that were in processing and had not been approved, we encouraged the originators to take their loans back, take them to another bank, which they did. So those -- so that -- both sides of that -- that was taken care of that weekend.

Q. Okay. I want to leave aside for purposes of these questions the handling of mortgages that had already been approved or ones that were being processed. I want to focus on the decision to stop any additional origination activities. Were those origination activities done out of a subsidiary, a mortgage company subsidiary?

A. They had a hundred people working all over the state, they were brokers, they were -- you know, they were getting paid by the deals they brought in.

Q. When you say all over the state, are you referring to New Jersey or Florida or --

A. No, they were all over, okay?

Q. Were any efforts made to at any point to market for sale the function at Carteret or any of its subsidiaries that was involved in mortgages origination?

A. It really wasn't a function. I think for all the institutions that I was involved with, that was the only one that was really in that position.

Q. What do you mean?

A. Only because of its size.

Q. What do you mean that was the only one that was in that position?

A. That had $120 million of mortgages in processing.

Q. Okay.

A. And another $250 million ready to close, there weren't too many banks in the country that had that kind of a situation.

Q. Again, I want to leave those out of this, I'm not talking about what's in process or what's been in the pipeline. I'm talking about there's an origination capacity at the bank, an infrastructure for that, correct? Was there any efforts made to

market that infrastructure, to market -- whether it was in a separate, sub or separate function, were there any efforts made to market that function, that origination capacity, that origination infrastructure, market that for sale?
A. No.
Q. Why not?
A. It was something that wasn't done. All lending stopped, okay and we convinced Washington to fund what was approved, okay, and that was stopped.
Q. All right. So is it fair to state and please correct me if I'm misstating it, that it was RTC policy to stop all originations --
A. It's documented, yes, there's documentation.
Q. And not to try to market any of that infrastructure for origination for sale?
A. Of the in process you're talking about?
Q. No. I'm talking whatever infrastructure there was to originate mortgages, was that marketed in any way, I think you said no. I'm asking you is that RTC policy?
A. Well, what are you marketing, are you marketing -- are you -- are you talking about marketing the ability to make mortgages, the

structure that they had set up?
Q. Right.
A. I mean if the structure was set up, that -- if you brought mortgages in you got paid. If you didn't bring any in you didn't get paid. So you know, it was a question of -- it wasn't something that was marketable is I guess what I'm saying. Because everybody -- everybody that was involved on that end of the bank was leaving anyway, the bank was closed.
Q. When you say everybody --
A. They were out of a job, the people who were origination -- the origination people were out of a job because there was no -- no bank to send the mortgage to anymore.
Q. They are out of a job because the decision was made to shut it down --
A. No, they were out of a job because the bank was closed.
Q. And was part of that decision was to shut down lending, correct?
A. Yes.
Q. Was any attempt made to value that aspect of the business?
A. If it was, I wasn't involved.

not funded.

Q. With respect to that next to last paragraph on page 2 of Exhibit 49, where the applications generated from apparently the fourth to the 11th were less than $10 million, where were those applications coming from?

A. I don't know. Where did they come from?

Q. Were they come from branches and the correspondents?

A. Yeah, probably, yeah. I mean I -- if you asked me if I looked at them, no, I didn't look at them.

Q. But that drop off in volume --

A. As soon as -- as soon as the word went out that Carteret had been taken over by the RTC, 90 percent of those guys never showed up again or whatever, you know, but they knew, you know, they'd been down that road before with several of the other institutions around that had been closed and there's nothing coming out of here. So they automatically took their mortgages someplace else. We didn't have to tell them that.

Q. So in effect there was, as far as the mortgages origination business there was nothing to sell?

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.

Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?

A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.

Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?

A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

indication that correspondent relationships had already moved. Meaning that the 10 million could have been in there that week from the correspondents and I would say that probably the bulk of that was correspondents, and the branches as I recall were not that, were not that strong in developing the mortgages.

Q. If you look at Exhibit 47 --

A. I said just the opposite.

Q. Not at all. I don't want to characterize what you said. But there are numbers on Exhibit 47 and I look at those numbers saying that the retail branches generated approximately 45 percent of the origination, of the mortgage loan closings year to date?

A. Well, since we were in the beginning of the month I would say that the greater portion would have been the wholesale office.

Q. The greater proportion of what, the $10 million?

A. Yes.

Q. What did that have to do with the beginning of the month versus the end of the month?

A. Because I would say, you know, these guys generated 5 to 4, 5 for every 4. So if you wanted to

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------x

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
:
Plaintiff :
:
vs. : NO. 93-531
:
THE UNITED STATES OF AMERICA :
:
Defendant :

----------------------------------x

The deposition of J. PAUL RAMEY, JR., was held on Tuesday, April 12, 2005, commencing at 10:00 a.m., at the Radisson Hotel, 210 Holiday Lane, Annapolis, Maryland, before Ronald E. Bennett, Notary Public.

APPEARANCES:

DAVID THOMPSON, ESQUIRE
On behalf of Ambase Corporation

DAVID C. HOFFMAN, ESQUIRE
On behalf of U.S.A.

ALSO PRESENT: LESLIE A. CONOVER, ESQUIRE
GARY A. KUIPER, ESQUIRE

Certified Copy

unfair or is this just another delaying tactic for some who probably won't be able to do a deal anyway.
Do you see that?
A. Yes.
Q. Was the concern that you were expressing here about a potential delaying tactic by those who wouldn't be able to do a deal anyway, was that based on your experience that the minority bidders who were de novo had a harder time closing deals than established financial institutions?
A. I don't recall.
Q. Is that a reasonable inference from this?
A. Not knowing who the other groups were. I probably wouldn't know who they were if you told me. It could have been someone that I was familiar with that had possibly tried a delaying tactic some other time and it was not able to consummate a transaction. It could have been something like that.. But I don't know.
Q. You were concerned with delay? You didn't want a delaying tactic. Is that fair?
A. Not for the sake of delaying, when we had everyone ready to go. It was in the form of a question. I was asking them what did they think.
Q. Sure. The next document that I would like

to have marked as Ramey 27 is a document that bears the Bates number C-AM-A- 0014370.

(Deposition Exhibit Number 27 marked for purposes of identification.)

BY MR. THOMPSON:

Q. Mr. Ramey, the original message is from Mr. Hambric to yourself, dated August 16, 1994. You can see that at the bottom. Then you make some comments to Mr. Hambric. Rather than reading this into the record, if you wouldn't mind taking a moment to read this, I'll ask you a question or two.

(Pause)

A. Okay. Go ahead.

Q. In your comments you are making the point that putting the bid off from August 15th to August 26th is going to be beneficial because it will allow potential acquirers to focus on the northern and southern franchises separately. Is that the point you are making in this e.mail?

A. Give me your question again.

Q. Let me strike that and ask the question this way. Are you explaining in your comments in this e.mail that one of the reasons, and the quote real problem, close quote, was that a minority group working either alone or with non-minorities would

have a freeze on the sale of assets of a conservatorship?

A. I'm not familiar with this. I don't know why there would have been or why there would not have been. I just don't know -- unless they were needed for other things. I just don't know.

Q. Do you know why they would have been asking your department resolutions whether it was okay?

A. What date is this? September 15th. '94.

Q. So it's about a month after the bids?

A. It's before the resolution.

Q. Yes. Exactly right.

A. At times we would freeze the assets because the purchasers might want them to pass.

Q. The minority purchasers?

A. Any purchasers. Some purchasers earning assets as opposed to cash. If we had earning assets that were of good quality, we may hold on to them to pass that resolution.

Q. Would you have been involved in that decision?

A. It's possible.

Q. Okay. Do you have any recollection as to the reasons why Carteret's assets were frozen or

UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------------x
AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.
--------------------------------------x
600 Fifth Avenue
New York, New York
March 31, 2006
9:35 a.m.

Deposition of MICHAEL SARAN, pursuant to Notice, before Sophie Nolan, a Notary Public of the State of New York.

Certified Copy

subsequent motion.

MR. COLATRIANO: Okay. As I did the last time this was mentioned, I'll reserve all of our rights to claim that any privilege or other protection has been waived and make any other arguments regarding this e-mail.

Q. But Exhibit 17 is a printout of a series of e-mails, one of which begins in the middle of the first page. It's an e-mail from you to Barbara Stark Tishuk, with CCs to three people dated December 1, 1999, "Subject, post-insolvency interest rates and priority of interest." It's Bates stamped AM through and including 537.

Is this the e-mail you were referring to a moment ago when you said you reviewed a document regarding an opinion you had put together regarding post-insolvency interest?

A. Yes, my counsel faxed to me a copy of this e-mail, that is correct.

Q. Okay. The e-mail is from you to Barbara Stark Tishuk. Who is she?

A. I do not recall.

Q. There are three CCs. Let's go over each of them. Who is Peter McDonald?

A. To my recollection Peter McDonald was -- I believe -- my recollection is he was the department head for claims.

Q. Okay.

A. In December of 1999.

Q. Department head for claims within the Hartford --

A. Yes, yes, I'm sorry. Within the Hartford Northeast Service Center, that is correct.

Q. Okay. I think you referred earlier as Thomas Hewitt as your supervisor; is that correct?

A. I believe at that time he was my section chief, my immediate supervisor.

Q. Who was John Vartelas?

A. He was another senior attorney in the corporate affairs, corporate operations. I don't recall exactly what my department was called at that time. I think it was called corporate affairs, corporate receivership operations in Hartford. He was a colleague. He was another senior attorney.

Q. All right. And was your -- this is an e-mail. Was there any other document that reflected your analysis of this issue or your opinion on this issue?

A. I do not know, although the first line of the e-mail says, "As a follow-up to my e-mail yesterday." I don't know or recall what that e-mail references. So, there may have been, but I do not recall any other involvement or analysis on this point other than what may have been contained or may be contained in an e-mail. I assume it would have been dated November 30, 1999.

Q. Okay. I think you said a moment ago that you don't recall why you were asked to perform this analysis; correct?

A. I don't recall, that is correct.

Q. Okay. Do you know why this request was coming at this time in late 1999?

A. No, I do not.

Q. Okay. There's discussion on these pages of post-insolvency interest as it affects, I think, five different institutions; correct?

A. That is correct.

Q. Okay. And there are dates in parenthesis after each one of them and they're all from either 1994 or 1995; correct?

A. That is correct.

Q. So, do you know why, if these institutions had failed or had been resolved years before, why this question was coming up in 1999?

A. I don't recall. I can speculate. I will assume or -- I assume these were the dates of the receivership, but I don't recall other than that's what I suspect it is, but I don't recall as to what the dates indicate.

Q. Okay, but whether it's the date of receivership or date of resolution or whatever, they were all from 1994 to 1995.

A. Right.

Q. And, so, what I'm trying to get a sense of is why if they had -- if that had happened four to five year previous, why this question regarding post-insolvency interest was coming up in 1999.

A. I don't have any recollection as to why.

Q. Okay. How did you go about

analyzing the issue of post-insolvency interest?

A. My e-mail makes reference to a memo titled "Receiverships Post-insolvency Interest" dated. It says -- it indicates the date as August 8, 1995, which I referred to as the policy memo and I also indicate that apparently it was authored by Tom Rose, and Steven Graham and Alvin Kitchen.

Relying upon that memo, I made a determination as to what the appropriate interest rate to be utilized to accrue interest on post-insolvency -- or post-insolvency interest of various receiverships.

Q. Did you base your opinion on any other documents or any other source?

A. I don't recall. I doubt it, but I don't recall with specificity.

Q. Okay. Do you recall whether you had discussions with anyone involving this issue while you were analyzing it?

A. I assume because John Vartelas' name is provided as a CC, I probably discussed it with John, but I don't recall any specific conversation.

Q. Ok. The same paragraph of your e-mail which refers to the Rose, Graham, Kitchen memo also refers to a Rodney Ray/Christine Bradley memo dated April 17, 1995.

Do you recall whether that was something that you consulted in performing your analysis?

A. I don't recall -- I can speculate, but I don't know, I don't recall whether or not I saw the Rodney Ray, but I don't recall with specificity.

Q. Do you know who Rodney Ray was or Christine Bradley?

A. I know who he is now. I don't -- Rodney Ray is an attorney with the FDIC, and I believe he's in Washington. I do not know what his responsibilities were in December of 1999 or, rather, April of 1995.

I do not know and have no recollection of a Christine Bradley.

Q. So, you don't know which division she worked in?

A. I do not.

Q. I take it that you had been

specifically asked about post-insolvency interest for only about the five institutions referenced in this e-mail; correct?

A. I don't recall any other inquiries regarding post-insolvency interest. I addressed five various receiverships. That's the only recollection and only based upon my review of the e-mail provided.

Q. Do you know why the inquiries related to just those five?

A. I do not.

Q. Do you know whether those five institutions are all institutions involved in goodwill litigation?

A. I do not know.

Q. I've got some more questions about that document, but while we're at it I'd like to have this document marked as Exhibit 18.

(Saran Exhibit 18, document Bates stamped AM 00096532 through AM 00096534, marked for identification.)

Q. Exhibit 18 is two memos really. The first one is dated June 14, 1995. It's from Sharon Powers Sivertsen, to regional counsel, subject post-insolvency interest

memorandum, and the attachment is a memo dated June 8, 1995 from Steven Graham, Alvin Kitchen and Thomas Rose to various regional officials of the FDIC, "Subject, receiverships post-insolvency interest." The Bates stamp for the exhibit is AM 00096532 through and including 534.

My questions are all going to be about the attachment, but you may -- is this June 8th memo that is part of Exhibit 18, is that the memo referred to in your e-mail, and I see that the date is not the same but --

A. I believe -- to the best of my recollection, it is the same memo and that I probably mistyped. I wasn't the best typist. I meant 6/8/95 and I typed 8/8/95.

Q. And I think at the outset of this deposition you mentioned that you reviewed, in preparing for this deposition, a memo prepared by Tom Rose.

Is the attachment to Exhibit 18 the memo you were referring to?

A. A copy of Exhibit 18 was provided to me on Thursday evening about 4 o'clock, that is correct.

Q. Is it fair to say, and please correct me if I'm wrong, that what you did in 1999 in analyzing this post-insolvency interest issue was you looked at the June 8, 1995 memo and made a determination about which of the categories listed in the June 8, 1995 memo Carteret fell into for purposes of calculating post-insolvency interest?

A. It would be a fair assessment. The 1995 memo refers to -- depending on the type of institution and receivership, it identifies four different types of institutions and, yes, I relied upon the 1995 policy memo, to the best of my recollection, yes.

Q. Okay. The 1995 policy memo has four categories. The first is "Prenational depositor preference state banks and savings associations which were not regulated by the Federal Home Loan Bank board."

The second is "Prenational depositor preference national banks." The third, is "National depositor preference state banks and savings associations," and the fourth is national depositor preference national banks and federal savings associations."

Do you see that?

A. I do.

Q. There's not a category on here that I can see about prenational depositor preference savings associations that were regulated by the Federal Home Loan Bank board; is that right?

A. I -- I guess it is. I really don't -- I guess I would have to agree. I don't know if it fits into one not regulated and -- I guess that would be right. I don't really know.

Q. When you analyzed this issue in, did you analyze it with the assumption that these four categories covered the universe of potential categories in which an institution could be placed?

A. I think that would be a fair statement, yes.

Q. The 1995 memo in the second paragraph of the first page of the June 8th memo says, "The interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the

jurisdiction it was in, and whether it had a state or federal charter."

What was your understanding about why these were the relevant factors?

A. I -- I don't recall. The memo was -- states -- you know, the memo was prepared by deputy general counsel and I didn't read beyond it.

Q. Okay. What was your understanding of what the memo meant when it said "when the institution failed"?

A. I don't recall.

Q. And are you aware of any other document or policy statement or any other source that defines what failure means for purposes of categorizing an institution for purposes of calculating post-insolvency interest?

A. I don't recall any other document.

Q. Okay.

A. Other than possibly the Rodney Ray/Christine Bradley memo which I don't recall -- you know, I don't recall if I consulted it or not or if it had been provided, but that may, but I don't recall.

Q. Okay. For each of these categories listed on the June 8 memo, there's a particular rate chosen. In some cases it's the state judgment rate and in other cases the treasury bill rate.

On what basis was it decided which rate to use for each of these categories?

A. I do not know.

Q. Okay. How was the RTC's or the FDIC's cost of resolving an institution affected by whether the institution was federally chartered or state chartered?

A. I do not know.

Q. Do you know how the cost of resolution was affected by the date of failure?

A. I do not know.

Q. If you look at your e-mail which is Exhibit 17, on the third page for your discussion of Carteret, go ahead and read that to yourself and let me know when you're ready to proceed, those four paragraphs discussing Carteret.

A. (Reviewing.)

Okay, I've read it.

Q. Is it fair to say that what you did

is look at the date of resolution for each of the three pieces of Carteret and used that date as the operative date for categorizing Carteret for purposes of post-insolvency interest calculations?

A. I don't recall specifically, but it appears to be that was the basis, that is correct.

Q. And why did you use the date of resolution of those three pieces as opposed to, for example, the December 1992 date for when Carteret was initially placed into receivership?

A. I don't recall.

Q. Do you recall having discussions with anyone regarding that issue?

A. I do not recall.

Q. Did you have any follow-up discussions with anyone regarding the post-insolvency issue after providing this opinion that's reflected in Exhibit 17?

A. Not that I recall.

Q. And since that time have you been involved in any other context with analysis of issues regarding how to calculate

post-insolvency interest for receiverships?
A. I want to say no, but I don't recall since I transferred to Open Bank in June of 2000, so I -- I'll say no, not to my recollection.
Q. Okay. So, is it fair to say that at least by your recollection, this was the only occasion in which you were asked to analyze --
A. To the best of my recollection, it is correct.
Q. Just so I finish the question, this is the only occasion, to the best of your recollection, which you were asked to analyze how to determine or calculate post-insolvency interest for a receivership; is that correct?
A. That appears to be correct, yes.
Q. In Exhibit 70 you actually state for each of the three pieces of Carteret what the interest rate should be.
How did you go about determining what the actual rate was? What source did you consult?
A. I don't recall. I can speculate, but I'd rather not.

MR. COLATRIANO: I'd like this marked as Exhibit 19.

MR. KUIPER: I'd like to note that Exhibit 18 on the third page a line is nearly blacked out. I believe it's referring to -- saying, "The rate is utilized to make post-insolvency interest."

I just note for the record because when we get copies I'm sure we won't be able to read it.

MR. COLATRIANO: That's how I read it as well.

MR. KUIPER: It's a line in footnote one.

MS. HART: I concur.

(Saran Exhibit 19, table from internet, marked for identification.)

Q. Exhibit 19 is a table that I will represent that we pulled off the internet on postjudgment interest rates and so I'm not representing to you that this is something that you've seen before because we pulled it off the internet, but I'm wondering if it would spark any recollection for how you went about

actually pinpointing the interest rate that should be used for Carteret.

A. No, it does not.

Q. Is it fair to say that when you prepared your opinion that's reflected in Exhibit 17, you had some source of information which told you whether the federal judgment rate was over the relevant time period; correct?

A. That would be a fair statement.

Q. Okay. Do you know how post-insolvency interest was calculated for Carteret before you prepared your opinion that's reflected in Exhibit 17?

A. No.

MR. KUIPER: Could counsel advise us as to where this came from? Is it state or federal rates or any idea?

MR. COLATRIANO: I think we -- what I can represent is we pulled it off the internet. We were searching for the federal judgment rate and I think this is a federal judgment rate table and I think if you look for the relevant dates, it matches the rates reflected in Exhibit.

# APB Opinion No. 16
# Business Combinations

## STATUS

Issued: August 1970

Effective Date: For business combinations initiated after October 31, 1970

Affects: Supersedes prospectively ARB 43, Chapter 5, paragraph 10
Supersedes ARB 48
Supersedes ARB 51, paragraphs 7 and 8
Amends ARB 51, footnote 1
Supersedes APB 6, paragraphs 12(c) and 22
Supersedes APB 10, paragraph 5 and footnote 6
Amends APB 11, paragraph 49

Affected by: Paragraph 6 superseded by FAS 71
Paragraphs 87 and 88 amended by FAS 96
Paragraph 88 amended by FAS 38 and FAS 87
Footnote 13 superseded by FAS 87
Paragraph 89 superseded by FAS 96
Paragraph 96 amended by FAS 79
Paragraph 99 amended by FAS 10

# APB Opinion No. 16
# Business Combinations

CONTENTS


| | Paragraph Numbers |
|---|---|
| Summary | 1— 8 |
| Problem | 1— 3 |
| Scope and Effect of Opinion | 4— 7 |
| Conclusions | 8 |
| Background | 9—41 |
| Present Accounting and Its Development | 9—14 |
| Development of Two Methods | 9—10 |
| Purchase Method | 11 |
| Pooling of Interests Method | 12—14 |
| Appraisal of Accepted Methods of Accounting | 15—41 |
| Purchase Method | 17—26 |
| An acquisition | 18 |
| A bargained transaction | 19—20 |
| Reporting economic substance | 21 |
| Defects attributed to purchase method | 22—26 |
| Pooling of Interests Method | 27—41 |
| Validity of the concept | 28—30 |
| Consistency with other concepts | 31 |
| Usefulness of the concept | 32 |
| Application of the concept | 33—34 |
| Defects attributed to pooling of interests method | 35—41 |
| Opinion | 42—96 |
| Applicability of Accounting Methods | 42—49 |
| Conditions for Pooling of Interests Method | 45—48 |
| Combining companies | 46 |
| Combining of interests | 47 |
| Absence of planned transactions | 48 |
| Subsidiary Corporation | 49 |
| Application of Pooling of Interests Method | 50—65 |
| Assets and Liabilities Combined | 51—52 |
| Stockholders' Equity Combined | 53—55 |
| Reporting Combined Operations | 56—57 |
| Expenses Related to Combination | 58 |
| Disposition of Assets After Combination | 59—60 |
| Date of Recording Combination | 61—62 |
| Disclosure of a Combination | 63—65 |
| Application of Purchase Method | 66—96 |
| Principles of Historical-Cost Accounting | 66—69 |
| Acquiring assets | 67 |
| Allocating cost | 68 |
| Accounting after acquisition | 69 |
| Acquiring Corporation | 70—71 |
| Determining Cost of an Acquired Company | 72—76 |
| Costs of acquisition | 76 |
| Contingent Consideration | 77—86 |
| Contingency based on earnings | 80 |
| Contingency based on security prices | 81—83 |
| Interest or dividends during contingency period | 84 |
| Tax effect of imputed interest | 85 |
| Compensation in contingent agreements | 86 |

Recording Assets Acquired and Liabilities Assumed .......... 87—89
Amortization of Goodwill .......... 90
Excess of Acquired Net Assets Over Cost .......... 91—92
Acquisition Date .......... 93—94
Disclosure in Financial Statements .......... 95—96
Effective Date .......... 97—99

## SUMMARY

### Problem

1. A business combination occurs when a corporation and one or more incorporated or unincorporated businesses are brought together into one accounting entity. The single entity carries on the activities of the previously separate, independent enterprises.

2. Two methods of accounting for business combinations—"purchase" and "pooling of interests"—have been accepted in practice and supported in pronouncements of the Board and its predecessor, the Committee on Accounting Procedure. The accounting treatment of a combination may affect significantly the reported financial position and net income of the combined corporation for prior, current, and future periods.

3. The Director of Accounting Research of the American Institute of Certified Public Accountants has published two studies on accounting for business combinations and the related goodwill: Accounting Research Study No. 5, *A Critical Study of Accounting for Business Combinations*, by Arthur R. Wyatt and Accounting Research Study No. 10, *Accounting for Goodwill*, by George R. Catlett and Norman O. Olson.[1] The two studies describe the origin and development of the purchase and pooling of interests methods of accounting for business combinations. The studies also cite the supporting authoritative pronouncements and their influences on accounting practices and evaluate the effects of practices on financial reporting.

### Scope and Effect of Opinion

4. The Board has considered the conclusions and recommendations of Accounting Research Studies Nos. 5 and 10, the discussions of the need for and appropriateness of the two accepted methods of accounting for business combinations, and proposals for alternative accounting methods. It has also observed the present treatments of combinations in various forms and under differing conditions. The Board expresses in this Opinion its conclusions on accounting for business combinations.

5. This Opinion covers the combination of a corporation and one or more incorporated or unincorporated businesses; both incorporated and unincorporated enterprises are referred to in this Opinion as companies. The conclusions of this Opinion apply equally to business combinations in which one or more companies become subsidiary corporations, one company transfers its net assets to another, and each company transfers its net assets to a newly formed corporation. The acquisition of some or all of the stock held by minority stockholders of a subsidiary is not a business combination, but paragraph 43 of this Opinion specifies the applicable method of accounting. The term business combination in this Opinion excludes a transfer by a corporation of its net assets to a newly formed substitute corporate entity chartered by the existing corporation and a transfer of net assets or exchange of shares between companies under common control (control is described in paragraph 2 of ARB No. 51), such as between a parent corporation and its subsidiary or between two subsidiary corporations of the same parent. This Opinion does not specifically discuss the combination of a corporation and one or more unincorporated businesses or of two or more unincorporated businesses, but its provisions should be applied as a general guide.

6. This Opinion applies to regulated companies in accordance with the provisions of the Addendum to APB Opinion No. 2, *Accounting for the "Investment Credit,"* 1962.

7. The conclusions of this Opinion modify previous views of the Board and its predecessor committee. This Opinion therefore supersedes the following Accounting Research Bulletins (ARB) and Opinions of the Accounting Principles Board (APB):

- ARB No. 43, Chapter 5, *Intangible Assets*, paragraph 10.
- ARB No. 48, *Business Combinations*.
- ARB No. 51, *Consolidated Financial Statements*, paragraphs 7 and 8.
- APB Opinion No. 6, *Status of Accounting Research Bulletins*, paragraphs 12c and 22.
- APB Opinion No. 10, *Omnibus Opinion—1966*, paragraph 5.

[1]Accounting research studies are not pronouncements of the Board or of the Institute but are published for the purpose of stimulating discussion on important accounting matters.

Since this Opinion supersedes those existing pronouncements, paragraph 87 of this Opinion should be substituted for the reference to ARB No. 51 in paragraph 49 of APB Opinion No. 11.

### Conclusions

8. The Board concludes that the purchase method and the pooling of interests method are both acceptable in accounting for business combinations, although not as alternatives in accounting for the same business combination. A business combination which meets specified conditions requires accounting by the pooling of interests method. A new basis of accounting is not permitted for a combination that meets the specified conditions, and the assets and liabilities of the combining companies are combined at their recorded amounts. All other business combinations should be accounted for as an acquisition of one or more companies by a corporation. The cost to an acquiring corporation of an entire acquired company should be determined by the principles of accounting for the acquisition of an asset. That cost should then be allocated to the identifiable individual assets acquired and liabilities assumed based on their fair values; the unallocated cost should be recorded as goodwill.

## BACKGROUND

### Present Accounting and Its Development

#### *Development of Two Methods*

9. Most business combinations before World War II were classified either as a "merger," the acquisition of one company by another, or as a "consolidation," the formation of a new corporation. Accounting for both types of combinations generally followed traditional principles for the acquisition of assets or issuance of shares of stock. The accounting adopted by some new corporations was viewed as a precedent for the combining of retained earnings and of amounts of net assets recorded by predecessor corporations as retained earnings and net assets of a new entity.

10. Emphasis shifted after World War II from the legal form of the combination to distinctions between "a continuance of the former ownership or a new ownership" (ARB No. 40, paragraph 1). New ownership was accounted for as a purchase; continuing ownership was accounted for as a pooling of interests. Carrying forward the stockholders' equity, including retained earnings, of the constituents became an integral part of the pooling of interests method. Significant differences between the purchase and pooling of interests methods accepted today are in the amounts ascribed to assets and liabilities at the time of combination and income reported for the combined enterprise.

#### *Purchase Method*[2]

11. The purchase method accounts for a business combination as the acquisition of one company by another. The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill. The reported income of an acquiring corporation includes the operations of the acquired company after acquisition, based on the cost to the acquiring corporation.

#### *Pooling of Interests Method*[2]

12. The pooling of interests method accounts for a business combination as the uniting of the ownership interests of two or more companies by exchange of equity securities. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting are retained. The recorded assets and liabilities of the constituents are carried forward to the combined corporation at their recorded amounts. Income of the combined corporation includes income of the constituents for the entire fiscal period in which the combination occurs. The reported income of the constituents for prior periods is combined and restated as income of the combined corporation.

13. The original concept of pooling of interests as a fusion of equity interests was modified in practice as use of the method expanded.[3] The method was first applied in accounting for combinations of affiliated corporations and then extended to some combinations of unrelated corporate ownership interests of comparable size. The method was later accepted for most business combinations in which common

[2] This Opinion refers to the "purchase method of accounting" for a business combination because the term is widely used and generally understood. However, the more inclusive terms "acquire" (to come into possession of) and "acquisition" are generally used to describe transactions rather than the more narrow term "purchase" (to acquire by the payment of money or its equivalent). The broader terms clearly encompass obtaining assets by issuing stock as well as by disbursing cash and thus avoid the confusion that results from describing a stock transaction as a "purchase." This Opinion does not describe a business combination accounted for by the pooling of interests method as an "acquisition" because the meaning of the word is inconsistent with the method of accounting.

[3] The origin, development, and application of the pooling of interests method of accounting are traced in Accounting Research Study No. 5 and summarized in Accounting Research Study No. 10.

stock was issued. New and complex securities have been issued in recent business combinations and some combination agreements provide for additional securities to be issued later depending on specified events or circumstances. Most of the resulting combinations are accounted for as poolings of interests. Some combinations effected by both disbursing cash and issuing securities are now accounted for as a "part purchase, part pooling."

14. Some accountants believe that the pooling of interests method is the only acceptable method for a combination which meets the requirements for pooling. Others interpret the existing pronouncements on accounting for business combinations to mean that a combination which meets the criteria for a pooling of interests may alternatively be accounted for as a purchase.

### Appraisal of Accepted Methods of Accounting

15. The pooling of interests method of accounting is applied only to business combinations effected by an exchange of stock and not to those involving primarily cash, other assets, or liabilities. Applying the purchase method of accounting to business combinations effected by paying cash, distributing other assets, or incurring liabilities is not challenged. Thus, those business combinations effected primarily by an exchange of equity securities present a question of choice between the two accounting methods.

16. The significantly different results of applying the purchase and pooling of interests methods of accounting to a combination effected by an exchange of stock stem from distinct views of the nature of the transaction itself. Those who endorse the pooling of interests method believe that an exchange of stock to effect a business combination is in substance a transaction between the combining stockholder groups and does not involve the corporate entities. The transaction therefore neither requires nor justifies establishing a new basis of accountability for the assets of the combined corporation. Those who endorse the purchase method believe that the transaction is an issue of stock by a corporation for consideration received from those who become stockholders by the transaction. The consideration received is established by bargaining between independent parties, and the acquiring corporation accounts for the additional assets at their bargained—that is, current—values.

#### *Purchase Method*

17. The more important arguments expressing the advantages and disadvantages of the purchase method and some of the practical difficulties experienced in implementing it are summarized in paragraphs 18 to 26.

18. *An acquisition.* Those who favor the purchase method of accounting believe that one corporation acquires another company in almost every business combination. The acquisition of one company by another and the identities of the acquiring and acquired companies are usually obvious. Generally, one company in a business combination is clearly the dominant and continuing entity and one or more other companies cease to control their own assets and operations because control passes to the acquiring corporation.

19. *A bargained transaction.* Proponents of purchase accounting hold that a business combination is a significant economic event which results from bargaining between independent parties. Each party bargains on the basis of his assessment of the current status and future prospects of each constituent as a separate enterprise and as a contributor to the proposed combined enterprise. The agreed terms of combination recognize primarily the bargained values and only secondarily the costs of assets and liabilities carried by the constituents. In fact, the recorded costs are not always known by the other bargaining party.

20. Accounting by the purchase method is essentially the same whether the business combination is effected by distributing assets, incurring liabilities, or issuing stock because issuing stock is considered an economic event as significant as distributing assets or incurring liabilities. A corporation must ascertain that the consideration it receives for stock issued is fair, just as it must ascertain that fair value is received for cash disbursed. Recipients of the stock similarly appraise the fairness of the transaction. Thus, a business combination is a bargained transaction regardless of the nature of the consideration.

21. *Reporting economic substance.* The purchase method adheres to traditional principles of accounting for the acquisition of assets. Those who support the purchase method of accounting for business combinations effected by issuing stock believe that an acquiring corporation accounts for the economic substance of the transaction by applying those principles and by recording:

a. All assets and liabilities which comprise the bargained cost of an acquired company, not merely those items previously shown in the financial statements of an acquired company.
b. The bargained costs of assets acquired less liabilities assumed, not the costs to a previous owner.
c. The fair value of the consideration received for stock issued, not the equity shown in the financial statements of an acquired company.

d. Retained earnings from its operations, not a fusion of its retained earnings and previous earnings of an acquired company.
e. Expenses and net income after an acquisition computed on the bargained cost of acquired assets less assumed liabilities, not on the costs to a previous owner.

22. *Defects attributed to purchase method.* Applying the purchase method to business combinations effected primarily by issuing stock may entail difficulties in measuring the cost of an acquired company if neither the fair value of the consideration given nor the fair value of the property acquired is clearly evident. Measuring fair values of assets acquired is complicated by the presence of intangible assets or other assets which do not have discernible market prices. Goodwill and other unidentifiable intangible assets are difficult to value directly, and measuring assets acquired for stock is easier if the fair value of the stock issued is determinable. The excess of the value of stock issued over the sum of the fair values of the tangible and identifiable intangible assets acquired less liabilities assumed indicates the value of acquired unidentified intangible assets (usually called goodwill).

23. However, the fair value of stock issued is not always objectively determinable. A market price may not be available for a newly issued security or for securities of a closely held corporation. Even an available quoted market price may not always be a reliable indicator of fair value of consideration received because the number of shares issued is relatively large, the market for the security is thin, the stock price is volatile, or other uncertainties influence the quoted price. Further, the determinable value of one security may not necessarily indicate the fair value of another similar, but not identical, security because their differences affect the value—for example, the absence of registration or an agreement which restricts a holder's ability to sell a security may significantly affect its value.

24. Those who oppose applying the purchase method to some or most business combinations effected by stock also challenge the theoretical merits of the method. They contend that the goodwill acquired is stated only by coincidence at the value which would be determined by direct valuation. The weakness is attributed not to measurement difficulties (direct valuation of goodwill is assumed) but to the basis underlying an exchange of shares of stock. Bargaining in that type of transaction is normally based on the market prices of the equity securities. Market prices of the securities exchanged are more likely to be influenced by anticipated earning capacities of the companies than by evaluations of individual assets. The number of shares of stock issued in a business combination is thus influenced by values attributed to goodwill of the acquirer as well as goodwill of the acquired company. Since the terms are based on the market prices of both stocks exchanged, measuring the cost of an acquired company by the market price of the stock issued may result in recording acquired goodwill at more or less than its value determined directly.

25. A related argument is that the purchase method is improper accounting for a business combination in which a relatively large number of shares of stock is issued because it records the goodwill and fair values of only the acquired company. Critics of purchase accounting say that each group of stockholders of two publicly held and actively traded companies evaluates the other stock, and the exchange ratio for stock issued is often predicated on relative market values. The stockholders and management of each company evaluate the goodwill and fair values of the other. Purchase accounting is thus viewed as illogical because it records goodwill and values of only one side of the transaction. Those who support this view prefer that assets and liabilities of both companies be combined at existing recorded amounts, but if one side is to be stated at fair values, they believe that both sides should be recorded at fair values.

26. Criticism of the purchase method is directed not only to the theoretical and practical problems of measuring goodwill in combinations effected primarily by stock but also to accounting after the combination for goodwill recorded by the purchase method. Present accounting for goodwill, which often has an indeterminate useful life, is cited as an example of lack of uniformity because selecting among alternative methods of accounting is discretionary.

### *Pooling of Interests Method*

27. The more important arguments expressing the advantages and disadvantages of the pooling of interests method and some of the practical difficulties experienced in implementing it are summarized in paragraphs 28 to 41.

28. *Validity of the concept.* Those who support the pooling of interests method believe that a business combination effected by issuing common stock is different from a purchase in that no corporate assets are disbursed to stockholders and the net assets of the issuing corporation are enlarged by the net assets of the corporation whose stockholders accept common stock of the combined corporation. There is no newly invested capital nor have owners withdrawn assets from the group since the stock of a corporation is not one of its assets. Accordingly, the net assets of the constituents remain intact but com-

bined; the stockholder groups remain intact but combined. Aggregate income is not changed since the total resources are not changed. Consequently, the historical costs and earnings of the separate corporations are appropriately combined. In a business combination effected by exchanging stock, groups of stockholders combine their resources, talents, and risks to form a new entity to carry on in combination the previous businesses and to continue their earnings streams. The sharing of risks by the constituent stockholder groups is an important element in a business combination effected by exchanging stock. By pooling equity interests, each group continues to maintain risk elements of its former investment and they mutually exchange risks and benefits.

29. A pooling of interests transaction is regarded as in substance an arrangement among stockholder groups. The fractional interests in the common enterprise are reallocated—risks are rearranged among the stockholder groups outside the corporate entity. A fundamental concept of entity accounting is that a corporation is separate and distinct from its stockholders. Elected managements represent the stockholders in bargaining to effect a combination, but the groups of stockholders usually decide whether the proposed terms are acceptable by voting to approve or disapprove a combination. Stockholders sometimes disapprove a combination proposed by management, and tender offers sometimes succeed despite the opposition of management.

30. Each stockholder group in a pooling of interests gives up its interests in assets formerly held but receives an interest in a portion of the assets formerly held in addition to an interest in the assets of the other. The clearest example of this type of combination is one in which both groups surrender their stock and receive in exchange stock of a new corporation. The fact that one of the corporations usually issues its stock in exchange for that of the other does not alter the substance of the transaction.

31. *Consistency with other concepts.* Proponents of pooling of interests accounting point out that the pooling concept was developed within the boundaries of the historical-cost system and is compatible with it. Accounting by the pooling of interests method for business combinations arranged through the issuance of common stock is based on existing accounting concepts and is not an occasion for revising historical costs. Both constituents usually have elements of appreciation and of goodwill which are recognized and offset, at least to some extent, in setting a ratio of exchange of stock. The bargaining which occurs usually reflects the relative earning capacities (measured by historical-cost accounts) of the constituents and frequently recognizes the relative market values of the two stocks, which in turn reflect earning capacity, goodwill, or other values. Accounting recognizes the bargaining by means of the new number of shares outstanding distributed in accordance with the bargained ratio, which has a direct effect on earnings per share after the combination.

32. *Usefulness of the concept.* Those who favor the pooling of interests method of accounting believe that the economic substance of a combination is best reflected by reporting operations up to the date of the exchange of stock based on the same historical-cost information used to develop the separate operating results of each constituent. Also, informative comparison with periods prior to the business combination is facilitated by maintaining historical costs as the basis of reporting combined operations subsequent to the combination.

33. *Application of the concept.* It has been observed that criteria for distinguishing between a pooling and a purchase have eroded over the years and that present interpretations of criteria have led to abuse. However, most accountants who support the pooling concept believe that criteria can be redefined satisfactorily to eliminate abuses. It is their view that the pooling of interests method of accounting for business combinations is justifiable on conceptual grounds and is a useful technique and therefore should be retained.

34. Some proponents of pooling of interests accounting support a restriction on the difference in size of combining interests because a significant sharing of risk cannot occur if one combining interest is minor or because a meaningful mutual exchange does not occur if the combination involves a relatively small number of shares. Most, however, believe that there is no conceptual basis for a size restriction and that establishing a size restriction would seriously impair pooling of interests accounting.

35. *Defects attributed to pooling of interests method.* Those who oppose the pooling of interests method of accounting doubt that the method is supported by a concept. In their view it has become essentially a method of accounting for an acquisition of a company without recognizing the current costs of the assets, including goodwill, underlying the transaction. The concept of a pooling of interests was described in general terms in the past—for example, as a continuity of equity interests or as a combination of two or more interests of comparable size. The descriptions tend to be contradictory. For example, accountants do not agree on whether or not relative size is part of the pooling of interests concept. Attempts to define the concept in terms of broad criteria for applying the method have also been unsuccessful.

36. Indeed, many opponents of the pooling of interests method of accounting believe that effective criteria cannot be found. The concept of a uniting or fusing of stockholder groups on which pooling of interests accounting is based implies a broad application of the method because every combination effected by issuing stock rather than by disbursing cash or incurring debt is potentially a pooling of interests unless the combination significantly changes the relative equity interests. However, so broad an application without effective criteria results in applying the pooling of interests method to numerous business combinations which are clearly in economic substance the acquisition of one company by another.

37. Some critics point out that the method was first applied to combining interests of comparable size and that pronouncements on business combinations have never sanctioned applying pooling of interests accounting to all or almost all business combinations effected by exchanging stock. All pronouncements have indicated that a large disparity in the size of the combining interests is evidence that one corporation is acquiring another.

38. Other criteria restricting application of pooling of interests accounting, such as those prohibiting future disposals of stock received and providing for continuity of management, were added to the size restriction. Those criteria have, however, tended to strengthen the view that one corporation acquires another because they are unilateral, that is, they are applied only to the stockholders and management of the "acquired" company.

39. The most serious defect attributed to pooling of interests accounting by those who oppose it is that it does not accurately reflect the economic substance of the business combination transaction. They believe that the method ignores the bargaining which results in the combination by accounting only for the amounts previously shown in accounts of the combining companies. The acquiring corporation does not record assets and values which usually influence the final terms of the combination agreement with consequent effects on subsequent balance sheets and income statements. The combined earnings streams, which are said to continue after a pooling of interests, can continue unchanged only if the cost of the assets producing those earnings is identical for the acquiring corporation and the acquired company. That coincidence rarely occurs because the bargaining is based on current values and not past costs.

40. Pooling of interests accounting is also challenged because the amount of assets acquired less liabilities assumed is recorded without regard to the number of shares of stock issued. The result does not reflect the presumption that a corporation issues stock only for value received and, in general, the greater the number of shares issued, the larger the consideration to be recorded.

41. Traditional principles of accounting for acquisitions of assets encompass all business combinations because every combination is effected by distributing assets, incurring liabilities, issuing stock, or some blend of the three. Those who oppose the pooling of interests method believe that a departure from the traditional principles is justified only if evidence shows that financial statements prepared according to other principles better reflect the economic significance of a combination. In their opinion, the characteristics of a business combination do not justify departing from traditional principles of accounting to accommodate the pooling of interests method.

## OPINION

### Applicability of Accounting Methods

42. The Board finds merit in both the purchase and pooling of interests methods of accounting for business combinations and accepts neither method to the exclusion of the other. The arguments in favor of the purchase method of accounting are more persuasive if cash or other assets are distributed or liabilities are incurred to effect a combination, but arguments in favor of the pooling of interests method of accounting are more persuasive if voting common stock is issued to effect a combination of common stock interests. Therefore, the Board concludes that some business combinations should be accounted for by the purchase method and other combinations should be accounted for by the pooling of interests method.

43. The Board also concludes that the two methods are not alternatives in accounting for the same business combination. A single method should be applied to an entire combination; the practice now known as part-purchase, part-pooling is not acceptable. The acquisition after the effective date of this Opinion of some or all of the stock held by minority stockholders of a subsidiary—whether acquired by the parent, the subsidiary itself, or another affiliate—should be accounted for by the purchase method rather than by the pooling of interests method.

44. The Board believes that accounting for business combinations will be improved significantly by specifying the circumstances in which each method should be applied and the procedures which should be followed in applying each method. The distinctive conditions which require pooling of interests

accounting are described in paragraphs 45 to 48, and combinations involving all of those conditions should be accounted for as described in paragraphs 50 to 65. All other business combinations should be treated as the acquisition of one company by another and accounted for by the purchase method as described in paragraphs 66 to 96.

*Conditions for Pooling of Interests Method*

45. The pooling of interests method of accounting is intended to present as a single interest two or more common stockholder interests which were previously independent and the combined rights and risks represented by those interests. That method shows that stockholder groups neither withdraw nor invest assets but in effect exchange voting common stock in a ratio that determines their respective interests in the combined corporation. Some business combinations have those features. A business combination which meets *all* of the conditions specified and explained in paragraphs 46 to 48 should be accounted for by the pooling of interests method. The conditions are classified by (1) attributes of the combining companies, (2) manner of combining interests, and (3) absence of planned transactions.

46. *Combining companies.* Certain attributes of combining companies indicate that independent ownership interests are combined in their entirety to continue previously separate operations. Combining virtually all of existing common stock interests avoids combining only selected assets, operations, or ownership interests, any of which is more akin to disposing of and acquiring interests than to sharing risks and rights. It also avoids combining interests that are already related by substantial intercorporate investments.

The two conditions in this paragraph define essential attributes of combining companies.

a. Each of the combining companies is autonomous and has not been a subsidiary or division of another corporation within two years before the plan of combination is initiated.

A plan of combination is initiated on the earlier of (1) the date that the major terms of a plan, including the ratio of exchange of stock, are announced publicly or otherwise formally made known to the stockholders of any one of the combining companies or (2) the date that stockholders of a combining company are notified in writing of an exchange offer. Therefore, a plan of combination is often initiated even though consummation is subject to the approval of stockholders and others.

A new company incorporated within the preceding two years meets this condition unless the company is successor to a part of a company or to a company that is otherwise not autonomous for this condition. A wholly owned subsidiary company which distributes voting common stock of its parent corporation to effect the combination is also considered an autonomous company provided the parent corporation would have met all conditions in paragraphs 46 to 48 had the parent corporation issued its stock directly to effect the combination.

Divestiture of assets to comply with an order of a governmental authority or judicial body results in an exception to the terms of this condition. Either a subsidiary divested under an order or a new company which acquires assets disposed of under an order is therefore autonomous for this condition.

b. Each of the combining companies is independent of the other combining companies.

This condition means that at the dates the plan of combination is initiated and consummated the combining companies hold as intercorporate investments no more than 10 percent in total of the outstanding voting common stock of any combining company.[4] For the percentage computation, intercorporate investments exclude voting common stock that is acquired after the date the plan of combination is initiated in exchange for the voting common stock issued to effect the combination. Investments of 10 percent or less are explained in paragraph 47-b.

47. *Combining of interests.* The combining of existing voting common stock interests by the exchange of stock is the essence of a business combination accounted for by the pooling of interests method. The separate stockholder interests lose their identities and all share mutually in the combined risks and rights. Exchanges of common stock that alter relative voting rights, that result in preferential claims to distributions of profits or assets for some common stockholder groups, or that leave significant minority interests in combining companies are incompatible with the idea of mutual sharing. Similarly, acquisitions of common stock for assets or debt, reacquisitions of outstanding stock for the purpose of exchanging it in a business combination, and other transactions that reduce the common stock interests are contrary to the idea of combining existing stockholder interests. The seven conditions in this paragraph relate to the exchange to effect the combination.

a. The combination is effected in a single transac-

[4] An exception for common stock held on October 31, 1970 is explained in paragraph 99.

tion or is completed in accordance with a specific plan within one year after the plan is initiated.

Altering the terms of exchange of stock constitutes initiation of a new plan of combination unless earlier exchanges of stock are adjusted to the new terms.[5]

A business combination completed in more than one year from the date the plan is initiated meets this condition if the delay is beyond the control of the combining companies because proceedings of a governmental authority or litigation prevents completing the combination.

b. A corporation offers and issues only common stock with rights identical to those of the majority of its outstanding voting common stock[6] in exchange for substantially all of the voting common stock interest of another company at the date the plan of combination is consummated.

The plan to issue voting common stock in exchange for voting common stock may include, within limits, provisions to distribute cash or other consideration for fractional shares, for shares held by dissenting stockholders, and the like but may not include a pro rata distribution of cash or other consideration.

Substantially all of the voting common stock means 90 percent or more for this condition. That is, after the date the plan of combination is initiated, one of the combining companies (issuing corporation) issues voting common stock in exchange for at least 90 percent of the voting common stock of another combining company that is outstanding at the date the combination is consummated. The number of shares exchanged therefore excludes those shares of the combining company (1) acquired before and held by the issuing corporation and its subsidiaries at the date the plan of combination is initiated, regardless of the form of consideration,[7] (2) acquired by the issuing corporation and its subsidiaries after the date the plan of combination is initiated other than by issuing its own voting common stock, and (3) outstanding after the date the combination is consummated.

*An investment in stock of the issuing corporation* held by a combining company may prevent a combination from meeting this condition even though the investment of the combining company is not more than 10 percent of the outstanding stock of the issuing corporation (paragraph 46-b). An investment in stock of the issuing corporation by another combining company is the same in a mutual exchange as an investment by the issuing corporation in stock of the other combining company—the choice of issuing corporation is essentially a matter of convenience. An investment in stock of the issuing corporation must be expressed as an equivalent number of shares of the investor combining company because the measure of percent of shares exchanged is in terms of shares of stock of the investor company. An investment in 10 percent or less of the outstanding voting common stock of the issuing corporation affects the measure of percent of shares exchanged in the combination as follows:

The number of shares of voting common stock of the issuing corporation held by the investor combining company at the date the plan is initiated plus shares it acquired after that date are restated as an equivalent number of shares of voting common stock of the investor combining company based on the ratio of exchange of stock in the combination.

The equivalent number of shares is deducted from the number of shares of voting common stock of the investor combining company exchanged for voting common stock of the issuing corporation as part of the plan of combination.

The reduced number of shares is considered the number exchanged and is compared with 90 percent of the outstanding voting common stock of the investor combining company at the date the plan is consummated to determine whether the terms of condition 47-b are met.

Since the number of shares of voting common stock exchanged is reduced for an intercorporate investment in voting common stock of the issuing corporation, the terms of condition 47-b may not be met even though 90 percent or more of the outstanding common stock of a combining company is exchanged to effect a combination.

*A combination of more than two companies* is evaluated essentially the same as a combination of two companies. The percent of voting common stock exchanged is measured separately for each combining company, and condition 47-b is met if 90 percent

[5]However, an adjustment after the effective date of this Opinion in the terms of exchange in a plan of combination initiated before and consummated after the effective date always constitutes initiation of a new plan. The one year specified in this condition is measured, therefore, from the date of adjustment of terms and all other conditions are evaluated for the new plan. (Paragraph 97 describes the application of this Opinion to a plan of combination initiated before the effective date of this Opinion and consummated later in accordance with the terms of exchange prevailing on the effective date.)

[6]A class of stock that has voting control of a corporation is the majority class.

[7]An exception for common stock held on October 31, 1970 is explained in paragraph 99.

or more of the voting common stock of each of the several combining companies is exchanged for voting common stock of the issuing corporation. The number of shares exchanged for stock of the issuing corporation includes only shares exchanged by stockholders other than the several combining companies themselves. Thus, intercorporate investments in combining companies are included in the number of shares of stock outstanding but are excluded from the number of shares of stock exchanged to effect the combination.

*A new corporation formed to issue its stock* to effect the combination of two or more companies meets condition 47-b if (1) the number of shares of each company exchanged to effect the combination is not less than 90 percent of its voting common stock outstanding at the date the combination is consummated and (2) condition 47-b would have been met had any one of the combining companies issued its stock to effect the combination on essentially the same basis.

*Condition 47-b relates to issuing common stock for the common stock interests in another company.* Hence, a corporation issuing stock to effect the combination may assume the debt securities of the other company or may exchange substantially identical securities or voting common stock for other outstanding equity and debt securities of the other combining company. An issuing corporation may also distribute cash to holders of debt and equity securities that either are callable or redeemable and may retire those securities. However, the issuing corporation may exchange only voting common stock for outstanding equity and debt securities of the other combining company that have been issued in exchange for voting common stock of that company during a period beginning two years preceding the date the combination is initiated.

*A transfer of the net assets of a combining company* to effect a business combination satisfies condition 47-b provided all net assets of the company at the date the plan is consummated are transferred in exchange for stock of the issuing corporation. However, the combining company may retain temporarily cash, receivables, or marketable securities to settle liabilities, contingencies, or items in dispute if the plan provides that the assets remaining after settlement are to be transferred to the corporation issuing the stock to effect the combination. Only voting common stock may be issued to effect the combination unless both voting common stock and other stock of the other combining company are outstanding at the date the plan is consummated. The combination may then be effected by issuing all voting common stock or by issuing voting common and other stock in the same proportions as the outstanding voting common and other stock of the other combining company. An investment in 10 percent or less of the outstanding voting common stock of a combining company held by another combining company requires special computations to evaluate condition 47-b. The computations and comparisons are in terms of the voting common stock of the issuing corporation and involve:

> *Stock issued for common stock interest.* The total number of shares of voting common stock issued for all of the assets[8] is divided between those applicable to outstanding voting common stock and those applicable to other outstanding stock, if any, of the combining company which transfers assets (transferor company).
>
> *Reduction for intercorporate investments.* The number of issued shares of voting common stock applicable to the voting common stock interests of the transferor combining company is reduced by the sum of (1) the number of shares of voting common stock of the issuing corporation held by the transferor combining company at the date the plan of combination is initiated plus shares it acquired after that date and (2) the number of shares of voting common stock of the transferor combining company held by the issuing corporation at the date the plan of combination is initiated plus shares it acquired after that date. The shares of the transferor combining company are restated as the equivalent number of shares of voting common stock of the issuing corporation for this purpose. Restatement is based on the ratio of the number of shares of voting common stock of the transferor combining company which are outstanding at the date the plan is consummated to the number of issued shares of voting common stock applicable to the voting common stock interests.

*Comparison with 90 percent.* The reduced number of shares of stock issued is compared with 90 percent of the issued number of shares of voting common stock applicable to voting common stock interests to determine if the transfer of assets meets the terms of condition 47-b.

c. None of the combining companies changes the equity interest of the voting common stock in contemplation of effecting the combination either within two years before the plan of combination is initiated or between the dates the combination is initiated and consummated; changes in contemplation of effecting the combination may include distributions to stockholders and additional issuances, exchanges, and retirements of securities.

[8]Including (for this computation) stock of the issuing corporation held by the transferor combining company.

Distributions to stockholders which are no greater than normal dividends are not changes for this condition. Normality of dividends is determined in relation to earnings during the period and to the previous dividend policy and record. Dividend distributions on stock of a combining company that are equivalent to normal dividends on the stock to be issued in exchange in the combination are considered normal for this condition.

d. Each of the combining companies reacquires shares of voting common stock only for purposes other than business combinations, and no company reacquires more than a normal number of shares between the dates the plan of combination is initiated and consummated.

Treasury stock acquired for purposes other than business combinations includes shares for stock option and compensation plans and other recurring distributions provided a systematic pattern of reacquisitions is established at least two years before the plan of combination is initiated. A systematic pattern of reacquisitions may be established for less than two years if it coincides with the adoption of a new stock option or compensation plan. The normal number of shares of voting common stock reacquired is determined by the pattern of reacquisitions of stock before the plan of combination is initiated.

Acquisitions by other combining companies of voting common stock of the issuing corporation after the date the plan of combination is initiated are essentially the same as if the issuing corporation reacquired its own common stock.

e. The ratio of the interest of an individual common stockholder to those of other common stockholders in a combining company remains the same as a result of the exchange of stock to effect the combination.

This condition means that each individual common stockholder who exchanges his stock receives a voting common stock interest exactly in proportion to his relative voting common stock interest before the combination is effected. Thus no common stockholder is denied or surrenders his potential share of a voting common stock interest in a combined corporation.

f. The voting rights to which the common stock ownership interests in the resulting combined corporation are entitled are exercisable by the stockholders; the stockholders are neither deprived of nor restricted in exercising those rights for a period.

This condition is not met, for example, if shares of common stock issued to effect the combination are transferred to a voting trust.

g. The combination is resolved at the date the plan is consummated and no provisions of the plan relating to the issue of securities or other consideration are pending.

This condition means that (1) the combined corporation does not agree to contingently issue additional shares of stock or distribute other consideration at a later date to the former stockholders of a combining company or (2) the combined corporation does not issue or distribute to an escrow agent common stock or other consideration which is to be either transferred to common stockholders or returned to the corporation at the time the contingency is resolved.

An agreement may provide, however, that the number of shares of common stock issued to effect the combination may be revised for the later settlement of a contingency at a different amount than that recorded by a combining company.

48. *Absence of planned transactions.* Some transactions after a combination is consummated are inconsistent with the combining of entire existing interests of common stockholders. Including those transactions in the negotiations and terms of the combination, either explicitly or by intent, counteracts the effect of combining stockholder interests. The three conditions in this paragraph relate to certain future transactions.

a. The combined corporation does not agree directly or indirectly to retire or reacquire all or part of the common stock issued to effect the combination.
b. The combined corporation does not enter into other financial arrangements for the benefit of the former stockholders of a combining company, such as a guaranty of loans secured by stock issued in the combination, which in effect negates the exchange of equity securities.
c. The combined corporation does not intend or plan to dispose of a significant part of the assets of the combining companies within two years after the combination other than disposals in the ordinary course of business of the formerly separate companies and to eliminate duplicate facilities or excess capacity.

*Subsidiary Corporation*

49. Dissolution of a combining company is not a condition for applying the pooling of interests method of accounting for a business combination. One or more combining companies may be subsidiaries of the issuing corporation after the combination is consummated if the other conditions are met.

**Application of Pooling of Interests Method**

50. A business combination which meets all of the

conditions in paragraphs 45 to 48 should be accounted for by the pooling of interests method. Appropriate procedures are described in paragraphs 51 to 65.

*Assets and Liabilities Combined*

51. The recorded assets and liabilities of the separate companies generally become the recorded assets and liabilities of the combined corporation. The combined corporation therefore recognizes those assets and liabilities recorded in conformity with generally accepted accounting principles by the separate companies at the date the combination is consummated.

52. The combined corporation records the historical-cost based amounts of the assets and liabilities of the separate companies because the existing basis of accounting continues. However, the separate companies may have recorded assets and liabilities under differing methods of accounting and the amounts may be adjusted to the same basis of accounting if the change would otherwise have been appropriate for the separate company. A change in accounting method to conform the individual methods should be applied retroactively, and financial statements presented for prior periods should be restated.

*Stockholders' Equity Combined*

53. The stockholders' equities of the separate companies are also combined as a part of the pooling of interests method of accounting. The combined corporation records as capital the capital stock and capital in excess of par or stated value of outstanding stock of the separate companies. Similarly, retained earnings or deficits of the separate companies are combined and recognized as retained earnings of the combined corporation (paragraph 56). The amount of outstanding shares of stock of the combined corporation at par or stated value may exceed the total amount of capital stock of the separate combining companies; the excess should be deducted first from the combined other contributed capital and then from the combined retained earnings. The combined retained earnings could be misleading if shortly before or as a part of the combination transaction one or more of the combining companies adjusted the elements of stockholders' equity to eliminate a deficit; therefore, the elements of equity before the adjustment should be combined.

54. A corporation which effects a combination accounted for by the pooling of interests method by distributing stock previously acquired as treasury stock (paragraph 47-d) should first account for those shares of stock as though retired. The issuance of the shares for the common stock interests of the combining company is then accounted for the same as the issuance of previously unissued shares.

55. Accounting for common stock of one of the combining companies which is held by another combining company at the date a combination is consummated depends on whether the stock is the same as that which is issued to effect the combination or is the same as the stock which is exchanged in the combination. An investment of a combining company in the common stock of the issuing corporation is in effect returned to the resulting combined corporation in the combination. The combined corporation should account for the investment as treasury stock. In contrast, an investment in the common stock of other combining companies (not the one issuing stock in the combination) is an investment in stock that is exchanged in the combination for the common stock issued. The stock in that type of intercorporate investment is in effect eliminated in the combination. The combined corporation should account for that investment as stock retired as part of the combination.

*Reporting Combined Operations*

56. A corporation which applies the pooling of interests method of accounting to a combination should report results of operations for the period in which the combination occurs as though the companies had been combined as of the beginning of the period. Results of operations for that period thus comprise those of the separate companies combined from the beginning of the period to the date the combination is consummated and those of the combined operations from that date to the end of the period. Eliminating the effects of intercompany transactions from operations before the date of combination reports operations before and after the date of combination on substantially the same basis. The effects of intercompany transactions on current assets, current liabilities, revenue, and cost of sales for periods presented and on retained earnings at the beginning of the periods presented should be eliminated to the extent possible. The nature of and effects on earnings per share of nonrecurring intercompany transactions involving long-term assets and liabilities need not be eliminated but should be disclosed. A combined corporation should disclose in notes to financial statements the revenue, extraordinary items, and net income of each of the separate companies from the beginning of the period to the date the combination is consummated (paragraph 64-d). The information relating to the separate companies may be as of the end of the interim period nearest the date that the combination is consummated.

57. Similarly, balance sheets and other financial information of the separate companies as of the

beginning of the period should be presented as though the companies had been combined at that date. Financial statements and financial information of the separate companies presented for prior years should also be restated on a combined basis to furnish comparative information. All restated financial statements and financial summaries should indicate clearly that financial data of the previously separate companies are combined.

*Expenses Related to Combination*

58. The pooling of interests method records neither the acquiring of assets nor the obtaining of capital. Therefore, costs incurred to effect a combination accounted for by that method and to integrate the continuing operations are expenses of the combined corporation rather than additions to assets or direct reductions of stockholders' equity. Accordingly, all expenses related to effecting a business combination accounted for by the pooling of interests method should be deducted in determining the net income of the resulting combined corporation for the period in which the expenses are incurred. Those expenses include, for example, registration fees, costs of furnishing information to stockholders, fees of finders and consultants, salaries and other expenses related to services of employees, and costs and losses of combining operations of the previously separate companies and instituting efficiencies.

*Disposition of Assets After Combination*

59. A combined corporation may dispose of those assets of the separate companies which are duplicate facilities or excess capacity in the combined operations. Losses or estimated losses on disposal of specifically identified duplicate or excess facilities should be deducted in determining the net income of the resulting combined corporation. However, a loss estimated and recorded while a facility remains in service should not include the portion of the cost that is properly allocable to anticipated future service of the facility.

60. Profit or loss on other dispositions of assets of the previously separate companies may require special disclosure unless the disposals are part of customary business activities of the combined corporation. Specific treatment of a profit or loss on those dispositions is warranted because the pooling of interests method of accounting would have been inappropriate (paragraph 48-c) if the combined corporation were committed or planned to dispose of a significant part of the assets of one of the combining companies. The Board concludes that a combined corporation should disclose separately a profit or loss resulting from the disposal of a significant part of the assets or a separable segment of the previously separate companies, provided

the profit or loss is material in relation to the net income of the combined corporation, and

the disposition is within two years after the combination is consummated.

The disclosed profit or loss, less applicable income tax effect, should be classified as an extraordinary item.

*Date of Recording Combination*

61. A business combination accounted for by the pooling of interests method should be recorded as of the date the combination is consummated. Therefore, even though a business combination is consummated before one or more of the combining companies first issues its financial statements as of an earlier date, the financial statements issued should be those of the combining company and not those of the resulting combined corporation. A combining company should, however, disclose as supplemental information, in notes to financial statements or otherwise, the substance of a combination consummated before financial statements are issued and the effects of the combination on reported financial position and results of operations (paragraph 65). Comparative financial statements presented in reports of the resulting combined corporation after a combination is consummated should combine earlier financial statements of the separate companies.

62. A corporation may be reasonably assured that a business combination which has been initiated but not consummated as of the date of financial statements will meet the conditions requiring the pooling of interests method of accounting. The corporation should record as an investment common stock of the other combining company acquired before the statement date. Common stock acquired by disbursing cash or other assets or by incurring liabilities should be recorded at cost. Stock acquired in exchange for common stock of the issuing corporation should, however, be recorded at the proportionate share of underlying net assets at the date acquired as recorded by the other company. Until the pooling of interests method of accounting for the combination is known to be appropriate, the investment and net income of the investor corporation should include the proportionate share of earnings or losses of the other company after the date of acquisition of the stock. The investor corporation should also disclose results of operations for all prior periods presented as well as the entire current period as they will be reported if the combination is later accounted for by the pooling of interests