method. After the combination is consummated and the applicable method of accounting is known, financial statements issued previously should be restated as necessary to include the other combining company.

*Disclosure of a Combination*

63. A combined corporation should disclose in its financial statements that a combination which is accounted for by the pooling of interests method has occurred during the period. The basis of current presentation and restatements of prior periods may be disclosed in the financial statements by captions or by references to notes.

64. Notes to financial statements of a combined corporation should disclose the following for the period in which a business combination occurs and is accounted for by the pooling of interests method.

a. Name and brief description of the companies combined, except a corporation whose name is carried forward to the combined corporation.
b. Method of accounting for the combination—that is, by the pooling of interests method.
c. Description and number of shares of stock issued in the business combination.
d. Details of the results of operations of the previously separate companies for the period before the combination is consummated that are included in the current combined net income (paragraph 56). The details should include revenue, extraordinary items, net income, other changes in stockholders' equity, and amount of and manner of accounting for intercompany transactions.
e. Descriptions of the nature of adjustments of net assets of the combining companies to adopt the same accounting practices and of the effects of the changes on net income reported previously by the separate companies and now presented in comparative financial statements (paragraph 52).
f. Details of an increase or decrease in retained earnings from changing the fiscal year of a combining company. The details should include at least revenue, expenses, extraordinary items, net income, and other changes in stockholders' equity for the period excluded from the reported results of operations.
g. Reconciliations of amounts of revenue and earnings previously reported by the corporation that issues the stock to effect the combination with the combined amounts currently presented in financial statements and summaries. A new corporation formed to effect a combination may instead disclose the earnings of the separate companies which comprise combined earnings for prior periods.

The information disclosed in notes to financial statements should also be furnished on a pro forma basis in information on a proposed business combination which is given to stockholders of combining companies.

65. Notes to the financial statements should disclose details of the effects of a business combination consummated before the financial statements are issued but which is either incomplete as of the date of the financial statements or initiated after that date (paragraph 61). The details should include revenue, net income, earnings per share, and the effects of anticipated changes in accounting methods as if the combination had been consummated at the date of the financial statements (paragraph 52).

**Application of Purchase Method**

*Principles of Historical-Cost Accounting*

66. Accounting for a business combination by the purchase method follows principles normally applicable under historical-cost accounting to recording acquisitions of assets and issuances of stock and to accounting for assets and liabilities after acquisition.

67. *Acquiring assets.* The general principles to apply the historical-cost basis of accounting to an acquisition of an asset depend on the nature of the transaction:

a. An asset acquired by exchanging cash or other assets is recorded at cost—that is, at the amount of cash disbursed or the fair value of other assets distributed.
b. An asset acquired by incurring liabilities is recorded at cost—that is, at the present value of the amounts to be paid.
c. An asset acquired by issuing shares of stock of the acquiring corporation is recorded at the fair value of the asset[9]—that is, shares of stock issued are recorded at the fair value of the consideration received for the stock.

The general principles must be supplemented to apply them in certain transactions. For example, the fair value of an asset received for stock issued may not be reliably determinable, or the fair value of an asset acquired in an exchange may be more reliably determinable than the fair value of a noncash asset given up. Restraints on measurement have led to the practical rule that assets acquired for other than cash, including shares of stock issued, should be stated at "cost" when they are acquired and "cost

[9] An asset acquired may be an entire entity which may have intangible assets, including goodwill.

may be determined either by the fair value of the consideration given or by the fair value of the property acquired, whichever is the more clearly evident."[10] "Cost" in accounting often means the amount at which an entity records an asset at the date it is acquired whatever its manner of acquisition, and that "cost" forms the basis for historical-cost accounting.

68. *Allocating cost.* Acquiring assets in groups requires not only ascertaining the cost of the assets as a group but also allocating the cost to the individual assets which comprise the group. The cost of a group is determined by the principles described in paragraph 67. A portion of the total cost is then assigned to each individual asset acquired on the basis of its fair value. A difference between the sum of the assigned costs of the tangible and identifiable intangible assets acquired less liabilities assumed and the cost of the group is evidence of unspecified intangible values.

69. *Accounting after acquisition.* The nature of an asset and not the manner of its acquisition determines an acquirer's subsequent accounting for the cost of that asset. The basis for measuring the cost of an asset—whether amount of cash paid, fair value of an asset received or given up, amount of a liability incurred, or fair value of stock issued—has no effect on the subsequent accounting for that cost, which is retained as an asset, depreciated, amortized, or otherwise matched with revenue.

*Acquiring Corporation*

70. A corporation which distributes cash or other assets or incurs liabilities to obtain the assets or stock of another company is clearly the acquirer. The identities of the acquirer and the acquired company are usually evident in a business combination effected by the issue of stock. The acquiring corporation normally issues the stock and commonly is the larger company. The acquired company may, however, survive as the corporate entity, and the nature of the negotiations sometimes clearly indicates that a smaller corporation acquires a larger company. The Board concludes that presumptive evidence of the acquiring corporation in combinations effected by an exchange of stock is obtained by identifying the former common stockholder interests of a combining company which either retain or receive the larger portion of the voting rights in the combined corporation. That corporation should be treated as the acquirer unless other evidence clearly indicates that another corporation is the acquirer. For example, a substantial investment of one company in common stock of another before the combination may be evidence that the investor is the acquiring corporation.

71. If a new corporation is formed to issue stock to effect a business combination to be accounted for by the purchase method, one of the existing combining companies should be considered the acquirer on the basis of the evidence available.

*Determining Cost of an Acquired Company*

72. The same accounting principles apply to determining the cost of assets acquired individually, those acquired in a group, and those acquired in a business combination. A cash payment by a corporation measures the cost of acquired assets less liabilities assumed. Similarly, the fair values of other assets distributed, such as marketable securities or properties, and the fair value of liabilities incurred by an acquiring corporation measure the cost of an acquired company. The present value of a debt security represents the fair value of the liability, and a premium or discount should be recorded for a debt security issued with an interest rate fixed materially above or below the effective rate or current yield for an otherwise comparable security.

73. The distinctive attributes of preferred stocks make some issues similar to a debt security while others possess common stock characteristics, with many gradations between the extremes. Determining cost of an acquired company may be affected by those characteristics. For example, the fair value of a nonvoting, nonconvertible preferred stock which lacks characteristics of common stock may be determined by comparing the specified dividend and redemption terms with comparable securities and by assessing market factors. Thus although the principle of recording the fair value of consideration received for stock issued applies to all equity securities, senior as well as common stock, the cost of a company acquired by issuing senior equity securities may be determined in practice on the same basis as for debt securities.

74. The fair value of securities traded in the market is normally more clearly evident than the fair value of an acquired company (paragraph 67). Thus, the quoted market price of an equity security issued to effect a business combination may usually be used to approximate the fair value of an acquired company after recognizing possible effects of price fluctuations, quantities traded, issue costs, and the like (paragraph 23). The market price for a reasonable period before and after the date the terms of the acquisition are agreed to and announced should be considered in determining the fair value of securities issued.

75. If the quoted market price is not the fair value of stock, either preferred or common, the consideration received should be estimated even though

[10] ARB No. 24; the substance was retained in slightly different words in Chapter 5 of ARB No. 43 and ARB No. 48.

measuring directly the fair values of assets received is difficult. Both the consideration received, including goodwill, and the extent of the adjustment of the quoted market price of the stock issued should be weighed to determine the amount to be recorded. All aspects of the acquisition, including the negotiations, should be studied, and independent appraisals may be used as an aid in determining the fair value of securities issued. Consideration other than stock distributed to effect an acquisition may provide evidence of the total fair value received.

76. *Costs of acquisition.* The cost of a company acquired in a business combination accounted for by the purchase method includes the direct costs of acquisition. Costs of registering and issuing equity securities are a reduction of the otherwise determinable fair value of the securities. However, indirect and general expenses related to acquisitions are deducted as incurred in determining net income.

*Contingent Consideration*

77. A business combination agreement may provide for the issuance of additional shares of a security or the transfer of cash or other consideration contingent on specified events or transactions in the future. Some agreements provide that a portion of the consideration be placed in escrow to be distributed or to be returned to the transferor when specified events occur. Either debt or equity securities may be placed in escrow, and amounts equal to interest or dividends on the securities during the contingency period may be paid to the escrow agent or to the potential security holder.

78. The Board concludes that cash and other assets distributed and securities issued unconditionally and amounts of contingent consideration which are determinable at the date of acquisition should be included in determining the cost of an acquired company and recorded at that date. Consideration which is issued or issuable at the expiration of the contingency period or which is held in escrow pending the outcome of the contingency should be disclosed but not recorded as a liability or shown as outstanding securities unless the outcome of the contingency is determinable beyond reasonable doubt.

79. Contingent consideration should usually be recorded when the contingency is resolved and consideration is issued or becomes issuable. In general, the issue of additional securities or distribution of other consideration at resolution of contingencies based on earnings should result in an additional element of cost of an acquired company. In contrast, the issue of additional securities or distribution of other consideration at resolution of contingencies based on security prices should not change the recorded cost of an acquired company.

80. *Contingency based on earnings.* Additional consideration may be contingent on maintaining or achieving specified earnings levels in future periods. When the contingency is resolved and additional consideration is distributable, the acquiring corporation should record the current fair value of the consideration issued or issuable as additional cost of the acquired company. The additional costs of affected assets, usually goodwill, should be amortized over the remaining life of the asset.

81. *Contingency based on security prices.* Additional consideration may be contingent on the market price of a specified security issued to effect a business combination. Unless the price of the security at least equals the specified amount on a specified date or dates, the acquiring corporation is required to issue additional equity or debt securities or transfer cash or other assets sufficient to make the current value of the total consideration equal to the specified amount. The securities issued unconditionally at the date the combination is consummated should be recorded at that date at the specified amount.

82. The cost of an acquired company recorded at the date of acquisition represents the entire payment, including contingent consideration. Therefore, the issuance of additional securities or distribution of other consideration does not affect the cost of the acquired company, regardless of whether the amount specified is a security price to be maintained or a higher security price to be achieved. On a later date when the contingency is resolved and additional consideration is distributable, the acquiring corporation should record the current fair value of the additional consideration issued or issuable. However, the amount previously recorded for securities issued at the date of acquisition should simultaneously be reduced to the lower current value of those securities. Reducing the value of debt securities previously issued to their later fair value results in recording a discount on debt securities. The discount should be amortized from the date the additional securities are issued.

83. Accounting for contingent consideration based on conditions other than those described should be inferred from the procedures outlined. For example, if the consideration contingently issuable depends on both future earnings and future security prices, additional cost of the acquired company should be recorded for the additional consideration contingent on earnings, and previously recorded consideration should be reduced to current value of the consideration contingent on security prices. Similarly, if the consideration contingently issuable depends on later settlement of a contingency, an increase in the cost of acquired assets, if any, should be amortized over the remaining life of the assets.

84. *Interest or dividends during contingency period.* Amounts paid to an escrow agent representing interest and dividends on securities held in escrow should be accounted for according to the accounting for the securities. That is, until the disposition of the securities in escrow is resolved, payments to the escrow agent should not be recorded as interest expense or dividend distributions. An amount equal to interest and dividends later distributed by the escrow agent to the former stockholders should be added to the cost of the acquired assets at the date distributed and amortized over the remaining life of the assets.

85. *Tax effect of imputed interest.* A tax reduction resulting from imputed interest on contingently issuable stock reduces the fair value recorded for contingent consideration based on earnings and increases additional capital recorded for contingent consideration based on security prices.

86. *Compensation in contingent agreements.* The substance of some agreements for contingent consideration is to provide compensation for services or use of property or profit sharing, and the additional consideration given should be accounted for as expenses of the appropriate periods.

*Recording Assets Acquired and Liabilities Assumed*

87. An acquiring corporation should allocate the cost of an acquired company to the assets acquired and liabilities assumed. Allocation should follow the principles described in paragraph 68.

> First, all identifiable assets acquired, either individually or by type, and liabilities assumed in a business combination, whether or not shown in the financial statements of the acquired company, should be assigned a portion of the cost of the acquired company, normally equal to their fair values at date of acquisition.
>
> Second, the excess of the cost of the acquired company over the sum of the amounts assigned to identifiable assets acquired less liabilities assumed should be recorded as goodwill. The sum of the market or appraisal values of identifiable assets acquired less liabilities assumed may sometimes exceed the cost of the acquired company. If so, the values otherwise assignable to noncurrent assets acquired (except long-term investments in marketable securities) should be reduced by a proportionate part of the excess to determine the assigned values. A deferred credit for an excess of assigned value of identifiable assets over cost of an acquired company (sometimes called "negative goodwill") should not be recorded unless those assets are reduced to zero value.

Independent appraisals may be used as an aid in determining the fair values of some assets and liabilities. Subsequent sales of assets may also provide evidence of values. The effect of taxes may be a factor in assigning amounts to identifiable assets and liabilities (paragraph 89).

88. General guides for assigning amounts to the individual assets acquired and liabilities assumed, except goodwill, are:

a. Marketable securities at current net realizable values.
b. Receivables at present values of amounts to be received determined at appropriate current interest rates, less allowances for uncollectibility and collection costs, if necessary.
c. Inventories:
   (1) Finished goods and merchandise at estimated selling prices less the sum of (a) costs of disposal and (b) a reasonable profit allowance for the selling effort of the acquiring corporation.
   (2) Work in process at estimated selling prices of finished goods less the sum of (a) costs to complete, (b) costs of disposal, and (c) a reasonable profit allowance for the completing and selling effort of the acquiring corporation based on profit for similar finished goods.
   (3) Raw materials at current replacement costs.
d. Plant and equipment: (1) to be used, at current replacement costs for similar capacity[11] unless the expected future use of the assets indicates a lower value to the acquirer, (2) to be sold or held for later sale rather than used, at current net realizable value, and (3) to be used temporarily, at current net realizable value recognizing future depreciation for the expected period of use.
e. Intangible assets which can be identified and named, including contracts, patents, franchises, customer and supplier lists, and favorable leases, at appraised values.[12]
f. Other assets, including land, natural resources, and nonmarketable securities, at appraised values.
g. Accounts and notes payable, long-term debt, and other claims payable at present values of amounts to be paid determined at appropriate current interest rates.
h. Liabilities and accruals—for example, accruals

[11] Replacement cost may be determined directly if a used asset market exists for the assets acquired. Otherwise, the replacement cost should be approximated from replacement cost new less estimated accumulated depreciation.

[12] Fair values should be ascribed to specific assets; identifiable assets should not be included in goodwill.

for pension cost,[13] warranties, vacation pay, deferred compensation—at present values of amounts to be paid determined at appropriate current interest rates.

i. Other liabilities and commitments, including unfavorable leases, contracts, and commitments and plant closing expense incident to the acquisition, at present values of amounts to be paid determined at appropriate current interest rates.

An acquiring corporation should record periodically as a part of income the accrual of interest on assets and liabilities recorded at acquisition date at the discounted values of amounts to be received or paid. An acquiring corporation should not record as a separate asset the goodwill previously recorded by an acquired company and should not record deferred income taxes recorded by an acquired company before its acquisition. An acquiring corporation should reduce the acquired goodwill retroactively for the realized tax benefits of loss carryforwards of an acquired company not previously recorded by the acquiring corporation.

89. The market or appraisal values of specific assets and liabilities determined in paragraph 88 may differ from the income tax bases of those items. Estimated future tax effects of differences between the tax bases and amounts otherwise appropriate to assign to an asset or a liability are one of the variables in estimating fair value. Amounts assigned to identifiable assets and liabilities should, for example, recognize that the fair value of an asset to an acquirer is less than its market or appraisal value if all or a portion of the market or appraisal value is not deductible for income taxes. The impact of tax effects on amounts assigned to individual assets and liabilities depends on numerous factors, including imminence or delay of realization of the asset value and the possible timing of tax consequences. Since differences between amounts assigned and tax bases are not timing differences (APB Opinion No. 11, *Accounting for Income Taxes*, paragraph 13), the acquiring corporation should not record deferred tax accounts at the date of acquisition.

*Amortization of Goodwill*

90. Goodwill recorded in a business combination accounted for by the purchase method should be amortized in accordance with the provisions in paragraphs 27 to 31 of APB Opinion No. 17, *Intangible Assets*.

*Excess of Acquired Net Assets Over Cost*

91. The value assigned to net assets acquired should not exceed the cost of an acquired company because the general presumption in historical-cost based accounting is that net assets acquired should be recorded at not more than cost. The total market or appraisal values of identifiable assets acquired less liabilities assumed in a few business combinations may exceed the cost of the acquired company. An excess over cost should be allocated to reduce proportionately the values assigned to noncurrent assets (except long-term investments in marketable securities) in determining their fair values (paragraph 87). If the allocation reduces the noncurrent assets to zero value, the remainder of the excess over cost should be classified as a deferred credit and should be amortized systematically to income over the period estimated to be benefited but not in excess of forty years. The method and period of amortization should be disclosed.

92. No part of the excess of acquired net assets over cost should be added directly to stockholders' equity at the date of acquisition.

*Acquisition Date*

93. The Board believes that the date of acquisition of a company should ordinarily be the date assets are received and other assets are given or securities are issued. However, the parties may for convenience designate as the effective date the end of an accounting period between the dates a business combination is initiated and consummated. The designated date should ordinarily be the date of acquisition for accounting purposes if a written agreement provides that effective control of the acquired company is transferred to the acquiring corporation on that date without restrictions except those required to protect the stockholders or other owners of the acquired company—for example, restrictions on significant changes in the operations, permission to pay dividends equal to those regularly paid before the effective date, and the like. Designating an effective date other than the date assets or securities are transferred requires adjusting the cost of an acquired company and net income otherwise reported to compensate for recognizing income before consideration is transferred. The cost of an acquired company and net income should therefore be reduced by imputed interest at an appropriate current rate on assets given, liabilities incurred, or preferred stock distributed as of the transfer date to acquire the company.

94. The cost of an acquired company and the values assigned to assets acquired and liabilities assumed should be determined as of the date of acquisition. The statement of income of an acquiring corpora-

[13] An accrual for pension cost should be the greater of (1) accrued pension cost computed in conformity with the accounting policies of the acquiring corporation for one or more of its pension plans or (2) the excess, if any, of the actuarially computed value of vested benefits over the amount of the pension fund.

tion for the period in which a business combination occurs should include income of the acquired company after the date of acquisition by including the revenue and expenses of the acquired operations based on the cost to the acquiring corporation.

*Disclosure in Financial Statements*

95. Notes to the financial statements of an acquiring corporation should disclose the following for the period in which a business combination occurs and is accounted for by the purchase method.

a. Name and a brief description of the acquired company.
b. Method of accounting for the combination—that is, by the purchase method.
c. Period for which results of operations of the acquired company are included in the income statement of the acquiring corporation.
d. Cost of the acquired company and, if applicable, the number of shares of stock issued or issuable, and the amount assigned to the issued and issuable shares.
e. Description of the plan for amortization of acquired goodwill, the amortization method, and period (APB Opinion No. 17, paragraphs 27 to 31).
f. Contingent payments, options, or commitments specified in the acquisition agreement and their proposed accounting treatment.

Information relating to several relatively minor acquisitions may be combined for disclosure.

96. Notes to the financial statements of the acquiring corporation for the period in which a business combination occurs and is accounted for by the purchase method should include as supplemental information the following results of operations on a pro forma basis:

a. Results of operations for the current period as though the companies had combined at the beginning of the period, unless the acquisition was at or near the beginning of the period.
b. Results of operations for the immediately preceding period as though the companies had combined at the beginning of that period if comparative financial statements are presented.

The supplemental pro forma information should as a minimum show revenue, income before extraordinary items, net income, and earnings per share. To present pro forma information, income taxes, interest expense, preferred stock dividends, depreciation and amortization of assets, including goodwill, should be adjusted to their accounting bases recognized in recording the combination. Pro forma presentation of results of operations of periods prior to the combination transaction should be limited to the immediately preceding period.

## EFFECTIVE DATE

97. The provisions of this Opinion shall be effective to account for business combinations initiated[14] after October 31, 1970. Business combinations initiated before November 1, 1970 and consummated on or after that date under the terms prevailing on October 31, 1970 (paragraph 47-a) may be accounted for in accordance with this Opinion or the applicable previous pronouncements of the Board and its predecessor committee.

98. The provisions of this Opinion should not be applied retroactively for business combinations consummated before November 1, 1970.

99. If a corporation holds as an investment on October 31, 1970 a minority interest in or exactly 50 percent of the common stock of another company and the corporation initiates after October 31, 1970 a plan of combination with that company, the resulting business combination may be accounted for by the pooling of interests method provided

the combination is completed within five years after October 31, 1970 and

the combination meets all conditions specified in paragraphs 45 to 48, except that

(i) the minority interest in the voting common stock of the combining company held on October 31, 1970 may exceed 10 percent of the outstanding voting common stock of the combining company (paragraph 46-b), and

(ii) the corporation which effects the combination issues voting common stock for at least 90 percent of the outstanding voting common stock interest, as described in paragraph 47-b, of the other combining company not already held on October 31, 1970 (rather than 90 percent of all of the common stock interest of the combining company).

The investment in common stock held on October 31, 1970 should not be accounted for as treasury stock or retired stock at the date of the combination. Instead, the excess of cost over the investor corporation's proportionate equity in the net assets of the combining company at or near the date the stock investment was acquired should be allocated to identifiable assets of the combining company at the

[14] Initiated is defined in paragraph 46-a whether the combination is accounted for by the pooling of interests method or by the purchase method.

date the combination is consummated on the basis of the fair values of those assets at the combination date. The unallocated portion of the excess should be assigned to an unidentified intangible asset (goodwill) and should be accounted for according to applicable previous pronouncements of the Board and its predecessor committee. The cost of goodwill should not be amortized retroactively but may be amortized prospectively under the provision of APB Opinion No. 17, paragraph 35. If the cost of the investment is less than the investor's equity in the net assets of the combining company, that difference should reduce proportionately the recorded amounts of noncurrent assets (except long-term investments in marketable securities) of the combining company.

*The Opinion entitled "Business Combinations" was adopted by the assenting votes of twelve members of the Board. Messrs. Broeker, Burger, Davidson, Horngren, Seidman, and Weston dissented.*

Messrs. Broeker, Burger, and Weston dissent to issuance of this Opinion because they believe that it is not a sound or logical solution of the problem of accounting for business combinations. They believe that, except for combinations of companies whose relative size is such as to indicate a significant sharing of ownership risks and benefits, business combinations represent the acquisition or purchase of one company by another and that accounting should reflect that fact. While they agree that the criteria specified in this Opinion for the pooling of interests method represent, in most cases, an improvement over present criteria in practice, this action does not, in their opinion, represent a substantive response by the Accounting Principles Board to the overall problem.

Messrs. Davidson, Horngren, and Seidman dissent to the Opinion because it seeks to patch up some of the abuses of pooling. The real abuse is pooling itself. On that, the only answer is to eliminate pooling. Paragraphs 35 to 41 set forth some of the defects of pooling. The fundamental one is that pooling ignores the asset values on which the parties have traded, and substitutes a wholly irrelevant figure—the amount on the seller's books. Such nonaccounting for bargained acquisition values permits the reporting of profits upon subsequent disposition of such assets when there really may be less profit or perhaps a loss. Had the assets been acquired from the seller for cash, the buyer's cost would be the amount of the cash. Acquisition for stock should make no difference. The accounting essence is the amount of consideration, not its nature. Payment in cash or stock can be a matter of form, not substance. Suppose the seller wants cash. The buyer can first sell stock and turn over the proceeds to the seller, or the seller can take stock and promptly sell the stock for cash.

The following deal with some arguments made in the Opinion for pooling: (1) Pooling is described in paragraph 28 as a fusion resulting from "pooling equity interests". But it is the sort of fusion where a significant exchange transaction takes place. The seller parts with control over its assets and operations. In return the buyer issues stock representing an interest in its assets and operations. That interest has value and is a measure of the cost of the acquisition to the buyer. (2) Paragraph 29 declares that pooling is really a transaction among the stockholders. That just is not the fact. The buyer is always a company. (3) Paragraph 25 decries purchase accounting because it results in a write-up of only seller's assets. There is no write-up. There is only a recording of cost to the buyer. That cost is measured by the value of the assets acquired from the seller. (4) Pooling is said to avoid the difficulty of valuing assets or stock (paragraph 22). Difficulty of valuation should not be permitted to defeat fair presentation. Besides, the parties do determine values in their bargaining for the amount of stock to be issued.

Some say that to eliminate pooling will impede mergers. Mergers were prevalent before pooling, and will continue after. Accounting does not exist to aid or discourage mergers, but to account for them fairly. Elimination of pooling will remove the confusion that comes from the coexistence of pooling and purchase accounting. Above all, the elimination of pooling would remove an aberration in historical-cost accounting that permits an acquisition to be accounted for on the basis of the seller's cost rather than the buyer's cost of the assets obtained in a bargained exchange.

## NOTES

*Opinions of the Accounting Principles Board present the conclusions of at least two-thirds of the members of the Board, which is the senior technical body of the Institute authorized to issue pronouncements on accounting principles.*

*Board Opinions are considered appropriate in all circumstances covered but need not be applied to immaterial items.*

*Covering all possible conditions and circumstances in an Opinion of the Accounting Principles Board is usually impracticable. The substance of transactions and the principles, guides, rules, and criteria described in Opinions should control the accounting for transactions not expressly covered.*

*Unless otherwise stated, Opinions of the Board are not intended to be retroactive.*

*Council of the Institute has resolved that Institute members should disclose departures from Board Opinions in their reports as independent auditors when the effect of the departures on the financial*

*statements is material or see to it that such departures are disclosed in notes to the financial statements and, where practicable, should disclose their effects on the financial statements (Special Bulletin,* Disclosure of Departures from Opinions of the Accounting Principles Board, *October 1964). Members of the Institute must assume the burden of justifying any such departures.*

Accounting Principles Board (1970)

LeRoy Layton, *Chairman*
Kenneth S. Axelson
Donald J. Bevis
Milton M. Broeker
Leo E. Burger
George R. Catlett
Joseph P. Cummings
Sidney Davidson
Philip L. Defliese
Newman T. Halvorson
Robert Hampton, III
Emmett S. Harrington
Charles B. Hellerson
Charles T. Horngren
Oral L. Luper
J. S. Seidman
George C. Watt
Frank T. Weston

# APB Opinion No. 17
# Intangible Assets

## STATUS

Issued: August 1970

Effective Date: For intangible assets acquired after October 31, 1970

Affects: Supersedes prospectively ARB 43, Chapter 5, paragraphs 1 through 9
Supersedes APB 6, paragraph 15

Affected by: Paragraph 6 amended by FAS 2
Paragraph 7 superseded by FAS 71
Paragraphs 29 through 31 amended by FAS 72
Paragraph 30 amended by FAS 96 and FAS 109
Paragraph 31 amended by APB 30 and FAS 121

Other Interpretive Pronouncements: AIN-APB 17, Interpretations No. 1 and 2
FIN 9

# APB Opinion No. 17
# Intangible Assets

CONTENTS


| | Paragraph Numbers |
|---|---|
| Summary | 1–9 |
| Problem | 1–3 |
| Scope and Effect of Opinion | 4–8 |
| Conclusions | 9 |
| Background | 10–23 |
| Bases of Classification | 10 |
| Present Accounting | 11–14 |
| Accounting for Costs at Acquisition | 11 |
| Accounting for Deferred Costs After Acquisition | 12–13 |
| Criticism of Present Practice | 14 |
| Appraisal of Alternative Procedures | 15–23 |
| Cost of Intangible Assets | 15 |
| Treatment of Costs | 16–20 |
| Arguments for nonamortization | 18–20 |
| Accounting on the Historical-Cost Basis | 21–22 |
| A Practical Solution | 23 |
| Opinion | 24–32 |
| Acquisition of Intangible Assets | 24–26 |
| Cost of intangible assets | 25–26 |
| Amortization of Intangible Assets | 27–31 |
| Method of amortization | 30 |
| Subsequent review of amortization | 31 |
| Disposal of Goodwill | 32 |
| Effective Date | 33–35 |


## SUMMARY

### Problem

1. An enterprise may acquire intangible assets from others or may develop them itself. Many kinds of intangible assets may be identified and given reasonably descriptive names, for example, patents, franchises, trademarks, and the like. Other types of intangible assets lack specific identifiability. Both identifiable and unidentifiable assets may be developed internally. Identifiable intangible assets may be acquired singly, as a part of a group of assets, or as part of an entire enterprise, but unidentifiable assets cannot be acquired singly. The excess of the cost of an acquired company over the sum of identifiable net assets, usually called goodwill, is the most common unidentifiable intangible asset.

2. Accounting for an intangible asset involves the same kinds of problems as accounting for other long-lived assets, namely, determining an initial carrying amount, accounting for that amount after acquisition under normal business conditions (amortization), and accounting for that amount if the value declines substantially and permanently. Solving the problems is complicated by the characteristics of an intangible asset: its lack of physical qualities makes evidence of its existence elusive, its value is often difficult to estimate, and its useful life may be indeterminable.

3. The Director of Accounting Research of the American Institute of Certified Public Accountants has published Accounting Research Study No. 10, *Accounting for Goodwill*, by George R. Catlett and Norman O. Olson.[1] The study emphasizes accounting for goodwill acquired in a business combination but also discusses accounting for goodwill developed internally. The study cites the supporting authoritative pronouncements and their influences on accounting practices and evaluates the effects of practices on financial reporting.

### Scope and Effect of Opinion

4. The Board has considered the conclusions and

[1] Accounting research studies are not pronouncements of the Board or of the Institute but are published for the purpose of stimulating discussion on important accounting matters.

recommendations of Accounting Research Study No. 10, the discussions of the appropriateness of accepted methods of accounting for intangible assets, and proposals for alternative accounting procedures. The Board expresses in this Opinion its conclusions on accounting for intangible assets.

5. This Opinion covers the accounting for both identifiable and unidentifiable intangible assets that a company acquires, including those acquired in business combinations. "Company" in this Opinion refers to both incorporated and unincorporated enterprises. The conclusions of the Opinion apply to intangible assets recorded, if any, on the acquisition of some or all of the stock held by minority stockholders of a subsidiary company. This Opinion also covers accounting for costs of developing goodwill and other unidentifiable intangible assets with indeterminate lives.

6. The provisions of this Opinion apply to costs of developing identifiable intangible assets that a company defers and records as assets. Some companies defer costs incurred to develop identifiable intangible assets while others record the costs as expenses as incurred. Certain costs, for example, [redacted] preoperating costs, present problems which need to be studied separately. The question of deferral of those costs is beyond the scope of this Opinion.

[redacted]

8. The conclusions of this Opinion modify previous views of the Board and its predecessor, the Committee on Accounting Procedure. This Opinion therefore supersedes the following Accounting Research Bulletin (ARB) and Opinion of the Accounting Principles Board (APB):

ARB No. 43, Chapter 5, *Intangible Assets*, except paragraph 10 which is superseded by APB Opinion No. 16, *Business Combinations*.

APB Opinion No. 6, *Status of Accounting Research Bulletins*, paragraph 15.

**onclusions**

The Board concludes that a company should cord as assets the costs of intangible assets quired from others, including goodwill acquired a business combination. A company should cord as expenses the costs to develop intangible ets which are not specifically identifiable. The ard also concludes that the cost of each type of angible asset should be amortized by systematic charges to income over the period estimated to be benefited. The period of amortization should not, however, exceed forty years.

**BACKGROUND**

**Bases of Classification**

10. Various intangible assets differ in their characteristics, their useful lives, their relations to operations, and their later dispositions. Intangible assets may be classified on several different bases:

Identifiability—separately identifiable or lacking specific identification.

Manner of acquisition—acquired singly, in groups, or in business combinations or developed internally.

Expected period of benefit—limited by law or contract, related to human or economic factors, or indefinite or indeterminate duration.

Separability from an entire enterprise—rights transferable without title, salable, or inseparable from the enterprise or a substantial part of it.

**Present Accounting**

*Accounting for Costs at Acquisition*

11. Present principles of accounting for intangible assets are generally similar to those for tangible, long-lived assets such as property, plant, and equipment. Intangible assets acquired from other entities are recorded at cost when acquired. Costs incurred to develop specifically identifiable intangible assets are often recorded as assets if the periods of expected future benefit are reasonably determinable. Costs of developing other intangible assets are usually recorded as expenses when incurred.

*Accounting for Deferred Costs After Acquisition*

12. Intangible assets have been divided into two classes for purposes of accounting for their costs: (a) those with a determinable term of existence because it is limited by law, regulation, or agreement, or by the nature of the asset, and (b) those having no limited term of existence and no indication of limited life at the time of acquisition. The cost of a type (a) intangible asset is amortized by systematic charges to income over the term of existence or other period expected to be benefited. The cost of a type (b) intangible asset may be treated in either of two ways: (1) the cost may be retained until a limit on the term of existence or a loss of value is evident, at which time the cost is amortized systematically over the estimated remaining term of existence or, if

worthless, written off as an extraordinary item in the income statement, or (2) the cost may be amortized at the discretion of management by charges to income even though no present evidence points to a limited term of existence or a loss of value.

13. The cost of an intangible asset, including goodwill acquired in a business combination, may not be written off as a lump sum to capital surplus or to retained earnings nor be reduced to a nominal amount at or immediately after acquisition (ARB No. 43, Chapter 5, and APB Opinion No. 9).

*Criticism of Present Practice*

14. Present accounting for goodwill and other unidentifiable intangible assets is often criticized because alternative methods of accounting for costs are acceptable. Some companies amortize the cost of acquired intangible assets over a short arbitrary period to reduce the amount of the asset as rapidly as practicable, while others retain the cost as an asset until evidence shows a loss of value and then record a material reduction in a single period. Selecting an arbitrary period of amortization is criticized because it may understate net income during the amortization period and overstate later net income. Retaining the cost as an asset is criticized because it may overstate net income before the loss of value is recognized and understate net income in the period of write-off.

**Appraisal of Alternative Procedures**

*Cost of Intangible Assets*

15. The cost of intangible assets acquired either singly or in groups, including intangible assets acquired in a business combination, from other businesses or individuals is determined by general principles of the historical-cost basis of accounting. The costs of developing goodwill and other intangible assets with indeterminate lives are ordinarily not distinguishable from the current costs of operations and are thus not assignable to specific assets.

*Treatment of Costs*

16. Costs of intangible assets which have fixed or reasonably determinable terms of existence are now amortized by systematic charges to income over their terms of existence. Differences of opinion center on the amortization of acquired intangible assets with lives which cannot be estimated reliably either at the date of acquisition or perhaps long after, for example, goodwill and trade names.

17. The literature on business combinations and goodwill, including Accounting Research Study No. 10, *Accounting for Goodwill*, contains at least four possible accounting treatments of goodwill and similar intangible assets:

a. Retain the cost as an asset indefinitely unless a reduction in its value becomes evident.
b. Retain the cost as an asset but permit amortization as an operating expense over an arbitrary period.
c. Retain the cost as an asset but require amortization as an operating expense over its estimated limited life or over an arbitrary but specified maximum and minimum period.
d. Deduct the cost from stockholders' equity at the date acquired.

18. *Arguments for nonamortization.* The two of the four accounting proposals which do not involve amortization of goodwill as an operating expense are based in part on the contention that goodwill value is not consumed or used to produce earnings in the same manner as various property rights, and therefore net income should not be reduced by amortization of goodwill. Further, net income should not be reduced by both amortization of goodwill and current expenditures that are incurred to enhance or maintain the value of the acquired intangible assets. All methods of amortizing goodwill are criticized as arbitrary because the life of goodwill is indefinite and an estimated period of existence is not measurable.

19. The basis for proposing that the cost of goodwill be retained as an asset until a loss in value becomes evident is that the cost incurred for acquired goodwill should be accounted for as an asset at the date acquired and in later periods. The cost should not be reduced as long as the value of the asset is at least equal to that cost.

20. The basis for proposing that the cost of goodwill be deducted from stockholders' equity at the date acquired is that the nature of goodwill differs from other assets and warrants special accounting treatment. Since goodwill attaches only to a business as a whole and its value fluctuates widely for innumerable reasons, estimates of either the terms of existence or current value are unreliable for purposes of income determination.

*Accounting on the Historical-Cost Basis*

21. All assets which are represented by deferred costs are essentially alike in historical-cost based accounting. They result from expenditures or owners' contributions and are expected to increase revenue or reduce costs to be incurred in future periods. If future benefit or the period to be benefited is questionable, the expenditure is usually treated as a current expense and not as a deferred cost. Associating deferred costs with the revenue or

period to which they are expected to relate is a basic problem in historical-cost based accounting both in measuring periodic income and in accounting for assets. The basic accounting treatment does not depend on whether the asset is a building, a piece of equipment, an element of inventory, a prepaid insurance premium, or whether it is tangible or intangible. The cost of goodwill and similar intangible assets is therefore essentially the same as the cost of land, buildings, or equipment under historical-cost based accounting. Deducting the cost of an asset from stockholders' equity (either retained earnings or capital in excess of par or stated value) at the date incurred does not match costs with revenue.

22. Accounting for the cost of a long-lived asset after acquisition normally depends on its estimated life. The cost of assets with perpetual existence, such as land, is carried forward as an asset without amortization, and the cost of assets with finite lives is amortized by systematic charges to income. Goodwill and similar intangible assets do not clearly fit either classification; their lives are neither infinite nor specifically limited, but are indeterminate. Thus, although the principles underlying present practice conform to the principles of accounting for similar types of assets, their applications have led to alternative treatments. Amortizing the cost of goodwill and similar intangible assets on arbitrary bases in the absence of evidence of limited lives or decreased values may recognize expenses and decreases of assets prematurely, but delaying amortization of the cost until a loss is evident may recognize the decreases after the fact.

*A Practical Solution*

23. A solution to this dilemma is to set minimum and maximum amortization periods. This accounting follows from the observation that few, if any, intangible assets last forever, although some may seem to last almost indefinitely. Allocating the cost of goodwill or other intangible assets with an indeterminate life over time is necessary because the value almost inevitably becomes zero at some future date. Since the date at which the value becomes zero is indeterminate, the end of the useful life must necessarily be set arbitrarily at some point or within some range of time for accounting purposes.

## OPINION

**Acquisition of Intangible Assets**

24. The Board concludes that a company should record as assets the costs of intangible assets acquired from other enterprises or individuals. Costs of developing, maintaining, or restoring intangible assets which are not specifically identifiable, have indeterminate lives, or are inherent in a continuing business and related to an enterprise as a whole—such as goodwill—should be deducted from income when incurred.

25. *Cost of intangible assets.* Intangible assets acquired singly should be recorded at cost at date of acquisition. Cost is measured by the amount of cash disbursed, the fair value of other assets distributed, the present value of amounts to be paid for liabilities incurred, or the fair value of consideration received for stock issued as described in paragraph 67 of APB Opinion No. 16.

26. Intangible assets acquired as part of a group of assets or as part of an acquired company should also be recorded at cost at date of acquisition. Cost is measured differently for specifically identifiable intangible assets and those lacking specific identification. The cost of identifiable intangible assets is an assigned part of the total cost of the group of assets or enterprise acquired, normally based on the fair values of the individual assets. The cost of unidentifiable intangible assets is measured by the difference between the cost of the group of assets or enterprise acquired and the sum of the assigned costs of individual tangible and identifiable intangible assets acquired less liabilities assumed. Cost should be assigned to all specifically identifiable intangible assets; cost of identifiable assets should not be included in goodwill. Principles and procedures of determining cost of assets acquired, including intangible assets, are discussed in detail in paragraphs 66 to 89 of APB Opinion No. 16, *Business Combinations.*

**Amortization of Intangible Assets**

27. The Board believes that the value of intangible assets at any one date eventually disappears and that the recorded costs of intangible assets should be amortized by systematic charges to income over the periods estimated to be benefited. Factors which should be considered in estimating the useful lives of intangible assets include:

a. Legal, regulatory, or contractual provisions may limit the maximum useful life.
b. Provisions for renewal or extension may alter a specified limit on useful life.
c. Effects of obsolescence, demand, competition, and other economic factors may reduce a useful life.
d. A useful life may parallel the service life expectancies of individuals or groups of employees.
e. Expected actions of competitors and others may restrict present competitive advantages.
f. An apparently unlimited useful life may in fact be indefinite and benefits cannot be reasonably projected.

g. An intangible asset may be a composite of many individual factors with varying effective lives.

The period of amortization of intangible assets should be determined from the pertinent factors.

28. The cost of each type of intangible asset should be amortized on the basis of the estimated life of that specific asset and should not be written off in the period of acquisition. Analysis of all factors should result in a reasonable estimate of the useful life of most intangible assets. A reasonable estimate of the useful life may often be based on upper and lower limits even though a fixed existence is not determinable.

29. The period of amortization should not, however, exceed forty years. Analysis at the time of acquisition may indicate that the indeterminate lives of some intangible assets are likely to exceed forty years and the cost of those assets should be amortized over the maximum period of forty years, not an arbitrary shorter period.

30. *Method of amortization.* The Board concludes that the straight-line method of amortization—equal annual amounts—should be applied unless a company demonstrates that another systematic method is more appropriate. The financial statements should disclose the method and period of amortization. Amortization of acquired goodwill and of other acquired intangible assets not deductible in computing income taxes payable does not create a timing difference, and allocation of income taxes is inappropriate.

31. *Subsequent review of amortization.* A company should evaluate the periods of amortization continually to determine whether later events and circumstances warrant revised estimates of useful lives. If estimates are changed, the unamortized cost should be allocated to the increased or reduced number of remaining periods in the revised useful life but not to exceed forty years after acquisition. Estimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income (APB Opinion No. 9, paragraph 21). However, a single loss year or even a few loss years together do not necessarily justify an extraordinary charge to income for all or a large part of the unamortized cost of intangible assets. The reason for an extraordinary deduction should be disclosed.

**Disposal of Goodwill**

32. Ordinarily goodwill and similar intangible assets cannot be disposed of apart from the enterprise as a whole. However, a large segment or separable group of assets of an acquired company or the entire acquired company may be sold or otherwise liquidated, and all or a portion of the unamortized cost of the goodwill recognized in the acquisition should be included in the cost of the assets sold.

**EFFECTIVE DATE**

33. The provisions of this Opinion shall be effective to account for intangible assets acquired after October 31, 1970. Intangible assets recognized in business combinations initiated before November 1, 1970 and consummated on or after that date under the terms prevailing on October 31, 1970[2] may be accounted for in accordance with this Opinion or Chapter 5 of ARB No. 43 and APB Opinion No. 9.

34. The provisions of this Opinion should not be applied retroactively to intangible assets acquired before November 1, 1970, whether in business combinations or otherwise.

35. The Board encourages the application on a prospective basis to all intangible assets held on October 31, 1970 of the provisions in paragraphs 27 to 31 of this Opinion which require amortization of all intangible assets. Unless the provisions of this Opinion are applied prospectively, the accounting for intangible assets held on October 31, 1970 should be in accordance with Chapter 5 of ARB No. 43 as modified by APB Opinion No. 9.

*The Opinion entitled "Intangible Assets" was adopted by the assenting votes of thirteen members of the Board. Messrs. Burger, Catlett, Davidson, Hellerson, and Horngren dissented.*

Mr. Catlett dissents to this Opinion because he believes that goodwill should never be shown as an asset in the balance sheet and should never be amortized as a charge to income. In his view, goodwill, regardless of the form of consideration paid for it, reflects values brought about by investor expectations attributable to a multitude of factors. Such values fluctuate frequently and widely, and the changes do not occur in any rational, predictable manner. Thus, there is no continuing relationship between the value of goodwill and its cost. Goodwill does not have a demonstrable useful life; and its expiration, if any, cannot be related on any logical basis to the operating revenues of particular periods. If goodwill values from an earlier date and for only a portion of a combined company, and the arbitrary

[2] Paragraphs 46-a and 47-a of APB Opinion No. 16, *Business Combinations*, define date initiated and describe the effect of changes in terms of a plan of combination.

amortization of such values, are reflected in financial statements, an unwarranted responsibility is placed upon investors to make proper allowance for this misstatement of assets and distortion of earnings in appraising the earning power and the value of the combined company, including all of its goodwill, on a current basis. Mr. Catlett believes that the lack of recognition by the Accounting Principles Board of the true nature of goodwill, as discussed in Accounting Research Study No. 10, has resulted in conclusions which adversely affect the development of sound accounting principles far beyond the accounting for goodwill. He also believes this Opinion demonstrates in a dramatic manner the urgent need for the Accounting Principles Board to define clearly the objectives of financial statements if it is to deal successfully with basic accounting problems.

Messrs. Burger, Davidson, Hellerson, and Horngren dissent to the required amortization of goodwill and other intangible assets (for example, perpetual franchises) having indeterminate lives. Whether amortization is appropriate depends on the particular circumstances of each case, including the evidence of increases or decreases in the value of such assets. In some cases, the facts may indicate maintenance or enhancement rather than diminution of value of the intangibles. In such cases, amortization is inappropriate. In other cases, the useful life may be determinable; then the cost should be amortized by systematic charges to income over the estimated period of usefulness. In all cases, the amortization of intangible assets should be based on professional judgment, rather than arbitrary rules.

**NOTES**

*Opinions of the Accounting Principles Board present the conclusions of at least two-thirds of the members of the Board, which is the senior technical body of the Institute authorized to issue pronouncements on accounting principles.*

*Board Opinions are considered appropriate in all circumstances covered but need not be applied to immaterial items.*

*Covering all possible conditions and circumstances in an Opinion of the Accounting Principles Board is usually impracticable. The substance of transactions and the principles, guides, rules, and criteria described in Opinions should control the accounting for transactions not expressly covered.*

*Unless otherwise stated, Opinions of the Board are not intended to be retroactive.*

*Council of the Institute has resolved that Institute members should disclose departures from Board Opinions in their reports as independent auditors when the effect of the departures on the financial statements is material or see to it that such departures are disclosed in notes to the financial statements and, where practicable, should disclose their effects on the financial statements. (Special Bulletin,* Disclosure of Departures from Opinions of the Accounting Principles Board, *October 1964). Members of the Institute must assume the burden of justifying any such departures.*

**Accounting Principles Board (1970)**

LeRoy Layton, *Chairman*
Kenneth S. Axelson
Donald J. Bevis
Milton M. Broeker
Leo E. Burger
George R. Catlett
Joseph P. Cummings
Sidney Davidson
Philip L. Defliese
Newman T. Halvorson
Robert Hampton, III
Emmett S. Harrington
Charles B. Hellerson
Charles T. Horngren
Oral L. Luper
J. S. Seidman
George C. Watt
Frank T. Weston

24

# ASSISTANCE AGREEMENT

between

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

and

CARTERET SAVINGS AND LOAN ASSOCIATION, F.A.

NEWARK, NEW JERSEY

ASSISTANCE AGREEMENT

TABLE OF CONTENTS


§ 1 Definitions....2
- (a) Book Value....2
- (b) Covered Asset....4
- (c) Credit/Credit Item....5
- (d) Debit/Debit Item....5
- (e) Effective Date....5
- (f) Foreclosure....5
- (g) Inital Audit....5
- (h) Insurance Regulations....6
- (i) Liquidation....6
- (j) Merger....6
- (k) Mortgage....6
- (l) Net Proceeds Received....6
- (m) Real Estate Owned (REO)....7
- (n) Special Reserve Account....7

§ 2 Special Reserve Account....7
- (a) Establishment....7
- (b) Opening Balance....7
- (c) Debits....7
- (d) Exclusions from Debits....10
- (e) Credits....11

§ 3 Inventory and Initial Audit....15
§ 4 Contributions....16
§ 5 Reports, Records, and Audits....18
§ 6 Covenants of the RESULTING ASSOCIATION....20
§ 7 Representations and Warranties....25
§ 8 Sale and Repair of Real Estate Owned....25
§ 9 Foreclosures....28
§ 10 Corporation's Right to Purchase Covered Assets; Assignments....31
§ 11 Termination of Agreement....32
§ 12 Instruments of Sale and Assignment....33
§ 13 Accounting Principles....34
§ 14 Conditions....34
§ 15 Notices....35
§ 16 Rights and Forbearance....36
§ 17 Entire Agreement, Modification, Headings....36
§ 18 Counterparts....37
§ 19 Governing Law....37
§ 20 Continuing Cooperation....37
§ 21 Successors and Assigns....38
§ 22 Sole Benefit....38
§ 23 Litigation; Power of Attorney....38
§ 24 Acknowledgement....39
§ 25 Severability....39
§ 26 Immediate Effect....39

an unreasonable financial burden on the RESULTING ASSOCIATION. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described herein.

§ 21 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective transferees, successors, and assigns, but this Agreement may not be assigned to any other party nor may any rights hereunder be transferred to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

§ 22 Sole Benefit. Nothing expressed or referred to herein is intended or shall be construed to give any person other than the CORPORATION or the RESULTING ASSOCIATION any legal or equitable right, remedy, or claim under or in respect to this Agreement, or any of its provisions, it being the intention of the parties hereto that this Agreement, the assumption of obligations and statements of responsibilities hereunder, and all conditions and provisions hereof, are for the sole benefit of the CORPORATION and the RESULTING ASSOCIATION and for the benefit of no other person.

§ 23 Litigation; Power of Attorney. In the event any action at law or in equity shall be instituted by any person against the RESULTING ASSOCIATION or the RESULTING ASSOCIATION and the CORPORATION as co-defendants, or in which action the CORPORATION joins or is joined as co-defendant, the RESULTING ASSOCIATION agrees to

# ASSISTANCE AGREEMENT

BETWEEN

THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

AND

CARTERET SAVINGS BANK, FA
Morristown, New Jersey

Dated: June 6, 1986

## SUMMARY OF SUBSTANTIVE PROVISIONS

| ASSISTANCE PROVIDED | SECTION IN AGREEMENT |
|---|---|
| 1. Negative Net Worth Contributions | §§ 3, 5 |
| 2. Indemnification for Undisclosed Liabilities, Challenges to the Acquisitions Transaction and Unreserved for Claims | §§ 3, 6 |
| 3. Covered Assets | §§ 3, 4, 5, 10, 11 |

ASSISTANCE AGREEMENT
BETWEEN
THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
AND
CARTERET SAVINGS BANK, FA

TABLE OF CONTENTS


| | Page |
|---|---|
| Recitals | 1 |
| § 1 Definitions | 3 |
| (a) "Acquisitions" | 3 |
| (b) "Acquisition of FIRST FEDERAL" | 3 |
| (c) "Acquisition of MSSB" | 3 |
| (d) "Merger Agreement for FIRST FEDERAL" | 3 |
| (e) "Acquisition Agreement" | 3 |
| (f) "Affiliate" | 3 |
| (g) "Bank Board" | 3 |
| (h) "Books of MSSB" or "MSSB's Books" | 4 |
| (i) "Books of FIRST FEDERAL" or "FIRST FEDERAL's Books" | 4 |
| (j) "Book Value" | 4 |
| (k) "Covered Asset" | 8 |
| (l) "Covered Asset Claim" | 10 |
| (m) "Credit" or "Credit Item" | 10 |
| (n) "Debit" or "Debit Item" | 10 |
| (o) "Effective Date" | 11 |
| (p) "Fair Market Value" | 11 |
| (q) "Foreclosure" | 11 |
| (r) "Initial Audit" | 11 |
| (s) "Liquidation" | 11 |
| (t) "Mortgage" | 12 |
| (u) "Negative Net Worth" | 12 |
| (v) "Net Proceeds Received" | 13 |
| (w) "Non-Performing Asset" | 13 |
| (x) "Non-Controlled Subsidiary" | 13 |
| (y) "Quarter" | 14 |
| (z) "Real Estate in Judgment" or "REJ" | 14 |




WOF011 0542 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

ASSISTANCE AGREEMENT

Table of Contents


| | Page |
|---|---|
| (aa) "Real Estate Owned" or "REO" ................ | 14 |
| (bb) "Related Claim" ............................ | 14 |
| (cc) "Special Reserve Account" .................. | 14 |
| (dd) "Controlled Subsidiary" .................... | 14 |
| (ee) "MSSB Claims" .............................. | 15 |
| (ff) "FIRST FEDERAL Claims" ..................... | 15 |
| (gg) "Claim" .................................... | 16 |
| § 2 Conditions .................................. | 16 |
| § 3 Special Reserve Account ..................... | 18 |
| (a) Debits ...................................... | 18 |
| (1) Negative Net Worth .......................... | 18 |
| (2) Capital Losses on Covered Assets ............ | 19 |
| (3) Covered Asset Claim Expenses ................ | 19 |
| (4) Appraisal Costs ............................. | 19 |
| (5) Write Down of a Covered Asset ............... | 19 |
| (6) Indemnification ............................. | 20 |
| (7) Related Claim Expenses ...................... | 20 |
| (8) MSSB Claim Expenses or FIRST FEDERAL Claim Expenses ....................... | 20 |
| (9) April, Inc. Adjustment ...................... | 20 |
| (10) Covered Asset Purchase ..................... | 20 |
| (11) Payment of Credits ......................... | 20 |
| (12) Expense to Cure ............................ | 21 |
| (13) Tax Benefit Adjustment Payments ............ | 21 |
| (14) Assignment of Covered Asset Claim, Related Claim, MSSB Claim, or FIRST FEDERAL Claim ................. | 21 |
| (15) Uncollected Interest ....................... | 21 |
| (16) Net Worth Adjustment ....................... | 22 |
| (b) Exclusions from Debits ...................... | 22 |
| (c) Credits to Special Reserve Account ......... | 23 |
| (1) Reserved .................................... | 23 |
| (2) Recoveries on Covered Assets ................ | 23 |
| (3) Refunds ..................................... | 24 |
| (4) Pre-Effective Date Interest ................. | 24 |
| (5) Other Recoveries on Covered Assets .......... | 24 |
| (6) Offset Gains ................................ | 24 |




WOF011 0543 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

ASSISTANCE AGREEMENT

Table of Contents

| | | Page |
|---|---|---|
| | (7) Tax Refunds .......................... | 24 |
| | (8) Tax Benefits ......................... | 25 |
| | (9) Uncollected Interest .................. | 27 |
| | (10) Recoveries on MSSB Claims or First Federal Claims and Recoveries by CORPORATION on Covered Asset Claims and Related Claims ........... | 28 |
| | (11) CORPORATION's Contribution ........... | 28 |
| | (12) Net Worth Adjustment .................. | 28 |
| | (13) April, Inc. Adjustment ................ | 28 |
| § 4 | Write Down of a Covered Asset .................. | 29 |
| | (a) Approval of Write Down ..................... | 29 |
| | (b) Limitation on Amount of Write Down ......... | 30 |
| | (c) Determination of Write Down ................ | 30 |
| | (f) Required Sale .............................. | 32 |
| | (g) Further Investment ......................... | 32 |
| § 5 | Contributions by the CORPORATION ................ | 33 |
| | (a) Debit Balance .............................. | 33 |
| | (b) Deductible ................................. | 33 |
| | (c) Reimbursement of Credit Balances ........... | 33 |
| | (d) Adjustments ................................ | 34 |
| § 6 | Indemnification for Undisclosed Liabilities, Unreserved for Claims, and Litigation Challenging the Acquisitions .................. | 34 |
| | (a) Indemnifications ........................... | 34 |
| | (1) Undisclosed Liabilities ............... | 35 |
| | (2) Unreserved for Claims ................. | 37 |
| | (3) Challenges to the Transactions ........ | 37 |
| § 7 | Pursuit of Related Claims ....................... | 38 |
| § 8 | MSSB Claims or FIRST FEDERAL Claims ............. | 39 |
| § 9 | Liquidation and Repair of Real Estate Owned ..... | 41 |



WOF011 0544 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER
App. 330

ASSISTANCE AGREEMENT

Table of Contents


| | Page |
|---|---|
| § 10 Foreclosures | 45 |
| § 11 CORPORATION's Right to Purchase Covered Assets Other Than Covered Asset Claims | 47 |
| § 12 Duplicate Payments | 49 |
| § 13 Non-Reimbursable Expenses | 49 |
| § 14 Reports, Records | 49 |
| (a) Quarterly Reports | 49 |
| (b) Reports on Covered Assets | 51 |
| (c) Final Accounting | 52 |
| (d) Access to Books and Records | 52 |
| (e) Audits and Examinations | 52 |
| (f) Reports Concerning Prosecution of Claims by Court Action and Settlement of Claims and Liabilities | 53 |
| (g) Other Reports | 56 |
| § 15 Covenants of the RESULTING ASSOCIATION | 56 |
| (a) Tax Benefits | 56 |
| (b) Administration of Assets and Liabilities | 57 |
| (1) Management Standard | 58 |
| (2) Pursuit of Claims | 58 |
| (3) Conduct of Litigation | 59 |
| (4) Covered Asset Restrictions | 62 |
| (5) Covered Asset Requirements | 63 |
| (6) Controlled Subsidiaries | 64 |
| (c) Compliance with Law | 66 |
| (d) Disclosure of Agreement | 67 |




WOF011 0545 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one and the same instrument, and any party may execute this Agreement by signing any such counterpart.

(b) No amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

Section 25. Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may any rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

Section 26. Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement



WOF011 0621 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

Section 27. Continuing Cooperation. It is the purpose of this Agreement to provide a means by which the failures of MSSB and FIRST FEDERAL may be prevented, the savers and other creditors of MSSB and FIRST FEDERAL may be protected against losses, the thrift and financing needs of the communities in which MSSB's and FIRST FEDERAL's offices are located may be served, the RESULTING ASSOCIATION may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described in this section.



WOF011 0622 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# OFFICE OF THRIFT SUPERVISION

## DEPARTMENT OF THE TREASURY

## REPORT OF EXAMINATION

**NAME OF INSTITUTION** CARTERET SAVINGS BANK, F.A.

**DOCKET NUMBER** 04702 **DISTRICT NUMBER** 02

**DATE OF EXAMINATION** May 22, 1989

**August 1989**

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | 02 | 04702 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: May 22, 1989
Examination concluded: November 14, 1989

**Prohibition of Disclosure or Release**

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the District Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 505 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.

0 15065

REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | 02 | 04702 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: May 22, 1989

Members of the Board:

As required by the Rules and Regulations for Insurance of Accounts, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends which impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate.

/s/ Russell J. Meyer
Examiner-in-Charge
Office of Thrift Supervision

0 15066

Date: May 22, 1989 Docket No.: 04702

INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Report Summary and Composite Rating. . . . . . . . . . . . . . . . . . . | 1 - 7 |
| Management, Asset Quality, Capital, Risk Management, Operating Results, and Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . | 8 - 64 |


APPENDIX


| | | |
|---|---|---|
| Outstanding Enforcement Actions . . . . . . . . . . . . . . | Omitted . . | A - 1.1 |
| Directors, Principal Officers and Attorneys . . . . . . . . . . . . . . | | A - 2.1 |
| Principal Operating Committees . . . . . . . . . . . . . . . | Omitted . . | A - 3.1 |
| Statement of Condition . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 4.1 |
| Statement of Operations. . . . . . . . . . . . . . . . . . . . . . . . . | | A - 5.1 |
| Key Ratios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 6.1 |
| Deposit/Liability Page . . . . . . . . . . . . . . . . . . . . | Omitted . . | A - 7.1 |
| Deposit from Other Financial Institutions . . . . . . . . | Omitted . . | A - 8.1 |
| Summary of Criticized Assets . . . . . . . . . . . . . . . . . . . . . . | | A - 9.1 |
| Summary of Scheduled Items . . . . . . . . . . | (NO LONGER REQUIRED). . | A - 10.1 |
| Summary of Action Required by Criticized Assets . . . . . . . . . . | | A - 11.1 |
| Classified Assets . . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 12.1 |
| Assets Subject to Special Mention . . . . . . . . . . . . . . . . . . . | | A - 13.1 |
| Loans in Process and Commitments . . . . . . . . . . . . . . | Omitted . . | A - 14.1 |
| Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . | Omitted . . | A - 15.1 |
| Gap Report Assumptions . . . . . . . . . . . . . . . . . . . . | Omitted . . | A - 16.1 |




0 15067

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ668 1978

Date: May 22, 1989 Docket No.: 04702

Gap Analysis - Hedged GAP (Graphic) . . . . . . . . . . . Omitted . . A - 17.1

Gap Analysis - Cumulative Hedged GAP (Graphic) . . . . . Omitted . . A - 18.1

Numerical GAP Analysis..Assets (0-5 years) . . . . . . . . Omitted . . A - 19.1

Numerical GAP Analysis..Assets (over 5 years) . . . . . . Omitted . . A - 20.1

Numerical GAP Analysis..Liabilities (0-5 years) . . . . Omitted . . A - 21.1

Numerical GAP Analysis..Liabilities (over 5 years) . . . Omitted . . A - 22.1

Service Corporations . . . . . . . . . . . . . . . . . . . . . . . . . A - 23.1

Other Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 24.1

Financial Reporting Errors . . . . . . . . . . . . . . . . . . . . . A - 25.1

Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . A - 26.1

ABBREVIATIONS USED IN THIS REPORT

P = President
EVP = Executive Vice President
VP = Vice President
CB = Chairman of the Board
MO = Managing Officer
CEO = Chief Executive Officer
COO = Chief Operations Officer
SVP = Senior Vice President
AVP = Assistant Vice President
S = Secretary
AS = Assistant Secretary
T = Treasurer
AT = Assistant Treasurer
C = Controller
D = Director
AD = Advisory Director
DE = Director Emeritus
A = Attorney
IVP = First Vice President
SO = Savings Officer
CSB = Carteret Savings Bank
CBC = Carteret BanCorp



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ668 1979

Date: May 22, 1989 Docket No.: 04702

REPORT SUMMARY (Continued)

The examiners' findings are highlighted as follows:

Capital

Although CSB has met the RAP capital requirements as of June 30, 1989, the implementation of FIRREA, continuing operating losses and the substantial increase in classified assets requiring the establishment of additional reserves, indicate that the bank will not meet future regulatory capital requirements.

Drastic changes in operations, a return to core operating profits, as well as overall asset shrinkage will be needed. Otherwise, additional capital contributions of $50 million committed by AmBase will not be sufficient to meet the future capital needs of the bank.

Operations

Carteret must return to core operating profits and not continue to rely on non-operating gains resulting from asset sales. As of the quarter ending June 30, 1989, Carteret has booked operating losses for four straight quarters. Operating losses for July and August 1989 were also booked.

Speculative as well as trading activities must stop until all the proper policies and controls are in place and an adequate capital position is attained. This will have an adverse effect on net income. Operating expenses must be reduced and loan products properly priced so as to maintain a profitable margin.

Assets

Carteret has experienced a tremendous increase in the amount of criticized assets, now representing 6.7% of assets and 154.2% of regulatory capital. This problem is somewhat the result of a general decline in the real estate market in the bank's main lending areas of Florida and recently New Jersey. However, a considerable part of the problem is also caused by poor underwriting. In particular, secured and unsecured commercial loans, commercial real estate loans and commercial construction loans all exhibited underwriting weaknesses which are contributing to the increasing amount of classified assets. Moreover, management failed to react to the softening real estate market in a timely manner and continued to invest in these areas through June, 1989.

The examiners have determined that the loan loss reserves established by the bank are inadequate and have requested that an additional $77.2 million in general valuation allowances be established. In addition, those assets classified "Loss", totaling $24,604,029 must be written off or a specific reserve established immediately.

ERO #447

RTC
Resolution Trust Corporation

loans procedures

MEMO TO: All Directors - Consolidated Offices
Managing Agents
Liquidation Site Managers
Supervisory Managing Agents

FROM: William M. Dudley
Regional Director
Eastern Region

WMD

DATE: June 20, 1990

SUBJECT: Prepayment Interest/Penalty

The Resolution Trust Corporations's Strategic Plan discloses in detail the RTC's mission to downsize and maximize recovery. In this vein, RTC is seeking to have loans moved to other institutions and/or paid off early to address the immediate liquidity needs. To facilitate this endeavor, RTC in this region during its Conservatorships and Receiverships interventions will waive prepayment interest/penalties on any obligation that is paid off early.

Should you have any questions regarding this matter, please contact the Regional Office Credit Staff.

WMD:gm

245 Peachtree Center Avenue, NE ■ Atlanta, Georgia 30303

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Jersey City | 04702 |
| | **Type of Examination** | |
| | Federal Regular | |

Examination commenced: June 17, 1991
Examination concluded: November 7, 1991

Service Corporations and Other Affiliates Which Are a Part of This Report:

AmBase Corporation (See separate report)
Carteret Communities, Inc.
Carteret Premium Finance, Inc. aka Imperial Premium Finance, Inc.
Carteret Realty Corporation
Carteret Service Corporation

### Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor. Independent auditors may be provided access to this report only after providing a written statement that they will not disclose the Report of Examination or any portion thereof.

If a subpoena or other legal process is received calling for production of this document, the Regional Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 510 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, must review this report thoroughly and provide a response to the Regional Office, signed by each member of the Board of Directors, within 30 days of receipt of this report. This report should not be considered an audit report.

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
| --- | --- | --- |
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Jersey City | 04702 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: June 17, 1991

Members of the Board:

As required by Section 563.170 of the Rules and Regulations, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends that impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate. All matters of criticism, violations of laws or regulations, and other matters of concern identified within this Report of Examination require the Board of Directors and management's prompt corrective action.

/s/ Thomas J. O'Rourke, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

Date: June 17, 1991 Docket No.: 04702

INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Report Summary and Composite Rating. . . . . . . . . . . . . . . . . . . | 1 - 4 |
| Management, Asset Quality, Capital, Risk Management, Operating Results, and Miscellaneous . . . . . . . . . . . . . . . . . . . . . . | 5 - 44 |

APPENDIX

| | |
|---|---|
| Outstanding Enforcement Actions . . . . . . . . . . . . . . . . . . . . | A - 1.1 |
| Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . . | A - 2.1 |
| Directors, Principal Officers and Attorneys . . . . . . . . . . . . . | A - 3.1 |
| Principal Operating Committees . . . . . . . . . . . . . . . . . Omitted | A - 4.1 |
| Statement of Condition . . . . . . . . . . . . . . . . . . . . . . . . | A - 5.1 |
| Statement of Operations. . . . . . . . . . . . . . . . . . . . . . . . | A - 6.1 |
| Key Ratios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A - 7.1 |
| Deposit/Liability Page . . . . . . . . . . . . . . . . . . . . . . . . | A - 8.1 |
| Deposit from Other Financial Institutions . . . . . . . . . . .Omitted | A - 9.1 |
| Summary of Criticized Assets . . . . . . . . . . . . . . . . . . . . . | A - 10.1 |
| Summary of Action Required by Criticized Assets . . . . . . . . . . . | A - 11.1 |
| Classified Assets and Assets Designated Special Mention . . . . . . | A - 12.1 |
| Loans in Process and Commitments . . . . . . . . . . . . . . . . .Omitted | A - 13.1 |
| Concentrations . . . . . . . . . . . . . . . . . . . . . . . . .Omitted | A - 14.1 |
| Interest Rate Risk Exposure Report . . . . . . . . . . . . . . . . . . | A - 15.1 |




OAM001 0491 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: June 17, 1991 Docket No.: 04702

REPORT SUMMARY (Continued)

Carteret is also operating with an unsafe level of interest rate risk in its balance sheet. The OTS Market Value of Portfolio Equity (MVPE) model reveals that an increase in interest rates from existing levels will deplete any remaining capital, on a market value basis, and compound the existing capital shortfall. In addition, Carteret's asset and liability management strategies during the examination period have added to already unacceptable levels of interest-rate risk. These strategies included selling adjustable-rate mortgage loans, at a $19 million net profit, and purchasing fixed rate mortgage securities. (See RISK MANAGEMENT comments).

Carteret posted a net loss of $131.8 million for 1990 and a net loss of $154.9 million for the six-month period ended June 30, 1991. Losses are due primarily to continued significant provisions for loan losses, however, core operations are also producing losses which appear irreversible thus rendering Carteret's viability is serious doubt absent an equity infusion. (See OPERATING RESULTS comments).

In summary, the problems facing Carteret have progressively worsened since the June 4, 1990 examination, when a Composite "5" was assigned. At this point the OTS believes that without substantial outside equity capital, government intervention appears to be the only available remedy.

The board is directed to certify that it has taken corrective action with regard to the following matters and that the following reports are forwarded to the Regional Director. Submission of these reports does not relieve Carteret of its reporting requirements under both the outstanding Supervisory Agreement and the Capital Directive:

1. Before November 30, 1991, submit a certified resolution of the board that addresses the board's disposition of the compensation claims of Robert Walsh.

2. Before November 30, 1991, submit all TFR amendments listed at Appendix A - 18.1 and ensure that accurate reports are forwarded in future periods.

3. Before December 31, 1991, submit a certified resolution that describes what specific actions the board intends to take in regard to the unauthorized advance to Robert B. O'Brien, and which also describes the actions taken to collect from AmBase a portion of the costs borne solely by Carteret in the Termination Agreements extended to Messrs. Gilgar and McCabe.

4. Before December 31, 1991, Carteret shall institute a comprehensive internal loan review program, which will provide for regular review and classification of all loan types as required pursuant to the terms of the outstanding Supervisory Agreement. In addition, Carteret shall supply a report to OTS that outlines the scope of the overall ILR function, plus the results of the ILR of the Western FS&LA multi-family loan pools and residential loans in excess of $500,000, and the resumes of the individuals who will carry out the reviews.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER OAM001 0494

# FORM 10-Q

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

[X] Quarterly Report Pursuant to Section 13 of the Securities Exchange Act of 1934

For the quarterly period ended June 30, 1991

[ ] Transition Report Pursuant to Section 13 of the Securities Exchange Act of 1934

Commission file number 1-7265

## AMBASE CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE | 95-2962743 |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| 200 South Street, Morristown, New Jersey | 07960 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (201) 326-1034

| | |
|---|---|
| 59 Maiden Lane, New York, New York | 10038-4548 |
| (Former address of principal executive offices) | (Zip Code) |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.

Yes X No __

At June 30, 1991 there were 38,279,459 shares of registrant's common stock, $.01 par value per share, outstanding, excluding 1,405,548 treasury shares.

Item 1. Financial Statements

## AMBASE CORPORATION AND SUBSIDIARIES
### Consolidated Statement of Income
### Second Quarter and Six Months ended June 30

| *(in millions, except per share data)* | Second Quarter 1991 | Second Quarter 1990 | Six Months 1991 | Six Months 1990 |
|---|---|---|---|---|
| **Interest income:** | | | | |
| First mortgage loans | $ 59 | $ 92 | $ 122 | $ 191 |
| Mortgage–backed securities | 39 | 22 | 74 | 41 |
| Other loans | 12 | 18 | 27 | 37 |
| Investments | 8 | 9 | 18 | 19 |
| | 118 | 141 | 241 | 288 |
| **Interest expense:** | | | | |
| Deposits | 52 | 79 | 106 | 162 |
| Advances from the Federal Home Loan Bank | 35 | 15 | 74 | 31 |
| Other borrowed funds | 5 | 17 | 12 | 30 |
| | 92 | 111 | 192 | 223 |
| **Net interest income** | 26 | 30 | 49 | 65 |
| Provision for losses on loans and real estate | 150 | 6 | 161 | 27 |
| Net interest income after provision for losses | (124) | 24 | (112) | 38 |
| **Non–interest income:** | | | | |
| Mortgage banking activities: | | | | |
| Gain on sales of securities and loans | – | 1 | 2 | 4 |
| Gain on sale of servicing | 6 | 2 | 6 | 7 |
| Gain on value of servicing | – | 1 | 3 | 1 |
| Servicing and other fees | 5 | 5 | 10 | 11 |
| Income from mortgage banking activities | 11 | 9 | 21 | 23 |
| Gain on sales of securities and loans | 2 | 5 | 9 | 7 |
| Loss from real estate operations | (3) | (1) | (5) | (2) |
| Other loan fees, service charges and other income | 1 | 4 | 5 | 8 |
| Non–interest income | 11 | 17 | 30 | 36 |
| Net interest and non–interest income | (113) | 41 | (82) | 74 |
| **Other expenses:** | | | | |
| Compensation and employee benefits | 14 | 15 | 27 | 32 |
| Occupancy | 8 | 9 | 16 | 18 |
| Federal and other insurance | 3 | 3 | 6 | 6 |
| Outside services and professional fees | 3 | 3 | 7 | 6 |
| Core deposit value and goodwill amortization | 1 | 4 | 2 | 8 |
| Other operating expenses | 7 | 7 | 13 | 14 |
| | 36 | 41 | 71 | 84 |
| Loss before corporate expenses | (149) | – | (153) | (10) |
| Corporate interest expense | – | 22 | 10 | 41 |
| Corporate expenses and other operations | 1 | 15 | 4 | 24 |
| **Loss from continuing operations before income taxes** | (150) | (37) | (167) | (75) |
| Income taxes | (3) | – | (6) | (3) |
| **Loss from continuing operations** | (153) | (37) | (173) | (78) |
| Loss from discontinued operations | – | (69) | – | (70) |
| **Loss before extraordinary item** | (153) | (106) | (173) | (148) |
| Extraordinary gain on extinguishment of debt, net of income taxes | – | – | 56 | – |
| **Net loss** | $ (153) | $ (106) | $ (117) | $ (148) |
| **Per share data:** | | | | |
| Loss from continuing operations | $ (4.01) | $ (1.11) | $ (4.58) | $ (2.31) |
| Loss from discontinued operations | – | (2.01) | – | (2.05) |
| Loss before extraordinary item | (4.01) | (3.12) | (4.58) | (4.36) |
| Extraordinary gain on extinguishment of debt, net of income taxes | – | – | 1.49 | – |
| **Net loss** | $ (4.01) | $ (3.12) | $ (3.09) | $ (4.36) |
| Dividends | – | – | – | $ 0.05 |
| Average shares outstanding | 38.1 | 34.1 | 37.8 | 34.1 |

*See notes to consolidated financial statements.*

**Consolidated Balance Sheet**

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| **Assets** | | |
| Cash | $ 102 | $ 84 |
| Loans of federal funds | 112 | 172 |
| Cash and cash equivalents | 214 | 256 |
| Investment securities, at amortized cost (market $149 and $106), including held for sale of $20 (market $20) at June 30, 1991 | 151 | 105 |
| Mortgage-backed securities (market $1,702 and $1,418), including held for sale of $163 and $302 (market $163 and $305) | 1,716 | 1,423 |
| Loans receivable, including held for sale of $258 and $250 | 2,740 | 3,098 |
| Investment in real estate | 175 | 232 |
| Interest and dividends receivable | 45 | 61 |
| Federal Home Loan Bank stock, at cost | 99 | 99 |
| Capitalized costs of future servicing | 89 | 102 |
| Net assets of discontinued operations | – | 769 |
| Other assets | 186 | 175 |
| Total assets | $ 5,415 | $ 6,320 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Deposits | $ 3,033 | $ 3,032 |
| Advances from the Federal Home Loan Bank | 1,903 | 1,963 |
| Other borrowed funds | 163 | 182 |
| Corporate and nonbanking indebtedness | – | 728 |
| Escrow | 139 | 143 |
| Other liabilities | 226 | 204 |
| Total liabilities | 5,464 | 6,252 |
| Stockholders' equity: | | |
| Common stock | – | 40 |
| Paid-in capital | 574 | 576 |
| Accumulated deficit | (595) | (478) |
| Treasury stock | (28) | (70) |
| Total stockholders' equity | (49) | 68 |
| Total liabilities and stockholders' equity | $ 5,415 | $ 6,320 |

*See notes to consolidated financial statements.*

TRANSMITTED FROM 201 2850530 08.14.91 17:45 P.05 *CARTERET

**Consolidated Statements of Cash Flow**
**Six Months ended June 30**

| *(in millions)* | 1991 | 1990 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Loss from continuing operations | $ (173) | $ (78) |
| Adjustments to reconcile loss from continuing operations to net cash provided by (used for) continuing operations: | | |
| Gains on sales of securities, loans and servicing by banking subsidiaries | (20) | (19) |
| Provision for losses on loans and real estate | 161 | 27 |
| Accretion of loan fees, premiums and discounts | (8) | (17) |
| Depreciation and amortization | 20 | 25 |
| Interest and dividends receivable | 16 | 4 |
| Interest payable | (17) | (4) |
| Other | 36 | (23) |
| Net cash provided by (used for) continuing operations | 15 | (85) |
| Loss from discontinued operations | – | (70) |
| Adjustments to reconcile loss from discontinued operations to net cash used for discontinued operations: | | |
| Realized losses on investments of insurance subsidiaries | – | 86 |
| Deferred policy acquisition costs | – | (19) |
| Unpaid insurance losses and loss adjustment expenses | – | 38 |
| Insurance premiums and net reinsurance balances receivables | – | (150) |
| Unearned insurance premiums | – | 128 |
| Investments of investment services subsidiaries | – | (43) |
| Investment services receivables, net of loans and payables | – | (6) |
| Securities sold, not yet purchased | – | 55 |
| Other | – | (41) |
| Net cash used for discontinued operations | – | (22) |
| Net cash provided by (used for) operating activities | 15 | (107) |
| **Cash flows from investing activities:** | | |
| Proceeds on fixed maturities and equity securities, principally sales | 63 | 822 |
| Purchases of fixed maturities and equity securities | (108) | (894) |
| Short–term investments, net | – | (46) |
| Payments on mortgage–backed securities | 116 | 51 |
| Loan payments and originations, net | (449) | (778) |
| Mortgage–backed securities sold | 717 | 641 |
| Sales of loans | 434 | 417 |
| Mortgage–backed securities purchased | (768) | (277) |
| Loans purchased | (67) | (50) |
| Proceeds from sale of discontinued operations | 541 | – |
| Investments services loans to customers | – | 47 |
| Investment transactions in the course of settlement | 7 | (47) |
| Other | – | (4) |
| Net cash provided by (used for) investing activities | 486 | (118) |
| **Cash flows from financing activities:** | | |
| Certificates of deposit, net | (79) | (219) |
| Excess of deposit receipts over withdrawals | 80 | 75 |
| Securities sold under agreements to repurchase, net | – | 130 |
| Increases in indebtedness | 118 | 631 |
| Reductions in indebtedness | (607) | (640) |
| Payments to repurchase indebtedness | (52) | – |
| Escrow | (4) | 34 |
| Dividends | – | (2) |
| Other | 1 | (9) |
| Net cash used for financing activities | (543) | – |
| Net decrease in cash and equivalents | (42) | (225) |
| Cash and equivalents at beginning of period | 256 | 427 |
| **Cash and equivalents at end of period** | $ 214 | $ 202 |

*See notes to consolidated financial statements.*

## AMBASE CORPORATION AND SUBSIDIARIES
### Notes to Consolidated Financial Statements

1. The accompanying June 30, 1991 and 1990 consolidated financial statements of AmBase Corporation (the "Company") are unaudited and may be subject to year-end adjustments. In the opinion of management, the interim financial statements reflect all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the Company's financial position and results of operations. Results for interim periods are not necessarily indicative of results for the full year. In preparing the financial statements, management makes certain assumptions and estimates, which it deems reasonable, that affect certain reported amounts. Future results could differ from such estimates. In addition, the accompanying consolidated financial statements have been prepared on a "going concern" basis and, accordingly, do not include adjustments to the carrying value of assets and liabilities which might be necessary should the Company or Carteret Bancorp Inc. ("Carteret Bancorp"), or Carteret Bancorp's principal subsidiary, Carteret Savings Bank, FA ("Carteret Savings"), not continue in operation. Pursuant to the designation of the operations of The Home Insurance Company ("The Home") and its subsidiaries as discontinued operations and The Home's subsequent sale, certain prior year amounts have been reclassified to conform to the 1991 presentation (see Note 2). The unaudited interim financial statements presented herein should be read in conjunction with the Company's consolidated financial statements included in its Annual Report on Form 10-K for the year ended December 31, 1990.

   At a special meeting of the stockholders of the Company held on February 12, 1991, a charter amendment resolution was approved reducing the par value of the Company's cumulative preferred stock and common stock from $1.00 to $.01 per share.

2. On February 13, 1991, the Company sold all the outstanding common stock of The Home and its subsidiaries, including US International Re, Inc., Gruntal Financial Corp. and Sterling Forest Corporation, and certain other subsidiaries of the Company, together with 6,277,180 shares of The Home's $2.95 Cumulative Preferred Stock, Series A, held by the Company, to Home Holdings Inc. (formerly TVH Acquisition Corporation) ("Home Holdings"), a Delaware corporation owned by an investment group consisting of Trygg-Hansa SPP Holding AB, a major Swedish insurer, Industrial Mutual Insurance Co., a major Finnish insurer, and certain other investors, pursuant to a stock purchase agreement dated as of September 28, 1990, as amended, among the Company, The Home and Home Holdings.

   The Company received approximately $541 million in cash in connection with the sale of The Home. In addition, Home Holdings assumed approximately (i) $102 million aggregate principal amount of the Company's 11 3/4% sinking fund debentures due April 15, 2008, (ii) the $60 million aggregate principal amount of the $150 million aggregate principal theretofore outstanding of the Company's 14 7/8% senior subordinated notes due 1998 not purchased by the Company in its tender offer therefor and (iii) the $57 million aggregate principal amount of the $76 million aggregate principal theretofore outstanding of the 14 7/8% debentures due 1999 of Home Group Funding Corporation ("Home Funding") (one of the subsidiaries sold to Home Holdings) not purchased by the Company in its tender offer therefor. The Home Funding debentures were guaranteed on a subordinated basis by the Company. Home Holdings also agreed to make $48 million in cash available to the Company, of which approximately $3 million had been received as of June 30, 1991, to meet certain specified future obligations of the Company relating to litigation, taxes and the Company's ongoing general and administrative expenses after the closing. The cash proceeds of the sale were used to repay the Company's bank indebtedness of $410 million, to pay for securities purchased in the Company's tender offers and to pay expenses associated with the sale of The Home. The Company also contributed $30 million to the capital of Carteret Savings. Prior to the sale, The Home held 593,931 shares of the Company's common stock which were classified as treasury stock prior to the sale. These shares have been included in the Company's outstanding shares subsequent to the sale.

   Accordingly, the consolidated operations of The Home have been designated as discontinued operations and the consolidated statement of income for the 1990 periods has been reclassified to report the loss from discontinued operations separately from the results of continuing operations by excluding the operating revenues and expenses of discontinued operations from the respective statement captions. The amount of income taxes allocated to continuing operations reflects the tax consequences of the pretax loss from continuing operations exclusive of the pretax loss from discontinued operations and the effects of an extraordinary item (see Note 5). The amount of income taxes allocated to discontinued operations reflects the incremental effect on income taxes that resulted from such operations.

## AMBASE CORPORATION AND SUBSIDIARIES

### Notes to Consolidated Financial Statements

Condensed information relating to loss from discontinued operations for the second quarter and six months ended June 30, 1990 is as follows:

| *(in millions)* | Second Quarter | Six Months |
|---|---|---|
| **Revenues:** | | |
| **Insurance:** | | |
| Earned premiums | $513 | $1,010 |
| Net investment income | 78 | 164 |
| Realized losses on investments | (44) | (86) |
| | 547 | 1,088 |
| Investment services | 63 | 131 |
| | $610 | $1,219 |
| **Loss from discontinued operations:** | | |
| **Insurance:** | | |
| Underwriting loss | $(68) | $(122) |
| Net investment income | 78 | 164 |
| Realized losses on investments | (44) | (86) |
| | (34) | (44) |
| Investment services | (1) | 1 |
| Other | (3) | (10) |
| Loss before income taxes | (38) | (53) |
| Income taxes | (25) | (5) |
| Preferred dividends of The Home, net of amounts paid to the Company | (6) | (12) |
| | $(69) | $ (70) |

The net assets of discontinued operations, including the Company's investment in preferred stock of The Home, are presented in the consolidated balance sheet at December 31, 1990 as a single amount as follows:

| *(in millions)* | |
|---|---|
| Investments | $3,850 |
| Premiums and investment services receivables | 1,587 |
| Deferred policy acquisition costs | 131 |
| Goodwill | 263 |
| Unpaid losses and loss adjustment expenses | (3,171) |
| Unearned premiums | (753) |
| Payable to brokers, dealers and customers | (524) |
| Subsidiary indebtedness | (113) |
| Other, net | 97 |
| Stockholders' equity of The Home | 1,367 |
| Preferred stock of The Home, net shares held by the Company | (161) |
| Unrealized equity accounts of The Home | 25 |
| Reserve for loss on disposition | (462) |
| Net assets of discontinued operations at realizable value | $ 769 |

**AMBASE CORPORATION AND SUBSIDIARIES**

**Notes to Consolidated Financial Statements**

3. **Loans receivable consist of the following:**

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $2,323 | $2,553 |
| Commercial real estate loans | 520 | 628 |
| Total first mortgage loans | 2,843 | 3,181 |
| Corporate loans | 226 | 259 |
| Consumer loans | 134 | 168 |
| Premium finance loans | 80 | 47 |
| Total other loans | 440 | 474 |
| | 3,283 | 3,655 |
| Loan participations sold | (249) | (393) |
| Loans in process | (10) | (30) |
| Unearned discounts and deferred loan fees | (143) | (34) |
| Allowance for losses on loans | (141) | (100) |
| | $2,740 | $3,098 |

The decrease in commercial real estate loans is primarily attributable to the transfer of loans to investment in real estate due to foreclosure or in-substance foreclosure.

Components of the allowance for losses on loans by major category follow:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $12 | $ 8 |
| Commercial real estate loans | 68 | 49 |
| Total first mortgage loans | 80 | 57 |
| Corporate loans | 54 | 39 |
| Consumer loans | 5 | 3 |
| Premium finance loans | 2 | 1 |
| Total other loans | 61 | 43 |
| | $141 | $100 |

The following table sets forth information on nonaccrual loans, past due loans which are still accruing and restructured loans.

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $ 83 | $ 47 |
| Commercial real estate loans | 51 | 14 |
| Corporate loans | 56 | 54 |
| Total nonaccrual loans | 190 | 115 |
| Residential first mortgage loans - 90 days past due | 34 | 27 |
| Consumer loans - 90 days past due | 4 | 4 |
| Premium finance loans - 180 days past due | 3 | 3 |
| Total 90 or more days past due, still accruing | 41 | 34 |
| Total nonperforming loans | 231 | 149 |
| Restructured loans | 120 | 123 |
| Total nonperforming and restructured loans | $351 | $272 |

4. Investment in real estate consists of the following:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Real estate held for development and sale | $ 39 | $ 41 |
| Real estate owned | 175 | 100 |
| In-substance foreclosed loans | 133 | 151 |
| | 347 | 292 |
| Allowance for losses on real estate: | | |
| Real estate held for development and sale | (18) | (6) |
| Real estate owned | (77) | (20) |
| In-substance foreclosed loans | (77) | (34) |
| | (172) | (60) |
| | $175 | $232 |

Loss from real estate operations as reflected in the consolidated statement of income is comprised of the net loss from operations of real estate held for development and sale, and real estate owned ("REO"). Costs associated with in-substance foreclosed loans are included in other expenses in the consolidated statement of income until the loan becomes REO. Any provision for possible losses is included in provision for losses on loans and real estate and the interest cost to carry REO is included in interest expense in the consolidated statement of income.

5. Corporate and other nonbanking indebtedness is as follows:

| *(dollars in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| AmBase Corporation: | | |
| Notes payable to banks under bridge loan facility | - | $410 |
| 11 3/4% sinking fund debentures, including $55 principal amount held by The Home, net of unamortized discount of $3 | - | 99 |
| 14 7/8% senior subordinated notes, net of unamortized discount of $5 | - | 145 |
| Home Group Funding Corporation 14 7/8% debentures, net of unamortized discount of $2 | - | 74 |
| | - | $728 |

As further described in Note 2, in connection with the sale of The Home on February 13, 1991, Home Holdings assumed all of the Company's 14 7/8% senior subordinated notes not purchased in a tender offer in which the Company purchased, at $520 per $1,000 principal amount, approximately $90 million of such notes; and also assumed all of the 14 7/8% debentures of Home Funding not purchased in a tender offer in which the Company purchased, at $250 per $1,000 principal amount, approximately $19 million of such debentures. As a result of these tender offers, the Company purchased such indebtedness at substantial discounts to face amount and recorded an extraordinary gain, before income taxes, of $57 million on the extinguishment of debt in the first quarter of 1991. In connection with the sale of The Home all indebtedness of the Company and Home Funding has either been repaid, purchased in tender offers or assumed by Home Holdings.

6. At June 30, 1991, due to a significant increase in the provision for losses on loans and real estate brought about by new management's thorough review of reserves, Carteret Savings failed to meet the minimum capital requirements of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") after giving effect to all supervisory goodwill claimed by Carteret Savings in its suit against the Office of Thrift Supervision ("OTS"). See Part II, Item 1 – "Legal Proceedings" for a description of these legal proceedings. Including all supervisory goodwill claimed by Carteret Savings at June 30, 1991, Carteret Savings' tangible, core and risk-based capital were $78 million, $81 million and $130 million, respectively, or 1.4%, 1.5% and 4.0%, respectively. The required levels of tangible, core and risk-based capital were $82 million, $164 million and $233 million, respectively, or 1.5%, 3.0% and 7.2%, respectively. Giving effect to the treatment of supervisory goodwill under the OTS' interpretation of FIRREA would have resulted in tangible, core and risk-based capital of ($73) million, $10 million and $58 million, respectively, or (1.4%), 0.2% and 1.8%, respectively. The required levels of tangible, core and risk-based capital under the OTS' interpretation of FIRREA were $80 million, $159 million and $228 million, respectively or 1.5%, 3.0% and 7.2%, respectively. In the determination of regulatory capital requirements, Carteret Savings' accounts have not been adjusted to reflect the purchase accounting adjustments arising from the acquisition of Carteret Bancorp by the Company.

Failure to meet one or more of the capital requirements subjects a savings association to various regulatory limitations and sanctions. Carteret Savings is likely to be subject to the issuance of a Capital Directive by the OTS. The Capital Directive, among other things, would likely (i) require Carteret Savings to secure and thereafter maintain a higher level of core capital, (ii) require Carteret Savings to submit a capital plan demonstrating achievement and maintenance of regulatory capital, (iii) prohibit asset growth, (iv) prohibit capital declarations or distributions and (v) impose significant restrictions on Carteret Savings' operations.

**AMBASE CORPORATION AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

Management is unable to determine the effect on Carteret Savings' future operations of its failure to meet minimum regulatory capital requirements and is uncertain whether Carteret Savings has the ability to attract the capital necessary to achieve and maintain minimum regulatory capital requirements. As previously mentioned, failure to meet minimum regulatory capital requirements and other regulatory requirements exposes Carteret Savings to an entire range of regulatory sanctions. In addition, Carteret Savings has incurred losses for the year ended December 31, 1990 and the first and second quarters of 1991 primarily due to increases in nonperforming assets and significant additions to the allowance for losses on loans and real estate. These circumstances raise substantial doubt about Carteret Savings' ability to continue as a going concern. Carteret Savings' ability to meet regulatory capital requirements in the future and to continue as a going concern will depend to a large extent upon future earnings, regulatory action and securing additional capital. Earnings will be affected by the level of reserves for losses on loans and real estate which is dependent upon conditions in the economy and real estate market and new management's ability to attract new capital, further control expenses and enhance the profitability of Carteret Savings' core business of mortgage and consumer banking.

Regulations have been proposed by the OTS which, if adopted, would increase the existing core capital requirement of 3.0% of assets for all but the most highly rated savings associations. Capital requirements would be established based upon the supervisory process on a case-by-case basis and range from 1.0% to 2.0% greater than the current 3.0% core capital requirement. Any increase in required regulatory capital levels would likely have an adverse effect on Carteret Savings' ability to meet such capital requirements.

7. On April 29, 1991, Carteret Savings entered into a Supervisory Agreement with the OTS. Under the Supervisory Agreement, Carteret Savings has agreed to take certain actions, including, in some cases, establishing additional policies and procedures relating to, among other things, internal asset review and establishment of valuation allowances, problem asset workout, trading activities, mortgage derivative securities activities, accounting for loan servicing, liquidity, Imperial Premium Finance, Inc. ("Imperial"), a business plan and budget, transactions with affiliates, compensation, and the Board of Directors. Most of the described actions required by the Supervisory Agreement have been addressed. The remaining items will be addressed promptly.

8. In connection with the settlement of certain OTS proceedings against directors and officers of the Company, described elsewhere herein (see Part II, Item 1 -- "Legal Proceedings"), the Company entered into a Stock Purchase Agreement dated as of April 25, 1991, with Carteret Savings, pursuant to which the Company agreed to purchase the capital stock of Carteret Premium Finance, Inc. ("Premium Finance"), the parent of Imperial, from Carteret Savings prior to August 9, 1991, for a cash price equal to the greater of $65 million or the appraised value of Premium Finance, such obligation being subject to, among other things, the Company's obtaining financing in an amount which, in the Company's sole discretion, is sufficient to permit it to complete such purchase. Pending the closing of the transaction, the Company deposited in escrow with Carteret Savings $12.5 million in cash which together with the earnings thereon, was to be applied to the purchase price of Premium Finance or, in the event the sale was not closed by August 9, 1991, as a contribution to the capital of Carteret Savings. Carteret Savings regulatory capital at June 30, 1991 includes a $12.5 million benefit relating to the Company's deposit with Carteret Savings regarding the potential IPF purchase. Since the sale of Premium Finance to the Company did not occur by August 9, 1991, the Stock Purchase Agreement may be terminated by either party. On August 9, 1991, the Company delivered to the OTS a proposed agreement, subject to certain conditions, providing for (i) the purchase of Premium Finance at the original price of $65 million, which would include the previous deposit of $12.5 million, compared to a recent appraised value of $45 million and (ii) a deferral of the closing. Such agreement provides for acquisition financing of $42.5 million and would require additional cash from the the Company of approximately $12 million, including transaction fees. The sale of Premium Finance would increase Carteret Savings' regulatory capital levels by approximately $17 million as a result of the gain on the sale and the elimination of certain intangible assets.

# AMBASE CORPORATION AND SUBSIDIARIES

## Notes to Consolidated Financial Statements

9. The Company is a defendant in certain claims and legal actions arising in the oridinary course of its business. After review with its legal counsel, the Company's management is of the opinion that the ultimate disposition of these matters will not have a material adverse effect on the Company's consolidated financial condition or results of operations. In addition, the Company and certain of its officers are defendants in various lawsuits alleging, among other things, violations of Federal securities laws and of the corporate laws of the State of Delaware. These actions are in their preliminary stages. See Part II, Item 1 -- "Legal Proceedings" for a further details of these lawsuits.

The Company and Carteret Savings have been involved in certain administrative and judicial proceedings with the OTS. See Notes 6,7 and 8 and Part II, Item 1 -- "Legal Proceedings" for a further description of these proceedings.

10. Other assets consist of the following:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Premises and equipment | $ 39 | $ 43 |
| Receivables from FHA/VA | 31 | 33 |
| Core deposit value | 20 | 22 |
| Other assets | 96 | 77 |
| | $186 | $175 |

Other liabilities consist of the following:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Deferred income taxes payable | $ 43 | $ 17 |
| Accrued interest payable | 35 | 52 |
| Undisbursed premiums | 24 | 22 |
| Other liabilities | 124 | 113 |
| | $226 | $204 |

11. Additional information regarding cash flow for the six months ended June 30 is as follows:

| *(in millions)* | 1991 | 1990 |
|---|---|---|
| Cash paid (received) during the period: | | |
| Interest expense | $213 | $271 |
| Income taxes | (19) | 10 |
| Noncash investing and financing activities: | | |
| Transfer of loans receivable to mortgage-backed securities due to securitization | $ 344 | $ 840 |
| Transfer of loans receivable to investment in real estate due to foreclosure or in-substance foreclosure | 71 | 20 |
| Indebtedness assumed by Home Holdings | 219 | - |
| Extraordinary gain on extinguishment of debt, net of income taxes | 56 | - |



WOQ628 1016 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The Company's continuing operations consist primarily of the operations of Carteret Savings. As a result of the sale of The Home as described in Note 2 to the Company's consolidated financial statements, the Company's administrative organization has been significantly downsized and its principal executive offices have been relocated to existing office facilities at Carteret Savings. During the second quarter of 1991 the Company's senior management was significantly changed. On May 22, 1991, Richard A. Bianco was named President and Chief Executive Officer of the Company and Chairman, President and Chief Executive Officer of Carteret Bancorp and Carteret Savings. Additionally, in July 1991 Donald Kramer was nominated Vice Chairman - Finance of Carteret Savings pending approval by the Board of Directors of Carteret Savings. Further, J. Wayne Moor was appointed Executive Vice President of Carteret Savings in charge of the Commercial Asset Management Division.

This group, together with existing management, has undertaken a thorough review of operations. This includes a review of reserves for losses on loans and real estate, in which management was assisted by a new public accounting firm. In addition the review of operations includes an evaluation of operating expenses, investments and other banking functions. The results of this review have had a material effect on reported results for the quarter ended June 30, 1991.

**FINANCIAL CONDITION**

**Banking**

At June 30, 1991 consolidated assets and liabilities of Carteret Bancorp were $5.3 billion and $5.4 billion, respectively, down slightly from December 31, 1990. Following a thorough review by new management, Carteret Savings recorded an additional $150 million to the allowance for losses on loans and real estate in the second quarter of 1991. This reserve review was not fully completed at the time of the filing of this report. The reserve amount recorded reflects management's current estimates of potential losses at this time. Further adjustments may be required as additional data is developed. The June 1991 Thrift Financial Report filed in July 1991 by Carteret Savings with the OTS is being appropriately amended to adjust for the recording of additional reserves.

Carteret Savings is continuing its efforts to restructure its balance sheet to emphasize assets favored under the risk-weighted capital requirement of FIRREA, particularly mortgage-backed securities. In accordance with FIRREA, assets are assigned risk weight factors in a manner that favors assets which are the most liquid and the least subject to interest rate and credit risk. The increase in mortgage-backed securities of $293 million and the decrease in residential first mortgage loans receivable of $230 million primarily reflect the restructuring of the balance sheet achieved by the securitization of mortgage loans and the related transfer to the mortgage-backed securities portfolio.

*Asset and Liability Management*

The objectives of Carteret Savings' asset and liability management strategy are to maximize net interest income over the course of an entire interest rate cycle, maintain stable earnings and control credit risk. Carteret Savings' asset and liability management process balances rate sensitive assets and liabilities to maintain rate volatility, net interest income and the market value of portfolio equity within the established limits of Carteret Savings' Interest Rate Risk policy. At June 30, 1991, Carteret had interest earning assets maturing or repricing within one year of $3.3 billion. Adjusted for the impact of hedging, Carteret Savings had $4.2 billion of interest bearing liabilities maturing or repricing during the same period. This created a liability sensitive cumulative one-year GAP of negative $952 million, or negative 17.56% of total assets. This compares with a negative $982 million, or negative 17.74% cumulative one-year GAP position at December 31, 1990. The balance sheet is less rate sensitive, the closer maturity GAPs are to zero. The June 30, 1991 cumulative one-year GAP of negative 17.56% reflects management's opinion that short term rates will remain stable during the second half of 1991. When the consensus develops that rates will rise, asset and liability strategy will be shifted to close maturity mismatches by increasing rate sensitive assets and extending liabilities, moving the cumulative one year GAP closer to zero.

*Liquidity*

The standard measure of liquidity for the savings and loan industry is the ratio of cash and eligible investments ("liquid assets") to the sum of net withdrawable savings and borrowings due within one year ("liquidity base").

Federally-insured savings associations are currently required to maintain a minimum liquidity ratio of 5.0%. The liquidity ratio of Carteret Savings was 5.40% at June 30, 1991 and 6.13% at December 31, 1990.

Carteret Savings' principal sources of liquidity have traditionally been deposits, principal and interest payments, advances from the Federal Home Loan Bank (the "FHLB") and collateralized borrowings, particularly reverse repurchase agreements. Sales and securitizations of loans have also been utilized as a source of liquidity.

At June 30, 1991, advances from the FHLB of New York aggregated $1,903 million compared to $1,963 million at December 31, 1990. Carteret Savings is currently required to deliver specific collateral to the FHLB of New York to secure its advances. Under current policies of the FHLB of New York, member institutions which meet regulatory capital requirements are required to maintain collateral in an amount not less than 110% of outstanding advances. Institutions which fall below minimum capital requirements are currently required to maintain collateral with the FHLB of New York in an amount not less than 125% of outstanding advances. Carteret Savings currently has sufficient available collateral to secure current advances at the 125% level.

On April 29, 1991, Carteret Savings entered into a Supervisory Agreement with the OTS which requires, among other things, that Carteret Savings submit a detailed liquidity plan under which it would demonstrate plans to achieve and maintain sufficient unpledged assets (giving effect to the applicable margin or "haircut" requirements), which may include assets used to satisfy regulatory liquidity requirements, that will enable Carteret Savings to secure advances from the FHLB of New York or borrowings from the Federal Reserve Bank of New York in an amount not less than 10% of the average balance of its liquidity base for the previous month. Carteret Savings currently has sufficient unpledged assets to satisfy such criterion. The liquidity plan must also include strategies to prudently reduce Carteret Savings' overall reliance on wholesale borrowed funds.

Based upon Carteret Savings' internal projected cash flow analysis which considers its liquid investments and other sources of funds, Carteret Savings believes there are, and will be, sufficient resources to fund outstanding and projected commitments for the remainder of 1991.

*Capital*

At June 30, 1991, due to a significant increase in the provision for losses on loans and real estate brought about by new management's intensive review of reserves, Carteret Savings failed to meet the minimum capital requirements of FIRREA after giving effect to all supervisory goodwill claimed by Carteret Savings in its suit against the OTS. See Part II, Item 1 -- "Legal Proceedings" for a description of these legal proceedings.

Failure to meet one or more of the capital requirements subjects a savings association to various regulatory limitations and sanctions. Carteret Savings is likely to be subject to the issuance of a Capital Directive by the OTS. The Capital Directive, among other things, would likely (i) require Carteret Savings to secure and thereafter maintain a higher level of core capital, (ii) require Carteret Savings to submit a capital plan demonstrating achievement and maintenance of regulatory capital, (iii) prohibit asset growth, (iv) prohibit capital declarations or distributions and (v) impose significant restrictions on Carteret Savings' operations.

Management is unable to determine the effect on Carteret Savings' future operations of its failure to meet minimum regulatory capital requirements and is uncertain whether Carteret Savings has the ability to attract the capital necessary to achieve and maintain minimum regulatory capital requirements. As previously mentioned, failure to meet minimum regulatory capital requirements and other regulatory requirements exposes Carteret Savings to an entire range of regulatory sanctions. In addition, Carteret Savings has incurred losses for the year ended December 31, 1990 and the first and second quarters of 1991 primarily due to increases in nonperforming assets and significant additions to the allowance for losses on loans and real estate. These circumstances raise substantial doubt about Carteret Savings' ability to continue as a going concern. Carteret Savings' ability to meet regulatory capital requirements in the future and to continue as a going concern will depend to a large extent upon future earnings, regulatory action and securing additional capital. Earnings will be affected by the level

of reserves for losses on loans and real estate which is dependent upon conditions in the economy and real estate market and new management's ability to attract new capital, further control expenses and enhance the profitability of Carteret Savings' core business of mortgage and consumer banking.

Carteret Savings was examined by the OTS and the FDIC for the period ended June 1990 and received the related OTS report of examination in December 1990. For further discussion see Item 7 -- "Management's Discussion and Analysis of Financial Condition and Results of Operations - Financial Condition - Banking Capital" in the Company's Annual Report on Form 10-K. In August 1991, Carteret Savings received the report from New York Regional Office of the FDIC on its June 1990 examination. The FDIC report of examination expressed concerns similar to those indicated in the OTS report of examination. The OTS examination indicated that Carteret Savings required close regulatory supervision. A similar finding was made by the FDIC. Both agencies are considering the level of supervision currently required.

*Credit Risk*

The following table sets forth information on nonaccrual loans, past due loans which are still accruing, REO, in-substance foreclosed loans and restructured loans at the dates indicated:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $ 83 | $ 47 |
| Commercial real estate loans | 51 | 14 |
| Corporate loans | 56 | 54 |
| Total nonaccrual loans | 190 | 115 |
| Residential first mortgage loans - 90 days past due | 34 | 27 |
| Consumer loans - 90 days past due | 4 | 4 |
| Premium finance - loans - 180 days past due | 3 | 3 |
| Total 90 or more days past due, still accruing | 41 | 34 |
| Total nonperforming loans | 231 | 149 |
| REO, net of allowances of $77 and $20 | 98 | 80 |
| In-substance foreclosed loans, net of allowances of $77 and $34 | 56 | 117 |
| Total nonperforming loans, REO and in-substance foreclosed loans | 385 | 346 |
| Restructured loans | 120 | 123 |
| Total nonperforming loans, REO, in-substance foreclosed loans and restructured loans | $505 | $469 |

Carteret employs a loan review system whereby potential problem loans and real estate are classified and closely monitored if uncertainty exists as to the future collectibility. Classified assets, which includes assets rated substandard, doubtful or loss, but excludes assets rated special mention, are as follows:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Substandard | $689 | $531 |
| Doubtful | 21 | 7 |
| Loss | 110 | 64 |
| | $820 | $602 |

Classified assets by asset type are as follows:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $117 | $ 74 |
| Commercial real estate loans | 250 | 147 |
| Total first mortgage loans | 367 | 221 |
| Corporate loans | 106 | 93 |
| Consumer loans | 15 | 17 |
| Premium finance loans | 3 | 3 |
| Total other loans | 124 | 113 |
| Total loans | 491 | 334 |
| Real estate held for development and sale | 21 | 17 |
| REO | 175 | 100 |
| In-substance foreclosed loans | 133 | 151 |
| Total investment in real estate | 329 | 268 |
| | $820 | $602 |

Assets rated special mention were $166 million and $245 million at June 30, 1991 and December 31, 1990, respectively. Classified assets and special mention assets at June 30, 1991 and December 31, 1990 include all nonperforming loans, REO and in-substance foreclosed loans.

A majority of Carteret Savings' residential and commercial real estate loans are secured by properties located in the states of New Jersey and Florida which have experienced a significant downturn in demand for such properties. Carteret Savings' management regularly analyzes each portfolio and records appropriate additions to the allowance for losses on loans and real estate. If conditions in the real estate markets in New Jersey and Florida worsen, there is no assurance that Carteret Savings will be able to collect its loans or liquidate real estate at amounts equal to their current carrying value.

The increase in nonperforming loans and REO is primarily due to the continued deterioration of the real estate markets, particularly the commercial real estate markets in the northeast and southeast regions, Carteret Savings' primary operating markets. Carteret Savings has responded to this rapidly changing environment in various ways. Consultants with a specialization in credit quality were retained to examine the internal review procedures. Credit review procedures were developed to strengthen and enhance the evaluation, identification and early recognition of potential losses on loans and investments in real estate. Such procedures include adoption of an internal portfolio evaluation program which includes the establishment of a detailed risk rating matrix system for loans and REO and the preparation of business plans for REO properties. Furthermore, Carteret Savings has recently retained additional qualified, experienced loan management personnel. New management has initiated a thorough review of Carteret Savings' portfolios and the related classifications and reserves. The review included site visits, interviews with respective account officers and examination of various documentation. The resolution process for problem assets is also receiving considerable attention from new management. Carteret Savings' aggressive approach has resulted in the addition of $150 million of reserves in the second quarter of 1991 and $161 million for the six months ending June 30, 1991.

The following table details the activity of the combined allowance for losses on loans and real estate for the second quarter and six months ended June 30:

| *(in millions)* | Second Quarter 1991 | Second Quarter 1990 | Six Months 1991 | Six Months 1990 |
|---|---|---|---|---|
| Allowance for losses on loans and real estate at beginning of period | $169 | $ 60 | $160 | $ 41 |
| Chargeoffs, net of recoveries | (6) | (1) | (8) | (3) |
| Total additions to allowance for losses on loans and real estate during period | 150 | 6 | 161 | 27 |
| Allowance for losses on loans and real estate at end of period | $313 | $ 65 | $313 | $ 65 |

Components of the allowance for losses on loans and real estate by major category follow:

| *(in millions)* | June 30, 1991 | December 31, 1990 |
|---|---|---|
| Residential first mortgage loans | $ 12 | $ 8 |
| Commercial real estate loans | 68 | 49 |
| Total first mortgage loans | 80 | 57 |
| Corporate loans | 54 | 39 |
| Consumer loans | 5 | 3 |
| Premium finance loans | 2 | 1 |
| Total other loans | 61 | 43 |
| Allowance for losses on loans | 141 | 100 |
| Real estate held for development and sale | 18 | 6 |
| REO | 77 | 20 |
| In-substance foreclosed loans | 77 | 34 |
| Allowance for losses on real estate | 172 | 60 |
| | $313 | $160 |

Management believes that a weakened overall economy and the depressed real estate market may result in future increases in Carteret Savings' nonperforming loans and REO levels and future decreases in the value of certain properties securing loans and REO. As previously mentioned, management's reserve review was not fully completed at the time of the filing of this report. The reserve amount recorded reflects management's current estimates of potential losses at this time. Further adjustments may be required as additional data is developed. Future adjustments to reserves will be recorded, as required, to reflect conditions existing at each reporting date.

**General**

On February 13, 1991 the Company sold all the outstanding common stock of The Home and its subsidiaries and certain other subsidiaries of the Company, together with 6,277,180 shares of The Home's $2.95 Cumulative Preferred Stock, Series A held by the Company, to Home Holdings pursuant to a stock purchase agreement dated as of September 28, 1990, as amended, among the Company, The Home and Home Holdings. For a further description see Note 2 to the Company's consolidated financial statements.

**RESULTS OF OPERATIONS**

***CONTINUING OPERATIONS***

**Banking**

The Company recorded a pretax loss before corporate expenses relating to its banking operations of $149 million and $153 million for the second quarter and six months ended June 30, 1991, respectively, compared with breakeven results and a pretax loss of $10 million for the same periods in 1990. As further described under "Financial Condition – Credit Risk," such losses include provisions for losses on loans and real estate of $150 million and $161 million for the second quarter and six months ended June 30, 1991, respectively, compared with $6 million and $27 million for the same periods in 1990. New management continues to focus on reserve strengthening, expense control and enhancement of core business profitability.

*Interest Income, Interest Expense and Net Interest Income*

| | Quarter ended June 30, 1991 | | | Quarter ended June 30, 1990 | | |
|---|---|---|---|---|---|---|
| *(dollars in millions)* | Average Balance | Interest | Average Rate | Average Balance | Interest | Average Rate |
| First mortgage loans | $2,605 | $ 59 | 9.06% | $3,565 | $92 | 10.41% |
| Mortgage-backed securities | 1,687 | 39 | 9.10 | 946 | 22 | 9.40 |
| Other loans | 505 | 12 | 10.41 | 564 | 18 | 12.92 |
| Investments | 394 | 8 | 7.58 | 409 | 9 | 8.59 |
| Total interest earning assets | $5,191 | $118 | 9.09% | $5,484 | $141 | 10.36% |
| Deposits | $3,043 | $ 52 | 6.85% | $4,148 | $ 79 | 7.66% |
| Advances from the FHLB | 1,946 | 35 | 7.24 | 671 | 15 | 9.13 |
| Other borrowed funds | 171 | 5 | 11.65 | 708 | 17 | 9.22 |
| Total interest bearing liabilities | $5,160 | $ 92 | 7.15% | $5,527 | $111 | 8.04% |
| Net interest income and margin | | $ 26 | 1.94% | | $ 30 | 2.32% |

| | Six Months ended June 30, 1991 | | | Six Months ended June 30, 1990 | | |
|---|---|---|---|---|---|---|
| *(dollars in millions)* | Average Balance | Interest | Average Rate | Average Balance | Interest | Average Rate |
| First mortgage loans | $2,672 | $122 | 9.22% | $3,603 | $191 | 10.70% |
| Mortgage-backed securities | 1,603 | 74 | 9.28 | 877 | 41 | 9.35 |
| Other loans | 520 | 27 | 10.78 | 569 | 37 | 13.22 |
| Investments | 463 | 18 | 7.66 | 444 | 19 | 8.53 |
| Total interest earning assets | $5,258 | $241 | 9.26% | $5,493 | $288 | 10.57% |
| Deposits | $3,039 | $106 | 7.05% | $4,213 | $162 | 7.75% |
| Advances from the FHLB | 1,940 | 74 | 7.67 | 682 | 31 | 9.20 |
| Other borrowed funds | 249 | 12 | 9.91 | 662 | 30 | 9.09 |
| Total interest bearing liabilities | $5,228 | $192 | 7.42% | $5,557 | $223 | 8.08% |
| Net interest income and margin | | $ 49 | 1.84% | | $ 65 | 2.49% |

The 1991 decrease in interest income was primarily due to a decreased asset base and decreased overall yield. The decrease in yield in 1991 reflects a near doubling of average nonperforming assets as compared with the prior year, investment in lower yielding products due to the concentration in assets favored under FIRREA's risk-based capital requirement, and a decrease in market investment interest rates. Interest expense decreased due to a decrease in the average balance of interest-bearing liabilities and a decrease in the overall cost of funds. The decrease in cost of funds is primarily attributable to a reduction in the cost of consumer deposits and advances from the FHLB.

*Non-interest Income*

Non-interest income for the second quarter of 1991 was $11 million versus $17 million for the same period in 1990. Non-interest income for the six months of 1991 decreased to $30 million from $36 million during the same period of 1990. The decrease was attributable to decreased other loan fees, service charges and other income due to the sale of branches in the fourth quarter of 1990 and a decreased emphasis on non-core businesses. In addition, increased losses from real estate operations due to increased REO contributed to the overall decrease in non-interest income.

*Other Expenses*

Other expenses in the second quarter of 1991 decreased to $36 million from $41 million in the same period of 1990. For the six months ended June 30, 1991 and 1990 other expenses were $69 million and $71 million, respectively. Despite 1991 including certain accruals relating to continued downsizing, compensation and employee benefits and occupancy expenses showed declines principally due to retail branch sales which occurred during the fourth quarter of 1990 and additional staff reductions attributable to downsizing. In addition, core deposit value and goodwill amortization in the second quarter and six months of 1991 decreased to $1 million and $2 million, respectively from $4 million and $8 million for the comparable periods of 1990, reflecting the write-off of goodwill in the fourth quarter of 1990. New management continues to focus on expense control.

**Corporate and Other Operations**

As further described under "Financial Condition – General," all indebtedness of the Company and Home Funding was either repaid, purchased in tender offers or assumed by Home Holdings in connection with the sale of The Home. As a consequence, no corporate interest expense was incurred in the 1991 second quarter compared with $22 million in the respective 1990 period. For the six months corporate interest expense was $10 million in 1991 compared with $41 million in 1990.

Corporate expenses and other operations decreased to $1 million in the second quarter of 1991 compared with $15 million in 1990. For the six months, corporate expenses and other operations decreased to $4 million in 1991 from $24 million in the 1990 period. Decreased expenses in the 1991 periods reflect the costs incurred in the prior year to downsize the Company's administrative organization as well as the related benefits of downsizing in the 1991 periods.

Income taxes on continuing operations were $3 million and $6 million in the second quarter and six months of 1991. Income taxes during these periods were principally comprised of state taxes and Internal Revenue Service interest. The loss from continuing operations before income taxes did not result in a federal income tax benefit in these periods.

*DISCONTINUED OPERATIONS*

For a discussion of discontinued operations refer to Note 2 to the Company's consolidated financial statements, the Company's quarterly reports on Form 10-Q for the quarterly periods ended June 30, 1990 and March 31, 1991, and the Company's Annual Report on Form 10-K for the year ended December 31, 1990.

**PART II. OTHER INFORMATION**

**Item 1. Legal Proceedings**

(a) The Company itself is a defendant in a number of lawsuits or proceedings including the following:

*Consolidated Securities and Stockholder Derivative Actions.* Fifteen complaints purporting to be class actions or stockholder derivative actions involving the Company have been filed in or transferred to the United States District Court for the Southern District of New York. Those actions have been consolidated under the caption *"In re AmBase Corporation Securities Litigation"* (the "Consolidated Actions"). The Consolidated Amended Class Action and Derivative Complaint (the "Consolidated Complaint") in the Consolidated Actions names as defendants the Company, The Home, Home Funding and certain of the directors and officers of the Company, as well as certain other parties.

The Consolidated Complaint asserts causes of action under the Securities Exchange Act of 1934 and the Securities Act of 1933, as well as causes of action based on common law negligent misrepresentation. Plaintiffs seek damages in an amount to be determined, plus certain declaratory and injunctive relief, costs and attorneys' fees. The Consolidated Complaint alleges that defendants published false and misleading information and wrongfully failed to disclose material information concerning the Company and its financial condition. The Consolidated Complaint also asserts derivatively on behalf of the Company claims against certain directors and officers of the Company based on alleged breach of fiduciary duty, gross mismanagement and corporate waste.

No class has been certified in the Consolidated Actions. On March 4, 1991, defendants moved to dismiss the Consolidated Complaint or, in the alternative, for summary judgment on all of plaintiffs' claims. That motion has now been fully briefed.

A new securities law action making allegations similar to those in the Consolidated Actions was commenced in the United States District Court for the Southern District of New York on July 12, 1991. Unlike the Consolidated Actions, this action is not filed as a class action, but rather is asserted individually on behalf of each of the plaintiffs.

*Delaware Derivative Action.* In June 1990, a stockholder derivative action was filed in Delaware Chancery Court. The allegations in this action are similar to the stockholder derivative allegations in the Consolidated Complaint.

*New York State Derivative Actions.* In January 1991, a stockholder derivative action was commenced in New York State Supreme Court. Plaintiff in this action alleges derivatively on behalf of the Company a cause of action for breach of fiduciary duty, waste of corporate assets and various claims and allegations relating to Marshall Manley, the Company's former President and Chief Executive Officer. Plaintiff requests damages against certain current and former Company directors and restitution and damages from Mr. Manley. After defendants moved to dismiss the complaint on the ground that plaintiff failed to make a demand on the Company's Board of Directors prior to commencing this action, plaintiff served an amended complaint including certain additional allegations concerning compensation received by officers and directors of the Company. On June 17, 1991, defendants renewed their motion to dismiss on essentially the same grounds.

On July 8, 1991, a new stockholder derivative action was commenced in New York State Supreme Court. Plaintiff in this action asserts derivatively on behalf of the Company claims against certain directors and officers of the Company and against Chase Manhattan Bank, N.A.

*Rolo and Tenerelli vs. City Investing Company Liquidating Trust et al..* This is a purported class action filed in the United States District Court for the District of New Jersey and asserting a variety of federal and state causes of action in connection with an alleged fraudulent scheme involving the marketing and sale of homesites and houses by General Development Corporation ("GDC"). Plaintiffs have named as defendants the Company and Carteret Savings, as well as a number of other financial institutions that had business dealings with GDC. By order dated December 12, 1990, the District Court administratively terminated the action. On

April 26, 1991, plaintiff's motion for reconsideration of that order was denied and the action was stayed pending the adjudication of plaintiff's claims against GDC in bankruptcy proceedings pending in Florida and the conclusion of criminal proceedings against two former GDC officers also named as defendants in the action.

In early April 1991, prior to the decision on plaintiff's motion for reconsideration, plaintiffs moved for a temporary restraining order and preliminary injunction seeking to restrain the Company and City Investing Company Liquidating Trust from paying dividends or liquidating. The District Court denied plaintiffs' application for a temporary restraining order and took no action on their request for a preliminary injunction in light of the stay entered in the action. AmBase has agreed not to pay dividends or make a liquidating dividend prior to September 30, 1991. This agreement may be extended from time to time.

Plaintiffs have appealed and requested a writ of mandamus from the United States Court of Appeals for the Third Circuit seeking to overturn the stay entered by the District Court. The appeal and request for mandamus have been fully briefed and oral argument, if granted, will take place in September.

The actions identified above are in their preliminary stages. In certain instances, the Company is not yet required to respond to the complaint. Nevertheless, the allegations are serious and, if proven, could result in substantial judgments against the Company. To the extent the aggregate of any such judgments were to exceed the litigation liability assumed by Home Holdings and the amounts of directors and officers insurance available therefor, these matters could have a material adverse effect on the Company's financial condition. The Company's counsel in these proceedings, by reason of the preliminary nature of these proceedings, have been unable to express any opinion as to their probable outcome.

*Consensual Cease and Desist Order.* On February 13, 1991, the Board of Directors of the Company approved the Company's entry into a Stipulation and Consent to Issuance of Order to Cease and Desist (the "Consent") with the OTS confirming the Company's obligation to contribute $30 million to Carteret Savings. That contribution was made by the Company to Carteret Savings on the same date.

*Arbitration Demand by Marshall Manley.* On August 9, 1991, Marshall Manley, former President and Chief Executive Officer of the Company, submitted a demand for arbitration against the Company to the American Arbitration Association. In his arbitration demand, Mr. Manley asserts claims for accrued or vested benefits, rights and entitlements owing to him in connection with past services, including but not limited to benefits under the Company's Long Term Incentive Compensation Plan and Supplemental Employee Pension Plan which, it is asserted, were not released as part of Mr. Manley's January 1991 settlement with the Company. No specific amount is claimed, however, Mr. Manley has previously claimed an amount in excess of $20 million.

(b) The Company is not itself a defendant in, but may be affected by the outcome of, the following proceedings:

*Settlement of OTS Proceedings Against Directors and Officers.* On February 14, 1991, the OTS initiated administrative cease and desist proceedings against twenty current and former directors and officers of the Company pursuant to Section 8(b) of the Federal Deposit Insurance Act ("FDIA") and Section 5(d) (1) (A) of the Home Owner's Loan Act ("HOLA") by issuing a Notice of Charges and Hearing for an Order to Cease and Desist and to Direct Restitution and other Affirmative Corrective Relief ("Notice"), and issued a Temporary Order to Cease and Desist ("Temporary Order") directed at the named directors and named officers. On February 15, 1991, the OTS filed a complaint for prejudgement attachment against the named officers (the "Action") in the United States District Court for the District of New Jersey, styled *OTS v. Plaxe, et al.*, Civ. Action No. 91-669 (Bissell, J.). In the Notice, Temporary Order and Action, the OTS alleged that certain incentive payments and the settlement of an employment dispute were unlawful because the agreements pursuant to which they were made were entered into when Carteret Savings was not in capital compliance and the payments themselves were made while the Company had an outstanding obligation of $30 million to Carteret Savings under a capital maintenance agreement and an outstanding contingent obligation to reimburse Carteret Savings if it were to sell Imperial prior to August 9, 1991, for less than $65 million. On April 25, 1991, the Company and the OTS entered into a settlement agreement pursuant to which (i) these proceedings have been dismissed by the OTS with prejudice, (ii) the OTS has agreed to refrain from initiating future proceedings against the Company, its officers and directors based on claims that severance agreements and payments thereunder were unreasonable, excessive or should not have been paid and (iii) the OTS has agreed to refrain from initiating any future proceedings based on any claims that the Company, its officers and directors have any further

obligations to infuse or contribute capital to Carteret Savings under either the capital maintenance agreement or the contingent obligation with respect to the sale of Imperial. Pursuant to the settlement, the Company agreed to purchase Imperial from Carteret Savings by August 9, 1991, for $65 million in cash, subject to certain conditions, and placed $12.5 million in escrow with Carteret Savings which was to be contributed to the capital of Carteret Savings if the transaction was not consummated. See Note 8 to the Company's consolidated financial statements.

*Carteret Savings Proceeding Against the Office of Thrift Supervision.* On February 14, 1991, Carteret Savings filed a complaint for injunctive, declaratory and other equitable relief in the United States District Court for the District of New Jersey against the OTS, in its own capacity and a successor in interest to the Federal Home Loan Bank Board ("FHLBB"), T. Timothy Ryan, Jr., individually and in his official capacity as Director, OTS, and the FDIC in its own capacity and a successor in interest to the FSLIC. The complaint asserts, among other things, that regulations issued pursuant to FIRREA erroneously interpret FIRREA to exclude from Carteret Savings' regulatory capital, certain goodwill recorded by Carteret Savings in acquisitions of several failing or failed thrift institutions in 1982 and 1986. On February 19, 1991, the Court entered an order that, among other things, (i) ordered the defendants to show cause why an order should not be entered preliminarily enjoining defendants from the enforcement of any capital regulation or any other action inconsistent with specified provisions of FIRREA, including any determination of regulatory capital deficiency and any regulatory sanctions, and (ii) pending determination of Carteret Savings' motion for a preliminary injunction enjoined and restrained defendants from taking any action against Carteret Savings by reason of defendants' failure to count as capital the total amount of supervisory goodwill recorded by Carteret Savings (amortized in accordance with Carteret Savings' agreements with the defendants' predecessor agencies), for all supervisory and regulatory capital determinations and purposes. At a hearing on April 12, 1991, the Court issued a preliminary injunction against the OTS continuing the restraints contained in the order to show cause. The preliminary injunction also continued the prohibition in the order to show cause on payments by Carteret Savings to the Company or its officers and directors in excess of $25,000 without prior OTS or Court approval. On April 19, 1991, the defendants appealed the Court's decision to the United States Court of Appeals for the Third Circuit. The FDIC, which was not made subject to the restraints of the preliminary injunction, has withdrawn its appeal. A subsequent opinion of the District Court dated July 8, 1991 also permits Carteret Savings to include for regulatory capital compliance purposes, supervisory goodwill written-off for GAAP purposes pursuant to the sale of branches.

*Office of Thrift Supervision Administrative Proceedings Regarding Carteret Savings.* By letter dated February 4, 1991, the OTS transmitted to Carteret Savings a proposed Stipulation and Consent to the Issuance of a Capital Directive and a proposed Capital Directive for execution by Carteret Savings and its Board of Directors no later than February 28, 1991. The preliminary injunction issued by the United States District Court for the District of New Jersey on April 12, 1991 and the final order issued on July 8, 1991 have enjoined and restrained the OTS from taking any action, including requiring Carteret Savings to consent to or otherwise comply with restrictions or requirements contained in the proposed Capital Directive, by reason of the OTS' failure to count as capital the full amount of supervisory goodwill in accordance with Carteret Savings' agreements with the OTS and FDIC's predecessor agencies. On February 21, 1991, subsequent to the entry of a temporary restraining order by that United States District Court regarding the proposed Capital Directive, the OTS presented to Carteret Savings a proposed Stipulation and Consent to the Issuance of an Order to Cease and Desist and a proposed Order to Cease and Desist relating to, among other things, certain matters raised in Carteret Savings' 1990 regulatory examination. Following extensive negotiations with the OTS, and in lieu of the issuance of such an Order to Cease and Desist, on April 29, 1991, Carteret Savings entered into a Supervisory Agreement with the OTS. Under the Supervisory Agreement, Carteret Savings has agreed to take certain actions, including, in some cases, establishing additional policies and procedures relating to, among other things, internal asset review and establishment of valuation allowances, problem asset workout, trading activities, mortgage derivative securities activities, accounting for loan servicing, liquidity, Imperial, a business plan and budget, transactions with affiliates, compensation, and the Board of Directors. Most of the described actions required by the Supervisory Agreement have already been addressed.

The OTS has initiated a formal examination and investigation concerning Carteret Savings, Carteret Bancorp, the Company and their affiliates and institution-affiliated parties. The Company and Carteret Savings became aware of the investigation in March 1991. The purpose and scope of the examination and investigation were not stated in the OTS Resolution initiating the investigation. The Company believes that a focus of the investigation is on any relationship that may have existed between the Company and its directors, officers and affiliates on the one hand, and GDC and its directors and affiliates on the other hand, in connection with the purchase by Carteret Savings of mortgage loans from an affiliate of GDC during the periods 1985 and 1989, of which approximately $64 million remained outstanding at June 30, 1991. Subpoenas have been served on certain of the Company's current and former directors and depositions of those persons have been taken by the OTS. The Company understands that subpoenas have also been served on GDC and certain of its affiliates.

The OTS commenced an examination of Carteret Savings on June 17, 1991. Certain issues relating to prior compensation, including bonuses paid December 1990 and advances paid in April 1990 to an officer of Carteret Savings, have been identified by the OTS. By letter dated July 24, 1991, the OTS has requested the Company and Carteret Savings provide extensive documentation relating to certain past compensation matters. The Company and Carteret Savings are currently involved in responding to the document request. The Company is unable to predict what action, if any, the OTS contemplates with respect to the subject of its document request.

*Proceedings with Drexel Burnham Lambert Group, Inc.* In February 1990, Drexel Burnham Lambert Group, Inc. ("Drexel") filed for protection under Chapter 11 of the Federal Bankruptcy Code. Prior to the date of filing, various customers of Home Capital Services, Inc. ("Capital Services"), a wholly owned subsidiary of the Company, had, through their agent Capital Services, from time to time made advances to Drexel under an unsecured demand note. Pending an overall resolution of the Drexel bankruptcy proceedings, the Company is unable to determine whether certain substantial pre-filing payments by Drexel under such note could be recoverable by Drexel as preferences, and from whom.

**Item 2. Changes in Securities**

Does not apply.

**Item 3. Defaults Upon Senior Securities**

Does not apply.

**Item 4. Submission of Matters to a Vote of Security Holders**

Does not apply.

**Item 5. Other Information**

Effective August 1, 1991, the Company surrendered its principal lease at 59 Maiden Lane, New York, New York 10038, and consolidated its remaining offices and personnel with those of Carteret Savings at 200 South Street, Morristown, New Jersey 07960. The Company continues to maintain a small office at 59 Maiden Lane, New York, New York.

FILE: 1) ERO-1118
2) RTC Lending

RESOLUTION TRUST CORPORATION
245 Peachtree Center Avenue
Suite 1400
Atlanta, GA 30303

**MEMORANDUM**

TO: Supervisory Managing Agents
Assistant Supervisory Managing Agents
Managing Agents
Assistant Managing Agents

THROUGH: Sandra A. Waldrop
Deputy Regional Director

FROM: Stephen A. Haley
Senior Conservatorship Specialist

Kenneth C. Herrmann KCH
Asset Marketing Coordinator

DATE: January 14, 1992

SUBJECT: **POLICY FOR CONTINUED LENDING IN CONSERVATORSHIP**

## RESCISSION OF 1989 LENDING POLICY/ESTABLISHMENT OF UPDATED POLICY

This memorandum rescinds and replaces the lending policy memo of 10/25/89 and subsequent memoranda regarding Eastern Region policy on origination of new loans and disbursements against existing loans and commitments by institutions in conservatorship. This memorandum establishes a contemporary 1992 update of Eastern Region conservatorship policy with respect to credit and lending.

## APPROACH USED TO DEVELOP THIS POLICY UPDATE

The approach to the 1989 version of this policy, by necessity, was more faceted than this update. In late 1989, Eastern Region conservatorships were still encouraged to preserve franchise value via continued new origination -- in addition to addressing the funding of preexisting legally binding commitments. A little over two years later, however, several factors including, but not necessarily limited to, RTC liquidity pressures, dwindling resolution premiums, and the emphasis on downsizing have served to limit lending activities, for the most part, to dealing with pre-intervention commitments, share loans, seller financing, workouts, compromises, and restructures -- but little, if any, on new origination.

Further, the initial 1989 policy was more difficult to author because of the then uncertainties (just two short months subsequent to the passage of FIRREA) with respect to the operations of conservatorships. While by no means a snap, this update, however, has been a time-consuming yet much simpler document to author because the knowns are greater, the uncertainties are fewer, and there are almost two and one-half years of field experience hopefully shedding light on what will and will not work and what does and does not make sense. And quite frankly, there is also the issue of public policy, i.e. what the administration, the Congress, borrowers and their lawyers, and taxpayers expect and/or will reasonably put up with with respect to credit and lending activities in conservatorship.

This memorandum establishes lending and credit policy and eliminates what was perceived to be but never was a formal requirement of submitting a "lending plan" within 60 days of intervention. The notion that such a "lending plan" was required was a result of the approach initially taken beginning in May 1991, but never implemented, to updating the 1989 policy. The "lending plan" approach served not only to update policy but to also tighten regional control over lending and credit activities. The "lending plan" approach was not adopted for two reasons. First, it was determined that additional control at the regional level served no utilitarian purpose. Second, it was determined that the "lending plan" approach was redundant. RTC policies, procedures, and other requirements (i.e. delegations of authority, reporting requirements, the Integrated Marketing Plan, the Downsizing Plan, the Conservatorship Operating Plan, cash flow and liquidity projections, and the like) have evolved over time such that the elements to have been included in the "lending plan" are already in place. Additionally, control and accountability with respect to credit and lending are already integral parts of the conservatorship process. In short, nothing was broken, and nothing needed fixing all that badly; things just needed updating. Accordingly, the "lending plan" approach was abandoned in November 1991 in favor of the approach found in this document.

Finally, the authors have endeavored to make this document "field friendly" by simplifying direction, providing guidance and examples where deemed appropriate, and allowing for more decision-making and creativity in the field subject to the parameters provided herein.

The following is a discussion of general policy, followed by more specific comments by loan category.

## GENERAL POLICY

### A. <u>Review at Intervention</u>

During intervention weekend and during the period immediately following intervention, a comprehensive review of the conservator-




App. 368

ship's lending and credit activities should be completed as expeditiously as possible. The following list is intended to be representative rather than all-inclusive and is the minimum that should be done in such a review:

(a) Identify any category of loan/lending that requires full or remaining funding of either closed (i.e. loan documents already executed) or unclosed (i.e. pipeline) closed-end commitments and/or revolving funding of either closed or unclosed open-end commitments;

(b) Identify any category of loan/lending where there are loan applications in process, i.e. not yet committed to nor denied;

(c) Identify any category of loan/lending where it is deemed desirable to continue new loan origination activities in conservatorship (situations should be rare, if any);

(d) Identify any subsidiaries which are involved in loan origination;

(e) Assess existing lending policy, underwriting criteria, loan documentation, staffing, servicing capabilities and delinquency;

(f) Have RTC Legal review existing commitments including, where deemed necessary, the right to repudiate;

(g) Anticipate sources of funds, cash flow and liquidity;

(h) Identify applicable loan disposition alternatives including use of the secondary market, whole loan sales, securitization and swaps, and other asset sale alternatives. Such disposition alternatives should be reviewed concurrently by an Asset Marketing Specialist for inclusion in the Integrated Marketing Plan.

B. New Loans/Origination in "Conservatorship"

With the exception of seller financing, share loans, and possibly some isolated rare exceptions, no "new lending/new loan origination" should occur at a conservatorship upon and after its intervention. Definitionally, "new lending/new loan origination" as used in the previous sentence does not mean to preclude the full or remaining funding of preexisting legally binding pipeline commitments and executed loans. Said another way, full or remaining funding on preexisting legally binding pipeline commitments and executed loans should not be construed as "new lending/new loan origination". All things held equal, full or remaining funding should be allowed to occur on preexisting non-onerous, legally binding pipeline commitments and executed loans

(including revolving credit). Stated again, with the aforementioned exceptions, "new credit commitments/new loan origination/new lending" in a conservatorship should cease upon intervention.

C. New Loans/Origination in "Subsidiaries"

With respect to wholly-owned subsidiary corporations of conservatorships which are involved in credit and lending activities (e.g. mortgage banking subsidiaries, consumer finance companies, insurance premium financing companies, and the like), it is possible that "new loans/new origination" will be allowed to continue in certain subsidiaries as a means of preserving franchise value of these subsidiaries while attempts are made to sell them as going concerns.

With respect to post-intervention continued new loan origination in mortgage banking subsidiaries, the Regional Conservatorship Mortgage Banking Coordinator should be contacted during intervention weekend or at the latest during the period immediately following intervention. The Mortgage Banking Coordinator will enlist the involvement of the RTC's national mortgage banking advisor. The advisor will coordinate an evaluation of the subsidiary in question to determine (first) the marketability of the subsidiary and (second) if continued origination would likely serve to preserve or increase the subsidiary's franchise value. If so, a case (citing the A-4 delegation) will be prepared by the conservatorship with assistance from the advisor recommending continued origination, and the case will be sent (depending of asset size of the subsidiary) to either the Eastern Regional Office Conservatorship Review Committee or the appropriate Washington committee for decision. See RTC Circular 9322.2 dated 9/20/91 for additional guidance with respect to mortgage banking subsidiaries.

With respect to post-intervention continued new loan origination in all other types of subsidiaries, the Regional Conservatorship Subsidiaries Coordinator should be contacted for guidance during intervention weekend or at the latest during the period immediately following intervention. The Subsidiaries Coordinator (with the assistance of the Managing Agent and RTC and association staff at the conservatorship) will seek "business" input concerning the loan subsidiary from knowledgeable subsidiary and conservatorship personnel, "franchise value" input from Washington or Regional Resolutions (depending on which will be coordinating the conservatorship's resolution), and "legal" input from assigned RTC counsel with respect to the nature of continued operations of such a subsidiary. Regardless of whether the resulting recommendation will be to continue to originate or to cease loan origination, a case (citing the A-4 delegation) supporting that recommendation should be forwarded to the Eastern Regional Conservatorship Review Committee for approval. The case should include a history and description of the company and how and where it operates, and discuss how franchise value will be impacted, how the subsidiary



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0315
App. 370

will fund existing commitments and new originations, how such loans are being and will be serviced, secondary marketing activities, staffing and how compensated, and the like. Pro forma sources and uses, profit and loss, and balance sheet statements should also be included.

While the "final" cases as described in the preceding two paragraphs are being developed, the Managing Agent (via a short, terse memorandum to the case log citing this policy memorandum and the A-4 delegation) is authorized to continue funding for up to 30 days beyond intervention with the concurrence of the Supervisory Managing Agent or designee. During this initial 30 days, and regardless of type of lending and to provide additional temporary authority while such recommendations and "final" cases are being developed, an "interim" case (citing the A-4 delegation) for each subsidiary in question to (1) continue new loan origination activities and to (2) provide intercompany warehouse funding (i.e. cash to fund originations), if necessary, to the subsidiary should be developed and forwarded to the Eastern Region Conservatorship Review Committee, with substantiation, requesting operating authority for the first 90 days following intervention.

D. Prior/Existing Commitments

The A-3 delegation provides the authority and guidance for funding with respect to preintervention prior/existing commitments.

Where commitments have been issued prior to intervention, the alleged commitments with respect to some types of (mostly closed-end) lending (e.g. residential permanent, commercial permanent, construction, and the like) should be reviewed on a case by case basis by RTC Legal to determine if each is legally binding. If deemed legally binding, each such commitment should then be reviewed to determine if creditworthiness of the borrower, pricing, other terms, etc. would, if funded, produce a loan that is onerous to the conservatorship and ultimately the taxpayer. If legally committed but deemed onerous enough, repudiation should be considered as a possible alternative. This paragraph is directly applicable to unclosed (not executed by the borrower) commitments. This paragraph is generally applicable to closed (executed by the borrower) commitments where full or some remaining funding has not occurred. Generally speaking, once a commitment is partially funded, the conservatorship should normally fund the remainder and use repudiation in only the most extreme and onerous situations. See General Policy E for guidance on repudiation.

With respect to other (mostly open-end) types of loans (e.g. revolving lines of credit, proprietary credit card, etc.) with generic terms and documentation and where commitments have been issued (and in most cases already closed) prior to intervention, existing accounts can be reviewed at the portfolio level for the purposes of determining if legally binding commitments exist and/or




App. 371

if pricing, terms, etc. are onerous. If legally committed but also deemed onerous enough, mass portfolio repudiation should be considered as a possible alternative. Before using the repudiation alternative, the possibility of amending terms and conditions at the portfolio level to cure onerous situations should be pursued. See General Policy E for guidance on repudiation.

Where commitments have been issued prior to intervention but remain unclosed (i.e. not executed by the borrower) on open-end type credit such as those categories described in the preceding paragraph, each such alleged commitment should be reviewed on a case by base basis by RTC Legal to determine if each is legally binding. If deemed legally binding, each such commitment should then be reviewed to determine if creditworthiness of the borrower, pricing, other terms, etc. would, if funded, produce a loan that is onerous to the conservatorship and ultimately the taxpayer. If legally committed but deemed onerous enough, repudiation should be considered as a possible alternative. See General Policy E for guidance on repudiation.

<u>As a single criterion, a conservatorship's lack of liquidity to fund a loan or a group of loans is not an acceptable reason to repudiate a commitment or to determine that a legally binding commitment is onerous</u>.

Maintaining or improving the marketability of generic revolving credit portfolios (i.e. performing credit card, other performing revolving lines of credit, etc.) is an acceptable reason to continue funding preexisting committed lines after determination that legally binding commitments for continued funding exist.

E. <u>Repudiation</u>

The general policy on funding vs. repudiation is to "err on the side of funding" where there is a preexisting legally binding commitment and when there are no <u>significantly</u> onerous, detrimental, or deleterious features or elements -- particularly when dealing with individual residential mortgage loans $500,000 or less, collateralized consumer loans/lines $100,000 or less, and business/commercial loans $1 million or less. Funding "bankable" and committed loans which are within these thresholds is advisable for several reasons including acquisition of a good and hopefully marketable asset, litigation avoidance (i.e. potential resulting litigation not being cost-effective at these lower threshold levels), and public and community relations. The funding vs. repudiation question on commitments above these thresholds must be decided on a case by case basis. When determining whether to fund commitments above these guideline thresholds, the Managing Agent and/or the committee with terminal delegated authority must weigh and consider any onerous, detrimental, or deleterious elements or features of the loan; the likely value of the loan in the secondary market; the likelihood of lender liability litigation if not

funded and the probable litigation outcome; the impact on the total credit relationship with that borrower; public policy; and so on.

GENERALLY SPEAKING, IF THERE IS NO LEGALLY BINDING COMMITMENT, DO NOT FUND!! It is recognized, however, that there will be situations in which good business judgment and/or common sense will support funding even when there is no legally binding commitment -- but the spirit and intent of this policy is that funding a loan request in the absence of a preexisting legally binding commitment should be a rarity. When such funding occurs, the A-4 delegation should be used.

Timeliness of repudiation is critical. Generally speaking, and because of recent court rulings concerning the time within which RTC can reasonably use its repudiation powers, all loan/lending/credit-related repudiations should occur by no later than the ninetieth (90th) day subsequent to intervention.

Each repudiation should be done with advice, consent, guidance of RTC Legal.

Repudiation of commitments should be selectively utilized for the most onerous situations, when a detrimental situation exists, or the results of such lending are judged to be deleterious. Representative examples of onerous, detrimental, and deleterious situations include, but are not limited to, loan pricing which is significantly below current market or not on a industry-standard basis; an amortization period which is too lengthy (e.g. 84 months on an auto loan secured by an average used automobile); loans which when sold in the secondary market will be sold at a significant discount to par (e.g. real estate and non-real estate commercial loans, unsecured loans, nonconforming loans with non-industry standard or non-agency standard terms or elements, and the like); and loans not properly collateralized, endorsed, or guaranteed.

Maintaining or improving the marketability of generic revolving credit portfolios (i.e. performing credit card, other performing revolving lines of credit, etc.) is an acceptable reason to continue funding existing commitments after determination that a legally binding commitment for continued funding exists.

F. Liquidity Issues

Continued lending is a matter of credit policy and such decisions, to fund or continue funding, should be based on sound credit policy and not on the basis of the conservatorship's liquidity. Liquidity is a function of operations and is a funding issue separate from the decision of credit. It is not prudent to ease liquidity problems by approaching credit decisions with a bias not to lend.

Liquidity can be dealt with, as lending is, in the conservatorship's budget, cash flow projections, Downsizing Plan, and the like.

As a single criterion, a conservatorship's lack of liquidity to fund a loan or a group of loans is not an acceptable reason to repudiate a commitment or to determine that a legally binding commitment is onerous.

G. Pricing

In those instances where continued lending occurs or when existing loans are subject to repricing, pricing must be at a "market rate" for each particular loan product. Continued lending for these purposes includes, for example, revolving credit portfolios in which the conservatorship has the flexibility to change pricing via amendments to program terms and conditions. Another example would be an expired legally binding commitment to provide a residential mortgage loan and on which the conservatorship wishes to extend the commitment but at a different rate than the original commitment. Another example would be a loan with a balloon maturity and on which the conservatorship wishes to renew or extend the maturity or amortization but at a different rate. Also included here are those rare instances in which the conservatorship finds it necessary or desirable to issue a postintervention commitment to make a new loan.

Considering the variety of markets RTC operates in (e.g. differences of geography, agrarian vs. urban communities, and so on), the diversity of loan types, and the difficulty in developing utilitarian "regional" boiler plate formulas for each category of lending, pricing will be at the discretion of the Managing Agent with the following guidelines:

(a) Any case for continued lending or funding must indicate, in sufficient detail, recommended pricing methodology.

(b) Local surveys and generic pricing indices used on a national level (FNMA, one-year T-bill, etc.) must be an exhibit to the case and support the recommended pricing methodology.

(c) If an index is used, it must be readily recognizable, information about it and changes to it must be readily accessible to both borrower and the conservatorship, and such that the individual conservatorship or the RTC has no control nor influence to set the index.

(d) Resulting rate pricing should not be at the low end of market surveys but should be at mid point or higher. In no event, however, should loan pricing be lower than the conservatorship's current marginal cost of funds.




App. 374

(e) To the extent that the conservatorship's cost of funds is used as at least a partial basis for determining asset pricing, the marginal cost of funds (for these purposes, the conservatorship's current nominal rate pricing for a 6-month C/D) should be used rather than average cost of deposits or weighted average cost of funds.

(f) Local loan pricing surveys should not be limited to thrift institutions but instead should include all viable competitors for the loan product being surveyed.

H. Balloon Maturities

Balloon maturities most often occur on amortizing commercial real estate and commercial non-real estate loans. They are generally used to provide the lender (and in some cases the borrower) periodic opportunities to review pricing, other terms, loan to value of collateral, and so on, and to make adjustments that will be in effect over the next or remaining amortization period. While there is ordinarily no commitment to provide continued amortization, it is generally understood that continued amortization will occur -- subject to whatever pricing, payment level, etc. modifications are deemed necessary and appropriate.

In today's environment, there are fewer alternatives for commercial loan financing. One primary reason is the greater risk factor assigned to commercial loans in arriving at an institution's required regulatory net worth, i.e. the greater the risk weight assigned to an asset, the more capital the institution has to have to support that asset. As a result, many lenders have begun to eschew that type of lending -- even to the most creditworthy borrowers.

When dealing with balloon maturities (regardless of type of loan), the first effort of the conservatorship should be to encourage the borrower to move the loan to another lender. If, however, this proves to be impossible, and if the loan has otherwise performed, it is in the best interest of the conservatorship and the RTC to establish another amortization period rather than to seek legal remedies -- particularly when the inability to acquire financing elsewhere is beyond the control of an otherwise good and performing borrower. The RTC would rather have a reamortized balloon loan than the collateral securing it.

I. Nonamortizing, Single-Maturity Loans

Not intending to encourage "evergreens", and for the same reasons, the same general approach as described above for balloon loans should be applied to nonamortizing, single-maturity loans. When such a loan comes due, the first effort should be to encourage the borrower to move the loan to another lender. If this fails, the




App. 375