next approach should be to attempt to establish at least a minimal repayment or amortization schedule. The use of compromise and/or restructure may also be applicable here. Only in the most onerous situations should legal remedies be sought. The RTC would rather have a newly amortizing loan, a renewed or extended single-maturity loan, or a compromised/restructured loan than the collateral securing it.

## LOAN CATEGORIES

### A. Residential 1-4 Family Mortgages

No new loans should be committed to or originated in conservatorship. (See General Policy C for guidance on origination of residential mortgage loans in subsidiaries of conservatorships.) Commitment extensions may be issued subject to site case approval and with legal concurrence that there existed a legally binding commitment. With respect to preexisting legally binding commitments, the general policy on funding vs. repudiation is to "err on the side of funding" if there are no significantly onerous, detrimental, or deleterious features or elements -- particularly when dealing with individual residential mortgage loans $500,000 or less. See General Policy for guidance with respect to funding vs. repudiation. At intervention, and as an alternative to funding or repudiation, originators and/or original borrowers should be encouraged to move/transfer applications and unfunded commitments to other lenders -- this effort to be accomplished with the full support and cooperation of the conservatorship but moved/transferred "as is" without any representations or warranties.

The Managing Agent and the CFO Asset Marketing Specialist with concurrence from RTC Legal should jointly determine as quickly as possible after intervention if any forward commitments exist and if these should be honored or repudiated.

### B. Construction/Development Outstanding Commitments

No new construction or development loans may be originated in conservatorship. See the General Policy section of this memorandum for overall guidelines and direction. During the initial review, disbursements against commitments outstanding at the time of intervention and extensions of same may only be funded subject to case approval at the appropriate delegation level with RTC Legal concurrence that there exists a legally binding commitment. Rights of repudiation should not be used as a basis to refuse to fund creditworthy projects. At the discretion of the Managing Agent, case approval can be either at the loan or the disbursement level. If at the loan level, the Managing Agent must ensure that there are sufficient controls over the disbursement process so that disbursements are in line with progress completed and/or, if present, the disbursement schedule agreed upon between the borrower and the




App. 376

ments, the lots remaining in Phase I are now worth 30% less than when the raw land was purchased by the developer. The raw land comprising Phases II-V is now worth 50% less than the original purchase price. Further, each of the 5 model homes (also financed by the institution) was appraised on a "typical unit" basis, and the appraised value of each declined on average 30% since the prior year. There are no environmental problems, and clear title to the underlying land and residential structures can be conveyed -- subject only to lender and contractor liens. The local area has 9% unemployment, and residential real estate values have been declining over the last 5 years and are expected to continue to decline for the next 5 years. A local manufacturing plant employing 5,000 has just announced it is relocating out of state.

Managing Agents, Credit Specialists, and conservatorship lending staffs in the Eastern Region face just this type situation every day. The initial inclination at intervention when confronted with the preceding scenario might be to repudiate the remainder of the commitment to the developer (which would shut down the development) and to concurrently repudiate committed permanent mortgage financing to homebuyers on the "presolds" -- under the decision-making assumption that additional "good" money should not follow "bad". **Normally, however, that is probably the wrong combination of decisions.**

As was suggested in the case of "single unit" projects, where for whatever reason(s) the amount disbursed or to be disbursed is of greater book value than the anticipated market value of the structure or project, it is generally in the best interests of the RTC to workout/restructure/compromise in such a way that funding can continue for completion of at least those units under construction, i.e. the 65 units under construction in Phase I in the example above. In most instances and in this example, the RTC is better off to have completed structures collateralizing its loan (or completed rather than in-construction REO, as the case may ultimately be). Completed units are simply easier to market and sell. All things held equal, the net realizable, utilitarian, and market values of these residential units will be dramatically greater once completed vis a vis left in an uncompleted state. Further, such uncompleted units generally become deteriorating eyesores over time as weeds grow, unpainted/untreated raw lumber grays, and so on. Not only is it poor public relations for RTC to leave uncompleted structures in such a state, such eyesores have a negative impact on the perceived, eye-appeal value of not just individual units but the entire development -- which ultimately manifests itself in less net realizable value to RTC and the taxpayer. Such uncompleted construction might also yield vandalism and liability problems, particularly if left unattended, as children and others play at or explore the site. In this example, the conservatorship is not only at risk on the 65 units under construction and the 5 models, but is also at risk on the 10 units already closed and financed by the institution. Should any or all of the units collateralizing these 10 permanent mortgage loans come



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0322

back to the conservatorship as REO, each is worth more if the development of which it is a part is perceived to be healthy and vibrant (i.e. without deteriorating uncompleted units casting a pale on the development).

With respect to the 10 units which have been sold but on which no construction has begun, the conservatorship must consider all factors and make a business decision regarding (1) whether to finance the construction for the builder/developer and (2) whether to repudiate the commitments to provide permanent mortgage financing. In some cases it will be prudent to finance the construction and provide end financing to the homebuyer. In other cases, it will not be prudent. Factors to consider are possible litigation from the developer, subcontractors, and/or the homebuyers; book vs. anticipated market value of the unit upon completion and occupancy; the value of Phase I (and possibly on the remaining phases) as more units are completed; and the like.

With respect to the remaining lots in Phase I on which there has been no activity, it would likely be in the best interest of the conservatorship and the RTC to not continue development financing. Assuming this is the decision arrived at, the conservatorship should workout via compromise or restructure in such a way that the developer is encouraged to market the remaining lots to other developers, builders, or investors or to agree to a deed in lieu of foreclosure or a friendly foreclosure so the conservatorship can have title. In some instances, another alternative for the conservatorship is to compromise in such a way that the developer can go to another lender for financing of the remainder of Phase I.

With respect to undeveloped Phases II-V, it would most likely be in the best interest of the conservatorship and the RTC to not provide continued development and construction financing. In this example, the development is deeply "under water" with respect to the institution's book investment compared to the current market value of the underlying collateral -- and the developer has no other assets and no other sources of cash or capital and is litigious. Given these assumptions, and to avoid costly and protracted litigation with a borrower who has no assets with which to satisfy a deficiency anyway, the likely best courses of action each involve compromise. One alternative would be to compromise in such a way that the developer provides a deed in lieu of foreclosure or allows an uncontested friendly foreclosure -- the outcomes being that the (1) conservatorship acquires title to the property and can begin immediately marketing it, and (2) the developer is relieved of any future liability. Another alternative would be to compromise the loan in such a way that the borrower can find financing elsewhere. For example, if the conservatorship's book value related to Phases II-V is $10 million, the market value of the property is $4 million, and another lender is willing and able to take over the remaining development lending at $3.2 million, it is in the best interest of the conservatorship to compromise the $6.8 million difference. While a significant loss in this example, this




App. 378

compromise precludes possible costly and protracted litigation, allows for the most expeditious liquidation of an asset, does so at an easily defendable net recovery to value percentage -- in this case 80%, and frees management time to deal with other matters.

The key elements to be derived from the extensive use of examples in this section of this memorandum are that:

* Loans collateralized by completed real estate structures (whether residences, office buildings, shopping centers, apartment buildings, or whatever) are normally in the better interest of the RTC than are uncompleted structures. Completed structures generally provide greater net realizable, utilitarian, and market values to the RTC than do uncompleted, in-construction structures; and

* Repudiation is not ordinarily the tool to use with respect to remaining unfunded construction and development commitments. Repudiation should be a last resort after all other alternatives have been exhausted -- with particular emphasis on the workout alternatives of restructure and compromise.

C. <u>Home Equity Loans/Lines of Credit</u>

No <u>new</u> home equity lines and loans may be originated in conservatorship. However, because discontinuance of disbursements on executed lines which existed prior to intervention will likely have an adverse effect on the overall value of this product (which typically sells in the secondary market at par or better), and because home equity lines are often accessed by negotiable instruments held by the borrower, it is generally in the best interest of the RTC to continue funding on such preexisting accounts. Analysis of the underwriting and historical performance of the portfolio should be performed during intervention weekend as outlined in General Policy A of this memorandum. The continuation of disbursements for a home equity portfolio is permitted during the period of review and RTC policy implementation for a period not to exceed 30 days while the A-3 analysis and case writing are being performed. Once an A-3 funding case is approved, reasonable and sound lending practices should be in place to minimize risk and maintain marketability. Controls should be in place or put in place to analyze individual draws to preclude funding lines which are delinquent and to preclude "over line" situations. The original notes should be reviewed to determine what options the lender has to discontinue funding of delinquent lines and what notifications must be provided to the borrower. Declaration of default and refusal to fund delinquent accounts should be in accordance with the terms of the note and mortgage. The Managing Agent and the CFO Asset Marketing Specialist should determine what is necessary to maintain the marketability of these loans.




App. 379

D. Credit Cards

No new credit card loans which will result in outstanding balances on the books of the institution (proprietary relationships) may be originated in conservatorship. A proprietary relationship is defined as one in which the conservatorship is an "issuing" institution, has full ownership of the receivables, and is at risk with respect to disbursements, collections, and so on. An agency relationship is one in which the association is acting on behalf of another "issuing" institution, does not own the receivables, has no or limited risk, and earns fee income from the issuing institution. If a conservatorship has a proprietary credit card program, it should be marketed and sold as soon as possible after intervention. Only agency relationships which pose no unusual risk to the institution may be continued without marketing attempts.

Funding for proprietary credit card lines should continue once it has been determined that a legally binding commitment exists and that such lending is not otherwise onerous with respect to portfolio creditworthiness, pricing, other terms, and the like. The continuation of funding for credit card purchases and advances is permitted during the period of review and RTC policy implementation for a period not to exceed 30 days while the A-3 analysis and case writing are being performed. Once an A-3 funding case is approved, reasonable and sound lending practices should be in place to minimize risk and maintain marketability. Controls should be in place or put in place to analyze individual draws to preclude funding lines which are delinquent and to preclude "over line" situations. Outstanding proprietary commitments at time of intervention should be monitored for serious delinquencies, and problem accounts should be addressed. Outstanding proprietary commitments must be carefully reviewed to determine what obligations exist in the original documents and what options or alternatives may be possible. RTC Legal must review the generic documentation and agreements. If the decision is to repudiate or to cease funding, any required notice period should be provided to the borrowers.

To reiterate, the Managing Agent and the CFO Asset Marketing Specialist should address a plan for disposition of this portfolio as expeditiously as possible after intervention, and any changes to the credit card plan must include an analysis as to secondary marketing implications and a review by RTC Legal.

E. Unsecured Overdraft Loans

Excluding formalized, well-underwritten, creditworthy overdraft accounts tied to a NOW or demand account at the institution, the creation of all other unsecured book balance overdrafts should not occur during conservatorship. While day to day NSF/overdraft

monitoring and decisions may be delegated to conservatorship staff or other RTC employees, the Managing Agent is responsible for overdraft management.

No new formalized overdraft accounts should be opened during conservatorship. With respect to existing performing formalized overdraft products, and with the assistance of RTC Legal, steps should be taken to unwind such arrangements as soon after intervention as possible. Should the Managing Agent or Resolutions, however, feel there is a compelling reason (such as maintaining franchise value) to continue funding such existing performing accounts rather than unwinding the product, then a case proposing such should be forwarded to the Eastern Region Conservatorship Review Committee for decision. Such a case should demonstrate that the conservatorship has sufficient controls and data processing linkages with demand accounts and other capabilities to support continuation of these arrangements and at the same time limit and mitigate risk. In no event, however, should new overdraft accounts be opened after intervention.

F. Share Loans

New share loans (maximum 90% LTV) may be originated and renewed in conservatorship. The interest rate should be at least 200 basis points greater than the nominal collateral account rate. If the collateral is a Certificate of Deposit, the CD collateral should be held in safekeeping. Holds or flags should be utilized to ensure the loan is repaid or is offset against the account prior to withdrawal of the Certificate funds.

Only C/D's and savings accounts of the conservatorship shall be used as collateral for share loans. Deposit accounts from other institutions cannot be used.

New and renewing share loans should have a maximum maturity of 1 year, but in no event can a share loan be set to mature after the maturity of the CD. Because of control problems and the difficulty sometimes with flags and holds, it is preferred that savings accounts not be used as collateral for share loans. The preference is to have the customer withdraw sufficient funds from savings and create a C/D which will act as collateral for the share loan. If, however, a share loan is made against a passbook account, the passbook should be held in the possession of the institution. If, however, the collateral account is a statement savings account, adequate controls (including but not necessarily limited to flags and holds) and procedures should exist or be implemented to ensure adequate collateral is sequestered until repayment of the loan.

G. Unsecured Loans

No new unsecured loans will be originated in conservatorship. Disbursements against preexisting legally binding commitments with respect to applications for unsecured credit will not be made without specific case approval under the A-3 commitment authority at the appropriate level of delegated authority. If the decision is to repudiate commitments to provide unsecured credit, RTC Legal should be asked to review such commitments and to provide letters of repudiation and notification to the borrowers, where necessary. Reread General Policy, Section E of this memorandum with respect to repudiation.

H. Consumer Loans/Autos, Boats, Etc.

No new consumer loans may be originated in conservatorship. During the initial days of conservatorship, preexisting legally binding commitments may have disbursements with approval on an A-3 case by case basis by the appropriate level of delegated authority and upon concurrence by RTC Legal. Consumer loans include auto, mobile home, boat, and other such categories. As suggested in General Policy, Section A of this memorandum, a careful review of policies and procedures should be undertaken to ensure prudent collection capabilities and continued servicing.

Generally these portfolios have received a good response by interested buyers but have required significant data preparation and file work in order to present a viable marketing package and to be prepared for sale and transfer. The review of these portfolios should start early and have a priority in the Integrated Marketing Plan. Significant policy changes to these portfolios should be reviewed with Asset Marketing so that their marketability is not diminished.

I. Student Loans

No new student loans may be originated in conservatorship. Generally speaking, preexisting commitments for federally and state guaranteed student loans should be honored. At the discretion of the Managing Agent, funding of preexisting commitments on loans which have lost their federal or state guarantee may be made if the situation causing the loss of guarantee is "cured" and the guarantee reinstated. Generally speaking, existing commitments on nonguaranteed loans and on loans where the guarantee has been lost and cannot be reinstated should be repudiated with the review and assistance of RTC Legal. Carefully considered exceptions to the last sentence can be made at the discretion of the Managing Agent.

J. Commercial Real Estate Loans

No new commercial real estate loans may be originated or committed during conservatorship. Disbursements against preexisting legally binding commitments outstanding and extensions may only be funded by A-3 case approval at the appropriate level and after concurrence by RTC Legal that there exists a legally binding commitment. Special review and decision-making is needed for these loans since they are very difficult to sell. Experience has shown that these are undesirable assets in that such loans typically sell at significant discounts to par and are collateralized by property with declining values. Against these negative characteristics and to arrive at a prudent business decision, Managing Agents must weigh the probability and anticipated outcome of protracted lender liability litigation if repudiation is used. Borrowers should be contacted and encouraged to move existing loans and unfunded requests to other lenders, and every effort to control and downsize should be implemented.

Furthermore, these loans could be in at least four end-loan statuses which will have a significant influence on a final decision. These statuses are:

(a) Construction with a permanent third party take-out. All things held equal, this type commitment should be funded provided that the end loan lender is still willing and able, and that RTC Legal advises that there is a legally binding commitment from the third party.

(b) Construction/Permanent with the conservatorship having the end loan commitment. This is a much more complex situation as many factors must be weighed before a decision is made. These decisions must be made on an individual loan-by-loan basis weighing the effect of repudiation vs. completion and what effect that decision has on the overall gain/loss to the RTC. See the General Policy sections of this memorandum for overall guidance with respect to funding vs. repudiation.

(c) Construction with no permanent take out. This obviously is a most undesirable situation and one in which, in effect, the conservatorship is the end lender whether it wishes to be or not. This situation is similar to (b) above but requires even greater deliberation.

(d) Permanent take out only. This decision will probably be more guided by RTC Legal and what impact protracted litigation and lender liability would have on the project. This is one instance in which repudiation may be the most desirable avenue. See the General Policy sections of this memorandum for overall guidance with respect to funding vs. repudiation.

institution. Repudiation is an alternative solution and should be used prudently after all factors and the consequences of a decision to repudiate have been considered. See General Policy E for guidance on repudiation.

With respect to nonfraudulent situations where for whatever reason(s) the amount disbursed is of greater book value than the market value of the uncompleted structure or project, it is generally in the best interests of the RTC to workout/restructure/compromise in such a way that funding can continue for completion of the project -- particularly when the project is 40% or more completed. In most instances, the RTC is better off to have a completed structure or project collateralizing its loan (or a completed rather than in-construction REO, as the case may ultimately be). All things held equal, the utilitarian and market values of the structure or project are dramatically greater once completed. On the other hand, common sense needs to prevail to preclude a hard and fast dictum. For example, if the conservatorship has funded only the first $100,000 of a $2 million office building project, it is probably not best to fund the remainder. In short, the economics of each project will need to be examined to arrive at a decision of whether to complete or not complete a project through continued funding of a construction loan or additional capital investment in an uncompleted REO.

The preceding paragraph dealt in content and example with "single unit" type projects. The same general direction, however, holds for "multiple unit" and possibly "multiple phase" projects. For example, at intervention an "acquisition, development, and construction" loan (an "ADC" loan) is brought to the attention of the Managing Agent and the site Credit Review Committee. It is a nonperforming loan in that the interest reserve has been depleted, interest payments for 5 months are due, and the developer has no other assets and has no other sources for cash or capital. The developer is litigious. This particular credit facility was committed by the institution to support a contiguous 5-phase residential development with 100 units to be developed in each sequential phase. The land for all 5 phases has been purchased. However, the horizontal infrastructure development (i.e. streets, utilities, etc.) has been completed only for Phase I. In Phase I, 65 units are under construction -- some with the slab foundation having just been poured, some 30% complete, some 50% complete, and some 80% complete. Of these 65, 35 are "presolds" (with permanent financing committed by the institution on all 35), and 30 are "specs". Another 10 units have already been completed and sold and are owner-occupied -- all having been financed by the institution. In addition, the builder/developer has an additional 10 legally binding contracts with 10% "at risk" down payments held in escrow on units not yet under construction.

The land was reappraised 4 months prior to intervention, and the appraisal was reviewed and concurred with by OTS review appraisers. Even with the addition of the horizontal infrastructure improve-



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5067 0329
App. 384

# POLICY and PROCEDURES
# for
# COMPUTATION of DIVIDEND PAYMENTS
# of
# PASS THROUGH RECEIVERSHIPS

Resolution Trust Corporation
Office of Research and Statistics
January 31, 1992

AM0010019

# POLICY and PROCEDURES
for
COMPUTATION of DIVIDEND PAYMENTS
of
PASS THROUGH RECEIVERSHIPS

## Table of Contents


| Section | | Page |
|---|---|---|
| | INTRODUCTION | 1 |
| I. | THEORY | 1 |
| | A. Background | 1 |
| | B. Legal Requirements | 3 |
| | C. Depositor Preference | 5 |
| | D. Formula for the Pro Rata Distribution | 6 |
| | E. Formula for the Interest Calculation | 7 |
| II. | METHODOLOGY | 9 |
| | A. Sources of Data | 9 |
| | B. Calculation of Variables | 14 |
| | C. Documentation | 25 |
| III. | AGGREGATE RESULTS | 29 |

Appendices:

| | | |
|---|---|---|
| 1. | Article V of the Purchase and Assumption Agreement | 33 |
| 2. | Sample CADSR Report | 35 |
| 3. | Sample TFR Statement of Condition | 37 |
| 4. | Annual Yields for 91-Day Treasury Bills | 42 |
| 5. | Rates Used to Discount AVR Market Value Data | 43 |
| 6. | Dividend Percentage Report | 44 |
| 7. | Fair Market Value Report | 46 |
| 8. | Indirect Expense Report | 49 |
| 9. | TFR Liabilities Report | 51 |


AM0010020

# POLICY and PROCEDURES for COMPUTATION of DIVIDEND PAYMENTS of PASS THROUGH RECEIVERSHIPS

## I. INTRODUCTION

This study: (a) summarizes RTC policy regarding payment of general unsecured creditors of pass-through purchase and assumption receiverships (PTRs); (b) describes the methodology used to compute the dividend payment due general unsecured creditors with proven claims; and (c) presents the results of the dividend payment analyses for 394 PTRs. The 394 PTRs constitute all PTRs that have occurred from the inception of the conservatorship program in February 1989 through March 31, 1991.

The analyses provide the pro rata percentage of claims due general creditors for each of the 394 PTRs. It includes workpapers for each thrift plus a summary of the aggregate results for all 394 thrifts. These results should be considered preliminary, pending review by RTC field staff.

## I. THEORY

### A. Background

Once an institution is determined to be insolvent by the Office of Thrift Supervision, the RTC is normally appointed receiver of the failed association and all of the assets and

liabilities are transferred to an initial receivership. This transaction is also called a pass-through purchase and assumption receivership (PTR). A separate federal mutual association (de novo) is then created and all of the assets and substantially all of the liabilities "pass-through" the initial receivership into the de novo. The initial receivership retains a claim on the assets of the de novo institution plus stockholders equity (if any) and selected liabilities; the liabilities include most general unsecured claims other than deposits and subordinated claims. The de novo association is then placed into conservatorship, and the RTC is appointed conservator. The procedures for these transactions are defined in a standardized "Purchase and Assumption Agreement" between the RTC as Receiver and both the initial receivership and the de novo association.[1]

When the Office of Thrift Supervision declares an institution insolvent, the RTC may elect to place an institution in conservatorship without the initial PTR step. If this occurs, the institution generally undergoes a PTR and becomes a de novo institution at some point prior to resolution. The procedures in the standardized "Purchase and Assumption Agreement" are used in either case.

---

[1] Note that the terms "receivership", "liquidation" and "purchase and assumption" are also used to describe institutions and transactions before or during resolution. In this study, these terms refer only to the earliest step or conversion of an insolvent institution to an initial receivership estate and then to a de novo association.



AM0010022

# Statement of Financial Accounting Standards No. 109

FAS109 Status Page
FAS109 Summary

## Accounting for Income Taxes

February 1992

Financial Accounting Standards Board
of the Financial Accounting Foundation
401 MERRITT 7, P.O. BOX 5116, NORWALK, CONNECTICUT 06856-5116

Copyright © 1992 by Financial Accounting Standards Board. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the Financial Accounting Standards Board.

**Statement of Financial Accounting Standards No. 109**

**Accounting for Income Taxes**

**February 1992**

## CONTENTS


| | Paragraph Numbers |
|---|---|
| Introduction | 1–2 |
| Standards of Financial Accounting and Reporting: | |
| Scope | 3–5 |
| Objectives and Basic Principles | 6–15 |
| Temporary Differences | 10–15 |
| Recognition and Measurement | 16–34 |
| Annual Computation of Deferred Tax Liabilities and Assets | 17–25 |
| A Change in the Valuation Allowance | 26 |
| An Enacted Change in Tax Laws or Rates | 27 |
| A Change in the Tax Status of an Enterprise | 28 |
| Regulated Enterprises | 29 |
| Business Combinations | 30 |
| Opinion 23 and U.S. Steamship Enterprise Temporary Differences | 31–34 |
| Intraperiod Tax Allocation | 35–39 |
| Certain Quasi Reorganizations | 39 |
| Separate Financial Statements of a Subsidiary | 40 |
| Financial Statement Presentation | 41–42 |
| Financial Statement Disclosure | 43–49 |
| Effective Date and Transition | 50–59 |
| Prior Business Combinations | 53–56 |
| Assets of Regulated Enterprises Reported on a Net-of-Tax or After-Tax Basis | 57–59 |
| Appendix A: Basis for Conclusions | 60–222 |
| Appendix B: Application of the Standards to Specific Aspects of Accounting for Income Taxes | 223–276 |
| Appendix C: Background Information | 277–285 |
| Appendix D: Amendments to Existing Pronouncements | 286–288 |
| Appendix E: Glossary | 289 |

# FAS 109: Accounting for Income Taxes

## FAS 109 Summary

This Statement establishes financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities during the current and preceding years. It requires an asset and liability approach for financial accounting and reporting for income taxes. This Statement supersedes FASB Statement No. 96, *Accounting for Income Taxes,* and amends or supersedes other accounting pronouncements listed in Appendix D.

### Objectives of Accounting for Income Taxes

The objectives of accounting for income taxes are to recognize (a) the amount of taxes payable or refundable for the current year and (b) deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an enterprise's financial statements or tax returns.

### Basic Principles of Accounting for Income Taxes

The following basic principles are applied in accounting for income taxes at the date of the financial statements:

a. A current tax liability or asset is recognized for the estimated taxes payable or refundable on tax returns for the current year.
b. A deferred tax liability or asset is recognized for the estimated future tax effects attributable to temporary differences and carryforwards.
c. The measurement of current and deferred tax liabilities and assets is based on provisions of the enacted tax law; the effects of future changes in tax laws or rates are not anticipated.
d. The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

### Temporary Differences

The tax consequences of most events recognized in the financial statements for a year are

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

included in determining income taxes currently payable. However, tax laws often differ from the recognition and measurement requirements of financial accounting standards, and differences can arise between (a) the amount of taxable income and pretax financial income for a year and (b) the tax bases of assets or liabilities and their reported amounts in financial statements.

APB Opinion No. 11, *Accounting for Income Taxes, used the term timing differences* for differences between the years in which transactions affect taxable income and the years in which they enter into the determination of pretax financial income. Timing differences create differences (sometimes accumulating over more than one year) between the tax basis of an asset or liability and its reported amount in financial statements. Other events such as business combinations may also create differences between the tax basis of an asset or liability and its reported amount in financial statements. All such differences collectively are referred to as *temporary differences* in this Statement.

**Deferred Tax Consequences of Temporary Differences**

Temporary differences ordinarily become taxable or deductible when the related asset is recovered or the related liability is settled. A deferred tax liability or asset represents the increase or decrease in taxes payable or refundable in future years as a result of temporary differences and carryforwards at the end of the current year.

**Deferred Tax Liabilities**

A deferred tax liability is recognized for temporary differences that will result in taxable amounts in future years. For example, a temporary difference is created between the reported amount and the tax basis of an installment sale receivable if, for tax purposes, some or all of the gain on the installment sale will be included in the determination of taxable income in future years. Because amounts received upon recovery of that receivable will be taxable, a deferred tax liability is recognized in the current year for the related taxes payable in future years.

**Deferred Tax Assets**

A deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carryforwards. For example, a temporary difference is created between the reported amount and the tax basis of a liability for estimated expenses if, for tax purposes, those estimated expenses are not deductible until a future year. Settlement of that liability will result in tax deductions in future years, and a deferred tax asset is recognized in the current year for the reduction in taxes payable in future years. A valuation allowance is recognized if, based on the weight of available evidence, it is *more likely than not* that some portion or all of the deferred tax asset will not be realized.

**Measurement of a Deferred Tax Liability or Asset**

This Statement establishes procedures to (a) measure deferred tax liabilities and assets

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

using a tax rate convention and (b) assess whether a valuation allowance should be established for deferred tax assets. Enacted tax laws and rates are considered in determining the applicable tax rate and in assessing the need for a valuation allowance.

All available evidence, both positive and negative, is considered to determine whether, based on the weight of that evidence, a valuation allowance is needed for some portion or all of a deferred tax asset. Judgment must be used in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed.

### Changes in Tax Laws or Rates

This Statement requires that deferred tax liabilities and assets be adjusted in the period of enactment for the effect of an enacted change in tax laws or rates. The effect is included in income from continuing operations.

### Effective Date

This Statement is effective for fiscal years beginning after December 15, 1992. Earlier application is encouraged.

## INTRODUCTION

1. This Statement addresses financial accounting and reporting for the effects of income taxes [1] that result from an enterprise's activities during the current and preceding years.

2. FASB Statement No. 96, *Accounting for Income Taxes*, which was issued in December 1987, superseded APB Opinion No. 11, *Accounting for Income Taxes*. The effective date of Statement 96 was delayed to fiscal years that begin after December 15, 1992. In March 1989, the Board began consideration of requests to amend Statement 96 to (a) change the criteria for recognition and measurement of deferred tax assets and various other requirements of Statement 96 and (b) reduce complexity. This Statement is the result of that reconsideration.

## STANDARDS OF FINANCIAL ACCOUNTING AND REPORTING

### Scope

3. This Statement establishes standards of financial accounting and reporting for income taxes

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

that are currently payable and for the tax consequences of:

a. Revenues, expenses, gains, or losses that are included in **taxable income** of an earlier or later year than the year in which they are recognized in financial income
b. Other events that create differences between the tax bases of assets and liabilities and their amounts for financial reporting
c. Operating loss or tax credit **carrybacks** for refunds of taxes paid in prior years and **carryforwards** to reduce taxes payable in future years.

This Statement supersedes Statement 96 and supersedes or amends other accounting pronouncements listed in Appendix D.

4. The principles and requirements of this Statement are applicable to:

a. Domestic federal (national) income taxes (U.S. federal income taxes for U.S. enterprises) and foreign, state, and local (including franchise) taxes based on income
b. An enterprise's [2] domestic and foreign operations that are consolidated, combined, or accounted for by the equity method
c. Foreign enterprises in preparing financial statements in accordance with U.S. generally accepted accounting principles.

5. This Statement does not address:

a. The basic methods of accounting for the U.S. federal investment tax credit (ITC) and for foreign, state, and local investment tax credits or grants (The deferral and flow-through methods as set forth in APB Opinions No. 2 and No. 4, *Accounting for the "Investment Credit,"* continue to be acceptable methods to account for the U.S. federal ITC.)
b. Discounting (Paragraph 6 of APB Opinion No. 10, *Omnibus Opinion—1966,* addresses that subject.)
c. Accounting for income taxes in interim periods (other than the criteria for recognition of tax benefits and the effect of enacted changes in tax laws or rates and changes in valuation allowances. (APB Opinion No. 28, *Interim Financial Reporting,* and other accounting pronouncements address that subject.)

## Objectives and Basic Principles

6. One objective of accounting for income taxes is to recognize the amount of taxes payable or refundable for the current year. A second objective is to recognize **deferred tax liabilities and assets** for the future **tax consequences** of events [3] that have been recognized in an enterprise's financial statements or tax returns.

7. Ideally, the second objective might be stated more specifically to recognize the *expected* future tax consequences of events that have been recognized in the financial statements or tax

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

returns. However, that objective is realistically constrained because (a) the tax payment or refund that results from a particular tax return is a joint result of all the items included in that return, (b) taxes that will be paid or refunded in future years are the joint result of events of the current or prior years and events of future years, and (c) information available about the future is limited. As a result, attribution of taxes to individual items and events is arbitrary and, except in the simplest situations, requires estimates and approximations.

8. To implement the objectives in light of those constraints, the following basic principles (the only exceptions are identified in paragraph 9) are applied in accounting for income taxes at the date of the financial statements:

a. A current tax liability or asset is recognized for the estimated taxes payable or refundable on tax returns for the current year.
b. A deferred tax liability or asset is recognized for the estimated future tax effects attributable to **temporary differences** and carryforwards.
c. The measurement of current and deferred tax liabilities and assets is based on provisions of the enacted tax law; the effects of future changes in tax laws or rates are not anticipated.
d. The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

9. The only exceptions in applying those basic principles are that this Statement:

a. Continues certain exceptions to the requirements for recognition of deferred taxes for the areas addressed by APB Opinion No. 23, *Accounting for Income Taxes—Special Areas*, as amended by this Statement (paragraphs 31-34)
b. Provides special transitional procedures for temporary differences related to deposits in statutory reserve funds by U.S. steamship enterprises (paragraph 32)
c. Does not amend accounting for leveraged leases as required by FASB Statement No. 13, *Accounting for Leases*, and FASB Interpretation No. 21, *Accounting for Leases in a Business Combination* (paragraphs 256-258)
d. Prohibits recognition of a deferred tax liability or asset related to goodwill (or the portion thereof) for which amortization is not deductible for tax purposes (paragraph 30)
e. Does not amend Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, for income taxes paid on intercompany profits on assets remaining within the group, and prohibits recognition of a deferred tax asset for the difference between the tax basis of the assets in the buyer's tax jurisdiction and their cost as reported in the consolidated financial statements
f. Prohibits recognition of a deferred tax liability or asset for differences related to assets and liabilities that, under FASB Statement No. 52, *Foreign Currency Translation*, are remeasured from the local currency into the functional currency using historical exchange rates and that result from (1) changes in exchange rates or (2) indexing for tax purposes.

Copyright © 1992, Financial Accounting Standards Board

Not for redistribution

**Temporary Differences**

10. **Income taxes currently payable**[4] for a particular year usually include the tax consequences of most events that are recognized in the financial statements for that year. However, because tax laws and financial accounting standards differ in their recognition and measurement of assets, liabilities, equity, revenues, expenses, gains, and losses, differences arise between:

a. The amount of taxable income and pretax financial income for a year
b. The tax bases of assets or liabilities and their reported amounts in financial statements.

11. An assumption inherent in an enterprise's statement of financial position prepared in accordance with generally accepted accounting principles is that the reported amounts of assets and liabilities will be recovered and settled, respectively. Based on that assumption, a difference between the tax basis of an asset or a liability and its reported amount in the statement of financial position will result in taxable or deductible amounts in some future year(s) when the reported amounts of assets are recovered and the reported amounts of liabilities are settled. Examples follow:

a. *Revenues or gains that are taxable after they are recognized in financial income.* An asset (for example, a receivable from an installment sale) may be recognized for revenues or gains that will result in future taxable amounts when the asset is recovered.
b. *Expenses or losses that are deductible after they are recognized in financial income.* A liability (for example, a product warranty liability) may be recognized for expenses or losses that will result in future tax deductible amounts when the liability is settled.
c. *Revenues or gains that are taxable before they are recognized in financial income.* A liability (for example, subscriptions received in advance) may be recognized for an advance payment for goods or services to be provided in future years. For tax purposes, the advance payment is included in taxable income upon the receipt of cash. Future sacrifices to provide goods or services (or future refunds to those who cancel their orders) will result in future tax deductible amounts when the liability is settled.
d. *Expenses or losses that are deductible before they are recognized in financial income.* The cost of an asset (for example, depreciable personal property) may have been deducted for tax purposes faster than it was depreciated for financial reporting. Amounts received upon future recovery of the amount of the asset for financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.
e. *A reduction in the tax basis of depreciable assets because of tax credits.*[5] Amounts received upon future recovery of the amount of the asset for financial reporting will exceed the remaining tax basis of the asset, and the excess will be taxable when the asset is recovered.
f. *ITC accounted for by the deferral method.* Under Opinion 2, ITC is viewed and accounted for as a reduction of the cost of the related asset (even though, for financial statement presentation, deferred ITC may be reported as deferred income). Amounts received upon

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

future recovery of the reduced cost of the asset for financial reporting will be less than the tax basis of the asset, and the difference will be tax deductible when the asset is recovered.

g. *An increase in the tax basis of assets because of indexing whenever the local currency is the functional currency.* The tax law for a particular tax jurisdiction might require adjustment of the tax basis of a depreciable (or other)asset for the effects of inflation. The inflation-adjusted tax basis of the asset would be used to compute future tax deductions for depreciation or to compute gain or loss on sale of the asset. Amounts received upon future recovery of the local currency historical cost of the asset will be less than the remaining tax basis of the asset, and the difference will be tax deductible when the asset is recovered.

h. *Business combinations accounted for by the purchase method.* There may be differences between the assigned values and the tax bases of the assets and liabilities recognized in a business combination accounted for as a purchase under APB Opinion No. 16, *Business Combinations.* Those differences will result in taxable or deductible amounts when the reported amounts of the assets and liabilities are recovered and settled, respectively.

12. Examples (a)-(d) in paragraph 11 illustrate revenues, expenses, gains, or losses that are included in taxable income of an earlier or later year than the year in which they are recognized in pretax financial income. Those differences between taxable income and pretax financial income also create differences (sometimes accumulating over more than one year) between the tax basis of an asset or liability and its reported amount in the financial statements. Examples (e)-(h) in paragraph 11 illustrate other events that create differences between the tax basis of an asset or liability and its reported amount in the financial statements. For all eight examples, the differences result in taxable or deductible amounts when the reported amount of an asset or liability in the financial statements is recovered or settled, respectively.

13. This Statement refers collectively to the types of differences illustrated by those eight examples and to the ones described in paragraph 15 as *temporary differences.* Temporary differences that will result in taxable amounts in future years when the related asset or liability is recovered or settled are often referred to in this Statement as **taxable temporary differences** (examples (a), (d), and (e) in paragraph 11 are taxable temporary differences). Likewise, temporary differences that will result in deductible amounts in future years are often referred to as **deductible temporary differences** (examples (b), (c), (f), and (g) in paragraph 11 are deductible temporary differences). Business combinations accounted for by the purchase method (example (h)) may give rise to both taxable and deductible temporary differences.

14. Certain basis differences may not result in taxable or deductible amounts in future years when the related asset or liability for financial reporting is recovered or settled and, therefore, may not be temporary differences for which a deferred tax liability or asset is recognized. One example under current U.S. tax law is the excess of cash surrender value of life insurance over premiums paid. That excess is a temporary difference if the cash surrender value is expected to be recovered by surrendering the policy, but is not a temporary difference if the asset is expected to be recovered without tax consequence upon the death of the insured (there will be no taxable amount if the insurance policy is held until the death of the insured).

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

15. Some temporary differences are deferred taxable income or tax deductions and have balances only on the income tax balance sheet and therefore cannot be identified with a particular asset or liability for financial reporting. That occurs, for example, when a long-term contract is accounted for by the percentage-of-completion method for financial reporting and by the completed-contract method for tax purposes. The temporary difference (income on the contract) is deferred income for tax purposes that becomes taxable when the contract is completed. Another example is organizational costs that are recognized as expenses when incurred for financial reporting and are deferred and deducted in a later year for tax purposes. In both instances, there is no related, identifiable asset or liability for financial reporting, but there is a temporary difference that results from an event that has been recognized in the financial statements and, based on provisions in the tax law, the temporary difference will result in taxable or deductible amounts in future years.

## Recognition and Measurement

16. An enterprise shall recognize a deferred tax liability or asset for all temporary differences[6] and operating loss and tax credit carryforwards in accordance with the provisions of paragraph 17. **Deferred tax expense or benefit** is the change during the year in an enterprise's deferred tax liabilities and assets.[7] For deferred tax liabilities and assets acquired in a purchase business combination during the year, it is the change since the combination date. Total income tax expense or benefit for the year is the sum of deferred tax expense or benefit and income taxes currently payable or refundable.

### Annual Computation of Deferred Tax Liabilities and Assets

17. Deferred taxes shall be determined separately for each tax-paying component (an individual entity or group of entities that is consolidated for tax purposes) in each tax jurisdiction. That determination includes the following procedures:

a. Identify (1) the types and amounts of existing temporary differences and (2) the nature and amount of each type of operating loss and tax credit carryforward and the remaining length of the carryforward period
b. Measure the total deferred tax liability for taxable temporary differences using the applicable tax rate (paragraph 18)
c. Measure the total deferred tax asset for deductible temporary differences and operating loss carryforwards using the applicable tax rate
d. Measure deferred tax assets for each type of tax credit carryforward
e. Reduce deferred tax assets by a **valuation allowance** if, based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance should be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

18. The objective is to measure a deferred tax liability or asset using the enacted tax rate(s) expected to apply to taxable income in the periods in which the deferred tax liability or asset is expected to be settled or realized. Under current U.S. federal tax law, if taxable income exceeds a specified amount, all taxable income is taxed, in substance, at a single flat tax rate. That tax rate shall be used for measurement of a deferred tax liability or asset by enterprises for which graduated tax rates are not a significant factor. Enterprises for which graduated tax rates are a significant factor shall measure a deferred tax liability or asset using the average graduated tax rate applicable to the amount of estimated annual taxable income in the periods in which the deferred tax liability or asset is estimated to be settled or realized (paragraph 236). Other provisions of enacted tax laws should be considered when determining the tax rate to apply to certain types of temporary differences and carryforwards (for example, the tax law may provide for different tax rates on ordinary income and capital gains). If there is a phased-in change in tax rates, determination of the applicable tax rate requires knowledge about when deferred tax liabilities and assets will be settled and realized.

19. In the U.S. federal tax jurisdiction, the applicable tax rate is the regular tax rate, and a deferred tax asset is recognized for alternative minimum tax credit carryforwards in accordance with the provisions of paragraph 17(d) and (e) of this Statement. If alternative tax systems exist in jurisdictions other than the U.S. federal jurisdiction, the applicable tax rate is determined in a manner consistent with the tax law after giving consideration to any interaction (that is, a mechanism similar to the U.S. alternative minimum tax credit) between the two systems.

20. All available evidence, both positive and negative, should be considered to determine whether, based on the weight of that evidence, a valuation allowance is needed. Information about an enterprise's current financial position and its results of operations for the current and preceding years ordinarily is readily available. That historical information is supplemented by all currently available information about future years. Sometimes, however, historical information may not be available (for example, start-up operations) or it may not be as relevant (for example, if there has been a significant, recent change in circumstances) and special attention is required.

21. Future realization of the tax benefit of an existing deductible temporary difference or carryforward ultimately depends on the existence of sufficient taxable income of the appropriate character (for example, ordinary income or capital gain) within the carryback, carryforward period available under the tax law. The following four possible sources of taxable income may be available under the tax law to realize a tax benefit for deductible temporary differences and carryforwards:

a. Future reversals of existing taxable temporary differences
b. Future taxable income exclusive of reversing temporary differences and carryforwards
c. Taxable income in prior carryback year(s) if carryback is permitted under the tax law
d **Tax-planning strategies** (paragraph 22) that would, if necessary, be implemented to, for

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

example:
(1) Accelerate taxable amounts to utilize expiring carryforwards
(2) Change the character of taxable or deductible amounts from ordinary income or loss to capital gain or loss
(3) Switch from tax-exempt to taxable investments.

Evidence available about each of those possible sources of taxable income will vary for different tax jurisdictions and, possibly, from year to year. To the extent evidence about one or more sources of taxable income is sufficient to support a conclusion that a valuation allowance is not necessary, other sources need not be considered. Consideration of each source is required, however, to determine the amount of the valuation allowance that is recognized for deferred tax assets.

22. In some circumstances, there are actions (including elections for tax purposes) that (a) are prudent and feasible, (b) an enterprise ordinarily might not take, but would take to prevent an operating loss or tax credit carryforward from expiring unused, and (c) would result in realization of deferred tax assets. This Statement refers to those actions as *tax-planning strategies*. An enterprise shall consider tax-planning strategies in determining the amount of valuation allowance required. Significant expenses to implement a tax-planning strategy or any significant losses that would be recognized if that strategy were implemented (net of any recognizable tax benefits associated with those expenses or losses) shall be included in the valuation allowance. Refer to paragraphs 246-251 for additional guidance.

23. Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Other examples of negative evidence include (but are not limited to) the following:

a. A history of operating loss or tax credit carryforwards expiring unused
b. Losses expected in early future years (by a presently profitable entity)
c. Unsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years
d. A carryback, carryforward period that is so brief that it would limit realization of tax benefits if (1) a significant deductible temporary difference is expected to reverse in a single year or (2) the enterprise operates in a traditionally cyclical business.

24. Examples (not prerequisites) of positive evidence that might support a conclusion that a valuation allowance is not needed when there is negative evidence include (but are not limited to) the following:

a. Existing contracts or firm sales backlog that will produce more than enough taxable income to realize the deferred tax asset based on existing sales prices and cost structures
b. An excess of appreciated asset value over the tax basis of the entity's net assets in an amount sufficient to realize the deferred tax asset

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

c. A strong earnings history exclusive of the loss that created the future deductible amount (tax loss carryforward or deductible temporary difference) coupled with evidence indicating that the loss (for example, an unusual, infrequent, or extraordinary item) is an aberration rather than a continuing condition.

25. An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset.

**A Change in the Valuation Allowance**

26. The effect of a change in the beginning-of-the-year balance of a valuation allowance that results from a change in circumstances that causes a change in judgment about the realizability of the related deferred tax asset in future years ordinarily shall be included in income from continuing operations. The only exceptions are the initial recognition (that is, by elimination of the valuation allowance) of certain tax benefits that are allocated as required by paragraph 30 and paragraph 36 (items (c) and (e)-(g)). The effect of other changes in the balance of a valuation allowance are allocated among continuing operations and items other than continuing operations as required by paragraph 35.

**An Enacted Change in Tax Laws or Rates**

27. Deferred tax liabilities and assets shall be adjusted for the effect of a change in tax laws or rates. The effect shall be included in income from continuing operations for the period that includes the enactment date.

**A Change in the Tax Status of an Enterprise**

28. An enterprise's tax status may change from nontaxable to taxable or from taxable to nontaxable. An example is a change from a partnership to a corporation and vice versa. A deferred tax liability or asset shall be recognized for temporary differences in accordance with the requirements of this Statement at the date that a nontaxable enterprise becomes a taxable enterprise. A deferred tax liability or asset shall be eliminated at the date an enterprise ceases to be a taxable enterprise. In either case, the effect of (a) an election for a voluntary change in tax status is recognized on the approval date or on the filing date if approval is not necessary and (b) a change in tax status that results from a change in tax law is recognized on the enactment date. The effect of recognizing or eliminating the deferred tax liability or asset shall be included in income from continuing operations.

**Regulated Enterprises**

29. Regulated enterprises that meet the criteria for application of FASB Statement No. 71,

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

*Accounting for the Effects of Certain Types of Regulation*, are not exempt from the requirements of this Statement. Specifically, this Statement:

a. Prohibits net-of-tax accounting and reporting
b. Requires recognition of a deferred tax liability (1) for tax benefits that are flowed through to customers when temporary differences originate and (2) for the equity component of the allowance for funds used during construction
c. Requires adjustment of a deferred tax liability or asset for an enacted change in tax laws or rates.

If, as a result of an action by a regulator, it is probable that the future increase or decrease in taxes payable for items (b) and (c) above will be recovered from or returned to customers through future rates, an asset or liability is recognized for that probable future revenue or reduction in future revenue pursuant to paragraphs 9-11 of Statement 71. That asset or liability also is a temporary difference for which a deferred tax liability or asset shall be recognized.

**Business Combinations**

30. A deferred tax liability or asset shall be recognized in accordance with the requirements of this Statement for differences between the assigned values and the tax bases of the assets and liabilities (except the portion of goodwill for which amortization is not deductible for tax purposes, unallocated "negative goodwill," leveraged leases, and acquired Opinion 23 differences [8]) recognized in a purchase business combination (refer to paragraphs 259-272 for additional guidance). If a valuation allowance is recognized for the deferred tax asset for an acquired entity's deductible temporary differences or operating loss or tax credit carryforwards at the acquisition date, the tax benefits for those items that are first recognized (that is, by elimination of that valuation allowance) in financial statements after the acquisition date shall be applied (a) first to reduce to zero any goodwill related to the acquisition, (b) second to reduce to zero other noncurrent intangible assets related to the acquisition, and (c) third to reduce income tax expense.

**Opinion 23 and U.S. Steamship Enterprise Temporary Differences**

31. A deferred tax liability is not recognized for the following types of temporary differences unless it becomes apparent that those temporary differences will reverse in the foreseeable future:

a. An excess of the amount for financial reporting over the tax basis of an investment in a foreign subsidiary or a foreign corporate joint venture as defined in APB Opinion No. 18, *The Equity Method of Accounting for Investments in Common Stock*, that is essentially permanent in duration
b. Undistributed earnings of a domestic subsidiary or a domestic corporate joint venture that is essentially permanent in duration that arose in fiscal years beginning on or before December 15, 1992 [9]

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

c. "Bad debt reserves" for tax purposes of U.S. savings and loan associations (and other "qualified" thrift lenders) that arose in tax years beginning before December 31, 1987 (that is, the base-year amount)
d. "Policyholders' surplus" of stock life insurance companies that arose in fiscal years beginning on or before December 15, 1992.

The indefinite reversal criterion in Opinion 23 shall not be applied to analogous types of temporary differences.

32. A deferred tax liability shall be recognized for the following types of taxable temporary differences:

a. An excess of the amount for financial reporting over the tax basis of an investment in a domestic subsidiary that arises in fiscal years beginning after December 15, 1992
b. An excess of the amount for financial reporting over the tax basis of an investment in a 50-percent-or-less-owned investee except as provided in paragraph 31(a) and (b) for a corporate joint venture that is essentially permanent in duration
c. "Bad debt reserves" for tax purposes of U.S. savings and loan associations (and other "qualified" thrift lenders) that arise in tax years beginning after December 31, 1987 (that is, amounts in excess of the base-year amount).

The tax effects of temporary differences related to deposits in statutory reserve funds by U.S. steamship enterprises that arose in fiscal years beginning on or before December 15, 1992 and that were not previously recognized shall be recognized when those temporary differences reverse or in their entirety at the beginning of the fiscal year for which this Statement is first applied.

33. Whether an excess of the amount for financial reporting over the tax basis of an investment in a more-than-50-percent-owned domestic subsidiary is a taxable temporary difference must be assessed. It is not a taxable temporary difference if the tax law provides a means by which the reported amount of that investment can be recovered tax-free and the enterprise expects that it will ultimately use that means. For example, under current U.S. federal tax law:

a. An enterprise may elect to determine taxable gain or loss on the liquidation of an 80-percent-or-more-owned subsidiary by reference to the tax basis of the subsidiary's net assets rather than by reference to the parent company's tax basis for the stock of that subsidiary.
b. An enterprise may execute a statutory merger whereby a subsidiary is merged into the parent company, the minority shareholders receive stock of the parent, the subsidiary's stock is cancelled, and no taxable gain or loss results if the continuity of ownership, continuity of business enterprise, and certain other requirements of the tax law are met.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

Some elections for tax purposes are available only if the parent company owns a specified percentage of the subsidiary's stock. The parent company sometimes may own less than that specified percentage, and the price per share to acquire a minority interest may significantly exceed the per share equivalent of the amount reported as minority interest in the consolidated financial statements. In those circumstances, the excess of the amount for financial reporting over the tax basis of the parent's investment in the subsidiary is not a taxable temporary difference if settlement of the minority interest is expected to occur at the point in time when settlement would not result in a significant cost. That could occur, for example, toward the end of the life of the subsidiary, after it has recovered and settled most of its assets and liabilities, respectively. The fair value of the minority interest ordinarily will approximately equal its percentage of the subsidiary's net assets if those net assets consist primarily of cash.

34. A deferred tax asset shall be recognized for an excess of the tax basis over the amount for financial reporting of an investment in a subsidiary or corporate joint venture that is essentially permanent in duration only if it is apparent that the temporary difference will reverse in the foreseeable future. The need for a valuation allowance for that deferred tax asset and other deferred tax assets related to Opinion 23 temporary differences (for example, a deferred tax asset for foreign tax credit carryforwards or for a savings and loan association's bad-debt reserve for financial reporting) shall be assessed. Paragraph 21 identifies four sources of taxable income to be considered in determining the need for and amount of a valuation allowance for those and other deferred tax assets. One source is future reversals of temporary differences. Future reversals of taxable differences for which a deferred tax liability has not been recognized based on the exceptions cited in paragraph 31, however, shall not be considered. Another source is future taxable income exclusive of reversing temporary differences and carryforwards. Future distributions of future earnings of a subsidiary or corporate joint venture, however, shall not be considered except to the extent that a deferred tax liability has been recognized for existing undistributed earnings or earnings have been remitted in the past.

**Intraperiod Tax Allocation**

35. Income tax expense or benefit for the year shall be allocated among continuing operations, discontinued operations, extraordinary items, and items charged or credited directly to shareholders' equity (paragraph 36). The amount allocated to continuing operations is the tax effect of the pretax income or loss from continuing operations that occurred during the year, plus or minus income tax effects of (a) changes in circumstances that cause a change in judgment about the realization of deferred tax assets in future years (paragraph 26), (b) changes in tax laws or rates (paragraph 27), (c) changes in tax status (paragraph 28), and (d) tax-deductible dividends paid to shareholders (except as set forth in paragraph 36 for dividends paid on unallocated shares held by an employee stock ownership plan [ESOP] or any other stock compensation arrangement). The remainder is allocated to items other than continuing operations in accordance with the provisions of paragraph 38.

36. The tax effects of the following items occurring during the year are charged or credited

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

directly to related components of shareholders' equity:

a. Adjustments of the opening balance of retained earnings for certain changes in accounting principles or a correction of an error
b. **Gains and losses included in comprehensive income but excluded from net income** (for example, translation adjustments under Statement 52 and changes in the carrying amount of marketable securities under FASB Statement No. 12, *Accounting for Certain Marketable Securities*)
c. An increase or decrease in contributed capital (for example, deductible expenditures reported as a reduction of the proceeds from issuing capital stock)
d. An increase in the tax basis of assets acquired in a taxable business combination accounted for as a pooling of interests and for which a tax benefit is recognized at the date of the business combination
e. Expenses for employee stock options recognized differently for financial reporting and tax purposes (refer to paragraph 17 of APB Opinion No. 25, *Accounting for Stock Issued to Employees*)
f. Dividends that are paid on unallocated shares held by an ESOP and that are charged to retained earnings
g. Deductible temporary differences and carryforwards that existed at the date of a quasi reorganization (except as set forth in paragraph 39).

37. The tax benefit of an operating loss carryforward or carryback (other than those carryforwards referred to at the end of this paragraph) shall be reported in the same manner as the source of the income or loss in the current year and not in the same manner as (a) the source of the operating loss carryforward or taxes paid in a prior year or (b) the source of expected future income that will result in realization of a deferred tax asset for an operating loss carryforward from the current year. The only exceptions are as follows:

a. Tax effects of deductible temporary differences and carryforwards that existed at the date of a purchase business combination and for which a tax benefit is initially recognized in subsequent years in accordance with the provisions of paragraph 30
b. Tax effects of deductible temporary differences and carryforwards that are allocated to shareholders' equity in accordance with the provisions of paragraph 36 (items (c) and (e)-(g)).

38. If there is only one item other than continuing operations, the portion of income tax expense or benefit for the year that remains after the allocation to continuing operations is allocated to that item. If there are two or more items other than continuing operations, the amount that remains after the allocation to continuing operations shall be allocated among those other items in proportion to their individual effects on income tax expense or benefit for the year. When there are two or more items other than continuing operations, the sum of the separately calculated, individual effects of each item sometimes may not equal the amount of income tax expense or benefit for the year that remains after the allocation to continuing operations. In

Copyright © 1992, Financial Accounting Standards Board Not for redistribution