those circumstances, the procedures to allocate the remaining amount to items other than continuing operations are as follows:

a. Determine the effect on income tax expense or benefit for the year of the total net loss for all net loss items
b. Apportion the tax benefit determined in (a) ratably to each net loss item
c. Determine the amount that remains, that is, the difference between (1) the amount to be allocated to all items other than continuing operations and (2) the amount allocated to all net loss items
d. Apportion the tax expense determined in (c) ratably to each net gain item.

Refer to paragraphs 273-276 for additional guidance.

**Certain Quasi Reorganizations**

39. The tax benefits of deductible temporary differences and carryforwards as of the date of a quasi reorganization as defined and contemplated in ARB No. 43, Chapter 7, "Capital Accounts," ordinarily are reported as a direct addition to contributed capital if the tax benefits are recognized in subsequent years. The only exception is for enterprises that have previously both adopted Statement 96 and effected a quasi reorganization that involves only the elimination of a deficit in retained earnings by a concurrent reduction in contributed capital prior to adopting this Statement. For those enterprises, subsequent recognition of the tax benefit of prior deductible temporary differences and carryforwards is included in income and reported as required by paragraph 37 (without regard to the referenced exceptions) and then reclassified from retained earnings to contributed capital. Those enterprises should disclose (a) the date of the quasi reorganization, (b) the manner of reporting the tax benefits and that it differs from present accounting requirements for other enterprises and (c) the effect of those tax benefits on income from continuing operations, income before extraordinary items, and on net income (and on related per share amounts).

**Separate Financial Statements of a Subsidiary**

40. The consolidated amount of current and deferred tax expense for a group that files a consolidated tax return shall be allocated among the members of the group when those members issue separate financial statements. This Statement does not require a single allocation method. The method adopted, however, shall be systematic, rational, and consistent with the broad principles established by this Statement. A method that allocates current and deferred taxes to members of the group by applying this Statement to each member as if it were a separate taxpayer [10] meets those criteria. Examples of methods that are not consistent with the broad principles established by this Statement include:

a. A method that allocates only current taxes payable to a member of the group that has taxable temporary differences

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

b. A method that allocates deferred taxes to a member of the group using a method fundamentally different from the asset and liability method described in this Statement (for example, the Opinion 11 deferred method)
c. A method that allocates no current or deferred tax expense to a member of the group that has taxable income because the consolidated group has no current or deferred tax expense.

Certain disclosures are also required (paragraph 49).

**Financial Statement Presentation**

41. In a classified statement of financial position, an enterprise shall separate deferred tax liabilities and assets into a current amount and a noncurrent amount. Deferred tax liabilities and assets shall be classified as current or noncurrent based on the classification of the related asset or liability for financial reporting. A deferred tax liability or asset that is not related to an asset or liability for financial reporting (paragraph 15), including deferred tax assets related to carryforwards, shall be classified according to the expected reversal date of the temporary difference pursuant to FASB Statement No. 37, *Balance Sheet Classification of Deferred Income Taxes*. The valuation allowance for a particular tax jurisdiction shall be allocated between current and noncurrent deferred tax assets for that tax jurisdiction on a pro rata basis.

42. For a particular tax-paying component of an enterprise and within a particular tax jurisdiction, (a) all current deferred tax liabilities and assets shall be offset and presented as a single amount and (b) all noncurrent deferred tax liabilities and assets shall be offset and presented as a single amount. However, an enterprise shall not offset deferred tax liabilities and assets attributable to different tax-paying components of the enterprise or to different tax jurisdictions.

**Financial Statement Disclosure**

43. The components of the net deferred tax liability or asset recognized in an enterprise's statement of financial position shall be disclosed as follows:

a. The total of all deferred tax liabilities measured in procedure (b) of paragraph 17
b. The total of all deferred tax assets measured in procedures (c) and (d) of paragraph 17
c. The total valuation allowance recognized for deferred tax assets determined in procedure (e) of paragraph 17.

The net change during the year in the total valuation allowance also shall be disclosed. A **public enterprise** shall disclose the approximate tax effect of each type of temporary difference and carryforward that gives rise to a significant portion of deferred tax liabilities and deferred tax assets (before allocation of valuation allowances). A **nonpublic enterprise** shall disclose the types of significant temporary differences and carryforwards but may omit disclosure of the tax effects of each type. A public enterprise that is not subject to income taxes because its income is

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

taxed directly to its owners shall disclose that fact and the net difference between the tax bases and the reported amounts of the enterprise's assets and liabilities.

44. The following information shall be disclosed whenever a deferred tax liability is not recognized because of the exceptions to comprehensive recognition of deferred taxes for any of the areas addressed by Opinion 23 (as amended by this Statement) or for deposits in statutory reserve funds by U.S. steamship enterprises:

a. A description of the types of temporary differences for which a deferred tax liability has not been recognized and the types of events that would cause those temporary differences to become taxable
b. The cumulative amount of each type of temporary difference
c. The amount of the unrecognized deferred tax liability for temporary differences related to investments in foreign subsidiaries and foreign corporate joint ventures that are essentially permanent in duration if determination of that liability is practicable or a statement that determination is not practicable
d. The amount of the deferred tax liability for temporary differences other than those in (c) above (that is, undistributed domestic earnings, the bad-debt reserve for tax purposes of a U.S. savings and loan association or other qualified thrift lender, the policyholders' surplus of a life insurance enterprise, and the statutory reserve funds of a U.S. steamship enterprise) that is not recognized in accordance with the provisions of paragraphs 31 and 32.

45. The significant components of income tax expense attributable to continuing operations for each year presented shall be disclosed in the financial statements or notes thereto. Those components would include, for example:

a. **Current tax expense or benefit**
b. Deferred tax expense or benefit (exclusive of the effects of other components listed below)
c. Investment tax credits
d. Government grants (to the extent recognized as a reduction of income tax expense)
e. The benefits of operating loss carryforwards
f. Tax expense that results from allocating certain tax benefits either directly to contributed capital or to reduce goodwill or other noncurrent intangible assets of an acquired entity
g. Adjustments of a deferred tax liability or asset for enacted changes in tax laws or rates or a change in the tax status of the enterprise
h. Adjustments of the beginning-of-the-year balance of a valuation allowance because of a change in circumstances that causes a change in judgment about the realizability of the related deferred tax asset in future years.

46. The amount of income tax expense or benefit allocated to continuing operations and the amounts separately allocated to other items (in accordance with the provisions of paragraphs 35-39) shall be disclosed for each year for which those items are presented.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

47. A public enterprise shall disclose a reconciliation using percentages or dollar amounts of (a) the reported amount of income tax expense attributable to continuing operations for the year to (b) the amount of income tax expense that would result from applying domestic federal statutory tax rates to pretax income from continuing operations. The "statutory" tax rates shall be the regular tax rates if there are alternative tax systems. The estimated amount and the nature of each significant reconciling item shall be disclosed. A nonpublic enterprise shall disclose the nature of significant reconciling items but may omit a numerical reconciliation. If not otherwise evident from the disclosures required by this paragraph and paragraphs 43-46, all enterprises shall disclose the nature and effect of any other significant matters affecting comparability of information for all periods presented.

48. An enterprise shall disclose (a) the amounts and expiration dates of operating loss and tax credit carryforwards for tax purposes and (b) any portion of the valuation allowance for deferred tax assets for which subsequently recognized tax benefits will be allocated to reduce goodwill or other noncurrent intangible assets of an acquired entity or directly to contributed capital (paragraphs 30 and 36).

49. An entity that is a member of a group that files a consolidated tax return shall disclose in its separately issued financial statements:

a. The aggregate amount of current and deferred tax expense for each statement of earnings presented and the amount of any tax-related balances due to or from affiliates as of the date of each statement of financial position presented
b. The principal provisions of the method by which the consolidated amount of current and deferred tax expense is allocated to members of the group and the nature and effect of any changes in that method (and in determining related balances to or from affiliates) during the years for which the disclosures in (a) above are presented.

**Effective Date and Transition**

50. This Statement shall be effective for fiscal years beginning after December 15, 1992. Earlier application is encouraged. Financial statements for any number of consecutive fiscal years before the effective date may be restated to conform to the provisions of this Statement. Initial application of this Statement shall be as of the beginning of an enterprise's fiscal year (that is, if the Statement is adopted prior to the effective date and during an interim period other than the first interim period, all prior interim periods of that fiscal year shall be restated). Application of the requirements for recognition of a deferred tax liability or asset for a restated interim or annual period shall be based on the facts and circumstances as they existed at that prior date and without the benefit of hindsight.

51. The effect of initially applying this Statement shall be reported as the effect of a change in accounting principle in a manner similar to the cumulative effect of a change in accounting principle (APB Opinion No. 20, *Accounting Changes*, paragraph 20) except for initially

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

recognized tax benefits of the type required by this Statement to be excluded from comprehensive income. If the earliest year restated is not presented in the financial statements, the beginning balance of retained earnings and, if necessary, any other components of shareholders' equity for the earliest year presented shall be adjusted for the effect of the restatement as of that date. Paragraph 30 addresses the manner of reporting acquired tax benefits initially recognized subsequent to a business combination and paragraph 36 identifies five items ((c)-(g)) for which tax benefits are excluded from comprehensive income and allocated directly to contributed capital or retained earnings. Pro forma effects of retroactive application (Opinion 20, paragraph 21) are not required if statements of earnings presented for prior years are not restated.

52. When initially presented, the financial statements for the year this Statement is first adopted shall disclose:

a. The effect, if any, of adopting this Statement on pretax income from continuing operations (for example, the effect of adjustments for prior purchase business combinations and for regulated enterprises) for the year of adoption if restated financial statements for the prior year are not presented
b. The effect of any restatement on income from continuing operations, income before extraordinary items, and net income (and on related per share amounts) for each year for which restated financial statements are presented.

**Prior Business Combinations**

53. If financial statements for prior years are restated, all purchase business combinations that were consummated in those prior years shall be remeasured in accordance with the requirements of this Statement.

54. For a purchase business combination consummated prior to the beginning of the year for which this Statement is first applied, any balance remaining as of that date for goodwill or negative goodwill shall not be adjusted to equal the amount it would be if financial statements for the year of the combination and subsequent years were restated. However, except for leveraged leases and except as provided in paragraph 55, (a) remaining balances as of the date of initially applying this Statement for assets and liabilities acquired in that combination shall be adjusted from their net-of-tax amounts to their pretax amounts and (b) any differences between those adjusted remaining balances and their tax bases are temporary differences. A deferred tax liability or asset shall be recognized for those temporary differences pursuant to the requirements of this Statement as of the beginning of the year for which this Statement is first applied.

55. If, for a particular business combination, determination of the adjustment for any or all of the assets and liabilities referred to in paragraph 54 is impracticable, either because the necessary information is no longer available or because the cost to develop that information is excessive, none of the remaining balances of any assets and liabilities acquired in that combination shall be adjusted to pretax amounts, that is, all remaining amounts that were originally assigned on a

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

net-of-tax basis pursuant to paragraph 89 of Opinion 16 shall not be adjusted. Any differences between those unadjusted remaining balances and their tax bases are temporary differences, and a deferred tax liability or asset shall be recognized for those temporary differences pursuant to the requirements of this Statement as of the beginning of the year for which this Statement is first applied.

56. The net effect of the adjustments required by paragraphs 54 and 55 shall be included in the effect of initially applying this Statement and reported in accordance with the provisions of paragraph 51.

**Assets of Regulated Enterprises Reported on a Net-of-Tax or After-Tax Basis**

57. Some regulated enterprises that apply Statement 71 have accounted for certain components of construction in progress on either a net-of-tax or after-tax basis, or both. Upon initial application of this Statement, those enterprises shall make appropriate adjustments required by this Statement to account for the net-of-tax and after-tax components of construction in progress as if the requirements of this Statement were applied to that construction in progress in all prior years. Except as provided in paragraph 58, the reported amount of plant in service at the beginning of the year for which this Statement is first applied shall be similarly adjusted.

58. If determination of the adjustment to plant in service referred to in paragraph 57 is impracticable, either because the necessary information is no longer available or because the cost to develop that information is excessive, any difference between the reported amount and the tax basis of that plant in service is a temporary difference, and a deferred tax liability shall be recognized for that temporary difference. If, as a result of an action by a regulator, it is probable that amounts required for settlement of that deferred tax liability will be recovered from customers through future rates, an asset and the related deferred tax liability for that additional temporary difference shall be recognized for that probable future revenue.

59. The net effect of the adjustments required by paragraphs 57 and 58 shall be included in the effect of initially applying this Statement and reported in accordance with the provisions of paragraph 51.

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

**The provisions of this Statement need not be applied to immaterial items.**

*This Statement was adopted by the unanimous vote of the six members of the Financial Accounting Standards Board:*

Dennis R. Beresford, *Chairman*
Joseph V. Anania
Victor H. Brown
James J. Leisenring
A. Clarence Sampson
Robert J. Swieringa

Copyright © 1992, Financial Accounting Standards Board Not for redistribution

OFFICE OF THRIFT SUPERVISION

EXAMINATION COMMENT STATUS REPORT

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| Carteret Savings Bank, FA<br>200 South Street<br>Morristown, New Jersey | Northeast | 04702 |

Type of Examination
Regular

Date of Examination: June 15, 1992

RESPONSE(S) OF:>

| | CORRECTIVE/PREVENTIVE ACTION (BY WHOM/DATE) | AUDIT VERIFICATION (BY WHOM/DATE) |
|---|---|---|

COMMENTS

The board is directed to certify that it has taken corrective action with regard to the following matters and that the following reports are forwarded to the Regional Director. Submission of these reports does not relieve Carteret of its reporting requirements under the outstanding Consent Agreement, Supervisory Agreement and the Capital Directive:

1. Submit a report from counsel no later than September 30, 1992, on the role of former CEO Robert C. Walsh in the purchase of $100 million (Pool #591) in low quality multi-family mortgage loans originated by Western FS&LA and sold to Carteret by DLJ Mortgage Capital, Inc. (DLJ). In addition, beginning on September 30, 1992, and monthly thereafter, Carteret must keep the Regional Director advised in writing as to the status of the litigation contemplated against Western and/or DLJ.

2. Charge off or establish specific reserves for the losses of $44.9 million identified in this report.

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
|---|---|---|
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Northeast | 04702 |
| | **Type of Examination** | |
| | Federal Regular | |

Examination commenced: June 15, 1992
Examination concluded: July 31, 1992

Service Corporations and Other Affiliates Which Are a Part of This Report:

Carteret Communities, Inc.
Carteret Premium Finance, Inc. aka Imperial Premium Finance, Inc.
Carteret Realty Corporation
Carteret Service Corporation

Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor. Independent auditors may be provided access to this report only after providing a written statement that they will not disclose the Report of Examination or any portion thereof.

If a subpoena or other legal process is received calling for production of this document, the Regional Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 510 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, must review this report thoroughly and provide a response to the Regional Office, signed by each member of the Board of Directors, within 30 days of receipt of this report. This report should not be considered an audit report.

# REPORT OF EXAMINATION

## OFFICE OF THRIFT SUPERVISION

| Name and Address of Institution | Region | Docket No. |
| --- | --- | --- |
| CARTERET SAVINGS BANK, F.A.<br>200 South Street<br>Morristown, New Jersey 07960 | Jersey City | 04702 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: June 15, 1992

Members of the Board:

As required by Section 563.170 of the Rules and Regulations, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends that impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate. All matters of criticism, violations of laws or regulations, and other matters of concern identified within this Report of Examination require the Board of Directors and management's prompt corrective action.

/s/ Thomas J. O'Rourke, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Report Summary and Composite Rating. . . . . . . . . . . . . . . . . . . | 1 - 6 |
| Regulatory Chronology, Management, Asset Quality, Capital, Risk Management, and Operating Results . . . . . . . . . . . . . . . . . . . . . . . . | 7 - 34 |

APPENDIX

| | | |
|---|---|---|
| Outstanding Enforcement Actions . . . . . . . . . . . . . . . . . . . . . . | | A - 1.1 |
| Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . . . | | A - 2.1 |
| Directors, Principal Officers and Attorneys . . . . . . . . . . . . . . | | A - 3.1 |
| Principal Operating Committees . . . . . . . . . . . . . . . . . . . . . | Omitted | A - 4.1 |
| Statement of Condition . . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 5.1 |
| Statement of Operations. . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 6.1 |
| Key Ratios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 7.1 |
| Deposit/Liability Page . . . . . . . . . . . . . . . . . . . . . . . . . . | | A - 8.1 |
| Deposit from Other Financial Institutions . . . . . . . . . . | .Omitted | A - 9.1 |
| Summary of Criticized Assets . . . . . . . . . . . . . . . . . . . . . . | | A - 10.1 |
| Summary of Action Required by Criticized Assets . . . . . . . . . . | | A - 11.1 |
| Classified Assets and Assets Designated Special Mention . . . . . . | | A - 12.1 |
| Loans in Process and Commitments . . . . . . . . . . . . . . . . . . | .Omitted | A - 13.1 |
| Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | .Omitted | A - 14.1 |
| Interest Rate Risk Exposure Report . . . . . . . . . . . . . . . . . . . | | A - 15.1 |




CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0040

## INDEX AND ABBREVIATIONS


| | | Page |
|---|---|---|
| Service Corporations | | A - 16.1 |
| Other Affiliates | Omitted | A - 17.1 |
| Financial Reporting Errors | | A - 18.1 |


## ABBREVIATIONS USED IN THIS REPORT

P = President
EVP = Executive Vice President
VP = Vice President
CB = Chairman of the Board
MO = Managing Officer
CEO = Chief Executive Officer
COO = Chief Operations Officer
SVP = Senior Vice President
AVP = Assistant Vice President
S = Secretary
AS = Assistant Secretary
T = Treasurer
AT = Assistant Treasurer
C = Controller
D = Director
AD = Advisory Director
DE = Director Emeritus
A = Attorney
IVP = First Vice President
SO = Savings Officer
CSB = Carteret Savings Bank
ISF = In-Substance Foreclosure
TDR = Troubled Debt Restructuring
GVA = General Valuation Allowance
SVA = Specific Valuation Allowance



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0041

Date: 06/15/92 Docket No.: 04702

REPORT SUMMARY

A regular federal examination commenced on June 15, 1992, utilizing financial data as of May 31, 1992 for asset classifications, with June 30, 1992, and March 31, 1992 information utilized for capital calculations and operations assessment purposes. The examination was performed in an expeditious manner and under rigid timetables due to the current recapitalization efforts being undertaken by management. The examination encompassed an analysis of the effectiveness of executive management and the Board of Directors with particular emphasis given to asset quality, capital adequacy, risk management, and operating results.

Carteret is a critically undercapitalized institution with little or no prospect of meeting either its current or prospective capital requirements without a substantial equity capital infusion. As calculated under FIRREA-imposed capital requirements, (adjusted for additions to GVAs indicated in this ROE) Carteret is insolvent as of June 30, 1992, by $72.7 million on a tangible basis and faces regulatory capital shortfalls of approximately $150.1 million on its existing minimum tangible requirement, $175.8 million on its core capital requirement and $233.2 million on its risk-based capital requirement.

Absent an immediate and sufficient infusion of equity capital, Carteret is expected to continue to experience minimal net operating profitability, at best, that will be insufficient to meet the current or fully phased-in capital requirements of FIRREA. It was noted that during this examination a letter of intent was executed between AmBase Corporation and Kohlberg & Co. that may result in the recapitalization of Carteret with $200 million.

Current management has taken swift remedial action in many areas of Carteret's operations and has implemented many overdue reforms. Compliance with the April 29, 1991, Supervisory Agreement, the October 7, 1991, Capital Directive and the February 27, 1992, Consent Agreement has been achieved. In addition, management has actively pursued a recapitalization of Carteret and has demonstrated acceptable progress in these efforts to date.

The previous senior management team was composed of Messrs. Robert O'Brien, Robert Walsh, Richard Braun, Robert McCarthy and Charles McCabe. This former management team is primarily responsible for the unsafe and unsound condition of Carteret and did not adequately fulfill its fiduciary responsibility. In another example (ie - in addition to those cited in prior examinations) of previous management's failure to exercise fiduciary responsibility the examiners have found that former CEO Walsh unilaterally approved Carteret's purchase of $100 million in multi-family mortgage loans originated and serviced by Western FS&LA, Marina Del Rey, California. This portfolio was poorly underwritten by Western and Carteret failed to perform proper due diligence prior to purchase. This portfolio will likely result in substantial credit losses to Carteret.

Carteret's asset quality has improved due to an intensive effort by management to liquidate non-performing assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructurings.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0042

Date: 06/15/92 Docket No.: 04702

REPORT SUMMARY (Continued)

Criticized assets have decreased by 20.9 percent since the June 17, 1991 examination with assets classified "Substandard" down by $28.9 million (4.7%), assets classified "Doubtful" down by $46.5 million (84%) and assets classified "Loss" down by $154.6 million (77.4%). Notwithstanding this improvement in the level and trend in criticized assets Carteret is in need of an additional $8 million in general valuation allowances to account for the residual risk inherent in its commercial assets portfolio and certain segments of its residential portfolio.

Administration of the approximately $763 million ($562 million net of $146 million in chargeoffs and $55 million in GVAs) commercial loan and REO portfolios has also improved dramatically and this has facilitated Carteret's efforts to dispose of this portfolio. The addition of EVP - Commercial Assets J. Wayne Moor has resulted in substantial improvement in the management and workout of the commercial asset portfolio. Mr. Moor has been responsible for reducing gross commercial assets by $238 million, augmenting total valuation allowances by more than $150 million, restructuring the loan workout department to a smaller yet more effective staffing level and initiating the implementation of aggressive asset workout plans.

Carteret is operating with an unsafe level of interest rate risk in its balance sheet. The OTS Market Value of Portfolio Equity (MVPE) model reveals that any increase in interest rates from existing levels will deplete any remaining capital, on a market value basis, and compound the existing capital shortfall. Carteret has performed internal MVPE calculations with an assumed recapitalization of $200 million in lieu of its present capital position. Because a significant portion of the volatility of Carteret's interest-rate risk is due to its low base level of MVPE, this calculation reduces Carteret's indicated MVPE exposure significantly.

Carteret posted a net loss of $160 million for 1991 and a net profit before taxes of $4.7 million for the five month period ended May 31, 1992. Losses in 1991 were due primarily to continued significant provisions for loan losses. However, core operations are improving as evidenced by the profit for the five month period ended May 31, 1992, which was due to improved net interest margins, lower loss provisions and reduced operating expenses. Carteret management projects a $13.7 million profit for 1992, however, the $8 million in additional GVAs required by this ROE will require a re-evaluation of that projection. Notwithstanding the improvement noted in operations Carteret's viability is in serious doubt without a sufficient equity capital infusion.

In summary, the problems facing Carteret have stabilized since the June 17, 1991 examination, when a Composite "5" was assigned, however, significant asset quality and regulatory capital problems persist. At this point the OTS believes that management must effect a substantial outside equity capital infusion in order to augment the rehabilitative process that commenced in June of 1991.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0043

Date: 06/15/92 Docket No.: 04702

## COMPOSITE EXAMINATION RATING

The Composite Rating assigned to Carteret Savings Bank is "5".

Composite "5" - This category is reserved for institutions with an extremely high immediate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from the shareholders or other sources. Such institutions require immediate corrective action and constant supervisory attention. Obviously, formal administrative action is presumed necessary. The probability of failure is high for these institutions. Institutions with negative regulatory capital and those with negative generally accepted accounting principles (GAAP) capital and experiencing operating losses would normally be assigned this rating.

The board is directed to certify that it has taken corrective action with regard to the following matters and that the following reports are forwarded to the Regional Director. Submission of these reports does not relieve Carteret of its reporting requirements under the outstanding Consent Agreement, Supervisory Agreement and the Capital Directive:

1. Submit a report from counsel no later than September 30, 1992, on the role of former CEO Robert C. Walsh in the purchase of $100 million (Pool #591) in low quality multi-family mortgage loans originated by Western FS&LA and sold to Carteret by DLJ Mortgage Capital, Inc. (DLJ). In addition, beginning on September 30, 1992, and monthly thereafter, Carteret must keep the Regional Director advised in writing as to the status of the litigation contemplated against Western and/or DLJ.

2. Charge off or establish specific reserves for the losses of $44.9 million identified in this report.

3. After charging off the losses cited in No. 2 above, increase general valuation allowances by $8 million to the required level of $53.7 million.

4. Submit evidence that the financing agreement between Carteret and IPF has been put into place and that the terms of this agreement are comparable to what Carteret and IPF would engage in if they were unaffiliated parties.

5. Obtain an independent third party review of the PMSR portfolio as of September 30, 1992. This review must incorporate the specific terms outlined in the CAPITAL comments section of this report. The engagement letter between Carteret and the prospective third party must be submitted for OTS review and non-objection prior to execution.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0044

Date: 06/15/92 Docket No.: 04702

COMPOSITE EXAMINATION RATING (Continued)

6. Submit, no later than September 30, 1992, a report on the staffing levels of the Internal Loan Review Department in relation to the need to promptly and accurately identify both problem assets and potential problem assets.

7. Submit, no later than September 30, 1992, evidence that Carteret has recorded the TFR adjustments listed in Appendix A - 18.1 of this report.

To the extent that any of the above requests conflict with the requirements of either the Consent Agreement, Supervisory Agreement or Capital Directive, priority shall be given to the Agreements and/or Directive.

The 1991 Credit Crunch policy and guidance issued by the Office of Thrift Supervision are to be discussed with Senior management and the Board of Directors in a meeting to be held on August 26, 1992. The discussion will include a review of the "Joint Supervisory Notice" issued on March 1, 1991, and the "Interagency Policy Statement on the Review and Classification of Commercial Real Estate Loans" issued in November of 1991. The examiners will answer questions regarding the policies.

Date: 06/15/92 Docket No.: 04702

REGULATORY CHRONOLOGY

The following is a summary of supervisory/regulatory events involving Carteret over the last two years:

In response to the findings of the ROE of June 4, 1990, Carteret was issued a proposed Stipulation and Consent to the Issuance of a Capital Directive on February 4, 1991. Carteret's response to this supervisory action was registered on February 14, 1991, when it filed for injunctive, declaratory and other equitable relief against the OTS and the FDIC in the United States District Court for the District of New Jersey. On April 12, 1991, the Court issued a ruling in favor of Carteret and placed an injunction upon the OTS precluding the enforcement of the regulatory capital regulations as they pertain to Carteret's inclusion of supervisory goodwill. This decision was appealed to the U.S. Third Circuit Court of Appeals which reversed the ruling of the district court on May 7, 1992, and allowed the OTS to apply the regulatory capital provisions of FIRREA to Carteret.

Throughout the period between the 1990 and 1991 examinations, numerous meetings were held with the board and management at which significant supervisory concern was communicated with regard to Carteret's deficient capital; high level of problem assets, internal loan review, and negative operating results.

On April 29, 1991, Carteret entered into a Supervisory Agreement in lieu of a Consent Cease and Desist Order presented to it on February 21, 1991. The Supervisory Agreement mandated the implementation of corrective action with regard to Carteret's internal asset review, the establishment of adequate valuation allowances, problem asset resolution, mortgage-backed securities trading activity, mortgage derivative securities activity, accounting for loan servicing assets, liquidity, Imperial Premium Finance, Inc., and the compensation of former Chairman Robert B. O'Brien.

On May 22, 1991, at an annual meeting of the shareholders of AmBase Corporation, Mr. Richard A. Bianco was named Chairman, President and Chief Executive Officer of Carteret and Mr. Ronald Burns was named a Director. In July of 1991 Donald Kramer was named a Director. Shortly after the annual meeting Chairman Robert B. O'Brien resigned from Carteret's board and Robert Walsh resigned from his position as President/CEO.

On May 24, 1991, a Supervisory Directive was issued in response to pre-examination (on-site scoping) findings that $875 thousand in Executive Performance Bonuses were paid on September 30, 1990, despite a fiscal year loss in 1990 in excess of $100 million. This directive ordered Carteret to cease all compensation payments, other than regular payroll, until such time as OTS could complete a review of all compensation arrangements in effect at Carteret.

In June of 1991, EVP Leo McCabe was appointed to the board to replace former AmBase officer Theodore Babcock. In July of 1991, Mr. Bianco supplemented Carteret's management with Vice Chairman - CFO, Donald Kramer and EVP - Commercial Assets, J. Wayne Moor.

Date: 06/15/92 Docket No.: 04702

REGULATORY CHRONOLOGY (Continued)

In August of 1991, Richard Braun resigned from the board and was replaced by C. Austin Fitts. In September of 1991, Mr. Walsh resigned from the board and has not been replaced.

On September 9, 1991, in response to Carteret reporting a failure to meet its capital requirements at June 30, 1991, due to the recording of an additional $150 million in loan loss allowances, the OTS presented Carteret with another Stipulation and Consent to the Issuance of a Capital Directive which called for the submission of a Capital Plan. This reported capital failure at June 30, 1991 was determined after giving rise to Carteret's inclusion of all supervisory goodwill as allowed under the amended order. The Capital Plan was submitted on September 30, 1991, and Carteret signed the Stipulation and Consent on October 7, 1991.

During the period between the 1991 and 1992 examinations, OTS continued to meet regularly with Carteret management to review capital raising efforts, progress with regard to the resolution of previous management's compensation practices and to monitor operations.

On February 27, 1992, Carteret signed a Consent Agreement with the OTS which provides, among other things, that Carteret demonstrate acceptable progress toward an unassisted recapitalization or risk being placed in the Accelerated Resolution Program of the RTC. To date, progress has been demonstrated and Carteret has received an extension until August 28, 1992 to progress towards a definitive recapitalization commitment.

On March 2, 1992, Carteret received contingent approval of its Capital Plan provided that it raise sufficient capital to meet the fully phased in capital requirements mandated by FIRREA.

On July 20, 1992, AmBase Corporation signed a letter of intent for a group of investors led by Kohlberg & Co. to invest $200 million in Carteret. The investment contemplated in the letter of intent was conditioned upon the satisfactory completion of due diligence, completion of the OTS examination, the reaching of a definitive agreement with AmBase and other customary closing conditions such as regulatory and corporate approvals.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0047

Date: 06/15/92 Docket No.: 04702

## MANAGEMENT

### Scope

The scope in this area consisted of an evaluation of the current executive management group composed of Messrs. Bianco, Kramer, Moor and McCabe. Current management was evaluated with regard to compliance with the April 29, 1991 Supervisory Agreement, the October 7, 1991 Capital Directive and the February 27, 1992 Consent Agreement the timely identification and proper establishment of valuation allowances for problem assets and efforts toward addressing severe capital and operating deficits.

Findings relative to previous management's role in matters of excessive compensation, the understatement of problem asset levels and valuation allowances, the treatment of goodwill for GAAP purposes, poor operating results and inadequate regulatory capital levels has forced current management and the OTS to focus a significant amount of attention on these issues. Previous management's actions continue to be reviewed as part of an ongoing OTS formal enforcement investigation as noted below.

### Management Overview

Current management is considered to be both capable and effective in dealing with Carteret's significant problems. Messrs. Bianco and Kramer are spending most of their time in search of equity capital investors. However, they have also been responsible for quickly addressing Carteret's problems by reorganizing management, setting up adequate loss reserves, aggressively disposing of Carteret's problem assets and paring operating expenses at a substantial rate. EVP Moor has been leading the effort to control and dispose of problem commercial assets. EVP McCabe manages the mortgage origination and retail branch functions and is also actively involved with the effort to pare down the operating expenses. Management is still significantly burdened by the asset quality and capital problems created by previous management and in addition, has had to undertake actions to pursue former management for improperly awarded bonuses and severance payments, which in the aggregate exceed $3 million.

Current management is capable of prudently managing Carteret through the recapitalization period. However, subsequent changes in the business plan of the institution must include a re-evaluation of management resources. This prospective re-evaluation is not reflective of current management's abilities, but rather a prudent measure to ensure that new activities are adequately planned, controlled and managed.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0048

Date: 06/15/92 Docket No.: 04702

MANAGEMENT (Continued)

Compliance with Outstanding Enforcement Actions

Carteret is considered to be in compliance with the Supervisory Agreement, Capital Directive and Consent Agreement. All applicable sections of each enforcement action have been addressed with corrective action having been implemented in key areas such as loan workout, the establishment of more realistic loan loss allowances, the cessation of mortgage trading activities, the submission of an approved capital plan and the demonstration of acceptable progress toward an unassisted recapitalization. (See Appendix A - 1.1)

Compliance with the Supervisory Directive of May 24, 1991

This directive was issued in response to the examiners becoming aware of $875 thousand in "Executive Performance Bonuses" that were authorized by the Compensation Committee of the board on September 30; 1990. This committee was formed by the board on the same day that it acted to approve these bonuses and was composed of three AmBase officers (Bean, Babcock and Feil). It should also be noted that two recipients of these bonuses, Robert Walsh and Richard Braun, voted affirmatively, as Carteret directors, to establish the committee. One of the provisions within the Directive ordered Carteret to cease payments of any additional funds for (a) bonus awards, (b) incentive compensation arrangements, (c) severance/termination pay-outs, (d) employment contracts, and (e) any other monetary enhancement arrangements made in addition to base salary and benefits available to all employees without the prior written non-objection of the OTS. Current Carteret management has made good faith efforts to abide by the terms of this directive and has independently sought restitution from the recipients of the aforementioned bonuses.

In response to prior management's compensation practices relating to executive performance bonus payments, cash advances on severance agreements that had yet to be validated and the awarding of so-called "stay bonuses", an OTS-Washington enforcement investigation (Resolution No. WA-91-03 dated September 4, 1991) was opened to review these matters and to determine whether restitution for payments made in contravention of OTS Regulation and/or safety and soundness principles is warranted. This investigation is still in progress and is focusing on the activities of AmBase and it former board of directors, including current AmBase Chairman Schaifenberger as well as former Carteret officers O'Brien, Walsh, Braun, McCarthy.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0049

Date: 06/15/92 Docket No.: 04702

MANAGEMENT (Continued)

Claims of Robert B. O'Brien

Pursuant to his perceived entitlement of accelerated retirement benefits under a May 11, 1983 Employment Agreement, amended as of January 18, 1988, former Chairman O'Brien has submitted claims against Carteret for amounts ranging between $8 million and $12 million, (less the $2.4 million previously advanced). Prior to the commencement of the June 17, 1991 examination, Carteret made a settlement proposal to O'Brien that offered to let him retain the $2.4 million already advanced and pay him three additional $150 thousand annual payments in return for a release of Carteret from the amended contract claims. O'Brien did not accept the offer. This action by Carteret's board was deemed unsound given that no analysis of Mr. O'Brien's 1990 and 1991 performance was undertaken prior to tendering the settlement offer. An analysis obtained in connection with the enforcement investigation by OTS of a draft report titled "Report Regarding Duties and Responsibilities of Robert B. O'Brien, Jr." documented that despite drawing full-time pay and benefits after leaving the CEO post in March 1990, Mr. O'Brien spent very little of his working time on Carteret matters. His activities appeared to be a blend of social and political events, along with AmBase related matters. In fairness to Carteret's current board, this matter was thrust upon them by former management during the transition period from former management to current management. The current board has now assessed Mr. O'Brien's tenure at Carteret and Carteret has initiated civil litigation to secure repayment of the $2.4 million advance.

Terminations of Robert C. Walsh, Richard L. Braun and Robert E. McCarthy

In July of 1991 Robert Walsh resigned from his post as CEO of Carteret. In August of 1991 and December of 1991 Messrs. Braun and McCarthy were respectively separated from Carteret. All three of these individuals are currently in the process of seeking $5 million (collectively) in severance payments from AmBase pursuant to what they perceive as the triggering of specific clauses contained within their respective severance agreements. Mr. McCarthy has proceeded the furthest along this track by obtaining a judgement against AmBase under an arbitration proceeding for $1.3 million. Mr. Braun has commenced litigation to seek an amount comparable to that awarded to Mr. McCarthy, while Mr. Walsh has communicated his intention to commence litigation for $2.4 million.

While no action has been taken against Carteret by these three individuals, the board has been considering Carteret's potential exposure under these severance agreements since Carteret was a co-signatory to these agreements. In addition, the board has sought $625 thousand in restitution collectively from these three individuals, relating to their receipt of executive performance bonuses in 1990.

The board is encouraged to continue with these efforts and to continue reporting to the OTS any material development in Carteret's efforts to secure these repayments.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0050

Date: 06/15/92 Docket No.: 04702

MANAGEMENT (Continued)

Actions of Robert C. Walsh

In the course of reviewing transactions that have had an adverse impact upon Carteret the examiners noted that in October of 1989, the purchase of a $100 million pool (Pool #591) of multi-family mortgage loans underwritten by Western FS&LA, Marina Del Rey, California and sold to Carteret by DLJ Mortgage Capital, Inc., was authorized by Robert C. Walsh, in direct contravention of the bank's credit policy. At the time of purchase Mr. Walsh did not have the authority to purchase loan packages in excess of $15 million without having obtained prior credit committee or board approval. Such approvals were not obtained. Furthermore, Mr. Walsh did not exercise his fiduciary responsibility to ensure that these loans were underwritten to acceptable standards, such as those promulgated by FNMA. Due to Mr. Walsh's actions and critical omissions Carteret is currently faced with an $84 million portfolio of loans in which 17 percent of the unpaid balances are either in excess of 90 days past due, in foreclosure or in bankruptcy. Carteret faces the risk of significant losses within this portfolio due to the poor underwriting and monitoring of these high risk loans. (See ASSET QUALITY comment - Multi-Family Loans Purchased from Western FS&LA)

Management is directed to have counsel fully investigate Mr. Walsh's role in the purchase of these low quality assets and to report to the OTS no later than September 30, 1992, its findings in this regard.

Codification of IPF/Carteret InterCompany Relationship

Since the acquisition of IPF in 1988 Carteret has provided funding of IPF's premium finance receivables on a consistent basis without benefit of a written agreement. These fundings have reached as high as $254 million and constitute a material portion of Carteret's lending activities. On June 1, 1992, the OTS issued a supervisory letter to Carteret in which it was directed to execute a written agreement with IPF that would preserve Carteret's interests in the financing of IPF's receivables and to submit an analysis of the specific terms of all previous fundings of IPF receivables by Carteret since the acquisition of IPF.

On June 15, 1992, Carteret submitted draft documents that would codify the intercompany relationship between Carteret and IPF. These documents would provide for the establishment of a financing facility of up to $400 million that would be conducted through a bankruptcy remote subsidiary on market terms. On June 23, 1992, Carteret supplied the aforementioned analysis of the specific terms relating to previous IPF fundings.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0051

Date: 06/15/92 Docket No.: 04702

MANAGEMENT (Continued)

Codification of IPF/Carteret InterCompany Relationship (Continued)

The board is reminded that Carteret must maintain separate corporate identities for its subsidiaries and must observe the formalities of the separate corporate procedures of each subsidiary. Failure to do so, as may be the case with regard to the financing of IPF's receivables without a written agreement, constitutes noncompliance with Section 571.21 of the OTS Regulations and could lead to potential exposure to Carteret for the actions of its subsidiaries. In light of the concerns noted above the board is requested to implement the agreements with IPF as soon as possible. These agreements have been reviewed by the examiners and do not raise any supervisory objections.

Summary

The new management team has aggressively pursued corrective action in key areas such as capital raising efforts, commercial asset management and disposal, operating expense reduction, preservation of Carteret's core lending and deposit taking functions and generally overcoming the poor management practices of past Carteret management. While it is commended for such actions, management is still confronted with the deep-seated problems left by previous management and will be further tested in dealing with the critical needs of capital augmentation, improved core earnings, and the residual problems attendant to Carteret's current weakened condition.

Close supervisory monitoring of Carteret will continue until such time as all of the aforementioned problems are remedied.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0052

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY

The primary scope of this examination review was to determine the adequacy of CSB's general valuation allowances (GVAs), the level and trend of classified assets, the adequacy of the internal loan review and the effectiveness of management's efforts to reduce the level of classified assets. A risk focused, minimum scope approach was taken toward the asset review. The initial review focused only on those assets with outstanding balances greater than $5 million. This was expanded to include those assets commented on in the previous report of examination. The review penetration level achieved was in excess of 60 percent of total gross commercial assets.

Composition of Classified Assets
(As of May 31, 1992)
(000's Omitted)

| | (1) Total Amount | % of Assets | Amount Classified | % of Total |
|---|---|---|---|---|
| Cash and Investments | $ 1,697,842 | 32.2 | $ 0 | 0.0 |
| Mortgage Loans | 2,700,110 | 51.2 | 199,069 | 7.4 |
| Consumer Loans | 113,422 | 2.2 | 3,365 | 3.0 |
| Commercial Loans | 18,178 | 0.3 | 61,179 | 336.6 |
| Real Estate Owned | 183,315 | 3.5 | 368,416 | 202.8 |
| Other Assets | 558,592 | 10.6 | 10,508 | 10.6 |
| Totals | $5,271,459 | 100.0% | $642,931 | 12.2% |

(1) Breakdown of assets as of March 31, 1992. Classifications are as of May 31, 1992. Commercial loans classified includes those loans redesignated as commercial by the Commercial Assets Division, therefore the figures do not reconcile to the TFR. Classified REO includes loans reclassified as ISF.

Although declining, the level of classified assets continues to threaten the viability of the institution thus making it impossible for Carteret to rebuild capital on its own. The ratio of classified assets to tangible capital plus GVAs before examiner adjustments was well in excess of 100 percent.

Level and Trend of Classified Assets

The level of classified assets has decreased significantly, 26.4 percent since the previous examination, as Carteret continues its efforts to dispose of classified and nonearning assets, as well as reduce total assets. The level of classified assets as a percentage of total assets has declined from 16.3 percent at the previous examination to 12.2 percent during this examination.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0053

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

The decline in overall totals can be clearly seen in this chart which reflects the level of classified assets as determined by the examiners for the past four examinations including this one.

| Classification | June 1992 | June 1991 | June 1990 | May 1989 |
|---|---|---|---|---|
| Substandard | $ 589,126 | $ 618,064 | $ 581,212 | $ 360,137 |
| Doubtful | 8,873 | 55,434 | 40,736 | 19,496 |
| Loss | 44,938 | 199,575 | 53,066 | 24,602 |
| Total Classified | $ 642,937 | $ 873,073 | $ 675,014 | $ 404,235 |
| Special Mention | $ 251,075 | $ 256,861 | $ 186,956 | $ 74,705 |
| Total Criticized | $ 894,012 | $1,129,934 | $ 861,970 | $ 478,940 |

Since the previous examination, the Commercial Assets Division has foreclosed on 15 major properties with a book value of over $40.2 million and sold 12 REO parcels on the books for $46.9 million, receiving $17.4 million cash and recognizing losses of $29.5 million covered by previously established reserves.

Over 33 loans totaling approximately $140 million have been liquidated. These included discounted poufs (compromised sales) of 18 loans with book values totaling approximately $114 million, where Carteret received over $52 million in cash while absorbing $62 million in losses covered by previously established reserves.

General Valuation Allowances

The examiners have determined that an additional $8 million will have to be set aside in GVAs as a result of this examination. This level was derived with full recognition of the fact that the examiners consider the methodology and review process utilized by Carteret to be very reasonable.

There was a problem however, regarding loans internally identified as in-substance foreclosed. A fair value was determined as required by GAAP, however, the asset was not consistently written down to that fair value as required. The amount which should have been written-off at that time was instead allocated a portion of the GVAs.

The examiners have identified $44.9 million in Loss classifications, of which all but approximately $6 million were properly identified by Carteret and should have been written-off. In effect, Carteret avoided recognizing these losses, thus GVAs were effectively overstated. (See page A - 11 for the effect on GVAs of these Loss classifications.)

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

General Valuation Allowances (Continued)

The minimum level of GVAs required was determined as in the previous examinations, by requiring various levels of reserves for the different types of assets and loans. Additional reserves are required for classified assets with individual consideration given to some of the more material classified assets. A copy of the asset classification work sheet and reserve requirement calculation have been given to management.

Asset Management

The new asset management team commenced its efforts in July of 1991 and has been effectively reducing the portfolio, with particular emphasis on the classified assets. No new major lending has taken place. The current emphasis is on getting not only the level of classified assets reduced, but also the total amount of assets, in an effort to improve capital ratios.

The team has worked well, both at the main office in New Jersey, as well as the Florida office. There is no one remaining on the staff who might feel compelled to defend a loan that they had originated. Further, the initial $150 million in reserves that were established in June of 1991, gave management the flexibility to pare down the portfolio.

The Corporate Asset Division provides a multitude of reports to assist in the management of the portfolio. The examiners noted however, that the proper controls may not be in place to ensure the accuracy of the reports produced. For example, the accuracy of a report on the status of real estate taxes due on the loans secured by real estate as well as REO, could not be verified through the asset managers or the individual asset files.

Internal Loan Review

In March 1992, William T. Brennan was hired as Loan Review Manager. The loan review function is structured as part of the Audit Department. Mr. Brennan is currently the only member of the ILR staff. On April 22, 1992, the Audit Committee adopted a general policy to selectively evaluate commercial, consumer and residential mortgage loans. The creation of the ILR function is attributed to the concerns noted in the previous report of examination, regarding multi-family loans serviced by Western FS & LA and in-house mortgage loans over $500 thousand.

As of this examination date, the department has completed a review of the loan portfolio serviced by Western. This review was found to be generally adequate and informative.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0055

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

Internal Loan Review (Continued)

Although the committee has adopted a general loan review policy, it has not approved a detailed policy and procedures for the ILR function. The Audit Committee must establish a policy which should include a system for targeting loans for review on a continuing basis and classifying troubled assets. In addition, the policy should provide guidance for setting up general and specific valuation allowances, consistent with the overall methodology for maintaining loan loss reserves.

Management should also assess staffing needs for the ILR department. Presently, CSB has approximately $460 million in mortgage loans serviced by 102 different servicers in addition to the Western loans. Some of the portfolios have high rates of delinquencies and are scheduled to be reviewed. Additional staffing may be required so that problem loans are identified within a reasonable time period. The level of staffing was also a matter of concern noted in the previous report of examination.

Appraisals

The appraisal policies and procedures appear to be adequate and satisfy the needs of Carteret in relation to the proper valuation of assets. Although a specific review of the appraisal function was not performed, the examiners noted that current appraisals were available in just about every instance, were reviewed by an in-house review appraiser and then utilized by the asset managers. The asset managers are familiar with what is required in a good appraisal as well as with discounted cash flows including NRV and FV calculations.

Multi-Family Loans Purchased from Western FS & LA

As of May 31, 1992, Carteret owned two pools (#591 and #745) of multi-family mortgage loans totaling $150.6 million that were originated and are presently serviced by Western FS&LA, Marina Del Rey, California, OTS No. 3865.

Pool #591 (purchased in 1989 from DLJ Mortgage Capital) has demonstrated significant performance problems with $17.3 million or 20.5% of the pool balance either delinquent or in REO as of March 31, 1992. Of the $17.3 million in problem assets within pool #591, $4.9 million was in REO, $6.6 million was past due over 60 days and $5.8 million was past due over 30 days. Pool #745 (purchased in 1991 from Goldman Sachs) has performed better with only $2.5 million or 3.8% in problem assets.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0056

Date: 06/15/92 Docket No.: 04702

ASSET QUALITY (Continued)

Multi-Family Loans Purchased from Western FS & LA (Continued)

In March of 1992 Carteret engaged the services of an outside consulting firm, The Sterling Advisory Group, Inc., to evaluate these loan pools and to specifically determine whether or not representations and warranties made at the time of purchase were consistent with the characteristics of the underlying portfolio. The consultant's report concluded that the loans sold to Carteret were not underwritten in accordance with the representations and warranties contained in the commitment letter, which were based on FNMA guidelines, and that as a result, Carteret could potentially seek a portfolio buyback of the loans from either DLJ or Western.

The specific breaches of the representations and warranties cited by the consultant center around Western's use of the first year discounted (teaser) interest rate in the debt service coverage calculations, the existence of negative amortization, and the failure of Western to require tax and insurance escrows. In addition, the consultant also points out various servicing breaches by Western that could serve as a basis for Carteret to pull the servicing from Western.

Carteret has demanded that Western repurchase 55 loans totaling $60 million that were improperly represented as being underwritten in accordance with FNMA guidelines. To date, the only response received from Western indicates that they do not acknowledge any of the breaches of representations and warranties communicated by Carteret. At this point Carteret is trying to schedule a meeting between the two institutions to focus on the underwriting problems noted in the consultant's report. In addition, Carteret management is exploring the prospect of pursuing litigation against DLJ and/or Western to force a buyback of the misrepresented loans.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0057

Date: 06/15/92 Docket No.: 04702

## CAPITAL ADEQUACY

### Scope

The review of capital adequacy included an assessment of the accuracy of Carteret's regulatory capital calculations. The adequacy of Carteret's capital position was evaluated as of March 31, 1992 and June 30, 1992. Consideration was given to the potential impact of the current recapitalization efforts on Carteret's capital position. OTS also assessed the adequacy of Carteret's capital position relative to the level of asset quality exposure, regulatory capital requirements and other market exposures such as interest rate risk and prepayment risk.

Capital Requirements (1)
(As of June 30, 1992)
(000's Omitted)

| | Capital | Requirement | Deficiency | Capital Ratio |
|---|---|---|---|---|
| Tangible Capital | ($ 72,777) | $ 77,369 | ($150,146) | (1.41%) |
| Core Capital | ($ 21,198) | $154,738 | ($175,936) | (0.41%) |
| Risk-Based Capital | ($ 21,910) | $211,335 | ($233,244) | (0.80%) |
| Fully Phased-In Risk-Based Capital | ($ 78,260) | $232,879 | ($311,139) | (2.86%) |

(1) After adjustments for losses and required additional general valuation allowances identified in this report. (See Appendix page A - 11.1.)

### Summary of Findings

Carteret is operating with an unsafe and unsound level of capital relative to its asset size and the level of risk in its balance sheet. Tangible, core and risk based capital levels are significantly below the current regulatory minimum capital requirements for healthy institutions. Further capital erosion has been halted largely due to management's efforts in reducing operating costs, balance sheet restructuring and the disposition of problem assets. Even with the improvements noted in the management of the institution, Carteret will not be able to cure its regulatory capital deficiencies through internal capital formation within any reasonable time frame.

Carteret's commercial real estate and REO portfolios have been significantly reduced from the previous examination, but remain a threat to Carteret's short term viability. Unidentified losses on real estate of a moderate magnitude could cause potential investors to reassess the recapitalization of Carteret. OTS has not identified a significant amount of additional exposure in the area of commercial real estate and REO, however there is no assurance that future events will not lead to additional losses. GVAs totaling $53.8 million after provisions required in this examination should provide for at least a partial cushion for any unidentified specific losses at this time.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0058

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Summary of Findings (Continued)

Total classified assets potentially threaten Carteret's capital position under any measure. Even under the assumption that Carteret is recapitalized with a $200 million capital infusion, as is currently proposed, classified assets would represent 365 percent of tangible capital plus remaining general valuation allowances. Carteret must continue to aggressively reduce its level of classified assets.

Management's efforts to stem operating losses and stabilize earnings have been effective in limiting further capital erosion. Balance sheet restructuring has aided in limiting the level of risk-based capital that Carteret is required to maintain. Additionally, management has been successful in soliciting investor interest in the form of a letter of intent by Kohlberg and Co. ("Kohlberg"). The proposed capital infusion of $200 million, which is subject to certain conditions, would apparently cure Carteret's capital deficiencies as of June 30, 1992 on a pro forma basis. Risk-based capital would likely need to be further augmented beyond the initial $200 million investment to bring Carteret into compliance with the fully phased in risk-based capital requirements, assuming that Carteret's balance sheet structure and composition remains unchanged.

The Kohlberg letter of intent between AmBase and Kohlberg indicates that Kohlberg will lead a group of private investors in the acquisition of a majority interest in Carteret subject to due diligence, the execution of a definitive agreement, regulatory and corporate approvals and the satisfactory disposition of potential regulatory issues and liability claims relating to AmBase. AmBase would likely retain a 10 percent equity interest in Carteret. The acquisition of Carteret by Kohlberg as currently proposed would include a $200 million (before fees/expenses) capital infusion into Carteret. On a pro forma basis utilizing Carteret's current balance sheet, the proposed capital infusion would cure Carteret's current regulatory capital deficiencies, but would not ensure compliance with fully phased-in risk-based capital requirements without further augmentation or balance sheet restructuring.

Management states that Kohlberg's proposed acquisition of Carteret would be accounted for using the purchase method of accounting. Carteret projects that there will be no goodwill created in the proposed transaction. Management is further assuming that the market value of assets will exceed the market value of liabilities by enough of a margin to offset the write-off of all goodwill and other intangible assets currently held by Carteret. In essence, the market value of Carteret would be zero at acquisition and the $200 million capital infusion would then elevate the "new" Carteret into compliance with fully phased in regulatory capital requirements. OTS's fully phased in capital calculation did not consider the purchase accounting adjustments that are being considered by management due to the lack of balance sheet mark to market estimates.

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital

Carteret's capital position includes certain components which will be negatively impacted by FIRREA regulatory capital phase-out requirements and other market factors such as interest rate risk and prepayment risk. A review of these items is presented below.

(a) Supervisory Goodwill

Carteret included $51.7 million (1 percent of tangible assets before deduction for non-qualifying purchased mortgage servicing rights ("PMSR")) in supervisory goodwill as core capital as of June 30, 1992. The inclusion of supervisory goodwill as core capital will decrease to 0.75 percent and 0.375 percent of tangible assets before PMSR deduction for the years ending December 31, 1993 and December 31, 1994, respectively. Supervisory goodwill will not be permitted as a component of core capital after December 31, 1994. Although goodwill is an amortized asset, it is unlikely that the current rate of amortization of supervisory goodwill would reduce the balance to a level less than that fully includable per phase-outs.

Additionally, from an accounting perspective, OTS expressed concern in the previous examination regarding the appropriateness of the carrying value of goodwill. Carteret retains significant amounts of goodwill relating to acquisitions where the majority of assets and liabilities originally acquired have either matured or been sold. Carteret claims that its continued market presence in the subject geographic areas justifies the carrying value of goodwill. Neither Carteret, nor its accountants, have provided documentation that adequately supports the carrying value of goodwill.

(b) Non-includable Subsidiaries

As of June 30, 1992, Carteret had $3.5 million in investments in subsidiaries that are engaged in activities not permissible for national banks. FIRREA requires that institutions deduct an increasing percentage of their investments in non-includable subsidiaries from tangible capital.

Carteret deducted 25 percent of such investments from equity capital as of June 30, 1992 for tangible capital calculations. It will have to deduct 40 percent and 60 percent of its non-includable subsidiary investments from tangible capital for the periods July 1, 1992 to June 30, 1993 and July 1, 1993 to June 30, 1994, respectively. After June 30, 1994, Carteret will be required to deduct 100 percent of its investment in non-includable subsidiaries from equity capital for purposes of determining tangible capital.

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(c) General Valuation Allowances ("GVAs")

GVAs on loans and leases are currently includable in supplementary capital up to 1.5 percent of total risk-based assets, except that supplementary capital can not exceed 100 percent of core capital, until December 31, 1992. Thereafter, GVAs are included in supplementary capital up to 1 percent of total risk-based assets, subject to not exceeding 100% of core capital. Carteret's risk-based assets of $2.7 billion would allow for the inclusion of $40.5 million in GVAs for risk-based capital. However, since core capital is negative as of June 30, 1992, GVAs can not be utilized for risk-based capital. GVAs would be available as a component of risk-based capital if the proposed capital infusion materializes.

(d) Core Deposit Value ("CDV")

CDV is includable in core capital up to a maximum of 25 percent of tangible capital plus qualifying supervisory goodwill. Due to Carteret's negative tangible and core capital positions, $2.0 million in CDV is prohibited from being included in its core capital calculation. CDV would be available for inclusion should the proposed capital infusion come to fruition.

(e) Non-deducted Equity Investments

Carteret has $2.9 million in unconsolidated equity investments which are required to be deducted from risk-based capital in accordance with regulatory phase-out requirements. As of June 30, 1992, Carteret deducted 25 percent of its investments from risk-based capital. The regulatory deduction increases to 40 percent, 60 percent, and 100 percent as of July 1, 1992, July 1, 1993 and July 1, 1994, respectively.

(f) Risk-based Capital Requirements

The risk-based capital requirement will be raised from the current 7.2 percent to 8 percent effective December 31, 1992. Based on the level of total risk assets as of June 30, 1992, Carteret's risk-based capital requirement would be increased by $21.8 million at year end 1992.

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR")

The book balance of Carteret's PMSR was $58.9 million as of June 30, 1992. Carteret can include, for regulatory capital purposes, the lesser of: (i) 90 percent of fair market value, (ii) 90 percent of original cost or (iii) current amortized book value. Carteret reported "non-qualifying" PMSR of $4.9 million as of June 30, 1992, which represents 90 percent of Carteret's fair market value estimate, $54.0 million, less the current amortized book value, $58.9 million. Carteret is amortizing its PMSR at a rate of $1.3 million per month, $15.6 million annually. At this rate, PMSR will be fully amortized by June, 1996.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0061

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR") (Continued)

Carteret utilizes the services of Hamilton, Carter, Smith & Co. ("HCS") to conduct its quarterly fair market value analysis of PMSR for regulatory capital purposes. Carteret presents HCS with its portfolio data and estimates of market assumptions, which HCS then analyzes in its PMSR market value model. The market value of PMSR is highly dependent on assumptions used in estimating the loan servicing cash flows. OTS, via letter dated July 22, 1991, expressed concern regarding the assumptions that HCS utilized in determining the value of Carteret's PMSR. Many of the concerns previously expressed by OTS regarding HCS's valuation assumptions have not been satisfactorily addressed.

Carteret's PMSR portfolio is comprised of 83.6 percent GNMA servicing, 10.5 percent FNMA servicing, 4.6 percent FHLMC servicing and 1.2 percent private servicing. Aggregate detail on Carteret's PMSR portfolio as reported by HCS is presented in further detail below:

PMSR Portfolio Characteristics
$000s omitted

| | 6/30/92 | 3/31/92 | 12/31/91 | 9/30/91 | 6/30/91 |
|---|---|---|---|---|---|
| Principal Balance | 4,318,909 | 4,592,194 | 4,859,330 | 5,051,298 | 5,196,450 |
| Qtly Ptflo Run-off | 273,285 | 267,136 | 191,968 | 145,152 | 178,971 |
| Prin. Reduction as % | 5.95% | 5.50% | 3.80% | 2.79% | 3.33% |
| Average Balance | 52,455 | 53,009 | 53,546 | 53,978 | 54,243 |
| Delinquency Rate | 6.54% | 5.87% | 7.27% | 8.02% | 6.74% |
| Foreclosure Rate | 1.42% | 1.57% | 1.57% | 0.84% | 1.37% |
| Wtd Avg Coupon | 9.88% | 9.91% | 9.94% | 9.96% | 9.97% |
| Wtd Avg Servicing Fee | .445% | .444% | .445% | .444% | .444% |
| Prepayment Speed (1) | 210PSA | 223PSA | 225PSA | 183PSA | 168PSA |
| Fair Mkt. Value | 138bps | 147bps | 138bps | 152bps | 156bps |

(1) Forecasted

HCS performs its PMSR valuation utilizing a four scenario model: (1) $75 cost to service, 17 percent internal rate of return ("$75/17%"), (2) $50/15%, (3) $75/15%, and (4) $50/17%. The valuation as of June 30, 1992 yielded the following fair market value estimates:

Valuation Analysis
$000s omitted

| Fair Market Value @ | $75/17% | $50/17% | $75/15% | $50/15% |
|---|---|---|---|---|
| ($000's) | $47,866 | $57,473 | $50,956 | $61,403 |
| Basis Points | 111bps | 133bps | 118bps | 142bps |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0062

Date: 06/15/92 Docket No.: 04702

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR") (Continued)

The fair market value of 138 basis points or $59.4 million assigned by HCS is not adequately supported in its valuation. It appears that HCS's value represents the average of scenarios 2 and 4 above, thus discarding consideration to the $75 average cost to service portion of the analysis. The blended average of the four scenarios would result in a fair market value estimate of 126 basis points or $54.4 million. This adjustment alone would increase Carteret's PMSR regulatory capital deduction from $4.9 million to $10.0 million. HCS does not support why it eliminated the $75 cost of service component from its consideration of market value.

Prepayments have obviously accelerated in Carteret's PMSR portfolio due to lower interest rates as is evident in the portfolio run-off experienced in the last year. Carteret has not analyzed actual prepayment experience by pool in the past, but is now attempting to compile this data. Similarly, HCS's market value analysis does not consider Carteret's historical prepayment experience in the various segments of Carteret's PMSR portfolio in determining the appropriate prepayment assumption to use in its model. HCS uses prepayment assumptions based on a generic servicing portfolio. HCS's prepayment assumptions may or may not be acceptable, but without historical prepayment information, this is impossible to assess.

HCS also states in its valuation assumptions that PMSR purchasers normally pay the percentage value on loans not 90 days or greater delinquent, in foreclosure or bankruptcy. HCS applies the percentage value (i.e. 138 bps) to the entire outstanding principal for Carteret's valuation, thus generating value from the $130.9 million of Carteret's servicing portfolio which is past due 90 days or more or in foreclosure. Eliminating the aforementioned $130.9 million section of the PMSR portfolio would result on a further market value decline of $1.7 million from the $54.4 million value referenced above assuming a 126 basis point percentage value.

GNMA servicing makes up 84 percent of Carteret's entire PMSR portfolio. HCS's market value analysis indicates that the pre-tax internal rate of return utilized in valuing GNMA servicing would be between 19 and 21 percent. However, HCS's market value spreadsheet appears to utilize pre-tax internal rates of return of 15 and 17 percent for GNMA servicing. The use of the lower internal rates of return in discounting the GNMA servicing cash flows will artificially indicate higher market values. OTS was unable to quantify the impact of this component due to the lack of supporting data.

Lastly, HCS provided a range of value estimates from 111 basis points ($47.9 million to 142 basis points ($61.4 million), indicating that the most probable value was 138 basis points ($59.4 million). HCS did not explain its rationale for selecting a value that was at the highest end of the range.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0063

CAPITAL ADEQUACY (Continued)

Composition of Capital (Continued)

(g) Non-qualifying Purchased Mortgage Servicing Rights ("PMSR") (Continued)

Carteret is directed to request that HCS update its valuation to address the issues raised above. Any adjustments necessary for regulatory capital purposes must be recorded internally and in amended June 30, 1992 TFR filings. Furthermore, Carteret is directed to retain the services of an outside firm, acceptable to OTS, to perform a fair market value analysis of its PMSR portfolio for the period ended September 30, 1992. The valuation must specifically address the concerns outlined in OTS's letter to Carteret dated July 22, 1991 and the concerns detailed in the preceding paragraphs. A summary of the items contained in OTS's letter which must be addressed in the valuation, both qualitatively and quantitatively, is presented below:

(i) mortgage pools must be segregated by type and coupon for each fifty basis point coupon range,

(ii) prepayment assumptions must be expressed to the nearest hundredth percent for each segregated portfolio,

(iii) the valuation must give consideration to the potential market value impact of VA no-bid exposure,

(iv) the market value must be calculated using pre-tax cash flows discounted by pre-tax discount rates,

(v) the valuation should address items 1 through 10 presented in the July 22, 1991 letter from OTS relating to (a) servicing costs, (b) the treatment of delinquent loans and fees generated on delinquent loans, (c) the amortization of principal, and (d) discount rates.

Compliance with Capital Plan Projections

Carteret has remained in material compliance with all components of the Capital Plan approved by OTS on March 2, 1992. The cornerstone of the Plan is the successful attraction of $200 million in outside capital into Carteret. Management is confident that Carteret will achieve full regulatory capital compliance through the currently proposed recapitalization from investors headed by Kohlberg & Co. by December 31, 1992.

Capital Reporting Errors

OTS discovered several errors in Carteret's regulatory capital calculations. Revisions have been made to the March 31, 1992 and June 30, 1992 capital calculations and are reflected in the data disclosed in this report. The reporting errors were detected primarily in the risk weighting of certain assets and off-balance sheet items. The revisions, which have been discussed with management, increase Carteret's risk based capital requirement by $5 million above the requirement reported on TFR schedule CCR as of March 31, 1992.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0064

Date: 06/15/92 Docket No.: 04702

## RISK MANAGEMENT

### Scope

The scope consisted of an overview of interest rate risk (IRR) management and Carteret's IRR measurement model, assuming a $200 million capital infusion. Carteret's retail and wholesale funding sources were also reviewed, in addition to investment activity and liquidity management.

Based on a comprehensive review of the underlying assumptions of Carteret's MVPE model in the previous examination, and management's response to OTS criticisms by implementing corrective measures, a full analysis of the current assumptions was not performed and the assumptions used are presumed to be valid.

### Interest Rate Risk Management

Management was required in the June 17, 1991 ROE to address the disparities between OTS' model and its internal model. Several items, including the impact of all off-balance sheet activity and the recognition that the market value of nonperforming assets (delinquent loans, REO) is impacted when interest rates change, were corrected by Carteret. OTS also required Carteret to address its apparent inability to meet board-established limits given its deficient capital position. Management responded that limits established by the board, as required by Thrift Bulletin 13, cannot be met without a capital infusion. Thus board limits remain set at levels which would indicate maximum exposure allowable whereby MVPE would not fall below Carteret's tangible capital requirement.

Market Value of Portfolio Equity (MVPE)
(000's Omitted)

1. OTS Model

| | 03/31/92 | | | 03/31/91 | | |
|---|---|---|---|---|---|---|
| BP Chg Rates | $ Chg MVPE | % Chg MVPE | MVPE | $ Chg MVPE | % Chg MVPE | MVPE |
| +200 | $-85,275 | -925 | $-76,056 | $-174,874 | -607 | -146,140 |
| +100 | -29,845 | -324 | -20,626 | -75,672 | -263 | -46,938 |
| 0 | 0 | 0 | 9,219 | 0 | 0 | 28,734 |
| -100 | 15,710 | 170 | 24,929 | 44,212 | 154 | 72,946 |
| -200 | 21,834 | 237 | 31,053 | 51,344 | -179 | 80,078 |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0065

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT (Continued)

2. Carteret Model (the ALBUM model)
Using consolidated financial data.
Based on anticipated $200 million capital infusion.

| BP Chg Rates | $ Chg MVPE | 03/31/92 % Chg MVPE | Board's TB-13 Limits | MVPE |
|---|---|---|---|---|
| +200 | $-75,826 | -44 | -34 | $97,475 |
| +100 | -36,060 | -21 | -17 | 137,241 |
| 0 | 0 | 0 | 0 | 173,301 |
| -100 | 27,231 | 16 | 17 | 200,532 |
| -200 | 38,785 | 22 | 34 | 212,086 |

The models indicate significantly different results due to the inclusion of the anticipated $200 million capital infusion in Carteret's model. With the capital infusion assumption, an instantaneous interest rate shock of plus 200 basis points would result in MVPE of $97.5 million as of that date, which indicates that Carteret would be able to maintain MVPE above its tangible capital requirement of $78.3 million as of March 31, 1992. Conversely, the lack of a capital infusion would result in a MVPE of -$76 million with a 200 basis points rise in interest rates as of March 31, 1992, as indicated in the OTS model.

The board-established MVPE limit is plus or minus 34 percent in an up or down 200 basis point scenario. This was derived by determining acceptable levels of decreases in MVPE while still remaining above Carteret's tangible capital requirement. Although the simulation indicates that even with the capital infusion Carteret would not meet the board established limits, management anticipates it would also restructure a significant portion of its rate sensitive liabilities to lengthen their repricing.

The major strategy would likely be to convert a large portion of the $1.7 billion (as of March 31, 1992) in variable rate FHLB Advances to fixed rate borrowings. A simulation performed as of December 31, 1991, assuming the capital infusion and the conversion of $650 million in FHLB advances to two and three year fixed rate borrowings, resulted in MVPE levels within all board-approved exposure levels: a minus 62 percent change in MVPE as compared to the board limit of minus 68 percent, at a maximum 400 basis point rise in interest rates. Under this scenario MVPE would be $87.6 million. The change in MVPE would be reduced to minus 28 percent at an up 200 basis point level.

Both models indicate Carteret's negative exposure to rising rates. After a capital infusion, however, the exposure to rising rates is somewhat lessened, as the increased capital level enhances Carteret's ability to fund assets with a lesser reliance on interest sensitive liabilities. Carteret will continue to be highly exposed to interest rate changes on the liability side of its balance sheet. The ability to improve Carteret's asset/liability mismatch and achieve a



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0066

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT (Continued)

Interest Rate Risk Management (Continued)

healthy net interest margin is largely based on its ability to successfully convert nonperforming assets to earning assets. Management does not anticipate significant fluctuations in net interest income due to interest rate risk; nevertheless Carteret will not be able to sustain core profitability until the level of earning assets achieves a healthy level in relation to costing liabilities. (See comment - Operating Results).

A comparison of the OTS base case MVPE from March 31, 1991 to March 31, 1992 demonstrates Carteret's inability to sustain sufficient market value equity even in a falling interest rate environment. An increase in the market value of assets when rates fell was offset by accelerated prepayments in mortgage loans and mortgage-backed securities. Carteret's low level of capital also contributes to the extreme sensitivity of MVPE.

Carteret remains significantly exposed to rising interest rates, and the previously mentioned unhedged position on the substantial level of FHLB advances repricing off LIBOR at three and six month intervals will be negatively impacted if short term interest rates rise. Until December 1991 Carteret had a portion of its risk hedged with short Eurodollar futures contracts, however an unhedged position is currently maintained based on management's perception that short term rates will continue to fall or remain flat through 1992.

Analysis of Asset/Liability Changes

Retail deposits declined from $3 billion at June 30, 1991 to $2.8 billion as of March 31, 1992. For the quarter ending March 31, 1992, the net outflow was $101.2 million, which was replaced with a $170 million increase in reverse repurchase agreements over the three month period.

Total assets decreased between examinations by 1.5 percent, to $5.3 billion as of March 31, 1992. The majority of the loan and investment porfolios declined in size over the review period, although investment in U.S. Treasuries (predominantly five year Notes) increased from $59.7 million as of June 30, 1991 to $264.7 million as of March 31, 1992. The increase can be partially attributed to Carteret's need to increase its liquidity level as required by OTS.

Investment Activity

Management stated that excess cash has been invested in Treasuries (maintained in the "Held for Sale" portfolio) in preference over Federal Funds Sold to achieve a higher return without increased credit risk. A review of purchase and sale activity indicates that Carteret recognized $643 thousand in gains on the sale of Treasuries during the nine months ending March 31, 1992, $542 thousand of which was realized in a single transaction involving the sale of $70 million in five year Treasuries in September 1991.

RISK MANAGEMENT (Continued)

Investment Activity (Continued)

The predominant activity in sale of investment securities resulted from the sale of purchased and originated mortgage backed securities (MBS) from Carteret's "Held for Sale" portfolio. For the nine months ending March 31, 1992, the net gain on the sale of purchased MBS was $1.1 million, while the net gain on the sale of originated MBS was $2.1 million. As of March 31, 1992 Carteret reported $123.6 million total MBS in its "Held for Sale" portfolio.

In addition, Carteret realized a gain of $1.1 million on the sale of four Z-bond securities in its "Held for Investment" portfolio, resulting from management's decision to eliminate the entire high-risk mortgage derivative security portfolio. In addition to $176 million notional principal amount in swap positions (off-balance sheet), Carteret has three CMO Residuals with a book value of $11.1 million as of March 31, 1992.

The March 31, 1992 market value of the CMO Residuals was $7.8 million, resulting in an unrealized loss of $3.3 million. Although the securities continue to be accounted for in the "Held for Investment" portfolio, management should examine the need to increase the amortization speed of these securities, as a substantial portion of the indicated loss is likely to be permanent, given the extremely high level of mortgage prepayments recently experienced, coupled with continued falling interest rates.

Liquidity Management

As part of the Supervisory Agreement executed on April 29, 1991, Carteret was required to maintain sufficient liquid assets and unpledged assets available for borrowings at a level of at least ten percent of the previous month's liquidity base. Additionally, as part of the Capital Directive executed on October 7, 1991, Carteret was required to submit a liquidity contingency plan that would raise the level of available liquidity to 15 percent if its Capital Plan was denied by the OTS. Since the Capital Plan was approved on March 2, 1992, Carteret now must abide by the 10 percent requirement.

Carteret has reported consistent compliance with its minimum regulatory liquidity requirements throughout the current review period. As of July 1, 1992, Carteret had liquid assets equal to approximately 22.7 percent of its liquidity base and was projecting to have an average liquidity ratio of 24.8 percent for the month of July. This ratio is projected to decrease given the need to fund IPF receivables, estimated at $65 million per month for the months of July, August and September, and the continued outflow of deposits, estimated at $122 million for the same three months. This outflow is due primarily to the historically low short term interest rates prevailing in the market. Carteret projects that it will continue to meet the required liquidity ratio by a comfortable margin. Uninsured deposits were estimated at $42 million as of June 30, 1992.

Date: 06/15/92 Docket No.: 04702

RISK MANAGEMENT (Continued)

Liquidity Management (Continued)

Carteret produces comprehensive internal cash flow projection reports on a weekly, monthly and quarterly basis, in addition to submitting weekly and monthly liquidity updates to the OTS. The liquidity reporting systems utilized by Carteret are considered satisfactory.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0069

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS

Scope

The Operating Results review encompassed a detailed analysis of CSB's earnings performance for the quarter ended March 1992, and the years ended December 31, 1991 and 1990. Special emphasis was placed on the savings bank's ability to generate core profits. In addition, a review of budgets and other internal reports prepared by management for the board was performed, and a limited test check was performed to assess the accuracy of schedules SC and SO of the bank's Thrift Financial Reports.

Comparative Operating Results
(000's Omitted)

| | 03/31/92 | Percent to Avg (1) Assets | 12/31/91 | Percent to Avg Assets | 12/31/90 | Percent to Avg Assets |
|---|---|---|---|---|---|---|
| Net Interest Income | $18,833 | 1.4 | $ 68,230 | 1.3 | $ 87,966 | 1.5 |
| Less: Prov for Loss | 2,575 | 0.2 | 170,767 | 3.2 | 124,983 | 2.1 |
| Net Int Marg after Prov | $16,258 | 1.2 | -102,537 | -1.9 | -37,017 | -0.6 |
| Plus: Noninterest Inc | 7,666 | 0.6 | 41,371 | 0.8 | 32,722 | 0.6 |
| Less: Operating Exp | 22,147 | 1.7 | 115,033 | 2.1 | 155,112 | 2.6 |
| Net Operating Income | 1,777 | 0.1 | -176,199 | -3.2 | -159,407 | -2.6 |
| Plus: Net Nonoper Inc | 458 | 0.0 | 13,922 | 0.2 | 21,254 | 0.3 |
| Net Income before Taxes | 2,235 | 0.1 | -162,277 | -3.0 | -138,153 | -2.3 |
| Less: Taxes | -556 | -0.1 | -2,026 | -0.0 | -6,310 | -0.1 |
| Net Income | 2,791 | 0.2 | -160,251 | -3.0 | -131,843 | -2.2 |

(1) Annualized

Conclusion

CSB's poor asset quality continues to hinder its ability to generate strong core earnings. This condition has persisted for the past two examinations and includes both problem commercial and residential real estate assets. Annualized net interest income for the quarter ended March 1992, as compared to the year ended 1991 has improved modestly. This is attributable to a favorable interest rate environment and progress in reducing non-performing loans. Positive net income for the quarter is attributable to the improved net interest position, combined with a decline in operating expense. However, this level of net income is insufficient to raise capital levels to regulatory requirements within a reasonable time period. Therefore, in order for the savings bank to remain a viable institution, a significant capital infusion is needed.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0070

Date: 06/15/92

Docket No.: 04702

OPERATING RESULTS (Continued)

Net Income

As noted above, net income for the quarter ended March 1992 has improved over the prior year's results. The primary cause for the improvement in net income as contrasted with previous periods is attributable to a significant reduction in provision for loan loss. In addition, CSB experienced a marginal improvement in net interest income over 1991, and a decline in non-interest expense.

Subsequent to this review, the bank reported preliminary net income of $3.0 million for the quarter ended June 1992. As noted in the Asset Quality section of this report, an additional provision for loan loss of $8 million is required. The effect of the additional loss provisions will more than likely lead to a net loss for the six month period ended December 1992.

Net Interest Margin

Net interest margin (NIM) before provision for loan loss continues to be weak due to the CSB's large percentage of non-performing and non-interest earning assets. The following table depicts the severity of the level of these assets:

Summary of Non-Performing
and Non-Interest Earning Assets
(000's Omitted)

| | 03/31/92 | Percent to total Assets | 12/31/91 | Percent to total Assets | 12/31/90 | Percent to total Assets |
|---|---|---|---|---|---|---|
| Nonaccrual loans | $126,171 | 2.4 | $139,439 | 2.7 | $117,875 | 2.1 |
| Real Estate Owned (1) | 183,315 | 3.5 | 186,687 | 3.6 | 157,809 | 2.8 |
| Investment in Subs (2) | 210,071 | 4.0 | 196,327 | 3.8 | 102,359 | 1.8 |
| Goodwill/intangibles | 93,097 | 1.8 | 94,907 | 1.8 | 102,581 | 1.8 |
| Other Assets | 128,049 | 2.4 | 114,282 | 2.2 | 176,504 | 3.3 |
| Cash & Non-int Deps | 102,838 | 2.0 | 85,839 | 1.6 | 54,457 | 1.0 |
| Total non-interest earning assets | $843,541 | 16.1 | $817,481 | 15.7 | $711,585 | 12.8 |

(1) Net of valuation allowances.
(2) Includes REO held by subsidiaries of $137.7 million, $126.6 million and $0, respectively.

As noted above, non-performing and non-interest earning assets remain at high levels. Management has been successful in disposing of a substantial portion of commercial REO since the previous examination dated June 17, 1991. However, residential REO (including in-substance foreclosures) has significantly increased from $11.8 million as of June 30, 1991, to $135.6 million as of March 1992.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0071

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Net Interest Margin (Continued)

The ability to continue to convert REO and other non-interest earning assets into interest earning assets within a reasonable time period will have a material impact on the NIM going forward.

The severity of the association's asset quality problems is more evident when noting that over the past 15 months, CSB has been operating in a favorable interest rate environment. NIM (before provision for loan loss) for the annualized quarter ended March 1992 revealed only a marginal improvement over 1991, and remains below the performance of 1990. As long as short-term rates remain favorable and asset quality does not deteriorate further, NIM should remain stable. However, a sudden upward movement in short term interest rates could erode NIM below its current level.

As of March 1992 the ratio of interest bearing assets to interest bearing liabilities was 84.0 percent. The average yield on interest earning assets for the quarter ended March 1992 was 8.4 percent, as compared to 9.2 percent for the year ended 1991.

CSB reported interest expense of $71.6 million ($286.3 million annualized) for the three month period ended March 31, 1992. This compares to $356.4 million for the year ended December 1991. The reduction of interest expense is primarily the result of a decline in the bank's cost of funds due to falling short term rates. The average cost of deposits as of March 1992 was 5.6 percent as compared to 7.3 percent one year ago, while the average cost of FHLB advances was 5.5 percent compared to 7.8 percent. Overall CSB's average cost of funds rate was 5.6 percent.

The cost of funds includes costs related to hedging activities. For the period ended March 1992, the bank amortized $424 thousand in net deferred losses on liability hedges, and recorded a net loss of $2.0 million on matched interest rate swaps. In December 1991 CSB disposed of two floating rate swap positions, which resulted in a net deferred gain of $4.9 million. This gain is currently being amortized into income at $215 thousand per month, over a 23 month period.

Provision for Loan Loss

As noted earlier, the additional provision for loan loss requirement of $8 million will result in a net loss for the six month period ended December 1992. Although loan loss provisions for the current year are not expected to be at 1990 and 1991 levels, the impact of continued provisions could materially affect future net income.

As of June 1992, actual provisions were $10.0 million versus budgeted projections of $6 million. Budgeted provisions for loan loss for the last six months of the year ended 1992 are $6.0 million.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0072

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Non-Interest Income

Non-interest income primarily consists of mortgage servicing fees, other charges and net gains associated with the securitization and sale of mortgage loans. During the quarter ended March 1992, CSB reported income of $6.5 million from mortgage banking activities. The March 1992 quarter's annualized income from mortgage banking activities of $26.0 million is below 1991 results of $39.9 million. The cause for the decline is attributable to a reduction in profits from the sale of securities and loans in Carteret's mortgage banking activities.

Non-interest income also includes a net loss of $1.2 million ($4.8 million annualized) from REO operations for the quarter ended March 1992. The net loss is primarily attributed to the payment of real estate taxes and maintenance. For the year ended 1991 the bank expensed $4.9 million in REO related costs. The cost of maintaining REO assets will be a continuing burden on operating results.

Non-Interest Expense

Non-interest expense for the annualized March 1992 quarter has declined 23 percent as compared to 1991. The improvement is primarily attributable to a reduction in personnel and office expenses. Goodwill and other intangibles are amortized at $7.2 million annually.

Presently the bank operates from two partially vacant facilities in Morristown, New Jersey and Parsippany, New Jersey. Due to the decline in staff, either location could accommodate the combined operations. The costs related to operating from both locations will continue to negatively impact net income. Management is attempting to sell the Morristown office and currently plans to combine the staffs at the Parsippany facility.

Actual vs. Budgeted Operating Results

OTS reviewed Carteret's consolidated actual operating results for the year to date May 31, 1992 and assessed the reasonableness of the budgeted operating results for the period beginning June 1, 1992 through December 31, 1992. Carteret experienced a net operating profit for each of the first five months of 1992. The following chart highlights Carteret's actual performance in comparison to budget projections, including the favorable or unfavorable variance from budget ($000's):



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0073

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Actual vs. Budgeted Operating Results (Continued)

For the five month period ending May 31, 1992

| | Actual | Budget | Fav/(Unfav) Variance |
|---|---|---|---|
| Interest Income | $ 157,135 | $ 159,886 | ($2,751) |
| Interest Expense | -114,205 | -115,562 | 1,357 |
| Net Interest Margin (NIM) | $ 42,930 | $ 44,324 | ($1,394) |
| Less: Provision for Loan Losses | - 6,788 | - 5,000 | ( 1,788) |
| NIM after Provision | $ 36,142 | $ 39,324 | ($3,182) |
| Non-Interest Income | + 15,384 | +14,856 | 528 |
| Non-Interest Expenses | - 46,823 | -48,401 | 1,578 |
| Income before Taxes | $ 4,703 | $ 5,779 | ($1,076) |

Declining interest rates and an increasing level of liquidity caused Carteret to fall short of its interest income projections. The lost interest income was partially offset by the reduced liability costs associated with Carteret's LIBOR based FHLB advances and deposit accounts. Carteret also recorded $1.8 million in valuation allowances above the $5 million that was budgeted for the period. Management deemed the valuation allowances necessary against an increase in residential mortgage loans transferred to ISF and the Western Federal multi-family mortgage portfolio. Carteret exceeded its budgeted projections for non-interest income and expenses through a cash settlement (Restitution) with former employees, gain on the sale of IPF loans and greater than planned expense reductions relating to advertising and marketing.

Management stated that it made up the net negative budget variance in the month of June with earnings of $1.5 million after additional provision for loan losses of $2.8 million. Strong earnings at IPF drove earnings above June's projections.

Assessment of Projections for the Second Half of 1992

Carteret projects net income of $8 million for the remaining six months of 1992. Management has not substantially altered its budgeted operating expenses and has consistently met or exceeded its expense reduction projections. Additional provisions for loan losses recommended in this examination will cause Carteret to exceed the level of reserves originally projected for 1992, reducing projected net income.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0074

Date: 06/15/92 Docket No.: 04702

OPERATING RESULTS (Continued)

Assessment of Projections for the Second Half of 1992 (Continued)

Interest earnings will also not meet budgeted projections due to Carteret's increased holdings in lower yielding liquid assets. Management has stated that the higher liquidity level will most likely decrease third quarter earning estimates by more than $1 million. Carteret will gradually reduce its liquidity position and increase net yield as it begins to fund IPF receivables. (See Comment - Risk Management.)

Interest expense has remained below budget projections as a result of the continued decline in interest rates. Carteret was not hedging its $1.9 billion in FHLB advances as of June 30, 1992. A marked increase in short term interest rates would have a significant adverse impact on the cost of Carteret's advances. Management has stated that it is ready to put on a hedge if the market appears to being moving against the institution. OTS does not consider Carteret's strategy prudent considering the minimal amount of interest rate risk that the institution can afford to take.

In summary, it appears that Carteret will be unable to meet its original budget projections for the second half of 1992 due to the need for additional valuation allowances and lower interest earnings resulting from the higher than anticipated level of liquid assets. Management is currently considering alternative strategies to increase earnings to the level originally projected. Overall, management has been able to operate Carteret within a reasonable range of its budget projections. Carteret's budget projections for the second half appear to be reasonable and attainable, with the exception of the items discussed above.

Financial Reporting

A review of mortgage banking activity disclosed that net profits related to the sale of mortgage loans were erroneously reported as non-operating income for the periods ended March 1992 and December 1991. The net profits, which amounted to $1.3 million and $6.8 million, respectively, were subsequently moved from net non-operating income to net non-interest income. The adjustments are reflected in the Comparative Operating Results above and in the Appendix pages A - 6.1 to A - 7.1.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0075

Date: >06/15/92 Docket: 04702

COMPARATIVE STATEMENTS OF OPERATIONS (2)

| (In Thousands) | Period Ended 31-MAR-1992 | Year Ended 31-DEC-1991 | Year Ended 31-DEC-1990 |
|---|---|---|---|
| Net Provision For Losses on Noninterest-Bearing Assets.......... | 0 | 350 | 0 |
| TOTAL NONINTEREST EXPENSE (9)....... | 22,147 | 115,033 | 155,112 |
| Income (Loss) Before Gain (Loss) on Sale of Assets................. | 1,777 | -176,199 | -159,407 |
| Gain/Loss On Sale of Assets (6) | | | |
| Gain on Sale of Assets.............. | 714 | 15,900 | 50,527 |
| Loss on Sale of Assets.............. | 256 | 1,978 | 29,273 |
| NET GAIN/LOSS ON SALE OF ASSETS..... | 458 | 13,922 | 21,254 |
| Net Income Before Taxes and Adjustments to Net Income.......... | 2,235 | -162,277 | -138,153 |
| Income Taxes....................... | -556 | -2,026 | -6,310 |
| Income (Loss) Before Extraordinary Items and Effects of Accounting Changes........................... | 2,791 | -160,251 | -131,843 |
| NET INCOME (LOSS).................. | 2,791 | -160,251 | -131,843 |
| Net Change in Stock Issued/Retained: | | | |
| Perpetual Preferred Stock.......... | 0 | 0 | 0 |
| Common Stock...................... | 0 | 0 | 0 |
| Common Stock - Other Adjustments... | 0 | 12,500 | 30,000 |
| Less Cash Dividends on: | | | |
| Perpetual Preferred Stock....... | 0 | 0 | 0 |
| Common Stock.................... | 0 | 0 | 0 |
| Net Change in Unrealized Losses on Marketable Equity Securities....... | 0 | 0 | 0 |
| Other Adj. To Retained Earnings..... | 0 | 0 | -9,508 |
| NET CHANGE IN EQUITY CAPITAL........ | 2,791 | -147,751 | -111,351 |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER WOQ673 0088

Date: >06/15/92 Docket: 04702

SUMMARY OF KEY OPERATING RATIOS AND TRENDS ) (2) (12)

| (In Thousands) | Period Ended 31-MAR-1992 | | Year Ended 31-DEC-1991 | | Year Ended 31-DEC-1990 | |
|---|---|---|---|---|---|---|
| | INST. | PEER GROUP | INST. | PEER GROUP | INST. | PEER GROUP |
| Asset Growth *............. | 5.2 | NA | -6.7 | -10.8 | -8.4 | -7.5 |
| Liability Growth *......... | 5.1 | NA | -4.2 | -11.4 | -7.1 | -7.2 |
| Net Income / Average Assets *......... | 0.2 | NA | -3.0 | -0.1 | -2.2 | -0.9 |
| Net Income / Gross Income ............ | 2.8 | NA | -33.2 | -1.4 | -21.7 | -8.9 |
| Gross Income / Average Assets *......... | 7.6 | NA | 9.0 | 9.5 | 10.3 | 9.6 |
| Gross Operating Income / Average Assets *......... | 7.5 | NA | 8.6 | 9.2 | 9.4 | 9.3 |
| Net Operating Income / Gross Operating Income .. | 1.8 | NA | -37.8 | -0.4 | -28.6 | -9.8 |
| Net Interest Income (unhedged) / Average Assets * (7)..... | 1.3 | NA | -1.9 | 1.4 | -0.6 | 0.7 |
| Net Int. Income After Provision for Losses on Int.-Bearing Assets / Avg. Assets *..... | 1.2 | NA | -1.9 | 1.3 | -0.6 | 0.7 |
| Total Interest Expense / Gross Operating Income (8) | 73.0 | NA | 76.5 | 70.4 | 78.4 | 80.4 |
| Total Interest Expense / Average Deposits and Borrowed Money * (8)... | 5.6 | NA | 6.8 | 6.9 | 7.8 | 7.9 |
| Interest-Earning Assets / Interest-Bearing Liabilities | 84.0 | NA | 84.6 | 92.1 | 89.9 | 90.5 |
| Noninterest Expense / Average Assets * (9)..... | 1.7 | NA | 2.1 | 2.1 | 2.6 | 2.0 |
| Noninterest Expenses / Gross Operating Income (9)...... | 22.6 | NA | 24.7 | 22.8 | 27.8 | 21.8 |

# CARTERET FEDERAL SAVINGS BANK

## *Conservatorship Strategic Plan*

**Carteret Federal Savings Bank / Morristown, NJ 07960**

**FIN #8602 / Date of Conservatorship 12/04/92**

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0103999

# Carteret Federal Savings Bank
# Conservatorship Strategic Plan
## Table of Contents


| | Page |
|---|---|
| **I. Description** | |
| A. Overview | 1 |
| B. Retail Banking and Deposit Information | 3 |
| C. Cash and Securities | 5 |
| D. Loans Receivable | 6 |
| E. Investment in Real Estate | 9 |
| F. Loan Servicing Portfolio | 10 |
| G. Other Interest-Bearing Liabilities | 11 |
| H. Other Assets and Other Liabilities | 13 |
| I. Subsidiaries | 17 |
| J. Litigation | 20 |
| K. Organization | 20 |
| L. Information Systems and Computer Resources | 20 |
| M. Other Support Functions | 24 |
| **II. Evaluation** | |
| A. Problems of the Institution | 26 |
| B. Retail Branch Network | 26 |
| C. Liquidity | 27 |
| D. Asset Quality | 27 |
| E. Loan Servicing Portfolio | 31 |
| F. Occupancy Issues | 32 |
| G. Candidacy for Combination with Another Institution | 33 |
| H. Subsidiaries | 33 |
| I. Pending Litigation Evaluation | 33 |
| J. Management Levels and Salary Justification | 34 |
| K. Quality and Cost Efficiency of Backroom Operations | 34 |
| L. Indications of Fraud | 34 |
| **III. Recommendations** | 35 |
| **IV. Operational Issues** | |
| A. Retail Banking | 36 |
| B. Managed Downsizing | 36 |
| C. Funding Strategy | 36 |
| D. Loan Workout | 36 |
| E. Sale or Discontinuation of Subsidiary Operations | 37 |
| F. Loan Servicing | 37 |
| G. Repudiation of Lease Obligations | 37 |
| H. Discontinuance of Residential Lending | 38 |
| I. Controller's Division Staffing | 38 |
| J. Accuracy of Books and Records | 38 |
| K. Marketing at Resolution | 38 |
| **V. Integrated Marketing Plan** | 39 |
| **VI. Operating Plan Budget** | 41 |


CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104000

# Carteret Federal Savings Bank
# Conservatorship Strategic Plan
# List of Exhibits

I. Thrift Financial Report (11/30/92)

II. Thrift Financial Report (9/30/92)

III. Deposit Information

- Deposits by County and State
- Retail Certificate Maturity by Term
- Retail Certificate by Interest Rate

IV. Retail Branch Information

- Branch Locations
- Branch Cost Analysis
- Branch Fact Sheets

V. Information Systems

VI. Facilities

VII. Loan Servicing Information

VIII. Organization Charts

IX. Employee Compensation

X. Litigation Listing

XI. Flowchart of Corporate Structure

XII. Subsidiary Listing

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104001

## Part I. Description

### A. Overview

*Intervention*

On December 4, 1992, Date of Conservatorship, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the Office of Thrift Supervision (OTS) placed Carteret Savings Bank, FA (CSB) into receivership and chartered a new federal mutual association, Carteret Federal Savings Bank (CFSB). OTS appointed the Resolution Trust Corporation (RTC) as Receiver of the old institution and as Conservator of the new institution.

References to CSB or the Bank contained in this section refer to Carteret Savings Bank, FA prior to December 5, 1992 and to Carteret Federal Savings Bank thereafter.

*Background*

CSB was incorporated in September 1939 as Carteret Building and Loan Association of Newark, New Jersey, a state-chartered thrift. CSB converted to a federally chartered mutual association – Carteret Savings and Loan Association – in 1982 and to a federally chartered stock association in 1983. In 1986, the institution changed its name to Carteret Savings Bank, FA.

In 1987, CSB created a holding company, Carteret Bancorp Inc., for the purpose of expanding its business activities. A year later, The Home Group, Inc., which subsequently changed its name to AmBase Corp., acquired Carteret Bancorp, and thus, CSB, for $266 million. AmBase shareholders retain no interest in CFSB.

CSB is one of the largest New Jersey thrifts insured by the FDIC through the Savings Association Insurance Fund. CSB is a member of both the Federal Home Loan Bank of New York (FHLB) and the Federal Reserve Bank of New York. CSB has 39 active subsidiaries of which the largest operating subsidiary is Imperial Premium Finance, Inc. (IPF), a California based company specializing in financing premiums for commercial lines of insurance. Other subsidiaries are primarily engaged in real estate development, property management and retail financial services. Refer to *Section I. Subsidiaries* for a brief description of the subsidiaries and to *Exhibit XI. - Flowchart of Corporate Structure* and *Exhibit XII. - Subsidiary Listing*. At the date of conservatorship, CSB and its subsidiaries employed approximately 1,100 people. The core businesses of CSB were retail banking and mortgage banking.

CFSB conducts business from 41 retail banking offices primarily located in New Jersey and Florida. CFSB is currently engaged in the business of maintaining savings, time and demand deposits. In 1990 CSB implemented a program to restructure its retail branch network. As part of this program, several less efficient branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. Certain of the branches sold had been acquired by CSB. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB was extensively involved in mortgage banking activities including the origination, servicing, securitization and sales of one-to-four family residential mortgage loans. At December 4, 1992 residential mortgage loans receivable, net were $1.563 billion. CSB was servicing $7.3 billion of loans, which included $6.2 billion of loans serviced for others. Effective December 14, 1992 the RTC decided to discontinue residential loan origination activities. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

CSB also offered consumer loans and other financial products which were intended to broaden its source of income, reduce its exposure to interest rate fluctuations and position CSB to compete more effectively in the retail financial services industry. All consumer lending has ceased with CFSB processing approved applications as of December 4, 1992. In addition, shortly after the date of conservatorship the offering of other financial services has been discontinued.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104002

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0055

CSB ceased all new corporate and commercial real estate loan originations pursuant to a policy established in the second half of 1989. This policy was established in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions have been experienced since 1989. At December 4, 1992, the corporate and commercial real estate loans receivable totalled $365.0 million ($311.9 million net of reserves). The corporate and commercial real estate owned and in-substance foreclosed loans were $100.4 million and $118.6 million, respectively.

At December 4, 1992, CSB remained out of compliance with minimum regulatory capital requirements promulgated by the OTS pursuant to FIRREA. CSB consented to the issuance of a Capital Directive by the OTS on October 8, 1991. In accordance with the Capital Directive, on September 30, 1991 CSB submitted a capital plan to the OTS with subsequent updates to the capital plan being filed during continuing discussions. On March 2, 1992, the OTS approved the capital plan which required the infusion of sufficient equity capital through a private placement to achieve a fully phased-in regulatory capital position. CSB and the OTS entered into an agreement, dated February 27, 1992 which provided, among other things, that, upon the earlier of (i) May 27, 1992 or (ii) the date on which the Regional Director of the OTS concludes acceptable progress is not being made and the recapitalization program is unlikely to be successful, CSB would be included in the Accelerated Resolution Program (ARP) of the government. CSB received several extensions of the original May 27, 1992 date. Due to lack of RTC funding for ARP, CSB was unable to be included in that program. After nine months, CSB was unsuccessful in its efforts to raise the required additional equity capital.

Total nonperforming assets decreased from $484.9 million at December 31, 1991 to $416.9 million at December 31, 1992. Nonperforming assets include nonaccrual loans, loans 90 or more days past due and still accruing, REO and in-substance foreclosed loans. Restructured loans increased from $64.0 million at December 31, 1991 to $103.1 million at December 31, 1992. As discussed further in *Part II. Evaluation - Section D. Asset Quality*, a majority of CFSB's residential and commercial real estate loans are secured by properties located in the states of New Jersey, Florida and California which have experienced a significant downturn in demand for such properties. CFSB regularly analyzes and closely monitors each portfolio. Potential problem loans are classified if uncertainty exists as to future collectibility.

At December 4, 1992, CSB had total assets of $4.770 billion. Mortgage-backed securities (MBS) and investments, net were $1.233 billion. Total deposits were $2.535 billion and FHLB advances and other borrowings totaled $1.968 billion.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104003

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0056

**B. Retail Banking and Deposit Information**

As of December 31, 1992, the Bank had retail deposits of $2.391 billion. CFSB maintains 41 full-service retail ba[illegible] offices in New Jersey, Florida and the District of Columbia. Based upon its total deposits of $2.934 billion at ye[illegible] 1991, Carteret was the fiftieth largest thrift in the United States.

CFSB offers a full range of retail deposit products including passbook and statement savings accounts, regular and interest-bearing checking accounts, money market accounts and certificates of deposit. Included among these programs are individual retirement accounts and Keogh accounts. Interest on products currently offered is established by CFSB as market conditions warrant. At year-end 1992, the Bank had approximately 66,000 savings accounts, 56,000 checking accounts and 133,000 certificate of deposit accounts.

Deposits at December 31, 1992 are comprised of the following:

| *(in thousands)* | Deposits | Average Cost of Funds |
|---|---|---|
| Regular savings | $114,350 | 3.24% |
| Money market savings | 316,611 | 3.27 |
| Total savings | 430,961 | 3.26 |
| 91 day certificate | 39,248 | 3.28 |
| 182 day certificate | 409,859 | 3.63 |
| 9 month certificate | 17,192 | 3.59 |
| 12 - 23 month certificate | 602,943 | 4.38 |
| 24 - 35 month certificate | 234,822 | 5.93 |
| 36 - 47 month certificate | 73,509 | 7.11 |
| 48 - 59 month certificate | 23,363 | 6.96 |
| 5 - 10 year certificate | 203,324 | 8.06 |
| Total certificates | 1,604,260 | 5.01 |
| Interest checking | 151,764 | 2.41 |
| Non-interest checking | 13,286 | |
| Money market demand | 184,226 | 3.24 |
| Commercial checking | 74 | |
| Total demand accounts | 349,350 | 2.76 |
| Total retail deposits | 2,384,571 | 4.36 |
| Negotiable rate certificates | 4,856 | 3.05 |
| As agent deposits | | |
| Accrued interest | 1,190 | |
| Total deposits | $2,390,617 | 4.36% |

Refer to *Exhibit III. - Deposit Information* for additional detail on deposits.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104004

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0057

In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.

CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.

Since the late 1980's, CSB has pursued a retail office network optimization strategy which has resulted in the sale or consolidation of those offices which were poor performers or which were geographically unacceptable. As part of this program, several branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB currently has 31 offices in New Jersey, 9 offices in Florida and one office in the District of Columbia. The New Jersey offices are located in the northern half of the State. In Florida, CSB offices are generally clustered in the south Florida and Tampa/Clearwater regions. CSB also affords its customers electronic access to certain accounts through its participation in various regional and national EFT networks. Refer to *Exhibit IV. - Retail Branch Information* for additional details on individual retail branches.

Prior to the date of conservatorship, CSB also originated residential mortgage loans and consumer loans through its retail office network. A variety of residential mortgage loans were offered to meet the needs of those who were purchasing a home or refinancing. Consumer lending efforts primarily focused on adjustable rate home equity lines of credit, overdraft lines of credit, fixed-rate home equity, auto loans and student loans. These loans are no longer offered, although existing lines of credit may still be accessed.

As of December 31, 1992, CSB had approximately $213 million of uninsured deposits. This figure was determined through a computer analysis of taxpayer identification numbers and combination of account data.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104005

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0058

## C. Cash and Securities

CFSB's portfolios at December 31, 1992 are detailed in this section.

*Cash and cash equivalents*

Cash and cash equivalents at December 31, 1992 is comprised of the following:

| *(in thousands)* | |
|---|---|
| Overnight Federal funds | $1,244,147 |
| Non-interest and interest bearing cash | 162,078 |
| | $1,406,225 |

*Investments*

The investment portfolio at December 31, 1992 consists of the following:

| *(in thousands)* | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| U.S. Government obligations | $0 | $500 | $500 |
| Corporate bonds | | 250 | 250 |
| Collateralized mortgage obligations | | 22,840 | 22,840 |
| Partnership investment | | 2,721 | 2,721 |
| Preferred stock | | 128 | 128 |
| Investments, book value | $0 | $26,439 | $26,439 |
| Investments, market value | $0 | $26,291 | $26,291 |

*Federal Home Loan Bank Stock*

The stock of the FHLB is carried at a cost of $44,265,000 at December 31, 1992. CSB is required to own and in fact does own capital stock in the FHLB in an amount determined generally by its outstanding home mortgage loans and advances from the FHLB. For the year ended December 31, 1992 the FHLB stock yielded 8.37%.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104006

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0059

*Mortgage-backed Securities*

MBS, net are summarized as follows:

| | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| Governmental National Mortgage Association ("GNMA") | $ 81,292 | $96,038 | $177,330 |
| Federal National Mortgage Association ("FNMA") | 63,811 | 11,663 | 75,474 |
| Federal Home Loan Mortgage Corporation ("FHLMC") | 744 | 40,870 | 41,614 |
| Pass-through securities | 3,636 | 636,269 | 639,905 |
| Other mortgage-backed securities (1) | | 9,926 | 9,926 |
| Mortgage-backed securities, book value | $149,483 | $794,766 | $944,249 |
| Mortgage-backed securities, market value | $150,119 | $806,279 | $956,398 |

(1) Other mortgage-backed securities consists of residual securities.

At December 31, 1992 CFSB had assets pledged to FHLB advances with a book value of $2.479 billion and to Medium Term Notes (MTN's) with a book value of $111.6 million. These pledged assets included Federal funds, mortgage-backed securities, whole loan participations and whole loans. On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's in October 1993.

**D. Loans Receivable**

Loans receivable, net, at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Gross loans: | |
| Residential first mortgage loans | $1,810,000 |
| Commercial real estate loans | 244,058 |
| Total first mortgage loans | 2,054,058 |
| Corporate loans | 108,112 |
| Consumer loans | 100,430 |
| Premium finance loans | 383,550 |
| Total other loans | 592,092 |
| Total loans receivable, gross | 2,646,150 |
| Loan participations sold | (228,115) |
| Loans in process | |
| Unearned discounts and deferred loan fees | (9,365) |
| Allowance for losses on loans | (59,597) |
| Total loans receivable, net | $2,349,073 |



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER C-AM-A-0104007

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0060

Loans receivable, net, at December 31, 1992 by type are as follows:

| *(in thousands)* | |
|---|---|
| Residential first mortgage loans | $1,578,679 |
| Commercial real estate loans | 215,726 |
| Total first mortgage loans | 1,794,405 |
| Corporate loans | 75,190 |
| Consumer loans | 98,248 |
| Premium finance loans | 381,230 |
| Total other loans | 554,668 |
| Total loans receivable, net | $2,349,073 |

The following discussion provides further information on the various loan portfolios.

*Residential First Mortgage Loans*

CSB was extensively involved in mortgage banking activities including the origination, securitization, sale and servicing of one-to-four family residential mortgage loans. CSB originated first mortgage loans through retail and wholesale mortgage production offices. Wholesale loans were originated by third parties and were primarily closed in the name of CSB or assigned to CSB subsequent to closing. The originated loans have traditionally been retained in CSB's portfolio or sold in the national secondary market on either a servicing-released or servicing-retained basis. It had been CSB's policy to originate fixed rate product for sale and adjustable rate product for portfolio. As of December 14, 1992, all new mortgage loan origination ceased. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

Throughout 1990, 1991 and 1992 CSB, continued to refine its composition of mortgage production offices. This was achieved through the closing of unprofitable offices and the consolidation of offices located in the same territories. At December 4, 1992 CSB had six mortgage production offices located in New Jersey and Florida.

CSB's portfolio of residential first mortgage loans at December 31, 1992 are geographically concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| In-house portfolio | $597,099 | $352,645 | $143,423 | $1,093,167 |
| Loans serviced by others portfolio | 86,020 | 150,535 | 480,278 (1) | 716,833 |
| | $683,119 | $503,180 | $623,701 | $1,810,000 |

(1) Loans serviced by others are primarily located in states other than New Jersey and Florida in an effort to diversify CSB's significant geographical concentration. A significant portion of these loans are located in California.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104008

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0061

*Commercial Real Estate and Corporate Loans*

As previously mentioned, pursuant to a policy established in the second half of 1989, CSB ceased all new corporate and commercial real estate loan originations. This policy was in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions were experienced resulting from the economic downturn and deterioration of the real estate markets served, particularly in commercial real estate.

The commercial real estate and corporate loan portfolios, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $ 7,816 | $ 6,051 | $ 10,990 | $ 24,857 |
| Apartments | 6,415 | 10,709 | 25,388 | 42,512 |
| Hotel | 15,834 | 32,992 | 24,283 | 73,109 |
| Retail | 9,489 | 9,221 | | 18,710 |
| Corporate loans | 17,082 | | 27,989 (1) | 45,071 |
| Warehouse | 8,173 | | 4,740 | 12,913 |
| Single family | 7,598 | 1,424 | 1,594 | 10,616 |
| Nursing homes | 13,146 | | 11,112 | 24,258 |
| Land & development | 3,717 | 967 | 2,997 | 7,681 |
| Mini storage | 6,552 | 12,111 | | 18,663 |
| Other | 4,097 | 7,052 | 1,377 | 12,526 |
| Commercial real estate and corporate loans, net | $99,919 | $80,527 | $110,470 | $290,916 |

(1) A majority of the corporate loans represent corporate lines of credit and are not identified with a particular state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104009

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0062

*Consumer Loans*

Prior to the date of conservatorship, CSB made various types of consumer loans, including home equity loans, auto lo student loans, unsecured personal loans, and loans to depositors secured by their deposit accounts. The shorter-ter.: normally higher interest rates charged on various types of consumer loans contribute to the maintenance of a positive spread between loan yields and CSB's cost of funds.

The consumer loan portfolio at December 31, 1992 by type of loan is geographically concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Home equity line of credit | $32,028 | $11,746 | $710 | $44,484 |
| Fixed equity | 21,719 | 14,998 | 1,604 | 38,321 |
| Unsecured line of credit | 3,724 | 1,070 | 88 | 4,882 |
| Savings account loans | 3,139 | 263 | | 3,402 |
| Student loans | 2,458 | 3 | | 2,461 |
| Auto loans | 1,823 | 451 | 39 | 2,313 |
| Other | 3,982 | 566 | 19 | 4,567 |
| | $68,873 | $29,097 | $2,460 | $100,430 |

*Premium Finance Loans*

Premium finance loans are originated by IPF. IPF has operated in the premium finance business since 1972, providing loans to small and medium sized businesses to finance premiums payable on property and casualty insurance policies. All loans made by IPF are collateralized by the unearned premium refundable by the insurer upon cancellation. The portfolio is well diversified by geography, loan size, business of the insureds and, also, diversified by insurer.

On September 30, 1992 CSB and IPF executed an agreement for the purchase of IPF receivables by CSB. This agreement represents a 3 year commitment to purchase up to $400 million of receivables. IPF would continue to service the receivables for a fee. A reserve fund to cover losses resulting from defaults is maintained for the benefit of CSB. The funding cost is passed through monthly based upon the higher of: a) CSB's average cost of funds for the previous month; or b) 30 day LIBOR plus 75 basis points. This cost is applied to the average monthly principal balance of receivables purchased.

**E. Investment in Real Estate**

Investment in real estate, net, at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Real estate held for development and sale | $5,799 |
| Real estate owned ("REO") - Commercial | 98,341 |
| - Mortgage | 39,490 |
| - Consumer | 1,878 |
| Total REO | 139,709 |
| In-substance foreclosed loans - Commercial | 118,359 |
| - Mortgage | 59,000 |
| Total in-substance foreclosed loans | 177,359 |
| | $322,867 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104010

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0063

*Real Estate Owned*

The commercial real estate owned portfolio, net, at December 31, 1992 consists of the following:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office | $3,461 | $4,165 | $5,617 | $13,243 |
| Apartments | | 18,212 | 2,899 | 21,111 |
| Hotel | 2,088 | 18,174 | 8,277 | 28,539 |
| Retail | | 11,367 | | 11,367 |
| Warehouse | | | 2,427 | 2,427 |
| Single family | 168 | 2,989 | 2,002 | 5,159 |
| Land development | 5,773 | 10,677 | | 16,450 |
| Other | | 48 | | 48 |
| | $11,490 | $65,632 | $21,222 | $98,344 |

*In-substance Foreclosed Loans*

The commercial in-substance foreclosed loans, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $26,960 | $3,377 | $16,100 (1) | $46,437 |
| Apartments | 4,035 | | 26,134 (2) | 30,169 |
| Hotel | 5,000 | | | 5,000 |
| Retail | 143 | 3,648 | | 3,791 |
| Corporate loans | | | | |
| Warehouse | 5,611 | 914 | | 6,525 |
| Single family | 1,422 | | | 1,422 |
| Nursing homes | | 2,979 | | 2,979 |
| Land & development | 12,328 | 4,359 | 699 | 17,386 |
| Mini storage | 2,526 | | | 2,526 |
| Other | | 1,719 | 405 | 2,124 |
| | $58,025 | $16,996 | $43,338 | $118,359 |

(1) Includes $13,900 located in the state of Ohio.

(2) Includes $20,100 located in the state of Ohio.

**F. Loan Servicing**

*Residential Mortgage Loan Servicing*

CFSB has a stand-alone residential mortgage loan servicing division operating in Clearwater, Florida. The Clearwater Servicing Center was acquired in 1989 from Numerica Financial Services, Inc. with almost 30,000 loans and related assets, plus an existing staff. To improve efficiencies and customer service, CSB consolidated its entire portfolio, most of which had been serviced from its New Jersey headquarters, into the Clearwater operation by the end of 1990. At its peak, the Center serviced 146,000 loans totalling almost $10 billion with over 900 loans per employee serviced at an average core cost of approximately $60 per loan.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104011

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0064

Among thrift servicers, CSB's portfolio serviced for others of $6.6 billion was the ninth largest as of June 30, 1992. Consisting almost equally of originated and purchased servicing, (47% and 53%, respectively), the entire portfolio contained 115,000 loans totalling $7.2 billion as of December 31, 1992. Of this total, 11,500 loans or $1.1 billion are asset loans owned in full by CFSB. The Bank also had a small participation interest in 3,000 loans with a total principal balance of $87 million. The remainder were primarily FNMA/FHLMC/GNMA.

The book value of capitalized costs of future servicing at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Purchased mortgage servicing rights | $51,078 |
| Excess servicing rights: | |
| Mortgage loans | 11,364 |
| Home equity loans | 1,661 |
| | 13,025 |
| | $64,103 |

*Consumer Loan Servicing*

During 1989 and 1990 CSB sold segments of its Consumer Loan portfolio to a variety of investors, retaining the right to earn recurring fee income by continuing to service the loans. The table that follows details the types of loans, names of investors and shows the balances outstanding together with the servicing spread for each portfolio:

| *(dollars in thousands)* | Number of Accounts | Credit Limit | Current Balance | Servicing Fee |
|---|---|---|---|---|
| Revolving: | | | | |
| United Jersey Bank | 1,991 | $109,916 | $ 64,751 | .65% |
| First Valley Bank | 3,420 | 180,369 | 106,916 | .55 |
| Massachusetts Company | 789 | 34,302 | 19,498 | .50 |
| Total revolving | 6,200 | 324,587 | 191,165 | |
| Fixed: | | | | |
| First Fidelity | 856 | 22,612 | 1,139 | .25 |
| West Jersey | 125 | 2,564 | 44 | .50 |
| Total fixed | 981 | 25,176 | 1,183 | |
| | 7,181 | $349,763 | $192,348 | |

At December 31, 1992 CFSB carried $1.66 million in excess servicing rights attributed to these portfolios on its books. Of the portfolios noted above only the First Valley (a subsidiary of UJB Financial in New Jersey) loans have a recourse liability which, at December 31, 1992 was about $2.26 million.

## G. Other Interest Bearing Liabilities

*Advances from the Federal Home Loan Bank*

CSB borrowed funds from the FHLB. The borrowings are collateralized by CSB's FHLB stock holdings and certain mortgage loans and other assets, principally mortgage-backed securities.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104012

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0065

At December 31, 1992, advances from the FHLB aggregated $885 million. CSB is currently required to physically deliver specific collateral to the FHLB to secure its advances. Under current policies of the Federal Home Loan Bank, member institutions are required to maintain collateral with market values in an amount ranging from 100% to 125% of outstanding advances, depending on the type of collateral pledged and the member's financial condition. CSB has delivered to the FHLB the required level of collateral necessary to secure its outstanding advances.

CSB's advances from the FHLB are primarily variable rate indexed to the London Interbank Offering Rate (LIBOR) with quarterly and semi-annual resets. At December 31, 1992, maturities of the advances from the FHLB ranged from June 1994 to January 1996.

Advances from the FHLB at December 31, 1992 are as follows:

| Date of Note | Principal Balance (000's) | Next Reset Date | Due Date of Note | Interest Rate |
|---|---|---|---|---|
| *Variance Rate Advances (3 Month LIBOR)* | | | | |
| June, 1989 | 50,000 | December, 1992 | June, 1994 | 3.33% |
| June, 1990 | 3,560 | December, 1992 | June, 1995 | 3.09% |
| August, 1990 | 1,750 | February, 1993 | August, 1995 | 3.61% |
| October, 1990 | 30,000 | December, 1992 | September, 1995 | 3.22% |
| | 85,310 | | | |
| *Variable Rate Advances (6 Month LIBOR)* | | | | |
| August, 1990 | 100,000 | February, 1993 | August, 1995 | 3.42% |
| October, 1990 | 300,000 | March, 1993 | September, 1995 | 3.34% |
| December, 1990 | 200,000 | December, 1992 | December, 1995 | 3.67% |
| December, 1990 | 200,000 | January, 1993 | January, 1996 | 3.58% |
| | 800,000 | | | |
| | $885,310 | | | |

On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Prepayment penalties through December 31, 1992 totalled $6.2 million.

*RTC Advances*

RTC Advances are being utilized to replace the advances from the FHLB. As of December 31, 1992, CFSB had $1.75 billion of RTC Advances. Interest expense on these advances is based upon the 13 week Treasury Bill plus 25 basis points. The rate adjusts weekly.

*Other Borrowed Funds*

CFSB's other borrowed funds consist of fixed rate MTN's. At December 31, 1992, the MTN's had maturities ranging from May 1993 to October 1993 and interest rates ranging from 8.00% to 9.34%, with interest payable semiannually on March 15 and November 15. The MTN's are not redeemable at the option of CFSB. The MTN's are primarily collateralized by mortgage-backed securities with current face values of approximately $115 million. As previously discussed, arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104013

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0066

*Hedges*

CSB periodically used interest rate futures and entered into options on future contracts to reduce exposure to fluctuations in interest rates. There were no open positions in either of these instruments on December 31, 1992.

CSB used interest rate swap agreements to adjust the repricing of certain assets and liabilities to minimize exposure to interest rate changes. Interest rate swaps outstanding at December 31, 1992 are as follows:

| *(dollars in thousands)* | Notional Amount | Weighted Average Fixed Rate | Weighted Average Floating Rate |
|---|---|---|---|
| Fixed Rate Payor | $151,000 | 8.94% | 3.63% |
| Floating Rate Payor | $10,000 | 8.16% | 3.58% |

The current swap contracts are with six dealers. The agreements outstanding at December 31, 1992 have expiration dates between January 1993 and August 1995.

The cost to unwind the interest rate swap agreements is currently estimated to be in excess of $6 million.

## H. Other Assets and Other Liabilities

Non-interest earning assets at December 31, 1992 are as follows:

| *(in thousands)* | |
|---|---|
| Interest and dividends receivable | $18,540 |
| Other assets | 86,026 |
| | $104,566 |

*Interest and Dividends Receivable*

Interest and dividends receivable represents the income earned on all interest earning assets but not yet received in cash.

*Goodwill of the Bank*

Goodwill of the Bank was originally recorded in connection with supervisory and nonsupervisory acquisitions in the 1980's and represents the excess of cost over fair value of assets acquired. A portion of goodwill was written off in connection with branch sales in 1990. The goodwill was being amortized to expense on a straight line basis over periods ranging from nine to 25 years. The goodwill of the Bank has been written off.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104014

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0067

*Other Assets*

Other assets at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Premises and equipment, net | $25,108 |
| FHA/VA receivables | 22,820 |
| Mortgage escrow advance | 17,047 |
| Core deposit value | 1,410 |
| Goodwill - IPF | 2,009 |
| Purchased distribution system - IPF | 14,420 |
| Tradename and Covenant Not To Compete - IPF | 2,706 |
| Other assets, net | 506 |
| | $86,026 |

Premises and equipment, net at December 31, 1992 is comprised of the following:

| *(in thousands)* | Gross | Accumulated Depreciation | Net |
|---|---|---|---|
| Land | $4,118 | | $4,118* |
| Buildings and improvements | 19,508 | ($8,370) | 11,138* |
| Leasehold improvements | 7,777 | (5,284) | 2,493 |
| Furniture, equipment and automobiles | 23,289 | (17,280) | 6,009 |
| | 54,692 | (30,934) | 23,758 |
| Subsidiaries | | | 1,350 |
| | $54,692 | ($30,934) | $25,108 |

* Land and buildings and improvements include, among others, the following facilities:

| *(in thousands)* | Gross | Accumulated Depreciation | Net(1) |
|---|---|---|---|
| South Street, Morristown, New Jersey - administrative offices | $7,748 | ($2,697) | $5,051 |
| Delray Beach, Florida - retail branch (2) and office | 3,098 | (1,099) | 1,999 |
| Phillipsburg, New Jersey - retail branch | 819 | (412) | 407 |
| West Delray Beach, Florida - retail branch (2) | 1,226 | (307) | 919 |
| Caldwell, New Jersey - retail branch | 940 | (262) | 678 |
| Newark, New Jersey - retail branch | 749 | (418) | 331 |

(1) Excludes furniture, fixtures and equipment.
(2) Owned by CFSB - leased to Great Western.

Refer to *Exhibit VI. - Facilities* for a complete listing of owned and leased premises.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104015

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0068

Non-interest bearing liabilities at December 31, 1992 are composed of the following:

| *(in thousands)* | |
|---|---|
| Escrow - Bank | $78,015 |
| Escrow - IPF | 2,078 |
| Other liabilities | 119,536 |
| | $199,629 |

*Escrow-Bank*

CFSB, as of December 31, 1992, services $7.3 billion of mortgage loans, of which $6.2 billion are loans serviced for others and $1.1 billion are CFSB asset loans. Earnings are generated from service fees, late charges and insurance income. Escrow funds include mortgagors' deposits for taxes and insurance ("T&I") and the float from the remittance of principal and interest ("P&I") to the investors for which CFSB services loans.

Included in CFSB's balance sheet at December 31, 1992 is a $78.0 million escrow liability which relates to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | X | |
| GNMA | X | |
| Other (private) | X | X |
| Asset loans | X | |

The T&I funds are insured for each mortgagor. The P&I funds are owned by the investors. For investment purposes, these funds are commingled with the Bank's assets and earn interest accordingly. Such interest is included in "interest income".

Additionally, escrow funds of approximately $120 million at December 31, 1992 which is not included in CFSB's balance sheet, are on deposit at the FHLB. These funds relate to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | | X |
| GNMA | | X |
| FNMA | X | X |

The above government agencies for which CFSB services loans require that these funds be maintained in custodial accounts in an eligible depository.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104016

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0069