*Other Liabilities*

Other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued interest payable | $12,534 |
| Undisbursed premiums - IPF | 22,823 |
| Outstanding payments to producers - IPF | 8,363 |
| Overdrawn cash | 25,755 |
| Custodial suspense (due to investors) | 17,148 |
| Construction loan - Midlantic | 4,166 |
| Other liabilities, net | 28,840 |
| | $119,629 |

Other - other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued liabilities: | |
| Pension liability | $1,859 |
| Supplemental retirement plan liability | 1,200 |
| Other accrued liabilities | 5,047 |
| | 8,106 |
| Accrued liabilities on the books of IPF | 1,330 |
| Intercompany payable to CSB Bancorp | 2,884 |
| Due to investors - principal and interest (HER loans serviced for others) | 3,940 |
| Deferred gain futures contract settlement | 1,874 |
| Accrued liability - interest rate swaps | 2,385 |
| Accruals for contingencies, warranty costs and Mt. Laurel units on the books of real estate development subsidiaries | 1,740 |
| Unclaimed property (a) | 1,070 |
| Other | 5,511 |
| | $28,840 |

(a) Represents unclaimed checks which are held for up to six years prior to escheatment to the state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104017

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 0070

Form **1120**

Department of the Treasury
Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 1992 or tax year beginning ________, 1992, ending ________, 19__
▶ Instructions are separate. See page 1 for Paperwork Reduction Act Notice.

OMB No. 1545-0123

**1992**

A Check if a:
(1) Consolidated return (attach Form 851) [X]
(2) Personal holding co. (attach Sch. PH) [ ]
(3) Personal service corp. (as defined in Temporary Regs. sec. 1.441-4T—see instructions) [ ]

Use IRS label. Otherwise, please print or type.

AmBase Corporation & Subsidiaries
99 University Place, 9th Floor
New York, New York 10003

B Employer identification number: 95-2962743
C Date incorporated: 11/22/75
D Total assets (see Specific Instructions): 75,345,760.

E Check applicable boxes: (1) [ ] Initial return (2) [ ] Final return (3) [X] Change in address

| Section | Line | Description | | Amount |
|---|---|---|---|---|
| Income | 1a | Gross receipts or sales 95,765,552. b Less returns and allowances ____ c Bal ▶ | 1c | 95,765,552. |
| | 2 | Cost of goods sold (Schedule A, line 8) | 2 | 63,327,258. |
| | 3 | Gross profit. Subtract line 2 from line 1c | 3 | 32,438,294. |
| | 4 | Dividends (Schedule C, line 19) | 4 | 6,336,053. |
| | 5 | Interest | 5 | 303,665,277. |
| | 6 | Gross rents | 6 | 13,100,221. |
| | 7 | Gross royalties | 7 | |
| | 8 | Capital gain net income (attach Schedule D (Form 1120)) | 8 | |
| | 9 | Net gain or (loss) from Form 4797, Part II, line 20 (attach Form 4797) | 9 | 7,168,434. |
| | 10 | Other income (see instructions—attach schedule) | 10 | 52,528,054. |
| | 11 | Total income. Add lines 3 through 10 ▶ | 11 | 415,236,333. |
| Deductions (See instructions for limitations on deductions.) | 12 | Compensation of officers (Schedule E, line 4) | 12 | 13,446,887. |
| | 13a | Salaries and wages 26,345,087. b Less jobs credit ____ c Balance ▶ | 13c | 26,345,087. |
| | 14 | Repairs | 14 | 1,555,540. |
| | 15 | Bad debts | 15 | 58,020,685. |
| | 16 | Rents | 16 | 6,207,232. |
| | 17 | Taxes | 17 | 8,053,261. |
| | 18 | Interest | 18 | 234,550,360. |
| | 19 | Charitable contributions (see instructions for 10% limitation) | 19 | |
| | 20 | Depreciation (attach Form 4562) — 20: 3,018,513. | | |
| | 21 | Less depreciation claimed on Schedule A and elsewhere on return — 21a: | 21b | 3,018,513. |
| | 22 | Depletion | 22 | |
| | 23 | Advertising | 23 | 1,834,957. |
| | 24 | Pension, profit-sharing, etc., plans | 24 | 561,340. |
| | 25 | Employee benefit programs | 25 | 3,193,963. |
| | 26 | Other deductions (attach schedule) | 26 | 71,285,573. |
| | 27 | Total deductions. Add lines 12 through 26 ▶ | 27 | 428,073,398. |
| | 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | 28 | -12,837,065. |
| | 29 | Less: a Net operating loss deduction (see instructions) — 29a: ; b Special deductions (Schedule C, line 20) — 29b: | 29c | |
| Tax and Payments | 30 | Taxable income — Subtract line 29c from line 28 | 30 | -12,837,065. |
| | 31 | Total tax (Schedule J, line 10) | 31 | |
| | 32 | Payments: a 1991 overpayment credited to 1992 — 32a: ; b 1992 estimated tax payments — 32b: ; c Less 1992 refund applied for on Form 4466 — 32c: ; d Bal ▶ 32d: | | |
| | | e Tax deposited with Form 7004 — 32e: | | |
| | | f Credit from regulated investment companies (attach Form 2439) — 32f: | | |
| | | g Credit for Federal tax on fuels (attach Form 4136). See instructions — 32g: | 32h | |
| | 33 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ [ ] | 33 | |
| | 34 | Tax due. If line 32h is smaller than the total of lines 31 and 33, enter amount owed | 34 | 0. |
| | 35 | Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | 35 | |
| | 36 | Enter amount of line 35 you want: Credited to 1993 estimated tax ▶ Refunded ▶ | 36 | |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ L. Mantell (Signature of officer) | 8/30/93 (Date) | ▶ Senior Vice President (Title)

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed [ ] | Preparer's social security no.

Firm's name (or yours, if self-employed) and address ▶ | E.I. No. ▶ | ZIP code ▶

AmBase Corporation & Subsidiaries 95-2962743

Form 1120 (1992) Page 2

SEE SUBSIDIARIES' SCHEDULES

## Schedule A Cost of Goods Sold (See instructions.)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 41,434,214. |
| 2 | Purchases | 2 | 9,581,853. |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) | 5 | 24,676,169. |
| 6 | Total. Add lines 1 through 5 | 6 | 75,692,236. |
| 7 | Inventory at end of year | 7 | 12,364,978. |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 63,327,258. |

9 a Check all methods used for valuing closing inventory:
(i) ☐ Cost (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4
(iii) ☐ Writedown of "subnormal" goods as described in Regulations section 1.471-2(c)
(iv) ☐ Other (Specify method used and attach explanation.) ➤

b Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ➤ ☐

c If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO 9c

d Do the rules of section 263A (for property produced or acquired for resale) apply to the corporation? ☐ Yes ☐ No

e Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes", attach explanation ☐ Yes ☐ No

SEE SUBSIDIARIES' SCHEDULES

## Schedule C Dividends and Special Deductions (See instructions.)

| | | (a) Dividends received | (b) % | (c) Special deductions: (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations that are subject to the 70% deduction (other than debt-financed stock) | | 70 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations that are subject to the 80% deduction (other than debt-financed stock) | | 80 | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 41.176 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 47.059 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs that are subject to the 70% deduction | | 70 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs that are subject to the 80% deduction | | 80 | |
| 8 | Dividends from wholly owned foreign subsidiaries subject to the 100% deduction (section 245(b)) | | 100 | |
| 9 | Total. Add lines 1 through 8. See instructions for limitation | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from certain FSCs that are subject to the 100% deduction (section 245(c)(1)) | | 100 | |
| 12 | Dividends from affiliated group members subject to the 100% deduction (section 243(b)(3)) | | 100 | |
| 13 | Other dividends from foreign corporations not included on lines 3, 6, 7, 8 or 11 | | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | | | |
| 15 | Foreign dividend gross-up (section 78) | | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 (section 246(d)) | | | |
| 17 | Other dividends | 6,336,053. | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities (see instructions) | | | |
| 19 | Total dividends. Add lines 1 through 17. Enter here and on line 4, page 1 ➤ | 6,336,053. | | |
| 20 | Total deductions. Add lines 9, 10, 11, 12, and 18. Enter here and on line 29b, page 1 ➤ | | | |

## Schedule E Compensation of Officers (See instructions for line 12, page 1.)

Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1, Form 1120) are $500,000 or more.

| (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned (d) Common | (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---|---|
| 1 SEE SUBSIDIARIES' SCHEDULES | | % | % | % | 13,446,887. |
| | | % | % | % | - |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |

| | | |
|---|---|---|
| 2 | Total compensation of officers | 13,446,887. |
| 3 | Compensation of officers claimed on Schedule A and elsewhere on return | |
| 4 | Subtract line 3 from line 2. Enter the result here and on line 12, page 1 | 13,446,887. |

For Paperwork Reduction Act Notice, see instr.

Copyright (c) 1992 form software only Center Piece Software, Inc.

Form 1120 (1992)

Form 1120 (1992) Page 3

## Schedule J Tax Computation (See instructions.)

1 Check if the corporation is a member of a controlled group (see sections 1561 and 1563) ▶ [X]

2 If the box on line 1 is checked:

a Enter the corporation's share of the $50,000 and $25,000 taxable income bracket amounts (in that order): (i) 0. (ii) 0.

b Enter the corporation's share of the additional 5% tax (not to exceed $11,750) ▶

3 Income tax. Check this box if the corporation is a qualified personal service corporation as defined in section 448(d)(2) (see instructions) ▶ [ ] | 3 | 0.

4a Foreign tax credit (attach Form 1118) | 4a |

b Possessions tax credit (attach Form 5735) | 4b |

c Orphan drug credit (attach Form 6765) | 4c |

d Credit for fuel produced from a nonconventional source | 4d |

e General business credit. Enter here and check which forms are attached: [ ] Form 3800 [ ] Form 3468 [ ] Form 5884 [ ] Form 6478 [ ] Form 6765 [ ] Form 8586 [ ] Form 8830 [ ] Form 8826 | 4e |

f Credit for prior year minimum tax (attach Form 8827) | 4f |

5 Total credits. Add lines 4a through 4f | 5 |

6 Subtract line 5 from line 3 | 6 |

7 Personal holding company tax (attach Schedule PH (Form 1120)) | 7 |

8 Recapture taxes. Check if from: [ ] Form 4255 [ ] Form 8611 | 8 |

9a Alternative minimum tax (attach Form 4626) | 9a |

b Environmental tax (attach Form 4626) | 9b |

10 Total tax. Add lines 6 through 9b. Enter here and on line 31, page 1 | 10 | 0.

## Schedule K Other Information (See instructions.)

| | Yes | No |
|---|---|---|
| 1 Check method of accounting: a [ ] Cash b [X] Accrual c [ ] Other (specify) ▶ | | |
| 2 Refer to the list in the instructions and state the principal: a Business activity code no. ▶ 6749 b Business activity ▶ See Subsidiaries c Product or service ▶ Schedules | | |
| 3 Did the corporation at the end of the tax year own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) | X | |
| If "Yes," attach a schedule showing: (a) name and identifying number; (b) percentage owned; and (c) taxable income or (loss) before NOL and special deductions of such corporation for the tax year ending with or within your tax year. | | |
| 4 Did any individual, partnership, corporation, estate, or trust at the end of the tax year own, directly or indirectly, 50% or more of the corporation's voting stock? (For rules of attribution, see section 267(c).) If "Yes," complete a, b, and c below | | X |
| a Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? | | |
| b Enter the name and identifying number of the parent corporation or other entity with 50% or more ownership ▶ | | |
| c Enter percentage owned ▶ | | |
| 5 During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See secs. 301 and 316.) | | X |
| If "Yes", file Form 5452. If this is a consolidated return, answer here for the parent corporation and on Form 851, Affiliations Schedule, for each subsidiary. | | |

| | Yes | No |
|---|---|---|
| 6 Was the corporation a U.S. shareholder of any controlled foreign corporation? (See sections 951 and 957.) | | X |
| If "Yes", attach Form 5471 for each such corporation. Enter number of Forms 5471 attached ▶ | | |
| 7 At any time during the 1992 calendar year, did the corporation have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | | X |
| If "Yes", the corporation may have to file Form TDF 90-22.1. If "Yes," enter name of foreign country ▶ | | |
| 8 Was the corporation the grantor of, or transferor to, a foreign trust that existed during the current tax year, whether or not the corporation has any beneficial interest in it? | | X |
| If "Yes," the corporation may have to file Forms 926, 3520, or 3520-A. | | |
| 9 Did one foreign person at any time during the tax year own, directly or indirectly, at least 25% of: (a) the total voting power of all classes of stock of the corporation entitled to vote, or (b) the total value of all classes of stock of the corporation? | | X |
| If "Yes," see instructions and a Enter percentage owned ▶ b Enter owner's country ▶ c The corporation may have to file Form 5472. (See instructions for penalties that may apply.) Enter number of Forms 5472 attached ▶ | | |
| 10 Check this box if the corporation issued publicly offered debt instruments with original issue discount ▶ [ ] If so, the corporation may have to file Form 8281. | | |
| 11 Enter the amount of tax-exempt interest received or accrued during the tax year ▶ 213,463. | | |
| 12 If there were 35 or fewer shareholders at the end of the tax year, enter the number ▶ | | |
| 13 If the corporation has an NOL for the tax year and is electing under sec. 172(b)(3) to forego the carryback period, check here ▶ [ ] | | |

AmBase Corporation & Subsidiaries 95-2962743

Form 1120 (1992) Page 4

**Schedule L — Balance Sheets**

| Assets | Beginning of tax year (a) | Beginning of tax year (b) | End of tax year (c) | End of tax year (d) |
|---|---|---|---|---|
| 1 Cash | | 347,357,918 | | 36,013,489. |
| 2a Trade notes and accounts receivable | 76,336,365. | | 100,000. | |
| b Less allowance for bad debts | -1,908,111. | 74,428,254. | | 100,000. |
| 3 Inventories | | 41,434,214. | | |
| 4 U.S. government obligations | | 199,888,486 | | |
| 5 Tax-exempt securities (see instructions) | | | | |
| 6 Other current assets (attach schedule) | | 44,169,408. | | 65,765. |
| 7 Loans to stockholders | | | | |
| 8 Mortgage and real estate loans | | 2255,799,327 | | |
| 9 Other investments (attach schedule) | | 1629,542,738 | | 39,384. |
| 10a Buildings and other depreciable assets | 56,905,719. | | | |
| b Less accumulated depreciation | 29,972,266. | 26,933,453. | | |
| 11a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 12 Land (net of any amortization) | | 4,161,780. | | |
| 13a Intangible assets (amortizable only) | 61,969,069. | | | |
| b Less accumulated amortization | 39,154,589. | 22,814,480. | | |
| 14 Other assets (attach schedule) | | 746,786,167 | | 39,127,122. |
| 15 Total assets | | 5393,316,225 | | 75,345,760. |
| **Liabilities and Stockholders' Equity** | | | | |
| 16 Accounts payable | | 1,517,055. | | 82,396. |
| 17 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 Other current liabilities (attach schedule) | | 142,664,432 | | 44,895,328. |
| 19 Loans from stockholders | | | | |
| 20 Mortgages, notes, bonds payable in 1 year or more | | 153,332,694 | | |
| 21 Other liabilities (attach schedule) | | 5171,817,317 | | 82,330,681. |
| 22 Capital stock a Preferred stock | | | | |
| b Common stock | 396,850. | 396,850. | 406,850. | 406,850. |
| 23 Paid-in or capital surplus | | 546,700,718 | | 547,315,718. |
| 24 Retained earnings – Appropriated (attach schedule) | | | | |
| 25 Retained earnings – Unappropriated | | -622,495,662 | | -599,037,838. |
| 26 Less cost of treasury stock | | -617,179. | | -647,375. |
| 27 Total liabilities and stockholders' equity | | 5393,316,225 | | 75,345,760. |

Note: You are not required to complete Schedules M-1 and M-2 below if the total assets on line 15, column (d) of Schedule L are less than $25,000.

**Schedule M-1 — Reconciliation of Income (Loss) per Books With Income per Return** (See instructions.)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | 23,457,824. | 7 Income recorded on books this year not included on this return (itemize): Tax-exempt interest 213463; SEE SUBS. 56830275 SCHEDULES | 57,043,738. |
| 2 Federal income tax | 4,219,100. | 8 Deductions on this return not charged against book income this year (itemize): a Depreciation; b Contributions carryover; SEE SUBSIDIARIES' SCHEDULES | 183,208,301. |
| 3 Excess of capital losses over capital gains | 99,993,000. | 9 Add lines 7 and 8 | 240,252,039. |
| 4 Income subject to tax not recorded on books this year (itemize) SEE SUBS.' SCHEDULES | 44,487,507. | 10 Income (line 28, page 1) – line 6 less line 9 | -12,837,065. |
| 5 Expenses recorded on books this year not deducted on this return (itemize): a Depreciation; b Contributions carryover; c Travel and entertainment; SEE SUBSIDIARIES SCHEDULES | 55,257,543. | | |
| 6 Add lines 1 through 5 | 227,414,974 | | |

**Schedule M-2 — Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)**

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year | -622,495,662 | 5 Distributions: a Cash | |
| 2 Net income (loss) per books | 23,457,824. | b Stock | |
| 3 Other increases (itemize): SEE SUBSIDIARIES' SCHEDULES | | c Property | |
| | | 6 Other decreases (itemize): | |
| | | 7 Add lines 5 and 6 | 0. |
| 4 Add lines 1, 2, and 3 | -599,037,838 | 8 Balance at end of year (line 4 less line 7) | -599,037,838. |

For Paperwork Reduction Act Notice, see instr.

Copyright (c) 1992 form software only Center Piece Software, Inc.

Form 1120 (1992)

[redacted]

[illegible] CORPORATION & SUBSIDIARIES

CONSOLIDATED TAXABLE INCOME

YEAR [illegible]

| GROSS INCOME | (1) TOTAL | (2) ELIMINATION ADJUSTMENTS | (3) SUBTOTAL | [illegible] Corporation | (?) [illegible] Corporation of New York Group [illegible] | (?) [illegible] Group [illegible] |
|---|---|---|---|---|---|---|
| a) Gross receipts or gross sales/premiums earned | [illegible] | | [illegible] | | [illegible] | [illegible] |
| b) Less returns and allowances/dividends on policies | 0 | | 0 | | [illegible] | 0 |
| c) Balance | [illegible] | 0 | [illegible] | 0 | [illegible] | [illegible] |
| Cost of goods sold and/or operations | [illegible] | | [illegible] | 0 | 0 | [illegible] |
| Gross profit (line 1(c) less 2) | [illegible] | 0 | [illegible] | 0 | [illegible] | [illegible] |
| Dividends | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Interest | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Gross rents | [illegible] | | [illegible] | | 0 | [illegible] |
| Gross royalties | 0 | | 0 | | [illegible] | 0 |
| a) Short-term capital gain or (loss) | [illegible] | | 0 | [illegible] | 0 | 0 |
| b) Long-term capital gain or (loss) | 0 | [illegible] | [illegible] | [illegible] | 0 | 0 |
| c) Casualty and theft | 0 | | 0 | 0 | 0 | 0 |
| d) Sales of sect. or other Sec. 1231 prop. | [illegible] | | [illegible] | [illegible] | 0 | [illegible] |
| e) Ordinary gain or (loss) | [illegible] | | [illegible] | 0 | 0 | [illegible] |
| Other income | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | | |
| Total income (lines 3 thru 10) | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| DEDUCTIONS | | | | | | |
| Compensation of officers | [illegible] | | [illegible] | [illegible] | 0 | [illegible] |
| a) Salaries and wages | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| b) Less Jobs Credit | 0 | | 0 | [illegible] | 0 | 0 |
| c) Net Salaries and Wages | [illegible] | 0 | [illegible] | [illegible] | [illegible] | [illegible] |
| Repairs | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Bad debts | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Rents | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Taxes | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Interest | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| Contributions | 0 | [illegible] | [illegible] | [illegible] | 0 | [illegible] |
| Depreciation | [illegible] | | [illegible] | [illegible] | 0 | [illegible] |
| a) Less Depr. claimed elsewhere in return | 0 | | 0 | 0 | | 0 |
| b) Net Depreciation (line 2a less 2(a)) | [illegible] | 0 | [illegible] | [illegible] | 0 | [illegible] |
| Depletion | 0 | | 0 | 0 | 0 | [illegible] |
| Advertising | [illegible] | | [illegible] | | [illegible] | [illegible] |
| Pension & Profit-Sharing Plans | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |

| | [illegible] | Total ([illegible]) | Eliminations & Adjustments | [illegible] ([illegible]) | Corporation |
|---|---|---|---|---|---|
| 1(a) | Gross receipts or gross sales/premium earned | [illegible] | | [illegible] | |
| 1(b) | Less returns and allowances/dividends to policyholders | 0 | | 0 | |
| 1(c) | Subtotal | [illegible] | 0 | [illegible] | 0 |
| | Cost of goods sold and/or operations * | [illegible] | | [illegible] | 0 |
| | Gross profit (line 1(c) less 2) | [illegible] | 0 | [illegible] | 0 |
| | Dividends* | [illegible] | | [illegible] | [illegible] |
| | Interest | [illegible] | | [illegible] | [illegible] |
| | Gross rents | [illegible] | | [illegible] | |
| | Gross royalties | 0 | | 0 | |
| (a) | Short-term capital gain or (loss) * | 0 | | 0 | 0 |
| (b) | Long-term capital gain or (loss) * | 0 | [illegible] | [illegible] | [illegible] |
| (a) | Casualty and theft * | 0 | | 0 | 0 |
| (b) | Sales of sech. of other [illegible] prop. * | [illegible] | | [illegible] | [illegible] |
| (c) | Ordinary gain or (loss) * | [illegible] | | [illegible] | 0 |
| | Other income * | [illegible] | | [illegible] | [illegible] |
| | | | | | |
| | Total income (lines 3 thru 10) | [illegible] | [illegible] | [illegible] | [illegible] |
| | DEDUCTIONS | | | | |
| | Compensation of officers * | [illegible] | | [illegible] | [illegible] |
| (a) | Salaries and wages | [illegible] | | [illegible] | [illegible] |
| (b) | Less jobs credit * | 0 | | 0 | 0 |
| (c) | Net salaries and wages | [illegible] | 0 | [illegible] | [illegible] |
| | Repairs | [illegible] | | [illegible] | [illegible] |
| | Bad debts * | [illegible] | | [illegible] | 0 |
| | Rents | [illegible] | | [illegible] | [illegible] |
| | Taxes * | [illegible] | | [illegible] | [illegible] |
| | Interest | [illegible] | | [illegible] | [illegible] |
| | Contributions * | 0 | [illegible] | [illegible] | 0 |
| | Depreciation * | [illegible] | | [illegible] | [illegible] |
| (a) | Less depr. claimed elsewhere in return * | 0 | | 0 | 0 |
| (b) | Net depreciation (line 20 less 21(a)) * | [illegible] | 0 | [illegible] | [illegible] |
| | Depletion * | 0 | | 0 | 0 |
| | Advertising | [illegible] | | [illegible] | |
| | Pension & profit-sharing plans * | [illegible] | | [illegible] | [illegible] |
| | Employee benefit programs | [illegible] | | [illegible] | [illegible] |
| | Other deductions * | [illegible] | | [illegible] | [illegible] |
| | | | | | |
| | Total deductions (add lines 12, 13(c), [illegible] thru [illegible], 21(b), 22 thru 26) | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | |
| | Taxable income (loss) (line 11 less 27) | [illegible] | [illegible] | [illegible] | [illegible] |

* See "Substitute" schedule for details

[illegible]
[illegible]

Page 1
SCHEDULE [illegible]

| Corporation of [illegible] Group | [illegible], Inc. Group | | | | | | |
|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | [illegible] | | | | | | |
| 0 | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| 0 | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| 0 | [illegible] | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | [illegible] | | | | | | |
| 0 | [illegible] | | | | | | |
| 3,7xx | [illegible] | | | | | | |
| | | | | | | | |
| [illegible] | [illegible] | | | | | | |
| | | | | | | | |
| 0 | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| 0 | [illegible] | | | | | | |
| 0 | [illegible] | | | | | | |
| 0 | 0 | | | | | | |
| 0 | [illegible] | | | | | | |
| 0 | 0 | | | | | | |
| 0 | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| [illegible] | [illegible] | | | | | | |
| | | | | | | | |
| [illegible] | [illegible] | | | | | | |
| | | | | | | | |
| [illegible] | [illegible] | | | | | | |

Page 2
SCHEDULE [illegible]

[redacted]

[illegible] CORPORATION & SUBSIDIARIES

CONSOLIDATED BALANCE SHEET – [illegible]

[illegible]

| ASSETS | TOTAL | ELIMINATIONS | SUBTOTAL | [illegible] | [illegible] | [illegible] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Cash | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 2 Trade notes and accounts receivable | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| (a) Allowance for bad debts | ([illegible]) | | ([illegible]) | ( ) | 0 | ([illegible]) | | | | | | |
| 3 Inventories | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| 4 [illegible] obligations (a) U.S. and instrumentalities | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| (b) State, subdivisions thereof, etc. | 0 | | 0 | | 0 | 0 | | | | | | |
| 5 Other current assets * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 6 Loans to stockholders | 0 | ([illegible]) | [illegible] | | [illegible] | 0 | | | | | | |
| 7 Mortgage and real estate loans | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| 8 Other investments * | [illegible] | ([illegible]) | [illegible] | ([illegible]) | 0 | [illegible] | | | | | | |
| 9 Buildings and other fixed depreciable assets | [illegible] | | [illegible] | 0 | [illegible] | [illegible] | | | | | | |
| (a) Less accumulated depreciation | ([illegible]) | | ([illegible]) | 0 | 0 | ([illegible]) | | | | | | |
| 10 Depletable assets | 0 | | 0 | | 0 | 0 | | | | | | |
| (a) Less accumulated depletion | 0 | | 0 | ( ) | 0 | 0 | | | | | | |
| 11 Land (net of any amortization) | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| 12 Intangible assets (amortizable only) | [illegible] | | [illegible] | 0 | [illegible] | [illegible] | | | | | | |
| (a) Less accumulated amortization | ([illegible]) | | ([illegible]) | 0 | ([illegible]) | ([illegible]) | | | | | | |
| 13 Other assets * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 14 Total assets (lines 1 thru 13) | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | | | | | | | |
| 15 Accounts payable | [illegible] | | [illegible] | [illegible] | 0 | [illegible] | | | | | | |
| 16 Mtges, notes, bonds payable in less than 1 year | 0 | | 0 | | 0 | 0 | | | | | | |
| 17 Other current liabilities * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 18 Loans from stockholders | 0 | ([illegible]) | [illegible] | | [illegible] | 0 | | | | | | |
| 19 Mtges, notes, bonds payable in 1 year or more | [illegible] | | [illegible] | | 0 | [illegible] | | | | | | |
| 20 Other liabilities * | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 21 Capital stock: (a) Preferred stock | 0 | | 0 | | 0 | 0 | | | | | | |
| (b) Common stock | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 22 Paid-in or capital surplus * | [illegible] | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] | | | | | | |
| 23 Retained earnings appropriated * | 0 | | 0 | | 0 | 0 | | | | | | |
| 24 Retained earnings unappropriated | ([illegible]) | [illegible] | [illegible] | [illegible] | [illegible] | ([illegible]) | | | | | | |

F309/T20
2-20-2006

Estimated beg equity (book) $ normal <Contra>
Carteret Bancorp, Inc. 1-1-92

Total assets (A) 5377902891
Total liabilities (B) 5340088564
Total equity - BV 37814327 ✓x

Equity balances
CS 100
Addl PIC 332915547
RE <295101320>
Total equity (BV) 37814327 ✓x

Beg BS (Consolidating)

✓ to 1992 SWP-2.3A
e.1(C)

| | ASSETS | (1) + (2) | [illegible] | (4) thru (23) | | | |
|---|---|---|---|---|---|---|---|
| 1 | Cash | 347,327,978 | | 347,327,972 | 22,322,961 | 322,970 | 326,412,967 |
| 2 | Trade notes and accounts receivable | 78,234,345 | | 78,234,343 | 348,328 | 7,335 | 78,226,043 |
| 2(a) | (a) Allowance for bad debts | (2,908,111) | | (1,908,111) | ( - ) | 0 | (1,908,111) |
| 3 | Inventories | 41,434,314 | | 41,434,214 | | 0 | 41,434,214 |
| 4 | Gov't obligations: (a) U.S. and instrumentalities | 199,383,446 | | 199,443,446 | | 0 | 199,344,446 |
| 4(b) | (b) State, subdivisions thereof, etc. | 0 | | 0 | | 0 | 0 |
| 5 | Other current assets * | 44,112,429 | | 44,110,136 | 322,390 | 3,320,437 | 40,327,336 |
| 6 | Loans to stockholders | 0 | (73,972,303) | 73,983,303 | | 73,973,303 | 0 |
| 7 | Mortgage and real estate loans | 2,323,779,327 | | 2,323,779,327 | | 0 | 2,323,779,327 |
| 8 | Other investments * | 1,477,342,734 | (29,172,125) | 1,454,221,444 | (29,172,229) | 0 | 1,449,393,313 |
| 9 | Buildings and other fixed depreciable assets | 54,903,712 | | 54,903,719 | 0 | 2,209 | 54,903,455 |
| 9(a) | (a) Accumulated depreciation | (27,977,240) | | (27,977,240) | 0 | 0 | (27,977,240) |
| 10 | Depletable assets | 0 | | 0 | | 0 | 0 |
| 10(a) | (a) Accumulated depletion | 0 | | 0 | ( ) | 0 | 0 |
| 11 | Land (net of any amortization) | 4,141,720 | | 4,141,720 | | 0 | 4,141,720 |
| 12 | Intangible assets (amortizable only) | 41,967,087 | | 41,967,062 | 0 | 2,119,322 | 39,347,747 |
| 12(a) | (a) Accumulated amortization | (39,114,349) | | (39,114,349) | 0 | (2,119,372) | (37,012,367) |
| 13 | Other assets * | 214,746,107 | | 214,746,107 | 36,144,538 | 6,093,144 | 430,427,104 |
| 14 | Total assets (lines 1 thru 13) | 5,390,316,325 | (97,962,211) | 5,173,277,428 | 36,148,725 | 81,224,329 | 5,377,902,891 (A) |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | |
| 15 | Accounts payable | 1,117,203 | | 1,117,403 | 1,087,223 | 0 | 309,332 |
| 16 | Mtges, notes, bonds payable in less than 1 year | 0 | | 0 | | 0 | 0 |
| 17 | Other current liabilities * | 142,444,120 | | 142,444,022 | 37,837,436 | 94,228,952 | 74,317,794 ← 5340088564 (B) |
| 18 | Loans from stockholders | 0 | (54,389,349) | 54,389,348 | | 54,389,348 | 0 |
| 19 | Mtges, notes, bonds payable in 1 year or more | 132,332,696 | | 132,332,696 | | 0 | 132,332,696 |
| 20 | Other liabilities * | 5,373,417,317 | | 5,373,497,317 | 37,077,339 | 4,333,144 | 5,347,946,852 |
| 21 | Capital stock: (a) Preferred stock | 0 | | 0 | | 0 | 0 |
| 21(b) | (b) Common stock | 334,458 | (1,979,483) | 2,301,446 | 344,424 | 3,373,545 | 100 |
| 22 | Paid-in or capital surplus * | 542,389,714 | (234,432,443) | 842,804,344 | 543,389,779 | 7,129,347 | 332,915,547 |
| 23 | Retained earnings - Appropriated * | 0 | | 0 | | 0 | 0 |
| 24 | Retained earnings - Unappropriated | (632,197,442) | 395,318,329 | (912,254,982) | (522,197,442) | 342,448 | (295,101,320) |
| 25 | Less cost of treasury stock | (417,179) | | (417,179) | (417,179) | 0 | 0 |
| 26 | Total liabilities and stockholders' equity (lines 15 thru 25) | 5,390,316,325 | (97,962,211) | 5,073,277,454 | 36,148,725 | 81,224,329 | 5,377,902,891 |

See stockholders' schedules for details

Page 1
SCHEDULE 27

Page 2
SCHEDULE 27

| | | | | | |
|---|---|---|---|---|---|
| 1 | Cash | [illegible] | | [illegible] | [illegible] |
| 2 | Trade notes and accounts receivable | [illegible] | | [illegible] | [illegible] |
| (a) | (a) Allowance for bad debts | 0 | | 0 | ( ) |
| 3 | Inventories | 0 | | 0 | |
| 4 | Gov't obligations (a) U.S. and instrumentalities | 0 | | 0 | |
| (b) | (b) State, subdivisions thereof, etc. | 0 | | 0 | |
| 5 | Other current assets * | [illegible] | | [illegible] | [illegible] |
| 6 | Loans to stockholders | 0 | 0 | 0 | |
| 7 | Mortgage and real estate loans | 0 | | 0 | |
| 8 | Other investments * | [illegible] | [illegible] | ([illegible]) | ([illegible]) |
| 9 | Buildings and other fixed depreciable assets | 0 | | 0 | 0 |
| (a) | (a) Accumulated depreciation | 0 | | 0 | 0 |
| 10 | Depletable assets | 0 | | 0 | |
| (a) | (a) Accumulated depletion | 0 | | 0 | ( ) |
| 11 | Land (net of any amortization) | 0 | | 0 | |
| 12 | Intangible assets (amortizable only) | 0 | | 0 | 0 |
| (a) | (a) Accumulated amortization | 0 | | 0 | 0 |
| 13 | Other assets * | [illegible] | | [illegible] | [illegible] |
| | | | | | |
| 14 | Total assets (lines 1 thru 13) | [illegible] | [illegible] | [illegible] | [illegible] |
| | | | | | |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | |
| | | | | | |
| 15 | Accounts payable | [illegible] | | [illegible] | [illegible] |
| 16 | Mtges, notes, bonds payable in less than 1 year | 0 | | 0 | |
| 17 | Other current liabilities * | [illegible] | | [illegible] | [illegible] |
| 18 | Loans from stockholders | 0 | 0 | 0 | |
| 19 | Mtges, notes, bonds payable in 1 year or more | 0 | | 0 | |
| 20 | Other liabilities * | [illegible] | | [illegible] | [illegible] |
| 21 | Capital stock: (a) Preferred stock | 0 | | 0 | |
| (b) | (b) Common stock | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 22 | Paid-in or capital surplus * | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 23 | Retained earnings- Appropriated * | 0 | | 0 | |
| 24 | Retained earnings- Unappropriated | ([illegible]) | [illegible] | ([illegible]) | ([illegible]) |
| 25 | Cost of treasury stock | ([illegible]) | | ([illegible]) | ([illegible]) |
| | | | | | |
| 26 | Total liabilities and stockholders' equity (lines 15 thru 25) | [illegible] | [illegible] | [illegible] | [illegible] |

* See subsidiaries' schedules for details

[illegible]

| |
|---|
| [illegible] |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| [illegible] |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| [illegible] |
| |
| [illegible] |
| |
| |
| |
| [illegible] |
| 0 |
| [illegible] |
| 0 |
| 0 |
| [illegible] |
| 0 |
| [illegible] |
| [illegible] |
| 0 |
| ([illegible]) |
| 0 |
| |
| [illegible] |

[illegible] CORPORATION & SUBSIDIARIES [illegible]

CONSOLIDATED BALANCE SHEET - END OF TAXABLE YEAR

[illegible] SCHEDULE [illegible]

| | ASSETS | (1) TOTAL | (2) ELIMINATIONS | (3) SUBTOTAL | (4) [illegible] Corporation |
|---|---|---|---|---|---|
| 1 | Cash | [illegible] | | [illegible] | [illegible] |
| 2 | Trade notes and accounts receivable | [illegible] | | [illegible] | [illegible] |
| (a) | (a) Allowance for bad debts | 0 | | 0 | ( ) |
| 3 | Inventories | 0 | | 0 | |
| 4 | Gov't obligations (a) U.S. and instrumentalities | 0 | | 0 | |
| (b) | (b) State, subdivisions thereof, etc. | 0 | | 0 | |
| 5 | Other current assets * | [illegible] | | [illegible] | [illegible] |
| 6 | Loans to stockholders | 0 | 0 | 0 | |
| 7 | Mortgage and real estate loans | 0 | | 0 | |
| 8 | Other investments * | [illegible] | [illegible] | ([illegible]) | ([illegible]) |
| 9 | Buildings and other fixed depreciable assets | 0 | | 0 | 0 |
| (a) | (a) Accumulated depreciation | 0 | | 0 | 0 |
| 10 | Depletable assets | 0 | | 0 | |
| (a) | (a) Accumulated depletion | 0 | | 0 | ( ) |
| 11 | Land (net of any amortization) | 0 | | 0 | |
| 12 | Intangible assets (amortizable only) | 0 | | 0 | 0 |
| (a) | (a) Accumulated amortization | 0 | | 0 | 0 |
| 13 | Other assets * | [illegible] | | [illegible] | [illegible] |
| 14 | Total assets (lines 1 thru 13) | [illegible] | [illegible] | [illegible] | [illegible] |
| | LIABILITIES & STOCKHOLDERS' EQUITY | | | | |
| 15 | Accounts payable | [illegible] | | [illegible] | [illegible] |
| 16 | Mtges, notes, bonds payable in less than 1 year | 0 | | 0 | |
| 17 | Other current liabilities * | [illegible] | | [illegible] | [illegible] |
| 18 | Loans from stockholders * | 0 | 0 | 0 | |
| 19 | Mtges, notes, bonds payable in 1 year or more | 0 | | 0 | |
| 20 | Other liabilities * | [illegible] | | [illegible] | [illegible] |
| 21 | Capital stock (a) Preferred stock | 0 | | 0 | |
| (b) | (b) Common stock | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 22 | Paid-in or capital surplus * | [illegible] | ([illegible]) | [illegible] | [illegible] |
| 23 | Retained earnings - Appropriated * | 0 | | 0 | |
| 24 | Retained earnings - Unappropriated | [illegible] | [illegible] | [illegible] | [illegible] |

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | SCHEDULE [illegible] |
|---|---|---|---|---|---|---|---|
| [illegible] | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| | | | | | | | |
| [illegible] | 0 | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| 0 | 0 | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| 0 | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| [illegible] | 0 | | | | | | |
| 0 | 0 | | | | | | |

CARTERET SAVINGS BANK FA

# MEMORANDUM

DATE: March 10, 1993

TO: George M. Gross, Jr., Managing Agent

FROM: James R. Hindnich, Credit Specialist

SUBJECT: UNCOMMITTED PIPELINE

On December 4, 1992, the day of intervention, the initial meeting held with the association employees raised many concerns regarding Carteret's ability to fund its current pipeline committed 1-4's totalling $245MM+ and uncommitted pipeline (APS in process) of another $175MM. This origination system consisted of approximately 100 association employees plus over 200 correspondents. A major concern was that elimination of the origination mortgage area would require the conservatorship to lay off employees.

Messrs. Smedley, Ford, Gross, Hallenbach, Bowers, DiGiondomenico, in concert with Steve Haley and Carol Wetherly, (telephonically) determined early Friday evening that Carteret would fund the pipeline and requested additional information in order to look at the possibility of funding/extending/continuing originations based on Mr. Ford's statement that failure to do so would create a significant void in mortgage dollars available based on Carteret's $100MM per month production.

At the team leaders' meeting on Saturday morning December 5, Messrs. Smedley, Ford, Gross, et al, with verbal concurrences from Carol Wetherley, reaffirmed the funding of the committed mortgages. Based on information regarding a case to continue funding 1-4's in process from Home Federal in California, Mr. Ford requested that Carteret continue to act in an ongoing fashion accepting applications for at least the next week ending Friday, December 11. During that period of time, Mr. DiGiondomenico was instructed to update all parties regarding the flow of applications and overall effect on the correspondents. Mr. Ford stated he would supply a copy of the California case.

In conjunction with this decision, was the study of Carteret's secondary marketing program operated in the Treasury area by Greg Fuhrmann. These transactions are consummated through creation of Fannie Mae mortgage-backed securities sold to Wall Street brokers or through whole loan sales to City Mae, GMAC,/RFC, GE Capital and other investors. The secondary marketing efforts and strategies are dependent upon the mortgage pipeline for product. At the time of intervention, we were told that Carteret had $500 million in commitments outstanding and had funded approximately $236MM requiring the difference to be generated from the current pipeline. Donna Cribbs and Bill Bailey were preparing an analysis of Carteret's position which we [illegible] no later than

Monday, December 7. Further discussion continued and Mr. Haley closed requesting Mr. Ford's concurrence on the matter.

On Tuesday, December 8, a conference call from Bob Smedley, Carol Wetherly, Donna Pillard, involving George Gross, John Walsh, Dean DiGiondomenico and myself was quick to point out that there was an apparent lack of control regarding the hands-on management of the pipeline and market sales. Mr. DiGiondomenico was requested to provide additional reports for a review by Donna Pillard and Jim Powers, et al at a meeting held on Thursday, December 10 in Parsippany.

On Thursday morning, December 10, Donna Cribbs presented her findings to Donna Pillard, Jim Powers, Bob Smedley, Gene Yalicki, and those present. Interviews with various association staff members in conjunction with the funding and secondary market situation were held. It was determined that the applications generated from date of conservatorship was less than $10 million; an indication that the correspondent relationship (60% of volume) had already moved. This combined with the interviews taken, the decision was made on December 11 to cease all further acceptance of mortgage applications.

All APS in the bank as of December 11 would be processed in accordance with the established standards of Carteret and would be approved and funded having met those guidelines.

Concur:

[signature]

Dean DiGiondomenico

JRH:mc

To: Robert O. Smedley@CONSERVE-CAR@RTCATL
W. Robert Haley@FSC-CONSERVE@RTCATL

Cc: Edward Mahaney@Oper@RTCDC
David J. Wisnewski@FSC-EXEC@RTCATL
Sally C. McCormick@Oper@RTCDC
Daryl M. Burton@FSC-CLOSING@RTCATL
Thomas A. Steinmetz@FSC-CONSERVE@RTCATL
Richard J. Mullen@ASSETS-FRAM@RTCATL
Dennis J Lauria@AREM@RTCVF
James K. Baebel@OPER-FLD@RTCDC

Bcc:
From: Stephen A. Haley@FSC-EXEC@RTCATL
Subject: ASSET SALES FROM CONSERVATORSHIPS
Date: Friday, March 19, 1993 11:28:11 EST ← note
Attach:
Certify: N
Forwarded by: Stephen A. Haley@FSC-EXEC@RTCATL

---

************************************************************************

PLEASE DISTRIBUTE THIS COMMUNICATION TO ALL ASSISTANT SMAs, MANAGING AGENTS, AND OTHER KEY RTC STAFF IMMEDIATELY.

************************************************************************

I am forwarding to you an email from Ed Mahaney (Vice President, Department of Operations, Washington) which deals with asset sales from conservatorships.

It appears we are in the midst of a shift in policy. For the past couple of years or so, the general direction has been to liquidate and liquefy the asset side of our conservatorship balance sheets. GENERALLY SPEAKING, THE EVOLVING NEW DIRECTION IS TO HOLD AND NOT LIQUIDATE PERFORMING ASSETS -- BUT TO CONTINUE TO LIQUIDATE NONPERFORMING ASSETS. Once prepared, a more definitive and detailed policy statement will follow.

The reason for this change in direction is a concern for how net interest margins have dwindled as a result of selling-off higher yielding assets and redeploying sale proceeds into low-yielding liquidity oriented assets -- these declines in spreads and margins even in light of conservatorships having been very successful in reducing their weighted average cost of funds. These declining net interest margins and resulting unprofitable or only marginally profitable operations are deemed to not be in the best interests of taxpayers or the RTC.

The attached email from Mr. Mahaney addresses major asset categories and to some extent addresses some types of asset marketing initiatives and the way each should be viewed for the future. Managing Agents should act accordingly. TO THE EXTENT THERE ARE CONFLICTING INTERPRETATIONS OR DISAGREEMENTS WITH RESPECT TO THIS POLICY SHIFT, THESE ISSUES SHOULD BE ELEVATED THROUGH YOU TO ME, AND ANY SUCH ISSUES WE CANNOT SUCCESSFULLY WORK-OUT WILL BE ELEVATED BY ME TO MR. MAHANEY OR MS. McCORMICK IN WASHINGTON.

To: Michael A. Jungman@Assets-mkl@RTCDC
Barry S. Kolatch@EXEC@RTCDC,J. Paul Ramey@FRB@RTCDC
CC: William H. Roelle@EXEC@RTCDC,Meg I. Joyner@EXEC@RTCDC
Marsh McJunkin@EXEC@RTCDC,Gary Bowen@Assets-ad@RTCDC
Thomas P. Horton@Assets-fa@RTCDC
Bcc:
From: Edward Mahaney@Oper@RTCDC
Subject: Asset Sales From Conservatorships
Date: Friday, March 12, 1993 14:57:56 EST ← note
Attach:
Certify: N
Forwarded by: Stephen A. Haley@FSC-EXEC@RTCATL

---

Comments by: Stephen A. Haley@FSC-EXEC@RTCATL
Forwarded to: Allan J. Morehead@Conserv@RTCATLSOM
Comments:

For our discussion.

---

Comments by: Stephen A. Haley@FSC-EXEC@RTCATL
Forwarded to: Robert O. Smedley@Conserv@RTCATLSOM
W. Robert Haley@FSC-CONSERVE@RTCATL,djw,sah

Comments:

To: Bobs (cc: Dave) --
Let's the 3 of us have a conference call on this Friday am. How about 8:30? Thanks.

---

Comments by: David J. Wisnewski@FSC-EXEC@RTCATL
Forwarded to: Stephen A. Haley@FSC-EXEC@RTCATL
Comments:

This is the e-mail that I was so vague about that everyone on the national conference call was aware of. I still have to review it. Your thoughts?

---

Comments by: Edward Mahaney@Oper@RTCDC
Forwarded to: James Densmore@Executive@RTCDEN
James Densmore@Exec-Rep@RTCDEN
Jim R. Messer@FSC-EXEC@RTCDAL
James G. Thompson@CONSERVE@RTCKC
David J. Wisnewski@FSC-EXEC@RTCATL
Sally C. McCormick@Oper@RTCDC
Comments:

Here's a heads up of a slight shift in policy. Please do not get into any serious disagreement with others in the field over what

# RESOLUTION TRUST CORPORATION

## ATLANTA FINANCIAL SERVICE CENTER
## ATLANTA, GEORGIA

## SUPERVISORY REVIEW MANUAL
## REVISED
## MARCH 1993

"PRIVILEGED AND CONFIDENTIAL"

ATLANTA OFFICE
800-628-4362

SUPERVISORY REVIEW
CONTRACTOR ORIENTATION & ENTRANCE BRIEFING

General Comments

1. The main objective of the review is to provide constructive criticism and point out deficiencies that could be problematic for the Managing Agent (hereinafter MA) and the institution.

2. If corrections to exceptions/deficiencies can be initiated and effectuated, or problems can be resolved during your visit, a comment on your final report is not necessary; however it should still be documented in your work papers.

3. The institution may have previously received (or you may have provided) a copy of the program and has already prepared answers and documentation for your use. This is not a problem; however, it is your responsibility to review, test, and sample the underlying records and procedures to substantiate your responses.

4. Reference materials other than the memos and directives which we have provided are various manuals that the MA should have in his possession.

5. Some of the questions overlap; therefore make sure that your answers are consistent. Additionally, provide sufficient detail for answers in the negative or N/A (not applicable).

6. The following timelines apply to the Supervisory Review Report completion:

a) Field Site Work Completion- 10 Business Days.

b) Contractor Report Delivery Date- 10 Business Days after Field Site Work Completion.

c) Program Office Initial Acceptance Date- 20 Business Days after Receipt of Report.

d) Program Office Revision Acceptance Date- 10 Business Days after Receipt of Revised Report.

7. At the end of the field site work [illegible] conducted by the contractor utilizing a "draft" of the final report. Attendance will include the MA, representatives from the Program Oversight Office (mandatory, either in person or by conference call) and any other institution or RTC employee considered necessary by the MA. The MA must also notify his SMA so that he (or his designee) has the opportunity to attend or participate either personally or by conference call.

8. If the Supervisory Review contracted for is a return engagement, the review should begin from the prior review date and not from the institution's intervention date.

9. The final Supervisory Review report must be in the exact format as dictated by the applicable Yellow Book (GAS) and AICPA standards. Failure to do so will result in the report being returned to the Contractor as unacceptable.

10. The Program Office reserves the right to change, modify or remove any exception(s) that it deems necessary at its own discretion without prior written approval.

11. The Contractor is responsible to contact the Oversight Manager within the RTC Supervisory Review and Oversight Department on the first day of work at the RTC field site. The RTC Oversight Manager is as follows:

Supervisory Review –
Joseph J. Curcio (215) 631-3877

12. The final Supervisory Review report (signed by the Contractor) and supporting work paper files are to be mailed to the address below:

RTC – Valley Forge Consolidated Office
ATTN: Joseph J. Curcio
1000 Adams Avenue or P.O. Box 1500
Norristown, PA 19403 Valley Forge, PA 19482

CONTRACTOR ACKNOWLEDGEMENT:

The undersigned Contractor Representative acknowledges receiving and reading this Orientation/Briefing Letter and the related program summary. (Please list field site team members below.)

[signature] 10/18/93
Contractor Representative Date

Field Site Team Members:

CRAIG RONHOVDE

TOM FLYNTZ

Revised 03/93

Conclusion:

Where an item that was previously considered an intangible asset, such as goodwill, but can no longer be recorded as such remains on the books after intervention, a substantive exception in the area of control exists. If the item is immaterial in amount, and the deficiency is corrected during the review, no exception need be taken.

6. Have appraisals or other value estimates been obtained for buildings (facilities owned) and all tangible "other assets" of material value that may reasonably be assumed to have market values differing significantly from their book values?

Conclusion:

Departures from the appraisal procedures prescribed in section VI-C of RTC's Asset Management and Disposition Manual (AMDM) should be treated as technical exceptions in the area of downsizing. Failure to obtain value estimates of material assets represents a substantive exception. If the exception is noted at a stage of the conservatorship's life cycle when the sale of the asset prior to resolution remains a realistic alternative, the exception should appear in the downsizing area. If the exception is noted at a time when further asset sales are "on hold" due to pending resolution, the exception pertains to the preparation for resolution section of the report.

Discussions, References, and Work Papers
Question 4, 5, and 6:

Sections IVc and IVd of the AMDM provide guidelines for obtaining appraisals of other assets, including works of art.

The reviewer should determine if the conservatorship has complied with the requirements of Memorandum ERO-459 (08/01/90 by Waldrop). This memorandum requires that an appraisal of conservatorship owned facilities be conducted within sixty days of intervention, unless an acceptable appraisal, not more than one year old, was acquired prior to intervention.

Such appraisals should also be obtained for leasehold interests, where the institution holds a long term lease on the property.

Appraisals should be obtained on furniture, fixtures, and equipment (FF&E). In the event that a sale of the entire institution by the Resolutions Department using a Total Asset Purchase Agreement is considered probable, the appraisal would be helpful in the evaluation be conducted as part of the institution's preparation for resolution. Works of art, that

may be carried on the books as a component of FF&E, should be appraised. Memorandum WDC-982 (09/27/91 by Kelly) details Resolution Trust Corporation policy with reference to the valuation, appraisal and disposition of all Furniture, Fixtures and Equipment.

The reviewer need not provide documentation of compliance with these procedures in the work papers. The institution's failure to obtain required appraisals need only be referenced in the report. In the event the appraisals are not in conformance with Resolution Trust Corporation guidelines, the specific nature of the deficiencies should be listed in the work papers, along with photocopies of examples of the deficiencies. If the appraisals were not acquired in the prescribed manner, such exceptions should be discussed in the chapter dealing with Asset Marketing and Contracting.

FIRREA mandates that conservatorships account for their operations in accordance with GAAP. Accordingly, the reviewer should be alert to instances where assets are carried on the books at an amount that exceeds their appraised value. Furthermore, the Act requires that certain items (considered other assets under RAP) must be written off. The most prominent of these are, deferred losses on the sale of loans and goodwill. Other items that are considered assets under GAAP are so considered with the understanding that the business in question is a "going concern." Such assets have no market value and must be written off by a conservatorship. Unamortized organizational costs is one example of other assets that should be written off.

7. Has the conservatorship implemented Memorandum WDC-1259 (05/04/92 by Kelly) with reference to self insurance for RTC controlled properties including property that secures loans in default for non-payment of insurance?

<u>Conclusion:</u>

Memorandum WDC-1259 establishes a Risk Management Policy of self insurance for all property controlled by The Resolution Trust Corporation. The memorandum directs the Managing Agent to review the insurance coverage on all RTC controlled assets. If existing coverage exists it should be canceled. If the Managing Agent has not implemented WDC-1259 the exception will be substantive. If implementation has begun and has not been completed the exception will be technical in the area of control.

8. Does each asset file contain sufficient documentation to substantiate the institution's ownership of the asset?



AM5067 0207 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Conclusion:

Exceptions to this question will generally be technical, relating to the area of control. If the institution has been scheduled for resolution, and such documentation deficiencies exist with respect to a major asset, a substantive exception in the resolutions preparation for area should be taken. In cases where the institution's ownership of a major asset is subject to a serious challenge, a critical exception exists in the control area.

Discussions, References, and Work papers:

Documentation of ownership should be maintained for each material asset in the other assets category. The standards applied to determine proof of ownership will generally parallel those used to document a lien position in a lending relationship. Ownership of real estate will be evidenced by a deed, of an automobile by a title, and other types of assets by a bill of sale or other customary indication of ownership.

This documentation should be in a six-part or two-part file in accordance with RTC policy.

9. Have those other assets for which a market exists been listed with a broker or exposed to the market in some other appropriate manner?

10. Does the conservatorship have a Strategic Plan including the marketing plan to facilitate the sale, redemption, liquidation, or write off of substantially all of its other assets prior to resolution?

Conclusion
Question 9 and 10:

The failure to include material elements of "other assets" in a downsizing plan, or to implement the downsizing process with respect to such assets, represents a substantive exception in the area of downsizing.

In cases where the institution has been scheduled for resolution, and where no process has been established to dispose of surplus fixed assets or to charge off stale or dubious reconciling items, a substantive exception in the area of preparation for resolution may be appropriate.

Discussions, References, and Work Papers
Questions 9 and 10:

Most of the components of other assets are subject to the same general mandate with respect to downsizing as are the loan and

## Stratification of Assets Remaining (Report M48A)

Change for Month of August 1993:

At August 31, 1993 Carteret had 127,620 loan and real estate owned (REO) assets (assets) with a book value of $2,431,301,000, a decrease of 107 assets and $47,457,000 in book value from 127,727 assets* with a book value of $2,478,758,000 at July 31, 1993.

The decrease in the number of loans was offset by loans purchased from Imperial Premium Finance ("IPF") an insurance premium finance subsidiary of Carteret. IPF had a net increase of 710 loans, but a net decrease of $1,947,000 in book value in the Commercial Unsecured category (line 303) from July 31 to August 31.
Also, Carteret received approval to increase the credit line available to IPF to $425,000,000 from $400,000,000 at June 30, 1993. With the increased credit line in place, the outstanding balance will likely increase from the actual balance of $376,306,555 with 86,346 loans at August 31, 1993.

Exclusive of IPF, Carteret's assets decreased by 817 from 42,091 to 41,274 with a corresponding book value decrease of $45,510,000 from $2,100,504,000 at July 31, 1993 to $2,054,994,000 at August 31, 1993.

Carteret continued to experience significant and positive paydown/ payoff activity in the performing portfolios. Approximately $8,692,000 was collected on the commercial loan portfolio, while approximately $25,000,000 was collected on the residential loan portfolio and REO.

In addition to the above, the institution serviced 93,887 loans and REO for others with a book value of $5,253,877,000 at August 31, 1993. This is a decrease of 1,959 assets and a decrease of $102,047,000 of book value from 95,846 assets with book value of $5,355,924,000 at July 31, 1993.

*Please note that there was a change in the number of loan assets for July 31, 1993 and prior, due to the incorrect number of IPF loans, as reported to Carteret by IPF. The number of non-mortgage loans will change, affecting the total loan and real estate owned asset totals, but the principle balances were not affected. Adjustments will be forwarded for previous reports.

Changes for the month are summarized on the attached Exhibit 1.

## Stratification of Assets Remaining (Report M48A)

Change since Date of Conservatorship (DOC) - December 4, 1992:

Since intervention on December 4, 1992, the number of assets has increased 30,110 from 97,510 to 127,620 at August 31, 1993. Assets have downsized $320,364,000 from a high of $2,751,665,000 to $2,431,301,000 at August 31, 1993. The increase in the number of loans is again due to the funding of the IPF loans as explained in the discussion of the monthly change.

Exclusive of IPF, the number of assets has decreased by 9,146 from 50,420 at DOC to 41,274 at August 31, 1993 and the book value of assets has decreased $390,332,000 from $2,445,326,000 at DOC to $2,054,994,000 at August 31, 1993.

In addition to the above, the book value of assets serviced for others downsized $1,132,595,000 from $6,386,472,000 to $5,253,877,000. The number of assets serviced for others decreased 18,247 from 112,134 at DOC to 93,887 at August 31, 1993.

Changes since DOC are also summarized on the attached Exhibit 1.

## SAMA/SAMDA - SALES Initiative Stratification (Report M48B)

The First Boston 1-4 Family Securitizations, for $809,927,000, have been put on hold indefinitely, as well as the Consumer loan sale for $78,156,744.

Three non-performing loan sales and one non-performing auction took place during this month, for which we are awaiting proceeds. They are as follows: S-1 on August 19th for $16,129,742; S-2 on August 19th for $71,868,559; N-3 on August 18th for $25,824,935; and the Non-Performing 1-4 Auction III on August 24-25 for $62,556,792.

At present time, Carteret is preparing to sell $120,000,000 in 1-4 Family mortgages for the Home Unity Resolution. This sale is to close by October 29, 1993.

The status of SAMA/SAMDA - Sales initiatives are included on the attached Exhibit 2.

Also, 19 subsidiaries have been dissolved, as of August 23, 1993.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: keymaster@town.hall.org
Originator-Key-Asymmetric:
MFkwCgYEVQgBAQICAgADSwAwSAJBALeWW4xDV4i7+b6+UyPn5RtObb1cJ7VkACDq
pKb9/DClgTKIm08lCfoilvi9Wl4SODbR1+1waHhiGmeZO8OdgLUCAwEAAQ==
MIC-Info: RSA-MD5,RSA,
EqAdNBM8smLwRC3OKlp5PtOldVCuAm/FKea9nbfFb2YC83R2foNnd9RbxObCn02M
Ul9z06KGllAZ5mZo+LGbeg==

<IMS-DOCUMENT>0000950144-94-000569.txt : 19940309
<IMS-HEADER>0000950144-94-000569.hdr.sgml : 19940309
ACCESSION NUMBER: 0000950144-94-000569
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT: 7
CONFORMED PERIOD OF REPORT: 19931231
FILED AS OF DATE: 19940308

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: FIRST TENNESSEE NATIONAL COR
CENTRAL INDEX KEY: 0000036966
STANDARD INDUSTRIAL CLASSIFICATION: 6021
IRS NUMBER: 620803242
STATE OF INCORPORATION: TN
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K
SEC ACT: 34
SEC FILE NUMBER: 000-04491
FILM NUMBER: 94514957

BUSINESS ADDRESS:
STREET 1: 165 MADISON AVE
CITY: MEMPHIS
STATE: TN
ZIP: 38103
BUSINESS PHONE: 9015234027

MAIL ADDRESS:
STREET 1: P O BOX 84
CITY: MEMPHIS
STATE: TN
ZIP: 38101-0084

FORMER COMPANY:
FORMER CONFORMED NAME: FIRST TENNESSEE BANKS INC
DATE OF NAME CHANGE: 19600201
</IMS-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FIRST TENNESSEE 10-K
<TEXT>

<PAGE> 1

SECURITIES AND EXCHANGE COMMISSION

Washington, D. C. 20549

FORM 10-K

(Mark One)

/x/ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 [FEE REQUIRED]
For the fiscal year ended December 31, 1993

- or -

/ / TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (NO FEE REQUIRED)
For the Transition period from __________ to __________

Commission File Number 0-4491

FIRST TENNESSEE NATIONAL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| TENNESSEE<br>(State or other jurisdiction of incorporation or organization) | 62-0803242<br>(I.R.S. Employer Identification Number) |
| 165 Madison Avenue, Memphis, Tennessee<br>(Address of principal executive offices) | 38103<br>(Zip Code) |

Registrant's telephone number, including Area Code: 901-523-5630

Securities registered pursuant to Section 12(b) of the Act:

NONE

Securities registered pursuant to Section 12(g) of the Act:

$2.50 Par Value Common Capital Stock
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. X YES ----- NO -----

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K. -----





At February 23, 1994, the aggregate market value of the voting stock of the registrant held by non-affiliates of the registrant was approximately $1,116,000,000.

At February 23, 1994, the registrant had 30,175,456 shares of common stock

outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

1. Annual Report To Shareholders for the year ended 12/31/93 - Parts I, II, and IV.

2. Proxy Statement furnished to shareholders in connection with Annual Meeting of Shareholders scheduled for 04/19/94 - Part III (to be provided by amendment not later than 120 days after the end of the 1993 fiscal year per General Instruction G(3) to Form 10-K).

Page 2 of 2

<PAGE> 3

PART I

ITEM 1
BUSINESS

General.

First Tennessee National Corporation (the "Corporation") is a Tennessee corporation incorporated in 1968 and registered as a bank holding company under the Bank Holding Company Act of 1956, as amended. At December 31, 1993, the Corporation had total assets of $9.6 billion and ranked first in terms of total assets among Tennessee-headquartered bank holding companies and ranked in the top 65 nationally.

Through its principal subsidiary, First Tennessee Bank National Association (the "Bank"), and its other banking and banking-related subsidiaries, the Corporation provides a broad range of financial services. The Corporation derives substantially all of its consolidated total pre-tax operating income and consolidated revenues from the banking business. As a bank holding company, the Corporation coordinates the financial resources of the consolidated enterprise and maintains systems of financial, operational and administrative control that allows coordination of selected policies and activities. The Corporation assesses the Bank and its subsidiaries for services they receive on a formula basis it believes to be reasonable.

The Bank is a national banking association with principal offices in Memphis, Tennessee. It received its charter in 1864 and operates primarily on a regional basis. During 1993 it generated gross revenue of approximately $841 million and contributed 96.1% of consolidated net income from continuing operations. At December 31, 1993, the Bank had $9.4 billion in total assets, $7.0 billion in total deposits, and $5.8 billion in net loans. Within the State of Tennessee on December 31, 1993, it ranked first among banks in terms of total assets and deposits. Nationally, it ranked in the top 100 in terms of total assets and deposits as of December 31, 1993. On December 31, 1993, the Corporation's subsidiary banks had 214 banking locations in 20 Tennessee counties, including all of the major metropolitan areas of the state, and 4 banking locations in Mississippi.

An element of the Corporation's business strategy is to seek acquisitions that would enhance long-term shareholder value. The Corporation has an acquisitions department charged with this responsibility which is

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the report of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of First Tennessee National Corporation and subsidiaries as of December 31, 1993 and 1992, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1993, in conformity with generally accepted accounting principles.

As discussed in Note 14 to the consolidated financial statements, effective January 1, 1993, the Company changed its method of accounting for postretirement benefits other than pensions.

Memphis, Tennessee,
January 18, 1994

Arthur Andersen & Co.

<PAGE> 43

MANAGEMENT DISCUSSION & ANALYSIS

CONSOLIDATED FINANCIAL REVIEW

First Tennessee National Corporation (FTNC) is the largest Tennessee-based bank holding company. FTNC offers a wide range of financial services to consumers, businesses, financial institutions, and governments.

On October 1, 1993, First Tennessee Bank National Association (FTBNA), a subsidiary of FTNC, completed the acquisition of Maryland National Mortgage Corporation (MNMC) for approximately $114 million in cash. The total purchase price included value for purchased mortgage servicing rights and approximately $41 million for tangible net assets. MNMC, which became a subsidiary of FTBNA at the close of the transaction, was the wholly owned mortgage banking subsidiary of MNC Financial, Inc., a Baltimore-based bank holding company. MNMC and its subsidiary, Atlantic Coast Mortgage Company, originate and service residential mortgage loans through a network of 31 offices primarily in Maryland, Virginia, Pennsylvania, Delaware, New Jersey, and Colorado. In 1993, MNMC originated $3.1 billion in mortgage loans and at year-end serviced $4.4 billion in mortgage loans. MNMC will continue to operate from its current headquarters in Baltimore.

On December 31, 1993, FTNC completed its acquisition of New South Bancorp (NSB) by merging into FTNC, NSB, the parent of New South Bank which has offices in Southaven, Como, and Crenshaw, Mississippi. Simultaneously, New South Bank merged into First Tennessee Bank National Association Mississippi. At December 31, 1993, NSB had $35 million in total assets, $32 million in total deposits, and $3 million in capital.

On January 4, 1994, FTNC completed the acquisition of SNMC Management Corporation (SNMC) for approximately $68 million in FTNC common stock. SNMC, which became a subsidiary of FTBNA at the close of the transaction, is the parent of Sunbelt National Mortgage Corporation (Sunbelt), both of which are headquartered in Dallas. Sunbelt originates and services residential mortgage

loans primarily through a network of 40 offices in 14 states, with most of the originations occurring in the Southwest, Florida, and North Carolina. In 1993, Sunbelt originated $3.3 billion in mortgage loans and at year-end serviced $6.1 billion in mortgage loans. SNMC will continue to operate from its current headquarters in Dallas.

On March 1, 1994, Highland Capital Management Corp. (HCMC) merged with First Tennessee Investment Management, Inc. (FTIM), a wholly owned subsidiary of FTNC. The combined organization became a subsidiary of FTNC with the name Highland Capital Management Corp. and manages $2.6 billion in fixed income and equity securities.

On July 28, 1993, FTNC and Cleveland Bank and Trust Company (CBT) of Cleveland, Tennessee, announced the execution of a definitive agreement providing for the acquisition of CBT by FTNC. CBT had $227 million in assets, $200 million in deposits, and $23 million in capital at December 31, 1993. This transaction is expected to close in the first quarter of 1994.

In addition to expanding the core banking franchise in Tennessee markets, FTNC's strategy is to extend its market presence into attractive markets outside of Tennessee. Further expansion of other key business lines, such as the bond division, mortgage banking, credit card, merchant credit card processing, check processing, and trust services is expected to occur as appropriate opportunities are identified.

This section provides a narrative discussion and analysis intended to cover the significant factors that affected FTNC's financial condition and results of operations for the last three years. The consolidated financial statements and accompanying notes should be read in conjunction with this discussion and the tables and graphs which are set forth immediately following this Consolidated Financial Review.

FINANCIAL PERFORMANCE SUMMARY

FTNC reported record earnings for 1993. Net income per share for 1993 was $4.26 compared to $3.19 per share for 1992 and $2.63 per share for 1991. Net income totaled $120.7 million in 1993 versus $89.2 million in 1992 and $73.0 million in 1991.

<PAGE> 44

Two key measures of profitability in the banking industry are return on average equity (ROE) and return on average assets (ROA). ROE was 18.99 percent in 1993 versus 15.44 percent in 1992 and 14.14 percent in 1991. ROA rose to 1.35 percent in 1993 from 1.07 percent in 1992 and .95 percent in 1991.

The 1992 earnings were impacted by the one-time acquisition expenses of Home Financial Corporation (HFC) during the fourth quarter. These expenses reduced earnings per share by 56 cents, and after adjusting for this impact, the return on equity would have been 18.14 percent and the return on assets would have been 1.26 percent.

In addition, higher net interest income (NII), a lower provision for loan losses, and strong growth in noninterest income contributed to the improved profitability. Increased noninterest expense partially offset the improvement in earnings. Supporting the growth in NII was a higher level of average earning assets. The net interest margin (NIM) remained stable at 4.35 percent in 1993 compared to 4.37 percent in 1992. The decline in the loan loss provision reflected the continued improvement in asset quality which has occurred over the last three years. Noninterest income provided a significant contribution to 1993 earnings, reaching approximately 44 percent of total revenues. Growth in noninterest income was led by a substantial increase in mortgage banking revenues, primarily related to the MNMC acquisition followed

RTC Reports

CARTERET SAVINGS BANK FA

# MEMORANDUM

**DATE:** February 18, 1994

**TO:** Distribution

**FROM:** Tanya L. Robertshaw TLR

**SUBJECT:** Monthly Conservatorship Reports

Please find attached a copy of the January Conservatorship Asset Summary Reports. If you have any questions, please contact me at extension 6006.

Distribution: L. Redwanowski
E. Griffin
D. DiGiondomenico
G. Scott
J. Mindnich
E. McGuire
J. Santos
R. Ennis
L. Gomez
D. Olsen
G. Cannarozzi
K. Miller
G. Radell

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021607



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM028 0146

App. 499

Executive Summary
Carteret Federal Savings Bank
January 31, 1994



## Stratification of Assets Remaining (Report M48A)

### Change for Month of January 1994:

At January 31, 1994 Carteret had 115,552 loan and real estate owned ("REO") assets ("assets") with a book value of $1,915,235,000, a decrease of 2,699 assets and $20,219,000 in book value from 118,251 assets with a book value of $1,935,454,000 at December 31, 1993.

The number of Imperial Premium Finance (IPF) loans, an insurance premium finance subsidiary, decreased again this month to 80,126 loans. However, the book value increased to $359,022,000. This resulted in a decrease of 1,948 loans and an increase of $818,000 in book value for the month, from 82,074 loans with a book value of $358,204,000 at December 31, 1993. Exclusive of IPF, Carteret's assets decreased by 751 from 36,177 to 35,426 with a corresponding book value decrease of $21,037,000 from $1,577,250,000 at December 31, 1993 to $1,556,213,000 at January 31, 1994.

One commercial mortgage loan for $1,950,000 was recorded in the Permanent Non-Residential portfolio (line 260) for a RTC-VFO seller-financing sale of a subsidiary-owned REO property. This loan is being serviced by 1st Fidelity Mtg. Corp. The note is held by RTC as Conservator/ Receiver for CFSB.

The institution also serviced 76,609 loans and REO for others with a book value of $4,214,379,000 at January 31, 1994. This is a decrease of 2,096 assets and a decrease of $144,616,000 book value from 78,705 assets with a book value of $4,358,995,000 at December 31, 1993.

Changes for the month are summarized on the attached Exhibit 1.

### Change since Date of Conservatorship (DOC) - December 4, 1992:

Since intervention on December 4, 1992, the number of assets has increased 20,205 from 95,347 to 115,552 at January 31, 1994. Assets have downsized $836,430,000 from a high of $2,751,665,000 to $1,915,235,000 at January 31, 1994. The increase in the number of loans is due to Carteret honoring a commitment to purchase loans from IPF.

Exclusive of IPF, the number of assets has decreased by 14,994 from 50,420 at DOC to 35,426 at January 31, 1994 and the book value of assets has decreased $889,113,000 from $2,445,326,000 at DOC to $1,556,213,000 at January 31, 1994.

In addition to the above, the book value of assets serviced for

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021608

others downsized $2,172,093,000 from $6,386,472,000 to $4,214,379,000. The number of assets serviced for others decreased 35,525 from 112,134 at DOC to 76,609 at January 31, 1994.

Changes since DOC are also summarized on the attached Exhibits 1 and 2.

**SAMA/SAMDA - SALES Initiative Stratification (Report H48B)* & Other Asset Activity (Exhibit 3)**

**Loan Servicing Operation**
The marketing package for the Clearwater Loan Servicing Operation is being prepared by Reserve Financial. The sales document and offering memorandum are to be completed by mid-February and sent out by the end of February. This sale includes the servicing rights for 72,920 1-4 family mortgage loans, totalling approximately $4 billion, and REO Claims Receivables in the amount of $27.8 million. The sale is scheduled for May, 1994.

**Clearwater Fallout**
In preparation for the sale of the Clearwater Loan Servicing Operation, the following portfolios have been identified as "fallout." The servicing and/or disposition options have been reviewed by Valley Forge RTC (VFO) and Carteret personnel. Knutson Mortgage Corporation was awarded the servicing contract by VFO Contracts Department. The servicing transfer will consist of two separate transfers. The performing 1-4 mortgage loans, including those designated for the Dryades Resolution sale and the Supplemental Loan Pool will be transferred on March 1, as will the Citimae SWAP loans, also. This first transfer encompasses approximately 82% of the "Clearwater Fallout." The remaining portfolios will be transferred on April 1. These items are identified within exhibit 3.

**-Performing Residential**
Performing 1-4 Family mortgages were previously scheduled for securitization. However, a freeze has been placed on sales of performing assets in conservatorship. Exclusive of the Dryades and the Supplemental loan pools, Carteret has 5,871 performing 1-4 loans, with a book value of $550,260,538, to be offered to the acquirer(s).

**-Home Unity/Chase Resolution Residential Loan Sale**
The sale of 1,056 1-4 family mortgages for the Home Unity/Chase Resolution closed on December 22, 1993. As of January 31, Carteret was interim servicing 1,029 loans, with a book value of $93,688,218. The sale was segregated into two pools. Servicing of the first pool was transferred to Commercial Federal on February 1,

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021609



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM028 0148
App. 501

1994. Servicing of the second pool will be transferred to Knutson on April 1, if not transferred to United Bank of Philadelphia prior.

-Dryades Resolution/Residential Loan Sale
Carteret has prepared approximately 912 1-4 family mortgages, with a book value of $64,304,325, of which an estimated $40 million will be used to facilitate the Dryades Resolution sale. Due diligence was performed by Real Estate Recovery/ Nationwide Mortgage in January. There is no closing date scheduled at this time.

-Non-Performing Residential
To date, 102 loans with a book value of $13,002,062 have been tagged for the National Non-Performing 1-4 Auction IV to be held in April, 1994 (*Included in M48B, line 250,253). An additional 325 loans, with a book value of $28,441,904, are not eligible for Auction IV and remain to be marketed as non-performing.

-Citimae SWAP Loans\CFSB Certificates
Carteret received a termination agreement from Citibank, which would allow CFSB to unwind 699 Citimae SWAP loans, with a book value of $57,572,470. RTC legal is presently reviewing and revising the agreement. Carteret also owns 7 other certificates, securitized by 494 loans, with a book value of $23,697,927. The legal department will review the procedures necessary to collapse these securitizations, also.

-Custer Federal WRAP Loans
These 4 loans, with a book value of $113,649, were excluded from the Smith Barney Package due to the fact that they are commercial loans. The case to unwind these loans will be presented to CFSB CRC in February. Once approved, the servicing will be transferred to Custer Federal.

-John Alden Commercial Loans
These 2 loans, with a book value of $1,605,326, were also excluded from the Smith Barney Package due to the fact that they are commercial loans. The case to unwind these loans will be presented to CFSB CRC in February. Once approved, the servicing will be transferred to John Alden.

-CFSB-Owned Participation Loans
The servicing for 127 CFSB-Owned participation loans, with a book value of $3,051,449, will be included in the April 1 transfer to Knutson, unless the participants pay off the Carteret portion and assume servicing.

FHLMC Participations
The sale of approximately 2,974 residential mortgages, with a book

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021610

value of $3,545,976, to FHLMC, in which Carteret holds only minimum participations, is currently in process. The servicing of these loans was transferred to Wendover in December. Sale is scheduled to close March, 1994.

GDV Financial Corporation
The GDV Financial Corporation portfolio, made up of 1,040 loans with a book value of $52,503,337 was being managed by SWAT. Subsequent to January 31, SWAT released this portfolio. Carteret is currently in the process of obtaining an estimated valuation for the portfolio, which is expected to be completed by the end of February. Once a valuation has been determined, a meeting with counsel will be scheduled to determine disposition.
The servicing of these loans was transferred to Wendover in December, with the remaining LSBO portfolios.

Western Federal
The servicing agreement for the Western Federal Multi-family mortgage portfolio is being restructured by SWAT. This portfolio consists of 176 loans, with a book value of $101,955,858. Disposition has not yet been determined.

Midland Compromises
Carteret currently has 24 commercial assets, with a book value of approximately $87,627,105, where the borrower has been offered a discounted pay-off by Midland Loan Services.

Weingarten
The Weingarten relationship consists of 6 loans with a book value of $30,784,548. SWAT is requiring Weingarten to pay off the $1,500,000 line of credit and the $80,000 loan to Ron Lichtenberger before they will negotiate a final settlement on the remaining portfolio. (*Included in M48B, lines 240,250,253,260,265)

HLT's
Carteret has 3 HLT loans, with a book value of $10,897,376, which remain scheduled for the National Sales Center auction, tentatively scheduled for March. Southern Bakeries was previously scheduled for this sale, but has recently been excluded due to the company's unwillingness to provide due diligence information to prospective buyers. This sale is being coordinated by Steve Guy in Washington. (*Included in M48B, line 300)

Imperial Premium Finance (IPF)
The IPF portfolio (unsecured commercial loans to finance insurance premiums) and subsidiary, made up of 80,126 loans with a book value of $359,022,000, was under agreement at January 31, 1994. This sale was being coordinated by James Powers of the Valley Forge RTC office. Subsequent to January 31, the sales agreement was

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0021611

rescinded. (*Included in M48B, line 303)

JDC Program
To date, Carteret has 125 consumer charge-offs for a book value of $537,048 which have been reported to the Valley Forge RTC office for inclusion in the Judgements, Deficiencies, and Charge-offs (JDC) Program. We will continue to review and build our inventory.

REO
An additional 12 residential REO assets were shipped to Verex Mortgage Corporation. To date, 278 residential and commercial real estate owned assets with a book value of $43,689,000 have been sent to SAMA/SAMDA contractors. Exhibit 4 contains a reconciliation between the M48A and M48B for real estate owned assets. Of the 13 residential not currently at a SAMDA, 5 are new (less than 2 mths); the remaining 8 involve title problems or difficulty in obtaining documents from the servicer. Included in the 11 commercial are 10 assets serviced and marketed by Western Federal and one which is scheduled to close in February.

Subsidiaries
Carteret had 85 subsidiaries at date of conservatorship. As of January 31, 1994, 24 have been dissolved or sold, and 27 mergers have been completed.

RPC/Mitchell-Titus manages 19 of the 34 remaining subsidiaries, of which 6 continue to hold real properties (REO). Bridge Asset Management manages 5 subsidiaries which are related to Imperial Premium Finance (see IPF above). RTC Valley Forge Office manages the remaining 10, including 5 that have been approved for dissolution. DRC is voting on 2 additional dissolutions and 1 merger.

Reconciliation Between TFR/CADSTAR and Conservatorship Asset Summary Report (M48A)

Reclassifications for in-substance foreclosures, totalling $42,048,000, were made this month in mortgage loans and real estate.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0021612

To: J. Paul Ramey@FRB@RTCDC
Cc:
Bcc:
From: James R Hambric@EXEC@RTCVF
Subject:
Date: Tuesday, August 16, 1994 15:34:34 EDT
Attach:
Certify: Y
Forwarded by: J. Paul Ramey@FRB@RTCDC

---

Forwarded to: James R Hambric@EXEC@RTCVF
cc:
Forwarded date: Tuesday, August 16, 1994 16:21:23 EDT
Comments by: J. Paul Ramey@FRB@RTCDC
Comments:

Thanks for your support, as usual.

There's no doubt in our mind that we will get a better premium by delaying. The delay was necessitated by a restructure of the transaction whereby we will allow minority bidders to bid on the northern and southern portions as if they were independent franchises, and offer the regular minority preferences. There was a real problem with minority groups getting together or getting with a non-minority group to put in a bid on the entire franchise. We felt that, if someone had to take the entire thing, the northern bidders would discount their bid because they didn't really want the southern part, vice versa. No matter what we do, we'll catch hell. We are having complaints from those that want to go ahead (because they don't want the competition to have time to get their act together) and we caught hell prior to the delay because of the restructure and the complainers said they didn't have time to get their act together. Some things never change.

By the way, I did not have a message that you called and there was no message on my audix. Maybe it's in this stack of sh.. on my desk.

Bonnie Tyler wears combat boots.

------------------------- [Original Message] -------------------------

I called you this am but no returned call, you never call anymore!

I guess the delay in Carteret will result in a much higher premium to offset the staffing cost due to delay! Are we getting a lot of intrest? Does if have a chance as a whole bank purchase by minority?

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER
C-AM-A-0014370

# TCB Holdings, Inc.

420 Lexington Avenue, Suite 300 • New York, NY 10170 • (212) 297-6200

*Glen R. Sergeon*
*CEO*

August 24, 1994

**Sent via facsimile**

Mr. John E. Ryan
Deputy Chief Executive Officer
Resolution Trust Corporation
801 Seventeenth Street, N.W.
Washington, D.C. 20434

Dear Jack:

As we approach tomorrow's bidding on Carteret, I'd like to add my thoughts to the many which you must have already received on why the minority preference in acquisition effort has not and is not likely to yield the desired results.

The motive of the Congressional Black Caucus and others who were involved in drafting and passage of the preference provisions of the RTC Completion Act was to make it possible and practical for minorities to compete for entry into the financial services industry. As you know, the barriers to entry are extremely high and despite many changes in the competitive and regulatory landscape, the banking industry continues with only token minority participation. It was hoped that these provisions would level the playing field.

Unfortunately, the marketplace and the majority banks have raised the barrier again. Because of the dearth of capital in minority communities, minority acquirers must go to the traditional (Wall Street) sources of funding and offer "alternative investment" rates of return to attract investors. All knowledgeable market participants, including the majority bidders know the required rates of return and the maximum associated deposit premiums that can, therefore, be paid by a de novo.

Bidding for non-minority acquirers is as much a strategic event as it is economic and in some cases it is more strategic than economic. The non-minority bidders are motivated by a long term goal to reduce competition. Toward that end, they are willing to pay above today's market. They do this by stepping in front of the minority competitors who

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0125162