are constrained by investor driven internal rate of return considerations. The strategic approach is only possible for established market competitors. This is a fact that has been proven in recent minority eligible resolutions and I fear it will prove true here also.

I have raised in excess of $100 million of equity capital. If there were sufficient returns available, I could raise considerably more. But every additional dollar of capital represents a dilution of returns unacceptable in the investment community. My equity capital, regulatory approvals and management team are in place; yet the odds of acquisition appear nearly impossible.*

Consequently, in addition to two standard bids, I intend to submit two non-conventional bids which I trust you will consider. The first is a bid where we assume the use of a portion of the Interim Capital Assistance toward the purchase price, the second is a formula based bid. These bids are meant to provide RTC with the means to creatively and affirmatively respond to the two Congressional mandates: to achieve the "least cost" and to "prefer" a minority bid over all other bids.

Since you have displayed leadership and commitment to a fair promulgation of rules for this program, I appeal to you to give positive consideration to my non-conventional bidding approach.

The sale of Carteret is the last opportunity to introduce substantive minority ownership into the banking industry. It is a goal of the Congress, the Administration and, I believe, you to make every effort to realize that opportunity. It's now or never.

*A similar situation occurred recently with the FCC auctions which prompted that agency to revise the minority program to better assure meaningful minority participation.

Sincerely,

Glen R. Sergeon

Glen R. Sergeon

cc: Congressman Floyd H. Flake
Rosemary Shaw
Johnnie B. Booker

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0125163

CARTERET SAVINGS BANK FA

MEMORANDUM

DATE: October 27, 1994

TO: Distribution

FROM: Tanya L. Robertshaw

SUBJECT: Monthly Conservatorship Reports

Please find attached a copy of the September Conservatorship Asset Summary Reports. If you have any questions, please contact me at extension 6006.

Distribution:
L. Redwanowski
C. McPhail
E. Griffin
D. DiGiondomenico
G. Scott
J. Mindnich
J. Tyburski
J. Santos
R. Ennis
L. Gomez
K. Duckworth
G. Cannarozzi
S. Croghan
R. Beck
C. Verhaegen
B. Campbell
M. Zubicki



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER AM5242 0250

App. 508

Stratification of Assets Remaining (Report M48A)

Change for Month of September 1994:

At September 30, 1994 Carteret had 102,491 loan and real estate owned ("REO") assets ("assets") with a book value of $1,641,400,000, a decrease of 2,494 assets and $120,767,000 in book value from 104,985 assets with a book value of $1,762,167,000 at August 31, 1994.

The number of Imperial Premium Finance (IPF) loans, an insurance premium finance subsidiary, decreased again this month to 75,762 loans with a book value of $374,657,000. This is a decrease of 1,259 loans and $6,124,000 in book value, from 77,021 loans for $380,781,000 at August 31, 1994. Exclusive of IPF, Carteret's assets decreased by 1,235 from 27,964 to 26,729, with a corresponding book value decrease of $114,643,000 from $1,381,386,000 at August 31, 1994 to $1,266,743,000 at September 30, 1994.

Two major transactions account for the largest decrease in volume for the month. The first transaction, LSBO Bulk Sale #4, included approximately 665 residential loans with a book value of $62,849,000. This resulted in proceeds to Carteret in the amount of $59,747,000. The second transaction, RTC 1994-S5VF Securitization, included 31 multi-family and commercial loans with a book value of $30,827,000. This transaction closed September 14 and funded September 22, resulting in gross proceeds to Carteret in the amount of $5,403,000, a Class B Certificate for $5,624,000 and Bond for $10,840,000.

As of September 30, 1994, Carteret had 94,193 assets for $1,561,967,000 serviced by others. The only assets which remain in-house are one Shared National Credit, of which Carteret's interest is $5,752,000, on line 300 (LSFO Participation) and is scheduled for the national HLT auction, and approximately $58,845,000 in consumer loans. Of the consumer loans, the closed-end are scheduled for an upcoming sales initiative being coordinated by the Valley Forge RTC office. The open-end, in order to continue operating post-resolution, are scheduled for sale to the core cluster acquirer. This is being coordinated with Sharon Dunn Yore of Resolutions, Washington, D.C.

Exhibit 3 provides a stratification of Carteret assets by servicer. Assets are predominantly serviced by RTC designated servicers, or a master servicer, in the case of Wendover.

As of September 30, 1994, the institution serviced 9 loans for others, with a book value of $9,250,000. This is an increase of 2

assets, but a decrease of $176,000 in book value, from 7 assets with a book value of $9,426,000 at August 31, 1994. The only remaining LSFO assets are 1 HLT participation and 8 REO with claims in process, which were not included in the Clearwater Servicing Operation sale.

Changes for the month are summarized on the attached Exhibit 1.

**Change since Date of Conservatorship (DOC) - December 4, 1992:**

Since intervention on December 4, 1992, the number of assets has increased 7,144 from 95,347 to 102,491 at September 30, 1994. However, assets have downsized $1,110,265,000 in book value, from $2,751,665,000 at DOC to $1,641,400,000 at September 30, 1994. The increase in the number of loans is due to Carteret honoring a commitment made prior to DOC to purchase loans from IPF.

Exclusive of IPF, the number of assets has decreased by 23,691 from 50,420 at DOC to 26,729 at September 30, 1994, while the book value of assets has decreased $1,178,583,000 from $2,445,326,000 at DOC to $1,266,743,000 at September 30, 1994.

In addition to the above, the book value of assets serviced for others has downsized $6,377,222,000 from $6,386,472,000 to $9,250,000. The number of assets serviced for others has decreased 112,125 from 112,134 at DOC to 9 at September 30, 1994.

Changes since DOC are also summarized on the attached Exhibits 1 and 2.

**SAMA/SAMDA - SALES Initiative Stratification (Report M48B)* & Other Asset Activity (Exhibit 4)**

**Loan Servicing Operation**

The final settlement on the Clearwater Mortgage Servicing Operation was made as of September 30, 1994. Chase received all necessary investor approvals, with the exception of one denial, and servicing was transferred on October 1, 1994. Carteret will continue to work with Chase under the "Transitional Services Agreement" to complete tasks necessary for Carteret's resolution and a uniform servicing transfer.

**Performing Residential Mortgage Loans**

The performing residential mortgage portfolio has been designated by Washington to be offered to minority acquirers of RTC-controlled institutions. Exclusive of the Dryades and the Supplemental loan pools, Carteret has approximately 5,794 performing residential

loans, with a book value of $525,295,000, available for minority acquirer(s). Kenneth Leventhal & Company and subcontractor, Data Management Network, completed due diligence on the bulk of this portfolio in August.

Dryades Resolution/Residential Loan Sale
Carteret has 830 performing residential mortgages, with a book value of approximately $56,841,000, which were due diligenced by Real Estate Recovery/Nationwide Mortgage in January. An estimated $40 million of these loans will be used to facilitate the Dryades Resolution sale. Washington continues the process of pricing the loans. A January closing date is anticipated.

Supplemental Residential Loan Pool
Due diligence was performed on this pool of residential mortgages by Real Estate Recovery/Nationwide Mortgage in January. The pool consists of 966 loans, with a book value of $78,181,000, also designated for minority acquirers of RTC-controlled institutions. These loans are located primarily in the state of New Jersey, with some also located in Pennsylvania, Delaware, Maryland, and New York.

To date, approximately 331 loans for $26,522,000 have been allocated to the Polifly minority sale. Due diligence has been completed by City National Bank of New Jersey for the Polifly acquirer. The loans are being priced again by Washington. A December closing is anticipated.

National Non-Performing Auction V
Auction V was held September 29-30 in Kansas City. Funding is anticipated in early November. Carteret is awaiting the final loan list. As of the last update, Carteret had 146 residential loans for $12,432,000 designated for the auction. (*Included in M48B, line 250,253).

National Non-Performing Auction VI
Due diligence is in process for those loans designated for Auction VI. Additional loans have been tagged for the auction, increasing Carteret's contribution to 89 residential loans, with a book value of $7,497,000. The auction is tentatively scheduled for December 13-15, 1994. (*Included in M48B, line 250,253)

Remaining Non-Performing Residential
An additional 118 loans, with a book value of $10,204,000, remain to be marketed as non-performing. It is anticipated that a number of these loans will become eligible for non-performing auctions.

CFSB-Owned Certificates
Carteret owns 7 certificates, securitized by 454 loans, with a

gross book value of $21,623,000. The legal department is reviewing the procedures necessary to collapse these securitizations.

LSBO Bulk Sales
The RTC Valley Forge office is in the process of selling all Carteret wholly-owned LSBO portfolios. The LSBO portfolios have been segregated into 4 transactions, Bulk Sales #4, #5, #6 and #7.

In September, LSBO Bulk Sale #4 commenced with the sale of Carteret's 4 largest LSBO portfolios, including approximately 1,330 loans (reported as 665 loans by Wendover*) for $62,849,000. The closings on the four portfolios took place September 19-30. Carteret received $59,747,000 in proceeds. We are currently awaiting final closing information to apply the funds.

The bid date for Bulk Sale #5 was September 29, 1994. It consisted of approximately 1,235 Carteret loans for $79,137,000. Closings were scheduled October 7-26. Carteret is awaiting final funds and closing information.

A number of small LSBO portfolios originally scheduled for LSBO Bulk Sale #5, were moved to Bulk Sale #6. This includes approximately 148 loans for $2,815,000. The bid date was scheduled for October 20, with closings scheduled November 1-8.

Hanover Capital has been approved as loan sale adviser and due diligence firm for Bulk Sale #7. The GDV portfolio, made up of approximately 1,010 loans for $50,318,000, accounts for the largest volume in Bulk Sale #7. Also included will be a number of smaller portfolios which have fallen out of previous sales. To date, Carteret has scheduled a total of 1,227 loans for $59,263,000 (including GDV). Bulk Sale #7 is tentatively scheduled for December.

(*All LSBO residential loans included in M48B, line 250,253)

LSBO Participated Loans
Carteret has minority interests in participations of 7,356 loans master serviced by Wendover. The gross principal balance at September 30, 1994 was $100,533,000, for which Carteret's interest is only $4,400,000. Cases are being prepared for the funding of "Guaranteed Remittances" which will be required post-resolution. Valley Forge Legal personnel are reviewing agreements. The Asset Marketing Department is reviewing possible disposition strategies.

Western Federal
Negotiations continue between Carteret and Western Federal regarding the proposed SWAT action plan to be implemented by the Alternate Dispute Resolution Group. Chris Yates of Valley Forge

SWAT is acting as arbitrator.

The portfolio consists of 144 multi-family loans, with a book value of $79,849,000. The majority of the portfolio, 125 loans for approximately $63,300,000, was included in the 1994-C1 Securitization. This securitization closed September 29, but did not fund until October 6. Carteret is awaiting the final closing memorandum and loan list.

The remainder of the portfolio has been tagged for the upcoming 1994-N2, 1994-N3, or 1995-C1. Carteret has been advised by Valley Forge that fallout loans will be tagged for other upcoming initiatives. (*All included in M48B, line 256)

**Commercial Securitizations**
As of September 30, 1994, Carteret had 51 commercial loans (excluding the Western Federal portfolio) for approximately $98,883,000 tagged for upcoming securitizations. They are allocated as follows: 39 loans for $73,398,000 for 1994-C1, which funded on Ocober 6; 1 loan for $5,060,000 for 1994-N2, scheduled for December 6; 1 loan for $310,000 for 1994-C2, scheduled for November 22; and 10 loans for $20,115,000 for 1994-N3, scheduled for December 20. (*Included in M48B, lines 250,253,256,260,265)

**Non-Performing Auction V**
In addition to the 146 residential loans noted above, 8 commercial loans for $469,000 were included in the Non-performing Auction V held in Kansas City on September 29-30. (*Included in M48B, line 260,265)

**RTC Field Initiatives**
Carteret has 6 additional commercial loans for $19,892,000 which have been designated for various RTC initiatives other than securitizations and non-performing auctions. Disposition dates are yet to be determined. (*Included in M48B, lines 260,265,and 300)

**Midland Compromises**
Excluding assets presently designated for securitization or other initiatives, Carteret has 13 commercial assets, with a book value of $67,581,000, which are pending compromised payoffs offered by Midland Loan Services. The $20.7 million compromised payoff of the Sand Key Relationship loans, book value of $22.8 million, closed in September (will be reflected in October).

**Weingarten**
The Weingarten global settlement was executed in August. As a result, 3 assets were paid off. The fourth loan in the settlement, book value $867,000, was also later paid off and will be reflected in October's report. It is anticipated that Carteret's interest in

the remaining Woodbridge asset, book value of $19,524,000, will be tagged for an upcoming sales initiative. (*Both included in M48B, lines 260 & 265)

**Remaining Commercial Portfolio**
Carteret has been advised by Valley Forge that all commercial assets will be tagged for one of the upcoming commercial securitizations or sales initiatives. Carteret has 22 commercial loans for approximately $26,666,000 yet to be tagged. These loans are excluded from the M48B sales initiatives, pending further notification.

**HLT National Auction**
The National HLT Auction remains on hold, as RTC continues to contract for a new loan sale adviser. Carteret has 4 loans, with a book value of $17,923,000, scheduled for the auction. Carteret is the lead participant for one HLT loan, requiring continued remittances to other investors post-resolution. Two of the three remaining HLT loans, for which Carteret is a participant, require funding of draws on revolving credit lines. Cases were approved by CFSB CRC for continued funding of the 3 HLTs in receivership and have been forwarded to Valley Forge RTC for approval. The fourth HLT does not require funding. (*Included in M48B, line 300)

**Imperial Premium Finance (IPF)**
The Asset Sales Agreement for the purchase of the IPF portfolio (unsecured commercial loans to finance insurance premiums) and subsidiary was signed by SunAmerica on May 18, 1994. The portfolio is made up of 75,762 loans, with a book value of $374,657,000. The sale is being coordinated by James Powers of the Valley Forge RTC office. The sale of the portfolio and the equity of the company is expected to generate approximately $450,000,000 gross proceeds. The buyer is awaiting licensing from four states. The sale is expected to close in November. (*Included in M48B, line 303)

**Consumer Loan Sale**
Carteret's consumer closed-end loan portfolio has been reserved for sale by the Valley Forge Asset Marketing Department. To date, this includes approximately 1,383 loans for $21,180,000. RTC due diligence was completed by Asset Strategies in August and marketing has begun. The bid date is tentatively set for December 13. The Consumer Loan Department will continue to service these loans post-resolution through the sale date and deconversion. (*Included in M48B, lines 323,326,330)

**Revolving Consumer Loans**
As of September 30, 1994, Carteret had 4,068 revolving loans with a balance of $35,647,000. Due to Carteret's inability to fund in receivership, these loans are being offered for sale to the

acquirer of the core cluster (Parsippany Branch).

Loans Secured by Deposit/Overdraft Checking
Loans tied to deposit liability accounts will pass to the acquirer(s). To date, Carteret has approximately 2,846 loans, with a book value of 2,018,000, which are tied to deposits.

JDC Program
The Valley Forge Office is currently coordinating JDC Transfer #7. This transfer is to include the bulk of Carteret's JDC inventory, including approximately 1,313 charge-offs for $13,704,000. Excluding charge-offs previously purchased, Carteret has a total of 1,355 with a book value of $13,803,000 which have been sent to Valley Forge. We continue to build our inventory, as this is an on-going program.

REO
To date, a total of 295 residential and commercial real estate owned assets with a book value of $45,282,000 have been sent to SAMA/SAMDA contractors. Exhibit 5 contains a reconciliation between the M48A and M48B for real estate owned assets. As of September 30, 1994, Carteret has only 5 commercial assets which are not under a SAMDA/SAMA contract. These assets are serviced and marketed by Western Federal. Of these, two have been sold and the remaining three are under contract.

Subsidiaries
There were no new mergers or dissolutions to report for September. To date, 26 of the original 85 subsidiaries have been dissolved or sold, and 28 have been merged into others. RPC/Mitchell-Titus manages 21 of the remaining 31 subsidiaries. Bridge Asset Management manages 2 subsidiaries, which are in the process of being sold (see "Imperial Premium Finance" above). RTC Valley Forge manages the remaining 8 subsidiaries, including 6 that have been approved for dissolution.

Reconciliation Between TFR/CADSTAR and Conservatorship Asset Summary Report (M48A)

No reclassifications were made this month.

INSTITUTION NAME: CARTERET FEDERAL SAVINGS BANK
FIN: 8602
DATE: October 17, 1994
PREPARED BY: Tanya L. Robertshaw
PHONE #: (201) 263-3011 ext. 6006

# CONSERVATORSHIPS ASSET SUMMARY REPORTS – Report Number M48 A
## STRATIFICATION OF ASSETS REMAINING
## FOR MONTH ENDED: September 30, 1994
(In Thousands [000])

PAGE 1

| | [redacted] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MORTGAGE LOANS (23) | | | | | | | | | | | | |
| 1–4 Dwelling Construction (230) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5+ Dwelling Construction (235) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nonres Construction (240) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1–4 Dwelling Units (250,253) | 0 | 0 | 197 | 714 | 17,915 | 847,671 | 0 | 0 | 0 | 0 | 18,112 | 848,385 |
| 5+ Dwelling Units (256) | 0 | 0 | 0 | 0 | 171 | 154,775 | 0 | 0 | 0 | 0 | 171 | 154,775 |
| Perm Non-Res., Land (260,265) | 0 | 0 | 0 | 0 | 65 | 153,271 | 0 | 0 | 0 | 0 | 65 | 153,271 |
| All Other Mortgage Loans (272,275) | 0 | 0 | 0 | 0 | 0 | 10,374 | 0 | 0 | 0 | 0 | 0 | 10,374 |
| (LIP, Unamort Yield Adjt) (280,281) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 197 | 714 | 18,151 | 1,166,091 | 0 | 0 | 0 | 0 | 18,348 | 1,166,805 |
| NONMORTGAGE LOANS (30) | | | | | | | | | | | | |
| Commercial Loans (32) | | | | | | | | | | | | |
| Secured, Other than Mortgages (300) | 1 | 8,630 | 1 | 5,732 | 7 | 14,210 | 0 | 0 | 0 | 0 | 8 | 19,962 |
| Unsecured (303) | 0 | 0 | 0 | 0 | 75,764 | 377,920 | 0 | 0 | 0 | 0 | 75,764 | 377,920 |
| Financing Leases (306) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUBTOTAL COMMERCIAL LOANS | 1 | 8,630 | 1 | 5,732 | 75,771 | 392,130 | 0 | 0 | 0 | 0 | 75,772 | 397,882 |
| Consumer (Closed End) (34) | | | | | | | | | | | | |
| Loans on Deposit (310) | 0 | 0 | 0 | 0 | 0 | 0 | 228 | 1,201 | 0 | 0 | 228 | 1,201 |
| Home Improvement Loans (316) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Education Loans (320) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Auto Loans (323) | 0 | 0 | 0 | 0 | 0 | 0 | 127 | 321 | 0 | 0 | 127 | 321 |
| Mobile Home Loans (326) | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 8 | 0 | 0 | 2 | 8 |
| Other, Including Leases (330) | 0 | 0 | 0 | 0 | 0 | 0 | 1,254 | 20,851 | 0 | 0 | 1,254 | 20,851 |
| Consumer (Open End) (34) | | | | | | | | | | | | |
| Revlvg Loans Secured/1–4 Dwllng Units (340) | 0 | 0 | 0 | 0 | 0 | 0 | 2,074 | 33,010 | 0 | 0 | 2,074 | 33,010 |
| Unsecured, Incl. Credit Cards & Other (345) | 0 | 0 | 0 | 0 | 0 | 0 | 4,612 | 3,454 | 0 | 0 | 4,612 | 3,454 |
| SUBTOTAL CONSUMER LOANS | 0 | 0 | 0 | 0 | 0 | 0 | 8,297 | 58,845 | 0 | 0 | 8,197 | 58,845 |
| Accrued Interest Receivable (348) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,621 | 0 | 0 | 0 | 1,621 |
| (LIP, Unamort Yield Adjt) (350,353) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUBTOTAL OTHER LOANS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,621 | 0 | 0 | 0 | 1,621 |
| TOTAL NONMORTGAGE LOANS (30) | 1 | 8,630 | 1 | 5,732 | 75,771 | 392,130 | 8,297 | 60,466 | 0 | 0 | 84,069 | 458,348 |
| REPOSSESSED ASSETS | | | | | | | | | | | | |
| Real Estate [Res] (415) | 8 | 620 | 0 | 0 | 12 | 621 | 55 | 4,192 | 0 | 0 | 67 | 4,813 |
| Real Estate [Com] (405,425,426,428) | 0 | 0 | 0 | 0 | 5 | 6,359 | 2 | 2,234 | 0 | 0 | 7 | 8,593 |
| Other Repossessed Assets (430) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,841 | 0 | 0 | 0 | 2,841 |
| TOTAL | 8 | 620 | 0 | 0 | 17 | 6,980 | 57 | 9,267 | 0 | 0 | 74 | 16,247 |
| GRAND TOTAL | 9 | 9,250 | 198 | 6,466 | 93,939 | 1,565,201 | 8,354 | 69,733 | 0 | 0 | 102,491 | 1,641,400 |

DUE DATE: [illegible]
Send Report to: [illegible]
Valley Forge Office
For Information Contact: [illegible]
Phone [illegible]
Fax [illegible]

CATEGORY DESCRIPTIONS

LSFO – [illegible] This field is not included in Total
LSFO Participations – [illegible]
LSBO – [illegible]
In-house – [illegible]
Off-line – [illegible]
Total – [illegible] LSFO Participations, LSBO, In-House and Off-line.

COMMENTS:

1. The servicing for the 1–4 Dwelling Units (250,253) LSFO Participations was transferred to Knutson Mortgage Corp. on 4/1/94.
2. The Non-mortgage Secured (Line 300) LSFO Participation consists of an SNC asset, for which CFSB is the lead participant. The asset is tagged for the national HLT auction, currently on hold, and is presently under Washington management.
3. All In-house REO assets are under SAMDA contracts.

INSTITUTION: CARTERET FEDERAL SAVINGS BANK
FIN: 8602
PREPARED BY: Tanya L. Robertshaw
DATE: October 17, 1994
PHONE: (201) 263-3011 ext. 6006

# CONSERVATORSHIP ASSET SUMMARY REPORT – Report Number M48 B
## SAMA/SAMDA – SALES INITIATIVES STRATIFICATION
## FOR MONTH ENDED: SEPTEMBER 30, 1994
(In Thousands [000])

PAGE 2

| | [illegible] | | | | | | TOTAL ASSETS IN SALES INITIATIVES | |
|---|---|---|---|---|---|---|---|---|
| | UNLIQUIDATED ASSETS | | LIQUIDATED ASSETS | | TOTAL ASSETS | | | |
| | # | BOOK VALUE | # | BOOK VALUE | # | BOOK VALUE | # | BOOK VALUE |
| MORTGAGE LOANS (23) | | | | | | | | |
| 1–4 Dwelling Construction (230) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5+ Dwelling Construction (240) | 0 | 0 | 4 | 4,266 | 4 | 4,266 | 0 | 0 |
| Nonres Construction (240) | 0 | 0 | 7 | 6,326 | 7 | 6,326 | 0 | 0 |
| 1–4 Dwelling Units (250,253) | | | | | | | 2,846 | 161,190 |
| 5+ Dwelling Units (256) | 20 | 56,334 | 18 | 29,010 | 38 | 85,344 | 158 | 111,710 |
| Perm Non–Res., Land (260,265) | 55 | 128,822 | 83 | 179,002 | 138 | 307,824 | 50 | 103,266 |
| TOTAL | 80 | 185,590 | 115 | 220,934 | 195 | 406,524 | 3,054 | 376,166 |
| NONMORTGAGE LOANS (30) | | | | | | | | |
| Commercial Loans (32) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Secured, Other than Mortgages (300) | 4 | 2,039 | 0 | 2,998 | 4 | 5,037 | 6 | 19,153 |
| Unsecured (303) | 2 | 3,262 | 4 | 2,074 | 6 | 5,336 | 75,763 | 377,889 |
| Financing Leases (306) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUBTOTAL COMMERCIAL LOANS | 6 | 5,301 | 4 | 5,072 | 10 | 10,373 | 75,769 | 397,042 |
| Consumer (Closed End) (34) | | | | | | | | |
| Loans on Deposit (310) | | | | | | | 0 | 0 |
| Home Improvement Loans (316) | | | | | | | 0 | 0 |
| Education Loans (320) | | | | | | | 0 | 0 |
| Auto Loans (323) | | | | | | | 127 | 321 |
| Mobile Home Loans (326) | | | | | | | 2 | 8 |
| Other, Including Leases (330) | | | | | | | 1,254 | 20,851 |
| Consumer (Open End) (34) | | | | | | | | |
| Revlvg Loans Secured/1–4 Dwlng Units(340) | | | | | | | 0 | 0 |
| Unsecured, Incl. Credit Cards & Other(345) | | | | | | | 0 | 0 |
| SUBTOTAL CONSUMER LOANS | | | | | | | 1,383 | 21,180 |
| TOTAL NONMORTGAGE LOANS (30) | 6 | 5,301 | 4 | 5,072 | 10 | 10,373 | 77,152 | 418,222 |
| REPOSSESSED ASSETS (40) | | | | | | | | |
| Real Estate [Res] (415) | 67 | 4,813 | 223 | 31,813 | 290 | 36,626 | | |
| Real Estate [Com] (405,425,426,428) | 2 | 2,233 | 3 | 6,423 | 5 | 8,656 | | |
| Other Repossessed Assets (430) | 0 | 0 | 0 | 0 | 0 | 0 | | |
| TOTAL | 69 | 7,046 | 226 | 38,236 | 295 | 45,282 | | |
| INVESTMENTS IN SER CORPS & SUBS(50) | | | | | | | | |
| Equity Invest & Unsecured Loans (522,524) | 17 | 16,779 | 36 | 5,419 | 53 | 22,198 | | |
| TOTAL | 17 | 16,779 | 36 | 5,419 | 53 | 22,198 | | |
| GRAND TOTAL | 172 | 214,716 | 381 | 269,661 | 553 | 484,377 | 80,206 | 794,388 |

COMMENTS:

N/A for that category

DUE DATE: THE 21ST OF EACH MONTH
Send Report to: [illegible] via Mail or E-mail
Phone (215)[illegible]
Fax (215)[illegible]
Valley Forge Office

CATEGORY DESCRIPTIONS

Unliquidated Assets – Number and dollar amount of those assets that the conservatorship has on their books that are in a SAMA/SAMDA contract.

Liquidated Assets – Number and dollar amount of those loans that the conservatorship had in a SAMA/SAMDA contract, but were liquidated.

Total – This is the total number and dollar amount of those assets that the conservatorship ever had in a SAMA/SAMDA contract.

Sales Initiative – Total number and dollar amount of assets that the conservatorship has presently tagged for a sales initiative (sales not started, but actually tagged.)

[illegible]

EXHIBIT 1

CARTERET FEDERAL SAVINGS BANK
SUMMARY OF STRATIFICATION OF ASSETS REMAINING (REPORT M48A)
SEPTEMBER 30, 1994

25-Oct-94

| Portfolio | September 30, 1994 # | September 30, 1994 ($000) | August 31, 1994 # | August 31, 1994 ($000) | Change for month # | Change for month ($000) |
|---|---|---|---|---|---|---|
| **Change for the month of September 1994** | | | | | | |
| Mortgage Loans | 18,348 | $1,166,805 | 19,461 | $1,269,224 | (1,113) | ($102,419) |
| Non-Mortgage Loans | 84,069 | $458,348 | 85,445 | $470,281 | (1,376) | ($11,933) |
| REO | 74 | $16,247 | 79 | $22,662 | (5) | ($6,415) |
| Total | 102,491 | $1,641,400 | 104,985 | $1,762,167 | (2,494) | ($120,767) |
| Less: IPF | 75,762 | $374,657 | 77,021 | $380,781 | (1,259) | ($6,124) |
| Total, excl. IPF | 26,729 | $1,266,743 | 27,964 | $1,381,386 | (1,235) | ($114,643) |
| LSFO Portfolio | 9 | $9,250 | 7 | $9,426 | 2 | ($176) |

| Portfolio | September 30, 1994 # | September 30, 1994 ($000) | December 4, 1992 # | December 4, 1992 ($000) | Change since DOC # | Change since DOC ($000) |
|---|---|---|---|---|---|---|
| **Change since Date of Conservatorship -- December 4, 1992** | | | | | | |
| Mortgage Loans | 18,348 | $1,166,805 | 34,445 | $2,223,097 | (16,097) | ($1,056,292) |
| Non-Mortgage Loans | 84,069 | $458,348 | 60,471 | $444,549 | 23,598 | $13,799 |
| REO | 74 | $16,247 | 431 | $84,019 | (357) | ($67,772) |
| Total | 102,491 | $1,641,400 | 95,347 | $2,751,665 | 7,144 | ($1,110,265) |
| Less: IPF | 75,762 | $374,657 | 44,927 | $306,339 | 30,835 | $68,318 |
| Total, excl. IPF | 26,729 | $1,266,743 | 50,420 | $2,445,326 | (23,691) | ($1,178,583) |
| LSFO Portfolio | 9 | $9,250 | 112,134 | $6,386,472 | (112,125) | ($6,377,222) |

C:\TLR\M4S\9004.WK3

CARTERET FEDERAL SAVINGS BANK
SEPTEMBER 30, 1994

SUMMARY OF STRATIFICATION OF ASSETS REMAINING (Report M4A)
CHANGE SINCE DATE OF CONSERVATORSHIP = DECEMBER 4, 1992

EXHIBIT 2
26-Oct-94

| PORTFOLIO | December 4, 1992 # | ($000) | March 31, 1993 # | ($000) | April 30, 1993 # | ($000) | May 31, 1993 # | ($000) | June 30, 1993 # | ($000) | July 31, 1993 # | ($000) | August 31, 1993 # | ($000) | September 30, 1993 # | ($000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | 34,445 | $2,223,097 | 33,132 | $2,149,118 | 32,392 | $1,980,805 | 30,233 | $1,966,851 | 29,440 | $1,902,431 | 29,134 | $1,907,220 | 32,710 | $1,888,830 | 23,349 | $1,778,009 |
| Non-Mortgage Loans | 60,471 | $444,549 * | 100,910 | $473,762 | 91,804 | $471,341 | 93,558 | $480,797 | 94,380 | $470,325 | 98,254 | $444,420 | 94,722 | $480,435 | 58,436 | $467,918 |
| RTO | 431 | $84,019 | 331 | $76,276 | 338 | $79,610 | 255 | $77,795 | 233 | $67,339 | 337 | $47,114 | 188 | $43,016 | 176 | $56,457 |
| Total | 95,347 | $2,751,665 | 134,543 | $2,699,156 | 124,544 | $2,531,756 | 124,063 | $2,525,443 | 124,195 | $2,440,295 | 127,727 | $2,478,754 | 127,620 | $2,431,361 | 126,439 | $2,302,384 |
| Less: IPF | 44,927 | $306,339 | 87,209 | $358,123 | 78,422 | $352,536 | 80,376 | $362,115 | 81,383 | $303,554 | 85,636 | $378,254 | 86,346 | $376,307 | 84,253 | $365,516 |
| Total, excl. IPF | 50,420 | $2,445,326 | 47,156 | $2,341,033 | 46,122 | $2,179,220 | 43,699 | $2,162,533 | 42,812 | $2,137,241 | 42,091 | $2,100,504 | 41,274 | $2,054,994 | 40,576 | $1,934,868 |
| RTO Portfolio | 112,134 | $4,366,472 | 104,751 | $4,692,564 | 101,844 | $3,921,472 | 101,448 | $3,753,019 | 97,404 | $3,525,734 | 95,846 | $3,315,924 | 93,867 | $3,253,877 | 90,703 | $3,006,772 |

| PORTFOLIO | October 31, 1993 # | ($000) | November 30, 1993 # | ($000) | December 31, 1993 # | ($000) | January 31, 1994 # | ($000) | February 28, 1994 # | ($000) | March 31, 1994 # | ($000) | April 30, 1994 # | ($000) | May 31, 1994 # | ($000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | 27,402 | $1,696,602 | 26,443 | $1,572,509 | 24,664 | $1,451,552 | 24,239 | $1,403,734 | 25,099 | $1,421,867 | 23,750 | $1,401,173 | 23,365 | $1,379,374 | 20,134 | $1,361,670 |
| Non-Mortgage Loans | 96,534 | $455,500 | 95,111 | $447,280 | 93,442 | $444,160 | 91,201 | $442,933 | 88,348 | $437,252 | 87,005 | $446,441 | 87,501 | $459,702 | 87,265 | $467,724 |
| RTO | 352 | $53,498 | 136 | $48,337 | 125 | $39,742 | 112 | $38,568 | 103 | $33,983 | 94 | $23,412 | 86 | $27,671 | 86 | $23,253 |
| Total | 124,288 | $2,205,600 | 121,690 | $2,068,126 | 118,231 | $1,935,454 | 115,552 | $1,915,235 | 113,550 | $1,893,102 | 110,849 | $1,870,466 | 110,852 | $1,866,947 | 107,505 | $1,852,647 |
| Less: IPF | 84,627 | $364,159 | 83,464 | $358,143 | 82,074 | $358,204 | 80,126 | $338,022 | 78,714 | $335,015 | 77,338 | $344,428 | 78,309 | $368,955 | 78,309 | $372,771 |
| Total, excl. IPF | 39,661 | $1,841,442 | 38,231 | $1,710,257 | 34,177 | $1,577,250 | 35,426 | $1,556,213 | 34,836 | $1,558,087 | 33,511 | $1,522,038 | 32,543 | $1,497,992 | 29,194 | $1,479,876 |
| RTO Portfolio | 83,110 | $4,627,859 | 80,753 | $4,461,518 | 78,305 | $4,358,095 | 76,809 | $4,254,379 | 72,783 | $3,971,340 | 71,443 | $3,857,827 | 68,910 | $3,701,223 | 67,563 | $3,669,775 |

| PORTFOLIO | June 30, 1994 # | ($000) | July 31, 1994 # | ($000) | August 31, 1994 # | ($000) | September 30, 1994 # | ($000) | Change since DOC # | ($000) |
|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Loans | 19,770 | $1,339,209 | 19,426 | $1,258,374 | 19,461 | $1,269,224 | 18,348 | $1,166,805 | (16,097) | ($1,056,292) |
| Non-Mortgage Loans | 87,180 | $471,687 | 87,795 | $480,356 | 83,445 | $470,281 | 84,069 | $458,348 | 23,598 | $13,799 |
| RTO | 82 | $33,511 | 82 | $23,549 | 79 | $22,662 | 74 | $16,247 | (357) | ($67,772) |
| Total | 107,033 | $1,824,437 | 107,303 | $1,795,479 | 104,985 | $1,762,167 | 102,491 | $1,641,400 | 7,144 | ($1,110,245) |
| Less: IPF | 78,385 | $379,094 | 79,141 | $392,933 | 77,021 | $380,781 | 75,762 | $374,657 | 30,835 | $68,518 |
| Total, excl. IPF | 28,647 | $1,445,393 | 28,162 | $1,402,546 | 27,964 | $1,381,386 | 26,729 | $1,266,743 | (23,691) | ($1,178,583) |
| RTO Portfolio | 606 | $33,246 | 439 | $30,324 | 7 | $19,426 | 9 | $39,250 | (112,125) | ($4,577,222) |

*The large increase in the number of non-mortgage loans from DOC to March, 1993, is due to the phasing in of a loan sale with Imperial Premium Finance. The commitment to fund this program was made prior to DOC. RTC has continued to honor this commitment, in order to enhance the salability of IPF as a going concern.

Exhibit 3

SL-8602: CARTERET FSB, PARSIPPANY, NJ
ASSET PORTFOLIO
AS OF SEPTEMBER 30, 1994
($000)

TOTAL MORTGAGES:

| | COL A TTL PORTFOLIO # LNS | COL A BOOK VAL | COL B NONPERFORMING # LNS | COL B BOOK VAL | A-B TTL REMAINING # LNS | A-B BOOK VAL |
|---|---|---|---|---|---|---|
| 1 - 4 FAMILY RESIDENTIAL | 16,112 | 848,385 | 589 | 43,156 | 17,523 | 805,229 |
| MULTI FAMILY | 171 | 154,775 | 11 | 13,234 | 160 | 141,541 |
| COMMERCIAL | 54 | 137,105 | 14 | 50,106 | 40 | 86,999 |
| LAND | 11 | 16,168 | 4 | 11,648 | 7 | 4,518 |
| TOTAL MORTGAGES | 18,348 | 1,156,431 | 618 | 118,144 | 17,730 | 1,038,287 |
| TOTAL NON-MORTGAGES: | | | | | | |
| NON-MORTGAGE COMMERCIAL | 75,772 | 397,882 | 1,727 | 12,692 | 74,045 | 385,190 |
| CONSUMER | 8,297 | 58,845 | 171 | 3,690 | 8,126 | 55,155 |
| TOTAL REAL ESTATE OWNED: | 74 | 13,405 | 0 | 0 | 74 | 13,405 |
| GRAND TOTAL | | | | | | |
| TOTALS | 102,491 | 1,626,564 | 2,518 | 134,526 | 99,973 | 1,492,038 |

MEMO: STRATIFICATION OF LOAN SERVICERS

| | KNUTSON MORTGAGE CORP # LNS | BOOK VAL | WENDOVER # LNS | BOOK VAL | MIDLAND SAMA/SAMDA # LNS | BOOK VAL | FIRST FIDELITY MORTGAGE CORP # LNS | BOOK VAL | GLEICHMAN SAMDA # LNS | BOOK VAL | OTHER SERVICERS # LNS | BOOK VAL | TOTAL LSBO's # LNS | BOOK VAL | REMAINING IN-HOUSE # LNS | BOOK VAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 - 4 FAMILY RESIDENTIAL | 8,140 | 691,164 | 9,967 | 156,787 | 5 | 434 | 0 | 0 | 0 | 0 | 0 | 0 | 16,112 | 848,385 | 0 | 0 |
| MULTI FAMILY | 1 | 51 | 0 | 0 | 20 | 56,334 | 6 | 16,641 | 0 | 0 | 144 | 79,849 * Western Federal | 171 | 154,775 | 0 | 0 |
| COMMERCIAL | 0 | 0 | 0 | 0 | 48 | 116,696 | 6 | 20,209 | 0 | 0 | 0 | 0 | 54 | 137,105 | 0 | 0 |
| LAND | 0 | 0 | 0 | 0 | 7 | 11,945 | 3 | 3,213 | 0 | 0 | 1 | 1,008 * Aldrich Eastman Waltch | 11 | 16,168 | 0 | 0 |
| TOTAL MORTGAGES | 8,141 | 691,215 | 9,967 | 156,787 | 80 | 185,409 | 15 | 41,963 | 0 | 0 | 143 | 80,857 | 18,348 | 1,156,431 | 0 | 0 |
| NON-MORTGAGE COMMERCIAL | 0 | 0 | 0 | 0 | 6 | 6,302 | 0 | 0 | 0 | 0 | 75,762 * IPF; 3 *HLT Part. w/Washington | 374,657; 12,171 | 75,771 | 392,130 | 1 | 5,752 *HLT w/Washington |
| CONSUMER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,297 | 58,845 |
| TOTAL REAL ESTATE OWNED | 0 | 0 | 0 | 0 | 2 | 2,234 | 0 | 0 | 67 | 4,613 | 5 | 8,359 * Western Federal | 74 | 13,405 | 0 | 0 |
| TOTALS | 8,141 | 691,215 | 9,967 | 156,787 | 88 | 193,145 | 15 | 41,963 | 67 | 4,613 | 75,915 | 474,044 | 94,193 | 1,561,967 | 8,298 | 64,597 |

June 8, 1995

MEMORANDUM TO: All Regional Directors (DAS)
All Regional Financial Officers (DOF)
All Regional Counsel (Liquidation)

FROM: Stephen N. Graham
Associate Director (DAS-Operations)

Alvin E. Kitchen
Deputy Director (DOF)

Thomas A. Rose
Deputy General Counsel

SUBJECT: Receiverships - Post-Insolvency Interest

The DAS Operations Section, DOF Financial Reporting Branch and Liquidation Branch of the Legal Division have reviewed and discussed the appropriate interest rate to utilize in making post-insolvency interest distributions from receivership estates. Based upon our discussions we are providing the following directions to assure that the Corporation's procedures and positions in this area are clear and uniform.

The interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the jurisdiction it was in, and whether it had a state or federal charter. Post-insolvency interest should be dealt with, depending on the type of institution in receivership, as follows:

1. Pre-National Depositor Preference State Banks and Savings Associations Which Were Not Regulated by the FHLBB - In the absence of a rate specifically provided in the applicable state's liquidation scheme or the adoption of the state contract rate by the state's supreme court, the FDIC should utilize the state judgment rate existing on the date the institution failed to calculate the payment of post-insolvency interest to creditors with allowed claims;

2. Pre-National Depositor Preference National Banks - For national banks that failed prior to the amendment of the federal judgment rate statute in 1982, the FDIC should apply the same rate applicable to a state bank in the same jurisdiction. For national banks failing after the amendment of the federal judgment rate statute, the applicable rate should be the 52 week Treasury bill rate specified in the statute on the date the bank

AM0010339

Memorandum to All Regional Directors
June 8, 1995
Page 2

failed;[1]

3. National Depositor Preference State Banks and Savings Associations - Unless the state's supreme court for the jurisdiction where the institution did business has adopted the state contract rate, post-insolvency interest distributions should be based on the state judgment rate; and

4. National Depositor Preference National Banks and Federal Savings Associations - Post-insolvency interest distributions should be based on the federal judgment rate.

Although we believe that these directions should adequately address the majority of the institutions where the FDIC is acting as receiver, the Closed Bank Litigation and Policy Section of the Legal Division should be consulted if your staff have any additional questions in this area.

[1] The applicable rate of interest can generally be obtained from personnel in the U.S. District Courts by inquiring as to the rate applicable to federal court judgments on the date that the institution failed. Information obtained in this manner, however, should be independently verified by DOF before the rate is utilized to make post-insolvency interest distributions.

United States General Accounting Office

GAO

Report to Congressional Committees

December 1995

# RESOLUTION TRUST CORPORATION

# Performing Assets Sold to Acquirers of Minority Thrifts

App. 523

GAO/GGD-96-44

[redacted]

GAO

United States
General Accounting Office
Washington, D.C. 20548

General Government Division

B-260116

December 22, 1995

The Honorable Alfonse M. D'Amato
Chairman
The Honorable Paul S. Sarbanes
Ranking Minority Member
Committee on Banking, Housing, and
Urban Affairs
United States Senate

The Honorable James A. Leach
Chairman
The Honorable Henry B. Gonzalez
Ranking Minority Member
Committee on Banking and
Financial Services
House of Representatives

As required by the Resolution Trust Corporation (RTC) Completion Act,[1] we have reviewed RTC's efforts to sell performing assets to acquirers of failed thrifts under the minority preference resolutions program. The act required us to annually assess RTC's determination of fair market value of performing assets and determine the number and type of assets sold under the program.

During fiscal year 1994, there were no transfers of assets under the minority preference resolutions program. This report covers asset transfers occurring in fiscal year 1995. This will be our only report on this subject since RTC has resolved all of the failed thrifts it received and all thrifts taken over in the future will be resolved by the Federal Deposit Insurance Corporation (FDIC). FDIC is not required by law to establish a similar asset transfer program.

## Results in Brief

On the basis of our discussions with firms experienced in pricing large volumes of mortgage loans and our review of mortgage loan valuation literature, we found that RTC had established a reasonable process anchored to agency[2] and mortgage securities markets standards. This process allowed for the independent valuation of 1- to 4-family residential mortgage loans that were offered for sale to minority acquirers. RTC

[1] The Resolution Trust Corporation Completion Act, P. L. 103-204, 107 Stat. 2369, 2378 (1993).

[2] Agency refers to the Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), and Government National Mortgage Association (Ginnie Mae).

contracted with two independent valuation contractors, experienced in mortgage securities markets, to provide separate prices for each loan, which RTC then averaged and offered to the minority acquirer as the final price. By removing itself from the initial phase of the loan pricing process, RTC demonstrated that it was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total return on the disposition of assets as required by law. Under this program, 11 of the 14 minorities who bought thrifts from RTC purchased 4,063 1- to 4-family residential mortgage loans.

Moreover, to price the loans, the two valuation contractors appeared to have established a reasonable methodology that considered and adjusted for movements in interest rates, credit risk sensitivity, and the fact that these were RTC loans. Further, officials at Fannie Mae and Freddie Mac found the pricing methodology used by the valuation contractors to be generally consistent with their approaches.

In commenting on a draft of this report, RTC's Vice President for Asset Management and Sales stated that RTC agreed with our findings, as well as with our description of its program to sell performing assets to acquirers of minority thrifts.

## Background

RTC was required by law to assist minorities to acquire failed thrifts. Specifically, the RTC Completion Act required RTC to give preference to any offer from minority bidders for acquiring failed thrifts located in predominantly minority neighborhoods (PMN) that would result in the same cost to RTC as determined under section 13(c)(4) of the Federal Deposit Insurance Act, as amended by the Federal Deposit Insurance Corporation Improvement Act of 1991. This section of the act requires RTC to choose the alternative for resolving a failed thrift that results in the least cost to RTC. Additionally, a minority acquirer of a thrift in a PMN was to have first priority in the deposition of performing assets of failed thrifts.

To satisfy these requirements, RTC established its minority preference resolutions program in February 1994. Under this multifaceted program, RTC was to offer a failed minority-owned thrift to investors of the same minority group before offering it to others. Additionally, bidding preferences were to be given to offers from minority-owned financial institutions to acquire any failed thrift whose home office was located in a PMN or that had 50 percent or more of its offices in PMNS, provided that this preference would not increase the cost to RTC. Specifically, under the

preference, if a minority bidder was within 10 percent of the highest bid made by a nonminority bidder, then a "best and final" round of bidding was to take place between them.

As part of this program, RTC was also to provide a winning minority bidder with (1) interim capital assistance of up to two-thirds of the required regulatory capital and (2) branch facilities, located in a PMN and owned by RTC, on a rent-free basis for 5 years. In July 1994, RTC issued procedures for selling 1- to 4-family residential mortgage loans to acquirers of whole thrifts or branches under this program. In essence, after the sale of a thrift, RTC was to have 45 days to develop the preliminary pricing of the loans to be sold, and the minority acquirer was to have up to 90 days to review the loans. When this review was completed, RTC was to give the acquirer the final sales prices for the loans. The acquirer was then to have 3 days to decide which loans to purchase and a fourth day to notify RTC of its choice. Minority acquirers could purchase loans of up to 100 percent of the net deposits assumed from RTC in the acquisition of the failed thrift.

The process RTC established to sell performing 1- to 4-family residential mortgage loans to minority acquirers has undergone several changes, in part because of concerns raised by a group of seven minority acquirers. This group believed (1) that RTC should not be responsible for pricing the loans, (2) that RTC's current methodology resulted in the loans being overpriced, and (3) that the resale provision was unfair. In March 1994, RTC stated that it would have its own staff price the loans. However, to ensure that the pricing was done in an equitable manner, in June 1994 RTC hired two asset valuation contractors to independently price the mortgage loans, thus removing itself from the pricing process. To ensure objectivity, RTC awarded fixed-fee contracts whereby neither the sales price established for the loans nor the price paid by the purchaser was a factor in determining the fee paid to the asset valuation contractors.

Additionally, RTC's March 1994 pricing procedures and mortgage loan sales agreement stated that RTC would be entitled to receive 50 percent of the acquirer's profit if the acquirer sold any of the mortgage loans prior to 181 days after the closing of the sales agreement. However, by June 1994, RTC had decided to eliminate this resale provision based on concerns raised by the minority group.

Finally, under the provisions of the mortgage loan sale agreement, RTC was expected to credit, to the minority acquirers who exercised their option to purchase the mortgage loans, the interest accrued on the loans selected.

The period of accrual was to begin 45 days after the signing of the agreement and end on the day preceding the closing date of the transaction. The accrued interest is defined in RTC's minority loan pricing procedures as the coupon interest rate on the loans less the average federal funds' rate during the accrual period.[3] However, to resolve a contract dispute regarding the final pricing of the mortgage loans, RTC provided the minority acquirers who decided not to purchase the mortgage loans with the following option—the acquirer could choose not to exercise the agreement on the loan portfolio, but rather receive the interest accrued on the respective portfolio. Under this option, the acquirer waived the right to purchase any 1- to 4-family residential mortgage loans through the minority resolutions preference program.

## Objectives, Scope, and Methodology

The RTC Completion Act required that we submit an annual report to Congress on transfers of performing assets by RTC to any acquirer. In discussions with the oversight committees, it was agreed that our report would focus on assets sold to minority acquirers. Specifically, the objectives of our review were to (1) assess how RTC determined the fair market value for the loans transferred and (2) ascertain the number and description of performing loans transferred to minority thrifts.

Although the act required us to assess RTC's determination of fair market value for the loans transferred, we were unable to evaluate RTC's determination for the following reasons. First, fair market value is commonly measured through competitive sales. Second, loans not purchased by minority acquirers were sold in bulk, and sales prices were not assigned to individual loans. Third, there were no data available to compare the prices of the mortgage loans sold to minority acquirers with the prices of other loans sold by RTC, because fewer whole loans were available for sale once RTC's securitization program started showing results around June 1991.[4] Therefore, we focused on assessing the reasonableness of the process RTC established to price the mortgage loans, including the methodology used by RTC's valuation contractors. To assess reasonableness, we discussed the methodology and models used to price the 1- to 4-family residential mortgage loans with RTC officials and the two valuation contractors. While both valuation contractors were cooperative in discussing the methodology in general, they were reluctant to discuss their pricing models in detail. The valuation contractors considered the

[3]The federal funds' rate is the interest rate charged by banks to other banks in need of overnight loans.

[4]Securitization is the process of assembling similar assets into pools that are used to collateralize newly-issued securities, which are referred to as mortgage-backed securities.

specifics of these models to be proprietary because each firm has individually and confidentially developed its own model. This did not affect our determination of the reasonableness of the these models because we were able to determine what factors were considered in the models.

We also interviewed two of RTC's three due diligence contractors to understand their role and responsibilities.[5] Further, we reviewed RTC's policies and procedures and the valuation contractors' operating guidelines. To obtain additional perspectives on RTC's process, we interviewed officials of Freddie Mac and Fannie Mae who were involved in valuing asset portfolios similar in type to RTC's assets. To better understand how mortgage loans are valued, we also reviewed academic literature on mortgage loan valuation.

Finally, we were contacted by seven minority acquirers and their advisers after they met with RTC and learned of our review. We subsequently met with them to understand their experiences in purchasing loans from RTC under the minority preference resolutions program. As a follow-up to that meeting, we also interviewed their valuation contractor to obtain information on the methodology used to assess the price of the loans.

To accomplish our second objective, which was to determine the number and type of loans sold to minority acquirers, we obtained and analyzed, but did not independently verify, RTC transaction reports showing asset sales through the minority preference resolutions program. These reports identify the type and number of loans sold, as well as their quality, price, and purchaser. In addition, we also interviewed RTC officials regarding the reliability of the reports.

We requested comments on a draft of this report from the Deputy and Acting Chief Executive Officer of RTC or his designee. On November 28, 1995, RTC's Vice President for Asset Management and Sales provided a written response in which he concurred with our findings. These comments are reprinted in appendix I.

We did our work between August 1994 and October 1995 in accordance with generally accepted government auditing standards.

[5]Due diligence is the process of evaluating information on the assets to fully assess their value.

## RTC Established a Reasonable Process for Pricing Mortgage Loans

The pricing of mortgage loans is a difficult and complex process requiring the use of a sophisticated and technical methodology. RTC established a reasonable process to price mortgage loans that was anchored to agency and mortgage securities markets standards. This process provided for an independent valuation of 1- to 4-family residential mortgage loans that were offered for sale to minority acquirers of failed thrifts located in PMNs. It is first important to note that RTC did not price the loans itself; instead, in June 1994 it hired two independent valuation contractors experienced in mortgage securities markets to determine the price of each mortgage loan. Each valuation contractor was required to price the mortgage loans on an individual basis, rather than at a portfolio level, because the acquirers were allowed to purchase some, all, or none of the loans under the minority preference resolutions program.

RTC also hired three due diligence contractors to preliminarily review each loan to determine whether it was eligible for sale under the minority preference resolutions program. To be eligible for sale under the program, the loan had to be a performing 1- to 4-family residential mortgage type. The purpose of RTC's due diligence loan file review was to secure essential information that could be used to evaluate the loans for sale. Some of the essential documents included the loan note, mortgage insurance certificate, title, appraisal, and credit and verification forms. The due diligence contractors were not required to make judgments about credit decisions or the loan's salability. According to RTC's valuation contractors, the pricing of the mortgage loans began upon receipt of the loan data files from RTC's due diligence contractors. The valuation contractors were to review these data files for completeness and accuracy and to notify RTC of any errors or missing documents in the loan file.

RTC told us that it generally resolved these deficiencies by requiring the due diligence contractors to update the loan file. The valuation contractors said that the loans were then stratified to determine whether individual loans conformed to secondary market standards.[6] Using RTC's stratification criteria, the two valuation contractors were to group the loans into three levels, referred to as "strats." According to RTC, its stratification criteria were based on agency and secondary market standards and reflected the minority preference resolutions program guidelines. See table 1 for RTC's criteria for the strat categories.

[6]The secondary mortgage market standards as recognized by Fannie Mae, Freddie Mac, and other investment firms include the rules for buying and selling mortgages that have already been originated or issued.

**Table 1: RTC's Strat Criteria**

| Strat category | Criteria |
|---|---|
| Strat one | Currently performing with no more than one 30-day delinquency in the last 12 months<br><br>Immaterial document deficiency |
| Strat two | Currently may be 30-days delinquent or may have two 30-day late payments in the last 12 months<br><br>Immaterial document deficiency |
| Strat three | Currently may have one 60-day or three 30-day late payments in the last 12 months<br><br>Significant document deficiency |

Note: Strat four loans are more than 60 days past due and are generally not offered under the program.

Source: RTC Division of Asset Management and Sales.

Under stratification, the two valuation contractors assigned strat codes based on the loan data provided by the due diligence contractors. The valuation contractors' pricing reports showed that they assigned the same strat for the majority of the loans. The two valuation contractors said that, in cases where there were missing loan data, the loans were considered to be of lower quality and were therefore assigned to a higher strat category.

After loan stratification, both valuation contractors used standard mortgage-backed security methodologies to price each RTC mortgage loan. This was done to determine the mortgage loan's market value as objectively as possible. The initial step under this approach was to assign each loan a benchmark price, which approximated the market value of a mortgage loan at a given point in time. For example, Freddie Mac's 1-year adjustable rate mortgage price was generally used as the benchmark for adjustable rate mortgages. According to one valuation contractor, selecting an appropriate benchmark price is a critical step in this methodology.

According to the valuation contractors, the agency benchmark price assigned to each mortgage loan was first determined by matching a loan's characteristics to the most closely similar agency mortgage-backed security.[7] Second, after the loan servicing fee was subtracted from the

[7] Loan characteristics include such factors as collateral type, geographic location, and interest rate.

current rate on RTC's mortgage loan,[8] the loan's interest rate and the agency's interest rate were matched. For example, a RTC fixed rate mortgage loan with an 8-percent interest rate net of loan servicing would be matched with an agency mortgage-backed security with an 8-percent fixed rate. Next, an equivalent benchmark price from the mortgage-backed security price database was selected. The two valuation contractors stated that, when determining the preliminary and final prices, they were required by RTC to use secondary market data from the close of business of the Wednesday prior to their receiving the loan data files. This pricing data, obtained from Knight-Ridder, was a composite of prices from seven different sources,[9] updated daily. Thus, the pricing reflected the actual market value of the mortgage loans purchased at that time. According to one valuation contractor, consistently using one date in time minimized subjectivity.

Once the agency benchmark price was determined, adjustments for movement in interest rates and credit risk sensitivity were made. To determine the adjustments for interest rate risk, both valuation contractors said they used an analytical technique known as option-adjusted spread model. This model priced a mortgage loan or mortgage-backed security by simulating many different future patterns of interest rates. The model then used these simulations and the specific characteristics of the mortgage loan to predict prepayments, which determined the cash flow of the mortgage. Finally, the model matched the predicted cash flow to the current mortgage prices, to determine the price for the mortgage in question.

In addition to the adjustments made for interest rate risks, assessments for credit risk were done to estimate the probability of default. To determine the discounts for credit risk, both contractors analyzed each loan and assigned it a risk weight based on characteristics that affect risk. These risk characteristics include loan-to-value (LTV) ratio, geographic location, mortgage insurance, and delinquency status.[10] Both valuation contractors agreed that an important variable in determining the severity of risk was the current LTV ratio, because it provided a reliable valuation of the collateral. In general, the higher the LTV the greater the risk. After the risk weights were assigned, they were multiplied together to obtain the total

[8]Loan servicing was initially removed so that the model would be on a par with the agency benchmark, since Fannie Mae and Freddie Mac were not involved in loan servicing. However, after the benchmark was determined, loan servicing was added back to RTC's mortgage loan benchmark.

[9]These seven sources included Fannie Mae, Freddie Mac, and Ginnie Mae mortgage securities.

[10]Loan-to-value ratio refers to the amount borrowed compared to the cost or value of the property purchased.

credit risk. The contractors acknowledged that this part of the process was slightly subjective, but they agreed that this was an accepted technique in the secondary market.

The final adjustments were for the strat category, unusual loan types (such as balloon mortgages where the balance of the loan was due in one lump sum on a specified date), and the fact that these were RTC loans from a failed thrift. The two valuation contractors also said that determining these adjustments was a subjective matter, but both believed that correct assessments of these discounts depended heavily on previous experience in valuing and marketing RTC assets—experience which both contractors possessed.

Each valuation contractor provided RTC with each loan's final price and strat category. After receiving the two reports, RTC averaged the two loan prices. The averaged price was offered to the minority acquirers as the final price. RTC's data showed that, although the two contractors worked independently to price the 4,063 mortgage loans, there were fewer than 100 cases in which they differed on the final price of the mortgage loan. The difference in price was usually less than half a percent. However, in cases where they differed significantly, RTC required both valuation contractors to reprice the loans.

We discussed the mortgage-backed securities approach used by RTC's contractors with officials from Fannie Mae and Freddie Mac, who said that the methodology appeared to be reasonable. Specifically, the officials said that the methodology was similar to the approach they used to value mortgage loans and contained the elements necessary to value mortgage loans. For example, although officials at Fannie Mae and Freddie Mac would not discuss the specifics of their models because they are considered proprietary, they explained that measuring interest rate movement and credit risk sensitivity are very important steps in valuing mortgage loans.

## Alternative Pricing Methodology Proposed by Some Minority Acquirers

Seven minority acquirers and RTC were unable to agree on the mortgage loan prices. These acquirers believed that the mortgage loans were overpriced. They also believed that RTC's pricing methodology did not establish the fair market value of the mortgage loans. They therefore discussed with RTC the possibility of using an alternative methodology to price the loans. RTC decided not to use the alternative methodology proposed by the minority acquirers because it believed that the

methodology being used established a fair market value for the loans and that none of the mortgage loans were overpriced.

The alternative methodology proposed by the minority acquirers was similar to the asset valuation reviews (AVR) used by RTC in 1992. Under the AVR process, RTC hired independent contractors to review samples of assets to estimate the potential loss for each asset category held by failed thrifts. AVR computes the present value of such assets using a discount rate based on secondary markets and adjusted for risk-related factors such as loan documentation. The estimated recovery values were not determined for individual loans in a portfolio, but rather for the category as a whole.

In their efforts to demonstrate that the mortgage loans were overpriced, the seven minority acquirers contracted with a firm to complete an analysis of the mortgage loans RTC made available for sale under the minority preference resolutions program. While the approach of the minority acquirers' contractor was somewhat similar to that used by RTC's contractors, there were also fundamental differences. For example, RTC's contractors stratified and assigned benchmarks to each loan, while the minority acquirers' contractor stated that benchmarks were not determined for individual loans, but rather for the portfolio as a whole. Additionally, RTC's contractors and the minority acquirers' contractor also differed on the coefficients, which are risk weight factors used in calculating the loan price.

As previously stated, the approach of the minority acquirers' contractor was similar to RTC's AVR process. In summary, to determine the mortgage loan price, the minority acquirers' contractor said it used a discounted cash flow methodology based on the assets' expected income and yields on mortgage trading in the secondary market. The price was then adjusted for risk-related factors, such as the probability of default, loan quality, and document deficiencies. To determine the adjustments for movement in interest rates, prepayment speeds were estimated using the Wall Street consensus speeds for like mortgage loan rates. Cash flows for each loan type were calculated using loan characteristics and prepayment speeds. These cash flows were discounted to determine the market value of the loans. Finally, the minority acquirers' contractor believed that a yield premium, to account for the fact that the loans were being provided in conjunction with an acquisition of marginal quality deposit liabilities, was also appropriate.

The seven minority acquirers and their contractor contended that the AVR approach was an acceptable methodology to price the assets because RTC had used it in the past. However, an RTC official stated that their process for pricing mortgage loans had evolved over the years and that they no longer used the AVR approach. RTC believed that the current mortgage-backed security approach resulted in a better determination of fair market value and attempted to maximize total return on the disposition of a failed thrift's assets, as required by law.

## Loans Sold to Minority Acquirers

RTC set aside about $3 billion in residential mortgage loans for possible sale to minority acquirers through its minority preference resolutions program. Between January 1994 and September 1995, RTC offered 16 pools of performing 1- to 4-family residential mortgage loans to the 14 minority acquirers who purchased failed thrifts located in PMNS. As of October 11, 1995, 11 minority acquirers had purchased 4,063 mortgage loans for $289.6 million. Table 2 provides detailed information on their 13 transactions.

Table 2: RTC Mortgage Loan Sales to Minority Acquirers

| Transaction | Date of sale | Number of loans | Purchase price (percent) | Purchase price (millions) |
|---|---|---|---|---|
| One | 10-31-94 | 446 | 94.61% | $30.6 |
| Two | 10-31-94 | 475 | 94.52 | 34.6 |
| Three | 11-08-94 | 161 | 95.83 | 11.0 |
| Four | 12-07-94 | 9 | 98.97 | 0.9 |
| Five | 12-20-94 | 1,132 | 82.68 | 45.1 |
| Six | 01-18-95 | 126 | 96.82 | 11.1 |
| Seven | 01-31-95 | 140 | 96.49 | 21.5 |
| Eight | 02-17-95 | 237 | 96.99 | 17.3 |
| Nine | 02-21-95 | 726 | 94.12 | 45.4 |
| Ten | 02-28-95 | 197 | 95.13 | 30.2 |
| Eleven | 05-31-95 | 354 | 96.87 | 32.3 |
| Twelve | 08-30-95 | 33 | 96.74 | 5.6 |
| Thirteen | 09-28-95 | 27 | 97.44 | 4.0 |
| Total | | 4,063 | | $289.6 |

Note: Two minority acquirers exercised two loan sales transactions each.

Source: RTC Division of Asset Management and Sales.

Additionally, our analysis of the final loan prices showed that, of the 4,063 mortgage loans, 64 percent, or 2,606, were sold for between 91 and 100 percent of the book value, as shown in figure 1.

Figure 1: Final Mortgage Loan Pricing Distribution




Note: The total number of loans sold was 4,063.

Source: RTC Division of Asset Management and Sales.

Finally, as of October 11, 1995, RTC had paid $4 million in accrued interest to the 11 minority acquirers who purchased mortgage loans and $1.4 million in accrued interest to 3 minority acquirers who decided not to exercise their option to purchase mortgage loans. RTC officials believe that paying the $1.4 million in accrued interest was the best alternative to resolving a contract dispute with the minority acquirers over the final pricing of the mortgage loans. We did not determine whether this practice was the best alternative to resolving the contract dispute because it was outside the scope of our assignment.

We are sending copies of this report to other interested congressional committees and subcommittees, RTC's Deputy and Acting Chief Executive Officer, and the Chairman of the Thrift Depositor Protection Oversight Board. Copies will be made available to others upon request.

This report was prepared under the direction of Ronald L. King, Assistant Director, Government Business Operations Issues. Other major contributors to this report are listed in appendix II. If you have any questions, please contact me on (202) 736-0479.

Gaston L. Gianni, Jr.
Associate Director, Government
Business Operations Issues

# Contents


Letter 1

Appendix I Comments From the Resolution Trust Corporation 16

Appendix II Major Contributors to This Report 17

Tables
Table 1: RTC's Strat Criteria 7
Table 2: RTC Mortgage Loan Sales to Minority Acquirers 11

Figure
Figure 1: Final Mortgage Loan Pricing Distribution 12


**Abbreviations**

| | |
|---|---|
| AVR | Asset Valuation Review |
| FDIC | Federal Deposit Insurance Corporation |
| LTV | loan-to-value |
| PMN | predominantly minority neighborhood |
| RTC | Resolution Trust Corporation |

# Comments From the Resolution Trust Corporation

RTC
RESOLUTION TRUST CORPORATION
Resolving The Crisis
Restoring The Confidence

November 28, 1995

TO: Gaston L. Gianni, Jr.
Associate Director
Government Business Operations Issues
U.S. General Accounting Office

FROM: Thomas P. Horton
Vice President for
Asset Management and Sales

RE: Draft Report: Performing Assets Sold to Acquirers of Minority Thrifts

This is in response to your draft report dated November 1995 which examined the sale of performing single family mortgage loan assets to minority thrift acquirers.

We have reviewed your report and agree with your findings and description of the aforementioned program.

Please do not hesitate to contact me if you require any further information.

cc: John E. Ryan
Hu Benton
Sandra Nobles

801 17th Street, N.W. Washington, D.C. 20434

# Major Contributors to This Report

## General Government Division, Washington, D.C.

Tammy R. Conquest, Senior Evaluator, Government Business Operations Issues
Michael M. Yacura, Evaluator

## Office of the Chief Economist, Washington, D.C.

William McNaught, Economist

September 18, 1996

MEMORANDUM TO: Operating Committee

FROM: John F. Bovenzi
Director, Division of Depositor and Asset Services

William F. Kroener, III
General Counsel

Paul L. Sachtleben
Director, Division of Finance

SUBJECT: Options Memorandum - Post-Insolvency Interest Regulation and Amendments to 12 C.F.R. § 360.3

*PROPOSALS*

Establish, by regulation, a uniform interest rate and priority for all prospective post-insolvency interest [1] distributions from FDIC administered receiverships, regardless of the failed institution's charter.

Amend 12 C.F.R. § 360.3 (section 360.3), governing the priority for distribution of assets from former FSLIC and RTC receiverships to eliminate inconsistencies between section 360.3 and the proposed regulation. [2]

---

[1] Post-insolvency interest is the interest paid on allowed receivership claims, under certain circumstances, after a receiver is appointed.

[2] Section 360.3 generally provides for the payment of interest to creditors in the depositor and general creditor class (category 6) on a ratable basis with claims that are not fixed on the date of the receiver's appointment (category 7). Under the regulation, interest on category 6 claims must be paid in full before distributions can be made to creditors in classes below category 7.

RECOMMENDATION

The proposed regulation will:

- establish the Federal Judgment Rate as the post-insolvency interest rate for all FDIC administered receiverships.

  This will include:

  1) all savings association receiverships transferred from the FSLIC and the RTC;

  2) all savings association receiverships, not otherwise subject to section 360.3, and state and national bank receiverships commenced prior to the enactment of national depositor preference (NDP), in August, 1993; and

  3) all receiverships commenced after the enactment of NDP.

- establish that prospective post-insolvency interest distributions will be made ratably to all creditors with allowed claims, regardless of class, after paying of the principal amount of all allowed claims, by class. The priority for payment of post-insolvency interest distributions will be subject, however, to any valid contractual or statutory subordination provision [3] governing a creditor's entitlement to post-insolvency interest.

- establish that the post-insolvency interest rate "locks" on the date an institution is declared insolvent and remains fixed until the receivership terminates.

- make the proposed regulation applicable only to prospective post-insolvency interest distributions, thereby avoiding the need to recalculate the amounts of previous post-insolvency interest distributions paid to creditors with allowed claims. Where partial distributions have already been made, the amount of such distributions will be applied to reduce the total

[3] A cross-guaranty assessment by the FDIC, pursuant to 12 U.S.C. §1815(e), is an example of a statutory subordination provision.

amount which will otherwise be distributable under the regulation.

JUSTIFICATION

Background. At various times in its history, the FDIC has administered receivership estates where receivership assets, after liquidation, have yielded sufficient proceeds to pay the principal amount of all proven creditor claims and some amount of post-insolvency interest. Because this situation rarely arose, issues related to the rate and priority of payment of post-insolvency interest were dealt with by the FDIC and the judicial system on a case by case basis. Therefore, divergent judicial decisions and, in some instances, state laws exist addressing the issues. Additionally, section 360.3, which was transferred to the FDIC when the Federal Home Loan Bank Board was abolished in 1989, contains an interest rate provision which only applies to the depositor and general creditor class and requires payment to that class, at the rate specified in the regulation, before payments are made on the principal amount of the allowed claims in lower creditor classes.

The FDIC's attention became focused on these issues in 1993 when the FDIC became involved in various shareholder suits challenging the right of the FDIC, as a subrogated deposit creditor, and other creditors holding allowed claims, to receive post-insolvency interest distributions. The suits also raised issues regarding the interest rate that should be used to make post-insolvency interest distributions. The FDIC's Legal Division, Division of Depositor and Asset Services, and Division of Finance reviewed the issues and existing law and found a surprising lack of consistency in positions taken in litigation. They also found a wide variation in potential outcomes, based upon the type of institution being liquidated, i.e., whether it was a savings association subject to section 360.3, or whether it was a state bank or savings association, or national bank. Additionally, the situation was further complicated, in August, 1993, when the FDI Act was amended to provide for distribution of assets from all institutions failing after August 9, 1993, pursuant to a NDP distribution scheme.

While staff recognized the complexity and need for guidance on the issues, there was concern that a policy statement or regulation addressing the issues may not be given effect by the



AM00097049

courts.[4] Therefore, DAS, DOF and the Legal Division issued a joint memorandum, which was merely intended to be a distillation of existing law, to all affected division staff providing direction and guidance on the interest rate issue. Since the issuance of the memorandum on June 8, 1995, the FDIC has paid post-insolvency interest in the manner set forth in Exhibit A.

Subsequent meetings and discussions with the Chief Financial Officer's staff and a recent decision by the United States Supreme Court [5] renewed interest in addressing various post-insolvency interest issues in a uniform manner by regulation.

Business Rationale. The FDIC's current practice of paying post-insolvency interest results in a significant administrative burden because post-insolvency interest issues must be researched by Legal Division and handled on a case by case basis. There is also a degree of risk involved in proceeding without a regulation because most state liquidation schemes do not address the issue of post-insolvency interest distributions or their priority. While the current guidance has provided a consistency regarding the interest rate issue, assuming sufficient assets exist to make post-insolvency interest distributions, it can potentially be challenged by any affected creditor or shareholder of an affected receivership and reviewed de novo by a court of competent jurisdiction.

Due to existing state and federal law ambiguities, it is difficult for the public, receivership creditors, and shareholders to determine with any degree of certainty the amount of post-insolvency interest payable to receivership creditors. This also may lend a degree of uncertainty to financial disclosures that the FDIC provides in receivership accountings

---

[4] See e.g. Irving Independent School District v. Packard Properties, 970 F.2d 58 (5th Cir. 1992) (Legal Memorandum, published after litigation was commenced on an issue, which was issued in connection with FDIC policy statement, was not entitled to deference, among other things, because timing of publication led court to conclude that it was the product of "biased opportunism").

[5] In Smiley v. Citibank, N.A., -- U.S. --, 116 S.Ct. 1730 (June 3, 1996) the Court overruled challenges to a regulation promulgated by the Comptroller of the Currency, pursuant to the notice-and-comment procedures of the Administrative Procedure Act, even though the regulation was prompted by the litigation, including the suit at issue. The Court found, "That it was litigation which disclosed the need for the regulation is irrelevant." Id., 1733.

which are required by the FDI Act. The proposed regulation will serve as a public notice and reference regarding the applicable interest rate and payment priority.

FDIC's current guidance merely follows applicable state and federal law and judicial precedents. This may result in potentially significant differences in post-insolvency interest distributions between receiverships, based solely upon the failed institution's charter. Reliance upon state judgment rates may also result in significant differences in outcomes between similarly situated state bank receiverships that are subject to differing state laws. Additionally, reliance upon state judgment rates, depending upon the circumstances involved, may result in what may appear to be over-compensation of creditors to the detriment of an institution's shareholders.

Legal Rationale. A regulation addressing the interest rate and priority issues is needed because instances have increasingly arisen over the past 2-3 years where receiverships have had sufficient assets to make post-insolvency interest distributions. This may occur more frequently in the future because of certain Prompt Corrective Action requirements enacted in the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), litigation regarding various contingent claims presently being pursued by FDIC receivers, and as receivers' commitments under various loss sharing agreements with failed institution acquirors expire.

There also is a lack of uniformity regarding the rate and priority of payment of post-insolvency interest in the various types of receiverships the FDIC is administering, making this a potentially fertile area for disputes and litigation. Therefore, uniform and consistent rules will be beneficial to the public, creditors and equity holders of affected institutions. A regulation governing these issues also should reduce the burden upon the court system and receivership resources by resolving issues addressed in the regulation without the need for court intervention.

While the FDI Act does not clearly address the Corporation's ability to supplant state laws relating to post-insolvency interest in liquidations of state chartered institutions, the Corporation has the authority to prescribe regulations which it may deem necessary to carry out the provisions of the FDI Act or any other laws it has responsibility for administering. 12 U.S.C. §1819 Tenth. Additionally, section 1821(d)(1) authorizes the Corporation to prescribe such regulations as it determines are appropriate regarding the conduct of receiverships. Post-insolvency interest payments are not addressed in the FDI Act,

however, providing for their payment is a necessary incident of the FDIC's express statutory responsibilities of administering a receivership claims process, paying dividends to creditors, and returning any remaining assets to the failed institution's shareholders. Under the circumstances, the Corporation will be provided reasonable discretion in interpreting the scope of its authority to regulate in this area. The Corporation's action should, therefore, be upheld even if not within explicit statutory authority, when and if it represents a legitimate, reasonable, and direct adjunct to the power explicitly conferred. United States v. Chesapeake & Ohio Railroad Co., 426 U.S. 500 (1976).

ANALYSIS - OPTIONS AND ALTERNATIVES CONSIDERED [6]

A. Interest Rate

The FDIC may maintain its current practice with or without a regulation. While the FDIC may obtain various benefits from a regulation, such as the ability to bind the public and obtain judicial deference to its administrative pronouncement, a regulation may limit FDIC's flexibility on the interest rate issue and render any deviation from the regulation's requirements invalid.

- Maintaining the current practice:
  - Provides creditors of estate with maximum amount of interest to which they are legally entitled;
  - Recognizes impact of varying state laws and judicial decisions;
  - Does not resolve rate disparities between receiverships for different types of institutions; and
  - Makes this the most labor intensive option due to revisions to state laws, new court decisions, and need to calculate interest (as often as monthly for some savings associations under section 360.3).

[6] Recommended options appear in bold print for the reader's convenience.

1. Maintain Status Quo - Without Regulation

Advantage - No action required.

Disadvantage - Without interest rate regulation, in the absence of a rate specified by statute or controlling court precedent, rate applied is subject to court challenge and de novo judicial review.

2. Maintain Status Quo - With Regulation

Advantages - Minimal rationalization required to support regulation because it essentially implements existing law or reasonable extensions thereof. Reduces probability of an effective challenge by receivership creditors and shareholders, assuming appropriate Administrative Procedure Act processes are followed.

Disadvantages - None, other than those stated in the introduction to this section.

- Uniform Rate

The FDIC also can attempt to establish a uniform rate for all receiverships, regardless of their charter. The following items apply equally to all uniform rate options:

- Utilization of a uniform rate for all receiverships will reduce internal administrative burdens;

- Because section 360.3 only provides for interest to be paid to creditors in category 6, and assuming no other modifications to that regulation, general creditors of the receivership (including the FDIC, as a subrogated deposit claimant) will receive the majority of any financial advantage or disadvantage; [7]

- FDIC's ability to supplant state laws by regulation may

[7] This may increase potential litigation risks for FDIC in certain savings association receiverships if significant recoveries are obtained on contingent claims.



App. 548

be challenged;[8].

- Utilization of a uniform rate, in some circumstances, may potentially conflict with requirements established in NDP provision of FDI Act where a rate has been established by state statute or judicial precedent;[9] and

- Uniform rate may be greater or less than the rate currently specified under section 360.3, for savings associations subject to that regulation.

Additional advantages and disadvantages of each option are listed below.

1. <u>Uniform Rate for All Receiverships - U.S. Treasury Financial Manual Rate</u>

Advantage - Publicly available rate charged on obligations owed to and from the Federal government.

Disadvantages - Focuses only on the FDIC's entitlement, as opposed to the entitlement of all creditors. Rate is only updated annually, in January. Rate is based upon average investment rates for the 12-month period ending every September of the preceding year. FDIC Board of Directors approved discontinuing use of this rate for calculating interest on over- and underpayments of deposit insurance assessments, in Federal Register notice, dated September 29, 1995, in favor of the 90-day T-Bill rate, adjusted quarterly, because the data is significantly aged by date of publication and may not be reflective of current market rates in volatile interest rate environments. Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate for some receiverships. Difficult to rationalize

---

[8] However, the number of receiverships where this could pose a serious issue are negligible and the position could be bolstered by the Corporation exercising its statutory right of self-appointment.

[9] NDP does not address the issue of rate, payment or priority of post-insolvency interest distributions. The statute indicates that state law is superseded by NDP, but only to the extent state law is inconsistent with NDP. NDP authorizes FDIC to make inconsistency determinations, subject to Administrative Procedure Act review, upon the request of the FDIC, any creditor, or a State.



AM00097054

legal justification for utilization of this rate for all creditors.

2. Uniform Rate for All Receiverships - Federal Judgment Rate

Advantages - Publicly available rate.[10] Rate has been applied to national bank receiverships by U.S. Supreme Court. Analogy of allowed claim to a judgment, for purposes of determining applicable rate, is widely recognized by judicial precedents. U.S. Supreme Court precedent concerning Federal Judgment Rate provides basis, by analogy, for "locking" rate at date of receiver's appointment, which compliments other judicial precedents holding that creditors' rights must be "fixed" at the point of insolvency. Application of this rate will bring all receiverships in line with current standard being applied to national bank receiverships, thereby eliminating rate disparity between receiverships for different types of institutions.

has also let another rate apply

but see Chemical Ba

Disadvantages - Federal Judgment Rate may be greater or less than rate which may otherwise be applicable under state law[11] for some receiverships. The same is true for the rate currently specified under section 360.3, for savings associations subject to that regulation.

3. Uniform Rate for All Receiverships - FDIC Investment Rate

Advantages - If rate floats, assures that FDIC - which usually holds 95-98% of claims against receivership estate - earns rate it could otherwise have earned on invested funds. Rate may be greater or less than rate established using other federal rates considered.

Disadvantages - Utilization of this rate is considered likely to embroil the FDIC in litigation over the calculation of its investment rate because the FDIC is the only source from which rate can be obtained. Focuses primarily on the FDIC's entitlement, as opposed to the entitlement of all creditors. Rate will vary with the mix of maturities for U.S. government obligations held in the FDIC's investment portfolio at any given time. Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate

[10] This rate is the 1 Year T-Bill rate established pursuant to 28 U.S.C. § 1961.

[11] Rates under state laws vary but are generally between 6 to 12% per annum.

for some receiverships. Difficult to rationalize viable legal justification for utilization of this rate.

4. Uniform Rate for All Receiverships - Three Month Treasury Bill Rate

Advantage - Publicly available rate.

Disadvantages - Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate for some receiverships. Difficult to rationalize viable legal justification for utilization of this rate.

7. Federal Financing Bank Borrowings Rate (FDIC Cost of Funds Rate)

Advantage - Publicly available rate.

Disadvantages - Rate may be greater or less than rate which may otherwise be applicable under state law or under the Federal Judgment Rate for some receiverships. Difficult to rationalize viable legal justification for utilization of this rate.

B. Floating or Locked Interest Rate

The FDIC's current guidance does not address whether the interest rate should "float" throughout the life of the receivership or "lock" on the date of insolvency. The FDIC's practice is to lock the rate on the date of insolvency, other than for institutions subject to section 360.3. [12]

1. Floating Interest Rate

Advantages - Allows interest rate to be adjusted on a periodic basis to compensate for increases or decreases in applicable interest rate over time. Rate should never be greater or less than the index to which it is tied.

Disadvantages - Experience with floating rate currently provided in section 360.3, applicable to certain savings associations, indicates that constant recalculations based upon floating rates are a complex task. Calculation requires periodic recalculation of principal and application of appropriate interest rates to outstanding principal balance to ascertain the amount of post-

[12] The regulation mandates a floating rate.

insolvency interest owed at any particular time. Existing legal precedents do not appear to provide support for floating rate because most courts analogize allowed claims against receiverships to judgments and judgments generally "lock" when a judgment is entered. Increased possibility of calculation errors due to constant recalculations. Difficult for creditors and shareholders to calculate post-insolvency interest claim because of need to prospectively adjust rate. Deviates from current practice for receiverships which are not subject to section 360.3. May potentially affect the accuracy of receivership financial statement disclosures issued by FDIC due to prospective nature of required adjustments. May result in litigation from certain creditors of institutions, not subject to section 360.3, if floating rate results in smaller post-insolvency interest distributions than are required if rate locks on date of insolvency. May result in litigation from shareholders of institutions, not subject to section 360.3, if floating rate results in greater post-insolvency interest distributions than are required if rate locks on date of insolvency.

2. <u>Locked Interest Rate</u>

Advantages - Interest rate remains constant throughout life of receivership making calculation of post-insolvency interest claim easily determinable for the public, receivership creditors; and shareholders. Reduced possibility of calculation errors because rate is ascertained retrospectively and adjustments to principal balance of claims are all that must be considered to ascertain amount of claim. Existing judicial precedents and the National Bank Act's ratability requirement lend support to the concept of locking the rate as of the date of the receiver's appointment. Consistent with current FDIC practice, for institutions other than those subject to section 360.3, regarding calculation of post-insolvency interest.

Disadvantages - Locked rate may be significantly greater or less than index to which it is tied. Deviates from current practice for receiverships subject to section 360.3. Locked rate may result in litigation from certain savings association creditors, subject to section 360.3, if floating rate currently provided in the regulation results in greater post-insolvency interest distributions to creditors than are required if rate locks on date of insolvency. Locked rate may result in litigation from certain savings association shareholders, subject to section 360.3, if floating rate currently provided in the regulation results in smaller post-insolvency interest distributions to creditors than are required if rate locks on date of insolvency.


App. 552

## C. Priority of Payment for Post-Insolvency Interest

The FDIC's current guidance does not address the priority of payment of post-insolvency interest. FDIC's current practice is to make a ratable distribution of post-insolvency interest, without regard to the class of the underlying claim, when the issue is not specifically addressed by federal regulation [13] or state statute. Thus, each class of claims shares equally in interest distributions after the payment of principal to each class.

If the FDIC makes the priority of post-insolvency interest distributions uniform, the following items will be common to all options:

- Utilization of a uniform distribution priority for all receiverships will reduce internal administrative burdens significantly;
- FDIC's ability to supplant state laws specifying distribution priority for post-insolvency interest by regulation may be subject to challenge; [14]
- Utilization of a uniform distribution priority, in some circumstances, may potentially conflict with requirements established in NDP provision of FDI Act where a distribution priority has been established by state statute or judicial precedent; [15]
- NDP amendment to the FDI Act does not specify distribution method for priority of post-

---

[13] Because section 360.3 specifically addresses the priority of interest distributions, the FDIC pays interest in the manner specified in the regulation, i.e., only to category 6 creditors, ratably with category 7 creditor distributions.

[14] However, the number of receiverships where this could pose a serious issue are negligible and the position could be bolstered by the Corporation exercising its statutory right of self-appointment.

[15] NDP does not address the issue of rate, payment or priority of post-insolvency interest distributions. The statute indicates that state law is superseded by NDP, but only to the extent state law is inconsistent with NDP. NDP authorizes FDIC to make inconsistency determinations, subject to Administrative Procedure Act review, upon the request of the FDIC, any creditor, or a State.

insolvency interest payments;

- Utilization of uniform distribution priority may alter distributions to creditors of certain savings association creditors subject to section 360.3, assuming application of regulation to prospective receivership distributions, because the regulation currently provides only for the ratable payment of interest to category 6 creditors, with distributions to category 7 creditors;

- Utilization of uniform distribution priority arguably expands the number of classes of creditors, under section 360.3, receiving post-insolvency interest distributions from a single class to all classes, which may adversely impact general creditor and shareholder distributions;[16] and

- Utilization of a uniform distribution priority may reduce the total payments to depositors and general creditors in receiverships subject to section 360.3 and under some state laws.

---

[16] An argument exists that post-insolvency interest distributions can be made to all creditors before making shareholder distributions because the regulation does not specifically refer to "post-insolvency" interest distributions. In similar situations, when courts have interpreted statutes that are silent on the issue of post-insolvency interest distributions, virtually all of the courts have been willing to read the requirement into the distribution scheme as an incident to the creditors' claims. The regulation's failure to specifically provide for the payment of post-insolvency interest prior to making shareholder distributions and its inclusion of an interest payment requirement in favor of category 6 claimants, however, may weaken the effectiveness of this argument.

An alternative the FDIC could consider would be to amend the regulation to specifically provide for the payment of post-insolvency interest to all classes of creditors, prior to making shareholder distributions, and provide credit for distributions previously received by the category 6 creditors under the existing regulation against their post-insolvency interest distribution under an amended regulation.

1. <u>Payment of Interest to All Creditors Within a Class Prior to Principal Payments to Creditors in Lower Classes</u>

Advantages - Provides the most favorable treatment to depositors, in depositor preference distribution scheme, and general creditors in non-depositor preference distribution schemes. This payment method is consistent with a few existing state distribution schemes.

Disadvantages - Allows higher priority creditors to obtain payment of the principal amount of their claims and all post-insolvency interest while the lower classes may receive no distribution on their claims. Distribution method appears to be contrary to court interpretations of the National Bank Act's ratable distribution requirement, with regard to national bank liquidations. Distribution method represents a minority position on the issue with regard to state liquidation schemes.

2. <u>Payment of Interest by Class After Payment of the Principal Amount of All Proven Creditor Claims</u>

Advantages - Allows all creditors to recover principal amount of their claims before any post-insolvency interest distributions are made. Provides favorable treatment to depositors, in depositor preference distribution scheme, and general creditors in non-depositor preference distribution schemes.

Disadvantages - Allows higher priority creditors to obtain all of their post-insolvency interest payments before any interest distributions are made to creditors in lower classes. Distribution method appears to be contrary to court interpretations of the National Bank Act's ratable distribution requirement, with regard to national bank liquidations. Although this distribution method may have been adopted in one or two state distribution schemes, legal justification and support for its utilization on a nationwide basis is considered weak.

3. <u>Ratable Payment of Post-Insolvency Interest to All Creditors, Regardless of Class, After Payment of the Principal Amount of All Proven Creditor Claims</u>

Advantages - Appears to be the majority rule established by the few judicial precedents addressing the issue. Is the position most likely to be favored by the states because of judicial preference for ratability in the absence of other controlling standards. Method is consistent with the National Bank Act's ratable distribution requirement. Allows all creditors to share equally in post-insolvency interest distributions, unless they

have contracted to have their claims subordinated to those of other creditors or their claims are subordinated by statute.

Disadvantages - None, other than those stated in the introduction to this section.

D. Applicability of the Regulation to Existing Receiverships

FDIC's current guidance does not address the issue of the law to be applied if the distribution scheme changes while an institution is being liquidated. The FDIC's practice, however, has been to apply the law as it existed at the time of the receiver's appointment and only apply changes in applicable law to future receiverships. Legal precedents exist, however, upholding prospective alterations of dividend distributions due to intervening changes in law. [17] Additionally, the FDIC and RTC properly altered distributions in receiverships pending in Florida when that state amended its receivership priority scheme and made the changes applicable to dividend distributions occurring after the date of the amendment of the statute. [18]

1. Retroactive Application of Regulation

NOT AN OPTION. U.S. Supreme Court has indicated that federal agencies exceed their authority by promulgating retroactive regulations, unless such authority has been expressly provided by Congress. [19]

2. Prospective Application to Future Receiverships Established After Regulation Becomes Effective

Advantages - Option poses the fewest legal problems and will be the easiest to administer because it will affect only

---

[17] See e.g. In re Advisory Opinion To The Governor, 593 A.2d 943 (RI 1991); Maryland Insurance Guaranty Association v. Muhl, 504 A.2d 637 (Md. Ct. Spec. App. 1986)(Claims against receiverships constitute a mere expectancy of a distribution and the claimant does not acquire vested rights to particular modes of distribution (including priorities), such that the legislature cannot change them).

[18] See Stattin v. RTC, 883 F. Supp. 678, aff'd, 74 F.3d 1252 (11th Cir. 1995).

[19] Bowen v. Georgetown Univ. Hospital, 488 U.S. 204 (1988).

receiverships established after regulation becomes effective. Provides maximum notice to the public of how FDIC will deal with issues addressed in the regulation when an institution goes into receivership. Poses no issues with regard to creditors or shareholder of institutions subject to section 360.3 because that regulation is inapplicable to any receivership established after August 9, 1993, the date NDP was enacted.

Disadvantage - Does not resolve any of the issues arising, or which may arise in the future, out of existing receiverships.

3. Prospective Application to Future Dividend Distributions From Existing Receiverships and to Receiverships Established After Regulation Becomes Effective

Advantages - Prospective application to future dividend distributions can be supported by existing judicial precedents because it does not affect vested rights. Addresses issues arising or which may arise in the future in existing receiverships. Should provide judicial deference to FDIC concerning issues addressed by the regulation, if all required Administrative Procedure Act procedures are followed. May significantly reduce burden on staff and financial resources of FDIC and receiverships required to defend legal disputes over issues addressed by the regulation.

Disadvantages - Public perception concerning FDIC changing rules after receiverships have been established, particularly with regard to institutions subject to section 360.3. Although the Administrative Procedure Act generally provides the public with an opportunity for notice and comment before a regulation can be implemented, a sympathetic court may attempt to find ways to avoid providing the FDIC deference normally provided for formal agency action, if a challenge is raised by a creditor or shareholder of an existing receivership, because of the promulgation of the regulation after the receivership was established.

FINANCIAL IMPACT

This analysis addresses the use of the Federal Judgment Rate as the applicable interest rate to calculate interest payments to creditors of receiverships in instances where the funds available for the payment of interest on proven receivership claims. The impact of the recommendation to change the priority in which

these payments are made is not reflected below.[20]

- Of the 1015 active receiverships, an estimated 28 receiverships, comprised of 8 FDIC institutions and 20 former RTC institutions, will have funds available for interest payments to creditors.

- Approximately 20 receiverships (5 FDIC and 15 former RTC) of the total 28 receiverships will not be affected by a change in the interest rate due to the insufficient value of the assets remaining in the receiverships. Regardless of the rate utilized, any excess recoveries will be designated as interest payments.

- Another 5 RTC receiverships will have funds available to make distributions to lower priority creditors, regardless of the rate utilized. Adopting the Federal Judgment Rate will reduce funds available for lower priority creditors of one of these receiverships by $150,000. In the other 4 RTC receiverships, total funds available for distribution to lower priority creditors will be reduced by approximately $18.3 million.

- The remaining 3 receiverships (FDIC) may have funds available for distribution to equity holders. These receiverships are national banks a federal association and the amounts distributed will not be affected by a change in the rates because the FDIC is already applying the Federal Judgment Rate.

---

[20] This information has not been prepared because the change in interest priorities under section 360.3 will require payment of the principal amounts of certain U.S. government tax claims before the payment of interest to general creditors. Information regarding the amount of these tax claims was not readily available at the time this memorandum was prepared.

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 LfyX4bFaI2mJojlo5du3rtDawRoYofewGA7MrXkDfg940nJzqGdRklJmlrtVWrL6
 IOrWcn/CTP9DyxQ4/UlJew==

<SEC-DOCUMENT>0000020639-98-000006.txt : 19980401
<SEC-HEADER>0000020639-98-000006.hdr.sgml : 19980401
ACCESSION NUMBER:		0000020639-98-000006
CONFORMED SUBMISSION TYPE:	10-K
PUBLIC DOCUMENT COUNT:		4
CONFORMED PERIOD OF REPORT:	19971231
FILED AS OF DATE:		19980331
SROS:			NONE

FILER:

	COMPANY DATA:	
		COMPANY CONFORMED NAME:			AMBASE CORP
		CENTRAL INDEX KEY:			0000020639
		STANDARD INDUSTRIAL CLASSIFICATION:	INVESTMENT ADVICE [6282]
		IRS NUMBER:				952962743
		STATE OF INCORPORATION:			DE
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		10-K
		SEC ACT:		
		SEC FILE NUMBER:	001-07265
		FILM NUMBER:		98583765

	BUSINESS ADDRESS:	
		STREET 1:		GREENWICH OFFICE PARK BLDG 2
		STREET 2:		51 WEAVER STREET
		CITY:			GREENWICH
		STATE:			CT
		ZIP:			06831-5155
		BUSINESS PHONE:		2035322000

	MAIL ADDRESS:	
		STREET 1:		GREENWICH OFFICE PARK, BLDG 2
		STREET 2:		51 WEAVER STREET
		CITY:			GREENWICH
		STATE:			CT
		ZIP:			06831-5155

	FORMER COMPANY:	
		FORMER CONFORMED NAME:	HOME GROUP INC
		DATE OF NAME CHANGE:	19890608

	FORMER COMPANY:	
		FORMER CONFORMED NAME:	CITYHOME CORP
		DATE OF NAME CHANGE:	19780917
```

</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>FORM 10-K FOR YEAR ENDED 12/31/97
<TEXT>

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

(Mark One)
|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (fee required)

For the fiscal year ended December 31, 1997

|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (no fee required)

For the Transition Period From ________ To ________

Commission file Number 1-7265

AMBASE CORPORATION
(Exact name of registrant as specified in its charter)

| DELAWARE | 95-2962743 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

51 Weaver Street, Building 2, Greenwich, CT 06831-5155
(Address of principal executive offices)

Registrant's telephone number, including area code (203) 532-2000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($0.01 par value) | None |
| Rights to Purchase Common Stock | None |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to the Form 10-K. X

At January 30, 1998, there were 44,533,519 shares of registrant's Common Stock outstanding. At January 30, 1998 the aggregate market value of registrant's voting securities (consisting of its Common Stock) held by nonaffiliates of the registrant, based on the average bid and asking price on such date of the Common Stock of $3.56 per share, was approximately $128 million. The Common Stock constitutes registrant's only outstanding security.

Portions of the registrant's definitive Proxy Statement for its 1998 Annual Meeting of Stockholders, which Proxy Statement registrant intends to file with the Securities and Exchange Commission not later than 120 days after the close of its fiscal year, is incorporated by reference with respect to certain information contained therein, in Part III of this Annual Report.

The Exhibit Index is located in Part IV, Item 14, Page 37.

<PAGE>

AmBase Corporation

Annual Report on Form 10-K
December 31, 1997

CROSS REFERENCE SHEET FOR
PARTS I, II, III and IV — Page

PART I

Item 1. Business....................1

Item 2. Properties....................2

Item 3. Legal Proceedings....................2

Item 4. Submission of Matters to a Vote of Security Holders....................3

Executive Officers of the Registrant....................3

PART II

Item 5. Market for Registrant's Common Equity and Related Stockholder Matters....................4

Item 6. Selected Financial Data....................5

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations....................5

Item 8. Financial Statements and Supplementary Data....................12

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure....................36

PART III

Item 10. Directors and Executive Officers of the Registrant....................36

Item 11. Executive Compensation..........................................36

Item 12. Security Ownership of Certain Beneficial
Owners and Management.........................................36

Item 13. Certain Relationships and Related Transactions..................36

PART IV

Item 14. Exhibits, Financial Statement Schedules and
Reports on Form 8-K...........................................37

<PAGE>

PART I

ITEM 1. BUSINESS

Corporate Profile

AmBase Corporation (the "Company") was incorporated in 1975 by the City Investing Company ("City") as the holding company for The Home Insurance Company, a New Hampshire insurance corporation, and its affiliated property and casualty insurance companies ("The Home"). In 1985, City, which prior to that date owned all the outstanding shares of the Common Stock of the Company, distributed the Company's shares to City's common stockholders. The Home was sold on February 13, 1991 to Home Holdings, Inc. ("Home Holdings").

In December 1997, the Company formed a new wholly-owned subsidiary, SDG Financial Corp. ("SDG Financial"), to pursue merchant banking activities. SDG Financial purchased an approximate 6.3% equity interest in SDG, Inc. for $1,250,000 and was granted the exclusive right to act as the investment banker/financial advisor to SDG, Inc. and all of its subsidiaries and affiliates.

SDG, Inc. is a development stage company which specializes in creating new technology-specific companies that are dedicated to the clinical and commercial development of proprietary, targeted liposomal delivery systems for pharmaceutical therapies and consumer product ingredients. SDG, Inc.'s lipid vesicles are protected by numerous U.S. and related foreign patents.

Also in December 1997, the Company purchased $100,000 of convertible preferred stock in AMDG, Inc. ("AMDG"), a majority owned subsidiary of SDG, Inc. AMDG is a development stage pharmaceutical company focused on the clinical development of new therapies for the treatment of both Type I and Type II diabetes and has received from SDG, Inc. a worldwide, exclusive, royalty-free license to certain patented technology. AMDG raised $3.7 million of equity through a private placement in December 1997.

In November 1993, the Company acquired 51% of the issued and outstanding common stock of Augustine Asset Management, Inc. ("Augustine"), a Florida based investment advisory firm. On October 4, 1996, the Company sold its entire interest in Augustine, to Augustine. See Item 8 - Note 6 to the Company's consolidated financial statements for further information.

In August 1988, the Company acquired Carteret Bancorp Inc. Carteret Bancorp

The Company anticipates that, as a result of filing a consolidated federal income tax return with Carteret FSB, approximately $170 million of tax NOL carryforwards will be generated from the Company's tax basis in Carteret/Carteret FSB as tax losses are incurred by Carteret FSB. The NOL carryforwards generated from the Company's tax basis in Carteret/Carteret FSB would expire no earlier than 2007, and would be available to offset future taxable income, in addition to the $30 million of NOL carryforwards as further detailed below.

In connection with the completion of the federal tax audit years (excluding Fresh Start) through 1992 (excluding the $170 million of tax NOL carryforwards from the Company's tax basis in Carteret/Carteret FSB), as noted above and the Company's federal income tax returns as filed from 1993 to 1996 (subject to IRS audit adjustments), at December 31, 1997 the Company has NOL carryforwards available to reduce future federal taxable income, which expire if unused, as follows:

| | |
|---|---|
| 2006 | $ 3,000,000 |
| 2007 | 12,000,000 |
| 2008 | 3,000,000 |
| 2009 | 7,000,000 |
| 2010 | 5,000,000 |
| | --------- |
| | $30,000,000 |

The utilization of certain carryforwards is subject to limitations under U.S. federal income tax laws. In addition, the Company has approximately $21 million of alternative minimum tax credit carryforwards, which are not subject to expiration.

Under Statement 109, the Company has calculated a net deferred tax asset of $33 million as of December 31, 1997 and 1996, arising primarily from NOL's, the excess of book over tax reserves and alternative minimum tax credits (not including the anticipated tax effects of the approximately $170 million of NOL's expected to be generated from the Company's tax basis in Carteret, resulting from the election decision, as more fully described above). A valuation allowance has been established for the entire net deferred tax asset, as management, at the current time, has no basis to conclude that realization is more likely than not.



<PAGE>



During 1995, the Company recorded as additional income tax expense a $1,800,000 increase in the income tax reserves. The increase in the income tax reserves was the result of the continuing review of the income tax reserves including additional reserves for amounts considered unrealizable. In addition, included in income tax expense is a state tax provision of $197,000 in 1995.

Note 12 - Commitments and Contingencies

Future minimum rental payments, principally for office space, under noncancellable operating leases at December 31, 1997, are: 1998, $74,000; 1999, $79,000; 2000, $80,000; 2001, $20,000; 2002, $0 and thereafter, $0. Rent expense charged to earnings was $67,000, $46,000 and $142,000 for the years ended December 31, 1997, 1996, and 1995, respectively.

Note 13 - Legal Proceedings

(a) The Company is a defendant in a number of lawsuits or proceedings, including the following:

Rolo and Tenerelli v. City Investing Company Liquidating Trust, et al. This is a purported class action filed in the United States District Court for the District of New Jersey (the "District Court"). Plaintiffs assert a variety of Federal and state causes of action in connection with an alleged fraudulent scheme involving the marketing and sale of homesites and houses by General Development Corporation ("GDC"), a former subsidiary of City. Plaintiffs have named as defendants the Company and Carteret, as well as a number of directors and other financial institutions that had business dealings with GDC. On December 27, 1993, the District Court entered an Order and Opinion dismissing the action against all parties (amended on January 17, 1994, to include the dismissal of Carteret Bancorp, Inc. and Carteret). Plaintiffs appealed the order to the United States Court of Appeals for the Third Circuit which affirmed the order and subsequently remanded the case for reconsideration in light of an intervening decision. Upon remand, the District Court again dismissed plaintiffs' complaint on August 24, 1995 and denied plaintiffs' petition for reconsideration. Plaintiffs have appealed the District Court's most recent order to the Court of Appeals where the case remains pending. The parties have completed briefing and argument and are awaiting a decision by the Court of Appeals on the plaintiffs' appeal of the dismissal of the case by the District Court.

In United States v. Brown, an action commenced in the United States District Court for the Southern District of Florida, certain officers of GDC, none of whom were officers of the Company, were convicted of violating the Federal Mail Fraud Statute and certain other related statutes. This development led two of GDC's insurers, National Union Fire Insurance Co. and Pacific Insurance Co., to seek to terminate their directors and officers' insurance coverage in two actions pending in the United States District Court for the Southern District of Florida, Pacific Insurance Co. v. Brown, et al. and National Union Fire Ins. Co. v. Brown, et al. During the fourth quarter of 1996, the U.S. Court of Appeals for the 11th Circuit reversed the conviction of the officers of GDC. Although the Company is not a party to these actions, certain individuals who were directors of GDC and the Company are defendants. Should the insurers be successful in the termination of their coverage, it is anticipated that the Company would be exposed to claims for indemnification. The parties to this litigation are currently engaged in settlement negotiations.

Marshall Manley v. AmBase Corporation. On November 14, 1996, Marshall Manley ("Manley"), a former President, Chief Executive Officer and Director of the Company, commenced an action against the Company, seeking indemnification from the Company pursuant to a May 27, 1993 employment settlement agreement between Manley and the Company. Manley seeks reimbursement of certain alleged payments he made to the Trustee in the bankruptcy proceedings of the law firm of Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey (the "Manley action"), arguing that he served at such firm at the request of the Company. The Manley action is pending in the United States District Court for the Southern District of New

York. The Company filed its answer on January 21, 1997, raising substantial affirmative defenses which the Company intends to vigorously pursue. On October 30, 1997, AmBase amended its Answer and Counterclaims to include a claim of fraud against Manley. In December 1997, Manley moved for summary judgment in his favor. The Company raised substantial opposition to the motion and moved to strike certain of Manley's affirmative defenses which Manley raised in connection with the Company's fraud claim against Manley. Oral argument on the motions is set for May 15, 1998.



<PAGE>



Disputes with Internal Revenue Service. The Company contractually assumed the tax liabilities of City, which, prior to September 1985, owned all the outstanding shares of Common Stock of the Company. The Company also contractually assumed certain tax liabilities of The Home and its subsidiaries from September 1985 through 1989. For all periods through 1991, the IRS and the Company do not agree with respect to only two issues; (1) withholding taxes in connection with a Netherlands Antilles finance subsidiary of City, and (2) "Fresh Start", an insurance industry issue.

(1) Withholding Taxes (Netherlands Antilles). On May 11, 1995, the IRS issued a Notice of Deficiency for withholding taxes on interest payments for the years 1979 through 1985. In the Notice of Deficiency, the IRS contends that City's wholly owned Netherlands Antilles finance subsidiary should be disregarded for tax purposes. The Company vigorously contested the IRS's position in accordance with the IRS's internal appeals procedures. In January 1992, the National Office of the IRS issued technical advice supporting the auditing agent's position. In October 1992, the Company appealed this technical advice to the National Office. The National Office advised the Company that it expected to issue technical advice supporting the auditing agent's position, whereupon, the Company advised the IRS that it was withdrawing its technical advice request.

On June 30, 1995, the Company filed a petition in the United States Tax Court contesting the Notice of Deficiency. The IRS filed its answer on August 23, 1995. The Company filed a motion for summary judgment in its favor on February 13, 1996. On April 17, 1996, the IRS filed a Notice of Objection to the Company's motion for summary judgment. The Tax Court requested, and the Company filed on July 3, 1996, a reply to the IRS's Notice of Objection. On September 19, 1996, the Tax Court denied the Company's motion for summary judgment without prejudice. Based on the Tax Court's examination of the record and the status of the discovery process, the Tax Court concluded that summary adjudication at this time was inappropriate. The Tax Court directed the parties to engage in full and complete discovery as expeditiously as possible. A trial was held in this case on March 24, 1997, after which the Judge asked the IRS and the Company to submit post-trial briefs, which have subsequently been submitted to the Tax Court. If the IRS were to prevail on this issue, the Company would be liable for taxes and interest in excess of the Company's financial resources.

In a case dealing with a similar withholding tax issue, the Tax Court ruled in