1997 V25 2: pp. 271–294
REAL ESTATE
ECONOMICS

NOTICE: THIS MATERIAL MAY
BE PROTECTED BY COPYRIGHT
LAW TITLE 17 U.S. CODE.

# An Analysis of Resolution Trust Corporation Transactions: Auction Market Process and Pricing

Sudhir Nanda,* James E. Owers** and Ronald C. Rogers***

This article describes the operations of the Resolution Trust Corporation (RTC), examines the procedures it employs to resolve distressed Savings and Loan scenarios and investigates the pricing of transactions undertaken by the RTC. The RTC has been criticized for allegedly transferring properties to acquirers at "bargain" prices. The transactions involving publicly traded acquirers in RTC sales are examined from an auction theory perspective. Overall, there is little evidence that winning bidders experience stock price gains. There are, however, subsets of bidders for which the outcomes are predominantly negative. The only category of transactions which provide statistically significant gains to acquirers are Insured Deposit Transfers.

The Resolution Trust Corporation (RTC) is a significant institution in the recent history of the United States financial system. It has had as many as 7,000 employees and has been considered to be the largest real estate owner in the country. During the first three and a half years of its existence it took control of 737 failed thrifts and acquired assets with a book value of $434 billion. The RTC took over the role of resolving the problems of insolvent Savings and Loans (S&Ls) from the Federal Savings and Loan Insurance Corporation (FSLIC) in August 1989, after its creation by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).

Several "sales" of failed thrifts by the FSLIC in late 1988 became controversial. The S&L insurance fund had few resources, and "regulators could only promise future assistance payments and tax breaks to attract buyers."[1] The future assistance primarily took the form of assured returns to buyers. Specified or covered assets carried a "yield maintenance" provision, and an assured return, often in the form of management fees. This structure of returns provided little incentive to improve (or even complete

*Pennsylvania State University, Harrisburg, PA 17057
**Georgia State University, Atlanta, GA 30303
***University of South Carolina, Columbia, SC 29208

[1] *The Wall Street Journal*, July 10, 1991.

the development of) covered assets.[2] Additionally, as has been found in some of the S&L controversy, there were interesting political intonations.[3]

The RTC is charged with the management and disposition of assets, liabilities and operations assumed from failed S&Ls. This role is critical because of its influence on the ultimate cost of the S&L industry's problems to taxpayers, and the degree of efficiency in the redeployment of assets and operations from distressed thrifts. The importance of pricing outcomes of RTC asset sales is apparent from the scale of operations. Approximately $500 billion of assets came to be involved in RTC operations.

Sales practices employed by the RTC have generated considerable controversy in the areas of sales mechanisms, pricing outcomes and administrative processes.[4] The RTC has been harshly criticized for practices such as the random selection of eligible bidders and inadvertent sales of particular properties to more than one bidder. The level of attention paid to the RTC's practices and pricing of transactions is not surprising given the public policy issues associated with an operation of this scale and the controversy surrounding a number of large transactions undertaken by the FSLIC in the period preceding the creation of the RTC.

The purpose of this article is to systematically review the operations of the institution and to examine the pricing outcomes for subsets of resolutions where another party acquires business interests from the RTC. The analysis provides evidence on the pricing of RTC transactions in both auction and merger and acquisitions contexts.

The paper is structured as follows: The following section reviews the acquisitions literature related to this paper and then the selling practices of the RTC are related to auction theory. After the sample, data and methodology are described, research findings are presented and discussed. The final section presents the conclusion.

---

[2] A review of some of these acquisitions revealed that in many cases. ". . . '88 thrifts seem to have decided to play it safe and just collect their fees. " *The Wall Street Journal*, p.1, July 10, 1991.

[3] *The Wall Street Journal*, July 10, 1991, "Buyers of Thrifts Made Big Gifts to Candidates," p. A6.

[4] For example, an article in *Forbes* magazine on October 29, 1990 contended that the RTC was transferring assets at prices reflecting "fire sale" levels.

## Background

The background literature for this study includes the *whole-firm acquisitions* literature (*e.g.*, Jensen and Ruback 1983; Jarrell, Brickley and Netter 1988; and Black 1989). The literature indicates that in recent transactions there is little evidence of systematic gains to acquirers, and some evidence of negative results. For particular subsets of bidders, the outcome is predominantly negative.

Another set of related literature is that pertaining to *acquirers in sell-off divestiture transactions*. The findings in studies such as Hite, Owers and Rogers (1987) are that both sellers and acquirers, on average, experience gains and that some of the aggregate increase in value accrues to the acquiring firm, reflected in an increase in their stock price. In the specific case of real estate assets, Glascock, Davidson and Sirmans (1991) investigated the impact of the number of bidders, frequency of acquisition and type of assets transferred for buyers and sellers. Overall, they found that both sellers and buyers gain, but the latter only in the case of infrequent acquisitions. A positive reaction for both parties was more likely when property, rather than a business unit, was being transacted.

Thus, the findings from the general literature on acquisition of whole-firms and business units are varied and do not portend a specific pattern of outcomes for acquirers in RTC transactions. If there is competition among bidders, then, as in the case of whole-firm acquisitions, there may be little if any gain in value for acquirers. In contrast, if the RTC transactions more closely resemble the market process for acquisitions of business *units*, then the process may be anticipated to generate gains to buyers. From the acquirer's perspective, some RTC transactions are similar to whole-firm acquisitions, while others are similar to sell-off divestitures of business units.

Much of the work of the RTC involves the transfer of distressed real estate assets. Crockett (1990) considers the process of managing distressed real estate assets, noting the distinction between distressed assets and distressed markets, and the roles of information asymmetry and incentive structures. Curry, Blalock and Cole (1991) find that the average rate of recovery on distressed commercial real estate assets under FSLIC receiverships in the late 1980s is 64%. The particular rate of recovery for given types of assets was influenced by the local market conditions, difficulty of management and disposition and write-downs prior to the FSLIC takeover. Recognizing the complexity of the process involved in efficiently managing and disposing of large quantities of distressed real estate, Benveniste, Capozza, Kormendi and

Wilhelm (1994) model the process in a principal/agent framework. They examine the standard asset and management agreement (SAMDA), a specific RTC contract, within their general framework for asset and management contracts.

Previous empirical research into the *acquisition of distressed financial institutions* has produced mixed findings. Several studies examine the use of the Purchase and Assumption strategy by the FDIC in the case of failed commercial banks. Giliberto and Varaiya (1989) consider such transactions as first-price, sealed bid auctions and find evidence of winner's curse.[5] Pettway and Trifts (1985) examine the abnormal returns to acquirers in these transactions. They find positive abnormal returns around the merger, followed by a persistent decline over the following 45 days. James and Wier (1987) conclude that prevailing bidders experience gains. Bertin, Ghazanfari and Torabzadeh (1989) examine 37 FDIC transactions over the interval 1983–1987 and find significant positive abnormal returns for acquirers. Balbirer, Jud and Lindahl (1992) examine abnormal return outcomes for acquirers of failed S&Ls in the pre-RTC 1980s, and find evidence of gains to acquirers. Gosnell, Hudgins and MacDonald (1993) compare acquirer outcomes under FSLIC and RTC assisted thrift mergers. They find little evidence of gains to acquirers.

Thus, while there is variation in the findings regarding acquiring firms in these distressed-institution transactions, there is a predominance of positive consequences for acquirers. A primary goal of this article is to investigate whether the valuation outcome for acquirers in RTC-resolution transactions varies with the specific nature and details of the transaction.

Ely and Varaiya (1992) examine the relationship between the structural attributes of RTC transactions and other bids to investigate pricing outcomes. Their analysis "utilizes predictions linking the magnitudes of winning and losing bids with the number of participating bidders and the degree of uncertainty of the thrift's franchise value" to address the issue of whether bidders overpay. They do not find evidence of underpricing by the RTC. This article investigates similar issues to Ely and Varaiya by examining abnormal returns associated with subsets of acquirers rather than relative bid levels as the key metric.

5 "Winner's curse" refers to the outcome in which the prevailing/acquiring bidder has paid more that the value of the object acquired. The "winner" is thus "cursed."

[redacted]



### The Auction Market Nature of RTC Transactions

Many RTC transactions can be categorized as auctions. Potential bidders attend due diligence informational meetings, and then submit sealed bids for the target assets. In pursuit of its "minimum cost" charter, the RTC has primarily used variants of the English auction and first-price, sealed-bid auction.[6] The transactions analyzed are typically first-price, sealed bid auctions.

Auction theory emphasizes the significance for the outcome of whether the *object* of the auction has the same value to all potential bidders (the *common value* assumption), or whether the object has potentially different values for various bidders (the *independent private value* assumption). McAffee and McMillan (1987) note that these may be interpreted as polar cases. The early formal work in auctions (*e.g.*, Vickrey 1961) assumed independent values between agents. Milgrom and Weber (1982) developed the notion of affiliated/common values and noted the significance of this versus independent private values. Kagel and Levin (1986) note the significant implications of common value auctions, particularly in the context of auctions by federal government agencies. The "winner's curse" has been discussed in the context of mineral lease and oil lease rights auctions where, just as with RTC resolutions, there is a transfer of property rights from government to private sector ownership.

When the assets and/or operations of an insolvent S&L are considered, it is possible that the object of the auction has different value to various bidders. For example, a particular set of S&L operations might have greater *private* value to an acquirer in close geographical proximity. In contrast, a larger, more complete set of operations may have a *common value* to all potential acquirers.[7] Such larger sets of operations likely have fewer attributes uniquely of value to any one potential acquirer. Additionally, the

---

[6] See McAffee and McMillan (1987) and Smith (1987) for analysis of the formal structure of auctions.

[7] For example, the common value characteristics of oil leases have frequently been said to generate winner's curse scenarios for prevailing bidders. If this anticipation is applied to acquirers in RTC resolutions, the expectation of NEGATIVE valuation consequences would follow, a prognostication clearly at odds with the claims of "fire sale" prices found in some press reports. For a detailed description of underlying values assumptions in auctions see McAffee and McMillan, p. 720. For a more complete application of these considerations to the RTC, see Ely and Varaiya (1992).

number of bidders and their game theoretic behaviors can affect the outcome.[8]

Given the uncertainty about whether RTC transactions involve private or common value objects and the related bidding strategies, the valuation outcome for bidders is an issue for empirical determination. The pricing outcomes are investigated by examining stock price reactions to announcements of completed transactions.

### *Risk and Auctions*

Uncertainty regarding the value of what is being sold impacts bidding strategies. This intuition has been formalized in the auction literature. Ely and Varaiya (1992), drawing from Capen, Clapp and Campbell (1971) and Kagel and Levin (1986), consider the role of variance of value estimates in formulation of optimal bidding strategy. In developing a model for the asset disposal process by the RTC, Lea and Thygerson (1994) conclude that sale proceeds will be inversely related to the uncertainty of both the value of the property and the sales practices used by the RTC in its disposition. These models all conclude that the greater uncertainty regarding the true value of what is being auctioned, the lower the optimal bid.

The implications for RTC transactions are substantial. Some RTC resolutions are hypothesized to involve assets with a *common value* to all bidders, while others potentially have *private values* across the set of potential bidders. This is depicted in the two columns in Figure 1. For cases where the "object of the auction" has low or zero variance of intrinsic value (row 1), bidders will experience little/no gain if the object has a *common value* to all potential bidders. Conversely, where there is little uncertainty of intrinsic worth, but that worth varies from one bidder to another (Independent Private Value), the bidder for whom intrinsic worth is greatest will experience gains.[9]

[8] McAfee and McMillan note that a first-price, sealed-bid auction (as typically employed by the RTC) does not have a *dominant equilibrium*, wherein the optimal strategy for each bidder is well-defined regardless of how high he anticipated competing bidders will go. The *Nash equilibrium* (a weaker criterion than the dominant equilibrium) then obtains. In determining his optimal bid, each bidder anticipates as best he can the strategies of competing bidders.

[9] This will follow from a strategy of bidding in the range bounded (below) by the value to the second-highest worth bidder and (above) by the value to the highest private-value bidder.

[redacted]

[redacted]



**Figure 1** ■ Implications of the nature and risk of S&L assets transacted for the abnormal return of acquirers.

Implications of the nature (Common Value or Independent Private Value) and risk level of S&L assets transacted for the Abnormal Returns of Acquirers. If there is little risk and uncertainty regarding the value of the target assets, when that value is the same for all bidders (Quadrant I) all will bid close to that common intrinsic value, and no bidder will create value by acquiring the assets. If values differ by acquirer (Quadrant II), the bidder for whom the assets have highest value can make a positive NPV acquisition. When there is considerable uncertainty regarding target asset values (row 2), then if the assets are of the same value to all acquirers (Quadrant IV), winner's curse will likely be experienced by the prevailing bidder. The implications for Quadrant III are indeterminate.

| | Common Value | Private Value |
|---|---|---|
| Low Risk | *Quadrant I*<br>0 | *Quadrant II*<br>>0 |
| High Risk | <0<br>*Quadrant IV* | ≥0<br>*Quadrant III* |

The implications for acquirers of common value and private value assets where there is high uncertainty regarding their intrinsic value is depicted in row 2 of Figure 1. With high variance in estimating intrinsic worth, when the object has a common value nature bidders will employ strategies to "win" which might lead to overpayment and "winner's curse," and associated declines in stock price as analysts and investors identify the overpayment. While the acquirer prevails in terms of acquiring the object property, it does not win in terms of value creation. Hence, the potential for negative acquirer outcomes in Quadrant IV of Figure 1. In Quadrant III, the outcome is indeterminate, depending on the magnitude of variance of intrinsic worth, the size of the differential values and strategies employed by bidders in order to prevail.

## Sample and Methodology

### *Sample*

The sample for the empirical work in this article was identified in the rosters in the quarterly *Mergers and Acquisitions*. Its listing of all activity includes identification of the selling party and specifically identifies the RTC when it is the seller. The sample includes all publicly traded acquirers in RTC transactions with the RTC in 1989 and 1990 subject to minimum data requirements for the methodology.

The RTC provided details of the sale transactions. This includes attributes of the bids and identification of both winning and losing bidders. To be included in the final sample, it was required that firms have complete daily return series for the period −200 to +100 days relative to the date of the outcome announcement (day 0) in *The Wall Street Journal*. A number of firms bid in multiple auctions, and when a firm was involved in two transactions within ten trading days, only the first transaction was included. This screen resulted in the exclusion of two transactions.

The event dates were identified by an examination of *The Wall Street Journal* and its *Index* and the *Dow Jones News Retrieval Service*. When necessary, additional announcement details were obtained from *The American Banker*. These sources were also used to screen for the presence of confounding events.

The resulting sample includes 58 successful acquirers and 46 losing bidders. The analysis of the abnormal returns is restricted to these samples. Descriptive statistics for the winning bidders are provided in Table 1. The differences between Exchange-Listed and OTC firms is marked in Panel B, which refers to the absolute size of the transactions. In contrast, the auction attributes and relative sizes reported in Panel A are generally similar for both Exchange-Listed and OTC firms.[10] For some items in Table 1, the averages reported accommodate a wide range of individual outcomes. For example, for Insured Deposit Transfer transactions, the percentage of bids relative to the core deposits being acquired had an average of 2.5% (as in Table 1, Panel A), a median of 1.2%, and a range from 0.0% to 16.6%.

---

[10] The Exchange-Listed and OTC subsets were examined separately. There is little differences in abnormal returns between the two subsets, and these findings are not otherwise reported here. The results are available from the authors.

**Table 1** ■ Descriptive statistics for auctions of S&Ls by the Resolution Trust Corporation.

| Variables | Combined ($n = 58$) | Exchange ($n = 30$) | OTC $n = 28$ |
|---|---|---|---|
| **Panel A: Attributes** | | | |
| Number of Bidders | 4.5 | 4.9 | 4.3 |
| Number of Bids | 5.6 | 5.7 | 5.5 |
| Bidders Attending[1] | 25.8 | 21.8 | 29.4 |
| Bidders Conducting Due Diligence | 4.7 | 5.6 | 3.9 |
| Percentage Bidding (%)[2] | 38.2 | 23.1 | 51.7 |
| Months S&L was with RTC[3] | 9.7 | 11.0 | 8.6 |
| Relative Size (%)[4] | 11.4 | 7.5 | 15.1 |
| Percentage of Assets Acquired (%)[5] | 51.4 | 42.9 | 59.6 |
| Winning Bid to Core Deposits (%)[6] | 2.5 | 2.1 | 2.9 |
| Second-highest Winning Bid (%)[7] | 43.6 | 44.1 | 43.1 |
| **Panel B: Size (millions of dollars)** | | | |
| Winner's Equity | 1,857 | 3,241 | 373 |
| Assets Acquired | 486 | 717 | 264 |
| Assets Retained by RTC | 771 | 1,136 | 406 |
| Winner's Deposits | 19,309 | 35,920 | 3,884 |
| Total Deposits of S&L | 1,313 | 1,915 | 710 |
| Deposits Acquired by Winner | 955 | 1,422 | 454 |
| Core Deposits | 980 | 1,405 | 555 |
| Liabilities Retained by RTC | 280 | 430 | 130 |
| RTC Funding[8] | 717 | 1,061 | 372 |
| Cost of Resolution to RTC[9] | 367 | 556 | 177 |

Numbers are means for all winners, Exchange Listed winners and OTC winners (respectively).

[1] Number attending bid conference or requesting a bid package.
[2] Number of Bidders/Bidders Attending × 100.
[3] Data was available for only 38 firms.
[4] Deposits Acquired/Winner's Deposits × 100.
[5] Proportion of S&L's assets acquired by the winner.
[6] Excludes transactions with one bid and in which one or both of the two highest bids were negative.
[7] Only 43 cases where both bids were positive are included.
[8] Estimated cash infusion by the RTC adjusted by bid amount and including RTC advances.
[9] Estimated resolution cost to the RTC after recovery on retained assets and payment to other creditors (net or bid).

SENT BY:BOALT EXSPRESS ; 2-23- 0 ;11:19AM ; BOALT EXPRESS→ +2124508289;#11/25



*Methodology*

The Appendix describes the empirical methods. For transactions involving OTC firms the issue of infrequent trading is a concern. A methodology that is similar to Handjinicolaou and Kalay's (1984) was used and multi-day returns calculated for missing return intervals and a returns series for the firm developed. Any firm that had missing returns for five consecutive days in the interval (−200, +100) was removed, resulting in three firms being excluded.[11]

## Analysis: Motivation and Findings

*Overall Hypotheses: Winners and Losers*

In the context of the RTC environment, an important question is whether the sales are effectively more like financial asset transactions (with essentially zero NPV attributes)[12] or real-asset transactions (with non-zero NPVs).[13] As developed in the section on auctions, this will be influenced by whether the assets and/or operations being sold are of common or private value to bidders, and the uncertainty of their value.

The following null hypothesis is posited to investigate the pricing outcomes of RTC transactions for bidders:

*Hypothesis*: For the successful bidders, acquisitions from the RTC represent zero-NPV outcomes as measured by the stock market response to outcome announcements.

*Corollary*: In the context of prices such that the acquisitions would have been zero-NPV transactions, losing/unsuccessful bidders experience zero valuation consequences.

---

[11] All the tests were also carried out using a bank index as a proxy for the market index. The bank index is a value-weighted index of all exchange-listed banks which were continuously traded in 1989 and 1990. Since the use of the bank index did not result in materially different conclusions, the results are presented only for the CRSP value-weighted index.

[12] For a review of literature pertaining to the risk/return and pricing attributes of financial securities, see Fama (1991).

[13] McConnell and Muscarella examine the valuation consequences of real-asset investment decisions in the context of capital budgeting. The overall conclusion is that, for non-regulated firms, real asset markets systematically generate positive NPV investments which are associated with increases in firm value.

[redacted]

**Table 2** ■ Returns to winners and losers in sales of S&Ls by the RTC.

| | Winners ($n$ = 58) | | | Losers ($n$ = 46) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| −5 to 0 | −0.2 | 52 | −1.2 | −0.3 | 48 | −0.8 |
| −2 to 0 | −0.4 | 53 | −1.9* | −0.1 | 48 | −0.3 |
| −1 to 0 | −0.2 | 48 | −0.8 | 0.4 | 54 | 1.0 |
| −2 | −0.2 | 45 | −2.2** | −0.4 | 43 | −1.9* |
| −1 | −0.4 | 47 | −1.3 | −0.2 | 46 | −0.0 |
| 0 | 0.2 | 53 | 0.1 | 0.5 | 48 | 1.4 |
| +1 to +5 | −0.5 | 40 | 1.6 | −0.5 | 54 | −1.4 |
| −5 to +5 | −0.7 | 43 | −2.0* | −0.8 | 41 | −1.5 |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date. The CRSP value-weighted index was used as a proxy for the market.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

*The Findings.* Table 2 reports the results for the 58 successful bidders ("winners") and the 46 unsuccessful bidders ("losers"). In Table 2 there is no evidence that the winning bidders have acquired the assets at bargain prices. The abnormal return (AR) over (−2,0) is −0.4% ($Z = -1.9$). Table 2 reports a significant negative reaction on day −2. There was considerable discussion about anticipated auction results, and it appears that the market anticipated on day −2 the outcome reported on day −1.[14]

The hypothesis of zero abnormal returns for winning bidders is therefore rejected. Although the AR over (−2,0) is significantly different from zero only at the 10% level, there is an indication that prevailing bidders experience negative valuation consequences.[15] This contrasts with references

[14] This pattern motivated a close examination of the information dissemination process associated with the transactions, but we did not identify anything other than the day −2 market reaction. However, the pervasiveness of the day −2 reaction leads to the focus on the interval (−2,0) for interpreting the results.

[15] This bears an interesting similarity to another public policy scenario. With safe harbor leasing, there were many claims (including Congressional Reports) of windfalls to acquirers of tax shields. In contrast to these claims, Owers and Rogers (1985) found empirical evidence of negative valuation outcomes for prevailing buyers. The market considered that acquirers of tax shields were paying more for them than their worth.

**Figure 2 ■ Subsamples of bidders in RTC transactions.**

The specified partitions are based on the different characteristics of the resulting subsets.




to "fire sale" press reports, and the empirical findings of some earlier studies of non-RTC government resolutions.[16] However, it is consistent with the results of studies examining the recent experience of acquirers in whole-firm acquisitions and those of Gosnell, Hudgins and MacDonald (1993).

Presumably the failure to succeed in acquiring assets from the RTC will have no negative effect if the acquisition did not represent a positive NPV opportunity. Table 2 shows little evidence that losers incurred a significant opportunity cost as a result of failing to prevail in the S&L acquisition. These findings generally support the corollary of zero valuation consequences for losing bidders.

In combination, the negative returns for "winners" and zero abnormal returns for losers does not support the notion that RTC transactions offered acquirers windfall gains. There is no overall evidence that the RTC systematically transacts at prices which generate significant gains for acquirers. The RTC has a "least cost" mandate for executing its transactions, and the findings indicate that goal was achieved for the *overall* sample. Next, that result is examinded to see if it holds for the various subsamples of prevailing bidders identified in Figure 2. This figure shows the relationship between the various subsamples of bidders, and the partitions of acquirers are motivated by the characteristics of the resulting subsets of transactions.[17]

---

[16] See Pettway and Trifts (1985), James and Weir (1987), and Bertin, Ghazanfari and Torabzadeh (1989), which are referenced in the literature review.

[17] Chi-square tests established that the various (specified) partitioning attributes are not systematically related.

[redacted]

[redacted]



*IDTs versus P&As*

RTC resolutions can take one of three primary forms: (1) the sale of assets (purchase and assumption or P&A); (2) the transfer of insured deposits (IDT); and (3) payouts to insured depositors. The analysis in this article provides evidence on the valuation impact for acquirers in the P&A and IDT transactions.

The most complex resolution transactions are P&As, wherein an acquirer (typically another financial institution) assumes operations from the failed thrift. The P&A strategy can be implemented in different ways:

1. The "whole institution" disposition whereby the acquirer takes on essentially all assets and liabilities. Such a transaction typically requires a payment from the RTC to the acquirer. Initially at least, these leave few assets for the RTC's balance sheet.
2. In a "clean institution" transfer, acquirers assume depositor liabilities and primarily sound assets, and the other (low quality) assets remain on the RTC balance sheet.
3. "Branch sales" have many of the attributes of selective, clean institution" type transfers. They are in effect partial acquisitions of clean institutions, often reflecting geographical proximity.

When there is no material transfer of assets, the resolution is termed an IDT. This typically results from a lack of "acceptable" bids in offered P&A resolutions. Qualified acquirers bid a premium for the franchise according to the percentage of core deposits and other attributes of the deposit base and franchise.[18]

The IDT and P&A transactions are quite distinct. IDTs are low risk in terms of the value of the deposits and franchise and may have different *private value* to geographically dispersed acquirers. As suggested in Quadrant II of Figure 1, this suggests they will generate positive abnormal returns for the winner. In contrast, it is posited here that P&As are more likely be *common value* objects with a high variance of intrinsic value, and are likely to be

[18] For an example of such a transaction, see *The Wall Street Journal*, Feb. 5, 1990, p. A6. "Ohio's Bank One acquires Bright Bank in Dallas: U.S. cost put at $1.4 billion." Bank One paid $45 million to acquire $2.7 billion in deposits. In reviewing these transactions, the *WSJ* noted that such arrangements could ". . . strip out most of the bad assets and leaves them with the government (RTC) for later disposal."

associated with "winners curse."[19] The IDT and P&As are structurally different transactions as characterized by Quadrants II and IV in Figure 1. Acquirers of the former will experience value gains, and of the latter, losses.

The evidence supports this hypothesis. Table 3, Panel A reports a difference in results for winners in IDT and P&A auctions. The difference in CARs over days (−2,0) is 2.2%: +1.5% ($Z$ = 2.0) for the IDT packages, −0.7% ($Z$ = −2.8) for the P&A category overall. They are respectively significant positive and negative outcomes.[20]

IDTs are associated with significant gains to acquirers. If IDTs are low-variance, private value objects, then the winning bidder should experience positive abnormal returns. In such cases, the winning bid is below the full value to the winner. This is similar to divestitures, where buyers systematically experience gains.

### *Whole-Institution versus Branch Transfers*

As indicated earlier, there are two distinct types of P&A transactions. The whole-institution P&A is a larger transaction, while a branch P&A involves more specialized assets, often based on geographical proximity and the corresponding private value attributes. The implications of this are formalized as:

Whole-institution versus branch P&As are distinct. Whole-institution acquisitions are *Common Value,* high variance purchases, with negative implications for winners. Branch P&As are *Private Value*, high variance objects, with zero or positive abnormal returns.

In Table 3, Panel B reports the results for these two subsamples of P&As. In the event window (−2,0), whole firm P&As are significantly negative, while branch acquisitions are not significantly different from zero. This supports the hypothesis. Within the overall category of Common Value, high variance P&As, there is a subset (of branch P&As) that have many of the attributes of Private Value objects, but do not experience significant negative valuation consequences. The branch P&As are typically more focused acquisitions than whole-institution P&As.

---

[19] They are represented by Quadrant 4 in Figure 1.

[20] The non-parametric Binomial Test was also conducted for the proportion of positive abnormal returns. Over (−5,0) and (−2,0) the number of positive returns to acquirers in IDT transactions were significant at the 12.5% level.

[redacted]

[redacted]



**Table 3** ■ Returns to winners in insured deposit transfers (IDT) and purchase and assumption (P&A) transactions (Panel A) with a partition for whole-institution and branch P&As (Panel B).

| | IDT ($n$ = 7) | | | P&A ($n$ = 51) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| Panel A: Returns to Winners in IDT and All PAA Transactions | | | | | | |
| −5 to 0 | 2.1 | 86 | 1.9* | −0.5 | 47 | −1.9* |
| −2 to 0 | 1.5 | 86 | 2.0** | −0.7 | 49 | −2.8*** |
| −1 to 0 | 0.4 | 71 | 0.6 | −0.3 | 45 | −1.1 |
| −2 | 1.1 | 57 | 2.5** | −0.4 | 43 | −3.3*** |
| −1 | −0.1 | 43 | 0.2 | −0.5 | 47 | −1.4 |
| 0 | 0.4 | 57 | 0.7 | 0.2 | 53 | −0.1 |
| +1 to +5 | −2.4 | 0 | −2.4** | −0.2 | 45 | −0.8 |
| −5 to +5 | −0.3 | 43 | −0.3 | 0.8 | 43 | −2.0** |
| Panel B: Comparison of Returns to Winners in Whole-Institution and Branch P&A Transactions | | | | | | |
| −5 to 0 | −0.3 | 46 | −1.5 | −1.1 | 50 | −1.3 |
| −2 to 0 | −0.8 | 51 | −3.2*** | −0.4 | 44 | −0.4 |
| −1 to 0 | −0.7 | 43 | −2.4** | 0.6 | 50 | 1.7* |
| −2 | −0.2 | 43 | −1.9* | −1.0 | 44 | −3.0*** |
| −1 | 1.0 | 43 | −2.9*** | 0.6 | 56 | 1.8* |
| 0 | 0.3 | 54 | −0.6 | −0.0 | 50 | 0.6 |
| +1 to +5 | −0.6 | 37 | −1.5 | 0.7 | 63 | 0.7 |
| −5 to +5 | −0.9 | 40 | −2.2** | −0.5 | 50 | −0.5 |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

*Options*

A notable feature of the RTC's operations is that it can write both put and call options on some transferred assets. The exercise of a put by the acquirer will return pre-specified poor quality assets to the RTC's portfolio.[21] These

[21] In its Statement No. 55 ("RTC Thrift Resolution Policies") the Shadow Financial Regulatory Committee (SRFC) notes that the option features of RTC transactions can result in an outcome which ". . . subjects the RTC to interim declines in value." and contributes to policies where ". . . transactions privatize only favorable outcomes." The complete text of the Statement No. 55 is found in the *Journal of Financial Research Supplement* 1992.

SENT BY:BOALT EXSPRESS ; 2-23- 0 ;11:21AM ; BOALT EXPRESS→ +2124508289;#17/25



options mean that there is uncertainty at the time of the initial closing of a given S&L transaction regarding which assets will eventually be left on the RTC's balance sheet.

The puts and/or calls sold by the RTC have potentially considerable value to buyers. Given the variance of quality of underlying assets, the value of the options may be substantial. Such options materially reduce the risk for the acquirers.[22] This dimension is captured by column one in Figure 1. These option attributes and their associated pricing implications suggest that whole-institution P&As with options represent Common Value, low risk acquisitions. With competition, such transactions would approach the zero NPV attributes of financial market transactions. This corresponds to Quadrant I in Figure 1. Conversely, whole-institution P&As without options are characterized by Common Value, high variance attributes and lead to "winner's curse" (Quadrant IV, Figure 1).

The sample of whole-institution P&As includes 27 transactions without options and 8 with options, and the partition has substantial valuation implications. Table 4 reports consistently significant negative (at the 1% level) abnormal returns for acquirers in transactions without options.

These findings support the anticipated overbidding in the high variance *common value* scenario of whole-institution P&As without options. The anticipated zero-valuation implications of the low variance, with-options transactions were also borne out. The with-options acquirers have positive abnormal returns, but over (−2,0) they are not significantly different from zero.[23]

### *Stock versus Mutual Targets*

The first of two sets of results for subsamples where the partition is not based on characteristics of the transactions are presented next. These two analyses consider the impact of stock versus mutual form of the pre-RTC organization (of the acquired S&L), and regional variations.

[22] The nature of options in RTC transactions is somewhat variable. Clearly they play no role in IDTs, and a potentially significant role in P&As. In some transactions, the same bidder submitted both with-options and without-options bids for evaluation by the RTC.

[23] The non-parametric Binomial test indicated that the with-options acquirers had significant positive returns at the 7% level for the interval (−2,0) and day 0.

[redacted]

**Table 4 ■** Returns to winners in whole-institution P&A transactions with and without options.

| | P&A with Option ($n$ = 8) | | | P&A w/o Option ($n$ = 27) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| −5 to 0 | 0.3 | 50 | 0.1 | −0.4 | 44 | −1.7* |
| −2 to 0 | 1.2 | 88 | 1.3 | −1.5 | 41 | −4.2*** |
| −1 to 0 | 0.1 | 63 | 0.1 | −0.9 | 37 | −2.9*** |
| −2 | 1.1 | 63 | 2.1*** | −0.6 | 37 | −3.3*** |
| −1 | −1.0 | 50 | −1.5 | −0.9 | 41 | −2.5*** |
| 0 | 1.1 | 88 | 1.7* | 0.0 | 44 | −1.6 |
| +1 to +5 | −1.5 | 25 | −1.5 | −0.4 | 41 | −0.9 |
| −5 to +5 | −1.2 | 50 | −0.9 | −0.8 | 37 | −1.8* |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date. The CRSP value-weighted index was used as a proxy for the market.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

Issues associated with stock versus mutual form of thrift organization have been examined in papers such as Masulis (1987) which analyzed the conversion process and performance differences. Cordell, MacDonald and Wohar (1993) provide evidence of different investment and risk taking behavior by mutual and stock S&Ls.

To investigate whether pre-RTC form of organization was reflected in acquirer outcomes, the CARs for subsets were compared based on this attribute of the assets acquired. Table 5 reports results when the winners are partitioned according to the pre-RTC ownership organization (stock or mutual) of the target S&L and reports outcomes for 56 acquirers, since the form of organization could not be determined for two S&Ls. They acquired the assets of 40 formerly mutual, and 16 formerly stock, institutions.

The (−2,0) event window shows significant losses to acquirers of mutual-organization S&Ls, with a CAR of −0.9% and a test statistic of −2.9. In contrast, there is a CAR of +1.1% over (−2,0) for acquirers of previously stock S&L assets, yet the gain is not significant ($Z$ = 1.5). There is a marked difference between the two subsets.

**Table 5** ■ Returns to winners broken down by the type of organization of the S&L.

| | Stock S&L ($n$ = 16) | | | Mutual S&L ($n$ = 49) | | |
|---|---|---|---|---|---|---|
| Interval | CAR (%) | % Positive | Z | CAR (%) | % Positive | Z |
| −5 to 0 | 2.3 | 69 | 1.9* | −0.8 | 48 | −2.1** |
| −2 to 0 | 1.1 | 63 | 1.5 | −0.9 | 53 | −2.9*** |
| −1 to 0 | −0.1 | 50 | −0.2 | −0.1 | 50 | −0.6 |
| −2 | 1.3 | 69 | 2.9*** | −0.8 | 35 | −4.2*** |
| −1 | −0.3 | 38 | −0.6 | −0.4 | 53 | −0.9 |
| 0 | 0.2 | 50 | 0.4 | 0.3 | 55 | 0.0 |
| +1 to +5 | −1.5 | 31 | −1.7* | −0.3 | 43 | −1.0 |
| −5 to +5 | 0.7 | 50 | 0.3 | −1.1 | 40 | −2.2** |

Mean cumulative abnormal returns (CARs), percentage of positive returns and the Z-statistic over various intervals around the announcement date. The CRSP value-weighted index was used as a proxy for the market.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

*Regional Variations*

The final partition of acquirers addresses the substantial variation in the regional attributes of the RTC's operations. The RTC classifies transactions into one of four geographic regions: East, Central, Southwest and West. The early transactions were disproportionately in the West. To examine whether the regional attributes of the properties had any implications on bidder returns, the abnormal returns findings were examined for acquirers of properties in each of the four regions.

Table 6 shows considerable regional variation in results. There are no abnormal returns for the Central and Southwest regions, while the results for the 11 transactions in the West are significantly negative. Over days (−2,0) the CAR is −2.5%, significant at the 1% level. A significant negative CAR of −1.8% (Z = −2.8) is also observed over (−1,0). In contrast, over (−1,0) winners in the East had positive abnormal returns of 0.9% (Z = 2.1).

There have been debates regarding the efficacy of various RTC offices and functional divisions.[24] These results indicate that the Western office was able

[24] See, for example, *The Wall Street Journal*, "RTC Legal staff faces Senate Probe on hiring practices," August 12, 1992.

[redacted]

[redacted]



Table 6 ■ Comparison of winners by RTC regions.

| Interval | East ($n$ = 25) | Central ($n$ = 17) | Southwest ($n$ = 5) | West ($n$ = 11) |
|---|---|---|---|---|
| −5 to 0 | 0.8 (56) | −0.3 (47) | −1.1 (60) | −1.8 (45) |
| | 0.4 | −0.4 | −0.6 | −2.5** |
| −2 to 0 | 0.5 (64) | −0.6 (53) | −0.0 (60) | −2.5 (27) |
| | 0.5 | −1.0 | 0.4 | −4.1*** |
| 1 to 0 | 0.9 (56) | −0.7 (53) | −0.6 (40) | −1.8 (27) |
| | 2.1** | −1.6 | −0.3 | −2.8*** |
| −2 | −0.4 (44) | 0.1 (47) | 0.5 (80) | −0.7 (27) |
| | −2.1** | 0.5 | 1.1 | −3.2*** |
| −1 | −0.3 (48) | −0.3 (53) | 0.2 (80) | −1.2 (18) |
| | 0.4 | −1.3 | 0.7 | −2.3** |
| 0 | 1.2 (68) | −0.4 (59) | −0.8 (40) | −0.6 (18) |
| | 2.6** | −0.9 | −1.2 | −1.6 |
| +1 to +5 | −1.3 (36) | −0.8 (41) | −0.0 (40) | 1.5 (45) |
| | −2.3** | −0.9 | −0.3 | 1.1 |
| −5 to +5 | −0.5 (36) | −1.1 (47) | −1.1 (40) | −0.3 (55) |
| | −1.2 | −0.9 | −0.6 | −1.2 |

Mean cumulative abnormal returns (CARs), percentage of positive returns (given in parentheses) and the Z-statistic (given below the cumulative abnormal return) over various intervals around the announcement date.

*Significant at the 10% level.
**Significant at the 5% level.
***Significant at the 1% level.

to extract systematically higher offers from bidders. This outcome is not explained by differences in the number of bidders, where regional averages were as follows: West 2.7, Southwest 2.0, Central 6.1 and East 4.7.

## Conclusion

This article provides a review of the institutional background of the RTC and considers the market characteristics of RTC asset and operations sales from an auction perspective. The RTC has been a major financial institution, and there have been claims that it has sold some S&L assets at "fire sale" prices. However, the findings indicate that the RTC auction system appears to have performed quite well given the policy goals of "least cost" resolutions.

The findings do not support the hypothesis that transactions are systematically favorable to acquirers, and most subsets of winning bidders have predominantly negative valuation outcomes. In particular, acquirers of

whole-institution P&As, formerly mutual institutions and properties in the Western region experience persistently negative abnormal returns. These findings are consistent with those of general whole-firm acquirers in recent times, and in contrast to most of the previous studies of acquirers of distressed financial institutions cited in the literature review.

The RTC's pricing of the options it writes has an impact on the valuation outcomes for acquirers. Bidders who do not receive options experience losses. Those who do receive options experience some gains from the perspective of the equity markets, but they are not significantly different from zero. When the patterns of abnormal returns are related to attributes of the acquired properties it transpires that the auction motivated insights are generally reflected in pricing outcomes.

In summary, there is little evidence of underpricing or positive abnormal returns for the sample of publicly traded acquirers examined. To the contrary, several subsets of transactions were found where acquirers experienced negative abnormal returns. The only subsample with significant positive returns to winning bidders is with IDT transactions. Auction theory predicts that such low variance, private value transactions can be expected to result in acquirer gains.

The policy implications of the issues associated with the RTC are substantial. The problems which led to its creation, and their aftermath, have had such a profound effect that the U.S. Treasury and the regulators of both S&Ls and commercial banks proposed on July 28, 1995 to abolish the S&L industry. While the RTC became controversial for many reasons, the analysis finds that it was not systematically transferring assets and operations at "fire sale" prices. Given the scale of its activities, some examples of mispricing might be expected, but the findings here are consistent with the notion that they were limited subsets of transactions rather than profiles of typical outcomes.

*We gratefully acknowledge input from two anonymous referees, Dennis Capozza (the editor), colleagues at our respective institutions, and participants in seminars at the University of South Carolina, Texas A&M University, Washington State University and the 1993 American Real Estate and Urban Economics Association meeting in Anaheim, CA. Ufuk Ince provided excellent research assistance. The support of the Georgia State University College of Business Administration Research Grant Program Council is gratefully acknowledged.*

[redacted]

## References

Balbirer, S.D., G.D. Jud and F.W. Lindahl. 1992. Regulation, Competition, and Abnormal Returns in the Market for Failed Thrifts. *Journal of Financial Economics* 31(1): 107–131.

Benveniste, L.M., D.R. Capozza, R. Kormendi and W.J. Wilhelm. 1994. Contract Design for Problem Asset Disposition. *Journal of the American Real Estate and Urban Economics Association* 22(1): 149–167.

Bertin, W.J., F. Ghazanfari and K.M. Torabzadeh. 1989. Failed Bank Acquisitions and Successful Bidders' Returns. *Financial Management* 18(2): 93–100.

Black, B. 1989. Bidder Overpayment in Takeovers. *Stanford Law Review* 41: 597–660.

Capen, E.C., R.V. Clapp and W.M. Campbell. 1971. Competitive Bidding in High-Risk Situations. *Journal of Petroleum Technology* 23: 641–653.

Cordell, L., G.D. MacDonald and M.E. Wohar. 1993. Corporate Ownership and the Thrift Crisis. *Journal of Law and Economics* 36(2): 719–756.

Crockett, J.H. 1990. Workouts, Deep Pockets, and Fire Sales: An Analysis of Distressed Real Estate. *Journal of the American Real Estate and Urban Economics Association* 18(1): 76–90.

Curry, T., J. Blalock and R. Cole. 1991. Recoveries on Distressed Real Estate and Relative Efficiency of Public versus Private Management. *Journal of the American Real Estate and Urban Economics Association* 19(4): 495–515.

Dodd, P. and J.B. Warner. 1983. On Corporate Governance: A Study of Proxy Contests. *Journal of Financial Economics* 11: 401–438.

Ely, D.P. and N.P. Varaiya. 1992. Assessing the Assistance Policies of the Resolution Trust Corporation. Working paper. San Diego State University.

Fama, E. 1991. Efficient Capital Markets II. *Journal of Finance* 46(5): 1575–1617.

Giliberto, M. and N. Varaiya. 1989. The Winner's Curse and Bidder Competition in Acquisitions: Evidence from Failed Bank Auctions. *Journal of Finance* 44(1): 59–75.

Glascock, J.L., W.N. Davidson III and C.F. Sirmans. 1991. The Gains from Corporate Selloffs: The Case of Real Estate Assets. *Journal of the American Real Estate and Urban Economics Association* 19(4): 567–583.

Gosnell, T.F., S.C. Hodgins and J.A. MacDonald. 1993. The Acquisition of Failing Thrifts: Returns to Acquirers. *Financial Management* 22: 58–68.

Handjinicolaou, G. and A. Kalay. 1984. Wealth Redistribution or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders around Dividend Announcements. *Journal of Financial Economics* 13(1): 35–63.

Hite, G.L., J.E. Owers and R.C. Rogers. 1987. The Market for Interfirm Asset Sales: Partial Sell-offs and Total Liquidations. *Journal of Financial Economics* 18(2): 229–252.

James, C.M. and P. Wier. 1987. Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking. *Journal of Political Economy* 95(2): 355–370.

Jarrell, G.A., J.A. Brickley and J.M. Netter. 1988. The Market for Corporate Control: The Empirical Evidence Since 1980. *Journal of Economic Perspectives* 2: 49–68.

Jensen, M.C. and R.S. Ruback. 1983. The Market for Corporate Control: The Scientific Evidence. *Journal of Financial Economics* 11(1–4): 5–50.

Kagel, J.H. and D. Levin. 1986. The Winner's Curse and Public Information in Common Value Auctions. *American Economic Review* 76(5): 894–920.

Lea, M. and K.J. Thygerson. 1994. A Model of the Asset Disposition Decision of the RTC. *Journal of the American Real Estate and Urban Economics Association* 22(1): 117–133.

Masulis, R.W. 1987. Changes in Ownership Structure: Conversions of Mutual Savings and Loans to Stock Charter. *Journal of Financial Economics* 18(1): 27–60.

McAfee, R.P. and J. McMillan. 1987. Auctions and Bidding. *Journal of Economic Literature* 25(2): 699–738.

McConnell, J. and C. Muscarella. 1985. Corporate Capital Expenditure Decisions and the Market Value of the Firm. *Journal of Financial Economics* 14(3): 399–422.

*Mergers & Acquisitions Quarterly*. 1989–91. 24(1–4)–26(1–4).

Milgrom, P. 1989. Auctions and Bidding: A Primer. *Journal of Economic Perspectives* 3(3): 3–22.

Milgrom, P. and R.J. Weber. 1982. A Theory of Auctions and Competitive Bidding. *Econometrica* 50(5): 1089–1122.

Owers, J.E. and R.C. Rogers. 1985. The Windfall of Safe Harbor Leasing: Evidence from Capital Markets. *National Tax Journal* 38(4): 561–565.

Pettway, R.H. and J.W. Trifts. 1985. Do Banks Overbid when Acquiring Failed Banks? *Financial Management* 14(2): 5–15.

Resolution Trust Corporation. 1989–91. *Transaction Records*.

Schifrin, M. 1990. Fire Sale. *Forbes* 146(10): 39–40.

Smith, V. 1987. Auctions. J. E. Eatwell, M. Milgate and P. Newman (eds.). *The New Palgrave: A Dictionary of Economics*. The Macmillan Press Limited.

Varaiya, N. and K.R. Ferris. 1987. Overpaying in Corporate Takeovers: The Winner's Curse. *Financial Analysts Journal* 43(3): 64–70.

Vickrey, W. 1961. Counterspeculation, Auctions and Competitive Sealed Tenders. *Journal of Finance* 16(1): 8–37.

## Appendix

### Methodology

For each security *j*, the market model is used to calculate an abnormal return (*AR*) for event day *t* as follows:

$$AR_{jt} = R_{jt} - (\alpha_j + \beta_j R_{mt}) \tag{1}$$

where $R_{jt}$ is the rate of return security *j* for event day *t*, and $R_{mt}$ is the rate of return on the CRSP value-weighted index on event day *t*. The coefficients $\alpha_j$ and $\beta_j$ are the ordinary least squares estimates of the intercept and slope, respectively, of the market model regression, which is run over an estimation period from $t = -200$ to $t = -51$, relative to the initial event date $t = 0$.

The cumulative abnormal return (*CAR*) from day $T_1$, to day $T_2$, is defined as:

[redacted]



$$CAR_j = \sum_{t=T_{1j}}^{T_{2j}} AR_j \tag{2}$$

Various intervals are cumulated around the announcement date. For a sample of $N$ securities, the mean $CAR$ is defined as:

$$\overline{CAR} = \sum_{j=1}^{N} CAR_j/N \tag{3}$$

The expected value of $CAR$ is zero in the absence of abnormal performance.

The test statistic described by Dodd and Warner (1983) is the mean standardized cumulative abnormal return. To compute this statistic, the abnormal return $AR_{jt}$ is standardized by its estimated standard deviation $s_{jt}$,[25] *i.e.*,

$$SAR_{jt} = AR_{jt}/S_{jt} \tag{4}$$

The standardized cumulative abnormal return $SCAR_j$ over the interval $t = T_{1j}, \ldots, T_{2j}$ is:

$$\overline{SCAR_j} = \sum_{t=T_{1j}}^{T_{2j}} SAR_{jt}/\sqrt{(T_{2j} - T_{1j} + 1)} \tag{5}$$

The test statistic for a sample of $N$ securities is

---

[25] The value of $S_{jt}^2$ is:

$$S_{jt}^2 = S_j^2\left(1 + \frac{1}{D_j} + (R_{mt} - \overline{R}_m)^2 \Big/ \sum_{\tau=1}^{D_j} (R_{m\tau} - \overline{R}_m)^2\right)$$

where
$S_j^2$ = residual variance for security $j$ from the market model regression
$D_j$ = number of observations during the estimation period
$R_{mt}$ = rate of return on the market index for date $t$ of the event period
$\overline{R}_m$ = mean rate of return on the market index during the estimation period
$R_{m\tau}$ = rate of return on the market of day $\tau$ of the estimation period

$$Z = \sum_{j=1}^{N} \overline{SCAR_j} / \sqrt{N} \tag{6}$$

Each $SAR_{jt}$ is assumed to be distributed unit normal in the absence of abnormal performance. Under this assumption, $Z$ is also unit normal.

[redacted]

# Managing the Crisis:

## The FDIC and RTC Experience 1980–1994

**Federal Deposit Insurance Corporation**
Washington, D.C.
August 1998

SW-BJ-0000316

First, the FDIC became concerned that the accumulation of assets would have a disastrous effect on the insurance fund. Former Chairman L. William Seidman, noting that before this time, emphasis had not been placed on the sale of assets at resolution, wrote:

> This was not a serious problem in an agency with very few failed banks, and when the FDIC insurance fund had lots of cash . . . But it could be disastrous as the number of bank failures increased . . . The strategy of holding on to assets would swallow up all our cash very quickly . . . Cash had never been a problem at the FDIC, with billions in premium income on deposit at the Treasury. But my calculations showed that on the basis of the way we were doing things, if you took the FDIC forecast of bank failures from 1985 to 1990, our cash reserve of $16 billion would be wiped out well before the end of the decade.[23]

Second, although there is no empirical evidence, it was generally believed that after an asset from a failing bank was transferred to a receivership, the asset would suffer a loss in value.[24] Loans have unique characteristics, and prospective purchasers need to gather information about the loans to properly evaluate them. Such "information cost" is factored into the price that the outside parties are willing to pay for the loans. That cost tends to be greater on assets from failed banks. In addition, a loss in value can occur because of the break in the bank-customer relationship. When a customer values a banking relationship, the customer is willing to work with the bank. However, when a customer merely has an obligation to pay and anticipates no continuance of a business relationship, that customer may not be as willing to pay his debt in full.

Third, as the FDIC began having to manage an extremely large portfolio of failed bank assets caused by the growing number of bank failures in the late 1980s, several logistical problems began to develop, and it therefore became more desirable to pass assets to acquirers rather than incur the added costs of acquiring, maintaining, and subsequently remarketing those assets.

Fourth, the FDIC simply considered it more appropriate for private assets to remain within the private marketplace.

Finally, the FDIC saw the sale of higher percentages of assets at resolution as a way to minimize disruption in the communities in which failing banks were located.

*Whole Bank Transactions*

The whole bank purchase and assumption transaction is a variation of the P&A transaction, distinguished by the fact that virtually all the failed bank's assets are passed to the

23. L. William Seidman, *Full Faith and Credit: The Great S&L Debacle and Other Washington Sagas* (New York: Times Books, 1993), 100.

24. This loss of value is known as the "liquidation differential." Frederick S. Carns and Lynn A. Nejezchleb, "Bank Failure Resolution: The Cost Test and the Entry and Exit of Resources in the Banking Industry," *The FDIC Banking Review* 5 (fall/winter 1992), 1-14.

Chart I.3-11

**Number of Whole Bank Transactions 1987–1992**




*Source:* FDIC Division of Resolutions and Receiverships.

acquirer with the institution's liabilities for a one-time cash payment. Whole bank transactions represent the most dramatic attempt by the FDIC to pass assets from failed banks quickly back into the private sector. Whole bank transactions were perceived to offer certain important advantages over other methods of transactions. Because loan customers of the failed institution continued to be serviced by an ongoing bank, the effect on the local community was minimized. In addition, whole bank transactions slowed the growth in the volume of assets held by the FDIC for liquidation. Starting in 1987, when the FDIC implemented 19 whole bank transactions, the whole bank P&A joined the clean bank P&A, the insured deposit transfer, and the straight deposit payoff as the FDIC's standard methods for resolving failures. In 1988, 69 of the 279 failed bank resolutions were whole bank transactions. Whole bank transactions were also widely used in 1989, 1990, and 1991, when they constituted 20.3, 25.4, and 18.9 percent of all resolutions, respectively.[25] With the introduction of the least cost test, however, the number of successful whole bank bids declined. Because a whole bank bid constitutes a one-time payment from the FDIC, bidders tended to bid very conservatively to cover all potential losses. Conservative whole bank bids could not compete with other transactions on a least cost basis. Overall, the FDIC completed 202 whole bank transactions between 1987 and 1992, or 18.2 percent of the total number of transactions during that period. (See chart I.3-11.) The failed banks handled as whole bank transactions had $8.2 billion in total assets.

Whole bank bids were almost always offered on an all-deposit basis, requiring any winning bidder to agree to assume both the insured and the uninsured deposits.

*Other Variations of Transaction Structures*

Other variations of P&A transactions existed between the clean bank P&A that passed few assets to the acquirer and the whole bank P&A that passed virtually all assets. The modified P&A required the winning bidder to purchase the cash and securities, and usually the installment loans as well as all or a portion of the mortgage loan portfolio.

25. FDIC Division of Finance.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
N8oZh8SjT30b9Ia9s0YQ1xAsofImVww/hugOlwgLZOFv7EkjJpa7pQmzhZpvNcyq
5Zef7fpuHV6t7sbhwN/lUA==

<SEC-DOCUMENT>0000020639-00-000004.txt : 20000327
<SEC-HEADER>0000020639-00-000004.hdr.sgml : 20000327
ACCESSION NUMBER: 0000020639-00-000004
CONFORMED SUBMISSION TYPE: 10-K
PUBLIC DOCUMENT COUNT: 4
CONFORMED PERIOD OF REPORT: 19991231
FILED AS OF DATE: 20000324

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: AMBASE CORP
CENTRAL INDEX KEY: 0000020639
STANDARD INDUSTRIAL CLASSIFICATION: INVESTMENT ADVICE [6282]
IRS NUMBER: 952962743
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K
SEC ACT:
SEC FILE NUMBER: 001-07265
FILM NUMBER: 577715

BUSINESS ADDRESS:
STREET 1: GREENWICH OFFICE PARK BLDG 2
STREET 2: 51 WEAVER STREET
CITY: GREENWICH
STATE: CT
ZIP: 06831-5155
BUSINESS PHONE: 2035322000

MAIL ADDRESS:
STREET 1: GREENWICH OFFICE PARK, BLDG 2
STREET 2: 51 WEAVER STREET
CITY: GREENWICH
STATE: CT
ZIP: 06831-5155

FORMER COMPANY:
FORMER CONFORMED NAME: HOME GROUP INC
DATE OF NAME CHANGE: 19890608

FORMER COMPANY:
FORMER CONFORMED NAME: CITYHOME CORP
DATE OF NAME CHANGE: 19780917
</SEC-HEADER>

<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>YEAR END 12/31/99
<TEXT>

<PAGE>

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

(Mark One)
|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 1999
OR
|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ________ To ________

Commission file number 1-7265

AMBASE CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DELAWARE | 95-2962743 |
| (State of incorporation) | (I.R.S. EmployerIdentification No.) |

51 Weaver Street, Building 2, Greenwich, CT 06831-5155
(Address of principal executive offices)

Registrant's telephone number, including area code (203) 532-2000

Securities registered pursuant to Section 12(b)of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock ($0.01 par value) | None |
| Rights to Purchase Common Stock | None |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the

best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to the Form 10-K. X

At January 31, 2000, there were 46,208,519 shares of registrant's Common Stock outstanding. At January 31, 2000 the aggregate market value of registrant's voting securities (consisting of its Common Stock) held by nonaffiliates of the registrant, based on the average bid and asking price on such date of the Common Stock of $0.93 per share, was approximately $34 million. The Common Stock constitutes registrant's only outstanding security.

Portions of the registrant's definitive Proxy Statement for its 2000 Annual Meeting of Stockholders, which Proxy Statement registrant intends to file with the Securities and Exchange Commission not later than 120 days after the close of its fiscal year, is incorporated by reference with respect to certain information contained therein, in Part III of this Annual Report.

The Exhibit Index is located in Part IV, Item 14, Page 34.

<PAGE>

AmBase Corporation

Annual Report on Form 10-K
December 31, 1999
<TABLE>
<CAPTION>

CROSS REFERENCE SHEET FOR
PARTS I, II, III and IV
Page
- --------------------------------------------
------
<S> <C>
<C>

PART I

Item 1.
Business..............................................................................1

Item 2.
Properties............................................................................2

Item 3. Legal
Proceedings...............................................................................2

Item 4. Submission of Matters to a Vote of Security
Holders..............................................3

| (in thousands, except per share data) | 1999 | 1998 | 1997 |
|---|---|---|---|
| | ==== | ==== | ==== |
| <S> | <C> | <C> | <C> |
| Net income (loss) | | | |
| As reported...................................................... | $ (4,515) | $ 181 | $ (1,084) |
| Proforma......................................................... | (4,651) | 61 | (1,171) |
| | ===== | ===== | ===== |
| Per share data | | | |
| As reported...................................................... | $ (0.10) | $ - | $ (0.02) |
| Proforma......................................................... | (0.10) | - | (0.02) |
| | ===== | ===== | ===== |

</TABLE>

<PAGE>

AMBASE CORPORATION AND SUBSIDIARIES
Notes to Consolidated Financial Statements (continued)

Note 9 - Income Taxes

The components of income tax (expense) benefit for the years ended December 31 are as follows:

<TABLE>
<CAPTION>

| (in thousands) | 1999 | 1998 | 1997 |
|---|---|---|---|
| | ==== | ==== | ==== |
| <S> | <C> | <C> | <C> |
| Income tax (expense) benefit | $ (235) | $ (242) | $ 191 |
| | ===== | ===== | ===== |

</TABLE>

The components of pretax income (loss) and the difference between income taxes computed at the statutory federal rate of 35% in 1999, 1998 and 1997, and the provision for income taxes for the years ended December 31 follows:

<TABLE>
<CAPTION>

| (in thousands) | 1999 | 1998 | 1997 |
|---|---|---|---|

====

==== ====

<S> <C>
<C> <C>
Net income (loss) before income taxes.......................... $
(4,515) $ 423 $ (1,275)

=====

===== =====

Tax (expense) benefit:
Tax at statutory federal rate.................................. $ 1,580
$ (148) $ 446
Prior year tax refund.......................................... -
- 475
Accounting loss benefit not recognized.........................
(1,580) - (446)
Accounting loss benefit recognized............................. -
148 -
State income taxes.............................................
(235) (242) (284)

--------

-------- --------

$
(235) $ (242) $ 191

=====

===== =====

</TABLE>
<TABLE>
<CAPTION>

The composition of income tax (expense) benefit for the year ended December 31 is as follows:

(in thousands) 1999
1998 1997

====

==== ====

<S> <C>
<C> <C>
Current:
Federal........................................................ $ -
$ - $ -
State..........................................................
(235) (242) (284)

--------

-------- --------

(235) (242) (284)

--------

-------- --------

Deferred (primarily federal):
Prior year tax refund.......................................... -
- 475

--------

-------- --------

| | | | |
|---|---|---|---|
| | | | - |
| -- | 475 | | |
| | | | -------- |
| -------- | -------- | | |
| | | | $ |
| (235) | $ (242) | $ 191 | |
| ===== | ===== | ===== | |

</TABLE>

<PAGE>

The Company contractually assumed the tax liabilities of City, which, prior to September 1985, owned all the outstanding shares of Common Stock of the Company. For all periods through 1992, the Internal Revenue Service ("IRS") and the Company disagree only with respect to withholding taxes in connection with a Netherlands Antilles finance subsidiary of City. See Note 11, Legal Proceedings, Disputes with Internal Revenue Service over Withholding Taxes (Netherlands Antilles), for additional details.

In June 1998, the Company paid $12,700,000 to the IRS for tax and estimated interest to be applied to the Company's Fresh Start tax liability, which related to a 1987 tax dispute with the IRS. Based on a proposed Final Stipulation between the Company and the IRS on the Fresh Start issue, the Company is presently awaiting the IRS's final calculation of interest on the Fresh Start issue. In connection with the proposed Final Stipulation, the Company anticipates utilizing approximately $29 million of NOL's. A summary of the Company's NOL carryforwards remaining after the utilization of the $29 million NOL's applied to Fresh Start is provided below.

During the first quarter of 1997, $475,000 of income taxes were refunded as the result of an overpayment to the IRS for 1988 through 1991 tax years. This amount was recorded as an income tax benefit in the first quarter of 1997. The Company's federal income tax returns for years subsequent to 1992 have not been reviewed by the IRS.

As a result of the OTS's December 4, 1992 placement of Carteret in receivership, under the management of the Resolution Trust Corporation ("RTC")/Federal Deposit Insurance Corporation ("FDIC"), and proposed Treasury Reg. ss.1.597-4(g), the Company had previously filed its 1992 and subsequent federal income tax returns with Carteret disaffiliated from the Company's consolidated federal income tax return. Based upon the impact of Treasury Reg. ss.1.597-4(g), which was issued in final form on December 20, 1995, a continuing review of the Company's tax basis in Carteret, and the impact of prior year tax return adjustments on the Company's 1992 federal income tax return as filed, the Company decided not to make an election pursuant to final Treasury Reg. ss.1.597-4(g) to disaffiliate Carteret from the Company's consolidated federal income tax return effective as of December 4, 1992 (the "election decision").

The Company has made numerous requests to the RTC/FDIC for tax information pertaining to Carteret and the resulting successor institution, Carteret Federal Savings Bank ("Carteret FSB"); however all of the information still has not been received. Based on the Company not making the election decision, as described above, and the receipt of some of the requested information from the RTC/FDIC, the Company has amended its 1992 consolidated federal income tax return to include the federal income tax effects of Carteret and Carteret FSB. The Company

is still in the process of amending its consolidated federal income tax returns for 1993 and subsequent years.

The Company anticipates that, as a result of filing a consolidated federal income tax return with Carteret FSB, a total of approximately $170 million of tax NOL carryforwards will be generated from the Company's tax basis in Carteret/Carteret FSB as tax losses are incurred by Carteret FSB of which $158 million are still available for future use. Based on the Company's recent filing of its amended 1992 consolidated federal income tax return to include the federal income tax effects of Carteret FSB, approximately $56 million of NOL carryforwards are generated for tax year 1992 which expire in 2007, with the remaining approximate $102 million of NOLs carryforwards to be generated, expiring no earlier than 2008. These NOL carryforwards would be available to offset future taxable income, in addition to the NOL carryforwards as further detailed below.

Based upon the Company's federal income tax returns as filed from 1993 to 1998 (subject to IRS audit adjustments), after utilizing $29 million of NOL carryforwards in connection with Fresh Start; and excluding the NOL carryforwards generated from the Company's tax basis in Carteret/Carteret FSB, as noted above, at December 31, 1999 the Company has NOL carryforwards available to reduce future federal taxable income, which expire if unused, as follows:
<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| 2008 | $ 1,000,000 |
| 2009 | 7,000,000 |
| 2010 | 5,500,000 |
| 2012 | 1,000,000 |
| 2018 | 5,500,000 |
| | ------------ |
| | $20,000,000 |
| | ============ |

</TABLE>

The utilization of certain carryforwards is subject to limitations under U.S. federal income tax laws. In addition, the Company has approximately $21 million of alternative minimum tax credit carryforwards, which are not subject to expiration.

<PAGE>

Under Statement 109, the Company has calculated a net deferred tax asset of $28 million and $25 million as of December 31, 1999 and 1998, respectively, arising primarily from NOL's, alternative minimum tax credits and the excess of book over tax reserves (not including the anticipated tax effects of the NOL's expected to be generated from the Company's tax basis in Carteret, resulting from the election decision, as more fully described above). A valuation allowance has been established for the entire net deferred tax asset, as management, at the current time, has no basis to conclude that realization is more likely than not.

Note 10 - Commitments and Contingencies

Future minimum rental payments, principally for office space, under noncancellable operating leases at December 31, 1999, are: 2000, $80,000; 2001,

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

OFFICE OF
CHIEF COUNSEL

January 18, 2002

Number: **200216016**
Release Date: 4/19/2002
CC:PSI:6/CAM-100908-00
UILC: 167.14-11; 446.04-17

INTERNAL REVENUE SERVICE NATIONAL OFFICE CHIEF COUNSEL ADVICE

MEMORANDUM FOR INDUSTRY DIRECTOR, FINANCIAL SERVICES
LMSB:F

FROM: Senior Technician Reviewer, Branch 6, Office of Associate Chief Counsel (Passthroughs and Special Industries), CC:PSI:6

SUBJECT: Denial of consent for change in method of accounting

In accordance with section 8.07(2)(a) of Rev. Proc. 2002-1, 2002-1 I.R.B. 1, this Chief Counsel Advice advises you that consent for a change in accounting method has been denied to a taxpayer within your jurisdiction. Pursuant to § 6110(k)(3) of the Internal Revenue Code, this Chief Counsel Advice should not be cited as precedent.

LEGEND:

Taxpayer =

Parent =

Predecessor =

A =

B =

Taxpayer filed a Form 3115, Application for Change in Accounting Method, to request permission to change its treatment of supervisory goodwill from a non-depreciable asset to a depreciable asset, beginning with the taxable year beginning A ("year of change").

Predecessor acquired several failing thrift institutions in tax-free reorganizations pursuant to § 368(a)(1) of the Code, using a carryover basis in the assets acquired. Predecessor acquired the thrifts through supervisory mergers, induced and arranged by the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Banking Board ("FHLBB"). The FSLIC permitted Predecessor to account for the acquisitions using the purchase method of

accounting. Pursuant to this method, Predecessor valued each asset acquired at fair market value. As a result, the acquired thrifts had a negative net worth. The excess of the purchase price (which included liabilities assumed) over the fair market value of the acquired assets was referred to as "supervisory goodwill" and was reported on Predecessor's balance sheet for regulatory purposes. Pursuant to the FSLIC's regulatory policies and procedures in effect at the time of acquisition of the failing thrifts, Predecessor was permitted to (1) amortize the supervisory goodwill over a specified period for regulatory purposes, and (2) count the supervisory goodwill towards its regulatory capital reserve requirements. On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), which phased out, over a five-year period, the ability to count supervisory goodwill for the purposes of meeting regulatory capital requirements. At the time of the acquisition of the failing thrifts, Predecessor did not assign any tax basis to the supervisory goodwill.

For federal income tax purposes, Predecessor excluded the supervisory goodwill from its gross income pursuant to § 597(a) of the Code, as such section applied at the time of the acquisitions. Also, Predecessor never amortized the supervisory goodwill.

Under the proposed method, Taxpayer, as the successor corporation to Predecessor, will depreciate under § 167 of the Code the tax basis of the supervisory goodwill over its useful life. Hereinafter, any reference to Taxpayer includes Predecessor. Taxpayer took the fair market value of the supervisory goodwill as its tax basis.

Taxpayer takes the position that the contractual "right to use" the purchase method of accounting, along with the resultant purchased goodwill, results in an asset on its books properly identified as supervisory goodwill. Taxpayer believes that this supervisory goodwill qualifies as other property for purposes of § 597 of the Code and is a form of financial assistance provided by the FSLIC under § 406(f) of the National Housing Act. And, as such, the asset was properly excluded from gross income pursuant to § 597(a). Relying on Newark Morning Ledger Co. v. United States, 507 U.S. 546 (1993), Taxpayer further believes that it, as a result of the application of § 597, has an ascertainable tax basis in its supervisory goodwill and that this asset, with the enactment of the FIRREA, had a limited useful life.

We cannot accept this view based on our analysis as set forth below. Accordingly, Taxpayer's requested change in method of accounting for supervisory goodwill was denied in a letter ruling dated B.

Law and Analysis

Issue (1): Whether "supervisory goodwill" qualifies as "money or other property" for purposes of § 597 of the Code?

Supervisory goodwill is a creature of regulatory accounting principles although it bears a nexus to the generally accepted accounting principles ("GAAP") asset of "purchased goodwill" that results under the purchase method of accounting upon the acquisition of one corporation by another.

For federal income tax purposes, Taxpayer's acquisition of the failing thrifts qualified (and were accounted for) as tax-free reorganizations under § 368(a)(1) of the Code. Thus, Taxpayer took a carryover basis in the assets and liabilities from the acquired institutions at their financial book basis and recognized no gain or loss on the acquisitions.

As a general matter, for federal income tax purposes, purchased goodwill is not an acquired asset in a tax-free reorganization. The value otherwise ascribed to purchased goodwill under GAAP (the excess of purchase price (including liabilities assumed) over the fair market value of the assets acquired) is already reflected in the book basis of the assets and liabilities acquired from the failing thrifts. Taxpayer, at the time of its acquisition of the failing thrifts, correctly did not recognize a separate intangible asset for federal income tax purposes comparable to its regulatory asset of supervisory goodwill that was booked on its acquisitions of the failing thrifts, as that regulatory asset was derived from the GAAP asset of purchased goodwill. Moreover, even where goodwill is recognized as a tax asset, it is not subject to recovery by depreciation or amortization. See United States v. Winstar Corporation, 518 U.S. 839, 849 at n.5 (1996) quoting Newark Morning Ledger Co. v. United States, 507 U.S. 546, 556 (1993), and Winstar, supra at 851, n.7.

As discussed more fully in Winstar, supra, during the years Taxpayer acquired the failing thrifts, the savings and loan industry was in crisis, and the FSLIC lacked the funds necessary to liquidate all of the failing thrifts. Accordingly, the FSLIC arranged mergers between healthy thrifts and failing thrifts. As an inducement for these mergers, the FSLIC allowed the acquiring thrifts to count supervisory goodwill toward regulatory capital reserve requirements set forth in 12 C.F.R. § 563.13 and to amortize the goodwill over as much as 40 years. In 1989, Congress enacted FIRREA which impacted a thrift's ability to count supervisory goodwill towards satisfaction of its capital reserve requirements.

At the time Taxpayer acquired the failing thrifts, § 597 of the Code, as added by § 244 of the Economic Recovery Tax Act of 1981, Pub. L. 97-34 (Aug. 13, 1981) (the "Act"), provided that the gross income of a domestic building and loan association did not include any amount of money or other property received from the FSLIC pursuant to § 406(f) of the National Housing Act (12 U.S.C. § 1729(f)), regardless of whether any note or other instrument was issued in exchange. Further, § 597(b) provided that no reduction in the basis of assets of a domestic building and loan association shall be made on account of such money or other property received.

Section 246(c) of the Act made § 597 of the Code applicable to payments made on or after January 1, 1981. The use of the word "payments" in § 246(c) of the Act, along with the statutory language of § 597 of the Code and § 406(f) of the National Housing Act, clearly indicates the congressional intent to limit § 597 to forms of financial assistance provided by the FSLIC.

Although the legislative history to § 244 of the Act is somewhat sparse, what legislative history there is also supports a conclusion that § 597 of the Code covers only financial assistance provided by the FSLIC. Section 597, as enacted, appears to have been first added in the version of H.R. 4242 that was passed by the House on July 29, 1981. See 127 Cong. Rec. at H5259 and H5279 (daily ed. July 29, 1981). The legislative history also indicates that this tax provision was initially agreed to in the Senate as a floor amendment (captioned "Section 604 FSLIC Financial Assistance") on July 23, 1981. See 127 Cong. Rec. at S8287 (daily ed. July 23, 1981).

In support of the Senate amendment, the congressional record reflects that the "amendment would facilitate the infusion of capital to a failing savings and loan, or the merger of a savings and loan with another financial institution by clarifying that these transactions are nontaxable events." Id, at S8288. Further, the use of terms such as "payment," "capital infusion," and "repayment" during the legislative process are further indications of a congressional intent to limit § 597 of the Code solely to forms of financial assistance. See, e.g., Letter from Richard T. Pratt (then-Chairman of the FHLBB, 127 Cong. Rec. at S8288. The conference report, moreover, indicates that this amendment was intended to resolve the question of whether financial assistance from the FSLIC was to be included in income or treated as a non-shareholder contribution to capital (with a consequential reduction in the tax basis of assets) by the taxpayer. H.R. Conf. Rep. No. 97-215, 97th Cong., 1st Sess. 284 (1981). See also Staff of the Joint Committee on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Tax Act of 1981 (H.R. 4242, 97th Cong; Pub. L. No. 97-34) (1981), at 152 ("to facilitate providing of financial assistance by the FSLIC") and 153 (referring to the FSLIC's "financial assistance program" and the proper treatment under prior law of such "assistance payments" from the FSLIC).

The FSLIC was created in 1934 with the passage of the National Housing Act chiefly to insure deposits made by the public. See Winstar, 518 U.S. at 844. In addition to providing deposit insurance, the FSLIC generally was authorized to make loans to, to make deposits in, to purchase the assets or securities of, to assume the liabilities of, or to make contributions to, any insured institution. See §406(f) of the National Housing Act, 12 U.S.C. § 1729(f).

As a result, supervisory goodwill does not resemble any type of financial assistance listed in § 406(f) of the National Housing Act. Rather, the concept of supervisory goodwill was merely part of an accounting regime designed to induce healthy thrifts to acquire failing thrifts. See Winstar, 518 U.S. at 849-856. The nature of

supervisory goodwill is one of regulatory forbearance rather than financial assistance.

Further, based on the types of assistance that the FSLIC was authorized to render under § 406(f) of the National Housing Act, the FSLIC assistance given under this provision was intended to increase the capital of an institution so that the institution could meet its obligations to depositors. Supervisory goodwill does not enhance the capital of an institution. Rather, it is the antithesis of capital as it relieves the institution and its shareholders of their obligations to meet otherwise applicable capital requirements. Nothing in the legislative history to § 597 of the Code indicates it was intended to apply to forms of assistance other than financial assistance. Under these circumstances, supervisory goodwill is not assistance within the meaning of § 597.

Moreover, both the statutory language and the legislative history of § 597 of the Code limit application of § 597 to financial assistance provided by the FSLIC. Under Title 12 of the United States Code, the regulatory forbearance that Taxpayer claims created supervisory goodwill was not provided by the FSLIC.

Generally, the clear meaning of a statute will control its application unless it is established that congressional intent would require a different result. Congress clearly differentiated between the FHLBB and the FSLIC for purposes of applying various contemporaneously enacted provisions of the Internal Revenue Code. Compare §§ 243 and 244 of the Act (in which Congress spoke only to actions by the FSLIC) with § 241 of the Act (in which Congress spoke to actions by either the FHLBB or the FSLIC). The FSLIC, although working with the FHLBB in such matters, was a separate corporation for tax purposes. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Further, the FSLIC had no authority to allow supervisory goodwill to be counted toward regulatory capital requirements under the rules of the FHLBB. Given the clear statutory reference in § 597 of the Code, we cannot expand the meaning of the FSLIC to encompass actions of the FHLBB.

We do not agree that because the FSLIC and the FHLBB have been treated as indistinguishable for purposes of determining a breach of contract with respect to the use of supervisory goodwill to meet regulatory capital requirements, the same result applies here. We note that the Supreme Court in Winstar, supra, did not hold that supervisory goodwill was provided by the FSLIC under § 406(f) of the National Housing Act within the meaning of § 597 of the Code.

We also do not agree that § 597 of the Code extends to the "right to use" supervisory goodwill to meet regulatory capital requirements and that the FSLIC, on Taxpayer's behalf, obtained that "right" from the FHLBB and then conveyed it to Taxpayer in connection with the acquisitions of the failing thrifts. For the reasons set forth above, we conclude that the "right to use" supervisory goodwill is not assistance provided by the FSLIC under § 597.

Issue (2): Whether Taxpayer properly established a tax basis in the book asset identified as supervisory goodwill?

For federal income tax purposes, a taxpayer's basis in property is generally established by reference to the taxpayer's cost. See § 1012 of the Code. The taxpayer's cost is usually measured by the amount the taxpayer paid (in cash or kind) for the property. See § 1.1012-1(a) of the Income Tax Regulations. When a taxpayer incurs no cost in connection with the acquisition of the property, the taxpayer's basis in that property may be established under other provisions of the Code. However, absent the application of a special provision that provides for the tax-free receipt of property, a taxpayer generally must include the fair market value of the property received in income in order to obtain a tax basis in such property. See, e.g., § 1.61- 2(d) of the regulations; Strong v. Commissioner, 91 T.C. 627 (1988). Thus, generally, when a taxpayer acquires property without incurring any cost, the amount of the taxpayer's basis in that property is equal to the amount included in income (that is, the property's fair market value).

Taxpayer Has No Tax Basis in Supervisory Goodwill

For federal income tax purposes, Taxpayer's acquisition of the failing thrifts qualified as tax-free reorganizations under § 368(a)(1) of the Code. Special basis rules apply in connection with assets and liabilities acquired by means of tax-free reorganizations. Under these rules, for federal income tax purposes, a taxpayer (such as Taxpayer) generally steps into the shoes of the transferor corporation (such as the failing thrifts acquired by Taxpayer) with respect to basis. See § 362(b). Because supervisory goodwill was not a pre-existing asset on the books of the failing thrifts acquired by Taxpayer, Taxpayer could not obtain a carryover basis in that asset. See also §§ 357(a) and 1032(a).

As Taxpayer could not obtain a carryover basis for supervisory goodwill under § 362(b) of the Code, Taxpayer must identify a fresh source from which basis can be obtained. Taxpayer takes the position that § 597 applies to provide a tax-free source of income from which this fresh basis can be said to derive. For the reasons set forth above under Issue 1, § 597 is not applicable to the acquisition of supervisory goodwill by Taxpayer. Consequently, Taxpayer was not entitled to exclude the value of supervisory goodwill from gross income under § 597(a). As Taxpayer did not separately pay for the purported asset and did not include the fair market value of that asset in gross income, Taxpayer cannot now claim that it had a tax basis in that asset. See § 1.61-2(d) of the regulations; Strong v. Commissioner, supra.

Taxpayer Has No Tax Basis in the "Right to Use" Goodwill

Even assuming that Taxpayer received an asset from the regulators that is recognizable for federal income tax purposes, this asset can only be the "right to use" purchased goodwill to meet regulatory capital requirements. Further, for federal income tax purposes, this right is considered "other property" and any tax

basis attributable to the acquisition of this right would be determined under rules applicable to the receipt of property. See § 1012 of the Code.

As a general matter, the creation of rights under governmental regulatory and licensing arrangements ("property rights") will usually not result in the recognition of gross income to the recipient of those property rights. See, e.g., Rev. Rul. 92-16, 1992-1 C.B. 15 (holding that the issuance of emission allowance by the Environmental Protection Agency does not result in gross income to the taxpayer (a utility) that receives it). Moreover, not even the excess of the fair market value of the property right over the cost of acquisition of that right will be income. See, e.g., Rev. Rul. 67-135, 1967-1 C.B. 20 (holding that the excess of the fair market value over the cost of a lease obtained by a taxpayer in a lottery conducted by the United States Bureau of Land Management is not includable in gross income).

Even where a tax basis in such a property right is properly determined under § 1012 of the Code, that basis is generally limited to the taxpayer's cost of acquiring the property right (not the fair market value of the right itself). The Service's position with respect to the proper determination of any tax basis to be accorded to the acquisition of these types of property rights has been implicitly adopted by a number of courts in cases holding that taxpayers' bases in similar property rights were the respective taxpayers' costs of obtaining those rights. See, e.g., Nachman v. Commissioner, 191 F.2d 934 (5th Cir. 1951); Nicolazzi v. Commissioner, 79 T.C. 109 (1982), aff'd per curiam, 722 F.2d 324 (6th Cir. 1983); Radio Station WBIR, Inc. v. Commissioner, 31 T.C. 803 (1959). Thus, as Taxpayer incurred no additional cost in order to obtain the "right to use" purchased goodwill for regulatory purposes, its cost basis in such an asset would be zero.

Issue (3): Whether Taxpayer is entitled to claim a deduction for depreciation of supervisory goodwill under § 167 of the Code?
Section 167(a) of the Code provides, as a depreciation deduction, a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or of property held for the production of income.

Section 167(c)(1) of the Code generally provides that the basis on which exhaustion, wear and tear, and obsolescence are allowed shall be the adjusted basis provided in § 1011, for the purpose of determining the gain on the sale or other disposition of the property. Section 1.167(g)-1 of the regulations provides that the basis upon which the allowance for depreciation is computed with respect to any property shall be the adjusted basis provided in § 1011 for the purpose of determining gain on the sale or other disposition of the property. Section 1.1011-1 provides the adjusted basis for determining gain or loss from the disposition of property is the cost or other basis prescribed in § 1012 or other applicable provisions of subtitle A of the Code.

Section 1.167(a)-1(a) of the regulations provides that the allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or held for the production of income is that amount which should be set

aside for the taxable year in accordance with a reasonably consistent plan, so that the aggregate of the amounts set aside will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of that property. The allowance shall not reflect amounts representing a mere reduction in market value.

Section 1.167(a)-1(b) of the regulations provides that the estimated useful life of an asset is not necessarily the useful life inherent in the asset but the period over which the asset may reasonably be expected to be useful to the taxpayer in its trade or business or in the production of the taxpayer's income. This period shall be determined by reference to the taxpayer's experience with similar property taking into account present conditions and probable future developments.

Section 1.167(a)-3 of the regulations provides that an intangible asset that is known from experience or other factors to be of use in the business or the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, may be the subject of a depreciation allowance. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance for depreciation will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

Section 1.167(a)-10 of the regulations provides that the period for depreciation shall begin when the asset is placed in service and shall end when the asset is retired from service.

In order to claim a depreciation deduction under § 167 of the Code, a taxpayer is required to: (1) have a determinable tax basis in the asset; (2) use the asset in the taxpayer's trade or business, or hold the asset for the production of income; and (3) have a useful life determinable with reasonable accuracy.

For the reasons set forth above under Issue 2, Taxpayer does not have a tax basis in the claimed intangible asset regardless of whether that asset is considered to be the regulatory asset of supervisory goodwill or merely the "right to use" such supervisory goodwill to meet regulatory capital requirements. Without a tax basis in that intangible asset, even if we were to conclude that such asset was a depreciable asset, Taxpayer's depreciable basis would be zero pursuant to § 167(c)(1) of the Code and § 1.167(g)-1 of the regulations. Thus, the amount of the depreciation deduction that would be allowable in any taxable year would be zero.

Even assuming that Taxpayer had established a tax basis in the claimed intangible asset (regardless of whether that asset is considered to be the regulatory asset of supervisory goodwill or merely the "right to use" such supervisory goodwill to meet regulatory capital requirements), that asset is not depreciable under § 167 of the Code. For GAAP, Taxpayer's acquisitions of the failing thrifts were accounted for under the purchase method for business combinations. The amount by which the

fair market value of the liabilities assumed by Taxpayer (the "acquisition price") exceeded the fair market value of the assets received by Taxpayer as a result of these acquisitions was recognized on Taxpayer's books as purchased goodwill. For regulatory purposes, this purchased goodwill corresponded to Taxpayer's regulatory asset identified as supervisory goodwill.

If the acquisitions of the failing thrifts created tax basis as Taxpayer alleges, then the calculation of the excess acquisition costs would be consistent with the residual method of determining tax accounting goodwill. See, e.g., Banc One v. Commissioner, 84 T.C. 476 (1985), aff'd, 815 F.2d 75 (6th Cir. 1986). In order to be depreciable, an identified asset requires a determination of value (basis) and a reasonably determinable useful life. Newark Morning Ledger Co. v. United States, 507 U.S. 546 (1993). These two requirements are to be met based on information available as of the transaction date. See Banc One, supra.

At most, Taxpayer received a "right to use" supervisory goodwill to meet regulatory capital requirements. Even assuming that such a right resulted in a recognizable asset for federal income tax purposes at the time of acquisition, this right is not clearly severable from the residual tax asset of goodwill. The mere fact that enactment of FIRREA eliminated Taxpayer's right to use its supervisory goodwill for regulatory purposes does not establish that its tax asset now also has a separately ascertainable value and a reasonably determinable useful life. Taxpayer has failed to substantiate that the fair market value of the right to use supervisory goodwill is equal to the residual amount. Likewise, the remaining useful life determined by the Taxpayer is for the right to use and not necessarily for the residual amount. Therefore, Taxpayer has failed to distinguish the right to use supervisory goodwill from nondepreciable goodwill.

Further, most of the value assigned to the regulatory/book asset of supervisory goodwill was likely derived from loans and other assets that had declined in value because of rising interest rates. See Winstar, 518 U.S. at 851-52. For federal income tax purposes, because Taxpayer took the loans and other assets (from which the regulatory/book asset of supervisory goodwill was derived) at their historic (that is, unreduced) book values, tax basis was properly reflected directly in these loans and other assets, rather than indirectly in a separately booked tax asset comparable to supervisory goodwill. Even if Taxpayer had tax basis in supervisory goodwill, such basis would be the fair market value of the right to use the supervisory goodwill toward regulatory capital requirements, not the full amount of the regulatory forbearance claimed by Taxpayer. While supervisory goodwill was used to meet regulatory capital requirements, the value is not equivalent to its capital cost and does not have a dollar for dollar value. See California Federal Bank v. United States, 43 Fed. Cl. 445, 449 (1999), aff'd in part and vacated in part, 245 F.3d 1342 (2001). Thus, Taxpayer has failed to substantiate the basis in its right to use supervisory goodwill.

Consequently, Taxpayer has not met its burden of separately identifying, valuing, and lifing the right to use as required by the Supreme Court in Newark Morning

Ledger, supra, in order for such right to be subject to a depreciation deduction under § 167 of the Code. Even assuming that the asset recognizable for federal income tax purposes is the regulatory asset of supervisory goodwill, Taxpayer also has not met its burden of separately valuing and lifing such asset as required by the Supreme Court in Newark Morning Ledger, supra. Therefore, the claimed intangible asset (regardless of whether that asset is considered to be the regulatory asset of supervisory goodwill or merely the "right to use" such supervisory goodwill to meet regulatory capital requirements) is not depreciable under § 167 and Taxpayer is not entitled to a deduction for depreciation or amortization under § 167 for this asset.

Conclusion

For the reasons set forth above, Taxpayer's requested change in method of accounting with respect to its supervisory goodwill has been denied.

If you have any questions on this matter, do not hesitate to call (202) 622-3110.

KATHLEEN REED

FDIC
Federal Deposit Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20434 Division of Finance

August 24,2006

TO: Floyd Robinson, General Counsel
Legal Division

FROM: Craig R. Jarvill, Chief (FOR)
Accounting Operations Section

SUBJECT: REISSUED - Goodwill Financial Reporting Package – Carteret Federal Savings Bank

The December 31,2005 Goodwill Financial Reporting Package for Carteret Federal Savings Bank, that was initially issued on March 31,2006, was inadvertently distributed with a **draft** version of the receivership balance sheet. This oversight does not impact the projected deficit of the receivership as reported in the initial package, since the receivership balance sheet was included as a supplemental report. Please note that this reissued goodwill reporting package is identical to the initial package except for the replacement of the **draft** Carteret receivership balance sheet with the **final** version as of December 31,2005.

Attached is the Division of Finance's Goodwill Financial Reporting Package, depicting results as of December 31,2005, for Carteret Federal Savings Bank (Receivership Fund Code 1309).

Included in this package are four reports prepared specifically in support of the goodwill litigation:

| | |
|---|---|
| Report 1 | Inception Pro Forma Recap |
| Report 1-A | Mapping of Total Asset Inception Balances from Report 1 to Report 2 |
| Report 2 | Statement of Assets and Liabilities in Liquidation (unaudited) - Adjusted 1213112005 Balances |
| Report 3 | Projected Receivership Results using Adjusted 1213112005 Balances |

In addition, included is DOF's standard set of receivership financial statements for Carteret Federal Savings Bank as of December 31,2005. DOF releases these statements to the public upon FOIA or other requests.

Attachments

cc: Susan Bank, Legal Division
John V. Thomas, Legal Division

**CARTERET FEDERAL SAVINGS BANK**
**Receivership Fund Code: 1309**
**Inception Date: 01/20/1995**

## Goodwill Package as of December 31,2005

**REPORT 1: Inception Pro Forma Recap**

This report summarizes the inception balances of this receivership per the Pro Forma package prepared by the Closing team. Adjustments are made to the failed institution's balance sheet in order to reflect the proven balances through the date of closing, as well as convert those asset and liability balances retained by the FDIC/RTC to a cash basis of accounting.

**REPORT 1-A: Mapping of Total Asset Inception Balances from Report 1 to Report 2**

This report provides a mapping of how the Pro Forma inception balances in Report 1 were combined and/or reclassified to record the inception balances on the receivership's general ledger, as presented in Report 2.

**REPORT 2: Statement of Assets and Liabilities in Liquidation (unaudited) – Adjusted 12/31/2005 Balances**

This report presents the financial position of this receivership as of December 31,2005 based on actual and adjusted general ledger results. The total asset, liability, and net assets/(deficit) balances at inception are carried forward from Report 1.

**REPORT 3: Projected Receivership Results using Adjusted 12/31/2005 Balances**

This report projects the financial position of this receivership after application of estimated liabilities based on assumed priority. The focus of this report is the underlying net assets/(deficit) position at various stages of claim distribution. Refer to Report 3 footnotes for additional information.

**Receivership Financial Statements**

The Statement of Assets and Liabilities in Liquidation (unaudited) and Statement of Operations (unaudited) for the period ended December 31,2005, and related footnotes are produced from the FDIC general ledger accounting system and present both year-to-date and inception-to-date activity for the receivership.

# CARTERET FEDERAL SAVINGS BANK
## INCEPTION PRO FORMA RECAP
(Rounded in Dollars)

**REPORT 1**
**Pro Forma Recap**

**Receivership Fund Code:** *1309*
**Inception Date:** *01120195*

| | Pro Forma Unadjusted Balance | Pro Forma Adjustments [a] | Inception Balances (Per Pro Forma) (Adjusted by RTC) |
|---|---|---|---|
| **Assets** | | | |
| Cash and Non-Interest Earning Deposits | 10,063,050 | (3,275) | 10,059,775 |
| Interest Earning Deposits with FHLB | 2,658,733 | | 2,658,733 |
| Securitization Reserve | 71,312,507 | (7,684,100) | 63,628,407 |
| Other Investment Securities | 7,389,821 | 7,077,893 | 14,467,714 |
| Subtotal Cash and Due From Balances | 91,424,111 | (609,482) | 90,814,629 |
| MBS Guar/Insur U.S. Government | 10,015,197 | | 10,015,197 |
| Other Mtg Backed Securities | 80,858,664 | | 80,858,664 |
| Equity Securities - Except FHLB Stock | 1,125 | | 1,125 |
| Federal Funds Sold | 294,184,760 | | 294,184,760 |
| Subtotal Securities & Obligations | 385,059,746 | | 385,059,746 |
| Mortgage Loans | 590,381,195 | 122,544,525 | 712,925,720 |
| Commercial Loans | | 14,181,058 | 14,181,058 |
| Consumer Loans | 34,705,402 | (637,355) | 34,068,047 |
| Construction Loans | 128,737,346 | (128,737,346) | |
| Subtotal Loans | 753,823,943 | 7,350,882 | 761,174,825 |
| Furniture/Fixtures/Autos | 2,320,854 | | 2,320,854 |
| Other Real Estate Owned | 2,782,443 | | 2,782,443 |
| Investments in Subsidiaries | 5,541,773 | 3,925,801 | 9,467,574 |
| Office Premises and Equipment | 5,013,564 | | 5,013,564 |
| Postage - Stamps/Meter | 2,452 | 4,273 | 6,725 |
| FHLB Stock | 7,860,200 | | 7,860,200 |
| Allowance for Loan Losses - Mtg. Loans | (60,019,396) | 60,019,396 | |
| Valuation Allowance - Securities | (154,525) | 154,525 | |
| Valuation Allowance - Mtg. Pool Securities | (7,562,671) | 7,562,671 | |
| Valuation Allowance - REO | (1,375,000) | 1,375,000 | |
| Valuation Allowance - Subsidiaries | (2,323,950) | 2,323,950 | |
| Accrued Interest - Securities | 56,349 | (56,349) | |
| Accrued Interest - Mtg. Pool Securities | 509,139 | (509,139) | |
| Accrued Interest - Mtg. Loans | 4,212,092 | (4,212,092) | |
| Accrued Interest Commer./Consum. Loans | 743,953 | (492,812) | 251,141 |
| Prepaid Expenses | 1,498,395 | (1,495,134) | 3,261 |
| Other Assets | 299,194 | (469,355) | (170,161) |
| Advances LSO | 1,296,238 | | 1,296,238 |
| Accrued Interest on FHLB Stock | 130,180 | (130,180) | |
| Valuation Allowance - Other Assets | (142,844) | 142,844 | |
| Subtotal Other Assets | (39,311,560) | 68,143,399 | 28,831,839 |
| Total Assets | 1,190,996,240 | 74,884,799 | 1,265,881,039 |
| **Liabilities** | | | |
| Demand Deposits | 231,244,658 | (49,767) | 231,194,891 |
| Savings Deposits | 344,836,845 | | 344,836,845 |
| Time Deposits | 793,321,472 | | 793,321,472 |
| Unearned Safe Deposit Box Income | 11,387 | 10,331 | 21,718 |
| Taxes Payable | 557 | (557) | |
| Other Liabilities | 8,703,838 | (1,745,390) | 6,958,448 |
| Suspense Liabilities | 67,949 | (67,677) | 272 |
| Total Liabilities | 1,378,186,706 | (1,853,060) | 1,376,333,646 |
| **Net Assets/(Deficit)** | | | |
| Undivided Profits/Acquired Equity | (187,190,466) | 76,737,859 | (110,452,607) |
| Total Net Assets/(Deficit) | (187,190,466) | 76,737,859 | (110,452,607) |
| Total Liabilities and Net Equity | 1,190,996,240 | 74,884,799 | 1,265,881,039 |

[a] Pro Forma Adjustments are commonly prepared by the FDIC/RTC to record unprocessed work, non-booked items, corrections of posting errors, and resolved reconciling items, in order to reflect the proven balance of the balance sheet accounts of the Failed Institution through the date of closing. Adjustments also include the conversion from an accrual basis of accounting to a cash basis of accounting for assets and liabilities retained by the FDIC/RTC.

REPORT 1 - A

Carteret Federal Savings Bank
Receivership Fund Code 1309
Mapping of Total Asset Inception Balances from Report#1 to Report #2

| Per Report #1 - Inception Pro Forma Recap | | Per Report #2 - Statement of Assets and Liabilities | |
|---|---|---|---|
| Line Item Descriptions | Inception Balances | Inception Balances | Line Item Descriptions |
| Assets: | | | |
| Interest Earning Deposits with FHLB | 2,658,733 | | |
| Securitization Reserve | 63,628,407 | | |
| Other Investment Securities | 14,467,714 | | |
| MBS Guar/Insur U.S. Government | 10,015,197 | | |
| Other Mtg Backed Securities | 80,858,664 | | |
| Equity Securities - Except FHLB Stock | 1,125 | | |
| Rounding | 1 | | |
| | 171,629,841 | 171,629,841 | Securities |
| Consumer Loans | 34,068,047 | 34,068,047 | Consumer Loans |
| Commercial Loans | 14,181,058 | 14,181,058 | Commercial Loans |
| Mortgage Loans | 712,925,720 | 712,925,720 | Real Estate Mortgages |
| Cash and Non-Interest Earning Deposits | 10,059,775 | | |
| Federal Funds Sold | 294,184,760 | | |
| FHLB Stock | 7,860,200 | | |
| Postage Stamps/Meters | 6,725 | | |
| Advances LSO | 1,296,238 | | |
| Accrued interest - Commer/Consumer Loa | 251,141 | | |
| Prepaid Expenses | 3,261 | | |
| Other Assets | (170,161) | | |
| Reclass from Investments in Subsidiaries | 7,911,088 [a] | | |
| Rounding | (1) | | |
| | 321,403,026 | 321,403,026 | Other Assets/Judgments |
| Other Real Estate Owned | 2,782,443 | | |
| Furniture/Fixtures/Autos | 2,320,854 | | |
| Office Premises and Equipment | 5,013,564 | | |
| | 10,116,861 | 10,116,861 | Owned Assets |
| Investments in Securities | 9,467,574 | | |
| Reclass to Other Assets | (7,911,088) [a] | | |
| | 1,556,486 | 1,556,486 | Net Investments in Subsidiaries |
| Total Assets | 1,265,881,039 | 1,265,881,039 | Total Assets |

[a] For purposes of recording inception balances to the FDIC general ledger, the Loan Receivable from Subsidiaries balance in the Investments in Subsidiaries category was reclassified to the Other Assets category.

**CARTERET FEDERAL SAVINGS BANK** — Report 2

**Statement of Assets and Liabilities in Liquidation (Unaudited)** — Adjusted 1213112005 Balances

**INCEPTION TO *1213112005***

**(Rounded in Dollars)**

**Receivership Fund Code:** *1309*
**Inception Date:** *01120195*

| | Inception Balances (Per RTC General Ledger) | Net Change In Balances | 12/31/2005 Actual G/L Balances | Adjustments to 1213112005 Actual G/L Balances | Adjusted 1213112005 Balances |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | | |
| Assets: | | | | | |
| Cash and Investments | - | 115,756 | 115,756 | | 115,756 |
| Receivables | - | - | - | | - |
| Assets in Liquidation | | | | | |
| Securities | 171,629,841 | (171,629,841) | - | | - |
| Consumer Loans | 34,068,047 | (34,068,047) | - | | - |
| Commercial Loans | 14,181,058 | (14,181,058) | - | | - |
| Real Estate Mortgages | 712,925,720 | (712,925,720) | - | | - |
| Other Assets/Judgments | 321,403,026 | (321,403,026) | - | | - |
| Owned Assets | 10,116,861 | (10,116,861) | - | | - |
| Net Investments in Subsidiaries | 1,556,486 | (1,556,486) | - | | - |
| Subtotal: Assets in Liquidation | 1,265,881,039 | (1,265,881,039) | - | | - |
| Less: Estimated Loss on Assets | - | - | - | | - |
| Advances on Assets | | | | | |
| **Total Assets** | 1,265,881,039 | (1,265,765,283) | 115,756 | | 115,756 |
| Liabilities: | | | | | |
| **Administrative Liabilities** | | | | | |
| Accounts/Notes Payable | - | - | - | | |
| Suspense/Escrow Accounts | - | 15,378 | 15,378 | | 15,378 |
| Due to FDIC for Service - Billed Expenses | - | 20,281 | 20,281 | | 20,281 |
| Due to FDIC for Borrowed Funds | - | 6,087,767 | 6,087,767 | | 6,087,767 |
| Estimated Litigation Losses - Probable | - | - | - | | |
| Other Contingent Liabilities | - | - | - | | |
| SubTotal - Administrative Liabilities | | 6,123,426 | 6,123,426 | | 6,123,426 |
| Proven Depositor/Creditor Claims | | | | | |
| Due to FDIC Subrogated Deposit Claims | | 18,520,362 | 18,520,362 | | 18,520,362 |
| Unisured Deposit Claims Due Others | 1,376,333,646 | (1,376,333,646) | | | |
| Other Creditor Claims | | 303,496 | 303,496 | | 303,496 |
| Estimated Interest on Claims | | 156,559,502 | 156,559,502 | | 156,559,502 |
| Subtotal - Proven Depositor/Creditor Claims | 1,376,333,646 | (1,200,950,286) | 175,383,360 | | 175,383,360 |
| Other Claims | | | | | |
| Estimated Federal Income Tax Liability | - | - | - | | - |
| Other Subordinated Obligations | - | - | - | | - |
| Liabilities at Inception - Unproven | - | - | - | | |
| Subtotal Other Claims | | | | | |
| **Total Liabilities** | 1,376,333,646 | (1,194,826,860) | 181,506,786 | | 181,506,786 |
| Net Assets / (Deficit): | | | | | |
| Net Assets/(Deficit) At Inception | (110,452,607) | - | (110,452,607) | | (110,452,607) |
| Premiums Received / (Paid) at Resolution | - | 143,821,654 | 143,821,654 | | 143,821,654 |
| Asset - Related Equity Adjustments | - | 25,488,825 | 25,488,825 | | 25,488,825 |
| Liability/Claims-Related Equity Adjustments | - | (157,796,452) | (157,796,452) | | (157,796,452) |
| Income/(Loss) of the Liquidation | | (82,452,450) | (82,452,450) | | (82,452,450) |
| **Total Net Assets/(Deficit)** | (110,452,607) | (70,938,423) | (181,391,030) | | (181,391,030) |
| **Total Liabilities and Net Assets/(Deficit)** | 1,265,881,039 | (1,265,765,283) | 115,756 | | 115,756 |

Estimated additional litigation losses considered reasonably possible: 1,410,000

[a] The inception balances per the General Ledger agree in total with the adjusted inception balances on Report 1 - Inception Pro Forma Recap. Refer to Report 1 - A for the mapping of total asset line items on Report 1 to the corresponding asset categories on Report 2.

[b] The amounts in this column reflect the net change in balances reported at inception (column entitled "Inception Balances") versus those as of the report date (column entitled "12/31/2005 Actual G/L Balances").

[c] These balances reflect amounts reported on the receivership's Statement of Assets and Liabilities in Liquidation. Refer to the accompanying footnotes applicable to the Statement of Assets and Liabilities in Liquidation, as these notes are an integral part of this statement.

THIS REPORT CONTAINS 12/31/2005 ESTIMATES BASED ON THE BEST INFORMATION AVAILABLE AS OF 12/31/2005. AS WITH ALL ESTIMATES AND PROJECTIONS, ACTUAL RESULTS MAY DIFFER.

CARTERET FEDERAL SAVINGS BANK
Projected Receivership Results Using Adjusted 12/31/2005 Balances
(Rounded In Dollars)

REPORT 3
Projected Receivership Results
Using Adjusted 12/31/2005 Balances

Receivership Fund Code: 1309
Inception Date: 01/20/95

| | Adjusted 12/31/2005 Balances | Post Insolvency Interest | Federal Income Tax | Projected Receivership Results (using Adj 12/31/2005 Bal) | Pass Through Receivership (Fund Code 8602) [d]: Outstanding Claims Priority 6 | Post Insolvency Interest Priority 7 | Claims Not Fixed on Day of Default Priority 7 | Federal Income Tax Priority 8 | Subordinated Debt Priority 9 | Projected Receivership Results Adjusted for Pass-Through Liab | Stockholders' Claims Priority 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | [b] | [c] | | | | | | | [a] |
| **Assets:** | | | | | | | | | | | |
| Cash and Investments | 115,756 | | | 115,756 | | | | | | 115,756 | |
| Receivables | - | | | - | | | | | | - | |
| Assets In Liquidation | | | | | | | | | | | |
| Securities | - | | | - | | | | | | - | |
| Consumer Loans | - | | | - | | | | | | - | |
| Commercial Loans | - | | | - | | | | | | - | |
| Real Estate Mortgages | - | | | - | | | | | | - | |
| Other Assets/Judgments | - | | | - | | | | | | - | |
| Owned Assets | - | | | - | | | | | | - | |
| Net Investments In Subsidiaries | - | | | - | | | | | | - | |
| Subtotal: Assets In Liquidation | - | | | - | | | | | | - | |
| Loss: Estimated Loss on Assets | - | | | - | | | | | | - | |
| Advances on Assets | | | | | | | | | | - | |
| **Total Assets** | 115,756 | | | 115,756 | | | | | | 115,756 | - |
| **Liabilities:** | | | | | | | | | | | |
| Administrative Liabilities | | | | | | | | | | | |
| Accounts/Notes Payable | - | | | | | | | | | | |
| Suspense/Escrow Accounts | 15,378 | | | 15,378 | | | | | | 15,378 | |
| Due to FDIC for Service - Billed Expenses | 20,281 | | | 20,281 | | | | | | 20,281 | |
| Due to FDIC for Borrowed Funds | 6,087,767 | | | 6,087,767 | | | | | | 6,087,767 | |
| Estimated Litigation Losses - Probable | - | | | | | | | | | | |
| Other Contingent Liabilities | - | | | | | | | | | - | |
| SubTotal - Administrative Liabilities | 6,123,426 | | | 6,123,426 | | | | | | 6,123,426 | |
| Proven Depositor/Creditor Claims | | | | - | | | | | | - | |
| Due to FDIC Subrogated Deposit Claims | 18,520,362 | | | 18,520,362 | | | | | | 18,520,362 | |
| Unisured Deposit Claims Due Others | - | | | - | 1,578,552 | | 292 | | | 1,578,844 | |
| Other Creditor Claims | 303,496 | | | 303,496 | | | | | | 303,496 | |
| Estimated Interest on Claim | 158,559,502 | [a] | | 158,559,502 | | 1,422,704 | | | | 157,982,206 | |
| Subtotal - Proven Depositor/Creditor Claims | 175,383,360 | | | 175,383,360 | 1,578,552 | 1,422,704 | 292 | | | 178,384,906 | |
| Other Claims | | | | | | | | | | | |
| Estimated Federal Income Tax Liability | - | | 93,748,141 | 93,748,141 | | | | | | 93,748,141 | |
| Other Subordinated Obligations | - | | | - | | | | | | - | |
| Liabilities at Inception - Unproven | - | | | - | | | | | | - | |
| Subtotal Other Claims | - | | 93,748,141 | 93,748,141 | - | - | - | - | - | 93,748,141 | |
| **Total Liabilities** | 181,506,786 | | 93,748,141 | 275,254,927 | 1,578,552 | 1,422,704 | 292 | | | 278,256,475 | |
| **Net Assets / (Deficit):** | | | | | | | | | | | |
| Net Assets/(Deficit) At Inception | (110,452,607) | | | (110,452,607) | | | | | | (110,452,607) | |
| Premium Received/ (Paid) at Resolution | 143,821,654 | | | 143,821,654 | | | | | | 143,821,654 | |
| Asset - Related Equity Adjustments | 25,488,825 | | | 25,488,825 | | | | | | 25,488,825 | |
| Liability/Claims-Related Equity Adjustments | (157,796,452) | | (93,748,141) | (251,544,593) | (1,578,552) | (1,422,704) | (292) | | | (254,546,141) | |
| Income/(Loss) of the Liquidation | (82,452,450) | | | (82,452,450) | | | | | | (82,452,450) | |
| **Total Net Assets/(Deficit)** | (181,391,030) | - | (93,748,141) | (275,139,171) | (1,578,552) | (1,422,704) | (292) | - | - | (278,140,719) | - |

The accompanying notes are an integral part of this Report 3.

## Footnotes to Report 3 - Fund Code 1309

[a] Fund Code 1309 is subject to the order of claims priority contained in 12 U.S.C. § 1821(d)(11), which applies to RTC receiverships commenced after 08/10/1993. The post insolvency interest estimate is computed on unpaid proven claims balance by applying the applicable federal judgement rate immediately prior to this receivership's inception date, consistent with 28 U.S.C. § 1961. The interest compounds annually and continues to accrue until the unpaid proven claims have been satisfied.

[b] Tax returns and IRS transcripts for this receivership reflect federal income taxes due in the amount of $29,902,504. Another $53,482,421 in accrued interest and $10,363,216 in penalties have been estimated through 12/31/05. An agreement signed between the IRS and the former RTC provides for a deferral of these tax liabilities as long as there are insufficient assets to pay depositor claims in full. Once deposit claims are paid in full, the tax liability becomes due and will be paid in accordance with the order of priority contained in 12 U.S.C. § 1821(d)(11). The potential tax effect of any pending litigation settlement has not been considered at this time.

[c] Pursuant to the contract of sale documents that conveyed the goodwill claims to the FSLIC Resolution Fund - RTC (the Fund), the Fund agreed to advance the costs of litigation, and to remit to the receiver any amounts collected on such claims after deduction of these costs. The Fund has accumulated $5.9 million in expenses incurred on this receiver's goodwill litigation efforts through 12/31/2005, and may continue to accumulate additional litigation expenses. There are no goodwill litigation expenses reflected on this receivership's general ledger as of 12/31/2005. If the final resolution of the goodwill litigation results in a monetary award to the receivership, accumulated goodwill litigation expenses will be deducted from any proceeds distributed to the receivership. If the final resolution of the goodwill litigation does not result in a monetary award to the receivership, the Fund will absorb the expenses.

[d] During the resolution process, a Pass-Through Receivership (Fund Code 8602) was established on 12/04/92. The estimated Pass-Through Receivership deficit as of 12/31/05 is estimated above and should be considered in any distribution. Total Pass-Through Receivership liabilities were $4.7 million of which $3.1 million has been paid to arrive at the $1.6 million in Priorities 1 through 6 and $292 in Priority 7 "Claims Not Fixed on Day of Default" shown above, in accordance with the order of claims priority contained in 12 C.F.R. § 360.3 (a). Post insolvency interest on Priority 6 claims, which was computed in accordance with 12 C.F.R. § 360.3 (b), is the $1.4 million shown as Priority 7 above. Note that this post insolvency interest estimate is compounded daily and continues to accrue until unpaid Priority 6 claims have been satisfied.

[e] This column is presented to indicate that stockholders' claims are subordinate to all other unpaid claims reported in the preceding columns.

CARTERET FSB
NEWARK, NJ
Fund Number: 1309
Inception Date: 03/10/1995
Statement of Assets & Liabilities in Liquidation (unaudited)
For Period Ending: December 31,2005
(Rounded in Dollars)

| | Current Balance | Inception Balance |
|---|---|---|
| Assets | | |
| Cash and Investments | $ 115,756 | $ 0 |
| Receivables | $ 0 | $ 0 |
| Assets in Liquidation | | |
| Securities | $ 0 | $ 171,629,841 |
| Consumer Loans | $ 0 | $ 34,068,047 |
| Commercial Loans | $ 0 | $ 14,181,058 |
| Real Estate Mortgages | $ 0 | $ 712,925,720 |
| Other Assets/Judgments | $ 0 | $ 321,403,026 |
| Owned Assets | $ 0 | $ 10,116,861 |
| Net Investments in Subsidiaries | $ 0 | $ 1,556,486 |
| Subtotal -Assets in Liquidation | $0 | $1,265,881,039 |
| Less: Estimated Loss on Assets in Liquidation (Note 3) | $ 0 | $ 0 |
| Advances on Assets | $ 0 | $ 0 |
| Total Assets | $115,756 | $1,265,881,039 |
| | | |
| Liabilities (Note 5) | | |
| Administrative Liabilities | | |
| Accounts/Notes Payable | $ 0 | $ 0 |
| Suspense/Escrow Accounts | $ 15,378 | $ 0 |
| Due to FDIC for Service - Billed Expenses | $ 20,281 | $ 0 |
| Due to FDIC for Borrowed Funds | $ 6,087,767 | $ 0 |
| Estimated Litigation Losses - Probable (Note 7) | $ 0 | $ 0 |
| Other Contingent Liabilities (Note 5) | $ 0 | $ 0 |
| Subtotal - Administrative Liabilities | $6,123,426 | $0 |
| Proven Depositor/Creditor Claims | | |
| Due to FDIC for Subrogated Deposit Claims | $ 18,520,362 | $ 0 |
| Uninsured Deposit Claims Due Others | $ 0 | $ 0 |
| Other Creditor Claims | $ 303,496 | $ 0 |
| Estimated Interest on Claims (Note 6) | $ 156,559,502 | $ 0 |
| Subtotal - Proven Depositor/Creditor Claims | $175,383,360 | $0 |
| Other Claims | | |
| Estimated Federal Income Tax Liability (Note 10) | $ 0 | $ 0 |
| Other Subordinated Obligations | $ 0 | $ 0 |
| Liabilities at Inception - Unproven | $ 0 | $ 1,376,333,646 |
| Subtotal - Other Claims | $0 | $1,376,333,646 |
| Total Liabilities | $181,506,786 | $1,376,333,646 |
| | | |
| Net Assets/(Deficit) | | |
| Net Assets I (Deficit) At Inception | ($ 110,452,607) | ($ 110,452,607) |
| Premiums Received I (Paid) at Resolution | $ 143,821,654 | $ 0 |
| Asset - Related Equity Adjustments | $ 25,488,825 | $ 0 |
| Liability/Claims-Related Equity Adjustments | ($ 157,796,452) | $ 0 |
| Income / Loss of the Liquidation Since Inception | ($ 82,452,450) | $ 0 |
| Total Net Assets/(Deficit) | ($181,391,030) | ($110,452,607) |
| Total Liabilities and Net Assets/(Deficit) | $115,756 | $1,265,881,039 |
| Estimated additional litigation losses considered reasonably possible: (Note 7) | $1,410,000 | |

The accompanying notes are an integral part of these financial statements.

Last Month Closed: January, 2006 (Period 01)

**CARTERET FSB**
**NEWARK, NJ**
**Fund Number: 1309**
**Inception Date: 03/10/1995**
**Statement of Operations (unaudited)**
**For Period Ending: 12/31/2005**
**(Rounded in Dollars)**

| | Year-to-Date | Inception-to-Date |
|---|---|---|
| Liquidation Revenues | | |
| Interest on Cash and Investments | $ 4,134 | $ 25,071,509 |
| Interest and Late Fee Income on: | | |
| Securities | $ 0 | $ 5,409,738 |
| Consumer Loans | $ 0 | $ 70,788 |
| Commercial Loans | $ 0 | $ 1,208,389 |
| Real Estate Mortgages | $ 0 | $ 30,852,852 |
| Other Assets and Judgments | $ 0 | $ 10,099 |
| Recoveries from Charged-Off Assets | $ 0 | $ 59,428 |
| Professional Liability/ Litigation Recoveries | $ 42,910 | $ 1,742,205 |
| Other Miscellaneous Income | $ 770 | $ 16,433,757 |
| Total - Liquidation Revenues | $47,815 | $80,858,765 |
| | | |
| Liquidation Expenses | | |
| Operations | | |
| FDIC Service-Billed Expenses for: (Note 9) | | |
| Marketing/ Closing/ Settlement | $ 0 | $ 0 |
| Oversight/ Claims/ Accounting | $ 16,200 | $ 88,261 |
| Asset Marketing/ Management | $ 0 | $ 13,163 |
| Investigation and Others | $ 1,085 | $ 112,433 |
| Salaries and Indirect Costs (Note 9) | $ 0 | $ 20,081,886 |
| Asset Servicing-Related Expenses | $ 300 | $ 15,253,315 |
| Asset Sales-Related Expenses | $ 0 | $ 4,715,122 |
| Legal and Other Professional Fees | $ 3,549 | $ 4,224,657 |
| Travel and Other Liquidation Expenses | $ 90 | $ 8,001,887 |
| Subtotal - Operating Expenses | $21,224 | $52,490,724 |
| Interest on FDIC Borrowed Funds | $ 0 | ($ 7,469) |
| Other Interest Expense | $ 0 | $ 594,646 |
| Litigation Losses | $ 0 | $ 229,546 |
| Loss on Contingent Liabilities | $ 0 | $ 2,547,088 |
| Total Liquidation Expenses | $21,224 | $55,854,536 |
| Net Income/(Loss) from Operations | $26,591 | $25,004,229 |
| | | |
| Net Income/(Loss)on Managed Assets | | |
| Owned Assets | $ 0 | ($ 82,176) |
| Net Investments in Subsidiaries | $ 0 | ($ 1,155,505) |
| Total Net Income/(Loss)on Managed Assets | $0 | ($1,237,681) |
| Gain/(Loss) on Disposition of Assets | | |
| Securities | $ 0 | ($ 32,405,294) |
| Consumer Loans | $ 0 | ($ 1,137,020) |
| Commercial Loans | $ 0 | ($ 4,495,093) |
| Real Estate Mortgages | $ 0 | ($ 61,247,406) |
| Other Assets/ Judgments | $ 0 | ($ 11,662,298) |
| Owned Assets | $ 0 | $ 736,157 |
| Net Investments in Subsidiaries | $ 0 | $ 3,991,956 |
| Total - Gain/(Loss) on Disposition of Assets | $0 | ($106,218,999) |
| Income/(Loss) of the Liquidation | $26,591 | ($82,452,450) |

The accompanying notes are an integral part of these financial statements.

Last Month Closed: January, 2006 (Period 01)

# *Notes to Financial Statements:*

1. ***Basis of Accounting*** : The FDI Act authorizes the FDIC, as receiver for a failed insured depository institution ("Receivership"), to administer and conclude the affairs of such institution. Financial statement presentations are based on the premise that the assets of the receivership will be liquidated and proceeds distributed to the institution's creditors over time as provided by applicable laws and regulations. While a receivership's average lifespan is three to six years, some may require longer time frames to conclude. At the onset of a receivership, the failed institution's financial records are reviewed and restated to establish a new basis of accounting. The assets and liabilities of the failed institution are adjusted to remove all estimated losses, accruals, and deferrals. These adjustments include loss allowances; partial write downs; prepaid, deferred or accrued expenses having no recovery value; and accrued or deferred income. Restated balances are shown under the Inception Balance heading of the Statement of Assets and Liabilities in Liquidation. After inception, FDIC's liquidation valuation and measurement practices, as described more fully in the paragraphs that follow, are adopted for all assets and liabilities. In general, transactions are recorded when cash is received or disbursed. Accruals may be used when prospective cash flows are probable and reasonably estimated.

2. ***Use of Estimates*** : As appropriate, estimates of asset values, liabilities, revenues, and expenses are reflected in the financial statements. These amounts are updated over time to compensate for uncertainties inherent in the estimation process. As with the use of all estimates, actual results may differ.

3. ***Valuation of Assets/Loss Allowances*** : Assets of the receivership are shown at values representing cash on deposit or the book value of amounts invested; the principal balance of loans, notes, other debt instruments or receivables (note that interest on these assets is not accrued after failure but is recognized when received); the foreclosed value of real and/or personal property or the book value of assets (cost less depreciation or amortization through date of the institution's failure); and the historical cost of the net investment in subsidiaries, partnerships, or joint ventures, adjusted where appropriate to reflect the receivership's portion of the underlying net earnings or losses.

An Estimated Loss on Assets is provided when anticipated future asset disposition proceeds, including associated expenses, are less than recorded amounts. Future asset disposition proceeds are generally estimated by determining, via sampling or recent disposition activity, the recovery rates for similar assets across all receiverships. However, actual recovery rates for this receivership may differ according to the quality and type of individual asset, as well as over time with changing market conditions. Accordingly, the gains or losses ultimately realized for this receivership will likely vary from amounts estimated.

4. ***Contingent Recoveries*** : Assets of the receivership generally exclude potential collections from activities such as professional liability or other types of pending legal actions. Significant uncertainties prevent reasonable estimation of the amounts ultimately collectible. Instead, these recoveries are generally recognized when cash is received, or when the collection is probable and the amount collectible can be reasonably estimated.

5. ***Actual and Estimated Liabilities*** : The FDIC, as receiver, determines (allows/disallows) claims and distributes proceeds derived from the disposition of the failed institution's assets according to applicable state and federal law governing the payment of creditor claims. Recorded liabilities comprise 1) proven or pending (unproven) claims against the receivership estate, 2) various operating liabilities, and 3) estimates of other probable losses such as pending defensive litigation. Applicable law governing the payment priority of distributions may vary depending on the inception date of the receivership. Therefore, liabilities of the receivership estate are not ranked in order of preference or payment priority on the Statement of Assets and Liabilities in Liquidation.

6. ***Estimated Interest on Claims*** : Applicable law governs or directs the payment of post-insolvency interest to creditors holding proven claims against the receivership estate, including the claim(s) held by the FDIC in its Corporate capacity. Post-insolvency interest is the interest

calculated and paid on proven creditor claims, under certain circumstances, after a receiver is appointed. Uncertainties exist as to the universe of creditors whose claims will ultimately be allowed and whether creditors will receive the full principal amount of proven claims against the receivership estate or any post-insolvency interest. No distribution will be made to holders of equity interests until allowed creditor claims have been paid principal and post-insolvency interest in full. Generally, the estimated liability for the total amount of post-insolvency interest payable respective to creditor claims is recognized in these financial statements when at least 95% of the principal of proven creditor claims has been paid.

*7. __Reasonably Possible Litigation Losses__* : In addition to the amounts recorded for probable litigation liabilities, the FDIC Legal Division has determined that the receivership may be subject to reasonably possible losses from unresolved litigation. Reasonably possible losses differ from those which are probable in that there is a lesser likelihood of loss and payment from the receivership. As such, reasonably possible losses are not accrued in the accounts until the FDIC, through periodic review, determines either that the litigation settlement expense has been incurred or that the likelihood of loss has become probable. While not recognized in the *Statement of Assets and Liabilities in Liquidation,* FDIC management may use all or part of the estimate of reasonably possible litigation losses to determine the assets that must be retained by the receivership to satisfy these potential obligations. The amount of reasonably possible losses is shown at the bottom of the receivership's *Statement of Assets and Liabilities in Liquidation* as a separate disclosure. Further, receiverships may be subject to significant losses from cases where uncertainties prevent a reasonable assessment of the ultimate outcome and/or an estimate of the amount of loss which could result.

*8. __Non-Cash Equity Adjustments__* : Unrecorded assets and claims determined to have existed as of the institution's failure are deemed discovered assets and liabilities, respectively, and are recorded as non-cash equity adjustments. Other non-cash equity adjustments include the Estimated Loss on Assets in Liquidation, the Estimated Interest on Claims, as well as the write-off of remaining unpaid liabilities prior to the inactivation of a receivership. Note that certain non-cash equity adjustments such as the estimated loss on assets and probable litigation are reversed when they are recognized as liquidation transactions in the *Statement of Operations.*

*9. __FDIC Service-Billed Expenses (Statement of Operations)__* : FDIC personnel, who are employed by the FDIC in its Corporate capacity, are responsible for conducting all liquidation-related activities for FDIC receiverships. The FDIC in its Corporate capacity bills the receiverships for various liquidation services provided on their behalf. Since 2002, these receivership billings are calculated by multiplying the actual workload volume attributable to an individual receivership by the benchmark rate for the service provided. Benchmark rates are developed and periodically reviewed by FDIC management after considering empirical and industry data relevant to the service provided as well as an overhead component. These expenses are presented by service type under the *"FDIC Service-Billed Expenses"* section in the *Statement of Operations.*

Prior to 2002, the costs of FDIC-provided services were billed to receiverships in two components comprising 1) employee salaries based on actual labor hours directly attributable to an individual receivership and 2) indirect costs allocated amongst active receiverships based on liquidation activity, as reflected by each receivership's salary charges. Where applicable, these billed expenses are reflected as *"Salaries and Indirect Costs"* in the *Statement of Operations.*

*10. __Income Taxes__* : Federal tax law requires that receivers of corporations, including depository institutions for which the FDIC serves as receiver, continue to file federal income tax returns for the receiverships they manage. A receivership may therefore incur a federal income tax liability from activities that occur during the life of the receivership, as well as during pre-receivership periods. Payment of federal income taxes is deferred until higher priority claims are satisfied, but prior to any payment made to equity holders of the failed institution. Because of the contingent nature of these tax claims, federal income tax liabilities are generally not recognized in these financial statements unless circumstances indicate that there is a high probability that they will be paid. Federal law provides an exemption from income taxes imposed by any State or local taxing authority once FDIC is appointed as receiver.

TABLE 5: CARTERET'S PERFORMANCE RELATIVE TO OTHER FAILED THRIFTS

| Year | N | Past Due and Nonaccruals/ Total Loans | Return on Assets (ROA) | Interest Expense/ Deposits |
|---|---|---|---|---|
| 1984 | 22 | N/A | -2.399% | 10.531% |
| 1985 | 50 | N/A | -4.219% | 7.121% |
| 1986 | 79 | N/A | -6.606% | 5.511% |
| 1987 | 65 | N/A | -7.363% | 4.640% |
| 1988 | 193 | N/A | -10.119% | 4.439% |
| 1989 | 273 | N/A | -6.376% | 5.607% |
| 1990 | 508 | 9.053% | -5.067% | 4.130% |
| 1991 | 362 | 10.415% | -4.916% | 3.800% |
| **1992** | **63** | **6.813%** | **-1.410%** | **6.720%** |
| 1993 | 56 | 12.556% | -7.483% | 3.222% |
| 1994 | 53 | 14.619% | -3.429% | 1.517% |
| 1995 | 8 | 5.003% | -1.042% | 31.613% |
| 1996 | 5 | 1.769% | -1.037% | 3.360% |
| 1997 | 2 | 1.304% | 0.747% | 2.865% |
| 1998 | 2 | 1.247% | 0.357% | 2.544% |
| 1999 | 4 | 3.408% | -2.305% | 3.650% |
| 2000 | 1 | 0.159% | -1.265% | 1.937% |
| 2001 | 1 | 3.233% | -5.710% | 2.587% |
| 2002 | 1 | 0.776% | 0.186% | 0.859% |
| 2003 | 1 | 3.199% | 0.880% | 1.040% |
| 2005 | 3 | 3.259% | 0.781% | 1.626% |
| **Total** | **1752** | **9.683%** | **-5.722%** | **4.668%** |
| **Carteret** | | **4.447%** | **0.189%** | **3.829%** |

*Source*: Thrift Financial Report data; FDIC Failure Transaction Database.

Table 5 shows that Carteret was in a stronger position than a typical failed thrift. Carteret had a lower ratio of past due and nonaccrual loans to total loans than the average for thrifts failing in 1992 and over the entire period. One problem with failed thrifts was the preponderance of "hot money," which is exhibited by a very high average deposit expense. Table 5 shows that hot money was not a concern with Carteret, as the ratio of deposit interest expense to total deposits in Carteret was extremely low relative to other thrifts failing both in 1992 and throughout the period. Finally, unlike average failed thrifts in 1992, Carteret was earning a positive return on assets ("ROA").

| | Old Bad Loans | Four-quarter earnings divided by end of period assets | Four-quarter interest expense divided by end of period deposits | One-quarter earnings divided by end of period assets | One-quarter interest expense divided by end of period deposits | Four-quarter earnings divided by average four-quarter assets | Four-quarter Interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|
| | badloans | ROA | intexp | QROA | QIntexp | AVGQROA | AVGQintexp |
| **CARTERET FSB** | | | | | | | |
| 9/30/1992 | 4.447% | 0.234% | 5.471% | 0.069% | 1.129% | 0.220% | 5.174% |
| 12/31/1992 * | 5.323% | -0.201% | 0.302% | -0.375% | -3.921% | -0.205% | 0.273% |

* Appears that new books were opened on Carteret under conservatorship. Fourth quarter results look more like typical first quarter results, so that typical quarter over quarter change does not make sense.

DEPOSITION EXHIBIT 11

PENGAD-Bayonne, N. J.

Savings and Loans ONLY (Structure Data-defined, CHTR_TYPE_CD=310)

| | Data | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQintexp | Average of AVGQIntexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 15 | -1.003% | 15 | 2.646% | | | | |
| 1985 | | | 43 | -4.259% | 43 | 12.269% | 43 | -2.008% | 43 | 2.531% | 43 | -3.948% | 43 | 10.568% |
| 1986 | | | 51 | -6.196% | 51 | 9.058% | 51 | -3.981% | 51 | 2.181% | 51 | -4.619% | 51 | 8.966% |
| 1987 | | | 42 | -10.896% | 42 | 7.923% | 42 | -3.585% | 42 | 1.856% | 42 | -9.945% | 42 | 7.804% |
| 1988 | | | 129 | -16.356% | 129 | 7.418% | 129 | -4.144% | 129 | 1.877% | 129 | -14.932% | 129 | 7.421% |
| 1989 | | | 261 | -11.863% | 261 | 7.713% | 263 | -3.653% | 263 | 1.981% | 261 | -10.710% | 261 | 7.564% |
| 1990 | 85 | 7.409% | 152 | -5.030% | 152 | 8.112% | 152 | -2.195% | 152 | 1.987% | 152 | -4.482% | 152 | 7.899% |
| 1991 | 91 | 5.827% | 91 | -2.948% | 91 | 7.849% | 91 | -0.584% | 91 | 1.842% | 91 | -2.730% | 91 | 7.456% |
| 1992 | 32 | 6.122% | 32 | -2.933% | 32 | 6.745% | 32 | -0.889% | 32 | 1.481% | 32 | -2.620% | 32 | 6.375% |
| 1993 | 3 | 5.027% | 3 | -6.881% | 3 | 5.369% | 3 | 0.325% | 3 | 1.168% | 3 | -6.088% | 3 | 4.925% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| 2003 | | | | | | | | | | | | | | |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 213 | 6.533% | 806 | -9.080% | 806 | 8.040% | 823 | -2.874% | 823 | 1.973% | 806 | -8.169% | 806 | 7.788% |

| | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Savings Banks and Savings and Loans ONLY (Structure Data-defined, CHTR_TYPE_CD=300 and 310)** | | | | | | | | | | | | | |
| | Data | | | | | | | | | | | | |
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQintexp | Average of AVGQintexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 15 | -1.003% | 15 | 2.646% | | | | |
| 1985 | | | 43 | -4.259% | 43 | 12.269% | 43 | -2.008% | 43 | 2.531% | 43 | -3.948% | 43 | 10.568% |
| 1986 | | | 56 | -6.055% | 56 | 9.067% | 56 | -3.719% | 56 | 2.169% | 56 | -4.580% | 56 | 8.943% |
| 1987 | | | 45 | -10.912% | 45 | 7.933% | 45 | -3.924% | 45 | 1.856% | 45 | -9.952% | 45 | 7.806% |
| 1988 | | | 145 | -15.700% | 145 | 7.391% | 145 | -4.089% | 145 | 1.869% | 145 | -14.344% | 145 | 7.388% |
| 1989 | | | 303 | -12.116% | 303 | 7.714% | 305 | -3.545% | 305 | 1.976% | 303 | -10.881% | 303 | 7.561% |
| 1990 | 121 | 7.758% | 206 | -4.854% | 206 | 8.090% | 206 | -2.044% | 206 | 1.978% | 206 | -4.352% | 206 | 7.878% |
| 1991 | 135 | 6.028% | 135 | -2.913% | 135 | 7.787% | 135 | -0.567% | 135 | 1.822% | 135 | -2.671% | 135 | 7.424% |
| 1992 | 60 | 6.067% | 60 | -3.265% | 60 | 6.853% | 60 | -0.974% | 60 | 1.461% | 60 | -2.858% | 60 | 6.409% |
| 1993 | 6 | 4.271% | 6 | -4.244% | 6 | 5.033% | 6 | 0.128% | 6 | 1.072% | 6 | -3.800% | 6 | 4.742% |
| 1994 | 2 | 5.567% | 2 | -6.189% | 2 | 4.299% | 2 | -3.776% | 2 | 1.030% | 2 | -5.828% | 2 | 4.160% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| 1996 | 1 | 0.310% | 1 | -8.291% | 1 | 5.876% | 1 | -6.044% | 1 | 1.487% | 1 | -7.973% | 1 | 5.971% |
| 1999 | | | | | | | | | | | | | | |
| 2000 | 1 | 6.198% | 1 | -10.105% | 1 | 4.599% | 1 | -5.203% | 1 | 1.052% | 1 | -8.718% | 1 | 4.210% |
| 2001 | 1 | 3.233% | 1 | -6.007% | 1 | 5.436% | 1 | -1.746% | 1 | 1.288% | 1 | -5.370% | 1 | 5.631% |
| 2002 | 1 | 0.776% | 1 | 0.542% | 1 | 3.831% | 1 | 0.186% | 1 | 0.859% | 1 | 0.558% | 1 | 3.900% |
| 2003 | | | | | | | | | | | | | | |
| 2004 | 1 | 3.199% | 1 | 0.880% | 1 | 1.040% | 1 | 0.164% | 1 | 0.274% | 1 | 0.976% | 1 | 1.167% |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 331 | 6.609% | 1008 | -8.551% | 1008 | 7.935% | 1025 | -2.670% | 1025 | 1.936% | 1008 | -7.681% | 1008 | 7.683% |

All TFR Filers (Used in report): Revised version from FTDB match on faildate

| | Data | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQIntexp | Average of AVGQIntexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 22 | -0.919% | 22 | 2.640% | | | | |
| 1985 | | | 57 | -4.126% | 57 | 11.660% | 57 | -1.844% | 57 | 2.518% | 57 | -3.892% | 57 | 10.452% |
| 1986 | | | 57 | -6.042% | 57 | 9.028% | 57 | -3.668% | 57 | 2.170% | 57 | -4.587% | 57 | 8.903% |
| 1987 | | | 49 | -11.748% | 49 | 7.900% | 49 | -3.652% | 49 | 1.845% | 49 | -10.565% | 49 | 7.783% |
| 1988 | | | 157 | -14.901% | 157 | 7.360% | 157 | -3.920% | 157 | 1.863% | 157 | -13.623% | 157 | 7.357% |
| 1989 | | | 306 | -12.050% | 306 | 7.712% | 308 | -3.528% | 308 | 1.974% | 306 | -10.794% | 306 | 7.529% |
| 1990 | 122 | 7.731% | 207 | -4.835% | 207 | 8.086% | 207 | -2.035% | 207 | 1.977% | 207 | -4.336% | 207 | 7.875% |
| 1991 | 136 | 6.016% | 136 | -2.909% | 136 | 7.780% | 136 | -0.571% | 136 | 1.821% | 136 | -2.668% | 136 | 7.417% |
| 1992 | 60 | 6.067% | 60 | -3.265% | 60 | 6.853% | 60 | -0.974% | 60 | 1.461% | 60 | -2.858% | 60 | 6.409% |
| 1993 | 6 | 4.271% | 6 | -4.244% | 6 | 5.033% | 6 | 0.128% | 6 | 1.072% | 6 | -3.800% | 6 | 4.742% |
| 1994 | 2 | 5.567% | 2 | -6.189% | 2 | 4.299% | 2 | -3.776% | 2 | 1.030% | 2 | -5.828% | 2 | 4.160% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| 1996 | 1 | 0.310% | 1 | -8.291% | 1 | 5.876% | 1 | -6.044% | 1 | 1.487% | 1 | -7.973% | 1 | 5.971% |
| 1997 | | | | | | | | | | | | | | |
| 1998 | | | | | | | | | | | | | | |
| 1999 | | | | | | | | | | | | | | |
| 2000 | 1 | 6.198% | 1 | -10.105% | 1 | 4.599% | 1 | -5.203% | 1 | 1.052% | 1 | -8.718% | 1 | 4.210% |
| 2001 | 1 | 3.233% | 1 | -6.007% | 1 | 5.436% | 1 | -1.746% | 1 | 1.288% | 1 | -5.370% | 1 | 5.631% |
| 2002 | 1 | 0.776% | 1 | 0.542% | 1 | 3.831% | 1 | 0.186% | 1 | 0.859% | 1 | 0.558% | 1 | 3.900% |
| 2003 | | | | | | | | | | | | | | |
| 2004 | 1 | 3.199% | 1 | 0.880% | 1 | 1.040% | 1 | 0.164% | 1 | 0.274% | 1 | 0.976% | 1 | 1.167% |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 333 | 6.596% | 1044 | -8.471% | 1044 | 7.944% | 1068 | -2.615% | 1068 | 1.944% | 1044 | -7.603% | 1044 | 7.695% |

Savings and Loans (FTDB-defined as SL)

| | Data | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Old Bad Loans | | Four-quarter earnings divided by end of period assets | | Four-quarter interest expense divided by end of period deposits | | One-quarter earnings divided by end of period assets | | One-quarter interest expense divided by end of period deposits | | Four-quarter earnings divided by average four-quarter assets | | Four-quarter interest expense divided by average four-quarter deposits |
| FAILYR | Count of badloans | Average of badloans | Count of ROA | Average of ROA | Count of Intexp | Average of intexp | Count of QROA | Average of QROA | Count of Qintexp | Average of Qintexp | Count of AVGQROA | Average of AVGQROA | Count of AVGQintexp | Average of AVGQintexp |
| 1980 | | | | | | | | | | | | | | |
| 1981 | | | | | | | | | | | | | | |
| 1982 | | | | | | | | | | | | | | |
| 1983 | | | | | | | | | | | | | | |
| 1984 | | | | | | | 22 | -0.919% | 22 | 2.640% | | | | |
| 1985 | | | 53 | -4.331% | 53 | 11.816% | 53 | -1.962% | 53 | 2.516% | 53 | -4.079% | 53 | 10.460% |
| 1986 | | | 52 | -6.190% | 52 | 9.050% | 52 | -3.926% | 52 | 2.189% | 52 | -4.637% | 52 | 8.959% |
| 1987 | | | 45 | -11.986% | 45 | 7.919% | 45 | -3.373% | 45 | 1.848% | 45 | -10.774% | 45 | 7.812% |
| 1988 | | | 136 | -15.777% | 136 | 7.392% | 136 | -4.047% | 136 | 1.873% | 136 | -14.402% | 136 | 7.397% |
| 1989 | | | 259 | -11.940% | 259 | 7.714% | 261 | -3.643% | 261 | 1.980% | 259 | -10.732% | 259 | 7.530% |
| 1990 | 83 | 7.395% | 151 | -4.912% | 151 | 8.090% | 151 | -2.135% | 151 | 1.985% | 151 | -4.376% | 151 | 7.880% |
| 1991 | 78 | 5.865% | 78 | -2.823% | 78 | 7.759% | 78 | -0.515% | 78 | 1.825% | 78 | -2.610% | 78 | 7.359% |
| 1992 | 29 | 5.671% | 29 | -2.598% | 29 | 6.773% | 29 | -0.817% | 29 | 1.489% | 29 | -2.310% | 29 | 6.409% |
| 1993 | 3 | 5.027% | 3 | -6.881% | 3 | 5.369% | 3 | 0.325% | 3 | 1.168% | 3 | -6.088% | 3 | 4.925% |
| 1995 | 2 | 10.252% | 2 | -4.303% | 2 | 4.476% | 2 | -0.322% | 2 | 1.168% | 2 | -3.997% | 2 | 4.358% |
| (blank) | | | | | | | | | | | | | | |
| Grand Total | 195 | 6.520% | 808 | -9.153% | 808 | 8.051% | 832 | -2.845% | 832 | 1.984% | 808 | -8.215% | 808 | 7.799% |

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -

AMBASE CORPORATION and : Civil Action
CARTERET BANCORP, INC., : No. 93-531
Plaintiffs :

and :

FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor :

vs :

THE UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - -

Wednesday, March 22, 2006
Allentown, Pennsylvania

Oral deposition of GEORGE FADIL, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:35 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

Certified Copy

A. My only role would have been purely from an accounting standpoint to calculate monies due to or from an acquiring bank based on the sale agreement.

Q. Okay.

MR. COLATRIANO: I'd like to have this marked as Exhibit 2, please.

(Whereupon, a document was marked for identification as Exhibit Fadil-2.)

MR. COLATRIANO: Exhibit 2 is a printout of an E-mail dated November 18th, 1992, which you're listed as a CC. The Bates stamp, the number at the bottom of the page, is C-AM-A-0018588. It's a very short E-mail. It just says, "None of you are affected by intervention activity this weekend. As you probably already know, the big one which was a last minute surprise, has been deferred to December 4."

BY MR. COLATRIANO:

Q. First of all, I'd like, if you could -- this E-mail is from Harry Smeck. I think you mentioned him earlier. He was your supervisor; is that correct?

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

AMBASE CORPORATION and : Civil Action
CARTERET BANCORP, INC., :
Plaintiffs :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor :
vs :
THE UNITED STATES OF AMERICA, :
Defendant : No. 93-531

- - - - - - - - - - - - - - - - - x

Thursday, March 23, 2006

Allentown, Pennsylvania

\- - -

Oral deposition of GLORIA MALIGAYA, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:30 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

CERTIFIED COPY

\- - -

placed in conservatorship?
A. This is probably one of the bigger ones.
Q. One of the bigger ones?
A. Yes. City Federal was the biggest in the Northeast. Next, I guess, is Carteret. City Federal was in the 10, 10 billion.
Q. Okay. Well, in comparison --
A. But a lot of the others are very small.
Q. Okay. So Carteret you would consider to be one of the larger institutions placed in conservatorship?
A. Yes.
Q. Do you know if the asset size of a conservatorship or institution would affect the duration of the conservatorship?
A. My opinion, I would think so.
Q. Okay. What about the quality of the assets that an institution possesses, would that also impact the duration of a conservatorship?
A. Having seen some of the conservatorships that went under because of

other things rather than operational, in resolving a bank, it's REOs that will take longer. The loans, you'll always have a market for those, but if there's bad REOs, that takes longer to turn around.

Q. Okay. Let's say if you have a thrift that has multiple branches in multiple states, is that another factor that would impact the duration of a conservatorship?

A. I think so, yeah. You're right.

Q. Can you think of any other factors that would impact the duration of a conservatorship?

A. Maybe the locations could also -- the locations of some of the branches could also.

Q. Okay. Could you explain that further, what you mean by that?

A. Maybe some of their branches are not in prime locations.

Q. And also, do you know that if a conservatorship had a more complex financial condition or had more complex operations --

A. Meaning lot of subsidiaries.
Q. Right. Subsidiaries, multiple operations, subsidiaries, would that also impact the duration of a conservatorship?
A. I think so.
Q. Okay. How often were operating budgets prepared for conservatorships?
A. Once a year. Once a year. And in cases where there are material change, then they would do a revision.
Q. Okay. And you mentioned earlier that there are also variance reports that were done on a quarterly basis; is that correct?
A. Yes.
Q. Now, were these operating budgets and variance reports a tool for monitoring and controlling --
A. For managing and controlling expenses.
Q. I'm going to say it one more time. Just so we have it clear for the record, I'll ask the question one more time.
Were these operating budgets and variance reports used as a tool to

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of August 2006, a copy of the foregoing "APPENDIX TO THE GOVERNMENT RESPONSE TO AMBASE'S STATEMENT OF ISSUES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt
David A. Levitt