IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION et al., | ) | |
| Plaintiffs, | ) | |
| FEDERAL DEPOSIT INSURANCE CORP., Successor to the rights of CARTERET SAVINGS BANK, F.A. | ) | No. 93-531C |
| | ) | Senior Judge Loren A. Smith |
| Plaintiff Intervener | ) | |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

# FDIC'S RESPONSE TO AMBASE'S STATEMENT OF ISSUES

Andrew C. Gilbert
*Counsel*
FEDERAL DEPOSIT INSURANCE CORPORATION
Legal Division
550 17th Street, NW
MB-3060
Washington, DC 20429
Telephone: 202-898-3871
Facsimile: 202-898-3908
AGilbert@fdic.gov
Attorney of Record for Plaintiff-Intervener FDIC

Of Counsel:
D. Ashley Doherty
Gary Kuiper
*Counsel*
Federal Deposit Insurance Corporation

September 13, 2006

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES……………………………………………….……….………..…....i

STATEMENT OF ISSUES PRESENTED……………………………….…….…………...2

STATEMENT OF THE CASE…………………………………………...…….…………2

STATEMENT OF FACTS………………………………………………………….…….…………6

SUMMARY OF ARGUMENT………………………………………………………..………..8

ARGUMENT……………………………………………………………….....................9

I. PRELIMINARY STATEMENT…………………..…..…..……...................................9

A. The FDIC Owns The Thrift's Contract Claims……..…………………...10

B. FDIC Also Owns The New Constitutional Claims Asserted By Ambase……………………....……………………………….……………11

II. THE RECEIVERSHIP DEFICIT ISSUE IS MOOT; THE CASE IS NOT…………………………………………………………………...……...……....13

III. FDIC-RECEIVER IS NOT "THE GOVERNMENT"……………………...………...15

IV. CFC LACKS JURISDICTION OVER AMBASE'S CLAIMS AGAINST FDIC…………………………………………………………………….……….....17

A. Subject Matter Jurisdiction Is Essential…………………………..……...17

B. The Tax Claim Is Not Within The Court's Jurisdiction…………………17

C. The Post-Insolvency Interest Claim Is Not Within The Court's Jurisdiction……………………………………………………………….20

D. The FDCI's Alleged Calculation and Administrative Errors Are Not Within The Court's Jurisdiction

1. AmBase Misreads *Bailey v. United States*……………………………24

2. Adjudication of AmBase's Claims Against FDIC Would Expand Jurisdiction and Decrease Judicial Economy…………………………….25

E. Ambase Is Attempting To "End Run" This Court's Takings Decision……………………………………..…………..…………26

CONCLUSION………...…………………………………...………………..………………27

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ambase Corporation v. United States*
58 Fed. Cl. 32 (2003) ........ 2, 3,10,11,16

*Ambase Corporation v. United States*
61 Fed. Cl. 794 (2004) ........ 3,7,9,13,16,22,26,27

*Bailey v. United States*
341 F.3d 1342 (Fed. Cir. 2003) ........ 13,19,24,25

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*
467 U.S. 837 (1984) ........ 23

*Christensen v. Harris County*
519 U.S. 576 (2000) ........ 23

*First Hartford Corp. Pension Plan & Trust v. United States*
194 F.3d 1279 (Fed. Cir. 1999) ........ 11, 13, 26

*Golden Pacific Bancorp v. Federal Deposit Insurance Corporation*
375 F.3d 196 (2d Cir. 2004) ........ 20

*Hall v. United States*
69 Fed. Cl. 51 (2005) ........ 24

*Heaton v. Monogram Credit Bank*
297 F.3d 416 (5th Cir. 2002) ........ 24

*Lawrence v. United States*
69 Fed. Cl. 550 (2006) ........ 24

*Landmark Land Co. v. Federal Deposit Insurance Corporation*
256 F.3d 1365 (2001) ........ 19

*Martinez v. United States*
333 F.3d 1295 (Fed. Cir. 2003) ........ 24

*McNabb v. United States*
54 Fed. Cl. 759 (2002) ........ 24

*Miller v. OPM*
449 F.3d 1374 (Fed. Cir. 2006)......26

*Paralyzed Veterans v. Secretary of Veterans Affairs*
345 F.3d 1334 (Fed. Cir. 2003)......21

*Ross v. Bernhard*
396 U.S. 531 (1970)......17

*Skidmore v. Swift & Company*
323 U.S. 531 (1970)......23

*Steel Co. v. Citizens for a Better Environment*
523 U. S. 83 (1998)......17

*Suess v. United States*
33 Fed. Cl. 89 (1995)......17

*Suess v. United States*
52 Fed. Cl. 221 (2002)......11, 17

*United States v. Haggar Apparel Co.*
526 U.S. 380 (1999)......23

*United States v. Winstar Corp.*
518 U. S. 839 (1996)......2

*Whitney Benefits, Inc. v. United States*
25 Cl. Ct. 232 (1992)......26

**STATUTES AND REGULATIONS**

12 U.S.C. § 1441a(m)(1)......11

12 U.S.C. § 1441a(m)(2)......11

12 U.S.C. § 1821a(a)(1-2)......11

12 U.S.C. § 1821(d)(6)......25

12 U.S.C. § 1821(d)(13)......25

12 U.S.C. § 1821(d)(13)(E)(ii)......22

12 U.S.C. § 1821(j)....................25

5 U.S.C. § 706(2)....................23

5 U.S.C. §704....................24

5 U.S.C. § 702....................24

12 C.F.R. § 350.3(b)....................21

12 C.F.R. § 360.3(b)....................21,22, 23

12 C.F.R. § 360.3(f)....................22,23,24,25

12 C.F.R. § 360.7....................22,23,24,25

**MISCELLANEOUS**

Moore's Federal Practice § 23.1.02[1](3d ed. 2005)....................11

R. Pierce, II Administrative Law Treatise § 15.5 (4th ed. 2002)....................24

American Bar Association, Section of Admin. Law and Regulatory Practice, "A Blackletter Statement of Federal Administrative Law" (2004)....................23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and<br>CARTERET BANCORP, INC.<br><br>Plaintiffs, | ) | |
| FEDERAL DEPOSIT INSURANCE CORP.,<br>Successor to the rights of<br>CARTERET SAVINGS BANK, F.A. | ) | No. 93-531C<br><br>Senior Judge Loren A. Smith |
| Plaintiff Intervener<br><br>v. | ) | |
| THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | |

FDIC'S RESPONSE TO AMBASE'S STATEMENT OF ISSUES

Pursuant to this Court's "show cause" Order of May 23, 2005, plaintiff-intervener Federal Deposit Insurance Corporation ("FDIC"), successor to the rights of the former Carteret Savings Bank, F.A., respectfully submits this response to the Corrected Statement of Issues ("SOI") filed June 26, 2006, by plaintiff AmBase Corporation ("AmBase").

On the basis of the matters set forth in the SOI, the FDIC urges denial of the Government's renewed motion to dismiss, the setting of this case for trial on the damages phase of the breach of contract claim, and reconsideration and vacation by this Court of its prior decision granting AmBase's motion to define the nature of the measure of damages in this case. In the alternative, the FDIC urges the Court to postpone decision on AmBase's claims against the FDIC until after certification of the FDIC's pending motion for interlocutory appeal and the damages trial.

STATEMENT OF ISSUES PRESENTED

1. Whether the Government's renewed motion to dismiss should be denied?

2. Whether this case should proceed directly to trial on the issue of contract damages?

3. Whether the Court's prior decision granting AmBase's motion to determine the measure of AmBase's contract damages (to the extent it sought consideration of the size and value of the receivership deficit) should be reconsidered and vacated?

4. Whether the FDIC's pending motion for interlocutory appeal, of the Court's prior decision granting AmBase's motion to determine the measure of contract damages (to the extent it sought consideration of the size and value of the receivership deficit), should be granted?

STATEMENT OF THE CASE

A. Nature of the Case

This case is one of the many "*Winstar*-related" cases arising out of the savings and loan crisis of the late 1980's.[1] The facts are set forth at length in a previous opinion in this case. *AmBase Corp. v. United States*, 58 Fed. Cl. 32, 34-40 (2003)("*AmBase I*").

B. The Course of Proceedings

The first complaint in this action was filed in August, 1993, by the "Shareholder Plaintiffs": AmBase, the 1988 acquirer of the thrift at issue, and Carteret Bancorp, Inc., which AmBase also acquired. This complaint sought damages for breach of contract (Count I), frustration of purpose

[1] The term "*Winstar*-related" derives from the case of *United States v. Winstar Corp.*, 518 U.S. 839 (1996). The history of the savings and loan crisis, and subsequent measures taken to resolve it, is extensively discussed in that case and well-known to this Court; therefore, it is not repeated here.

(Count II), reasonable reliance (Count III), and violations of the Fifth Amendment to the Constitution (i.e., "takings")(Count IV). Shortly thereafter, further proceedings were stayed pending a final decision in the *Winstar* case.

After the final *Winstar* decision was handed down, the Federal Deposit Insurance Corporation ("FDIC") filed, in March of 1997, a complaint in intervention, asserting its ownership of the claims set forth in the Shareholder Plaintiffs' original complaint and seeking damages. Shareholder Plaintiffs then filed an amended complaint, asserting two new claims for relief: a claim for surplus (Count V) and a derivative claim on behalf of the thrift (Count VI). In 1998 the FDIC moved for partial summary judgment on the issue of the Government's contract liability.

C. Disposition to Date

In *AmBase I*, this Court granted the FDIC's motion for partial summary judgment against the Government on liability, finding that the post-FIRREA restrictions on Carteret Savings Bank's use of regulatory goodwill violated contracts created in 1982 and 1986 during that thrift's supervisory acquisitions of the four thrifts. 58 Fed. Cl. at 49. This Court granted the Government's cross-motion for summary judgment on the takings claims. *Id.* at 52. The Court also held that the Shareholder Plaintiffs failed to state an independent claim for an "illegal exaction." This left only the contract claims for trial.

The Shareholder Plaintiffs then moved to dismiss the FDIC and to define the "measure of Carteret's contract damages," arguing, inter alia, that the FDIC had taken steps to inflate the receivership deficit. This Court denied the Shareholder Plaintiffs' motion to dismiss the FDIC as a party. *AmBase Corp. v. United States*, 61 Fed. Cl. 794 (2004)(*"AmBase II"*). The remainder of the motion was granted, "to the extent that it requests the Court to consider the size and value of

the FDIC's receivership deficit when calculating damages." *Id*. at 802. As the Court noted, this leaves "the logistical question of how to conduct such a review [of the receivership deficit]." At that time, however, the Court saw "no reason to pursue any inquiry into the specifics of the receivership until at least such time as there is a decision that some damages must be awarded." *Id.*

The Government moved for reconsideration or, in the alternative, to dismiss the Shareholder Plaintiff's derivative claim and the FDIC's complaint in intervention. In January of 2005, the Court denied the Government's motion. The Government and the FDIC each then moved for certification of an immediate interlocutory appeal and to stay discovery.

After argument on the motions to certify, the Court decided to

> proceed with [a] preliminary show-cause order by the [Shareholder] Plaintiffs as to what is the basis of any FDIC deficit or claim that there is no deficit because if the [Shareholder] Plaintiff doesn't succeed in doing that the case is over and therefore we don't need to bring to the Court of Appeals' attention a certification it may or may not accept with the factual data that may well be inadequate in a purely legal question that really doesn't have much precedent behind it.

Transcript of Oral Argument, *AmBase Corp. v. Unites States*, No. 93-531 at 73-74 (Fed. Cl., Apr. 2005). Decision on the certification motions was stayed pending resolution of the show cause. *Id*. at 75. The Court also indicated that it did not contemplate that the show cause order would result in any "adversarial testing" of the merits of AmBase's charges. *Id.* at 75-76. Rather the show cause order would ask for "basic facts that AmBase has generated that would give some basis for the Court saying yes, there's enough material here to proceed here, some minimum." *Id.* at 76.

The Court subsequently entered an order providing that, inter alia,

> Ambase shall file and serve a statement of issues which summarized the respects in which the books [of the FDIC as receiver] allegedly overstate or misrepresent the receivership deficit. With respect to each such issue, Ambase shall set forth

> the dollar amount by which it contends the books overstate or misstate the receivership deficit. . . If Ambase contends that the FDIC violated any statute, regulation or legal duty with respect to the administration of the receivership, it shall identify each issue involved and the nature of the statu[t]e, regulations, or duty and the manner in which it was allegedly violated.

Order, *AmBase v. United States*, No. 93-531C (Fed. Cl., May 23, 2005). Thus AmBase was, in effect, ordered to show cause that a genuine issue of fact existed with respect to the size of the receivership deficit, sufficient to allow the Court to retain jurisdiction over the derivative contract claims and also to justify certification of an interlocutory appeal.

Pursuant to that order, AmBase has now filed its (corrected) statement of issues ("SOI"), together with an appendix and an expert affidavit. AmBase argues therein that it has shown that this Court has "clear jurisdiction" over the pending contract claim:

> [W]e have previously stated that AmBase's purchase of Carteret for $266 million in 1988 plus its additional $60 million investment in Carteret might be a reasonable proxy for the damages for AmBase's takings claim. But takings damages are, of course, set at the time of the taking. By contrast, Carteret's [contract] expectancy damages are measured through the life of the contract. Given that the last 15 years has been a golden era for the banking industry, it follows that Carteret's profits that have been lost would be substantially in excess of $300 million.

SOI at 6. AmBase concluded it had "shown cause that the Court has jurisdiction. Additionally, the Court should deny the government's motion for interlocutory review." *Id*. 117. The FDIC's pending motion for certification is not addressed.

On August 30, 2006, the Government filed a Response to AmBase's Statement of Issues ("GR"), together with an appendix and an expert affidavit. The Government argues, inter alia, that the bulk of the SOI contains "tort and breach of fiduciary duty claims against a non-Government entity, the FDIC as receiver," which are outside the jurisdiction of this Court. GR at 6. It also argues that

> As Ambase conceded, as of December 31, 2005, the receivership deficit was $278 million, or more than $12 million more than the amount even AmBase calculates as the value of Carteret as of the date of the breach ($266 million). Therefore, any recovery upon Carteret's contract claim will flow to the United States and the case is moot. In short, because the receivership deficit is not overstated and the case is moot, the amended complaint should be dismissed.

GR at 6 (citations omitted). The FDIC's complaint in intervention is not discussed.

STATEMENT OF FACTS

On December 4, 1992, the Office Thrift Supervision ("OTS") seized Carteret Savings Bank, placed it in receivership, and appointed the Resolution Trust Corporation ("RTC") receiver. [Shareholder Plaintiffs'] First Amended Complaint, ¶ 68. All assets and liabilities of Carteret were immediately transferred to the newly-chartered Carteret Federal Savings Bank ("Carteret Federal"), for which RTC was appointed conservator. *Id.*; *see also* FDIC Complaint, ¶ 9. On January 20, 1995, RTC was appointed receiver for Carteret Federal. FDIC Complaint, ¶ 9. By operation of law, the FDIC has succeeded the RTC as receiver of both Carteret Savings Bank and Carteret Federal.

The FDIC prepares a "Goodwill Financial Reporting Package," as of the close of each calendar year that includes, inter alia, a report on "Projected Receivership Results" using adjusted year-end balances. Gov. App. at 609-19 (CY 2005), *see also* SOI App. at 1070-74 (CY 1995); 1075-78 (CY 1996); 1079-86 (CY 1997); 1087-94 (CY 1998); 1095-1102 (CY 1999); 1103-1111 (CY 2000); 1112-20 (CY 2001); 1121-29 (CY 2002); 1130-38 (CY 2003); 1139-47 (CY 2004); 1148 ( CY 2004 Restated). These reports include estimates of the receivership deficit as of the respective reporting periods.

The most recent report, that for calendar year 2005, shows that virtually all reported assets have been liquidated; leaving total assets, consisting of cash and investments, of $ 115,756. Govt. App. at 613, 614, 616 & 618. The report also shows a projected total net deficit of $278

million.[2] This figure includes $6.1 million administrative liabilities, the $18.5 million unpaid principal balance of the subrogated deposit claim and $156.6 million in estimated interest on proven claims.[3] It also includes a potential IRS claim for federal taxes (including estimated penalties and interest), currently estimated at $93.8 million.[4]

The actual amount, if any, that will ultimately be paid in federal taxes is yet to be finally determined,[5] as it must be before any surplus distribution can be made to Carteret's shareholders. Exclusive of taxes, as well as pass-through claims, the projected total net deficit is $181.4 million.[6]

---

[2] FDIC Report 3, 2006 Goodwill Financial Reporting Package for Carteret Federal Savings Bank, Projected Receivership Results Using Adjusted 12/31/2005 Balances, Gov. App. at 614. The total projected receiverships result reported for the prior year-end (as of 12/31/2004) was a $259.8 million net deficit. SOI App. at 1449. For year-end 2003, the total projected net deficit was $242.6 million. SOI App. at 1134. At year–end 2002, the total projected deficit was estimated to be approximately $229 million. *AmBase II*, 61 Fed. Cl. at 796.

[3] *See* Govt. App. at 614 (FDIC Report 3 to 2006 Goodwill Financial Reporting Package for Carteret Federal Savings Bank, Projected Receivership Results Using Adjusted 12/31/2005 Balances); *see also* Govt. App. at 613 (Report 2, Statement of Assets and Liabilities in Liquidation, Inception to 12/31/2005); 616 (Statement of Assets & Liabilities in Liquidation For Period Ending Dec. 31, 2005); 618-19 (Notes 5 & 6 to Financial Statements).

[4] *See id*. at 614 & 615 (Footnote [b] to Report 3). The total projected receivership results in Report 3 also include approximately $3 million in outstanding claims (including estimated interest) from the December 1992 pass through receivership in this case. Govt. App. at 614, 615 (Footnote [d] to Report 3). *See also* Govt. App. at 614, 615 (Footnotes [b] & [c] to Report 3), 616 (Statement of Assets & Liabilities), and 619 (Notes 5 & 7 to Receivership Financial Statements). The Goodwill Financial Reporting package for the prior year, as of 12/31/2004, reflects estimated federal income taxes, interest and penalties of $86.8 million. SOI App. at 01449.

[5] *See*, *e.g.*, Govt. App. at 615 (Footnote [b] to Report 3)(Agreement between IRS and RTC provides for deferral of tax liabilities as long as there are insufficient assets to pay depositor claims in full); *id*. at 619 (Note 10 to Financial Statements).

[6] Govt. App. at 613, 614 & 616. As of the prior year-end (12/31/2004) the total deficit was stated at $170,139,080, including (inter alia) a principal balance on the subrogated claim of

## SUMMARY OF ARGUMENT

In its SOI, AmBase primarily attempts to do two things: (1) demonstrate that the FDIC's estimate of the size of the receivership deficit is erroneous, and (2) demonstrate that, as a result, this Court has jurisdiction over the thrift's breach of contract claims. AmBase attacks various FDIC decisions and calculations made in the course of estimating the size of the deficit and administering the receivership estate. It also attacks various actions, taken by Congress or the FDIC that allegedly caused the cost of resolving Carteret (and thus the size of the receivership deficit) to be larger than it otherwise would have been.

AmBase fails to demonstrate that the FDIC's most recent estimate of the size of the receivership deficit is erroneous. Moreover, it fails to demonstrate that this Court has jurisdiction over any of the claims asserted against the FDIC or that trial thereof would promote judicial economy. In fact, AmBase now alleges contract damages that moot any concern about this Court's jurisdiction over the derivative claims it asserts on behalf of the thrift, as well as any concern about the mootness of the pending requests for certification of interlocutory appeals.

Even AmBase's previous contract damages claim exceeds the estimated receivership deficit exclusive of projected taxes. As a result, the alleged deficiencies in the FDIC's current estimate of the receivership deficit are irrelevant and need not be addressed by this Court. The Government's renewed motion to dismiss for lack of jurisdiction should be denied, and the Court's prior decision granting Shareholder Plaintiffs' motion to determine the measure of Carteret's damages should be reconsidered and vacated as moot.

---

$18,823,858, and total estimated interest on claims of $145,280,962. *See* SOI Appendix at 01449.

ARGUMENT

I. PRELIMINARY STATEMENT

The SOI effectively dashes "this Court's hope that counsel for all parties will able to present their arguments economically," if and when "the receivership's alleged value" is evaluated. *AmBase II*, 61 Fed. Cl. at 802. The SOI also defeats the Court's expectation that arguments could be kept "within judicially manageable bounds" and that the "size and complexity of the issues" could be kept "within reasonable constraints." *Id.* The SOI is not restricted to the "two primary arguments" previously identified by this Court: (a) "a challenge to a $32 million tax assessment" and (b) "the interest rates being applied to the receivership deficit." *Id*. AmBase's attack on the current estimate of the receivership deficit has, in a word, metastasized.

The SOI is also confusing. At times it complains of the calculation of the receivership deficit by the FDIC as receiver, while at others it argues that "the receivership deficit is entirely a product of government conduct." SOI at 1. The SOI contains allegations of fault (e.g., allegedly "egregious examples of incompetence committed by the RTC in managing Carteret") that are nevertheless not claimed to have contributed to the alleged misstatement of the receivership deficit. *See* SOI 22-23 (table). (Presumably, these allegations are "[m]erely corroborative detail, intended to give artistic verisimilitude to an otherwise bald and unconvincing narrative." W.S. Gilbert, *The Mikado*, Act II. Nevertheless, they contribute to the confusion.) Therefore, the

following chart sets forth the FDIC's understanding of what actions AmBase challenges and by what entity they were allegedly taken:

| SOI § | SOI # | ACTION | ACTOR | NATURE OF ALLEGED FAULT |
|---|---|---|---|---|
| III | 1 | Projection of federal income tax liability | FDIC-Receiver | Taking, Statutory violation, breach of fiduciary duty |
| IV | 2, 3, 4, 10 | Calculation of post-insolvency interest | FDIC-Receiver | Taking, Statutory violation, Breach of fiduciary duty |
| VI | 5 | Enactment of Minority Preference Program | Congress | Denial of Equal protection, breach of fiduciary duty |
| V | 6, 7, 11 | Failure to fund RTC in 1993; FIRREA deprivation of Goodwill value; sale of Carteret Mortgage | Congress | Taking, breach of contract |
| VII, VIII | 8, 9 | Calculation of receiver's administrative expenses | FDIC-Receiver | Taking, statutory violation, breach of fiduciary duty |

Notes:
1. "SOI §" refers to the section of the SOI that primarily discusses the alleged fault.
2. "SOI #" refers to the item number on the chart at pp. 22-23 of the SOI, entitled "Ways in Which the Government [sic] Overstated Carteret's Receivership Deficit."

## II. THE FDIC, AS SUCCESSOR TO CARTERET, OWNS THE THRIFT'S CLAIMS

### A. <u>The FDIC Owns the Thrift's Contract Claims</u>

As noted above, the only claims alleged in the Shareholder Plaintiffs' amended complaint and remaining to be tried in this case are the thrift's claims for breach of contract. *AmBase I,* 58 Fed. Cl. at 52, 54 (dismissing the takings and "illegal exaction" claims). As this Court has previously made clear, the Government's breach of contract

> create[d] in the corporation, here Carteret, a cause of action against the government. If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action.

*Id*. at 51. This Court has also made it clear that the

> FDIC is an indispensable party as the successor to the rights of Carteret, which include the breach of contract claims that the shareholder Plaintiffs seeks to

> pursue derivatively. The claims of Carteret cannot proceed without Carteret or its legal successor (in this case, the FDIC) as a party to the litigation.

*AmBase I*, 61 Fed. Cl. at 794.

Despite this clear direction from the Court, AmBase continues to imply that it is entitled to a direct award of damages. *See, e.g.*, SOI at 48 ("damages due AmBase for the government's breach of contract"); 50 ("damages due AmBase," "AmBase's damages award"); "damages owed by the United States to Carteret and AmBase"). Therefore, the FDIC notes that it continues to be, as it has been throughout this action, the successor to the rights of Carteret and also the manager of the FSLIC Resolution Fund that succeeded, by operation of law, to the assets and liabilities of the Resolution Trust Corporation ("RTC"). 12 U.S.C. §§ 1441a(m)(1), 1441a(m)(2), 1821a(a)(1-2). As a result, it owns Carteret's breach of contract claim. Moreover, any damages awarded on that claim are payable only to the FDIC, which will distribute them to claimants of the Carteret receivership according to the established system of priorities. *Ross v. Bernhard*, 396 U.S. 531, 538 (1970); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1287 (1999); *Suess v. United States*, 52 Fed. Cl. 221, 232 (2002); 5 J.W. Moore et al., *Moore's Federal Practice* § 23.1.02[1](3d ed. 2005).

B. <u>FDIC Also Owns the New Constitutional Claims Asserted by AmBase</u>

AmBase now asserts that Congress, in addition to breaching contracts with by passing FIRREA, injured it in other ways. Specifically, AmBase charges that Congress "handcuffed the RTC" by enacting a Minority Preference Program and thus requiring RTC "to sell Carteret pursuant to an unconstitutional system of racial preferences." SOI at 4; *see also id.* at 16-19. This allegedly constituted a denial of Constitutional "equal protection," *id.* at 5, emanating from "the Fifth Amendment's Due Process Clause, *id.* at 78, and a "per se violation of the Takings Clause." *Id.* at 85, 90. AmBase also asserts that Congress committed another taking when it "grossly

inflated" the cost of resolving Carteret by "failing to properly fund the RTC for most of 1993." *Id.* at 8, 72, 73-74. And they assert that when the government "prevented the RTC from realizing any value for Carteret's supervisory goodwill" it not only breached a contract but also committed a taking. *Id.* at 71; *see also* 8, 72-73.

As AmBase notes, these allegations relate primarily "to the actions of Congress, not the FDIC or the RTC, which were handcuffed by congressional policy." *Id.* at 4 (re Minority Preference Program); *see also* 71 ("actions taken by the United States"). Nevertheless, they assert, the remedy for these alleged violations should be the elimination of "all the interest and principal reflected in the FDIC's financial statements." *Id.* at 5.

As the Government has noted, however, the first two claims (re the Minority Preference Program and the failure to fund) are really claims for money damages from the Government. GR at 94. The third claim (the alleged prevention of RTC's ability to realize any value from Carteret's supervisory goodwill) is said to arise out of Congress's breach of contract in passing FIRREA; thus, it is really not a separate claim but a potential additional item of damages for that already-alleged breach. None of these claims is a basis for recalculating the estimated receivership deficit.

If any of these claims is valid and within the jurisdiction of this Court, the appropriate remedy is a judgment against the Government. Moreover, the logic that compelled the conclusion that the FDIC owns the thrift's breach of contract claim also compels the conclusion that these claims belong to the FDIC and may be maintained by AmBase only derivatively. Any

additional damages awarded on these claims must, like damages awarded for the breach of contract claim, must be paid to the FDIC for distribution.[7]

III. THE RECEIVERSHIP DEFICIT ISSUE IS MOOT; THE CASE IS NOT

The question of "which costs are legitimately part of the receivership deficit," *AmBase II*, 61 Fed. Cl. at 802, first arose in the context of concern that the receivership deficit might come to exceed the maximum possible recovery and thus render the thrift's claims non-justiciable. *Id.* at 801, discussing *Bailey v. United States*, 341 F.3d 1342 (Fed. Cir. 2002), *cert. den*. 541 U.S. 1072 (2004). The Court stated that "[i]f this litigation were to continue much longer it is likely that the receivership deficit would swallow the potential award and there could be no recovery by the Plaintiffs." *Id.* at 802.

The Court then saw "no reason to pursue any inquiry into the specifics of the receivership." *Id.* Subsequently, however, as discussed above, the Court expressed concern that mootness was imminent and would render futile any certification of an interlocutory appeal to the Court of Appeals. AmBase was thus directed to show cause that a genuine issue of fact existed with respect to the size of the receivership deficit.

The Government argues here, as it has previously done, that AmBase has conceded that the receivership deficit is $12 million more than the value ($266 million) of Carteret at the time of breach. Having demonstrated that the receivership deficit is not overstated, the Government asserts that the "case is moot" and that the amended complaint should now be dismissed. GR at 6. In short, the Government argues that, due to intervening events, the plaintiffs have lost

[7] This Court has rejected "direct pro rata recovery" because it is the "well-established rule in shareholder derivative suits that 'the only claim that can be heard is the corporation's contract claim against the government and the only beneficiary of any relief will similarly be the corporation.' " *AmBase II,* 61 Fed. Cl. at 796, quoting *First Hartford Corp. Pension Plan v. United States*, 194 F.3d 1279, 1293 (1999).

standing and the court has been divested of jurisdiction. Martin H. Redish, "Issues of Justiciability," 15 *Moore's Federal Practice* § 101.93[2] at 101-169-70 (3d ed. 2006).

"The burden of establishing mootness rests on the party raising the issue." *Id.* at § 101.101. Although the Shareholder Plaintiffs raised the issue most recently, via their motion to determine the measure of Carteret's damages, they argue that this case is not moot but justiciable. SOI at 117. The Government is the only party now maintaining that this case is moot. Therefore, the burden of establishing mootness rests on the Government.

The burden of establishing mootness "is a heavy one," *id.*, and the Government has not met it. In particular, in focusing on AmBase's earlier claim that damages will amount to $266 million, the Government overlooks the fact that Ambase now expects to prove that the lost profits resulting from defendant's FIRREA contract breach were "substantially in excess of $300 million." SOI at 6. AmBase asserts that "even if no adjustments were made to the receivership deficit, Carteret's expectancy damages will surely be more than the stated amount of the receivership." *Id.*

As discussed above, the projected total net deficit, as of the end of CY 2005, is $278 million. If the IRS's potential claim for taxes, penalties, and interest (in the amount of $93.8 million) is excluded, the projected total net deficit is approximately $ 180 million.[8] Both amounts are less than $300 million, and the second amount is less than $266 million.

[8] Govt. App. at 613, 614 & 616. As of the prior year-end 912/31/2004) the total deficit was stated at $170,139,080, including (inter alia) a principal balance on the subrogated claim of $18,823,858, and total estimated interest on claims of $145,280,962. *See* SOI Appendix at 01449.

At this time, therefore, this case is not moot, nor is the FDIC's pending motion for certification of an interlocutory appeal to the Court of Appeals. What is now moot is Ambase's attempt to have this Court review the receivership deficit prior to a trial on damages.

IV. FDIC-RECEIVER IS NOT "THE GOVERNMENT"

In the SOI, AmBase repeatedly makes statements like this: "the receivership deficit is entirely a product of government conduct," SOI at 1; "the government's actions must . . . be eliminated as a component of the receivership deficit," *id.* at 6; "the government cannot be allowed to deduct phantom liabilities," *id.* at 7. In making these statements, AmBase appears to be asserting that the FDIC is "the government" even when acting as receiver.

AmBase also appears to conflate the FDIC, as receiver, with "the government" when discussing its Constitutional claims. For example, AmBase argues that "the FDIC may not take AmBase's property interest in the potential liquidation surplus by improperly inflating the receivership deficit." SOI at 109-110; *see also* 114 (re Carteret Mortgage operations). This sounds like AmBase is asserting takings claims against the FDIC. Similarly, AmBase complains that the RTC, pursuant to the Congressionally-mandated Minority Preference Program, "held back Carteret's assets to sell to minority acquirers of other institutions" and preferred minority bids for Carteret over non-minority bids. This sounds like AmBase is asserting that the FDIC, as successor to the RTC, is responsible for an alleged violation of the "guarantee of equal protection emanat[ing] from the Fifth Amendment's Due Process Clause." SOI at 93, 96, 78; *see also* 22-23 (table).

As this Court previously noted,

> AmBase's claim that the FDIC has mismanaged the Carteret receivership is a claim against the FDIC, but for purposes of this litigation this is not a claim against the government. The FDIC is not generally considered to be the government for jurisdictional purposes in Winstar litigation.

*AmBase II,* 61 Fed. Cl. at 797. This Court also noted that "[u]nder prevailing constitutional law, the FDIC receiver . . . cannot be the government as well" as an intervener against the United States. *Id.* (italics omitted). Thus, all of AmBase's claims against the FDIC are claims "between two non-governmental parties," not claims against the Government. *Id.*

In particular, AmBase's Constitutional claims, under the Fifth Amendment to the Constitution, may not be maintained against the FDIC in this action. The Fifth Amendment, which provides that private property shall not "be taken for public use, without just compensation," U.S.C.A. Const. Amend. V, applies to the government, not to private parties. That Amendment's provision that no one "be deprived of . . . property, without due process of law," *id.*, is likewise applicable only to the government. Because the FDIC, when acting as receiver, is not "the government," AmBase may not assert takings claims, or claims for denial of equal protection, via the due process clause, against it.

Finally, as this Court has recognized, "[a] long established rule of judicial construction" provides that

> constitutional questions should only be reached if there is no common law or statutory rule that resolves the particular question. Constitutional values are so fundamental that they should only be addressed in cases as a last resort.

*AmBase I,* 58 Cl. Ct. at 39. Given that AmBase has now alleged damages in excess of the receivership deficit as currently estimated, there is now no need to reach these Constitutional questions.

V. THE CFC LACKS JURISDICTION OVER AMBASE'S CLAIMS AGAINST FDIC

A. Subject Matter Jurisdiction is Essential

"[F]undamental principles of separation of powers" and a "long and venerable line" of Supreme Court cases have established that subject matter jurisdiction must be established as a "threshold matter." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998). This rule is 'inflexible and without exception.' " *Id.* at 94-95.

AmBase alleges three primary defects in the FDIC's current estimate of the Carteret receivership deficit: (1) errors in estimating federal income tax liability; (2) errors in calculating post-insolvency interest; and (3) errors in calculating the receiver's administrative expenses. As discussed above, there is no need for this Court to exert questionable jurisdiction over these claims against the FDIC now, and possibly ever, given AmBase's current estimation of its damages. As the Government has demonstrated, each of these attacks on the FDIC's projections will, if and when it is ever adjudicated, fail on its merits. Most importantly, each of these claims is outside this Court's jurisdiction.

B. The Tax Claim Is Not Within The Court's Jurisdiction

AmBase claims that the receivership deficit, as currently estimated by the FDIC, contains estimates of forthcoming tax payments that are "phantom liabilities." SOI at 29. Its theory is that the FDIC, as receiver for Carteret, will never be required by the Internal Revenue Service ("IRS") to pay these amounts, since the IRS significantly reduced the Benjamin Franklin receivership's tax liability. *Id*. at 31.

As this Court is aware, however, the shareholder plaintiffs who litigated the *Winstar*-related case on behalf of the Benjamin Franklin receivership did not litigate the FDIC's accounting for tax liability in the Court of Federal Claims. To the contrary, breach of contract

liability and damages were litigated in the normal fashion in federal district court. *Suess v. United States*, 33 Fed. Cl. 89 (1995); *Suess v. United States*, 52 Fed. Cl. 221 (2002). The receivership's tax liability was determined by settlement of a separate lawsuit. Order, *United States v. Federal Deposit Insurance Corporation*, No. 02-1427 (D.D.C., May 2, 2006).[9]

The *Suess* Court did not attempt to determine, or even predict, what taxes would be paid by the receiverships at issue. As these cases indicate, the question at issue is not really what estimates the FDIC has made of any final tax liability of the Carteret receivership. Rather, the question is how much tax, if any, will ultimately be assessed by the IRS and paid by the receivership. Given that the IRS is not a party to this action, that question cannot be answered here. AmBase's challenge to the FDIC's current accounting entries with respect to anticipated future tax liability must therefore fail.

In *Suess*, the Government argued, once damages had been quantified, that the then-pending federal tax claim against the receivership would "overwhelm" both the existing receivership surplus and the entire $35 million damages award, and that the case was therefore non-justiciable. Defendant's Motion for Reconsideration, *Suess v. United States*, No. 90-981-C (Fed. Cl., June 20, 2002). As the FDIC later pointed out to the Court, the Government ultimately

---

[9] As this Court is also aware, settlement of the Benjamin Franklin tax case took a long time. Therefore, the IRS may be requested to provide a "tax advisory opinion" in another Winstar-related case involving another receivership. [Proposed] Judicial Request for Tax Advisory Opinion, *Slattery v. United States*, No. 93-280C (Fed. Cl., June 20, 2006). The Government has argued there, however, that the Anti-Injunction Act, 26 U.S.C. § 7421, "removes from the federal courts the jurisdiction to issue any sort of ruling that would restrain assessment or collection of federal taxes, or would restrain any action that might lead to assessment or collection" and that "the tax exception to the Declaratory Judgment Act, 28 U.S.C. § 2201, prevents courts from making a binding determination" about tax impact. Defendant's Response to Plaintiffs' Proposed Judicial Request for Tax Advisory Opinion, *Slattery v. United States*, No. 93-280C (Fed. Cl., July 19, 2006). If so, a request for a tax advisory opinion is unlikely to be productive.

turned out to be wrong. FDIC's Response to Defendant's Opposition to Shareholder Plaintiffs' Motion for Reconsideration, *id.*, (July 6, 2006).

*Suess* demonstrates that, in seeking to have this Court take over the FDIC's internal accounting function, AmBase is posing the wrong question. The right question is whether, in determining if it has jurisdiction to try the damages portion of a contract case (usually in the context of a motion by the Government to dismiss), the courts must, once evidence has been introduced that an FDIC-estimated receivership deficit exceeds potential damages, treat each element of that estimated deficit as a conclusive, or irrebuttable, presumption, such that lack of jurisdiction must be inferred and may not be disputed. *See* John W. Strong et al., *McCormick on Evidence* § 342 at 434 (5th ed. 1999).

In some situations, treating elements of an FDIC-estimated receivership deficit as conclusive is appropriate; e.g., when advances made by the FRF to a thrift's depositors upon liquidation are claimed, after trial, to exceed the damages awarded. *See Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1381 (Fed. Cir. 2001). Such a sum is final, not projected, as well as easy to determine; moreover, after trial, damages have been reduced to a sum certain, so that the two numbers may be meaningfully compared. *See also Bailey v. United States*, 341 at 1345 (FDIC's subrogated claim determined, after trial, to exceed damages awarded).

In this case, however, the amount of damages has not been established. Moreover, as the FDIC noted earlier, "[t]he amount of taxes, penalties, and interest, if any, due to the IRS has not been finally determined." Response of Plaintiff Federal Deposit Insurance Corporation to AmBase's Motion to Dismiss the FDIC, *AmBase Corp. v. United States*, No. 98-531C at 8 n. 5 (Fed. Cl. Sept. 30, 2003). In this case, as in *Suess*, although other portions of the estimated net deficit may not be subject to challenge, there is no reason to treat the FDIC's current estimates of

the receivership's ultimate tax liability as dispositive. Therefore, the Government's renewed motion to dismiss, GR at 6, should be dismissed.

C. The Post-Insolvency Interest Claim Is Not Within the Court's Jurisdiction

AmBase asserts that the FDIC, in its current estimates of the size of the receivership deficit, has not only "imposed post-insolvency interest on the subrogated claim, [but also has] inflated the amount of interest accruing through several mechanisms," viz., "charging usurious interest rates and otherwise mis-calculating." SOI at 28, 29. It also argues that "the FDIC should have calculated the amount of interest according to 12 C.F.R. § 360.3(b)."

As the Government has demonstrated, the FDIC was thoroughly justified in charging post-insolvency interest on loans to the receivership. GR at 53, discussing *Golden Pacific Bancorp v. FDIC*, 375 F.3d 196 (2nd Cir. 2004). Moreover, AmBase errs in contending that the FDIC, as receiver, should be utilizing Section 360.3(b) of 12 C.F.R. in its current estimates of the size of the receivership deficit.

Section 360.3(b) governs the calculation of interest on various receivership claims. It provides that interest shall be calculated "at a rate or rates adjusted monthly to reflect the average rate for U.S. Treasury bills with maturities of not more than ninety-one (91) days during the preceding three (3) months." However, that section is inapplicable to this receivership by virtue of Section 360.3(f) of the same Title, which provides as follows:

> Under the provisions of section 11(d)(11) of the [National Depositor Preference] Act (12 U.S.C. 1821(d)(11)), the provisions of this § 360.3(b) do not apply to any receivership established and liquidation or other resolution occurring after August 10, 1993.

As noted above, the Carteret receivership for which post-insolvency interest has been calculated was created in January of 1995, i.e., after August 10, 1993. GR at 58. Therefore, Section 360.3(b) is inapplicable to this thrift.

A more recent regulatory provision, Section 360.7 of 12 C.F.R., governs the calculation and distribution of post-insolvency interest to creditors. That section establishes the following post-insolvency interest rate:

> For any calendar year, the coupon equivalent yield of the average discount rate set on the three-month Treasury bill at the last auction held by the U.S. Treasury Department during the preceding calendar quarter, and adjusted each quarter thereafter.

This rate, which is similar to Section 360.3(b), is applicable only to "FDIC-administered receiverships established after June 13, 2002." 12 C.F.R. § 360.7(a). Thus Section 360.7 is also inapplicable to this thrift.

Prior the adoption, in July of 1995, of Section 360.3(f), the FDIC issued an internal policy memorandum requiring the application of a different rate, the federal judgment rate, to thrift receiverships created after August 10, 1993 (the cut-off-date specified by 12 C.F.R. § 360.3(f) for application of the interest rate provided by 12 C.F.R. § 360.3(b)).[10] Originally, the memorandum applied to all receiverships created after August 10, 1993. Now that Section 360.7 governs receiverships established after June 13, 2002, however, the internal memorandum applies only to receiverships, like Carteret, created between August 10, 1993, and June 13, 2002.

Although the internal policy memorandum was distributed within the FDIC, the staff originally failed to apply the federal judgment rate to Carteret when estimating the receivership deficit; however, this error was caught when it became necessary to report post-insolvency interest because 95% of the principal claims had been satisfied. FDIC in-house counsel,

---

[10] Neither the fact that the internal memorandum provides for application of a different rate than that set forth in Section 360.3(b), nor the fact that the staff did not immediately apply it, invalidates the policy therein. As the Government has demonstrated, GR at 58-63, the FDIC's adoption of the policy set forth in the memorandum was eminently reasonable. Moreover, agencies are allowed to exercise their judgment and make changes. *Paralyzed Veterans v. Secretary of Veterans Affairs*, 345 F.3d 1334 (Fed. Cir. 2003).

examining the question of what interest rate to apply at the request of FDIC staffers in the Division of Finance, advised that post-insolvency interest for Carteret should be calculated at the federal judgment rate, in accordance with the memorandum. GR at 59-62.

AmBase's scatter-shot criticisms of the FDIC's current estimation of post-insolvency interest, its assertion that the FDIC should be applying Section 360.3(b) thereto, and its failure to address Section 360.3(f), can be understood in several ways: (a) as an attack on Section 360.3(f), which prohibits the application of Section 360.3(b) to receiverships established after August 10, 1993 (*see* SOI at 56-57); (b) as an attack on the prospective nature of Section 360.7, which precludes the application of the interest rate contained therein to receiverships established after June 13, 2002 (SOI at 4; *but see id.* at 63); and (c) as an attack on the post-insolvency interest policy set forth in the June 1995 internal FDIC memo.

This Court's earlier decision, in *AmBase II*, left open the question of the nature of these sorts of attacks on the FDIC's current calculations of post-insolvency interest. AmBase now contends that the calculations of the receivership deficit constitute Constitutional takings, breaches of fiduciary duty, and violations of a statutory duty to "minimize[ ] the amount of any loss realized in the resolution of cases" prescribed by 12 U.S.C. § 1821(d)(13)(E)(ii). SOI at 23.

Sections 360.3(f) and 360.7 are rules, adopted by the FDIC, in its corporate capacity, after formal rule-making procedures. Judicial review of these rules may be obtained only pursuant to the provisions of the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 702-704. The June 1995 memorandum is informal agency action. R. Pierce, II *Administrative Law Treatise* at § 15.5 (4th ed. 2002). As such, the June 1995 memorandum may, like Sections 360.3(f) and 360.7, be challenged only pursuant to the APA.

Agency action may be attacked under the APA only for specified reasons, 5 U.S.C. § 706(2), often summarized as "arbitrary, capricious or irrational." As the Government has demonstrated, the FDIC's current calculations of post-insolvency interest are eminently reasonable. GR at 52-67. In addition, a reviewing court must defer to the FDIC's interpretation of statutes pursuant to which the rules were enacted, since the FDIC administers those statutes. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984).[11] The 1995 internal policy memorandum is also entitled to judicial deference. *Christensen v. Harris County*, 519 U.S. 576 (2000); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

More importantly for the purposes of this case, the APA waives sovereign immunity only for actions "seeking relief other than money damages." 5 U.S.C. § 702. If Section 360.3(f), Section 360.7, or the June 1995 policy memorandum is defective, no court may dictate the rate of post-insolvency interest that the FDIC should apply. Courts may only set them aside, whereupon the FDIC is free to try (or not) to fix its mistake. 5 U.S.C. § 706(2); *see also* ABA Section of Administrative Law and Regulatory Practice, *A Blackletter Statement of Federal Administrative Law* at 29 (2004).

Given this limited relief, this Court lacks jurisdiction to review the FDIC's post-insolvency interest rules. "The APA itself does not provide jurisdiction in suits seeking review of federal administrative action." *Id.* at 41. In the case of the federal district courts, such jurisdiction is provide by the federal question statute, 28 U.S.C. § 1331. However, this Court, the jurisdiction of which is limited to cases seeking money damages, "does not have jurisdiction to review an agency decision under the APA." *Hall v. United States*, 69 Fed. Cl. 51, 56 (2005), citing *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) and *McNabb v. United States*,

[11] Despite some initial disagreement on the issue, it is now clear that the *Chevron* rule applies in this Circuit. *United States v. Haggar Apparel Co*, 526 U.S. 380 (1999).

54 Fed. Cl. 759, 767 (2002); *see also Lawrence v. United States,* 69 Fed. Cl. 550, 554 (2006)(claim not within jurisdiction of Court of Federal Claims to extent it seeks judicial review of agency action). Therefore, this Court may not address the question of whether Section 360.3(f), Section 360.7, or the June 1995 internal policy memorandum is defective.

D. The FDIC'S Alleged Calculation and Administrative Errors
Are Not within the Court's Jurisdiction

1. AmBase Misreads *Bailey v. United States*

The last remnant of AmBase's claims against the FDIC consists of attacks on its administration of the receivership and on miscellaneous accounting decisions. For example, AmBase challenges the classification of the Carteret receivership as a post-August 10, 1993 receivership; challenges the mathematical calculation of post-insolvency interest; and challenges the calculation of administrative expenses. Under the misimpression that "the receivership deficit serves in this case as a partial offset to damages owed to the plaintiff" (SOI at 9, 53 & 116; *see also id*. at 22, 24, 47) AmBase seeks to have "the amount by which [each] violation needlessly inflated the receivership deficit ['offset']" reduce the amount of such "offset" to any damages awarded on the contract claim. SOI at 22. In effect, each alleged overstated liability would be a sort of "counter-offset."

The concepts of "offset," "deduction," and "subtracting" are purportedly based on the decision in *Bailey v. United States.* That case did not, however, create an "offset" scheme. Rather, it held that receivership deficits are not, per se, assets available for recovery by the FDIC as receiver, on the theory that claims for receivership deficits are not "predominately held" by the receiver but by the FRF (FSLIC Resolution Fund). 341 F.3d at 1345, 1346. The receivership deficit was not "subtracted," it was not included because the receiver, standing in the shoes of the thrift, was not deemed to own it. By that logic, the receivership deficit here is not, *qua* deficit,

recoverable on the thrift's behalf here, but it will not be offset against any damages award in this case to the FDIC as the thrift's successor.

2. Adjudication of AmBase's Claims against FDIC Would Expand Jurisdiction and Decrease Judicial Economy

As the Government notes, this Court's original decision to entertain AmBase's claims against the FDIC was based on the belief that the claims were neither tort claims nor claims between private parties. GR at 11-13. Now, despite AmBase's attempt to characterize many FDIC actions as having been taken by "the government," and despite its attempt to allege Constitutional claims against the FDIC, it is clear that such is not the case: to the extent AmBase has stated any valid claims against the FDIC as receiver, it has stated tort claims against a non-governmental party.

In the interests of judicial economy, the FDIC does not repeat the Government's prior arguments on these points, or the prior argument that exclusive jurisdiction over claims with respect to the FDIC's management of receiverships, including challenges to its accounting and administration like those asserted here, may be brought, if at all, only in the federal district courts. 12 U.S.C. §§ 1821(d)(6), 1821(d)(13), 1821(j). Nor does the FDIC repeat the Government's argument with respect to the lack of judicial economy that would result from trying AmBase's deficit-related claims prior to its contract claims: it is now self-evident that such adjudication of AmBase's challenges to the FDIC's receivership accounting and management would be the *least* efficient way in which to proceed.[12]

---

[12] Even if that were not so, however, the "possibility that a different regime would be more efficient does not justify [a court's] rejection of the system of review that Congress has put into place." *Miller v. Office of Personnel Management*, 449 F.3d 1374 (Fed. Cir. 2006).

*Whitney Benefits, Inc. v. United States* is not to the contrary: in that case, the plaintiffs (an owner of mineral rights and its lessee) each had a direct, non-derivative, claim against the Government, arguably making the Government a ”stakeholder” of the damages to be paid and justifying the exertion of jurisdiction. 25 Cl. Ct. 232, 234 (1992). That is not true of AmBase here, which is now suing only on a derivative claim has no “competing right” to the damages that may be awarded here.[13] Nor do the interests of judicial economy support the exercise of jurisdiction, since, unlike in that case, the facts that allegedly support AmBase’s claims against the FDIC are not the same as the facts that support the claim for contract damages. *Id.* Finally, the questions of “such constitutional metaphysics as the nature of sovereignty, institutional personality, and separation of function,” *AmBase II* at 797, will become more complicated, not less, if this Court should entertain AmBase’s claim that the FDIC, as receiver, should apply 12 U.S.C. § 360.3(b), since FDIC, acting in its corporate capacity, must be afforded an opportunity to defend its rules and the internal policy memorandum of June 1995. *Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 424 (5th Cir. 2002)(FDIC must be allowed to intervene as of right to decision to grant deposit insurance).

E. AmBase Is Attempting to “End Run” This Court’s Taking Decision

This Court has previously decided held that AmBase does not have a takings claim against the Government in this case, given the contract remedy. *AmBase II* at 51-52. In reaction, AmBase is now asserting that nearly every decision the FDIC made with respect to the Carteret

[13] In speaking of its “property interest in the potential liquidation surplus,” SOI at 109-110, AmBase implies that it has a direct claim against the Government in this action. AmBase’s interest in the potential surplus gives it standing to assert a derivative claim; it does not give it a direct claim in its own right. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999). Moreover, the rules of this Court do not provide for cross-claims against co-parties because the United States is the only permissible defendant. R. Ct. Fed. Cl. 13(g)[omitted] & Rules Committee Note, 2002 Revision.

receivership was a taking, either by the FDIC or (somehow) by the Government. Given that the FDIC's projection of the amount of the receivership deficit is, as AmBase acknowledges, merely an estimate, these claims are not ripe for adjudication at this time. As the FDIC has demonstrated about, AmBase may not assert takings claims against the FDIC in its receivership capacity. Most importantly, however, this Court should not countenance AmBase's attempt to evade the effect of its decision by characterizing all of the FDIC's alleged administration and calculation errors as "takings." To do so completely vitiates the principle that takings claims are not available when contract remedies exist. *AmBase II* at 51-52.

## CONCLUSION

The Government's renewed motion to dismiss should be denied, and this case should proceed to trial forthwith on damages. In addition, this Court's prior decision granting AmBase's motion to define the nature of Carteret's measure of damages should be reconsidered and vacated. Alternatively, the Court should postpone decision on AmBase's claims against the FDIC, until after certification of the FDIC's pending motion for interlocutory appeal and the damages trial.

Respectfully submitted,

By _s/ Andrew C. Gilbert
Andrew C. Gilbert
*Counsel*
FEDERAL DEPOSIT INSURANCE CORPORATION
Legal Division
550 17th Street, NW
MB-3060
Washington, DC 20429
Telephone: 202-898-3871
Facsimile: 202-898-3908
Attorney of Record for Plaintiff-Intervener FDIC

OF COUNSEL:
D. Ashley Doherty
Gary Kuiper

*Counsel*
Federal Deposit Insurance Corporation
Legal Division

September 13, 2006

**CERTIFICATE OF SERVICE**

I hereby certify this 13th day of September 2006, that I caused a copy of the foregoing FDIC'S RESPONSE TO AMBASE'S STATEMENT OF ISSUES to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

s/ Andrew C. Gilbert