**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 93-531<br>(Judge Loren Smith) |

# AMBASE STATEMENT OF ISSUES REPLY BRIEF

Charles J. Cooper
Counsel of Record

Vincent J. Colatriano
David H. Thompson
Howard C. Nielson, Jr.
David M. Lehn
COOPER & KIRK, PLLC
555 11th Street, NW, Suite 750
Washington, D.C. 20004
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

October 19, 2006

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ............ iii

INTRODUCTION ............ 1

I. This Court Has Jurisdiction over AmBase's Objections to the Calculation of the Receivership Deficit. ............ 2

A. AmBase's objections arise incident to its suit against the United States for breach of contract. ............ 2

B. AmBase's suit is against the United States, not the FDIC as receiver. ............ 4

C. The FDIC is a government actor for constitutional purposes. ............ 7

D. AmBase's arguments provide an appropriate basis for reducing the receivership deficit. ............ 9

1. AmBase's objections to the improper inflation of the receivership deficit are not claims for additional damages. ............ 9

2. The FDIC misconstrues *Bailey v. United States*. ............ 11

II. As The FDIC Concedes, A Tax Liability Should Not Be Included In The Receivership Deficit At This Time. ............ 13

A. The FDIC's Tax Returns Improperly Included FFA Income. ............ 15

B. Post-Insolvency Interest Can And Will Be Deducted From Carteret's Taxable Income. ............ 16

C. Carteret's 1992 NOL Is Available to Reduce Its 1995 Taxable Income ............ 22

D. There Is No Excuse for the Other Errors in the FDIC's Tax Returns ............ 23

E. Penalties Will Not Be Assessed. ............ 25

F. Interest Will Not Be Assessed. ............ 26

G. Taxes Might Be Appropriate If the FDIC Were Reporting a Surplus ............ 27

III. The FDIC's Estimates of Post-Insolvency Interest Should Be Rejected. ............ 27

A. The United States should not be allowed to recover interest on the RTC loans from the damages otherwise payable to AmBase. ............ 28

1. The United States should not be allowed to recover interest because the necessity for the RTC loans is attributable to Congress. ............ 28

2. Interest should not be deducted from the damages otherwise payable to AmBase because those damages cannot be adjusted to reflect the time value of money. ............ 33

B. If the United States is allowed to recover interest, it must be calculated pursuant to 12 C.F.R. §360.3(b). ............ 39

1. The interest rates used in the FDIC's retroactive interest calculations are contrary to law. ....39

2. The FDIC's retroactive interest calculations upset reasonable, well-settled expectations. ....47

3. The rates used in the FDIC's retroactive interest calculations have no economic justification. ....49

C. If the FDIC's interest rates are used, its calculations must be corrected to eliminate other flaws. ....51

1. The FDIC's interest calculations misallocate payments from the sale of Carteret's assets. ....52

2. The FDIC's interest calculations improperly treat the deposit premiums from the branch sales. ....54

IV. The Unconstitutional Minority Preference Program Substantially Inflated the Receivership Deficit. ....56

A. This Court has jurisdiction to consider AmBase's challenge to the MPP. 57

B. AmBase has standing to challenge the Minority Preference Program. ....60

C. The MPP substantially inflated the receivership deficit. ....62

1. The MPP deflated the premiums received for Carteret branches. .63

2. The MPP caused assets to be sold below market value. ....65

V. Other Improper Actions Have Also Inflated the Receivership Deficit. ....66

A. Congress' failure to fund the RTC delayed Carteret's resolution and greatly decreased deposit premiums. ....66

B. The enactment of FIRREA directly eliminated a valuable asset that would have greatly increased Carteret's resolution value. ....67

C. The RTC squandered Carteret Mortgage Company's considerable value. 72

VI. The United States and the FDIC Are Attempting to Overcharge the Carteret Receivership for Litigation and Administrative Expenses. ....74

VII. The Inclusion in the Receivership of Charges Not Reasonably Related to Benefits Conferred by the Government Will Effect an Unconstitutional Taking. 76

CONCLUSION ....83

# TABLE OF AUTHORITIES

**Cases** **Page**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)....8

*Alfa Laval Separation* v. *United States*, 175 F.3d 1365 (Fed. Cir. 1999)....61

*AmBase Corp. v. United States*, 61 Fed. Cl. 794 (2004)....4, 6, 12

*AmBase Corp. v. United States*, 58 Fed. Cl. 32 (2003)....76, 80

*American Federation of Government Employees v. United States*, 258 F.3d 1294 (Fed. Cir. 2001)....61

*Atlas Corp. v. United States*, 895 F.2d 745 (Fed. Cir. 1990)....82

*Auction Company of America* v. *FDIC*, 132 F.3d 746 (D.C. Cir. 1997)....5, 7

*Bailey v. United States*, 341 F.3d 1342 (Fed. Cir. 2003).... *passim*

*Berkovitz v. United States*, 486 U.S. 531 (1988)....20, 21

*Bluebonnet Savings Bank v. United States*, 339 F.3d 1341 (Fed. Cir. 2003)....71

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)....43

*Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995)....11, 81, 82

*CACI, Inc.-Fed.* v. *United States*, 719 F.2d 1567 (Fed. Cir. 1983)....61

*Cameron* v. *United States*, 34 Fed. Cl. 422 (1995)....58

*Carlyle v. United States*, 674 F.2d 554 (6th Cir. 1982)....22

*Carteret Savings Bank, FA v. Office of Thrift Supervision*, 963 F.2d 567 (1992)....68

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .43

*Christensen v. Harris County*, 529 U.S. 576 (2000)....43

*Christian* v. *United States*, 46 Fed. Cl. 793 (2000), *rev'd in part on other grounds*, 337 F.3d 1338 (Fed. Cir. 2003)....59

*Citibank v. Nyland*, No. 86 Civ. 9181, 1990 U.S. Dist. LEXIS 12338 (S.D.N.Y. Sept. 19, 1990)....76

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)....22

*Corbin v. Federal Reserve Bank*, 475 F. Supp. 1060 (S.D.N.Y. 1979)....34, 45, 46

*Crocker* v. *United States*, 125 F.3d 1475 (Fed. Cir. 1997)....57

*Data Gen. Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996)....61

*Doty v. United States*, 109 F.3d 746 (Fed. Cir. 1997)....38

*Dunlop v. Bachowski*, 421 U.S. 560 (1975)....22

*Eastern Enterprises, Inc. v. Apfel*, 524 U.S. 498 (1998)....11, 81

*Elmco Properties, Inc. v. Second National Fed. Sav. Ass'n*, 94 F.3d 914 (4th Cir. 1996)....7

*Exxon Corp. v. United States*, 40 Fed. Cl. 73 (1998)....41

*FDIC v. Citizens State Bank*, 130 F.2d 102 (8th Cir. 1942)....34

*FDIC v. Mallen*, 486 U.S. 230 (1988)....7

*FDIC v. Meyer*, 510 U.S. 471 (1994)....7

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999)....10, 60, 78, 80

*Frank's Livestock & Poultry Farm, Inc. v. United States*, 905 F.2d 1515 (Fed. Cir. 1990)....59

*Frank's Livestock & Poultry Farm, Inc. v. United States*, 17 Cl. Ct. 601 (1989)....59

*Glass v. United States*, 47 Fed. Cl. 316 (2000), *rev'd in part, vacated in part*, 258 F.3d 1349 (Fed. Cir. 2001)....69, 70

*Glendale Fed. Bank v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)....

*Golden Pac. Bancorp v. FDIC*, 375 F.3d 196 (2d Cir. 2004)....46

*Golden Pac. Bancorp v. FDIC*, No. 98 Civ. 9281, 2002 U.S. Dist. LEXIS 24961 (S.D.N.Y. Dec. 24, 2002)....33, 46

*Golden Pac. Bancorp*, No. 95 Civ. 9281, 1997 U.S. Dist. LEXIS 15537 (S.D.N.Y. Oct. 7, 1997)....20, 21, 45

*Hall v. United States*, 69 Fed. Cl. 51 (2005)....3, 44

*Hamlet v. United States*, 63 F.3d 1097 (Fed. Cir. 1995)....3

*Hamlet* v. *United States*, 873 F.2d 1414 (Fed. Cir. 1989)....57, 58

*Heagy* v. *United States*, 12 Cl. Ct. 694 (1987)....57

*Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994)....44

*Home Sav. of Am., FSB v. United States*, 399 F.3d 1341 (Fed. Cir. 2005)....69, 71

*In re First Nat'l Bank*, 523 N.W.2d 591 (Iowa 1994)....33, 46

*In re Hartsdale Assocs.*, 452 F. Supp. 67 (S.D.N.Y. 1978)....45

*Jackson* v. *United States*, 428 F.2d 844 (Ct. Cl. 1970)....58

*Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483 (1966)....4

*LaChance* v. *United States*, 15 Cl. Ct. 127 (1988)....57

*Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001)....11

*LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003)....71

*Lee v. United States*, 32 Fed. Cl. 530 (1995)....58

*Local Oklahoma Bank, N.A. v. United States*, 452 F.3d 1371 (Fed. Cir. 2006)....38

*Longshore v. United States*, 77 F.3d 440 (Fed. Cir. 1996) ....................................78, 79, 82

*Longval* v. *United States*, 41 Fed. Cl. 291 (1998)............................................................58

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003)..............................................44

*Matagorda County v. Russell Law*, 19 F.3d 215 (5th Cir. 1994)........................................7

*Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449 (2d Cir. 1995) ..........................82

*Mid-Jersey Nat'l Bank v. Fidelity-Mortgage Investors*, 518 F.2d 640 (3d Cir. 1975) ......45

*National Bank of the Commonwealth v. Mechanics' Nat'l Bank*, 94 U.S. 437 (1877)......54

*Ochran v. United States*, 117 F.3d 495, 504 n.4 (11th Cir. 1997).....................................22

*Paralyzed Veterans of Am. v. Secretary of Veterans Affairs*, 345 F.3d 1334 (Fed. Cir. 2003)..........................................................................................................44

*Plaintiffs in all Winstar-Related Cases*, 44 Fed. Cl. 3 (1999) ..........................................60

*Prescott v. United States*, 973 F.2d 696 (9th Cir. 1992)....................................................22

*Simon v. Cebrick*, 53 F.3d 17 (3d Cir. 1995) ......................................................................7

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..................................................................43

*Slattery v. United States*, No. 93-280C, 2006 U.S. Claims LEXIS 301 (Fed. Cl. Oct. 11, 2006) ...........................................................................................5, 6

*Statistica, Inc. v. Christopher*, 102 F.3d 1577 (Fed. Cir. 1996) .......................................61

*Stewart v. United States*, 199 F.2d 517 (7th Cir. 1952)....................................................22

*Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999)..................................................................7

*Swaaley* v. *United States*, 376 F.2d 857 (Ct. Cl. 1967) .....................................................58

*Texas State Bank v. United States*, 423 F.3d 1370 (Fed. Cir. 2005)...................................9

*Traynor v. Turnage*, 485 U.S. 535 (1988) ..........................................................................41

*United States* v. *Connolly*, 716 F.2d 882 (Fed. Cir. 1982) ...............................................58

*United States v. Mikutowicz*, 365 F.3d 65 (1st Cir. 2004) .................................................15

*United States v. Sperry*, 493 U.S. 52 (1989)...........................................................81, 82

*Walter E. Heller & Co. v. Cox*, 343 F. Supp. 519 (S.D.N.Y. 1972)..................................45

**Statutes and Regulations**

12 U.S.C. § 1441a(w)(17)(A) ..........................................................................................8

12 U.S.C. § 1813(j)............................................................................................................40

12 U.S.C. § 1821(d)(13)(D)(ii)...........................................................................................6

12 U.S.C. § 1831...............................................................................................................50

28 U.S.C. §1491................................................................................................................62

28 U.S.C. § 2516(a) ..........................................................................................................34

Pub. L. No. 102-242, § 131, 105 Stat. 2236, 2253-55 (1991) ....................50
12 C.F.R. § 360.3 .................... *passim*
12 C.F.R. § 360.7 ....................49, 50, 53
26 C.F.R. § 1.446-1....................25
60 Fed. Reg. 35,487 ....................42
60 Fed. Reg. 35,488 ....................42
66 Fed. Reg. 65,144 ....................50
66 Fed. Reg. 65,145 ....................50
66 Fed. Reg. 65,146 ....................50, 53

**Other**

ANTHONY SAUNDERS & MARCIA MILLON CORNETT, FINANCIAL MARKETS AND INSTITUTIONS: AN INTRODUCTION TO THE RISK MANAGEMENT APPROACH 418 (2007)....................36

Timothy Curry & Lynn Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC BANKING REV. 26 (2000) ....................35

U.S. GEN. ACCOUNTING OFFICE, FINANCIAL AUDIT: FEDERAL DEPOSIT INSURANCE CORPORATION'S 1997 AND 1996 FINANCIAL STATEMENTS 11 (1998) ....................36

U.S. GEN. ACCOUNTING OFFICE, RESOLUTION TRUST CORPORATION: PERFORMING ASSETS SOLD TO ACQUIRERS OF MINORITY THRIFTS 4 (1995)....................64, 65

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC., | ) |
| Plaintiffs, | ) |
| and | ) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | ) |
| Plaintiff-Intervenor, | ) Civil Action No. 93-531 |
| v. | ) (Judge Loren Smith) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

**AMBASE STATEMENT OF ISSUES REPLY BRIEF**

**INTRODUCTION**

The briefing in this show cause proceeding has now made clear that this Court has jurisdiction to consider Carteret's claims for damages. The FDIC now explicitly concedes as much because, in its words, "there is no reason to treat the FDIC's current estimates of the receivership's ultimate tax liability as dispositive." FDIC Br. 19-20. This concession was well-founded because, as we explained in our opening brief, because Carteret's receivership could not have both generated a large deficit and an enormous amount of taxable income. Neither the FDIC nor the United States has any coherent response to this economic reality.

The briefing has also made clear that no interest should be charged to the receivership deficit. The FDIC, the RTC, the GAO, and the textbook authored by the

United States' own expert all calculate the cost of the resolution without including any charge for interest. More importantly, neither the United States nor the FDIC offers any justification for charging interest on the offset to damages when there is no interest on the damages themselves. As for the retroactive decision in 1999 to increase the rate of interest at a cost of $64 million to the receivership, neither the United States nor the FDIC offer any basis for concluding that the National Depositor Preference statute should govern Carteret's receivership. Nor has any legal or factual justification been provided for the FDIC's failure to pay down the highest cost loans first.

Faced with this reality that neither the taxes nor the interest, which constitute the bulk of the receivership deficit, are genuine costs to the receivership, the United States attempts to relitigate the issue of whether this Court can peer behind the receivership deficit. As this Court has noted before, this is not the first time that the Department of Justice has deployed this tactic in the *Winstar* cases. This Court's determinations were right when made, however, and they are right today. That the United States dislikes them is not the proper ground for reconsideration.

## I. This Court Has Jurisdiction over AmBase's Objections to the Calculation of the Receivership Deficit.

### A. AmBase's objections arise incident to its suit against the United States for breach of contract.

This is a suit against the United States for breach of contract falling squarely within the scope of the Tucker Act. That the United States breached its contract with Carteret has been established, but the amount of damages it must pay is yet to be determined. As sole shareholder of Carteret, AmBase will receive the damages awarded net of the receivership deficit. *See*, *e.g.*, *Bailey v. United States*, 341 F.3d 1342, 1345

(Fed. Cir. 2003). Furthermore, under Federal Circuit precedent, the justiciability of this suit arguably depends on whether the damages owed by the United States for breach of contract exceed the final receivership deficit. *See*, *e.g.*, *id*. at 1346. Thus, AmBase's objections to the calculation of the receivership deficit arise incident to determining whether this suit against the United States is justiciable and, if it is, the amount of damages for the United States' breach of contract to which AmBase is entitled. These objections are *not* freestanding claims. They are merely sub-issues in the determination of justiciability and the calculation of damages on a breach-of-contract claim.

Both the United States and the FDIC contend that AmBase's objections may not be considered because the Tucker Act does not grant this Court jurisdiction to consider torts or breaches of fiduciary duty. *See* U.S. Br. 11-13; FDIC Br. 25. This argument presupposes that each of AmBase's objections to the calculation of the receivership deficit is a freestanding claim that must have a separate and independent basis of jurisdiction in the Tucker Act.

This presupposition is plainly wrong. As the Court of Federal Claims and the Federal Circuit have confirmed in multiple contexts, the Tucker Act confers jurisdiction to consider issues—such as AmBase's objections to the deficit calculation—that arise as *incidents* of the adjudication of a Tucker Act claim, regardless of whether there would be jurisdiction over those issues if they were brought as freestanding claims. *See, e.g.*, *Hamlet v. United States*, 63 F.3d 1097, 1107 (Fed. Cir. 1995) (holding that the Tucker Act bars jurisdiction over constitutional torts only when they are brought "'standing alone,' *i.e.* **without an underlying statutory or regulatory right to recovery**" (emphasis added)); *Hall v. United States*, 69 Fed. Cl. 51, 56 (2005) (holding that the

Tucker Act grants jurisdiction to review agency actions as an incident of a breach-of-contract claim); *Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 488 (1966) (holding that the Court may use equitable accounting procedures incidental to rendering a money judgment); *see also infra* Part IV. A; Part III. B.1. As correctly determined in *AmBase II*, AmBase's objections to the receivership deficit calculations arise as incidents of its breach-of-contract claim, and this Court has authority to review those objections because it has jurisdiction over AmBase's breach-of-contract claim. As this Court has repeatedly emphasized, reviewing the receivership deficit will **not** in any way extend this Court's jurisdiction beyond the pending claim for breach of contract. Rather, review of the deficit is merely a necessary incident to confirming justiciability, calculating damages, and resolving the contract claim. *See AmBase Corp. v. United States*, 61 Fed. Cl. 794, 797 (2004) ("*AmBase II*") ("Plaintiffs in this case ask nothing more of this Court than the exercise of its equitable power incident to their claim for money damages against the federal government, a claim which lies squarely within our jurisdiction."); *id.* at 800 ("Plaintiffs do not ask the Court to expand its jurisdiction, but rather to conduct an equitable review which is an incident of our general jurisdiction.") (quotation marks omitted.").

**B. AmBase's suit is against the United States, not the FDIC as receiver.**

The United States and the FDIC likewise contend that this Court may not consider AmBase's objections relating to the FDIC's management of the receivership and calculation of the receivership deficit. They argue that the Tucker Act does not confer jurisdiction over suits against parties other than the United States and that the FDIC in its capacity as receiver should not be considered the United States for jurisdictional

purposes. *See* U.S. Br. 11-13; FDIC Br. 15-16. Even assuming, solely for the sake of argument, that the FDIC is not the United States for purposes of the Tucker Act when it acts as receiver, *see Slattery v. United States*, No. 93-280C, 2006 U.S. Claims LEXIS 301, at *10-*12 (Fed. Cl. Oct. 11, 2006); *but see Auction Company of America v. FDIC*, 132 F.3d 746, 750 (D.C. Cir. 1997) (holding that "the FDIC as Receiver counts as the United States for the Tucker Act"), AmBase brings no claim against the FDIC in that capacity. Much of the improper inflation of the receivership deficit is attributable to actors other than the FDIC as receiver—for example, to Congress for imposing the Minority Preference Program (MPP) and for its failure to fund the RTC, and to the FDIC in its corporate capacity for its policies and decisions relating to tax accounting, interest calculation, and allocation of administrative expenses. *See* Corrected Statement of Issues ("Opening Br.") 29-103. And though the FDIC as receiver did play a role in calculating and improperly inflating the receivership deficit, scrutinizing its actions is not tantamount to adjudicating a "claim" against it, because, contrary to the United States' bald assertion, *see* U.S. Br. 12, a reduction in the receivership deficit does not amount to an award of damages against the FDIC as receiver. Quite the contrary—as the FDIC acknowledges, *see* FDIC Br. 24-25, *Bailey* holds that the claim for the receivership deficit is held by the United States **against** the receivership—and hence against both Carteret and the FDIC as its receiver. Indeed, the receivership deficit is in the nature of a set of counterclaims held by the United States against Carteret. For example, the purported tax liability is in the nature of a potential claim by the IRS against the failed thrift, and the interest calculation reflects the subrogated depositors' claim held by the FDIC in its corporate (*i.e.*, governmental) capacity against Carteret. Accordingly, AmBase, as Carteret's sole

shareholder, raises its objections to the improper inflation of the receivership deficit as a defense to the United States' counterclaims against the receivership, which will in effect function as an offset against any contract damages recovered. Thus, as this Court properly recognized in *AmBase II*, none of AmBase's objections to the receivership deficit constitutes a "**claim** relating to any act or omission of [the FDIC] as receiver," 12 U.S.C. § 1821(d)(13)(D)(ii) (emphasis added), because AmBase's "claim [is] not *against* the receivership, but rather against the United States for breach of a goodwill contract." 61 Fed. Cl. at 799.[1]

In sum, AmBase has brought a claim against the United States seeking damages for breach of contract. It has brought no tort claim or claim for breach of fiduciary duty. It brings no claim against, nor seeks any damages from, the FDIC as receiver or any party other than the United States. AmBase merely requests that this Court "accurately and fairly determine the amount of claims that are otherwise plainly within [its] jurisdiction, and determine monetary awards in fair and efficient fashion." *AmBase II*, 61 Fed. Cl. 800-01 (quotation marks omitted). In order to do so, this Court "must determine the size of the [receivership] deficit or surplus." *Id.* at 802.

---

[1] This case is therefore quite different from *Slattery v. United States*, No. 93-280C, 2006 U.S. Claims LEXIS 301 (Fed. Cl. Oct. 11, 2006). That case involved freestanding claims seeking money damages directly against the FDIC as receiver, for its alleged failure to comply with the depositor preference statute. *See id.* at *8-*9. The calculation of the receivership deficit was not at issue, and a finding of liability would have resulted in a direct award of damages against the FDIC as receiver. *See id.* Here, by contrast, a finding that the FDIC has mismanaged the receivership is only relevant in determining the amount of damages owed by the *United States* for its breach of contract, not by the FDIC for its mishandling of the receivership.

**C. The FDIC is a government actor for constitutional purposes.**

Going beyond its contention that the FDIC as receiver should not be considered as the United States for jurisdiction purposes, the FDIC also advances the remarkable assertion that when it acts as receiver it is not even a government actor subject to the constraints of the Constitution. *See* FDIC Br. 16 ("Because the FDIC, when acting as receiver, is not 'the government,' AmBase may not assert takings claims, or claims for denial of equal protection, via the due process clause, against it."). This is plainly false: regardless of whether it should be distinguished from the "United States" for jurisdictional purposes when it acts as a receiver, the FDIC is plainly a "federal instrumentality," *Auction Company*, 132 F.3d at 749, subject to the constraints of the Constitution in whatever capacity it acts. *See, e.g.*, *Elmco Properties, Inc. v. Second National Fed. Sav. Ass'n*, 94 F.3d 914, 918-19 (4th Cir. 1996) (holding that the RTC as receiver violated the Due Process Clause in failing to provide adequate notice of its receivership and in denying a creditor's claim against the receivership); *Simon v. Cebrick*, 53 F.3d 17, 23 (3d Cir. 1995) ("[T]he FDIC is acting in a governmental capacity when it winds up the affairs of failed banking institutions pursuant to FIRREA."); *see also FDIC v. Meyer*, 510 U.S. 471, 483-86 (1994) (considering whether a constitutional tort committed by the FDIC as receiver in violation of the Fifth Amendment could support a *Bivens* claim against the agency); *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (holding that the Due Process Clause restricted the FDIC's statutory discretion to order the suspension of an indicted bank officer); *Stone v. FDIC*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) (holding that the FDIC is "the government" subject to the Due Process Clause in discharging its own employees); *cf. Matagorda County v. Russell Law*, 19 F.3d 215, 223-

25 (5th Cir. 1994) (adjudicating a takings claim against the FDIC for actions taken in its receivership capacity).

Furthermore, AmBase's constitutional objections are directed against the United States. While it is true that the FDIC as receiver has played (and is playing) a role in the constitutional violations of which AmBase complains, that role is limited to implementing or facilitating the United States' unconstitutional actions. First, with respect to the Minority Preference Program, the FDIC merely implemented Congress's unconstitutional mandate. *See* 12 U.S.C. § 1441a(w)(17)(A) ("[T]he [RTC] **shall** give preference to an offer from any minority individual, minority-owned business, or a minority depository institution, over any other offer that results in the same cost . . . .") (emphasis added). Even if the FDIC when acting as receiver could properly be considered a genuinely private actor, its implementation of the MPP would plainly violate the equal protection component of the Fifth Amendment. As the Supreme Court has explained regarding this provision's Fourteenth Amendment counterpart, "a State is responsible for the discriminatory act of a private party when the State, by its law, has compelled the act. . . . [D]iscriminatory acts done by private parties done under the compulsion of state law offend the Fourteenth Amendment." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170-71 (1970).

With respect to its takings objection, AmBase challenges the potential confiscation of some or perhaps all of its property interest in the potential liquidation surplus **by the United States**. Although the FDIC as receiver, through its management of the receivership and its calculation of the receivership deficit, has played a role in improperly inflating this deficit, the effect of including improper charges within the

receivership deficit is to capture some or all of AmBase's interest in the potential liquidation surplus and transfer that interest to the owner of the receivership deficit—which is not the FDIC but the United States. *Cf. Texas State Bank v. United States*, 423 F.3d 1370, 1377 (Fed. Cir. 2005) ("[W]here, as here, the government command to a third party results in the transfer of alleged private property *to the United States*, we think that the United States must bear responsibility if a direct government appropriation would itself constitute a compensable taking.") (emphasis added). In short, the effect of the FDIC's improper actions as receiver is to facilitate the United States' seizure of AmBase's liquidation surplus for itself.

**D. AmBase's arguments provide an appropriate basis for reducing the receivership deficit.**

**1. AmBase's objections to the improper inflation of the receivership deficit are not claims for additional damages.**

The FDIC argues that AmBase's due process and takings objections "are really claims for money damages from the Government," that its goodwill objection "is really not a separate claim but a potential additional item of damages for [the] already-alleged breach [of contract]," and that "[n]one of these claims is a basis for recalculating the estimated receivership deficit." FDIC Br. 12. Once again it misses the mark. As noted above, the receivership deficit is in the nature of a counterclaim owned by the United States against the failed thrift, the value of which must be deducted from the recovery to shareholders because the United States has higher priority than the shareholders in the statutory distribution framework. *See Bailey*, 341 F.3d at 1345. AmBase raises its objections not as freestanding claims, but in a defensive posture against the United States' asserted offset to its recovery.

For example, the gravamen of AmBase's takings argument is that the improper inflation of the receivership deficit, together with the subsequent deduction of that deficit from the damages to which it would otherwise be entitled as Carteret's sole shareholder, will take some, and perhaps all, of its property interest in the potential liquidation surplus.[2] Plainly this argument arises directly from the operation of the *Bailey* regime in the context of this case.

Similarly, AmBase's arguments relating to the MPP and to the elimination of its supervisory goodwill are raised neither as freestanding claims seeking damages nor additional items of damages to be awarded on its breach-of-contract claim. *See* FDIC Br. 12. Rather, AmBase objects to the inclusion in the receivership deficit of costs that would not have been incurred but for improper government action. In the case of the MPP, Congress's mandate that Carteret be resolved according to a cumbersome and unconstitutional system of racial preferences directly increased the costs of resolution by causing the receivership to incur otherwise unnecessary debt and by reducing the premiums obtained from the sale of Carteret's deposits. *See* Opening Br. 74-103. In the case of the supervisory goodwill, Congress's statutory breach of its contract with Carteret directly eliminated a critical asset that would have greatly increased Carteret's resolution value, thereby increasing resolution costs. *See* Opening Br. 72-73. AmBase's objections thus arise in the context of this case because the inclusion of these costs in the

[2] Contrary to the FDIC's assertion, see FDIC Br. 13 n.7, AmBase's takings argument does not assert derivatively an interest owned by the receivership. Rather, AmBase seeks to protect its own interest in the liquidation surplus. As the Federal Circuit explained in *First Hartford Corp. Pension Plan & Trust v. United States*, this is "a *direct* and cognizable property interest." 194 F.3d 1279, 1296 (Fed. Cir. 1999) (emphasis added).

receivership deficit will directly reduce the amount of damages that AmBase would otherwise receive from the breach-of-contract claim.

In all events, even if the FDIC's characterization of AmBase's objections were correct in treating these arguments as freestanding claims or additional items of damages, awarding extra damages in the precise amount of the improper inflation of the receivership deficit, and then allowing the United States to recover the improperly inflated deficit from the enhanced damages award—which is essentially what the FDIC's position would require—"would entail an utterly pointless set of activities." *Eastern Enterprises, Inc. v. Apfel*, 524 U.S. 498, 521 (1998) (quotation marks omitted); *see also Branch v. United States*, 69 F.3d 1571, 1576 (Fed. Cir. 1995) (declining to embrace "the curious conclusion that the government may take [plaintiff's] money as long as it pays the money back").

### 2. The FDIC misconstrues *Bailey v. United States*.

The FDIC also argues that AmBase's objections to the FDIC's mismanagement of the receivership and its calculation of the receivership deficit do not provide a basis for reducing the receivership deficit. *Bailey* did not "create an 'offset' scheme," according to FDIC, but rather "held that receivership deficits are not, per se, assets available for recovery by the FDIC as receiver" because they are " 'predominantly held' " not by the receiver but by the United States. FDIC Br. 24 (quoting *Bailey*, 341 F.3d at 1345). Under the regime outlined in *Bailey*, however, it is plain that once this Court determines the amount of damages owed by the United States for breach of contract, the receivership deficit will first be paid from those damages, and then the remainder will be paid to AmBase as Carteret's sole shareholder. *See Landmark Land Co. v. FDIC*, 256 F.3d

1365, 1380 (Fed. Cir. 2001). There can be no doubt that the receivership deficit thus functions as an offset to AmBase's recovery against the United States. *See AmBase II*, 61 Fed. Cl. at 802 ("Under *Bailey* . . . the AmBase Plaintiffs are to have their recovery reduced by the size of the receivership deficit . . . .").

The language the FDIC quotes from *Bailey*—that the receivership deficit is not "available for recovery by the FDIC as receiver" because it is " 'predominantly held' " by the United States, FDIC Br. 24 (quoting *Bailey*, 341 F.3d at 1345)—in no way suggests that the receivership deficit will not be deducted from the damages that would otherwise be paid to a thrift's shareholders. As is evident from context, this language was not addressed to the question whether the receivership deficit would reduce the shareholders' recovery—a point that *Bailey* recognized and indeed took for granted—but rather constituted the court's reason for refusing to allow the receivership to recover an amount of damages equivalent to the receivership deficit, in addition to the amount of damages otherwise caused by the United States' breach of contract, to compensate for the subsequent deduction of the receivership deficit from the damages award. Indeed, the court's statement confirms that the receivership deficit—because owned by and payable to the United States rather than the FDIC as receiver—functions as a direct offset to the damages otherwise owed by the United States on the breach-of-contract claim.

Any suggestion that the FDIC's improper actions cannot constitute a proper ground for reducing the receivership deficit because the receivership deficit is payable to the United States rather than the FDIC, is a *non sequitur*. Even though the receivership deficit belongs to the United States, the FDIC as receiver is charged with administering the receivership and calculating the receivership deficit. Accordingly—as this case well

illustrates—the FDIC plainly can incur or recognize fictional, or otherwise illegitimate, receivership costs that should not be included in the receivership deficit. Indeed, as explained above, it is precisely because this deficit is owed to the United States rather than the FDIC as receiver that it functions as an offset to AmBase's breach-of-contract claim for damages and that AmBase's objections to the improper inflation of the deficit constitute a defense to the United States' offset rather than a series of separate claims against the FDIC as receiver.

## II. As The FDIC Concedes, A Tax Liability Should Not Be Included In The Receivership Deficit At This Time.

The FDIC as receiver has acknowledged what our opening brief made clear: the receivership deficit should not include a $93.7 million tax liability. The FDIC as receiver acknowledges that "[t]he actual amount, **if any**, that will ultimately be paid in federal taxes is yet to be finally determined," FDIC Br. 7 (emphasis added), and thus "there is **no reason** to treat the FDIC's current estimates of the receivership's ultimate tax liability as dispositive." FDIC Br. 19-20 (emphasis added). As the FDIC as receiver quite properly concedes, the removal of the tax liability as a component of the receivership deficit, standing alone, makes clear that this Court has jurisdiction to decide Carteret's claim for breach-of-contract damages. Significantly, even the United States concedes that only the actual amount of taxes ultimately paid should be included in the receivership deficit. *See* U.S. Br. 85 (acknowledging that receivership deficit should be adjusted "if IRS settles the tax claim against Carteret and the receivership shows a lesser deficit than now appears on the books"). This concession confirms the commonsense proposition that Carteret's contract damages cannot be mooted by claims of possible future expense. This is especially true where, as here, there is no genuine underlying liability.

As a global matter, the United States has no explanation as to how the Carteret receivership could have simultaneously both generated a loss of $160 million and a tax liability of $90 million. To be sure, the United States notes that $80 million of deductions (relating to the interest deduction) were, in its view, lost as a result of timing differences. But even if that were correct, the United States cannot explain how the remaining claimed loss of $80 million could have generated a tax liability of more than $90 million. Thus, viewed at a global level, the tax returns that the United States seeks to rehabilitate cannot be squared with the financial statements that underlie the FDIC's calculation of the receivership deficit.

As for the specific errors identified in our opening brief, neither the FDIC nor the United States has pointed to any law or facts undermining the conclusions that:

- the IRS would have allowed the deduction of NOLs generated by Carteret in 1992 on its 1995 tax return;
- the IRS would have allowed the FDIC to eliminate $21.2 million of taxable income from its 1995 return under the proper interpretation of the FFA regulations; and
- the IRS would have allowed Carteret to deduct post-insolvency interest on the 1995 return.

The United States repeatedly claims that it is "pure speculation" as to whether the IRS will fight the FDIC's interpretation of the tax issues relevant to Carteret's tax liability. But the relevant statutes, the regulations, and the case law uniformly support AmBase's interpretation of the tax code, and the United States has cited no legal authority that is contrary to AmBase's views. Moreover, the FDIC has acknowledged the

reasonableness of the IRS in this area, and the IRS's conduct with respect to Ben Franklin confirms this view. But even if it were not crystal clear that the IRS will adhere to its position with respect to Ben Franklin, the United States could end any "speculation" simply by consulting with itself, since the IRS is an arm of the United States. The failure to do so is telling.

Nevertheless, the United States does attempt to defend the validity of the tax returns prepared by the FDIC. We briefly address these arguments below.

**A. The FDIC's Tax Returns Improperly Included FFA Income.**

The United States maintains that "there is **no evidence** FFA was improperly calculated." U.S. Br. 72 (emphasis added). But as AmBase's opening brief made clear, the FDIC's own tax representative stated repeatedly during his 30(b)(6) deposition that FFA had not been properly treated on the 1993, 1994, and 1996 returns. *See* Opening Br. 33-35. In addition, as demonstrated in AmBase's opening brief, the IRS agreed to the FDIC's current understanding of FFA in its settlement with Ben Franklin. Tellingly, the United States makes no attempt to defend the FDIC's handling of FFA on the returns for 1993, 1994, and 1996. Nor does the United States dispute the magnitude of the impact of a proper treatment of FFA, which it properly acknowledges to be $21.2 million. U.S. Br. 73 n.12.

The United States nevertheless makes a token effort to charge Carteret with FFA income. First, the United States notes that AmBase has not retained a tax expert. This is true, but irrelevant, since the proper interpretation of Section 597 of the Internal Revenue Code is a question of law as to which expert testimony is not required. *See, e.g., United States v. Mikutowicz*, 365 F.3d 65, 73 (1st Cir. 2004) (holding, in a tax case, that

"[e]xpert testimony proffered solely to establish the meaning of a law is presumptively improper") (quotation marks omitted). Second, the United States notes that there are no "work papers" associated with the FDIC's current calculations of FFA income. U.S. Br. 74. But the United States is in possession of the actual spread sheets detailing those calculations. Tellingly, the United States offers no indication as to how these work papers could possibly change the result of the FDIC's analysis: given that there was positive tax basis in Carteret, no FFA could possibly have been included in taxable income. *See* Opening Br. 35.

Finally, the United States quotes Mr. Vordtriede's deposition for the proposition that the IRS "accepted" the FDIC's calculation of FFA. U.S. Br. 74. But Mr. Vordtriede made clear that he had no reason to believe the IRS had ever even looked at this issue with respect to Carteret. *See* App. 992 (Deposition of James F. Vordtriede ("Vordtriede Dep.") 295) ("Q[uestion]: Well, when you answered the question that the IRS had accepted the FFA calculation, do you just mean that they hadn't rejected the return. A[nswer]: Yes, I would say that's true."). Moreover, as noted, the IRS's position is clear since it agreed with the FDIC's current view of FFA in the Ben Franklin case.

### B. Post-Insolvency Interest Can And Will Be Deducted From Carteret's Taxable Income.

Again, the United States states that there is "no evidence" that the IRS will agree to allow Carteret to deduct post-insolvency interest from 1995. U.S. Br. 76. All of the evidence contradicts the United States' view. AmBase's opening brief quoted from the internal FDIC documents that acknowledged that post-insolvency interest could be deducted going back to 1995. Opening Br. 39-40. Of course, any other approach would violate the basic principle that thrifts are required to pay tax only on their **net** interest

income and are entitled to a deduction for their cost of funds. Not surprisingly, the IRS, in the words of an FDIC tax specialist, "agrees that this is a valid tax deduction available from the date of closing [*i.e.*, 1995]." App. 10380. Government witness after government witness agreed. *See* Opening Br. 40. And Mr. Vordtriede agreed in an internal email: "[t]he way I see it, we ought to accrue and deduct PII from inception [*i.e.*, 1995]." App. 10381 (Vordtriede Dep. Ex. 9).

AmBase's opening brief pointed to the IRS's recent settlement in *Suess* as confirming evidence of the FDIC's position that PII is deductible in 1995. The United States responds that there is "no evidence" that Ben Franklin and Carteret's tax profile are "remotely similar." U.S. Br. 78. In fact, Ben Franklin and Carteret are similarly situated in all material respects relevant to the deductibility of PII. Both Ben Franklin and Carteret were in receivership at the relevant time period. Both received advances from the RTC. Both were charged interest from the date of the loan. And in neither case did the RTC deduct such interest at the time of the loan on the tax returns, thereby creating a very significant tax liability since the primary expense of the financial institutions was not deducted. In *Ben Franklin's* case, of course, the IRS has now agreed that such a deduction may still be taken. The United States has pointed to no law, logic, or factual evidence that would suggest a different result should and will obtain here.

The United States attempts to justify the FDIC's failure to deduct post-insolvency interest by claiming that any other policy would have entailed " 'a huge administrative cost.' " U.S. Br. 76 (quoting App. 262). The United States never explains, however, what that burden would have been. The United States' desire to gloss over this point is understandable because the burden would have been trivial: under the United States'

method of calculating interest, anyone with access to a calculator could quantify the amount of interest accruing for Carteret in less than a few hours. But even if there were genuinely a significant burden, it surely would have not been severe enough to forgo an $80 million tax deduction. And it would have been easy enough for the government to confine making such a calculation to those institutions with some prospect of being able to pay the interest, including those with *Winstar* claims. Moreover, the United States offers no excuse for failing to round 94.96% up to 95% in order to take an $80 million tax deduction.

Nor does it offer any justification for the receivership's failure to pay $712,000 out of its $20 million cash horde to hit the 95 percent threshold and qualify for the deduction. To be sure, the United States claims "[t]here is no evidence in the record suggesting that the money could have been used for this purpose at the time." U.S. Br. 79. But the FDIC's debt repayment schedule shows that just such payments were made in 1998. Reply App. 00094 (Liability Register). Moreover, the 1997 income statement for the receivership confirms that Carteret was an empty shell with little or no operating expenses—for all of 1997, total expenses were $300,000. App. 01084. Presumably, the $20 million of cash plus $23 million of securities available at the end of 1997 would have been sufficient to meet operating expenses even if a $712,000 debt repayment had been made. In short, the evidence conclusively demonstrates that there was in fact ample cash available to comply with the 95% requirement and qualify for the deduction even under the FDIC's policy. The simple reality is that there is no indication that anyone at the FDIC gave a moment's thought to attempting to minimize Carteret's tax burden. If anyone had, he would have realized that by failing to make the debt repayment of

$712,000, and by failing to round 94.96% up to 95%, the FDIC was denying Carteret the ability to take an $80 million deduction.

Significantly, there is no FDIC document that purports to justify the 95 percent rule on the basis of the tax code. Nevertheless, the Department of Justice offers this made-for litigation defense. Specifically, the United States invokes the "all events" test of Section 461 in an attempt to cast some doubt on whether it was appropriate to deduct the interest that was accruing in 1995 on the 1995 return. The United States fails to cite a single case that calls into question the proposition, established in the cases cited in AmBase's opening brief, that the accrual method of accounting **requires** the deduction of such interest, even if it is highly unlikely that the taxpayer will be able to pay the interest. *See* Opening Br. 41-42 (collecting authority). And, of course, the IRS's agreement to allow Ben Franklin to eliminate almost $900 million in tax liability largely because of this issue confirms AmBase's understanding of the case law.

Without citation, the United States maintains that "the FDIC believed the 95 percent policy served the interests of receiverships." U.S. Br. 71. That is nonsense. The policy systematically created a tax liability where none would have existed under a faithful adherence to the Internal Revenue Code. *See* Opening Br. 41-42. But the receiverships did not benefit from this policy in any conceivable way, and no FDIC employee or document suggested any such advantage. Rather, the impact of this policy ranged from indifference for those receiverships that had no funds to pay taxes to disaster for those like Ben Franklin and Carteret that did have such funds.[3]

[3] The United States argues that it is "utterly irreconcilable" for AmBase to seek a tax deduction for interest paid and to claim that the interest entailed no cost to the

In the face of the overwhelming evidence that the FDIC was and still is permitted to deduct post-insolvency interest from the 1995 tax return, the United States attempts to immunize the FDIC's conduct from judicial review, again. In a thinly veiled effort to reverse this Court's ruling of August 31, 2004, the United States argues that the Court cannot review the reasonableness of the FDIC's policy of not accruing interest until 95% of the principal had been paid down. As a threshold matter, this argument is a red herring. The issue is not whether the FDIC's policy of accruing interest on its own internal books is appropriate. Rather, the issue is whether the FDIC's failure to deduct the interest on the tax returns it filed improperly inflated the receivership deficit, irrespective of internal FDIC recordkeeping procedures. The FDIC's witnesses acknowledged that tax returns often differ from the books and records of the taxpayer. App. 00817 (Deposition of Elaine Tama).

Even if the tax issue did turn upon the validity of the FDIC's accrual policy, this Court has the authority to consider all aspects of the receivership deficit, including this aspect of the FDIC's tax calculation. The United States argues that AmBase's challenge to the FDIC's policy fails because AmBase "offers no evidence" that the policy is not subject to the "discretionary act exception to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)" or "the 'committed to agency discretion' provision of the Administrative Procedure Act[,] 5 U.S.C. § 701(a)(2)." U.S. Br. 70. In support, the United States cites only two cases: *Berkovitz v. United States*, 486 U.S. 531, 537 (1988), and an unreported decision of the Southern District of New York, *Golden Pac. Bancorp*, No. 95 Civ. 9281, 1997 U.S. Dist. LEXIS 15537 (S.D.N.Y. Oct. 7, 1997). Far from supporting the United

---

government. U.S. Br. 77 n.13. If the receivership is charged interest, the interest is a cost to the receivership and gives rise to a tax deduction.

States' arguments, both cases confirm that the United States' irrational and self-serving policy is subject to judicial review.[4]

Finally, neither of the two cases cited by the United States supports its contention that AmBase must introduce evidence showing that neither the APA's exception for actions "committed to agency discretion," nor the discretionary-act exception to the

---

[4] In *Golden Pacific Bancorp v. United States*, the shareholder plaintiff claimed that the FDIC had breached its fiduciary duties when it sold all the bank's assets to a Hong Kong bank in return for payment far short of the true franchise value, and that the FDIC's liquidation expenses were "excessive, self-serving, and wasteful." No. 95 Civ. 9281, 1997 U.S. Dist. LEXIS 15537, at *6. As here, the FDIC argued (1) that the plaintiff's claims for breach of fiduciary duty had to be brought under the FTCA, and were therefore barred by its "discretionary act" exception; and (2) in any case, that the "committed to agency discretion" exception of the APA barred judicial review of its actions. *Id.* at *4-*5 (quotation marks omitted). The Court rejected the first argument out of hand, holding that "claims for unjust enrichment and breach of fiduciary duty are not claims for money damages and are not torts within the meaning of the FTCA." *Id.* at *3. Thus, the FTCA's discretionary-act exception was irrelevant. Similarly here, AmBase has not brought a claim under the FTCA, and the United States has not and cannot point to a single claim by AmBase that sounds in tort.

The *Golden Pacific* Court next turned to the "committed to agency discretion" exception to the APA. The Court noted that this APA exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at *4-*6 (quotation marks omitted). Accepting as true the plaintiff's allegations that "the FDIC [had] made a decision to proceed with the liquidation of a bank which it had discovered was solvent, and conducted that liquidation in a deliberately wasteful and self-serving manner," the Court refused to dismiss the complaint under section 701(a), finding that those decisions would "not fall into the category of the permissible exercise of policy judgment exempted from judicial review." *Id.* at *6-*7 (quotation marks omitted). Thus, far from supporting the United States' argument that AmBase's claims are barred by the "committed to agency discretion" exception of the APA, *Golden Pacific* in fact held precisely the opposite.

Even less relevant is *Berkovitz.* That case involved a suit under the FTCA against the FDA regarding its decision to license a certain vaccine manufacturer. *Berkovitz v. United States*, 486 U.S. 531, 539-58 (1998). Not only is this case obviously irrelevant on its facts, but the Supreme Court actually **reversed** the lower court's finding that the suit was barred by the discretionary-act exception and held that the FDA had no discretion to issue the license without demonstrating proper compliance with regulatory procedures. *Id.* at 544, 548. In any case, as discussed above, AmBase did not bring suit under the FTCA, its claims do not sound in tort, and that statute is therefore irrelevant.

FTCA applies. The case law is clear that absent an express statutory bar on judicial review, the party seeking to invoke the "committed to agency discretion" exception bears a "heavy burden of overcoming the strong presumption" that Congress intended judicial review of agency actions. *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975). The United States has not even attempted to meet this burden. Nor could it, because the exception applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. REP. NO. 752, 79th Cong., 1st Ses., 26 (1945)). Here, the FDIC's conduct is regulated both by statute and by the Fifth Amendment, which is self-executing.[5]

**C. Carteret's 1992 NOL Is Available to Reduce Its 1995 Taxable Income**

The United States concedes that "the 1992 return prepared by Carteret indicates a tax loss of $73.9 million." U.S. Br. 80. And the United States does not contest that net operating losses generated by Carteret in 1992 would have been available to shield Carteret's income in 1995, provided they had not already been utilized. The United States notes, however, that because AmBase reported some losses for a portion of 1992, the amount of available NOL carryforwards generated by Carteret in 1992 were "approximately $56 million rather than $73.9 million." U.S. Br. 81. It is a fair point that

[5] Similarly, with respect to the FTCA, the "burden of production of the policy considerations that might influence the challenged conduct" is "on the Government." *Ochran v. United States*, 117 F.3d 495, 504 n.4 (11th Cir. 1997); *see also Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992) ("[T]he government bears the ultimate burden of proving the applicability of an exception to the FTCA"); *Carlyle v. United States*, 674 F.2d 554 (6th Cir. 1982) (same); *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952) (same). Here, the United States' statement that the "FDIC believed the policy served the interests of receiverships," U.S. Br. 71, is obviously insufficient to meet this burden.

NOLs cannot be used twice. But only $15 million of Carteret's 1992 NOLs have ever been used. *See* Reply App. 00014. AmBase has not used any of the other NOLs. Thus, there was no excuse for the FDIC's failure to deduct the remaining $58 million in NOLs.[6]

### D. There Is No Excuse for the Other Errors in the FDIC's Tax Returns

As for the other errors identified in AmBase's opening brief, the United States repeats its unsupported refrain that there is "no evidence" of such errors. The facts regarding each of these issues are otherwise:

a. **Interest deduction.** The United States does not dispute that Carteret paid depositors interest of $3.7 million in 1995. Nor does the United States dispute that only $584,000 of interest was deducted from the 1995 return. Nor does the United States dispute that interest that is paid can be deducted. These concessions necessarily yield the conclusion that the FDIC neglected to deduct millions of dollars of interest that all parties agree was a legitimate deduction.

The United States resists this conclusion on two grounds. First, the United States notes that the interest deduction appears on statement 19 of the 1995 return. Although the United States complains that the statement "is not part of the record," U.S. Br. 84, the complete 1995 return is a part of the record, including a page bearing the label "statement 19." More importantly, the United States fails to offer any explanation—for there is

[6] Contrary to the United States' inexplicable assertion, Mr. Vordtriede testified that it would be prudent to examine whether there were any NOL carry-forwards available to shield the 1995 income. App. 00896 (Vordtriede Dep. 46). The exchange between counsel and Mr. Vordtriede illustrates that the FDIC recognized the obvious fact that NOLs should be carried forward to reduce taxable income. App. 00894-96 (Vordtriede Dep. 41-46).

none—as to how that statement could possibly justify the failure to deduct $3.7 million of interest that was actually paid to depositors.

Second, the United States suggests that this omission is harmless error. The United States hypothesizes that "[s]ince the FDIC's tax returns followed its book financial statements, the $3.7 million in additional interest expense was not accounted for in the receivership deficit either." U.S. Br. 87. This argument fails because the receivership deficit includes an "inception balance" reflecting the operating results of Carteret through March 10, 1995. The interest paid to depositors was paid out before the sale of the branches on that date. Thus, this interest expense is almost certainly reflected in the "inception balance" of negative $110 million which is itself part of the receivership deficit. *See, e.g.*, App. 01083.

b. **Supervisory Goodwill Deduction.** The United States does not dispute that the FDIC failed to deduct supervisory goodwill from the 1995 tax return. Nor does the United States dispute that supervisory goodwill can be deducted for federal income tax purposes. Rather, the United States notes that the RTC wrote off the supervisory goodwill in 1992. This observation is irrelevant because the 1992 Carteret return prepared by the RTC itself did not take a supervisory goodwill deduction. If it had, the resulting incremental net operating loss could have been carried forward to shield income in 1995. *See* Opening Br. 44. Thus, the FDIC's failure to take this valid deduction increased Carteret's taxable income by millions.

c. **Change in accounting method.** The United States does not deny that the FDIC's change in accounting method gave rise to $19 million in taxable income in 1995. The United States' only defense is to point to an internal FDIC e-mail from March of

2004. But that e-mail acknowledges that "C" corporations, such as Carteret, "are basically denied use of the cash method under Section 446" of the Internal Revenue Code. App. 10382 (Vordtriede Dep. Ex. 79). Given that the 1995 return itself describes the method of accounting as a departure from accrual accounting under GAAP, the return on its face does not comply with the Internal Revenue Code. *See* Opening Br. 45. In addition, as the e-mail itself acknowledges, even if such a change were permissible, the IRS would require the FDIC to seek permission for the change. The United States and the FDIC as receiver have acknowledged that permission was not sought with respect to Carteret, and there is no evidence that such permission was in any way granted.[7] The United States' assertion that the IRS would have permitted the change if asked is beside the point, because the IRS in fact was not asked. U.S. Br. 82. Under the regulations described above, this is a fatal defect for an accounting method change. *See* 26 C.F.R. § 1.446-1. Moreover, Section 448 required the accrual method in any event.

**E. Penalties Will Not Be Assessed.**

The United States contends that it is "pure speculation" whether the IRS will waive the assessment of penalties. But, as AmBase's opening brief demonstrated, the FDIC has consistently maintained that no penalties are due because it has the authority to defer payment of any taxes until funds are available to make payment. *See* Opening Br. 45-46. AmBase also demonstrated that the IRS agreed with the FDIC in the Ben Franklin

---

[7] The United States suggests that AmBase cannot simultaneously accept the validity of the $19 million adjustment in the receivership deficit and contest the inclusion of that adjustment as income. U.S. Br. 82 n.14. But the United States ignores the fact that in the absence of a change in method, the $19 million would not have been realized at that time. All the parties agree that there were ample net operating losses in subsequent years to shield such income. Thus, the improper inclusion of this $19 million in 1995 directly inflated the tax liability of Carteret.

case and waived all penalties. Opening Br. 47. Thus, there is no basis in fact or law to conclude that the IRS would be successful in imposing penalties upon the receivership, even assuming it would seek to do so. Indeed, the IRS handbook specifically states that "interest will not be asserted against agencies or instrumentalit[ies] of the United States." App. 10459.

**F. Interest Will Not Be Assessed.**

AmBase's opening brief articulated four independent reasons why no interest will be charged on the receivership's tax liability. Opening Br. 46-48. First, AmBase noted that the interest charges are entirely derivative of the underlying liability, which AmBase has demonstrated is zero. The United States does not dispute that the interest is derivative of the underlying liability. Second, the IRS handbook specifically states that "penalties and interest will not be asserted against agencies or instrumentalit[ies] of the United States." App. 10459. The United States has no answer to this dispositive point.

As for our third point that Congress's funding delays and imposition of a Minority Preference Program deprived the receivership of sufficient funds to pay the tax liability in 1995, the United States argues that, if AmBase is correct, there would have been even more taxable income due and owing to the government in earlier years. That may be true, but there would have been ample profits to pay all the taxes due and owing if the receivership had been operated consistent with the principles identified by Professor Calomiris. *See* Reply App. 00001a (Declaration of Charles W. Calomiris of July 14, 2006 ("Calomiris Decl.") ¶ 9) (showing a receivership surplus of $87 million).

Finally, as for the unfairness of charging interest on the tax liability, as demonstrated below, the United States has no answer to the proposition that any advances

to the Carteret receivership were made with interest-free funds in the form of Carteret's damage award. The United States offers no justification for reaping a windfall by receiving interest where it has borne no cost.

### G. Taxes Might Be Appropriate If the FDIC Were Reporting a Surplus

The United States claims that there is an inconsistency between AmBase's analysis of the surplus that should have been generated and its view of the taxes. AmBase will cheerfully stipulate that the financials of the receivership should bear a reasonable relationship to the tax returns. But this point cuts fatally against the United States, since it seeks to simultaneously defend a receivership deficit of $160 million and yet claims that there is a tax liability of more than $90 million generated by that same receivership. As noted above, the United States has offered no explanation how both propositions can be true.

As for the United States' claimed inconsistency, AmBase does not seek to have the Court reverse all the inaccuracies and overstatements in the receivership deficit so that AmBase would receive a surplus even apart from any contract damages. Rather, AmBase merely seeks to have the receivership deficit reduced to zero for purposes of the *Bailey* calculation. A receivership that breaks even surely cannot owe taxes.

## III. The FDIC's Estimates of Post-Insolvency Interest Should Be Rejected.

AmBase has shown that no amount of interest on the RTC loans should be included in the receivership deficit. *See* Opening Br. 50-54. It has also demonstrated that if interest on these loans is nonetheless included, it must be calculated using a floating rate tied to short-term Treasury bills as provided in 12 C.F.R. § 360.3(b), not the exorbitant rates used in the FDIC's retroactive calculations. *See* Opening Br. 54-67.

Finally, it has established that if the FDIC's flawed rates are permitted, the FDIC's calculations must be corrected to eliminate the effects of misallocations of payments from the sale of Carteret's assets as well as improper treatment of the deposit premiums obtained from the branch sales. *See* Opening Br. 67-71. As demonstrated below, the responses of the United States and the FDIC to these arguments are wholly unpersuasive.

### A. The United States should not be allowed to recover interest on the RTC loans from the damages otherwise payable to AmBase.

AmBase has demonstrated that any interest on the RTC loans should be excluded from the receivership deficit for two reasons. First, the RTC loans would have been unnecessary if Congress had provided funding for the RTC, or even if it had not subjected Carteret's resolution to the unconstitutional Minority Preference Program. Second, interest should not be deducted from the damages owed by the United States because those damages cannot be adjusted to reflect the time value of money owing to AmBase.

#### 1. The United States should not be allowed to recover interest because the necessity for the RTC loans is attributable to Congress.

As AmBase demonstrated in its opening brief, if Congress had not failed to fund the RTC for 21 months, there would have been no need for Carteret's receivership to borrow to fund the branch sales. The United States does not dispute that Congress denied funding to the RTC for the first 12 months of the receivership. Although Carteret had been slated to be resolved promptly in the RTC's Accelerated Resolution Program ("ARP"), the RTC acknowledged that this lack of funding delayed Carteret's resolution. Reply App. 00038 (Deposition of Anthony Saunders ("Saunders Dep.") Ex. 7) ("Due to lack of RTC funding for ARP, CSB was unable to be included in that program."). Nor

does the United States dispute that during this year Carteret lost hundreds of millions of dollars of deposits that could have been sold to an acquirer at a premium. Finally, it is undisputed that, if Professor Calomiris is correct in his opinion about the size of the premiums that would have been realized in December 1993 when Carteret should have been resolved, there would have been no need for the RTC loans—and thus no interest whatsoever.

Nevertheless, the United States claims that Carteret benefited from the delay resulting from the lack of funding. Specifically, the United States' expert has noted that deposit premiums on average were lower in 1992 and 1993 than at the time of Carteret's actual branch sales. The United States' discussion of specific deposit premiums is wide of the mark because Professor Calomiris demonstrated that absent the delay in funding, Carteret would have been resolved in a whole-bank transaction and the sale of the overall institution would have generated a premium well in excess of 10 percent. *See* Reply App. 00006a-10 (Calomiris Decl. ¶¶ 90-98). The RTC agreed that selling Carteret's assets and deposits together would "would represent an excellent P&A marketing element." Reply App. 00075 (Saunders Dep. Ex. 8). Moreover, even if deposit premiums in 1993 were relevant, Professor Calomiris explained during his deposition that deposit premiums increased dramatically in the critical fourth quarter of 1993, and thus it is impermissible to rely upon averages from 1992 and 1993. Reply App. 00012 (Deposition of Charles W. Calomiris 610). Significantly, the United States' expert agreed during deposition that market conditions had changed dramatically at the end of 1993. *See* Reply App. 00033 (Saunders Dep. 479) ("There is a spike up in fourth quarter of '93."). Moreover, as the United States' own data indicate, Carteret's branches

received better than average premiums, U.S. Br. 17, and thus reliance on any average metric is misleading. In short, the United States' reliance on averages from the incorrect time frame says nothing about the premiums that the RTC would have realized by including Carteret in the Accelerated Resolution Program and promptly resolving the thrift before hundreds of millions of dollars of deposits ran off.

In a final attempt to evade the harm resulting from the congressionally imposed delay, the United States distorts Professor Calomiris' position by suggesting that somehow there would have been a $400 million deficit if the institution had been sold in December of 1993. *See* U.S. Br. 36. The United States does not claim that this result would have obtained, and neither did Professor Calomiris. His report makes clear that there would have been no such deficit and explains the calculations cited by the United States. Reply App. 00004-06 (Calomiris Decl. ¶¶ 83-84). Given that Professor Calomiris's calculations are reasonable and indeed conservative, it necessarily follows that there would have been no loan and thus no interest but for Congress's decision to delay funding to the RTC.

Quite apart from this the delay in congressional funding, any need for the RTC loans still would have been averted but for Congress's enactment of the unconstitutional Minority Preference Program. Specifically, as AmBase has demonstrated, Carteret was required to take massive loans of some $1.18 billion from the RTC only because the Minority Preference Program precluded Carteret from selling its own assets prior to or in conjunction with the branch sales. The United States concedes that $686 million of Carteret's assets were "subject to the MPP." U.S. Br. 32. The United States never explains what it means for those assets to have been "subject" to the MPP, but the record

makes clear that those assets—and more—were subject to a freeze on their disposition. For example, in an August 23, 1993 memo, Jay Jupiter, the assistant director for resolutions, suggested that Carteret's loans be sold in connection with the branches, thereby "creating a unique franchise opportunity for acquirors." Reply App. 00075 (Saunders Dep. Ex. 8). But his superior responded: "This won't fly. There are too many initiatives associated with Carteret. There is a securitization effort but it may be sidelined because they are pulling loans to furnish on the minority acquisitions. Let's hold off." Reply App. 00075 (Saunders Dep. Ex. 8).

Likewise, a December 21, 1993 internal memo addresses the "asset freeze guidelines" and makes clear that the RTC has "responsibility for making sure that sufficient acceptable loan product is available and can be delivered for resolutions, as may be required to comply with minority branch sales and other resolution requirements." Reply App. 00076 (Saunders Dep. Ex. 11). And, as noted in AmBase's opening brief, the freeze continued up until the time of the branch sales, leading one RTC analyst to state: "[w]e're chomping at the bit waiting to sell securities of Carteret. Should they still remain **frozen**?" Reply App. 00078 (Saunders Dep. Ex. 12) (emphasis added). During depositions, the RTC's employees confirmed the plain meaning of these documents: "as long as a minority might want to exercise its option to buy performing assets, [the RTC] [wasn't] going to sell these assets." App. 00794 (Deposition of J. Paul Ramey, Jr. 152-53). The feigned ignorance of the United States regarding the asset freeze is further belied by its failure to offer any explanation of how the RTC would have fulfilled its obligations under the Minority Preference Program without such a freeze.

Obviously, if Carteret had been permitted to sell its loans prior to or in conjunction with the sale of its branches, the proceeds from the loans would have reduced the principal of the RTC loans dollar for dollar. Although the United States insinuates that the scope of the freeze was only about $700 million of assets, the contemporaneous documents demonstrate otherwise. Specifically, an RTC e-mail from September 1994, responding to the question whether Carteret's assets remained frozen posed above, stated, "We are still working with a minority whole bank bidder. We will need about $1.4 billion in loans." Reply App. 00079 (Saunders Dep. Ex. 13).[8] Because the book value of Carteret's assets was at that time approximately $1.4 billion, this email makes clear that essentially all of Carteret's assets were subject to the freeze.[9] In short, the only loan that would have been necessary but for the Minority Preference Program would have been to fund any shortfall resulting from the sale or transfer of assets. We now know that the assets of Carteret, even including losses in value resulting from the delay in resolution and sale of the assets, were at a minimum worth only $19 million less than the amount of the RTC loans. Reply App. 00094 (Liability Registry). And it would have been unnecessary to borrow even that amount of principal because, as demonstrated below, *see infra* Part IV.C, the premiums realized on the sale of Carteret's branches would have been $19.4 million higher absent the Minority Preference Program.

[8] The e-mail continued: "If Sandra has the loans and does not need the securities then we should be able to release the securities." Reply App. 00079 (Saunders Dep. Ex. 13). But there is no indication that the assets were released prior to the branch sales.

[9] In any event, even if the United States were correct that "only" $686 million of assets were subject to the freeze, those assets were readily marketable residential mortgages, which if sold in conjunction with the branch sales would have lowered the amount of the RTC loans from $1.18 billion to less than $500 million. Obviously, the interest would have been less than half what it is now, even assuming all of the FDIC's current methodologies were upheld.

**2. Interest should not be deducted from the damages otherwise payable to AmBase because those damages cannot be adjusted to reflect the time value of money.**

As AmBase's opening brief demonstrated, because prejudgment interest cannot be awarded on the damages owed by the United States for breach of contract, allowing the United States to offset those damages by charging interest on the RTC loans would reimburse the United States for a cost it did not bear and allow it to expropriate some or all of the damages that would otherwise be payable to AmBase. The United States responds that the law requires that interest be charged on the RTC loans, *see* U.S. Br. 54-55; that not charging interest on the RTC loans would contravene the policy of the statute barring the recovery of prejudgment interest from the United States, U.S. Br. 54; and that interest is necessary to compensate the United States for real costs it incurred in relationship to the RTC loans, because " 'every $1.00 borrowed to finance Carteret's loans added $1.00 (plus interest) to the national debt,' " U.S. Br. (quoting U.S. App. 12 (Declaration of Anthony Saunders ("Saunders Decl.") ¶ 27)). None of these responses has merit.

First, none of the authorities that the United States cites in support of its claim that the law requires that interest be paid on money lent to the receivership of an insolvent institution addresses a situation where either (1) the insolvency resulted from the United States' breach of contract for which the insolvent institution has a substantial but yet unpaid damages claim against the United States, or (2) the receivership would not have needed to borrow money to fund resolution but for Congress' funding or other legislative decisions. *See Golden Pac. Bancorp v. FDIC*, No. 98 Civ. 9281, 2002 U.S. Dist. LEXIS 24961 (S.D.N.Y. Dec. 24, 2002) (neither factor present); *In re First Nat'l Bank*, 523

N.W.2d 591 (Iowa 1994) (neither factor present; interest required by contract); *FDIC v. Citizens State Bank*, 130 F.2d 102 (8th Cir. 1942) (neither factor present); *Corbin v. Federal Reserve Bank*, 475 F. Supp. 1060 (S.D.N.Y. 1979) (neither factor present; interest required by contract). Both of these factors are of course present here, and each renders any payment of interest to the United States inappropriate.

Second, although 28 U.S.C. § 2516(a) sets forth a rule barring the payment of prejudgment interest by the United States in the absence of constitutional, statutory, or contractual provision for such interest, it does not establish some sort of penumbral policy against any result that " 'would have an effect very much like paying prejudgment interest,' " as the United States suggests. U.S. Br. 54 (quoting U.S. App. 12 (Saunders Decl. ¶ 27)). Furthermore, not allowing the United States to recover interest on the RTC loans would **not** have an effect anything like requiring it to pay prejudgment interest. The prohibition on prejudgment interest prevents damages owed by the United States from **increasing** to reflect the time-value of money, a prohibition that is especially significant when, as here, a substantial amount of time passes between the time the damages accrue and the time they are awarded. Thus, assuming no additional damages accrue, the prohibition has the effect of keeping the nominal amount of damages owed by the United States constant regardless of how long it takes for litigation to proceed to judgment. In this case, barring the United States from collecting interest on the RTC loans would not allow the amount of damages owed by the United States to increase with the passage of time to reflect the time value of money. Rather, the nominal amount of damages owed would remain constant over time, consistent with the prohibition of prejudgment interest. By contrast, allowing the United States to recover interest on the

RTC loans at the same time Carteret and AmBase are barred from collecting prejudgment interest would cause the amount of damages owed by the United States to **decrease** with the passage of time and perhaps ultimately to disappear altogether. Such a result is not supported by any conceivable policy or rationale that may stand behind the rule against prejudgment interest.

Finally, the assertion of the United States' expert, Professor Anthony Saunders, that "every $1.00 borrowed to finance Carteret's loans added $1.00 (plus interest) to the national debt," U.S. App. 12 (Saunders Decl. ¶27), does not establish that the United States bore any real cost relating to the RTC loans for which it should be reimbursed through the recovery of post-insolvency interest. Despite the position now advanced by the United States and the FDIC, when the RTC calculated and compared the projected costs of resolution and payout for Carteret in late 1994, it did not include a financing-cost component in these contemporaneous calculations, *see* Reply App. 00083-93 (Cost of Resolution (projected) to Anticipated Thrift Closing), as Professor Saunders was forced to acknowledge during his deposition, *see* Reply App. 00024 (Saunders Dep. 368).

Similarly, in calculating the total cost of the savings and loan crisis, FDIC economists Timothy Curry and Lynn Shibut have expressly excluded any financing costs. *See* Reply App. 00099 (Timothy Curry & Lynn Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC BANKING REV. 26, 30 (2000)). As these economists explained, "including financing costs when tallying the costs of the thrift crisis is methodologically incorrect. It is invalid because, in present-value terms, the amount borrowed is equal to the sum of the interest charges plus debt repayment." Reply App. 00099. Thus, "[a]dding the sum of interest payments to the amount borrowed

would overstate the true economic cost of resolving the [thrift] crisis." Reply App. 00099; *see also* Reply App. 00099 (explaining that "the federal government does not include interest charges when costing specific programs, such as weapons systems or school lunches").

The GAO has likewise estimated the total cost of the savings and loan crisis using figures that are quite similar to those of Curry and Shibut and that apparently do not include financing costs. *See, e.g.*, Reply App. 00108 (U.S. GEN. ACCOUNTING OFFICE, FINANCIAL AUDIT: FEDERAL DEPOSIT INSURANCE CORPORATION'S 1997 AND 1996 FINANCIAL STATEMENTS 11 (1998)). In fact, Professor Saunders himself has used similar numbers, both in his textbook, *see* Reply App. 00110 (ANTHONY SAUNDERS & MARCIA MILLON CORNETT, FINANCIAL MARKETS AND INSTITUTIONS: AN INTRODUCTION TO THE RISK MANAGEMENT APPROACH 418 (2007); *see also* Reply App. 00021, 00022 (Saunders Dep. 355-56, 358), and even in his expert declaration for this case, *see* U.S. App. 11 (Saunders Decl. ¶ 24).

Although Professor Saunders now says that he disagrees with these estimates, he expressly declined to say that they were wrong. *See* Reply App. 00023 (Saunders Dep. 362) ("No, I'm not saying they're wrong, I disagree, I'm taking their cost that they report and you're asking me should they add in the financing costs, in my opinion there is a financing cost, that's all I'm saying."); *see also* Reply App. 00022 (Saunders Dep. 358-59) (similar).

Furthermore, the scope of Professor Saunders' disagreement with these estimates is small. During his deposition, he stated that in determining the costs borne by the government, the cost of any borrowing should be discounted back to "[p]resent value"

using a discount rate equivalent to "[w]hatever the cost of borrowing was for the government." Reply App. 00023 (Saunders Dep. 362-63). Professor Saunders argued that "governments have a social discount rate, not a private discount rate," Reply App. 00023 (Saunders Dep. 363), and that in lending money to the receivership, the United States suffered "an opportunity cost," namely, "writing a dollar to national debt" and "taking money away from other projects," Reply App. 00022 (Saunders Dep. 359).

Professor Saunders did not identify any project or spending that the United States actually forwent because it lent money to the Carteret receivership, however, and given the relatively small size of the RTC loans when compared to that of the federal budget, as well as the general lack of fiscal restraint in Congress, it is difficult to imagine with a straight face that the United States in fact suffered any opportunity cost such as that hypothesized by the Professor.[10] Furthermore, although Professor Saunders asserted that it would be possible to calculate "the social opportunity cost of capital," Reply App. 00023 (Saunders Dep. 364), he did not in fact attempt to do so, either in his declaration or in his deposition testimony. In all events, even assuming such a cost—which Professor Saunders said would "depen[d] on various features of the economy, . . . on lots of factors that come in besides the budget deficit and constraints on the budget, other programs you want to do," Reply App. 00023 (Saunders Dep. 364)—Professor Saunders did not suggest, and there is no reason to suppose, that it would bear any relationship whatsoever

[10] Professor Saunders suggested that even if the United States did not in fact forgo any spending, the incremental increase in the national debt may have increased inflation or interest rates. *See* Reply App. 00022, 00023 (Saunders Dep. 360, 365). Once again, this hypothetical effect seems highly implausible given the miniscule size of the RTC loans when compared to the national debt. *See* Reply App. 00024 (Saunders Dep. 366) (acknowledging that the national debt amounts to $5 trillion).

to the amount of interest the United States seeks to recover and attempts to justify as compensation for this "cost."

The United States cannot have it both ways: advocating that capital is free in damages cases, as it has consistently done, and now arguing that there is a cost of capital to the receivership. We do not ask the Court to endorse the flawed *ex ante* cost of capital analysis embraced by the RTC, FDIC, GAO, and the United States' own expert. Rather, as Professor Calomiris demonstrated, on an *ex post* basis, there was no interest cost to the United States since it has been able to fund its loan with Carteret's damages award, which bears no interest. Indeed, although Carteret has repaid all but $18.8 million of the principal on the RTC loans, the United States has not yet paid any portion of the damages resulting from its breach of contract. Thus, even if it is appropriate to consider social opportunity costs (and benefits), it is clear that over the course of the receivership the United States has **not** incurred a social opportunity cost, as urged by the United States and its expert, but rather has received a net social opportunity **benefit**. Indeed, the RTC loans should be viewed as being financed not with federal borrowing but rather with Carteret's own money. At least under these circumstances, allowing the United States to recover interest as compensation for "the social opportunity cost of capital" is plainly unwarranted. *See Doty v. United States*, 109 F.3d 746, 748-49 (Fed. Cir. 1997) (holding that "the interest the government charged [plaintiffs] for use of their own money should be returned"); *Cf. Local Oklahoma Bank, N.A. v. United States*, 452 F.3d 1371, 1378 (Fed. Cir. 2006) ("Where, as here, one party (i.e., the government) has a liquidated claim subject to prejudgment interest and the other party (i.e., [the plaintiff]) has a directly related unliquidated set-off not subject to prejudgment interest, prejudgment interest is

available on the net difference between the government's claim and [the plaintiff's] set-off.").

**B. If the United States is allowed to recover interest, it must be calculated pursuant to 12 C.F.R. §360.3(b).**

AmBase has shown that if the United States is allowed to recover post-insolvency interest on the RTC loans, that interest should be calculated, consistent with the FDIC's original methodology, using a floating rate tied to short-term Treasury bills as provided in 12 C.F.R. § 360.3(b). As AmBase has demonstrated, the exorbitant fixed rates used in the FDIC's retroactive interest calculations are contrary to law, upset settled expectations, and lack economic justification.

**1. The interest rates used in the FDIC's retroactive interest calculations are contrary to law.**

AmBase's opening brief established that any post-insolvency interest must be calculated pursuant to 12 C.F.R. § 360.3(b) for two independent reasons: first, the National Depositor Preference of 1993 ("NDP") took effect after a receiver was appointed for Carteret and by its terms therefore does not apply to the Carteret receivership; and second, even if it did apply, the NDP does not address the calculation of post-insolvency interest and accordingly cannot reasonably be understood to repeal the specific guidance on this issue set forth in section 360.3(b). *See* Opening Br. 56-60.

Remarkably, neither the United States nor the FDIC contests AmBase's demonstration that Carteret is not subject to the NDP. True, both the United States and the FDIC dogmatically assert that the Carteret receivership was established after the NDP's effective date. *See* U.S. Br. 58; FDIC Br. 20; *but see* U.S. App. 42M (Saunders Decl. ¶ 102) (recognizing that Carteret went through receivership in December 1992).

AmBase demonstrated, however, that (1) the NDP's application turns on whether a receiver was appointed for a seized thrift before or after August 10, 1993 (the NDP's effective date); (2) a receiver was appointed for Carteret on December 4, 1992; (3) a conservator was appointed the same day for Carteret Federal—the artificial de novo institution to which Carteret's assets and most of its liabilities were transferred; and (4) for purposes of the FDIC Act—of which the NDP is part—**"[t]he term 'receiver' includes a . . . conservator."** 12 U.S.C. § 1813(j) (emphasis added). Neither the United States nor the FDIC offers any response to this argument, which conclusively establishes that Carteret is a pre-NDP receivership. Nor does either dispute that any post-insolvency interest for pre-NDP receiverships should be calculated using the methodology set forth in section 360.3(b). It follows without more that even if the United States is allowed to recover post-insolvency interest, the FDIC's retroactive interest calculations are contrary to law and must be corrected.

The United States and the FDIC do respond to AmBase's demonstration that any post-insolvency interest should be calculated pursuant to section 360.3(b) even if Carteret is subject to the NDP. In particular, they argue that this regulation was superseded by the NDP; that 12 C.F.R. § 360.3(f) and an FDIC memorandum from June, 1995—which the FDIC alternatively asserts are subject to judicial deference or outside this Court's jurisdiction to review—confirm that 12 C.F.R. § 360.3(b) does not apply to post-NDP receiverships; and that legal authority supports the exorbitant fixed rates the FDIC has used to determine post-insolvency interest. *See* U.S. Br. 55-60; FDIC Br. 22-24. As explained below, these arguments are unavailing.

The NDP plainly does not supersede section 360.3(b). Neither the United States nor the FDIC disputes AmBase's showing that the NDP nowhere even mentions post-insolvency interest, let alone the methodology pursuant to which it should be calculated. Accordingly, it cannot be understood to expressly repeal section 360.3(b). Nor does it repeal that regulation by implication. True, the NDP does dictate the order of priority in which proceeds from the resolution of failed financial institutions should be distributed to satisfy claims and liabilities and, where it applies, thus supplants the previous priority schedule established by 12 C.F.R. § 360.3**(a)**. There is no reason, however, to infer from this that the NDP also supplants the methodology for calculating post-insolvency interest set forth in section 360.3**(b)**. This methodology is readily severable from section 360.3(a)'s distribution schedule and nothing in the NDP is inconsistent with that methodology. For these reasons, and given that the NDP says nothing whatsoever about post-insolvency interest, this statute cannot reasonably be understood to repeal section 360.3(b) by implication. *See Exxon Corp. v. United States*, 40 Fed. Cl. 73, 85 (1998) (holding that statute did not implicitly repeal earlier regulation and explaining that for implicit repeal "there must be a positive repugnancy between the provisions of the new laws and those of the old; and even then the old law is repealed by implication **only**, *pro tanto*, **to the extent of the repugnancy**") (quotation marks omitted) (emphasis added); *see also Traynor v. Turnage*, 485 U.S. 535, 545-47 (1988).

Furthermore, neither section 360.3(f) nor the June 1995 memorandum establishes that section 360.3(b) does not apply to post-NDP receiverships established by the RTC. The language of section 360.3(f), especially its express citation of the NDP, indicates that it was intended simply to implement the statutory text, not to create substantive law going

beyond that text. Accordingly, this regulation should be understood to confirm that the NDP supplants those provisions of section 360.3 that are inconsistent with the statute, not to repeal provisions of 360.3 that would not otherwise be affected by the NDP. Indeed, the explanatory material provided with the final rule in the Federal Register makes clear that section 360.3(f) was intended only to confirm that—while "the **receivership priorities** for failed savings associations" set forth in "[t]he current § 360.3 . . . will continue to apply to such savings associations for which a receiver was appointed on or prior to the effective date of the statutory amendment, August 10, 1993"—nevertheless, "[a]s provided for in the [NDP,] all FDIC-insured institutions for which a receiver is appointed after the date of enactment of the statute will be subject to the **priorities** provided therein." 60 Fed. Reg. 35,487, 35,488 (1995) (emphases added).

As for the June 1995 memorandum, neither the United States nor the FDIC has offered any response to AmBase's demonstration that this memorandum—which was written several months before the FDIC assumed responsibility for RTC receiverships such as Carteret—reflected only FDIC practice for FDIC receiverships, not RTC practice for RTC receiverships and, prior to the FDIC's abrupt about-face at the end of 1999, was never understood to apply to receiverships established by the RTC even after responsibility for those receiverships was transferred to the FDIC. *See* Opening Br. 56 n.17, 61-62. Furthermore, any suggestion that the June 1995 memorandum was intended to bar reliance on section 360.3(b) in calculating post-insolvency interest for RTC loans to receiverships (such as the loans to Carteret) made long before this memorandum was even written is especially implausible: even had it wished to do so, the FDIC could not by informal, internal memorandum have repealed a formally promulgated regulation, let

alone have done so retroactively. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding retroactive agency action invalid absent grant of retroactive rulemaking authority "conveyed by Congress in express terms"); *cf.* U.S. App. 95 (Saunders Decl., Ex. 4) (FDIC interest calculation method timeline).

Thus, contrary to the FDIC's assertion, AmBase is not challenging the validity of 12 C.F.R. § 360.3(f) or the June 1995 memorandum, neither of which establishes that post-insolvency interest on the RTC loans should be calculated using the federal judgment rate rather than section 360.3(b).[11] Rather, it is challenging the FDIC's abrupt decision in late 1999 to change its methodology for calculating post-insolvency interest on the RTC loans.

As AmBase has explained, this ad hoc, poorly reasoned decision—which retroactively adopted a regime for calculating post-insolvency interest that differed sharply from prior and subsequent regulations governing such calculations—contravened § 360.3(b), altered prior agency practice, upset settled expectations, and defied economic logic. Such a decision is plainly entitled to no deference whatsoever. *See, e.g., Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (holding that informal agency interpretations are not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that the weight to be given agency interpretation "in a particular case will depend upon the thoroughness evident in its consideration, the

[11] Nor is AmBase mounting "an attack on the prospective nature of [12 C.F.R. §] 360.7, which precludes the application of the interest rate contained therein to receiverships established [before] June 13, 2002." FDIC Br. 22. On the contrary, AmBase submits that section 360.7 illustrates the proper way for changing the methodology for calculating post-insolvency interest—*i.e.*, prospectively.

validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"); *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994) (explaining that agency interpretations "are subject to *Georgetown Hospital*'s ban on retroactivity").[12]

Indeed, despite its current litigating position, the FDIC previously recognized that a decision to apply the federal judgment rate to determine post-insolvency interest absent regulatory authorization "would be subject to court challenge and ***de novo* judicial *review*.**" App. 20060 (emphasis added). And, contrary to the FDIC's spurious suggestion, this Court plainly has jurisdiction to consider the validity of the methodology used to calculate post-insolvency interest as an incident to its Tucker Act jurisdiction over AmBase's breach-of-contract claim. *See, e.g., Martinez v. United States*, 333 F.3d 1295, 1313-14 (Fed. Cir. 2003) (recognizing that "in monetary actions brought under the Tucker Act, the Court of Claims and the Court of Federal Claims have often reviewed [agency action]" to determine whether it "is arbitrary, capricious, unsupported by substantial evidence, or contrary to law"); *Hall v. United States*, 69 Fed. Cl. 51, 56 (2005) ("[I]f the court's jurisdiction over Counts I, II, and IV solely was dependant on the APA, those counts would have to be dismissed. Since Counts I, II, and IV are not so dependent and the Tucker Act provides the court with jurisdiction over each of these claims in so far

---

[12] *Paralyzed Veterans of America v. Secretary of Veterans Affairs*, 345 F.3d 1334 (Fed. Cir. 2003), is not to the contrary. That decision, which addressed a challenge to a formal regulation, held that an agency may change its position as long as it provides adequate reasons for doing so. *Id*. at 1352. *Paralyzed Veterans* did not hold or suggest that an agency may change its position through a poorly reasoned, ad hoc informal "decision," let alone hold or suggest that such a decision would be entitled to any degree of judicial deference.

as they allege, individually and collectively, a breach of the Settlement Agreement, the Government's motion to dismiss on APA grounds is denied.").[13]

The United States' argument that legal authority supports the exorbitant fixed rates used in the FDIC's retroactive interest calculations also fails. In all but one of the cases that the United States cites, the rate of interest approved by the court was established by contract or controlling statute. *See Corbin*, 475 F. Supp. at 1062-64 (approving interest rates established by "arm's length" contract); *Mid-Jersey Nat'l Bank v. Fidelity-Mortgage Investors*, 518 F.2d 640, 645 (3d Cir. 1975) (approving prejudgment interest at rate set by contract); *Walter E. Heller & Co. v. Cox*, 343 F. Supp. 519, 527 (S.D.N.Y. 1972) (interest rate set by contract); *In re Hartsdale Assocs.*, 452 F. Supp. 67, 68 (S.D.N.Y. 1978) (determining which of two statutory rates of interest applied). Obviously none of these authorities has any relevance here. Neither the United States nor the FDIC has identified any contractual provision requiring or even contemplating that interest on the RTC loans be paid at the high fixed rates used in the FDIC's current calculations. Indeed, as demonstrated in AmBase's opening brief and discussed more fully below, the parties' expectations were otherwise. Nor does any statute require or support these rates: neither the NDP nor the federal judgment statute says anything at all about how interest should be calculated for the RTC loans, *cf. In re Hartsdale Associates*, 452 F. Supp. at 68 (rejecting application of state statute governing interest payable on

---

[13] The United States' suggestion that *Golden Pacific Bancorp v. FDIC*, 1997 U.S. Dist. LEXIS 15537 (S.D.N.Y. Oct. 7, 1997), bars review of the FDIC's methodology "because the FDIC merely applied a pre-existing policy to the calculation of [post-insolvency interest] for the Carteret loans," U.S. Br. 62-63, is equally spurious. As discussed above, *see supra* note 4, the United States plainly misreads *Golden Pacific Bancorp*. Furthermore, as AmBase has demonstrated, the FDIC's new methodology represents a retroactive alteration, not an application, of previously existing policy.

judgments to determine interest due on a defaulted loan and noting "the distinction, critical to this case, of judgments on one hand and loans or forbearances on the other"), and indeed a controlling regulation (section 360.3(b)) requires that any interest on these loans be calculated using a floating, short-term interest rate.

The United States' remaining authority held that post-insolvency interest that had been paid at an effective rate of 4.3% was not excessive. *Golden Pacific Bancorp.*, 2002 U.S. Dist. LEXIS 24961, at *23. This rate was significantly lower than the federal judgment rate, well below market rates, and "well within the FDIC's cost of funds." *Id.*; *see also id.* at *23 n.13 (expressing preference for rate reflecting "a party's actual cost of funds over fixed state statutory rates"). Furthermore, on appeal the court noted that the effective rate of interest actually paid was only 0.3 percent higher than the rate the plaintiff argued should have applied and determined that it was unable to evaluate which rate was proper because the difference between these rates "would not be large enough to confer standing upon [plaintiff] because the outstanding tax claim, owed to the IRS, would offset any potential recovery by [plaintiff]." *Golden Pacific Bancorp v. FDIC*, 375 F.3d 196, 204 (2d Cir. 2004). The court's approval of the modest rate of interest paid in *Golden Pacific Bancorp* plainly provides no support for the exorbitant rates of interest that the FDIC has used to calculate post-insolvency interest here. *Compare Corbin*, 475 F. Supp. at 1070 (approving contractual interest rate that "afforded a yield below the relevant market rates . . . and the legal lending rate"), *with In re First Nat'l Bank*, 523 N.W.2d at 596 (rejecting high fixed rate of interest on an FDIC loan that was "based on a formula devised by the FDIC that averaged the treasury bill rate for the three years preceding the bank's default" because it bore "no relationship to the funds

expended here, or to the value of funds invested over the eight-year period of the receivership"). In short, neither the United States nor the FDIC has provided a persuasive legal justification for calculating interest on the RTC loans using the high fixed rates contemplated by the FDIC's retroactive methodology as opposed to a floating, short-term rate as required by section 360.3(b).

**2. The FDIC's retroactive interest calculations upset reasonable, well-settled expectations.**

As AmBase's opening brief demonstrated, the FDIC's retroactive decision to calculate interest on the RTC loans also upset reasonable and well-settled expectations by departing sharply from established FDIC practice with respect to former RTC receiverships in general and the government's course of dealing with the Carteret receivership in particular. *See* Opening Br. 60-63; *cf*. Reply App. 00031 (Saunders Dep. 438-39) (acknowledging the importance of the receivership knowing "the terms of the cost of funds prospectively"). Citing the June 1995 memorandum discussed above and a 1996 Memorandum proposing the promulgation of a regulation "establish[ing] the Federal Judgment Rate as the post-insolvency interest rate for all FDIC administered receiverships," App. 20058, the United States argues principally that the FDIC had a clear, longstanding policy of calculating post-insolvency interest using the federal judgment rate and that pre-1999 calculations of post-insolvency interest for Carteret's RTC loans represented nothing more than an erroneous departure from this policy. *See* U.S. Br. 59-60. The United States is mistaken.

As shown above, the June 1995 memorandum established FDIC policy for FDIC receiverships, not RTC policy for RTC receiverships. And the proposal contained in the 1996 memorandum was apparently rejected—the FDIC never promulgated a regulation

establishing that post-insolvency interest should be calculated using the federal judgment rate. Not only do the documents cited by the United States thus fail to establish that the FDIC's pre-1999 practice was to calculate post-insolvency interest for former RTC receiverships using the federal judgment rate, AmBase has cited numerous internal FDIC documents postdating the documents cited by the United States, as well as deposition testimony from the FDIC's designated witness for interest issues, that establish that pre-1999 FDIC practice for former RTC receiverships was in fact to apply the methodology set forth in section 360.3(b). *See* Opening Br. 61-62. The United States offers no response to this evidence, and its expert witness, when confronted by this evidence and forced to acknowledge that "the practice of the FDIC even in 1997 was to continue to use the short-term floating rate," responded only that this practice was "incorrect[]." Reply App. 00032 (Saunders Dep. 443).

Nor does the United States offer any meaningful response to AmBase's demonstration that the FDIC's retroactive interest calculations were contrary to the specific course of dealings between Carteret and the government lenders.[14] Although the United States argues that the rate of interest charged on the 1992 RTC advances to the receivership provides no guidance regarding the appropriate rate of interest on the 1994-95 RTC loans because the 1992 advances "were priced to subsidize the resolution," U.S. Br. 56, its own expert witness acknowledged that he could identify no reason why a floating, short-term rate should apply to the 1992 advances but a fixed, long-term rate

[14] Indeed, Professor Saunders' declaration suggests that the mutual understanding between the government and Carteret that any interest owed to government lenders on Carteret's liabilities would be charged at floating, short-term rates predated Carteret's seizure. *See* U.S. App. 22-23 (Saunders Decl. ¶¶ 47-48) (noting that in 1990 the Federal Home Loan Bank lent funds to Carteret at "a variable rate" tied to "three-month and six-month LIBOR rates").

should apply to the 1994-95 loans. *See* Reply App. 00028 (Saunders Dep. 412-13). Furthermore, as discussed more fully below, *see infra* Part III.C, the accounting treatment of the paydown of the principal on the three RTC loans and of the deposit premiums from the branch sales confirms the mutual understanding of all involved that any post-insolvency interest on the RTC loans would be calculated using a floating, short-term rate as required by section 360.3(b).

**3. The rates used in the FDIC's retroactive interest calculations have no economic justification.**

AmBase also demonstrated that the interest rates used in the FDIC's current calculations of the receivership are "historically excessive," App. 00022-23 (Calomiris Report ¶ 39), and lack any economic rationale. *See* Opening Br. 64-67. Although the United States argues that the high fixed rates used in the FDIC's current calculations are justified (and perhaps even generous) in light of the risk and potential long-term nature of the RTC loans, its expert acknowledged, during his deposition, that any borrowings by the United States would have been obtained at a risk-free rate, and that he could point to no other instance "where the government has borrowed money at a risk-free rate and then given it to an agency and charged the agency a risk-adjusted rate." Reply App. 00027 (Saunders Dep. 402-03). Perhaps more importantly, the United States has no answer to the fact that when actually promulgating regulations, as opposed to crafting litigation positions, the government has consistently chosen to charge post-insolvency interest at a floating, short-term rate. *See* 12 C.F.R. § 360.7; 12 C.F.R. § 360.3(b).

Indeed, in promulgating its most recent regulation in this area, the FDIC explicitly rejected, on economic grounds, the specific methodology the United States and the FDIC attempt to defend here in favor of a floating rate tied to the three-month Treasury Bill.

*See* 66 Fed. Reg. 65144, 65145-46 (2001). Most significantly, the FDIC recognized that even using simple rather than compound interest calculations, such a floating, short-term rate would "provide a reasonable amount of interest to compensate receivership creditors for the time value of money." Fed. Reg. at 65,146.[15]

The United States attempts to distinguish the economic rationale offered for the methodology reflected in section 360.7 on the ground that "because of the prompt corrective action provisions of the Federal Deposit Insurance Corporation Improvement Act, 12 U.S.C. § 1831o(a), (c) ("FDICIA"), it is reasonable to expect that post-2002 receiverships will be of shorter duration on average than resolutions in the 1980s and early 1990s." U.S. Br. 66-67. This distinction is transparently thin. The statutory provisions the United States cites were enacted in 1991, *see* Pub. L. No. 102-242, § 131, 105 Stat. 2236, 2253-55 (1991)—long before the RTC loans were issued and even before Carteret was seized. Indeed, at the time these provisions were enacted—and for most if not all of the "resolutions in the 1980s and the early 1990s" which the United States seeks to distinguish—post-insolvency interest was indisputably calculated pursuant to section 360.3(b) using a methodology quite similar to that adopted by section 360.7.

In short, the considered judgments reflected in the government's formal regulatory policy in this area belie the economic justifications proffered by the United States' advocates in this case. This Court should accordingly treat these proffered justifications as what they truly are—a post hoc attempt to rationalize what was at best a

[15] Although the United States also argues that a fixed interest rate was economically justified because it provided the receivership a "hedg[e] against rising interest rates," U.S. Br. 65-66, in promulgating section 360.7, the FDIC expressly rejected a fixed rate in favor of a floating rate in order "to mitigate interest rate risk due to changes in economic conditions during the life of the receivership." 66 Fed. Reg. at 65,145-46.

poorly reasoned, ad hoc decision, made years after the RTC loans were issued, that increased the receivership deficit by more than $60 million—and what was at worst a transparent attempt to transfer that same amount from Carteret's owner to the Government's own pocket—with little more than a cursory email and the stroke of a pen.

### C. If the FDIC's interest rates are used, its calculations must be corrected to eliminate other flaws.

As AmBase has explained, the FDIC allocated payments from the proceeds on the sale of Carteret's assets on a pro-rata basis to pay down the principal on each of the three RTC loans that funded the branch sales. *See* Opening Br. 67-68. In addition, although the three branch sales were funded by RTC wire transfers in the amount of the deposit liabilities less the deposit premiums (and certain assets transferred from Carteret to the acquiring thrifts), the receivership was treated as having borrowed principal equal to the entire amount of the transferred deposit liabilities and the premium was treated as a credit to an escrow account where it was held for some time before being credited to the receivership as a dividend. *See* Opening Br. 69-70.

Neither accounting practice created any significant problem under the FDIC's original methodology for calculating interest on the RTC loans. Because the interest rate for each loan was adjusted monthly according to the formula set forth in section 360.3(b), at any given time the interest rate for all three loans was the same and it accordingly made little difference how payments were allocated among the loans. Similarly, the rate of interest paid on the escrow balance was quite similar to the floating, short-term rate mandated by section 360.3(b), so the artificial inflation of the principal of the RTC loans and the delay in crediting the paper premium to the receivership had only a marginal economic effect.

By contrast, AmBase has demonstrated that under the FDIC's retroactive interest calculations each of these accounting practices substantially inflated the receivership deficit without any economic justification. *See* Opening Br. 67-71. Accordingly, it seems very unlikely that the pro-rata paydown and the artificial treatment of the deposit premium would have gone without protest by a receivership acting in accordance with its fiduciary obligations if the concerned parties had understood that post-insolvency interest would be calculated at the exorbitant rates now urged by the United States and the FDIC. Indeed, the contemporaneous toleration of these accounting practices strongly confirms the settled expectations of all concerned that any post-insolvency interest would be calculated using a floating, short-term rate as required by section 360.3(b). If the Court nevertheless permits the FDIC to calculate post-insolvency interest using its retroactive methodology that ignores these settled expectations, it should at a minimum correct the FDIC's interest calculations to eliminate the effects of these unjustified accounting practices.

**1. The FDIC's interest calculations misallocate payments from the sale of Carteret's assets.**

AmBase has demonstrated that, given FDIC accrual methodology under which no further interest accrues once the principal on a loan is paid off, the pro rata paydown of the RTC loans increased the interest owed on these loans by $51.1 million under the FDIC's retroactive interest-rate methodology. *See* Opening Br. 69. AmBase further demonstrated that there was no economic justification for a pro rata paydown of the debt. *See* Opening Br. 68.

Relying on its expert witness, the United States attempts to justify the pro-rata paydown of the three loans as " 'normal practice in banking.' " U.S. Br. 67 (quoting U.S.

App. 20 (Saunders Decl. ¶43)). As Professor Calomiris explained, however, although such a practice may make sense where loans of equal priority are owed to **different creditors**, it makes no sense at all when the loans are not only owed to the same creditor—the United States—but are paid into the same government fund. Professor Saunders does not even attempt to provide a justification for applying so-called "normal practice" in this context, where it serves no apparent purpose other than to inflate the receivership deficit.

The United States also argues that "interest did not discontinue accruing upon the repayment of principal" and that AmBase has provided "no evidence of any savings" that would have resulted from paying down the highest-cost debt first if interest continued to accrue on unpaid interest after the principal had been paid in full. U.S. Br. 67. AmBase and Professor Calomiris have presented evidence, however—including internal FDIC documents and the deposition testimony of the FDIC's designated witness for interest issues—that plainly belies the United States' post-hoc characterization of FDIC accrual methodology. *See* App. 20120 (Post Insolvency Interest Procedures Analysis); App. 00382 (Deposition of Wayne S. Green 456-57); *see also* Reply App. 00002 (Calomiris Decl. ¶ 45 n.38) (collecting sources). The United States does not even address this clear evidence, and the authority it invokes in support of its new-found litigating position is plainly inapposite.[16] And even if the United States' description of the FDIC's accrual

[16] Even if it supported the United States' litigating position, 12 C.F.R. § 360.7 applies only to "FDIC-administered receiverships established after June 13, 2002." § 360.7(a). In all events, the United States' citation of this regulation is ironic, for this regulation's prescription of simple rather than compound interest, *see* § 360.7(c)(4), is plainly inconsistent with the United States' assertion that interest continues to accrue on unpaid interest after the principal is paid in full. *See also* 66 Fed. Reg. at 65,146 ("Finally, the proposed rule [§ 360.7] provides that post-insolvency interest distributions

methodology were correct, it is simply mistaken that "there is no evidence" that "any savings" would have resulted from the payment of the highest-cost debt first. Indeed, AmBase specifically presented evidence that even if interest had continued to accrue on each RTC loan after the principal was paid in full, the unjustifiable pro-rata paydown still would have inflated the receivership deficit by $13.5 million. *See* Opening Br. 69 (citing App. 00026-27 (Corrected Declaration of Charles Calomiris (dated May 23, 2006) ¶ 45)).

### 2. The FDIC's interest calculations improperly treat the deposit premiums from the branch sales.

AmBase demonstrated that when post-insolvency interest on the RTC loans is calculated using the FDIC's retroactive methodology, the accounting treatment of the deposit premiums received from the branch sales increases the amount of interest owed by $1 million. *See* Opening Br. 70-71. AmBase also established that this accounting treatment lacks any economic justification. *See* Opening Br. 71.

Neither the United States nor its expert has offered any defense of the artificial accounting which treated the principal of the RTC loans as the entire amount of the deposit liabilities assumed by the acquiring institutions rather than the amount that the RTC actually paid these institutions to accept the deposits. Indeed, during his deposition, Professor Saunders admitted that "the right number for the principal balance of the [RTC] loan should be the amount of cash that was in fact borrowed [from] the RTC by the receiver to fund the branch sales." Reply App. 00025 (Saunders Dep. 388). Absent this

---

would be calculated using a simple interest method, rather than a compound interest method."). And while *National Bank of the Commonwealth v. Mechanics' Nat'l Bank* recognized that **pre**-insolvency interest was properly considered as part of a creditor's claim, *see* 94 U.S. 437, 439-40 (1877), it did not address the proper accrual of **post**-insolvency interest, let alone prescribe a rule contrary to the FDIC's accrual methodology.

unjustified accounting methodology, the deposit premiums would never have been credited to an escrow account or included in the principal of the RTC loans.

Nor has the United States or its expert provided a satisfactory justification for charging the receivership a higher interest rate on the RTC loans than it was paid on the deposit premiums held in the escrow account. Citing Professor Saunders, the United States argues only that it was justified in charging “a higher interest rate on the loans to Carteret than the receiver received on the loans in the escrow accounts” because “the escrow accounts were not subject to the general claims of FDIC creditors, whereas the loans to the receiver were.” U.S. Br. 67). Setting the rate of interest charged on the RTC loans at a rate higher than was paid on the escrow account, however, “intentionally sets up a guaranteed negative spread . . . a clearly illogical proposition and a strategy which no financial intermediary could survive.” U.S. App. 49 (Saunders Decl. ¶ 115).

Furthermore, the United States’ argument in no way justifies the delay in crediting the receivership for the deposit premiums from the branch sales. Nor could Professor Saunders offer any meaningful justification for this delay during his deposition. Indeed he admitted that he could think of no justification for this delay other than “possible legal concerns” and the receivership’s possible need to maintain “liquidity.” Reply App. 00026 (Saunders Dep. 399-400). He did not, however, identify any legal concerns that might have been raised by promptly crediting the indebted receivership for the deposit premiums earned from its branch sales, and obviously there were no such concerns. And the suggestion that the delay may have helped preserve “liquidity” is plainly absurd: the deposit premium credited to the escrow account did not represent funds actually received from the acquiring institutions, but was simply a phantom product

of dubious accounting that represented the difference between the amount of money actually wired by the RTC to the acquiring institutions, on the one hand, and the amount of the acquired deposits—which was treated as the amount of money lent to the receivership to fund the branch sales—on the other hand.

## IV. The Unconstitutional Minority Preference Program Substantially Inflated the Receivership Deficit.

As AmBase has demonstrated, *see* Opening Br. 74-102, Congress's enactment of the unconstitutional Minority Preference Program inflated the receivership deficit by holding back Carteret's assets so that they could be made available to minority acquirers of other thrifts—thereby making it necessary for Carteret to borrow money to fund the branch sales—and by imposing minority preferences on the bidding process that significantly decreased the deposit premiums received from those sales. The United States does not even attempt to contest AmBase's demonstration that the MPP violated the equal protection component of the Due Process Clause of the Fifth Amendment.[17] Rather, it argues that this Court lacks subject matter jurisdiction to consider AmBase's constitutional objection to the MPP, that AmBase lacks standing to challenge the MPP, and that the MPP did not in fact inflate the receivership deficit. As demonstrated below, all of these arguments lack merit.

[17] The United States' request for permission to file an additional brief defending the constitutionality of the MPP should be denied. The United States has made a tactical decision to rely on its jurisdictional and standing arguments, and this Court should hold it to that decision. Additional briefing on this issue would only serve to further delay resolution of this case, which has already dragged on long enough.

**A. This Court has jurisdiction to consider AmBase's challenge to the MPP.**

The United States contends that this Court lacks jurisdiction to consider AmBase's objection that the Minority Preference Program ("MPP") violated the equal protection component of the Fifth Amendment Due Process Clause, on the ground that the Due Process Clause is not money-mandating. U.S. Br. 94-95. This argument is spurious. As explained above, *supra* Part I.A, this Court's authority to review the improper inflation of the receivership deficit arises from its Tucker Act jurisdiction over the breach-of-contract claim. The Fifth Amendment issue arises only as an *incident* of that contractual claim.

The principle, invoked by the United States, that the Court of Federal Claims lacks jurisdiction to consider claims "based *solely* on . . . Fifth Amendment violations," *Hamlet* v. *United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989), extends—as the italicized language makes clear—only to cases in which the plaintiff brings a claim based solely upon a non-money-mandating provision of the Constitution such as the Due Process Clause of the Fifth Amendment. Consistent with this qualification, the cases cited by the United States that dismissed Fifth Amendment due process and equal protection claims for lack of jurisdiction all involved only freestanding constitutional claims based solely on these provisions. *See, e.g.*, *Crocker* v. *United States*, 125 F.3d 1475, 1475-76 (Fed. Cir. 1997); *LaChance* v. *United States*, 15 Cl. Ct. 127, 130 (1988); *Heagy* v. *United States*, 12 Cl. Ct. 694, 698 (1987).

By contrast, it is well settled that the Court of Federal Claims has jurisdiction to resolve constitutional questions that arise incidentally to claims over which it has an independent basis of jurisdiction—regardless of whether the constitutional provision in

question is money-mandating. For example, in suits for back pay, the question whether a government employee's discharge was improper (and back pay is therefore due) often turns on a non-money-mandating constitutional provision, and the CFC regularly decides such constitutional questions—including under the Fifth Amendment Due Process Clause. *See*, *e.g.*, *Hamlet*, 873 F.2d at 1416 (holding that the Claims Court had jurisdiction where the plaintiff's entitlement to back pay turned on First Amendment and Fifth Amendment due process questions); *United States* v. *Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1982) ("[T]he Tucker Act jurisdiction of the Court of Claims followed from the pay legislation pertaining to those employees and the latters' invocation of the first amendment formed part of their claims that they had been illegally deprived of their pay"); *Lee v. United States*, 32 Fed. Cl. 530, 542 (1995) ("[A] claim for back pay based on wrongful discharge in response to an exercise of First Amendment rights is within this court's jurisdiction."); *Jackson* v. *United States*, 428 F.2d 844, 846 (Ct. Cl. 1970) (exercising jurisdiction over a back pay suit that was brought "solely to vindicate the First Amendment right"); *Swaaley* v. *United States*, 376 F.2d 857, 858 (Ct. Cl. 1967) (similar). As one court has stated, "the pay statutes are the only necessary requisite to jurisdiction. Once jurisdiction attaches, the [plaintiff] can argue that his deprivation of pay was improper for various reasons, including an infringement of [Fifth Amendment] rights." *Cameron* v. *United States*, 34 Fed. Cl. 422, 427 n.10 (1995). The Claims Court and the Court of Federal Claims have exercised jurisdiction over such constitutional questions incident to authorized suits for money damages in other contexts as well. *See, e.g., Longval* v. *United States*, 41 Fed. Cl. 291, 295 (1998) (conducting a collateral review of a military court-martial proceeding for violations of Fifth Amendment due process,

incident to a claim for money damages caused by a wrongful conviction); *Frank's Livestock & Poultry Farm, Inc.* v. *United States*, 17 Cl. Ct. 601, 606 (1989) (deciding, incident to a claim for damages under a money-mandating statute, whether the denial of agricultural benefits by the USDA violated Fifth Amendment due process rights), *aff'd*, *Frank's Livestock & Poultry Farm, Inc. v. United States*, 905 F.2d 1515, 1517 n.2 (Fed. Cir. 1990) ("Because the denial . . . is based upon the Agricultural Act of 1949, 7 U.S.C. §§ 1444d, 1444e, and 1446 (1988), which can be fairly interpreted as mandating the payment of money to participants, . . . the Claims Court had jurisdiction under 28 U.S.C. §1491 (1998) to entertain [plaintiff's] damage claims.").

In fact, in circumstances that are strikingly similar to this case, this Court has already exercised jurisdiction over a Fifth Amendment challenge to a Minority Preference Program that arose incident to a suit over which it had jurisdiction. In *Christian* v. *United States*, 46 Fed. Cl. 793 (2000), *rev'd in part on other grounds*, 337 F.3d 1338 (Fed. Cir. 2003), the plaintiff brought suit under 10 U.S.C. §1552 and the Military Pay Act, and the Court considered whether the Army's system of minority preferences for certain promotions violated the equality component of the Fifth Amendment's Due Process Clause in order to determine whether a discharged serviceman's retirement was " 'involuntary and improper' under the Constitution." *Id.* at 799, 802-15. Because the suit was brought under separate money-mandating statutes, the fact that the Due Process Clause does not itself mandate money damages posed no obstacle to this Court's jurisdiction. Rather, the Court's authority to consider the plaintiff's equal protection argument was a proper incident of its Tucker Act jurisdiction over the plaintiff's claim: "This Court has jurisdiction to entertain [the equal protection

challenge] presented by plaintiff pursuant to the Tucker Act . . . . If plaintiff's retirement was 'involuntary and improper' under the Constitution . . . , he retains his right to active duty pay under [the Military Pay Act]." *Id.* at 799.

**B. AmBase has standing to challenge the Minority Preference Program.**

The United States also contends that AmBase lacks Article III standing to challenge the MPP because it has no " 'particularized legal interest' " in the "contingent right to share" "in a potential liquidation surplus from the resolution of Carteret" and because it was not "an actual or potential bidder for Carteret's assets." U.S. Br. 95-96. These arguments are wholly unpersuasive.

As an initial matter, AmBase need not establish a separate basis of standing to raise its equal protection argument. The United States does not contest AmBase's standing to sue for breach of contract and, as demonstrated above, this Court may properly consider AmBase's constitutional objections to the receivership deficit as a necessary incident to resolving that suit.

Furthermore, it is established beyond cavil that a failed thrift's shareholder "possesses a direct and cognizable property interest in a potential liquidation surplus and consequently has standing to sue" to vindicate that interest. *First Hartford Corp. Pension Plan & Trust* v. *United States*, 194 F.3d 1279, 1296 (Fed. Cir. 1999); *see also id.*, at 1290 ("a shareholder's direct interest in a liquidation surplus is a cognizable property interest the taking of which by the federal government gives rise to standing to sue"); *Plaintiffs in all Winstar-Related Cases*, 44 Fed. Cl. 3, 10 n.7 (1999) (holding that shareholder plaintiffs in *Winstar* cases "have a direct, vested, individual right" in the potential liquidation surplus that confers standing to sue); Opening Br. 100 & n.38 (citing cases).

It is therefore indisputable that AmBase has a "particularized legal interest" in the potential litigation surplus conferring Article III standing to contest the MPP (and every other factor contributing to the improper inflation of the receivership deficit).

Relying on *Alfa Laval Separation* v. *United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999), the United States argues that "[g]iven the fact that AmBase was not an actual or potential bidder for Carteret's assets, it lacks the requisite 'particularized interest' to challenge the bidding rules for those assets." U.S. Br. 96. But *Alfa Laval* and the cases it cites deal only with the standing of **bid protestors**—disappointed bidders who challenge the allocation of government contracts. *See Alfa Laval*, 175 F.3d at 1367 ("To prevail in a **bid protest**, the **protestor** must show a significant, prejudicial error in the procurement process.") (emphases added); *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *CACI, Inc.-Fed.* v. *United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983). A potential bidder's **only** interest in a liquidated thrift would be in the auctions incident to its resolution, and that is why a bid protestor who could not have been injured by auction procedures lacks standing under *Alfa Laval*. But AmBase is not a bid protestor and does not challenge the MPP on the ground that AmBase was wrongfully excluded from the auctions or mistreated as a bidder. Rather, AmBase contends that the unconstitutional misconduct in Carteret's resolution will, unless this Court corrects the resulting improper inflation of the receivership deficit, directly injure AmBase's property interest in Carteret's potential liquidation surplus.

The only other case on which the United States relies, *American Federation of Government Employees v. United States*, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001), is

even more clearly inapposite. That case had nothing to do with *Article III* standing at all. Instead, it interpreted the phrase "interested party" in 28 U.S.C. §1491(b)(1) to determine whether that statutory provision conferred jurisdiction over a suit challenging bidding practices brought by a labor union that was not a bid protestor. The case had nothing to say about the union's **constitutional** standing. AmBase does not sue under 28 U.S.C. §1491(b)(1), which gives the Court of Federal Claims jurisdiction over bid protest cases. The interpretation of that provision is thus irrelevant to this case. Instead, AmBase sues under 28 U.S.C. §1491(a)(1), which gives this Court jurisdiction over its breach-of-contract claim—a claim that it indisputably has Article III standing to bring.

Finally, the United States argues that AmBase lacks Article III standing to challenge the MPP because the MPP did not actually injure AmBase. U.S. Br. 96. As AmBase has demonstrated, *see* Opening Br. 93-103, however, and as discussed further below, the MPP improperly inflated the receivership deficit by causing the receivership to engage in unnecessary borrowing and by directly reducing the deposit premiums it received from the branch sales. Because the receivership deficit will be deducted from the damages otherwise payable to AmBase, this improper inflation of the receivership deficit will, if not corrected by this Court, plainly injure AmBase's property interest in the potential liquidation surplus.

### C. The MPP substantially inflated the receivership deficit.

As demonstrated above, the MPP is directly responsible for all of Carteret's interest because without the asset freeze, there would have been no loan. Below we address two other discrete items of injury resulting from the MPP.

### 1. The MPP deflated the premiums received for Carteret branches.

The United States concedes that "it is true that the amount originally bid for the Carteret branches was $19.4 million greater than the amount eventually received." U.S. Br. 39. As AmBase's opening brief demonstrated, that diminution in premium was the result of the delay engendered by implementation of the MPP. The United States does not dispute this causal connection.[18] Rather, it suggests that the Minority Preference Program actually inflated the initial bids by allegedly bringing more bidders into the process. As a threshold matter, we note that minorities were allowed to participate in all RTC branch auctions. Thus, there is no evidence that there were in fact more bidders under the Minority Preference Program than there would have been in its absence. Moreover, as noted in AmBase's opening brief, the RTC's chief marketing strategist recognized that "**any** type of bidding preference . . . is a deterrent to the competitive aspect of the bidding process." App. 00093-94. The United States simply ignores the contemporaneous view of the RTC. Significantly, the United States' own expert admitted during deposition that a right of first refusal, which is what the minority bidders had here, has value to the recipient. Reply App. 00020 (Saunders Dep. 334). The value to the recipient is obviously an advantage over the other bidders. Thus, both the RTC's internal documents and the concession of the United States' expert foreclose the notion that the Minority Preference Program somehow inflated the bids for Carteret.

[18] The United States devotes considerable energy to attempting to show that the **rate** of decline in deposits was not adversely affected by the Minority Preference Program. This issue is a red herring. The bids for Carteret branches declined because of the runoff of hundreds of millions of dollars of deposits. The United States does not deny that these deposits ran off during the delay occasioned by the Minority Preference Program.

The United States attempts to avoid this conclusion by citing two sources. First, the United States cites a GAO report ostensibly for the proposition that the report approved the procedures implementing the Minority Preference Program. The GAO report did not assess whether the RTC would have realized more value absent the Minority Preference Program. "Although the act required us to asses the RTC's determination of fair market value, we were unable to evaluate RTC's determination . . . ." Reply App. 00196 (U.S. GEN. ACCOUNTING OFFICE, RESOLUTIONTRUST CORPORATION: PERFORMING ASSETS SOLD TO ACQUIRERS OF MINORITY THRIFTS 4 (1995)). Instead, the GAO report focused on the RTC's performance within the constraints imposed by Congress. Second, the United States cites academic literature which it claims supports the view that the Minority Preference Program increased bids. But, as Professor Saunders admitted during his deposition, none of the academic studies he or the United States cites involved auctions that conferred a preference upon one group of bidders. Reply App. 00019 (Saunders Dep. 333). Thus, these studies have no relevance to the issue of whether the preferential bidding system imposed by Congress depressed the premiums realized for Carteret's branches.

In closing, we note that Professor Calomiris did not attempt to quantify the additional harm resulting from the Minority Preference Program's auction structure. But as the foregoing reflects, this was a conservative assumption, for if he had, the RTC's own internal documents indicate that there would have been more value to be realized in an open bidding structure without preferences.

**2. The MPP caused assets to be sold below market value.**

The United States devotes many pages to a defense of the RTC's sale of assets under the Minority Preference Program, even though Professor Calomiris did not quantify the damages resulting from the RTC's procedures. We briefly address the United States' arguments.

a. The RTC's standard procedure for selling assets was to hold an auction in an effort to realize fair market value. But, of course, the RTC was not permitted by Congress to sell assets in an auction under the MPP. Rather, the assets were presented at a set price to the minority acquirers who were free to purchase them or not. The United States attempts to gloss over this fact by citing a GAO report that analyzed the RTC's asset procedures. But the GAO specifically declined to opine on whether the RTC had realized full fair market value on the assets. Reply App. 000106 (U.S. GEN. ACCOUNTING OFFICE, RESOLUTION TRUST CORPORATION: PERFORMING ASSETS SOLD TO ACQUIRERS OF MINORITY THRIFTS 4 (1995)). Instead, the GAO analyzed the efficacy of the RTC's efforts within the constraints imposed by Congress, including the ban on auctions.

b. As one would expect, the RTC was not able to realize full fair market value with out being allowed to use auctions. Specifically, as we demonstrated in our opening brief, one minority acquirer was able to flip loans acquired from the RTC, realizing a 6% profit **in a single day**. *See* Opening Br. 95 n.29. The United States' only response is that some of these loans may not have been acquired from Carteret. The fact remains, however, that these loans sold by the RTC pursuant to the MPP were underpriced as evidenced by the presence of a buyer willing to pay 6% more than the minority acquirer. Although we have not conducted an exhaustive analysis of each of

Carteret's loans sold pursuant to the MPP, the United States has made no showing that the results Professor Calomiris analyzed were in any way outliers.

## V. Other Improper Actions Have Also Inflated the Receivership Deficit.

In addition to the unconstitutional Minority Preference Program, other improper government actions inflated the receivership deficit by destroying value without conferring any benefits on the receivership. Such actions include Congress's failure to fund the RTC during the early period of the Carteret receivership; Congress's breach of its goodwill contract with Carteret, which directly eliminated a valuable asset that would have greatly increased Carteret's resolution value; and the FDIC's precipitate decision to shut down Carteret Mortgage Company.

### A. Congress' failure to fund the RTC delayed Carteret's resolution and greatly decreased deposit premiums.

AmBase has demonstrated that Congress' failure to fund the RTC greatly delayed Carteret's resolution, aggravating the effects of deposit runoff and thereby reducing the deposit premiums ultimately obtained by at least $43.8 million. *See* Reply App. 00005 (Calomiris Decl. ¶ 84). In addition to disallowing interest on the RTC loans—which, as discussed above, would have been unnecessary but for Congress's failure to fund the RTC—this Court should also deduct an amount equal to the $43.8 million of squandered potential deposit premiums from the receivership deficit so that Carteret and AmBase are not forced to bear costs attributable solely to Congress. Deducting this amount from the receivership deficit will properly reflect the fact that, had funding been available to enable the timely resolution of Carteret, the net balance resulting from the sale of Carteret's deposits and assets would have been a surplus of at least $23.1 million rather

than the shortfall of $18.8 million represented by the remaining unpaid principal of the RTC loans. *See* Reply App. 00006 (Calomiris Decl. ¶ 85).

**B. The enactment of FIRREA directly eliminated a valuable asset that would have greatly increased Carteret's resolution value.**

In its opening brief, AmBase showed that the United States' breach of its contract with Carteret, through the enactment of FIRREA, destroyed a valuable asset—Carteret's supervisory goodwill—that would have otherwise been available to the receivership. The loss of this asset—which AmBase's expert demonstrated was worth more than $40 million—substantially decreased the value recovered from Carteret's resolution, thereby inflating the receivership deficit. *See* Opening Br. 71-73. In order to correct this direct effect of Congress' breach of contract, this Court should reduce the receivership deficit by an amount equal to value of the supervisory goodwill that Congress wrongfully eliminated.

The United States responds that even absent FIRREA, the receivership could not have recovered the value of Carteret's supervisory goodwill. Specifically, it argues that this goodwill could not have survived Carteret's seizure and the imposition of the receivership, that the goodwill could not have been transferred to an acquiring institution, and that the goodwill would have been of no value to any acceptable acquiring entity. *See* U.S. Br. 22-26. As demonstrated below, the United States is wrong on all counts.

Contrary to the United States' assertion, in the absence of FIRREA, GAAP would not have required the receivership to write off Carteret's goodwill. Accounting Principles Board Opinion ("APB") 17, cited by the United States, observes only that "[e]stimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly." U.S. App. 228 (APB 17, ¶ 31).

Carteret's goodwill, which could be used instead of cash to satisfy regulatory capital requirements, had obvious substantial value that was not dependent on Carteret's solvency or its status as an independent entity. Absent FIRREA, which eliminated the "value and future benefits" of Carteret's goodwill, the United States provides no reason to believe that the estimated value and future benefits of this asset would have been so reduced by the imposition of the receivership that GAAP would have required it to be written off.

Furthermore, while RTC policy as it existed at the time Carteret was placed in receivership did require that goodwill be written off, it did so because "FIRREA . . . requires that certain items (considered other assets under RAP) must be written off. The most prominent of these are, deferred losses on the sale of loans and goodwill." U.S. App. 490 (Revised RTC Manual 62). The United States provides no reason for assuming that this FIRREA-based policy would have existed in the absence of FIRREA.

Nor is there any reason to believe that Carteret's goodwill could not have been transferred to another financial institution in connection with the acquisition of all or part of Carteret. As relevant here, *Carteret Savings Bank, FA v. Office of Thrift Supervision*, 963 F.2d 567 (1992), held only that FIRREA barred Carteret from using its supervisory goodwill to satisfy regulatory capital requirements; contrary to the United States' suggestion, *see* U.S. Br. 3, this case did not even address whether goodwill could be transferred to an acquiring institution, let alone whether it could be transferred in the absence of FIRREA.

Furthermore, GAAP plainly contemplates that goodwill can be transferred from one company to another either with "the enterprise as a whole" or with "a large segment

or separable group of assets." U.S. App. 321 (APB 17, ¶32); *see also* U.S. App. 318 (APB 17, ¶ 9) ("The Board concludes that a company should record as assets the costs of intangible assets acquired from others, including goodwill acquired in a business combination.").[19] And even if GAAP provided otherwise, it would be superseded by the Assistance Agreements, *see Home Savings of America, FSB v. United States*, 399 F.3d 1341, 1351 (Fed. Cir. 2005), which plainly provide that Carteret's contractual rights—including, no doubt, the right to apply supervisory goodwill toward regulatory capital requirements—can be transferred, so long as the consent of the FSLIC is first obtained, *see* U.S. App. 325 (1982 Assistance Agreement); U.S. App. 332 (1986 Assistance Agreement). Since the receivership's ability to transfer supervisory goodwill to an acquiring company would increase resolution value and thus directly decrease the amount

[19] The United States' other authorities do not establish otherwise. *Glass v. United States*, 47 Fed. Cl. 316 (2000), *rev'd in part, vacated in part*, 258 F.3d 1349 (Fed. Cir. 2001), simply recited an expert's opinion that, in valuing goodwill, one must consider the fact that goodwill "cannot be invested and has no potential to increase." *Id*. at 328. Although the expert stated that this was "because goodwill is not negotiable or transferable," *id*., it is plain from context that the expert meant only that as an unidentifiable intangible asset, goodwill cannot be isolated and transferred independent of any other assets. As APB 17 explains, "Identifiable intangible assets may be acquired singly, as part of a group of assets, or as part of an entire enterprise, but unidentifiable assets cannot be acquired singly. The excess of the cost of an acquired company over the sum of identifiable net assets, usually called goodwill, is the most common unidentifiable intangible asset." U.S. App. 317 (APB 17, ¶1). As this provision implies, and the provisions quoted in the text confirm, although goodwill cannot be transferred singly, it can be transferred in conjunction with other assets. APB 16, ¶ 88, n.12, which states that "identifiable assets should not be included in goodwill" merely confirms the distinction drawn by GAAP between identifiable assets, on the one hand, and unidentifiable assets—such as goodwill—on the other hand. U.S. App. 311 (APB 16, ¶ 88, n.12). Contrary to the United States' suggestion, this provision does not speak to the issue of whether goodwill can be transferred. *Compare* U.S. App. 311 (APB, ¶ 88) ("General guides for assigning amounts to the individual assets acquired and liabilities assumed, except goodwill"), *with* U.S. App. 312 (APB 16, ¶ 90) ("Goodwill recorded in a business combination accounted for by the purchase methods should be amortized in accordance with the provisions in paragraphs 27 to 31 of APB Opinion No. 17, *Intangible Assets*.").

of money required to be advanced by the United States to facilitate resolution, it is difficult to imagine that, in the absence of FIRREA, such consent would not have been forthcoming from the RTC (or other successor in interest to the FSLIC).

The United States' suggestion that, even in the absence of FIRREA, Carteret's supervisory goodwill would have been of no value to a healthy, and therefore eligible, acquiring institution is unpersuasive. As the large sums of money wired to the acquiring institutions in connection with Carteret's branch sales suggests, even a healthy institution would almost certainly need to increase its capital reserves to absorb Carteret's deposit liabilities without falling out of compliance with regulatory capital requirements. Because, in the absence of FIRREA, supervisory goodwill could be used as a partial substitute for cash to meet regulatory capital requirements, it would plainly be of value to an acquiring institution. Indeed, even if the acquiring company did not need the supervisory goodwill to satisfy these requirements, that goodwill would still be of value because, by freeing up cash otherwise required to maintain capital reserves, it would allow the acquiring institution to "leverage [its] capital." *Glass v. United States*, 47 Fed. Cl. 316, 327 (2000), *rev'd in part, vacated in part*, 258 F.3d 1349 (Fed. Cir. 2001). And if nothing else, the supervisory goodwill would at a minimum have value to a healthy acquiring firm because it would provide "a cushion against future losses." *Id.*

The United States also claims that Professor Calomiris's calculation of the value of supervisory goodwill is flawed. The United States starts its critique by claiming that supervisory goodwill has less value to a closed institution than to an open one. *See* U.S. Br. 27. But this observation is irrelevant to Professor Calomiris's analysis since he looked at the value supervisory goodwill would have had to a healthy open institution

acquiring Carteret. Second, the United States relies upon Professor Saunders' expert report to criticize the specifics of Professor Calomiris's calculation. All of these criticisms fail because they are just as applicable to the cost-of-capital analysis upheld by the Federal Circuit in *Home Savings of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005). During his deposition, Professor Saunders acknowledged that he believes supervisory goodwill has little value to either an open or a closed institution. Reply App. 00014-15 (Saunders Dep. 105-07). This view, which underlies his entire discussion of supervisory goodwill, is flatly inconsistent with the cost-of-capital decisions of the Federal Circuit in *Home Savings*, *LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003), and *Bluebonnet Savings Bank v. United States*, 339 F.3d 1341 (Fed. Cir. 2003).[20]

Finally, the United States criticizes Professor Calomiris's event study. Professor Saunders admitted during his deposition, however, that he had not reviewed the front-page New York Times article detailing that the effort to remove the breaching provisions of FIRREA had failed. Reply App. 00016 (Saunders Dep. 202). As for the point that the New York Times article did not refer to Carteret, any investor in Carteret would have been able to grasp the significance of the elimination of supervisory goodwill for Carteret, and thus it is immaterial that the article did not mention by name each and every one of the victims of the United States' breach.

---

[20] The United States also suggests that the balance of supervisory goodwill in Professor Calomiris's calculation is too high. *See* U.S. Br. 27. But irrespective of whatever requirements of GAAP may have applied, Carteret had a contractual right to count the supervisory goodwill for regulatory capital requirements. *See Home Savings of Am. v. United States*, 399 F.3d 1341 (Fed. Cir. 2005).

**C. The RTC squandered Carteret Mortgage Company's considerable value.**

The United States' discussion of Carteret Mortgage Company ("CMC") cannot obscure several undisputed facts: (1) the author of the key memo evaluating CMC unequivocally stated during her deposition that any concerns she identified about CMC could have been addressed and that CMC was viable App. 01207 (Deposition of Donna L. Cribbs ("Cribbs Dep.") 39 ("I perceived that if they tightened controls, it was a viable company")); (2) the RTC made no effort whatsoever to market CMC; and (3) the stock of the company that acquired the mortgage origination capacity of CMC went up 17% -- or $18 million -- on the day of the announcement. Taken together, these facts demonstrate that the RTC simply squandered the considerable value inherent in CMC. Nevertheless, the United States makes several arguments in an attempt to defend the RTC's conduct. We address each in turn.

1. First, the United States invokes the RTC's policy of downsizing institutions that it has seized. This policy is irrelevant to the failure to market CMC for two reasons. First, the RTC could have ceased origination activity and still realized value from the sale of CMC's mortgage origination capability. In fact, this is precisely what happened. Mortgage origination ceased almost immediately upon seizure, but still the market assigned considerable value to CMC's mortgage origination capability less than four weeks later. Second, it was not necessary to close down the origination capacity to "downsize." The loans that were originated could have been repackaged and sold to Fannie Mae, as many of the loans had been prior to seizure.

2. The United States claims that the RTC had a policy of determining the "marketability" of such institutions. But the record is devoid of any evidence that the RTC made any effort to market CMC.

3. The United States also points to the attrition in correspondent originations that CMC experienced after the RTC took over Carteret. By way of background, correspondent originations are loans originated by a third party that were then referred to CMC. The United States attempts to portray this aspect of the business as critical to the value of CMC. But Donna Cribbs testified that she actually thought CMC was better off without the correspondent relationships. App. 01223 (Cribbs Dep. 104). Moreover, the increase in stock market value experienced by Imperial Credit after the acquisition of CMC's staff in no way reflected any value from the correspondent relationships which had deteriorated. Thus, Professor Calomiris's reliance upon that market-based data imputes no value to the correspondent relationships. In any event, the correspondent originations decreased after seizure precisely because the RTC's policy of ceasing new originations was well know in the correspondent community. Reply App. 00112 (Deposition of James R. Midnich 183-84). For the United States to now point to the decrease in originations to justify its policy is a classic exercise of circular reasoning.

4. Finally, the United States seeks to minimize the relevance of the Credit Imperial acquisition in two ways. First, the United States argues that Imperial did not acquire the "troubled assets" of CMC. But as Professor Saunders acknowledged, he could not identify any troubled assets held by CMC. Reply App. 00017 (Saunders Dep. 212). Moreover, the RTC simply could have held back those assets and sold the mortgage origination capability, which is exactly what Imperial acquired. Second, the

United States points to the subsequent decline in Imperial Credit's stock price several months after the acquisition of CMC. But, a subsequent decline in stock market value says nothing about the value of CMC that was perceived at the time of its acquisition.[21]

## VI. The United States and the FDIC Are Attempting to Overcharge the Carteret Receivership for Litigation and Administrative Expenses.

AmBase has demonstrated that this Court should scrutinize carefully the methodologies used by the FDIC to calculate and allocate litigation and administrative expenses before allowing any deduction of these expenses, whether as part of the receivership deficit or otherwise, from the damages otherwise payable to AmBase. *See* Opening Br. 103-08. In particular, AmBase showed that the FDIC has provided little or no documentation or explanation for the litigation expenses which it seeks to deduct from these damages, that it intends to seek reimbursement for these expenses regardless of whether they contributed in anyway to Carteret's recovery, and that it intends to apply ten percent of the damage award (less direct litigation expenses) to defray so-called "indirect litigation expenses" incurred by **all** of the active receiverships, even though only a small proportion of the FDIC's litigation expenses are in fact attributable to the Carteret litigation. AmBase also showed that the thinly documented "indirect" administrative expenses included in FDIC's receivership deficit calculations improperly charge to Carteret alone costs that benefited numerous other receiverships as well.

[21] As for the United States' criticisms of the comparables that Professor Calomiris utilized in performing a confirming analytic of the value of CMC, the United States has failed to point to any other transactions which were more comparable. Moreover, there is no relevance to the assets that were acquired in the Sears transaction since a like number of liabilities were also transferred. Reply App. 00080-82 (PNC 10Q for period ending Sept. 30, 1993).

With respect to litigation expenses, the United States offers no response to AmBase's demonstration that these expenses are neither adequately documented nor limited to expenses that contributed to Carteret's recovery. Nor does it dispute that its peculiar methodology for recovering indirect litigation costs may result in Carteret and AmBase footing the bill for litigation expenses overwhelmingly attributable to other receiverships.[22] Rather, it argues only that if this Court rejects their claim for breach of contract, or if another thrift happens to obtain a large recovery first, Carteret and AmBase may not have to pay for any of the indirect litigation expenses. *See* U.S. Br. 89-90. That the FDIC's methodology is capricious, however, hardly means that it is justified. Nor does the United States' response in anyway negate the very real possibility that the FDIC will seek to appropriate a substantial portion of damages that would otherwise be distributed to AmBase in this case in order to defray litigation expenses overwhelmingly attributable to other cases.

The United States also argues that the indirect administrative costs included in the FDIC's receivership deficit calculations are well documented and dismisses as trivial the expenses that AmBase has identified that benefited eighteen receiverships besides Carteret, but are charged to Carteret alone. *See* U.S. Br. 90-92. AmBase respectfully submits, however, that these expenses are significant not because of their amount but because of what they reveal about the casual and apparently arbitrary nature of the FDIC's accounting methodology, and that the United States' cavalier defense and

[22] The United States contends that AmBase's suggestion that only four percent of FDIC's direct litigation expenses are attributable to the Carteret litigation is inaccurate and that the correct figure is twelve percent. Whether the correct figure is four or twelve percent, however, it is plain that the overwhelming majority of these expenses is attributable to receiverships other than Carteret. And the United States does not dispute the reasonable inference that the same is true of indirect litigation expenses as well.

apparent toleration of this methodology heightens, rather than alleviates, the need for careful scrutiny of the FDIC's calculation and allocation of litigation and administrative expenses.[23]

## VII. The Inclusion in the Receivership of Charges Not Reasonably Related to Benefits Conferred by the Government Will Effect an Unconstitutional Taking.

In its opening brief, AmBase demonstrated that under controlling Federal Circuit precedent it has a direct and cognizable property interest in the potential liquidation surplus that will result if Carteret receives compensation for the United States' breach of contract. *See* Opening Br. 109. AmBase also demonstrated that the reduction or elimination of this interest through the inclusion in the receivership deficit of charges—such as those described above and in AmBase's opening brief—that bear no reasonable relationship to expenses that have been, or need ever be, actually borne by the receivership or the government, or that were necessitated solely by deliberate, wrongful governmental actions that destroyed value without conferring any benefit on the receivership or AmBase, would constitute a taking of AmBase's property without just compensation. *See* Opening Br. 109-16.

In response, the United States argues that AmBase lacks standing to raise its takings argument, U.S. Br. 14-15, 95, that its argument is foreclosed by *Bailey v. United States*, 341 F.3d 1342 (Fed. Cir. 2003), U.S. Br. 13-14, and that the argument fails on the merits in all events, U.S. Br. 97-98. The FDIC argues that AmBase's takings argument is not ripe, FDIC Br. 26-27, and is foreclosed by this Court's decision in *AmBase Corp. v.*

---

[23] Although the United States contends that *Citibank v. Nyland*, No. 86 Civ. 9181, 1990 U.S. Dist. LEXIS 12338 (S.D.N.Y. Sept. 19, 1990), supports the FDIC's casual methodology, that case in fact refused to sanction various actions taken by the Receiver in the absence of adequate explanation or justification. *See id.* at *7-*9.

*United States*, 58 Fed. Cl. 32 (2003) ("*AmBase II*"). As demonstrated below, all of these arguments lack merit.[24]

The United States' contention that AmBase lacks standing because it did not suffer injury from Congress's failure to provide adequate funding to the RTC and because it lacks a legally protected interest in any particular level of congressional funding rests on factually and legally flawed premises. As demonstrated above, Congress's inaction did result in increased costs to the receivership which, if included in the receivership deficit, plainly would injure AmBase. Furthermore, AmBase need not establish a separate basis of standing to raise its takings argument—AmBase indisputably has standing to sue for breach of contract, and this Court may properly consider AmBase's constitutional objections to the receivership deficit as a necessary incident to resolving that suit.

More importantly, the United States' argument reflects a fundamental misunderstanding of the nature of AmBase's takings argument. Contrary to the United States' suggestion, AmBase does not claim a property interest in a particular level of congressional funding, nor does it assert that Congress's failure to provide proper funding for the RTC, standing alone, constituted a taking. Rather, AmBase objects to the

[24] The FDIC also argues that "AmBase may not assert takings claims against the FDIC in its receivership capacity," FDIC Br. 27, and that AmBase's takings argument is really a claim for money damages from the Government, not "a basis for recalculating the estimated receivership deficit," FDIC Br. 12. As demonstrated above, however, AmBase's claims relating to the calculation of the receivership deficit are properly considered claims against the United States and, in all events, the FDIC is plainly a governmental actor subject to the Constitution even when acting in its receivership capacity. *See supra* Part I.A-C. And as further demonstrated, this Court may simply reduce the receivership deficit by the amount necessary to prevent a taking of AmBase's property interest in the liquidation surplus rather than undertake "the utterly pointless" activity of permitting the taking and then requiring the government to pay it back as just compensation. *See supra* Part I.D.

reduction of the potential liquidation surplus—in which controlling authority establishes that AmBase does have a property interest—in order to defray expenses that would never have been incurred but for Congress's inaction. Nor is AmBase's argument limited to this concern: the United States never even attempts to come to grips with AmBase's demonstration that inclusion in the receivership deficit of (1) a phantom tax liability that has not been and may never be paid, (2) interest bearing no relationship to any costs actually borne by the United States, (3) poorly documented administrative costs that appear to have benefited other receiverships, and (4) expenses that never would have been incurred but for improper government actions such as (a) the unconstitutional Minority Preference Program, (b) the precipitate shutdown of Carteret Mortgage Company, and (c) the elimination of Carteret's goodwill, would constitute an unconstitutional taking of AmBase's property interest in the potential liquidation surplus.

Under controlling precedent, "because [AmBase], as a shareholder in [Carteret], possesses a direct and cognizable property interest in a potential liquidation surplus," AmBase "consequently has standing to sue for its taking." *First Hartford*, 194 F.3d at 1296. *Longshore v. United States*, 77 F.3d 440 (Fed. Cir. 1996), does not establish or suggest otherwise. That case addressed a takings challenge to a $200 application fee required as a condition of participating in a federal lottery for a cellular radio system license. *See id*. at 441. The plaintiff's claim failed because he could not identify any "property interest that was taken from him by government action"—he had no property right either to access the radio spectrum or to participate in the lottery without paying the statutory fee. *See id*. at 443, 444. By contrast, AmBase indisputably has a property interest in the potential liquidation surplus that will be taken (in whole or in part) by

improper inflation of the receivership deficit. Furthermore, the court in *Longshore* did not hold that the plaintiff lacked standing to raise his takings claim; rather, it rejected that claim **on the merits**. *See id*. at 442.

Although the FDIC does not challenge AmBase's standing to raise its takings argument, it contends that this argument is not ripe because the amount of the receivership deficit has not yet been finally determined. Relatedly, it suggests that this Court should not yet reach the constitutional question presented by AmBase's argument. *See* FDIC Br. 16. The FDIC's argument misses the point. AmBase simply contends that because the reduction or elimination of this interest through the unwarranted inflation of the receivership deficit would constitute a taking, it would be improper to dismiss this case as moot based on the FDIC's current projection of that deficit. Furthermore, this Court need not reach the merits of the takings question if it concludes, as urged in AmBase's opening brief and above, that the unwarranted expenses that the government seeks to charge to the receivership should be excluded from the receivership deficit for nonconstitutional reasons.

Contrary to the suggestions of the United States and the FDIC, AmBase's takings argument is not foreclosed by *Bailey* or *AmBase II*. Neither decision addressed, let alone rejected, the argument that the inclusion in the receivership deficit of charges bearing no reasonable relationship to expenses that have been, or need ever be, actually borne by the receivership or the government, or that were necessitated solely by deliberate, wrongful governmental actions that destroyed value without conferring any benefit on the receivership or the thrift's shareholders, takes the shareholders' property interest in a potential liquidation surplus.

Rather, the court in *Bailey* rejected plaintiff's contention that "his inability to recover the receivership deficit in combination with the statutory depositor preference priority scheme takes his contractual remedy to any surplus recovery." *Bailey*, 341 F.3d at 1347. AmBase, however, is challenging the taking not of its "contractual remedy" but rather of its property interest in the liquidation surplus itself—an interest expressly recognized by *Bailey* as well as other Federal Circuit precedents. *See, e.g., id.* Nor does AmBase challenge the "the application of the statutory priority scheme" as a taking of its "property interest in the surplus or right to pursue the remedy." *Id*. On the contrary, AmBase recognizes that it is the statutory priority scheme that confirms its property interest in the potential liquidation surplus. *See First Hartford*, 194 F.3d at 1288. Finally, AmBase challenges here not its "inability to recover the receivership deficit," *Bailey*, 341 F.3d at 1347, but rather the improper inflation of this deficit through the inclusion of unwarranted expenses.

In *AmBase II*, this Court rejected AmBase's claim "that the government took its bank, for which it paid $266 million, by not honoring the goodwill contracts created in the 1982 and 1986 transactions." 58 Fed. Cl. at 51. This Court's analysis of AmBase's challenge to the impact of different government actions on a different property interest is plainly not controlling here.

Citing various authorities, the United States also argues that AmBase's takings argument fails because AmBase cannot have a property interest in a rule of law or in the appropriation of federal funds, *see* U.S. Br. 98, and because "it is well established that laws which result in assessments against property do not 'take' property within the meaning of the Fifth Amendment," U.S. Br. 97. All of these arguments miss the mark.

As an initial matter, although AmBase's property interest in the potential liquidation surplus was created by law, it does not follow that it is asserting a property interest in the rule of law itself. Nor does it follow that its property right is unprotected by the Constitution. Indeed, the United States' own authority recognizes that while no person has a property right in a rule of law, property rights that have been created by law are protected by the Fifth Amendment. *See Branch*, 69 F.3d at 1577-78. Moreover, as explained above, AmBase is not asserting a property interest in the appropriation of federal funds.

The United States' "assessment" argument also misapprehends the nature of AmBase's takings objection. AmBase does not challenge the simple imposition of a "financial burden" but rather the potential confiscation, in part and perhaps in whole, of a "specific and identified" property interest. *Eastern Enterprises*, 524 U.S. at 540-41 (Kennedy, J., concurring in judgment and dissenting in part) (distinguishing government action that imposes a "financial burden" but "does not operate upon or alter an identified property interest" from government action affecting "a specific property right or interest"); *see also id.* at 544 (opining that government action "must relate to a specific property interest to implicate the Takings Clause"). None of the United States' authorities sanctions the naked confiscation of a "specific and identified" property interest through the levying against that interest of charges bearing no reasonable relationship to expenses properly borne by the government. Indeed, with the exception of *United States v. Sperry*, 493 U.S. 52 (1989), the United States' authorities address only simple assessments of financial liability, and none of its authorities, including *Sperry*, upheld a government assessment of any sort bearing no reasonable relationship to costs

borne by the government or caused by the plaintiff. *See Sperry*, 493 U.S. at 60 (upholding the deduction and payment to the government of 1.5 percent of awards rendered by the Iran-United States Tribunal as a "fair approximation of the cost of benefits supplied" by the government) (quotation marks omitted); *Branch*, 69 F.3d 1571 (upholding the assessment of liability against a bank to offset losses resulting from the failure of another bank owned by the same holding company); *Meriden Trust & Safe Deposit Co. v. FDIC,* 62 F.3d 449 (2d Cir. 1995) (same); *Atlas Corp. v. United States*, 895 F.2d 745 (Fed. Cir. 1990) (rejecting takings challenge to statute requiring uranium and thorium miners to stabilize mill tailings); *see also id*. at 756 (quoting lower court's explanation that "[i]ndividuals hold their property subject to the limitation that they do not use it in dangerous or noxious ways"); *cf. Longshore*, 77 F.3d at 443, 444 (upholding $200 application fee as condition for participating in federal lottery for a cellular radio system license where plaintiff had no property right to access the radio spectrum or to participate in the lottery absent payment of the application fee).

Far from undermining AmBase's takings argument, the authorities cited by the United States actually support AmBase's position. Thus, *Longshore* recognized that a taking would result if the government were to withhold "a portion of a privately owned asset which it held or controlled" and "there was no justification for the withholding." 77 F.3d at 444. And in upholding a modest user fee levied against awards rendered by the Iran-United States Tribunal as a "fair approximation of the cost of benefits supplied" by the government, *Sperry*, 493 U.S. at 60 (quotation marks omitted), the Supreme Court expressly distinguished, as an impermissible taking, "a situation where the Government has appropriated all, or most, of the award to itself and labeled the booty as a user fee,"

*id*. at 62. As demonstrated above and in AmBase's opening brief, precisely such a constitutionally impermissible situation would result if the government is allowed to reduce or eliminate AmBase's property interest in the potential liquidation surplus through the inclusion of unwarranted charges in the receivership deficit.

**CONCLUSION**

For the foregoing reasons, as well as for the reasons stated in AmBase's opening brief, AmBase has shown cause that the Court has jurisdiction. Additionally, the Court should deny the United States' motion for interlocutory review and its renewed motion to dismiss.

October 19, 2006

Respectfully submitted,

/s/ Charles J. Cooper

Charles J. Cooper
*Counsel of Record*

David H. Thompson
Vincent J. Colatriano
Howard C. Nielson, Jr.
David M. Lehn

COOPER & KIRK, PLLC
555 11th Street, N.W., Suite 750
Washington, D.C. 20004
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 93-531<br>(Judge Loren Smith) |

# APPENDIX TO AMBASE'S STATEMENT OF ISSUES REPLY BRIEF


Charles J. Cooper
Counsel of Record

Vincent J. Colatriano
David H. Thompson
Howard C. Nielson, Jr.
David M. Lehn
COOPER & KIRK, PLLC
555 11th Street, NW, Suite 750
Washington, D.C. 20004
Telephone: (202) 220-9600
Facsimile: (202) 220-9601


October 19, 2006

**INDEX**


Declaration of Charles W. Calomiris (July 14, 2006) (excerpts) .................. Reply App. 00001

Deposition of Charles W. Calomiris (Jul. 5-7, 2006) (excerpts) .................. Reply App. 00011

Deposition of Anthony Saunders (Oct. 3-4, 2006) (excerpts) ...................... Reply App. 00013

Conservatorship Strategic Plan (Dec. 4, 1992) (Saunders Dep. Ex.7) .......... Reply App. 00034

Memorandum from J. Jupiter to T. Horton (Aug. 23, 1993) (Saunders Dep. Ex. 8) ................................................................ Reply App. 00075

Memorandum from E. Mahaney to T. Horton (Dec. 21, 1993) (Saunders Dep. Ex. 9) ................................................................ Reply App. 00076

Email from A. Richards to H. Held (Sept. 15, 1994) (Saunders Dep. Ex. 12) .............................................................. Reply App. 00078

Email from A. Richards to H. Held (Sept. 16, 1994) (Saunders Dep. Ex. 13) .............................................................. Reply App. 00079

PNC Bank Corp 10Q (for period ending Sept. 30, 1993) (excerpts)............ Reply App. 00080

Cost of Resolution (projected) to Anticipated Thrift Closing (Oct. 31, 1994) ........................................................................... Reply App. 00083

Liability Register (Oct. 29, 1998)................................................................. Reply App. 00094

Timothy Curry & Lynn Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC BANKING REV. 26 (2000) (excerpts) ........................................... Reply App. 00095

U.S. GEN. ACCOUNTING OFFICE, RESOLUTION TRUST CORPORATION: PERFORMING ASSETS SOLD TO ACQUIRERS OF MINORITY THRIFTS (1995) (excerpts).................................................. Reply App. 00105

U.S. GEN. ACCOUNTING OFFICE, FINANCIAL AUDIT: FEDERAL DEPOSIT INSURANCE CORPORATION'S 1997 AND 1996 FINANCIAL STATEMENTS (1998) (excerpts)............................................... Reply App. 00107

ANTHONY SAUNDERS & MARCIA MILLON CORNETT, FINANCIAL MARKETS AND INSTITUTIONS: AN INTRODUCTION TO THE RISK MANAGEMENT APPROACH (2007) (excerpts) ....................... Reply App. 00109

Deposition of James R. Mindnich (Mar. 16, 2006) (excerpts) ...................... Reply App. 00111

Consolidated Taxable Income Year 1992..................................................... Reply App. 00113

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs, and FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervener, v. THE UNITED STATES OF AMERICA, Defendant. | ) | No. 93-531 Judge Loren Smith |

**DECLARATION OF CHARLES W. CALOMIRIS OF JULY 14, 2006**


Qualifications

Introduction

I. Inappropriate Interest Calculations Inflated the Receivership Deficit After the Resolution
   A. Because the Government Does Not Pay the Time Value of Money for Damages, It Is Inconsistent and Incorrect for the Government to Impute Interest When Calculating the Receivership Deficit
   B. The Time Value of Money Used for Computing Imputed Interest Costs for a Receivership Deficit Should Be Calculated Using Short-Term Floating U.S. Treasury Interest Rates for the Period of the Receivership

mortgage brokerage business during the liquidation. Section V considers the additional inflation of the receivership deficit that resulted from the delayed sale of some financial assets, which resulted in lower sales prices for those financial assets.

9. Table 1 summarizes my findings that the adjustments described in each of the five sections have a significant effect on the principal and interest balance ("P&I balance") of the receivership deficit. Rows (I) through (IV) of Table 1 show the effects of each set of changes in isolation. The last row of Table 1 shows the effect on the receivership deficit P&I balance of combining all the proper adjustments discussed in Sections I, II, III, and IV.[1] When all the appropriate adjustments are made, the receivership would have a surplus P&I balance of $87.4 million. This is a conservative estimate, which does not fully take into account all of the factors I identify that would have added to the receivership surplus.

TABLE 1: RECEIVERSHIP DEFICIT BUT-FOR COMPUTATIONAL AND CONCEPTUAL ERRORS, CONGRESSIONAL INJURY, CLOSURE OF CARTERET MORTGAGE COMPANY, AND CONTRACTUAL BREACH IN THE TREATMENT OF GOODWILL

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) |
|---|---|---|---|
| (I) Charge no interest on receivership deficit & charge no interest on escrow | 20.7 | 154.7 | 156.6 |
| (II) Impact of Congressional delay on sale of branches | (23.1)* | 198.5 | 156.6 |
| (III) Supervisory goodwill restored | 59.6 | 115.8 | 97.0 |
| (IV) Mortgage origination unit sold | 138.0 | 37.4 | 19.0 |
| **Corrections (I), (II), (III), & (IV) Combined** | **(87.4)*** | **262.8** | **156.6** |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

1. Although I do not attempt to quantify the effects on the receivership deficit from the adjustments discussed in Section V, these adjustments would decrease the receivership deficit when considered in isolation from any other adjustments and when combined with any other adjustments.

computations, the FDIC applies the debt repayments on a pro-rata basis to all three loans. Presumably, the FDIC's rationale is that some creditors of the thrift should not be paid off before others. Although that approach might make sense when crediting various private parties who are creditors, here the identity of the creditor for all three loans is the same: the government. In this case, there are no preferences or conflicts among creditors because the loans are all from the same entity. Thus, payments should be allocated first on the highest cost loans, regardless of the timing of their resolutions. There is no economic justification for a pro rata pay down of the debt.

44. FDIC witness Wayne Green testified in a deposition that the three loans had the same priority, that dividends for all three loans were paid into the same FRF RTC resolution fund, and that the receivership-maximizing allocation of dividends would be to allocate dividends to the highest rate liability.[35] He testified that the payments were allocated across all three liabilities rather than to any particular liability.[36] He admitted that allocating payments to the claims on a pro-rata basis rather than to the highest cost claims resulted in increasing the cost of the receivership.[37]

### 2. Assuming the Government's Faulty Interest Rates Are Not Corrected, the Government's Failure to Allocate Payments to the Highest-Cost Resolutions First Substantially Inflated the Receivership Deficit through December 2005

45. If payments are allocated to the highest-cost resolution until its principal is paid down,[38] and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $124.3 million as of December 31, 2005 if

35. Deposition of Wayne S. Green at 291-294 (Mar. 1, 2006).

36. *Id.* at 294-295.

37. *Id.*

38. The principal for the three resolutions should be paid down first, because once the principal is paid down, interest stops accruing according to the FDIC accrual rules. *See* Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006); "Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499); E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).

interest stops accruing in an individual loan once the principal in that loan is paid. This deficit is $51.1 million lower than the $175.4 million deficit's P&I balance calculated using the FDIC's faulty methodology. If payments are allocated to the highest-cost resolution until its principal is paid down, and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $161.9 million as of December 31, 2005 if interest stops accruing in an individual loan once the principal amounts in *all* loans are paid (row (4) of Table 2). This deficit is $13.5 million lower than the $175.4 million receivership deficit P&I balance calculated using the FDIC's faulty methodology. Of course, if one properly excludes interest from the receivership calculations, or if one includes interest but uses floating short-term Treasury yields instead of the frozen 52-week rates, then the receivership deficit calculations would not be affected by the allocation of payments among the three loans. Thus, correcting the FDIC's assumed allocation of payments is only relevant if one inappropriately includes interest in the receivership deficit, and if one uses the FDIC's incorrect interest rate concept in those calculations.

**E. The RTC/FDIC Failed to Credit Sales Premium to the Loan Principal Using a Consistent Measure of the Time Value of Money**

46. As noted above, the RTC credited the sales premium from branch sales to an escrow account and did not credit the resolution loans by the amount of the sales premium until April 1995. That delay mattered because the RTC used a lower interest rate when calculating accrued interest on the escrow account than the rate it used when calculating interest costs of the receivership. According to FDIC spreadsheets, the interest earned in the escrow account was

institutions: Carteret spent 826 days in resolution, compared to 673 for Atlantic and 693 for Lincoln. Given Carteret's quality and the timing of its resolution, it is conservative to assume that in the but-for world it would have been resolved in 365 days, which is the average resolution period for the other 10 large thrifts that failed in the late 1980s and early 1990s, including Atlantic and Lincoln.

82. Had Carteret been resolved in the average time period in which thrifts of comparable size in the late 1980s and early 1990s were resolved, then Carteret's resolution would have occurred on or before December 4, 1993—365 days after it was seized. But-for the Congressional funding delays to the RTC, the RTC could have marketed Carteret as a whole bank, thus enabling it to sell Carteret's deposits and assets simultaneously at the time of resolution. In addition, the absence of the minority preference program would have lifted another obstacle to selling Carteret as a single entity. In this but-for world, if the value of Carteret's assets plus the deposit premium were greater than or equal to the value of Carteret's deposits, then no loan would be required to fund the resolution, and there never would have been a receivership deficit.

83. As of December 31, 1993, Carteret had $1.787 billion in deposits. I assume that, but-for the delay, Carteret would have sold its branches at the same 10.5 percent deposit premium as it actually sold its branches in the second resolution (the first 14 New Jersey branches sold subject to the minority preference program). This is a conservative assumption, as the deposit premium likely would have been higher but-for the minority preference program, as I explain below. Given its deposits of $1.787 billion and a 10.5 percent deposit premium, I estimate that but-for the delay resulting from Congressional actions, the Carteret branches would have sold for a total deposit premium of $187.6 million—$43.8 million greater than the $143.8

million deposit premium the branches actually sold for. I assume that the sales proceeds from Carteret's assets in December 1993 would have been $1.205 billion—equal to the sum of actual dividends paid toward the resolution loans ($1.351 billion), minus the actual interest earned from the escrow account of $1.9 million, minus the actual deposit premiums of $143.8 million from the resolutions. This is a highly conservative approach to valuing the but-for market value of Carteret's assets, as I explain in the remainder of this section and in Section V. I estimate the total sales proceeds (equal to deposit premium plus assets sold, minus settlement interest[94]) but-for the delay to be $1.393 billion at the time of the but-for resolution (versus the $187.3 million in sales proceeds at the time of the actual resolutions).

84. Because the but-for sales proceeds of $1.393 billion exceed the actual resolution loan principal of $1.370 billion,[95] no loan would be required to fund the resolution when correcting for the delay and value destruction of Carteret's receivership, and the receivership's P&I balance would be $23.1 million in surplus. As shown in row (1) of Table 4, this balance would have been $198.5 million lower than the government's inappropriate estimate of that balance as of the end of 2005.

---

94. When calculating the but-for receivership deficit's P&I balance under any scenario throughout my report, I use the actual value of settlement interest without adjusting it. The settlement interest paid by the RTC to the acquirors reflected the two to three day delay between closing the sale and wiring the funds equal to the difference between the amount of deposits assumed less premium paid and assets purchased. The value of actual settlement interest, which was less than $500,000, or 0.26 percent of total sales proceeds, is inconsequential to the results of the analysis.

95. The deposit runoff between the time Carteret should have been sold in December 1993 and the time its branches were actually sold was funded dollar for dollar by earnings and asset sales. Therefore, the difference between the but-for sales proceeds, including the earnings and asset sales that funded the deposit runoff, and the balance of deposits in December 1993 is equal to the difference between my measure of the but-for sales proceeds of $1.393 billion and the actual resolution funding requirement of $1.37 billion.

### c. Isolating the Consequences of Delay and Deposit Runoff from the Minority Preference Program

85. The minority preference program delayed the sale of 16 Carteret branches. This delay resulted in deposit runoff, which in turn contributed to the lowered amounts bidders were willing to pay for those branches.

86. The initial bids submitted for the 16 branches would have yielded a premium of $87.8 million—the amount of premium that Midlantic and Sovereign would have offered for those branches before the re-auction.[96] However, the RTC ultimately realized a premium of only $68.4 million on those 16 branches when they were sold in March 1995. Absent the delay caused by the minority preference program, but without taking account of the prior delay associated with the lack of Congressional funding, the branches would have likely been sold for $87.8 million at the same time as the other group of branches were sold in October 1994. In addition, the branches that were actually sold in the January 1995 resolution would have also been sold in October 1994 but-for the minority preference program. Although those branches did not require reauctioning like the branches that sold in March 1995, and therefore did not result in lower deposit premiums from the delay, their sale was still delayed by the problems with the initial disqualified minority bidders. In addition, Carteret would have been sold as a whole bank without the constraints of the minority preference program that forced it to be sold in pieces. Therefore, Carteret's assets and deposits would have been sold simultaneously in 1994, and a loan would have only been required if the sales proceeds from assets and deposits sold did not exceed the resolution funding requirement, approximately equal to the book value of the deposits.

---

96. Ramey Exhibit 49, at 4-5 (C-AM-A-0130614 – 15); Midlantic National Bank, Bid Form for Carteret National Savings Bank, at C-AM-A-0129998 - 0130000, 0130010 - 12.

### 2. The Minority Preference Program Resulted in Lower Deposit Premiums from the Branch Sales

88. The delays and value destruction by the government not only reduced the deposits available for sale, they likely reduced the premium received per deposit dollar for the sale of the branches. The premium per deposit dollar likely was reduced by two factors: (1) the value-destroying structuring of the transactions through which the bank was sold, and (2) the rules of the bidding process for its assets, which likely further reduced the value received. Both the value-destroying structure of the sale and the value-destroying bidding rules were direct consequences of the minority preference program. Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence suggesting that these losses were significant economically. Thus, my quantitative estimates in Table 4, which do not adjust for the reduced premium per deposit dollar, should be viewed as highly conservative (low) estimates of the reduction in the receivership surplus that resulted from government value destruction.

#### a. The Minority Preference Program Forced Carteret to Be Sold in Pieces, Rather Than on a Whole-Bank Basis

89. Carteret was sold in pieces rather than as a whole, which tends to reduce the premium received. The piecemeal sale of Carteret reflected the constraints imposed by the minority preference program, which favored smaller bank bidders for whom Carteret's large size would otherwise have been prohibitive.

90. Recall that Carteret initially qualified for the Accelerated Resolution Program (ARP) in 1992. ARP resolutions, which are typically reserved for banks with high potential sale premiums, are similar to "Reprivatizations" (save that banks resolved through ARP were not always formally in receivership). According to the standard RTC/FDIC measure of going concern value (the estimated difference between "resolution cost" and "payoff cost" of the

institution, which the agencies compute as part of their analysis of least cost resolution, expressed here in percent terms as payoff cost minus resolution cost divided by payoff cost), Carteret had a high going concern value. Intuitively, that going concern value represents the incremental value of having a going concern make depositors whole versus having the RTC/FDIC do so instead (and then sell the bank assets piecemeal in order to cover the present value of the outlay). If the expected cost of resolution is close to the expected cost of payoff then there is not much perceived value in preserving the institution through creative marketing programs. If, on the other hand, the expected costs are very different, that indicates that the RTC/FDIC believes that an acquiring institution will pay a premium to acquire the resolved bank's assets and liabilities as a package. Because neither the RTC/FDIC nor an acquiring institution should fail to recognize potential value, the going concern value is closely related to the expected premium from sale as a going concern rather than in pieces. Carteret's least cost resolution forecast indicates an expected premium value that compares favorably with other bank and thrift failures, no matter how measured.[97]

91. Judging from the RTC/FDIC measure of going concern value, Carteret's expected premium value of 37.4 percent was better than (that is, above) 75.7 percent of all other banks and thrifts that failed between 1980 and 2004, meaning that Carteret should have commanded a higher transaction premium, *ceteris paribus*, than more than 75 percent of other institutions that failed in the past two decades. Carteret's expected premium value was higher than 73.7 percent of the other thrifts that failed between 1980 and 2004, higher than 75.0 percent of the other thrifts that failed in 1992, and higher than 90.0 percent of the other thrifts with assets between $4

97. I refer to the estimated percent difference between resolution cost and payoff cost as the "expected" premium value, although it is not clear whether this measure is an unbiased forecast of the realized premium. Nevertheless, the estimated percent difference between resolution cost and payoff cost should be highly correlated with realized premiums.

billion and $6 billion that failed between 1980 and 2004 (all of which failed between 1988 and 1991). Hence, Carteret should have commanded a much higher sale premium than most other institutions.

92. Because the RTC was not sufficiently funded to assist Carteret to reprivatize in the ARP program, Carteret ended up being marketed as a Purchase and Assumption more than two years later under the newly-amended minority preference program, which was carried out as a "Branch Sale." Statistically, for thrifts being resolved in the 1990s, the change from a "Reprivatization" to a "Branch Sale" is associated with substantially lower premium received per deposit dollar.

93. How did Carteret's marketing as a Purchase and Assumption (instead of a Reprivatization under the ARP in early 1992) affect its resolution outcome? Figure 3 shows the propensity for resolutions of different types based upon the institution's particular expected premium value. It is clear from Figure 3 that Merger and Reprivatization transactions enjoy higher expected premium value from resolution, followed by Purchase and Assumption transactions, and Insured Deposit Transfer and Payoff transactions. Mergers and Reprivatizations are the typical means of resolutions when expected premium values lie above 25 percent (Carteret's expected premium value was 37.4 percent) while Insured Deposit Transfers and Payoffs are far more common when premium values approach 0 percent (the cost of resolution is not very different from a payoff, i.e., there is little going concern value to be preserved).

94. The expected premium value is a good predictor of the resolution type, and institutions with high going concern value are resolved through methods that preserve that value. Judging from Carteret's expected premium in 1992 and its status as an ARP transaction, it is likely that far less value would have been lost had Carteret been resolved through a Merger or

Reprivatization under the ARP program as originally intended. Instead, as a consequence of the minority preference program, Carteret was resolved by Purchase and Assumption instead of Merger/Reprivatization, a style difference that is associated with a 28.8 percent lower average expected premium value of 19.0 percent. The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[98]

FIGURE 3: VALUE AND RESOLUTION STRATEGY: PRIMARY RESOLUTION TYPES




98. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

95. How did the Branch Sale structure, arising from the implementation of the minority preference program, further affect the outcome? Figure 4 shows the frequency of branch sales based upon different premium values of different institutions. Again, branch sales are typically used where there is less expected premium value to be preserved through more value-preserving resolution techniques. Branch Sales are uncommon when premium values lie above 25 percent (recall, again, Carteret is 37.4 percent) while Branch Sales are very common when premium values approach 0 percent (since the cost of resolution is not very different from a payoff, i.e., there is little value to be preserved). Again, the main point is that a low expected premium value is a good predictor of a Branch Sale, while other institutions with high expected premium values are resolved through different methods that preserve their franchise values. It is likely that far less value would have been lost had Carteret been resolved through a Merger or Reprivatization under the ARP program as originally intended. Instead, Carteret was resolved by Branch Sale, a style difference that is associated with an average 15.1 percent lower value premium on deposit sales over non-branch sale resolutions.

96. The average expected value premium on Mergers and Reprivatizations was 47.9 percent, whereas the average expected premium for a standalone Purchase and Assumption was 20.1 percent, the average expected premium for a Purchase and Assumption with a Branch Sale was 14.3 percent, the average expected premium for a standalone Insured Deposit Transfer was 7.6 percent, and the average expected premium for an Insured Deposit Transfer with a Branch Sale was 2.1 percent. The lack of Congressional funding and increased minority preference restrictions imposed by Congress during the wait for funding resulted in Carteret being resolved as a Purchase and Assumption with a Branch Sale, implying an average expected premium value of 14.3 percent rather than a Mergers and Reprivatization transaction with an average expected

premium value of 47.9 percent, an absolute difference of 33.6 percent (or viewed alternatively, a 70.1 percent drop in expected premium value). The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[99]

FIGURE 4: VALUE AND RESOLUTION STRATEGY: BRANCH SALES




**b. The Minority Preference Program Discouraged Non-Minority Bidders from Participating in the Auction for Carteret's Branches**

97. Controlling for other factors, the bidding rules of the minority preference program reduced the number of bids and created disincentives for high bids. The preference program

99. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

amounted to the granting (for free) of a valuable option to minorities to match the high bid of others who had invested resources to value Carteret's branches. The effect of such a grant is to discourage entry by non-minority bidders, which in turn, depresses auction prices. Indeed, an internal government memo confirms that the minority preference program likely discouraged non-minority bidders from participating in the auction. In a memo dated October 26, 1995, J. Paul Ramey, Vice President, Division of Resolutions of the RTC, considered whether "[p]re-screening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received." His complete response was as follows:

> Although the statement may be true, I believe apples and oranges have been mixed here; what do "pre-screening of bidders" and "minority bidder preference programs" have in common? The pre-screening, if you are talking about up-front disqualification from bidding, would likely result in a lesser number of initial attendees at a bidders' meeting and theoretically decrease the competition. As for any type of bidding preferences, it has been my personal opinion that this is a deterrent to the competitive aspect of the bidding process; however, this has not been definitively proven to be the case.[100]

Mr. Ramey reasons correctly that non-preferred entities would not want to make the investment necessary to value a series of branches if they thought that their efforts would be futile or could be utilized by a preferred bidder. The cost of preparing a bid is not trivial. Given this significant cost of participation, it is reasonable to conclude that a non-minority bidder would not incur such an expense if it knew that its high bid could be matched and thus the likelihood of winning was close to zero.

**c. The Minority Preference Program Induced Non-Minority Bidders to Bid Less Aggressively Than They Otherwise Would Have Conditional on Entering the Auction**

98. Unfortunately, the price-depressing effect of the minority preference program was not limited to deterring entry. By creating a "toehold" advantage for certain bidders, the minority

100.Memo of J. Paul Ramey, Oct. 26, 1995, Exhibit Ramey 12 at 4 (C-AM-A0125188).

preference program could have depressed prices in ways not contemplated in the Ramey memo. In particular, the minority preference program may have induced non-minority bidders to bid less aggressively than they otherwise would have conditional on entering the auction. In a seminal auction paper, Professors Bulow, Huang and Klemperer show that even a slight toehold advantage to one bidder can have a significant impact on auction revenues in a common-value ascending (English) auction.[101] Hence, the minority program could have depressed the deposit premium for Carteret in two separate yet complementary ways: (1) by discouraging entry by non-minority bidders, and (2) by inducing non-minority bidders to bid less aggressively during the auction.

99. To understand the intuition behind a toehold advantage, consider a very simple example in which two bidders compete for a prize equal to the sum of the money in bidder 1's wallet (which is unknown to bidder 2) plus the money in bidder 2's wallet (which is unknown to bidder 1). For ease of exposition, assume that the most money in either bidder's wallet is $1. If bidder 1 wins the auction, he gets paid the sum of the money in the two wallets less his bid. If bidder 2 wins, he gets paid the sum of the money in the two wallets less 95 percent of his bid. In the language of Bulow, Huang and Klemperer, bidder 2 has a "toehold advantage" equal to 5 percent. When the auction is symmetric—that is, when neither bidder has a toehold advantage, each bidder remains in the auction until the price for the content of the two wallets reaches roughly two times the content of his own wallet.[102] When bidder 2 has a slight toehold equal to 5 percent, bidder 1 remains in the auction until the price for the content of the two wallets reaches

101.Jeremy Bulow, Ming Huang & Paul Klemperer, *Toeholds and Takeovers*, 107 J. POL. ECON. 427 (1998).
102.*Id.* at 438-439.

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - x
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
:
and :
:
FEDERAL DEPOSIT INSURANCE : No. 93-531
CORPORATION, : Judge Loren Smith
Plaintiff/Intervener, :
:
vs. :
:
THE UNITED STATES OF :
AMERICA, :
Defendant. :
\- - - - - - - - - - - - - x

DEPOSITION OF CHARLES W. CALOMIRIS
VOLUME 3

New York, New York
Friday, July 7, 2006

REPORTED BY:
DONALD R. THACKER

Page 609

Q Slight in the government's favor?
A May I?
Q Yes.
A There is a very slight difference in -- over time, that is not clear whether it is statistically significant difference. When you look at transactions as I have had occasion to do, very informally, so you could say that we know that in the business cycle generally that especially the industry financial cycle for banks and savings and loans, that deposit premium may vary over the cycle.

Now, if we were doing a but-for calculation for 1991 or early 1992 there would be a significant, not necessarily statistically significant still, because there are so few observations that one has, but there would be at least a somewhat economically significant difference, maybe of a couple percentage point, between let's say 1991, '92, and something like 1994-'95.

Remember that -- so if we were looking at let's say 1991-'92 we might see a couple of

Page 610

percentage point difference in the average deposit premiums received, because that was such a starkly different time, '91 versus '94-'95.

By about the middle of 1993 there had been a very big recovery in deposit premiums in the market, to the extent that we can have a small sample of observed deposit premiums really make those kinds of fine distinctions about exactly when you would say near full recovery had happened.

And there is, as far as I can tell from having looked at a few observations which are in the past, which are not enough observations to do a statistical analysis of changeover time because we don't have enough, that change was pretty much complete by the end of 1993.

So while there was a couple of percentage point difference between let's say 1992 and 1994, that was no longer true by the end of 1993, that is the end of '93 and the end of '94 were pretty much the same.

So if I could have made an adjustment based on reliable statistical inference with data

Page 611

that I knew I could use I would have done it. It would have been essentially zero for the comparison between December '93 and the end of '94 as far as I know, but I also don't, haven't seen a database that would allow me to do that with any statistical precision.

More importantly, my calculation is very conservative so the difference of let's say 10.5 percent versus 10.4 percent or 10.2 percent, if it turned out that such a database existed, and it might produce very, very slight differences, I am confident that they would be slight differences between December '93 and December '94, if at all, and that those slight differences would be dwarfed by the considerations that I am leaving out that make this analysis very conservative, which we discussed at length yesterday.

So just to summarize, if this were an analysis of a '91 but-for transaction I think that there would be some need to discuss this issue, it would still probably, that two percentage point or whatever it would be different would probably be

Page 612

dwarfed by the other aspects of this calculation that are being left out which I have discussed at length.

Q So as I understand --
A But, I don't believe that there is a significant either economically or statistically significance of any that magnitude between December '93 and '94, as far as I know.
Q If there were a two point difference in the government's favor between the market for deposit premiums in '95 and '93, you are confident that that would have been more than made up for by the synergy effect so that it is still a conservative appraisal you have made?
A Given all the conservatisms, having to do with the bidding process, the structuring of the transaction, yes, I think that is a fair conclusion but that is not one that I had to grapple with because this is not a 1992 or even an early or mid 1993 counter factual, it is a December of '93 counter factual. And given my knowledge of the market I can say with some confidence that

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------------

AMBASE CORPORATION and CARTERET BANCORP, INC.,

Plaintiffs,

-and- No. 93-531

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Intervener,

-against-

THE UNITED STATES OF AMERICA,

Defendant.

----------------------------------------

Tuesday, October 3, 2006

9:46 a.m.

Deposition of ANTHONY SAUNDERS, taken by Plaintiffs, pursuant to Notice, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, before Lisa Rosenfeld, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 102

leading to a high degree of customer loyalty?
A. Yes, then I would have to look at turnover rates and depositors and turnover rates in loan customers. So that means a number of numerical measures there I can apply. But as I said, I haven't done the application so I don't know.
Q. So you wouldn't treat this as presumptively correct without doing your own analysis?
A. Yes, you're asking me as an economist and I'm saying so.
Q. If it were true and if you did conclude that this was correct, would that be a positive for an acquirer?
A. Yes.
Q. Now the same with the statements on page 26 that I read to you and into the record about the office network being well positioned in strategic markets and located in some of the top performing market areas. If that were true, would those be positives for an acquirer?
A. Yes, if that was true.

Page 103

Q. Turning to the paragraph right above liquidity on page 27, it says "The bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office present. Average account balances for each product at CFSB exceed industry averages. These characteristics combined with the relative stable deposit base further enhance the valuation of the bank's franchise."
Do you have any reason to disagree with those statements?
A. Again it's the same as I've said before, I haven't done my own analysis, I have no reason to agree or disagree.
Q. If you were to do your own analysis and you concluded that these statements were accurate, then is the conclusion at the end of the paragraph accurate that it would enhance value of the franchise?
A. It depends. I mean high-balance households, it depends if I can provide the certain

Page 104

services that high-balance households demand. It might not be the best strategy if I am a bank in Newark which this bank had a presence in Newark. It might be better if I had better service for let's say low-balance households. So it's not clear.
Q. Do you have an opinion as to what the value of Carteret's franchise was on a fair market value basis, its branch network franchise in December of 1992?
A. No, I don't have an analysis.
Q. Do you have an opinion as to what the fair market valuation of Carteret's branch network was as of December 1993?
A. I haven't done that analysis either.
Q. Let's turn in your report to page 53. In paragraph 100 you talk about "The errors in logic arise in part from a mixing up of arguments relating to the difference in the value of goodwill of a going concern versus that of a failed institution like Carteret."
Before we get into the specifics of this, you talk about the errors in logic that

Page 105

Professor Calomiris committed. Does Professor Calomiris have a good reputation in the academic community?
A. Yes.
Q. He does, okay. In terms of the value of goodwill to a going concern. Do you recall testifying in Fifth Third that goodwill's value to an open institution was, quote, virtually nil, close quote?
A. Open in what context, open a failed institution or open an ongoing institution?
Q. Open an ongoing institution.
A. I think I was opining on Fifth Third, I don't know the context, I'd have to read the context. There's a difference between a value of goodwill of a successful going concern bank and a value of goodwill of a failed bank.
Q. Well, for a successful going concern bank with lots of excess regulatory capital, big capital cushion, do you think supervisory goodwill had substantial value?
A. Not really.

Page 106

Q. Why not?
A. Because presumably if you're saying substantially it's got a good bank, it's got a lot of capital tangible. So supervisory aspect of goodwill would be of little value.
Q. Does it have any value?
A. Well, it has some goodwill. I thought you said supervisory goodwill.
Q. Yes, does supervisory goodwill to an open institution that's healthy with plenty of excess capital to your opinion have any value to that institution?
A. Well, goodwill has value.
Q. I'm talking supervisory goodwill.
A. It depends, it depends on what its optimal -- you're talking about an open institution where we're counting supervisory goodwill as part of capital?
Q. Yes, and where even without counting, it still has plenty of excess capital. And my question is we'll just put some numbers on this, maybe to make it concrete. Let's say you had an institution

Page 107

that had a hundred million in assets, it had 20 million in tangible capital, capital requirement of 3 percent.
A. Uh-huh.
Q. And it has another hundred million of supervisory goodwill. My question is an institution like that, very well capitalized, would the supervisory goodwill in your opinion have value to that institution?
A. Very little value.
Q. Now let's say that the institution had zero -- that same institution, a hundred million in assets, 3 percent capital requirements or requirement of 30 million of -- excuse me, 3 million of tangible -- of capital, let's say, and let's say it has zero tangible capital but it has 5 million of supervisory goodwill. Would that institution have value from supervisory will?
A. It shouldn't.
Q. Why is that, because it could raise capital?
A. No, because its true capital is tangible

Page 108

capital and that protects me against losses. Supervisory goodwill is intangible capital, does not protect me against losses.
Q. But the supervisory goodwill would allow you to stay in business?
A. If the regulator was foolish enough to allow you to stay in business.
Q. Let's say the regulator had a contract which required him to allow you to?
A. I'm not -- that's a legal opinion. But I'm just saying is a bank with no tangible capital and just supervisory goodwill has no protection against losses and to my mind is insolvent and should not be let to continue to exist.
Q. Well, but wasn't -- all these Winstar cases like Carteret, like the Glendale case, I mean these were institutions that where you had a healthy thrift come and at the government's invitation to bid, acquire these bad thrifts, failed thrifts, and then when they're done, the day after the merger the combined entity has negative tangible capital. So is the criticism you're making about regulators

Page 109

allowing these institutions to stay open, are you taking issue with the supervisory goodwill transactions from the get-go?
A. No, I mean also the banks themselves have a decision. They didn't have to do the acquisitions. They had a business -- they made a business decision. They had, well, we can grow our assets, we can move into new markets, the fact that it didn't turn out very well is an ex post outcome. But you can't just blame the government for the contracts. There's two sides to any contract. There was no gun at the head of the banks to go into the contracts.
Q. Do you think it was ill-advised of the government to set these contracts up?
A. I think if you look at the economics that they closed the banks when they were -- early on in many cases better than letting them run on and grow and then fail.
Q. Of course many of them didn't fail at all, right?
A. I think 20 percent failed, if not more.

Page 202

A. I can't remember. I can't remember.
Q. You can't remember whether you read it or you can't remember what it says?
A. I can't remember what it says and I can't remember whether I read it.
Q. Well, if you didn't read it how would you know whether it was newsworthy or not?
A. As I say, I don't until I read it. I didn't dispute, you're telling me it's newsworthy, I'm saying I don't know. It's the editors' decision. If the editors decide it's newsworthy, whether I agree is my own personal opinion.
Q. My question is --
A. I haven't read it so I can't opine.
Q. If it were newsworthy then that would explain the bump in the -- the drop in the stock price, right?
A. It depends when the news came out. News comes on the news wire all the time. Is it old news, is it stale news, is it news from weeks ago when these things happened. Newspapers are often the last to report the news, financial news.

Page 203

Q. This was a report of a key vote in the Congress from the day before, so that's not stale news, is it?
A. It depends what time the vote was taken.
Q. Back in 1989.
A. What time of the day the vote was taken.
Q. In 1989 news did not get stale from one day to the next, did it?
A. You're a more financial expert than me.
Q. Well, let me ask you, I mean do you think news in 1989 got stale in a day?
A. Yes, I think the market is pretty efficient.
Q. Really?
A. Yes.
Q. Point me to an example in the late '80s or early '90s where news got stale in a day.
A. I'm sure I could find one if I went back to look.
Q. But you can't think of one here?
A. Not offhand.
Q. And you certainly can't think of one

Page 204

where it was a vote in the Congress?
A. Well, votes in Congress are very quick to come on the wire. So I'm surprised -- it depends, as I say, what time in the day. Was it 1 o'clock, was it 2 o'clock. I'd have to take a look.
Q. So if it was after trading hours closed, then the soonest it could have been reflected was in the morning, right?
A. The following morning?
Q. Yes.
A. Of the next day?
Q. Yes.
A. After 4:30?
Q. Yes.
A. I agree. If there was any material value to that news.
Q. And if the stock market moves in an abnormal direction the morning of the release of a vote that occurred at night, isn't that powerful evidence that the market thought it had an impact?
A. Yes, but this is market for what

Page 205

Carteret stocks, all stocks?
Q. Carteret.
A. Did all other stocks move?
Q. No, that's why it's an abnormal market.
A. No, is it an announcement that affects all thrifts. Was there another announcement on that date that affected all thrifts in the thrift industry, I don't know.
Q. You haven't looked?
A. I have not looked.
Q. So you have no reason to dispute Professor Calomiris's conclusion that that New York Times story explains the stock market performance?
A. I just gave you 15 reasons why I do dispute it.
Q. No, you gave me 15 reasons of why it might be possible if you had read the article that you dispute it.
A. No, I'm just saying a lot of news is stale. A lot of news is not relevant. It depends on the relevance of the news, it depends on what's in the news article and when it's announced. It

Page 210

correspondence would cut off their supply of inflow of pipeline into the company.
Q. How would that -- is that just a risk that -- how would that risk affect the company?
A. If you've got nothing coming in there's nothing to do out so it's defunct.
Q. If it were entirely dependent upon correspondence?
A. It would significantly be dependent on correspondence.
Q. A couple of times in your report you referred to the assets and liabilities of Carteret Mortgage Company. What assets did Carteret Mortgage Company have?
A. The assets would have been those assets that it received to sell to outside parties that it held during the period which it was going to turn them over.
Q. Do you know what the typical period of time that Carteret Mortgage Company would hold assets?
A. I think pretty short.

Page 211

Q. Do you have any concerns about the assets that Carteret Mortgage Company was holding in December of 1992?
A. I didn't evaluate their portfolio that they were holding in 1992.
Q. So you don't have any concerns about it?
A. I didn't say I didn't have any concerns. I don't really know what the composition of that portfolio was to make that evaluation.
Q. On page 77 in paragraph 137, about halfway through the paragraph you make reference to the firm's, which I assume is CMC, troubled assets and liability. Why would you think they're troubled if you didn't examine their characteristics?
A. Well, to the extent that they were absorbing assets and liabilities mortgages from Carteret itself rather than from outside correspondent banks.
Q. When you say absorbing, what do you mean by that?
A. Well, the risk of the underlying holding company here, Carteret, which was a subsidiary of

Page 212

Carteret, was more risky.
Q. I'm sorry, why does that follow in the sense of Carteret Mortgage Company didn't have any troubled assets on its books, did it?
A. I'd have to go and look at that.
Q. You don't know though?
A. All I know is a subsidiary of a company that had considerable classified assets, troubled assets.
Q. Professor Calomiris is looking at Carteret Mortgage Company as standalone entity that could be spun out, so why would the parent's companies alleged problems have anything to do with --
A. I don't know, there might be contingent assets and contingent liabilities. There generally are between contingent assets and contingent liabilities existing between a subsidiary of a company and its owner or holding company.
Q. Were there any such liabilities between Carteret and Carteret Mortgage Company?
A. Well, there might have been some -- I

Page 213

don't know, there's a potential there for risk shifting.
Q. Potential for what?
A. Risk shifting.
Q. And but you didn't see any evidence of that risk shifting?
A. I didn't see any evidence, no.
Q. What sort of liabilities would Carteret Mortgage Company have had?
A. The most companies like this raised their funding with short-term paper.
Q. Now you make the point that while Imperial was able to hire Carteret Mortgage Company staff without acquiring any of the firm's troubled assets and liabilities, right?
A. Uh-huh.
Q. Now, the RTC in the real world was stuck with those assets and liabilities, right?
A. Uh-huh, that's correct.
Q. So what impediment as a financial or economic matter would there have been for the RTC to say okay, we're stuck with these assets and

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------------

AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiffs,
-and- No. 93-531
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervener,
-against-
THE UNITED STATES OF AMERICA,
Defendant.

----------------------------------------

Wednesday, October 4, 2006
9:37 a.m.

Continued deposition of ANTHONY SAUNDERS, taken by Plaintiffs, pursuant to Adjournment, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, before Lisa Rosenfeld, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 330

A. I don't know because an auction is uncertainty.
Q. What does that mean, there's uncertainty? 09:54
A. In an auction by definition you're competing. You're uncertain as to whether you will get the goods.
Q. So how does that impact your bidding 09:54 strategy?
A. I might well say if I want it I'll offer a higher price today to be sure to get it.
Q. That's a fair point that maybe the Gulf Coast might have paid an even higher price. But is 09:54 there any reason why they would have paid a lower price if this had been an auction?
A. As I say I don't know, I don't know what the assets were and I don't know what the value was, but all I can say is observing a higher price is not 09:54 unusual in an asset sale because it has more private value to the buyer.
Q. Is it unusual for someone to be able to buy loans on one day and sell them for a 6 percent

Page 331

profit on the next day? 09:54
A. Yes, I think the loan sales market now is a market of probably $200 billion a year, it's one of the largest financial markets. Loans get bought and sold every day.
Q. At 6 percent profit within a single day? 09:55
A. It can change a loan.
Q. 6 percent in one day?
A. I'd have to look.
Q. You've never seen one that's changed 09:55 6 percent in one day?
A. There's 200 billion being traded, I don't know the prices of every single loan but all I know is they're traded.
Q. Sure. 09:55
A. And it's a very frequent activity, I'm sure, there are cases where prices have changed 10 percent or 15 percent.
Q. In a day?
A. Yes, I wouldn't be surprised. 09:55
Q. Are there ethics rules on brokers about their ability to market up a loan in one day?

Page 332

A. In a secondary market?
Q. Yes.
A. I think secondary market loans are 09:55 tradable assets.
Q. You say secondary market, is that in distinction to the primary market?
A. Yes, because these loans are outstanding and then we're selling them in the secondary market. 09:55
Q. What's the primary market?
A. Market of originations.
Q. Are there any ethics rules on that?
A. The truth in lending laws, et cetera, 09:55 et cetera.
Q. I mean on the markup of you buy an asset on one day if you're a broker, can you --
A. Then it's a secondary market. Once I sell it, it's a secondary market. It's completely 09:56 different.
MR. LEVITT: I think also it should be pointed out that your statement of issues pointed out that the auction was well prior to the closing and the sale of the Dryades. 09:56

Page 333

Q. You point to some auction articles in your report. Did those study auctions in which there was a preference?
A. Which auction articles are you talking about, Calomiris's ones or my ones? 09:56
Q. Your ones.
A. I think the one I pointed to as empirical.
Q. That didn't study auctions in which there was a preference that afforded some bidders, 09:56 did it?
A. All it looked at were wholesale banks versus branch sales, if I remember.
Q. Right, but it didn't try to in any way 09:57 address the concern that Professor Calomiris is raising which is when you give an incentive or some preference to some bidders, that can depress the price?
A. On the other hand if you really want the 09:57 good is a higher value than the good of the common value that you pay higher.
Q. What does that mean, the good has a

Page 334

common value?
A. Well, the paper he's referring to is 09:57 what's called a common value auction where you and I agree that the asset has the same value, a private value auctions, you and I incur a particular asset and disagree over its true value when we trade. If my private value is higher than your private value I 09:57 will pay higher price.
Q. The only way to figure that out is with an open auction?
A. No. The same thing, even Joskow and Bulow, the paper Calomiris refers to, agrees the 09:58 results changed flipped, if you like, when there's a private value auction rather than a common value auction.
Q. Is there a value to a right of first 09:58 refusal, having a right of first refusal?
A. I would think so, yes.
Q. If a financial institution came to you and said we have an opportunity to bid on some branches but it's going to cost us a lot of money to 09:58 do due diligence and at the end of the day our

Page 335

primary competitor is very interested in that market, has a right of first refusal, is going to see our bid, has a right of first refusal.
A. If he matches the bid. 09:59
Q. Yes, and we're concerned that we may sink a lot of money into this due diligence, come up with the right price and our competitor won't spend a dime and say thanks a lot, we like what you've come up with and we'll take it at that price. 09:59
Would that be a fair concern?
A. No, I think what he would say if I really wanted the, good, I'd pay a higher price because I want to make sure I can outbid the buyer that has the first right of refusal. I want to make 09:59 sure if I really want that asset, I price it higher, not lower or even equal. I push the prices up. That's what a private value auction is. We disagree on the value of a branch or disagree on the value of 09:59 a particular bank.
Q. Have you ever been involved in any auction in the real world?
A. You mean like auction for antiques or

Page 336

something? 09:59
Q. I don't know.
A. I mean you're talking about an ascending auction, but these were not ascending auctions, which is another mistake in that article in the sense that it's not a mistake in the article he's 10:00 looking at ascending auctions. Our auctions are private value sealed bid auctions.
Q. Have you had any experience in the real world with private value sealed auctions?
MR. LEVITT: I want to object on 10:00 relevance.
A. Have I ever done, no.
Q. Have you ever had any participation in one?
A. No. 10:00
Q. Isn't it fair to say that bidders would be concerned if their competitors get advantages and preferences in the bidding process?
A. Yes, so the reaction is if we really 10:01 want the asset, we price it higher.
Q. If we really want it?

Page 337

A. If our private value is sufficiently high.
Q. Right, and if your private value isn't 10:01 sufficiently high it's just I think it's worth X, I'm willing to pay X. It's not worth any more to me than to him, wouldn't it be a concern that the other person can avoid the due diligence and snap up the branch? 10:01
A. No, because he has to match my price, so he might think about bidding 95, I can bid 99. And even to get to the second round he's got to match my bid.
Q. Why did the RTC have a 10 percent limit, 10:01 why did the minority bidder have to be within 10 percent of the highest bid?
A. To get to the second round.
Q. Yes, why?
A. To get to the second round. 10:01
Q. Why did the RTC have that feature?
A. That was an administrative 10 percent.
Q. Didn't it serve a purpose which was to give some comfort to the other -- to the other 10:02

Page 354

(Recess taken)
BY MR. THOMPSON:
Q. Professor, do you have your report in front of you? 10:30
A. Yes.
Q. I'd like to direct your attention to page 11 of the report. In particular in paragraph 24 you state in the middle of it "Despite the 10:30 enormity of the problem, you're talking about failed thrifts, Curry and Shibut estimate the cost of the RTC resolution from 1989 through 1995 as $82.7 billion with 7.1 billion, almost 9 percent borne by the private sector." Do you see that? 10:31
A. Yes.
Q. Do you think that's an appropriate estimate of the cost of the cleanup of the thrift problems for '89 through '95?
A. They are two economists at the FDIC so I 10:31 have no reason to doubt that that's a reasonable estimate of the cost.
Q. Let's look at your textbook and forgive me, I hope this isn't a copyright violation.

Page 355

MR. THOMPSON: So I'd like to ask the 10:32 court reporter to mark this as Saunders 17.
(Saunders Exhibit 17, Excerpt from textbook, was so marked for identification.)
Q. In your textbook Financial Markets and Institutions on page 418 you have a discussion at 10:32 the bottom of the page in the last paragraph, "In the 1980's the large number of savings association failures depleted the resources of the FSLIC to such an extent that by 1989 it was massively insolvent. 10:32 For example between 1980 and 1988 514 thrifts failed at an estimated cost of 42.3 billion. Moreover between 1989 and 1992 an additional 734 thrifts failed at a cost of 78 billion." Do you see that?
A. Yes, I do. 10:33
Q. That number is perfectly consistent with what the FDIC came up with, which was 87 billion for '89 through '92, right?
A. It would appear these numbers are for '89 through '95. These numbers are '80 to '88 and 10:33 '89 through '92 so they're not coincidental periods.
Q. But they are consistent to the extent

Page 356

that your textbook uses a shorter timetable and has $78 billion. The FDIC has added three years and it's $9 billion, right? 10:34
A. I don't know, but I'm just taking -- I'm just a reference to Curry and Shibut to what they say from the FDIC.
Q. But the numbers in your textbook are reliable, correct? 10:34
A. I would hope so.
Q. You don't have any reason to doubt it, do you?
A. Not that I can think of. 10:34
MR. THOMPSON: Let's ask the court reporter to mark as the next Exhibit 18, Exhibit 18, the Curry and Shibut.
(Saunders Exhibit 18, Document, was so marked for identification.) 10:35
Q. Let's turn to page 30, the last paragraph in the left-hand column which reads "However in our view, including financing costs when tallying the costs of the thrift crisis is methodologically incorrect. It is invalid because 10:35

Page 357

in present value terms the amount borrowed is equal to the sum of the interest charges plus debt repayment. Adding the sum of interest payments to the amount borrowed would overstate the true economic cost of resolving the crisis. An example 10:36 will illustrate the point. Assume an individual pays $100,000 for the purchase of a residential property and finances the whole amount with a 30-year loan at 10 percent interest. Over the 30 years of the loan the individual pays more than 10:36 300,000 in total costs, compromising interest and principle. Yet the cost of the home is still $100,000 because the present value of the total cost of 300,000 for 30 years of payments discounted by 10:36 the interest rate of 10 percent is approximately 100,000."
Do you agree with that analysis?
A. No.
Q. So the number in your textbook is wrong 10:37 and the FDIC is wrong?
A. No, I'm disagreeing with the first sentence.

Page 358

Q. Well, Curry and Shibut have calculated the cost to RTC without including a financing cost, 10:37 correct?
A. I don't know.
Q. That's what it says right here, right?
A. What it says they're doing.
Q. So you don't have any reason to doubt 10:37 that's what they're doing, they're saying that's what they're doing, right?
A. They're saying that's what they're doing.
Q. So they don't use finance costs, any 10:37 interest on the cost to the RTC, do they?
A. That's what they're saying.
Q. Your textbook uses a number that doesn't have any interest on the cost to the RTC, correct? 10:37
A. I just took the RTC's numbers.
Q. So why are you saying that the RTC -- are you saying that the RTC is wrong and your textbook is wrong?
A. No, I'm saying if I had known this I 10:38 would have reconsidered that number.

Page 359

Q. And come out with a different conclusion?
A. There's a financing cost involved.
Q. Why isn't this a correct analysis, 10:38 what's wrong?
A. They're saying in our view, that's their view.
Q. Right, so why --
A. It cost the government to raise money 10:38 and what they're doing in the Shibut Curry thing is distinguishing from the government's cost and the private sector's cost. It cost the government money to make loans to the RTC, there's an opportunity cost. 10:38
Q. Well, they say on a net present value basis a 100,000 dollar home costs 100,000. Do you agree with that part of their analysis?
A. But they're writing a dollar to national 10:38 debt and they're taking money away from other projects. There's an opportunity cost here.
Q. What do you mean taking money away from other projects?

Page 360

A. I want to spend more on helping the 10:39 banks, investing a dollar on helping the poor.
Q. Because of the fiscal restraint in Washington?
A. Because the budget constraint set by Congress. 10:39
Q. Which have been very onerous the last few years, right?
A. Back in this period I think it was more binding.
Q. They go on to say another example. 10:39
A. Can I make a second point because the more you borrow, they push up the interest rate as well. So the cost of borrowing goes up the more you borrow as well, so there's a second part to the financing cost that happens when you borrow more, as 10:39 you push the rate of interest up the cost goes up. This also adds to the financing cost.
Q. Now Curry and Shibut also say at the end of that paragraph "Another example, the federal 10:39 government does not include interest charges when costing specific programs such as weapons systems or

Page 361

school lunches." Are they right about that?
A. I'd have to check.
Q. You don't know? 10:40
A. There's a whole debate about how government should price things. And I believe they should price things correctly based on the cost, and if they don't then that's a government decision. I thought you asked me whether I agree with this or 10:40 not, as an economist I don't agree with it.
Q. So if the government reports we just bought a new hospital for Medicaid and we paid a hundred million dollars, you would say that's not the cost, there needs to be interest on top of that? 10:40
A. If they borrowed money to do that, yes.
Q. Now, what happens if there's a surplus, if the government had a surplus?
A. It's a long time since we've had a surplus, the national debt has grown every year for 10:40 200 years.
Q. Didn't we have a surplus in the late '90s?
A. I think for two years. 10:41

Page 362

Q. So now I'll represent to you that the GAO has consistently reported the cost to the RTC without interest costs and but your opinion is the GAO is wrong, the RTC is wrong and your textbook is wrong? 10:41
A. No, I'm not saying they're wrong, I disagree, I'm taking their cost that they report and you're asking me should they add in the financing costs, in my opinion there is a financing cost, that's all I'm saying. 10:41
Q. Should they discount it back to the date of the issuance of those financing costs?
A. They should pass on the interest cost to the borrower, yes.
Q. Should they -- in calculating what that 10:41 interest cost is, should the government in your opinion discount the cost of the interest?
A. Of the borrowing?
Q. Of the borrowing.
A. Yes. 10:42
Q. Back to present value?
A. Present value, yes.

Page 363

Q. And what discount rate should be used?
A. Whatever the cost of borrowing was for 10:42 the government.
Q. And so and if you discount back at --
A. Sorry, go ahead.
Q. If you discount back at the cost of whatever the borrowing was to the government, then 10:42 the only cost of the financing would be transactions costs, right?
A. Not necessarily because as I mentioned, there's opportunity costs as well.
Q. Like what? 10:42
A. Because I'm taking money away from one program to give to another program.
Q. So how do --
A. So there's a substitution effect going on here. There's a social -- you see governments 10:42 have a social discount rate, not a private discount rate, and the social discount rate can be very different from the private discount rate. Here they're arguing to think about the government like a private sector entity, it's not, it's out there to 10:42

Page 364

maximize social welfare.
Social welfare uses social discount rate which takes into account the opportunity cost of funds in terms of one program versus another 10:43 program.
Q. And how -- if the judge listened to that and thought that's brilliant, I agree with everything the professor said, now I want to calculate the social cost discount rate, how would 10:43 you go about doing that?
A. We would have to do a calculation that we would look at the social opportunity cost of capital.
Q. How would you calculate that? 10:43
A. It's common, it depends on various features of the economy, it's economy-based, it depends on lots of factors that come in besides the budget deficit and constraints on the budget, other programs you want to do. It's welfare cost 10:43 analysis.
Q. If there's no constraint then there would be no opportunity cost?

Page 365

A. If I can -- yes, there would because then there would be inflation. My discount rate 10:44 wouldn't change -- wouldn't stay the same, I'd be pushing it up into the future.
Q. What would be the marginal impact on the rate of inflation of Carteret having a loan of at 10:44 present time the principal balance is $18 million?
A. Yes, but I'd have policies consistent across all banks. We're talking about -- I mean there was not a policy specific to Carteret that was passed about interest rates. It was common across 10:44 everything. In terms of not paying interest on --
Q. What would the marginal impact on inflation be of having $80 billion added to the national debt?
A. I don't know. 10:44
Q. It would be trivial, wouldn't it?
A. I don't know, I don't think so.
Q. Is it less than 1 percent of the national debt?
A. I really don't know. 10:45
Q. You don't know what the national debt

Page 366

is?
A. $5 trillion. It doesn't matter, it's the marginal effect, it's the flow rather than the stocks, I'm adding a flow variable here. So it's 10:45 the rate of increase -- inflation is a flow variable.
Q. Let's see how the RTC dealt with interest at the time. You're familiar with a least 10:45 cost test analysis?
A. Uh-huh.
MR. THOMPSON: I'd like to ask the court reporter to mark as Saunders 19 a document that bears the Bates number C-AM-A-0130727 10:46 through 738.
(Saunders Exhibit 19, Document bearing Bates numbers C-AM-A-0130727 through 738, was so marked for identification.)
Q. Professor, this is a document, it 10:47 appears to be two documents but it was produced to us in Bates numbered sequence. We just put the top e-mail on, but starting on the second page, is this what you're familiar with as the cost of resolution

Page 367

document? 10:47
A. Uh-huh.
Q. And the way this was calculated was first there was a projected -- actually strike that. On the second part of the table is a projected cost of payout of approximately $361 million? 10:47
A. Uh-huh.
Q. Do you know how that was calculated?
A. I just assume it's the cost of paying off the depositors and closing the bank. 10:47
Q. Right, it's like a liquidation value of here are the assets, here are the liabilities, the difference is 361 million, correct?
A. Uh-huh.
Q. And the cost of resolution is just the 10:48 cost of payout minus the premium?
A. In this case the expected premium.
Q. Since the document's being prepared actually six days after the closing, you can see this little computer printout in the right-hand 10:48 corner that says March 16th, 1995, the reason why the -- so the premium is not only expected but it's

Page 368

known, right?
A. At this time.
Q. And so but nowhere in here in this cost 10:48 did the government -- did the RTC include an interest component, did it?
A. I can see that.
Q. I beg your pardon?
A. I can see that. 10:48
Q. So if the RTC didn't include an interest component in its contemporaneous calculations of the cost, then why should they be permitted to add it to the receivership deficit now? 10:49
A. Because there's a cost of capital, there's a cost of funds. It cost the government money to raise on the debt markets to provide the funds to the receivership.
Q. So they were wrong in the way in which 10:49 they did these cost test analysis?
A. Here it's showing it without interest rate adjustments.
Q. And that was incorrect in your opinion?
A. No, you can show it like this but as 10:49

Page 369

long as you know there's no interest rate adjustments put in here. They added the interest rate later on, that's what you're telling me. I believe they did in receivership they charged them interest. 10:49
Q. I'm asking you whether you have any indication that in fulfilling the congressional mandate to do the least cost test, whether the RTC gave any consideration to interest costs? Have you seen any evidence of that? 10:50
A. I'd have to look carefully at it.
Q. Which is to say that no, you haven't seen any evidence of that?
A. This is the cost of closure rather than 10:50 the cost of lending to a receivership, which is a different thing.
Q. No, they're looking at two things, they're looking at the cost of closure, number one, and number two, the cost of doing the actual 10:50 transaction.
A. So this is just a cost of closure, so they're adding the cost of the transaction later on,

Page 386

it doesn't make a difference. There's an opportunity cost there as well.
Q. But my question is -- maybe we can eliminate it this way, but in this case are you aware that the -- do you know what the term "subrogated claim" is? 11:08
A. No.
Q. Well, do you know what the principal balance that the interest was calculated off of was?
A. I think we were discussing that yesterday, weren't we? 11:08
Q. Yes.
A. The 1.2 billion which I rounded up to 2 billion.
Q. We're going to get a little more specific now exactly how much it was. 11:08
(Saunders Exhibit 20, Document bearing Bates numbers AM 00095015 through 019, was so marked for identification.)
Q. This bears a Bates number AM 00095015 through 019. The first line says FDIC original liability, do you see that, it's $1.369 billion? 11:09

Page 387

A. I see, right at the top here, I see claim balances, is that what you're talking about? 11:10
Q. Yes. So do you see that?
A. I do, just about.
Q. And that's the -- does this refresh your recollection that that's the principal amount against which the interest was charged? 11:10
A. I believe it's of this order, yes.
Q. But in fact when the branches were sold a premium was realized, right, collectively of about $143 million?
A. Yes. 11:10
Q. And some assets were transferred of about $44 million to the acquirers, is that right?
A. I believe so.
Q. So that's $187 million, and if you want I can show you, if there's any doubt in your mind 11:11 I'll get the documents and I can show you. But is it your understanding that in fact when you look at the amount of money that had to be wired to the acquirers to fund the branch sales, the amount of cash, that it was the 1.369 billion minus the 11:11

Page 388

premium and the assets that went?
A. This is the size of the loans, not the deposits, we're talking about deposits that are transferred. I don't think the numbers are the 11:11 same, are they? This is the claim balance of receivership which is different.
Q. I want to make sure that I understand conceptually as an economist what the right answer would be, then we'll get to figure out which of 11:11 these numbers it is. But the right number for the principal balance of the loan should be the amount of cash that was in fact borrowed by the RTC by the receiver to fund the branch sales, right?
A. Yes, but you asked me a different 11:11 question about wire transfers, deposits and stuff.
Q. Now I'm going to represent to you that in fact this 1.369 billion reflects the amount of deposits and not the amount of the wire transfers, and the principal paydowns you see in the right-hand 11:12 column here?
A. Where are we now?
Q. Gross amount.

Page 389

A. Yes.
Q. These are the principal paydowns and 11:12 you'll see that it goes down to at present if you go to the second page, it's down to $18.8 million, which is the number that I believe I referenced yesterday. 11:12
A. Okay, now I see which column you're talking about.
Q. Now, you have talked and have defended the escrow account?
A. Yes. 11:13
Q. The fact I was surprised, but in any event the escrow account, how did that work, what's your understanding of the way in which the RTC accounted for the escrow account?
A. I think they received the premiums and 11:13 then they put them in a special fund with the Federal Home Loan Bank as an escrow account separated account.
Q. Well, in fact the RTC actually didn't get a check for $143 million, did they, it was just 11:13 a deduct on the amount of cash that had to go to the

Page 398

nothing lower risk than Treasury bills. You're pretty sure you're following prudent man bills when investing in Treasury bills.
Q. Well, the RTC would not have been increasing the risk to the receivership by taking 11:23 the Treasury bills and paying down the high cost debt, would it have?
A. Perhaps it was worried about legal risk. Perhaps it was worried that if it quickly paid it out, then therefore we took a loss on these funds, 11:23 therefore I'd be subject to some prudent man violation.
Q. Because of a --
A. Legal.
Q. Legal concerns? 11:23
A. Yes. Perhaps.
Q. Yes, perhaps. Anything else?
A. No. I'm going back to what I said. I think there's liquidity reasons and prudent man concerns. 11:23
Q. But the only prudent man concern you've identified on the record has been these possible

Page 399

legal risks, any other?
A. No. The role of a prudent man, prudent 11:24 man investment behavior is to keep a risk-free portfolio.
Q. And my question to you is how would it have increased any risk to the receivership deficit to take the money in T-bills and pay down a debt? 11:24
A. One, liquidity risk. Secondly, any risk pertaining to violation of prudent man rules.
Q. That's a circular.
A. No, they're two distinct things.
Q. Leave liquidity to the side, the record 11:24 is clear on that. Then I'm asking you about prudent man risk and you said, oh, well, it might increase the risk of the institution and then I said, well, what risk. You said, well, you'd be violating prudent man rules. So forget -- so you've now drawn 11:24 a circle.
A. No.
Q. My question is this, what risk to the Carteret receivership other than liquidity and possible legal concerns would there have been from 11:24

Page 400

taking the 187 million in T-bills and paying down higher cost debt?
A. Other than those two considerations?
Q. Yes. 11:25
A. I can't think of any other two.
Q. Let's look back at your report at paragraph 25, and you say in the third sentence, "This interest," meaning the interest on the receivership -- in the receivership deficit 11:26 "resulted from the funds the receivership had to borrow from the RTC to finance the sales of its Florida branches and its New Jersey branches given the perilous state of Carteret's assets at the time of its closure and transfer to the RTC." 11:26
Now what is your understanding of where the RTC got the money to fund these branch sales?
A. I think they had received it, I'm trying to remember it either from the FDIC or the Federal Financing Bank. 11:26
Q. And where did they get their funds, from the Treasury?
A. They raise it in a Treasury market.

Page 401

Q. Wasn't that the holdup and the delay of -- didn't Congress in December of 1993 11:26 appropriate $18.3 billion to the RTC or 19.3 billion?
A. The Completion Act?
Q. Yes. 11:27
A. I don't know if it appropriated it for the RTC, but it appropriated it for the RTC purposes.
Q. Right.
A. How it worked in terms of the transfer 11:27 of funds, it would still be a borrowing of $18 billion coming into the RTC.
Q. So that money --
A. What it means is additional borrowings.
Q. By the United States Treasury? 11:27
A. To finance this, yes.
Q. In your report you make reference to the prime rate, but the United States Treasury didn't have to pay the prime rate, did it?
A. No, it paid Treasury rates. 11:27
Q. What's the relevance of the prime rate?

Page 402

A. It's not the cost of borrowing, it's the cost of lending. The government of the United States is a different quality borrower from the borrower of similar to Carteret's receivership which 11:28 has a risky asset portfolio.
Q. Doesn't the government do this all the time where they go out and borrow at a risk-free rate and then they fund something that may be risky? 11:28
A. Yes. That's why a risk-adjusted return should be roughly equivalent with the risk-free rate.
Q. Can you think of any other instance in your career where the government has borrowed money 11:28 at a risk-free rate and then given it to an agency and charged the agency a risk-adjusted rate saying what you're about to do with this money is risky, so we want a risk-adjusted return?
A. I think it's the RTC that was lending it 11:28 to the receivership at a risk-adjusted rate.
Q. Can you think of any other instances where the government does that?
A. No, he wasn't actually doing that, he

Page 403

was lending it at a one-year Treasury bond rate or 11:28 bill rate, but my argument is bear the credit risk or liquidity risk of these loans, it could well have charged higher rates than the one that it charged, which is the one-year federal judgment rate.
Q. Can you point to any instance in which 11:29 the United States Government has done what you were suggesting?
A. I don't think I looked.
Q. Not as you sit here? 11:29
A. I'm just saying it's rational behavior if you've got a risky asset portfolio.
Q. So under your regime just so I understand how the Saunders regime would work, the RTC would have to figure out what the risk 11:29 characteristics were of each entity that it was lending money to and it would have a credit committee go in and do due diligence, is that what you're suggesting?
A. I'm saying I think in this case it's 11:30 associate -- since the public purse is at risk, clearly they should take into account the riskiness

Page 404

of the assets, yes. That's my private view.
Q. Now, you make reference to in paragraph 25 the perilous state of Carteret's assets. And 11:30 when would be the time that one would have to assess the riskiness of the assets? At the time of the issuance of the debt?
A. You mean RTC?
Q. Yes. 11:30
A. It priced the loans as of the time the loans were made. It priced it ex post, partially ex post fixed rate loan.
Q. When you say partially ex post, what do 11:31 you mean by that?
A. Well, originally it was floating and then it went back to fixed. It was fixed backwards.
Q. Yes, it was.
A. I'm sure we're coming to that. 11:31
Q. Now, even if you're right, even if a court agrees with you that there were some perilous assets in this portfolio but there were also some good assets that Carteret had, correct?
A. They had performing assets, yes. 11:31

Page 405

Q. And couldn't Carteret -- couldn't the RTC have done mezzanine financing where they would get a good rate on the bulk of the loan by pledging the good assets as security. So for example when you go -- when a bank like Carteret pre-seizure went 11:32 to the Federal Home Loan Bank to get advances it would pledge $110, for every $100 of advance it would give $110 of performing residential one to fours, and the Federal Home Loan Bank would give it a very good rate because the loan to value ratio was 11:32 very acceptable.
A. If you want to -- I mean in this case it was given a risk-free rate. The government didn't charge a risk premium, that's my whole point, it 11:32 charged a Treasury bill rate.
Q. Are you saying what the government did was wrong?
A. I'm saying that the government charged a lower rate than commercial rates to provide subsidy. 11:32
Q. So you're saying that the government charged an incorrect rate in your opinion as an economist?

Page 410

a short-term floating risk-free rate. Why as a financial economist should there be a different rate on that loan than on the loan that the RTC made in 1995?
A. As I said, 1995 -- in my opinion 11:37 long-term rate was appropriate.
Q. So you think that -- is it fair to say that the same rate should be applied to both loans?
A. I'm saying the RTC was giving a subsidy to the borrower for the first two or three years 11:38 until the conservatorship ended and then it was -- I'm sorry, it was passing risk on to the borrower during this period, and in the second period it was willing to absorb the risk.
Q. So are you saying that yes, the two 11:38 loans should be treated the same and in both instances there should be a long-term risky rate?
A. Given based on the judgment as of the time of the likely length of receiverships or conservatorships, which was very long, three to six 11:38 years, then I think the long-term rate would have been more appropriate.

Page 411

Q. I just want to make sure the record is crystal clear on this, do you think it's appropriate 11:38 that the same rate be applied to the loan to the pass-through receivership as to the ultimate receivership?
A. I didn't study that question, I just studied the long-term versus short-term. 11:39
Q. You don't have an opinion on that?
A. I think throughout this period the long-term rate was thc most appropriate rate.
Q. I just want to make sure the record is clear on this because I don't want to hear something 11:39 at trial that we didn't get to hear today. Can you identify any differences or do you have an opinion as to whether there should be a different rate on the loan to the pass-through receivership to the receivership in '95? 11:39
A. As the pass-through receivership is going to last for one day, then a one-day rate might be appropriate. Because if I know it's one day, then you're telling me the conservatorship, the conservatorship, I'm not sure when it's going to 11:39

Page 412

end, I look at the historical data on conservatorship resolutions and it's beyond three months and I say, well, okay, three-month rate is too long, I think a longer term rate is appropriate. 11:40
Q. That's a helpful clarification, I think I need to clarify one thing. The pass-through receivership still exists today 14 years later. What happened was the assets and liabilities of Carteret Bank, Mr. Bianco's bank, got put on 11:40 December 4th, 1992 into the pass-through receivership and then those assets and liabilities, most of them but not all of them. Some got kept in the pass-through receivership, some of the liabilities in particular get put into the 11:40 conservatorship. So the interest has been calculated for -- been running for the last 14 years, even longer than on the '95 loan, so let me ask the question again.
As a financial economist is there any 11:40 reason there should be a different rate charged the pass-through receivership than to the receivership in '95?

Page 413

MR. GILBERT: Just let me register an objection to the characterization of the 11:41 facts.
MR. THOMPSON: If you want to clarify, Mr. Gilbert.
MR. GILBERT: I just want to state an 11:41 objection.
A. If what you tell me is correct, then the long-term rate would have been appropriate for both.
Q. So it should be the same rate for both?
A. If one is longer than another it would 11:41 have been a higher fixed rate than the other. This is a liquidity issue.
Q. So the pass-through receivership should actually have a higher rate in your opinion than the final receivership? 11:41
A. I'm only giving an opinion ex post ex ante, I don't know how long it's going to last so I'd ask the question ex ante, how long is it going to last. I don't know with hindsight what is going to happen. All I know is I look at historical 11:41 experience and I try to look at the market, I say

decided to bear the interest rate.

MR. THOMPSON: I see it's noon and we're 12:00
not -- let's go off the record for a moment.

(Discussion off the record)

(Lunch recess: 12:00 noon)

Afternoon Session

1:00 p.m.

ANTHONY SAUNDERS,

having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. THOMPSON:

Q. Professor, welcome back.
A. Thank you. 01:01
Q. I wanted just to follow up on this



concept of risk adjustment and the propriety of risk-adjusting the loan from the RTC to the Carteret receivership, and just to sort of make sure I understand how credit risk works and why there's a 01:01 risk premium, if Bank of America makes a loan to someone to buy a house for a million dollars and gives a million dollar loan and then the person defaults, Bank of America moves in, sells the property for $900,000, then Bank of America would be 01:02 out $100,000, and that hundred thousand would come right out of Bank of America's capital, isn't that right, right out of its tangible capital?
A. Yes, it would be charged against its capital. 01:02
Q. So if Bank of America had set its optimal capital level and said, oh, gosh, we didn't anticipate that it would go out and it would raise capital, 100,000 of capital, and it would have to 01:02 pay whatever its cost of capital was, which would be a risk-adjusted rate, correct?
A. If it could raise that money, yes.
Q. And so that's -- is that why Bank of



America would want to be compensated for credit 01:02 risk, because if it bears that risk it's going to have a cost of capital to go out and raise the shortfall in the capital markets?
A. If it could or it takes it out of reserves, that's normal to do. The last resort 01:03 would be to go to the capital market. Normally you take it out of profits, cash flow.
Q. There's a cost of that capital too?
A. Opportunity.
Q. Now, with respect to the RTC and I'm 01:03 going to -- why don't we use the term "RTC corporate" as the lender versus the Carteret receivership as the borrower, I'm going to use those terms, is that okay?
A. Yes. 01:03
Q. So if the RTC corporate made a loan of $1.2 billion to the Carteret receivership and if the Carteret receivership sold all of its assets and at the end of the day only it could pay back 1.1 01:03 billion, then the RTC corporate division would be out a hundred million dollars?



A. Right.
Q. But isn't it true that the RTC corporate would just get that money from the Treasury which 01:04 would borrow it at a risk-free rate?
A. My understanding it would go first to the FDIC. The FDIC has reserves called reserves collected from deposit insurance premium charged to banks, and I would think that that would be charged 01:04 against the insurance fund, so that's equivalent to your capital in your hypothetical example.
Q. I want to focus on the RTC. I mean the FDIC, let's look at 1995 because you had priced at ex ante, right? 01:04
A. Priced at ex ante at the time, yes.
Q. Let's focus on 1995. In 1995, first of all, the appropriation that Congress gave the RTC was more than what the RTC needed, isn't that right?
A. I don't know. 01:05
Q. Let's say if the RTC corporate were trying to figure out, well, what's going to happen if there's a shortfall if the Carteret receivership doesn't pay us back, then isn't the answer the RTC 01:05

Page 434

corporate is still part of the government and worst case scenario they go to the capital markets and borrow at a risk-free rate?
A. I believe it's not quite as simple as that because I believe they would be charged the 01:05 FDIC and the FDIC has a private fund coming from the bank so it would be charged their reserve fund.
Q. Even in 1995?
A. We would have to go back because my understanding of Federal Financing Bank was the 01:05 underlying source of funds from the FDIC to the RTC.
Q. In 1995?
A. The genesis of most of the funds was through that mechanism.
Q. I thought the funds we had talked about 01:06 earlier came from -- the funds for Carteret's loan came from the appropriation from the United States Treasury?
A. Well, well, you told me that, but it had other funds that were being used at other times. 01:06 You can't say which dollar came from which in the aggregate of funds. So you're saying there are some

Page 435

extra funds, as I understand there were still resolutions going on even though they were waiting 01:06 for money to come in from the Treasury.
Q. And if the reserves ran dry then the RTC corporate could borrow money from the United States Treasury at a risk-free rate?
A. I'm not sure what the arrangement was 01:06 with the Treasury, what the mechanism was.
Q. If money were appropriated by Congress to RTC, then Congress would still be able to borrow at a risk-free rate, right?
A. I don't know if the RTC was going 01:06 directly to the Treasury. The FDIC is part of the Treasury, is an agency of the Treasury, so when it says the Treasury, in my understanding it was the FDIC. The FDIC has private equity from the banks which is reserve fund and it would be charged up 01:07 against that.
Q. So the risk -- so the cost then would be not even borne by the government, it would be borne by the private banks who fund this?
A. Well, the FDIC would bear this and then 01:07

Page 436

it would be an obligation of the FDIC, so that would be it's taking risk on those deposit insurance funds, therefore it would charge appropriate risk premium for those deposit insurance funds as part of 01:07 the risk.
Q. But then the FDIC turns around and pass those costs on to the banks?
A. The banks have had a huge subsidy in these matters in my opinion. 01:07
Q. In your opinion, but the banks actually pay the money into the insurance fund, right?
A. They do pay premium, yes.
Q. And that's where the reserve comes from?
A. That's where the FDIC gets its funds 01:07 from.
Q. Is from the private sector?
A. From the banking system, which has a moral obligation to support the banking system.
Q. If -- 01:08
A. The providers of the funds.
Q. If the reserves are coming from the private sector then how does the government bear any

Page 437

cost?
A. Because why should Bank of America be 01:08 punished because of Carteret's failure. It has a breach of obligation.
Q. Why should the government get to charge interest that Bank of America had to pay? 01:08
A. Bank of America is paid in the premiums because that's the law. FDIC has kept the premiums as its reserve fund, it might borrow extra money over and above that, and therefore if a loan is getting charged off it has to get charged off of the 01:08 insurance for a loan to be repaid to the Treasury sometime in the future.
Q. Do you agree that whatever the rule was about interest, whether it was floating or fixed, that it was important for the RTC managers of the 01:08 Carteret receivership to know what the rules were before it, ahead of time that they be applied prospectively?
A. I don't know what the question is, tell me the question again. 01:09
Q. If you were running a financial

Page 438

institution would you want to know what your cost of funds were ahead of time before you made business decisions?

A. I think they do, did know. 01:09

Q. We'll get into what they did know.

A. I think they did know.

Q. That's good, but my first question is do you think it's important -- 01:09

A. That's why they charged the Treasury rate.

Q. Do you think it's important that the managers of Carteret's receivership knew ahead of time what their cost of funds were going to be? 01:09

A. They did because the rate was fixed.

Q. Do you think it was important that they knew what the cost of funds would be beforehand so they could perform their conduct --

A. Yes, because the government was bearing 01:09 the interest rate risk. That's why I said the float with a fixed rate loan, the risk is borne, the interest rate risk is borne by the government.

Q. So it was important that they knew the

Page 439

terms of the cost of funds prospectively, is that 01:10 true?

A. I think it's important.

Q. Now the document that you cite to from June of 1995 --

A. Where, which document? 01:10

Q. You make reference to it, for example paragraph 37, page 17.

A. Yes.

Q. Now that's an FDIC document, right? 01:10 Have you seen any evidence that that information was communicated to the RTC, and in particular to the -- well, actually to anyone at the RTC?

A. I know there was a general memo that was sent out by Gray & Beck in 1995 that described this 01:11 change to a fixed rate should be applying to Carteret and for post '93 receiverships. I think it was pretty -- if I remember it was pretty widely disposed.

Q. Have you seen any evidence that it was 01:11 sent to the RTC?

A. I'd have to look. I'm sure you're going

Page 440

to show me in a moment, I can take a look at it, but I know it's widely disposed with a number of names on it. 01:11

Q. Have you seen any evidence that anyone with a responsibility for the Carteret receivership had knowledge of this change in policy?

A. Well, they did in 1999.

Q. Yes, but in 1995 or '96 or '97 or '98? 01:12

A. I don't know.

Q. Let's look at Saunders 22 which bears a Bates number AM 0010347 through 349.

(Saunders Exhibit 22, Chart dated June 01:12 26th, 1997 bearing Bates numbers AM 0010347 through 349, was so marked for identification.)

Q. This is a chart dated June 26th, 1997, it says post insolvency interest procedures. The 01:13 left-hand column is FDIC procedures and then the next column is former RTC procedures. Obviously the RTC doesn't exist at this time, so presumably that's why it says former, but it says "Rate under RTC, average 90 day T-bill rate as directed by regulator 01:13

Page 441

for pre-national deposit preference receiver. However, the reg does not specify compounding the rate floats and is adjusted monthly to reflect rate of the three previous months."

So does this reflect that -- oh, excuse 01:14 me, then it goes down under adjustments corrections, the last row it says "Apply to claim balance when recorded, not retroactively."

Does this reflect a policy not to apply rate changes retroactively? 01:14

A. This is only referring to 90-day Treasury bill rule, which was not the effective rate being used for Carteret's receiverships.

Q. What do you understand it to mean, if 01:14 you have an understanding about apply to claim balance when recorded, i.e. not retroactively?

A. I'm saying it's not being applied to Carteret. The first column is the rate being applied to Carteret. It doesn't say that in the 01:14 adjustments.

Q. Well, maybe this next document will illuminate this.

Page 442

A. No, it's the first column.
MR. GILBERT: This will be Saunders 23 01:15
which bears a Bates number AM 0010431 through
432.
(Saunders Exhibit 23, Memo bearing Bates
numbers AM 0010431 through 432, was so marked
for identification.) 01:15
Q. In particular, Professor Saunders, I'd like to direct your attention to the question 2 where it says "How" -- excuse me "Where, how the interest rates are obtained." It says "FDIC claims obtained the rate from Washington legal and provides 01:15 it to DOF. RTC the average of the prior three months of the three months' Treasury bill quoted yield."
Doesn't this memo reflect that even as 01:16 of June 5th, 1997 the RTC's stated policy was a three-month T-bill?
A. No, my understanding was that for post 1993 receiverships the fixed one-year pre-judgment rate was thc appropriate interest rate. 01:16
Q. Doesn't this seem inconsistent with it

Page 443

because it's saying RTC average three months, average of the three prior months, three-month Treasury bill?
A. It doesn't agree with practice and what 01:16 was believed by other people. So I think it's -- she wanted to be corrected in 1999 and she was corrected and she applied the correet interest rate in 1999.
Q. Have you seen -- strike that. But her 01:17 practiee or the practice of the FDIC even in 1997 was to continue to use the short-term floating rate?
A. Incorrectly, I believe, yes.
Q. Did you see any other mistakes that the FDIC made in calculating the interest? 01:17
A. I didn't go through the exact calculation of the interest. I just looked at a general model to come to find the interest rate which is the one year pre-judgment. 01:17
Q. Do you have any opinion as to why in December of 1999 an attorney at the FDIC and Ms. Tama were discussing the appropriate interest rate?
A. If I beg to remember, she sent him a

Page 444

query as to how the interest rate should be charged 01:18 in the Carteret receivership and he responded that we should charge the one-year pre-judgment interest rate as effectively as of 1995 in the Carteret case.
Q. Do you have any idea as to why she was asking that question at that time? 01:18
A. I think there was some inquiry from Carteret about the receivership balance.
Q. When you say from Carteret, I mean by 1999 Carteret no longer --
A. Or Ambase. Whoever was concerned about 01:18 the size of the receivership, or inquired about the size of the interest rate. So the representatives of the receivership inquired about the size of the receivership.
Q. Now, it says on page 17, paragraph 38, 01:18 you say in the second sentence, "Citing the 1995 policy memo," meaning Mr. Saran, "Requested the use of the federal judgment rate for the Carteret receivership as well as for four other receiverships 01:19 for similar calculation issues had been raised. Importantly Carteret was not singled out for any

Page 445

special treatment."
Isn't it true that all five of these receiverships were Winstar receiverships? 01:19
A. I can't remember the other four. If you tell me that I have no reason to disbelieve you.
Q. And if they were all Winstar receiverships, then this change would benefit the government in all five cases? 01:19
A. Not necessarily, if interest rates were rising, they may have risen after 1999, the receivership would benefit.
Q. At the time the change was made for Carteret it was a $20 million benefit for the 01:20 government, right?
A. If you do a simulation that shows that.
Q. And --
A. Calomiris's simulation and mine.
Q. And the $20 million itself would 01:20 compound with interest?
A. No, because with the floating rate in 2000 interest rates rose -- if it's the next year after 1999, in the year 2000 the interest rates 01:20

and the minority preference program advantaged Carteret? 01:59
A. He got a higher premium than it would have got in '93. From branch sales in '95 than a whole bank sale in '93 is claimed by Professor Calomiris.
Q. But are you saying then that the reason 01:59 that it took 826 days is because of the funding delay in the minority preference program?
A. It's your words so I'm saying it was careful with the resolution it turned out to take that long a time. In reality it turned out they did 01:59 very well.
Q. Why did it take so long to resolve Carteret, do you have an opinion on that question?
A. Well, I think we already said it was a 01:59 complex institution.
Q. No, you --
A. I did say that about an hour ago.
Q. No, but then but complex as compared to the other institutions, you hadn't done that 01:59 analysis. So --



A. In my opinion it's a complex institution.
Q. As compared to the other institutions that were resolved, I thought you testified you 01:59 hadn't done that analysis?
A. That's true. Because it's a large population I haven't done it yet.
Q. Professor Calomiris testified during his deposition that it was important to look at the 02:00 right time in 1993 because the market changed significantly during that year, do you have any reason to disagree with him?
A. There is a spike up in fourth quarter of '93. Only in the mean premium but not in the mean 02:00 weighted mean premium. Or the premium for whole bank transactions in the fourth quarter.
Q. What do you mean the mean weighted?
A. Deposit weighted mean premium. I 02:00 present three premiums, medium, mean deposit weighted. You only see it happening in the mean -- the deposit weighted premium stays roughly the same, and if you break out wholesale transactions to the



fourth quarter you'll see the effect is still very 02:01 low, 2 to 3 percent range.
Q. In looking at relative deposit premiums, do you think it's more important to look at premiums expressed as a percentage of overall deposits or premiums as expressed as a percentage of core 02:01 deposits?
A. No, they're paying a premium for deposits that are transferred.
Q. But don't you think -- I thought we had said yesterday that the reason an acquirer would pay 02:01 premium is because the customer relationships, is that true?
A. A depositor can have a checking account and a CD account.
Q. Right, but they're not paying -- 02:01
A. They are very common in fact.
Q. An acquirer is not paying a premium for hot money deposits, are they?
A. In fact that suggests Carteret did even 02:02 better because it had lots of CDs. Over 70 percent of its liabilities were CDs, very few were core



deposits. The fact that it got 10 or 11 percent were very good. If I follow your line of argument.
Q. I don't have a line of argument, I'm 02:02 just asking questions, and my question is, isn't it true that in assessing value, the acquirer would look at the core deposits?
A. If that's true. I don't believe so, but if you're telling me that's your model. 02:02
Q. I don't know, you're the economist.
A. CDs and core depositors could also be important, it goes beyond that. But I also noted that they had a large -- perhaps this is a different issue, they had a large component of their balance 02:02 sheet was CDs.
Q. Yes.
A. And I agree, core deposits have more customer relationships in general than CDs, and the fact they got a 10 percent, 11 percent premium seems 02:03 to be quite remarkable in terms of good business.
Q. In that they had a very strong core deposit base?
A. No, that the market was willing to pay 02:03

# CARTERET FEDERAL SAVINGS BANK

## *Conservatorship Strategic Plan*

**Carteret Federal Savings Bank / Morristown, NJ 07960**

**FIN #8602 / Date of Conservatorship 12/04/92**

EXHIBIT
Saunders # 7
10/3/06 LR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0103999

**Carteret Federal Savings Bank**
**Conservatorship Strategic Plan**
**Table of Contents**


| | | Page |
|---|---|---|
| **I.** | **Description** | |
| | A. Overview | 1 |
| | B. Retail Banking and Deposit Information | 3 |
| | C. Cash and Securities | 5 |
| | D. Loans Receivable | 6 |
| | E. Investment in Real Estate | 9 |
| | F. Loan Servicing Portfolio | 10 |
| | G. Other Interest-Bearing Liabilities | 11 |
| | H. Other Assets and Other Liabilities | 13 |
| | I. Subsidiaries | 17 |
| | J. Litigation | 20 |
| | K. Organization | 20 |
| | L. Information Systems and Computer Resources | 20 |
| | M. Other Support Functions | 24 |
| **II.** | **Evaluation** | |
| | A. Problems of the Institution | 26 |
| | B. Retail Branch Network | 26 |
| | C. Liquidity | 27 |
| | D. Asset Quality | 27 |
| | E. Loan Servicing Portfolio | 31 |
| | F. Occupancy Issues | 32 |
| | G. Candidacy for Combination with Another Institution | 33 |
| | H. Subsidiaries | 33 |
| | I. Pending Litigation Evaluation | 33 |
| | J. Management Levels and Salary Justification | 34 |
| | K. Quality and Cost Efficiency of Backroom Operations | 34 |
| | L. Indications of Fraud | 34 |
| **III.** | **Recommendations** | 35 |
| **IV.** | **Operational Issues** | |
| | A. Retail Banking | 36 |
| | B. Managed Downsizing | 36 |
| | C. Funding Strategy | 36 |
| | D. Loan Workout | 36 |
| | E. Sale or Discontinuation of Subsidiary Operations | 37 |
| | F. Loan Servicing | 37 |
| | G. Repudiation of Lease Obligations | 37 |
| | H. Discontinuance of Residential Lending | 38 |
| | I. Controller's Division Staffing | 38 |
| | J. Accuracy of Books and Records | 38 |
| | K. Marketing at Resolution | 38 |
| **V.** | **Integrated Marketing Plan** | 39 |
| **VI.** | **Operating Plan Budget** | 41 |


CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104000

**Carteret Federal Savings Bank**
**Conservatorship Strategic Plan**
**List of Exhibits**

I. Thrift Financial Report (11/30/92)

II. Thrift Financial Report (9/30/92)

III. Deposit Information

- Deposits by County and State
- Retail Certificate Maturity by Term
- Retail Certificate by Interest Rate

IV. Retail Branch Information

- Branch Locations
- Branch Cost Analysis
- Branch Fact Sheets

V. Information Systems

VI. Facilities

VII. Loan Servicing Information

VIII. Organization Charts

IX. Employee Compensation

X. Litigation Listing

XI. Flowchart of Corporate Structure

XII. Subsidiary Listing

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104001

# Part I. Description

## A. Overview

*Intervention*

On December 4, 1992, Date of Conservatorship, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the Office of Thrift Supervision (OTS) placed Carteret Savings Bank, FA (CSB) into receivership and chartered a new federal mutual association, Carteret Federal Savings Bank (CFSB). OTS appointed the Resolution Trust Corporation (RTC) as Receiver of the old institution and as Conservator of the new institution.

References to CSB or the Bank contained in this section refer to Carteret Savings Bank, FA prior to December 5, 1992 and to Carteret Federal Savings Bank thereafter.

*Background*

CSB was incorporated in September 1939 as Carteret Building and Loan Association of Newark, New Jersey, a state-chartered thrift. CSB converted to a federally chartered mutual association -- Carteret Savings and Loan Association -- in 1982 and to a federally chartered stock association in 1983. In 1986, the institution changed its name to Carteret Savings Bank, FA.

In 1987, CSB created a holding company, Carteret Bancorp Inc., for the purpose of expanding its business activities. A year later, The Home Group, Inc., which subsequently changed its name to AmBase Corp., acquired Carteret Bancorp, and thus, CSB, for $266 million. AmBase shareholders retain no interest in CFSB.

CSB is one of the largest New Jersey thrifts insured by the FDIC through the Savings Association Insurance Fund. CSB is a member of both the Federal Home Loan Bank of New York (FHLB) and the Federal Reserve Bank of New York. CSB has 39 active subsidiaries of which the largest operating subsidiary is Imperial Premium Finance, Inc. (IPF), a California based company specializing in financing premiums for commercial lines of insurance. Other subsidiaries are primarily engaged in real estate development, property management and retail financial services. Refer to *Section I. Subsidiaries* for a brief description of the subsidiaries and to *Exhibit XI. - Flowchart of Corporate Structure* and *Exhibit XII. - Subsidiary Listing*. At the date of conservatorship, CSB and its subsidiaries employed approximately 1,100 people. The core businesses of CSB were retail banking and mortgage banking.

CFSB conducts business from 41 retail banking offices primarily located in New Jersey and Florida. CFSB is currently engaged in the business of maintaining savings, time and demand deposits. In 1990 CSB implemented a program to restructure its retail branch network. As part of this program, several less efficient branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. Certain of the branches sold had been acquired by CSB. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB was extensively involved in mortgage banking activities including the origination, servicing, securitization and sales of one-to-four family residential mortgage loans. At December 4, 1992 residential mortgage loans receivable, net were $1.563 billion. CSB was servicing $7.3 billion of loans, which included $6.2 billion of loans serviced for others. Effective December 14, 1992 the RTC decided to discontinue residential loan origination activities. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

CSB also offered consumer loans and other financial products which were intended to broaden its source of income, reduce its exposure to interest rate fluctuations and position CSB to compete more effectively in the retail financial services industry. All consumer lending has ceased with CFSB processing approved applications as of December 4, 1992. In addition, shortly after the date of conservatorship the offering of other financial services has been discontinued.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104002

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

CSB ceased all new corporate and commercial real estate loan originations pursuant to a policy established in the second half of 1989. This policy was established in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions have been experienced since 1989. At December 4, 1992, the corporate and commercial real estate loans receivable totalled $365.0 million ($311.9 million net of reserves). The corporate and commercial real estate owned and in-substance foreclosed loans were $100.4 million and $118.6 million, respectively.

At December 4, 1992, CSB remained out of compliance with minimum regulatory capital requirements promulgated by the OTS pursuant to FIRREA. CSB consented to the issuance of a Capital Directive by the OTS on October 8, 1991. In accordance with the Capital Directive, on September 30, 1991 CSB submitted a capital plan to the OTS with subsequent updates to the capital plan being filed during continuing discussions. On March 2, 1992, the OTS approved the capital plan which required the infusion of sufficient equity capital through a private placement to achieve a fully phased-in regulatory capital position. CSB and the OTS entered into an agreement, dated February 27, 1992 which provided, among other things, that, upon the earlier of (i) May 27, 1992 or (ii) the date on which the Regional Director of the OTS concludes acceptable progress is not being made and the recapitalization program is unlikely to be successful, CSB would be included in the Accelerated Resolution Program (ARP) of the government. CSB received several extensions of the original May 27, 1992 date. Due to lack of RTC funding for ARP, CSB was unable to be included in that program. After nine months, CSB was unsuccessful in its efforts to raise the required additional equity capital.

Total nonperforming assets decreased from $484.9 million at December 31, 1991 to $416.9 million at December 31, 1992. Nonperforming assets include nonaccrual loans, loans 90 or more days past due and still accruing, REO and in-substance foreclosed loans. Restructured loans increased from $64.0 million at December 31, 1991 to $103.1 million at December 31, 1992. As discussed further in *Part II. Evaluation - Section D. Asset Quality*, a majority of CFSB's residential and commercial real estate loans are secured by properties located in the states of New Jersey, Florida and California which have experienced a significant downturn in demand for such properties. CFSB regularly analyzes and closely monitors each portfolio. Potential problem loans are classified if uncertainty exists as to future collectibility.

At December 4, 1992, CSB had total assets of $4.770 billion. Mortgage-backed securities (MBS) and investments, net were $1.233 billion. Total deposits were $2.535 billion and FHLB advances and other borrowings totaled $1.968 billion.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104003

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**B. Retail Banking and Deposit Information**

As of December 31, 1992, the Bank had retail deposits of $2.391 billion. CFSB maintains 41 full-service retail banking offices in New Jersey, Florida and the District of Columbia. Based upon its total deposits of $2.934 billion at ye 1991, Carteret was the fiftieth largest thrift in the United States.

CFSB offers a full range of retail deposit products including passbook and statement savings accounts, regular and interest-bearing checking accounts, money market accounts and certificates of deposit. Included among these programs are individual retirement accounts and Keogh accounts. Interest on products currently offered is established by CFSB as market conditions warrant. At year-end 1992, the Bank had approximately 66,000 savings accounts, 56,000 checking accounts and 133,000 certificate of deposit accounts.

Deposits at December 31, 1992 are comprised of the following:

| *(in thousands)* | Deposits | Average Cost of Funds |
|---|---|---|
| Regular savings | $114,350 | 3.24% |
| Money market savings | 316,611 | 3.27 |
| Total savings | 430,961 | 3.26 |
| 91 day certificate | 39,248 | 3.28 |
| 182 day certificate | 409,859 | 3.63 |
| 9 month certificate | 17,192 | 3.59 |
| 12 - 23 month certificate | 602,943 | 4.38 |
| 24 - 35 month certificate | 234,822 | 5.93 |
| 36 - 47 month certificate | 73,509 | 7.11 |
| 48 - 59 month certificate | 23,363 | 6.96 |
| 5 - 10 year certificate | 203,324 | 8.06 |
| Total certificates | 1,604,260 | 5.01 |
| Interest checking | 151,764 | 2.41 |
| Non-interest checking | 13,286 | |
| Money market demand | 184,226 | 3.24 |
| Commercial checking | 74 | |
| Total demand accounts | 349,350 | 2.76 |
| Total retail deposits | 2,384,571 | 4.36 |
| Negotiable rate certificates | 4,856 | 3.05 |
| As agent deposits | | |
| Accrued interest | 1,190 | |
| Total deposits | $2,390,617 | 4.36% |

Refer to *Exhibit III. - Deposit Information* for additional detail on deposits.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104004

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.

CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.

Since the late 1980's, CSB has pursued a retail office network optimization strategy which has resulted in the sale or consolidation of those offices which were poor performers or which were geographically unacceptable. As part of this program, several branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB currently has 31 offices in New Jersey, 9 offices in Florida and one office in the District of Columbia. The New Jersey offices are located in the northern half of the State. In Florida, CSB offices are generally clustered in the south Florida and Tampa/Clearwater regions. CSB also affords its customers electronic access to certain accounts through its participation in various regional and national EFT networks. Refer to *Exhibit IV. - Retail Branch Information* for additional details on individual retail branches.

Prior to the date of conservatorship, CSB also originated residential mortgage loans and consumer loans through its retail office network. A variety of residential mortgage loans were offered to meet the needs of those who were purchasing a home or refinancing. Consumer lending efforts primarily focused on adjustable rate home equity lines of credit, overdraft lines of credit, fixed-rate home equity, auto loans and student loans. These loans are no longer offered, although existing lines of credit may still be accessed.

As of December 31, 1992, CSB had approximately $213 million of uninsured deposits. This figure was determined through a computer analysis of taxpayer identification numbers and combination of account data.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104005

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**C. Cash and Securities**

CFSB's portfolios at December 31, 1992 are detailed in this section.

*Cash and cash equivalents*

Cash and cash equivalents at December 31, 1992 is comprised of the following:

| *(in thousands)* | |
|---|---|
| Overnight Federal funds | $1,244,147 |
| Non-interest and interest bearing cash | 162,078 |
| | $1,406,225 |

*Investments*

The investment portfolio at December 31, 1992 consists of the following:

| *(in thousands)* | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| U.S. Government obligations | $0 | $500 | $500 |
| Corporate bonds | | 250 | 250 |
| Collateralized mortgage obligations | | 22,840 | 22,840 |
| Partnership investment | | 2,721 | 2,721 |
| Preferred stock | | 128 | 128 |
| Investments, book value | $0 | $26,439 | $26,439 |
| Investments, market value | $0 | $26,291 | $26,291 |

*Federal Home Loan Bank Stock*

The stock of the FHLB is carried at a cost of $44,265,000 at December 31, 1992. CSB is required to own and in fact does own capital stock in the FHLB in an amount determined generally by its outstanding home mortgage loans and advances from the FHLB. For the year ended December 31, 1992 the FHLB stock yielded 8.37%.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104006

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 005

*Mortgage-backed Securities*

MBS, net are summarized as follows:

| | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| Governmental National Mortgage Association ("GNMA") | $ 81,292 | $96,038 | $177,330 |
| Federal National Mortgage Association ("FNMA") | 63,811 | 11,663 | 75,474 |
| Federal Home Loan Mortgage Corporation ("FHLMC") | 744 | 40,870 | 41,614 |
| Pass-through securities | 3,636 | 636,269 | 639,905 |
| Other mortgage-backed securities (1) | | 9,926 | 9,926 |
| Mortgage-backed securities, book value | $149,483 | $794,766 | $944,249 |
| Mortgage-backed securities, market value | $150,119 | $806,279 | $956,398 |

(1) Other mortgage-backed securities consists of residual securities.

At December 31, 1992 CFSB had assets pledged to FHLB advances with a book value of $2.479 billion and to Medium Term Notes (MTN's) with a book value of $111.6 million. These pledged assets included Federal funds, mortgage-backed securities, whole loan participations and whole loans. On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's in October 1993.

**D. Loans Receivable**

Loans receivable, net, at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Gross loans: | |
| Residential first mortgage loans | $1,810,000 |
| Commercial real estate loans | 244,058 |
| Total first mortgage loans | 2,054,058 |
| Corporate loans | 108,112 |
| Consumer loans | 100,430 |
| Premium finance loans | 383,550 |
| Total other loans | 592,092 |
| Total loans receivable, gross | 2,646,150 |
| Loan participations sold | (228,115) |
| Loans in process | |
| Unearned discounts and deferred loan fees | (9,365) |
| Allowance for losses on loans | (59,597) |
| Total loans receivable, net | $2,349,073 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104007

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

Loans receivable, net, at December 31, 1992 by type are as follows:

| *(in thousands)* | |
|---|---|
| Residential first mortgage loans | $1,578,679 |
| Commercial real estate loans | 215,726 |
| Total first mortgage loans | 1,794,405 |
| Corporate loans | 75,190 |
| Consumer loans | 98,248 |
| Premium finance loans | 381,230 |
| Total other loans | 554,668 |
| Total loans receivable, net | $2,349,073 |

The following discussion provides further information on the various loan portfolios.

*Residential First Mortgage Loans*

CSB was extensively involved in mortgage banking activities including the origination, securitization, sale and servicing of one-to-four family residential mortgage loans. CSB originated first mortgage loans through retail and wholesale mortgage production offices. Wholesale loans were originated by third parties and were primarily closed in the name of CSB or assigned to CSB subsequent to closing. The originated loans have traditionally been retained in CSB's portfolio or sold in the national secondary market on either a servicing-released or servicing-retained basis. It had been CSB's policy to originate fixed rate product for sale and adjustable rate product for portfolio. As of December 14, 1992, all new mortgage loan origination ceased. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

Throughout 1990, 1991 and 1992 CSB, continued to refine its composition of mortgage production offices. This was achieved through the closing of unprofitable offices and the consolidation of offices located in the same territories. At December 4, 1992 CSB had six mortgage production offices located in New Jersey and Florida.

CSB's portfolio of residential first mortgage loans at December 31, 1992 are geographically concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| In-house portfolio | $597,099 | $352,645 | $143,423 | $1,093,167 |
| Loans serviced by others portfolio | 86,020 | 150,535 | 480,278 (1) | 716,833 |
| | $683,119 | $503,180 | $623,701 | $1,810,000 |

(1) Loans serviced by others are primarily located in states other than New Jersey and Florida in an effort to diversify CSB's significant geographical concentration. A significant portion of these loans are located in California.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104008

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Commercial Real Estate and Corporate Loans*

As previously mentioned, pursuant to a policy established in the second half of 1989, CSB ceased all new corporate and commercial real estate loan originations. This policy was in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions were experienced resulting from the economic downturn and deterioration of the real estate markets served, particularly in commercial real estate.

The commercial real estate and corporate loan portfolios, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $ 7,816 | $ 6,051 | $ 10,990 | $ 24,857 |
| Apartments | 6,415 | 10,709 | 25,388 | 42,512 |
| Hotel | 15,834 | 32,992 | 24,283 | 73,109 |
| Retail | 9,489 | 9,221 | | 18,710 |
| Corporate loans | 17,082 | | 27,989 (1) | 45,071 |
| Warehouse | 8,173 | | 4,740 | 12,913 |
| Single family | 7,598 | 1,424 | 1,594 | 10,616 |
| Nursing homes | 13,146 | | 11,112 | 24,258 |
| Land & development | 3,717 | 967 | 2,997 | 7,681 |
| Mini storage | 6,552 | 12,111 | | 18,663 |
| Other | 4,097 | 7,052 | 1,377 | 12,526 |
| Commercial real estate and corporate loans, net | $99,919 | $80,527 | $110,470 | $290,916 |

(1) A majority of the corporate loans represent corporate lines of credit and are not identified with a particular state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104009

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Consumer Loans*

Prior to the date of conservatorship, CSB made various types of consumer loans, including home equity loans, auto lo student loans, unsecured personal loans, and loans to depositors secured by their deposit accounts. The shorter-ter.: normally higher interest rates charged on various types of consumer loans contribute to the maintenance of a positive spread between loan yields and CSB's cost of funds.

The consumer loan portfolio at December 31, 1992 by type of loan is geographically concentrated as follows:

| *(In thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Home equity line of credit | $32,028 | $11,746 | $710 | $44,484 |
| Fixed equity | 21,719 | 14,998 | 1,604 | 38,321 |
| Unsecured line of credit | 3,724 | 1,070 | 88 | 4,882 |
| Savings account loans | 3,139 | 263 | | 3,402 |
| Student loans | 2,458 | 3 | | 2,461 |
| Auto loans | 1,823 | 451 | 39 | 2,313 |
| Other | 3,982 | 566 | 19 | 4,567 |
| | $68,873 | $29,097 | $2,460 | $100,430 |

*Premium Finance Loans*

Premium finance loans are originated by IPF. IPF has operated in the premium finance business since 1972, providing loans to small and medium sized businesses to finance premiums payable on property and casualty insurance policies. All loans made by IPF are collateralized by the unearned premium refundable by the insurer upon cancellation. The portfolio is well diversified by geography, loan size, business of the insureds and, also, diversified by insurer.

On September 30, 1992 CSB and IPF executed an agreement for the purchase of IPF receivables by CSB. This agreement represents a 3 year commitment to purchase up to $400 million of receivables. IPF would continue to service the receivables for a fee. A reserve fund to cover losses resulting from defaults is maintained for the benefit of CSB. The funding cost is passed through monthly based upon the higher of: a) CSB's average cost of funds for the previous month; or b) 30 day LIBOR plus 75 basis points. This cost is applied to the average monthly principal balance of receivables purchased.

**E. Investment in Real Estate**

Investment in real estate, net, at December 31, 1992 consists of the following:

| *(In thousands)* | |
|---|---|
| Real estate held for development and sale | $5,799 |
| Real estate owned ("REO") - Commercial | 98,341 |
| - Mortgage | 39,490 |
| - Consumer | 1,878 |
| Total REO | 139,709 |
| In-substance foreclosed loans - Commercial | 118,359 |
| - Mortgage | 59,000 |
| Total in-substance foreclosed loans | 177,359 |
| | $322,867 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104010

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Real Estate Owned*

The commercial real estate owned portfolio, net, at December 31, 1992 consists of the following:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office | $3,461 | $4,165 | $5,617 | $13,243 |
| Apartments | | 18,212 | 2,899 | 21,111 |
| Hotel | 2,088 | 18,174 | 8,277 | 28,539 |
| Retail | | 11,367 | | 11,367 |
| Warehouse | | | 2,427 | 2,427 |
| Single family | 168 | 2,989 | 2,002 | 5,159 |
| Land development | 5,773 | 10,677 | | 16,450 |
| Other | | 48 | | 48 |
| | $11,490 | $65,632 | $21,222 | $98,344 |

*In-substance Foreclosed Loans*

The commercial in-substance foreclosed loans, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $26,960 | $3,377 | $16,100 (1) | $46,437 |
| Apartments | 4,035 | | 26,134 (2) | 30,169 |
| Hotel | 5,000 | | | 5,000 |
| Retail | 143 | 3,648 | | 3,791 |
| Corporate loans | | | | |
| Warehouse | 5,611 | 914 | | 6,525 |
| Single family | 1,422 | | | 1,422 |
| Nursing homes | | 2,979 | | 2,979 |
| Land & development | 12,328 | 4,359 | 699 | 17,386 |
| Mini storage | 2,526 | | | 2,526 |
| Other | | 1,719 | 405 | 2,124 |
| | $58,025 | $16,996 | $43,338 | $118,359 |

(1) Includes $13,900 located in the state of Ohio.
(2) Includes $20,100 located in the state of Ohio.

**F. Loan Servicing**

*Residential Mortgage Loan Servicing*

CFSB has a stand-alone residential mortgage loan servicing division operating in Clearwater, Florida. The Clearwater Servicing Center was acquired in 1989 from Numerica Financial Services, Inc. with almost 30,000 loans and related assets, plus an existing staff. To improve efficiencies and customer service, CSB consolidated its entire portfolio, most of which had been serviced from its New Jersey headquarters, into the Clearwater operation by the end of 1990. At its peak, the Center serviced 146,000 loans totalling almost $10 billion with over 900 loans per employee serviced at an average core cost of approximately $60 per loan.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104011

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

Among thrift servicers, CSB's portfolio serviced for others of $6.6 billion was the ninth largest as of June 30, 1992. Consisting almost equally of originated and purchased servicing, (47% and 53%, respectively), the entire portfolio contained 115,000 loans totalling $7.2 billion as of December 31, 1992. Of this total, 11,500 loans or $1.1 billion are asset loans owned in full by CFSB. The Bank also had a small participation interest in 3,000 loans with a total principal balance of $87 million. The remainder were primarily FNMA/FHLMC/GNMA.

The book value of capitalized costs of future servicing at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Purchased mortgage servicing rights | $51,078 |
| Excess servicing rights: | |
| Mortgage loans | 11,364 |
| Home equity loans | 1,661 |
| | 13,025 |
| | $64,103 |

*Consumer Loan Servicing*

During 1989 and 1990 CSB sold segments of its Consumer Loan portfolio to a variety of investors, retaining the right to earn recurring fee income by continuing to service the loans. The table that follows details the types of loans, names of investors and shows the balances outstanding together with the servicing spread for each portfolio:

| *(dollars in thousands)* | Number of Accounts | Credit Limit | Current Balance | Servicing Fee |
|---|---|---|---|---|
| Revolving: | | | | |
| United Jersey Bank | 1,991 | $109,916 | $ 64,751 | .65% |
| First Valley Bank | 3,420 | 180,369 | 106,916 | .55 |
| Massachusetts Company | 789 | 34,302 | 19,498 | .50 |
| Total revolving | 6,200 | 324,587 | 191,165 | |
| Fixed: | | | | |
| First Fidelity | 856 | 22,612 | 1,139 | .25 |
| West Jersey | 125 | 2,564 | 44 | .50 |
| Total fixed | 981 | 25,176 | 1,183 | |
| | 7,181 | $349,763 | $192,348 | |

At December 31, 1992 CFSB carried $1.66 million in excess servicing rights attributed to these portfolios on its books. Of the portfolios noted above only the First Valley (a subsidiary of UJB Financial in New Jersey) loans have a recourse liability which, at December 31, 1992 was about $2.26 million.

**G. Other Interest Bearing Liabilities**

*Advances from the Federal Home Loan Bank*

CSB borrowed funds from the FHLB. The borrowings are collateralized by CSB's FHLB stock holdings and certain mortgage loans and other assets, principally mortgage-backed securities.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104012

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

At December 31, 1992, advances from the FHLB aggregated $885 million. CSB is currently required to physically deliver specific collateral to the FHLB to secure its advances. Under current policies of the Federal Home Loan Bank, member institutions are required to maintain collateral with market values in an amount ranging from 100% to 125% of outstanding advances, depending on the type of collateral pledged and the member's financial condition. CSB has delivered to the FHLB the required level of collateral necessary to secure its outstanding advances.

CSB's advances from the FHLB are primarily variable rate indexed to the London Interbank Offering Rate (LIBOR) with quarterly and semi-annual resets. At December 31, 1992, maturities of the advances from the FHLB ranged from June 1994 to January 1996.

Advances from the FHLB at December 31, 1992 are as follows:

| Date of Note | Principal Balance (000's) | Next Reset Date | Due Date of Note | Interest Rate |
|---|---|---|---|---|
| *Variance Rate Advances (3 Month LIBOR)* | | | | |
| June, 1989 | 50,000 | December, 1992 | June, 1994 | 3.33% |
| June, 1990 | 3,560 | December, 1992 | June, 1995 | 3.09% |
| August, 1990 | 1,750 | February, 1993 | August, 1995 | 3.61% |
| October, 1990 | 30,000 | December, 1992 | September, 1995 | 3.22% |
| | 85,310 | | | |
| *Variable Rate Advances (6 Month LIBOR)* | | | | |
| August, 1990 | 100,000 | February, 1993 | August, 1995 | 3.42% |
| October, 1990 | 300,000 | March, 1993 | September, 1995 | 3.34% |
| December, 1990 | 200,000 | December, 1992 | December, 1995 | 3.67% |
| December, 1990 | 200,000 | January, 1993 | January, 1996 | 3.58% |
| | 800,000 | | | |
| | $885,310 | | | |

On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Prepayment penalties through December 31, 1992 totalled $6.2 million.

*RTC Advances*

RTC Advances are being utilized to replace the advances from the FHLB. As of December 31, 1992, CFSB had $1.75 billion of RTC Advances. Interest expense on these advances is based upon the 13 week Treasury Bill plus 25 basis points. The rate adjusts weekly.

*Other Borrowed Funds*

CFSB's other borrowed funds consist of fixed rate MTN's. At December 31, 1992, the MTN's had maturities ranging from May 1993 to October 1993 and interest rates ranging from 8.00% to 9.34%, with interest payable semiannually on March 15 and November 15. The MTN's are not redeemable at the option of CFSB. The MTN's are primarily collateralized by mortgage-backed securities with current face values of approximately $115 million. As previously discussed, arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
CAM-A-0104013

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00(

*Hedges*

CSB periodically used interest rate futures and entered into options on future contracts to reduce exposure to fluctuations in interest rates. There were no open positions in either of these instruments on December 31, 1992.

CSB used interest rate swap agreements to adjust the repricing of certain assets and liabilities to minimize exposure to interest rate changes. Interest rate swaps outstanding at December 31, 1992 are as follows:

| | | Weighted Average | |
|---|---|---|---|
| *(dollars in thousands)* | Notional Amount | Fixed Rate | Floating Rate |
| Fixed Rate Payor | $151,000 | 8.94% | 3.63% |
| Floating Rate Payor | $10,000 | 8.16% | 3.58% |

The current swap contracts are with six dealers. The agreements outstanding at December 31, 1992 have expiration dates between January 1993 and August 1995.

The cost to unwind the interest rate swap agreements is currently estimated to be in excess of $6 million.

## H. Other Assets and Other Liabilities

Non-interest earning assets at December 31, 1992 are as follows:

| *(In thousands)* | |
|---|---|
| Interest and dividends receivable | $18,540 |
| Other assets | 86,026 |
| | $104,566 |

*Interest and Dividends Receivable*

Interest and dividends receivable represents the income earned on all interest earning assets but not yet received in cash.

*Goodwill of the Bank*

Goodwill of the Bank was originally recorded in connection with supervisory and nonsupervisory acquisitions in the 1980's and represents the excess of cost over fair value of assets acquired. A portion of goodwill was written off in connection with branch sales in 1990. The goodwill was being amortized to expense on a straight line basis over periods ranging from nine to 25 years. The goodwill of the Bank has been written off.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104014

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Other Assets*

Other assets at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Premises and equipment, net | $25,108 |
| FHA/VA receivables | 22,820 |
| Mortgage escrow advance | 17,047 |
| Core deposit value | 1,410 |
| Goodwill - IPF | 2,009 |
| Purchased distribution system - IPF | 14,420 |
| Tradename and Covenant Not To Compete - IPF | 2,706 |
| Other assets, net | 506 |
| | $86,026 |

Premises and equipment, net at December 31, 1992 is comprised of the following:

| *(in thousands)* | Gross | Accumulated Depreciation | Net |
|---|---|---|---|
| Land | $4,118 | | $4,118* |
| Buildings and improvements | 19,508 | ($8,370) | 11,138* |
| Leasehold improvements | 7,777 | (5,284) | 2,493 |
| Furniture, equipment and automobiles | 23,289 | (17,280) | 6,009 |
| | 54,692 | (30,934) | 23,758 |
| Subsidiaries | | | 1,350 |
| | $54,692 | ($30,934) | $25,108 |

* Land and buildings and improvements include, among others, the following facilities:

| *(in thousands)* | Gross | Accumulated Depreciation | Net(1) |
|---|---|---|---|
| South Street, Morristown, New Jersey - administrative offices | $7,748 | ($2,697) | $5,051 |
| Delray Beach, Florida - retail branch (2) and office | 3,098 | (1,099) | 1,999 |
| Phillipsburg, New Jersey - retail branch | 819 | (412) | 407 |
| West Delray Beach, Florida - retail branch (2) | 1,226 | (307) | 919 |
| Caldwell, New Jersey - retail branch | 940 | (262) | 678 |
| Newark, New Jersey - retail branch | 749 | (418) | 331 |

(1) Excludes furniture, fixtures and equipment.
(2) Owned by CFSB - leased to Great Western.

Refer to *Exhibit VI. - Facilities* for a complete listing of owned and leased premises.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104015

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

Non-interest bearing liabilities at December 31, 1992 are composed of the following:

| *(in thousands)* | |
|---|---|
| Escrow - Bank | $78,015 |
| Escrow - IPF | 2,078 |
| Other liabilities | 119,536 |
| | $199,629 |

*Escrow-Bank*

CFSB, as of December 31, 1992, services $7.3 billion of mortgage loans, of which $6.2 billion are loans serviced for others and $1.1 billion are CFSB asset loans. Earnings are generated from service fees, late charges and insurance income. Escrow funds include mortgagors' deposits for taxes and insurance ("T&I") and the float from the remittance of principal and interest ("P&I") to the investors for which CFSB services loans.

Included in CFSB's balance sheet at December 31, 1992 is a $78.0 million escrow liability which relates to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | X | |
| GNMA | X | |
| Other (private) | X | X |
| Asset loans | X | |

The T&I funds are insured for each mortgagor. The P&I funds are owned by the investors. For investment purposes, these funds are commingled with the Bank's assets and earn interest accordingly. Such interest is included in "interest income".

Additionally, escrow funds of approximately $120 million at December 31, 1992 which is not included in CFSB's balance sheet, are on deposit at the FHLB. These funds relate to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | | X |
| GNMA | | X |
| FNMA | X | X |

The above government agencies for which CFSB services loans require that these funds be maintained in custodial accounts in an eligible depository.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104016

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00€

*Other Liabilities*

Other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued interest payable | $12,534 |
| Undisbursed premiums - IPF | 22,823 |
| Outstanding payments to producers - IPF | 8,363 |
| Overdrawn cash | 25,755 |
| Custodial suspense (due to investors) | 17,148 |
| Construction loan - Midlantic | 4,166 |
| Other liabilities, net | 28,840 |
| | $119,629 |

Other - other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued liabilities: | |
| Pension liability | $1,859 |
| Supplemental retirement plan liability | 1,200 |
| Other accrued liabilities | 5,047 |
| | 8,106 |
| Accrued liabilities on the books of IPF | 1,330 |
| Intercompany payable to CSB Bancorp | 2,884 |
| Due to investors - principal and interest (HER loans serviced for others) | 3,940 |
| Deferred gain futures contract settlement | 1,874 |
| Accrued liability - interest rate swaps | 2,385 |
| Accruals for contingencies, warranty costs and Mt. Laurel units on the books of real estate development subsidiaries | 1,740 |
| Unclaimed property (a) | 1,070 |
| Other | 5,511 |
| | $28,840 |

(a) Represents unclaimed checks which are held for up to six years prior to escheatment to the state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104017

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

**I. Subsidiaries**

Bridge Asset Management, Inc. has been assigned the responsibility for the management and disposition of all subsidiaries and subsidiary assets from the date of intervention and continuing through the disposition or the transfer of the subsidiary and subsidiary assets to one or more permanent SAMA/SAMDA contractors.

Bridge Asset Management, Inc. has identified 76 wholly owned subsidiary corporations which have been grouped into four major categories: (1) Carteret Premium Finance, Inc. and its subsidiary corporations; (2) Other non-real estate operating companies; (3) Real estate development and real estate owned holding companies; and (4) Inactive companies and companies currently in the process of dissolution. Refer to *Exhibit XI - Flowchart of Corporate Structure* and *Exhibit XII - Subsidiary Listing.*

Carteret Premium Finance, Inc. and Subsidiaries

Carteret Premium Finance, Inc. (CPF) is a wholly owned subsidiary of CFSB. CPF was incorporated in the State of New Jersey and currently functions as a holding company for Imperial Premium Finance, Inc. (IPF-DE), a wholly owned operating company incorporated in Delaware. IPF-DE has three wholly owned subsidiaries, including an operating company of the same name incorporated in California (IPF-CA). IPF-DE and IPF-CA (together referred to as IPF) are both primarily engaged in the financing of insurance premiums, with IPF-CA originating loans within the State of California and IPF-DE originating loans outside the state. The other two subsidiaries of IPF-DE, Imperial Premium Funding Corp., Inc. and Imperial Premium Finance Holding Corp., Inc., are special purpose finance subsidiaries through which loans originated by IPF-DE and IPF-CA were previously sold to Chemical Bank and are currently being sold to CFSB, respectively.

Other Active Non-Real Estate Operating Companies

In addition to CPF and its subsidiaries, there are a number of other special purpose finance and financial services subsidiaries which were active at the date of intervention: Carteret Holdings Corporation, Carteret Insurance Services, Inc., Carteret Financial Services, A New Jersey Corporation and CSB Manor Park, Inc.

*Carteret Holdings Corporation*

This subsidiary is a wholly owned subsidiary of CFSB which delivered a limited guarantee in connection with the March 28, 1988 issuance by CSB of $55,035,674 of Class A and Class B Series 1988-1 Mortgage Pass-Through Certificates.

*Carteret Insurance Services, Inc.*

This subsidiary is a subsidiary of CFSB which was established to secure force placed mortgage insurance on behalf of CSB and to offer optional insurance products, including mortgage life and mortgage disability insurance to mortgage customers of CSB. The subsidiary currently generates gross revenues of approximately $2.1 million. Bridge Asset Management, Inc. is in the process of drafting a Case Memorandum recommending that Carteret Insurance Services, Inc. renew its insurance license and errors and omissions policy, process the optional insurance applications which it has received as a result of a solicitation mailing in November and continue to procure force placed insurance and to administer existing optional insurance policies.

*Carteret Financial Services, A New Jersey Corporation*

This subsidiary is a subsidiary which was actively engaged in the sale of annuity products and which provided office space and equipment and limited marketing support to a discount brokerage firm under a financial services agreement. The subsidiary stopped marketing annuities the morning following the date of intervention and both CFSB and the subsidiary suspended all marketing support for the discount brokerage firm that same morning. In a meeting on December 29, 1992, representatives from CFSB and the discount brokerage firm, Wall Street Investment Services (WSIS), met as a result of which WSIS agreed to consolidate its operations into the second floor of the Caldwell, New Jersey branch and to pay fair market rent for the space; the office is physically separated from the Bank's facilities on the first floor and has a separate entrance. Bridge Asset Management, Inc. has requested RTC Legal to review the financial services agreement between Carteret Financial Services and WSIS to clarify the subsidiary's options and potential liabilities in terminating the agreement.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104018

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*CSB Manor Park, Inc.*

This subsidiary currently serves as a holding company for The Inn at Clark, Inc. (The Inn), a corporation originally owned and controlled by a borrower of CSB who had assigned 100% of the stock in The Inn in connection with a mortgage on a Ramada Inn in Clark, New Jersey. Upon the borrower's default under the mortgage loan, CSB initiated foreclosure actions against the Ramada Inn and began exercising its right as assignee to control the operations and affairs of The Inn. The Inn subsequently engaged a third party hotel management company, Signet Hotel Corporation, to operate the Ramada Inn which is awaiting sheriff's auction as a result of foreclosure proceedings initiated by CSB.

Real Estate Investment and Real Estate Owned Holding Companies

*First Affiliate, Inc.*

This subsidiary currently acts as a holding company for Carteret Boca Gardens, Inc., a real estate development company which is constructing and marketing single family attached homes in a residential subdivision in Boca Raton, Florida. At present, there are three model units, eleven completed units ready for sale, thirteen units under construction and six units for which slab has been poured. A total of five units have been sold since the date of intervention and a total of 675 units in this 703 unit development have been sold since work originally began in 1983.

*Carteret Realty Corp.*

This subsidiary is actively engaged in the construction of townhouses and condomiums in a major planned unit development (PUD) known as Foxmoor and located outside of Princeton, New Jersey. At present, the subsidiary is in the process of completing the development of three subdivisions within the PUD, having already successfully completed four subdivisions within the PUD. Spread among the three subdivisions currently under development, the subsidiary currently owns 10 model units, 27 completed units, 12 units which are under construction, 20 units for which the foundations have been poured and 76 planned units on which no work has been done. At present, there are approximately 1,380 families living within the PUD and the subsidiary has contracts or is holding deposits on 42 of the 145 units enumerated above.

In addition to the three subsdivisions currently under active development, the subsidiary owns an additional three undeveloped subdivisions within the PUD, one of which has received the necessary approvals for the construction of 248 condomiums, the second of which has received the necessary approvals for 312 townhouses and third of which has been approved for 40,000 square feet of office space.

The entire asset has a current book value of approximately $6.5 million and a current appraised value of $15.3 million. The asset is currently encumbered by a mortgage to Midlantic National Bank in the amount of $4.5 million. A Case Memorandum has recently been submitted recommending that the subsidiary utilize its existing cash balances to prepay the mortgage in an amount of up to $2 million.

*Carteret Waterview, Inc.*

This subsidiary is a limited partner in B & C Land Partnership, L.P. and a limited partner in 10 Waterview Associates, L.P., having a 40% interest in each of the limited partnerships. 10 Waterview Associates, L.P. owns the building at 10 Waterview Boulevard in which CFSB houses a majority of its operations. B & C Land Partnership, L.P. owns the land on which 10 Waterview was constructed under a 97 year ground lease. CFSB is currently considering repudiating and/or renegotiating its leases at 10 Waterview; any repudiation or significant renegotiation of either of its two leases at 10 Waterview will eliminate any existing or future equity which the subsidiary may have in the land or the building.

*Other*

In addition to these three real estate investment subsidiaries, there are currently 27 subsidiaries holding single real estate assets which were originally mortgaged to CSB and subsequently acquired through foreclosure or by deed-in-lieu of foreclosure. There were 29 such subsidiaries at the date of intervention, two of which have sold their single real estate assets and which are now categorized as formerly active subsidiaries.

The 27 remaining real estate assets have a total combined book value of approximately $125.2 million. Nine of these single real estate asset subsidiaries own a real estate asset with a book value in excess of $5 million and these nine assets have a combined book value of $82.3. The following tables provide specific information regarding the nine largest assets and summary information regarding all 27 of the assets.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104019

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

The following are major subsidiary REO assets:

| *(in millions)* Subsidiary Name | Asset Name | Type of Asset | Asset Location | Asset Value |
|---|---|---|---|---|
| Carteret Amberwood | Spectrum Business Park | Vacant Land | Florida | $8.9 |
| CSB Northern Real Estate, Inc. | La Mirada | Office/Retail Buildings | Florida | 6.4 |
| Talarico Real Estate, Inc. | Talarico Warehouse | Industrial Warehouse | New Jersey | 6.3 |
| CSB Pembroke Development, Inc. | The Landings | Undeveloped PUD Tracts | Florida | 5.8 |
| CSB Land Management, Inc. | Paramount Plaza | Office Building | Florida | 5.8 |
| CSB New Jersey Development | Old Mill Inn | Hotel/Restaurant | New Jersey | 5.7 |
| CSB Custom Living Homes, Inc. | Hunter's Glen - Jefferson | Vacant Land | New Jersey | 5.0 |
| CSB Southern Properties, Inc. | Bel-Air Apartments | Apartment Complex | Florida | 11.6 |
| CSB Florida Building, Inc. | Radisson Plaza Hotel | Hotel | Florida | 26.8 |
| Total | | | | $82.3 |

The following are the number of subsidiary REO assets by type and by state:

| | New Jersey | Florida | Arizona | Ohio | Total |
|---|---|---|---|---|---|
| Office Parks, Office | 5 | 3 | | 1 | 9 |
| Residential Developments | 3 | 3 | | | 6 |
| Commercial, Industrial | 1 | 4 | | | 5 |
| Hotel, Motel, Restaurant | 1 | 1 | 1 | | 3 |
| Land, Mixed Use, Other | 2 | | 1 | | 3 |
| Agricultural | 1 | | | | 1 |
| Total | 13 | 11 | 2 | 1 | 27 |

The following are the book value of subsidiary REO assets by type and by state:

| *(in millions)* | New Jersey | Florida | Arizona | Ohio | Total |
|---|---|---|---|---|---|
| Office Parks, Office | $11.5 | $21.1 | | $2.2 | $34.8 |
| Residential Developments | 10.4 | 19.4 | | | 29.8 |
| Commerical, Industrial | 6.3 | 11.3 | | | 17.6 |
| Hotel, Motel, Restaurant | 5.7 | 26.8 | $4.9 | | 37.4 |
| Land, Mixed Use, Other | 5.3 | | .1 | | 5.4 |
| Agricultural | .1 | | | | .1 |
| Total | $39.3 | $78.6 | $5.0 | $2.2 | $125.1 |

Seven of the 27 real estate assets are currently in the process of being transferred to Midland in conjunction with a SAMDA/auction program and the remaining assets are currently expected to be transferred to one or more permanent SAMDA contractors on or before March 4, 1993.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104020

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

Inactive Companies and Companies in the Process of Dissolution

There are five subsidiary corporations currently in the process of dissolution, 18 corporations which were established to hold real estate acquired through foreclosure or by deed in lieu of foreclosure and which were never activated, 15 inactive subsidiaries which were formerly active developing or holding real estate assets and five inactive subsidiary corporations which were formerly active holding or non-real estate operating companies. Bridge Asset Management, Inc. is currently in the process of preparing a Case Memorandum recommending the expedited dissolution of the 18 subsidiary corporations which never commenced operations. A preliminary due diligence of the 20 formerly active subsidiary corporations has been completed and has disclosed outstanding issues on many of these subsidiary corporations which must be resolved prior to their dissolution. Ongoing due diligence efforts will initially focus on those subsidiaries with known outstanding issues in order to expedite the dissolution strategy of these subsidiaries.

**J. Litigation**

A litigation report, dated December 31, 1992, is attached in *Exhibit X. - Litigation Listing*. This report is a summary of all known litigation involving CSB or its subsidiaries. Excluded from this report are foreclosure related actions and other minor claims arising in the normal course of business.

**K. Organization**

At December 4, 1992, CSB and its subsidiaries had 1,124 employees which included approximately 102 part-time and 1,022 full-time employees. Total annual payroll was approximately $35 million. The related benefit expense is approximately $6 million. The table below summarizes CSB's headcount by major category. Refer to *Exhibit VIII. - Organization Charts* and *Exhibit IX. - Employee Compensation* for further information.

| | |
|---|---|
| Commercial Workout Operations | 31 |
| Imperial Premium Finance | 195 |
| Mortgage Servicing | 151 |
| Mortgage Production | 90 |
| Mortgage Administration | 59 |
| Retail Branches and Support | 353 |
| Information Systems Division | 70 |
| Controller's Division | 55 |
| Corporate Services | 38 |
| Consumer Lending | 28 |
| Human Resources | 14 |
| Internal Audit | 14 |
| All Other | 26 |
| | 1,124 |

On December 29, 1992 it was announced that approximately 90 employees, primarily in the mortgage production area, joined a new eastern division of Imperial Credit Industries, Inc. of Newport Beach, California under an arrangement approved by the RTC. The employee starting dates will be staggered over the first quarter of 1993, allowing CFSB to complete the processing of mortgage applications.

**L. Information Systems and Computer Resources**

The Information Systems Division organization in CFSB consists of four functional units: Management/Administration; Systems Development; Data Processing Operations; and Telecommunications. The organization is located at the Waterview Operations Center in Parsippany, New Jersey. All Information Systems services are centrally managed and supported with the exception of the mortgage servicing system which is serviced by Computer Power Inc., Jacksonville, Florida.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104021

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*Payroll/Human Resources*

All payroll and human resource management information needs are supported on a departmental processor, IBM System 38, on an application software package from Software Plus. Comprehensive reporting needs are serviced by a separate report writer from Martin, Ross & Cole.

Computer Resources

The Information Systems Division supports the use of all in-house computer resources with the exception of Branch Automation. The Bank's in-house computer resources are comprised of six primary operating environments:

| | |
|---|---|
| Centralized Core Systems | IBM Large Scale Host |
| Department Support Systems | IBM Medium Scale Host |
| Item Processing Systems | NCR Check Equipment |
| Branch Automation Systems | NCR Branch Equipment |
| Local Area Network Systems | AST Compaq Servers |
| Individual PC Systems | IBM AST Compaq PC's |

*Centralized Core Systems*

The Bank's sole in-house Data Center (DC) is located in Parsippany, New Jersey. The DC provides large-scale processing for core business applications via an IBM System/370, MVS/XA, JES, CICS, TSO operating environment. The current workload is supported by a single IBM 3081-K64 HIPO CPU with 24 channels, rated at 14.8 MIPS. The operating environment is configured with 75 gigabytes of IBM 3390 disk storage, 8 address of IBM 3480 cartridge tape with autoloaders and IDRC, two address of IBM 3422 reel tape, one IBM 3800-3 high speed laser printer and one IBM 4245 high speed impact printer. Microfiche and a microfilm are produced in-house via Anacomp dry process microfiche machine and Kodak Prostar wet microfilm machine. The DC supports approximately 500 remote devices in 50 locations in New Jersey, Washington, D.C. and Florida. Front-end communications processor, networking and remote devices are described in further detail in the communications section. The DC operates on a seven day by 24 hour with unattended operation on Sunday. Detailed hardware and operating system software information is provided in *Exhibit V. - Information Systems.*

A full disaster recovery contract is in effect with Comdisco Disaster Recovery Services, North Bergen, New Jersey which covers both the IBM Host System 38 and peripheral devices.

*Departmental Support Systems*

Departmental application processing is provided for via an IBM S38 5282-BQ1, CPF operating environment. The system is configured with 1.6 gigabytes of IBM 9335 disk storage, one, IBM 3430 tape address and two IBM 5262 line printers. The Departmental Processor is located in the DC and supports approximately 30 remote devices in two locations in New Jersey and Florida. Networking and remote devices are described in further detail in the communications section.

*Item Processing Systems*

Item Processing support is provided for the Northern Region via NCR 7770 check processing equipment. The function is not part of the DC but is housed separately in the Parsippany, New Jersey location. Item processing which includes inclearing, transit and lock box are processed on four banks of NCR 7770 check equipment consisting of five, four-pocket modules. Consolidation and transmission to host is provided via an NCR 7770 Tower. The check processing function operates on a two-shift basis five days a week and a single shift on Saturday. Detailed hardware and operating system software information is provided in *Exhibit V. - Information Systems*. Check processing for the Mid-Atlantic and Southern Regions are provided for via outside service contracts with Signet and Sun Bank respectively.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104023

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*Branch Automation Systems*

All retail branches have installed the NCR Financial Tower System. This system is comprised of a Tower branch processor which runs the TMX operating system and connects to all teller and customer service PC workstations via a local branch network. The Tower is also the gateway for transmitting information between the branch and the mainframe in Parsippany via a data line. All customer service terminals have Cross Sell Manager from Berman Technologies. Cross Sell Manager is a screen-based, integrated customer marketing, document preparation and on-line account opening software program. The teller application is Financial Plus from Systems Concepts which provides cash control, electronic journaling and on-line transaction and inquiry processing. Both terminals emulate 3270 CRT processing for direct access to the InfoPoint mainframe software applications.

*Microsystems*

Standards established in 1987 for Microsystems have been constantly updated to reflect the rapid changes in hardware, software and networks. The Microsystems department provides help desk support, hardware and software evaluations, acquisitions, installations and first level hardware maintenance.

*Local Area Network Systems (LAN)*

There are three operational LAN's in CFSB. Two additional LAN's are being installed in support of the Controller's Division and the Purchasing Department. File servers will be upgraded to 486 class processors utilizing Novell Netware version 3.11 and token ring topology. Applications supported on all LAN's are Lotus, WordPerfect and dBase IV. Host connectivity will be through Novell's SAA Gateway.

*Individual PC Systems*

Current inventory consists of approximately 225 individual PC's and 100 printers.

Older 286 technology is being gradually replaced by 486 technology. Printers consist of a mixture of dot matrix and HP laser jets. Refer to *Exhibit V. - Information Systems.*

<u>Telecommunications</u>

CFSB's voice and data communications networks are centrally managed by the Telecommunications unit located in Waterview. All requests for communications services are handled by the Telecommunications unit which is responsible for all phases of the project including maintenance.

*Network Services*

CFSB's network employs a myriad of services including OPX circuits, OUTWATS, 800 Service, T1 and DID. Service is provided by AT&T, MCI, Sprint, and the BOCS. By allocating traffic to all three major long distance network vendors, CFSB protects itself from single-vendor network outages and promotes an environment of competition among the carriers. Aggregation and Term Plan contracts are established whenever possible to reduce "per minute" call costs.

*PBX*

CFSB maintains the AT&T System 75 as its PBX standard. The Morristown, Parsippany, Clearwater and Delray Beach offices are each serviced by a System 75 PBX. Station equipment (telephone) standards are based upon user job function. All control equipment is maintained in a secure environment, supported by UPS/Battery Backup and Fire suppression systems where available. System uptime routinely exceeds 99.9%.

*Automated Attendant/Voice Mail*

CFSB has selected the VMX Opcom Dial System as the Auto Attendant/Voice Mail standard for the Company. Each PBX site includes one VMX system providing these services. All employees, with the exception of customer service agents, are encouraged to use Voice Mail as a backup to traditional methods of message taking.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104024

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*ACD/Call Management Systems*

High volume customer service call groups in both Parsippany and Clearwater are monitored by AT&T 3B2 Call Management Systems (CMS). Call group supervisors have terminals with which to monitor activity and agent performance in real time. Group performance is monitored and reported to senior management.

*Inside Wire/Cable Systems*

Virtually all wiring is UTP level 3 or above depending upon devices attached. Twisted pair is used to connect telephones, IBM 3270 terminals, and LAN's. Most cable installations and cross connects are performed by in-house telecommunication technicians.

*Electronic Key Systems*

Small NEC key systems are used to provide voice service in all retail branch and mortgage production offices. The systems are all owned by CFSB, and do not provide any enhanced services such as voice mail or auto attendant.

*Data Network*

CFSB's data network originates in the Parsippany data center and connects to all retail branch and mortgage production offices. The network is built on a backbone architecture supported by T1 and 56KB digital circuits connected with Network Equipment Technologies (NET) multiplexers. The backbone provides redundancy and is able to reroute past failed facilities. As a result, uptime routinely exceeds 99.5%. Backbone nodes are located in Morristown, Parsippany, Clearwater and Delray Beach.

Local circuits running at 9.6KB connect remote offices to the nearest backbone node. Codex Corporation modems and data service units complete the connection.

CFSB's data network supports over 500 terminal and print devices, and is monitored by network management systems from IBM, NET and Codex. The network is linked to the Comdisco disaster recovery site, allowing for full operation in the event a disaster occurs in the Parsippany data center. Refer to *Exhibit V. - Information Systems*.

**M. Other Support Functions**

CFSB is generally organized by business lines. Support divisions are functionally organized. The following is a brief description of the functional support divisions.

*Corporate Services*

This division is responsible for purchasing, building maintenance, record management, microfiche department and mailroom staff. Corporate Services also manages certain equipment leases and facilities management functions.

*Controller's*

This division is responsible for the financial reporting system and the preparation of financial reports. The Controller's division handles general, divisional and corporate accounting, treasury accounting and operations, payroll, and financial analysis and budgeting.

*Marketing*

Advertising, public relations and other marketing support services are handled by this division.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104025

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*Legal*

This division provides title and other mortgage lending legal support to the residential lending and servicing divisions. The Legal division oversees the management of attorney relationships and the coordination of the civil and other legal actions described in the Litigation section of this report.

*Human Resources*

This division ensures compliance with the Bank's personnel policies; assists in the hiring, performance evaluation and termination of staff and manages the Bank's employee benefit programs.

*Information Systems Division*

This division is responsible for the management of all computer resources. This includes the functions described in the Information Systems section of this report. ISD encompasses the management of the IBM mainframe as well as mini-computer and micro-computer applications.

*Internal Audit*

The Internal Audit Division reviews the activities of the Bank for compliance with Bank policies and procedures and performs financial audits of the Bank's records to ensure their accuracy and completeness.

*Treasurer's*

This division includes the Treasury and Loan Sales functions. Treasurer's managed the Bank's investment and mortgage-backed securities portfolio and its wholesale borrowings which include FHLB advances, MTN's and Jumbo CD's. The division also performs liquidity and cash management services for the Bank. The Capital Markets group negotiates sales of residential loans and other financial instruments and executes interest-rate risk management strategies for the Bank.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104026

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

## II. Evaluation

### A. Problems of the Institution

On December 4, 1992, CSB was placed in Receivership by the OTS, and a new federal mutual association, CFSB was chartered. CSFB was then placed into conservatorship and the RTC was named conservator. This action was initiated because the OTS determined that CSB was operating in an unsafe and unsound condition in that it had insufficient capital, with no reasonable prospect of replenishment without federal assistance.

CSB's condition was primarily due to heavy losses on poorly underwritten commercial real estate and residential development loans originated under former management. Many of the loans were poorly documented and lacked adequate appraisals.

As of September 30, 1992, assets of $523.9 million, or 11 percent of total assets, were classified as substandard, doubtful or loss. CSB reported net losses of $131.8 million in 1990 and $160 million in 1991.

CSB had a significant amount of supervisory goodwill recorded in acquisitions of several failing or failed thrift institutions in 1982 and 1986. Under the OTS interpretation of FIRREA such goodwill was not includable in regulatory capital. CSB's agreement with the federal regulators at the time of the acquisitions of the ailing thrifts allowed CSB to use the goodwill acquired as capital for regulatory purposes. CSB's regulatory capital levels were significantly damaged by the change in the banking laws in 1989. At September 30, 1992, CSB remained out of compliance with minimum regulatory capital requirements as promulgated by the OTS pursuant to FIRREA. The regulations issued pursuant to FIRREA required CSB to exclude supervisory goodwill, from regulatory capital. The OTS interpretation of FIRREA eliminated the benefit of supervisory goodwill, with thrift regulators not honoring earlier commitments.

Progress by current management in reducing operating costs and disposing of nonperforming assets resulted in earnings of $9.1 million for the first nine months of 1992. But profits were insufficient to overcome a significant level of nonperforming and under-performing assets. Thus, recovery based on core earnings was highly improbable. Current management's efforts were also impaired by a depressed real estate market. The institution had been operating under regulatory restrictions since 1991.

The receivership followed intensive efforts by OTS and CSB's holding company to recapitalize the institution. The April 1992 expiration of congressional funding for thrift resolutions effectively removed CSB from ARP, under which CSB was eligible for sale with minimal government financial assistance. Subsequent attempts to sell the thrift without government financial aid were unsuccessful.

### B. Retail Branch Network

Since the date of conservatorship, CFSB has restricted certain products and significantly reduced interest rates on others. As a result, the Bank has experienced an outflow of $138.4 million in retail deposits through December 31, 1992. For the 27 days following the December 4, 1992 date of conservatorship, net certificate outflows totalled $63.4 million or 51.1% of scheduled maturities. In addition, tax-deferred annuities and brokerage services which were previously sold in New Jersey retail offices are no longer offered.

The CFSB retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution. During the past five years, the Bank's consumer banking efforts have been focused upon optimization of the retail office network. Each retail office was evaluated on its financial performance compared to the potential of the branch market area. Many of the offices which were determined to be substandard were closed, consolidated or sold to another financial institution. Operations at the remaining offices were streamlined and marketing efforts focused on acquisition/retention of high-balance deposit households.

CFSB retail offices in New Jersey and Florida are located in some of the top performing market areas in each respective state. The New Jersey markets tend to be suburban and upper middle class in nature, but also include some stable and ethnic blue-collar neighborhoods in urban areas. In Florida, the markets also tend to be suburban and upper middle class, and are characterized by a preponderance of senior citizens.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104027

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008(

Based upon total deposits, CFSB ranks as the second largest SAIF-insured institution headquartered in New Jersey. While considerably smaller in scope, the Bank's Florida retail office network nevertheless affords a possible acquiring institution of these CFSB branches the opportunity to be a significant player, specifically in South Florida.

In recent years, CSB has made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty. Retail office managers are also encouraged to be active in their respective local communities. The "outstanding" rating which CSB received for its Community Reinvestment Act activities is further evidence of the Bank's commitment to the individual communities it serves.

In its New Jersey market areas, CFSB is second only to First Fidelity Bank in terms of retail deposit market share. The Bank is the market share leader in eight of its New Jersey market areas and among the top three in over half of the markets. In Florida, CFSB faces much more competition, but nevertheless is among the top ten institutions in over half of its markets.

The Bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office presence. Average account balances for each product type at CFSB exceed industry averages. These characteristics, combined with a relatively stable deposit base, further enhance the valuation of the Bank's franchise.

**C. Liquidity**

An evaluation of CFSB liquidity was performed by the RTC immediately following conservatorship. Under the circumstances, liquidity was increased to fund anticipated deposit outflows, to reduce higher costing borrowings and to accommodate the orderly disposition of pledged assets. At December 31, 1992 CFSB's RTC liquidity ratio was 20.8%.

**D. Asset Quality**

CSB employs a loan review system whereby potential problem loans are classified and closely monitored if uncertainty exists as to the future collectibility. Classified assets, which includes assets rated substandard, doubtful or loss but exclude assets rated special mention, are as follows:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Substandard | $500,689 | $672,583 |
| Doubtful | 5,973 | |
| Loss | 65,207 | |
| | $571,869 | $672,583 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104028

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

Classified assets by asset type are as follows:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Residential first mortgage loans | $ 50,365 | $ 64,259 |
| Commercial real estate loans | 94,690 | 171,761 |
| Total classified first mortgage loans | 145,055 | 236,020 |
| Corporate loans | 48,553 | 88,694 |
| Consumer loans | 3,328 | 4,370 |
| Premium finance loans | 3,100 | 2,492 |
| Total classified other loans | 54,981 | 95,556 |
| Total classified loans | 200,036 | 331,576 |
| Real estate held for development and sale | 3,861 | 3,452 |
| REO | 153,909 | 109,537 |
| In-substance foreclosed loans | 204,021 | 227,813 |
| Total classified investment in real estate | 361,791 | 340,802 |
| Total classified loans and investment in real estate | 561,827 | 672,378 |
| Mortgage-backed securities | 10,042 | |
| Investments | | 205 |
| | $571,869 | $672,583 |

Assets rated special mention were $268 million and $202 million at December 31, 1992 and December 31, 1991, respectively. Classified assets and special mention assets include all nonperforming loans, REO and in-substance foreclosed loans.

A majority of CSB's residential and commercial real estate loans are secured by properties located in the states of New Jersey, Florida and California which have experienced a significant downturn in demand for such properties. CSB's management regularly analyzes each portfolio and records appropriate additions to the allowance for losses on loans and real estate as required to reflect conditions existing at each reporting date.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104029

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008

The following table details the activity of the allowance for losses on loans and real estate:

| *(in thousands)* | December 31, 1991 | Additions | Chargeoffs | Recoveries | Other | December 31, 1992 |
|---|---|---|---|---|---|---|
| Allowance for losses on loans: | | | | | | |
| Mortgage | $14,371 | $16,917 | ($11,043) | $1,311 | $3,815 | $25,371 |
| Commercial real estate loans | 33,177 | 14,645 | (210) | 2,976 | (25,341) | 25,247 |
| Corporate loans | 13,481 | | (6,716) | 25 | (2,305) | 4,485 |
| Consumer loans | 1,706 | 2,600 | (2,786) | 519 | 135 | 2,174 |
| Premium finance loans | 1,908 | 2,875 | (3,002) | 539 | | 2,320 |
| | 64,643 | 37,037 | (23,757) | 5,370 | (23,696) (a) | 59,597 |
| Allowance for losses on real estate: | | | | | | |
| Real estate owned - commercial real estate | | 2,043 | (934) | 1,865 | 11,287 | 14,261 |
| Real estate owned - consumer | 150 | | | | (150) | |
| In-substance foreclosed loans | 19,788 | | (5,685) | | 12,559 | 26,662 |
| | 19,938 | 2,043 | (6,619) | 1,865 | 23,696 (a) | 40,923 |
| Total allowance for losses on loans and real estate | $84,581 | $39,080 | ($30,376) | $7,235 | $0 | $100,520 |

(a) Reclass between allowance for losses on loans and real estate.

The allowance for losses on loans and real estate at December 31, 1992 includes specific reserves of $24 million and $41 million on *loans classified loss and on assets classified loss, respectively.*



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104030

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008

The following table sets forth information on nonaccrual loans, past due loans which are still accruing interest, REO, in-substance foreclosed loans and restructured loans:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Residential first mortgage loans | $48,007 | $53,610 |
| Commercial real estate loans | 33,265 | 60,804 |
| Corporate loans | 747 | 20,209 |
| Consumer loans | 3,328 | 4,370 |
| Total nonaccrual loans | 85,347 | 138,993 |
| Residential first mortgage loans - 90 days past due | 2,359 | 10,649 |
| Commercial real estate loans - 90 days past due | 7,564 | 15,159 |
| Corporate loans - 90 days past due | 1,431 | |
| Premium finance loans - 180 days past due | 3,100 | 2,492 |
| Total loans 90 or more days past due, still accruing | 14,454 | 28,300 |
| Total nonperforming loans | 99,801 | 167,293 |
| REO, net of allowances of $14,261 in 1992 and $150 in 1991 | 139,709 | 109,537 |
| In-substance foreclosed loans, net of allowances of $26,662 in 1992 and $19,788 in 1991 | 177,359 | 208,025 |
| Total nonperforming loans, REO and in-substance foreclosed loans | 416,869 | 484,855 |
| Restructured loans | 103,069 | 63,955 |
| Total nonperforming loans, REO, in-substance foreclosed loans and restructured loans | $519,938 | $548,810 |

A detailed schedule of allowance for losses on loans and real estate at the dates indicated follows:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Residential first mortgage loans | $25,371 | $14,371 |
| Commercial real estate loans | 25,247 | 33,177 |
| Total first mortgage loans | 50,618 | 47,548 |
| Corporate loans | 4,485 | 13,481 |
| Consumer loans | 2,174 | 1,706 |
| Premium finance loans | 2,320 | 1,908 |
| Total other loans | 8,979 | 17,095 |
| Allowance for losses on loans | 59,597 | 64,643 |
| REO | 14,261 | 150 |
| In-substance foreclosed loans | 26,662 | 19,788 |
| Allowance for losses on real estate | 40,923 | 19,938 |
| | $100,520 | $84,851 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104031

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**E. Loan Servicing Portfolio**

*Residential Mortgage Loan Servicing*

The statistical information contained in the tables which are included in *Exhibit VII. - Loan Servicing Information* provides detailed illustrations of the serviced portfolio characteristics. Highlights include: servicing in all 50 states with 32% in New Jersey and 18% in Florida; high percentage of conventional, fixed rate (43%) and government product (45%); a net weighted average servicing fee of 41.8 basis points, and a six member management team with a combined 80+ years of experience. Gross servicing income exceeded $39 million in 1992.

The age, source and geographic concentration of loans all contribute to a relatively high percentage of default, particularly loans in bankruptcy and foreclosure, although overall delinquency ratios were consistently improved in 1992 versus 1991 despite a declining portfolio. Runoff exceeded new loan originations in 1992 by 15,500 loans for a net decline of $759 million in volume. Even though this trend adversely affects efficiencies as well as delinquency (and value), the operation continued to service on average more than 800 loans per person with an annualized core servicing cost of less than $70 per loan. Incremental costs are estimated by management at less than half this amount.

The centralized Clearwater Servicing Center performs all loan administration, accounting and related functions including customer and investor services, escrow administration, payoff and assumptions, default administration, foreclosure and REO. In addition, the Center administers the Master Servicing and loans serviced by others owned by CFSB. This portfolio contained an additional 21,000 loans totalling $564 million as of December 31, 1992.

Essentially a self-sufficient, independent cost center, the staff also performs underwriting, human resources, training, switchboard and reception, office services and facilities, file control and complete system automation using, as a remote client, Computer Power Inc.'s MSP as well as numerous PC applications.

*Consumer Loan Servicing*

The portfolio of Consumer Loans serviced for investors noted in *Part I - Section F. Loan Servicing* has been handled by the Consumer Loan group at the Parsippany, New Jersey facility. This servicing represents a unique set of operational concerns as much of it (the Home Equity Reserve, or HELO's as they are generically known) requires the servicer to be able to advance funds to consumers, reconcile daily both consumer and investor accounts, and render monthly statements, similar to a checking or credit card account. This is not the type of servicing normally associated with a mortgage servicing operation.

Total gross servicing fee income for the portfolios serviced for investors was $1.45 million in 1992. In addition, late fee collections were $137,000.

These portfolios have been serviced on the Consumer Loan System IL5500 from American Management Systems, installed on CFSB's in-house mainframe.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104032

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**F. Occupancy Issues**

CFSB has certain leased properties which are no longer being used. Closed leased locations are as follows:

| Location | Lease Expiration | Monthly Lease Payments |
|---|---|---|
| Cresthaven, FL | 3/93 | $3,614 |
| Catonsville, MD | 9/93 | 4,706 |
| Mission Bay, FL | 10/93 | 10,670 |
| Lighthouse Point, FL | 11/93 | 1,248 * |
| Orlando, FL | 10/94 | 5,263 |
| Tampa AEC Sign, FL | 2/97 | 1,583 |
| Reston, VA | 4/99 | 4,524 * |
| Lake Worth, FL | 10/10 | 4,548 |

* Net of existing sublease.

As previously noted, a single branch exists in the Washington, D.C. area. Specifics of this lease are as follows:

| Location | Lease Expiration | Monthly Lease Payments |
|---|---|---|
| Washington, D.C. | 10/97 | $12,519 |

As also previously mentioned, mortgage production has ceased and personnel will be joining Imperial Credit Industries, Inc. However, Imperial is not assuming the leases on the mortgage production leased offices, detailed as follows:

| Location | Lease Expiration | Monthly Lease Payments |
|---|---|---|
| Clark, NJ | 2/94 | $13,489 |
| Princeton, NJ | 8/97 | 5,098 |
| Toms River, NJ | 2/98 | 3,497 |

CFSB owns its executive office building located at 200 South Street, Morristown, New Jersey. The building is approximately 84,000 square feet and is carried at approximately $5 million. No mortgage exists on the building. Real estate taxes on this building are approximately $190,000.

In addition, CFSB has a three-story leased financial services center totalling approximately 189,000 square feet located in Parsippany, New Jersey. The building is leased from Bellemead Management Company, Inc. in two separate pieces.

| | Square Footage | Lease Expiration | Yearly Rent * |
|---|---|---|---|
| First and second floor | 139,421 | 5/97 | $2,272,562 |
| Third floor | 49,636 | 9/97 | 809,067 |
| | 189,057 | | $3,081,629 |

* Calculated at $16.30 per square foot.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104033

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008

In addition to rent expense of approximately $3 million, payments are made to Bellemead Management Company, Inc. for management fees and additional building maintenance services of approximately $80,000 and $60,000, respectively. Real estate taxes paid by CFSB are estimated to be $500,000.

Excess capacity exists at both the Morristown and Parsippany locations.

**G. Candidacy for Combination with Another Institution**

Since CFSB is a large institution, $4.8 billion of assets at date of conservatorship, the Bank is not considered to be positioned for combination or merger at this time. However, the possibility could exist for one or more smaller institutions to be combined with CFSB.

***H. Subsidiaries***

As previously discussed, the RTC has assigned the responsibility of all subsidiaries to a third party contractor - Bridge Asset Management, Inc. Refer to *Part I. - Section I. Subsidiaries* for further a discussion of the subsidiaries.

***IPF***

CFSB has been purchasing loans from IPF under the terms of a $400 million loan purchase agreement executed between IPF DE, IPF-CA, Imperial Premium Finance Holding Corp., Inc. and CSB prior to the date of intervention in order to preserve and to protect the fair market value of IPF, currently estimated to be between $45 and $50 million. Bridge Asset Management, Inc. has drafted and will be submitting a Case Memorandum recommending the continuation of the funding arrangements. Meanwhile, Bridge Asset Management, Inc. has been working with the management of IPF to identify alterntive funding sources, including a reinstatement of a prior loan repurchase arrangement with Chemical Bank. Bridge Asset Management, Inc. has instituted a formal review procedures for all loan funding transactions and is currently conducting a limited field review of the IPF regional loan processing centers and some of its sales offices to establish a level of comfort that IPF has adequate internal controls relative to the origination and servicing of loans and that loans sold to CFSB meet the requirements of the loan purchase agreement.

On December 30, 1992, the Financial Instruments Department in the Valley Forge Office assumed responsibility for the disposition of IFP with Bridge Asset Management, Inc. retaining responsibility for the management oversight of IPF during the marketing period. IPF is a well run, established and consistently profitable company and approximately a dozen major domestic and international corporations, investment bankers and investment groups have expressed interest in a cash purchase of IPF. Both Bridge Asset Management, Inc. and the Financial Instruments Department believe that IPF can and should be sold as quickly as possible. The average weighted maturity of the loan portfolio is less than 9 months given that the typical loan requires repayment in nine monthly installments, the first of which must be made at the time of the down payment. As a result, the volume of the loan servicing portfolio is significantly impacted by short term changes in loan origination volumes and any negative publicity, adverse comments by competitors or loss of key marketing personal will have an immediate impact upon profitability.

As a consequence, Bridge Asset Management, Inc., the Subsidiaries Department, the Financial Instruments Department and the Conservatorship have made a concerted effrot to avoid any unecessary interference in the day to day operations of IPF and to expedite the marketing effort. Since December 30, 1992, the Financial Instruments Department has engaged legal counsel to conduct the necessary due diligence efforts connected with the sale of the company and its subsidiaries and has issued a task order solicitation for and is currently in the process of selecting a financial advisor for the transaction. Meanwhile, Bridge Asset Management, Inc. has completed a solicitation for business valuation services which it initiated prior to December 30, 1992 and has drafted and submitted a Case Memorandum recommending the engagement of Amercian Appraisal Associates to prepare a business valuation of IPF. The Financial Instruments Department currently believes, based upon the number and quality of interested acquirors, that IPF can be sold prior to the end of the second quarter.

***I. Pending Litigation Evaluation***

As described in *Part I. - Section J. Litigation* and *Exhibit X - Litigation*, CFSB is a party to certain legal actions; the outcome of which could have a material financial impact.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104034

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

### J. Management Levels and Salary Justification

The organizational structure and salary levels, as currently constituted, appear appropriate for this institution based on asset size and complexity of business operations and loan problems. The salaries of four CSB officers have been reduced. Refer to *Exhibit IX - Employee Compensation.*

As the business of the Mortgage Production is completed, the staffing levels of related loan administration and support departments will be appropriately contracted. As the Multiple Acquirer Preparation Plan is implemented, employees will be reassigned or, if needed, additional staff will be hired.

### K. Quality and Cost Efficiency of Backroom Operations

The Information Systems Division provides a Value Added Component to the organization that it services. The Value Added is demonstrated by providing consistently high levels of systems availability and service levels at a competitive price. The Division's most valuable asset is its highly qualified professional staff.

The current equipment configuration can provide approximately thirty percent growth in the existing application product set at little or no incremental expense. The Division is housed in an excellent physical plant with sufficient space to expand processing capacity by a factor of ten.

### L. Indications of Fraud

CFSB is currently reviewing past events, including loan origination and purchase practices and may consider bringing civil charges against current and former employees seeking damages for fraudulent or negligent lending activities.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104035

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

## III. Recommendations

Based on the evaluation of the current condition of CFSB, the general operating strategy consists of the following key components:

1. The preservation of the retail banking franchise value by maintaining the New Jersey retail branch network intact. The Florida branches should be marketed as three separate packages.

2. The downsizing and liquefying of the balance sheet through the sale of investment securities, mortgage-backed securities and loans receivable in conjunction with the Capital Asset Marketing Specialists. The proceeds will be utilized to fund deposit outflow and retire existing borrowings.

3. RTC - Valley Forge to evaluate the nonperforming assets and to dispose of the properties as efficiently as possible, including REO properties held by subsidiaries.

4. The sale or discontinuation of all other subsidiary operations. This includes the sale of assets of IPF.

5. Sale of the mortgage servicing operation and servicing rights together as an ongoing concern.

6. Repudiation of certain lease obligations.

7. The discontinuation of residential lending and related subsequent sales of these loans to Investors.

8. The retention of personnel necessary to provide continuing service to retail banking customers and borrowers, as well as to facilitate the pooling, packaging, marketing and liquefication of assets.

9. To evaluate and adjust, accordingly, the staffing of the Controller's Division to accomplish the additional tasks required under RTC guidelines.

10. To pursue the civil charges for damages for fraudulent and negligent action by current and former employees.

11. Implementation and coordination of the Integrated Marketing Plan in conjunction with the appropriate RTC staff and outside contractors.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104036

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

## IV. Operational Issues

CFSB Operating Plan is based primarily upon the components outlined in *Part III. - Recommendations.* This Section of the Plan sets forth the detailed strategy to implement the recommended goals and objectives enumerated in that section.

### A. Retail Banking

It is recommended that the CFSB retail banking franchise be sold as a going-concern profitable operation. It is believed that the greatest value would be obtained by the following:

- o Sell the 31 New Jersey retail offices as one package.
- o Sell the nine Florida retail offices as three packages: the five South Florida offices as one package, the two Clearwater offices and the Tampa office as a second package, and the Winter Haven office as a third package.
- o Close the District of Columbia retail office.

For each package, the retail office locations together with the respective deposits and staff would be sold along with whatever supervisory management and back-office support may be required by each of the acquirers.

### B. Managed Downsizing

The Operating Plan Budget details the anticipated liquefying of Bank assets and subsequent paydown of borrowings and high-cost deposits. This projection reduces the $4.7 billion of total liabilities, at intervention date, to $607 million at December 31, 1992 for a total reduction of approximately $4.1 billion.

The resulting smaller institution will be positioned to be marketed to a broader range of third-party investors interested in establishing or increasing their New Jersey or Florida banking presence.

The Operating Plan Budget, along with forecasted sales information, are addressed in detail in *Part V. Integrated Marketing Plan*. The RTC Credit Specialist, in conjunction with the Asset Marketing Specialists will develop an overall cost effective asset disposition strategy.

The Operating Plan Budget in *Part VI.* provides the anticipated timing of the planned sales and restructuring activity and the assumptions used to develop the budget.

Increasing operating profits has not been established as a major strategy because the operating expenses are appropriate for an institution of this size.

### C. Funding Strategy

As previously noted and detailed in the Operating Plan Budget, CFSB is currently funding a portion of its operations through Advances from the RTC. Additional funding is expected to be provided through the sales of assets. Other sources of funds include loan principal repayments, servicing fee revenue and other traditional sources of liquidity until the underlying assets are sold.

### D. Loan Workout

As described in *Part II. - Section D. Asset Quality* the Bank has $520 million of nonperforming assets at December 31, 1992. Commercial Workout Division is responsible for the management of the commercial non-accrual loans and REO, as described in that section. The Foreclosure and REO department of the Clearwater, Florida Servicing Center is responsible for the residential first mortgage non-accrual loans and REO.

The Commercial Workout Division will continue with its primary function of resolving non-accrual loans through restructuring or legal action and managing and disposing of the Bank's REO. Procedures will be followed which comply with RTC guidelines and which minimize potential losses. The responsibilities of this division will eventually be assumed by a third party contractor.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104037

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

To continue to manage the current residential first mortgage non-accrual loans and REO properties and to process the new delinquencies which are anticipated as a result of the economic recession, the responsibilities of the Foreclosure and REO department will be assumed by a third party contractor.

**E. Sale or Discontinuation of Subsidiary Operations**

The RTC has hired Bridge Asset Management as the contractor for subsidiaries. Bridge Asset Management is currently in the process of legally dissolving all inactive subsidiaries. The REO properties will be placed under SAMA/SAMDA contract effective March 1, 1993. A marketing plan for all subsidiary operations will be presented at a later date along with the Integrated Marketing Plan.

As previously mentioned, responsibility for the sale of IPF was transferred to the Financial Instruments Department. Additional marketing information will be presented along with the Integrated Marketing Plan.

**F. Loan Servicing**

*Residential Mortgage Loan Servicing*

The $7.2 billion total portfolio serviced by CFSB for itself and others, described in *Part I - Section F. Loan Servicing Portfolio* and in *Exhibit VII. - Loan Servicing Information*, is presently generating approximately $3.2 million per month in gross servicing fee and ancillary income. The portfolio's high percentage of agency servicing, strong net servicing fees, and the efficiencies produced by its remote Clearwater Servicing Center operations represent a significant value to the Bank, despite interest rate inspired runoff and fairly high delinquency.

The loan servicing rights is one of the most significant assets the Bank retains. In addition, the stand-alone Clearwater Servicing Center operation with its proven performance and capacity for expansion has value in and of itself. Special consideration should be given to selling the operation and servicing rights together as an ongoing concern. Properly analyzed and structured for sale, the combined package should expand the number of prospective buyers to include those without expertise in this field who have a desire to invest in mortgage loan servicing and thus maximize the total value realized. Certain loans serviced by CFSB have recourse provisions. The potential recourse on loans with principal balance of approximately $140 million at December 31, 1992, would be a consideration in the pricing of the loan servicing package. The availability of standard representations and warranties from the RTC will also significantly influence the eventual price for this package.

The asset whole loan portfolio can be sold through normal market channels, either with the servicing rights retained or released. Since there is a possibility all of the defaulted asset loans will have been sold separately in advance of marketing the remainder of the portfolio, retention of the servicing rights and adding that value to the Clearwater operations package may again promote maximum value realization.

*Consumer Loan Servicing*

The Consumer Loans serviced for investors portfolio is an asset for which some value should be realized. However, the universe of potential acquirers will be limited, as the operational concerns associated with a portfolio such as this may outweigh the economics. This type of servicing will be most attractive to financial institutions that currently originate and service similar loan types. In fact, this servicing may realize its highest value by being offered to the owners of the underlying loans.

**G. Repudiation of Lease Obligation**

As noted in *Part II - Section F. Occupancy Issues*, an area which must be addressed within a certain period of time is the repudiation of certain lease obligations.

The leases on the closed locations that have been previously identified and the three leased mortgage production offices should be repudiated as soon as possible, but no later than April 1, 1993. In addition, the lease on the Washington, D.C. branch should be repudiated by May 1, 1993. The deposits of this branch should be transferred to a New Jersey branch in that CFSB has been unsuccessfull in marketing the deposits to a local financial institution.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104038

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00!

Negotiations are currently being conducted on the leased building in Parsippany, New Jersey. Current plans are to reduce the rent expense on the building to $15.00 per square foot and to eliminate the additional charges for management fees and building maintenance. As the employees previously associated with mortgage production are scheduled to vacate the premises no later than March 31, 1993, employees from the Morristown, New Jersey location will be relocated to the first and second floors in Parsippany. The lease for the third floor will be repudiated effective April 1, 1993. The owned building in Morristown is estimated to be sold at book value on July 1, 1993.

**H. Discontinuance of Residential Lending**

As previously discussed, residential first mortgage loan origination ceased December 14, 1992.

**I. Controller's Division Staffing**

CFSB's staffing level in all departments could best be described as lean. Because of the added reporting under RTC Conservatorship and anticipated attrition, the staffing level of the Controller's Division is of particular concern. The RTC will continually monitor and adjust, accordingly, the staffing of the Controller's Division to accomplish the additional tasks required under RTC guidelines. Where appropriate, as certain positions are eliminated elsewhere in the Bank, employees from these other areas of the Bank will be reassigned to the Controller's Division.

**J. Accuracy of Books and Records**

Internal controls appear adequate to ensure the accuracy of books and records. No major expenditures are anticipated in this area. The Bank's Internal Auditing Division is responsible for monitoring the adequacy of internal controls.

**K. Marketing at Resolution**

Although marketing the institution as a whole is the most desirable goal, it can be offered in four or five major components based upon the retail market segments it serves.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104039

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 009

## VI. Operating Plan Budget

CFSB operating plan budget is presented for the year ended December 31, 1993. This budget anticipates general and administrative expenses of $66.7 million for the year. Operating expenses related to normal banking activities are projected to decline from $25.9 million in the first quarter to $8.8 million in the fourth quarter.

Total nonperforming assets were $520 million at December 31, 1992 and are expected to decline in 1993 as the result of sales and dispositions. Additions are expected to be minimal.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104040

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 009:

EXHIBIT
Saunders # 8
10/3/06 LR

9/1/93 Jay: This won't fly. There are too many initiatives associated with Carteret. There is a securitization effort but it may be sidelined because they are pulling loans to furnish in the minority acquisitions. Let's hold off. JF

RTC
RESOLUTION TRUST CORPORATI
Resolving The (
Restoring The Confi

TO: Thomas Horton, \
Field Activities

THROUGH: J. Paul Ramey, V
Resolutions

FROM: Jay A. Jupiter
Assistant Director, Resolutions

DATE: August 23, 1993

SUBJECT: Request for Waiver of Certain Mortgage Loans from Securitization for: Carteret Federal Savings Bank, Parsippany, NJ

There are approximately $517 million and $294 million of performing single family residential mortgage loans at Carteret originated in New Jersey and Florida respectively, that we believe are integral to both the franchise value and the marketability of this institution in a Purchase and Assumption transaction.

Carteret has 31 branches in New Jersey with deposits of approximately $1.9 billion and 9 branches in Florida with deposits of approximately $343 million. If a waiver is granted to release these loans from Securitization they can be offered for sale with the deposit franchise of Carteret. Resolutions will contact the Director of Asset Management and Sales in the Valley Forge office to assist in the sales process of the loans.

The basis for this request follows:

1. All loans were originated by and are serviced by Carteret, creating a unique franchise opportunity for acquirors.

2. Inclusion of these loans in the P&A would provide acquirors with earning assets in lieu of RTC cash. Given the size of the portfolio, this would represent an excellent P&A marketing element.

APPROVAL:

Thomas Horton, Vice President Field Activities

DATE

801 17th Street, N.W. Washington, D.C. 20434

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130544

RTC
RESOLUTION TRUST CORPORATION
Resolving The Crisis
Restoring The Confidence

1994 JAN 10 P 9:41

RECEIVED DEC 23 1993

December 21, 1993

MEMORANDUM TO: Thomas P. Horton
Vice President
Field Activities

FROM: Edward D. Mahaney EDM
Vice President
Department of Operations

SUBJECT: Asset Freeze Waiver Revision

Now that the funding bill has passed and resolutions are being scheduled, we have reviewed the August 26, 1993, asset freeze guidelines and have made three revisions.

- All performing commercial loans will be released to AMSD for a commercial securitization effort to occur no earlier than April 1994. Sale of performing commercial loans not included in this effort will be under the control of AMSD but such sales may not occur prior to April 1994 unless they comply with the 45-day settlement provision in the August 26, 1993 memo.

- All 1-4 mortgage loans will be available for sale but can not settle more than 45 days prior to a scheduled resolution date. These loans will be released to AMSD's Pipeline Management's control for determination of the best sales approach. However, to also confirm, Pipeline Management has full responsibility for making sure that sufficient acceptable loan product is available and can be delivered for resolutions, as may be required to comply with minority branch sales and other resolution requirements. In addition, Resolutions advises that the legislation has additional requirements that AMSD should be sensitive to, including the sale of existing performing product at institutions with minority branch exposure or at minority institutions like Life Savings in Baton Rouge, Louisiana. Holding such product for resolution might be a better approach than selling existing product from these institutions and then trying to locate other performing loans from other institutions or receiverships in order to meet requirements.

801 17th Street, N.W. Washington, D.C. 20434

EXHIBIT
Saunders # 11
10/3/06 LR

AM5067 0499

- o Consumer loans are also released to AMSD subject to the 45 day settlement provision in the August 26 asset freeze guidelines.

All other previous asset sale restrictions (including those at Old Stone) still apply and all previous waivers provided to Resolutions to include loans in the resolution remain in force. If there are any questions about these revisions, please contact Barbara Bleistift of my staff at (202)416-7461.

Attachment

cc: William H. Roelle
J. Paul Ramey
Marsh McJunkin
Lynette Andresen
Field Office VP's
FSC VP's
Philip Jones
T. Michael Thompson
Sally C. McCormick
Ken Baebel
Sandra L. Nobles
Dave J. Bodi
Meg J. Kruse

AM 50670500

To: Herb J. Held@Reso@RTCDC
Cc:
Bcc:
From: Ann Richards@FUNDING2@RTCDC
Subject:
Date: Thursday, September 15, 1994 14:01:59 EDT
Attach:
Certify: N
Forwarded by: Herb J. Held@Reso@RTCDC

---

Forwarded to: Sharon Dunn Yore@Reso@RTCDC
cc:
Forwarded date: Tuesday, September 20, 1994 8:47:24 EDT
Comments by: Herb J. Held@Reso@RTCDC
Comments:

fyu

------------------------- [Original Message] -------------------------

We're chomping at the bit waiting to sell securities out of Carteret. Should they still remain frozen?

Ann

EXHIBIT
Saunders #12
10/3/06 LR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0077208

To: Ann Richards@FUNDING2@RTCDC
Sandra L. Nobles@Assets-mkl@RTCDC
cc:
From: Herb J. Held@Reso@RTCDC
Subject: re:Carteret
Date: Friday, September 16, 1994 15:26:56 EDT
Attach:
Certify: N
Forwarded by: Herb J. Held@Reso@RTCDC

---

Forwarded to: Sharon Dunn Yore@Reso@RTCDC
cc:
Forwarded date: Tuesday, September 20, 1994 8:46:54 EDT
Comments by: Herb J. Held@Reso@RTCDC
Comments:

fyi

------------------------- [Original Message] -------------------------

We are still working with a minority whole bank bidder. We will need about $1.4 billion in loans. If Sandra has the loans and does not need the securities than we should be able to release the securities.

EXHIBIT
Saunders # 13
10/3/06 LR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0014279

**PNC BANK CORP**
**Document Type:** 10-Q
**Form Type:** 10-Q
**Document Date:** September 30, 1993
**Document Control Number:** 93524538 EDGAR Search

1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)

X ! QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 1993

OR

! TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to .

COMMISSION FILE NUMBER 1-9718

PNC BANK CORP.
(Exact name of registrant as specified in its charter)

PENNSYLVANIA

| | |
|---|---|
| | 25-1435979 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

ONE PNC PLAZA
FIFTH AVENUE AND WOOD STREET
PITTSBURGH, PENNSYLVANIA 15265
(Address of principal executive offices)
(Zip Code)

(412) 762-2666
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common Stock ($5 par value): 234,445,135 shares as of October 28, 1993.

The PNC Bank Hotline at 800 982 7652 or Shareholder Relations at 800 843 2206.

Analysts and institutional investors should contact:
William H. Callihan, Vice President,
Investor Relations at 412 762 8257.

News media representatives and others seeking
general information should contact:
Jonathan Williams, Vice President,
Media Relations, at 412 762 4550.
24

1
EXHIBIT 28.2

PRO FORMA CONSOLIDATED FINANCIAL INFORMATION

PNC Bank Corp. has entered into definitive agreements to acquire Sears Mortgage Corporation, Sears Mortgage Securities Corporation and Sears Savings Bank(collectively "Sears Mortgage"). The acquisition is expected to be completed by the end of the year and is subject to various regulatory approvals.

Under the terms of the definitive agreements, PNC Bank Corp. will acquire all of thestock of each Sears Mortgage entity for cash. PNC Bank Corp. will account for the acquisition using the purchase method and allocate the purchase price to all assets acquired and liabilities assumed based on their estimated fair values at the date of acquisition. The amounts recorded will depend upon several factors, including prevailing interest rates and residential mortgage prepayment rates, as well as Sears Mortgage's assets, liabilities and off balance sheet items on the date of acquisition. Actual market rates and other factors may differ from those used in preparing the pro forma financial information.

The pro forma financial information on the following pages presents (i) the historical consolidated balance sheets of PNC Bank Corp. and subsidiaries ("Corporation")and Sears Mortgage at September 30, 1993, giving effect to the acquisition as if it had occurred on that date and (ii) the historical consolidated statementsof income of the Corporation and Sears Mortgage for the nine month period ended September 30, 1993 and the year ended December 31, 1992, giving effect to theacquisition as if it had occurred on January 1, 1993 and January 1, 1992, respectively. For purposes of presenting the pro forma financial information, intercompany transactions between Sears Mortgage entities have been eliminated and certain financial statement reclassifications have been made.

The pro forma financial information includes only those actions to be completed on or prior tothe closing date and excludes (i) balance sheet changes, if any, that may occur after the closing date and (ii) the intended effect of expense savings to be initiated as part of the consolidation of the mortgage banking operations of the Corporation and Sears Mortgage.

The pro forma financial information is intended for informational purposes and may not be indicative of the financial position or results of operations that actually would have occurred, or may be attained in the future, had the Corporation completed its acquisition of Sears Mortgage on the dates indicated. The pro forma financial information should be read in conjunction with the Corporation's 1992 Annual Report on Form 10 K, the Corporation's March 31, 1993 Quarterly Report on Form 10 Q (which includes as exhibits the 1992 audited financial statements for each Sears Mortgage entity), the Corporation's September 30, 1993 Quarterly Report on Form 10 Q, and the unaudited financial statements for each Sears Mortgage entity as of and for the periods ended September 30, 1993, filed herewith as Exhibits 28.3, 28.4 and 28.5.

PNC BANK CORP. PRO
FORMA CONSOLIDATED BALANCE SHEET (Unaudited) September 30, 1993 (In millions)

| | PNC Bank Corp. | Sears Mortgage | Pro Forma Adjustments | Pro Forma(a) |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and due from banks | $1,742 | $258 | $250 (b) (328)(c) | $1,922 |
| Short term investments | 250 | 244 | | 494 |
| Securities available for sale | 3,443 | 957 | 7 (d) | 4,407 |
| Mortgages held for sale | 296 | 1,391 | | 1,687 |
| Investment securities | 17,732 | | | 17,732 |
| Loans, net of unearned income | 27,385 | 4,609 | 184 (d) (300)(e) | 31,878 |
| Allowance for credit losses | (940) | (23) | | (963) |
| Net loans | 26,445 | 4,586 | 184 | 30,915 |
| Purchased mortgage servicing | 28 | 221 | 40 (d) | 289 |
| Other | 2,344 | 291 | (53)(d) | 2,582 |
| Total assets | $52,280 | $7,948 | ($200) | $60,028 |
| LIABILITIES | | | | |
| Deposits | | | | |
| Noninterest bearing | $5,394 | $48 | | $5,442 |
| Interest bearing | 22,872 | 2,830 | $172 (d) | 25,874 |
| Total deposits | 28,266 | 2,878 | 172 | 31,316 |
| Federal funds purchased and repurchase agreements | 7,470 | 2,478 | | 9,948 |
| Other borrowings | 6,543 | 1,686 | (300)(e) | 7,929 |
| Notes and debentures | 4,310 | 295 | 250 (b) | 4,855 |
| Other | 1,572 | 176 | 58 (d) 55 (f) | 1,861 |
| Total liabilities | 48,161 | 7,513 | 235 | 55,909 |
| SHAREHOLDERS'EQUITY | 4,119 | 435 | (435)(c) | 4,119 |
| Total liabilities and shareholders' equity | $52,280 | $7,948 | ($200) | $60,028 |

See accompanying Notes to Pro Forma Consolidated Financial Information.

3

PNC BANK CORP.
PRO FORMA CONSOLIDATED STATEMENT OF INCOME (Unaudited)
Nine Months Ended September 30, 1993
(In thousands, except per share data)

| | PNC Bank Corp. | Sears Mortgage |
|---|---|---|
| INTEREST INCOME | | |
| Loans and fees on loans | $1,433,932 | $338,015 |
| Securities | 923,293 | 40,901 |
| Other | 28,694 | 22,404 |

## COST OF RESOLUTION (projected) TO ANTICIPATED THRIFT CLOSING

| | | | |
|---|---|---|---|
| S&L NAME: CARTERET FSB | | FIN: | 8602 |
| Location: NEWARK, NJ | | Date of Cost Test Data: | 10/31/94 |
| Anticipated Transaction Type: | BRANCH PA | Expected Closing Date: | 3/10/95 |

(in 000's)

| | | | |
|---|---|---|---|
| **Projected Cost of Resolution:** | | | |
| 1 | Cost of Proposed Transaction (Per Cost Test dated 03/16/95) | $226,960 | |
| | Add: | | |
| 2 | Adjustment for Operating Expenses * | ($1,656) | |
| 3 | **Projected Cost of Resolution at Expected Date of Closing** | | **$225,304** |
| **Projected Cost of Payout:** | | | |
| 4 | Cost of Payout on Proposed Transaction (Per Cost Test dated 03/16/95) | $361,427 | |
| | Add: | | |
| 5 | Adjustment for Operating Expenses * | ($1,656) | |
| 6 | **Projected Cost of Payout at Expected Date of Closing** | | **$359,771** |
| 7 | **PROJECTED SAVINGS AFTER ADJUSTMENT FOR OPERATING EXPENSES** | | **$134,467** |

* Adjustment for Operating Expenses calculated as follows:

| | | |
|---|---|---|
| Per Day Operating Loss | : | ($12,759) |
| RTC Pro Rata Loss Ratio | : X | 99.8524% |
| Per Day Operating Loss (RTC Share) | : | ($12,740) |
| Number of Days to Closing | : X | 130 |
| RTC Share of Operating Expenses | | ($1,656) |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER
C-AM-A-0130728

## REPORT A

| | | | |
|---|---|---|---|
| S&L NAME: CARTERET FSB | | FIN: | 8602 |
| LOCATION: NEWARK, NJ | | DATE OF DATA: | 10/31/94 |
| DEPOSITOR PREFERENCE STATE: | YES | | |

**LIQUIDATION SUMMARY STATEMENT AND DISTRIBUTION OF LOSS**
**(in 000's)**

| | Assets: | | | Liabilities (Not Subordinated): | |
|---|---|---|---|---|---|
| 1A | Cash and Securities | 636,103 | | | |
| 2A | 1-4 Residential Loans | 776,949 | 19A | Sec./Pref. Deposits | 0 |
| 3A | 2nd Mortgage Loans | 0 | 20A | Insured Deposits | 1,269,540 |
| 4A | 5+ Residential Loans | 69,521 | 21A | Uninsured Deposits | 1,876 |
| 5A | Consumer Loans | 57,358 | | | ---------- |
| 6A | Other Loans | 467,725 | 22A | Total Deposits | 1,271,416 |
| 7A | Real Estate Owned | 14,649 | 23A | Sec./Pref. Liab. | 948,485 |
| 8A | Other Assets | 140,753 | 24A | Other Liabilities | (57,887) |
| | | ---------- | | | ---------- |
| 9A | Book Assets | 2,163,058 | 25A | Book Liabilities | 2,162,014 |
| 10A | Non-book Assets | 0 | 26A | Non-book Liab.-Sec. | 0 |
| 11A | RTC M-T-M Asset Loss | (252,177) | 27A | Non-book Liab.-Others | 75,941 |
| 12A | Est. Indirect Expenses | (51,970) | | | ---------- |
| 13A | Admin. Costs of Payoff | (971) | 28A | Adjusted Liabilities | 2,237,955 |
| | | ---------- | | | |
| 14A | Adjusted Assets | 1,857,940 | 29A | Sec./Pref. Claims | (948,485) |
| 15A | Sec./Pref. Claims | (948,485) | | | ---------- |
| | | ---------- | 30A | Claims | 1,289,470 |
| 16A | Available Assets | 909,455 | 31A | Junior Claims* | (18,054) |
| 17A | Total Loss - Sr. Claims | 361,961 | | | |
| | | ---------- | | | ---------- |
| 18A | Proof | 1,271,416 | 32A | Net Senior Claims | 1,271,416 |

**PRO-RATA DISTRIBUTION OF LOSS AND RECOVERY IN LIQUIDATION**

| | | NET CLAIMS | % OF SR. CLAIMS | EXPECTED LOSS | EXPECTED RECOVERY |
|---|---|---|---|---|---|
| 33A | RTC for Insured Deposits | 1,269,540 | 99.8524% | 361,427 | 908,113 |
| 34A | Uninsured Deposits | 1,876 | 0.1476% | 534 | 1,342 |
| 35A | Other Creditors | 18,054 | 0.0000% | 18,054 | 0 |
| | | 1,289,470 | 100.0000% | 380,015 | 909,455 |

* Applies only in depositor preference states.

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER
C-AM-A-0130729

## REPORT B

| | | | |
|---|---|---|---|
| S&L NAME: | CARTERET FSB | FIN: | 8602 |
| | | | |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

TRANSACTION SUMMARY (In 000's)

| | | BRNCH(Ins) | BRANCH P&A | | |
|---|---|---|---|---|---|
| 1B | Liabilities Assumed | 1,269,540 | 1,271,416 | | |
| 2B | Original BV of Assets Acquired | 38,635 | 38,635 | | |
| 3B | Gross Cash to Acquiror | 1,230,905 | 1,232,781 | | |
| 4B | Add: RTC Advances | 945,243 | 945,243 | | |
| 5B | Gross RTC Funding | 2,176,148 | 2,178,024 | | |
| 6B | Less: Premium/Discount | (133,868) | (134,031) | | |
| 7B | Net RTC Funding | 2,042,280 | 2,043,993 | | |
| 8B | Asset Retained by RTC | 2,124,423 | 2,124,423 | | |
| 9B | Loss on Retained Assets | (303,446) | (303,446) | | |
| 10B | Net Recovery on Retained Assets | 1,820,977 | 1,820,977 | | |

RTC COST SUMMARY WINNER

| | | | | | |
|---|---|---|---|---|---|
| 11B | Best Bidder by Option type | Various | Various | | |
| 12B | Gross Cash to Acquiror | 1,230,905 | 1,232,781 | | |
| 13B | Recovery on Retained Assets | (1,820,977) | (1,820,977) | | |
| 14B | Adj. to BV per P&A Agreement | 702 | 702 | | |
| 15B | RTC Advances | 945,243 | 945,243 | | |
| 16B | Gross Book Value on Put Assets | 0 | 0 | | |
| 17B | Recovery on Put Assets | 0 | 0 | | |
| 18B | Recapture of Transfer Value Adjustment | 0 | 0 | | |
| 19B | Dist. to Oth. Creditors (Sec./Unsec.) | 4,585 | 3,242 | | |
| 20B | Insured Deposits Not Passing to Acquiror | 0 | 0 | | |
| 21B | Entry/Exit Fees (BIF/IDT Only) | 0 | 0 | | |
| 22B | Administrative Costs * | 80 | 0 | | |
| 23B | RTC Share Bid Amount (Incl. Implied Asset Premiums) | (133,670) | (134,031) | | |
| 24B | Cost of Proposed Transaction | 226,869 | 226,960 | | |
| 25B | Cost to RTC of Payoff | (361,427) | (361,427) | | |
| 26B | Savings over Payoff ** | 134,558 | 134,467 | | |
| 27B | Uninsured Deposits -- Share of Loss | 0 | 533 | | |
| 28B | Actual or Implied Premium | 134,558 | 134,999 | | |

* :Administrative Cost may include the spread between the RTC borrowing rate and the average deposit rate for deposits not acquired, if applicable.

10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130730

# REPORT C2
## RTC COST TEST FOR DEPOSITOR PREFERENCE STATE

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

(In 000's)

| | | |
|---|---|---|
| 1C2 | Total Deposits (Incl. Accrued Int.) | 1,271,416 |
| | ADD OTHER LIABILITIES: | |
| 2C2 | Secured Borrowings | 945,243 |
| 3C2 | Secured Liabilities | 872 |
| 4C2 | Preferred Liabilities | 2,370 |
| 5C2 | Est. Loss in Contg. Liab. (Secured) | 0 |
| 6C2 | Total Liabilities | 2,219,901 |
| | SUBTRACT SECURED LIABILITIES: | |
| 7C2 | Secured Deposits | 0 |
| 8C2 | Preferred Deposits | 0 |
| 9C2 | Secured Borrowings | 945,243 |
| 10C2 | Secured Liabilities | 872 |
| 11C2 | Preferred Liabilities | 2,370 |
| 12C2 [A] | NET TOTAL LIABILITIES | 1,271,416 |
| 13C2 | Gross Book Assets | 2,163,058 |
| 14C2 | Plus: Non-Booked Assets | 0 |
| 15C2 | Gross Assets | 2,163,058 |
| | Less: | |
| 16C2 | M-T-M Loss Estimate | 252,177 |
| 17C2 | Indirect Expenses Estimate | 51,970 |
| 18C2 | Secured and Preferred Deposits | 0 |
| 19C2 | Secured and Preferred Liab. | 948,485 |
| 20C2 [B] | NET FREE ASSETS | 910,425 |
| 21C2 | Net Loss (A-B) | 360,991 |
| 22C2 | Add: Administrative Cost* – Payout | 971 |
| | – IDT | 80 |
| | – P&A | 0 |
| 23C2 [C] | TOTAL LOSS AS: – Payout | 361,961 |
| | – IDT | 361,071 |
| | – P&A | 360,991 |
| 24C2 | Total Deposits | 1,271,416 |
| | Less: | |
| 25C2 | [D] Uninsured Deposits | 1,876 |
| 26C2 | Secured Deposits | 0 |
| 27C2 | Preferred Deposits | 0 |
| 28C2 [E] | Total Insured Liabilities | 1,269,540 |

| (BEFORE PREMIUMS RECEIVED) | PAYOUT | IDT | P&A |
|---|---|---|---|
| 29C2 [F] RTC PERCENTAGE (E/A) | 99.8524% | 99.8524% | 99.8524% |
| 30C2 [G] PRO RATA LOSS RATIO (C/A) | 28.4891% | 28.3991% | 28.3928% |
| 31C2 RTC SHARE OF LOSS (CxF) | 361,427 | 360,538 | 360,458 |
| 32C2 Premium Needed For Transfer of Uninsured Deposits (DxG) | NA | NA | 533 |

(BEFORE PREMIUMS RECEIVED)

| | | | |
|---|---|---|---|
| 33C2 I – | Assets Transferred in Excess of RTC M-T-M | (1) | |
| 34C2 | Loss in Transferring Uninsured Deposits at Par | 0 | |
| 35C2 | Estimated Loss on Potential Asset Puts | 0 | |
| 36C2 | Pro Rata Savings of Administrative Costs | 889 | |
| 37C2 | MAXIMUM DISCOUNT FOR BR PA(INS) | | 888 |
| 38C2 II – | Assets Transferred in Excess of RTC M-T-M | (1) | |
| 39C2 | Loss in Transferring Uninsured Deposits at Par | (533) | |
| 40C2 | Estimated Loss on Potential Asset Puts | 0 | |
| 41C2 | Pro Rata Savings of Administrative Costs | 969 | |
| 42C2 | MAXIMUM DISCOUNT FOR BRANCH PA | | 436 |

| (BEFORE PREMIUMS RECEIVED) | PAYOUT | IDT/P&A-BRANCH(ins) | P&A |
|---|---|---|---|
| 53C2 [H] Uninsured Depositors | 1,876 | 1,876 | 1,876 |
| 54C2 Est. Loss to Uninsured Depositors (GxH) | 534 | 533 | 533 |
| 55C2 PRO RATA DISTRIBUTION TO UNINSURED CREDITORS | 1,342 | 1,343 | 1,343 |

| | | |
|---|---|---|
| 55C2 SEC/PREF LIABILITIES RETAINED | – OPTION I | 3,242 |
| | – OPTION II | 3,242 |
| | – OPTION III | 3,242 |
| | – OPTION IV | 3,242 |

* : # of Deposits Accounts:
157,808 x $6.15 # Payout
157,808 x $0.51 per account # IDT

18-Mar-95 10:25:53 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130731

## REPORT D



### PROPOSED BID STRUCTURE AND RELATED RTC M-T-M LOSS DATA

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

| ALTERNATIVE | BOOK VALUE | ADJUSTED BOOK VALUE | RTC MTM LOSS | ASSETS PASSING TO ACQUIROR: ADJUSTED BOOK VALUE | RTC MTM LOSS | RTC MTM VALUE | TRANSFER VALUE | ASSETS RETAINED BY RTC: ADJUSTED BOOK VALUE | RTC MTM LOSS | RTC MTM VALUE | ASSETS REPURCHASED BY RTC: GROSS BV ON PUT ASSETS | RECOVERY ON PUT ASSETS | EST. LOSS ON PUT ASSETS | RECAPT. TFR. VAL. ADJSTMT. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BR PA(INS)** | | | | | | | | | | | | | | |
| 1D Cash and Securities | 636,103 | 636,103 | 76,344 | 4,712 | 0 | 4,712 | 4,712 | 631,391 | 76,344 | 555,047 | 0 | 0 | 0 | 0 |
| 2D 1-4 Res. Loans | 776,949 | 760,951 | 54,631 | 0 | 0 | 0 | 0 | 760,951 | 54,631 | 706,320 | 0 | 0 | 0 | 0 |
| 3D 2nd Mortgage Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4D 5+ Residential Loans | 69,521 | 66,377 | 39,872 | 0 | 0 | 0 | 0 | 66,377 | 39,872 | 26,505 | 0 | 0 | 0 | 0 |
| 5D Consumer Loans | 57,356 | 55,606 | 2,147 | 32,947 | (274) | 33,221 | 33,221 | 22,659 | 2,421 | 20,238 | 0 | 0 | 0 | 0 |
| 6D Other Loans | 467,725 | 447,698 | 54,279 | 0 | 0 | 0 | 0 | 447,698 | 54,279 | 393,419 | 0 | 0 | 0 | 0 |
| 7D Real Estate Owned | 14,649 | 13,624 | 4,993 | 0 | 0 | 0 | 0 | 13,624 | 4,993 | 8,631 | 0 | 0 | 0 | 0 |
| 8D Other Assets | 140,753 | 130,729 | 19,911 | 0 | 0 | 0 | 0 | 130,729 | 19,911 | 110,818 | 0 | 0 | 0 | 0 |
| 9D Total Assets | 2,163,058 | 2,111,088 | 252,177 | 37,659 | (274) | 37,933 | 37,933 | 2,073,429 | 252,451 | 1,820,977 | 0 | 0 | 0 | 0 |
| 10D Assets transferred in excess of RTC M-T-M Value.................................... | | | | | | | (1) | | | | | | | |
| **BRANCH P&A** | | | | | | | | | | | | | | |
| 11D Cash and Securities | 636,103 | 636,103 | 76,344 | 4,712 | 0 | 4,712 | 4,712 | 631,391 | 76,344 | 555,047 | 0 | 0 | 0 | 0 |
| 12D 1-4 Res. Loans | 776,949 | 760,951 | 54,631 | 0 | 0 | 0 | 0 | 760,951 | 54,631 | 706,320 | 0 | 0 | 0 | 0 |
| 13D 2nd Mortgage Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14D 5+ Residential Loans | 69,521 | 66,377 | 39,872 | 0 | 0 | 0 | 0 | 66,377 | 39,872 | 26,505 | 0 | 0 | 0 | 0 |
| 15D Consumer Loans | 57,356 | 55,606 | 2,147 | 32,947 | (274) | 33,221 | 33,221 | 22,659 | 2,421 | 20,238 | 0 | 0 | 0 | 0 |
| 16D Other Loans | 467,725 | 447,698 | 54,279 | 0 | 0 | 0 | 0 | 447,698 | 54,279 | 393,419 | 0 | 0 | 0 | 0 |
| 17D Real Estate Owned | 14,649 | 13,624 | 4,993 | 0 | 0 | 0 | 0 | 13,624 | 4,993 | 8,631 | 0 | 0 | 0 | 0 |
| 18D Other Assets | 140,753 | 130,729 | 19,911 | 0 | 0 | 0 | 0 | 130,729 | 19,911 | 110,818 | 0 | 0 | 0 | 0 |
| 19D Total Assets | 2,163,058 | 2,111,088 | 252,177 | 37,659 | (274) | 37,933 | 37,933 | 2,073,429 | 252,451 | 1,820,977 | 0 | 0 | 0 | 0 |
| 20D Assets transferred in excess of RTC M-T-M Value.................................... | | | | | | | (1) | | | | | | | |

16-Mar-95 10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130732

**REPORT E**

## SUMMARY OF BIDS

(in 000's)

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

| BR PA(INS) | BIF/SAIF or OAKAR | AMOUNT OF BID | BID AFTER FEE ADJUSTMENT | RTC COST | RTC SAVINGS OVER PAYOFF |
|---|---|---|---|---|---|
| Various | SAIF | $133,868 | 133,868 | 226,869 | 134,558 |
| **BRANCH P&A** | | | | | |
| Various | SAIF | $134,031 | 134,031 | 226,960 | 134,467 |
| **ERR** | | | | | |
| NONE | | | | | |
| **ERR** | | | | | |
| NONE | | | | | |

16-Mar-95 10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130733

**REPORT E (Attachment)**

## CARTERET FSB
## SUMMARY OF WINNING BIDS
(000's)

| NAME OF WINNING BIDDER | Branches | | PREMIUM |
|---|---|---|---|
| Linked Bids: | | | |
| Chase Manhattan Bank of N.J. N.A. | Oradell, Ridgeworth & Riveredge | 13,305 | |
| Boiling Springs SB | Hillsdale & Lyndhurst | 2,820 | 16,125 |
| | | | |
| Stand Alone Bids: | | | |
| Penn Federal SB | Cluster 6 | | 18,745 |
| Bank of New York NA | Cluster 8 | | 13,001 |
| Provident SB | Cluster 5 | | 10,297 |
| Investors SB | Cluster 5A | | 7,755 |
| Trenton SB, FSB | Cluster 12 | | 2,506 |
| TOTAL | | $ | 68,429 |
| Total Premium received on sale of 14 NJ brances 1/20/95 | | | 65,602 |
| TOTAL ALL DEPOSIT PREMIUM RECEIVED FOR NJ BRANCHES | | $ | 134,031 |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130734

**REPORT F** 

## PRO FORMA BALANCE SHEET

(in 000's)

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | SR PA(INS) |
| DEPOSITOR PREF. STATE: | YES | DATE OF DATA: | 10/31/94 |

ASSETS (Gross Book Value)

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 1F | Cash & Inv. Securities | $636,103 | $631,391 | $4,712 |
| | Mortgage Loans: | | | |
| 2F | 1-4 Residential Loans: | | | |
| | - Schedule B | $0 | $0 | $0 |
| | - Adjustable | $497,845 | $497,845 | $0 |
| | - Fixed | $279,104 | $279,104 | $0 |
| 3F | 2nd Mortgage Loans | $0 | $0 | $0 |
| 4F | 5+ Residential Loans | $69,521 | $69,521 | $0 |
| 5F | Construction Loans | $0 | $0 | $0 |
| 6F | Land Loans | $17,146 | $17,146 | $0 |
| 7F | Other Mortgage Loans | $56,963 | $56,963 | $0 |
| | Total Mortgage Loans | $920,579 | $920,579 | $0 |
| | Non-Mortgage Loans: | | | |
| 8F | Consumer Loans | $55,957 | $23,435 | $32,522 |
| | - Share | $1,401 | $0 | $1,401 |
| 9F | Commercial Loans | $393,616 | $393,616 | $0 |
| | Total Non-Mortgage Loans | $450,974 | $417,051 | $33,923 |
| | TOTAL LOANS: | $1,371,553 | $1,337,630 | $33,923 |
| 10F | Real Estate Owned | $14,649 | $14,649 | $0 |
| 11F | Subsidiaries | $98,384 | $98,384 | $0 |
| 12F | Fixed Assets | $12,550 | $12,550 | $0 |
| 13F | Other Assets | $29,819 | $29,819 | $0 |
| 14F | TOTAL ASSETS | $2,163,058 | $2,124,423 | $38,635 |

| Estimated Variable Indirect Expenses (Percentage of Assets Balances) | |
|---|---|
| Cash & Securities | 0% |
| "Schedule B" 1-4 Loans | 0% |
| 1-4 Residential Loans | 2% |
| NP 1-4 Res. Loans | 4% |
| 5+ Residential Loans | 2% |
| NP 5+ Res. Loans | 8% |
| Construction Loans | 6% |
| Land Loans | 6% |
| Commercial Mort. Loans | 4% |
| NP Comm. Mort. Loans | 8% |
| Share Loans | 0% |
| Consumer Loans | 3% |
| NP Consumer Loans | 5% |
| Commercial Non-Mort. Lns | 4% |
| NP Comm. Non-Mort. Lns. | 4% |
| Real Estate Owned | 7% |
| Subsidiaries | 9% |
| Fixed Assets | 7% |
| Other Assets | 4% |
| FHLB Stock | 0% |
| Accrued Int. Rec. (Loans) | 0% |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130735

REPORT F



| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | BR PA(INS) |

LIABILITIES:

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 15F | Insured Deposits | $1,269,540 | $0 | $1,269,540 |
| 16F | Uninsured Deposits | $1,876 | $1,876 | $0 |
| 17F | FHLB Advances | $0 | $0 | $0 |
| 18F | RTC Advances | $945,243 | $945,243 | $0 |
| 19F | Secured Borrowings | $0 | $0 | $0 |
| 20F | Secured Liabilities | $872 | $872 | $0 |
| 21F | Unsecured Borrowings | $10,247 | $10,247 | $0 |
| 22F | Accrued Expenses | $0 | $0 | $0 |
| 23F | Prefered Liabilities | $2,370 | $2,370 | $0 |
| 24F | Other Liabilities | $7,807 | $7,807 | $0 |
| 25F | Total Liabilities | $2,237,955 | $968,415 | $1,269,540 |
| 26F | Net Worth | ($74,897) | $1,156,008 | ($1,230,905) |
| 27F | TOTAL LIABILITIES & EQUITY | $2,163,058 | $2,124,423 | |

| | | | | |
|---|---|---|---|---|
| 28F | Gross Cash to Acquiror | NA | NA | $1,230,905 |
| | Plus RTC Advances | NA | NA | $945,243 |
| | Gross RTC Funding | NA | NA | $2,176,148 |

MEMO ITEMS:

| | | |
|---|---|---|
| 29F | General & Specific Reserves | $75,141 |
| 30F | Total Deposits <$80,000 | $1,181,839 |
| 31F | Brokered Deposits <$80,000 | $0 |
| 32F | Total Brokered Deposits | $0 |
| 33F | Secured Deposits | $0 |
| 34F | Preferred Deposits | $0 |
| 35F | Total Mortgage Delinquents | $87,329 |
| 36F | Total Non-Mortgage Delinquents | $16,198 |
| 37F | # of Branches | 30 |
| 38F | # of Deposit Accounts | 157,808 |
| 39F | RTC M-T-M Loss | $252,177 |

41F ESTIMATED LOSS IN CONTINGENT & NON-BOOKED LIABILITIES:

| | |
|---|---|
| Secured Borrowings | $0 |
| Secured Liabilities | $0 |
| Total Secured | $0 |
| Unsecured Borrowings | $0 |
| Unsecured Accrued Expenses | $0 |
| Unsecured Other Liabilities | $75,941 |
| Total Unsecured | $75,941 |

| | |
|---|---|
| 42F Estimated Indirect Overhead Expenses | $51,970 |

40F NON-BOOKED ASSETS:

| | |
|---|---|
| Cash & Securities | $0 |
| 1-4 Residential Loans | $0 |
| 2nd Mortgage Loans | $0 |
| 5+ Residential Loans | $0 |
| Consumer Loans | $0 |
| Other Loans | $0 |
| Real Estate Owned | $0 |
| Other Assets | $0 |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130736

# REPORT F



## PRO FORMA BALANCE SHEET

(In 000's)

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | BRANCH P&A |
| DEPOSITOR PREF. STATE: | YES | DATE OF DATA: | 10/31/94 |

ASSETS (Gross Book Value)

| | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|
| 1F Cash & Inv. Securities | 636,103 | $631,391 | $4,712 |
| Mortgage Loans: | | | |
| 2F 1-4 Residential Loans: | | | |
| - Schedule B | $0 | $0 | $0 |
| - Adjustable | $497,845 | $497,845 | $0 |
| - Fixed | $279,104 | $279,104 | $0 |
| 3F 2nd Mortgage Loans: | $0 | $0 | $0 |
| 4F 5+ Residential Loans: | $69,521 | $69,521 | $0 |
| 5F Construction Loans: | $0 | $0 | $0 |
| 6F Land Loans: | $17,146 | $17,146 | $0 |
| 7F Other Mortgage Loans: | $56,963 | $56,963 | $0 |
| Total Mortgage Loans | $920,579 | $920,579 | $0 |
| Non-Mortgage Loans: | | | |
| 8F Consumer Loans: | $55,957 | $23,435 | $32,522 |
| - Share | $1,401 | $0 | $1,401 |
| 9F Commercial Loans: | $393,616 | $393,616 | $0 |
| Total Non-Mortgage Loans | $450,974 | $417,051 | $33,923 |
| TOTAL LOANS: | $1,371,553 | $1,337,630 | $33,923 |
| 10F Real Estate Owned: | $14,649 | $14,649 | $0 |
| 11F Subsidiaries: | $98,384 | $98,384 | $0 |
| 12F Fixed Assets: | $12,550 | $12,550 | $0 |
| 13F Other Assets: | $29,819 | $29,819 | $0 |
| 14F TOTAL ASSETS | $2,163,058 | $2,124,423 | $38,635 |

| Estimated Variable Indirect Expenses (Percentage of Assets Balances) | |
|---|---|
| Cash & Securities | 0% |
| "Schedule B" 1-4 Loans | 0% |
| 1-4 Residential Loans | 2% |
| NP 1-4 Res. Loans | 4% |
| 5+ Residential Loans | 2% |
| NP 5+ Res. Loans | 8% |
| Construction Loans | 6% |
| Land Loans | 6% |
| Commercial Mort. Loans | 4% |
| NP Comm. Mort. Loans | 8% |
| Share Loans | 0% |
| Consumer Loans | 3% |
| NP Consumer Loans | 5% |
| Commercial Non-Mort. Lns | 4% |
| NP Comm. Non-Mort. Lns. | 4% |
| Real Estate Owned | 7% |
| Subsidaries | 9% |
| Fixed Assets | 7% |
| Other Assets | 4% |
| FHLB Stock | 0% |
| Accrued Int. Rec. (Loans) | 0% |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130737

REPORT F



| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | BRANCH P&A |

LIABILITIES:

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 15F | Insured Deposits | $1,269,540 | $0 | $1,269,540 |
| 16F | Uninsured Deposits | $1,876 | $0 | $1,876 |
| 17F | FHLB Advances | $0 | $0 | $0 |
| 18F | RTC Advances | $945,243 | $945,243 | $0 |
| 19F | Secured Borrowings | $0 | $0 | $0 |
| 20F | Secured Liabilities | $872 | $872 | $0 |
| 21F | Unsecured Borrowings | $10,247 | $10,247 | $0 |
| 22F | Accrued Expenses | $0 | $0 | $0 |
| 23F | Prefered Liablilities | $2,370 | $2,370 | $0 |
| 24F | Other Liabilities | $7,807 | $7,807 | $0 |
| 25F | Total Liabilities | $2,237,955 | $966,539 | $1,271,416 |
| 26F | Net Worth | ($74,897) | $1,157,884 | ($1,232,781) |
| 27F | TOTAL LIABILITIES & EQUITY | $2,163,058 | $2,124,423 | |

| | | | | |
|---|---|---|---|---|
| 28F | Gross Cash to Acquiror | NA | NA | $1,232,781 |
| | Plus RTC Advances | NA | NA | $945,243 |
| | Gross RTC Funding | NA | NA | $2,178,024 |

MEMO ITEMS:

| | | |
|---|---|---|
| 29F | General & Specific Reserves | $75,141 |
| 30F | Total Deposits <$80,000 | $1,181,839 |
| 31F | Brokered Deposits <$80,000 | $0 |
| 32F | Total Brokered Deposits | $0 |
| 33F | Secured Deposits | $0 |
| 34F | Preferred Deposits | $0 |
| 35F | Total Mortgage Delinquents | $87,329 |
| 36F | Total Non-Mortgage Delinquents | $16,198 |
| 37F | # of Branches | 30 |
| 38F | # of Deposit Accounts | 157,808 |
| 39F | RTC M-T-M Loss | $252,177 |

41F ESTIMATED LOSS IN CONTINGENT & NON-BOOKED LIABILITIES:

| | |
|---|---|
| Secured Borrowings | $0 |
| Secured Liabilities | $0 |
| Total Secured | $0 |
| Unsecured Borrowings | $0 |
| Unsecured Accrued Expenses | $0 |
| Unsecured Other Liabilities | $75,941 |
| Total Unsecured | $75,941 |

| | |
|---|---|
| 42F Estimated Indirect Overhead Expenses | $51,970 |

40F NON-BOOKED ASSETS:

| | |
|---|---|
| Cash & Securities | $0 |
| 1-4 Residential Loans | $0 |
| 2nd Mortgage Loans | $0 |
| 5+ Residential Loans | $0 |
| Consumer Loans | $0 |
| Other Loans | $0 |
| Real Estate Owned | $0 |
| Other Assets | $0 |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130738

Report LDS.01
Report Date 10/19/98
Page 1

Bank Name CARTERET SAVINGS
Bank # 1309
Date of Closure 03/10/95

Liability Register

| Priority | Claim/RC# | | Claimant | Original Claim Amount | Dividends Date | Check # | Amount | To Date | Claim Balance |
|---|---|---|---|---|---|---|---|---|---|
| 961.0 | 1 | 1 | RESOLUTION TRUST CORP | 1,368,154,803.42 | | | | | |
| | | | | | 09/30/95 | 111 | 783,757,424.67 | 783,757,424.67 | |
| | | | | | 10/31/95 | 222 | 258,157,000.00 | 1,041,914,424.67 | |
| | | | | | 11/30/95 | 333 | 24,062,000.00 | 1,065,976,424.67 | |
| | | | | | 12/29/95 | 444 | 1,829,000.00 | 1,067,805,424.67 | |
| | | | | | 01/31/96 | 555 | 20,670,000.00 | 1,088,475,424.67 | |
| | | | | | 02/29/96 | 666 | 24,858,000.00 | 1,113,333,424.67 | |
| | | | | | 04/30/96 | 777 | 16,343,000.00 | 1,129,676,424.67 | |
| | | | | | 05/31/96 | 888 | 5,984,000.00 | 1,135,660,424.67 | |
| | | | | | 06/10/96 | 999 | 19,465,000.00 | 1,155,125,424.67 | |
| | | | | | 10/01/96 | 10 | 64,515,326.46 | 1,219,640,751.13 | |
| | | | | | 02/14/97 | 11 | 500,000.00 | 1,220,140,751.13 | |
| | | | | | 02/18/97 | 12 | 500,000.00 | 1,220,640,751.13 | |
| | | | | | 02/21/97 | 12 | 45,000,000.00 | 1,265,640,751.13 | |
| | | | | | 02/28/97 | 13 | 1,200,000.00 | 1,266,840,751.13 | |
| | | | | | 03/11/97 | 14 | 800,000.00 | 1,267,640,751.13 | |
| | | | | | 04/01/97 | 15 | 800,000.00 | 1,268,440,751.13 | |
| | | | | | 04/08/97 | 16 | 400,000.00 | 1,268,840,751.13 | |
| | | | | | 04/29/97 | 17 | 400,000.00 | 1,269,240,751.13 | |
| | | | | | 06/01/97 | 18 | 7,142,543.41 | 1,276,383,294.54 | |
| | | | | | 07/08/97 | 19 | 2,700,000.00 | 1,279,083,294.54 | |
| | | | | | 08/12/97 | 20 | 4,000,000.00 | 1,283,083,294.54 | |
| | | | | | 08/19/97 | 21 | 4,100,000.00 | 1,287,183,294.54 | |
| | | | | | 10/07/97 | 22 | 2,000,000.00 | 1,289,183,294.54 | |
| | | | | | 10/21/97 | 23 | 5,200,000.00 | 1,294,383,294.54 | |
| | | | | | 10/28/97 | 24 | 100,000.00 | 1,294,483,294.54 | |
| | | | | | 11/01/97 | 110197 | 5,519,502.75 | 1,300,002,797.29 | |
| | | | | | 11/04/97 | 25 | 400,000.00 | 1,300,402,797.29 | |
| | | | | | 12/16/97 | 26 | 100,000.00 | 1,300,502,797.29 | |
| | | | | | 10/30/98 | 27 | 27,667,768.95 | ✓1,328,170,566.24 | 39,984,237.18 |
| Subtotal Class | | | 01 | 1,368,154,803.42 | | | 1,328,170,566.24 | | 39,984,237.18 |
| 941.0 | 1 | 1 | RESOLUTION TRUST CORP | 178,810.69 | | | | | 178,810.69 |
| Subtotal Class | | | 02 | 178,810.69 | | | 0.00 | | 178,810.69 |
| Grand Total | | | | 1,368,333,614.11 | | | 1,328,170,566.24 | | 40,163,047.87 |

"G"=Gross Dividend; "N"=Net Dividend; "I"=Interest only Not included in totals

# The Cost of the Savings and Loan Crisis: Truth and Consequences

by Timothy Curry and Lynn Shibut*

It has been more than a decade since enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which began the taxpayers' involvement in the cleanup of the savings and loan industry.[1] Over time, misinformation about the cost of the crisis has been widespread; some published reports have placed the cost at less than $100 billion, and others as high as $500 billion.[2] Now that the cleanup is nearly complete, we can answer the following questions about a debacle that has consumed the nation for years:

- What was the total cost of the crisis?
- How much of the total was borne by the U.S. taxpayer?
- How much was borne by the thrift industry?
- How do the actual costs compare with those predicted before and during the cleanup years?

The thrift cleanup was Congress's response to the greatest collapse of U.S. financial institutions since the 1930s. From 1986 to 1989, the Federal Savings and Loan Insurance Corporation (FSLIC), the insurer of the thrift industry, closed or otherwise resolved 296 institutions with total assets of $125 billion (table 1).[3] An even more traumatic period followed, with the creation of the Resolution Trust Corporation (RTC) in 1989 and that agency's resolution by mid-1995 of an additional 747 thrifts with total assets of $394 billion.[4] The combined closings by both agencies of 1,043 institutions holding $519 billion in assets contributed to a massive restructuring of the number of firms in the industry. From January 1, 1986, through year-end 1995, the number of federally insured thrift institutions in the United States declined from 3,234 to 1,645, or by approximately 50 percent.[5]

* Timothy Curry is a financial economist and Lynn Shibut is Chief of the Financial Modeling Section in the FDIC's Division of Research and Statistics. The authors thank the FDIC's James Marino, Barry Kolatch, George Hanc, John Thomas, and Karen Hughes for helpful comments, and Katie Wehner and Sandy Hinegardner for research assistance. Matthew Green of the Treasury Department contributed useful suggestions.

[1] Although the roots of the savings and loan crisis lay in the late 1970s, the passage of FIRREA in 1989 marked the first time taxpayer funds were used to resolve the crisis. That use of taxpayer funds to meet the guarantee to insured depositors is the reason the term *cleanup* is used rather than *bailout*.

[2] For example, see White (1991), 197. Also, Thomas (2000), 13.

[3] The word *thrifts* refers to savings associations insured by the FSLIC until August 8, 1989, and after that date by the Savings Association Insurance Fund (SAIF), administered by the FDIC.

[4] The $394 billion figure measures total assets as reported in the Thrift Financial Report that was most recent at the time of each thrift's failure. This figure is net of valuation allowances on the books of the institution at the time of failure. Other published numbers have reported the total assets for the 747 thrifts at takeover to be $402.4 billion. This reported number is gross of valuation allowances. Unless otherwise noted, the source for all data is the FDIC.

[5] The total number of thrift institutions represents those that were FSLIC-insured at year-end 1986 and SAIF-insured at year-end 1995. It should be noted that not all of the thrift industry consolidation occurred because of the thrift crisis. Even without such a crisis, some consolidation of the industry would probably have occurred.

**Table 1**
**Thrift Failures, 1986–1995**
($Millions)

| | FSLIC | | RTC | |
|---|---|---|---|---|
| Year | Number | Assets | Number | Assets |
| 1986 | 54 | $ 16,264 | | |
| 1987 | 48 | 11,270 | | |
| 1988 | 185 | 96,760 | | |
| 1989 | 9 | 725 | 318 | $134,520 |
| 1990 | | | 213 | 129,662 |
| 1991 | | | 144 | 78,899 |
| 1992 | | | 59 | 44,197 |
| 1993 | | | 9 | 6,148 |
| 1994 | | | 2 | 137 |
| 1995 | | | 2 | 435 |
| Total | 296 | $125,019 | 747 | $393,998 |

*Source:* FDIC.
*Note:* Data are for the period January 1, 1986, to December 31, 1995.

Although the roots of the thrift crisis stretch back to the late 1970s, the financial losses experienced by taxpayers and the industry are tabulated as beginning on January 1, 1986, and ending at year-end 1995. The year 1986 was selected as the starting point because this was the first year when the FSLIC was reported insolvent. Before then, the thrift insurance fund had been able to cover losses from thrift failures. Recognition of the FSLIC's insolvency as of year-end 1986 marked a watershed: at that time many observers realized that taxpayer involvement in the resolution of the crisis was a strong possibility.

The next section of this article provides background material on the crisis. It is followed first by a retrospective on the changing estimates of the size of the thrift problem over time and then by a three-part section identifying and analyzing the cost of meeting the deposit insurance obligations that remained in the wake of the debacle. The costs are broken into the FSLIC and RTC segments, as well as the taxpayer and the thrift industry shares of each, and the total is then analyzed. A brief summary concludes. An appendix discusses the "goodwill" litigation associated with FIRREA.

## Background

The causes and severity of the thrift crisis have been documented by scholars for more than a decade.[6] Several reasons cited for the collapse include:

- high and volatile interest rates during the late 1970s and early 1980s, which exposed thrifts to interest-rate risk (caused by a mismatch in duration and by interest-rate sensitivity of assets and liabilities);
- the phase-out and eventual elimination in the early 1980s of the Federal Reserve's Regulation Q, which caused increasing costs of thrift liabilities relative to many fixed-rate assets and adversely affected industry profitability and capital;
- adverse regional economic conditions;
- state and federal deregulation of depository institutions, which allowed thrifts to enter new but riskier loan markets;
- the deregulation of the thrift industry without an accompanying increase in examination resources (for some years examiner resources actually declined);
- reduced regulatory capital requirements, which allowed thrifts to use alternative accounting procedures to increase reported capital levels;
- excessive chartering of new thrifts during the 1980s;
- the withdrawal in 1986 of federal tax laws (enacted in 1981) that benefited commercial real-estate investments;
- the development during the 1980s of the brokered deposit market; and
- delays in funding the thrift insurance fund during the 1980s and the RTC during the 1990s, which led to regulators' failure to close many insolvent institutions in a timely manner.

As a consequence of all these factors, during the 1980s the thrift industry realized unprecedented losses on loans and investments. The result, as noted, was the failure of hundreds of thrift institutions and the insolvency by year-end 1986 of the FSLIC, the federal insurer for the thrift industry. As of year-end 1986, 441 thrifts with $113 billion in assets were book insolvent, and another 533 thrifts, with $453 billion in assets, had tangible capital of no more than 2 percent of total assets. These 974 thrifts held 47 percent of industry assets. In response, Congress created the Financing Corporation (FICO) in 1987 to provide funding to the FSLIC by issuing long-term bonds. By the time FIRREA was passed two years later, FICO had contributed $8.2 billion in financing to the

[6] *See* Barth *et al.* (1985); Kane (1989); Barth (1991); White (1991); Barth and Brumbaugh (1992); Bennett and Loucks (1996); and FDIC (1997).

Table 2
**Chronology of Thrift Crisis Events**

| | |
|---|---|
| December 31, 1986 | FSLIC insolvent |
| August 10, 1987 | FICO created to fund FSLIC |
| August 9, 1989 | Enactment of FIRREA |
| | – FSLIC abolished |
| | – FRF created (succeeds to FSLIC's assets, liabilities, and operations) |
| | – SAIF created to handle thrift failures starting August 9, 1992 |
| | – RTC created to resolve thrifts placed into conservatorships or receiverships between January 1, 1989 and August 8, 1992[a] (RTC to cease operations December 31, 1996)[b] |
| | – REFCORP created to fund RTC |

*Note:* FSLIC - Federal Savings and Loan Insurance Corporation
FICO - Financing Corporation
FRF - FSLIC Resolution Fund
SAIF - Savings Association Insurance Fund
RTC - Resolution Trust Corporation
REFCORP - Resolution Funding Corporation

[a]Cutoff date for takeovers later extended to June 30, 1995.
[b]Date to cease operations later changed to December 31, 1995.

FSLIC, an amount insufficient to deal with the industry's massive problems.[7]

In response to the deepening crisis, Congress enacted FIRREA on August 9, 1989, beginning the taxpayers' involvement in the resolution of the problem. (See table 2 for a listing of thrift crisis events.) FIRREA abolished the FSLIC and transferred its assets, liabilities, and operations to the newly created FSLIC Resolution Fund (FRF), to be administered by the FDIC. In addition, FIRREA created—to be administered by the FDIC—a new thrift insurance fund named the Savings Association Insurance Fund (SAIF), which would handle thrift failures starting three years from the date of FIRREA. FIRREA also created the RTC to resolve virtually all troubled thrifts placed into conservatorships or receiverships between January 1, 1989, and August 8, 1992. Because of the continuing thrift crisis, however, the RTC's authorization to take over insolvent institutions was twice extended, the second time to June 30, 1995.[8] The RTC was required to cease its operations on December 31, 1995, and transfer any remaining assets and liabilities to the FSLIC Resolution Fund.[9]

FIRREA provided the RTC with $50 billion to resolve failed institutions. Approximately $30 billion of this amount originated through the establishment of the Resolution Funding Corporation (REFCORP), which was a private-public partnership created to issue long-term bonds to the public.[10] The remaining $20 billion came from the U.S. Treasury ($18.8 billion) and the Federal Home Loan Banks ($1.2 billion). Because the $50 billion in initial funding was insufficient to deal with the scope of the problem, Congress enacted subsequent legislation three times, raising total authorized RTC funding for losses to $105 billion between 1989 and 1995. Some of this amount was never used. (See table 3.)

[7] FICO was created by the Competitive Equality Banking Act of 1987 (CEBA) as the vehicle for recapitalizing the insolvent FSLIC. The law authorized FICO to raise funds for the FSLIC by selling bonds to the public; as noted, FICO had $8.2 billion of outstanding debt as of the passage of FIRREA in August 1989. Initially the thrift industry was to be responsible for payment of interest and principal on the outstanding debt. Later FIRREA permitted the FICO bonds to be paid for by annual assessments from the newly created SAIF insurance fund. Because of concern over the low reserves of the SAIF, the Deposit Insurance Funds Act of 1996 (PL 104-208) provided for the SAIF's capitalization. As part of the capitalization effort, future interest payments on the FICO bonds were to be paid for by all FDIC-insured institutions.

[8] FIRREA's original period for the takeover of insolvent institutions was three years, which ended August 8, 1992. The RTC Refinancing, Restructuring and Improvement Act of 1991 extended the period to October 1, 1993. The RTC Completion Act of 1993 extended it through June 30, 1995.

[9] The original RTC termination date, established by FIRREA in August 1989, was December 31, 1996. The RTC Completion Act of 1993 changed the closure date to December 31, 1995.

[10] The 1989 legislation created a quasi-private corporation to provide funds for the RTC. The organization and structure of REFCORP were patterned after FICO, established in 1987 to raise funds for the insolvent FSLIC. REFCORP was authorized to issue debt obligations in an aggregate amount of $30 billion starting in fiscal years 1990 and 1991. The $30 billion in principal on the REFCORP bonds was paid from the sale of non-interest-bearing U.S. Treasury obligations, which REFCORP purchased in amounts approximately equal to the principal of the REFCORP obligations. These zero-coupon securities were funded from the reserves and special assessments of the FHLBs and the SAIF. Funds for the payment of interest on REFCORP obligations came from several sources, including $300 million per year from FHLB contributions and from the U.S. Treasury. REFCORP raised the $30 billion in offerings by January 1991.

Table 3

RTC Funding Legislation

($Billions)

| Legislation | Loss Funds | Date of Enactment |
|---|---|---|
| FIRREA, 1989 | $ 50.1 | August 9, 1989 |
| RTC Funding Act of 1991 | 30.0 | March 23, 1991 |
| RTC Refinancing, Restructuring and Improvement Act of 1991 | 6.7 | December 12, 1991 |
| RTC Completion Act of 1993 | 18.3 | December 17, 1993 |
| Total Funds Appropriated | $105.1 | |
| Total Funds Provided to RTC | $ 91.3 | |

## History of Cost Estimates

Before, during, and even after the RTC's lifetime, estimates of the costs of the crisis created widespread confusion. Federal agencies, politicians, thrift industry experts, and others put forth myriad estimates on what was called the size of the problem. These forecasts often diverged widely and changed frequently in response to surging industry losses. For example, most loss projections for RTC resolutions during the year leading up to passage of FIRREA in 1989 were in the range of $30 billion to $50 billion, but some reached as high as $100 billion at that time.[11] Over the next few years, as a greater-than-expected number of thrifts failed and the resolution costs per failure soared, loss projections escalated. Reflecting the increased number of failures and costs per failure, the official Treasury and RTC projections of the cost of the RTC resolutions rose from $50 billion in August 1989 to a range of $100 billion to $160 billion at the height of the crisis peak in June 1991, a range two to three times as high as the original $50 billion.[12] The fact that the estimates were moving targets increased the public's confusion and compounded Congress's difficulty in reaching a consensus on funding levels for the cleanup.

What accounted for the disparity and volatility among these projections? First, timely information on the condition of the failed institutions was lacking, especially during the early years. Analysts were forced to base their loss predictions on Thrift Financial Report data that were often outdated and unreliable (because thrift examinations had been infrequent and relaxed accounting standards were used at the time). In reality, the industry was in much worse shape than most observers had anticipated, and once the cleanup got under way and the industry came under intense scrutiny, this became apparent. During the asset reviews of insolvent and undercapitalized institutions, it became obvious that the embedded losses were much greater than thrift financial statements had reported.

Another factor was uncertainty about the expected number of future failures. This number was hard to predict because the economy was changing, as were interest rates and commercial real-estate markets. The Bush administration, for example, originally estimated that more than 400 thrifts with over $200 billion in assets would be turned over to the RTC at a cost of approximately $50 billion, but in less than a year the administration's estimate had grown to 700 or 800 thrifts with assets of over $400 billion. The dramatic misreading of the number of failures and subsequent costs of the crisis, especially during the early years, was acknowledged by L. William Seidman, Chairman of both the FDIC and RTC during this era, in his memoir. "Only three months after the cleanup started," he said, "it was already evident that the problem was far worse than anyone in government had envisioned, including me, and it was getting worse every day. The economy was beginning to slide into recession. Real estate was in real depression in some parts of the country, particularly in Texas, where the savings and loan problem was the largest . . . we would also need billions more to pay off depositors and carry weak assets of the institutions until they were sold and we could

[11] The $30 billion to $50 billion estimates formed the basis for the Bush administration plan in February 1989 to provide $50 billion in funding for the cleanup. Experts outside the federal government at that time claimed that the costs could be substantially higher—possibly reaching $100 billion.

[12] During the final year of the cleanup, the Treasury lowered its official estimates to $120 billion.

recover the funds we had invested . . . we were faced with taking the most politically unacceptable action of all, having to admit that we made a big mistake."[13]

A third factor contributing to the disparate and volatile nature of the projections was that some public reports on the size of the problem looked at "apples" and others at "oranges," and the two groups were not comparable. For example, some estimates included only the expected losses from RTC failures but did not incorporate past FSLIC costs. Other estimates included both the FSLIC and RTC losses but focused only on the taxpayers' losses, while excluding losses incurred by the thrift industry over the same period.

One of the most important factors in explaining the variance among the loss estimates was methodological: the total estimated cost sometimes did and sometimes did not include, in addition to the estimated losses, the borrowing costs for the billions of dollars of debt issues floated to fund the cleanup. During the FSLIC and RTC eras, the industry contributed $38.3 billion (sometimes in partnership with the Treasury) in funding for the cleanup. Special government-established financing entities (FICO and REFCORP) raised these funds by selling long-term bonds in the capital markets. The Treasury contributed another $99 billion,[14] some or all of which was also borrowed because the federal government was experiencing large budget deficits during the period. When some analysts tabulated the costs of the cleanup, they included not only the principal borrowed but also interest costs for periods of up to 30 to 40 years on some or all of the borrowings. Including the financing costs in addition to principal could easily double or triple the estimates of the final cost of the cleanup.

However, in our view, including financing costs when tallying the costs of the thrift crisis is methodologically incorrect. It is invalid because, in present-value terms, the amount borrowed is equal to the sum of the interest charges plus debt repayment. Adding the sum of interest payments to the amount borrowed would overstate the true economic cost of resolving the crisis. An example will illustrate the point. Assume an individual pays $100,000 for the purchase of a residential property and finances the whole amount with a 30-year loan at 10 percent interest. Over the 30 years of the loan the individual pays more than $300,000 in total costs, comprising interest and principal. Yet, the cost of the home is still $100,000, because the present value of the total costs of $300,000 for 30 years of payments discounted by the interest rate of 10 percent is approximately $100,000.[15] Another example: the federal government does not include interest charges when costing specific programs, such as weapons systems or school lunches.

## Accounting for the Thrift Cleanup Costs

The costs of the thrift crisis are analyzed below in three sections. The first section looks at costs borne by the FSLIC for thrifts that failed from year-end 1985 through August 8, 1989.[16] Funds were provided to the FSLIC, and when the FSLIC was abolished in 1989, the FRF became responsible for paying off notes and other obligations the FSLIC had left behind.[17]

The second section analyzes costs associated with the RTC resolutions of institutions that failed after January 1, 1989 (excluding failures resolved by the FSLIC). These institutions consist of two groups of failed thrifts: (1) those that were nationalized and placed into FDIC-supervised conservatorships from January 1, 1989, through the passage of FIRREA on August 9, 1989,[18] and (2) those that failed after August 8, 1989. In the first group—institutions taken over before August 9, 1989—there were 262 failed thrifts from 33 states, with $104 billion in total assets. In the second group—institutions that failed after August 8, 1989, and before June 30, 1995—there were 485 thrifts with total assets of $290 billion. The third section analyzes total estimated resolution costs.

Table 4 breaks out the thrift crisis losses for both FSLIC- and RTC-related resolutions by source—either the private or the public sector—as of year-end 1999.

[13] Seidman (1993), 208.

[14] Includes $43.5 billion to the FRF and $55.9 billion to the RTC. See table 4. An additional $4.2 billion was provided to the RTC and later returned to the Treasury.

[15] Actually, the total amount paid out over 30 years would be $315,925.

[16] As mentioned above, the tabulation of costs begins in 1986 because that was the year when the FSLIC became insolvent. Its equity was depleted from a positive balance of $4.6 billion on January 1, 1986, to a negative balance of $6.3 billion on December 31, 1986.

[17] FIRREA transferred all of the FSLIC's assets, liabilities, and operations to the newly created FRF to be administered by the FDIC. The funds needed to settle the FSLIC's remaining liabilities were provided by appropriations from the Treasury, industry assessments, and recoveries from asset sales.

[18] Although the failed thrifts were placed into FSLIC conservatorships, an agreement among the FDIC, the FHLBB, and the FSLIC gave the FDIC authority to supervise these conservatorships. In August 1989 at the RTC's inception, the conservatorships were turned over to the RTC for management and ultimate resolution.

Table 4

## Estimated Savings and Loan Resolution Cost, 1986–1995

($Billions)

| | Private Sector | Public Sector | Total |
|---|---|---|---|
| **Direct Cost** | | | |
| FSLIC/FSLIC Resolution Fund, 1986–95 | | | |
| FSLIC year-end equity and reserves, 1985 | $6.1 | | $6.1 |
| FSLIC insurance premiums, 1986–89 | 5.8 | | 5.8 |
| SAIF assessments diverted to FRF, 1989–92 | 2.0 | | 2.0 |
| FICO bond proceeds, 1987–89 | 8.2 | | 8.2 |
| FRF appropriations, 1989–95 | | $43.5 | 43.5 |
| Less: FRF equity at 12/31/99[a] | | (2.5) | (2.5) |
| **Estimated Direct FSLIC/FRF Cost** | **$22.0** | **$41.0** | **$63.0** |
| RTC, 1989–95 | | | |
| Raised through REFCORP bond proceeds:[b] | | | |
| FHLB payments to defease REFCORP debt, 1989–91 | 1.3 | | 1.3 |
| SAIF assessments paid to defease REFCORP debt, 1990 | 1.1 | | 1.1 |
| Net present value of FHLB-paid interest on REFCORP bonds[c] | 3.5 | | 3.5 |
| Net present value of REFCORP interest paid by U.S. Treasury[d] | | 24.2 | 24.2 |
| Total REFCORP bond proceeds | 5.9 | 24.2 | 30.1 |
| Appropriations from U.S. Treasury[e] | | 55.9 | 55.9 |
| Initial contribution from FHLB system | 1.2 | | 1.2 |
| Less: RTC equity at 12/31/99[a] | | (4.5) | (4.5) |
| **Estimated Direct RTC Cost** | **7.1** | **75.6** | **82.7** |
| Estimated Total Direct Cost | $29.1 | $116.5 | $145.7 |
| **Indirect Cost** | | | |
| Estimated cost of tax benefits to acquirers from FSLIC assistance | | 6.3 | 6.3 |
| Increased interest expense from higher interest rates on REFCORP bonds compared with U.S. Treasury borrowings[f] | | 1.0 | 1.0 |
| **Estimated Indirect Cost** | | **7.3** | **7.3** |
| Estimated Total Cost | $29.1 | $123.8 | $152.9 |
| Memo: goodwill litigation cost through 12/31/99[g] | | 0.4 | 0.4 |

*Note:* For these costs to be comparable to those of other government programs, they exclude interest on the national debt incurred to fund the cleanup, and, in the case of FICO and REFCORP, interest that would have accrued to the national debt had such funding come from the general fund of the U.S. Treasury instead of from FICO and REFCORP. Resolution costs start with 1986 because the FSLIC became insolvent that year.

[a]Adjusted for expenses associated with goodwill litigation. See note g below.

[b]REFCORP bonds were funded via a public-private partnership. Total funds raised by REFCORP were $30.1 billion. Because of the mix of private and public funding, discounting is used to allocate the $30.1 billion on the basis of the contributions made by various parties at different times.

[c]Net present value of the FHLBs' $300 million annual contribution to cover part of REFCORP interest expense.

[d]Calculated as the total REFCORP contribution ($30.1 billion) minus the net present value of the private-sector contributions.

[e]Total appropriations were $60 billion, but $4.2 billion was returned to the Treasury in 1999.

[f]Present value of higher interest expense of REFCORP borrowing compared with comparable-term U.S. Treasury securities. This is treated as a public-sector expense because the U.S. Treasury is responsible for all interest expenses above those paid by the FHLBs.

[g]The FDIC cost of litigation stemming from changes in accounting treatment of supervisory goodwill and other items in FIRREA through 12/31/99. The cost borne by the Department of Justice and estimated future costs are unavailable. Awards that have not been paid are excluded. In this presentation, goodwill expenses and recoveries are excluded from the cost of the Savings and Loan resolutions. Goodwill expenses and recoveries relate to legislative changes in FIRREA, not to the resolution of failed thrifts. Thus, this is reported only as a memo item.

### *FSLIC Estimated Resolution Costs*

For FSLIC failures, the loss from the beginning of 1986 forward was $63.0 billion, of which the public sector accounted for $41.0 billion, or 65 percent, while the thrift industry paid $22.0 billion, or 35 percent of the total. All the FRF-related public-sector losses were accounted for by the Treasury's $43.5 billion contribution. As of year-end 1999, however, the FRF still retained $2.5 billion in equity that was expected to be returned to the taxpayers, so the net loss was $41.0 billion.[19] (As mentioned above, the FRF was responsible for settling accounts on all outstanding FSLIC assistance agreements and receiverships.) The $22.0 billion in thrift industry funding for FSLIC losses included: $8.2 billion that came from the thrift industry through the sale of long-term FICO bonds; FSLIC insurance premiums from 1986 forward and SAIF assessments diverted to the FRF, accounting for an additional $7.8 billion in spending; and $6.1 billion from the original FSLIC insurance fund equity and reserves as of year-end 1985.[20]

### *RTC Estimated Resolution Costs*

As of December 31, 1999, the RTC losses for resolving the 747 failed thrifts taken over between January 1, 1989, and June 30, 1995, amounted to an estimated $82.7 billion, of which the public sector accounted for $75.6 billion, or 91 percent, and the private sector accounted for $7.1 billion, or 9 percent (table 4).

The largest component of the public-sector loss was direct Treasury appropriations of $55.9 billion;[21] the Treasury also absorbed $24.2 billion of the $30.1 billion in REFCORP contributions received from 1989 to 1991. However, the public-sector losses were reduced by $4.5 billion in equity held by the RTC as of year-end 1999.[22]

This accumulation of equity over the years was attributable to a number of factors. When an insured depository institution was closed and put into a receivership, the RTC placed a loss adjustment factor against the book value of the assets (this value was based on appraisals or other market information available at the time). These loss reserves reduced the value of the assets to the expected market or recovery value. In its reserving procedures, the RTC (with the approval of the GAO) took a conservative approach so as not to overstate the value of the assets acquired from failed institutions. In applying reserving procedures, the RTC considered a variety of factors including the fair market value of assets when residential and commercial markets were collapsing and the costs associated with particular sales methods developed by the RTC. For example, claims from both representation and warranty guarantees on asset sales and securitizations of nonstandard assets had to be anticipated and loss reserves established. During the 1990s, as the economy improved and real-estate markets recovered, the losses on asset sales and claims from representation and warranty and asset-securitization guarantees were less than anticipated. Thus, a portion of previously set-aside reserves were recaptured into the RTC equity account and offset the overall costs of the cleanup.

The thrift industry losses included the initial $1.2 billion contributed by the Federal Home Loan Banks (FHLBs) to capitalize the REFCORP. The FHLBs also paid $1.3 billion, and the SAIF paid $1.1 billion, to purchase zero-coupon securities worth $30 billion at maturity—to be used to pay the principal of REFCORP debt. The FHLBs incurred an additional $3.5 billion loss that represented the present value of the FHLBs' portion of the interest payments on REFCORP bonds.

### *Total Estimated Resolution Costs*

As of December 31, 1999, total direct costs attributable to the closing of insolvent thrift institutions over the 1986–1995 period amounted to $145.7 billion. Indirect costs due to the loss of Treasury revenue because of the tax benefits that accrued to acquirers of failed institutions under past FSLIC resolutions amounted to $6.3 billion.[23] An additional $1.0 billion of indirect costs was incurred because interest expens-

[19] The FRF equity will be returned to the Treasury as the remaining workload is completed. This figure is adjusted for goodwill litigation costs.

[20] These reserves were premiums paid before 1986 that were spent during the crisis.

[21] Appropriations were $60 billion, but approximately $4.2 billion was returned to the Treasury in 1999.

[22] These funds will be returned to the Treasury, or will be used to reduce the Treasury's interest payments on the REFCORP bonds, as the remaining workload is completed. This figure is adjusted for goodwill litigation costs.

[23] During most of the 1980s, special tax benefits accrued to those acquiring insolvent thrift institutions. For example, assistance paid to acquiring institutions was nontaxable. In addition, in some cases acquiring organizations could carry over certain losses and tax attributes of the troubled institutions to reduce their overall tax liability. These provisions reduced the amount that the FSLIC was required to pay acquiring organizations to take over insolvent institutions. As a consequence of these tax benefits, revenue was lost to the Treasury. Thus, these tax benefits are referred to as "indirect costs." No such benefits were granted after 1988.

es were higher with the use of REFCORP bonds than with Treasury financing.[24] Thus, the combined total for all direct and indirect losses of FSLIC and RTC resolutions was an estimated $152.9 billion. Of this amount, U.S. taxpayer losses amounted to $123.8 billion, or 81 percent of the total costs. The thrift industry losses amounted to $29.1 billion, or 19 percent of the total.

The accumulated losses of $152.9 billion were higher than the official and private forecasts of the late 1980s but lower than those made by the government and others during the early to mid-1990s. As mentioned above, during the late 1980s the full extent of the problem was unknown until the cleanup began; thus, many early forecasts underestimated the size of the problem. In the early to mid-1990s, lower interest rates and an improving economy reduced the number of thrift failures and improved prices for thrift franchises and assets held by thrifts; thus, the final losses were less than those predicted at the height of the crisis. In addition, because perceptions of thrift assets during the crisis years had been unfavorable, the RTC adopted conservative accounting procedures, and the combination of these policies and a strong economy caused the costs of the cleanup to decline every year after 1991.

As of year-end 1999, the savings and loan cleanup was largely complete. The FSLIC Resolution Fund, which controls all remaining assets and liabilities of both the FSLIC and the RTC, either held or had a direct claim on approximately $7 billion in assets, most of which were cash and low-risk securities.[25] Thus, losses from future asset sales will not materially change the loss figures. However, the costs of the goodwill litigation associated with FIRREA (see the Appendix) are still largely unknown, and it could be several more years before these cases are concluded.

## Summary

The savings and loan crisis of the 1980s and early 1990s produced the greatest collapse of U.S. financial institutions since the Great Depression. Over the 1986–1995 period, 1,043 thrifts with total assets of over $500 billion failed. The large number of failures overwhelmed the resources of the FSLIC, so U.S. taxpayers were required to back up the commitment extended to insured depositors of the failed institutions. As of December 31, 1999, the thrift crisis had cost taxpayers approximately $124 billion and the thrift industry another $29 billion, for an estimated total loss of approximately $153 billion. The losses were higher than those predicted in the late 1980s, when the RTC was established, but below those forecasted during the early to mid-1990s, at the height of the crisis.

[24] The REFCORP funding mechanism essentially required that the U.S. Treasury pay interest at slightly higher rates than it did for Treasury bonds of similar maturity. Although some might argue that this requirement relates to funding more than to resolution costs, this funding mechanism was considered necessary for Congress to enact the enabling legislation. Further delays in funding would have increased total resolution costs.

[25] Included are $2.9 billion in cash held directly by the FRF, as well as the FRF's claim on $1.5 billion in cash and low-risk securities held by receiverships for which the FRF is the primary creditor.

# APPENDIX: GOODWILL LITIGATION

On July 1, 1996, the U.S. Supreme Court ruled that, with the 1989 passage of FIRREA, the federal government had violated contractual obligations.[26] FIRREA mandated new regulatory capital accounting for depository institutions and provided for the elimination or rapid phase-out of the use of "supervisory goodwill" in calculating the regulatory capital of financial institutions. As a result of the Court's ruling, numerous thrifts that had been involved in mergers and acquisitions during the 1980s and had "supervisory goodwill" on their books became undercapitalized. Many of these thrifts were closed by supervisors, while others altered their business strategies (for example, by shrinking their asset base) to meet the new capital standards.

In response, as of July 31, 2000, 141 thrift acquirers had filed suit in District Court or the U.S. Court of Federal Claims, seeking compensation from the federal government for losses (table A.1). As of July 31, 2000, two judgments totaling $40 million had been paid for cases filed in District Court. All other cases were consolidated to the U.S. Court of Federal Claims, where 103 cases were still pending trial. At the U.S. Court of Federal Claims, judgments have been rendered in six cases, awarding the plaintiffs $983 million from the federal government.[27] Four of these cases were on appeal to the U.S. Federal Circuit Court of Appeals; the other two were recent decisions, and appeals are likely. In another five cases, settlements have been reached with plaintiffs receiving approximately $135 million. Another 3 cases had been tried and were awaiting decision; 7 cases had been dismissed; 12 cases had been consolidated with others; and miscellaneous actions have been taken in 3 others.

In cases involving approximately 40 failed thrifts, the FDIC as successor to the closed institutions had become a co-plaintiff in goodwill suits against the United States. Only two of those cases had been decided as of July 31, 2000, and the trial court awarded the FDIC-managed receiverships $19.8 million. All parties appealed one of the decisions, and an appeal of the second decision is expected.

[26] The case was *Winstar Corporation v. United States*, 90-8C; United Savings Bank, Windom, MN.

[27] Most of the $983 million in judgments against the government came from one case: Glendale Federal Bank, FSB, of Glendale, California, was awarded a judgment of $908.9 million.

**Table A.1**

**Status of Goodwill Cases as of July 31, 2000**

| Case Status | Number | Settlements/ Judgments ($Millions) |
|---|---|---|
| Cases with judgments paid[a] | 2 | $ 40 |
| Cases pending trial | 103 | |
| Cases with unpaid judgments | 6 | 983 |
| Cases settled[b] | 5 | 135 |
| Cases tried and awaiting decisions | 3 | |
| Cases dismissed | 7 | |
| Cases consolidated into others | 12 | |
| Other | 3 | |
| Total | 141 | $1,158 |

*Source:* FDIC.

[a]These cases were decided at District Courts. All remaining cases were consolidated to the U.S. Court of Federal Claims.

[b]In one case (Winstar), the Department of Justice settled with the shareholder plaintiff but not with the FDIC. The settlement amount is included here even though the case was pending trial as of July 31, 2000.

## REFERENCES

Barth, James R. 1991. *The Great Savings and Loan Debacle.* American Enterprise Institute Press.

Barth, James R., and R. Dan Brumbaugh, Jr. 1992. "Depository Institution Failures and Failure Costs: The Role of Moral-Hazard and Agency Problems." In *Rebuilding Public Confidence through Financial Reform, Conference Proceedings*, 3–19. Ohio State University.

Barth, James R., R. Dan Brumbaugh, Jr., Daniel Sauerhaft, and George Wang. 1985. "Thrift Institution Failures: Causes and Policy Issues." In *Proceedings of the Conference on Bank Structure and Performance.* Federal Reserve Bank of Chicago.

Bennett, Randall, and Christine Loucks. "The Politics and Length of Time to Bank Failure: 1986–1990." *Contemporary Economic Policy* 14 (1996):29–41.

Bierman, Leonard, Donald Fraser, and Asghar Zardkoohi. "On the Wealth Effects of the Supervisory Goodwill Controversy." *Journal of Financial Research* 22, no. 1 (1999):69–81.

Blalock, Joseph, Timothy Curry, and Peter Elmer. "Resolution Costs of Thrift Failures." *FDIC Banking Review* 4, no. 1 (1991):15–25.

Federal Deposit Insurance Corporation. 1997. "The Savings and Loan Crisis and Its Relationship to Banking." In *History of the Eighties, Lessons for the Future: An Examination of the Banking Crises of the 1980s and Early 1990s.* Vol 1. Federal Deposit Insurance Corporation.

Kane, Edward J. 1989. *The S&L Insurance Mess: How Did it Happen?* Urban Institute Press.

Marino, James, and Rosalind Bennett. "The Consequences of National Depositor Preference." *FDIC Banking Review* 12, no. 2 (1999):19–38.

Seidman, L. William. 1993. *Full Faith and Credit: The Great S&L Debacle and Other Washington Sagas.* Times Books.

Thomas, Kenneth J. *American Banker* (September 1, 2000):13.

White, Lawrence J. 1991. *The S&L Debacle: Public Policy Lessons for Bank and Thrift Regulation.* Oxford University Press.

United States General Accounting Office

GAO

Report to Congressional Committees

December 1995

# RESOLUTION TRUST CORPORATION

## Performing Assets Sold to Acquirers of Minority Thrifts

GAO/GGD-96-44

The period of accrual was to begin 45 days after the signing of the agreement and end on the day preceding the closing date of the transaction. The accrued interest is defined in RTC's minority loan pricing procedures as the coupon interest rate on the loans less the average federal funds' rate during the accrual period.[3] However, to resolve a contract dispute regarding the final pricing of the mortgage loans, RTC provided the minority acquirers who decided not to purchase the mortgage loans with the following option—the acquirer could choose not to exercise the agreement on the loan portfolio, but rather receive the interest accrued on the respective portfolio. Under this option, the acquirer waived the right to purchase any 1- to 4-family residential mortgage loans through the minority resolutions preference program.

## Objectives, Scope, and Methodology

The RTC Completion Act required that we submit an annual report to Congress on transfers of performing assets by RTC to any acquirer. In discussions with the oversight committees, it was agreed that our report would focus on assets sold to minority acquirers. Specifically, the objectives of our review were to (1) assess how RTC determined the fair market value for the loans transferred and (2) ascertain the number and description of performing loans transferred to minority thrifts.

Although the act required us to assess RTC's determination of fair market value for the loans transferred, we were unable to evaluate RTC's determination for the following reasons. First, fair market value is commonly measured through competitive sales. Second, loans not purchased by minority acquirers were sold in bulk, and sales prices were not assigned to individual loans. Third, there were no data available to compare the prices of the mortgage loans sold to minority acquirers with the prices of other loans sold by RTC, because fewer whole loans were available for sale once RTC's securitization program started showing results around June 1991.[4] Therefore, we focused on assessing the reasonableness of the process RTC established to price the mortgage loans, including the methodology used by RTC's valuation contractors. To assess reasonableness, we discussed the methodology and models used to price the 1- to 4-family residential mortgage loans with RTC officials and the two valuation contractors. While both valuation contractors were cooperative in discussing the methodology in general, they were reluctant to discuss their pricing models in detail. The valuation contractors considered the

[3]The federal funds' rate is the interest rate charged by banks to other banks in need of overnight loans.

[4]Securitization is the process of assembling similar assets into pools that are used to collateralize newly-issued securities, which are referred to as mortgage-backed securities.

United States General Accounting Office

GAO

Report to the Congress

June 1998

# FINANCIAL AUDIT

# Federal Deposit Insurance Corporation's 1997 and 1996 Financial Statements

GAO/AIMD-98-204

FRF's losses from liquidation activities have been realized as of December 31, 1997.

**Table 1: FRF's Realized and Unrealized Losses as of December 31, 1997**

(Dollars in billions)

| | FRF-RTC | FRF-FSLIC | Total FRF |
|---|---|---|---|
| Realized losses | $83.2 | $41.4 | $124.6 |
| Unrealized losses | 1.6 | 0.8 | 2.4 |
| **Total realized and unrealized losses (accumulated deficit)** | **$84.8** | **$42.2** | **$127.0** |

The accumulated deficit for FRF includes losses that have already been realized, as well as future estimated losses from assets and liabilities not yet liquidated. Losses are realized when failed financial institution assets in receiverships are disposed of and the proceeds are not sufficient to repay amounts payable to FRF. Losses are also realized if assets that FRF purchases from terminating receiverships are later sold for less than the purchase price. Losses are also realized when certain estimated liabilities associated with FRF's liquidation activities are paid out. Uncertainties still exist with regard to the unrealized losses, and the final amount will not be known with certainty until all remaining assets and liabilities are liquidated.

In total, $135.5 billion was received to cover liabilities and losses associated with the former FSLIC and RTC resolution activities. Of the $135.5 billion total, $91.3 billion[4] was received by RTC through December 31, 1995, the date of RTC's termination, to cover losses and expenses associated with failed institutions from its caseload. FRF received $44.2 billion to cover the liabilities and losses associated with the former FSLIC activities.

As shown in table 2, after reducing the total amount of funding received by the amount of recorded accumulated deficit, an estimated $8.5 billion in available funds will remain. The RTC Completion Act requires FDIC to deposit in the general fund of the Treasury any funds transferred to RTC pursuant to the Completion Act but not needed for RTC-related losses. Also, after providing for all outstanding RTC liabilities, FDIC must transfer to

[4]FIRREA provided an initial $50 billion to RTC. The Resolution Trust Corporation Funding Act of 1991 provided an additional $30 billion. The Resolution Trust Corporation Refinancing, Restructuring, and Improvement Act of 1991 provided $25 billion in December 1991, of which $6.7 billion was obligated prior to the April 1, 1992 deadline. In December 1993, the RTC Completion Act removed the April 1, 1992, deadline, thus making the remaining $18.3 billion available to RTC for resolution activities. Prior to RTC's termination on December 31, 1995, RTC drew down $4.6 billion of the $18.3 billion that was made available by the RTC Completion Act.

Anthony Saunders • Marcia Millon Cornett



Reply App. 00109

# Financial Markets and Institutions

## An Introduction to the Risk Management Approach

**TABLE 14-2 Balance Sheets of Savings Associations [percentage of tot assets and liabilities]**

| Item | 1977 | 1982 |
|---|---|---|
| **Liabilities** | | |
| Fixed ceiling liabilities | 87.3% | 22.0% |
| Passbook and NOW accounts | 33.9 | 15.6 |
| Fixed ceiling time deposits | 53.4 | 6.4 |
| Market ceiling small time deposits | 0.0 | 52.8 |
| Money market certificates | 0.0 | 28.6 |
| Small saver certificates | 0.0 | 19.3 |
| Other small time deposits | 0.0 | 4.9 |
| Discretionary liabilities | 8.6 | 23.2 |
| Large time deposits | 2.1 | 8.1 |
| FHLB advances | 4.7 | 10.3 |
| Other borrowings | 1.8 | 4.6 |
| Other liabilities | 4.0 | 2.0 |
| **Assets** | | |
| Mortgage assets | 86.0 | 81.1 |
| Fixed rate | 86.0 | 74.9 |
| Adjustable rate | 0.0 | 6.2 |
| Nonmortgage loans | 2.3 | 2.6 |
| Cash and investments | 9.2 | 11.2 |
| Other assets | 2.5 | 5.1 |

Source: *Federal Reserve Bulletin*, December 1982 **www.federalreserve.gov**

find sufficient buyers for the bonds. Stuck with these bonds, many savings associations, especially those in California, suffered large losses.[5]

Further, in the mid-1980s, real estate and land prices in Texas and the Southwest collapsed. This was followed by economic downturns in the Northeast and Western states of the United States. Many borrowers with mortgage loans issued by savings associations in these areas defaulted. In other words, the risks incurred by many of these institutions did not pay off. This risk-taking behavior was accentuated by the policies of the federal insurer of savings associations' deposits, FSLIC. It chose not to close capital-depleted, economically insolvent savings associations (a policy of **regulator forbearance**) and to maintain deposit insurance premium assessments independent of the risk taken by the institution (see Chapter 13). As a result, an alarming number (1,248) of savings association failures occurred in the 1982–1992 period (peaking at 316 in 1989), alongside a rapid decline in asset growth of the industry. Figure 14-2 shows the number of failures, mergers, and new charters of **savings institutions** (savings associations and savings banks combined) from 1984 through 2004. Notice the large number of failures from 1987 through 1992 and the decline in the number of new charters.

**regulator forbearance**

A policy not to close economically insolvent FIs, allowing them to continue in operation.

**savings institutions**

Savings associations and savings banks combined.

In the 1980s, the large number of savings association failures depleted the resources of the FSLIC to such an extent that by 1989 it was massively insolvent. For example, between 1980 and 1988, 514 thrifts failed, at an estimated cost of $42.3 billion. Moreover, between 1989 and 1992 an additional 734 thrifts failed, at a cost of $78 billion. As a result, Congress passed an additional piece of legislation: the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989. This legislation abolished the FSLIC and created a new savings association insurance fund (SAIF) under the management of the FDIC (with the help of a $100 billion infusion of funds by the U.S. government). FIRREA also replaced the

5. Milken and several other Drexel corporate officials pleaded guilty to six felony counts of federal securities fraud.

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

\- - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 182

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.
Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?
A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.
Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?
A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

Page 183

saved 20, $25 million of monies.
MR. HUGHES: I have no further questions.
MR. COLATRIANO: I have a couple of follow-up questions.
FURTHER EXAMINATION
BY COUNSEL FOR PLAINTIFFS
BY MR. COLATRIANO:
Q. Based on Exhibit 49 that counsel has just been going over with you. You stated a few minutes ago that the correspondent relationships, they all knew once the RTC came in to go elsewhere; is that a fair statement?
A. Yeah, yes.
Q. How much of that was related to the fact that it was RTC's policy to stop lending; was that well-known among correspondents?
A. Oh, sure, oh, sure.
Q. Okay.
A. I mean, what we did -- again as I said in the beginning, you had a mortgage commitment to close on your house from Carteret and why should you suffer.
Q. All right.
A. Right? And you couldn't close, you could have gone bankrupt because of that. Our feeling was

Page 184

that, you know, our intent is not to do that, to 10,000 families in New Jersey or wherever else the mortgages were, we would not -- we didn't feel that that was what we're here for. And we had to go and get approval to do that, but we went and just said we're not going to sit here and not fund -- we're just not going to do that.
Q. Okay. Now, leaving aside again --
A. And we funded every one that wanted to close. Of that portfolio, anybody that wanted to close, closed.
Q. Right. Let's leave aside again mortgages that were already in process and had already been approved. I think counsel asked you about new applications dried up from correspondents after the RTC came in; is that correct?
A. Um-hum.
Q. And is it fair to say that the reason it dried up is because the correspondents knew that it was RTC's policy to stop lending; is that a fair statement?
A. Yes, yes.
Q. This document also refers to the fact that between Friday December 4th and Thursday morning December 10th, there was still approximately $10

Page 185

million in new mortgage applications had come in, correct?
A. That's what I said, that's approximately correct, that's what the memo says.
Q. So in less than a week there was still $10 million in new applications, correct? And so if the correspondent relationships had dried up is it fair to say most of that $10 million was coming from the retail side of the origination --
A. I don't know the breakdown.
Q. The memo does say, if you look at the second page March 10th, it's the next to the last paragraph, the paragraph that begins on Thursday morning, it says in the middle it was determined that the applications generated from date of conservatorship?
A. That the corresponding -- I see it had already moved.
Q. Had already moved. Is it fair to say the bulk of that $10 million was in the retail side of the origination network?
A. I -- no, I think this -- I think this -- the correspondent relationships that -- it was determined that the applications generated from date of conservatorship were less than $10 million, an

AMBASE CORPORATION & SUBSIDIARIES
Group name: CARTERET BANCORP INC. GROUP

EIN: 95-2962743
EIN: 51-0296535

CONSOLIDATED TAXABLE INCOME
YEAR 1992

1/1/92 - 12/4/92

SCHEDULE 01

| | GROSS INCOME | (1) TOTAL (C2 + C3) | (2) ELIMINATIONS ADJUSTMENTS | (3) SUBTOTAL (C4 thru C50) | (4) Carteret Bancorp Inc. |
|---|---|---|---|---|---|
| 1(a) | Gross receipts or gross sales/Premiums earned | 94,695,125 | | 94,695,125 | |
| 1(b) | Less Returns and Allowances/Dividends to policyholders | 0 | | 0 | |
| 1(c) | Subtotal | 94,695,125 | 0 | 94,695,125 | 0 |
| 2 | Cost of goods sold and/or operations * | 63,327,258 | | 63,327,258 | 0 |
| 3 | Gross profit (line 1(c) Less 2) | 31,367,867 | 0 | 31,367,867 | 0 |
| 4 | Dividends* | 6,336,053 | | 6,336,053 | 0 |
| 5 | Interest | 301,197,394 | | 301,197,394 | |
| 6 | Gross rents | 13,100,221 | | 13,100,221 | |
| 7 | Gross royalties | 0 | | 0 | |
| 8(a) | Short-term capital gain or (Loss) * | 0 | | 0 | 0 |
| 8(b) | Long-term capital gain or (Loss) * | 0 | | 0 | 0 |
| 9(a) | Casualty and theft * | 0 | | 0 | 0 |
| 9(b) | Sales or exch. or other Sec. 1231 prop. * | (1,836,637) | | (1,836,637) | 0 |
| 9(c) | Ordinary gain or (Loss) * | 8,913,638 | | 8,913,638 | 0 |
| 10 | Other Income * | 52,308,472 | | 52,308,472 | 0 |
| | | | | | |
| 11 | Total Income (lines 3 thru 10) | 411,387,008 | 0 | 411,387,008 | 0 |
| | DEDUCTIONS | | | | |
| 12 | Compensation of officers * | 11,899,493 | | 11,899,493 | 0 |
| 13(a) | Salaries and wages | 23,978,085 | | 23,978,085 | |
| 13(b) | Less Jobs Credit * | 0 | | 0 | 0 |
| 13(c) | Net Salaries and Wages | 23,978,085 | 0 | 23,978,085 | 0 |
| 14 | Repairs | 1,506,591 | | 1,506,591 | |
| 15 | Bad debts * | 58,011,401 | | 58,011,401 | 0 |
| 16 | Rents | 5,905,493 | | 5,905,493 | |
| 17 | Taxes * | 7,566,514 | | 7,566,514 | 0 |
| 18 | Interest | 234,167,663 | | 234,167,663 | |
| 19 | Contributions * | 25,196 | | 25,196 | 0 |
| 20 | Depreciation * | 3,004,815 | | 3,004,815 | 0 |
| 21(a) | Less Depr. claimed elsewhere in return * | 0 | | 0 | 0 |
| 21(b) | Net Depreciation (line 20 less 21(a)) * | 3,004,815 | 0 | 3,004,815 | 0 |
| 22 | Depletion * | 0 | | 0 | 0 |
| 23 | Advertising | 1,834,957 | | 1,834,957 | |
| 24 | Pension & Profit-Sharing Plans * | 488,053 | | 488,053 | 0 |
| 25 | Employee benefit programs | 2,902,309 | | 2,902,309 | |
| 26 | Other deductions * | 59,538,868 | | 59,538,868 | 121,215 |
| | | | | | |
| 27 | Tot deduct(Add lines 12,13(c),14 thru 19,21(b),22 thru 26) | 410,829,438 | 0 | 410,829,438 | 121,215 |
| | | | | | |
| 28 | Taxable Income (Loss) (line 11 Less 27) | 557,570 | 0 | 557,570 | (121,215) |

* See subsidiaries' schedules for details

Revised 10/16/92
92ENTITY\CONSOL\CO-SCH01

Page 1
SCHEDULE 01

SCHEDULE 01

| (5) Carteret Savings Bank, FA | (6) Bay Front Fiesta, Inc. | (7) Carteret Amberwood, Inc. | (8) Carteret Building Services, Inc. | (9) Carteret Communities, Inc. | (10) Carteret Consumer Credit Company, Inc. | (11) Carteret Financial Services, a NJ Corp. | (12) Carteret Hills of Chester, Inc. |
|---|---|---|---|---|---|---|---|
| 0 | | | 836,140 | 17,986,132 | | | |
| | | | | | | | |
| 0 | 0 | 0 | 836,140 | 17,986,132 | 0 | 0 | 0 |
| 0 | 0 | 0 | 2,071,914 | 18,180,903 | 0 | 0 | 0 |
| 0 | 0 | 0 | (1,235,774) | (194,771) | 0 | 0 | 0 |
| 6,336,053 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 301,136,518 | | | | | | | |
| 366,294 | 37,182 | | | | | | |
| | | | | | | | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (1,563,510) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10,186,901 | (868,446) | 0 | 0 | 0 | 0 | 0 | 0 |
| 17,238,169 | 942,777 | 0 | 3,203,078 | 11,756 | 0 | 2,314,832 | 2,011,944 |
| | | | | | | | |
| 333,700,425 | 111,513 | 0 | 1,967,304 | (183,015) | 0 | 2,314,832 | 2,011,944 |
| | | | | | | | |
| 9,747,948 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14,860,454 | 4,320 | | | | | 192,946 | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14,860,454 | 4,320 | 0 | 0 | 0 | 0 | 192,946 | 0 |
| 1,236,919 | 495 | | | | | 1,543 | |
| 56,005,961 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4,664,184 | 320 | | | | | 1,528 | |
| 3,721,758 | 18,344 | 0 | 0 | 0 | 0 | 143,671 | 0 |
| 220,560,871 | | | | | | | |
| 20,729 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,658,366 | 0 | 0 | 0 | 2,042 | 0 | 5,065 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,658,366 | 0 | 0 | 0 | 2,042 | 0 | 5,065 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 863,757 | 1,656 | | | 6,998 | | 4,706 | |
| 156,675 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,576,974 | | | | | | 8,554 | |
| 31,675,062 | 56,230 | 0 | 0 | 43,592 | 0 | 398,275 | 1,617,010 |
| | | | | | | | |
| 348,749,658 | 81,365 | 0 | 0 | 52,632 | 0 | 756,288 | 1,617,010 |
| | | | | | | | |
| (15,049,233) | 30,148 | 0 | 1,967,304 | (235,647) | 0 | 1,558,544 | 394,934 |