**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 93-531<br>(Judge Loren Smith) |

# APPENDIX TO AMBASE'S STATEMENT OF ISSUES REPLY BRIEF

Charles J. Cooper
Counsel of Record

Vincent J. Colatriano
David H. Thompson
Howard C. Nielson, Jr.
David M. Lehn
COOPER & KIRK, PLLC
555 11th Street, NW, Suite 750
Washington, D.C. 20004
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

October 19, 2006

# INDEX


Declaration of Charles W. Calomiris (July 14, 2006) (excerpts) .................. Reply App. 00001

Deposition of Charles W. Calomiris (Jul. 5-7, 2006) (excerpts) .................. Reply App. 00011

Deposition of Anthony Saunders (Oct. 3-4, 2006) (excerpts) ....................... Reply App. 00013

Conservatorship Strategic Plan (Dec. 4, 1992) (Saunders Dep. Ex.7) .......... Reply App. 00034

Memorandum from J. Jupiter to T. Horton (Aug. 23, 1993) (Saunders Dep. Ex. 8) .................... Reply App. 00075

Memorandum from E. Mahaney to T. Horton (Dec. 21, 1993) (Saunders Dep. Ex. 9) .................... Reply App. 00076

Email from A. Richards to H. Held (Sept. 15, 1994) (Saunders Dep. Ex. 12) .................... Reply App. 00078

Email from A. Richards to H. Held (Sept. 16, 1994) (Saunders Dep. Ex. 13) .................... Reply App. 00079

PNC Bank Corp 10Q (for period ending Sept. 30, 1993) (excerpts)............ Reply App. 00080

Cost of Resolution (projected) to Anticipated Thrift Closing (Oct. 31, 1994) .................... Reply App. 00083

Liability Register (Oct. 29, 1998).................... Reply App. 00094

Timothy Curry & Lynn Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC BANKING REV. 26 (2000) (excerpts) .................... Reply App. 00095

U.S. GEN. ACCOUNTING OFFICE, RESOLUTION TRUST CORPORATION: PERFORMING ASSETS SOLD TO ACQUIRERS OF MINORITY THRIFTS (1995) (excerpts).................... Reply App. 00105

U.S. GEN. ACCOUNTING OFFICE, FINANCIAL AUDIT: FEDERAL DEPOSIT INSURANCE CORPORATION'S 1997 AND 1996 FINANCIAL STATEMENTS (1998) (excerpts).................... Reply App. 00107

ANTHONY SAUNDERS & MARCIA MILLON CORNETT, FINANCIAL MARKETS AND INSTITUTIONS: AN INTRODUCTION TO THE RISK MANAGEMENT APPROACH (2007) (excerpts) ....................... Reply App. 00109

Deposition of James R. Mindnich (Mar. 16, 2006) (excerpts) ...................... Reply App. 00111

Consolidated Taxable Income Year 1992.................... Reply App. 00113

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs, | ) | |
| and | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervener, | ) | No. 93-531 Judge Loren Smith |
| v. | ) | |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**DECLARATION OF CHARLES W. CALOMIRIS OF JULY 14, 2006**


Qualifications

Introduction

I. Inappropriate Interest Calculations Inflated the Receivership Deficit After the Resolution
   A. Because the Government Does Not Pay the Time Value of Money for Damages, It Is Inconsistent and Incorrect for the Government to Impute Interest When Calculating the Receivership Deficit
   B. The Time Value of Money Used for Computing Imputed Interest Costs for a Receivership Deficit Should Be Calculated Using Short-Term Floating U.S. Treasury Interest Rates for the Period of the Receivership

mortgage brokerage business during the liquidation. Section V considers the additional inflation of the receivership deficit that resulted from the delayed sale of some financial assets, which resulted in lower sales prices for those financial assets.

9. Table 1 summarizes my findings that the adjustments described in each of the five sections have a significant effect on the principal and interest balance ("P&I balance") of the receivership deficit. Rows (I) through (IV) of Table 1 show the effects of each set of changes in isolation. The last row of Table 1 shows the effect on the receivership deficit P&I balance of combining all the proper adjustments discussed in Sections I, II, III, and IV.[1] When all the appropriate adjustments are made, the receivership would have a surplus P&I balance of $87.4 million. This is a conservative estimate, which does not fully take into account all of the factors I identify that would have added to the receivership surplus.

TABLE 1: RECEIVERSHIP DEFICIT BUT-FOR COMPUTATIONAL AND CONCEPTUAL ERRORS, CONGRESSIONAL INJURY, CLOSURE OF CARTERET MORTGAGE COMPANY, AND CONTRACTUAL BREACH IN THE TREATMENT OF GOODWILL

| Scenario | Receivership Deficit P&I Balance as of 12/31/2005 ($Million) | Difference from Receivership Deficit P&I Balance of $175.4 Million Using Government's Methodology ($Million) | Difference in Interest Balance from Government's Interest Balance of $156.6 Million ($Million) |
|---|---|---|---|
| (I) Charge no interest on receivership deficit & charge no interest on escrow | 20.7 | 154.7 | 156.6 |
| (II) Impact of Congressional delay on sale of branches | (23.1)* | 198.5 | 156.6 |
| (III) Supervisory goodwill restored | 59.6 | 115.8 | 97.0 |
| (IV) Mortgage origination unit sold | 138.0 | 37.4 | 19.0 |
| **Corrections (I), (II), (III), & (IV) Combined** | **(87.4)*** | **262.8** | **156.6** |

* Parentheses indicate a P&I surplus balance. Results listed in this column without parentheses indicate a deficit.

1. Although I do not attempt to quantify the effects on the receivership deficit from the adjustments discussed in Section V, these adjustments would decrease the receivership deficit when considered in isolation from any other adjustments and when combined with any other adjustments.

computations, the FDIC applies the debt repayments on a pro-rata basis to all three loans. Presumably, the FDIC's rationale is that some creditors of the thrift should not be paid off before others. Although that approach might make sense when crediting various private parties who are creditors, here the identity of the creditor for all three loans is the same: the government. In this case, there are no preferences or conflicts among creditors because the loans are all from the same entity. Thus, payments should be allocated first on the highest cost loans, regardless of the timing of their resolutions. There is no economic justification for a pro rata pay down of the debt.

44. FDIC witness Wayne Green testified in a deposition that the three loans had the same priority, that dividends for all three loans were paid into the same FRF RTC resolution fund, and that the receivership-maximizing allocation of dividends would be to allocate dividends to the highest rate liability.[35] He testified that the payments were allocated across all three liabilities rather than to any particular liability.[36] He admitted that allocating payments to the claims on a pro-rata basis rather than to the highest cost claims resulted in increasing the cost of the receivership.[37]

### 2. Assuming the Government's Faulty Interest Rates Are Not Corrected, the Government's Failure to Allocate Payments to the Highest-Cost Resolutions First Substantially Inflated the Receivership Deficit through December 2005

45. If payments are allocated to the highest-cost resolution until its principal is paid down,[38] and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $124.3 million as of December 31, 2005 if

35. Deposition of Wayne S. Green at 291-294 (Mar. 1, 2006).
36. *Id.* at 294-295.
37. *Id.*
38. The principal for the three resolutions should be paid down first, because once the principal is paid down, interest stops accruing according to the FDIC accrual rules. *See* Deposition of Wayne S. Green at 456-457 (Apr. 5, 2006); "Post Insolvency Interest Procedures Analysis," June 17, 1997 (AM0010499); E-mail from Michael P. Caco to Karen Hughes et al., re: Post-insolvency Interest (AM0010453-10454).

interest stops accruing in an individual loan once the principal in that loan is paid. This deficit is $51.1 million lower than the $175.4 million deficit's P&I balance calculated using the FDIC's faulty methodology. If payments are allocated to the highest-cost resolution until its principal is paid down, and then payments are made to the next highest-cost resolution until its principal is paid down, and then payments are made on the third resolution until its principal is paid down, then the receivership deficit's P&I balance would be $161.9 million as of December 31, 2005 if interest stops accruing in an individual loan once the principal amounts in *all* loans are paid (row (4) of Table 2). This deficit is $13.5 million lower than the $175.4 million receivership deficit P&I balance calculated using the FDIC's faulty methodology. Of course, if one properly excludes interest from the receivership calculations, or if one includes interest but uses floating short-term Treasury yields instead of the frozen 52-week rates, then the receivership deficit calculations would not be affected by the allocation of payments among the three loans. Thus, correcting the FDIC's assumed allocation of payments is only relevant if one inappropriately includes interest in the receivership deficit, and if one uses the FDIC's incorrect interest rate concept in those calculations.

**E. The RTC/FDIC Failed to Credit Sales Premium to the Loan Principal Using a Consistent Measure of the Time Value of Money**

46. As noted above, the RTC credited the sales premium from branch sales to an escrow account and did not credit the resolution loans by the amount of the sales premium until April 1995. That delay mattered because the RTC used a lower interest rate when calculating accrued interest on the escrow account than the rate it used when calculating interest costs of the receivership. According to FDIC spreadsheets, the interest earned in the escrow account was

institutions: Carteret spent 826 days in resolution, compared to 673 for Atlantic and 693 for Lincoln. Given Carteret's quality and the timing of its resolution, it is conservative to assume that in the but-for world it would have been resolved in 365 days, which is the average resolution period for the other 10 large thrifts that failed in the late 1980s and early 1990s, including Atlantic and Lincoln.

82. Had Carteret been resolved in the average time period in which thrifts of comparable size in the late 1980s and early 1990s were resolved, then Carteret's resolution would have occurred on or before December 4, 1993—365 days after it was seized. But-for the Congressional funding delays to the RTC, the RTC could have marketed Carteret as a whole bank, thus enabling it to sell Carteret's deposits and assets simultaneously at the time of resolution. In addition, the absence of the minority preference program would have lifted another obstacle to selling Carteret as a single entity. In this but-for world, if the value of Carteret's assets plus the deposit premium were greater than or equal to the value of Carteret's deposits, then no loan would be required to fund the resolution, and there never would have been a receivership deficit.

83. As of December 31, 1993, Carteret had $1.787 billion in deposits. I assume that, but-for the delay, Carteret would have sold its branches at the same 10.5 percent deposit premium as it actually sold its branches in the second resolution (the first 14 New Jersey branches sold subject to the minority preference program). This is a conservative assumption, as the deposit premium likely would have been higher but-for the minority preference program, as I explain below. Given its deposits of $1.787 billion and a 10.5 percent deposit premium, I estimate that but-for the delay resulting from Congressional actions, the Carteret branches would have sold for a total deposit premium of $187.6 million—$43.8 million greater than the $143.8

million deposit premium the branches actually sold for. I assume that the sales proceeds from Carteret's assets in December 1993 would have been $1.205 billion—equal to the sum of actual dividends paid toward the resolution loans ($1.351 billion), minus the actual interest earned from the escrow account of $1.9 million, minus the actual deposit premiums of $143.8 million from the resolutions. This is a highly conservative approach to valuing the but-for market value of Carteret's assets, as I explain in the remainder of this section and in Section V. I estimate the total sales proceeds (equal to deposit premium plus assets sold, minus settlement interest[94]) but-for the delay to be $1.393 billion at the time of the but-for resolution (versus the $187.3 million in sales proceeds at the time of the actual resolutions).

84. Because the but-for sales proceeds of $1.393 billion exceed the actual resolution loan principal of $1.370 billion,[95] no loan would be required to fund the resolution when correcting for the delay and value destruction of Carteret's receivership, and the receivership's P&I balance would be $23.1 million in surplus. As shown in row (1) of Table 4, this balance would have been $198.5 million lower than the government's inappropriate estimate of that balance as of the end of 2005.

---

94. When calculating the but-for receivership deficit's P&I balance under any scenario throughout my report, I use the actual value of settlement interest without adjusting it. The settlement interest paid by the RTC to the acquirors reflected the two to three day delay between closing the sale and wiring the funds equal to the difference between the amount of deposits assumed less premium paid and assets purchased. The value of actual settlement interest, which was less than $500,000, or 0.26 percent of total sales proceeds, is inconsequential to the results of the analysis.

95. The deposit runoff between the time Carteret should have been sold in December 1993 and the time its branches were actually sold was funded dollar for dollar by earnings and asset sales. Therefore, the difference between the but-for sales proceeds, including the earnings and asset sales that funded the deposit runoff, and the balance of deposits in December 1993 is equal to the difference between my measure of the but-for sales proceeds of $1.393 billion and the actual resolution funding requirement of $1.37 billion.

### c. Isolating the Consequences of Delay and Deposit Runoff from the Minority Preference Program

85. The minority preference program delayed the sale of 16 Carteret branches. This delay resulted in deposit runoff, which in turn contributed to the lowered amounts bidders were willing to pay for those branches.

86. The initial bids submitted for the 16 branches would have yielded a premium of $87.8 million—the amount of premium that Midlantic and Sovereign would have offered for those branches before the re-auction.[96] However, the RTC ultimately realized a premium of only $68.4 million on those 16 branches when they were sold in March 1995. Absent the delay caused by the minority preference program, but without taking account of the prior delay associated with the lack of Congressional funding, the branches would have likely been sold for $87.8 million at the same time as the other group of branches were sold in October 1994. In addition, the branches that were actually sold in the January 1995 resolution would have also been sold in October 1994 but-for the minority preference program. Although those branches did not require reauctioning like the branches that sold in March 1995, and therefore did not result in lower deposit premiums from the delay, their sale was still delayed by the problems with the initial disqualified minority bidders. In addition, Carteret would have been sold as a whole bank without the constraints of the minority preference program that forced it to be sold in pieces. Therefore, Carteret's assets and deposits would have been sold simultaneously in 1994, and a loan would have only been required if the sales proceeds from assets and deposits sold did not exceed the resolution funding requirement, approximately equal to the book value of the deposits.

---

96. Ramey Exhibit 49, at 4-5 (C-AM-A-0130614 – 15); Midlantic National Bank, Bid Form for Carteret National Savings Bank, at C-AM-A-0129998 - 0130000, 0130010 - 12.

### 2. The Minority Preference Program Resulted in Lower Deposit Premiums from the Branch Sales

88. The delays and value destruction by the government not only reduced the deposits available for sale, they likely reduced the premium received per deposit dollar for the sale of the branches. The premium per deposit dollar likely was reduced by two factors: (1) the value-destroying structuring of the transactions through which the bank was sold, and (2) the rules of the bidding process for its assets, which likely further reduced the value received. Both the value-destroying structure of the sale and the value-destroying bidding rules were direct consequences of the minority preference program. Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence suggesting that these losses were significant economically. Thus, my quantitative estimates in Table 4, which do not adjust for the reduced premium per deposit dollar, should be viewed as highly conservative (low) estimates of the reduction in the receivership surplus that resulted from government value destruction.

#### a. The Minority Preference Program Forced Carteret to Be Sold in Pieces, Rather Than on a Whole-Bank Basis

89. Carteret was sold in pieces rather than as a whole, which tends to reduce the premium received. The piecemeal sale of Carteret reflected the constraints imposed by the minority preference program, which favored smaller bank bidders for whom Carteret's large size would otherwise have been prohibitive.

90. Recall that Carteret initially qualified for the Accelerated Resolution Program (ARP) in 1992. ARP resolutions, which are typically reserved for banks with high potential sale premiums, are similar to "Reprivatizations" (save that banks resolved through ARP were not always formally in receivership). According to the standard RTC/FDIC measure of going concern value (the estimated difference between "resolution cost" and "payoff cost" of the

institution, which the agencies compute as part of their analysis of least cost resolution, expressed here in percent terms as payoff cost minus resolution cost divided by payoff cost), Carteret had a high going concern value. Intuitively, that going concern value represents the incremental value of having a going concern make depositors whole versus having the RTC/FDIC do so instead (and then sell the bank assets piecemeal in order to cover the present value of the outlay). If the expected cost of resolution is close to the expected cost of payoff then there is not much perceived value in preserving the institution through creative marketing programs. If, on the other hand, the expected costs are very different, that indicates that the RTC/FDIC believes that an acquiring institution will pay a premium to acquire the resolved bank's assets and liabilities as a package. Because neither the RTC/FDIC nor an acquiring institution should fail to recognize potential value, the going concern value is closely related to the expected premium from sale as a going concern rather than in pieces. Carteret's least cost resolution forecast indicates an expected premium value that compares favorably with other bank and thrift failures, no matter how measured.[97]

91. Judging from the RTC/FDIC measure of going concern value, Carteret's expected premium value of 37.4 percent was better than (that is, above) 75.7 percent of all other banks and thrifts that failed between 1980 and 2004, meaning that Carteret should have commanded a higher transaction premium, *ceteris paribus*, than more than 75 percent of other institutions that failed in the past two decades. Carteret's expected premium value was higher than 73.7 percent of the other thrifts that failed between 1980 and 2004, higher than 75.0 percent of the other thrifts that failed in 1992, and higher than 90.0 percent of the other thrifts with assets between $4

97. I refer to the estimated percent difference between resolution cost and payoff cost as the "expected" premium value, although it is not clear whether this measure is an unbiased forecast of the realized premium. Nevertheless, the estimated percent difference between resolution cost and payoff cost should be highly correlated with realized premiums.

billion and $6 billion that failed between 1980 and 2004 (all of which failed between 1988 and 1991). Hence, Carteret should have commanded a much higher sale premium than most other institutions.

92. Because the RTC was not sufficiently funded to assist Carteret to reprivatize in the ARP program, Carteret ended up being marketed as a Purchase and Assumption more than two years later under the newly-amended minority preference program, which was carried out as a "Branch Sale." Statistically, for thrifts being resolved in the 1990s, the change from a "Reprivatization" to a "Branch Sale" is associated with substantially lower premium received per deposit dollar.

93. How did Carteret's marketing as a Purchase and Assumption (instead of a Reprivatization under the ARP in early 1992) affect its resolution outcome? Figure 3 shows the propensity for resolutions of different types based upon the institution's particular expected premium value. It is clear from Figure 3 that Merger and Reprivatization transactions enjoy higher expected premium value from resolution, followed by Purchase and Assumption transactions, and Insured Deposit Transfer and Payoff transactions. Mergers and Reprivatizations are the typical means of resolutions when expected premium values lie above 25 percent (Carteret's expected premium value was 37.4 percent) while Insured Deposit Transfers and Payoffs are far more common when premium values approach 0 percent (the cost of resolution is not very different from a payoff, i.e., there is little going concern value to be preserved).

94. The expected premium value is a good predictor of the resolution type, and institutions with high going concern value are resolved through methods that preserve that value. Judging from Carteret's expected premium in 1992 and its status as an ARP transaction, it is likely that far less value would have been lost had Carteret been resolved through a Merger or

Reprivatization under the ARP program as originally intended. Instead, as a consequence of the minority preference program, Carteret was resolved by Purchase and Assumption instead of Merger/Reprivatization, a style difference that is associated with a 28.8 percent lower average expected premium value of 19.0 percent. The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[98]

FIGURE 3: VALUE AND RESOLUTION STRATEGY: PRIMARY RESOLUTION TYPES




98. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

95. How did the Branch Sale structure, arising from the implementation of the minority preference program, further affect the outcome? Figure 4 shows the frequency of branch sales based upon different premium values of different institutions. Again, branch sales are typically used where there is less expected premium value to be preserved through more value-preserving resolution techniques. Branch Sales are uncommon when premium values lie above 25 percent (recall, again, Carteret is 37.4 percent) while Branch Sales are very common when premium values approach 0 percent (since the cost of resolution is not very different from a payoff, i.e., there is little value to be preserved). Again, the main point is that a low expected premium value is a good predictor of a Branch Sale, while other institutions with high expected premium values are resolved through different methods that preserve their franchise values. It is likely that far less value would have been lost had Carteret been resolved through a Merger or Reprivatization under the ARP program as originally intended. Instead, Carteret was resolved by Branch Sale, a style difference that is associated with an average 15.1 percent lower value premium on deposit sales over non-branch sale resolutions.

96. The average expected value premium on Mergers and Reprivatizations was 47.9 percent, whereas the average expected premium for a standalone Purchase and Assumption was 20.1 percent, the average expected premium for a Purchase and Assumption with a Branch Sale was 14.3 percent, the average expected premium for a standalone Insured Deposit Transfer was 7.6 percent, and the average expected premium for an Insured Deposit Transfer with a Branch Sale was 2.1 percent. The lack of Congressional funding and increased minority preference restrictions imposed by Congress during the wait for funding resulted in Carteret being resolved as a Purchase and Assumption with a Branch Sale, implying an average expected premium value of 14.3 percent rather than a Mergers and Reprivatization transaction with an average expected

premium value of 47.9 percent, an absolute difference of 33.6 percent (or viewed alternatively, a 70.1 percent drop in expected premium value). The actual deposit premiums obtained in Carteret's three resolutions were 5.6 percent, 10.5 percent, and 11.1 percent.[99]

FIGURE 4: VALUE AND RESOLUTION STRATEGY: BRANCH SALES




### b. The Minority Preference Program Discouraged Non-Minority Bidders from Participating in the Auction for Carteret's Branches

97. Controlling for other factors, the bidding rules of the minority preference program reduced the number of bids and created disincentives for high bids. The preference program

---

99. Exhibit Ramey 38 at 1 (C-AM-A-0088740); Exhibit Ramey 49 at 2 (C-AM-A-0130612); Exhibit Ramey 54 at 2 (C-AM-A-0013422).

amounted to the granting (for free) of a valuable option to minorities to match the high bid of others who had invested resources to value Carteret's branches. The effect of such a grant is to discourage entry by non-minority bidders, which in turn, depresses auction prices. Indeed, an internal government memo confirms that the minority preference program likely discouraged non-minority bidders from participating in the auction. In a memo dated October 26, 1995, J. Paul Ramey, Vice President, Division of Resolutions of the RTC, considered whether "[p]re-screening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received." His complete response was as follows:

> Although the statement may be true, I believe apples and oranges have been mixed here; what do "pre-screening of bidders" and "minority bidder preference programs" have in common? The pre-screening, if you are talking about up-front disqualification from bidding, would likely result in a lesser number of initial attendees at a bidders' meeting and theoretically decrease the competition. As for any type of bidding preferences, it has been my personal opinion that this is a deterrent to the competitive aspect of the bidding process; however, this has not been definitively proven to be the case.[100]

Mr. Ramey reasons correctly that non-preferred entities would not want to make the investment necessary to value a series of branches if they thought that their efforts would be futile or could be utilized by a preferred bidder. The cost of preparing a bid is not trivial. Given this significant cost of participation, it is reasonable to conclude that a non-minority bidder would not incur such an expense if it knew that its high bid could be matched and thus the likelihood of winning was close to zero.

**c. The Minority Preference Program Induced Non-Minority Bidders to Bid Less Aggressively Than They Otherwise Would Have Conditional on Entering the Auction**

98. Unfortunately, the price-depressing effect of the minority preference program was not limited to deterring entry. By creating a "toehold" advantage for certain bidders, the minority

100.Memo of J. Paul Ramey, Oct. 26, 1995, Exhibit Ramey 12 at 4 (C-AM-A0125188).

preference program could have depressed prices in ways not contemplated in the Ramey memo. In particular, the minority preference program may have induced non-minority bidders to bid less aggressively than they otherwise would have conditional on entering the auction. In a seminal auction paper, Professors Bulow, Huang and Klemperer show that even a slight toehold advantage to one bidder can have a significant impact on auction revenues in a common-value ascending (English) auction.[101] Hence, the minority program could have depressed the deposit premium for Carteret in two separate yet complementary ways: (1) by discouraging entry by non-minority bidders, and (2) by inducing non-minority bidders to bid less aggressively during the auction.

99. To understand the intuition behind a toehold advantage, consider a very simple example in which two bidders compete for a prize equal to the sum of the money in bidder 1's wallet (which is unknown to bidder 2) plus the money in bidder 2's wallet (which is unknown to bidder 1). For ease of exposition, assume that the most money in either bidder's wallet is $1. If bidder 1 wins the auction, he gets paid the sum of the money in the two wallets less his bid. If bidder 2 wins, he gets paid the sum of the money in the two wallets less 95 percent of his bid. In the language of Bulow, Huang and Klemperer, bidder 2 has a "toehold advantage" equal to 5 percent. When the auction is symmetric—that is, when neither bidder has a toehold advantage, each bidder remains in the auction until the price for the content of the two wallets reaches roughly two times the content of his own wallet.[102] When bidder 2 has a slight toehold equal to 5 percent, bidder 1 remains in the auction until the price for the content of the two wallets reaches

---

101.Jeremy Bulow, Ming Huang & Paul Klemperer, *Toeholds and Takeovers*, 107 J. POL. ECON. 427 (1998).
102.*Id.* at 438-439.

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - x
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
:
and :
:
FEDERAL DEPOSIT INSURANCE : No. 93-531
CORPORATION, : Judge Loren Smith
Plaintiff/Intervener, :
:
vs. :
:
THE UNITED STATES OF :
AMERICA, :
Defendant. :
- - - - - - - - - - - - - - x

DEPOSITION OF CHARLES W. CALOMIRIS

VOLUME 3

New York, New York
Friday, July 7, 2006

REPORTED BY:
DONALD R. THACKER

Page 609

Q Slight in the government's favor?
A May I?
Q Yes.
A There is a very slight difference in -- over time, that is not clear whether it is statistically significant difference. When you look at transactions as I have had occasion to do, very informally, so you could say that we know that in the business cycle generally that especially the industry financial cycle for banks and savings and loans, that deposit premium may vary over the cycle.

Now, if we were doing a but-for calculation for 1991 or early 1992 there would be a significant, not necessarily statistically significant still, because there are so few observations that one has, but there would be at least a somewhat economically significant difference, maybe of a couple percentage point, between let's say 1991, '92, and something like 1994-'95.

Remember that -- so if we were looking at let's say 1991-'92 we might see a couple of

Page 610

percentage point difference in the average deposit premiums received, because that was such a starkly different time, '91 versus '94-'95.

By about the middle of 1993 there had been a very big recovery in deposit premiums in the market, to the extent that we can have a small sample of observed deposit premiums really make those kinds of fine distinctions about exactly when you would say near full recovery had happened.

And there is, as far as I can tell from having looked at a few observations which are in the past, which are not enough observations to do a statistical analysis of changeover time because we don't have enough, that change was pretty much complete by the end of 1993.

So while there was a couple of percentage point difference between let's say 1992 and 1994, that was no longer true by the end of 1993, that is the end of '93 and the end of '94 were pretty much the same.

So if I could have made an adjustment based on reliable statistical inference with data

Page 611

that I knew I could use I would have done it. It would have been essentially zero for the comparison between December '93 and the end of '94 as far as I know, but I also don't, haven't seen a database that would allow me to do that with any statistical precision.

More importantly, my calculation is very conservative so the difference of let's say 10.5 percent versus 10.4 percent or 10.2 percent, if it turned out that such a database existed, and it might produce very, very slight differences, I am confident that they would be slight differences between December '93 and December '94, if at all, and that those slight differences would be dwarfed by the considerations that I am leaving out that make this analysis very conservative, which we discussed at length yesterday.

So just to summarize, if this were an analysis of a '91 but-for transaction I think that there would be some need to discuss this issue, it would still probably, that two percentage point or whatever it would be different would probably be

Page 612

dwarfed by the other aspects of this calculation that are being left out which I have discussed at length.
Q So as I understand --
A But, I don't believe that there is a significant either economically or statistically significance of any that magnitude between December '93 and '94, as far as I know.
Q If there were a two point difference in the government's favor between the market for deposit premiums in '95 and '93, you are confident that that would have been more than made up for by the synergy effect so that it is still a conservative appraisal you have made?
A Given all the conservatisms, having to do with the bidding process, the structuring of the transaction, yes, I think that is a fair conclusion but that is not one that I had to grapple with because this is not a 1992 or even an early or mid 1993 counter factual, it is a December of '93 counter factual. And given my knowledge of the market I can say with some confidence that

UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------

AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiffs,
-and- No. 93-531
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervener,
-against-
THE UNITED STATES OF AMERICA,
Defendant.

---------------------------------------

Tuesday, October 3, 2006
9:46 a.m.

Deposition of ANTHONY SAUNDERS, taken by Plaintiffs, pursuant to Notice, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, before Lisa Rosenfeld, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 102

leading to a high degree of customer loyalty?
A. Yes, then I would have to look at turnover rates and depositors and turnover rates in loan customers. So that means a number of numerical measures there I can apply. But as I said, I haven't done the application so I don't know.
Q. So you wouldn't treat this as presumptively correct without doing your own analysis?
A. Yes, you're asking me as an economist and I'm saying so.
Q. If it were true and if you did conclude that this was correct, would that be a positive for an acquirer?
A. Yes.
Q. Now the same with the statements on page 26 that I read to you and into the record about the office network being well positioned in strategic markets and located in some of the top performing market areas. If that were true, would those be positives for an acquirer?
A. Yes, if that was true.

Page 103

Q. Turning to the paragraph right above liquidity on page 27, it says "The bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office present. Average account balances for each product at CFSB exceed industry averages. These characteristics combined with the relative stable deposit base further enhance the valuation of the bank's franchise."
Do you have any reason to disagree with those statements?
A. Again it's the same as I've said before, I haven't done my own analysis, I have no reason to agree or disagree.
Q. If you were to do your own analysis and you concluded that these statements were accurate, then is the conclusion at the end of the paragraph accurate that it would enhance value of the franchise?
A. It depends. I mean high-balance households, it depends if I can provide the certain

Page 104

services that high-balance households demand. It might not be the best strategy if I am a bank in Newark which this bank had a presence in Newark. It might be better if I had better service for let's say low-balance households. So it's not clear.
Q. Do you have an opinion as to what the value of Carteret's franchise was on a fair market value basis, its branch network franchise in December of 1992?
A. No, I don't have an analysis.
Q. Do you have an opinion as to what the fair market valuation of Carteret's branch network was as of December 1993?
A. I haven't done that analysis either.
Q. Let's turn in your report to page 53. In paragraph 100 you talk about "The errors in logic arise in part from a mixing up of arguments relating to the difference in the value of goodwill of a going concern versus that of a failed institution like Carteret."
Before we get into the specifics of this, you talk about the errors in logic that

Page 105

Professor Calomiris committed. Does Professor Calomiris have a good reputation in the academic community?
A. Yes.
Q. He does, okay. In terms of the value of goodwill to a going concern. Do you recall testifying in Fifth Third that goodwill's value to an open institution was, quote, virtually nil, close quote?
A. Open in what context, open a failed institution or open an ongoing institution?
Q. Open an ongoing institution.
A. I think I was opining on Fifth Third, I don't know the context, I'd have to read the context. There's a difference between a value of goodwill of a successful going concern bank and a value of goodwill of a failed bank.
Q. Well, for a successful going concern bank with lots of excess regulatory capital, big capital cushion, do you think supervisory goodwill had substantial value?
A. Not really.

Page 106

Q. Why not?
A. Because presumably if you're saying substantially it's got a good bank, it's got a lot of capital tangible. So supervisory aspect of goodwill would be of little value.
Q. Does it have any value?
A. Well, it has some goodwill. I thought you said supervisory goodwill.
Q. Yes, does supervisory goodwill to an open institution that's healthy with plenty of excess capital to your opinion have any value to that institution?
A. Well, goodwill has value.
Q. I'm talking supervisory goodwill.
A. It depends, it depends on what its optimal -- you're talking about an open institution where we're counting supervisory goodwill as part of capital?
Q. Yes, and where even without counting, it still has plenty of excess capital. And my question is we'll just put some numbers on this, maybe to make it concrete. Let's say you had an institution

Page 107

that had a hundred million in assets, it had 20 million in tangible capital, capital requirement of 3 percent.
A. Uh-huh.
Q. And it has another hundred million of supervisory goodwill. My question is an institution like that, very well capitalized, would the supervisory goodwill in your opinion have value to that institution?
A. Very little value.
Q. Now let's say that the institution had zero -- that same institution, a hundred million in assets, 3 percent capital requirements or requirement of 30 million of -- excuse me, 3 million of tangible -- of capital, let's say, and let's say it has zero tangible capital but it has 5 million of supervisory goodwill. Would that institution have value from supervisory will?
A. It shouldn't.
Q. Why is that, because it could raise capital?
A. No, because its true capital is tangible

Page 108

capital and that protects me against losses. Supervisory goodwill is intangible capital, does not protect me against losses.
Q. But the supervisory goodwill would allow you to stay in business?
A. If the regulator was foolish enough to allow you to stay in business.
Q. Let's say the regulator had a contract which required him to allow you to?
A. I'm not -- that's a legal opinion. But I'm just saying is a bank with no tangible capital and just supervisory goodwill has no protection against losses and to my mind is insolvent and should not be let to continue to exist.
Q. Well, but wasn't -- all these Winstar cases like Carteret, like the Glendale case, I mean these were institutions that where you had a healthy thrift come and at the government's invitation to bid, acquire these bad thrifts, failed thrifts, and then when they're done, the day after the merger the combined entity has negative tangible capital. So is the criticism you're making about regulators

Page 109

allowing these institutions to stay open, are you taking issue with the supervisory goodwill transactions from the get-go?
A. No, I mean also the banks themselves have a decision. They didn't have to do the acquisitions. They had a business -- they made a business decision. They had, well, we can grow our assets, we can move into new markets, the fact that it didn't turn out very well is an ex post outcome. But you can't just blame the government for the contracts. There's two sides to any contract. There was no gun at the head of the banks to go into the contracts.
Q. Do you think it was ill-advised of the government to set these contracts up?
A. I think if you look at the economics that they closed the banks when they were -- early on in many cases better than letting them run on and grow and then fail.
Q. Of course many of them didn't fail at all, right?
A. I think 20 percent failed, if not more.

A. I can't remember. I can't remember.
Q. You can't remember whether you read it or you can't remember what it says?
A. I can't remember what it says and I can't remember whether I read it.
Q. Well, if you didn't read it how would you know whether it was newsworthy or not?
A. As I say, I don't until I read it. I didn't dispute, you're telling me it's newsworthy, I'm saying I don't know. It's the editors' decision. If the editors decide it's newsworthy, whether I agree is my own personal opinion.
Q. My question is --
A. I haven't read it so I can't opine.
Q. If it were newsworthy then that would explain the bump in the -- the drop in the stock price, right?
A. It depends when the news came out. News comes on the news wire all the time. Is it old news, is it stale news, is it news from weeks ago when these things happened. Newspapers are often the last to report the news, financial news.


Q. This was a report of a key vote in the Congress from the day before, so that's not stale news, is it?
A. It depends what time the vote was taken.
Q. Back in 1989.
A. What time of the day the vote was taken.
Q. In 1989 news did not get stale from one day to the next, did it?
A. You're a more financial expert than me.
Q. Well, let me ask you, I mean do you think news in 1989 got stale in a day?
A. Yes, I think the market is pretty efficient.
Q. Really?
A. Yes.
Q. Point me to an example in the late '80s or early '90s where news got stale in a day.
A. I'm sure I could find one if I went back to look.
Q. But you can't think of one here?
A. Not offhand.
Q. And you certainly can't think of one


where it was a vote in the Congress?
A. Well, votes in Congress are very quick to come on the wire. So I'm surprised -- it depends, as I say, what time in the day. Was it 1 o'clock, was it 2 o'clock. I'd have to take a look.
Q. So if it was after trading hours closed, then the soonest it could have been reflected was in the morning, right?
A. The following morning?
Q. Yes.
A. Of the next day?
Q. Yes.
A. After 4:30?
Q. Yes.
A. I agree. If there was any material value to that news.
Q. And if the stock market moves in an abnormal direction the morning of the release of a vote that occurred at night, isn't that powerful evidence that the market thought it had an impact?
A. Yes, but this is market for what


Carteret stocks, all stocks?
Q. Carteret.
A. Did all other stocks move?
Q. No, that's why it's an abnormal market.
A. No, is it an announcement that affects all thrifts. Was there another announcement on that date that affected all thrifts in the thrift industry, I don't know.
Q. You haven't looked?
A. I have not looked.
Q. So you have no reason to dispute Professor Calomiris's conclusion that that New York Times story explains the stock market performance?
A. I just gave you 15 reasons why I do dispute it.
Q. No, you gave me 15 reasons of why it might be possible if you had read the article that you dispute it.
A. No, I'm just saying a lot of news is stale. A lot of news is not relevant. It depends on the relevance of the news, it depends on what's in the news article and when it's announced. It

Page 210

correspondence would cut off their supply of inflow of pipeline into the company.
Q. How would that -- is that just a risk that -- how would that risk affect the company?
A. If you've got nothing coming in there's nothing to do out so it's defunct.
Q. If it were entirely dependent upon correspondence?
A. It would significantly be dependent on correspondence.
Q. A couple of times in your report you referred to the assets and liabilities of Carteret Mortgage Company. What assets did Carteret Mortgage Company have?
A. The assets would have been those assets that it received to sell to outside parties that it held during the period which it was going to turn them over.
Q. Do you know what the typical period of time that Carteret Mortgage Company would hold assets?
A. I think pretty short.

Page 211

Q. Do you have any concerns about the assets that Carteret Mortgage Company was holding in December of 1992?
A. I didn't evaluate their portfolio that they were holding in 1992.
Q. So you don't have any concerns about it?
A. I didn't say I didn't have any concerns. I don't really know what the composition of that portfolio was to make that evaluation.
Q. On page 77 in paragraph 137, about halfway through the paragraph you make reference to the firm's, which I assume is CMC, troubled assets and liability. Why would you think they're troubled if you didn't examine their characteristics?
A. Well, to the extent that they were absorbing assets and liabilities mortgages from Carteret itself rather than from outside correspondent banks.
Q. When you say absorbing, what do you mean by that?
A. Well, the risk of the underlying holding company here, Carteret, which was a subsidiary of

Page 212

Carteret, was more risky.
Q. I'm sorry, why does that follow in the sense of Carteret Mortgage Company didn't have any troubled assets on its books, did it?
A. I'd have to go and look at that.
Q. You don't know though?
A. All I know is a subsidiary of a company that had considerable classified assets, troubled assets.
Q. Professor Calomiris is looking at Carteret Mortgage Company as standalone entity that could be spun out, so why would the parent's companies alleged problems have anything to do with --
A. I don't know, there might be contingent assets and contingent liabilities. There generally are between contingent assets and contingent liabilities existing between a subsidiary of a company and its owner or holding company.
Q. Were there any such liabilities between Carteret and Carteret Mortgage Company?
A. Well, there might have been some -- I

Page 213

don't know, there's a potential there for risk shifting.
Q. Potential for what?
A. Risk shifting.
Q. And but you didn't see any evidence of that risk shifting?
A. I didn't see any evidence, no.
Q. What sort of liabilities would Carteret Mortgage Company have had?
A. The most companies like this raised their funding with short-term paper.
Q. Now you make the point that while Imperial was able to hire Carteret Mortgage Company staff without acquiring any of the firm's troubled assets and liabilities, right?
A. Uh-huh.
Q. Now, the RTC in the real world was stuck with those assets and liabilities, right?
A. Uh-huh, that's correct.
Q. So what impediment as a financial or economic matter would there have been for the RTC to say okay, we're stuck with these assets and

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------------

AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiffs,
-and- No. 93-531
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervener,
-against-
THE UNITED STATES OF AMERICA,
Defendant.

----------------------------------------

Wednesday, October 4, 2006
9:37 a.m.

Continued deposition of ANTHONY SAUNDERS, taken by Plaintiffs, pursuant to Adjournment, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, before Lisa Rosenfeld, a Shorthand Reporter and Notary Public within and for the State of New York.

Page 330

A. I don't know because an auction is uncertainty.
Q. What does that mean, there's uncertainty? 09:54
A. In an auction by definition you're competing. You're uncertain as to whether you will get the goods.
Q. So how does that impact your bidding 09:54 strategy?
A. I might well say if I want it I'll offer a higher price today to be sure to get it.
Q. That's a fair point that maybe the Gulf Coast might have paid an even higher price. But is 09:54 there any reason why they would have paid a lower price if this had been an auction?
A. As I say I don't know, I don't know what the assets were and I don't know what the value was, but all I can say is observing a higher price is not 09:54 unusual in an asset sale because it has more private value to the buyer.
Q. Is it unusual for someone to be able to buy loans on one day and sell them for a 6 percent

Page 331

profit on the next day? 09:54
A. Yes, I think the loan sales market now is a market of probably $200 billion a year, it's one of the largest financial markets. Loans get bought and sold every day.
Q. At 6 percent profit within a single day? 09:55
A. It can change a loan.
Q. 6 percent in one day?
A. I'd have to look.
Q. You've never seen one that's changed 09:55 6 percent in one day?
A. There's 200 billion being traded, I don't know the prices of every single loan but all I know is they're traded.
Q. Sure. 09:55
A. And it's a very frequent activity, I'm sure, there are cases where prices have changed 10 percent or 15 percent.
Q. In a day?
A. Yes, I wouldn't be surprised. 09:55
Q. Are there ethics rules on brokers about their ability to market up a loan in one day?

Page 332

A. In a secondary market?
Q. Yes.
A. I think secondary market loans are 09:55 tradable assets.
Q. You say secondary market, is that in distinction to the primary market?
A. Yes, because these loans are outstanding and then we're selling them in the secondary market. 09:55
Q. What's the primary market?
A. Market of originations.
Q. Are there any ethics rules on that?
A. The truth in lending laws, et cetera, 09:55 et cetera.
Q. I mean on the markup of you buy an asset on one day if you're a broker, can you --
A. Then it's a secondary market. Once I sell it, it's a secondary market. It's completely 09:56 different.
MR. LEVITT: I think also it should be pointed out that your statement of issues pointed out that the auction was well prior to the closing and the sale of the Dryades. 09:56

Page 333

Q. You point to some auction articles in your report. Did those study auctions in which there was a preference?
A. Which auction articles are you talking about, Calomiris's ones or my ones? 09:56
Q. Your ones.
A. I think the one I pointed to as empirical.
Q. That didn't study auctions in which there was a preference that afforded some bidders, 09:56 did it?
A. All it looked at were wholesale banks versus branch sales, if I remember.
Q. Right, but it didn't try to in any way 09:57 address the concern that Professor Calomiris is raising which is when you give an incentive or some preference to some bidders, that can depress the price?
A. On the other hand if you really want the 09:57 good is a higher value than the good of the common value that you pay higher.
Q. What does that mean, the good has a

Page 334

common value?
A. Well, the paper he's referring to is 09:57 what's called a common value auction where you and I agree that the asset has the same value, a private value auctions, you and I incur a particular asset and disagree over its true value when we trade. If my private value is higher than your private value I 09:57 will pay higher price.
Q. The only way to figure that out is with an open auction?
A. No. The same thing, even Joskow and Bulow, the paper Calomiris refers to, agrees the 09:58 results changed flipped, if you like, when there's a private value auction rather than a common value auction.
Q. Is there a value to a right of first 09:58 refusal, having a right of first refusal?
A. I would think so, yes.
Q. If a financial institution came to you and said we have an opportunity to bid on some branches but it's going to cost us a lot of money to 09:58 do due diligence and at the end of the day our

Page 335

primary competitor is very interested in that market, has a right of first refusal, is going to see our bid, has a right of first refusal.
A. If he matches the bid. 09:59
Q. Yes, and we're concerned that we may sink a lot of money into this due diligence, come up with the right price and our competitor won't spend a dime and say thanks a lot, we like what you've come up with and we'll take it at that price. 09:59
Would that be a fair concern?
A. No, I think what he would say if I really wanted the, good, I'd pay a higher price because I want to make sure I can outbid the buyer that has the first right of refusal. I want to make 09:59 sure if I really want that asset, I price it higher, not lower or even equal. I push the prices up. That's what a private value auction is. We disagree on the value of a branch or disagree on the value of 09:59 a particular bank.
Q. Have you ever been involved in any auction in the real world?
A. You mean like auction for antiques or

Page 336

something? 09:59
Q. I don't know.
A. I mean you're talking about an ascending auction, but these were not ascending auctions, which is another mistake in that article in the sense that it's not a mistake in the article he's 10:00 looking at ascending auctions. Our auctions are private value sealed bid auctions.
Q. Have you had any experience in the real world with private value sealed auctions?
MR. LEVITT: I want to object on 10:00 relevance.
A. Have I ever done, no.
Q. Have you ever had any participation in one?
A. No. 10:00
Q. Isn't it fair to say that bidders would be concerned if their competitors get advantages and preferences in the bidding process?
A. Yes, so the reaction is if we really 10:01 want the asset, we price it higher.
Q. If we really want it?

Page 337

A. If our private value is sufficiently high.
Q. Right, and if your private value isn't 10:01 sufficiently high it's just I think it's worth X, I'm willing to pay X. It's not worth any more to me than to him, wouldn't it be a concern that the other person can avoid the due diligence and snap up the branch? 10:01
A. No, because he has to match my price, so he might think about bidding 95, I can bid 99. And even to get to the second round he's got to match my bid.
Q. Why did the RTC have a 10 percent limit, 10:01 why did the minority bidder have to be within 10 percent of the highest bid?
A. To get to the second round.
Q. Yes, why?
A. To get to the second round. 10:01
Q. Why did the RTC have that feature?
A. That was an administrative 10 percent.
Q. Didn't it serve a purpose which was to give some comfort to the other -- to the other 10:02

Page 354

(Recess taken)
BY MR. THOMPSON:
Q. Professor, do you have your report in front of you? 10:30
A. Yes.
Q. I'd like to direct your attention to page 11 of the report. In particular in paragraph 24 you state in the middle of it "Despite the 10:30 enormity of the problem, you're talking about failed thrifts, Curry and Shibut estimate the cost of the RTC resolution from 1989 through 1995 as $82.7 billion with 7.1 billion, almost 9 percent borne by the private sector." Do you see that? 10:31
A. Yes.
Q. Do you think that's an appropriate estimate of the cost of the cleanup of the thrift problems for '89 through '95?
A. They are two economists at the FDIC so I 10:31 havc no reason to doubt that that's a reasonable estimate of the cost.
Q. Let's look at your textbook and forgive me, I hope this isn't a copyright violation.

Page 355

MR. THOMPSON: So I'd like to ask the 10:32 court reporter to mark this as Saunders 17.
(Saunders Exhibit 17, Excerpt from textbook, was so marked for identification.)
Q. In your textbook Financial Markets and Institutions on page 418 you have a discussion at 10:32 the bottom of the page in the last paragraph, "In the 1980's the large number of savings association failures depleted the resources of the FSLIC to such an extent that by 1989 it was massively insolvent. 10:32 For example between 1980 and 1988 514 thrifts failed at an estimated cost of 42.3 billion. Moreover between 1989 and 1992 an additional 734 thrifts failed at a cost of 78 billion." Do you see that?
A. Yes, I do. 10:33
Q. That number is perfectly consistent with what the FDIC came up with, which was 87 billion for '89 through '92, right?
A. It would appear these numbers are for '89 through '95. These numbers are '80 to '88 and 10:33 '89 through '92 so they're not coincidental periods.
Q. But they are consistent to the extent

Page 356

that your textbook uses a shorter timetable and has $78 billion. The FDIC has added three years and it's $9 billion, right? 10:34
A. I don't know, but I'm just taking -- I'm just a reference to Curry and Shibut to what they say from the FDIC.
Q. But the numbers in your textbook are reliable, correct? 10:34
A. I would hope so.
Q. You don't have any reason to doubt it, do you?
A. Not that I can think of. 10:34
MR. THOMPSON: Let's ask thc court reporter to mark as the next Exhibit 18, Exhibit 18, the Curry and Shibut.
(Saunders Exhibit 18, Document, was so marked for identification.) 10:35
Q. Let's turn to page 30, the last paragraph in the left-hand column which reads "However in our view, including financing costs when tallying the costs of the thrift crisis is methodologically incorrect. It is invalid because 10:35

Page 357

in present value terms the amount borrowed is equal to the sum of the interest charges plus debt repayment. Adding the sum of interest payments to the amount borrowed would overstate the true economic cost of resolving the crisis. An example 10:36 will illustrate the point. Assume an individual pays $100,000 for the purchase of a residential property and finances the whole amount with a 30-year loan at 10 percent interest. Over the 30 years of the loan the individual pays more than 10:36 300,000 in total costs, compromising interest and principle. Yet the cost of the home is still $100,000 because the present value of the total cost of 300,000 for 30 years of payments discounted by 10:36 the interest rate of 10 percent is approximately 100,000."
Do you agree with that analysis?
A. No.
Q. So the number in your textbook is wrong 10:37 and the FDIC is wrong?
A. No, I'm disagreeing with the first sentence.

Page 358

Q. Well, Curry and Shibut have calculated the cost to RTC without including a financing cost, correct? 10:37
A. I don't know.
Q. That's what it says right here, right?
A. What it says they're doing.
Q. So you don't have any reason to doubt that's what they're doing, they're saying that's what they're doing, right? 10:37
A. They're saying that's what they're doing.
Q. So they don't use finance costs, any interest on the cost to the RTC, do they? 10:37
A. That's what they're saying.
Q. Your textbook uses a number that doesn't have any interest on the cost to the RTC, correct? 10:37
A. I just took the RTC's numbers.
Q. So why are you saying that the RTC -- are you saying that the RTC is wrong and your textbook is wrong?
A. No, I'm saying if I had known this I would have reconsidered that number. 10:38

Page 359

Q. And come out with a different conclusion?
A. There's a financing cost involved.
Q. Why isn't this a correct analysis, what's wrong? 10:38
A. They're saying in our view, that's their view.
Q. Right, so why --
A. It cost the government to raise money and what they're doing in the Shibut Curry thing is distinguishing from the government's cost and the private sector's cost. It cost the government money to make loans to the RTC, there's an opportunity cost. 10:38 10:38
Q. Well, they say on a net present value basis a 100,000 dollar home costs 100,000. Do you agree with that part of their analysis?
A. But they're writing a dollar to national debt and they're taking money away from other projects. There's an opportunity cost here. 10:38
Q. What do you mean taking money away from other projects?

Page 360

A. I want to spend more on helping the banks, investing a dollar on helping the poor. 10:39
Q. Because of the fiscal restraint in Washington?
A. Because the budget constraint set by Congress. 10:39
Q. Which have been very onerous the last few years, right?
A. Back in this period I think it was more binding.
Q. They go on to say another example. 10:39
A. Can I make a second point because the more you borrow, they push up the interest rate as well. So the cost of borrowing goes up the more you borrow as well, so there's a second part to the financing cost that happens when you borrow more, as you push the rate of interest up the cost goes up. This also adds to the financing cost. 10:39
Q. Now Curry and Shibut also say at the end of that paragraph "Another example, the federal government does not include interest charges when costing specific programs such as weapons systems or 10:39

Page 361

school lunches." Are they right about that?
A. I'd have to check.
Q. You don't know? 10:40
A. There's a whole debate about how government should price things. And I believe they should price things correctly based on the cost, and if they don't then that's a government decision. I thought you asked me whether I agree with this or not, as an economist I don't agree with it. 10:40
Q. So if the government reports we just bought a new hospital for Medicaid and we paid a hundred million dollars, you would say that's not the cost, there needs to be interest on top of that? 10:40
A. If they borrowed money to do that, yes.
Q. Now, what happens if there's a surplus, if the government had a surplus?
A. It's a long time since we've had a surplus, the national debt has grown every year for 200 years. 10:40
Q. Didn't we have a surplus in the late '90s?
A. I think for two years. 10:41

Page 362

Q. So now I'll represent to you that the GAO has consistently reported the cost to the RTC without interest costs and but your opinion is the GAO is wrong, the RTC is wrong and your textbook is wrong? 10:41
A. No, I'm not saying they're wrong, I disagree, I'm taking their cost that they report and you're asking me should they add in the financing costs, in my opinion there is a financing cost, that's all I'm saying. 10:41
Q. Should they discount it back to the date of the issuance of those financing costs?
A. They should pass on the interest cost to the borrower, yes.
Q. Should they -- in calculating what that 10:41 interest cost is, should the government in your opinion discount the cost of the interest?
A. Of the borrowing?
Q. Of the borrowing.
A. Yes. 10:42
Q. Back to present value?
A. Present value, yes.

Page 363

Q. And what discount rate should be used?
A. Whatever the cost of borrowing was for 10:42 the government.
Q. And so and if you discount back at --
A. Sorry, go ahead.
Q. If you discount back at the cost of whatever the borrowing was to the government, then 10:42 the only cost of the financing would be transactions costs, right?
A. Not necessarily because as I mentioned, there's opportunity costs as well.
Q. Like what? 10:42
A. Because I'm taking money away from one program to give to another program.
Q. So how do --
A. So there's a substitution effect going on here. There's a social -- you see governments 10:42 have a social discount rate, not a private discount rate, and the social discount rate can be very different from the private discount rate. Here they're arguing to think about the government like a private sector entity, it's not, it's out there to 10:42

Page 364

maximize social welfare.
Social welfare uses social discount rate which takes into account the opportunity cost of funds in terms of one program versus another 10:43 program.
Q. And how -- if the judge listened to that and thought that's brilliant, I agree with everything the professor said, now I want to calculate the social cost discount rate, how would 10:43 you go about doing that?
A. We would have to do a calculation that we would look at the social opportunity cost of capital.
Q. How would you calculate that? 10:43
A. It's common, it depends on various features of the economy, it's economy-based, it depends on lots of factors that come in besides the budget deficit and constraints on the budget, other programs you want to do. It's welfare cost 10:43 analysis.
Q. If there's no constraint then there would be no opportunity cost?

Page 365

A. If I can -- yes, there would because then there would be inflation. My discount rate 10:44 wouldn't change -- wouldn't stay the same, I'd be pushing it up into the future.
Q. What would be the marginal impact on the rate of inflation of Carteret having a loan of at 10:44 present time the principal balance is $18 million?
A. Yes, but I'd have policies consistent across all banks. We're talking about -- I mean there was not a policy specific to Carteret that was passed about interest rates. It was common across 10:44 everything. In terms of not paying interest on --
Q. What would the marginal impact on inflation be of having $80 billion added to the national debt?
A. I don't know. 10:44
Q. It would be trivial, wouldn't it?
A. I don't know, I don't think so.
Q. Is it less than 1 percent of the national debt?
A. I really don't know. 10:45
Q. You don't know what the national debt

Page 366

is?
A. $5 trillion. It doesn't matter, it's the marginal effect, it's the flow rather than the stocks, I'm adding a flow variable here. So it's 10:45 the rate of increase -- inflation is a flow variable.
Q. Let's see how the RTC dealt with interest at the time. You're familiar with a least 10:45 cost test analysis?
A. Uh-huh.
MR. THOMPSON: I'd like to ask the court reporter to mark as Saunders 19 a document that bears the Bates number C-AM-A-0130727 10:46 through 738.
(Saunders Exhibit 19, Document bearing Bates numbers C-AM-A-0130727 through 738, was so marked for identification.)
Q. Professor, this is a document, it 10:47 appears to be two documents but it was produced to us in Bates numbered sequence. We just put the top e-mail on, but starting on the second page, is this what you're familiar with as the cost of resolution

Page 367

document? 10:47
A. Uh-huh.
Q. And the way this was calculated was first there was a projected -- actually strike that. On the second part of the table is a projected cost of payout of approximately $361 million? 10:47
A. Uh-huh.
Q. Do you know how that was calculated?
A. I just assume it's the cost of paying off the depositors and closing the bank. 10:47
Q. Right, it's like a liquidation value of here are the assets, here are the liabilities, the difference is 361 million, correct?
A. Uh-huh.
Q. And the cost of resolution is just the 10:48 cost of payout minus the premium?
A. In this case the expected premium.
Q. Since the document's being prepared actually six days after the closing, you can see this little computer printout in the right-hand 10:48 corner that says March 16th, 1995, the reason why the -- so the premium is not only expected but it's

Page 368

known, right?
A. At this time.
Q. And so but nowhere in here in this cost 10:48 did the government -- did the RTC include an interest component, did it?
A. I can see that.
Q. I beg your pardon?
A. I can see that. 10:48
Q. So if the RTC didn't include an interest component in its contemporaneous calculations of the cost, then why should they be permitted to add it to the receivership deficit now? 10:49
A. Because there's a cost of capital, there's a cost of funds. It cost the government money to raise on the debt markets to provide the funds to the receivership.
Q. So they were wrong in the way in which 10:49 they did these cost test analysis?
A. Here it's showing it without interest rate adjustments.
Q. And that was incorrect in your opinion?
A. No, you can show it like this but as 10:49

Page 369

long as you know there's no interest rate adjustments put in here. They added the interest rate later on, that's what you're telling me. I believe they did in receivership they charged them interest. 10:49
Q. I'm asking you whether you have any indication that in fulfilling the congressional mandate to do the least cost test, whether the RTC gave any consideration to interest costs? Have you seen any evidence of that? 10:50
A. I'd have to look carefully at it.
Q. Which is to say that no, you haven't seen any evidence of that?
A. This is the cost of closure rather than 10:50 the cost of lending to a receivership, which is a different thing.
Q. No, they're looking at two things, they're looking at the cost of closure, number one, and number two, the cost of doing the actual 10:50 transaction.
A. So this is just a cost of closure, so they're adding the cost of the transaction later on,

Page 386

it doesn't make a difference. There's an opportunity cost there as well.
Q. But my question is -- maybe we can eliminate it this way, but in this case are you aware that the -- do you know what the term "subrogated claim" is? 11:08
A. No.
Q. Well, do you know what the principal balance that the interest was calculated off of was?
A. I think we were discussing that yesterday, weren't we? 11:08
Q. Yes.
A. The 1.2 billion which I rounded up to 2 billion.
Q. We're going to get a little more specific now exactly how much it was. 11:08
(Saunders Exhibit 20, Document bearing Bates numbers AM 00095015 through 019, was so marked for identification.)
Q. This bears a Bates number AM 00095015 through 019. The first line says FDIC original liability, do you see that, it's $1.369 billion? 11:09

Page 387

A. I see, right at the top here, I see claim balances, is that what you're talking about? 11:10
Q. Yes. So do you see that?
A. I do, just about.
Q. And that's the -- does this refresh your recollection that that's the principal amount against which the interest was charged? 11:10
A. I believe it's of this order, yes.
Q. But in fact when the branches were sold a premium was realized, right, collectively of about $143 million?
A. Yes. 11:10
Q. And some assets were transferred of about $44 million to the acquirers, is that right?
A. I believe so.
Q. So that's $187 million, and if you want I can show you, if there's any doubt in your mind 11:11
I'll get the documents and I can show you. But is it your understanding that in fact when you look at the amount of money that had to be wired to the acquirers to fund the branch sales, the amount of cash, that it was the 1.369 billion minus the 11:11

Page 388

premium and the assets that went?
A. This is the size of the loans, not the deposits, we're talking about deposits that are transferred. I don't think the numbers are the 11:11
same, are they? This is the claim balance of receivership which is different.
Q. I want to make sure that I understand conceptually as an economist what the right answer would be, then we'll get to figure out which of 11:11
these numbers it is. But the right number for the principal balance of the loan should be the amount of cash that was in fact borrowed by the RTC by the receiver to fund the branch sales, right?
A. Yes, but you asked me a different 11:11
question about wire transfers, deposits and stuff.
Q. Now I'm going to represent to you that in fact this 1.369 billion reflects the amount of deposits and not the amount of the wire transfers, and the principal paydowns you see in the right-hand 11:12
column here?
A. Where are we now?
Q. Gross amount.

Page 389

A. Yes.
Q. These are the principal paydowns and 11:12
you'll see that it goes down to at present if you go to the second page, it's down to $18.8 million, which is the number that I believe I referenced yesterday. 11:12
A. Okay, now I see which column you're talking about.
Q. Now, you have talked and have defended the escrow account?
A. Yes. 11:13
Q. The fact I was surprised, but in any event the escrow account, how did that work, what's your understanding of the way in which the RTC accounted for the escrow account?
A. I think they received the premiums and 11:13
then they put them in a special fund with the Federal Home Loan Bank as an escrow account separated account.
Q. Well, in fact the RTC actually didn't get a check for $143 million, did they, it was just 11:13
a deduct on the amount of cash that had to go to the

Page 398

nothing lower risk than Treasury bills. You're pretty sure you're following prudent man bills when investing in Treasury bills.
Q. Well, the RTC would not have been increasing the risk to the receivership by taking 11:23 the Treasury bills and paying down the high cost debt, would it have?
A. Perhaps it was worried about legal risk. Perhaps it was worried that if it quickly paid it out, then therefore we took a loss on these funds, 11:23 therefore I'd be subject to some prudent man violation.
Q. Because of a --
A. Legal.
Q. Legal concerns? 11:23
A. Yes. Perhaps.
Q. Yes, perhaps. Anything else?
A. No. I'm going back to what I said. I think there's liquidity reasons and prudent man concerns. 11:23
Q. But the only prudent man concern you've identified on the record has been these possible

Page 399

legal risks, any other?
A. No. The role of a prudent man, prudent 11:24 man investment behavior is to keep a risk-free portfolio.
Q. And my question to you is how would it have increased any risk to the receivership deficit to take the money in T-bills and pay down a debt? 11:24
A. One, liquidity risk. Secondly, any risk pertaining to violation of prudent man rules.
Q. That's a circular.
A. No, they're two distinct things.
Q. Leave liquidity to the side, the record 11:24 is clear on that. Then I'm asking you about prudent man risk and you said, oh, well, it might increase the risk of the institution and then I said, well, what risk. You said, well, you'd be violating prudent man rules. So forget -- so you've now drawn 11:24 a circle.
A. No.
Q. My question is this, what risk to the Carteret receivership other than liquidity and possible legal concerns would there have been from 11:24

Page 400

taking the 187 million in T-bills and paying down higher cost debt?
A. Other than those two considerations?
Q. Yes. 11:25
A. I can't think of any other two.
Q. Let's look back at your report at paragraph 25, and you say in the third sentence, "This interest," meaning the interest on the receivership -- in the receivership deficit 11:26 "resulted from the funds the receivership had to borrow from the RTC to finance the sales of its Florida branches and its New Jersey branches given the perilous state of Carteret's assets at the time of its closure and transfer to the RTC." 11:26
Now what is your understanding of where the RTC got the money to fund these branch sales?
A. I think they had received it, I'm trying to remember it either from the FDIC or the Federal Financing Bank. 11:26
Q. And where did they get their funds, from the Treasury?
A. They raise it in a Treasury market.

Page 401

Q. Wasn't that the holdup and the delay of -- didn't Congress in December of 1993 11:26 appropriate $18.3 billion to the RTC or 19.3 billion?
A. The Completion Act?
Q. Yes. 11:27
A. I don't know if it appropriated it for the RTC, but it appropriated it for the RTC purposes.
Q. Right.
A. How it worked in terms of the transfer 11:27 of funds, it would still be a borrowing of $18 billion coming into the RTC.
Q. So that money --
A. What it means is additional borrowings.
Q. By the United States Treasury? 11:27
A. To finance this, yes.
Q. In your report you make reference to the prime rate, but the United States Treasury didn't have to pay the prime rate, did it?
A. No, it paid Treasury rates. 11:27
Q. What's the relevance of the prime rate?

Page 402

A. It's not the cost of borrowing, it's the cost of lending. The government of the United States is a different quality borrower from the borrower of similar to Carteret's receivership which 11:28 has a risky asset portfolio.

Q. Doesn't the government do this all the time where they go out and borrow at a risk-free rate and then they fund something that may be risky? 11:28

A. Yes. That's why a risk-adjusted return should be roughly equivalent with the risk-free rate.

Q. Can you think of any other instance in your career where the government has borrowed money 11:28 at a risk-free rate and then given it to an agency and charged the agency a risk-adjusted rate saying what you're about to do with this money is risky, so we want a risk-adjusted return?

A. I think it's the RTC that was lending it 11:28 to the receivership at a risk-adjusted rate.

Q. Can you think of any other instances where the government does that?

A. No, he wasn't actually doing that, he

Page 403

was lending it at a one-year Treasury bond rate or 11:28 bill rate, but my argument is bear the credit risk or liquidity risk of these loans, it could well have charged higher rates than the one that it charged, which is the one-year federal judgment rate.

Q. Can you point to any instance in which 11:29 the United States Government has done what you were suggesting?

A. I don't think I looked.

Q. Not as you sit here? 11:29

A. I'm just saying it's rational behavior if you've got a risky asset portfolio.

Q. So under your regime just so I understand how the Saunders regime would work, the RTC would have to figure out what the risk 11:29 characteristics were of each entity that it was lending money to and it would have a credit committee go in and do due diligence, is that what you're suggesting?

A. I'm saying I think in this case it's 11:30 associate -- since the public purse is at risk, clearly they should take into account the riskiness

Page 404

of the assets, yes. That's my private view.

Q. Now, you make reference to in paragraph 25 the perilous state of Carteret's assets. And 11:30 when would be the time that one would have to assess the riskiness of the assets? At the time of the issuance of the debt?

A. You mean RTC?

Q. Yes. 11:30

A. It priced the loans as of the time the loans were made. It priced it ex post, partially ex post fixed rate loan.

Q. When you say partially ex post, what do 11:31 you mean by that?

A. Well, originally it was floating and then it went back to fixed. It was fixed backwards.

Q. Yes, it was.

A. I'm sure we're coming to that. 11:31

Q. Now, even if you're right, even if a court agrees with you that there were some perilous assets in this portfolio but there were also some good assets that Carteret had, correct?

A. They had performing assets, yes. 11:31

Page 405

Q. And couldn't Carteret -- couldn't the RTC have done mezzanine financing where they would get a good rate on the bulk of the loan by pledging the good assets as security. So for example when you go -- when a bank like Carteret pre-seizure went 11:32 to the Federal Home Loan Bank to get advances it would pledge $110, for every $100 of advance it would give $110 of performing residential one to fours, and the Federal Home Loan Bank would give it a very good rate because the loan to value ratio was 11:32 very acceptable.

A. If you want to -- I mean in this case it was given a risk-free rate. The government didn't charge a risk premium, that's my whole point, it 11:32 charged a Treasury bill rate.

Q. Are you saying what the government did was wrong?

A. I'm saying that the government charged a lower rate than commercial rates to provide subsidy. 11:32

Q. So you're saying that the government charged an incorrect rate in your opinion as an economist?

Page 410

a short-term floating risk-free rate. Why as a financial economist should there be a different rate on that loan than on the loan that the RTC made in 1995?

A. As I said, 1995 -- in my opinion 11:37 long-term rate was appropriate.

Q. So you think that -- is it fair to say that the same rate should be applied to both loans?

A. I'm saying the RTC was giving a subsidy to the borrower for the first two or three years 11:38 until the conservatorship ended and then it was -- I'm sorry, it was passing risk on to the borrower during this period, and in the second period it was willing to absorb the risk.

Q. So are you saying that yes, the two 11:38 loans should be treated the same and in both instances there should be a long-term risky rate?

A. Given based on the judgment as of the time of the likely length of receiverships or conservatorships, which was very long, three to six 11:38 years, then I think the long-term rate would have been more appropriate.

Page 411

Q. I just want to make sure the record is crystal clear on this, do you think it's appropriate 11:38 that the same rate be applied to the loan to the pass-through receivership as to the ultimate receivership?

A. I didn't study that question, I just studied the long-term versus short-term. 11:39

Q. You don't have an opinion on that?

A. I think throughout this period the long-term rate was thc most appropriate rate.

Q. I just want to make sure the record is clear on this because I don't want to hear something 11:39 at trial that we didn't get to hear today. Can you identify any differences or do you have an opinion as to whether there should be a different rate on the loan to the pass-through receivership to the receivership in '95? 11:39

A. As the pass-through receivership is going to last for one day, then a one-day rate might be appropriate. Because if I know it's one day, then you're telling me the conservatorship, the conservatorship, I'm not sure when it's going to 11:39

Page 412

end, I look at the historical data on conservatorship resolutions and it's beyond three months and I say, well, okay, three-month rate is too long, I think a longer term rate is appropriate. 11:40

Q. That's a helpful clarification, I think I need to clarify one thing. The pass-through receivership still exists today 14 years later. What happened was the assets and liabilities of Carteret Bank, Mr. Bianco's bank, got put on 11:40 December 4th, 1992 into the pass-through receivership and then those assets and liabilities, most of them but not all of them. Some got kept in the pass-through receivership, some of the liabilities in particular get put into the 11:40 conservatorship. So the interest has been calculated for -- been running for the last 14 years, even longer than on the '95 loan, so let me ask the question again.

As a financial economist is there any 11:40 reason there should be a different rate charged the pass-through receivership than to the receivership in '95?

Page 413

MR. GILBERT: Just let me register an objection to the characterization of the 11:41 facts.

MR. THOMPSON: If you want to clarify, Mr. Gilbert.

MR. GILBERT: I just want to state an 11:41 objection.

A. If what you tell me is correct, then the long-term rate would have been appropriate for both.

Q. So it should be the same rate for both?

A. If one is longer than another it would 11:41 have been a higher fixed rate than the other. This is a liquidity issue.

Q. So the pass-through receivership should actually have a higher rate in your opinion than the final receivership? 11:41

A. I'm only giving an opinion ex post ex ante, I don't know how long it's going to last so I'd ask the question ex ante, how long is it going to last. I don't know with hindsight what is going to happen. All I know is I look at historical 11:41 experience and I try to look at the market, I say

Page 430

decided to bear the interest rate.
MR. THOMPSON: I see it's noon and we're 12:00
not -- let's go off the record for a moment.
(Discussion off the record)
(Lunch recess: 12:00 noon)

Afternoon Session
1:00 p.m.
ANTHONY SAUNDERS,
having been previously duly sworn, was examined and testified further as follows:
EXAMINATION (Continued)
BY MR. THOMPSON:
Q. Professor, welcome back.
A. Thank you. 01:01
Q. I wanted just to follow up on this

Page 431

concept of risk adjustment and the propriety of risk-adjusting the loan from the RTC to the Carteret receivership, and just to sort of make sure I understand how credit risk works and why there's a 01:01 risk premium, if Bank of America makes a loan to someone to buy a house for a million dollars and gives a million dollar loan and then the person defaults, Bank of America moves in, sells the property for $900,000, then Bank of America would be 01:02 out $100,000, and that hundred thousand would come right out of Bank of America's capital, isn't that right, right out of its tangible capital?
A. Yes, it would be charged against its capital. 01:02
Q. So if Bank of America had set its optimal capital level and said, oh, gosh, we didn't anticipate that it would go out and it would raise capital, 100,000 of capital, and it would have to 01:02 pay whatever its cost of capital was, which would be a risk-adjusted rate, correct?
A. If it could raise that money, yes.
Q. And so that's -- is that why Bank of

Page 432

America would want to be compensated for credit 01:02 risk, because if it bears that risk it's going to have a cost of capital to go out and raise the shortfall in the capital markets?
A. If it could or it takes it out of reserves, that's normal to do. The last resort 01:03 would be to go to the capital market. Normally you take it out of profits, cash flow.
Q. There's a cost of that capital too?
A. Opportunity.
Q. Now, with respect to the RTC and I'm 01:03 going to -- why don't we use the term "RTC corporate" as the lender versus the Carteret receivership as the borrower, I'm going to use those terms, is that okay?
A. Yes. 01:03
Q. So if the RTC corporate made a loan of $1.2 billion to the Carteret receivership and if the Carteret receivership sold all of its assets and at the end of the day only it could pay back 1.1 01:03 billion, then the RTC corporate division would be out a hundred million dollars?

Page 433

A. Right.
Q. But isn't it true that the RTC corporate would just get that money from the Treasury which 01:04 would borrow it at a risk-free rate?
A. My understanding it would go first to the FDIC. The FDIC has reserves called reserves collected from deposit insurance premium charged to banks, and I would think that that would be charged 01:04 against the insurance fund, so that's equivalent to your capital in your hypothetical example.
Q. I want to focus on the RTC. I mean the FDIC, let's look at 1995 because you had priced at ex ante, right? 01:04
A. Priced at ex ante at the time, yes.
Q. Let's focus on 1995. In 1995, first of all, the appropriation that Congress gave the RTC was more than what the RTC needed, isn't that right?
A. I don't know. 01:05
Q. Let's say if the RTC corporate were trying to figure out, well, what's going to happen if there's a shortfall if the Carteret receivership doesn't pay us back, then isn't the answer the RTC 01:05

Page 434

corporate is still part of the government and worst case scenario they go to the capital markets and borrow at a risk-free rate?

A. I believe it's not quite as simple as that because I believe they would be charged the 01:05 FDIC and the FDIC has a private fund coming from the bank so it would be charged their reserve fund.

Q. Even in 1995?

A. We would have to go back because my understanding of Federal Financing Bank was the 01:05 underlying source of funds from the FDIC to the RTC.

Q. In 1995?

A. The genesis of most of the funds was through that mechanism.

Q. I thought the funds we had talked about 01:06 earlier came from -- the funds for Carteret's loan came from the appropriation from the United States Treasury?

A. Well, well, you told me that, but it had other funds that were being used at other times. 01:06 You can't say which dollar came from which in the aggregate of funds. So you're saying there are some

Page 435

extra funds, as I understand there were still resolutions going on even though they were waiting 01:06 for money to come in from the Treasury.

Q. And if the reserves ran dry then the RTC corporate could borrow money from the United States Treasury at a risk-free rate?

A. I'm not sure what the arrangement was 01:06 with the Treasury, what the mechanism was.

Q. If money were appropriated by Congress to RTC, then Congress would still be able to borrow at a risk-free rate, right?

A. I don't know if the RTC was going 01:06 directly to the Treasury. The FDIC is part of the Treasury, is an agency of the Treasury, so when it says the Treasury, in my understanding it was the FDIC. The FDIC has private equity from the banks which is reserve fund and it would be charged up 01:07 against that.

Q. So the risk -- so the cost then would be not even borne by the government, it would be borne by the private banks who fund this?

A. Well, the FDIC would bear this and then 01:07

Page 436

it would be an obligation of the FDIC, so that would be it's taking risk on those deposit insurance funds, therefore it would charge appropriate risk premium for those deposit insurance funds as part of 01:07 the risk.

Q. But then the FDIC turns around and pass those costs on to the banks?

A. The banks have had a huge subsidy in these matters in my opinion. 01:07

Q. In your opinion, but the banks actually pay the money into the insurance fund, right?

A. They do pay premium, yes.

Q. And that's where the reserve comes from?

A. That's where the FDIC gets its funds 01:07 from.

Q. Is from the private sector?

A. From the banking system, which has a moral obligation to support the banking system.

Q. If -- 01:08

A. The providers of the funds.

Q. If the reserves are coming from the private sector then how does the government bear any

Page 437

cost?

A. Because why should Bank of America be 01:08 punished because of Carteret's failure. It has a breach of obligation.

Q. Why should the government get to charge interest that Bank of America had to pay? 01:08

A. Bank of America is paid in the premiums because that's the law. FDIC has kept the premiums as its reserve fund, it might borrow extra money over and above that, and therefore if a loan is getting charged off it has to get charged off of the 01:08 insurance for a loan to be repaid to the Treasury sometime in the future.

Q. Do you agree that whatever the rule was about interest, whether it was floating or fixed, that it was important for the RTC managers of the 01:08 Carteret receivership to know what the rules were before it, ahead of time that they be applied prospectively?

A. I don't know what the question is, tell me the question again. 01:09

Q. If you were running a financial

Page 438

institution would you want to know what your cost of funds were ahead of time before you made business decisions?
A. I think they do, did know. 01:09
Q. We'll get into what they did know.
A. I think they did know.
Q. That's good, but my first question is do you think it's important -- 01:09
A. That's why they charged the Treasury rate.
Q. Do you think it's important that the managers of Carteret's receivership knew ahead of time what their cost of funds were going to be? 01:09
A. They did because the rate was fixed.
Q. Do you think it was important that they knew what the cost of funds would be beforehand so they could perform their conduct --
A. Yes, because the government was bearing 01:09 the interest rate risk. That's why I said the float with a fixed rate loan, the risk is borne, the interest rate risk is borne by the government.
Q. So it was important that they knew the

Page 439

terms of the cost of funds prospectively, is that 01:10 true?
A. I think it's important.
Q. Now the document that you cite to from June of 1995 --
A. Where, which document? 01:10
Q. You make reference to it, for example paragraph 37, page 17.
A. Yes.
Q. Now that's an FDIC document, right? 01:10 Have you seen any evidence that that information was communicated to the RTC, and in particular to the -- well, actually to anyone at the RTC?
A. I know there was a general memo that was sent out by Gray & Beck in 1995 that described this 01:11 change to a fixed rate should be applying to Carteret and for post '93 receiverships. I think it was pretty -- if I remember it was pretty widely disposed.
Q. Have you seen any evidence that it was 01:11 sent to the RTC?
A. I'd have to look. I'm sure you're going

Page 440

to show me in a moment, I can take a look at it, but I know it's widely disposed with a number of names on it. 01:11
Q. Have you seen any evidence that anyone with a responsibility for the Carteret receivership had knowledge of this change in policy?
A. Well, they did in 1999.
Q. Yes, but in 1995 or '96 or '97 or '98? 01:12
A. I don't know.
Q. Let's look at Saunders 22 which bears a Bates number AM 0010347 through 349.
(Saunders Exhibit 22, Chart dated June 01:12 26th, 1997 bearing Bates numbers AM 0010347 through 349, was so marked for identification.)
Q. This is a chart dated June 26th, 1997, it says post insolvency interest procedures. The 01:13 left-hand column is FDIC procedures and then the next column is former RTC procedures. Obviously the RTC doesn't exist at this time, so presumably that's why it says former, but it says "Rate under RTC, average 90 day T-bill rate as directed by regulator 01:13

Page 441

for pre-national deposit preference receiver. However, the reg does not specify compounding the rate floats and is adjusted monthly to reflect rate of the three previous months."
So does this reflect that -- oh, excuse 01:14 me, then it goes down under adjustments corrections, the last row it says "Apply to claim balance when recorded, not retroactively."
Does this reflect a policy not to apply rate changes retroactively? 01:14
A. This is only referring to 90-day Treasury bill rule, which was not the effective rate being used for Carteret's receiverships.
Q. What do you understand it to mean, if 01:14 you have an understanding about apply to claim balance when recorded, i.e. not retroactively?
A. I'm saying it's not being applied to Carteret. The first column is the rate being applied to Carteret. It doesn't say that in the 01:14 adjustments.
Q. Well, maybe this next document will illuminate this.

Page 442

A. No, it's the first column.
MR. GILBERT: This will be Saunders 23 01:15 which bears a Bates number AM 0010431 through 432.
(Saunders Exhibit 23, Memo bearing Bates numbers AM 0010431 through 432, was so marked for identification.) 01:15
Q. In particular, Professor Saunders, I'd like to direct your attention to the question 2 where it says "How" -- excuse me "Where, how the interest rates are obtained." It says "FDIC claims obtained the rate from Washington legal and provides 01:15 it to DOF. RTC the average of the prior three months of the three months' Treasury bill quoted yield."
Doesn't this memo reflect that even as 01:16 of June 5th, 1997 the RTC's stated policy was a three-month T-bill?
A. No, my understanding was that for post 1993 receiverships the fixed one-year pre-judgment rate was the appropriate interest rate. 01:16
Q. Doesn't this seem inconsistent with it

Page 443

because it's saying RTC average three months, average of the three prior months, three-month Treasury bill?
A. It doesn't agree with practice and what 01:16 was believed by other people. So I think it's -- she wanted to be corrected in 1999 and she was corrected and she applied the correct interest rate in 1999.
Q. Have you seen -- strike that. But her 01:17 practice or the practice of the FDIC even in 1997 was to continue to use the short-term floating rate?
A. Incorrectly, I believe, yes.
Q. Did you see any other mistakes that the FDIC made in calculating the interest? 01:17
A. I didn't go through the exact calculation of the interest. I just looked at a general model to come to find the interest rate which is the one year pre-judgment. 01:17
Q. Do you have any opinion as to why in December of 1999 an attorney at the FDIC and Ms. Tama were discussing the appropriate interest rate?
A. If I beg to remember, she sent him a

Page 444

query as to how the interest rate should be charged 01:18 in the Carteret receivership and he responded that we should charge the one-year pre-judgment interest rate as effectively as of 1995 in the Carteret case.
Q. Do you have any idea as to why she was asking that question at that time? 01:18
A. I think there was some inquiry from Carteret about the receivership balance.
Q. When you say from Carteret, I mean by 1999 Carteret no longer --
A. Or Ambase. Whoever was concerned about 01:18 the size of the receivership, or inquired about the size of the interest rate. So the representatives of the receivership inquired about the size of the receivership.
Q. Now, it says on page 17, paragraph 38, 01:18 you say in the second sentence, "Citing the 1995 policy memo," meaning Mr. Saran, "Requested the use of the federal judgment rate for the Carteret receivership as well as for four other receiverships 01:19 for similar calculation issues had been raised. Importantly Carteret was not singled out for any

Page 445

special treatment."
Isn't it true that all five of these receiverships were Winstar receiverships? 01:19
A. I can't remember the other four. If you tell me that I have no reason to disbelieve you.
Q. And if they were all Winstar receiverships, then this change would benefit the government in all five cases? 01:19
A. Not necessarily, if interest rates were rising, they may have risen after 1999, the receivership would benefit.
Q. At the time the change was made for Carteret it was a $20 million benefit for the 01:20 government, right?
A. If you do a simulation that shows that.
Q. And --
A. Calomiris's simulation and mine.
Q. And the $20 million itself would 01:20 compound with interest?
A. No, because with the floating rate in 2000 interest rates rose -- if it's the next year after 1999, in the year 2000 the interest rates 01:20

Page 478

and the minority preference program advantaged
Carteret? 01:59
A. He got a higher premium than it would
have got in '93. From branch sales in '95 than a
whole bank sale in '93 is claimed by Professor
Calomiris.
Q. But are you saying then that the reason 01:59
that it took 826 days is because of the funding
delay in the minority preference program?
A. It's your words so I'm saying it was
careful with the resolution it turned out to take
that long a time. In reality it turned out they did 01:59
very well.
Q. Why did it take so long to resolve
Carteret, do you have an opinion on that question?
A. Well, I think we already said it was a 01:59
complex institution.
Q. No, you --
A. I did say that about an hour ago.
Q. No, but then but complex as compared to
the other institutions, you hadn't done that 01:59
analysis. So --

Page 479

A. In my opinion it's a complex
institution.
Q. As compared to the other institutions
that were resolved, I thought you testified you 01:59
hadn't done that analysis?
A. That's true. Because it's a large
population I haven't done it yet.
Q. Professor Calomiris testified during his
deposition that it was important to look at the 02:00
right time in 1993 because the market changed
significantly during that year, do you have any
reason to disagree with him?
A. There is a spike up in fourth quarter of
'93. Only in the mean premium but not in the mean 02:00
weighted mean premium. Or the premium for whole
bank transactions in the fourth quarter.
Q. What do you mean the mean weighted?
A. Deposit weighted mean premium. I 02:00
present three premiums, medium, mean deposit
weighted. You only see it happening in the mean --
the deposit weighted premium stays roughly the same,
and if you break out wholesale transactions to the

Page 480

fourth quarter you'll see the effect is still very 02:01
low, 2 to 3 percent range.
Q. In looking at relative deposit premiums,
do you think it's more important to look at premiums
expressed as a percentage of overall deposits or
premiums as expressed as a percentage of core 02:01
deposits?
A. No, they're paying a premium for
deposits that are transferred.
Q. But don't you think -- I thought we had
said yesterday that the reason an acquirer would pay 02:01
premium is because the customer relationships, is
that true?
A. A depositor can have a checking account
and a CD account.
Q. Right, but they're not paying -- 02:01
A. They are very common in fact.
Q. An acquirer is not paying a premium for
hot money deposits, are they?
A. In fact that suggests Carteret did even 02:02
better because it had lots of CDs. Over 70 percent
of its liabilities were CDs, very few were core

Page 481

deposits. The fact that it got 10 or 11 percent
were very good. If I follow your line of argument.
Q. I don't have a line of argument, I'm 02:02
just asking questions, and my question is, isn't it
true that in assessing value, the acquirer would
look at the core deposits?
A. If that's true. I don't believe so, but
if you're telling me that's your model. 02:02
Q. I don't know, you're the economist.
A. CDs and core depositors could also be
important, it goes beyond that. But I also noted
that they had a large -- perhaps this is a different
issue, they had a large component of their balance 02:02
sheet was CDs.
Q. Yes.
A. And I agree, core deposits have more
customer relationships in general than CDs, and the
fact they got a 10 percent, 11 percent premium seems 02:03
to be quite remarkable in terms of good business.
Q. In that they had a very strong core
deposit base?
A. No, that the market was willing to pay 02:03

# CARTERET FEDERAL SAVINGS BANK

## *Conservatorship Strategic Plan*

**Carteret Federal Savings Bank / Morristown, NJ 07960**

**FIN #8602 / Date of Conservatorship 12/04/92**

EXHIBIT
Saunders # 7
10/3/06 LR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0103999

# Carteret Federal Savings Bank
# Conservatorship Strategic Plan
# Table of Contents


| | Page |
|---|---|
| **I. Description** | |
| A. Overview | 1 |
| B. Retail Banking and Deposit Information | 3 |
| C. Cash and Securities | 5 |
| D. Loans Receivable | 6 |
| E. Investment in Real Estate | 9 |
| F. Loan Servicing Portfolio | 10 |
| G. Other Interest-Bearing Liabilities | 11 |
| H. Other Assets and Other Liabilities | 13 |
| I. Subsidiaries | 17 |
| J. Litigation | 20 |
| K. Organization | 20 |
| L. Information Systems and Computer Resources | 20 |
| M. Other Support Functions | 24 |
| **II. Evaluation** | |
| A. Problems of the Institution | 26 |
| B. Retail Branch Network | 26 |
| C. Liquidity | 27 |
| D. Asset Quality | 27 |
| E. Loan Servicing Portfolio | 31 |
| F. Occupancy Issues | 32 |
| G. Candidacy for Combination with Another Institution | 33 |
| H. Subsidiaries | 33 |
| I. Pending Litigation Evaluation | 33 |
| J. Management Levels and Salary Justification | 34 |
| K. Quality and Cost Efficiency of Backroom Operations | 34 |
| L. Indications of Fraud | 34 |
| **III. Recommendations** | 35 |
| **IV. Operational Issues** | |
| A. Retail Banking | 36 |
| B. Managed Downsizing | 36 |
| C. Funding Strategy | 36 |
| D. Loan Workout | 36 |
| E. Sale or Discontinuation of Subsidiary Operations | 37 |
| F. Loan Servicing | 37 |
| G. Repudiation of Lease Obligations | 37 |
| H. Discontinuance of Residential Lending | 38 |
| I. Controller's Division Staffing | 38 |
| J. Accuracy of Books and Records | 38 |
| K. Marketing at Resolution | 38 |
| **V. Integrated Marketing Plan** | 39 |
| **VI. Operating Plan Budget** | 41 |


CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104000

# Carteret Federal Savings Bank
## Conservatorship Strategic Plan
## List of Exhibits

I. Thrift Financial Report (11/30/92)

II. Thrift Financial Report (9/30/92)

III. Deposit Information

- Deposits by County and State
- Retail Certificate Maturity by Term
- Retail Certificate by Interest Rate

IV. Retail Branch Information

- Branch Locations
- Branch Cost Analysis
- Branch Fact Sheets

V. Information Systems

VI. Facilities

VII. Loan Servicing Information

VIII. Organization Charts

IX. Employee Compensation

X. Litigation Listing

XI. Flowchart of Corporate Structure

XII. Subsidiary Listing

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104001

## Part I. Description

### A. Overview

*Intervention*

On December 4, 1992, Date of Conservatorship, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the Office of Thrift Supervision (OTS) placed Carteret Savings Bank , FA (CSB) into receivership and chartered a new federal mutual association, Carteret Federal Savings Bank (CFSB). OTS appointed the Resolution Trust Corporation (RTC) as Receiver of the old institution and as Conservator of the new institution.

References to CSB or the Bank contained in this section refer to Carteret Savings Bank, FA prior to December 5, 1992 and to Carteret Federal Savings Bank thereafter.

*Background*

CSB was incorporated in September 1939 as Carteret Building and Loan Association of Newark, New Jersey, a state-chartered thrift. CSB converted to a federally chartered mutual association -- Carteret Savings and Loan Association -- in 1982 and to a federally chartered stock association in 1983. In 1986, the institution changed its name to Carteret Savings Bank, FA.

In 1987, CSB created a holding company, Carteret Bancorp Inc., for the purpose of expanding its business activities. A year later, The Home Group, Inc., which subsequently changed its name to AmBase Corp., acquired Carteret Bancorp, and thus, CSB, for $266 million. AmBase shareholders retain no interest in CFSB.

CSB is one of the largest New Jersey thrifts insured by the FDIC through the Savings Association Insurance Fund. CSB is a member of both the Federal Home Loan Bank of New York (FHLB) and the Federal Reserve Bank of New York. CSB has 39 active subsidiaries of which the largest operating subsidiary is Imperial Premium Finance, Inc. (IPF), a California based company specializing in financing premiums for commercial lines of insurance. Other subsidiaries are primarily engaged in real estate development, property management and retail financial services. Refer to *Section I. Subsidiaries* for a brief description of the subsidiaries and to *Exhibit XI. - Flowchart of Corporate Structure* and *Exhibit XII. - Subsidiary Listing*. At the date of conservatorship, CSB and its subsidiaries employed approximately 1,100 people. The core businesses of CSB were retail banking and mortgage banking.

CFSB conducts business from 41 retail banking offices primarily located in New Jersey and Florida. CFSB is currently engaged in the business of maintaining savings, time and demand deposits. In 1990 CSB implemented a program to restructure its retail branch network. As part of this program, several less efficient branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. Certain of the branches sold had been acquired by CSB. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB was extensively involved in mortgage banking activities including the origination, servicing, securitization and sales of one-to-four family residential mortgage loans. At December 4, 1992 residential mortgage loans receivable, net were $1.563 billion. CSB was servicing $7.3 billion of loans, which included $6.2 billion of loans serviced for others. Effective December 14, 1992 the RTC decided to discontinue residential loan origination activities. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

CSB also offered consumer loans and other financial products which were intended to broaden its source of income, reduce its exposure to interest rate fluctuations and position CSB to compete more effectively in the retail financial services industry. All consumer lending has ceased with CFSB processing approved applications as of December 4, 1992. In addition, shortly after the date of conservatorship the offering of other financial services has been discontinued.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104002

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

CSB ceased all new corporate and commercial real estate loan originations pursuant to a policy established in the second half of 1989. This policy was established in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions have been experienced since 1989. At December 4, 1992, the corporate and commercial real estate loans receivable totalled $365.0 million ($311.9 million net of reserves). The corporate and commercial real estate owned and in-substance foreclosed loans were $100.4 million and $118.6 million, respectively.

At December 4, 1992, CSB remained out of compliance with minimum regulatory capital requirements promulgated by the OTS pursuant to FIRREA. CSB consented to the issuance of a Capital Directive by the OTS on October 8, 1991. In accordance with the Capital Directive, on September 30, 1991 CSB submitted a capital plan to the OTS with subsequent updates to the capital plan being filed during continuing discussions. On March 2, 1992, the OTS approved the capital plan which required the infusion of sufficient equity capital through a private placement to achieve a fully phased-in regulatory capital position. CSB and the OTS entered into an agreement, dated February 27, 1992 which provided, among other things, that, upon the earlier of (i) May 27, 1992 or (ii) the date on which the Regional Director of the OTS concludes acceptable progress is not being made and the recapitalization program is unlikely to be successful, CSB would be included in the Accelerated Resolution Program (ARP) of the government. CSB received several extensions of the original May 27, 1992 date. Due to lack of RTC funding for ARP, CSB was unable to be included in that program. After nine months, CSB was unsuccessful in its efforts to raise the required additional equity capital.

Total nonperforming assets decreased from $484.9 million at December 31, 1991 to $416.9 million at December 31, 1992. Nonperforming assets include nonaccrual loans, loans 90 or more days past due and still accruing, REO and in-substance foreclosed loans. Restructured loans increased from $64.0 million at December 31, 1991 to $103.1 million at December 31, 1992. As discussed further in *Part II. Evaluation - Section D. Asset Quality*, a majority of CFSB's residential and commercial real estate loans are secured by properties located in the states of New Jersey, Florida and California which have experienced a significant downturn in demand for such properties. CFSB regularly analyzes and closely monitors each portfolio. Potential problem loans are classified if uncertainty exists as to future collectibility.

At December 4, 1992, CSB had total assets of $4.770 billion. Mortgage-backed securities (MBS) and investments, net were $1.233 billion. Total deposits were $2.535 billion and FHLB advances and other borrowings totaled $1.968 billion.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104003

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**B. Retail Banking and Deposit Information**

As of December 31, 1992, the Bank had retail deposits of $2.391 billion. CFSB maintains 41 full-service retail banking offices in New Jersey, Florida and the District of Columbia. Based upon its total deposits of $2.934 billion at ye 1991, Carteret was the fiftieth largest thrift in the United States.

CFSB offers a full range of retail deposit products including passbook and statement savings accounts, regular and interest-bearing checking accounts, money market accounts and certificates of deposit. Included among these programs are individual retirement accounts and Keogh accounts. Interest on products currently offered is established by CFSB as market conditions warrant. At year-end 1992, the Bank had approximately 66,000 savings accounts, 56,000 checking accounts and 133,000 certificate of deposit accounts.

Deposits at December 31, 1992 are comprised of the following:

| *(in thousands)* | Deposits | Average Cost of Funds |
|---|---|---|
| Regular savings | $114,350 | 3.24% |
| Money market savings | 316,611 | 3.27 |
| Total savings | 430,961 | 3.26 |
| 91 day certificate | 39,248 | 3.28 |
| 182 day certificate | 409,859 | 3.63 |
| 9 month certificate | 17,192 | 3.59 |
| 12 - 23 month certificate | 602,943 | 4.38 |
| 24 - 35 month certificate | 234,822 | 5.93 |
| 36 - 47 month certificate | 73,509 | 7.11 |
| 48 - 59 month certificate | 23,363 | 6.96 |
| 5 - 10 year certificate | 203,324 | 8.06 |
| Total certificates | 1,604,260 | 5.01 |
| Interest checking | 151,764 | 2.41 |
| Non-interest checking | 13,286 | |
| Money market demand | 184,226 | 3.24 |
| Commercial checking | 74 | |
| Total demand accounts | 349,350 | 2.76 |
| Total retail deposits | 2,384,571 | 4.36 |
| Negotiable rate certificates | 4,856 | 3.05 |
| As agent deposits | | |
| Accrued interest | 1,190 | |
| Total deposits | $2,390,617 | 4.36% |

Refer to *Exhibit III. - Deposit Information* for additional detail on deposits.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104004

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.

CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.

Since the late 1980's, CSB has pursued a retail office network optimization strategy which has resulted in the sale or consolidation of those offices which were poor performers or which were geographically unacceptable. As part of this program, several branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. CSB reduced operating expenses as a result of these branch sales and consolidations. The transferred deposits were replaced in substantial part with similar or lower cost funds, primarily adjustable rate advances from the FHLB.

CSB currently has 31 offices in New Jersey, 9 offices in Florida and one office in the District of Columbia. The New Jersey offices are located in the northern half of the State. In Florida, CSB offices are generally clustered in the south Florida and Tampa/Clearwater regions. CSB also affords its customers electronic access to certain accounts through its participation in various regional and national EFT networks. Refer to *Exhibit IV. - Retail Branch Information* for additional details on individual retail branches.

Prior to the date of conservatorship, CSB also originated residential mortgage loans and consumer loans through its retail office network. A variety of residential mortgage loans were offered to meet the needs of those who were purchasing a home or refinancing. Consumer lending efforts primarily focused on adjustable rate home equity lines of credit, overdraft lines of credit, fixed-rate home equity, auto loans and student loans. These loans are no longer offered, although existing lines of credit may still be accessed.

As of December 31, 1992, CSB had approximately $213 million of uninsured deposits. This figure was determined through a computer analysis of taxpayer identification numbers and combination of account data.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104005

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**C. Cash and Securities**

CFSB's portfolios at December 31, 1992 are detailed in this section.

*Cash and cash equivalents*

Cash and cash equivalents at December 31, 1992 is comprised of the following:

| *(in thousands)* | |
|---|---|
| Overnight Federal funds | $1,244,147 |
| Non-interest and interest bearing cash | 162,078 |
| | $1,406,225 |

*Investments*

The investment portfolio at December 31, 1992 consists of the following:

| *(in thousands)* | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| U.S. Government obligations | $0 | $500 | $500 |
| Corporate bonds | | 250 | 250 |
| Collateralized mortgage obligations | | 22,840 | 22,840 |
| Partnership investment | | 2,721 | 2,721 |
| Preferred stock | | 128 | 128 |
| Investments, book value | $0 | $26,439 | $26,439 |
| Investments, market value | $0 | $26,291 | $26,291 |

*Federal Home Loan Bank Stock*

The stock of the FHLB is carried at a cost of $44,265,000 at December 31, 1992. CSB is required to own and in fact does own capital stock in the FHLB in an amount determined generally by its outstanding home mortgage loans and advances from the FHLB. For the year ended December 31, 1992 the FHLB stock yielded 8.37%.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104006

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 005

*Mortgage-backed Securities*

MBS, net are summarized as follows:

| | Held for Sale | Held for Investment | Total |
|---|---|---|---|
| Governmental National Mortgage Association ("GNMA") | $ 81,292 | $96,038 | $177,330 |
| Federal National Mortgage Association ("FNMA") | 63,811 | 11,663 | 75,474 |
| Federal Home Loan Mortgage Corporation ("FHLMC") | 744 | 40,870 | 41,614 |
| Pass-through securities | 3,636 | 636,269 | 639,905 |
| Other mortgage-backed securities (1) | | 9,926 | 9,926 |
| Mortgage-backed securities, book value | $149,483 | $794,766 | $944,249 |
| Mortgage-backed securities, market value | $150,119 | $806,279 | $956,398 |

(1) Other mortgage-backed securities consists of residual securities.

At December 31, 1992 CFSB had assets pledged to FHLB advances with a book value of $2.479 billion and to Medium Term Notes (MTN's) with a book value of $111.6 million. These pledged assets included Federal funds, mortgage-backed securities, whole loan participations and whole loans. On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's in October 1993.

**D. Loans Receivable**

Loans receivable, net, at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Gross loans: | |
| Residential first mortgage loans | $1,810,000 |
| Commercial real estate loans | 244,058 |
| Total first mortgage loans | 2,054,058 |
| Corporate loans | 108,112 |
| Consumer loans | 100,430 |
| Premium finance loans | 383,550 |
| Total other loans | 592,092 |
| Total loans receivable, gross | 2,646,150 |
| Loan participations sold | (228,115) |
| Loans in process | |
| Unearned discounts and deferred loan fees | (9,365) |
| Allowance for losses on loans | (59,597) |
| Total loans receivable, net | $2,349,073 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104007

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

Loans receivable, net, at December 31, 1992 by type are as follows:

| *(in thousands)* | |
|---|---|
| Residential first mortgage loans | $1,578,679 |
| Commercial real estate loans | 215,726 |
| Total first mortgage loans | 1,794,405 |
| Corporate loans | 75,190 |
| Consumer loans | 98,248 |
| Premium finance loans | 381,230 |
| Total other loans | 554,668 |
| Total loans receivable, net | $2,349,073 |

The following discussion provides further information on the various loan portfolios.

*Residential First Mortgage Loans*

CSB was extensively involved in mortgage banking activities including the origination, securitization, sale and servicing of one-to-four family residential mortgage loans. CSB originated first mortgage loans through retail and wholesale mortgage production offices. Wholesale loans were originated by third parties and were primarily closed in the name of CSB or assigned to CSB subsequent to closing. The originated loans have traditionally been retained in CSB's portfolio or sold in the national secondary market on either a servicing-released or servicing-retained basis. It had been CSB's policy to originate fixed rate product for sale and adjustable rate product for portfolio. As of December 14, 1992, all new mortgage loan origination ceased. However, the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB.

Throughout 1990, 1991 and 1992 CSB, continued to refine its composition of mortgage production offices. This was achieved through the closing of unprofitable offices and the consolidation of offices located in the same territories. At December 4, 1992 CSB had six mortgage production offices located in New Jersey and Florida.

CSB's portfolio of residential first mortgage loans at December 31, 1992 are geographically concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| In-house portfolio | $597,099 | $352,645 | $143,423 | $1,093,167 |
| Loans serviced by others portfolio | 86,020 | 150,535 | 480,278 (1) | 716,833 |
| | $683,119 | $503,180 | $623,701 | $1,810,000 |

(1) Loans serviced by others are primarily located in states other than New Jersey and Florida in an effort to diversify CSB's significant geographical concentration. A significant portion of these loans are located in California.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104008

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Commercial Real Estate and Corporate Loans*

As previously mentioned, pursuant to a policy established in the second half of 1989, CSB ceased all new corporate and commercial real estate loan originations. This policy was in response to the adverse economic conditions which affected the northeast and southeast regions of the United States, CSB's primary operating markets. Significant increases in nonperforming loans in both regions were experienced resulting from the economic downturn and deterioration of the real estate markets served, particularly in commercial real estate.

The commercial real estate and corporate loan portfolios, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $ 7,816 | $ 6,051 | $ 10,990 | $ 24,857 |
| Apartments | 6,415 | 10,709 | 25,388 | 42,512 |
| Hotel | 15,834 | 32,992 | 24,283 | 73,109 |
| Retail | 9,489 | 9,221 | | 18,710 |
| Corporate loans | 17,082 | | 27,989 (1) | 45,071 |
| Warehouse | 8,173 | | 4,740 | 12,913 |
| Single family | 7,598 | 1,424 | 1,594 | 10,616 |
| Nursing homes | 13,146 | | 11,112 | 24,258 |
| Land & development | 3,717 | 967 | 2,997 | 7,681 |
| Mini storage | 6,552 | 12,111 | | 18,663 |
| Other | 4,097 | 7,052 | 1,377 | 12,526 |
| Commercial real estate and corporate loans, net | $99,919 | $80,527 | $110,470 | $290,916 |

(1) A majority of the corporate loans represent corporate lines of credit and are not identified with a particular state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104009

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Consumer Loans*

Prior to the date of conservatorship, CSB made various types of consumer loans, including home equity loans, auto lo student loans, unsecured personal loans, and loans to depositors secured by their deposit accounts. The shorter-ter.: normally higher interest rates charged on various types of consumer loans contribute to the maintenance of a positive spread between loan yields and CSB's cost of funds.

The consumer loan portfolio at December 31, 1992 by type of loan is geographically concentrated as follows:

| *(In thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Home equity line of credit | $32,028 | $11,746 | $710 | $44,484 |
| Fixed equity | 21,719 | 14,998 | 1,604 | 38,321 |
| Unsecured line of credit | 3,724 | 1,070 | 88 | 4,882 |
| Savings account loans | 3,139 | 263 | | 3,402 |
| Student loans | 2,458 | 3 | | 2,461 |
| Auto loans | 1,823 | 451 | 39 | 2,313 |
| Other | 3,982 | 566 | 19 | 4,567 |
| | $68,873 | $29,097 | $2,460 | $100,430 |

*Premium Finance Loans*

Premium finance loans are originated by IPF. IPF has operated in the premium finance business since 1972, providing loans to small and medium sized businesses to finance premiums payable on property and casualty insurance policies. All loans made by IPF are collateralized by the unearned premium refundable by the insurer upon cancellation. The portfolio is well diversified by geography, loan size, business of the insureds and, also, diversified by insurer.

On September 30, 1992 CSB and IPF executed an agreement for the purchase of IPF receivables by CSB. This agreement represents a 3 year commitment to purchase up to $400 million of receivables. IPF would continue to service the receivables for a fee. A reserve fund to cover losses resulting from defaults is maintained for the benefit of CSB. The funding cost is passed through monthly based upon the higher of: a) CSB's average cost of funds for the previous month; or b) 30 day LIBOR plus 75 basis points. This cost is applied to the average monthly principal balance of receivables purchased.

**E. Investment in Real Estate**

Investment in real estate, net, at December 31, 1992 consists of the following:

| *(In thousands)* | |
|---|---|
| Real estate held for development and sale | $5,799 |
| Real estate owned ("REO") - Commercial | 98,341 |
| - Mortgage | 39,490 |
| - Consumer | 1,878 |
| Total REO | 139,709 |
| In-substance foreclosed loans - Commercial | 118,359 |
| - Mortgage | 59,000 |
| Total in-substance foreclosed loans | 177,359 |
| | $322,867 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104010

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Real Estate Owned*

The commercial real estate owned portfolio, net, at December 31, 1992 consists of the following:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office | $3,461 | $4,165 | $5,617 | $13,243 |
| Apartments | | 18,212 | 2,899 | 21,111 |
| Hotel | 2,088 | 18,174 | 8,277 | 28,539 |
| Retail | | 11,367 | | 11,367 |
| Warehouse | | | 2,427 | 2,427 |
| Single family | 168 | 2,989 | 2,002 | 5,159 |
| Land development | 5,773 | 10,677 | | 16,450 |
| Other | | 48 | | 48 |
| | $11,490 | $65,632 | $21,222 | $98,344 |

*In-substance Foreclosed Loans*

The commercial in-substance foreclosed loans, net, at December 31, 1992 are concentrated as follows:

| *(in thousands)* | New Jersey | Florida | Other | Total |
|---|---|---|---|---|
| Office buildings | $26,960 | $3,377 | $16,100 (1) | $46,437 |
| Apartments | 4,035 | | 26,134 (2) | 30,169 |
| Hotel | 5,000 | | | 5,000 |
| Retail | 143 | 3,648 | | 3,791 |
| Corporate loans | | | | |
| Warehouse | 5,611 | 914 | | 6,525 |
| Single family | 1,422 | | | 1,422 |
| Nursing homes | | 2,979 | | 2,979 |
| Land & development | 12,328 | 4,359 | 699 | 17,386 |
| Mini storage | 2,526 | | | 2,526 |
| Other | | 1,719 | 405 | 2,124 |
| | $58,025 | $16,996 | $43,338 | $118,359 |

(1) Includes $13,900 located in the state of Ohio.
(2) Includes $20,100 located in the state of Ohio.

**F. Loan Servicing**

*Residential Mortgage Loan Servicing*

CFSB has a stand-alone residential mortgage loan servicing division operating in Clearwater, Florida. The Clearwater Servicing Center was acquired in 1989 from Numerica Financial Services, Inc. with almost 30,000 loans and related assets, plus an existing staff. To improve efficiencies and customer service, CSB consolidated its entire portfolio, most of which had been serviced from its New Jersey headquarters, into the Clearwater operation by the end of 1990. At its peak, the Center serviced 146,000 loans totalling almost $10 billion with over 900 loans per employee serviced at an average core cost of approximately $60 per loan.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104011

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

Among thrift servicers, CSB's portfolio serviced for others of $6.6 billion was the ninth largest as of June 30, 1992. Consisting almost equally of originated and purchased servicing, (47% and 53%, respectively), the entire portfolio contained 115,000 loans totalling $7.2 billion as of December 31, 1992. Of this total, 11,500 loans or $1.1 billion are asset loans owned in full by CFSB. The Bank also had a small participation interest in 3,000 loans with a total principal balance of $87 million. The remainder were primarily FNMA/FHLMC/GNMA.

The book value of capitalized costs of future servicing at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Purchased mortgage servicing rights | $51,078 |
| Excess servicing rights: | |
| Mortgage loans | 11,364 |
| Home equity loans | 1,661 |
| | 13,025 |
| | $64,103 |

*Consumer Loan Servicing*

During 1989 and 1990 CSB sold segments of its Consumer Loan portfolio to a variety of investors, retaining the right to earn recurring fee income by continuing to service the loans. The table that follows details the types of loans, names of investors and shows the balances outstanding together with the servicing spread for each portfolio:

| *(dollars in thousands)* | Number of Accounts | Credit Limit | Current Balance | Servicing Fee |
|---|---|---|---|---|
| Revolving: | | | | |
| United Jersey Bank | 1,991 | $109,916 | $ 64,751 | .65% |
| First Valley Bank | 3,420 | 180,369 | 106,916 | .55 |
| Massachusetts Company | 789 | 34,302 | 19,498 | .50 |
| Total revolving | 6,200 | 324,587 | 191,165 | |
| Fixed: | | | | |
| First Fidelity | 856 | 22,612 | 1,139 | .25 |
| West Jersey | 125 | 2,564 | 44 | .50 |
| Total fixed | 981 | 25,176 | 1,183 | |
| | 7,181 | $349,763 | $192,348 | |

At December 31, 1992 CFSB carried $1.66 million in excess servicing rights attributed to these portfolios on its books. Of the portfolios noted above only the First Valley (a subsidiary of UJB Financial in New Jersey) loans have a recourse liability which, at December 31, 1992 was about $2.26 million.

## G. Other Interest Bearing Liabilities

*Advances from the Federal Home Loan Bank*

CSB borrowed funds from the FHLB. The borrowings are collateralized by CSB's FHLB stock holdings and certain mortgage loans and other assets, principally mortgage-backed securities.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104012

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

At December 31, 1992, advances from the FHLB aggregated $885 million. CSB is currently required to physically deliver specific collateral to the FHLB to secure its advances. Under current policies of the Federal Home Loan Bank, member institutions are required to maintain collateral with market values in an amount ranging from 100% to 125% of outstanding advances, depending on the type of collateral pledged and the member's financial condition. CSB has delivered to the FHLB the required level of collateral necessary to secure its outstanding advances.

CSB's advances from the FHLB are primarily variable rate indexed to the London Interbank Offering Rate (LIBOR) with quarterly and semi-annual resets. At December 31, 1992, maturities of the advances from the FHLB ranged from June 1994 to January 1996.

Advances from the FHLB at December 31, 1992 are as follows:

| Date of Note | Principal Balance (000's) | Next Reset Date | Due Date of Note | Interest Rate |
|---|---|---|---|---|
| *Variance Rate Advances (3 Month LIBOR)* | | | | |
| June, 1989 | 50,000 | December, 1992 | June, 1994 | 3.33% |
| June, 1990 | 3,560 | December, 1992 | June, 1995 | 3.09% |
| August, 1990 | 1,750 | February, 1993 | August, 1995 | 3.61% |
| October, 1990 | 30,000 | December, 1992 | September, 1995 | 3.22% |
| | 85,310 | | | |
| *Variable Rate Advances (6 Month LIBOR)* | | | | |
| August, 1990 | 100,000 | February, 1993 | August, 1995 | 3.42% |
| October, 1990 | 300,000 | March, 1993 | September, 1995 | 3.34% |
| December, 1990 | 200,000 | December, 1992 | December, 1995 | 3.67% |
| December, 1990 | 200,000 | January, 1993 | January, 1996 | 3.58% |
| | 800,000 | | | |
| | $885,310 | | | |

On January 13, 1993, the balance of FHLB advances totalling $885.3 million was repaid thus releasing all pledged assets. Prepayment penalties through December 31, 1992 totalled $6.2 million.

*RTC Advances*

RTC Advances are being utilized to replace the advances from the FHLB. As of December 31, 1992, CFSB had $1.75 billion of RTC Advances. Interest expense on these advances is based upon the 13 week Treasury Bill plus 25 basis points. The rate adjusts weekly.

*Other Borrowed Funds*

CFSB's other borrowed funds consist of fixed rate MTN's. At December 31, 1992, the MTN's had maturities ranging from May 1993 to October 1993 and interest rates ranging from 8.00% to 9.34%, with interest payable semiannually on March 15 and November 15. The MTN's are not redeemable at the option of CFSB. The MTN's are primarily collateralized by mortgage-backed securities with current face values of approximately $115 million. As previously discussed, arrangements are currently being made to liquidate the MTN pledged assets and then maintain cash collateral until the final maturity of the MTN's.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
CAM-A-0104013

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00(

*Hedges*

CSB periodically used interest rate futures and entered into options on future contracts to reduce exposure to fluctuations in interest rates. There were no open positions in either of these instruments on December 31, 1992.

CSB used interest rate swap agreements to adjust the repricing of certain assets and liabilities to minimize exposure to interest rate changes. Interest rate swaps outstanding at December 31, 1992 are as follows:

| *(dollars in thousands)* | Notional Amount | Weighted Average Fixed Rate | Weighted Average Floating Rate |
|---|---|---|---|
| Fixed Rate Payor | $151,000 | 8.94% | 3.63% |
| Floating Rate Payor | $10,000 | 8.16% | 3.58% |

The current swap contracts are with six dealers. The agreements outstanding at December 31, 1992 have expiration dates between January 1993 and August 1995.

The cost to unwind the interest rate swap agreements is currently estimated to be in excess of $6 million.

## H. Other Assets and Other Liabilities

Non-interest earning assets at December 31, 1992 are as follows:

| *(In thousands)* | |
|---|---|
| Interest and dividends receivable | $18,540 |
| Other assets | 86,026 |
| | $104,566 |

*Interest and Dividends Receivable*

Interest and dividends receivable represents the income earned on all interest earning assets but not yet received in cash.

*Goodwill of the Bank*

Goodwill of the Bank was originally recorded in connection with supervisory and nonsupervisory acquisitions in the 1980's and represents the excess of cost over fair value of assets acquired. A portion of goodwill was written off in connection with branch sales in 1990. The goodwill was being amortized to expense on a straight line basis over periods ranging from nine to 25 years. The goodwill of the Bank has been written off.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104014

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Other Assets*

Other assets at December 31, 1992 consists of the following:

| *(in thousands)* | |
|---|---|
| Premises and equipment, net | $25,108 |
| FHA/VA receivables | 22,820 |
| Mortgage escrow advance | 17,047 |
| Core deposit value | 1,410 |
| Goodwill - IPF | 2,009 |
| Purchased distribution system - IPF | 14,420 |
| Tradename and Covenant Not To Compete - IPF | 2,706 |
| Other assets, net | 506 |
| | $86,026 |

Premises and equipment, net at December 31, 1992 is comprised of the following:

| *(in thousands)* | Gross | Accumulated Depreciation | Net |
|---|---|---|---|
| Land | $4,118 | | $4,118* |
| Buildings and improvements | 19,508 | ($8,370) | 11,138* |
| Leasehold improvements | 7,777 | (5,284) | 2,493 |
| Furniture, equipment and automobiles | 23,289 | (17,280) | 6,009 |
| | 54,692 | (30,934) | 23,758 |
| Subsidiaries | | | 1,350 |
| | $54,692 | ($30,934) | $25,108 |

* Land and buildings and improvements include, among others, the following facilities:

| *(in thousands)* | Gross | Accumulated Depreciation | Net(1) |
|---|---|---|---|
| South Street, Morristown, New Jersey - administrative offices | $7,748 | ($2,697) | $5,051 |
| Delray Beach, Florida - retail branch (2) and office | 3,098 | (1,099) | 1,999 |
| Phillipsburg, New Jersey - retail branch | 819 | (412) | 407 |
| West Delray Beach, Florida - retail branch (2) | 1,226 | (307) | 919 |
| Caldwell, New Jersey - retail branch | 940 | (262) | 678 |
| Newark, New Jersey - retail branch | 749 | (418) | 331 |

(1) Excludes furniture, fixtures and equipment.
(2) Owned by CFSB - leased to Great Western.

Refer to *Exhibit VI. - Facilities* for a complete listing of owned and leased premises.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104015

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

Non-interest bearing liabilities at December 31, 1992 are composed of the following:

| *(in thousands)* | |
|---|---|
| Escrow - Bank | $78,015 |
| Escrow - IPF | 2,078 |
| Other liabilities | 119,536 |
| | $199,629 |

*Escrow-Bank*

CFSB, as of December 31, 1992, services $7.3 billion of mortgage loans, of which $6.2 billion are loans serviced for others and $1.1 billion are CFSB asset loans. Earnings are generated from service fees, late charges and insurance income. Escrow funds include mortgagors' deposits for taxes and insurance ("T&I") and the float from the remittance of principal and interest ("P&I") to the investors for which CFSB services loans.

Included in CFSB's balance sheet at December 31, 1992 is a $78.0 million escrow liability which relates to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | X | |
| GNMA | X | |
| Other (private) | X | X |
| Asset loans | X | |

The T&I funds are insured for each mortgagor. The P&I funds are owned by the investors. For investment purposes, these funds are commingled with the Bank's assets and earn interest accordingly. Such interest is included in "interest income".

Additionally, escrow funds of approximately $120 million at December 31, 1992 which is not included in CFSB's balance sheet, are on deposit at the FHLB. These funds relate to the following:

| Investor | T & I | P & I |
|---|---|---|
| FHLMC | | X |
| GNMA | | X |
| FNMA | X | X |

The above government agencies for which CFSB services loans require that these funds be maintained in custodial accounts in an eligible depository.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104016

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 006

*Other Liabilities*

Other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued interest payable | $12,534 |
| Undisbursed premiums - IPF | 22,823 |
| Outstanding payments to producers - IPF | 8,363 |
| Overdrawn cash | 25,755 |
| Custodial suspense (due to investors) | 17,148 |
| Construction loan - Midlantic | 4,166 |
| Other liabilities, net | 28,840 |
| | $119,629 |

Other - other liabilities at December 31, 1992 consist of the following:

| *(in thousands)* | |
|---|---|
| Accrued liabilities: | |
| Pension liability | $1,859 |
| Supplemental retirement plan liability | 1,200 |
| Other accrued liabilities | 5,047 |
| | 8,106 |
| Accrued liabilities on the books of IPF | 1,330 |
| Intercompany payable to CSB Bancorp | 2,884 |
| Due to investors - principal and interest (HER loans serviced for others) | 3,940 |
| Deferred gain futures contract settlement | 1,874 |
| Accrued liability - interest rate swaps | 2,385 |
| Accruals for contingencies, warranty costs and Mt. Laurel units on the books of real estate development subsidiaries | 1,740 |
| Unclaimed property (a) | 1,070 |
| Other | 5,511 |
| | $28,840 |

(a) Represents unclaimed checks which are held for up to six years prior to escheatment to the state.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104017

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

**I. Subsidiaries**

Bridge Asset Management, Inc. has been assigned the responsibility for the management and disposition of all subsidiaries and subsidiary assets from the date of intervention and continuing through the disposition or the transfer of the subsidiary and subsidiary assets to one or more permanent SAMA/SAMDA contractors.

Bridge Asset Management, Inc. has identified 76 wholly owned subsidiary corporations which have been grouped into four major categories: (1) Carteret Premium Finance, Inc. and its subsidiary corporations; (2) Other non-real estate operating companies; (3) Real estate development and real estate owned holding companies; and (4) Inactive companies and companies currently in the process of dissolution. Refer to *Exhibit XI - Flowchart of Corporate Structure* and *Exhibit XII - Subsidiary Listing.*

Carteret Premium Finance, Inc. and Subsidiaries

Carteret Premium Finance, Inc. (CPF) is a wholly owned subsidiary of CFSB. CPF was incorporated in the State of New Jersey and currently functions as a holding company for Imperial Premium Finance, Inc. (IPF-DE), a wholly owned operating company incorporated in Delaware. IPF-DE has three wholly owned subsidiaries, including an operating company of the same name incorporated in California (IPF-CA). IPF-DE and IPF-CA (together referred to as IPF) are both primarily engaged in the financing of insurance premiums, with IPF-CA originating loans within the State of California and IPF-DE originating loans outside the state. The other two subsidiaries of IPF-DE, Imperial Premium Funding Corp., Inc. and Imperial Premium Finance Holding Corp., Inc., are special purpose finance subsidiaries through which loans originated by IPF-DE and IPF-CA were previously sold to Chemical Bank and are currently being sold to CFSB, respectively.

Other Active Non-Real Estate Operating Companies

In addition to CPF and its subsidiaries, there are a number of other special purpose finance and financial services subsidiaries which were active at the date of intervention: Carteret Holdings Corporation, Carteret Insurance Services, Inc., Carteret Financial Services, A New Jersey Corporation and CSB Manor Park, Inc.

*Carteret Holdings Corporation*

This subsidiary is a wholly owned subsidiary of CFSB which delivered a limited guarantee in connection with the March 28, 1988 issuance by CSB of $55,035,674 of Class A and Class B Series 1988-1 Mortgage Pass-Through Certificates.

*Carteret Insurance Services, Inc.*

This subsidiary is a subsidiary of CFSB which was established to secure force placed mortgage insurance on behalf of CSB and to offer optional insurance products, including mortgage life and mortgage disability insurance to mortgage customers of CSB. The subsidiary currently generates gross revenues of approximately $2.1 million. Bridge Asset Management, Inc. is in the process of drafting a Case Memorandum recommending that Carteret Insurance Services, Inc. renew its insurance license and errors and omissions policy, process the optional insurance applications which it has received as a result of a solicitation mailing in November and continue to procure force placed insurance and to administer existing optional insurance policies.

*Carteret Financial Services, A New Jersey Corporation*

This subsidiary is a subsidiary which was actively engaged in the sale of annuity products and which provided office space and equipment and limited marketing support to a discount brokerage firm under a financial services agreement. The subsidiary stopped marketing annuities the morning following the date of intervention and both CFSB and the subsidiary suspended all marketing support for the discount brokerage firm that same morning. In a meeting on December 29, 1992, representatives from CFSB and the discount brokerage firm, Wall Street Investment Services (WSIS), met as a result of which WSIS agreed to consolidate its operations into the second floor of the Caldwell, New Jersey branch and to pay fair market rent for the space; the office is physically separated from the Bank's facilities on the first floor and has a separate entrance. Bridge Asset Management, Inc. has requested RTC Legal to review the financial services agreement between Carteret Financial Services and WSIS to clarify the subsidiary's options and potential liabilities in terminating the agreement.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104018

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00