*CSB Manor Park, Inc.*

This subsidiary currently serves as a holding company for The Inn at Clark, Inc. (The Inn), a corporation originally owned and controlled by a borrower of CSB who had assigned 100% of the stock in The Inn in connection with a mortgage on a Ramada Inn in Clark, New Jersey. Upon the borrower's default under the mortgage loan, CSB initiated foreclosure actions against the Ramada Inn and began exercising its right as assignee to control the operations and affairs of The Inn. The Inn subsequently engaged a third party hotel management company, Signet Hotel Corporation, to operate the Ramada Inn which is awaiting sheriff's auction as a result of foreclosure proceedings initiated by CSB.

Real Estate Investment and Real Estate Owned Holding Companies

*First Affiliate, Inc.*

This subsidiary currently acts as a holding company for Carteret Boca Gardens, Inc., a real estate development company which is constructing and marketing single family attached homes in a residential subdivision in Boca Raton, Florida. At present, there are three model units, eleven completed units ready for sale, thirteen units under construction and six units for which slab has been poured. A total of five units have been sold since the date of intervention and a total of 675 units in this 703 unit development have been sold since work originally began in 1983.

*Carteret Realty Corp.*

This subsidiary is actively engaged in the construction of townhouses and condomiums in a major planned unit development (PUD) known as Foxmoor and located outside of Princeton, New Jersey. At present, the subsidiary is in the process of completing the development of three subdivisions within the PUD, having already successfully completed four subdivisions within the PUD. Spread among the three subdivisions currently under development, the subsidiary currently owns 10 model units, 27 completed units, 12 units which are under construction, 20 units for which the foundations have been poured and 76 planned units on which no work has been done. At present, there are approximately 1,380 families living within the PUD and the subsidiary has contracts or is holding deposits on 42 of the 145 units enumerated above.

In addition to the three subsdivisions currently under active development, the subsidiary owns an additional three undeveloped subdivisions within the PUD, one of which has received the necessary approvals for the construction of 248 condomiums, the second of which has received the necessary approvals for 312 townhouses and third of which has been approved for 40,000 square feet of office space.

The entire asset has a current book value of approximately $6.5 million and a current appraised value of $15.3 million. The asset is currently encumbered by a mortgage to Midlantic National Bank in the amount of $4.5 million. A Case Memorandum has recently been submitted recommending that the subsidiary utilize its existing cash balances to prepay the mortgage in an amount of up to $2 million.

*Carteret Waterview, Inc.*

This subsidiary is a limited partner in B & C Land Partnership, L.P. and a limited partner in 10 Waterview Associates, L.P., having a 40% interest in each of the limited partnerships. 10 Waterview Associates, L.P. owns the building at 10 Waterview Boulevard in which CFSB houses a majority of its operations. B & C Land Partnership, L.P. owns the land on which 10 Waterview was constructed under a 97 year ground lease. CFSB is currently considering repudiating and/or renegotiating its leases at 10 Waterview; any repudiation or significant renegotiation of either of its two leases at 10 Waterview will eliminate any existing or future equity which the subsidiary may have in the land or the building.

*Other*

In addition to these three real estate investment subsidiaries, there are currently 27 subsidiaries holding single real estate assets which were originally mortgaged to CSB and subsequently acquired through foreclosure or by deed-in-lieu of foreclosure. There were 29 such subsidiaries at the date of intervention, two of which have sold their single real estate assets and which are now categorized as formerly active subsidiaries.

The 27 remaining real estate assets have a total combined book value of approximately $125.2 million. Nine of these single real estate asset subsidiaries own a real estate asset with a book value in excess of $5 million and these nine assets have a combined book value of $82.3. The following tables provide specific information regarding the nine largest assets and summary information regarding all 27 of the assets.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104019

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

The following are major subsidiary REO assets:

| *(in millions)* Subsidiary Name | Asset Name | Type of Asset | Asset Location | Asset Value |
|---|---|---|---|---|
| Carteret Amberwood | Spectrum Business Park | Vacant Land | Florida | $8.9 |
| CSB Northern Real Estate, Inc. | La Mirada | Office/Retail Buildings | Florida | 6.4 |
| Talarico Real Estate, Inc. | Talarico Warehouse | Industrial Warehouse | New Jersey | 6.3 |
| CSB Pembroke Development, Inc. | The Landings | Undeveloped PUD Tracts | Florida | 5.8 |
| CSB Land Management, Inc. | Paramount Plaza | Office Building | Florida | 5.8 |
| CSB New Jersey Development | Old Mill Inn | Hotel/Restaurant | New Jersey | 5.7 |
| CSB Custom Living Homes, Inc. | Hunter's Glen - Jefferson | Vacant Land | New Jersey | 5.0 |
| CSB Southern Properties, Inc. | Bel-Air Apartments | Apartment Complex | Florida | 11.6 |
| CSB Florida Building, Inc. | Radisson Plaza Hotel | Hotel | Florida | 26.8 |
| Total | | | | $82.3 |

The following are the number of subsidiary REO assets by type and by state:

| | New Jersey | Florida | Arizona | Ohio | Total |
|---|---|---|---|---|---|
| Office Parks, Office | 5 | 3 | | 1 | 9 |
| Residential Developments | 3 | 3 | | | 6 |
| Commercial, Industrial | 1 | 4 | | | 5 |
| Hotel, Motel, Restaurant | 1 | 1 | 1 | | 3 |
| Land, Mixed Use, Other | 2 | | 1 | | 3 |
| Agricultural | 1 | | | | 1 |
| Total | 13 | 11 | 2 | 1 | 27 |

The following are the book value of subsidiary REO assets by type and by state:

| *(in millions)* | New Jersey | Florida | Arizona | Ohio | Total |
|---|---|---|---|---|---|
| Office Parks, Office | $11.5 | $21.1 | | $2.2 | $34.8 |
| Residential Developments | 10.4 | 19.4 | | | 29.8 |
| Commerical, Industrial | 6.3 | 11.3 | | | 17.6 |
| Hotel, Motel, Restaurant | 5.7 | 26.8 | $4.9 | | 37.4 |
| Land, Mixed Use, Other | 5.3 | | .1 | | 5.4 |
| Agricultural | .1 | | | | .1 |
| Total | $39.3 | $78.6 | $5.0 | $2.2 | $125.1 |

Seven of the 27 real estate assets are currently in the process of being transferred to Midland in conjunction with a SAMDA/auction program and the remaining assets are currently expected to be transferred to one or more permanent SAMDA contractors on or before March 4, 1993.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104020

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

Inactive Companies and Companies in the Process of Dissolution

There are five subsidiary corporations currently in the process of dissolution, 18 corporations which were established to hold real estate acquired through foreclosure or by deed in lieu of foreclosure and which were never activated, 15 inactive subsidiaries which were formerly active developing or holding real estate assets and five inactive subsidiary corporations which were formerly active holding or non-real estate operating companies. Bridge Asset Management, Inc. is currently in the process of preparing a Case Memorandum recommending the expedited dissolution of the 18 subsidiary corporations which never commenced operations. A preliminary due diligence of the 20 formerly active subsidiary corporations has been completed and has disclosed outstanding issues on many of these subsidiary corporations which must be resolved prior to their dissolution. Ongoing due diligence efforts will initially focus on those subsidiaries with known outstanding issues in order to expedite the dissolution strategy of these subsidiaries.

**J. Litigation**

A litigation report, dated December 31, 1992, is attached in *Exhibit X. - Litigation Listing*. This report is a summary of all known litigation involving CSB or its subsidiaries. Excluded from this report are foreclosure related actions and other minor claims arising in the normal course of business.

**K. Organization**

At December 4, 1992, CSB and its subsidiaries had 1,124 employees which included approximately 102 part-time and 1,022 full-time employees. Total annual payroll was approximately $35 million. The related benefit expense is approximately $6 million. The table below summarizes CSB's headcount by major category. Refer to *Exhibit VIII. - Organization Charts* and *Exhibit IX. - Employee Compensation* for further information.

| | |
|---|---|
| Commercial Workout Operations | 31 |
| Imperial Premium Finance | 195 |
| Mortgage Servicing | 151 |
| Mortgage Production | 90 |
| Mortgage Administration | 59 |
| Retail Branches and Support | 353 |
| Information Systems Division | 70 |
| Controller's Division | 55 |
| Corporate Services | 38 |
| Consumer Lending | 28 |
| Human Resources | 14 |
| Internal Audit | 14 |
| All Other | 26 |
| | 1,124 |

On December 29, 1992 it was announced that approximately 90 employees, primarily in the mortgage production area, joined a new eastern division of Imperial Credit Industries, Inc. of Newport Beach, California under an arrangement approved by the RTC. The employee starting dates will be staggered over the first quarter of 1993, allowing CFSB to complete the processing of mortgage applications.

**L. Information Systems and Computer Resources**

The Information Systems Division organization in CFSB consists of four functional units: Management/Administration; Systems Development; Data Processing Operations; and Telecommunications. The organization is located at the Waterview Operations Center in Parsippany, New Jersey. All Information Systems services are centrally managed and supported with the exception of the mortgage servicing system which is serviced by Computer Power Inc., Jacksonville, Florida.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104021

CONFIDENTIAl MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*Payroll/Human Resources*

All payroll and human resource management information needs are supported on a departmental processor, IBM System 38, on an application software package from Software Plus. Comprehensive reporting needs are serviced by a separate report writer from Martin, Ross & Cole.

Computer Resources

The Information Systems Division supports the use of all in-house computer resources with the exception of Branch Automation. The Bank's in-house computer resources are comprised of six primary operating environments:

| | |
|---|---|
| Centralized Core Systems | IBM Large Scale Host |
| Department Support Systems | IBM Medium Scale Host |
| Item Processing Systems | NCR Check Equipment |
| Branch Automation Systems | NCR Branch Equipment |
| Local Area Network Systems | AST Compaq Servers |
| Individual PC Systems | IBM AST Compaq PC's |

*Centralized Core Systems*

The Bank's sole in-house Data Center (DC) is located in Parsippany, New Jersey. The DC provides large-scale processing for core business applications via an IBM System/370, MVS/XA, JES, CICS, TSO operating environment. The current workload is supported by a single IBM 3081-K64 HIPO CPU with 24 channels, rated at 14.8 MIPS. The operating environment is configured with 75 gigabytes of IBM 3390 disk storage, 8 address of IBM 3480 cartridge tape with autoloaders and IDRC, two address of IBM 3422 reel tape, one IBM 3800-3 high speed laser printer and one IBM 4245 high speed impact printer. Microfiche and a microfilm are produced in-house via Anacomp dry process microfiche machine and Kodak Prostar wet microfilm machine. The DC supports approximately 500 remote devices in 50 locations in New Jersey, Washington, D.C. and Florida. Front-end communications processor, networking and remote devices are described in further detail in the communications section. The DC operates on a seven day by 24 hour with unattended operation on Sunday. Detailed hardware and operating system software information is provided in *Exhibit V. - Information Systems.*

A full disaster recovery contract is in effect with Comdisco Disaster Recovery Services, North Bergen, New Jersey which covers both the IBM Host System 38 and peripheral devices.

*Departmental Support Systems*

Departmental application processing is provided for via an IBM S38 5282-BQ1, CPF operating environment. The system is configured with 1.6 gigabytes of IBM 9335 disk storage, one, IBM 3430 tape address and two IBM 5262 line printers. The Departmental Processor is located in the DC and supports approximately 30 remote devices in two locations in New Jersey and Florida. Networking and remote devices are described in further detail in the communications section.

*Item Processing Systems*

Item Processing support is provided for the Northern Region via NCR 7770 check processing equipment. The function is not part of the DC but is housed separately in the Parsippany, New Jersey location. Item processing which includes inclearing, transit and lock box are processed on four banks of NCR 7770 check equipment consisting of five, four-pocket modules. Consolidation and transmission to host is provided via an NCR 7770 Tower. The check processing function operates on a two-shift basis five days a week and a single shift on Saturday. Detailed hardware and operating system software information is provided in *Exhibit V. - Information Systems.* Check processing for the Mid-Atlantic and Southern Regions are provided for via outside service contracts with Signet and Sun Bank respectively.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104023

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*Branch Automation Systems*

All retail branches have installed the NCR Financial Tower System. This system is comprised of a Tower branch processor which runs the TMX operating system and connects to all teller and customer service PC workstations via a local branch network. The Tower is also the gateway for transmitting information between the branch and the mainframe in Parsippany via a data line. All customer service terminals have Cross Sell Manager from Berman Technologies. Cross Sell Manager is a screen-based, integrated customer marketing, document preparation and on-line account opening software program. The teller application is Financial Plus from Systems Concepts which provides cash control, electronic journaling and on-line transaction and inquiry processing. Both terminals emulate 3270 CRT processing for direct access to the InfoPoint mainframe software applications.

*Microsystems*

Standards established in 1987 for Microsystems have been constantly updated to reflect the rapid changes in hardware, software and networks. The Microsystems department provides help desk support, hardware and software evaluations, acquisitions, installations and first level hardware maintenance.

*Local Area Network Systems (LAN)*

There are three operational LAN's in CFSB. Two additional LAN's are being installed in support of the Controller's Division and the Purchasing Department. File servers will be upgraded to 486 class processors utilizing Novell Netware version 3.1.1 and token ring topology. Applications supported on all LAN's are Lotus, WordPerfect and dBase IV. Host connectivity will be through Novell's SAA Gateway.

*Individual PC Systems*

Current inventory consists of approximately 225 individual PC's and 100 printers.

Older 286 technology is being gradually replaced by 486 technology. Printers consist of a mixture of dot matrix and HP laser jets. Refer to *Exhibit V. - Information Systems.*

Telecommunications

CFSB's voice and data communications networks are centrally managed by the Telecommunications unit located in Waterview. All requests for communications services are handled by the Telecommunications unit which is responsible for all phases of the project including maintenance.

*Network Services*

CFSB's network employs a myriad of services including OPX circuits, OUTWATS, 800 Service, T1 and DID. Service is provided by AT&T, MCI, Sprint, and the BOCS. By allocating traffic to all three major long distance network vendors, CFSB protects itself from single-vendor network outages and promotes an environment of competition among the carriers. Aggregation and Term Plan contracts are established whenever possible to reduce "per minute" call costs.

*PBX*

CFSB maintains the AT&T System 75 as its PBX standard. The Morristown, Parsippany, Clearwater and Delray Beach offices are each serviced by a System 75 PBX. Station equipment (telephone) standards are based upon user job function. All control equipment is maintained in a secure environment, supported by UPS/Battery Backup and Fire suppression systems where available. System uptime routinely exceeds 99.9%.

*Automated Attendant/Voice Mail*

CFSB has selected the VMX Opcom Dial System as the Auto Attendant/Voice Mail standard for the Company. Each PBX site includes one VMX system providing these services. All employees, with the exception of customer service agents, are encouraged to use Voice Mail as a backup to traditional methods of message taking.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104024

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*ACD/Call Management Systems*

High volume customer service call groups in both Parsippany and Clearwater are monitored by AT&T 3B2 Call Management Systems (CMS). Call group supervisors have terminals with which to monitor activity and agent performance in real time. Group performance is monitored and reported to senior management.

*Inside Wire/Cable Systems*

Virtually all wiring is UTP level 3 or above depending upon devices attached. Twisted pair is used to connect telephones, IBM 3270 terminals, and LAN's. Most cable installations and cross connects are performed by in-house telecommunication technicians.

*Electronic Key Systems*

Small NEC key systems are used to provide voice service in all retail branch and mortgage production offices. The systems are all owned by CFSB, and do not provide any enhanced services such as voice mail or auto attendant.

*Data Network*

CFSB's data network originates in the Parsippany data center and connects to all retail branch and mortgage production offices. The network is built on a backbone architecture supported by T1 and 56KB digital circuits connected with Network Equipment Technologies (NET) multiplexers. The backbone provides redundancy and is able to reroute past failed facilities. As a result, uptime routinely exceeds 99.5%. Backbone nodes are located in Morristown, Parsippany, Clearwater and Delray Beach.

Local circuits running at 9.6KB connect remote offices to the nearest backbone node. Codex Corporation modems and data service units complete the connection.

CFSB's data network supports over 500 terminal and print devices, and is monitored by network management systems from IBM, NET and Codex. The network is linked to the Comdisco disaster recovery site, allowing for full operation in the event a disaster occurs in the Parsippany data center. Refer to *Exhibit V. - Information Systems.*

**M. Other Support Functions**

CFSB is generally organized by business lines. Support divisions are functionally organized. The following is a brief description of the functional support divisions.

*Corporate Services*

This division is responsible for purchasing, building maintenance, record management, microfiche department and mailroom staff. Corporate Services also manages certain equipment leases and facilities management functions.

*Controller's*

This division is responsible for the financial reporting system and the preparation of financial reports. The Controller's division handles general, divisional and corporate accounting, treasury accounting and operations, payroll, and financial analysis and budgeting.

*Marketing*

Advertising, public relations and other marketing support services are handled by this division.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104025

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

*Legal*

This division provides title and other mortgage lending legal support to the residential lending and servicing divisions. The Legal division oversees the management of attorney relationships and the coordination of the civil and other legal actions described in the Litigation section of this report.

*Human Resources*

This division ensures compliance with the Bank's personnel policies; assists in the hiring, performance evaluation and termination of staff and manages the Bank's employee benefit programs.

*Information Systems Division*

This division is responsible for the management of all computer resources. This includes the functions described in the Information Systems section of this report. ISD encompasses the management of the IBM mainframe as well as mini-computer and micro-computer applications.

*Internal Audit*

The Internal Audit Division reviews the activities of the Bank for compliance with Bank policies and procedures and performs financial audits of the Bank's records to ensure their accuracy and completeness.

*Treasurer's*

This division includes the Treasury and Loan Sales functions. Treasurer's managed the Bank's investment and mortgage-backed securities portfolio and its wholesale borrowings which include FHLB advances, MTN's and Jumbo CD's. The division also performs liquidity and cash management services for the Bank. The Capital Markets group negotiates sales of residential loans and other financial instruments and executes interest-rate risk management strategies for the Bank.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104026

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 007

## II. Evaluation

### A. Problems of the Institution

On December 4, 1992, CSB was placed in Receivership by the OTS, and a new federal mutual association, CFSB was chartered. CSFB was then placed into conservatorship and the RTC was named conservator. This action was initiated because the OTS determined that CSB was operating in an unsafe and unsound condition in that it had insufficient capital, with no reasonable prospect of replenishment without federal assistance.

CSB's condition was primarily due to heavy losses on poorly underwritten commercial real estate and residential development loans originated under former management. Many of the loans were poorly documented and lacked adequate appraisals.

As of September 30, 1992, assets of $523.9 million, or 11 percent of total assets, were classified as substandard, doubtful or loss. CSB reported net losses of $131.8 million in 1990 and $160 million in 1991.

CSB had a significant amount of supervisory goodwill recorded in acquisitions of several failing or failed thrift institutions in 1982 and 1986. Under the OTS interpretation of FIRREA such goodwill was not includable in regulatory capital. CSB's agreement with the federal regulators at the time of the acquisitions of the ailing thrifts allowed CSB to use the goodwill acquired as capital for regulatory purposes. CSB's regulatory capital levels were significantly damaged by the change in the banking laws in 1989. At September 30, 1992, CSB remained out of compliance with minimum regulatory capital requirements as promulgated by the OTS pursuant to FIRREA. The regulations issued pursuant to FIRREA required CSB to exclude supervisory goodwill, from regulatory capital. The OTS interpretation of FIRREA eliminated the benefit of supervisory goodwill, with thrift regulators not honoring earlier commitments.

Progress by current management in reducing operating costs and disposing of nonperforming assets resulted in earnings of $9.1 million for the first nine months of 1992. But profits were insufficient to overcome a significant level of nonperforming and under-performing assets. Thus, recovery based on core earnings was highly improbable. Current management's efforts were also impaired by a depressed real estate market. The institution had been operating under regulatory restrictions since 1991.

The receivership followed intensive efforts by OTS and CSB's holding company to recapitalize the institution. The April 1992 expiration of congressional funding for thrift resolutions effectively removed CSB from ARP, under which CSB was eligible for sale with minimal government financial assistance. Subsequent attempts to sell the thrift without government financial aid were unsuccessful.

### B. Retail Branch Network

Since the date of conservatorship, CFSB has restricted certain products and significantly reduced interest rates on others. As a result, the Bank has experienced an outflow of $138.4 million in retail deposits through December 31, 1992. For the 27 days following the December 4, 1992 date of conservatorship, net certificate outflows totalled $63.4 million or 51.1% of scheduled maturities. In addition, tax-deferred annuities and brokerage services which were previously sold in New Jersey retail offices are no longer offered.

The CFSB retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution. During the past five years, the Bank's consumer banking efforts have been focused upon optimization of the retail office network. Each retail office was evaluated on its financial performance compared to the potential of the branch market area. Many of the offices which were determined to be substandard were closed, consolidated or sold to another financial institution. Operations at the remaining offices were streamlined and marketing efforts focused on acquisition/retention of high-balance deposit households.

CFSB retail offices in New Jersey and Florida are located in some of the top performing market areas in each respective state. The New Jersey markets tend to be suburban and upper middle class in nature, but also include some stable and ethnic blue-collar neighborhoods in urban areas. In Florida, the markets also tend to be suburban and upper middle class, and are characterized by a preponderance of senior citizens.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104027

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008(

Based upon total deposits, CFSB ranks as the second largest SAIF-insured institution headquartered in New Jersey. While considerably smaller in scope, the Bank's Florida retail office network nevertheless affords a possible acquiring institution of these CFSB branches the opportunity to be a significant player, specifically in South Florida.

In recent years, CSB has made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty. Retail office managers are also encouraged to be active in their respective local communities. The "outstanding" rating which CSB received for its Community Reinvestment Act activities is further evidence of the Bank's commitment to the individual communities it serves.

In its New Jersey market areas, CFSB is second only to First Fidelity Bank in terms of retail deposit market share. The Bank is the market share leader in eight of its New Jersey market areas and among the top three in over half of the markets. In Florida, CFSB faces much more competition, but nevertheless is among the top ten institutions in over half of its markets.

The Bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office presence. Average account balances for each product type at CFSB exceed industry averages. These characteristics, combined with a relatively stable deposit base, further enhance the valuation of the Bank's franchise.

### C. Liquidity

An evaluation of CFSB liquidity was performed by the RTC immediately following conservatorship. Under the circumstances, liquidity was increased to fund anticipated deposit outflows, to reduce higher costing borrowings and to accommodate the orderly disposition of pledged assets. At December 31, 1992 CFSB's RTC liquidity ratio was 20.8%.

### D. Asset Quality

CSB employs a loan review system whereby potential problem loans are classified and closely monitored if uncertainty exists as to the future collectibility. Classified assets, which includes assets rated substandard, doubtful or loss but exclude assets rated special mention, are as follows:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Substandard | $500,689 | $672,583 |
| Doubtful | 5,973 | |
| Loss | 65,207 | |
| | $571,869 | $672,583 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104028

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

Classified assets by asset type are as follows:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Residential first mortgage loans | $ 50,365 | $ 64,259 |
| Commercial real estate loans | 94,690 | 171,761 |
| Total classified first mortgage loans | 145,055 | 236,020 |
| Corporate loans | 48,553 | 88,694 |
| Consumer loans | 3,328 | 4,370 |
| Premium finance loans | 3,100 | 2,492 |
| Total classified other loans | 54,981 | 95,556 |
| Total classified loans | 200,036 | 331,576 |
| Real estate held for development and sale | 3,861 | 3,452 |
| REO | 153,909 | 109,537 |
| In-substance foreclosed loans | 204,021 | 227,813 |
| Total classified investment in real estate | 361,791 | 340,802 |
| Total classified loans and investment in real estate | 561,827 | 672,378 |
| Mortgage-backed securities | 10,042 | |
| Investments | | 205 |
| | $571,869 | $672,583 |

Assets rated special mention were $268 million and $202 million at December 31, 1992 and December 31, 1991, respectively. Classified assets and special mention assets include all nonperforming loans, REO and in-substance foreclosed loans.

A majority of CSB's residential and commercial real estate loans are secured by properties located in the states of New Jersey, Florida and California which have experienced a significant downturn in demand for such properties. CSB's management regularly analyzes each portfolio and records appropriate additions to the allowance for losses on loans and real estate as required to reflect conditions existing at each reporting date.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104029

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008

The following table details the activity of the allowance for losses on loans and real estate:

| *(in thousands)* | December 31, 1991 | Additions | Chargeoffs | Recoveries | Other | December 31, 1992 |
|---|---|---|---|---|---|---|
| Allowance for losses on loans: | | | | | | |
| Mortgage | $14,371 | $16,917 | ($11,043) | $1,311 | $3,815 | $25,371 |
| Commercial real estate loans | 33,177 | 14,645 | (210) | 2,976 | (25,341) | 25,247 |
| Corporate loans | 13,481 | | (6,716) | 25 | (2,305) | 4,485 |
| Consumer loans | 1,706 | 2,600 | (2,786) | 519 | 135 | 2,174 |
| Premium finance loans | 1,908 | 2,875 | (3,002) | 539 | | 2,320 |
| | 64,643 | 37,037 | (23,757) | 5,370 | (23,696) (a) | 59,597 |
| Allowance for losses on real estate: | | | | | | |
| Real estate owned - commercial real estate | | 2,043 | (934) | 1,865 | 11,287 | 14,261 |
| Real estate owned - consumer | 150 | | | | (150) | |
| In-substance foreclosed loans | 19,788 | | (5,685) | | 12,559 | 26,662 |
| | 19,938 | 2,043 | (6,619) | 1,865 | 23,696 (a) | 40,923 |
| Total allowance for losses on loans and real estate | $84,581 | $39,080 | ($30,376) | $7,235 | $0 | $100,520 |

(a) Reclass between allowance for losses on loans and real estate.

The allowance for losses on loans and real estate at December 31, 1992 includes specific reserves of $24 million and $41 million on loans classified loss and on assets classified loss, respectively.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0104030

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008

The following table sets forth information on nonaccrual loans, past due loans which are still accruing interest, REO, in-substance foreclosed loans and restructured loans:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Residential first mortgage loans | $48,007 | $53,610 |
| Commercial real estate loans | 33,265 | 60,804 |
| Corporate loans | 747 | 20,209 |
| Consumer loans | 3,328 | 4,370 |
| Total nonaccrual loans | 85,347 | 138,993 |
| Residential first mortgage loans - 90 days past due | 2,359 | 10,649 |
| Commercial real estate loans - 90 days past due | 7,564 | 15,159 |
| Corporate loans - 90 days past due | 1,431 | |
| Premium finance loans - 180 days past due | 3,100 | 2,492 |
| Total loans 90 or more days past due, still accruing | 14,454 | 28,300 |
| Total nonperforming loans | 99,801 | 167,293 |
| REO, net of allowances of $14,261 in 1992 and $150 in 1991 | 139,709 | 109,537 |
| In-substance foreclosed loans, net of allowances of $26,662 in 1992 and $19,788 in 1991 | 177,359 | 208,025 |
| Total nonperforming loans, REO and in-substance foreclosed loans | 416,869 | 484,855 |
| Restructured loans | 103,069 | 63,955 |
| Total nonperforming loans, REO, in-substance foreclosed loans and restructured loans | $519,938 | $548,810 |

A detailed schedule of allowance for losses on loans and real estate at the dates indicated follows:

| *(in thousands)* | December 31, 1992 | December 31, 1991 |
|---|---|---|
| Residential first mortgage loans | $25,371 | $14,371 |
| Commercial real estate loans | 25,247 | 33,177 |
| Total first mortgage loans | 50,618 | 47,548 |
| Corporate loans | 4,485 | 13,481 |
| Consumer loans | 2,174 | 1,706 |
| Premium finance loans | 2,320 | 1,908 |
| Total other loans | 8,979 | 17,095 |
| Allowance for losses on loans | 59,597 | 64,643 |
| REO | 14,261 | 150 |
| In-substance foreclosed loans | 26,662 | 19,788 |
| Allowance for losses on real estate | 40,923 | 19,938 |
| | $100,520 | $84,851 |



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104031

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**E. Loan Servicing Portfolio**

*Residential Mortgage Loan Servicing*

The statistical information contained in the tables which are included in *Exhibit VII. - Loan Servicing Information* provides detailed illustrations of the serviced portfolio characteristics. Highlights include: servicing in all 50 states with 32% in New Jersey and 18% in Florida; high percentage of conventional, fixed rate (43%) and government product (45%); a net weighted average servicing fee of 41.8 basis points, and a six member management team with a combined 80+ years of experience. Gross servicing income exceeded $39 million in 1992.

The age, source and geographic concentration of loans all contribute to a relatively high percentage of default, particularly loans in bankruptcy and foreclosure, although overall delinquency ratios were consistently improved in 1992 versus 1991 despite a declining portfolio. Runoff exceeded new loan originations in 1992 by 15,500 loans for a net decline of $759 million in volume. Even though this trend adversely affects efficiencies as well as delinquency (and value), the operation continued to service on average more than 800 loans per person with an annualized core servicing cost of less than $70 per loan. Incremental costs are estimated by management at less than half this amount.

The centralized Clearwater Servicing Center performs all loan administration, accounting and related functions including customer and investor services, escrow administration, payoff and assumptions, default administration, foreclosure and REO. In addition, the Center administers the Master Servicing and loans serviced by others owned by CFSB. This portfolio contained an additional 21,000 loans totalling $564 million as of December 31, 1992.

Essentially a self-sufficient, independent cost center, the staff also performs underwriting, human resources, training, switchboard and reception, office services and facilities, file control and complete system automation using, as a remote client, Computer Power Inc.'s MSP as well as numerous PC applications.

*Consumer Loan Servicing*

The portfolio of Consumer Loans serviced for investors noted in *Part I - Section F. Loan Servicing* has been handled by the Consumer Loan group at the Parsippany, New Jersey facility. This servicing represents a unique set of operational concerns as much of it (the Home Equity Reserve, or HELO's as they are generically known) requires the servicer to be able to advance funds to consumers, reconcile daily both consumer and investor accounts, and render monthly statements, similar to a checking or credit card account. This is not the type of servicing normally associated with a mortgage servicing operation.

Total gross servicing fee income for the portfolios serviced for investors was $1.45 million in 1992. In addition, late fee collections were $137,000.

These portfolios have been serviced on the Consumer Loan System IL5500 from American Management Systems, installed on CFSB's in-house mainframe.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104032

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**F. Occupancy Issues**

CFSB has certain leased properties which are no longer being used. Closed leased locations are as follows:

| Location | Lease Expiration | Monthly Lease Payments |
|---|---|---|
| Cresthaven, FL | 3/93 | $3,614 |
| Catonsville, MD | 9/93 | 4,706 |
| Mission Bay, FL | 10/93 | 10,670 |
| Lighthouse Point, FL | 11/93 | 1,248 * |
| Orlando, FL | 10/94 | 5,263 |
| Tampa AEC Sign, FL | 2/97 | 1,583 |
| Reston, VA | 4/99 | 4,524 * |
| Lake Worth, FL | 10/10 | 4,548 |

* Net of existing sublease.

As previously noted, a single branch exists in the Washington, D.C. area. Specifics of this lease are as follows:

| Location | Lease Expiration | Monthly Lease Payments |
|---|---|---|
| Washington, D.C. | 10/97 | $12,519 |

As also previously mentioned, mortgage production has ceased and personnel will be joining Imperial Credit Industries, Inc. However, Imperial is not assuming the leases on the mortgage production leased offices, detailed as follows:

| Location | Lease Expiration | Monthly Lease Payments |
|---|---|---|
| Clark, NJ | 2/94 | $13,489 |
| Princeton, NJ | 8/97 | 5,098 |
| Toms River, NJ | 2/98 | 3,497 |

CFSB owns its executive office building located at 200 South Street, Morristown, New Jersey. The building is approximately 84,000 square feet and is carried at approximately $5 million. No mortgage exists on the building. Real estate taxes on this building are approximately $190,000.

In addition, CFSB has a three-story leased financial services center totalling approximately 189,000 square feet located in Parsippany, New Jersey. The building is leased from Bellemead Management Company, Inc. in two separate pieces.

| | Square Footage | Lease Expiration | Yearly Rent * |
|---|---|---|---|
| First and second floor | 139,421 | 5/97 | $2,272,562 |
| Third floor | 49,636 | 9/97 | 809,067 |
| | 189,057 | | $3,081,629 |

* Calculated at $16.30 per square foot.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104033

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 008

In addition to rent expense of approximately $3 million, payments are made to Bellemead Management Company, Inc. for management fees and additional building maintenance services of approximately $80,000 and $60,000, respectively. Real estate taxes paid by CFSB are estimated to be $500,000.

Excess capacity exists at both the Morristown and Parsippany locations.

**G. Candidacy for Combination with Another Institution**

Since CFSB is a large institution, $4.8 billion of assets at date of conservatorship, the Bank is not considered to be positioned for combination or merger at this time. However, the possibility could exist for one or more smaller institutions to be combined with CFSB.

***H. Subsidiaries***

As previously discussed, the RTC has assigned the responsibility of all subsidiaries to a third party contractor - Bridge Asset Management, Inc. Refer to *Part I. - Section I. Subsidiaries* for further a discussion of the subsidiaries.

***IPF***

CFSB has been purchasing loans from IPF under the terms of a $400 million loan purchase agreement executed between IPF DE, IPF-CA, Imperial Premium Finance Holding Corp., Inc. and CSB prior to the date of intervention in order to preserve and to protect the fair market value of IPF, currently estimated to be between $45 and $50 million. Bridge Asset Management, Inc. has drafted and will be submitting a Case Memorandum recommending the continuation of the funding arrangements. Meanwhile, Bridge Asset Management, Inc. has been working with the management of IPF to identify alterntive funding sources, including a reinstatement of a prior loan repurchase arrangement with Chemical Bank. Bridge Asset Management, Inc. has instituted a formal review procedures for all loan funding transactions and is currently conducting a limited field review of the IPF regional loan processing centers and some of its sales offices to establish a level of comfort that IPF has adequate internal controls relative to the origination and servicing of loans and that loans sold to CFSB meet the requirements of the loan purchase agreement.

On December 30, 1992, the Financial Instruments Department in the Valley Forge Office assumed responsibility for the disposition of IFP with Bridge Asset Management, Inc. retaining responsibility for the management oversight of IPF during the marketing period. IPF is a well run, established and consistently profitable company and approximately a dozen major domestic and international corporations, investment bankers and investment groups have expressed interest in a cash purchase of IPF. Both Bridge Asset Management, Inc. and the Financial Instruments Department believe that IPF can and should be sold as quickly as possible. The average weighted maturity of the loan portfolio is less than 9 months given that the typical loan requires repayment in nine monthly installments, the first of which must be made at the time of the down payment. As a result, the volume of the loan servicing portfolio is significantly impacted by short term changes in loan origination volumes and any negative publicity, adverse comments by competitors or loss of key marketing personal will have an immediate impact upon profitability.

As a consequence, Bridge Asset Management, Inc., the Subsidiaries Department, the Financial Instruments Department and the Conservatorship have made a concerted effrot to avoid any unecessary interference in the day to day operations of IPF and to expedite the marketing effort. Since December 30, 1992, the Financial Instruments Department has engaged legal counsel to conduct the necessary due diligence efforts connected with the sale of the company and its subsidiaries and has issued a task order solicitation for and is currently in the process of selecting a financial advisor for the transaction. Meanwhile, Bridge Asset Management, Inc. has completed a solicitation for business valuation services which it initiated prior to December 30, 1992 and has drafted and submitted a Case Memorandum recommending the engagement of Amercian Appraisal Associates to prepare a business valuation of IPF. The Financial Instruments Department currently believes, based upon the number and quality of interested acquirors, that IPF can be sold prior to the end of the second quarter.

***I. Pending Litigation Evaluation***

As described in *Part I. - Section J. Litigation* and *Exhibit X - Litigation*, CFSB is a party to certain legal actions; the outcome of which could have a material financial impact.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104034

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

**J. Management Levels and Salary Justification**

The organizational structure and salary levels, as currently constituted, appear appropriate for this institution based on asset size and complexity of business operations and loan problems. The salaries of four CSB officers have been reduced. Refer to *Exhibit IX - Employee Compensation*.

As the business of the Mortgage Production is completed, the staffing levels of related loan administration and support departments will be appropriately contracted. As the Multiple Acquirer Preparation Plan is implemented, employees will be reassigned or, if needed, additional staff will be hired.

**K. Quality and Cost Efficiency of Backroom Operations**

The Information Systems Division provides a Value Added Component to the organization that it services. The Value Added is demonstrated by providing consistently high levels of systems availability and service levels at a competitive price. The Division's most valuable asset is its highly qualified professional staff.

The current equipment configuration can provide approximately thirty percent growth in the existing application product set at little or no incremental expense. The Division is housed in an excellent physical plant with sufficient space to expand processing capacity by a factor of ten.

**L. Indications of Fraud**

CFSB is currently reviewing past events, including loan origination and purchase practices and may consider bringing civil charges against current and former employees seeking damages for fraudulent or negligent lending activities.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104035

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

## III. Recommendations

Based on the evaluation of the current condition of CFSB, the general operating strategy consists of the following key components:

1. The preservation of the retail banking franchise value by maintaining the New Jersey retail branch network intact. The Florida branches should be marketed as three separate packages.

2. The downsizing and liquefying of the balance sheet through the sale of investment securities, mortgage-backed securities and loans receivable in conjunction with the Capital Asset Marketing Specialists. The proceeds will be utilized to fund deposit outflow and retire existing borrowings.

3. RTC - Valley Forge to evaluate the nonperforming assets and to dispose of the properties as efficiently as possible, including REO properties held by subsidiaries.

4. The sale or discontinuation of all other subsidiary operations. This includes the sale of assets of IPF.

5. Sale of the mortgage servicing operation and servicing rights together as an ongoing concern.

6. Repudiation of certain lease obligations.

7. The discontinuation of residential lending and related subsequent sales of these loans to Investors.

8. The retention of personnel necessary to provide continuing service to retail banking customers and borrowers, as well as to facilitate the pooling, packaging, marketing and liquefication of assets.

9. To evaluate and adjust, accordingly, the staffing of the Controller's Division to accomplish the additional tasks required under RTC guidelines.

10. To pursue the civil charges for damages for fraudulent and negligent action by current and former employees.

11. Implementation and coordination of the Integrated Marketing Plan in conjunction with the appropriate RTC staff and outside contractors.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104036

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00

## IV. Operational Issues

CFSB Operating Plan is based primarily upon the components outlined in *Part III. - Recommendations*. This Section of the Plan sets forth the detailed strategy to implement the recommended goals and objectives enumerated in that section.

### A. Retail Banking

It is recommended that the CFSB retail banking franchise be sold as a going-concern profitable operation. It is believed that the greatest value would be obtained by the following:

- o Sell the 31 New Jersey retail offices as one package.
- o Sell the nine Florida retail offices as three packages: the five South Florida offices as one package, the two Clearwater offices and the Tampa office as a second package, and the Winter Haven office as a third package.
- o Close the District of Columbia retail office.

For each package, the retail office locations together with the respective deposits and staff would be sold along with whatever supervisory management and back-office support may be required by each of the acquirers.

### B. Managed Downsizing

The Operating Plan Budget details the anticipated liquefying of Bank assets and subsequent paydown of borrowings and high-cost deposits. This projection reduces the $4.7 billion of total liabilities, at intervention date, to $607 million at December 31, 1992 for a total reduction of approximately $4.1 billion.

The resulting smaller institution will be positioned to be marketed to a broader range of third-party investors interested in establishing or increasing their New Jersey or Florida banking presence.

The Operating Plan Budget, along with forecasted sales information, are addressed in detail in *Part V. Integrated Marketing Plan*. The RTC Credit Specialist, in conjunction with the Asset Marketing Specialists will develop an overall cost effective asset disposition strategy.

The Operating Plan Budget in *Part VI.* provides the anticipated timing of the planned sales and restructuring activity and the assumptions used to develop the budget.

Increasing operating profits has not been established as a major strategy because the operating expenses are appropriate for an institution of this size.

### C. Funding Strategy

As previously noted and detailed in the Operating Plan Budget, CFSB is currently funding a portion of its operations through Advances from the RTC. Additional funding is expected to be provided through the sales of assets. Other sources of funds include loan principal repayments, servicing fee revenue and other traditional sources of liquidity until the underlying assets are sold.

### D. Loan Workout

As described in *Part II. - Section D. Asset Quality* the Bank has $520 million of nonperforming assets at December 31, 1992. Commercial Workout Division is responsible for the management of the commercial non-accrual loans and REO, as described in that section. The Foreclosure and REO department of the Clearwater, Florida Servicing Center is responsible for the residential first mortgage non-accrual loans and REO.

The Commercial Workout Division will continue with its primary function of resolving non-accrual loans through restructuring or legal action and managing and disposing of the Bank's REO. Procedures will be followed which comply with RTC guidelines and which minimize potential losses. The responsibilities of this division will eventually be assumed by a third party contractor.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104037

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00!

To continue to manage the current residential first mortgage non-accrual loans and REO properties and to process the new delinquencies which are anticipated as a result of the economic recession, the responsibilities of the Foreclosure and REO department will be assumed by a third party contractor.

**E. Sale or Discontinuation of Subsidiary Operations**

The RTC has hired Bridge Asset Management as the contractor for subsidiaries. Bridge Asset Management is currently in the process of legally dissolving all inactive subsidiaries. The REO properties will be placed under SAMA/SAMDA contract effective March 1, 1993. A marketing plan for all subsidiary operations will be presented at a later date along with the Integrated Marketing Plan.

As previously mentioned, responsibility for the sale of IPF was transferred to the Financial Instruments Department. Additional marketing information will be presented along with the Integrated Marketing Plan.

**F. Loan Servicing**

*Residential Mortgage Loan Servicing*

The $7.2 billion total portfolio serviced by CFSB for itself and others, described in *Part I - Section F. Loan Servicing Portfolio* and in *Exhibit VII. - Loan Servicing Information*, is presently generating approximately $3.2 million per month in gross servicing fee and ancillary income. The portfolio's high percentage of agency servicing, strong net servicing fees, and the efficiencies produced by its remote Clearwater Servicing Center operations represent a significant value to the Bank, despite interest rate inspired runoff and fairly high delinquency.

The loan servicing rights is one of the most significant assets the Bank retains. In addition, the stand-alone Clearwater Servicing Center operation with its proven performance and capacity for expansion has value in and of itself. Special consideration should be given to selling the operation and servicing rights together as an ongoing concern. Properly analyzed and structured for sale, the combined package should expand the number of prospective buyers to include those without expertise in this field who have a desire to invest in mortgage loan servicing and thus maximize the total value realized. Certain loans serviced by CFSB have recourse provisions. The potential recourse on loans with principal balance of approximately $140 million at December 31, 1992, would be a consideration in the pricing of the loan servicing package. The availability of standard representations and warranties from the RTC will also significantly influence the eventual price for this package.

The asset whole loan portfolio can be sold through normal market channels, either with the servicing rights retained or released. Since there is a possibility all of the defaulted asset loans will have been sold separately in advance of marketing the remainder of the portfolio, retention of the servicing rights and adding that value to the Clearwater operations package may again promote maximum value realization.

*Consumer Loan Servicing*

The Consumer Loans serviced for investors portfolio is an asset for which some value should be realized. However, the universe of potential acquirers will be limited, as the operational concerns associated with a portfolio such as this may outweigh the economics. This type of servicing will be most attractive to financial institutions that currently originate and service similar loan types. In fact, this servicing may realize its highest value by being offered to the owners of the underlying loans.

**G. Repudiation of Lease Obligation**

As noted in *Part II - Section F. Occupancy Issues*, an area which must be addressed within a certain period of time is the repudiation of certain lease obligations.

The leases on the closed locations that have been previously identified and the three leased mortgage production offices should be repudiated as soon as possible, but no later than April 1, 1993. In addition, the lease on the Washington, D.C. branch should be repudiated by May 1, 1993. The deposits of this branch should be transferred to a New Jersey branch in that CFSB has been unsuccessfull in marketing the deposits to a local financial institution.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104038

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 00!

Negotiations are currently being conducted on the leased building in Parsippany, New Jersey. Current plans are to reduce the rent expense on the building to $15.00 per square foot and to eliminate the additional charges for management fees and building maintenance. As the employees previously associated with mortgage production are scheduled to vacate the premises no later than March 31, 1993, employees from the Morristown, New Jersey location will be relocated to the first and second floors in Parsippany. The lease for the third floor will be repudiated effective April 1, 1993. The owned building in Morristown is estimated to be sold at book value on July 1, 1993.

**H. Discontinuance of Residential Lending**

As previously discussed, residential first mortgage loan origination ceased December 14, 1992.

**I. Controller's Division Staffing**

CFSB's staffing level in all departments could best be described as lean. Because of the added reporting under RTC Conservatorship and anticipated attrition, the staffing level of the Controller's Division is of particular concern. The RTC will continually monitor and adjust, accordingly, the staffing of the Controller's Division to accomplish the additional tasks required under RTC guidelines. Where appropriate, as certain positions are eliminated elsewhere in the Bank, employees from these other areas of the Bank will be reassigned to the Controller's Division.

**J. Accuracy of Books and Records**

Internal controls appear adequate to ensure the accuracy of books and records. No major expenditures are anticipated in this area. The Bank's Internal Auditing Division is responsible for monitoring the adequacy of internal controls.

**K. Marketing at Resolution**

Although marketing the institution as a whole is the most desirable goal, it can be offered in four or five major components based upon the retail market segments it serves.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104039

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 009

## VI. Operating Plan Budget

CFSB operating plan budget is presented for the year ended December 31, 1993. This budget anticipates general and administrative expenses of $66.7 million for the year. Operating expenses related to normal banking activities are projected to decline from $25.9 million in the first quarter to $8.8 million in the fourth quarter.

Total nonperforming assets were $520 million at December 31, 1992 and are expected to decline in 1993 as the result of sales and dispositions. Additions are expected to be minimal.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0104040

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CAM090 009:

EXHIBIT
Saunders # 8
10/3/06 LR

9/1/93 Jay: This won't fly. There are too many initiatives associated with Carteret. There is a securitization effort but it may be sidelined because they are pulling loans to furnish in the minority acquisitions. Let's hold off. JJK

RTC
RESOLUTION TRUST CORPORATI
Resolving The (
Restoring The Confi

TO: Thomas Horton, V
Field Activities

THROUGH: J. Paul Ramey, V
Resolutions

FROM: Jay A. Jupiter
Assistant Director, Resolutions

DATE: August 23, 1993

SUBJECT: Request for Waiver of Certain Mortgage Loans from Securitization for: Carteret Federal Savings Bank, Parsippany, NJ

There are approximately $517 million and $294 million of performing single family residential mortgage loans at Carteret originated in New Jersey and Florida respectively, that we believe are integral to both the franchise value and the marketability of this institution in a Purchase and Assumption transaction.

Carteret has 31 branches in New Jersey with deposits of approximately $1.9 billion and 9 branches in Florida with deposits of approximately $343 million. If a waiver is granted to release these loans from Securitization they can be offered for sale with the deposit franchise of Carteret. Resolutions will contact the Director of Asset Management and Sales in the Valley Forge office to assist in the sales process of the loans.

The basis for this request follows:

1. All loans were originated by and are serviced by Carteret, creating a unique franchise opportunity for acquirors.

2. Inclusion of these loans in the P&A would provide acquirors with earning assets in lieu of RTC cash. Given the size of the portfolio, this would represent an excellent P&A marketing element.

APPROVAL:

Thomas Horton, Vice President Field Activities DATE

801 17th Street, N.W. Washington, D.C. 20434

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130544

RTC
RESOLUTION TRUST CORPORATION
Resolving The Crisis
Restoring The Confidence

1994 JAN 10 P 9:41

REC... DEC 2 3 1993

December 21, 1993

MEMORANDUM TO: Thomas P. Horton
Vice President
Field Activities

FROM: Edward D. Mahaney EDM
Vice President
Department of Operations

SUBJECT: Asset Freeze Waiver Revision

Now that the funding bill has passed and resolutions are being scheduled, we have reviewed the August 26, 1993, asset freeze guidelines and have made three revisions.

- All performing commercial loans will be released to AMSD for a commercial securitization effort to occur no earlier than April 1994. Sale of performing commercial loans not included in this effort will be under the control of AMSD but such sales may not occur prior to April 1994 unless they comply with the 45-day settlement provision in the August 26, 1993 memo.

- All 1-4 mortgage loans will be available for sale but can not settle more than 45 days prior to a scheduled resolution date. These loans will be released to AMSD's Pipeline Management's control for determination of the best sales approach. However, to also confirm, Pipeline Management has full responsibility for making sure that sufficient acceptable loan product is available and can be delivered for resolutions, as may be required to comply with minority branch sales and other resolution requirements. In addition, Resolutions advises that the legislation has additional requirements that AMSD should be sensitive to, including the sale of existing performing product at institutions with minority branch exposure or at minority institutions like Life Savings in Baton Rouge, Louisiana. Holding such product for resolution might be a better approach than selling existing product from these institutions and then trying to locate other performing loans from other institutions or receiverships in order to meet requirements.

801 17th Street, N.W. Washington, D.C. 20434

EXHIBIT
Saunders # 11
10/3/06 LR

AM5067 0499

o Consumer loans are also released to AMSD subject to the 45 day settlement provision in the August 26 asset freeze guidelines.

All other previous asset sale restrictions (including those at Old Stone) still apply and all previous waivers provided to Resolutions to include loans in the resolution remain in force. If there are any questions about these revisions, please contact Barbara Bleistift of my staff at (202)416-7461.

Attachment

cc: William H. Roelle
J. Paul Ramey
Marsh McJunkin
Lynette Andresen
Field Office VP's
FSC VP's
Philip Jones
T. Michael Thompson
Sally C. McCormick
Ken Baebel
Sandra L. Nobles
Dave J. Bodi
Meg J. Kruse

AM 50670500

To: Herb J. Held@Reso@RTCDC
Cc:
Bcc:
From: Ann Richards@FUNDING2@RTCDC
Subject:
Date: Thursday, September 15, 1994 14:01:59 EDT
Attach:
Certify: N
Forwarded by: Herb J. Held@Reso@RTCDC

---

Forwarded to: Sharon Dunn Yore@Reso@RTCDC
cc:
Forwarded date: Tuesday, September 20, 1994 8:47:24 EDT
Comments by: Herb J. Held@Reso@RTCDC
Comments:

fyu

------------------------- [Original Message] -------------------------

We're chomping at the bit waiting to sell securities out of Carteret. Should they still remain frozen?

Ann

EXHIBIT
Saunders #12
10/3/06 LR

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0077208

To: Ann Richards@FUNDING2@RTCDC
Sandra L. Nobles@Assets-mkl@RTCDC
C..

F...: Herb J. Held@Reso@RTCDC
Subject: re:Carteret
Date: Friday, September 16, 1994 15:26:56 EDT
Attach:
Certify: N
Forwarded by: Herb J. Held@Reso@RTCDC

---

Forwarded to: Sharon Dunn Yore@Reso@RTCDC
cc:
Forwarded date: Tuesday, September 20, 1994 8:46:54 EDT
Comments by: Herb J. Held@Reso@RTCDC
Comments:

fyi

------------------------- [Original Message] -------------------------

We are still working with a minority whole bank bidder. We will need about $1.4 billion in loans. If Sandra has the loans and does not need the securities than we should be able to release the securities.

EXHIBIT
Saunders # 13
10/3/06 LR

CONFIDENTIAL-SUBJECT
TO PROTECTIVE ORDER
C-AM-A-0014279

**PNC BANK CORP**
**Document Type:** 10-Q
**Form Type:** 10-Q
**Document Date:** September 30, 1993
**Document Control Number:** 93524538 EDGAR Search

1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)

X ! QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 1993

OR

! TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to .

COMMISSION FILE NUMBER 1-9718

PNC BANK CORP.
(Exact name of registrant as specified in its charter)

PENNSYLVANIA

25-1435979

(State or other jurisdiction of incorporation or organization)

(I.R.S. Employer Identification No.)

ONE PNC PLAZA
FIFTH AVENUE AND WOOD STREET
PITTSBURGH, PENNSYLVANIA 15265
(Address of principal executive offices)
(Zip Code)

(412) 762-2666
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common Stock ($5 par value): 234,445,135 shares as of October 28, 1993.

The PNC Bank Hotline at 800 982 7652 or Shareholder Relations at 800 843 2206.

Analysts and institutional investors should contact:
William H. Callihan, Vice President,
Investor Relations at 412 762 8257.

News media representatives and others seeking
general information should contact:
Jonathan Williams, Vice President,
Media Relations, at 412 762 4550.





EXHIBIT 28.2

PRO FORMA CONSOLIDATED FINANCIAL INFORMATION

PNC Bank Corp. has entered into definitive agreements to acquire Sears Mortgage Corporation, Sears Mortgage Securities Corporation and Sears Savings Bank(collectively "Sears Mortgage"). The acquisition is expected to be completed by the end of the year and is subject to various regulatory approvals.

Under the terms of the definitive agreements, PNC Bank Corp. will acquire all of thestock of each Sears Mortgage entity for cash. PNC Bank Corp. will account for the acquisition using the purchase method and allocate the purchase price to all assets acquired and liabilities assumed based on their estimated fair values at the date of acquisition. The amounts recorded will depend upon several factors, including prevailing interest rates and residential mortgage prepayment rates, as well as Sears Mortgage's assets, liabilities and off balance sheet items on the date of acquisition. Actual market rates and other factors may differ from those used in preparing the pro forma financial information.

The pro forma financial information on the following pages presents (i) the historical consolidated balance sheets of PNC Bank Corp. and subsidiaries ("Corporation")and Sears Mortgage at September 30, 1993, giving effect to the acquisition as if it had occurred on that date and (ii) the historical consolidated statementsof income of the Corporation and Sears Mortgage for the nine month period ended September 30, 1993 and the year ended December 31, 1992, giving effect to theacquisition as if it had occurred on January 1, 1993 and January 1, 1992, respectively. For purposes of presenting the pro forma financial information, intercompany transactions between Sears Mortgage entities have been eliminated and certain financial statement reclassifications have been made.

The pro forma financial information includes only those actions to be completed on or prior tothe closing date and excludes (i) balance sheet changes, if any, that may occur after the closing date and (ii) the intended effect of expense savings to be initiated as part of the consolidation of the mortgage banking operations of the Corporation and Sears Mortgage.

The pro forma financial information is intended for informational purposes and may not be indicative of the financial position or results of operations that actually would have occurred, or may be attained in the future, had the Corporation completed its acquisition of Sears Mortgage on the dates indicated. The pro forma financial information should be read in conjunction with the Corporation's 1992 Annual Report on Form 10 K, the Corporation's March 31, 1993 Quarterly Report on Form 10 Q (which includes as exhibits the 1992 audited financial statements for each Sears Mortgage entity), the Corporation's September 30, 1993 Quarterly Report on Form 10 Q, and the unaudited financial statements for each Sears Mortgage entity as of and for the periods ended September 30, 1993, filed herewith as Exhibits 28.3, 28.4 and 28.5.

PNC BANK CORP. PRO
FORMA CONSOLIDATED BALANCE SHEET (Unaudited) September 30, 1993 (In millions)

| | PNC Bank Corp. | Sears Mortgage | Pro Forma Adjustments | Pro Forma(a) |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and due from banks | $1,742 | $258 | $250 (b) | $1,922 |
| | | | (328)(c) | |
| Short term investments | 250 | 244 | | 494 |
| Securities available for sale | 3,443 | 957 | 7 (d) | 4,407 |
| Mortgages held for sale | 296 | 1,391 | | 1,687 |
| Investment securities | 17,732 | | | 17,732 |
| Loans, net of unearned income | 27,385 | 4,609 | 184 (d) | 31,878 |
| | | | (300)(e) | |
| Allowance for credit losses | (940) | (23) | | (963) |
| Net loans | 26,445 | 4,586 | 184 | 30,915 |
| Purchased mortgage servicing | 28 | 221 | 40 (d) | 289 |
| Other | 2,344 | 291 | (53)(d) | 2,582 |
| Total assets | $52,280 | $7,948 | ($200) | $60,028 |
| LIABILITIES | | | | |
| Deposits | | | | |
| Noninterest bearing | $5,394 | $48 | | $5,442 |
| Interest bearing | 22,872 | 2,830 | $172 (d) | 25,874 |
| Total deposits | 28,266 | 2,878 | 172 | 31,316 |
| Federal funds purchased and repurchase agreements | 7,470 | 2,478 | | 9,948 |
| Other borrowings | 6,543 | 1,686 | (300)(e) | 7,929 |
| Notes and debentures | 4,310 | 295 | 250 (b) | 4,855 |
| Other | 1,572 | 176 | 58 (d) | 1,861 |
| | | | 55 (f) | |
| Total liabilities | 48,161 | 7,513 | 235 | 55,909 |
| SHAREHOLDERS'EQUITY | 4,119 | 435 | (435)(c) | 4,119 |
| Total liabilities and shareholders' equity | $52,280 | $7,948 | ($200) | $60,028 |

See accompanying Notes to Pro Forma Consolidated Financial Information.



PNC BANK CORP.
PRO FORMA CONSOLIDATED STATEMENT OF INCOME (Unaudited)
Nine Months Ended September 30, 1993
(In thousands, except per share data)

| | PNC Bank Corp. | Sears Mortgage |
|---|---|---|
| INTEREST INCOME | | |
| Loans and fees on loans | $1,433,932 | $338,015 |
| Securities | 923,293 | 40,901 |
| Other | 28,694 | 22,404 |

# COST OF RESOLUTION (projected) TO ANTICIPATED THRIFT CLOSING

| | | | |
|---|---|---|---|
| S&L NAME: CARTERET FSB | | FIN: | 8602 |
| Location: NEWARK, NJ | | Date of Cost Test Data: | 10/31/94 |
| Anticipated Transaction Type: | BRANCH PA | Expected Closing Date: | 3/10/95 |

(in 000's)

| | | | |
|---|---|---|---|
| **Projected Cost of Resolution:** | | | |
| 1 | Cost of Proposed Transaction (Per Cost Test dated 03/16/95) | $226,960 | |
| | Add: | | |
| 2 | Adjustment for Operating Expenses * | ($1,656) | |
| 3 | **Projected Cost of Resolution at Expected Date of Closing** | | **$225,304** |
| **Projected Cost of Payout:** | | | |
| 4 | Cost of Payout on Proposed Transaction (Per Cost Test dated 03/16/95) | $361,427 | |
| | Add: | | |
| 5 | Adjustment for Operating Expenses * | ($1,656) | |
| 6 | **Projected Cost of Payout at Expected Date of Closing** | | **$359,771** |
| 7 | **PROJECTED SAVINGS AFTER ADJUSTMENT FOR OPERATING EXPENSES** | | **$134,467** |

* Adjustment for Operating Expenses calculated as follows:

| | | |
|---|---|---|
| Per Day Operating Loss | : | ($12.759) |
| RTC Pro Rata Loss Ratio | : X | 99.8524% |
| Per Day Operating Loss (RTC Share) | : | ($12.740) |
| Number of Days to Closing | : X | 130 |
| **RTC Share of Operating Expenses** | | ($1,656) |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130728

# REPORT A

| | | | |
|---|---|---|---|
| S&L NAME: CARTERET FSB | | FIN: | 8602 |
| LOCATION: NEWARK, NJ | | DATE OF DATA: | 10/31/94 |
| DEPOSITOR PREFERENCE STATE: | YES | | |

**LIQUIDATION SUMMARY STATEMENT AND DISTRIBUTION OF LOSS**
**(in 000's)**

| | Assets: | | | Liabilities (Not Subordinated): | |
|---|---|---|---|---|---|
| 1A | Cash and Securities | 636,103 | | | |
| 2A | 1-4 Residential Loans | 776,949 | 19A | Sec./Pref. Deposits | 0 |
| 3A | 2nd Mortgage Loans | 0 | 20A | Insured Deposits | 1,269,540 |
| 4A | 5+ Residential Loans | 69,521 | 21A | Uninsured Deposits | 1,876 |
| 5A | Consumer Loans | 57,358 | | | ---------- |
| 6A | Other Loans | 467,725 | 22A | Total Deposits | 1,271,416 |
| 7A | Real Estate Owned | 14,649 | 23A | Sec./Pref. Liab. | 948,485 |
| 8A | Other Assets | 140,753 | 24A | Other Liabilities | (57,887) |
| | | ---------- | | | ---------- |
| 9A | Book Assets | 2,163,058 | 25A | Book Liabilities | 2,162,014 |
| 10A | Non-book Assets | 0 | 26A | Non-book Liab.-Sec. | 0 |
| 11A | RTC M-T-M Asset Loss | (252,177) | 27A | Non-book Liab.-Others | 75,941 |
| 12A | Est. Indirect Expenses | (51,970) | | | ---------- |
| 13A | Admin. Costs of Payoff | (971) | 28A | Adjusted Liabilities | 2,237,955 |
| | | ---------- | | | |
| 14A | Adjusted Assets | 1,857,940 | 29A | Sec./Pref. Claims | (948,485) |
| 15A | Sec./Pref. Claims | (948,485) | | | ---------- |
| | | ---------- | 30A | Claims | 1,289,470 |
| 16A | Available Assets | 909,455 | 31A | Junior Claims* | (18,054) |
| 17A | Total Loss - Sr. Claims | 361,961 | | | |
| | | ---------- | | | ---------- |
| 18A | Proof | 1,271,416 | 32A | Net Senior Claims | 1,271,416 |

**PRO-RATA DISTRIBUTION OF LOSS AND RECOVERY IN LIQUIDATION**

| | | NET CLAIMS | % OF SR. CLAIMS | EXPECTED LOSS | EXPECTED RECOVERY |
|---|---|---|---|---|---|
| 33A | RTC for Insured Deposits | 1,269,540 | 99.8524% | 361,427 | 908,113 |
| 34A | Uninsured Deposits | 1,876 | 0.1476% | 534 | 1,342 |
| 35A | Other Creditors | 18,054 | 0.0000% | 18,054 | 0 |
| | | 1,289,470 | 100.0000% | 380,015 | 909,455 |

* Applies only in depositor preference states.

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130729

## REPORT B

| | | | |
|---|---|---|---|
| S&L NAME: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

TRANSACTION SUMMARY (In 000's)

| | | BRNCH(Ins) | BRANCH P&A | | |
|---|---|---|---|---|---|
| 1B | Liabilities Assumed | 1,269,540 | 1,271,416 | | |
| 2B | Original BV of Assets Acquired | 38,635 | 38,635 | | |
| 3B | Gross Cash to Acquiror | 1,230,905 | 1,232,781 | | |
| 4B | Add: RTC Advances | 945,243 | 945,243 | | |
| 5B | Gross RTC Funding | 2,176,148 | 2,178,024 | | |
| 6B | Less: Premium/Discount | (133,868) | (134,031) | | |
| 7B | Net RTC Funding | 2,042,280 | 2,043,993 | | |
| 8B | Asset Retained by RTC | 2,124,423 | 2,124,423 | | |
| 9B | Loss on Retained Assets | (303,446) | (303,446) | | |
| 10B | Net Recovery on Retained Assets | 1,820,977 | 1,820,977 | | |

RTC COST SUMMARY WINNER

| | | | | | |
|---|---|---|---|---|---|
| 11B | Best Bidder by Option type | Various | Various | | |
| 12B | Gross Cash to Acquiror | 1,230,905 | 1,232,781 | | |
| 13B | Recovery on Retained Assets | (1,820,977) | (1,820,977) | | |
| 14B | Adj. to BV per P&A Agreement | 702 | 702 | | |
| 15B | RTC Advances | 945,243 | 945,243 | | |
| 16B | Gross Book Value on Put Assets | 0 | 0 | | |
| 17B | Recovery on Put Assets | 0 | 0 | | |
| 18B | Recapture of Transfer Value Adjustment | 0 | 0 | | |
| 19B | Dist. to Oth. Creditors (Sec./Unsec.) | 4,585 | 3,242 | | |
| 20B | Insured Deposits Not Passing to Acquiror | 0 | 0 | | |
| 21B | Entry/Exit Fees (BIF/IDT Only) | 0 | 0 | | |
| 22B | Administrative Costs * | 80 | 0 | | |
| 23B | RTC Share Bid Amount (Incl. Implied Asset Premiums) | (133,670) | (134,031) | | |
| 24B | Cost of Proposed Transaction | 226,869 | 226,960 | | |
| 25B | Cost to RTC of Payoff | (361,427) | (361,427) | | |
| 26B | Savings over Payoff ** | 134,558 | 134,467 | | |
| 27B | Uninsured Deposits -- Share of Loss | 0 | 533 | | |
| 28B | Actual or Implied Premium | 134,558 | 134,999 | | |

* :Administrative Cost may include the spread between the RTC borrowing rate and the average deposit rate for deposits not acquired, if applicable.

10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER C-AM-A-0130730

# REPORT C2
## RTC COST TEST FOR DEPOSITOR PREFERENCE STATE

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

(In 000's)

| | |
|---|---|
| 1C2 Total Deposits (Incl. Accrued Int.) | 1,271,416 |
| ADD OTHER LIABILITIES: | |
| 2C2 Secured Borrowings | 945,243 |
| 3C2 Secured Liabilities | 872 |
| 4C2 Preferred Liabilities | 2,370 |
| 5C2 Est. Loss in Contg. Liab. (Secured) | 0 |
| 6C2 Total Liabilities | 2,219,901 |
| SUBTRACT SECURED LIABILITIES: | |
| 7C2 Secured Deposits | 0 |
| 8C2 Preferred Deposits | 0 |
| 9C2 Secured Borrowings | 945,243 |
| 10C2 Secured Liabilities | 872 |
| 11C2 Preferred Liabilities | 2,370 |
| 12C2 [A] NET TOTAL LIABILITIES | 1,271,416 |
| 13C2 Gross Book Assets | 2,163,058 |
| 14C2 Plus: Non-Booked Assets | 0 |
| 15C2 Gross Assets | 2,163,058 |
| Less: | |
| 16C2 M-T-M Loss Estimate | 252,177 |
| 17C2 Indirect Expenses Estimate | 51,970 |
| 18C2 Secured and Preferred Deposits | 0 |
| 19C2 Secured and Preferred Liab. | 948,485 |
| 20C2 [B] NET FREE ASSETS | 910,425 |

| | | |
|---|---|---|
| 21C2 Net Loss (A-B) | 360,991 | |
| 22C2 Add: Administrative Cost* | -Payout | 971 |
| | -IDT | 80 |
| | -P&A | 0 |
| 23C2 [C] TOTAL LOSS AS: | -Payout | 361,961 |
| | -IDT | 361,071 |
| | -P&A | 360,991 |

| | |
|---|---|
| 24C2 Total Deposits | 1,271,416 |
| Less: | |
| 25C2 [D] Uninsured Deposits | 1,876 |
| 26C2 Secured Deposits | 0 |
| 27C2 Preferred Deposits | 0 |
| 28C2 [E] Total Insured Liabilities | 1,269,540 |

| (BEFORE PREMIUMS RECEIVED) | PAYOUT | IDT | P&A |
|---|---|---|---|
| 29C2 [F] RTC PERCENTAGE (E/A) | 99.8524% | 99.8524% | 99.8524% |
| 30C2 [G] PRO RATA LOSS RATIO (C/A) | 28.4691% | 28.3991% | 28.3928% |
| 31C2 RTC SHARE OF LOSS (CxF) | 361,427 | 360,538 | 360,458 |
| 32C2 Premium Needed For Transfer of Uninsured Deposits (DxG) | NA | NA | 533 |

| (BEFORE PREMIUMS RECEIVED) | | |
|---|---|---|
| 33C2 I- Assets Transferred in Excess of RTC M-T-M | (1) | |
| 34C2 Loss in Transferring Uninsured Deposits at Par | 0 | |
| 35C2 Estimated Loss on Potential Asset Puts | 0 | |
| 36C2 Pro Rata Savings of Administrative Costs | 889 | |
| 37C2 MAXIMUM DISCOUNT FOR BR PA(INS) | | 888 |
| 38C2 II- Assets Transferred in Excess of RTC M-T-M | (1) | |
| 39C2 Loss in Transferring Uninsured Deposits at Par | (533) | |
| 40C2 Estimated Loss on Potential Asset Puts | 0 | |
| 41C2 Pro Rata Savings of Administrative Costs | 969 | |
| 42C2 MAXIMUM DISCOUNT FOR BRANCH PA | | 436 |

| (BEFORE PREMIUMS RECEIVED) | PAYOUT | IDT/P&A-BRANCH(ins) | P&A |
|---|---|---|---|
| 53C2 [H] Uninsured Depositors | 1,876 | 1,876 | 1,876 |
| 54C2 Est. Loss to Uninsured Depositors (GxH) | 534 | 533 | 533 |
| 55C2 PRO RATA DISTRIBUTION TO UNINSURED CREDITORS | 1,342 | 1,343 | 1,343 |

| | | |
|---|---|---|
| 55C2 SEC/PREF LIABILITIES RETAINED | - OPTION I | 3,242 |
| | - OPTION II | 3,242 |
| | - OPTION III | 3,242 |
| | - OPTION IV | 3,242 |

*: # of Deposits Accounts:
157,808 x $6.15 # Payout
157,808 x $0.51 per account # IDT

18-Mar-95 10:25:53 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130731

Reply App. 00087

## REPORT D



### PROPOSED BID STRUCTURE AND RELATED RTC M-T-M LOSS DATA

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

| | | | | ASSETS PASSING TO ACQUIROR | | | | ASSETS RETAINED BY RTC | | | ASSETS REPURCHASED BY RTC | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALTERNATIVE | BOOK VALUE | ADJUSTED BOOK VALUE | RTC MTM LOSS | ADJUSTED BOOK VALUE | RTC MTM LOSS | RTC MTM VALUE | TRANSFER VALUE | ADJUSTED BOOK VALUE | RTC MTM LOSS | RTC MTM VALUE | GROSS BV ON PUT ASSETS | RECOVERY ON PUT ASSETS | EST. LOSS ON PUT ASSETS | RECAPT. TFR. VAL. ADJSTMT. |
| BR PA(INS) | | | | | | | | | | | | | | |
| 1D Cash and Securities | 636,103 | 636,103 | 76,344 | 4,712 | 0 | 4,712 | 4,712 | 631,391 | 76,344 | 555,047 | 0 | 0 | 0 | 0 |
| 2D 1-4 Res. Loans | 776,949 | 760,951 | 54,631 | 0 | 0 | 0 | 0 | 760,951 | 54,631 | 706,320 | 0 | 0 | 0 | 0 |
| 3D 2nd Mortgage Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4D 5+ Residential Loans | 69,521 | 66,377 | 39,872 | 0 | 0 | 0 | 0 | 66,377 | 39,872 | 26,505 | 0 | 0 | 0 | 0 |
| 5D Consumer Loans | 57,356 | 55,606 | 2,147 | 32,947 | (274) | 33,221 | 33,221 | 22,659 | 2,421 | 20,238 | 0 | 0 | 0 | 0 |
| 6D Other Loans | 467,725 | 447,698 | 54,279 | 0 | 0 | 0 | 0 | 447,698 | 54,279 | 393,419 | 0 | 0 | 0 | 0 |
| 7D Real Estate Owned | 14,649 | 13,624 | 4,993 | 0 | 0 | 0 | 0 | 13,624 | 4,993 | 8,631 | 0 | 0 | 0 | 0 |
| 8D Other Assets | 140,753 | 130,729 | 19,911 | 0 | 0 | 0 | 0 | 130,729 | 19,911 | 110,818 | 0 | 0 | 0 | 0 |
| 9D Total Assets | 2,163,056 | 2,111,088 | 252,177 | 37,659 | (274) | 37,933 | 37,933 | 2,073,429 | 252,451 | 1,820,977 | 0 | 0 | 0 | 0 |
| 10D Assets transferred in excess of RTC M-T-M Value........................................ | | | | | | | (1) | | | | | | | |
| BRANCH P&A | | | | | | | | | | | | | | |
| 11D Cash and Securities | 636,103 | 636,103 | 76,344 | 4,712 | 0 | 4,712 | 4,712 | 631,391 | 76,344 | 555,047 | 0 | 0 | 0 | 0 |
| 12D 1-4 Res. Loans | 776,949 | 760,951 | 54,631 | 0 | 0 | 0 | 0 | 760,951 | 54,631 | 706,320 | 0 | 0 | 0 | 0 |
| 13D 2nd Mortgage Loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14D 5+ Residential Loans | 69,521 | 66,377 | 39,872 | 0 | 0 | 0 | 0 | 66,377 | 39,872 | 26,505 | 0 | 0 | 0 | 0 |
| 15D Consumer Loans | 57,356 | 55,606 | 2,147 | 32,947 | (274) | 33,221 | 33,221 | 22,659 | 2,421 | 20,238 | 0 | 0 | 0 | 0 |
| 16D Other Loans | 467,725 | 447,698 | 54,279 | 0 | 0 | 0 | 0 | 447,698 | 54,279 | 393,419 | 0 | 0 | 0 | 0 |
| 17D Real Estate Owned | 14,649 | 13,624 | 4,993 | 0 | 0 | 0 | 0 | 13,624 | 4,993 | 8,631 | 0 | 0 | 0 | 0 |
| 18D Other Assets | 140,753 | 130,729 | 19,911 | 0 | 0 | 0 | 0 | 130,729 | 19,911 | 110,818 | 0 | 0 | 0 | 0 |
| 19D Total Assets | 2,163,056 | 2,111,088 | 252,177 | 37,659 | (274) | 37,933 | 37,933 | 2,073,429 | 252,451 | 1,820,977 | 0 | 0 | 0 | 0 |
| 20D Assets transferred in excess of RTC M-T-M Value........................................ | | | | | | | (1) | | | | | | | |

16-Mar-95 10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130732

REPORT E

## SUMMARY OF BIDS

(in 000's)

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | DATE OF DATA: | 10/31/94 |

| BR PA(INS) | BIF/SAIF or OAKAR | AMOUNT OF BID | BID AFTER FEE ADJUSTMENT | RTC COST | RTC SAVINGS OVER PAYOFF |
|---|---|---|---|---|---|
| Various | SAIF | $133,868 | 133,868 | 226,869 | 134,558 |
| BRANCH P&A | | | | | |
| Various | SAIF | $134,031 | 134,031 | 226,960 | 134,467 |
| ERR | | | | | |
| NONE | | | | | |
| ERR | | | | | |
| NONE | | | | | |

16-Mar-95 10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130733

**REPORT E (Attachment)**

## CARTERET FSB
## SUMMARY OF WINNING BIDS
(000's)

| NAME OF WINNING BIDDER | Branches | | PREMIUM |
|---|---|---|---|
| Linked Bids: | | | |
| Chase Manhattan Bank of N.J. N.A. | Oradell, Ridgeworth & Riveredge | 13,305 | |
| Boiling Springs SB | Hillsdale & Lyndhurst | 2,820 | 16,125 |
| | | | |
| Stand Alone Bids: | | | |
| Penn Federal SB | Cluster 6 | | 18,745 |
| Bank of New York NA | Cluster 8 | | 13,001 |
| Provident SB | Cluster 5 | | 10,297 |
| Investors SB | Cluster 5A | | 7,755 |
| Trenton SB, FSB | Cluster 12 | | 2,506 |
| TOTAL | | $ | 68,429 |
| Total Premium received on sale of 14 NJ brances 1/20/95 | | | 65,602 |
| TOTAL ALL DEPOSIT PREMIUM RECEIVED FOR NJ BRANCHES | | $ | 134,031 |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130734

REPORT F



# PRO FORMA BALANCE SHEET

(in 000's)

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | SR PA(INS) |
| DEPOSITOR PREF. STATE: | YES | DATE OF DATA: | 10/31/94 |

ASSETS (Gross Book Value)

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 1F | Cash & Inv. Securities | $636,103 | $631,391 | $4,712 |
| | Mortgage Loans: | | | |
| 2F | 1-4 Residential Loans: | | | |
| | - Schedule B | $0 | $0 | $0 |
| | - Adjustable | $497,845 | $497,845 | $0 |
| | - Fixed | $279,104 | $279,104 | $0 |
| 3F | 2nd Mortgage Loans | $0 | $0 | $0 |
| 4F | 5+ Residential Loans | $69,521 | $69,521 | $0 |
| 5F | Construction Loans | $0 | $0 | $0 |
| 6F | Land Loans | $17,146 | $17,146 | $0 |
| 7F | Other Mortgage Loans | $56,963 | $56,963 | $0 |
| | Total Mortgage Loans | $920,579 | $920,579 | $0 |
| | Non-Mortgage Loans: | | | |
| 8F | Consumer Loans | $55,957 | $23,435 | $32,522 |
| | - Share | $1,401 | $0 | $1,401 |
| 9F | Commercial Loans | $393,616 | $393,616 | $0 |
| | Total Non-Mortgage Loans | $450,974 | $417,051 | $33,923 |
| | TOTAL LOANS: | $1,371,553 | $1,337,630 | $33,923 |
| 10F | Real Estate Owned | $14,649 | $14,649 | $0 |
| 11F | Subsidiaries | $98,384 | $98,384 | $0 |
| 12F | Fixed Assets | $12,550 | $12,550 | $0 |
| 13F | Other Assets | $29,819 | $29,819 | $0 |
| 14F | TOTAL ASSETS | $2,163,058 | $2,124,423 | $38,635 |

| Estimated Variable Indirect Expenses (Percentage of Assets Balances) | |
|---|---|
| Cash & Securities | 0% |
| "Schedule B" 1-4 Loans | 0% |
| 1-4 Residential Loans | 2% |
| NP 1-4 Res. Loans | 4% |
| 5+ Residential Loans | 2% |
| NP 5+ Res. Loans | 8% |
| Construction Loans | 6% |
| Land Loans | 6% |
| Commercial Mort. Loans | 4% |
| NP Comm. Mort. Loans | 8% |
| Share Loans | 0% |
| Consumer Loans | 3% |
| NP Consumer Loans | 5% |
| Commercial Non-Mort. Lns | 4% |
| NP Comm. Non-Mort. Lns. | 4% |
| Real Estate Owned | 7% |
| Subsidiaries | 9% |
| Fixed Assets | 7% |
| Other Assets | 4% |
| FHLB Stock | 0% |
| Accrued Int. Rec. (Loans) | 0% |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130735

REPORT F



| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | BR PA(INS) |

LIABILITIES:

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 15F | Insured Deposits | $1,269,540 | $0 | $1,269,540 |
| 16F | Uninsured Deposits | $1,876 | $1,876 | $0 |
| 17F | FHLB Advances | $0 | $0 | $0 |
| 18F | RTC Advances | $945,243 | $945,243 | $0 |
| 19F | Secured Borrowings | $0 | $0 | $0 |
| 20F | Secured Liabilities | $872 | $872 | $0 |
| 21F | Unsecured Borrowings | $10,247 | $10,247 | $0 |
| 22F | Accrued Expenses | $0 | $0 | $0 |
| 23F | Prefered Liabilities | $2,370 | $2,370 | $0 |
| 24F | Other Liabilities | $7,807 | $7,807 | $0 |
| 25F | Total Liabilities | $2,237,955 | $968,415 | $1,269,540 |
| 26F | Net Worth | ($74,897) | $1,156,008 | ($1,230,905) |
| 27F | TOTAL LIABILITIES & EQUITY | $2,163,058 | $2,124,423 | |

| | | | | |
|---|---|---|---|---|
| 28F | Gross Cash to Acquiror | NA | NA | $1,230,905 |
| | Plus RTC Advances | NA | NA | $945,243 |
| | Gross RTC Funding | NA | NA | $2,176,148 |

MEMO ITEMS:

| | | |
|---|---|---|
| 29F | General & Specific Reserves | $75,141 |
| 30F | Total Deposits <$80,000 | $1,161,839 |
| 31F | Brokered Deposits <$80,000 | $0 |
| 32F | Total Brokered Deposits | $0 |
| 33F | Secured Deposits | $0 |
| 34F | Preferred Deposits | $0 |
| 35F | Total Mortgage Delinquents | $87,329 |
| 36F | Total Non-Mortgage Delinquents | $16,198 |
| 37F | # of Branches | 30 |
| 38F | # of Deposit Accounts | 157,808 |
| 39F | RTC M-T-M Loss | $252,177 |

41F ESTIMATED LOSS IN CONTINGENT & NON-BOOKED LIABILITIES:

| | |
|---|---|
| Secured Borrowings | $0 |
| Secured Liabilities | $0 |
| Total Secured | $0 |
| Unsecured Borrowings | $0 |
| Unsecured Accrued Expenses | $0 |
| Unsecured Other Liabilities | $75,941 |
| Total Unsecured | $75,941 |

| | |
|---|---|
| 42F Estimated Indirect Overhead Expenses | $51,970 |

40F NON-BOOKED ASSETS:

| | |
|---|---|
| Cash & Securities | $0 |
| 1-4 Residential Loans | $0 |
| 2nd Mortgage Loans | $0 |
| 5+ Residential Loans | $0 |
| Consumer Loans | $0 |
| Other Loans | $0 |
| Real Estate Owned | $0 |
| Other Assets | $0 |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130736

## REPORT F



# PRO FORMA BALANCE SHEET

(In 000's)

| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | BRANCH P&A |
| DEPOSITOR PREF. STATE: | YES | DATE OF DATA: | 10/31/94 |

ASSETS (Gross Book Value)

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 1F | Cash & Inv. Securities | 636,103 | $631,391 | $4,712 |
| | Mortgage Loans: | | | |
| 2F | 1-4 Residential Loans: | | | |
| | - Schedule B | $0 | $0 | $0 |
| | - Adjustable | $497,845 | $497,845 | $0 |
| | - Fixed | $279,104 | $279,104 | $0 |
| 3F | 2nd Mortgage Loans: | $0 | $0 | $0 |
| 4F | 5+ Residential Loans: | $69,521 | $69,521 | $0 |
| 5F | Construction Loans: | $0 | $0 | $0 |
| 6F | Land Loans: | $17,146 | $17,146 | $0 |
| 7F | Other Mortgage Loans: | $56,963 | $56,963 | $0 |
| | Total Mortgage Loans | $920,579 | $920,579 | $0 |
| | Non-Mortgage Loans: | | | |
| 8F | Consumer Loans: | $55,957 | $23,435 | $32,522 |
| | - Share | $1,401 | $0 | $1,401 |
| 9F | Commercial Loans: | $393,616 | $393,616 | $0 |
| | Total Non-Mortgage Loans | $450,974 | $417,051 | $33,923 |
| | TOTAL LOANS: | $1,371,553 | $1,337,630 | $33,923 |
| 10F | Real Estate Owned: | $14,649 | $14,649 | $0 |
| 11F | Subsidiaries: | $98,384 | $98,384 | $0 |
| 12F | Fixed Assets: | $12,550 | $12,550 | $0 |
| 13F | Other Assets: | $29,819 | $29,819 | $0 |
| 14F | TOTAL ASSETS | $2,163,058 | $2,124,423 | $38,635 |

| Estimated Variable Indirect Expenses (Percentage of Assets Balances) | |
|---|---|
| Cash & Securities | 0% |
| "Schedule B" 1-4 Loans | 0% |
| 1-4 Residential Loans | 2% |
| NP 1-4 Res. Loans | 4% |
| 5+ Residential Loans | 2% |
| NP 5+ Res. Loans | 8% |
| Construction Loans | 6% |
| Land Loans | 6% |
| Commercial Mort. Loans | 4% |
| NP Comm. Mort. Loans | 8% |
| Share Loans | 0% |
| Consumer Loans | 3% |
| NP Consumer Loans | 5% |
| Commercial Non-Mort. Lns | 4% |
| NP Comm. Non-Mort. Lns. | 4% |
| Real Estate Owned | 7% |
| Subsidaries | 9% |
| Fixed Assets | 7% |
| Other Assets | 4% |
| FHLB Stock | 0% |
| Accrued Int. Rec. (Loans) | 0% |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130737

REPORT F



| | | | |
|---|---|---|---|
| INSTITUTION: | CARTERET FSB | FIN: | 8602 |
| LOCATION: | NEWARK, NJ | BID OPTION: | BRANCH P&A |

LIABILITIES:

| | | ACTUAL | RETAINED BY RTC | PASSED TO ACQUIROR(S) |
|---|---|---|---|---|
| 15F | Insured Deposits | $1,269,540 | $0 | $1,269,540 |
| 16F | Uninsured Deposits | $1,876 | $0 | $1,876 |
| 17F | FHLB Advances | $0 | $0 | $0 |
| 18F | RTC Advances | $945,243 | $945,243 | $0 |
| 19F | Secured Borrowings | $0 | $0 | $0 |
| 20F | Secured Liabilities | $872 | $872 | $0 |
| 21F | Unsecured Borrowings | $10,247 | $10,247 | $0 |
| 22F | Accrued Expenses | $0 | $0 | $0 |
| 23F | Prefered Liablilties | $2,370 | $2,370 | $0 |
| 24F | Other Liabilities | $7,807 | $7,807 | $0 |
| 25F | Total Liabilities | $2,237,955 | $966,539 | $1,271,416 |
| 26F | Net Worth | ($74,897) | $1,157,884 | ($1,232,781) |
| 27F | TOTAL LIABILITIES & EQUITY | $2,163,058 | $2,124,423 | |

| | | | | |
|---|---|---|---|---|
| 28F | Gross Cash to Acquiror | NA | NA | $1,232,781 |
| | Plus RTC Advances | NA | NA | $945,243 |
| | Gross RTC Funding | NA | NA | $2,178,024 |

MEMO ITEMS:

| | | |
|---|---|---|
| 29F | General & Specific Reserves | $75,141 |
| 30F | Total Deposits <$80,000 | $1,181,839 |
| 31F | Brokered Deposits <$80,000 | $0 |
| 32F | Total Brokered Deposits | $0 |
| 33F | Secured Deposits | $0 |
| 34F | Preferred Deposits | $0 |
| 35F | Total Mortgage Delinquents | $87,329 |
| 36F | Total Non-Mortgage Delinquents | $16,198 |
| 37F | # of Branches | 30 |
| 38F | # of Deposit Accounts | 157,808 |
| 39F | RTC M-T-M Loss | $252,177 |

41F ESTIMATED LOSS IN CONTINGENT & NON-BOOKED LIABILITIES:

| | |
|---|---|
| Secured Borrowings | $0 |
| Secured Liabilities | $0 |
| Total Secured | $0 |
| Unsecured Borrowings | $0 |
| Unsecured Accrued Expenses | $0 |
| Unsecured Other Liabilities | $75,941 |
| Total Unsecured | $75,941 |

| | |
|---|---|
| 42F Estimated Indirect Overhead Expenses | $51,970 |

40F NON-BOOKED ASSETS:

| | |
|---|---|
| Cash & Securities | $0 |
| 1-4 Residential Loans | $0 |
| 2nd Mortgage Loans | $0 |
| 5+ Residential Loans | $0 |
| Consumer Loans | $0 |
| Other Loans | $0 |
| Real Estate Owned | $0 |
| Other Assets | $0 |

16-Mar-95
10:25 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
C-AM-A-0130738

Report LDS.01
Report Date 10/19/98
Page 1

Bank Name CARTERET SAVINGS
Bank # 1309
Date of Closure 03/10/95

Liability Register

| Priority | Claim/RC# | | Claimant | Original Claim Amount | Dividends Date | Dividends Check # | Dividends Amount | Dividends To Date | Claim Balance |
|---|---|---|---|---|---|---|---|---|---|
| 961.0 | 1 | 1 | RESOLUTION TRUST CORP | 1,368,154,803.42 | | | | | |
| | | | | | 09/30/95 | 111 | 783,757,424.67 | 783,757,424.67 | |
| | | | | | 10/31/95 | 222 | 258,157,000.00 | 1,041,914,424.67 | |
| | | | | | 11/30/95 | 333 | 24,062,000.00 | 1,065,976,424.67 | |
| | | | | | 12/29/95 | 444 | 1,829,000.00 | 1,067,805,424.67 | |
| | | | | | 01/31/96 | 555 | 20,670,000.00 | 1,088,475,424.67 | |
| | | | | | 02/29/96 | 666 | 24,858,000.00 | 1,113,333,424.67 | |
| | | | | | 04/30/96 | 777 | 16,343,000.00 | 1,129,676,424.67 | |
| | | | | | 05/31/96 | 888 | 5,984,000.00 | 1,135,660,424.67 | |
| | | | | | 06/30/96 | 999 | 19,465,000.00 | 1,155,125,424.67 | |
| | | | | | 10/01/96 | 10 | 64,515,326.46 | 1,219,640,751.13 | |
| | | | | | 02/14/97 | 11 | 500,000.00 | 1,220,140,751.13 | |
| | | | | | 02/18/97 | 12 | 500,000.00 | 1,220,640,751.13 | |
| | | | | | 02/21/97 | 12 | 45,000,000.00 | 1,265,640,751.13 | |
| | | | | | 02/28/97 | 13 | 1,200,000.00 | 1,266,840,751.13 | |
| | | | | | 03/11/97 | 14 | 800,000.00 | 1,267,640,751.13 | |
| | | | | | 04/01/97 | 15 | 800,000.00 | 1,268,440,751.13 | |
| | | | | | 04/08/97 | 16 | 400,000.00 | 1,268,840,751.13 | |
| | | | | | 04/29/97 | 17 | 400,000.00 | 1,269,240,751.13 | |
| | | | | | 06/01/97 | 18 | 7,142,543.41 | 1,276,383,294.54 | |
| | | | | | 07/08/97 | 19 | 2,700,000.00 | 1,279,083,294.54 | |
| | | | | | 08/12/97 | 20 | 4,000,000.00 | 1,283,083,294.54 | |
| | | | | | 08/19/97 | 21 | 4,100,000.00 | 1,287,183,294.54 | |
| | | | | | 10/07/97 | 22 | 2,000,000.00 | 1,289,183,294.54 | |
| | | | | | 10/21/97 | 23 | 5,200,000.00 | 1,294,383,294.54 | |
| | | | | | 10/28/97 | 24 | 100,000.00 | 1,294,483,294.54 | |
| | | | | | 11/01/97 | 110197 | 5,519,502.75 | 1,300,002,797.29 | |
| | | | | | 11/04/97 | 25 | 400,000.00 | 1,300,402,797.29 | |
| | | | | | 12/16/97 | 26 | 100,000.00 | 1,300,502,797.29 | |
| | | | | | 10/28/98 | 27 | 27,667,768.95 | ✓1,328,170,566.24 | 39,984,237.18 |
| Subtotal Class | | | 01 | 1,368,154,803.42 | | | 1,328,170,566.24 | | 39,984,237.18 |
| 941.0 | 1 | 1 | RESOLUTION TRUST CORP | 178,810.69 | | | | | 178,810.69 |
| Subtotal Class | | | 02 | 178,810.69 | | | 0.00 | | 178,810.69 |
| Grand Total | | | | 1,368,333,614.11 | | | 1,328,170,566.24 | | 40,163,047.87 |

"G"=Gross Dividend; "N"=Net Dividend; "I"=Interest only Not included in totals

# The Cost of the Savings and Loan Crisis: Truth and Consequences

by Timothy Curry and Lynn Shibut*

It has been more than a decade since enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which began the taxpayers' involvement in the cleanup of the savings and loan industry.[1] Over time, misinformation about the cost of the crisis has been widespread; some published reports have placed the cost at less than $100 billion, and others as high as $500 billion.[2] Now that the cleanup is nearly complete, we can answer the following questions about a debacle that has consumed the nation for years:

- What was the total cost of the crisis?
- How much of the total was borne by the U.S. taxpayer?
- How much was borne by the thrift industry?
- How do the actual costs compare with those predicted before and during the cleanup years?

The thrift cleanup was Congress's response to the greatest collapse of U.S. financial institutions since the 1930s. From 1986 to 1989, the Federal Savings and Loan Insurance Corporation (FSLIC), the insurer of the thrift industry, closed or otherwise resolved 296 institutions with total assets of $125 billion (table 1).[3] An even more traumatic period followed, with the creation of the Resolution Trust Corporation (RTC) in 1989 and that agency's resolution by mid-1995 of an additional 747 thrifts with total assets of $394 billion.[4] The combined closings by both agencies of 1,043 institutions holding $519 billion in assets contributed to a massive restructuring of the number of firms in the industry. From January 1, 1986, through year-end 1995, the number of federally insured thrift institutions in the United States declined from 3,234 to 1,645, or by approximately 50 percent.[5]

* Timothy Curry is a financial economist and Lynn Shibut is Chief of the Financial Modeling Section in the FDIC's Division of Research and Statistics. The authors thank the FDIC's James Marino, Barry Kolatch, George Hanc, John Thomas, and Karen Hughes for helpful comments, and Katie Wehner and Sandy Hinegardner for research assistance. Matthew Green of the Treasury Department contributed useful suggestions.

[1] Although the roots of the savings and loan crisis lay in the late 1970s, the passage of FIRREA in 1989 marked the first time taxpayer funds were used to resolve the crisis. That use of taxpayer funds to meet the guarantee to insured depositors is the reason the term *cleanup* is used rather than *bailout*.

[2] For example, see White (1991), 197. Also, Thomas (2000), 13.

[3] The word *thrifts* refers to savings associations insured by the FSLIC until August 8, 1989, and after that date by the Savings Association Insurance Fund (SAIF), administered by the FDIC.

[4] The $394 billion figure measures total assets as reported in the Thrift Financial Report that was most recent at the time of each thrift's failure. This figure is net of valuation allowances on the books of the institution at the time of failure. Other published numbers have reported the total assets for the 747 thrifts at takeover to be $402.4 billion. This reported number is gross of valuation allowances. Unless otherwise noted, the source for all data is the FDIC.

[5] The total number of thrift institutions represents those that were FSLIC-insured at year-end 1986 and SAIF-insured at year-end 1995. It should be noted that not all of the thrift industry consolidation occurred because of the thrift crisis. Even without such a crisis, some consolidation of the industry would probably have occurred.

**Table 1**
**Thrift Failures, 1986–1995**
($Millions)

| Year | FSLIC | | RTC | |
|---|---|---|---|---|
| | Number | Assets | Number | Assets |
| 1986 | 54 | $ 16,264 | | |
| 1987 | 48 | 11,270 | | |
| 1988 | 185 | 96,760 | | |
| 1989 | 9 | 725 | 318 | $134,520 |
| 1990 | | | 213 | 129,662 |
| 1991 | | | 144 | 78,899 |
| 1992 | | | 59 | 44,197 |
| 1993 | | | 9 | 6,148 |
| 1994 | | | 2 | 137 |
| 1995 | | | 2 | 435 |
| Total | 296 | $125,019 | 747 | $393,998 |

*Source:* FDIC.
*Note:* Data are for the period January 1, 1986, to December 31, 1995.

Although the roots of the thrift crisis stretch back to the late 1970s, the financial losses experienced by taxpayers and the industry are tabulated as beginning on January 1, 1986, and ending at year-end 1995. The year 1986 was selected as the starting point because this was the first year when the FSLIC was reported insolvent. Before then, the thrift insurance fund had been able to cover losses from thrift failures. Recognition of the FSLIC's insolvency as of year-end 1986 marked a watershed: at that time many observers realized that taxpayer involvement in the resolution of the crisis was a strong possibility.

The next section of this article provides background material on the crisis. It is followed first by a retrospective on the changing estimates of the size of the thrift problem over time and then by a three-part section identifying and analyzing the cost of meeting the deposit insurance obligations that remained in the wake of the debacle. The costs are broken into the FSLIC and RTC segments, as well as the taxpayer and the thrift industry shares of each, and the total is then analyzed. A brief summary concludes. An appendix discusses the "goodwill" litigation associated with FIRREA.

## Background

The causes and severity of the thrift crisis have been documented by scholars for more than a decade.[6] Several reasons cited for the collapse include:

- high and volatile interest rates during the late 1970s and early 1980s, which exposed thrifts to interest-rate risk (caused by a mismatch in duration and by interest-rate sensitivity of assets and liabilities);
- the phase-out and eventual elimination in the early 1980s of the Federal Reserve's Regulation Q, which caused increasing costs of thrift liabilities relative to many fixed-rate assets and adversely affected industry profitability and capital;
- adverse regional economic conditions;
- state and federal deregulation of depository institutions, which allowed thrifts to enter new but riskier loan markets;
- the deregulation of the thrift industry without an accompanying increase in examination resources (for some years examiner resources actually declined);
- reduced regulatory capital requirements, which allowed thrifts to use alternative accounting procedures to increase reported capital levels;
- excessive chartering of new thrifts during the 1980s;
- the withdrawal in 1986 of federal tax laws (enacted in 1981) that benefited commercial real-estate investments;
- the development during the 1980s of the brokered deposit market; and
- delays in funding the thrift insurance fund during the 1980s and the RTC during the 1990s, which led to regulators' failure to close many insolvent institutions in a timely manner.

As a consequence of all these factors, during the 1980s the thrift industry realized unprecedented losses on loans and investments. The result, as noted, was the failure of hundreds of thrift institutions and the insolvency by year-end 1986 of the FSLIC, the federal insurer for the thrift industry. As of year-end 1986, 441 thrifts with $113 billion in assets were book insolvent, and another 533 thrifts, with $453 billion in assets, had tangible capital of no more than 2 percent of total assets. These 974 thrifts held 47 percent of industry assets. In response, Congress created the Financing Corporation (FICO) in 1987 to provide funding to the FSLIC by issuing long-term bonds. By the time FIRREA was passed two years later, FICO had contributed $8.2 billion in financing to the

[6] *See* Barth *et al.* (1985); Kane (1989); Barth (1991); White (1991); Barth and Brumbaugh (1992); Bennett and Loucks (1996); and FDIC (1997).

Table 2
**Chronology of Thrift Crisis Events**

| | |
|---|---|
| December 31, 1986 | FSLIC insolvent |
| August 10, 1987 | FICO created to fund FSLIC |
| August 9, 1989 | Enactment of FIRREA |
| | – FSLIC abolished |
| | – FRF created (succeeds to FSLIC's assets, liabilities, and operations) |
| | – SAIF created to handle thrift failures starting August 9, 1992 |
| | – RTC created to resolve thrifts placed into conservatorships or receiverships between January 1, 1989 and August 8, 1992[a] (RTC to cease operations December 31, 1996)[b] |
| | – REFCORP created to fund RTC |

*Note:* FSLIC - Federal Savings and Loan Insurance Corporation
FICO - Financing Corporation
FRF - FSLIC Resolution Fund
SAIF - Savings Association Insurance Fund
RTC - Resolution Trust Corporation
REFCORP - Resolution Funding Corporation

[a]Cutoff date for takeovers later extended to June 30, 1995.
[b]Date to cease operations later changed to December 31, 1995.

FSLIC, an amount insufficient to deal with the industry's massive problems.[7]

In response to the deepening crisis, Congress enacted FIRREA on August 9, 1989, beginning the taxpayers' involvement in the resolution of the problem. (See table 2 for a listing of thrift crisis events.) FIRREA abolished the FSLIC and transferred its assets, liabilities, and operations to the newly created FSLIC Resolution Fund (FRF), to be administered by the FDIC. In addition, FIRREA created—to be administered by the FDIC—a new thrift insurance fund named the Savings Association Insurance Fund (SAIF), which would handle thrift failures starting three years from the date of FIRREA. FIRREA also created the RTC to resolve virtually all troubled thrifts placed into conservatorships or receiverships between January 1, 1989, and August 8, 1992. Because of the continuing thrift crisis, however, the RTC's authorization to take over insolvent institutions was twice extended, the second time to June 30, 1995.[8] The RTC was required to cease its operations on December 31, 1995, and transfer any remaining assets and liabilities to the FSLIC Resolution Fund.[9]

FIRREA provided the RTC with $50 billion to resolve failed institutions. Approximately $30 billion of this amount originated through the establishment of the Resolution Funding Corporation (REFCORP), which was a private-public partnership created to issue long-term bonds to the public.[10] The remaining $20 billion came from the U.S. Treasury ($18.8 billion) and the Federal Home Loan Banks ($1.2 billion). Because the $50 billion in initial funding was insufficient to deal with the scope of the problem, Congress enacted subsequent legislation three times, raising total authorized RTC funding for losses to $105 billion between 1989 and 1995. Some of this amount was never used. (See table 3.)

[7] FICO was created by the Competitive Equality Banking Act of 1987 (CEBA) as the vehicle for recapitalizing the insolvent FSLIC. The law authorized FICO to raise funds for the FSLIC by selling bonds to the public; as noted, FICO had $8.2 billion of outstanding debt as of the passage of FIRREA in August 1989. Initially the thrift industry was to be responsible for payment of interest and principal on the outstanding debt. Later FIRREA permitted the FICO bonds to be paid for by annual assessments from the newly created SAIF insurance fund. Because of concern over the low reserves of the SAIF, the Deposit Insurance Funds Act of 1996 (PL 104-208) provided for the SAIF's capitalization. As part of the capitalization effort, future interest payments on the FICO bonds were to be paid for by all FDIC-insured institutions.

[8] FIRREA's original period for the takeover of insolvent institutions was three years, which ended August 8, 1992. The RTC Refinancing, Restructuring and Improvement Act of 1991 extended the period to October 1, 1993. The RTC Completion Act of 1993 extended it through June 30, 1995.

[9] The original RTC termination date, established by FIRREA in August 1989, was December 31, 1996. The RTC Completion Act of 1993 changed the closure date to December 31, 1995.

[10] The 1989 legislation created a quasi-private corporation to provide funds for the RTC. The organization and structure of REFCORP were patterned after FICO, established in 1987 to raise funds for the insolvent FSLIC. REFCORP was authorized to issue debt obligations in an aggregate amount of $30 billion starting in fiscal years 1990 and 1991. The $30 billion in principal on the REFCORP bonds was paid from the sale of non-interest-bearing U.S. Treasury obligations, which REFCORP purchased in amounts approximately equal to the principal of the REFCORP obligations. These zero-coupon securities were funded from the reserves and special assessments of the FHLBs and the SAIF. Funds for the payment of interest on REFCORP obligations came from several sources, including $300 million per year from FHLB contributions and from the U.S. Treasury. REFCORP raised the $30 billion in offerings by January 1991.

Table 3

RTC Funding Legislation

($Billions)

| Legislation | Loss Funds | Date of Enactment |
|---|---|---|
| FIRREA, 1989 | $ 50.1 | August 9, 1989 |
| RTC Funding Act of 1991 | 30.0 | March 23, 1991 |
| RTC Refinancing, Restructuring and Improvement Act of 1991 | 6.7 | December 12, 1991 |
| RTC Completion Act of 1993 | 18.3 | December 17, 1993 |
| Total Funds Appropriated | $105.1 | |
| Total Funds Provided to RTC | $ 91.3 | |

## *History of Cost Estimates*

Before, during, and even after the RTC's lifetime, estimates of the costs of the crisis created widespread confusion. Federal agencies, politicians, thrift industry experts, and others put forth myriad estimates on what was called the size of the problem. These forecasts often diverged widely and changed frequently in response to surging industry losses. For example, most loss projections for RTC resolutions during the year leading up to passage of FIRREA in 1989 were in the range of $30 billion to $50 billion, but some reached as high as $100 billion at that time.[11] Over the next few years, as a greater-than-expected number of thrifts failed and the resolution costs per failure soared, loss projections escalated. Reflecting the increased number of failures and costs per failure, the official Treasury and RTC projections of the cost of the RTC resolutions rose from $50 billion in August 1989 to a range of $100 billion to $160 billion at the height of the crisis peak in June 1991, a range two to three times as high as the original $50 billion.[12] The fact that the estimates were moving targets increased the public's confusion and compounded Congress's difficulty in reaching a consensus on funding levels for the cleanup.

What accounted for the disparity and volatility among these projections? First, timely information on the condition of the failed institutions was lacking, especially during the early years. Analysts were forced to base their loss predictions on Thrift Financial Report data that were often outdated and unreliable (because thrift examinations had been infrequent and relaxed accounting standards were used at the time). In reality, the industry was in much worse shape than most observers had anticipated, and once the cleanup got under way and the industry came under intense scrutiny, this became apparent. During the asset reviews of insolvent and undercapitalized institutions, it became obvious that the embedded losses were much greater than thrift financial statements had reported.

Another factor was uncertainty about the expected number of future failures. This number was hard to predict because the economy was changing, as were interest rates and commercial real-estate markets. The Bush administration, for example, originally estimated that more than 400 thrifts with over $200 billion in assets would be turned over to the RTC at a cost of approximately $50 billion, but in less than a year the administration's estimate had grown to 700 or 800 thrifts with assets of over $400 billion. The dramatic misreading of the number of failures and subsequent costs of the crisis, especially during the early years, was acknowledged by L. William Seidman, Chairman of both the FDIC and RTC during this era, in his memoir. "Only three months after the cleanup started," he said, "it was already evident that the problem was far worse than anyone in government had envisioned, including me, and it was getting worse every day. The economy was beginning to slide into recession. Real estate was in real depression in some parts of the country, particularly in Texas, where the savings and loan problem was the largest . . . we would also need billions more to pay off depositors and carry weak assets of the institutions until they were sold and we could

[11] The $30 billion to $50 billion estimates formed the basis for the Bush administration plan in February 1989 to provide $50 billion in funding for the cleanup. Experts outside the federal government at that time claimed that the costs could be substantially higher—possibly reaching $100 billion.

[12] During the final year of the cleanup, the Treasury lowered its official estimates to $120 billion.

recover the funds we had invested . . . we were faced with taking the most politically unacceptable action of all, having to admit that we made a big mistake."[13]

A third factor contributing to the disparate and volatile nature of the projections was that some public reports on the size of the problem looked at "apples" and others at "oranges," and the two groups were not comparable. For example, some estimates included only the expected losses from RTC failures but did not incorporate past FSLIC costs. Other estimates included both the FSLIC and RTC losses but focused only on the taxpayers' losses, while excluding losses incurred by the thrift industry over the same period.

One of the most important factors in explaining the variance among the loss estimates was methodological: the total estimated cost sometimes did and sometimes did not include, in addition to the estimated losses, the borrowing costs for the billions of dollars of debt issues floated to fund the cleanup. During the FSLIC and RTC eras, the industry contributed $38.3 billion (sometimes in partnership with the Treasury) in funding for the cleanup. Special government-established financing entities (FICO and REFCORP) raised these funds by selling long-term bonds in the capital markets. The Treasury contributed another $99 billion,[14] some or all of which was also borrowed because the federal government was experiencing large budget deficits during the period. When some analysts tabulated the costs of the cleanup, they included not only the principal borrowed but also interest costs for periods of up to 30 to 40 years on some or all of the borrowings. Including the financing costs in addition to principal could easily double or triple the estimates of the final cost of the cleanup.

However, in our view, including financing costs when tallying the costs of the thrift crisis is methodologically incorrect. It is invalid because, in present-value terms, the amount borrowed is equal to the sum of the interest charges plus debt repayment. Adding the sum of interest payments to the amount borrowed would overstate the true economic cost of resolving the crisis. An example will illustrate the point. Assume an individual pays $100,000 for the purchase of a residential property and finances the whole amount with a 30-year loan at 10 percent interest. Over the 30 years of the loan the individual pays more than $300,000 in total costs, comprising interest and principal. Yet, the cost of the home is still $100,000, because the present value of the total costs of $300,000 for 30 years of payments discounted by the interest rate of 10 percent is approximately $100,000.[15] Another example: the federal government does not include interest charges when costing specific programs, such as weapons systems or school lunches.

## *Accounting for the Thrift Cleanup Costs*

The costs of the thrift crisis are analyzed below in three sections. The first section looks at costs borne by the FSLIC for thrifts that failed from year-end 1985 through August 8, 1989.[16] Funds were provided to the FSLIC, and when the FSLIC was abolished in 1989, the FRF became responsible for paying off notes and other obligations the FSLIC had left behind.[17]

The second section analyzes costs associated with the RTC resolutions of institutions that failed after January 1, 1989 (excluding failures resolved by the FSLIC). These institutions consist of two groups of failed thrifts: (1) those that were nationalized and placed into FDIC-supervised conservatorships from January 1, 1989, through the passage of FIRREA on August 9, 1989,[18] and (2) those that failed after August 8, 1989. In the first group—institutions taken over before August 9, 1989—there were 262 failed thrifts from 33 states, with $104 billion in total assets. In the second group—institutions that failed after August 8, 1989, and before June 30, 1995—there were 485 thrifts with total assets of $290 billion. The third section analyzes total estimated resolution costs.

Table 4 breaks out the thrift crisis losses for both FSLIC- and RTC-related resolutions by source—either the private or the public sector—as of year-end 1999.

[13] Seidman (1993), 208.

[14] Includes $43.5 billion to the FRF and $55.9 billion to the RTC. See table 4. An additional $4.2 billion was provided to the RTC and later returned to the Treasury.

[15] Actually, the total amount paid out over 30 years would be $315,925.

[16] As mentioned above, the tabulation of costs begins in 1986 because that was the year when the FSLIC became insolvent. Its equity was depleted from a positive balance of $4.6 billion on January 1, 1986, to a negative balance of $6.3 billion on December 31, 1986.

[17] FIRREA transferred all of the FSLIC's assets, liabilities, and operations to the newly created FRF to be administered by the FDIC. The funds needed to settle the FSLIC's remaining liabilities were provided by appropriations from the Treasury, industry assessments, and recoveries from asset sales.

[18] Although the failed thrifts were placed into FSLIC conservatorships, an agreement among the FDIC, the FHLBB, and the FSLIC gave the FDIC authority to supervise these conservatorships. In August 1989 at the RTC's inception, the conservatorships were turned over to the RTC for management and ultimate resolution.

**Table 4**

**Estimated Savings and Loan Resolution Cost, 1986–1995**

($Billions)

| | Private Sector | Public Sector | Total |
|---|---|---|---|
| **Direct Cost** | | | |
| FSLIC/FSLIC Resolution Fund, 1986–95 | | | |
| FSLIC year-end equity and reserves, 1985 | $6.1 | | $6.1 |
| FSLIC insurance premiums, 1986–89 | 5.8 | | 5.8 |
| SAIF assessments diverted to FRF, 1989–92 | 2.0 | | 2.0 |
| FICO bond proceeds, 1987–89 | 8.2 | | 8.2 |
| FRF appropriations, 1989–95 | | $43.5 | 43.5 |
| Less: FRF equity at 12/31/99[a] | | (2.5) | (2.5) |
| **Estimated Direct FSLIC/FRF Cost** | **$22.0** | **$41.0** | **$63.0** |
| RTC, 1989–95 | | | |
| Raised through REFCORP bond proceeds:[b] | | | |
| FHLB payments to defease REFCORP debt, 1989–91 | 1.3 | | 1.3 |
| SAIF assessments paid to defease REFCORP debt, 1990 | 1.1 | | 1.1 |
| Net present value of FHLB-paid interest on REFCORP bonds[c] | 3.5 | | 3.5 |
| Net present value of REFCORP interest paid by U.S. Treasury[d] | | 24.2 | 24.2 |
| Total REFCORP bond proceeds | 5.9 | 24.2 | 30.1 |
| Appropriations from U.S. Treasury[e] | | 55.9 | 55.9 |
| Initial contribution from FHLB system | 1.2 | | 1.2 |
| Less: RTC equity at 12/31/99[a] | | (4.5) | (4.5) |
| **Estimated Direct RTC Cost** | **7.1** | **75.6** | **82.7** |
| Estimated Total Direct Cost | $29.1 | $116.5 | $145.7 |
| **Indirect Cost** | | | |
| Estimated cost of tax benefits to acquirers from FSLIC assistance | | 6.3 | 6.3 |
| Increased interest expense from higher interest rates on REFCORP bonds compared with U.S. Treasury borrowings[f] | | 1.0 | 1.0 |
| **Estimated Indirect Cost** | | **7.3** | **7.3** |
| Estimated Total Cost | $29.1 | $123.8 | $152.9 |
| Memo: goodwill litigation cost through 12/31/99[g] | | 0.4 | 0.4 |

*Note:* For these costs to be comparable to those of other government programs, they exclude interest on the national debt incurred to fund the cleanup, and, in the case of FICO and REFCORP, interest that would have accrued to the national debt had such funding come from the general fund of the U.S. Treasury instead of from FICO and REFCORP. Resolution costs start with 1986 because the FSLIC became insolvent that year.

[a]Adjusted for expenses associated with goodwill litigation. See note g below.

[b]REFCORP bonds were funded via a public-private partnership. Total funds raised by REFCORP were $30.1 billion. Because of the mix of private and public funding, discounting is used to allocate the $30.1 billion on the basis of the contributions made by various parties at different times.

[c]Net present value of the FHLBs' $300 million annual contribution to cover part of REFCORP interest expense.

[d]Calculated as the total REFCORP contribution ($30.1 billion) minus the net present value of the private-sector contributions.

[e]Total appropriations were $60 billion, but $4.2 billion was returned to the Treasury in 1999.

[f]Present value of higher interest expense of REFCORP borrowing compared with comparable-term U.S. Treasury securities. This is treated as a public-sector expense because the U.S. Treasury is responsible for all interest expenses above those paid by the FHLBs.

[g]The FDIC cost of litigation stemming from changes in accounting treatment of supervisory goodwill and other items in FIRREA through 12/31/99. The cost borne by the Department of Justice and estimated future costs are unavailable. Awards that have not been paid are excluded. In this presentation, goodwill expenses and recoveries are excluded from the cost of the Savings and Loan resolutions. Goodwill expenses and recoveries relate to legislative changes in FIRREA, not to the resolution of failed thrifts. Thus, this is reported only as a memo item.

### *FSLIC Estimated Resolution Costs*

For FSLIC failures, the loss from the beginning of 1986 forward was $63.0 billion, of which the public sector accounted for $41.0 billion, or 65 percent, while the thrift industry paid $22.0 billion, or 35 percent of the total. All the FRF-related public-sector losses were accounted for by the Treasury's $43.5 billion contribution. As of year-end 1999, however, the FRF still retained $2.5 billion in equity that was expected to be returned to the taxpayers, so the net loss was $41.0 billion.[19] (As mentioned above, the FRF was responsible for settling accounts on all outstanding FSLIC assistance agreements and receiverships.) The $22.0 billion in thrift industry funding for FSLIC losses included: $8.2 billion that came from the thrift industry through the sale of long-term FICO bonds; FSLIC insurance premiums from 1986 forward and SAIF assessments diverted to the FRF, accounting for an additional $7.8 billion in spending; and $6.1 billion from the original FSLIC insurance fund equity and reserves as of year-end 1985.[20]

### *RTC Estimated Resolution Costs*

As of December 31, 1999, the RTC losses for resolving the 747 failed thrifts taken over between January 1, 1989, and June 30, 1995, amounted to an estimated $82.7 billion, of which the public sector accounted for $75.6 billion, or 91 percent, and the private sector accounted for $7.1 billion, or 9 percent (table 4).

The largest component of the public-sector loss was direct Treasury appropriations of $55.9 billion;[21] the Treasury also absorbed $24.2 billion of the $30.1 billion in REFCORP contributions received from 1989 to 1991. However, the public-sector losses were reduced by $4.5 billion in equity held by the RTC as of year-end 1999.[22]

This accumulation of equity over the years was attributable to a number of factors. When an insured depository institution was closed and put into a receivership, the RTC placed a loss adjustment factor against the book value of the assets (this value was based on appraisals or other market information available at the time). These loss reserves reduced the value of the assets to the expected market or recovery value. In its reserving procedures, the RTC (with the approval of the GAO) took a conservative approach so as not to overstate the value of the assets acquired from failed institutions. In applying reserving procedures, the RTC considered a variety of factors including the fair market value of assets when residential and commercial markets were collapsing and the costs associated with particular sales methods developed by the RTC. For example, claims from both representation and warranty guarantees on asset sales and securitizations of nonstandard assets had to be anticipated and loss reserves established. During the 1990s, as the economy improved and real-estate markets recovered, the losses on asset sales and claims from representation and warranty and asset-securitization guarantees were less than anticipated. Thus, a portion of previously set-aside reserves were recaptured into the RTC equity account and offset the overall costs of the cleanup.

The thrift industry losses included the initial $1.2 billion contributed by the Federal Home Loan Banks (FHLBs) to capitalize the REFCORP. The FHLBs also paid $1.3 billion, and the SAIF paid $1.1 billion, to purchase zero-coupon securities worth $30 billion at maturity—to be used to pay the principal of REFCORP debt. The FHLBs incurred an additional $3.5 billion loss that represented the present value of the FHLBs' portion of the interest payments on REFCORP bonds.

### *Total Estimated Resolution Costs*

As of December 31, 1999, total direct costs attributable to the closing of insolvent thrift institutions over the 1986–1995 period amounted to $145.7 billion. Indirect costs due to the loss of Treasury revenue because of the tax benefits that accrued to acquirers of failed institutions under past FSLIC resolutions amounted to $6.3 billion.[23] An additional $1.0 billion of indirect costs was incurred because interest expens-

[19] The FRF equity will be returned to the Treasury as the remaining workload is completed. This figure is adjusted for goodwill litigation costs.

[20] These reserves were premiums paid before 1986 that were spent during the crisis.

[21] Appropriations were $60 billion, but approximately $4.2 billion was returned to the Treasury in 1999.

[22] These funds will be returned to the Treasury, or will be used to reduce the Treasury's interest payments on the REFCORP bonds, as the remaining workload is completed. This figure is adjusted for goodwill litigation costs.

[23] During most of the 1980s, special tax benefits accrued to those acquiring insolvent thrift institutions. For example, assistance paid to acquiring institutions was nontaxable. In addition, in some cases acquiring organizations could carry over certain losses and tax attributes of the troubled institutions to reduce their overall tax liability. These provisions reduced the amount that the FSLIC was required to pay acquiring organizations to take over insolvent institutions. As a consequence of these tax benefits, revenue was lost to the Treasury. Thus, these tax benefits are referred to as "indirect costs." No such benefits were granted after 1988.

es were higher with the use of REFCORP bonds than with Treasury financing.[24] Thus, the combined total for all direct and indirect losses of FSLIC and RTC resolutions was an estimated $152.9 billion. Of this amount, U.S. taxpayer losses amounted to $123.8 billion, or 81 percent of the total costs. The thrift industry losses amounted to $29.1 billion, or 19 percent of the total.

The accumulated losses of $152.9 billion were higher than the official and private forecasts of the late 1980s but lower than those made by the government and others during the early to mid-1990s. As mentioned above, during the late 1980s the full extent of the problem was unknown until the cleanup began; thus, many early forecasts underestimated the size of the problem. In the early to mid-1990s, lower interest rates and an improving economy reduced the number of thrift failures and improved prices for thrift franchises and assets held by thrifts; thus, the final losses were less than those predicted at the height of the crisis. In addition, because perceptions of thrift assets during the crisis years had been unfavorable, the RTC adopted conservative accounting procedures, and the combination of these policies and a strong economy caused the costs of the cleanup to decline every year after 1991.

As of year-end 1999, the savings and loan cleanup was largely complete. The FSLIC Resolution Fund, which controls all remaining assets and liabilities of both the FSLIC and the RTC, either held or had a direct claim on approximately $7 billion in assets, most of which were cash and low-risk securities.[25] Thus, losses from future asset sales will not materially change the loss figures. However, the costs of the goodwill litigation associated with FIRREA (see the Appendix) are still largely unknown, and it could be several more years before these cases are concluded.

## *Summary*

The savings and loan crisis of the 1980s and early 1990s produced the greatest collapse of U.S. financial institutions since the Great Depression. Over the 1986–1995 period, 1,043 thrifts with total assets of over $500 billion failed. The large number of failures overwhelmed the resources of the FSLIC, so U.S. taxpayers were required to back up the commitment extended to insured depositors of the failed institutions. As of December 31, 1999, the thrift crisis had cost taxpayers approximately $124 billion and the thrift industry another $29 billion, for an estimated total loss of approximately $153 billion. The losses were higher than those predicted in the late 1980s, when the RTC was established, but below those forecasted during the early to mid-1990s, at the height of the crisis.

[24] The REFCORP funding mechanism essentially required that the U.S. Treasury pay interest at slightly higher rates than it did for Treasury bonds of similar maturity. Although some might argue that this requirement relates to funding more than to resolution costs, this funding mechanism was considered necessary for Congress to enact the enabling legislation. Further delays in funding would have increased total resolution costs.

[25] Included are $2.9 billion in cash held directly by the FRF, as well as the FRF's claim on $1.5 billion in cash and low-risk securities held by receiverships for which the FRF is the primary creditor.

# APPENDIX: GOODWILL LITIGATION

On July 1, 1996, the U.S. Supreme Court ruled that, with the 1989 passage of FIRREA, the federal government had violated contractual obligations.[26] FIRREA mandated new regulatory capital accounting for depository institutions and provided for the elimination or rapid phase-out of the use of "supervisory goodwill" in calculating the regulatory capital of financial institutions. As a result of the Court's ruling, numerous thrifts that had been involved in mergers and acquisitions during the 1980s and had "supervisory goodwill" on their books became undercapitalized. Many of these thrifts were closed by supervisors, while others altered their business strategies (for example, by shrinking their asset base) to meet the new capital standards.

In response, as of July 31, 2000, 141 thrift acquirers had filed suit in District Court or the U.S. Court of Federal Claims, seeking compensation from the federal government for losses (table A.1). As of July 31, 2000, two judgments totaling $40 million had been paid for cases filed in District Court. All other cases were consolidated to the U.S. Court of Federal Claims, where 103 cases were still pending trial. At the U.S. Court of Federal Claims, judgments have been rendered in six cases, awarding the plaintiffs $983 million from the federal government.[27] Four of these cases were on appeal to the U.S. Federal Circuit Court of Appeals; the other two were recent decisions, and appeals are likely. In another five cases, settlements have been reached with plaintiffs receiving approximately $135 million. Another 3 cases had been tried and were awaiting decision; 7 cases had been dismissed; 12 cases had been consolidated with others; and miscellaneous actions have been taken in 3 others.

In cases involving approximately 40 failed thrifts, the FDIC as successor to the closed institutions had become a co-plaintiff in goodwill suits against the United States. Only two of those cases had been decided as of July 31, 2000, and the trial court awarded the FDIC-managed receiverships $19.8 million. All parties appealed one of the decisions, and an appeal of the second decision is expected.

[26] The case was *Winstar Corporation v. United States*, 90-8C; United Savings Bank, Windom, MN.

[27] Most of the $983 million in judgments against the government came from one case: Glendale Federal Bank, FSB, of Glendale, California, was awarded a judgment of $908.9 million.

**Table A.1**

**Status of Goodwill Cases as of July 31, 2000**

| Case Status | Number | Settlements/ Judgments ($Millions) |
|---|---|---|
| Cases with judgments paid[a] | 2 | $ 40 |
| Cases pending trial | 103 | |
| Cases with unpaid judgments | 6 | 983 |
| Cases settled[b] | 5 | 135 |
| Cases tried and awaiting decisions | 3 | |
| Cases dismissed | 7 | |
| Cases consolidated into others | 12 | |
| Other | 3 | |
| Total | 141 | $1,158 |

*Source:* FDIC.

[a] These cases were decided at District Courts. All remaining cases were consolidated to the U.S. Court of Federal Claims.

[b] In one case (Winstar), the Department of Justice settled with the shareholder plaintiff but not with the FDIC. The settlement amount is included here even though the case was pending trial as of July 31, 2000.

## REFERENCES


Barth, James R. 1991. *The Great Savings and Loan Debacle.* American Enterprise Institute Press.

Barth, James R., and R. Dan Brumbaugh, Jr. 1992. "Depository Institution Failures and Failure Costs: The Role of Moral-Hazard and Agency Problems." In *Rebuilding Public Confidence through Financial Reform, Conference Proceedings*, 3–19. Ohio State University.

Barth, James R., R. Dan Brumbaugh, Jr., Daniel Sauerhaft, and George Wang. 1985. "Thrift Institution Failures: Causes and Policy Issues." In *Proceedings of the Conference on Bank Structure and Performance.* Federal Reserve Bank of Chicago.

Bennett, Randall, and Christine Loucks. "The Politics and Length of Time to Bank Failure: 1986–1990." *Contemporary Economic Policy* 14 (1996):29–41.

Bierman, Leonard, Donald Fraser, and Asghar Zardkoohi. "On the Wealth Effects of the Supervisory Goodwill Controversy." *Journal of Financial Research* 22, no. 1 (1999):69–81.

Blalock, Joseph, Timothy Curry, and Peter Elmer. "Resolution Costs of Thrift Failures." *FDIC Banking Review* 4, no. 1 (1991):15–25.

Federal Deposit Insurance Corporation. 1997. "The Savings and Loan Crisis and Its Relationship to Banking." In *History of the Eighties, Lessons for the Future: An Examination of the Banking Crises of the 1980s and Early 1990s.* Vol 1. Federal Deposit Insurance Corporation.

Kane, Edward J. 1989. *The S&L Insurance Mess: How Did it Happen?* Urban Institute Press.

Marino, James, and Rosalind Bennett. "The Consequences of National Depositor Preference." *FDIC Banking Review* 12, no. 2 (1999):19–38.

Seidman, L. William. 1993. *Full Faith and Credit: The Great S&L Debacle and Other Washington Sagas.* Times Books.

Thomas, Kenneth J. *American Banker* (September 1, 2000):13.

White, Lawrence J. 1991. *The S&L Debacle: Public Policy Lessons for Bank and Thrift Regulation.* Oxford University Press.

United States General Accounting Office

GAO

Report to Congressional Committees

December 1995

# RESOLUTION TRUST CORPORATION

## Performing Assets Sold to Acquirers of Minority Thrifts

GAO/GGD-96-44

The period of accrual was to begin 45 days after the signing of the agreement and end on the day preceding the closing date of the transaction. The accrued interest is defined in RTC's minority loan pricing procedures as the coupon interest rate on the loans less the average federal funds' rate during the accrual period.[3] However, to resolve a contract dispute regarding the final pricing of the mortgage loans, RTC provided the minority acquirers who decided not to purchase the mortgage loans with the following option—the acquirer could choose not to exercise the agreement on the loan portfolio, but rather receive the interest accrued on the respective portfolio. Under this option, the acquirer waived the right to purchase any 1- to 4-family residential mortgage loans through the minority resolutions preference program.

## Objectives, Scope, and Methodology

The RTC Completion Act required that we submit an annual report to Congress on transfers of performing assets by RTC to any acquirer. In discussions with the oversight committees, it was agreed that our report would focus on assets sold to minority acquirers. Specifically, the objectives of our review were to (1) assess how RTC determined the fair market value for the loans transferred and (2) ascertain the number and description of performing loans transferred to minority thrifts.

Although the act required us to assess RTC's determination of fair market value for the loans transferred, we were unable to evaluate RTC's determination for the following reasons. First, fair market value is commonly measured through competitive sales. Second, loans not purchased by minority acquirers were sold in bulk, and sales prices were not assigned to individual loans. Third, there were no data available to compare the prices of the mortgage loans sold to minority acquirers with the prices of other loans sold by RTC, because fewer whole loans were available for sale once RTC's securitization program started showing results around June 1991.[4] Therefore, we focused on assessing the reasonableness of the process RTC established to price the mortgage loans, including the methodology used by RTC's valuation contractors. To assess reasonableness, we discussed the methodology and models used to price the 1- to 4-family residential mortgage loans with RTC officials and the two valuation contractors. While both valuation contractors were cooperative in discussing the methodology in general, they were reluctant to discuss their pricing models in detail. The valuation contractors considered the

[3]The federal funds' rate is the interest rate charged by banks to other banks in need of overnight loans.

[4]Securitization is the process of assembling similar assets into pools that are used to collateralize newly-issued securities, which are referred to as mortgage-backed securities.

United States General Accounting Office

GAO

Report to the Congress

June 1998

# FINANCIAL AUDIT

# Federal Deposit Insurance Corporation's 1997 and 1996 Financial Statements

GAO/AIMD-98-204

FRF's losses from liquidation activities have been realized as of December 31, 1997.

**Table 1: FRF's Realized and Unrealized Losses as of December 31, 1997**

(Dollars in billions)

| | FRF-RTC | FRF-FSLIC | Total FRF |
|---|---|---|---|
| Realized losses | $83.2 | $41.4 | $124.6 |
| Unrealized losses | 1.6 | 0.8 | 2.4 |
| **Total realized and unrealized losses (accumulated deficit)** | **$84.8** | **$42.2** | **$127.0** |

The accumulated deficit for FRF includes losses that have already been realized, as well as future estimated losses from assets and liabilities not yet liquidated. Losses are realized when failed financial institution assets in receiverships are disposed of and the proceeds are not sufficient to repay amounts payable to FRF. Losses are also realized if assets that FRF purchases from terminating receiverships are later sold for less than the purchase price. Losses are also realized when certain estimated liabilities associated with FRF's liquidation activities are paid out. Uncertainties still exist with regard to the unrealized losses, and the final amount will not be known with certainty until all remaining assets and liabilities are liquidated.

In total, $135.5 billion was received to cover liabilities and losses associated with the former FSLIC and RTC resolution activities. Of the $135.5 billion total, $91.3 billion[4] was received by RTC through December 31, 1995, the date of RTC's termination, to cover losses and expenses associated with failed institutions from its caseload. FRF received $44.2 billion to cover the liabilities and losses associated with the former FSLIC activities.

As shown in table 2, after reducing the total amount of funding received by the amount of recorded accumulated deficit, an estimated $8.5 billion in available funds will remain. The RTC Completion Act requires FDIC to deposit in the general fund of the Treasury any funds transferred to RTC pursuant to the Completion Act but not needed for RTC-related losses. Also, after providing for all outstanding RTC liabilities, FDIC must transfer to

[4]FIRREA provided an initial $50 billion to RTC. The Resolution Trust Corporation Funding Act of 1991 provided an additional $30 billion. The Resolution Trust Corporation Refinancing, Restructuring, and Improvement Act of 1991 provided $25 billion in December 1991, of which $6.7 billion was obligated prior to the April 1, 1992 deadline. In December 1993, the RTC Completion Act removed the April 1, 1992, deadline, thus making the remaining $18.3 billion available to RTC for resolution activities. Prior to RTC's termination on December 31, 1995, RTC drew down $4.6 billion of the $18.3 billion that was made available by the RTC Completion Act.

Anthony Saunders • Marcia Millon Cornett



Reply App. 00109

# Financial Markets and Institutions

## An Introduction to the Risk Management Approach

**TABLE 14-2 Balance Sheets of Savings Associations [percentage of total assets and liabilities]**

| Item | 1977 | 1982 |
|---|---|---|
| **Liabilities** | | |
| Fixed ceiling liabilities | 87.3% | 22.0% |
| Passbook and NOW accounts | 33.9 | 15.6 |
| Fixed ceiling time deposits | 53.4 | 6.4 |
| Market ceiling small time deposits | 0.0 | 52.8 |
| Money market certificates | 0.0 | 28.6 |
| Small saver certificates | 0.0 | 19.3 |
| Other small time deposits | 0.0 | 4.9 |
| Discretionary liabilities | 8.6 | 23.2 |
| Large time deposits | 2.1 | 8.1 |
| FHLB advances | 4.7 | 10.3 |
| Other borrowings | 1.8 | 4.6 |
| Other liabilities | 4.0 | 2.0 |
| **Assets** | | |
| Mortgage assets | 86.0 | 81.1 |
| Fixed rate | 86.0 | 74.9 |
| Adjustable rate | 0.0 | 6.2 |
| Nonmortgage loans | 2.3 | 2.6 |
| Cash and investments | 9.2 | 11.2 |
| Other assets | 2.5 | 5.1 |

Source: *Federal Reserve Bulletin*, December 1982 **www.federalreserve.gov**

find sufficient buyers for the bonds. Stuck with these bonds, many savings associations, especially those in California, suffered large losses.[5]

Further, in the mid-1980s, real estate and land prices in Texas and the Southwest collapsed. This was followed by economic downturns in the Northeast and Western states of the United States. Many borrowers with mortgage loans issued by savings associations in these areas defaulted. In other words, the risks incurred by many of these institutions did not pay off. This risk-taking behavior was accentuated by the policies of the federal insurer of savings associations' deposits, FSLIC. It chose not to close capital-depleted, economically insolvent savings associations (a policy of **regulator forbearance**) and to maintain deposit insurance premium assessments independent of the risk taken by the institution (see Chapter 13). As a result, an alarming number (1,248) of savings association failures occurred in the 1982–1992 period (peaking at 316 in 1989), alongside a rapid decline in asset growth of the industry. Figure 14–2 shows the number of failures, mergers, and new charters of **savings institutions** (savings associations and savings banks combined) from 1984 through 2004. Notice the large number of failures from 1987 through 1992 and the decline in the number of new charters.

**regulator forbearance**

A policy not to close economically insolvent FIs, allowing them to continue in operation.

**savings institutions**

Savings associations and savings banks combined.

In the 1980s, the large number of savings association failures depleted the resources of the FSLIC to such an extent that by 1989 it was massively insolvent. For example, between 1980 and 1988, 514 thrifts failed, at an estimated cost of $42.3 billion. Moreover, between 1989 and 1992 an additional 734 thrifts failed, at a cost of $78 billion. As a result, Congress passed an additional piece of legislation: the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989. This legislation abolished the FSLIC and created a new savings association insurance fund (SAIF) under the management of the FDIC (with the help of a $100 billion infusion of funds by the U.S. government). FIRREA also replaced the

5. Milken and several other Drexel corporate officials pleaded guilty to six felony counts of federal securities fraud.

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

- - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 182

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.
Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?
A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.
Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?
A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

Page 183

saved 20, $25 million of monies.
MR. HUGHES: I have no further questions.
MR. COLATRIANO: I have a couple of follow-up questions.

FURTHER EXAMINATION
BY COUNSEL FOR PLAINTIFFS
BY MR. COLATRIANO:

Q. Based on Exhibit 49 that counsel has just been going over with you. You stated a few minutes ago that the correspondent relationships, they all knew once the RTC came in to go elsewhere; is that a fair statement?
A. Yeah, yes.
Q. How much of that was related to the fact that it was RTC's policy to stop lending; was that well-known among correspondents?
A. Oh, sure, oh, sure.
Q. Okay.
A. I mean, what we did -- again as I said in the beginning, you had a mortgage commitment to close on your house from Carteret and why should you suffer.
Q. All right.
A. Right? And you couldn't close, you could have gone bankrupt because of that. Our feeling was

Page 184

that, you know, our intent is not to do that, to 10,000 families in New Jersey or wherever else the mortgages were, we would not -- we didn't feel that that was what we're here for. And we had to go and get approval to do that, but we went and just said we're not going to sit here and not fund -- we're just not going to do that.
Q. Okay. Now, leaving aside again --
A. And we funded every one that wanted to close. Of that portfolio, anybody that wanted to close, closed.
Q. Right. Let's leave aside again mortgages that were already in process and had already been approved. I think counsel asked you about new applications dried up from correspondents after the RTC came in; is that correct?
A. Um-hum.
Q. And is it fair to say that the reason it dried up is because the correspondents knew that it was RTC's policy to stop lending; is that a fair statement?
A. Yes, yes.
Q. This document also refers to the fact that between Friday December 4th and Thursday morning December 10th, there was still approximately $10

Page 185

million in new mortgage applications had come in, correct?
A. That's what I said, that's approximately correct, that's what the memo says.
Q. So in less than a week there was still $10 million in new applications, correct? And so if the correspondent relationships had dried up is it fair to say most of that $10 million was coming from the retail side of the origination --
A. I don't know the breakdown.
Q. The memo does say, if you look at the second page March 10th, it's the next to the last paragraph, the paragraph that begins on Thursday morning, it says in the middle it was determined that the applications generated from date of conservatorship?
A. That the corresponding -- I see it had already moved.
Q. Had already moved. Is it fair to say the bulk of that $10 million was in the retail side of the origination network?
A. I -- no, I think this -- I think this -- the correspondent relationships that -- it was determined that the applications generated from date of conservatorship were less than $10 million, an

AMBASE CORPORATION & SUBSIDIARIES
Group name: CARTERET BANCORP INC. GROUP

EIN: 95-2962743
EIN: 51-0296535

CONSOLIDATED TAXABLE INCOME
YEAR 1992

1/1/92 - 12/4/92

SCHEDULE 01

| | GROSS INCOME | (1) TOTAL (C2 + C3) | (2) ELIMINATIONS ADJUSTMENTS | (3) SUBTOTAL (C4 thru C50) | (4) Carteret Bancorp Inc. |
|---|---|---|---|---|---|
| 1(a) | Gross receipts or gross sales/Premiums earned | 94,695,125 | | 94,695,125 | |
| 1(b) | Less Returns and Allowances/Dividends to policyholders | 0 | | 0 | |
| 1(c) | Subtotal | 94,695,125 | 0 | 94,695,125 | 0 |
| 2 | Cost of goods sold and/or operations * | 63,327,258 | | 63,327,258 | 0 |
| 3 | Gross profit (line 1(c) Less 2) | 31,367,867 | 0 | 31,367,867 | 0 |
| 4 | Dividends* | 6,336,053 | | 6,336,053 | 0 |
| 5 | Interest | 301,197,394 | | 301,197,394 | |
| 6 | Gross rents | 13,100,221 | | 13,100,221 | |
| 7 | Gross royalties | 0 | | 0 | |
| 8(a) | Short-term capital gain or (Loss) * | 0 | | 0 | 0 |
| 8(b) | Long-term capital gain or (Loss) * | 0 | | 0 | 0 |
| 9(a) | Casualty and theft * | 0 | | 0 | 0 |
| 9(b) | Sales or exch. or other Sec. 1231 prop. * | (1,836,637) | | (1,836,637) | 0 |
| 9(c) | Ordinary gain or (Loss) * | 8,913,638 | | 8,913,638 | 0 |
| 10 | Other Income * | 52,308,472 | | 52,308,472 | 0 |
| | | | | | |
| 11 | Total Income (lines 3 thru 10) | 411,387,008 | 0 | 411,387,008 | 0 |
| | DEDUCTIONS | | | | |
| 12 | Compensation of officers * | 11,899,493 | | 11,899,493 | 0 |
| 13(a) | Salaries and wages | 23,978,085 | | 23,978,085 | |
| 13(b) | Less Jobs Credit * | 0 | | 0 | 0 |
| 13(c) | Net Salaries and Wages | 23,978,085 | 0 | 23,978,085 | 0 |
| 14 | Repairs | 1,506,591 | | 1,506,591 | |
| 15 | Bad debts * | 58,011,401 | | 58,011,401 | 0 |
| 16 | Rents | 5,905,493 | | 5,905,493 | |
| 17 | Taxes * | 7,566,514 | | 7,566,514 | 0 |
| 18 | Interest | 234,167,663 | | 234,167,663 | |
| 19 | Contributions * | 25,196 | | 25,196 | 0 |
| 20 | Depreciation * | 3,004,815 | | 3,004,815 | 0 |
| 21(a) | Less Depr. claimed elsewhere in return * | 0 | | 0 | 0 |
| 21(b) | Net Depreciation (line 20 less 21(a)) * | 3,004,815 | 0 | 3,004,815 | 0 |
| 22 | Depletion * | 0 | | 0 | 0 |
| 23 | Advertising | 1,834,957 | | 1,834,957 | |
| 24 | Pension & Profit-Sharing Plans * | 488,053 | | 488,053 | 0 |
| 25 | Employee benefit programs | 2,902,309 | | 2,902,309 | |
| 26 | Other deductions * | 59,538,868 | | 59,538,868 | 121,215 |
| | | | | | |
| 27 | Tot deduct(Add lines 12,13(c),14 thru 19,21(b),22 thru 26) | 410,829,438 | 0 | 410,829,438 | 121,215 |
| | | | | | |
| 28 | Taxable Income (Loss) (line 11 Less 27) | 557,570 | 0 | 557,570 | (121,215) |

* See subsidiaries' schedules for details

Revised 10/16/92
92ENTITY\CONSOL\CO-SCH01

Page 1
SCHEDULE 01

| (5) Carteret Savings Bank, FA | (6) Bay Front Fiesta, Inc. | (7) Carteret Amberwood, Inc. | (8) Carteret Building Services, Inc. | (9) Carteret Communities, Inc. | (10) Carteret Consumer Credit Company, Inc. | (11) Carteret Financial Services, a NJ Corp. | (12) Carteret Hills of Chester, Inc. |
|---|---|---|---|---|---|---|---|
| 0 | | | 836,140 | 17,986,132 | | | |
| | | | | | | | |
| 0 | 0 | 0 | 836,140 | 17,986,132 | 0 | 0 | 0 |
| 0 | 0 | 0 | 2,071,914 | 18,180,903 | 0 | 0 | 0 |
| 0 | 0 | 0 | (1,235,774) | (194,771) | 0 | 0 | 0 |
| 6,336,053 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 301,136,518 | | | | | | | |
| 366,294 | 37,182 | | | | | | |
| | | | | | | | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (1,563,510) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10,186,901 | (868,446) | 0 | 0 | 0 | 0 | 0 | 0 |
| 17,238,169 | 942,777 | 0 | 3,205,078 | 11,756 | 0 | 2,314,832 | 2,011,944 |
| | | | | | | | |
| 333,700,425 | 111,513 | 0 | 1,967,304 | (183,015) | 0 | 2,314,832 | 2,011,944 |
| | | | | | | | |
| 9,747,948 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14,860,454 | 4,320 | | | | | 192,946 | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14,860,454 | 4,320 | 0 | 0 | 0 | 0 | 192,946 | 0 |
| 1,236,919 | 495 | | | | | 1,543 | |
| 56,005,961 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4,664,184 | 320 | | | | | 1,528 | |
| 3,721,758 | 18,344 | 0 | 0 | 0 | 0 | 143,671 | 0 |
| 220,560,871 | | | | | | | |
| 20,729 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,658,366 | 0 | 0 | 0 | 2,042 | 0 | 5,065 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,658,366 | 0 | 0 | 0 | 2,042 | 0 | 5,065 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 863,757 | 1,656 | | | 6,998 | | 4,706 | |
| 156,675 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,576,974 | | | | | | 8,554 | |
| 31,675,062 | 56,230 | 0 | 0 | 43,592 | 0 | 398,275 | 1,617,010 |
| | | | | | | | |
| 348,749,658 | 81,365 | 0 | 0 | 52,632 | 0 | 756,288 | 1,617,010 |
| | | | | | | | |
| (15,049,233) | 30,148 | 0 | 1,967,304 | (235,647) | 0 | 1,558,544 | 394,934 |