**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**AMBASE CORPORATION AND**
**CARTERET BANCORP, Inc.**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES OF AMERICA**

---

# GOVERNMENT'S POSITION WITH RESPECT TO CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DAMAGES

---

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Deputy Director**

**DAVID A. LEVITT**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20005**
**Tel: (202) 307-0309**
**Fax: (202) 514-7969**

**OF COUNSEL:**
**TAREK SAWI**
**Senior Trial Counsel**
**ARLENE PIANKO GRONER**
**MELINDA HART**
**ELIZABETH M. HOSFORD**
**F. JEFFERSON HUGHES**
**DELISA SANCHEZ**
**AMANDA TATUM**

**Date: November 7, 2007** **Attorneys for Defendant**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

GOVERNMENT'S POSITION WITH RESPECT TO CROSS-MOTIONS
FOR SUMMARY JUDGMENT ON DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. UNDISPUTED FACTS ESTABLISH A LACK OF CAUSATION BETWEEN THE BREACH AND THE FAILURE OF CARTERET . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. AMBASE IS NOT ENTITLED TO CARTERET'S UNEXPECTED MARKET VALUE AT THE TIME OF TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. AMBASE'S ESTIMATE OF UNEXPECTED CASH FLOWS CANNOT BE SUPPORTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. AMBASE'S CLAIMS TO PREJUDGMENT INTEREST ARE INVALID . . . . . . . . . 13

V. AMBASE'S WOUNDED-BANK DAMAGES CLAIMS ARE INVALID . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

### FEDERAL CASES

Admiral Financial Corp. v. United States, 57 Fed. Cl. 418 (2003), aff'd 278 F.3d 1336 (Fed. Cir. 2004) . . . . . 5

Ambase Corp. v. United States, 58 Fed. Cl. 32 (2003) . . . . . 3, 4, 5

American Capital Corp. v. Federal Deposit Insurance Corp., 472 F.3d 859 (Fed.Cir. 2006) . . . . . 16

American Federal  Bank v. United States, 72 Fed. Cl. 586 (2006) . . . . . 7

California Federal Bank v. United States, 245 F.3d 1342 (Fed. Cir. 2001) . . . . . 9, 10

California Federal Bank v. United States, 395 F.3d 1263 (Fed. Cir. 2005), cert. den 126 S. Ct. 344 (2005) . . . . . 9

Castle v. United States, 301 F.3d 1328 (Fed.Cir. 2002) . . . . . 17

Citizens Federal Bank, FSB v. United States, 52 Fed. Cl. 561 (2002) . . . . . 2

Commercial Federal Bank v. United States, 59 Fed. Cl. 338 (Fed. Cl. 2004) . . . . . 12

Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed.Cir. 2002) . . . . . 14

Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 223 (2003) . . . . . 9, 10

Fifth Third Bank of Western Ohio v. United States, 462 F.3d 1221 (Fed. Cir. 2005) . . . . . 2

Glendale Federal Bank, F.S.B. v. United States, 378 F.3d 1308 (Fed. Cir. 2004) . . . . . 9

Globe  Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330 (2005) aff'd in part, vacated in part, and remanded, 189 Fed.Appx. 964 (Fed. Cir. 2006) . . . . . 12

Granite Management Corporation v. United States, 416 F.3d 1373 (Fed. Cir. 2005) . . . . . 2, 16

Hansen Bancorp, Inc. v United States, 67 Fed. Cl. 411 (2005) . . . . . 5

Estate of Lillian Berg v. United States, 687 F.2d 377 (Ct. Cl. 1982) . . . . . 6

Long Island Savings Bank v. United States, 60 Fed. Cl. 80 (2004), rev'd on other grounds, 2007 WL 2685640 (Fed.Cir. 2007) . . . . . 15

Old Stone Corp. v. United States, 450 F.3d 1360 (Fed. Cir. 2006) . . . . . 6, 7
Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689 (1933) . . . . . 7

Slattery v. United States, 69 Fed. Cl. 573 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Southwest Investment Co. Inc. v. United States of America, 63 Fed. Cl. 182 (2004), aff'd 158 Fed.Appx. 283 (Fed.Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5

Suess v. United States, 52 Fed. Cl. 221 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Suess v. United States, 74 Fed. Cl. 510 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Westfed Holdinggs, Inc. v. United States, 52 Fed. Cl. 135 (2002), aff'd in part, rev'd in part, and remanded 407 F.3d 1352 (Fed.Cir. 2005) . . . . . . . . . . . . . . . . . 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AMBASE CORPORATION AND CARTERET BANCORP, INC.**, | ) | |
| **Plaintiffs**, | ) | |
| and | ) | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION**, | ) | No. 93-531C<br>Senior Judge Loren Smith |
| **Plaintiff-Intervenor**, | ) | |
| v. | ) | |
| **THE UNITED STATES** | ) | |
| **Defendant**. | ) | |

**GOVERNMENT'S POSITION WITH RESPECT TO CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DAMAGES**

In April 2007, this Court ordered the parties to express their views on the wisdom of delaying trial pending the resolution of cross-motions for summary judgment on damages. Order dated April 13, 2007. As we demonstrate, because Ambase's damage claims are contrary to relevant case law, the Court should delay Appendix A filings and trial until the resolution of cross-motions for summary judgment on damages. Assuming these claims are resolved favorably to the United States, as we demonstrate they should be, trial will be avoided entirely or there will be fewer and less complex issues to be tried

**BACKGROUND**

In February 2007, Ambase filed a "motion for an order setting pretrial schedule," which argued that any questions relating to its claims for damages would "almost certainly focus on quintessentially factual issues . . . ." Plaintiffs' Motion For Entry Of An Order Setting Pretrial Schedule at 3. Ambase contended it would be inefficient to delay trial until the resolution of cross-motions for summary judgment on damages because its damage claims were unlikely to be

resolved in a summary judgment proceeding. Id.

Contrary to Ambase's contentions, we pointed out that many damage claims in Winstar-related cases have been resolved on cross-motions for summary judgment on damages. See, Government Opposition To Plaintiffs' Motion For Entry Of An Order Setting Pretrial Schedule; see, e.g., Granite Management Corporation v. United States, 416 F.3d 1373, 1378 (Fed. Cir. 2005) (restitution and mitigation claims resolved on cross-motions for summary judgment on damages), Citizens Federal Bank, FSB v. United States, 52 Fed. Cl. 561, 564-66 (2002) (theories related to cost of replacement resolved on cross-motions for summary judgment on damages); Southwest Investment Co. Inc. v. United States of America, 63 Fed. Cl. 182 (2004), aff'd 158 Fed.Appx. 283 (Fed.Cir. 2005) (expectancy damages and causation claims resolved on cross-motions for summary judgment on damages); Fifth Third Bank of Western Ohio v. United States, 462 F.3d 1221, 1236-37 (Fed. Cir. 2005) (claims relating to lost leveraging profits resolved on cross-motions for summary judgment on damages).

Ambase argued in reply that because its damage claims would "largely track the damages awarded in Slattery v. United States," there would be no novel issues which could be resolved on cross-motions for summary judgment on damages. Plaintiffs' Reply In Support Of Their Motion For Entry Of An Order Setting Pretrial Schedule at 2.[1]

Although we might have agreed with Ambase that, if it had based its claims on Slattery and Suess, few if any legal issues might be resolved on cross-motions for summary judgment on damages, it has not done so. As demonstrated by the report of Professor Charles Calomiris, Ambase's damages expert, the damage theories Ambase advances are contrary to Winstar-related

[1] This Court in Slattery awarded as expectation damages the market value of the thrift on the date of the breach plus a market-based control premium. Slattery v. United States, 69 Fed. Cl. 573 (2006). This Court later adopted the same approach to expectancy damages in Suess v. United States, 74 Fed. Cl. 510 (2006).

cases. Thus, cross-motions for summary judgment are the appropriate procedure for resolving the inconsistency of Professor Calomiris's theories with relevant law.[2]

## ARGUMENT

### I. UNDISPUTED FACTS ESTABLISH A LACK OF CAUSATION BETWEEN THE BREACH AND THE FAILURE OF CARTERET

Professor Calomiris acknowledges that Ambase rectified Carteret's small regulatory capital deficiency following the implementation of FIRREA by investing $50 million. May Dec. at 13. Further, he acknowledges that the United States District Court for the District of New Jersey issued a preliminary injunction in February 1991 which required the Office of Thrift Supervision ("OTS") to count goodwill, including that related to branches sold in 1990, as regulatory capital. Id. at 82. Finally, this Court has acknowledged that, because of losses on real estate investments, by the end of the second quarter of 1991, even counting goodwill as regulatory capital, Carteret was unable to comply with regulatory capital requirements imposed by FIRREA. Ambase Corp. v. United States, 58 Fed. Cl. 32, 39-40 (2003) ("Ambase I"). Professor Calomiris's estimation of Carteret's regulatory capital absent the breach as of September 1992 (the quarter immediately prior to Carteret's failure), shows that (1) "but for" Carteret would have been unable to comply with two of three regulatory capital requirements (risk based capital and core capital), and (2) that the write-downs of Carteret's real estate holdings in 1990 and 1991 vastly exceeded the amount of supervisory goodwill on Carteret's books at the time of the breach. July Supp. Dec. at 8.

Professor Calomiris bases his damage calculations upon the assumption that Carteret would not have failed in the absence of the breach. If this is false as a matter of law, it will be

[2] Professor Calomiris's declaration dated May 19, 2007 ("May Dec."), and supplemental declaration, dated July 12, 2007 ("July Supp. Dec."), are attached hereto as Exhibits I and II, respectively.

unnecessary to consider Ambase's damage claims in a trial. As we will demonstrate in a motion for summary judgment on damages, the breach was immediately mitigated by Ambase's investment pursuant to the capital maintenance agreement. Ambase I, 58 Fed. Cl. At 38-40. Thereafter, before the breach could have had any substantial effect, the district court required the regulators to count goodwill as regulatory capital. Id. Between the second quarter of 1991 and the imposition of the receivership in December 1992, it is undisputed that Carteret was unable to satisfy regulatory capital requirements even counting the goodwill as regulatory capital. Id. These conditions render the assumptions that underlay Professor Calomiris's calculation of damages, namely that Carteret would have survived and prospered absent the breach, invalid. Assuming, as we will demonstrate in a motion for summary judgment on damages, that Professor Calomiris's assumptions are invalid, Carteret's failure cannot be attributable to the breach and a trial on Ambase's damage claims can be avoided.

Winstar-related precedents demonstrate that causation issues, such as those raised by the Calomiris Declarations, can be decided upon cross-motions for summary judgment on damages. For example, in Southwest Investment Co., as here, the undisputed evidence indicated that the thrift's insolvency would not have been cured by the addition of goodwill to regulatory capital. 63 Fed. Cl. at 195-99. The court ruled that summary judgment was appropriate because, based upon undisputed financial information, "Louisiana was insolvent [i.e., unable to satisfy minimum regulatory capital requirements] notwithstanding the promises." Id. at 196. See also, Admiral Financial Corp. v. United States, 57 Fed. Cl. 418, 434-35 (2003), aff'd 278 F.3d 1336 (Fed. Cir. 2004) (because the thrift was insolvent with or without goodwill, it was not harmed by the breach); Hansen Bancorp, Inc. v United States, 67 Fed Cl. 411 (2005) (same).

In short, like in other Winstar-related cases, the undisputed financial facts in this case indicate that Carteret was not injured by the breach. It was protected from the breach by

Ambase's capital maintenance contributions and the district court's injunction. Ambase I, 58 Fed. Cl. at 36-38. The thrift, however, became insolvent in the second quarter of 1991 notwithstanding insulation from the breach and Ambase's mitigation efforts. Id. These facts are conceded in Professor Calomiris' report and can be demonstrated by undisputed financial and regulatory records in a motion for summary judgment on damages. July Supp. Dec. at 8.

## II. AMBASE IS NOT ENTITLED TO CARTERET'S UNEXPECTED MARKET VALUE AT THE TIME OF TRIAL

Professor Calomiris contends that Ambase is entitled to the market value of the unexpected cash flows "but for" Carteret allegedly would have realized between the time of the breach and the time of trial (estimated to be December 2006 or December 2008) if it had survived the breach. To determine the market value of the unexpected cash flows, Professor Calomiris applies a mathematical formula (the so-called Gordon Growth Model) to estimate future cash flows upon the basis of historical earnings and a discount factor. May Dec. at 26 (1982-1988 Table 5). After estimating the alleged book value of the "but for" thrift in 2006 and 2008 (based upon estimated future cash flows), Professor Calomiris calculates the market value based upon the market-to-book ratios of alleged "peer institutions." He claims that Carteret is entitled to the market value of its "but for" equity in 2006 or 2008 which, under his preferred estimate, is more than three times the thrift's estimated market value at the time of the breach. Professor Calomiris claims that "[t]he market's predictions of Carteret's future profitability in 1988 and 1989 were, with the benefit of hindsight, unduly conservative if the breach had not caused Carteret to fail." May Dec. at 28-29

Contrary to Calomiris's contentions, the case law requires that damages relating to the loss of market value be calculated as of the date of breach and not upon the basis of ex post theories contending the market was "unduly conservative" in valuing future cash flows. See, e.g., Estate of Lillian Berg v. United States, 687 F.2d 377, 380 (Ct. Cl. 1982) ("the date of breach is

the proper date for establishing fmv"). While the breaching party might be able to foresee the loss of market value at the time of the breach, if the market at that time could not foresee future cash flows, as a matter of law, neither could the breaching party. See, e.g., Old Stone Corp. v. United States, 450 F.3d 1360, 1374-78 (Fed. Cir. 2006).

In Old Stone, for example, the holding company sought, as reliance and restitution damages, over $115 million in cash and stock it had invested in the troubled thrifts at the time of the transactions. Following the breach, the holding company invested another $75 million which it raised by selling assets to mitigate the effects of the breach. Notwithstanding the mitigation, the thrift failed. The Federal Circuit, while allowing the recovery of the $75 million which was the cost of mitigation, disallowed recovery of the initial investments because the breaching party could not have foreseen the loss of future cash flows resulting from the investment of the capital. As the Court held: "[E]ven if the need for replacement capital was foreseeable, that hardly establishes that the adverse consequences alleged to flow from the need to make infusions were foreseeable." Id. at 1376.

Professor Calomiris's damage theory is contrary to Old Stone because it assumes that the breaching party would have been able to foresee at the time the contracts were formed in 1982 and 1986 that cash flows between 1989 and 2006 or 2008 would have exceeded the market's estimate of the thrift's value as of 1989 by a factor of at least three. In other words, according to Professor Calomiris's assumption, while the market underestimated Carteret's profitability in 1988 and 1989, Carteret's post-1989 profitability would have been foreseeable to the regulators in 1982 and 1986. As in Old Stone, however, it is highly speculative to assume the regulators could have foreseen future developments at the time the contracts were formed that the market could not foresee in 1989. Professor Calomiris's theory, which is to "charge the offender with elements of value non-existent at the time of his offense," Sinclair Refining Co. v. Jenkins Petroleum

Process Co., 289 U.S. 689, 698 (1933), is not permissible in contract actions. Id.; see, e.g., American Fed. Bank v. United States, 72 Fed. Cl. 586, 602-03 (the improved economy broke the chain of causation between the breach and the mitigating event).

In short, Professor Calomiris's method for calculating damages is contrary to relevant case law. If his methodology is rejected on cross-motions for summary judgment, there will be no need to address at trial the extensive evidence regarding the alleged growth of thrift indices and a sample of thrifts between the date of breach and 2006 or 2008. Accordingly, addressing a motion contesting these aspects of Professor Calomiris's calculation prior to trial should simplify the trial and advance judicial efficiency.

## III. AMBASE'S ESTIMATE OF UNEXPECTED CASH FLOWS CANNOT BE SUPPORTED

Professor Calomiris advances a lost profits claim based upon a simple arithmetic extrapolation of historical earnings using the Gordon Growth Model, without any estimates or analysis of what would have happened to the thrift on a year-by-year basis in a "but for" world, assuming Carteret had survived. Professor Calomiris uses Carteret's market value at the time of the breach as a starting point for then calculating market value as of 2006 or 2008, incorporating elements of ex post analysis and pre-judgment interest.

As previously noted, Professor Calomiris purports to calculate unexpected future cash flows of "but for" Carteret by taking historical earnings and an estimated discount factor and applying the so-called Gordon Growth Model to Carteret's estimated market value as of 1989. Putting aside whether Carteret's historical earnings, which Professor Calomiris acknowledges failed to exhibit steady growth, can be used to estimate future earnings under the Gordon Growth Model, which assumes a constant rate of growth of earnings, the question of whether unexpected foregone earnings can be predicted with reasonable certainty based upon an arithmetic formula raises a pure issue of law. As the case law establishes, future unexpected cash flows cannot be

demonstrated by theoretical models but, instead, depend upon contemporaneous documentation of the financial performance of the "but for" thrift. Professor Calomiris failed to identify any specific lost investment opportunities underlaying the supposed growth of earnings. Therefore, Professor Calomiris's method for estimating unexpected future cash flows is invalid as a matter of law.

For example, in California Federal Bank v. United States, 245 F.3d 1342, 1349-50 (Fed. Cir. 2001), the Federal Circuit reversed the trial court's award of summary judgment on a lost profits claim because the thrift had presented substantial evidence of its assets and liabilities in a "but for" world. As the Court noted:

> Cal Fed presented documentary evidence to show that it sold significant assets in the wake of the breach. Its business plans and Office of Thrift Supervision documents allegedly showed its intent to invest in low risk assets that it claims have proven profitable. It provided specific documentation of 24,664 single-family adjustable rate mortgages worth approximately $4 billion that it claims it was forced to sell to remain in capital compliance after the breach. Cal Fed then provided expert testimony, which traced the actual post-sale performance of these loans and arrived at lost profits of $317 million attributable to these sales. Additional documentary and deposition evidence was submitted to support Cal Fed's claim that in 1993 it was forced to sell a profitable business unit, California Thrift & Loan, to meet its capital requirements.

Cal Fed, 245 F.3d at 1349-50. This evidence was deemed sufficient to withstand a motion for summary judgment on damages. At trial, however, Cal Fed was unable to prove lost profits. See California Federal Bank v. United States, 395 F.3d 1263, 1267-73 (Fed. Cir. 2005), cert. den. 126 S.Ct. 344 (2005) (insufficient proof the shrinkage was caused by the breach; Glendale Federal Bank, F.S.B. v. United States, 378 F.3d 1308, 1310 (Fed. Cir. 2004) (lost profits models do not "fit comfortably with the history of these cases in the years following the breach").

Notwithstanding CalFed, in Fifth Third Bank of Western Ohio v. United States, 55 Fed.

Cl. 223, 240-41 (2003), this Court awarded summary judgment to the United States on Fifth Third's lost profits claim. The thrift claimed lost profits based upon the assumption that the "but for" thrift would have been larger than the actual thrift and would have achieved the same level of profitability as had been achieved by the actual thrift. Reading CalFed as "reflect[ing] the nature and quality of evidence that the Federal Circuit ruled sufficient to withstand a summary judgment action," this Court ruled that the evidence Fifth Third proffered did not meet that standard. Specifically, Fifth Third's evidence consisted of arithmetic projections from the real world to the "but for" world based upon the leveraging of goodwill. As the Court noted:

> Plaintiff's model fails to account for any real-world events other than the profitability of Citizens during the 1990's before its purchase by plaintiff. Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the but for Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Fifth Third, 55 Fed. Cl. at 241.

Similarly, in this case Professor Calomiris "fails to account for any real-world events other than the profitability of [Carteret] during the 1990's [through 2006 or 2008]." Id. To calculate foregone earnings, Professor Calomiris simply engages in an arithmetic exercise which depends upon the assumption that Carteret's historical earnings increased at a steady state and therefore unexpected future cash flows can be estimated by the Gordon Growth Model. Even assuming, however, that Professor Calomiris correctly averaged Carteret's historical operating earnings, the undisputed financial data relating to Carteret's 1982 to 1988 net after tax income demonstrates that Carteret simply did not exhibit a steady growth in income during this period.

Instead, as Professor Calomiris concedes, Carteret's income fluctuated wildly year by year and, in many years, decreased rather than increased. May Dec. at 26. Therefore, by reference to Professor Calomiris's own data, the application of the Gordon Growth Model to Carteret is simply inappropriate.

Indeed, Professor Calomiris assumes that Carteret would have been profitable each and every year after FIRREA. See Table 6, May Dec. at 28. Such an assumption, however, ignores the huge losses Carteret recorded in 1990 and 1991 because of its asset quality problems, many of which were as a result of investment decisions made well before FIRREA. May Dec. at 26, n. 59. Such an assumption has the effect of saying that every dollar of loan loss was due to the breach which even Professor Calomiris acknowledges is not correct. As he admits: "Carteret would likely have eventually suffered some of these same losses even in the absence of the Government's breach. May Dec. at 74.

Even if Carteret had demonstrated a steady growth in historical earnings, the relevant case law does not regard the application of a simple arithmetic formula as credible evidence from which to estimate unexpected future cash flows. To the contrary, lost profits claims have been rejected in most Winstar-related cases because the thrift was unable to demonstrate with the required specificity the financial performance it would have enjoyed in a "but for" world. See, e.g., CalFed, 245 F.3d at 1349-50; Suess v. United States, 52 Fed. Cl. 221 at 228-30 (detailed model based upon earnings of allegedly comparable thrifts and financial projections in a capital plan unrealistic and implausible). Professor Calomiris's model is less specific than already-rejected models because he does not even attempt to establish balance sheets and profit and loss statements Carteret would have enjoyed in a world without the breach.

Wintar-related case law simply does not support a theoretical approach to damages such as that contained in the Calomiris report. Indeed, Professor Calomiris's model is inconsistent

with the only cases, of which we are aware, awarding lost profits. For example, in Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330, 363-64 (2005), aff'd in part, vacated in part, and remanded, 189 Fed.Appx. 964 (Fed. Cir. 2006), the thrift presented extensive evidence concerning its business plans and the performance of investment vehicles it was forced to sell because of the breach. Id. at 363-64. In this case, by contrast, Professor Calomiris simply uses a theoretical model without identifying any of the assets or liabilities of the "but for"thrift.

Likewise, in Commercial Federal Bank v. United States, 59 Fed. Cl. 338, 344-51 (Fed. Cl. 2004), the thrift demonstrated at trial "the types of categories of investment opportunities that [the institution] would have exploited [in the absence of the breach]." Id. at 349, n.29. Further, both before and after the breach, the thrift demonstrated "a "record of profitable growth and average asset returns in excess of one percent [of assets]." Id. at 350. Therefore, Professor Calomiris's model has none of the indicia of reliability accepted by the courts in Winstar-related cases.[3]

## IV. AMBASE'S CLAIMS TO PREJUDGMENT INTEREST ARE INVALID

Professor Calomiris's model assumes that Carteret should reap the benefit of favorable economic conditions after 1992, and claims that Carteret's market value at the time of breach did not reflect the favorable economic conditions. According to Professor Calomiris, Carteret is entitled to damages based upon his estimate of the dividends that Carteret would have paid to Ambase ($188.7 million per Table 6, May Dec. at 28) absent the breach, plus what Carteret's market value allegedly would have been in 2006 or 2008 had it survived. In his preferred

---

[3] The issue of whether the model meets the relevant evidentiary standards is separate from the accuracy of the inputs provided by Professor Calomiris. As we will demonstrate at trial, should one become necessary, Carteret did not have the financial profile prior to the breach to warrant application of the Gordon Growth Model. Further, even if it did, Professor Calomiris's estimates of Carteret's market value as of the time of breach are implausible and unsupported. Although our experts will present a persuasive rebuttal to Professor Calomiris at trial, because there appear to be differences of opinion between the experts on Carteret's financial characteristics prior to the breach, these disputed factual questions arguably cannot be decided in the context of cross-motions for summary judgment.

approach, he estimates this market value by compounding "but for" Carteret's earnings net of estimated dividends at 4.2 percent per year after 1989, and then multiplying the estimated book value of the "but for" thrift as of 2006 and 2008 by the average market-to-book value ratio of "peer institutions."[4] May Dec. at 25-43.

Although Professor Calomiris claims his methodology is not tantamount to seeking prejudgment interest on Carteret's market value as of the time of the breach, in effect it is. That is, the methodology adjusts Carteret's 1989 market value by adding to it an annual compound interest rate of 4.2 percent which is Professor Calomiris's estimated annual rate of return for Carteret absent the breach. May Dec. at 26. Professor Calomiris contends he is avoiding the proscription on prejudgment interest by excluding estimated dividends from "but for' Carteret's annual return. Although this may lower the effective rate of prejudgment interest, it does not eliminate prejudgment interest.

While it is true that lost profits between the time of the breach and the time of trial do not have to be discounted to avoid prejudgment interest, see, e.g., Energy Capital Corp. v. United States, 302 F.3d 1314, 1330-34 (Fed.Cir. 2002), Professor Calomiris does not claim "but for" Carteret's lost profits as the measure of damage but, instead, the estimated market value of "but for" Carteret in 2006 or 2008. As a matter of law, when the measure of damage is the lost market value of an asset injured or destroyed as a result of the breach, the date to measure the market value is the date of breach and not some time in the future. Estate of Berg, 687 F.2d at 380.

In effect, Professor Calomiris's estimate simply adds an estimated rate of return to

---

[4] Professor Calomiris's "preferred" estimate of Carteret's but-for market value of $892.1 million as of December 31, 2006 is based upon his estimate of Carteret's book value of $442.9 million as of December 31, 2006 (his $269.3 million in book value in July 1989 minus $175.0 million of goodwill amortization plus $348.6 million of "retained earnings" as of December 31, 2006 from his Table 6, May Dec. at 28). The $442.9 million is increased to $892.1 million in his Table 13, May Dec. at 41, based upon the increase in the mean market-to-book value of his "peer institutions" from 1989 to 2006.

Carteret's market value of equity at the time of breach to calculate "but for" Carteret's estimated market value in 2006 or 2008. This is tantamount to adding prejudgment interest to Cartert's market value at the time of breach calculated as the estimated annual rate of earnings growth (4.2 percent) compounded net of dividends. Although the prejudgment interest impact on total book value will be less than 4.2 percent because the earnings begin with a $20.5 million base whereas the beginning book value is $269.3 million, Table 3, May Dec. at 19, the calculation results in prejudgment interest on Carteret's estimated 1989 market value.[5]

The facts concerning Professor Calomiris's damage calculations are not disputed and prejudgment interest claims have been decided on cross-motions for summary judgment in other Winstar-related cases. For example, in Long Island Savings Bank v. United States, 60 Fed. Cl. 80, 94 (2004), rev'd on other grounds, 2007 WL 2685640 (Fed.Cir. 2007), the thrift claimed as expectation damages the reduction in interest bearing liabilities that allegedly would have been enjoyed if lost profits had been earned in the absence of the breach. On cross-motions for summary judgment on damages, this court ruled that the claim was tantamount to prejudgment interest. Id.

Professor Calomiris's claim is similar in that it seeks a return on Carteret's market value as of the time of breach computed as a function of the estimated growth of earnings net of dividends (and compounded annually). As in Long Island, whether the claim represents pre-judgment interest can be resolved as a matter of law on the undisputed record. See also, Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 162-64 (Fed. Cl. 2002), aff'd in part, rev'd in

---

[5] For example, net income between 1990 and 1991 increases by 4.2 percent or by $0.9 million ($20.5 to $21.4), whereas dividends increase by $0.3 million ($6.5 to $6.8). Table 6, May Dec. at 28. Therefore, the net increase to book value due to the earnings growth rate is $0.6 million, which results in an increase in book value of 0.22 percent ($0.6/$269.3). This demonstrates pre-judgment interest is significant though less than 4 percent of Carteret's 1989 estimated market value.

part, and remanded, 407 F.3d 1352 (Fed.Cir. 2005) (interest on debt to mitigate damage determined not to constitute prejudgment interest as a matter of law).

In short, Professor Calomiris's claim to Carteret's market value as of 2006 or 2008 is a claim for prejudgment interest. Eliminating the claim on the basis of cross-motions for summary judgment will necessarily reduce the complexity and duration of the anticipated trial.

## V. AMBASE'S WOUNDED-BANK DAMAGES CLAIMS ARE INVALID

Ambase seeks wounded bank damages totaling $16.8 million which consist primarily of severance payments Ambase made to employees of Ambase and Carteret, transaction costs incurred by Ambase in seeking capital for Carteret, and costs incurred by Ambase to defend Ambase and Carteret officers and directors against administrative charges brought by OTS. In calculating wounded bank damages relating to employee payments and administrative expenses, Professor Calomiris does not distinguish between payments made by Ambase and payments made by Carteret (if any). Of course, only losses Carteret would have avoided in a "but for" world are compensable as "wounded bank" damages. Because losses that might have been avoided by Ambase, which was not a party to the goodwill contract between Carteret and the Federal Home Loan Bank Board ("FHLBB"), are not recoverable, Professor Calomiris's claim for wounded bank damages is invalid as a matter of law.

Professor Calomiris justifies Ambase's claim for wounded bank damages upon the ground that the payments Ambase seeks would not have been incurred in the absence of Carteret's breach-induced weakened condition. We dispute that the payments related to the breach. More importantly for our summary judgment motion, even if the payments were caused by the breach, they are unrecoverable as a matter of law because Ambase was not a party to the contract.

For example, in Granite, 416 F.3d at 1373, the thrift sought to recover costs related to a capital investment by its parent, Ford Motor Company ("Ford"). The Federal Circuit, however,

disallowed the recovery upon the ground that Ford was not a party to the suit. Although Ambase is a party to this suit, it is not contracting party or a direct plaintiff (its suit is derivative only). Like the thrift's claim for parent expenses in Granite, therefore, Carteret's claim for expenses incurred by Ambase is not a cost incurred by a contracting party and should be denied.

Similarly, in American Capital Corp. v. Federal Deposit Insurance Corp., 472 F.3d 859, 865-67 (Fed.Cir. 2006), the Federal Circuit rejected the thrift's parent's claim for the value of the thrift's equity upon the ground that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary. . ." Id. at 866. Under American Capital, therefore, the parent is not entitled to recover costs incurred by the thrift because they are separate juridical entities. In this case, if only the value of Ambase's equity was reduced by the severance payments, transaction costs, and administrative expenses, only Ambase would have a claim for these costs (assuming for the sake of argument they were related to the breach). As Ambase was not a contract party and only is suing in a derivative capacity for Carteret, however, these costs are not recoverable by Ambase.

In Castle v. United States, 301 F.3d 1328, 1340-41 (Fed.Cir. 2002), contract parties asserted reliance damage claims on behalf of non-parties who had invested in the thrift. The Court, however, rejected the claims on the ground that the contract parties "lack standing to assert any reliance interest on behalf of the other shareholders." Id. at 1340. In this case, Ambase, a derivative plaintiff, lacks standing to assert the reliance interest of itself, a non-party, with respect to expenditures made to third parties.

In short, Ambase's wounded bank damage claims, which assume that Carteret can collect damages for costs incurred by Ambase, are both invalid as a matter of law and resolvable on cross motions for summary judgment. Resolving these claims on cross-motions for summary judgment may eliminate the need to present witnesses and documentary evidence with respect to

approximately $16.8 million worth of claims at trial.

## CONCLUSION

For these reasons, the court should establish a schedule for cross-motions for summary judgment on damages and delay scheduling Appendix A filings and trial until resolving those cross- motions.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s// Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street,, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309

Attorneys for Defendant

Date: November 7, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 7th day of November 2007, a copy of the foregoing "GOVERNMENT'S POSITION WITH RESPECT TO CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DAMAGES " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt
David A. Levitt