# EXHIBIT I

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 93-531<br><br>Judge Loren Smith |

**DECLARATION OF CHARLES W. CALOMIRIS OF MAY 19, 2007**


Qualifications

Introduction

I. Carteret's Value at the Time of the Breach and the Subsequent Increase in Its Value But-For the Breach
   A. Carteret Was Sold to AmBase for $266 Million in August 1988—One Year Before the Breach
   B. Carteret's Value Did Not Substantially Change Between the Time of Its Sale to AmBase and the Breach
      1. In May 1989, a Bid of $252 Million Was Made to Purchase Carteret

2. Based on the Valuation Changes in Standalone Publicly Traded Thrifts, Carteret's Market Value Could Not Have Substantially Decreased Between the Date of Its Acquisition by AmBase and the Date of the Breach
3. AmBase's Stock Price Movements Are Correlated with News Relating to the Evolution of FIRREA Before Its Passage

C. Carteret's Market Value Was a Reflection of its Discounted Future Cash Flows, Whereas Its Undiscounted Future Cash Flows Net of Dividends from August 9, 1989 through 2008 But-For the Breach Would Have Been $406.9 Million

D. But-For the Breach, Carteret's Value Can Be Estimated Based on the Performance and Growth of the Thrift Industry
1. The Growth in Market Values of the Thrift Industry
2. The Growth in Book Values and Market-to-Book Ratios of the Thrift Industry

E. But-For the Breach, Carteret's Value Can Be Estimated Based on the Performance and Growth of Comparable Institutions that Survived FIRREA
1. The Growth in Market Values of Comparable Institutions that Survived FIRREA
2. The Growth in Book Values and Market-to-Book Ratios of Comparable Institutions that Survived FIRREA

F. Damages Are Equal to the But-For Market Value of Carteret Plus Any But-For Dividends That Were Not Distributed in the Actual World

G. Any Damage Award Should Account for AmBase's Tax Liability on the Damages

II. Carteret Would Not Have Failed in 1992 But-For the Breach

A. Carteret Had a Large Franchise Value, Both at the Time of the Breach and at the Time of Failure

B. Carteret Would Have Been Sufficiently Capitalized But-For the Breach
1. Carteret Would Have Had Added Extra Capital at the End of 1992 But-For the Breach
   a. The Inclusion of Supervisory Goodwill in Regulatory Capital Would Have Added $139.1 Million in Extra Capital as of September 1992 But-For the Breach
   b. Carteret Sold Branches in 1990 as a Result of the Breach
   c. Carteret's Cost of Deposits Increased as a Result of the Breach, Reducing Its Capital
   d. Carteret Could Have Counted Supplementary Capital Towards Regulatory Capital But-For the Breach
   e. Carteret's Size Decreased as a Result of the Breach, Reducing Its Capital
2. Even If Carteret Had Not Had Sufficient Regulatory Capital at the End of 1992, It Could Have Raised That Capital
   a. Carteret Could Have Raised Capital by Selling Its Mortgage Businesses
   b. Carteret Could Have Raised Capital through Borrowing

C. The Breach's Negative Impact on Carteret Was Immediate in AmBase's Stock Price

III. But-For the Breach, Carteret Would Not Have Failed at Any Time After 1992
- A. Carteret's Commercial Real Estate Portfolio Was Not as Troubled as Write-Downs Implied
  - 1. Carteret's Writedowns Were Extremely Aggressive
  - 2. Carteret's Commercial Real Estate Write-Downs Were Excessive in Light of the Eventual Increase in Property Values
    - a. Carteret's Reserves Were Almost Sufficient to Cover the Difference Between the Actual Sales Value of Its Commercial Real Estate Assets and the Principal Balance of Those Assets
    - b. The RTC Did Not Achieve Full Sales Values for Carteret's Commercial Real Estate Assets
      - i. The Real Option Value of Liquidation Limited the RTC's Achieved Sales Value for Carteret's Assets
      - ii. The Replacement of Carteret's Superior Management Limited the RTC's Achieved Sales Value for Carteret's Assets
      - iii. The Minority Preference Program Limited the RTC's Achieved Sales Value for Carteret's Assets
    - c. Commercial Real Estate Values Increased Over Time in Carteret's Markets
- B. Thrift Failures After 1992 Were Rare

IV. AmBase Suffered Significant "Wounded Bank" Damages as a Result of the Breach
- A. Turning Over Carteret to the RTC Triggered Costs Related to Employment Contracts
- B. Carteret Endured Costs from Selling Branches Because of the Breach
- C. Transaction Costs Associated with Efforts to Raise Capital
- D. Transaction Costs Related to Cease and Desist Proceedings

Conclusion

Appendix A: Estimating the Market Value of Supervisory Goodwill
- A. Cash Equivalent Value of Supervisory Goodwill
- B. Cost of Replacement Based on a Common Stock Issuance
- C. Summary

Appendix B: Materials Relied Upon

Appendix C: Curriculum Vitae

Appendix D: Expert Witness History Since 2003

## QUALIFICATIONS

1. I, Charles W. Calomiris, am the Henry Kaufman Professor of Financial Institutions at the Columbia University Graduate School of Business and a Professor at Columbia's School of International and Public Affairs. I am the Academic Director of Columbia Business School's Jerome Chazen Institute of International Business and the Director of Columbia University's Center for International Business Education and Research. I co-direct the Project on Financial Deregulation at the American Enterprise Institute (AEI) and am the Arthur Burns Scholar in International Economics at AEI. I am a member of the Shadow Financial Regulatory Committee, a Research Associate of the National Bureau of Economic Research, and was a Senior Fellow at the Council on Foreign Relations.

2. I am Chairman of the Board of Greater Atlantic Financial Corporation, a publicly traded bank based in the Washington D.C. metropolitan area, and a Managing Partner of Gauss Fund, LP. I served on the International Financial Institution Advisory Commission, a Congressional commission to advise the U.S. government on the reform of the IMF, the World Bank, the regional development banks, and the WTO. My research spans several areas, including banking, corporate finance, financial history, and monetary economics.

3. My recent publications include: "Bank Capital and Portfolio Management: The 1930s 'Capital Crunch' and Scramble to Shed Risk" (with Berry Wilson), in the *Journal of Business* (July 2004); "Credit Card Securitization and Regulatory Arbitrage" (with Joseph Mason), in the *Journal of Financial Services Research* (August 2004); "Consequences of Bank Distress During the Great Depression" (with Joseph Mason), in the *American Economic Review* (June 2003); *U.S. Bank Deregulation in Historical Perspective* (Cambridge University Press, 2000); *Emerging Financial Markets* (with David Beim, Irwin-McGraw Hill, 2001); "Blueprints for a New Global Financial Architecture" in *International Financial Markets*: *The Challenge of*

*Globalization* (Leonardo Auernheimer, ed., University of Chicago Press, 2000); and "Is the Bank Merger Wave of the 1990s Efficient?" (with Jason Karceski) in *Mergers and Productivity* (Steven Kaplan, ed., University of Chicago Press, 2000).

4. I am the recipient of research grants or awards from the National Science Foundation, the World Bank, the Japanese Government, the Herbert V. Prochnow Foundation, and the Garn Institute of Finance. In 1995, I was named a University Scholar at the University of Illinois, where I served as Associate Professor of Finance and Co-Director of the Office for Banking Research. I am, or have been, a member of the editorial boards of the *Journal of Banking and Finance*, the *Journal of Financial Services Research*, the *Journal of Financial Intermediation*, the *Journal of Economic History*, the *Journal of Economics and Business*, and *Explorations in Economic History*. I serve or have served as a consultant or visiting scholar for the Federal Reserve Banks of New York, Chicago, Cleveland, and St. Louis, the Federal Reserve Board, the World Bank, and the governments of Mexico, Argentina, Japan, China, El Salvador, Connecticut and Massachusetts. My private sector clients have included AIG, Ameriquest, Astoria Savings, Bank of America, Citicorp, Credit Suisse, Fleet Bank, The Limited, Lloyds, UBS Securities, U.S. Trust Corporation, and Xilinx.

5. I designed (with David Beim) and teach an MBA and Executive MBA case course on emerging market finance, which won the 1997-1998 Chazen International Innovation Prize at Columbia Business School. I have taught international banking, emerging financial markets, and advanced corporate finance at the MBA and Ph.D. levels at Columbia, as well as the MBA core course in Business Values and Ethics. I have taught Ph.D.-level courses at the World Bank and the IMF, including a course at the IMF on Emerging Financial Markets.

6. I earned a Ph.D. in economics from Stanford University and a B.A. in economics, *magna cum laude*, from Yale University.

## INTRODUCTION

7. This report considers the damages to Carteret Savings Bank ("Carteret") that resulted from the elimination of supervisory goodwill from Carteret's regulatory capital requirements. Section I of this report establishes Carteret's value at the time of the breach in 1989 and the increase in Carteret's value through 2006 had the contractual breach in the treatment of supervisory goodwill not occurred. This counterfactual value of Carteret as of the date damages are awarded, plus any dividends received in the but-for world that were not received, plus additional "wounded bank" damages in the actual world, constitutes the damages due to plaintiffs. Section II demonstrates that Carteret would not have been seized by the Resolution Trust Corporation ("RTC") had Carteret's supervisory goodwill not been excluded from its required capital as mandated by Congress through the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). Carteret was a healthy institution at the time of FIRREA's passage and would have survived but-for the exclusion of supervisory goodwill from its capital requirements. In Section III, I show that Carteret would not have failed in the years following FIRREA even when considering the weakest aspects of Carteret's business, its commercial real estate portfolio. In Section IV, I estimate the "wounded bank" damages suffered by Carteret as a direct result of the breach. Table 1 summarizes my lowest, highest, and preferred estimates of damages that resulted from the breach. The estimates in Table 1 are shown both before and after accounting for any potential tax liabilities on the damage award.

TABLE 1: DAMAGES RESULTING FROM THE BREACH OF FIRREA'S REMOVAL OF SUPERVISORY GOODWILL FROM CARTERET'S REGULATORY CAPITAL

| Damages Estimate | Damages Before Accounting for Tax Liabilities ($Million) | Damages After Accounting for Tax Liabilities ($Million) |
|---|---|---|
| Highest | $4,904.6 | $8,146.2 |
| Lowest | $785.7 | $1,295.6 |
| Preferred | $1,097.5 | $1,814.3 |

## I. CARTERET'S VALUE AT THE TIME OF THE BREACH AND THE SUBSEQUENT INCREASE IN ITS VALUE BUT-FOR THE BREACH

8. Carteret was a federally chartered savings and loan association that was a successor to thrift institutions dating back to 1888.[1] Prior to the breach of contract, Carteret had a consistent track record of growth. As of September 1987, it ranked as the 19th largest thrift in the United States based on deposits.[2] From 1982 through 1988, Carteret grew its asset base from $3.62 billion to $6.44 billion.[3] Profitability accompanied this growth. Carteret's consistent performance, as indicated by its annual income statements, demonstrates that the company was firmly established and profitable. Furthermore, activity from the financial markets showed that investors had positive expectations about the company's potential. As Figure 1 shows, in the seven years from 1982 through 1988, the last year that Carteret was an independent company, Carteret recorded net losses in only one year, 1982.

1. Carteret Bancorp Inc., 1987 Annual Report, at C-AM-A-0056661.
2. *Id.*
3. Carteret Savings and Loan Association, FA 1982 Annual Report, at 1 (AMB029911); Carteret Bancorp Inc. and Subsidiary, FHLB Docket #02-4702, Consolidated Financial Statements, Sep. 30, 1988 (AMB013963).

FIGURE 1: CARTERET NET INCOME, 1982 - 1988




*Sources*: Carteret Savings & Loan Association, F.A., Annual Report 1984, at 26 (AMB029992); Carteret Savings & Loan Association, F.A., Annual Report 1985, at 21 (AMB030079); Carteret Bancorp, Inc., Annual Report 1987, at 1 (C-AM-A-0056662); Carteret Bancorp Inc. and Subsidiary, FHLB Docket #02-4702, Consolidated Financial Statements, Sept. 30, 1988, at 3 (AMB013962).

Carteret received income from a diverse range of recurring business activities, including financial services to individuals, households, and corporate customers.[4] Carteret's development of fee-based and non-interest income revenue sources, such as residential mortgage financing,[5] represented a successful strategy that strengthened the company's bottom line.[6]

---

4. Carteret Bancorp Inc., 1987 Annual Report, at C-AM-A-0056661.

5. *See* Carteret Bancorp Inc., 1987 Annual Report, at 43 (C-AM-A-0056697) ("Through Carteret Mortgage, Carteret has expanded its presence in the mortgage banking industry. Carteret Mortgage originates first mortgage loans, both fixed and adjustable rate and may sell a portion of such loans into the national secondary market while retaining the servicing rights thereto. At September 30, 1987, Carteret serviced $5,964,437,000 of mortgage loans for outside investors compared with $2,104,689,000 at September 30, 1986. For the year ended September 30, 1987, mortgage activities contributed $24,501,000 in loan fees and service charges to non-interest income, and an additional $9,872,000 from valuation of loan servicing retained on loans sold to investors.")

6. *See* Carteret Savings & Loan Association, F.A., Annual Report 1985, at 21 ("Carteret Savings, as most other thrift institutions, has assets with maturities that exceed those of its liabilities. This maturity difference or 'gap', results in the Association's liabilities repricing more rapidly to changes in interest rates than do its assets. In view of the earnings limitations of its fixed-rate, long-term assets as compared to its more volatile liabilities,

9. As a result of its strong franchise and consistent profits, Carteret was able repeatedly to raise capital in the open markets in the 1980s. Carteret's public stock offerings from 1983 to 1986 are summarized in Table 2.

TABLE 2: CARTERET ISSUANCES OF STOCK, 1983 - 1988

| Year | Shares | Net Proceeds | Type |
|---|---|---|---|
| 1983 | 6,820,000 | $58,367,000 | Common |
| 1985 | 1,000,000 | $11,027,000 | Common |
| 1985 | 892,000 | $21,209,000 | Preferred |
| 1986 | 1,425,000 | $28,671,000 | Common |

*Sources*: Carteret Savings & Loan Association, F.A., Annual Report 1984, at 29 (AMB029996); Carteret Savings & Loan Association, F.A., Annual Report 1985, at 35; Carteret Savings Bank FA, Annual Report 1986, at 28.

The success of these transactions indicates that both the company and investors saw great potential in Carteret's future performance. The expectation that Carteret's solid performance would continue caused AmBase Corp. ("AmBase") to explore a merger with Carteret in 1987.

10. In 1982 Carteret acquired two failing thrifts, Barton Savings and Loan of Newark, New Jersey ("Barton") and First Federal Savings and Loan of Delray Beach, Florida ("Delray"). According to the government's internal reports, Carteret had $2.3 billion in assets and a book value net worth of $36.5 million immediately prior to the transactions.[7] At the time of the FSLIC-assisted merger, Barton was experiencing "substantial and accelerating operating losses."[8] Delray was in "irreversible decline."[9] In connection with the transactions, Carteret recorded supervisory goodwill of $46 million and $168 million, respectively, representing the levels of insolvency of these institutions, which was counted toward regulatory capital for Carteret. Even according to early internal government reports prepared on the eve of the acquisition (before the assets and liabilities were marked to market), the government estimated

Carteret Savings adopted as a major strategy the generation of new earning assets with variable interest rates or shorter terms. A second major goal was diversification into lines of business that produce fee income. New earning assets are generated through an expansion of adjustable rate mortgage lending, diversification into commercial, consumer and income-property lending and retail financial services.")

7. S-Memo, WOR839 0347-0359 at 0347, 0358.
8. *Id*. at 0350.
9. *Id*.

that it would have cost $42.6 million to liquidate Barton alone.[10] According to those same documents, the cost to the government of Carteret's bid for Barton was $23.5 million less than the other bid and $31 million less than the estimated present value cost of liquidation.[11] The cost to the government of Carteret's bid for Delray was $20 million less than the next lowest bid.[12] As detailed below, Carteret lost the entirety of the value it contributed to these transactions when the RTC seized Carteret as a result of the breach.

11. In 1986 Carteret acquired two more failing thrifts, First Federal Savings and Loan of Montgomery County, Blacksburg, Virginia ("First Federal") and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security"). According to the government's internal reports, Carteret had $5.153 billion in assets as of March 31, 1986 and a book value net worth of $272.5 million immediately prior to the transaction.[13] In connection with this combined transaction, Carteret recorded $21.7 million in supervisory goodwill that was counted toward regulatory capital. The government's internal reports show that Carteret's combined bid for the two thrifts represented a savings to the government of $5 million over the next highest bidders and $14.6 million over the present value cost of liquidation.[14] As detailed below, Carteret lost the entirety of the value it contributed to these transactions when the RTC seized Carteret as a result of the breach. The government, in contrast, benefited hugely from Carteret's assumption of the liabilities of these failed thrifts.[15]

---

10. *Id*. at 0354.
11. WOR839 0347-0359 at 0353-54.
12. *Id*. at 0356.
13. S-Memo, WOR063 0879-0893 at 0879, 0887.
14. Cost Summary, WOR999 0240-0253 at 0240.
15. As noted above, the government estimated the cost of liquidating Barton as $42.6 million and the cost of liquidating First Federal and Mountain Security as $14.6 million. The government did not calculate the cost of liquidating Delray. In order to calculate an estimate of the cost of liquidating Delray, I use the ratio of the cost of liquidation as compared to the net liability assumed. For the transactions for which I have data, the ratio was 84.49 percent -- that is, the government's estimated cost of liquidation equaled, on average, 84.49 percent of the net

### A. Carteret Was Sold to AmBase for $266 Million in August 1988—One Year Before the Breach

12. On August 4, 1987, AmBase (then known as "The Home Group, Inc.") entered into a merger agreement with Carteret.[16] The August 1987 merger agreement called for each share of Carteret common stock to be exchanged for $22.50 in cash on the effective date of the merger.[17] In addition, each share of Carteret preferred stock would be converted to common stock, and each share of that common stock would be exchanged for $22.50 in cash on the effective date of the merger.[18] AmBase's financial advisor, Salomon Brothers, issued a fairness opinion in support of the $22.50 cash consideration.[19]

13. On October 19, 1987, just two and a half months after the merger agreement, the U.S. stock market suffered its worst one-day drop in history. On that date, the Dow Jones Industrial Average fell 22.6 percent,[20] Carteret's stock price fell from $18 to $14.625 (18.8 percent), and AmBase's stock price fell from $16.375 to $13.75 (16.0 percent).[21] By the end of

---

liability assumed. The net liability assumed in connection with the acquisition of Delray was $168 million so I estimate the cost of liquidation to be $141.9 million. This is a conservative estimate since, as I discuss below, the government does not realize the full fair market value of assets when it performs a liquidation. Therefore, I estimate the liquidation costs for all four acquisitions would have been $199.1 million. As part of Carteret's acquisition of Barton, FSLIC provided $11.7 million in assistance. *See* Carteret Savings & Loan Association, F.A. & Subsidiaries, Consolidated Financial Statements, Sept. 30, 1980, 1981, & 1982 (C-AM-A-0265001 – 041 at 005, 016). Therefore, the total avoided liquidation cost to the government was $187.4 million. Beyond the total avoided liquidation costs of $187.4 million, the government realized huge savings in not having to issue debt in this amount. Assuming the savings began at the end of the calendar year in which Carteret purchased the institutions, and using the one-year Treasury constant maturity yield compounded annually, I estimate the total savings of avoided liquidation cost plus avoided debt service equals $709 million through the end of 2007.

16. Agreement of Merger of JAM Financial Corp. with and into Carteret Bancorp Inc. at 1 , Aug. 4, 1987, (KH029240).

17. *Id*. at 4-5 (KH029243 – KH029244).

18. *Id*.

19. Letter from Salomon Brothers to The Board of Directors, The Home Group, Inc., Aug. 18, 1987, (AMB028576 – AMB028578).

20. Tim Metz, Alan Murray, Thomas E. Ricks & Beatrice E. Garcia, *The Crash of '87: Stocks Plummet 508.32 Amid Panicky Selling --- Percentage Decline Is Far Steeper Than '29; Bond Prices Surge*, WALL ST. J., Oct. 20, 1987.

21. CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006.

1987, Carteret's stock price had risen to $15.25 but had still not reached its pre-crash price.[22] In the aftermath of this price decline, AmBase and Carteret renegotiated their merger agreement, and on January 18, 1988, the merger agreement was amended such that Carteret's stock would be exchanged for $19 per share instead of $22.50 per share.[23] First Boston Corp., Carteret's financial advisor, issued a fairness opinion in support of the $19 cash consideration.[24] Of course, the stock market subsequently rebounded after the purchase price was set in January of 1988 to levels that prevailed when Salomon Brothers issued its original fairness opinion in August 1987.

14. On August 8, 1988, AmBase completed its purchase of Carteret for $19 per share of common stock (including preferred stock that was convertible to common stock) for a total consideration of approximately $266 million.[25] The purchase price for Carteret was supported by an appraisal opinion from Kaplan Smith.[26] The facts that a willing buyer paid $266 million for Carteret, and that the purchase price was supported by other financial analysts, constitute powerful evidence of the value of Carteret just one year before the breach.

15. In addition, AmBase secured a credit agreement of $300 million from Chase Manhattan Bank in June 1988 for the specific purpose of funding the Carteret acquisition. Carteret's common stock was used as collateral for this credit agreement.[27] The fact that Chase

---

22. *Id*.

23. Appendix D, Jan. 18, 1988 (AMB068044 – AMB068045).

24. Carteret Bancorp Inc. May 18, 1988 Proxy Statement, at F-1 – F-2.

25. Carteret Bancorp, Inc., 1989 Annual Report (C-AM-A-0394532); The Home Group, Inc., 1988 Annual Report (Form 10-K) at 9 (C-AM-A-0395940); *Home Group Announces Completion of Carteret Acquisition*, PR NEWSWIRE, Aug. 8, 1988.

26. Kaplan, Smith & Associates, Inc., Acquisition Valuation: Carteret Bancorp, Inc., Morristown, New Jersey Valued as of August 8, 1988 at Table I-1 (Jan. 18, 1989) (CAM4411095) [hereinafter KAPLAN SMITH VALUATION REPORT]

27. Minutes of the Meeting of the Board of Directors of the Home Group, Inc. (May 20, 1988), at 5-6; The Home Group, Inc., Credit Agreement, Dated as of June 10, 1988, The Chase Manhattan Bank (National Association) as Agent; Letter from Bruce W. Bean, Sr. Vice President & General Counsel, The Home Group, Inc., to the Banks Party to the Credit Agreement Referred to Below & The Chase Manhattan Bank (National Ass'n.) as Agent, Aug. 8, 1988; Letter from Richard R. Butler, Vice President, Chase Manhattan Bank, N.A., & Mark S. Thorum, Director, Chase Manhattan Capital Markets Corp., to Jack R. Plaxe, Sr. Vice President, Chief Financial

Manhattan Bank specifically requested that Carteret's common stock be used as collateral for the credit agreement further substantiates that Carteret was a significantly valuable property at the time of its acquisition by AmBase, just one year before the breach. Furthermore, the fact that Chase Manhattan, in its role as a sophisticated bank that was very familiar with regulatory capital requirements, was confident to make the loan to AmBase to purchase Carteret demonstrates that there was little doubt about the health and survivability of Carteret as an institution before the breach.

16. The sales value of $266 million is a conservative estimate for the value of Carteret as of August 8, 1988 because of two obligations forced upon AmBase by the Federal Home Loan Bank Board as conditions of the merger.[28] The first obligation was a regulatory capital maintenance agreement (RCMA). As part of the RCMA, AmBase promised to infuse Carteret with up to $50 million in capital if Carteret ever fell out of compliance with its regulatory capital requirements.[29] AmBase also agreed to a limit on the dividends that Carteret could distribute.[30] This obligation is a real put option with positive value.[31] If Carteret ever fell out of compliance with its regulatory capital requirements, the government would exercise its real option to "put" the cost on to AmBase of infusing sufficient capital into Carteret. The value of this put option was relatively low at the time of the sale because the *ex ante* probability of Carteret falling out of

---

Officer, & Treasurer, The Home Group, Jan. 25, 1988; The Home Group, Inc., FSLIC Amendment No. 1 to Application H-(e) 1, at 14 (AMBNP026545); The Home Group, Inc., FHLB Application H-(e) 1, at 7 (FAM0010011).

28. Federal Home Loan Bank Board, No: 88-657, Aug. 5, 1988, at 3 (AMB009232).

29. Stipulation and Agreement, Aug. 8, 1988 (ANB009226 – ANB009229). The RCMA was amended after the merger, but AmBase was still required to provide up to $50 million in capital if Carteret's regulatory capital did not meet defined criteria. *See* Exhibit C, Regulatory Capital Maintenance/Dividend Agreement, Nov. 28, 1988 (AMBNP001430 – AMBNP001440).

30. *Id*.

31. For a primer on financial options, see JOHN HULL, OPTIONS, FUTURES, AND OTHER DERIVATIVES 6 (Prentice Hall, 6th ed. 2006). Under a put option, the seller agrees to buy back the commodity or instrument at a strike-price, which is specified in the terms of the option. *Id.* The buyer has the right, but not the obligation, to exercise the put option at the strike price. *Id.* Because the put option provides a form of price insurance to the buyer, the buyer pays a premium to the seller for the value of having the put option. *Id.*

regulatory capital compliance was low. However, the real put option eventually became valuable as the government's breach resulted in Carteret's falling out of regulatory capital compliance, and AmBase was required to contribute $50 million.[32] As a conservatism, I do not attempt to quantify the value of this put option.

17. The second regulatory requirement in the transaction was related to AmBase's sale of Imperial Premium Finance to Carteret for $65 million as part of AmBase's purchase of Carteret. To appease the Federal Home Loan Bank Board, AmBase was required to cover any potential loss on a future sale of Imperial Premium Finance through August 9, 1991.[33] Again, this requirement was a real put option with positive value. Specifically, the strike price of the option was $65 million, equal to the sale price of Imperial Premium Finance to the buyer, Carteret. If the value of Imperial Premium Finance fell below $65 million before August 9, 1991, a value that would have been revealed had Carteret attempted to sell Imperial Premium Finance before August 9, 1991, Carteret would have had the option to, in effect, sell Imperial Premium Finance back to AmBase at $65 million, with AmBase sustaining the loss in value. Ultimately, AmBase paid $12.5 million to satisfy this obligation.[34] As with the first option, I do not attempt to quantify this option. However the presence of both of these options indicates that the $266 million sales price is a conservatively low estimate of the value of Carteret as of the date of its sale to AmBase.

---

32. AmBase Corp. v. United States, 58 Fed.Cl. 32, 38 (2003).
33. Federal Home Loan Bank Board, No: 88-657, Aug. 5, 1988, at 7 (AMB009236); Agreement, Aug. 1988 (AMB009202 – AMB009203).
34. AmBase Corp. v. United States, 58 Fed.Cl. 32, 38 (2003).

**B. Carteret's Value Did Not Substantially Change Between the Time of Its Sale to AmBase and the Breach**

18. Once AmBase acquired Carteret, Carteret ceased trading as a standalone public company and became part of AmBase's portfolio of companies, which included The Home Insurance Company, Gruntal Financial Corp., USI Re, Inc., Commonwealth Insurance Company, and Sterling Forest Corporation.[35] Because market values for Carteret are not explicitly observable between the date of its sale to AmBase and the date of the breach, I estimate Carteret's market value at the time of the breach by examining any bids for Carteret during that year, the financial statements of Carteret and AmBase, the performance of other publicly-traded thrifts, and changes in value of AmBase's publicly traded common stock.

**1. In May 1989, a Bid of $252 Million Was Made to Purchase Carteret**

19. In May 1989, two former directors of Carteret, General Alexander Haig and Harry Jacobs, among others, offered to purchase Carteret for $252 million.[36] Mr. Jacobs and General Haig were intimately familiar with Carteret because Mr. Jacobs served on Carteret's board from 1984 to 1988, and General Haig was on the board from 1986 to 1988. Mr. Jacobs was the former Chairman of Prudential-Bache Securities and remained a senior officer there at the time of his bid for Carteret. As explained in my declaration of July 14, 2006, AmBase experienced a

---

35. *Home Group Announces Completion of Carteret Acquisition*, PR NEWSWIRE, Aug. 8, 1988. Carteret had $47 million in pretax earnings in 1989. AMBASE 1989 ANNUAL REPORT, at 21 (C-AM-A-0394701). The Home Insurance Company was AmBase's American insurance division and Commonwealth Insurance Company was AmBase's Canadian insurance division. Both concentrated on larger insurance policies requiring underwriting expertise. *Id*. at 11 (C-AM-A-0394691). Together they had $168 million in pretax earnings in 1989. *Id.* Gruntal Financial Corporation was AmBase's investment division, offering many of the same services as the largest investment firms. *Id*. at 27 (C-AM-A-0394707). It accounted for $14 million of AmBase's pretax earnings in 1989. *Id.* U.S. International Reinsurance Company was AmBase's treaty and facultative reinsurance division. *Id.* at 17 (C-AM-A-0394697). It had pretax earnings of $23 million. *Id.* Sterling Forest Corporation was the major real estate holding of AmBase. *Id.* at 31 (C-AM-A-0394711). The AmBase 1989 Annual Report did not report pretax earnings for Sterling Forest Corp.

36. Letter from Robert B. O'Brien, Jr., Carteret Savings Bank, to George T. Scharffenberger, AmBase Corp., Aug. 29, 1990, at 2 (KH089941).

significant negative abnormal return in late May of 1989.[37] As my declaration makes clear, this drop in valuation was causally connected to the breach. As I discuss later in this report, other events related to FIRREA had already occurred by the May 1989 bid, such that the May 1989 bid would have included some discount in accounting for the possibility of supervisory goodwill being removed from regulatory capital as a part of FIRREA. Thus, the May 1989 bid is a conservative measure of the non-breach-effected value of Carteret. In the aftermath of the negative impact on Carteret's value of the news about FIRREA, the potential acquirers modified their bid by the end of May to include only the Florida branches.[38] The modified bid was rejected.

20. The fact that a bid of $252 million was made for Carteret in the midst of uncertainty over the future treatment of supervisory goodwill demonstrates that Carteret's market value as of May 1989 would have been *greater than* $252 million but-for the breach.

### 2. Based on the Valuation Changes in Standalone Publicly Traded Thrifts, Carteret's Market Value Could Not Have Substantially Decreased Between the Date of Its Acquisition by AmBase and the Date of the Breach

21. Because market values for Carteret are not explicitly observable between the date of its sale to AmBase and the date of the breach, I estimate Carteret's market value at the time of the breach by examining the change in its book value between the date of its sale to AmBase and the breach, and the change in market-to-book ratios for other publicly-traded thrifts over the same time period.

22. As reflected in the Kaplan Smith valuation opinion produced for Carteret regarding its sale to AmBase, Carteret's book value (equal to its assets less its liabilities) was

37. Declaration of Charles W. Calomiris of July 14, 2006, at 87-89.

38. Letter from Robert B. O'Brien, Jr., Carteret Savings Bank, to George T. Scharffenberger, AmBase Corp., Aug. 29, 1990, at 2 (KH089941).

$306 million at the time of the sale, leaving Carteret with a market-to-book ratio of 0.869.[39] At that time, Carteret's assets included existing goodwill of $192.9 million—equal to 63 percent of Carteret's book value.[40]

23. Carteret's book value decreased by 11.6 percent (from $306.0 million to $270.5 million) from the time of its sale to AmBase in August 1988 to June 30, 1989, the last quarter-end date before the breach occurred with FIRREA's passage.[41] The decline in book value included a net decrease in Carteret's goodwill of $7.8 million (from $192.9 million to $185.1 million),[42] $22.867 million of dividends declared between August 8, 1988 and December 31, 1988, and $1.275 million of dividends declared in the first quarter of 1989.[43] Therefore, 90 percent of the decline in book value from July 31, 1988 to June 30, 1989 ($31.9 million of the $35.5 million) was attributable to dividend distributions and goodwill amortization. Based on Carteret's goodwill amortization schedule from August 1989, Carteret's total goodwill was amortized at a rate of $1.254 million per month in 1989.[44] Therefore, I estimate that Carteret's book value as of July 31, 1989 was equal to $269.3 million (equal to Carteret's $270.5 million book value from June 1989 minus $1.254 million in goodwill amortization).

24. The mean market-to-book ratio of the 46 thrifts with data available from Compustat as of July 31, 1988 and as of July 31, 1989 changed from 0.589 as of July 31, 1988,

---

39. KAPLAN SMITH VALUATION REPORT, *supra* note 26, at Table I-1 (CAM4411105).

40. *Id.* at Table I-1 (CAM4411104).

41. *Id.* at Table I-1 (CAM4411105); Carteret Bancorp Inc. and Subsidiary, Consolidated Statements of Financial Condition (June 30, 1989) (CAM4470985).

42. *Id*.; Carteret Savings Bank, FA, Thrift Financial Report, June 30, 1989, at Q-1 (AM050308).

43. Carteret Bancorp Inc. & Subsidiary, Consolidated Financial Statements (Dec. 31, 1989) (C-AM-A-0394516); TFR data.

44. Goodwill Amortization Schedule (Historical), August 1989 (CAM5300023). This figure includes $984,932 in monthly amortization of supervisory goodwill and $268,657 of monthly amortization of non-supervisory goodwill. Table A1 shows amortization of supervisory goodwill based on amortization schedules from August 1989 and December 1989. Table A9 shows amortization of total goodwill from those same schedules.

to 0.633 as of July 31, 1989 (an increase of 7.4 percent).[45] Carteret's market-to-book ratio as of the time of its sale to AmBase was 0.869. Assuming Carteret's market-to-book ratio increased at the same rate as the average thrift, then its market-to-book ratio would have been 0.934 as of July 31, 1989. Given my estimate of Carteret's book value of $269.3 million on July 31, 1989, and the assumption that Carteret's market-to-book ratio increased at the same rate as the average thrift, I estimate that its market value was $251.4 million (equal to $269.3 million times 0.934) on July 31, 1989, just before the breach. This market value just before the breach was only 5

45. Compustat. I define a firm in Compustat as a thrift if its NAICS code is 522120 (Savings Institutions). I define a company's market-to-book ratio in Compustat in any given month to be equal to its market value at the end of the month divided by its stockholder's equity at quarter-end for the given month. The Compustat database did not include book value data for many of the thrifts for which it contained market value data for the late 1980s and early 1990s. In order to increase the sample of thrifts in the analysis (especially for the later comparison when I only consider thrifts that existed as standalone public companies from 1989 to 2006), I supplemented the Compustat data with book value data from TFRs. The Compustat database and the TFR data do not share a common identifying variable that allows a perfect match between companies in Compustat and thrifts in the TFR data. In order to manually match observations from Compustat and the TFRs, I first identified all thrifts with month-end stock prices in every month from July 1989 to December 2006 in Compustat. I then manually matched the names and locations of those companies with the names and locations of thrifts in the TFR data. To ensure that this process did not result in any mismatches (such as matching a thrift from the TFR data to a unitary thrift holding company owning multiple thrifts from Compustat), I collected annual reports, 10-Ks, and 10-Qs for the potentially matched Compustat companies. I compared the assets and stockholders' equity from these filings with the assets and equity reported in the TFR data for 1988 and 1989. If the differences between values for both assets and stockholder's equity between the two data sources (TFR data and SEC filings) were no more than 10 percent in 1988 or 1989 for a given thrift, then I included that thrift in my sample. Therefore, if a successful match was made, and the book value for the company was not present in Compustat, I used the thrift's equity from the TFR data as the company book value when estimating market-to-book ratios. The companies for which I used TFR data in 1988 and 1989 in any market-to-book ratio analysis consisted of: Ameriana Bancorp (only 1989 TFR data used due to an acquisition in September 1988), BankUnited Financial Corp., Elmira Savings Bank FSB, FMS Financial Corp., First Financial Holdings Inc., Harleysville Savings Financial Corp., Independence Federal Savings Bank, Parkvale Financial Corp., Washington Fed Inc., Washington Savings Bank FSB, and WSFS Financial Corp. *See* Ameriana Bancorp, SEC Form 10-K, Dec. 31, 1989; Bankatlantic Financial Corp., Annual Report, Dec. 31, 1988; Bankatlantic Financial Corp., Annual Report, Dec. 31, 1989; Bankunited, A Saving Bank, Annual Report, Sept. 30, 1989; CCNB Corp., Annual Report, Dec. 31, 1988; The Elmira Savings Bank, FSB, SEC Form 10-Q, Sept. 30, 1988; The Elmira Savings Bank, FSB, SEC Form 10-Q, Sept. 30, 1989; First Financial Holdings Inc., Annual Report, Sept. 30, 1988; First Financial Holdings Inc., Annual Report, Sept. 30, 1989; FMS Financial Corp., SEC Form 10-K, Dec. 31, 1988; FMS Financial Corp., SEC Form 10-Q, June 30, 1989; Harleysville Savings Bank, PASA , Annual Report, Sept. 30, 1988; Harleysville Savings Bank, PASA, Annual Report, Sept. 30, 1989; Independence Federal Savings Bank, Annual Report, Dec. 31, 1989; Northeast Bancorp, Inc., Annual Report, Dec. 31, 1988; Parkvale Financial Corp., Annual Report, June 30, 1990; Peoples Bancorp Inc., SEC Form 10-Q, June 30, 1988; Peoples Bancorp Inc., SEC Form 10-Q, June 30, 1989; Sovereign Bancorp Inc., Annual Report, Dec. 31, 1989; Trustco Bank Corp. NY, Annual Report, Dec. 31, 1989; Washington Federal Savings & Loan Association, Annual Report, Sept. 30, 1988; Washington Federal Savings & Loan Association, Annual Report, Sept. 30, 1989; Washington Mutual Savings Bank, Annual Report, Dec. 31, 1988; The Washington Savings Bank, F.S.B., SEC Form 10-K, July 31, 1989; Washington Mutual Savings Bank, Annual Report, Dec. 31, 1989; The Washington Savings Bank, F.S.B., SEC Form 10-K, July 31, 1990; Star States Corp., SEC Form 10-Q, June 30, 1988; Star States Corp., SEC Form 10-Q, June 30, 1989.

percent lower than Carteret's market value of $266 million at the time of its acquisition by AmBase. Table 3 summarizes this calculation.

TABLE 3: CARTERET'S MARKET VALUE AS OF JULY 1989 BASED ON MARKET-TO-BOOK RATIOS OF PUBLICLY TRADED THRIFTS

| | **Dollars in Millions** | ***1988*** |
|---|---|---|
| [1] | Carteret Book Value as of 7/31/1988 | $306.0 |
| [2] | Carteret Market Value as of 7/31/1988 | $266.0 |
| [3] = [2] / [1] | Carteret Market-to-Book Ratio as of 7/31/1988 | 0.869 |
| [4] | Mean Market-to-Book Ratio for Thrifts as of 7/31/1988 | 0.589 |
| | | ***1989*** |
| [5] | Carteret Book Value as of 6/30/1989 | $270.5 |
| [6] | Goodwill Amortization from 7/1/1989 - 7/31/1989 | $1.3 |
| [7] = [5] - [6] | Carteret Book Value as of 7/31/1989 | $269.3 |
| [8] | Mean Market-to-Book Ratio for Thrifts as of 7/31/1989 | 0.633 |
| [9] = ([8] - [4]) / [4] | % Increase in Market-to-Book Ratio for Thrifts from 7/31/1988 to 7/31/1989 | 7.4% |
| [10] = [3] × (1 + [9]) | Carteret Market-to-Book Ratio as of 7/31/1989 | 0.934 |
| [11] = [5] × [10] | Carteret Market Value as of 7/31/1989 | $251.4 |

25. The estimate of Carteret's market value as of July 31, 1989, is a conservative measure of Carteret's market value at that time but-for the breach. As I explain later in this report, the market value for AmBase (and Carteret) was negatively affected by news related to FIRREA's developments in Congress in the months leading up to its eventual enactment in August 1989. Carteret was already operating in a breach-affected world in July 1989 because much of what would be in the final version of FIRREA (including the breach) was known by the market. It is difficult to determine the latest date at which Carteret's market value was not tainted by the breach. The end of July 1989 is a very conservative estimate of this date given that it is only nine days before FIRREA's enactment.

26. The estimate of Carteret's July 31, 1989 market value of $251.4 million is conservative because the decrease in Carteret's book value is largely due to the dividends paid and goodwill amortization, which are viewed by the market as favorable reasons for a decrease in book value. Although dividends decrease a firm's book value, dividend payments have been

found to have a positive effect on the market value of the firm. For example, research by Professors Amy Chang, Praveen Kumar, and K. Sivaramakrishnan of the University of Houston tested the validity of the dividend-signaling hypothesis.[46] Specifically, the dividend-signaling hypothesis states that dividends can be used to convey information about future earnings, and the authors find evidence to support this hypothesis.[47] They find that the relationship between dividend changes and future earnings is strongest for firms that have the highest marginal net benefit from signaling.[48] Therefore, to the extent that the dividends that Carteret paid were perceived by the market as a positive signal of future earnings, the valuation estimate presented above is conservative.

27. Furthermore, goodwill amortization has much less than a dollar-for-dollar effect in reducing the market value of an institution. In my previous declaration, I estimated that the market value of Carteret's supervisory goodwill would have been between $45.9 million and $49.0 million as of December 6, 1993, when the face value of goodwill would have been $128.3 million.[49] Using a similar methodology (see Appendix A), I estimate that the market value of Carteret's supervisory goodwill was between $63.3 million and $69.0 million as of August 9, 1989, when the face value of that goodwill was $169.3 million. Based on these estimates, the ratio of the market value of supervisory goodwill to the book value of supervisory goodwill was between 37.4 percent and 40.8 percent. Because a decrease in the balance of goodwill reduces book value more than market value, the market-to-book ratio will increase. In Carteret's case,

---

46. Amy Chang, Praveen Kumar & K. Sivaramakrishnan, *Dividend Changes, Cash Flow Predictability, and Signaling of Future Cash Flows* (Nov. 15, 2005), *available at* http://ssrn.com/abstract=881511.

47. *Id* at 1.

48. *Id* at 25. Firms with the highest marginal net benefit from signaling tend to be firms with relatively unpredictable cash flow. *Id.*

49. Declaration of Charles W. Calomiris of July 14, 2006, at 69-84, 108-113.

goodwill amortization (supervisory and non-supervisory) accounted for $7.8 million of the $35.5 million decrease in book value between July 1988 and July 1989.

28. Approximately 90 percent of the reduction in Carteret's book value from July 1988 to June 1989 was attributable to dividends and goodwill amortization. Reductions in book value due to dividend payments and goodwill amortization have much less than a dollar-for-dollar effect on market values. Indeed, given the positive signaling effects of dividend payments, reductions in book value experienced by Carteret from July 1988 to July 1989 could have increased its market value. Furthermore, because the mean market-to-book ratios for all other thrifts increased from July 1988 to July 1989, and because that mean is depressed by the negative effects of the breach on many of those other thrifts, it is reasonable to assume that Carteret's market-to-book ratio also increased over this time span, resulting in a market value in a but-for world at the time of the breach that could not have been substantially lower than Carteret's market value at the time it was acquired by AmBase, and arguably would have been higher.

### 3. AmBase's Stock Price Movements Are Correlated with News Relating to the Evolution of FIRREA Before Its Passage

29. Between the date of AmBase's acquisition of Carteret on August 8, 1988, and the date of FIRREA's passage on August 9, 1989, AmBase's stock price increased from $13.00 to $15.625—an increase of 20.2 percent.[50] However, as events unfolded regarding the evolution of FIRREA through Congress, the market reaction to those events can be seen in negative movements in AmBase's stock.

30. FIRREA passed the House of Representatives on June 15, 1989, and the Senate on June 21, 1989, but in the weeks leading up to its passage, there was substantial uncertainty

50. CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006.

about whether FIRREA would pass and what provisions it would contain. During the spring of 1989, as Congress debated FIRREA, the thrift regulators, thrifts potentially affected by FIRREA, and market participants responded to its prospective passage. The costliness of FIRREA to thrifts that maintained supervisory goodwill depended not only on whether supervisory goodwill would be phased out but on the details of how such a phaseout would be enforced. Those details, in turn, were not known in advance but rather evolved during the Congressional debate.

31. Tracking what exactly constitutes news is difficult given all the different legislative proposals put forth while FIRREA was debated in Congress. In addition, news events close to the date of a bill's passage are often less significant signals to the market than earlier events because much of the uncertainty over what the bill will include has been removed through earlier debates.

32. An important example of one of these earlier debates that had a material impact on the final provisions of FIRREA was an amendment offered by Congressman Henry Hyde ("Hyde amendment") on May 24, 1989 in the House Judiciary Committee.[51] Had it passed, this amendment would have required a lengthy regulatory review process before an institution could be prevented from counting supervisory goodwill towards regulatory capital. As reported on the front page of the New York Times, this amendment was defeated on May 24 by a 17-17 tie as FIRREA passed through the House Judiciary Committee on its way to the floor.[52]

33. In my earlier declaration, I examined the negative effects on AmBase's stock of the increased expectation of the elimination of supervisory goodwill based on the beginning of an OTS examination report on May 22, 1989 and the defeat of the Hyde amendment on May 24,

---

51. Matt Yancey, *Some House GOP Members Want S&L Bill Changes*, ASSOCIATED PRESS, May 23, 1989; Kathleen Day, *S&L Supporters Plan Offensive To Retain 'Goodwill' as Capital*, WASH. POST, May 24, 1989, at F1.

52. Nathaniel C. Cash, *Some in G.O.P. Deserting Bush On Savings Plan*, N.Y. TIMES, May 25, 1989, at A1.

1989.[53] The defeat of the Hyde amendment occurred early enough in the development of FIRREA that it constituted important news about what would be included in the final legislation. As I discussed in my earlier declaration, the narrow defeat of this amendment was a significant negative signal to the market about the increased risk posed by the legislation. Table 4 shows the cumulative abnormal returns of AmBase over the one, three, five, seven, and eleven-day windows surrounding the defeat of the Hyde amendment on May 24, 1989.[54]

TABLE 4: CUMULATIVE ABNORMAL RETURNS FOR AMBASE FOR DEFEATED HYDE AMENDMENT

| Event Window Around May 24, 1989 | Cumulative Abnormal Daily Stock Returns | Z-Statistic | (Cumulative Abnormal Return) x (Market Value on Day Preceding Event Window) |
|---|---|---|---|
| 1-Day | –1.3% | –0.75 | –$5.6 million |
| 3-Day | –6.8%** | –2.09 | –$30.2 million |
| 5-Day | –7.5%* | –1.70 | –$33.6 million |
| 7-Day | –10.0%* | –1.88 | –$45.1 million |
| 11-Day | –10.2% | –1.52 | –$47.0 million |

*Note*: * Significant at 10 percent level ; ** Significant at 5 percent level; *** Significant at 1 percent level.
*Sources*: Federal Reserve Statistical Release H.15, 30-year Treasury constant maturities (nominal); CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006.

As Table 4 shows, AmBase experienced a negative abnormal return of –1.3 percent (a $5.6 million reduction in market value) on the date of the defeated Hyde amendment. In the eleven-day window around May 24, AmBase experienced a negative abnormal return of –10.2 percent (a $47.0 million reduction in market value). To account for any subsequent news about FIRREA's evolution prior to its passing the House of Representatives that likely affected AmBase's market value, I also considered an expanded event window that began on May 15 and ended on June 15, 1989 (the day FIRREA passed the House of Representatives). Cumulative abnormal returns over this extended window totaled –8.6 percent, implying a loss of value of $40.0 million.[55]

53. Declaration of Charles W. Calomiris of July 14, 2006, at 85-89.
54. I discussed the methodology for estimating these abnormal returns in my earlier declaration. *Id*.
55. *Id*. at 88.

34. In spite of all the negative effects of FIRREA, the market did not believe that Carteret faced a significant risk of failing because of the high value associated with Carteret's franchise. In addition, general economy trends were important. Both the stock market as a whole and the thrift industry were increasing in value between the time of AmBase's merger with Carteret and the date of the breach, as shown in Figure 2.

FIGURE 2: AMBASE STOCK RETURNS VERSUS S&P 500 AND SNL THRIFT INDEX RETURNS




*Sources*: CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006; SNL Securities Database; Yahoo! Finance.

As Figure 2 shows, AmBase's cumulative return from August 8, 1988 to the date that FIRREA was enacted was not substantially different from the cumulative returns in the S&P 500 and the cumulative returns in the SNL Thrift Index, a stock index of thrifts maintained by SNL Financial. Figure 2 shows the substantial decline in AmBase's stock price relative to the S&P 500 around the date of the defeat of the Hyde amendment. By the time FIRREA passed in August 1989, AmBase's stock price had recovered to its earlier levels. However, soon after

FIRREA passed, both AmBase and the thrift industry as a whole substantially declined relative to the S&P 500 as the market reacted to the ramifications from FIRREA. The fundamental values of AmBase and Carteret were rising over time, but FIRREA more than negated that historical rise in value for Carteret and other similarly situated thrifts as the bill was developed in Congress and in the months and years after its enactment.

### C. Carteret's Market Value Was a Reflection of its Discounted Future Cash Flows, Whereas Its Undiscounted Future Cash Flows Net of Dividends from August 9, 1989 through 2008 But-For the Breach Would Have Been $406.9 Million

35. The market value of Carteret on any particular date represents the expected future profits of the bank discounted back to present value as of that date. Legal counsel has instructed me not to compute compound interest on but-for cash flow damages occurring prior to the time of trial. Accordingly, I calculate the expected annual non-compounded profits implied by Carteret's market valuation. In Appendix A, I estimate Carteret's cost of capital to be between 12.34 percent and 13.40 percent as of August 9, 1989. To perform the calculation of Carteret's undiscounted cash flows, I have assumed the lower discount rate of 12.34 percent. This assumption is conservative, especially in light of the fact that AmBase issued $150 million in 14-7/8 percent senior subordinated notes in June 1988.[56] A higher cost of capital would lead to a higher estimate of undiscounted cash flows. Furthermore, for simplicity, I have assumed a stabilized earnings growth path over time, and I have assumed that earnings in the first year after the breach would have been equal to Carteret's average net income between 1982 and 1988—$20.5 million—as shown in Table 5.

56. The Home Group, Inc., Quarterly Report (Form 10-Q), at 8 (CAM4150081).

TABLE 5: CARTERET'S NET INCOME, 1982 - 1988

| Fiscal Year ended September 30: | Net Income ($Million) |
|---|---|
| 1982 | (23.228) |
| 1983 | 34.809 |
| 1984 | 7.521 |
| 1985 | 25.222 |
| 1986 | 46.091 |
| 1987 | 33.417 |
| 1988 | 19.988 |
| Average | 20.546 |

*Sources*: Carteret Savings & Loan Association, F.A., Annual Report 1984, at 26 (AMB029992); Carteret Savings & Loan Association, F.A., Annual Report 1985, at 21 (AMB030079); Carteret Bancorp, Inc., Annual Report 1987, at 1 (C-AM-A-0056662); Carteret Bancorp Inc. and Subsidiary, FHLB Docket #02-4702, Consolidated Financial Statements, Sept. 30, 1988, at 3 (AMB013962).

The estimate of $20.5 million in net income in the first year following the breach is conservative in light of the actual net income of $43.0 million for the year ending December 31, 1989, and because the average is depressed due to the negative earnings in 1982.[57]

36. Given (1) my estimate of the market value of Carteret of $251.4 million as of the date of the breach when using the increase in market-to-book ratios for other thrifts, (2) the discount rate of 12.34 percent, and (3) but-for earnings in the first year after the breach of $20.5 million, I calculate the implied stabilized annual growth rate in earnings to be 4.2 percent.[58] Again, this is a conservative assumption; profits in the banking industry have reached historic highs over the last 15 years.[59] Next, I assume that Carteret would have paid out 31.7 percent of its earnings each year in dividends. This ratio is equal to the mean annual dividend payout ratio

---

57. Carteret Bancorp, Inc., 1989 Annual Report (C-AM-A-0394515).

58. I estimate the stabilized growth rate by using the Gordon model of a constantly growing perpetuity, $P_0 = \dfrac{E_1}{i-g}$, where $P_0$ is the market value of the institution at time 0, $E_1$ is the earnings in year 1, $i$ is the discount rate, and $g$ is the stabilized annual growth rate in earnings.

59. One may argue that the initial annual earnings of approximately $20 million are aggressive in light of Carteret's actual net losses of $160.25 million in 1991 and $131.84 million in 1990. *See* Carteret Savings Bank FA, 1991 Annual Report, at 2 (KH053774). However, those losses are breach-affected. For example, Carteret took provisions for losses on loans and real estate of $122.349 million in 1990 and $171.634 million in 1991. *Id*. As I discuss later in this report, those writedowns were made as part of an aggressive effort by Carteret to raise capital from outside investors—capital that Carteret needed to raise as a direct result of not being able to treat supervisory goodwill as regulatory capital. In any event, as the commercial real estate market in the Northeast rebounded, many of these provisions for loan losses could have been reversed.

for all publicly traded thrifts with data available in Compustat from August 1989 through December 2006.[60] Therefore, the undiscounted earnings from August 9, 1989 to December 31, 2008 are equal to $595.6 million. Table 6 summarizes projected earnings, projected dividends, and annual earnings net of dividend distributions. In summary, the market value of Carteret as of August 9, 1989 implies a conservatively estimated earnings stream that would have delivered $188.7 million of dividends plus $406.9 million of accumulated retained earnings for Carteret over the period from August 9, 1989 to December 31, 2008. Those accumulated retained earnings of $406.9 million would have substantially increased the value of the bank's book capital. The book value of Carteret at the end of 2008 would have been equal to the book value as of the breach, less amortized goodwill through the end of 2008, plus the earnings retained from the time of the breach through the end of 2008. This book value at the end of 2008 would have been equal to $493.7 million. Stockholders of Carteret, in the but-for world, would have received the $188.7 million of dividend payments and would have retained an ownership interest in the surviving bank. On a non-compounded book-value basis, $595.6 million would be an estimate of damages based on a 2008 book value. But damages should be calculated on a market value basis, and market values remain above book values during the relevant period. In my subsequent analysis, I take market value appreciation into account in calculating damages. A

60. To estimate the mean, I collect each monthly observation of thrifts in Compustat with data available for the thrift's annual dividend payout ratio. I then calculated the mean of these annual dividend payout ratios across all thrifts in Compustat and all months from August 1989 to December 2006. I use December 2006 as the latest date throughout my report because it is the latest date for which almost all companies had results reported in Compustat at the time of the writing of this report. I also estimated the mean dividend payout ratio to be 29.5 percent for thrifts that survived as standalone thrifts with stock price data available for every month between July 1989 and December 2006. I estimated the mean dividend payout ratio to be 23.9 percent for thrifts that survived as standalone thrifts with market-to-book ratio data available for every month between July 1989 and December 2006. Note that when institutions distribute a higher share of earnings as dividends, book values are lower and the institution does not have the chance to use those retained earnings to grow the institution. Furthermore, because of the legal restrictions on compounding interest in computations of damages, dividends, once paid, do not accrue interest in the damages calculation. Therefore, the high dividend payout ratio assumption of 31.7 percent is conservative.

proper measure of damages due in 2008 would include the sum of dividends received in the but-for world that were not received in the actual world through 2008, and the 2008 but-for market value of the bank.

TABLE 6: BUT-FOR UNDISCOUNTED CASH FLOWS FROM AUGUST 9, 1989 TO DECEMBER 31, 2008

| Period | Net Income (Million $) [A] | Dividends Distributed (Million $) [B] = 31.6% × [A] | Cash Flows Net of Dividends (Million $) [C] = [A] – [B] |
|---|---|---|---|
| 8/9/1989 - 8/8/1990 | $20.5 | $6.5 | $14.0 |
| 8/9/1990 - 8/8/1991 | $21.4 | $6.8 | $14.6 |
| 8/9/1991 - 8/8/1992 | $22.3 | $7.1 | $15.2 |
| 8/9/1992 - 8/8/1993 | $23.2 | $7.4 | $15.9 |
| 8/9/1993 - 8/8/1994 | $24.2 | $7.7 | $16.5 |
| 8/9/1994 - 8/8/1995 | $25.2 | $8.0 | $17.2 |
| 8/9/1995 - 8/8/1996 | $26.2 | $8.3 | $17.9 |
| 8/9/1996 - 8/8/1997 | $27.3 | $8.7 | $18.7 |
| 8/9/1997 - 8/8/1998 | $28.5 | $9.0 | $19.5 |
| 8/9/1998 - 8/8/1999 | $29.7 | $9.4 | $20.3 |
| 8/9/1999 - 8/8/2000 | $30.9 | $9.8 | $21.1 |
| 8/9/2000 - 8/8/2001 | $32.2 | $10.2 | $22.0 |
| 8/9/2001 - 8/8/2002 | $33.5 | $10.6 | $22.9 |
| 8/9/2002 - 8/8/2003 | $34.9 | $11.1 | $23.9 |
| 8/9/2003 - 8/8/2004 | $36.4 | $11.5 | $24.9 |
| 8/9/2004 - 8/8/2005 | $37.9 | $12.0 | $25.9 |
| 8/9/2005 - 8/8/2006 | $39.5 | $12.5 | $27.0 |
| 8/9/2006 - 8/8/2007 | $41.1 | $13.0 | $28.1 |
| 8/9/2007 - 8/8/2008 | $42.8 | $13.6 | $29.3 |
| 8/9/2008 - 12/31/2008* | $17.7 | $5.6 | $12.1 |
| Total 8/9/1989 – 12/31/2008 | $595.6 | $188.7 | $406.9 |
| | | | |
| 8/9/2006 - 12/31/2006 | $16.3 | $5.2 | $11.2 |
| Total 8/9/1989 – 12/31/2006 | $510.2 | $161.6 | $348.6 |

*Note*: * For the final partial periods, August 9, 2008 to December 31, 2008 and August 9, 2006 to December 31, 2006, I assume that net income is distributed evenly throughout the year.

## D. But-For the Breach, Carteret's Value Can Be Estimated Based on the Performance and Growth of the Thrift Industry

### 1. The Growth in Market Values of the Thrift Industry

37. The market value of any firm represents a discounted prediction of the firm's future cash flows. The market's predictions of Carteret's future profitability in 1988 and 1989 were, with the benefit of hindsight, unduly conservative if the breach had not caused Carteret to

fail. The fourteen years following Carteret's failure has been a golden era of banking growth and profitability. Standard stock market indices for banks and thrifts reflect the significant profits generated during this period. For example, Standard & Poor's (S&P's) index of savings and loan (S&L) companies increased from 59.31 on August 9, 1989, to 207.75 on December 31, 2001 (the last date on which S&P published an S&L index)—a 250 percent increase. Since the end of 2001, an S&L index compiled by Bloomberg has increased by an additional 82 percent through December 2006. Combined, these two indices show that the market value for savings and loans increased by 537 percent from August 9, 1989 to December 31, 2006. Figure 3 shows the changes of these two indices, in addition to other savings and loan indices, the Nasdaq Bank Index (which contains securities of Nasdaq-listed banks and thrifts), and the stock prices for Carteret and AmBase from 1986 through 2006.

FIGURE 3: INDICES OF U.S. SAVINGS & LOANS AND BANKS AND THE STOCK PRICES FOR CARTERET & AMBASE
1986-2006




*Note*: Indices normalized to 100 as of December 31, 1999.
*Sources*: Bloomberg; Compustat; Dow Jones Indexes; CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006; SNL Securities Database; Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (2002 ed.) at 314-315; Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (1998 ed.), at 296-297; Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (1992 ed.), at 105; Yahoo! Finance (http://finance.yahoo.com/).

As Figure 3 shows, all of the savings and loan indices track each other very closely, whereas the Nasdaq Bank Index has lagged slightly behind the savings and loan indices. Table 7 summarizes the increases in market value of these indices through December 2006, and what Carteret's market value would have been had it tracked these indices from the end of July 1989, based on an assumed market value of $251.4 million as of July 31, 1989.

TABLE 7: CARTERET'S BUT-FOR MARKET VALUE GIVEN THE INCREASES IN THRIFT & BANK INDICES FROM JULY 1989 TO DECEMBER 2006

| Method | Aggregate % Increase | But-For Carteret Market Value as of Dec. 31, 2006 (Million $) |
|---|---|---|
| SNL Thrift Index from 7/31/1989 to 12/31/2004;<br>Russell 3000 U.S. S&L Index from 12/31/2004 to 12/31/2006 | 820.9% | $2,315.3 |
| SNL Thrift Index from 7/31/1989 to 12/31/1991;<br>Nasdaq Bank Index from 12/31/1991 to 12/31/2006 | 612.1% | $1,790.3 |
| S&P U.S. S&L Index from 7/31/1989 to 12/31/2001;<br>Russell 3000 U.S. S&L Index from 12/31/2001 to 12/31/2006 | 670.6% | $1,937.5 |
| S&P U.S. S&L Index from 7/31/1989 to 12/31/2001;<br>Bloomberg U.S. S&L Index from 12/31/2001 to 12/31/2006 | 553.7% | $1,643.7 |
| Average of All Indices from Figure 3 from 7/31/1989 to 12/31/2006 | 581.7% | $1,713.9 |

*Sources*: Bloomberg; Compustat; CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006; SNL Securities Database; Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (2002 ed.) at 314-315; Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (1998 ed.), at 296-297; Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (1992 ed.), at 105; Yahoo! Finance (http://finance.yahoo.com/).

Had Carteret's market value simply tracked the SNL Thrift Index from the end of July 1989, just before the breach, through 2004, and then tracked the Russell 3000 S&L index through December 2006, Carteret's market value would have been $2.315 billion, based on my estimate of Carteret's market value of $251.4 million on July 31, 1989. If, instead, Carteret's market value tracked the S&P U.S. S&L Index from the end of July 1989, just before the breach, through 2001, and then tracked the Bloomberg U.S. S&L index through December 2006, Carteret's market value would have been $1.644 billion. If Carteret's market value had tracked the average index value of all the indices shown in Figure 3, Carteret's market value would have been $1.714 billion as of the end of December 2006.

### 2. The Growth in Book Values and Market-to-Book Ratios of the Thrift Industry

38. An alternative approach to estimating the but-for value of Carteret is to estimate Carteret's but-for book value, and apply an industry market-to-book ratio. Table 8 shows how

book values and market-to-book ratios changed for thrifts between July 1989 and December 2006. In Table 8, I apply the rates of change in those variables to Carteret's values for those variables as of the breach to estimate Carteret's but-for market value as of December 2006.[61]

TABLE 8: BOOK VALUES AND MARKET-TO-BOOK RATIOS OF ALL THRIFTS IN JULY 1989 AND DECEMBER 2006

| | Equal Weight | | | Market Value Weight | | |
|---|---|---|---|---|---|---|
| | July 31, 1989 (Obs=49) | Dec. 31, 2006 (Obs=175) | % Change | July 31, 1989 (Obs=49) | Dec. 31, 2006 (Obs=175) | % Change |
| Mean Book Value (Million $) | 269.6 | 475.0 | 76% | 1,250.4 | 10,758.0 | 760% |
| Mean Market-to-Book Ratio | 0.627 | 1.553 | 148% | 1.023 | 1.815 | 77% |
| But-For Carteret Book Value (Million $) | 269.3 | 474.4 | | 269.3 | 2,316.7 | |
| But-For Carteret Market-to-Book Ratio | 0.934 | 2.313 | | 0.934 | 1.657 | |
| But-For Carteret Market Value (Million $) | 251.4 | 1,097.3 | | 251.4 | 3,839.2 | |

*Note*: Market-to-book ratio is defined as the market value of the thrift divided by the stockholder's equity for the given quarter. For each date, the sample consists of all firms with both stockholders' equity and market value data available from Compustat, with TFR data supplemented as discussed above. I define a company in Compustat as a thrift if its NAICS code is 522120 (Savings Institutions). Equal-weighted measures indicate that each thrift is treated equally when the mean is calculated. Market value weighted measures indicate that the thrifts are weighted by their market values when calculating means. Therefore, thrifts with higher market values have a greater impact on the mean than thrifts with lower market values.
*Sources*: Compustat; TFR data.

As Table 8 shows, between July 31, 1989, just before the breach, and December 31, 2006, the mean market-to-book ratio for all thrifts changed from 0.627 to 1.553, and the mean book value

61. The Compustat database did not include book value data for many of the thrifts for which it contained market value data for the late 1980s and early 1990s. In order to increase the sample of thrifts in the analysis (especially for the later comparison when I only consider thrifts that existed as standalone public companies from 1989 to 2006), I supplemented the Compustat data with book value data from TFRs. The Compustat database and the TFR data do not share a common identifying variable that allows a perfect match between companies in Compustat and thrifts in the TFR data. In order to manually match observations from Compustat and the TFRs, I first identified all thrifts with prices in every month from July 1989 to December 2006. I then manually matched the names and locations of those companies with the names and locations of thrifts in the TFR data. To ensure that this process did not result in any mismatches (such as matching a thrift from the TFR data to a unitary thrift holding company owning multiple thrifts from Compustat), I collected annual reports, 10-Ks, and 10-Qs for the matched Compustat companies. I compared the assets and stockholders' equity from these filings with the assets and equity reported in the TFR data for 1989. If the differences between values for both assets and stockholder's equity between the two data sources (TFR data and SEC filings) were no more than 10 percent in 1989 for a given thrift, then I included that thrift in my sample. Therefore, if a successful match was made, and the book value for the company was not present in Compustat, I used the thrift's equity from the TFR data as the company book value when estimating market-to-book ratios.

increased from $269.6 million to $475.0 million. However, the mean book values and mean market-to-book ratios in 2006 are biased downward by the presence of new entrants. New entrants are smaller than established thrifts, and therefore tend to depress implied growth in book values. In addition, new entrants tend to have lower market-to-book ratios than existing thrifts.

39. A potential drawback with using industry averages to estimate Carteret's book value in 2006 relates to the fact that goodwill constituted a significant portion of Carteret's book value at the time of the breach. This goodwill would have amortized by between $9.2 million and $12.1 million per year, depending on the year, through 2006.[62] Most of the thrifts in the sample of publicly traded firms in Table 8, however, had much less goodwill than Carteret. The mean ratio of goodwill to book value for all thrifts other than Carteret in June 1989 was 21.4 percent, whereas Carteret's ratio of goodwill to book value was 70.0 percent.[63] Therefore, Carteret's book value would have decreased in a but-for world faster than the average publicly-traded thrift's book value vis-à-vis the amortization of goodwill.

40. To account for this discrepancy in goodwill amortization between Carteret and other publicly-traded thrifts, I present an alternative method of estimating Carteret's book value as of December 31, 2006. I assume that Carteret's book value would decrease by the amount of amortized goodwill between July 31, 1989 and December 31, 2006 ($175.0 million based on the August 1989 and December 1989 amortization schedules and using straight-line amortization to

62. Goodwill Amortization Schedule (Historical), August 1989 (CAM5300023). As of the end of August 1989, Carteret carried a goodwill balance for nine separate acquisitions. The goodwill for North Jersey was scheduled to be completely amortized in 1991. *Id*. The goodwill for Amerifirst and Largo was scheduled to be completely amortized in 1994. *Id*. The goodwill for Freedom was scheduled to be amortized in 2001. *Id*. The supervisory goodwill for Barton and Delray was scheduled to be completely amortized in 2007. *Id*. The supervisory goodwill for Mountain Security and Blacksburg, and the goodwill for Admiral Builders, was scheduled to be completely amortized in 2011. *Id*.

63. TFR data.

estimate the goodwill amortized from July 31, 1989 to August 31, 1989).[64] I then assume that the retained earnings from August 9, 1989 to December 31, 2006 that I estimated in Table 6 ($348.6 million) would have been added to Carteret's book value. This calculation results in a but-for book value for Carteret of $442.9 million as of December 31, 2006 (equal to $269.3 million of book value in July 1989, minus $175.0 million of goodwill amortization, plus $348.6 million of retained earnings). Finally, I estimate Carteret's but-for market value as of the end of 2006 using the same market-to-book ratios estimated in Table 8, where I assumed that Carteret's market-to-book ratio would have increased from July 1989 to December 2006 at the same rate as the average market-to-book ratio for all thrifts. Table 9 summarizes the calculations.

TABLE 9: BOOK VALUES AND MARKET-TO-BOOK RATIOS OF ALL THRIFTS IN JULY 1989 AND DECEMBER 2006, ADJUSTED FOR GOODWILL & RETAINED EARNINGS

| | Equal Weight | | | Market Value Weight | | |
|---|---|---|---|---|---|---|
| | July 31, 1989 (Obs=49) | Dec. 31, 2006 (Obs=175) | % Change | July 31, 1989 (Obs=49) | Dec. 31, 2006 (Obs=175) | % Change |
| Mean Market-to-Book Ratio | 0.627 | 1.553 | 148% | 1.023 | 1.815 | 77% |
| But-For Carteret Book Value without Goodwill (Million $) | 269.3 | 442.9 | | 269.3 | 442.9 | |
| But-For Carteret Market-to-Book Ratio without Goodwill | 0.934 | 2.313 | | 0.934 | 1.657 | |
| But-For Carteret Market Value (Million $) without Goodwill | 251.4 | 1,024.4 | | 251.4 | 733.9 | |

*Sources*: Compustat; TFR data.

As Table 9 shows, Carteret's but-for market value at the end of 2006 would have been $1.024 billion (using the increase in the equal-weighted mean market-to-book ratios for all thrifts) or $733.9 million (using the increase in market value-weighted mean market-to-book ratios for all thrifts). The market value-weighted results in Table 9 are significantly lower than the corresponding result in Table 8 ($3.839 billion). In Table 8, I increased Carteret's book value by the increase in weighted average mean book values for the industry. This weighted average gave

64. Goodwill Amortization Schedule (Historical), August 1989 (CAM5300023).

more importance to larger thrifts, resulting in a but-for book value for Carteret of $2.3 billion. In Table 9, however, I adjust Carteret's book value for the market value-weighted calculations in the same manner that I adjust Carteret's book value for the equal-weighted calculations.

41. The adjustments I make to Carteret's July 1989 book value to estimate its December 2006 book value are conservative. Based on the stock returns in the thrift industry throughout the 1990s and 2000s as depicted in Figure 3, projected earnings in 1989 (as implied by the market value of thrifts) were lower than actual earnings. Therefore, using projected earnings, as I do when estimating the retained earnings to add to Carteret's book value, is conservative.

42. In addition, my estimate of Carteret's but-for market-to-book ratio at the end of 2006 is conservative because Carteret would have exchanged tangible capital (retained earnings) for goodwill capital during the period between July 1989 and December 2006. Tangible capital has a greater market value than goodwill capital. For example, based on my estimates of the market value of goodwill from earlier in this report, the market value of Carteret's goodwill was between $63.3 million and $69.0 million as of the date of the breach. If I assume that the market value of goodwill as of the end of July 1989 was equal to the average of these two estimates, then the market value of Carteret's other assets net of liabilities *without* its goodwill was equal to $185.3 million (equal to $251.4 million for the entire company's market value minus $66.2 million in goodwill market value). Without goodwill, Carteret's market-to-book ratio was 2.164 as of July 31, 1989 (equal to $185.3 million divided by $85.6 million); whereas the market-to-book ratio of Carteret's supervisory goodwill at that time was between 0.374 and 0.408—less than 20 percent of Carteret's market-to-book ratio without goodwill. As a conservatism, however, I do not attempt to adjust the market-to-book ratio in Table 9 to account for this capital

exchange. In reality, there would be an upward adjustment in Carteret's but-for market-to-book ratio to account for the replacement of goodwill capital with tangible capital.

## E. But-For the Breach, Carteret's Value Can Be Estimated Based on the Performance and Growth of Comparable Institutions that Survived FIRREA

### 1. The Growth in Market Values of Comparable Institutions that Survived FIRREA

43. The previous section estimated Carteret's value based on the performance of the broad thrift industry. The sample of thrifts used included thrifts that eventually merged with other institutions, or failed, and new thrifts that were born after FIRREA. However, Carteret may be more appropriately compared to those thrifts that existed at the time of FIRREA and survived through the present. Figure 4 shows the performance of all the publicly traded thrifts in Compustat that existed at the time of FIRREA, and remained in existence as publicly traded thrifts through December 2006.

FIGURE 4: MEAN CUMULATIVE STOCK RETURN OF THRIFTS THAT WERE PUBLICLY TRADED FROM JULY 1989 THROUGH DECEMBER 2006




*Note*: The Equal-Weighted Return Index is calculated by estimating the mean cumulative return since July 1989 in each month for the 32 thrifts in Compustat with stock price data available for every month from July 1989 through December 2006, and normalizing to 100 in July 1989. The Market Value-Weighted Return Index is calculated by estimating the mean cumulative return since July 1989 for the 32 thrifts in each month, weighted by the thrifts' market values from Compustat in the given month. If market values were missing for a thrift in a given month in Compustat, then I calculated the thrift's market value by multiplying the thrift's stock price by its number of common shares outstanding in that month. If the number of common shares outstanding was also missing, I used the average of the number of common shares outstanding from the last date available before the given month and the number of common shares outstanding from the first date available after the given month.
*Source*: Compustat.

As Figure 4 shows, the value indices for the 32 thrifts that were publicly traded from July 1989 through December 2006 rose from the level of 100 to levels of 1,296 and 1,869. Table 10 shows Carteret's but-for market value as of December 2006 if Carteret's market value had increased as the same rate as the indices of thrifts shown in Figure 4.

TABLE 10: BUT-FOR MARKET VALUE OF CARTERET BASED ON THRIFTS THAT WERE PUBLICLY TRADED FROM JULY 1989 TO DECEMBER 2006

| | Equal Weighted Average Return | Market Value Weighted Average Return |
|---|---|---|
| Index Value on 7/31/1989 | 100.0 | 100.0 |
| Index Value on 12/31/2006 | 1,296.1 | 1,869.0 |
| Carteret Estimated Market Value on 7/31/1989 (Million $) | 251.4 | 251.4 |
| But-for Carteret Market Value on 12/31/2006 (Million $) | 3,258.6 | 4,699.2 |

As Table 10 shows, Carteret's but-for market value as of December 2006 would have been between $3.2 billion and $4.7 billion if its stock had increased at a similar rate as the stocks of other thrifts that were publicly traded from the time of the breach to December 2006. If Carteret had only increased at the same rate as the thrifts at the bottom quartile of this sample, it would have increased by 586 percent between July 1989 and December 2006. Even if Carteret had only increased at the same rate as the thrifts at the bottom decile of this sample, it would have increased by 457 percent between July 1989 and December 2006. Therefore, even if I use my *lowest* estimate of Carteret's market value as of July 1989 ($251.4 million), and if I assume that it had only increased at the same rate as the bottom decile of standalone publicly traded thrifts, Carteret's market value still would have increased from $251.4 million to $1.4 billion from July 1989 to December 2006.

**2. The Growth in Book Values and Market-to-Book Ratios of Comparable Institutions that Survived FIRREA**

44. Table 12 shows how book values and market-to-book ratios changed between July 1989 and December 2006 for the nine thrifts with data available for those dates in Compustat, with supplemental data on those nine thrifts for book values taken from TFRs where I could match a thrift from the TFR database to a company from Compustat. Table 11 summarizes some characteristics of these nine companies that survived FIRREA and remained standalone companies as of the end of 2006.

TABLE 11: CHARACTERISTICS OF THE NINE SURVIVORS AS OF JULY 31, 1989

| Name | State | Book Value | Goodwill's Share of Book Value | Market-to-Book Ratio |
|---|---|---|---|---|
| FIRSTFED FINANCIAL CORP/CA | California | 126.738 | 1.5% | 1.304 |
| AMERIANA BANCORP | Indiana | 35.673 | 5.4% | 0.619 |
| BANKUNITED FINANCIAL CORP | Florida | 9.874 | 0.0% | 0.471 |
| FIRST FINANCIAL HOLDINGS INC | South Carolina | 53.994 | 0.0% | 0.921 |
| PARKVALE FINANCIAL CORP | Pennsylvania | 32.062 | 2.8% | 0.663 |
| WSFS FINANCIAL CORP | Delaware | 87.285 | 0.0% | 0.677 |
| WASHINGTON SVGS BANK F S B | Maryland | 11.392 | 0.0% | 0.211 |
| ELMIRA SVGS BANK FSB/NY | New York | 12.150 | 0.0% | 0.460 |
| DOWNEY FINANCIAL CORP | California | 229.890 | 4.5% | 1.264 |

*Sources*: Compustat; TFR Data.

As Table 11 shows, each of the surviving thrifts had little or no goodwill balances. As I discussed above, using market-to-book ratios for a sample of thrifts with little to no goodwill to estimate Carteret's but-for market-to-book ratio is extremely conservative.

45. Table 12 shows Carteret's but-for market value as of the end of 2006 assuming that Carteret's book value and market-to-book ratios would have increased from their pre-FIRREA levels at a similar rate as the rate of increase of the book values and market-to-book ratios of these nine thrifts. This table is analogous to Table 8, in which I did not restrict the sample to surviving standalone thrifts throughout the July 1989 to December 2006 period. In addition to examining the means of the increases in book values and market-to-book ratios in Table 12, I also include medians of these measures. Because this sample of surviving thrifts is small, outliers can affect the means.

TABLE 12: BOOK VALUES AND MARKET-TO-BOOK RATIOS FOR THRIFTS WITH DATA AVAILABLE IN BOTH JULY 1989 AND DECEMBER 2006

| | Equal Weight | | | Market Value Weight | | |
|---|---|---|---|---|---|---|
| | July 31, 1989 (Obs=9) | Dec. 31, 2006 (Obs=9) | % Change | July 31, 1989 (Obs=9) | Dec. 31, 2006 (Obs=9) | % Change |
| Mean Book Value (Million $) | 66.6 | 392.9 | 490% | 156.6 | 857.6 | 448% |
| Median Book Value (Million $) | 35.7 | 188.0 | 427% | | | |
| Mean Market-to-Book Ratio | 0.732 | 1.579 | 116% | 1.130 | 1.586 | 40% |
| Median Market-to-Book Ratio | 0.663 | 1.442 | 117% | | | |
| But-For Carteret Book Value Using Mean (Million $) | 269.3 | 1,589.6 | | 269.3 | 1,474.7 | |
| But-For Carteret Book Value Using Median (Million $) | 269.3 | 1,419.0 | | | | |
| But-For Carteret Market-to-Book Ratio Using Mean | 0.934 | 2.014 | | 0.934 | 1.310 | |
| But-For Carteret Market-to-Book Ratio Using Median | 0.934 | 2.031 | | | | |
| But-For Carteret Market Value Using Mean (Million $) | 251.4 | 3,202.0 | | 251.4 | 1,932.1 | |
| But-For Carteret Market Value Using Median (Million $) | 251.4 | 2,881.6 | | | | |

*Note*: Market-to-book ratio is defined as the market value of the thrift divided by the stockholder's equity for the given quarter. For each date, the sample consists of all firms with both stockholders' equity and market value data available for both June 1989 and December 2006.
*Source*: Compustat; TFR data.

As Table 12 shows, Carteret's market value as of December 31, 2006 would have been between $1.932 billion and $3.202 billion if its book value and market-to-book ratio had increased at the same rate of increase in mean or median book values and market-to-book ratios for standalone surviving thrifts. Table 13 shows Carteret's market value based on the increases in market-to-book ratios of surviving thrifts when I estimate Carteret's but-for December 2006 book value by adjusting its July 1989 book value for amortized goodwill and retained earnings, as I did in Table 9.

TABLE 13: BOOK VALUES AND MARKET-TO-BOOK RATIOS FOR THRIFTS WITH DATA AVAILABLE IN BOTH JULY 1989 AND DECEMBER 2006, ADJUSTED FOR GOODWILL & RETAINED EARNINGS

| | Equal Weight | | | Market Value Weight | | |
|---|---|---|---|---|---|---|
| | July 31, 1989 (Obs=9) | Dec. 31, 2006 (Obs=9) | % Change | July 31, 1989 (Obs=9) | Dec. 31, 2006 (Obs=9) | % Change |
| Mean Market-to-Book Ratio | 0.732 | 1.579 | 116% | 1.130 | 1.586 | 40% |
| Median Market-to-Book Ratio | 0.663 | 1.442 | 117% | | | |
| But-For Carteret Book Value (Million $) | 269.3 | 442.9 | | 269.3 | 442.9 | |
| But-For Carteret Market-to-Book Ratio Using Mean | 0.934 | 2.014 | | 0.934 | 1.310 | |
| But-For Carteret Market-to-Book Ratio Using Median | 0.934 | 2.031 | | | | |
| But-For Carteret Market Value Using Mean (Million $) | 251.4 | 892.1 | | 251.4 | 580.2 | |
| But-For Carteret Market Value Using Median (Million $) | 251.4 | 899.4 | | | | |

*Note*: Market-to-book ratio is defined as the market value of the thrift divided by the stockholder's equity for the given quarter. For each date, the sample consists of all firms with both stockholders' equity and market value data available for both June 1989 and December 2006.
*Source*: Compustat; TFR data.

As Table 13 shows, Carteret's market value would have been between $580.2 million and $899.4 million as of the end of 2006 if its book value had increased by its projected retained earnings (and decreased by its scheduled amortization of goodwill), and if its market-to-book ratio had increased at the same rate of increase as mean or median market-to-book ratios for the nine surviving thrifts. Even if Carteret's market-to-book ratio at the end of 2006 had been equal to the *lowest* market-to-book ratio as of the end of 2006 for these nine survivors (1.051 for Washington Savings Bank), Carteret's market value would have been $465.5 million at the end of 2006.[65]

---

65. Even when only accounting for inflation, Carteret would have been worth $407.9 million as of December 2006 but-for the breach. Inflation is an economic concept that is different from interest. When one adjusts for inflation, one is adjusting for changes in the general price of goods and or services in the economy. *See, e.g.*, OLIVIER BLANCHARD, MACROECONOMICS 29-30 (Prentice Hall 1997). Put simply, an adjustment for inflation is valid when one's analysis considers price levels at two different periods in time. *Id*. By contrast, interest is a concept that allows one to calculate the opportunity cost of receiving a dollar now versus a dollar in the future or a dollar

### F. Damages Are Equal to the But-For Market Value of Carteret Plus Any But-For Dividends That Were Not Distributed in the Actual World

46. So far I have estimated Carteret's market value as of the end of 2006 (or 2008) using a variety of comparable samples and methods. The next step in estimating damages is to add to these market values the dividends that would have been distributed through 2008 but-for the breach (or whenever damages are awarded), but that were not actually distributed in the actual world. In the actual world, Carteret paid no dividends after the breach.[66] Based on my estimates in Table 6, Carteret would have paid $188.7 million in dividends through 2008 but-for the breach. Therefore, damages are equal to $188.7 million in dividend distributions, plus the but-for market value of Carteret as of the end of 2006 (or 2008).

### G. Any Damage Award Should Account for AmBase's Tax Liability on the Damages

47. None of my damage estimates above considers the effect of taxes that AmBase may be liable for on the damages awarded in this case. To account for this potential tax liability, my damages estimates should be grossed up by AmBase's marginal tax rate. Table 14 shows the changes to my estimates when considering the potential tax liability AmBase would face after being awarded damages by the government. I assume a marginal federal corporate income tax rate of 35 percent and a marginal state income tax rate for Connecticut of 7.5 percent. Because

---

now versus a dollar at some future point in time. *Id*. at 167. That is, adjusting for interest allows one to adjust for the time-value of money—namely, that consumers are impatient and a dollar now is therefore more valuable than a dollar received in the future. That inflation and interest are separate economic concepts is also evidenced by the real versus the nominal interest rate. The nominal interest rate is the interest rate *unadjusted* for inflation. *Id.* at 128-29. The real interest rate, which is calculated as the nominal interest rate minus the rate of inflation, is a rate one can use if one wants to control for the price of goods in one's time-value calculations. *Id.* Specifically, the real interest rate allows one to determine the amount of goods or services one would need tomorrow to compensate one for the loss of goods or services today. *Id.* The Consumer Price Index (CPI) for all urban consumers, which is an inflation measure that is standard in economic analysis (*Id.* at 30-31), was equal to 124.4 in July 1989, and had increased to 201.8 on December 2006—an increase of 62.2 percent. *See* U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index-All Urban Consumers, *available at* http://data.bls.gov/cgi-bin/surveymost?cu. Had my $251.4 million estimate of Carteret's July 1989 market value increased at the same rate as the CPI, Carteret's market value would have been $407.9 million as of December 2006.

66. Carteret paid no dividends in 1990 and 1991 and did not anticipate paying dividends in 1992. AmBase Corp., 1991 SEC Form 10-K, at 29 (CAM4020339).

state income taxes are deductible from federal taxes, the effective federal tax rate after the state tax deduction is 32.375 percent (equal to 0.35 × (1 – 0.075)), and the combined federal and state tax rate is 39.875 percent.

TABLE 14: ADJUSTING CALCULATIONS ACCOUNTING FOR POTENTIAL TAX LIABILITY (MILLION DOLLARS)

| Concept | Estimate (Not Accounting for Tax Liability) [A] | Estimate Accounting for Tax Liability [B] = [A] / (1 – 39.875%) | Taxes [C] = [B] – [A] = [B] × 39.875% |
|---|---|---|---|
| (1) Carteret's But-For Market Value as of the Date of the Breach | $251.4 | | |
| (2) Carteret's But-For Undiscounted Earnings from Aug. 9, 1989 to Dec. 31, 2008 | $595.6 | | |
| (3) Damages Estimate = Foregone Dividends + Carteret's But-For Market Value as of Dec. 2006 using Thrift Indices | $1,832.3 to $2,503.9 | $3,047.5 to $4,164.6 | $1,215.2 to $1,660.6 |
| (4) Damages Estimate = Foregone Dividends + Carteret's But-For Market Value as of Dec. 2006 using Market-to-Book Ratios for All Thrifts | $922.6 to $4,027.9 | $1,534.4 to $6,699.2 | $611.8 to $2,671.3 |
| (5) Damages Estimate = Foregone Dividends + Carteret's But-For Market Value as of Dec. 2006 using Market Returns for Surviving Thrifts | $3,447.3 to $4,887.8 | $5,733.5 to $8,129.4 | $2,286.2 to $3,241.6 |
| (6) Damages Estimate = Foregone Dividends + Carteret's But-For Market Value as of Dec. 2006 using Market-to-Book Ratios for Surviving Thrifts | $768.9 to $3,390.6 | $1,278.8 to $5,639.3 | $509.9 to $2,248.7 |

*Note:* These estimates do not include the "wounded bank" damages I estimate later in this report.

## II. CARTERET WOULD NOT HAVE FAILED IN 1992 BUT-FOR THE BREACH

48. Carteret was a healthy institution at the time of the breach in August 1989. However, the actions taken by regulators as a result of the breach eventually concluded with Carteret's seizure by the OTS in December 1992. In this section, I show how a healthy institution

in 1989 was brought to ruin by the regulations resulting from the breach. Carteret would not have failed in 1992 but-for the breach.

## A. Carteret Had a Large Franchise Value, Both at the Time of the Breach and at the Time of Failure

49. Despite the breach, Carteret survived through a difficult recession that began in July 1990 and reached its trough in March 1991.[67] The OTS did not seize Carteret until December 1992. As I discussed in my earlier declaration, Carteret was a healthier thrift than the average failed thrift in the 1980s and 1990s.[68] Its positive return on assets, its ratio of interest expense to deposits, and its ratio of past due and nonaccruals to total loans in the quarter prior to being seized were stronger than the corresponding ratios for the average failed thrift in the 1980s and 1990s in the quarter prior to failure.[69] This relative strength helped Carteret survive until the end of 1992, after the vast majority of bank failures had occurred. Carteret's strength during this difficult time period can be explained by its large franchise value.

50. An institution's market value is equal to the market value of its tangible assets plus the institution's franchise value, plus the market value of its other intangible assets (supervisory goodwill), minus the market value of its liabilities. As I estimate in Appendix A, the market value of Carteret's supervisory goodwill was between $63.3 million and $69.0 million as of the date of the breach. If I assume that the market value of Carteret's tangible assets and liabilities as of the breach are equal to the face value of tangible assets and liabilities as of the end of the quarter before the breach (June 30, 1989), if I assume that Carteret's total market value was equal to $251.4 million as of the breach, and if I use the average of my two estimates

---

67. National Bureau of Economic Research, Business Cycle Expansions and Contractions, *available at* http://www.nber.org/cycles.html.

68. Declaration of Charles W. Calomiris of July 14, 2006, at 40-43.

69. *Id.* at 40-41.

of the market value of goodwill, then the market value of Carteret's franchise was equal to $99.9 million as of the breach. Table 15 summarizes this calculation.

TABLE 15: ESTIMATING CARTERET'S FRANCHISE VALUE AS OF DATE OF THE BREACH

| Category | | Million $ |
|---|---|---|
| Carteret's Total Market Value as of July 31, 1989 | [A] | $251.4 |
| Market Value of Supervisory Goodwill as of July 31, 1989 | [B] | $66.2 |
| Face Value of Total Assets as of June 30, 1989 | [C] | $7,286.1 |
| Goodwill as of June 30, 1989 | [D] | $185.1 |
| Face Value of Non-Goodwill Assets as of June 30, 1989 | [E] = [C] – [D] | $7,101.0 |
| Face Value of Liabilities as of June 30, 1989 | [F] | $7,015.6 |
| Market Value of Franchise as of the Breach | [G] = [A] – ([B] + [E] – [F]) | $99.9 |

*Sources*: TFR data; Carteret Bancorp Inc. and Subsidiary, Consolidated Statements of Financial Condition (June 30, 1989) (CAM4470985); 1989 Goodwill Amortization Schedule (AM050531); August 1989 Goodwill Amortization Schedule (CAM5300023); Carteret Savings Bank, FA, Thrift Financial Report, Jun. 30, 1989, at Q-1 (AM050308); Calomiris calculations.

51. Even though Carteret's market-to-book ratio in 1988 was less than 1, Carteret's implied franchise value was enormous once one has taken into account that supervisory goodwill was such a significant part of its book value. The market clearly understood that these intangible assets were valuable. Further evidence of Carteret's large franchise value is found in independent analysis of the thrift at the time it was acquired by AmBase. Peat Marwick Main & Co. estimated the value of Carteret's deposit base intangible asset to be $53.9 million in August 1988.[70]

52. Furthermore, support for a high franchise value of Carteret can be found in the RTC's post-seizure observations that Carteret's competitive deposit interest rates reflected its high quality of retail banking relationships and effective marketing strategy:

> In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.
>
> CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a

70. Valuation of the Deposit Base Intangible Asset from the Acquisition of Carteret Savings Bank (Aug. 8, 1988), at III-I (PM 004486).

fairly sophisticated database marketing system which it utilized to occasionally target households with offers for bonus rates on certificates of deposit. These marketing programs were generally used to attract new households and to cross-sell additional products to existing customer households.[71]

The CFSB retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution. During the past five years, the Bank's consumer banking efforts have been focused upon optimization of the retail office network. Each retail office was evaluated on its financial performance compared to the potential of the branch market area. Many of the offices which were determined to be substandard were closed, consolidated or sold to another financial institution. Operations at the remaining offices were streamlined and marketing efforts focused on acquisition/retention of high-balance deposit households.

CFSB retail offices in New Jersey and Florida are located in some of the top performing market areas in each respective state. The New Jersey markets tend to be suburban and upper middle class in nature, but also include some stable and ethnic blue-collar neighborhoods in urban areas. In Florida, the markets also tend to be suburban and upper middle class, and are characterized by a preponderance of senior citizens.

Based upon total deposits, CFSB ranks as the second largest SAIF-insured institution headquartered in New Jersey. While considerably smaller in scope, the Bank's Florida retail office network nevertheless affords a possible acquiring institution of these CFSB branches the opportunity to be a significant player, specifically in South Florida.

In recent years, CSB has made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty. Retail office managers are also encouraged to be active in their respective local communities. The "outstanding" rating which CSB received for its Community Reinvestment Act activities is further evidence of the Bank's commitment to the individual communities it serves.

In its New Jersey market areas, CFSB is second only to First Fidelity Bank in terms of retail deposit market share. The Bank is the market share leader in eight of its New Jersey market areas and among the top three in over half of the markets. In Florida, CFSB faces much more competition, but nevertheless is among the top ten institutions in over half of its markets.

The Bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office presence. Average account balances for each product type at CFSB exceed industry averages. These characteristics, combined with a relatively stable deposit base, further enhance the valuation of the Bank's franchise.[72]

---

71. Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993), at 4 (C-AM-A-0400792).
72. *Id*. at 26-27 (C-AM-A-0400815 – C-AM-A-0400816).

## B. Carteret Would Have Been Sufficiently Capitalized But-For the Breach

### 1. Carteret Would Have Had Added Extra Capital at the End of 1992 But-For the Breach

53. But-for the breach, Carteret would have had additional capital it could have counted towards its regulatory requirements. This additional capital included not only supervisory goodwill, but also funds Carteret and AmBase expended as a result of the breach. Although I do not attempt to quantify *all* potential funds that would have been available to Carteret but-for the breach, I do calculate a lower bound of the extra capital that would have been available to Carteret in a no-breach world. Table 16 summarizes these but-for capital adjustments, which I describe in more detail in this section.

TABLE 16: CARTERET'S BUT-FOR CAPITAL PROFILE AS OF SEPTEMBER 1992 (MILLION DOLLARS)

| | Tangible Capital | | Core Capital | | Risk-Based Capital | | |
|---|---|---|---|---|---|---|---|
| | Tangible Capital | Tangible Assets | Core Capital | Adj. Tangible Assets | Risk-based Capital | Risk-Weight Assets [4] | Fully Capitalized Items |
| **Actual Level** | (61.7) | 4,765.1 | (14.0) | 4,765.1 | (15.2) | 2,882.5 | 12.7 |
| ***Adjustments:*** | | | | | | | |
| – Qualifying Supervisory Goodwill [1] | 0.0 | 0.0 | 47.7 | 0.0 | 47.7 | 47.7 | 0.0 |
| + But-For Total Supervisory Goodwill Balance | 139.1 | 139.1 | 139.1 | 139.1 | 139.1 | 139.1 | 0.0 |
| – Premiums from 1990 Branch Sales | 40.7 | 40.7 | 40.7 | 40.7 | 40.7 | 0.0 | 0.0 |
| + Transaction Costs from Branch Sales | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 0.0 | 0.0 |
| + Deposit Interest Expense Overpayment Resulting from Breach | 28.2 | 28.2 | 28.2 | 28.2 | 28.2 | 0.0 | 0.0 |
| + Supplementary Capital | 0.0 | 0.0 | 0.0 | 0.0 | 43.3 | 0.0 | 0.0 |
| + Profits Lost from Asset Shrinkage | Not calculated | Not calculated | Not calculated | Not calculated | Not calculated | Not calculated | Not calculated |
| + Profits Lost from Deposit Runoff | Not calculated | Not calculated | Not calculated | Not calculated | Not calculated | Not calculated | Not calculated |
| + Cash Infusion from AmBase [2] | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 0.0 | 0.0 |
| + Reduction in Asset Writedowns [3] | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 75.0 | 0.0 |
| **But-For Level** | 153.2 | 4,980.0 | 153.2 | 4,980.0 | 195.4 | 3,049.0 | 12.7 |
| **Actual Requirement** | 71.5 | | 143.0 | | 220.2 | | |
| **Actual Surplus (Deficit)** | (133.2) | | (157.0) | | (235.4) | | |
| **But-For Requirement** | 74.7 | | 149.4 | | 232.2 | | |
| **But-For Surplus (Deficit)** | 78.5 | | 3.8 | | (36.9) | | |

*Notes*:

[1] In the actual world, qualifying supervisory goodwill was limited to 1% of tangible assets, and was only counted towards core capital and risk-based capital compliance.

[2] AmBase had $36 million in cash as of the end of 1992 that it could have contributed to Carteret to keep it in regulatory compliance. *See* AmBase Corp., 1992 Annual Report (Form 10-K), at 16 (AMB030534). This amount included $1.4 million in restricted cash. However, in a but-for world, that $1.4 million would have been available to infuse into Carteret. In the course of purchasing IPF from Carteret at the insistence of federal regulators, AmBase incurred $1,438,867.91 in transaction costs. Specifically, AmBase paid Quirk Carson Peppet $276,917.56, Creditanstalt Bankverein $569,608.67, and Manufacturers' Appraisal $29,968.68 for investment banking services. AmBase also paid Cravath, Swaine & Moore $270,217, Sills, Cummis, Epstein & Gross $146,440, Kaye Scholer $24,662, and O'Melveny & Myers $121,054 for legal services. *See* IPF Transaction Fees. AmBase did not contribute this capital in the breach-affected world in late 1992 because it would not have been enough to prevent seizure.

[3] It is my understanding that AmBase will offer testimony at trial demonstrating that it would have taken no more than $100 million of the mid-1991 reserve by the end of 1992 in the absence of the breach.

[4] For total supervisory goodwill, I followed the regulator's convention of counting qualifying supervisory goodwill as 100% risk-weight assets. For all other adjustments to risk-weight assets, except for the reduction in asset writedowns, I assume that the adjustments would be treated as 0% risk-weight assets. I assume that half of the reduction in writedowns would be treated as 100% risk-weight assets, and half would be treated as 200% risk-weight assets. This assumption is based on the fact that the writedowns were focused on Carteret's commercial real estate portfolio, which consisted of loans and REOs. Commercial real estate loans are treated as 100% risk-weight assets, and REOs are treated as 200% risk-weight assets. Therefore, the average risk-weight assigned to the reduction in writedowns is 150%.
*Sources*: Carteret Savings Bank, FA, Thrift Financial Report, Sept. 30, 1992, at 35-37 (CAM5350308 – CAM5350310); Office of Thrift Supervision, TFR Instruction Manual, Consolidated Capital Requirement - Schedule CCR (Sept. 1991).

**a. The Inclusion of Supervisory Goodwill in Regulatory Capital Would Have Added $139.1 Million in Extra Capital as of September 1992 But-For the Breach**

54. Under FIRREA, Carteret was required to maintain certain levels of capital. Its tangible capital was required to be at least 1.5 percent of adjusted assets.[73] Its core capital was required to be at least 3.0 percent of adjusted total assets.[74] Its risk-based capital was required to be at least the sum of fully capitalized items[75] and 6.4 percent of risk-weighted assets, subject to a phase-in scheduled requirement of 7.2 percent at the end of 1990 and 8.0 percent at the end of 1992.[76]

55. In the but-for world, Carteret would have had a supervisory goodwill balance of $139.1 million as of September 30, 1992.[77] In the but-for world, all of this supervisory goodwill would have counted towards all three categories of regulatory capital requirements. In the actual

---

73. Carteret Savings Bank FA, 1991 Annual Report, at 20 (KH 053792). Adjusted assets, or tangible assets, were equal to total assets, plus the thrift's pro rata share of assets of unconsolidated subsidiaries, less assets of "nonincludable" subsidiaries required to be deducted, goodwill and other intangible assets, less nonqualifying purchased mortgage loan servicing. *See* Office of Thrift Supervision, TFR Instruction Manual, Consolidated Capital Requirement - Schedule CCR (Sept. 1991), at 9-14.

74. *Id*.

75. Fully capitalized items, line CCR-70 on the Thrift Financial Reports, include the amount of recourse liability retained by a thrift institution when it is less than the capital requirement for credit-risk exposure and therefore not converted to an on-balance-sheet equivalent (*e.g.*, in the sale of most assets with 1% recourse, the amount of liability retained usually is less than the capital requirement and therefore, 1% of the assets sold would be reported on CCR-70); and (2) other items that may be defined by OTS for inclusion on this line. *See* Office of Thrift Supervision, TFR Instruction Manual, Consolidated Capital Requirement - Schedule CCR (Sept. 1991), at 39.

76. *Id*.

77. I estimate Carteret's but-for supervisory goodwill balance as of September 30, 1992 based on Carteret's goodwill amortization schedule from the end of 1989. *See* December 1989 Goodwill Amortization Schedule (AM050531).

world, only $47.7 million of “qualifying” supervisory goodwill counted towards core capital and risk-based capital requirements, and no supervisory goodwill was counted towards tangible capital requirements. In Table 16, I assume that supervisory goodwill would be assigned 100 percent risk-weight when calculating but-for risk-weighted assets. This is conservative because supervisory goodwill was a promise from the government, and therefore could have been categorized with 0 percent risk-weight in the but-for world.

### b. Carteret Sold Branches in 1990 as a Result of the Breach

56. Carteret sold thirteen of its Florida branches to Great Western Bank on October 9, 1990, five of its New Jersey branches to Bankers Corp. on October 22, 1990, and five of its Maryland branches to Loyola Federal Savings and Loan Association on December 17, 1990.[78] Carteret’s pre-tax loss on these branch sales was $16.568 million.[79] This loss included $53.237 million of reduced supervisory goodwill.[80] Therefore, Carteret’s pre-tax gain on the sales, not including the reduced supervisory goodwill, was $36.669 million. Disaggregated by transaction,

---

78. Carteret Savings Bank FA, 1990 Annual Report (Feb. 1, 1991), C-A-MA-0394503.

79. *Id*. at C-AM-A-0394506. See *Id.* at C-AM-A-0394503, “On October 9, 1990 the Bank sold deposits and certain branch offices of thirteen Florida locations to Great Western Bank, a Federal Savings Bank, (“Great Western”), with the approval of supervisory authorities. The disposal consisted of the sale of premises and equipment for $6,317,000 and the assumption by Great Western of certain deposit liabilities of $746,799,000 and related accrued interest of $1,265,000, as well as related loans receivable of $537,000. Additionally, the disposal resulted in a $686,000 elimination of deposit purchase accounting revaluations, as well as a reduction of goodwill of $50,000,000, of which $48,700,000 was supervisory goodwill. The transaction resulted in a $24,153,000 loss which is included in loss on sale of branches in the accompanying consolidated statements of operations for the year ended December 31, 1990. On October 22, 1990 the Bank sold five Maryland branch offices to Loyola Federal Savings and Loan Associations, of Baltimore, Maryland (“Loyola”), with the approval of supervisory authorities. The disposal consisted of the sale of premises and equipment for $1,719,000 and the assumption by Loyola of certain deposit liabilities of $51,592,000 and related accrued interest of $202,000, as well as related loans receivable of $168,000. Additionally, the disposal resulted in a $19,000 elimination of deposit purchase accounting revaluations, as well as a reduction of supervisory goodwill of $1,537,000. The transaction resulted in a $1,305,000 loss which is included in loss on sale of branches in the accompanying consolidated statements of operations for the year ended December 31, 1990. On December 17, 1990 the Bank sold five New Jersey branch offices to Bankers Savings of Perth Amboy, New Jersey (“Bankers”), with the approval of supervisory authorities. The disposal consisted of the sale of premises and equipment for $1,592,000 and the assumption by Bankers of certain deposit liabilities of $379,099,000 and related accrued interest of $1,285,000, as well as related loans receivable of $449,000. Additionally, the disposal resulted in a reduction of supervisory goodwill of $3,000,000. The transaction resulted in a $8,890,000 gain which is included in a loss on sale of branches in the accompanying consolidated statements of operations for year ended December 31, 1990.”

80. *Id*. at C-AM-A-0394503.

Carteret incurred a loss of $24.153 million on the sale to Great Western, incurred a loss of $1.305 million on the sale to Loyola, and posted a gain of $8.890 million on the sale to Bankers Corp.[81] Carteret received a premium of $40.74 million on these three sets of branch sales. Bankers Corp. paid a premium of $12.041 million, Great Western paid a premium of $28.336 million, and Loyola paid a premium of $0.363 million.[82]

57. In a counterfactual world without the breach, it appears that Carteret would not have needed to sell these 23 branches. It is my understanding that the Government has previously argued, and can be expected to argue again, that my analysis overstates the amount of supervisory goodwill that Carteret would have been entitled to count for regulatory capital purposes in the no-breach world. As I understand the Government's argument, its contention is that because Carteret wrote off approximately $53 million in goodwill when it sold the branches described above in 1990,[83] Carteret would have written off the same amount of supervisory goodwill for purposes of its regulatory capital calculations even if the Government had not breached its contract. For several reasons, it appears that any such argument by the Government would be inconsistent with the facts. First, the unstated premise of the argument – that Carteret would have made the 1990 branch sales even in the absence of the breach – appears to be inconsistent with contemporaneous documents relating to the branch sales. For example, in its 1990 annual report and 10-K, AmBase made clear that "a significant factor considered in the decision to sell said branches in 1990 was that under capital regulations of the [OTS] adopted under [FIRREA], as interpreted by the OTS, the goodwill recorded in connection with

81. *Id.*
82. Branch Closing Statement, Interim Federal Savings Bank, Bankers Savings and Bankers Corp., at CAM4900015 (Dec. 17, 1990); Branch Closing Statement, Great Western Bank, at CAM4441169 (Oct. 9, 1990); Loyola Branch Sale Deposits and Calculation of Premium, at CAM4900499 (Nov. 21, 1990).
83. Carteret Savings Bank FA, 1991 Annual Report at 8 (KH053780).

[Carteret's acquisitions of failing thrifts] is required to be deducted from regulatory capital, subject, in the case of supervisory acquisitions, to a phase-out period."[84] In addition, it is my understanding that the Government's argument was rejected by a federal district court, which ruled in 1991 that Carteret was entitled to an injunction allowing it to count, for regulatory capital purposes, the goodwill written off in connection with the branch sales. In making this decision, the court found "persuasive" Carteret's claim that it "would not have sold the branches in question in the manner that it did if OTS had not eliminated the benefit of retaining supervisory goodwill."[85]

58. For these reasons, it would not be appropriate to eliminate, in any calculation of Carteret's regulatory capital if the Government had honored the contract, the supervisory goodwill written down by Carteret in connection with the 1990 branch sales. Of course, if I assume that the 1990 branch sales would not have occurred absent the breach, it is necessary to adjust any analysis of the but-for bank's regulatory capital in order to eliminate any financial impacts of those branch sales. For that reason, my analysis reverses the net gain (not taking into account the goodwill write-down itself) that Carteret booked in connection with those branch sales. However, because the branches sold by Carteret were, in the aggregate, considered by Carteret to contribute to Carteret's profitability, those branches would have earned Carteret additional income between 1990 and 1992 in a but-for world. I do not attempt to quantify this additional income. Therefore, my estimate of the net impact of reversing the 1990 branch sales in the but-for world is conservative because I adjust Carteret's capital downward to account for the

84. AmBase 1990 Annual Report (Form 10-K), at 5 (AMB030223).

85. Carteret Savings Bank v. OTS, No. 91-661, slip op. at 9 (D.N.J. July 8, 1991). It is my understanding that the court also determined that under Carteret's contract with the Government, the fact that a goodwill write-off might be required under GAAP did not control whether the goodwill should be written off for regulatory capital purposes. *Id.* at 7-8. While that issue presents a legal question, upon which I do not express an opinion, I have been instructed by counsel that the district court was correct that Carteret's contract, as a matter of law, did not require a goodwill write-down whenever GAAP would require such a write-down.

premium received from the branch sale, but I do not adjust Carteret's net income upward to account for the profits those branches would have contributed to the institution from 1990 to 1992.[86]

### c. Carteret's Cost of Deposits Increased as a Result of the Breach, Reducing Its Capital

59. The depositors that Carteret was able to maintain after FIRREA had to be encouraged to stay with the thrift. The market's reaction to the increased risk of Carteret's failure as a result of FIRREA manifested itself through the interest rates offered depositors as well as deposit outflows. To analyze changes in the deposit rates Carteret offered, I searched for all press references to Carteret deposit rates from 1989 to the time Carteret was seized. I found that the 6-month CD rate was the most common rate published in the press for Carteret. Table 17 shows the interest rates for 6-month CDs that Carteret offered to depositors in 1989, 1990, 1991, and 1992, and compares these rates with the average secondary market 6-month CD rates compiled by the Federal Reserve. Because of the high frequency of observations of Carteret's deposit rates from April 1991 to September 1992, I summarize the results for that period by quarter.

86. There is no need to adjust assets because in the event, advances increased to substitute for the loss of deposits from the branch sales.

TABLE 17: CARTERET'S INTEREST RATES ON SIX-MONTH CDS

| Date | Carteret's Rate [A] | Federal Reserve Avg. Secondary Market Rate [B] | Difference [A] – [B] |
|---|---|---|---|
| Apr. 3, 1989 | 9.285 | 10.34 | –1.055 |
| Dec. 28, 1990 | 7.68 | 7.67 | 0.01 |
| Apr. 3, 1991 | 6.75 | 6.29 | 0.46 |
| Avg. of Apr. 5 1991 – June 30, 1991 (obs=5 ) | 6.37 | 6.14 | 0.23 |
| Avg. of July 1, 1991 – Sept. 30, 1991 (obs=8 ) | 6.11 | 5.85 | 0.27 |
| Avg. of Oct. 1, 1991 – Dec. 31, 1991 (obs= 10) | 5.54 | 4.94 | 0.59 |
| Avg. of Jan. 1, 1992 – Mar. 31, 1992 (obs=12) | 4.58 | 4.18 | 0.40 |
| Avg. of Apr. 1, 1992 – June 30, 1992 (obs=12) | 4.34 | 4.02 | 0.31 |
| Avg. of Jul. 1, 1992 – Sept. 30, 1992 (obs=10) | 3.90 | 3.43 | 0.47 |

*Sources*: Articles listed under *Periodicals on Deposit Interest Rates* in Appendix B; Federal Reserve Statistical Release H.15, 6-month CDs (Secondary Market), *available at* http://www.federalreserve.gov/releases/h15/data/Business_day/H15_CD_M6.txt.

As Table 17 shows, Carteret's interest rates on 6-month CDs were more than a full percentage point lower than the Federal Reserve's published average 6-month CD rate four months before the breach. By the end of 1990, however, this spread had vanished and Carteret had to offer interest rates above the Federal Reserve rate. In 1991 and 1992, this trend continued with Carteret depositors earning an interest rate significantly above Federal Reserve rates.

60. Precisely estimating how much extra interest Carteret was forced to pay depositors as a result of the breach is challenging to compute. One must account for the changes in Carteret's mix of deposits, how that mix was affected by the breach, the interest rates offered to depositors on the different classes of deposits by Carteret, and lags in repricing of deposits. I may perform more research to fully account for all of these factors to calculate a comprehensive damage estimate of deposit interest overpayments resulting from the breach. However, one can perform a simple calculation that conservatively estimates the additional interest expense paid to

depositors as a result of the breach, based on the CD rates shown in Table 17 and Carteret's mix of deposits. Figure 5 shows Carteret's mix of deposits as of the end of each fiscal year from 1986 through 1991.

FIGURE 5: CARTERET'S DEPOSIT MIX, 1986 - 1992




*Note*: Negotiable Rate-Jumbo CD includes a small amount of deposits held "As Agent" in 1991.
*Sources*: Carteret Bancorp Inc. and Subsidiary, FHLB Docket #02-4702, Consolidated Financial Statements, Sept. 30, 1988 (AMB013960-AMB013995, at AMB013979); Carteret Bancorp Inc., 1989 Annual Report, Dec. 31, 1989 (C-AM-A-0394527); Carteret Savings Bank, FA & Subsidiaries, Consolidated Financial Statements, Dec. 31, 1990, (AMB014070); Carteret Savings Bank, FA and Subsidiaries, 1992 Annual Report, at 17 (CAM 5070016).

As Figure 5 shows, 32 percent of Carteret's deposits were in CDs with durations between 6 and 23 months as of September 30, 1988. By December 31, 1989, CDs with durations between 6 and 23 months increased to 43 percent of Carteret's deposits. This share increased to 50 percent by the end of 1991.

61. Table 17 shows the actual contractual CD rates that Carteret paid for new deposits both before and after the breach. As Table 17 shows, Carteret's deposit rate on 6-month CDs was 105.5 basis points lower than the average 6-month CD rate published by the Federal Reserve in

April 1989. By the end of 1990, this spread was almost completely eliminated, and in 1991 and 1992 Carteret's 6-month CD rates for new deposits were substantially higher than the Federal Reserve's 6-month CD benchmark. Based on the duration of CDs, Figure 5 shows that at least 43 percent of depositors in September 1989 were in repriced deposit instruments by 1991 (assuming those depositors remain with Carteret). I conservatively estimate that but-for the breach, the spread between Carteret's but-for rates on instruments with durations between 6 months and 23 months would have been 105.5 basis points—equal to the pre-breach spread between Carteret's 6-month CD rate and the average Federal Reserve 6-month CD rate. This spread is conservative because, as Table 17 shows, actual Carteret 6-month CD rates actually increased above the Federal Reserve benchmark in 1991 and 1992.

62. As a further conservatism, I estimate that only half of the deposits in 6-month to 23-month CDs were priced at breach-affected interest rates. Again, this is conservative because other instruments besides CDs of durations between 6 months and 23 months would have repriced to breach-affected rates. I also assume that this breach-induced increase in interest cost for deposits would only begin in 1991. The spread between Carteret's 6-month CD rate and the benchmark in Table 17 had narrowed to zero by the end of 1990. Table 18 shows the effects of assuming that the pricing of only half of the deposits in CDs with durations between 6 months and 23 months in 1991 and 1992 was affected by the breach-induced increase in CD spreads of 105.5 basis points.

TABLE 18: BREACH-INDUCED INCREASE IN DEPOSIT INTEREST EXPENSE INCURRED BY CARTERET

| Year-End | Deposits (Million $) [B] | Average of Beginning of Year & End of Year Deposits (Billion $) [C] | Breach-Induced Increase in Deposit Interest Expense Payments [C] x 0.01055 |
|---|---|---|---|
| 1990 | 1,406.1 | | |
| 1991 | 1,452.8 | 1,429 | 15.1 |
| 1992 | 1,030.0 | 1,241 | 13.1 |
| | | | **28.2** |

*Sources*: Carteret Savings Bank FA, 1990 Annual Report (Feb. 1, 1991), (C-AM-A-0394489); Carteret Savings Bank FA, 1991 Annual Report, (KH-053789); Carteret Savings Bank, FA & Subsidiaries, 1992 Annual Report, Dec. 31, 1992, at 17 (CAM5070016); Articles listed under *Periodicals on Deposit Interest Rates* in Appendix B; Federal Reserve Statistical Release H.15, 6-month CDs (Secondary Market), *available at* http://www.federalreserve.gov/releases/h15/data/Business_day/H15_CD_M6.txt.

As Table 18 shows, my conservative estimate of the breach-induced increase in deposit interest expense is $28.2 million.

#### d. Carteret Could Have Counted Supplementary Capital Towards Regulatory Capital But-For the Breach

63. Furthermore, once Carteret's core capital was positive, its regulatory capital would have automatically increased even more through its General Valuation Allowances ("GVAs") on loans and leases. GVAs "denote allowances for losses inherent in an institution's portfolio of loans, investments and other assets."[87] According to an OTS exam report of Carteret from June 1992,

> GVAs on loans and leases are currently includable in supplementary capital up to 1.5 percent of total risk-based assets, except that supplementary capital can not exceed 100 percent of core capital, until December 31, 1992. Thereafter, GVAs are included in supplementary capital up to 1 percent of total risk-based assets, subject to not exceeding 100% of core capital. Carteret's risk-based assets of $2.7 billion would allow for the inclusion of $40.5 million in GVAs for risk-based capital. However, since core capital is negative as of June 30, 1992, GVAs can not be utilized for risk-based capital. GVAs would be available as a component of risk-based capital if the proposed capital infusion materializes.[88]

Once Carteret's core capital was positive, it would have automatically enjoyed the ability to count GVAs towards its regulatory capital. As of November 30, 1992, Carteret's available

87. Office of Thrift Supervision, Examination Handbook 261, Adequacy of Valuation Allowances ...Asset Quality, Section 261, *available at* http://www.ots.treas.gov/docs/4/422092.pdf.

88. Office of Thrift Supervision, Report of Examination (June 15, 1992), at 20 (WOQ6730061).

supplementary capital was equal to $43.6 million.[89] Because GVAs would not exceed 1.5 percent of Carteret's total but-for risk-based assets, the entire balance of GVAs would have been included in regulatory capital.

### e. Carteret's Size Decreased as a Result of the Breach, Reducing Its Capital

64. The breach also likely caused Carteret to downsize. A Carteret capital plan dated September 30, 1991 notes that between December 31, 1988 and August 31, 1991, Carteret decreased its asset base from approximately $6.7 billion to approximately $5.4 billion.[90] These figures do not fully capture the amount of Carteret's shrinkage. Carteret's TFRs indicate that in the last six months of 1989, Carteret shrank its total assets by almost $1.1 billion, from $7.17 billion to $6.10 billion.[91] During 1990, Carteret shrank another $500 million, down to $5.58 billion in total assets.[92] During 1991, Carteret shrank by more than $350 million, down to $5.20 billion in total assets.[93] And during the first nine months of 1992, Carteret shrank down to $4.83 billion in total assets.[94] All in all, between the beginning of the third quarter of 1989 and the end of the third quarter in 1992, Carteret shrank by more than $2.3 billion in total assets.

65. While a substantial portion of this shrinkage was related to Carteret's efforts to discontinue corporate and commercial real estate lending and to dispose of related assets, it is clear that much of this shrinkage was driven by Carteret's efforts to improve its capital position. Carteret's 1990 business plan, for example, noted that to meet the new FIRREA capital requirements, Carteret's "1989 strategy was altered," among other things, to "significantly

---

89. Carteret Savings Bank, FA & Subsidiaries, Financial Report, Nov. 30, 1992, at S-15 (AMB014584)
90. Carteret Savings Bank, FA, Capital Plan (Sept. 30, 1991) at 49 (WOQ6781145).
91. Carteret Savings Bank FA, Thrift Financial Report, June 30, 1989, at AM050308; Carteret Savings Bank FA, Thrift Financial Report, Dec. 31, 1989 at WOQ6652300.
92. Carteret Savings Bank FA, Thrift Financial Report, Dec. 31, 1990, at AM035971.
93. Carteret Savings Bank FA, Thrift Financial Report, Dec. 31, 1991, at AM030528.
94. Carteret Savings Bank FA, Thrift Financial Report, Sept. 30, 1992, at CAM5350262.

downsize the balance sheet."[95] This plan also noted that Carteret "was forced to alter its business strategy in response to the new capital requirements of FIRREA. A plan for Carteret to grow into a much larger mortgage origination and servicing bank changed."[96] Similarly, AmBase's 1990 10-K noted that "[d]uring 1990, in a continuing effort to meet the stringent capital requirements of FIRREA, as interpreted by the OTS, Carteret continued to downsize its balance sheet and restructure its asset mix to facilitate compliance with FIRREA's risk-based capital requirement."[97] Given the large amount of supervisory goodwill on Carteret's books, it is clear that a substantial portion of Carteret's asset shrink would not have taken place if the Government had allowed Carteret to continue counting its supervisory goodwill for regulatory capital purposes.[98]

66. This breach-induced asset shrink deprived Carteret of net earnings. A large portion of the asset shrink was effectuated through shrinkage in Carteret's portfolio of residential loans and MBSs. For example, these portfolios shrank by over $900 million during the last six months of 1989, and by over $300 million in 1990.[99] These portfolios consisted of low-credit risk assets that were generally performing, and generating positive net income, during the 1989-92 period. Contemporaneous documents make clear that this asset shrinkage cost Carteret earnings. For example, AmBase's 1990 10-K noted that decreases in Carteret's asset volume during that year had a "negative impact" of $8 million on net interest income, and

---

95. 1990 Business Plan of Carteret Bancorp Inc. and Carteret Savings Bank, FA (Apr. 17, 1990), at 7 (C-AM-A-0264601).

96. *Id*.

97. AmBase 1990 Annual Report and Form 10-K at 38 (AMB030256).

98. It is true that in February 1991 a federal district court granted Carteret an injunction that effectively required the Government to count Carteret's supervisory goodwill for regulatory capital purposes. But Carteret had already shrunk its asset base by approximately $1.6 billion—from $7.2 billion to $5.6 billion—by the end of 1990. Carteret Savings Bank, FA, Capital Plan (Sept. 30, 1991) at 49, Appendix B-3 (WOQ6781145, WOQ6781177).

99. Carteret Savings Bank, FA, Thrift Financial Report, June 30, 1989; Carteret Savings Bank, FA, Thrift Financial Report, Dec 31, 1989; Carteret Savings Bank, FA, Thrift Financial Report, December 31, 1990.

AmBase's 1991 10-K noted that volume decreases in 1991 had a "negative impact" of another $20 million.[100] Because I have not performed a lost profits analysis, and do not need to do so in order to formulate an opinion as to whether Carteret would have survived in the no-breach world, I have not attempted to precisely quantify either what portion of Carteret's asset shrink was caused by the breach or how much the breach-induced shrink cost Carteret in net income. For the above reasons, however, I am confident that Carteret would not have shrunk nearly as much as it did if it had been allowed to fully count its supervisory goodwill for regulatory capital purposes, and that such breach-induced shrinkage led to a substantial reduction in net income for the thrift. This lost net income would have been used to improve Carteret’s capital condition.

67. Carteret also experienced deposit runoff as a result of the breach, which contributed to its asset decline and its reduced profitability. Figure 6 shows the quarterly decline in Carteret’s deposits from the beginning of 1989 to the end of 1992.

100. AmBase Corp., 1990 SEC Form 10-K, at 11; AmBase Corp., 1991 SEC Form 10-K, at 9.

FIGURE 6: CARTERET DEPOSIT BALANCE, 1989 - 1992




*Sources*: TFR data; Carteret Savings Bank FA, 1990 Annual Report, at C-A-MA-0394503 (Feb. 1, 1991).

When a bank's regulatory capital is reduced (in this case, by the breach) the resulting weakend condition of the bank will tend to produce a decline in deposits.[101] As Figure 6 shows, Carteret's deposits began a steady decline as Congress began formulating FIRREA. In the quarter preceding FIRREA's enactment, Carteret had $4.72 billion in deposits. In the quarter before Carteret sold its branches in the fourth quarter of 1990, its deposits had fallen to $4.35 billion. Carteret only had $2.47 billion in deposits at the end of 1992, just after its seizure. Even when

101.*See*, *e.g.*, Charles W. Calomiris & Joseph R. Mason, *Fundamentals, Panics and Bank Distress During the Depression*, 93 AM. ECON. REV. 1615 (2003); Charles W. Calomiris & Berry Wilson, *Bank Capital and Portfolio Management: The 1930s "Capital Crunch" and the Scramble to Shed Risk*, 77 J. BUS. 421 (2004); Charles W. Calomiris & Andrew P. Powell, *Can Emerging Market Bank Regulators Establish Credible Discipline? The Case of Argentina, 1992-1999* (National Bureau of Economic Research , Working Paper No. W7715, 2000).

adding back the $1.18 billion in deposits sold with the 1990 branch sales, Carteret's deposits would only have been $3.65 billion at the end of 1992.

68. The deposit runoff resulted in less income for Carteret. Carteret could not enjoy the benefits of the valuable customer relationships inherent in its implied franchise value once those customers left the bank. But-for the breach, this additional income would have enhanced Carteret's regulatory capital profile, further assisting Carteret in maintaining regulatory compliance. I do not attempt to quantify this additional but-for income because the additional income was not necessary to keep Carteret out of failure.

**2. Even If Carteret Had Not Had Sufficient Regulatory Capital at the End of 1992, It Could Have Raised That Capital**

69. As is clear from looking at Table 16, absent the breach Carteret would have had capital surplus for tangible capital and core capital, but would have had a small deficit of $36.9 million in risk-based capital. One way to address the deficit in risk-based capital would have been to convert some assets from assets with relatively high risk-weight to assets with relatively low risk-weight. Thus, one solution to the risk-based capital deficit projected in Table 16 would simply be a slight restructuring of Carteret's asset portfolio. Of course, even that may not have been necessary since in the but-for world, the less shrinkage in assets and deposits may, by itself, have resulted in a risk-based capital surplus. In light of the foregoing it is my opinion that it would not have been necessary for Carteret to raise any additional capital in order to survive absent the breach. Even if the adjustments discussed in the previous section failed to leave Carteret in regulatory capital compliance but-for the breach, any capital shortfall would have been fairly minor. In a world without the breach, Carteret's large franchise value and higher non-breach-affected earnings would have enabled it to easily raise tens of millions of dollars, if needed, to comply with capital regulations.

TABLE 19: POTENTIAL SOURCES OF CAPITAL FOR CARTERET IN 1992

| Source | Estimated Amount (Million $) |
|---|---|
| Carteret Mortgage Co. | $18.4 - $57.8 |
| Carteret's Servicing Portfolio | $101.6 - $135.5 |
| Raising Funds in the Capital Markets | N/A |

**a. Carteret Could Have Raised Capital by Selling Its Mortgage Businesses**

70. If Carteret had been required to raise additional capital beyond what AmBase could have contributed, Carteret had a ready source of additional capital as a result of its ownership of Carteret Mortgage Company and a sizable loan servicing portfolio. As detailed in my prior declaration, Carteret Mortgage Company was a valuable business. In my prior report, I conservatively valued Carteret Mortgage Company at between $18 million and $58 million as of the end of 1992.[102] By selling Carteret Mortgage Company, Carteret could have raised capital in that amount.

71. In addition to its mortgage origination business, Carteret had a substantial loan servicing portfolio amounting to approximately $7.6 billion as of June 1992.[103] Contemporaneous independent appraisals suggest a value of approximately $101.6 million for Carteret's $8.0 billion servicing rights alone as of September 30, 1991,[104] a value of $63.0 million to $79.4 million for Carteret's *purchased* loan servicing rights of $5 billion as of September 1991,[105] and a value of $46.1 million for servicing rights on Carteret's *originated*

102. Declaration of Charles W. Calomiris of July 14, 2006, at 94-100.

103. Hamilton, Carter, Smith Consulting, Inc., Carteret Savings Bank, F.A., $7.6 Billion Purchased & Originated Loan Servicing Portfolio Data (July 22, 1992) (WOP3161635 – WOP3161643).

104. Kidder, Peabody & Co. & Merrill Lynch & Co., Carteret Savings Bank FA, Company and Investment Overview (Mar. 9, 1992), at 2.

105. Hamilton, Carter, Smith & Co., Carteret Savings Bank, F.A., $5 Billion Purchased Mortgage Servicing Rights Evaluation (Nov. 14, 1991), at Section 1 (WOP3161869).

loans only as of June 1992.[106] Actual sales of portions of the loan servicing portfolio are consistent with this valuation. During first the eight months of 1991, Carteret sold $465 million in servicing rights, resulting in a gain of $7.1 million.[107] These sales proceeds of 1.5 percent of the servicing rights are consistent with the value of Carteret's servicing rights implied by the 1991 and 1992 appraisals.

72. Furthermore, the sale of the loan servicing portfolio by the RTC confirms the substantial value in this portfolio. The RTC waited until 1994 to sell the loan servicing portfolio, which had shrunk considerably from $7.2 billion at the end of 1992[108] to $3.3 billion at the time of sale in June 1994.[109] Nevertheless, the RTC still received $61.7 million in connection with the sale.[110] The bottom line is that Carteret could have raised substantial amounts of capital -- in excess of $120 million -- if it had chosen to sell all, or a portion of, Carteret Mortgage Company and the loan servicing portfolio in 1992. Indeed, if the two businesses had been sold together, they would have been even more valuable.

**b. Carteret Could Have Raised Capital through Borrowing**

73. Beyond all these sources of capital, given Carteret's large franchise value and higher non-breach-affected earnings, it would have also been successful in raising funds from the capital markets but-for the breach. As detailed in my prior report, the cost of such capital can be readily quantified through a regression forecast of preferred stock yields or by estimating Carteret's cost of common equity using the CAPM.[111] Table 20 summarizes Carteret's cost of

---

106.Hamilton, Carter, Smith & Co., Carteret Savings Bank, F.A., $3.3 Billion Originated Loan Servicing Rights Evaluation (Jul. 22, 1992), at Section 1 (WOP3161616).

107.Carteret Savings Bank, FA, Capital Plan (Sept. 30, 1991) at 31 (WOQ6781130).

108.Clearwater Servicing Center, at 1.1 (C-AM-A-0026931).

109.Memorandum from Bruce A. Campbell, Carteret Savings Bank, F.A., to Loss Analysis File, Sept. 25, 1985 (C-AM-A-0362965).

110.*Id*.

111.Declaration of Charles W. Calomiris of July 14, 2006, at 71-81.

preferred stock capital using the same coefficients estimated in the regression from my previous declaration and the relevant inputs for the end of 1992. For illustrative purposes, I use three estimates of the amount of capital Carteret could have raised—$10 million (a hypothetical low estimate), $30 million (a hypothetical medium estimate), and $136.81 million (equal to the principal amount of Carteret's supervisory goodwill at the end of 1992, as shown in Appendix A). Table 21 summarizes Carteret's cost of common equity capital using the CAPM and the relevant inputs for 1992.

TABLE 20: CARTERET'S COST OF PREFERRED CAPITAL AS OF DECEMBER 31, 1992

| | | | Carteret Input Values | | |
|---|---|---|---|---|---|
| | **Dollars in Millions** | **Regression Coefficients** | **12/31/1992 [1]** | **12/31/1992 [1]** | **12/31/1992 [2]** |
| [3] | Principal amount ($) | | 10.00 | 30.00 | 136.81 |
| [4] = LN [3] | Natural log of principal amount | -0.3321 | 2.30 | 3.40 | 4.92 |
| [5] | Equity-to-asset ratio (%) | -2.9981 | 3.90 | 3.90 | 3.90 |
| [6] | Convertible issue | -2.5743 | 0 | 0 | 0 |
| [7] | Duration of offering (In years) | 0.0241 | 19.00 | 19.00 | 19.00 |
| [8] | Non-performing assets ($) | | 322.64 | 322.64 | 322.64 |
| [9] | Total Assets ($) | | 5229.19 | 5229.19 | 5229.19 |
| [10] = [8] / [9] | Non-performing assets-to-total assets ratio (%) | 0.5326 | 6.17 | 6.17 | 6.17 |
| [11] | Merrill Lynch high-yield debt index | -0.1335 | 96.17 | 96.17 | 96.17 |
| [12] | Issuer is holding company | -0.7222 | 0 | 0 | 0 |
| [13] = $[5]^2$ | Equity-to-asset ratio squared | 0.2152 | 15.21 | 15.21 | 15.21 |
| [14] = $[10]^2$ | Non-performing assets-to-total assets squared | -0.0338 | 38.07 | 38.07 | 38.07 |
| [15] | Rating | 0.0599 | 0 | 0 | 0 |
| [16] | Issuer is rated | -1.5959 | 0 | 0 | 0 |
| [17] | Constant | 32.9728 | | | |
| | | **[18] Forecasted Yield** | 13.41% | 13.04% | 12.54% |

*Notes*:
[1] Applicable data for Carteret Bancorp from Q4 1992 TFR. Range of principal amounts assumed to be $10 million to $30 million.
[2] Applicable data for Carteret Bancorp from Q4 1992 TFR. Principal amount is equal to Supervisory Goodwill Balance as of 12/31/1992.
[5] For Q4 1992, Carteret Bancorp equity is negative. The worst in-sample equity-to-asset ratio is used instead.
[7] The duration of the offering is set to match the number of years until the Supervisory Goodwill is completely amoritized as indicated on the 1989 Goodwill Amortization Schedule. For 12/31/92 the duration is set to 19 years (2011-1992).
[8] Non-performing Assets are comprised of Nonaccrual Loans, Repossessed Assets & Real Estate Held for Investment, and Foreclosures. Source: Thrift Financial Reports
[9] Source: Thrift Financial Reports
[11] Merrill Lynch high-yield debt index data is from Bloomberg.
[18] Forecasted Yield is equal to the sum of the product of regression coefficients and the corresponding Carteret input value.
*Sources*: Declaration of Charles W. Calomiris of July 14, 2006, at 106; Thrift Financial Reports; Bloomberg.

TABLE 21: CARTERET'S COST OF COMMON CAPITAL

| | | Carteret Input Values 1992 | | |
|---|---|---|---|---|
| | | 10 Year | 30 Year | |
| 10 or 30 Year Constant Maturity Treasury Rate | $r_f$ | 6.70% | 7.40% | [1] |
| Beta | $\beta$ | 0.88 | 0.88 | [2] |
| Market Risk Premium | $E(r_M)$-$r_f$ | 6.00% | 6.00% | [3] |
| **CAPM Cost of Equity Capital** | $r_f + \beta(E(r_M)-r_f)$ | 11.98% | 12.68% | |

*Notes*:
[1] For 1992 both the 10-year and 30-year Treasury Rates as of 12/31/92 are shown.
*Source*: <http://research.stlouisfed.org/fred2/data/DGS10.txt> and <http://research.stlouisfed.org/fred2/data/DGS30.txt>
[2] Median beta for depository institutions in 1994. Earlier data for depository institutions was not available.
*Source:* IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1994 YEARBOOK., p. 6-4.
[3] Declaration of Charles W. Calomiris of July 14, 2006, at 80.

As reflected in Tables 20 and 21, Carteret's cost of raising capital would have been approximately 12 percent. However, several of the inputs relating to Carteret's financial condition in 1992 that are the basis for the cost of preferred capital calculations in Table 20 are conservative in that they are breach affected. For example, the ratio of Carteret's equity to assets may not have been negative in world without the breach. An increase in this ratio would lower the cost of preferred capital.

74. The laws governing regulatory capital compliance by thrifts changed slightly in December 1992, when the regulatory capital provisions of the FDIC Improvement Act of 1991 ("FDICIA") became effective. FDICIA, among other things, created new categories of capitalization status for thrifts, and in effect raised the core capital requirement from 3 percent to 4 percent of assets. In addition, FDICIA imposed requirements for thrift regulators to take so-called "prompt corrective actions" against thrifts that were considered "critically undercapitalized." A thrift was considered critically undercapitalized if it failed to meet a ratio of "tangible equity" to total assets of at least 2 percent. FDICIA authorized the regulators to place critically undercapitalized institutions in receivership or conservatorship within a certain amount of time, but the legislation authorized the regulators to refrain from appointing a receiver or

conservator if they made a determination that the institution was viable.[112] For the same reasons, discussed above, that I have concluded that, in the no-breach world, Carteret would have been well positioned to achieve compliance with the FIRREA minimum capital requirements, I have also concluded that Carteret, if it had the benefit of its supervisory goodwill, would have been well positioned to take actions to ensure that it did not fall into the "critically undercapitalized" category once FDICIA became effective in December 1992. In short, if Carteret had the benefit of its contractually-guaranteed supervisory goodwill, Carteret would have been able to take other measures to raise sufficient capital to meet both the FIRREA and FDICIA standards.

**C. The Breach's Negative Impact on Carteret Was Immediate in AmBase's Stock Price**

75. FIRREA's passage marked the end of a gradual increase in AmBase's stock ever since it acquired Carteret in August 1988. Figure 7 shows the movements in AmBase's stock from 1987 until it was delisted as a result of Carteret's seizure by the government in December 1992.

112. *See generally* 1991 AmBase 10-K at 10-11 (CAM4020320-21).

FIGURE 7: AMBASE'S STOCK PRICE, 1987-1992




*Sources*: CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006; *AmBase Seen Opening Sharply Lower*, REUTERS NEWS, Aug. 15, 1990; *AmBase Says Q2 Results Hurt Negotiations*, REUTERS NEWS, Aug. 15, 1990; *Stockholder Sues AmBase Over Dividend Cancellation*, REUTERS NEWS, Aug. 16, 1990; *Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 762 F. Supp. 1159 (1991); *Great Western Buys Branches*, N.Y. TIMES, June 19, 1990, at D5; Press Release, Great Western Financial Corp., Great Western Announces Florida Acquisition (June 18, 1990) (CAM4900654- CAM4900655); *Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 963 F.2d 567, 585 (3d Cir. 1992); Press Release, Carteret Completes Sales of 13 Florida Offices to Great Western Bank (Oct. 9, 1990) (CAM4071763); *Ambase 1st Qtr Loss; To Pay Special Div; Suspends Qtr Div*, DOWJONES NEWSWIRES, May 14, 1990; Michele Galen, *Top of the News: AmBase Shareholders Are Used to Disappointment. But This . . . –Management Reneges on a Dividend to Pay Unexpected Debt*, BUS. WEEK, Sep. 3 1990, at 38; *OTS Seeks $30 Million Capital Infusion Into Carteret Savings*, DOWJONES NEWSWIRES, Sep. 6, 1990.

As Figure 7 shows, AmBase's stock fell from its $15 to $16 range at the time FIRREA was enacted to the $6 to $7 range over the next nine months. On May 14, 1990, AmBase announced that it would suspend its quarterly common stock dividend of $0.05 per share.[113] However, that news was overshadowed by the announcement that AmBase would pay a special dividend upon

113.*AmBase Suspends Quarterly Dividend*, REUTERS NEWS, May 14, 1990.

the sale of its Home Insurance Co.[114] As Figure 7 shows, this announcement stopped the decline in AmBase's stock price, and the price gradually increased until August 14, 1990.

76. On August 14, 1990, AmBase announced that it posted a $106 million second quarter loss, and, more importantly, that it would not pay the special dividend announced in May.[115] Stockholders had expected this special dividend to be around $4 per share when AmBase announced its cancellation.[116] The day after this news was announced, AmBase's stock price fell from $7.50 to $2.75. The dividend cancellation announcement was coupled with the announcement that AmBase planned to sell the Home Insurance Co. to Vik Brothers International for $905 million.[117] Finally, on September 6, 1990, AmBase announced that the OTS had requested a $30 million capital infusion into Carteret.[118]

77. The proximity between the OTS's request for the capital infusion and the announcement of the cancellation of the special dividend reflects a common cause, namely the reduction in capital caused by the breach. AmBase's management had been in contact with the regulators about Carteret's capital troubles before the OTS's request for the capital infusion. In addition to the expected capital requirements of Carteret, AmBase was under pressure from bankers with whom it was in default on loan covenants. AmBase was pressured to reach a final agreement to sell the Home Insurance Co. by the end of September 1990 to avoid penalties with

---

114. *Ambase 1st Qtr Loss; To Pay Special Div; Suspends Qtr Div*, DOWJONES NEWSWIRES, May 14, 1990.

115. Michele Galen, *Top of the News: AmBase Shareholders Are Used to Disappointment. But This . . . – Management Reneges on a Dividend to Pay Unexpected Debt*, BUS. WEEK, Sep. 3 1990 at 38.

116. *Stockholder Sues AmBase Over Dividend Cancellation*, REUTERS NEWS, Aug. 16, 1990.

117. Michele Galen, *Top of the News: AmBase Shareholders Are Used to Disappointment. But This . . . – Management Reneges on a Dividend to Pay Unexpected Debt*, BUS. WEEK, Sep. 3 1990 at 38.

118. *OTS Seeks $30 Million Capital Infusion Into Carteret Svngs*, DOWJONES NEWSWIRES, Sep. 6, 1990.

its lenders, and it apparently turned down an earlier, higher bid of $955 million from Sequoia Associates for the purpose of a quick close of the sale.[119]

78. No other event (other than the eventual seizure of Carteret that resulted in the delisting of AmBase's stock) carried the weight with investors that the cancellation of the special dividend did. For example, Figure 7 shows that AmBase's stock price did not react as strongly to the announcements of its branch sales. Furthermore, AmBase's stock price did not react as strongly to events related to the injunction against regulators disregarding supervisory goodwill. On April 25, 1991, the United States District Court for the District of New Jersey issued a preliminary injunction that prevented the OTS from disregarding Carteret's supervisory goodwill from regulatory capital.[120] AmBase's stock price never closed beyond a trading range of $0.8125 to $0.875 in the five trading days around the preliminary injunction. The OTS appealed the preliminary injunction, and on May 7, 1992, the United States Court of Appeals for the Third Circuit vacated the district court's order granting the preliminary injunction.[121]

79. In summary, the effects of FIRREA on the value of Carteret were visible in AmBase's stock price movements beginning in May 1989. The stock market did not immediately anticipate in August 1989 all of FIRREA's eventual damage to Carteret. The costliness of the breach to Carteret increased over time as a result of regulatory policies related to the enforcement of FIRREA. AmBase's stock price, and thus the market's view of the viability of Carteret as an institution, swiftly declined as the market recognized the ramifications of these policies.

---

119.Michele Galen, *Top of the News: AmBase Shareholders Are Used to Disappointment. But This . . . – Management Reneges on a Dividend to Pay Unexpected Debt*, BUS. WEEK, Sep. 3 1990 at 38.
120.*Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 762 F. Supp. 1159 (1991).
121.*Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 963 F.2d 567, 585 (3d Cir. 1992).

## III. BUT-FOR THE BREACH, CARTERET WOULD NOT HAVE FAILED AT ANY TIME AFTER 1992

80. Even if supervisory goodwill had not been eliminated from Carteret's regulatory capital, to ascertain whether the breach caused Carteret to fail one must ask whether other factors unrelated to the breach would have resulted in the seizure of the thrift. Carteret's operations and its portfolio show that Carteret would not have failed but-for the elimination of supervisory goodwill from its regulatory capital. Carteret had 14 consecutive months of significantly profitable operations through November 1992.[122] Even the weakest part of Carteret's asset portfolio, its commercial real estate loans, would not have caused Carteret to fail in a world without the breach. Had Carteret not been seized, it would have been able to enjoy the record economic prosperity that ensued following the 1990-91 recession that other thrifts enjoyed, as I discussed in Section I.

81. The attitude of the OTS regulators who were most familiar with Carteret's operations also confirmed that Carteret would not have failed absent the breach. Specifically, the top regulators in the OTS's northeast region expressed great confidence in Carteret's management. These regulators noted that Carteret had positive core earnings by 1992 even in the aftermath of the breach. The regulators also acknowledged that Carteret had made great strides in solving the problems in its commercial real estate portfolio. Most importantly, the regulators admitted that Carteret would not have been seized if it had an additional $140 million in capital.[123] Throughout its examination reports, OTS regulators praised Carteret's management and its solid income statement:

122. AmBase Corp., 1992 Annual Report (Form 10-K) (AMB030515).
123. Deposition of Angelo A. Vigna at 158 (Oct. 26, 1999).

> Carteret's asset quality has improved due to an intensive effort by management to liquidate non-performing assets and to work out deteriorating problem assets by negotiating mutually agreeable payoffs or restructurings.[124]
>
> Criticized assets have decreased by 20.9 percent since the June 17, 1991 examinations with assets classifies "Substandard" down by $28.9 million (4.7%), assets classified "Doubtful" down by $46.5 million (84%) and assets classified "Loss" down by $154.6 million (77.4%).[125]
>
> Administration of the approximately $763 million ($562 million net of $146 million in chargeoffs and $55 million in GVAs) commercial loan and REO portfolios has also improved dramatically and this has facilitated Carteret's efforts to dispose of this portfolio. The addition of EVP-Commercial Assets J. Wayne Moor has resulted in substantial improvement in the management and workout of the commercial asset portfolio. Mr. Moor has been responsible for reducing gross commercial assets by $238 million, augmenting total valuation allowances by more than $150 million, restructuring the loan workout department to a smaller yet more effective staffing level and initiating the implementation of aggressive asset workout plans.[126]
>
> However, core operations are improving as evidenced by the profit for the five month period ended May 31, 1992, which was due to improved net interest margins, lower loss provisions and reduced operating expenses.[127]
>
> Current management is considered to be both capable and effective in dealing with Carteret's significant problems. Messrs/ Bianco and Kramer and spending most of their time in search of equity capital investors. However, they have also been responsible for quickly addressing Carteret's problems by reorganizing management, setting up adequate loss reserves, aggressively disposing of Carteret's problem assets and paring operating expenses at a substantial rate. EVP Moor has been leading the effort to control and dispose of problem commercial assets. EVP McCabe manages the mortgage origination and retail branch functions and is also actively involved with the effort to pare down the operating expenses.[128]
>
> Current management is capable of prudently managing Carteret through the recapitalization period.[129]
>
> The new asset management team commenced its efforts in July of 1991 and has been effectively reducing the portfolio, with particular emphasis on the classified assets. No new major lending has taken place. The current emphasis is on getting not only the level of classified assets reduced, but also the total amount of assets, in an effort to improve capital rations. The team has worked well, both at the main office in New Jersey , as well as the Florida office.[130]

---

124.Office of Thrift Supervision, Report of Examination (Jun. 15, 1992) at 1 (WOQ6730042).
125.*Id*. at 2 (WOQ6730043).
126.*Id*.
127.*Id*.
128.*Id*. at 7. (WOQ6730048).
129.*Id*.
130.*Id*. at 14. (WOQ6730055).

> As noted above, net income for the quarter ended March 1992 has improved over the prior year's results. The primary cause for the improvement in net income as contrasted with previous periods is attributable to a significant reduction in provision for loan loss. In addition, CSB experienced a marginal improvement in net interest income over 1991, and a decline in non-interest expense.[131]
>
> The current management team has made significant progress in improving credit administration and work-out operations and understands that recapitalization is an absolute necessity. New management has been cooperative with OTS regulators and has complied with all regulatory directives.[132]
>
> The bank's new asset recovery team, which has only been in place for a little over one year, has done a commendable job in identifying and disposing of problem assets.[133]

These observations provide further evidence of Carteret's large franchise value, just six months before Carteret was seized. Given the strength of Carteret's management and Carteret's income, it was highly unlikely that Carteret would have failed once it survived the rough period of the early 1990s.

### A. Carteret's Commercial Real Estate Portfolio Was Not as Troubled as Write-Downs Implied

82. It is evident that, apart from the Government's elimination of Carteret's supervisory goodwill capital, the biggest challenges facing Carteret in the 1990-92 period related to the asset quality problems inherent in Carteret's corporate and commercial real estate lending portfolios. Due to some underwriting problems and, more importantly, due to the commercial real estate recession of the early 1990s, Carteret suffered severe losses on its corporate/commercial real estate portfolios. Carteret would likely have eventually suffered some of these same losses even in the absence of the Government's breach. However, as I have previously discussed, if Carteret had not been forced, as a direct result of the breach, to begin intensive efforts to raise external capital, it would have booked a smaller amount of reserves on

---

131. *Id*. at 30 (WOQ6730071).
132. Federal Deposit Insurance Corporation, Report of Examination (June 19, 1992) at I (C-AM-A-0054145).
133. *Id*. at I-2 (C-AM-A-0054147).

these assets and would not have sold as many of these assets as quickly into the depressed commercial real estate market. Rather, it would have been able to hold onto many of these assets until the real estate market recovered, and accordingly would likely have obtained higher values on disposition. Moreover, as is also discussed below, it is my opinion that Carteret in the 1991-92 period booked adequate reserves to cover the vast majority of the losses that would have been suffered on these assets, and that these losses themselves would not have been sufficient to lead to Carteret's failure in the no-breach world.

83. In addition, in the no-breach world Carteret would not have suffered any additional losses relating to its corporate and commercial real estate lending, because Carteret effectively discontinued that lending in 1989 for reasons unrelated to the breach. Once again, the contemporaneous documents make this clear. For example, the 1990 AmBase 10-K states that "Carteret ceased all new corporate and commercial real estate loan originations during 1990 pursuant to a policy established in 1989. This policy was in response to the adverse economic conditions which affected the Northeast and Southeast regions of the United States, Carteret's primary operating markets. Both of these regions have experienced significant increases in non-performing loans in 1990 resulting from continued deterioration of the real estate markets, particularly in commercial real estate."[134] Because Carteret discontinued its corporate/commercial real estate lending because of "adverse economic conditions" rather than the breach, there is no reason to assume that, in the no-breach world, Carteret would have continued, let alone expanded, its corporate/commercial real estate lending.

134. AmBase 1990 Annual Report (Form 10-K), at 4-5 (AMB030222-23).

### 1. Carteret's Writedowns Were Extremely Aggressive

84. Angelo Vigna, the top OTS regulator in the Northeast region, explained that Carteret's significant write-downs in 1991 were the result of the need to raise capital:

> "They took a very, very aggressive, and I would say ultraconservative, view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally . . . . I think it was, as I recall, the feeling was if they were going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money that there were no surprises, other big write-downs subsequent to that. On the other hand, as a consequence, it put them in a more difficult and worse regulatory posture in terms of their capital requirements, their capital position."[135]

### 2. Carteret's Commercial Real Estate Write-Downs Were Excessive in Light of the Eventual Increase in Property Values

85. I have examined records of the RTC's sales of Carteret's assets, and I have concluded that Carteret's reserve balance just before it was seized was almost sufficient to cover the losses actually suffered on the sales of those assets. However, Carteret's reserves would have been more than sufficient but-for the breach after I consider (1) the depressed sales proceeds the RTC achieved at the time of the asset sales, and (2) the increase in commercial real estate values after the RTC had disposed of Carteret's assets.

#### a. Carteret's Reserves Were Almost Sufficient to Cover the Difference Between the Actual Sales Value of Its Commercial Real Estate Assets and the Principal Balance of Those Assets

86. From my review of materials relating to the RTC's and FDIC's disposition of Carteret's corporate and commercial real estate loans and related assets, I believe that Carteret had, by November 1992, booked an adequate level of reserves to cover the losses that actually would have been suffered on these assets in a no-breach world.[136] For the reasons discussed below, I believe it is likely that Carteret would have obtained better results in disposing of these

135. Deposition of Angelo A. Vigna at 110 (Oct. 26, 1999).

136. The list of documents I reviewed relating to the RTC's and FDIC's disposition of these assets are listed in my Materials Relied Upon in Appendix B under *Real Estate Sales*.

assets than did the RTC/FDIC. Also, Carteret would not have sold so many of its commercial real estate assets in a recessionary environment.

**b. The RTC Did Not Achieve Full Sales Values for Carteret's Commercial Real Estate Assets**

**i. The Real Option Value of Liquidation Limited the RTC's Achieved Sales Value for Carteret's Assets**

87. The application of option theory to bankruptcy costs was analyzed by Professor Joseph Mason of Drexel University.[137] In his research, Professor Mason explained that in the event of bankruptcy, the trustee has the duty to maximize creditor recoveries, which is equivalent to minimizing creditor losses.[138] In solving this problem, the trustee understands that if it liquidates at current asset values, it forgoes the opportunity to liquidate at future asset values.[139] Therefore, the trustee would intelligently choose not to liquidate in any given period if the future expected asset price growth is sufficiently large to offset the direct costs of delaying the liquidation.[140]

88. Furthermore, Professor Mason explained that the likelihood of delaying the liquidation is typically increased in times of economic expansion. In analyzing the timing of liquidation with real estate price data between 1986 and 1996, he found that after 1991, which marked the beginning of an economic expansion, intelligent trustees delayed the liquidation of volatile assets because asset price volatility was indicative of the potential for greater returns and, therefore, improved loss minimization. Put simply, Professor Mason found volatility in real estate asset prices was "a double-edged sword, benefiting the trustee in expansionary periods but

---

137.Joseph Mason, *A Real Options Approach to Bankruptcy Costs*: *Evidence from Failed Commercial Banks During the 1990s*, 78 J. OF BUS. 1523, 1523-1553 (2005).

138.*Id*. at 1524.

139.*Id.*

140.*Id.*

posing a risk of prolonged exposure to depressed asset values in contractionary periods."[141] Therefore, a rational trustee faced with the decision to hold or quickly liquidate volatile assets after 1991 would have chosen to hold those assets in an effort to benefit from the upside that such price volatility generates.

89. Applying the logic of Professor Mason's research to the instant case, one realizes that the real option value of the liquidation almost certainly exceeded the actual sales values of the assets in question. Specifically, the RTC and Carteret sold assets at a faster pace than they would have but-for the loss of supervisory goodwill from FIRREA. However, there is a real option value of waiting to liquidate those assets and that real option value is high because (1) the price of the assets in question were volatile and (2) the economy was in a state of economic expansion at the time. Property sales of failed banks provide ample evidence to support this conclusion. Put simply, there was a foreseeable prospective reduction in the illiquidity discount in real estate values because the number of sellers (the failed and failing banks) was high in 1990 and 1991.

#### ii. The Replacement of Carteret's Superior Management Limited the RTC's Achieved Sales Value for Carteret's Assets

90. In addition to the low sales prices caused by the glut of sales from other failed thrifts, the actual sales values of Carteret's commercial real estate loans would have been higher but-for the breach because they would have been sold by Carteret instead of the RTC. As Stuart Root, executive director of the FSLIC from 1987 to 1989, has put it, "assets lose up to twenty percent of value when they are taken over by the government for disposition. A liquidation program involving hundreds of billions of dollars in assets is thus bound to have an adverse

141. *Id*. at 1549.

impact on values of assets held by institutions."[142] A number of other former high-ranking government banking officials agree that seizure and liquidation invariably reduces substantially the value of a thrift's assets.[143] For example, William Seidman, a former chairman of the FDIC, has said, "It is very clear that assets lose value as they are moved out of banks and into a liquidation mode."[144] Roger Watson, former director of research for the FDIC, has said, "As soon as the FDIC assumes the bad loans from a failing bank that's being taken over, the assets suffer an immediate loss of about 15% in value."[145] Along similar lines, Angelo Vigna testified during his deposition in this case that seizure of a thrift typically reduces the thrift's franchise value by 10 to 15 percent.[146]

**iii. The Minority Preference Program Limited the RTC's Achieved Sales Value for Carteret's Assets**

91. As I discussed in my previous report, the RTC gave bidding preferences to minority-owned depository institutions when selling either a failed bank as an entire institution, or when selling branches of the failed bank.[147] In December 1993, the RTC Completion Act of 1993 "required that the RTC give 'bidding preference' to an offer from a minority owned depository institution to acquire any failed depository institution, or any branch thereof, located in a neighborhood in which 50 percent or more of the residents were minorities, as part of the Predominantly Minority Neighborhoods (PMN) Program."[148] "Minority bidders were permitted

---

142. Stuart D. Root, *Bank Capital, Asset Liquidation, and the Credit Crunch*, 1993 COLUM. BUS. L. REV. 169, 182-86.

143. *See id.* at 183 n.65.

144. Steve Klinkerman, *The High Road is Costing RTC Time and Money*, AMER. BANKER, August 6, 1990, at 1.

145. Kenneth H. Bacon, *As Deposit Insurance Dwindles, FDIC Wonders If It Should Start Running the Banks It Seizes*, WALL ST. J., Dec. 31, 1990, at A30.

146. Deposition of Angelo A. Vigna at 127-128, 187-189 (Oct. 26, 1999).

147. For further discussion of the minority preference program, see Declaration of Charles W. Calomiris of July 14, 2006, at 35-39, 55-65.

148. FEDERAL DEPOSIT INSURANCE CORPORATION, MANAGING THE CRISIS: THE FDIC AND RTC EXPERIENCE, 1980-1994 136 (1998). [hereinafter MANAGING THE CRISIS].

to submit a second bid if their initial bid was within 10 percent of the otherwise winning lowest bid by a nonminority bidder. The option to purchase performing loans at market value and [interim capital assistance] were also available to the minority acquirers."[149] To facilitate these transactions, the minority preference program required the RTC to "provide, in connection with such acquisition [by a minority acquirer] . . . , performing assets under the control of the [RTC] in an amount . . . not greater than the amount of net liabilities carried on the books of the institution or branch, including deposits, which are assumed in connection with the acquisition."[150]

92. As I discussed in my earlier declaration, the minority preference program forced Carteret to be sold in pieces, rather than on a whole-bank basis.[151] The minority preference program favored small bank bidders for whom Carteret's large size was prohibitive when considering a whole-bank bid. With the advent of the minority preference program, Carteret's resolution was transformed from a reprivatisation to a Purchase and Assumption that was carried out as a "Branch Sale."[152] Branch sales are associated with substantially lower premium received per deposit dollar than reprivatisations.[153] In addition, the minority preference program discouraged other bidders from participating in the auction of Carteret's deposits and assets.[154] Those bidders who did participate in the bidding bid less aggressively than they otherwise would have had there been no minority preference program.[155] Because the minority preference program called for the RTC to make performing assets available to a specific acquiror, it was not possible to obtain competitive bids from multiple prospective purchasers.

149.*Id*.
150.12 U.S.C. § 1441a(w)(17)(C).
151.Declaration of Charles W. Calomiris of July 14, 2006, at 57-62
152.*Id*.
153.*Id*.
154.*Id*. at 62-63.
155.*Id*. at 63-65.

93. Empirical evidence of the distorting effect of the minority preference program on sales proceeds is present in documents relating to Carteret's asset sales. For example, Dryades Savings Bank, a minority acquirer of another institution, purchased $32.14 million of Carteret's assets for $30.96 million on February 21, 1995.[156] It also purchased $9.80 million of another failing institution's performing assets for $8.88 million.[157] The next day, Dryades flipped $6.13 million of these assets for a 6.4 percent profit.[158] In addition, United Bank, a minority acquirer of another institution, purchased $30.32 million of Carteret's performing assets in December 1993. By February 2004, United Bank had already sold $13 million of those assets to Chemical Mortgage Co.[159] Had those minority institutions not had a comparative advantage over other bidders in acquiring Carteret's assets, the RTC may have received the higher sales proceeds in its sale of those assets that the minority bidders eventually enjoyed when they flipped the assets.

**c. Commercial Real Estate Values Increased Over Time in Carteret's Markets**

94. Commercial real estate values are tracked over time both at the national level and the regional level through the National Council of Real Estate Investment Fiduciaries (NCREIF) Property Index (NPI). The NPI is a quarterly index based on appraisals of existing operating properties that are acquired on behalf of tax-exempt institutions and held in a fiduciary environment.[160] The NPI is available at a national level, a regional level, and a metropolitan statistical area (MSA) level. The NPI is also available by property type: apartment, industrial, office, retail, and hotel. The NPI is a reliable indicator of commercial real estate value because it

---

156. Dryades Savings Bank, FSB, Summary of Loans Purchased (Feb. 21, 1995); Minority Preference Funding Statement, Dryades Savings Bank (Feb. 21, 1995).

157. *Id*.

158. Funding Statement, Gulf Coast Bank (Feb. 22, 1995).

159. Executive Summary, Carteret Federal Savings Bank, Feb. 28, 1994, at 2-3 (AM52900133 – AM52900134).

160. NATIONAL COUNCIL OF REAL ESTATE INVESTMENT FIDUCIARIES, FREQUENTLY ASKED QUESTIONS ABOUT NCREIF AND THE NCREIF PROPERTY INDEX (NPI), http://www.ncreif.org/pdf/Users_Guide_to_NPI.pdf.

accounts for both the net operating income of the properties in the index and changes in the market value of the properties in the index.

95. HVS International, a consulting firm for the hospitality industry, produces an index of hotel values. HVS International's Hotel Valuation Index (HVI) tracks hotel values in major metropolitan areas and in the United States as a whole. The HVI is derived from an income capitalization approach, utilizing market area data and historical operational and capitalization rate information.[161]

96. Figure 8 shows the increase in the NPI from 1989 through 2006 for each region of the country.

FIGURE 8: NPI BY REGION, 1989 - 2006




*Source*: NCREIF Index/Data, http://www.ncreif.org/indices/.

161. Aaron Gumpenberger & Steve Rushmore, HVS International, 2005 UNITED STATES HOTEL VALUATION INDEX (Nov. 2005) at 1.

As Figure 8 shows, changes in commercial real estate values did not vary substantially across the different regions of the country during the 1990s. Commercial real estate values peaked nationally and in each region of the country in the third quarter of 1990 (except the midwest, in which commercial real estate values peaked one year later). Commercial real estate values then fell during the recession of the early 1990s. Commercial real estate values reached a trough in each region except the west in the fourth quarter of 1992, just as Carteret was seized by the OTS. By the first quarter of 1996, commercial real estate values in every region of the country had surpassed their earlier highs.

97. Figure 9 shows the quarterly NPI for each property type and the annual HVI for hotel values from the end of 1988 through 2006.

FIGURE 9: NPI & HVI BY PROPERTY TYPE, 1988 Q4 – 2006 Q4




*Sources*: NCREIF Index/Data, http://www.ncreif.org/indices/; Aaron Gumpenberger & Steve Rushmore, HVS International, 2005 UNITED STATES HOTEL VALUATION INDEX (Nov. 2005) at 1.

As Figure 9 shows, commercial real estate values had more variance across property types than across regions of the country. Declines in apartment values were less severe and of a shorter duration than that of other property types in the early 1990s. Offices suffered the largest and most prolonged decline. Nevertheless, all property types recovered their values by 1997 and increased dramatically in the subsequent years.

98. As Figures 8 and 9 show, commercial real estate values were at or near their lows at the time Carteret was seized in December 1992. Because a loan is a senior claim, the value of the real estate loan portfolio should not fall as much as the value of the underlying properties. Therefore, the writedowns in Carteret's portfolio should not have exceeded the decrease in value of those properties.

99. Figure 10 shows the evolution of the market value of Carteret's commercial real estate portfolio, conservatively assuming that the sales proceeds for the assets were equal to the assets' market values at the time of the sales, and assuming that the market values of those assets grew at the same rate as the corresponding NPI and HVI property type indices shown in Figure 9.

FIGURE 10: EVOLUTION OF MARKET VALUE OF CARTERET'S COMMERCIAL REAL ESTATE PORTFOLIO BASED ON INDEX RETURNS




*Note*: Current use, property description, or property name suffix from property appraisal or inspection documents was used to determine property type labels. Office properties were mapped to the nationwide office NPI growth rates, hotel properties were mapped to nationwide hotel HVI growth rates, apartment and condo properties were mapped to nationwide apartment NPI growth rates, retail properties were mapped to nationwide retail NPI growth rates, warehouse properties were mapped to nationwide industrial NPI growth rates, and all other properties—including construction projects, land, storage facilities, self-storage facilities, day care centers, service stations, single family residences, and properties that lacked a description—were mapped to the national average NPI growth rate. Properties that lacked either a date or a sale price were excluded from the calculation of market values and principal value at disposition.
*Sources*: Sources listed in Appendix B under *Real Estate Sales*; NCREIF Index/Data, http://www.ncreif.org/indices/; Aaron Gumpenberger & Steve Rushmore, HVS International, 2005 UNITED STATES HOTEL VALUATION INDEX (Nov. 2005) at 1; Calomiris calculations.

As Figure 10 shows, even if I assume that the true market value of Carteret's commercial real estate portfolio was equal to the sales price obtained by the RTC, the market value of Carteret's

portfolio would have exceeded the remaining principal at disposition by the beginning of 1998. In fact, the principal balance at disposition is an upper bound on what the principal balance for Carteret's commercial real estate assets would have been in a but-for world. Many of those assets were performing, meaning that the principal was being paid down. In addition, the sales proceeds and the estimated portfolio market value in Figure 10 do not account for any of the so-called equity adjustments booked in connection with securitizations of some of the asset sales included in Figure 10. In a but-for world, the market value of Carteret's commercial real estate assets would have exceeded the principal balance even sooner than 1998. Figure 10 provides further evidence that that Carteret had ample reserves to cover any losses on its commercial real estate portfolio.

**B. Thrift Failures After 1992 Were Rare**

100. Once Carteret would have survived in the but-for world through 1992, it would have suffered little risk of failure in light of the tremendous performance of the banking and thrift industry throughout the 1990s and 2000s. As Figure 2 showed, thrift industry stock returns skyrocketed beginning in 1995. In addition, only 120 banks and thrifts failed between January 1993 and November 2006, 50 of which failed in 1993 during the last vestiges of the banking industry's stagnation.[162] Table 22 shows the number of institutions that failed during each year, relative to the total number of FDIC-insured institutions at the beginning of that year.

---

162. FDIC Historic Statistics on Banking, Bank and Thrift Failure Reports, *available at* http://www2.fdic.gov/hsob/ SelectRpt.asp?EntryTyp=30.

TABLE 22: FAILED INSTITUTIONS RELATIVE TO TOTAL NUMBER OF FDIC-INSURED INSTITUTIONS 1993-2005

| Year | Institutions at Beginning of Year [A] | Institutions at End of Year [B] | Average [C] = ([A]+[B]) / 2 | Failures During Year [D] | Percent [D] / [C] |
|---|---|---|---|---|---|
| 1993 | 13,832 | 13,221 | 13,527 | 50 | 0.37% |
| 1994 | 13,221 | 12,602 | 12,912 | 15 | 0.12% |
| 1995 | 12,602 | 11,970 | 12,286 | 8 | 0.07% |
| 1996 | 11,970 | 11,452 | 11,711 | 6 | 0.05% |
| 1997 | 11,452 | 10,922 | 11,187 | 1 | 0.01% |
| 1998 | 10,922 | 10,461 | 10,692 | 3 | 0.03% |
| 1999 | 10,461 | 10,220 | 10,341 | 8 | 0.08% |
| 2000 | 10,220 | 9,908 | 10,064 | 7 | 0.07% |
| 2001 | 9,908 | 9,613 | 9,761 | 4 | 0.04% |
| 2002 | 9,613 | 9,354 | 9,484 | 11 | 0.12% |
| 2003 | 9,354 | 9,182 | 9,268 | 3 | 0.03% |
| 2004 | 9,181 | 8,975 | 9,078 | 4 | 0.04% |
| 2005 | 8,976 | 8,832 | 8,904 | 0 | 0.00% |

Source: FDIC, Statistics on Banking, Structure Tables, Changes in Number and Classification, *available at* http://www2.fdic.gov/SDI/SOB/.

As Table 22 shows, the failure of an institution was an extraordinarily rare event, especially beginning in 1994. In addition, none of the institutions that failed after 1992 were as large as Carteret in terms of deposits and assets as of the date of failure.[163] Carteret's chance of failing during this era of prosperity for banks and thrifts was practically zero had the breach not occurred.

## IV. AMBASE SUFFERED SIGNIFICANT "WOUNDED BANK" DAMAGES AS A RESULT OF THE BREACH

101. Having established (1) Carteret's value today but-for the breach and (2) that Carteret would not have failed but-for the government's breach, I can also estimate "wounded bank" damages to Carteret—those costs incurred by AmBase and Carteret as a direct result of the breach not otherwise compensated by the damage estimates provided above. Table 23 summarizes the components of these "wounded bank" damages.

163. *Id*.

TABLE 23: WOUNDED BANK DAMAGES (MILLION DOLLARS)

| Category | Damage Estimate |
|---|---|
| (1) Employment Contracts | 12.5 |
| (2) Costs from Branch Sales | 2.4 |
| (3) Transaction Costs from Raising Capital | 0.6 |
| (4) Transaction Costs Related to Cease and Desist Proceedings | 1.3 |
| Total | 16.8 |

*Note*: Wounded bank damages do not need accounting for tax liabilities.

## A. Turning Over Carteret to the RTC Triggered Costs Related to Employment Contracts

102. Various costs relating to employee severance pay were incurred that would not have been incurred absent the government's breach. Specifically, in December 1989 and January 1990, Carteret (and AmBase) entered into severance agreements with eight Carteret executives: Mary S. Riether, Joseph P. Tyburski, Leo O. McCabe, James M. Krupinski, Ledyard H. Smith, Robert A. Laskowski, Robert E. McCarthy, and Robert C. Walsh. As these former executives explained in complaints that they subsequently filed seeking enforcement of their severance agreements, FIRREA's disallowance of supervisory goodwill had an "adverse impact" on Carteret by "decreas[ing]" Carteret's "capital levels … dramatically."[164] "In order to induce [the former executives] to not seek other, more stable employment opportunities, AmBase and/or Carteret approached [the former executives] and offered the terms of the Severance Agreements as both an incentive to not 'jump the sinking ship,' and as a financial safety net for the executives and their families in the event Carteret was sold or taken over by the federal regulators."[165] Thus, but for the government's breach, AmBase and Carteret would not have

164.Compl. ¶¶ 7-8, *Riether v. AmBase Corp.*, No. UNN-L-5594 (N.J. Super. Ct.) (filed Sept. 13, 1993) ("Riether Compl.").

165.Riether Compl. ¶ 14. *See also* Compl. ¶¶ 4-12, *Tyburski v. AmBase Corp.*, No. UNN-L-5596-93 (N.J. Super. Ct.) (filed Sept. 13, 1993); Compl. ¶¶ 5-10, *McCabe v. AmBase Corp.*, No. UNN-L-5597-93 (N.J. Super. Ct.) (filed Sept. 13, 1993); Compl. ¶¶ 5-12, *Krupinski v. AmBase Corp.*, No. UNN-L-5592-93 (N.J. Super. Ct.) (filed Sept. 13, 1993); Compl. ¶¶ 5-12, *Smith v. AmBase Corp.*, No. UNN-L-5596-93 (N.J. Super. Ct.) (filed Sept. 13, 1993); Compl. ¶¶ 5-12, *Laskowski v. AmBase Corp.*, No. UNN-L-5596-93 (N.J. Super. Ct.) (filed Sept. 13, 1993); Compl. ¶¶ 17-18, *McCarthy v. AmBase Corp.*, No. UNN-C-220-91 (N.J. Super. Ct.) (filed Dec. 20, 1991); Compl., *Walsh v. AmBase Corp.*, No. C-000128-92 (N.J. Super. Ct.) (filed Oct. 30, 1992). Although Mr. McCarthy and Mr.

entered into such severance agreements. The resulting costs of these agreements totaled $9,684,039.32, which includes substantial sums paid to the former executives in severance pay and substantial litigation costs in defending against the former executives' lawsuits.[166] In addition, AmBase and Carteret entered into a similar severance agreement with Richard L. Braun, who subsequently brought suit against AmBase to enforce that agreement.[167] The resulting costs of the agreement with Braun totaled $2,821,975.44, which includes substantial sums paid to Braun in severance pay and substantial litigation costs in defending against the lawsuit.[168] Therefore, my total estimate of the costs related to the employment contracts is $12.5 million.

**B. Carteret Endured Costs from Selling Branches Because of the Breach**

103. As I discussed earlier in this report, Carteret was forced to sell branches in the fourth quarter of 1990 to raise capital and remain in capital compliance as a result of the breach. Carteret incurred transaction costs, including data processing, investment banking fees, accounting fees, severance payouts, and legal fees, through these branch sales equaling $2,353,000.[169]

**C. Transaction Costs Associated with Efforts to Raise Capital**

104. In addition, transactions costs of $632,750 were incurred in 1992 in connection with efforts to raise capital to mitigate the loss of its supervisory goodwill. Specifically, Merrill

---

Walsh did not explicitly allege that they were offered severance packages because of the government's breach, the timing of their severance agreements and the circumstances under which they were offered those severance agreements show that the parties were motivated by the same breach-induced problems and concerns that operated with respect to the other former executives. *See* Riether Compl. ¶ 14 (referring to Mrs. Riether *and other members of senior management of Carteret*") (emphasis added).

166.*See* Carteret Employment Contract Cases.

167.Comply., *Braun v. AmBase Corp.* (N.J. Super. Ct.).

168.*See* Carteret Employment Contract Cases.

169.Carteret Savings Bank, Response to Office of Thrift Supervision Comments on Bankers Savings Branch Sale Application, Oct. 5, 1990 (CAM4901276); Carteret Savings Bank, FA, Branch Sale Analysis-Purchase Accounting, Oct. 31, 1990 (CAM4920185).

Lynch received $300,000 to act as financial advisor and placement agent, Kidder, Peabody & Co. received $200,000 to act as financial advisor and placement agent, and Kohlberg & Co. received $132,750 to perform due diligence.[170] These costs were passed through to AmBase which ultimately paid these expenses.

**D. Transaction Costs Related to Cease and Desist Proceedings**

105. With Carteret's condition substantially weakened as a result of the breach, government regulators scrutinized it much more carefully than they would have absent the breach, initiating several regulatory actions against Carteret, AmBase, and former officers and directors. As a result of these actions, costs totaling more than $1,272,193.90 were incurred.[171] For example, legal expenses of $174,348.10 were incurred when the OTS initiated administrative cease and desist proceedings against twenty directors and officers, alleging that certain incentive payments and the settlement of an employment dispute were unlawful.[172] And legal expenses of $339,759.18 were incurred when the RTC and the OTS investigated certain losses at Carteret,[173] as were legal expenses of $758,086.62 when the OTS challenged compensation paid to certain officers, directors, and employees.[174]

## CONCLUSION

106. The Government's removal of supervisory goodwill from Carteret's regulatory capital through the enactment of FIRREA was an unlawful breach of contract. FIRREA's passage in August 1989 directly led to Carteret's seizure by the OTS in December 1992. But-for

170. *See* CSB Recapitalization Efforts.
171. *See* Professional Fees – OTS-RTC.
172. *See* AmBase 10-Q (Mar. 31, 1991) at 18-19.
173. *See* AmBase 10-K (Dec. 31, 1992) at 50-51; AmBase 10-Q (June 30, 1996) at 36.
174. *See* AmBase 10-K (Dec. 31, 1992) at 49-50; AmBase 10-K (Dec. 31, 1995) at 35.

the breach, Carteret would not have been seized in 1992, and would still survive today as either a standalone institution, as a subsidiary of AmBase, or as part of another firm.

107. Carteret should be awarded damages equal to the sum of (1) what its but-for market value would have been at the time damages are awarded (for which I provide various estimates, adjusted for tax liabilities), (2) any dividend distributions in the but-for world that were not distributed in the actual world (equal to $313.8 million after accounting for tax liabilities), and (3) "wounded bank" damages (equal to $16.8 million, for which there is no need to adjust for tax liabilities). My estimates of damages are lower-bounds because I have used conservative assumptions throughout my analyses.

108. Table 1 presented three sets of calculations, each unadjusted for taxes and adjusted for taxes. The preferred damage estimate in Table 1 is derived from combining wounded bank damages and foregone dividends with an estimate of terminal market value based on the equal-weighted average market-to-book ratio of the nine comparable surviving thrifts presented in Table 13. In my opinion, an estimate based on a conservative forecast of Carteret's but-for book value and the market-to-book ratio of surviving thrifts provides the most reliable basis for estimating terminal market value. To provide a sense of the range of estimated terminal market values, and related damage estimates, I also provide in Table 1 the damage estimates based on the highest and lowest terminal values calculated in my report.

I declare that the foregoing opinion is to the best of my knowledge a fully true and correct one. I reserve the right to update opinions in the report based on continuing research.

Dated: May 19, 2007

Charles W. Calomiris

## APPENDIX A: ESTIMATING THE MARKET VALUE OF SUPERVISORY GOODWILL

109. I have assessed the value of Carteret's lost supervisory goodwill at August 9, 1989, the date FIRREA was signed into law. This is the date I equate with the breach of Carteret's contract. I estimate the dollar cost to Carteret of the loss of supervisory goodwill as the result of the government's breach of its agreements using two approaches: First, I estimate a cash equivalent value of lost supervisory goodwill, which measures the amounts of cash that, if transferred to Carteret on August 9, 1989, would have compensated it for the loss of supervisory goodwill as of that date. Second, I estimate the cost of replacing the lost supervisory goodwill with tangible capital in the form of a common stock offering in August 1989.

### A. Cash Equivalent Value of Supervisory Goodwill

110. Based on the goodwill amortization schedule for August 1989, the schedule I identified closest to the date of the breach, Carteret had $168,554,816 in unamortized supervisory goodwill as of August 31, 1989. (See Table A1) Using this schedule, I estimate that Carteret would have had $169,267,205 in supervisory goodwill on August 9, 1989 (using straight-line amortization from the figures in the August schedule). Had Carteret received an equivalent amount of cash on that date, it would have had its capital position restored. For unamortized supervisory goodwill balances for December 31, 1989 and after, I continue to rely on a goodwill amortization schedule from December 1989.

111. Unlike supervisory goodwill, cash would have provided Carteret with income generating opportunities that supervisory goodwill could not have offered. Specifically, the cash could have been invested to generate additional income. Also, unlike supervisory goodwill, the cash would not amortize. These two features make cash preferable to supervisory goodwill of an equal amount on a savings and loan's balance sheet. The value of these features is an estimate of the value that cash has in excess of supervisory goodwill assuming that the cash was provided at

the time of the breach.

112. My analysis of the value of Carteret's supervisory goodwill begins with the contractually promised goodwill balances for the life of the contract through 2011. I estimate that cash principal invested in U.S. Treasury securities would have generated an expected yield of 8.12 percent over the length of the contract based on the yield of 30-year Treasury securities on August 9, 1989. I choose to invest the principal in U.S. Treasury securities to most accurately replicate the risk characteristics of the contractual goodwill that I am replacing. The ability to use supervisory goodwill to count as regulatory capital constituted a promise from the U.S. government. Investing the cash principal in U.S. Treasury securities most clearly matches that promise.

113. The earnings on the invested cash principal I assume would be taxed at a rate of 35 percent. It is my understanding that this is the marginal federal tax rate during the relevant period.[175] In addition to the after-tax earnings, the cash principal could have been offered to investors. The repayment of the cash principal in my model matches the planned amortization of the contractual goodwill. This ensured that Carteret had cash principal only in an amount equal to the amount of contractual goodwill that would have counted towards its capital requirements.

114. In my analysis of the harm suffered by Carteret, I valued the cash flows from the after-tax earnings and the return of principal as of August 9, 1989. An investor interested in acquiring such cash flows would have valued them based on the risk of a preferred stock offering of Carteret at that time (the security which most closely matches the characteristics of those cash flows). My analysis requires an estimate of Carteret's discount rate on preferred stock for valuing the cash flows.

175. This is conservative to the extent a higher tax rate would have been paid due to local and state taxes.

115. I use the tool of regression analysis to quantify how the risk characteristics of savings institutions that raised preferred stock and other fixed-income capital affected their interest costs on that capital around the date that I wish to measure Carteret's discount rate. The parameters estimated from the regression analysis are then applied to the particulars of Carteret's breached situation to arrive at forecasts of the cost of preferred stock capital. This regression forecast controls for Carteret's particular risk situation to forecast preferred stock yields.

116. A number of published academic papers have used regression analysis to understand how a firm's risk situation influences its cost of raising funds from various alternative financial instruments. In this context, regression analysis is a statistical method used to measure the relative contribution of various determinants ("variables") to the overall risk of a given financial instrument as perceived by the capital markets. The theory behind the published research is called the contingent claims pricing theory. I have written or co-written several empirical papers on the pricing of risk in various bank financial instruments.[176] Using the principles and techniques in the published economics literature to determine Carteret's cost of preferred stock capital is a straightforward application of a well-accepted scientific methodology in the profession.

117. In order to have a sufficient number of observations to perform statistical analysis, and since regression analysis can control for many differences, I include in my sample high-yield debt offerings as well as preferred stock offerings issued by savings institutions, resulting in a sample of 33 offerings by thrifts and savings banks in the 1993-1994 period. SDC

---

176. See, *e.g.*, Charles W. Calomiris and Joseph R. Mason, *Credit Card Securitization and Regulatory Arbitrage*, 26 J. FIN. SERVICES RES. 5 (2004); Charles W. Calomiris and Berry Wilson, *Bank Capital and Portfolio Management: The 1930s Capital Crunch and Scramble to Shed Risk*, 77 J. BUSINESS 421 (2004).

downloads, SEC filings, and the offering prospectuses provided the financial data on the offerings and the offering institutions.[177]

118. I used regression analysis to estimate (essentially, to "explain") the yield on the 33 offerings. I included several variables to explain the offer yields:

a) 20 observations had a debt rating from either Moody's or Standard and Poor's at the time of the offering. Using a pair of variables (one indicating whether the issuer was rated at the time of offering, the other a coded variable of the rating received,[178] if it exists), I accounted for the effect of the issuer's rating on the offer yield;

b) The size of the offering, because smaller offerings should, other things equal, pay higher yields, to compensate for lower liquidity and higher transactions costs per dollar when trading them;

c) The ratio of equity to assets for the offering institution, because a higher ratio (implying lower leverage) should, other things equal, reduce the risk of default on the new offering. The square of this ratio was also used to allow for a non-linear relationship between the ratio and the offering yield (which, in theory, should exist);[179]

d) The ratio of nonperforming assets to total assets,[180] because a thrift with more nonperforming assets is, other things equal, less profitable and more risky and should therefore have to offer higher yields. The square of this ratio (as for the ratio of equity to

177. For those offerings where prospectuses were unavailable, SEC filings prior to the offering date were used.

178. The "indicating" variable is equal to 1 for rated issues and 0 otherwise. For the coded variable, higher values denote poorer ratings, except for zero, which denotes an unrated issue. In the range of high-yield ratings, the values are: 11 for BBB/baa2 issues, 14 for BB/ba2 issues, 17 for B/b2 issues, 20 for CCC/caa2 issues, 23 for CC/ca2 issues, 26 for C/c2 issues, and 28 for D rated issues. Intermediate ratings (e.g., "+" or "-") fill in the series.

179. A non-linear relationship between the explanatory variable and the yield is one where the effect of changes in the value of the variable on changes in the value of the yield may be different at the high and low ends of the range of the variable.

180. The ratio of nonperforming assets to total assets was calculated in this context as the sum of nonaccrual loans plus REO divided by total assets.

assets) was also used to allow for a non-linear relationship between the ratio and the offering yield (which, in theory, should exist);

e) A variable[181] indicating whether or not the issue was a convertible preferred offering, because a convertible offering, other things equal, should offer a lower yield, as the investor is otherwise compensated through the option value of an upside return if the enterprise does very well;

f) The duration of the offering (i.e., years to maturity) to account for the fact that longer maturity offerings must compensate investors for making a long-term investment;

g) The Merrill Lynch high-yield debt index, a price index for bonds rated BB and lower,[182] to capture market-wide changes through time in yields (which are inversely related to bond prices) that are unrelated to the specifics of these particular offerings;

h) A variable[183] indicating whether the issuer is a holding company.

The regression results are reported at the end of the Appendix in Table A2.

119. The model explained the offer yields quite well, with an adjusted R-squared[184] of 84 percent. The coefficients have the kind of explanatory effects that one would expect according to economic theory. Rated issuers offer lower yields relative to unrated issuers reflecting the superior information available to investors. Higher rated issuers (i.e., those with lower coded values in my rating variable) offer lower yields. Better-capitalized institutions (with higher equity to assets ratios) can offer lower yields. Convertible offerings offer lower yields. A

---

181. This variable assumes a value of 1 if the issue is convertible and 0 otherwise. It estimates the average effect of convertibility on the offer yield controlling for the other variables in the model.

182. This rating refers to ratings performed by Standard & Poor's, a ratings agency, which ranks the risk of a given financial instrument at the time of issue from AAA through CC, with AAA being the least risky. Issues with ratings closer to the beginning of the alphabet and containing more letters are less risky, so that, for example, an issue with a rating of BB is considered less risky than one with a rating of B.

183. This variable assumes a value of 1 if the issuer is a holding company and 0 otherwise. It estimates the average effect of an issuer being a holding company on the offer yield controlling for the other variables in the model.

184. A statistical measure of how well the regression fits the data.

thrift with more non-performing assets (as a percentage of its total assets) has to offer higher yields. When market yields rise, so do the yields in this sample. Larger offerings have lower yields.

120. To predict the preferred stock discount rate for Carteret on August 9, 1989, I took the coefficient estimates from the regression model and multiplied them by the respective values I calculate for Carteret on that date, as shown in Table A3. The simulation gives a predicted preferred stock yield of 12.34 percent as a conservative estimate of Carteret's cost of preferred stock capital.[185]

121. I ran several other regressions to further check the sensitivity of the results. Including indicator variables for preferred offerings and for cumulative preferred offerings had small effects on the model, their coefficients were imprecisely estimated, and the inclusion of these variables had a small effect on my forecast for Carteret. Modifying the model presented above by excluding some variables tended to explain the data less well and those exclusions had small effects on the forecasted offer yields. The regression reported above had a higher adjusted R-squared than any of the alternatives, as shown in Table A4. Based on the preceding analyses and the underlying data, I believe the forecasts generated by the model in Table A2 are reasonable and conservative estimates of the appropriate discount rate for my cash equivalents model.

185. Given the distressed condition of Carteret that resulted from the breach, its equity was negative in 1992 and 1993, and therefore its ratio of equity to assets was negative. In my previous analysis and report, to avoid using an extremely low equity-to-assets ratio that would be well outside the range of the sample used to construct these estimates, I calculated my forecast of Carteret's preferred yield using the lowest equity-to-assets ratio in the regression sample in lieu of Carteret's negative ratio. Because a lower equity to assets ratio raises the forecasted yield, bounding Carteret's equity ratio from below by using the lowest value observed in the sample was a conservative procedure. In 1989, Carteret had a positive equity ratio that while lower than the equity ratios in the sample was consistent with them. I have therefore used Carteret's equity-to-assets ratio when calculating the forecasted yield of preferred stock.

122. In the model shown in Table A5, I use a discount rate of 12.34 percent to calculate the present value of the cash flows available to an investor (which must be subtracted from the opening supervisory goodwill balance as of August 9, 1989) would be $109,097,716 at August 9, 1989. That amount can be compared with the amount of the supervisory goodwill at the same date ($169,267,205) that, absent the breach, would have been contractually allowed to count as capital at the same point in time. As noted above, this reflects value not available from contractual goodwill, hence the value of supervisory goodwill at the time of the breach is the face amount of the goodwill less the value of the cash flows. This amount is $60,169,489.

123. To arrive at a lost value estimate from the firm's perspective under this method, it is appropriate to add any transaction costs from the issuance of a security to investors. I have relied on an article published in the finance literature, as well as my own empirical work in this area, to estimate the cost of issuing such a security.[186] I estimate that the transaction costs would be $5,160,322. Accordingly, the lost value estimated by the model in Table A5, is $65,329,811 ($60,169,489 plus $5,160,322).

## B. Cost of Replacement Based on a Common Stock Issuance

124. As a separate method for evaluating the lost value of the supervisory goodwill to Carteret, I have constructed a model that is based on the issuance of common stock to replace the contractual goodwill. Common stock issued by Carteret in an amount equal to the contractual goodwill would have counted toward the new capital standards imposed by FIRREA. The common stock would have allowed Carteret to maintain its desired asset and liability mix and achieve the earnings that those assets and liabilities would have generated. The cost of the common stock issued to replace the supervisory goodwill is a measure of the lost value.

186. Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

125. The primary element of the cost is that common stock would require that the issuer provide a return (that I model in the form of dividends) to the stockholders. Contractual goodwill had no such requirement. Also the issuance of common stock would entail transaction costs that the existing contractual goodwill would not incur.

126. Several adjustments are necessary to ensure that the common stock most closely replicates the benefits of the contractual goodwill. First, the contractual goodwill was scheduled to amortize so it is necessary to estimate common stock dividends only on the amount of common stock equal to the unamortized balance of contractual goodwill that would have been on Carteret's balance sheet. Second, the proceeds from the common stock could be invested in earning assets. The income from these earning assets is a benefit of the common stock, which reduces the costs of common stock vis-à-vis contractual goodwill.

127. Given the amount of common stock that must be issued to replace the entirety of the contractual goodwill, I have again relied on the finance article mentioned previously that provides empirical evidence of the transaction costs of issuing capital. To the transaction costs I add the dividend costs of the common stock. The dividends that would be paid on the hypothetical common stock need to reflect the returns that an investor in Carteret would require.

128. The proceeds from the hypothetical common stock issuance can be invested in earning assets, but they need to be invested in assets with similar risk as contractual goodwill. U.S. Treasury securities are an asset with risk characteristics that are consistent with contractual goodwill. Consequently, I invest the proceeds from the hypothetical common stock in U.S. Treasury securities, the earnings from which reflect the benefit of the common stock relative to contractual goodwill. These earnings though would be taxed at the marginal rate of Carteret, which as noted earlier, I have estimated to be 35 percent. Taxing the earnings from the invested

proceeds is also appropriate because the dividend payments on the hypothetical common stock must be paid from the after-tax net income of the bank. Deducting the benefit associated with the pre-tax earnings of the invested proceeds from an after-tax cost figure would be inconsistent. The after-tax earnings from U.S. Treasury securities partially offset the dividend and transaction costs of the hypothetical common stock. Finally, to value the net costs as of August 9, 1989, I discount the annual net costs at the required return of the hypothetical common stock.

129. I measure the required return that holders of Carteret common stock would demand in two ways. One measure of Carteret's discount rate for equity capital is the rate implied by the standard capital asset pricing model (CAPM). That model computes the return required on equity capital as the sum of the risk-free rate of return and an equity risk premium that takes into account the extent to which the firm's stock value moves with the market (beta). The required return on equity, according to this model, is the sum of the risk-free rate of return plus beta times the equity risk premium for the overall market. According to Ibbotson Associates, the median required rate of return on equity, using this formulation, for depository institutions in 1994 was 14.39 percent, and the median beta for depository institutions in 1994 was 0.88, based on the most recent Ibbotson data.[187] This is the first year for which Ibbotson reported either a return on equity or a beta for depository institutions.

130. Ibbotson calculates an overall market equity risk premium in 1990 of 7.5 percent, which is based on historical experience through 1989 and may be larger than the forward-looking equity risk premium.[188] In my opinion, based on my experience as a financial economist, a 6 percent equity risk premium would be a conservative estimate for 1989. Combining that conservative equity risk premium with a conservative estimate for beta of 0.88 implies a

187. IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1994 YEARBOOK 6-4.
188. IBBOTSON ASSOCIATES, STOCKS BONDS BILLS AND INFLATION, 1990 YEARBOOK 121.

conservative estimated required rate of return on equity for savings institutions in August of 1989 of 13.40 percent. That is the result of adding 8.12 percent (the risk-free rate of interest, which I define as the yield on a 30-year Treasury bond) and the requisite risk premium, which I estimate at (0.88) x 6 percent. I consider 13.40 percent to be a highly conservative measure of the cost of equity capital (and thus the discount rate) for Carteret in August 1989.

131. The cost of replacement that results from using this CAPM value is $68,985,788 for August 9, 1989 (shown in Table A6).

132. I also estimate the required return for holders of Carteret common stock a second way. I conservatively equate the cost of common stock issuance with the cost of preferred stock issuance. Common stock, as a less senior capital instrument, would be more expensive to issue than preferred stock because of its higher risk, higher underwriting costs, and adverse-selection costs.[189] Therefore, the results from the common stock model using the preferred stock yield as the measure of the required return for common equity provide conservative measures of replacement costs incurred from the lost goodwill. I forecast the conservative measure of the cost of common stock for Carteret using the regression model developed in the cash equivalence value estimates above, and use the resulting yields of 12.34 percent for August 9, 1989) in the cost of replacement model. The replacement cost value that results using these assumptions is $63,319,387 for August 9, 1989 (shown in Table A7).

189. For a theoretical proof that adverse-selection costs (in the form of adverse pricing effects for new issues) are more severe for common stock than for preferred stock, see Stewart C. Myers & Nicholas S. Majluf, *Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have*, 13 J. FIN. ECON. 187 (1984); for evidence see Christopher M. James & Peggy Wier, *An Analysis of FDIC Failed Bank Auctions*, 20 J. MONETARY ECON. 141 (1987). For evidence on the underwriting costs of the two types of securities, see Inmoo Lee et al., *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996), and Charles W. Calomiris & Charles P. Himmelberg, *Investment Banking Costs as a Measure of the Cost of External Finance*, Working Paper, Columbia Business School, revised May 2001.

## C. Summary

133. Table A8 summarizes the results of my analysis. As of August 9, 1989, the value of Carteret's lost supervisory goodwill was between $63.3 million and $69.0 million. I emphasize that my estimates of the value of lost supervisory goodwill depend upon assumptions about the cost of raising preferred stock and equity. My calculations for the cost of equity capital in the replacement cost models either conservatively equate the cost of equity capital with the cost of raising preferred stock or assume a low market equity premium and a low value of beta. Furthermore, market conditions for raising equity or preferred stock for thrifts in the U.S. in the late 1980s and early 1990s were very challenging. The severe losses experienced by many thrifts made many investors wary of investing in thrifts. My conservative estimates of the value of Carteret's lost supervisory goodwill do not constitute an opinion that it would have been possible for Carteret to raise preferred stock or equity capital at the low costs assumed in my calculations.

# TABLE A1: SUPERVISORY GOODWILL AMORTIZATION SCHEDULE

| August 1989 Schedule | Barton [1] | Delray [2] | Mountain [3] | Blacksburg [4] | Supervisory Goodwill Balance [5] = [1]+[2]+[3]+[4] |
|---|---|---|---|---|---|
| Balance 8/31/1989 | $31,581,826 | $127,618,732 | $8,006,092 | $1,348,166 | $168,554,816 |
| Months Remaining | 217 | 217 | 262 | 262 | |
| Current Years' Monthly Amortization | $145,538 | $588,105 | $246,143 | $5,146 | |
| Balance 8/9/1989 (interpolated) | $31,687,092 | $128,044,101 | $8,184,124 | $1,351,888 | $169,267,205 |
| Balance 7/31/1989 (interpolated) | $31,730,156 | $128,218,116 | $8,256,955 | $1,353,410 | $169,558,637 |
| **December 1989 Schedule** | | | | | |
| Balance 12/31/89 | $30,607,642 | $125,385,580 | $7,021,521 | $1,327,583 | $164,342,326 |
| Months Remaining | 213 | 213 | 258 | 258 | |
| Current Years' Monthly Amortization | $143,698 | $588,665 | $27,186 | $5,146 | |

| Year (12/31) | Barton [1] | Delray [2] | Mountain [3] | Blacksburg [4] | Total Supervisory Goodwill Amortized [5] = [1]+[2]+[3]+[4] | Total Amortized | Supervisory Goodwill Balance |
|---|---|---|---|---|---|---|---|
| 1989 | | | | | | | $164,342,326 |
| 1990 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $9,176,330 | $155,165,996 |
| 1991 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $18,352,661 | $145,989,665 |
| 1992 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $27,528,991 | $136,813,335 |
| 1993 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $36,705,322 | $127,637,004 |
| 1994 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $45,881,652 | $118,460,674 |
| 1995 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $55,057,982 | $109,284,344 |
| 1996 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $64,234,313 | $100,108,013 |
| 1997 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $73,410,643 | $90,931,683 |
| 1998 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $82,586,974 | $81,755,352 |
| 1999 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $91,763,304 | $72,579,022 |
| 2000 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $100,939,634 | $63,402,692 |
| 2001 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $110,115,965 | $54,226,361 |
| 2002 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $119,292,295 | $45,050,031 |
| 2003 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $128,468,626 | $35,873,700 |
| 2004 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $137,644,956 | $26,697,370 |
| 2005 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $146,821,286 | $17,521,040 |
| 2006 | $1,724,374 | $7,063,976 | $326,232 | $61,748 | $9,176,330 | $155,997,617 | $8,344,709 |
| 2007 | $1,293,280 | $5,297,982 | $326,232 | $61,748 | $6,979,243 | $162,976,859 | $1,365,467 |
| 2008 | | | $326,232 | $61,748 | $387,980 | $163,364,839 | $977,487 |
| 2009 | | | $326,232 | $61,748 | $387,980 | $163,752,819 | $589,507 |
| 2010 | | | $326,232 | $61,748 | $387,980 | $164,140,799 | $201,527 |
| 2011 | | | $170,656 | $30,871 | $201,527 | $164,342,326 | $0 |
| Total: | $30,607,642 | $125,385,580 | $7,021,521 | $1,327,583 | $164,342,326 | | |

Source: December 1989 Goodwill Amortization Schedule (AM050531); August 1989 Goodwill Amortization Schedule (CAM5300023)

## TABLE A2: REGRESSION OF OFFER YIELD

| **Variable** | **Coefficients** | **Absolute Value of T Statistics** | |
|---|---|---|---|
| Issuer is rated | -1.596 | 2.16 | [a] |
| Rating | 0.06 | 1.70 | |
| Log of principal amount | -0.332 | 1.90 | |
| Equity-to-asset ratio | -2.998 | 4.97 | [b] |
| Equity-to-asset ratio squared | 0.215 | 4.79 | [b] |
| Non-performing assets-to-total assets | 0.533 | 3.68 | [b] |
| Non-performing assets-to-total assets squared | -0.034 | 2.18 | [a] |
| Convertible issue | -2.574 | 9.38 | [b] |
| Duration of offering (in years) | 0.024 | 1.81 | |
| Merrill Lynch high-yield debt index | -0.133 | 2.06 | |
| Issuer is holding company | -0.722 | 2.64 | [a] |
| Constant | 32.973 | 5.01 | [b] |
| | | | |
| Number of observations | 33 | | |
| Adjusted R2 | 0.84 | | |

*Notes*:
[a] Significant at 5%.
[b] Significant at 1%.

TABLE A3: COST OF PREFERRED STOCK CAPITAL FOR CARTERET BANCORP

| | Dollars in Millions | Regression Coefficients | Carteret Input Values 8/9/1989 [2] |
|---|---|---|---|
| [3] | Principal amount ($) | | 169.27 |
| [4] = LN [3] | Natural log of principal amount | -0.3321 | 5.13 |
| [5] | Equity-to-asset ratio (%) | -2.9981 | 3.68 |
| [6] | Convertible issue | -2.5743 | 0 |
| [7] | Duration of offering (In years) | 0.0241 | 22.00 |
| [8] | Non-performing assets ($) | | 178.61 |
| [9] | Total Assets ($) | | 7171.18 |
| [10] = [8] / [9] | Non-performing assets-to-total assets ratio (%) | 0.5326 | 2.49 |
| [11] | Merrill Lynch high-yield debt index | -0.1335 | 93.30 |
| [12] | Issuer is holding company | -0.7222 | 0 |
| [13] = $[5]^2$ | Equity-to-asset ratio squared | 0.2152 | 13.57 |
| [14] = $[10]^2$ | Non-performing assets-to-total assets squared | -0.0338 | 6.20 |
| [15] | Rating | 0.0599 | 0 |
| [16] | Issuer is rated | -1.5959 | 0 |
| [17] | Constant | 32.9728 | |
| | | **[18] Forecasted Yield** | 12.34% |

*Notes:*
[2] Applicable data for Carteret Bancorp from Q2 1989 TFR. Principal amount is equal to Supervisory Goodwill Balance as of 8/9/1989.
[5] Equity-to-asset ratio (%) calculated as GAAP Capital (= Modified Equity Capital [A801] less Deferrals Pursuant to 563c.14 [A525]) divided by Total Assets [A800] less Deferrals Pursuant to 563c.14 [A525].
[7] The duration of the offering is set to match the number of years until the Supervisory Goodwill is completely amortized as indicated on the 1989 Goodwill Amortization Schedule. For 8/9/89 the duration is set to 22 years (2011-1989).
[8] Non-performing Assets are comprised of Repossessed Assets & Real Estate Held for Investment and Foreclosures from 6/30/89 Thrift Financial Reports plus Non-Accrual Loans from the Carteret 1989 Annual Report.
[9] Source: Thrift Financial Reports
[11] Merrill Lynch high-yield debt index data is from Bloomberg. Data from 7/31/89, the closest data to 8/9/89 available.
[18] Forecasted Yield is equal to the sum of the product of regression coefficients and the corresponding Carteret input value.

*Sources*: Prospectuses; SEC Filings; SDC Database; Bloomberg; TFRs

## TABLE A4: CARTERET BANCORP REGRESSIONS OF OFFER YIELD

| | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 | Model 6 |
|---|---|---|---|---|---|---|
| Log of principal amount | -0.596 | -0.327 | -0.332 | -0.315 | -0.113 | -0.298 |
| | (4.61)** | -1.70707 | -1.899 | -1.716 | -0.519 | -1.546 |
| Equity-to-asset ratio | -3.310 | -2.970 | -2.998 | -2.982 | -2.988 | -2.863 |
| | (5.36)** | (4.15)** | (4.96)** | (4.70)** | (3.80)** | (4.31)** |
| Convertible issue | -2.423 | -2.568 | -2.574 | -2.333 | -2.335 | -2.242 |
| | (8.91)** | (8.61)** | (9.37)** | (9.25)** | (7.63)** | (8.62)** |
| Duration of offering (in years) | 0.026 | 0.028 | 0.024 | | | |
| | -1.833 | -0.359 | -1.809 | | | |
| Non-performing assets-to-total assets | 0.540 | 0.538 | 0.533 | 0.494 | 0.294 | 0.237 |
| | (3.63)** | (3.42)** | (3.68)** | (3.28)** | (4.16)** | (3.82)** |
| Merrill Lynch high-yield debt index | -0.169 | -0.134 | -0.133 | -0.123 | -0.051 | -0.143 |
| | (2.684)* | -1.963 | -2.063 | -1.822 | -0.670 | -2.031 |
| Issuer is holding company | -0.817 | -0.683 | -0.722 | -0.930 | | -0.894 |
| | (2.85)** | -1.814 | (2.634)* | (3.56)** | | (3.26)** |
| Equity-to-asset ratio squared | 0.234 | 0.213 | 0.215 | 0.216 | 0.224 | 0.206 |
| | (5.07)** | (4.09)** | (4.78)** | (4.57)** | (3.85)** | (4.16)** |
| Non-performing assets-to-total assets squared | -0.032 | -0.034 | -0.034 | -0.030 | | |
| | -1.952 | -2.066 | (2.174)* | -1.856 | | |
| Preferred stock issue | | -0.041 | | | | |
| | | -0.027 | | | | |
| Cumulative preferred stock issue | | -0.067 | | | | |
| | | -0.162 | | | | |
| Rating | | 0.058 | 0.060 | 0.057 | 0.069 | 0.060 |
| | | -1.290 | -1.701 | -1.535 | -1.509 | -1.539 |
| Issuer is rated | | -1.564 | -1.596 | -1.633 | -2.049 | -1.568 |
| | | -1.761 | (2.158)* | (2.100)* | (2.155)* | -1.923 |
| Constant | 38.096 | 32.856 | 32.973 | 32.450 | 24.000 | 34.185 |
| | (6.13)** | (4.67)** | (5.01)** | (4.70)** | (3.12)** | (4.75)** |
| Observations | 33 | 33 | 33 | 33 | 33 | 33 |
| R-Squared | 0.87 | 0.90 | 0.90 | 0.88 | 0.80 | 0.86 |
| Adjusted R-Squared | 0.82 | 0.82 | 0.84 | 0.82 | 0.73 | 0.81 |
| **Carteret preferred stock offer yield forecast August 9, 1989 (%)** | **12.01** | **12.34** | **12.34** | **12.32** | **11.41** | **12.16** |

*Notes*: Absolute value of t-statistics are in parentheses. * Significant at 5%. ** Significant at 1%.

## TABLE A5: CASH EQUIVALENT MODEL
## ESTIMATED VALUE OF CARTERET SUPERVISORY GOODWILL AT 8/9/89
## DISCOUNTED USING REGRESSION FORECAST
## (FIGURES IN THOUSAND DOLLARS)

| | Assumptions | |
|---|---|---|
| [1] | Cash earning rate: | 8.12% |
| [2] | Discount Rate: | 12.34% |
| [3] | Discount Date: | 8/9/1989 |
| [4] | Tax Rate: | 35.00% |
| [5] | Transaction Cost: | 4.73% |

Present Value of Foregone Cash Flows

| | [6] | [7] | [8] | [8a] | [9]=[6]-[7] | [10]=[8a]+[9] | [11] |
|---|---|---|---|---|---|---|---|
| **Year Ending Dec. 31** | **Beginning Balance** | **Ending Balance** | **Pre-tax cash earnings** | **After-tax cash earnings** | **Re-payment of principal** | **Net cash flow** | **Present value at 8/9/89** |
| 8/9/89 - 12/31/89 | 169,267 | 164,342 | 5,344 | 3,473 | 4,925 | 8,398 | 8,021 |
| 1990 | 164,342 | 155,166 | 12,972 | 8,432 | 9,176 | 17,608 | 14,971 |
| 1991 | 155,166 | 145,990 | 12,227 | 7,947 | 9,176 | 17,124 | 12,960 |
| 1992 | 145,990 | 136,813 | 11,482 | 7,463 | 9,176 | 16,640 | 11,211 |
| 1993 | 136,813 | 127,637 | 10,737 | 6,979 | 9,176 | 16,155 | 9,689 |
| 1994 | 127,637 | 118,461 | 9,992 | 6,495 | 9,176 | 15,671 | 8,366 |
| 1995 | 118,461 | 109,284 | 9,246 | 6,010 | 9,176 | 15,187 | 7,217 |
| 1996 | 109,284 | 100,108 | 8,501 | 5,526 | 9,176 | 14,702 | 6,220 |
| 1997 | 100,108 | 90,932 | 7,756 | 5,042 | 9,176 | 14,218 | 5,354 |
| 1998 | 90,932 | 81,755 | 7,011 | 4,557 | 9,176 | 13,734 | 4,604 |
| 1999 | 81,755 | 72,579 | 6,266 | 4,073 | 9,176 | 13,249 | 3,954 |
| 2000 | 72,579 | 63,403 | 5,521 | 3,589 | 9,176 | 12,765 | 3,391 |
| 2001 | 63,403 | 54,226 | 4,776 | 3,104 | 9,176 | 12,281 | 2,904 |
| 2002 | 54,226 | 45,050 | 4,031 | 2,620 | 9,176 | 11,796 | 2,483 |
| 2003 | 45,050 | 35,874 | 3,286 | 2,136 | 9,176 | 11,312 | 2,120 |
| 2004 | 35,874 | 26,697 | 2,540 | 1,651 | 9,176 | 10,828 | 1,806 |
| 2005 | 26,697 | 17,521 | 1,795 | 1,167 | 9,176 | 10,343 | 1,536 |
| 2006 | 17,521 | 8,345 | 1,050 | 683 | 9,176 | 9,859 | 1,303 |
| 2007 | 8,345 | 1,365 | 394 | 256 | 6,979 | 7,235 | 851 |
| 2008 | 1,365 | 977 | 95 | 62 | 388 | 450 | 47 |
| 2009 | 977 | 590 | 64 | 41 | 388 | 429 | 40 |
| 2010 | 590 | 202 | 32 | 21 | 388 | 409 | 34 |
| 2011 | 202 | 0 | 8 | 5 | 202 | 207 | 15 |
| | | | | | | **Total Value of Cash Flows:** | **109,098** |

| | | |
|---|---|---|
| **Face Value of GW:** | **169,267** | **[12]** |
| **Less Value of Cash Flows:** | **109,098** | |
| **Value of Goodwill:** | **60,169** | |
| **Plus Transaction Costs:** | **5,160** | **[13]** |
| **Total Lost Value:** | **65,330** | |

*Notes:*
[1] Interest earned at the 8/9/89 30-year Treasury rate of 8.12%. Source: http://research.stlouisfed.org/fred2/data/DGS30.txt
[2] 12.34% is the required dividend rate.
[3] Cash Flows discounted to 8/9/89.
[4] Tax rate is 35%.
[5] Total direct costs as a percentage of total proceeds cited in "The Cost of Raising Capital", *The Journal of Financial Research*, Vol. XIX, No. 1, Lee, Lochhead, Ritter & Zhao.
[6] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[7] Contractual supervisory goodwill at respective year ends.
[8] Cash earnings (8.12%) on the average goodwill amount for that year.
[8a] Equals cash earnings on an after-tax basis. Equals [7] * (1 - 35%).
[9] Amount of supervisory goodwill amortized in each period.
[10] Net cash flows for the year.
[11] Cash flows discounted back to 8/9/89 at 12.34%.
[12] Amount of supervisory goodwill at the period beginning 8/9/89.
[13] Cost of one-time seasoned offering of common stock in the amount of total value of cash flows ($109.1 million), based on 4.73% of offering size cited in "The Cost of Raising Capital", *The Journal of Financial Research*, Vol. XIX, No. 1, Lee, Lochhead, Ritter & Zhao.

# TABLE A6: CARTERET BANCORP COMMON STOCK MODEL
## RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL
## AFTER-TAX BASIS AND DISCOUNTED TO 8/9/89 USING CAPM-BASED RATE
## (FIGURES IN THOUSAND DOLLARS)

| | [1] | [2] | [3] | [4] | [5] | [6] | [6a] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| **Year Ending Dec. 31** | **Beginning Contractual Supervisory Goodwill** | **Ending Contractual Supervisory Goodwill** | **Average Common Stock to Replace Disallowed Supervisory Goodwill** | **Transaction Cost** | **Dividend Cost of Common** | **Pre-Tax "Benefit" of Capital** | **After-Tax "Benefit" of Capital** | **Net Cost of Common** | **Present Value at 8/9/89 of Common Discounted at 13.4%** |
| 8/9/89 - 12/31/93 | 169,267 | 164,342 | 166,805 | 7,143 | 8,818 | 5,344 | 3,473 | 12,488 | 11,884 |
| 1990 | 164,342 | 155,166 | 159,754 | | 21,407 | 12,972 | 8,432 | 12,975 | 10,888 |
| 1991 | 155,166 | 145,990 | 150,578 | | 20,177 | 12,227 | 7,947 | 12,230 | 9,050 |
| 1992 | 145,990 | 136,813 | 141,402 | | 18,948 | 11,482 | 7,463 | 11,485 | 7,494 |
| 1993 | 136,813 | 127,637 | 132,225 | | 17,718 | 10,737 | 6,979 | 10,739 | 6,180 |
| 1994 | 127,637 | 118,461 | 123,049 | | 16,489 | 9,992 | 6,495 | 9,994 | 5,071 |
| 1995 | 118,461 | 109,284 | 113,873 | | 15,259 | 9,246 | 6,010 | 9,249 | 4,139 |
| 1996 | 109,284 | 100,108 | 104,696 | | 14,029 | 8,501 | 5,526 | 8,503 | 3,355 |
| 1997 | 100,108 | 90,932 | 95,520 | | 12,800 | 7,756 | 5,042 | 7,758 | 2,700 |
| 1998 | 90,932 | 81,755 | 86,344 | | 11,570 | 7,011 | 4,557 | 7,013 | 2,152 |
| 1999 | 81,755 | 72,579 | 77,167 | | 10,340 | 6,266 | 4,073 | 6,268 | 1,696 |
| 2000 | 72,579 | 63,403 | 67,991 | | 9,111 | 5,521 | 3,589 | 5,522 | 1,318 |
| 2001 | 63,403 | 54,226 | 58,815 | | 7,881 | 4,776 | 3,104 | 4,777 | 1,005 |
| 2002 | 54,226 | 45,050 | 49,638 | | 6,652 | 4,031 | 2,620 | 4,032 | 748 |
| 2003 | 45,050 | 35,874 | 40,462 | | 5,422 | 3,286 | 2,136 | 3,286 | 538 |
| 2004 | 35,874 | 26,697 | 31,286 | | 4,192 | 2,540 | 1,651 | 2,541 | 367 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,963 | 1,795 | 1,167 | 1,796 | 228 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,733 | 1,050 | 683 | 1,050 | 118 |
| 2007 | 8,345 | 1,365 | 4,855 | | 651 | 394 | 256 | 394 | 39 |
| 2008 | 1,365 | 977 | 1,171 | | 157 | 95 | 62 | 95 | 8 |
| 2009 | 977 | 590 | 783 | | 105 | 64 | 41 | 64 | 5 |
| 2010 | 590 | 202 | 396 | | 53 | 32 | 21 | 32 | 2 |
| 2011 | 202 | 0 | 101 | | 14 | 8 | 5 | 8 | 0 |
| **Total Cost** | | | | | | | | | **68,986** |

*Notes:*
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 12/6/93 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 8/9/89 ($169.3 million), based on 4.22% of offering size cited in "The Cost of Raising Capital", *The Journal of Financial Research*, Vol. XIX, No. 1, Lee, Lochhead, Ritter & Zhao.
[5] Dividend cost of common stock. Assumes a 13.4% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 8.12%, the 30-year Treasury rate at 8/9/89. Source: http://research.stlouisfed.org/fred2/data/DGS30.txt
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 8/9/89 - 12/31/89 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 8/9/89 at 13.4%, the required dividend on the common stock.

## TABLE A7: CARTERET BANCORP COMMON STOCK MODEL RAISE COMMON STOCK TO REPLACE CONTRACTUAL SUPERVISORY GOODWILL AFTER-TAX BASIS AND DISCOUNTED TO 8/9/89 USING REGRESSION FORECAST (FIGURES IN THOUSAND DOLLARS)

| Year Ending Dec. 31 | [1] Beginning Contractual Supervisory Goodwill | [2] Ending Contractual Supervisory Goodwill | [3] Average Common Stock to Replace Disallowed Supervisory Goodwill | [4] Transaction Cost | [5] Dividend Cost of Common | [6] Pre-Tax "Benefit" of Capital | [6a] After-Tax "Benefit" of Capital | [7] Net Cost of Common | [8] Present Value at 8/9/89 of Common Discounted at 12.34% |
|---|---|---|---|---|---|---|---|---|---|
| 8/9/89 - 12/31/93 | 169,267 | 164,342 | 166,805 | 7,143 | 8,119 | 5,344 | 3,473 | 11,789 | 11,260 |
| 1990 | 164,342 | 155,166 | 159,754 | | 19,710 | 12,972 | 8,432 | 11,278 | 9,589 |
| 1991 | 155,166 | 145,990 | 150,578 | | 18,578 | 12,227 | 7,947 | 10,630 | 8,046 |
| 1992 | 145,990 | 136,813 | 141,402 | | 17,446 | 11,482 | 7,463 | 9,982 | 6,726 |
| 1993 | 136,813 | 127,637 | 132,225 | | 16,313 | 10,737 | 6,979 | 9,335 | 5,598 |
| 1994 | 127,637 | 118,461 | 123,049 | | 15,181 | 9,992 | 6,495 | 8,687 | 4,638 |
| 1995 | 118,461 | 109,284 | 113,873 | | 14,049 | 9,246 | 6,010 | 8,039 | 3,820 |
| 1996 | 109,284 | 100,108 | 104,696 | | 12,917 | 8,501 | 5,526 | 7,391 | 3,127 |
| 1997 | 100,108 | 90,932 | 95,520 | | 11,785 | 7,756 | 5,042 | 6,743 | 2,539 |
| 1998 | 90,932 | 81,755 | 86,344 | | 10,653 | 7,011 | 4,557 | 6,096 | 2,043 |
| 1999 | 81,755 | 72,579 | 77,167 | | 9,521 | 6,266 | 4,073 | 5,448 | 1,626 |
| 2000 | 72,579 | 63,403 | 67,991 | | 8,388 | 5,521 | 3,589 | 4,800 | 1,275 |
| 2001 | 63,403 | 54,226 | 58,815 | | 7,256 | 4,776 | 3,104 | 4,152 | 982 |
| 2002 | 54,226 | 45,050 | 49,638 | | 6,124 | 4,031 | 2,620 | 3,504 | 738 |
| 2003 | 45,050 | 35,874 | 40,462 | | 4,992 | 3,286 | 2,136 | 2,856 | 535 |
| 2004 | 35,874 | 26,697 | 31,286 | | 3,860 | 2,540 | 1,651 | 2,209 | 368 |
| 2005 | 26,697 | 17,521 | 22,109 | | 2,728 | 1,795 | 1,167 | 1,561 | 232 |
| 2006 | 17,521 | 8,345 | 12,933 | | 1,596 | 1,050 | 683 | 913 | 121 |
| 2007 | 8,345 | 1,365 | 4,855 | | 599 | 394 | 256 | 343 | 40 |
| 2008 | 1,365 | 977 | 1,171 | | 145 | 95 | 62 | 83 | 9 |
| 2009 | 977 | 590 | 783 | | 97 | 64 | 41 | 55 | 5 |
| 2010 | 590 | 202 | 396 | | 49 | 32 | 21 | 28 | 2 |
| 2011 | 202 | 0 | 101 | | 12 | 8 | 5 | 7 | 1 |
| **Total Cost** | | | | | | | | | **63,319** |

*Notes:*
[5],[6],[6a] Figures for the first period are prorated to reflect the period between 8/9/89 and the end of the fiscal year.
[1] Contractual supervisory goodwill at respective year beginnings. Values are from Goodwill Amortization Schedule.
[2] Contractual supervisory goodwill at respective year ends.
[3] Average of [1] and [2].
[4] Cost of one-time seasoned offering of common stock in the amount of total contractual SGW at 8/9/89 ($169.3 million), based on 4.22% of offering size cited in "The Cost of Raising Capital", *The Journal of Financial Research,* Vol. XIX, No. 1, Lee, Lochhead, Ritter & Zhao.
[5] Dividend cost of common stock. Assumes a 12.34% required dividend.
[6] Benefit of incremental tangible capital. Assumed to equal 8.12%, the 30-year Treasury rate at 8/9/89. Source: http://research.stlouisfed.org/fred2/data/DGS30.txt
[6a] Tax Rate is 35%. After-Tax Benefit of incremental tangible capital. Equals [6] * (1 - 35%).
[7] Net cost is the dividend cost of common less the after-tax benefit of capital. The 8/9/89 - 12/31/89 figure includes the transaction cost. ([7] = [5] - [6a] + [4])
[8] Equals [7], discounted to 8/9/89 at 12.34%, the required dividend on the common stock.

## TABLE A8: ESTIMATES OF CARTERET'S LOST VALUE FROM THE LOSS OF SUPERVISORY GOODWILL

| | 8/9/1989 | | |
|---|---|---|---|
| Method for Estimating Cost of Equity Capital | Cost of Equity Capital | Lost Value Amount using Cash Equivalents Model | Lost Value Amount using Cost of Replacement Model |
| CAPM [1] | 13.40% | - | $68,985,788 |
| Regression-Based Estimate [2] | 12.34% | $65,329,811 | $63,319,387 |

*Notes*:
[1] The 30-Year Treasury Rate on 8/9/89 is 8.12%. According to Ibbotson Associates, the median beta for depository institutions in 1994 was 0.88. Using this beta and an equity risk premium of 6% the cost of equity capital was calculated using the CAPM.
[2] Q2 1989 Carteret Bancorp financial data was used for 8/9/1989.

## TABLE A9: TOTAL GOODWILL AMORTIZATION SCHEDULE

| | | *Non-Supervisory Goodwill* | | | | | |
|---|---|---|---|---|---|---|---|
| **August 1989 Schedule** | **Supervisory Goodwill Balance [1]** | **Freedom [2]** | **North Jersey [3]** | **Amerifirst [4]** | **Largo [5]** | **Admiral [6]** | **Goodwill Balance [7] = [1]+[2]+[3]+[4]+[5]+[6]** |
| Balance 8/31/1989 | $168,554,816 | $3,551,271 | $1,645,711 | $5,527,753 | $1,505,026 | $1,617,150 | $182,401,727 |
| Months Remaining | | 145 | 20 | 54 | 61 | 262 | |
| Current Years' Monthly Amortization | $984,932 | $53,161 | $82,286 | $102,366 | $24,673 | $6,172 | $1,253,589 |
| Balance 8/9/1989 (interpolated) | $169,267,205 | $3,589,722 | $1,705,227 | $5,601,793 | $1,522,871 | $1,621,615 | $183,308,433 |
| Balance 7/31/1989 (interpolated) | $169,558,637 | $3,605,452 | $1,729,575 | $5,632,082 | $1,530,171 | $1,623,441 | $183,679,358 |
| **December 1989 Schedule** | | | | | | | |
| Balance 12/31/89 | $164,342,326 | $3,338,626 | $1,316,569 | $5,118,290 | $1,406,336 | $1,592,461 | $177,114,608 |
| Months Remaining | | 141 | 16 | 50 | 57 | 258 | |
| Current Years' Monthly Amortization | | $39,125 | $73,692 | $102,368 | $24,673 | $6,172 | |

| **Year (12/31)** | **Total Supervisory Goodwill Amortized [1]** | **Freedom [2]** | **North Jersey [3]** | **Amerifirst [4]** | **Largo [5]** | **Admiral [6]** | **Total Goodwill Amortized [7] = [1]+[2]+[3]+[4]+[5]+[6]** | **Total Amortized** | **Goodwill Balance** |
|---|---|---|---|---|---|---|---|---|---|
| 1989 | | | | | | | | | $177,114,608 |
| 1990 | $9,176,330 | $469,495 | $884,309 | $1,228,420 | $296,071 | $74,068 | $12,128,693 | $12,128,693 | $164,985,915 |
| 1991 | $9,176,330 | $441,573 | $432,260 | $1,228,420 | $296,071 | $74,068 | $11,648,722 | $23,777,415 | $153,337,193 |
| 1992 | $9,176,330 | $410,802 | | $1,228,420 | $296,071 | $74,068 | $11,185,691 | $34,963,106 | $142,151,502 |
| 1993 | $9,176,330 | $387,723 | | $1,049,106 | $296,071 | $74,068 | $10,983,298 | $45,946,405 | $131,168,203 |
| 1994 | $9,176,330 | $358,043 | | $383,925 | $222,053 | $74,068 | $10,214,420 | $56,160,824 | $120,953,784 |
| 1995 | $9,176,330 | $322,517 | | | | $74,068 | $9,572,915 | $65,733,740 | $111,380,868 |
| 1996 | $9,176,330 | $281,127 | | | | $74,068 | $9,531,526 | $75,265,265 | $101,849,343 |
| 1997 | $9,176,330 | $234,953 | | | | $74,068 | $9,485,352 | $84,750,617 | $92,363,991 |
| 1998 | $9,176,330 | $185,301 | | | | $74,068 | $9,435,699 | $94,186,316 | $82,928,292 |
| 1999 | $9,176,330 | $133,580 | | | | $74,068 | $9,383,979 | $103,570,295 | $73,544,313 |
| 2000 | $9,176,330 | $81,129 | | | | $74,068 | $9,331,527 | $112,901,823 | $64,212,785 |
| 2001 | $9,176,330 | $32,382 | | | | $74,068 | $9,282,781 | $122,184,603 | $54,930,005 |
| 2002 | $9,176,330 | | | | | $74,068 | $9,250,399 | $131,435,002 | $45,679,606 |
| 2003 | $9,176,330 | | | | | $74,068 | $9,250,399 | $140,685,400 | $36,429,208 |
| 2004 | $9,176,330 | | | | | $74,068 | $9,250,399 | $149,935,799 | $27,178,809 |
| 2005 | $9,176,330 | | | | | $74,068 | $9,250,399 | $159,186,197 | $17,928,411 |
| 2006 | $9,176,330 | | | | | $74,068 | $9,250,399 | $168,436,596 | $8,678,012 |
| 2007 | $6,979,243 | | | | | $74,068 | $7,053,311 | $175,489,906 | $1,624,702 |
| 2008 | $387,980 | | | | | $74,068 | $462,048 | $175,951,954 | $1,162,654 |
| 2009 | $387,980 | | | | | $74,068 | $462,048 | $176,414,002 | $700,606 |
| 2010 | $387,980 | | | | | $74,068 | $462,048 | $176,876,050 | $238,558 |
| 2011 | $201,527 | | | | | $37,030 | $238,558 | $177,114,608 | $0 |
| Total: | $164,342,326 | $3,338,626 | $1,316,569 | $5,118,290 | $1,406,336 | $1,592,461 | $177,114,608 | | |

Source: Goodwill Amortization Schedule (Historical), August 1989 (CAM5300023); Goodwill Amortization Schedule, December 1989 (AM050531)

## APPENDIX B: MATERIALS RELIED UPON

***Declarations***
Declaration of Charles W. Calomiris of July 14, 2006 (and all documents relied upon).

***Depositions***
Deposition of Stuart D. Root (Jan. 9, 1997).
Deposition of Michael Simone (Sept. 3, 1999).
Deposition of Robert Albanese (Oct. 15, 1999).
Deposition of Angelo A. Vigna (Oct. 26, 1999).
Deposition of Richard Bianco (Nov. 16, 1999).
Deposition of George T. Scharffenberger (Nov. 22, 1999).
Deposition of Wayne Moor (Nov. 23, 1999).

***SEC Filings***
AmBase Corp., 1989 Annual Report, (C-AM-A-0394679 - C-AM-A-0394750).
AmBase Corp., 1990 Annual Report (Form 10-K), (AMB030217-AMB030340).
AmBase Corp., 1991 Annual Report (Form 10-K), (CAM4020309-CAM4020412).
AmBase Corp., 1992 Annual Report (Form 10-K), (AMB030514 – AMB030585).
AmBase Corp., 1995Annual Report (Form 10-K), (Dec. 31, 1995).
AmBase Corp., Quarterly Report (Form 10-Q), (Mar. 31, 1991) (CAM3531033-CAM3531055).
AmBase Corp., Quarterly Report (Form 10-Q), (June 30, 1996).
Carteret Bancorp Inc., 1987 Annual Report, (C-AM-A-0056660 - C-AM-A-0056702).
Carteret Bancorp, Inc., 1989 Annual Report, (C-AM-A-0394512 – C-AM-A-0394541).
Carteret Savings Bank FA, 1986 Annual Report, (AMB030100-AMB030139).
Carteret Savings Bank FA, 1990 Annual Report (Feb. 1, 1991), (C-AM-A-0394477 – C-AM-A-0394510).
Carteret Savings Bank FA, 1991 Annual Report, (KH 053771 – KH 053804).
Carteret Savings Bank, FA & Subsidiaries, 1992 Annual Report, (CAM5070002-CAM5070019).
Carteret Savings & Loan Association, F.A., Annual Report 1982, (AMB029909-AMB029928).
Carteret Savings & Loan Association, F.A., Annual Report 1983, (AMB029929-AMB029972).
Carteret Savings & Loan Association, F.A., Annual Report 1984, (AMB029973-AMB030006).
Carteret Savings & Loan Association, F.A., Annual Report 1985, (AMB030057-AMB030099).
The Home Group, Inc., 1988 Annual Report (Form 10-K), (C-AM-A-0395930 – C-AM-A-0395967).
The Home Group, Inc., Quarterly Report (Form 10-Q), (CAM4150073-CAM4150084).
Ameriana Bancorp, SEC Form 10-K, Dec. 31, 1989.
Bankatlantic Financial Corp., Annual Report, Dec. 31, 1988.
Bankatlantic Financial Corp., Annual Report, Dec. 31, 1989.
Bankunited, A Saving Bank, Annual Report, Sept. 30, 1989.
CCNB Corp., Annual Report, Dec. 31, 1988.
The Elmira Savings Bank, FSB, SEC Form 10-Q, Sept. 30, 1988.
The Elmira Savings Bank, FSB, SEC Form 10-Q, Sept. 30, 1989.
First Financial Holdings Inc., Annual Report, Sept. 30, 1988.
First Financial Holdings Inc., Annual Report, Sept. 30, 1989.
FMS Financial Corp., SEC Form 10-K, Dec. 31, 1988.
FMS Financial Corp., SEC Form 10-Q, June 30, 1989.
Harleysville Savings Bank, PASA , Annual Report, Sept. 30, 1988.
Harleysville Savings Bank, PASA, Annual Report, Sept. 30, 1989.
Independence Federal Savings Bank, Annual Report, Dec. 31, 1989.
Northeast Bancorp, Inc., Annual Report, Dec. 31, 1988.
Parkvale Financial Corp., Annual Report, June 30, 1990.
Peoples Bancorp Inc., SEC Form 10-Q, June 30, 1988.
Peoples Bancorp Inc., SEC Form 10-Q, June 30, 1989.
Sovereign Bancorp Inc., Annual Report, Dec. 31, 1989.
Trustco Bank Corp. NY, Annual Report, Dec. 31, 1989.
Washington Federal Savings & Loan Association, Annual Report, Sept. 30, 1988.

Washington Federal Savings & Loan Association, Annual Report, Sept. 30, 1989.
Washington Mutual Savings Bank, Annual Report, Dec. 31, 1988.
Washington Mutual Savings Bank, Annual Report, Dec. 31, 1989.
The Washington Savings Bank, F.S.B., SEC Form 10-K, July 31, 1989.
The Washington Savings Bank, F.S.B., SEC Form 10-K, July 31, 1990.
Star States Corp., SEC Form 10-Q, June 30, 1988.
Star States Corp., SEC Form 10-Q, June 30, 1989.

***Other Financial Reports***

Carteret Savings & Loan Association, F.A. & Subsidiaries, Consolidated Financial Statements, Sept. 30, 1980, 1981, & 1982 (C-AM-A-0265001 – 041).
Carteret Bancorp Inc. and Subsidiary, FHLB Docket #02-4702, Consolidated Financial Statements, Sept. 30, 1988 (AMB013960-AMB013995).
Carteret Bancorp Inc. and Subsidiary, Consolidated Statements of Financial Condition, June 30, 1989, (CAM4470985-CAM4470987).
Carteret Bancorp Inc. May 18, 1988 Proxy Statement.
Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993) (C-AM-A-0400781 – C-AM-A-0400869).
Carteret Savings Bank, FA, Capital Plan (Sept. 30, 1991), (WOQ6781101-WOQ6781188).
Carteret Savings Bank, FA & Subsidiaries, Financial Report, Nov. 30, 1992, (AMB014552-AMB014585).
Carteret Savings Bank, FA & Subsidiaries, Consolidated Financial Statements, Dec. 31, 1990, (AMB014054-AMB014086).
Federal Deposit Insurance Corporation, Report of Examination (June 19, 1992), (C-AM-A-0054144 – C-AM-A-0054166).
Kidder, Peabody & Co. & Merrill Lynch & Co., Carteret Savings Bank FA, Company and Investment Overview (Mar. 9, 1992).
Office of Thrift Supervision, Report of Examination (June 15, 1992) (WOQ6730039 – WOQ6730154).
Carteret Savings Bank, FA, Thrift Financial Report, Jun. 30, 1989, (AM050308-AM050319).
Carteret Savings Bank FA, Thrift Financial Report, Dec. 31, 1989, (WOQ6652300-WOQ6652312).
Carteret Savings Bank FA, Thrift Financial Report, Dec. 31, 1990, (AM035969-AM036012).
Carteret Savings Bank FA, Thrift Financial Report, Dec. 31, 1991, (AM030526-AM030571).
Carteret Savings Bank FA, Thrift Financial Report, Sept. 30, 1992, (CAM5350260-cAM5350310).
1990 Business Plan of Carteret Bancorp Inc. and Carteret Savings Bank, FA (Apr. 17, 1990), at 7 (C-AM-A-0264592 – C-AM-A-0264655).
Office of Thrift Supervision, TFR Instruction Manual, Consolidated Capital Requirement - Schedule CCR (Sept. 1991).

***E-mails, Letters and Memorandum***

Letter from Robert B. O'Brien, Jr., Carteret Savings Bank, to George T. Scharffenberger, AmBase Corp. (KH089940 – KH089945) (Aug. 29, 1990).
Letter from Salomon Brothers to The Board of Directors, The Home Group, Inc. (AMB028576-AMB028578) (Aug. 18, 1987).
Memorandum from Bruce A. Campbell, Carteret Savings Bank, F.A., to Loss Analysis File, Sept. 25, 1985 (C-AM-A-0362965).
Memorandum from Tom J. O'Rourke, Examiner in Charge, Office of Thrift Supervision, to John C. Griffin, Assistant Director, Office of Thrift Supervision (WOP3322394-WOP3322397) (Aug. 22, 1991).
Letter from Bruce W. Bean, Sr. Vice President & General Counsel, The Home Group, Inc., to the Banks Party to the Credit Agreement Referred to Below & The Chase Manhattan Bank (National Ass'n.) as Agent, Aug. 8, 1988.
Letter from Richard R. Butler, Vice President, Chase Manhattan Bank, N.A., & Mark S. Thorum, Director, Chase Manhattan Capital Markets Corp., to Jack R. Plaxe, Sr. Vice President, Chief Financial Officer, & Treasurer, The Home Group, Jan. 25, 1988.

***Databases***


Compustat

FDIC Failure Transaction Database, updated through December 2004.

FDIC, Thrift Financial Reports.

FDIC Historic Statistics on Banking, Bank and Thrift Failure Reports, at http://www2.fdic.gov/hsob/SelectRpt.asp?EntryTyp=30.

FDIC, Statistics on Banking, Structure Tables, Changes in Number and Classification, at http://www2.fdic.gov/SDI/SOB/.

NCREIF Index/Data, http://www.ncreif.org/indices/.

National Bureau of Economic Research, Business Cycle Expansions and Contractions, http://www.nber.org/cycles.html.

NATIONAL COUNCIL OF REAL ESTATE INVESTMENT FIDUCIARIES, FREQUENTLY ASKED QUESTIONS ABOUT NCREIF AND THE NCREIF PROPERTY INDEX (NPI), http://www.ncreif.org/pdf/Users_Guide_to_NPI.pdf.

Aaron Gumpenberger & Steve Rushmore, HVS International, 2005 UNITED STATES HOTEL VALUATION INDEX (Nov. 2005).

Bloomberg (Bloomberg U.S. Savings & Loan Index).

Dow Jones Indexes (Dow Jones U.S. Savings & Loan Index).

CRSP, Center for Research in Security Prices. Graduate School of Business, The University of Chicago 2006.

SNL Securities Database.

Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (2002 ed.).

Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (1998 ed.).

Standard & Poor's, S&P SECURITY PRICE INDEX RECORD STATISTICAL SERVICE (1992 ed.).

U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index-All Urban Consumers, at http://data.bls.gov/cgi-bin/surveymost?cu.

Federal Reserve, 6-month CDs (Secondary Market), at http://www.federalreserve.gov/releases/h15/data/Business_day/H15_CD_M6.txt.

Federal Reserve, 1-month CDs (Secondary Market), at http://www.federalreserve.gov/releases/h15/data/Business_day/H15_CD_M1.txt.

Federal Reserve, 3-month CDs (Secondary Market), at http://www.federalreserve.gov/releases/h15/data/Business_day/H15_CD_M3.txt.

Yahoo! Finance (http://finance.yahoo.com/).

Federal Reserve, Statistical Release H.15, U.S. Government Securities/Treasury Constant Maturities/Nominal, *available at* http://www.federalreserve.gov/releases/h15/data/Business_day/H15_TCMNOM_Y1.txt.

http://research.stlouisfed.org/fred2/data/DGS10.txt.

http://research.stlouisfed.org/fred2/data/DGS30.txt.


***Academic Writings***


JOHN HULL, OPTIONS, FUTURES, AND OTHER DERIVATIVES 6 (Prentice Hall, 6th ed. 2006).

Stuart D. Root, *Bank Capital, Asset Liquidation, and the Credit Cruch*, 1993 COLUM. BUS. L. REV. 169 (1993).

Douglas G. Baird, *The Uneasy Case for Corporate Reorganizations*, 15 J. LEGAL STUD. 127 (1986).

Amy Chang, Praveen Kumar & K. Sivaramakrishnan, *Dividend Changes, Cash Flow Predictability, and Signaling of Future Cash Flows* (Nov. 15, 2005), *available at* http://ssrn.com/abstract=881511.

OLIVIER BLANCHARD, MACROECONOMICS 29-30 (Prentice Hall 1997).

Joseph Mason, *A Real Options Approach to Bankruptcy Costs*: *Evidence from Failed Commercial Banks During the 1990s*, 78 J. OF BUS. 1523, 1523-1553 (2005).

FEDERAL DEPOSIT INSURANCE CORPORATION, MANAGING THE CRISIS: THE FDIC AND RTC EXPERIENCE, 1980-1994 136 (1998).

APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 50 (12th ed. 2001).

Charles W. Calomiris & Joseph R. Mason, *Fundamentals, Panics and Bank Distress During the Depression*, 93 AM. ECON. REV. 1615 (2003).

Charles W. Calomiris & Berry Wilson, *Bank Capital and Portfolio Management: The 1930s "Capital Crunch" and the Scramble to Shed Risk*, 77 J. BUS. 421 (2004).

Charles W. Calomiris & Andrew P. Powell, *Can Emerging Market Bank Regulators Establish Credible Discipline? The Case of Argentina, 1992-1999* (National Bureau of Economic Research , Working Paper No. W7715, 2000).

Stewart C. Myers & Nicholas S. Majluf, *Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have*, 13 J. FIN. ECON. 187 (1984).
Christopher M. James & Peggy Wier, *An Analysis of FDIC Failed Bank Auctions*, 20 J. MONETARY ECON. 141 (1987).
Charles W. Calomiris & Charles P. Himmelberg, *Investment Banking Costs as a Measure of the Cost of External Finance*, Working Paper, Columbia Business School, revised May 2001.
Charles W. Calomiris and Joseph R. Mason, *Credit Card Securitization and Regulatory Arbitrage*, 26 J. FIN. SERVICES RES. 5 (2004).
Inmoo Lee, Scott Lochhead, Jay Ritter & Quanshui Zhao, *The Cost of Raising Capital*, 19 J. FIN. RES. 59 (1996).

***Periodicals***

*Home Group Announces Completion of Carteret Acquisition*, PR NEWSWIRE, Aug. 8, 1988.
Tim Metz, Alan Murray, Thomas E. Ricks & Beatrice E. Garcia, *The Crash of '87: Stocks Plummet 508.32 Amid Panicky Selling --- Percentage Decline Is Far Steeper Than '29; Bond Prices Surge*, WALL ST. J., Oct. 20, 1987.
Matt Yancey, *Some House GOP Members Want S&L Bill Changes*, ASSOCIATED PRESS, May 23, 1989.
Kathleen Day, *S&L Supporters Plan Offensive To Retain 'Goodwill' as Capital*, WASH. POST, May 24, 1989, at F1.
Nathaniel C. Cash, *Some in G.O.P. Deserting Bush On Savings Plan*, N.Y. TIMES, May 25, 1989, at A1.
*AmBase Seen Opening Sharply Lower*, REUTERS NEWS, Aug. 15, 1990.
*AmBase Says Q2 Results Hurt Negotiations*, REUTERS NEWS, Aug. 15, 1990.
*Stockholder Sues AmBase Over Dividend Cancellation*, REUTERS NEWS, Aug. 16, 1990.
Steve Klinkerman, *The High Road is Costing RTC Time and Money*, AMER. BANKER, August 6, 1990, at 1.
Kenneth H. Bacon, *As Deposit Insurance Dwindles, FDIC Wonders If It Should Start Running the Banks It Seizes*, WALL ST. J., Dec. 31, 1990, at A30.
*Western Buys Branches*, N.Y. TIMES, June 19, 1990, at D5.
Press Release, Great Western Financial Corp., Great Western Announces Florida Acquisition (June 18, 1990) (CAM4900654- CAM4900655).
Press Release, Carteret Completes Sales of 13 Florida Offices to Great Western Bank (Oct. 9, 1990) (CAM4071763).
*Ambase 1st Qtr Loss; To Pay Special Div; Suspends Qtr Div*, DOWJONES NEWSWIRES, May 14, 1990.
Michele Galen, *Top of the News: AmBase Shareholders Are Used to Disappointment. But This . . . –Management Reneges on a Dividend to Pay Unexpected Debt*, BUS. WEEK, Sep. 3 1990, at 38.
*OTS Seeks $30 Million Capital Infusion Into Carteret Savings*, DOWJONES NEWSWIRES, Sep. 6, 1990.
*AmBase Suspends Quarterly Dividend*, REUTERS NEWS, May 14, 1990.

***Periodicals on Deposit Interest Rates***

Marilee Loboda Braue, *CD Rate War Bringing Out the Crowds*, N.J. REC., Apr. 3, 1989, at C01.
*Correction*, SOUTH FLORIDA SUN-SENTINEL, Jan. 1, 1991, at *1.
Robert Hurtado, *Declining C.D. Yield Slows*, N.Y. TIMES, Apr. 3, 1991, at 4.
Robert Hurtado, *Yields Decline for 7th Week*, N.Y. TIMES, Apr. 17, 1991, at 20.
Robert Hurtado, *C.D.'s and Bank Funds Down 11th Week*, N.Y. TIMES, May 15, 1991, at 11.
Robert Hurtado, *Bank Fund and C.D. Yields Post Another Weekly Drop*, N.Y. TIMES, May 29, 1991, at 8.
Robert Hurtado, *Bank Funds And C.D.'s Still Falling*, N.Y. TIMES, June 5, 1991, at 11.
Robert Hurtado, *Bank Funds And C.D.'s Off Slightly*, N.Y. TIMES, June 26, 1991, at 15.
Robert Hurtado, *Yields Mixed On C.D.'s and Bank Funds*, N.Y. TIMES, Jul. 10, 1991, at 6.
Elizabeth M. Fowler, *Short-Term Yields Fall A Bit More*, N.Y. TIMES, Jul. 31, 1991, at 18.
Elizabeth M. Fowler, *Bank Funds And C.D.'s Fall in Week*, N.Y. TIMES, Aug. 7, 1991, at 19.
Elizabeth M. Fowler, *Short-Term Rates Off Again; Further Drop Is Expected*, N.Y. TIMES, Aug. 14, 1991, at 16.
Robert Hurtado, *C.D.'s and Bank Funds Fall*, N.Y. TIMES, Aug. 21, 1991, at 5.
Robert Hurtado, *C.D. Yields Decline Again*, N.Y. TIMES, Aug. 28, 1991, at 18.
Robert Hurtado, *Yields Drop On C.D.'s and Bank Funds*, N.Y. TIMES, Sept. 4, 1991, at 7.
Elizabeth M. Fowler, *Money Market Accounts And C.D.'s Decline Again*, N.Y. TIMES, Sept. 18, 1991, at 14.
Elizabeth M. Fowler, *C.D.'s and Bank Money Funds Fall Again*, N.Y. TIMES, Oct. 2, 1991, at 18.
Elizabeth M. Fowler, *C.D.'s and Bank Funds Drop Sharply in Week*, N.Y. TIMES, Oct. 9, 1991, at 20.
Elizabeth M. Fowler, *Yields Fall On C.D.'s and Bank Funds*, N.Y. TIMES, Oct. 16, 1991, at 4.
Elizabeth M. Fowler, *C.D.'s and Bank Funds Fall*, N.Y. TIMES, Oct. 23, 1991, at 7.

Elizabeth M. Fowler, *Bank Funds and C.D.'s Fall***,** N.Y. TIMES, Nov. 6, 1991, at 13.
Elizabeth M. Fowler, *C.D.'s and Bank Funds Fall***,** N.Y. TIMES, Nov. 20, 1991, at 7.
Elizabeth M. Fowler, *C.D.'s and Bank Funds Dip***,** N.Y. TIMES, Nov. 27, 1991, at 9.
Elizabeth M. Fowler, *Bank Funds, C.D.'s Lower***,** N.Y. TIMES, Dec. 4, 1991, at 12.
Elizabeth M. Fowler, *Bank C.D. Yields Off Again***,** N.Y. TIMES, Dec. 18, 1991, at 8.
Elizabeth M. Fowler, *C.D. and Bank Fund Yields Post Steeper Drop in Week*, N.Y. TIMES, Dec. 25, 1991, at 3.
Robert Hurtado, *CREDIT MARKETS; Bank Fund, C.D. Yields Down Again*, N.Y. TIMES, Jan. 1, 1992, at 55.
Elizabeth M. Fowler, *Bank Funds and C.D.'s Fall*, N.Y. TIMES, Jan. 8, 1992, at 13.
Elizabeth M. Fowler, *Bank Fund, C.D. Yields Down Again*, N.Y. TIMES, Jan. 22, 1992, at 19.
Elizabeth M. Fowler, *Bank Yields Drop Slightly*, N.Y. TIMES, Jan. 29, 1992, at 18.
Elizabeth M. Fowler, *Bank Fund Yields Mixed*, N.Y. TIMES, Feb. 5, 1992, at 16.
Elizabeth M. Fowler, *C.D.'s and Bank Funds Fall*, N.Y. TIMES, Feb. 12, 1992, at 21.
Elizabeth M. Fowler, *C.D. and Bank Fund Yields Continue to Fall*, N.Y. TIMES, Feb. 19, 1992, at 15.
Elizabeth M. Fowler, *C.D. Rates Down Slightly*, N.Y. TIMES, Feb. 26, 1992, at 6.
Elizabeth M. Fowler, *Slight Changes in Yields On C.D.'s and Bank Funds*, N.Y. TIMES, Mar. 4, 1992, at 18.
Elizabeth M. Fowler, *Bank Fund, C.D. Yields Are Mixed*, N.Y. TIMES, Mar. 11, 1992, at 15.
Elizabeth M. Fowler, *Bank Yields Show Mixed Trend for Week*, N.Y. TIMES, Mar. 18, 1992, at 15.
Elizabeth M. Fowler, *Bank Fund And C.D. Yields Mixed*, N.Y. TIMES, Mar. 25, 1992, at 20.
Elizabeth M. Fowler, *Bank Fund, C.D. Yields Still Mixed*, N.Y. TIMES, Apr. 1, 1992, at 13.
Robert Hurtado, *Bank Yields Are Mixed Once Again*, N.Y. TIMES, Apr. 8, 1992, at 9.
Robert Hurtado, *C.D.'s and Bank Funds Are Down Sharply***,** N.Y. TIMES, Apr. 15, 1992, at 11.
Robert Hurtado, *Bank Yields Are Lower For Week***,** N.Y. TIMES, Apr. 22, 1992, at 13.
Robert Hurtado, *Yields Flat On C.D.'s and Bank Funds*, N.Y. TIMES, Apr. 29, 1992, at 11.
Robert Hurtado, *Yields Fall Once Again At Banks*, N.Y. TIMES, May 6, 1992, at 20.
Robert Hurtado, *C.D.'s and Bank Funds Off On Weak Demand for Loans*, N.Y. TIMES, May 13, 1992, at 21.
*Yields Down Moderately On Bank Funds and C.D.'s*, N.Y. TIMES, May 20, 1992, at 7.
Robert Hurtado, *Consumer Bank Rates Are Down*, N.Y. TIMES, May 27, 1992, at 15.
Robert Hurtado, *Yields Down on C.D.'s and Bank Funds*, N.Y. TIMES, June 3, 1992, at 15.
Robert Hurtado, *Bank Money Market and C.D. Rates Drop*, N.Y. TIMES, June 10, 1992, at 13.
Robert Hurtado, *C.D.'s and Bank Funds Off*, N.Y. TIMES, June 17, 1992, at 14.
Robert Hurtado, *Yields Lower On C.D.'s and Bank Funds*, N.Y. TIMES, June 24, 1992, at 9.
Robert Hurtado, *Bank Yields Off Slightly*, N.Y. TIMES, Jul. 1, 1992, at 15.
Robert Hurtado, *Bank Yields Down Sharply*, N.Y. TIMES, Jul. 8, 1992, at 13.
Robert Hurtado, *Yields Continue to Plunge For Bank Funds and C.D.'s*, N.Y. TIMES, Jul. 15, 1992, at 16.
Michael Quint, *Banks' Rates On Deposits Drop Again*, N.Y. TIMES, Jul. 22, 1992, at 9.
Michael Quint, *Bank Rates Drift Lower In Week*, N.Y. TIMES, Jul. 29, 1992, at 14.
Robert Hurtado, *Yields Fall at Slower Pace For Bank Funds and C.D.'s*, N.Y. TIMES, Aug. 5, 1992, at 2.
Robert Hurtado, *Bank Funds And C.D.'s Fall Again*, N.Y. TIMES, Aug. 19, 1992, at 14.
Robert Hurtado, *Bank Yields On Accounts Decrease*, N.Y. TIMES, Aug. 26, 1992, at 10.
Robert Hurtado, *Bank Funds And C.D.'s Dip in Yield*, N.Y. TIMES, Sept. 2, 1992, at 10.
*Yields Fall At Banks*, N.Y. TIMES, Sept. 16, 1992, at 24.
Robert Hurtado, *Bank Money Market Yields And C.D. Rates Off in Week*, N.Y. TIMES, Sept. 23, 1992, at 26.
Robert Hurtado, *Bank Yields Are Off Again*, N.Y. TIMES, Oct. 7, 1992, at 9.
Robert Hurtado, *C.D. Yields Are Mixed For Week*, N.Y. TIMES, Oct. 21, 1992, at 15.
Robert Hurtado, *Yields Mixed At Banks This Week*, N.Y. TIMES, Dec. 16, 1992, at 13.
Robert Hurtado, *Bank Rates Remain Flat This Week*, N.Y. TIMES, Dec. 23, 1992, at 14.
Robert Hurtado, *C.D. Yields Unchanged For Week*, N.Y. TIMES, Dec. 30, 1992, at 12.

***Real Estate Sales***
Action Plan from Tom Hamberger, National SWAT Chairman, to National SWAT Team #4, Resolution Trust Corporation (Mar. 8, 1994) (AM4343 2736-2743)
AM4091 0003
AM4281 1760
AM4337 0345
AM4343 0736-0738 (Spinnaker)
AM4343 2730-31

AM5066 2327
AM5327 0078-0080
AM5349 0134
AM5558 1942
AM5558 1988
AM5559 0861
CAM370 0608
CAM370 0840-44
CAM495 0160
CAM666 0222
CAMA 0175669
CAMA0005629-34
CAMA0103458
CAMA0338631-33
CAMA0360041-2
CAMA0360059-61
CAMA0360086-88
CAMA0360285-88
Carteret Federal Savings Bank Participations (Feb. 28, 1995) (AM4343 2554-2558)
Carteret Federal Savings Bank, Commercial Asset Division 1994-C2 Sales Initiative (Nov. 11, 1994) (AM4087-0100)
Carteret Federal Savings Bank, Commercial Bankruptcies, Feb. 10, 1995 (AM4343 0111-0112)
Carteret Federal Savings, Commercial Loans, Jan. 24, 1995 (AM5242 1100-1103)
Carteret Federal Savings, Commercial Loans, Scheduled Initiatives, Apr. 28, 1995 (AM5392 1467-1469)
Carteret Federal Savings, Commercial Loans, Scheduled Initiatives, Mar. 23, 1995 (AM5393 1341-1342)
Carteret Loss Analysis File 1: Intro and Target Loans (AM4087 0001-0099)
Carteret Savings Bank, Commercial Asset Division, Trial Balance of Loans, Rec & Reserve 7/91 to 9/92 (C-AM-A-0338631-33)
Carteret Savings Bank, Commercial Asset Division-Summary, Dec. 31, 1991 (C-AM-A-0175668-69)
CLP 92
CLP 93
CLP 94
Commercial Asset Portfolio Analysis (Nov. 30, 1992), (CAM3862674-CAM3862699).
Drill Down Acct 071120
Letter from Bruce A. Campbell to David M. Rasking (Jan. 5, 1995) (AM5392 0253-0254)
Memorandum from Bruce A. Campbell, to Stephen Croghan (Jul. 27, 1994) (AM4343 1933)
Memorandum from Mark R. Krenz, Asset Manager, to the Asset Review Committee, Resolution Trust Corporation (Sept. 23, 1994) (C-AM-A-0352132-46)
Memorandum from National SWAT, to the Executive Committee, Resolution Trust Corporation (Jul. 18, 1994) (AM4120 0145-0162 Hyatt)
Memorandum from Phillip M. Hadley. Asset Manager, to the Asset Review Committee, Resolution Trust Corporation (Feb. 15, 1995) (C-AM-A-0010833-39)
Memorandum from Rebecca S. Kester, Asset Manager, to the Asset Review Committee, Resolution Trust Corporation (Dec. 22, 1994) (AM 4281 0003 City View)
Memorandum from Scott W. Ashley to Dean DiGiondomenico (Apr. 5, 1994) (C-AM-A-0160781-82)
Memorandum from Tanya L. Gray to Lisa Redwanowski (Sept. 18, 1995) (CAM666 0223-0224)
Midland Loan Service, Compromise Report, Sept. 1-30, 1995 (C-AM-A-0010846)
Sales 6/30/95

***Real Estate Appraisals***
AM 4010 0100-0199
AM 4015 0100-0199
AM 4015 0200-0299
AM 4015 0800-0899
AM 4015 1000-1099

AM 4015 1100-1199
AM 4015 1238
AM 4015 1700-1799
AM 4015 1800-1899
AM 4015 2000-2099
AM 4015 2105-2112 (Wedgewood Park South)
AM 4015 2200-2299
AM 4015 2349-2360
AM 4015 2400-2499
AM 4015 2500-2599
AM 4097 0300-0399
AM 4097 0500-0599
AM 4097 0600-0699
AM 4097 0800-0899
AM 4102 0555
AM 4102 0558-0560
AM 4102 0562-0563
AM 4102 0564-0565
Am 4102 0566-0567
AM 4102 0568
AM 4102 0571-0573
AM 4102 0574-0575
AM 4102 0576-0577
AM 4102 0578-0579
AM 4102 0584-0585
AM 4120 0163
AM 4135 2100-2199
AM 4201 0100-0199
AM 4201 0300-0399
AM 4201 0400-0499
AM 4201 0600-0699
AM 4201 0727-0733
AM 4336 0605-0998 (Ramblewood)
AM 4336 1040-1192 (Foxmoor)
AM 4350 0013-0167 (Hialeah Associates)
AM 5005 0300-0399
AM 5005 0400-0499
AM 5005 0500-0599
AM 5005 0600-0699
AM 5005 0700-0799
AM 5005 0800-0899
AM 5067 0900-0999
AM 5067 1000-1099
AM 5247 1900-1999
AM 5267 0700-0799
AM 661 0031-0037
AM4012 0580-0582
CAM 541 1900-1999
CAM 550 1800-1899
CAM 563 0900-0999
CAM 569 2300-2399
CAM 572 0300-0399
CAM 573 1256-1493 (Bel-Air Apartments)
CAM 601 000000-0099
CAM 603 0000-0099
CAM 603 0300-0399

CAM 603 0400-0499
CAM 603 0500-0599
CAM 603 0700-0799
CAM 603 0800-0899
CAM 603 0900-0999
CAM 603 1000-1099
CAM 603 1100-1199
CAM 603 1200-1299
CAM 603 1300-1399
CAM 603 1400-1499
CAM 603 1500-1598
CAM 612 0200-0299
CAM 612 0500-0599
CAM 612 0600-0699
CAM 612 0700-0799
CAM 612 0719-0723 (Padlock Mini Storage)
CAM 620 1100-1199
CAM 626 0275-0446
CAM 628 0142-0215 (Spectrum Office Building)
CAM 637 0800-0899
CAM 658 0100-0199
CAM 692 040069
CAM 698 1473-1634 (Boca Storage)
CAM 711 1300-1399
CAM 738 0900-0999
CAM 740 0001-0099
CAM 750 0459-0613 (Paramount Plaza)
CAM 772 010020
CAM 879 0700-0799

***Miscellaneous***

Agreement of Merger of JAM Financial Corp. with and into Carteret Bancorp Inc., Aug. 4, 1987, (KH029240 – KH029249).

Appendix D, Jan. 18, 1988, (AMB068044 – AMB068045).

Kaplan, Smith & Associates, Inc., Acquisition Valuation: Carteret Bancorp, Inc., Morristown, New Jersey Valued as of August 8, 1988 (Jan. 18, 1989), (CAM4411092 – CAM4411288).

Executive Summary, Carteret Federal Savings Bank, Feb. 28, 1994, (AM52900132 – AM52900135).

Federal Home Loan Bank Board, No: 88-657, Aug. 5, 1988, (AMB009230 – AMB009236).

Stipulation and Agreement, Aug. 8, 1988, (ANB009226 – ANB009229).

Exhibit C, Regulatory Capital Maintenance/Dividend Agreement, Nov. 28, 1988, (AMBNP001430 – AMBNP001440).

Agreement, Aug. 1988, (AMB009202 – AMB009203).

Dryades Savings Bank, FSB, Summary of Loans Purchased (Feb. 21, 1995).

Minority Preference Funding Statement, Dryades Savings Bank (Feb. 21, 1995).

Funding Statement, Gulf Coast Bank (Feb. 22, 1995).

Hamilton, Carter, Smith Consulting, Inc., Carteret Savings Bank, F.A., $5 Billion Purchased Mortgage Servicing Rights Evaluation (Nov. 14, 1991), (WOP3161866 – WOP3161903).

Valuation of the Deposit Base Intangible Asset from the Acquisition of Carteret Savings Bank (Aug. 8, 1988), (PM004480-PM004498).

Hamilton, Carter, Smith Consulting, Inc., Carteret Savings Bank, F.A., $7.6 Billion Purchased & Originated Loan Servicing Portfolio Data (July 22, 1992), (WOP3161613 – WOP3161643).

Carteret Savings Bank, Response to Office of Thrift Supervision Comments on Bankers Savings Branch Sale Application, Oct. 5, 1990, (CAM4901274-CAM4901277).

Carteret Savings Bank, FA, Branch Sale Analysis-Purchase Accounting, Oct. 31, 1990, (CAM4920185).

Minutes of the Meeting of the Board of Directors of the Home Group, Inc. (May 29, 1988).
The Home Group, Inc., Credit Agreement, Dated as of June 10, 1988, The Chase Manhattan Bank (National Association) as Agent.
The Home Group, Inc., FSLIC Amendment No. 1 to Application H-(e) 1, (AMBNP026529-AMBNP026558).
The Home Group, Inc., FHLB Application H-(e) 1, (FAM0010005-FAM0010019).
Goodwill Amortization Schedule (Historical), August 1989 (CAM5300023).
Goodwill Amortization Schedule, December 1989 (AM050531).
Clearwater Servicing Center, at 1.1 (C-AM-A-0026931).
IBBOTSON ASSOCIATES, COST OF CAPITAL QUARTERLY, 1994 YEARBOOK.
IBBOTSON ASSOCIATES, STOCKS BONDS BILLS AND INFLATION, 1994 YEARBOOK.
S-Memo, WOR839 0347-0359.
S-Memo, WOR063 0879-0893.
Cost Summary, WOR999 0240-0253.
IPF Transaction Fees.
Carteret Employment Contract Cases.
CSB Recapitalization Efforts.
Professional Fees – OTS-RTC.
Closing Statement, Interim Federal Savings Bank, Bankers Savings and Bankers Corp., at CAM4900015 (Dec. 17, 1990).
Branch Closing Statement, Great Western Bank, at CAM4441169 (Oct. 9, 1990).
Loyola Branch Sale Deposits and Calculation of Premium, at CAM4900499 (Nov. 21, 1990).
Office of Thrift Supervision, Examination Handbook 261, Adequacy of Valuation Allowances ...Asset Quality, Section 261, *available at* http://www.ots.treas.gov/docs/4/422092.pdf.
Appendix B-3 (WOQ6781145, WOQ6781177).

***Court Filings***

Compl. ¶¶ 7-8, *Riether v. AmBase Corp.*, No. UNN-L-5594 (N.J. Super. Ct.) (filed Sept. 13, 1993).
Compl. ¶¶ 4-12, *Tyburski v. AmBase Corp.*, No. UNN-L-5596-93 (N.J. Super. Ct.) (filed Sept. 13, 1993).
Compl. ¶¶ 5-10, *McCabe v. AmBase Corp.*, No. UNN-L-5597-93 (N.J. Super. Ct.) (filed Sept. 13, 1993).
Compl. ¶¶ 5-12, *Krupinski v. AmBase Corp.*, No. UNN-L-5592-93 (N.J. Super. Ct.) (filed Sept. 13, 1993).
Compl. ¶¶ 5-12, *Smith v. AmBase Corp.*, No. UNN-L-5596-93 (N.J. Super. Ct.) (filed Sept. 13, 1993).
Compl. ¶¶ 5-12, *Laskowski v. AmBase Corp.*, No. UNN-L-5596-93 (N.J. Super. Ct.) (filed Sept. 13, 1993).
Compl. ¶¶ 17-18, *McCarthy v. AmBase Corp.*, No. UNN-C-220-91 (N.J. Super. Ct.) (filed Dec. 20, 1991).
Compl., *Walsh v. AmBase Corp.*, No. C-000128-92 (N.J. Super. Ct.) (filed Oct. 30, 1992).
Compl., *Braun v. AmBase Corp.* (N.J. Super. Ct.).
*Carteret Savings Bank v. OTS*, No. 91-661, slip op. at 9 (D.N.J. July 8, 1991).
*AmBase Corp. v. United States*, 58 Fed.Cl. 32, 38 (2003).
*Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 762 F. Supp. 1159 (1991).
*Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 963 F.2d 567, 585 (3d Cir. 1992).
12 U.S.C. § 1441a(w)(17)(C).

## APPENDIX C: CURRICULUM VITAE

HOME ADDRESS AND PHONE: 251 Fox Meadow Road
Scarsdale, NY 10583
(914) 722-6905

OFFICE ADDRESS AND PHONE: Division of Finance and Economics
Graduate School of Business, Columbia University
3022 Broadway, 601 Uris Hall
New York, NY 10027
(212) 854-8748
(212) 316-9219 (fax)
cc374@columbia.edu

BIRTHDATE: November 8, 1957

EDUCATION:

Ph.D., Economics, Stanford University, June 1985.
Dissertation: Historical Perspectives on the Tax-Based Theory of Money.

B.A., Economics, Yale University, Magna Cum Laude, May 1979.

CURRENT ACADEMIC POSITIONS:

Henry Kaufman Professor of Financial Institutions (beginning March 2003; previously Paul M. Montrone Professor, 1996-March 2003), Division of Finance and Economics, Graduate School of Business, Columbia University, and Professor of International and Public Affairs, Columbia School of International and Public Affairs, 1996-present.

Academic Director, Jerome Chazen Institute of International Business, Columbia Business School, October 1, 2004-present, and Director, Center for International Business and Education Research, Columbia University, October 1-present.

Research Associate, National Bureau of Economic Research, October 1996-present. (Faculty Research Fellow, October 1991-October 1996)

Member, Shadow Financial Regulatory Committee, December 1997-December 2004, December 2005-present.

Arthur Burns Fellow in International Economics, American Enterprise Institute, December 2001-present, and Co-Director, AEI Project on Financial Deregulation, January 1997-present (Adjunct Scholar, American Enterprise Institute, January 1995-December 2001).

PREVIOUS ACADEMIC POSITIONS

Associate Professor, Department of Finance, and Co-Director, Office for Banking Research, University of Illinois, August 1992-June 1996.

Fellow, Council on Foreign Relations, May 2000-December 2000

Visiting Associate Professor, Department of Finance, The Wharton School, August 1991-July 1992.

Assistant Professor, Department of Economics, Northwestern University, September 1984-July 1991.

Visiting Assistant Professor, Department of Economics, Stanford University, January 1989-June 1989.

OTHER AFFILIATIONS

Consultant, Comision Bancaria y de Valores, Mexico, May 1999-2000

Consultant, Federal Reserve Bank of New York, July 1996-1999. Visiting Scholar, Federal Reserve Bank of New York, June 1995.

Consultant, Banco Central de la Republica Argentina, September 1996-1998.

Consultant, Banco Central de la Reserva, El Salvador, October 1996-1998.

Consultant, World Bank mission on Argentine financial sector, February 1998

Consultant, International Comparative Study of Term Finance, The World Bank, March 1995-May 1996.

Member, Federation of American Scientists Committee on Systemic Risk, October 1995-January 1996.

Consultant, World Bank mission on Mexican banking reform, November 1995.

Consultant, Federal Reserve Bank of St. Louis, May 1993-June 1995.

Consultant, Board of Governors of the Federal Reserve System, Division of Research and Statistics, November 1993.

Consultant, project to evaluate Japan's industrial credit programs, The World Bank, November 1991-February 1995.

Consultant, Federal Reserve Bank of Chicago, July 1989-July 1991.Visiting Economist, Federal Reserve Bank of Chicago, June 1988-December 1988.

Economist, International Monetary Fund, Summer 1981.

BOARD MEMBERSHIPS

Chairman of the Board, Greater Atlantic Financial Corp., January 2001-present.

Member, Advisory Board, Hillman Capital Management, 2001-present.

Member, Academic Advisory Panel to the Conference Board/Group of Thirty For: "Do Exchange Rates Matter? A Global Survey of CEOs and CFOs on Exchange Rates, 2000-2004.

Member, Board of Directors, Mercia Corporation, September 2004-present.

Principal, CHP Asset Management LLC, 2004-present.

Member, Board of Advisors, Suvidha Starnet Ltd. (India), September 2006-present.

Vice President, Axion Estin Foundation, Inc., 2005-present.

MEMBERSHIP IN ACADEMIC ORGANIZATIONS:

American Economic Association
Cliometric Society
Economic History Association
American Finance Association
Financial Management Association
American Law and Economics Association
National Association of Scholars

GOVERNMENT SERVICE

Congressional Appointee to the International Financial Institution Advisory Commission (Meltzer Commission), September 1999-March 2000.

Member, Ad Hoc Task Force on International Finance to Advise Senators Lieberman and Roth and Congressmen Dreir and Matsui, 1999.

Adviser to Senator John McCain's Presidential Campaign, 1999-2000.

ACADEMIC PROGRAM COMMITTEES:

Program Committee, American Finance Association Annual Meetings, 2000
Program Committee, Economic History Association Meetings, September 1996
Program Committee, Financial Management Association Meetings, October 1995.
Program Committee, Econometric Society Meetings, ASSA, January 1992.
Program Committee, Economic History Association Meetings, September 1991.

AWARDS, RESEARCH GRANTS, AND CONTRACTS:

1997-1998 Chazen International Innovation Prize for the development of the course, "Emerging Financial Markets" (developed with David Beim).

National Science Foundation for "Assistance to Banks during the Great Depression," July 1994-December 1996.

University Scholar, University of Illinois, 1995.

University of Illinois Research Board Grant for "Sources and Effects of High Costs of External Finance," 1994-1995.

Office for Research Grants, College of Commerce and Business Administration, UIUC 1993, 1995.

World Bank Project to Evaluate Industrial Credit Programs in Japan (with Charles M. Kahn, Charles Himmelberg, and World Bank staff), 1992.

Stanford Center for Economic Policy Research for "Excess Returns and Dividend Yields over the Firm 'Life Cycle': A Panel Study" (with Orazio Attanasio), 1990.

Garn Institute of Finance for "The Efficiency of Cooperative Interbank Relations: The Suffolk System" (with Charles M. Kahn), 1990.

Prochnow Foundation grant to study interbank self-regulation historically, and its implications for regulatory reform (with Charles M. Kahn), 1988.

Garn Institute of Finance for "The Role of Demandable Debt in Structuring Optimal Banking Arrangements" (with Charles M. Kahn), 1988.

Northwestern University Research Grants, 1985, 1987.

EDITORIAL SERVICE

Editorial Boards

Annals of Finance, beginning 2004
Journal of Economics and Business, beginning 9/98
Journal of Financial Intermediation, 12/97-2001.
Journal of Economic History, 9/97-2001.
Journal of Financial Services Research, 1995-present.
Journal of Banking and Finance, 1994-2004.
Economic Policy Review, Federal Reserve Bank of New York, 1994-present.
Explorations in Economic History, 1993-2003.

Refereeing

National Science Foundation
American Economic Review
Bulletin of Economic Research
Business History Review
Economic Inquiry
The Economic Journal

Economic History Review
Explorations in Economic History
International Review of Economics and Finance
Journal of Applied Econometrics
Journal of Development Economics
Journal of Banking and Finance
Journal of Econometrics
Journal of Economic History
Journal of Economic Literature
Journal of Economics and Business
Journal of Finance
Journal of Financial Services Research
Journal of Financial Intermediation
Journal of International Money and Finance
Journal of Macroeconomics
Journal of Monetary Economics
Journal of Money, Credit, and Banking
Journal of Political Economy
Journal of Public Economics
Journal of Small Business Finance
Oxford Economic Papers
Quarterly Journal of Economics
Review of Economic Studies
Review of Economics and Statistics
Review of Financial Studies
Real Estate Economics

OTHER CONSULTING

Consulting work in the areas of banking, corporate finance, mergers and acquisitions, asset management, and financial regulation for private sector clients including Citigroup, Fleet-BankBoston, Bank of America, Fidelity, Lloyds, AIG, UBS, Credit Suisse, Verizon, The Limited, Xilinx, Tech Central, Astoria Savings Bank, AmBase, Wachtel Lipton, Milbank Tweed, Cleary Gottlieb, Kirkland Ellis, O'Melveny Myers, Mayer Brown, LeBoeuf Lamb, Latham Watkins, Fenwick & West, Winston & Strawn, Attorneys General of Massachusetts and Connecticut, and M&A Advisor. Duties have included being qualified to offer expert testimony in U.S. Tax Court and Federal Claims Court, and judging the competition for M&A Advisor's annual prizes for best deals, investment banks and law firms in 2004.

PUBLICATIONS

Articles in Refereed Journals

"Banker Fees and Acquisition Premia for Targets in Cash Tender Offers: Challenges to the Popular Wisdom on Banker Conflicts," NBER Working Paper No. 11333, May 2005, Journal of Law Economics and Organization, forthcoming.

"Venture Capital as Human Resource Management" (with Gledson Carvalho and Joao Amaro de Matos), NBER Working Paper No. 11350, May 2005, Journal of Economics and Business, forthcoming.

"Devaluation with Contract Redenomination in Argentina," NBER Working Paper No. 12644, October 2006, Annals of Finance 3, 2007, 155-192.

"Bank Capital and Portfolio Management: The 1930s 'Capital Crunch' and Scramble to Shed Risk" (with Berry Wilson), NBER Working Paper No. 6649, July 1998, Journal of Business, July 2004, 421-56.

"Credit Card Securitization and Regulatory Arbitrage" (with Joseph Mason), Journal of Financial Services Research, August 2004, 5-27.

"Consequences of U.S. Bank Distress During the Depression," (with Joseph Mason), American Economic Review 93, June 2003, 937-47.

"Fundamentals, Panics and Bank Distress During the Depression" (with Joseph Mason), NBER Working Paper No. 7919, September 2000, American Economic Review, 93, December 2003, 1615-47, and forthcoming in Financial Crises, edited by Franklin Allen and Douglas Gale, Edward Elgar Publishing 2007.

"The Role of ROSCAs: Lumpy Durables or Event Insurance?" (with Indira Rajaraman), Journal of Development Economics 56 (1998), 207-216.

"Contagion and Bank Failures During the Great Depression: The June 1932 Chicago Banking Panic" (with Joseph Mason), , American Economic Review 87, December 1997, 863-883. National Bureau of Economic Research Working Paper 4934, November 1994. Republished in The Regulation and Supervision of Banks, edited by Maximilian J. B. Hall, Edward Elgar Publishing, 2001.

"The Efficiency of Self-Regulated Payments Systems: Learning from the Suffolk System" (with Charles M. Kahn). Journal of Money, Credit and Banking, 28, November 1996, 766-797.

"Internal Finance and Investment: Evidence from the Undistributed Profits Tax of 1936-1937" (with R. Glenn Hubbard), NBER Working Paper No. 4288 (March 1993), Journal of Business , October 1995, 443-482.

"Financial Fragility: Issues and Policy Implications," in Coping with Financial Fragility: A Global Perspective, Harald Benink and George Kaufman, eds., Journal of Financial Services Research, 9, 1995, 241-257.

"Housing-Finance Interventions and Private Incentives: Helping Minorities and the Poor" (with Charles M. Kahn and Stanley D. Longhofer), Journal of Money, Credit and Banking, August 1994, 634-674.

"Consistent Measures of Output for the Antebellum and Postbellum Periods: Issues and Preliminary Results" (with Christopher Hanes), Journal of Economic History, June 1994, 409-422. Republished as "Consistent Output Series for the Antebellum and Postbellum Periods: Issues and Preliminary Results," in Business Cycles since 1820, edited by Trevor J.O. Dick, Edward Elgar, 1998, 15-27.

"The Panic of 1857: Origins, Transmission, and Containment" (with Larry Schweikart), Journal of Economic History, December 1991, 807-34.

"The Role of Demandable Debt in Structuring Optimal Banking Arrangements" (with Charles M. Kahn), American Economic Review, June 1991, 497-513. Republished in The Regulation and Supervision of Banks, edited by Maximilian J. B. Hall, Edward Elgar Publishing, 2001, and forthcoming in Financial Crises, edited by Franklin Allen and Douglas Gale, Edward Elgar Publishing 2007.

"The Motives of U.S. Debt-Management Policy, 1790-1880: Efficient Discrimination and Time Consistency," Research in Economic History, 13, 1991, 67-105.

"Is Deposit Insurance Necessary? A Historical Perspective," Journal of Economic History, June 1990, 283-95.

"Firm Heterogeneity, Internal Finance, and Credit Rationing" (with R. Glenn Hubbard), Economic Journal, March 1990, 90-104.

"Price Flexibility, Credit Availability and Economic Fluctuations: Evidence from the U.S., 1894-1909" (with R. Glenn Hubbard), Quarterly Journal of Economics, August 1989, 429-52.

"The Motivations for Loan Commitments Backing Commercial Paper," Journal of Banking and Finance, May 1989, 271-77.

"The Effects of Asset Substitutes on Money Demand and the Inflation Process in Brazil" (with Ian Domowitz), Journal of Money, Credit, and Banking, February 1989, 78-89.

"Price and Exchange Rate Determination During the Greenback Suspension," Oxford Economic Papers, December 1988, 719-50.

"Institutional Failure, Monetary Scarcity, and the Depreciation of the Continental," Journal of Economic History, March 1988, 47-68.

"The Depreciation of the Continental: A Reply," Journal of Economic History, September 1988, 693-98.

CONFIDENTIAL MATERIALS – SUBJECT TO PROTECTIVE ORDER

Articles in Other Journals

"Alan Greenspan's Legacy: An Early Look: The Regulatory Record of the Greenspan Fed," American Economic Association Papers and Proceedings, Vol. 96, No. 2, May 2006, 170-73.

"China's Missed Opportunity," The Financial Regulator, Vol. 11, No. 3, December 2006, 58-62.

"Marginal Tax Rate Cuts and the Public Tax Debate" (with Kevin Hassett), National Tax Journal, March 2002, 119-32. Also appeared in part as "Searching for Sense in the Tax Cut Debate" in On the Issues, American Enterprise Institute, December 2001.

"Banking Approaches the Modern Era," Regulation, 25th Anniversary Special Report, Summer 2002, 14-21.

"The Regulation of Operational Risk in Investment Management Companies (with Richard Herring), Perspective, Investment Co. Institute, September 2002, Vol. 8, No. 2.

"Lessons from Argentina and Brazil" Cato Journal, 23 (Spring/Summer) 2003, 33-46. Translated into Spanish as "Lecciones de la Argentina y Brasil," in Crisis Financieras Internacionales: Que Rol le Corresponde al Gobierno?, edited by Daniel Artana and James A. Dorn, Cato Institute, 2003, 33-46.

"Emerging Market Banks: The Achilles Heel of Liberalization," Economic Directions, Vol 12, No. 2, 2002.

"Safety Nets, Bailouts, and Market Discipline: An Interview," The Financial Regulator, Vol. 7, No. 1, June 2002.

"Financial Regulation in a Global Marketplace" (with Robert E. Litan), Brookings-Wharton Papers on Financial Services 2000.

"When Will Economics Guide IMF and World Bank Reforms?" The Cato Journal 20 (Spring/Summer) 2000, 85-103.

"Fixing the IMF" (with Allan Meltzer), The National Interest, Summer 1999, 88-96.

"The Impending Collapse of the European Monetary Union," The Cato Journal 18 (Winter) 1999, 445-452.

"Runs on Banks and the Lessons of the Great Depression," Regulation 22 (1) 1999, 4-7.

“How To Invent a New IMF,” The International Economy, January/February 1998, 32-35, 67. Reprinted in On the Issues, American Enterprise Institute, May 1999.

“Market-Based Banking Supervision,” The Financial Regulator 4 (March) 1999, 33-36.

“The IMF’s Imprudent Role As Lender of Last Resort,” The Cato Journal 17 (Winter) 1998, 275-294, Republished in Forrest H. Capie and Geoffrey E. Wood, eds., The Lender of Last Resort, Routledge, 2007, 445-62.

“Universal Banking ‘American-Style’,” Journal of Institutional and Theoretical Economics 154, March 1998, 43-60.

“High Loan-To-Value Mortgages: Problem or Cure,” The Journal of Lending and Credit Risk Management, September 1998, 39-43.

“Reducing Moral Hazard: Introducing Market Signals into Banking Supervision,” Economic Perspectives, U.S. Information Agency, August 1998.

“Historical and Contemporary Perspectives on Banking Instability, Deposit Insurance, and Prudential Regulation and Supervision,” Review of Monetary and Financial Studies 16 (January) 2000, 8-16 (Japan).

“The Role of Financial Relationships in the History of American Corporate Finance” (with Carlos Ramirez), The Bank of America Journal of Applied Corporate Finance, Summer 1996, 52-73.

"Commercial Paper, Corporate Finance, and the Business Cycle: A Microeconomic Approach" (with Charles Himmelberg and Paul Wachtel), Carnegie-Rochester Series on Public Policy, 42, 1995, 203-250.

“Pricing Margins: Competition Is the Driver,” Journal of Retail Banking Services, Autumn 1995, 59-62.

“Valuing a Cash Flow Mortgage,” Illinois Real Estate Letter, Winter/Spring 1995, 5-6.

"Is the Discount Window Necessary? A Penn-Central Perspective," NBER Working Paper No. 4573 (December 1993), Federal Reserve Bank of St. Louis Review, May-June 1994, 31-55.

"Financial Factors and the Great Depression," Journal of Economic Perspectives, Spring 1993, 61-85. Republished in The Economics of Deflation, edited by Pierre L. Siklos, International Library of Critical Writings in Economics, Series Editor, Mark Blaug, 2005.

"Cooperative Arrangements for the Regulation of Banking by Banks" (with Charles M. Kahn), Illinois Business Review, Summer 1990, 8-13.

"Deposit Insurance: Lessons from the Record," Economic Perspectives, Federal Reserve Bank of Chicago, May/June 1989, 10-30.

"The Farm Debt Crisis and Public Policy" (with R. Glenn Hubbard and James Stock), Brookings Papers on Economic Activity 2 (1986), 441-85.

"Comment on 'Disclosure, Volatility, and Transparency…'," Economic Policy Review, Beyond Pillar 3 in International Banking Regulation: Disclosure and Market Discipline of Financial Firms, Federal Reserve Bank of New York, September 2004, 47-48.

"Comment on 'Devaluation Risk and the Business Cycle Implications of Exchange Rate Management'" (by Enrique G. Mendoza and Martin Uribe), Carnegie-Rochester Series on Public Policy, 2000.

"Comment on 'Sound Money' by Michael Bordo and 'Lessons from Financial Crises' by Randall Kroszner," in Anna J. Schwartz: The Policy Influence, special issue of the Journal of Financial Services Research 18 (December) 2000, 173-177.

"Comment on 'An Historical Perspective on the Federal Reserve's Monetary Aggregates: Definition, Construction, and Targeting'" (by Richard Anderson and Kenneth Kavajecz), Federal Reserve Bank of St. Louis Review, March/April 1994, 67-71.

"Comment on 'The Decline of Private Deposit Insurance in the U.S.'" (by William English), Carnegie-Rochester Series on Public Policy, 38, June 1993, 129-142.

Parts of Books (Chapters)

"Banking Crises," New Palgrave Dictionary of Economics, 2nd Edition, edited by Steven Durlauf and Lawrence Blume, forthcoming.

"Credit Rationing" (with Stanley Longhofer), New Palgrave Dictionary of Economics, 2nd Edition, edited by Steven Durlauf and Lawrence Blume, forthcoming.

"Capital Flows, Financial Crises, and Public Policy," in Globalization: What's New?, edited by Michael Weinstein, Columbia University Press, 2005, 36-76.

"Financial Crisis Policies and Resolution Mechanisms: A Taxonomy from Cross-Country Experience" (with Daniela Klingebiel and Luc Laeven), World Bank Policy Research Paper WPS3379, August 2004 in Systemic Financial Distress: Containment and Resolution, edited by Patrick Honohan and Luc Laeven, Cambridge University Press, 2005, 25-75.

“Reestablishing Market Discipline as Part of Bank Regulation,” in Claudio Borio, William C. Hunter, George Kaufman, and Costas Tsatsaronis, eds., Market Discipline: The Evidence across Countries and Industries, MIT Press, 2004, 407-16.

“Financial History and the Long Reach of the Second Thirty Years War,” in History Matters: Economic Growth, Technology, and Population, T. Guinnane, W. Sundstrom, and W. Whatley, eds., Stanford University Press, 2004, 115-41.

“Banking and Financial Intermediation,” in Technological Innovation and Economic Performance, Benn Steil, David Victor, and Richard Nelson, eds., Princeton University Press, 2002, 285-313.

“Banking: Modern Period,” The Oxford Encyclopedia of Economic History, Joel Mokyr, ed., Volume 1, Oxford University Press, 2003, 226-35.

“Jonathan Hughes,” The Oxford Encyclopedia of Economic History, Joel Mokyr, ed., Volume 2, Oxford University Press, 2003, 549-50.

“How to Restructure Failed Banking Systems: Lessons from the U.S. in the 1930s and Japan in the 1990s” (with Joseph Mason), in Governance, Regulation, and Privatization in the Asia-Pacific Region, Takatoshi Ito and Anne Krueger, eds., National Bureau of Economic Research, University of Chicago Press, 2004, 375-420.

“An Economist’s Case for GSE Reform,” in Serving Two Masters, Yet Out of Control, Peter J. Wallison, ed., AEI Press, 2001, 85-106. Originally published as “Are Fannie and Freddie Optimal Mechanisms? An Economist’s Case for GSE Reform,” in Fannie Mae and Freddie Mac: Mixing Private Interest and Public Purpose, Peter J. Wallison, ed., American Enterprise Institiute, 2000.

“Can Emerging Market Bank Regulators Establish Credible Discipline?”, in Prudential Supervision: What Works and What Doesn’t, Frederic S. Mishkin, ed., National Bureau of Economic Research, University of Chicago Press, 2001, 147-196. Also appeared as NBER Working Paper, June 2000.

“Blueprints for a New Global Financial Architecture,” in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer, ed., University of Chicago Press, 2003, 259-90. Earlier version appeared in Joint Economic Committee of the U.S. Congress, Compendium of Studies on International Economic Issues, 105th Congress, Second Session, October 1998.

“Is the Bank Merger Wave of the 90s Efficient?” (with Jason Karceski), in Mergers and Productivity, Steven Kaplan, ed., National Bureau of Economic Research, University of Chicago Press, 2000, 93-161. Also published in the series, AEI Studies on Financial Market Deregulation as Is the Bank Merger Wave of the 90s Efficient, American Enterprise Institute, 1998.

“Building an Incentive-Compatible Safety Net, ” in Lessons from the Tequila Crisis for Successful Financial Liberalization, edited by Charles W. Calomiris, special issue of the Journal of Banking and Finance, October 1999.

“Universal Banking and the Financing of Industrial Development,” in Reforming Financial Systems: Historical Implications for Policy, Gerard Carpio, Jr., and

Dimitri Vittas, eds., Cambridge University Press, 1997, 113-127.

“Was the Great Depression a Watershed in American Monetary Policy?” (with David Wheelock), in The Defining Moment: The Great Depression and the American Economy in the Twentieth Century, Michael Bordo, Claudia Goldin, and Eugene White, eds., National Bureau of Economic Research, University of Chicago Press, 1998, 23-66.

“Designing the Post-Modern Safety Net: Lessons from Developed and Developing Economies,” in Money, Prices, and the Real Economy, edited by Geoffrey Wood, Edward Elgar, 1998, 94-120. Also published in the series, AEI Studies on Financial Market Deregulation as The Postmodern Bank Safety Net, American Enterprise Institute, 1997.

"The Financing of the American Corporation, 1800-1990" (with Carlos Ramirez), in The American Corporation Today, Carl Kaysen, ed., Oxford University Press, 1996, 128-186. Winner of the 1996 American Publishers’ Award for Best Book in the Area of Business and Management.

"Leverage as a State Variable for Employment, Inventory Accumulation, and Fixed Investment" (with Athanasios Orphanides and Steven Sharpe), NBER Working Paper No. 4800 (July 1994), in Asset Prices and the Real Economy, Forrest Capie and Geoffrey Wood, eds., Macmillan, 1997, 169-193.

"Historical Macroeconomics and American Macroeconomic History" (with Christopher Hanes), NBER Working Paper No. 4935 (November 1994), in Macroeconometrics: Developments, Tensions, and Prospects, Kevin D. Hoover, ed., Kluwer Academic Press, 1995, 351-416.

"The Evolution of Market Structure, Information, and Spreads in American Investment Banking" (with Daniel M.G. Raff), in Anglo-American Finance: Financial Markets and Institutions in 20th-Century North America and the U.K., Richard Sylla and Michael Bordo, eds., New York University Solomon Center, Business One Irwin, 1995, 103-160.

"International Adjustment Under the Classical Gold Standard: Evidence for the U.S. and Britain, 1879-1914" (with R. Glenn Hubbard), NBER Working Paper No. 2206 (April 1987), in Modern Perspectives on the Gold Standard, Tamim Bayoumi, Barry Eichengreen, and Mark Taylor, eds., Cambridge University Press, 1996, 189-217.

"The Costs of Rejecting Universal Banking: American Finance in the German Mirror, 1870-1914," in The Coordination of Economic Activity Within and Between Firms, Naomi Lamoreaux and Daniel Raff, eds., National Bureau of Economic Research, University of Chicago Press, 1995, 257-321.

"The Origins of Federal Deposit Insurance" (with Eugene N. White), in The Regulated Economy: A Historical Approach to Political Economy, Claudia Goldin and Gary Libecap, eds., National Bureau of Economic Research, University of Chicago Press, 1994, 145-188.

"Greenback Resumption and Silver Risk: The Economics and Politics of Monetary Regime Change in the United States, 1862-1900," NBER Working Paper No. 4166, in Monetary Regime Transformations, Michael D. Bordo and Forrest Capie, eds., Cambridge University Press, 1993, 86-132.

"Regulation, Industrial Structure, and Instability in U.S. Banking: An Historical Perspective," Structural Change in Banking, Michael Klausner and Lawrence J. White, eds., New York University Solomon Center, Business One Irwin, 1993, 19-115.

"Greenbacks," in the New Palgrave Dictionary of Money and Finance, Peter Newman, Murray Wilgate, and John Eatwell, eds., Macmillan, 1992, Volume 2: 281-284.

"Do 'Vulnerable' Economies Need Deposit Insurance?: Lessons from the U.S. Agricultural Boom and Bust of the 1920s," in If Texas Were Chile: A Primer on Banking Reform, Philip Brock, ed., ICS Press, 1992, 237-314, 319-28, 450-58.

"Getting the Incentives Right in the Current Deposit Insurance System: Successes from the Pre-FDIC Era," in The Reform of Federal Deposit Insurance: Disciplining the Government and Protecting Taxpayers, James R. Barth and R. Dan Brumbaugh, Jr., eds., Harper Business, 1992, 13-35.

"Agricultural Capital Markets," in The Agricultural Transition in East/Central Europe and the USSR, Avishay Braverman, Karen Brooks, and Csaba Csaki, eds., The World Bank, 1992, 161-86.

"The Origins of Banking Panics: Models, Facts, and Bank Regulation" (with Gary Gorton), in Financial Markets and Financial Crises, R. Glenn Hubbard, ed., National Bureau of Economic Research, University of Chicago Press, 1991, 109-73.

“Comment” on ‘International Standards for Strengthening Financial Systems,’ by Liliana Rojas-Suarez, New Proposals and Recent Challenges on Financing for Development, Institute for International Economics, 2002, 165-69.

“Comment” on ‘Governing the Corporation: Transcending Compliance in the Age of Scandal’ (by Justin O’Brien), in The Structure of Financial Regulation, edited by David Mayes and Geoffrey Wood, Routledge, 2007, 116-22.

“Comment” on ‘The Microeconomic Evidence on Capital Controls: No Free Lunch,’ (by Kristin Forbes) in International Capital Flows, edited by Sebastian Edwards, NBER, University of Chicago Press, 2007, 199-202.

“Comment” on ‘Systemic Risk and Regulation,’ (by Franklin Allen and Douglas Gale) in The Risks of Financial Institutions, edited by Mark Carey and Rene Stulz, NBER, University of Chicago Press, 2007, 368-74.

“Comment” on Antitrust Merger Policy: Lessons from the Australian Experience (by Philip Williams and Graeme Woodbridge), in Governance, Regulation, and

Privatization in the Asia-Pacific Region, edited by Takatoshi Ito and Anne Krueger, National Bureau of Economic Research, University of Chicago Press, 2004, 67-70.

"Comment on 'Financial and Monetary Policies in an Economy with Balance Sheet Effects' (by Aaron Tornell)," in Preventing Currency Crises in Emerging Markets, Sebastian Edwards and Jeffrey A. Frankel, eds., National Bureau of Economic Research, University of Chicago Press, 2002, 732-38.

"Comment on 'Financial Systems, Economic Growth, and Globalization' (by Peter L. Rousseau and Richard Sylla)," in Globalization in Historical Perspective, M.D. Bordo, A.M. Taylor, and J.G. Williamson, eds., National Bureau of Economic Research, University of Chicago Press, 2003, 413-15.

"Comment on 'The Performance of the Federal Reserve in Pursuing International Monetary Objectives'" (by Anna J. Schwartz), in George Edward Durell Foundation, Money and Banking: The American Experience, George Mason University Press, 1995, 265-75.

"The History of Ownership and Control in New England Banking: Comment on Lamoreaux," in Getting Inside the Business Enterprise: The Use and Transformation of Information, Peter Temin, ed., National Bureau of Economic Research, University of Chicago Press, 1991, 195-203.

"Alexander Hamilton," in Encyclopedia of American Business History and Biography, Larry Schweikart, ed., Bruccoli Clark Layman, 1990, 239-248.

Published Proceedings

"The Political Economy of Competition Policy and Bank Regulation," Conference on Bank Regulation and Corporate Finance, International Bank for Reconstruction and Development, October 26, 2006.

"Reforming the IMF: Governance and the Executive Board," IMF Economic Forum, November 4, 2005, http://www.imf.org/external/np/tr/2005/tr051104.htm

"Credit Card Securitization, Recourse, and Regulatory Arbitrage" (with Eric J. Higgins and Joseph R. Mason) Proceedings of the 37th Annual Conference on Bank Structure and Competition, May 2003, Federal Reserve Bank of Chicago, 2004, 471-92.

"Harnessing Market Discipline in Bank Regulation," The Financial Crisis and Beyond, Korea Deposit Insurance Corporation, 2002.

"Comments on 'Refocusing the Role of the International Monetary Fund' by David Lipton," in Reforming the International Monetary and Financial System, Peter B. Kenen and Alexander Swoboda, eds., International Monetary Fund, 2000.

"Moral Hazard is Avoidable," The Asian Financial Crisis: Origins, Implications, and Solutions, William C. Hunter, George G. Kaufman, and Thomas H. Krueger, eds., Kluwer Academic Publishers, 1999, 379-384.

"The Causes of U.S. Bank Distress During the Depression," Proceedings of the 37th Annual Conference on Bank Structure and Competition, May 2001, Federal Reserve Bank of Chicago, 2002.

"Reforming the Global Financial System," in Global Financial Crises: Implications for Banking and Regulation, Proceedings of the 35th Annual Conference on Bank Structure and Competition, May 1999, Federal Reserve Bank of Chicago, 553-560.

"Gauging the Efficiency of Bank Consolidation during a Merger Wave," Journal of Banking and Finance 23, February 1999, 615-622.

"Comments on Papers by Steinherr, Kroszner, and Benston," in Universal Banking, Anthony Saunders and Ingo Walter, eds., Business One-Irwin, 1996, 109-117.

"Bank Failures, Panics, and Public Policy During the Great Depression" (with Joseph Mason), Proceedings of the 31st Annual Conference on Bank Structure and Competition, May 1995, Federal Reserve Bank of Chicago, 1996, 110-122.

"Directed Credit Programs for Agriculture and Industry: Arguments from Theory and Fact" (with Charles P. Himmelberg), Proceedings: Annual World Bank Conference on Development Economics 1993, 1994, 113-137.

"Loan Market Competition Between Foreign and Domestic Banks: Some Facts About Loans and Borrowers" (with Mark Carey), Proceedings of the 30th Annual Conference on Bank Structure and Competition, May 1994, Federal Reserve Bank of Chicago, 1995, 331-351.

"Corporate-Finance Benefits from Universal Banking: Germany and the United States, 1870-1914," NBER Working Paper No. 4408 (September 1993), in Proceedings of the 29th Annual Conference on Bank Structure and Competition, May 1993, Federal Reserve Bank of Chicago, 1994, 450-464.

"Comment: Three Papers on Inside Information in Banking," Proceedings of the 28th Annual Conference of Bank Structure and Competition, May 1992, Federal Reserve Bank of Chicago, 1993.

"Comment on 'International Bank Capital Standards'" (by George Benston), in Emerging Challenges for the International Financial Services Industry, James Barth, ed., Research in International Business and Finance, 9, 1992, 75-81.

"Demandable Debt as the Optimal Banking Contract" (with Charles M. Kahn), Proceedings: Symposium on Deposit Insurance, The Garn Institute of Finance, University of Utah, 1989, 35-44.

Books, Monographs, Reports and Pamphlets

China's Financial Transition at a Crossroads, (Editor), Columbia University Press, forthcoming, 2007.

Sustaining India's Growth Miracle: Bottlenecks for Reform, (Editor, with Jagdish Bhagwati), Columbia University Press, forthcoming, 2008.

U.S. Bank Deregulation in Historical Perspective (*in Chinese*), China Financial Publishing House, 2005.

What's Wrong with Expensing Employee Stock Options?, American Enterprise Institute, AEI Studies on Financial Market Deregulation, August 2005.

A Globalist Manifesto for Public Policy. Institute for Economic Affairs, London, 2002.

Emerging Financial Markets (with David O. Beim), McGraw Hill, 2001.

U.S. Bank Deregulation in Historical Perspective, Cambridge University Press, 2000, 2006.

Reforming Bank Capital Regulation: A Proposal by the U.S. Shadow Financial Regulatory Committee (with other members of the Committee), American Enterprise Institute, AEI Studies on Financial Market Deregulation, 2000.

Lessons from the Tequila Crisis for Successful Financial Liberalization, edited by Charles W. Calomiris, Special Issue of the Journal of Banking and Finance, October 1999.

High Loan-To-Value Mortgage Lending: Problem or Cure? (with Joseph R. Mason), American Enterprise Institute Press, AEI Studies on Financial Market Deregulation series, 1999.

"The IMF and International Policy," Statement before the Joint Economic Committee of Congress, February 24, 1998, Joint Economic Committee, U.S. Government Printing Office.

Argentina: Financial Sector Review, The World Bank, September 1998 (with G. Caprio, R. Cull, J. Gutierrez, P. Levy, M. Miller, D. Vittas, and S. Schmukler).

"Promoting Financial Development in El Salvador," Commissioned by the Government of El Salvador, December 1997.

Readings in Money, Financial Institutions, and Markets, Addison-Wesley, 1994. This is a customized, annotated reader. Instructors may choose which of the possible 18 chapters they wish to use in their course. The book is intended for use

in undergraduate and MBA courses on money and banking, financial markets, commercial bank management, and international finance.

The Bank Merger Wave of the 90s (Co-Edited with Jason Karceski). Office for Banking Research, University of Illinois, 1996.

Competing Bank Strategies in Chicago: An Illinois MBA Project Report (Co-Edited with Jason Karceski). Office for Banking Research, University of Illinois, 1995.

Book Reviews

Review of Intervention to Save Hong Kong, by Charles Goodhart and Lu Dai, Central Banking, XIV (4), May 2004, 96-100.

Review of Stock Market Crashes and Speculative Manias, edited by Eugene N. White, Journal of Economic History, September 1998, 614-617.

Review of Universal Banking in the United States: What Could We Gain? What Could We Lose? by Anthony Saunders and Ingo Walter, Journal of Economic Literature, September 1995, 1357-1359.

Review of The Rise of Financial Capitalism: International Capital Markets in the Age of Reason by Larry Neal, Journal of Economic Literature, December 1993, 2008-2010.

Review of Financial Failure and Confederate Defeat by Douglas B. Ball, Journal of American History, 1992.

Review of Lessons from the Great Depression by Peter Temin, Journal of Economic Literature, December 1991, 1779-82.

Review of Premodern Financial Systems by Raymond Goldsmith, Journal of Economic Literature, March 1989, 88-89.

Review article on A Retrospective on the Classical Gold Standard, 1821-1931, Michael D. Bordo and Anna J. Schwartz, eds, Journal of Economic History, December 1985, 965-68.

Publications in the Popular Press

“Have Financial Developments Made the International Monetary Fund Obsolete?”, The International Economy, May 2007, forthcoming.

“The Unfinished Business of Financial Reform,” in Japan Economic Currents 55, Keizai Koho Center, July 2005, 5-7.

“What Does It Mean To Have a Global Vision?,” Chazen Institute of International Business Web Site, October 2004 (http://www-1.gsb.columbia.edu/chazen/calovision.html)

“Is There a Need To Change the Structure of the IMF and World Bank,” Emerging Markets, IMF/World Bank 60th Anniversary Special, October 2004, 19.

“The Board Game,” Financial Times, December 6, 2002.

“There Are No Good Arguments Against Tax Cuts,” Wall Street Journal, August 28, 2002.

“Europe and Globalization – A Historic Tour,” The Globalist (www.theglobalist.com), December 12, 2002.

“How to Break the Impasse in Development Aid,” Financial Times, (FT.com), March 21, 2002.

“Lessons from Argentina and Brazil,” these excerpts from the longer article referred to above were published in many on line publications throughout Latin America, including Libertaddigital.com, November 11, 2002, BBCMundo.com, November 4, 2002, and UrgenteSemanal, February 28, 2002.

“Tendencias,” (Interview in Spanish) Urgente Semanal, January 16-23, 2002.

“Why Cavallo Failed and Why He Must Go” (Interview in Spanish), Urgente 24, December 2001, 31-35.

“The Fastest, Fairest Way Out of the Argentine Debt Crisis,” Wall Street Journal, November 9, 2001.

“Homeownership That’s Too Important to Risk” (with Robert Litan), New York Times, August 20, 2001.

“Subordinated Debt Issuance By Fannie, Freddie, Falls Short” (with Peter Wallison),” The American Banker,May 11, 2001.

“Argentina Can’t Pay What It Owes,” Wall Street Journal, April 13, 2001.

“The IMF Needs More than a New Boss,” Wall Street Journal, March 2, 2000.

“First Step to a Flat Tax” (with Kevin Hassett), Wall Street Journal, February 10, 2000.

“Changing Constraints Ensure Economic Recovery,” The Nikkei Weekly, June 14, 1999, republished in The Nikkei Daily (in Japanese), September 22, 1999.

“A Welcome to Foreign Banks Could Energize Mexico,” Wall Street Journal, July 16, 1999.

“Buffing Up the Body Politic,” Hermes (Fall 1999), 24-27.

"Pushing for a Sub Debt Requirement" (with Harald Benink), The Banker (September 1999), 17-18.

"How to Structure the Japanese Bank Bailout," Nikkei (in Japanese), February 12, 1998, and reprinted as "Revitalizing Ailing Japanese Banks," in Nikko Capital Trends (in English), May 1998.

"The IMF's Moral Hazard," The Washington Times, August 5, 1998.

"Wanted: Market Discipline in Deposit Insurance," American Banker, September 1, 1998.

"High Loan-To-Value Consumer Lending: Problem or Cure?" The New York Mortgage Press, The Washington Mortgage Press, and The Michigan Mortgage Press , August 1998 (reprinted from similar version in Journal of Lending and Credit Risk Management, September 1998). Shorter version appeared as "High Loan-To-Value Mortgage Lending: Problem or Cure," American Enterprise Institute, Conference Summary, November 1998.

"Perspectives: Sound Money for the Future," The Economic Times, New Delhi, December 15, 1998.

"Do We Need an Umbrella Financial Regulator?" American Enterprise Institute, Conference Summary, January 1998.

"A Market Approach to Securities Regulation," American Enterprise Institute, Conference Summary, October 1998.

"How to Structure the Japanese Bank Bailout," Nikkei (Japanese edition), February 12, 1998.

"The Bailout that Kills," Asian Wall Street Journal, November 21-22, 1997, and reprinted as "Harmful Bailouts," American Enterprise Institute, On the Issues, January 1998.

"Mortgage Reform: Good Intentions Gone Awry," Investor's Business Daily, April 18, 1997 (with Stanley Longhofer).

"Shifting Debt Can Help Lower Deficit," St. Louis Post Dispatch, July 27, 1993.

INVITED LECTURES

"The Resolution of Financial Distress." Invited Speaker, 11th International Conference of Macroeconomic Analysis and International Finance, University of Crete, May 25, 2007.

"Mixing Commerce and Banking," Invited Keynote Panel Discussion, Federal Reserve Bank of Chicago, Conference on Bank Structure, May 17, 2007.

"Finance, Globalization, and China in the Years to Come." Keynote Address to the Annual Meetings of the Hellenic Finance and Accounting Association, Athens, December 16, 2005.

"Institutional Failures in Developing Countries: What Can We Do About Them?" First Annual Friedrich Hayek Lecture, City University of New York, April 7, 2005.

"Emerging Market Banks: The Achilles Heel of Liberalization," The McKenna Lecture, St. Vincent College, October 24, 2001. Published under the same title by St. Vincent College, 2002.

"A Globalist Manifesto for Public Policy," The Friedrich A. Hayek Memorial Lecture, Institute of Economic Affairs, London England, July 5, 2001. Published under the same title by IEA, 2002.

CONGRESSIONAL TESTIMONY

"Regulatory Policy, Predatory Lending, and Subprime Lending," U.S. House of Representatives Committee on Banking and Financial Services, March 31, 2004.

"The Policy Response to the September 11 Attack," U.S. House Ways and Means Committee, September 20, 2001, Closed door session.

"What to Do, and What not to Do, About Predatory Lending," Statement Before the U.S. Senate Committee on Banking, Housing and Urban Affairs, July 26, 2001.

"How New Is the New IMF?" Statement Before the Joint Economic Committee of the U.S. Congress, March 8, 2001.

"When Will Economics Guide IMF and World Bank Reforms," Statement Before the U.S. Senate Committee on Foreign Relations, May 23, 2000.

"Statement Before the Joint Economic Committee of the U.S. Congress," April 12, 2000.

"Statement Before the U.S. House of Representatives Committee on Banking and Financial Services," March 23, 2000.

"Statement Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs," March 9, 2000.

"Blueprints for a New Global Financial Architecture," Statement Before the Joint Economic Committee of the U.S. Congress, February 24, 1998.

"Firewalls and Universal Banks," Statement Before the Senate Subcommittee on Financial Institutions and Regulatory Relief, March 20, 1997.

WORKING PAPERS

"Activity-Based Valuation of Bank Holding Companies" (with Doron Nissim), NBER Working Paper No. 12918, February 2007.

"The Case for Eliminating the National Deposit Market Share Ceiling," December 2006.

"Relationship Banking and the Pricing of Financial Services" (with Thanavut Pornrojnangkool), NBER Working Paper No. 12622, October 2006, Under Revision, Journal of Finance.

"Monopoly-Creating Bank Consolidation? The Merger of Fleet and BankBoston" (with Thanavut Pornrojnangkool), NBER Working Paper No. 11351, May 2005.

"Resolving the Puzzle of the Underissuance of National Bank Notes" (with Joseph Mason), NBER Working Paper No. 10951, December 2004.

"The Technical Challenge to Accurately Valuing Employee Stock Options" (with Kevin Hassett, Randall Kroszner, and Lawrence Lindsey), February 2005.

"The Political Economy of Bank Entry Restrictions: Theory and Evidence from the U.S. in the 1920s" (with Carlos Ramirez), Columbia Business School, December 2004.

"Options Pricing and Accounting Practice" (with R. Glenn Hubbard), January 2004.

"Do Budget Deficit Announcements Move Interest Rates?" (with Eric Engen, Kevin A. Hassett, and R. Glenn Hubbard), December 2003.

"Regulatory Policy, Predatory Lending, and Subprime Lending," Presented to the U.S. House of Representatives Committee on Banking and Financial Services, March 2004.

"How Often Do "Conflicts of Interests" in the Investment Banking Industry Arise During Hostile Takeovers?" (with Hal J. Singer), February 2004.

"Rational Divestiture in Real Options-Based Liquidation Cycles: Evidence from Failed Bank Assets in the Great Depression" (with Joseph Mason), October 2004.

"Investment Banking Costs as a Measure of the Cost of External Finance" (with Charles Himmelberg), Columbia Business School, Revised May 2001.

"Evaluation of Citigroup's Financial Sector Vulnerability Model" (confidential report), January 2005.

"What Drives Credit Card Securitizations and Sales?" (with Joseph Mason).

"Government Credit Policy and Industrial Performance: Japanese Machine Tool Producers, 1963-1991" (with Charles P. Himmelberg), Policy Research Working Paper 1434, Financial Sector Development Department, The World Bank, March 1995.

"Optimal Contingent Bank Liquidation Under Moral Hazard" (with Charles M. Kahn and Stefan Krasa), Federal Reserve Bank of Chicago Working Paper WP-1991/13.

“Debt Maturity, Financial Asset Accumulation, and the Cost of External Finance: Evidence from the U.S. and Colombia (with Thekla Halouva and Sandra Ospina)

"Evaluating Industrial Credit Programs in Japan" (with Charles Himmelberg and Charles Kahn).

"Was the South Backward?: North-South Differences in Antebellum Banking" (with Larry Schweikart), Federal Reserve Bank of Chicago Working Paper, August 1988.

WORK IN PROGRESS

“Do the Poor Subsidize the Rich? The Cross-Section of Mortgage Prepayment Risk” (with Joseph Mason)

“Slave Prices and Politics” (with Jonathan Pritchett and Larry Schweikart)

“Commercial Bank Arbitrage Activities” (with Joseph Mason)

“The Institutional Origins of Rome”

“A Banking Theory of Market Microstructure and Liquidity” (with Berry Wilson).

“Bank Liability Composition and Market Discipline in the 1930s” (with Joseph Mason).

Victorian Perspectives on the Banking Collapses of the 1980s and 1990s.

Banks and Banking: A Short History.

Banking Instability and Government Policy During the Great Depression (with Joseph Mason).

“Reserve Requirement Changes and the Recession of 1937 Reconsidered” (with Joseph Mason and David Wheelock).

SEMINAR AND CONFERENCE PRESENTATIONS

"The Farm Debt Crisis and Public Policy"
The Brookings Panel
NBER Summer Institute
NBER Conference on Government Expenditures

"Financial Markets and the U.S. Economy in the Nineteenth Century"
Stanford-U.C. Berkeley Economic History Colloquium

"Institutional Failure, Monetary Scarcity, and the Depreciation of the Continental"
Social Science History Association
Indiana University

"Is Monetarism Dead?"
National Economists' Club

"Firm Heterogeneity, Internal Finance, and Credit Rationing"
NBER Summer Institute
Econometric Society Meetings

"The Motives of U.S. Debt-Management Policy, 1790-1880: Efficient Discrimination and Time Consistency"
Economic History Association Meetings
NBER Summer Institute on War Finance

"International Adjustment Under the Classical Gold Standard"
Harvard University
Cliometric Society Meetings
Econometric Society Meetings
Stanford University

"Regulations and Markets as Determinants of the Performance and Vulnerability of Antebellum Banks"
American Economic Association Meetings
University of Montreal
Stanford University
University of California – Berkeley

"What's Good about 'Bad' Banking?"
Chicago Fed Midwest Workshop on Financial Markets and Intermediation

"The Role of Demandable Debt in Structuring Optimal Banking Arrangements"
Federal Reserve Bank of Chicago
Purdue University
SUNY -- Stony Brook
NBER Conference on Financial Markets
Federal Reserve System Meeting on Financial Markets
Garn Institute of Finance Annual Meetings
Econometric Society Meetings

"The Panic of 1857: Origins, Transmission, and Containment"
Stanford University
University of California -- Berkeley
Federal Reserve Bank of Richmond
University of British Columbia
NBER Summer Institute

"Is Universal Banking Right for the United States"
American Enterprise Institute
New York University Conference on Universal Banking

"Getting the Incentives Right in the Current Deposit Insurance System: Lessons from Pre-FDIC Successes"

CONFIDENTIAL MATERIALS – SUBJECT TO PROTECTIVE ORDER

Stanford CEPR Conference on Deposit Insurance Reform

"Government Policy to Improve Agricultural Capital Markets"
World Bank Conference on Agricultural Reform in East Europe (Budapest)

"Policy Implications of Imperfect Capital Markets"
American Economic Association Meetings

"Was the South Backward? North-South Differences in Antebellum Banking During Crisis and Normalcy"
Stanford University
University of California -- Berkeley
Yale University
Washington University in St. Louis
Indiana University
University of North Carolina -- Greensboro
Miami University of Ohio
University of Texas -- Austin
Federal Reserve Bank of New York

"Evaluating Industrial Credit Programs in Japan"
The World Bank
Columbia University
Federal Reserve Board of Governors
Vanderbilt University
Seminar on Policy-Based Lending (Ministry of Finance, Beijing, China)
Japan Development Bank (Tokyo, Japan)

"The Origins of Banking Panics: Models, Facts, and Bank Regulation"
NBER Conference on Financial Markets and Financial Crises
Stanford University
Fall Academic Conference, Federal Reserve Bank of San Francisco

"What Do We Really Know About Antebellum Business Cycles?"
Economic History Association meetings

"Directed Credit Programs for Agriculture and Industry"
World Bank Annual Conference on Development Economics

"Is the Discount Window Necessary? A Penn-Central Perspective"
Columbia University
Federal Reserve Board of Governors
Federal Reserve Bank of St. Louis

"The Costs of Rejecting Universal Banking: American Finance in the German Mirror, 1870-1914"
NBER Conference on the Coordination of Economic Activity
NBER Conference on Financial Institutions and Macroeconomic Stability
Brandeis University
Harvard University
American Finance Association Meetings
Vanderbilt University
Indiana University
Chicago Fed Conference on Bank Structure and Competition

Yale University
The World Bank

"Historical Perspectives on Deposit Insurance and Deposit Insurance Reform"
Senate Banking Committee
The Jerome Levy Institute "Deposit Insurance: Lessons from the Record"
Economic History Association Meetings
Western Economic Association Meetings
Federal Reserve Bank of Chicago Conference on Bank Structure
American Economic Association Meetings
Stanford University
University of California -- Berkeley

"Greenback Resumption and Silver Risk: The Economics and Politics of Monetary Regime Change in the United States, 1862-1900"
International Economic History Meetings (Leuven)
University of California -- Berkeley
The Wharton School of Finance
NBER Summer Institute
University of Chicago
Federal Reserve Bank of St. Louis

"Price Flexibility, Credit Availability, and Economic Fluctuations: Evidence from the U.S., 1894-1909"
All-University of California Annual Economic History Meetings
University of Chicago

"Regulation, Industrial Structure, and Instability in U.S. Banking"
New York University Conference on Structural Change in Banking
Columbia/New York University Economic History Colloquium
The Wharton School of Finance

"Optimal Contingent Bank Liquidation Under Moral Hazard"
Econometric Society Congress (Barcelona)
Econometric Society Meetings
Hilliard-Lyons Symposium, Indiana University

"The Efficiency of Cooperative Interbank Relations: The Suffolk System"
Cliometric Society Meetings
Federal Reserve Board of Governors Conference on the Payments System

"Do Vulnerable Economies Need Deposit Insurance? Evidence from the U.S. Agricultural Boom and Bust of the 1920s"
Sequoia Institute Conference on Financial Risk and Regulation
Federal Reserve Board of Governors Conference on Deposit Insurance
University of Michigan
The Wharton School of Finance
Ohio State University
Queens University
University of Western Ontario
Rutgers University

"Housing-Finance Interventions and Private Incentives: Helping Minorities and the Poor"
Federal Reserve Bank of Cleveland

"The Origins of Federal Deposit Insurance"
NBER Conference on the Political Economy of Regulation
University of California, Los Angeles

"The Evolution of Market Structure, Information, and Spreads in American Investment Banking"
New York University (Stern School)
Harvard University

"Leverage as a State Variable in the Investment Equation"
City University of London Conference on Debt Deflation
NBER Conference on Corporate Finance

"Commercial Paper and Corporate Finance: A Microeconomic Approach"
Carnegie-Rochester Conference Series on Public Policy
NBER Summer Institute on Corporate Finance
Dartmouth College (Amos Tuck School)

"Financial Fragility: Issues and Policy Implications"
Conference on Coping with Financial Fragility: A Global Perspective (Maastricht)

“Was the Great Depression a Watershed for American Monetary Policy?”
NBER Conference on the Great Depression

“Credit Risk Pricing of Bank Loans”
Federal Reserve Bank of New York
Beckman Institute, University of Illinois

"Loan Market Competition Between Foreign and Domestic Banks: Some Facts About Loans and Borrowers"
1994 Conference on Bank Structure and Competition, Chicago Fed
Conference on Foreign Banks in the U.S.,Office of the Comptroller of the Currency

“Derivatives, Capital, and Bank Risk Management”
Chicago Board of Trade

"Internal Finance and Investment: Evidence from the Undistributed Profits Tax of 1936-1937"
NBER Summer Institute
Federal Reserve Board of Governors
Federal Reserve Bank of Richmond
Federal Reserve Bank of Chicago
NBER Conference on Macroeconomic History
Bank of Norway 175th Anniversary Conference (Oslo)
The Wharton School of Finance
Princeton University
University of Virginia
University of Illinois -- Urbana-Champaign
Indiana University
Federal Reserve Bank of Philadelphia
Loyola University of Chicago

"Debt Maturity, Financial Asset Accumulation, and the Cost of External Finance: Evidence from the U.S. and Colombia"
World Bank Conference on Term Finance

"Designing an Effective Deposit Insurance System in Mexico"
Bank of Mexico (Mexico City)
Universidad Torcuato di Tella (Buenos Aires)

"Building an Incentive-Compatible Safety Net: Problems for Developing Countries"
Joint Dallas Fed-Universidad Torcuato di Tella Conference on "Tequila Effect" (Buenos Aires)

"Banking System Fragility and the Safety Net"
The World Bank
Universidad Torcuato di Tella (Buenos Aires)
International Monetary Fund

"Designing the Post-Modern Safety Net"
Inter-American Development Bank
Swiss National Bank (Zurich)

"Firewalls for Universal Banks"
American Enterprise Institute

"Banking Collapses: An International Disease?"
National Economists Club Educational Foundation

"The Bankers' Roundtable's Plan for Deposit Insurance Reform"
American Enterprise Institute

"Keeping the Big Bang from Becoming the Big Bust"
Japan Society/Columbia Business School Conference, "Pressing Issues in U.S.-Japan Financial Markets"

"Investment Banking Costs as a Measure of the Cost of External Finance"
University of Florida, Gainesville
Federal Reserve Bank of New York
Columbia University
Federal Reserve Board of Governors
Econometric Society Meetings
Federal Reserve Bank of Cleveland
Federal Reserve Bank of Chicago
American Finance Association Meetings
University of Mannheim, Germany
University of Michigan School of Business
University of Maryland School of Business

"Contagion and Bank Failures During the Great Depression: The June 1932 Chicago Banking Panic"
Georgetown University
American Economic Association Meetings/Cliometric Society Meetings
NBER Program Meeting on the Development of the American Economy
1995 Conference on Bank Structure and Competition, Chicago Fed

Western Economic Association Meetings
Financial Management Association Meetings
Columbia University
Universidad Torcuato di Tella (Buenos Aires)
University of Florida, Gainesville

"Universal Banking American Style"
University of Konstanz (Germany)
JITE Conference on Institutional Economics (Germany)

"What Drives Credit Card Bank Securitizations and Loan Sales?"
American Enterprise Institute
Columbia University
Financial Management Association Meetings

"Bank Fragility and IMF Policy"
International Monetary Fund

"Does the IMF Produce Moral Hazard?"
Joint IMF-Chicago Fed Conference: "Asia: An Analysis of Financial Crisis"

"U.S. Retail Banking"
Caisse des Depots Seminar on Savings Banks

"Do We Need an Umbrella Financial Regulator?"
American Enterprise Institute

"Gauging the Benefits of Consolidation During a Merger Wave"
New York Fed Conference on Bank Consolidation

"Two Tales of Tequila: Hangover and Sunrise"
American Enterprise Institute

"High Loan-To-Value Lending: Problem or Cure?"
American Enterprise Institute

"The Global Economic and Financial Outlook"
American Enterprise Institute

"Bank Capital and Portfolio Management: The 1930s Capital Crunch and Scramble to Shed Risk"
1996 Conference on Bank Structure and Competition, Chicago Fed
Universidad Torcuato di Tella (Buenos Aires)
Brown University
Yale University
Columbia University
University of Illinois, Urbana-Champaign
NYU-Columbia Finance Colloquium
New York/ Columbia Economic History Colloquium
Ohio State University

Federal Reserve Bank of Atlanta
Federal Reserve Board of Governors
Northwestern University
City University of New York
University of Utah
University of Mannheim (Germany)
University of St. Gallen (Switzerland)
Federal Reserve Bank of St. Louis
National Bureau of Economic Research
Federal Reserve Bank of Cleveland

"The Global Economic and Financial Situation: Time for a New Cure?"
Federal Reserve Board Academic Consultants' Meeting

"Banking Instability and Regulatory Reform"
International Monetary Fund

"Restructuring the IMF"
The Bretton Woods Committee, September 23, 1998.

"Should We Expand the Role of the Federal Home Loan Banks?"
National Association of Home Builders Annual Meeting

"Victorian Perspectives on the Banking Crises of the 1980s and 1990s"
Bank of England
The World Bank

"Reforming the Global Financial Architecture"
Institute of International Banking Annual Conference
Federal Reserve Bank of Chicago Conference on Bank Structure
Council on Foreign Relations
Claremont-McKenna College
Columbia School of Journalism

"Are Fannie and Freddie Optimal Mechanisms?"
American Enterprise Institute

"Would Reforming the IMF Stabilize Global Finance?"
International Monetary Fund Conference on Key Issues in Reform

"Global Markets in Turmoil"
Financial Women's Association of NY, Moody's Investors Service, April 8, 1999

"The Impending Collapse of the Euro"
European Society Panel Roundtable, Columbia Business School, April 15, 1999

"What Role for the IMF?"
Columbia International Fellows Weekend, SIPA, April 30, 1999

"Prospects for Japan's Economic Recovery"

Nikkei Annual Luncheon, June 1, 1999

"Reforming the IMF"
Presentation to the Group of Thirty, September 30, 1999

"The Clinton Administration's International Financial Policy"
Princeton University CEPR Symposium on Clintonomics, November 13, 1999

"Blueprints for a New Global Financial Architecture"
American Enterprise Institute
Bank of England/London School of Economics Conference, July 13, 1999
Texas A&M Conference on International Financial Markets

"Banking Distress During the Great Depression"
Yale Law Forum

"Reforming the IMF"
The Cato Institute 17th Annual Monetary Conference
Peter Kenen Graduate Student Seminar, Princeton University

"Future Bank Deregulation in Historical Perspective"
American Enterprise Institute Conference: Is Bank Regulation Necessary?

"Financial Regulation in a Global Marketplace"
Brookings-Wharton Conference on Financial Services

"Can Emerging Market Regulators Establish Credible Discipline? The Case of Argentina"
NBER Conference on Prudential Supervision
Annual World Bank Conference on Development Economics

"Reforming Bank Capital Standards"
Shadow Financial Regulatory Committee, American Enterprise Institute
Joint Shadow Committee Conference on Reforming Bank Capital Standards

"Measuring Technological Progress in Corporate Finance and Financial Intermediation"
Council on Foreign Relations Conference on Technological Innovation

"Financial History and the Long Reach of the Second Thirty Years War"
Paul David Festschrift Conference: History Matters, Stanford University

"Foreign Exchange Rate Determination: A Primer"
Morgan Stanley-Dean Witter (twice)

"The Role of Subordinated Debt in Bank Capital"
Office of the Comptroller of the Currency
The European Central Bank
Harvard Law School

"How to Restructure Failed Banking Systems: Lessons from the U.S. in the 1930s and Japan in the 1990s"
NBER Conference, Hong Kong
Bank of Italy, October 14, 2004
International Monetary Fund, April 21, 2005

"Emerging Markets and the Argentine Crisis"
- Salomon Smith Barney (twice)
- Central Intelligence Agency Roundtable
- Barclay's Capital
- American Enterprise Institute
- Bear Stearns-EMCA Sovereign Creditor Rights Conference

"The Consequences of U.S. Bank Distress During the Great Depression"
- Wharton School of Finance
- Northwestern University Kellogg School
- Economic History Association Meetings
- University of Virginia
- Tulane University

"The Regulatory Use of Ratings"
- New York University Stern School Conference on Ratings Industry

"Harnessing Market Discipline in Bank Regulation"
- Korea Deposit Insurance Corporation Conference

"The Roles and Responsibilities of the Official and Private Sectors in Crisis Resolution"
- Meeting of G20 Finance and Central Bank Deputies, Toronto, October 2001

"Resolving the Puzzle of the Underissuance of National Bank Notes"
- ASSA Meetings (Cliometric Society)
- Federal Reserve Bank of Atlanta, November 17, 2006

"The Causes of U.S. Bank Distress During the Great Depression"
- National Bureau of Economic Research DAE Conference
- Indiana University
- American Finance Association Meetings
- University of Wyoming
- Wharton School of Finance
- Northwestern University Kellogg School
- Yale University Banking Conference
- Federal Reserve Bank of Chicago Bank Structure Conference
- University of Virginia
- Tulane University

"The Political Economy of Bank Entry Restrictions: Theory and Evidence from the U.S. in the 1920s"
- ASSA Meetings
- Rutgers University
- NBER Summer Institute

"Does the Market Help or Hurt Emerging Economies?"
- Columbia SIPA, Gitelson Symposium, January 26, 2001.

"What's Wrong with Gramm-Leach-Bliley"
- AEI Conference: Retrospective on Gramm-Leach-Bliley, November 13, 2001

"Bank Risk, Safety Nets, and Prudential Standards"
- International Monetary Fund Institute (three times)

NBER Conference, Beijing
Hong Kong Forum Breakfast

"Lessons from Argentina and Brazil"
CATO Institute Annual Monetary Conference, October 17, 2002.

"Regulation of Subprime Lending and Public Policy"
FCC, Economic Perspectives Home Mortgage Market, October 16, 2002.

"Emerging Market Prospects"
Salomon Smith Barney Investors Meeting, June 18, 2002.

"Global Economic Outlook"
Columbia Business School Real Estate Forum, May 17, 2001
American Enterprise Institute, December 13, 2001
Embassy of France, December 18, 2001

"Employee Stock Options and Corporate Earnings"
American Enterprise Institute, November 20, 2002.

"How to Resolve the Argentine Sovereign Debt Crisis," April 6, 2001,
American Enterprise Institute.

"Does a Stimulus Package Have Unintended Consequences?" April 4, 2002
American Enterprise Institute

"The Mexican Financial Crisis"
Conference on Further Liberalization of Global Financial Services Markets,
Institute for International Economics, June 5, 2002.

"International Financial Standards"
Conference on New Proposals for Financing Development,
Institute for International Economics, February 19, 2002.

"IMF and World Bank Reform,"
Columbia Journalism School International Journalists Seminar, March 20, 2001.

"International Finance and Financial Stability"
Stanford conference on international finance honoring Ronald McKinnon, 2002.

"IMF Reform Design"
National Association of Business Economists, September 11, 2001.

"Building an Incentive-Compatible Safety Net,"
Korean Deposit Insurance Conference, December 11, 2001.

"Resolving Bank Distress in Japan in the 1990s and in the U.S. in the 1930s"
NBER Conference, Hong Kong, June 2001.

"A Retrospective on the Gramm-Leach-Bliley Act"
American Enterprise Institute, November 13, 2001

CONFIDENTIAL MATERIALS – SUBJECT TO PROTECTIVE ORDER

"Fiscal Discipline and Emerging Markets"
Gitelson Symposium, Columbia SIPA, January 26, 2001.

"IMF Reform and Sovereign Debt Restructuring"
Salomon Smith Barney Conference, Washington DC, September 2002.
Emerging Market Creditors Association Conference, October 2001.
Meeting of the Deputy Finance Ministers of Group of 20, Toronto, Nov. 2001.

"The Future of the Financial Services Industry"
Financial Services Roundtable Panel on Financial Services,
National Press Club, February 21, 2002

"What Is Meltzerism? Allan Meltzer and International Reform"
American Enterprise Institute Tribute to Allan Meltzer, February 26, 2003

"Enhancing Market Discipline Over Banks"
IMF Economics Training High-Level Seminar, May 19-21, 2003

"Economic Outlook"
Columbia Business School Real Estate Roundtable, May 28, 2003

"Argentine Economic Outlook"
Citigroup Global Markets Group

"Credit Card Securitization, Recourse, and Regulatory Arbitrage"
Federal Reserve Bank of Chicago Conference on Bank Structure, 2003

"A Taxonomy of Financial Crisis Restructuring Mechanisms"
World Bank Conference on Systemic Financial Distress, October 8-9, 2003
Bank of Italy, October 13, 2004
International Monetary Fund, April 21, 2005

"Tying, Relationship Banking, and the Repeal of Glass-Steagall"
Federal Reserve Bank of New York. June 30, 2003
Federal Reserve Board, August 5, 2003
American Enterprise Institute, September 24, 2003
University of Illinois, Urbana-Champaign, March 18, 2004

"Reestablishing Market Discipline as Part of Bank Regulation"
Chicago Fed/BIS Conference on Market Discipline, November 1, 2003

"Credit Card Securitization and Regulatory Arbitrage"
FDIC/JFSR Conference Conference: Finance and Banking, December 5-6, 2003

"Roundtable on Venezuela"
Central Intelligence Agency Workshop, December 3, 2003

"Do Budget Deficit Announcements Move Interest Rates?"
American Economic Association Meetings, January 2004

"Options Pricing and Accounting Practice"

American Enterprise Institute Conference on Expensing Options, January 2004

"What's Missing in the Basel Committee's Regulatory Framework for Banks?"
World Economic Forum, Davos, Switzerland, January 23, 2004

"Do the SEC's Shareholder Voting Rules Serve Any Useful Purpose?"
American Enterprise Institute, January 26, 2004

"Lessons from the Argentine Crisis"
Columbia Business School LABA Annual Conference, February 13, 2004

"Deficits and the U.S. Economy"
American Enterprise Institute Tax Policy Retreat, February 26-27, 2004.

"A New Monopoly-Creating Phase of Bank Consolidation? The Effect of the Merger of Fleet and BankBoston on Middle Market Borrowers in New England"
Federal Deposit Insurance Corporation, March 1, 2004
City University of New York, April 1, 2005

"Is the American Model Right for the World?"
Columbia Business School Class Reunion, April 17, 2004

"The Future of the IMF"
International Monetary Fund Workshop, April 28, 2004

"How to Promote Involvement of Institutional Investors in Corporate Governance"
American Enterprise Institute, March 8, 2004

"Restructuring Argentina's External Debt"
American Enterprise Institute, March 31, 2004

"Argentina's Reintegration into International Capital Markets"
Argentina Forum, Council of the Americas, May 5, 2004

"What Does It Mean to Have a Global Vision of Business?"
Speech to Incoming Columbia Business School MBAs, September 2004

"Risk, Regulation, and Finance in a Sarbanes-Oxley World"
American Enterprise Institute New York Forum, September 23, 2004

"Private Equity and Emerging Markets: Research Topics"
Entrepreneurship and Private Equity in Emerging Markets Dinner Series, Columbia Business School, November 9, 2004

"Capital Flows, Financial Crises, and Public Policy"
Panel discussion of <u>Globalization: What's New</u>, Jerome Chazen Institute, April 18, 2005

"Argentina's Redenomination Policy"
Bank of Italy, October 14, 2004
International Monetary Fund, April 21, 2005
London School of Economics, Conference on Financial Stability, May 18, 2006

"Roundtable on Argentina"

Central Intelligence Agency, November 18, 2004

"Banker Fees and Acquisition Premia for Targets in Cash Tender Offers: Challenges to the Popular Wisdom on Banker Conflicts"
Columbia Business School Finance Free Lunch, March 10, 2005

"The Global Economy and Business Career Prospects"
Twelfth Annual Chazen/CIBER International MBA Career Services Conference
March 17, 2005

"The Chazen Institute's Agenda"
Presentation to the Columbia Business School Board of Overseers, May 2, 2005

"Multilateral Institutions and the Evolving Global Economy"
AEI Japan Forum, May 3, 2005

"Takeovers and Corporate Governance"
Joint AEI-Japan Ministry of Economics, Trade, and Industry Meeting, 5/4/05

"The Need for Banking Reform in China"
Joint AEI-CCPS Conference on China, May 9, 2005
Columbia Chinese Students Association, February 22, 2006
PRMIA Conference on Risk Management, February 16, 2007

"The IMF in a Changing World"
Joint IMF-Bundesbank Symposium, Frankfurt, June 21, 2005

"Restructuring Failed Banking Systems"
Keizai Koho Center, Tokyo, May 28-June 3, 2005

"Financial Intermediation, Innovation, and Global Stability"
Reuters Panel, November 2, 2005

"Reforming the IMF: Governance and the Executive Board"
IMF Economic Forum, November 4, 2005

"Finance and Development in Emerging Markets"
Center for Brazilian Studies, Columbia University, Executive Education for
Visiting Brazilian Executives, November 16, 2005, October 9, 2006

"The Regulatory Record of the Greenspan Fed"
American Economic Association Meetings, January 7, 2006

"Global Imbalances: Assessing Trends"
Central Intelligence Agency Conference, New York City, March 8, 2006

"The Changing Landscape for Jobs"
Columbia Business School Annual Career Services Conference, March 23, 2006

"Argentina and the IMF: Lessons Learned: Discussant for Presentation by Hector Torres"
Columbia University SIPA, March 31, 2006

"The Cross-Section of Mortgage Prepayment Risk"

Federal Reserve Board, April 18, 2006

"The Pitfalls of Implementing Basel II", Panel on the Political Economy of Competition Policy and Bank Regulation,"
Conference on Bank Regulation and Corporate Finance, International Bank for Reconstruction and Development, October 26, 2006.

"Relationship Banking and the Pricing of Financial Services"
George Mason University, November 11, 2005
University of Western Ontario, December 2, 2005
Yale Law School, February 23, 2006
Columbia University Seminar on Contracting, April 3, 2006
Federal Reserve Board, April 19, 2006
Federal Deposit Insurance Corp., September 27, 2006
Claremont McKenna College, January 26, 2007
Bank for International Settlements, May 30, 2007

"Challenges for Valuation and Risk Assessment of Banks"
NBER Conference on Risk Management, May 15, 2007

DISCUSSANT, SESSION CHAIR, CONFERENCE ORGANIZER:

Chair, Panel on Global Entrepreneurship, Pan-European Reunion 2006, Columbia Business School, Rome, October 21, 2006.

Chair and Discussant, "The White Man's Burden," by William Easterly, Columbia Business School, April 11, 2006.

Chair, "Expanding Public Awareness of the WTO and Its Work," The WTO at 10: Governance, Dispute Settlement and Developing Countries, Columbia University, April 7, 2006.

Organizer, "China's Financial Transition at a Crossroads," Pre-Conference at Tsinghua University, Beijing, August 23, 2005, Conference at Columbia Business School, February 13, 2006.

Chair, Council on Foreign Relations Study Group on Currency Stability, December 13, 2005, June 28, 2006.

Chair and Discussant, Joint Conference on Finance and Law in China, White & Case and Columbia Business School, January 23, 2006.

Organizer and Chair, "Global Financial Centers: Opportunities and Challenges," Dinkins Forum, Columbia SIPA, October 10, 2005.

Organizer and Chair, "Japan's Proposed Takeover Rules," June 13, 2005.

Co-Organizer and Chair, "China's Capital Markets: The Achilles Heel of Its Liberalization," Chazen Institute and Columbia University Symposium on China's Economic Emergence, April 8, 2005.

Participant, Economic Roundtable, Columbia Business School, February 10, 2005.

Discussant, "Transcending Compliance in the Age of Scandal" (by Justin O'Brien), Bank of Finland Conference, The Structure of Financial Regulation, September 3, 2004.

Discussant, "Bank Regulation and Supervision: What Works Best?" Columbia Law School Interdisciplinary Workshop on Law, Finance, and Political Economy, April 24, 2004.

Discussant, "The Microeconomic Evidence on Capital Controls: No Free Lunch,' (by Kristin Forbes), NBER Conference on International Capital Flows, Santa Barbara, CA, December 18, 2004.

Discussant, "Systemic Risk and Regulation," (by Franklin Allen and Douglas Gale), NBER Conference on the Risks of Financial Institutions, Woodstock, VT, October 22, 2004.

Discussant, "Privatizing the Housing GSEs: Comments on Ely and Stanton Papers." American Enterprise Institute Conference on the Privatization of the Housing GSEs, January 12, 2004.

Panel Chair, "China: Is the Economic Boom Sustainable?" 12th Annual Net Impact Conference, Columbia Business School, November 13, 2004.

Panel Chair, "Creating Markets in Emerging Markets," Annual Investment Banking Conference, Columbia Business School, October 29, 2004.

Session Chair, "Why All Financial Regulation Is Now Global," World Economic Forum, Davos, Switzerland, January 23, 2004.

Moderator, "Regulatory Trends in Financial Services," World Economic Forum, Davos, Switzerland, January 23, 2004.

Session Chair, "Governors Breakfast with Financial Regulators," World Economic Form, Davos, Switzerland, January 23, 2004.

Discussant, "Disclosure in Banking: What Matters Most" (by Baumann and Nier), New York Fed Conference on Market Discipline, October 2003.

Conference Organizer and Discussant, "Saving Capitalism from the Capitalists" (by Rajan and Zingales), May 21, 2003.

Discussant, "Why Did Finance Capitalism and the Second Industrial Revolution Arise in the 1890s?" Social Science Research Council Program on Financing Major Innovations, UCLA, March 21-22, 2003.

Conference Chair, "Risk Management Workshop for Regulators: Assessing, Managing, and Supervising Financial Risk," World Bank, April 28, 2003.

Conference Organizer and Presenter, "IMF Proposal for Sovereign Debt Restructuring," American Enterprise Institute, October 7, 2002.

Conference Organizer, "Who Lost Argentina?" American Enterprise Institute, February 5, 2002.

Discussant for "Moses Abramovitz and Open Economy Macro" by Peter Temin, ASSA Meetings, January 2002.

Discussant for "Prudential Supervision" by J. Barth, G. Caprio, and R. Levine, NBER Conference on Risk Management, November 30, 2001.

Discussant for "Antitrust Merger Policy" by P. Williams and G. Woodbridge, NBER Conference, Hong Kong, June 2001.

Discussant for "Financial Systems, Economic Growth, and Globalization" by P. Rousseau and R. Sylla, NBER Conference on Globalization in Historical Perspective, May 2001.

Conference Organizer and Chair, "Sovereign Debt Reductions: Private and Public Burden-Sharing and the Role of the IMF, American Enterprise Institute, February 21, 2001.

Session Chair, Columbia Business School, Latin American Business Association, Panel on Venture Capital, February 9, 2001.

Conference Organizer and Chair, "Dollarization and Debt Markets," American Enterprise Institute, February 7, 2001.

Discussant for "Financial and Monetary Policies in an Economy with Balance Sheet Effects" by A. Tornell, NBER Conference on Preventing Currency Crises, January 2001.

Moderator, Conference on Subprime Lending, American Enterprise Institute, October 30, 2002.

Discussant for three papers on banking, Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, May 2002.

Discussant, Paper on Bank Lending Behavior over the Business Cycle (by Allen Berger and Gregory Udell), Bank for International Settlements Conference on Changes in Risk Through Time: Measurement and Policy Options, March 6, 2002.

Discussant, American Finance Association Panel on Banking, ASSA Meetings, January 2002.

Discussant, "Antitrust Merger Policy" by P. Williams and G. Woodbridge, NBER

Conference, Hong Kong, June 2001.

Discussant, "Financial Systems, Economic Growth, and Globalization" by P. Rousseau and R. Sylla, NBER Conference on Globalization in Historical Perspective, May 2001.

Session Chair, Columbia Business School, Latin American Business Association, Panel on Venture Capital, February 9, 2001.

Discussant, "Financial and Monetary Policies in an Economy with Balance Sheet Effects" by A. Tornell, NBER Conference on Preventing Currency Crises, January 2001.

Discussant for "Inside the Crisis: An Empirical Analysis of Banking Systems in Distress" by A. Demirguc-Kunt and E. Detragiache, University of Maryland, Fourth Maryland Finance Symposium, November 18, 2000.

Discussant for Andrew Crockett presentation on bank regulation, Bundesbank-BIS Conference, Frankfurt, September 28-29, 2000.

Discussant for paper on history of U.S. industrial organization, by N. Lamoreaux, D. Raff, and P. Temin, September 2000.

Discussant for "Sound Money" by M. Bordo and "The Role of Clearinghouses" by Randall Kroszner, AEI/JFSR Conference on Anna Schwartz: The Policy Influence, May 2000.

Session Chair and Organizer, American Finance Association ASSA Meetings, 2000.

Conference Organizer and Discussant, "Saving the Euro," American Enterprise Institute, November 22, 1999.

Discussant for "Devaluation Risk and the Business Cycle Implications of Exchange Rate Management" by E. Mendoza and M. Uribe, Carnegie-Rochester Conference on Public Policy, November 19, 1999.

Discussant, World Bank Mini-Conference on Banking Regulation, March 1999.

Discussant for "Refocusing the IMF" by David Lipton, September 1999.

Conference Organizer, "Bank Capital Regulation," Sponsored by the Shadow Financial Regulatory Committees of the United States, Europe, and Japan, and by Ernst & Young, June 14, 1999.

Conference Organizer, "Victorian Perspectives on Capital Mobility and Financial Fragility in the 1990s," American Enterprise Institute, January 15, 1999.

Conference Organizer, “The Japanese Financial System: Reconstructing for the Future,” Columbia Business School, October 1-2, 1998

Conference Organizer, “High Loan-To-Value Mortgage Lending,” American Enterprise Institute, July 8, 1998.

Conference Organizer, “A Market Approach to Securities Regulation,” American Enterprise Institute, June 12, 1998.

Conference Organizer, “Why It Pays to File for Bankruptcy,” American Enterprise Institute, June 19, 1998.

Conference Organizer, “Bringing Markets into Bank Regulation,” American Enterprise Institute, September 11, 1998.

Conference Organizer, “The Future of Federal Home Loan Banks,” American Enterprise Institute, December 2, 1998.

Conference Organizer, “Are SEC Disclosure Rules Necessary? Evidence from Private and Public Bond Placements,” American Enterprise Institute, December 17, 1998.

Conference Organizer, “Credit Card Banking: Challenges and Opportunities,” American Enterprise Institute, December 5, 1997.

Conference Organizer, “Do We Need an Umbrella Financial Regulator?” American Enterprise Institute, October 9, 1997.

Conference Organizer, “The Deregulation of Derivatives: Legal Certainty for Private Contracts,” American Enterprise Institute, July 22, 1997.

Conference Organizer, “The Bankers’ Roundtable Program for Reforming Federal Deposit Insurance,” American Enterprise Institute, May 23, 1997.

Conference Organizer, “Firewalls for Diversified Banks,” American Enterprise Institute, March 26, 1997.

Conference Organizer, “Managing Bank Risk and Capital,” Program on Financial Institutions, Columbia Business School, May 16, 1997.

Program Co-Organizer, Summer Institute on the Development of the American Economy, July 1994.

Conference Co-Organizer, "Banking Under the Community Reinvestment Act," 1993.

Program Co-Organizer, Summer Institute on the Development of the American Economy, July 1993.

Program Co-Organizer, Midwest Workshop on Financial Markets and Intermediation, October 1992.

Program Organizer, Financial History Session, NBER Workshop on the Development of the American Economy, July 1992.

Program Organizer, Colloquium on Introducing Historical Perspectives into Teaching and Research at the Wharton School, April 1992.

Comment on "A Contracting Theory of the Origins of Federal Deposit Insurance" (by Edward Kane and Berry Wilson), Federal Reserve Bank of Cleveland Conference on Comparative Banking Systems, November 7, 1997.

Comment on Three Papers on Contingent Liability Rules in Banking, Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, May 1997.

Comment on "The Performance of the Federal Reserve System in Pursuing International Monetary Objectives" (by Anna J. Schwartz), Durrell Foundation Conference on Money and Banking: The American Experience.

Comment on "Money and Prices in Colonial America" (by Bennett McCallum), American Economic Association Meetings.

Comment on Three Papers on the Great Depression, Economic History Association Meetings (Montreal).

Comment on "The Profitability of Note Issue During the Free Banking Era" (by Haupert and Bodenhorn), Cliometric Society Meetings.

Comment on "An Historical Perspective on the Federal Reserve's Monetary Aggregates: Definition, Construction, and Targeting" (by Richard Anderson and Kenneth Kavajecz), Federal Reserve Bank of St. Louis.

Comment on "Outside Activity in Japanese Companies: Determinants and Managerial Implications" (by Steven N. Kaplan and Bernadette A. Minton), Fourth Annual Conference on Financial Economics and Accounting, Washington University of St. Louis.

Comment on "Identifying Credit Crunches" (by Owens and Schreft), Econometric Society Meetings.

Comment on Three Papers on Financial Contracting, Southern Finance Meetings.

Comment on Three Papers on Inside Information in Banking, Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago.

Comment on "The Decline of Private Deposit Insurance in the U.S." (by William English), Carnegie-Rochester Conference Series on Public Policy.

Comment on "The History of Ownership and Control in New England Banking" (by Lamoreaux), NBER Conference on Microeconomic History.

Comment on Three Papers on the Early Organization of Stock Markets, Social Science History Association Meetings.

Comments on Papers by Steinherr, Kroszner, and Benston, NYU Stern School Conference on Universal Banking.

TEACHING

Executive Education

PRMIA Course on Risk Management, May 2 and 9, 2007

Joint Columbia Business School-Fudan University Executive Education Course, August 27-30, 2005 in Shanghai, June 12, 2006 in New York.

Columbia Business School CSEP Lectures on Finance and Development, September 7, 2005.

Emerging Financial Markets
Ph.D. Economists Course, IMF Institute, 2001, 2002, 2003, 2004.

Commercial Bank Management
Senior Managers of Bank of Communications,China, 1994
Senior Managers of Bank of China, 1995

Financial Institutions and Public Policy
Staff training, The World Bank, 1995
Universidad Torcuato di Tella (Buenos Aires) 1996

Bank Regulation and Exchange Rate Policies in Developing Economies
Ph.D. Economists Course, The World Bank, 1997, 1998
Ph. D. Economists Course, IMF Institute, 1999-present

Determinants of Exchange Rates
Morgan Stanley Dean Witter training, 2000, 2001

The History and Theory of Banking: Four Lectures
University of St. Gallen, Switzerland, 1997

Graduate Courses

Business Values and Ethics (Columbia, MBA)
Conceptual Foundations (Columbia, MIA, MPA)
Corporate Finance (Columbia, Ph.D.)
Advanced Corporate Finance (Columbia, MBA)
Emerging Financial Markets (Columbia, MBA, EMBA, MPA)
Emerging Financial Markets and the Case of China (EMBA)
International Banking (Columbia, MBA, MPA)
American Economic History (Northwestern, Ph.D.)
Monetary Theory (Northwestern, Ph.D.)
Financial Markets and Economic Development (Stanford, Ph.D.)

Banking (Wharton, MBA; University of Illinois, MBA., MIF)
Financial Intermediation Theory (University of Illinois, Ph.D.)
Theory of Financial Decision Making (University of Illinois, Ph.D.)
American Financial History (Wharton, MBA)

Undergraduate Courses

American Economic History (Northwestern and Stanford)
Money and Banking (Northwestern)
Macroeconomics (Northwestern)
Bank Management (Wharton, University of Illionis)
Freshman Seminar on Bank Regulation (Northwestern)
American Financial History (Wharton and Northwestern)
Financial Markets and Intermediaries (University of Illinois)
Financial Intermediaries (University of Illinois)

Ph.D. Student Advisees

Richard Szostak (Economics, Northwestern)
Akira Motomura (Economics, Northwestern)
Charles Himmelberg (Economics, Northwestern)
John Keating (Economics, Northwestern)
John Veitch (Economics, Northwestern)
Dorothy Petersen (Economics, Northwestern)
Scott Erwin (Economics, Northwestern)
Joseph Mason (Economics, UIUC)
Stanley Longhofer (Economics, UIUC)
Benito Sopranzetti (Finance, UIUC)
Gregory Chaudoin (Finance, UIUC)
Taek Seon Roh (Economics, UIUC)
Sandra Ospina (Economics, UIUC)
Steve Quinn (Economics, UIUC)
Thekla Halouva (Finance, UIUC)
Jason Karceski (Finance, UIUC)
Gledson Carvallo (Economics, UIUC)
Murillo Campello (Finance, UIUC)
Gail Buyske (Economics, Columbia)
Hani Shammah (Economics, Columbia)
Daniel Schiffman (Economics, Columbia)
Elizabeth Gordon (Accounting, Columbia)
Inessa Chevchinskaia (Finance, Columbia)
Mark Weidenmeier (Economics, UIUC)
Jimmy K. Liew (Finance, Columbia)
Woodrow Johnson (Finance, Columbia)
Hua Fan (Finance, Columbia)
Robert Papp (History, Columbia)
Eric Hilt (Economics, Columbia)
Wook Sohn (Economics, Columbia)
Ruth Ben-Artzi (Political Science, Columbia)
Sanket Mohaptra (Economics, Columbia)
Bobby Pornrojnangkool (Finance, Columbia)

Goetz von Peter (Economics, Columbia)
Sandya Persad (Economics, Columbia)
Sujatta Visaria (Economics, Columbia)
Hayong Yun (Finance, Columbia)
Vikrant Vig (Finance, Columbia)
Pepita Miquel-Florensa (Economics, Columbia)
Heechul Min (Economics, Columbia)
Yongxiang Wang (Finance, Columbia)

UNIVERSITY SERVICE:

To University

Chair, Search Committee, NT Wang Professor of Chinese Business and Economy, 2006-2007.
Member, Board of Advisors, Interdisciplinary Center for Contract and Economic Organization, Columbia University, September 2006-present.
Co-Organizer, Columbia-Council on Foreign Relations Geoeconomics Project, 2001-2002
Davis Fellowship Fund Advisory Committee, 2000-present
Senator, Columbia University, 1997-1998, 1998-1999
Chair, Housing Committee, University Senate, 1998-1999
Executive Committee, Columbia University Public Policy Consortium, 1997-1998. 1998-1999
Lecturer, "Lifelong Learners Series," Columbia University, 1998
Columbia University Ad hoc Committee for Tenure Review, 1996
Chancellor's Search Committee for V.P. for Finance, 1995, University of Illinois.
Senate Committee on Student Discipline: Subcommittee on Undergraduate Student Conduct, 1995, University of Illinois.

To Schools

Member, Advisory Board, Columbia Business School Executive Education, 2007.
Member, Search Committee, PEPM Director (SIPA), 2006
International Economics Search Committee, School for International and Public Affairs, 2004-2005.
Task Force for reviewing and reforming the IFB Concentration, School for International and Public Affairs, 2004-2005.
Member, Career Services Committee, Columbia Business School, 1998-2000
School for International and Public Affairs Executive Committee, 1996-present
International Economics Search Committee, School for International and Public Affairs, 1998-1999
College Executive Committee, 1994, College of Commerce, University of Illinois
Search Committee for Director of Career Development and Placement for the MBA Program, College of Commerce, University of Illinois
Office for Banking Research Co-Director (UIUC), 1992, 1993, 1994, 1995
Business Advisory Council (UIUC), 1992, 1993, 1994, 1995
Executive Education Committee (UIUC), 1993, 1994, 1995

College of Arts and Sciences Admission Committee (NU), 1986-87, 1987-88.

To Departments

Chair, Ph.D. Committee, Division of Finance and Economics, 1998-2000
Ph.D Admissions, Department of Finance, Columbia GSB, 1997-2000
Recruiting Committee, Department of Finance, Columbia GSB, 1996-2001
Department of Finance Ad Hoc Committee to Advise the Illinois Attorney General on Hotel Settlement Proposals (UIUC), 1995.
Department of Finance Executive Committee (UIUC), 1993, 1994.
Department of Finance Seminar Co-Organizer (UIUC), 1993, 1994.
Department of Finance Recruiting Committee (UIUC), 1992, 1993, 1994.
Undergraduate Departmental Adviser (NU), 1986-87, 1987-88, 1990-91.
Freshman Adviser (NU), 1985-86, 1986-87, 1987-88, 1989-90.
Macroeconomics Seminar Organizer (NU), 1986-87, 1989-90.
Economic History Seminar Organizer (NU), 1985-1988.
Economics Department Undergraduate Studies Committee (NU), 1985-86.

## APPENDIX D: EXPERT WITNESS HISTORY SINCE 2003

1. Xilinx Inc. and Subsidiaries, et al., v. Commissioner of Internal Revenue Service, Docket Nos. 4142-01 and 702-03.

2. Long Island Savings Bank, FSB, et al., v. The United States, No. 92-517C.

3. Bluebonnet Savings Bank FSB, Stone Capital, Inc., and James M. Fail, v. The United States, No. 95-532C.

4. AmBase Corp. and Carteret Bancorp, Inc., v. The United States, No. 93-531.

5. Various arbitrations.