**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC., Plaintiffs, and FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervenor, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 93-531 (Judge Loren Smith) |

**PLAINTIFFS' POSITION STATEMENT ON THE COURT'S TRIAL SCHEDULE**

Charles J. Cooper
*Counsel of Record*

David H. Thompson
Vincent J. Colatriano
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

I. CARTERET WAS A SUCCESS STORY UNTIL THE BREACH........................3

II. THE BREACH CAUSED CARTERET'S FAILURE. ..........................................6

III. CARTERET'S DAMAGES ARE AMPLY SUPPORTED BY SUBSTANTIAL EVIDENCE..............................................................................................................9

IV. THERE IS ABUNDANT EVIDENCE DEMONSTRATING THAT THE GOVERNMENT'S CLAIMED RECEIVERSHIP DEFICIT IS GROSSLY INFLATED. .........................................................................................................11

CONCLUSION...........................................................................................................14

# TABLE OF AUTHORITIES

**Cases** **Page/s**

*American Fed. Bank v. United States*, 68 Fed. Cl. 346 (2005) .......... 1

*American Sav. Bank v. United States*, 62 Fed. Cl. 6 (2004) .......... 1

*Anchor Sav. Bank v. United States*, 59 Fed. Cl. 126 (2003) .......... 1

*Astoria Fed. Sav. & Loan Ass'n v. United States*, 72 Fed. Cl. 712 (2006) .......... 1

*California Federal Bank v. United States*, 245 F.3d 1342 (2001) .......... 2

*Carteret Savings Bank v. Office of Thrift Supervision*, 762 F. Supp. 1159 (D.N.J. 1991), *reversed on other grounds* 963 F.2d 567 (3rd Cir. 1992) .......... 5

*Citizens Fin. Servs. v. United States*, 57 Fed. Cl. 64 (2003) .......... 1

*Citizens Fed. Bank v. United States*, 52 Fed. Cl. 561 (2002) .......... 1

*Coast Fed. Bank v. United States*, 48 Fed. Cl. 402 (2000) .......... 1

*Energy Capital v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) .......... 10

*Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223 (2003) .......... 1

*First Fed. Lincoln Bank v. United States*, 68 Fed. Cl. 602 (2005) .......... 1

*Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108 (2003) .......... 1

*Globe Savings Bank v. United States*, 59 Fed. Cl. 86 (2003) .......... 2

*Granite Management Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005) .......... 1

*Holland v. United States*, No. 95-524, 2007 U.S. Claims LEXIS 40 (Fed. Cl. Feb. 20, 2007) .......... 1

*Hometown Fin. v. United States*, 56 Fed. Cl. 477 (2003) .......... 2

*La Van v. United States*, 382 F.3d 1340 (Fed. Cir. 2004) .......... 1

*Long Island Sav. Bank v. United States*, 60 Fed. Cl. 80 (2004) .......... 2

*Northeast Savings v. United States*, 72 Fed. Cl. 173 (2006) .......... 1, 2

*Slattery v. United States*, 69 Fed. Cl. 573 (2006) .......... 1

*Southern Nat'l Corp. v. United States*, 57 Fed. Cl. 294 (2003) .......... 2

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) .......... 2

**PLAINTIFFS' POSITION STATEMENT**
**ON THE COURT'S TRIAL SCHEDULE**

Plaintiffs AmBase Corporation and Carteret Bancorp, Inc. ("Plaintiffs") hereby respectfully submit this position statement concerning whether the trial schedule should be modified in order to provide for a summary judgment phase.

In this case, Plaintiffs intend to prove damages that largely track the damages awarded in *Slattery v. United States*, 69 Fed. Cl. 573 (2006). Just as a trial was necessary in that case to resolve the issues of causation and reasonable certainty, so too these inherently factual questions will have to be resolved at trial here. Given that *Slattery* has already set forth the legal framework governing such damages, summary judgment in this context will serve no purpose other than delay for delay's sake.[1]

[1] Defendant has previously cited to a handful of *Winstar* decisions in which Defendant was granted summary judgment on damages issues. *See* Gov't Opp. to Pretrial Schedule at 3-4. The fact of the matter is that the reported *Winstar* decisions convincingly establish the virtual certainty that our damages claims will not be fully resolved on summary judgment. We are aware of ***at least*** 20 cases in which this Court or the Federal Circuit have held that Defendant's summary judgment motion should be denied either in full or in part. Indeed, earlier this year, this Court observed that it " 'often has rejected the use of summary judgment in considering claims for expectancy damages.' " *Holland v. United States*, No. 95-524, 2007 U.S. Claims LEXIS 40, at *22 (Fed. Cl. Feb. 20, 2007) (quoting *Astoria*, 72 Fed. Cl. at 717)). In fact, in one of the cases relied upon by Defendant, Judge Miller acknowledged that in light of the inherently factual nature of the damages questions raised in these cases, "it would be the *rara avis*, indeed, that could merit summary judgment." *Fifth Third*, 55 Fed. Cl. at 236. *See California Fed. Bank v. United States*, 245 F.3d 1342 (2001); *Granite Management Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005); *La Van v. United States*, 382 F.3d 1340, 1352 (Fed. Cir. 2004); *Northeast Sav. v. United States*, 72 Fed. Cl. 173 (2006) (motion denied in full); *Astoria Fed. Sav. & Loan Ass'n v. United States*, 72 Fed. Cl. 712 (2006) (motion denied in full); *Holland v. United States*, No. 95-524, 2007 U.S. Claims LEXIS 40 (Fed. Cl. Feb. 20, 2007) (motion denied in full); *American Fed. Bank v. United States*, 68 Fed. Cl. 346 (2005) (motion denied in part); *American Sav. Bank v. United States*, 62 Fed. Cl. 6 (2004) (motion denied in part); *Anchor Sav. Bank v. United States*, 59 Fed. Cl. 126 (2003) (motion denied in part); *Citizens Fed. Bank v. United States*, 52 Fed. Cl. 561 (2002) (motion denied in part); *Citizens Fin. Servs. v. United States*, 57 Fed. Cl. 64 (2003) (motion denied in part); *Coast Fed. Bank v. United States*, 48 Fed. Cl. 402 (2000)

Not only is it virtually certain that summary judgment motions will not obviate the need for a trial, it is also virtually certain that such motions would not substantially narrow the scope of that trial. As described below, any damages trial in this case will almost certainly focus on quintessentially factual issues, including such questions as whether the claimed damages were caused by the breach, whether Carteret Savings Bank would have failed even absent the breach, and whether the claimed damages have been calculated with reasonable certainty. There is simply no appreciable chance that these inherently fact-bound questions could be resolved on summary judgment. *See California Federal Bank v. United States*, 245 F.3d 1342 at 1350 (2001) ("Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute."); *Northeast Savings v. United States*, 72 Fed. Cl. 173 at 180 (2006) ("Causation presents a quintessential issue of fact."); *Globe Savings Bank v. United States*, 59 Fed. Cl. 86 at 98 (2003) ("Causation . . . is an issue of fact and ordinarily is not properly adjudicated on a motion for summary judgment.").

The only conceivable basis for granting summary judgment in favor of the government would be the absence of evidence supporting plaintiffs' claims. As we briefly demonstrate below, on each of the potentially material factual issues raised by the government's experts, there is substantial evidence supporting plaintiffs' claim for damages.

---

(motion denied in part); *Fifth Third Bank of W. Ohio v. United States*, 55 Fed. Cl. 223 (2003) (motion denied in part); *First Fed. Lincoln Bank v. United States*, 68 Fed. Cl. 602 (2005) (motion denied in part); *Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108 (2003) (motion denied in part); *Globe Sav. Bank v. United States*, 59 Fed. Cl. 86 (2003) (motion denied in part); *Hometown Fin. v. United States*, 56 Fed. Cl. 477 (2003) (motion denied in part); *Long Island Sav. Bank v. United States*, 60 Fed. Cl. 80 (2004) (motion denied in part); *Southern Nat'l Corp. v. United States*, 57 Fed. Cl. 294 (2003) (motion denied in part); *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) (motion denied in part).

## I. CARTERET WAS A SUCCESS STORY UNTIL THE BREACH.

By way of background, Carteret acquired two massively insolvent savings and loan associations, Barton and Delray, in 1982. Immediately after, and as a direct result of, the acquisitions, Carteret's tangible net worth went from positive $40 million to negative $210 million. 1982 S – Memo for Barton and Delray (Exhibit 1). Carteret was given forty years to amortize the resulting supervisory goodwill and to fill the capital hole created by its acquisition of Barton and Delray.

Carteret's operation of these insolvent thrifts was a success story prior to the passage of FIRREA. In the mid-1980s, Carteret generated substantial earnings. Indeed, according to the government's own expert witness, Carteret generated earnings of more than $165 million from 1983 to 1988. Report of Anthony Saunders at Exhibit 3 (Exhibit 2). Through its retained earnings, Carteret had eliminated the net tangible capital deficit it had inherited from Barton and Delray. Report of Charles Calomiris of May 19, 2007 at 19 (Exhibit 3). During 1990 and 1991, Carteret, like virtually every other financial institution in the country, sustained losses. But even with those losses, Carteret had closed $170 million of the $210 million deficit it had assumed from the government. Report of Roy Smith at Exhibit 3 (Exhibit 4). Moreover, Carteret had substantial earnings in 1992 as the recession of 1990-91 lifted. Calomiris Report at 72 (Exhibit 3).

In light of Carteret's success in generating strong earnings, AmBase acquired Carteret in August of 1988 for more than $266 million. AmBase's valuation of Carteret was supported by an exhaustive fairness opinion prepared by CS First Boston. Calomiris Report at 12 (Exhibit 3). The valuation was also supported by Chase Manhattan Bank which in June of 1988 loaned AmBase $250 million secured by Carteret's stock. *Id.* at

12-13. AmBase's purchase price for Carteret represented a slight discount to Carteret's book value. *Id.* at 19.

Over the course of 1989, Carteret's book value declined slightly as it paid dividends to its parent and amortized its supervisory goodwill. *Id.* at 17. Plaintiffs' expert, Professor Charles Calomiris of Columbia Business School, conservatively estimates the value of Carteret as $254 million as of July 31, 1989. *Id*. at 17-19. This valuation is confirmed by documentary evidence showing that inside directors made a bid of $252 million for Carteret in May of 1989. *Id.* at 15-16. As the breach became a virtual certainty in May of 1989, the directors withdrew their bid. *Id.* at 16.

The breaching provisions of FIRREA sent Carteret into a death spiral. Overnight, Carteret went from having a significant capital cushion to being out of compliance with the fully phased in core capital requirement.[2] The stock market immediately recognized the negative ramifications of the breach as reflected by its reaction to the defeat of the Hyde Amendment, which would have removed the breaching provisions from FIRREA. *Id.* at 23. A front page story in *The New York Times* on May 25, 1989, acknowledged that the Hyde Amendment was the last realistic chance to remove the breaching provisions from FIRREA. *Id.* at 22. When this effort failed, the stock market capitalization of AmBase fell $45 million within a week. *Id.* at 23.

The stock market's concern was well-founded. As Angelo Vigna, the top regulator in the northeast region of the OTS, recognized, the breaching provisions of FIRREA

---

[2] According to Carteret's 1989 Annual report, Carteret exceeded its core capital requirement by $32.4 million as of December 31, 1989. 1989 Carteret annual report at Bates KH053726 (Exhibit 5). At that date, Carteret had $164.3 million in supervisory goodwill on its books. *Id.* at KH053717. Thus, on a fully-phased in basis -- that is, excluding all of its supervisory goodwill, Carteret did not satisfy its core capital requirement.

"had a very substantial impact on the regulators' assessment of [Carteret's] safety and soundness." Vigna Deposition at 81 (Exhibit 6). As the district court found in issuing a preliminary injunction in April 1991, the breach adversely affected Carteret's asset size. *Carteret Savings Bank v. Office of Thrift Supervision*, 762 F. Supp. 1159 (D.N.J. 1991), *reversed on other grounds* 963 F.2d 567 (3rd Cir. 1992). Indeed, in 1989, Carteret shrank by more than $700 million from $6.8 to $6.1 billion. *See* 1989 TFRs (Exhibit 7). The government's expert also conceded that Carteret's relative cost of funds increased because of its capital shortfall. As a result of its lack of regulatory capital, Carteret was also forced to sell its commercial real estate at the bottom of the market. Carteret also took large write downs in its commercial loan portfolio because of its breach-induced need to raise capital. As Mr. Vigna explained, Carteret's write downs were "ultraconservative" and were driven by its need to raise substantial costs of capital:

> They took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally.
> Q Did you assess that as being a good thing, a prudent managerial approach?
> A I think it was, as I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money there was no surprises, other big writedowns subsequent to that.

Vigna Deposition at 110 (Exhibit 6). By taking "ultraconservative" write-downs in an effort to raise capital, Carteret lowered its capital ratios below where they would have been otherwise. Taken together, the negative effects of FIRREA doomed Carteret to failure. This conclusion parallels the finding of Judge Bissell of the United States District Court for New Jersey who granted Carteret's request for injunctive relief precisely because of the irreparable harm that the breach was continuing to inflict on Carteret. *Carteret*, 762 F. Supp. at 1181.

## II. THE BREACH CAUSED CARTERET'S FAILURE.

The centerpiece of the government's defense in this case is its contention that Carteret would have failed even absent the breach. But as Carteret's principal regulators themselves candidly acknowledged during fact discovery, if Carteret's supervisory goodwill had been counted toward regulatory capital requirements, Carteret would not have been seized. Mr. Vigna was clear on this point during his deposition:

> Question: If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
> Answer: **No.**

Vigna deposition at 159 (Exhibit 6). Likewise, the regulators acknowledged that if supervisory goodwill had been viewed as tangible capital, as required by the contract, Carteret would not have been seized. Again, Mr. Vigna's deposition is clear:

> Question: If Carteret had cash, tangible cash, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret had been seized, in your opinion?
> Answer: No.

*Id.* at 158. Likewise, Robert Albanese, the second highest ranking regulator in the OTS's Northeast region, acknowledged that if Carteret had met its tangible capital requirement, as it would have absent a breach, Carteret would not have been seized. Albanese Deposition at 159-161 (Exhibit 8). Indeed, Mr. Vigna acknowledged that during his 32 years as a government regulator, he was unaware of any thrift that was seized while it was in compliance with its tangible capital requirements. Vigna Deposition at 156 (Exhibit 6).

These unequivocal admissions of the OTS regulators are more than enough to defeat a summary judgment motion on the question of whether the breach caused Carteret to fail. Additionally, there is ample evidence to support the regulators' admissions. For

one thing, the generally favorable economic climate that prevailed in 1992 allowed Carteret to return to profitability for the 14 months prior to seizure. Calomiris Report at 72 (Exhibit 3) (citing 1992 Annual Report, AMB030515.) For Carteret in 1992, "the trends were very positive," as Mr. Albanese acknowledged. Albanese deposition at 138-141 (Exhibit 8). The regulators also had great confidence in the management of Carteret -- Mr. Vigna testified that "this was as good a team as you'd find." Vigna Deposition at 106-107 (Exhibit 6). In short, Mr. Vigna testified that even in a breach affected world, Carteret would have survived if it had been given more time and would have been "very successful, very successful." *Id.* at 151-153. It necessarily follows that in a non-breach world, Carteret would have done at least as well.

In the face of this compelling evidence that Carteret had returned to profitability and was enjoying "very favorable trends," the government still attempts to argue that Carteret would have failed even absent a breach. The centerpiece of the government's argument is the facile assumption that even with the supervisory goodwill, Carteret would not have satisfied all three regulatory capital requirements in late 1992. But (1) the government can point to no thrift with a regulatory capital profile comparable to Carteret's (assuming no breach) that was seized and (2) in any event, the government's calculations are irrelevant because they fail to take into account the harm that the breach inflicted on Carteret between 1989 and 1992 as a result of the asset shrink, the increased cost of funds, the severe write down of commercial assets pursuant to an ultraconservative write-down policy, and the forced sale of assets at the nadir of the commercial real estate market. *See* Calomiris Report at 50-57 (Exhibit 3). The government should not be

allowed to disavow the testimony of its own regulators and rewrite history, especially in the context of a summary judgment motion.

Even if the government's revisionist history were correct, it is undisputed that Carteret would have had to raise much less capital in a non-breach world than it was required to do by the government regulators in the aftermath of the breach. The government regulators conceded the obvious: that it would have been easier for Carteret to raise a smaller amount of capital (at worst, no more than $50 million would have been necessary) than the $200 million it had to seek after the breach. Albanese Deposition at 159-161 (Exhibit 8). Carteret had a myriad of different ways in which to raise such capital. First, AmBase had approximately $35 million of cash that could have been infused into Carteret. Calomiris report at 48 (Exhibit 3). Second, Carteret could have sold its servicing business for more than $100 million or its mortgage origination business for $20 million. *Id.* at 63. Third, Carteret could have securitized its mortgage loans and thereby reduced its risk-based capital requirements -- securitized mortgage backed securities have a lower risk weighting than unsecuritized loans. Supplemental Declaration of Charles W. Calomiris of July 12, 2007 at ¶ 11 and Table 2 (Exhibit 9). Fourth, Carteret could have shrunk further. Additionally, Carteret could have raised capital in the open markets. Calomiris report at 64 (Exhibit 3).

In short, there is ample evidence in the testimony of the regulators themselves, the contemporaneous documents, and the expert analysis of Professor Calomiris demonstrating that Carteret would have survived absent the breach.

## III. CARTERET'S DAMAGES ARE AMPLY SUPPORTED BY SUBSTANTIAL EVIDENCE.

Each of Carteret's three primary damages claims is amply supported by substantial evidence.

1. As in *Slattery*, Carteret is entitled to the fair market value of the thrift prior to the breach. Here, Carteret's value is established by an arms length sales transaction. AmBase paid $266 million in cash, as well as other consideration, in August of 1988, with the regulators' encouragement and approval. Less than six months later, FIRREA was announced. As a result, Carteret began shrinking its asset base in the second quarter of 1989 to increase its capital ratio -- from March 31, 1989 to December 31, 1989, Carteret's assets shrank from $6.82 billion to $6.097 billion. *See* 1989 TFRs (Exhibit 7). Clearly, it would not have been prudent to wait for FIRREA to be enacted, let alone implemented in regulations, to take action to meet FIRREA's requirements. Thus, at the latest, Carteret's value should be measured as of July 1989.

Professor Calomiris has calculated the value of Carteret to have been at least $251.4 million as of July 31, 1989. Calomiris Report at 17-18 (Exhibit 3). Professor Calomiris's market valuation is based on his analysis of stock market trends and valuation for thrifts from August of 1988 until the passage of FIRREA. Professor Calomiris's analysis is confirmed by a contemporaneous bid of $252 million for Carteret made by two of its directors in May of 1989. This evidence is more than sufficient to defeat any summary judgment motion by the government as to the reasonable certainty of Carteret's fair market value prior to the breach.

2. The framework of damages announced by this Court in *Slattery* is based on the sound proposition that the fair market value of an institution is a reasonably certain

method of ascertaining future profits. But in measuring fair market value in 1989, the profits inherent in such valuation have been discounted by investors back to 1989. For example, if investors in 1989 believed that Carteret was likely to make $20 million for the next twenty years, then the value of Carteret's earnings for the next twenty years would not be $400 million. The fair market value of those earnings would be the present value of such earnings discounted back to 1989. Thus, awarding the fair market value of Carteret in 1989 is tantamount to discounting lost profits back to the date of the breach.

In *Energy Capital v. United States*, 302 F.3d 1314, 1330 (Fed. Cir. 2002), the Federal Circuit clarified that only profits that would accrue *post-trial* are to be discounted. Applying the holding of *Energy Capital* to the damages framework in *Slattery* yields the conclusion that Carteret's earnings should not be discounted back to 1989. Thus, in the simple example provided above, Carteret's earnings from 1989 through 2008 would equal $400 million. The fair market value of those earnings would not be the equivalent of pre-judgment interest. Rather, prejudgment interest would involve increasing the face amount of each year's earnings by an interest factor. Professor Calomiris has not done so. Rather, he has simply added together the face amount of the undiscounted earnings accruing prior to trial that are implicit in Carteret's fair market value as of 1989. Calomiris Report at 25-28 (Exhibit 3).

3. Additionally, Professor Calomiris has quantified the value of Carteret today, since in the absence of a breach, Carteret would still be a vibrant financial institution. Professor Calomiris has calculated the value of Carteret by analyzing the earnings Carteret would have retained in the absence of the breach and then applying market to book ratios that prevail in the market today. *Id.* at 28-41. Professor Calomiris has ana-

lyzed this issue from a number of different perspectives, including the stock market performance of thrifts from the date of the breach to the present, market to book ratios of the thrift industry, and peer group analyses for comparable thrifts. *Id.* Although the government disputes Professor Calomiris's conclusions, this is not a basis for granting a summary judgment motion.

* * *

Finally, we note that Carteret's damages should be grossed up. The government's experts have admitted that fair market values reflect projected *after-tax* earnings. Saunders Deposition at 66 (Exhibit 10). For example, if the market predicts that an institution will have pre-tax earnings of $20 million in year one, it will assume after tax cash flow of $13 million (assuming a tax rate of 35%) in arriving at a stream of earnings to be discounted back to present value. Accordingly, since the market values are after tax numbers and awards of expectancy damages are to be made on a pre-tax basis, the damages must be grossed up in order to make Carteret whole.

## IV. THERE IS ABUNDANT EVIDENCE DEMONSTRATING THAT THE GOVERNMENT'S CLAIMED RECEIVERSHIP DEFICIT IS GROSSLY INFLATED.

Likewise, the government is not entitled to summary judgment on the issues relating to the validity and size of the receivership deficit claimed by the government. In our statement of issues, filed on June 16, 2006, we marshaled *overwhelming* evidence that the receivership deficit is grossly inflated -- far more than sufficient evidence to withstand any summary judgment motion by Defendant. Specifically, there were two principal (but by no means the only) sources of inflation of the receivership deficit: taxes and interest.

The documentary evidence relating to Carteret's alleged tax deficit of some $90 million demonstrates three key errors. First, the 1995 federal income tax return filed by the FDIC on behalf of Carteret, which is the sole source of the alleged tax liability, includes interest on loans as gross income, but has no offset for the interest expense associated with funding those loans. No financial institution would file a return that is so facially flawed. Second, the returns filed by the RTC failed to utilize net operating loss carryforwards and carrybacks that were available to shield the legitimate components of net income, if any, realized by Carteret in 1995. Third, the FDIC's returns demonstrate that they improperly recorded federal financial assistance as an item of income on multiple returns. In addition to the returns themselves, there are numerous internal documents and emails from the FDIC that confirm these errors, as well as the sworn testimony of the FDIC's 30(b)(6) witness. *See* Plaintiffs' Statement of Issues (June 16, 2006) at 29-47 (compiling evidence demonstrating the tax liability is a pure fiction).

With respect to the interest that the FDIC has been charging Carteret's receivership, the factual record confirms that the government's own expert calculates the resolution cost to the RTC without any interest component. *See* Anthony Saunders, Financial Markets & Institutions at 348-349 (Exhibit 11). Likewise, internal government documents demonstrate that the FDIC charged Carteret a floating rate of interest for several years and then retroactively switched the rate back to a much higher fixed rate once rates dropped. As outlined in our statement of issues, there is plainly sufficient evidence to defeat a summary judgment motion defending the government's calculation of interest.

* * *

Given the fact that summary judgment motions are extremely unlikely to obviate

the need for or significantly narrow the scope of the trial, and given the fact that every day in which the resolution of this case is delayed threatens to further erode the damages to which Plaintiffs may be entitled, the balance of the entities weighs heavily in favor of holding a trial on all relevant issues in February 2008. In short, any inefficiencies or unfairness that might result from the parties being required to continue preparing for trial during the pendency of summary judgment motions pales in comparison with the inefficiencies and unfairness that would result should pretrial proceedings and trial be suspended for months while summary judgment motions that stand no realistic chance of either obviating the need for or materially limiting the scope of trial are litigated.

Ultimately, Defendant's argument that trial should be put off indefinitely in favor of lengthy summary judgment proceedings has nothing to recommend it. After fourteen years of litigation in this Court (to say nothing of previous litigation in the district court), and with the all-too-real dangers further delay poses to any prospect of recovery by Plaintiffs for Defendant's breach, this Court should insist on a compelling justification before it adopts a proposal that would put off the final resolution of this case any longer than is necessary.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court maintain the current trial schedule and reject any request by the government to postpone the trial pending the resolution of a summary judgment motion.

November 7, 2007

Respectfully submitted,

/s/ Charles J. Cooper

Charles J. Cooper
*Counsel of Record*

David H. Thompson
Vincent J. Colatriano

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of November 2007, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

Andrew Gilbert, Esq.
FDIC Legal Division
550 17th Street, N.W.
Room 2098
Washington, DC 20429

/s/Charles J. Cooper