IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

October 26, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of ANGELO A. VIGNA,

a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

excluded on this schedule, and for purposes of simplicity I have added back or would suggest to you that we add back $180 million of goodwill, one gets, according to my math, just under $230 million worth of capital.

Is that consistent with your quick math there?

THE WITNESS: I didn't follow. Would you read that back, please.

(The question requested was read back by the reporter.)

A It sounds correct.

Q So if you add back the excluded goodwill, would Carteret satisfy its tangible capital requirement under FIRREA?

A I believe so.

Q I would like to represent to you that at least according to my math, $230 million of capital would compute to 3.48 percent of Carteret's total assets at that time.

Does that seem generally accurate?

A Yes.

Q So is it accurate to say that if Carteret's tangible capital had included unamortized supervisory goodwill, Carteret would



have well exceeded its tangible capital at that point in time?

A Yes.

Q Would you agree that for Carteret the exclusion from FIRREA's regulatory capital requirements of supervisory goodwill was a devastating blow?

MR. LEVITT: Objection, that's a vague question. Can you define a devastating blow?

It still satisfied the other two capital standards, and AmBase still had an obligation to provide capital under the capital maintenance agreement, which it did.

With that you can answer, if you can. Was it a devastating blow is the question.

A I think devastating might be a stronger word than I would use. It certainly was an event that created a lot of problems for the institution.

It changed, certainly changed their financial status from a regulatory standpoint.

Q So you would resist the notion that



the loss of at least $180 million of regulatory capital was a devastating blow?

A I guess I don't like the word devastating.

Q Okay.

A It certainly was a very severe consequence of this legislation. As a consequence of this legislation they lost a great deal of regulatory capital, and while it didn't make them insolvent, it certainly put them out of compliance with regulatory requirements and put them into a category, a regulatory category that -- a problem regulatory category, and it certainly also had an impact on their market value.

Q What was the impact on their market value, according to your recollection?

A I don't recall specifically, but obviously now that you're, you know, you're in a different regulatory category the market is going to view you differently.

Although it really shouldn't, because economically nothing really changed, but I think that psychologically it had an impact on the market's view of the value of this company.

Q Well, in this report of examination



Carteret is characterized as a macro 4, composite macro 4.

In the prior report of examination do you remember what its composite macro was?

A No, I don't recall.

Q Would it refresh your recollection if I represented to you that it was a 2?

A That would probably be appropriate, yes, as I recall.

Q So, is it accurate to say that the loss of Carteret's supervisory goodwill as regulatory capital had a very substantial impact on the regulators' assessment of its safety and soundness?

A Yes.

Q And that too would naturally be reflected in a loss of market value, would it not?

A Well, you know, the exam ratings are not public, so no one other than those within the regulatory field and the institution itself knew what the exam rating was.

But the fact that now it was publicly known that Carteret and a lot of other institutions were out of regulatory compliance with capital standards I think put them in a

Page 106

surprises.
Q Mr. Bianco I take it was a regular visitor to your offices, is that accurate?
A We spent a lot of time together. We spent a lot of time together, because when they first came into the institution we frankly didn't, you know, the regulators are always suspect, particularly of somebody on Wall Street.
We didn't know these people, and the fact that they had money at stake here, and we weren't very happy with the existing management.
Q Let me ask you this, as the principal regulator in the northeast region for quite some time, you had lots of and frequent occasion to review and assess management capacity. Is that true?
A Yes.
Q How would you rank Mr. Bianco and his colleagues in terms of management capacity and commitment?
A I would say in terms of, in all the years that I was in the regulatory area, thirty-two, these were as strong not only financially but in terms of their dedication and their diligence, this was for the time, for the

Page 107

situation, a workout, this was as good a team as you'd find.
Now, I don't know, with a lot of capital and no problems they might build the place up, but in terms of working out a very, very difficult financial situation in a very short period of time, they did more than I would have ever, ever expected to be done in a situation like this.
I mean, to get, to turn around this kind of an operation and to start showing some profits was a pretty monumental task in my view, so in a long-winded answer to your question, I found them to be a very, very strong workout team.
Q You just mentioned Carteret's turnaround in terms of profitability, and your memo states in the second paragraph here,
"Carteret recorded net income of $2.2 million for the fourth quarter 1991, exceeding its projected break-even results.
"Carteret's fourth quarter profit was attributable to aggressive expense reductions, improved mortgage banking revenues, better than projected asset dispositions and a generally favorable

Page 108

interest rate environment, which led to reduced deposit costs."
Your reference to generally favorable interest rate environment, is it true or do you recall whether by the date of this memo, around January 1992, that economic conditions generally for the thrift industry were starting to look a little more favorable?
A My best recollection is that at this point in time there were some signs that, small signs that economically things were starting to get a little bit better for thrifts.
I don't have any specific recollection of why, but it's just my general recollection that things very, very slowly were starting to move in a positive vein.
Q On the next page of the memo, really at the end of the carryover paragraph there, the statement is made, "It is our opinion that absent the need for significant additional valuation reserves, Carteret should be able to attain reasonable core profitability in 1992."
Do you recall what you based that opinion on?

Page 109

A No.
Q Was it in part the evidence that Carteret had been restored to at least initial profitability and that things were beginning to look more favorable in the industry generally?
MR. LEVITT: Only if he can remember.
A I don't really recall specifically. I don't think it had anything to do with any views about where the industry was going.
Q Okay.
A My recollection it was just based on what they had done in particular the fourth quarter and what, you know, what we thought the environment for them particularly was going forward.
Q In the next paragraph the statement is made, "In this regard, the bank's valuation allowances already represent 6.09 percent of total assets and 33.4 percent of criticized assets, the highest ratios in the northeast region and approximately triple the pure average for comparable size institutions nationally."
Do you recall why Carteret's

Page 110

valuation allowances were so high?

A They took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally.

Q Did you assess that as being a good thing, a prudent managerial approach?

A I think it was, as I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money that there was no surprises, other big writedowns subsequent to that.

On the other hand, as a consequence, it put them in a more difficult and worse regulatory posture in terms of their capital requirements, their capital position.

Q Because the writedowns eroded capital by a like amount, is that correct?

A Sure. But it was, as I recall, and the view of management, necessary to raise capital.

Page 111

Q In the next sentence there you state, "the combination of A, the bank's already sizable level of reserves; B, the fact that $1 million per month in additional reserves are included in Carteret's 1992 operating results," and I want to ask you to explain that B point that you made.

Was this with respect to Carteret's 1992 projections? Because this is a January 1992 document.

A I'm not following your question.

Q I'm just looking for an explanation, I'm not sure I understand the point stated here under letter B, "$1 million per month in additional reserves are included in Carteret's 1992 operating results."

Does that mean that Carteret, in their projections, projected that they would take additional reserves of $1 million a month throughout 1992 and nonetheless projected a profit despite that fact?

I'm trying to interpret that point. Is that an accurate interpretation?

A I think what this is says is despite the fact that we have a fairly highly reserved

Page 112

bank here, if they're going to take another, they're going to reserve another $1 million a month, that's going to add to this already very high loan loss reserve, and it's already factored into their operations, and even after this $1 million a month they're still anticipating running profits.

Q Okay. The sentence continues, "C, the ongoing conservative practice of allocating gains from sales of disposed troubled real estate back to general reserves instead of income."

Could you explain that point, please?

A When they were selling assets, and selling them above net book, they could have taken those gains and put them through profit and loss, and instead they took those gains and put them back into the loan loss reserves.

So they could have shown, they could have reflected stronger operating position, more profits, if they had done from an accounting point what was very acceptable.

Instead, they took a conservative position and continued to build the loan loss

Page 113

reserve position.

Q So the net income of $2.2 million for the fourth quarter of 1991 referred to on the first page of your memo would have been or could have been higher had Carteret decided to book those profits rather than plow them back into reserves?

A I believe so. I mean, I don't recall specifically what the number is, but based on my reading of this memo, that's probably the case.

Q Okay. You conclude that sentence with, "D, the very favorable track record already established by the troubled asset workout group make us optimistic that significant additional reserves are avoidable in 1992."

This favorable track record I take it is referring to the disposition of troubled assets by Mr. Moor and his workout team?

A Yes.

Q Now, in the next sentence you make specific reference to, I think to a writedown of assets.

The statement reads, "The aggressive assessment and reevaluation of Carteret's

Page 150

staff.
Q Do you know if Mr. Downey felt that Carteret should be closed at that time or be given more time?
A I think that my recollections of my conversations with John Downey around this point in time was that he was sympathetic to my view, but that the view of the Director and possibly some others at senior levels was that we had exhausted the time to allow the management of Carteret to find capital, and that they were never going to find capital, and that the only alternative we had was to transfer it to RTC.
Q What has happened in the thrift industry since the beginning of 1993?
A The ability to raise capital increased substantially. Institutions with low capital were able, particularly mutuals were able to raise capital in public markets.
Investors and investor groups were willing to put money into thrifts now. The economic environment changed. The financial environment changed.
Q Quite dramatically, did it not?
A I'd say quite dramatically over a

Page 151

three, four year period, because I think part of it was the consequence of the fact that the really hopelessly insolvent and very costly insolvencies have been cleared away and the economy was changing, rates were favorable, there was -- we came out of a recessionary time and the economy just got stronger and capital became more abundant and thrifts became in some circles the real darlings of investors.
Q The real estate market rebounded?
A The real estate market rebounded, yes.
Q Did that have a beneficial effect on the valuation of assets of thrifts?
A Sure. I think some investors felt that now there were bargains out there, that, you know, the real estate was going to come back, and rather than take losses now, big profits were potentially in these portfolios.
Q In your opinion, if Carteret had been given more time, do you believe it would have succeeded in its efforts to recapitalize and thus to survive?
MR. LEVITT: Objection as to relevance. You can answer.

Page 152

A My personal belief is that, yes, at some point in time they would have raised enough capital to restore viability in the institution.
Q If Carteret had survived and had continued to be managed by Mr. Bianco and his colleagues, do you believe that it would have benefited from the economic environment that has occurred in the thrift industry and more generally, as you've previously described, from 1993 on?
A Well, it's hard to crystal ball what someone is -- what's going to happen in the future. They had done a wonderful job in a very, very severe workout situation.
You know, I don't know what they would have done if they had raised capital and managed to operate in a very favorable economic environment.
You know, these people had been successful in all their business careers. I would suspect they would have been successful going forward, but that's crystal balling.
Q But you also are in a position of considerable knowledge and experience with respect to thrift management, and I'm just asking for your

Page 153

basic judgment based upon what you knew about Carteret and about its management and the conditions that prevailed in the industry.
MR. LEVITT: Again I object on relevance. You can answer.
A Again, these were people who had -- were outstanding businessmen, had done a great job here in a very short period of time, and, you know, if I was a betting man I'd say that they were going to be successful.
The economic times, if you look out there, I can point to institutions that recapitalized after Carteret was transferred and some of them are still around and are very successful, others were sold, you know, in a public sale to other institutions at great rewards to investors.
So, you know, if you want me to give you my personal judgment --
Q Yes, sir.
A I think they would have been very successful, very successful.
Q Do you recall that earlier we talked about and went through a comparison from I think the S-Memo of Carteret's capital profile with the

goodwill, supervisory goodwill, $150 million or so at that time, and without it.
If instead of having a $70 million deficit in tangible capital, negative tangible capital, Carteret had had $70 million or so in positive tangible capital at the time that it was seized, in your opinion, would it have been seized?
MR. LEVITT: Objection, calls for speculation. You can answer.
A I don't know. I'd have to -- probably not, but I'd have to look at the numbers and, you know, how -- where they measured up in terms of capital compliance and whether they could submit a business plan, a capital plan to recapitalize the institution internally.
I mean, we could accept capital plans. If they had that much capital they might have been able to give us a capital plan that reflected restoring capital through internal operations and maybe with only marginal or no outside capital.
I don't know, I'd have to look at those projections.
Q Well, if I ask you to assume for a



moment that Carteret, if Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?
A Probably not.
Q During your time at OTS and its predecessor agencies, how many seizures would you say you were involved in?
A Over what period?
Q The whole time.
A Thirty-two years?
Q Yes, sir.
A Both in Washington and in New York?
Q Scores, maybe?
A A couple of hundred.
Q Really?
A It was over 90, almost 100 institutions in the northeast region, you know, from FIRREA, late '80s.
Q That's in the late '80s.
A Yes.
Q Focusing on then just the late '80s, you say there's approximately a hundred or so?
A Yes, I think, yes. I once counted and I had ninety something. That's the whole



region, yes.
Q Can you recall a time when a thrift was seized that had positive tangible capital?
A Yes. I can't recall specifically, but it might have had a little bit of capital but it was going south, the losses, you know, would have dissipated it.
You know, if the losses are dissipating capital, we try to get there sooner rather than later, before all the capital has gone.
Q Can you recall a thrift that was seized that had positive tangible capital and was profitable and whose trends were profitable?
A I can't recall specifically any, that there were any in that condition.
Q Can you recall a thrift that satisfied or nearly satisfied its tangible capital requirement that was seized?
A No.
Q If Carteret in December of 1992, around the time it was seized, had satisfied or nearly satisfied its tangible capital requirement, do you believe that its ability to attract additional capital, additional investment, and



raise additional capital would have been very substantially enhanced?
MR. LEVITT: Objection, calls for speculation. You can answer.
A Regardless of the new capital rules, regardless of the new treatment of goodwill?
Q Yes, I'm asking if instead of having $70 million negative tangible capital, Carteret had positive $70 million of tangible capital and was effectively in compliance with its tangible capital requirement, could it have raised capital, in your opinion?
A Well --
Q Additional capital?
A In real economic terms it's the same institution. It's the same value, really.
I would say probably, you know, you're assuming that there's no -- that we still count goodwill.
So probably we could have had other institutions that would have acquired Carteret and would be taking on a little bit more goodwill, but if it was profitable and had some capital, I don't know whether it would have in fact at that point in time attracted capital. That's speculation on

Page 158

my part.
But realistically it's the same institution financially and economically, whether you allow the goodwill or you don't allow the goodwill.
Q Let me ask it in this way. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion?
A No.
Q Would Carteret have been able to attract additional capital in that condition, in your opinion?
A I would say it would be very likely that they could attract more capital.
Q If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing it's not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized, in your opinion?
MR. LEVITT: Objection, asked and answered.

Page 159

THE WITNESS: Would you read that question back.
(The question requested was read back by the reporter.)
A I don't follow that question. It's cash, I mean, it's real capital. We're talking about an intangible. It just --
Q I understand.
A It's an accounting number, not even -- it's not real, it has no return. I mean, cash can be invested for a return.
Q Yes.
A So your question isn't -- it's not realistic.
Q Let me come at it --
A My apologies, but that's not a realistic question.
Q Let me come at it this way.
If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
A No.

Page 160

MR. COOPER: We're at a convenient stopping point if you want to take five or ten minutes, because I think I may be thirty minutes or so away from the end of my questioning.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Vigna, do you recall that AmBase was called upon by the regulators to perform under the RCMA that we reviewed earlier, the regulatory capital maintenance agreement that was executed by --
A Yes.
Q So I'm clear, do you recall that AmBase was called upon to perform under that RCMA?
A Yes, I do have a recollection of that.
Q What do you recall?
A I don't recall the details, just that there was a capital maintenance agreement of some sort and that we did put -- make a call on it.
Q Do you recall what general time frame the initial performance under that RCMA took

Page 161

place?
A No.
Q Do you recall that performance under the RCMA came in two different capital contributions, an initial $20 million one and then a subsequent $30 million capital contribution?
A No, I don't have any specific recollection of that.
Q Let's see if this document helps to refresh your recollection.
MR. COOPER: I'd ask the court reporter to mark as Exhibit 13 a one page document Bates stamped OAM 0040077.
(The above-described document was marked Vigna Exhibit 13 for identification, as of this date.)
Q Would you identify this document, please?
A It's a letter from Joseph P. Kehoe, the OTS Assistant Director, to Bruce Bean, acknowledging receipt of his letter to the effect that AmBase had contributed $20 million in cash to Carteret.
Q Does that refresh your recollection about a $20 million capital contribution in this

Page 158

my part.

But realistically it's the same institution financially and economically, whether you allow the goodwill or you don't allow the goodwill.

Q Let me ask it in this way. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion?

A No.

Q Would Carteret have been able to attract additional capital in that condition, in your opinion?

A I would say it would be very likely that they could attract more capital.

Q If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing it's not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized, in your opinion?

MR. LEVITT: Objection, asked and answered.

Page 159

THE WITNESS: Would you read that question back.

(The question requested was read back by the reporter.)

A I don't follow that question. It's cash, I mean, it's real capital. We're talking about an intangible. It just --

Q I understand.

A It's an accounting number, not even -- it's not real, it has no return. I mean, cash can be invested for a return.

Q Yes.

A So your question isn't -- it's not realistic.

Q Let me come at it --

A My apologies, but that's not a realistic question.

Q Let me come at it this way.

If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?

A No.

Page 160

MR. COOPER: We're at a convenient stopping point if you want to take five or ten minutes, because I think I may be thirty minutes or so away from the end of my questioning.

(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)

Q Mr. Vigna, do you recall that AmBase was called upon by the regulators to perform under the RCMA that we reviewed earlier, the regulatory capital maintenance agreement that was executed by --

A Yes.

Q So I'm clear, do you recall that AmBase was called upon to perform under that RCMA?

A Yes, I do have a recollection of that.

Q What do you recall?

A I don't recall the details, just that there was a capital maintenance agreement of some sort and that we did put -- make a call on it.

Q Do you recall what general time frame the initial performance under that RCMA took

Page 161

place?

A No.

Q Do you recall that performance under the RCMA came in two different capital contributions, an initial $20 million one and then a subsequent $30 million capital contribution?

A No, I don't have any specific recollection of that.

Q Let's see if this document helps to refresh your recollection.

MR. COOPER: I'd ask the court reporter to mark as Exhibit 13 a one page document Bates stamped OAM 0040077.

(The above-described document was marked Vigna Exhibit 13 for identification, as of this date.)

Q Would you identify this document, please?

A It's a letter from Joseph P. Kehoe, the OTS Assistant Director, to Bruce Bean, acknowledging receipt of his letter to the effect that AmBase had contributed $20 million in cash to Carteret.

Q Does that refresh your recollection about a $20 million capital contribution in this