IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION, et al.

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

October 15, 1999

8:30: a.m.

200 Park Avenue

New York, New York

DEPOSITION of ROBERT ALBANESE, a witness in the above entitled matter, before a Notary Public of the State of New York

138

date.

"Frankly we did not view the transfer date, whether it was November 20, December 4 or January 4th, to be a critical factor in our analysis of the situation."

Now, at the beginning of that paragraph you say the institution's financial condition continued to improve.

In what way, do you recall how it continued to improve?

A My recollection generally is that it continued to be more profitable as time went on, and the problem assets continued to decline. Those are the two things I remember.

Q I take it also that the as time went on during it period, the economy generally for thrift businesses was improving as well, is that true?

A Again, based upon what you showed me before, that would be a fact, I don't know whether I factored that into the thinking then when I wrote this.

I believe I was focused more on the critical factors that we looked at while an institution was still open, I don't know if I

139

would have factored that into my thinking.

Q Really?

A I may have, but -- I don't recall that being -- I do recall those two other things.

Q Would it be fair to say that improvement in a general climate of industry improvement might be more meaningful than some idiosyncracy of a thrift institution that was going against the otherwise trend?

A I wouldn't necessarily agree with that. We have situations where the economy is improving, interest rates are coming down and institutions are going to hell in a handbasket.

Q And you say that, "supervisory risk of loss, while it remained open, was very low."

Again, is that because -- well, just could you elaborate on that?

A Well, our view was that the institution was profitable, it was improving and that a lot of the trends that we look at were going in the right direction, and so that the likelihood of a costly failure was not great, we didn't see anything that would create that scenario, other than the fact that the institution was very thinly capitalized.

140

But the trends were very positive, so we -- that must have been, that's my thinking now, I think that was my thinking then.

Q Is it accurate that if the trends that you cite here continue, that the risk of loss to the insurance fund would continue to be diminished as long as the thrift improved?

A That's a big if, though.

The flip side of this, is that different people viewed this and different people had different views.

I mean obviously I wrote this, obviously we felt that way.

Other people perceived the risk, higher levels in the organization differently, and that because the institution is thinly capitalized, there is so little margin for error, if we as a supervisory group miss something and something negative were to happen, then perhaps we wouldn't be correct in our view, and that's the way the process works; we make the recommendation, somebody else goes, makes the decision.

Our view was that clearly and my view was, I wrote the memo, that the risk of loss was low and that the situation was improving.

141

Obviously if the profitability continued to improve and the problem assets continued to decline, which probably would enhance profitability, and nothing else unforeseen happened, given the tenuous capital position of this institution, negative happened, then I would say your statement is correct. But it's somewhat complicated.

Q This makes reference to the perceived benefit of an early transfer date.

Do you know what perceived benefit might have been in the minds of anyone interested in seizing the institution?

A I don't know why I wrote that that way. I could speculate, but that would be speculation.

Q Let me ask you this, what are the costs of transferring an institution to the RTC -- of placing an institution in receivership?

A Well, the costs of actually doing the action isn't very great, there are obviously costs subsequent to the transfer of running the institution, the number of employees you need to run the institution.

The other costs that has been

to be managed by Mr. Bianco and his colleagues, do you believe that it would have prospered in the economic environment that has prevailed since the end of 1992?

MS. TORNATORE: I will object as to speculation. You may answer to the extent you think you can.

A I think I could say that as I have said repeatedly, that we viewed this institution as being well run, and as an institution, a management team that was making progress.

I know of -- to take the other side, I do know of well run institutions that didn't do too well during good times, so you can't say with absolute certainty what would have happened, I certainly can't speculate on that.

Q I am just asking for your best judgment.

A My opinion is that it was a good management team, and a good management team and a good economy ought to be able to do pretty well.

Whether they would have prospered, I think that's -- what is prospered? They would have survived probably? Yes.

Q Do you recall how much the capital



deficit, and now I will just confine the question to the tangible capital deficit of Carteret was at this time, the time it was seized?

A No. Frankly I didn't even think it was negative, but I think it was below the minimum, but I don't recall, actually.

The deficit, I am talking about negative capital, not negative to the requirement.

Q Yes, I am talking, and my question is and I guess my representation is that its regulatory capital was negative?

A Okay.

Q Deficit?

A I don't recall.

Q I am just wondering if you recall.

A No.

Q So you don't recall what it's capital snapshot was at the time, so to speak?

A No.

Q Let me ask the question this way, if Carteret had satisfied at that time its tangible capital requirement, whatever that might have been, let's just say for purposes of this question that it was a $70 million tangible capital requirement, if they had satisfied that, do you



believe that Carteret would have been able to attract an investor to make up the much smaller difference that was then needed?

Do you understand my question?

A No, I don't. If you are asking me if they had a smaller hole to fill was somebody more likely to step in?

Q That's essentially what I am asking you, yes.

A I think that that pretty much goes without saying, for them and any other institution.

Q Do you believe that Carteret would have been seized if they had satisfied their -- its tangible capital requirement rather than having had, as it did, a tangible capital deficit?

A No.

Q If the OTS and the other regulatory authorities had in good faith at this time recognized Carteret's supervisory goodwill as regulatory capital no different from cash, do you believe that Carteret would have been seized at this time?

A You are saying if the supervisory goodwill was not eliminated, therefore bringing



that ratio way down and therefore they would have had somewhere in the neighborhood of 5 percent, based upon the numbers you showed me before?

Q It was actually 3.5, based upon those earlier numbers?

A If that supervisory goodwill was sufficient for them to meet the minimum capital requirements -- let me put it another way -- if the elimination -- if we did not eliminate the goodwill?

Q Yes, that's it.

A If they had enough that their tangible capital requirement would have been met, I think it gets back to your earlier question, I don't think they would have been seized.

Q Did the regulators ever consider infusing some of their own money into this thrift?

A While it was open?

Q Yes, I think that there were programs called open thrift assistance, and frankly I'm not specifically acquainted with them, I am sure you are.

A You are sure.

Q Do you recall if any consideration was given to possibly assisting a transaction in