# Financial Markets and Institutions

## A Modern Perspective

Anthony Saunders • Marcia Millon Cornett



**Table 12–2** Balance Sheets of Savings Associations (percentage of total assets and liabilities)

| Item | 1977 | 1982 |
|---|---|---|
| **Liabilities** | | |
| Fixed ceiling liabilities | 87.3% | 22.0% |
| Passbook and NOW accounts | 33.9 | 15.6 |
| Fixed ceiling time deposits | 53.4 | 6.4 |
| Market ceiling small time deposits | 0.0 | 52.8 |
| Money market certificates | 0.0 | 28.6 |
| Small saver certificates | 0.0 | 19.3 |
| Other small time deposits | 0.0 | 4.9 |
| Discretionary liabilities | 8.6 | 23.2 |
| Large time deposits | 2.1 | 8.1 |
| FHLB advances | 4.7 | 10.3 |
| Other borrowings | 1.8 | 4.6 |
| Other liabilities | 4.0 | 2.0 |
| **Assets** | | |
| Mortgage assets | 86.0 | 81.1 |
| Fixed rate | 86.0 | 74.9 |
| Adjustable rate | 0.0 | 6.2 |
| Nonmortgage loans | 2.3 | 2.6 |
| Cash and investments | 9.2 | 11.2 |
| Other assets | 2.5 | 5.1 |

**Source:** *Federal Reserve Bulletin*, December 1982. *www.federalreserve.gov*

NOW accounts, and to issue more market rate–sensitive liabilities such as money market deposit accounts (MMDAs) to limit disintermediation and to compete with mutual funds. On the asset side of the balance sheet, they were allowed to offer floating- or adjustable-rate mortgages and, to a limited extent, expand into consumer real estate development and commercial lending. Note the structural shifts in savings association balance sheets between 1977 and 1982 in Table 12–2. For many savings associations, the new powers created safer and more diversified institutions.

For a small but significant group, however, whose earnings and shareholders' capital was being eroded in traditional areas of asset and liability business, the new regulations meant the opportunity to take more asset side risks which, if they paid off, could return the institution to profitability. However, in the mid-1980s, real estate and land prices in Texas and the Southwest collapsed. This was followed by economic downturns in the Northeast and Western states of the United States. Many borrowers with mortgage loans issued by savings associations in these areas defaulted. In other words, the risks incurred by many of these institutions did not pay off. This risk-taking behavior was accentuated by the policies of the federal insurer of savings associations' deposits, FSLIC. It chose not to close capital-depleted, economically insolvent savings associations (a policy of **regulator forbearance**) and to maintain deposit insurance premium assessments independent of the risk taken by the institution (see Chapter 14). As a result, an alarming number (1,248) of savings association failures occurred in the 1982–1992 period (peaking at 316 in 1989), alongside a rapid decline in asset growth of the industry. Figure 12–2 shows the number of failures, mergers, and new charters of **savings institutions** (savings associations and savings banks combined) from 1984 through 2001. Notice the large number of failures from 1987 through 1992 and the decline in the number of new charters.

**regulator forbearance**

A policy not to close economically insolvent FIs, allowing them to continue in operation.

**savings institutions**

Savings associations and savings banks combined.

In the 1980s, the large number of savings association failures depleted the resources of the FSLIC to such an extent that by 1989 it was massively insolvent. For

**Figure 12-2** Structural Changes in the Number of Savings Institutions, 1984–2001




**Source:** Federal Deposit Insurance Corporation, *Quarterly Banking Profile,* Fourth Quarter 1994 and 2001, and *Historical Statistics,* various years. *www.fdic.gov*

**QTL test**

Qualified thrift lender test that sets a floor on the mortgage-related assets that thrifts can hold (currently, 65 percent).

example, between 1980 and 1988, 514 thrifts failed, at an estimated cost of $42.3 billion. Moreover, between 1989 and 1992 an additional 734 thrifts failed, at a cost of $78 billion. As a result, Congress passed an additional piece of legislation: the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989. This legislation abolished the FSLIC and created a new savings association insurance fund (SAIF) under the management of the FDIC (with the help of a $100 billion infusion of funds by the U.S. government). FIRREA also replaced the Federal Home Loan Bank Board with the Office of Thrift Supervision (OTS) as the main regulator of federally chartered savings associations. In addition, the act created the Resolution Trust Corporation (RTC) to close and liquidate the most insolvent savings insitutions.[3] The FIRREA also strengthened the capital requirements of savings associations and constrained their non-mortgage-related asset investment powers under a revised qualified thrift lender test, or **QTL test** (discussed below). Following FIRREA, Congress further enacted the Federal Deposit Insurance Corporation Improvement Act (FDICIA). The FDICIA of 1991 introduced risk-based deposit insurance premiums (starting in 1993) in an attempt to limit excessive risk taking by savings association owners. It also introduced a prompt corrective action (PCA) policy, such that regulators could close thrifts and banks faster (see Chapter 14). In particular, if a savings association's ratio of its owners' equity capital to its assets fell below 2 percent, it had to be closed down or recapitalized within three months.

3. At the time of its dissolution in 1995, the RTC had resolved or closed more than 700 savings associations and savings banks at an estimated cost of $200 billion to U.S. taxpayers.