**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AMBASE CORPORATION and CARTERET BANCORP, INC.** | ) | |
| **Plaintiffs,** | ) | |
| **FEDERAL DEPOSIT INSURANCE CORP., Successor to the rights of CARTERET SAVINGS BANK, F.A.** | ) | **Case No. 93-531C** **Senior Judge Smith** |
| **Plaintiff Intervenor** | ) | |
| **v.** | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**FDIC'S STATEMENT WITH REGARD TO SUMMARY JUDGMENT**

**Federal Deposit Insurance Corporation**
**Legal Division**
**Andrew C. Gilbert**
***Counsel of Record***
***for Plaintiff-Intervenor***
**550 Seventeenth Street, NW, MB-3060**
**Washington, DC 20429**
**(202) 898-3871**
**agilbert@fdic.gov**

**Of Counsel:**

**John V. Thomas**
***Deputy General Counsel***
**D. Ashley Doherty**
***Counsel***

**November 7, 2007**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

FDIC'S STATEMENT WITH REGARD TO SUMMARY JUDGMENT ........ 1

ARGUMENT ........ 3

I. Issues Relating to The Receivership Deficit Are Premature ........ 3

A. The Receivership Deficit Is Relevant Only to Justiciability ........ 3

B. Justiciability Is Not Currently At Issue ........ 4

II. Future Evidentiary Issues Can Be Decided on Summary Judgment ........ 7

A. Which Elements Will Flow to the "Coffers of the Government"? ........ 7

B. Which Elements of the Receivership Deficit Are Insufficiently Final for Justiciability? . 8

III. Substantive Review of Carteret's Receivership Deficit Is Inappropriate ........ 9

A. Attacks on Congressional Action Are Damages Claims against the Government ........ 10

B. FDIC-R's Past and Future Conduct Is Not Reviewable Here on the Merits ........ 11

C. FDIC-C Polices Are Not Reviewable Here on The Merits ........ 13

IV. The Damages Claim Here Belongs to the FDIC-R ........ 14

V. Unless Justiciability Issues Are Deferred, The Pre-Trial Schedule Should Be Adjusted.... 15

CONCLUSION ........ 16

CERTIFICATE OF FILING ........ 18

ATTACHMENT A ........ 19

# TABLE OF AUTHORITIES

## Cases

AmBase Corp. v. United States, 58 Fed. Cl. 32 (2003) ........................................................ 4, 15

AmBase Corp. v. United States, 61 Fed. Cl. 794 (2004) .................................................... passim

American Capital Corp. v. FDIC, 472 F.3d 859, 867 (Fed. Cir. 2007) ...................................... 15

Bailey v. United States, 341 F.3d 1342 (2003) ......................................................... 3, 7, 8

Bennett v. Coors Brewing Co., 189 F.3d 1221, 1238 (10th Cir. 1999) ......................................... 5

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 658 (2003) ................................. 5

First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1287 (1999).......... 15

Glidden v. Zdanok, 370 U.S. 530, 557 (1962) ......................................................................... 11

Hall v. United States, 69 Fed. Cl. 51, 56 (2005) .................................................................... 13

In re . Milwaukee, St. Paul & Pacific Railroad Co., 701 F.2d. 604 (7th Cir. 1983) ............... 12, 13

In re Bean, 252 F.3d 113, 117-118 (2nd Cir. 2001) ..................................................................... 5

Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003 ........................................................ 13

McNabb v. United States, 54 Fed. Cl. 759 (2002) .................................................................... 13

MedImmune, Inc. v. Genentech, Inc., -- U.S --, 127 S.Ct.764, 771 (2007) ................................ 12

Ross v. Bernhard, 396 U.S. 531, 538 (1970) ............................................................................ 15

Suess v. United States, 33 Fed. Cl. 89 (1995) ............................................................................ 9

Suess v. United States, 74 Fed. Cl. 510, 516 (2006) ............................................................. 6, 9

Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.,
482 F.3d 1330, 1336 (Fed. Cir. 2007) ........................................................................... 12

Texas v. United States, 523 U.S. 296, 300 (1998) ...................................................................... 5

Trek Leasing, Inc. v. United States, 62 Fed. Cl. 673 (2004) ..................................................... 13

United States v. King, 395 U.S. 1, 3 (1969) .............................................................................. 11

**Statutes**


12 U.S.C. § 1441a(m)(2)........ 15

12 U.S.C. § 1821(d)(13)(D)........ 11

12 U.S.C. § 1821(j)........ 11

12 U.S.C. § 1821a(a)(1-2)........ 15

28 U.S. C. § 2503(b)........ 6

5 U.S.C. §§ 701 et seq........ 13


**Other Authorities**


Amended Order, AmBase Corp. v. U.S., No. 93-531C (Apr. 13, 2007)........ 5

Order, AmBase Corp. v. United States, No. 93-531C (Dec. 13, 2006)........ 5

Order, United States v. Federal Deposit Insurance Corporation, No. 02-1427 (D.D.C., May 2, 2006)........ 10


**Rules**


Fed. R. Evid. 402........ 6

Fed. R. Evid. 401........ 6

Fed. R. Evid. 401, cmt. (1972 Prop. Rules)........ 6

R. Ct. Fed. Cl. 57, cmt. (2002 Rev.)........ 11


**Treatises**


C. Callen, "Rationality and Relevancy: Conditional Relevancy and Constrained Resources," 2003 Mich. St. L. Rev. 243 (2003)........ 6

C.A. Wright, et al., 13A *Fed. Prac. & Proc. Juris. 2d*. § 3532 (2007)........ 5, 6

J.W. Moore, et al., 5 *Moore's Federal Practice* § 23.1.02[1](3d. ed. 2005)........ 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AMBASE CORPORATION and CARTERET BANCORP, INC.** | ) | |
| **Plaintiffs,** | ) | |
| **FEDERAL DEPOSIT INSURANCE CORP., Successor to the rights of CARTERET SAVINGS BANK, F.A.** | ) | **Case No. 93-531C** **Senior Judge Smith** |
| **Plaintiff Intervenor** | ) | |
| **v.** | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**FDIC'S STATEMENT WITH REGARD TO SUMMARY JUDGMENT**

Plaintiff-Intervenor Federal Deposit Insurance Corporation ("FDIC-R"), successor to the rights of the former Carteret Savings Bank, F.A. ("Carteret" or "the Thrift"), submits this statement pursuant to the Court's Trial Scheduling Order ("TSO") of April 13, 2007. The TSO ordered the parties to submit their positions with regard to "whether the trial schedule [set forth in the TSO] can be avoided by summary judgment."

This statement addresses the question of whether and when it would be profitable for the Court to entertain summary judgment motions relating to justiciability, and, in connection therewith, Carteret's projected receivership deficit. After a lengthy discovery and briefing process, this Court recently found that the case is currently justiciable. Therefore, both trial and summary judgment motions on that topic are premature and inappropriate at this time.

The projected receivership deficit will become relevant to this goodwill contract case if, and only if, a question arises in the future as to whether this case continues to be justiciable. That question will arise if, and only if, this Court awards damages in an amount *less* than the projected receivership deficit. At that time, the question of justiciability would then be ripe for decision.

The issue before the Court at that time will not be what the receivership deficit "should" be. Rather, it will be an *evidentiary* issue: whether the Government can produce evidence, sufficient in quantity and weight, to show that damages due are less than the amount of money that would ultimately flow back to the United States Treasury via payment of claims against the Carteret receivership. Whether the Government has produced sufficient evidence to show how much money FDIC-R is likely to pay to Treasury is a question that can, when and if necessary, be resolved by summary judgment.

Neither trial nor summary judgment will ever be appropriate in this case with respect to conduct of the Resolution Trust Corporation in resolving Carteret, the past conduct of FDIC-R in resolving the Carteret estate, the anticipated conduct of FDIC-R with respect to payment of claims against the Carteret estate, or the conduct of the Federal Deposit Insurance Corporation acting in its corporate capacity ("FDIC-C") in adopting various policies. Those issues are outside the jurisdiction of this Court.[1]

[1] The Shareholder-Plaintiffs have contended that the FDIC "explicitly concedes" that "this Court has jurisdiction to consider Carteret's claims for damages." AmBase Statement of Issues Reply Brief at 1 (Oct. 19, 2006). If this is meant to imply that FDIC-R concedes jurisdiction in this Court to adjudicate the conduct of FDIC in any capacity, it is mistaken. The FDIC's statement that "there is no reason to treat the FDIC's current estimates of the receivership's ultimate tax liability as dispositive" refers, as was clear in context, only to the evidentiary weight and probative value of those "current estimates." FDIC's Response to AmBase's Statement of Issues at 19-20 (Sept. 13, 2006). The statement in no way constitutes a concession that FDIC's ultimate tax liability, or any other element of the projected receivership deficit, is an appropriate issue for decision in this case, which they are not.

# ARGUMENT

## I. Issues Relating to The Receivership Deficit Are Premature

### A. The Receivership Deficit Is Relevant Only to Justiciability

This Court has determined that it "must carefully review the receivership deficit to permit inclusion of only those costs which are legitimately part of the receivership deficit." AmBase Corp. v. United States, 61 Fed. Cl. 794, 802 (2004). As the Court further noted, "[t]his leaves, of course, the logistical question of how to conduct such a review." Id.

At the present time, there is no basis for reviewing the receivership deficit by means of either summary judgment or trial. As this Court has stated, the significance of the receivership deficit in goodwill cases is that it is relevant to whether claims should be dismissed "for lack of Article III standing as an intra-governmental dispute." Id. at 801, discussing Bailey v. United States, 341 F.3d 1342 (2003). Specifically, a goodwill case presents "a nonjusticiable intra-governmental dispute" if the size of the award "recovered from the government by the FDIC" is less than the FDIC's subrogated claim, such that the entire damages award "would flow to the [FSLIC Resolution Fund], from one government coffer to another." Id., quoting Bailey, 341 F.3d at 1346.

The Shareholder-Plaintiffs appear to argue that this Court should determine the "proper calculation and size of the receivership deficit" even if it awards damages in an amount *greater* than the projected receivership deficit. Plaintiffs' Reply in Support of Their Motion for Entry of an Order Setting Pretrial Schedule at 8 (Mar. 26, 2007)("SHP Reply").[2] They assert that this is

---

[2] The Shareholder Plaintiffs emphasize that "the receivership deficit at the time of any award effectively reduces any damages recovery by the shareholders of the thrift." SHP Reply at 8. That stockholders will receive distributions from the receivership estate only after creditors are paid in full does not affect the justiciability of the case. Therefore, it cannot justify inquiry by this Court into "the specifics of the receivership."

appropriate because "the receivership deficit at the time of *any* award effectively reduces *any* damages recovery by the shareholders of the thrift." Id. (emphasis added).

Given that any damages awarded in this case must be paid to FDIC-R, and that other claims with statutory priorities higher than those of the Shareholder-Plaintiffs are pending against the Carteret receivership, Shareholder-Plaintiffs can indeed expect ultimately to receive less than 100% of damages awarded here. That is, of course, merely a function of the fact that this is, as this Court has previously held, a shareholder-derivative case. AmBase Corp. v. United States, 58 Fed. Cl. 32, 52, 54 (2003)(shareholder plaintiffs pursue Carteret's breach of contract claim derivatively). It does not change the fact that the only relevance of the size of the projected receivership deficit here is to the issue of justiciability.

B. Justiciability Is Not Currently At Issue

Since the receivership deficit is relevant here only for purposes of comparison to a damages award, this Court originally saw "no reason" for it to "pursue any inquiry" in this case "into the specifics of the receivership until at least such time as there is a decision that some damages must be awarded." AmBase Corp. v. U.S., 61 Fed. Cl. at 802. Two years later, the Government challenged the continued justiciability of the case, arguing that "any recovery on Carteret's contract claim will flow to the United States and the case is moot" and should therefore be dismissed. Government Response to AmBase's Statement of Issues at 6 (August 30, 2006). This Court rejected that argument, however, and found that "the case is justiciable at this time." Amended Order, AmBase Corp. v. U.S., No. 93-531C (Apr. 13, 2007); see also Order, AmBase Corp. v. United States, No. 93-531C (Dec. 13, 2006).

No challenge to the justiciability of the case is currently pending. Nor has the most recent round of discovery produced evidence indicating that the case has become non-justiciable. To the

contrary, the Shareholder-Plaintiffs' experts now calculate damages ranging from $785 million to over $8 billion dollars. An award of an amount anywhere on this continuum would greatly exceed Carteret's total net receivership deficit, which was last projected at $299.7 million (including taxes), as of year-end 2006.[3] Moreover, as discussed below, discovery has clarified the fact that currently projected estimate of income taxes that will ultimately be paid by the receivership is so highly contingent that it should be disregarded for purposes of determining justiciability. Therefore, the question of justiciability is not currently at issue.

Whether the case continues to be justiciable depends upon "the outcome of another as-yet undecided issue", viz., damages; for now, therefore, the issue of justiciability continues to be premature. C.A. Wright, et al., 13A *Fed. Prac. & Proc. Juris. 2d*. § 3532 at 114 (2007), citing In re Bean, 252 F.3d 113, 117-118 (2nd Cir. 2001)(issue of whether bankruptcy trustee's compensation should be offset did not present "real controversy" until after bankruptcy court had passed on trustee's fee application); Bennett v. Coors Brewing Co., 189 F.3d 1221, 1238 (10th Cir. 1999)(prior to determination of whether plaintiffs' releases were valid, attorneys' fees provision therein was not ripe for review). In fact, the issue of justiciability is not merely premature: it is "not ripe for judicial review" since "it is premised upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 658 (2003), quoting Texas v. United States, 523 U.S. 296, 300 (1998). Moreover, it may never be mature or ripe for decision: as this Court has recognized, "[i]f, after trial, it is determined that no damages are to be awarded, it will render the present question moot." AmBase Corp. v. United States, 61 Fed. Cl. at 802.

[3] Goodwill Financial Reporting Package-Carteret Federal Savings Bank (Mar. 23 2007), a copy of which is attached hereto as Exhibit A.

"Evidence which is not relevant is not admissible" at trial. Fed. R. Evid. 402.[4] Relevant evidence is

> evidence having any tendency to make the existence of any fact that *is* of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 401 (emphasis added). There is no provision for admission of evidence with respect to facts that *may be* "of consequence to the determination of the action." As the drafters of the Federal Rules of Evidence note, relevance exists "only as a relation between an item of evidence and a matter properly provable in the case." Fed. R. Evid. 401, cmt. (1972 Prop. Rules). Matter that *may be* "properly provable," depending on the outcome of the case, is not relevant.[5]

Consideration now of the future justiciability of this case, including inquiry into the "specifics of the receivership deficit," would not result in judicial or other economies. Rather, it would "dissipate judicial energies better conserved for litigants who have a real need for official assistance," as well as forcing parties "to bear the burdens of litigation without substantial justification" and to "grapple with hypothetical possibilities rather than immediate facts." 13A *Fed. Prac. & Proc.* § 3532.1 at 114. In another goodwill case, this Court was led to believe, at the time of its decision on damages, that "the receivership deficit *would be* a negative number and thus valueless." Suess v. United States, 74 Fed. Cl. 510, 516 (2006)(emphasis added). However, as this Court noted, this "did not [a]ffect the government's liability for the breach." Id. Therefore, the case went forward, through the damages trial and damages decision, despite uncertainty with respect to future justiciability. Here, where there is currently no pending

---

[4] "The proceedings of the Court of Federal Claims shall be . . . in accordance with the Federal Rules of Evidence." 28 U.S.C. § 2503(b).

[5] Such evidence does not fall within the definition of evidence the relevancy of which is "conditioned on fact." Fed. R. Evid. 104(b). Such evidence is evidence whose relevance is dependent on the introduction of other evidence, not on the outcome of the trial. Id. "Trial judges generally limit their application of conditional relevancy to a few sorts of problems, such as authentication, proof of notice or knowledge, admissibility of prior wrongs or acts under Federal Rule 404(b), and personal knowledge of witnesses." C. Callen, "Rationality and Relevancy: Conditional Relevancy and Constrained Resources," 2003 Mich. St. L. Rev. 1243, 1253 (2003); see also id. at 1297.

challenge to justiciability of this case, nor evidence currently indicating that justiciability is questionable, the same procedure should be followed.

II. Future Evidentiary Issues Can Be Decided on Summary Judgment

If damages eventually awarded are less than the projected receivership deficit, the Government can be expected to argue that the case has become non-justiciable. It can also be expected to proffer the then-current Carteret goodwill financial reporting package as evidence in support of that proposition.

A. Which Elements Will Flow to the "Coffers of the Government"?

At that time, the first question before the Court will be which elements of the total projected receivership deficit should be considered for the purposes of determining justiciability. In the Bailey case, the Court did not hold that the damages award should be compared to the entire "receivership deficit" of $68.2 million. Rather, it held that the "subrogated claim owned by the [FSLIC Resolution Fund]" of $66 million was the relevant comparison. Bailey v. United States, 341 F.3d at 1346. The subrogated claim was a claim "for funds provided to cover deposit liabilities" that the receivership had been unable to repay out of recoveries on assets. Id. The rationale for the Court's decision was that "the FRF's subrogated claim of $66 million" would exceed the "maximum potential damages award of $64 million" and thus "any damage award . . . would flow to the FRF." Id.

In reaching the decision that Bailey was non-justiciable, the court in that case did not take into account either "expenses, including FDIC operating expenses, and taxes," or interest, which brought the receivership deficit to "$71.1 million as of December of 200." Bailey, 341 F.3d at 1344-45. The logical inference is that, for the purposes of determining justiciability, it is appropriate to consider the various elements of a receivership deficit, rather than considering it *in*

*toto*. If justiciability becomes an issue after the damages trial, the question of which elements of the total receivership deficit are relevant to the issue of justiciability can be decided by summary judgment.

At that time, the first question before the Court will be which elements of the total projected receivership deficit will never be relevant to justiciability: that is, which elements will, if paid, *not* result in the flow "from one government coffer [i.e., the FSLIC Resolution Fund] to another." Bailey, 341 F.3d at 1346. An obvious category is amounts owed to third-party creditors of the receivership, together with the interest owed thereon. Payment of those amounts would flow to those creditors, not to the U.S. Treasury. If and when justiciability becomes an issue again, this should be demonstrable on summary judgment.

B. Which Elements of the Receivership Deficit Are Insufficiently Final for Justiciability?

When and if it becomes necessary for this Court to re-examine justiciability, the second question will be what weight should be given to evidence proffered by the Government. For example, income taxes, a primary component of the total projected net receivership results, will, if ever paid, flow to the U.S. Treasury. However, it is almost certain that the Government will be unable to submit evidence of the amount of a future tax payment that will be sufficiently probative for the purposes of determining justiciability. The estimates of Carteret's future tax liability contained in the goodwill financial reporting package are contingent in the extreme. As the FDIC has consistently stated, "[t]he amount of taxes, penalties, and interest, if any, due to the IRS has not been finally determined." Response of Plaintiff Federal Deposit Insurance Corporation to AmBase's Motion to Dismiss the FDIC (Fed. Cl. Sept. 30, 2003); see also FDIC's Response to AmBase's Statement of Issues at 19 (Sept. 13, 2006).

As in other goodwill cases, the ultimate tax liability of the Carteret receivership is dependent both upon a substantial award of damages and upon the results of negotiations with the Internal Revenue Service. See, e.g., Suess v. United States, 33 Fed. Cl. 89 (1995); Suess v. United States, 52 Fed. Cl. 221 (2002); Order, United States v. Federal Deposit Insurance Corporation, No. 02-1427 (D.D.C., May 2, 2006)(approving tax settlement). The estimate of the Carteret receivership's potential future tax liability that is set forth in the Carteret goodwill reporting package should thus be disregarded for the purposes of determining justiciability. If the Government contends otherwise, this evidentiary issue will be suitable for summary judgment.[6]

In sum, only amounts that are both reasonably certain *and* reasonably certain to flow back to the "coffers of the Government," such as the outstanding principal on the subrogated deposit resolution loan, should be considered for the purpose of determining continued justiciability. Elements of the receivership deficit that will go elsewhere (e.g., to third-party creditors) or that are not final should not be included in the justiciability calculation. Which elements fall into that category should be determinable by summary judgment, if and when justiciability becomes an issue.

## II. Substantive Review of Carteret's Receivership Deficit Is Inappropriate

Anticipating a future Government challenge to justiciability, the Shareholder-Plaintiffs have already challenged estimates of other elements of the receivership deficit. Those challenges fall into three broad categories:

[6] The issue of whether the Carteret receivership's ultimate tax liability can be projected with sufficient certainty to be relevant for justiciability purposes is different from the issue of whether any damages award in this case should be "grossed up" to reflect tax consequences. See Suess v. United States, 74 Fed. Cl. 510, 515 (2006)(denying, as premature, a gross-up for taxes expected to be paid on damages award).

(a) attacks on Congressional action, such as the alleged failure adequately to fund the RTC, which allegedly reduced the value of the Carteret receivership and created a need to borrow, and the enactment of the Minority Preference Program;

(b) attacks on the conduct of FDIC as receiver, such as the sale of Carteret Mortgage Company, which was allegedly a bad business decision; and

(c) attacks on policies established by the FDIC acting in its corporate capacity ("FDIC-C"), including policies relating to tax accounting, post-insolvency interest, allocation of administrative and litigation expenses, and establishing and carrying out a Minority Preference Program, allegedly in violation of the Constitution and economic rationality.

A. Attacks on Congressional Action Are Damages Claims against the Government

The Shareholder-Plaintiffs' attacks on Congressional action, particularly its alleged failure adequately to fund the RTC, are misstated as challenges to elements of the receivership deficit. In reality, these attacks are contentions that, in a "but for" world, events would have transpired otherwise: the value of the Carteret receivership would have been higher, and consequently there would have been no need for the receivership to borrow. As such, these contentions are claims that the Government, by its actions or inactions, inflated the damages caused by its breach of Carteret's goodwill contract.

These claims can be pursued by the Shareholder-Plaintiffs only against the United States directly. The projected receivership deficit should not be reduced to reflect any diminution in the value of the Carteret receivership caused by Government action or inaction.

B. FDIC-R's Past and Future Conduct Is Not Reviewable Here on the Merits.

FDIC-R believes that it has handled Carteret, and the hundreds of other receiverships it dealt with during the crisis of the late 1980's and early 1990's, effectively, legally, and well. Whether it is right is not a question properly before this Court.

Attacks on the past and future conduct of the FDIC itself, as receiver, are outside the jurisdiction of this Court. The FDIC does not repeat here its argument that the FDI Act precludes any court from having jurisdiction over "any claim relating to any act or omission" of a depository institution for which the FDIC, or RTC, was appointed receiver, or any action of the FDIC, or RTC, as receiver. 12 U.S.C. § 1821(d)(13)(D). Nor does the FDIC repeat its argument that the FDI Act also precludes this court from "restrain[ing] or affect[ing] the exercise of powers or functions of the Corporation as . . . receiver," 12 U.S.C. § 1821(j), which, as this Court has noted, "is intended to prevent injunctive relief against the FDIC's actions as receiver." AmBase Corp v. United States, 61 Fed. Cl. at 799. FDIC-R does, however, still stand on these arguments.

The FDI Act is not the only curb on the power to review and grant relief with respect to the FDIC's actions as receiver. In this case, the FDIC-R is a plaintiff-intervenor, not a defendant. The Shareholder-Plaintiffs have not, and cannot, assert a claim against FDIC-R: the Government is the only permissible defendant before this Court, and the FDIC-R is not, as this Court has recognized, "the Government." AmBase Corp. v. United States, 61 Fed. Cl. at 796-07. Moreover, the Court of Federal Claims grants only money judgments; it does not grant either injunctions or declaratory relief. United States v. King, 395 U.S. 1, 3 (1969)(relief the Claims Court can give is

"limited to actual, presently due money damages from the United States"); Glidden Co. v. Zdanok, 370 U.S. 530, 557 (1962).[7]

As a result, any finding by this Court that the FDIC-R erred, or may be going to err, in its conduct of the Carteret receivership would be non-binding on FDIC-R. To put it more bluntly, if damages are awarded in this case, a finding critical of FDIC-R's management of the Carteret receivership would not preclude FDIC-R from paying claims against that receivership according to the projections set forth in the then-current goodwill financial package or, for that matter, in some other fashion. Such a finding by this Court would constitute, at most, " 'an opinion advising what the law would be upon a hypothetical state of facts,' " in a dispute that did not " 'admi[t] of specific relief through a decree of a conclusive character.' " Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp., 482 F.3d 1330, 1336 (Fed. Cir. 2007), quoting MedImmune, Inc. v. Genentech, Inc., -- U.S. – , 127 S.Ct.764, 771 (2007); see also Teva Pharmaceuticals. at 1337 (plaintiffs seeking declaratory judgment must show "injury-in-fact" that is "likely to be redressed by the requested relief.").

In a strikingly similar case, shareholders of a railroad in the midst of reorganization sought a declaratory judgment that certificates of indebtedness held by the railroad were worthless. In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 701 F.2d 604 (7th Cir. 1983). The shareholders sought to have the certificates declared worthless because they had been issued pursuant to a federal statute, known as the "MRRA," that allegedly violated the Constitution. Holding that the shareholders' claims were not ripe for review, the court stated:

> [T]he shareholders' claims are speculative and hypothetical. The shareholders are not currently suffering any concrete harm because neither the principal nor interest is being paid. There is a possibility that there will be insufficient assets remaining in the estate to satisfy the [railroad's] creditors with priority senior to

[7] The authority of Court of Federal Claims to render declaratory judgments is limited to "the context of procurement protests." R. Ct. Fed. Cl. 57, cmt. (2002 Rev.)

> MRRA claims. There is, moreover, an excellent possibility that the entire MRRA-related debt will be forgiven as a result of [another statute]. If either of these events occurs, there will be no injury to the shareholders, and they will have no case or controversy to press.
>
> . . . .
>
> . . . Future events may well render the shareholders' claims moot.

Id. at 609, 610 (dismissing appeal). The Shareholder-Plaintiffs here are in exactly the same position. Therefore, their allegations with respect to FDIC-R's conduct of the receivership should not be adjudicated on the merits.

C. FDIC-C Policies Are Not Reviewable Here on the Merits

In addition to attacking FDIC-R's conduct of the Carteret receivership, the Shareholder-Plaintiffs attack the policies that FDIC-R followed, such as the post-insolvency interest rate and the establishment of a Minority Preference Program. See, e.g., AmBase Statement of Issues Reply Brief at 5 (Oct. 19, 2006)(alleging "improper inflation of the receivership deficit" is attributable to "FDIC in its corporate capacity").

The only statutory basis for attacking those polices is the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. ("APA"), which provides the remedy for administrative action that is "arbitrary, capricious, or irrational." Claims under the APA are not adjudicable in the Court of Federal Claims. Hall v. United States, 69 Fed. Cl. 51, 56 (2005)(CFC lacks jurisdiction to review an agency decision under the APA), citing Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003)(CFC lacks APA jurisdiction) and McNabb v. United States, 54 Fed. Cl. 759 (2002)("APA reviews are conducted in federal district court rather than the Court of Federal Claims, since the APA addresses 'relief other than money damages.').[8] In the absence of the ability to invalidate an FDIC-C policy, and require a "do-over," an opinion finding that FDIC-C acted arbitrarily would, like a finding that FDIC-R erred, constitute an advisory opinion. Consequently,

---

[8] 28 U.S.C.§ 1367, which provides for "supplemental jurisdiction," is not applicable to the Court of Federal Claims. Hall v. United States, 69 Fed. Cl. at 57, citing Trek Leasing, Inc. v. United States, 62 Fed. Cl. 673 (2004).

Shareholder-Plaintiffs may not here attack, on the merits, the policies adopted by FDIC-C, and currently being applied by FDIC-R, with respect to the calculation of post-insolvency interest.

FDIC-R thus disputes the Shareholder-Plaintiffs' ability to obtain an "equitable review," AmBase v. United States, 61 Fed. Cl. at 797, 800, or any other merits determination concerning the projected receivership deficit. However, FDIC-R does not dispute Shareholder-Plaintiffs' ability to obtain an *evidentiary* review of the Government's evidence if, at some point in the future, the Government makes a new motion challenging justiciability. If that should happen, the Shareholder-Plaintiffs would free to attack, as this Court would be to review, the sufficiency (including the relevance, weight, and probative value) of any evidence submitted by the Government with respect to the issue of what funds will ultimately flow to its "coffers."

That review must, however, be limited to traditional evidentiary grounds: it cannot serve as a subterfuge for deciding non-justiciable and unenforceable claims against the FDIC-R, as receiver or in any capacity. If such an evidentiary review is called for, summary judgment is likely to be appropriate.

## III. The Damages Claim Here Belongs to the FDIC-R

Without going into specifics, the Shareholder-Plaintiffs have characterized as "flawed" the "analysis" that "any damages award must 'flow through' the receivership, and that the receivership deficit at the time of any award effectively reduces any damages recovery by the shareholders of the thrift." Plaintiffs' Reply in Support of Their Motion for Entry of an Order Setting Pretrial Schedule at 8 (Mar. 26, 2007). Apparently, in Shareholder-Plaintiffs'' view, either the damages award in this case does not "flow through" the receivership, or their recovery should not be reduced by payment of higher-priority claims, or both. Shareholder-Plaintiffs seem to be implying that they are entitled to a direct award of damages.

In view of this insinuation, FDIC-R repeats what should not, in light of this Court's prior statements,[9] need repeating: Carteret, not its shareholders, owned its contract claims. FDIC-R is the successor to the rights of Carteret and also the manager of the FSLIC Resolution Fund that succeeded, by operation of law, to the assets and liabilities of the Resolution Trust Corporation ("RTC"). 12 U.S.C. §§ 1441a(m)(1), 1441a(m)(2), 1821a(a)(1-2). As a result, it owns Carteret's breach of contract claim. Moreover, any damages awarded on that claim are payable only to the FDIC, which will distribute them to claimants of the Carteret receivership according to the established system of priorities. Ross v. Bernhard, 396 U.S. 531, 538 (1970); First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1287-88 (1999); Suess v. United States, 52 Fed. Cl. 221, 232 (2002); J.W. Moore, et al., 5 *Moore's Federal Practice* § 23.1.02[1] (3d. ed. 2005). Shareholder-Plaintiffs "cannot randomly disregard the corporate form to [their] own benefit. [A thrift's] injuries that resulted in its losses and ultimate downfall are properly its own." American Capital Corp. v. FDIC, 472 F.3d 859, 867 (Fed. Cir. 2007).

V. Unless Justiciability Issues Are Deferred, The Pre-Trial Schedule Should Be Adjusted

Should the Court decide to entertain evidence relating to the projected receivership deficit prior to rendering a decision on damages, summary judgment motions are likely to reduce the necessity for trial as to some or all elements of that projection.

At this time, both Shareholder-Plaintiffs' and intervenor-plaintiffs' Appendix A submissions are due on Dec. 21, 2007, with the Government's Appendix A submission due one

---

[9] This Court previously made it clear that the Government's breach of contract "create[d] in . . . Carteret, a cause of action against the government," AmBase v. United States, 58 Fed. Cl. at 51, and that "FDIC is an indispensable party as the successor to the rights of Carteret, which include the breach of contract claims that the shareholder Plaintiffs seeks to pursue *derivatively*." AmBase Corp. v. United States, 61 Fed. Cl. at 795 (emphasis added).

month later, on January 21 or 22, 2008.[10] If the Court decides to hear evidence relating to justiciability, including evidence with respect to the projected receivership deficit, prior to deciding damages, this schedule should be adjusted.

In that event, FDIC proposes that the existing schedule be amended to provide for filing of its motions on January 22, 2007, one month after Shareholder-Plaintiffs file their Appendix A submission. FDIC-R further proposes to file its own Appendix A submission on February 5, 2008, two weeks after the Government files its Appendix A submission.

Because of the likelihood that summary judgment motions would reduce the necessity for trial as to some or all elements of the projected receivership deficit, summary judgment motions on that subject should be decided prior to trial, and the trial should be postponed until after they are decided.

## CONCLUSION

The issue of justiciability, and the related issue of what weight should be given to projections of Carteret's receivership deficit, is premature at this time. In fact, depending on the damages award ultimately made, those issues may never need to be decided. Therefore, the Court should neither entertain summary judgment motions on, nor try, these issues until after a damages award has been made.

If, after damages have been awarded, the continued justiciability of this case becomes doubtful, the Court will need to evaluate the Government's evidence as to the amount of money that would ultimately flow back to the United States Treasury via payment of claims against the Carteret receivership. That limited issue should be resolvable at that time by summary judgment.

Should the Court decide to entertain evidence relating to justiciability before deciding damages, summary judgment motions should be useful in obviating the need for trial. In that

[10] January 21, the date specified in the TSO, is a federal holiday.

event, the existing trial schedule should be modified to allow FDIC-R to file its motions on January 22, 2007, and its Appendix A submission on February 5, 2008. Trial should be postponed until those motions are decided.

Respectfully submitted,

Federal Deposit Insurance Corporation
Legal Division

s/ *Andrew C. Gilbert*
Andrew C. Gilbert
*Counsel of Record*
*for Plaintiff-Intervenor*
550 Seventeenth Street, NW, MB-3060
Washington, DC 20429
(202) 898-3871

Of Counsel:

John V. Thomas
*Deputy General Counsel*
D. Ashley Doherty
*Counsel*

November 7, 2007

**CERTIFICATE OF FILING**

I hereby certify this 7th day of November 2007, that I caused a copy of the foregoing FDIC'S STATEMENT WITH REGARD TO SUMMARY JUDGMENT to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and that parties may access this filing through the Court's electronic filing system.

s/ *Andrew C. Gilbert*

**ATTACHMENT A**

Goodwill Financial Reporting Package-Carteret Federal Savings Bank (Mar. 23 2007).

FDIC
Federal Deposit Insurance Corporation
3501 North Fairfax Drive
Arlington, VA 22226

March 23, 2007

**TO:** Floyd Robinson, Senior Counsel
Legal Division

**FROM:** J. Craig Sweeney, Manager
Subsidiary Accounting and Resolution Support Unit
Division of Finance

**SUBJECT:** Goodwill Financial Reporting Package – Carteret Federal Savings Bank

Attached is the Division of Finance's Goodwill Financial Reporting Package for the Carteret Federal Savings Bank receivership as of December 31, 2006. Included in this package are the following four reports which were specifically prepared to support this goodwill litigation matter:

| | |
|---|---|
| Report 1 | Inception Pro Forma Recap |
| Report 1-A | Mapping of Total Asset Inception Balances from Report 1 to Report 2 |
| Report 2 | Statement of Assets and Liabilities in Liquidation (unaudited) |
| Report 3 | Projected Receivership Results as of 12/31/2006 |

A standard set of receivership financial statements for Carteret Federal Savings Bank as of December 31, 2006 is also provided. DOF releases these receivership financial statements to the public upon FOIA or other requests.

Attachments

cc: Susan Bank, Legal Division
John V. Thomas, Legal Division

# CARTERET FEDERAL SAVINGS BANK
## Receivership Fund Code: 1309
## Inception Date: 1/20/1995

## Goodwill Package as of December 31, 2006

### REPORT 1: Inception Pro Forma Recap

This report summarizes the inception balances of this receivership per the Pro Forma package prepared by the Closing team. Adjustments are made to the failed institution's balance sheet in order to reflect the proven balances through the date of closing, as well as convert those asset and liability balances retained by the FDIC/RTC to a cash basis of accounting.

### REPORT 1-A: Mapping of Total Asset Inception Balances from Report 1 to Report 2

This report provides a mapping of how the Pro Forma inception balances in Report 1 were combined and/or reclassified to record the inception balances on the receivership's general ledger, as presented in Report 2.

### REPORT 2: Statement of Assets and Liabilities in Liquidation (unaudited)

This report presents the financial position of this receivership as of December 31, 2006 based on actual general ledger results and post-close adjustments, if any. The total asset, liability, and net assets/(deficit) balances at inception are carried forward from Report 1.

### REPORT 3: Projected Receivership Results as of 12/31/2006

This report projects the financial position of this receivership after application of estimated liabilities based on assumed priority. The focus of this report is the underlying net assets/(deficit) position at various stages of claim distribution. Refer to Report 3 footnotes for additional information.

### Receivership Financial Statements

The Statement of Assets and Liabilities in Liquidation (unaudited), Statement of Operations (unaudited), and accompanying footnotes are produced from the FDIC general ledger accounting system and present both year-to-date and inception-to-date receivership activity for the period ended December 31, 2006.

# CARTERET FEDERAL SAVINGS BANK
## INCEPTION PRO FORMA RECAP
(Rounded in Dollars)

**REPORT 1**
**Pro Forma Recap**

**Receivership Fund Code: 1309**
**Inception Date: 1/20/95**

| | Pro Forma Unadjusted Balance | Pro Forma Adjustments [a] | Inception Balances (Per Pro Forma) (Adjusted by RTC) |
|---|---|---|---|
| **Assets** | | | |
| Cash and Non-Interest Earning Deposits | $ 10,063,050 | $ (3,275) | $ 10,059,775 |
| Interest Earning Deposits with FHLB | 2,658,733 | - | 2,658,733 |
| Securitization Reserve | 71,312,507 | (7,684,100) | 63,628,407 |
| Other Investment Securities | 7,389,821 | 7,077,893 | 14,467,714 |
| **Subtotal Cash and Due From Balances** | **91,424,111** | **(609,482)** | **90,814,629** |
| MBS Guar/Insur U.S. Government | 10,015,197 | - | 10,015,197 |
| Other Mtg Backed Securities | 80,858,664 | - | 80,858,664 |
| Equity Securities - Except FHLB Stock | 1,125 | - | 1,125 |
| Federal Funds Sold | 294,184,760 | - | 294,184,760 |
| **Subtotal Securities & Obligations** | **385,059,746** | **-** | **385,059,746** |
| Mortgage Loans | 590,381,195 | 122,544,525 | 712,925,720 |
| Commercial Loans | - | 14,181,058 | 14,181,058 |
| Consumer Loans | 34,705,402 | (637,355) | 34,068,047 |
| Construction Loans | 128,737,346 | (128,737,346) | - |
| **Subtotal Loans** | **753,823,943** | **7,350,882** | **761,174,825** |
| Furniture/Fixtures/Autos | 2,320,854 | - | 2,320,854 |
| Other Real Estate Owned | 2,782,443 | - | 2,782,443 |
| Investments in Subsidiaries | 5,541,773 | 3,925,801 | 9,467,574 |
| Office Premises and Equipment | 5,013,564 | - | 5,013,564 |
| Postage - Stamps/Meter | 2,452 | 4,273 | 6,725 |
| FHLB Stock | 7,860,200 | - | 7,860,200 |
| Allowance for Loan Losses - Mtg. Loans | (60,019,396) | 60,019,396 | - |
| Valuation Allowance - Securities | (154,525) | 154,525 | - |
| Valuation Allowance - Mtg. Pool Securities | (7,562,671) | 7,562,671 | - |
| Valuation Allowance - REO | (1,375,000) | 1,375,000 | - |
| Valuation Allowance - Subsidiaries | (2,323,950) | 2,323,950 | - |
| Accrued Interest - Securities | 56,349 | (56,349) | - |
| Accrued Interest - Mtg. Pool Securities | 509,139 | (509,139) | - |
| Accrued Interest - Mtg. Loans | 4,212,092 | (4,212,092) | - |
| Accrued Interest Commer./Consum. Loans | 743,953 | (492,812) | 251,141 |
| Prepaid Expenses | 1,498,395 | (1,495,134) | 3,261 |
| Other Assets | 299,194 | (469,355) | (170,161) |
| Advances LSO | 1,296,238 | - | 1,296,238 |
| Accrued Interest on FHLB Stock | 130,180 | (130,180) | - |
| Valuation Allowance - Other Assets | (142,844) | 142,844 | - |
| **Subtotal Other Assets** | **(39,311,560)** | **68,143,399** | **28,831,839** |
| **Total Assets** | **$ 1,190,996,240** | **$ 74,884,799** | **$ 1,265,881,039** |
| **Liabilities** | | | |
| Demand Deposits | 231,244,658 | (49,767) | 231,194,891 |
| Savings Deposits | 344,836,845 | - | 344,836,845 |
| Time Deposits | 793,321,472 | - | 793,321,472 |
| Unearned Safe Deposit Box Income | 11,387 | 10,331 | 21,718 |
| Taxes Payable | 557 | (557) | - |
| Other Liabilities | 8,703,838 | (1,745,390) | 6,958,448 |
| Suspense Liabilities | 67,949 | (67,677) | 272 |
| **Total Liabilities** | **$ 1,378,186,706** | **$ (1,853,060)** | **$ 1,376,333,646** |
| **Net Assets/(Deficit)** | | | |
| Undivided Profits/Acquired Equity | (187,190,466) | 76,737,859 | (110,452,607) |
| **Total Net Assets/(Deficit)** | **$ (187,190,466)** | **$ 76,737,859** | **$ (110,452,607)** |
| **Total Liabilities and Net Equity** | **$ 1,190,996,240** | **$ 74,884,799** | **$ 1,265,881,039** |

[a] Pro Forma Adjustments are commonly prepared by the FDIC/RTC to record unprocessed work, non-booked items, corrections of posting errors, and resolved reconciling items, in order to reflect the proven balance of the balance sheet accounts of the Failed Institution through the date of closing. Adjustments also include the conversion from an accrual basis of accounting to a cash basis of accounting for assets and liabilities retained by the FDIC/RTC.

**REPORT 1 - A**

**Carteret Federal Savings Bank**
**Receivership Fund Code 1309**
**Mapping of Total Asset Inception Balances from Report #1 to Report #2**

| Per Report #1 - Inception Pro Forma Recap | | | Per Report #2 - Statement of Assets and Liabilities | |
|---|---|---|---|---|
| **Line Item Descriptions** | **Inception Balances** | | **Inception Balances** | **Line Item Descriptions** |
| **Assets:** | | | | |
| Interest Earning Deposits with FHLB | 2,658,733 | | | |
| Securitization Reserve | 63,628,407 | | | |
| Other Investment Securities | 14,467,714 | | | |
| MBS Guar/Insur U.S. Government | 10,015,197 | | | |
| Other Mtg Backed Securities | 80,858,664 | | | |
| Equity Securities - Except FHLB Stock | 1,125 | | | |
| Rounding | 1 | | | |
| | **171,629,841** | | **171,629,841** | Securities |
| Consumer Loans | **34,068,047** | | **34,068,047** | Consumer Loans |
| Commercial Loans | **14,181,058** | | **14,181,058** | Commercial Loans |
| Mortgage Loans | **712,925,720** | | **712,925,720** | Real Estate Mortgages |
| Cash and Non-Interest Earning Deposits | 10,059,775 | | | |
| Federal Funds Sold | 294,184,760 | | | |
| FHLB Stock | 7,860,200 | | | |
| Postage Stamps/Meters | 6,725 | | | |
| Advances LSO | 1,296,238 | | | |
| Accrued interest - Commer/Consumer Loar | 251,141 | | | |
| Prepaid Expenses | 3,261 | | | |
| Other Assets | (170,161) | | | |
| **Reclass from Investments in Subsidiaries** | **7,911,088** | **[a]** | | |
| Rounding | (1) | | | |
| | **321,403,026** | | **321,403,026** | Other Assets/Judgments |
| Other Real Estate Owned | 2,782,443 | | | |
| Furniture/Fixtures/Autos | 2,320,854 | | | |
| Office Premises and Equipment | 5,013,564 | | | |
| | **10,116,861** | | **10,116,861** | Owned Assets |
| Investments in Securities | 9,467,574 | | | |
| **Reclass to Other Assets** | **(7,911,088)** | **[a]** | | |
| | **1,556,486** | | **1,556,486** | Net Investments in Subsidiaries |
| **Total Assets** | **$ 1,265,881,039** | | **$ 1,265,881,039** | **Total Assets** |

**[a]** For purposes of recording inception balances to the FDIC general ledger, the Loan Receivable from Subsidiaries balance in the Investments in Subsidiaries category was reclassified to the Other Assets category.

**REPORT 2**

## CARTERET FEDERAL SAVINGS BANK
### Statement of Assets and Liabilities in Liquidation (Unaudited)
**INCEPTION TO 12/31/2006**
**(Rounded in Dollars)**

**Receivership Fund Code: 1309**
**Inception Date: 1/20/95**

| | Inception Balances (Per RTC General Ledger) [a] | Net Change In Balances [b] | 12/31/2006 Actual G/L Balances [c] | Adjustments to 12/31/2006 Actual G/L Balances | Adjusted 12/31/2006 Balances |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash and Investments | $ - | $ 109,085 | $ 109,085 | | $ 109,085 |
| Receivables | - | - | - | | - |
| **Assets in Liquidation** | | | | | |
| Securities | 171,629,841 | (171,629,841) | - | | - |
| Consumer Loans | 34,068,047 | (34,068,047) | - | | - |
| Commercial Loans | 14,181,058 | (14,181,058) | - | | - |
| Real Estate Mortgages | 712,925,720 | (712,925,720) | - | | - |
| Other Assets/Judgments | 321,403,026 | (321,403,026) | - | | - |
| Owned Assets | 10,116,861 | (10,116,861) | - | | - |
| Net Investments in Subsidiaries | 1,556,486 | (1,556,486) | - | | - |
| **Subtotal: Assets in Liquidation** | **1,265,881,039** | **(1,265,881,039)** | - | | - |
| Less: Estimated Loss on Assets | - | - | - | | - |
| Advances on Assets | - | - | - | | - |
| **Total Assets** | **$ 1,265,881,039** | **$ (1,265,771,954)** | **$ 109,085** | **$ -** | **$ 109,085** |
| **Liabilities:** | | | | | |
| **Administrative Liabilities** | | | | | |
| Accounts/Notes Payable | - | - | - | | - |
| Suspense/Escrow Accounts | - | 15,378 | 15,378 | | 15,378 |
| Due to FDIC for Service - Billed Expenses | - | 68,384 | 68,384 | | 68,384 |
| Due to FDIC for Borrowed Funds | - | 6,024,887 | 6,024,887 | | 6,024,887 |
| Estimated Litigation Losses - Probable | - | - | - | | - |
| Other Contingent Liabilities | - | - | - | | - |
| **SubTotal - Administrative Liabilities** | - | **6,108,649** | **6,108,649** | | **6,108,649** |
| **Proven Depositor/Creditor Claims** | | | | | |
| Due to FDIC Subrogated Deposit Claims | - | 18,527,270 | 18,527,270 | | 18,527,270 |
| Unisured Deposit Claims Due Others | 1,376,333,646 | (1,376,333,646) | - | | - |
| Other Creditor Claims | - | 303,496 | 303,496 | | 303,496 |
| Estimated Interest on Claims | - | 168,625,125 | 168,625,125 | | 168,625,125 |
| **Subtotal - Proven Depositor/Creditor Claims** | **1,376,333,646** | **(1,188,877,755)** | **187,455,891** | | **187,455,891** |
| **Other Claims** | | | | | |
| Estimated Federal Income Tax Liability | - | - | - | | - |
| Other Subordinated Obligations | - | - | - | | - |
| Liabilities at Inception - Unproven | - | - | - | | - |
| **Subtotal Other Claims** | - | - | - | | - |
| **Total Liabilities** | **$ 1,376,333,646** | **$ (1,182,769,106)** | **$ 193,564,540** | **$ -** | **$ 193,564,540** |
| **Net Assets / (Deficit):** | | | | | |
| Net Assets/(Deficit) At Inception | (110,452,607) | - | (110,452,607) | | (110,452,607) |
| Premiums Received / (Paid) at Resolution | - | 143,821,654 | 143,821,654 | | 143,821,654 |
| Asset - Related Equity Adjustments | - | 25,488,825 | 25,488,825 | | 25,488,825 |
| Liability/Claims-Related Equity Adjustments | - | (169,868,983) | (169,868,983) | | (169,868,983) |
| Income/(Loss)of the Liquidation | - | (82,444,344) | (82,444,344) | | (82,444,344) |
| **Total Net Assets/(Deficit)** | **$ (110,452,607)** | **$ (83,002,848)** | **$ (193,455,455)** | **$ -** | **$ (193,455,455)** |
| **Total Liabilities and Net Assets/(Deficit)** | **$ 1,265,881,039** | **$ (1,265,771,954)** | **$ 109,085** | **$ -** | **$ 109,085** |

**Estimated additional litigation losses considered reasonably possible: $1,410,000**

[a] The inception balances per the General Ledger agree in total with the adjusted inception balances on Report 1 - Inception Pro Forma Recap. Refer to Report 1 - A for the mapping of total asset line items on Report 1 to the corresponding asset categories on Report 2.

[b] The amounts in this column reflect the net change in balances reported at inception (column entitled "Inception Balances") versus those as of the report date (column entitled "12/31/2006 Actual G/L Balances").

[c] These balances reflect amounts reported on the receivership's Statement of Assets and Liabilities in Liquidation. Refer to the accompanying footnotes applicable to the Statement of Assets and Liabilities in Liquidation, as these notes are an integral part of this statement.

**THIS REPORT CONTAINS 12/31/2006 ESTIMATES BASED ON THE BEST INFORMATION AVAILABLE AS OF 12/31/2006. AS WITH ALL ESTIMATES AND PROJECTIONS, ACTUAL RESULTS MAY DIFFER.**

**REPORT 3**

**CARTERET FEDERAL SAVINGS BANK**
**Projected Receivership Results as of 12/31/2006**
**(Rounded in Dollars)**

**Receivership Fund Code: 1309**
**Inception Date: 1/20/95**

| | Adjusted 12/31/2006 Balances | Federal Income Tax | Projected Receivership Results (using Adj 12/31/2006 Bal) | Pass Through Receivership (Fund Code 8602) [d] Outstanding Claims Priority 6 | Post Insolvency Interest Priority 7 | Claims Not Fixed on Day of Default Priority 7 | Subordinated Debt Priority 9 | Projected Receivership Results Adjusted for Pass-Through Liab | Stockholders' Claims Priority 10 |
|---|---|---|---|---|---|---|---|---|---|
| | | [b] | [c] | | | | | | [e] |
| **Assets:** | | | | | | | | | |
| Cash and Investments | $ 109,085 | | $ 109,085 | | | | | $ 109,085 | |
| Receivables | - | | - | | | | | - | |
| **Assets in Liquidation** | | | | | | | | | |
| Securities | - | | - | | | | | - | |
| Consumer Loans | - | | - | | | | | - | |
| Commercial Loans | - | | - | | | | | - | |
| Real Estate Mortgages | - | | - | | | | | - | |
| Other Assets/Judgments | - | | - | | | | | - | |
| Owned Assets | - | | - | | | | | - | |
| Net Investments in Subsidiaries | - | | - | | | | | - | |
| **Subtotal: Assets in Liquidation** | - | | - | | | | | - | |
| Less: Estimated Loss on Assets | - | | - | | | | | - | |
| Advances on Assets | - | | - | | | | | - | |
| **Total Assets** | $ 109,085 | | $ 109,085 | | | | | $ 109,085 | - |
| **Liabilities:** | | | | | | | | | |
| **Administrative Liabilities** | | | | | | | | | |
| Accounts/Notes Payable | - | | | | | | | 15,378 | |
| Suspense/Escrow Accounts | 15,378 | | 15,378 | | | | | 68,384 | |
| Due to FDIC for Service - Billed Expenses | 68,384 | | 68,384 | | | | | 6,024,887 | |
| Due to FDIC for Borrowed Funds | 6,024,887 | | 6,024,887 | | | | | - | |
| Estimated Litigation Losses - Probable | - | | - | | | | | - | |
| Other Contingent Liabilities | - | | | | | | | - | |
| **SubTotal - Administrative Liabilities** | 6,108,649 | | 6,108,649 | | | | | 6,108,649 | |
| **Proven Depositor/Creditor Claims** | | | - | | | | | - | |
| Due to FDIC Subrogated Deposit Claims | 18,527,270 | | 18,527,270 | | | | | 18,527,270 | |
| Uninsured Deposit Claims Due Others | - | | - | 1,578,552 | | 292 | | 1,578,844 | |
| Other Creditor Claims | 303,496 | | 303,496 | | | | | 303,496 | |
| Estimated Interest on Claims | 168,625,125 | [a] | 168,625,125 | | 1,566,971 | | | 170,192,096 | |
| **Subtotal - Proven Depositor/Creditor Claims** | 187,455,891 | - | 187,455,891 | 1,578,552 | 1,566,971 | 292 | - | 190,601,706 | |
| **Other Claims** | | | | | | | | | |
| Estimated Federal Income Tax Liability | - | 103,093,931 | 103,093,931 | | | | | 103,093,931 | |
| Other Subordinated Obligations | - | | - | | | | | - | |
| Liabilities at Inception - Unproven | - | | - | | | | | - | |
| **Subtotal Other Claims** | - | 103,093,931 | 103,093,931 | - | - | - | - | 103,093,931 | |
| | | | | | | | | - | |
| **Total Liabilities** | $ 193,564,540 | $ 103,093,931 | $ 296,658,471 | $ 1,578,552 | $ 1,566,971 | $ 292 | $ - | $ 299,804,286 | - |
| **Net Assets / (Deficit):** | | | | | | | | | |
| Net Assets/(Deficit) At Inception | (110,452,607) | | (110,452,607) | | | | | (110,452,607) | |
| Premiums Received / (Paid)/at Resolution | 143,821,654 | | 143,821,654 | | | | | 143,821,654 | |
| Asset - Related Equity Adjustments | 25,488,825 | | 25,488,825 | | | | | 25,488,825 | |
| Liability/Claims-Related Equity Adjustments | (169,868,983) | (103,093,931) | (272,962,914) | (1,578,552) | (1,566,971) | (292) | | (276,108,729) | |
| Income/(Loss)of the Liquidation | (82,444,344) | | (82,444,344) | | | | | (82,444,344) | |
| **Total Net Assets/(Deficit)** | $ (193,455,455) | $ (103,093,931) | $ (296,549,386) | $ (1,578,552) | $ (1,566,971) | $ (292) | $ - | $ (299,695,201) | - |

**The accompanying notes are an integral part of this Report 3.**

## Footnotes to Report 3 - Fund Code 1309

[a] Fund Code 1309 is subject to the order of claims priority contained in 12 U.S.C. § 1821(d)(11), which applies to RTC receiverships commenced after 8/10/1993. The post insolvency interest estimate is computed on unpaid proven claims balance by applying the applicable federal judgement rate immediately prior to this receivership's inception date, consistent with 28 U.S.C. § 1961. The interest compounds annually and continues to accrue until the unpaid proven claims have been satisfied.

[b] Tax returns and IRS transcripts for this receivership reflect federal income taxes due in the amount of $29,902,504. Another $62,828,211 in accrued interest and $10,363,216 in penalties have been estimated through 12/31/2006. An agreement signed between the IRS and the former RTC provides for a deferral of these tax liabilities as long as there are insufficient assets to pay depositor claims in full. Once deposit claims are paid in full, the tax liability becomes due and will be paid in accordance with the order of priority contained in 12 U.S.C. § 1821(d)(11). The potential tax effect of any pending litigation settlement has not been considered at this time.

[c] Pursuant to the contract of sale documents that conveyed the goodwill claims to the FSLIC Resolution Fund - RTC (the Fund), the Fund agreed to advance the costs of litigation, and to remit to the receiver any amounts collected on such claims after deduction of these costs. The Fund has accumulated $6.8 million in expenses incurred on this receiver's goodwill litigation efforts through 12/31/2006, and may continue to accumulate additional litigation expenses. There are no goodwill litigation expenses reflected on this receivership's general ledger as of 12/31/2006. If the final resolution of the goodwill litigation results in a monetary award to the receivership, accumulated goodwill litigation expenses will be deducted from any proceeds distributed to the receivership. If the final resolution of the goodwill litigation does not result in a monetary award to the receivership, the Fund will absorb the expenses.

[d] During the resolution process, a Pass-Through Receivership (Fund Code 8602) was established on 12/4/1992. The estimated Pass-Through Receivership deficit as of 12/31/2006 is estimated above and should be considered in any distribution. Total Pass-Through Receivership liabilities were $4.7 million of which $3.1 million has been paid to arrive at the $1.6 million in Priorities 1 through 6 and $292 in Priority 7 "Claims Not Fixed on Day of Default" shown above, in accordance with the order of claims priority contained in 12 C.F.R. § 360.3 (a). Post insolvency interest on Priority 6 claims, which was computed in accordance with 12 C.F.R. § 360.3 (b), is the $1.57 million shown as Priority 7 above. Note that this post insolvency interest estimate is compounded daily and continues to accrue until unpaid Priority 6 claims have been satisfied.

[e] This column is presented to indicate that stockholders' claims are subordinate to all other unpaid claims reported in the preceding columns.

**CARTERET FSB**
**NEWARK, NJ**
**Fund Number: 1309**
**Inception Date: 1/20/1995**
**Statement of Assets & Liabilities in Liquidation (unaudited)**
**For Period Ending: December 31, 2006**
**(Rounded in Dollars)**

| | Current Balance | Inception Balance |
|---|---|---|
| **Assets** | | |
| Cash and Investments | $ 109,085 | $ 0 |
| Receivables | 0 | 0 |
| **Assets in Liquidation** | | |
| Securities | 0 | 171,629,841 |
| Consumer Loans | 0 | 34,068,047 |
| Commercial Loans | 0 | 14,181,058 |
| Real Estate Mortgages | 0 | 712,925,720 |
| Other Assets/Judgments | 0 | 321,403,026 |
| Owned Assets | 0 | 10,116,861 |
| Net Investments in Subsidiaries | 0 | 1,556,486 |
| **Subtotal - Assets in Liquidation** | **$ 0** | **$ 1,265,881,039** |
| Less: Estimated Loss on Assets in Liquidation (Note 3) | 0 | 0 |
| Advances on Assets | 0 | 0 |
| **Total Assets** | **$ 109,085** | **$ 1,265,881,039** |
| | | |
| **Liabilities (Note 5)** | | |
| **Administrative Liabilities** | | |
| Accounts/Notes Payable | 0 | 0 |
| Suspense/Escrow Accounts | 15,378 | 0 |
| Due to FDIC for Service - Billed Expenses | 68,384 | 0 |
| Due to FDIC for Borrowed Funds | 6,024,887 | 0 |
| Estimated Litigation Losses - Probable (Note 7) | 0 | 0 |
| Other Contingent Liabilities | 0 | 0 |
| **Subtotal - Administrative Liabilities** | **$ 6,108,649** | **$ 0** |
| **Proven Depositor/Creditor Claims** | | |
| Due to FDIC for Subrogated Deposit Claims | 18,527,270 | 0 |
| Uninsured Deposit Claims Due Others | 0 | 0 |
| Other Creditor Claims | 303,496 | 0 |
| Estimated Interest on Claims (Note 6) | 168,625,125 | 0 |
| **Subtotal - Proven Depositor/Creditor Claims** | **$ 187,455,891** | **$ 0** |
| **Other Claims** | | |
| Estimated Federal Income Tax Liability (Note 10) | 0 | 0 |
| Other Subordinated Obligations | 0 | 0 |
| Liabilities at Inception - Unproven | 0 | 1,376,333,646 |
| **Subtotal - Other Claims** | **$ 0** | **$ 1,376,333,646** |
| **Total Liabilities** | **$ 193,564,540** | **$ 1,376,333,646** |
| | | |
| **Net Assets/(Deficit)** | | |
| Net Assets / (Deficit) At Inception | (110,452,607) | (110,452,607) |
| Premiums Received / (Paid) at Resolution | 143,821,654 | 0 |
| Asset - Related Equity Adjustments | 25,488,825 | 0 |
| Liability/Claims-Related Equity Adjustments | (169,868,983) | 0 |
| Income /(Loss) of the Liquidation Since Inception | (82,444,344) | 0 |
| **Total Net Assets/(Deficit)** | **$ (193,455,455)** | **$ (110,452,607)** |
| **Total Liabilities and Net Assets/(Deficit)** | **$ 109,085** | **$ 1,265,881,039** |

**Estimated additional litigation losses considered reasonably possible: (Note 7)** **$ 1,410,000**

**The accompanying notes are an integral part of these financial statements.**

Last Month Closed: January 2007 (Period 01)

**CARTERET FSB**
**NEWARK, NJ**
**Fund Number: 1309**
**Inception Date: 1/20/1995**
**Statement of Operations (unaudited)**
**For Period Ending: December 31, 2006**
**(Rounded in Dollars)**

| | Year-to-Date | Inception-to-Date |
|---|---|---|
| **Liquidation Revenues** | | |
| Interest on Cash and Investments | $ 5,867 | $ 25,077,376 |
| **Interest and Late Fee Income on:** | | |
| Securities | 0 | 5,409,738 |
| Consumer Loans | 0 | 70,788 |
| Commercial Loans | 0 | 1,208,389 |
| Real Estate Mortgages | 0 | 30,852,852 |
| Other Assets and Judgments | 0 | 10,099 |
| Recoveries from Charged-Off Assets | 225 | 59,653 |
| Professional Liability / Litigation Recoveries | 2,800 | 1,745,005 |
| Other Miscellaneous Income | 47,317 | 16,481,074 |
| **Total - Liquidation Revenues** | **$ 56,209** | **$ 80,914,974** |
| | | |
| **Liquidation Expenses** | | |
| **Operations** | | |
| **FDIC Service-Billed Expenses for: (Note 9)** | | |
| Marketing / Closing / Settlement | 0 | 0 |
| Oversight / Claims / Accounting | 45,005 | 133,266 |
| Asset Marketing / Management | 0 | 13,163 |
| Investigation and Others | 1,274 | 113,707 |
| Salaries and Indirect Costs (Note 9) | 0 | 20,081,886 |
| Asset Servicing-Related Expenses | 0 | 15,253,315 |
| Asset Sales-Related Expenses | 0 | 4,715,122 |
| Legal and Other Professional Fees | 0 | 4,224,657 |
| Travel and Other Liquidation Expenses | 1,825 | 8,003,712 |
| **Subtotal - Operating Expenses** | **$ 48,104** | **$ 52,538,828** |
| Interest on FDIC Borrowed Funds | 0 | (7,469) |
| Other Interest Expense | 0 | 594,646 |
| Litigation Losses | 0 | 229,546 |
| Loss on Contingent Liabilities | 0 | 2,547,088 |
| **Total Liquidation Expenses** | **$ 48,104** | **$ 55,902,639** |
| **Net Income/(Loss) from Operations** | **$ 8,105** | **$ 25,012,335** |
| | | |
| **Net Income/(Loss)on Managed Assets** | | |
| Owned Assets | 0 | (82,176) |
| Net Investments in Subsidiaries | 0 | (1,155,505) |
| **Total Net Income/(Loss)on Managed Assets** | **$ 0** | **$ (1,237,681)** |
| **Gain/(Loss) on Disposition of Assets** | | |
| Securities | 0 | (32,405,294) |
| Consumer Loans | 0 | (1,137,020) |
| Commercial Loans | 0 | (4,495,093) |
| Real Estate Mortgages | 0 | (61,247,406) |
| Other Assets / Judgments | 0 | (11,662,298) |
| Owned Assets | 0 | 736,157 |
| Net Investments in Subsidiaries | 0 | 3,991,956 |
| **Total - Gain/(Loss) on Disposition of Assets** | **$ 0** | **$ (106,218,998)** |
| **Income/(Loss) of the Liquidation** | **$ 8,105** | **$ (82,444,344)** |

**The accompanying notes are an integral part of these financial statements.**

Last Month Closed: January 2007 (Period 01)

# *Notes to Financial Statements:*

1. ***Basis of Accounting*** : The FDI Act authorizes the FDIC, as receiver for a failed insured depository institution ("Receivership"), to administer and conclude the affairs of such institution. Financial statement presentations are based on the premise that the assets of the receivership will be liquidated and proceeds distributed to the institution's creditors over time as provided by applicable laws and regulations. While a receivership's average lifespan is three to six years, some may require longer time frames to conclude. At the onset of a receivership, the failed institution's financial records are reviewed and restated to establish a new basis of accounting. The assets and liabilities of the failed institution are adjusted to remove all estimated losses, accruals, and deferrals. These adjustments include loss allowances; partial write downs; prepaid, deferred or accrued expenses having no recovery value; and accrued or deferred income. Restated balances are shown under the *Inception Balance* heading of the *Statement of Assets and Liabilities in Liquidation*. After inception, FDIC's liquidation valuation and measurement practices, as described more fully in the paragraphs that follow, are adopted for all assets and liabilities. In general, transactions are recorded when cash is received or disbursed. Accruals may be used when prospective cash flows are probable and reasonably estimated.

2. ***Use of Estimates*** : As appropriate, estimates of asset values, liabilities, revenues, and expenses are reflected in the financial statements. These amounts are updated over time to compensate for uncertainties inherent in the estimation process. As with the use of all estimates, actual results may differ.

3. ***Valuation of Assets/Loss Allowances*** : Assets of the receivership are shown at values representing cash on deposit or the book value of amounts invested; the principal balance of loans, notes, other debt instruments or receivables (note that interest on these assets is not accrued after failure but is recognized when received); the foreclosed value of real and/or personal property or the book value of assets (cost less depreciation or amortization through date of the institution's failure); and the historical cost of the net investment in subsidiaries, partnerships, or joint ventures, adjusted where appropriate to reflect the receivership's portion of the underlying net earnings or losses.

An Estimated Loss on Assets is provided when anticipated future asset disposition proceeds, including associated expenses, are less than recorded amounts. Future asset disposition proceeds are generally estimated by determining, via sampling or recent disposition activity, the recovery rates for similar assets across all receiverships. However, actual recovery rates for this receivership may differ according to the quality and type of individual asset, as well as over time with changing market conditions. Accordingly, the gains or losses ultimately realized for this receivership will likely vary from amounts estimated.

4. ***Contingent Recoveries*** : Assets of the receivership generally exclude potential collections from activities such as professional liability or other types of pending legal actions. Significant uncertainties prevent reasonable estimation of the amounts ultimately collectible. Instead, these recoveries are generally recognized when cash is received, or when the collection is probable and the amount collectible can be reasonably estimated.

5. ***Actual and Estimated Liabilities*** : The FDIC, as receiver, determines (allows/disallows) claims and distributes proceeds derived from the disposition of the failed institution's assets according to applicable state and federal law governing the payment of creditor claims. Recorded liabilities comprise 1) proven or pending (unproven) claims against the receivership estate, 2) various operating liabilities, and 3) estimates of other probable losses such as pending defensive litigation. Applicable law governing the payment priority of distributions may vary depending on the inception date of the receivership. Therefore, liabilities of the receivership estate are not ranked in order of preference or payment priority on the *Statement of Assets and Liabilities in Liquidation*.

6. ***Estimated Interest on Claims*** : Applicable law governs or directs the payment of post-insolvency interest to creditors holding proven claims against the receivership estate, including the claim(s) held by the FDIC in its Corporate capacity. Post-insolvency interest is the interest

calculated and paid on proven creditor claims, under certain circumstances, after a receiver is appointed. Uncertainties exist as to the universe of creditors whose claims will ultimately be allowed and whether creditors will receive the full principal amount of proven claims against the receivership estate or any post-insolvency interest. No distribution will be made to holders of equity interests until allowed creditor claims have been paid principal and post-insolvency interest in full. Generally, the estimated liability for the total amount of post-insolvency interest payable respective to creditor claims is recognized in these financial statements when at least 95% of the principal of proven creditor claims has been paid.

**7. *Reasonably Possible Litigation Losses* :** In addition to the amounts recorded for probable litigation liabilities, the FDIC Legal Division has determined that the receivership may be subject to reasonably possible losses from unresolved litigation. Reasonably possible losses differ from those which are probable in that there is a lesser likelihood of loss and payment from the receivership. As such, reasonably possible losses are not accrued in the accounts until the FDIC, through periodic review, determines either that the litigation settlement expense has been incurred or that the likelihood of loss has become probable. While not recognized in the *Statement of Assets and Liabilities in Liquidation*, FDIC management may use all or part of the estimate of reasonably possible litigation losses to determine the assets that must be retained by the receivership to satisfy these potential obligations. The amount of reasonably possible losses is shown at the bottom of the receivership's *Statement of Assets and Liabilities in Liquidation* as a separate disclosure. Further, receiverships may be subject to significant losses from cases where uncertainties prevent a reasonable assessment of the ultimate outcome and/or an estimate of the amount of loss which could result.

**8. *Non-Cash Equity Adjustments* :** Unrecorded assets and claims determined to have existed as of the institution's failure are deemed discovered assets and liabilities, respectively, and are recorded as non-cash equity adjustments. Other non-cash equity adjustments include the Estimated Loss on Assets in Liquidation, the Estimated Interest on Claims, as well as the write-off of remaining unpaid liabilities prior to the inactivation of a receivership. Note that certain non-cash equity adjustments such as the estimated loss on assets and probable litigation are reversed when they are recognized as liquidation transactions in the *Statement of Operations.*

**9. *FDIC Service-Billed Expenses (Statement of Operations)* :** FDIC personnel, who are employed by the FDIC in its Corporate capacity, are responsible for conducting all liquidation-related activities for FDIC receiverships. The FDIC in its Corporate capacity bills the receiverships for various liquidation services provided on their behalf. Since 2002, these receivership billings are calculated by multiplying the actual workload volume attributable to an individual receivership by the benchmark rate for the service provided. Benchmark rates are developed and periodically reviewed by FDIC management after considering empirical and industry data relevant to the service provided as well as an overhead component. These expenses are presented by service type under the "*FDIC Service-Billed Expenses*" section in the *Statement of Operations.*

Prior to 2002, the costs of FDIC-provided services were billed to receiverships in two components comprising 1) employee salaries based on actual labor hours directly attributable to an individual receivership and 2) indirect costs allocated amongst active receiverships based on liquidation activity, as reflected by each receivership's salary charges. Where applicable, these billed expenses are reflected as "*Salaries and Indirect Costs*" in the *Statement of Operations.*

**10. *Income Taxes* :** Federal tax law requires that receivers of corporations, including depository institutions for which the FDIC serves as receiver, continue to file federal income tax returns for the receiverships they manage. A receivership may therefore incur a federal income tax liability from activities that occur during the life of the receivership, as well as during pre-receivership periods. Payment of federal income taxes is deferred until higher priority claims are satisfied, but prior to any payment made to equity holders of the failed institution. Because of the contingent nature of these tax claims, federal income tax liabilities are generally not recognized in these financial statements unless circumstances indicate that there is a high probability that they will be paid. Federal law provides an exemption from income taxes imposed by any State or local taxing authority once FDIC is appointed as receiver.