IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AMBASE CORPORATION AND CARTERET BANCORP, INC.**, | ) | |
| **Plaintiffs**, | ) | |
| and | ) | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION**, | ) | No. 93-531C |
| | ) | Senior Judge Loren Smith |
| **Plaintiff-Intervenor**, | ) | |
| v. | ) | |
| **THE UNITED STATES** | ) | |
| **Defendant**. | ) | |

**DEFENDANT'S MEMORANDUM CONCERNING THE VIEWS OF MESSRS. BIANCO, VIGNA, AND ALBANESE ON THE INSOLVENCY OF CARTERET IN THE ABSENCE OF THE BREACH**

At a hearing on November 14, 2007, the Court requested that the parties present evidence concerning whether, in 1991, Mr. Richard Bianco acknowledged that Carteret Savings Bank, F.A. ("Carteret") was insolvent, and whether Messrs. Angelo Vigna and Robert Albanese acknowledged that, absent the breach, Carteret would not have been transferred to the Resolution Trust Corporation ("RTC"). Relevant supervisory memoranda generated in October 1991 and November 1992, Carteret's response to the 1991 Report of Examination of the Federal Deposit Insurance Corporation ("FDIC"), and the deposition testimony of Messrs. Bianco, Vigna, and Albanese demonstrate that, in 1991, Mr. Bianco did acknowledge Carteret's essential insolvency, and neither Mr. Vigna nor Mr. Albanese ever testified that Carteret would not have been seized in the absence of the breach. Accordingly, Ambase's contention that the failure of causation cannot be demonstrated by material undisputed facts is incorrect and the Court should

grant our request to delay the trial until the resolution of cross-motions for summary judgment on damages.

## ARGUMENT

### I. MR. BIANCO ACKNOWLEDGED CARTERET'S INSOLVENCY AS OF JUNE 30, 1991

Mr. Bianco was approved as, and assumed the responsibilities of, Chairman of the Board of Directors and Chief Executive Officer of Carteret on May 22, 1991. As Chairman and CEO of Carteret, Mr. Bianco was responsible for Carteret's submission of quarterly financial reports ( "TFRs") to the Office of Thrift Supervision ("OTS").

Based upon data contained in Carteret's September 30, 1991 TFR, OTS Regional Director Vigna and Deputy Regional Director Albanese wrote a memorandum to OTS's Washington Office (the "S-Memorandum") recommending that OTS impose a receivership upon Carteret. S-Memorandum dated October 25, 1991 (Exhibit 1). The recommendation noted that Carteret was severely undercapitalized, essentially insolvent, and an unsafe and unsound institution. Id. As reported by Messrs. Albanese and Vigna, Carteret's September 1991 TFR reported that, as of that date, Carteret's GAAP Equity Capital, which included goodwill, was approximately $32.5 million, or only .6 percent of the total assets of approximately $5.2 billion. Exhibit I at 1.

Messrs. Albanese and Vigna further reported that, even counting goodwill as regulatory capital, as required by the injunction of the United States District Court for New Jersey, Carteret failed the tangible capital requirement by approximately $3 million, the core capital requirement by approximately $82 million, and the risk-based capital requirement by approximately $99 million. Id. at p. 3. If goodwill were not counted toward regulatory capital requirements, the

memorandum noted that Carteret failed the tangible capital requirement by approximately $151 million, the core capital requirement by approximately $150 million, and the risk-based capital requirement by approximately $203 million.

Messrs. Albanese and Vigna further reported that "the deterioration of Carteret's [regulatory] capital position [was] primarily the result of the Savings Bank's unsuccessful extension into corporate and commercial real estate lending and its failure to internally identify and address problem assets." Exhibit 1 at 6. They further noted that "Carteret is not currently capable of generating core profits [and it was] unlikely that Carteret will be able to replenish its capital position without a significant external capital infusion." Id.

As Chairman and CEO of Carteret, Mr. Bianco acknowledged OTS's assessment of the regulatory capital position of Carteret. Indeed, the assessment was based upon Carteret's September 1991 TFR for which Mr. Bianco was responsible. Further, in correspondence with the regulators, Mr. Bianco recognized the perilous state of Carteret's financial condition. For example, in a letter to the FDIC responding to the 1991 report of examination, Mr. Bianco, joined by other members of the Board of Directors, noted that "Carteret continues to experience financial difficulties principally due to deterioration of its commercial real estate and corporate loan portfolios, with some deterioration in the first mortgage portfolio as well." Letter from Mr. Bianco and Members of the Board to Nicholas J. Ketcha, Jr., Regional Director, FDIC, dated August 30, 1991, at p. 2 (Exhibit 2).

Further, Mr. Bianco and his colleagues acknowledged that "[w]ith the significant increase in reserves for losses on loans and real estate in the second quarter of 1991, Carteret does not meet any of the three minimum capital requirements of FIRREA at June 30, 1991." Id.

at 3. Further, Messrs. Bianco and colleagues acknowledged that, based upon a "rapid and comprehensive review of Carteret's commercial real estate and corporate loan portfolios and related classifications and reserves," Carteret continued to suffer a "deterioration in its loan portfolios due to the prolonged downturn in the real estate market," and that, out of a commercial real estate portfolio of approximately $1 billion, "Carteret's total internally criticized assets at June 30, 1991, totaled $986 million . . . ." Id.

At his deposition in 1999, Mr. Bianco acknowledged the perilous state of Carteret's commercial real estate portfolio and the need for investment funds of approximately $200 million, under Federal regulatory requirements, to regain the thrift's viability. Bianco Dep., (Exhibit 3) at pp. 71-76; 81-88; 137-155. He testified that he disagreed with the OTS requirements concerning the valuation of the commercial loan portfolio and would have relied to a greater degree upon indices estimating future market trends. Id. at 147-49. He further testified that he and Carteret's Chief Financial Officer believed that, in the absence of OTS regulatory pressure, Carteret could have replenished regulatory capital over a six to seven year period by cutting expenses, returning to profitability, and retaining earnings. Id. at 152-155. Nevertheless, he acknowledged that such an approach did not meet regulatory criteria because Carteret failed regulatory capital requirements and needed to recapitalize. Id. at 151-152. In short, he stated that, under the OTS requirements, his "mandate [was] to bring in outside capital." Id., p. 69, line 20; p. 72, line 10; p. 150, lines 12-16.

Although Mr. Bianco essentially blamed the requlators for failing to recognize Carteret's "franchise" value and pressing for too prompt and large an investment, he did not contest the necessity of a recapitalization under OTS regulations. Although he believed these regulations

were shortsighted, he did not deny their substance, or that Carteret was massively undercapitalized. Indeed, he testified on three occasions that he understood that, under OTS requirements, his “mandate was to raise capital.” Exhibit 3, p. 69, line 20; p. 72, line 10; p. 150, lines 12-16. Accordingly, while he attempted to place the blame for Carteret’s failure on the impatience of the regulators, nowhere in the deposition does he deny the undisputed facts concerning Carteret’s massive undercapitalization. As noted, this was explicitly acknowledged by the Board of Directors’ 1991 letter to the FDIC, which was signed by Chairman Bianco and other members of the Board.

In short, although an advocate for Carteret, Mr. Bianco has provided no evidence to rebut the undisputed facts concerning Carteret’s regulatory capital shortfalls during the relevant time frame both with and without goodwill. To the contrary, contemporaneously with the events involving Carteret in 1991 and 1992, he explicitly acknowledged the parlous condition of the balance sheet and prospects for the future. Accordingly, although Mr. Bianco’s subjective opinion may be that Carteret would have survived in the absence of the breach, it is not supported by Carteret’s massive undercapitalization (with or without goodwill) and failure to raise tangible capital. Thus, the testimony is immaterial to cross-motions for summary judgment on damages and should not obviate the efficiencies that may be gained if the need for trial is eliminated, or the scope is simplified, as a result of the resolution of cross-motions.

## II. MESSERS. ALBANESE AND VIGNA TESTIFIED THAT EVEN IN THE ABSENCE OF THE BREACH CARTERET WOULD NOT HAVE SURVIVED

As noted above, in October 1991, Messrs Albanese and Vigna recommended transferring Carteret to the RTC because it was massively undercapitalized and, therefore, an unsafe and unsound institution. For nine months in 1992, OTS delayed transferring the institution in order

to allow an exploration of the availability of private investment funds. Carteret tried but failed to raise capital from private investors. On November 13, 1992, Messrs. Albanese and Vigna recommended a second time that Carteret be placed with the RTC because of a lack of capital. November 13, 1992 S-Memorandum (Exhibit 4). They noted that the transfer to the RTC recommended in the October 25, 1991 S-Memorandum had been delayed in order to accord Carteret's new management an opportunity to raise capital; however, in August 1992, "the lead investor, Kohlberg & Co. withdrew its July 20, 1992 conditional letter of intent to infuse $200 million into Carteret." Exhibit 4 at p. 2.

Messrs. Albanese and Vigna further noted that Kohlberg's refusal to invest was "due to Carteret's $502.2 million in nonperforming loans and REO (9.6 % of total assets at June 30, 1992), possible overvaluation of purchased mortgage servicing rights, possible additional losses on the commercial loan and real estate owned portfolios, and lack of support for Carteret's financial assumptions and projected earnings." Id. Two other potential investors, The Carlyle Group and Colony Capital, also notified OTS that they were withdrawing their conditional letter of intent because, "following due diligence, [they] had concluded that [they] could not receive an adequate rate of return on [their] investment and had concerns about 'regulatory risk.'" Id.

Messrs. Albanese and Vigna acknowledged that Mr. Bianco and colleagues had halted Carteret's capital erosion "largely due to management's reduction of operating costs, balance sheet restructuring and disposition of problem assets." Exhibit 4 at p. 5. They concluded, however, that Carteret continued to be effectively insolvent with total GAAP equity of approximately $56.2 million (only 1.2 percent of assets), negative tangible capital of approximately $62 million, negative core capital of approximately $14 million, and negative

risk-based capital of approximately $15 million. Id. at 3. Carteret failed to meet its tangible, core and risk-based regulatory capital requirements by $133.2 million, $157 million and $235.4 million, respectively. Id. at 5. Even counting the disputed amount of $150 million in supervisory goodwill as regulatory capital, Messrs. Albanese and Vigna still would have recommended transfer to the RTC because of a lack of capital, lack of prospect of raising capital, and the fact that "Carteret's high level of problem assets continue[d] to negatively impact earnings and capital through the loss of interest income, additions to reserves and charge-offs." Id. at 8-9.

Notwithstanding the recommendation in the November 1992 S-Memorandum, Ambase argues in its November 14, 2007 "Position Statement On The Court's Trial Schedule" ("Position Statement") at p. 6 that "the regulators [i.e. Albanese and Vigna] acknowledged that if supervisory goodwill had been viewed as tangible capital, as required by the contract, Carteret would not have been seized." This contention is incorrect. As the 1992 recommendation to OTS unambiguously stated, Messrs. Vigna and Albanese believed Carteret was in an unsafe and unsound condition primarily because of a lack of capital and needed to be transferred to the RTC even counting supervisory goodwill as regulatory capital. Exhibit 4 at pp. 8-9.

Ambase misleads the Court in the manner in which it interprets the two regulators' depositions. For example, after asserting in the Position Paper that the regulators acknowledged that Carteret would not have been seized if "supervisory goodwill had been viewed as tangible capital," Ambase provides the following quotation from the Vigna deposition:

> Q. If Carteret had cash, tangible cash, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret had been seized, in your opinion?

A. No.

This passage is cited as evidence that Mr. Vigna acknowledged that Carteret would not have been seized in the absence of the breach. The reliance is manifestly mistaken, however. As the quoted language makes clear, Mr. Vigna is referring to the investment of <u>cash</u> in the amount of $150 million not the recognition of goodwill as regulatory capital. Indeed, when asked whether it would have made a difference to the seizure decision if supervisory goodwill had been counted as regulatory capital, Mr. Vigna stated it would not:

> Q. If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing its not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized in your opinion.
> [OBJECTION]
> A. Would you read that back.
> [QUESTION RE-READ]
> A. I don't follow that question. It's cash, I mean, its real capital. We're talking about an intangible. It just - -
> Q. I understand.
> A. It's an accounting number, not even - - its not real, it has no return. I mean, cash can be invested for a return.
> Q. Yes.
> A. So your question isn't - - its not realistic.

Vigna Dep. at p. 158-159 (Exhibit 5). Contrary to Ambase's assertions, therefore, Mr. Vigna did not testify that Carteret would not have been seized if goodwill had counted as regulatory capital. His 1992 S-Memorandum states precisely the opposite.

Similarly, Mr. Albanese never testified that Carteret would have survived in the absence of the breach. To the contrary, he joined with Mr. Vigna in the 1991 and 1992 S- Memoranda which explicitly stated that Carteret should be transferred to the RTC even if supervisory

goodwill had been counted as regulatory capital. Exhibit 1 at pp. 2-4; Exhibit 4 at pp. 2-4; 8. At his deposition (Exhibit 6), he was asked whether he believed Carteret would have been seized if, as a result of goodwill counting as regulatory capital, Carteret would have satisfied its tangible capital requirement. Exhibit 6 at pp. 159-160. The question, however, did not specifically address Carteret's situation as of November 1992, which was that even counting $150 million of supervisory goodwill as regulatory capital (approximately $50 million of which had already been written off Carteret's books when it sold branches in 1990), Carteret would have failed core and risk-based regulatory capital requirements.

Further, if Carteret was unable to count the goodwill associated with the sale of branches in 1990, it would have failed all three regulatory capital ratios by a large margin even counting the remaining supervisory goodwill as regulatory capital. Finally, Mr. Albanese seemed to misunderstand the question as referring to all three regulatory capital requirements rather than tangible capital alone. Exhibit 6 at p. 161. Therefore, even assuming Mr. Albanese did not misunderstand the question, the deposition fails to reflect an acknowledgment that Carteret would not have been seized in the absence of the breach.

In short, based upon the S-Memoranda and Messrs. Vigna's and Albanese's deposition testimony, it is undisputed that Carteret was severely undercapitalized and that the regulatory capital deficiencies could not have been and would not have been remedied even if $150 million in goodwill were counted as regulatory capital. The only way the deficiency could have been remedied would have been through an infusion of approximately $200 million in tangible capital, which Carteret was unable to achieve despite working with OTS to attempt to secure private equity capital for approximately nine months in 1992. As Messrs. Vigna and Albanese

note in the 1992 S-Memorandum, Exhibit 4 at pp. 8-9, in these circumstances, transferring Carteret to the RTC was the only responsible course and was required by statute and regulation.

**CONCLUSION**

For these reasons and those discussed in our November 7, 2007 Memorandum, the court should delay scheduling Appendix A filings and trial until allowing the parties to brief summary judgment on damages.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s// Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street,, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309

Attorneys for Defendant

OF COUNSEL:
TAREK SAWI
Senior Trial Counsel

ARLENE PIANKO GRONER
ELISABETH . HOSFORD
F. JEFFERSON HUGHES
DELISA SANCHEZ
AMANDA TATUM

Date: November 19, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 19th day of November 2007, a copy of the foregoing "DEFENDANT'S MEMORANDUM CONCERNING THE VIEWS OF MESSRS. BIANCO, VIGNA, AND ALBANESE ON THE INSOLVENCY OF CARTERET IN THE ABSENCE OF THE BREACH" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt
David A. Levitt

.