**EXHIBIT 1**

OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION
S-MEMORANDUM - CARTERET SAVINGS BANK, F. A.

TO: Thomas A. Loeffler
Assistant Director, for Supervision Operations
Office of Thrift Supervision

CC: V. Gerard Comizio, OTS
Deborah Silberman, OTS
Mary Shean, OTS
Faith Hochberg, OTS
Sandra Waldrop, RTC
Ann McGlinn, RTC
Daniel Dionne, FDIC

THROUGH: Angelo A. Vigna
Regional Director
Northeast Regional Office

FROM: Robert C. Albanese
Deputy Regional Director

DATE: October 25, 1991

SUBJECT: Carteret Savings Bank, F. A.
Morristown, New Jersey
OTS Docket No. 04702
Home Office:
200 South Street
Morristown, New Jersey 07960

Summary of Financial Information
($000s)

| | | TFR 9/30/91~ | % of Assets | TFR 6/31/91 | % of Assets |
|---|---|---|---|---|---|
| Total Assets ....... | (SC060) | $5,223,719 | 100.0% | $5,354,370 | 100.0% |
| Total Liab. ........ | (SC070) | 5,191,251 | 99.4 | 5,314,472 | 99.3 |
| GAAP Equity Capital. | (SC080) | 32,468 | 0.6 | 39,898 | 0.7 |
| Net Op. Inc. (YTD) ... | (SO055) | (170,218) | (4.4) * | (157,327) | (11.8) * |
| Net Income (YTD) .... | (SO081) | (156,417) | (4.0) * | (148,987) | (11.1) * |
| Critic. Asts. | (TA400+410+430) | 982,627 | 18.8 | 977,897 | 18.3 |
| Delinq. Loans .. | (PD10+20+30) | 417,218 | 8.0 | 341,329 | 6.4 |
| Dep. Outfl. (Qtr) | (CF420+430) | (82,257) | (6.3) * | (36,620) | 2.7* |

~ 9/30/91 TFR data is unedited.
* Annualized



WOP333 0969 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

## GROUNDS FOR THE APPOINTMENT OF A RECEIVER

### I. SUMMARY

The Northeast Regional Office ("Office") recommends that the Director of OTS appoint the Resolution Trust Corporation ("RTC") as receiver for Carteret Savings Bank, F. A. ("Carteret" or the "Savings Bank") pursuant to Section 5(d)(2)(A) of the Home Owners' Loan Act ("HOLA"), 12 U.S.C.A. § 1464(d)(2)(A). Carteret has incurred losses that have severely impaired its capital position and is likely to incur additional losses that will severely deplete any remaining GAAP capital. The financial condition of Carteret has deteriorated to the point where recapitalization of the Savings Bank is not feasible absent direct government assistance.

Mostly during the quarter ended June 30, 1991, Carteret experienced nearly a complete turnover in its executive management team and Board of Directors. New individuals particpating in the affairs of Carteret include: Richard A. Bianco as Chairman of the Board, Chief Executive Officer and President to replace Robert B. O'Brien and Robert C. Walsh, respectively; J. Wayne Moor as Chief Loan Workout Officer to replace Richard Braun; Donald Kramer to fill the vacant Chief Financial Officer position and a vacant board slot; and Leo O. McCabe, Ronald Burns and C. Austin Fitts as new directors. In addition to the aforementioned personnel changes, Carteret elected to change external auditors from Peat Marwick to Price Waterhouse effective for the quarter ended June 30, 1991.

Carteret's new management team and Price Waterhouse focused their initial efforts on conducting a comprehensive loan portfolio evaluation. Carteret's senior management and outside counsel advised this Office at a meeting on July 29, 1991 that the findings of the portfolio evaluation indicated that Carteret needed to recognize an additional $175 to $200 million in loan loss provisions effective for the reporting period ended June 30, 1991. Carteret formally reported in the 10Q filing of its parent, AmBase Corporation, that the Savings Bank had recognized $150 million in loan loss provisions for the quarter ended June 30, 1991.[1]

---

1. See Exhibit 1 - AmBase Corporation SEC Form 10Q for the quarterly period ended June 30, 1991.



W WOP333 0970 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX
# # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO
PI PROTECTIVE ORDER

Summary of Capital Position:

The following chart presents Carteret's capital position as of June 30, 1991 in two formats. The first two columns represent Carteret's capital position including $150.5 million in supervisory goodwill for all calculations in accordance with the preliminary injunction order, issued by U. S. District Court for the District of New Jersey in Carteret Savings Bank, F. A. v. Office of Thrift Supervision et al. ("Carteret Savings").[2] The second two columns represent Carteret's capital position excluding supervisory goodwill.

( Amounts in 000's as of June 30, 1991 )

| | Including Goodwill | | Excluding Goodwill | |
|---|---|---|---|---|
| GAAP Capital | $ 39,898 | 0.73% | $ 39,898 | 0.73% |
| Tangible Capital | $ 78,786 | 1.44% | ($71,739) | (1.44%) |
| Tang. Capital Req. | 81,795 | 1.50 | 79,723 | 1.50 |
| Surplus/(Deficit) | 3,009 | (0.06%) | (151,462) | (2.86%) |
| Core Capital | $ 81,972 | 1.50% | $ 9,983 | 0.19% |
| Core Capital Req. | 163,686 | 3.00 | 159,509 | 3.00 |
| Surplus/(Deficit) | (81,714) | (1.50) | (149,526) | (2.81%) |
| Risk Based Capital | $130,196 | 4.26% | $ 19,966 | 0.67% |
| Risk Based Cap. Req. * | 229,596 | 7.51 | 222,680 | 7.51 |
| Surplus/(Deficit) | ( 99,400) | (3.25%) | (202,714) | (6.84%) |

* Carteret's risk based capital requirement is derived by taking 7.2% times total risk weighted assets plus $9,416 in recourse items that are capitalized dollar-for-dollar.

2. The preliminary injunction order, as amended, enjoins the OTS from deduction supervisory goodwill for the purposes of evaluating Carteret's compliance with the capital standards prescribed in the Financial Institution Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). Thus, Carteret reports an additional $150,526,000 supervisory goodwill in its tangible, core and risk based capital calculations. Carteret's supervisory goodwill is comprised of two components: (i) On-balance sheet = $93,314 and (ii) Off-balance sheet = $57,212. Off-balance sheet goodwill represents amounts amortized or charged-off by Carteret pursuant to GAAP, but included in Carteret's capital calculations pursuant to the U. S. District Court's order dated July 8, 1991.



WOP333 0971 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

I. SUMMARY (continued)

The deterioration of Carteret's capital position is primarily the result of the Savings Bank's unsuccessful extension into corporate and commercial real estate lending and its failure to internally identify and address problem assets. Losses continued to mount as Carteret provided for additional loan loss provisions necessary to provide adequate coverage against the overall credit exposure inherent in its balance sheet.

The Savings Bank's earnings capability has been severely impaired due to the accelerating rise of non-performing credits, credits not performing to original terms and assets taken through foreclosure. The following chart provides a summary of the substantial impairment to Carteret's interest earning capacity caused by non-performing loans, trouble debt restructurings, real estate owned and other non-earning assets as of June 30, 1991.

| | $'s in 000's |
|---|---|
| Loans 30-89 Days Past Due | $103,020 |
| Loans 90 Days + Past Due | 42,573 |
| Loans on Non-accrual | 195,736 |
| Total Delinquent Loans | $341,329 |
| Troubled Debt Restructured | $219,665 |
| Real Estate Owned (Net) | 101,688 |
| Investment in and Loans to Subs | 133,554 |
| Total Not Performing to Terms | $454,907 |
| Goodwill & Other Non-Interest Bearing Assets | $238,463 |
| Total Delinquent, Non-Performing & Non-Earning Assets | $1,034,699 or 18.9% of T.A. |

Carteret is not currently capable of generating core profits. The lack of core profitability at Carteret, combined with the nominal capital resources of its parent, AmBase, makes it unlikely that Carteret will be able to replenish its capital position without a significant external capital infusion. Carteret has presented a Capital Plan that details its proposal to attract $150 million by December 31, 1992. It is our opinion that Carteret's precarious financial condition will deter any serious potential investors and/or acquirers, except to the extent that the Federal government would provide financial assistance. This Office is recommending that Carteret's Capital Plan be denied. A formal recommendation and supporting workpapers are currently being prepared.



WOP333 0972 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

SELECTED SUPERVISORY INFORMATION:

| | M-A-C-R-O | Composite |
|---|---|---|
| Examination Results: | | |
| June 17, 1991 | In Progress | 5 (projected) |
| June 4, 1990 | 4-5-4-3-4 | 5 |
| May 22, 1989 | 4-4-4-3-5 | 4 |

Consent Agreement: No.

Capital Directive(s): This Office presented Carteret with three separate Capital Directives on January 17, 1991, June 28, 1991 and again on September 11, 1991. Carteret initiated suits against the OTS, which had effectively nullified the impact of the first two Capital Directives by permitting Carteret to include supervisory goodwill for all capital calculations. Carteret executed the third Capital Directive on October 7, 1991 after second quarter losses caused the Savings Bank to be capital deficient including all supervisory goodwill. The Capital Directive was issued on October 8, 1991.

Open Applications: Transaction with affiliates: Carteret has applied to sell a subsidiary, Imperial Premium Finance, Inc. ("IPF"), to AmBase for $65 million pursuant to the terms of a "global agreement" executed between OTS and AmBase on April 25, 1991. A July 25, 1991 appraisal prepared by Deloitte Touche valued IPF at $45 million. AmBase is finalizing the arrangements for funding the IPF acquisition.

Capital Disputes: See Part V. Capital Plan and Related Considerations

## II. PROPOSAL

This memorandum discusses the financial and supervisory aspects of this Office's recommendation that the Director, OTS, appoint a receiver for Carteret Savings Bank, FA, Morristown, New Jersey, pursuant to Section 5(d)(2)(A) of the Home Owners' Loan Act ("HOLA"), as amended by (FIRREA), (12 U.S.C. Sec. 1464(d)(2)(A)).



WOP333 0973 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

## III. BACKGROUND

Carteret was incorporated on September 15, 1939 as a state chartered savings and loan association as Carteret Building and Loan Association of Newark, New Jersey. Carteret converted to a federally chartered mutual association on May 5, 1982 and to a federally chartered stock association in September 7, 1983. Carteret Savings and Loan Association changed its name to Carteret Savings Bank, FA on January 15, 1986. Carteret is a member of the Federal Home Loan Bank ("FHLB") system and its accounts are insured by the Savings Association Insurance Fund ("SAIF") of the Federal Deposit Insurance Corporation ("FDIC").

Carteret created a savings and loan holding company in 1987, Carteret Bancorp, Inc. ("Bancorp"), for the purpose of expanding its business activities. AmBase Corporation, through its subsidiary, The Home Insurance Company (Home"), acquired Bancorp, and thus, Carteret, on August 8, 1988 for $266 million. As part of the acquisition, Carteret acquired Imperial Premium Finance ("IPF") from Home for $65 million. IPF has certain intangible assets which have negatively impacted the regulatory capital position of Carteret since the enactment of FIRREA.

AmBase began actively pursuing the sale of Home in early 1990 in an attempt to get out from under its enormous debt burden. After several renegotiations, AmBase agreed upon terms for the sale of Home to TVH Acquisitions ("TVH") (now Home Holding, Inc.), a major Swedish insurer. The sale of Home to TVH was ultimately consummated on February 12, 1991 enabling AmBase to repay its borrowings and infuse $30 million in capital into Carteret. AmBase's lone remaining direct operating subsidiary is Carteret through its ownership of Bancorp.

Carteret operates 32 retail branches throughout Central and Northern New Jersey, 12 branches in Florida and 4 branches in the Washington DC area. Carteret substantially reduced its retail operations in 1990 by selling 23 branches, including more than $1 billion in deposit liabilities. The branch sales were largely funded through FHLB advances. Carteret continues to seek ways to shrink its retail branch network and ultimately plans to liquidate its remaining presence in the mid-Atlantic states.

Carteret also operates an extensive network of service corporations which are engaged in various activities, some of which are impermissible for national banks and are thereby required to be deducted from capital for regulatory capital calculation purposes. Carteret has recently utilized the service corporation network to take title to the Savings Bank's foreclosed properties principally in order to shield the Savings Bank from potential liabilities. A description of Carteret's service corporation network and the activities in which each service corporation are engaged in has been included as Exhibit 2.



WOP333 0974 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

This Office conducted a full scope examination of Carteret from June 4, 1990 through October 26, 1990. Carteret was assigned a "5" Composite rating in the final Report of Examination transmitted on December 12, 1990. The "5" rating was assigned as a result of the serious concerns of this Office as to the ultimate viability of Carteret. The additional valuation allowances deemed necessary pursuant to the examination findings indicated that Carteret was capital deficient on tangible, core and risk-based capital standards by $76 million, $71 million and $86 million, respectively. Carteret's growing operating losses appeared to squelch any reasonable expectation for full recapitalization absent significant external capital contributions.

Carteret set aside the valuation allowances requested per the examination findings during the third and fourth quarters of 1990, a delayed recognition, which softened the immediate impact of the examination findings. In addition, Carteret orchestrated three separate branch sale transactions in the fourth quarter thereby eliminating more than $50 million of excess supervisory goodwill. Carteret reported tangible, core and risk-based capital deficiencies of $31 million, $27 million and $62 million as of December 31, 1990.

This office made numerous requests of AmBase to immediately infuse $30 million into Carteret in satisfaction of its remaining obligation to Carteret under the Regulatory Capital Maintenance Agreement dated November 28, 1988. Additionally, this Office presented Carteret with a Capital Directive on January 18, 1991. The Capital Directive incorporated stringent operating restrictions deemed necessary by this Office to address significant supervisory concerns. Finally, as a result of AmBase's failure to infuse $30 million into Carteret, this Office issued AmBase a Consent Cease and Desist Order on February 12, 1991 requiring that AmBase cause $30 million of the anticipated proceeds from the sale of Home to be infused into Carteret. AmBase executed the Cease and Desist Order on February 12, 1991.

The sale of Home to TVH received shareholder approval on February 12, 1991. AmBase infused $30 million into Carteret on February 13, 1991 using a portion of the proceeds from the sale of Home. In February, 1991, AmBase was also directed by this Office to reimburse Carteret $6.6 million for a tax refund received by AmBase that was due and unpaid to Carteret. After a short deliberation, AmBase agreed to refund the monies due to Carteret.

AmBase's remaining resources are relatively limited when considering the tremendous capital needs of Carteret. It has been conveyed to this Office that AmBase has approximately $20 million in liquid assets. AmBase has signed a letter of intent to purchase IPF from Carteret which would require AmBase to use $10 million as partial payment for IPF. The remaining AmBase resources have been earmarked for the continued operation of AmBase and for the settlement of several

compensation and tax obligations. AmBase has fulfilled its obligations under the Regulatory Capital Maintenance Agreement dated November 28, 1988.

Carteret filed suit against the OTS and the FDIC on February 14, 1991 challenging the OTS' interpretation of FIRREA's capital requirements and seeking relief with respect to the Capital Directive presented to the Savings Bank on January 17, 1991. The District Court ruled in Carteret's favor on February 18, 1991 and issued a temporary restraining order ("TRO") enjoining the OTS from excluding supervisory goodwill when determining Carteret's compliance with minimum regulatory capital standards.

This Office presented a Consent Cease and Desist Order to Carteret on February 21, 1991 in order to address operating deficiencies described in the Report of Examination. Carteret and AmBase sought to resolve a wide spectrum of issues in considering whether or not to consent to the issuance of the Cease and Desist Order. Ultimately, this Office opted, as part of a "global agreement" to present Carteret with a Supervisory Agreement that contained, in substance, all of the operating restrictions that had been presented in the Cease and Desist Order. As part of settling the final enforcement action, this Office required that AmBase infuse $12.5 million into Carteret and agree to purchase IPF from Carteret at the higher of $65 million or fair market value. AmBase agreed to make the $12.5 million infusion and to use its best efforts to secure adequate financing to purchase IPF and Carteret executed the Supervisory Agreement on April 29, 1991.

On June 17, 1991, this Office commenced an examination of Carteret. Examiners engaged in pre-examination scoping at the Savings Bank uncovered certain objectionable compensation practices. These practices include, but are not limited to, significant cash bonuses paid to officers while Carteret was experiencing continued, sizable net losses, lucrative severance agreements and consulting arrangements with terminated employees, the extensive use of "stay" or "retention" bonuses and questionable transferral of funds to a former CEO and President of Carteret. All compensation issues are being actively investigated as part to the ongoing examination. OTS Enforcement is working jointly with this Office in reviewing all of the compensation matters. It is likely that a formal Notice of Charges will be issued in the near future. Restitution will be sought from AmBase for its failure to prevent abusive compensation practices at Carteret and for AmBase's role, via its compensation committee, in approving the abusive use of Carteret funds.

Senior management officials at Carteret met with staff from this Office on July 29, 30 and 31, 1991 to discuss the Savings Bank's ongoing comprehensive portfolio evaluation. Carteret's management team acknowledged that the institution was substantially under-reserved and recorded a $150 million provision for loan loss for the quarter ended



WOP333 0976 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

June 30, 1991. Carteret established $5.7 million in additional valuation allowances during the two month period ended August 31, 1991.

Carteret completed the majority of its comprehensive portfolio evaluation and prepared a draft reserve analysis as of September 30, 1991 (see Exhibit 3). Carteret reported $978 million in total criticized assets on its Thrift Financial Report as of June 30, 1991, up by $106 million from June 30, 1990. The Savings Bank currently holds $282 million in general and specific valuation allowances against its $956 million portfolio of real estate owned, joint ventures, and commercial real estate and corporate loans. Carteret has $33.9 million in additional valuation allowances against the institution's remaining assets as of September 30, 1991. The following chart summarizes the findings of the portfolio evaluation, which only includes commercial real estate and corporate loans, REO and joint ventures. The portfolio review did not encompass an analysis of Carteret's relatively low risk assets (i.e. performing single family mortgages).

$'s in 000's

| Category | Total Balance | SpecialM | Substand. | Specific Allow. | General Allow. | Total Allow |
|---|---|---|---|---|---|---|
| Com RE/Corp. | $768,710 | $42,690 | $446,202 | $89,879 | $101,136 | $194,592 |
| REO/JVs | 187,040 | 0 | 96,001 | 91,039 | 0 | 97,039 |
| Totals | $955,750 | $42,690 | $542,203 | $180,918 | $101,136 | $282,054 |

## IV. FINANCIAL CONDITION

### A. Problem Assets

Overall, Carteret's asset quality continues to deteriorate. While the total amount of delinquent loans reached a high of $513 million as of October 30, 1990, the decline in non-performing loans is primarily the result of sharply increased foreclosure activity rather than an improvement in loan performance. Carteret foreclosed on $215 million in mortgage loans during 1990. Carteret is expected to continue to initiate foreclosure proceedings on non-accrual loans totaling $296 million as of August 31, 1991.

The continued decline in asset quality is placing tremendous pressure on Carteret's net interest margin. Carteret's net interest margin before provision for loan losses was $88 million (approximately 1.5% of total assets) for the year ended December 31, 1990. Weakening asset quality during 1991 has lowered Carteret's net interest margin to approximately 1.2% of total assets on an annualized basis for the eight months ended August 31, 1991. As asset quality deteriorates,



WOP333 0977 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Carteret's interest earning potential will decline, additional valuation allowances will be required and operating expenses will rise as the legal and workout costs of problem assets continue to mount.

B. Liquidity

Carteret utilized extensive borrowings from the FHLB to finance its $1 billion in branch sales during the fourth quarter of 1990. The FHLB had alternated its collateral margin from 110% to 125% as a result the Court's various rulings with regard to supervisory goodwill. Second quarter 1991 losses have caused the FHLB to enforce a 125% collateral requirement. The credit problems experienced in Carteret's mortgage loans negatively impacts its additional borrowing capacity.

Although market short term deposit rates have dropped steadily during 1991, Carteret "bidded up" its CD rates above its local competitors to solicit steady deposits inflows. Carteret's deposit rates have come down somewhat, but its CD rates are still consistently 10 to 15 basis points above its competitors. The impact of such a pricing strategy becomes apparent in Carteret's net interest margin.

Carteret has also utilized $35 million in deposits from the "As Agent" deposit program offered through the FHLB-Dallas. The "As Agent" deposits are priced at LIBOR plus a 12 basis point fee. The CDs and "As Agent" deposit inflows have enabled Carteret to pay down borrowings and free up collateral. The existing Capital Directive prohibits Carteret from renewing and accepting new "As Agent" CDs.

Carteret is required to maintain total liquid assets and borrowing capacity of 10% of its liquidity base (approximately $300 million) under the April 29, 1991 Supervisory Agreement. Additionally, should Carteret's Capital Plan be rejected, it would be required to increase its total liquidity and borrowing capacity to 15% of its total liquidity base within 30 days of such denial.

C. Earnings

Carteret has not generated a net operating profit since the first quarter of 1988. A summary of Carteret's operations for the years ended December 31, 1989 and 1990 and year to date August 31, 1991 is as follows (amounts in $000,000's):

| | YTD 8/91 | Jul/Aug 91 | 2nd Q 91 | 1st Q91 |
|---|---|---|---|---|
| Net Int. Income | $ 43.7 | $10.5 | $ 17.1 | $16.1 |
| Prov for Loan Loss | -165.2 | - 5.7 | -148.4 | -11.1 |
| Net Non-Int. Inc. | - 58.1 | -15.0 | - 26.0 | -17.1 |
| Net Operating Inc. | -179.6 | -10.2 | -157.3 | -12.1 |
| Net Non-Oper. Inc. | 15.9 | 2.6 | 7.7 | 5.6 |
| Net Income B/Tax | -$163.7 | - 7.6 | -149.6 | - 6.5 |



WOP333 0978 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX, # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION
S-MEMORANDUM - CARTERET SAVINGS BANK, F. A.

C. Earnings (continued)

| | YTD 12/90 | 4thQ 90 | 3rdQ 90 | 2ndQ 90 | 1stQ 90 |
|---|---|---|---|---|---|
| Net Int. Income | $ 88.0 | $15.3 | $21.7 | $24.1 | $26.9 |
| Prov for Loan Loss | -106.8 | -43.2 | -34.9 | - 7.7 | -21.0 |
| Net Non-Int. Inc. | -115.9 | -32.7 | -30.2 | -23.7 | -29.3 |
| Net Operating Inc. | -134.7 | -60.5 | -43.4 | - 7.3 | -23.5 |
| Net Non-Oper. Inc. | + 21.2 | -14.1 | +22.5 | + 4.3 | + 8.5 |
| Net Income B/Tax | -113.5 | -74.6 | -20.9 | - 3.0 | -15.0 |

| | YTD 12/89 | 4thQ 89 | 3rdQ 89 | 2ndQ 89 | 1stQ 89 |
|---|---|---|---|---|---|
| Net Int. Income | $ 79.0 | $17.2 | $20.1 | $19.2 | $22.5 |
| Prov for Loan Loss | - 31.7 | -18.0 | - 9.2 | - 3.3 | - 1.2 |
| Net Non-Int. Inc. | -101.1 | -24.3 | -29.7 | -21.5 | -25.6 |
| Net Operating Inc. | - 53.8 | -25.1 | -18.8 | - 5.6 | - 4.3 |
| Net Non-Oper. Inc. | + 61.4 | +17.3 | +39.8 | + 1.7 | + 2.6 |
| Net Income B/Tax | + 7.6 | - 7.8 | +21.0 | - 3.9 | - 1.7 |

As can be seen in the charts provided above, Carteret has been able to partially disguise the impact of significant net operating losses by utilizing non-operating gains recognized from the sale of assets which had been held for investment. Carteret reported a $179.6 million net operating loss (which includes a $165.2 million provision for loan loss) and a $162.4 million net loss after taxes for the six months ended June 30, 1991. However, Carteret's strategy of selling relatively attractive yielding assets at a gain has contributed to the declining net interest margin and inability to generate core profits.

Carteret's net operating losses have continued to grow as proceeds from asset sales have, in part, been reinvested in lower yielding assets and, in part, due to the severe problems experienced mostly in its real estate loan and real estate owned portfolios. Weak real estate market conditions in the Northeast region have increased the severity of the already troubled portfolio. Also, the regional and national economic recession has negatively impacted Carteret's mortgage loan delinquency rates during 1990 and 1991.

## V. CAPITAL PLAN AND RELATED CONSIDERATIONS

This Office presented Carteret with Capital Directives requiring Capital Plans on three separate occasions only to be rebutted by Carteret through court proceedings on the first two Capital Directives. On September 11, 1991, OTS-NE presented Carteret with a third Capital Directive as a result of Carteret's capital deficiency as of June 30, 1991 including all supervisory goodwill as capital. Carteret agreed to consent to the Capital Directive, which required the submission of a Capital Plan by September 30, 1991. The Savings Bank delivered a Capital Plan on September 30, 1991. The Capital Directive was issued on October 8, 1991 (see Exhibit 4).



WOP333 0979 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

A. Summary of Carteret Capital Plan Submission

Carteret submitted its Capital Plan ("Plan") on 9/30/91, in which it projects full compliance with FIRREA capital requirements by 6/30/94. Compliance is projected through (i) Carteret's return to profitability via aggressive expense reductions, limited additional provisions for loan losses, aggressive disposition of troubled assets and a widening net interest margin, and (ii) a $150 million external capital infusion by 12/31/92. Carteret would maintain its current size, approximately $5.5 billion, throughout the term of the Plan. The following charts summarize several components of the Plan.

1. Summary of Carteret's Earning Projections ($'s in 000's):

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| Interest Income | $430,385 | $410,507 | $426,237 | $432,158 |
| Interest Expense | 350,259 | 315,787 | 308,256 | 299,152 |
| Net Interest Margin | 80,125 | 94,720 | 117,981 | 133,006 |
| Prov. for Loan Losses | -170,168 | - 12,000 | - 12,000 | - 7,000 |
| Net Non-Int. Margin | - 72,149 | - 73,688 | - 76,057 | - 72,663 |
| Net Income | -$162,192 | $ 9,032 | $ 29,924 | $ 53,343 |
| Net Income with OTS Interest rate projections | | $ 4,125 | $ 22,924 | $ 41,403 |

2. Summary of Capital Projections ($'s in 000's):

| | 9/30/91 | 12/31/91 | 12/31/92 | 12/31/93 | 12/31/94 |
|---|---|---|---|---|---|
| Tang Capital | $-74,842 | $-64,692 | $100,942 | $140,013 | $198,732 |
| Tang Reqrmnt | 79,967 | 81,242 | 82,330 | 82,345 | 82,331 |
| Tang Deficit | -154,809 | -144,748 | + 18,612 | + 57,668 | +116,399 |
| Core Capital | $ 8,014 | $ 17,956 | $157,232 | $181,402 | $219,313 |
| Core Reqrmnt | 160,021 | 164,567 | 164,701 | 164,697 | 164,662 |
| Core Deficit | -152,007 | -142,233 | - 7,469 | + 16,705^ | +54,651* |
| R-B Capital | $ 55,369 | $ 65,117 | $194,773 | $216,893 | $253,625 |
| R-B Reqrmnt | 233,691 | 230,305 | 239,719 | 226,986 | 221,071 |
| R-B Deficit | -178,322 | -160,374 | - 44,946 | - 10,093 | +32,554~ |

^ Actual compliance with 3% core requirement on 9/30/93.
* Actual compliance with 4% core requirement on 12/31/94.
~ Actual compliance with 8% RBC requirement on 6/30/94.

Note: Carteret would achieve tangible, core and risk-based capital compliance by 6/92, 12/92 and 12/92, respectively, including all supervisory goodwill.



WOP333 0980 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

3. Summary of Overall Capital Plan Strategies:

- Sell IPF to AmBase for $65 million by December 31, 1991, realizing a $5 million book gain and decreasing intangible assets by $12 million, thereby increasing regulatory capital by $17 million.

- Dramatically reduce expenses by January 1, 1992 through: (i) a reduction in workforce ("RIF") program, (ii) curtailing the use of outside attorneys and consultants, (iii) a restructuring of the data processing division, (iv) cutbacks in advertising and marketing (v) renegotiating and/or allowing to lapse certain unfavorable leases. Total expense reductions projected to save Carteret $13.1 million annually.

- Gain control of and aggressively market existing problem credits, thereby converting at least 20%, and up to 50%, of remaining non-performing loans to earning status per year throughout the Capital Plan period.

- Solicit $150 million in capital from outside investors by December 31, 1992. Possible investors include, (i) institutional investors (i.e. pension, investment and endowment funds, etc.), (ii) strategic investors (i.e. non-bank financial companies, mortgage banking interests, insurance companies, etc.) (iii) banking institutions and (iv) bridge financing groups.

B. Capital Plan Status

On October 22, 1991 OTS-NE received Carteret's response to this Office's request for additional information. Carteret's original Capital Plan submission was run utilizing a relatively optimistic interest rate scenario (flat/falling). Carteret was requested on October 15, 1991 to rerun its projections using OTS's interest rate scenario (slightly rising rates). The OTS rate scenario has a negative impact on Carteret's earnings projections and thus ability to achieve capital compliance.

OTS-NE has reviewed the revised Capital Plan and is preparing a recommendation for rejection of the Plan.

## VI. Litigation History

The following chronology of events details the Capital Plan process and supervisory goodwill litigation issues that have taken place through the time of this writing.

September 30, 1990 — Carteret reports that it is capital deficient on a tangible basis. Several branch sales in October and November, 1990 enable Carteret to report that it has cured its capital deficiency.



WOP333 0981 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION
S-MEMORANDUM - CARTERET SAVINGS BANK, F. A.

Litigation History (continued):

| | |
|---|---|
| December 31, 1990 | Carteret records substantial additions to its valuation allowances as had been previously recommended via this Office's examination transmittal dated December 12, 1990. |
| January 17, 1991 | This Office presents Carteret with a Capital Directive requiring the Savings Bank to submit a Capital Plan by February 28, 1991 demonstrating compliance with a five percent (5%) core capital requirement by December 31, 1992. |
| February 14, 1991 | Carteret files suit against the OTS in the U.S. District Court for the District of New Jersey seeking injunctive relief enjoining the OTS from taking any action against Carteret based on insufficient capital without counting supervisory goodwill as a component of capital. |
| February 18, 1991 | Judge Bissell, U. S. District Court, issues a temporary restraining order enjoining OTS from deducting goodwill from capital in determining Carteret's compliance with the minimum capital requirements prescribed in FIRREA. |
| April 12, 1991 | Judge Bissell hears oral arguments in a preliminary injunction hearing on the inclusion of goodwill as a capital component. |
| April 17, 1991 | Judge Bissell rules in Carteret's favor on the preliminary injunction, thereby formalizing the restrictions contained in the temporary restraining order. |
| April 19, 1991 | OTS appeals to the Third Circuit Court of Appeals, the District Court's grant of a preliminary injunction. |
| May 10, 1991 | OTS seeks reconsideration of that portion of the District Court's order requiring inclusion of, for capital purposes, goodwill that had been written off in connection with Carteret's sale of certain branches in 1990. |
| May 17, 1991 | Judge Bissell amends Preliminary Injunction on May 18, 1991, permitting OTS to deduct from goodwill certain supervisory goodwill that had been written off pursuant to GAAP in connection with certain branch sales. |

Litigation History (continued):

| | |
|---|---|
| June 28, 1991 | This Office presents Carteret with a Capital Directive requiring Carteret to submit a Capital Plan which demonstrates how the Savings Bank will attain compliance with the tangible (1.5%), core (3%) and risk based capital (7.2% and 8%) requirements. |
| July 2, 1991 | Carteret files a motion for reconsideration of Judge Bissell's order dated May 17, 1991 claiming that the Court's order caused Carteret to fail its risk based capital requirement and thus, triggered this Office to present the Savings Bank with a second Capital Directive. |
| July 8, 1991 | Judge Bissell reverses his May 17, 1991 amendment to the PI. In effect, the July 8, 1991 ruling reinstated, for capital purposes, $57 million in supervisory goodwill that had been written off by Carteret in accordance with GAAP. |
| July 10, 1991 | In order to comply with Judge Bissell's July 8, 1991 ruling, this Office withdraws the Capital Directive that had been presented to Carteret on June 28, 1991. |
| July 12, 1991 | OTS appeals to the Third Circuit the District Court's July 8, 1991 ruling. |
| August 14, 1991 | AmBase files its SEC Form 10 Q for the period ending June 30, 1991 disclosing that second quarter losses at Carteret caused the Savings Bank to be capital deficient by more than $100 million, including all supervisory goodwill as capital. |
| September 11, 1991 | OTS-NE presents Carteret with a third Capital Directive. |
| September 30, 1991 | Carteret submits a Capital Plan that documents its plan to achieve capital compliance by (i) December 31, 1991 including supervisory goodwill as capital and (ii) by December 31, 1994 excluding the use of supervisory goodwill as capital. |
| October 7, 1991 | Carteret consents to the issuance of a Capital Directive which, in turn is executed by the OTS-NE Regional Director on October 8, 1991. |
| October 15, 1991 | OTS-NE requests that Carteret provide additional information in regard to its Capital Plan filing. |
| October 22, 1991 | Carteret submits its response to the OTS-NE request for additional information. |

## VII. GROUNDS FOR APPOINTMENT OF A RECEIVER

This Office is of the view that grounds exist for the appointment of a receiver for Carteret pursuant to Section (5)(d)(2)(A) of the HOLA.

### A. Subsection (iii): UNSAFE OR UNSOUND CONDITION TO TRANSACT BUSINESS, INCLUDING HAVING SUBSTANTIALLY INSUFFICIENT CAPITAL OR OTHERWISE

As shown on page 3, as of June 30, 1991 Carteret failed to meet all three of its capital requirements, regardless of whether supervisory goodwill is excluded or included in determining capital compliance. When supervisory goodwill is included for purposes of calculating capital compliance, tangible capital was deficient by $3.0 million, core capital was deficient by $81.7 million, and total (risk based) capital was deficient by $99.4 million. Excluding supervisory goodwill in determining capital compliance, Carteret is capital deficient by $152 million, $149 million and $205.9 million, respectively on a tangible, core and total (risk based) basis.

As indicated in Section IV, the Savings Bank continues to suffer significant losses from its core operations. Consequently, we anticipate that Carteret's capital deficiencies will continue to grow.

Given the size of the existing capital deficiencies and the continued losses from core operations, we conclude that Carteret's capital is substantially insufficient, and that the Savings Bank is in an unsafe or unsound condition to transact business.

### B. Subsection (vii): THE SAVINGS ASSOCIATION HAS INCURRED OR IS LIKELY TO INCUR LOSSES THAT WILL DEPLETE ALL OR SUBSTANTIALLY ALL OF ITS CAPITAL, AND THERE IS NO REASONABLE PROSPECT FOR THE SAVINGS ASSOCIATION'S CAPITAL TO BE REPLENISHED WITHOUT FEDERAL ASSISTANCE

For the reasons discussed below, Carteret's capital has been substantially depleted as of June 30, 1991. Including supervisory goodwill, Carteret had tangible capital of $78.8 million, core capital of $81.9 million and total (risk based) capital of $130.2 million. When excluding supervisory goodwill for deterimining Carteret's capital position, it is tangibly insolvent by $71.7 million, core capital is $11.8 million, and total (risk based) capital is $23.7 million.

Carteret's losses have resulted from several factors. First, Carteret recorded $290 million in valuation allowances during the period January 1, 1991 to August 31, 1991. If supervisory goodwill is excluded for purposes of determining Carteret's capital compliance, this factor alone nearly eradicated all of Carteret's capital, and rendered the



WOP333 0984 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Savings Bank tangibly insolvent. When supervisory goodwill is included, the effect of the valuation allowances was to substantially deplete the Savings Bank's capital.

Second, as shown in Section IV C, Carteret has not generated a net operating profit since the first quarter of 1988. Net operating income was -$53.8 at year-end 1989, -$134.7 at year-end 1990 and -$179.6 as of August 31, 1991.

Third, as previously discussed, Carteret's earnings capability has been severely impaired due to a substantial increase in delinquent, non-performing and non-earning assets. At June 30, 1991, these assets totaled over $1 billion, or 18.9% of total assets. In addition to necessitating nearly $300 million in valuation allowances in a twenty month period, Carteret's continued decline in loan performance is significantly affecting its net interest margin, which declined from 1.5% of total assets for the year ended December 31, 1990 to 1.2% on an annualized basis in 1991 based on the eight month period ended August 31, 1991.

Finally, due to Carteret's weak financial condition (i.e., continued large volume of problem assets, resulting in substantial valuation allowances, and lack of core profitability), and the relative lack of capital resources of AmBase, in our opinion there is no reasonable prospect for the capital of the Savings Bank to be replenished without substantial Federal assistance. This Office is of the opinion that Carteret's plan to raise capital is unrealistic and, therefore, will be recommending to OTS-DC that the Carteret Capital Plan be denied.

Accordingly, for these reasons, a receiver should be appointed for Carteret.

## VIII. OTHER CONSIDERATIONS

### A. Management and Directorate

Carteret has experienced a substantial overhaul of senior management and members of the board of directors. New individuals particpating in the affairs of Carteret include:

Richard A. Bianco as Chairman of the Board, Chief Executive Officer and President to replace Robert B. O'Brien and Robert C. Walsh, respectively;

J. Wayne Moor as Chief Loan Workout Officer to replace Richard Braun;

Donald Kramer to fill the vacant Chief Financial Officer position and a vacant board slot; and

Leo O. McCabe, Ronald Burns and C. Austin Fitts as new directors to the Carteret board.



WOP333 0985 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Mr. Bianco attracted Mr. Moor from AmeriFirst to take the Chief Loan Workout Officer position. Mr. Moor brings a wealth of accounting and real estate experience to Carteret from his past endeavors, including his work at AmeriFirst. Mr. Moor has attracted a skilled team of individuals to assist in Carteret's loan review and workout efforts. The individuals assisting Mr. Moor, for the most part, had worked with him while he was at AmeriFirst.

B. Franchise Value

This Office is of the opinion that Carteret's branch network would be found to be attractive to investors.

C. Subordinated Debentures

Carteret does not have any subordinated debentures.

D. Litigation Considerations

It has been our experience that the likelihood of a legal challenge to a resolution action increases where the following factors are present: (i) there are holders of securities (stock and/or debt securities) issued by the association; (ii) an individual, corporation or group owns a significant amount of the outstanding securities of the association; and (iii) the association reports positive capital as determined under GAAP.

First, Carteret is wholly owned by AmBase Corporation, a publicly held corporation, and is the holding company's sole remaining operating asset since the sale of Home to TVH. AmBase was a defendant in a number of shareholder derivative lawsuits as of August 14, 1991.

Second, no individual, corporation or group owns more than 3.5% of the outstanding shares of AmBase. 3.5% and 2.7% of the outstanding shares of AmBase are presently owned by AmBase Savings Plan and AmBase Executive Benefit Trust, respectively. These shares are voted by the trustees of the Plan and the Trust. In addition, Richard Bianco, Chief Executive Officer of AmBase and Chairman, President and Chief Executive Officer of Carteret, owns 3.3% of the outstanding shares of AmBase, while Ronald Burns, a director of AmBase and of Carteret, owns 2.7% of the outstanding shares. Donald Kramer, Chief Financial Officer of Carteret, and a director of Carteret and AmBase, owns 2.3% of the outstanding shares, and George Scharffenberger, President and CEO of AmBase, owns 2.7%. Mr. Burns and Mr. Kramer disclaim beneficial ownership of the stated shares.

Third, as of September 30, 1991, Carteret reported GAAP capital of $32.5 million, representing a reduction of $253 million from one year



WOP333 0986 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

ago. In addition to these three factors, a further consideration is Carteret's lawsuit challenging OTS' interpretation of FIRREA's capital requirements. Carteret Savings, supra. See Background and Section VI, Litigation History. The U.S. District Court for the District of New Jersey entered a preliminary injunction enjoining the OTS from deducting supervisory goodwill when calculating Carteret's compliance with FIRREA's minimum regulatory capital requirements. The decision is currently on appeal to the U.S. Court of Appeals for the Third Circuit.

Given that (1) Carteret Savings and the various shareholder derivative suits mentioned above demonstrate that neither Carteret nor the shareholders of AmBase are reluctant to initiate a challenge through court action, (2) Carteret is the sole remaining operating asset of AmBase, (3) Carteret has some remaining GAAP capital, and (4) the largest shareholders of AmBase stand to lose their remaining investments and their jobs if a receiver is appointed, in the opinion of the Assistant Regional Counsel, there is a 50% likelihood that the appointment of a receiver will be challenged.

E. Contingent Liabilities

OTS-NE issued two separate Supervisory Directives to address compensations practices that were considered by this office to be unsafe and unsound (see Exhibit 5). The Supervisory Directives have effectively held in abeyance the contractual payment on numerous severance contacts, change of control contracts, and "stay" or "retention" bonus agreements. To date, no individual(s) have pursued legal recourse to collect on the withheld contractual payments. Total payments negated by the Supervisory Directives exceed $1 million as of this writing. The individuals who were supposed to have received one or more of the above payments might litigate these payments claims against Carteret and/or the OTS.

F. Carteret Savings Bank, F.A. v. Office of Thrift Supervision et al.

The Carteret Savings case, presently on appeal to the Third Circuit of Appeals, will become moot, and will be dismissed, in the event that a receiver is appointed for Carteret.

VIII. CONCLUSION

The statutory grounds exist for the appointment of a receiver for Carteret. We recommend that the Director take immediate action to appoint the RTC as receiver for Carteret.



WOP333 0987 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

of Exhibits:
==================================

1. AmBase Corporation SEC Form 10Q as of June 30, 1991
2. Carteret Savings Bank Subsidiary listing
3. Carteret Portfolio Evaluation as of September 30, 1991
4. Capital Directive Executed on October 7, 1991
5. Supervisory Directives dated May 24, 1991 and June 14, 1991

Other Exhibits:

* Supervisory Agreement Executed on April 29, 1991
* Report of Examination dated June 4, 1990
* Thrift Financial Reports for:
  September 30, 1991
  June 30, 1991
  March 31, 1991
* Capital Plan dated September 30, 1991 and amendment dated October 21, 1991
* OTS-NE Interim Examination Reports #1 and #2
* Global Agreement Executed on April 25, 1991



WOP333 0988 FL AMBASE 93-531C CARTERET SB FA DOCKET # 04702 WIN BOX # WC00005514 ACC # NE-JC-241 REGIONAL BOX # NEJ178 OTS DOCUMENTS FOR 1ST 30 CASES GOODWILL CAPITAL CALL MEMO 10 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 2**

CARTERET SAVINGS BANK FA

200 South Street
Morristown, New Jersey 07960
201-326-1000

EXHIBIT Bianco 27 10-11/16/95

August 30, 1991

CONFIDENTIAL

Mr. Nicholas J. Ketcha, Jr.
Regional Director
Federal Deposit Insurance Corporation
452 Fifth Avenue, 21st Floor
New York, NY 10018

Dear Mr. Ketcha:

This letter is being submitted on behalf of the Board of Directors of Carteret Savings Bank, FA ("Carteret") in response to the Report of Examination as of June 11, 1990 transmitted by your letter dated July 29, 1991, which was received at Carteret on August 5, 1991. As requested in your letter, the Board of Directors of Carteret considered the Report of Examination at a meeting held on August 29, 1991, which was the first meeting of the Board held following receipt of your letter. This letter is to advise you, as requested in your letter of July 29, of the actions taken or contemplated with respect to the matters discussed in the Examiner's Comments and Conclusions. The Board of Directors wanted to respond as promptly as possible to matters raised in the Report of Examination, which are being aggressively addressed by Carteret. The Report of Examination is lengthy. We have not attempted in this letter to address all of the statements in the Report, including various statements with which we may disagree. Rather, this letter is intended to address, as you have requested, the areas listed in the Examiner's Comments and Conclusions, with emphasis on the constructive steps taken and being taken by Carteret.

Since June 11, 1990, the date on which the Federal Deposit Insurance Corporation ("FDIC") commenced its examination of Carteret and in fact since April 22, 1991, the date findings of the FDIC examination were first presented to Carteret's Board of Directors, a great many management changes have occurred at Carteret in addition to numerous actions by management to address problems and improve the condition of the Bank.

As you know, Mr. Richard A. Bianco was named Chairman, President and Chief Executive Officer of Carteret Bancorp Inc. and Carteret Savings Bank, FA in May 1991 with Board of Directors and Office of Thrift Supervision ("OTS") approval. Mr. Donald Kramer was appointed as Chief Financial Officer and Vice Chairman of Finance of Carteret effective September 1, 1991 with Board of Directors and OTS approval.

The Board of Directors, along with new management, is actively pursuing resolution of all problem areas noted in the Report of Examination, as well as

making an extraordinary effort to improve the profitability of its core business of mortgage and consumer banking. It should be noted that the issues addressed in the FDIC Report of Examination are the same as those addressed in the OTS Report of Examination received by Carteret in December 1990, which the Board has been seriously working to resolve. All of Carteret's Examination Comment Status Reports under the 1990 OTS Report of Examination have also been submitted to the FDIC.

General Condition

Carteret continues to experience financial difficulties principally due to deterioration of its commercial real estate and corporate loan portfolios, with some deterioration in the first mortgage portfolio as well. While core earnings have improved somewhat in recent months, overall earnings have not been positive due to the negative effect of the establishment of additional reserves for losses on loans and real estate.

In the second half of 1990 Carteret established an additional $95 million in reserves for losses on loans and real estate which exceeded the recommendations of $65.2 million by FDIC examiners and $77.0 million by OTS examiners in their 1990 examinations.

In the first half of 1991 Carteret recorded an additional $161 million in reserves for losses on loans and real estate. Management realizes that the commercial and corporate real estate markets have remained weak in New Jersey and Florida which has caused Carteret's loan portfolios to deteriorate further. The recognition of this deterioration and establishment of dramatically higher reserves at this time should allow Carteret to return to a more normal level of additions to reserves going forward.

Capital and Reserves

As stated in the 1990 Business Plan, Carteret has been actively attempting to improve its capital position via branch sales and a return to traditional banking activities.

In the fourth quarter of 1990 Carteret completed the proposed sales of the deposits and certain branch offices of 23 locations in Florida, Maryland and New Jersey combined. These sales were effected to help reduce the high costs Carteret has experienced within its branch network and to reduce Carteret's overall cost of funds.

In February 1991, Carteret received the $30 million capital contribution from AmBase Corporation ("AmBase") under the terms of the Regulatory Capital Maintenance/Dividend Agreement. While this payment improved Carteret's capital position, management is well aware that a further significant influx of capital is necessary to create a firm capital foundation for the thrift going forward.

With the additional reserves as well as the exclusion of certain intangible assets related to Imperial Premium Finance from regulatory capital, Carteret was

still able to meet the minimum capital requirements per FIRREA through March 31, 1991 after giving effect to all supervisory goodwill covered by the preliminary injunction issued by Judge Bissell of the U.S. District Court.

Revised OTS thrift financial reports for the quarters ended December 31, 1989 through December 31, 1990 were submitted by Carteret to the OTS on May 15, 1991 which reflect the reduction of regulatory capital due to the intangible assets of Imperial Premium Finance.

In April 1991 Carteret entered into a Stock Purchase Agreement with AmBase in which AmBase agreed to purchase the capital stock of Carteret Premium Finance ("Premium Finance") prior to August 9, 1991 for the greater of $65 million or the appraised value of Premium Finance, subject to certain conditions. Carteret obtained an appraisal which valued Premium Finance at $45 million. This appraisal was provided to the OTS on July 25, 1991. AmBase deposited $12.5 million in escrow with Carteret, pending the close of the transaction, which was to be applied to the purchase price of Premium Finance or, in the event the sale was not closed by August 9, 1991, as a capital contribution to Carteret. Since the sale of Premium Finance did not occur by August 9, the Stock Purchase Agreement may be terminated by either party. AmBase proposed a modified agreement to OTS for its review and approval on August 9, 1991 which provides for the purchase of Premium Finance for $65 million, including the $12.5 million already deposited. Subject to certain conditions, the sale of Premium Finance pursuant to such proposal would increase Carteret's regulatory capital levels by approximately $17 million resulting from a gain on the sale and the elimination of intangible assets.

With the significant increase in reserves for losses on loans and real estate in the second quarter of 1991, Carteret does not meet any of the three minimum capital requirements of FIRREA at June 30, 1991. Carteret's tangible, core and risk-based capital at June 30, 1991 were $78 million, $81 million and $130 million, respectively, or 1.4%, 1.5% and 4.0% respectively, including all supervisory goodwill covered by the injunction.

<u>Asset Quality</u>

New management has performed a rapid and comprehensive review of Carteret's commercial real estate and corporate loan portfolios and related classifications and reserves. The loan review and asset classification processes are being performed independent of each other with increased emphasis on the immediate resolution of the problem loans, if possible.

Based on this review and the continued deterioration in its loan portfolios due to the prolonged downturn of the real estate market, Carteret's total internally criticized assets at June 30, 1991 totaled $986 million of which $166 million, $689 million, $21 million and $110 million were classified special mention, substandard, doubtful and loss, respectively. As a result, Carteret increased its loan loss reserves by $161 million in the first half of 1991, in addition to the increase of $95 million in the second half of 1990.

These significant increases in criticized assets, thereby reserves reflects new management's determined efforts to identify and quantify problems within the various loan portfolios.

Internal Loan Review

In the Fall of 1989, Carteret ceased all new commercial real estate and corporate lending. In early 1991, Carteret engaged an independent consultant, KPMG Peat Marwick Credit Quality Consulting Group, to conduct a comprehensive review of the internal loan review procedures and asset classification program. In addition, the former heads of the Internal Loan Review and Asset Management Divisions have been replaced with new individuals whose purpose is to implement the new asset classification program and strengthen the loan review process.

The revised method of loan review allows for early identification of potential losses on loans and real estate investments. A risk rating matrix system has been implemented by loan officers in the Asset Management Division to grade all loans delinquent more than 30 days. Business plans are being prepared for all commercial REO assets and real estate development subsidiaries. In addition to the business plan, each asset's fair value will be determined based on appraisals, real estate broker's estimates, bids by prospective buyers and operating performance. The Internal Loan Review Department is now required to perform an independent assessment of the risk ratings and plans prepared by the loan officers. Differences of ratings will be reconciled by the individuals involved, the Credit Committee or the Board of Directors. The Bank's new Executive Vice President/Chief Workout Officer may recommend additional changes to the Internal Loan Review Department in the near future.

The commitment of management to improve the classification process, adequacy of reserves and the effectiveness of the new loan review method can be seen in the significant increase in internally criticized assets at June 30, 1991 and the additional reserves of $150 million for the quarter ended June 30, 1991. Regarding specific loans mentioned in the Report of Examination, current total reserves on the Moore Estates and Swedeland Development Group loans are $12 million and $20 million, respectively, on outstanding balances of $17 million and $34 million, respectively. In addition, on August 22, 1991 Carteret disposed of the Hovbilt, Inc. loan.

Management realizes that a continuation of the depressed real estate market could result in further increases in Carteret's nonperforming assets and REO. If necessary, adjustments to reserves will be recorded to reflect the increase.

Earnings

As stated in Carteret's 1990 and 1991 Business Plans, the Bank has been striving to improve earnings via the sale of branches, reduction of operating expenses, consolidation of certain Bank functions and withdrawal from commercial and corporate lending.

As mentioned previously, the deposits and certain offices of 23 branches were sold in the fourth quarter of 1990 in an effort to decrease operating expenses and streamline the market Carteret serves. Ten other marginal branches were closed in 1990 to further decrease retail banking expenses. The marginal sale of the deposits and certain of the 13 offices in Florida allowed the retail back office operations function to be eliminated in Florida. The sale of the five Maryland branches allowed Carteret to exit Maryland entirely.

Management also determined that extensive cost savings could be achieved by consolidating the New Jersey and Florida mortgage loan service centers into one location in Florida. This was accomplished in the second half of 1990. Carteret anticipates an annual savings of $6.6 million from this consolidation due to a lowering in the per-loan costs and reduction in staff.

Carteret's Mortgage and Retail Divisions were consolidated into one Consumer Banking Division thereby reducing the support staff needed. Additional consolidation of branches and mortgage production offices in 1991 will further reduce expenses and, as a result, improve earnings. To further reduce expenses, Carteret has been making an ongoing effort to reduce its staff. This is evidenced by the overall decrease of nearly 1,000 employees since January 1, 1989. Carteret anticipates having approximately 1,000 employees by the end of August 1991 compared to a total complement of over 2,000 at December 31, 1988. Carteret is also in the process of negotiating discounts and reduced fee arrangements with outside vendors, attorneys and servicing companies and is attempting to renegotiate various equipment and real estate leases to further reduce operating expenses.

The Bank's withdrawal from commercial and corporate lending will also improve earnings in the long-term. In the short-term the increase in nonperforming assets continues to require the establishment of additional reserves which is an additional expense. Foreclosure and legal expenses related to these loans have an additional negative impact. Management is committed in its efforts to dispose of these assets in a cost effective and efficient manner. Earnings also reflect Carteret's efforts to establish adequate reserves for losses on loans and real estate as evidenced by the additional $259 million of reserves recorded since June 30, 1990.

Carteret continues to restructure and shrink its balance sheet in an effort to maximize net interest income and control credit risk. Total consolidated assets have decreased from $6.076 million at June 30, 1990 to $5.427 million at June 30, 1991. While the balance sheet has decreased in size, it has been further restructured to emphasize assets which the risk-weighting of FIRREA favors — more liquid assets with less associated risk.

Carteret's cost of funds has decreased from 7.98% at June 30, 1990 to 6.95% at June 30, 1991. This is primarily due to the smaller deposit base resulting from the sale of 23 branches in 1990 and lower interest rates being paid on deposits. Maturing Federal Home Loan Bank advances have also been replaced by advances with a considerably lower rate which further lowered the Bank's cost of funds.

Carteret management has been performing a thorough review of all of its operations and related expense to determine where downsizing and further consolidation can be made to reduce expenses. Reductions in staff are ongoing. Because employee compensation is a significant portion of Carteret's operating expense, The Board and management are analyzing all aspects including bonuses and commissions.

The Board and Carteret management do understand that continued deterioration of the commercial real estate and corporate loan portfolios makes generating positive core earnings even more difficult.

Funds Management

In response to the 1990 OTS Report of Examination, Carteret's Investment Policy was revised to reflect, in greater detail, activities permitted and limitations established for various investment securities. Carteret has ceased all trading as outlined by the appendix to section 571.19 of the OTS regulations.

Carteret continues to make a concerted effort to sell the mortgage derivative securities currently in its portfolio. This is evidenced by the decrease in outstanding mortgage derivative securities of $19 million from June 1990 to June 1991. Carteret has and continues to dispose of these securities in an orderly fashion as market conditions allow.

While Carteret management believes that all securities transactions were at arm's length with Gruntal & Co., documentation supporting at least three competitive bids for each investment is now being utilized, at the suggestion of the OTS.

The balance sheet of Carteret continues to decrease in size in a further effort to comply with capital standards established by FIRREA.

Business Plan

Carteret is well advanced in its efforts to return to a traditional mortgage/consumer bank. While Carteret's 1991 Business Plan reflects more stringent operational strategies than those in its 1990 Business Plan, new management has taken additional strides to further address the issues of a deteriorating loan portfolio, improving core earnings and obtaining an outside capital infusion.

Relationship with AmBase

With the sale in February 1991 by AmBase of its significant subsidiaries except for Carteret and substantial changes in senior management at AmBase and Carteret, the relationship between AmBase and Carteret has changed. Mr. Bianco was named Chief Executive Officer of both Carteret and AmBase with the approval of the OTS. In addition, Carteret has received the $30 million capital contribution and the $12.5 million relating to the proposed purchase of IPF from AmBase.

Violations

With regard to the purported violations, Carteret was paid its outstanding tax refund in February 1991 and signed amended tax sharing agreements which were provided to the OTS and the FDIC in the June 1, 1991 Examintion Comment Status Report Update. With respect to the appraisals on loans purchased from GDV Financial Corporation, we previously pointed out to the FDIC at its meeting with the Board of Directors on April 22, 1991, that the OTS appraisal regulation in question was not even in existence when many of the GDV loans were purchased by Carteret. With regard to obtaining appraisals on the GDV loans, as stated in its response to the 1990 OTS Report of Examination, Carteret submitted a proposal from Principal Financial Group to review the loans purchased from General Development Corporation to the OTS for review on January 25, 1991 and requested a waiver of this requirement due to the cost. Carteret did not receive a response from the OTS regarding this matter. As you may be aware, the purported class action against Carteret was dismissed by a Florida court.

As you can see, Carteret's Board of Directors and management have taken dramatic strides since June, 1990 to address the problem areas noted in the OTS' 1990 Report of Examination which Carteret received in December 1990. Outstanding issues remaining from that examination continue to be aggressively pursued. Now that the Board of Directors has reviewed the 1990 FDIC Report of Examination, this same effort will be made to address those problem areas still outstanding at this time.

The Board of Directors and management are committed in their attempt to resolve these in cooperation with the FDIC.

This response has been signed by the following persons on behalf of Carteret and in the capacities on the date indicated.

| Signature | Title | Date |
|---|---|---|
| Richard A. Bianco | Chairman of the Board, President and Chief Executive Officer | August 29, 1991 |
| Donald Kramer | Director, Vice Chairman and Chief Financial Officer | August 29, 1991 |
| Bruce W. Bean | Director | August 29, 1991 |
| Ronald J. Burns | Director | August 29, 1991 |
| Leo O. McCabe | Director and Executive Vice President | August 29, 1991 |

WOQ690 2384LAMBASE 93-531C CARTERET SB DOCKET # 04702 WIN BOX # WC00004851 ACC # NE- JC-163 REGIONAL BOX # NEJ28 OTS DOCUMENTS FOR 1ST 30 CASESCONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER