**EXHIBIT 3**

**Depo of: Richard Bianco (Ambase v. USA) 11-16-99**

**ACE-FEDERAL REPORTERS, INC.**

**Page 1 to Page 291**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**ACE-FEDERAL REPORTERS, INC.**
**1120 G Street, N.W.**
**Suite 500**
**Washington, DC 20005**
**Phone: 800-336-6646**
**FAX: 202-737-3638**

I'm going to ask you about a couple of these bullets. The bullet 1 talks about the, what I'll call the goodwill litigation, which was Carteret seeking an injunction to prevent FIRREA being interpreted to apply to the supervised transactions Carteret had made earlier. And it reflects that Carteret was asking Judge Bissell to reconsider an amended order concerning the amount of goodwill –

MR. KIRK: No, it actually appears to indicate that they were intending to ask Judge Bissell to reconsider something.

Q. It's irrelevant to the question, but I'll just tell you, it's about the amount of goodwill that the injunction would cover, but let me ask you, do you recall the so-called goodwill litigation, as I've described it?

A. Yes.

Q. Were you in favor of it when you became CEO–after you became CEO of Carteret and learned about the goodwill litigation, were you in favor of it?

MR. KIRK: Objection. It assumes he had an

Page 69

opinion.

Q. If you didn't have an opinion, you can say that.

A. I didn't understand it at that time.

Q. Was it explained to you over time as you continued to serve as CEO of Carteret?

A. Yes.

Q. And when it was explained to you and you thought about it, at that point, if you can recall, did you favor doing it, continuing to do it?

A. I did.

Q. I take it, the doing of it initially was not your idea, it was someone else's idea?

A. I was told when I took over, when I was approved by Albanese and Vigna that the first time I really heard or one of the first times I heard about supervisory goodwill was that they did not calculate supervisory goodwill in capital, that it was something that did not in their opinion have value or should be used, and my mandate from them was to raise capital, so I didn't analyze it in detail at that time, and later went on to understand it better.

Page 70

Q. As your counsel pointed out, this bullet point we're looking at, indicates that Carteret was preparing an appeal to Judge Bissell to reconsider an amended order, and I'm telling you, the appeal was about how much of the goodwill should be able to be includable, and my question is, you were there at Carteret at this time, and therefore I'm asking whether you recall this litigation about having Judge Bissell revise the injunction order in the goodwill litigation.

A. I don't recall the specifics of a revision, but I do recall Bissell, the Bissell order, and I do recall the Judge Lacey who was our attorney at LeBeouff working on this.

Q. As CEO, I assume Judge Lacey needed someone's permission to go to the Judge to seek a revision of the order, and my question is, were you the person he talked to and you said to him–

MR. KIRK: Hold on.

Q. Did you approve the going to Judge Bissell at this point? You were CEO of Carteret now.

MR. KIRK: Mr. Bianco, please just answer yes or no to the precise question, did you approve going to

Page 71

Judge Bissell to seek some revision of some order.

A. No.

Q. And do you know who did?

A. No.

MR. KIRK: If anyone.

Q. If anyone did, and if someone did, who did.

A. No idea who did.

Q. If you look at the third bullet point, please. "Carteret is considering moving to PriceWaterhouse." Let me ask a foundational. Was AmBase when you became CEO, was its public auditor Peat Marwick?

A. Yes.

Q. Did AmBase consider moving to PriceWaterhouse around the same time that Carteret considered moving to PriceWaterhouse?

A. Yes.

Q. Why did Carteret and AmBase want to move from Peat Marwick to PriceWaterhouse?

A. I wanted. I don't think AmBase did, and I think Carteret was indifferent. I wanted to move to PriceWaterhouse, it was part of my total plan of raising

Page 72

capital and restructuring the organization, bringing in the best people, even the second point, you know, changing general counsel to Sills Cummis. I did a series of things, controlling expenses, outsourcing computer facilities, changing PriceWaterhouse, changing general counsel, bringing in Don

Kramer, bringing in real estate experts, so that outside capital, because of my experience on Wall Street, would recognize Carteret for the value that it had, which was my mandate to bring in outside capital.

Q. Did you–

A. So nobody told me to hire PriceWaterhouse as my decision part of this strategy.

Q. Did you feel that Peat Marwick had not done a good job in what it had done earlier or had made errors that you weren't happy with, that's why you wanted to find someone else like PriceWaterhouse?

A. I wanted to change, part of my strategy was to change a lot of the key management positions to give confidence to outside investors that there was new people who would look at things just differently or clearly.

Q. If you look at bullet point 4, it says, "In

Page 73

your eyes Walsh is an asset to the organization, but he needs a break." Do you see that?

A. Yes.

Q. It also says, "Walsh is the only person fully knowledgeable," I guess, "in the issues facing Carteret."

MR. KIRK: It actually says "acclimated."

A. Yes, I see that.

Q. Did you think of Walsh as an asset?

A. I said that earlier. I do. I did.

Q. Did you regard him really as the only person who at this time had a full grasp of the issues facing Carteret?

A. I did.

Q. And this memo says, "he needs a break." I was going to ask, why did you feel he needed a break, but your testimony was he's the one that feels he needed a break, is that correct?

A. You can tell in a person's voice. He was the senior manager and I felt he couldn't take the OTS daily pressure, and I was witnessing that at the same time. The memos, as I flash back now, you see six or seven very strong memos in a very short period of time. There was a

Page 74

lot of pressure by the OTS on everything he did. And I think he might have been close to needing a rest because of just not wanting–

Q. In other words, the supervisor–

MR. KIRK: Please don't interrupt the witness' answers, David.

Q. There was close regulation, and he was feeling that?

A. No, I'm saying that he felt that the bank was being impeded by the regulatory process. He couldn't operate it as a businessman, and that he didn't want to work in an environment where he had that kind of pressure.

Q. Is that the reason you think he felt he needed a break?

A. That's what he told me.

Q. Bullet point 5 is what I'll call the–excuse me, it's 6, the larger paragraph, "Former CSB President O'Brien." Do you see that?

A. Yes.

Q. I'll call that the O'Brien issue. It's about O'Brien's employment contract and his getting an advance of 2.4 million, and seeking a buyout of 6 million, this

Page 75

says.

Do you recall this so-called O'Brien issue, as I've–

A. I do.

Q. Did you have people look at it?

A. We did.

Q. Do you recall whether O'Brien had a written contract with Carteret?

A. He did.

Q. And do you recall that it contained a change of control provision?

A. I don't recall that as a provision.

Q. Did you recall that O'Brien had a valid claim against Carteret for money were he to resign or were he to be terminated?

A. Definitely so. So much so that Angelo Vigna had recommended to me that O'Brien be taken care of and be paid and this issue get behind us.

Q. You say Vigna told you that?

A. Yes.

Q. Was that around the time–was that at this meeting, if you recall?

Page 76

A. He told it to me on several occasions, probably starting at this time.

Q. What was your strategy for dealing with it, if you can recall?

MR. KIRK: When?

Q. As CEO, that you probably started around May of '91–

MR. KIRK: He's been CEO for eight years.

Q. From the acquisition of AmBase on, which was '88.
MR. KIRK: So did you do a retrospective review of the salary that was paid to Bob O'Brien before you were ever involved?
Q. My question was did you ever obtain knowledge of what he was paid.
A. I did not.
Q. You did not gain knowledge of what he was paid?
A. I don't recall if I did. I don't think I did.
Q. When you say he resigned, I think you testified he resigned from Carteret the day you were

Page 81

installed. That was from Carteret BanCorp, isn't it, because I can represent to you that Walsh took over at the Carteret level. Do you recall that?
A. I don't, but I accept that as whatever the process was or procedure.
Q. During your service as the CEO of Carteret, in hindsight, did you ever have an opinion whether O'Brien did any work at Carteret after Walsh became CEO of Carteret?
MR. KIRK: Objection. He's already, I think, answered this in the context of answering his prior question that he doesn't have any opinion as to the job O'Brien did.
Q. You can answer, if you have an opinion.
A. I was not aware of Bob O'Brien's involvement.
Q. If you look at the next point after the O'Brien point on the exhibit that's Bianco 8, according to the writer of this memo, Bianco reportedly indicated at the meeting that Carteret loan problems are more severe than he had originally thought. "Bianco indicated further that there is a nominal effort being put into working out the problem loans and watching the performing ones." Do

Page 82

you see that?
A. I do.
Q. What did you originally think about Carteret's commercial, real estate and corporate loan portfolio when you became CEO of Carteret?
A. What did I originally think? I don't think I had an opinion other than what was told to me by Vigna and Albanese, which was, "You need capital, your problems are being caused by your nonperforming assets."
Q. Didn't you have any discussions with Carteret people about it when you first came on board as president, CEO?
A. I spoke to Rick Braun when I first came on board, and he was leaving, Walsh was leaving, we talked about commercial assets, we talked about other assets of the institution, and I had an opinion from talking to Braun as to what the status was, what I thought existed.
And I had just hired Wayne Moor.
Q. Did you ever come to learn that--well, did Braun express opinions to you about the state of those assets?
A. Basically the opinions were being expressed

Page 83

to me by the guy who I had just hired, which was Wayne Moor. Braun may have also expressed opinions to me, but the guy now, the new guy who was in charge of that area was Wayne Moor.
Q. The memo here says that you indicated that Carteret loan problems were more severe than he originally thought. So I assume from that you had some thought, and then you had to revise, is that accurate?
MR. KIRK: Is what accurate? That he said that, or this is a reflection of what he really thought? I mean, you need to add--I object, there's a lack of foundation here.
Q. Is it accurate you had an original idea of the state of the commercial loan assets and you revised that estimation when you learned more?
A. I did.
Q. And how did you come to learn that things were worse than you had originally been led to believe they were?
A. Through the efforts of my investigation with Don Kramer and Stanley and Wayne Moor's efforts.
Q. Were they related, Stanley Moore and Wayne

Page 84

Moor? I haven't seen the name Stanley Moore, I've seen Wayne Moor.
A. No.
Q. Did you come to have an opinion about whether, and I take it you learned that there were real problems with the commercial real estate and

corporate loan portfolios, is that a fair statement?

MR. KIRK: Objection.

A. Commercial real estate and–

Q. And the corporate loan portfolios.

MR. KIRK: Objection to the form of the question. It's vague and ambiguous.

A. They're one and the same.

Q. By commercial real estate I mean non-one to four family loans secured by real estate, and by corporate, I mean unsecured loans, commercial type loans to corporations that can be secured or–.

A. We had very few corporate loans.

Q. Let's limit it to the commercial real estate. Did you come to have an opinion that the commercial real estate was in a sorry state?

MR. KIRK: Objection to the form of the

Page 85

question it's vague and ambiguous.

A. Corporate real estate we felt was very strong. The commercial loans we felt more–for an investor to come in to putting capital into Carteret which is what our mandate was, we had to be able to answer and address any question they had about close to a billion dollars worth of real estate. I did not feel, and that's where I felt it was more severe than I originally thought, that we could have several people within our organization stand up and address from almost memory details of what was going on in our commercial asset area. I did not feel Rick Braun was capable of doing that. He was an overall manager, he had several qualified people working for him, but that's why we hired a Wayne Moor, so Wayne could be our liaison with the outside investors.

Q. Did Braun come to Carteret from AmBase, do you know?

A. I think he did.

Q. You used the term corporate loans as contrasted with real estate. What do you mean by

Page 86

corporate? Like I described?

A. Loans to Bill Simon to buy, you know, a factory or something.

Q. Did you come to form an opinion concerning the underwriting of the real estate, commercial real estate loans at Carteret?

A. No.

Q. Do you know whether Wayne Moor had an opinion of the underwriting?

A. I don't think he did about the underwriting. I think we felt the loans were what commercial loans were about, very typical of what was in the commercial real estate area, and that we were into a difficult economic environment in commercial real estate.

Q. But there was no independent assessment that you recall now?

A. On the underwriting?

Q. Yes.

A. No.

Q. Putting Braun aside, whom you mentioned, do you recall having an opinion about the staffing of the commercial real estate department at Carteret? Whether

Page 87

the people were qualified to be doing commercial lending like Carteret was doing?

A. Qualified is a tough word. What do you mean?

MR. KIRK: Hold it a second. Your question assumes they were doing commercial lending at the time Mr. Bianco joined, and I believe he testified they were not.

Q. He had to see what was on the books. And they were doing workouts.

MR. KIRK: That's different from doing commercial lending, David, that was my point.

Q. Was there a commercial loan department at Carteret when you go got there?

A. No.

Q. Had there been one before you got there?

A. Yes.

Q. Was it changed to be called a workout department?

A. I don't know what they called it, but we were doing the monitoring to the real estate on the books that we owned.

Q. And with regard to the staff doing that

Page 88

function, do you recall if you had an opinion whether they were technically expert enough in the area to be doing that work?

A. They were, as Rick was, CPA's by background, as opposed to Wayne Moor, which was a real estate background.

Q. Did you have occasion to become knowledgeable

other people were not in, so yes, I did. Otherwise I wouldn't have joined the institution. I had retired–

Q. Well, you got the shares for 75 cents a share, or something.

A. Well, 75 cents–

MR. KIRK: Hold it, there's not a question pending.

Q. Thank you. Now let's look at some of the data, we'll look at the 1991 annual report.

MR. KIRK: Is now an appropriate time for lunch?

MR. LEVITT: Off the record.

Page 137

(Discussion off the record.)

(Whereupon, at 12:20 p.m., a luncheon recess was taken.)

o0o

AFTERNOON SESSION

(12:50 p.m.)

(Bianco Exhibit 14 was so marked for identification).

MR. LEVITT: The next exhibit is the annual report. I'll direct you to the portions I want to ask you a couple of questions about. First you and Scharffenberger co-authored a document dated May 30, 1992, which is a document to all stockholders, do you see that? The first page. And I want to ask you about the second bullet point which has a little circle in front of it. It says, "During the course of the year we incurred a net loss of 145 million, principally due to the establishment of reserves on loans on real estate of 172 million in our Carteret Savings Banks."

A. Correct.

Q. Do you recall whether these reserves were established based on Moor's recommendation?

Page 138

MR. KIRK: All 172 million?

MR. LEVITT: Yes.

A. I don't recall.

Q. Do you recall whether you had an opinion whether this 172 million in reserves was justified by the state of these credits or the state of these loans?

A. What do you mean "justified by the state of these credits?"

Q. That the condition of the portfolio required to be consistent with good banking practice that this amount of reserves be set aside, 172 million.

A. No. As I said to you earlier, my mandate in going in to run Carteret was to draw capital. Maybe this will help us as we go along. In order to get capital, I had to show all these different areas, whether it was PriceWaterhouse, Sills Cummis, Wayne Moor, that this was a valuable purchase for somebody bringing in the capital from the outside. Part of that was ascertaining that real estate wasn't a big, black hole, that there wasn't massive problems there, that there was what I considered a marked to market or a valuation where people felt that this was an attractive investment for outside capital, so it wasn't

Page 139

a standard type of banking practices that you would take in having reserves and working this out of a situation over a couple of years. I had to bring in outside investors who looked at these assets, we're talking about commercial assets here, in this particular case, real estate, where they found them to be attractive.

Q. Let me ask it the other way, then. Was it your opinion that putting aside the need to draw capital, just dealing with the commercial real estate portfolio and the merits of the portfolio, that amount of reserves, 172 million, would not have been required?

A. Without a doubt.

Q. What amount would have been?

MR. KIRK: Wait a minute, hold it. Could you read back the last question and answer? I want to make sure that–

MR. LEVITT: It was a good answer for you.

MR. KIRK: I think it was, all of Mr. Bianco's answers are good for me, but I would like to hear it. I just want to make sure I understand the wording of the question and the answer.

Page 140

(Record read.)

MR. KIRK: Thank you. Go ahead.

MR. LEVITT: Was there another question after that one?

(Record read.)

A. I don't think I analyzed it from that point of view at that time. I don't know the specific amount. I know we concentrated on one amount.

Q. Now, when Mr. Moor did his job of reviewing the commercial real estate portfolio, which was one of his jobs or his main job–

A. It was his main job.

Q. Was he instructed by you to look at it from two points of view; one, the merits of what the portfolio required in terms of reserves and, two, in the context of needing to draw capital in or just on the merits of his technical application of skills to the portfolio?

A. Wayne Moor was very different from Rick Braun. Rick Braun was an accountant who had looked at the real estate from a CPA's point of view and an evaluation.

We were not in the commercial lending business, so we didn't need real estate experts per se, we needed a Rick

Page 141

Braun type who would evaluate a stagnant portfolio–

Q. A Moor type, no?

A. No, we needed Rick Braun to evaluate a stagnant portfolio that wasn't growing. We weren't doing business as to an evaluation. He wasn't a real estate expert. We brought in a real estate expert like Wayne Moor who had done work with one of Ron Burns' banks in Florida, so he had a very strong expertise in the Florida area, and his purpose was to give us his honest opinion of what would be attractive to outside investors.

If he was to sit before, as we did eventually, the Carlyle Group, the various pension funds, Kohlberg, that they would look at the assets of this bank in his particular area. We had people in other areas, other asset classes, in commercial real estate, that somebody would say, "Wayne, I think that's a cheap investment."

As a matter of fact, the Carlyle people said "Wayne, we don't know of any other bank that's taken a Draconian writedown of reserves. Your reserves are different." The same asset, as a matter of fact, I think there was one asset that they looked at on our books that

Page 142

we had written down, it's 8 million that they had seen, it was another party who also had 50 percent of that loan, this kept it at $10 million. We had the same loan own our books at 8 million.

Our purpose was to draw these people, these investors into this institution, by having the best people I could find in experts in various areas. Kramer was an expert in working out from insurance, working out problems, working with management, working with employees, outsourcing companies and a great chief financial officer, so that's really where we came into this.

Does that help?

Q. It helps, but there are gray areas that I want to understand a little bit better.

One approach, as I understand it, to this, is that there are OTS regulations that, or that examiners follow in determining what loans ought to be classified and what reserves ought to be taken against those classifications, and there are criteria that bear on that, like has the borrower missed more than three payments, is the collateral valuable enough on an evaluation basis to cover the outstanding debt or not cover the outstanding

Page 143

debt and so forth and reserves are determined in accordance with technical criteria like that.

Now, my question to you is, did that process using technical criteria come into play at least in part in the kind of work you instructed Moor to do on the commercial real estate portfolio?

MR. KIRK: Are you asking him whether the reserves that were taken were consistent with the way OTS would view the taking of reserves, is that your question?

Q. I'm asking in part whether the technical criteria you would want to satisfy when OTS came to examine, did you at least start with that before Moor started his work?

MR. KIRK: I object to that. I think "technical criteria" is unclear.

Q. Okay. You can answer it.

A. Wayne Moor was always told follow the letter of what the OTS requirements were, if that's what you're addressing what the technical aspect of it. Were you stating to me that or did we, were we told by the OTS to take these reserves of 150 million? The answer to that was categorically no.

Page 144

Q. Right.

A. Okay? If anything, when I first discussed this, before we took this, I discussed this with Albanese and Vigna and they said, "It's going to take you years to analyze $750 million of 300 real estate properties, how

can you take that amount of reserves?"
And I said, "Guys, our initial analysis by Wayne Moor and his team, who were real estate experts in the Florida area, have come to this analysis, and the purpose of what we're trying to do, we're not selling it all, so we're not going to lose value if we're overreserved. What we're trying to do is attract this capital in."
His recommendation to me, Vigna's recommendation to me was, "Dick, don't take this in this one chunk, do it over a couple of years."
My response was, "If I do it that way, Angelo, I'm going to lose the confidence of an investor coming in to say Bianco is telling them to come in and invest $200 million" or whatever the number was, $150 million. They had confidence in me as a manager that all the assets they were buying, they were buying at a

Page 145

relatively cheap or riskless to what the market existed at that point in time. That was the strategy.
So OTS wasn't telling me take 150 million of reserve, just the opposite. Vigna said, "Dick, wow, slow this down."
Q. Let me go at it from one other direction. Would you say that the objective was to price these properties or these loans at a level where a buyer of the company would feel he in turn could get selling it on the market, was that it, to get a fair market value for those loans?
A. That he saw the upside potential of Carteret, yes, not that there was downside potential because these were overvalued.
Q. Okay.
A. Because we continued to take reserves even after we marked this up, and any profits, he'll kick me if I say–any profits that we took, we continued to take reserves. We had a policy of keep it as strict as you possibly can, and knowing that we didn't hit, you know, three to five hundred assets right on the nose every time and people had to go back several times and that fell into

Page 146

what Vigna had said to us, which was how could you assess all these properties at one point in time that had taken you years to accumulate.
You got to remember, the two or three largest assets were probably the Swidland loans, Perfido loans, and they were 30 or $40 million respectively. The rest of the loans dropped down to a million, five million category spread over $700 million, there were a lot of properties to look at, rent rolls to evaluate, towns to assess, golf courses and progress being made in various aspects of development. Developmental land, things like that.
That's why Wayne and the team, we eventually moved, that team had an office in Florida as well as in New Jersey, they were almost out of the bank totally in Parsippany and spent their time on the road. Those guys were on the road 90 percent of the time.
Q. What I want to know, though, in addition to what you've said, which is helpful is, did you have an opinion as of, let's say May of 1991 when you became CEO whether the commercial real estate portfolio as it was valued on Carteret's books at that time was overvalued?
A. In May of '91?

Page 147

Q. Yes.
MR. KIRK: Overvalued in a market sense or on a book sense?
Q. On a book sense. In the sense that there's a requirement–
A. To the criteria of getting it invested? Yes.
Q. How about not that criteria but about the criteria of satisfying the OTS regulations?
A. Slightly overvalued, 20, $0 million on a relative basis, just because the commercial real estate was continuing to weaken, corporate loans were, I would say undervalued, real estate, commercial real estate would have been overvalued slightly.
Q. So your position is that if someone were to say that the way the books valued some of those loans was outrageous because you could go look at the property and see that the valuation was based on selling X units by X date and they only sold a fraction and yet they didn't reduce the valuation, you would say that's a false statement in general?
A. Give me that again.
MR. LEVITT: Read that back.

Page 148

MR. KIRK: You combined specific and general in a way that made it very confusing.
MR. LEVITT: Read that back, if you would.
(Record read.)
A. There are so many negatives–
MR. KIRK: I really want to object.
A. Could you rephrase–
Q. I'll rephrase it.
If I were to say that the valuations on Carteret's books for the commercial real estate portfolio were way out of synch in the majority of cases because they were based on premises that were outmoded and hadn't been realized, like a certain volume of selling of apartment buildings and so forth, your position would be that that's just a wrong appraisal of that portfolio?
A. I think that's too general a statement. I think that a real estate expert who thinks of selling a property kicks the tires, as opposed to a CPA who looks at a real estate index in a certain community in a certain town. I think one's a more big picture approach and the other one is a more specific approach, Wayne Moor versus Rick Braun.

Page 149

I think their approaches were totally different. I think there was a lot more time and effort going over properties, as I said earlier, in an apartment building or a commercial real estate property, looking at the rent roll, the financial creditworthiness of the tenant.
Q. And you're saying–
MR. KIRK: Hold it.
A. Looking at the development property, whether or not that whole community or that county was growing population wise. Rick did it on a more general basis, and definitely, I would have used a combination of both, but to sell something or to bring in investors for confidence Wayne Moor was my guy.
Q. Do you know what value methodology Wayne Moor used? Was it a liquidation valuation or going concern valuation?
A. From what I was told by others, not only Wayne Moor did this, but PriceWaterhouse worked very closely with him, it was basically a liquidation of where we could sell it today without giving paper back or lending people money to buy back the same property, putting a mortgage on it.

Page 150

Q. But someone would pay cash for the property?
A. That somebody would pay cash was the general approach to the property. A cash buyer without having to put new pieces of paper on our books for a loan.
Q. Your understanding was that Braun did not use that approach?
A. Braun did not use that approach.
Q. Could Braun's approach if you understood what it was, be characterized as valuing on a going concern basis?
A. I didn't get into the–I didn't analyze it that way. Braun was leaving, from before I even got there, and I knew what my mandate was, which was to get capital, from the day Vigna accepted my application so I didn't analyze it that way.
Q. I'm going to get more into the capital thing that you were more focused on by mandate as you put it in a minute and I want to ask you a little bit about this in this letter, the paragraph that starts "On March 2nd," which is the third or fourth big paragraph. Do you see that paragraph?

Page 151

A. I do.
Q. It says "On March 2nd OTS approved a capital plan which caused our investment bankers to raise over $200 million of equity to bring Carteret to a fully phased in capital position under current capital requirements."
Did you agree outside capital of 200 million or more was necessary to make Carteret viable?
MR. KIRK: Do you mean to satisfy OTS?
MR. LEVITT: No, I mean to make Carteret financially viable.
Q. This says 200 million was needed under your capital plan to bring into phase requirements. I'm asking you a slightly different question, whether you felt 200 million was needed to make Carteret financially viable?
MR. KIRK: Does your question ask him to assume that financial viability in a world where OTS can't

swoop down and take you?

MR. LEVITT: Financial viability in 1991 or 1992.

A. From my criteria, not the OTS's criteria.

Q. From your criteria.

A. Don Kramer and I constantly, and Donald is

Page 152

considered an expert in insurance and asset liability analysis. We felt that the bank not only did not need $200 million, we felt that the bank, now, this is without a criteria formula to meet by the OTS or the FDIC, that we could actually determine, he used to use bootstrap earnings. We could actually earn back whatever we needed in capital requirements for the future.

Q. In other words, you didn't need anything?

MR. KIRK: Let him finish the answer.

A. That if we didn't have a hurdle that the OTS told us, originally they said it was 50, then 100 million, then 200 million–

Q. That's because of the lawsuit–

MR. KIRK: Don't argue with him, David. Let him finish answering the question.

A. We felt, and we had, we went into this institution, as I said earlier, because we felt there was value, that the earnings, the internal earnings away from real estate, we actually felt that real estate eventually would bounce back, but putting that aside, that the earnings from the bank would make up any capital needs that were imposed by FIRREA internally without outside

Page 153

borrowings.

Q. By when did you think that could happen?

A. We thought they could do that in six or seven years and with the NOL's, net operating losses that the bank had, that basically all income would be sheltered, so rather than being a 40 percent income or 35 percent corporate income tax rate, that we would be able to compound faster; that the mortgage origination, mortgage service businesses were spectacular, and that our interest rate and deposit bases were superior to just about any in that region.

Q. Did that projection depend on working through the nonperforming loans to reinvest the capital in performing so you got some income from it?

A. We did not have another shoe dropping or disaster scenario forecast. We did forecast continuing to take reserves, continuing to plow back all profits of real estate sales back into that portfolio, but we did not have a disaster scenario of, one scenario that we analyzed and we came to the conclusion that that would not happen is what would happen if the insurance industry in America was held to the same tough criteria that our bank was held to

Page 154

by the OTS. What if there were OTS type, and we knew, he being an expert in that area and me as well, that insurance regulators were state regulators, as opposed to a national regulation, and we knew that the FDIC, although, and the OCC were although tough on the thrift industry, that they were more lenient on commercial banks.

We had analyzed our portfolio, and we knew that AmBase's portfolio through Carteret was marked differently than Citibank's portfolio was in their own commercial real estate, that if Citibank had marked their portfolio, they would have been insolvent, so there were two different criterias. Citibank being a Rick Braun type of an analysis and ours being to attract capital into the institution.

So that was what we, but we did not forecast a disaster, another shoe dropping, which would have been insurance companies having to sell at fire sale prices commercial real estate, because that would have had a very massive negative impact on how fast we could operate.

Q. And I take it it must have been premised on the economy getting better, the real estate economy getting better?

Page 155

A. No. Actually, I wanted to–I could go on for days on this. I wanted to forecast that and Merrill Lynch told me no. Merrill Lynch didn't want to take an aggressive analysis on what I thought would happen to commercial real estate in the next four years. They toned that down to the outside investors. They wanted us to say

**EXHIBIT 4**

OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION
S-MEMORANDUM - CARTERET SAVINGS BANK, F. A.

TO: Diana L. Garmus
Deputy Assistant Director
Corporate Activities
Supervisory Operations

and

Deborah Silberman
Assistant Chief Counsel
Corporate and Securities Division
Office of Chief Counsel

CC: Thomas Loeffler, OTS
V. Gerard Comizio, OTS
Faith Hochberg, OTS
Ellen Kulka, OTS
Sharon Freed, OTS
Richard Denby, OTS
Molly Mahoney, OTS
Marcus Boyer, RTC
Nicholas Ketcha, Jr. FDIC

THROUGH: Angelo A. Vigna
Regional Director
Northeast Regional Office

FROM: Robert C. Albanese
Regional Deputy Director
Northeast Regional Office

DATE: November 13, 1992

RE: Addendum to October 25, 1991 Recommendation for Appointment of the Resolution Trust Corporation ("RTC") as Conservator/Receiver For Carteret Savings Bank, F. A. ("Carteret" or the "Savings Bank")
Morristown, New Jersey
OTS Docket No. 04702



WOP324 0878 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

WOP3240878

FDIC Vigna 1

**OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION**
**S-MEMORANDUM - CARTERET SAVINGS BANK, F. A.**

## I. RECOMMENDATION

On October 25, 1991, this Office transmitted a Supervisory Memorandum recommending that the Director appoint a receiver for Carteret. See Exhibit 1. In the interim period, until August 1992, Carteret made progress toward an unassisted recapitalization with a variety of potential investors. In August, however, the lead investor, Kohlberg & Co. withdrew its July 20, 1992 conditional letter of intent to infuse $200 million into Carteret.

Kohlberg & Co.'s unwillingness to commit to an unassisted recapitalization of the institution was due to Carteret's $502.2 million in nonperforming loans and REO (9.6 percent of total assets at June 30, 1992), possible overvaluation of purchased mortgage servicing rights, possible additional losses on the commercial loan and real estate owned portfolios, and lack of support for Carteret's financial assumptions and projected earnings.

Subsequently, on October 15, 1992 Carteret entered into a conditional letter of intent with a group of investors headed by The Carlyle Group and Colony Capital ("Carlyle Group") to invest $200 million in Carteret in exchange for an 80% interest in the Association. On November 11, 1992, OTS received verbal notification that the Carlyle Group was withdrawing its conditional letter of intent because following due diligence, it had concluded that it could not receive an adequate rate of return on its investment and had concerns about "regulatory risk".

Accordingly, based on these developments, we recommend that the Director of the OTS appoint a receiver for Carteret Savings Bank, F.A., Morristown, New Jersey. Our recommendation is based on Section 5(d)(2)(A) of the Home Owners' Loan Act of 1933 ("HOLA"), as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") 12 U.S.C.A. §1464(d)(2)(A).



WOP324 0879 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

WOP3240879

## II. KEY FINANCIAL AND SUPERVISORY INFORMATION

**Summary of Financial Condition**
($000s)

| | TFR 9/30/92 (error free) | % to Assets Ratio | Regulatory Requirement |
|---|---|---|---|
| Tangible Capital ........... | $(61,694) | (1.29) | $71,477 |
| Core Capital ............... | (14,043) | (0.29) | 142,954 |
| Risk Based Capital ......... | (15,183) | (0.52) | 220,222 |
| Total Assets ....... (SC060) | $4,827,462 | | 100.0 |
| Total Liab. ........ (SC070) | 4,771,219 | | 98.8 |
| Net Income (previous four quarters 9/91 - 6/92) | $520 | | |
| Net Income (quarter ended 9/30/92) | $3,325 | | |

**Additional Financial Information**
($000s)

| | TFR 9/30/92 (error free) | % of Assets |
|---|---|---|
| Total Equity (GAAP) Capital. (SC080) | $ 56,243 | 1.2 |
| Net Op. Inc. (YTD) ... | 6,948 | 0.2 * |
| Critic. Assets .... (TA400-430) | 808,058 | 16.7 |

* Annualized



WOP324 0880 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION**
**S-MEMORANDUM - CARTERET SAVINGS BANK, F. A.**

SELECTED SUPERVISORY INFORMATION:

| Examination Results: | M-A-C-R-O | Composite |
|---|---|---|
| June 15, 1992 | 3-5-5-4-4 | 5 |
| June 17, 1991 | 4-5-5-4-5 | 5 |
| June 4, 1990 | 4-5-4-3-4 | 5 |
| May 22, 1989 | 4-4-4-3-5 | 4 |

| | |
|---|---|
| Consent Agreement (Y/N): | See ARP below |
| Open Issues or Applications (Y/N): | N |
| Denied Capital Plan (Y/N): | Revocation of conditional Capital Plan approval being prepared |
| Capital Disputes (Y/N): | N |
| Enforcement Issues (Y/N): | Y (See Section VI) |
| Date Classified RMS IV: | 25-AUG-91 |
| ARP (Y/N): | On 27-FEB-92, Carteret entered into an Agreement under which it consented to the appointment of a receiver or conservator for purposes of ARP in the event that recapitalization efforts do not proceed in a manner acceptable to OTS within 90 days. OTS granted two requests for time extensions, the last of which expired on August 28, 1992. See Exhibit 8. |
| Qualified Financial Contracts | Yes. See Exhibit 12. |



WOP324 0881 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

WOP3240881

## III. CORPORATE STRUCTURE

### A. General

Information relating to corporate structure is set forth under Section III (Background) of the October 25, 1991 Supervisory Memorandum.

### B. Service Corporations/Subsidiaries

1. Carteret's service corporations/subsidiaries are identified in Exhibit 3.

2. We reported in the October 25, 1991 Supervisory Memorandum that Carteret had applied to sell a subsidiary, Imperial Premium Finance, Inc. ("IPF") to AmBase for $65 million pursuant to a "Global Agreement" executed by OTS and AmBase on April 25, 1991. AmBase was unable to secure adequate financing for the acquisition and, consequently, pursuant to the "Global Agreement", Carteret received $12.5 million in escrowed funds in satisfaction of AmBase's obligations to Carteret with respect to IPF.

## IV. UPDATE OF MAJOR PROBLEMS

### A. Capital Position

As shown above, Carteret reported regulatory capital insolvency as of September 30, 1992. Tangible, core, and total (risk-based) capital measurements were $(61.7) million, $(14.0) million, and $(15.2) million, respectively. In addition, Carteret failed to meet its minimum regulatory capital requirements by $133.2 million, $157.0 million, and $235.4 million, respectively.

Capital erosion has been halted largely due to management's reduction of operating costs, balance sheet restructuring and disposition of problem assets. However, as discussed below, the Association continues to suffer from poor asset quality and interest rate risk that pose a threat to future earnings.

### B. Asset Quality

Carteret's asset quality has improved since the June 17, 1991 examination due to an intensive effort by management to liquidate non-performing assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructurings.

As of May 31, 1992, criticized assets decreased by 20.9 % and classified assets decreased by 26.4%. Assets classified "substandard", "doubtful", and "loss" were down by $28.9 million (4.7%), $46.5 million (84%), and $154.6 million (77.4%), respectively. Administration of the approximately $763 million ($562 million net of $146 million in



WOP324 0882 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Following amendments to Carteret's Capital Plan ("Plan"), the OTS approved the Plan on March 2, 1992, conditioned on Carteret's compliance with the terms, conditions and requirements of the Plan, as well as the Supervisory Agreement dated April 29, 1991, the Capital Directive issued October 8, 1991, and the ARP Agreement dated February 27, 1992. See Exhibit 9. The Plan as approved requires full compliance with FIRREA capital requirements by December 31, 1992 and projects an external infusion of $200 million.

Carteret has been unsuccessful in securing outside investors to infuse sufficient capital into the Association to meet FIRREA capital requirements. As stated above, Kohlberg and Company and the Carlyle Group withdrew their letters of intent on August 14, 1992 and November 11, 1992, respectively. Presently, with no serious potential investors in discussions with Carteret, we believe that there is no reasonable possibility for Carteret to secure the necessary capital by December 31, 1992 or in any other reasonable time frame. Consequently, we are preparing a revocation of Carteret's conditional Capital Plan approval.

## VI. ENFORCEMENT/SUPERVISORY ACTIONS

A chronological history of significant events is attached as Exhibit 10.

### A. June 15, 1992 Report of Examination

The June 15, 1992 Report of Examination, completed on July 31, 1992, was transmitted to the Association by letter dated August 20, 1992. See Exhibit 6. Carteret was assigned a composite rating of "5". In its response to the Report of Examination, Carteret did not raise any material issues with respect to the OTS findings in the examination.

### B. Capital Directive and Supervisory Agreement

Carteret is in substantial compliance with the October 7, 1991 Capital Directive and the April 29, 1991 Supervisory Agreement. See Exhibits 4 and 6 to the October 25, 1991 Supervisory Memorandum.

### C. ARP Agreement

Under an ARP Agreement, entered into on February 27, 1992, Carteret consented to the Association's inclusion in the ARP program in the event that its efforts to recapitalize without government participation were not proceeding in a manner acceptable to OTS or within 90 days. Carteret requested, and the OTS agreed to, two time extensions, the last of which expired on August 28, 1992. See Exhibit 8.

### D. Formal Investigation of Certain Compensation Practices

In September 1991, OTS initiated a formal investigation of prior management's compensation practices relating to executive performance bonus payments, unauthorized cash advances on severance agreements, and the granting of "stay" bonuses. This ongoing investigation focuses on



WOP324 0884 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

WOP3240884

the actions of current AmBase Chairman Scharffenberger and former members of the AmBase board of directors, as well as former Carteret officers O'Brien, Walsh, Braun and McCarthy. Former Carteret Vice Chairman and Chief Operating Officer Pierson and former President Mueller have paid a combined total of $660,000 in restitution. See Exhibit 6.

## VII. SUPERVISORY GOODWILL LITIGATION

On May 7, 1992, the U.S. Court of Appeals for the Third Circuit vacated the U.S. District Court's preliminary injunction which had barred the OTS from excluding $150.5 million in supervisory goodwill for purposes of determining Carteret's regulatory capital compliance. See Exhibit 2 and Chronological History of Significant Events, Exhibit 10. Due to the exclusion of supervisory goodwill pursuant to OTS regulation, Carteret reports larger deficiencies in all three regulatory capital measurements.

However, even if supervisory goodwill were included as of September 30, 1992 for purposes of determining the Association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver based on the grounds set forth below.

## VIII. GROUNDS FOR APPOINTMENT OF A RECEIVER

This Office is of the view that grounds exist for the appointment of a receiver for Carteret pursuant to Section (5)(d)(2)(A) of the HOLA.

### A. Subsection (iii): UNSAFE OR UNSOUND CONDITION TO TRANSACT BUSINESS, INCLUDING HAVING SUBSTANTIALLY INSUFFICIENT CAPITAL OR OTHERWISE

Carteret failed to meet its minimum tangible, core, and total (risk-based) capital requirements by $133.2 million, $157.0 million, and $235.4 million, respectively, as of September 30, 1992.

As discussed below, we believe that no reasonable prospect exists for an unassisted recapitalization in any reasonable time frame.

Accordingly, we believe that Carteret's capital clearly is substantially insufficient and that the Association is in an unsafe or unsound condition to transact business.

### B. Subsection (vii): THE SAVINGS ASSOCIATION HAS INCURRED OR IS LIKELY TO INCUR LOSSES THAT WILL DEPLETE ALL OR SUBSTANTIALLY ALL OF ITS CAPITAL, AND THERE IS NO REASONABLE PROSPECT FOR THE SAVINGS ASSOCIATION'S CAPITAL TO BE REPLENISHED WITHOUT FEDERAL ASSISTANCE

The Association reported net losses of $113.5 million for 1990, a net loss of $160 million for 1991, and a net profit before taxes of $8.5 million for the nine months ended September 30, 1992.

However, despite improvements in disposition of problem assets and level of criticized assets, Carteret's high level of problem assets



WOP324 0885 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

WOP3240885

continues to negatively impact earnings and capital through the loss of interest income, additions to reserves and charge-offs. These losses have substantially depleted Carteret's capital.

Carteret's approved Capital Plan recognizes that the Association cannot cure its regulatory capital deficiencies through earnings, but rather requires a significant external capital infusion. Despite the intensive efforts of management, Carteret has been unable to secure outside investors to cure the Association's capital deficiencies. The withdrawal by both Kohlberg & Company and the Carlyle Group of their letters of intent to infuse $200 million in Carteret is clear evidence that Carteret's problems are too severe for the Association to attract outside capital on an unassisted basis. The FDIC independently has reach the same conclusion. <u>See</u> Exhibit 11.

Because of Carteret's continued large volume of problem assets and inability to sufficiently increase capital either internally or through outside investors, as well as AmBase's lack of capital resources, in our opinion there is no reasonable prospect for the capital of the Savings Bank to be replenished by December 31, 1992 as required or in any other reasonable time period without Federal assistance.

**C. Subsection (vi): <u>THERE IS A VIOLATION OR VIOLATIONS OF LAWS OR REGULATIONS, OR AN UNSAFE AND UNSOUND PRACTICE OR CONDITION WHICH IS LIKELY TO CAUSE INSOLVENCY OR SUBSTANTIAL DISSIPATION OF ASSETS OR EARNINGS, OR IS LIKELY TO WEAKEN THE CONDITION OF THE ASSOCIATION OR OTHERWISE SERIOUSLY PREJUDICE THE INTERESTS OF ITS DEPOSITORS</u>**

As noted in Section V above, with Kohlberg & Co. and the Carlyle Group's withdrawal of their letters of intent, this Office believes that there is no longer any reasonable possibility for Carteret to secure $200 million in capital by December 31, 1992, the date specified in its capital plan, or in any other reasonable time frame, absent Federal assistance. The Association's inability to meet its capital target constitutes a material violation of its capital plan and, accordingly, we are preparing to revoke the conditional approval of Carteret's capital plan. In addition, a material violation of a capital plan constitutes an unsafe and unsound practice under 12 U.S.C. Section 1464(t)(6)(E).

Based on Carteret's inability to meet its capital target, we believe the Association is operating in an unsafe and unsound manner which is likely to weaken the condition of the Association.

**VIII. CONTACTS**

A. <u>REGIONAL OFFICE CONTACT/PHONE</u>

Michael Simone, Assistant Director/(201) 413-7303
John C. Griffin, Assistant Director/(201) 413-7319

B. <u>ON-SITE EXAMINER CONTACT/PHONE</u>

Thomas J. O'Rourke, Examiner-in-Charge/(201) 326-1024



WOP324 0886 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

WOP3240886

## IX. CONCLUSION

Statutory grounds continue to exist for the appointment of a receiver for Carteret. We recommend that the Director take immediate action to appoint the RTC as receiver for Carteret.

------------------------------
Angelo A. Vigna
Regional Director
Office of Thrift Supervision
Northeast Region



WOP324 0887 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**X. EXHIBITS**

1. October 25, 1991 Supervisory Memorandum
2. Carteret Savings Bank, FA v. Office of Thrift Supervison et al., Nos. 91-5597 and 91-5290 (3rd Cir. May 7, 1992)
3. Carteret service corporations/subsidiaries
4. AmBase Corporation SEC Form 10Q as of June 30, 1992, and March 31, 1992
5. AmBase Corporation SEC Form 10K as of December 31, 1991 and SEC Form 8 dated May 13, 1992
6. Report of Examination dated June 15, 1992 and August 20, 1992 transmittal letter
7. Thrift Financial Reports for quarters ended September 30, 1992, June 30, 1992, March 31, 1992, and December 31, 1991
8. ARP Agreement between Carteret and the OTS dated February 27, 1992, and letters from Regional Director OTS-NE dated May 27, 1992 and July 6, 1992 to the Board of Directors regarding time extensions under ARP Agreement
9. Letter from Regional Director OTS-NE dated March 2, 1992 to the Board of Directors regarding conditional approval of capital plan.
10. Chronology of enforcement actions, supervisory actions and supervisory goodwill litigation
11. August 28, 1992 memorandum to Files from Michael J. Zamorski, FDIC
12. Qualified financial contracts



WOP324 0888 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

cc: Robert Albanese
Michael Simone
John Griffin
James Porreca
Aaron Kahn - OTS Washington
Richard Riese - OTS Washington Enforcement
Scott B. Smith
Donald Hom
Thomas J. O'Rourke



WOP324 0889 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

## Chronological History of Significant Events

The following chronology of events highlights capital issues, supervisory goodwill litigation and enforcement and supervisory actions to date.

| | |
|---|---|
| June 4, 1990 | A regular examination of Carteret commences. |
| September 30, 1990 | Carteret reports that it is capital deficient on a tangible basis. Several branch sales in October and November, 1990 enable Carteret to report that it has cured its capital deficiency. |
| December 31, 1990 | Carteret records substantial additions to its valuation allowances as had been previously directed via this Office's examination transmittal dated December 12, 1990. |
| January 17, 1991 | This Office requests Carteret's consent to a Capital Directive requiring the Savings Bank to submit a Capital Plan by February 28, 1991 demonstrating compliance with a five percent (5%) core capital requirement by December 31, 1992. |
| February 14, 1991 | Carteret files suit against the OTS in the U.S. District Court for the District of New Jersey seeking injunctive relief enjoining the OTS from taking any action against Carteret based on insufficient capital without counting supervisory goodwill as a component of capital. |
| February 18, 1991 | Judge Bissell, U. S. District Court, issues a temporary restraining order enjoining OTS from deducting goodwill from capital in determining Carteret's compliance with the minimum capital requirements prescribed in FIRREA. |
| April 17, 1991 | Judge Bissell rules in Carteret's favor on the preliminary injunction, thereby formalizing the restrictions contained in the temporary restraining order. |

WOP324 0890 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| April 19, 1991 | OTS appeals to the Third Circuit Court of Appeals the District Court's grant of a preliminary injunction. |
| April 29, 1991 | Carteret consents to a Supervisory Agreement requiring corrective action in Carteret's management of commercial assets, mortgage-derivative products, PMSR, and compensation issues relating to former Chairman Robert B. O'Brien. |
| May 10, 1991 | OTS seeks reconsideration of that portion of the District Court's order requiring for capital purposes inclusion of goodwill that had been written off in connection with Carteret's sale of certain branches in 1990. |
| May 17, 1991 | Judge Bissell amends the preliminary injunction on May 18, 1991, permitting OTS to deduct from goodwill certain supervisory goodwill that had been written off pursuant to GAAP in connection with certain branch sales. |
| June 17, 1991 | A regular examination of Carteret commences. |
| June 28, 1991 | This Office requests Carteret's consent to a Capital Directive requiring Carteret to submit a Capital Plan which demonstrates how the Savings Bank will attain compliance with all applicable requirements. |
| July 2, 1991 | Carteret files a motion for reconsideration of Judge Bissell's order dated May 17, 1991 claiming that the Court's order caused Carteret to fail its risk based capital requirement and thus, this Office's request for a second Capital Directive. |
| July 8, 1991 | Judge Bissell reverses his May 17, 1991 ruling regarding the preliminary injunction and, in effect, reinstates, for capital purposes, $57 million in supervisory goodwill written off by Carteret in accordance with GAAP. |

WOP324 0891 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| July 10, 1991 | In order to comply with Judge Bissell's July 8, 1991 ruling, this Office withdraws the Capital Directive that presented to Carteret on June 28, 1991. |
| July 12, 1991 | OTS appeals to the Third Circuit the District Court's July 8, 1991 ruling. |
| August 14, 1991 | AmBase files its SEC Form 10 Q for the period ending June 30, 1991 disclosing second quarter losses at Carteret which resulted in a capital deficiency of more than $100 million, including all supervisory goodwill as capital. |
| September 4, 1991 | OTS-WASH ENFORCEMENT opens an investigation into the compensation practices of former Carteret management. |
| September 11, 1991 | OTS-NE requests Carteret's consent to a third Capital Directive. |
| September 30, 1991 | Carteret submits a Capital Plan. |
| October 7, 1991 | Carteret consents to the issuance of a Capital Directive which, in turn is executed by the OTS-NE Regional Director on October 8, 1991. |
| October 15, 1991 | OTS-NE requests that Carteret provide additional information in regard to its Capital Plan filing. |
| October 22, 1991 | Carteret submits its response, in the form of an amended Capital Plan, to the OTS-NE request for additional information. |
| November 20, 1991 | The results of the June 17, 1991 Report of Examination are presented to the Board. The Board responds in a timely manner to matters of examination concern. |
| December 20, 1991 | AmBase is notified that the OTS-WASH ENFORCEMENT is planning to issue a notice of charges relating to the compensation practices of former Carteret management that were approved by AmBase. Settlement discussions are initiated. |

| | |
|---|---|
| February 27, 1992 | Carteret consents to an Agreement to be placed in the Accelerated Resolution Program of the RTC if its capital raising efforts are unsuccessful within 90 days. |
| March 2, 1992 | Carteret's Capital Plan is approved by OTS-NE subject to continued progress being demonstrated in capital raising efforts on an unassisted basis. This plan calls for the infusion of $200 million in equity capital through a private placement to achieve a fully phased-in capital position under the current capital requirements of FIRREA. |
| May 7, 1992 | The U.S. Court of Appeals for the Third Circuit vacates the U.S. District Court's issuance of the preliminary injunction requiring inclusion of supervisory goodwill for purposes of calculating Carteret's compliance with minimum capital requirements. Carteret subsequently amends its TFR filings to comply with the provisions of FIRREA and at March 31, 1992, records insolvency under all three capital measurements. |
| May 18, 1992 | OTS-NE issues a Cease and Desist Order to former Vice Chairman Robert Pierson relating to Employment Agreement amendments that were entered into without full disclosure to Carteret's board of directors. Pierson consents to the issuance of the order and makes restitution to Carteret of $350,000. |
| May 20, 1992 | OTS-NE issues a Cease and Desist Order to former President Robert J. Mueller relating to Employment Agreement amendments that were entered into without full disclosure to Carteret's board of directors. Mueller consents to the issuance of the order and makes restitution to Carteret of $310,000. |
| May 27, 1992 | OTS grants Carteret's request for an extension of time to July 6, 1992 to demonstrate acceptable progress in its capital raising efforts on an unassisted basis. |

| | |
|---|---|
| June 15, 1992 | A regular examination of Carteret commences. |
| July 6, 1992 | OTS grants Carteret's further request for an extension of time extension of time to August 28, 1992 to demonstrate acceptable progress in its capital raising efforts on an unassisted basis. |
| July 20, 1992 | A conditional letter of intent is executed by AmBase and Kohlberg & Co., stating Kohlberg's intent to form an investor group that will raise $200 million to purchase a controlling interest in Carteret subject to due diligence reviews, regulatory approvals and customary closing requirements. |
| August 14, 1992 | Kohlberg & Co. withdraws its conditional letter of intent based on the preliminary findings of its due diligence review. These findings relate to Carteret's level of loan loss allowances, carrying value of PMSR, regulatory capital requirements and the validity of Carteret's proforma income projections for 1993 and beyond. |
| August 28, 1992 | Carteret's time extension expires under the ARP Agreement. |
| October 15, 1992 | Carteret enters into a conditional letter of intent with a group of investors headed by The Carlyle Group and Colony Capital to invest $200 million in Carteret in exchange for an 80% interest in the Association. |
| November 11, 1992 | OTS receives verbal notification that the Carlyle Group is withdrawing its conditional letter of intent. |

WOP324 0894 FL AMBASE 93-531C WIN BOX # WC00005505 ACC # NE-JC-253 REGIONAL BOX # NEJ169
OTS DOCUMENTS FOR 1ST 30 CASES CARTERET CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 5**

IN THE COURT OF FEDERAL CLAIMS

----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

----------------------------------------x

October 26, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of ANGELO A. VIGNA,

a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

my part.
But realistically it's the same institution financially and economically, whether you allow the goodwill or you don't allow the goodwill.
Q Let me ask it in this way. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion?
A No.
Q Would Carteret have been able to attract additional capital in that condition, in your opinion?
A I would say it would be very likely that they could attract more capital.
Q If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing it's not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized, in your opinion?
MR. LEVITT: Objection, asked and answered.



THE WITNESS: Would you read that question back.
(The question requested was read back by the reporter.)
A I don't follow that question. It's cash, I mean, it's real capital. We're talking about an intangible. It just --
Q I understand.
A It's an accounting number, not even -- it's not real, it has no return. I mean, cash can be invested for a return.
Q Yes.
A So your question isn't -- it's not realistic.
Q Let me come at it --
A My apologies, but that's not a realistic question.
Q Let me come at it this way.
If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
A No.



MR. COOPER: We're at a convenient stopping point if you want to take five or ten minutes, because I think I may be thirty minutes or so away from the end of my questioning.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Vigna, do you recall that AmBase was called upon by the regulators to perform under the RCMA that we reviewed earlier, the regulatory capital maintenance agreement that was executed by --
A Yes.
Q So I'm clear, do you recall that AmBase was called upon to perform under that RCMA?
A Yes, I do have a recollection of that.
Q What do you recall?
A I don't recall the details, just that there was a capital maintenance agreement of some sort and that we did put -- make a call on it.
Q Do you recall what general time frame the initial performance under that RCMA took



place?
A No.
Q Do you recall that performance under the RCMA came in two different capital contributions, an initial $20 million one and then a subsequent $30 million capital contribution?
A No, I don't have any specific recollection of that.
Q Let's see if this document helps to refresh your recollection.
MR. COOPER: I'd ask the court reporter to mark as Exhibit 13 a one page document Bates stamped OAM 0040077.
(The above-described document was marked Vigna Exhibit 13 for identification, as of this date.)
Q Would you identify this document, please?
A It's a letter from Joseph P. Kehoe, the OTS Assistant Director, to Bruce Bean, acknowledging receipt of his letter to the effect that AmBase had contributed $20 million in cash to Carteret.
Q Does that refresh your recollection about a $20 million capital contribution in this

**EXHIBIT 6**

IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION, et al.

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

October 15, 1999

8:30: a.m.

200 Park Avenue

New York, New York

DEPOSITION of ROBERT ALBANESE, a witness in the above entitled matter, before a Notary Public of the State of New York

to be managed by Mr. Bianco and his colleagues, do you believe that it would have prospered in the economic environment that has prevailed since the end of 1992?

MS. TORNATORE: I will object as to speculation. You may answer to the extent you think you can.

A I think I could say that as I have said repeatedly, that we viewed this institution as being well run, and as an institution, a management team that was making progress.

I know of -- to take the other side, I do know of well run institutions that didn't do too well during good times, so you can't say with absolute certainty what would have happened, I certainly can't speculate on that.

Q I am just asking for your best judgment.

A My opinion is that it was a good management team, and a good management team and a good economy ought to be able to do pretty well.

Whether they would have prospered, I think that's -- what is prospered? They would have survived probably? Yes.

Q Do you recall how much the capital



deficit, and now I will just confine the question to the tangible capital deficit of Carteret was at this time, the time it was seized?

A No. Frankly I didn't even think it was negative, but I think it was below the minimum, but I don't recall, actually.

The deficit, I am talking about negative capital, not negative to the requirement.

Q Yes, I am talking, and my question is and I guess my representation is that its regulatory capital was negative?

A Okay.

Q Deficit?

A I don't recall.

Q I am just wondering if you recall.

A No.

Q So you don't recall what it's capital snapshot was at the time, so to speak?

A No.

Q Let me ask the question this way, if Carteret had satisfied at that time its tangible capital requirement, whatever that might have been, let's just say for purposes of this question that it was a $70 million tangible capital requirement, if they had satisfied that, do you



believe that Carteret would have been able to attract an investor to make up the much smaller difference that was then needed?

Do you understand my question?

A No, I don't. If you are asking me if they had a smaller hole to fill was somebody more likely to step in?

Q That's essentially what I am asking you, yes.

A I think that that pretty much goes without saying, for them and any other institution.

Q Do you believe that Carteret would have been seized if they had satisfied their -- its tangible capital requirement rather than having had, as it did, a tangible capital deficit?

A No.

Q If the OTS and the other regulatory authorities had in good faith at this time recognized Carteret's supervisory goodwill as regulatory capital no different from cash, do you believe that Carteret would have been seized at this time?

A You are saying if the supervisory goodwill was not eliminated, therefore bringing



that ratio way down and therefore they would have had somewhere in the neighborhood of 5 percent, based upon the numbers you showed me before?

Q It was actually 3.5, based upon those earlier numbers?

A If that supervisory goodwill was sufficient for them to meet the minimum capital requirements -- let me put it another way -- if the elimination -- if we did not eliminate the goodwill?

Q Yes, that's it.

A If they had enough that their tangible capital requirement would have been met, I think it gets back to your earlier question, I don't think they would have been seized.

Q Did the regulators ever consider infusing some of their own money into this thrift?

A While it was open?

Q Yes, I think that there were programs called open thrift assistance, and frankly I'm not specifically acquainted with them, I am sure you are.

A You are sure.

Q Do you recall if any consideration was given to possibly assisting a transaction in