IN THE COURT OF FEDERAL CLAIMS

----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

----------------------------------------x

October 26, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of ANGELO A. VIGNA, a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

Page 154

goodwill, supervisory goodwill, $150 million or so at that time, and without it.
If instead of having a $70 million deficit in tangible capital, negative tangible capital, Carteret had had $70 million or so in positive tangible capital at the time that it was seized, in your opinion, would it have been seized?
MR. LEVITT: Objection, calls for speculation. You can answer.
A I don't know. I'd have to -- probably not, but I'd have to look at the numbers and, you know, how -- where they measured up in terms of capital compliance and whether they could submit a business plan, a capital plan to recapitalize the institution internally.
I mean, we could accept capital plans. If they had that much capital they might have been able to give us a capital plan that reflected restoring capital through internal operations and maybe with only marginal or no outside capital.
I don't know, I'd have to look at those projections.
Q Well, if I ask you to assume for a

Page 155

moment that Carteret, if Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?
A Probably not.
Q During your time at OTS and its predecessor agencies, how many seizures would you say you were involved in?
A Over what period?
Q The whole time.
A Thirty-two years?
Q Yes, sir.
A Both in Washington and in New York?
Q Scores, maybe?
A A couple of hundred.
Q Really?
A It was over 90, almost 100 institutions in the northeast region, you know, from FIRREA, late '80s.
Q That's in the late '80s.
A Yes.
Q Focusing on then just the late '80s, you say there's approximately a hundred or so?
A Yes, I think, yes. I once counted and I had ninety something. That's the whole

Page 156

region, yes.
Q Can you recall a time when a thrift was seized that had positive tangible capital?
A Yes. I can't recall specifically, but it might have had a little bit of capital but it was going south, the losses, you know, would have dissipated it.
You know, if the losses are dissipating capital, we try to get there sooner rather than later, before all the capital has gone.
Q Can you recall a thrift that was seized that had positive tangible capital and was profitable and whose trends were profitable?
A I can't recall specifically any, that there were any in that condition.
Q Can you recall a thrift that satisfied or nearly satisfied its tangible capital requirement that was seized?
A No.
Q If Carteret in December of 1992, around the time it was seized, had satisfied or nearly satisfied its tangible capital requirement, do you believe that its ability to attract additional capital, additional investment, and

Page 157

raise additional capital would have been very substantially enhanced?
MR. LEVITT: Objection, calls for speculation. You can answer.
A Regardless of the new capital rules, regardless of the new treatment of goodwill?
Q Yes, I'm asking if instead of having $70 million negative tangible capital, Carteret had positive $70 million of tangible capital and was effectively in compliance with its tangible capital requirement, could it have raised capital, in your opinion?
A Well --
Q Additional capital?
A In real economic terms it's the same institution. It's the same value, really.
I would say probably, you know, you're assuming that there's no -- that we still count goodwill.
So probably we could have had other institutions that would have acquired Carteret and would be taking on a little bit more goodwill, but if it was profitable and had some capital, I don't know whether it would have in fact at that point in time attracted capital. That's speculation on

Page 158

my part.
But realistically it's the same institution financially and economically, whether you allow the goodwill or you don't allow the goodwill.
Q Let me ask it in this way. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion?
A No.
Q Would Carteret have been able to attract additional capital in that condition, in your opinion?
A I would say it would be very likely that they could attract more capital.
Q If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing it's not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized, in your opinion?
MR. LEVITT: Objection, asked and answered.

Page 159

THE WITNESS: Would you read that question back.
(The question requested was read back by the reporter.)
A I don't follow that question. It's cash, I mean, it's real capital. We're talking about an intangible. It just --
Q I understand.
A It's an accounting number, not even -- it's not real, it has no return. I mean, cash can be invested for a return.
Q Yes.
A So your question isn't -- it's not realistic.
Q Let me come at it --
A My apologies, but that's not a realistic question.
Q Let me come at it this way.
If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
A No.

Page 160

MR. COOPER: We're at a convenient stopping point if you want to take five or ten minutes, because I think I may be thirty minutes or so away from the end of my questioning.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Vigna, do you recall that AmBase was called upon by the regulators to perform under the RCMA that we reviewed earlier, the regulatory capital maintenance agreement that was executed by --
A Yes.
Q So I'm clear, do you recall that AmBase was called upon to perform under that RCMA?
A Yes, I do have a recollection of that.
Q What do you recall?
A I don't recall the details, just that there was a capital maintenance agreement of some sort and that we did put -- make a call on it.
Q Do you recall what general time frame the initial performance under that RCMA took

Page 161

place?
A No.
Q Do you recall that performance under the RCMA came in two different capital contributions, an initial $20 million one and then a subsequent $30 million capital contribution?
A No, I don't have any specific recollection of that.
Q Let's see if this document helps to refresh your recollection.
MR. COOPER: I'd ask the court reporter to mark as Exhibit 13 a one page document Bates stamped OAM 0040077.
(The above-described document was marked Vigna Exhibit 13 for identification, as of this date.)
Q Would you identify this document, please?
A It's a letter from Joseph P. Kehoe, the OTS Assistant Director, to Bruce Bean, acknowledging receipt of his letter to the effect that AmBase had contributed $20 million in cash to Carteret.
Q Does that refresh your recollection about a $20 million capital contribution in this

Page 162

time frame? The date on this is March 22, 1990.
A Yes.
Q It does?
A Yes.
Q Do you recall what Carteret's regulatory capital profile was when this capital contribution was made?
A Well, based on my reading of the letter there was a capital deficiency, and presumably the $20 million cured the deficiency.
Q And this was almost immediately after FIRREA's implementing regulations took effect, is that correct?
A I would say so, yes, based on the date of this letter.
Q Based upon our earlier discussions today, Mr. Vigna, concerning the amount of supervisory goodwill that was excluded from capital under FIRREA's requirements, is it accurate to say that if Carteret's supervisory goodwill at that time had not been excluded from regulatory capital, AmBase would not have been obligated under the RCMA to infuse $20 million, would it?
THE WITNESS: Could you read that

Page 163

question back.
(The question requested was read back by the reporter.)
MR. LEVITT: Only if you know.
A I don't know specifically without looking at the actual numbers at the time.
Q Okay. Do you recall our earlier discussion when we reviewed a document that indicated that Carteret had lost approximately $180 million of unamortized supervisory goodwill?
A Yes.
Q As a result of FIRREA?
A Yes.
Q If the loss of that regulatory capital resulted in a $20 million capital deficiency which was then cured by AmBase under the RCMA, then am I incorrect in stating that had Carteret's $180 million or so of supervisory goodwill been included in capital, it would have been way, way over its capital requirement and therefore not obligated to enhance capital under the RCMA?
A Yes.
Q Mr. Vigna, did you and your colleagues in the northeast region ever consider

Page 164

whether the exclusion of Carteret's supervisory goodwill from regulatory capital had effectively relieved AmBase of its obligation to provide maintenance of Carteret's capital under the RCMA?
A I don't recall that kind of a discussion. It's possible, I just don't recall.
Q Do you recall when the remaining $30 million of the capital obligated under the RCMA was called for by the regulators?
A No.
MR. COOPER: I'd like the court reporter to mark as Exhibit 14 a document, one page in length, that is Bates stamped AMB 009931.
(The above-described document was marked Vigna Exhibit 14 for identification, as of this date.)
Q Do you recognize this document?
A I don't recall it, no.
Q Would you identify it for the record?
A It's a letter from me to the Board of Directors of AmBase requesting under the 1988 regulatory capital maintenance agreement that AmBase infuse an additional $30 million into

Page 165

Carteret.
Q It's dated August 29, 1990?
A That's correct.
Q Does this help to refresh your recollection regarding the request to infuse additional, the remaining $30 million under the RCMA?
A Yes.
Q In this opening paragraph you stated to the AmBase Board of Directors, "The OTS is currently conducting an examination of Carteret, and based upon an ongoing review of asset quality and taking into account needed specific and general loss reserves, it has been determined that Carteret currently fails its regulatory capital requirement by at least $30 million."
The paragraph suggests that the examination was not complete, but rather that it was ongoing, but nonetheless you were asking Carteret to make a $30 million capital contribution before the examination is complete.
Was that typical, or would such a request typically come after the completion of an examination?