IN THE COURT OF FEDERAL CLAIMS

---------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

---------------------------------------x

September 3, 1999
10:00 a.m.

200 Park Avenue
New York, New York

DEPOSITION of MICHAEL SIMONE, a witness in the above entitled matter, before a Notary Public of the State of New York

recollection?
A I don't recall.
Q You have no recollection as to this?
A No.
Q Do you recall why the Prince ultimately did not make an investment in Carteret?
A No, I do not.
Q Do you recall whether there was a regulatory barrier independent of this that was interposed that precluded him from making such an investment?
A I don't recall.
Q Do you recall having any concerns about the Prince as a potential investor?
A I don't recall.
MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 26 a document that bears the Bates number WOK 6790378.
(The above described document was marked Simone Exhibit 26 for identification, as of this date.)
Q Sir, would you please identify this document for the record?
A It appears to be a copy of AmBase's



HB-11 report for the quarter ended June 30, 1992 which was forwarded to me by John Ferrara of AmBase Corporation.
Q I would like to turn your attention to Page 6 of the filing. I think if you keep going another couple of pages, I am referring to the page numbers at the bottom not the Bates number.
If you just take a moment to review the paragraphs under "other materially important events," please?
A Okay.
Q Focusing for a moment on the third paragraph, where reference is made to the fact that Kohlberg & Co. had executed a Letter of Intent for $200 million investment in Carteret, and a statement is made there that "Carteret will meet the fully phased in requirements of FIRREA afollowing the recapitalization."
Did you agree with that?
Was that your understanding of the amount of capital that was needed to fulfill the fully phased in requirements of FIRREA?
A I don't recall the specifics, but it clearly was enough to keep an extension going for



the institution, so.
Q And if the institution had, let's say, an additional $100 million of capital already in place, is it your opinion that it would have been easier for the institution to raise an additional $100 million?
A Yes.
Q Is it your understanding that if the institution had an extra $100 million in capital, that it would have been permitted to continue in operation for some period of time beyond December 4, 1992?
A I don't recall that. I do not recall that.
Q I would like to just try to follow up and refresh your recollection, if it's possible, by referring you back to the S Memo?
A Right.
Q And to the fifth page of that document under "capital position?"
A Yes.
Q Where it refers to the various deficiencies in capital that Carteret had at this time and the most substantial of them is tangible capital.



I guess my question to you is if, let's say Carteret had an additional $140 million in capital so that its tangible capital instead of being negative $60 million had been positive $80 million, do you think that Carteret would have been permitted to operate beyond December 4, 1992?
A It's very likely, particularly if they were still capital deficient there would have been some sort of a capital plan put back in place.
Q But it's your opinion that given Carteret's core profitability, if it had a positive tangible capital of say $80 million, it would have been permitted to continue to operate, is that correct?
A It's likely, yes.
Q Can you think of any instance in which a thrift was seized where it had positive tangible capital of $80 million and core profitability?
A No.
Q Wouldn't that have been highly unusual, to seize a thrift in a situation where it had a fairly substantial amount of capital in terms of absolute dollars, even if not as a

percentage of assets, where it was profitable?
A To seize an institution for capital purposes, yes, but it's -- it's possible that for some other reasons the institution could have been seized.
Q I understand hypothetically speaking. In terms of Carteret, can you think of any reason, given the fact that it had solid management in place, that its profits were solid and that its asset quality had been improved?
A No.
Q So it's your understanding that if it had the additional capital of, let's say $140 million, that it would have been permitted to continue to operate?
A Again, I don't recall the specifics, but based on what I'm seeing here, yes, it's possible.
Q And likely, in fact?
A Yes.
Q Fair enough.
Now I would like to return to this document that's been marked as number 26.
Do you recall why the Kohlberg Letter of Intent ultimately did not materialize



into a capital infusion?
A No, I do not.
MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 27 a document that bears the Bates number WOP 3250280.
(The above described document was marked Simone Exhibit 27 for identification, as of this date.)
Q Sir, would you please identify this document for the record?
A It's an internal memo put together by Scott Smith addressed to me and it's dated October 15, 1992.
Q Reference is made in the first paragraph to a "current investor group" which included Carlisle and the Pennsylvania Teachers Retirement Fund, the McArthur Foundation, a few other financial entities.
Do you recall the interest expressed by this investor group?
A I remember the names, I don't remember the specific interest that was expressed. But yes.
Q Now, on the bottom of the page



reference is made to what is termed an "unusual term in the proposed Letter of Intent that the investors want to reserve the right to purchase two properties from AmBase/Carteret at their adjusted net book value, even if the Letter of Intent is terminated."
Do you recall whether you ever learned what those properties were?
A I don't recall.
Q Do you recall whether this term, although somewhat unusual, was actually an impediment to the consummation of the transaction?
A I don't.
MR. THOMPSON: At this point I would like to have the court reporter mark as Simone Exhibit 28 a document that bears the Bates number AMB 034109.
(The above described document was marked Simone Exhibit 28 for identification, as of this date.)
Q I'd like you to please identify this document for the record, sir?
A It's an October 30, 1992 letter with an accompanying HB-11 filing that John P. Ferrara



sent to me from AmBase Corporation.
Q I would like to direct your attention to the second to last page of the exhibit, under "other materially important events."
Will you please just take a moment to review that, sir?
A Okay.
Q Does this refresh your recollection as to the fact that a Letter of Intent was executed on October 19, 1992 between AmBase and the Carlisle Group?
A Not really. I remember the name Carlisle Group coming up as an interested party, but no, it does not.
Q And do you recall why the Carlisle group ultimately did not make a capital contribution?
A No, I do not.
MR. THOMPSON: At this point I would like to ask the court reporter to mark as Simone Exhibit 29 a document that bears the Bates number WOP 3340714.
(The above described document was marked Simone Exhibit 29 for