KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS

M E M O R A N D U M

TO: File

FROM: Robert C. Seiger, Jr.

DATE: February 15, 1995

RE: Carteret
File No. 4010-001
Re: Meeting with OTS - January 31, 1995

---

The January 31, 1995 together with Ken Gainer, Lou Childress and Ray Williams of Lou Childress' office, we met with OTS personnel, Mr. Michael L. Simone, Assistant Director of Operations, Mr. Thomas O'Rourke, Chief Examiner and Eugene M. Schwartz, Assistant Regional Counsel in the office of the OTS, Newark, New Jersey.

The purpose of the meeting was to discuss with the OTS their conclusions and their findings concerning the failure of Carteret Savings.

According to the OTS, Messrs. Kramer and Bianco were extremely cooperative and helpful in the transition from an operating institution to a conservatorship. According to Messrs. Simone and O'Rourke, Mr. Kramer and Bianco facilitated the transition and came "close" to successfully recapitalizing the institution and avoiding conservatorship. As an aside, Mr. Simone indicated that had the institution approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing.

According to the OTS, the main cause of the demise of the institution was poor underwriting of loans. The key year of the troubles of the institution was, according to the OTS reflected in the 1990 examination, when it was determined that approximately $77 million of additional loan loss reserves which should have been allocated were not allocated. In fact, according to the OTS the additional reserves were never allocated. The additional reserve requirement resulted from the continual discovery of poorly underwritten loans which began as early as 1986 and continued until lending activity was terminated in 1989. According to the OTS, after 1989 no additional loans were made, but the institution continued to suffer the results of its prior ventures into real

estate lending and other areas in which the institution had no experience.

According to Mr. Thomas O'Rourke, the on-site examiner, the underwriting of real estate loans was particularly bad. He noted in particular the Profetta loans and the Swedeland loan being prime examples of real estate lending on the basis of poor financial information and not understanding the nature of the business. Mr. O'Rourke noted in particular that appraisals obtained were, for the most part, obtained from the borrower and did not reflect appropriate market conditions. Noteworthy in his comments was the fact that the institution did not maintain a review appraiser on staff. O'Rourke pointed out that the institution retained from time to time, review appraisers to confirm the results of prior appraisals (noting as an example the appraisal in the Oakwood transaction) but, the review appraiser did not properly advise the institution of the deficiencies in the appraisal. Mr. O'Rourke hasten to add that the review appraisals contained sufficient "caveats" and "warnings" which would, in his view, make it difficult to bring an action against the review appraiser but he noted that the institution failed to recognize the danger signs.

According to the OTS and particularly Mr. O'Rourke, loan decisions were made by the Credit Committee. Once a decision was made by the Credit Committee, the Board was a mere "rubber stamp" board and did not review the recommendations of the Credit Committee. The members of the Credit Committee who were responsible for majority of the poorly underwritten loans were Bob Walsh, Mr. Robert O'Brien, Mr. Charles McCabe and Mr. Redfern. Both Messrs. Walsh and McCabe were on the Board of Directors as well. The institution's lending policies provided that real estate loans in excess of $10 Million were to be approved by the Board of Directors. However, according to Mr. O'Rourke, the Credit Committee made these decisions on their own authority, and the Board exercised no due-diligence in reviewing such loans but merely ratified the decisions of the Credit Committee.

Mr. O'Rourke further noted that there were additional changes made to the loan between the time that the loan was approved and the time that the loan was ultimately closed. In particular, he pointed out in the Swedeland loan that there was a requirement for a $5 Million letter of credit which without the approval of the Board, was waived and a $2.5 Million certificate of deposit was accepted in lieu of the letter of credit. The other example was in connection with the Profetta loan where a participation from the local bank in Dayton, Ohio was required in connection with the credit transaction but this was also waived and cash collateral accepted. In both of these instances, the cash collateral was provided by Carteret. According to Mr. O'Rourke, the poor underwriting procedures began to be fully realized by the institution in 1989 and 1990 when the interest reserves and other

payment deferral programs and/or reserves established at the time the loan was funded ran out and Carteret discovered that the borrower was unable to fund loan payments and, that the projects did not cash flow.

Mr. O'Rourke further pointed out in connection with the Swedeland loan that the projections with respect to the times within which the project was expected to cash flow were not feasible.

Mr. O'Rourke further pointed out that in connection with the Profetta loan there was significant litigation by Profetta against the institution being handled by Sills Cummis concerning alleged lender liability.

Mr. O'Rourke pointed out that approximately $1.5 Billion in prior real estate loans were made by Carteret. The Credit Committee was in his opinion, "unfettered" and the Board held no discussion of any credit prior to ratification.

Mr. O'Rourke pointed out that in the 1990 examination, compliments were paid to management. Mr. O'Rourke explained that this somewhat inconsistent position of complimenting management while further indicating that the 1990 report was a "key" report in pointing out the deficiencies of the institution was due to the fact that management had, in fact, made certain progress from the financial condition of the institution during 1989. However, the 1990 report was the report in which the $77 Million additional loan loss reserves was required but not funded; and Carteret never was able to address the problem of additional loan losses. According to Mr. O'Rourke Carteret was making progress during the time frame between 1989 and 1990, but such progress stopped in 1990.

Mr. O'Rourke pointed out that in addition the FDIC conducted its own independent examination in 1990.

We asked to whom the reports of the examination were forwarded. Mr. Simone and Mr. O'Rourke said that they believed the 1990 report was sent, by letter of transmittal, directly to each individual Director at his home address. They are currently reviewing the files of the OTS to determine where the 1990 examination was forwarded. However, they indicated that it was the general practice of the OTS to forward the report of examination addressed to the Board at the institution's corporate address. Mr. O'Rourke further indicated that comments to the reports were received after the 1989 report but, at the time the 1990 report was concluded and delivered in September, the institution was in the midst of the next year's examination and corrective letters were not forwarded. Mr. O'Rourke pointed out that he did attend the meeting of the Board at which the FDIC report was discussed by the FDIC examiner with the Board during 1991. According to OTS records such meeting took place in April of 1991. The supervisory files of

the OTS may be the source of correspondence from which copies of reports of examination, letters of transmittal and responses would be found.

Upon question by Mr. Childress concerning payments made to the Board and senior executives, Mr. O'Rourke recommended that we speak to Rebecca Stone, in the Washington Office of the OTS.

Mr. Jim Hershorn of Sills is the contact at Sills, Cummis concerning the Profetta counter-suit.

According to Mr. O'Rourke, Mr. Bianco was diligently pursuing refinancing of the institution. Mr. Kramer worked closely with Mr. Bianco and was more of a "technician" than Mr. Bianco. Mr. Kramer was the insurance expert at Carteret and negotiated the D&O and other insurance policies.

According to Mr. O'Rourke, the OTS did not believe there were any claims to be made in the securities area. He believed that trading in the securities account was in due course with the exception of the DLJ transaction.

According to Mr. O'Rourke the DLJ transaction was booked as a security but should have been booked as a loan. The transaction was approved by Mr. Walsh individually and, in Mr. O'Rourke's opinion, was a device to circumvent the lending policies of the institution. Mr. O'Rourke's review of the securities transactions to Carteret confirmed that he did not believe a claim existed in this area and the securities personnel acted approximately with, of course, the exception of the DLJ portfolio.

Mr. O'Rourke suggested that we speak with Mr. Wayne Moor hired by Mr. Bianco to run the "work out" section of the institution. He indicated that Mr. Wayne Moor could provide significant information concerning the deficiencies in the problem loan portfolio. In discussions, we also talked about Mr. Stanley Mohr. Mr. O'Rourke confirmed that Mr. Stanley Mohr was an experienced real estate entrepreneur hired by Mr. Kramer to sell the "REO" properties of the institution. Mr. O'Rourke had high praise for Mr. Mohr.

Finally, in summary, it was the conclusion of the OTS that the lending policies and procedures of Carteret were the main cause of its demise, particularly in the real estate area. The OTS confirmed that Carteret did not have the expertise in house to review real estate policies and procedures. The lending group (which was headed by McCabe), was hired from Fidelity and purported to have the expertise necessary to develop a real estate lending area. However, because of the many "bonus payment" programs which were instituted at the institution whereby lenders increased their compensation by making loans, and the demonstrated lack of expertise in real estate lending, the assumption that good

quality real estate or lending procedures were brought to the institution by this group was, in fact, incorrect.

Mr. O'Rourke commented on the lending practices of the institution and noted that even though some of the written policies of the institution, particularly those which may have been written by Mr. Yates, outlined the manner in which real estate and other real estate related loans were to be made were adequate and, had the procedures been followed, may have resulted in a good real estate lending practices, they were not in fact followed. Mr. O'Rourke noted extensively that the real estate loans closed without compliance with good lending practices and in fact some policies of Carteret. However, no procedures were in place to control these lending practices. Mr. O'Rourke pointed out that the prime reason for loan difficulties was that the Credit Committee was unchecked. Because the Credit Committee was unchecked, the Board's failure to exercise appropriate controls over loans was a clear violation of prudent banking practices particularly after the Board had received notice of the underwriting problems contained in the various reports of the examination.

Mr. O'Rourke commented that Mr. Bianco may be helpful in pointing out individuals who should be further interviewed. Mr. O'Rourke noted that Mr. Bianco had a professional dislike for Mr. Walsh. Both Mr. Walsh and Mr. Isbransten were now working together and he indicated that they should be contacted to discuss their role in the lending practices of the institution.

The OTS concluded that poor underwriting was the prime cause of the institution's demise; a lack of controls was rampant and the Board exercised no control or review function with respect to the loans.