**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 93-531<br>(Judge Loren Smith) |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:
Vincent J. Colatriano
David H. Thompson
Jesse Panuccio

COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

December 21, 2007

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... i

INTRODUCTION ..... 1

PLAINTIFFS CONTENTIONS OF FACT ..... 5

A. Carteret's Success & Profitability Prior to the Breach ..... 5

B. The Government's Breach of the Supervisory Goodwill Contracts ..... 11

C. The Effect of the Breach on Carteret ..... 11

D. Congress and the FDIC Create A Receivership Deficit ..... 20

1. Congress's actions radically inflated the receivership deficit ..... 20

2. The post-solvency interest has no relationship to the actual cost of the loans ..... 21

3. The tax liability is a chimera of the FDIC's own making ..... 24

4. The Minority Preference Program prevented Carteret from using its own assets to finance its resolution and reduced the premiums it obtained ..... 26

5. The RTC shut down Carteret Mortgage Company abruptly ..... 28

STATEMENT OF ISSUES OF FACT AND LAW ..... 29

PLAINTIFFS' CONTENTIONS OF LAW ..... 30

I. PLAINTIFFS ARE ENTITLED TO THE VALUE OF THE BANK. ..... 32

A. The Loss of Carteret's Value Was Reasonably Foreseeable ..... 32

B. The Loss of Carteret's Value Was Caused by the Government's Breach ..... 38

1. Government regulators acknowledged that absent the breach, Carteret would have survived ..... 41

2. Carteret's successful performance prior to the breach and prior to seizure confirms that Carteret would have survived ..... 43

3. The breach devastated Carteret ......................................................................46

a. Asset shrink and deposit runoff .........................................................48

b. 1990 branch sales .................................................................................51

c. Increased cost of funds.........................................................................52

d. Commercial real estate sales and writedowns ....................................53

4. Carteret's capital position absent the breach ..................................................53

5. The Government's causation arguments are meritless ...................................57

a. Adding back goodwill as of time of seizure .......................................57

b. Carteret's supposed mitigation and the 1991 preliminary injunction ..59

c. The goodwill written off in connection with the 1990 branch sales....60

d. Carteret's exposure to commercial lending losses...............................64

e. Carteret's supposed failure to mitigate by raising capital....................67

C. Carteret Can Prove Its Expectancy Damages With Reasonable Certainty ............70

II. PLAINTIFFS SUFFERED SIGNIFICANT WOUNDED BANK DAMAGES. ..76

III. AMBASE IS ENTITLED TO RELIANCE DAMAGES. ....................................80

IV. AMBASE IS ENTITLED TO RESITUTION DAMAGES. ................................82

V. THE RECEIVERSHIP DEFICIT IS OVERSTATED .........................................83

A. Section 1821 Does Not Bar Review of the Validity of the Receivership Deficit..83

B. The FDIC Breached Repeatedly Its Fiduciary and Statutory Duties Toward Carteret and AmBase.........................................................................................85

1. The tax "liability" is a phantom liability that will never be paid by the FDIC .........................................................................................................86

2. The tax liability is a creation of the FDIC's repeated errors in filling out Carteret's tax returns ..........................................................................................87

a. The FDIC concedes that is erroneously overstated taxable income as a

result of its treatment of federal financial assistance ..........................87

b. The IRS will allow the FDIC to deduct up to $84 million as an interest expense for 1995 ..................................................................89

i. The FDIC failed to deduct interest actually paid by Carteret ..90

ii. The FDIC failed to deduct interest actually accruing on loans to Carteret.....................................................................90

c. The FDIC failed to carry forward the 1992 tax return........................93

d. Penalties for nonpayment will not be assessed and thus are not a proper component of the receivership deficit..........................................94

e. Interest on the tax liability is attributable to Congress's actions .........95

C. The FDIC's Estimates of Post-solvency Interest Should Be Excluded from the Receivership Deficit...........................................................................96

1. The United States is not entitled to deduct interest in the RTC loan from the damages due AmBase ........................................................................98

a. Interest on the RTC loan should not be deducted from the damages due AmBase because that loan is wholly attributable to Congress's failure to provide funding for the RTC ........................................................98

b. Interest should not be deducted from the damages due AmBase because those damages cannot be adjusted to reflect the time value of money........................................................................................99

2. If interest is deducted, it must be calculated pursuant to 12 C.F.R. § 360.3(b) ......................................................................100

a. The interest rates used in the FDIC calculations are contrary to law.........................................................................................101

b. The interest rates use in the FDIC calculations upset reasonable, well-settled expectations ..........................................................103

c. The interest rates used in the FDIC calculations have no economic justification ..........................................................................105

3. If the FDIC's interest rates are used, its calculations must be corrected to eliminate other flaws ..........................................................................106

a. The FDIC's interest calculations misallocate payments from the sale of Carteret's assets ....................................................................106

b. The FDIC's interest calculations improperly treat the premiums from Carteret's deposit sales ...................................................................108

D. The Receivership Deficit Was Overinflated Due to the Breach and Delays in Resolution ..........................................................................................110

E. The Unconstitutional Minority Preference Program Inflated Substantially the Receivership Deficit ...........................................................................113

1. The Minority Preference Program ..............................................................113

2. The Minority Preference Program violates the Due Process Clause ............114

a. Congress failed to demonstrate a compelling interest of the Minority Preference Program..........................................................................115

b. The Minority Preference Program is not narrowly tailored to a compelling interest...........................................................................117

3. The Minority Preference Program harmed Carteret and AmBase................120

a. The RTC held back Carteret's assets to sell minority acquirers of other institutions.............................................................................120

b. Minority bids for Carteret were preferred over non-minority bids....122

VI. DAMAGES SHOULD BE PAID TO AMBASE DIRECTLY ............................124

A. Governing Principles of Contract Law Require That Damages Be Paid Net of the Receivership Deficit.............................................................................124

B. Direct Payment of Damages to AmBase, As the Thrift's Sole Residuary Claimant, Will Vindicate Controlling Principles of Contract Law .....................................127

C. Direct Payment of Damages to AmBase Will Avoid Substantial Questions under the Taking Clause ..........................................................................128

CONCLUSION.........................................................................................................130

# TABLE OF AUTHORITIES

**Cases** **Page/s**

*Acme Process Equip. Co. v. United States*, 347 F.2d 509 (Ct. Cl. 1965) ........................82

*Adarand Contructors, Inc. v Pena,* 515 U.S. 200 (1995) ............................................114

*AmBase Corp. v. United States,* 61 Fed. Cl. 794 (2004)......................83, 84, 100, 125, 126

*AmBase Corp. v. United States,* 58 Fed. Cl. 32 (2003)........................................... *passim*

*American Capital Corp. v. United States,* 472 F.3d 859 (Fed. Cir. 2006).........................81

*American Capital Corp. v. United States,* 66 Fed. Cl. 315 (2005) ...................................80

*Bailey v. United States*, 341 F.3d 1342 (Fed. Cir. 2003) ..................................84, 100, 127

*Belmont Indus., Inc. v Bechtel Corp.*, 425 F. Supp. 524 (E.D. Pa. 1976).........................69

*Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341 (Fed. Cir. 2003) .................76

*Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ......... *passim*

*California Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) ........................124

*California Fed. Bank v. United States*, 245 F.3d 1342 (2001) ................................35, 125

*Carteret Sav. Bank v. OTS*, 963 F.2d 567 (3d Cir. 1992) ...............................14, 16, 48, 60

*Carteret Sav. Bank v. United States*, No. 91-661, slip op.
(D.N.J. July 8, 1991)....................................................................15, 51, 60, 61

*Carteret Sav. Bank v. OTS*, 762 F. Supp. 1159
(D.N.J. 1991), *vacated on other grounds,* 963 F.2d 567 (3d Cir. 1992)......................48

*Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002) ...............................................129

*Christian v. United States*, 46 Fed. Cl. 793 (2000).......................................................115

*Citizens Fed. Bank v. United States,* 474 F.3d 1314 (Fed. Cir. 2007).........................38, 39

*Citizens Fed. Bank v. United States,* 59 Fed. Cl. 507 (2004)................................38, 39, 40

*City of Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989) ..........................114, 117, 119

*Coast Fed. Bank v. United States,* 323 F.3d 1035 (Fed. Cir. 2003).................................63

*Coast Fed. Bank v. United States,* 48 Fed. Cl. 402 (2000) ..................................39, 40, 64

*Commercial Fed. Bank v. United States,* 59 Fed. Cl. 338 (2004).........................39, 64, 76

*Commercial Fed. Bank v. United States* ,125 Fed. Appx. 1013 (Fed. Cir. 2005) .............39

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)..............30, 32, 38

*Energy Capital Corp. v. United States*, 47 Fed. Cl. 382 (2000), *aff'd in part and rev'd in part*, 302 F.3d 1314 (Fed. Cir. 2002)...........................................................................38

*FDIC v. Mallen*, 486 U.S. 230 (1988) ...........................................................................22

*FDIC v. Meyer*, 510 U.S. 471 (1994) ....................................................................22

*First Fed. Sav. & Loan Bank v. United States*, 76 Fed. Cl. 106 (2007)............................40

*Glendale Fed. Bank, FSB v. United States*, 43 Fed. Cl. 390 (Fed. Cl. 1999) ..............76, 77

*Glendale Fed. Bank, FSB v. United States*, 54 Fed. Cl. 8 (2002)...............................77, 80

*Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1313 (Fed. Cir. 2004) ........70, 77, 79

*Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001) ............ *passim*

*Globe Savings Bank v. United States*, 65 Fed. Cl. 330 (2005), *aff'd in part and vacated in part*, 189 Fed. Appx. 964 (Fed. Cir. 2006) ..........................................................33, 76

*Granite Management Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005)................79

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...........................................................114, 116

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004) ..........................81

*Hirabayashi v. United States*, 320 U.S. 81 (1943).........................................................114

*Holland v. United States*, 75 Fed. Cl. 483 (2007)...........................................................40

*Home Sav. of Am., FSB v. United States*, 399 F.3d 1341 (Fed. Cir. 2005)............... *passim*

*Home Sav. of Am., FSB v. United States*, 50 Fed. Cl. 427 (2001) ...................................62

*Hughes Commc'n Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001)...........79

*Koby v. United States*, 53 Fed. Cl. 493 (2002) .........................................................69, 84

*La Van v. United States*, 382 F.3d 1340 (Fed. Cir. 2004) ..............................................32

*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001)......................33, 81

*LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363 (Fed. Cir. 2003).........70, 110

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) .......................................................70

*Myerle v. United States*, 33 Ct. Cl. 1 (1897)...................................................................39

*NLRB v. Catholic Bishop*, 440 U.S. 490 (1979) ...........................................................129

*Northeast Sav. Bank v. OTS*, 770 F. Supp. 19 (D.D.C. 1991) .........................................15

*Nyquist v. Randall*, 819 F.2d 1014 (11th Cir. 1987) ..................................................69, 84

*Old Stone v. United States*, 63 Fed. Cl. 65 (2004), *aff'd in part and rev'd in part*, 450 F.3d 1360 (Fed. Cir. 2006) ......................................................................39, 44

*Perry v. United States*, 294 U.S. 330 (1935) ..................................................................82

*Reich v. Collins*, 513 U.S. 106 (1994) ............................................................................83

*Rothe Dev. Corp. v. United States Dep't of Defense*, 262 F.3d 1306 (Fed. Cir. 2001)......................................................................115, 117, 118, 119

*Shaw v. Hunt*, 517 U.S. 899 (1996) ..............................................................................116

*Slattery v. United States*, 73 Fed. Cl. 527 (2006) ..................................124, 125, 126, 127

*Slattery v. United States*, 69 Fed. Cl. 573 (2006) .................................................. *passim*

*Southern California Sav. & Loan Ass'n v. United States*, 422 F.3d 1319 (Fed. Cir. 2005)..........................................................................................40

*Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999)..........................................................22

*Suess v. United States*, 74 Fed. Cl. 510 (2006) ..............................................................31

*Suess v. United States*, 52 Fed. Cl. 221 (2002) ...................................................30, 59, 72

*Toyota Indus. Trucks USA, Inc. v. Citizens Nat'l Bank*, 611 F.2d 465 (3d Cir. 1979)..........................................................................................69, 84

*United States v. Burton Coal Co.*, 273 U.S. 337 (1927) ..................................................79

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................................116

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)....................................5, 34, 68, 124

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ..........................100

*Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005)........................81

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003) ..............................39, 68

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) ....................................38

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) .................................................115

**Other**

12 U.S.C. § 1441a(w)(17)(A) ..............................................................113, 118, 27

12 U.S.C. § 1441a(w)(17)(C) ..........................................................................113

12 U.S.C. § 1813(j)............................................................................................102

12 U.S.C. § 1821.........................................................................................101, 102

12 U.S.C. § 1821(d)(10)(C) ..............................................................................105

12 U.S.C. § 1821(d)(11) ..................................................................94, 124, 127, 128

12 U.S.C. § 1821(d)(13)(E)(iv)..........................................................................118

12 U.S.C. § 1821(g)(2) .......................................................................................105

12 U.S.C. § 1821(j)......................................................................................127, 128

26 U.S.C. § 448.....................................................................................................94

26 U.S.C. § 597.....................................................................................................87

26 U.S.C. § 6621(d) ............................................................................................110

26 U.S.C. § 7507(b) ..............................................................................................86

28 U.S.C. § 1961 ........ 103

28 U.S.C. § 2516(a) ........ 98, 99

Resolution Trust Corporation Completion Act, Pub. L. No. 103-204, § 3(a), 107 Stat. 2369 (1993) (codified at 12 U.S.C. § 1441a(w)(17)(A)) ........ 26, 113

12 C.F.R. § 1.446-1(e)(2)(i) ........ 94

12 C.F.R. § 360.3 ........ 94

12 C.F.R. § 360.3(b) ........ 97, 100, 101, 103

12 C.F.R. § 360.7 ........ 105

12 C.F.R. § 360.7(b)(3) ........ 106

66 Fed. Reg. 65,144 (Dec. 18, 2001) ........ 23, 101, 102, 106

139 CONG REC. H10,162 (1993) ........ 116

5 ARTHUR CORBIN, CORBIN ON CONTRACTS § 1012 (1964) ........ 33

5 ARTHUR CORBIN, CORBIN ON CONTRACTS § 1039 (1964) ........ 69, 69, 84

11 ARTHUR CORBIN, CORBIN ON CONTRACTS § 57.11 ........ 69

DOBBS, LAW OF REMEDIES § 1.1 ........ 125

Douglas G. Baird, *The Uneasy Case for Corporate Reorganization*, 15 J. LEGAL STUD. 127 (1986) ........ 27, 122

Kenneth H. Bacon, *As Deposit Insurance Dwindles, FDIC Wonders If It Should Start Running the Banks It Seizes*, WALL ST. J., Dec. 31, 1990, at A30 ........ 66

RESTATEMENT (SECOND) OF CONTRACTS § 344(a) ........ 125

RESTATEMENT (SECOND) OF CONTRACTS § 344(b) ........ 80

RESTATEMENT (SECOND) OF CONTRACTS § 344(c) ........ 82

RESTATEMENT (SECOND) OF CONTRACTS § 347 ........ 77

RESTATEMENT (SECOND) OF CONTRACTS § 349 ........ 81

RESTATEMENT (SECOND) OF CONTRACTS § 350 ........ 69

RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a ........ 81

RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. c ........ 77

24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:2 (4th ed. 2002) ........ 77, 124, 125

Steve Klinkerman, *The High Road is Costing RTC Time and Money*, AMER. BANKER., Aug. 6, 1990, at 1 ........ 66

Stuart D. Root, *Bank Capital, Asset Liquidation, and the Credit Crunch*, 1993 COLUM. BUS. L. REV. 169 (1993) ........ 66

Pursuant to RCFC App. A, ¶ 14(a), Plaintiffs AmBase Corporation ("AmBase") and Carteret Bancorp, Inc., respectfully submit this Memorandum of Contentions of Fact and Law pertaining to the damages issues that are to be tried in this action. As discussed in detail below, the evidence at trial will establish that Ambase is entitled to recover substantial damages that were caused by the government's breach of contract.

**INTRODUCTION**

In 1982, Carteret Savings Bank, F.A. ("Carteret") [1] agreed to acquire from the federal government two massively insolvent thrifts whose combined liabilities exceeded their assets by over $200 million. The acquisition on its face would have been "madness," as the Supreme Court aptly put it in *Winstar*, but for the government's promise to allow Carteret to count $214 million in supervisory goodwill toward its regulatory capital requirements over 40 years. The fundamental economic premise of this contractual arrangement, as in *Winstar*, was that Carteret would be able to earn enough profits over the 40-year life of the contract to eliminate the capital deficiency of the insolvent thrifts it had acquired.

In the years prior to FIRREA, Carteret performed exactly as the regulators had hoped. From 1983 to 1988, Carteret generated more than $150 million in profits. But, as this Court has found, the government breached its contractual obligations to Carteret with the passage of FIRREA in 1989 and eviscerated Carteret's regulatory capital profile. Overnight, Carteret went from being a well-capitalized thrift to falling out of compliance with its fully phased in capital requirements by some $80 million.

[1] Carteret Building and Loan Association of Newark, New Jersey was incorporated as a state-chartered savings and loan association on September 15, 1939. On May 5, 1982, the thrift converted to a federally chartered stock association; later that year it was renamed Carteret Savings Bank, F.A. *See* PX 6 (Carteret Bancorp Inc., 1987 Annual Report) at C-A-MA 0056661.

Carteret responded to this capital crisis by shrinking its balance sheet by almost $2 billion and foregoing the positive spread income on those assets. The timing of this massive downsizing could not have been worse, for the commercial real estate market was in the midst of a major downturn. While other financial institutions in the Northeast were able to ride out the real estate downturn, Carteret was forced to sell hundreds of millions of dollars in commercial real estate at the nadir of the market. To make matters worse, Carteret's cost of funds went up significantly as negative publicity about the impact of the government's breach on Carteret's capital profile became known. Carteret was also forced to cannibalize its branch network to increase its capital ratios.

Notwithstanding the difficulties resulting from the breach, Carteret's management team was able to restore the thrift to profitability. From September of 1991 through November of 1992, Carteret generated profits in each month. Problem assets were reduced significantly. The thrift's mortgage origination business thrived, with originations totaling $1 billion in the year prior to seizure. Carteret also had a multibillion-dollar servicing operation that was very efficient and consistently generated earnings. Most important, Carteret had a stellar franchise. As the RTC recognized after the seizure, Carteret's branch network was very well situated and enjoyed a very high level of customer satisfaction. Indeed, even after the RTC had allowed Carteret's deposit base to run off by more than 50% during the conservatorship, Carteret's competitors were willing to pay a premium of $143 million for the remaining deposit base. This premium is a testament to the franchise value of Carteret. Not surprisingly, the regulators were uniform in their praise of Richard Bianco, the CEO of Carteret, and his management team for their extraordinary efforts in restoring Carteret's profitability.

Nevertheless, the government maintains that Carteret would have failed even absent the breach's harmful effects on Carteret. The centerpiece of the government's argument is that Carteret would not have been in capital compliance even if the government had honored its contractual promises and Carteret's $168 million in bargained for supervisory goodwill had been included in Carteret's regulatory capital ratios at the time of seizure. But this contention rests on the false premise that Carteret suffered no harm whatsoever from shrinking its asset base by $2 billion, selling off its branch network, enduring a higher cost of funds, and a myriad of other problems created by its breach-induced capital shortfall. Moreover, even if additional capital had been needed, it would have been far easier to raise a small amount of additional capital.

But the Court need not take our word for the proposition that Carteret had turned the corner and would have survived even absent the breach. The top regulators in the OTS Northeast region have unequivocally testified under oath that Carteret would have survived if the supervisory goodwill promise had been honored. We know of no other *Winstar* case in which the sworn testimony of the actual regulators on the ground so strongly contradicts the Department of Justice's litigation position. The Department should not be allowed to rewrite history and disavow the sworn statements of the government's top regulators.

The damages flowing from this breach are substantial. Carteret had a value of the least $251 million on the eve of the breach. Indeed, AmBase had acquired Carteret for $266 million just a year before the passage of FIRREA. These market valuations in 1989, however, represent projected earnings discounted back to 1989. The Federal Circuit has now made clear that profits that would have been earned prior to trial should not be discounted. Accordingly, Professor Charles Calomiris of Columbia Business School has analyzed the undiscounted amount of profits implied by the 1989 valuation. He concludes that the stock market expected Carteret to generate

$595 million of profits between 1989 and the present. Moreover, Professor Calomiris demonstrates that the stock market was unduly conservative in 1989 about the prospects of the financial services industry. Given the thrift industry's performance since the breach, Carteret would plainly have made far more than that amount and today would be a vibrant financial franchise worth at least $1 billion. If Carteret is to be made whole for the effects of the government's breach, then it should receive the full value that the franchise would enjoy today.

The FDIC in its capacity as a receiver seeks to siphon off these damages as an offset to pay the so-called receivership "deficit." As this Court held in *Slattery v. United States*, 69 Fed. Cl. 573 (2006), such an offset makes no sense where, as here, there would have been no receivership but for the government's breach. Additionally, as we demonstrated at length in our 2006 statement of issues, the alleged deficit is the result of Enron-style accounting. The FDIC, for example, posits that a receivership that is alleged to have generated hundreds of millions of dollars of losses nevertheless generated significant taxable income. But these statements cannot both be true, and here neither is. Even assuming that it is appropriate to include interest in the deficit, the FDIC also has manipulated the interest component of its alleged deficit through a series of changes retroactively applied with the specific effect of artificially increasing the interest of by tens of millions of dollars. And the tax liability results in part from the FDIC's failure to deduct the bogus interest it seeks to charge the receivership.

For these reasons, the damages should not be offset for any portion of the so-called receivership deficit. But if this Court concludes that such a reduction is mandatory even for a demonstrably bogus receivership deficit, then it should hold that AmBase has suffered a taking of property. If the government can evade paying damages for breach of contract simply by

creating artificial offsets, then the contract remedy is an empty promise and a taking has occurred.

**PLAINTIFFS' CONTENTIONS OF FACT**

**A. Carteret's Success & Profitability Prior to the Breach**

In 1982, Carteret had a positive net worth of nearly $37 million. *See* PX 2433 (S-Memos re: FSLIC Assister Merger of Barton and Unassisted Supervisory Merger of Delray into Carteret (Sept. 30, 1982) at WOR8390347, 0358). Carteret had "operated relatively free of supervisory concern and had operating ratios that were generally more favorable than those of like-sized institutions." *AmBase Corp. v. United States*, 58 Fed. Cl. 32, 41 (2003) (internal quotation marks omitted). Many of Carteret's peer institutions, however, were not so well situated. As has been well-documented, rising interest rates in the early 1980s visited a financial crisis upon the thrift industry. Many thrifts held "long-term, fixed-rate mortgages created when interest rates were low" but had to "raise the rates they paid to depositors in order to attract funds." *United States v. Winstar Corp.*, 518 U.S. 839, 845 (1996). Due to this negative spread, "some 435 thrifts failed between 1981 and 1983." *Id.*

This parade of failures left the federal Government in a bind. The Federal Savings and Loan Insurance Corporation ("FSLIC")—the entity responsible for regulating thrifts and insuring thrift deposits—"lacked the funds to liquidate all of the failing thrifts." *Id.* at 847. To solve this problem, the Federal Home Loan Bank Board ("FHLBB") "encourag[ed] healthy thrifts . . . to take over ailing institutions in a series of 'supervisory mergers.' " *Id.*

Thus, in the spring of 1982, government regulators began soliciting potential acquirers to take over two FSLIC-insured failing thrifts, Barton Savings & Loan Association of Newark, New Jersey ("Barton"), and First Federal Savings and Loan Association of Delray Beach,

Florida ("Delray"). *See* PX 2433 (S-Memos re: FSLIC Assister Merger of Barton and Unassisted Supervisory Merger of Delray into Carteret (Sept. 30, 1982)). Both institutions had recorded significant operating losses that had completely eroded their capital, and rendered them insolvent. *AmBase*, 58 Fed. Cl. at 35; PX 2433 at WOR8390352-WOR8390355. By the fall of 1982, the total amount of the insolvency of Barton and Delray was $168 million and $46 million, respectively. *AmBase*, 58 Fed. Cl. at 36.

On September 29, 1982, Carteret and FSLIC entered into an Assistance Agreement whereby Carteret agreed to acquire Barton and Delray in return for certain benefits. Since the failing thrifts' insolvency amounts far eclipsed Carteret's positive net worth, the government induced Carteret to enter this agreement by promising Carteret it could include the supervisory goodwill resulting from the acquisitions in the calculation of its regulatory capital, to be amortized over a period of up to forty years. *Id* at 35-36. The ability to use supervisory goodwill was the *sine qua non* of the bargain between Carteret and the government. As this Court found in the liability phase of this case, "it would have been irrational . . . for [Carteret] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." *AmBase*, 58 Fed. Cl. at 42 (second alteration in original). The supervisory goodwill that arose from the 1982 acquisitions was approximately $214 million. *Id.* at 36. This figure closely approximates the financial cost that FSLIC would have been forced to bear had it not been able to arrange for the acquisition by Carteret. PX 2702 (Decl. of Charles W. Calomiris (May 19, 2007) at n. 15) (hereinafter "Calomiris May 2007 Report"). Absent the use of supervisory goodwill, Carteret would have been insolvent

immediately upon consummation of the transaction, with a staggering negative net worth of approximately $212 million.[2]

In the years following these acquisitions, Carteret generated significant profits by expanding its franchise into new states, expanding its asset base, and venturing into new lines of business. The following table illustrates Carteret's asset growth from 1983 through 1988:

| Year | Total Assets |
|---|---|
| 1983 | $4,267,314,000 |
| 1984 | $5,045,678,000 |
| 1985 | $5,121,801,000 |
| 1986 | $5,537,547,000 |
| 1987 | $5,910,170,000 |
| 1988 | $6,682,279,000 |

As Carteret grew its assets, it generated substantial profits. *See* PX 0601 (Carteret Bancorp Inc. 1987 10K) at 14; PX 0008 (Carteret Savings Bank 1989 Annual Report) at KH078235-KH078236.

| Year | Net Income |
|---|---|
| 1983 | $34,809,000 |
| 1984 | $7,521,000 |
| 1985 | $25,222,000 |
| 1986 | $46,091,000 |
| 1987 | $33,417,000 |
| 1988 | $22,933,000 |

These substantial profits enabled Carteret to eliminate the tangible net worth deficit generated by the 1982 acquisitions. By 1988, Carteret had grown to more than $6 billion in assets from just under $2 billion in 1981. Despite its asset growth and the difficult economy in the early 1980s,

[2] Initially, Carteret reported a smaller deficit of $165 million. *See AmBase*, 58 Fed. Cl. at 42; PX 6844 (S-Memo: FSLIC Assisted Merger of Barton, First FS&LA of Delray Beach, and Carteret). However, when Carteret conducted its Initial Public Offering in 1983, it restated its earnings.

Carteret had maintained and even improved its compliance with regulatory capital requirements. Thus, in its 1988 Report of Examination, the FHLBB concluded that:

> Carteret remains in a period of asset stability for the calendar years 1985 thru 1987. This followed a period of rapid growth during which time the bank restructured its balance sheet from a traditional thrift lender into a diversified financial services institution. . . . The bank has diversified geographically with primary emphasis on the Mid Atlantic and Florida markets.

PX 2104 (1988 FHLBB Report of Examination) at 3. The Report also concluded that:

> Carteret has enjoyed improving net operating income in the successive calendar year periods 1985 through 1987. This favorable scenario is the result of earnings from the bank's restructured balance sheet, with emphasis on higher yielding commercial, consumer and commercial real estate lending, during a period of relatively stable interest rates. This has produced a favorable above peer group interest margin . . . .

*Id.* at 10.[3]

As part of this growth strategy, Carteret acquired two additional FSLIC-insured failing thrifts on June 6, 1986—First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia ("First Federal"), and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security").[4] In that transaction, the federal government again promised, *inter alia*, that Carteret would be permitted to include the supervisory goodwill resulting from those acquisitions in calculating its regulatory capital, this time for a period of up to twenty-five years. *See* PX 2483 (Peat Marwick Accounting Letter (June 4, 1986)). Carteret booked a total

---

[3] *See also id.* at 1 ("The bank continues to retain an adequate level of capital. In addition, risk factors are well managed . . . ."); *id.* at 7 ("Carteret has both adequate RAP and GAAP capital position. This has been the result of a combination of good earnings, favorable acceptance in the capital markets, and a sustained period of asset stability, which together have dramatically reversed the precarious capital position Carteret experienced during the early 1980s. The present capital base is sufficient to provide protection against classified assets and reasonable adverse changes in the interest rate scenario, with its negative earnings impact on the remaining asset/liability mismatch.").

[4] As part of this transaction, Carteret also acquired a third thrift insured by the Maryland Deposit Insurance Fund.

of $21.7 million in supervisory goodwill—$20 million from Mountain Security and $1.7 million from First Federal. *AmBase*, 58 Fed. Cl. at 37. Once again, Carteret relieved the FSLIC of a substantial cost in exchange for a goodwill promise that made it economically rational and advantageous to acquire the two failed thrifts. As this Court has noted, "[w]ithout the goodwill, it is likely Carteret would not have entered the transaction." *Id.* at 55.

The 1986 acquisitions contributed to Carteret's strength, and the thrift's growth continued apace from 1986 through 1988. Indeed, in approving the acquisition of Carteret by the AmBase Corporation (then known as The Home Group) in 1988, the government described Carteret as "profitable," stated that "[t]he bank is considered financially strong and is not the subject of supervisory concern," and noted that as of March 31, 1988, the bank had "[n]et regulatory capital of $321.9 million represent[ing] 5.70% of total liabilities." PX 2612 (FHLBB District Bank Mem. (June 30, 1988)) at 9. Underlying this financial analysis of Carteret, and inescapably central to the FHLBB's positive judgment in 1988, was the fact that more than $182 million of the capital on Carteret's balance sheet (as of March 31, 1988) was backed up by a contractual promise from the government, and was therefore assumed by all of the sundry professionals involved in the acquisition to be as solid as any other type of capital.[5] PX 4897 (Carteret Savings Bank Goodwill Amortization Schedule) at AM00050511. Without its contractual right to count this $182 million in supervisory goodwill toward its regulatory capital requirements, Carteret would have had roughly a $29 million capital *deficit*, rather than more than $150 million

[5] The professional firms that analyzed and executed the Carteret acquisition included some of the most sophisticated and experienced lawyers, financiers, lenders, and accountants in the country. It is implausible that *all* of these firms—Salomon Brothers, First Boston, Peat Marwick, Cravath, Swaine & Moore, Arnold & Porter, and Chase Manhattan Bank—could have been mistaken in relying on the strength of Carteret's capital position.

in *surplus* capital. *See* PX 1706 (Thrift Financial Report (Mar. 31, 1988)) at AM00050357, 0365; PX 4897 (Carteret Savings Bank Goodwill Amortization Schedule).

Such was the state of Carteret's financial condition in the summer of 1988, when AmBase paid $266 million in cash to acquire 100% control of the thrift's holding company, Carteret Bancorp. PX 302 (The Home Group, Inc., Annual Report (1988)) at 29. AmBase's evaluation of Carteret was supported by a formal fairness opinion provided by CS First Boston. PX 5257 (First Boston Fairness Opinion Report). This opinion was accompanied by a detailed analysis that concluded that Carteret's book value was $306 million. *Id.* Moreover, Chase Manhattan Bank entered into $300 million credit agreement with AmBase for the specific purpose of funding the acquisition of Carteret. PX 2611 (The Home Group, Inc., Credit Agreement, The chase Manhattan Bank (National Association) as Agent). The collateral for the agreement was Carteret's stock. *Id.* Chase's willingness to accept Carteret's stock as collateral for its loan further confirms Carteret's value in 1988 prior to the breach.

As part of the Carteret transaction, AmBase and federal regulators entered into a negotiated, contractual agreement requiring AmBase to infuse additional capital into Carteret in the event that Carteret's capital fell below required levels in the future.[6] Specifically, the parties agreed that for so long as AmBase controlled Carteret, AmBase would be obliged to infuse up to $50 million in additional capital to maintain Carteret's regulatory capital at required levels.[7] PX 2614 (Memo re: H-(e)1 Application Filed by the Home Group to Acquire Carteret).

---

[6] This understanding was set forth initially in a Stipulation and Agreement ("Stipulation") executed on August 8, 1988, and subsequently in a superseding Regulatory Capital Maintenance/Dividend Agreement ("RCMA") executed November 28, 1988. PX 2617 (Stipulation and Agreement (Aug. 8, 1988)); PX 2625 (Regulatory Capital Maintenance/Dividend agreement (Nov. 28, 1998)) at 3.

[7] Also as part of the Carteret transaction, AmBase and the Government agreed that an existing AmBase subsidiary, Imperial Premium Finance, Inc. ("IPF"), could be sold by AmBase

**B. The Government's Breach of the Supervisory Goodwill Contracts**

Despite individual success stories such as Carteret, "the overall regulatory response of the early and mid-1980s was unsuccessful in resolving the crisis in the thrift industry." *Winstar*, 518 U.S. at 856. On February 9, 1989, President George H. W. Bush announced his plan for what would become FIRREA. Because this legislation was a priority for both the Republican president and the Democrat-controlled Congress, the legislative process progressed swiftly. On April 13, 1989, the Senate Committee on Banking, Housing, and Urban Affairs reported S 744 to the full Senate. On May 16, HR 1278 was reported in the House. On May 24, the House Judiciary Committee rejected an amendment offered by Congressman Hyde. The Hyde Amendment would have required a lengthy regulatory review process before an institution could be prevented from counting supervisory goodwill towards regulatory capital. As reported on the front page of the *New York Times*, the amendment was defeated by a 17-17 tie vote. Calomiris May 2007 Report at ¶ 32. The stock market's reaction was swift and severe. Within a week, $45 million had been eliminated from AmBase's stock market valuation. *See* Calomiris May 2007 Report at ¶ 33. On June 21, the Senate passed HR 1278 with substitution from the text of S 744. Over the next seven weeks, the two houses conferred and, on August 4, 1989, agreed to the final version of FIRREA. On August 9, 1989, President Bush signed the bill into law.

**C. The Effect of the Breach on Carteret**

The market had good reason to react to FIRREA's breach of contract. The breach's impact on Carteret, which had over $168 million in supervisory goodwill in August 1989, was

---

to Carteret for $65 million and would become a subsidiary of Carteret. In order to receive the Government's approval for this sale, however, AmBase was forced to sign a "keep well" agreement (the "IPF Agreement") under which AmBase agreed that, should Carteret subsequently sell IPF to another entity prior to August 9, 1991, at a lower price, then AmBase would (under certain conditions) be obligated to pay Carteret the difference between $65 million and the subsequent sale price. *See* PX 2618 (IPF Agreement (Aug. 15, 1988)).

seismic. The breach immediately devastated Carteret's capital ratios. As of June 30, 1989, Carteret had regulatory capital of $312 million, well in excess of its then-applicable regulatory capital requirement. PX 1711 (Thrift Financial Report (June 30, 1989)) at AM050309. After the passage of FIRREA, however, the government drafted an exam report in November 1989, dropping Carteret from its previous status as a composite "2" rated institution—its rating of one year earlier—and instead giving it a composite MACRO rating of "4," which indicated that the bank had an inadequate level of capital and required prompt action to ensure future viability. PX 2106 (Report of Examination (May 22, 1989)). The examination report stated that Carteret would be unlikely to meet *any* of FIRREA's three capital requirements. *Id.* at 45.

Carteret's core capital ratios reflect the dimension of the breach's impact. At the time of the breach, Carteret had approximately $6 billion in total assets. PX 0008 (Carteret Savings Bank Annual Report at KH 078235). Under the fully phased in capital requirements, Carteret was required to maintain core capital equal to 3% of its assets—here, approximately $180 million. On a fully phased-in basis, however, the breach left Carteret with only $99 million in core capital—some $80 million short of the requirement. PX 1801 (Letter Transmitting Amended TFRs December 1989-December 1990). In short, Carteret went from having a comfortable core capital cushion the day before FIRREA took effect to having an enormous shortfall the day after it took effect.

Carteret had only two options for bringing its capital ratios in line with regulatory requirements: it could raise capital or shrink its asset base. Unfortunately, due to the hostile regulatory environment, the capital markets were closed to Carteret for the first two years

following the breach. Thus, Carteret was forced to shrink. And shrink it did. The following table illustrates Carteret's declining asset base in the post-FIRREA period[8]:

| Date | Carteret's Total Assets |
|---|---|
| 6/30/89 | $7,171,183,000 |
| 9/30/89 | $6,791,547,000 |
| 12/31/89 | $6,097,461,000 |
| 12/31/90 | $5,575,023,000 |
| 12/31/91 | $5,203,475,000 |
| 9/30/92 | $4,827,462,000 |

Significantly, throughout this breach-necessitated shrinkage period, Carteret enjoyed a positive spread income,[9] meaning that the breach caused Carteret to sell valuable income-producing assets. Moreover, Carteret had to shrink—that is, sell off its assets—during "one of the worst recessions since the Second World War." (Decl. of Professor Anthony Saunders (Sept. 21, 2007) at 20-21). Thus, precisely when Carteret most needed its capital cushion, FIRREA swept it away and the thrift was forced to sell many commercial real estate assets at a loss. In addition, the breach caused Carteret to begin to dismantle its strong retail deposit franchise. Carteret sold thirteen of its Florida branches to Great Western Bank on October 9, 1990, five of its New Jersey

[8] *See* PX 1710 (Carteret TFR for 3/31/1989) at 1; PX 1711 (Carteret TFR for 6/30/1989) at 1; PX 1712 (Carteret TFR for 9/30/1989) at 1; PX 1713 (Carteret TFR for 12/31/1989) at 1; PX 1724 (Carteret TFR for 12/31/1990) at 3; PX 1734 (Carteret TFR for 12/31/1991) at 3; PX 1737 (Carteret TFR for 9/30/1992) at 3.

[9] *See* PX 802 (Ambase 10K 12/31/90) at 10 (spread of 2.12 at year ended 12/31/89); PX 1504 (Ambase 10Q 3/31/90) at 10 (spread of 2.24 at quarter ended 3/31/90); PX 1505 (Ambase 10Q 6/30/90) at 11 (spread of 2.38 at quarter ended 6/30/90); PX 1509 (Ambase 10Q 9/30/91) at 16 (spread of 2.15 at quarter ended 9/30/90); PX 802 (Ambase 10K 12/31/90) at 10 (spread of 2.21 at year ended 12/31/90); PX 1510 (Ambase 10Q 3/31/92) at 20 (spread of 3.01 at quarter ended 3/31/91); PX 1511 (Ambase 10Q 6/30/92) at 20 (spread of 2.36 at quarter ended 6/30/91); PX 1512 (Ambase 10Q 9/30/92) at 20 (spread of 2.39 at quarter ended 9/30/91); PX 803 (Ambase 10K 12/31/91) at 8 (spread of 1.88 year ended 12/31/91); PX 1510 (Ambase 10Q 3/31/92) at 20 (spread of 2.18 at quarter ended 3/31/92); PX 1511 (Ambase 10Q 6/30/92) at 20 (spread of 3.24 at quarter ended 6/30/92); PX 1512 (Ambase 10Q 9/30/92) at 20 (spread of 2.83 at quarter ended 9/30/92).

branches to Bankers Corp. on October 22, 1990, and five of its Maryland branches to Loyola Federal Savings and Loan Association on December 17, 1990. *See* PX 9 (Carteret Savings Bank FA, 1990 Annual Report (Feb. 1, 1991) at C-A-MA-0394503. Carteret received a premium of $40.74 million on these three sets of branch sales, which increased Carteret's capital.[10]

In an effort to save the institution and vindicate its contract rights, Carteret filed suit against the OTS and the FDIC on February 14, 1991, seeking to enjoin the regulators to abide by the government's goodwill promises. After holding a hearing and reviewing volumes of documentary evidence, the District of New Jersey found that "Carteret had a contract with the government to use its supervisory goodwill for regulatory purposes." *Carteret Sav. Bank v. OTS*, 762 F. Supp. 1159, 1180 (D.N.J. 1991), *vacated on other grounds*, 963 F.2d 567 (3d Cir. 1992). The district court emphasized that "Carteret alleviated the Government's obligation of bailing out the four thrifts acquired, in exchange for the right to use supervisory goodwill." *Id.* The court also found that Carteret had been placed under "extreme" regulatory restrictions solely "because OTS does not count the supervisory goodwill in making its [regulatory capital] determination." *Id.* at 1165. As the district court put it:

> This case constitutes an example of agency discretion gone haywire. Despite operating losses in 1990, Carteret has not exhibited financial instability or poor management; in fact, it has made considerable effort to come into compliance with the new requirements. Despite these facts, however, OTS apparently wants to charge in and micro-regulate the institution because OTS chooses not to honor a valid contract made by its predecessor.

---

[10] Bankers Corp. paid a premium of $12.041 million, Great Western paid a premium of $28.336 million, and Loyola paid a premium of $0.363 million. PX 4726 (Branch Closing Statement, Interim Federal Savings Bank, Bankers Savings and Bankers Corp. (Dec. 17, 1990)) at CAM4900015; PX 4718 (Branch Closing Statement, Great Western Bank (Oct. 9, 1990)) at CAM4441169; PX 4724 (Loyola Branch Sale Deposits and Calculation of Premium (Nov. 21, 1990)) at CAM4900499.

*Id.* at 1177 (footnote omitted). The court emphasized that Carteret was financially sound and that the regulators themselves posed the only threat to Carteret's survival. "There is no apparent threat that the regulatory agencies will be required to 'bail out' Carteret in the near future. Ironically, the OTS' threatened actions are more likely to *produce* that result, if unrestrained." *Id.* at 1180-81 (emphasis in original).

In light of these findings, and the district court's determination that Carteret was likely to prevail on its claims, the court, on April 25, 1991, preliminarily enjoined the regulators from taking any action inconsistent with fully counting Carteret's supervisory goodwill as regulatory capital. *Id.* at 1182. Specifically, the court saw that enforcement of the FIRREA capital requirements would result in "injury to Carteret in terms of lost business opportunities, withdrawals and damage to its reputation in the community," that these "damages are immeasurable," and that "[t]he institution itself will have lost the benefit of the current balance of what was initially over $200 million in supervisory goodwill, an amount it would have otherwise required in tangible assets before acquisition of the failed banks, or else it would not have entered the transaction." *Id.* at 1180. On July 8, 1991, the district court clarified that the OTS had to count the approximately $50 million of supervisory goodwill in the Carteret capital calculations, which goodwill had been written down for financial statement reporting purposes when Carteret sold the branches in 1990 as a result of the breach. *See Carteret Savings Bank, F.A. v OTS*, No. 91-661, slip op. (D.N.J. July 8, 1991).

The impact of this favorable ruling, however, was muted. Both Carteret and the market had early indications that the injunction might not hold. For example, on July 16, 1991, the District Court for the District of Columbia held, in a similar case, that a thrift's FIRREA-based breach of contract claim was cognizable only in this Court. *See Northeast Sav., F.A. v. OTS*, 770

F. Supp. 19, 23-25 (D.D.C. 1991). And, indeed, on May 7, 1992, the Third Circuit similarly held that this Court has exclusive jurisdiction under the Tucker Act over Carteret's claims against the government. *Carteret Sav. Bank v. OTS*, 963 F.2d 567 (3d Cir. 1992).[11] The Third Circuit therefore vacated the preliminary injunction.

On May 22, 1991, the AmBase Board installed new management and board members at Carteret. PX 2111 (OTS Report of Examination (June 17, 1991)) at 1. Richard Bianco was named the new Chairman and CEO of Carteret. Mr. Bianco had enjoyed a successful career as a Wall Street investment banker and brought with him an experienced team of professionals. As Mr. Bianco will explain at trial, the new officers understood that to rescue the crippled thrift they had one important mission: to improve the bank's regulatory capital position so as to make up for the drastic loss in capital caused by the loss of supervisory goodwill. Because AmBase had by this time been reduced primarily to Carteret's holding company, this mission required an infusion of capital from an outside investor.

In the effort to convince outside investors quickly that Carteret was a promising investment regardless of regulatory actions or economic fluctuations, Carteret's new management took the highly unusual step of voluntarily taking huge additional loss reserves. In 1991, $172 million was added to the allowance for losses, of which $150 million was recorded in the second quarter. PX 0803 (Ambase 10K for 1991) at 31, 37-38. Absent the need to raise capital, the thrift could have carried its assets at their existing book values, taking much smaller reserves at that time, and waited as the value of the thrift's assets was restored by the rebound in

[11] Finding that "compensation could certainly be paid for damage to the thrift's business," the court concluded that "[i]t follows that because the Tucker Act remedy is available to Carteret, Carteret must seek to vindicate its taking claim in Claims Court." *Id.* at 583, 584.

the real estate and commercial debt markets beginning in early 1993. As Angelo Vigna, the top regulator for the northeast region of OTS, explained:

> They took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally.
> Q. Did you assess that as being a good thing, a prudent managerial approach?
> A. I think it was, as I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money there was no surprises, other big writedowns subsequent to that.

Vigna Dep. at 110. By taking "ultraconservative" write-downs in an effort to raise capital, Carteret lowered its capital ratios below where they would have been otherwise.

The efforts of the new management team paid dividends. By September 1991, Carteret had returned to profitability, and from that date until the date of seizure recorded positive net income totaling more than $13 million. PX 3802 (Carteret Savings Bank Financial Report (Nov. 30, 1992)). The following table illustrates Carteret's return to black in the months prior to seizure[12]:

[12] *See* PX 6814 (Carteret Savings Bank Financial Report (September 30, 1991)) at CAM4731489; PX 6815 (Carteret Savings Bank Financial Report (October 31, 1991)) at CAM4731456; PX 6816 (Carteret Savings Bank Financial Report (November 30, 1991)) at CAM4731423; PX 6817 (Carteret Savings Bank Financial Report (December 31, 1991)) at CAM4731390; PX 6818 (Carteret Savings Bank Financial Report (January 31, 1992)) at CAM4820244; PX 6819 (Carteret Savings Bank Financial Report (February 29, 1992)) at CAM4820211; PX 6820 (Carteret Savings Bank Consolidated Financial Statements Purchase Accounting Basis (March 31, 1992)) at CAM4820577; PX 6821 (Carteret Savings Bank Financial Report (April 30, 1992)) at CAM4820522; PX 6822 (Carteret Savings Bank Financial Report (May 31, 1992) at CAM4820145); PX 6823 (Carteret Savings Bank Financial Report (June 30, 1992)) at C-AM-A-0186353; PX 6824 (Carteret Savings Bank Financial Report (July 31, 1992)) at CAM4820112; PX 6825 (Carteret Savings Bank Financial Report (August 31, 1992)) at C-AM-A-0181259; PX 6826 (Carteret Savings Bank Financial Report (September 30, 1992)) at CAM4820343; PX 6827 (Carteret Savings Bank Financial Report (October 31, 1992)) at C-AM-A-0184905; PX 3802 (Carteret Savings Bank Financial Report (November 30, 1992)) at CAM4820011.

| Month | Net Income |
|---|---|
| 9/91 | $3,000 |
| 10/91 | $208,000 |
| 11/91 | $915,000 |
| 12/91 | $1,032,000 |
| 1/92 | $509,000 |
| 2/92 | $740,000 |
| 3/92 | $1,542,000 |
| 4/92 | $680,000 |
| 5/92 | $852,000 |
| 6/92 | $1,472,000 |
| 7/92 | $1,383,000 |
| 8/92 | $965,000 |
| 9/92 | $977,000 |
| 10/92 | $1,357,000 |
| 11/92 | $533,000 |
| Total | $13,148,000 |

Nonetheless, achieving capital compliance by attracting new capital into a savings and loan industry still reeling from the effects of FIRREA and a depressed real estate market proved to be a very tall order. While AmBase and Carteret managed to attract a number of interested investors, no investor was immediately willing to expose itself to the regulatory risk of becoming a savings and loan holding company subject to the whim of the regulators.

Despite its difficulties attracting outside capital, Carteret remained profitable in 1992, as the above table indicates. Indeed, in their depositions, OTS regulators had high praise for Carteret's new management. Thus, as both internal conditions and external market conditions turned more favorable in 1992, the prospects for an outside capital infusion heightened. Accordingly, throughout 1992, OTS's regional regulators repeatedly expressed favorable opinions about Carteret and argued against its seizure. For example, in a July 7, 1992 letter to the FDIC, Robert Albanese—OTS's Regional Deputy Director—stated that Carteret had made "reasonable progress toward achieving a recapitalization of Carteret without federal assistance." PX 2816 (Letter from R. Albanese to N. Ketcha (July 7, 1992)) at WOP3340862. Most tellingly,

just two weeks before OTS seized Carteret, the agency's regional directors expressed the unequivocal opinion that the thrift had turned a corner, was attracting potential investors, and should not be seized. A memorandum authored by Mr. Albanese on November 17, 1992, is illustrative of what the evidence will show at trial:

> A conference call with Jonathan Fiechter, Deputy Director for Washington Operations, was held on Monday evening, November 16, 1992, to discuss the scheduled transfer date of Carteret Savings Bank, FSB to the Resolution Trust Corporation. Mike Simone and I represented OTS-Northeast on the call.
>
> We had initiated the call after becoming concerned that the transfer date for Carteret was being moved up to this Friday (November 20). . . . We strongly recommended that more time be given to Carteret's management because there was still considerable interest being expressed by investors in the institution, and there were no compelling reasons for not leaving the institution open for the few weeks needed to consider a possible offer from First Gibraltar.
>
> We pointed out that, in our view, the institution's financial condition continued to improve, and that supervisory risk of loss while it remained open was very low. We argued that the possible benefit of leaving Carteret open while recapitalization discussions were continuing; namely, a possible unassisted resolution of this $5 billion troubled institution, would far outweigh any perceived benefit of an early transfer date. Frankly, we did not view the transfer date, whether it was November 20th, December 4th or January 4th, to be a critical factor in our analysis of the situation.

PX 2819 (Internal Mem. From R. Albanese to File (Nov. 17, 1992)) at WOQ6791063.

As the regional directors understood, Carteret was an institution on the mend, with bright prospects for an unassisted resolution. The strength of the new management team, and the favorable results they had achieved from September 1991 forward readily apparent. Moreover, the RTC itself recognized, immediately after the seizure, that Carteret had a strong franchise. According to a February 1, 1993 RTC memorandum valuing the bank's franchise:

- Carteret's "retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution."
- Carteret's "retail offices in New Jersey and Florida are located in some of the top performing market areas in each respective state."

- Carteret had, in recent years, "made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty."
- Carteret's "penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties" where it has a retail office.

*See* PX 4002 (Carteret Federal Savings Bank, Conservatorship Strategic Plan (Feb. 1, 1993)) at 4, 26-27.

Thus, despite fourteen straight months of profitability, despite universal praise for the new management team, despite clear and readily available evidence of Carteret's substantial franchise value, despite ongoing expressed interest from outside investors, and over the unequivocal protestations of the regional directors who knew Carteret best, OTS seized the thrift on December 4, 1992, the last day of Tim Ryan's tenure as Director of the OTS. PX 4896 (OTS Order No. 92-509 (Dec. 4, 1992)).

**D. Congress and the FDIC Create A Receivership Deficit.**

On the day of seizure, Carteret's assets and liabilities were placed into a "pass-through receivership," which in turn placed almost all the assets and liabilities into a conservatorship, Carteret Federal Savings Bank. As we demonstrated at length in our Corrected Statement of Issues of June 26, 2006 ("Statement of Issues") and our Reply Brief on the Statement of Issues, the cost of resolving Carteret was artificially inflated by a series of actions by Congress and the FDIC acting in both its corporate and receivership capacity. We incorporate all the materials from the Statement of Issues herein, and briefly summarize the key points below.

**1. Congress's actions radically inflated the receivership deficit.**

Much of the receivership deficit relates to interest on a loan provided by the RTC to Carteret. But the loan itself would not have been necessary in the absence of a series of congressional actions that systematically destroyed Carteret's franchise value. First, in passing

FIRREA, Congress deprived Carteret of the value of its supervisory goodwill, which Professor Calomiris has conservatively estimated to be between $41 and 49 million. PX 2703 (Declaration of Charles W. Calomiris of July 14, 2006, hereinafter "Calomiris 2006 Report") at ¶ 120. Second, in failing to properly fund the RTC for most of 1993, Congress prolonged Carteret's conservatorship. As a result, Carteret sustained significant deposit runoff that would not have occurred had funding been made available promptly. *Id.* at ¶ 51. Professor Calomiris has concluded that this delay cost Carteret approximately $24 million in foregone premiums that would have been realized upon the sale of the deposit base that ran off during the delay attributable to the lack of funding. *Id.* at ¶ 84. Third, the minority preference program imposed by Congress upon the RTC engendered further delay that caused Carteret to lose $19 million in premiums that would otherwise have been realized in the absence of the racial preference. *Id.* at ¶ 88. Fourth, the minority preference program froze Carteret's assets—without this asset freeze and the failure to fund the RTC, Carteret would not have needed a loan from the RTC. Even assuming that a loan would have been made to Carteret, these congressional actions cost Carteret about $90 million, which could have been utilized both to repay principal on the loan and to pay any other obligations, including the alleged tax liability, that were accruing interest. At the rate of interest charged by the FDIC, the availability of such funds would have yielded additional savings of more than $90 million. Indeed, had Congress not taken any one of these steps, interest would have stopped accruing over seven years ago because it is FDIC policy not to accrue additional interest once the principal balance of the subrogated claim has been repaid. At present, the subrogated claim stands at slightly less than $19 million and has been that low since May 2000. PX 5090 (Liability Register Report).

**2. The post-insolvency interest has no relationship to the actual cost of the loans.**

No interest should be charged to Carteret since the interest on the subrogated claim does not represent an actual cost to the FDIC.[13] As Professor Calomiris explained:

> the receivership deficit serves in this case as a partial offset to the damages owed to the plaintiff. But it makes no sense to include the time value of money in the receivership deficit if the government itself is barred from paying the time value of money on the damages it owes to the plaintiffs. By including the time value of money as a cost in the receivership deficit, **the government effectively is asking to be reimbursed for a cost that it does not bear.** To be consistent with the legal prohibition on the payment of interest on damages caused by the government, the government should not be able to credit itself for the time value of money on those same damages. A consistent treatment would be to exclude all imputed interest from the receivership deficit.

Calomiris 2006 Report at ¶ 21 (emphasis in original).

Even if interest were a proper component of the receivership deficit, the accrued post-insolvency interest would still be substantially overstated. The FDIC has artificially manipulated the rate of interest that has been charged on the subrogated claim. In 1994, when interest first began to accrue on the subrogated claim, the FDIC charged Carteret a short term floating interest rate based on the rate for three-month United States Treasury bills. At the time, this rate was 4.48 percent. PX 5058 (Calculation of Accrued Interest on Priority 6 Claimants).

But after following this practice for five years, the FDIC decided to retroactively increase the rate of interest by locking in a long-term fixed rate of interest equaling 7.34 percent, 6.57 percent, and 6.06 percent on each of the three loans that were made to Carteret. PX 5112 (Calculations of Accrued Interest on Priority 6 Claimants) at AM0097219-AM0097277. Curiously, this change was made at the very time the FDIC was responding to AmBase's interrogatories as to how the rate of interest was calculated on the subrogated claim. PX 5066

[13] The FDIC, whether as receiver or in its corporate capacity, is a government actor subject to the requirements of the Constitution. *See*, *e.g.*, *FDIC v. Meyer*, 510 U.S. 471 (1994) (FDIC as receiver); *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (corporate capacity); *Stone v. FDIC*, 179 F.3d 1368, 1377-78 (Fed. Cir. 1999) (corporate capacity).

(Email re Post Insolvency Interest Rates and Priority of Interest). The interest rate that was selected by the FDIC, and that the FDIC decided to lock in until the subrogated claim was repaid, was the highest rate of interest on government obligation of like maturities at any time since 1995.

There is no economic justification for charging Carteret a long-term fixed rate of interest. And the FDIC's current practices demonstrated that such a rate over compensates the FDIC for any costs incurred in connection with making a loan to Carteret. In 2002, the FDIC promulgated regulations to impose a uniform rate of interest on all loans to receiverships on a prospective basis. The FDIC selected a short term floating rate of interest based on three-month United States Treasury bills because it provided "a reasonable rate of return" to the FDIC. Calomiris 2006 Report at ¶ 35. The FDIC also chose a floating Treasury bill over the fixed federal judgment rate because "the market-based rate should be more reflective of the interest rate environment in existence during the life of the future receiverships." Payment of Post-Insolvency Interest in Receiverships with Surplus Funds, 66 Fed. Reg. 65,144, 65,145 (Dec. 18, 2001) (codified at 12 C.F.R. Part 360).

The FDIC's 1999 decision to retroactively and radically alter its methodology for calculating post-insolvency interest had the predictable result of adding tens of millions of dollars to the receivership deficit. By increasing the rate of interest by more than 200 basis points, the FDIC has increased the amount of interest it is charging AmBase by more than **$64 million** as of the end of 2005. Calomiris 2006 Report ¶18, Table 2.

Even if it had been legitimate for the FDIC to retroactively select an increased interest rate, the FDIC's accounting for the repayment of the loans has exacerbated the effect of this change. Specifically, the FDIC has allocated each debt repayment on a pro rata basis to each of

the three loans that comprise the subrogated claim. As Professor Calomiris points out, however, the FDIC could have reduced the interest charge by $51 million if it had simply paid off the highest cost debt first. *Id*. Of course, all of the debt repayment was made to the FDIC in its corporate capacity, so the increased interest charge is entirely created by the FDIC's arbitrary and self-serving accounting procedures.

**3. The tax liability is a chimera of the FDIC's own making.**

The other significant liability on the FDIC's financial statements relates to taxes. As of December 31, 2006, the FDIC was reporting an estimated federal income tax liability of $103 million. PX 1114 (Goodwill Package as of December 31, 2006). This liability consists of $29.9 million of federal income tax on the $85 million of taxable income reported on the amended 1995 return, as well as interest and penalties for late filing. PX 1111 (Restated Goodwill Package as of December 31, 2004); PX 4415 (Form 1120X Amended U.S. Corporation Income Tax Return, Carteret Federal Savings Bank c/o FDIC 720/1309). The remainder reflects estimated IRS interest penalties for both nonpayment of the underlying tax liability and for the late filing of the 1995 federal income tax return. PX 1111 (Restated Goodwill Package as of December 31, 2004).

On its face, the tax liability makes no sense: if the receivership lost hundreds of millions of dollars, a tax liability of $100 million cannot have been generated. During discovery, the FDIC admitted that the tax liability was "artificially created." Deposition of James F. Vortriede ("Vortriede Dep.") 388. Specifically, the FDIC created the tax liability by improperly failing to take deductions of more than $150 million, and improperly including items of income in a net amount of more than $20 million. Significantly, the record also reveals that the IRS will not (and could not) insist upon payment of this bogus tax liability. In the Ben Franklin settlement

with the FDIC, the IRS allowed the FDIC to retroactively fix the very same mistakes to reduce the tax liability by 95 percent. Here, those same adjustments would eliminate the tax liability in their entirety.

Although Carteret's 1995 return is festooned with errors, there are three that are worthy of specific mention. First, the 1995 return failed to take a deduction for Carteret's interest expense. The return neglected to deduct $3.7 million in interest that was actually paid to depositors. *See* Statement of Issues at 38. The FDIC also neglected to take a tax deduction in 1995 for the interest expense that was accruing in that year. Vortriede Dep. at 87-89. Interest accruing in 1995 through 1997 could have shielded taxable income in 1995. Under the FDIC's current calculations, at least $80 million of interest accrued during these years. None of this interest was used to shield taxable income generated in 1995. In internal e-mails, the FDIC has acknowledged that "the IRS agrees that [such interest] is a valid tax deduction available from the date of closing [*i.e.*, 1995]." PX 5171 (Email re PII Accrual). And the FDIC recently confirmed during the fairness hearing surrounding taxes owed by the receivership for Ben Franklin that the IRS allowed such a deduction from the date of closing for post-insolvency interest incurred by Ben Franklin's receiver. PX 5106 (Transcript of Fairness Hearing before the Honorable Emmitt G. Sullivan, *United States v. FDIC*, No. CA 02-1427).

The second significant tax error made by the FDIC relates to the treatment of so-called federal financial assistance. During discovery, the FDIC admitted that it improperly included a net amount of $21.9 million under Section 597 of the Internal Revenue Code, which covers federal financial assistance to thrifts that have been seized. Vortriede Dep. at 175. The details of this error are explained below in the tax analysis, but suffice it to say that the FDIC has unequivocally admitted this error. *Id.* And here again, the IRS agrees. In the settlement of Ben

Franklin's tax liability, the IRS allowed the FDIC to pay tax under the final regulations implementing Section 597. PX 5106 (Transcript of Fairness Hearing before the Honorable Emmitt G. Sullivan, *United States v. FDIC*, No. CA 02-1427).

Third, under the Internal Revenue Code, net tax losses incurred in one year can be carried forward to shield income in a future year. 26 U.S.C. § 172 (allowing carry forward for 5 years in 1995). In 1992, Carteret had a tax loss of $73.9 million. PX 4429 (CFSB Form 1120 U.S. Corporation Income Tax Return for 1992); PX 4401 (Carteret State Income Tax Return, New Jersey 1992); PX 4403 (Ambase Corporation and Subsidiaries, Carteret Savings Bank, Taxable Income Schedule 1, 1/1/92-12/31/92). But the FDIC did not carry forward that loss to future years and thus deprived Carteret of a significant tax deduction that was entirely permissible under the Internal Revenue Code.

Any two of these adjustments would wipe out the tax liability in its entirety. In light of these mistakes, the FDIC's internal documents confirm that **"there are still compelling reasons for the IRS to abate these taxes."** PX 4418 (Tax issues related to the Goodwill Litigation at AM0010656) (emphasis added). And the IRS's conduct in Ben Franklin confirms that the IRS is also committed to arriving at the proper tax liability. Here, the evidence demonstrates that the appropriate tax liability for Carteret is zero.

**4. The Minority Preference Program prevented Carteret from using its own assets to finance its resolution and reduced the premiums it obtained.**

Yet another way in which the government inflated the receivership deficit was through the two special programs that established special advantages for minority bidders and acquirers. Congress created this Minority Preference Program ("MPP") in 1993.[14] *See* 12 U.S.C.

[14] Specifically, Congress mandated that, when "considering offers to acquire any insured depository institution, or any branch of an insured depository institution, located in a

§ 1441a(w)(17)(C). Carteret was subjected to both aspects of this Minority Preference Program: its performing assets were held back to be available for other minority acquirers, and minority bids for Carteret were afforded a preference over non-minority bids. Professor Calomiris demonstrates that in the absence of the MPP, Carteret would not have needed a loan to fund its branch sales, and thus **no interest** would have accrued. Calomiris 2006 Report at ¶¶ 88-100.

Carteret's large cache of performing assets was "the most readily available source of mortgages [for minority acquirers] in one spot on which due diligence has been performed." PX 4919 (Email re Home Unity) at C-AM-A-008937; PX 4925 (Email re Carteret Loans for Dryades); PX 4922 (Email re Due Diligence Carteret Loans). To ensure that Carteret's performing assets would be available for minority acquirers, the RTC "froze" Carteret's performing assets, PX 4207 (Executive Summary of CFSB, Stratification of Assets Remaining). Even though Carteret's managing agent was "chomping at the bit" to sell Carteret's own performing assets to finance its resolution, PX 4975 (Email re Carteret Securities), the RTC did not release the assets, and instead Carteret was forced to borrow from the RTC $1.18 billion in order to finance its resolution. PX 4986 (Consolidated Florida Branch Resolution Summary).

Moreover, the MPP suppressed the prices at which the RTC sold Carteret's performing assets to minority acquirers. Because the MPP called for the RTC to make performing assets available to a specific acquirer, it was not possible to obtain competitive bids from multiple prospective purchasers. Instead, the RTC set the prices itself, which method is inherently prone to underpricing, especially since minority acquirers enjoyed a risk-free option: they could

---

predominantly minority neighborhood . . . , the [RTC] shall give preference to an offer from any minority individual, minority-owned business, or a minority depository institution, over any other offer that results in the same cost to the" RTC. Resolution Trust Corporation Completion Act, Pub. L. No. 103-204, § 3(a), 107 Stat. 2369, 2375-76 (1993) (codified at 12 U.S.C. § 1441a(w)(17)(A)).

purchase the loans, but were under no obligation to do so. *See, e.g.*, Douglas G. Baird, *The Uneasy Case for Corporate Reorganizations*, 15 J. LEGAL STUD. 127, 136-38 (1986) (proposing that bankrupt firms be auctioned on the open market rather than valued judicially for purposes of reorganization). Minority acquirers were thus able to pick and choose from Carteret's assets and often flipped those assets at a substantial profit. PX 4211 (Executive Summary, Carteret Federal Savings Bank, Stratification of Assets Remaning).

The MPP also substantially affected the premium received for Carteret during its resolution. The resulting delay was very costly for Carteret because a substantial amount of its deposits ran off during that time. PX 4981 (Memo re Failing Thrift Case, Reccommendation on Bid Acceptance for 9 Florida Branches, Proposed Closing 10/28/94); PX 5001 (Memo re Failing Thrift Case, Recommendation on Bid Acceptance, 14 of 30 New Jersey Branches, Proposed Closing 1/20/95); PX 4968 (Memo re Update Status of Minority Bids for Carteret FSB and Closing); PX 4992 (Interoffice Memo re Staus: Carteret/Bahia); Calomiris 2006 Report at ¶ 82. Deposit runoff rapidly reduces the premium that potential acquirers are willing to pay. *See* PX 4309 (AFSC Conservatorship/Receivership Field Operations, Managing Agents Meeting). As a direct result of the deposit runoff that occurred while the RTC tried to accommodate minority bidders pursuant to the MPP, the high bids on the remaining 16 branches came in at $19.4 million less than they had been originally, which in turn increased the principal balance of Carteret's resolution loans by $17.5 million. PX 5025 (Recommendations on the Application to the FDIC of the RTC's Minority Preference Application); Calomiris 2006 Report ¶¶ 61-64, 86-88.

**5. The RTC shut down Carteret Mortgage Company abruptly.**

Carteret was seized on a Friday. One of the first orders of business for the conservator was to review ongoing operations at Carteret's mortgage banking division, Carteret Mortgage Company ("CMC"). CMC had a robust mortgage origination capability, and the company originated over a billion dollars of loans in the twelve months prior to seizure. PX 3804 (Carteret FSB and Subsidiaries Financial Report). This mortgage origination allowed Carteret to generate income by (i) retaining the servicing rights to the loans that were originated and (ii) by reselling these loans. Calomiris 2006 Report at ¶ 156; PX 6007 (Carteret Savings Bank, Mortgage Banking Activities Income for the Year, 1991, 1992, 1993). In 1992, Carteret projected that its mortgage banking activities would generate more than $30 million in income in 1993. PX 6007 (Carteret Savings Bank, Mortgage Banking Activities Income for the Year 1991, 1992, 1993). Instead, the RTC made the snap judgment that CMC should be shut down. The RTC simply squandered the value inherent in CMC.

And the evidence demonstrates that there was substantial value to CMC. Calomiris 2006 Report at ¶¶ 144-61. Specifically, when the employees of CMC received notice that they would be terminated, they left en masse to Imperial Credit Industries, Inc. On the day that Imperial Credit announced this defection, its market capitalization increased by $20 million. *Id.* at ¶ 152. As Professor Calomiris demonstrates in his report, this is a conservative estimate of the value of CMC that the RTC simply abandoned without making any effort to capture this value. *Id.* at ¶¶ 153-61.

**STATEMENT OF ISSUES OF FACT AND LAW**

1. Whether Plaintiffs' damages were reasonably foreseeable to the Government?

2. Whether Plaintiffs' damages were caused by the Government's breach of the parties' goodwill contracts?

3. Whether the fact of Plaintiffs' damages is established, and whether the amount of damages claimed by Plaintiffs is a fair and reasonable approximation of those damages?

4. Whether the Carteret receivership deficit is over-inflated?

5. Whether Plaintiffs' damages should be awarded directly to AmBase?

**PLAINTIFFS' CONTENTIONS OF LAW**

"It is well settled that the law provides that a non-breaching party may be made whole by damages representing the benefits they reasonably expected to receive if the breach had not occurred." *Slattery v. United States*, 69 Fed. Cl. 573, 581 (2006). In the *Winstar* context, this Court has recognized that a thrift's pre-FIRREA stock market capitalization is a viable measure of such damages. *See id.* at 585-86; *Suess v. United States*, 52 Fed. Cl. 221, 230-31 (2002). As this Court has explained, to account for the true effect of the breach, stock market capitalization must be measured at the point before which informational leakage about FIRREA began affecting stock prices. *See Slattery*, 69 Fed. Cl. at 585. This framework is based on the sound proposition that the fair market value of an institution is a reasonably certain method of ascertaining future profits. That is, "[t]his amount establishes how the market valued future income . . . discounted to present value, and it presumably incorporates the value the market assigned to goodwill which remained on [the] books at the time of the breach." *Suess*, 52 Fed. Cl. at 231.

The Court's recognition that stock market capitalization is a measure that discounts to present value suggests that another step is necessary to arrive at the true value of the thrift at the time of breach. By way of example, if investors in 1989 believed that Carteret was likely to make $20 million for the next twenty years, the 1986 fair market value of those earnings would not be $400 million. Instead, the fair market value would be the present value of such earnings discounted back to 1989. Thus, awarding the fair market value of Carteret in 1989 is tantamount

to discounting lost profits back to the date of the breach. In *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1330 (Fed. Cir. 2002), however, the Federal Circuit clarified that only profits that would accrue **post-trial** are to be discounted. Applying the holding of *Energy Capital* to the damages framework in *Slattery* yields the conclusion that Carteret's earnings should not be discounted back to 1989. Thus, in the simple example provided above, Carteret's earnings from 1989 through 2008 would equal $400 million. It is important to note that this process does not result in an award of pre-judgment interest. Whereas prejudgment interest involves increasing the face amount of each year's earnings by an interest factor, accounting for the discount rate involves simply adding together the face amount of the undiscounted earnings accruing prior to trial that are implicit in Carteret's fair market value as of 1989.

But even with this *Energy Capital* adjustment, Carteret's pre-FIRREA market capitalization does not capture the full measure of damages in this case. "[T]he law makes the non-breaching party whole [by] giv[ing] him the benefits he expected to receive had the breach not occurred." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). In order to truly make Plaintiffs whole, we respectfully submit that the Court should award as damages the value of Carteret had it survived. In the non-breach world, Carteret would currently be a vibrant and valuable franchise. Accordingly, the final step in valuing a thrift that became insolvent because of FIRREA is to calculate the market value of the thrift in a non-breach world. Our expert has done just that, and the evidence at trial will demonstrate that this measurement arrives at the proper amount of damages. This Court has recognized that perfecting the damages calculation in *Winstar* cases is an ongoing process, *see Suess v. United States*, 74 Fed. Cl. 510, 513 (2006), and Plaintiffs respectfully submit that the final step in that process should be taken in this case.

This Court has also recognized that a thrift may recover wounded bank damages. *Slattery*, 69 Fed. Cl. at 578. Here, Carteret suffered four categories of wounded bank damages: (1) costs associated with the termination of employment contracts; (2) transaction costs associated with shrinkage necessitated by the breach; (3) transaction costs associated with efforts to raise capital; and (4) transaction costs associated with cease and desist proceedings. At trial, Plaintiffs will produce evidence proving they are entitled to recover each of these costs. Finally, Plaintiffs will show that at a minimum, they are entitled to recover either reliance damages measured by the volume of Carteret at the time of the 1986 contract, or resolution measured by the benefit Carteret conferred on the government.

## I. PLAINTIFFS' ARE ENTITLED TO THE VALUE OF THE BANK

The standards for proving expectancy damages are well established: a plaintiff is entitled to recover expectancy damages upon demonstrating by a preponderance of the evidence that:

> (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*La Van v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004) (quoting *Energy Capital*, 302 F.3d at 1325); *see also Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, at 1355 (Fed. Cir. 2001) ("Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."). The evidence at trial will satisfy each of these requirements.

### A. The Loss of Carteret's Value Was Reasonably Foreseeable

"Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable." *Bluebonnet*, 266 F.3d T, 1355. " 'Loss may be foreseeable as a probable result of

a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.' " *Landmark Land Co. v. United States*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351(2)); *see also Globe Sav. Bank v. United States*, 65 Fed. Cl. 330, 347 (2005), *aff'd in part and vacated in part*, 189 Fed. Appx. 964 (Fed. Cir. 2006). Thus, " 'the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach.' " *Landmark*, 256 F.3d at 1378 (quoting 5 ARTHUR CORBIN, CORBIN ON CONTRACTS § 1012, at 88 (1964)). "Here, the question is whether regulators foresaw, or should have foreseen, at the time of contract formation, that breaching the 'goodwill' portion or their contract with [Carteret] would have resulted in a significant or total loss of [Carteret's] net worth or market value." *Slattery*, 69 Fed. Cl. at 582.

As this Court has already recognized, Carteret was a thriving bank at the time of its merger with Barton and Delray: "Prior to the merger, Carteret operated relatively free of supervisory concern and had operating ratios that were generally more favorable than those of like-sized institutions." *AmBase*, 58 Fed. Cl. at 41 (internal quotations omitted). Barton and Delray, on the other hand, "were thrifts in dire financial straights," *id.*, and Carteret's absorption of their liabilities absent an agreement on supervisory goodwill would have left the newly formed institution immediately and massively insolvent—to the tune of a negative net worth of $165 million, *id.* at 42. Consequently, the "goodwill provision . . . made the deal possible," and the "regulators clearly understood this" at the time. *Slattery*, 69 Fed. Cl. at 582. Indeed, the Director of the Office of the FSLIC in 1982 confirmed this conclusion under oath, explaining that "it's clear that absent the use of purchase accounting that neither side would have wanted—neither side being Carteret or the FSLIC, would have wanted to do this transaction, or the

transaction could not have occurred . . . because Carteret would have immediately had a negative net worth even on a book basis." Beesley Dep. at 45. As for the 1986 merger, this Court has likewise found that "Mountain Security and First Federal were insolvent at the time," and that "Carteret's request to account for the resulting goodwill in a particular fashion was one of several important motivations surrounding the transactions." *AmBase*, 58 Fed. Cl. at 55.

Equally well understood by the government at the time of contract formation was the fact that thrifts make money by leveraging their capital to support expanding their earning assets and liabilities to a multiple of their regulatory capital, creating a positive interest spread in the process. As Director Beesley testified: "[W]ith capital you have the option of leveraging and the expectation and hope of a positive spread." Beesley Dep. at 63. The FSLIC Acting Director in 1986 reached the same conclusion:

> Q. Were . . . excess capital and liquidity things you felt were important to allow the thrift to . . . withstand any adverse economic terms and to grow their business?
>
> A: Yes.

Connell Dep. at 120. All else equal, more heavily leveraged thrifts are able to earn higher rates of return on capital, but have less of a cushion with which to absorb potential losses. Regulators establish minimum acceptable ratios of capital to assets, which limit the extent of leveraging. Both Carteret and the government understood, therefore, that the supervisory goodwill created by the Carteret mergers was extremely valuable because it gave Carteret the opportunity to leverage that regulatory capital to earn profits while remaining in compliance with capital requirements. *See Winstar*, 518 U.S. at 851 ("[T]he treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)."). Indeed, the very theory behind the supervisory goodwill device was that it would provide the capital and time cushion necessary for healthy

thrifts to eliminate the debt of the acquired, failing thrifts. As Director Beesley explained, the use of supervisory goodwill "bought time for Carteret, as a combined entity . . . to work through these problems." Beesley Dep. at 32; *see also id.* at 41 ("[F]rom our point of view at FSLIC, the use of purchase accounting improved the viability of the combined institutions because of the benefits to the income stream on a short-term basis, at least . . . ."). Acting FSLIC Director Thurman Connell testified similarly:

> Q. And I take it that the testimony you've previously provided holds true here insofar as to the extent supervisory goodwill was created in these acquisitions, it would have been the regulator's expectation that that supervisory goodwill would have been leveraged toward profit-making, lending activity?
>
> A. . . . Yes, it would have been our expectation.

Connell Dep. at 392. It was perfectly foreseeable, then, that yanking the supervisory goodwill rug out from under Carteret would hinder the thrift's ability to leverage its assets and could eventually cause Carteret to fall out of capital compliance and be seized.

Moreover, it was foreseeable that a breach of the supervisory goodwill agreement would necessitate Carteret's taking drastic mitigation measures in an attempt to remain in regulatory compliance. As the Federal Circuit recognized in *California Federal Bank v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) ("*CalFed*"), a thrift such as Carteret, confronted with the elimination of regulatory capital, has only two options to increase its ratio of capital to assets: raise capital or shrink its asset base. Acting Director Connell recognized as much under oath:

> Q. And if . . . supervisory goodwill were taken away from Carteret at a later point in time, it would have been your expectation that the institution would have either had to shrink or attempt to find replacement capital?
>
> A. Yes. That would—Knowing the business and so forth, that would have been something—that would have been a conclusion that we would have reached under those circumstances.

Connell Dep. at 392-93. Accordingly, the government cannot credibly dispute that it was reasonably foreseeable—indeed, that the government actually foresaw—that Carteret would shrink its assets in response to the breach, thereby decreasing the value of the bank and harming its ability to turn profits and maintain regulatory compliance in the years to come.

The government can be expected to argue that even if it was foreseeable that the breach would cause regulatory problems for Carteret, damages of the magnitude requested by AmBase were not foreseeable. The plain facts and logic of the 1982 and 1986 mergers belie this contention. As noted above, the 1982 merger had Carteret assuming $214 million of debt in excess of the acquired assets. Yet, as this Court has already found, the government approved the deal only upon a finding of future viability. *AmBase*, 58 Fed. Cl. at 42; *see also* PX 2433 (memo from FSLIC to FHLB "project[ing] that the resulting association will report a profit during the second year after the merger and will remain profitable thereafter" at WOR8390359).[15] Since the regulatory goodwill was to be amortized, a prediction of Carteret's future viability had to be based on the premise that the thrift would earn enough profits to erase that debt over the course of the amortization period.

Acting Director Connell elucidated the point in his deposition:

---

[15] At his deposition, Director Beesley confirmed this point:

> Q. In terms of recommending that the transaction be approved, you'd have to conclude that the resulting institution is viable; isn't that right?
> A: Yes.
> . . .
> Q: Isn't it fair to say given that you recommended that the bank board approve these transactions, that you did, in fact, have confidence in Carteret's management's ability to run a healthy and sound institution after it acquired Delray and Barton?
> . . .
> A: I think the answer is yes.

Beesley Dep. at 43-44, 55.

> Q. If the institution acquired a failing institution and GAAP allowed it to amortize the goodwill over a period of 40 years, what would the effect be if the amortization period was reduced in, say, year five or six?
>
> . . .
>
> Q. To the balance of the amortization in one year, what effect would that have on the viability?
>
> . . .
>
> A. It would have a very dramatic impact in it because . . . you're, basically, taking that expense in over that 40-year period. And the model has been run with that 40 years in there or whatever period was agreed to.
>
> And so if you reduced it to your five years or eight year or whatever, then you would be taking that much more expense into income against your income, so it could have a pretty dramatic impact on what the viability of the institution would be.

Connell Dep. at 85-86. Accordingly, the government predicted—that is, foresaw—that Carteret would earn *at least* $214 million after acquiring Barton and Delray, which translates into an expectation of a large, highly profitable thrift for years to come.

The same logic holds for the 1986 merger, but with even greater force. By 1986, Carteret was doing *exactly* what the government had predicted in 1982—turning substantial profits and erasing the debt it had assumed in the Barton and Delray acquisitions. Thus, at the time of the 1986 transaction, the government had every reason to believe that Carteret could and would remain viable and highly profitable if it could work with the large amounts of supervisory goodwill for which it had contracted. Accordingly, the FSLIC reported to the FHLB that "Carteret is projected to be a viable institution as a result of the acquisition of Mountain Security and First Federal." PX 2484 at 8. *See also* Connell Dep. at 71, 76, 416.

Again, at the time of contract formation, the government anticipated a profitable and valuable future Carteret. The magnitude of harm flowing from the government's breach of contract was thus entirely foreseeable—the government knew Carteret had been, and predicted

Carteret would continue to be, a highly profitable and valuable thrift.

**B. The Loss of Carteret's Value Was Caused by the Government's Breach**

AmBase must demonstrate that the government's breach caused the seizure of Carteret and the attendant loss of the thrift's value. *Slattery*, 69 Fed. Cl. at 581. The Federal Circuit has recognized both a "substantial factor" and a "but for" standard of causation. *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1319 (Fed. Cir. 2007). The substantial factor test asks whether the breach was a "substantial factor in causing the damages" suffered by the non-breaching party. *Id.* at 1318. The but-for test holds that "the breaching party is liable only for those damages that it directly and entirely caused." *Id.* *Citizens* established that the selection of the appropriate standard "depends upon the facts of the particular case and lies largely within the trial court's discretion." *Id.* at 1319. While Plaintiffs' evidence will establish causality under either standard, in *Slattery* this Court applied the substantial factor test, *see* 69 Fed. Cl. at 582 (citing *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 159-60 (2002)), and that approach seems equally appropriate in this *Slattery* derivative.

This Court's prior decisions in *Energy Capital* and *Citizens* strongly suggest that the substantial factor standard is properly invoked when the parties assert multiple possible causes for the claimed damages. As explained in *Energy Capital*, "[b]ecause often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that the defendant's breach was a substantial factor in causing the injury." *Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000), *aff'd in part and rev'd in part*, 302 F.3d 1314 (Fed. Cir. 2002) (internal quotations omitted) *accord Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 514-16 (2004) (quoting *Energy Capital* and discussing the multiple causes asserted for

plaintiff's injury). In such cases, the substantial factor test is particularly well suited to addressing causation because it avoids any necessity for engaging in a highly counterfactual attempt to isolate the precise effects of each of the causes that may have contributed to the claimed damages. This is especially the case since one of the purposes of regulatory capital is to help cushion financial institutions from the effects of recessions and many of other nonbreach factors often cited by the government in *Winstar* cases. *See, e.g.*, *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005); *Commercial Fed. Bank, FSB*, 59 Fed. Cl. 338, 347 (2004), *aff'd*, 125 Fed. Appx. 1013 (Fed. Cir. 2005); *Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 425-26 (2000); *Old Stone Corp. v. United States*, 63 Fed. Cl. 65, 80-81 (2004), *aff'd in part and rev'd in part*, 450 F.3d 1360 (Fed. Cir. 2006).

The Federal Circuit's approval of this Court's analysis in *Citizens* also suggests, more broadly, that the substantial factor standard is generally appropriate in most *Winstar* cases as a class. Indeed, the Federal Circuit quoted the following language from the trial court's opinion:

> The "substantial factor" standard has been reviewed with approval by the Federal Circuit in both *Bluebonnet* [*Savings Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001)] and *Energy Capital* even though *Myerle* [*v. United States*, 33 Ct. Cl. 1 (1897)] has not been explicitly overruled. Because the Federal Circuit has accepted this standard, it is consistent with this Court's analysis in *Energy Capital*, and because the standard has been adopted in numerous *Winstar*-related cases before other judges on this Court, this Court concludes that it is the appropriate standard to be applied in the present case.

*Citizens*, 474 F.3d at 1319-20 (quoting 59 Fed. Cl. at 515). Referring to this quotation—which did not discuss any particular facts present in *Citizens* but rather emphasized the widespread use of the standard in the *Winstar* context as a whole—the Federal Circuit held that the trial court had "adequately explained the reasons for its action" and therefore "did not abuse its discretion in using the 'substantial factor' theory of causation." 474 F.3d at 1319. Consistent with this broader understanding of *Citizens*, this Court has repeatedly applied the substantial factor

standard in *Winstar* cases decided both prior to the Federal Circuit's decision, *see Citizens*, 59 Fed. Cl. at 514-15 (collecting cases); *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 553 (2003) (collecting cases); *Coast*, 48 Fed. Cl. at 435, and subsequent to it, *see First Fed. Sav. & Loan Ass'n v. United States*, 76 Fed. Cl. 106, 113 (2007); *Holland v. United States*, 75 Fed. Cl. 483, 489 (2007). The Federal Circuit, moreover, has indicated its approval of trial courts' use of the substantial factor standard not only in *Citizens*, but also in other *Winstar* cases, including *Southern California Federal Savings & Loan Association v. United States*, 422 F.3d 1319 (Fed. Cir. 2005), and *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

In the final analysis, however, the question of which causation standard is appropriate in this case is of purely academic interest. Regardless of whether the but-for standard or the substantial factor standard applies, AmBase will prove at trial that its damages were caused by the breach. Overwhelming evidence supports the common-sense proposition that the government's breach of its contractual promises to recognize, for regulatory capital purposes, over $160 million of supervisory goodwill led directly and inexorably to Carteret's seizure (and thus, to the loss of Carteret's value). In order to avoid appellate risk of a remand, we ask the court to find that the breach caused Carteret to fail under both standards.

**1. Government regulators acknowledged that absent the breach, Carteret would have survived.**

Some of the most compelling evidence that the government's breach led to Carteret's seizure comes out of the mouths of the government's own witnesses. The three most senior regulators in the Northeast Region of the OTS all testified unequivocally in their depositions that Carteret would not have been seized if the government had honored its supervisory goodwill promises. Thus, Angelo Vigna, who as the Director of the OTS's Northeast Region office was intimately familiar with Carteret's business, financial condition, strategies, and prospects, testified as follows:

> Q. If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
>
> A. No.

Vigna Dep. at 159. Mr. Vigna also acknowledged that if supervisory goodwill had been viewed as tangible capital, as required by the contract, Carteret would not have been seized:

> Q. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized in your opinion?
>
> A. No.

Vigna Dep. at 158.

Likewise, Robert Albanese, the second highest ranking regulator in the OTS's Northeast region, acknowledged that if Carteret had met its tangible capital requirement, as it would have absent a breach, Carteret would not have been seized:

> Q. Do you believe that Carteret would have been seized if they had satisfied their -- its tangible capital requirement rather than having had, as it did, a tangible capital deficit?

A. No….

A. If they had enough that their tangible capital requirement would have been met, I think it gets back to your earlier question, I don't think they would have been seized.

Albanese Dep. at 159-161.

Mr. Vigna's and Mr. Albanese's testimony on causation was corroborated by the testimony of Michael Simone, the Supervisory Agent of the Northeast Region who reported directly to Mr. Albanese at the time of Carteret's seizure. He testified during his deposition as follows:

Q. I guess my question to you is if, let's say Carteret had an additional $140 million in capital so that its tangible capital instead of being negative $60 million had been positive $80 million, do you think that Carteret would have been permitted to operate beyond December 4, 1992?

A. It's very likely, particularly if they were still capital deficient there would have been some sort of a capital plan put back in place.

Q. But it's your opinion that given Carteret's core profitability, if it had a positive tangible capital of say $80 million, it would have been permitted to continue to operate, is that correct?

A. It's likely, yes.

Q. Can you think of any instance in which a thrift was seized where it had positive tangible capital of $80 million and core profitability?

A. No.

Simone Dep. at 105.[16]

[16] Likewise, in a 1995 interview, Mr. Simone "indicated that had the institution approximately two weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing." PX 5311 (Memo re: Meething with OTS 1/31/95) at 1. If the institution would have survived even in the aftermath of the breach, it necessarily follows that Carteret would have survived absent the breach.

**2. Carteret's successful performance prior to the breach and prior to seizure confirms that Carteret would have survived.**

One need look no further than the foregoing straightforward admissions by Carteret's primary regulators to conclude that absent the breach, Carteret would not have been seized. But these admissions are far from the only evidence establishing causation. Rather, the contemporaneous record and the testimony of our expert, Professor Charles Calomiris, will prove that the breach had a catastrophic, and ultimately fatal, impact on the thrift.

To begin with, Carteret's successful performance before the government's breach provides powerful support for the proposition that it clearly would have survived absent the breach. While Carteret, like virtually every other member of the thrift industry, was not immune from the effects of the harsh economic environment of the late 1980s and early 1990s, the fact remains that Carteret's operation of the insolvent thrifts it had acquired in reliance on the government's contractual promises was a success story prior to the breach. In the mid-1980s, Carteret generated substantial earnings. Indeed, according to the government's own expert witness, Carteret generated earnings of more than $165 million from 1983 to 1988. Report of Anthony Saunders at Exhibit 3. Through its retained earnings, Carteret had eliminated the net tangible capital deficit it had inherited from Barton and Delray. During 1990 and 1991, Carteret, like virtually every other financial institution in the country, sustained losses. But even with those losses, Carteret had closed $170 million of the $210 million deficit it had assumed from the government. Report of Roy Smith at Exhibit 3. Moreover, Carteret had substantial earnings in 1992 as the recession of 1990-91 lifted. Calomiris May 2007 Report at ¶ 80.

Carteret's inherent value and financial strength is evidenced by the fact that notwithstanding the breach, Carteret survived through the severe recession that began in mid-1990 and reached its trough in March 1991. Calomiris May 2007 Report at ¶ 49. Professor

Calomiris will testify that Carteret's strength during this difficult time period can be explained in large part by its substantial franchise value.[17] Professor Calomiris has conservatively estimated that the market value of Carteret's franchise was equal to about $100 million as of the time of the breach. Calomiris May 2007 Report at ¶¶ 49-52. Further evidence of Carteret's substantial franchise value is found in an independent analysis conducted by Peat Marwick at the time Carteret was acquired by AmBase. Peat Marwick estimated the value of Carteret's deposit base intangible asset to be approximately $54 million in August 1988. PX 5328 (Valuation of the Deposit Base Intangible Asset) at III-I (PM 004486).

The relative strength of Carteret's core franchise is demonstrated by the fact that by the end of 1991, Carteret had turned the corner. The improving economic climate allowed Carteret to return to profitability for the 14 months prior to seizure. Calomiris May 2007 Report at ¶ 80 (citing PX 0404 (AmBase Annual Report 1992)) at AMB030515. For Carteret in 1992, "the trends were very positive," as Mr. Albanese acknowledged. Albanese Dep. at 138-41. *Cf. Old Stone*, 63 Fed. Cl. at 88 (noting that thrift had two months of operating profits prior to seizure). The regulators also had great confidence in Carteret's new management team. In fact, Mr. Vigna testified that "this was as good a team as you'd find." Vigna Dep. at 106-07. Furthermore, the regulators also acknowledged that Carteret had made great strides in solving the problems in its commercial real estate portfolio. In short, Mr. Vigna testified that even in a breach-affected world, Carteret would have survived if it had been given more time and would have been "very

---

[17] A financial institution's franchise value is one component of its market value. The institution's market value is equal to the market value of its tangible assets plus the institution's franchise value, plus the market value of its other intangible assets (supervisory goodwill), minus the market value of its liabilities. The franchise value of a depository institution such as a bank or thrift is often a reflection of the strength of its deposit base and retail branch network. Calomiris May 2007 Report at ¶ 50.

successful, very successful." *Id.* at 151-53. *See also* PX 2819 (Albanese memo to file dated Nov. 17, 1992). It necessarily follows that in a non-breach world, Carteret would have done at least as well.

The regulators' deposition testimony is reinforced by the contemporaneous documents. Throughout its examination reports, OTS regulators praised Carteret's new management and its solid performance in a difficult economic environment. The 1992 OTS exam report, for example, contained the following positive findings:

> Carteret's asset quality has improved due to an intensive effort by management to liquidate non-performing assets and to work out deteriorating problem assets by negotiating mutually agreeable payoffs or restructurings. PX 2118 (1992 OTS Report of Examination) at 1.
>
> Criticized assets have decreased by 20.9 percent since the June 17, 1991 examinations with assets classifies "Substandard" down by $28.9 million (4.7%), assets classified "Doubtful" down by $46.5 million (84%) and assets classified "Loss" down by $154.6 million (77.4%). *Id.* at 2.
>
> [C]ore operations are improving as evidenced by the profit for the five month period ended May 31, 1992, which was due to improved net interest margins, lower loss provisions and reduced operating expenses. *Id.*
>
> Current management is considered to be both capable and effective in dealing with Carteret's significant problems. *Id.* at 7.

*See also* PX 2119 (1992 FDIC Report of Examination) at I, I-2. Given the strength of Carteret's management and Carteret's income, it was highly unlikely that Carteret would have failed once it survived the rough period of the early 1990s. Moreover, had Carteret not been seized, it would have been able to participate in the record economic prosperity that followed the 1990-91 recession. Calomiris May 2007 Report at ¶¶ 80,100.

Additional support for the fact that Carteret retained substantial franchise value even with the breach can be found in the fact that Carteret was a much healthier thrift than the average thrift that failed in the 1980s and 1990s. Judging by several key measures of financial strength,

such as return on assets, ratio of interest expense to deposits, and ratio of past due and nonaccrual loans to total loans, Carteret was significantly stronger than the average failed thrift. Calomiris May 2007 Report at ¶ 49; Calomiris 2006 Report at ¶ 67-69. Indeed, even the RTC made observations, **after** Carteret had been seized, concerning the high quality of Carteret's retail banking relationships and effective retail marketing strategies, noting among other things that (1) the "CFSB retail office network [was] well-positioned in strategic markets and offer[ed] a prime opportunity for any acquiring institution"; (2) "CFSB retail offices in New Jersey and Florida [were] located in some of the top performing market areas in each respective state"; (3) Carteret's retail offices exhibited "a high level of customer service leading to a high degree of customer loyalty"; (4) the bank's "penetration of high balance households far exceed[ed] its overall market penetration in each of the New Jersey and Florida counties where CFSB [had] a retail office presence"; and (5) these and other "characteristics, combined with a relatively stable deposit base, further enhance[d] the valuation of the Bank's franchise." PX 4002 (Conservatorship Strategic Plan) at 1-4. Such evidence of Carteret's performance and value even in the breach-affected world thus serves as powerful evidence that Carteret would have survived in the no-breach world.

**3. The breach devastated Carteret.**

As noted above, the relative strength of Carteret's franchise helped Carteret survive until the end of 1992, after the vast majority of bank failures had occurred, **notwithstanding the government's breach**. It should be obvious that, absent the breach, Carteret would have been in an **even stronger** financial, capital, and regulatory position. This is especially the case when one considers the substantial evidence that establishes the numerous ways in which the breach sent Carteret into a death spiral. *Cf. Slattery*, 69 Fed. Cl. at 583 (referring to "downward death spiral"

caused by breach).

Even before FIRREA was finally enacted, the stock market recognized the negative ramifications of the impending breach. This is reflected by the market's reaction to the defeat of the Hyde Amendment, a proposed amendment to the thrift bill that would have removed, or significantly ameliorated the effects of, the breaching provisions from FIRREA. Calomiris May 2007 Report at ¶ 32-33. When the Hyde Amendment failed, the stock market capitalization of AmBase fell $45 million within a week. *Id.*[18]

The stock market's concern was well-founded. As Mr. Vigna recognized, the breaching provisions of FIRREA "had a very substantial impact on the regulators' assessment of [Carteret's] safety and soundness." Vigna Dep. at 81. And the removal, with one stroke of the pen, of more than $160 million in regulatory capital had devastating implications for Carteret's business strategies and financial performance. Overnight, Carteret went from having a significant capital cushion to being out of compliance with the fully phased in core capital requirement.[19] As the evidence at trial will show, Carteret was forced to take painful measures to cope with the government's breach. As a result, among other things, Carteret was forced to

[18] Even this drop in AmBase's stock price did not fully reflect the adverse effects that the breach would visit upon Carteret. As Professor Calomiris will testify, FIRREA's passage and implementation marked the end of a gradual increase in AmBase's stock ever since it acquired Carteret in August 1988. The stock market did not immediately adjust in May or even in August of 1989 for all of the damage the breach would eventually visit upon Carteret. The costliness of the breach to Carteret increased over time as a result of regulatory policies related to the enforcement of FIRREA's capital provisions. AmBase's stock price, and thus the market's view of the viability of Carteret as an institution, swiftly declined as the market recognized the ramifications of these policies. *See* Calomiris May 2007 Report at ¶¶ 75-70.

[19] According to Carteret's 1989 Annual report, Carteret exceeded its core capital requirement by $32.4 million as of December 31, 1989. PX 8 (Carteret Savings Bank Annual Report 1989). At that date, Carteret had $164.3 million in supervisory goodwill on its books, a portion of which counted (temporarily) as core capital *Id.* at KH053717. On a fully-phased in basis -- that is, excluding all of its supervisory goodwill -- Carteret did not satisfy its core capital requirement.

dispose of many of its best and safest assets as well as huge portions of its valuable branch network, suffered substantial increases in its relative cost of funds and other expenses, and was required to sell much of its commercial real estate at the bottom of the market and to take large write-downs in its commercial real estate and commercial loan portfolios because of its breach-induced need to raise substantial capital. Taken together, these and other negative results of the breach, some of which are briefly described below, doomed Carteret to failure. This conclusion parallels the finding of Judge Bissell of the United States District Court for New Jersey, who in 1991 granted Carteret's request for preliminary injunctive relief precisely because of the irreparable harm that the breach was inflicting on Carteret. *Carteret Sav. Bank v. OTS*, 762 F. Supp. 1159, 1181 (D.N.J. 1991), *vcated on other grounds*, 963 F.2d 567 (3d Cir. 1992).

**a. Asset shrink and deposit runoff**

As the district court found in issuing a preliminary injunction in April 1991, and as the contemporaneous records and the witnesses at trial will confirm, the breach caused Carteret to drastically reduce and restructure its balance sheet. *Carteret Sav. Bank v. OTA*, 762 F. Supp. 1159 (D.N.J. 1991). Faced with removal of more than $160 million in regulatory capital, and operating in an environment in which the capital markets were effectively closed to the thrift industry, Carteret had no choice but to significantly downsize. In just the last six months of 1989, Carteret shrank its total assets by almost $1.1 billion, from $7.17 billion to $6.10 billion. PX 1711 (Carteret Savings Bank TFR) at AM050308; PX 1713 (Carteret Savings Bank TFR) at WOQ6652300. During 1990, Carteret shrank another $500 million, down to $5.58 billion in total assets. PX 1724 (Carteret Savings Bank TFR) at AM035971. During 1991, Carteret shrank by more than $350 million, down to $5.20 billion in total assets. PX 1734 (Carteret Savings Bank TFR) at AM030528. And during the first nine months of 1992, Carteret shrank down to $4.83 billion in total assets. PX 1737 (Carteret Savings Bank TFR) at CAM5350262. All in all,

starting from the middle of 1989 (*i.e.*, shortly after the Hyde Amendment was defeated and the likelihood of a government breach became apparent) and continuing through the end of the third quarter in 1992, Carteret shrank by more than $2.3 billion in total assets. *See also* PX 1737 (Carteret Savings Bank TFR).

While a portion of this shrinkage was related to Carteret's efforts to discontinue corporate and commercial real estate lending and to dispose of related assets, and thus would have occurred even absent the breach, much of the shrinkage was clearly driven by Carteret's efforts to improve its capital position. Carteret's 1990 business plan, for example, noted that to meet FIRREA's new capital requirements, Carteret's "1989 strategy was altered," among other things, to "significantly downsize the balance sheet." PX 1905 (Carteret Bancorp Inc. and Carteret Savings Bank 1990 Business Plan) at 7. This plan also noted that Carteret "was forced to alter its business strategy in response to the new capital requirements of FIRREA. A plan for Carteret to grow into a much larger mortgage origination and servicing bank changed." *Id.* Similarly, AmBase's 1990 10-K noted that "[d]uring 1990, in a continuing effort to meet the stringent capital requirements of FIRREA, as interpreted by the OTS, Carteret continued to downsize its balance sheet and restructure its asset mix to facilitate compliance with FIRREA's risk-based capital requirement." PX 0802 (AmBase 10-K 1990) at 38. Given the significant amount of goodwill on its books, it is clear that a huge portion of Carteret's asset shrink would not have taken place if the government had allowed Carteret to continue to count its contractual goodwill for regulatory capital purposes. *See* Calomiris May 2007 Report at ¶ 65.

This breach-induced asset shrink came at a steep cost to Carteret, as it deprived Carteret of substantial earnings. Much of the shrink was accomplished through reductions in Carteret's portfolio of residential loans and mortgage-backed securities ("MBS"). For example, these

portfolios shrank by over $900 million during the last six months of 1989, and by over $300 million in 1990. *Compare* PX 1711 (Carteret Savings Bank TFR (June 30, 1989)), PX 1713 (Carteret Savings Bank TFR (Dec. 31, 1989)), and PX 1724 (Carteret Savings Bank TFR (Dec. 31, 1990)). These portfolios consisted of very low-credit risk assets that were generally performing, and generating positive net income, during the 1989-92 period. Contemporaneous documents make clear that this asset shrinkage cost Carteret earnings. For example, AmBase's 1990 10-K estimated that decreases in Carteret's asset volume during that year had a "negative impact" of $8 million on net interest income, and AmBase's 1991 10-K noted that volume decreases in 1991 had a "negative impact" of another $20 million. PX 0802 (AmBase 10-K 1990) at 11; PX 0803 (AmBase 10-K 1991) at 9.

Professor Calomiris will also testify that when a bank's regulatory capital is reduced, as Carteret's was by the breach, the resulting weakened condition of the bank will tend to produce a decline in deposits. Calomiris May 2007 Report at ¶67. Carteret experienced deposit runoffs amounting to more than $1 billion in the wake of the breach. *Id.* This deposit runoff led to a reduction in income, as Carteret could not enjoy the benefits of the valuable customer relationships inherent in its franchise value once those customers left the bank. But-for the breach, this additional income would have enhanced Carteret's regulatory capital profile, further assisting Carteret in maintaining regulatory compliance. *Id* at ¶ 68.

Because Professor Calomiris has not performed a lost profits analysis, and did not need to do so in order to formulate an opinion as to whether Carteret would have survived in the no-breach world. Nor has he attempted to precisely quantify either what portion of Carteret's asset shrink or deposit runoff was caused by the breach or how much the breach-induced shrink and runoff cost Carteret in net income. The evidence summarized above, and other evidence that

will be presented at trial, however, will establish that Carteret would not have shrunk nearly as much as it did if it had been allowed to fully count its supervisory goodwill for regulatory capital purposes, and that such breach-induced shrinkage and deposit runoffs led to a substantial reduction in net income. This lost income would have enhanced Carteret's capital condition. Calomiris May 2007 Report at ¶¶ 66, 68.

**b. 1990 branch sales**

In addition to causing Carteret to significantly reduce the size of its balance sheet, the breach also caused Carteret to sell or dispose of more than 20 branch offices in 1990. *See* Calomiris May 2007 Report at ¶¶ 56-57; PX 9 (Carteret Savings Bank Annual Report 1990).[20] Absent the breach, Carteret would not have needed to sell these branches. Once again, contemporaneous documents relating to the branch sales clearly tie the branch sales to the breach. To take one example, in its 1990 10-K, AmBase made clear that "a significant factor considered in the decision to sell such branches in 1990 was that under capital regulations of the [OTS] adopted under [FIRREA], as interpreted by the OTS, the goodwill recorded in connection with [Carteret's acquisitions of failing thrifts] is required to be deducted from regulatory capital, subject, in the case of supervisory acquisitions, to a phase-out period." PX 802 (AmBase 10-K at 5). Notably, the New Jersey district court made a similar finding on this issue when it ruled in 1991 that Carteret was entitled to an injunction allowing it to count, for regulatory capital purposes, the goodwill written off in connection with the branch sales. In making this decision, the court found "persuasive" Carteret's claim that it "would not have sold the branches in question in the manner that it did if OTS had not eliminated the benefit of retaining supervisory goodwill." *Carteret Savings Bank v. OTS*, No. 91-661, slip op. at 9 (D.N.J. July 8, 1991).

---

[20] These branch sales did not themselves result in additional downsizing of Carteret's balance sheet, since Carteret used FHLB advances to substitute for the loss of the deposits sold.

Professor Calomiris has calculated the effect of the 1990 branch sales on Carteret's capital position, and has taken into account such things as the need to reverse the effects of both the premiums booked by Carteret and the transaction costs incurred by Carteret in connection with the sales. Calomiris May 2007 Report at ¶ 58. However, Professor Calomiris has not attempted to quantify the additional income Carteret would have been able to generate had it not sold the branches, which were, in the aggregate, considered by Carteret to contribute to Carteret's profitability. Professor Calomiris' estimate of the net impact of reversing the 1990 branch sales in the but-for world is therefore conservative, since he has adjusted Carteret's capital downward to account for the premiums received from the branch sales, but has not adjusted Carteret's capital upward to account for the profits those branches would have contributed to the institution. Calomiris May 2007 Report at ¶ 58.

**c. Increased cost of funds**

Professor Calomiris has also concluded that the breach caused Carteret's relative cost of deposits to increase, as the market's reaction to the increased risk of Carteret's failure as a result of the breach manifested itself through increased interest rates offered depositors as well as deposit outflows. Professor Calomiris has determined that while prior to the breach Carteret enjoyed an advantage in the pricing of its deposits relative to other thrifts, it lost that advantage as a result of the capital problems it experienced subsequent to the breach. Professor Calomiris has conservatively estimated that by September 30, 1992, Carteret had paid at least $17 million in excess deposit costs as a direct result of the breach. Absent the breach, these expenses would not have been incurred, and Carteret's capital position would have been enhanced by a like amount. PX 2704 (Decl. of Charles W. Calomiris (July 12, 2007) (hereinafter "Calomiris July 2007 Report") at 2-6.

**d. Commercial real estate sales and writedowns**

Finally, as a result of its lack of regulatory capital, Carteret was also forced to sell its commercial real estate at the bottom of the market. Carteret also took large write downs in its commercial loan portfolio because of its breach-induced need to raise capital. As Mr. Vigna explained, Carteret's write downs were "ultraconservative" and were driven by its need to raise substantial capital:

> A. …They took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally.
>
> Q. Did you assess that as being a good thing, a prudent managerial approach?
>
> A. I think it was, as I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money there was no surprises, other big writedowns subsequent to that.

Vigna Dep. at 110. By taking "ultraconservative" write-downs in an effort to raise capital, Carteret lowered its capital ratios below where they would have been otherwise. The evidence at trial will indicate that absent the breach, Carteret would have taken less in writedowns than it actually took. Calomiris May 2007 Report at ¶ 82 and Table 16..

**4. Carteret's capital position absent the breach**

Professor Calomiris has calculated what Carteret's regulatory capital levels would have been as of September 30, 1992 – the last quarter end prior to Carteret's seizure on December 4, 1992 – had the government not breached its contractual promises. Professor Calomiris will testify that after adding back Carteret's contractual goodwill,[21] and after adjusting for such things

---

[21] In the but-for world, Carteret would have had a supervisory goodwill balance of $139.1 million as of September 30, 1992. Calomiris May 2007 Report at ¶ 55 (citing PX 5265 (December 1989 Goodwill Amortization Schedule)). Absent the breach, all of this supervisory

as the effects of Carteret's breach-induced 1990 branch sales, its breach-caused increase in its cost of deposits, the reduction by $50 million in Carteret's asset writedowns, and Carteret's ability in a no-breach world to recognize for risk-based capital purposes more than $40 million in "supplementary capital,"[22] Carteret would have exceeded its tangible capital requirement by more than $25 million, and would have fallen just shy of both its core capital requirement and its risk-based capital requirement. Calomiris July 2007 Report at Table 2. Significantly, these calculations do not give Carteret *any* credit for the other adverse effects of the breach, such as the net income it lost as a result of its massive breach-induced asset shrinkage or the net income it lost as a result of breach-caused deposit outflows. *Id.* If these items were to be quantified, Carteret's capital profile in the but-for world would have been even stronger.

Moreover, there can be little doubt that Carteret would not have been seized even if it were assumed that its September 1992 capital profile had been no better than as calculated by Professor Calomiris. As noted above, those calculations establish that Carteret would have exceeded its tangible capital requirement by more than $25 million. As even the government's witnesses have acknowledged, thrifts with such a tangible capital profile were simply not placed into receivership. Indeed, Mr. Vigna acknowledged that during his 32 years as a government regulator, he was unaware of any thrift that was seized while it was in compliance with its

---

goodwill would have counted towards all three categories of regulatory capital requirements. In the actual world, only $47.7 million of "qualifying" supervisory goodwill counted towards core capital and risk-based capital requirements, and no supervisory goodwill was counted towards tangible capital requirements. Calomiris May 2007 Report at ¶ 55.

[22] This "supplementary capital" adjustment reflects the fact that under the OTS's capital rules, once Carteret's core capital was positive, it would have been entitled to include in its risk-based capital, up to 1.5 percent of total risk-based assets, its General Valuation Allowances ("GVAs") on loans and leases. *See* PX 2221 (OTS Report of Examination (June 15, 1992) at 20). As of November 30, 1992, Carteret's available supplementary capital under this rule amounted to $43.6 million. PX 3802 (Carteret Savings Bank, FA & Subsidiaries, Financial Report, Nov. 30, 1992, at S-15). Calomiris May 2007 Report at ¶ 63.

tangible capital requirements:

> Q. Can you recall a thrift that satisfied or nearly satisfied its tangible capital requirement that was seized?
>
> A. No.

Vigna Dep. at 156. *See also* Simone Dep. at 105.

In any event, even assuming that Carteret would have needed to improve its capital position by $50-60 million absent the breach, Carteret would have had a myriad of options to raise such capital in the no-breach world. First, AmBase had approximately $35 million of cash that could have been infused into Carteret. Calomiris May 2007 Report at Table 16. The fact that AmBase did not infuse these funds into Carteret in the breach-affected world, in which the regulators made clear to Carteret and AmBase that Carteret needed to raise six times as much capital as AmBase had to offer in order to avoid seizure, is irrelevant to whether AmBase would have infused these funds in the but-for world, in which Carteret would have needed much, much less additional capital (if any) to survive.

Second, if Carteret had been required to raise additional capital beyond what AmBase could have contributed, Carteret could have raised substantial capital by selling its valuable mortgage origination and mortgage servicing businesses. Professor Calomiris has conservatively valued Carteret's mortgage origination business, Carteret Mortgage Company, at between $18 million and $58 million as of the end of 1992. Calomiris July 2007 Report at ¶ 152-162; Calomiris May 2007 Report at ¶ 70. In addition to its mortgage origination business, Carteret had a substantial loan servicing portfolio amounting to approximately $7.6 billion as of June 1992. After reviewing contemporaneous independent appraisals and other evidence, Professor Calomiris has concluded that Carteret's servicing portfolio was worth as much as $100 million.

*See* Calomiris May 2007 Report at ¶¶ 71-72 (discussing evidence of value).[23] The bottom line is that Carteret could have raised substantial amounts of capital -- in excess of $120 million -- if it had chosen to sell all, or a portion of, Carteret Mortgage Company and the loan servicing portfolio in 1992.

Third, to the extent Carteret needed to take action in the no-breach world to address a relatively small risk-based capital deficit, it would have been able to restructure its asset portfolio by converting assets with relatively high risk-weights to assets with relatively low risk-weights. Thus, Carteret could have securitized its mortgage loans and thereby considerably reduced its risk-based capital requirements, since MBSs have a lower risk weighting than unsecuritized loans. Calomiris July 2007 Report at ¶ 11 and Table 2. Similarly, Carteret could have reduced its core and risk-based capital requirements through further modest asset shrinkage.

Finally, because any capital shortfall Carteret might have faced in the no-breach world would have been relatively modest, Carteret would not have faced the same constraints in raising outside capital that it faced in the breach-affected world. In a world without the breach, therefore, Carteret's large franchise value and higher non-breach-affected earnings would have enabled it to easily raise tens of millions of dollars, if needed, to comply with the FIRREA capital regulations. Calomiris May 2007 Report at ¶ 73.

In sum, while it cannot be denied that Carteret, like virtually every thrift facing the difficult economic environment of the early 1990s, would have faced challenges that were

---

[23] Actual sales of portions of the loan servicing portfolio are consistent with this valuation. For example, in 1991, Carteret sold $465 million in servicing rights, resulting in a gain of $7.1 million. PX 2001 (Carteret Savings Bank Capital Plan) at 31. Similarly, the RTC's 1994 sale of Carteret's remaining loan servicing portfolio confirms the substantial value in this portfolio. Notwithstanding the fact that the portfolio had shrunk considerably by the time the RTC finally got around to selling it, the RTC still received $61.7 million in connection with the sale. PX 5026 (Memo re: Sale of Loan Servicing Operation Clearwater, Florida at C-AM-A-0362965).

separate and apart from the government's breach, there can be no real doubt that, had the government honored its contractual commitment to recognize tens of millions of dollars in regulatory capital, Carteret would have been able to overcome those challenges and to maintain compliance with its regulatory capital requirements.[24] The evidence will therefore establish that but-for the breach, Carteret would have survived and would have participated in the general economic recovery and boom period for the thrift industry that began in the mid-1990s. At the very least, the evidence at trial will prove that the government's breach was a substantial causative factor in Carteret's failure.

### 5. The government's causation arguments are meritless

In the face of this compelling evidence that Carteret's failure was a direct result of the government's breach, the government has made clear that it will contend that Carteret would have failed even absent a breach. We briefly address below some of the causation arguments the government is likely to raise at trial.

#### a. Adding back goodwill as of time of seizure

The centerpiece of the government's argument is the facile assumption that even with the

[24] The laws governing regulatory capital compliance by thrifts changed slightly in December 1992, when the regulatory capital provisions of the FDIC Improvement Act of 1991 ("FDICIA") became effective. Among other things, FDICIA imposed requirements for thrift regulators to take so-called "prompt corrective action" against thrifts that were considered "critically undercapitalized." A thrift was considered critically undercapitalized if it failed to meet a ratio of "tangible equity" to total assets of at least 2 percent. FDICIA authorized the regulators to place critically undercapitalized institutions in receivership or conservatorship within a certain amount of time, but the legislation authorized the regulators to refrain from appointing a receiver or conservator if they made a determination that the institution was viable. *See generally* PX 0803 (AmBase 10-K 1991 at 10-11). For the same reasons that Carteret would have been well positioned to achieve compliance with the FIRREA minimum capital requirements in the no-breach world, it is also the case that if Carteret had had the benefit of its supervisory goodwill, it would have been well positioned to take actions to ensure that it did not fall into the "critically undercapitalized" category under FDICIA. Indeed, Professor Calomiris's but-for capital calculations indicate that Carteret would have easily satisfied a two percent tangible capital standard as of September 1992. Calomiris July 2007 Report at Table 2.

supervisory goodwill, Carteret would not have satisfied all three regulatory capital requirements in late 1992. This argument fails on just about every level of serious analysis. As an initial matter, even assuming that such a static capital snapshot, performed as of a time **three years** after the government's breach, was meaningful to the causation analysis, it would not help the government one bit. That is because the government can point to no thrift with a regulatory capital profile comparable to Carteret's (assuming no breach) that was seized in the early 1990s. As noted above, Carteret would have had positive tangible capital if its contractual goodwill were added back as of September 1992, Calomiris July 2007 Report at Table 2, and even government regulators such as Mr. Vigna and Mr. Simone testified that thrifts with such a positive tangible capital profile were rarely, if ever, seized.[25]

In any event, the government's calculations are irrelevant because they fail to take into account the harm that the breach inflicted on Carteret between 1989 and 1992 as a result of such things as the asset shrink, the increased cost of funds, the severe write down of commercial assets pursuant to an ultraconservative write-down policy, and the forced sale of assets at the nadir of the commercial real estate market. *See* Calomiris May 2007 Report at ¶¶ 56-68, 84.

Finally, even ignoring the above points and taking the government's simplistic capital add-back analysis at face value, it cannot seriously be disputed that Carteret would have had to raise much less capital in a non-breach world than it was required to raise in the aftermath of the breach. The government regulators conceded the obvious: that it would have been easier for Carteret to raise a smaller amount of capital (at worst, no more than $50-60 million would have been necessary) than the $200 million it had to seek after the breach. Albanese Dep. at 159-161.

---

[25] *Cf. Slattery*, 69 Fed. Cl. at 583 ("Even assuming there were periods of minor [capital] noncompliance,…it is clear to the Court that had Meritor's goodwill been counted, it would never have been…seized.").

As discussed above, Carteret would have had a myriad of options to raise such capital.[26]

**b. Carteret's supposed mitigation and the 1991 preliminary injunction.**

The government has also suggested that Carteret was at all times fully shielded from the effects of the breach because it fully mitigated shortly after FIRREA was enacted when it received a $20 million capital infusion from AmBase and because it sought and obtained a preliminary injunction in 1991 that required the OTS to accord full regulatory capital treatment to Carteret's contractual goodwill. These arguments ignore and/or mischaracterize the facts. First of all, it is ludicrous for the government to contend that AmBase's infusion of $20 million in 1989 somehow served as full mitigation for the government's removal of more than $160 million of regulatory capital. In any event, the evidence will show that AmBase would have made that capital infusion even absent the breach. That infusion, therefore, does not count as even a partial mitigation of the breach, much less the complete mitigation that the government claims it is.

It is true that in 1991 the federal district court granted Carteret a temporary restraining order and ultimately a preliminary injunction that effectively required the government to count Carteret's supervisory goodwill for regulatory capital purposes. But as discussed above, by the time that relief was granted, the government's breach had already visited considerable damage upon Carteret. To cite just one example, Carteret had already shrunk its asset base by approximately $1.6 billion—from $7.2 billion to $5.6 billion—by the end of 1990. PX 2001 (Carteret Savings Bank Capital Plan) at 49, Appendix B-3. Moreover, the notion that during the relatively short period that the preliminary injunction was in effect, Carteret and government

---

[26] *Cf. Suess*, 52 Fed. Cl. at 230 ("Although defendant did present evidence of Franklin's obvious capital problems regardless of the treatment of the goodwill, there is also ample evidence…that the problems could have been managed had Franklin had the capital cushion that goodwill provided.").

regulators acted precisely as they would have acted had there been no breach to begin with is fanciful at best. The government immediately, and ultimately successfully, appealed the grant of the injunction, *see Carteret Savings Bank, F.A. v. OTS*, 963 F.2d 567, 585 (3d Cir. 1992), and there was considerable uncertainty during the period of the injunction regarding whether it would be upheld.

Finally, it is more than a bit odd for the government to point to the preliminary injunction as somehow showing that Carteret would have been seized even absent the breach, because **it was only after that injunction was vacated and the government's breach was allowed to continue** that the government seized Carteret. If anything, therefore, the facts pertaining to the preliminary injunction support the proposition that absent the breach, Carteret would have survived.

**c. The goodwill written off in connection with the 1990 branch sales.**

The government is also likely to argue that it is inappropriate to add back to Carteret's capital the goodwill that Carteret wrote off in connection with its 1990 branch sales. Only two things stand in the way of this argument: the facts and the law.

First of all, as discussed above, the evidence will establish that the 1990 branch sales were a consequence of the breach. *See* PX 802 (AmBase 10-K 1990) at 5. Indeed, as noted, the New Jersey district court found "persuasive" Carteret's claim that it "would not have sold the branches in question in the manner that it did if OTS had not eliminated the benefit of retaining supervisory goodwill." *Carteret Savings Bank v. OTS*, No. 91-661, slip op. at 9 (D.N.J. July 8, 1991). Absent the breach, therefore, Carteret would have kept these branches, and there would be no question that it would have been entitled to keep on its books the goodwill it wrote when it sold those branches.

In any event, even if it were assumed, contrary to the evidence, that Carteret would still have sold the branches even absent the breach, it does not at all follow that Carteret would have needed to write the goodwill off its books for regulatory capital purposes. Notably, the district court determined that under Carteret's contract with the government, the fact that a goodwill write-off might be required under GAAP did not control whether the goodwill should be written off for regulatory capital purposes. *Id.* at 7-8.

This holding is consistent with applicable and controlling law in this Court. Specifically, the legal question of whether Carteret was required to write off goodwill associated with sold branches whenever GAAP would require such a writeoff is governed by the Federal Circuit's decision in the virtually indistinguishable case of *Home Savings*. In *Home Savings*, as in this case, the plaintiff thrift had written off supervisory goodwill after selling various branches in the wake of FIRREA. There, as here, the government argued that because GAAP required a goodwill writeoff when the branches were sold, the goodwill needed to be written off for regulatory capital purposes as well. The Federal Circuit held that because the parties' contracts, not GAAP, controlled the treatment of subsequent goodwill writeoffs, Home Savings would not have been required to write off the goodwill for regulatory capital purposes when it sold the acquired branches, even if GAAP required Home Savings to write off the goodwill for purposes of its GAAP books. *Home Sav. of Am., FSB v. United States*, 399 F.3d at 1351.

In all relevant respects, the *Home Savings* contracts are indistinguishable from the contracts here. Specifically, in *Home Savings*, the FHLBB resolutions (1) specified that in accounting for the mergers, Home Savings "shall use [GAAP] prevailing in the savings and loan industry, as accepted, modified, clarified and interpreted by applicable regulations of the Bank Board and the FSLIC"; and (2) required Home Savings to submit an accountant's opinion

describing any intangible assets arising from the merger, and substantiating the reasonableness of the goodwill amount and the resulting "amortization periods and methods." *Home Sav. of Am., F.S.B. v. United States*, 50 Fed. Cl. 427, 432–33 (2001), *aff'd in part and vacated in part*, 399 F.3d 1341 (Fed. Cir. 2005). Here, the FHLBB resolution issued as part of the contract governing the 1986 acquisition of Mountain Security and First Federal is virtually identical to the *Home Savings* resolution, as it also provided that in accounting for the merger, Carteret "shall use [GAAP] prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC," and called for the submission of an accountant's opinion substantiating the reasonableness of the goodwill amount and the resulting "amortization periods and methods." PX 2487 (FHLBB Res. 86-566 at 17). Since the 1986 contract is virtually a verbatim reproduction of the *Home Savings* contract, the *Home Savings* decision controls, and mandates rejection of the government's position.

Although the precise formulation in the contract governing the Barton/Delray acquisition was slightly different, it is also functionally equivalent to the formulation in *Home Savings*. Specifically, the FHLBB's forbearance letter for that transaction specified that

> Provided that Carteret submits to [the FHLBB] certification by Carteret's independent accountants that Carteret has accounted for the assets and liabilities acquired in the Mergers, and the resulting period for the amortization of goodwill and the accretion of the loan discount, in accordance with [GAAP], as GAAP existed at the time of the Bank Board's approval of the Mergers, such certification shall be considered to be satisfactory evidence that Carteret's use of the purchase method of accounting is in accordance with GAAP, and such use of the purchase method of accounting will be considered to be in accordance with regulatory accounting procedures.

PX 2441 (Letter re: September 30, 1882 Forbearance Letter). Just like the 1986 resolution, therefore, the forbearance letter required the submission of an accountant's certification substantiating the amortization period and method for the goodwill booked in connection with

the transaction. Indeed, the 1982 forbearance letter went further in that it effectively specified that the initial amortization period and method used in connection with the merger would continue to control "even if GAAP were to subsequently change." *AmBase Corp. v. United States*, 58 Fed. Cl. at 39-40. This is particularly relevant in light of the fact that the GAAP rule requiring goodwill writeoffs, under certain conditions, when branches were sold itself post-dated the 1982 contract. *See* PX 6806 (FASB Statement of Standards). Thus, the plain language of the contract makes clear that this post-contract GAAP rule would not govern the treatment of goodwill for regulatory purposes. Surely, if the 1986 contract would not require a goodwill writeoff whenever GAAP would require a writeoff, then neither would the 1982 contract.

Additionally, in *Home Savings* at least some of the relevant contract documents "did **not** specify an amortization period, but they did set out the process by which the amortization period would be determined" —that is, by providing for the submission of an accountant's opinion. *Home Savings*, 399 F.3d at 1350. Again, our case is functionally indistinguishable from *Home Savings*. Therefore, just as in *Home Savings*, once the amortization period was set, the contracts, not GAAP, controlled whether any further adjustments to goodwill were required for regulatory capital purposes. Because nothing in the contracts said anything about subsequent goodwill writeoffs (other than normal amortization), there was no contractual obligation to write off goodwill for RAP purposes just because it was written off for GAAP purposes.

If past cases are any guide, the government will likely seek to rely upon the Federal Circuit's decision in *Coast Federal Bank, F.S.B. v. United States*, 323 F.3d 1035 (Fed. Cir. 2003) (en banc), as support for its position. *Coast*, however, does not help the government. *Coast* involved a question about amortization, and held that the contract required the parties to look to GAAP to determine what the amortization period would be for a certain component of goodwill.

This case involves the very different question of whether the contract required a subsequent writeoff of RAP goodwill whenever GAAP would require such a writeoff. *Coast* did not address such a question; *Home Savings* did, and resolved it squarely against the government.

**d. Carteret's exposure to commercial lending losses.**

The government will also likely argue that it was Carteret's exposure to substantial losses in its corporate and commercial real estate lending portfolios, rather than the breach, that caused Carteret to fail. To be sure, there can be no question that if one leaves aside for the moment the government's action in depriving Carteret of more than $160 million of contractually-guaranteed regulatory capital, one of the biggest challenges facing Carteret in the 1990-92 period derived from the asset quality problems inherent in Carteret's corporate and commercial real estate lending portfolios. Calomiris May 2007 Report at ¶ 82. Due primarily to the commercial real estate recession of the early 1990s, as well as some underwriting deficiencies under Carteret's previous management, Carteret suffered severe losses in those portfolios, and booked substantial reserves against potential additional losses in the future. Carteret would no doubt have eventually suffered a substantial portion of these same losses even in the absence of the government's breach.

It is simply not the case, however, that the asset quality problems Carteret faced would have led to Carteret's failure if the government had continued to honor its regulatory capital promises. Of course, the government's argument ignores that one of the very purposes and values of regulatory capital is to help cushion financial institutions from the effects of recessions and market downturns. *See, e.g., Home Savings*, 399 F.3d at 1353; *Commercial Federal*, 59 Fed. Cl. at 347; *Coast*, 48 Fed. Cl. at 425-26. In a very real sense, therefore, the government's breach came at the worst possible time, as Carteret was deprived of regulatory capital at the moment

that it needed capital the most. Moreover, as noted above, if Carteret had not been forced, as a direct result of the breach, to begin intensive efforts to raise external capital, it would have booked a smaller amount of reserves on its commercial lending assets and would not have sold as many of these assets as quickly into the depressed market. Calomiris May 2007 Report at ¶ 82. As discussed previously, Mr. Vigna's testimony supports the proposition that Carteret's approach to taking loan reserves was "very, very aggressive" and "ultraconservative" and was driven by its breach-caused need to raise substantial outside capital. Vigna Dep. at 110. Absent the breach, Carteret likely would have booked a smaller amount of reserves and would have been able to retain many of these assets until the real estate market recovered.

For these and other reasons, it is likely that Carteret's loan losses would have been somewhat lower in the no-breach world than they were in the breach-affected world. At an absolute minimum, however, there can be no reasonable doubt that absent the breach, Carteret would not have suffered any **additional** losses relating to its corporate and commercial real estate lending. For one thing, as the contemporaneous record makes clear, Carteret effectively discontinued such lending in 1989 for reasons unrelated to the breach. AmBase's 1990 10-K, for example, noted that:

> Carteret ceased all new corporate and commercial real estate loan originations during 1990 pursuant to a policy established in 1989. This policy was in response to the adverse economic conditions which affected the Northeast and Southeast regions of the United States, Carteret's primary operating markets. Both of these regions have experienced significant increases in non-performing loans in 1990 resulting from continued deterioration of the real estate markets, particularly in commercial real estate.

PX 802 (AmBase 10-K 1990), at 4-5. Because Carteret discontinued its corporate/commercial real estate lending because of "adverse economic conditions" rather than the breach, the government is simply wrong to the extent it suggests that, in the no-breach world, Carteret would

have expanded, or even continued, its corporate/commercial real estate lending.

Moreover, Carteret's loan loss reserve balance at the time it was seized was essentially sufficient to cover the losses actually suffered on the RTC's subsequent sales of those assets. Calomiris May 2007 Report at ¶¶ 85-86; Calomiris July 2007 Report at ¶¶ 12-16. However, Carteret's reserves would have been more than sufficient but-for the breach in light of (1) the depressed sales proceeds the RTC achieved at the time of the asset sales; and (2) the increase in commercial real estate values after the RTC had disposed of Carteret's assets.

With respect to the former proposition, Professor Calomiris will testify that the RTC typically achieved lower sales proceeds than would have been achieved by thrift management. Calomiris May 2007 Report at ¶¶87-93. This common sense proposition is confirmed by numerous statements by former government officials. For example, Stuart Root, the executive director of the FSLIC from 1987 to 1989, has noted that "assets lose up to twenty percent of value when they are taken over by the government for disposition. A liquidation program involving hundreds of billions of dollars in assets is thus bound to have an adverse impact on values of assets held by institutions." Stuart D. Root, *Bank Capital, Asset Liquidation, and the Credit Crunch*, 1993 COLUM. BUS. L. REV. 169, 182-86 (1993). Similarly, former FDIC chairman William Seidman has observed that "[i]t is very clear that assets lose value as they are moved out of banks and into a liquidation mode." Steve Klinkerman, *The High Road is Costing RTC Time and Money*, AMER. BANKER, Aug. 6, 1990, at 1.[27] And in this very case, Mr. Vigna testified during his deposition that seizure of a thrift typically reduces the thrift's franchise value

[27] Roger Watson, the former director of research for the FDIC, has also noted that "[a]s soon as the FDIC assumes the bad loans from a failing bank that's being taken over, the assets suffer an immediate loss of about 15% in value." Kenneth H. Bacon, *As Deposit Insurance Dwindles, FDIC Wonders If It Should Start Running the Banks It Seizes*, WALL ST. J., Dec. 31, 1990, at A30.

by 10 to 15 percent. Vigna Dep. at 127-128, 187-189. Notably, this decrease in value does not even take into account the decreases in asset values caused by such things as the operation of the RTC's minority preference program. *See* Calomiris May 2007 Report at ¶¶ 91-93; Calomiris July 2006 Report at ¶¶ 88-99.

For these and other reasons, it is eminently reasonable to conclude that had Carteret rather than the RTC disposed of its commercial real estate assets, Carteret would have achieved higher returns on such assets. Carteret therefore would not have needed to book substantial additional loss reserves for those assets. Moreover, the conclusion that Carteret's reserves on these assets would have been more than sufficient in the no-breach world to cover any ultimate losses on those assets is reinforced when one considers that commercial real estate values began to recover after 1992, and significantly and more-or-less consistently increased throughout the remaining part of the decade. Calomiris May 2007 Report at ¶¶ 94-100.

**e. Carteret's supposed failure to mitigate by raising capital**

The government has recognized that if Carteret had met its tangible capital requirements in 1992—that is, if Carteret had on hand an additional $150 million in tangible capital—OTS would not have seized the thrift. *See, e.g.*, Vigna Dep. at 158; Albanese Dep. at 159-61; Downey Dep. at 213; Fiechter Dep. 87-88. As stated above, Plaintiffs will demonstrate that absent the breach, Carteret could have easily remained in compliance with capital requirements. Plaintiffs will also demonstrate, that even in a world **without supervisory goodwill**, Carteret could have met its capital requirements but for the breach's collateral consequences and the government's subsequent actions in blocking Carteret's attempts at mitigation. This demonstration will serve to show that the government caused the total loss of Carteret's value. It will also rebut, as both

factually and legally untenable, the government's likely argument that Plaintiffs' contentions about its ability to raise capital in a non-breach world are undermined by the fact that Carteret did not actually raise capital in the breach-affected world.

As already noted, a non-compliant thrift has only two options to increase its ratio of capital to assets: (1) attempt to raise capital or (2) sell assets (and use the sales proceeds to pay down liabilities). *CalFed*,, 245 F.3d at 1350. Because by 1992 Carteret had a negative net worth, it ultimately had to raise capital if it was to survive. But the breach made this exceedingly difficult: many outside investors feared the government's erratic regulatory posture and were unwilling to invest in the thrift industry. *See Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. at 562 (finding that potential investors in a thrift withdrew their bids after the passage of FIRREA due to "a new policy not to invest in the thrift industry," and that the thrift's "later efforts to raise capital also failed because it was 'impossible to attract investors' once New Western was designated as 'critically undercapitalized' by OTS"). More significantly, once Carteret was on the verge of securing outside investment, the government exacerbated the breach by seizing the bank just before the deals could be consummated. Thus, the breach not only caused Carteret to fall out of capital compliance, but also made it nearly impossible for the thrift to work its way back into compliance. And then, after years of efforts by Carteret to mitigate the breach, OTS delivered the final, fatal blow by refusing Carteret the additional time it needed to obtain a capital infusion. *See Winstar*, 518 U.S. at 870 ("[T]he Government exacerbated its breach when it seized the liquidated respondents' thrifts for regulatory noncompliance.").

Where, as here, a breaching party exacerbates the breach and blocks efforts at mitigation, the breaching party is liable for the full extent of the harm it caused. *See* 5 ARTHUR CORBIN, CORBIN ON CONTRACTS § 1039, at 250-51 (1964) ("Losses are not regarded as avoidable if the

defendant prevents the plaintiff from taking the steps necessary to avoid them."); 11 ARTHUR CORBIN, CORBIN ON CONTRACTS § 57.11 (same); *Nyquist v. Randall*, 819 F.2d 1014, 1019 (11th Cir. 1987) (same); *Toyota Indus. Trucks USA, Inc. v. Citizens Nat'l Bank*, 611 F.2d 465, 471 (3d Cir. 1979) (same). This Court's decision in *Koby v. United States*, 53 Fed. Cl. 493 (2002) illustrates the point. In *Koby*, the Court found that the IRS breached its contract with Mr. Koby by voiding the sale of property he had won at auction. *Id.* at 494. The IRS argued that Mr. Koby failed to mitigate his damages because he did not participate in a second auction for the property. The Court rejected this argument, noting that Mr. Koby's failure to participate in the auction was due, in part, to actions by the IRS. The Court explained that "as the party in default, [the Government] was all the more duty-bound to minimize damages and thus should not be heard to complain of plaintiff's supposed failure to mitigate when that failure, at least in part, is attributable to its own employees[]. . . ." *Id.* at 500 (citing 5 CORBIN ON CONTRACTS § 1039, at 250-51). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 350, ill. 2 (noting that breaching party's refusal to accept contracted-for item means that nonbreaching party made reasonable effort); *Belmont Indus., Inc. v. Bechtel Corp.*, 425 F. Supp. 524, 527 (E.D. Pa. 1976) (noting that a defendant's preventing a plaintiff's mitigation of damages in a contract case "would affect the amount of damages recoverable if a breach of contract by defendants is established"). Here, the government was likewise duty-bound to minimize the damages of the FIRREA breach but failed to do so. Accordingly, the government is liable for the full extent of its breach—a breach which initially stripped Carteret of significant value and, despite the thrift's significant efforts at mitigation, ultimately stripped it of all value.

## C. Carteret Can Prove Its Expectancy Damages With Reasonable Certainty

The Federal Circuit has made clear on multiple occasions that, with respect to claims for expectancy damages, " 'if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of damages.' " *Glendale Fed. Bank, FSB*, 378 F.3d 1313, 1314 (Fed. Cir. 2004) (quoting *Bluebonnet*, 266 F.3d at 1356-57) (internal quotation marks omitted)); *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) (quoting *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)). "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ." *Bluebonnet,* 266 F.3d at 1355. The Federal Circuit has also emphasized that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman*, 317 F.3d at 1374. In short, provided AmBase can demonstrate that it sustained some injury because of the government's breach, it need only demonstrate a fair and reasonable approximation of damages in order to recover.

Here, it cannot reasonably be doubted that the government's breach necessarily gave rise to severe injury. As the Federal Circuit has recognized, the government's supervisory goodwill promise had **"substantial value."** *Glendale*, 239 F.3d at 1381-82 (emphasis added). FIRREA eliminated that value by breaching Carteret's contractual right to count its supervisory goodwill toward its regulatory capital requirements. As we will demonstrate at trial, this breach forced Carteret to shed performing assets and liabilities on which it was earning a positive spread. The loss of an item with "substantial value" establishes that Carteret sustained economic injury and more than demonstrates a reasonable probability of damage.

Because there can be no legitimate question that the evidence clearly establishes a "reasonable probability of damage[s]," *Bluebonnet*, 266 F.3d at 1356-57 (quotation marks omitted), the question becomes whether AmBase's trial evidence will allow the Court to make a "fair and reasonable approximation" of damages. *Id.* at 1357 (quotation marks omitted). Professor Calomiris's damages analysis and the other evidence offered at trial will easily satisfy this standard.

At trial, Professor Calomiris will demonstrate with reasonable certainty each of the alternative measure of damages sought by Carteret. The primary damages that we seek in the alternative are: (1) the discounted present value of Carteret's future earnings as of 1989; (2) the undiscounted stream of Carteret's future earnings as of 1989; (3) Carteret's current fair market value in a non-breach world.

1. The most powerful evidence of Carteret's fair market value prior to the breach is AmBase's arms-length acquisition of Carteret in August 1988 for $266 million dollars. This valuation of Carteret is supported by a formal fairness opinion provided by CS First Boston. PX 5257 (First Boston Fairness Opinion Report). In the course of 200 pages of analysis, First Boston concluded that Carteret's book value was $306 million. *Id.* Thus, the purchase price of $266 million represented a market-to-book ratio of .87. *See* Calomiris 2007 Report at ¶ 24.

The validity of this valuation is further confirmed by the actions of Chase Manhattan Bank. Specifically, in June of 1988, Chase entered into a $300 million credit agreement with AmBase for the specific purpose of funding the acquisition of Carteret. The collateral for the loan was Carteret's stock. Chase's willingness to accept Carteret's stock as collateral for the $300 million confirms the substantial value of Carteret. *See* Calomiris May 2007 Report at ¶ 15.

Over the next year, Carteret paid several large dividends that reduced its book value to $269 million as of July 31, 1989. *See* Calomiris May 2007 Report at ¶ 23. Applying a market-to-book ratio consistent with the price paid by AmBase, Professor Calomiris estimates that Carteret's value as of July 31, 1989 was at least $251 million. *See* Calomiris May 2007 Report at ¶ 24. This valuation is confirmed by a bid to acquire Carteret in May 1989 by Carteret's former directors. Specifically, former Secretary of State Al Haig and Harry Jacobs, the former Chairman of Prudential Bache Securities, offered to buy Carteret for $252 million. *See* Calomiris May 2007 Report at ¶¶ 19-20. Although AmBase declined to accept this bid, *id.*, the bid provides independent confirmation of Professor Calomiris' conclusion.

2. As this Court noted in *Suess*, 52 Fed. Cl. at 231, a firm's stock market capitalization "establishes how the market valued future income . . . discounted to present value . . . ." But as noted above, the Federal Circuit in *Energy Capital* has now made clear that only post-trial profits are to be discounted. In other words, those profits reflected in Carteret's value that would have been realized from 1989 to the present should not be discounted. Indeed, such discounting would serve no economic purpose at all. Instead, the face amount of these profits should be awarded as damages.

Professor Calomiris has calculated the face amount of the pre-trial earnings implied by Carteret's 1989 stock market valuation. This calculation depends on two variables (1) an appropriate discount rate and (2) the market's predictions about future earnings. With respect to the discount rate, Professor Calomiris utilized Carteret's cost of capital, which he conservatively estimates at 12 percent. *See* Calomiris May 2007 Report at ¶ 120. Professor Calomiris derived this cost of capital as the result of a series of regression analyses keyed off of the capital issuances of other thrifts. In reality, it would have been extremely difficult for Carteret to raise

equity capital for a twelve percent rate of return in 1989. But by using a low discount rate, Professor Calomiris has effectively lowered the estimate of the face amount of future lost profits in Carteret's stock market valuation—that is, for a given price, here $251 million, a higher discount rate would have implied higher expected future earnings.

With respect to the stream of earnings reflected in Carteret's stock market valuation in 1989, Professor Calomiris relies upon Carteret's historical earnings from 1982 through 1988 which averaged to $20.5 million. *See* Calomiris May 2007 Report at ¶ 35. Carteret's average earnings over the life of a business cycle reflects the reasonable expectation of investors. In addition, Professor Calomiris has conservatively estimated future growth in income at a rate of four percent. This 4 percent growth rate is derived by the application of well-established principles of corporate finance and is derived from the value of Carteret of $251 million. *See* Calomiris May 2007 Report at ¶ 36. A 4 percent growth rate is a conservative assumption since profits in the banking industry have reached historic highs over the last 15 years. *Id.* Indeed, even with a 4 percent growth rate, Professor Calomiris estimates that Carteret would have earned a return on assets of no more than 66 basis points. In reality, financial institutions made much higher returns over the relevant period.

Based on these conclusions, Professor Calomiris demonstrates that the face amount of earnings implied by Carteret's 1989 market valuation from the time of the breach to the present is equal to $595 million. *See* Calomiris May 2007 Report at ¶ 36, Table 6. Awarding this amount is not the equivalent of awarding pre-judgment interest, as the government has previously suggested. Rather, the $595 million simply reflects the face amount of the earnings Carteret was expected to realize in 1989 and would in fact have realized. Prejudgment interest

would result from increasing this face amount by an interest factor, a calculation Professor Calomiris did not perform.

3. As demonstrated above, the evidence will establish that Carteret would have survived absent the breach. As the government's own experts have acknowledged, the last 15 years has been a golden era of banking. If Carteret had not failed, it would have participated in this era of prosperity and would be a thriving franchise today. Thus, in order to be made whole, Carteret should be awarded its value as of the present time. We certainly concede that awarding the value of Carteret as of 1989 has the virtue of absolute certainty. But Professor Calomiris has calculated Carteret's current fair-market value through a variety of metrics that establish this amount with reasonable certainty.

Professor Calomiris's analysis of the current value of Carteret is premised on its value of $251 million as of 1989. Professor Calomiris then tracks the changes in that valuation that would have occurred since 1989 by analyzing market-to-book ratios and stock market returns both for specific thrift peers and for the overall S&L industry.

Professor Calomiris's preferred method of valuation depends upon the book value of Carteret. Professor Calomiris conservatively estimates the book value of Carteret at present as $474 million. *See* Calomiris May 2007 Report at ¶ 38. In essence, Professor Calomiris assumes that Carteret would have increased its book value by approximately $10 million a year over the last twenty years, even though actual earnings would certainly have been more robust. *See* Calomiris May 2007 Report at ¶ 41. Applying prevailing market-to-book ratios to Carteret's current book value yields a valuation of $1.097 billion. *See* Calomiris May 2007 Report at ¶ 38. This is Professor Calomiris's preferred damages estimate. Nevertheless, he notes that utilizing

the market-to-book ratios of stand alone thrifts in business from 1989 to the present yields valuations of approximately $3 billion. *See* Calomiris May 2007 Report at ¶ 43.

As a confirming analytic, Professor Calomiris has also analyzed the stock market return of thrifts. Drawing upon both the SNL thrift index and the NASDAQ bank index, Professor Calomiris demonstrates that the value of Carteret today would be approximately $1.7 billion. *See* Calomiris May 2007 Report at ¶ 37.

4. Finally, Professor Calomiris makes an additional adjustment to all three methods of measuring Carteret's value. First, the market valuation is grossed-up for taxes. This approach is justified because market valuations reflect present valuations of **after-tax** cash flows. For example, if the stock market expects a company to earn $20 million a year on a pre-tax basis and that company has a 35 percent tax rate, then the market will value those earnings at $13 million, discounted back to present value. Expectancy damages are awarded on a pre-tax basis since the IRS takes the position that such damages are themselves subject to taxation. Accordingly, the valuations for Carteret must be grossed-up if plaintiffs are to be whole.

Second, with respect to the current valuation of Carteret, Professor Calomiris adds back the dividends that Carteret would have paid from 1989 to the present. Those dividends reflect profits that Carteret would have earned. Specifically, drawing upon an industry average dividend payout ratio of 31 percent, Professor Calomiris concludes that approximately one-third, or $188 million, of Carteret's profits from 1989 to the present would have been paid out as dividends. This amount is added back to Carteret's current valuation in an effort to make the institution whole.

5. If the court does not agree that all aspects of Professor Calomiris' damages calculation have been proved with reasonable certainty, the court has discretion to modify the

calculation as the court sees fit. The court is not confronted with an all-or-nothing choice. In *Bluebonnet*, the Federal Circuit stated: "We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages—but only where the evidence adducted was sufficient to enable a court or jury to make a fair and reasonable approximation." 266 F.3d at 1357; *see also Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1346 (Fed. Cir. 2003) ("We reiterate the point made in our prior opinion that, at a minimum, jury verdict damages would be appropriate in this case."). Accordingly, in *Globe* Judge Lettow combined components of two different lost profits damages analyses and then modified the hybrid before arriving at an appropriate measure of damages. *Globe*, 65 Fed. Cl. at 351-57; *see also Commercial Fed. Bank, FSB v. United States*, 59 Fed. Cl. at 351 (though satisfied that the plaintiff had proved the amount of lost profits damages that it set out to prove, Judge Futey noted that "under the jury verdict method, this amount [of lose profits damages] would be a fair and reasonable approximation of the damages caused by FIRREA.").

## II. PLAINTIFFS SUFFERED SIGNIFICANT WOUNDED BANK DAMAGES

This Court has recognized that a thrift may recover wounded bank damages caused by the breach. *Slattery*, 69 Fed. Cl. at 578. "Specifically, 'wounded bank' damages are costs incurred by the thrift because of its status as a 'troubled' or under-capitalized institution—a status directly related to FIRREA's mandated removal of goodwill from the thrift's regulatory capital." *Id.* The Court has characterized such damages as "incidental reliance damages." *Id.*; *see also Glendale Fed. Bank, FSB v. United States*, 43 Fed. Cl. 390, 403 (1999), *aff'd in part and vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001) (stating that reimbursement "for costs [a thrift] never would have incurred had the contract not been entered" are "classic reliance damages"). Because there is some overlap between damage measures, *see Glendale Federal Bank, FSB v.*

*United States*, 43 Fed. Cl. at 408, wounded bank damages might also properly be included in the valuation of expectancy damages. Indeed, the Federal Circuit has held that expectancy damages include any losses caused by the breach, including incidental losses. *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d at 1380 (citing RESTATEMENT (SECOND) OF CONTRACTS § 347); 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:2, at 30 (4th ed. 2002).[28] Since the evidence at trial will demonstrate that the breach caused Plaintiffs to suffer significant wounded bank damages, that these damages were foreseeable, and that they can be measured with reasonable certainty,[29] the label applied is inconsequential.

Carteret suffered significant wounded bank damages that would not have arisen but for the breach. Most significantly, Carteret incurred huge increases in its relative cost of deposits. *See* Calomiris May 2007 Report at ¶ 59-67. This Court has held that such costs "are actual, ascertainable damages suffered by [a thrift] as a result of the breach." *Glendale Fed. Bank, FSB v. United States*, 54 Fed. Cl. 8, 14 (2002), *aff'd*, 378 F.3d 1308, 1311-12 (Fed. Cir. 2004). At trial, Professor Calomiris will demonstrate that the breach caused Carteret's relative cost of deposits to increase, as the market's reaction to the increased risk of Carteret's failure as a result of the breach manifested itself through increased interest rates offered depositors as well as deposit outflows. While Carteret enjoyed an advantage in the pricing of its deposits relative to other thrifts prior to the breach, it lost that advantage as a result of the capital problems it experienced subsequent to the breach. *See Glendale*, 43 Fed. Cl. at 408 ("The evidence showed

---

[28] "Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction." RESTATEMENT (SECOND) CONTRACTS § 347 cmt. c; *see also* WILLISTON § 66:55-56, at 664-77.

[29] In *Slattery*, this Court stated that wounded bank damages "must not be speculative." 69 Fed. Cl. at 578.

that Glendale lost an historical cost advantage over its competitors because the government's breach ultimately forced Glendale out of capital compliance. . . . It also showed that a typical and logical response is to raise rates to both attract and keep deposits.") Professor Calomiris has conservatively estimated that by September 30, 1992, Carteret had paid at least $17 million in excess deposit costs as a direct result of the breach. Absent the breach, these expenses would not have been incurred, and Carteret's capital position would have been enhanced by a like amount. Calomiris July 2007 Report at ¶ 2-10.

The breach also required Carteret to make several other incidental outlays. First, in the immediate aftermath of FIRREA's passage, several Carteret executives felt that the thrift was a "sinking ship." PX 6409 (Compl., *Riether v. AmBase Corp.*, No. UN-L-5594 (N.J. Super. Ct.) (filed Sept. 13, 1993) at ¶ 14). To avoid the additional harm that a mass exodus of executive personnel would entail, Carteret had to induce these employees to remain with the company by entering into severance agreements with them in December 1989 and January 1990. *Id.* The cost of these agreements, including litigation that ensued over them, was $9,684,039.32.

Second, Carteret incurred transaction costs associated with the breach-necessitated asset shrink and capital-raising efforts. As discussed above, Carteret was forced to sell branches in 1990. The transaction costs attendant to these sales—including data processing, investment banking fees, accounting fees, severance payments, and legal fees—totaled $2,353,000. *See* Calomiris May 2007 Report at ¶ 103. Similarly, Carteret's efforts in 1992 to raise capital entailed transaction costs—including financial and placement advising and due diligence services—totaling $632,750. *See id.* at ¶ 104.

Third, Carteret incurred significant costs in responding to the heightened regulatory scrutiny that accompanied Carteret's breach-weakened financial status. For example, when the

OTS initiated administrative cease and desist proceedings against Carteret, the thrift incurred nearly $200,000 in legal fees. As the evidence at trial will show, the total amount of such costs from the time of breach to the time of seizure ran to more than $1,200,000. *See id.* at 90.

Because the government's breach deprived Carteret of necessary regulatory capital, it was reasonably foreseeable that the thrift would incur costs related to its shortage of regulatory capital. *See, e.g., Home Sav. of Am., FSB v. United States*, 399 F.3d at 1355 (holding that it was foreseeable that a thrift would "incur expenses to replace . . . lost supervisory goodwill" after FIRREA). Moreover, because the government's breach caused Carteret's capital problems constraints, the breach necessarily caused the thrift to incur the costs of addressing those problems. *See, e.g., Glendale,* 378 F.3d at 1311-12. And, as detailed in Professor Calomiris's report, the Plaintiffs will prove these costs with reasonable certainty at trial.

As to some of the incidental damages outlined above, the government can be expected to argue that Carteret did not incur the costs because AmBase paid them. This contention is foreclosed by the Federal Circuit's decision in *Hughes Communications Galaxy, Inc. v. United States*, which flatly held that a non-breaching party to a contract can recover the costs of the breach even if those costs were "passed through" to a third party. 271 F.3d 1060, 1072 (Fed. Cir. 2001). *See also United States v. Burton Coal Co.*, 273 U.S. 337, 340 (1927) (holding that a breaching party's "liability is not measured by [the non-breaching party's] losses or gains, if any, under its agreements" with third parties). The Federal Circuit's decision in *Granite Management Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005) is not to the contrary. In that case, the court held a thrift could not recover costs covered by a cash infusion from its parent corporation. The instant case differs in an important factual respect from *Granite*: here, the same party that breached the contract and caused the incidental costs also pressured the parent company to cover

the thrift's costs. Nothing in *Granite* suggests, and indeed it cannot possibly be the law, that a breaching party can insulate itself from liability for the breach by coercing a third party to bear the costs. To the extent *Granite* can be construed to block recovery in this case, it is inconsistent with the Supreme Court's holding in *Burton Coal*.

## III. AMBASE IS ENTITLED TO RELIANCE DAMAGES

If for some reason the Court concludes that expectancy damages are not recoverable, Plaintiffs are still entitled to reliance damages measured by the value of Carteret at the time of the contracts. A party's "reliance interest is 'his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made . . . .' " *Glendale Fed. Bank v. United States*, 54 Fed. Cl. at 11 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344(b)). "The central idea behind reliance damages is that 'a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise.' " *Slattery,* 69 Fed. Cl. at 576 (quoting *Glendale*, 239 F.3d at 1382).

In *American Capital Corp. v. United States*, this Court found that a thrift's reliance interest in a goodwill contract "was fixed as the cost of performance for the [agreement], *i.e.*, what was 'put on the table' by plaintiffs as consideration for FSLIC's agreement to convey to" the thrift the failing institutions and the permission to treat their debt as amortizable supervisory goodwill. 66 Fed. Cl. 315, 333 (2005). On the table was "an ongoing business" with a fixed equity value on the date of the transaction, "which was the contract 'price' paid as performance for the benefits set forth in the [agreement]." *Id.* at 334. On appeal, the Federal Circuit reversed the decision, finding that the reliance claim in that case belonged to the thrift rather than the

holding company. *See American Capital v. United States*, 472 F.3d 859, 865-67 (Fed. Cir. 2006). Critically, however, the Court did not question the underlying basis for or calculation of those damages. Indeed, under Federal Circuit precedent, reliance damages measured by the value of businesses contributed to a supervisory merger are an appropriate measure of FIRREA-induced harm. *See e.g.*, *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1356 (Fed. Cir. 2005); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308-09 (Fed. Cir. 2004).

As in *American Capital*, Carteret put the value of its ongoing business on the table and at risk as consideration for the acquisition of severely troubled thrifts, and did so in reliance on the government's regulatory capital promises. The value of Carteret immediately prior to the 1986 transaction was $272.5 million. *See* Calomiris May 2007 Report at ¶ 11. Accordingly, by relying on the government's promises, Carteret lost $272.5 million.

"In order to recover reliance damages, the 'plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation.' " *American Capital*, 472 F.3d at 867 (quoting *Landmark Land Co. v. FDIC*, 256 F.3d at 1378). For the reasons discussed above, the government could foresee—indeed, the government foresaw—that stripping Carteret of its supervisory goodwill would cause the thrift to fail and thus be put in a position far worse than if the contract had never been made. And this is all Plaintiffs need to show for recovery. It is the government's burden to prove the breach did not cause this loss. *See id.* at 869. As aptly stated in *American Capital*, "by choosing to breach the contract, the government chose to shoulder the burden of proof under the reliance theory of damages." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a). *See also* RESTATEMENT § 349. For the reasons already discussed, the government cannot possibly show that Carteret would have lost the value of its equity if the government had honored the contract.

## IV. AMBASE IS ENTITLED TO RESTITUTION DAMAGES

If nothing else, AmBase is entitled to restitution for the government's breach. Restitution damages seek to restore to a plaintiff "any benefit that he has conferred on the other party." RESTATEMENT (SECOND) OF CONTRACTS § 344(c). "The applicability of restitution as an alternative remedy for breach is well-established in both the federal and state courts." *Acme Process Equip. Co. v. United States*, 347 F.2d 509, 528 (Ct. Cl. 1965). *Acme Process* makes clear that restitution damages are available in breach of contract cases against the government. *Id.* at 529 (" 'When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments.' " (quoting *Perry v. United States*, 294 U.S. 330, 352 (1935)). This Court has noted that restitution damages in *Winstar* cases may be appropriate, and has left open the possibility of awarding them. *See Slattery v. United States*, 69 Fed. Cl. 573, 586 (2006).

According to government reports prepared immediately prior to the Barton and Delray acquisitions, accepting the next best bid on Barton would have increased the cost to the government by $23.5 million, and accepting the next best bid on Delray would have increased the cost to the government by $20 million. *See* Calomiris May 2007 Report at ¶ 10. As for the 1986 acquisitions of First Federal and Mountain Security, contemporaneous government reports show that Carteret's involvement saved the government $5 million over accepting the next highest bids. *See id.* at ¶ 11. Accordingly, for the breach of the 1982 and 1986 contracts, Carteret is entitled to $48.5 million in restitution damages.[30]

---

[30] We also note that the Government saved $709 million in liquidation costs as a result of Carteret's performance. *See* Calomiris ¶ 11 n.15.

## V. THE RECEIVERSHIP DEFICIT IS OVERSTATED

### A. Section 1821 Does Not Bar Review of the Validity of the Receivership Deficit.

This Court has already held, correctly, that 12 U.S.C. § 1821 does not prevent it from reviewing the receivership deficit to determine whether and to what extent the deficit constitutes a valid offset to the damages that the United States owes AmBase for breaching the contract. *AmBase Corp. v. United States*, 61 Fed. Cl. 794, 798-99 (2004). The evidence AmBase will submit confirms this Court's conclusion.

First, the evidence will show that the bulk of the receivership deficit is a direct result of Congress's own actions. Section 1821 does not purport to bar review of actions taken by **Congress** to inflate the receivership deficit. Even the government's sweeping interpretation of Section 1821—that it "prevents this Court from reviewing its management of a receivership, or indeed any of its actions as a receiver," *id*. at 798—does not reach that far. If Section 1821 did bar such review, it would violate due process. *See Reich v. Collins*, 513 U.S. 106 (1994) (state's elimination of post-deprivation review of tax assessment violates due process where no genuine pre-deprivation review was available either).

As we explain in detail in the sections that follow, Congress caused Carteret to have to borrow funds to finance its resolution, and consequently to incur interest on those loans, in several ways. In order to comply with Congress's mandate that performing assets be made available to minority acquirers, the RTC refrained from selling or transferring Carteret's assets; Carteret could have used these assets to finance the resolution. In addition, the effort to afford minority bidders their congressionally mandated preference delayed the resolution so much that the winning bidders eventually reduced their bids by $19 million. In addition, Congress withheld

funding from RTC for over a year, thereby reducing the resolution value of Carteret by $43 million. Congress eliminated supervisory goodwill, which reduced the resolution value of Carteret by over $40 million. And if Congress had not destroyed Carteret's value in these various ways, Carteret would have had sufficient funds to pay off its tax liability (assuming it is valid) and avoid interest charges on that liability. Moreover, in the FDIC's view, the exorbitant rate at which post-insolvency interest accrued on the loans was set by Congress.

As this Court previously recognized, the government's reading of *Bailey v. United States,* 341 F.3d 1342 (Fed. Cir. 2003) seems to empower the government to "prevent Plaintiffs from recovering any amount by compounding the interest owed on the receivership deficit and pursuing other actions which enlarge the deficit, and then simply relying on the passage of time to protect the government from recovery." *AmBase*, 61 Fed. Cl. at 802. Discovery has revealed that the government has indeed pursued other actions that enlarged the deficit, namely, the numerous wrongful actions just discussed—including compounding the interest owed on the chimerical receivership deficit at a usurious rate. By attempting to wipe out the entire receivership surplus through these wrongful actions, the government has, in effect, taken away one of Carteret's basic contract remedies, an action for damages. And certainly no principle of contract law permits the breaching party to exacerbate with impunity the damages from its breach. *See, e.g.*, 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1039 (1964) ("Losses are not regarded as avoidable if the defendant himself prevents the plaintiff from taking the steps necessary to avoid them."); *Nyquist v. Randall*, 819 F.2d at 1019 (same); *Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank,* 611 F.2d at 471 (same); *Koby v. United States,* 53 Fed. Cl. at 500 ("Indeed, as the party in default, defendant here was all the more duty-bound to minimize damages."). Only judicial review of the receivership deficit can ensure that the contract damages

remedy provides just compensation. Short of that, FIRREA must constitute a taking of Carteret's contract.

**B. The FDIC Breached Repeatedly Its Fiduciary and Statutory Duties Toward Carteret and AmBase.**

As demonstrated above, Carteret would not have failed absent the breach, and thus there would have been no receivership deficit in the absence of a breach. For this reason, just as in *Slattery*, the receivership deficit has no relevance to an award of damages. The very purpose of expectancy damages, which aims to make plaintiffs whole, necessitates this approach. Any other rule which allowed injury flowing from the breach to offset a damages recovery would render expectancy damages a dead letter. The Department of Justice has vigorously contested the Court's holding in *Slattery* on the ground that it is foreclosed by *Bailey*. But *Bailey* simply stands for the proposition that the receivership deficit is not typically an asset available for recovery.

Nevertheless, in light of the Department's position, we respectfully request that the Court make findings of fact that the receivership deficit is at the level of fact and law invalid. As we demonstrate in the pages below, the deficit is a product of a series of self-dealing transactions that have the sole effect of inflating the receivership deficit and thus siphoning off Carteret's damages award for the United States Treasury. Even if the Department of Justice's strained reading of *Bailey* is correct, surely there is no basis for subtracting artificially created liabilities that are the result of Enron-style accounting. Nor can the defendant, the United States, avoid liability for harm flowing directly from Congressional enactments.

In managing the Carteret receivership, the government breached its fiduciary and statutory duties to act in the best interest of Carteret and its creditors. As a direct result of these breaches, the government inflated the receivership deficit.

**1. The tax "liability" is a phantom liability that will never be paid by the FDIC.**

The FDIC includes a tax "liability" of some $100 million on the receivership's balance sheet. But during discovery, the FDIC candidly acknowledged that this tax liability was "**artificially created**." Vortriede Dep. at 388 (emphasis added). And it is transparently so. It is self-evident that a receiver that claims to have a non-tax deficit of more than $160 million cannot also have been so wildly profitable that it owes tens of millions of dollars in taxes. The only way such a counterintuitive result could occur is if the receiver (1) improperly included non-taxable income on the tax returns or (2) failed to take permissible deductions. Here, the FDIC did both.

To be sure, the FDIC acknowledges that the tax liability is "contingent in the extreme." FDIC's Statement with regard to Summary Judgment at 8 (Filed Nov. 7, 2007). But the more important point is that the evidence demonstrates that the imposition of any tax liability on the receivership was, in the FDIC's words, an "artificial creation" resulting from FDIC's inexplicable failure to take valid deductions. Indeed, even the IRS, in the *Suess* case, agreed that the FDIC can take the deductions at issue here. Thus, the Court should find that taxes are not a valid component of the receivership deficit. In the absence of such a finding, there is a very real threat that plaintiffs will be held in limbo for several years as the FDIC and the IRS "negotiate" over the phantom tax liabilities created by the FDIC.

Tellingly, not even the IRS views the tax liability as fixed, given that the agency does not have a valid claim on file with the FDIC and is not even permitted to make an assessment against the receivership until sufficient funds are available to pay the subrogated claim. PX 5051 (email re footnote – Carteret); 26 U.S.C. § 7507(b) (prohibiting the IRS from making any assessment against a receiver until sufficient funds are available to pay depositors).

**2. The tax liability is a creation of the FDIC's repeated errors in filling out Carteret's tax returns.**

The tax liability arises solely from the amended 1995 return, which purports to show taxable income of $85 million. But there was more than $160 million of deductions available to Carteret that could have been applied to eliminate this tax liability in its entirety. The FDIC has admitted that it failed to take tens of millions of dollars of deductions that were available to Carteret in 1995, and it has represented that it is committed to correcting those errors. Vortriede Dep. at 362. And the FDIC has acknowledged that the IRS has been "generally cooperative" in allowing such errors to be reversed and that the IRS has been interested in "determining the proper tax over the period." Vortriede Dep. at 143, 362. Thus, it is highly likely that these errors will be corrected. Vortriede Dep. at 366.

As we demonstrated in our Statement of Issues, there are three significant deductions that the FDIC failed to take relating to (1) the treatment of federal financial assistance ("FFA"), (2) accrued interest, and (3) net operating loss ("NOL") carryforwards. We briefly summarize each of these errors below.

**a. The FDIC concedes that it erroneously overstated taxable income as a result of its treatment of federal financial assistance.**

The FDIC concedes that it mishandled the treatment of federal financial assistance. The FDIC's error resulted in a $21.9 million overstatement of the receivership's taxable income.

Section 597 of the Internal Revenue Code governs the tax ramifications of government contributions needed to bail out insolvent thrifts and banks, known as federal financial assistance. 26 U.S.C. § 597. Statement of Issues at 33-34. The FDIC admits that **none of the key tax returns filed prior to 1997 conformed to the final IRS regulations implementing section 597**. *See, e.g.*, Vortriede Dep. at 175.

In light of these acknowledged errors, the FDIC has maintained in an internal memorandum that "regardless of whatever mistakes may have been made in the past by the RTC or FDIC, or by the IRS in being slow to enact regulations**, there are still compelling reasons for the IRS to abate these taxes** with or without reopening the statute." PX 4418 (Tax Issues Related to the Goodwill Litigation) (emphasis added). And the IRS has evidenced its willingness to work with the FDIC in "determining the proper tax over the period [rather] than . . . hiding behind statute, closed statute dates, old regulation rules which were more punitive than finalized regs." Vortriede Dep. at 362. Indeed, the IRS agreed to a dramatic reduction in the taxable income of Ben Franklin by agreeing to the application of the final regulations, rather than its prior guidance. PX 5106 (Transcript of Fairness Hearing at 16).

The FDIC itself has recalculated the amount of tax that is due under the final regulations, admitting that for the years 1992 to the present, Carteret should not have included any FFA as taxable income in any of its tax returns. *See* Vortriede Dep. at 175 (acknowledging that no FFA should have been included for the years 1992 through 2004). Under the FDIC's revised calculations, the taxable income for Carteret in 1995 should be reduced by $21.9 million. PX 4428 (Summary of FFA Recomputations and Supporting Tax Attributes 1992-2004); PX 4430 (Cumulative Data Found for FFA Computation Worksheet 1988-1991).[31]

---

[31] The FDIC has now concluded that Carteret should have reported taxable income of $51.4 million in 1993 and should not have made any adjustments for FFA. PX 4428 (Summary of FFA Recomputations and Supporting Tax Attributes). But the RTC in the initial 1993 return inexplicably used the concept of FFA to reduce that taxable income to zero. *Id.* Thus, the RTC's improper treatment of FFA on the 1993 return **decreased** the receivership's taxable income by $51.4 million, according to the FDIC's own calculations. *Id.* But in 1994, the RTC made an even bigger mistake the other way. Specifically, the RTC included $66.3 million of FFA as taxable income, thereby eliminating a net operating loss ("NOL") of the same amount. In other words, in the absence of the RTC's improper inclusion of FFA in the 1994 return, Carteret would have been able to shield the 1993 tax liability in its entirety and still have $14.9 million of NOL carryforwards available to shield taxable income in 1995. The FDIC has

In light of the FDIC's concession that it improperly calculated FFA in Carteret's returns, and the FDIC's acknowledgment that the IRS seeks to assess the proper amount of tax (as reflected in the Ben Franklin settlement), Carteret's taxable income for 1995 must be reduced by $21.9 million. If Carteret's taxable income for 1995 were reduced by this amount, then the tax liability reflected on the receivership would be at least $20 million lower.

**b. The IRS will allow the FDIC to deduct up to $84 million as an interest expense for 1995.**

The fundamental economic principle underlying the banking industry is that banks generate profit by borrowing money at a low interest rate and lending it out at a higher interest rate, resulting in net interest income. And it is an equally fundamental principle that banks pay tax only on the net income, if any, derived from a positive interest spread—obviously, a bank does not owe tax on all of its interest income without deducting its interest expense. But this is precisely what Carteret's 1995 tax return did. Incredibly, although the FDIC claims that Carteret owes it $48 million in interest for 1995 and more than $80 million in interest over the period in which such interest expense could have offset Carteret's 1995 income, the **FDIC did not deduct any of this interest on Carteret's 1995 tax return**.

In light of the universal practice of financial institutions deducting interest expense to arrive at taxable income, it should come as no surprise that the IRS permits the FDIC to deduct

---

candidly acknowledged as much. *See* Vortriede Dep. at 166. The FDIC has made no adjustments with respect to the 1995 return because that return was premised on the correct conclusion that FFA need not be included in that return.

In addition, Carteret in 1996 had a net operating loss of $6.3 million that was wiped out by the improper inclusion of FFA. The FDIC has now acknowledged that this $6.3 million loss would have been available to shield income in 1995, but for the improper inclusion of federal financial assistance as income. *See, e.g.*, PX 4428 (Summary of FFA Recomutations and Supporting Tax Attributes); Vortriede Dep. at 167. Thus, the combined effects of the errors made in 1993, 1994, and 1996 led to the improper elimination of NOLs of $21.9 million, which should have been utilized to reduce the 1995 tax liability.

interest accruing on the loans made to banks that it has seized. Both the internal e-mails of the FDIC and the sworn testimony of its employees confirm that the IRS permits such a deduction. Indeed, in Ben Franklin when the RTC made a similar mistake in neglecting to deduct accrued interest, the IRS allowed the FDIC to take a deduction in the year that the interest began to accrue, which in that case was 1990. That same result should obtain here. When Carteret's interest expense is included as a deduction in the 1995 return, the tax liability is reduced by more than 90 percent—and it disappears in its entirety when the other adjustments outlined below are made.

**i. The FDIC failed to deduct interest actually paid by Carteret.**

At the beginning of 1995, Carteret still operated 30 branches with deposits of more than $1.3 billion. As a result, Carteret continued to pay interest to its depositors. Specifically, Carteret paid depositors $3.7 million in 1995. The 1995 return submitted by the FDIC for Carteret did not take a deduction for this interest. Obviously, there is no justification for this failure to deduct interest that was actually paid, and Carteret's taxable income for 1995 must be reduced by $3.7 million.

**ii. The FDIC failed to deduct interest actually accruing on loans to Carteret.**

At the time of Carteret's branch sales in January and March of 1995, Carteret's funding for its assets switched from deposits to loans from the RTC, which form the basis of the FDIC's subrogated claim. As noted above, the FDIC has assessed Carteret interest of more than $168 million on these loans (through the end of 2006). But the FDIC failed to deduct one penny of this interest in 1994, 1995, 1996, or 1997, all of which could have been utilized to reduce taxable income in 1995. Under the FDIC's current methodology for calculating the interest on the subrogated claim, $80.5 million in interest accrued on the subrogated claim during these years.

In discovery, the FDIC has explained that the 1995 tax return simply mirrored the FDIC's non-tax books for Carteret, which did not include interest on the RTC's loan to Carteret. Internal documents and witnesses confirmed that the FDIC had an internal policy of reflecting such interest only when 95 percent of the principal balance of the loan had been paid off. Significantly, this policy was not born out of consideration for the requirements of the Internal Revenue Code. Indeed, the FDIC has acknowledged that the IRS's position is that the FDIC may deduct interest on the subrogated claim as of the date the loan was made to the institution in receivership, which here would be 1994 for the loan for the Florida branches and 1995 for the loans for the New Jersey branches. Indeed, an e-mail from Steven Johnston, an accountant in the FDIC's tax department, acknowledged this point with respect to Carteret. The e-mail reads:

> Legal asked that we review Carteret Savings and verify the $76 million tax liability we reported on our 2002 Goodwill estimate. This is another case where had we accrued PII [post-insolvency interest] from the date of our closing [*i.e.*, 1995], **we could have significantly reduced our tax exposure**, and, maybe more importantly, our litigation exposure. In this case, the subrogated claim was nearly $1 billion and it closed early in 1995. **Had we accrued PII the tax liability would have been approximately $9 million instead of $32 million.** This $32 million has now grown to over $76 million with penalties and interest.
>
> While in Dallas, we found a few other examples of where PII accruals from the beginning could have reduced the tax liability. Santa Barbara was one. **It should be noted that the IRS agrees that this is a valid tax deduction available from the date of closing [*i.e.*, 1995].**

PX 5171 (Email re PII Accrual) (emphasis added). And it is precisely because such a deduction was available that the FDIC has admitted the tax liability was "artificially created." (Vortriede Dep. at 388. Every government witness confirmed in discovery that post-insolvency interest is properly deductible under the Internal Revenue Code from the date of closing. Tama Dep. at 113-14; Johnston Dep. at 40-43; Deposition of James Anderson at 87. The FDIC's Rule 30(b)(6) representative on tax matters, James Vortriede, offered the same opinion in an e-mail from 2004.

Mr. Vortriede wrote a colleague at the FDIC: “the way I see it, we ought to accrue and deduct PII from inception [*i.e.*, 1995] as if it will be paid.” PX 5079 (Email re Questions on Tax Return Preparation for Receiverships). During his deposition, Mr. Vortriede agreed that the post-insolvency interest had accrued from 1994 through 1997. Vortriede Dep. at 87-89, 92-94.[32] The legal basis for this conclusion is clear. *See* Corrected Statement of Issues at 41-42.

The impact of this deduction is seismic. As noted above, a deduction for the post-insolvency interest as calculated by the FDIC would eliminate $80.5 million of the $85 million of taxable income reported on the amended 1995 return. (Under the FDIC’s original methodology for calculating interest on the subrogated claim, the amount of interest that could have been deducted on the 1995 return would equal $63.7 million). With $3.7 million of deductions for interest actually paid, a deduction for the interest alone would all but wipe out the tax liability.

Finally, even if the FDIC’s arbitrary practice of deducting post-insolvency interest only after repayment of 95 percent of the principal had been mandated by the Internal Revenue Code (which it was not), it was inexcusable for the Carteret receivership not to take action to come within this policy by the end of 1997. Specifically, at year-end 1997, Carteret had repaid **94.95 percent** of the principal balance of the subrogated claim.[33] At that time, the receiver had more

---

[32] But during cross-examination by the Department of Justice, however, Mr. Vortride suggested that “I think I would take the position” that post-insolvency interest should not be deducted until it was reflected on the financial statements. Vortriede Dep. at 279. This self-serving testimony by the so-called fiduciary of Carteret is inconsistent with his contemporaneous statements, his sworn testimony, the position of the IRS, and as we demonstrate below, dispositive case law. As such, it should be utterly disregarded.

[33] The amount of dividends paid as of 12/31/97 was $1,300,502,797. PX 5090. The initial subrogated claim in the annual goodwill reporting packages and FDIC financial statements was $1,369,700,396. PX 5090.

than $20 million in cash and no remaining operational expenses.[34] If the FDIC had simply used $712,000 of that cash to repay the subrogated claim, it would have brought the repayment to the 95 percent level. In that event, the FDIC would have satisfied its own arbitrary internal policy and would have taken the $80 million tax deduction. Alternatively, if the FDIC had simply done what any sane taxpayer would have done and recognized reality by rounding up its calculation of the amount of repaid principal by 0.05% (*i.e.*, from 94.95 percent to 95 percent), it would have realized that it had *already* satisfied its internal 95 percent policy. The FDIC's failure to take either of these simple steps to avoid this massive tax liability is a blatant example of self-dealing, since it is the United States Treasury that is the direct beneficiary of this manufactured tax liability. No fiduciary is allowed to enrich itself at the expense of its beneficiaries in such a manner.

**c. The FDIC failed to carry forward the 1992 tax return.**

The third inexplicable error reflected in the 1995 tax return relates to the failure to take a deduction for NOL carryforwards that were available to Carteret. In 1992, the Internal Revenue Code allowed taxpayers to carry forward NOLs for 15 years into the future to offset income. But the 1995 return neglects to utilize Carteret's NOLs of approximately $73 million that were generated in 1992 and were available to shield income in 1995. *See* Statement of Issues at 44. Here again, this failure to take a permissible deduction has had the direct effect of artificially increasing the receivership deficit and unjustly enriching the defendant. Carteret cannot be made

[34] The receivership had $20,242,349 in cash and $164,416 in receivables at the end of 1997. PX 1103 (Goodwill Package as of December 31, 1997 at AM00097038).

to pay this government-manufactured liability, and Carteret's 1992 NOL should be applied to reduce, and indeed eliminate, the 1995 tax liability.[35]

**d. Penalties for nonpayment will not be assessed and thus are not a proper component of the receivership deficit.**

The estimated tax liability also includes $10.3 million of penalties. As a threshold matter, we note that the penalties for nonpayment will be eliminated when the underlying tax liability itself is properly calculated and shows that Carteret owes no tax for 1995. But even if Carteret owed tax for 1995, no penalty can be imposed upon the receivership. As an internal memo from the head of the FDIC's tax policy unit explained, "with regard to the late payment penalties, both the interagency agreement for RTC and the Internal Revenue Code 7507 justify deferred payment of income taxes." PX 4418 (Tax Issues Related to the Goodwill Litigation); Vortriede Dep. at 356. Additionally, under the priority scheme, the FDIC is not permitted to pay the IRS until the subrogated claim has been retired. 12 U.S.C. § 1821(d)(11); 12 C.F.R. § 360.3. Thus, as the FDIC acknowledged during depositions, "**essentially by law we're not allowed to pay the IRS so they shouldn't be penalizing us for following the law**." Vortriede Dep. at 351

[35] The most significant errors in the 1995 return are outlined above. But there are numerous other errors in the return: as the return itself acknowledges, "no depreciation was computed," "books and records of most subsidiaries were not available," and issues relating to consolidation were ignored because "pre-resolution information of the parent was not available and is not reflected on the return." PX 4408 (Carteret Federal Income Tax Return, 1996). The return also acknowledged that the method of accounting had been changed because "records are not kept by the FDIC, successor of the RTC, as to the income and expense on the accrual method of accounting. Consequently, the hybrid method was used on the December 31, 1995, federal corporation income tax return." *Id*. The failure to use a pure accrual method accounting violates 26 U.S.C. § 448, and the failure to receive permission to switch accounting methods violated Treasury regulations. *See* 26 C.F.R. § 1.446-1(e)(2)(i). This impermissible change in accounting methodology gave rise to pro forma adjustments necessitated by the switch from a pure accrual method to the hybrid method, which triggered taxable income included in a $19 million "post resolution equity adjustment." Id; Vortriede Dep. at 287, 392. Additionally, no deduction was taken for supervisory goodwill or any other basis in the sale of the branches that generated a premium of $134 million, all of which was taken into taxable income.

(emphasis added). The FDIC's internal documentation and the IRS's conduct confirm that the IRS will not impose penalties on Carteret. Specifically, an internal FDIC memo documented a high-level meeting between the IRS and the FDIC in which "the IRS indicated that penalties would probably be eligible for abatement." PX 4418 (Tax Issues Related to the Goodwill Litigation). The FDIC confirmed in depositions that the IRS "tend[s] to be reasonable with respect to these types of penalties as they should be." Vortriede Dep. at 355.

In light of this reality, the IRS agreed to waive **the entirety** of the more than $200 million in penalties that could have been imposed upon Ben Franklin. Fairness Hearing at 13. The IRS's conduct in the Ben Franklin case confirms the obvious: a taxpayer cannot and will not be penalized for obeying the law. If penalties are agreed to by the FDIC, the only rationale will be to siphon off the damages award for the benefit of the Treasury. Thus, the penalties should be removed from any calculation of the receivership deficit.

**e. Interest on the tax liability is attributable to Congress's actions.**

In its most recent financial statements, the FDIC reflects more than $46.5 million in interest on the tax liability. There are four reasons why this interest is not properly included as a component of the receivership deficit. First, it is entirely derivative of the tax liability and will be reduced on a pro rata basis with the tax liability, so no interest will be charged when the tax liability is eliminated. By way of example, in Ben Franklin, the IRS initially sought interest of $770 million, but then settled with the FDIC for only $38 million in interest because the underlying tax liability had been reduced. *See* PX 5106 (Transcript of Fairnress Hearing in *United States v. FDIC*, DDC No. 02-1427, at 11-12, 13-14).

Second, even if the tax liability were valid, the FDIC **"routinely requests and receives abatement of penalty and interest assessments."** PX 6859. Indeed, the IRS Handbook

specifically states "that penalties and interest will not be asserted against agencies or instrumentalities of the United States." *Id.* Thus, there is no basis to include an interest component on the tax liability in the receivership deficit. *See* PX 6855.

Third, even if the tax liability were genuine, the interest charge would be entirely attributable to the actions of the defendant and thus cannot be an offset to Carteret's damages. Specifically, if Congress had not diminished the franchise value of Carteret by delaying the funding for Carteret's resolution, imposing racial preferences, and eliminating supervisory goodwill, then Carteret would have had sufficient funds to pay the tax liability of $29 million in 1995. *See* Calomiris 2006 Report at ¶ 9 (estimating non-tax surplus to amount to $87 million in the absence of congressional and FDIC conduct that destroyed franchise value). As noted above, Carteret cannot be held liable for damages directly resulting from defendant's conduct.

Fourth, in the context of the FDIC's claim for interest, Professor Calomiris has explained that the FDIC incurs no cost in connection with the subrogated claim because it has the use of Carteret's damage award interest-free. *See id*. at ¶ 12. So too here, the government cannot charge Carteret for the time value of money on the tax liability because there is no cost to the government, nor any benefit to Carteret, from the failure to pay.

**C. The FDIC's Estimates of Post-insolvency Interest Should Be Excluded from the Receivership Deficit.**

The RTC sold Carteret's Florida branches in October, 1994, and its New Jersey branches in two groups in January and March, 1995. PX 4986 (Consolidated Florida Branch Resolution Summary at AM54120696, AM54120691, AM54120693; Calomiris 2006 Report at ¶ 10. Because the RTC needed to make performing assets available to minority bidders under the MPP, most of Carteret's assets were frozen and therefore not immediately available to fund the branch sales. Calomiris 2006 Report at ¶ 10. To complete the sales, the receivership

accordingly borrowed $ 1.37 billion from the RTC.[36] All but $18.8 million of this amount has been repaid from the proceeds of the subsequent sales of Carteret's assets. *See* PX 2111 (Restated Goodwill Financial Reporting Package (May 10, 2005)).

The FDIC maintains that it is entitled to deduct interest as well as the remaining principal of this loan from the damages due AmBase for the government's breach of contract. The FDIC originally calculated the interest on this loan pursuant to 12 C.F.R. § 360.3(b),[37] which provides for interest "at a rate or rates adjusted monthly to reflect the average rate for U.S. Treasury bills with maturities of not more than ninety-one (91) days during the preceding three (3) months." *See* PX 5058 (Calculation of Accrued Interest on Priority 6 Claimants); PX 1105 (Goodwill Financial Reporting Package (July 28, 2000)).

However, in 1999, at the same time it was working to respond to AmBase's interrogatories probing into its receivership deficit calculations, the FDIC abruptly decided to radically change course, opting to recalculate **retroactively** the interest purportedly due on the loan, by switching from a floating rate of interest to a fixed rate of interest. *See id*.; Green Dep. at 242-43, 263; PX 5057 (Pls.' First Set of Interrogs. to Def. (Dec. 24, 1998)); PX 5060 ( Def.'s Objections and Resps. To Pls.' First Set of Interrogs. (Feb. 8, 1999)). As the FDIC's designated witness on interest issues conceded was readily knowable to the FDIC and to the United States, the effect of this *post hoc* recalculation was to lock in interests rates at their highest levels at any time since the initial seizure of Carteret in 1992. *See* Calomiris 2006 Report at ¶ 39. As a result

[36] Actually, as discussed more fully below, the RTC only actually needed to borrow $1.18 billion to fund the branch sales, as that was the amount that was actually wired to the acquirers. The difference between the $1.37 billion loan and the $1.18 billion actually expended by the RTC reflects the premium paid by the acquirers for Carteret's deposits, as well as Carteret assets purchased by the acquirers.

[37] This provision has been redesignated several times since its promulgation in 1988. For convenience, plaintiffs refer to this provision by its current designation.

of this change from a floating to a fixed rate of interest, the FDIC improperly inflated the interest it seeks by more than $64.7 million. *Id*. at ¶ 41.

**1. The United States is not entitled to deduct interest on the RTC loan from the damages due AmBase.**

Interest on the RTC loan should not be subtracted from AmBase's damages award for two reasons. First, but for Congress' failure to provide funding for the RTC, it would have been unnecessary for the receivership to borrow money to fund the branch sales. Second, because 28 U.S.C. § 2516(a) bars this Court from increasing the damages owed by the United States to Carteret and AmBase to reflect the time value of money, it would be highly improper to reduce those damages by adjusting the receivership deficit to reflect the time value of money.

**a. Interest on the RTC loan should not be deducted from the damages due AmBase because that loan is wholly attributable to Congress's failure to provide funding for the RTC.**

Although the exclusion of goodwill from Carteret's capital after the enactment of FIRREA caused Carteret to fall below minimum capital requirements, it was at the time of seizure an otherwise healthy firm with a sound financial structure, a large deposit base, and both a positive return on assets and a positive net income. *See* Calomiris 2006 Report at ¶¶ 67-68; *AmBase v. United States*, 58 Fed. Cl. at 39. *See also* Statement of Issues at 51. For this reason, "it should have been relatively easy to resolve Carteret in a timely manner so as to retain the majority of [its] charter value for prospective purchasers." Calomiris 2006 Report at ¶ 73.

Unfortunately, however, Carteret was seized during a twenty-one month period (from March, 1992, through December, 1993) when Congress, concerned by allegations of overspending and mismanagement, failed to provide funding for the RTC. *See id*. at ¶¶ 54-56. The lack of funding sharply limited the RTC's ability to resolve seized institutions in a timely and cost-effective manner. This lack of funding, as well as the minority preference requirements

subsequently imposed by Congress (discussed below), substantially delayed Carteret's resolution, despite the institution's relatively strong financial position and the favorable economic climate prevailing at that time. *Id*. at ¶ 70-81; Statement of Issues at 52. Absent this delay, "the RTC could have marketed Carteret as a whole bank, thus enabling it to sell Carteret's deposits and assets simultaneously at the time of resolution." Calomiris 2006 Report at ¶ 83. Had Carteret been resolved without delay, the value of its assets plus the deposit premium would have exceeded the value of its deposits, and no loan would have been required to fund the resolution. *See id*. at ¶¶ 83-85; *see also id*. at ¶¶ 8, 52.[38] Because the RTC loan (and, *a fortiori*, any interest on that loan) is directly attributable to Congress' failure to fund the RTC during 1992 and 1993, this Court should not deduct interest on this loan from the damages due AmBase for the government's breach of contract.

**b. Interest should not be deducted from the damages due AmBase because those damages cannot be adjusted to reflect the time value of money.**

Even if the RTC loan were not wholly attributable to Congress' failure to fund the RTC, this Court should not deduct interest on that loan from AmBase's damages given that 28 U.S.C. § 2516(a) bars this Court from adjusting those damages to reflect the time value of money. As Professor Calomiris explains:

> As a matter of economic logic, adjustments for the time value of money should be consistent for the purpose of computing damages. The interest charges in the receivership deficit effectively reduce damages by taking account of the time over which the receivership deficit has remained unpaid. [The] receivership deficit serves in this case as a partial offset to damages owed to the plaintiff. But it makes no sense to include the time value of money in the receivership deficit if the government itself is barred from paying the time value of money on the damages it owes to the plaintiffs. By including the time value of money as a cost

[38] Moreover, even given Congress's failure to fund the RTC during 1992 and 1993, it likely would have been unnecessary to borrow money to fund Carteret's resolution had Congress not subjected its resolution to the minority preference requirements discussed below. Calomiris 2006 Report at ¶¶ 53, 88.

> in the receivership deficit, **the government effectively is asking to be reimbursed for a cost that it does not bear**.

*Id*. at ¶ 21 (emphasis in original); *see also Glendale Fed. Bank v. United States*, 239 F.3d at 1382 (rejecting damages award "measured in terms of a liability that never came to pass").

Reading *Bailey v. United States,* 341 F.3d 1342 (Fed. Cir. 2003) to countenance such inconsistent treatment of the time value of money would thus "have the economic effect of allowing the government to expropriate some (or perhaps all) of AmBase's and Carteret's damages." Calomiris 2006 Report at ¶12. As the Court previously recognized, under such a reading, "the government may prevent Plaintiffs from recovering any amount by compounding the interest owed on the receivership deficit . . . and then simply relying on the passage of time to protect the government from recovery." *AmBase*, 61 Fed. Cl. at 802. *Cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162 (1980) ("Indeed, if the [government] were entitled to the interest, its officials would feel an inherent pressure and possess a natural inclination to defer distribution, for that interest return would be greater the longer the fund is held; there would be, therefore, a built-in disincentive against distributing the principal to those entitled to it.") *Bailey* need not, and indeed must not, be read to sanction the naked expropriation of more than $150 million of AmBase's damages award. Calomiris 2006 Report at ¶ 17 & Table 2.

**2. If interest is deducted, it must be calculated pursuant to 12 C.F.R. § 360.3(b).**

Even if interest on the RTC loan properly could be deducted from AmBase's damages award, it should be calculated, consistent with the FDIC's original methodology, using a floating rate tied to short-term Treasury bills as provided in 12 C.F.R. § 360.3(b). Indeed, not only are the FDIC's new—and likely litigation-inspired—interest calculations inconsistent with the methodology employed by the FDIC before 1999, they are also flatly inconsistent with the

FDIC's **current** methodology for calculating post-insolvency interest for receiverships established since 2002. Significantly, the FDIC has itself acknowledged that its practice for the post-2002 receiverships, which essentially mirrors how the FDIC calculated post-insolvency interest for Carteret before 1999, suffices to "provide a reasonable amount of interest to compensate receivership creditors for the time value of money." Payment of Post-Insolvency Interest in Receiverships with Surplus Funds, 66 Fed. Reg. 65,144, 65,146 (Dec. 18, 2001) (codified at 12 C.F.R. Part 360).

**a. The interest rates used in the FDIC calculations are contrary to law.**

In abandoning its original methodology, the FDIC appears to have relied solely on a cursory analysis of the National Depositor Preference statute ("NDP"). *See* Statement of Issues at 56. This legal analysis is flawed in at least two fundamental respects. First, Carteret was placed in receivership in 1992, well before the NDP's effective date. That statute is, accordingly, inapplicable. Second, even if it did apply, by the FDIC's own admission, the NDP simply does not address the calculation of post-insolvency interest and cannot reasonably be read to repeal the specific guidance on this issue set forth in 12 C.F.R. § 360.3(b).

The NDP, which was enacted on August 10, 1993, applies "with respect to insured depository institutions for which a receiver is appointed after the date of the enactment of this Act." 12 U.S.C. § 1821 note. It is undisputed that Carteret was declared insolvent and was seized and the RTC appointed its receiver on December 4, 1992. *See* Statement of Issues at 57.

The FDIC's classification of Carteret as a post-NDP receivership appears to be based on the fact that at the same time Carteret Savings was placed in receivership, a new institution—Carteret Federal—was created and placed into conservatorship, and that this institution was placed into three subsequently consolidated receiverships in conjunction with the branch sales in

1994 and 1995. *See* PX 5072 (Email re Classification of Post Insolvency Interest); Green Dep. at 102-104. Given that it cannot be disputed that Carteret was seized by the RTC in 1992, *see, e.g.*, Green Dep. at 102-131, 231, it is plainly arbitrary and irrational to treat Carteret as an NDP receivership simply because the RTC **chose** to resolve it through a series of artificial entities. *See* Statement of Issues at 58.

Moreover, the FDIC's apparent decision, in determining the application of the NDP to Carteret, to accord dispositive significance to the fact that the RTC decided to place Carteret Federal into conservatorship rather than receivership in 1992 overlooks the fact that the statutory framework of which the NDP is a part equates a conservatorship with a receivership for this purpose. Thus, although the application of the NDP is tied to the appointment of a "receiver" for the insured institution, 12 U.S.C. § 1821 note, for purposes of the FDIC Act (which the NDP amends, *see* 66 Fed. Reg. at 65,144), "[t]he term **'receiver'** includes a receiver, liquidating agent, **conservator**, commission, person, or other agency charged by law with the duty of winding up the affairs of a bank or savings association." 12 U.S.C. § 1813(j) (emphases added). Since it is undisputed that in December, 1992, the RTC was appointed not only receiver for Carteret Savings but also conservator for the newly created Carteret Federal,[39] there can be no doubt that the FDIC's *post hoc* classification of Carteret as an NDP receivership is contrary to law.

Furthermore, even if the Carteret receivership were subject to the NDP, **nothing** in that statute states or even implies that post-insolvency interest should be calculated at a fixed rate based on the federal judgment rate. Indeed, the statute nowhere mentions post-insolvency interest or the methodology for calculating it, let alone fixed rates or the federal judgment rate.

---

[39] *See* PX 5188 (Purchase and Assumption Agreement Carteret Savings and Carteret Federal); *see also* Green Dep. at 231; *AmBase*, 58 Fed. Cl. at 39.

(The federal judgment rate statute, 28 U.S.C. § 1961—which applies by its terms to interest on judgments entered by federal courts—likewise says nothing about the calculation of post-insolvency interest.) Significantly, even the FDIC acknowledges that the "NDP does not address the issue of rate, payment or priority of post-insolvency interest distributions." PX 5036 (Options Memorandum—Post-Insolvency Interest Regulation and Amendments to 12 C.F.R. § 360.3); *see also* Green Dep. at 188-91.

**b. The interest rates used in the FDIC calculations upset reasonable, well-settled expectations.**

Not only was the FDIC's *post hoc* decision to calculate post-insolvency interest using a fixed rate based on the federal judgment rate contrary to law, it also upset reasonable and well-settled expectations by departing sharply from the FDIC's established practice with former RTC receiverships in general and the government's course of dealing with the Carteret receivership in particular. This methodology was no accident or anomaly. Rather, prior to its about-face in December 1999, the FDIC also used the methodology "outlined in 360.3" for "all other RTC receiverships in the calculation of post-insolvency interest." Green Dep. at 238. As stated by the FDIC's designated deponent, it was the general opinion of the FDIC's accounting and goodwill team staffs "that the methodology under . . . section 360.3" was the proper "method to use" "to calculate post-insolvency interest" for former RTC receiverships. *Id*. at 105; *see also id*. at 194 (similar); PX 5065 (Email re: Carteret – FIN #1309) (stating that "[w]e calculated post insolvency interest [for Carteret] per CFR 360.3, because I understood it applied to all RTC FINs").

Not only was interest on the 1994 and 1995 RTC loan calculated pursuant to a floating rate tied to short-term Treasury bills prior to the end of 1999, the government's entire course of dealing with the Carteret receivership up to that time reflected a mutual understanding that

interest on Carteret's liabilities would be charged at a floating, short-term rate. Thus, as discussed above, a floating short-term rate was applied to the $1.75 billion advanced by the RTC in 1992, and interest on the remaining obligations of the 1992 "pass-through" receivership was, and continues to be, calculated pursuant to section 360.3(b). Reciprocally, when, as discussed more fully below, the government held the deposit premiums from the sales of Carteret's deposits in an escrow account for several months prior to crediting them to the receivership, it appears to have paid interest on these funds at a floating, short-term rate. *See* Calomiris 2006 Report at ¶¶ 37-38; Green Dep. at 434-36.

The Carteret receivership relied on this mutual understanding in making cash investments with a rate of return greater than the rate of interest on the RTC loan as calculated pursuant to section 360.3(b) but less than the rate of interest subsequently calculated by the FDIC using its new methodology. Mr. Griffin, who ran the conservatorship, testified that the receivership would never have made investments that created a negative spread and thus would not have made these investments had it anticipated the FDIC's abrupt methodology change. Griffin Dep. 39-41. Indeed, during the period from January through July 1995, the Carteret receivership continued to make cash investments with average rates of return ranging from 5.70 percent to 5.91 percent. PX 2820 (Purchase, Sales and Maturities Transaction Report from 1/1/95 to 1/31/95 at CAM3820732, CAM3820739, CAM3820947, CAM3821000, CAM3821031, CAM3821076, CAM3821108). At the same time under the FDIC's retroactively adopted interest rates, it was paying rates of 7.34 percent on the $616 million borrowed on January 20, 1995, and 6.57 percent on the $597 million borrowed on March 10, 1995, resulting in a negative spread of 66 to 164 basis points during this period, without even taking into consideration the effect of compounding the interest on the borrowed funds.

**c. The interest rates used in the FDIC calculations have no economic justification.**

In addition, the "historically excessive" interest rates used by the FDIC "do not have any economic rationale." Calomiris 2006 Report at ¶ 13. These rates plainly exceed any actual cost of funds to the government, *see* PX 4431 (Accounting and Tax Policy Section, Discussion Memorandum re FDIC Corporate and Receivership Transactions Subject to Interest at 3), and almost certainly far exceed the actual dividends that would have been due the depositors in whose shoes the FDIC stands on its subrogated claim, *see* Green Dep. at 116; 12 U.S.C. § 1821(g)(2).

Furthermore, the FDIC's new fixed-rate methodology for calculating rates is arbitrary and has no economic justification as a measure of the realized time value of money during the receivership period. Calomiris 2006 Report at ¶ 23-28. As Professor Calomiris explains,

> The interest rate used in the calculation of the interest rate component of the receivership deficit is an ex post rate, imputed to account for the realized cost associated with the time value of money for the period between the time when the branches were sold (which defines the initial balance of the loan) and the date at which the receivership deficit is retired (in this case, the date at which damages awarded by this Court are paid).

Id. at ¶ 23. Furthermore, because "the outcome and timing of this Court's decision" on damages "is not known in advance,"

> the ex post imputed interest cost associated with the deficit should be computed on a continuous basis. Interest cost should roll forward at the short-term Treasury rate of interest. At the date the transfer occurs, therefore, the interest cost associated with the receivership deficit should represent a concatenation of short-term Treasury interest rates multiplied by the outstanding balance at each point in time over the life of the receivership deficit.

Tellingly, the FDIC has recently *rejected* the fixed-rate methodology on economic grounds in favor of a floating rate tied to short-term Treasury yields. Thus, 12 C.F.R. § 360.7, which the FDIC promulgated in 2002 at Congress' prompting, *see* 12 U.S.C. § 1821(d)(10)(C) (authorizing

the FDIC to "prescribe such rules, including definitions of terms, as it deems appropriate to establish a single uniform interest rate for . . . post-insolvency interest"), prospectively sets the post-insolvency interest rate for receiverships of insured financial institutions at "the coupon equivalent yield of the average discount rate set on the three-month Treasury bill at the last auction held by the United States Treasury Department during the preceding calendar quarter, and adjusted each quarter thereafter." 12 C.F.R. § 360.7(b)(3). The FDIC recognized that even using a simple rather than compound interest calculation, a floating rate tied to short-term Treasury yields would **"provide a reasonable amount of interest to compensate receivership creditors for the time value of money."** 66 Fed. Reg. at 65,146 (emphasis added).

**3. If the FDIC's interest rates are used, its calculations must be corrected to eliminate other flaws.**

For the reasons already discussed, post-insolvency interest should not be included in the Carteret receivership deficit for purposes of assessing Carteret's or AmBase's damages. But even were the Court to assume that it is appropriate to use the FDIC's interest rates to calculate post-insolvency interest, the FDIC's calculations would still have to be corrected in other important respects. Specifically, these calculations would need to be adjusted to eliminate the effects of misallocations of payments from the sale of Carteret's assets as well as improper treatment of the premiums received from the branch sales.

**a. The FDIC's interest calculations misallocate payments from the sale of Carteret's assets.**

As discussed above, the RTC lent funds to the Carteret receivership in conjunction with each of the three branch sales. In the FDIC's initial interest calculations based on section 360.3(b), the interest rate for all three loans was the same because all three rates were adjusted monthly to track changes in the three-month Treasury yield. Under the FDIC's new fixed-rate

methodology, however, a different interest rate applies to each loan: 6.04 percent for the Florida branch sale, 7.34 percent for the first New Jersey branch sale, and 6.57 percent for the second New Jersey branch sale. *See* PX 5066 (Email re Post Insolvency Interest Rates and Priority of Interest at AM0096537). Furthermore, under the FDIC's accrual methodology, once the principal on a loan is paid off, no further interest accrues. *See* PX 4313 (Post-Insolvency Interest Procedures Analysis); Green Dep. at 456-57.

Under these circumstances, payments from the proceeds of the sale of Carteret's assets should have been allocated to the highest-cost loan until its principal was paid off, then to the next highest-cost loan, and finally to the lowest-cost loan. Calomiris 2006 Report at ¶¶ 14, 43. The FDIC, however, "misallocated payments across the various balances due," *id*. ¶ 14, by allocating payments on a pro-rata basis to all three loans, Green Dep. at 294. While allocating payments in this manner might have made sense if the loans were of different priorities or to different creditors, in this case all three loans had the same priority, *see id.* at 293, 295, and "the identity of the creditor for all three loans [was] the same: the government," Calomiris 2006 Report at ¶ 43; *see also* Green Dep. at 291, 294. In fact, payments on all three loans were credited to **the very same government fund**. *See id*.; Green Dep. at 292, 295.

As Professor Calomiris explains, on these facts "[t]here is no economic justification for a pro rata pay down of the debt." Calomiris 2006 Report at ¶ 43. The FDIC itself conceded during depositions that "economically it would make most sense to pay off the highest rate liability" before lower cost loans, Green Dep. at 294; *see also* Green Dep. at 292-93 (similar), and that the FDIC's method of allocating payments pro rata to the three loans "had the effect of increasing the cost of the receivership," *id*. at 295. Nor could the FDIC identify during depositions any policy, manual, or regulation supporting the allocation method used here. *See*

*Id*. at 296). Indeed, the FDIC appears never to have even considered the propriety or effect of its allocation method: although the RCFC 30(b)(6) deponent designated by the FDIC to testify on interest issues described the effect of the allocation method used here on the size of the receivership deficit as only "nominal," he conceded that he had never actually "attempted to calculate what the effect would have been." *Id*. at 295.

The effect of the FDIC's misallocation of payments was in fact far from "nominal," however. As Professor Calomiris explains, the effect of this misallocation is to increase the interest claimed by the FDIC by $51.1 million. Calomiris 2006 Report at ¶ 45. Even under the assumption that interest would continue to accrue until the principal of all three loans was repaid, the FDIC's unsupported and unsupportable *pro rata* methodology has the effect of overstating interest by $13.5 million. *See* Id. at ¶ 45. Thus, even if interest may be deducted from AmBase's damages award and charged at the exorbitant rates used by the FDIC, this Court must not countenance so massive and arbitrary an expropriation.

**b. The FDIC's interest calculations improperly treat the premiums from Carteret's deposit sales.**

When the RTC sold Carteret's deposits in 1994 and 1995 it obtained deposit premiums totaling $143.8 million. PX 4986. This meant that although the acquiring institutions assumed responsibility for $1.37 billion of deposit liabilities, the government only needed to pay these institutions $1.18 billion.[40] *Id*. The FDIC's interest calculations, however, treat the full $1.37 billion as the amount of principal for the RTC loan. Calomiris 2006 Report at ¶ 37; PX 5090; PX 4986. The deposit premiums were credited to an escrow account where they were held until April 1995 when they were credited to the receivership as a dividend. Calomiris 2006 Report at

[40] The difference between these figures reflects not only the deposit premium, but also $44 million in Carteret's assets transferred to the acquiring institutions less $0.5 million in settlement interest paid to the acquirers. Calomiris 2006 Report at ¶ 46.

¶ 37. The premiums held in the escrow account earned interest at a short-term Treasury rate. Id. at ¶¶ 37-38.

During depositions, the FDIC was unable to provide any justification for the delay in crediting the deposit premiums. *See* Green Dep. at 166, 289-91, 277-78.[41] This delay would have made only a nominal difference under the FDIC's original methodology for calculating post-insolvency interest, since the rate at which interest was paid on the escrow account balance was quite similar to the floating, short-term rate mandated by section 360.3(b). *See* Calomiris 2006 Report at ¶ 48. Under the FDIC's new methodology, however, the rates charged to the receivership are substantially higher than the rate paid on the escrow account, and the delay becomes significant: although the interest earned on the deposit premiums while they were held in the escrow account was $1.9 million, the interest that accrued during the same period on the portion of the RTC loan corresponding to these premiums was $2.4 million under the FDIC's new methodology. *See Id*. at ¶ 46. As Professor Calomiris explains, "this $0.5 million

[41] Indeed, the very fact that the RTC/FDIC included the amount of the deposit premium and the value of Carteret assets transferred to the acquirers in its calculation of the government's subrogated claim appears contrary to both agencies' stated policies. Thus, the "Liability Accounting" chapter of the FDIC Field Accounting Manual explicitly provided that to be included in the FDIC's corporate proof of claim against the receivership – *i.e.*, in the subrogated claim – "insurance funds must have actually been expended by" the FDIC. PX 4311 (NFSC Accounting Manual, Liability Accounting) Similarly, although the RTC's Claims Manual indicated that in certain types of deposit transfer transactions, the subrogated claim was to be based on the gross amount of liabilities transferred, the manual went on to emphasize that "[i]n order to be included in the [subrogated claim], insurance funds **must have actually been spent**." PX 4305 (RTC Claims Manual, Chapter 10, Corporate Proof of Claims) (emphasis in original). To the extent that the subrogated claim against the Carteret receivership included the amount of the deposit premium paid by the acquirers and the value of Carteret assets bought by the acquirers, the subrogated claim necessarily included components that were not based on funds "actually . . . expended" or "actually . . . spent" by the government, in direct violation of these policies. *See also* Green Dep. at 532 (Carteret subrogated claim not limited to the amount of funds actually spent).

difference between the two amounts has increased through time by accruing interest . . . to $1.0 million as of December 31, 2005." Id. at ¶ 46.

"There is no economic justification for charging the receivership a higher interest rate on the loan than the interest rate credited to the receivership through the escrow account of the sales premiums." Id. at ¶ 47. Not only was the FDIC unable to articulate any such rationale during depositions, *see id*. at ¶ 38, but Congress has expressly rejected such manipulation of the time value of money by the government in other contexts. *See, e.g.*, 26 U.S.C. § 6621(d) ("To the extent that, for any period, interest is payable under subchapter A and allowable under subchapter B on equivalent underpayments and overpayments by the same taxpayer of tax imposed by this title, the net rate of interest under this section on such amounts shall be zero for such period."). Even assuming this Court determines that interest may be deducted from damages due AmBase and approves the rates used in the FDIC calculations, it must correct the FDIC's improper treatment of the deposit premiums from the branch sales.

**D. The Receivership Deficit Was Overinflated Due to the Breach and Delays in Resolution.**

As discussed elsewhere in this brief, actions taken by the United States in connection with its handling of the Carteret conservatorship and receivership had the result of reducing Carteret's value and thus ultimately increasing the amount of the receivership deficit. Examples of such value-destroying actions include the application of the MPP program to Carteret and the RTC's decision to simply shutter Carteret Mortgage Company. But in addition to the matters previously discussed, other actions taken by Congress had the effect of increasing the receivership deficit in at least two other respects: first, the government's breach of its regulatory capital contract itself prevented the RTC from realizing any value for Carteret's supervisory goodwill; and second, Congressional delays in funding the RTC unduly extended the duration of

Carteret's resolution, leading to significant reductions in Carteret's value. These two actions had the predictable result of reducing the resolution value of Carteret by tens of millions of dollars. As noted, it is probable that had these actions not occurred, there would have been no need for an RTC loan in the first place. But at a minimum, the Court should, for purposes of assessing the impact of *Bailey* on any ultimate damages award in this case, reduce the receivership deficit by the amounts by which these actions reduced Carteret's value.

As discussed above, we will show that had the United States honored its regulatory capital contract, there is no way that Carteret would have been seized in December 1992 or at any time thereafter. We will also demonstrate that this breach-induced seizure of Carteret led AmBase and Carteret to suffer losses amounting to hundreds of millions of dollars. For present purposes, however, the relevant point is that even assuming that Carteret would have been seized in the no-breach world, the RTC would at least have been able to realize value from the supervisory goodwill on Carteret's books. Calomiris 2006 Report at ¶ 103.

It is now beyond legitimate dispute that supervisory goodwill had value absent the breach. *See, e.g., Home Sav. of Am., FSB v. United States*, 399 F.3d at 1354-55; *LaSalle Talman Bank v. United States*, 317 F.3d at 1374-75. Using well-established valuation methods employing conservative assumptions, Professor Calomiris has conservatively estimated the value of Carteret's unamortized balance of supervisory goodwill, assuming no breach by the government, as of both December 1994 (the time of the resolution transactions) and December 1993 (the time at which Carteret would likely have been resolved absent congressionally caused delays). At both relevant times, the unamortized balance of supervisory goodwill would have greatly exceeded $100 million. *See, e.g.*, Calomiris 2006 Report at ¶ 108 (December 1993 balance of $128.3 million); *Id.* at Appendix A (December 1994 balance of $118.5 million).

Using two different valuation methods—one of which estimates the cash equivalent value of the goodwill and the other of which estimates the cost to replace the goodwill with a stock issuance—Professor Calomiris has concluded that the goodwill had a value of $46-$49 million as of December 1993, and a value of $41-$44 million as of December 1994. *Id*. at ¶¶ 121-22, 131-33, Table 12. Thus, if the United States had honored its contractual obligations to Carteret, the receiver would have been able to recover least $40 million, and probably closer to $50 million, in additional value from the Carteret receivership. This value, which was eliminated from the receivership asset base solely because of the breach, should be added back to reduce the receivership deficit.

Finally, the government's delays in resolving Carteret also led directly to substantial decreases in realized value. Given the size and sound financial structure of Carteret, "it should have been relatively easy to resolve Carteret in a timely manner so as to retain the majority of [its] charter value for prospective purchasers." *Id*. at ¶ 73. But because Carteret was seized during a period in which Congress refused to provide funding for the RTC, *id*. at ¶¶ 54-56, Carteret's resolution was significantly delayed, despite the institution's relatively strong financial position and the favorable economic climate prevailing at that time.

Professor Calomiris has opined that given "Carteret's quality and the timing of its resolution, it is conservative to assume" that, had funding been available to the RTC in 1992 and 1993, Carteret would have been resolved in about one year instead of the more than two years it actually took for resolution to be completed. *Id*. at ¶ 82. Moreover, had Carteret been resolved in one year, "the RTC could have marketed Carteret as a whole bank, thus enabling it to sell Carteret's deposits and assets simultaneously at the time of resolution." *Id*. at ¶ 83. Had Carteret been resolved at this time and in this manner, the value of its assets plus the deposit premium

would have exceeded the value of its deposits, and no loan would have been required to fund the resolution. *See id*. at ¶¶ 83-85; *see also id*. at ¶¶ 8, 52. At a minimum, had the RTC resolved Carteret in late 1993 rather than early 1995, it would have been able to recover at least $43.8 million in additional value. *Id*. at ¶ 83. Here again, this value should be added back to the receivership's assets.

### E. The Unconstitutional Minority Preference Program Inflated Substantially The Receivership Deficit.

#### 1. The Minority Preference Program.

In December 1993, Congress amended the Federal Home Loan Bank Act to establish a minority preference program ("MPP"). Specifically, Congress mandated that, when "considering offers to acquire any insured depository institution, or any branch of an insured depository institution, located in a predominantly minority neighborhood . . . , the [RTC] shall give preference to an offer from any minority individual, minority-owned business, or a minority depository institution, over any other offer that results in the same cost to the" RTC. Resolution Trust Corporation Completion Act, Pub. L. No. 103-204, § 3(a), 107 Stat. 2369, 2375-76 (1993) (codified at 12 U.S.C. § 1441a(w)(17)(A)).

To facilitate these minority acquisitions, the MPP called for the RTC to "provide, in connection with such acquisition [by a minority acquirer] and in addition to performing assets of the depository institution or branch, other performing assets under the control of the [RTC] in an amount (as determined on the basis of the [RTC's] estimate of the fair market value of the assets) not greater than the amount of net liabilities carried on the books of the institution or branch, including deposits, which are assumed in connection with the acquisition." 12 U.S.C. § 1441a(w)(17)(C).

Initially, with respect to branch sales, "Whenever the premium bid by a minority bidder is within 10 percent of the highest premium bid by a non-minority bidder on an institution or branch located in a 'predominantly minority neighborhood,' a limited second round of bidding will be conducted . . . ." PX 4931 (Memo regarding Implementation of "Predominantly Minority Neighborhood" Resolution Provisions of Section 21A (w) (17) (A) of the Federal Home Loan Bank Act at 1, 4). The second round of bidding was to include "[o]nly the highest first round non-minority bidder(s) and the highest first round minority bidder(s) which were within 10 percent of the highest first round non-minority bid(s) . . . ." *Id* at 4. On May 25, 1994, however, the RTC jettisoned the second round of bidding in favor of allowing the minority bidder an opportunity to match the highest non-minority bidder in order to win the purchase. PX 4952 (Letter re Bids for Carteret FSB);PX 4956 (Letter Transmitting Revised Bid Form Pages); PX 5013 (Chronological Events of the Carteret FSB Transaction Through March 8, 1995).

**2. The Minority Preference Program violates the Due Process Clause.**

The Minority Preference Program is a race-conscious law both on its face and in its application because it treats individuals and institutions differently solely on the basis of their race. Race-based classifications are "by their very nature odious to a free people whose institutions are founded upon the doctrine of equality" before the law. *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). Consequently, "all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny' " to ensure that they comport with the guarantee of equal protection of the law that the Constitution affords all people. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494 (1989). Because the MPP is a federal regulation, the pertinent guarantee of equal protection emanates

from the Fifth Amendment's Due Process Clause. *See Rothe Dev. Corp. v. United States Dep't of Def. ("Rothe I")*, 262 F.3d 1306, 1317-20 (Fed. Cir. 2001).[42] "Determining whether a racial classification satisfie[s] strict scrutiny require[s] an inquiry into whether the 'suspect classification' (i.e., race) serve[s] a 'compelling interest' and was 'narrowly tailored' in furtherance of that interest." *Rothe I*, 262 F.3d at 1318.

In creating the MPP, Congress failed to establish a compelling interest. And even if the MPP were justified by a compelling interest, the MPP would not be narrowly tailored to that interest. Therefore, the MPP fails both prongs of strict scrutiny, and accordingly violates the Due Process Clause. As this Court has said before, a "contrary holding would resurrect the ghost of 'Jim Crow.' " *Christian v. United States*, 46 Fed. Cl. 793, 806 (2000).

**a. Congress failed to demonstrate a compelling interest for the Minority Preference Program.**

In order for the MPP to survive strict scrutiny, Congress must have concluded that there was a compelling interest in creating such a race-based regime. "[C]ourts are not obligated to receive proffered remedial reasons as fact and rubber-stamp the government's race-based programs." *Christian*, 46 Fed. Cl. at 808. Congress's conclusions about whether a compelling interest exists must have been supported by a "strong basis in evidence." *Rothe I*, 262 F.3d at 1322; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986). And that evidence "must have actually been before the legislature at the time of enactment." *Rothe I*, 262 F.3d at 1327. As the Supreme Court and the Federal Circuit have emphasized, "the reviewing court must assess what

[42] Because the MPP does not entail regulation of the States, it must be an exercise of Congress's powers under Article I, not its remedial powers under Section 5 of the Fourteenth Amendment. Therefore, there is no occasion for this Court to decide whether race-conscious laws enacted under Section 5 should be examined under a less exacting standard than strict scrutiny requires, or whether the MPP would survive that examination. *See Rothe I*, 262 F.3d at 1317-18.

'actually' motivated the legislature, not what 'may have motivated it.' " *Id*. at 1327 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996)); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."). Although AmBase bears the ultimate burden of proving that the MPP is not justified by a compelling interest, "the government bears the burden to produce evidence" of a compelling interest that would justify the MPP. *Id*. at 1317. Congress's decision to create a race-based classification is not entitled to any "deference." *Id*. at 1320-21. The MPP cannot survive this exacting standard.

In neither the text of the RTC Completion Act, through which Congress created the MPP, nor the accompanying joint explanatory statement in the conference report did Congress attempt to identify a compelling interest for creating the MPP. *See* 139 CONG. REC. H10,162, 10,175-76 (1993). The only attempt in the RTC Completion Act's legislative record to set forth the rationale for the MPP appears to be a statement by Representative Kweisi Mfume, who was neither a sponsor nor a conferee. Rep. Mfume articulated three rationales for the MPP: providing economic opportunities for minorities, promoting diversity, and remedying discrimination. Even assuming *arguendo* that these rationales can in principle constitute compelling governmental interests for erecting a race-based legal regime, the requisite "strong basis in evidence" to support these rationales is entirely absent here.

First, diversity has been held to constitute a compelling interest only in the context of higher education, where the Supreme Court has "long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter*, 539 U.S. at 330. *See id*. at 330-31 (citations omitted). By contrast, at no point does

Rep. Mfume (or anyone else in the legislative record) explain why the RTC cannot adequately carry out its institutional mission of resolving failing depository institutions in a cost-effective manner without engaging in race-conscious action.

The other rationale identified by Rep. Mfume—remedying discrimination—is equally unavailing here. Mere invocation of the phrase "remedying discrimination" does not magically open the door to creating legitimate race-based legal regimes. As the Federal Circuit has recognized, "a race-based classification may be enacted to remedy only identified systematic discrimination," and the evidence must show that "discriminatory conduct or effects were experienced in the specific industry." *Rothe I*, 262 F.3d at 1323, 1330. "[A] generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy," and is therefore inadequate to survive strict scrutiny. *Croson*, 488 U.S. at 498, *quoted in Rothe I*, 262 F.3d at 1323. Moreover, the evidence must be "sufficiently timely and sufficiently substantive (i.e., not merely anecdotal) to properly support the program's constitutionality." *Rothe I*, 262 F.3d at 1330. As the time Congress enacted the RTC Completion Act, Congress had before it absolutely no evidence that the RTC—or any other arm of the federal government—was discriminating against minorities who were in or wanted to be in the depository banking industry, or that the effects of such discrimination were still lingering.

**b. The Minority Preference Program is not narrowly tailored to a compelling interest.**

A race-based classification must not only be justified by a compelling governmental interest; it must also be narrowly tailored to that interest. "There are six factors commonly considered in the narrow tailoring analysis: (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver

provisions; (4) the relationship of the stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the overinclusiveness or underinclusiveness of the racial classification." *Rothe I*, 262 F.3d at 1331 (collecting decisions). As described in more detail in our Statement of Issues briefing, each of these factors demonstrates that the MPP is not narrowly tailored to a compelling governmental interest.

With respect to race-neutral alternatives, the government is prohibited from discriminating against minorities in the depository banking industry on the basis of their race by the same race-neutral Due Process Clause that protects AmBase against the injustice of being subjected to the MPP. The RTC is also required statutorily to conduct its operations in a manner that "prohibits discrimination on the basis of race . . . in the solicitation and consideration of offers." 12 U.S.C. § 1821(d)(13)(E)(iv). There is no evidence that the Due Process Clause or section 1821(d)(13)(E)(iv) are inadequate to protect minorities against such discrimination.

The RTC has no flexibility in determining whether to apply the MPP to a given depository institution. Neither the RTC Completion Act nor the RTC's implementation creates any exception or opportunity for a waiver—if the depository institution meets the criteria for determining whether it is within a predominantly minority neighborhood, then the RTC "shall give preference" to minority bids, 12 U.S.C. § 1441a(w)(17)(A). The relationship of the stated numerical goals to the relevant market is difficult to assess in this case because the MPP has **no** numerical goals. The absence of such goals reflects the inherent inflexibility of the program: **every** minority gets a preference with respect to **every** depository institution in a predominantly minority neighborhood.

As detailed at length below and in Professor Calomiris' Report, the MPP can have a very substantial effect on innocent third parties, and in fact has had a devastating effect on the

Plaintiff. Most affirmative action programs harm innocent third parties only by reducing their opportunity to win a contract or gain admissions. The MPP, of course, reduces non-minorities' opportunity to acquire potentially valuable depository institutions from the RTC—a harm not substantively different from the typical burden imposed by an affirmative action program. But the MPP also concentrates a separate and very substantial burden on a few. Depository institutions that are sold through the MPP, depository institutions whose performing loans are sold to a minority acquirer, and the owners of those institutions are, in effect, compelled by the MPP to transfer a portion of their value to the minority acquirer. Here, the application of the MPP caused Carteret to have to borrow over $1 billion to finance its resolution even though it had sufficient assets to supply the financing, reduced the premium paid for Carteret by at least $19.4 million, and reduced the amount paid for Carteret's performing assets.

Finally, the MPP is substantially over-inclusive as a means of remedying discrimination and under-inclusive as a means of achieving diversity. For purposes of the MPP, the term "minority" means "any Black American, Native American, Hispanic American, or Asian American." There is no evidence in the legislative record that members of **each** of the statutorily defined minority groups have attempted to acquire depository institutions or to obtain loans from depository institutions, let alone that members of **each** group were unable to do so because of specific discriminatory acts. As the Supreme Court stated in *Croson*, "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the [relevant] industry . . . suggests that perhaps the [government's] purpose was not in fact to remedy past discrimination. . . . The gross overinclusiveness of [the government's] racial preference strongly impugns the [the government's] claim of remedial motivation." 488 U.S. at 506; *see also Rothe I*, 262 F.3d at 1330, 1332.

### 3. The Minority Preference Program harmed Carteret and AmBase.

In the course of its receivership, Carteret was subjected to the MPP in two basic ways: Carteret's performing loan assets were held back to be available for other minority acquirers, and minority bids for Carteret were afforded a preference over non-minority bids. As a result, the MPP substantially inflated Carteret's receivership deficit. Professor Calomiris demonstrates that in the absence of the MPP, Carteret would not have needed a loan to fund its branch sales, and thus **no interest** would have accrued. Calomiris 2006 Report at ¶¶ 88-100. Professor Calomiris will testify at trial to both of these harms.

#### a. The RTC held back Carteret's assets to sell to minority acquirers of other institutions.

Many minority acquirers of institutions other than Carteret exercised their option under the MPP to purchase performing assets under the control of the RTC to offset the liabilities of the institution they were acquiring. Consequently, performing assets were a prized commodity within the RTC, particularly after it had resolved many of the larger institutions in receivership. With $1.8 billion in performing loans when it was seized, PX 0904 (Carteret Federal Savings Bank and Subsidiaries Consolidated Statements of Financial Condition, December 1992), Carteret was one of the last large institutions to be resolved, *see* Calomiris 2006 Report at ¶ 82. Its performing assets provided the RTC "the most readily available source of mortgages in one spot on which due diligence has been performed." PX 4919 (Email re Home Unity).

Consequently, Carteret's performing assets became critical to the functioning of the MPP—as one RTC employee put it, Carteret was "an easy choice as the source of the loans" for minority purchasers. *Id.*; *see also* PX 4925 (Email re Carteret Loans for Dyrades); PX 4912 (Email re Home Unity); PX 4922 (Email re: Due Diligence Carteret Loans). To preserve Carteret's cache of performing assets for minority acquirers of other institutions, the RTC

"froze" Carteret's performing assets, PX 4207 (Executive Summary, CSFB, Stratification of Assets Remaining); in order to sell them, Carteret's managing agents had to obtain approval from the Resolutions group to "release" them, *see, e.g.*, PX 4907 (Email re Carteret LSBOS).

This freeze precluded Carteret from selling its own performing assets as part of its own resolution. Jay Jupiter, a RTC marketing specialist, noted that Carteret's performing assets were "integral to both the franchise value and the marketability of this institution in a Purchase and Assumption transaction," and requested that the loans be released from the securitizations group so that "they can be offered for sale with the deposit franchise of Carteret. . . . Given the size of the portfolio, this would represent an excellent P&A marketing element." PX 4018 (Memo re: Request for Waiver of Certain Mortgage Loans from Securitization for Carteret Federal Savings Bank). Ramey responded: "This won't fly. There are too many initiatives associated with Carteret. There is a securitization effort but it may be sidelined because they are pulling loans to furnish on the minority acquisitions." Id. On the eve of Carteret's resolution, Ann Richards, a member of the RTC's asset sales team, stated, "We're chomping at the bit waiting to sell securities out of Carteret. Should they still remain frozen?" *Id*. Herb Held, a high ranking RTC official, replied, "We are still working with a minority whole bank bidder. We will need about $1.4 billion in loans. If Sandra has the loans [to satisfy the minority bidder] and does not need the securities th[e]n we should be able to release the securities." PX 4975 (Email re Carteret Securities); *see also* Ramey Dep. at 152-53 (conceding that the point of Held's email was that "as long as a minority might want to exercise its option to buy performing assets, [the RTC] w[as]n't going to sell these assets").

Because of the MPP, Carteret's performing assets were not released for its own resolution. Instead, Carteret had to borrow from the RTC $1.18 billion in order to finance its

resolution. PX 4986 (Consolidated Florida Branch Resolution Summary). At the time of its resolution, Carteret still had a comparable amount of assets. PX 0905 (Carteret Federal Savings Bank and Subsidiaries Consolidated Financial Statements). **Thus, but for the asset freeze, it would not have needed a loan to finance the resolution.** In fact, this calculation underestimates the true fair market value of Carteret. The RTC sold most assets under its control through competitive bidding, which is a reliable method for determining the market price. *See, e.g.*, Douglas G. Baird, *The Uneasy Case for Corporate Reorganizations*, 15 J. LEGAL STUD. 127, 136-38 (1986). But when the RTC sold performing assets for the benefit of minority acquirers, it eschewed competitive bidding in favor of setting the price unilaterally. This method is inherently prone to underpricing, especially since minority acquirers enjoyed a risk-free option: they could purchase the loans, but were under no obligation to do so.[43]

**b. Minority Bids for Carteret were preferred over non-minority bids.**

Ideally, Carteret would have been resolved as a whole institution. Calomiris 2006 Report at ¶¶ 90-97. But because Carteret was such a large bank spread across two disparate states (New Jersey and Florida), there was, as Ramey noted in an August 1994 email, "a real problem with minority groups getting together or getting with a non-minority group to put in a bid on the entire

[43] Evidence obtained through discovery confirms this: On February 21, 1995, Dryades Savings Bank, a minority acquirer of another institution, purchased $32.10 million of Carteret's performing assets for $30.96 million. It also purchased $9.77 million of another failing institution's performing assets for $8.88 million. PX 5007 (Dryades Savings Bank, FSB, Summary of Loans Purchased); PX 5008 (Minority Preference Funding Statement, Dryades Savings Bank ). The next day, Dryades flipped $6.13 million these assets for a 6.4 percent profit. PX 5009 (Funding Statement, Gulf Coast Bank). In addition, United Bank, a minority acquirer of another institution, purchased $30.32 million of Carteret's performing assets. Shortly thereafter, United Bank flipped $13 million of those assets to Chemical Mortgage Co. PX 4211 (Executive Summary, Carteret Federal Savings Bank, Stratification of Assets Remaining).

franchise." PX 4961 (Email re Delay in Carteret Bidding).[44] To assist minority bidders, the RTC split Carteret into "clusters" of branches. *See* PX 3934 (Bid Form for Carteret Federal Savings Bank with Instructions). *See also* Calomiris 206 Report at ¶ 90. The piecemeal sale of Carteret necessitated by the MPP prevented the RTC from resolving Carteret in the more economically beneficial form of a whole institution. Id. at ¶¶ 90-97. Thus, by forcing Carteret to be resolved through a method that was economically inappropriate for it, the MPP reduced the premium value that Carteret would recover. *Id.*

In addition, the MPP's procedures caused delay in selling Carteret's branches. For several months, the RTC worked with minority bidders to help them make viable bids that matched the high bids, but in the end the RTC had to disqualify five of the minority bidders, for various reasons. Meanwhile, Carteret's customers were withdrawing their deposits, and doing so at a quickening pace. Deposit runoff destroys franchise value because it rapidly reduces the premium that potential acquirers are willing to pay. PX 4309 (AFSC Conservatorship/Receivership Field Operations, Managing Agents Meeting, Atlanta) (noting that deposit runoff is a "major impediment[] to continuing conservatorship operations [and] resolution" because it "Reduces Franchise Value and Makes Some Branches Untenable"). As Professor Calomiris shows, the delay occasioned by the MPP reduced the deposit premium by at least $19.4 million, and thus increased the principal balance of Carteret's resolution loans. Calomiris 2006 Report at ¶ 88.

[44] *See also* PX 5220 (Memo re: Carteret FSB Acquirors, deposits and premiums) ("Carteret was designated as a PMN institution, however, no acceptable bid for the entire franchise was received from a qualified minority acquirer[]."); PX 5205 (Recommendations on the Application to the FDIC of the RTC's Minority Preference Program at CAM5370117, CAM5370121) ("[L]arge bank resolutions, particularly sales to minority investor groups, have been ineffective, especially because of lack of capital and inability of the bidders to meet the regulatory time frames.").

## VI. DAMAGES SHOULD BE PAID TO AMBASE DIRECTLY

The damages due Carteret should be paid directly to plaintiff AmBase, as Carteret's sole residuary claimant, "net of any receivership claims" and "outside the statutory distribution scheme as advanced by the government in 12 U.S.C. § 1821(d)(11)." *Slattery v. United States,* 73 Fed. Cl. 527, 531 (2006). In light of the decisions of the Federal Circuit and other legal authorities, payment in this manner is the most effective way to ensure that the thrift is made whole and to avoid the substantial constitutional questions that would follow if the receivership deficit is allowed to swallow up the damages award.

### A. Governing Principles of Contract Law Require That Damages Be Paid Net of the Receivership Deficit.

Controlling Supreme Court precedent directs that this case be resolved in accordance with "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *United States v. Winstar Corp.*, 518 U.S. 839, 871 (1996). And it is hornbook law that when a party breaches a contract, "the disappointed promisee is generally entitled to an award of money damages in an amount reasonably calculated to make him or her whole." 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:1 (4th ed. 1993) ("WILLISTON ON CONTRACTS"). Indeed, "[c]ontract remedies are designed to make the nonbreaching party whole." *California Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed Cir. 2005); *accord Glendale Fed. Bank, FSB v. United States*, 239 F.3d at 1383 ("The consequences the law imposes [for breach of contract] are for the purpose of making the non-breaching party whole . . . ."). Thus, as Williston explains, the "goal of compensating the promisee following a breach of contract by the promisor is, to the extent possible through an award of money damages, to place the plaintiff-promisee in as good a

position as he or she would have occupied had the defendant-promisor not breached the contract." WILLISTON ON CONTRACTS § 64:1; *accord Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d at 1355 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)); *California Fed. Bank, FSB v. United States*, 245 F.3d at 1349; *Glendale*, 239 F.3d at 1380. At a minimum, an award of damages for breach of contract should "mak[e] good the plaintiff's losses." DOBBS, LAW OF REMEDIES § 1.1, at 3 (2d ed. 1995) (quoted in *AmBase v. United States*, 61 Fed. Cl. at 801).

Carteret will not be made whole if it is forced to shoulder the expense of the receivership deficit. Such a result would constitute a blatant departure from the "ordinary principles of contract construction and breach" that the Supreme Court has instructed this Court to apply.

It does not matter that the receivership deficit represents claims against the receivership. "If the breach had not occurred, there would have been no receivership." *Slattery*, 69 Fed. Cl. at 586; *accord Slattery*, 73 Fed. Cl. at 531 ("The Government caused [the thrift] to be forced into receivership which it would otherwise not have been forced into . . . ."). "Any value lost in the receivership and liquidation process would not have been lost, but for the breach." *Slattery*, 69 Fed. Cl. at 586. Thus, "the very existence of the receivership deficit is the result of the breach of contract by the defendant." *AmBase*, 61 Fed. Cl. at 802.

By breaching the contract, the government thus caused Carteret to incur liabilities that it otherwise would not have incurred. It is well settled that when "a breach of contract results in claims by third persons against the injured party[,] [t]he party in breach is liable for the amount" of any foreseeable expenses incurred by the injured party in paying or settling those third party claims. RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. c (1981). Similarly, the Federal Circuit has held that when the government breaches a contract, it is responsible for increased

costs paid by the plaintiffs to third parties as a result of the breach. *See, e.g.*, *Bluebonnet*, 266 F.3d at 1355-57 (increased financing costs). While in this case Carteret has not yet fully paid the liabilities incurred as a result of the breach, that is a distinction without a difference to the question of whether such liabilities may be deducted without compensation from the injured thrift's damages award or must be borne by the breaching party. Under well-settled principles of contract law, the answer is clear: because the receivership deficit resulted from the government's breach of contract, it is the government that must shoulder the responsibility for that deficit. *See Slattery*, 73 Fed. Cl. at 531 ("the Government is liable for any receivership deficit").

Requiring the thrift, rather than the government, to bear the cost of the receivership deficit would be especially inappropriate here, where the thrift's predominant creditor is the government itself. As this Court has previously recognized, the law does not compensate a party for expenses that it suffers as a result of its own breach:

> Suppose, hypothetically, that a contractor contracts to renovate a house, and in the process destroys that house. As remedies for breach of contract are traditionally understood, the contractor would then be obligated to rebuild that house. His fulfillment of this obligation will naturally incur some opportunity costs, as the time spent rebuilding the house is time not spent working on some other, profitable job. Nevertheless, the contractor will not be compensated for this lost time, as the loss is incurred as a result of his own breach of contract.

*AmBase*, 61 Fed. Cl. at 802. The law thus provides that a breaching party will bear its own costs suffered as a result of the breach. And it certainly bars that party from shifting those costs to the nonbreaching party. Yet that is exactly what will happen if the government is allowed to reimburse itself from the thrift's damages award for the costs its has incurred as a result of its own breach. Simply put, the law directs that the breaching party make the injured party whole, not that the injured party make the breaching party whole. The government should not be allowed to turn this well-settled principle on its head.

### B. Direct Payment of Damages to AmBase, As the Thrift's Sole Residuary Claimant, Will Vindicate Controlling Principles of Contract Law.

Controlling principles of contract law thus require that the thrift's damages be paid "net of any receivership claims." *Slattery*, 73 Fed. Cl. at 531. While awarding damages in the amount of the receivership deficit in addition to the other damages flowing from the government's breach of contract would be a natural way to effectuate the requirement that Carteret be made whole, the government will no doubt argue that Federal Circuit precedent restricts this Court's ability to award damages directly for the receivership deficit. *See Bailey v. United States*, 341 F.3d 1342, 1346 (Fed. Cir. 2003). And while awarding damages to the receivership and directing the receiver to distribute those damages without diversion to the receivership deficit might also serve to make the thrift whole, the FDIC would likely argue that such distribution is barred by the statutory distribution framework set forth in 12 U.S.C. § 1821(d)(11). In addition, the FDIC may challenge this Court's authority to direct the FDIC's actions in this manner. *See* 12 U.S.C. § 1821(j).

Ordering payment of damages directly to AmBase "outside the statutory distribution scheme," *Slattery*, 73 Fed. Cl. at 531, however, would serve to make the thrift whole while avoiding these objections. Because such an award would not flow through the receivership and therefore would not be diverted to the receivership deficit, no damages need be awarded for the receivership deficit to make the thrift whole.

In *Bailey*, the Federal Circuit held only that the receivership deficit is not an asset available for recovery by the FDIC. *Id.* But nothing in *Bailey* presents a challenge to this bedrock principle of contract law: that the breaching party pay the injured party directly for the breach. In *Slattery*, this Court properly followed this simple proposition. AmBase requests no more and no less here.

Moreover, there are two important factual distinctions between this case and *Bailey*. First, in *Bailey*, neither the plaintiff nor the Federal Circuit questioned the validity of the receivership deficit. Here, however, the entirety of the receivership deficit is bogus. Second, the alleged deficit here resulted from Congressional policies and such as the MPP and the delaying of funding to the RTC, separate and apart from the breach. As discussed above, when a breaching party exacerbates the harm caused by the beach, it is the breaching party who must bear the cost.

Furthermore, because such an award would not be paid to the receiver, it would not constitute "amounts realized from the liquidation or other resolution of any insured depository institution **by any receiver** appointed for such institution," 12 U.S.C. § 1821(d)(11) (emphasis added), and would therefore not be governed by the statutory distribution framework. Finally, an order directing the **government** to pay damages would not be directed to the FDIC **as receiver**, and would therefore not impermissibly "restrain or affect the exercise of powers or functions of the Corporation **as a conservator or a receiver**." 12 U.S.C. § 1821(j) (emphasis added).

Not only will an award of this sort result in damages being paid "net of any receivership claims" to the thrift's sole residuary claimant, it will also place responsibility for the receivership deficit where it should lie—with the government—which may either reimburse the receivership for the deficit or, if it chooses not to do so, will still bear the cost of the unpaid deficit indirectly as the receivership's predominant creditor. In light of Federal Circuit precedent and other legal authorities, AmBase respectfully suggests that a direct award of damages to AmBase is the most practical approach for effectuating controlling principles of contract law.

### C. Direct Payment of Damages to AmBase Will Avoid Substantial Questions under the Takings Clause.

Awarding damages directly to AmBase will also allow this Court to avoid "the difficult and sensitive questions" that would arise under the Takings Clause if the government is allowed

to confiscate Carteret's recovery to defray expenses suffered by the government as a result of the government's breach. *N.L.R.B. v. Catholic Bishop*, 440 U.S. 490, 507 (1979).

The Federal Circuit has held that the enactment of FIRREA did not constitute a taking of the contractual rights of thrifts such as Carteret so long as those thrifts "retai[n] the full range of remedies associated with any contractual property right they possessed." *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002). In other words, as this Court has explained, a takings claim does not arise so long as a contract remedy exists pursuant to which, if the thrift prevails, it "would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action." *AmBase v. United States*, 58 Fed. Cl. 32, 51 (2003).

If Carteret is both forced to pay the costs of the receivership deficit and also barred from obtaining offsetting damages, its contract remedy will not restore it "to the position it would have been in" but for the breach and "the shareholder" will not "have lost nothing by the government's action." If FIRREA and other controlling authorities are interpreted to compel this result, then Carteret does not "retai[n] the full range of remedies" associated with its contractual property rights. Not only would such a result substantially impair a thrift's contractual remedies, it would allow the government to eliminate those remedies entirely, merely by delaying resolution of the thrift's suit for breach of contract until the receivership deficit, including interest, finally swallows the damage claim entirely. Such a result would almost certainly be unconstitutional. But this Court need not resolve that question. Rather, it should interpret controlling authorities to permit an award of the damages due Carteret directly to AmBase, as Carteret's sole residuary claimant.

## CONCLUSION

For the foregoing reasons, the Court should enter final judgment awarding AmBase damages of no less than $1.8 billion dollars.

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:

Vincent J. Colatriano
David H. Thompson
Jesse Panuccio

COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

Dated: December 21, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of December, 2007, I caused to be served by U.S. Mail copies of the foregoing on the following counsel:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

Andrew Gilbert, Esq.
FDIC Legal Division
550 17th Street, N.W.
Room 2098
Washington, DC 20429

/s/ Jesse Panuccio
Jesse Panuccio