COURT OF FEDERAL CLAIMS

* * *

AmBASE CORPORATION and FEDERAL:
DEPOSIT INSURANCE CORP.
:
-vs-
:
THE UNITED STATES NO. 93-531C
:

* * *

Oral deposition of THOMAS O'ROURKE, held at the law Clarion Hotel, 1010 Race Street, Philadelphia, Pennsylvania, on Monday, September 27, 1999, beginning at approximately 9:30 a.m., before Audree E. Jones, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

* * *

APPEARANCES:

COOPER, CARVIN & ROSENTHAL
BY: HAMISH HUME, ESQUIRE
1500 K Street, N.W. - Suite 200
Washington, DC 20005
(202) 220-9638
-- Representing the Plaintiff AmBase

FEDERAL DEPOSIT INSURANCE CORPORATION
BY: JAMES IGO, ESQUIRE
550 17th Street, N.W. PA-1730, Suite 300
Washington, DC 20429
(202) 942-3609
-- Representing the Plaintiff FDIC

U.S. DEPARTMENT OF JUSTICE
BY: DAVID A. LEVITT, ESQUIRE
1100 L Street, N.W.
Washington, DC 20001
(202) 307-0309
-- Representing the Defendant

ALSO PRESENT:
MICHAEL CARENZO, ESQUIRE
WILLIAM PURCELL
JEFFREY CURRY



INDEX


| WITNESS: | PAGE |
|---|---|
| THOMAS O'ROURKE | |
| BY: MR. HUME | 5, 205 |
| BY: MR. IGO | 202 |


* * *

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| O'Rourke-1 | 10/25/91 Memo | 16 |
| O'Rourke-2 | 7/7/92 Letter | 28 |
| O'Rourke-3 | 8/26/92 Memo | 34 |
| O'Rourke-4 | 8/28/92 Memo | 42 |
| O'Rourke-5 | 10/14/92 Memo | 47 |
| O'Rourke-6 | 10/15/92 Memo | 52 |
| O'Rourke-7 | 11/13/92 Memo | 56 |
| O'Rourke-8 | 8/30/90 Memo | 92 |
| O'Rourke-9 | Criminal Referral | 94 |
| O'Rourke-10 | 1990 ROE | 98 |
| O'Rourke-11 | Transcript | 126 |
| O'Rourke-12 | 5/14/91 Memo | 137 |
| O'Rourke-13 | 11/22/91 Memo | 145 |




EXHIBITS CONTINUED...


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| O'Rourke-14 | 5/24/91 Letter | 150 |
| O'Rourke-15 | 11/22/91 Letter | 153 |
| O'Rourke-16 | 1991 ROE | 156 |
| O'Rourke-17 | Summary | 184 |
| O'Rourke-18 | 7/29/91 Letter | 186 |
| O'Rourke-19 | 7/6/92 Memo | 188 |
| O'Rourke-20 | 7/7/92 Memo | 189 |
| O'Rourke-21 | 1992 ROE | 190 |
| O'Rourke-22 | 9/15/92 Memo | 194 |
| O'Rourke-23 | 1993 ROE | 195 |
| O'Rourke-24 | 12/14/92 Letter | 197 |
| O'Rourke-25 | 2/27/92 Memo | 205 |




THOMAS J. O'ROURKE, was called as a witness and after having been first duly sworn, according to law, was examined and testified as follows:

EXAMINATION

BY MR. HUME:
Q. I'm Hamish Hume. I work at Cooper, Carvin & Rosenthal in Washington, D.C. I represent AmBase Corporation in the lawsuit against the United States. Why don't we all introduce ourselves for the record.
MR. CARENZO: Michael Carenzo of AmBase Corporation.
MR. IGO: James Igo for the FDIC.
MR. CURRY: Jeff Curry for the Secura Group.
MR. PURCELL: William Purcell for AmBase.
MR. LEVITT: David Levitt of the Department of Justice, representing the witness.
BY MR. HUME:
Q. State your name.
A. Thomas J. O'Rourke.
Q. Could you state your address for the record.
A. 4876 Veracrus Road, Centerville,

Pennsylvania.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. When was that?
A. 1990, I believe.
Q. What litigation was that?
A. Franklin Savings versus the Director of the OTS.
Q. There are a few formalities.
Have you done anything to prepare for this deposition?
A. Reread the OTS examination of Carteret, report of examination.
Q. Have you looked at any other documents?
A. No.
Q. Was that in your possession?
A. Off the database.
Q. Have you done anything else to prepare?
A. No.
Q. Have you ever been convicted of a felony?
A. Never.
Q. As you probably know, the deposition will consist of me asking a series of questions. Your counsel may state legal objections. Unless he



instructs you not to answer, you can still answer. If at any time you want to take a break, say the word, and we'll do that.
A. Very good.
Q. Could you tell me your academic background and how you came to first work for the Federal Home Loan Board?
A. I received a Bachelors degree from Bethany College in Kansas, in '82. I went to work for the Federal Home Loan Bank of Topeka in 1985.
Then I was transferred to the Office of Thrift Supervision in 1989. Then I transferred to a different region of the OTS in 1990. That's where I am presently employed, as examiner for the OTS in Jersey City, New Jersey.
Q. Did you have any accounting training?
A. Yes. Whatever the curriculum requirements were. I believe 12 hours.
Q. Your Bachelors degree was in what?
A. Business economics.
Q. Do you know what this litigation is about?
A. I have an idea from working with Carteret years ago. There was a goodwill issue. I know it involves goodwill.
Q. Goodwill, do you mean supervisory goodwill?



A. Correct.
Q. What is supervisory goodwill? How do you define that?
A. I don't know the precise definition. What was deemed supervisory goodwill in FIRREA, I believe was instituted. Institutions labeled it accordingly, whether correct or not.
Q. Do you remember when you first worked on Carteret?
A. June '90.
Q. Prior to that, were you working in Kansas?
A. I was in the process of moving from Kansas to New Jersey, and was working on Franklin matters at the time. I started working on Carteret matters.
Q. Was Franklin the primary thing you were working on before you moved back east?
A. Yes.
Q. What happened with Franklin?
A. It was transferred to the RTS, and after several challenges, was disposed of.
Q. Have you been in charge there as well?
A. No, I was supervisory analyst assigned to monitor Franklin Savings 100 percent of my time.
Q. For what reason was it taken into conservatorship?



A. Losses that exceeded capital, inability to sustain profitability. Unsafe and unsound operating condition.
Q. When you first started working at the Federal Home Loan Bank Board, there was a period in which the industry was in a state of crisis?
A. I worked with Federal Home Loan Bank of Topeka, which was distinct from the Bank Board.
Q. It was the regulatory body that had regulatory responsibilities for savings and loans in that region?
A. Yes, correct, delegated, I believe, from the Bank Board. To answer your question --
MR. LEVITT: Objection. The word crisis is ambiguous.
THE WITNESS: Restate it.
BY MR. HUME:
Q. I was asking the state of the industry when you started working at the Federal Home Loan Bank Board, and whether you remember it as a time when the industry was in crisis?
A. I can't opine whether it was a crisis or not. The industry was. The region I was working in, several institutions, were in distress, and we needed to make an assessment of how bad it was.

office would call me for updates, and so forth. I don't recall if they were on site with us in 1991.
Q. Do you remember William Day?
A. Yes, I remember Bill Day from the 1990 exam.
Q. Do you remember if he was the FDIC examiner in charge?
A. Yes.
Q. How closely did the FDIC work with the OTS examiners during that exam in 1990?
A. I know I worked very closely with Bill Day and his loan people, in sharing results and making a team effort, rather than having two agencies pursue separate efforts.
Q. Did the FDIC examiners that you worked with have as much experience working with savings and loan associations as you did?
A. I don't recall.
Q. Do you remember them not understanding the industry as well as you did?
MR. LEVITT: Objection to form.
THE WITNESS: I'm not sure I can answer that. I don't know their experience base. Bill Day had experience with several other thrifts. As far as the rest of his team, I don't know, or I don't recall at this time.



BY MR. HUME:
Q. Do you remember following the October of 1991 S-Memorandum we looked at, that there was an agreement entered into between the OTS and Carteret relating to the ARP program?
A. I remember ARP being a subject that was being considered. Unless you can show it to me, I'm not sure one was ever executed. The lapse of time made me cloudy on that. I know ARP was being considered.
Q. Do you remember Carteret being given certain defined time periods to raise new capital?
A. I don't know if we specified time periods. We were going along since we had it stabilized and allowing Mr. Bianco to search for capital.
Q. Take a minute to review this letter.
A. (Witness complies).
Q. This doesn't discuss all of the terms of the February 27, 1992 agreement.
Do you remember, in general, what the Accelerated Resolution Program was?
A. My understanding, expedited monies getting an institution through a receivership that had a promise of capital being infused.
The capital would be infused, and the



institution would be fully capitalized.
Q. Was it, therefore, reserved for the most valuable or successful franchises? Something worse reserving?
A. Viable franchises and management team that could ultimately make that institution successful.
Q. Do you remember thinking of Carteret as an institution that was a viable franchise?
A. With the capital infusion, yes.
Q. This letter states in the second paragraph, "We believe to the contrary that progress in stabilizing a large, troubled institution has been made by the new management team since taking control of Carteret in July 1991, and that reasonable progress toward achieving a recapitalization of Carteret without federal assistance has continued to be made since the February 27, 1992 agreement was signed by OTS and Carteret."
Do you remember sharing that view around the time of July 1992?
A. Yes.
Q. Do you remember thinking that the FDIC at that time was putting pressure on the OTS to take more aggressive action against Carteret?



A. I can't answer that. I was not the subject of any pressure. If it was exerted, it was at the regional level.
I didn't feel any pressure to do anything other than present the condition of the institution.
Q. Does it refresh your recollection that at that time progress was being made because there were a number of interested investors looking at the institution?
A. I read reports to that effect. I did not sit through any meetings with prospective investors, or have firsthand knowledge of any investor interest.
Mine was based on what it was doing economically. The commercial asset portfolio was being managed very well by Wayne Moor.
Q. At that time you felt the institution deserved more time; is that right?
A. I felt, and I recommended, as long as we were maintaining a presence, and keeping on top of what was going on, there was no additional risk by waiting.
Q. No additional risk, none to insurance fund; is that right?

34

A. No additional risk of capital being depleted.
Q. The second page of this letter refers to a meeting with Kohlberg & Co.
Do you remember meeting with Kohlberg & Co.?
A. Never.
Q. Do you remember Kohlberg was interested in investing in Carteret?
A. I was advised by Mr. Bianco, that was one of his interested investor groups.
Q. Was it part of your job responsibility to know which investors were looking at Carteret?
A. To be aware of the prospect for recapitalization. When it came to following up with investor groups, that was management function, left to Albanese.
MR. HUME: Mark this as O'Rourke-3.
(The above document was marked for identification as O'Rourke-3).
BY MR. HUME:
Q. This letter, does this refresh your recollection as to what occurred in 1992?
Were there any other events it refreshes your recollection about, that I didn't ask you?

35

MR. LEVITT: Objection as to form.
THE WITNESS: It refreshes my memory as to the date Carteret executed what I believe was the accelerated resolution agreement. I believe a consent agreement was also signed.
BY MR. HUME:
Q. What do you mean by consent agreement?
A. Consent, which the board consented to, if they did not raise capital, they were to be placed into receivership.
Q. Do you remember such an agreement being signed?
A. I believe there was one. I'm not certain to the date.
Q. When an institution signs an agreement like that, is it because they were under threat of being placed into conservatorship at that time?
MR. LEVITT: Objection. Vague.
THE WITNESS: My experience is, yes, they are signed by a Board of Directors in facing the prospect of being placed into receivership or conservatorship.
BY MR. HUME:
Q. Is the purpose of the institution's, of management's consent in order to have it given in

36

exchange for the OTS agreement, to give the institution a certain amount of time to raise capital; is that how it works?
A. That's my understanding.
Q. The last paragraph on the second page of the letter says, "In conclusion, we believe the termination of the agreement and the underwriting process while progress is being made to recapitalize a troubled institution which assets of over $5 billion would not be effective supervision or good policy."
Do you remember agreeing with that statement?
A. I would agree with that, yes.
Q. Do you remember agreeing there was progress being made in the summer of 1992 with Carteret?
A. From what I heard, and my limited knowledge, I understood progress was being made. I don't know to what degree, or whether it was satisfactory to the people above me.
Q. Let me refer you to Exhibit 3. This is dated August 26, 1992. It says reply to the attention of Thomas J. O'Rourke. Is this a document you would have written?
A. Yes, it is.

37

Q. It refers to an August 24, 1992 meeting at OTS, where Carteret's capital raising efforts were discussed.
"In the wake of the withdrawal by Kohlberg & Co." Do you remember that meeting?
A. No, but if I wrote the memo, I would have been there. At this point, I can't recall it in my mind as to the particular meeting.
Q. Do you remember Kohlberg had a letter of intent to invest in Carteret?
A. That I remember, yes.
Q. Do you remember thinking it was a high likelihood they would invest in Carteret?
A. I knew it was subject to due diligence, and I was very hopeful something would happen, but I had no expectations.
Q. You didn't expect either way? You didn't know what to expect?
A. Correct.
Q. Did you consider it to be a serious prospect?
A. Yes, due to the fact that Dick Bianco was well regarded. I knew it was in good faith.
Q. Do you recollect why Kohlberg decided to withdraw from the letter of intent?
A. I don't know.

Q. Do you remember the LZO report?
A. I remember, yes. I remember that.
Q. What do you remember about their report?
A. They prescribed an additional amount of loan loss reserves. I'm not sure what the basis was.
Q. Page 2 of this letter, it refers to four investors; do you see that?
A. Yes.
Q. The MacArther Foundation, The Pennsylvania Teachers Retirement Fund, RoseDev, and U.S. West Financial.
Do you remember those investors having an interest in infusing capital into Carteret?
A. I remember them being stated. Dick Bianco listed them in the meeting as potential investors.
Q. Do you remember considering them to be serious prospects for a new investment into Carteret?
A. I didn't know their level of interest and how much of the institution they looked at.
Q. Do you remember Mr. Albert of Merrill Lynch?
A. I can't place a face to the name.
Q. With all of these investors, do you remember it being a problem for them, whatever capital they



put into Carteret, that OTS said would be sufficient to bring it into compliance? Do you remember them worrying they would be on the hook to put more in shortly after that?
A. I don't know any particular investor's concerns in that regard. They were never voiced to me. If I heard it, it would be secondhand. That's the limit to those concerns. I didn't know the total basis for them.
Q. Further down on the page it discusses the LZO report. It lists four conclusions that the LZO report reached. Do you see where I'm looking on this page?
A. Yes.
Q. Yield curve risks; loan loss reserves; Carteret might face further regulatory mandatory writedowns of its PMSR, even after purchase accounting adjustments were made, and; the regulatory environment would place the investor's capital at risk, due to new regulations, safety/soundness concerns, and other non-defined potential regulatory events.
Do you remember these investors being concerned about the regulatory environment at the time?



MR. LEVITT: Irrespective of what he wrote here?
MR. HUME: Whether he recollects having reviewed this document that he wrote, whether these investors were concerned about the regulatory environment at that time?
THE WITNESS: I was capturing what was relayed to me. They were experiencing those concerns, I was documenting them in the meeting memo.
I know on many occasions, Dick Bianco told me they were skidish given FIRREA imposed new requirements, and future regulatory or legislative actions might impose new requirements on an institution. They did not know the size and magnitude of it.
Q. Did you find those statements by Mr. Bianco credible?
A. They were legitimate concerns, given the past. An investor who was going to put money into an institution would have those concerns. I thought they were normal concerns.
Q. Given the ARP program worked, wasn't it incentive for the investor to wait until the institution went into conservatorship, and then



infuse capital, so they can get a larger stake at a lower price?
A. Not in my opinion, as an examiner. Any time an institution was intervened on by a regulatory body, I believe it causes damage to the franchise. Subsequently, I believe you're selling, in my opinion, damaged goods.
Q. The publicity effect of the negative supervisory action might outweigh the benefit to the investor; is that correct?
A. That was a very real risk, in my estimation.
Q. Wasn't there some negative publicity on the institution, based on prior supervisory action by the OTS?
A. I heard reports.
Q. In principal, the existence of a supervisory memorandum that states that the institution should be recommended for receivership, being considered for an ARP program, that it's subject to capital directives, operating under a supervisory agreement, all of those things, as they become known to the investing public, would affect the institution negatively as well, wouldn't it?
A. I'm not sure I follow that. The announcement would have a negative impact on the public and

would get through safely without capital infusion.
Q. On Page 6, the paragraph headed, operating results.
A. Yes.
Q. It states Carteret posted a loss of $160 million in 1991, net profit before taxes of $8.5 million for the nine month period ending September 30, 1992?
A. Yes.
Q. Does that comport with your recollection of the level of profitability Carteret had at that time in 1992?
A. The numbers sound ballpark.
Q. "Profits for the first nine months of this year are attributable to improved net interest margins and reduced operating expenses, and to lower loss provisions for the first six months of 1992."
Doesn't that sentence indicate that the income is not nonrecurring income, but occurring in the right economic environment?
A. Yes, the first two would lead to it. If they were wrong on that, they can be underestimating or overestimating their profits.
Q. By this stage weren't loss provisions being



done in connection with the OTS?
A. We're aware of what they were doing on assets. When you set aside loan loss provisions, you're making a judgement as to the time period of the asset and net reliable value you obtain. There's a lot of estimations that go into that process.
If they were wrong, even though we felt they were reasonable, if they were wrong, there would be additional loss in the future. That's a real risk.
Q. Those estimations and judgement that are the foundation of the loss provisions involve predictions about the future, don't they?
A. Yes, they do.
Q. Reasonable people can differ as to what's likely to happen in the relevant markets that will affect the asset portfolio of an institution; is that correct?
A. Yes, they can.
Q. In hindsight, which no one would have the benefit of at this time, isn't it true to say the asset portfolio would have performed very well, given the development in the economy?
MR. LEVITT: Objection as to relevance.



THE WITNESS: I can't agree with that from the sole point, I don't know the time of the disposition of the assets. If they held them from now to then, you can make that argument.
I do not know what timing Carteret would have laid out for disposing of the portfolio. I can't agree with that statement.
Q. You don't disagree with it, isn't that correct?
A. I can't rule it out, because I don't have -- you have to put the scenario in the context when the assets are disposed of, and what the real estate condition would be at that time.
Q. To answer with a high degree of accuracy you would have to review the portfolio in great detail and planned asset disposition in great detail, and business plan.
My question is more broad than that. With the benefit of hindsight, isn't it true things economically in the country, also in the region, and with respect to the assets this institution held, improved a great deal shortly after the institution was taken, and that indicates the institution's asset portfolio would generate profits for the institution?



MR. LEVITT: Objection.
THE WITNESS: Shortly. I can't agree that -- it would have been an element of time for the assets to become more valuable. The optimization of the price received for those assets would depend on timing, and when they are sold.
I don't know the timing of what these assets would have been sold at, what years. It's not one pool of assets, individual assets within that pool with different characteristics.
Q. Some of these assets may have been sold before they had a chance to recover?
A. That is correct.
Q. You talk about a reserve against under performing assets and whether or not that's over reserving against the asset. It depends if you sold it before it bounced back or after?
A. That is correct.
Q. Would you agree that as non-performing assets were worked out or sold, the earning position of the institution would improve?
A. To the extent he can replace the assets with cash that would be invested with interest, yes.
Q. Would it be your view the Carteret management

102

forward. I would evaluate it, and put it in context of what type of risks we saw in that commercial asset portfolio, and how much in losses are going to stem from that, that would be charged to capital.
We would also, making that determination, look at how much was composed of goodwill.
Q. Turn to Page 19 of the report -- actually Page 20 is better. Carteret reported in excess for its three different capital measures. Those are the capital as reported before examination adjustments; do you see that?
A. Yes.
Q. Turn the page, Page 21, it shows the same capital numbers adjusted for the requirement of IPF intangibles. Do you see that?
A. Capital with IPF interest deducted?
Q. Yes. Do you see the equity capital, under that, less goodwill and other intangibles, footnote one? That includes $168.1 million in supervisory goodwill; do you see that?
A. Yes.
Q. $168 million in supervisory goodwill is included in the tangible capital calculation.

103

Would that affect your analysis of whether this institution was in capital compliance?
A. At that point, yes. I assume it was a qualifying component of capital.
Q. I want to refer you to Page 8 of the exam. This discusses conclusions on asset quality.
The first paragraph following conclusions, "The poor quality of loan underwriting noted in the previous report of examination, a declining economic environment and a declining real estate market coupled with the problems noted in the ILR function had made a bad problem worse. Consequently, loan loss allowances are seriously inadequate. The bank's viability has deteriorated due to the corrosive effect of its asset problems on its level of capital."
Do you recollect the declining economic environment and declining real estate market had a significant impact on Carteret's asset quality at that time?
A. I believe they were contributors, and significant contributors, as to asset quality problems, yes.
Q. What is it that you think Carteret could have

104

done better with respect to ILR functions in 1990?
A. ILR functions had been properly performed, identified in a timely manner, assets showing signs of weakness prior to onset of severe delinquencies, and other problems that these assets manifested.
Due to the fact Carteret was slow in identifying these problems, by the time they got around to addressing them, they were very limited in what they can do to salvage their position in these assets.
Q. ILR is something that allows you to let you know how bad, where your problems are, and what the extent of the problems are?
A. Monitoring function that involves the assessment of assets on an ongoing basis, to see whether or not there is a presence of a potential collection problem.
Q. Excess capital would allow you to absorb problems and give you more time to work out problems in an institution, would you agree with that?
A. Yes, generally speaking. Excess capital, an institution would be able to withstand a higher level of asset quality problems.

105

Q. The purpose of having a good ILR function is, likewise, to give you advance notice of potential problems so you have enough time to work the problems out?
A. That is correct. Help mitigate losses.
Q. The reference to poor quality of loan underwriting noted in the previous ROE, do you remember that referring to commercial loan underwriting?
A. Commercial real estate lending. Both, yes, I do. Underwriting concerns were identified for both.
Q. Was that related to those being new types of assets for the institution to be investing in?
The point about a poor underwriting system related to the point that the institution was investing in new lines of business that savings and loan institutions had not historically been in?
A. That was part of the problem. The management was much too aggressive in making assumptions as to whether the assets would ultimately be paid.
Q. Based on overly optimistic predictions?
A. As to income, these properties would slow off. The timeframe in which development projects

146

Q. This is an exam memorandum written by you, dated November 22, 1991. It's essentially your own summary of the presentation that we just saw the transcript of.
Do you remember writing this memorandum?
A. Yes.
Q. Do you see the paragraph on previous management, it states, "The unsafe and unsound management practices of Messrs. O'Brien, Walsh, Braun, C. McCabe were detailed for the board with emphasis being placed on the initiation of corrective actions and the pursuit of restitution from unjustly enriched parties."
You would have written that sentence?
A. Yes.
Q. Is the meaning of that sentence that the primary emphasis in describing unsafe and unsound management practices of those individuals was their previous compensation packages entered into in 1990, and an attempt to obtain restitution of that money?
A. There was a discussion of unsafe and unsound management practices of that management team, that were documented and discussed on many occasions

147

with Mr. Bianco and his management team.
We, again, in this meeting, detailed them. There's a chronology that covers all of that. The emphasis we brought forward was to recapture compensation that was paid to these people. There wasn't emphasis on discussing the past sins, but what do we do from here, going forward.
Q. Turn to Page 2 of this document, under capital. Review that first paragraph. The third sentence states, "The board was advised that this deficiency must be addressed through an infusion of equity capital significant enough to restore a stable and adequate stream of operating earnings that would ensure full regulatory capital compliance after giving rise to the FIRREA mandated elimination of goodwill, non-includable subsidiary investments, and other intangibles, as well as the potential negative adjustments to the purchased servicing asset and the likely prospect of an increased core capital standard."
Was it your view at that time that regardless of the status of the judicial order and the injunction that Carteret won in court, that the institution needed to forecast capital

148

compliance without the use of its goodwill?
A. Yes.
Q. It absolutely was required that the institution be able to maintain compliance?
A. Yes, we expected the capital plan to be tendered, and capital raised in an amount sufficient to meet the requirements.
Q. I want to refer you to the paragraph under risk management. "The board was advised of the examiners' concern with Carteret's level of interest rate risk and the asset/liability management decisions such as the sale of loans to DLJ Mortgage Capital, Inc., that appear to have increased Carteret's exposure to interest rate risk. "
Do you remember how it was that Carteret was exposed to interest rate risk?
A. Very generally, it was profitable for them to do so. In the process of doing so, they increased their exposure to fixed rate mortgage loans, which had the effect of increasing exposure to increasing interest rates.
Q. Do you think that was motivated by a desire to show profit?
A. Yes.

149

Q. Do you think the desire to show short term profit was motivated by a need to improve capital ratios?
A. Yes, in response to our request for increase loan loss provisions.
Q. Wouldn't you agree that was also in response to the loss of goodwill and its treatment of goodwill as capital under FIRREA?
A. That could have been a partial reason. The main motivation was we confronted Mr. Walsh with additional loan loss provisions, and he came back with a couple transactions where he can generate profits from selling assets.
Q. Those loan loss provisions would have been less worrisome to him if he had capital in excess of his regulatory requirements; do you agree with that?
A. I don't know.
Q. Wouldn't they be less worrisome to you if Carteret had excess capital over and above its requirement?
A. When you say excess capital, in my mind, I'm assuming that to mean capital without goodwill. I view goodwill as a non-economic asset. It does nothing to add to interest income, does nothing to

150

buffer loan losses.
In that context, no, I would not view it just because they had stated capital, that included goodwill, that I would consider that to be indicative of their ability to withstand losses.
MR. HUME: Mark this as O'Rourke-14.
(The above document was marked for identification as O'Rourke-14).
BY MR. HUME:
Q. This discusses the discussions of bonuses paid out. It's written by Michael Simone to the Carteret Board of Directors. On the second page it describes the chronology of events that lead to the conclusion that Carteret should have known, according to the letter, that its financial condition was rapidly deteriorating when it decided to pay the bonuses. Please review that chronology.
A. (Witness complies).
Q. Do you remember having reviewed that chronology when AmBase had infused $30 million in cash into Carteret?
A. I still don't know the date the funds were infused. I know the 1990 examination indicated

151

the need for it to be infused. That was transmitted late in 1990. As far as I know, it must have been sometime after that.
Q. Do you remember whether the timing of the $39 million payment coincided with the timing of the preliminary injunction lawsuit by Carteret?
A. I believe it was after that, but my basic answer is, I don't recall. I thought it was part of a global settlement. Global settlement would have been reached after the injunction had been resolved.
Q. The $30 million was paid February 13th, and the lawsuit was filed the next day, essentially. The injunction was granted.
Having had that represented to you, does it refresh your recollection as to what the reaction was at OTS to the filing of the lawsuit by Carteret?
A. It was not viewed positively, I know that. We saw it as a device that old management was using to keep Carteret in existence and taking the focus off.
We should have been seeking new capital. We saw it as a stalling tactic.
Q. Do you remember there being a supervisory

152

agreement under which Carteret had to operate?
A. I'm not aware of the proceedings.
Q. Do you have any other experience with supervisory agreements wherein the OTS sets forth certain parameters how management can manage the institution?
A. My general knowledge of supervisory agreements is that we try to keep management from doing the activities that got us into the problem in the first place, bad lending practices, imprudent investments, speculative type activities, excessive compensation payments. Those are the types of things we usually prescribe in those agreements.
Q. Do you remember whether the existence of a supervisory agreement with Carteret was in part instigated by OTS' reaction to the goodwill lawsuit?
A. I don't recall if that factored into the decision or not. My recollection was that after the 1990 examination Carteret was deemed capital deficient with or without goodwill.
We knew that there were probably more loan losses to be taken. In our criteria we set up, we were very cautious about not going over

153

board. As a consequence, we knew there were more losses there. It ultimately did come to the surface.
Q. If the management was paying unsafe and unsound compensation bonuses and instituting a lawsuit that you viewed as a delay tactic, wouldn't those factors contributed to the reaction of a supervisory agreement?
A. They could have been, but not being the drafter of the agreement, I can't answer that.
Q. Do you remember who the drafter of the supervisory agreement was?
A. I don't recall. Generally, they're drafted by counsel.
MR. HUME: Mark this as O'Rourke-15.
(The above document was marked for identification as O'Rourke-15).
BY MR. HUME:
Q. This is a letter sent to Bob O'Brien dated November 22, 1991 signed by Don Kramer, vice chairman of Carteret. It refers to the advancement of funds by Carteret to an individual to help him purchase the home of Mr. O'Brien.
It goes on to discuss other issues related to the compensation made to Mr. O'Brien.

know.
Q. Do you remember Nicholas Ketcha, threatening termination of its insurance?
A. I don't recall when and if that happened.
MR. HUME: Mark this O'Rourke-18.
(The above document was marked for identification as O'Rourke-18).
BY MR. HUME:
Q. This letter is the transmittal letter from Mr. Ketcha to the board on July 29, 1991.
Could you review the third paragraph of this letter, please.
A. (Witness complies).
Q. Having read that letter, do you recollect the FDIC telling Carteret there was a chance they would revoke their insurance?
A. I believe they were informed that was one of the options available. I don't recall them being threatened with it in a meeting.
Q. Do you remember the FDIC terminating insurance for any institution?
A. Not that I can recall. I know it's been initiated. I don't recall one that's followed through to conclusion.
Q. Would you agree that the communication of the



potential result of terminated FDIC insurance was designed to put pressure on Carteret, rather than as a real threat that the FDIC would actually carry out?
A. I don't know. At this point things were, if I recall, well under control, and I don't think anybody was going to jump the gun as far as enforcement action, while there was still hope of attracting capital.
Q. Did this letter put pressure on you as an OTS examiner or any of your colleagues?
A. Not in the least. I sat through many meetings where this type of action has been mentioned as a possibility. I have never considered it something that would jar us to do something we wouldn't do.
Q. Do you remember taking management of Carteret by surprise?
A. I don't recall his reaction to this letter.
Q. Would you characterize this as something that Carteret would view as an extreme action?
A. I can't speak to that. I don't know. I don't recall it being discussed with me by Mr. Bianco. Mr. Bianco was well aware that his primary regulator would make the ultimate



decision.
Q. It was clear the OTS would be the one to make the decision as to whether Carteret should be placed into conservatorship, and not the FDIC?
A. Correct.
Q. Do you remember having any disagreements with any of the FDIC examiners who worked on Carteret over the timing of Carteret, how much more time it should be given to raise capital?
A. No. I thought it was a very orchestrated response that we had. I don't recall anything over the timing of it, at my level, anyway.
MR. HUME: Mark this as O'Rourke-19.
(The above document was marked for identification as O'Rourke-19).
BY MR. HUME:
Q. This is a memorandum from Mike Finn to a group of OTS regulators, including yourself, describing Carteret's operating results. You will note significant improvement in net interest margin and net operating expenses.
On the second page it lists the results of the six months ending May 1992, compared to six months ending November 1991. They both show positive net income after taxes,



increased by three and a half million. Do you see that?
A. Yes.
Q. Do you remember thinking Carteret was showing an increasing level of profitability by the middle of 1992?
A. Yes. I was quite pleasantly surprised by it. It was an indication of the positive effect the new management team had. It was not going to be enough to resolve the issue we had with the capital deficit.
Q. Had you seen any other institutions benefit from an upswing in the business cycle before?
A. Now, I have, yes. I have now been through a full economic cycle.
Q. At that point in 1992 you had not been?
A. No.
Q. It would be unusual to see an institution go from significant operating losses and huge writedowns to a sustained period of profitability?
A. At that particular time, yes.
MR. HUME: Mark this as O'Rourke-20.
(The above document was marked for identification as O'Rourke-20).
BY MR. HUME:

taken greater reserves as of the summer of 1992?
A. I can't say that at this point. The reserves we asked for in this report would have reflected what we wanted. We never analyzed it again. It was a matter of months before the institution was dissolved.
Q. Do you remember how much you worked on Carteret subsequent to the seizure of Carteret?
A. I assisted the RTC in making myself available to questions they had for me. That died out, and my involvement after that, I did one examination of RTC's efforts. It gradually just faded out.
MR. HUME: Mark this as O'Rourke-22.
(The above document was marked for identification as O'Rourke-22).
BY MR. HUME:
Q. This is an interoffice memorandum by you regarding the LZO analysis dated September 15, 1992. I want to refer you to one section of it.
In the third sentence there, "LZO appears to have used more of an intuitive approach based on the limited individual asset comments contained within their report."
Do you remember the difference between LZO and LTS methodology?



A. Based on my reading of their report, there were very brief comments associated with it.
The methodology they used was cursory. Therefore, it was not as reliable as the work that Wayne Moor's people did, and we did in concert with Wayne Moor's people.
Q. Did you think that may have led them to have an overly negative view of the institution?
A. No, I think they had a less informed view, and therefore, by default, they decided to opt for a higher number of reserves to CYA themselves.
Q. Do you mean take a conservative approach to avoid future finger pointing in their direction?
A. Correct.
MR. HUME: Mark this as O'Rourke-23.
(The above document was marked for identification as O'Rourke-23).
BY MR. HUME:
Q. Exhibit 23 is the December 13, 1993 report of examination of Carteret. You were listed as the examiner in charge.
Could you explain what's involved in being the examiner in charge for an institution already placed in conservatorship?
A. This was basically a limited scope review of



an institution that was operating under RTC control, but was still a chartered S & L, subject to our rules and regulations.
Q. Did you get involved how they were to workout some of the assets when you were examining Carteret in the previous years?
A. No, that issue no longer was a concern to us. We were looking at the procedures the RTC was using, and whether they were complying with their own procedures, as well as OTS regulations.
It was a very technical review, along the lines of looking just at the compliance regulations and policy.
Q. Do you remember, in general, that the RTC approach to working out problem assets of institutions that have been placed in conservatorship was a bulk sale approach, trying to off load them as quickly as possible?
A. I heard that. As I talked to Ed Griffin, who was the managing officer, they were using a more diversified approach, that involved using subcontractors to assemble pools, also bulk sales and workouts of some of the assets.
There was a variety of ways they were managing the asset pool. They used Midland



Mortgage, or someone out in Kansas City, to do work in evaluating the loans.
MR. HUME: Mark this as O'Rourke-24.
(The above document was marked for identification as O'Rourke-24).
BY MR. HUME:
Q. Regarding Exhibit 23. It lists Edward Griffin and George Gross as the managing agents. Do you remember Ed Griffin?
A. Yes.
Q. Do you know where he is today?
A. No, I don't. Last I heard, he was released at RTC. He was unemployed, searching for employment.
Q. What about George Gross?
A. When he left that assignment, I don't know where he went. I heard he passed away.
Q. Do you have a copy of Exhibit 24?
A. Yes.
Q. This is a letter you wrote to Dick Bianco and Don Kramer 12 days after Carteret was taken into receivership. Please review that.
A. (Witness complies)
Q. Do you remember writing this letter?
A. Yes.

198

Q. Do you remember expressing positive feelings toward Dick Bianco and his colleagues?
A. Yes.
Q. Do you stand by those feelings today?
A. Yes. There's nothing I learned since then that changed my opinion about the way the situation was handled, and the staff they retained.
Q. Look at the attachment. "Personnel noted in December 14, 1992 letter."
Was that attachment made to summarize the people you thought had done a particularly good job?
A. Yes.
Q. You made up that list?
A. Yes.
Q. Do you continue to feel positively towards the work that each of those individuals did on Carteret during that period?
A. There's nothing I learned by any of these individuals that would change my opinion. To my knowledge, I was lauding for the efforts they made, and put forward in helping Carteret. I learned nothing subsequent that would change that. I hope that's not the case, I hope nothing

199

happened.
Q. The letter states in the first paragraph, "I know that the events of December 4, 1992 were not a fitting end to what I observed as a remarkable transformation of an institution that had been grossly mismanaged in prior years. Your efforts will not be overshadowed by the failure of Carteret, but in fact, the RTC will realize that your stewardship over the institution mitigated losses that previous management had embedded within the bank's operations."
I'd like to ask you about the decision at OTS to place Carteret into conservatorship. This lawsuit does not involve you personally or the work you did. Was it your feeling at that time that if Carteret had been given a little more time and been able to find an investor to invest new capital into the institution, that it could have survived?
A. I believe that with the management team in place and with amount of capital that we could have with close supervisory attention to Carteret, and the caliber of management in the institution at the time, that the institution could have ultimately gotten back to full capital compliance.

200

Q. That belief is shared by some of your colleagues, including some who have had senior positions at OTS, who testified they thought Carteret should have been given more time to raise more equity capital.
A. It remains a mystery to me. The people in the region were supportive of management's efforts. I won't say how much capital, but --
Q. You won't say how much capital, is that because you don't feel it's proper to say how much?
A. If I say a number, it will be endorsing a particular number. I don't want to do that. Any capital we could have been able to work with it and make a go of it.
If we deemed we needed more, we would try to get more. We needed to get to that first step. People higher than me precluded that.
Q. How were things like capital target levels set? If there was a capital directive and a capital plan approved or rejected, it generally involved an actual number. Who were the people that had to come up with the number?
A. Mr. Ryan or his successor.
Q. Would he generally target that at the number

201

of the maximum deficit?
A. I couldn't say. The region would make a recommendation to him, and he would make his own decision. I can't say what his mind set is. It puzzles me to this day what it was.
Q. You obviously have a lot of business acumen and background with finance.
What rate of return would you have needed as an investor in this industry in 1992 to have offset what has been discussed in this deposition as regulatory risk?
A. Minimum of 15 percent.
Q. Was it your understanding that was a view that was shared by most of the investors who looked at the institution?
A. I don't know.
Q. I'd like to ask one or two questions on goodwill. We revisited this point a number of times during the deposition.
You testified that you didn't view supervisory goodwill as having economic value, simply because of assumptions it could be treated as capital. It might have economic value if it related to a certain franchise value of an acquired thrift.

202

A. That is correct.
Q. My hypothetical question to you earlier, it must have some value if it allows the institution to continue in existence; would you agree with that?
A. That would be intrinsic value to the people running the institution, and that may exist for them. I don't believe you can translate that into the type of value that an institution needs to demonstrate, to tract capital and sustain earnings.
MR. HUME: That's all I have for now.

EXAMINATION

BY MR. IGO:
Q. Hamish was asking about capital plans. Was the authority to deny a capital plan delegated to the regions by Washington?
A. I don't recall. However, if we determined a capital plan not to be suitable, that would carry a lot of weight with whoever the final decision rested with.
Q. The authority to deny was sent down to the region. The authority to approve a capital plan

203

would have to go to Ryan?
A. No. An S-Memo had been sent down there. That was already in Tim Ryan's hands.
Q. In general, if you wanted to get a capital plan approved or recommend it, you go through the regional director in Washington?
A. That's my belief. It would be at the region, subject to Washington's approval.
Q. Denial would stop at the region?
A. It would have led to the drawing up of an S-Memorandum transmitted to Washington.
Q. I wanted to ask you about the Tier III exam, piggy back exams.
Could you tell me what the FDIC did during that exam, what you perceived they did?
A. My recollection is that they come in and take a lot of our work papers and use those numbers to do a limited field report. They would do independent tests and go on their own.
They had a limited staff, two or three people. They were limited in what they could do. They put our numbers in their report.
Q. It's pretty much a review conducted at OTS offices?
A. No, on site some of the time, some right out

204

of their offices.
Q. You testified earlier that the ARP program was designed, at least in part, to minimize damage to the franchise from putting an institution into receivership; is that correct?
A. From having an intervention.
Q. Was that a program that Mr. Ryan was involved in creating?
A. I don't recall. I think so. The RTC may have developed that program.
Q. There may be damage to a franchise, from intervention, leaving it in conservatorship for a long time?
A. Yes, once you have a conservator appointed, the public perception is the government controls it.
Q. Because deposits run off after that becomes public knowledge?
A. That, and if you're a mortgage lender, you're giving that up. Deposits run off because you're pricing becomes more conservative. You lose business on both ends.
Q. What about staff?
A. Yes. We saw that occur. Most talented people left.

205

Q. You saw the other effects, shut down of the lending function?
A. Yes, I remember that striking me as very sad, that Carteret has competent people in New Jersey.
Q. Deposit run off?
A. Right.
MR. IGO: That's all that I have.

RE-EXAMINATION

MR. HUME: Mark this O'Rourke-25.
(The above document was marked for identification as O'Rourke-25).
BY MR. HUME:
Q. This is a document dated February 27, 1992 written by you, and describes a meeting with Angelo Vigna and Carteret management regarding the agreement entered into relating to placement of Carteret into ARP.
Review the three paragraphs on the second page quickly, whether that refreshes your recollection about that meeting?
A. Yes.
Q. Does it refresh your recollection that the consent agreement was executed as a condition to