Michael Edward Finn June 9, 1999

Jersey City, New Jersey

*Page 1 to Page 265*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

**Page 1**

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

-----------------------------------x
AMBASE CORP. & CARTERET BANCORP, INC.
AND
FDIC, as Receiver for CARTERET SAVINGS
BANK,
Intervenor Plaintiff,
v.
THE UNITED STATES OF AMERICA.
-----------------------------------x

June 9, 1999
9:35 a.m.

10 Exchange Place
Jersey City, New Jersey

DEPOSITION of MICHAEL EDWARD FINN, a witness in the above entitled matter, before a Notary Public of the State of New Jersey.

**Page 2**

APPEARANCES:

COOPER, CARVIN & ROSENTHAL, LLC
Attorneys for AmBase Corporation
1500 K Street, N.W.
Washington, D.C. 20005

BY: HAMISH P. M. HUME, ESQ.

MICHAEL T. CARENZO, ESQ.
Associate Legal Counsel AmBase
Corporation
51 Weaver Street
Greenwich, Connecticut 06831

ELIZABETH FRANK, ESQ.
Trial Attorney
U.S. Department of Justice
Attorneys for The United States of
America
1100 L Street, N.W.
Washington, D.C. 20530

EXHIBIT INDEX AT REAR

**Page 3**

MICHAEL EDWARD FINN,
called as a witness, having been first duly sworn by the Notary Public, was examined and testified as follows:

Q What is your full name?
A Michael Edward Finn.
Q What is your home address?
A 167 11th Street, Hoboken, New Jersey 07030.
Q Good morning, Mr. Finn; better late than never.
I introduced myself already, but again I am Hamish Hume, here is my card, from Cooper Carvin & Rosenthal, we represent a company called AmBase Corporation in a lawsuit against the United States. AmBase was the 100 percent owner of a thrift institution called Carteret Savings Bank.
I know that you have been deposed before in this case, and maybe in others, so I assume I don't need to break you in at all, but just to remind you, as you know you are under oath.
Depositions are not designed to be a

**Page 4**

trap in any way, it's designed for you to give your account of events and facts and your understanding, so hopefully we can still keep our schedule, we can get it done today.
Can I ask you before you get started whether you have reviewed any documents in preparation for this deposition?
A No, I haven't.
Q Have you done anything else in preparation?
A I met with Beth Frank yesterday for approximately an hour to talk about a deposition in general, and to talk about this case in specific, but did not review documents.
Q Again, having reviewed the transcript of your other deposition, I think we can go quickly through some background.
Can you quickly review for me your career working for the government?
A Sure, I started with the Federal Home Loan Bank of New York in December 1986.
There my position was an ICR analyst, which is a financial analyst evaluating the thrift financial reports, the financial information that comes to us from thrift

**Page 5**

institutions.

I was an ICR analyst for approximately two years. From there I became a supervisory analyst, and I was a supervisory analyst for about two and a half years.

As a supervisory analyst we wrote correspondence to the institution based off of exam findings, we did quarterly financial monitoring of the thrift institutions within our caseload, and we would schedule meetings with management, Boards of Directors when issues needed to be discussed.

From there I became a field examiner, which I did for approximately four years.

There you go out to the institution and evaluate their books, records, financials, evaluate internal audit functions, controls, and try and assess the overall health of the institution.

From there I moved into -- back into our office here at Jersey City, as a capital markets analyst, which is the specialty area within the investment, interest rate risk, asset liability, asset area, and I have been doing that

**Page 6**

for about two and a half to three years now.

Somewhere along the way, when obviously the Federal Home Loan Bank became OTS, I just transferred over, so my employment has been consistent from '86 through now from the FHLB into OTS, I think in August of '89.

Q So you have been a government regulator dealing with the thrift industry for roughly the past 13 years?

A Correct.

Q During that period, I assume you were trained and developed expertise in general accounting, business accounting, as well as thrift accounting, is that more or less correct?

A I wouldn't necessarily say expertise in accounting.

Accounting is not -- it was not my undergraduate major, and I haven't taken any specialty accounting courses.

We do get trained in thrift accounting, and how to understand what's presented in a balance sheet, but I would definitely say I am not an expert in accounting.

We have regional accountants that we would defer to on those issues.

**Page 7**

Q So you are not technically an accountant?

A No.

Q But your job basically throughout this period involved looking at financial reports and looking at accounting statements?

A Yes. I have developed an understanding of the thrift accounting, but again, claiming an expertise would not be something I would do.

Q I understand.

Well, I am sure you know essentially -- well, let me ask you, do you have a basic familiarity with what the so-called Winstar related litigation is all about?

A Yes, I do.

Q So you understand that it is a lawsuit having to do with something called supervisory goodwill?

A Yes, I do.

Q How would you, given your understanding of accounting, explain or think about yourself what supervisory goodwill is?

A Supervisory goodwill I associate with -- number one, the word supervisory tied with

**Page 8**

goodwill means it was a troubled case, troubled institution that was being acquired, and there was special considerations that were given; that created this supervisory goodwill.

Goodwill is an accounting term that's used in many industries, but when it's supervisory goodwill, it was specifically related to the thrift industry during a period in time during the 1980s.

Supervisory goodwill generally was the number that was equivalent to the negative net worth that the acquiring institution would take over.

Goodwill in general accounting terms is a plug number for the difference between the value of the assets and the value of the liabilities.

For those institutions, often it ended up being a negative net worth of the institution being acquired.

That goodwill was allowed to stay on the books for a certain number of years, and it would be amortized down by the acquiring institution.

That's about the broad definition.

**Page 9**

Q In terms of what it represents on a balance sheet or financial report that you might review in the course of your work as a regulator, is it substantially different from other assets?

MS. FRANK: Objection as to form.

You can answer, if you understand the question.

A If you could clarify what you mean by different?

Q If you were reviewing a balance sheet and you saw a line item for supervisory goodwill, would it necessarily mean something to you different from other sorts of assets that you would see on a balance sheet?

A I guess there are two ways to look at it.

One, there are tangible assets and then there are intangible assets, and goodwill is an intangible asset, because there is no -- you can't necessarily remove it and sell it to a competitor.

The other thing is we would generally look at a balance sheet for asset strength, and you look for an asset that produces an earnings stream, and if you owned a mortgage

**Page 10**

backed security you would earn interest.

If you owned goodwill, you don't necessarily receive an interest flow that's generated from it.

There may be some value that's derived from it, but it's very intangible by its nature.

Q Right, I guess that's sort of what I am trying to get at.

If you were explaining this litigation, or just the concept in general to a lay person who doesn't work in finance, and I am not asking for your expert opinion as either an accountant or a regulator, just your understanding, would you describe goodwill as something that is -- the word has been used before -- as a gimmick?

A I don't think goodwill is a gimmick, but it's an accounting pronouncement, and many probably very learned accountants came up with the idea of putting goodwill on the books.

It's been a hotly debated issue. It makes sense, because the theory is that you would pay no more than what something is worth, and when you assign goodwill, you are assuming that there

**Page 11**

is a value tied with that to the enterprise that you are buying.

In the case of supervisory goodwill, there was some argument that it was a deferral of the losses that should have been incurred at the institution that was being acquired, but still the thought was if you had an acquirer that was willing to pay X price, there is some value to that acquirer, and presumably it would have been associated with the business franchise, as opposed to necessarily the assets that were on the balance sheet, because they are paid a premium above what normally the assets would have been worth.

So I don't think it was a gimmick at all.

It might have been a deferral of some recognition of losses at the time, but not --

Q But in a sense, all assets are deferrals -- are expenses or losses waiting to happen for when you deal with them, would you agree with that statement?

In the sense that if you have cash on your balance sheet and you spend it, that cash will go off as an expense, and potentially a loss on your balance sheet?

**Page 12**

MS. FRANK: I object as to form.

A Yes, I don't know if I really understand that question.

I mean I think with certain assets there is a predictability of cash, and that's where it's a little bit different, and with goodwill, the predictability is not there, at least for the most part.

I mean there might be some businesses or industries where it is more predictable, but at that point in time, that was a very unpredictable number.

So I think it is different from other assets and liabilities.

Q Different from if you had another intangible asset on a balance sheet, let's say a patent or a copyright on your balance sheet.

Isn't that another intangible asset that you would carry at the price you paid for it, and there is always a risk that its value could go up or down?

MS. FRANK: Counsel, I object to this line of questioning, in that he has stated that he's not an expert in accounting.

**Page 41**

they acquired Carteret, they signed on with an agreement that, in short, they would keep the capital above a certain level.

So, there was a sense of support that we expected out of them based on that agreement.

So their ability to make good on that agreement was important to us.

Q Do you recall how much AmBase paid for Carteret?

A I don't.

Q Would you have been likely to have known that at the time?

A Yes, I would have.

Q So at the time, do you recall when AmBase acquired Carteret, in what year?

A I believe it was 1987.

Q And you would have known that when you started -- you would have known the year it was acquired -- just let me tell you it was 1988.

A Okay.

Q And you would have certainly known at least the basic details of that acquisition when you started working on Carteret, is that correct?

**Page 42**

MS. FRANK: Objection as to form.

A I wouldn't have known when I first assumed the caseload, it was something I would have become aware of most likely reading through the examination reports, which would have talked about the arrangements.

Q And at that time you then would have known how much they paid, as you testified earlier?

A Correct.

Q Do you remember thinking that AmBase had paid too much for Carteret?

MS. FRANK: Objection as to form.

A No, I don't remember thinking that.

Q Or that they had made a really stupid investment?

A No, I don't remember thinking that.

Q Were you aware of AmBase's dependence on dividends from Carteret to help pay down and service debt in AmBase?

A Yes, I was.

Q And you were aware of the fact that those dividends would not be available after the passage of FIRREA?

A I don't recall specifically what the

**Page 43**

regulatory framework would have been.

It would make sense if it caused them to be undercapitalized, the dividends would be restricted, but I don't recall a specific regulatory framework.

Q So you would have started working at Carteret right around the time that FIRREA was either about to be passed or right after it was passed?

A Correct.

Q Do you remember any general change in regulatory attitude as a result of the passage of FIRREA?

MS. FRANK: Objection, vague.

A Not a change in attitude, no, I don't recall a change in attitude. A change in volume of work, but not in attitude.

Q Do you remember thinking that one of the major impacts of FIRREA was its impact on the treatment of supervisory goodwill?

MS. FRANK: Objection as to form.

A I do recall supervisory goodwill as being one of the -- one of the major components of FIRREA in terms of its impact on the thrift industry.

**Page 44**

Q And so the concept of supervisory goodwill would have been a concept you were familiar with even before FIRREA was passed?

A I was familiar with supervisory goodwill from the first month that I was working at OTS, because it was slightly different from the accounting that you would learn in college.

You knew supervisory goodwill was on thrift balance sheets.

The impact was not -- in 1986, you know, we didn't know FIRREA was coming, so when FIRREA came, I was aware of how much goodwill was out there and what the potential impact was.

Q Was it considered to be a suspect asset?

MS. FRANK: Objection, vague.

A Goodwill is an asset that if there is a high concentration, would cause general regulatory concern, because of its non-earning and intangible nature.

Suspect asset, I mean I don't know what you mean by that.

Q I guess I mean was there a general consensus it was basically worthless?

MS. FRANK: Objection, vague.

**Page 61**

So to the extent that capital does have an impact on the overall rating of the institution, it would be more of a concern.

But again, that rating is going to be based on a combination of factors, and those other factors you can't -- you can't remove from the equation.

Q Would the regulators have been likely, before FIRREA, let's say in the 1986, '87, '88 exam, to have known the amount of supervisory goodwill that an institution was carrying on its books?

A Yes.

Q Would their attitude to that goodwill have been changed by FIRREA?

MS. FRANK: Objection, calls for speculation.

Q Do you remember the attitude of regulators being changed by FIRREA, the attitude towards goodwill?

MS. FRANK: Objection, vague.

A The treatment of it became different, so I guess attitude is a way of thinking, and yes, the treatment did change, so we looked at what was on the books differently,

**Page 62**

because now it needed to be deducted from equity capital when calculating regulatory capital.

So, yes, how we thought of that goodwill did change because it needed to be treated differently.

Q I am just trying to understand, if you think about it, an institution can be fully compliant before the regulatory change and noncompliant after the change, it must affect -- am I wrong in saying that it must affect how you view that institution?

A Yes, but I am also saying that in 1988 before the law came out, you had an institution that was in capital compliance.

A year later you assess the same institution, whether it be Carteret or another one, and the law changed and the capital calculations changed, but you also had a drastically changing economic environment.

So you know if you are talking about one instant in time and nothing else is different, economic, asset quality or otherwise, yes, the landscape totally changed with the enactment of FIRREA.

But trying to take it from period to

**Page 63**

period does not work, because other things were changing.

Q I understand. Let me state it differently then.

Given that the regulations said from -- in '88 they said supervisory goodwill is a good asset that counts towards regulatory, then after '89 they say no, it's not, you can't count it at all.

Aren't you by law bound as a regulator to change your attitude towards supervisory goodwill?

MS. FRANK: Objection.

Q Or was your attitude the same throughout the period, but now there was a different regulation in terms of how you applied your attitude?

MS. FRANK: Objection as to form.

A I just -- the term attitude doesn't, like that's not the way I would describe it.

The treatment changed, so the way we treated it, but again, it's an accounting entry. We didn't have an attitude towards it, it was a treatment of what was on the books.

Attitude is -- I think of it as

**Page 64**

somebody with a bad attitude.

The treatment of the asset question changed, and so our -- how we dealt with supervisory goodwill changed.

I mean our attitude about it, I don't know.

Q I am using the word attitude because I thought that we had established -- you had testified that judgment had to be exercised in evaluating these institutions?

A I also tried to qualify that, or clarify that the judgment -- what you used from the MACRO factors was an objective analysis of the rating definitions, and so while judgment came into play, it wasn't an arbitrary process, there were objective measures that needed to be met as part of that process, and attitude was not one of the factors that we use in that process.

Q Just before we leave the question of the immediate effect of FIRREA on Carteret, I have a few more documents I wanted to show you.

Would you generally characterize the change from a 2 rating to a 4 rating as a substantial change?

A Yes, I would.

**Page 65**

Q Would you say that a change like that to occur in a one year period is dramatic?

MS. FRANK: Objection, vague.

A It's unusual that an institution would drop down two ratings very quickly within a one year period, unless there were significant factors at stake.

Q And one of those factors would surely be the passage of FIRREA?

MS. FRANK: Objection as to form.

A The passage of FIRREA definitely had an impact on how the institutions were rated from the prior year.

Q How often, in your experience, have you seen institutions go from 2 to 4 in a one year period without any regulatory change involved?

A It happens I would say occasionally. I mean there are probably several cases each year that come up, it could be due to insider abuse, hidden losses.

Q Isn't it quite rare, though?

A Oh, yeah, yeah, I think I used the term unusual.

It's something that does happen, but it's not a common trend.

**Page 66**

Typically it would be something that had not been detected that may have existed at the prior exam, and then comes to light during the most recent exam.

But the passage of a new law could have dramatic impact as well.

Q In other words, an institution -- it could be other factors such as a change in the economy, or general changes in the business environment, right?

A Correct.

Q But that normally takes some time to occur?

A Or certain aspects were hidden, either through deception or it just wasn't picked up as part of the exam process.

Q It would normally be something that would take more than one year. I understand that you have testified occasionally, or rarely it happens in one year, but normally it would take more than a year for an institution to decline that rapid rapidly?

MS. FRANK: Objection as to form.

A Normally it depends upon the environment.

**Page 67**

Q Just normally in your experience as a regulator?

A In a very healthy economy that we are in now, it would be unusual.

In the 1989 environment, there were so many factors at hand that it would have -- it was not abnormal then, because projects, real estate, the real estate markets changed dramatically, and projects that were performing one year were all of a sudden not performing next year.

If you had a concentration in certain markets or in certain types of development projects, many institutions were negatively impacted by that.

It really depends upon the environment that you are dealing with, as to when it's normal and when it's unusual.

Q Would it surprise you if the change occurred in a period of less than one year?

MS. FRANK: Objection as to form.

A Assuming you have full information of the condition from the prior period, yes.

But as I mentioned, often things may have not come to light at the prior exam, and then

**Page 68**

it comes to light at the following exam.

It's not that it wasn't there prior, it's just that it was not picked up prior, so it would depend whether or not it was disclosed or known at the prior period.

MR. HUME: Please mark this AmBase Finn Exhibit 2.

(The above described document was marked AmBase Finn Exhibit 2 for identification, as of this date.)

Q Please review this, a short cover letter to you from Carla O'Connor and the attachments, you can probably review quite quickly.

A All right.

Q Do you remember Carla O'Connor?

A Yes, I do.

Q Did you work with her a lot?

A I dealt with her a lot, yes.

She worked in the accounting area and would answer many questions about the financial reporting.

Q Do you notice a substantial discrepancy between these numbers and the numbers on the ROE I showed you?

Page 237

So approximately four months had passed, and I don't know what happened in those intervening months that would have impacted their decision whether or not to continue.

But from the notes of the discussion with Bob, it appears that they had determined that was not in their best interest.

Q Why wouldn't they just have withdrawn their application?

A Well, it goes on to state that we offered the opportunity to consider withdrawing the application.

I asked Bob to respond by March 5th, Bob agreed, I don't know what happened after that, if they did withdraw it or not.

Oh no, I'm sorry, a recommendation for denial was issued on March 5th.

Q Is it conceivable to you that they could have continued to apply for something that their asset liability committee would say is really not in their best interest?

A Again, the passage of time.

MS. FRANK: Objection, calls for speculation.

A The passage of time may have had an

Page 238

impact on their decision.

Q Would it be possible that they could have wanted to do it because they had to for capital compliance reasons, but known that it was not in their best interests for other reasons?

A That would be speculation, I don't know.

Q Doesn't the second paragraph of this memo suggest strongly that Carteret was continuing to insist on February 21, 1991, the Summit application be approved?

MS. FRANK: Counsel, the document speaks for itself.

MR. HUME: Apparently not.

MR. CARENZO: What the witness testified to is different than what that says, so I just wanted to make sure it was clear.

MS. FRANK: What's the question?

Q The question is is it really the passage of time that explains Carteret's desire at once to have the Summit Bancorp branch sale approved, while stating by it's assets liability committee that that may not be in our best interests?

Page 239

MS. FRANK: If you recall.

A I don't recall.

Q Do you remember any specifics about this, other than what you are able to read on this document?

A No, I don't.

Q So reading this document doesn't make you remember anything independently?

A No.

Q Do you recall anything about the final decision to place Carteret into conservatorship?

A No, I don't specifically.

Q Do you know anyone who worked specifically on that?

A I don't recall.

Q Do you remember being involved in any of the potential acquirers or investors in Carteret?

A Sitting in on a meeting?

Q Knowing anything about them?

A Yes.

Q What do you remember?

A I remember that there were potential investors that Mr. Bianco had tried to make

Page 240

arrangements with at several stages, including American Stock Transfer, the Carlisle Group, Kohlberg.

I think those are the three that I can recall.

Q Let's take them one at a time.

What do you remember about American Stock Transfer?

A Just that they had expressed an interest.

I think they had signed an agreement with Carteret, but it may have just been a confidentiality agreement to do a review.

I don't know if they actually reached a definitive agreement.

Q Do you remember anything about the transaction itself?

A Not specifically.

Q Do you remember whether it was a cash investment or a merger?

A I don't think that they had cash.

I thought they were trying to contribute their stock, the value of their company to the institution.

So, a merger would have been the

**Page 241**

most probable.
Q Would that have made a difference to the OTS?
MS. FRANK: Objection, vague.
A In terms of approvability, the threshold of a noncash capital infusion is more complicated because you have to go out and get appraisals and ensure that the value is appropriate, and that the value can be maintained.
So, yes, it would be more difficult to approve than an all cash transaction.
Q And in general, was there pressure on the Carteret management to come up with a cash investment in Carteret?
MS. FRANK: Objection, vague and ambiguous.
A I recall cash, a cash investment as being the -- being important to having an approvable capital plan, but not necessarily 100 percent cash.
I think there needed to be a certain amount of cash up front to get a comfort level moving forward with an acquisition plan.
Q What do you remember about Kohlberg & Co.?

**Page 242**

A Just that they were an interested party.
Q Do you have any idea why that deal didn't work?
A No, I don't.
Q I'm sorry, do you have any idea why the American Stock Transfer deal did not work?
A I don't know.
Q Would it be possible in your mind that it didn't work because it didn't get regulatory approval?
A I don't think that there was an application made for it.
Q And you don't remember why the Kohlberg & Co. deal did not work?
A I don't know if they even had a deal.
I mentioned that I thought they were an interested party.
Q What about Carlisle Group, what do you remember about them?
A Again, that I reference -- I saw their name referenced on a document, so it reminded me that they were an interested party as well.

**Page 243**

Q During this period of time, the latter half of 1992, and when these inquiries by interested investors were being made, do you now recall whether or not you were still working on the case, or not working on the case?
A I believe that I had some periphery involvement, but again the majority of my duties was outside of Carteret.
I was a field examiner doing regular examination work out in the field.
Q Does that mean you wouldn't have been involved in evaluating any of these proposed transactions?
A As I mentioned, I think I was probably involved on the periphery, but it was not as if I was sitting in an office here in Jersey City evaluating all the documents that came through.
Q What would you have looked for in your evaluations of them?
A Which documents?
Q I am just saying, to the extent that you would have been involved or that you were involved in these proposed transactions, what would you have looked for in evaluating them?

**Page 244**

A The strengths of a deal, if there was a deal.
MS. FRANK: I object, it's compound and it assumes facts not in evidence.
You can answer, if you can.
A It is compound in terms of looking at which deal are we talking about, or if you are talking in broad terms what type of deal would you look for.
Q Okay, Carlisle?
A As I said, I knew that they were involved based on referring to it.
Q It's not a compound question, it is a question about the general criteria that you would look for in evaluating a proposed investment in a failing, troubled thrift like Carteret.
A I would look to the adequacy of their ability to have Carteret achieve capital compliance.
Q Were you aware of the fact that Carteret made a net income profit for each of the four quarters prior to its seizure?
A No, I was not.
Q Do you find that to be a relevant fact to its seizure?

Page 249

If there is something else I can give you or something else that you are looking for, you can clarify.

Q Let me ask this specific question, if Carteret had been able to include $150 million worth of goodwill, it would have, let's say, been barely in compliance under tangible capital and out of compliance under core and risk based capital, and you would have been required to honor that if the judge's order had stood, isn't that correct?

A Presuming the judge's order said that we could not deduct goodwill from equity capital to calculate tangible core and risk based capital, yes, the numbers would be increased by what you claim is $150 million.

Q And under that scenario, Carteret would not have been seized, isn't that right?

A I don't know.

Q Well, let me ask you this way, it would have made a huge difference had that been the case, isn't that right?

A The capital deficiency would have been smaller.

Q And that would have been respected

Page 250

for purposes of making a decision as to whether or not to place the institution into conservatorship?

MS. FRANK: Objection, calls for speculation.

A I don't know specifically myself.

Q Would it make a difference to how you analyzed the institution?

A Their need for capital would be smaller, so the ability -- their capital plan, if it could demonstrate that they could fill the remaining smaller hole, would be $150 million easier to accept, because there is less of a hole to fill.

Instead of raising $233 million in external capital, you would only need to raise $80 million or $83 million.

Q In your experience, was it unusual for an institution to have as much goodwill as Carteret?

MS. FRANK: Objection, vague.

Q Do you need your memory refreshed as to how much goodwill they had, or do you have a recollection?

A I know a rough amount as to what they had, and there were a number of institutions

Page 251

that had a similar amount or a significant amount of goodwill relative to assets.

Q Was it rare for an institution as large as Carteret, $5 billion or $6 billion in assets preFIRREA, $6 billion, to have this significant amount of goodwill?

MS. FRANK: Objection, vague.

A I think that many of the institutions that were multibillion dollars had a significant amount of goodwill.

Q And the reason for that was what?

A They did transactions that created goodwill on their balance sheet.

Q Just circling all the way back to the beginning and before FIRREA, what were those transactions?

A Goodwill is created when you purchase a company, and you may --

Q Supervisory goodwill I am talking about, specifically.

A Supervisory goodwill would have associated with institutions that were considered supervisory cases, and as such it was designated supervisory goodwill.

Those institutions -- again, the

Page 252

goodwill is just goodwill, like GAAP accounting would say, but what the regulatory agreements did is allowed for a longer amortization period than GAAP might normally indicate.

I don't know whether or not that was specifically the case with Carteret, but I believe their amortization period was longer than what GAAP would have allowed, and typically for other institutions it would have been the same.

Q Why is it that the amount of goodwill on one of these institution's balance sheets would not have given rise to a concern as to the regulatory strength or security of that institution prior to the passage of FIRREA?

MS. FRANK: Objection as to form.

A The amount of goodwill, the importance of the amount of goodwill is measured relative to the capital of the institution, so it's not necessarily the dollar amount that's important, but the percentage of its makeup as a percent of assets and as a percent of capital.

Q Right, but why wouldn't it have given rise to concern that the only reason an institution is able to pass its regulatory requirement is because it's allowed to use

**Page 253**

supervisory goodwill?
MS. FRANK: Objection, it calls for speculation.
Q I am calling only for your understanding of how these institutions were analyzed and evaluated.
A The regulatory capital structure at that point in time did not touch on supervisory goodwill.
It was a net worth requirement that was based strictly on equity capital, there was not a deduction for goodwill, so it was not factored into the capital analysis.
The level of goodwill did not come into the capital analysis.
Q Right, but you understand that it may not have come in officially, but nevertheless it was there for you to see.
I mean the regulators were aware of its existence?
A It was an asset, just like any other asset and we would evaluate it relative to its importance on the balance sheet.
If goodwill represented 15 percent of assets, and you had fixed assets of another 5

**Page 254**

percent of assets, you would have 20 percent of your assets in nonearning, noninterest earning assets.
So it would be a concern because of its nature, yes.
Q Let me ask you the question this way, do you think your concern about nonearning assets was equal to -- isn't that concern about nonearning assets one of the things that the FIRREA capital requirements codifies by saying now we are going to look to specifically what your tangible capital levels are?
A I don't know how that ties into it being a nonearning asset, though.
Q Generally tangible capital will be earning, whereas goodwill would not be earning.
A That's a generalization, because fixed assets are nonearning and other assets are nonearning and they are not deducted from capital either.
Q Well, to the extent that that's the difference, there may be some overlap, but in the sense that the concerns about the weakness of an intangible asset like goodwill were a large part of what the FIRREA capital requirements were

**Page 255**

trying to implement, isn't that correct?
MS. FRANK: Objection as to form; vague.
You can answer, if you can.
A I mean we are getting to Congressional intent as to why they wanted to exclude goodwill.
Q I am getting to your understanding of what it is the rules were trying to do.
You said that the goodwill would be evaluated prior to FIRREA on the balance sheet, and I am saying well, isn't that evaluation what is codified, you are given actual regulations with which to evaluate it after FIRREA?
A I stated, though, that the evaluation was because you had what could have been a large nonearning asset on the books, not because it is a deduction from capital.
What they did in codifying it in the regulations is much different from how you evaluate a nonperforming asset.
It relates to the same asset, but it's not equivalent in any regard.
Q Were you aware of the fact that most of the supervisory goodwill or many cases was

**Page 256**

created pursuant to formal agreements between the government and the thrift institution?
A I was aware that the level of amortization was permitted a longer amortization period for goodwill than GAAP would have required, but the goodwill was calculated just like GAAP goodwill, and signed off by the accounting firms when they did these transactions.
Q But weren't parts of the agreement that goodwill would be allowed for regulatory accounting purposes also?
A It may have been in certain agreements, you would have to look at each individual agreement; I don't know if that was consistent.
Q And it was part of the agreements that they would be honored for regulatory capital purposes also?
MS. FRANK: Objection as to form.
A Those are your terms, I don't know, you would have to look at the actual agreement.
Q If it were the case that you had a contractual right to this asset, a contractual right to treat it as regulatory capital, wouldn't that be a reason to consider it to be a very