IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x
AMBASE CORPORATION AND :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
v. : Civil Action
UNITED STATES OF AMERICA, : No. 93-531
Defendant. :
- - - - - - - - - - - - - - - - - x

Washington, D.C.
Monday, August 23, 1999

Deposition of BRIAN DOUGLAS DITTENHAFER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DOLORES A. BYERS, a Notary Public in and for the Washington, D.C., taken at the offices of Cooper, Carvin & Rosenthal, 1500 K Street, N.W., Suite 200, Washington, D.C., at 10:00 a.m., on Monday, August 23, 1999, and the proceedings being taken down by Stenotype by DOLORES A. BYERS, CSR,

EXHIBITS

| AMBASE-DITTENHAFER EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 9 | Report of Examination of Cateret Savings Bank | 130 |
| 10-D | Application to Offer Brokerage Service | 193 |
| 11-D | Interoffice Memo to Tri Magia, et al., dated 7-19-89 | 196 |
| 12-D | Letter to Mr. Vigna from Mr. Townsend dated 7-27-92 | 204 |



PROCEEDINGS

Whereupon,

BRIAN DOUGLAS DITTENHAFER,

called for examination by counsel for Plaintiff and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. HUME:

Q. Good morning, Mr. Dittenhafer.

A. Good morning.

Q. , My name is Hamish Hume. I work for Cooper, Carvin and Rosenthal and, as you know, I represent the company named AmBase Corporation in a lawsuit against the United States.

Thank you for appearing this morning. Have you ever had your deposition taken before?

A. Yes.

Q. So you'll be familiar with the few formalities that we have to go through before we get started. Could I ask you to state your full name for the record?

A. My name is Brian Douglas Dittenhafer.

Q. Can I ask you whether you have ever been convicted of a felony before?

A. You may ask the question. The answer



is no.

Q. I'd like to ask you a few general questions about your career at the Government. Would you begin by telling me, please, your academic background?

A. I am a graduate of Ursinus College with a major in economics and a minor in history. A master from Temple University. Everything except my dissertation completed for the Ph.D. Would you like for me to continue with my work?

Q. Please, if you don't mind.

A. I spent five years at a bank in Atlanta. From there I went to the Federal Home Loan Bank as chief economist. Successfully, I became senior vice president and chief financial officer, executive vice president and president of the bank. President carried the additional duty of principal supervisory agent for the Federal Savings and Loan Insurance Corporation at that time.

Q. Do you remember when you became the president?

A. In -- I became acting president on June 7, 1985, and was confirmed -- my election by the board was confirmed by the FDIC on



September 6, 1985.

Q. And you continued as president until what time?

A. September 30th, 1992.

Q. And at that stage what did you do?

A. I became president of Collective Federal Savings Bank which has since been acquired by Summit Bank Corporation in New Jersey and I left there in June of '94 and I basically have been semi-retired ever since.

I'm director of investor savings bank in Milburn, New Jersey, and I've done various consulting jobs since that time.

Q. Do you have any professional affiliation with any institution that is a plaintiff in a goodwill lawsuit against the United States?

A. Not to my knowledge. I'm not sure how this comes in. But I will put this on the table. I was an expert witness in the original Glendale case but never testified.

Q. Did you submit an expert report?

A. No. My name was on the list but nothing ever came from that point.

Q. Were you consulted?

independent at that point. And I guess we remained independent because I don't remember this proposal ever going forward.

Q. What do you remember about market perception and the strength of the banking system at that time?

A. It was very strong. Because the market was aware that all the twelve banks were fully collateralized and this was a topic of great concern and mortgage was always mortgage-backed securities which was readily marketable or first mortgages on homes in the United States which could be packaged and sold.

So it was highly liquid collateral.

The banks had a policy which usually resulted in over collateralization of 25 percent and most of them are mark to market monthly if not quarterly. So the banks were in a very strong collateral position. We were collateral lenders and the market understood that.

Q. And what do you remember about the pressures on the FSLIC fund throughout that period from 1988 --

A. They didn't have enough money to deal with their problems. And there were all sorts of



creative solutions put forward and to try to save the FSLIC money when it came to resolving cases.

Q. And did one -- one of those methods was to encourage thrifts to merge or acquire other thrifts?

A. Yes.

Q. And how was that thought to help alleviate the burden on the FSLIC?

A. The object was to have a better capitalized thrift acquire a less well capitalized thrift in most instances. I would think that the resultant institution would be more efficient and perhaps better managed.

Q. And did that policy continue right up until the passage of FIRREA in 1989?

A. Yes.

Q. Can I ask you what your general understanding is of the nature of this litigation -- sorry. What is your general understanding of the nature of this litigation?

MR. LEVITT: Do you mean this particular case or Winstar in general?

MR. HUME: Winstar in general.

THE WITNESS: Winstar in general, one of the creative solutions to saving the FSLIC



money was to allow the write-off of goodwill in acquisition of thrift institutions over 40 years -- up to 40 years which was the limit of the accounting professions good graces at the time. But allowing the write-off of the goodwill in the acquisition and allowing such a long period of time in which to write it off that saved FSLIC money.

In 1989 Congress took that and said these contracts are no longer valid. The goodwill no longer counts. If you were counting goodwill as capital it is no longer capital. And if you're under capitalized, you may be put out of business. I think that's a fairly succinct version of that.

At the time in '89 I was upset to that. I wrote several letters to the Congress about it telling them that that was wrong and that no good was going to come of that.

The Winstar litigation is the attempt to recover the damages from -- well, the first case that I'm aware of was Glendale. And the Glendale case, as I understand it, was decided in favor of the plaintiff by the Supreme Court ultimately. And now we're talking about what are the amount of the damages involved.



MR. LEVITT: I would like to object to the question and the answer on the grounds of relevancy.

BY MR. HUME:

Q. When you were at the Federal Home Loan Bank both as executive vice president and vice president and principal supervisory agent, did you understand the Government to be giving an assurance and a promise, a contractual guarantee that goodwill could be counted as regulator capital?

MR. LEVITT: Objection on the grounds of relevancy.

THE WITNESS: Do I answer?

MR. LEVITT: Yes.

THE WITNESS: The answer is yes.

BY MR. HUME:

Q. And can you define for me what you understood supervisory goodwill to mean?

A. My understanding -- there were two accounting systems in existence at that time. There was a supervisory accounting system and then there was the normal accounting system. And what we said was that for supervisory purposes this would count as goodwill. And we couldn't control

what the accounting industry would do but could influence it a little bit, I guess, and they went along with that at that time.

Q. When you say it could count as goodwill, did you mean to say it would be counted as capital?

A. Yes. It would count as capital. Otherwise many of those institutions would not have been persuaded to take over the nearly insolvent or insolvent institutions because it would have brought their own capital to a point where they would have been subject to much heavier supervisory scrutiny and they would have objected to that.

Q. And in your role as principal supervisory agent when you were president of the Federal Home Loan Bank to the extent you worked as a supervisor, was supervisory goodwill therefore respected on the balance sheet as a reliable asset?

MR. LEVITT: Object. Unintelligible question but you can answer if you understand it.

THE WITNESS: The answer is yes but we didn't count it as collateral. We were looking at the balance sheet of an institution and



determining whether or not we should take collateral. We looked at tangible assets not the goodwill which is an intangible asset.

BY MR. HUME:

Q. That would have been for purposes of the collateral advance --

A. The collateral requirements of the advancement.

Q. But in the role of supervisor which I take it is to be supervising the examination in the evaluation of the bank which had a regulatory function, for that function was supervisory goodwill considered to be an asset that could be relied on as capital?

MR. LEVITT: Objection. Asked and answered.

THE WITNESS: The answer is yes. I will say that we always differentiated between the tangible and the intangible even in the supervisory function.

BY MR. HUME:

Q. And when you say always, you mean prior to the passage of FIRREA?

A. Prior to the passage of FIRREA.

MR. HUME: Please mark this as



AmBase-Dittenhafer 2.

(AmBase-Dittenhafer Exhibit No. 2 was marked for identification.)

BY MR. HUME:

Q. This is a December '88 letter from you to Stuart Root regarding resolution policy.

A. Okay.

Q. Do you remember this letter?

A. No.

Q. Do you remember working with Stuart Root at FSLIC on resolution policy issues?

A. I do not remember ever working with him directly on resolution policy issues. He was the head of FSLIC at the time and his primary responsibility, of course, was to get as many cases resolved as cheaply as possible in a given amount of time. I don't recall working with him directly.

He had -- he was a lawyer and had some ideas about how these things could be done and using FSLIC's tax free status. I do not recall working with him directly on that. No.

Q. And you don't really recall working



with him directly on anything?

A. Before he went to FSLIC he was the director of our bank. So I worked with him. I knew Stuart Root prior to his becoming a director. I have no recollection of working with him on any -- there may be a case. There may be a signature of mine on something but I have no recollection of any particular case that we worked on or policy that we worked on regarding FSLIC resolution of cases.

Q. Reading the letter now, if you look at the second sentence where it says: The outcome of these discussions is to focus our efforts on those cases that provide the greatest cost savings over liquidation.

Is he talking there about supervisory acquisitions and assisted acquisitions as an alternative to liquidation or is it something else?

MR. LEVITT: Objection. I don't see how Mr. Dittenhafer could know what was in Stuart Root's mind.

THE WITNESS: I really don't know what he was thinking about. If you ask what it means to me.

BY MR. HUME:
Q. That's what I'm asking.
A. Then, yes, he was looking at, as I indicated earlier, he was trying to resolve the greatest number of cases. The greatest dollar value of problem cases would probably be a better way to phrase it at the lowest possible price to FSLIC. And liquidation was usually a more costly alternative than assisted merger. That's what he was looking for, it seems to me.
Q. Do you ever remember a policy where larger institutions were targeted by the FSLIC to be resolved and placed into conservatorship?
MR. LEVITT: Could you read that back.
THE REPORTER: "Question: Do you ever remember a policy where larger institutions were targeted by the FSLIC to be resolved and placed into conservatorship"?
THE WITNESS: No. I would say that they weren't targeted. What we did do is categorize institutions by size. And, as I recall, there were certain delegations made to the district banks, say, bank presidents of principal supervisory agents where we could effectively commit FSLIC for very small cases and sort of



commit them for other cases and not commit them for very large cases.
But the word target, to me, implies that there were institutions that we were after in some sense. No. I would not say that at all.
BY MR. HUME:
Q. You mentioned earlier that you wrote several letters to Congress regarding the passage of FIRREA. I have one such letter I'd like to show you. But before I do, could you tell me what your recollection was of the effect FIRREA had on the savings and loan industry?
A. Well, what we've just gone over gives everybody a sense that there was a million dollar year period of growing concern of the adequacy of the reserve funds in the Federal Savings and Loan Insurance Corporation to cover the problems that were -- that existed in the industry and in some areas were growing.
The deregulation of the industry in the late seventies or '79 or thereabouts and continuing deregulation of it in the early eighties had two effects. One, in some areas and probably in every district it was more prevalent in more areas people who should not have been in a



position of fiduciary trust should not have been running a savings and loan and basically crooks were.
And other instances the deregulation, the simple re-legislation of interest rates caused well run savings and loan associations to eat into capital that had been built up for 50 or 60 or 70 years because they had negative spreads on the funds that they were borrowing to fund mortgages that were in their portfolio. And both of those were going to cost the FSLIC money sometime.
Now I've lost my train of thought.
Q. Simply what the passage of the effect of FIRREA was on the industry-at-large. And since you've given me the opportunity, let me specify what the question was.
What would you say was the effect of the new capital requirements and the elimination of the ability to use supervisory goodwill as regulatory capital, what effect did that have in your view on the industry?
A. The biggest -- from a public policy point of view, the worse impact of that was it caused the demise of institutions which probably could have survived without costing the FSLIC any



money.
There were institutions -- I can't think of the name. They had been enticed to take over institutions by the principal supervisory agent over the years and the supervisory goodwill even with that drag on their earnings, they were making it. They would have continued to make it.
If you take that away, they are insolvent and the RTC after '89 had no sympathy for anybody who had ever been connected with the industry no matter how much good they were doing for their institutions. And people who had valuable careers in the industry, their institutions were taken over summarily without any -- it cost the Government money.
There's no question in my mind about that at all. These institutions, A, would have survived without having the cost of resolution trust agencies to resolve as individual cases and sell them to somebody else. They would have continued to pay insurance premiums to the FSLIC. It was a bad policy which is for the reason I was concerned about it.
Q. Do you think there was an over arching policy behind the legislation in its

58

that you remember being under financial pressure, was it your recollection that vis-a-vis the rest of the industry it was still one of the healthier thrifts?

A. Yes. All things are relative here. I wouldn't say that at that point there were very many thrifts around who would be considered well capitalized today. But relative to the rest of the industry, Carteret was in reasonably good shape. As I say, I was amazed that they got it to that point. In the early eighties I wouldn't have given you $2 for their chances of being around in 1987.

Q. Do you remember its acquisition or merger with Mountain Security Savings Bank of Blacksburg, Virginia, and First Federal Savings and Loan in -- I think you pronounce it White Fall, Virginia? This was in 1986.

A. When you mention the names, I recall them. This brings to mind some questions. I recall some discussions with the Atlanta Bank. These would have been within the Atlanta district.

Q. Right.

A. I think theoretically these were part of a holding company and not branches or

59

subsidiaries. So they theoretically had their own board of directors and theoretically had their own minutes, et cetera and that didn't work very well.

Q. Is it fair to say that Carteret would not have been asked to enter into a supervisory acquisition such as those if it were not among the healthier thrifts in the industry at that time?

MR. LEVITT: Objection. The question said Carteret would not have been asked. But there is no foundation for that assumption that Carteret was asked.

Was Carteret asked, if you know?

THE WITNESS: I don't know the answer to whether they were asked. It's fair to say that they would not have been allowed to complete the acquisition if they were not considered financially viable at the time.

BY MR. HUME:

Q. And would that have been equally true if they were asked to participate in a supervisory acquisition of failed or failing thrifts in the early 1980s and 1982?

A. I'm sorry. Would you repeat that question?

Q. Would it also have been true that the

60

thrifts that were asked to acquire failing institutions in 1981 or '82 were also generally healthier thrifts?

A. Again, in relative terms they were healthier than some of the others but they were considered financially viable with the acquisition. Otherwise the acquisition would not have been allowed to take place.

Q. Do you remember the acquisition of Delray First Federal Savings and Loan Association of Delray, Florida, as a supervisory acquisition?

A. It would have been a supervisory acquisition. Otherwise it would not have been an interstate acquisition.

Q. And as a supervisory acquisition, it would have been one where the goodwill that was created from the acquisition was assured that's something that could be used towards regulatory capital?

A. I have no specific recollection of that but that would generally be the case. Yes.

MR. HUME: To carry on this thread of Carteret's financial condition, I would like to mark this as AmBase-Dittenhafer Exhibit 5.

(AmBase-Dittenhafer

61

Exhibit No. 5 was marked for identification.)

BY MR. HUME:

Q. This is the 1988 report of examination. Don't worry. I'm not going to ask you to review the whole thing.

A. I didn't know I had that much to do with AmBase.

Q. The first question on the report of examination is simply this is, as you can see on the second page, would have been concluded May 13, 1988. The acquisition by AmBase was consummated in August of '88 and the recommendation for approval was dated -- the FHLB's recommendation for approval was dated June 30th.

Would this report have been something that you or someone working for you would have been likely to have reviewed in your decision whether or not to recommend approval for the acquisition by AmBase?

A. Yes.

Q. And would it have been something that you personally would have been likely to review or someone working for you?

82

million representing 3 percent of $5.9 billion in total assets. We have two barometers for measuring total classifications.
Can you recollect being familiar? Do those numbers mean anything to you in terms of your recollection what was normal? What was high? What was outrageous in the industry at that time?
A. No. I don't have any specific recollection of those.
Q. So that's not something that you would have --
A. No.
Q. And you wouldn't have known whether it was more significant what the ratio was to assets versus ratio to regulatory capital?
A. I have no information to add to anybody's knowledge on that point. It's not something that I was familiar with at the time and not something that I'm familiar with now.
Q. Just to be clear. I'm not only -- you've answered the question in terms of what you remember factually about the industry. I would also be interested, as principal supervisory agent at that time, would you have been more concerned with the ratio of classifications to assets or the

83

ratio of classifications to capital?
A. I don't have any basis to answer the question. And the reason for that is a lot of it would depend upon the examiners or supervisor agents being familiar with the specifics of the situation and what their frame of reference would have been.
Q. Okay.
Back to Page 4, if we could, to that same paragraph. It goes on to read that given the relatively small amount of doubtful and loss classifications along with the institution's historical loan loss rate and management's close monitoring of problem assets, the examiners feel that the existing loan loss reserve is presently adequate.
A. That's exactly what I was saying earlier that it would go depending upon the examiners and supervisory agents' feel for the assets and feel for management's ability to handle them.
That would be much more significant than the specific ratio.
Q. And does reading this refresh your recollection at all as to what it was the

84

supervisory agent or the examiners were reporting to you about Carteret at the time AmBase wanted to acquire it?
A. Clearly they believed that their loan loss reserves were adequate and then they were adequately capitalized.
Q. You'll note also that the on the last paragraph it says: Chairman O'Brien stated that an expanded loan workout division has been formed to facilitate the resolution of problem assets and references a guy named James Kurdek.
Do you know who Mr. James Kurdek is?
A. No.
Q. Do you remember generally in your role as principal supervisory agent whether there was a frequent concern with the way thrift institutions reviewed their loan portfolios? In other words, that there was constantly a problem or a question with whether a thrift institution was adequately reviewing its loan portfolio?
A. I would say my general feeling would be that it was not usually a problem. As I say, there would be some nitpicking about particular loans. But, no, it was generally not considered a problem. In fact, many cases mutual would have

85

over reserved for tax reasons but that was not a concern for the regulator.
So, no, I don't think it was generally a -- now, you said generally in the industry. Now we're talking about -- here we're referring specifically to a significant portfolio of commercial loans of Carteret. They were one of the first institutions in our district to get into commercial lending.
The feeling was at the time -- my feeling was at the time they did it well by hiring basically a department out of a commercial bank and they were criticized by the banking industry at the time for doing it. But they just bought a commercial loan department and, therefore, my feeling was that was a pretty good way to do it.
Q. Because these were people who were professionals --
A. Professionals, experienced and had a pretty good track record at the institution where they were before.
Q. Do you remember why it was they were criticized by the banking industry for doing that?
A. Yeah. You're going to let the savings and loan industry raid all our commercial lenders

MR. LEVITT: So what is the question.
THE WITNESS: I'm not sure where we are.
BY MR. HUME:
Q. The question is would the regulators who reviewed this application by AmBase to acquire Carteret have been cognizant that without its supervisory goodwill Carteret would have failed its capital requirement?
MR. LEVITT: Would it have been likely they would have done the math to see that if you subtract goodwill from total regulatory capital there wouldn't be enough to satisfy the standard? Is that what you're asking? What do you mean cognizant? Would it affect the division on the application --
THE WITNESS: Certainly they would have been aware of the amount of supervisory goodwill.
BY MR. HUME:
Q. And would they have relied on it?
A. Yes.
Q. That's the regulator?
A. That's the regulator.
Q. In what sense would they have relied on it? Would they have relied on it as something



that would continue to count towards regulatory capital?
A. Yes.
Q. Do you remember working with Charlie O'Toole -- Charles O'Toole?
A. Charlie. Yes.
Q. Did he go by Charlie?
A. He went by Charlie.
Q. Do you remember working him?
A. I once had an office about two offices from his early in my career. Yes.
Q. So does that mean you remember vaguely but you don't remember working with him a lot?
A. I remember Charlie. I guess he would have been involved in an acquisition. He was -- Charlie was not a supervisory agent with responsibilities that I'm described to you earlier in the deposition with responsibilities for following a specific institution.
Charlie's responsibilities were more to -- originally branch acquisitions or branch applications we used to call them. An acquisition would be an application -- he was an analyst on applications. Yes. He had a supervisory agent title but his specialty was analyzing applications



of various kinds.
BY MR. HUME:
Q. At the Federal Home Loan Bank of New York?
A. For the supervision division of the Federal Home Loan Bank of New York.
Q. Therefore he would have been one of the people who came over to the Federal Home Loan Bank of New York?
A. He was working for the Federal Home Loan Bank before the examiners came over.
Q. We have sort of spoken amorphously about the regulators in terms of reliance on the goodwill and on the regulatory capital. Would that reference include Angelo Vigna?
A. Yes.
Q. And would it have included anyone else you can remember by name who would have had responsibility for Carteret at that time?
A. I don't recall who would have had responsibility for it. You mentioned several names. One of them I didn't know. I knew Bob Albanese. I don't know if he had a particular role in Carteret. I mentioned Charlie.
To my recollection at that point he



reported to Linda Macurio who would have been -- I think he reported to her as head of applications. She was head of applications and he was an analyst in applications is my recollection of that.
MR. HUME: Please mark this AmBase-Dittenhafer Exhibit 8.
(AmBase-Diffenhafer Exhibit No. 8 was marked for identification.)
BY MR. HUME:
Q. This is what I refer to as the recommending approval memoranda. I don't know if there's a better term for it than that -- signed by -- if you flip to the last page -- Charles O'Toole as the supervisory agent and the concurring signature by you as principal supervisory agent dated June 30, 1988 for the AmBase application to acquire Carteret Bancorp.
Incidentally, I'm using the name AmBase -- AmBase was at that time known as the Home Group. I will use them interchangeably and probably just use AmBase just so you'll know.
Having now seen this, does it refresh your recollection at all about this memorandum or

maintenance?
A. Absolutely.
Q. It's the same point?
A. The same point.
MR. HUME: May we take a break for five minutes.
(Recess.)
BY MR. HUME:
Q. Mr. Dittenhafer --
A. What page are we on now?
Q. We are now back on Page 6 of the O'Toole memo.
A. Okay.
Q. I want to quickly go to Page 7. But I want to highlight and have you review the second paragraph which is discussing the projections for the cash flow needed to cover debt service.
And it says: There are no projections to indicate that sufficient funds will be available. Dividends from both Home which is the insurance subsidiary of Home Group and Carteret will undoubtedly be relied upon.
On Page 8 then discusses, as we have reviewed, the net worth maintenance and dividend limitations.



Given that this memorandum was clearly aware of the need for cash flow from Carteret to be paid up to AmBase of the Home Group to continue to finance this transaction, is it conceivable that the author of this memorandum or any of the regulators involved could have anticipated that Carteret was going to be thrown massively out of capital compliance by the loss of supervisory goodwill?
A. I don't think they would have anticipated that. No.
Q. Is it fair to say that they assumed that that would not happen?
A. I think that's a fair assumption.
Q. So basically both parties to this approval -- well, all three parties to the transaction shared the assumption that Carteret would continue to be able to count its supervisory goodwill toward their regulatory capital?
MR. LEVITT: Object as to the form of the question.
THE WITNESS: I think that's a fair assumption.
BY MR. HUME:
Q. Do you remember it to be the case?



A. No.
Q. And you don't remember it not to be the case?
A. Correct.
Q. But based on your review of the document today and what you do remember about it generally and about your time at the Federal Home Loan Bank, it is your judgment that that was likely to have been the case; is that correct?
A. What was likely to have been the case?
Q. That it is likely that the parties to this transaction including both AmBase, Carteret and the regulators at the Federal Home Loan Bank would have shared the assumption that Carteret could continue to count its supervisory goodwill towards regulatory capital?
MR. LEVITT: Object to the question.
THE WITNESS: That's correct.
MR. LEVITT: It's a party transaction that Carteret and AmBase entered into an acquisition agreement. This document before us clearly states which did not involve the bank or just simply approving or being asked to approve an application. So I object to the form of the question.



BY MR. HUME:
Q. I think you know what I meant but I'll rephrase it so that it's clearly that I mean both the parties to the commercial transaction and the regulators in charge of approving that transaction which approval was required. In your judgment, having reviewed this document, are very likely to have shared the assumption that the supervisory goodwill of Carteret would continue to be counted towards its regulator capital?
A. That's correct.
Q. Were you aware that the Home Group was not itself an insurance company but a holding company that owned an insurance company?
A. No. Not to the best of my recollection. At the time I may have been aware of it. I don't recall at this point. At least I thought of it as an insurance company.
Q. Given the extent of the leverage used by AmBase in this acquisition, the fact that it was likely to rely on dividends from Carteret as well as from its insurance subsidiary, would it have made sense if the regulators had known that goodwill was likely to be disallowed as regulatory capital for them to approve this transaction?

146

million.
A. Right.
Q. So that's one way of looking at this institution?
A. Are we not talking about RAP capital there?
Q. Yes. Absolutely.
A. Okay.
Q. But this is written at a time when RAP capital exists in two universes. There was pre-FIRREA RAP capital and an anticipated assessment of what FIRREA RAP capital would be.
A. Correct.
Q. Which we see for the next several pages including on the bottom of Page 49 results in a deficiency of either 130 or $103 million.
A. That's correct.
Q. I guess my question is don't you think the effect of FIRREA is a whole lot more dramatic than the effect of any of the trailing operating losses or recommended loans reserves that are listed in the paragraph I read?
MR. LEVITT: Objection. Asked and answered. He's already testified to it. And to the extent he hasn't, it calls for blatant

147

speculation. And I think the deposition ought to move forward because this repetition accumulates the number of pages and the expense and the time that we have all to spend. So I think the deposition ought to stop covering the things that have already been covered.
MR. HUME: We also think that when depositions get too important and unfavorable facts, they ought to cease. We share the same view.
THE WITNESS: There's no question that the capital -- that FIRREA and its affect on the capital of this institution would have had a major, in my view, a major impact on the examiner's rating of the institution.
Did they mention tangible capital in the previous report? I don't think they did. But maybe they did. But here it's clearly -- these people have been reading about FIRREA in the American Banker for six months and its tangible capital requirements. Clearly it had a major impact on the examiner and his evaluation.
BY MR. HUME:
Q. In your view, Mr. Dittenhafer, from what you remember about the acquisition and to the

148

extent that recollection has been refreshed today, do you think that it would have been, to coin a phrase, madness for AmBase to have acquired Carteret if it had even an inkling of a suspicion that Carteret's supervisory goodwill would not be allowed to be counted towards its regulatory capital?
MR. LEVITT: Objection. Seeks speculation and is irrelevant.
THE WITNESS: I really can't answer it. There are other institutions that had -- other businesses that acquired institutions with supervisory goodwill. Presumably it was considered a good business decision at the time by those organizations as well. Some of them became very profitable.
BY MR. HUME:
Q. Do you mean there are other institutions that bought thrifts that had a lot of supervisory goodwill? Is that your point?
A. (Witness nods head.)
Q. You need to speak for the record?
A. Oh, yes. That's my point.
Q. Do you have any personal recollection of an acquisition where the thrift's regulatory

149

capital was only two times, over half of it was made up of supervisory goodwill and where the thrift would have been out of capital compliance without the goodwill?
A. I don't have personal knowledge of those other institutions that were in other districts. But you have -- there were acquisitions by companies where they made money on them. To speculate that it would be madness for AmBase to do it, I couldn't say that. It could have been a good business decision.
Q. Even knowing that they would lose $180 million?
A. If they had known that in advance, why would anybody acquire it. But other companies did acquire financial institutions under the same circumstances and made money on it. So the point is I don't know.
Clearly if they knew in advance, it would be madness. Was it crazy for them to take over Carteret? I assume it was a good business decision. Other people made the same sorts of decisions obviously with different facts in each case but made the same sorts of decisions and, in fact, made money on it.

154

Yes. There was a value to that as a lender. But if I'm a lender and my concern is do I have a collateral -- and, frankly, I didn't trust the FSLIC either. I told you earlier we got double collateral on the loans we made with the FSLIC because I figured they'd stiff us before they'd stiff anybody else. We never lost a dime when I was there and I don't think they've lost a dime since.

Q. If you can refer back very briefly to the O'Toole memorandum on Page 7.

A. Exhibit 8?

Q. Yeah. On Page 7 at the top -- this goes to your private sector lender point. At the top of the page it says: HGI will also enter into a credit agreement with Chase Manhattan Bank and Chase Manhattan Capital Markets. Advances would be up to $250 million and a six-year term loan and a six-year revolving credit loan up to 50 million. As security, HGI will pledge all the capital stock of Bancorp, meaning Carteret Bancorp the owner of that savings bank.

So there's a private sector lender that essentially exposed itself for $300 million of credit based on the strength of an institution

155

that would not have been in capital compliance without a supervisory goodwill, in fact, would have been substantially out of compliance and which did not have significant tangible capital.

So from their perspective wouldn't you agree the assumption and belief that supervisory goodwill would continue to be counted as regulatory capital had a lot of value? I'm sorry. The assumption didn't have value. They had the assumption --

A. They had the assumption --

Q. Wouldn't you agree they had that assumption?

A. I don't know what -- there may have been other security for this loan that I don't know about.

Q. This is the only security.

A. From what is written here, I would have to agree with your statement. Yes.

MR. HUME: Let's take -- I promise this one will be a reasonable break, very short because I think I'm basically done. But before I sign off, I'm going to confer with my client. And we'll come back and counsel for the Government may have a few questions.

156

(Recess.)

BY MR. HUME:

Q. I have a very small number of questions and then I will turn the floor over.

Mr. Dittenhafer, I have a few more questions about supervisory goodwill and I'd like to just sort of back up so I can make sure I understand your testimony and ask a few more simplistic questions.

Would you agree that the definition of supervisory goodwill is the excess of liabilities over assets in a failed or failing institution that was acquired in a supervisory acquisition?

A. Without specifying that as a technical definition, yes, I would agree with it in general.

Q. Would you agree that it represents roughly the -- well, it may under estimate but it is one measure of the liability to FSLIC had it liquidated that institution?

MR. LEVITT: Could you just repeat that because I was wondering for a second.

THE REPORTER: "Question: Would you agree that it represents roughly the -- well, it may under estimate but it is one measure of the liability to FSLIC had it liquidated that

157

institution"?

THE WITNESS: The answer is that's correct, roughly.

BY MR. HUME:

Q. As you've testified already that the purpose -- that one of the ways in which the FSLIC arranged for supervisory acquisitions to resolve problem cases in the early to mid-1980s and even up to the time of FIRREA was to assure thrifts that they could use this supervisory goodwill amount as regulatory capital subject to a beneficial lengthy amortization period?

A. That's correct.

Q. And just for a moment can I also ask you in all those basic descriptions, do you know of anything or do you recollect anything after this deposition that would lead you to believe that that description of supervisory goodwill would not apply to the supervisory goodwill on Carteret's balance sheet?

MR. LEVITT: Objection as to form.

THE WITNESS: My answer was no. I don't recall that there's nothing that would differentiate Carteret from the general case you described earlier.

182

A. I think that's --
Q. Excess cost over fair value.
A. I'm sorry. I'm looking at the wrong number.
Q. 214.953, that's on the asset side, the third item up from total assets.
A. Yes.
Q. So that would mean that the tangible equity would be the 290 minus 215 which would be about 75 million; is that correct?
MR. HUME: Objection. Lack of foundation. It could be other intangible assets.
MR. LEVITT: That's a valid objection. So let me rephrase the question.
BY MR. LEVITT:
Q. If you look at the total equity and you take away from the total equity the line item we've identified as goodwill, what would be left would be approximately 75 million; is that correct?
A. That's correct.
Q. Now I want you to just keep this document in front of you but look again at the O'Toole memorandum which is No. 8 and you'll see that the purchase price that AmBase paid for

183

Bancorp was 268 million. That's on Page 1 in the first paragraph under structure. Do you see that?
A. No, I don't.
Q. On the first page of the O'Toole memorandum, it says the transaction --
A. The transaction is structured as a cash merger with a purchase price of 268 million.
Q. So it looks like AmBase has agreed to pay 268 million where the stockholders equity minus the goodwill is about 75 million. Do you agree with that?
A. Yes.
Q. Does that strike you as a risky proposition to pay 260 million for 214 million of the total 290 million of assets as goodwill?
MR. HUME: Objection. Calls for speculation.
BY MR. LEVITT:
Q. If you can answer without speculating.
MR. HUME: It calls for expert testimony.
THE WITNESS: Let me answer it this way. There is a legitimate GAAP accounting principle on goodwill because institutions have franchise value in their name and goodwill does

184

have a value. And certainly a part of the difference between the two numbers you've indicated here can be attributed to the fact that Carteret as a savings bank had a good name in a number of very lucrative markets.
BY MR. LEVITT:
Q. Did the Government have any role in the negotiations that led to this acquisition price of 268 million?
A. I don't know the answer to the question.
Q. Was the Government a party to the acquisition agreement between Carteret Bancorp and AmBase?
A. My recollection is no.
Q. I'd like you to turn again to the O'Toole memorandum, please. Now did you testify or, as I recall, you testified that one of the aspects you looked -- the district looked at in deciding whether to recommend the approval of a proposed acquisition or not to recommend it was the personnel that were going to be involved in operating the savings bank after the acquisition.
Is that an accurate summary of what you said earlier?

185

A. Yes.
Q. Do you recall without having your refreshed by the O'Toole memorandum that there were any sensitive issues with respect to personnel in the proposed acquisition by AmBase or Bancorp?
A. My recollection is -- and a man I never met, a man named Manley who was involved in that. And I don't recall the specifics but there was some concern about his involvement with AmBase and another institution.
Q. Let's look at --
A. I do not recall the specifics of it. But I do remember the certain.
Q. Let's look at the portion of the O'Toole memorandum that talks about that and see if that brings back any of it to you. And I'll direct your attention to Page 7 under five, management resources.
A. Marshal Manley. Okay.
Q. The last paragraph on this page says that Mr. Manley had been an incorporator of First National Bank in Beverly Hills and that they engaged in real estate transactions that the FSLIC regarded or the Comptroller of the Currency