IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

September 29, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of WILLIAM JAMES DAY, JR., a witness in the above entitled matter, taken before a Notary Public of the State of New York.

APPEARANCES:

COOPER, CARVIN & ROSENTHAL, LLC
Attorneys for Plaintiff
1500 K Street
Washington, D.C. 20005

BY: HAMISH HUME, ESQ.

JAMES IGO, ESQ.
Attorney for the FDIC as Plaintiff Intervenor
550 17th Street, N.W.
Washington, D.C. 20429

DAVID A. LEVITT, ESQ.
Attorney for The United States of America
1100 L Street, N.W.
Washington, D.C. 20001



APPEARANCES (Continued):

CLAIRE L. McGUIRE, ESQ.
Counsel, Legal Division
Federal Deposit Insurance Corporation
1717 H Street, N.W.
Washington, D.C. 20006

ALSO PRESENT:

JAMES V. FELLERMAN
Senior Program Analyst
Federal Deposit Insurance Corporation

Exhibit index at end of transcript.



WILLIAM JAMES DAY, JR., called as a witness, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. HUME:

Q What is your full name?
A William James Day, Jr.
Q Where do you presently reside?
A 349 Route 94, Newton, New Jersey 07860.
Q Good morning Mr. Day. Thank you for appearing today. My name is Hamish Hume. I work at the law firm of Cooper, Carvin & Rosenthal, and I represent AmBase Corporation in the lawsuit against the government.
You've already stated your name and address for the record, so why don't we begin by having everyone else present at the deposition introduce themselves.
MR. LEVITT: David Levitt, attorney for the government and representing Mr. Day today.
MS. McGUIRE: Claire McGuire,



attorney for FDIC assisting the Department of Justice.
MR. IGO: Jim Igo, representing FDIC as Plaintiff Intervenor.
MR. FELLERMAN: Joe Fellerman, FDIC, Plaintiff Intervenor.
Q Mr. Day, have you ever had your deposition taken before?
A Yes.
Q When was that?
A Just generally a deposition, period, or in this case?
Q Have you had your deposition taken more than once?
A In this case or did --
Q No, at all.
A Yes, I have had a deposition.
Q More than once?
A No.
Q When was your prior deposition?
A I'd say four years ago.
Q Did it involve savings and loan litigation against the government?
A No, it did not.
Q So it had nothing to do with the

Winstar cases?
A No, it did not.
Q As you're aware, there are a few formalities before we get started.
Have you ever been convicted of a felony before?
A No.
Q Have you done anything to prepare for this deposition?
A No.
Q You haven't reviewed any documents?
A No.
Q Could you begin by giving me your academic background and describing how you first came to work at FDIC?
A I have a Bachelor of Science from Sienna College, 1967; spent to years in the army, took the federal service entrance exam and was hired by the FDIC in February 1970.
Q Have you worked at the FDIC since then?
A Yes, I have.
Q Are you still employed there today, sir?
A Yes, I am.



Q You work in the northeast region still?
A The New York region.
Q The New York region?
A Yes.
Q During the years from 1988 to 1992 did you work for the FDIC also in the New York region?
A Yes, I did.
Q And the New York region includes New Jersey and other areas?
A Yes.
Q What is the total area covered by the New York region?
A New York, New Jersey, Pennsylvania, Delaware, Puerto Rico, Maryland.
Q Have you worked anywhere other than the FDIC New York region since 1970?
A No, I have not.
Q Have you worked as an examiner throughout that time period?
A Yes, I have.
Q Have you worked as anything other than an examiner for the FDIC?
A No, I have not.



Q When you started with FDIC was your primary responsibility with commercial banks?
A No, the majority of the banks in the New York region at that time, which just covered New York, New Jersey, and Puerto Rico, were thrifts.
I would say two-thirds of my time was spent with thrifts.
Q In the 1970s?
A Yes, savings banks, not savings and loans, state chartered savings banks.
Q So non-FSLIC insured thrifts?
A Exactly.
Q What is the difference between a commercial bank, an FDIC insured savings bank prior to FIRREA, and a FSLIC insured savings bank?
A You want the long story or the short story?
Q Well --
A The primary difference was the powers of a commercial bank and the types of assets they could invest in, the loans they can make, and on the other side, there was Regulation Q, which gave the thrifts the ability to pay higher interest rates.



Q What was the difference between the thrift that was FDIC insured and the thrift that was FSLIC insured prior to FIRREA?
A Generally it was the same, it was just the chartering agency and, I have to think about that, but I don't think there was any significant difference.
Q Was there a different regulatory body charged with oversight of the institution?
A Yes, there was. The FDIC supervised the state chartered thrifts, and when I first began to work at the Federal Home Loan Bank Board, they supervised savings and loans.
Q So the FDIC was both the insurance body and the regulatory body for the non-FSLIC insured thrifts?
A Or the state chartered savings banks.
MR. LEVITT: Objection to the extent it implies there weren't state regulated agencies as well.
A That's true. The New York Banking Department and the New Jersey Banking Department was also involved in regulating.
Q So until 1989 your responsibility

regulatory goodwill.
Most of it was from discussions with the OTS examiners and some of the bank personnel about their, the OTS' findings regarding asset quality.
Q Do you remember that the institution without the use of its goodwill was out of capital compliance under FIRREA?
A I don't recall exactly.
Q You don't recall?
I'll refer you to the second page of this document which has as its Bates number WOQ 6821051.
You would have reviewed these financial statements at that time, is that right?
A Yes.
Q I'd like to refer your attention to the total stockholders' equity at the bottom of Page, $264.6 million.
Do you see that?
A Yes, I do.
Q Then I'd like to refer you to on the asset portion of the statement the line that's three lines up from the bottom, excess of cost over fair value of net assets acquired, net. It's



$187.4 million.
Do you see that?
A Yes.
Q Would you have understood at that time that excess of cost over fair value of net assets acquired referred to the goodwill of the institution?
A Yes, sir.
Q And that that would likely be a supervisory goodwill of the institution?
A Yes, sir.
Q Do you remember other institutions that had goodwill on their balance sheets that was that high as a percentage of stockholders' equity?
A Again, prior to this I wasn't in institutions that really had any significant goodwill.
Q Do you remember thinking that Carteret was going to get hit very hard by FIRREA's exclusion of goodwill from capital?
A I assume I did think that, yes.
Q Do you remember thinking that without the ability to treat that goodwill as capital, Carteret was going to have a very hard time staying in existence?



A Yes, I do.
Q And do you remember any of your colleagues either at the FDIC or at the OTS sharing that view?
A The people on the examination with me or visitation I assume shared the same view.
Q Do you remember who those people were?
A My recollection an examiner named Michael Kostrna and an examiner -- the other reason for the limited scope, I had a very small crew, I believe there were only two or three or people, another examination Edward Szymanski, and I'm not going to even try and attempt to spell that, it's S-z something. I think that was it.
I think I might have had one other person for a couple of days, so that was another reason why we couldn't do a full scope examination, because we didn't have the staff available.
Q What about the OTS examiners, do you remember who they were? We've mentioned Russ Meyer already.
A Russ Meyer is the one I remember most. Then there was another lady on the



examination who had worked for the FDIC. I believe her name was Peggy Kelly.
Those are the only two names. I mean, I interacted with the people at the exam, but I can't recall the rest of the names.
Q Can I refer you back to Day Exhibit 1, on the third page of that exhibit which has Bates number AM 001425.
A Yes.
Q Do you see there a list of OTS examiners both from the Supervision Division and from the Examination Division?
A Right.
Q Do those names refresh your recollection as to OTS personnel working on this exam?
A The second name, John Michelet, rings a bell, but I can't put any exact recollection as to why.
Q You don't remember Dave Dorgan, Joe Kehoe, Scott Smith --
A Oh, the Examination Division.
Q I'm sorry, I meant for you to look at both.
A I remember the individuals, Dave

Dorgan and Joseph Kehoe and Scott Smith, I believe, too, but not anything specific about them.

I recognize the name -- Michael Finn, I don't recognize that name at all.

Q Do you recollect discussing Carteret with any of those individuals in 1989?

A Yes.

Q Do you remember having a difference of opinion with any of them about the state of the institution at that time?

A I don't -- the discussions I think that I recollect is the meeting we had prior to making this presentation to the Board of Directors, and I think we were in agreement with their conclusions.

Q I'll refer you to the fourth page of Exhibit 2 which has Bates number, it ends with the four digits 1053.

You'll see here an analysis of the institution's tangible capital requirement.

Do you remember that FIRREA introduced a tangible capital requirement for these institutions?

A Yes. I don't remember exactly how



it was defined.

Q Do you remember that supervisory goodwill was not allowed to count towards this capital requirement?

A Yes, I do.

Q If you look at the bottom of the page it shows, in the second column it shows the minimum tangible as percentage of assets.

Do you see that?

A Yes.

Q It shows the percentage for each of the periods, it's sort of a phase-in schedule there.

Do you see that?

A Yes.

Q Does that refresh your recollection that as of the passage of FIRREA the requirement was 1.5 percent?

A I can't recall exactly what it was, but if that's what it was, that's what it was.

Q Do you remember that in the years subsequent to the passage of FIRREA, and by that I mean specifically 1990 and 1991, that the Northeast Region was hit hard by both a general economic recession, and more specifically a



significant decline in the real estate market?

A Generally, yes.

Q Do you remember that hurting financial institutions, both commercial banks and savings and loan institutions?

A Yes.

Q Do you remember that that decline led to the failure of a number of institutions?

A I'm trying to think of my specific circumstances. The decline impacted some institutions that failed, and it's as much a recognition of the decline as the actual decline.

There was a quality problem with real estate appraisals in the '80s, and part of FIRREA was resolved and the standards were raised involving real estate appraisals, which resulted in lower valuations.

Q You see on this page the calculation of tangible capital for this institution showing the -- this is in the middle of the page showing the gap, historical capital, then the subtraction out of the $187 million of goodwill, leaving $83 million.

Do you see that?

A Yes, I do.



Q Knowing what you know now about what happened in the economy in the year subsequent to this, would you agree that the loss of capital initiated by FIRREA was like a death blow to this institution?

A It was a significant factor.

MR. LEVITT: Objection to the extent the implication is that in year 1 the tangible capital is what is shown in this exhibit.

In fact, FIRREA phased in the reduction of the supervisory goodwill, so the tangible capital in year 1 following FIRREA was not that number.

MR. HUME: The testimony that we just received from counsel from the Department of Justice is both inaccurate and unauthorized.

MR. LEVITT: It's not unauthorized, and it's fully accurate.

MR. HUME: There was no phase-out of the goodwill for tangible capital.

Q If you look at the top of this page, Mr. Day, it says, "Per HR 1278," and the date of the document is October '89, but the date of this

86

A I remember -- yes, I do remember, but I'm not sure exactly the date, if it was a result of the time I was there in '89, it wouldn't have been by recommendation, it would have been the subsequent exam, which was more of a full scope exam where I would have made such a recommendation.
Q You mean it wouldn't have been your recommendation in '89 because you didn't conduct an asset review?
A I would have made the same recommendation as the OTS. I didn't conduct an asset review, but I would have concluded probably that if that was their recommendation.
Q That would have been because it was not a full scale exam in '89?
A What I'm trying to say is it would have been my recommendation -- it would have been the OTS recommendation, and I would have just piggybacked on it.
Q But during the 1990 exam you would have been more actively involved?
A Yes.
Q And do you have some recollection of the need to recommend to Carteret that they take

87

additional reserves?
A Yes, I remember that we disagreed on the quality of some larger loans.
Q When you say disagreed, you remember that you and the institution disagreed?
A Yes.
Q How, as a general matter, how do those disagreements tend to get resolved between management and regulators as to the appropriate level of reserves?
A The way that the FDIC works is I present my arguments in the examination report about why they need additional reserves.
It would then come back to our office. They would review it, either concur or disagree with those recommendations, forward the exam report and the findings to the bank, meet with the bank Board of Directors and request that they increase the reserves.
If they don't request it, then we have regulatory authority to issue a cease and desist and require that they do it.
Q I'm not sure I followed the second to last step.
When you say if they don't

88

request --
A We would request. If they don't comply with the request, and we consider it significant, we would probably go to an enforcement action.
Originally we would probably start with the first step, the memorandum of understanding they would do it.
Q And the "they" is the management of the institution?
A Yes.
Q Do you remember understanding that OTS operated in the same way or in a different way in dealing with disagreements like that?
A I think, because they were the primary regulator, I think they did it differently.
I think they can actually just tell them to do it. That's just my recollection of how they operated. I'm not sure.
Q Do you remember in an instance like this where you were both regulating the institution, they were the primary regulator?
A Yes.
Q So it would be done the way they did

89

it, the disagreements would be dealt with however the OTS dealt with it?
A Yes, unless in the case where we thought that their conclusions were wrong, and then I think we could have stepped in as the insurer and taken additional action.
Q So you do remember that there would have been some authority that the FDIC could exert if it strongly disagreed with the OTS?
A Yes. I believe, though, the only thing we could do at that stage was termination of insurance, we didn't have -- we didn't have 8 B authority.
Q Of the FDI Act, which allowed the FDIC to --
A It's the enforcement provision of the Act.
Q (Continuing) -- to take enforcement actions against an institution that they thought were unsafe or unsound, is that correct?
A Yes.
Q Were there any circumstances -- would a threat of termination of insurance be essentially a tool used by the FDIC only under certain circumstances where the FDIC disagreed

with the way the OTS, the primary regulator, was regulating the institution?
A That's my opinion. I guess there were other circumstances.
Q But that's how you remember it.
A Yes.
Q Would you agree, Mr. Day, that the process of taking reserves for -- first of all, let me clarify.
When I use the term reserves, I don't know that I use it in a technical sense. I mean to use it in a way that covers what are called a provision against future loan losses, or a general valuation allowance.
Am I using it in a way that makes sense to you, or should we --
A Yes, it gets somewhat complex, but generally yes, you're correct.
Q I basically use it in a way that means that the institution has to take a charge of some kind that will go on its income statement and reduce income and therefore in that way also affect capital, and that it will carry a level of reserves, but will sometimes need to increase that level based on a feeling of future losses, but



will also sometimes be able to reduce its reserves if in fact its assets bounce back.
Is that a fair description of what a reserve, how a reserve works?
A Generally, yes, that's the way the FDIC would work. I believe the OTS at that time had, I don't know if it was before or after FIRREA, that they required specific reserves rather than general reserves.
It would be rare, I've only seen it once in my life where they actually took money out of the reserves and put it back into income.
Q Where the OTS did that?
A No, the bank that I was involved with, a commercial bank.
Q But it would be rare in your experience for the OTS to do that.
A I've never -- I don't know what the OTS did, I'm just talking about my experience examining banks.
I've only seen one bank that actually recaptured a provision, and that was a commercial bank.
Q Okay.
Would you agree that the process of



determining the appropriate level of reserves is a process that involves a number of different judgments based on a prediction of the performance of assets in a portfolio?
A Yes.
Q Would you agree that that judgment, while there were a lot of mathematical and statistical methods that can be used, ultimately is at least at much art as science?
A If art enters into it it should be to a very small degree.
Q I guess art and science may be slightly confusing terms.
A The art would be in only assessing future economic conditions, as far as I'm concerned.
Q Right, because there is, the science side of it would be based on the historical loss experience of the institution for assets that meet certain definitional criteria?
A Well, that's what the accountants said at the time. That was a problem we had with some accountants, is that for thrifts, is that they based their, and I believe Carteret was one of them, where the allowance was based on what the



accountant said was the historical loss.
It was my contention, and I think I represented a general consensus of the FDIC, is when you had an institution like Carteret who changed its business plan very dramatically into commercial lending, that it had a historical loss, that was not the way to assess the allowance, it should be predicated on the quality of the portfolio.
Q Had you worked with other institutions where that had been the case, or because they had shifted into a different line of business --
A Carteret is the one that comes to mind, because I believe, I can't remember the accountants, I think it might have been Peat Marwick, had attested that based on, in their published statements, that their allowance was adequate based on historical loan losses, and I believe we had some discussion at that time about that.
Q So it was your view that because of the line of business being --
A Changed.
Q Different, and --

94

A And the economics being changed.
Q And the economic situation being changed --
A That that wasn't the appropriate way to look at it.
Q So that you needed to do more than just look at the historical loss experience.
A Exactly.
Q In doing more than looking at the historical loss experience -- well, first of all, in deciding to do more than look at historical loss experience, you have to make a judgment, just as the one you just explained, based on your understanding of the industry and of the economic environment.
Would you agree with that?
A That's part of it, but the primary judgment is based on the evaluation of the asset portfolio.
In this case we're talking about loans, so it would be the loan portfolio.
Q And based on that judgment, as well as your judgments about the economic environment and the changed nature of the business, you could conclude, as you did, that you needed to do

95

something more than historical loss experience.
A Yes, and to clarify economic environment, that would have been reflected in the real estate appraisals that were provided at the time.
If the real estate appraisals were done at a significantly prior date, you would have factored that in as well.
Q So you remember having a view as to the method of taking reserves that was different from the view of Carteret's then accountants, Peat Marwick?
A Yes.
Q Do you remember having similar disagreements with Peat Marwick with other institutions?
A Peat Marwick, not specifically. Other accounting firms at other institutions.
Q Or what I guess were then the big six, or who knows how many there were.
A Yes.
Q Did you have better or worse experience with any of those major accounting firms on this issue?
A The experience I had with other

96

accounting firms were based on assessment of the asset quality, not assessment of the historical loans.
See, commercial banks and the banks that we regulated didn't rely on historical loan loss. That was practically primarily thrifts that did that, stayed basically in the residential mortgage market. So it wasn't a big factor in how the allowance was determined.
Q So there was no accounting firm that you remember being more receptive to your view than you remember Peat Marwick being?
A I'm not exactly clear on your question.
Q I guess I'm focusing on the disagreement as to the method of taking reserves and whether to rely purely on historical loss experience, and whether or not some accounting firms shared your view that in an institution like Carteret that had been -- was a thrift but that also had commercial loans, it was not appropriate, whereas Peat Marwick had said that that was.
A I don't believe I ever had a similar situation. In that case I thought the reasoning was fairly specious based on the fact that they

97

had changed their business approach, but apparently that was what accounting guidelines allowed them to do.
Q After making the judgment as to whether or not to rely purely on historical loss experience, would you agree that there are other subjective judgments involved in determining what the appropriate level of reserves is?
A Yes.
Q How are those judgments made?
A It's the evaluation of the quality of the loan portfolio, whether or not the bank has correctly assessed that and provided appropriate reserves.
MR. HUME: Can we mark this AmBase Day Exhibit 5.
(The above-described document was marked AmBase Day Exhibit 5 for identification, as of this date.)
Q Mr. Day, Exhibit 5 is an August 6th, and I believe it's 1990, even though we can't see the last number.
A Yes.
Q Memorandum from you to from Nick Ketcha. It relates to Carteret's reserves. I

114

reserves?
A Well, interestingly enough, there's been an ongoing debate with the Securities & Exchange Commission about that, about managing earnings through taking too much reserves. So obviously --
Q In this industry?
A Currently in the banking industry, yes, the FDIC wanting the biggest reserves it could get and the SEC saying you're managing your earnings.
That's semi-resolved now, as far as I understand.
Q And it was resolved in whose favor?
A I believe the SEC backed off a little bit.
Q They wanted to try to scale back the extent to which FDIC required large reserves?
A I don't think they were alleging that it was FDIC required reserves, it was a management determining reserves that were more than they thought appropriate.
Q So the SEC would be concerned that institutions may take large reserves in order to "manage earnings" so that the next year they could

115

have very large earnings?
A Or vice versa. Just to have some available, to bring their earnings up to a certain level of next year by taking it out of the reserves or not providing as much reserves the next year.
Q So it is potentially a tool that could be manipulated to distort earnings.
A That apparently is what the SEC thinks.
Q I guess my earlier question was simply if you take a reserve on a pool of assets, essentially you are, could it be described as writing them down to a lower value?
A That would be more of a specific reserve, which again, the FDIC has never really used that vehicle.
What you're doing is anticipating loss in the reasonably near future on certain loans and setting up a general reserve.
You're not technically writing them down, you're still setting up a reserve.
Q But if you take a specific reserve such as that, is it then possible to sell that asset subsequently at a profit? Isn't it easier

116

to sell it at a profit?
A You wouldn't necessarily sell it at a profit. You would sell the loan for whatever price, whether it was discounted or whatever, you might determine you don't need that level of reserves anymore, so therefore your earnings might be a little better.
The end result is probably what you're alluding to.
Q Is it also possible that taking reserves will enhance the credibility of management if they're trying to raise new investment capital because they can present the balance sheet as something that's rock solid?
A My understanding is the external analysis, the investment analysis, they consider, the level of reserves is very significant when they recommend buy and sell.
Q Buy and sell of institutions?
A Stock.
Q Or investment in institutions?
A Or the stock. If they see the reserves are a low percentage of non-performing loans, they usually aren't too comfortable with that.

117

Q By "they," you mean the investment community?
A Right.
Q Wall Street?
A Right.
Q From the regulatory perspective, do you think there are additional reasons why, from a regulator's perspective, reserves are important?
A Well, not so much from a regulator's perspective, from an insurer's perspective, that's our first line of defense.
So from an insurer's perspective, we would like to see the most reserves management could put in there rather than pay it out in dividends, but it still has to be reasonable.
Q And in an instance where -- are you familiar with regulatory capital maintenance agreements between shareholders and regulators or the OTS?
A No, not with the OTS.
Q Are you familiar with situations where the OTS regulated institutions that had shareholders subject to capital maintenance agreements?
A No.

A The last name was McCabe. I can't think of his first name. Charles?
Q You say you thought it was inappropriate for him to come to a loan discussion, you mean a loan discussion between the examiners and the loan officers?
A Right, and if I recall, he was a former Federal Reserve examiner, and I think he tried to intimidate people by saying I was an examiner and I know more than you do.
Q When you say intimidate people, intimidate the examiners who were actually working on the exam?
A Some of the examiners.
Q Do you recollect that tactic of his being effective?
A Yes -- well, not with me, because I knew him when he was a federal examiner.
Q How do you remember it being effective, then?
A I remember him, you know, using that as the rationale why, that he was an experienced as an examiner, and he was assigning appropriate classifications and that we were all wrong in our judgments.



Q And at that period of time you were an experienced examiner, isn't that right?
A I'd been examining banks for twenty years.
Q You started in 1970 and we're talking about '90.
A Right.
Q Do you remember what level you were in the FDIC?
A I was a CG 14.
Q Which is quite a senior level?
A That's the highest field examiner level.
Q Is that what you are today still?
A Yes.
Q Who were the people at Carteret for whom it was appropriate for them to be at these loan discussion meetings?
A It should be the lending officer, you know, or -- generally you have your loan discussions with the person who is the senior credit officer, and more than likely the people who were involved in those particular loans would be involved in the discussion.
Q Do you remember --



A My program is normally to give them the written classification, tell them what we think about it, and ask them to rebut our classification.
Q Do you remember any of those individuals at Carteret, those loan officers? Is it correct to call them loan officers?
A Yes.
I remember the senior lending officer, I can't remember his name right now. There were a couple of McCabes there, maybe you can refresh --
Q There was a Leo McCabe and a Charles McCabe.
A Leo McCabe if I recall was involved mainly in residential lending. I don't think I had any significant disagreements with him other than maybe GDC.
The Charles McCabe, was he the senior credit officer?
Q I think you're recollecting him correctly.
A Okay.
Q I'm asking about people to be honest that I don't know the names of right now,



specifically the, when I use the term loan officer, I guess I'm not sure I have as clear a perception of what I mean.
I'm thinking of there being a number of these individuals at Carteret who worked on specific loans or a series of loans that they helped actually approve and then I suppose they're responsible for.
Is that a fair description of what a loan officer is?
A Yes, but as I recall --
Q I didn't mean like a chief lending officer.
A Right, but our preliminary discussions, the person who is reading the credit file and reviewing the loan would have talked to the loan officer responsible for that loan, come to a conclusion, brought it back it me for review.
We would have given management our preliminary findings, then if they wished to rebut them, we would have a meeting with the senior staff, which may or may not include the loan officer responsible for that loan.
Q Okay. That meeting was one in which the chief lending officer would come but not

138

still at the FDIC?
A Yes.
Q Do you still work with them?
A Mike Zamorski now is Deputy Director in Washington of the Division of Supervision, Dan Dionne still is an Assistant Regional Director, and Jim Devaney is still the field office supervisor for north Jersey.
Q Have you spoken with any of those individuals or with Nick Ketcha about the Carteret or AmBase litigation?
A I was at a meeting two weeks ago and I mentioned to Mike Zamorski that I was going to be deposed and he basically said he didn't want to get involved.
Q That's a surprise.
A I probably should rephrase that. He didn't say he didn't want to get involved, he said it wasn't appropriate that he got involved, which puts a different spin on that.
I'm not trying to say he wasn't interested.
Q That's fine. You're not going to get him into trouble.
MR. HUME: Can we mark this exhibit,

139

please, as Exhibit 6.
(The above-described document was marked AmBase Day Exhibit 6 for identification, as of this date.)
Q Mr. Day, this is a memorandum from you to Nicholas Ketcha dated August 13, 1990 also regarding Carteret. Its Bates stamp is WOQ 6821467.
It discusses a meeting that will be held with OTS for the following Tuesday.
A Yes.
Q You reference that Morgan Freeman may be there, but you won't be able to be there.
A Monroe Freeman.
Q I'm sorry, Monroe Freeman. Morgan Freeman was probably busy making a movie at that point.
I'll refer you to the first sentence of the second paragraph where it says,
"The reported reason that the OTS would like to conclude their loan review is to get some type of agreement in place to compel AmBase to fulfill their commitment to down stream $30 million to the bank."
A Yes.

140

Q Do you remember, having reviewed that portion of the memorandum that you wrote in 1990, does it refresh your recollection that the OTS was eager to conclude their review possibly early in order to encourage AmBase to infuse new capital into Carteret?
A It appears that's what I thought at the time.
Q Does it refresh your recollection as to that?
A Yes. I mean, prior to this I don't remember -- when you asked the question before about the capital maintenance agreement, I wasn't -- I didn't recall exactly what it was.
Q Right. It then states that you agree with this goal, but it says, "However, rushing through the examination may be short-sighted."
Do you remember having that concern at the time?
A Yes.
Q Do you remember it being the OTS' primary goal to expedite the infusion of the $30 million from AmBase?
A I don't -- again, I put that down

141

here as a goal, but I don't know what they thought their primary goal was.
I assume that was done at the regional office level.
MR. LEVITT: Just to clarify, the memorandum reads, "The reported reason." That's in the first --
Q Did I not read that?
So when you said reported reason, did you mean the reason that OTS had reported to you or had reported generally?
A That's probably what the examiners reported to me.
Q Would that have been orally or in written form?
A Orally.
Q Which examiners at OTS would that have been?
A At that time I assume it would be Tom O'Rourke.
Q I'll just represent to you that in 1990 Russ Meyer was the Examiner-In-Charge, but I think O'Rourke was involved in the exam.
A Okay, it could have been. I assume it was the Examiner-In-Charge at that time.

178

classifications.
I don't recall any significant difference. There might have been some small ones.
Q As a general matter, if a thrift is undercapitalized, do you as an examiner have greater concern about what their asset quality is like?
A I don't think -- if you're asking between the difference between a thrift and a commercial bank and our level of concern?
Q No, sorry, no. If any institution is inadequately capitalized, has capital that is only barely meeting the requirement or is below the requirement, does that cause you as an examiner to have greater concern about what the quality of that institution's assets are?
A If I can assume what you're getting at here, if the asset quality is the reason for the concern, or is it that we have the concern initially and then we get more concerned with asset quality?
Q Well --
A Usually it follows that the asset quality drives the capital concern.

179

Q Erodes capital?
A Yes.
Q What if you come to an institution new and you don't know what its asset quality is like, and in conducting the exam at the beginning you're told that that institution is insufficiently capitalized, doesn't that pose a greater risk to the insurance fund and therefore raise more concern as to its asset quality?
A Capital being the first, the primary protection of the insurance, obviously, if there were a certain level of problem assets you wouldn't be as concerned in a well capitalized bank as we were in a marginally capitalized bank.
Q And presumably your job as an examiner is to make sure that you discover any problems with bad assets.
A That's the primary job.
Q I mean, if the institution has asset problems that you don't alert both the institution's management and the people you report to at FDIC to, then you haven't done a good job, is that fair to say? I mean all other things being equal?
A Generally asset quality evaluation

180

is the driving force of the examination.
However, there are exceptions where interest rate risk could be just as important, possibly liquidity, but in my experience asset quality is usually the bellwether for the problems.
Q And your interest is to make sure that the insurance fund has a full knowledge of what the threat is posed is by this institution?
A Correct.
Q So if the institution has inadequate capital, bad assets for that institution pose a much greater threat than it does on an institution that has a large amount of excess capital?
A Correct.
Q Isn't it fair to say that that then, I guess this is just my original question drawn out longer, isn't it fair to say that that will lead an examiner to pay much closer scrutiny to an institution's assets when that institution has insufficient capital?
A Correct.
Q Do you remember reviewing any materials that informed you about AmBase's, the nature of AmBase's acquisition of Carteret when

181

you started to examine Carteret?
A Yes, I believe I reviewed their SEC filings, their public information, and I think I probably asked management for some documentation.
Q At the bottom of this page, let me first ask you, do you remember learning through that review that AmBase had acquired Carteret through the use of a large amount of debt?
A I can't recall. I probably did that analysis, but I can't recall what I learned.
Q So you would have been likely to know at the time but you don't recollect now how highly leveraged that transaction was?
A That's correct.
Q At the bottom of this page it states a couple of sentences up from the bottom, "The only reasonable source of such an infusion," and I guess this is relating to a capital infusion, "that will be necessary for Carteret," do you see that sentence? It's five lines up from the bottom.
A Okay.
Q I guess I'll start with the sentence before.
A The print is pretty small.

182

Q I know, I apologize for that.
It states, "Management anticipated gains from asset sales may help somewhat, but it is evident that a substantial capital infusion will be necessary.
"The only reasonable source of such an infusion would be AmBase Corporation. The prospects for such aid are not encouraging, as AmBase has other financial problems which have placed its own future in jeopardy."
Do you remember thinking that part of AmBase's financial problems at that time was the fact it was not able to receive any cash flow from Carteret to service its debt payments with?
A I don't remember that specifically, but it's probable.
Q Do you recollect that AmBase was a holding company that owned Carteret and other operating subsidiaries?
A Yes, I do.
Q And it relied on dividends and cash from the subsidiaries to service its holding company debt?
A Yes.

183

Q Why do you think -- well, I should back up.
Would you have been the principal author for this report, or would you have reviewed things that were written by other people?
A The comments on the pages is one that would be primarily mine. The loan writeups and some other comments would probably be prepared by somebody else and reviewed by me.
Q Do you remember why you would have thought that AmBase is the only possible source for an infusion of capital into Carteret?
MR. LEVITT: Objection. It says the only reasonable source.
A Well, the process of elimination, I didn't think, absent a stock offering or something like that, which the bank couldn't do, it would have to be done by AmBase, a sale, there really was no other logical source.
It wasn't like it was an independent bank that could go to the market to recapitalize.
Q Was there any reason or was that sentence meant to indicate that you didn't think it was possible for AmBase or Carteret to raise money from an outside investor, private investor?

184

A Well, like I said, the prospects weren't encouraging. I didn't presume to know what AmBase's resources were to go either to a private placement or to a public offering.
Again, I was just -- I saw what I saw from their financials and probably had some discussions with senior bank personnel.
Q Do you remember Carteret trying to raise money from other private investors which would have required AmBase to reduce its equity stake?
A I can't remember the exact circumstances. I know at some point in time. I don't know if it was after the examination. I think his name is Dick Bianco, came in and he had some alternate plans, but I can't remember exactly what they were.
Q Do you remember having any reason to doubt the viability of such plans?
A Again, I don't remember what the plans were. I remember being fairly impressed by the individual, Dick Bianco.
If I'm not mistaken he was a partner at Dillon Read or something like that, to that effect. He would have known more about it.

185

My assumption it was going to be difficult, but he wouldn't be investing his time unless he thought there was some possibility.
Q Do you see the last sentence that states, "The bank's viability is therefore considered to be very precarious with the specter of future deterioration in the real estate marketplace offering little hope for improvement."
Do you remember thinking that the future looked very bleak because of the very bleak future you saw for the real estate market at that time?
A At that time I probably -- it probably would have been more accurate to say the near term future.
I mean, they needed capital then and, the only way that the real estate market would have helped them was if it turned around very fast.
Q Do you remember thinking that because of AmBase's size it was, and for any other reasons, that it was likely to need more than the minimum regulatory capital requirement?
A AmBase or Carteret?

230

Q Is there a reason why in your discussion of capital and other areas in this report you would not mention a loss of supervisory goodwill from regulatory capital as something that had had a significant impact on the thrift?
A A reason? I don't recall any reason. I think it was presumed that whoever was looking at this report would realize that we would be following the new rules established by FIRREA.
I mean, I'm not even aware of making the comment or deliberately not making the comment.
Q In the second sentence it describes overhead expenses as being high and then states relatively high mortgage servicing costs and substantial goodwill amortization.
Do you see that?
A Yes.
Q It's referring to the different overhead costs and other costs of the thrift?
A Correct.
Q Is it correct to criticize a thrift for having a high level of goodwill amortization if the goodwill at the same time is not being treated at capital?

231

Isn't that sort of getting them coming and going?
A I'm not necessarily criticizing them. I'm just making an objective comment.
Q Shouldn't you almost factor that out of its negative effect on earnings given that the goodwill is not being counted as capital?
A Well, I think I was talking in the past tense here, from '86.
Q Would you agree with me that once goodwill can't be counted towards capital it ought not to be considered to be a negative factor for reducing earnings, since if you are, isn't that the whole point of taking it out of capital?
A If they were reporting under GAAP at that time it would still come out of earnings.
Q Right.
A Regulatory capital, we would probably have to make that adjustment, because it wouldn't be fair to exclude it on the capital side, then also tell them they had to expense it. I never came across that situation.
I think maybe coming in the following year it would have probably been something to consider.

232

Q Why only in the following year?
A Well, you know, I think we just excluded it from capital in this exam.
Q Right.
A So, you mean to restate the earnings on prior years and put it back in? The thought never occurred to me.
Q Because this is the first year it would have been excluded from capital?
A Yes, that's my recollection. I guess that's an approach, but it didn't occur to me at the time, and I don't know if that was the standard procedure.
Q If you look to the third paragraph on Page 1-4, I'd like to ask you a question about that.
A Okay.
Q That paragraph, the first sentence states, "Primarily as a result of the impact of FIRREA, substantial growth of retail deposits, facilitated by the acquisition of troubled savings and loan associations in the 1980s, has effectively been reversed."
Were you aware that Carteret had grown significantly as a result of acquisitions of

233

troubled savings and loans during the 1980s?
A Yes, I was.
Q Were you aware that those were acquisitions made pursuant to invitations from the Federal Home Loan Bank and the FSLIC?
A I don't know about the invitation part of it, but I was aware they were involved.
Q You were aware that there were supervisory transactions?
A Yes, generally.
Q What did you mean when you wrote the sentence that as a result of the impact of FIRREA that growth in retail deposits through those supervisory transactions had been reversed?
A Well, I think if I had to rewrite it I'd say the trend had been reversed. That the growth pattern had ceased and that assets were now and deposits were now declining.
Q Was that because an institution that had capital problems had to shrink in order to improve its capital ratios?
A That's one way to do it.
Q Did it ever strike you as unfair that FIRREA was reversing this earlier trend?
MR. LEVITT: Objection as to

relevance. You can answer.
Q You can answer.
A I just wanted to make sure you were listening.
Q I'm sorry.
A Unfair, I think I understood management's position. Unfair, I guess that would be a subjective judgment. Maybe this particular bank.
I don't know what I felt in general. I can't recall exactly what I felt.
Q But you did understand in writing this sentence you were referring in part to FIRREA's changed treatment of the goodwill that had been generated through the acquisition of troubled savings and loan associations in the 1980s.
A I understood the impact, yes.
Q The next sentence states, "Total assets declined approximately 16 percent to $16 billion between examinations as management struggled to alleviate capital strains.
"However, financial projections contained in the business plan indicate



that total assets will increase to the $7 billion level in 1991."
Would you agree that that business plan had to be abandoned after the institution's capital problems became evident?
A Yes, because of the decrease of 16 percent to $6 billion, not $16 billion.
Q I'm sorry, did I misread it?
A Yes. That was the focus of this comment, that the business plan they submitted had to be changed.
Q If you look to the top of Page 1-5 we'll flesh that out.
It states, "Management's response to these criticisms and to the changing regulatory and financial environment is contained in a revised 1990 business plan which sets four principal goals.
"Number one is compliance with FIRREA's capital requirements. Two is contraction of the retail branch network. Three, development of a strategy to withdraw from corporate banking and commercial real estate and real estate development. And four, positioning the



bank for a permanent return to core profitability."
Do you remember management having to revise its 1990 business plan?
A I can't recall exactly what the circumstances were.
Q Would you agree that the impact of FIRREA included a complete transition and change of the institution's business plan?
A Yes.
Q Do you ever remember that the institution had as part of its business plan prior to FIRREA a plan to grow to become a $10 billion institution?
A I don't remember.
Q On Page 1-5 it also states in the section entitled "Relationship with AmBase" in the first sentence that, "The bank has not materially benefited from the August 1988 acquisition of its holding company by AmBase."
Do you see that?
A Yes.
Q Do you remember thinking that Carteret had been adversely affected by the acquisition by AmBase?



A Could you repeat that question?
Q Do you remember thinking at the time of this exam report, at the time you wrote this sentence, that Carteret had been negatively or adversely affected by AmBase's acquisition?
A In the third sentence in this paragraph speaking about the management fees that the OTS required to be reversed, I think that tells me that I didn't think it was a good relationship, that it was an adverse effect.
Q Did you not think that the institution was better off having a large corporate shareholder who at least, who was likely to infuse capital as support than it would have been if it had been publicly held?
A It could have been. I mean, I had no way of knowing. Ideally, yes, it's good to have a large corporate shareholder with access to funds.
But when I wrote this I was probably feeling that that situation didn't exist with Carteret.
Q Do you remember ever reviewing the OTS' approval memorandum for the '88 acquisition by AmBase?

250

greater risk and were therefore assessed at 15 percent reserve requirement.
It mentions Custom Living, Hovbilt, Ivanhoe, KS Middlesex, Penn Garden, Perfecta. It sounds like a horse race.
Do you remember any of those assets or loans?
A Hovbilt I remember. The other ones I don't.
Q We've already discussed Hovbilt. So you don't know why any of those would have been given a 15 percent reserve requirement rather than a 10 percent?
A No, I'm not sure. What is oftentimes done is you look at the specific classifications and you say this looks like it's probably going to have more than a 10 percent.
But because we can't come up with an exact number you put a portion in loss, you maybe give a higher percentage in the special mention portion.
Q Just to go back a few steps, did you say these percentages, while they were somewhat discretionary, also had some basis in a manual of some kind, or does it not?

251

A I don't know if it's ever been codified, but the explanation that I received at one time, and maybe it still happens, that the FDIC tracked classifications in failed banks to see what the actual loss would have been to see if it validated the classification and it reasonably did.
Q So the FDIC would perform ongoing reviews to determine if their reserve requirements that they were recommending were --
A Well, the percentage allocation was reasonable. In other words, if they found out that 90 percent of the substandard loans only had suffered losses of 5 percent, they probably would have revisited that guideline.
Q In performing those studies do you know if the FDIC ever looked at performance of criticized assets in thrifts that did not fail?
A I don't believe they included thrifts in this analysis. It was a long time ago.
Q Okay, forget about the thrifts, then.
Do you think they ever included in their analysis the performance of criticized assets at institutions, banks, commercial banks

252

that did not fail?
A I'm not aware of whether they included that.
Q Do you remember having any disagreements with Carteret management over the appropriate percentage level to be applied to criticized assets?
A I think if we were in agreement with the classification that they probably didn't agree with the percentage level, because that was not unusual.
Q That you would fight the first war over the classification and --
A I don't know what they used internally, but I would guess it was somewhat analogous.
Q So you think that once there's an agreement on classification, then there may be disagreement on percentages, is that what you said?
A There may be, but there probably wouldn't be, nothing significant. And they probably had, their policy for doing the allowance probably set forth those, and I doubt that these are very dissimilar.

253

Q Would you agree that a study of the loss of assets in a receivership would be different from the study of losses in an open bank, that the price that an asset will receive is different?
A Yes, I think that's logical.
Q Do you know whether the FDIC ever took that into account?
A You know, again, I don't think these were set in stone, and it was the kind of thing that the FDIC would probably not put in writing.
I don't think they would have had the ability to do that in an open bank situation.
Q Would you agree that the receivership losses would as a general matter be higher than open bank losses?
A I think so.
Q Did you ever hear of a policy of the FDIC, unwritten or written or just a general discussion, of the concept of being too big to fail? Does that ring a bell?
A I haven't heard it in the FDIC, but I've read articles on it.
Q Do you ever remember knowing that people thought that there were certain

"The statement does not list Mr. Walosoff's contingent liabilities. This information is not suitable for analysis purposes.
"Substandard classification is therefore reported based on the inability of the properties to support debt service and a questionable collateral value."
Does my reading of that paragraph refresh your recollection at all as to the Wolosoff credits?
A No, but this is not an unusual qualification of financial information.
Q Meaning that it's not unusual to have the credit classified substandard if the borrower doesn't supply adequate and substantiated financial information?
A That would be a factor that this type of information is not acceptable in order to analyze the ability of the principal, the guarantor, to support the credit, because he hasn't even stated, by not signing the document he isn't even attesting that he has these assets.
And the accountant who provided the compilation is not forming any opinion at all that



he has these assets, so it basically doesn't tell you anything.
Q I want to refer back to Mr. Walsh. In one of the sentences you reviewed in that middle paragraph on Page a-1 it states that Mr. Walsh thought that the differences in Carteret's IOR reports and the examiner's findings was only a matter of timing and perception.
Do you see that sentence?
A Yes.
Q Isn't it really true that it is all a matter of timing and perception?
A You could take that approach, but I mean, that's not the examining approach. It is what it is at the time we examine the bank.
Q But do you really think, is it really what you're saying that a reserve against future losses which is derived as a percentage on assets that are criticized is the same as a loss?
A No. It's, because it's a general reserve. I mean, this goes back to the debate we mentioned earlier between the SEC and the regulators, what should constitute a general reserve and how you can support what that is.
So that reserve should be a moving



target, depending on the assessment of the asset quality at any given point in time.
Q Isn't the question of at what point in time that reserve should be taken a question of timing and perception?
A Timing, perception and evaluation, the actual evaluation of the asset quality.
Q Do you remember Mr. Walsh saying that he thought that 10 percent was not the right percentage for substandard classifications?
A I don't specifically remember it, but I wouldn't have put it in there unless he did say it.
Q Do you remember any other institutions that you examined complaining when you used 10 percent for substandard classifications?
A No. As a matter of fact, as I recall, Howard used even higher.
Q You mean the management voluntarily used higher?
A Yes. What they did is they took each project and assessed the valuation to each project that they criticized, which I think is the preferable way to do it.



Q Presumably the 10 percent is not determined, given that it's a round number, I can't believe it's determined based strictly on historical loss experience or any other pure formula of some kind?
A No, I don't think so.
Q Isn't it basically a rough judgment of whoever is setting that percentage that this is the appropriate predicting percentage?
A Yes, but I think it's an educated judgment, in that that 10 percent would have been used probably by all, most if not all of the regulators at that time.
I believe if I'm not mistaken the OTS was using a higher percentage.
Q I would just like to go back to your earlier testimony about art versus science in coming up with the general valuation allowances.
I certainly didn't mean to indicate in my question that the art was uneducated art, but it seems sort of inconceivable to me that the determination of whether something has a distinct possibility of loss and then the application of a percentage based on an educated judgment isn't something that more resembles a subjective

278

judgment that I call art, and if you don't like the terminology, that's fine.
A No I can --
Q Rather a straightforward mechanical calculation that I classify as science.
Would you agree with that?
A I think it's very close, those two things.
Q What two things?
A The art, if you incorporate the educated assessment and based on experience and knowledge and whatnot.
Q In other words, redefine, and rather than using the word art, would you agree that it does involve educated but ultimately discretionary and subjective judgments rather than a purely mechanical calculation?
A Right. I can't speak for the other regulators, but the FDIC generally has never put anything in writing that this is the percentage you will apply to all substandard classifications.
Q It has never put that in writing so far as you know?
A Not to my recollection.
Q So there is some level of discretion

279

left to the examiners?
A It you applied more than 25 I think it would raise some eyebrows.
Q Right. And likewise I assume they have put in writing the definition of substandard, but it's put in writing in maybe the form of a paragraph that includes this phrase about the distinct possibility of loss; is that right?
A What I gave you is also verbatim out of our examination manual.
Q Rather than 30 pages of statistics --
A No.
Q (Continuing) -- depending on the attributes of the loan?
A Yes, well, the FDIC tries to be uniform. You have to leave judgment at some stage up to the discretion of the examiners in the field.
Q What did you think of Bob Walsh?
A If I recall his background it was basically residential mortgage lending.
The first time I was there, the second time when the numbers started coming out he basically was not terribly friendly, but I thought

280

that his background in the residential mortgage area didn't really qualify him to be running a troubled thrift with the problems that Carteret had. I forget who he replaced.
Q Do you remember Bob O'Brien?
A Yes. I only met the gentleman once at that first -- twice at Board meetings is the only contact I had.
I think we did have a wrap-up discussion with him one time.
Q With Bob O'Brien?
A Yes.
Q What was your impression of Bob Obrien's expertise and background and suitability for running a thrift like this?
A He seemed like he had the appropriate background. If I recall, he had been Chairman of FSLIC, had been at the bank for a while and then actually started out at Bowery Savings Bank across the street.
But I really don't know if he was really running the place more than being the Chairman.
They really needed a chief executive operating officer who was hands-on management.

281

Q Do you remember whether the management change at Carteret in 1991 brought in more appropriate people?
A Now we're talking about Dick Bianco?
Q Dick Bianco, and do you remember J. Wayne Moore?
A Yes.
Q Do you remember that he had expertise in working out problem loans and problem assets?
A Yes.
Q Did you feel that they did a good job and were well suited to the task at hand?
A I did. I believe he brought his own, Wayne Moore brought his own appraiser with him too, and that was a big help.
They actually, if I recall, they went on a rush trip and visited all the properties, so they became much more familiar with the properties themselves than the management before them had been, which I thought was a pretty refreshing approach.
Q Can you turn to the next page, Page a-2, and just review that first paragraph there, if you would.

306

and the Moore Estates classifications and maybe other ones, that they had requested review of those and appealed the classification.
Q Do you remember why it is that Carteret withdrew its request for the mediation?
A As far as I cam recall it was because they had brought Wayne Moore in there to look at these assets and he concurred with how we classified them, and they felt, I assume the new management felt they had no basis for contesting it.
Q Is it likely that management could have succeeded in contesting those asset classifications?
A Well, my experience it's always hard to determine what an arbitrator is going to come up with, but I think we believed in our classifications, and it would have been an interesting argument.
Q How long would it have taken?
A I hadn't, have not been involved in that process. I'm not sure what the time frames are.
Q Is it possible in your mind that Mr. Moore was simply doing what he thought to be most

307

pragmatic in choosing not to fight the classifications and instead trying to work out the assets?
A I don't think he would have made that decision. I think they hired him to give a realistic appraisal of what these assets were worth.
Q Is it conceivable that whoever did make that decision made it on those grounds?
A It's conceivable.
Q Could you review the section of this, of Page 1-1 entitled "Capital Plan."
A Okay.
Q Having reviewed that paragraph, do you remember thinking that Carteret's profitability forecasts in its capital plan were unrealistic?
A Yes.
Q Do you remember thinking whether in hindsight, after another year's passage in 1992, when Carteret did turn a profit, do you remember thinking then that perhaps they were not unrealistically optimistic on the profitability point?
A I don't recall, you know, reviewing

308

the situation in 1992 when they did turn a profit. I'm not familiar with that.
This may have been the last time that I was at the institution.
Q The second part of the capital plan discussed in this paragraph is the infusion of $150 million in new capital by December 31, 1992.
Do you know where that deadline came from, sir?
A I do not, no.
Q Do you know whether that was a deadline that the FDIC agreed with?
A I do not know that.
Q Do you ever remember discussing the deadline by which Carteret needed to receive an infusion of new capital?
A No, I think probably I saw this document when I went on-site, just capsulized it in this comment.
Q Can I ask you to turn to Page 1-2. The last paragraph before the section beginning "Earnings," could you review that paragraph, please.
A Yes.
Q Having reviewed that, do you

309

remember thinking that $150 million in new capital would not have enough to recapitalize Carteret?
A I think that was my conclusion, although, as I do say, it would be helpful.
Again, not having any say in the matter, but as somebody who represents their insurer, another $150 million in the bank would always have been helpful to us.
Q Would it also have been helpful if the institution had been allowed to treat its goodwill, which at that time totaled roughly $150 million, as regulatory capital?
A Yes.
Q And the combination of those two things would have been more helpful than just having the cash infused?
A I think that's reasonable.
Q Do you ever remember trying to figure out how much capital, cash capital Carteret would need if it was able to treat its goodwill as regulatory capital?
A I probably did, but it's not the kind of thing I would have written down. It would just be something for informational purposes.
Q Why wouldn't it have been the type

310

of thing you would have written down?
A Probably because it would have been discoverable.
Q It's discoverable now. But now you don't remember, is that your point?
A No, as I said, I probably did do some rough calculations, but --
Q It's interesting. Do you think that the OTS examiners thought in the same way, that with a certain amount -- that if the institution was clearly going to be allowed to treat its supervisory goodwill as regulatory capital, then that would change the amount of new cash capital that the institution would need?
A I don't remember having that particular discussion with them. I mean, because at that stage of the game it wasn't a realistic alternative.
I mean, it's an interesting academic discussion, but I don't know if I remember us having it at the time.
Q But at this time there was an injunction that essentially required the institution to be treated as if the goodwill was in capital.

311

A As I recall.
Q Could you turn to Page 3-2. This page shows the capital figures for Carteret per Carteret and per FIRREA, and per Carteret I believe is essentially consistent with the injunction.
Then it shows the deficiencies per FIRREA.
A Right.
Q If you look at the tangible capital level under the two columns you see that per Carteret they would have $78.7 million in tangible capital and negative $71.7 million per FIRREA.
A Correct.
Q Doesn't that represent a dramatic difference in how you see the institution as an examiner?
A Yes, it does.
Q And that the required tangible capital per FIRREA would be $151 million short of the requirement, whereas, and correct me if my math is wrong, but the capital would be a roughly $3 million short per Carteret's view?
MR. LEVITT: Does it have the tangible capital requirement on this page?

312

MR. HUME: Yes, it does.
MR. LEVITT: Where is that?
MR. HUME: $81.7 million per Carteret's view. The requirement changes because the assets change.
MR. LEVITT: Yes.
Q The calculation changes mildly. So the requirement changes just by a couple of million, but it's $81 million per Carteret as opposed to a level of $78.7 million.
So they're $3 million short of the requirement as opposed to $151 million short, correct?
A Right.
Q Would you agree that's a dramatic difference in terms of how to view the institution's capital health?
A Yes.
Q Would you agree that an institution that's only $3 million out of tangible capital is very unlikely to be seized by the OTS or RTC?
A Very unlikely? It would certainly be less likely. It depends on some other factors, whether there were deteriorating trends, prospects of becoming adequately capitalized and a few

313

others, but it would certainly be less likely.
Q Would you agree that it would be less likely also to have its insurance terminated by the FDIC or have any other type of enforcement action taken?
A I would think that would be the case.
Q If you look down to the risk-based capital calculation, further down the page, it shows the deficiency of $202 million per FIRREA and a deficiency of just under $100 million per Carteret. Do you see that?
A Yes.
Q So there's roughly $100 million difference on that definition of capital.
A Right.
Q Would you agree that that's also quite a dramatic difference in how to see the institution?
A Yes, it's a significant difference.
Q Would you agree that of the three different capital calculations the risk-based capital calculation is the easiest one to fix, because you can fix it by a restructuring of your balance sheet, at least to some extent?

314

A Well, theoretically yes, but given the situation here, to restructure the balance sheet and sell off some of those high risk assets would quite likely result in a loss, so it might not have been productive to do it that way.
Q Do you know whether that would have been the case for Carteret at this time?
A I think it would be a factor of both interest rates and the real estate market at the time. Theoretically, you know, if there's some profits or, you know, you could sell off some of the securities they had in the portfolio, if they weren't significantly underwater.
I don't know how easy it would have been to dispose of the real estate, high risk real estate loans.
Q What about the high risk fixed rate mortgages?
A Again, I think that would be a function of the interest rates at the time.
Q If the rates were who low it would actually be a good time to get rid of fixed rates.
A Yes.
Q So if rates were low you could restructure, at least to the extent of your

315

adjustable -- fixed rate mortgages, selling them and trading them for adjustable rates, that would have helped you with your risk-based capital, wouldn't it?
A Theoretically, yes. You would have to do more analysis than that.
Q Isn't it true you could also securitize a lot of otherwise unsecured loans in order to improve your risk-based capital ratios?
A At that time I don't know what the situation was. I mean, that's certainly, a lot of banks have done that.
Q Do you think that it's -- I guess another way of asking these questions is given that risk-based capital is slightly more malleable than the other two forms of capital, would it have been the focus of both the institution and the examiners and yourself if you remember at this time to address the deficiencies in tangible and core capital and have that be their focus more than the deficiency in risk-based capital, as a primary focus?
A Again, as an examiner, we don't get involved in management's decisions. I mean, we don't want to cross that line about what their

316

investment decisions, what their strategic decisions are.
If they make them and we think they're inappropriate, we would criticize them, but I don't think we would offer advice on how they should do it.
That would be outside of our responsibilities.
MR. LEVITT: I just want to note for the record that the footnote which is starred on this page states that "OTS FIRREA capital classifications have not been adjusted for loss classifications determined at this examination."
So that has to be factored in in appraising the prior testimony relating to the FIRREA numbers on this page.
Q That footnote that counsel for the Department of Justice just testified to in the absence of either an objection or a clarification of the question, I have a question to follow on to.
It states in the second sentence, Mr. Day, that, "OTS has allowed management," and I think there's a grammatical error here, "to

317

reallocate a portion of the general valuation allowance to compensate for the additional loss."
Does that mean that a portion of the GVA would be allocated as a special valuation allowance so that this additional loss would not impact capital?
A Unfortunately I don't recall exactly what I meant by that. I could only guess.
Q Is it possible that you meant what I said?
A Yes.
Q I can represent to you, Mr. Day, that it is in fact the case that even per the OTS FIRREA view, Carteret never had a tangible capital deficiency of more than $151 million as represented here, at least never materially more, and that in fact, over the next year it was reduced by $20 million.
So I don't think -- simply representing that to you, given the footnote noted by counsel for the Department of Justice, is there anything about that that changes the way you answered any of my questions about this page?
MR. LEVITT: You mean the math he

did for you?
Q Is there anything about this footnote pointed out by Mr. Levitt or about what I represented to you that changes the way you answered the questions I asked about this page?
A I don't think so. It may or may not have said that. I think this is something I worked up with the OTS examiners.
This was our finding as of June 30, 1991. What happened after that I'm not sure of.
Q Would your basic view as to the different type of institution presented per Carteret's version versus per the FIRREA version of calculating capital be altered in any way?
A Again, I don't know what relevance my view would have. I mean, I was presenting what their position was so that the reader of this report, particularly my regional office, would have a perspective on what management's view was.
Q Right, and you as an examiner would agree that the two pictures presented --
A Are very different.
Q (Continuing) -- a very different picture of the institution.
A Yes, they would.



Q Can I ask you to turn to Page 3-1, the previous page.
I would just like to see if you can help me understand the reserves listed on this page.
It gives a required reserve number for the assets listed special mention, and a reserve number for assets classified substandard, for doubtful assets and for non-criticized assets.
Do you see that?
A Yes.
Q Before I move on, can I ask why was the percentage for substandard .091816 rather than 10 percent?
Is that evidence that the percentage was derived from some kind of a formula?
A I don't recall why it was set up that way or whether they went down the classified assets and individually determined what the potential of the distinct possibility of loss was for each one and that's what it resulted in. That's my guess at what it was.
Q Because sometimes you will apply 15 percent and sometimes 10 percent?
A I think so. Maybe 5.



Q Maybe 5 occasionally?
A Yes.
Q Why would there be a reserve required for the assets not criticized, which is shown here a reserve of $20 million, just over $20 million?
A That is either based on historical performance or just an extrapolation of the fact that we don't review all the loans, you know, we only review loans over a certain size with certain characteristics.
So you might assume that there's some reserve necessary for those loans that aren't reviewed.
I'm not sure exactly if they applied a percentage to say residential real estate loans in this calculation or, you know, in the examination report the uncriticized loans, uncriticized commercial real estate loans, one could criticize certain loans and --
Q You would take a certain percentage of those?
A I believe that's probably how they arrived at this.
Q Were those percentages also



determined in the same way as the percentages for the classified assets? In other words --
A I think that was more like historical performance on the residential ones, that we would buy into that analysis, but I think it probably was a bit subjective based on the guidance, experience or whatever.
I'm not sure -- again, what I'm doing here is restating what the OTS had concluded. I didn't do the analysis myself.
Q That adds up to a total of $112 million.
A Right.
Q Of required reserves.
A Right.
Q Added to that is the specific reserve, which is parenthetically described as a OTS loss classification, which adds up to a total of $312 million.
A Right.
Q Presumably that's the total level of reserves both specific and general that would be required at that time.
A Right.
Q Then it states a line below that,

322

that says reserves as of 6/31/91 in the amount of $325 million.
Am I reading this correctly to say that the reserve level at the institution was at that point $13 million, roughly, $13 million higher than the amount determined as required in this exam?
A Yes.
Q Would you then say that Carteret was at that time slightly overreserved?
A I think you could say that.
Q How do I understand that $199 million loss classification for the specific reserve?
Does that mean that's the amount of assets that during that year, that twelve month period since the last exam, had gone from not being loss assets to being loss assets, or simply that were still on the books and were loss assets but may have been carried as such for a couple of years?
A I'm not sure of the exact answer. It's my recollection that this is partially derived from Wayne Moore's analysis of the portfolio.

323

How he exactly got to it, I don't know, but basically he was driving this number and coming up with this conclusion based on his review.
Q Let me refer you to Page 1-1 and see if that helps clarify what I'm trying to ask you about.
The bottom of Page 1-1, three lines, four lines up from the bottom, it says,
"Furthermore," on the left margin,
"Furthermore, specific reserves were established for the approximately $110 million in assets considered to be loss."
A Right.
Q Why does it say 110 there and 199 on the other page?
A I don't recall what the reason for that is.
Q Okay.
Do you remember what Tier I capital is?
A The definition?
Q Yes.
A Specifically, no. There's various nuances in that and it's changed.

324

Q Is Tier I capital the same as core capital, or is it different?
A I'm not sure of the difference. Based on this it's different. Again, I would have been familiar with the instructions for that at the time.
Q Are you looking at Page 3?
A 3-2, yes.
Q What about just Page 3, a couple of pages before that?
It states at the top there "Computation of Tier I (core capital)."
A Right. Yes, this would be the way we calculated it.
Q But it's not core capital, is it?
A There were a lot of semantics in those days. Because of the various regulations and what had happened is sometimes our examination reports didn't, as I recall, dovetail exactly with the dates.
Q If you just compare this computation which shows Tier I capital and adjusted Tier I capital with Page 3-2 and the core capital listed there, either per Carteret or per FIRREA, there are different numbers completely.

325

Do you understand why they're different?
A Right now, no, I'd have to sit down and figure it out with a calculator.
Q Well, forget about mathematically.
Do you understand, do you understand conceptually, in other words, I understand FIRREA as having three capital requirements, core, tangible and risk-based capital, so Page 3-2 makes sense to me.
Page 3 does not make sense to me, and I'm wondering if it makes sense to you.
A I think there was a mechanical problem with working with the Report of Examination that was slightly different from the legislation. That's all I can say.
I was following whatever the outstanding instructions were at that time for that page.
We are starting at equity capital per FIRREA, we're starting at the same number. The 39899 is the same. We're starting at that point anyway. So it does --
Q There's some overlap?
A Yes.

334

I couldn't find it, at least not easily. There were five categories and there were two 4s given.
Do you remember or can you tell based on the standard format here what those 4s were for?
A It would be capital, assets, management, earnings and liquidity.
Q So it would have been management and liquidity received a 4 and the others received 5s?
A Right.
Q Were you ever concerned with Carteret that bad publicity about the thrift's financial health may lead to a runoff in deposits?
A Not particularly.
Q Is that because you don't recollect, or did you not think that was a big problem?
A It's because I was involved in other thrifts that had worse publicity that didn't have a deposit runoff.
My experience was that people in this area were comfortable with the deposit insurance.
Q Can I refer you to Page A-1 in the second paragraph on that page. The last two sentences, the second to last states, "Liquidity

335

is barely adequate at this point, but adverse publicity could be a serious problem."
MR. LEVITT: Just a second. Let me turn to that page.
Q Do you see that sentence, Mr. Day?
A Yes, I'm saying it could be.
Q I understand.
A That would be a standard, but for instance, in the Bowery Savings Bank right across the street, they had some very bad publicity and they didn't have a significant runoff, but that would be based on my experience, my response before. This would be a normal scenario.
Q So you would be writing this because under normal circumstances that --
A Bad publicity could result in deposit outflow. It just wasn't my experience, it didn't necessarily follow.
Q Did you think if it didn't follow with Carteret that would be a good sign of the strength of the franchise value?
A If in fact it didn't follow? It could have been. It just doesn't seem to be a big concern at exactly this time.

336

I know there was a thrift in Paterson that it did become a concern with. There actually was a run in deposits, but I'm not sure what the difference in perception was at that institution.
Q You don't think people in New Jersey are stupid compared to people in other parts of --
A I generally think that they'd been comfortable with the fact that they were going to get their money back, that it was insured, and possibly they were smart in realizing that sometimes the troubled thrifts paid more interest on their deposits than the other ones.
Q So one of the reasons there may not have been a decrease in deposits was the fact that Carteret was paying higher interest rates?
A Could have been. I mean, I'm just speculating. I don't recall the exact situation.
Q Having reviewed this exam report, do you remember the conclusions of the FDIC's supervisory agents or the Regional Director to what you reported to them in this report?
A I don't remember what their conclusions were. I think they probably were in some kind of contact with the OTS senior staff,

337

and that was above my level.
Q Do you think the existence of the preliminary injunction against OTS was frustrating to the FDIC supervisors?
A I'd be speculating. I'm not sure.
Q Do you remember testifying earlier in this deposition that the threat to terminate insurance was one of the few tools the FDIC could use against a thrift that it felt was out of compliance?
A I don't know exactly what it was after FIRREA, but I know that in my experience at other institutions that was the only enforcement action authority that we could take.
Q Was the FDIC most likely in your experience to take that enforcement action where it thought the OTS was failing to take the enforcement action it should be taking?
A In the particular cases I was involved with it wasn't used.
Q It wasn't used?
A No.
Q So are you saying you don't remember, you don't have any opinion on when it was that it was likely to be used?

338

A I'm not sure if --
Q Excuse me. I don't mean the actual termination of the insurance, I mean the threat to terminate insurance.
A I'm not sure I would characterize it as a threat. I mean, we would explain to management that, you know, that was a viable alternative unless they recapitalized. It might be perceived as a threat.
Q Okay. Well, however it's characterized, do you recollect that informing the institution that it was in danger of losing its insurance was one step that might be taken by the FDIC when it felt the OTS was not taking the enforcement actions it needed to take?
A I don't believe we would have said that in front of the institution. We would have been undermining the other agency.
Q I can understand that, but would that have in fact been part of the reason for taking that step at the FDIC?
A Again, it's speculation. I guess that we would have done that, but I'm not aware if we ever did get to that stage with any of the thrifts.

339

Q You don't have any recollection of Nicholas Ketcha informing Carteret of that possibility?
A I don't know. Again, as far as I know, the only one that addressed the Board was Mike Zamorski, and the termination of insurance doesn't happen overnight anyway.
It's, as I recall it takes a while, a period of time, with notification and whatnot, so it's not an immediate event.
Q Would you agree it would be alarming to the institution to find out that the FDIC was considering revoking its insurance or terminating its insurance?
A Yes, I would.

(E V E N I N G S E S S I O N)

MR. HUME: Can we mark this, please, AmBase Day Exhibit 14.
(The above-described document was marked AmBase Day Exhibit 14 for identification, as of this date.)
Q Mr. Day, this is a letter from Nicholas Ketcha to the Board of Directors at

340

Carteret dated July 29, 1991, which if you review the first paragraph, you'll see was transmitted with the exam report that you concluded. It states as of the close of business June 11, 1990.
I'm not sure whether that's correct or not, or whether it's referring to the 1991 exam report or not. Maybe you'll remember.
Then if you look down to the third paragraph, and review it, you'll see that it does include the step of informing the institution that the FDIC was considering terminating its insurance.
A Yes.
Q Have you had a chance to review that?
A The third paragraph, I just read it. Again, I would not necessarily have seen this letter before this.
Q I understand, and I certainly didn't mean to imply that I'm trying to trick you.
Reviewing the first paragraph do you think that is a typo or do you think this was with the 1990 report?
A I think that's probable, because I don't know if we sent a Tier III examination

341

report back to the bank.
I don't think we did, but I can't recall exactly, so it would have been the full scope exam that we sent back.
Q Right, and I guess we had seen earlier that the presentation of that report was only in April, late April, the 22nd.
A Right, and I think the exam concluded in October.
Q Right.
A But it was based on June information.
Q So it's plausible and it does seem it should be read at face value.
A I would assume.
Q And seeing it doesn't refresh your recollection as to this being communicated to the Board by Nicholas Ketcha?
A No, again, I think I left, the last contact I had with the bank was when I did this September 1991 examination report, and I don't think we met with the Board at that time.
So, I mean it's possible I could have seen it, maybe possibly somebody in the bank showed it to me and it's possible that the

342

regional office forwarded it to me, but I don't recall seeing this specifically.
Again, this is something that a field examiner would not go lightly to a Board of Directors and tell them.
We would make sure that the senior staff would maybe doing that in its presentation.
Q Do you think it's likely that Mike Zamorski was involved in the decision to send this letter?
A I would imagine so.
Q Because would Nicholas Ketcha have known much about the institution, or wouldn't he have consulted with someone closer to the field?
A Yes, he would have consulted with the staff.
Q Which means Zamorski and Dionne?
A Right. And possibly whoever the case manager or reviewing examiner was, Bill Pollack I think maybe at this time.
Q Is it possible he consulted with you and you don't remember?
A I don't remember consulting with him, no, with Nick Ketcha. I don't remember really having any contact with him. With Mike

343

Zamorski, yes.
Q Do you think it's likely or possible that he did consult with you and you don't remember?
A It's possible and I don't remember.
Q Can I ask you about the one sentence that's the focal point of what I was talking about in this third paragraph that begins, "Based on."
Do you see that sentence?
A Right.
Q It says, "Based on the recent court decision we are recommending to our Washington office that administrative action be initiated that could ultimately result unless substantial capital augmentation occurs in termination of the institution's Federal Deposit Insurance pursuant to Section 8A of the Federal Deposit Insurance Act."
Having had your memory refreshed about the preliminary injunction case that Carteret filed against OTS, but also based just in general, can I ask you what do you think, reading this, what do you think he's referring to based on the recent court decision?

344

A I think it's safe to conclude this they were saying that regardless of that decision, that they were going to recommend some kind of -- this type of enforcement action.
Q That's what I thought, but it's slightly awkwardly written.
A Welcome to the organization. This I'm sure was gone over by legal staff, too, before this went out.
Q Do you think that this was in a sense the FDIC's response to the fact that the OTS had its hands tied against Carteret?
A I think that's quite likely.
Q Would you agree that an 8A action is usually a last resort for the FDIC?
A Yes.
Q And it's usually preceded by a memorandum of understanding with the institution or by an 8B action?
A Yes.
Q So does this letter surprise you now that you see it?
A Well, going back to my original statement that I think, my recollection is that we could not apply 8B, the cease and desist.

345

That type of cease, and desist orders against these institutions and the attorneys can correct me if I'm wrong here, but that was the only action that we could take.
Q Is Nick Ketcha still a Regional Director for FDIC here?
A No, he's not.
Q Is he still with the FDIC?
A No, he's not.
Q Do you remember any of Nick Ketcha's views about Carteret during the 1990 or 1991 period?
A Again, I can't remember discussing it with him.
Q Do you remember hearing from other people or thinking that he had a belief that Carteret should be taken into conservatorship?
A I don't remember having that discussion, no.
Q Do you remember that the FDIC in 1989, prior to the passage of FIRREA, had initiated and essentially self-pointed itself Receiver of FSLIC insured thrifts?
A Well, self-appointed I'm not sure. I know we did move in as Receiver I guess based on