UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x
AMBASE CORPORATION and :
CARTERET BANCORP, INC., : No. 93-531
Plaintiffs, : Judge Loren Smith
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA, :
Defendant. : PAGES 1 - {}
- - - - - - - - - - - - - - - - x

Deposition of HERBERT J. HELD, held at the offices of Cooper and Kirk, 1500 K Street, Suite 200, Washington, D.C., commencing at 9:30 a.m., Friday, April 8, 2005, before Elizabeth Mingione, Notary Public.

Page 10

A. That's correct.
Q. And did you become involved in the marketing of institutions at that time?
A. Yes.
Q. And is it fair to say that you have been involved in the marketing of institutions from 1984 to the present?
A. Yes.
Q. And when the RTC was created with FIRREA; is that correct?
A. Yes.
Q. And what was your -- what were your responsibilities at the time FIRREA was passed, after FIRREA was passed with the RTC?
A. After the RTC was formed, I was -- I think the beginning I was one of the managers, first line managers in the large bank resolutions group.
Q. Okay. And so you were attempting to sell either branches or whole banks for large failed institutions. Is that fair?
A. We were resolving the over $500 million banks.
Q. Okay. And do you recall approximately how many there were in the early 1990s that you were working on?

Page 11

A. I don't know the number that we worked on.
Q. Okay. And what do you do now for the FDIC?
A. I'm Assistant Director in the Division of Resolutions and Receiverships and Franchise and Asset Marketing Branch. We are over the resolution of failing institutions and sale of the assets.
Q. Okay. And are there a lot of failed institutions now that are being marketed?
A. No.
Q. Okay. Are there any?
A. No.
Q. Okay.
A. It's very sad.
Q. So, all right, well, let's go to the first exhibit which I'd like to have marked as Held Exhibit 1.

\- - -

(A document was marked as Deposition Exhibit Number 1)

\- - -

BY MR. THOMPSON:
Q. Now this is a memo from Paul Ramey to those who have been cc'd on the second page. Is that right?

Page 12

A. Yes.
Q. And it's dated July 13, 1993. Is that correct?
A. Yes.
Q. Who was Mr. Ramey?
A. Ramey.
Q. Ramey. Okay. Good. Thank you.
MR. HOFFMAN: Let me interrupt here and just advise the witness that if you need to take an opportunity to reread it, by all means do that before you answer any questions, if you feel you need to.
BY MR. THOMPSON:
Q. Absolutely. That's a very good and fair admonition, Mr. Held. Certainly I'm going to be showing you a lot of documents today and generally referring you to certain passages in the interest of time. But to the extent you want to read any or all a portion of a document to get the appropriate context, your counsel is absolutely right. You should do so.
But my question was, and it's without prejudice to your ability to read this document, is who Mr. Ramey, what position he had at the time he prepared this document?

Page 13

A. As it says, he was the the Vice President of the Department of Resolutions, so he was in charge of all resolutions in 1993.
Q. And did he report to you or did you report to him?
A. I reported to him.
Q. How many people -- and do you recall what your title was at that time?
A. I was head of major resolutions. I don't recall whether it was director, well, I don't recall the exact title.
Q. So you reported directly to Mr. Ramey. Is that correct?
A. That's correct.
Q. And was there a director of non major resolutions?
A. Yes.
Q. Who was that?
A. Ron Hoch.
Q. And did you consider Mr. Ramey to be competent in his position?
A. Yes.
Q. How, the first couple of sentences of this document read, quote, "Glen Sergeon, a

Page 18

Q. Did you have an opinion on that issue?
A. I can't recall.
Q. And do you recall whether Mr. Sergeon's bidding group was ultimately deemed to be a minority bidder?
A. I don't recall.
Q. At this point I would like to ask the court reporter to mark as Held Exhibit 3 a document that bears the Bates number C-AM-A-0014578.
- - -
(A document was marked as Deposition Exhibit Number 3)
- - -
BY MR. THOMPSON:
Q. Mr. Held, I'm slightly unfamiliar with the format of these e-mails. It says on the bottom, Original Message, above the top, the last paragraph. Do you see that?
A. Yes.
Q. And so was that original message sent from Mr. Bodi to Donna Pillard and cc'd to a bunch of people?
A. I don't know. This is an old style, isn't it.
Q. It is.

Page 19

A. Well, I don't know.
Q. Okay. And then, because in the middle there's the middle paragraph that says "comments by" "forwarded to". And do you know whether that is a comment on the original message?
A. I don't know.
Q. Okay. Well --
A. I can't remember this far back.
Q. Well, if it comes back to you, we are going to see a lot of e-mails like this today, so certainly if it comes back to you at any point during the deposition, I would appreciate your clarifying that. But, regardless, the middle section, comments by Paul Ramey to Herbert J. Held and others; do you see that?
A. Yes.
Q. It says, "FYI, as I understand it, Carteret loans are to be used for both Chase and Home Unity minority acquisition commitments."
Do you know what that meant, that loans were going to be used for certain acquisition commitments?
A. There was a provision in the minority program that minority acquirers would be able to acquire loans at market value from the RTC.

Page 20

Q. And was there a set amount of loans so that if, for example, a minority bidder was going to buy deposits of $100 million, that they would be entitled to buy assets of $100 million? Do you recall that?
A. I don't recall the extent of the commitment. I knew that it was if you bought so much in deposits you got so much in loans, but I can't remember the ratio.
Q. But there was some ratio?
A. Yeah.
Q. Okay. And in the original message in Held Exhibit 3, it says, "Since we have been unsuccessful in our efforts to negotiate the release of the due diligence from the Carteret loans from First Boston, please issue your own SOS under the National DD TOA and ask John Tierney to waive for use."
And I'm going to ask your assistance in figuring out some of these phrases. Do you know what, Please issue your own SOS, I mean, is that just the colloquial SOS?
A. I don't think so.
Q. Okay.
A. It's different terminology than used

Page 21

today. And that's the asset folk terminology, so I don't really know. I don't know what they are --
Q. What they are talking about. Do you remember this issue of trying to get some documentation from First Boston and being unable to receive it?
A. No.
Q. Can you recall as to why due diligence from certain loans would have even been relevant to the disposition of a thrift and conservatorship?
A. This is related to some kind of securitization. That 93-6 is a securitization number.
Q. Okay.
A. And they were securitizing assets out of the conservatorships.
Q. And just so that I'm clear on what that means, that the asset officials would come in, select certain assets from institutions in conservatorship, package them together and sell them in the secondary markets; is that what you mean by securitization?
A. Yes.
Q. Were you involved in that process at all?
A. No.

Page 66

Q. Okay. And once the statute came into place, were there changes in the minority preference program?
A. Yes.
Q. And was the change that you had this second round of bidding that we've just described? Is that --
A. That was one of the changes.
Q. Can you recall any other changes?
A. The whole concept of the predominantly minority neighborhoods.
Q. Describe how, what the shift was there, what it was prior to the statute and then what it was after the statute, to the best of your recollection?
A. The program only applied to historically minority-owned institutions, prior to this last iteration of the program. And then in the new -- the revision applied to institutions in predominantly -- institutions and branches in predominantly minority neighborhoods.
Q. And so this was a change in the scope and the number of -- or strike that. This is a change in the criteria that were applied to figure out which branches are going to be sold pursuant to the

Page 67

Minority Preference Program?
A. Yes.
Q. Okay. Any other changes that you can recall?
A. I think that was the major change.
Q. Okay. Was Carteret one of the first institutions that had its branches sold pursuant to the new statutory scheme that Congress established?
A. I don't recall.
Q. Do you recall how many other institutions you were involved with in selling branches pursuant to the new congressional mandate?
A. I don't recall the number.
Q. Can you recall any others that you were involved in, even if you don't remember the names but do you know whether you were involved in any other ones or is this the only one you can recall?
A. There were other ones.
Q. Do you have any estimate as to how many?
A. No.
Q. Okay. I don't know if others want to take a break or --
MR. HOFFMAN: Yeah, that would be fine.
- - -
(Recessed at 11:07 a.m.)

Page 68

(Reconvened at 11:20 a.m.)
- - -
BY MR. THOMPSON:
Q. At this point I would like to ask the court reporter to mark as Exhibit 17 a document that bears the Bates number C-AM-A-0131543.
- - -
(A document was marked as Deposition Exhibit Number 17)
- - -
BY MR. THOMPSON:
Q. So now this is a letter from Charlie Rangel to Mr. Ryan dated October 3, 1994. Is that right?
A. That's correct.
Q. And you are listed as a CC in handwriting. Is that correct?
A. Yes.
Q. And it states in the, well, first let me ask you, do you recall any political pressure being placed on you or your colleagues at the RTC to sell branches to minorities?
A. No.
Q. Did you perceive this letter as encouraging you to sell branches to minorities?

Page 69

A. Typical letter from a congressman stating his point of view.
Q. And so is it fair to say that you and your colleagues at the RTC were simply trying to satisfy the congressional mandate in implementing the Minority Preference Program?
A. That's correct. We were implementing the law.
Q. And now in terms of the objectives of the law, Congressman Rangel says in the third full paragraph, "The first goal was to resolve failed institutions in an expeditious manner." And then he says, "The second goal was to promote ethnic diversity in the banking community to better serve communities, including some which I represent that are frequently neglected by banks and thrift institutions," closed quote.
Now, with respect to the first goal, do you have an opinion as to whether the, actually, strike that.
Were you aware of what the goals were of the program?
A. Of the Minority Preference Program?
Q. Yes.
A. The goals were what were, I mean, we

Page 70

were -- the law had certain requirements in it and we were fulfilling them.
Q. So you weren't concerned about what the goals were. You were concerned about what you needed to do and you did it. Is that right?
A. That's true.
Q. Did you have, though, any understanding as to what the goals were?
A. The goals were to promote ethnic diversity in the banking. Yes.
Q. And were you, let me ask you, were you aware of any discrimination by the RTC or any other arm of the federal government in the period prior to the adoption of the Minority Resolution Preference Program in the selling of branches? Any --
A. No.
Q. -- racial discrimination?
A. No.
Q. And were you aware of any racial discrimination by the RTC or any other arm of the federal government in the period prior to the adoption of the Minority Resolution Preference Program in connection with the selling of any financial institution?
A. Well, I can't speak for anything to do

Page 71

with the FDIC. The RTC, I don't know the discrimination of sale of institutions.
Q. And you were involved in the marketing of financial institutions from 1984 through 1994. Is that correct?
A. On the thrift side.
Q. On the thrift side?
A. Only.
Q. And if the federal government had systematically been discriminating against minority bidders on the thrift side in the '80s or '90s, would you have been aware of that?
A. I was not -- I'm not aware of any discrimination against minority bidders.
Q. Okay. All right. And we've touched upon this somewhat, but in terms of the process, the bids were collected on August 25, 1994. Then minority bidders had an opportunity to submit another bid provided they were within ten percent of the high bid.
And my question is do you recall what the typical amount of delay was as you and your colleagues negotiated with the minority bidders?
A. There wasn't any negotiation.
Q. Well, they would submit another bid. Is

Page 72

that right?
A. They would submit another bid.
Q. And would they ever ask for -- were they entitled to limitless interim capital assistance or was that a point that you would discuss with them?
A. The assistance that they were entitled to was set out in the program.
Q. Okay.
A. Specifically.
Q. And so you would just receive their bid and evaluate it. Is that it?
A. That's correct.
Q. Okay. And do you recall whether the other bidders, while that process, well, first of all, let me ask you, do you have a recollection as to how long that process took of the second round of bidding for the minority bidders?
A. For Carteret?
Q. Yes.
A. No.
Q. Okay. Generally, do you have a sense as to the amount of time that resulted from this second round of bidding?
A. They were given a specific amount of time to submit another bid. And how long it took us to

Page 73

analyze and finalize the bid I think varied with the institution and the bidders.
Q. Okay. Were there any rough sense that you have as to how long it typically took to analyze that second round of bidding?
A. There was an analysis of the bids.
Q. Yes.
A. And then there was getting regulatory approval and being able to show they could close it. Enough if the bids on a purely dollar basis was done quickly. And that probably didn't vary very -- didn't vary a whole lot from case to case. Getting regulatory approval and showing that they could close I think varied with each institution.
Q. And when you talk about having the ability to close, you are talking about being able to raise the capital such that they come in and they have a viable, safe and sound institution that results from the transaction they are proposing. Is that what you are talking about?
A. That's correct.
Q. Okay. And there wasn't any particular rule of thumb that you had in 1994 as to how long that should take with respect to a minority bidder. Is that fair?

Page 110

was accounted for. I mean, that's not my area of expertise.
Q. Okay. I'd like the next exhibit which is Held Exhibit 26, it has a Bates number of C-AM-A-0125205.
- - -
(A document was marked as Deposition Exhibit Number 26)
- - -
BY MR. THOMPSON:
Q. Do you need a moment to review, sir?
A. (The Witness nods.)
Q. Okay?
A. Okay.
Q. Now, in the first paragraph it says -- this is a memo from you to Mr. Ryan dated December 6, 1994. Is that correct?
A. Yes.
Q. And are those your initials above your name?
A. Yes.
Q. And in the first paragraph it references that on Friday, December 2, 1994, Bahia, for the first time acknowledged that they could not meet the agreed-upon closing schedule of December 16, 1994.

Page 111

Do you see that?
A. Yes.
Q. And then in the second paragraph, in the second sentence, it says, "Thus after almost two months of having awarded matching rights to Bahia, they have not been able to perform," closed quote. Do you see that?
A. Yes.
Q. And was this frustrating to have Bahia pull out at the last moment like this? Or to acknowledge that they couldn't meet the schedule?
A. I don't know if -- I have no idea what I was feeling at the time.
Q. Do you have any recollection of this, of Bahia having been given some period of time in which to make a matching bid and then informing you that it would in fact not be able to meet the timetable?
A. Yes.
Q. Okay. And what course of action did you think was appropriate at this time; do you recall?
A. Well, the memo kind of lays out what we said.
Q. Okay.
A. Or I said.
Q. And you say in Point Two, recommended

Page 112

course of action, move to award Carteret to the high bid group and seek to close as soon as possible. Why did you think it was important to seek to close as soon as possible?
A. I think we are always wanting to close these deals as soon as we could.
Q. Why is that?
A. To get the bidders in there and get, you know, get out of institution and move on.
Q. And was that -- did they give you that as part of the fulfillment of your mission to resolve these institutions in the least cost manner possible to the American taxpayer?
A. Yes.
Q. Now, moving on to the next exhibit which will be Exhibit 27.
- - -
(A document was marked as Deposition Exhibit Number 27)
- - -
A. Okay.
Q. Now, this is a letter from you to the Chairman of Hamilton Bank dated December 14, 1994. Is that correct?
A. Yes.

Page 113

Q. And is that your signature that appears at the bottom of your name?
A. Yes.
Q. And in the penultimate paragraph it reads, quote, "While there was a delay in the closing of the sale of the Florida branches, Hamilton was informed during the delay that it was not being held to the bid submitted on August 25, 1994, unless Hamilton wanted to proceed with the acquisition at their bid price. Hamilton was given updated deposit information during the waiting period and consummated the acquisition on that basis," closed quote.
Now, do you recall whether you were giving special treatment to Hamilton by allowing them not to be held to their bid?
A. No.
Q. And do you recall whether a standard operating procedure to allow bidders to not honor their bids?
A. In this case we told them that they, you know, could reaffirm their bid or not.
Q. Right. And what I'm trying to find out, sir, was whether that was standard operating procedure to go to bidders and say, If you want to

honor your bid you may, but you don't have to?
A. We did -- in most cases, you know, we closed quickly and we didn't have to do that.
Q. So here it was the delay between the August 25 bid and December that led you to the conclusion that it was appropriate to allow the bidders to reconsider and to reaffirm whether they wanted to stand by their earlier bids. Is that fair?
A. Yes.
Q. Okay. Let's move on to the next document which will be Held 28.
- - -
(A document was marked as Deposition Exhibit Number 28)
- - -
BY MR. THOMPSON:
Q. And it bears a Bates number C-AM-A-0028088. And this is an e-mail from you to Jay Jupiter and others dated December 7, 1994. Is that correct?
A. Yes.
Q. And the Paul that's referenced in the first sentence, that's Paul Ramey?
A. That's correct.



Q. Okay. And it states, quote, "Paul and I met with Jack Ryan yesterday afternoon to discuss Bahia's latest proposal. Mr. Ryan was not persuaded by the new information that we could count on the transaction closing. He told us to inform Bahia that we were moving on to the next bidder and that they were no longer being considered," closed quote.
Did you agree with that decision?
A. Yes.
Q. And why did you agree with that decision?
A. I don't know what the information was that we got, but Jack was my boss. I agreed with him on this, obviously.
Q. All right. I would like to have at this time the next Exhibit 29 marked. It bears the Bates number C-AM-A-0028037.
- - -
(A document was marked as Deposition Exhibit Number 29)
- - -
A. All right.
Q. And the last sentence says, "he," Mr. Brian Collins it appears, asked, and I confirmed that Carteret was the only depository institution in conservatorship at present. Do you see that?



A. Yes.
Q. Now, this is an e-mail from Mr. Hoch to Mr. Ramey and yourself dated December 29, 1994. Is that correct?
A. That's correct.
Q. And Mr. Hoch was the gentleman who was in charge of the non-major dispositions?
A. Field resolutions, as we called it.
Q. Okay. Field resolutions. And do you have any reason to doubt that Carteret was the only depository institution in conservatorship at the time of this e-mail?
A. No.
Q. Do you know why Carteret was the last thrift at this time to have been resolved?
A. No.
Q. At this point I would like to have the next exhibit, 30, marked. It's C-AM-A-0130611.
- - -
(A document was marked as Deposition Exhibit Number 30)
- - -
BY MR. THOMPSON:
Q. As with all the documents, sir, I have some specific questions, but you tell me when you



are comfortable with us starting.
A. Okay.
Q. Now, this is a memo from Jay Jupiter to Mr. Ramey through you. Is that correct?
A. Yes.
Q. And does your signature on this document indicate that you agreed with Mr. Jupiter's analysis and recommendations?
A. Yes.
Q. Okay. And then turning to the second page in the first full paragraph, it states that a premium of approximately $65.6 million was going to be garnered from the sale of these 14 branches. Do you have any reason to doubt the validity of that number?
A. No.
Q. Then on page 4 of the document, starting in the first full paragraph on that page, it talks about the following are bids received from minority investor groups that appeared, on the surface, to be the higher or within the ten percent of the high bid. Do you see that?
A. Yes.
Q. And then the first paragraph underneath that reads, "TCB Holdings, Inc, a minority de novo

investor group led my Glen Sergeon, bid" around the number, approximately $146 million for New Jersey and was within 10 percent of the high bid.
Then the end of that paragraph it says, "Among other things, more than 50 percent of the thrift's profits were being distributed to non minorities; this not being allowed. On October 12, 1994, the matched bid was rejected," closed quote.
Does that comport with your recollection that at least one of the reasons why Mr. Sergeon's bid was rejected was because 50 percent of the profits were going to non minorities?
A. He didn't meet our definition of what a minority institution was.
Q. That was one of --
A. That was one of the requirements.
Q. Yes. And he didn't satisfy that. Is that correct?
A. Right.
Q. Now the next paragraph talks about a minority investor group headed by F.D. Terrell submitted a bid of, and again I'm going to round the number, $165 million for the Carteret franchise. The bid was submitted with the FDIC regulatory acknowledgement form stating that the applications



submitted were substantially incomplete.
When asked for additional information about the capital and proposed structure, they were unable or unwilling to provide it. The bid was disqualified because of lack of regulatory assurances the transaction could be consummated, insufficient structure information and failure to show evidence of funding.
Do you have any reason to doubt the accuracy of that paragraph?
A. No.
Q. Then the next paragraph talks about the Carteret Acquisition Corporation bid. And that's the one that we looked at earlier with the premium of $185.1 million. And this paragraph describes how the bid was conditioned upon acquisition of loans at 9.25 percent discount from fair market value in direct contravention of RTC policy, which is to furnish loans at market value.
An analysis of the transaction, allowing for the required discount on loans, showed that the 9.25 percent discount would have effectively decreased the bid by some $135.8 million and thus decreased the effective amount of the bid to approximately $49.2 million, an amount which was not



within the 10 percent margin and substantially less than several bids received.
And do you have any reason to doubt that this paragraph is an accurate description of the reasons why the Carteret Acquisition Corporation's bid was rejected?
A. No.
Q. And we've already talked about Bahia, right, and they didn't -- which was described on page 5 of this memo, and the fact that they were not able to raise the necessary capital by the closing date. And is it true that that's the reason why they did not have their bid accepted?
A. Right. Yes.
Q. Okay. Now, on the final paragraph on page 5, it starts, in the first sentence, "Bahia and the high bid group were then given the opportunity to bid on Midatlantic's 15 branches and Sovereign's 1 branch. They did not reaffirm at the original bid price of approximately $87 million by December 30, 1994."
And first let me just ask you about that $87 million. Do you have any reason to doubt the validity of that number?
A. No.



Q. And do you have any reason to doubt that the RTC would have been able to realize that premium if it had not been required under congressional mandate to do a second round of bidding with minority investors?
A. Well, the only thing about that is you don't know whether they would have bid 87 million in the first place, if it hadn't been for the threat of the minority bidders. So it's very hard to say whether something would be there if conditions were not in effect that were, that they bid on, so --
Q. Do you have an opinion on that or are you just saying you don't have an opinion because you think it's hard to --
A. You can't have an opinion.
Q. Well, you don't --
A. I mean nobody -- I don't have an opinion as to what somebody would have done if something hadn't been what it was.
Q. Okay. But let me ask it this way then. Do you have any reason to believe that the high bid group would not have met -- been able to satisfy its obligations and receive the necessary regulatory approvals if their bids had been accepted in a timely fashion?

Page 122

A. And there hadn't been minority bidders.
Q. Correct.
A. If they had bid --
Q. If they bid $87 million and no minority bidders showed up, within ten percent, do you have any reason to doubt that the RTC would have been able to realize that $87 million premium?
A. If the premium had been there, they probably would have closed.
Q. Okay. You don't have any reason to doubt that they would have closed, do you?
A. No.
Q. Okay.
A. I just doubt -- have doubts about whether the 87 million was there, would have been there.
Q. And why is that?
A. Competition always has shown throughout time, which is why these things bid on a branch break-up basis; the more competition you have, the higher the bid premiums.
Q. But wasn't the whole theory of the minority program was that the minorities really couldn't compete without some preferential treatment. And so when Midatlantic and Chase and Chemical are bidding against each other, they are

Page 123

not worried about Mr. Sergeon and Mr. Terrell.
A. Well, now they are given these incentives to bid and they are there, and they know they are there, it adds more competition to the mix. And how they viewed them, you would have to ask them, but all I know is that more competition breeds higher premiums.
Q. And do you have an opinion as to whether the minority bidders could have competed against the entities that were the high bid group without the preferential treatment?
A. They probably could.
Q. I think those are all the questions for this document. Let's move on to Held Exhibit 31. And it has a Bates number C-AM-A-0077742.
- - -
(A document was marked as Deposition Exhibit Number 31)
- - -
A. Okay.
Q. This is a memo from Mr. Jupiter to Mr. Ramey and Mr. Smith, and it was copied to you. Is that correct?
A. Correct.
Q. And it's dated January 18, 1995. Is that

Page 124

correct?
A. Right.
Q. And it references in the middle of the e-mail the fact it says, "We believed any further delay would be very costly, both in image and money to the RTC. And briefly explained the history of the details already experienced," closed quote.
Did you share the view that further delay could be very costly to the RTC?
A. I don't recall.
Q. And as you sit here today, do you have an opinion one way or the other whether further delay would have been very costly to the RTC?
A. You know, I can't give you dollars and cents. No.
Q. Well, but do you, even without asking you to quantify it specifically, do you have a sense as to whether further delay would have been -- would have resulted in additional costs to the RTC or do you not have an opinion?
A. I don't have an opinion.
Q. Okay. Do you recall how the issue with Bahia was ultimately resolved?
A. I don't think they bought Carteret.
Q. Right. The next exhibit, Held 32,

Page 125

will -- bears a Bates number C-AM-A-0028010.
- - -
(A document was marked as Deposition Exhibit Number 32)
- - -
BY MR. THOMPSON:
Q. Are you ready, sir? Okay. So this is an e-mail from you to Ann Richards dated January 4, 1995. Is that correct?
A. Correct.
Q. And it says, quote, "We need your analysis by early next week," closed quote. Now, Ms. Richards, she was in the asset division; right?
A. Yes.
Q. Do you know what analysis you needed from her?
A. No.
Q. Okay. Would it help if I told you that the scheduled closing of the second -- or the 14 branches of New Jersey were two weeks later, 16 days later?
A. No.
Q. Okay. Do you know what sort of analysis, if any, you generally needed from the asset people before you could close on a branch sale or deposit

Page 146

you need a break.
THE WITNESS: I'm ready.
MR. THOMPSON: The next exhibit, 41, bears a Bates number of C-AM-A-0077208.
- - -
(A document was marked as Deposition Exhibit Number 41)
- - -
BY MR. THOMPSON:
Q. And this is an e-mail from Ann Richards to you dated September 15, 1994. Is that correct?
A. Yes.
Q. And Ms. Richards message says, "We are chompint at the bit waiting to sell securities out of Carteret. Should they still remain frozen. Ann."
And I guess my first question is do you have any recollection of the asset freeze at Carteret, the freeze on sale of Carteret's assets?
A. No.
Q. At the time, would you have had any responsibility in connection with the decision to have frozen Carteret's assets?
A. I don't know. I don't recall.
Q. And so do you have any -- can you think

Page 147

of any reason why their assets would have been frozen?
A. I don't know.
Q. And I'm not -- just to be clear about my question, I'm not asking -- you have been clear that you don't recall specifically about Carteret, but I'm just saying generally, based in your experience of marketing institutions for over 20 years, do you know why these assets might have been frozen?
A. The marketing institutions has changed. I mean, in 20 years we've done things 50 different ways. So what was going on in 1994, I don't know. And it would just be total speculation as to why the assets were frozen.
Q. Well, have you been involved in -- can you think of any other marketing effort you have been involved in where there was a freeze on the sale of assets?
A. Well, in time in the beginning of the RTC we were selling assets with the franchise.
Q. Right.
A. And then after awhile, we weren't. And, you know, today we sell assets with the franchise, some assets. Some assets we don't sell.
I mean, it depends on what the, you know,

Page 148

the policy is at the time, what the markets, you know, what's the best execution. Is it better to sell with a franchise or without the franchise.
At various times it has been, it hasn't been; it's better to securitize, it isn't to securitize. It's, you know, if this was September of '94, I probably could tell you what the conditions were that caused that.
Q. But do you have an opinion as to whether it was better for Carteret to have had an asset freeze or not?
A. I have no opinion.
Q. Okay. And you have referenced in your answer the fact that sometimes assets are sold with the institution and sometimes they are not sold with the institution. And is that relevant to an asset freeze because if you are going to sell the assets with the institution, you need to wait till you sell the institution?
A. Right.
Q. Okay. I was just trying to understand what your comment was in reference to. Now, so you don't recall how long the asset freeze was at Carteret?
A. No.

Page 149

Q. And can you, just so the record is clear, can you think of any other instance in which an institution you have been involved in marketing has had its assets frozen?
MR. HOFFMAN: Objection. Asked and answered.
A. I can't cite any specific institutions.
Q. Do you have a general recollection as to whether there was such institution?
A. I've sold institutions with all the assets and with none of the assets and pretty much everywhere in between over time, so.
Q. Now, and you don't know when the asset freeze was lifted or why it was lifted?
A. Or if it was lifted.
Q. Or if it was lifted. And do you have any knowledge of whether it was in any way related to the minorities' bidders option to buy certain assets?
A. No.
Q. Do you know who would have this information?
A. No.
Q. Do you know what division would have had responsibility for making this determination?

Page 150

A. No.
Q. I'd like to ask the court reporter to mark as Held Exhibit 42 a document that bears the Bates number C-AM-A-0014279.
- - -
(A document was marked as Deposition Exhibit Number 42)
- - -
BY MR. THOMPSON:
Q. Now, this is an e-mail from you to Ms. Richards the day after she sent her e-mail to you, which was Held Exhibit 41, and in which you state, quote, "We are still working with a minority whole bank bidder. We still need about 1.4 billion in loans. If Sandra has the loanses and does not need the securities, then we should be able to release the securities."
Do you see that?
A. Yes.
Q. And does this suggest to you that reason there was a freeze and that they were coming to you to ask about this was the fact that the minority bidders would have an option to purchase loans?
A. That's what it says. I forgot why we needed securities, but I guess it's supposed to be

Page 151

loans but doesn't seem right to me.
Q. I'm sorry. What doesn't seem --
A. It's just that there was a loan program and I don't remember anything to do with securities, but obviously somehow securities were being used to satisfy that. But I don't remember anything about that.
Q. So you are picking up on the fact that your e-mail makes reference both to the loans, 1.4 billion in loans, but then it also says, "If Sandra has the loans and does not need the securities, then we should be able to release the securities."
And I take it you are not recalling why the term securities was used in your e-mail?
A. Right.
Q. But you do recall that there was a need for loans, so that's what this e-mail indicates. Is that right?
A. Yes.
Q. And that that need was linked to the fact that there were minority bidders out there who would have an option to buy assets. Is that right in?
A. That's correct.
Q. Okay. And who is Sandra? Sandra Nobles I see actually up there. She's cc'd. Do you recall

Page 152

any interactions with her?
A. She was in Asset Marketing, as I recall.
Q. Okay. And do you recall in the aftermath of this e-mail exchange where Ms. Nobles ever indicated whether she, you know, whether you could lift the freeze or not?
A. I don't recall.
Q. Okay. I'd like to ask the court reporter to mark as Held Exhibit 43 a document that bears the Bates number C-AM-A-0014275.
- - -
(A document was marked as Deposition Exhibit Number 43)
- - -
BY MR. THOMPSON:
Q. And this is an e-mail from you to Paul Ramey dated September 19, 1994. Is that correct?
A. Yes.
Q. And it says, quote, "I talked with Manny Friedman and Karen Edwards this morning," closed quote. Now, Manny Friedman, he's a principal in Friedman, Billings and Ramsey. Is that right?
A. Yes.
Q. "I told them that Jack Ryan was not talking with any of the bidders on Carteret since he

Page 153

may be the deciding party in the case. They wanted to make sure that we weren't giving out any additional information on the assets. I insured them that no information would be given to the bidders until after closing," closed quote.
Do you know what Friedman Billings' concern was? I mean, just conceptually about the release of information on the assets?
A. No.
Q. Do you recall what the process for asset disclosure was in connection with the Carteret transaction?
A. No.
Q. Do you generally have a recollection as to how asset disclosure worked in connection with the Minority Preference Program that was in place with, at the time of Carteret's transactions that we've been discussing today, '94, '95?
A. The cases I -- not even cases, but my recollection is we didn't disclose asset information until after closing.
Q. Okay. So they had an option, but they weren't told what the -- or what it was that they might be able to buy until after they had closed. Is that what you are saying?