UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------------x
AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.
--------------------------------------x
600 Fifth Avenue
New York, New York
March 30, 2006
9:40 a.m.

Deposition of EDWARD GRIFFIN, pursuant to Subpoena, before Sophie Nolan, a Notary Public of the State of New York.

57 Document Bates stamped CAM 0591090 through CAM 0591099 166
58 Document Bates stamped CAM 8090345 168
59 Document Bates stamped CAM 8090340 through CAM 8090343 168
60 Document Bates stamped CAM 8090322 through CAM 8090323 169
61 Document Bates stamped CAM 0320492 through CAM 0320495 170
62 Document Bates stamped CAM 0470167 through CAM 0470185 171



EDWARD GRIFFIN, called as a witness, having been first duly sworn, was examined and testified as follows:
EXAMINATION BY
MR. THOMPSON:
Q. Please state your name, sir.
A. Edward J. Griffin.
Q. Good morning. I'm David Thompson. I represent Ambase Corporation in the suit of Ambase versus the United States and with counsel for the FDIC --
MR. KUIPER: Gary Kuiper from the FDIC and I represent Mr. Griffin.
MS. PIANKO GRONER: Arlene Pianko Groner. With me is Melinda Hart representing the United States.
Q. Good. Well, good morning, sir. Thank you for coming down today.
Have you been deposed before?
A. Yes, I have.
Q. Okay. So you understand that this is a question and answer format. I certainly want your full testimony today and if at any time I cut you off, please just let me know. That's not my intention.



If you need to take a break at any point today, just let me know and I'm happy to do that.
MR. THOMPSON: Why don't we just dive right in then and I'd like to start by asking the court reporter to mark as Griffin Exhibit 1 a document that bears the Bates number C-AM-A-005380. I have to apologize. It has some handwritten scribblings of my own in the upper right-hand corner. So, just ignore those.
(Griffin Exhibit 1, document Bates stamped C-AM-A-005380, marked for identification.)
Q. Mr. Griffin, is this a copy of your resume?
A. May I read it, please?
Q. Sure. In fact, Mr. Griffin, let me just say that throughout the day I've got a lot of documents and I'm typically going to point you to a particular portion of them, but if at any time you want to take more time to read more, absolutely take more time?
A. Thank you.
Q. Let me know when you're ready.



A. (Reviewing.)
Yes, this is a copy of my resume.
Q. When did you leave the employment of the RTC or FDIC?
A. December 1995.
Q. When the RTC suns setted?
A. Correct.
Q. And what have you done since that time?
A. Since that time I have worked for the World Bank in Tanzania and U.S. Aid in Bosnia Herzegovina and to current, financial manager of the Two Rivers Water Reclamation Authority located in Monmouth Beach, New Jersey.
Q. Broadly speaking, what were your responsibilities at the World Bank?
A. The responsibilities at the world bank were training prospective bank examiners to audit banks in the new emerging market economy.
Q. All right. And what years were you at the World Bank, approximately?
A. From 1996 to 1997.
Q. All right. And then how long were you at U.S. Aid?
A. 1997 to 1998.

Page 18

were your responsibilities there?
A. I was executive vice president in charge of the overall management of the bank.
Q. So, you had responsibilities for all aspects?
A. Yes.
Q. Why did you leave Summit Bank Corporation?
A. I left Summit Bank Corporation due to their consolidation of operations in the existing banking environment in the State of New Jersey.
Q. Okay.
A. I lost my job.
Q. Okay. And then you went to the RTC and it says that you "Managed the planning, directing and controlling of the daily operations of institutions, ranging in asset size from 200 million to 4.9 billion."
Do you recall when you got to the RTC what your first assignment was?
A. Yes, it was in Masalon, Ohio in a failed institution there as the operations specialist.
Q. And what were your responsibilities as an operations specialist?

Page 19

A. Operation specialist maintained the control of safeguarding the liabilities, deposits, and packaging the assets, loans.
Q. For sale?
A. For sale.
Q. Do you recall the name of that institution?
A. No, I do not.
Q. Approximately how long were you with that institution?
A. Approximately three to four months.
Q. All right. And do you recall what your next assignment was?
A. I have a hard time remembering the sequence of the assignments, but I do remember most of the towns without the name of the banks that I was associated with.
Q. All right, well, why don't you just tell me, prior to coming to Carteret, what you can recall about the institutions where you worked for the RTC?
A. I was in Ewing Township, New Jersey. Hyannis, Massachusetts, Plymouth, Massachusetts, Toms River, New Jersey, Paterson, New Jersey, Carteret, New Jersey.

Page 20

Q. And what were your responsibilities? Were they consistent in these various assignments?
A. They changed after Masalon to become a managing agent for each institution while in conservatorship.
Q. Was the managing agent the equivalent of a CEO in the private sector?
A. Yes, it was.
Q. And do you recall that George Gross was your predecessor --
A. Yes.
Q. Do you recall whether Mr. Gross was relieved of his responsibilities?
A. Yes.
Q. And do you recall whether Mr. Gross was charged with having or was thought to have stolen from Carteret?
A. Yes.
Q. What is your understanding of what the accusations against Mr. Gross were?
A. There were two accusations, one of which was what you might term stealing. He was filling his personal car with the gas tank -- the gas supplies from Carteret.
The second was purely internal. It

Page 21

was how he brought certain people into the conservatorship who, in the opinion of the management of RTC, were not qualified to perform the job and who were overpaid.
Q. Okay. Do you recall who the individuals who were deemed to be unqualified were?
A. I recall one. Her name was Debra Thornton.
Q. Do you recall what Ms. Thornton's responsibilities were?
A. I am going to say control of asset management now.
Q. It says on your resume under the "FDIC/RTC," the second bullet point is, "Organized residential and commercial loans, securitizations."
Do you see that?
A. Yes.
Q. And what is a securitized sale?
A. A securitized sale is a group of loans anywhere from 5 to 500, secured by notes, government notes.
Q. And did the securitization make the loans more attractive to acquirers?

at Carteret.
Q. And was this CD runoff a concern because it was having a negative impact on the franchise value of Carteret?
A. Yes.
Q. And do you recall with whom you spoke at Valley Forge about this issue?
A. Dennis Lauria and James -- the head of the RTC in Valley Forge, Jay --
Q. Hambric?
A. Hambric, yes.
Q. And do you recall what the result of those conversations was?
A. We received permission to go offer rates slightly higher than that particular period RTC directive.
Q. I've got a document which I can show you in a little bit with sort of month-by-month deposit runoff flows, but do you recall whether this was successful when you raised the rates, whether that had a positive impact on limiting runoff?
A. To my recollection, it did not.
Q. Okay.
MR. THOMPSON: At this point I'd like



to ask the court reporter to mark as Griffin 5 a document that bears the Bates number AM 52900173 through AM 52900175.
(Griffin Exhibit 5, document Bates stamped AM 52900173 through AM 52900175, marked for identification.)
A. (Reviewing.)
I'm ready.
Q. So, this is a memo from yourself dated April 12, 1994. The subject is "Conservatorship Objective/Mission Statement"; is that correct?
A. That is correct.
Q. Is that your signature on the third line of this memo?
A. That is my signature.
Q. Okay. And then turning to the second page of the exhibit, in the paragraph after the first asterisk, one of the sentences reads, "Sales initiatives on performing assets are dictated by various RTC marketing specialists wherein emphasis is on maintaining earning assets rather than selling and reinvesting proceeds into low-yielding liquidity-oriented assets."
What was the strategy that you're



describing here?
A. The first item there from that particular sentence, "various RTC marketing specialists," would be the securitization specialist in Valley Forge and/or Atlanta or national.
The emphasis was to maintain existing earning assets rather than selling those assets in these various pools so that these performing loans would contribute to the bottom line of the conservatorship, rather than selling these loans or putting these loans into pools and getting them off your balance sheet while they were still earning assets according to the terms of the loan agreement that was originally signed by the borrower and the lender.
Q. And as you say in the next sentence, this helps to reduce conservatorship operating losses by maintaining a higher net interest margin; is that correct?
A. That's correct.
Q. And was that an important part of your strategy to maintain a positive interest margin?
A. Yes.



Q. And can you think of any instance in which you would have knowingly maintained earning assets where the cost of funds was greater than the yield on the assets?
A. Not to my knowledge.
Q. Okay. That just would be bad business; is that correct?
A. Yes.
Q. Okay. And, now, under the third asterisk or next to the third asterisk it says, "Downsize the balance sheet in such a way as to maximize the franchise value of the institution."
Do you see that?
A. Yes.
Q. And that was one of your objectives?
A. Yes.
Q. And does that mean that as assets and branches are sold off, you wanted to do it in a way such that you weren't unduly diminishing the value of the franchise?
A. That's correct.
MR. THOMPSON: At this point I'd like to ask the court reporter to mark as Griffin 6 a document that bears the Bates number C-AM-A-0400938 through 940.

Page 162

A. Yes.
(Recess taken.)
MS. PIANKO GRONER: I'd like to mark another document as Exhibit 54.
(Griffin Exhibit 54, document Bates stamped CAM 0820080 through CAM 0820087, marked for identification.)
Q. While we were off the record, I asked the reporter to mark as Exhibit 54 a January 23, 1995 memorandum to you, Mr. Griffin, from George Fadil, pro forma team leader, and the subject is the exit memorandum of the pro forma section with attachments -- not with attachments. Let me clarify.
That is the first page, CAM 0820080. Behind it is a January 22, 1995 exit memoranda of the personnel section and then behind that is a -- what appears to be a draft January 23, 1995 exit memorandum of the settlement section and that begins at CAM 0820082 and then behind that beginning at page CAM 0820085, is an exit memorandum of the ISA section dated January 22, 1995. And then, finally, beginning at page CAM 0820086 is an exit memorandum of the claim section dated January 21, 1995.

Page 163

Take a look at these exit memoranda and I ask you to tell me what you recall about the final resolution of Carteret.
A. (Reviewing.)
I'm ready.
Q. This was also a partial resolution; is that correct?
A. Yes, yes.
Q. And what do you recall about this resolution for FIN number 1309?
A. I remember receiving this memo specifically because of a couple minor items in there which caught my attention. But it -- my remembrance of this was it was a -- obviously a very smooth resolution with the exception of one item. Certain jackets weren't labeled correctly, but everything else -- any place --
This was the smoothest resolution that I had ever experienced, albeit the largest, so the staff did a very good job. I remember receiving this and patting the team on the back for a job well done.
MS. PIANKO GRONER: I'd like to ask the reporter to mark another document.
(Griffin Exhibit 55, document Bates

Page 164

stamped CAM 0940057 through CAM 0940058, marked for identification.)
Q. I asked the reporter to mark as Exhibit 55 a January 31, 1995 memo from John Kauchak to you and the subject is "Carteret Federal Savings Bank of New Jersey partial FIN 1309 final exit memorandum."
Please take a look at this document and then just tell me if this refreshes your recollection about anything with respect to this resolution.
A. (Reviewing.)
Yes, I'm ready.
Q. Did you receive this document?
A. Yes, I did.
Q. Is that your initials or Mr. --
A. No, it's John Kauchak.
Q. And does this refresh your recollection at all about the final resolution?
A. Yes, it -- I particularly remember this because of Banco Popular being declared a minority institution after much wrangling prior to this and that's my main recollection of this. The other -- and, again, the initialing of the jackets correctly.

Page 165

Q. What was the effect of Banco Popular being declared a minority institution?
A. To my knowledge in the eastern region, in our region, in the northeast region, it was the first minority acquisition.
Q. And why did you say there was much wrangling?
A. There was wrangling about the definition of what minority bank is going all the way to shareholders, customers, and it's my recollection that the decision was based upon depositors as opposed to shareholders.
Q. And did you agree with that decision?
A. Yes, I did.
MS. PIANKO GRONER: Okay. Another document.
(Griffin Exhibit 56, document Bates stamped CAM 1961260 through CAM 1961262, marked for identification.)
Q. I've asked the reporter to mark as Exhibit 56 a memo from Sharon Yore to you and others dated March 9, 1995 subject "Carteret FSB acquirers deposits and premiums" and it's a memo with an attachment.
First of all, can you tell me if you