IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

AMBASE CORPORATION, ET AL. :

Plaintiffs :

and : No. 93-531

FDIC :

Plaintiff-Intervenor :

-vs-

:

UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - - x

April 5, 2006

Washington, D.C.

DEPOSITION OF:

STEVEN JOHNSTON

was called for examination by counsel for the Plaintiffs, pursuant to notice, taken at Cooper & Kirk, 555 11th Street, N.W., Suite 750, Washington, D.C., commencing at 9:37 a.m., before Misty Klapper, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

Page 6

Texas for about two years.
Q. What sort of work were you doing for them?
A. Tax accounting mostly, a little bit of auditing.
Q. Okay. And then what did you go on to?
A. I moved from there to Dallas, Texas, where I worked for another CPA firm for approximately two years.
Q. And what were you doing at that firm?
A. Basically the same thing, tax, mostly tax return preparation.
Q. Very good. And then what did you go on to?
A. I went to a subsidiary of Guaranty Federal Savings Bank called GSC Realty.
Q. All right. And how long were you there for?
A. About a year and a half, I believe.
Q. And what were your responsibilities there?
A. I was a property -- property management accountant.
Q. And what did that entail?
A. Just responsible for, you know, the

Page 7

accounting for different types of real estate property, mostly apartment complexes, that sort of thing.
Q. Okay. Very good. And what did you do when you left there?
A. I left there and went to the FDIC.
Q. And approximately what time was that?
A. That was in September of 1990.
Q. And what were your responsibilities at the FDIC?
A. Initially I was hired to -- as part of a group that oversaw the -- what was known at the time as the Southwest Plan Assistance Agreements.
Q. And in that capacity what were you doing?
A. I had a couple of institutions assigned to me and I would oversee contractors. And the main responsibility was to monitor their contract or what was known as the assistance agreement and the compliance of the agreement by the institution.
Q. Okay. And how long did you stay on in that capacity?
A. Approximately, two years.
Q. All right. And then what did you move on to within the FDIC?
A. I transferred over to the Division of

Page 8

Finance.
Q. And how long were you with the Division of Finance?
A. I'm still with the Division of Finance, but initially I worked in what was known as the liability reconciliation group.
Q. What did you do as part of that group?
A. We were -- we reconciled the inter-company or the -- the balances between corporate and the receivership, made sure that both their books were in agreement.
Q. And just so that I understand this, I mean, let's say a bank is seized and is taken over and it has books and records. Those books and records, would they be converted to, you know, FDIC-type accounting?
A. Yes.
Q. Have you ever heard of the term AGLARS before?
A. No.
Q. Okay. And so the institution would maintain its own books and records, is that right, once it was placed into receivership?
A. I'm not sure.
Q. Well, I guess I'm just trying to

Page 9

understand what was being reconciled with what. And so I'll just let you maybe explain that.
A. Well, the institution would not maintain the books and records. It was still -- as receiver, you know, we would have corporate books and receivership books.
Q. Okay.
A. And there would be certain transactions between the two entities, receivable on, maybe, one book, payable on the other.
Q. Okay.
A. And we just made sure that we could, you know, account for any differences.
Q. Okay. Because -- so the receivership would have its own books and records and I understand how that would work.
A. Right.
Q. But -- and, actually, though, let me ask you a question. I mean, when an institution was in conservatorship, so it was still being run on a day-to-day basis and being prepared for sale, it would have books and records; is that right?
A. I believe so. I'm not -- I'm not real familiar with the conservatorship process.
Q. Okay.

Page 18

clean. It was just a matter of working with the state to get a tax clearance.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 4 a document that bears the Bates number AM52170710.
(Thereupon, Johnston Deposition Exhibit Number 4 was marked for identification.)
BY MR. THOMPSON:
Q. And this is an E-mail from Barbara Stohl to Nancy Appleby, copied to yourself and Jim Vordtriede, dated February 23, 1998; is that correct?
A. Yes.
Q. And then under miscellaneous at the bottom it says Steve is continuing to work on sub dissolutions. And it continues, tax opinions are requiring an increased time commitment. DRR has committed to terminating 263 FINs this year. We are current with respect to tax opinions requested by the DOF terminations group to date.
Were you involved at all in the decision as to which FINs would be terminated in a given year?
A. No.
Q. Okay. Do you know whether any case -- goodwill cases were terminated in 1998?
A. I don't know.

Page 19

Q. Okay.
MR. THOMPSON: All right. At this point I'd like to ask the Court Reporter to mark as Johnston 5 a document that bears the Bates number CAM9580594.
(Thereupon, Johnston Deposition Exhibit Number 5 was marked for identification.)
BY MR. THOMPSON:
Q. And this is an E-mail from Jim Vordtriede to yourself and Eldon Ford, copied to Lee Henderson, and dated March 2nd 1998; is that right?
A. Yes.
Q. Okay. And I guess, actually, that's sort of the second message. Underneath it, under the original message, it's an E-mail from yourself to Mr. Vordtriede, also dated March 2nd 1998, a little bit earlier in the day; is that right?
A. Yes.
Q. Okay. And was Mr. Vordtriede your supervisor at this time?
A. Yes, he was.
Q. Okay. And under point number two, Homefed Bank, it says, quote, this issue involves the re-allocation of NOLs to the holding company.
Is an NOL a net operating loss?
A. Yes, sir.

Page 20

Q. Okay. According to Lee, it may involve preparation of amended returns for two or three years. This appears to be an outgrowth of the 85,000,000 refund that we received a while back. Lee is somewhat familiar with this one, as she was also involved in the refund, closed quote.
In terms of amending returns, what's your understanding about when a return can be amended? Is it within three years of filing the return or payment of the tax, whichever is later?
A. That's the basic Statute of Limitations.
Q. And was it FDIC policy that when you were within the Statute of Limitations and you could lower the tax liability for the entity in receivership to file an amended return?
A. I can only speak for -- you know, from my experience, but, yes, it was.
Q. Okay.
MR. THOMPSON: I'd like to ask the Court Reporter to mark as Johnston 6 a document that bears the Bates number AM52170707.
(Thereupon, Johnston Deposition Exhibit Number 6 was marked for identification.)
BY MR. THOMPSON:
Q. And this is an E-mail from Barbara Stohl

Page 21

to Nancy Appleby, copied to Mr. Vordtriede and yourself, dated March 16th 1998; is that correct?
A. Yes.
Q. In the fourth paragraph under the initial heading of TOA it reads, quote, I already mentioned in an E-mail and will reiterate here that I think it would be a good idea to have a meeting to discuss the return preparation process. In reviewing the returns that Jake prepared for the March 15th deadline, and in discussing with other members of the tax staff, it would appear that there is some confusion over some of the details involved in preparation of the returns. Mostly, it's the little things, what needs to be stamped, what attachments are added, the nuances of the alternative minimum tax, FFA, who signs what and how do returns get routed, et cetera.
Do you recall that there was some confusion over these details?
A. No, I don't recall.
Q. Okay. And do you know what FFA is?
A. Federal financial assistance.
Q. And was Mr. Vordtriede the tax unit's expert on FFA?
A. I think that's fair.
Q. Okay. Are you familiar with the fact

Page 30

claim? I mean, is there a form that they're supposed to file?
A. Yes.
Q. All right. And is the IRS supposed to file that form in order to get paid?
A. There's a -- the claim form refers to the FDIC's claim process that all creditors are subject to when a bank fails.
Q. Okay. Now, this refers to current practice.
Do you know whether there ever came a time after this E-mail of June 2000 where the practice changed?
A. I don't think it ever did.
Q. Okay. And, now, referring to item number six, it says tax claims that include penalties. It says, in part, there are a few instances where an RC has been issued for tax claims that includes penalties. Are we legally obligated for these penalties? We believe that the IRS will abate most penalties if we can show reasonable cause, but does the fact that we've accepted a claim that includes penalties bind us legally.
What was -- why did you think that the IRS would abate penalties if reasonable cause could be

Page 31

shown? Was that based on your experience or --
A. It was based on -- it was based on, you know, kind of things, you know, that were overheard, you know, from other people in the tax department. I don't think the IRS, you know, ever took an official position or officially agreed with us. But there was always a feeling, you know, that they would.
Q. Okay. A feeling within the tax group of the FDIC?
A. Right.
Q. Okay. And do you know, for example, with respect to Ben Franklin whether the IRS has, in fact, abated penalties?
A. I didn't work directly on that. I don't know.
Q. Okay. Can you think of any instance in which the IRS actually insisted upon being paid for penalties?
A. See, the -- in my experience, we never got to the point where we ever had to pay them anything, so the issue never really came to a head.
Q. Okay. I see.
A. It never resolved and that's why it was on this list here.
Q. Okay. Now, you posed the question does

Page 32

the fact that we've accepted a claim that includes penalties bind us.
Do you recall whether you were ever given an answer to that question?
A. Not definitively.
Q. Okay. Do you remember what the tentative answer was?
A. No, I don't.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 13 a document that bears the Bates number AM0010647.
(Thereupon, Johnston Deposition Exhibit Number 13 was marked for identification.)
BY MR. THOMPSON:
Q. And there are a series of E-mail messages on Johnston 13, but I guess it's the -- the first message that shows here at the top is from yourself to Elaine Tama, stating, thought you might be interested, and dated June 28th 2000; is that correct?
A. Yes.
Q. And Ms. Tama -- were you sending this to her because she was knowledgeable about tax issues?
A. No, her involvement was on the accounting policy side.

Page 33

Q. Okay. Was she -- strike that.
Now, with respect to the original message that appears right underneath that, it's from Jonnie Wells.
Do you see that?
A. Yes.
Q. Okay. And what was Ms. Wells' position at this time, June of 2000?
A. I believe she was over Jim Vordtriede or whoever the tax manager was at that time. I don't remember when Jim came to Dallas exactly.
Q. Was she -- did she have an expertise in tax?
A. No, she was more of a managerial role.
Q. Okay. And is she still with the FDIC, do you know?
A. I believe so.
Q. In Washington or Dallas?
A. Dallas.
Q. Okay. And then this message from Ms. Wells says Karen, another issue we may want to consider is how we would record these claims on the GL and what impact it may have on the receiverships's financial for both financial and tax purposes; example, colon, now when we accrue for the PII, it

Page 34

causes a debit to equity in the year we accrue. When we do the tax return, this debit to equity increases the receivership's loss, expenses, for that year and is so reflected on the return. However, if we then terminate the receivership in subsequent years and don't actually pay the PII and reverse the entry, it increases equity in the year it is reversed, income, causing a mismatch of income and expenses. Technically, we should go back and amend the prior years' returns or we could analyze equity and do a tax adjustment at that time.
Did you agree with Ms. Wells as to what the technically correct approach would be to the issue she's identified here?
A. Let me have a minute to review it.
Q. Please.
A. I'd say that her position stated here, you know, was a reflection of the -- the attitude of most of the tax accountants.
Q. At the FDIC?
A. At that time.
Q. Okay. Do you think it was the -- well, in any event, then it says in the next sentence either way, it should be noted that this kind of accrual may also need different treatment for financial and tax

Page 35

purposes.
Do you recall there being any discussion about that point?
A. I'm sorry, I'm trying to find where you were reading from.
Q. Oh, sure, it's just the last sentence.
A. Last sentence?
Q. Yes.
A. Okay. Could you restate your question?
Q. Sure. Do you recall whether there was any discussion about this point?
A. No, I don't know where the issue went from there.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 14 a document that bears the Bates number AM0010611 through 10614.
(Thereupon, Johnston Deposition Exhibit Number 14 was marked for identification.)
BY MR. THOMPSON:
Q. And so this is a cover E-mail from yourself to Elaine Tama and Robert Ferrer, subject, tax claims issues, and dated November 20th 2002; is that right?

Page 36

A. Yes.
Q. And then attached to this E-mail was a matrix of different tax claims issues; is that right?
A. Yes.
Q. Okay. I'd like to direct your attention to the last page of this document and specifically to the section the issue tax claims and penalties. And it says status -- first of all, may I ask, is this a document that you prepared, this matrix, do you know?
A. I believe so.
Q. Okay. And it says under status, the IRS recently abated significant penalties on Ben Franklin which was in response to our specific request through the District Director's office. The IRS continues to abate penalties on a case-by-case basis and requests for abatement have to be submitted through the various District offices. However, certain high profile cases in litigation still have substantial penalties which are reflected on IRS transcripts.
Does this refresh your recollection that Ben Franklin did, in fact, have an abatement of penalties?
A. Yes.
Q. Okay. And do you recall whether it was difficult for the FDIC to get that abatement or

Page 37

whether it was, you know, a simple request and the FDIC granted it -- excuse me, the IRS granted it?
A. Yeah, I don't know. I know Ben Franklin is still ongoing and I don't know that -- even though it implies there that it was, you know, a settled thing, I'm not sure that that was necessarily true, you know. It evolved for a few more years, so I was probably referencing something -- you know, information I was given by someone else.
Q. Well, with respect to the issue of penalties -- I mean, I know with Ben Franklin there are a lot of tax issues in that case. But with respect to the penalties, do you have any reason to believe that the statement in your matrix is incorrect?
A. No, it's probably correct.
Q. Okay. And is the IRS's position that there needs to be reasonable cause shown for the nonpayment in order to abate the penalties? Is that your understanding?
A. I don't know. I don't recall ever, you know, having any or receiving any, you know, direct response to anything I worked on, you know, from the IRS that stated their position.
MR. THOMPSON: We've been going about an

Page 38

hour. Is it okay if we take a five-minute break?
MR. HUGHES: Sure.
(Thereupon, a brief recess was taken.)
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 15, then, the next exhibit.
(Thereupon, Johnston Deposition Exhibit Number 15 was marked for identification.)
BY MR. THOMPSON:
Q. Mr. Johnston, I'd like to direct your attention, actually, to the original message on this page, which is from yourself to Elaine Tama, copied to Rick Cywinski, subject PII accrual, and dated October 9th 2003; is that correct?
A. Yes.
Q. And it reads, in part, Elaine, I thought you might be interested in this. Legal asked that we review Carteret Savings and verify the $76,000,000 tax liability we reported on our 2002 goodwill estimate. This is another case where we had -- excuse me -- where had we accrued PII from the date of closing, we could have significantly reduced our tax exposure and, maybe more importantly, our litigation exposure. In this case, the subrogated claim was nearly $1 billion and it closed very early in 1995. Had we accrued PII,

Page 39

the tax liability would have been approximately $9,000,000 instead of $32,000,000. This $32,000,000 has now grown to over $76,000,000 with penalties and interest.
Are you confident that the calculations that you made in this E-mail were correct?
A. I'm sure they were estimates. I don't recall doing the calculation, to be honest.
Q. Do you have any reason to doubt that they were accurate estimates at the time you made them?
A. I have no reason to doubt it.
Q. Okay. And then it says in the next paragraph, while in Dallas, we found a few other examples of where PII accruals from the beginning could have reduced the tax liability. Santa Barbara was one.
Do you recall if there were any other institutions that fell into this category?
A. I don't recall specifically.
Q. Okay. And with respect to where it says we found a few other examples, do you recall who else, while you were in Dallas, was looking at this issue?
A. It's hard to say.
Q. Okay. And then it says it should be noted that the IRS agrees that this is a valid tax

Page 40

deduction available from the date of closing.
Isn't it true that that's the position that the IRS has now taken in the Ben Franklin case, they've allowed the deduction of post-insolvency interest from the date of closing?
A. That's my understanding.
Q. Okay. And are you familiar with any instances in which the IRS has not allowed the deduction of post-insolvency interest from the date of closing?
A. I'm not aware of any other cases of where it was an issue or where it was challenged.
Q. Okay. When you wrote that the IRS agrees that this is a valid tax deduction, do you recall why you had formed that belief? Was it because of Ben Franklin or some other reason?
A. I can't recall any other reason, other than, possibly, the Ben Franklin case. I'm not aware of any other instance where the IRS, you know, specifically agreed to that position.
Q. Okay. And just so the record is clear, you can't recall any other instances in which the IRS took a position on that issue; is that right?
A. That's correct.
Q. Okay. Do you recall whether there was

Page 41

anyone who disagreed with you at the FDIC that the IRS would allow this as a valid deduction from the date of closing?
A. I don't recall anyone disagreeing with that.
Q. Okay. And then it says I'm not sure where your proposal stands, but this should be of interest to the decision makers.
Do you recall who the decision makers were who you were referencing?
A. It was whoever, you know, the accounting managers were in Dallas at that time. This is, you know -- this is, obviously, a receivership issue. By this time, you know, I was in D.C. It was a receivership, you know, decision whether or not to, you know, record this liability.
Q. Okay. And at least in terms of the tax issue and the IRS's position on Ben Franklin and everything, in terms of the accrual method of accounting is it appropriate to take a deduction for post-insolvency interest from the date of a closing?
A. I'm not, you know, an expert on GAAP accounting. From a tax standpoint we, you know -- I -- it was always my position, my belief, that it was a more fair presentation of the receivership's assets

Page 42

and liabilities to accrue it, but it was -- there are accounting issues involved that I'm not, you know, an expert in. And the decision was made, I guess, years ago for whatever reasons not to accrue PII.
Q. For accounting purposes?
A. Accounting purposes.
Q. Right. Okay. Do you know why that decision was made?
A. I don't know.
Q. And do you know who made that decision?
A. I mean, it goes back forever. I mean, there's a zillion people over the years.
Q. Do you know whether -- when you use the term litigation exposure in the first paragraph, do you recall what you were referring to?
A. I think that was just a general, you know, comment. You know, personally I've always had kind of a sympathetic view toward, you know, shareholders and creditors that, you know, we should have a fair -- you know, as accurate a presentation of a receivership's financial status as possible.
Q. Okay.
A. And I understand there's different points of view over the PII and when it's appropriate to accrue.

Page 43

Q. Okay. But can you recall anyone at the FDIC who, with respect to the tax issue and not the accounting issue, took a position different to the one the IRS and you yourself were taking about the validity of deducting PII from the date of closing?
A. I can't speak for everyone. Over the years there were, you know, hundreds of people involved in the receivership tax returns but, no, I don't know of anyone that had a different position.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 16 a document that bears the Bates number AM0010600 through AM0010602.
(Thereupon, Johnston Deposition Exhibit Number 16 was marked for identification.)
BY MR. THOMPSON:
Q. And, in particular, I'd like to direct your attention to the original message. I know you weren't copied on the original message, but it was subsequently, I guess, forwarded to you by Elaine Tama.
But on the original message from Mr. Vordtriede to Miss Tama, copied to Wayne Green, and dated February 20th 2004 it says under item number

Page 44

one, original equity, the net credit or debit effect of pro forma adjustments are picked up in the closing year income tax return as an addition to net book income. Naturally, a net credit is an addition to book income and a net debit a reduction in net book income, closed quote.
Do you see that?
A. Yes.
Q. Is it your understanding that those pro forma adjustments made in the closing year were brought about because of a change in accounting method from an accrual method to a hybrid method?
A. I've never -- I don't recall ever being directly involved with the preparation of the closing year tax return. I -- I don't feel comfortable opining on the process.
Q. Fair enough.
Do you know anything about the next topic, which is discovered assets? And feel free to review that bullet point.
MR. HUGHES: While he's reviewing that, I'll just note this is not the original E-mail. That's the middle E-mail, I guess. It's actually one that starts towards the bottom of the second page.
MR. THOMPSON: Good. Thank you.

Page 45

MR. HUGHES: I think you clarified it.
MR. THOMPSON: Thank you, Mr. Hughes.
THE WITNESS: Could you restate your question?
BY MR. THOMPSON:
Q. Sure. Did you have any involvement in the treatment of discovered assets on tax returns?
A. Not directly. I remember I had one -- we had one receivership that when the tax return was done it generated or it showed a large amount as taxable income. And after investigation it was discovered or, I guess, the cause of that income was, you know, the inappropriate treatment as taxable income of a discovered asset. And it was reversed and the tax return adjusted.
Q. Okay. Do you remember what institution that was?
A. I don't remember. It was several years ago, but it was always unusual whenever a receivership showed taxable income.
Q. Okay.
A. So it was logical to, you know, look into as to what caused it.
Q. Okay. And in terms of the reversal, was it your understanding that it was inappropriate to

Page 46

take a discovered asset into taxable income?
A. That particular asset.
Q. Okay. I mean, generally speaking, if an asset is discovered, there wouldn't be a taxable event until the asset was sold; is that right?
A. Again, I'm not comfortable with the nuts and bolts of receivership, you know, tax return preparation.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 17 the next exhibit.
(Thereupon, Johnston Deposition Exhibit Number 17 was marked for identification.)
BY MR. THOMPSON:
Q. All right. And the original message on this exhibit is an E-mail from yourself to Mr. Green, Mr. Vordtriede, Mr. Colley and Linda Shaw. It's dated February 9, 2005. The subject is Carteret goodwill case; is that correct?
A. Yes.
Q. And it says, does anyone know if the IRS has an RC on file with us for Carteret's 1995 tax liability. Linda, this is FIN number 1309. Steve Johnston.

Page 47

What's an RC?
A. Receivership claim.
Q. Okay. And who is Linda Shaw? What are her responsibilities?
A. She was the claims department manager.
Q. Okay. And so if anyone -- is she the authority on these sorts of issues?
A. That was always my point of contact.
Q. Okay. And she answered yes and no. The original claim was $36,317.25. The claim was withdrawn on May 19th 1999.
Did -- is that your understanding of what happened with the claim?
A. Apparently, if -- I have no reason to think otherwise.
Q. Okay. I just didn't know if there was -- you know, if any of the other recipients of your E-mail had responded with any contrary information.
A. No, it would have been -- Linda -- the other people were probably just copied, you know, just to let them know or be advised. But -- actually, these people represented the people that were working in the Dallas tax group at the time.
Q. Okay.
A. But Linda would have been the primary

Page 48

person that I expected a response from.
Q. Okay. And do you know if there's any IRS claim currently pending?
A. I don't know.
Q. Okay. Do you know why the IRS withdrew the claim?
A. I don't know for certain, but it was always my position that -- and I think the IRS acknowledged this too -- that I didn't want the IRS filing a claim. It wasn't in their best interest and it wasn't in the receivership's best interest. Obviously, if they file a claim today, you know, the amount is different tomorrow because of interest.
Q. Okay.
A. And we also want to preserve our right to go back and file amended returns to carry back net operating losses, et cetera.
Q. Okay.
A. So it works both ways. That's why you won't see a lot of IRS receivership claims.
Q. Okay. Because it wasn't in the FDIC's interest or in the IRS's interest to lock in a final number; is that right?
A. Right.
Q. Okay. And the time that, you know, the

Page 49

number would be finally locked in would be the moment at which there might actually be a prospect of paying the tax liability?
A. Exactly right.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 18 a document -- well, it doesn't have a Bates number, so the next exhibit.
(Thereupon, Johnston Deposition Exhibit Number 18 was marked for identification.)
BY MR. THOMPSON:
Q. Okay. And these are some followup E-mails to the E-mail string that we just looked at. As you predicted, they don't relate to your initial question, but Mr. Green first asks David Colley, David, do we have a recent transcript on Carteret from the IRS, question mark, if not, then we need to request one. Thanks.
And then, again, Mr. Green later, on February 9th, says David, please make an inventory of the tax returns on Carteret that we have here in the office. Also, can you tell me if we filed this return on a consolidated basis with the holding company.
And do you know, Mr. Johnston, whether

Page 58

Would those have come out of the federal tax returns again?
A. I don't recognize the -- this report or the system that generated it, but I would assume that the numbers came from the tax returns.
Q. Okay. Do you have any reason to doubt the validity of the numbers that are in this document from your files?
A. Well, without having the tax returns in front of me, you know, I can't confirm them.
Q. Well, let's -- maybe we can facilitate that and that's exactly what I wanted to do, was just to look at the tax returns that were in your personal files --
A. Okay.
Q. -- and see if we can confirm them. And let's keep this chart in front of us.
A. Okay.
MR. THOMPSON: But with respect to 1995, I'd like to ask the Court Reporter to mark as Johnston 24 a document that bears the Bates number AM0144 through AM0152.
(Thereupon, Johnston Deposition Exhibit Number 24 was marked for identification.)
BY MR. THOMPSON:

Page 59

Q. So, Mr. Johnston, this is the tax return that came out of your personal files; is that right?
A. I don't know.
Q. Okay. Well, I'll represent to you it was produced the night before your deposition.
A. Okay.
Q. And in terms of trying to figure out, you know, the right number for taxable income for 1995, would we look at part one, row three, taxable income, and then column C, correct amount, which shows $85,435,725?
A. That appears to be the taxable income after the amended return.
Q. Okay. And that's what's reflected on this NOL by LOC document that's the second page of Johnston 23; is that right?
A. Correct.
Q. Okay. So that number comes from the tax return; is that right?
A. Yes.
Q. I don't know that I have the '98 return in front of me, but the number that appears on the chart NOL by LOC for 1998 is negative $27,667,637; is that right?
A. Correct.

Page 60

Q. Okay. And if we look back at Johnston 22, for example, it's, again, the same number; is that right?
A. Yes.
Q. Okay. And then the only other year that we have information for is, let's see, 1992.
MR. THOMPSON: I'd like the Court Reporter to mark as Johnston 25 a document that bears the Bates number AM0194.
(Thereupon, Johnston Deposition Exhibit Number 25 was marked for identification.)
BY MR. THOMPSON:
Q. And Johnston 25 was produced to us the night before your previously scheduled deposition, so it's fair to assume it comes out of your personal files; is that right?
A. Yes.
Q. Okay. And it shows taxable income on line 30 of $73,902,030, is that -- negative $73,902,030; is that right?
A. Yes, it's a loss.
Q. And that's the same amount that's reflected in the NOL by LOC chart that's the second page of Johnston 23; is that right?
A. That's correct.

Page 61

Q. Okay. So it's fair to assume that's an accurate number?
A. It appears to be.
Q. Okay.
MR. THOMPSON: And then just to make sure that we've got the right files for the other tax returns, because I think there may have been some discussion about this, for the 1995 tax return, I'd like the Court Reporter to mark as Johnston 26 a document that bears the Bates number AM0153 through 0174.
(Thereupon, Johnston Deposition Exhibit Number 26 was marked for identification.)
MR. KUIPER: Counsel, just to clarify, some of these documents you probably already received, but what you're representing is these particular copies are the ones that were produced the night before the original --
MR. THOMPSON: Yes, sir.
MR. KUIPER: So even though you had many of these or all of these, just these particular copies is what --
MR. THOMPSON: Exactly, and that's reflected in the Bates number methodology that we see at the bottom of the page. I believe that these