UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, March 31, 2006

Deposition of ELAINE TAMA, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:40 a.m., Friday, March 31, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 14

clients?
MR. THOMPSON: Mr. Levitt, she has counsel with Ms. Doherty, so --
MS. DOHERTY: I understand the clarification he's asking for. He asked was it standard operation for clients to prepare -- the question was, was it standard operating procedure for you to do this for your clients or was it standard operating procedure for your clients to do the returns.
MR. THOMPSON: I appreciate that. I think one objector is enough.
BY MR. THOMPSON:
Q. The question is, was it standard operating procedure of your accounting firm to prepare tax returns to minimize tax liabilities for the clients consistent with the Internal Revenue Code, IRS regulations and any other guidance the IRS provided?
A. Yes.
Q. And did you do any corporate tax returns?
A. Yes.
Q. Did any of your clients have books for financial reporting purposes and then separate books for tax purposes? This would be a question not just for this job, but in any of your jobs.

Page 15

A. Well, you would convert the general ledger financial reports to the tax basis.
Q. Okay. And is that a common feature of accounting, that sometimes there are adjustments that are made from the general ledger or the financial statements to do tax returns?
A. Yes.
Q. All right. Now, how long were you with this company?
A. About a year.
Q. And what was next?
A. Then I came to FDIC.
Q. Excellent. What year was that?
A. 1989.
Q. All right, and what were your responsibilities?
A. I was an accountant at the FDIC.
Q. And what did that entail?
A. Many different diverse accounting activities and work.
Q. Well, let's -- I want to know about your background as much as possible. Did you stay with the FDIC until 2005?
A. Yes.
Q. And when in 2005 did you leave?

Page 16

A. July 2005.
Q. And you're now at NASA?
A. Yes.
Q. Are you an accountant there?
A. I'm an auditor.
Q. And what do you audit?
A. NASA financial statements.
Q. Okay. Let's go back to the FDIC. And so you came in 1989 as an accountant and what were your responsibilities while you were at the FDIC? And to the extent they changed over time, if you could flesh that out, I'd appreciate it.
A. Well, I first was in the financial assistance division.
Q. And what were your responsibilities there -- strike that.
What does the financial assistance division do?
A. It was responsible for the assistance agreements of FSLIC.
Q. When you say responsible for them, was it negotiating the agreements or implementing the agreements, what?
A. Implementing the agreements.
Q. Okay. And was that something that you

Page 17

worked on?
A. I worked on the accounting payments under the assistance agreements.
Q. And so this would be -- yield maintenance agreements, for example?
A. Yes.
Q. And did you have any involvement in tax sharing issues?
A. Very limited involvement.
Q. And how long approximately did you stay in the financial assistance group?
A. Approximately three years.
Q. And then what was -- where were you assigned next?
A. The financial reporting group.
Q. And what were the responsibilities of the financial reporting group?
A. The financial reporting group prepares the financial statements for FDIC and other financial reports.
Q. So financial statements for FDIC, what would that involve? In other words, are you talking about institutions that are in receivership or are you talking about the agency's own financial statements?

Page 82

the first day of receivership from which interest runs the day of the pass through receivership or is it the day of the final receivership, if you know?
A. It is the day of the final receivership.
Q. Is that because that's the day the funds are lent for the branch sales and whatever other closing costs there are?
A. It is because that's what legal told us.
MR. THOMPSON: At this point, I'd like to ask the court reporter to mark as Tama 21, a document that bears the Bates number AM 0010350.
(Tama Exhibit No. 21 was Marked for identification.)
BY MR. THOMPSON:
Q. So this is a chart that's entitled post-insolvency interest distribution priorities and interest rates; is that right?
A. That's right.
Q. And it says, "federal judgment rate under post-insolvency interest rate for the row," that's through one, national banks, do you see that?
A. Yes.
Q. And then continue, the fifth row, it says, "national banks and federal savings institutions," and again under the rate column it says federal

Page 83

judgment rate; is that right?
A. That's right.
Q. And it has a little asterisk and there are several asterisks, but -- well, is the key date the failure date of the national -- the date of the enactment of the National Depositor Preference Statute?
MS. DOHERTY: Would you read that back?
MR. THOMPSON: Let me ask it -- that was a little confused.
BY MR. THOMPSON:
Q. Under the failure date column, which is the second column there, a series of dates, do you see that?
A. (The witness nodded.)
Q. And it says for the row national banks and federal savings associations, it says after August 10th, '93, do you see that?
A. Yes.
Q. Was that the date of the National Depositor Preference Statute?
A. Yes.
Q. And for purposes of making the post-insolvency interest calculations, did you view the National Depositor Preference Statute as

Page 84

governing those calculations?
A. If it was in the statute.
Q. Do you recall -- did you have any involvement in the actual calculation of Carteret's post-insolvency interest?
A. I don't recall specifically.
Q. And do you recall whether there came a time where the FDIC changed its methodology in terms of how it calculated Carteret's post-insolvency interest?
A. No, I don't recall that.
Q. At this point, I'd like to ask the court reporter to mark as Tama 22, a document that bears the Bates number AM 0010134?
(Tama Exhibit No. 22 was Marked for identification.)
BY MR. THOMPSON:
Q. Now, this is a document dated May 1st, 2002; is that right?
A. That's right.
Q. And the subject is final regulation regarding payment of post-insolvency interest and receivership through surplus funds; is that right?
A. That's right.
Q. And were you involved in the formulation

Page 85

of this regulation, the discussion that led up to its proposal to the board?
A. Yes.
Q. And it says, turning to page 3 of the document, "The final rule further provides for the post-insolvency interest rate for all FDIC administered receiverships to be based on the coupon equivalent yield of the average discount rate set on the 3-month Treasury bill. The 3-month Treasury bill is widely recognized as a performance benchmark for cash investment management, and its yield has historically tracked to some degree changes in the rate of inflation. The post-insolvency interest rate will be adjusted in order to mitigate interest rate risk due to changes in economic conditions during the life of the receivership. Post-insolvency interest distributions will be calculated using a simple interest method, which should provide a reasonable amount of interest to compensate receivership creditors for the time value of money from the time the receivership is established until dividend payments are received."
Do you agree with the last sentence of the paragraph which I just read, the way in which post-insolvency interest was calculated under the

Page 86

final regulation provided receivership creditors with a reasonable amount of interest to compensate them for the time value of money?
A. Yes, I do.
Q. At this point, I'd like to ask the court reporter to mark as Tama 23, a document that bears the Bates number AM 0010231?
(Tama Exhibit No. 23 was Marked for identification.)
BY MR. THOMPSON:
Q. And so this is an E-mail from yourself to Wayne Green and others dated June 11, 2001; is that right?
A. That's right.
Q. It says, "treat the calculation of PII exactly as FDIC currently treats interest on over or underpayment of assessments. This is proposed because it reduces our administrative burden, risk of error and provides consistency within the FDIC." Do you see that?
A. Yes.
Q. And what was an assessment when you made reference to interest on over or underpayment of assessments, what's an assessment?
A. The assessment of fees that FDIC charges

Page 87

its banks.
Q. Okay. And that's for solvent ongoing banks?
A. That's right.
Q. This is not their assessments to entities in receivership, are they?
A. No.
Q. And so that was the point of consistency that you were making in the second sentence, that there would be consistency between the methodology of the proposed reg and the way in which interest was treated on assessments?
A. The consistency issue was more internal to FDIC.
Q. Okay. Yes, but was the consistency that you were pointing to relating to the treatment of interest on assessments by FDIC?
A. What was your question again?
Q. What I'm really getting at, Ms. Tama, is whether there was some other way in which the FDIC applied an interest calculation in addition to assessments. You testified about how they treated assessments and I understand it was post reg, I just didn't know if there was some other way the FDIC would make interest calculations that you had in mind

Page 88

when you wrote about consistency?
A. Well, we had -- there were some other ways of calculating interest at FDIC used.
Q. Okay. And were those ways that you were concerned that you wanted to have consistency with?
A. Well, this really was not my -- my opinion.
MR. THOMPSON: That's fine. Why don't we -- if there are no objections, break for lunch.
MS. DOHERTY: No, that's fine.
(Whereupon, at 12:27 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:30 p.m., this same day.)

Page 89

AFTERNOON SESSION
(1:28 p.m.)
Whereupon,
ELAINE TAMA,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (RESUMED)
BY MR. THOMPSON:
Q. Welcome back.
A. Thank you.
Q. Let's see, I'd like to ask the court reporter to mark as Tama Exhibit 24, a document that bears the Bates number AM 0011404?
(Tama Exhibit No. 24 was Marked for identification.)
BY MR. THOMPSON:
Q. And this is a statement of position of the FDIC, dated March 22, the 1994; do you see that?
A. Yes.
Q. It says, "recognition of receivership tax refund for related tax issues," is that right?
A. That's right.
Q. And then if you turn to the second page of this document, it says under background, "The current

Page 110

reduced our tax exposure and maybe more importantly our litigation exposure. In this case, the subrogated claim was nearly $1 billion and it closed very early in 1995. Had we accrued PII, the tax liability would have been approximately 9 million instead of 32 million. This 32 million has now grown to over 76 million with penalties and interest."
Is Mr. Johnston's analysis accurate in your opinion?
A. In my opinion it is.
Q. In the next paragraph, it says, "while in Dallas we found a few other examples of PII accruals that from the beginning could have reduced the tax liability, Santa Barbara was one." Do you know what any of the other institutions were that fell into that category, can you recall?
A. Well, I'm not sure, but I -- I'm not sure, but I think one of them was Meritor.
Q. Do you know if Ben Franklin was another?
A. Oh, I would -- not Meritor, Ben Franklin.
Q. Okay. Then Mr. Johnston goes on in the next sentence to state, "It should be noted that the IRS agrees that this is a valid tax deduction available from the date of closing." Do you have any reason to doubt the validity of this statement?

Page 111

A. I recall there was a little disagreement about that statement.
Q. What do you recall about that?
A. I -- I recall that Johnnie as well did not agree with that statement.
Q. Do you know what the basis for disagreement with that statement was?
A. I don't recall her basis except she just thought it wasn't correct.
Q. Do you have an opinion on this subject as to whether Mr. Johnston's statement is accurate?
A. Well, from my recollection with these discussions about this, my opinion is that it was something worth pursuing.
Q. To see if the IRS would allow the deductions at the date of closing; is that right?
A. That's right.
Q. Do you know if there was any follow up on this issue?
A. Well, there was following up in that a decision was made.
Q. And what was the decision?
A. Well, my recollection is the decision was that we would not do that.
Q. Do you recall who made that decision?

Page 112

Strike that.
So the record is clear, when you say, so we would not do that, do you mean approach the IRS about being allowed to take the deductions from the date of closing, is that what you meant?
A. Yes.
Q. So who made that decision?
A. I don't recall specifically who made the decision, but someone higher than me.
Q. Do you recall who was involved in the discussions that lead to that decision?
A. Johnnie Wells and Wayne Green and I think Rick Cywinski and Jim Vordtriede. I -- that's all I can think of right now.
Q. And do you know why the decision was made not to pursue this with the IRS?
A. No, I don't.
Q. At this point, I'd like to ask the court reporter to mark as Tama 31, a document that bears the Bates number AM 0010608.
(Tama Exhibit No. 31 was Marked for identification.)
BY MR. THOMPSON:
Q. I'd like to direct your attention, Ms. Tama -- first of all, let me ask you to identify this

Page 113

document. Is this a memo from Jim Vordtriede to yourself, dated March 16th, 2004?
A. Yes, it is.
Q. And under 3 it says -- actually, the lead in to all these numbered items is, "Elaine, in answer to your questions." And third question reads, "post-insolvency interest. Do you agree with the proposal to deduct this as an expense on an accrual basis from year 1 on the receivership forward. Do you agree with using the PII deduction to generate tax refunds? What if the institution never pays any PII?"
And Mr. Vordtriede -- "Wayne Green was asking this question recently, it is a good one and we probably ought to ask Rick Cywinski what he thinks, too. The way I see it, we ought to deduct PII from inception as if it will be paid. If the receivership never pays PII, there will be a large reversal in the final years of the FIN, which will generate a tax liability, probably AMT, but the fact that the PII wasn't paid will mean the receivership remains insolvent and thus any federal income tax generated will remain deferred."
Did that strike you as a reasonable approach from a tax perspective what Mr. Vordtriede

outlined here?
A. Yes, it did.
Q. Tama 32 does not have a Bates number, maybe I will just -- this is one that was produced I think in December or January of this year, I will hand write on --
MR. GILBERT: Just describe the document.
MR. THOMPSON: Okay.
MR. GILBERT: E-mail dated so-and-so.
MR. THOMPSON: Fine, that's what we'll do.
BY MR. THOMPSON:
Q. This is an E-mail from yourself to Mr. Green and others, that's -- for completeness sake I should put this in -- Robert Ferrer, Sharon Kelley, Vanessa Hester, cc to Johnnie Wells, Rick Cywinski and Steve Johnston, it is dated Monday, June 16th, 2003?
(Tama Exhibit No. 32 was Marked for identification.)
BY MR. THOMPSON:
Q. Was the debate surrounding the deductibility of PII from year one, did it center around whether the IRS would allow this deduction from one closing or did it center around whether the IRS should be approached on this subject?



MS. DOHERTY: Or something else.
MR. THOMPSON: Or something else.
THE WITNESS: It centered around whether the IRS would allow it.
BY MR. THOMPSON:
Q. But a decision was made not to approach the IRS?
A. That's correct.
Q. Now, turning to Tama 32, this is an E-mail from yourself dated June 16th, 2003; is that right?
A. That's right.
Q. And it says, "below is a short summary of the issues discussed at today's meeting. One, the calculation of PII is automatic now and there are only about two FINS which DPS cannot calculate, Carteret and Meritor."
What does DPS stand for?
A. Dividend Payment System.
Q. Do you know why the DPS could not calculate Carteret's PII automatically?
A. I don't recall at this point. I -- probably because it was different.
Q. Because it was different you said?
A. Yes.
Q. In what way different?



A. I don't -- I don't remember right now.
Q. "Two, agreed: Option 1, calculate PII for every receivership beginning on day number 1, which will be booked in a memo statistical account, the amount of which would be disclosed on the financial statement such as 'Reasonably possible litigation.' This means: Move to recognized liability when payment becomes probable, tax would know the amount of PII to put on the tax return." Do you see that?
A. Yes.
Q. And what had been agreed here?
MS. DOHERTY: Excuse me, the memo says what was agreed. Are you asking for her understanding of what that meant?
MR. THOMPSON: Yeah, since you wrote it.
THE WITNESS: Yes, we would calculate PII on every receivership and treat it as a disclosure on financials.
MR. THOMPSON: Starting from day 1.
THE WITNESS: Day 1 means calculate the PII starting on day 1 of the receivership.
MR. THOMPSON: Right.
BY MR. THOMPSON:
Q. It says, Roman III, "when to book the liability, how to book it. Option, book when paying



95 percent in dividends current practice, down side of this approach, receivership gets a hit of huge amount of interest when you wait until the point where it has paid 95 percent in dividends," do you see that?
A. Yes.
Q. Was this a down side that you wanted to avoid?
A. Yes.
Q. Was that a common objective at the FDIC to avoid this down side?
A. No.
Q. Who at the FDIC had a different approach, did Wayne Green have a different view of this than you?
A. Well, I -- what I recall is that Wayne Green agreed with waiting -- waiting to book the interest.
Q. Okay. And do you know about any of these other individuals, where they came in on this issue -- strike that.
Do you know why Mr. Green wanted to wait to book the interest?
A. He felt that there were so many receiverships that were never paid, it was quite a

Page 118

burden, an administrative burden.
Q. Fair enough. Do you know where the other individuals to whom you addressed this E-mail stood on this issue?
A. Well, I recall that Rick and Steve were in favor of calculating it.
Q. To minimize the tax to liability for the receiverships?
A. I -- I'm not -- I don't know if that date that's what they were thinking, maybe it's the same date, but they were also thinking, to know the number and get it on there.
Q. Okay. Which would have -- okay.
Do you recall what the other individuals, what their position was on this?
A. No, I don't.
Q. And seeing this memo, does this refresh your recollection as to whether this was Mr. Green's decision to make?
A. No, this would not be Mr. Green's decision to make.
Q. Do you recall whose decision it would have been after seeing all these names?
A. I don't know whose decision it was.
Q. Was there anyone on this E-mail more

Page 119

senior than Mr. Green?
A. Johnnie Wells was his supervisor.
Q. And is Ms. Wells still with the FDIC?
A. I don't know.
Q. I'm always reluctant to say this, but I have no further questions. But you know our friends at the DOJ may have some questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. LEVITT:
Q. I want to show you a document that we'll mark as Tama 33.
(Tama Exhibit No. 33 was Marked for identification.)
BY MR. LEVITT:
Q. This is an E-mail from Michael Caco to a number of people, Karen Hughes, Dennis Nolan, John Quinn, Martin Becker, James Anderson with cc's to other people including you; do you see that?
A. Yes.
Q. And it's dated August 22nd, 1997; is that right?
A. That's right.
Q. The first paragraph says, "there was a meeting on August 22nd to discuss outstanding issues respective to post-insolvency interest. The issues

Page 120

discussed, the GROUP's consensus concerning each of the following." The first one says, "should the post-insolvency interest calculation compound the interest after the principal claim is paid." What does that mean?
A. I -- that's not clear to me.
Q. Does it -- is an interpretation that once the principal is paid, there's no principal left to continue to charge interest on, therefore interest should not be assessed against the interest that had previously been assessed?
A. Oh, yes, but the problem is the word compound, but if the word were calculate, yes, that's what it would mean.
Q. And the answer is no, because it makes the calculation more conservative; do you see that?
A. Yes.
Q. And it explains what it means by that, that "the total amount of post-insolvency interest accumulated, and the corporation would generally receive less than if compounding were to continue, which is in line with FDIC's past and present conservative policy concerning its approach towards the handling of the corporate claim." Do you see that?

Page 121

A. Yes.
Q. Do you agree with that?
MS. DOHERTY: Well, agree with what? Every portion of that statement? There are a lot of propositions embodied there.
BY MR. LEVITT:
Q. Do you agree hat FDIC had a conservative policy in its approach to handling the corporate claim?
A. No, I don't.
Q. And why not?
A. I don't understand what he means.
Q. And that's the basis for your answer is you don't understand what he means.
If he means that the corporation had a policy that didn't enhance the amount it was due in receivership, would you agree with that?
A. Could you repeat that?
THE REPORTER: "Question: If he means that the corporation had a policy that didn't enhance the amount it was due in receivership, would you agree with that?"
MS. DOHERTY: Agree with the policy or agree that the policy was conservative or what?
THE WITNESS: I don't agree the

Page 122

calculation is based on principal amount of the claim which -- once it's paid, it's gone.
BY MR. LEVITT:
Q. And therefore, no more interest should be charged?
A. Yes.
Q. And that's what this memo is suggesting?
A. Yes.
Q. And you agree with that, with the suggestion in the memo?
A. I don't agree with the wording here.
Q. Well, how about the concept of when the principal's gone, interest should stop accreting?
A. I agree with that.
Q. Now, as I understand your testimony this morning and this afternoon, it is that the -- that until 95 percent of the principal claim is paid, the financial statement would not show post-insolvency interest; is that right?
A. That's right.
Q. And we just looked at a couple of memos that show a down side to that as it relates to the calculation of taxes; is that correct?
A. That's correct.
Q. All right. Do you recall -- do you recall

Page 123

why the policy has been and was that the financial statement not show the post-insolvency interest until 90 percent of the claim was paid?
A. Yeah, I -- I recall the reasoning was twofold, that most receiverships would not -- would never pay and it would be an administrative burden to calculate this interest on all receiverships when most of them would never pay the interest.
Q. And were there any other reasons you recall?
A. No.
Q. Isn't it true it's -- that if it's unlikely a receivership would ever pay the post-insolvency interest under liquidation accounting, it would not be an expense that should be recorded on a financial statement?
A. Can you repeat that?
Q. Isn't it true that if -- it's unlikely a receivership would pay post-insolvency interest under liquidation accounting, that potential liability should not be booked on the financial statement?
A. Yes.
Q. Now, I take it the issue reflected in the memos we just looked at was that if the post-insolvency interest is booked, let's say in --

Page 124

let's say in the fifth year of the receivership, wasn't -- but wasn't booked earlier as accrued, that the tax return for the earlier year would not show that post-insolvency interest as a deduction in terms of the calculation of the tax; is that right?
A. Not necessarily.
Q. Not necessarily because even if the post-insolvency interest is not booked on the financial statement, the tax preparer still could use it as a deduction in the year that it accrued?
A. I think so.
Q. Do you know if that happened at the FDIC?
A. No, I don't know.
Q. We looked at a memo that talked about calculating the post-insolvency interest, even before the principal claim was 95 -- even before the principal claims were 95 percent paid, so that the post-insolvency interest was not recorded on the financial statement. Isn't it a fact that calculations were done that showed what the post-insolvency interest was?
A. Not that I recall.
Q. You don't recall that?
A. I don't recall them doing that.
Q. All right. When you calculate post --

Page 125

take the year prior -- take the year you left the FDIC, which I recall you testifying was what, 2004 --
A. '5.
Q. '5.
A. Um-hum.
Q. Post-insolvency interest is simply a mechanical mathematical calculation done by a computer, isn't it?
A. Yes.
Q. So if the inputs were clear, namely the date you should start the computation, the rate and the principal balance, it is very unlikely there are going to be errors, isn't that right?
A. It's always possible that there will be errors.
Q. But if there is a computer program that is designed to make the calculation, and it has the inputs such as the date the accrual or the computation starts, plus the rate, plus the principal balance, there aren't going to be mathematical -- it is unlikely there will be computational errors, isn't that true?
A. There wouldn't be computational errors, but the principal balance may change.
Q. In which event, to get an accurate number