UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------------x
AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.
---------------------------------------x
600 Fifth Avenue
New York, New York
March 31, 2006
9:35 a.m.

Deposition of MICHAEL SARAN, pursuant to Notice, before Sophie Nolan, a Notary Public of the State of New York.

Page 6

MICHAEL SARAN, called as a witness, having been first duly sworn, was examined and testified as follows:
EXAMINATION BY
MR. COLATRIANO:
Q. Good morning, Mr. Saran.
A. Good morning.
Q. My name is Vincent Colatriano. I'm with the law firm of Cooper & Kirk and we represent the private Plaintiffs in this matter.
MR. COLATRIANO: Can counsel please identify themselves for the record?
MR. KUIPER: Gary Kuiper from FDIC representing the witness, Mr. Saran.
MS. HART: I'm Melinda Hart with the Department of Justice representing the United States.
Q. Mr. Saran, have you ever been deposed before?
A. No.
Q. You are an attorney; correct?
A. Yes.
Q. Just a couple of basic groundrules here, if you need to take a break at any time,

Page 7

please let me know, I'd be happy to take a break whenever you'd like. I'll try to take periodic breaks anyway, but if you need to take a break, let me know.
My only request is if a question is pending when you want to take a break, I'd appreciate if you'd answer the question before we'd take a break. If you need me to rephrase or clarify a question at any point, please let me know. I'll be glad to attempt to, so just let me know if you don't understand a question.
Is that acceptable to you?
A. Yes.
Q. Where are you currently employed?
A. Federal Deposit Insurance Corporation, New York regional office.
Q. And what is your position there?
A. I'm a senior attorney.
Q. What, if anything, have you done to prepare for this deposition?
A. I spoke to my counsel, Andrew Gilbert. He provided a copy of an e-mail that I had written, and that's about it.
Q. Did you have a discussion with anyone else about the deposition or about

Page 8

Ambase or Carteret?
A. No.
Q. Did you review any other documents other than the e-mail you just mentioned?
A. There was one other memo that was provided yesterday about 4 o'clock. I think I reference it in my e-mail. It's referred to or I refer to it in an e-mail as a policy memo. I think one of the authors is Tom Rose, I think.
Q. Could you briefly describe for me your educational background, college degrees, post-graduate degrees?
A. Sure. I graduated from Tulane University in New Orleans. Do you want the dates as well?
Q. Approximate.
A. 1974, I believe it was, with a BA. I graduated from Rutgers Graduate School of Business in -- I think it was 1975. That is a in Newark, and I graduated and attended from Seton Hall Law School 1980.
Q. You mentioned you're an attorney. Do you hold any other professional certifications?
A. No.

Page 9

Q. Okay. Can you briefly summarize for me your professional career and let's begin when you graduated from Seton Hall Law School? Just give me in chronological order your places of employment?
A. I worked for an accounting firm. It was called Price Waterhouse at that time. I left Price Waterhouse early 1980s. I don't recall the exact date. I became a senior tax advisor with another accounting firm by the name of Coopers & Lybrand.
I joined a law firm as an associate in or about 1985. The law firm's name at that time was Starr, Weinberg & Fradkin in Roseland, New Jersey.
I left Starr, Weinberg & Fradkin and joined the Resolution Trust Corporation in, I believe April of 1991, and -- do you want me to go through the offices I've been with the RTC and the FDIC?
Q. Yes, actually I do.
A. I joined the Resolution Trust Corporation, RTC, in Somerset New Jersey which was the metropolitan field office in 1991. I was at that location until that office was

Page 10

closed in -- in I'll say 1993. I don't recall the exact date, and I transferred to the Resolution Trust Corporation regional office or field office. I don't recall exactly what it was called, in Valley Forge, Pennsylvania.

That office, the RTC Valley Forge office, closed in December of 19 -- either in or 1995, I don't recall what year, and transferred to the Hartford office of the FDIC.

In 1995, December, I believe, the Resolution Trust Corporation was merged or became part of the Federal Deposit Insurance Corporation and I transferred to the Hartford office of the Federal Deposit Corporation in January of -- I think it was 1996. I don't recall specifically. It was January of 1995 or January of 1996.

I was with the Hartford office of the FDIC until June of 2001 -- excuse me, that was June of 2000 at which time I transferred to the New York regional office of the FDIC and I've been with the New York regional office of the FDIC since that time.

Q. Okay. Thank you very much. You mentioned that you were a tax advisor at

Page 11

Coopers & Lybrand?

A. Yes.

Q. Did you also do tax work at Price Waterhouse?

A. Yes.

Q. Did you specialize at either institution with respect to a certain industry, like financial institutions, banks?

A. No.

Q. What area of the law did you practice in at the law firm, Starr --

A. Starr, Weinberg & Fradkin. It was a small firm and our practice was involved in real estate, tax planning, estate planning.

Q. Focusing for a minute on your RTC work, you summarized where you were physically Somerset, New Jersey and Valley Forge. Then I wasn't sure if you said you transferred to the Hartford office of the RTC or whether that was the FDIC when you went to the Hartford --

A. It was the FDIC. The RTC -- the best I can recall, I -- the Resolution Trust Corporation, RTC, was merged. I don't know -- I believe by operation of law or by statute of Congress, the RTC was merged into the FDIC in

Page 12

or about -- I want to say December of 1995.

Q. And that's when you went to Hartford?

A. That is correct.

Q. Focusing for a second on the RTC, Somerset and Valley Forge, can you summarize what your -- can you tell me what your job titles were and what your responsibilities were and how they changed, if at all?

A. Okay. I was hired as, I believe a staff attorney and there was not, to my recollection, any specific -- my responsibilities involved providing guidance counsel, legal services, to our client with respect to failed financial institutions.

I believe it was in about 1991, and those responsibilities remained fairly the same until I transferred in about 19 -- I think it was 1993 to Valley Forge, when it became -- the RTC became somewhat more organized or I should say structured in terms of I became part of a department which I believe was referred to as receivership operations in '93, I think that was.

And I basically, in that capacity,

Page 13

continued to provide legal services with respect to failed financial institutions, the operations of those institutions.

Q. How did it work? Were you assigned particular institutions to be put into conservatorships or did you have a plate of conservatorships that were your responsibility or receiverships or was it more ad hoc than that?

A. It would be assigned by a section chief based on, I guess, time commitments or availability. There was no specialization. There was no -- I was not assigned certain receiverships to my recollection.

In certain instances it was assigned upon, based -- if I can recall correctly, it was based on geographics. I mean, I lived in New Jersey until I was transferred to Pennsylvania, but a lot of the receiverships I worked on were in New Jersey.

I believe, if I recall correctly, New Jersey had, I think, 30 plus odd failed institutions so there was more than enough work in New Jersey that I would work on. So, there was not one particular institution or a pool.

Page 14

It would be just based on whoever was available in the group.
Q. As we get into some documents, you'll see that you're on a number of documents as an attorney working on matters involving Carteret, the conservatorship and the receivership for Carteret Savings Bank.
In connection with your work on Carteret, to whom did you report?
A. My immediate supervisor would have been, to my recollection, an individual by the name of Tony Pagano. To my recollection, that was the only individual. He was the section chief in my group and he was my supervisor.
Q. And would it be fair to say that your assignments with respect to matters involving Carteret would come from Mr. Pagano or could you also get them from, say, the managing agent of Carteret?
A. I would say a lot would come from the managing agent.
Q. To whom did you report when you transferred to the Valley Forge office? Was it still Mr. Pagano?
A. It was.

Page 15

Q. Now, focusing on your time period on your work at the FDIC, let's just say beginning '96 to -- and I understand you don't have a precise recollection of that timeframe, but focusing on your period with the FDIC, can you describe what your positions were and what your responsibilities were and how they've changed, if at all, over the years?
A. From when I transferred from the RTC to the FDIC?
Q. Yes.
A. I believe it was January of '96. It may have been January of '95, but let's for purposes of this discussion let's just assume it was January of '96 when I transferred to Hartford. My -- I don't specifically recall who my immediate supervisor was. I believe it was an individual by the name of Carol Laakso, but I'm not certain.
I don't recall if Tony Pagano came to Hartford. I don't really recall who my immediate -- I believe it was Carol Laakso and I was assigned to the receivership operation. I believe it was referred to as the receivership operation section and would be

Page 16

assigned work based upon availability. I believe the department or section, the receivership operation, corporate affairs.
It's changed names from '96 one or two times. It was either receivership operations or corporate affairs. I don't recall which one it was, dealt with the receivership operation issues and that could have been any -- as opposed to the other areas where litigation, which I was not involved in, I believe there are two sections of litigators or individuals at the FDIC who handled litigation involving receiverships.
There was a group called asset disposition which involved sales of assets. There was, I believe, a bankruptcy group, and there was receivership operations. So, in terms of receivership operations, I would handle matters that came in generally to my supervisor, my section chief, and they would be assigned to me and I would do that work.
Q. And this discussion, were you referring just to your work in Hartford or does that apply to your work --
A. That was really just Hartford.

Page 17

That was through June of, I think, 2000. When I transferred to New York, I changed or transferred to a new division.
In January -- in June of 2000, I went from what was previously or was currently known as the liquidation division to a division of supervision and consumer protection, and I deal, since June of 2000, my responsibilities are with respect to supervision issues involving open banks as opposed to failed institutions.
So, my responsibilities have changed significantly and the type of work I do has changed significantly.
Q. Focusing on the period in Hartford then, since that was the period focusing on failed institutions, did you specialize in thrift receiverships or bank receiverships or both or --
A. I don't recall -- I just did whatever was assigned to me and I don't recall if it was a thrift or a bank or --
Q. Okay. With respect to your work in Hartford, I think you said that you believe your initial supervisor was Carol Laakso?

Page 18

A. Laakso.
Q. Did that change over time, again focusing on Hartford?
A. It did. Carol, I believe, transferred out of the closed bank group to the supervision open bank, the division of supervision and consumer protection, and I don't know when that -- I don't recall when, but initially, to my recollection, Carol was my supervisor for most of my time in Hartford or at some point she did leave, she transferred out and I believe she was replaced by, I want to say Tom Hewitt.
There were two other individuals that come to mind and I don't know and I don't recall the sequencing, the timing. After Carol Laakso left, another individual by the name of Mary Williams was my supervisor. I know Mary came after Carol and I think after Mary Williams transferred, I believe Mary ultimately received another position and transferred out of Hartford, that an individual by the name of Tom Hewitt became my supervisor. Those are the only individuals that I recall. There may have been others, but those are the three that stick

Page 19

in my mind.
Q. At the outset of the deposition this morning you mentioned that you've not -- you've never been deposed before; correct?
A. That is correct.
Q. Have you given any other testimony in any other form regarding financial institution issues or regarding your work at the FDIC or the RTC such as at a trial or a hearing or before a legislative panel?
A. No.
Q. Have you ever prepared an expert report or affidavit regarding financial institutions issues or your work for either the RTC for the FDIC?
A. Not that I recall.
Q. With respect to either your work at the RTC or your work at the FDIC, what role if any did you play in developing any policies regarding the administration of conservatorships or receiverships?
A. To my recollection, none.
Q. Did you play any role at either agency regarding the development of policies for the marketing or liquidation of

Page 20

receivership or conservatorship assets?
A. No.
Q. Did you play any role at either agency with respect to developing policy concerning the determination or analysis of claims against the conservatorship or the receivership?
A. Not that I recall.
Q. Did you -- at either agency, did you play any role in developing policies regarding tax issues concerning conservatorships or receiverships?
A. Not that I recall.
Q. I had asked you if you played any role with respect to developing policy regarding the determination of claims.
Was it part of your role at the FDIC or the RTC to work on matters involving particular claims against the conservatorship or the receivership?
A. Yes.
Q. And what was your role there?
A. As a senior attorney, I would be assigned claims that had been filed by third parties against failed institutions, and I

Page 21

would analyze the claim and make a recommendation as to allowing or denying the claim.
Q. And how did that claims process work? Who ultimately decide whether a claim would be allowed or disallowed?
A. Well, my recommendation would go to the claims department and I don't really know. I can speculate. I -- there was a claims department on the business side. I was in the legal division as opposed to the business department, the business side of it, and I would make a recommendation to the claims department, generally the head of the -- not manager. I guess you'd call him --
I do not recall what his title was, but there was a claims administrator, for lack of a better term. I do not recall what the individual's title was, but he was in the claims department on the business side and they would make a determination ultimately, I assume. I don't know what they did with my opinion or my recommendation. I'm assuming they did something with it.
Q. And how, generally, did the process

Page 22

work from your perspective? What would you analyze when you got a claim or what was the process, was there a hearing? Was it just a paper claim or paperwork submitted and you decided on the basis of that?
A. My recollection is that there was a process, and I don't recall the process, whereby a third-party would file a claim, a proof of claim, which was to be supported by documentation.
That claim would then be generally sent. I don't know if all the claims were sent. I don't recall the process of how. I just know that I would be assigned claims that had been filed. Whether or not it constituted all the claims, I don't recall, but the claims I worked on would generally be assigned to me and would be from the claims department on the business side and I would review those claims that had been filed to determine if indeed there was a basis for allowing or denying the claim based on the facts submitted. That's to the best of my recollection the process.
Q. Okay. So, it was done on sort of the paperwork of the claims. There wasn't,

Page 23

like, a formal type of hearing or anything like that?
A. There -- I was never involved in any hearings. I don't recall if there was a process for a hearing.
Q. Okay. And in discussing this claims process, you've made reference a couple of times to claims by third parties.
Would third parties include other government agencies or was there a different process for that, for claims by different government agencies?
A. I don't recall. I don't recall working on any claims by -- when you say -- could you clarify or rephrase -- restate your question?
Q. Well, you had mentioned the claims process for claims by third-parties and I was wondering if the process was any different if, for example, you're working at the RTC if the FDIC made a claim against the institution or the conservatorship or the receivership.
A. I don't recall seeing any claims by other federal agencies. I recall -- I believe I may have responded to a claim from a

Page 24

municipality for taxes, but -- but when I refer to third-parties, I mean those other than federal agencies or other -- you know, other government entities that may have a claim. I don't recall ever working on claims involving any other potential Internal Revenue Service or claims.
Q. Okay. And I've seen reference in documents to something called a corporate proof of claim. Do you know what that is?
A. I do not know.
Q. Okay. Would you work on claims that were submitted by the RTC in its corporate capacity, such as a subrogated claim against a receivership estate?
A. That, I don't recall.
Q. What role, if any, did you play in the initial seizure of Carteret Savings Bank?
A. I assume that you're referring to the appointment of the receiver?
Q. That's right.
A. I was on the closing team, I believe, among six or seven other attorneys, I believe, part of the closing team.
Q. And what was your -- what were your

Page 25

responsibilities as part of the closing team? Do you recall?
A. I do not recall what -- I remember attending the closing and that's about it.
Q. Okay.
MR. COLATRIANO: I'm going to have this document marked as Exhibit 1, please.
(Saran Exhibit 1, document Bates stamped C-AM-A-0125374 through C-AM-A-0125409, marked for identification.)
MR. COLATRIANO: Exhibit 1 is a document entitled, "Purchase and Assumption Agreement between RTC in its Capacity as a Receiver of Carteret Savings Bank and RTC in its Capacity as Conservator for Carteret Federal Savings Bank" dated December 4, 1992.
It's Bates stamped at the bottom of the page C-AM-A-0125374 through and including 409.
Q. My main purpose in giving you this document is to give you a sense of the timeframe we're talking about here. December

Page 26

of 1992 is when, to my understanding, a receiver was initially appointed for Carteret Savings Bank.
Was this part of the closing that you were referring to, this purchase and assumption agreement, or were you referring to something else?
A. I believe it was.
Q. Okay. And at the bottom left-hand corner of the first page, there's a block for the RTC and it has, "Attention legal" with your name on it.
What role, if any, did you play in preparing this document? Do you recall?
A. I do not recall.
Q. Okay.
MR. KUIPER: Counsel, do you know what's crossed out there?
MR. COLATRIANO: It was crossed out on our copy, but I think if you look to the last page, it has the same legend and it says, "Record and return to."
MR. KUIPER: Thank you.
MR. COLATRIANO: I didn't know whether this was a legend that was put on

Page 27

here afterwards or whether this indicates that you were working on this agreement at the time it was prepared.
Q. Do you know, Mr. Saran?
A. To the best of my recollection, I did not prepare the document. The notation on the last page "Record and return to" refers to the fact that the document, to the best of my recollection, was recorded in the Morris County clerk's office on December 7, 1992.
Q. Do you know why it was recorded in the Morris county clerk's office?
A. To the best of my recollection, Carteret Savings Bank's charter was located, I believe, in Morristown, New Jersey, which is in Morris County, New Jersey. I believe or my recollection is it was recorded in the county where the institution was headquartered as a document to indicate or put on notice third-parties that the receiver had been appointed.
Q. Okay. If you look at the -- a few pages in, a page Bates stamped 378 are the last three numbers.
A. Okay, yes.

Page 28

Q. There's some recitals there. The first one is "Whereas, Carteret Savings Bank has been closed by the Office of Thrift Supervision" and the second one is, "Whereas, the OTS has appointed the RTC as receiver for the failed association."
Do you see that?
A. Yes, I do.
Q. Okay. I just want to make -- does this comport with your recollection that this is the approximate timeframe when the RTC was appointed as receiver for Carteret, December of 1992?
A. Yes.
Q. Do you know at what point the RTC stopped being appointed as receiver for institutions that were not already in conservatorship?
A. No, I do not.
Q. Okay. But at some point, I take it, the RTC was dissolved or folded into the FDIC and at that point, certainly no later than that point, to the extent a receiver was appointed, it would be the FDIC, correct, for thrift?

Page 29

A. To the best of my recollection, and it would be just conjecture on my part, but I believe it was December of '95 was when the RTC was merged, so I suspect or assume subsequent to that point in time the RTC was no longer in existence.
Q. And the reference in that first recital to "Closed" -- "Carteret Savings Bank has been closed by the OTS," is that a reference to a receiver has been appointed for Carteret or does that mean something else?
A. I do not know what that means.
Q. This is an agreement between the RTC as -- in its capacity as a receiver for Carteret and the RTC in its capacity as conservator for a new institution, Carteret Federal Savings Bank; correct?
A. That is my understanding, correct.
Q. And it's my understanding that this was a fairly typical structure when an institution was placed into receivership; is that correct?
A. As to the appointment of the receiver, yes. As to the document itself, I do not know.

Page 66

MR. COLATRIANO: I'd like this marked as Exhibit 15, please.
(Saran Exhibit 15, document Bates stamped AM 42481052, marked for identification.)
Q. Exhibit 15 is a printout of an e-mail from Kevin Zencak to a list of recipients including yourself dated May 8, "Subject, Carteret Premium Finance, Inc." It's Bates stamped AM 42481052.
Go ahead and review it to yourself and let me know when you're ready to proceed.
A. (Reviewing.)
I've reviewed it.
Q. The first paragraph says that, "Carteret Federal Savings Bank, the receivership, is scheduled for termination in the near future."
Who was -- who had made the decision to schedule Carteret for termination in the near future?
A. I do not know.
Q. Is that referring to termination of the receivership?
A. If it's the writer, Mr. Zancek

Page 67

states it's -- his schedule is slated for termination. I don't know anything else other than what he's stating here.
Q. What was the practice within the RTC regarding when receiverships would be terminated?
A. Again, that would be a business decision and not a legal decision, so I don't really feel qualified to respond. It ultimately is a business decision.
Q. If you have an understanding, whatever it's based on, on what the practice was, that's what I'm asking for. I understand that you weren't making the decision, but if you have an understanding.
A. Again, it's speculation on my part, but my understanding is where the assets and the liabilities of the receivership have been identified, and a decision, I will assume by a business person as opposed to a legal decision, although legal -- my comment, because I see this here that there's one, two, three, four, five different lawyers that were notified here each in different areas, assets, litigation, POS, so it's my understanding or, you know, as

Page 68

to what I understand the process is that they're soliciting comments as to whether or not we're aware of any potential legal issues involving a receivership that would in some way impede or should be considered in the decision to terminate a receivership.
Q. Other than this e-mail, have you worked on any other matters or issues involving whether the Carteret receivership should be terminated?
A. I don't recall anything specific, no, as to the Carteret receivership or receiverships. I don't recall if there was more than one in terms of receiverships.
Q. Okay. And just to be clear, when I asked that question, I wasn't -- I didn't specify RTC versus FDIC. I'm covering the entire period. So, would that change your answer?
A. No, I don't recall if the receivership was terminated -- to my recollection and, again, it's speculation on my part, it wasn't terminated when I left the division of liquidation in December of or, excuse me, in June of 2000.

Page 69

I don't recall, but it's my guess that it had not been terminated.
Q. Do you know why it had not been terminated?
A. No.
Q. Do you know who made the decision not to terminate it?
A. No. I just want to clarify. I don't know if it had been terminated. I was just speculating. So, if it was not terminated, I do not know why it wasn't terminated and if it had been terminated, I was not aware of it.
Q. Okay.
MR. COLATRIANO: Let's go off the record for a second.
(Recess taken.)
Q. Mr. Saran, what was your role in determining how to calculate interest on claims against the Carteret receivership?
A. As I recall, I was asked by someone, I don't recall who, to determine the appropriate rate of interest, I believe it was, on receivership claims.
Q. Do you recall approximately when

Page 70

this was?
A. Only because I was provided a copy of an e-mail I don't recall writing, but it appears to be something I wrote in December of.
Q. And at that point you were in Hartford; is that correct?
A. I was in Hartford. Right, Hartford had been scheduled to close, that is correct.
Q. Had you, in between the resolution of Carteret, which, I think happened -- the last one, the last piece of it, happened in March of 1995. Between that time and 1999, how much work had you done on Carteret issues?
A. I don't recall any specific matters involving Carteret. It -- you know, my responsibilities in the corporate operations section were really responding to any claims from any receivership, so there's -- there may have been some claims that came in from Carteret post '95, but I don't recall any specific, you know, single claim that -- you know, there may have been some, but I don't recall.
Q. Prior to this request that you're referring to in 1999 to determine which

Page 71

interest rate to use on the Carteret -- for purposes of claims against the Carteret receivership, had you performed any work regarding post-insolvency interest issues?
A. Not that I recall.
Q. Do you know why this request came to you as opposed to somebody else?
A. I do not recall why it was assigned to me, but it apparently was because I rendered an opinion, but it involved multiple -- the e-mail references, I don't know, five or six different receiverships. So, I don't -- I don't recall why it came to me, but it was just -- it was assigned to me.
Q. Before you get to that e-mail, I have one more for you.
(Saran Exhibit 16, e-mail to M. Strunc from E. Tama dated 7/14/98, marked for Identification.)
Q. Exhibit 16 is a printout of an e-mail from Elaine Tama to Mark Strunc dated July 14, 1998, "Subject Carteret report number one." It's not Bates stamped. It has an attachment, but I'm only interested in the e-mail, so go ahead and review the cover

Page 72

e-mail.
A. Okay.
Q. Have you seen this e-mail before?
A. I don't recall seeing it.
Q. Do you know who either Elaine Tama or Mark Strunc were?
A. I do not recall who they are.
Q. The first line says, "As long last we've unraveled the mystery of Carteret."
Do you know what that's referring to?
A. No, I do not.
Q. Do you know whether it has in some way to do with the post-insolvency receivership issue?
A. I do not, no.
MR. COLATRIANO: I'd like to have this marked as Exhibit 17, please.
(Saran Exhibit 17, document Bates stamped AM 00096535 through AM 00096537 marked for identification.)
MS. HART: Before we start the questioning, I want to note our objection, as previously, as to this e-mail which may be can be raised in a

Page 73

subsequent motion.
MR. COLATRIANO: Okay. As I did the last time this was mentioned, I'll reserve all of our rights to claim that any privilege or other protection has been waived and make any other argument regarding this e-mail.
Q. But Exhibit 17 is a printout of a series of e-mails, one of which begins in the middle of the first page. It's an e-mail from you to Barbara Stark Tishuk, with CCs to three people dated December 1, 1999, "Subject, post-insolvency interest rates and priority of interest." It's Bates stamped AM through and including 537.
Is this the e-mail you were referring to a moment ago when you said you reviewed a document regarding an opinion you had put together regarding post-insolvency interest?
A. Yes, my counsel faxed to me a copy of this e-mail, that is correct.
Q. Okay. The e-mail is from you to Barbara Stark Tishuk. Who is she?
A. I do not recall.

Page 74

Q. There are three CCs. Let's go over each of them. Who is Peter McDonald?
A. To my recollection Peter McDonald was -- I believe -- my recollection is he was the department head for claims.
Q. Okay.
A. In December of 1999.
Q. Department head for claims within the Hartford --
A. Yes, yes, I'm sorry. Within the Hartford Northeast Service Center, that is correct.
Q. Okay. I think you referred earlier as Thomas Hewitt as your supervisor; is that correct?
A. I believe at that time he was my section chief, my immediate supervisor.
Q. Who was John Vartelas?
A. He was another senior attorney in the corporate affairs, corporate operations. I don't recall exactly what my department was called at that time. I think it was called corporate affairs, corporate receivership operations in Hartford. He was a colleague. He was another senior attorney.

Page 75

Q. All right. And was your -- this is an e-mail. Was there any other document that reflected your analysis of this issue or your opinion on this issue?
A. I do not know, although the first line of the e-mail says, "As a follow-up to my e-mail yesterday." I don't know or recall what that e-mail references. So, there may have been, but I do not recall any other involvement or analysis on this point other than what may have been contained or may be contained in an e-mail. I assume it would have been dated November 30, 1999.
Q. Okay. I think you said a moment ago that you don't recall why you were asked to perform this analysis; correct?
A. I don't recall, that is correct.
Q. Okay. Do you know why this request was coming at this time in late 1999?
A. No, I do not.
Q. Okay. There's discussion on these pages of post-insolvency interest as it affects, I think, five different institutions; correct?
A. That is correct.

Page 76

Q. Okay. And there are dates in parenthesis after each one of them and they're all from either 1994 or 1995; correct?
A. That is correct.
Q. So, do you know why, if these institutions had failed or had been resolved years before, why this question was coming up in 1999?
A. I don't recall. I can speculate. I will assume or -- I assume these were the dates of the receivership, but I don't recall other than that's what I suspect it is, but I don't recall as to what the dates indicate.
Q. Okay, but whether it's the date of receivership or date of resolution or whatever, they were all from 1994 to 1995.
A. Right.
Q. And, so, what I'm trying to get a sense of is why if they had -- if that had happened four to five year previous, why this question regarding post-insolvency interest was coming up in 1999.
A. I don't have any recollection as to why.
Q. Okay. How did you go about

Page 77

analyzing the issue of post-insolvency interest?
A. My e-mail makes reference to a memo titled "Receiverships Post-insolvency Interest" dated. It says -- it indicates the date as August 8, 1995, which I referred to as the policy memo and I also indicate that apparently it was authored by Tom Rose, and Steven Graham and Alvin Kitchen.
Relying upon that memo, I made a determination as to what the appropriate interest rate to be utilized to accrue interest on post-insolvency -- or post-insolvency interest of various receiverships.
Q. Did you base your opinion on any other documents or any other source?
A. I don't recall. I doubt it, but I don't recall with specificity.
Q. Okay. Do you recall whether you had discussions with anyone involving this issue while you were analyzing it?
A. I assume because John Vartelas' name is provided as a CC, I probably discussed it with John, but I don't recall any specific conversation.

Page 78

Q. Ok. The same paragraph of your e-mail which refers to the Rose, Graham, Kitchen memo also refers to a Rodney Ray/Christine Bradley memo dated April 17, 1995.
Do you recall whether that was something that you consulted in performing your analysis?
A. I don't recall -- I can speculate, but I don't know, I don't recall whether or not I saw the Rodney Ray, but I don't recall with specificity.
Q. Do you know who Rodney Ray was or Christine Bradley?
A. I know who he is now. I don't -- Rodney Ray is an attorney with the FDIC, and I believe he's in Washington. I do not know what his responsibilities were in December of 1999 or, rather, April of 1995.
I do not know and have no recollection of a Christine Bradley.
Q. So, you don't know which division she worked in?
A. I do not.
Q. I take it that you had been

Page 79

specifically asked about post-insolvency interest for only about the five institutions referenced in this e-mail; correct?
A. I don't recall any other inquiries regarding post-insolvency interest. I addressed five various receiverships. That's the only recollection and only based upon my review of the e-mail provided.
Q. Do you know why the inquiries related to just those five?
A. I do not.
Q. Do you know whether those five institutions are all institutions involved in goodwill litigation?
A. I do not know.
Q. I've got some more questions about that document, but while we're at it I'd like to have this document marked as Exhibit 18.
(Saran Exhibit 18, document Bates stamped AM 00096532 through AM 00096534 marked for identification.)
Q. Exhibit 18 is two memos really. The first one is dated June 14, 1995. It's from Sharon Powers Sivertsen, to regional counsel, subject post-insolvency interest

Page 80

memorandum, and the attachment is a memo dated June 8, 1995 from Steven Graham, Alvin Kitchen and Thomas Rose to various regional officials of the FDIC, "Subject, receiverships post-insolvency interest." The Bates stamp for the exhibit is AM 00096532 through and including 534.
My questions are all going to be about the attachment, but you may -- is this June 8th memo that is part of Exhibit 18, is that the memo referred to in your e-mail, and I see that the date is not the same but --
A. I believe -- to the best of my recollection, it is the same memo and that I probably mistyped. I wasn't the best typist. I meant 6/8/95 and I typed 8/8/95.
Q. And I think at the outset of this deposition you mentioned that you reviewed, in preparing for this deposition, a memo prepared by Tom Rose.
Is the attachment to Exhibit 18 the memo you were referring to?
A. A copy of Exhibit 18 was provided to me on Thursday evening about 4 o'clock, that is correct.

Page 81

Q. Is it fair to say, and please correct me if I'm wrong, that what you did in 1999 in analyzing this post-insolvency interest issue was you looked at the June 8, 1995 memo and made a determination about which of the categories listed in the June 8, 1995 memo Carteret fell into for purposes of calculating post-insolvency interest?
A. It would be a fair assessment. The 1995 memo refers to -- depending on the type of institution and receivership, it identifies four different types of institutions and, yes, I relied upon the 1995 policy memo, to the best of my recollection, yes.
Q. Okay. The 1995 policy memo has four categories. The first is "Prenational depositor preference state banks and savings associations which were not regulated by the Federal Home Loan Bank board."
The second is "Prenational depositor preference national banks." The third, is "National depositor preference state banks and savings associations," and the fourth is national depositor preference national banks and federal savings associations."

Do you see that?
A. I do.
Q. There's not a category on here that I can see about prenational depositor preference savings associations that were regulated by the Federal Home Loan Bank board; is that right?
A. I -- I guess it is. I really don't -- I guess I would have to agree. I don't know if it fits into one not regulated and -- I guess that would be right. I don't really know.
Q. When you analyzed this issue in, did you analyze it with the assumption that these four categories covered the universe of potential categories in which an institution could be placed?
A. I think that would be a fair statement, yes.
Q. The 1995 memo in the second paragraph of the first page of the June 8th memo says, "The interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the



jurisdiction it was in, and whether it had a state or federal charter."
What was your understanding about why these were the relevant factors?
A. I -- I don't recall. The memo was -- states -- you know, the memo was prepared by deputy general counsel and I didn't read beyond it.
Q. Okay. What was your understanding of what the memo meant when it said "when the institution failed"?
A. I don't recall.
Q. And are you aware of any other document or policy statement or any other source that defines what failure means for purposes of categorizing an institution for purposes of calculating post-insolvency interest?
A. I don't recall any other document.
Q. Okay.
A. Other than possibly the Rodney Ray/Christine Bradley memo which I don't recall -- you know, I don't recall if I consulted it or not or if it had been provided, but that may, but I don't recall.



Q. Okay. For each of these categories listed on the June 8 memo, there's a particular rate chosen. In some cases it's the state judgment rate and in other cases the treasury bill rate.
On what basis was it decided which rate to use for each of these categories?
A. I do not know.
Q. Okay. How was the RTC's or the FDIC's cost of resolving an institution affected by whether the institution was federally chartered or state chartered?
A. I do not know.
Q. Do you know how the cost of resolution was affected by the date of failure?
A. I do not know.
Q. If you look at your e-mail which is Exhibit 17, on the third page for your discussion of Carteret, go ahead and read that to yourself and let me know when you're ready to proceed, those four paragraphs discussing Carteret.
A. (Reviewing.)
Okay, I've read it.
Q. Is it fair to say that what you did



is look at the date of resolution for each of the three pieces of Carteret and used that date as the operative date for categorizing Carteret for purposes of post-insolvency interest calculations?
A. I don't recall specifically, but it appears to be that was the basis, that is correct.
Q. And why did you use the date of resolution of those three pieces as opposed to, for example, the December 1992 date for when Carteret was initially placed into receivership?
A. I don't recall.
Q. Do you recall having discussions with anyone regarding that issue?
A. I do not recall.
Q. Did you have any follow-up discussions with anyone regarding the post-insolvency issue after providing this opinion that's reflected in Exhibit 17?
A. Not that I recall.
Q. And since that time have you been involved in any other context with analysis of issues regarding how to calculate

Page 86

post-insolvency interest for receiverships?
A. I want to say no, but I don't recall since I transferred to Open Bank in June of 2000, so I -- I'll say no, not to my recollection.
Q. Okay. So, is it fair to say that at least by your recollection, this was the only occasion in which you were asked to analyze --
A. To the best of my recollection, it is correct.
Q. Just so I finish the question, this is the only occasion, to the best of your recollection, which you were asked to analyze how to determine or calculate post-insolvency interest for a receivership; is that correct?
A. That appears to be correct, yes.
Q. In Exhibit 70 you actually state for each of the three pieces of Carteret what the interest rate should be.
How did you go about determining what the actual rate was? What source did you consult?
A. I don't recall. I can speculate, but I'd rather not.

Page 87

MR. COLATRIANO: I'd like this marked as Exhibit 19.
MR. KUIPER: I'd like to note that Exhibit 18 on the third page a line is nearly blacked out. I believe it's referring to -- saying, "The rate is utilized to make post-insolvency interest."
I just note for the record because when we get copies I'm sure we won't be able to read it.
MR. COLATRIANO: That's how I read it as well.
MR. KUIPER: It's a line in footnote one.
MS. HART: I concur.
(Saran Exhibit 19, table from internet, marked for identification.)
Q. Exhibit 19 is a table that I will represent that we pulled off the internet on postjudgment interest rates and so I'm not representing to you that this is something that you've seen before because we pulled it off the internet, but I'm wondering if it would spark any recollection for how you went about

Page 88

actually pinpointing the interest rate that should be used for Carteret.
A. No, it does not.
Q. Is it fair to say that when you prepared your opinion that's reflected in Exhibit 17, you had some source of information which told you whether the federal judgment rate was over the relevant time period; correct?
A. That would be a fair statement.
Q. Okay. Do you know how post-insolvency interest was calculated for Carteret before you prepared your opinion that's reflected in Exhibit 17?
A. No.
MR. KUIPER: Could counsel advise us as to where this came from? Is it state or federal rates or any idea?
MR. COLATRIANO: I think we -- what I can represent is we pulled it off the internet. We were searching for the federal judgment rate and I think this is a federal judgment rate table and I think if you look for the relevant dates, it matches the rates reflected in Exhibit.

Page 89

MR. KUIPER: You don't recall where it came from?
MR. COLATRIANO: It came off the internet. That's all I can tell you. It came off, I'm pretty sure, some type of federal database maintained by a federal court or a federal agency. If you'd like --
MR. KUIPER: I'm just curious --
MR. COLATRIANO: And if you look for March 2, 1995, the rate in Exhibit 19 is 6.57 percent, which is the same rate that Mr. Saran used for the March 1995 resolution in Exhibit 17, the date on the table, Exhibit 19 for, let's see, the date listed for 10, it looks like, 13, 1994 is 6.06 percent, which is the same rate used in Mr. Saran's opinion for the October 28, 1994 resolution, and the rate in Exhibit 19 for January 5, 1995 is 7.34 percent, which is the same rate reflected in Mr. Saran's memo for the January 20, 1995 resolution.
So, I'm reasonably confident that these match up. These are the federal

Page 94

marked for identification.)
Q. Exhibit 21 is a printout of a proposed rule of the FDIC dated December 18, 2001 payment of post-insolvency interest in receiverships with surplus funds, Bates stamped AM 00096596 through and including 96602.
I have one question about this. Based on your previous testimony I am assuming that you had no role in the in any work that led to the promulgation of any proposed rule on post-insolvency interest; is that correct?
A. That is correct, I had no involvement in this whatsoever.
Q. Okay.
MR. COLATRIANO: I'd like this document marked as Exhibit 22, please.
(Saran Exhibit 22, document Bates stamped C-AM-A-0012806 through C-AM-A-0012807, marked for identification.)
Q. Exhibit 22 is a memo on Carteret Savings Bank letterhead dated December 23, 1992 from Andrew Bowes to yourself, "Subject, Western Federal." It's Bates stamped C-AM-A-0012806 through and including 807.

Page 95

Go ahead and review that memo to yourself and let me know when you're ready to proceed.
A. (Reviewing.)
I reviewed it.
Q. Okay. Does this refresh your recollection at all about an issue involving a claim by Carteret against Western Federal?
A. No, it does not. You're referring to -- when you say "a claim," do you mean a formal claim or a lawsuit or --
Q. I wasn't using any particular sense --
A. No, I don't recall a claim involving Western Federal, no.
Q. Okay. The last paragraph of the memo says that, "The above is an attempt to briefly summarize a highly complex political and potentially volatile situation."
Do you know why Mr. Bowes was referring to this situation involving Western Federal "as political and potentially volatile"?
A. I do not.
MR. KUIPER: Counsel, do you know

Page 96

what the words are that are marked out on the fourth paragraph?
MR. COLATRIANO: No. My copy is not good on that either.
MS. HART: On the second page?
MR. KUIPER: The first page.
MR. COLATRIANO: I'd like this document marked as Exhibit 23, please.
(Saran Exhibit 23, document Bates stamped C-AM-A-0335009 through C-AM-A-0335010, marked for identification.)
Q. Exhibit 23 a printout of an e-mail dated January 29, 1993 from Thomas Feeney to Wayne Weight. You're listed as a CC, "Subject Carteret Savings Bank" and it's Bates stamped C-AM-A-0335009 through and including 5010.
My questions are going to be about the discussion beginning at the very bottom of the first page, that begins, "The second matter is the lawsuit," but if you need to read the whole thing please feel free?
A. Let me quickly scan it.
Q. Okay.
A. Thank you. (Reviewing.)

Page 97

Okay.
Q. This e-mail referred to an RTC SWAT team?
A. Yes.
Q. What was the SWAT?
A. To my recollection SWAT is an acronym for Strategic Workout -- I want to say Asset Team, but I think the T stands for "team" and S stands for "strategic." The W and the A is either "workout asset" -- that's what I think it is and they dealt with large assets.
Q. Okay. Does this e-mail refresh your recollection at all about the western issue or any western litigation or claims?
A. Just that it was a nonperforming or a problem asset. That's my only recollection.
Q. The third from the last paragraph on the second page, the paragraph that begins "This asset should go to a SWAT," it goes on to say, "It also needs some immediate consideration and decisions. Among other things we are suing an open insured institution which I've been told is not in the best of health."
Why does it matter from the