IN THE COURT OF FEDERAL CLAIMS

------------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

------------------------------------------x

September 3, 1999
10:00 a.m.

200 Park Avenue
New York, New York

DEPOSITION of MICHAEL SIMONE, a witness in the above entitled matter, before a Notary Public of the State of New York

E_X_H_I_B_I_T_S (Continued)

| SIMONE | | PAGE |
|---|---|---|
| 25 | Document Bates range WOP 3340890 through 0891 | 100 |
| 26 | Document Bates range WOQ 6790378 through 0386 | 102 |
| 27 | Document Bates range WOP 3250280 through 0281 | 107 |
| 28 | Document Bates range AMB 034109 through 4117 | 108 |
| 29 | Document Bates range WOP 3340714 through 0716 | 109 |
| 30 | Document Bates WOP 3340684 | 118 |
| 31 | Document Bates WOP 3340683 | 122 |
| 32 | Document Bates range WOP 3340685 through 0686 | 124 |



E_X_H_I_B_I_T_S (Continued)

| SIMONE | | PAGE |
|---|---|---|
| 33 | Document Bates range WOP 3260194 through 0198 | 134 |
| 34 | Document Bates range WOP 3340900 through 0902 | 137 |
| 35 | Document Bates range C-AM-A-0183212 through 3213 | 138 |
| 36 | Document Bates WOT 7070140 | 141 |
| 37 | Document Bates WOT 6710712 | 143 |
| 38 | Document Bates range AMB 054055 through 4059 | 145 |
| 39 | Document Bates range KH 040112 through 0113 | 147 |



MICHAEL L. SIMONE, called as a witness, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. THOMPSON:

Q Good morning, sir, my name is David Thompson.
Will you please state your name and address for the record, please?
A My name is Michael Simone, S-i-m-o-n-e, I live at 18 Donna Lane in Wayne, New Jersey.
MR. THOMPSON: Thank you very much. I am with the law firm of Cooper Carvin & Rosenthal in Washington, D.C. and with me today are Michael Kirk, also of the law firm Cooper, Carvin, Rosenthal, Dick Bianco, Chairman of AmBase and Mike Carenzo.
Would counsel like to identify herself for the record?
MS. TORNATORE: Thank you. My name



is Tonia Tornatore and I represent the United States, appearing with the Department of Justice.
Q And, sir, have you had your deposition taken before?
A Yes, I have.
Q I would just like to go over some of the ground rules today.
If at any time any of my questions aren't clear, I hope you will ask me to clarify the questions and I would be happy to try to do so.
At times your attorney may object to my questions. She's free to do so, but unless she instructs you not to answer a question you may, and in fact you must go ahead and answer the question provided you understand it.
If at any time you want to take a break, feel free to do so.
My one request would be if there is a question pending, if you would please go ahead and answer the question then you can take a break, you are free to do so.
I am going to show you several documents today, and generally I will ask you to

18

other types of reports that we would use back in the office.
The office staff was the supervisory staff, we would take that report and then call for whatever corrective action we deem to be appropriate.
Q You were supervisory agent.
Did there come a time where your responsibilities changed, or have you essentially stayed in that function of supervising the institutions under your jurisdiction in reporting to either Mr. Albanese or Mr. Vigna?
A What has changed over the years is the managerial responsibilities that go along with it.
As far as the supervisory agent responsibilities, while the name may have changed over time, now we refer to it as Assistant Director, or whatever, they have remained pretty much the same.
Q But you have then added to those responsibilities managerial --
A Yes.
Q (Continuing) -- duties?
What did those entail?

19

A Having a staff of individuals as supervisory analysts, senior analysts and so forth, field managers.
There came a point in time where examinations and supervision were merged and were now one unit, so each of the individual units that we have have a combination of both examiners and supervisory staff.
Q What is your current title, just so the record is clear?
A Regional Deputy Director.
Q Do you report to Mr. Albanese now?
A Yes, I do.
Q How many regional deputy directors are there in your geographic area?
A In the northeast region I am the only Regional Deputy Director for Operations.
We do have a Regional Deputy Director for Administration, and there is another one for I guess it's almost administration, I forget what his duties are, but I am the only operations RDD.
Q Does operations refer to examination and supervision?
A That's correct.

20

Q Do you recall when you first started working on supervisory matters pertaining to Carteret?
Was it as soon as you first arrived in 1976, or --
A I would think so.
Q How was the work divied up at the time you arrived at the Federal Home Loan Bank?
Were you assigned to Carteret and to some other institutions, or how did that work?
A My recollection is you didn't have an assigned caseload back then.
We would have -- there was a drawer, when an examination report was prepared, nothing was computerized at that time, when it was typed and it was available it would go in a drawer for the next supervisory analyst who was available to take it.
So, if you were the next available person you took the next report and you would work with that report until the next examination.
Q How many supervisory analysts were there at the time divvying up this work?
A When I first started, I believe I was the third.

21

Q Okay, what was the geographic scope of your jurisdiction?
Was it New York, New Jersey and Puerto Rico?
A When I first started it was New York, New Jersey and Puerto Rico.
Q Did that change at some point?
A Yes, it did, when we became the Office of Thrift Supervision, Puerto Rico institutions were put under the supervision of the southeast region of OTS, and New York headed up the northeast region, which runs from Maine down through West Virginia.
Q But up until 1989, the geographic region essentially remained the same?
A Yes.
Q Did the number of supervisory analysts grow in time?
A Yes.
Q Do you remember approximately how many there were in 1989, ballpark?
A Could have been anywhere from between 12 and 18, at that point in time.
Q So now when you became a supervisory agent, how was the work assigned at that time?

been in compliance with its minimum capital requirements, isn't that right?

MS. TORNATORE: I will just object as to your characterization on Page 1. I think the figure there is goodwill and other intangible assets, I'm not sure that it is simply supervisory goodwill. There may be other items inclusive in that.

MR. THOMPSON: That's so noted.

Q But, sir, you were saying that Carteret would not have been in capital compliance without its ability to utilize goodwill at this time?

A That's what this shows.

Q So, when you made the statement in the S Memorandum that this transaction represented a permanent solution to the resolution of the two entities, you were assuming that Carteret would continue to be well capitalized well into the future, correct, otherwise --

A That's correct.

Q And so you were assuming that Carteret had the ability to utilize the goodwill well into the future, correct?

A Correct.



Q I would like just to go back to the S Memo actually just for a second, we won't dwell on it long, but just to ask you a question or two.

On Page 9, and just to give you the context, on the bottom of Page 8 there is a heading "condition of acquirer" and I take it that you would have been more involved in the preparation and review of this portion of the S Memo, as this was an entity that was under your jurisdiction?

A In a review of, yes.

Q Turning to the bottom of Page 9 where it says, "Carteret's maturity gap as of March 31, 1986 compares favorably to peer group data due to its restructuring efforts."

What does that refer to?

A What we are talking about is their interest rate risk sensitivity, and what it's indicating is that it doesn't appear to be out of line with other financial institutions.

Q Just for the record, as your attorney has noted, that Line 540 of the TFR is not totally free of ambiguity, on Page 9 do you see, sir, in the second paragraph where it says,



"As of March 31, 1986 goodwill totaled $236.8 million and is being amortized on a straight line basis over 40 years?"

A Yes, I do.

Q Is that approximately the same number that appears on the TFR on Line 540?

A That's correct.

Q And, in fact, would the TFR probably be the source of the information that's contained in the S Memo?

A In most cases yes, unless there was a recent examination report.

Q Now, also on Page 13 of this document, reference is made to the purchase method of accounting?

A Right.

Q Do you know what that term signifies?

A It's an accounting term on how the combination will be viewed in accordance with the FASB rulings.

My understanding is they mark to market the assets and the liabilities of the institution when you use purchase accounting, as compared to a pooling of interest where you just



merge the two entities together with the numbers that exist on their books.

Q And the resulting difference between liabilities and assets is called goodwill, is that correct?

A Correct.

Q Is that the number that's represented on this TFR?

In other words, is the TFR the result of prior transactions in which supervisory goodwill was created?

A Yes.

Q Do you recall why the FSLIC and the Federal Home Loan Bank wanted Carteret to submit an accounting letter?

A No.

Q Just one last question on this, sir, isn't it true that you could not have recommended for the Bank Board to approve this transaction unless you believed Carteret to be a healthy institution that could handle the absorption of Mountain Security and First Federal?

A That's correct.

MR. THOMPSON: At this point I would like to ask the court reporter to mark as

Q But it's a reasonable conclusion to draw from this?
A Yes.
MR. THOMPSON: We are actually going to be referring back to this document frequently through the next period of time, so don't flip it over and put it in the stack.
But I am going to mark at this time another document and I would like to have marked as Simone Exhibit 9 a document that bears the Bates number WOP 3330463.
(The above described document was marked Simone Exhibit 9 for identification, as of this date.)
Q Will you please identify this document for the record, sir?
A It appears to be another report from Examiner O'Rourke dated June 1, 1992 and it's addressed to me, John Griffin, Scott Smith and Donald Hom.
Q Now, was Mr. Hom, when his title says Analytical Supervisor, is that what was previously known as a Supervisory Analyst?
A Or a Senior Supervisory Analyst,



yes.
Q Will you please take a moment to review the second paragraph of this document, please?
A All right.
Q Did you agree with Mr. O'Rourke's conclusion that core earnings would be enhanced as earning status return for $30 million of commercial assets and as operating expenses were reduced?
A That's -- if that's the case, yes, absolutely.
Q Now, turning back to the S Memo for a second, to Page 5 of that document, under the heading "capital position," it states in the second full paragraph "capital erosion has been halted, largely due to management's reduction of operating costs, balance sheet restructuring and disposition of problem assets".
Did you agree with that statement?
A My recollection, yes, yes.
Q So essentially because the institution had core operating profits and its asset quality had been improved, there wasn't a



substantial likelihood that its capital position would deteriorate in the immediate future, is that correct?
MS. TORNATORE: Objection, mischaracterizes the testimony and the document, I think.
A What it's saying is that the institution's capital position is no longer deteriorating.
The hemorrhaging has stopped, that's what's being indicated here.
Q Yes, and my question to you is do you have any reason to believe that the hemorrhaging might begin in the near future after preparation of this document?
A No.
Q Can you recall any other thrift during your tenure as a bank and thrift regulator being seized when it had core earnings and profitability and its asset quality had been substantially improved?
A I don't recall. It's possible during this period of time that there were institutions with negative capital that were still, seized even though their operations may



have been positive.
Q But you can't recall any?
A I don't recall it specifically.
Q And you are not sure that there was?
A No.
MR. THOMPSON: At this point I would like to take a five minute break, if that's okay with you, and we can go off the record.
(At this point in the proceedings there was a recess, after which the deposition continued as follows:)
MR. THOMPSON: We are back on the record.
Q I'd like to turn at this point to Page 6 of the document.
A Document S Memo?
Q The S Memo, exactly, that you have before you.
I would like to turn to the interest rate risk section, which reads in part "Carteret is operating with an unsafe level of interest rate risk. The OTS market value of portfolio equity model reveals that any significant increase in interest rates from

dealing with salary and other forms of remuneration, and it could have addressed that.
Q Can you think of anything else?
A No. Well, we also had the problems with the poor underwriting of the credits and so forth, so there may have been regulatory violations involving that.
Q Do you recall if there was ever a period of time where the supervisory agents and your other colleagues had a favorable view of these individuals at Carteret?
For example, in 1986 when the S Memorandum was prepared and put in saying that Carteret represents a permanent solution and that these other problems identified here only came to light subsequent?
A Clearly at the time those S Memos were written, we had to have a favorable view, otherwise there would have been no recommendation for Carteret to acquire those institutions.
Q Because the competence of management was an important consideration?
A Yes, it is.
MR. THOMPSON: Now, at this point I would like to ask the court reporter to



mark as Exhibit 15 a document that bears the Bates number C-AM-A-0360326.
(The above described document was marked Simone Exhibit 15 for identification, as of this date.)
Q I apologize for the poor quality of this copy, but would you please identify the document for the record?
A It's an August 7, 1991 letter on Carteret Savings Bank stationery written to Nick Keecha who was the Regional Director of the FDIC's New York office.
It was signed by Mr. Bianco
Q In the second to last paragraph of the letter on Page 2, Mr. Bianco makes reference to what he terms an "extremely close and daily cooperation with the OTS."
Does that comport with your recollection of your interaction with Mr. Bianco?
A Yes.
Q He also says in the next sentence that he had established a "good working relationship with the OTS."
Do you agree with that statement?
A Yes, I do.



Q Do you recall meeting with Mr. Bianco during your tenure at the OTS?
A A number of times, yes.
Q Was it five times or ten times or dozens of times?
A Many times.
Q Many times, and so you feel like your opinion of Mr. Bianco and his management team is well informed?
A I felt that way, yes.
Q And did you have confidence that he was able to run Carteret in a safe, sound and profitable manner?
A Yes.
MR. THOMPSON: At this point I would like to ask the court reporter mark as Simone Exhibit 16 a document that bears the Bates number C-AM-A-0370922.
(The above described document was marked Simone Exhibit 16 for identification, as of this date.)
Q Sir, would you please identify the document for the record?
A It's a memo of oral communications dated May 31, 1991 prepared by Mike Finn and it



deals with Carteret Savings.
Q On the second page of this document it lists the distribution and the first person identified is MS.
Is that you, do you believe?
A That would be me.
Q In fact, it states in the second sentence that "the summary of the content of the meeting is taken from discussions with Michael Simone regarding Bianco's comments," do you see that?
A Yes, I do.
Q Turning to the fifth item that's identified where it says, "Carteret is reviewing the bonus issue. There may be a plan to offer stock options in exchange for the cash previously received".
Do you recall how that issue was resolved?
A I do not.
Q In the next item reference is made to Mr. O'Brien's compensation and to various proposals as to how to structure a resolution of that.
Do you recall how this issue and the

102

recollection?
A I don't recall.
Q You have no recollection as to this?
A No.
Q Do you recall why the Prince ultimately did not make an investment in Carteret?
A No, I do not.
Q Do you recall whether there was a regulatory barrier independent of this that was interposed that precluded him from making such an investment?
A I don't recall.
Q Do you recall having any concerns about the Prince as a potential investor?
A I don't recall.
MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 26 a document that bears the Bates number WOK 6790378.
(The above described document was marked Simone Exhibit 26 for identification, as of this date.)
Q Sir, would you please identify this document for the record?
A It appears to be a copy of AmBase's

103

HB-11 report for the quarter ended June 30, 1992 which was forwarded to me by John Ferrara of AmBase Corporation.
Q I would like to turn your attention to Page 6 of the filing. I think if you keep going another couple of pages, I am referring to the page numbers at the bottom not the Bates number.
If you just take a moment to review the paragraphs under "other materially important events," please?
A Okay.
Q Focusing for a moment on the third paragraph, where reference is made to the fact that Kohlberg & Co. had executed a Letter of Intent for $200 million investment in Carteret, and a statement is made there that "Carteret will
meet the fully phased in requirements of FIRREA afollowing the recapitalization."
Did you agree with that?
Was that your understanding of the amount of capital that was needed to fulfill the fully phased in requirements of FIRREA?
A I don't recall the specifics, but it clearly was enough to keep an extension going for

104

the institution, so.
Q And if the institution had, let's say, an additional $100 million of capital already in place, is it your opinion that it would have been easier for the institution to raise an additional $100 million?
A Yes.
Q Is it your understanding that if the institution had an extra $100 million in capital, that it would have been permitted to continue in operation for some period of time beyond December 4, 1992?
A I don't recall that. I do not recall that.
Q I would like to just try to follow up and refresh your recollection, if it's possible, by referring you back to the S Memo?
A Right.
Q And to the fifth page of that document under "capital position?"
A Yes.
Q Where it refers to the various deficiencies in capital that Carteret had at this time and the most substantial of them is tangible capital.

105

I guess my question to you is if, let's say Carteret had an additional $140 million in capital so that its tangible capital instead of being negative $60 million had been positive $80 million, do you think that Carteret would have been permitted to operate beyond December 4, 1992?
A It's very likely, particularly if they were still capital deficient there would have been some sort of a capital plan put back in place.
Q But it's your opinion that given Carteret's core profitability, if it had a positive tangible capital of say $80 million, it would have been permitted to continue to operate, is that correct?
A It's likely, yes.
Q Can you think of any instance in which a thrift was seized where it had positive tangible capital of $80 million and core profitability?
A No.
Q Wouldn't that have been highly unusual, to seize a thrift in a situation where it had a fairly substantial amount of capital in terms of absolute dollars, even if not as a

percentage of assets, where it was profitable?
A To seize an institution for capital purposes, yes, but it's -- it's possible that for some other reasons the institution could have been seized.
Q I understand hypothetically speaking. In terms of Carteret, can you think of any reason, given the fact that it had solid management in place, that its profits were solid and that its asset quality had been improved?
A No.
Q So it's your understanding that if it had the additional capital of, let's say $140 million, that it would have been permitted to continue to operate?
A Again, I don't recall the specifics, but based on what I'm seeing here, yes, it's possible.
Q And likely, in fact?
A Yes.
Q Fair enough.
Now I would like to return to this document that's been marked as number 26.
Do you recall why the Kohlberg Letter of Intent ultimately did not materialize



into a capital infusion?
A No, I do not.
MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 27 a document that bears the Bates number WOP 3250280.
(The above described document was marked Simone Exhibit 27 for identification, as of this date.)
Q Sir, would you please identify this document for the record?
A It's an internal memo put together by Scott Smith addressed to me and it's dated October 15, 1992.
Q Reference is made in the first paragraph to a "current investor group" which included Carlisle and the Pennsylvania Teachers Retirement Fund, the McArthur Foundation, a few other financial entities.
Do you recall the interest expressed by this investor group?
A I remember the names, I don't remember the specific interest that was expressed. But yes.
Q Now, on the bottom of the page



reference is made to what is termed an "unusual term in the proposed Letter of Intent that the investors want to reserve the right to purchase two properties from AmBase/Carteret at their adjusted net book value, even if the Letter of Intent is terminated."
Do you recall whether you ever learned what those properties were?
A I don't recall.
Q Do you recall whether this term, although somewhat unusual, was actually an impediment to the consummation of the transaction?
A I don't.
MR. THOMPSON: At this point I would like to have the court reporter mark as Simone Exhibit 28 a document that bears the Bates number AMB 034109.
(The above described document was marked Simone Exhibit 28 for identification, as of this date.)
Q I'd like you to please identify this document for the record, sir?
A It's an October 30, 1992 letter with an accompanying HB-11 filing that John P. Ferrara



sent to me from AmBase Corporation.
Q I would like to direct your attention to the second to last page of the exhibit, under "other materially important events."
Will you please just take a moment to review that, sir?
A Okay.
Q Does this refresh your recollection as to the fact that a Letter of Intent was executed on October 19, 1992 between AmBase and the Carlisle Group?
A Not really. I remember the name Carlisle Group coming up as an interested party, but no, it does not.
Q And do you recall why the Carlisle group ultimately did not make a capital contribution?
A No, I do not.
MR. THOMPSON: At this point I would like to ask the court reporter to mark as Simone Exhibit 29 a document that bears the Bates number WOP 3340714.
(The above described document was marked Simone Exhibit 29 for

identification, as of this date.)
Q Sir, will you please identify this document for the record?
A It's an interoffice memo that Angelo Vigna forwarded to Bob Albanese, myself and Robin Schneider.
Q Now, just so I understand, and it's dated October 14 --
A 1992.
Q Just so I understand, this is a memo from Rock Tonkel?
A Yes.
Q To Tim Ryan, is that correct?
A That's what it says, yes.
Q And then Mr. Vigna forwarded this on to you and to Mr. Albanese?
A Correct.
Q Is this an e-mail?
A Yes, it is.
Q Do you remember who Mr. Tonkel was?
A He worked in Washington OTS, I believe he was a special assistant to the director of the agency.
Q And the director of the agency being Mr. Ryan?



A That's correct.
Q And do you recall whether Mr. Tonkel was closely involved with Carteret's and closely monitoring Carteret's efforts to raise capital?
A He was.
Q Was there anyone else at OTS Washington in addition to Mr. Tonkel and Mr. Ryan himself who was closely monitoring the situation and in frequent contact with you all?
A Everyone under the sun.
Jim Winning was certainly involved and a number of other people in Washington monitored all troubled institutions for the agencies, so once you hit the troubled list, you were looked at closely by a number of people within the agency.
Q Just to try to get their names out, to the extent you can recall, I know it was a long time ago, there was Mr. Winning, Mr. Tonkel, obviously Mr. Ryan?
A John Downey, certainly.
Q Do you remember this fellow Mr. Kelso who is listed on this memo?
A I remember the name David Kelso, I don't recall how much involvement or what type of



involvement he had with it.
Q Can you recall anyone else in D.C. who was really closely involved in monitoring this?
A No.
Q Who was the principal contact that you all had with Washington, D.C.?
A Principal contacts were typically by Angelo, either with Tim Ryan or I would say Rock Tonkel is my recollection.
Q Did you have much interaction with Washington, or was it more limited?
A No, it was really Angelo who dealt directly with Washington on this.
Q Did you ever have conversations with Mr. Ryan about Carteret's financial state?
A Not that I recall, Rock Tonkel yes, Ryan, no.
Q Do you recall the substance of your conversations with Mr. Tonkel?
A I recall that he called to ask questions a number of times, but the specifics, I just don't -- I don't recall.
Q Now I would like to refer your attention to the bottom of the second page of this



document where in the last full sentence on this page it reads in part "The time frames" -- and it's time frames for due diligence -- "are extremely compressed and the work required to achieve a sufficient comfort level is substantial."
Does that statement comport with your recollection that the potential investors were being subject to an extremely tight time frame in which to complete their due diligence?
A Yes.
Q Did that raise concerns in your mind that a potential investor that was genuinely interested in Carteret might pull out merely because they didn't have enough time to decide whether it was a worthwhile investment to put $200 million into the institution?
A That was a possibility.
Q Did you have that concern at the time?
MS. TORNATORE: I just object as to speculation as to what the other investors may have thought.
MR. THOMPSON: I am asking Mr. Simone whether he had this concern.

A It was an issue as to whether or not a deal could be structured during a set period of time, but a set period of time is all that they were given.
Q Do you recall whose decision it was to give them that set period of time?
A My recollection was Mr. Ryan's decision.
MR. THOMPSON: I think we are actually at a convenient stopping point for lunch, and if you don't have an objection, we would like to go off the record.
(At this point in the proceedings there was a luncheon recess, after which the deposition continued as follows.)
Q We are back on the record, sir.
I would like to pick up again back to the S Memo.
Prior to the lunch break we were discussing the Carlisle group's Letter of Intent to acquire or to make a capital contribution into Carteret.
I would like to direct your attention to the third paragraph on Page 2 of this document.



The second paragraph -- the second sentence of that paragraph reads, "On November 11, 1992 OTS received verbal notification that the Carlisle Group was withdrawing its conditional Letter of Intent, because following due diligence it had concluded that it could not receive an adequate rate of return on its investment and had concerns about regulatory risk."
Do you recall who received the verbal notification from the Carlisle Group that it was withdrawing its Letter of Intent?
A No.
Q Do you know who the most likely candidate would have been to receive that sort of notification?
A It could have been Angelo, it could have been Bob, it could have been me, one of the three of us.
Q Now, in terms of the reasons that were given here, they appear to be two-fold, number one, an inadequate rate of return, and number two, regulatory risk.
Do you recall what was intended by the phrase which is in quotes in the memo,



regulatory risk?
A I do not recall specifically.
Q Do you have any general recollection as to the types of concerns that the Carlisle Group may have had?
A It may have had something to do with the amount that they would invest and the fact that the institution may not have been fully capitalized, and what restrictions they would have to operate under and so forth.
That sort of sticks out in my mind.
Q And that makes sense.
I take it that there was a prospect that there might be some restrictions placed on the institution even after it got the capital infusion, and that's what raised the concern?
A If it were not fully capitalized, yes.
Q Do you recall what type of -- what form those restrictions might have taken?
A Well, I think it would be similar to restrictions placed on any institution that failed to meet its full capital requirement.
Probably limited the amount of growth, or payments, compensation.



Q Dividends?
A Definitely dividends, yes, I would say, absolutely.
Q And there would also be close scrutiny as to the lines of business that an enterprise might go into, is that correct?
A Possibly, yes, possibly.
Q Now, so that was one reason that was given.
The second reason that was given was that they didn't believe they would receive an adequate rate of return.
Do you recall what the Carlisle Group -- whether they ever indicated to you or your colleagues what they believed an adequate rate of return to be?
A I don't recall.
Q Now in assessing a rate of return and its adequacy, is it true that an investor would look at number one, the amount of income that it would receive, and number two, the risk that they would actually receive it, is that a fair statement?
A I would say so.
Q In this instance, one of the reasons

they are giving for pulling out is the regulatory risk, right?
A Yes; yes.
Q So, in essence, the two reasons they give are related insofar as the rate of return is going to be influenced by -- that they would require to make an infusion is influenced by the regulatory risk, is that correct?
A I guess they could be related. Not necessarily, but they could be, yes.
Q And you have no other recollection about these matters?
A No.
Q After the Carlisle Group pulled out, do you recall whether there were any other investors who were still interested in potentially making an investment in Carteret?
A I don't recall specifically, but I think Mr. Bianco had a number of potential investors that he could have contacted.
MR. THOMPSON: At this point I would like the court reporter to mark as Simone Exhibit 30 a document that bears the Bates number WOP 3340684.
(The above described document was



marked Simone Exhibit 30 for identification, as of this date.)
Q Sir, I know that the date is somewhat obscured by the Post-It in the left-hand corner, but do your best to identify the document for the record, and I think there is a time date stamp that may be of some assistance?
A It's a letter from CoreStates to Angelo Vigna indicating their desire to at least take a look at the Carteret operation, and it's date stamped November 23rd, and I assume it's 1992.
Q Right, because just to the right of where the Post-It is, can you see the '92, if nothing else?
A Yes, I see the '92.
Q So, this would have been -- this expression of a "high level of interest" would have come in, in fact, even after the S Memo was prepared, is that correct?
A Yes.
Q Do you have any recollection as to CoreStates's level of interest?
A No.
Q Do you have any recollection as to



why CoreStates did not proceed with making a capital infusion?
A I believe the decision was made by the agency that there were sufficient -- you are talking about why we didn't grant an extension, correct?
Q Well, it's a related question, yes, so please?
A I think the agency reached a conclusion that the number of extensions had been granted and that the institution was not recapitalized, and therefore enough time was enough time, and they needed to resolve the issues at hand.
Q Who were the people making that decision; was that Mr. Ryan?
A I would say it would be Mr. Ryan, yes.
Q And was he the principal person making that decision?
A I would say so.
Q Just so that I am clear, the deadline that had been imposed was December 31, 1992, does that comport with your recollection?
A I don't recall the specific



deadline.
I know a number of extensions had been granted, and I think they were set for specific periods of time.
Q In your opinion, would four or five weeks have been enough time for an investor with a substantial level of interest to complete a thorough due diligence prior to making a $200 million investment, or do you think it would have probably taken the investor more time?
A I don't know. My recollection was that management did a very good job of putting together the information needed by a potential investor to take a look at the institution.
I think each potential acquirer looks at an entity differently, and some way want to make a decision in 24 hours and do a conditional type of approval, others may take months.
So I don't know if you could say that there is any set period of time.
Q But in your experience, many investors would require a substantial period of time prior to making a -- an unconditional $200 million investment?

A I would say so.
Otherwise there would be some sort of a conditional type of agreement that they would put on the table.
MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 31 a document that bears the Bates number WOP 3340683.
(The above described document was marked Simone Exhibit 31 for identification, as of this date.)
Q Sir, will you please identify this document for the record?
A It's an internal memo from Bob Albanese to Angelo, I am copied on it, along with John Griffin and Sharon Frid, it's dated November 27, 1992.
Q Then referring to the first paragraph, it states that, "Dick Bianco advised me," Robert Albanese, "that he has been in contact with the CFO at PNC and probably will be meeting with senior PNC representatives this weekend."
Do you recall this activity at the end of November '92?



A I do not.
Q But it's consistent with your general recollection that there were investors out there who were still very interested?
A Yes.
Q Now, in the last paragraph Mr. Albanese states, "If PNC still is interested and only needs a few days to firm up a decision, it would be foolish to rush a transfer on December 4th".
Did you agree with that assessment?
A That makes sense, yes.
Q Did you feel that in light of the extremely compressed time for due diligence that these investors were being put under significant time constraint in terms of making their decision?
A It's a short period of time. Looking at it from an agency perspective, several extensions had been granted, and at some point enough is enough, and the agency needed to move forward with what it needed to accomplish.
I think that was the position that was taken at the time.
Q That was the agency position?
A That was the agency position.



MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 32 a document that bears the Bates number WOP 3340685.
(The above described document was marked Simone Exhibit 32 for identification, as of this date.)
Q Sir, the document is just a page long, will you please identify it for the record?
A Yes, this is an internal memorandum prepared by Robert Albanese dated November 17, 1992.
Q Would you just take a moment to review the memo?
A Okay.
Q Sir, do you recall participating in a conference call with Mr. Victor on or about November 16 of '92 of with Mr. Albanese?
A Not really, but I have no reason to suspect this is incorrect.
Q Fair enough.
Where it says that, in the second paragraph, "we strongly recommended that more time be given to Carteret's management because there was still considerable interest being



expressed by investors in the institution and there were no compelling reasons for not leaving the institution open for the few weeks needed to consider a possible offer from First Gibraltar."
I take it you and Mr. Albanese were strongly of the view that this matter ought to be resolved in the most cost efficient manner possible, and that an artificial deadline shouldn't be placed on allowing investors to do the due diligence necessary; is that right?
A Yes. Based on what we were aware of, at the time we thought that there would be no harm leaving the institution intact for another several weeks to see if this investor stepped up to the plate, yes.
Q Exactly. It is that kind of the point where it says at the end of the third paragraph, "frankly, we did not view the transfer date, whether it was November 20, December 4 or January 4th, to be a critical factor in our analysis of the situation."
Was that because it had -- Carteret had solid management in place and because it was operating on a profitable basis and wasn't in

jeopardy of having its capital further eroded at that time?
A Yes. As I indicated before, the hemorrhaging had stopped, so we didn't expect to have a worsening situation that would end up costing the insurance fund additional monies.
Q So while it was the agency position that December 31, '92 had some magical significance, it was your view and Mr. Albanese's view that more time should have been given to Carteret, is that correct?
A Yes, at least to see where the investors would end up in this particular case, yes.
Q Do you recall what Mr. Victor, what his response was when you called, and I take it, sir, that this call was three days after the S Memo was prepared making the recommendation, do you recall what Victor said to you?
A No, I don't, I really don't.
Q What was Mr. Victor's position at the time, do you recall?
A No.
Q Do you recall why he was contacted as opposed to some of the other gentlemen whom we



have been talking about, Mr. Tonkel or Mr. Downing?
A Victor had a high position within the agency, I don't recall if Tim Ryan left by this point in time, and Jonathan may have been the Acting Director for the agency; that's a possibility.
Q Just so the record is clear, Mr. Ryan actually left on December 4, 1992, the same day that Carteret was seized.
Let me just ask you that question, do you recall whether there was any correlation between the date of the actual closure and the date that Mr. Ryan left?
A Not that I can recall.
Q Was that anything that anyone ever suggested to you all, that, well, Mr. Ryan wants to clean his desk off, this has been lingering around a long period of time, and we would just like to close the books?
A That's a possibility, but I don't recall that specifically.
Q Do you recall any governmental agency putting pressure on you all to come up with the recommendation in the S Memo of all right, put



the paper in place, we want to take the institution down and we can't do it until we have an S Memo. So go ahead and fill out the S Memo.
Is that something that you recall?
A You mean arm twisting from Washington or something like that? No.
Q I wouldn't want to use a negative word like that.
A No. Not at all.
Q And nothing from the Resolution Trust?
A Let me clarify that, not at my level.
If it happened at a higher level, I am not aware of it.
Q Do you recall whether the Resolution Trust Company was bringing any pressure to bear of hey, we've got resources and we want to deploy them and close this now?
A Not that I recall, no.
Q Are you aware, sir of any other instance in which the regional regulators were telling the agency officials in Washington, D.C. give this institution a few more weeks and we think we can resolve the situation in a cost free



manner, where that advice and counsel was not followed?
A I don't recall another situation where any extension was granted.
If an institution met the criteria to a point of a conservator or receiver, we just did it.
Best of my recollection this is the only institution that ever got any extensions.
Q Right, okay.
A In the northeast region.
Q Given your advice of give the institution a few more weeks and given the low interest rate environment that was prevailing at the time, isn't it true that if your advice and Mr. Albanese's advice had been heeded, the government would have been able to save itself a considerable amount of money because Carteret never would have had to have been liquidated in the first place?
MS. TORNATORE: Objection, speculation. You may answer it.
A I can't say that, simply because several extensions were granted and none of the previous people who stepped up to the plate to

take a look at this institution went forward with the transaction.
So if history wanted to repeat itself, the possibility exists that maybe this investor would also walk.
What was at risk here was the several additional weeks, that's all.
Q But if Carteret had been given several additional weeks, just given the favorable economic conditions that were prevailing and the low interest rate environment that we spoke about earlier, isn't it true that Carteret was well positioned to take advantage of that and might have been able to make itself sufficiently attractive that it would have been able to receive a capital infusion?
A Possibly, possibly.
Q And do you think that that was more likely than not?
And is that why you made the recommendation to Mr. Victor that hey, give these guys some time, we think they can make it work out?
A That's right, based on my universe within the region. You had other people outside



the region looking at it from a wider universe.
Q And I understand that, but from your perspective, that was the most likely scenario?
A Yes.
Q And just so that I understand all the players and what everyone's respective roles were, within senior management at the OTS, northeast regional office here, were you the person who was most intimately familiar with the operations of Carteret?
A No.
Q Who would have been the -- and I don't mean sort of at the field examiner level or the analyst level, but I mean senior management?
A Right, John Griffin.
Q John Griffin?
A Yes.
Q But you were very familiar with Carteret and its management?
A Yes.
Q I take it Mr. Griffin reported to you?
A Yes, he did.
Q So he kept you apprised of any significant developments at Carteret?



A That's correct, yeah, he was -- the first line office supervisor, there were field managers, there were examiners, but he would have been the first line office supervisor overseeing Carteret.
MR. THOMPSON: I see. Thank you, that helps clarify.
At this point we are getting close to the end of proceedings. I know that's going to break you up, but I would like to take a five-minute break and also just arrange a few more exhibits so that I don't detain you unduly, but we are getting close to the end.
(At this point in the proceedings there was a recess, after which the deposition continued as follows:)
MR. THOMPSON: Let's go back on the record.
There are a few miscellaneous documents that are more in the nature of just random items that I would like to clean up.
Q Before we do that, we have had a lot of conversation today about supervisory goodwill



and capital requirements.
I just want to be clear, after FIRREA, did the regulatory officials view supervisory goodwill as different than cash in terms of assessing the capital position of an institution?
A What do you mean by that?
It was certainly excluded from the capital calculation.
Q Right, and I suppose even if a Court Order were to require it to be included in capital, I take it that in assessing the financial health of the institution and the restrictions that ought to be placed on it, that the capital, the supervisory goodwill and the cash were not deemed to be equivalent; is that right?
A Yes. Even before I don't -- I wouldn't say it carried the same weight that cash did.
We recognized it for what it was. Regulations allowed for it to be included in capital, but nevertheless it wasn't like having cash in the till.
Q I understand.
A And that continues.