UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

EXHIBITS (Continued)


MINDNICH EXHIBIT PAGE NO.
NO. 21 MAPP Credit Committee Minutes 7/29/93 91
NO. 22 Operations Committee Meeting Minutes - 8/16/93 95
NO. 23 Managing Agents Mtg. - Minutes 8/17/93 101
NO. 24 12/16/97 Document - Total NSSO SSR - Asset Type 45-522 From Inception to 11/30/97 109
NO. 25 04/04/94 - WMDFS for RTC Valley Forge Office - Info Needed to Complete Securitization Reconciliation 110
NO. 26 Operations Committee Meeting Minutes - 8/30/93 112
NO. 27 Executive Summary - 8/31/93 - Stratification of Assets Remaining (Report M48A) 115
NO. 28 ALCO Committee minutes 9/15/93 118
NO. 29 Memo, 9/23/93, Smedley to Mng. Agents 120
NO. 30 ALCO Committee minutes 11/17/93 124




EXHIBITS (Continued)


MINDNICH EXHIBIT PAGE NO.
NO. 31 Mindnich to Credit Review Committee, 1/11/94 - re: Home Unity Resolution 127
NO. 32 ALCO Committee minutes 11/24/94 128
NO. 33 Cover E-mail w/Attachment -- 11/29/93 - Update of the "Clearwater Sales Issues" Document 129
NO. 34 Executive Summary - 11/30/93 - Stratification of Assets Remaining (Report M48A) 130
NO. 35 E-mail, 1/6/94, DiGiondomenico and Mindnich to Flesta, Hallenbeck, Lauria 133
NO. 36 Executive Summary - 1/31/94 - Stratification of Assets Remaining (Report M48A) 136
NO. 37 ALCO Committee minutes 2/16/94 138
NO. 38 ALCO Committee minutes 3/23/94 140
NO. 39 ALCO Committee minutes 4/28/94 141




EXHIBITS (Continued)


MINDNICH EXHIBIT PAGE NO
NO. 40 Memorandum 5/23/94, Robertshaw to Distribution, Monthly Conservatorship Reports 142
NO. 41 ALCO Committee Minutes 6/8/94 146
NO. 42 ALCO Committee Minutes 6/15/94 148
NO. 43 ALCO Committee minutes 6/29/94 153
NO. 44 E-mail, 9/15/94, Richards to Held 153
NO. 45 E-mail, Held to Richards, Nobles, 9/16/94 154
NO. 46 Carteret FSB Strategic Savings Plan, 12/04/92 155
NO. 47 Memo, Cribbs to Mindnich, 12/7/92 Summary of Mortgage Banking Ops 163
NO. 48 Memo, Cribbs to Mindnich, 12/7/92 Summary of Findings 169
NO. 49 3/10/93 Memorandum 177




PROCEEDINGS

Whereupon,

JAMES R. MINDNICH,

business address at Advisors Mortgage Group, LLC, 2517 Highway 35, Building B, Suite 103, Manasquan, New Jersey, was called as a witness by counsel for the Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. COLATRIANO:

Q. Good morning, Mr. Mindnich.
A. Good morning.
Q. Before we --
A. Would you do me a favor and speak loud?
Q. I'll try to.
A. With the air conditioning going.
Q. I will try to, if you can't hear me, let me know. I have a tendency to start mumbling at points, but please let me know if you can't hear anything I'm saying.
A. Thank you.
Q. Before we get started, let me introduce myself. I'm Vince Colatriano, I'm with the law firm of Cooper & Kirk and we represent Ambase Corporation in this case. I think it would be useful to go

Page 10

around the table and have every one introduce themselves.

MR. HUGHES: Jeff Hughes, I represent the United States.

THE WITNESS: May I have your card?

MS. GRONER: Arlene Pianko Groner.

MS. CONOVER: Leslie Conover with the FDIC, assisting DOJ, also present with DOJ.

MR. KUIPER: Gary Kuiper, FDIC.

MR. COLATRIANO: Gary, are you representing the witness as well?

MR. KUIPER: Yes, I am.

BY MR. COLATRIANO:

Q. Mr. Mindnich, have you ever been deposed before?

A. No.

Q. Let me just go over a couple of ground rules for you, to kind of help us along here, one of which we just discussed. If at any point you have trouble hearing anything I'm saying or my questions please speak up, I'll be glad to repeat myself. If at any time you're not sure what I'm asking you, please ask me to clarify or to rephrase and I'll try to make my questions more clear.

If at any point you'd like to take a

Page 11

break, please let me know, I'd be happy to take a break. I'm sure I'm going to ask for breaks on a periodic basis anyway, but if you ever need one, just let me know. My only request is that if a question is pending, I'd like to you answer the question before we take the break.

So, I'm going to be showing you a lot of documents today as well so -- there will be a number of exhibits that I will be showing you and asking you questions about.

Do you have any questions before we get going?

A. No, sir.

Q. Are you currently employed, Mr. Mindnich?

A. Yes.

Q. And how are you currently employed?

A. I have a corporation that I started and currently run.

Q. Is that Advisors Mortgage Group?

A. No, they're a client, I work for them corporately.

Q. Oh, okay, okay. And what do you do for them?

A. I advise them on commercial properties, rate funds, funding financial.

Page 12

Q. What, if anything, have you done to prepare for this deposition today?

A. Said a couple of prayers.

Q. Anything besides that?

A. Thought about it a lot.

Q. Did you have any discussions with anybody?

A. No, sir.

Q. About -- okay. Did you review any documents?

A. No, sir.

Q. Are you aware that in addition to asking you to appear here for a deposition, we also asked you by subpoena to bring any documents, if you have any, relating to Carteret or Ambase Corporation?

A. Yes, I saw that.

Q. And do you have any such documents?

A. No, sir.

Q. Can you please briefly describe for me if you could your educational background if you have any college or graduate degrees?

A. I graduated from St. Peters College in Jersey City, 1959. Took some additional courses at NYU.

Q. What was your degree at St. Peters College?

Page 13

A. Bachelor's of science in business administration.

Q. Do you hold any professional certifications?

A. No, sir.

Q. I'd like to have you walk me through in summary fashion your professional experience over the years in, say, starting from --

A. 1960?

Q. Let's leave it to anything that has to do with real estate or financial institutions, things like that.

A. Well, I spent ten years at the Empire Trust Bank of New York.

Q. When was that approximately?

A. 1960 to 1970.

Q. And what did you do for Empire Trust?

A. I was a commercial lender.

Q. And what did you do after that?

A. I went to New Jersey National, 1970 to '75.

Q. And New Jersey National was a bank?

A. Commercial lending, yes.

Q. What did you do after New Jersey National?

A. Well, let me see, went to work for the

Page 14

Franklin state Bank of New Jersey, commercial lending.
Q. And when was that?
A. '75 to '78.
Q. And what did you do after Franklin State Bank?
A. I went for the Jersey Shore Bank.
Q. And what position did you held there?
A. Vice president in charge of commercial lending.
Q. And how long were you at Jersey Shore Bank?
A. Three and a half years.
Q. So approximately 1978 to '81?
A. Yeah, '81.
Q. Okay. And what did you do after Jersey Shore Bank?
A. Worked for the Money Store Investment Corporation.
Q. And what did you do there?
A. I was a new business development --
Q. What kind of business?
A. They were the largest SBA lender in the United States.
Q. SBA, Small Business Administration?

Page 15

A. Yes.
Q. And what was the approximate time frame for when were you with the Money Store?
A. I left there in '85 -- excuse me. Yes, '85.
Q. And what did you do after you left Money Store?
A. Went to work for the First Fidelity Bank of New Jersey.
Q. And what did you do for First Fidelity Bank?
A. I was a commercial lender.
Q. What was the time frame?
A. I worked there until '90.
Q. So roughly 1985 to 1990?
A. Yeah, those are rough numbers, but --
Q. I understand.
A. Then I went to work for the RTC.
Q. So you started working for the RTC in --
A. May of '90 and I finished up in December of '94 and I started my company in January of '95.
Q. That's what you've been doing since then?
A. I'm self-employed, yes.
Q. I'm sorry, you said this, but I didn't write it down, what's the name of your company?

Page 16

A. Called Chrisco, C-h-r-i-s-c-o, Inc.
Q. Now, concentrating on the period when you were with the RTC, the Resolution Trust Corporation from May of '90 to December of 1994, what did you do for the RTC?
A. I was a credit specialist.
Q. What does that mean, what were your responsibilities as a credit specialist?
A. That's about 87 pages worth, okay?
Q. If you could just summarize it?
A. I was in the -- let me think about it, I was in the group that was assigned conservatorships, banks that were closed and I would go in as the lead commercial person on assisting the lead commercial person. My responsibilities were basically to downsize the asset side of the bank, loans, mortgages.
Q. Thank you. Is it fair to state that while you were with the RTC you basically worked in a series of conservatorships?
A. Yes.
Q. Can you walk me through which conservatorships?
A. Let me think about that. I was in Springfield Savings, I believe that was --

Page 17

Springfield Savings from May 1990 through September.
Q. September 1990?
A. Yes.
Q. Where was Springfield?
A. Springfield, New Jersey, I'm sorry.
Q. Okay. Then where did you go after that?
A. I was transferred to become part of the take-down group of the Ensign Savings Bank in New York City.
Q. And how long were you with Ensign?
A. I'm trying to figure out if it was three or four months. Say roughly four months.
Q. So roughly until the end of 1990; is that fair?
A. Just about, yeah.
Q. And when you say you were part of the take-down group for Ensign, what did you mean by that?
A. Well, I was part of the group that walked in and closed the bank on a Friday afternoon and I stayed for three months.
Q. And you stayed in your capacity as a credit specialist?
A. Yes.
Q. Where did you go after Ensign?

Page 18

A. I'm trying to -- I can't even think of the name of the bank, it was a small bank down in South Jersey -- in Hammanton, H-a-m-m-a-n-t-o-n .
Q. And how long were you with Hammanton?
A. Five months.
Q. So is that roughly --
A. June.
Q. To June 1991?
A. Yeah, six months, early June.
Q. All right. And I take it your role at Hammanton was similar?
A. A credit specialist.
Q. A credit specialist, okay.
A. Basically there I ran the credit side of the bank, as was the case with Ensign also.
Q. When you say you ran the credit side of the bank?
A. You had the managing agent, the credit guy and the head operation guy.
Q. Okay. Where did you go after Hammanton?
A. Went to a small bank in Pennsylvania, Springfield Savings Bank in Springfield, Pennsylvania.
Q. And how long were you there?
A. Six months.

Page 19

Q. So roughly June of '91 through November, December of '91?
A. Yeah, it was just about six months, I came in the middle of June and I left in I think the middle of January.
Q. And again were you there as a credit specialist?
A. Yes.
Q. Were you in charge of the credit side?
A. Yes.
Q. Where did you go after Springfield?
A. Went back to Hammanton to the Hammanton Savings Bank.
Q. You went back in the same capacity you were there before?
A. Yes.
Q. And what time frame was that?
A. January of -- what year were we in?
Q. I think we're in 1992?
A. Yeah, January '92.
Q. Until?
A. I guess until December, December 2nd I believe the date Carteret was closed.
Q. So you went from Hammanton to Carteret?
A. (The witness nodded.)

Page 20

Q. Sorry, for the court reporter, you need to answer.
A. Yes.
Q. How long were you with Carteret?
A. Two years.
Q. So December of '92 to December of '94?
A. (The witness nodded.)
Q. And so was that the last RTC institution you worked for?
A. Yes, I'm sorry.
Q. I didn't catch that one.
What was your role at Carteret, was it credit specialist again?
A. Yes, I worked under the head of the credit team.
Q. Who was the head of the credit team?
A. A gentleman by the name of Dean DiGiondomenico. He was a 34-year old kid who had Lou Gehrig's disease and died at the age of 37.
Q. Was he there the entire time you were there?
A. He was there until they closed the doors.
Q. You mentioned this is the first time you've been deposed, correct?
A. Yes.

Page 21

Q. Have you given any testimony on financial institutions issues in any other contacts in court or before legislatures or anything like that?
A. Yes.
Q. Can you describe when you've given such testimony?
A. I went to Brooklyn on something at Bank of New York, some case involving, you know, default on a mortgage or something of that nature.
The second time was -- well, Franklin State Bank, an employee of a major insurance company had stolen checks and opened up an account at the bank.
Q. Any other times that you've given testimony?
A. No.
Q. You walked me through the various institutions in which you worked as a credit specialist while you were with the RTC. How was the decision made which institution you were going to go to and when you would switch, how were those decisions made?
A. When I came on board in May of '90, they had a district -- the RTC had a district office in what was the old City Fed building, City Federal

Page 34

A. Yes.
Q. And what's NTE?
A. Not to exceed, I think sounds good.
Q. Works for me. There are various items that have the acronym AV?
A. I'm sorry.
Q. AV. I assume BV was book value and I didn't know what AV was.
A. Asset value.
Q. There's one reference under sale of real estate under B, it says AV 1 million and then (80, 60, 50 percent rule) do you know what that's referring to?
A. I don't recall.
Q. For asset transactions that did exceed these values laid out here, what was the process for getting authority to sell those or to otherwise resolve those?
A. A case was written, taken to the credit committee.
Q. The credit committee of the conservatorship?
A. Yes.
(Mindnich Exhibit No. 2 was marked for identification.)

Page 35

BY MR. COLATRIANO:
Q. Exhibit 2 are minutes of the Asset Liability Committee, dated January 19th, 1993 and it lists that you were present at that meeting.
What was the Asset Liability Committee?
A. If I may have a few moments to review this?
Q. Sure.
A. In answer to the question, this committee dealt with the cash flow of the institution.
Q. And was it your practice to attend these meetings?
A. No.
Q. This one you are listed as being present, correct?
A. Yes.
Q. I'm only going to have a couple of questions about this particular meeting minute.
A. Sure.
Q. At the bottom of the first page there is a discussion of liquidity and right at the bottom it says, we are settling out the FHLB advances today, 885 million is being paid off.
Do you know why that decision was made to --

Page 36

A. No.
Q. Okay. Were you involved at all in making that decision?
A. No.
Q. On page 4 right at the top there's a discussion where you're discussing loans in the pipeline; do you see that?
A. Yes.
Q. What is being referred to here by loans in the pipeline, what does that mean?
A. When we came in on the 4th of December I believe the Carteret Savings Bank had possibly 100 mortgage people in the field who were developing and creating mortgage applications. There was also -- let me backtrack.
That -- that in-process figure, 100 to $120 million mortgages, there was an approved portfolio of mortgages that were awaiting closure, that was 100 to $125 million. I was updating this committee that day on or projections for cash flow based upon the mortgages and processing versus those that were approved for closure.
Q. And when you say pipeline, you're referring to those that have been already approved, but not yet funded?

Page 37

A. That's correct.
Q. It says at the end of that paragraph the pipeline is falling quickly and most of it is in the wholesale area and post closing people will be cleaning things up. What do you mean by the wholesale area?
A. People in the field who would -- who would direct mortgages into Carteret.
Q. And is that a distinction between other sources of mortgages for Carteret?
A. Yes.
Q. What would be a retail source of mortgage?
A. From a branch.
Q. I think you referred to 100 or so people in the mortgage origination side --
A. Wholesale.
Q. That's all wholesale?
A. Primarily.
Q. Do you recall whether the pipeline -- this refers to the pipeline falling quickly mostly in the wholesale, do you remember whether -- how the pipeline was being affected in the retail area around this time period?
A. The -- when we came in and closed the bank, in theory all lending was to stop immediately

Page 38

In the case of Carteret, you have a quarter of a billion dollars of mortgages in the processing stage, it was decided that the only people we would hurt would be the mortgagees.
Q. What do you mean when you say the only people we would hurt would be the mortgagees, hurt by what?
A. Well, if you had a mortgage in processing or in the stages of processing or approved, and we told you we're closing it, that served no political justice and we were -- the bottom line was we upsized the bank before we downsized the bank.
Q. What do you mean by that?
A. We put mortgages on the books, we closed -- we closed all and every mortgage that was approved that we could.
Q. Okay.
A. On the wholesale side since those people had no longer any place to put the mortgages, we encouraged the wholesale people to take the mortgages in process to another institution, with our blessings.
Q. And why did you encourage that?
A. Because they were not approved mortgages.
Q. At the beginning of your answer a moment

Page 39

ago you said in theory when you closed the bank all lending was to stop immediately. Why -- what -- why was that, what was the basis for that policy?
A. The bank was closed.
Q. That's true even though the bank was in conservatorship, that was still the policy?
A. It was the policy of a conservatorship.
Q. To stop lending?
A. (Indicating)
Q. I'm sorry, that's a yes?
A. Yes.
(Mindnich Exhibit No. 3 was marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Mindnich, Exhibit 3 are Managing Agents Meeting Hints from January 27, 1993 and they list you as being present at that meeting. I'm only going to ask questions about a couple of things on the first page and then one paragraph on the second page. And I will be showing you a lot, unfortunately a lot of meeting minutes today, so I'll try every time to tell you where I'm going to focus. Obviously you can review as much as you need to to put it into context.
But on the second paragraph of this

Page 40

exhibit, Exhibit 3, there is a discussion of your reporting on your meeting with national SWAT team and national SWAT contractors. What was the SWAT team?
A. Don't ask me.
These were groups that were I guess hired -- I guess hired by Washington on a national basis to handle various pools of loans, okay.
Q. Okay. And there's also a reference in that paragraph to a SAMDA, S-A-M-D-A.
A. It's the same thing, don't ask me what the acronym is, I really can't remember.
Q. Okay.
A. But basically it was the same thing. I forget the distinction -- but basically what they did was they came in and they portfolioed and took out or usually put up for sale or ran or used or collected or whatever.
Q. Okay.
A. And in this case I think they walked in the door -- if I can just back-step, it was a contractor type that took over the subsidiaries, okay? They went in (Indicating), gone. And that's what they did, they came in and took the stuff and left and dealt with it. And we were not -- we were not prepared in 60 days to let them do that and we

Page 41

were not going to let them do that until we were ready to let them do that.
Q. And when you say do that, you're not preparing to let them do what exactly, take control?
A. Take the files out of our possession. I mean we were responsible for the assets to the conservatorship and we were going to protect our right for the assets to the conservatorship. It wasn't a war, it was just what transpired.
Q. Do you know why they wanted to take -- wanted the total commercial portfolio to be delivered to a SAMDA contractor in two weeks?
A. Yeah, because that was part of the process nationally.
Q. Meaning what, what was part of the process?
A. In the larger institutions they hired these people to come in and do this and as I said we were responsible for the assets of the conservatorship and we were going to maintain our responsibility, okay? And we were not bending over so to speak, you know, and not allowing that to happen in their time frame. It was going to happen in our time frame.
Q. Okay.

Page 154

marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 44 appears to be a printout of an E-Mail dated September 15th, 1994 from Ann Richards to Herb Held. Do you know who Ann Richards was?
A. I'm looking at her address. She was in Washington, I don't know.
Q. Her E-Mail says we are champing at the bit waiting to sell securities out of Carteret. Should they still remain frozen?
A. She could have also been in Valley Forge, but I don't think she was in Carteret.
Q. Do you recall any discussions with anybody in Carteret or between Washington and Valley Forge regarding an eagerness to begin selling securities out at Carteret that was being hindered by this asset freeze?
A. I had no involvement. That was over my head.
(Mindnich Exhibit No. 45 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 45 is a printout of an E-Mail dated September 16th, 1994 from Herb Held to Ann Richards and Sandra L. Nobles. It says, we're still

Page 155

working with a minority whole bank bidder. We will need about $1.4 billion in loans. If Sandra has the loans and does not need the securities then we should be able to release the securities.
Who is Herb Held, do you know?
A. I have no idea. I don't think I ever met or saw these two people.
Q. These two people being Ann Richards or Herb Held?
A. Yes.
Q. There are other people mentioned on this E-mail, Sandra Nobles and Sharon Dunn Yore, do you know either of them?
A. I don't recall.
Q. Do you recall around this time frame Carteret being asked to hold back roughly 1.4 billion in loans because of RTC Washington working with a minority whole bank bidder?
A. No.
(Mindnich Exhibit No. 46 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 46 is a document titled Carteret Federal Savings Bank conservatorship strategic plan. And I'm only going to have one fairly targeted

Page 156

question about this. I found a particular passage in here, but before I get to that, what role, if any, did you have in the preparation of this document?
A. I just don't recall. I could say.
MR. HUGHES: I would just note that it looks like there's an E-Mail which may or may not be related attached -- do you want to us rip it off or --
MR. COLATRIANO: Can I see what you're talking about?
MR. HUGHES: Sure, it's not on yours?
MR. COLATRIANO: Oh, my God. Can you rip this off and return it to me, if that's okay? Thank you, that should not be part of this.
BY MR. COLATRIANO:
Q. Mr. Mindnich, there is an E-Mail, the last page of this shouldn't be part of that.
(Document tendered to counsel.)
MR. COLATRIANO: Thank you.
MR. HUGHES: Eagle eye Leslie here.
MR. COLATRIANO: All right, thank you.
BY MR. COLATRIANO:
Q. I think you were in the midst of an answer?
A. Why don't you ask me the question.

Page 157

Q. What role if any did you have in the preparation of this, and I think you said you don't recall but then I think you started saying if I may?
A. I looked through it, I'm sure I was involved, but to what extent --
Q. The only purpose I'm using this document for is to try to establish a date for something. If you could turn to page 1. There's a paragraph that's the next to last paragraph on that page that begins CSB was extensively involved in mortgage banking activities.
A. Um-hum.
Q. Fourth line down says effective December 14, 1992 the RTC decided to discontinue residential loan origination activities. However the existing pipeline of accepted loan applications and lending commitments of approximately $360 million as of that date will be honored by CFSB, do you see that?
A. Um-hum.
Q. I think that's something we talked about way at the beginning?
A. Yeah, we did.
Q. Shutting down the loan origination function, correct?
A. Yes.

Page 158

Q. And this decision was made, Carteret was seized on December the 4th so this decision was made fairly quickly after Carteret was seized, ten days later, correct?
A. It was made on I believe the day we went in, on the 4th.
Q. And who made that decision, was it a decision from Washington or --
A. It was our decision and it was approved.
Q. And why was that the decision, why was the decision made to shut down the origination activities?
A. That was an automatic. I mean when the RTC went in all -- everything stopped, all lending stopped, all anything stopped, okay? That was across the board, okay?
We went in here. There were I think I said there were 100 people referring mortgages in a pipeline of. In process was 100 million, the approved to close was another 100 -- they are talking 360 million; that was pretty close to my original comments.
We told Washington, we said, you know, you're going to create havoc if you don't fund these mortgages that were approved. I mean you're not --

Page 159

you're screwing with people, literally, these people are waiting to get their money and buy their houses, we don't want to be -- we don't want to be part of this, because it's not fair. As simple as that, you know, and we made that case and they said fine, go ahead and fund anything that's approved and we wrote a case to do that and that was signed off in Washington.
Q. Okay.
A. Now, on the other side the loans that were in processing and had not been approved, we encouraged the originators to take their loans back, take them to another bank, which they did. So those -- so that -- both sides of that -- that was taken care of that weekend.
Q. Okay. I want to leave aside for purposes of these questions the handling of mortgages that had already been approved or ones that were being processed. I want to focus on the decision to stop any additional origination activities. Were those origination activities done out of a subsidiary, a mortgage company subsidiary?
A. They had a hundred people working all over the state, they were brokers, they were -- you know, they were getting paid by the deals they brought in.

Page 160

Q. When you say all over the state, are you referring to New Jersey or Florida or --
A. No, they were all over, okay?
Q. Were any efforts made to at any point to market for sale the function at Carteret or any of its subsidiaries that was involved in mortgages origination?
A. It really wasn't a function. I think for all the institutions that I was involved with, that was the only one that was really in that position.
Q. What do you mean?
A. Only because of its size.
Q. What do you mean that was the only one that was in that position?
A. That had $120 million of mortgages in processing.
Q. Okay.
A. And another $250 million ready to close, there weren't too many banks in the country that had that kind of a situation.
Q. Again, I want to leave those out of this, I'm not talking about what's in process or what's been in the pipeline. I'm talking about there's an origination capacity at the bank, an infrastructure for that, correct? Was there any efforts made to

Page 161

market that infrastructure, to market -- whether it was in a separate, sub or separate function, were there any efforts made to market that function, that origination capacity, that origination infrastructure, market that for sale?
A. No.
Q. Why not?
A. It was something that wasn't done. All lending stopped, okay and we convinced Washington to fund what was approved, okay, and that was stopped.
Q. All right. So is it fair to state and please correct me if I'm misstating it, that it was RTC policy to stop all originations --
A. It's documented, yes, there's documentation.
Q. And not to try to market any of that infrastructure for origination for sale?
A. Of the in process you're talking about?
Q. No. I'm talking whatever infrastructure there was to originate mortgages, was that marketed in any way, I think you said no. I'm asking you is that RTC policy?
A. Well, what are you marketing, are you marketing -- are you -- are you talking about marketing the ability to make mortgages, the

Page 162

structure that they had set up?
Q. Right.
A. I mean if the structure was set up, that -- if you brought mortgages in you got paid. If you didn't bring any in you didn't get paid. So you know, it was a question of -- it wasn't something that was marketable is I guess what I'm saying. Because everybody -- everybody that was involved on that end of the bank was leaving anyway, the bank was closed.
Q. When you say everybody --
A. They were out of a job, the people who were origination -- the origination people were out of a job because there was no -- no bank to send the mortgage to anymore.
Q. They are out of a job because the decision was made to shut it down --
A. No, they were out of a job because the bank was closed.
Q. And was part of that decision was to shut down lending, correct?
A. Yes.
Q. Was any attempt made to value that aspect of the business?
A. If it was, I wasn't involved.

Page 163

(Mindnich Exhibit No. 47 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 47 is a memo, dated December 7th, 1992 from Donna Cribbs and William Bailey to yourself, subject: Summary of Mortgage Banking Operations at Carteret. My first question is, do you remember who Donna Cribbs was or who William Bailey was?
A. Do I remember Donna Cribbs?
Q. Yes.
A. I remember the name. She was -- she was at the bank when we closed it.
Q. At Carteret?
A. Yes. I mean she was part of the team that went in.
Q. Oh, okay?
A. That's how I knew her.
Q. She was part of the RTC team that went in?
A. Yes. For the -- for the closing process.
Q. For the closing process. She didn't stay after that?
A. No.
Q. December 7th. It is my understanding that the bank was seized on a Friday, December 4th.

Page 164

A. Um-hum.
Q. This is dated the Monday, December 7th. What was the process -- is it fair to state that over that weekend Ms. Cribbs and Mr. Bailey were reviewing and analyzing the mortgage banking operations; is that what they were brought in to do?
A. Why don't you ask me that question again?
Q. Were -- well, let me back up a second. You described what you recall about Ms. Cribbs. Who was Mr. Bailey, do you know?
A. He was another guy from Valley Forge.
Q. Were Ms. Cribbs and Mr. Bailey, were they brought in to over the first weekend after Carteret was seized to perform an analysis of mortgage banking operations?
A. No, she was around, she was -- she was -- I guess you might say she was -- she was looking for the, you know, the exotic kind of stuff. You know, things that were not -- because of the size of the bank they were involved in, especially at the investment end of it, they were involved in stuff that some banks never heard of, nor had half of the guys that were there. And she was asked to prepare this document.
I know she uncovered some things along the

Page 165

areas of, type of investments that they were doing and how they were tying them into all these exotic kinds of things. I mean, to the point where if there were five guys that knew what she was talking about, that was a lot, she had that talent.
Q. Okay, so is it fair to state that she had a fair amount of expertise in these types of issues --
A. Oh yes. She was very competent, yeah.
Q. At the bottom of the first page this memo states overall the production activity of CMC -- and if you look at the top CMC is Carteret Mortgage Company. It says, overall the production activity of CMC is well managed and recent years' repurchase activity has been minimal.
A. What page are you on?
Q. First page, very bottom of the first page?
A. Oh, the last sentence?
Q. Yes.
A. Oh, all right.
Q. Based on your -- strike that.
Is that a statement that you would agree with regarding CMC?
A. The bank failed.
Q. I understand that, but this is a question

Page 182

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.

Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?

A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.

Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?

A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

Page 183

saved 20, $25 million of monies.

MR. HUGHES: I have no further questions.

MR. COLATRIANO: I have a couple of follow-up questions.

FURTHER EXAMINATION
BY COUNSEL FOR PLAINTIFFS
BY MR. COLATRIANO:

Q. Based on Exhibit 49 that counsel has just been going over with you. You stated a few minutes ago that the correspondent relationships, they all knew once the RTC came in to go elsewhere; is that a fair statement?

A. Yeah, yes.

Q. How much of that was related to the fact that it was RTC's policy to stop lending; was that well-known among correspondents?

A. Oh, sure, oh, sure.

Q. Okay.

A. I mean, what we did -- again as I said in the beginning, you had a mortgage commitment to close on your house from Carteret and why should you suffer.

Q. All right.

A. Right? And you couldn't close, you could have gone bankrupt because of that. Our feeling was

Page 184

that, you know, our intent is not to do that, to 10,000 families in New Jersey or wherever else the mortgages were, we would not -- we didn't feel that that was what we're here for. And we had to go and get approval to do that, but we went and just said we're not going to sit here and not fund -- we're just not going to do that.

Q. Okay. Now, leaving aside again --

A. And we funded every one that wanted to close. Of that portfolio, anybody that wanted to close, closed.

Q. Right. Let's leave aside again mortgages that were already in process and had already been approved. I think counsel asked you about new applications dried up from correspondents after the RTC came in; is that correct?

A. Um-hum.

Q. And is it fair to say that the reason it dried up is because the correspondents knew that it was RTC's policy to stop lending; is that a fair statement?

A. Yes, yes.

Q. This document also refers to the fact that between Friday December 4th and Thursday morning December 10th, there was still approximately $10

Page 185

million in new mortgage applications had come in, correct?

A. That's what I said, that's approximately correct, that's what the memo says.

Q. So in less than a week there was still $10 million in new applications, correct? And so if the correspondent relationships had dried up is it fair to say most of that $10 million was coming from the retail side of the origination --

A. I don't know the breakdown.

Q. The memo does say, if you look at the second page March 10th, it's the next to the last paragraph, the paragraph that begins on Thursday morning, it says in the middle it was determined that the applications generated from date of conservatorship?

A. That the corresponding -- I see it had already moved.

Q. Had already moved. Is it fair to say the bulk of that $10 million was in the retail side of the origination network?

A. I -- no, I think this -- I think this -- the correspondent relationships that -- it was determined that the applications generated from date of conservatorship were less than $10 million, an