UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------X

AMBASE CORPORATION and :

CARTERET BANCORP, INC., :

Plaintiffs, :

and :

FEDERAL DEPOSIT INSURANCE : No. 93-531

CORPORATION, : Judge Loren Smith

Plaintiff-Intervenor, :

vs. :

THE UNITED STATES OF :

AMERICA, :

Defendant. :

---------------------------X

Washington, D.C.

Tuesday, March 7, 2006

Deposition of DONNA L. CRIBBS, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 10:17 a.m., Tuesday, March 7, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 2

APPEARANCES:
On behalf of the Plaintiffs:
DAVID H. THOMPSON, ESQ.
DAVID M. LEHN, ESQ.
Cooper & Kirk, PPLC
555 11th Street, N.W., Suite 200
Washington, DC 20005
Phone: 202-220-9660

On behalf of the Plaintiff-Intervenor, FDIC:
ASHLEY DOHERTY, ESQ.
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226
Phone: 202-736-0011

On behalf of the Defendant:
TIMOTHY JAMES ABRAHAM, ESQ.
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Washington, DC 20530
Phone: 202-616-0477
APPEARANCES (Continued)

Page 3

ALSO PRESENT:
LESLIE ANN CONOVER, Counsel
Legal Division
Federal Deposit Insurance Corporation

Via Speakerphone:
RICHARD A. BIANCO, Chairman
AmBase Corporation

Page 4

CONTENTS

| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| DONNA L. CRIBBS | PLAINTIFFS |
| By Mr. Thompson | 5, 103 |
| | DEFENDANT |
| By Mr. Abraham | 51 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Cribbs-1 | 35 | |
| Memo dated December 7, 1992 | | |
| Cribbs-2 | 46 | |
| Carteret Federal Savings Bank | | |
| Conservatorship Strategic Plan | | |
| Cribbs-3 | 76 | |
| Bates CAM 3200535 to 0536 | | |
| Cribbs-4 | 90 | |
| Bates AM5067 0546 to 0547 | | |
| Cribbs-5 | 108 | |
| Outstanding sale commitment schedule | | |
| as of 12/4/92 | | |

Page 5

PROCEEDINGS

Whereupon,
DONNA L. CRIBBS,
residing at 255 Lackland Court, Atlanta, GA 30350, was called as a witness by counsel for plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. Good morning.
A. Good morning.
Q. Please state your name for the record?
A. Donna Cribbs.
Q. Your address?
A. 255 Lackland Court, Atlanta, 30350.
Q. Ms. Cribbs, have you ever been deposed before?
A. Yes, I have.
Q. Okay. On approximately how many occasions?
A. On two other occasions.
Q. Did those have anything to do with Winstar -- well, do you know what supervisory goodwill is?
A. Yes, I do.

Page 38

Q. Do you recall with whom you spoke -- if anyone -- at Carteret about Carteret Mortgage Company?
A. Actually, I would not recall the names.
Q. Do you recall if you had any conversation with top executives who were in charge of operating and supervising Carteret Mortgage Company?
A. Actually, I can't say that I had those conversations or did not have the conversations. I recall I was more focused on actually the associates that did -- that were working in these areas.
Q. I'm sorry. When you say "associates."
A. The employees, the staff that were in these areas.
Q. What if anything do you recall about those conversations with the staff?
A. Just basically -- you know -- how do you do your job; just -- again aggregating information and documentation as to how these areas performed
Q. Okay.
A. And expectations of continued performance
Q. Do you have any recollection of what your impressions were based on those interviews or that aggregation of information?
A. That they had to tighten up.

Page 39

Q. Okay. In what --
A. That there was --
Q. -- ways?
A. -- the recommendation in this document was tighter controls be placed. For continued operations, there needed to be a change in how the operation was -- the controls that were in place.
Q. Did you make any assessment as to what the financial performance of Carteret Mortgage Company had been in the time prior to your review?
A. No.
Q. Okay. And if the tightening up that is reflected in your recommendations in this memo had been effectuated, do you believe that Carteret Mortgage Company had a viable business?
A. Only -- I mean -- and this would be an opinion only -- is that if -- I perceived that if they tightened controls, it was a viable company.
Q. Okay.
A. And properly managed it, going forward.
Q. Okay. And just -- let's talk for a minute about what sort of tightening would need to take place.
Under Recommendations on page 2 of this memo, it says active hands on pipeline management

Page 40

should be developed immediately to assure timely purchase of sale commitments and execution of trades.
Is that the process we were talking about earlier, of you've got the pipeline and you need to be able to hedge by selling a portion of that?
A. Right.
Q. Okay. And what was your concern about the way the pipeline was being managed?
A. There was more trading activity than I felt the pipeline warranted. So there were a number of pair-offs where you actually created a position and you can't deliver into that position, so you financially have to pair it off to get out of the obligation.
Q. Okay. And I apologize to make you walk through this. Can you give me an example of how a pair-off works?
A. Say I positioned 5 million dollars, but I wasn't able to deliver 5 million dollars.
Q. Yes.
A. Okay. Then I still have this obligation. At this specific rate. And then I would have to buy my way out of that position, and that would be a pair-off.
Q. Okay. So you would perhaps go out and

Page 41

have to buy the loans from somebody else to deliver them? Would that be a pair-off?
A. Physically, you don't -- typically, it is only a financial transaction. You don't really go out and find replacement loans. For a fee or a penalty, you are -- you pay as opposed to deliver.
Q. I see. Okay.
Now, the point number 2 is pricing should be conservative and origination product types should be limited to readily marketable loan programs, modifications to current menu where necessary to accomplish this.
What did you mean by this?
A. Okay. Gearing it more towards agency product which is -- rather than private sector product. Which would be the Fannie Mae, Freddie Mac, Ginny Mae that you get out of sort of the niche products.
Q. Okay. Do you recall what sort of niche products they had?
A. No.
Q. Okay. Now, point number 3 is it is essential to ascertain the willingness of the agencies and private investors to continue committing for purchase, accepting for delivery, and funding of

Page 42

loans from CMC.
Do you see that?
A. Yes.
Q. Is this the process you were describing earlier vis-a-vis Cowger where you went out and met with bankers and saw whether there was going to be a willingness to be a partner?
A. Yes.
Q. Do you know whether that was done with respect to Carteret Mortgage Company?
A. I have no idea.
Q. Number 4, evaluation must be made of the opportunity to retain Carteret Mortgage Company personnel and correspondent relationships related to production. Any significant attrition would limit viability of Carteret Mortgage Company continuance in the origination marketplace.
Do you know whether this evaluation was done?
A. I do not.
Q. Number 5, tighter controls must be placed upon the receipt of closed loan files to facilitate a streaming -- excuse me, a streamlining of the review and delivery process.
And what was your concern there?

Page 43

A. That part of the issue with not making timely delivery was based on their infrastructure for the receipt and processing of closed loans.
Q. Do you know if there was any effort to market Carteret Mortgage Company?
A. I do not know.
Q. And do you know if there was any attempt made to value Carteret Mortgage Company in December of '92 by the RTC?
A. My participation was limited to coming down and spending several days reviewing and making recommendations.
Q. Okay.
A. Then I had no further, to my recall, no further conversations or involvement with Carteret Mortgage.
Q. A few more questions actually about this memo?
A. Sure.
Q. So under mortgage loan production in the second sentence, it says CMC employ 108 individuals, a staff level adequate to meet current production demands?
MS. DOHERTY: Excuse me. Where are you looking.

Page 44

THE WITNESS: Here (indicating.)
MS. DOHERTY: Okay. The paragraph on page 1, labeled Mortgage Loan Production? Okay.
BY MR. THOMPSON:
Q. Do you recall having any concerns about the staffing at Carteret Mortgage Company?
A. Specifically, no.
Q. Okay. If you had had concerns, would you have put them in this memo?
A. Well, I actually, point 4, was the valuation to retain the personnel, that if there was any -- my concern would be it was adequate to take care of it; but if you didn't retain it, you were in a different position.
Q. Sure. Okay. That makes sense.
Now, turning to the first page underneath the chart, the first full paragraph says in the last sentence, the rate of attrition from loan application to closing is 58.6 percent and occurs at its highest level in wholesale.
Is that level of attrition within industry norms for that time, do you recall?
A. Very high.
Q. Okay. And was it -- it is higher for the wholesale than for the retail?

Page 45

A. That's common.
Q. Okay. And how do you -- so the retail -- looking at this chart -- is the attrition rate 44.87 percent? Or actually, maybe not. Maybe that's actually the portion of the loans that is attributable to retail and then -- okay -- 55?
A. It's not pull-through. It's actual.
Q. Are the pull-through statistics reflected in that chart?
A. They would have predated the chart.
Q. Okay.
A. The loans that were attritted would not have made it to these statistics.
Q. At the bottom of page 1, it says overall the production activity of CMC is well managed and recent years repurchase activity has been minimal.
When you referred to the production activity, what were you referring to there?
A. The ability to produce on a retail and wholesale basis loan applications, processing, closing, underwriting type, the origination side of the business.
Q. Then it says recent years repurchase activity has been minimal.
What does repurchase activity refer to?

Page 46

A. When you sell loans into the secondary marketing, you have certain reps and warranties you make related to those loans; and if the loan goes into early payment default or if there is suspicion of misrep, anything that would be covered under the reps and warranties could cause Freddie Mac or Fannie Mae to require that you repurchase the loan that they have previously bought.
Q. Okay. Thank you.
A. That's where you look for fraud and other activities.
MR. THOMPSON: I'd like to ask the court reporter to mark as Cribbs Exhibit 2 a document which doesn't have a Bates number but which is entitled Carteret Federal Savings Bank Conservatorship Strategic Plan.
(A document was marked for identification as Exhibit No. Cribbs-2.)
BY MR. THOMPSON:
Q. Turning to the page that's numbered 1 at the bottom, in the second to the last full paragraph, it states in the second to the last sentence, effective December 14, 1992, the RTC decided to discontinue residential loan origination activities.

Page 47

However, the existing pipeline of accepted loan applications and lending commitments of approximately 360 million as of that date will be honored by CFSB.
Were you involved in any way in the decision to discontinue residential loan origination activities?
A. No.
Q. And do you know who was involved in that process?
A. No.
MR. THOMPSON: I think we're very close to being done. I'd like to take just a five-minute break to collect my thoughts and make sure I'm not missing anything and then hopefully we just have a couple more questions. At least our questioning will be done.
THE WITNESS: Okay.
MR. THOMPSON: Thank you.
(Recess.)
MR. THOMPSON: Ms. Cribbs, we are back on the record. I have a few more minutes of follow-up that occurred to us.
BY MR. THOMPSON:
Q. In terms of the process of preparing this memo, did you physically go to Carteret?

Page 48

MS. DOHERTY: Excuse me. This memo being Cribbs 1?
MR. THOMPSON: Yes.
BY MR. THOMPSON:
Q. Yes, did you?
A. Yes.
Q. Do you recall other than meeting with the staff, do you recall talking to any of the executives?
A. No.
Q. Okay. And you were never employed by Carteret, were you?
A. No.
Q. Did you have any experience at the time in the New Jersey mortgage business?
A. In terms of personal experience working in the New Jersey market?
Q. Yeah.
A. No.
Q. Or any -- did you have any knowledge of regional differences between Cowger's situation versus Carteret's situation versus -- you know -- your other employers' situations?
A. No.
Q. Over the course of your career in the

Page 49

mortgage banking business, have you observed that there are at any given time sometimes regional variations in how the business functions?
A. Very seldom.
Q. Okay. What are the types of differences, though, that you have observed?
A. Mostly driven by -- the only thing I can do is an example.
Q. Sure.
A. Where there may be a depressed desire for investors to buy loans in a certain marketplace. That would be currently, say, Georgia, Florida, they are very high on the radar screen for fraud. So there may be some investors that would be less interested in purchasing loans out of Georgia.
I have seen that happen with Texas and Florida in the past but actually never so much out of other regions of the country.
Q. Okay. Do you know whether anyone offered to buy Carteret Mortgage Company?
A. I have no idea.
Q. Okay. Now, we talked a little bit about hedging strategies earlier. Have you ever been responsible for developing or implementing hedging strategies in any of your jobs?

A. Yes.
Q. Okay. And which jobs were those?
A. It was Loan America, Citizen Savings Financial, and with the bank group in Atlanta.
Q. And what was your approach to hedging when you were in charge of them?
A. I'm very conservative.
Q. Okay. Now -- and how does that conservatism reflect itself? If you are very conservative, does that mean you try to match as much as you can your pipeline to minimize the exposure?
A. Right. And the interest rate risk -- I think -- there are all kinds of derivative instruments that have existed over time, repos, reverse repos, things like that. I was never much of a paper hedger. It was more -- I know what my pull-through is going to be, and this is how I position.
Q. Okay. Carteret also had a servicing outfit named Clearwater Servicing. Did you have any involvement in the analysis of Clearwater?
A. Actually, no.
Q. And do you recall anything that we haven't discussed today about Carteret other than what we've discussed?



A. No.
Q. Okay.
MR. THOMPSON: Well, Ms. Cribbs, I'd like to thank you very much for your time coming to Washington. We very much appreciate it.
Certainly, the Department of Justice has the right to ask questions if they'd like.
MR. ABRAHAM: Thank you. I just ask at this time -- once again I'm Tim Abraham from the Justice Department -- Ms. Cribbs, if you'd like a break now for lunch or keep going?
THE WITNESS: Just keep going.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. ABRAHAM:
Q. I'm just going to ask you a couple of background questions to try to fill in areas that I didn't hear filled in.
A. Okay.
Q. First of all, is there any reason why your testimony today would be impaired, that you know of?
A. No.
Q. You said that you testified earlier that you received your degree from Georgia State?
A. I actually did not get a degree at Georgia State. I went to Georgia State.



Q. What degrees do you hold post-high school?
A. I attended Georgia State for five years.
Q. Okay. So there are no college degrees or graduate degrees that you hold?
A. No.
Q. What about certifications? Are you a CPA?
A. No.
Q. Okay. Any other certifications, licenses, or degrees?
A. No.
Q. What kind of training have you received on the job?
A. I've taken a number of courses through the Mortgage Bankers Association and I -- mostly on the job. You just walk in, and this is -- you know, you learn through experience and by performing the job.
Q. Any other courses besides the ones you mentioned relating to mortgage banking?
A. No.
Q. And what specifically were those courses related to mortgage banking?
A. Mortgage law, underwriting type courses, how to underwrite a self-employed borrower.
Q. Approximately what years did you receive that training?



A. Over the course of -- you know -- a number of years.
Q. Would that have been in the Seventies or Eighties?
A. Ongoing. I receive training now.
Q. Okay. So throughout your tenure from the Seventies to -- until today, you have received training on and off?
A. Ongoing, yes. Industry changes, yes.
Q. Could you say approximately how many hours of training you've had?
A. Not realistically, no.
Q. Would it be more than 100 hours?
A. Yes.
Q. Would it be more than 500?
A. (Indicating.)
Q. Okay.
A. There's no -- there is an MBA from the Mortgage Bankers Association, a certification process, et cetera. But there's not -- it is not like there's continuing ed requirements or anything like that in mortgage banking.
Q. You had said that you worked at Molton, Allen & Williams?
A. Yes.

Page 102

was shared with me or not.
Again I wasn't looking at it -- I was looking at it more from a risk/take care of business perspective than a continuation of business perspective.
Q. According to the last sentence of this paragraph, the reduction in volume combined with the interviews taken, it says the decision was made on December 11 to cease all further acceptance of mortgage applications?
MS. DOHERTY: Just a moment. I'm going to object to that characterization of the document because it says "this" and it is not clear to me that "this" has the antecedent that you assumed it does. Aside from that, you can go ahead and answer based on your understanding of what the author is referring to -- the author who is not you is referring to.
BY MR. ABRAHAM:
Q. I can rephrase that. Based on the last sentence, saying this combined with the interviews taken, the decision was made on December 11 to cease all further acceptance of mortgage applications.
Do you know who made the decision to cease acceptance of mortgage applications?
A. No. And I didn't participate in that

Page 103

decision.
Q. That last paragraph, says that all APS, meaning applications, in the bank as of December 11 would be processed in accordance with the established standards of Carteret, would be approved and funded having met those guidelines.
Are you aware of who made the decision, that decision referred to there?
A. No.
Q. Once again, you did not participate in that decision?
A. That's correct.
MR. ABRAHAM: At this point, I have no further questions.
MR. THOMPSON: Okay.
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. While we have it before us, let's take a quick look at Cribbs 4.
In terms of the fact that a portion of the correspondent relationships were moved as of the December 10, according to this memo, that fact wouldn't have any impact on retail origination, correct?
A. That's correct.

Page 104

Q. You testified earlier the high attrition rate was the result of the wholesale piece of the operation; is that right?
A. A big contributor, yes.
Q. To the extent the correspondents had moved on, that would have made the remaining piece of Carteret Mortgage Company less risky, is that right? Because it would have been more focused retail?
A. In a manner of speaking retail has less risk associated with it because you control the volume.
Q. During your involvement -- strike that. You already testified to that.
Let's see. There's discussion about the pipeline.
Did you have an opportunity to review the asset and liability reports of management?
A. No.
Q. And did you -- strike that.
In terms of the choices that were available to the conservatorship if the originations were shut down, would -- how would that impact the ability to fund the pipeline?
A. If origination were shut down, there would be less potential cash used in the funding of the

Page 105

loans.
So as an ongoing basis, they would not have the need for cash to fund additional loans.
Q. Okay. During the time frame that's covered in this memo, Cribbs 4, December of 1992, early December 1992, was there any discussion given to trying to sell Carteret Mortgage Company?
A. Not that I was involved in.
Q. Okay. Now, let's see, moving on to another document, in particular Cribbs 3, the beginning of that document says in the first sentence, excuse me, the last sentence of the first paragraph, the department appears newly formed and management emphasis on problem resolvement recently developed.
Was that a positive that management was trying to resolve these problems?
A. First steps in the right direction, I would say.
Q. Okay. And in terms of -- let's say if the problems in this memo -- Cribbs 3 -- had not been corrected in terms of recertification of certain pools that originated in 1987 to 1989 had not been fixed, what would the consequence have been to Carteret Mortgage Company?