UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

AMBASE CORPORATION and : Civil Action
CARTERET BANCORP, INC., :
Plaintiffs :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor :
vs :
THE UNITED STATES OF AMERICA, :
Defendant : No. 93-531

- - - - - - - - - - - - - - - x

Thursday, March 23, 2006
Allentown, Pennsylvania

- - -

Oral deposition of GLORIA MALIGAYA, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:30 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

- - -

in any connection with this, but that's about it. I don't know -- I don't have any contact with any former RTC employee or anything like that.
Q. All right.
MR. COLATRIANO: I'd like to have this document marked as Exhibit 1, please.
(Whereupon, a document was marked for identification as Exhibit Maligaya-1.)
BY MR. COLATRIANO:
Q. Exhibit 1 is a copy of a subpoena that was served on you recently in regards to this deposition along with a cover letter. And I think you've anticipated my next question, but this subpoena asked you to produce, or to bring with you, any documents that you have relating to the AmBase Corporation or Carteret or any receivership or conservatorship regarding Carteret. And I take it from your --
A. I do not have any documents.
Q. Okay. Thank you.
Can you briefly describe



your educational background, if you have any college degrees or anything post-college.
A. I have a BS degree, Accounting major. I took -- I finished all academic credits for an MBA.
Q. Okay. When did you get your BS degree approximately?
A. 1965.
Q. Okay. Do you hold any professional or have you held any professional certifications?
A. I'm a CPA.
Q. In which jurisdictions are you licensed?
A. New Jersey.
Q. And how long have you been a licensed CPA?
A. Mid-'90s.
Q. Were you a CPA at the time you were with the Resolution Trust --
A. I was a CPA in the Philippines, but not here. I did not pursue the licensure until --
Q. Okay. Can you now briefly



describe your professional experience, and let's say -- how long have you been in the United States?
A. '73. 1973.
Q. Can we start there and just --
A. Okay. I worked as a financial reporting supervisor for a pencil manufacturing company, U. S. Pencil Manufacturing Company.
Q. Okay. And what was the approximate time frame for that?
A. Nine years.
Q. So 1973 to roughly 1982?
A. Yeah.
Q. Then what did you do after that?
A. Then I worked for Transamerica ICS. That's a container leasing company. I was manager of financial reporting and budgets.
Q. And what was the time frame on that?
A. '82 to '85.
Q. And what did you do after that?
A. I worked for City Federal Savings --



Q. City Federal Savings?
A. -- as manager of financial forecasts from '87 to 1991.
Q. '87 to '91?
A. Um-hmm. It was taken over by RTC.
Q. Okay. Where was City Federal based?
A. Somerset.
Q. New Jersey?
A. Yeah.
Q. You said you started there in 1987 and you had left Transamerica in 1985. Had you done anything between those two?
A. Maybe '86 is the -- or wait. Wait. I was, like, a temporary. I was working for accountants on call on various short-term assignments.
Q. After City Federal Savings, what did you do after that?
A. RTC hired me while I was working for City Federal.
Q. So that was in 1991?
A. Yes, through 1995.
Q. And approximately when in 1995 did you leave the RTC?

A. December. That was when it folded.
Q. Okay. What did you do after that?
A. Merrill Lynch.
Q. Okay. Focusing on the time when you were at the RTC, can you describe what positions you held there and which offices you worked with?
A. The title was Operations Specialist, and I worked for the Eastern regional office, although I was housed in City Federal at first, and then when they sold that building, they moved me to Carteret along with other RTC employees.
Q. Okay. So approximately when did you move to the Carteret building?
A. Maybe '94.
Q. Okay.
A. Towards the last year, 1994.
Q. Okay. So just so I understand, you were an RTC employee, but you were located first in the City Federal office headquarters building and then in the Carteret headquarters building?
A. Yes.



Q. Okay.
A. My function was to help or to review financial plans submitted by the savings banks taken over by RTC in the Northeast.
Q. Okay. So even though you were located physically in Carteret's headquarters, or in City Federal's headquarters, you worked --
A. My main function is regional office rather than --
Q. Okay. So you worked on matters involving a number of conservatorships and receiverships?
A. Right, exactly.
Q. And so I take it you were never an employee of Carteret, the conservatorship; correct?
A. No, I don't think so.
Q. Okay.
A. No.
Q. Okay. And you've touched on this, but I want to make sure I understand. What were your responsibilities as an Operations Specialist at RTC?



A. After a bank is taken over by RTC, they are required to prepare a conservatorship operating plan. And I am the one who would be reviewing that with the main objective of looking at the expenses, making sure that no expenses are incurred for future benefits. Like, if they had planned a financial program, an application that might have benefited in the future, I'm supposed to say, don't do that. But mainly, it is the work of the bank employee. I review it if I had questions, and my emphasis is in the expenses more than the assets, or things like that.
Q. Okay. I think you said during the course of that that one of your objectives in reviewing these plans was to make sure that expenses for future planning didn't go forward?
A. Um-hmm.
Q. Why was that? Was that because --
A. Because it's probably not going to be worthwhile spending because of the nature of their business at the time.



Q. Okay. And was that because it was anticipated that once a thrift entered into conservatorship, it would ultimately be closed?
A. Yes.
Q. And you mentioned that your emphasis was primarily on expenses?
A. Right.
Q. Did you also review other aspects of the plan, or were you --
A. Mostly expenses is what I go through.
Q. Okay. Were other people in your office tasked with reviewing other aspects of these plans?
A. No.
Q. Okay.
A. No. In the preparation of the operating plan, the bank employee, the bank accountant, are in discussions with every area in the bank. And if an RTC employee has not taken over some of the duties of -- they would be referring to them if there's any.
But I did not receive any

Page 18

communication from an RTC employee regarding anything regarding any discussions between them and the bank employees. I did not receive any communication from another RTC employee regarding the conservative operation, the operating plan.
Q. Okay. But just so I understand, when this operating plan would be submitted to you for review, it was your job to review the whole thing, correct, not just the expenses part of it?
A. The expenses. More the expenses.
Q. Your emphasis was on expenses, but you needed to review the whole thing; is that fair to state?
A. It's -- I probably would look at it not to review and not to say it's right or wrong. My main thing is expenses, comparing with prior year; and if there is any variance, that I'm to ask what it is about.
Q. Okay. While you were with the RTC, to whom did you report?
A. There is a -- there is an in-house

Page 19

person who I can refer questions to, but mostly it will be with Atlanta on the phone, because they are the people who the conservatorship operating plan would go to.
Q. Okay. So the operating plan would ultimately go to the RTC's Atlanta office?
A. Atlanta office.
Q. And is this in the Operations Division, or do you remember?
A. No, I don't remember.
Q. And you said that there could be a person in-house that you could ask questions to. Are you referring to in-house at the bank?
A. In the bank, in Carteret. There was -- there were other RTC employees that are being housed there.
Q. Okay. Did you report to anyone in the RTC's Valley Forge office?
A. That's in the last year.
Q. The last year?
A. In the last year that I was oversight for audits of contractors. In the last year after Carteret is gone, we were moved to Valley Forge for the last

Page 20

year.
Q. Okay.
A. And my duty changed from an Operations Specialist to a Contractor Performance Analyst.
Q. Okay. So physically in the last year you were at the RTC, you operated out of Valley Forge?
A. Yes.
Q. Okay. And I take it that in your role as a Contractor Performance Analyst, do you recall performing any duties that had specifically to do with Carteret?
A. No.
Q. Did you have any staff while you were at the RTC? Did anybody report to you?
A. No.
Q. You mentioned that you have not been deposed before. Have you given any other testimony regarding financial institutions issues in any other context, in a trial or a hearing?
A. No.
Q. Have you ever prepared an

Page 21

affidavit concerning financial institutions issues or your work at the RTC?
A. No.
Q. While you were at the RTC, you were not in the Accounting Division; correct?
A. No.
Q. Okay. And so is it fair to state that you did not perform any functions regarding accounting issues for conservatorshps or receiverships?
A. No.
Q. No, you did not?
A. No, I did not.
Q. Okay. Did you perform any functions while at the RTC regarding claims against the receivership estate?
A. No.
Q. Okay. Did you perform any functions at the RTC regarding decisions involving the sale of conservatorship or receivership assets?
A. No.
Q. Did you perform any functions regarding the sale or the transfer of

at a deep discount?
A. No.
Q. Do you know why that wasn't included in the original budget?
A. I don't know.
MR. COLATRIANO: Let's marked this Exhibit 9, please.
(Whereupon, a document was marked for identification as Exhibit Malagaya-9.)
MR. COLATRIANO: Exhibit 9 is a memo from Robert Smedley to Managing Agents dated September 23, 1993, Subject, Integrated Marketing Plan/Conservatorship Strategic Plans, and has an attached E-mail. It's Bates stamped AM5290 0177 through 0178.
BY MR. COLATRIANO:
Q. I see that you're listed as a CC on the memo; correct?
A. Yes.
Q. Okay. Go ahead and review the memo and the E-mail and let me know when you're ready to proceed.
A. Yes, I've read it.



Q. Okay. Have you read the E-mail as well, the attachment?
A. Oh, the attachment. Yes.
Q. And I apologize, I can't remember if I asked you this before, but Integrated Marketing Plan, was that something that you would have reviewed when they were prepared?
A. Not for purposes of making recommendations. Probably just as a basis of how they whittled down the assets in the conservatorship operating plan.
Q. I'm sorry, as a basis for how they what?
A. As a basis how they plan the reduction of the assets for the plan.
Q. On the attached E-mail, there's a reference in the last paragraph. The first sentence says, "We understand that the people in Resolutions need assets in order to sell the 'whole' bank, and therefore do not see the need for us to dispose of anything until after we get funding and the institutions are sold."
Do you know what the



reference to funding is referring to?
A. Again, this I read from the newspapers that at some point, RTC didn't have funds to do the resolutions of these banks.
Q. And --
A. It was waiting for Senate approval.
Q. Okay. And is it your recollection that that funding issue was one of the reasons behind this freeze on asset sales or slowed-down asset sales?
A. It is just my own assumption, not coming from anybody.
Q. It's your assumption what, that that was related?
A. That was related.
Q. Okay.
MR. COLATRIANO: Let's have this marked as Exhibit 10, please.
(Whereupon, a document was marked for identification as Exhibit Maligaya-10.)
MR. COLATRIANO: Exhibit 10 is a document that has a cover E-mail



dated -- cover memo, excuse me, dated October 14, 1993 from Diane Friebely, F-R-I-E-B-E-L-Y, to yourself, Subject, Operating Plan Budget. The memo and its attached are Bates stamped C-AM-A-0051215 through, and including, 51257.
BY MR. COLATRIANO:
Q. Who was Diane Friebely?
A. From here, it says vice president, Controller's Division for Carteret.
Q. Okay. Was she somebody that you --
A. Met, no.
Q. You had never met her?
A. No.
Q. Okay. Was she somebody that you dealt with?
A. I called on the telephone. That's about it.
Q. Okay. This refers to a revised operating plan budget for the conservatorship strategic plan. How typical was it for these types of budgets to be revised?
A. It's not typical. It's not

Page 66

typical. I guess in this instance, they were asking for a 1.3 million increase in expenses. That's why they had to do this.
Q. And you're basing that on the discussion --
A. On the cover. On the cover, thing here.
Q. The page Bates stamped 51 --
A. Page 1217.
Q. All right. And that says, "This represents a $1.3 million increase in operating expenses primarily attributable to an increase to the Satisfaction Project and increased mortgage securitization expense."
I had asked you about this earlier, and I don't know whether this puts it in any better context for you, but do you recall what the Satisfaction Project was?
A. No, I do not.
Q. Do you know, do you have a recollection for whether it was a Carteret-specific program or whether it was an RTC program more generally applicable

Page 67

to --
A. No, I do not recall.
Q. Turn to the page that's Bates stamped 51221, and if you need to review the previous page to put that in context, obviously feel free to do so. Once you read that paragraph to yourself, let me know when you're ready to proceed.
A. Yes.
Q. What was the RTC Contracting HUB?
A. I don't know. This is the first I heard of that term. There must have been a department in RTC that reviews contracts, RTC Contract HUB.
Q. From the context, I'm assuming that this is something that was just being established around this time, October of 1993; is that right, do you know?
A. I do not know exactly.
Q. Okay. It says, "The RTC Contracting HUB will provide services to 19 conservatorships to be phased in between mid-October and the end of November. The allocation to conservatorships, which includes compensation and related costs and

Page 68

telephone, postage and supplies, will be based on support time spent by the contracting staff."
How was that allocation actually done? I mean, when it says it's based on support time spent by the contracting staff, did the staff keep track of their time and allocate it to specific conservatorships, do you know?
A. I do not know.
Q. I'm sorry?
A. I do not know.
Q. Okay. It then says, "Office occupancy expense will be absorbed by Carteret since such amounts are primarily fixed in nature." I read that to --
A. Meaning no allocations for occupancy.
Q. No allocations to who, to other conservatorships?
A. It seems to be, yeah.
Q. Okay. And I take it this RTC Contracting HUB was physically based at Carteret's headquarters; is that right?
A. I do not know.

Page 69

Q. Okay.
A. I do not know all the employees of -- or that contractors especially, I do not know.
Q. Okay. When it says, "Office occupancy expense will be absorbed by Carteret," why was Carteret absorbing all of the occupancy expense related to the contracting HUB?
A. I do not know what kind of space RTC Contracting HUB would have occupied in Carteret. They're saying here that those expenses are spent by Carteret are contracting HUB or not.
Q. I'm sorry?
A. They're saying here that the occupancy costs are fixed in nature, meaning it's spent by Carteret whether there was a contracting HUB or not.
Q. Right.
A. That's what it says here.
Q. Right. But even if they're fixed in nature, the Contracting HUB was providing services to at least 18 other conservatorships; correct?

A. True, it says here.
Q. Okay. And so it would be possible, would it not be, to allocate even fixed costs among those conservatorships?
A. It is possible. It seems like in this statement here, they're saying direct expenses related to contracting HUB are being allocated to conservatorships, and just that fixed expense which Carteret spends anyway, no matter what would be absorbed by Carteret.
Q. And the other conservatorships are benefiting from that expense; correct?
A. Yes. I don't know to what extent. Even the contracts could have been 80 percent contract. I don't know the -- I do not know the extent of the contract, the work of the contracting HUB. Maybe 99 percent is Carteret-related. We don't know that.
Q. Right. And maybe one percent is Carteret-related, we don't know that either?
A. We do not know that.
Q. Right. We don't know whether it's



one percent or 99 percent; correct?
A. Yes.
Q. Okay.
MR. KUIPER: You mean, counsel, based on what we're reading here?
MR. COLATRIANO: Yeah. And if the witness knows from some other basis, she's free to tell us.
THE WITNESS: They are just saying here 19 conservatorships.
BY MR. COLATRIANO:
Q. Right. And all of those conservatorships are benefiting from the services provided from the RTC contracting HUB; correct?
A. I do not know that all of them. Some of the conservatorships may not have assets that were transferred to the contractors.
Q. Well, it says it will provide services to 19 conservatorships; correct?
A. Okay. That's what it says here. I do not know the extent.
Q. Okay. Do you know who made the decision that office occupancy expenses



would not be allocated to the other conservatorships?
A. I do not know.
Q. I'm sorry?
A. I do not know.
Q. That's all I have for that document.
MR. COLATRIANO: Have this marked as Exhibit 11, please.
(Whereupon, a document was marked for identification as Exhibit Maligaya-11.)
MR. COLATRIANO: Exhibit 11 is a document that has a cover memo dated December 7, 1993 from Diane Friebely to yourself, Subject, 1994 Operating Plan Budget. It's Bates stamped WOP2971574 through, and including, 1615.
BY MR. COLATRIANO:
Q. Turn to the page that's been Bates stamped 1578.
A. Okay.
Q. There's a reference in the first paragraph at the end of that first paragraph to "Resolution related RTC



projects are in process, with the following status as of October 31, 1993." And it has three items, AGLARS, MAPP and Pre-Resolution. I asked you about a couple of these at least before, and I just wanted to ask you again if any of these documents have refreshed your recollection about what these items are, AGLARS, MAPP or Pre-Resolution.
A. I do not know MAPP. AGLARS, I vaguely -- I do not know. I don't know exactly.
Q. How about Pre-Resolution? What project was that?
A. I do not know.
Q. Do you know what the percentages next to each of these items is designed to signify?
A. It seems to me they're telling the status of the disposition and whatever asset that was moved to these things. It seems 91 percent of AGLARS has been sold or -- sold. That's how I read it. I do not know. I've never seen this.
Q. Okay. You say you've never seen

Page 78

Q. Do you know who prompted the decision to make those changes? Was that coming from RTC to Carteret or --
A. I do not know.
Q. Okay. That's all I have for that document.
MR. COLATRIANO: Have this document marked as Exhibit 13, please.
(Whereupon, a document was marked for identification as Exhibit Maligaya-13.)
MR. COLATRIANO: Exhibit 13 is a memo dated January 5, 1994 from yourself through Robert Valentino to the Managing Agents, Northeast Cluster, Subject, Year-end Closing Procedures. It's Bates stamped CAM4000136.
BY MR. COLATRIANO:
Q. Go ahead and review that to yourself. Let me know when you're ready to proceed.
A. Yes.
Q. Okay. Does this document refresh your recollection --
A. Yes. It seems like I'm still

Page 79

there.
Q. You're still there at --
A. January 5, 1994.
Q. But "by there," you mean you're still at Carteret?
A. Carteret.
Q. Okay. The first sentence of this memo says, "This is to remind you that all conservatorships have to use GAAP in financial reporting." Was there a concern that some conservatorships weren't following GAAP?
A. It seems from this paragraph that this is the case.
Q. Do you recall whether there was any concern regarding whether Carteret was following GAAP?
A. I do not recall.
Q. Okay. The next to last paragraph says, "In 1994, the budget variances are being strictly monitored and it is in our mutual interest to have only immaterial variances." Why were the variances being strictly monitored in 1994?
A. It seems like in 1993,

Page 80

explanations that expenses related to prior months were booked in another month was -- it's like -- it's an accepted thing, and now they're stressing that everything should be accrued so that expenses will be booked during the month that they were spent. I'm just getting it from this memo. I do not really recall the circumstances.
Q. Okay. That's all I have for that document.
MR. COLATRIANO: Have this document marked as Exhibit 14, please.
(Whereupon, a document was marked for identification as Exhibit Maligaya-14.)
MR. COLATRIANO: Exhibit 14 is a document with a cover memo dated April 14th, 1994 from Diane Friebely to yourself, Subject, 1994 Revised Operating Plan Budget. The memo and its attachments are Bates stamped CAM3670059 through, and including, 101.
BY MR. COLATRIANO:
Q. The first paragraph in the memo says that, "The 1994 Revised Operating Plan

Page 81

Budget, sent to you on 3/31/94, does not anticipate the bank's resolution." Do you know why that was the case?
A. I do not recall.
Q. Do you know whether that was something related to Carteret's specific concern or whether it was policy --
A. It would seem to me this is Carteret related from this memo.
Q. Okay. Turn to the page Bates stamped 062. This page has a listing of major assumptions, and under "Balance Sheet," the third bullet point, it says, "IPF - The sale of Imperial Premium Finance was originally budgeted for March 1994. Necessary approvals could not be obtained for this sale and Valley Forge is pursuing alternative agreements. Operations for IPF have been reinstated for April through December, as a definitive agreement has not been reached."
I take it from your earlier testimony that you were not involved in the efforts to sell Imperial Premium Finance; correct?

Page 82

A. No, I'm not.
Q. Okay. Do you have any recollection for why approvals for the sale of IPF could not be obtained as of the date of this document?
A. No.
Q. Okay. Turn to the next page, the page Bates stamped 063. This page has some assumptions for the income statement. The last one is, "The RTC Contracting Hub is anticipated to be phased out by March 31, 1994. Expenses connected with the Contracting Hub have been eliminated for April through December."
Earlier, we saw a document that referred to the contracting HUB. Do you know why it was anticipated to be phased out by March of 1994?
A. I do not know.
Q. Okay. Do you know who made that decision?
A. No.
Q. I think one of the earlier documents that referred to the contracting HUB, which was Exhibit 9, appeared to be

Page 83

suggesting, if you look on page 221 of Exhibit 9, that --
MR. KUIPER: I don't think it's Exhibit 9.
MR. COLATRIANO: Okay. I marked it wrong. Exhibit 10 then.
MR. KUIPER: What page?
MR. COLATRIANO: Yeah, it's Exhibit 10. I apologize. It's page 221. I apologize about that.
BY MR. COLATRIANO:
Q. Talks about the contracting HUB to be phased in between mid-October --
A. What page?
Q. 221. We had talked about this discussion earlier. And it talked about the contracting HUB was to be phased in between mid-October and the end of November of 1993. And now Exhibit 14 is talking about the contracting HUB being phased out by March 31, 1994. So if I'm reading these documents correctly, it was in existence for roughly six months or so, or even less than six months. Do you know why it was phased out so quickly?

Page 84

A. I do not know.
Q. I'm sorry?
A. I do not know.
Q. Okay. Were you involved in any decisions regarding either the phasing in or the phasing out of the contracting HUB?
A. No.
MR. COLATRIANO: Let's go off the record.
(Whereupon, a discussion was held off the record.)
(Brief pause.)
MR. COLATRIANO: Back on the record.
Ms. Maligaya, I have no further questions at this time.
THE WITNESS: Thank you.
BY MS. HART:
Q. Ms. Maligaya, as I indicated earlier, my name is Melinda Hart and I am with the Department of Justice representing the United States in this litigation. I just have some follow-up questions based upon questions you got earlier from Mr. Colatriano, and then just a couple of

Page 85

new issues.
A. Okay.
Q. And we'll just follow the same ground rules that Mr. Colatriano mentioned to you this morning, if that's acceptable to you.
A. Yes.
Q. Okay. If I could have you get Exhibit 2, the document that was marked earlier as Exhibit 2.
A. Yes.
Q. And once you have that document, if you could turn to the page that is marked as C-AM-A0400840. Do you have that page?
A. Yes.
Q. Okay. Now, if you look on there, these numbers are all in thousands. You'll notice that the total assets for Carteret Federal Savings Bank as of December 1992 was approximately 5.3 billion?
A. Yes.
Q. Okay. Do you know how that asset size for Carteret compared to the asset size for other institutions that were