**SlimScript**

UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------------------------x

AmBASE CORPORATION and CARTERET BANCORP, INC., :

:

Plaintiffs,

93-531C

-against-

:

FEDERAL DEPOSIT INSURANCE CORPORATION,

:

Plaintiff-Intervenor,

:

-against-

:

UNITED STATES,

:

Defendant.

:

------------------------------------------------x

DEPOSITION of RUSSELL J. MEYER, taken by the Plaintiffs, pursuant to Notice, held at the offices of Gibson, Dunn & Crutcher, Esqs., 200 Park Avenue, New York, New York, on September 10, 1999, at 10:35 a.m., before a Notary Public of the State of New York.

***********************************************

BARRISTER REPORTING SERVICE, INC.
120 Broadway
New York, N.Y. 10271
212-732-8066

APPEARANCES:

COOPER, CARVIN & ROSENTHAL, ESQS.
Attorneys for Plaintiffs
Suite 200
1500 K Street, N.W.
Washington, D.C. 20005
BY: HAMISH P.M. HUME, ESQ.,
of Counsel

U.S. DEPARTMENT OF JUSTICE
Attorneys for Defendant
UNITED STATES
1100 L Street, N.W.
Washington, D.C. 20001
BY: DAVID A. LEVITT, ESQ.,
of Counsel



APPEARANCES (CONTINUED):
AmBASE CORPORATION
Attorneys for Plaintiff
AmBASE CORPORATION
Greenwich Office Park
Building 2
51 Weaver Street
Greenwich, Connecticut 06831-5155
BY: MICHAEL T. CARENZO, ESQ.,
of Counsel

FEDERAL DEPOSIT INSURANCE CORPORATION
Attorneys for Plaintiff-Intervenor
550 17th Street, N.W.
PA Suite 300
Washington, D.C. 20429
BY: JAMES IGO, ESQ.,
of Counsel

NOT PRESENT:

GIBSON, DUNN & CRUTCHER, ESQS.
Attorneys for Plaintiff
200 Park Avenue
New York, New York
xxxxx



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, be and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

xxxxx



RUSSELL J. MEYER,
having been first duly sworn before a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. HUME:
Q. Please state your name for the record.
A. Russell J. Meyer.
Q. What is your address?
A. Office of Thrift Supervision, Department of Treasury, 10 Exchange Place, 18th Floor, Jersey City, New Jersey 07302.
Q. Good morning, Mr. Meyer.
A. Good morning.
Q. As you know, my name is Hamish Hume. I work with the law firm of Cooper, Carvin & Rosenthal, and I represent a company named AmBase Corporation.
MR. HUME: Before we get started, maybe we should have everyone state who is here presently

6

Meyer
at the deposition.
Could you state your name for the record?
THE WITNESS: Russell Meyer.
MR. HUME: Could you state your address for the record?
THE WITNESS: 35 7th Street, Belford, B-E-L-F-O-R-D, New Jersey.
MR. LEVITT: I am David Levitt for the United States.
MR. IGO: I am James Igo from Federal Deposit Insurance Company, representing plaintiff-intervenor.
MR. CARENZO: I am Michael Carenzo from AmBase Corporation.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. Was it in conjunction with one of the so-called Winstar docketed cases?
A. No.
Q. What was it in conjunction with?
A. Outside of work. It was a personal lawsuit, injury.

7

Meyer
Q. You may remember there are some formalities to go through. To begin with, I will remind you of those.
First of all, have you ever been convicted of a felony?
A. No.
Q. Have you done anything to prepare for this deposition today?
A. No -- I met with Beth Frank, a DOJ attorney, for about an hour or so.
Q. In Washington?
A. She came to Jersey City.
Q. Have you reviewed any documents in preparation for this?
A. No.
Q. Could you begin by giving me a description of your academic background of how you came to work as a regulator?
A. I have a bachelor of science degree in management from Rutgers University, and how I came to work -- I worked for Manufacturers Hanover Trust for fifteen years. I went to school at night, getting my degree.

8

Meyer
I left the bank in '79, worked for the IRS for two years and then came here.
I worked for the Federal Home Loan bank board for one year.
I left and worked for two years across the street at Curtis, Mallet, Prevost, Golt & Mosle as a fiduciary accountant of taxes, and then I came back to the Federal Home Loan Bank Board in '84 or so.
Q. Do you have formal training in accounting?
A. No, other than just required two credits to get.
Q. Do you recall what year you came to the Federal Home Loan Bank?
A. I came to the Bank Board in '81. Then I left for two years. I worked for one year, to '82, left for two years and worked at Curtis and came back to the Bank Board in '84.
In '85 they became -- we were rift from the Bank Board and worked for the Federal Home Loan Bank of New York until

9

Meyer
'89. They put us back to the OTS. I had the same job, but three or four different employers.
Q. Were all of those positions with either the Bank Board or Federal Home Loan or OTS in New Jersey?
A. Well, no, the whole region. The office was originally in the World Trade Center. We moved to New Jersey when we became OTS in '89. I worked in New York, New Jersey, Puerto Rico, the whole region.
Q. Do you have a basic understanding of what this litigation is about?
A. Just basically. I don't pay too much attention to it.
Q. You understand that it is litigation between savings and loan associations and the U.S. government?
A. Right, the holding companies, correct.
Q. Or the holding companies and major shareholders of those savings and loans associations?
A. Right.

Meyer
Q. You understand that one of the
things it relates to is the treatment of
supervisory goodwill?
A. Yes.
Q. Can I ask you to give me your
definition of what supervisory goodwill is?
A. Basically the institutions were
given money to put into net worth to take
over failing institutions. That is the
nutshell without going into the details of
accounting.
Q. Does the goodwill relate to the
money that they were given to enter into
those transactions?
A. They weren't given money; they were
just given the opportunity to take over
institutions and other areas, enter other
areas.
Q. Were they given goodwill as an
accounting forbearance in exchange for
entering into those transactions?
A. Yes.
Q. Do you recall that those
transactions were generally induced by the



Meyer
government in order to resolve failed or
failing institutions?
MR. LEVITT: Objection to
form.
You may answer.
A. Yes.
Q. Do you recollect that in undertaking
those transactions, some institutions
generated a large amount of supervisory
goodwill on their balance sheet?
A. Yes.
Q. Do you recall that in 1989 Congress
passed legislation by its acronym, FIRREA?
A. Yes.
Q. Do you recall that FIRREA changed
the accounting treatment for purposes of
determining regulatory capital by
disallowing those institutions to use
supervisory goodwill towards regular trade
capital?
A. Yes.
Q. Do you recall that prior to the
passage of FIRREA, those institutions had
supervisory goodwill towards regulatory



Meyer
capital?
A. Yes.
Q. Do you recall that when entering
into these assisted transactions or
supervisory transactions, those
institutions were assured that they would
be able to use account supervisory goodwill
towards regulatory capital?
MR. LEVITT: Objection. It
asks for a legal conclusion. I
object to the form of the question.
You may answer.
A. I wasn't there, but I assume that
was the inducement, yes.
Q. Were you aware at any time that the
Federal Home Loan Board or the Federal Home
Bank of New York were ever involved in work
on supervisory transactions?
A. No.
Q. Was your role always in examination
of institutions --
A. Yes.
Q. -- rather than in any acquisitions?
A. Right. I was a field examiner.



Meyer
Q. Throughout your whole career there?
A. Yes.
Q. I am sorry. I should have asked
you, you are still an employee of the OTS;
is that correct?
A. Yes.
Q. You have been continuously over the
last, since --
A. Since '89, yes.
Q. Do you recall the institution
Carteret Savings Bank?
A. Yes.
Q. Do you recall AmBase Corporation?
A. Yes.
Q. Do you recall that AmBase became the
100 percent owner of Carteret?
A. Yes, I remember they were the owner.
I don't recall if it was a hundred percent,
but probably, yes.
Q. Do you recall when that acquisition
of Carteret by AmBase took place?
MR. LEVITT: You mean what
year?
MR. HUME: Yes, what year.

14

Meyer
A. No, I don't remember specifically. It had to be around -- I don't recall the exact year.
Q. I should have said at the beginning, please, if any of my questions are unclear, don't hesitate to ask me to clarify. Your counsel may object to some questions. It doesn't mean that you can't answer unless he instructs you not to do so.
A. Right.
Q. If at any time you would like to take a break, it doesn't have to be at regular intervals, for whatever reason, let me know.
When do you first remember working on Carteret?
A. I worked on Carteret a few times before I was the EIC. I had worked there as an assistant before that.
That is why I am not sure what year that might have happened, but Carteret was always one of the largest institutions. I am not sure the first year I worked on Carteret.

15

Meyer
Q. Do you recall knowing about Carteret throughout your whole career at the Federal Home Loan Bank Board or Bank?
A. Yes.
Q. Do you recall what your impressions of Carteret were prior to becoming examiner in charge?
A. Prior to becoming examiner in charge, it was considered -- I considered it a good institution. It was nationally recognized. They had a well-known board. They had prominent people on the board at the time.
The building was beautiful. They are always co-operative with the examiners. We never had a problem.
Q. Do you recall when you became examiner in charge?
A. I think the specific year, no. '89, maybe. I am not sure. I would have to check that.
Q. You think you may have been involved in exams before then, but you don't remember exactly which ones?

16

Meyer
A. Right.
Q. It may have been the case that you worked on some exams before then, but not every one?
A. Definitely, right. I didn't work on every one.
Q. You didn't work on every one leading up to that, but you may have had some involvement with some of them?
A. Right.
Q. I will ask you a few questions about supervisory goodwill.
Do you recall being aware of Carteret as being an institution that during the 1980's engaged in a number of supervisory acquisitions that led to a large amount of supervisory goodwill?
A. Yes.
Q. Do you recall what those acquisitions were?
A. I don't recall the acquisitions. I just know that when I was there, they had institutions in Del Rey Beach, I believe, and Boca Raton. I don't recall.

17

Meyer
I know they had a loan portfolio from Maryland or Washington D.C. area somewhere. There was probably an institution they picked up from there somewhere, but I don't recall specifically the names or the date.
Q. Your recollection is quite good. In 1982 they acquired in a supervisory acquisition of two thrifts First Federal Savings and Loan of Del Rey Beach in Florida and the Barton Federal Savings and Loan Association in New Jersey. That acquisition in 1982 generated approximately $214 million of goodwill, supervisory goodwill.
Having had me represent that to you, does it refresh your recollection about the acquisition?
A. First, yes. Barton I had forgotten about.
First at Del Rey I will never forget. We were able to zip down to Florida to review loans. That was always something to try to do.

30

Meyer
way I was thinking, that the EIC's would corroborate, the current and the previous EIC?
A. If you had a question about the report, you may; otherwise, you may not.
Q. You don't remember having any specific questions about this report?
A. No.
Q. You notice in the first paragraph on this page on capital, in discussing capital it states that Carteret has both adequate RAP and GAAP capital position.
Can you explain to me what the difference between RAP and GAAP capital is?
A. Was, at that time GAAP capital was the financial, the generally accepted accounting principle.
Regulatory capital, RAP capital was -- there were modifications made to assist the industry at the time.
For example, the goodwill, as I mentioned before, appraised equity capital weren't considered acceptable by GAAP.
Q. The longer amortization period by

31

Meyer
goodwill and its ability, therefore, to count towards capital was a RAP concept rather than a GAAP concept?
A. It may have been a GAAP, but as I recall, they took it another step. I don't recall the specifics, but it was included in the RAP capital.
Q. Then it goes on to state that, "Carteret's adequate capital position has been the result of combination of good earnings, favorable acceptance in the capital markets and a sustained period of asset stability."
Do you recall thinking that Carteret had gone through a sustained period of asset stability when you first came to work on that as EIC in 1989?
A. Probably up to this point, yes, but at that time the real estate markets were declining, as I recall.
Q. Do you recollect what your thoughts were about management of Carteret when you first became examiner in charge in 1989?
A. I think, yes, we thought highly of

32

Meyer
management. I did.
Q. Do you recall specific people who were Carteret managers at that time that you worked with?
A. When I went in, I think O'Brien had left. I was working with Bob Walsh, I think, at the time. I thought he was a positive for the institution at first, and Jeff Connor was counsel.
Then the loan people, there were a few I thought highly of at first, and I changed my opinion later on. McCabe and Redfern.
Q. Do you recall which McCabe that was or do you recall his first name?
A. No.
Q. Do you think it was Charles McCabe?
A. I don't recall. He was one of the loan big shots.
Q. Do you recollect what your view was of Carteret's risk exposure when you first started to work as EIC on Carteret?
A. Offhand, I don't recall. I don't think I thought it was a problem, but I

33

Meyer
don't recall.
Q. We'll refer you now to Bates stamp, last three digits 341, which is also page 2 of the '88 exam report.
MR. LEVITT: What page?
MR. HUME: Page 2 of the report, and the last three numbers of the Bates stamp is 341.
Q. On that page you will see a long discussion of the merger between The Home Group. It is called merger agreement, but it was actually an acquisition of Carteret by The Home Group, subsequently named AmBase.
Do you recollect whether you had an opinion of any kind about whether the acquisition of Carteret by AmBase at that time was good or bad for the institution?
MR. LEVITT: He is asking what you thought in '87 or '88; is that correct?
MR. HUME: Yes.
A. I am not sure I had an opinion at that time. I think the general opinion was

42

Meyer

whatever we wanted.

I always tried to focus on bad people as opposed to bad institutions, but I liked the industry. I am sorry to see what happened to it.

Q. When you say you are sorry to see what happened to it, you mean as a result of FIRREA?

A. Even before FIRREA, just permit them to make all of the commercial loans and giving them the expanded authority to see that the best places remaining are ones that stayed with just doing mortgages and taking deposits.

Q. You felt that the institutions took advantage with the regulations of investments in terms of what they could invest in were going down the wrong course?

A. Not in the beginning. I thought they had to do it to survive like everyone else did, but looking back, I think it was wrong.

Q. Did you think that the new capital rules in FIRREA caused a lot of

43

Meyer

institutions to fail?

A. A lot -- I know that they caused institutions to fail, yes.

Q. Do you recall thinking that it caused Carteret to fail?

A. Yes.

Q. Because of its disallowance of the ability to use goodwill towards capital?

A. It was one of the things, yes. They could have survived, I thought.

Q. Let me refer you to some of the capital discussion in this ROE, page 46 of the report, which has a Bates number 639.

Let's go to the page before that, actually, the beginning of the capital section. Last Bates number 638 are the last three digits on page 45 of the exam. If you go to the conclusion paragraph at the bottom of that page, do you see that?

A. Yes.

Q. The second sentence states, "Although the institution will be able to meet the current regulatory minimum required by section 563.13 of the Insurance

44

Meyer

Regulations, it is not likely to meet the tangible, leverage ratio and risk-based minimum captain levels required by FIRREA."

Do you recollect that that was the case, having reread that sentence?

A. Yes.

Q. That they were in compliance with a fair degree of comfort and excess capital under the pre-FIRREA regulations, but under the new three-part rules on the defining capital requirements they were out of compliance?

A. I don't know that was a fair degree of comfort, but they were going to be be in compliance.

Q. Turn the page to the top of page 46, Bates number, last three digits 639. It gives a good one-paragraph description of capital cushion in 1989 under the pre-FIRREA rules, and then we'll go on to look at the FIRREA rules as reported on the institution's TFR of June 30, 1989.

Regulatory capital totalled $310.06 million or 4.4 percent of total assets. As

45

Meyer

of the same period, the institution's regulatory capital requirement was $205.7 million. The institution's RAP capital level exceeded the regulatory requirement by $149 million.

Would you agree that that level of capital cushion is a pretty good level of excess capital?

MR. LEVITT: It assumes the TFR reported the losses, which it didn't.

With that exception, you may answer the question.

A. I wouldn't assume that. You would have to see.

MR. HUME: I would like to object to the form of that objection which is highly suggestive and in no way is accurate to the actual facts.

MR. LEVITT: That is what I was going to say.

MR. HUME: It is highly speculative.

MR. LEVITT: That is what I

A. The regulations, our procedures, the whole industry.
Q. Would you say that it was dramatically different, how you would look at an institution after FIRREA? You would approach your job as diligently as you had before, but with all these new rules you would see an institution very differently?
MR. LEVITT: Objection. Asked and answered.
A. No, I am just looking for the same category. There is just different requirements.
For example, now there is no more goodwill. I am still looking at capital, looking at asset quality and management. I always place a high priority on management even after FIRREA.
Q. I understand that. I understand that you will look at the same thing. You would look at assets, capital, you will look at management. The titles are the same in your reports, but the rules are different?



A. Right.
Q. Presumably, would I be right in saying that you look at an institution that is in capital compliance different from the way you would look at an institution that is way out of capital compliance?
A. Yes.
Q. If an institution is only barely in compliance or out of capital compliance, doesn't it pose a greater risk to the insurance fund?
A. Yes.
Q. It is your job as a regulator to protect the insurance fund?
A. I disagree with that, but, yes.
Q. Why?
A. My job is to be sure that the institutions are run legally and within regulatory -- someone else is worrying about the level of insurance fund, if they are screwing up.
That is all that I am reporting. Whether it affects the insurance fund or not, that is just a ramification of what I



am doing.
Q. You agree that the larger purpose of the regulatory function is to protect the insurance fund?
A. The regular -- yes.
Q. If an institution is at or below its requirement or barely above or below its requirement, then it does pose a larger risk to the insurance fund?
A. Yes.
Q. If it poses a larger risk to the insurance fund, isn't it more dangerous if it has a high level of classified assets?
A. Yes.
Q. Isn't it something that you have to be more careful about looking at?
MR. LEVITT: Objection. It is a nonsensical question.
Can you rephrase the question?
A. More carefully what?
Q. Don't you have to be more careful in worrying about an institution's asset portfolio and strength of its assets at or below its capital requirement than if it



has a great deal of excess capital?
MR. LEVITT: Would you read that back?
(Whereupon the record was read back by the reporter.)
A. I look at the asset quality at every institution. I am not going to change the way I am looking at it based on the capital level. The ramifications of what I determine will affect the capital level definitely, but I am generally not looking at that affected by the capital level.
Q. Let me ask it this way: Who decides how many examiners will work on an institution's asset analysis during an exam?
A. As the EIC, if I am given sufficient staff, then I determine. If I am not given sufficient staff, somebody else is determining it.
I know what I am doing. A large institution like Carteret, I might assign one person to capital, one to the books, one or two to investments, then the vast

70

Meyer
question.
MR. HUME: Thank you. I am happy to read lots more irrelevant things that have nothing to do with that.
A. It was a change of ownership, which is always something we're concerned with.
Other than that, I don't recall looking at this. If there is something in here, it speaks for itself; is that the term?
Q. You don't remember why AmBase was an area of concern?
A. Definitely for a change in control. A change in control is a major concern.
Q. Change of control happened a year earlier, had been mentioned as you saw in the '88 report; had it not?
A. Right.
Q. Under the conclusion in this report summary, a little farther down that page -- I am sorry I will skip over a few sentences. If you would like me to read it, I will.

71

Meyer
It states, "Carteret has serious financial problems with core operating losses over the last four quarters and declining asset quality resulting in a strained capital position. Inadequate loan loss reserves and changes in the regulations mandated by FIRREA placed additional strains on the bank."
Do you recall thinking, Mr. Meyer, when you worked on Carteret in 1989 that FIRREA was an additional strain on the institution?
A. Yes.
Q. Do you recall thinking that it was more than just an additional strain?
MR. LEVITT: Objection. It is vague.
Can you answer?
A. I didn't think withdrawing the goodwill like that was right, personally.
Q. You mean you didn't think it was fair that the institution couldn't treat its goodwill capital anymore?
A. Right.

72

Meyer
MR. LEVITT: Objection as to relevance.
Q. Do you recall whether that had any significant impact on Carteret?
MR. LEVITT: Objection, because the word "significant" is vague.
He says in the report it placed an additional strain on the bank.
Q. You can answer, Mr. Meyer.
A. What was the question?
Q. Did you think that it had a significant impact on Carteret?
MR. LEVITT: Objection to the word "significant." It is vague.
A. The report says it placed an additional strain on the bank. I thought it had a negative impact on Carteret.
Q. Let me ask you to turn to page 49 of the report, last three Bates numbers 642.
Actually, let's begin two pages earlier than that on page 47 of the report, last three Bates numbers 640. It shows in

73

Meyer
the middle of that page, "Calculation of tangible capital under FIRREA."
Do you see that? Do you see at the top of the page it says, "FIRREA"?
A. Yes.
Q. Then tangible capital, it begins with an equity capital number of $264 million?
A. Yes.
Q. Then it takes out a GVA and loss calculation amount and an intangible amount and ends up with 49.6 million; do you see that?
A. Yes.
Q. Do you see the footnote 2 next to intangibles?
A. Yes.
Q. Do you see underneath the note for footnote 2, it describes how that intangible number of $214 million was reached? Do you see that?
A. Yes.
Q. Why don't you review that, please, and let me know when you're done reviewing

74

Meyer
it?
A. I am done.
Q. Footnote 2 you had a chance to review?
A. Yes.
Q. Do you see that the goodwill number is $187.4 million?
A. Yes.
Q. Do you see that the capital goes from 264 million to 49.6 million under this calculation of tangible capital? Do you see that?
A. Yes.
Q. If you turn over to page 49, last three Bates stamp numbers 642, you can see that it then -- and it is no secret; I am showing you the bad stuff -- there was significant valuation allowances that this exam recommended Carteret take, and specifically if you see the line of $77 million there, you will see the valuation allowance recommended.
Do you see that at the bottom of the page? Maybe I wasn't being clear.

75

Meyer
A. Yes, I see, yes.
Q. This exam recommended that there was a $77 million writeoff that reduced the tangible capital from 49.6 million to negative 27.5 million?
A. Yes.
Q. Leading to a capital deficiency of $132 million?
A. Right.
Q. Do you recall Carteret being thought to be that far out of capital compliance at the time of this exam?
MR. LEVITT: Objection. It is a vague question.
Q. Do you recall when you worked on this exam, that it reached conclusions that Carteret was out of capital compliance on an order of magnitude around $100 million?
MR. LEVITT: Does he remember these numbers besides refreshing his recollection with this document?
Q. Having had your memory refreshed, do you recall that?
A. Yes.

76

Meyer
Q. Do you recall thinking that that was a very serious problem?
A. Yes.
Q. Do you recall thinking that Carteret was in danger of failing?
A. Yes.
Q. Do you recall thinking that the reason it was in danger of failing was that a major reason -- that one major reason it was in danger of failing was the new capital requirements imposed by FIRREA?
A. Yes.
Q. One major reason that the capital requirements by FIRREA were caused to fail was that they disallowed goodwill to be treated as capital?
A. Yes.
Q. Would you agree that not being able to treat $187.4 million of goodwill as capital is more damaging than having a reserve of $77.1 million, more damaging to capital?
MR. LEVITT: Objection, vague. You may answer.

77

Meyer
A. Yes, specifically the numbers, but the 77 million represents a potential requirement in the loan portfolio, which could be more damaging. That is a number that is pretty impressive.
Q. Do you recall whether Carteret agreed with that number?
A. Agreed with it, I think so, yes. As I recall, they did.
Q. Do you recall whether they followed the recommendation and took the reserves recommended here?
A. I would -- I don't recall, but I would assume they did. I don't recall specifically.
A lot of times when I leave, I am gone. I don't want to --
Q. My question was whether the goodwill being greater than capital was more significant in impact than the $77 million in reserves that were recommended here.
Am I correct that your answer was yes, it is on a mathematical basis?
A. Right, that is just math. It is

Meyer
more money and it is reducing capital, but the 77 million is a very significant number based on the size of the institution and the loan portfolio.
Q. It is clearly very significant. Isn't it true that the 77 million is reached through a process of asset analysis that is debatable?
MR. LEVITT: Objection. Vague.
A. Everybody has a scientific way to calculate it, and that is the problem. It is debatable, yes.
Q. The goodwill calculation, in terms of whether the goodwill can be treated as capital or not was following the plain language of the institute. As a legal matter seemed to be not required. It wasn't the amount of money --
A. Assuming the money was calculated proper, yes.
Q. In measuring the health of the institution, isn't the impact even more pronounced, the impact of the goodwill even



Meyer
more pronounced than the loss valuation allowance is?
MR. LEVITT: Objection. Vague. Asked and answered.
MR. HUME: Let me see if I can clarify the question.
Q. If this institution had been seized because it was $133 million out of tangible compliance, wouldn't you agree that the major reason was its inability to treat goodwill in its regulatory capital and the attributing reason is the writedown in assets recommended here?
MR. LEVITT: Before you answer, can you read it back, please?
MR. LEVITT: Objection. It is a hypothetical question. It wasn't seized at this time, but answer if you can.
A. Again, it is just numbers. Definitely, that number is higher than the 77 million. However, in my mind the 77 million was more -- regulatory capital,



Meyer
somebody could assign another law and made it okay the next day.
It is there. It is a serious issue, but the concern that I had was the 77 million, the asset quality.
Q. That was more related to the actual job you were doing of reviewing the portfolio?
A. Right. Somebody is going to tell me what the regulatory capital should be, and there is nothing that I can do about it.
The absolute number is greater than that number, and if you want to say that that is the prime reason, that is fine.
Let's move on. I am with you. I disagree with it.
Q. Do you recall any other examiners disagreeing with the requirement of goodwill in FIRREA?
MR. LEVITT: Objection as to relevance of who disagreed with what, when and where, but answer if you want to.
A. I don't recall particularly.



Meyer
Q. Do you recall if Angelo Vigna specifically shared that view?
A. No.
Q. You don't know?
A. I didn't talk to Angelo Vigna. One or two social occasions, but that was all. Not about this institution that I can remember.
Q. How about Thomas O'Rourke?
MR. LEVITT: The question is does he know O'Rourke's attitude about FIRREA?
MR. HUME: That is correct.
A. I don't know Tom's opinion about FIRREA. I think Tom was on this job.
Q. Tom became Examiner-in-Charge after you?
A. Yes.
Q. In '91?
A. He might have assisted me in '89. I am not sure. He was new to us.
Q. Let's quickly try to get through some of the rest of the report before we break for lunch.

82

Meyer

On page 1, again, last three numbers of the Bates stamp 594, there is a discussion of activities that must be ceased in the draft. It discusses these former fees, manager fees to holding company.

Do you recall anything about those fees?

A. Just what I am reading here. I remember there was a concern about transactions between institution and AmBase, and I don't recall specifically, except as I just read here, that they were fees.

Q. Turn the page. Paragraph 4, that is labeled, "Commercial/Construction Loans," stating that, "All lending of this type must cease" --

MR. LEVITT: -- "until such time as adequate underwriting policies are developed and approved by the Board."

Q. Do you recall what you thought about Carteret's commercial loan division?

83

Meyer

A. Yes. We didn't think too highly of them at this point by the end of the exam.

Q. Do you recall Rob Muller?

A. Yes.

Q. Do you recall him as someone who was in charge of the commercial loan division?

A. I don't remember specifically. He was in charge of pretty much everything, I think. I don't remember.

There were two guys that I would go and talk to. You didn't talk to O'Brien. You talked to Muller and some other guy. I believe the second year they were both gone or they moved on.

I am sorry. Go ahead.

Q. That is okay.

Do you recall that Carteret, in establishing or in starting up a commercial loan division, essentially acquired a commercial loan department of another bank?

A. Right. There was a whole team of guys that came from somewhere else. I don't recall where.

Q. Do you recall whether that was

84

Meyer

something that was unusual for thrift institutions that started to get into the commercial loan business at that time?

A. No. It was a standard practice and actually something I considered good, prudent.

Some places were trying to take a residential mortgage guy and trying to tell them to run out and make commercial loans when he knew nothing about them. Many of the smaller places, that is all they could do. A bigger place like Carteret could afford to have a department, so to speak.

Q. It was a more prudent way to get into a new line of business?

A. I thought so, yes.

Q. Do you recall thinking that the actual people who came in with that group into Carteret to undertake its commercial loan business were generally competent?

A. Initially I thought they were competent at that time. Even maybe by the end of this exam I might have thought they were competent. By the time I was done, I

85

Meyer

didn't have a very good opinion of it.

Q. Do you recall why that was?

A. We found fraudulent documents, and just that they were working to achieve bonuses, but nothing that they could -- as I recall, they just weren't doing what they had to do, as I recall, identifying the proper loans.

Q. Do you recall specifically what you mean by fraudulent documents?

A. I remember some loans. I can't think of the name. We found criminal referrals, phony rent rolls and things like that.

Q. Do you recall individuals specifically who were involved in that?

A. I am going to say Profetta, I believe, was one of the borrowers who had loans.

Q. I guess I meant individuals -- I am sorry --

A. Loan officers?

Q. When you refer to fraudulent documents, do you refer to fraud on the

94

Meyer

A. Wait. You just said -- what did you say?

Q. You don't know how that would have impacted its exposure to credit risks?

A. To credit risks?

Q. Do you recall how that happened?

A. They have increased by the commercial the questionable loans, the questionable --

Q. Do you recall how its attempt to reduce exposure to interest rate risks increased its exposure to credit risks?

MR. LEVITT: Objection. It assumes facts not in evidence.

Q. If it did.

A. It was separate operations. On one hand they were trying to reduce their exposure to interest rate risks. Like I said, I don't recall specifically, but reduce the maturities on the loans and the assets going out, and they increased their exposure to credit risk by the types of commercial lending that they were doing.

95

Meyer

Q. The next sentence, the next paragraph reads, "The bank's management team appears capable and is qualified to deal with the current problems. They have acted decisively when they felt the need to change and should continue to do so in the future."

When you say, "The bank's management team," in that sentence and in this context, does it refer to the senior management?

A. Yes.

Q. Do you recollect having a positive feeling towards their ability to handle the problems in the institution at that time?

A. That is what I said, yes.

Q. Do you recall your feelings about senior management changing after this time?

A. Yes, there were major changes. I don't remember the time frames, but O'Brien left and Muller eventually left.

There was another guy. There was a tribunal of three guys, Pierson. He might have been the last one to go, but I thought

96

Meyer

they were all capable and would do the right thing.

I don't know, maybe they didn't have the ability to handle the commercial lending they got into as you look back on it, but at the time I felt very confident of those three men and the heads of the department also.

Q. Turn to page 9 of the report. In the middle of that page in paragraph 3, in the third sentence it states, "Compounding the decision to venture into riskier lending areas is management's failure to properly read," in quotes, "'the softening commercial real estate market resulting in continued investment through June of 1989.'"

Do you recall the commercial real estate market taking a downturn around that time in 1989?

A. Yes.

Q. Do you recall whether or not there were many thrift managers who foresaw that downturn?

97

Meyer

A. Many thrift -- I don't recall. At that time I was only on one or two other.

Q. This sentence states that, "The management failed to read softening market," and I guess my question is simply whether you know of anyone who did properly read this softening commercial real estate market.

A. I didn't care. I was only worried about here. They didn't.

Q. Do you recall thinking that they didn't because they were negligent or simply because they couldn't see what was going to happen in the market?

A. I don't recall. They just didn't see what was happening. I don't think they were negligent that I can recall.

Q. In the reference to riskier lending areas, do you recall that being more interest rate risks or are we talking about junk bond risks?

A. This was --

Q. What kind of risks do you recall there being?

98

Meyer
A. This would be saying riskier lending, that is credit risk.
Q. Is that referring to junk bonds? Is that what you remember?
A. I would say no, I would say lending. It says lending. I would have put investments.
Q. Was the institution undertaking higher risk investments like that in order to make bigger profits?
A. Like what? The credit risk or the junk bond?
Q. Was it your recollection that institutions entered into riskier lending areas in order to increase profitability?
A. Yes, and to address the interest rate risk, because they could adjust the rate on the commercial lending where a mortgage would be mostly thirty years fixed.
When I say ARM lending, most of the commercial lending was adjustable rates also.
Q. I guess the problem is trying to

99

Meyer
make more money by taking more risk, but because of the risk, you can also lose money; isn't that right?
A. Right.
Q. When you lose money, it depletes capital; isn't that the effect on the balance sheet?
A. Yes, sure.
Q. Wouldn't an institution have been more likely to engage in riskier activities if it had a large excess of capital over its requirement than if it did not?
MR. LEVITT: Objection.
I don't know whether that is within the witness's expertise, but if you have expertise, go ahead.
Q. It is not calling for your expertise. It is simply calling for your experience.
Was it your experience that you thought institutions-- let me put it this way -- was it your regulatory view that it was more acceptable for institutions to engage in high-risk lending activities if

100

Meyer
they at least had excess capital of the requirement than if they did not?
A. Yes, but that didn't stop places with no excess.
Q. At the bottom of page 9 it states that, "Management has implemented the strategy of moderate shrinkage via asset sales to produce nonoperating profits and to achieve the capital requirements specified by FIRREA."
Do you recall that as a result of its new capital requirements, Carteret decided that it needed to shrink in size?
A. That is what it says.
Q. Do you recollect that fact independently?
A. Specifically, yes. They knew they had to shrink.
Q. Do you remember that they had originally had a plan to try to grow that they then had to change?
A. I don't specifically recall, but I believe that my impression is that, yes, they were trying to grow all along prior to

101

Meyer
this report, this exam.
Q. When an institution loses a large amount of capital, is one way that it can try to maintain compliance by reducing assets so that its capital retirement will move down?
A. Yes.
Q. Was this a standard response to the new capital requirements that thrift institutions that were severely affected by it needed to shrink assets?
MR. LEVITT: Objection.
It assumes that the only reason is because of the new requirements of FIRREA. In fact, there were a lot of reasons.
MR. HUME: Object to the testimonial nature of the objection.
MR. LEVITT: Objection.
You may answer.
Q. Do you recall other institutions taking that course of action after the passage of FIRREA in 1989?
A. Specifically, no. That was general,

102

Meyer
even before FIRREA. If you were in trouble with capital, one of the things you could do was shrink assets.
Q. Do you recall a larger number of institutions having a problem with passage of FIRREA?
A. Of course, there were more. Anyone that had a goodwill wiped out would have capital problems.
Q. Those institutions would need to undertake an asset shrinkage even if they had previously planned to grow; isn't that what happened?
A. They may have had to do it even with just the collapse of the real estate market at that time. Like I said, it is one way to address the problem asset shrinkage, change in your business playing.
Q. Would you look at the bottom of page 10? I will not go through all 64 pages.
At the bottom of page 10, the second-to-last paragraph right above the section entitled, "Management fee," I will read the two sentences in that paragraph.

103

Meyer
Let me ask you, do you recall the company named Imperial Premium Finance?
A. Yes.
Q. Do you recall when AmBase acquired Carteret? Carteret purchased Imperial Finance?
A. Yes.
Q. I will now call it IPF.. Let me read this sentence that refers to that acquisition in paragraph:
"By the end of August, 1988 AmBase received $24 million in funds from Carteret, 13 million in dividends declared and 11 million on profits on the sale of IPF. Additional dividends were declared subsequent to the consummation of the acquisition."
Do you recall having a concern with the purchase price AmBase Carteret paid for IPF?
A. Yes.
Q. What was the nature of your concern?
A. Just whether they overpaid the valuation, as I recall. Any time there is

104

Meyer
a transaction between affiliates, we have those concerns.
Q. Do you recall whether your concerns were ever appeased or did they get worse?
A. I thought IPF was a pretty good company. I was not familiar with insurance premium financing up to that point, and when I was looking into it, I thought it was a rather good business.
Q. Having had me refresh your recollection by reading this paragraph, do you recall that the purchase price Carteret paid for IPF was comprised of several different components including dividends?
MR. LEVITT: Where does it say the purchase price involved dividends?
Q. Review the paragraph previous to the one I just read.
A. They wrote 65 million.
MR. LEVITT: What is the question?
Q. The question is do you recall that part of that purchase price of 65 million

105

Meyer
was paid in the form of a dividend?
MR. LEVITT: Where does it say that?
MR. HUME: When did I say that it said that? I am asking a question.
MR. LEVITT: You are asking whether he remembers that part of the 65?
(Whereupon the record was read back by the reporter.)
A. No.
Q. Do you recall how it was paid?
A. No.
Q. Do you have any recollection of the way the deal was structured?
A. No.
Q. Reading this paragraph doesn't help you remember that?
A. No.
Q. Do you recall anything about Carteret paying what were termed stay payments or stay bonuses to some of its officers and directors?

106

Meyer
A. It sounds familiar, but I don't recall specifically.
Q. Refer to page 13, it may refresh your recollection.
You can see at the bottom of the page there is a list of bonuses to specific officers of Carteret. I am not sure if they are referred to as stay payments in this paragraph or not, but more generally, do you recall that institutions had to pay out bonuses in order to try to keep their officers and directors employed?
MR. LEVITT: Bonuses or stay bonuses?
MR. HUME: I am talking about stay bonuses or stay payments.
MR. LEVITT: Not bonuses of doing a job over the course of the year with the change of control? Were stay payments made? Is that what you're talking about? I am trying to get the question.
MR. HUME: Who is being deposed here?

107

Meyer
MR. LEVITT: The witness is.
MR. HUME: Why are you asking for clarification?
MR. LEVITT: I am the lawyer. I instruct him not to answer.
MR. HUME: Is there an objection?
MR. LEVITT: Yes. It is an unclear question.
MR. HUME: Normally lawyers say, "Objection, vague."
MR. LEVITT: I disagree. Normally lawyers ask for a clarification.
MR. HUME: Are you suggesting what the witness should say?
MR. LEVITT: Can you give us a clarification?
Q. My question, Mr. Meyer, is do you recall generally the existence of stay bonuses or stay payments in the industry at that time?
A. I remember contracts. I don't know when they were awarded to keep people, to

108

Meyer
keep them on.
I seem to recall a problem at the time because a lot of them were for five years, six years, and we did not think that was appropriate because the Board only had three-year terms in committing the future board of directors to these things, but other than that, any time there is a transaction, a merger or takeover, the key people sometimes were awarded those things.
Q. Do you ever remember stay bonuses needing to be paid because people simply didn't want to be directors of a savings and loan institution?
A. Specifically, no.
Q. Were you aware that there was a view in the industry on the part of some, at least, that it was ill-advised to be a director of the S&L after the passage of the FIRREA?
A. Yes.
Q. What was the reason for that perspective?
A. Because of the possibility of

109

Meyer
lawsuit. The government was going around suing everybody now.
Q. Do you recall that some of the directors were being sued personally and were being held personally accountable?
A. At Carteret?
Q. Generally in the industry at that time.
A. I don't recall any specifics.
Q. You do recall that --
A. I remember it happened. I just don't recall who specifically, anybody.
Q. You remember the threat of accountability and of lawsuits against the personal assets of directors as a reason why some people thought it was not wise to be a director of an S&L?
A. Yes, exactly, as I recall.
Q. Is that a perspective that existed prior to FIRREA?
A. As I recall, I don't think so, no.
Q. Turn to page 16. You can see some documentary support for some questions that I asked you. Item number 4, it says,

110

Meyer

"Increase asset size to $10 billion."

Do you ever remember thinking that Carteret's asset size plans were unrealistic?

MR. LEVITT: Before this exam or after this exam or what?

A. Going in, I did not think they were unrealistic.

Q. You did at one time think that they could grow to the size of $10 billion?

A. Yes.

Q. During the course of this exam you came to change that view?

A. Yes.

Q. The reason you changed that view was because --

MR. LEVITT: Ask him the reason you changed the view. Why do we need testimony?

MR. HUME: I can ask questions the way I want to ask questions.

MR. LEVITT: Go ahead.

MR. HUME: Do you want to ask the questions? Are you proposing

111

Meyer

that you cross-examine the deposition before I am finished?

MR. LEVITT: I am proposing that you finish and ask direct questions.

MR. HUME: Your lawyer is going to prevent this deposition from ending today. I want you to know that there is no way this deposition can be finished if this is the way he chooses to defend it, which is to testify.

MR. LEVITT: Ask your question.

MR. HUME: You won't let me ask the question that I am trying to ask.

I am happy for you to call the judge and complain about the way that I am conducting this deposition. I will have the court reporter read back the way you are objecting should we do that.

MR. LEVITT: I would like the

112

Meyer

deposition to continue.

MR. HUME: I would like to take a break.

(Brief recess taken.)

(Whereupon the record was read back by the reporter.)

Q. I think the question was whether during the course of the 1989 exam you came to view that the business plan to grow to an asset size of $10 billion was unrealistic. Do you remember that?

A. I believe I came to that conclusion. What does it say in here?

Are you asking me a question that is answered in the next page?

Q. I am asking you what you remember, that is all.

MR. LEVITT: What page was that?

MR. HUME: Page 16.

A. As I recall, I didn't think it was realistic at that time.

Q. Do you recall you thought that the enactment of FIRREA and change of the

113

Meyer

capital rules were going to necessitate a change in the business plan of this institution?

A. Among other things, yes. They were going to require a change in the business plan of every institution, probably.

Q. Do you think that would have been true even if the institution had not had asset problems?

A. Yes, sure.

Q. Turn to page 20 of this report. The second-to-last paragraph it notes that the bank had a concentration -- do you see where I am in the paragraph that begins, "Finally, it was noted that the bank has a concentration of credit to certain borrowers FL Industries and P. Profetta. If either of these borrowers experienced financial difficulty, it would" -- I think you referred to Profetta earlier.

Do you recall FL Industries?

A. Off the top of my head, no. Did they have another name?

MR. LEVITT: Forstman and

118

Meyer
A. Yes, some did.
Q. There were many institutions that had to take increased valuation reserves as a result of the recess and the real estate decline; is that right?
A. Yes.
Q. Do you recall that there was anything atypical about Carteret's underwriting policies?
MR. LEVITT: Objection to the word "atypical."
Q. Let me clarify what I mean by atypical.
Do you recall that Carteret had underwriting policies that were very different from other thrifts in the industry at that time?
A. No.
Q. Do you recall anything else about Carteret that was very different from anybody else in the industry at that time?
MR. LEVITT: Vague, general, broad.
A. This was a big institution. I said

119

Meyer
we thought -- I thought very highly of Carteret going in, even after this, as I wrote; some of the senior management I still considered capable.
Q. Turn to page 53 of this exam report section entitled, "Ability of AmBase to Infuse Capital." Do you see that?
A. Yes.
Q. First sentence states, "Based upon the conclusion that Carteret will not be able to meet FIRREA's minimal capital requirement, AmBase's ability to assist the institution in increasing its capital level was reviewed."
Do you recall participating or overseeing that review of AmBase's ability to infuse capital?
A. I remember, yes, we did some things with AmBase. I don't recall what we did specifically to this.
Q. Do you recollect that AmBase had a very high debt burden?
A. I don't recall.
Q. You don't remember that it borrowed

120

Meyer
a lot of money to purchase Carteret?
A. Like I said, off the top of my head I don't recall. Whatever we wrote in here.
Q. I think that you may be concerned about something that I don't want you to be concerned about.
I am not asking you questions to try to trick you by showing you something in the document. I am using the document to refresh your recollection where I think it is helpful.
As I stated earlier, if you feel that you really want to look at more of the document or that without spending hours reviewing it, you can't answer one of my questions, then please say so.
I sense that the way I am using it is a little confusing to you, so please don't let it be.
A. I don't recall them having a huge level.
Q. Do you have any recollection that they were relying on Carteret's dividends from Carteret in order for their cash flow

121

Meyer
needs?
A. I think that was the concern we had, yes, like I said, as any transaction between any affiliates is also looked on.
Q. Do you recall whether AmBase did, in fact, pay money into Carteret at any time, as an infusion?
A. I don't recall. I seem to think, I seem to recall they did, but it wasn't during the exam. I heard of it later on, but I don't specifically remember saying, "Okay, we have a check from AmBase," or something.
Q. Was it less or part of your job, since your job -- I don't mean to say "simply"; it is a huge job -- it was to examine the institution and the supervisory regulators as opposed to the examining regulators were in charge of worrying whether or not AmBase was paying money?
A. No, I think we did a whole in-company exam of AmBase also. Just general, their balance sheet and things like that.

130

Meyer
(Time noted: 1:55 p.m.)

MR. HUME: We'll resume the deposition.

EXAMINATION CONTINUED
BY MR. HUME:
Q. This morning or earlier in the deposition I showed you the 1989 report of examination. In that showed some of the tangible capital calculations done in that report. It showed a deficiency from the capital requirement on the order of 100 or 130 million.
Do you recall that?
A. Yes.
Q. Do you recall generally that in the 1989 exam report you considered the impact of FIRREA regulations on capital as applied to Carteret?
A. Yes.
Q. That the conclusions reached was Carteret was very unlikely to meet any of those requirements?

131

Meyer
A. Going forward, yes.
Q. Given the extent of their potential capital deficiency envisioned in that report, do you recall thinking that Carteret was very likely to need to raise new capital, to have a capital infusion?
A. Yes.
Q. They would not be able to continue in business unless they raised new capital?
A. Yes, they would be capital deficient. Whether that happened depended on FDIC, whatever.
Q. Did you ever think that they could continue to survive without having problems with either the RTC or the FDIC if they did not raise capital?
A. Yes, I thought they still had chances to shrink and go forward. I think there was a strong thought at the time that AmBase had money and was going to put it in.
Q. Do you recall the recession improving at all after 1989 and 1990 or '91?

132

Meyer
A. Not as far as the lending loans.
Q. Not as far as it impacted the thrift industry?
A. Right.
Q. Given Carteret's need to raise capital coupled with the recession, do you recall thinking that it was almost inevitable that this thrift was going to continue to decline unless it had new equity infused into it?
A. Again, they had to shrink. They had to do a lot of things than get new equity. It was probably a key component, yes.
Q. I guess my question is, do you recall thinking that if they were not able to get new equity of substantial amounts, that it was almost inevitable that they would continue to decline?
A. Yes.
Q. Do you recall what their composite rating was in the 1990 report?
A. No.
Q. Why don't we look at the 1990 report. It is on page 4 of the report.

133

Meyer
Do you see the composite rating assigned to Carteret is 5? Do you recall being involved in the decision to give Carteret a rating of 5?
A. Yes.
Q. Do you recall whether there was much debate about that rating?
A. I don't recall.
Q. Do you recall what was significantly different about the institution in 1990 versus how it looked in 1989?
A. I don't recall. I would have to read the report. I don't recall any specifics.
Q. Do you recall generally that it was the same problems it had in '89, there had not been sufficient new capital to counteract those problems?
A. Definitely I believe there was still asset problems. There were more concerns with the assets, of course, than the capital.
Q. Obviously, a lot of my questions have related to impact of FIRREA on

Meyer
Carteret and its new capital requirements. We reviewed that in the 1989 report.
Would you consider it a fair characterization that the effect of FIRREA's capital requirements on Carteret was similar to removing some level of insurance or some level of cushion to protect against recesses and declining real estate markets such as those that occurred in 1989 to '92, '93, in the early '90s?
A. I never thought of it that way. It was just -- I just never considered it that way as a form of insurance against recession, no.
Q. You never thought of a capital cushion as something that protected you in the event of a declining market?
A. A capital cushion would protect you against anything. Declining markets, I didn't think --
Q. Maybe my question was too specific. All I meant was would you agree that a capital cushion, excess capital of the requirements served as a cushion against



Meyer
unforeseen events that would negatively impact capital?
A. Yes.
Q. To take that away at the time that a recession comes along is, at the very least, extremely bad luck for the institution?
A. It didn't help.
Q. Wouldn't you agree that it made the institution extra sensitive to any such market downturns?
A. Sensitivity remained. It just reduced capital.
There was a line that regulators put up there as a regulatory capital, and their assets was just as sensitive to them whether they had a lot of capital or a little capital. They would fall under the regulatory capital without the cushion.
Q. In that sense it would be more sensitive? That is what I meant.
A. In that sense, yes.
Q. Could you refer to page 9 of the 1990 exam report? There is a description



Meyer
here of trend of criticized assets at Carteret and a chart that shows three different accounts of those criticized assets, the 1990 ROE, the 1989 ROE and in the middle Carteret as of June of 1990. Do you see that?
A. Yes.
Q. Do you see that the numbers for each of those three reporting events are quite different?
A. Yes.
Q. I asked you earlier about how criticized events or valuation allowances are determined. This chart gives us the bottom line for three different reporting events. If you compare them, I have a hard time understanding how the GVA is derived from the total level of classified assets.
Is there a set formula that makes that derivation that determines the level of GVA from classified assets?
A. There is no regulations formula. There is just general guidelines and examiner's evaluation of each loan.



Meyer
I am not sure; at that time we might have just said set a certain amount for the different levels of classifications, and the institution did it differently or took different amounts.
Q. The ROE in '89 also did it differently. I guess what I am focusing on is the percentage of total classified assets that ends up as a GVA requirement, and it is a much higher percentage for the ROE in 1990 than it is for either the other two reporting events. Would you agree with that?
A. It is much higher, but I don't think that it is calculated differently. You can't get that out of that.
Q. When you say you don't think it is calculated differently --
A. You said they were arrived at differently.
Q. I don't know how they were arrived at. I am actually trying to find out how they were arrived at, since it clearly is not a straightforward percentage

138

Meyer
multiplication.
A. Well, it could be. The different levels of classification could be the same for both ROE's.
In other words, you might have a bunch of -- the lowest adverse classified is substandard.
Q. It depends on the subsets of classifications?
A. Yes.
Q. Once those different subsets are determined, is it then a straightforward mathematical calculation?
A. We try, yes, to keep it as simple as possible.
Actually, you're trying to anticipate the amount of loss that is going to occur in each of the loans, and it is like you said, no two people will agree.
Q. It is a little bit more art than science; would you agree?
A. It is scientific, but there is a lot of leeway in there.
Q. Room for argument?

139

Meyer
A. Right, wiggle room.
Q. Can you look at page 18 of that report, please? Please review the bottom half of this page underneath, "Inadequacy of GVA." There are two paragraphs, then five points.
Have you had a chance to review that section just on this page?
A. Yes.
Q. First let me ask you, do you recall having an outside or the bank commission an outside consultant to review its commercial real estate portfolio in 1990?
A. I remember they did. I don't recall the specific year.
Q. Do you recall whether they did at the request of the OTS or independently?
A. I don't recall.
Q. The observations yielded in that review, according to this second paragraph here, reinforced the need for an aggressive approach for establishing GVA's.
When looking at those observations, only the fifth one appears to be specific

140

Meyer
about Carteret. The others are industry factors or economic factors related to the economy in general.
Would you agree that it was important to take into account what was happening to the real estate market and other aspects of the economy in determining the appropriate level of GVA?
A. Yes.
Q. You will see that the reason for that, as you said earlier, you're trying to predict performance of these assets; isn't that right?
A. Possible losses, right.
Q. In order to predict them, you need to have some sense of what you think is going to happen in the market; is that right?
A. Yes.
Q. Isn't it quite a difficult thing to predict?
A. Yes.
Q. For instance, the first factor there is listed as, "Possibility of a long-term

141

Meyer
decline in Northeast residential market."
That didn't exactly happen, did it?
A. No, that area where Carteret was turned around faster than others, it was still isolated.
I don't recall how, where all of their loans were, but based on where the main office was, that area didn't suffer long-term. I don't know the whole northeast. It is a possibility.
Q. In other words, in 1989, it was possible for someone to have the view that things may really be going downhill for a long time even though, with the benefit of hindsight right now, we can see that they did not; is that right?
A. Yes.
Q. Isn't it equally possible that somebody else could have had a different view that with hindsight would have turned out to be slightly more accurate?
A. It is possible, yes.
Q. Do you recall an asset called Swedeland Golf Course or Loan Project?

154

Meyer
A. Yes.
Q. This shows tangible capital in excess of 24 million, so it is $110 million difference?
A. Right.
Q. The amount of goodwill, amortized supervisory goodwill at that time, the end of 1990, was somewhere on the order of 160 million, so in fact, the effect solely attributable to goodwill would be even greater than that if you treated goodwill as good capital?
A. Yes.
Q. For purposes of the tangible capital requirement?
A. Yes.
Q. Would you agree that whether you viewed this institution as an institution that could not treat supervisory goodwill as tangible capital or whether you viewed it as an institution that could treat supervisory goodwill for good capital for all of the FIRREA requirements would present a very different picture as to the

155

Meyer
state and health of the institution at that time, notwithstanding the same problems that it had in the recession, the declining real estate and all other areas? Would that single fact not have made a very dramatic difference in how you viewed the institution?
A. Yes, it is whether it would make regulatory capital or not.
Q. How much its excess capital would be? It would be very different, wouldn't it?
A. I won't make any assumptions based on these two figures and this here now, because they are so far apart.
Q. I understand that, but the main reason they are far apart is precisely because of the inclusion of goodwill and the amended figures.
In fact, if the adjustment was only based on goodwill, as I tried to demonstrate to you, it would be even more farther apart. They are amended both up and down, if you understand what I mean?

156

Meyer
A. They put our corrections in there except for the goodwill?
Q. Exactly. So my question to you is if you just consider the impact on the institution of whether you treat the goodwill as good capital or don't, doesn't it present a dramatically different picture?
A. Yes.
Q. Would you turn to page 35 of the report?
Would it be likely that holding all other things equal in terms of the problems of the institution of which, as you reviewed, there were several, there was a recession and the declining real estate market and needs for reserves and writedowns, holding all of that equal, but changing whether or not you were allowed to treat the goodwill as good capital, would that have been likely to affect the rating of the institution? Would it have presented a dramatically different picture of the institution? Wouldn't it be likely

157

Meyer
that the institution would not have been rated a 5?
A. I don't have the other ratings with me, but as I mentioned before, you evaluate all the areas, but I don't know. Probably. I just don't see the other macro ratings.
That overall 5 is a composite of the other ratings.
Q. I guess all I am saying -- I understand you are saying that you would want to look at each of the subratings to be able to answer that question.
A. Right. As I said, there were some guidelines. If management was rated a 5, I couldn't rate the composite rating any better than a 5.
I am not sure what was in effect at that time. I don't know what the other ones were.
Q. If you look at page 5 of the report, which may help clarify some of this, read what the composite 5 rating represents.
First of all, it says, "This category is reserved for institutions with

162

Meyer
did achieve profitability or return to profitability after this exam?
A. I think I heard they did, yes.
Q. Do you recall what happened to Carteret?
A. Yes, I was there. RTC took them over.
Q. Do you recall when that was?
A. No, I don't recall. I don't recall what date it was.
Q. How about what year?
A. It had to be '92, I guess.
Q. When you say you were there, did you actually play a role? Were you still working on Carteret at that time?
A. Like I said, I went back and I assisted O'Rourke and I did the asset review. I was in charge of the asset review.
I had about ten examiners under me. I was impressed with what they had done. I thought they did a good job.
They had these guys -- what was that guy's name -- they came in and they

163

Meyer
really -- they had nothing to lose. They went in and did a good job, and I was against anybody taking them over.
I always liked Carteret. I thought they could still make it.
Q. Did you think that if they had been given a little more time that, that maybe they could make it?
MR. LEVITT: Objection to relevancy.
You may answer.
A. In my opinion, yes.
Q. Do you have some recollection that they returned to profitability at that time?
A. As far as I think, they did the last TFR or the last one or two before they were taken off. They showed a profit. I don't remember how much or if it was just a dollar, but I do remember I know that it was good.
Q. It was about $10 million over the first nine or ten months.
A. Okay.

164

Meyer
Q. The real estate market was at that time rebounding a little bit, was it not?
A. I think so, yes.
Q. Recession was easing and the economy starting to gradually improve?
A. I don't recall all of the external things. I was deeply involved with the real estate assets. I always thought that was their main problem, and I think they did what they had to do.
They cut out all of the crap. They wrote everything down to what it was really worth and they were finally on the right track, I thought. The external things sure played a part, but the management at that time, Bianco brought in these guys, Moore and Fernandez. They really did a great job.
Q. Do you recall that the one thing they really needed to be able to do was to raise new capital even during that period when they were returning to profitability?
A. Again, every institution has to raise capital. It is the bottom line.

165

Meyer
When I examine a place, I am looking at five individual areas and I am not worried about saving the insurance fund. Like I mentioned, if capital is done, it is done. It is just one component of the exam to me.
I am not in supervision. I am not in insurance. I am concerned about it and that is what I write, and that is what affects my decision, but it is just one component of the five, and their problem was the asset quality. Then we had management concerns after that.
Q. Did those management concerns subside or lessen or go away after Dick Bianco came in and brought new people?
A. I think so, yes.
(Brief recess taken.)
MR. HUME: We'll resume the deposition.
As I mentioned earlier, I do have a number of documents that I would like to show you and ask you really only one or two questions on

178

Meyer

who worked for the Federal Home Loan Bank. Griffin came aboard late. I guess when we went to the bank, he was hired. A very sharp guy. He came out to the field a few times. I worked for him directly.

Q. He had slightly more of a banking background than in this industry?

A. He had more of a knowledge than a background. I don't think he had a close savings and loan background like Bob Albanese and Mike Simone did. He knew management, he knew numbers, that type of thing.

Q. What about Angelo Vigna?

A. Angelo, again, I never worked direct, maybe one or two meetings which he ran, and then after that I saw him a few more times because we were both defendants in a case.

Angelo knows what he is doing and he makes sure that everything is covered the way it should be before. He seemed to be more decisive than Bob Albanese, but it is different management solving.

179

Meyer

Q. As an examiner who spent a long and successful career in the OTS and Federal Home Loan Bank, did you have an opinion about either the judgment or the general management approach of Tim Ryan as director of OTS?

MR. LEVITT: Objection to relevancy.

You may answer.

A. He is a political appointee. He came in and he did what he had to do. He tried to raise our professional level a little.

It wasn't a particularly happy time. I liked working for the Bank of New York. I don't know what decisions he made that reflect his professionalism.

Q. I don't mean to call into question his credibility or honesty in any way. I am asking did the OTS under his tenure take on a different term?

When you say it wasn't a particularly happy time, what do you mean by that?

180

Meyer

A. We were working with the Bank of New York who, as I said, were good employers. They just took care of you.

The difference between the government and a private company is tremendous, and unless you have done both, it is hard to realize.

For example, no matter where you're traveling, you're on the road and you get a little slip of paper that says you're allowed $50 for a hotel, and you walk around and there is no hotel for $50.

The government says, "Tough." You find a place for $50 or you eat the difference.

The bank, you call up and say, "There is no place for $50."

They say, "Go where you can and send us a memo." That is the difference between government and a company.

The same thing with rental cars. We would go to Puerto Rico and have to have four rental cars for four guys and you had to pick up everybody. You go to the bank

181

Meyer

and you say, "I am going here, okay?"

"Get four rental cars." It is a totally different atmosphere.

Q. That change of atmosphere is a change that has continued the same, and it has been OTS under treasury since '89 and you have been there since that time.

Specific to Tim Ryan's tenure that ended in '92, would you characterize it as also an unhappy time relative to post-'92 or --

A. I do personally, because I didn't like all of the takeover and the RTC. I thought that was a little bit overkill.

It could have solved the problems years before that with a few billion dollars. They elected to use the shotgun approach and take everybody out. Personally, I just disagreed with it.

Q. Did you think --

MR. LEVITT: Objection to relevance.

MR. HUME: To the question I am asking now?

182

Meyer
MR. LEVITT: To the last question. It is a post-question objection.
Q. As a bank examiner, savings and loan examiner you presumably throughout this period had a good sense of what was going on at least regionally in the real estate market?
A. Yes.
Q. Did you think during that period when the RTC was taking over a number of thrift institutions and resolving them through conservatorships and receiverships and selling wholesale a lot of their assets, did you think that that compounded the real estate to decline in the depression in those years?
A. Yes.
Q. In this region in particular or as much this region as anywhere?
A. I know of this region, yes, it did.
Q. When do you think the effects of that started to subside?
A. I don't know. The real estate

183

Meyer
market has been on a recovery since the past five years, maybe even more than that. It all hit the fan.
Q. This document I promised to go through so quickly, the bottom that refers to in section 4 the "No doc" loans.
Why don't you review that paragraph real quick on your own, if you would, please? Have you had a chance to review that paragraph?
A. Yes.
Q. Do you recall Carteret's use of what are called "no doc" loans?
A. No, I don't specifically recall it except what I am reading here.
Q. You don't have any independent recollection?
A. No, I just recall something about Florida. No, I don't.
(Whereupon a memorandum of oral communication from Scott Smith dated October 13, 1989 was marked AmBase Meyer Exhibit 6, for identification as of this date.)

184

Meyer
Q. This is a memorandum of oral communication by someone with the initials SBS.
A. Scott Smith.
Q. The conversation he is memorializing is with you; is that right? Am I reading the document correctly?
A. Yes.
Q. In the middle of this page under the section entitled, "Business Plan," it states -- let me first say the document is dated October 13, 1989, and under "Business Plan" it states, "Russ received a draft on Tuesday. Walsh told him this morning that it is being revised to include specifically" -- obviously a typo -- "to specifically include the following which was apparently only alluded to in the draft. Carteret plans to sell its Florida and Virginia operations, essentially pulling back to operate as a New Jersey community thrift. This is essentially just a plan to sell branches. Carteret will retain the following in Florida: (1) loan

185

Meyer
office -- to workout problem credits currently on the books, (2) loan servicing operations, and (3) EDP and check processing operations."
Do you recall Carteret's sale of branches in 1989 or 1990 specifically?
A. I don't remember them selling branches. I remember that was a plan that was one of the asset shrinkage to consolidate into New Jersey. I don't particularly remember the sale of the branches itself.
Q. You don't have any recollection as to what led to the decision to sell those branches?
A. I think, as I recall, we were trying to determine if they were profitable and they couldn't determine that.
They didn't have the necessary records to say, "We got this, this much deposits. We're making this much money on these branches," and we wanted them to tell us are they worth keeping, and I don't think they could.

186

Meyer

Q. It was simply impractical? They didn't have the necessary record keeping or data processing --

A. Not that it was impractical. I don't think they thought it was worth it.

Q. They didn't think it was worth finding out --

MR. LEVITT: Let him finish.

A. I don't think they thought it was worth going through the effort, to be honest with you. That is my personal opinion.

They shouldn't have had the operation unless they were keeping track of its profitability.

Q. Just to clarify, when you say you didn't think it was worth the effort, when you say you think that they thought that it wasn't worth the effort, you mean the effort to determine whether they were profitable?

A. Right. I think O'Brien had a goal to be the East Coast king of savings and loans, and he was going to keep them in no

187

Meyer

matter what, I think.

I don't think they were profitable based on deposit size, and they couldn't come up with the information to show us that they were worth it. Plus, like I said, they were going to do asset shrinkage anyway, so it was just stood to reason that they would do that.

Q. When you say they were going to do asset shrinkage otherwise in October of 1989, that was still a pretty recently developed strategy, wasn't it?

A. That is -- like I said before, that is a basic strategy any time it looks like you're going to be in capital trouble, and apparently we must have been talking about it or maybe they didn't have a business plan until we asked for it.

Q. The 1989 report that we looked at showed the business plan with the plan to get to 10 billion in assets?

A. Correct. This one here they probably might not even had a business plan, or I don't know --

188

Meyer

Q. It states that you received a draft on Tuesday?

A. Right.

Q. Do you think they may have modified their business plans because of their need --

A. I don't recall. If they didn't have one to begin with, that seems like it would be comment worthy if they didn't have a business plan and they were doing all of this.

Q. If they had a business plan to grow to $10 billion in assets?

A. In '89?

Q. I believe so.

A. Now, apparently -- I wish I could go back in time. Apparently they all probably agreed that it is not realistic. I don't know what Walsh's position was at that time.

Q. Do you recall John Mackerey?

A. Yes, I believe he was the internal loan review guy at Carteret.

Q. He would have been this person that

189

Meyer

was responsible for analyzing the adequacies of Carteret's loan review program?

A. He was the internal loan review program, John Mackerey or something like that, Mackefey.

Q. If you look at the last paragraph here it says, "Analyst on site." It says, "John Mackerey will spend most of next week at the institution."

Was he an OTS employee?

A. I can't remember that guy. He must be.

It says, "Supervision." He must have been from the office. I can't recall him.

Q. Do you remember there being an on-site examiner, someone that would go to work every day at Carteret for six months?

A. Yes. I am not sure after this one. Maybe after the '90 one. I think O'Rourke was up there. He was up there a lot. He might have been on site.

Q. Do you not understand this paragraph

226

Meyer

stuff. He then as the supervisor analyst would handle information received from institutions, followed up, like I mention before.

If there was a capital plan requirement and they had to submit information monthly or whatever, Mike Finn or another supervisory analyst would be the one receiving it, reviewing it and passing it on to the assistant directors or the directors.

Once the examiners leave the institution, we're out of the loop. We don't come back unless we're deposed or dragged in kicking or fighting or something, but we generally don't get back involved.

Q. Were you ever aware of any pressure that was put on either the supervisory analyst or the assistant director to give more information or to do anything else with respect to the examination of Carteret?

A. Not that I know of. Like I said, I

227

Meyer

am sure they were reporting weekly or monthly or whatever they do to Washington.

I think they have something now called Hot Topics, so if they had that back then, this might be included in the Hot Topic report. There would have to be weekly updates or daily updates. I am not sure what they do.

MR. HUME: I would like to introduce AmBase Meyer Exhibit 15.

(Whereupon an interoffice memorandum dated April 25, 1991 from Mr. Meyer was marked AmBase Meyer Exhibit 15, for identification as of this date.)

Q. This is an interoffice memorandum written by you dated April 25, 1991. It discusses an April 22, 1991 meeting, special meeting of the Board of Directors of Carteret Savings Bank called at the request of the FDIC in the spring of 1991.

Do you recall working on Carteret?

A. Again, I went back with Tom O'Rourke, but I don't remember the dates.

228

Meyer

Q. Do you recall this FDIC meeting?

A. I remember being at meetings with Mike Zamorski and Bill Day, so I guess -- yes, I remember being at the meetings, so this must be one of them.

Q. Do you recall Mike Zamorski in particular?

A. Yes.

Q. What do you recall his role being in terms of examinations of Carteret?

A. He had nothing to do physically on the exam. He was, I guess, the regional director's representative or chief examiner.

He worked -- he was over Bill Day and Bill Pollack, I guess. He was the Deputy Regional Director.

Q. Did Bill Pollack or Jim Devaney take part in the exam work?

A. No, I remember Pollack didn't, that I can recall. I remember Devaney. I mostly remember Bill Day, and I saw his name in another document. Devaney was there a few times. I don't recall Pollack.

229

Meyer

There was another guy from the FDIC. I can't think of his name right now. They had a bunch of people in and out, but at this meeting I remember Zamorski and Devaney. I don't recall Pollack too much.

Q. Do you recall whether any of those individuals had a particularly negative view of Carteret?

A. I don't recall. What did I write? Not particularly negative. I think they just presented information that we saw.

Q. Do you ever remember the FDIC threatening to terminate your insurance of Carteret?

A. Saying that directly?

Q. Yes, saying it directly to Carteret.

A. Not particularly. I don't remember that specifically, no.

Q. When you say you don't remember it specifically, do you remember it as something that may have been discussed not with Carteret, just between OTS and FDIC?

A. No, I mean I think it was understood it could happen.

Meyer

you a few more questions, I am done with my questioning.

I thank you again for making yourself available today.

THE WITNESS: You're welcome.

MR. IGO: I have no questions.

MR. LEVITT: I will be brief, but I have a couple of questions.

EXAMINATION BY
MR. LEVITT:

Q. You recall that you testified that personally you felt that it was a bit premature to impose a conservatorship on Carteret in December of '92?

A. Yes.

Q. Why was it that you said that?

A. I think they had done everything we asked them to do. They had shrunk, they had written off all of the assets and they had started to make a profit. I thought they had turned the corner.

Q. Were you involved with the institution in '92 in any way?

A. I don't recall. Again, Tom O'Rourke



Meyer

did an exam. I may have assisted him somewhere along the line.

I was there when the RTC went in. I just asked if they were going to do this, I wanted to be there.

Q. Is it fair to say -- and if it isn't, say so -- is it fair to say that the beginning of your personal opinions were based on your impressions of what was going on at the time?

A. My impressions, yes, plus what I thought they had done.

Q. Could you make a statement about your feelings on Mr. O'Rourke's professional competence as an examiner?

A. Tom is excellent. He is one of our best examiners. I think highly of him. I enjoyed working with him. I think he does a good job. We might have differences, but I think he is an excellent examiner.

Q. Let me represent to you that the exam that he did in '92 when he was examiner commenced June 15, '92 and ended July '92. I will read you a couple of



Meyer

statements from the report.

MR. HUME: Do you have a copy?

MR. LEVITT: I have one copy.

MR. HUME: Should you make it an exhibit?

MR. LEVITT: I can. I thought I would read the statements.

MR. HUME: I was required to make copies and mark it as an exhibit. I tried to do it on my deposition Wednesday and I was not allowed to.

MR. LEVITT: By whom?

MR. HUME: Tony Cornicor (phonetic).

MR. LEVITT: Do you want to make copies?

MR. HUME: Read it. Then if I feel we need to look at it, we will.

MR. LEVITT: If you want me to show you at the point that I am reading it, I will.

Q. I will represent to you that what I have in front of me is the June 15, 1992



Meyer

report of examination done by Mr. O'Rourke, and I only have the one copy.

I will read to you some sentence from the report summary. I will ask you if you agree with them or don't agree with them.

MR. HUME: I would like to object to the line of questioning, since the witness testified that he was not working on the examination report in 1992.

MR. LEVITT: Let's get that out of the way.

Q. You said you thought you might be looking at some assets; is that correct?

A. I assisted Tom O'Rourke in an exam. I don't know in it was '91 or '92.

MR. LEVITT: With that objection, I will ask these questions. We'll see what your responses are.

Q. On page 1, it states, "Carteret's asset quality has improved due to an intensive effort by management to liquidate