CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and )
CARTERET BANCORP, INC., )
Plaintiff, )
and FEDERAL DEPOSIT )
INSURANCE CORPORATION )
Plaintiff Intervenor, )
vs ) Case No. 93-531C
UNITED STATES OF AMERICA ) Chief Judge Loren A. Smith
Defendant. )
FIRST FEDERAL SAVINGS )
BANK OF HEGWISCH )
Plaintiff, )
vs ) Case No. 93-162C
UNITED STATES OF AMERICA )
Defendant, ) Chief Judge Loren A. Smith
O. BRUTON SMITH and BILL )
SMITH, )
Plaintiffs )
and FEDERAL DEPOSIT )
INSURANCE CORPORATION )
as successor to the rights)
of North Carolina Federal )
Saving & Loan Association,)
Plaintiff Intervenor )

vs ) Case No. 92-540C
UNITED STATES OF AMERICA ) Chief Judge Loren A. Smith
Defendant, )

---

DEPOSITION BY TELEPHONE UPON ORAL EXAMINATION OF:

HORACE BRENT BEESLEY

---

TAKEN AT: 185 South State Street, Suite 500
Salt Lake City, Utah

DATE : September 27, 1999

REPORTED BY: Suksette M. Snider, CSR,RPR

MS. WILLIAMS: Objection on vague.

THE WITNESS: Yes, I think it's a fair assumption that this would have been one of our serious problem cases.

Q (By Mr. Thompson) Okay.

A Of which there were many.

MR. THOMPSON: At this point I'd like to ask the court reporter to mark as AmBase Beesley 3 a document that bears the Bates No. WOR0590419.

(AmBase Beesley Exhibit 3 was marked.)

Q (By Mr. Thompson) And, sir, would you please identify this document for the record in terms of its date and the addressee and the author?

A Well, it's addressed to me from a Mr. Britt Evans of Homestead Savings regarding Homestead Savings' proposal to acquire First Federal Savings & Loan of Delray Beach and others in what we would call an assisted merger.

Q All right. And in the second paragraph of this letter in the second sentence, do you see the reference to the purchase method of accounting would be used for the acquisitions?

A Yes.

Q And I know you provided testimony on

Quantitative Analysis Division at this time?
A Yes.
Q And do you recall whether, in fact, QAD actually used Carteret's assumptions and replaced those in its viability analysis or whether it just went with its standard assumptions?
A I have no recollection.
Q And do you recall whether it was common for QAD to take assumptions from an actual institution as opposed to utilizing its standard assumptions?
A Well, it happened from time to time. I don't recall how common it was, but it was within the scope of their operations. If they felt that the case-specific assumptions were better or more useful, they certainly had the authority to use them.
Q This document also makes reference to a viability analysis, and is this a document that QAD would produce?
A Yes.
Q And is it fair to say the purpose of that document was to make sure that the resulting institution would be healthy and would be able to stay in compliance with its minimum capital

requirements?
A Yes, given the assumptions that were used.
Q Okay. And I take it that the purpose of having a viability analysis was to ensure that the solutions that you found were permanent solutions and weren't merely temporary measures that may land back on your doorstep in a few months' time. Is that fair to say?
MS. WILLIAMS: Objection, vague. Objection, I think he's just answered the question on what the purpose was.
THE WITNESS: Well, when you start using words like "permanent," it does become a little bit problematic. It was viable within the analysis that was done. Obviously, if we'd have had an environment similar to what we had in the early 1980s, it's hard to say anything would be permanent. But given the assumptions that were used, the analysis would have shown viability.
Q (By Mr. Thompson) And was part of the viability analysis and your judgment that a transaction should be approved your assessment of management and its capabilities?
A Yes.

accounting that were in effect in 1981, 1980, 1982 were wholly inadequate, and I would have much preferred focusing on a true economic test of value rather than historical cost accounting which camouflaged to a large degree the problems in these institutions.

Q (By Mr. Thompson) Okay. Now, the second prerequisite states, "the transaction will reduce the FSLIC's insurance liability or risk," and when Carteret acquired Delray, do you recall how that transaction reduced the FSLIC's risk? Was it because Carteret was putting its equity in between the net liability of Delray and the FSLIC?

MS. WILLIAMS: Well, objection. The question is compound. I think you're asking him two questions in one.

MR. THOMPSON: Well, if the witness understands the question, he may answer it.

THE WITNESS: Well, not exactly, because Carteret also had a negative net worth on a true economic basis if I -- if I'm not mistaken. But what it did is it bought time for Carteret, as a combined entity, through the use of goodwill and as shown by our viability analysis to work through these problems in a manner which, as it says here,

reduced the risk. I mean we were faced with an immediate outlay with First of Delray, and as a result of this merger, if -- if things went according to the assumptions in our model, we would not have any further outlays in this situation.

Q (By Mr. Thompson) And was one of the reasons that you were in favor of this transaction was because you had confidence in Carteret's management and its ability to adequately work its way out of the problems that Delray and Barton had?

MS. WILLIAMS: Objection, vague.

THE WITNESS: Well, we -- we had confidence in their management and with, as I say, some favorable economic conditions, had every expectation that they'd be able to complete their -- or that the outcome would be similar to what was shown on the analysis.

Q (By Mr. Thompson) And in one of your recent answers you stated that Carteret also was insolvent, and do you have a specific recollection of that or is that just your general sense given its capital position and the interest rate environment in which it was operating?

A The latter.

Q Okay. And then turning to page 3 of

(The question was read.)

THE WITNESS: Well, from our point of view at the FSLIC, the use of purchase accounting improved the viability of the combined institutions because of the benefits to the income stream on a short-term basis, at least, and I suspect that that was also a motivating factor for the acquirers or the parties involved in these things. There -- there's no inherent value other than the difference between the two -- the difference between the accretion of the discount versus the amortization of the goodwill.

MR. THOMPSON: All right. And at this point I'd like to step back for a moment and look at the economic reality surrounding this transaction and ask your opinion as to that.

And I'd like to ask the court reporter to mark as AmBase Beesley 11 a document that bears the Bates No. C-AM-A-0403574.

(AmBase Beesley Exhibit 11 was marked.)

Q (By Mr. Thompson) And, sir, I'll represent to you that this is a true and correct copy of a decision rendered by the United States District Court for the District of New Jersey in the matter of Carteret Savings Bank versus Office

1982 was approximately $36.4 million. Do you see that? It's on the third line down --

A It's book net worth?

Q Yes, that's correct, the book net worth.

A Um-hum. (Affirmative.)

Q And isn't it fair to say that it would have been madness for an institution with only 36.4 million of book net worth to have acquired net liabilities of 46 million and 168 million, respectively, if it didn't receive the contractual right to utilize the supervisory goodwill towards its regulatory capital requirements?

MS. WILLIAMS: Objection, vague. Objection, foundation, and objection, it calls for a legal conclusion.

THE WITNESS: I think -- I think it would have certainly been the intent of Carteret to utilize purchase accounting in its transaction. There's no doubt about that in my mind. I don't -- I don't want to deal with the contractual issue, which it sounds to me like the court has dealt with anyway, because I just don't know.

Q (By Mr. Thompson) Well, let me ask this way: In terms of recommending that the

transaction be approved, you'd have to conclude that the resulting institution is viable; isn't that right?

A Yes.

Q And isn't it true that this institution, once the mark to market had been done and a negative liability of 46 million from Barton and negative 168 million from Delray, would not have been viable had the resulting supervisory goodwill not been included in the regulatory capital of the resulting institution?

A Absolutely correct.

Q Okay. So, in fact, not only would it have been Carteret's expectation that it would have this contractual right, but it was also the FSLIC's expectation as well; is that right?

A Well, it was the --

MS. WILLIAMS: Object --

THE WITNESS: -- it was the FSLIC's expectation they would use purchase accounting. Again, I think the contractual right issue versus what's in the resolution and the expectations just goes beyond what I am comfortable testifying to because I know in a lot of these agreements we had actual contracts that specified one way or the

other how the accounting was.
I don't know what -- what's at stake here, but I can tell you that -- that it's clear that absent the use of purchase accounting that neither side would have wanted -- neither side being Carteret or the FSLIC, would have wanted to do this transaction, or the transaction could not have occurred, as you pointed out, because Carteret would have immediately had a negative net worth even on a book basis.
Q (By Mr. Thompson) All right. And you've referenced earlier and in some of your prior testimony as well in the common portion of the deposition the benefits of purchase method of accounting to the acquiring institutions, and I just want to quickly make sure that the record is clear on this. Are there two principal benefits, one, that the discount will be accreted and that there will be -- and that income will be recognized on that basis as loans come in and the amortization of the goodwill is written off over a longer period of time?
A That's -- that's the main benefit, yes.
Q And then is there also a benefit that Carteret would be able to take this supervisory

A Yes, operating expenses, assets per employee. There's a whole bunch of different ratios --
Q That you would have looked at?
A Well, we might have looked at them.
Q Might have looked at, exactly.
A I don't remember what we looked at.
Q Okay. All right. Then turning to page 12 of this document under Viability, if you'd just take a moment to review that paragraph or the two paragraphs on this page.
A Okay.
Q Isn't it fair to say given that you recommended that the bank board approve these transactions, that you did, in fact, have confidence in Carteret's management's ability to run a healthy and sound institution after it acquired Delray and Barton?
MS. WILLIAMS: Objection, vague.
THE WITNESS: I think the answer is yes.
Q (By Mr. Thompson) Okay. Perhaps if we could just take a short two- or three-minute break. I think we're almost finished.
A Okay.

the conclusion that 1982 dollars are more dear than 1992 dollars. So under those facts, which as I say are unlikely, it would have been the difference in the present value of the two cases, which would have been substantial.

MR. THOMPSON: All right, sir. Well, I have no further questions for you. I'd like to thank you very much for taking the time to come down this morning and chat with me.

THE WITNESS: Glad to do it.

MS. WILLIAMS: Actually, I do have a couple of questions.

EXAMINATION

BY MS. WILLIAMS:

Q Mr. Beesley, earlier you had testified -- Mr. Thompson had asked you some questions about benefits to the government of purchase accounting, and I think you testified about -- he asked you some questions about leveraging and obtaining profits. And what I'd like to ask you is is your testimony that the transactions that Mr. Thompson has discussed here this morning guaranteed the institutions profits?

A No. That isn't my testimony. In theory, generally, if you have capital and you have

the ability to leverage, your hope and expectation is there will be a positive spread. That doesn't always occur, and, in fact, the fact that we had the S&L crisis during the early '80s is evidence that all spreads are not always positive. But with capital you have the option of leveraging and the expectation and hope of a positive spread.

Q And then I only have I think one other question. Earlier Mr. Thompson asked you some questions about confidence in Carteret's management and the belief that it would create a healthy and sound institution. But I just wanted to ask you, your analysis of the ultimate let me say progress of Carteret was contingent on all of the assumptions set forth in the viability analysis; is that correct?

A Yes. I think -- I think both cases are -- both scenarios or both situations are correct. In other words, we -- we did have a positive level of confidence regarding the management at Carteret --

Q Um-hum. (Affirmative.)

A -- and the viability was also contingent on the assumptions in the model, in reality being no worse than the assumptions in the