IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:

PLAINTIFFS IN ALL :

WINSTAR-RELATED :

CASES AT THE COURT, : No. 90-8C et.

al : (Chief Judge

Plaintiffs, : Loren A.

Smith)

Vs. :

:

THE UNITED STATES, : VIDEOTAPE

: DEPOSITION OF

Defendant. : THURMAN C.

----------------------------------: CONNELL

CERTIFIED COPY

DEPOSITION OF THURMAN C. CONNELL, taken before Jill Madsen, Certified Shorthand Reporter and Notary Public, at the University Park Holiday Inn, Chamber Room, West Des Moines, Iowa, commencing at 9:11 a.m., on June 28, 1999.

Reported by: Jill Madsen, CSR, RPR

than what their book value was or else you would have had an even par; is that correct?

A. Correct.

Q. Those assets may or may not have income streams flowing from that; is that correct?

A. That's correct.

Q. And was it the purpose of these transactions that the institution would use those income streams to reinvest that money?

MR. PIVNICK: Objection. Lack of foundation.

A. Yes. And that way that would increase their earning capacity which hopefully would continue their -- their strength as an ongoing institution.

Q. It would also help them earn the money to pay off the yearly amortization?

A. That's correct, sure.

Q. Is that correct? Now, as I understand it, savings and loans have capital requirements; correct, sir?

A. Yes, they do.

Q. Okay. And the capital requirements are ratios of either assets or liabilities or whatever that ratio is; is that correct?

Page 70

from that period of time until the time you left?
A. Yes, he was.
MR. MANNING: This is a good time for a break.
THE VIDEOGRAPHER: We're off the record at 10:35.
(Recess taken.)
(Comments off the record.)
MR. MANNING: Now, was anyone else unable to hear me, or is it just Gaston?
MS. JOWAISAS: This is Marion Jo Jowaisas in Dallas. I wasn't able to hear your questions real well.
MR. MANNING: Well, life is full of people who don't speak up. If you don't speak up, we can't fix it.
Is that better?
MS. JOWAISAS: Yes.
THE VIDEOGRAPHER: Back on the record at 10:50.
Q. We're back on, again, Mr. Connell. And I -- we have everyone by phone who wants to be here.
I would like to focus for a bit on mergers between healthy institutions and failing

Page 71

institutions that required assistance from the Federal Savings Loan Insurance Corporation or FSLIC.
Okay?
A. All right, sir.
Q. In connection with that process, was there a requirement at any time that the acquiring institution's financials be reviewed to determine whether they had financial and managerial capabilities sufficient to handle the acquisition?
A. Yes.
MR. PIVNICK: Objection. Vague. Sorry.
A. Yes, sir, there would have been.
Q. And what was the purpose of that, as you understood it?
A. Well, basically, if you're going to have two institutions merging either with or without assistance, you want to make sure that the financial and managerial capability is there, that you're not creating a larger problem for the FSLIC down the road.
So you do review their financials, their management capability. You know, you want

Page 72

to get a sense of what their lending portfolio is like, et cetera, so that you're not creating another problem for yourself down the road.
Q. Now, was there any effort by either the FSLIC or the Federal Home Loan Bank Board to determine the viability of the merged entities when they're combined in the future?
MR. PIVNICK: Objection. Vague and lack of foundation.
A. Part of the FSLI -- well, one of the divisions of the FSLIC was the quantitative and analysis division, and that was their primary function.
The FSLIC had developed a model that they used for mergers, and they inputted the information that was provided to them by the supervisory agent regarding the financials of each of the institutions, the acquirer, and the failing institution.
They also inputted whatever financial arrangements may have been negotiated up to that point so they would get an idea that, okay, if -- if these provisions are agreed to and are granted, how will that impact the transactions.
So they had a model that you inputted

Page 73

all this information, and you would at least then be able to do some analysis as to whether or not from a financial point of view the merger made sense.
Q. Okay. Now, would that analysis from -- can I call it a viability analysis?
A. Yes, that's essentially what it was.
Q. Did that project into the future the viability of the combined institutions, and if so, how long a projection was it, if you recall?
A. It did project into the future. And my recollection is vague, but it seems like it was either 10 to 20 years in there. So it was a significant period of time beyond when the analysis was done.
Q. Now, you talked about the financial arrangements that had been negotiated up to that point in time.
Do you remember talking about that a minute ago?
A. Yes.
Q. For example, if FSLIC was going to contribute cash, that would be put into the viability model; is that correct?
A. That's correct.

Page 74

Q. Now, was there a time when the FSLIC would use what's called the income capital certificate or an ICC?
MR. PIVNICK: Objection. Lack of foundation.
A. Yes, there was a time when we used those. I remember the name. And I can tell you right now I don't remember many of the details of that, so --
Q. Were the income capital certificates used as equity instruments or debt instruments to go on the balance sheet of the thrift?
A. Yes.
Q. Okay.
A. Now, don't -- you asked a double question there. I --
Q. Okay.
A. My recollection right now is very vague as to how ICCs were used.
Q. Were they considered as a part of the regulatory capital of the merged institution?
A. Yes.
MR. PIVNICK: Objection. Lack of foundation.
A. Yes, they were.

Page 75

Q. And if there was an income capital certificate involved in the transaction, that would be factored into the viability model as well; correct?
A. Based on my recollection, that we factored everything into that model that would have an impact on the financials.
Q. Now, we talked about earlier today at some point in time there was the ability to use the goodwill, supervisory goodwill generated from the purchase accounting in connection with the merger as regulatory capital.
Do you remember that, sir?
A. Yeah.
MR. PIVNICK: Objection.
A. I remember your reference to it, yes.
Q. Well, do you remember there was a time when goodwill was used and could be counted toward regulatory capital?
MR. PIVNICK: Objection. Lack of foundation.
A. Yes.
Q. Okay. Was -- in doing the viability analysis, was the amount of goodwill generated through the purchase accounting transaction

Page 76

factored into the viability analysis as well?
A. Based on my recollection it was.
Q. It has two components, does it not? You certainly had to account for, in terms of viability, the amortization which was an expense over time; is that correct, sir?
A. Yes, it was.
Q. And you also had to account for any projections as to earnings coming off the assets that were required; correct, sir?
A. Yes.
Q. Okay. Was it ever in your experience the case that a FSLIC assisted merger occurred where the viability analysis did not show continued viability of the merged institution?
A. No.
Q. And why was that, sir?
A. Well, if -- if the viability analysis showed that it wasn't really going to be feasible or that the institution that survived would not really be viable, then the Bank Board would not have approved it.
Q. Was there some cost at which the Bank Board would not be willing to do a merger?
MR. PIVNICK: Objection. Lack of

Page 77

foundation.
Q. And so that you understand what I'm talking about.
A. Yeah.
Q. If an institution is failing and it needs to be resolved, it can be liquidated, or a variety of other things could happen to it; correct, sir?
A. Yes.
Q. Was there some -- withdrawn.
And with respect to assisted transactions, there is cost to FSLIC in connection with that assistance; correct, sir?
A. Yes.
Q. Is there -- was there some waiting beyond which the cost of the assisted transaction could not go, it couldn't cost more than?
A. Well --
MR. PIVNICK: Objection. Vague. Lack of foundation.
A. Yeah. In addition to the viability, they also ran a cost of liquidation, and that really kind of set the bases from which they worked, because that -- that would be probably the most expensive way for them to go.

Q. Does that refresh your recollection at all as to how the accounting should be done with respect to the fair value of assets and liabilities?
A. I am -- I'm not an accountant by trade or nature. And the description here certainly would seem to be appropriate.
Q. Okay. All right. If I could turn your attention to page 6 of the attachment, which is page 7 of the exhibit, at the bottom of the page, it refers to "amortizing intangible assets."
Do you see that, sir?
A. Yes.
Q. Okay. We had discussed earlier the amortization period with respect to the goodwill which started up to 40 years and then was reduced at some point later.
Do you recall talking about that, sir?
A. Yes, sir, I do.
Q. Okay. Is it your recollection that at the time that goodwill was used in merger cases, at least in the beginning that amortization period was up to 40 years?
A. Yes, I do.
Q. Okay. At any time do you recall



discussions by Federal Home Loan Bank in the fourth district or the Federal Home Loan Bank Board in the supervisory section about the possibility of shortening the amortization period at some point in time of the merger transactions?
MR. PIVNICK: Objection. Vague and lack of foundation.
A. I -- I don't know that I had personal discussions.
Q. Uh-huh.
A. But I know the discussions took place mainly because the accounting profession felt like the 40 years was -- was too extensive.
Q. Now, was there not an effort in 1981 and 1982 to make sure that the purchase accounting that was used was in accordance with GAAP, generally accepted accounting principles?
MR. PIVNICK: Objection. Vague. Lack of foundation.
A. It was the desire of the Bank Board that those accounting issues should conform with GAAP.
Q. Okay.
A. And I think that's why they made some



changes that they did to help their relationship with the accounting profession.
Q. Well, at some point in time GAAP changed with respect to the application of the amortization period; correct?
A. Yes.
Q. Through the introduction of File 72?
A. Could --
Q. Could be?
A. I'd have to take your word for that.
Q. Okay.
A. I don't recall.
Q. At any time to your knowledge in institutions that you were involved with was a viability analysis run on the institutions that had a 40-year amortization period where the amortization period was shortened --
MR. PIVNICK: Objection. Vague.
Q. -- arbitrarily?
MR. PIVNICK: Objection. Vague.
A. No. I don't recall, Mr. Manning.
Q. Do you recall any instance in what I will call balloon amortization occurred; in other words, you could amortize it for a 40-year level for five years and all of a sudden you had to pay



down the entire amount and take it into expenses on the sixth year?
Was that ever thought about or discussed?
MR. PIVNICK: Objection. Vague.
A. Not that I recall.
Q. If the institution acquired a failing institution and GAAP allowed it to amortize the goodwill over a period of 40 years, what would the effect be if the amortization period was reduced in, say, year five or six?
MR. PIVNICK: Objection. Lack of foundation.
Q. To the balance of the amortization in one year, what effect would that have on the viability?
MR. PIVNICK: Same objection.
A. It would have a very dramatic impact in it because you're -- as we've discussed so far, you're, basically, taking that expense in over that 40-year period. And the model has been run with that 40 years in there or whatever period was agreed to.
And so if you reduced it to your five years or eight years or whatever, then you would

Page 86

be taking that much more expense into income against your income, so it could have a pretty dramatic impact on what the viability of the institution would be.
Q. At the time of the Glendale-Broward transaction, which was in late 1981, was there any discussion about the possibility that the amortization period permitted under GAAP would be shortened?
MR. PIVNICK: Objection.
Q. Prior to the -- it's full time?
MR. PIVNICK: Objection. Vague.
A. Not -- not that I was aware of, Mr. Manning.
Q. In any of the transactions that you were involved in in the fourth district where purchase accounting was used and supervisory goodwill was created, was there ever any discussion of reducing the amortization period permitted at the time?
A. No, sir.
Q. Okay. Was it your belief at any time you worked at the Federal Home Loan Bank Board in the fourth district that the amortization period following the supervisory merger goodwill could

Page 87

be reduced shorter than the time permitted by GAAP?
MR. PIVNICK: Objection.
A. No.
MS. JOWAISAS: Excuse me. The question is fading out again.
MR. MANNING: Okay. I'll try to speak up.
Q. You've talked about in 1981 the Glendale-Broward transaction and the Washington Federal transaction as being possible interstate mergers in 1981.
Do you recall any others in 1981 that occurred in the fourth district, interstate?
A. There were a couple others that were close, but I -- it was either very late '81 or into '82. And I -- quite frankly, I don't remember the names of them right now.
Q. Okay. Once an association moved into, for example, Florida, and in a supervisory merger, was that association then free to merge with other Florida thrifts, obviously, subject to the approval of the Bank Board?
A. Yes. Here again, my recollection is somewhat hazy. Only in the answer -- direct

Page 88

answer to your question is yes.
They -- but it seems like there may have been a short period of time there were -- they discouraged other mergers now they were given the ability to branch so they can establish other facilities.
And -- but it seemed like there was a short period of time there were -- for example, I don't know that they would have allowed Glendale, as an example, to merge with someone else. That, I think, ultimately went away.
And if they had a voluntary merger, then it was subject to the normal requirements for being approved.
Q. Now, you referred to something as a voluntary merger.
Is that a merger where there is an acquisition of another thrift without supervisory help?
Is that how you define a voluntary --
A. Pretty much so, yes.
Q. So if the acquired institution is a supervisory case as far as you're concerned and the Federal Home Loan Bank Board assists in its disposition, you consider that to be a voluntary

Page 89

merger?
A. No.
Q. Okay. And I don't mean assist in terms of giving financial assistance, but in terms of trying to find a buyer for it or a merger partner?
A. I'm sorry. I was -- my mind was going back over what I just said, so would you mind repeating that?
Q. Sure. I want to make sure I understand what your answer was --
A. Okay.
Q. -- which is why I was following up.
A. Right.
Q. If the transaction involves an association in the fourth district that you viewed as a supervisory case and you participated in trying to find it a merger partner, do you believe that is a voluntary merger?
A. If we -- we may have, you know, been active in trying to bring two parties together, but if we didn't dictate any of the terms, then I would still consider it a voluntary merger as long -- even though we may have been active, an active participant.

Page 118

A. Okay.
Q. 1980 -- following April of 1986 when you became the acting director of FSLIC, did the type of problem that you saw in cases to be resolved differ from the problems you had seen in the early '80s?
A. Fairly significantly because in the middle '80s after interest rates had subsided, it was very apparent that the savings and loan industry had been weakened by this economic crisis that we had, and that, basically, a lot of thrifts at that time felt like the only way that they would really be able to survive another situation like that would be for them to really kind of grow out of it.
So there was a significant effort on the part of a number of thrifts to grow their deposits.
And by growing the deposits, they could take those funds and make additional loans and generate income from a number of sources.
And unfortunately, a lot of that growth got put into loans that weren't very good, and in a number of cases were even fraudulent.
And so the cases that we were seeing in

Page 119

1986, well, say '80s, particularly '87, '88, were much more the asset-quality problems than we had seen in the early '80s, which were, basically, the interest rate problems.
Q. Okay. Are those type of problems more difficult to resolve -- withdrawn.
Are institutions that have the asset-quality problems more difficult to resolve on a long-term basis than were the interest rate problems?
A. Yes, they are because if you don't have the same confidence that that the bad loans are going to be able to be made good by adequate warranty of those loans by even good, qualified loan people.
And so, you know, if an acquirer is having to take over a troubled thrift that has asset quality, you, generally speaking, want a heck of a lot more cushion there because it's an unknown as to how bad, even though you can do a due diligence, you've always got a lot more doubt as to the quality of those loans because you don't generally look at every one of them.
Q. When you were in your supervisory role, did you believe that it was important for thrifts

Page 120

to have excess capital above the required limits as a cushion?
A. Absolutely.
Q. Did you believe it was important for thrifts to have liquidity as well?
A. Absolutely.
Q. Were those -- was excess capital and liquidity things you felt were important to allow the thrift to restain -- withstand any adverse economic terms and to grow their business?
A. Yes.
Q. There is a tension, is there not, between having excess capital above your limit and the liquidity and being fully invested?
A. That's correct. If you don't -- if you have -- you can have too much capital, although there was a time there when there just wasn't enough capital around, so -- and then as we've seen in, you know, the last few years where solid mutual institutions converted to capital-stock-type charter, they actually had too much capital, and it was very hard for them to earn enough on their assets to turn around and be able to pay the type of return that investors were expecting on that capital.

Page 121

Q. Was there an occasion at the time when you were the director of FSLIC or acting director of FSLIC when the market turned and there was an opportunity for FSLICs to convert from mutual to stock?
MR. PIVNICK: Objection. Vague.
Q. I withdraw the question.
A. What?
Q. I'll withdraw the question.
A. Okay.
Q. Was -- from the -- from the time in 1982 -- and use that as a marker that I've given you -- when mutual thrifts could convert from a mutual to a stock, were there times in which the market was not conducive to such conversions?
A. Absolutely.
Q. And why was that, sir?
A. Well, just because of the nature of the economy at that time.
Also, the investment community, there were times when there was less confidence in the industry as a whole as to whether or not the industry itself was going to survive, and so there was a great reluctance to go to the market and try to convert to capital stock.

Page 391

moment to review that paragraph?
A. Okay, sir.
Q. Do you understand this paragraph to be stating that Carteret is conditioning its bid on the ability to trade supervisory goodwill towards its regulatory capital requirements, that is, any supervisory goodwill resulting out of the mergers contemplated herein?
MS. JOHNSON: Objection. The document speaks for itself and lack of foundation.
A. That's what the document appears to say, yes.
Q. And was it your belief that any supervisory goodwill that was created pursuant to Carteret's acquisition of Barton and Delray would have been counted towards Carteret's regulatory capital requirements?
A. Assuming that was what was, you know, agreed to in the final documents.
Q. But that was a standard provision at the time?
A. Yes.
Q. And you can't think of any reason why the Government would have rejected this condition of the bid?

Page 392

MS. JOHNSON: Objection. Leading.
A. No, I cannot.
Q. Are you aware of any incidents in which an acquiring institution requested a contractual right to trade supervisory goodwill towards its regulatory capital requirements where the Government rejected that request?
A. No, sir, I'm can't.
Q. And can you think of any reason why the Government would have rejected such a request?
A. No, not today.
Q. And I take it that the testimony you've previously provided holds true here insofar as to the extent supervisory goodwill was created in these acquisitions, it would have been the regulator's expectation that that supervisory goodwill would have been leveraged toward profit-making, lending activity?
MS. JOHNSON: Objection. Lack of foundation. Vague. Speculation.
A. Yes. Sorry. Yes, it would have been our expectation.
Q. And if that supervisory goodwill were taken away from Carteret at a later point in time, it would have been your expectation that the

Page 393

institution would have either had to shrink or attempt to find replacement capital?
MS. JOHNSON: Objection. Leading and speculative.
A. Yes. That would -- Knowing the business and so forth, that would have been something -- that would have been a conclusion that we would have reached under those circumstances.
Q. Do you have any recollection as to whether the Government approached Carteret in connection with its acquisition of Delray and Barton Savings of Newark or whether Carteret approached the Government?
A. No, sir, I don't.
MR. THOMPSON: At this point I'd like to change gears and jump ahead a few years and ask you some questions about your tenure at the FSLIC as director of that organization in connection with Carteret's acquisition of three institutions in 1986.
And the first document that I'd like to show you in connection with these acquisitions I would like to have marked as AmBase Connell 9.
It is a document that bears the Bates number WOQ4002138 through 2139.

Page 394

(AmBase Connell Deposition Exhibit No. 9 marked for identification.)
Q. And sir, would you please identify this document for the record.
A. This is a letter from Mr. Bobby L. Hughes, H-u-g-h-e-s, as the managing director of Management Strategies, Incorporated.
The letter was dated November 12, 1985, and it was to Mr. S. G. Frank Haas, III, and at that time he was the director of the Office of District Banks at the Federal Home Loan Bank Board.
Q. And sir, are you listed as a copy at the bottom of the page of this document?
A. Yes, I am.
Q. And would you have been copied on this document in your capacity as a supervisory agent with responsibility for the State of Maryland which was in the Fourth District?
A. Yes, I would have.
Q. And sir, would you please take a moment to review the first full paragraph.
A. Okay, sir.
Q. Reference is made in the second paragraph to "FSLIC's policy regarding the interstate acquisition of a state-insured

a very substantial benefit to the FSLIC in a measure sufficient to constitute a compelling factor in determining to make an aware to the applicant," resulting from the acquisitions outlined herein?
MS. JOHNSON: Objection. Lack of foundation.
A. Yes, it would.
Q. And was the very substantial benefit conferred upon the FSLIC here the fact that Carteret had agreed to assume the net liabilities of Mountain Security and First Federal?
MS. JOHNSON: Objection. Leading and lack of foundation.
A. The answer would be yes.
Q. And sir, turning to page 8 of this document, there is a listing of several other bids for both First Federal and Mountain Security, and do you know whether a Viability Analysis was, in fact, prepared for any of these institution's bids?
A. No, I don't, but the general practice would have been not to have run a Viability Analysis on each one of these, but analysis would have been done.
Q. Yes. But the formal Viability



Analysis that was a prerequisite to the closure of a deal was generally only done for the lowest cost bid; is that correct?
A. Yes.
Q. Now, referring to the final paragraph which reads "Viability," and it states, "The Analysis and Evaluation Division of the OFSLIC indicated that Carteret is projected to be a viable institution as a result of the acquisition of Mountain Security and First Federal," and I take it that you concurred in that conclusion?
A. Yes, I did.
Q. And by the term "viable," did you mean that Carteret had the managerial and financial and capitol capabilities to successfully acquire Mountain Security and First Federal?
MS. JOHNSON: Objection. Leading. Lack of foundation.
A. Yes.
MR. THOMPSON: At this point I would like to have marked as AmBase Connell 12 a document that bears the Bates No. C-AM-A-0386235 through 242.
(AmBase Connell Deposition Exhibit No. 12 marked for identification.)



Q. And sir, would you please identify this document for the record?
A. This is the Issues Memorandum from myself as the acting director of FSLIC to the Federal Home Loan Bank Board dated June 5, 1986, and the subject matter is the "Appointment of FSLIC as receiver for and the FSLIC-assisted acquisition of the Assets and Liabilities of Mountain Securities Savings Bank, Wytheville, Virginia, and the supervisory conversion and FSLIC-assisted merger of First Federal Savings and Loan, Blacksburg, Virginia, and the issuance of insurance to and merger of New Admiral-Builders Savings and Loan Association, Parkville, Maryland, by and into Carteret Savings Bank, Morristown, New Jersey."
Q. All right, sir, and could you please tell me what the purpose of having both an Issues Memorandum and an A Memorandum was as the two, I'll represent to you, are almost verbatim, the same?
A. Well, the Issues Memorandum would specifically identify any issues that the Board members should be made aware of in their consideration as to whether or not to approve whatever package was before them at that time.
So although a lot of the information



was exactly the same, the Issues Memorandum was intended to focus solely on those for highlighting it for the benefit of the Board members.
And then A Memorandum, the purpose there would have been to focus on the financial aspects of the proposed transaction.
Q. Okay. Thank you. Now, turning to the eighth page of this document, eighth and final page of the document, is that your signature, sir?
A. Yes, it is.
Q. Now, the very last line of the document reads "These transactions will resolve two problem cases in the Southwestern part of Virginia."
And did you consider this resolution or these two cases to be permanent?
A. Yes, we did.
Q. And was that because you had satisfied yourself that Carteret had the financial strength to absorb these institutions?
MS. JOHNSON: Objection. Leading.
A. Yes, we would have.
Q. Okay. Was it a common practice for you, during your tenure as the director of the FSLIC, to sign the actual assistance agreements

Page 423

Q. And in your capacity as president of the Federal Home Loan Bank of Des Moines and principal supervisory agent thereof, would you have had occasion to rule on such an application?
MS. JOHNSON: Objection. Vague.
A. Possibly. I don't recall -- I was trying to recall one before I answered in my capacity in Des Moines, but right now I don't recall any such applications, but they were certainly available in most Home Loan Bank districts.
Q. All right. And did one of these applications to the best of your knowledge have to be filed every time a corporation wanted to acquire a federally insured thrift?
MS. JOHNSON: Objection. Lack of foundation. Calls for speculation.
A. You know, to the best of my recollection, Mr. Thompson, yes.
Q. And understanding that you were not involved in the specifics of this Application, I hope you'll just indulge me in a few questions that I just want to ask to make sure that I understand the process by which such applications would be considered.

Page 424

And I'd like to that end direct your attention to on page 6 of this document, and under the term "Financing of the Subject Transaction," it states "The subject transaction requires a complete restructuring of Home Group, Inc.'s, outstanding debt." Do you see that, sir?
A. Yes.
Q. And then in the paragraph, the second paragraph on the page, it says that "Projections indicate sufficient funds to cover debt service over a very short term period. However, principal payments on subordinated debt will be substantial in the 1990s. There are no projections to indicate that sufficient funds will be available. Dividends from both Home and Carteret will undoubtedly be relied upon." Do you see that?
A. Yes, I do, sir.
Q. As I understand this, this document is essentially saying that Home Group in order to be able to meet its debt servicing payments will have to rely upon dividends from Carteret.
Is that the way I understand this second paragraph on this page?
MS. JOHNSON: Objection. Lack of foundation, and the document speaks for itself.

Page 425

A. That appears to be what the document says.
Q. And if you were ruling on such an application, would you permit the transaction to go forward if you had doubts about Carteret's ability to generate such profits and therefore for the acquiring company to make its debt service payments?
MS. JOHNSON: Objection. Lack of foundation. Calls for speculation.
A. Not likely.
Q. And another just second short set of questions that I'd like to ask you that pertain to page 8 of this document, and this states under Section 7 "Net Worth Maintenance/Dividend Limitations," toward the bottom of the page, the first sentence states, "Under present Bank Board policy, a holding company must agree to maintain the insured subsidiary's net worth at required regulatory levels for as long as it controls the institution."
Do you recall that being the Bank Board's policy in 1988?
MS. JOHNSON: Objection. Lack of foundation.

Page 426

A. No, I don't. I just -- I would be uncomfortable saying that I did.
Q. Right.
A. Because more than likely, it was, but I'm not a good person to confirm that.
Q. Okay. And in the next sentence it indicates that the Home Group, Inc., "has expressed it's unwillingness to execute a standard maintenance agreement."
And without going through all the details, what the document states is that the Home Group as an alternative was willing to agree to infuse only $50 million, up to $50 million in additional capital.
Do you think that the person reviewing this application or -- strike that.
Do you think that a reasonable person reviewing this application would have approved limiting the Home Group's commitment to only $50 million in contravention of Bank Board policy if they had any doubts as to whether Carteret was going to actually stay in capital compliance?
MS. JOHNSON: Objection. Calls for speculation. Lack of foundation. Vague.
A. More than likely, not.