E_X_H_I_B_I_T_S



| ALBANESE | | PAGE |
|---|---|---|
| 1 | Document Bates stamped WOP 9161048 | 48 |
| 2 | Document Bates stamped C-AM-A-0339588 through 657 | 53 |
| 3 | Document Bates stamped WOP 3440528 through 0549 | 82 |
| 4 | Document Bates stamped WOQ 6791376 | 93 |
| 5 | Document Bates stamped WOP 3320528 through 529 | 93 |
| 6 | Document Bates stamped WOP 3340714 through 0716 | 101 |
| 7 | Document Bates stamped WOP 3340862 through 0864 | 110 |
| 8 | Office of Thrift Supervision News | 122 |
| 9 | Document Bates stamped WOQ 6791063 through 1064 | 131 |
| 10 | Document Bates stamped MBO 78491 through 8492 | 148 |





A P P E A R A N C E S:

COOPER, CARVIN & ROSENTHAL, LLC
Attorneys for Plaintiff
1500 K Street
Washington, D.C. 20005

BY: CHARLES J. COOPER, ESQ.
- and -
BY: HAMISH P. HUME, ESQ.

TONIA J. TORNATORE, ESQ.
Attorney for The United States of America
1100 L Street
Washington, D.C. 20530



A P P E A R A N C E S (Continued):

JAMES IGO, ESQ.
Attorney for the FDIC
550 17th Street, N.W.
Washington, D.C. 20429

ALSO PRESENT:

MICHAEL T. CARENZO, ESQ.
RICHARD A. BIANCO



R O B E R T A L B A N E S E, called as a witness, having been first duly sworn by the Notary Public was examined and testified as follows:

EXAMINATION BY MR. COOPER:

Q Good morning, Mr. Albanese.
A Good morning.
Q My name is Charles Cooper. First I want to thank you for making yourself available to us all day today and beginning at 8:00, even though it's 8:30 now, we got a late start, we know how busy your schedule is and we appreciate your being available to us.
Why don't you state your name and address for the record?
A Okay, my name is Robert Albanese, my home address is 145 Shady Lane, Randolph, New Jersey and the zip code is 07869.
Q Again, I am Charles Cooper, I am with the law firm of Cooper, Carvin & Rosenthal.
I represent the Plaintiff, AmBase

18

somebody as a supervisory agent?
A That's correct.
Q After you -- when you progressed beyond an analyst, what did you become then?
A I don't know which came first, but I became an Assistant Vice President of the bank and a supervisory agent, and that's the full supervisory agent with full supervisory authority.
Subsequently I became a Vice President, retained the supervisory agent's designation, and then when the examination function was removed from the Bank Board or the examiners were placed into the Federal Home Loan Banks, as I said before, sometime in mid-1980s, and those functions thankfully were merged, the examination and supervision functions, I ended up being designated a Senior Vice President and still retained the supervisory agent responsibility.
Q Now earlier you mentioned you were vested -- at that time were vested with the examination responsibility.
Did that also involve the supervisory responsibility because they were merged, as you said?
A I should clarify that the merger of

19

the functions came later, I became a Senior Vice President and Director of Examinations when the examination function was pulled into the Federal Home Loan Banks.
My responsibilities only -- at that time were only for the examination function.
Subsequently they were merged, and I think they were merged either just before or just after the creation of OTS.
Q So, prior to this mid-1980s period you were a supervisory agent. Did you have a geographical responsibility as supervisory agent?
A I know I had responsibilities for New York for quite a period of time, for the State of New York, I don't recall if at some point I might have had responsibilities for New Jersey.
But I don't think so, I think my recollection is that I always had responsibilities for the State of New York, and perhaps Puerto Rico at a time.
Caseload sometimes would swing back and forth, but I think my responsibilities pretty much stayed in New York.
Q Did your responsibilities require you to do -- to do on-site inspections of Puerto

20

Rican savings and loans?
A When I was an examiner, and far too often; believe me.
Q Usually in the winter?
A No, actually not, and it could easily ruin your marriage.
Q Okay, I think we were up to the mid-'80s when you took over these responsibilities which subsequently included the supervisory function.
Where did your career with the Bank Board take you after that?
A With the creation of the Office of Thrift Supervision, I became a regional Deputy Director, and a Regional Director at the time was Angelo Vigna and I was the Regional Deputy Director, which was basically the number two person in the region.
I should say, I think, that my recollection is that when the -- I know when the -- when the OTS was created we had 12 districts, and so at the time in 1989 or early 1990, I believe Angelo Vigna would have been a District Director, and I don't remember what my title was.

21

Q Were you functioning as the number two guy?
A I was functioning effectively as the number two person in the district.
Within a two year period, the 12 districts were consolidated into five regions.
At that time he was the Regional Director, Angelo Vigna, and I was the Regional Deputy Director, but functionally the only thing that changed is we picked up responsibilities for what had been formerly the examination and supervision functions for the Federal Home Loan Bank of Boston and Pittsburgh.
That's how we became a region and that's how we expanded from New York, New Jersey and Puerto Rico to the 13 states I mentioned before.
Q In that expansion, had Mr. Vigna come from one of these other offices, or had he been with you in the New York office?
A He had been in New York.
Q So, essentially I take it the leadership of the New York district, Mr. Vigna and you, became the leadership for the entire 13 state region?

46

Q Yes.
A I don't know. Honestly, I don't recall what -- whether we did that or we didn't.
Q Can you recall closing institutions that had negative tangible capital?
A Yes.
Q I take it you have closed many institutions in that profile?
A Yes. Getting back to your question.
Q Yes?
A Your earlier question, post-FDICIA you asked me to speculate, and I know my counsel has said not to speculate; but since the Congress at the time pretty much directed us to take certain actions at certain levels of capital and certainly we would have been expected to take action above -- at times when there was positive tangible capital, I think the answer to your question probably was yes.
Q After FDICIA you believe that you did close?
A I believe it's likely. I don't recall anything specifically, but I believe that it is contemplated in the Act that we would close an institution even if it had positive tangible

47

capital, if that tangible capital was so low as to present a risk or serious potential problem to the government and a risk to the taxpayers.
Q Prior to FDICIA, can you recall having closed an institution that was profitable?
MS. TORNATORE: Objection, vague as to profitable. You may answer, to the extent you can.
A I don't recall.
Q Do you recall having closed institutions that were not profitable?
A Often.
Q Do you think it was likely after enactment of FDICIA if you -- that you may have closed an institution that actually satisfied its tangible capital requirement?
A No.
Q How about prior to FDICIA?
A I don't recall prior to FDICIA any specific cases, so it's really hard for me to answer the question.
I think it's possible, I think there was serious management problems and serious loan problems where we had doubts. Maybe more than doubts, facts as to the potential losses in the

48

institution and potential losses in assets that hadn't yet been completely pinned down with formal appraisals, that we may have acted on on an institution knowing that it was insolvent.
Q Knowing that what?
A It was insolvent, that the losses were so severe, and that time was of the essence. But I can't recall specific cases.
The only case, like I said before that I can specifically recall right now, pre-FDICIA that I was involved with is Flushing Federal.
Q Well, if a -- if an institution was insolvent, then presumably it wouldn't satisfy its tangible capital requirement?
A That's correct.
MR. COOPER: Mr. Albanese, I would like to hand you -- I would actually like to have marked first as an exhibit a document that is stamped with number WOP 9161048.
(The above described document was marked Albanese Exhibit 1 for identification for identification.)
MR. COOPER: If you will review

49

that, please.
Q Mr. Albanese, will you identify this document, please?
A This is what's referred to as an informational report from the examiner in charge, Kevin Hoyt to me, Director of Examinations, that's what DE after my name is, it's dated April 8, 1988 and it's in reference to Carteret Savings Bank, F.A.
Q What were your responsibilities as DE? This was Director of Examinations you have referred to earlier, I take it?
A Yes. This is when I was in charge of the examination function, when I was put in charge of the examination function at the Federal Home Loan Bank for that three or four year period subsequent to 1986.
Q The second paragraph of that, of this informational report states that "As of this date, the examination has extended thoroughly into all major operating areas of the bank.
"The examiners are satisfied that management at all levels is competent. In addition, adequate procedures and controls

Q The regulations implementing FIRREA, do you recall when those were implemented?
A No.
Q They were, to refresh your memory, they were implemented in December of 1989.
A Okay.
Q So, you have no -- you have no sense for how many thrifts in your region were impacted by the supervisory goodwill provisions of FIRREA?
A It would be a pure guess.
Q Do you recall that Carteret was impacted by them?
A Yes.
Q Did you understand that fact at the time FIRREA was enacted?
A I don't know. I'm not trying to be evasive, I don't know specifically when I might have been aware of any specific institution that might have been impacted by it.
I know at some point, clearly, I was aware that Carteret was impacted by it, because they had it, but I don't know if I knew at the time in 1989 that I would have been aware with respect to any institution what their situation was; vis-a-vis the goodwill.



Q Well at the time that FIRREA was enacted in August, anyway, I assume that you and your colleagues knew that it would have -- that its provisions eliminating goodwill from tangible capital would have a profound impact on at least some of the thrifts that you supervised?
A Correct.
Q But you don't recall when you first appreciated the fact that Carteret was within that group?
A That's correct.
Q And you don't recall how many thrifts within your responsibility were within that group either?
A That's correct.
Q When did you and your colleagues as the regulators of the thrift industry in the region begin encouraging the thrifts that were going to be severely impacted by FIRREA's goodwill provisions, when did you begin encouraging them to take steps to deal with that?
A I don't recall the specific actions that we took, but I would say it's safe to say that shortly after we became aware of the fact that many institutions, however many there were



were impacted by -- capital was impacted by the elimination of goodwill, that we would have probably sent a letter to all institutions advising them that they had to begin immediately to start addressing the capital issue and raising capital.
But specifically I don't remember what we did or when we did it.
Q Do you recall that the legislation that ultimately became FIRREA was a very controversial and highly publicly discussed legislation even prior to its passage?
A Yes.
Q And I assumed that it was a focus of a lot of attention by you and your colleagues?
A Yes, I just don't have specific recollection. I also would assume.
Q Do you recall whether prior to the legislation you were cautioning thrifts within your responsibilities that they should be aware that they might be severely impacted by the goodwill provisions in the new legislation, should it pass?
A I don't recall if we did.
Q Is it possible that you did?



A It's possible.
Q Do you recall whether or not any of the thrifts within your responsibility actually did begin to take steps to cope with the new statute and its regulatory capital provisions even before FIRREA was passed?
A I don't recall any specific institution, no.
Q Do you believe that prudent managers of savings and loan institutions would have been preparing themselves, at least to take steps to cope with the new legislation in light of the likelihood of its pending enactment?
A Yes.
Q After FIRREA's enactment, do you recall what actions that you and your colleagues who regulated the thrifts within your region did to advise thrifts about the new regulatory capital provisions in FIRREA?
A I don't recall any specific document, a specific document.
I have a recollection that we communicated with the industry under our supervision, some type of an advisory letter highlighting aspects of the Act that would impact

70

caused me to think that.
Q But there were, in any event, things that came to light after this comment would have been written?
A Right, correct.
Q Let me now refer you to Page 45. About the middle of the page there is a heading that is called capital.
In the last sentence of the first paragraph the statement is made "The institution's ability to meet the current capital requirements of Section 563.13 of the insurance regulations and those proposed by FIRREA were also considered."
So, at least in connection with this examination report, which came out before the effective date, anyway, of FIRREA's regulatory capital limitations, the examiners were looking at it with an eye to the impact that FIRREA would have on thrifts, is that correct?
A That's certainly what the conclusion indicates, what the comments indicate in this report, yes.
Q Is that consistent with your recollection?

71

A Yes; generally.
Q At this time you knew that FIRREA was coming?
A Right, it's kind of what I said before. It would be very surprising if we weren't all focused on what was going to be the potential impact.
Q In the paragraph that has been headed "conclusion," the statement is made, "Carteret Savings has experienced declining levels of capital since December '87. Although the institution will be able to meet the current regulatory minimum required by Section 563.13 of the insurance regulation, it is not likely to meet the tangible leverage ratio and risk based minimum capital levels required by FIRREA."
And then skipping a sentence to the next sentence, it says, "The deficit at August 31, 1989 may be reduced to $110 million due to gains on sale of assets recorded during August."
So, does this, Mr. Albanese, suggest that even as early as August when FIRREA was enacted, that the management of Carteret was

72

taking steps and in particular here, shrinking, selling assets, in order to brace itself for the implementation of the new capital regulations disallowing goodwill?
A Well, it is certainly inferred, but I don't think you can tell from this comment whether they were planning to do an asset sale for other reasons, or for whatever reason.
But the sale itself and the gain was going to have that effect. Whether they were actually taking the action because of the capital requirement; I don't think you can necessarily get that confirmed.
But it clearly indicates that they were going to be selling assets to generate a gain and that that gain would reduce the potential deficits.
Q Okay, on the next page, Page 46, towards the bottom of the page there is a heading "financial Institutions Reform Recovery and Enforcement Act (FIRREA)."
Under that subheading A says, "Tangible capital" and the statement is made there, "Although the new capital regulations of FIRREA will not become

73

effective until December 7, 1989, initial calculations s indicate that the institution will not be able to meet the FIRREA minimum tangible capital requirement of 1.5 percent of total assets."
Then on the next page it continues, "The following schedule approximates the institution's July 30, 1989 and August 31, 1989 tangible capital level (without consideration of additional general valuation allowances) on a consolidated Carteret Savings Bank basis." Then it sets forward a tabulation.
Could you interpret that tabulation for me?
What does it indicate the tangible capital profile of Carteret will be?
I know you haven't looked at this before now, so it's not all that clear and it's going to take --
A I'm not sure this would be clear if I had looked at it.
Q Take your time.
A This is interesting. What it clearly shows is the amount of tangible capital

74

was going to increase over a two month period from June of '89 to August of '89; there are a million footnotes.
It doesn't, from what I can see, really show what the requirement was going to be; unless I am missing it.
Q Okay, well it does suggest -- let's just take then the first column which is headed 6/30/89, which is, I take it, the June 30, 1989 calculation.
It says that Carteret would have equity capital of $264 million and then it subtracts out two items, the significant one of which is intangibles?
A That's correct.
Q And the amount it subtracts out there is $214 million dollars, actually $215 rounded up, leaving tangible capital of just under $50 million.
A Correct.
Q Which in turn, in the line immediately under that, appeared to have been .70 percent of total assets.
A Correct.
Q And therefore something less than

75

half of the tangible capital requirement, which is the previous page, and I'm sure you will recall --
A 1.5 percent.
Q Was 1.5 percent.
A Correct.
Q So it clearly indicates that Carteret under FIRREA will lose a very substantial amount of its regulatory capital?
A That's correct.
Q I think in footnote 2, which is a footnote to the item intangibles, it gives us an indication of how much that goodwill loss is?
A Correct.
Q Do you see where it calculates the amount of goodwill?
A It seems to indicate goodwill of $187,446?
Q Yes, that's how I read it as well.
A That's correct.
Q So, if you assume that all of that or the lion's share of that goodwill is supervisory goodwill, and by that I mean goodwill generated by the '82 and the 86 acquisitions.
A Correct.
Q It is obvious that if -- without the

76

goodwill, that Carteret is quite substantially undercapitalized on a tangible capital basis, but that including the goodwill, Carteret would be not only in compliance with its capital requirement, but would exceed it.
Is that an accurate assessment based upon your view of this?
A Yes.
Q I have done some quick calculations here, Mr. Albanese, and added $180 million of goodwill back to the $50 million tangible capital number here, and that brings you to right at $230 million worth of capital, which by my calculations, anyway, would be about 3.5 percent of the total assets.
Do those rough calculations at least sound like they might be accurate to you?
A Yes.
Q So, with the goodwill, then, Carteret would very substantially exceed the requirement for tangible capital.
In light of this, would you agree that Carteret was very severely impacted by FIRREA's provisions disallowing goodwill in the calculation of regulatory capital?

77

A Yes.
A From the standpoint of the tangible capital requirement?
Q Yes.
A Yes.
Q That's the only requirement that is calculated here in this examination report?
A Right.
Q Mr. Albanese, based upon your experience, if Carteret at this time had been permitted to calculate its goodwill as tangible capital, otherwise to include it in capital for purposes of satisfying the new regulatory requirements, do you believe it would have been given a 4 rating in this examination?
A You know, I will really have to look at the report.
I don't know what else is in here, but -- it's a long report, there is liable to be serious management problems.
I would say that it's certainly something that would have been factored into the rating by the examiner if -- negatively.
It would have influenced the rating to go lower, the fact that they had this large

projected deficit on their capital requirement, clearly.

But I couldn't tell you without looking at this report what the asset problems or anything else.

Q I understand.

On Page 52 of the examination report there is at the top of the page a heading that states, "Management's tentative plans to improve capital," and then it lists several items and we will go through them.

But obviously I suggest management was focused on the difficulties that FIRREA posed and its exclusion of goodwill, and presumably so was the examiner and the supervisory staff, in light of the fact that this examination report prior to the effective date of the new regulations includes so much discussion and focus on the impact of FIRREA.

Is that an accurate observation?

A Yes.

Q In this part of the report, the last phrase really before the item, the itemized entries, it says, "Management has indicated that they have or will be addressing this issue



through the following means; 1, the high level of problem assets will be addressed by increasing manpower in the loan workout division, this will help reduce nonearning assets and increase the interest earning asset base, thereby increasing core earnings."

Do you recall whether Carteret's management actually did do that, actually addressed that point?

A I don't recall.

Q Would your answer be the same if I asked you the same question with respect to these other items?

A I don't recall any action specifically they would have taken.

Q That's fair enough.

Q Mr. Albanese, you were very much involved, were you not, in the decision making process concerning how to resolve Carteret and in particular whether or not to place it in receivership?

A Yes.

Q Do you recall what the date was when Carteret was placed into receivership?



A I should, but I don't know.

Q Would it refresh your memory if I suggest to you it was December 4, 1992?

A Yes, mean I don't know if that's the date, but I assume you got it.

Q Hearing no correction from your counsel, I will assume that we are agreed on that.

Would it refresh your recollection if I suggested to you that it was the same day that Mr. Ryan left his position as Director of the Office of Thrift Supervision?

A I believe that's correct.

Q Then that does help place the event in some chronological context for you?

A Right, yes.

Q Earlier I think you did recall when I reminded you of the date that Mr. Bianco and his colleagues joined the Carteret Savings & Loan in or around the early summer of 1991?

A Correct.

Q Do you recall when the regulators in your office, when I guess you and your colleagues initially recommended that Carteret be placed into receivership?

A It was very late, if we recommended



it at all.

I don't have the documents in front of me. There may have been a written document that ultimately -- Angelo Vigna ultimately signed and sent down, but -- and I think we were required at the time to make a formal written recommendation, and Angelo might have done that, might have signed something, but I remember there were discussions very, very late in this process, within maybe even a week or two, regarding still potential outside capital and potential acquisitions that might be -- potential parties that might step in.

I don't know exactly, but I guess as late as two weeks before or three weeks before the close. But it's a vague recollection.

Q I actually am having reference to the -- to a recommendation prior to that time, the initial recommendation for the appointment of a Receiver.

A I don't recall.

MR. COOPER: I would ask the reporter to mark this document which is Bates stamped WOP 3440528 on its first page and has a number of pages connected with

will, and I would like for you to note the first full paragraph on that page.

It states, "Mr. Bianco attracted Mr. Moor from AmeriFirst to take the Chief Loan Workout Officer position. Mr. Moor brings a wealth of accounting and real estate experience to Carteret from his past endeavors, including his work at AmeriFirst.

"Mr. Moor has attracted a skilled team of individuals to assist in Carteret's loan review and workout efforts.

"The individuals assisting Mr. Moor for the most part have worked with him for the most part while he was at AmeriFirst".

You mentioned that you recalled well when Mr. Bianco and his colleagues took over the management of Carteret?

A Yes.

Q Do you believe that was a positive development for the Carteret?

A Yes.

Q Why is that?

A There was a vast improvement in management over the prior management team.



Q So, it was your judgment as the principal regulator for this institution that Mr. Bianco and his colleagues provided good management to this institution?

A Yes.

Q How would you rate their management of the institution during the time they were there?

A Rate them as a management team or rate them --

Q Yes.

A They were a very strong management team.

Mr. Bianco brought in a good, solid Chief Financial Officer in Mr. Kramer, Mr. Moor was very well respected by our examination team in his resolution of problem assets, and Mr. Bianco himself was a pretty dynamic Chief Executive Officer.

Q Mr. Albanese, could you please turn to Page 19, and I will draw your attention to the final statement which is under the heading conclusion.

The statement is, "The statutory grounds exist for the appointment of a



Receiver for Carteret. We recommend that the Director take immediate action to appoint the RTC as Receiver for Carteret."

It bears a signature line for Mr. Vigna, although at least my copy and the copies that we are aware of don't have his signature.

Does yours?

A My copy does not.

Q Carteret wasn't seized at that time, was it?

A No.

Q Do you recall why?

A My recollection is that we were still on -- working with the institution's management team, and the number of outside investors in order to try to raise -- in order for them, frankly, to raise enough capital to meet a minimum standard that had been established which would have been necessary for the institution to remain independent and not transferred to the RTC.

I don't recall specifically, there were many different investor groups, and I don't recall the sequence of them, which ones we might have been talking to or they might have been talking to, although frankly we were all talking



to them at that time. We were pretty actively involved in the process.

Q You personally were actively involved in that process?

A Yes, I was involved.

Q Do you recall who the underwriters were that Mr. Bianco brought in to assist in that effort?

A You mean the different groups that came in?

The different -- the potential investor groups?

Q Well, actually here I am more referring to perhaps the investment bankers who assisted in trying to find interested and capable investors?

A No.

A I don't recall the underwriters.

MR. COOPER: If the reporter will please mark this as the next exhibit.

(The above described document was marked Albanese Exhibits 4 and 5 for identification, as of this date.)

MR. COOPER: Mr. Albanese, the reporter has just marked a document as

investor groups.
Q The investor groups are actually listed on the next page of Exhibit 5, and I am not going to name all these investor groups, but as you look down these names, it looks like there are roughly 20 names.
Do you recall any of these potential investors and having had contact yourself with any of them?
A Yes.
Q Which ones do you recall particularly?
A I specifically recall a meeting which we had in Jersey City with GE Capital and again, the Carteret team, management team there.
I think it's misspelled, but down in the third group, Cargill, there was a group that came in, it is misspelled, right?
It was the former Secretary of Defense or somebody in that group, I remember that one. I think we met with U.S. West, but I'm not sure about that.
We had some telephone conversations from time to time with other groups, but I couldn't say specifically which ones; maybe



Pennsylvania Teachers, we might have called them and talked to them, trying to determine just how serious groups were.
Q Mr. Albanese, would you say that you were impressed by the efforts that Mr. Bianco and his colleagues were making to find investors for this bank?
A Yes.
Q Were you impressed as well by the kind of contacts that Mr. Bianco had in the capital markets and the number of potential investors that he discussed this with?
A Yes, I believe we had discussions among ourselves.
That was one of the strengths that was -- that this team, this particular team brought in, and that was the ability to make contact with large investor groups and have those kinds of contacts.
I do recall that kind of discussion.
Q Do you think that there is anything more that Mr. Bianco and his colleagues could have done in order to attract interest in -- interested investors to possibly recapitalizing Carteret?
A I really couldn't say, I think



that's probably a good question to ask Mr. Bianco, but I could tell you that the honest answer to this is that we were not disappointed in the efforts that were being made to raise the capital. Whether he could have done more, I couldn't tell you.
Q Is it accurate to say that the effort, including your personal effort to find investors, was a very active and energetic one?
A Yes.
Q Did it involve Washington personnel of OTS, were they involved or knowledgeable of the efforts that were being made?
A They certainly were very aware of what we are doing, because we were briefing them very frequently by telephone or by memo.
But many, many phone calls, so they were involved actively.
I don't recall if anybody in our Washington office may have met with an investor group or not. It's possible, but I don't recall.
It wasn't typically done, but it's possible in this case it was done, I just don't recall.
MR. COOPER: I ask the reporter to



mark this document which bears Bates stamp WOP 3340714 as Exhibit 6, please.
(The above described document was marked Albanese Exhibit 6 for identification, as of this date.)
Q Mr. Albanese, can you identify Exhibit 6 for me, please?
A I'm not sure.
It's in a format, but I don't recall ever seeing like this, but it seems to be a memorandum that Rock Tonkel sent to Timothy Ryan.
Rock Tonkel, I don't remember what his position was, but Mr. Ryan had brought him in, he worked out of our Washington office and he did work on troubled cases and raising capital.
Mr. Ryan was the head of the agency.
It appears to be a memorandum from Mr. Tonkel to Mr. Ryan regarding the current status of Carteret Savings, which then was forwarded to us, I guess, because five days later it's forwarded from Angelo Vigna to myself, Michael Simone and Robin Snyder.
Q So then the author, I take it, of this memorandum or of the substantive part of the memorandum, is Mr. Tonkel?

106

generally based upon progress in bringing investor groups together and the likelihood of a deal, of a recapitalization without having to transfer the institution to the RTC.

Q These time pressures, though, I take it, and the statement I have just read certainly suggests, required compressing the period in which investors could do due diligence?

A Well, I would say this, my recollection is that it got more compressed as it got later.

There was certainly time pressures and -- but over the process of getting investors in and doing due diligence, as we got later in the process and closer to the date of the transfer, there were shorter -- my recollection is that the time frames became shorter to do these things.

That the first couple, early on and I don't remember who was first, due diligence periods and the period end process was probably more extended, it got more compressed as it got later.

Q On the next page of this document, after that subheading "conclusion," the statement is made "Despite these hurdles, all parties to the

107

transaction (with the exception of Carlyle who has not completed due diligence) are enthusiastic about an investment in Carteret.

"They have seen the interest and valuation Howard received. They have confidence in management and they understand that the trend in Carteret's condition is static at worst.

"These facts argue for allowing Carlyle to complete it's truncated due diligence process and pursue a Letter of Intent, if they are so inclined, at the conclusion of their real estate review."

Do you recall that the parties that are referenced in this document were keenly and seriously interested in investing in Carteret? Enthusiastic about it, as Mr. Tonkel puts it?

A I believe they were.

I believe the meeting that I attended in Jersey City, there was some real interest.

Q What is he referring to in your opinion when he references the interest in valuation Howard received?

108

A I don't know.

Q Do you know what Howard is?

A I was thinking about that as you read it. It will come to me, but Howard is a person.

Q Howard is a person?

A Yes.

Q Howard is not -- I had assumed reading this that it was a savings and loan institution?

A No, I think it's Howard, I can't remember his name, but there was somebody else involved in this process with Rock Tonkel, and I believe it's a Howard somebody; I think.

Q The interest in valuation Howard received?

A I think it's a person in the office; I think, but I could be wrong.

Q Was there an institution within the region called Howard?

A Yes, there was a Howard Savings Bank which we didn't regulate.

Q Oh, is that right?

A Yes.

Q Who regulated them?

109

A I believe the State of New Jersey and the FDIC, they were a state charter.

Q State charter?

A Yes.

Q Howard Savings Bank, do you know anything about the circumstances of Howard Savings Bank?

A In what sense?

Q Do you know if Howard was in trouble and looking for investors in the same profile that Carteret was, or a similar profile, I should say?

A I have a recollection now that you mention it of Howard Savings Bank somehow being involved in discussions, something to do with mortgage banking operations or some interest, I don't recall whether they were in trouble or not.

But again, I assume this was Howard Bluver, but I could be wrong, but I could be wrong, Howard Bluver, I believe he was involved in the resolution process, but it could be Howard Savings Bank.

Q Well if we assume for a moment that it is Howard Savings Bank, do you have any knowledge of how Howard Savings Bank was resolved?

I understand and accept that it was

to whether or not the institution ought to be turned over to the resolution staff for resolution.
Q I take it it was his recommendation that additional extensions should be denied and that Carteret should be transferred to the RTC?
A Yes.
Q This letter reveals your disagreement with that view?
A Correct.
Q When you say the primary regulator, you mean the OTS, right?
A Yes.
Q I want to call your attention first specifically now to the second full paragraph.
That paragraph states, "Your recommendation seems to have been based upon the premise that there has been a lack of demonstrated progress by the association to raise capital since January 1991, as well as insufficient financial improvement by the institution to actually attract a firm commitment from investors.
"We believe to the contrary, that progress in stablizing a large troubled



institution has been made by the new management team since taking control of Carteret in July of 1991, and that reasonable progress toward achieving a recapitalization of Carteret without federal assistance has continued to be made since the February 27, 1992 agreement was signed by OTS and Carteret."
This reference to the new management team, is that another reflection, I think, am I correct, of your judgment at that time that you were impressed by the competence and the commitment of the management team headed by Mr. Bianco?
A Yes.
Q What did you mean by stabilizing a large troubled institution?
A There are a number of things that we look at, obviously, during the resolution process, when a process like this is going on.
My recollection is that those areas generally are earnings, asset problems and capital.
The management, clearly, but the trends that we would look to would relate to is



the institution getting better or getting worse.
My recollection is that Mr. Moor, who was brought in by Mr. Bianco was making progress in turning around problem assets, problem assets were declining.
The financial operations of the institution was becoming more positive, if not positive, the losses were shrinking, I believe at one point they did maybe turn positive.
So the financial performance -- the profitability of the institution was improving and the problem assets were declining.
It might have been more than that, but that's my recollection.
Q And an institution in that profile that you have just described, is not at that time anyway experiencing further capital erosion?
A That's correct; if it's profitable.
Q Exactly.
A Right.
Q It makes reference to this February 27, 1992 agreement; do you recall the agreement?
A I would not have recalled it if I hadn't seen it in a prior document, but now that I have seen it, yes, there was a written agreement



which I think the institution basically said to us authorize us at any time to take them. I don't remember the specifics much beyond that, but yes.
There wasn't sufficient progress being made.
Q That's the essence of it.
And, in fact, you point out in the first paragraph that, under that agreement, that the process can halt at any time that OTS decides it is not satisfied?
A Correct.
Q The next paragraph states, "Regarding the recapitalization efforts, OTS has not merely been accepting management's assurances that progress is being made to obtain capital.
"We have had meetings and/or conference calls with the underwriting group virtually every week to monitor the legitimacy of investor interest.
"We also have been meeting with major investors to assess their earnestness toward committing capital to Carteret.
"We met with Kohlberg & Company last week and are scheduled to meet with another

major investor on July 16th. We expect a nonbinding Letter of Intent from a major investor within fifteen days.

"Lastly, considerable funds continue to be spent by potential investors to complete the due diligence process."

Do you recall who these unnamed investors were?
A No.
Q But this paragraph certainly comports very well with your earlier testimony, I am asking you if it comports with your recollection of events?
A Yes.
Q The next paragraph, about the fourth line down reads as follows "Steady financial improvement has been demonstrated by the new management team, as evidenced by a comparison of the six month operating periods ended November 30, 1991 and May 31, 1992, net income for the six months ended May 1992 was $5.4 million, compared to $1.8 million from the November 1991 period.

"More important, core earnings (before provision for loan losses,



gains/losses on sales of assets, and taxes) improved by $11.5 million during the December-may period."

It then in the last sentence goes on to point out that "net income in the $2.5 to $3 million range is forecast for the month of July."

Mr. Albanese, this specifically makes the point you made generally just a moment ago, does it not, that Carteret -- that among the things obviously you look at in terms of trends are its earnings and after a sustained period of not earning money it was earning money again, is that an accurate characterization of this?
A Yes.
Q Do you recall how long Carteret had sustained profitability at this point?
Let me amend that, until the time it was seized at the very end of 1992?
A No. You can get out of the paragraph I wrote here that it had been for at least a six month period.
Q At least a six month period in July?
A And it continues, but I don't know how long prior the beginning of that six month



period they may have been profitable.
Q In light of the data, the letter, one can assume that Carteret or one knows from this paragraph Carteret had been profitable all of 1992 anyway, the first two quarters of 1992?
A Correct.
Q Now, based upon your intimate familiarity with the thrift industry as obviously a major regulator and official of OTS, is it correct to say that at this time that this letter was written, the real estate market had begun to show signs of rebounding and that the thrift industry and the economy, generally, had begun to show signs of strengthening?
A My recollection is that the industry did; I don't recall whether or not the real estate market was rebounding, honestly.
My recollection is we were starting to see progress by the industry, the industry was starting to improve.
A But as for the real estate market itself, I couldn't say.
Q But economic conditions were easing for your region, that thrifts within your region in a general sense during that period?



A Yes, I could say with certainty that within six months we started to have more institutions coming in to raise capital in the private -- in the marketplace, and that generally is an indication times were getting better for the industry.
But I don't recall anything with respect to the real estate markets.
Q When you say within six months, you mean within six months of the time this letter was written?
A Probably by the middle of the following year we had -- we were seeing more interest on part of the industry to raise capital and there seemed to be having a better time of it, so that's usually an indication that markets are becoming more favorable for the industry, the industry is improving.
Q Did you not also start seeing thrifts becoming profitable at this period?
A Yes.
Q And that's a pretty good indication too, I take it?
A Yes, I don't -- it seems like it's not that long ago; I don't recall specifically any

one thing that would confirm that, but generally speaking in the mid '90s, early to mid '90s, we started to see the industry bounce back, and it's continued to this day, obviously.

MR. COOPER: I did not anticipate using this as an exhibit, and if you can believe that I've got duplicates of a lot of documents I'm not going to use as an exhibit, I don't have duplicates of a document that I now would like to ask you to take a quick look at.

We can make a copy later for your convenience, Toni.

MS. TORNATORE: That's fine, we will just mark it now and have him look at it.

MR. COOPER: If you will mark this as the next exhibit, it has no Bates stamp.

(The above described document was marked Albanese Exhibit 8 for identification, as of this date.)

Q Mr. Albanese, Exhibit 8 is a press release that was issued by the OTS when Mr. Ryan resigned. The thing I really want to focus your attention on is the second page of it I think -- I beg your pardon, it's on what is the third page



where it says number 3, "restore the industry to profitability".

I would ask if you don't mind, it's a short paragraph, and since I have only one copy, if you will read that paragraph into the record?

A Point 3?

Q Yes, please.

A "Restore the industry to profitability," underscore.

"The industry has strung together six consecutive profitable quarters and profits in the first six months of 1992 were a record $2.8 billion.

"Ninety-three percent of the industry was profitable in the second quarter and the capital level of the industry has increased 17 fold to nearly 6 percent from less than one-third percent in 1988.

"There were 632 insolvent institutions (1 in 5) in 1998 and today there is 1."

Q Thank you.

Mr. Albanese, does that help refresh or really confirm your recollection that during



this period the industry did appear finally to be coming out of a sustained economic slump?

A Yes, that would indicate that.

Q Referring again now back to Exhibit number 7. The second full paragraph of that exhibit states as follows "Carteret also continues to improve its troubled commercial asset portfolio. Though our current examination has not concluded, a report from examiner Tom O'Rouke disclosed $217.5 million in commercial loan payoffs and repossessed commercial asset sales from June 30, 1991 to May 31, 1992.

"The total net book value of this high risk troubled portfolio declined during the same period from $926.4 million to $574.4 million, and valuation reserves represented 28 percent of gross commercial assets at May 31, 1992. (it is important to note that part of this portfolio was performing and that the valuation reserves represent a far greater percentage of the nonperforming segment)."

Earlier you mentioned that one of the components that you look at when you assess



the issues concerning the resolution of a troubled thrift and its trend, I think was the word you used, is how was was it dealing with its troubled assets.

This paragraph suggests to me that you felt that Mr. Bianco, and I guess this is Mr. Moor's specific contribution to the effort, was doing a very good job in working out the problem assets that they had.

A Yes.

Q The decline in the troubled asset portfolio from $926.4 million to $574.4 million during the period referenced here, was that an impressive accomplishment on behalf of Carteret's workout specialists?

A Yes, we were impressed by the fact that they were able to get more assets earning, and so that -- that was critical, so that is -- that is very good progress.

Q The statement in the parentheticals where you say that it's important to note that part of this portfolio is performing, explain what you mean by that?

I'm not sure I understand what that point means.

people we reported to in Washington, the John Downeys of the world looked at this and said no we can go with it, because we still controlled the process at that point, I don't know.
Q Apart from this correspondence, do you recall having any conversations with Mr. Ketcha bout the situation at this time?
A No, I recall having frequent, I have to define frequent, a few discussions with Mr. Ketcha and Mike Zmorski along the way.
Judging from this memo and the fact that we had to write it, probably not enough of them, but I do recall having discussions with them.
We did try to keep them in the loop, it was an important case and a large institution, and they felt as though they needed to understand what was happening.
But I can't say specifically that I talked to him after or during the process of writing this memo -- this letter.
MR. COOPER: I would ask the reporter to mark as Exhibit 9 a document that is Bates stamped WOQ 6791063.
(The above described document was



marked Albanese Exhibit 9 for identification, as of this date.)
Q Mr. Albanese if you will take a look at that document, it's another document I will call your attention to several passages in it so if you will take a few moments and look it over.
A Okay.
Q Would you identify this document, please?
A It's an internal memorandum that I wrote to the file on November 17, 1992, basically memorializing a conference call that I and Mike Simone, who reported to me, had with Jonathan Fiechter, at that time Deputy Director of Washington operations regarding possible acceleration of a transfer of Carteret to the RTC.
Q Who was Jonathan Fiechter?
A He reported to Tim Ryan, I don't recall the exact structure, but there were some direct deputies that he had.
Jonathan Fiechter was a key deputy for Tim Ryan, involved in all aspects of what we did, and he became Director of the agency when Tim Ryan left on an active basis.
Q Were his responsibilities?



A I should say Tim Ryan didn't leave on an acting basis, he became acting Director.
Q Were Mr. Fiechter's responsibilities at that time targeted on resolution cases, problem institutions?
A You know, it's interesting, I would have said no up until reading this document.
My dealings, our dealings almost exclusively were with John Downey.
So I am not sure, maybe John Downey was out for a few weeks, and Mr. Fiechter stepped in on the case, or I don't know, I can't recall, I can't recall this conversation first of all, but I can't recall why Mr. Fiechter would have been involved here.
Q But that was going to be my next question. You don't have any present recollection of this conversation?
A No. We had so many.
Q It does make reference to, as you noted earlier, the scheduled transfer date of Carteret Savings, and I take that that means the scheduled transfer date of Carteret to the RTC?
A Yes.
Q In the last paragraph of this



memorandum you mention the fact that this scheduled transfer date was December 4, 1992. This memo was written on November 17.
Typically how far in advance would the decision be made to place an institution in Receivership?
A It's case by case.
Q Well, so there is no -- there is no typical time frame?
Were there logistical considerations that stirred into that, is that it?
A There were issues certainly as to the RTC's availability to assume control of the institution and to run it. But I believe that it became more case by case.
An institution that suddenly had a major problem in the course of say a three or four week period, we were going to accelerate the process, it would be irresponsible not to.
An institution that was making progress and improving, we wouldn't have that same urgency to do it.
So, it may have been some written standard under which we were expected to operate, but my recollection is that we really didn't

date.
"Frankly we did not view the transfer date, whether it was November 20, December 4 or January 4th, to be a critical factor in our analysis of the situation."
Now, at the beginning of that paragraph you say the institution's financial condition continued to improve.
In what way, do you recall how it continued to improve?
A My recollection generally is that it continued to be more profitable as time went on, and the problem assets continued to decline. Those are the two things I remember.
Q I take it also that the as time went on during it period, the economy generally for thrift businesses was improving as well, is that true?
A Again, based upon what you showed me before, that would be a fact, I don't know whether I factored that into the thinking then when I wrote this.
I believe I was focused more on the critical factors that we looked at while an institution was still open, I don't know if I



would have factored that into my thinking.
Q Really?
A I may have, but -- I don't recall that being -- I do recall those two other things.
Q Would it be fair to say that improvement in a general climate of industry improvement might be more meaningful than some idiosyncracy of a thrift institution that was going against the otherwise trend?
A I wouldn't necessarily agree with that. We have situations where the economy is improving, interest rates are coming down and institutions are going to hell in a handbasket.
Q And you say that, "supervisory risk of loss, while it remained open, was very low."
Again, is that because -- well, just could you elaborate on that?
A Well, our view was that the institution was profitable, it was improving and that a lot of the trends that we look at were going in the right direction, and so that the likelihood of a costly failure was not great, we didn't see anything that would create that scenario, other than the fact that the institution was very thinly capitalized.



But the trends were very positive, so we -- that must have been, that's my thinking now, I think that was my thinking then.
Q Is it accurate that if the trends that you cite here continue, that the risk of loss to the insurance fund would continue to be diminished as long as the thrift improved?
A That's a big if, though.
The flip side of this, is that different people viewed this and different people had different views.
I mean obviously I wrote this, obviously we felt that way.
Other people perceived the risk, higher levels in the organization differently, and that because the institution is thinly capitalized, there is so little margin for error, if we as a supervisory group miss something and something negative were to happen, then perhaps we wouldn't be correct in our view, and that's the way the process works; we make the recommendation, somebody else goes, makes the decision.
Our view was that clearly and my view was, I wrote the memo, that the risk of loss was low and that the situation was improving.



Obviously if the profitability continued to improve and the problem assets continued to decline, which probably would enhance profitability, and nothing else unforeseen happened, given the tenuous capital position of this institution, negative happened, then I would say your statement is correct. But it's somewhat complicated.
Q This makes reference to the perceived benefit of an early transfer date.
Do you know what perceived benefit might have been in the minds of anyone interested in seizing the institution?
A I don't know why I wrote that that way. I could speculate, but that would be speculation.
Q Let me ask you this, what are the costs of transferring an institution to the RTC -- of placing an institution in receivership?
A Well, the costs of actually doing the action isn't very great, there are obviously costs subsequent to the transfer of running the institution, the number of employees you need to run the institution.
The other costs that has been

142

documented, I think, and it varies from institution to institution, has been the cost of sometimes resolving the assets subsequent to the transfer, and whether or not the asset prices that are achieved by the RTC are equal to the asset prices that could have been achieved in the private sector.
That varies from institution to institution, certainly, but those are the types of things that are generally talked about when you hear people refer to the cost of the transfer to the RTC.
Q Well, with respect to that latter point, you previously testified that you and your colleagues were impressed by the job that Mr. Moor was doing in resolving the troubled assets.
In your opinion, could RTC have resolved the troubled assets as efficiently as Carteret was doing up until that time?
A I guess the word could leaves open the possibility that the answer is yes.
Q Then I will recast my question and ask you within your opinion you think it would be more likely than not that the troubled assets of Carteret could be resolved more efficiently and at

143

greater valuations for the thrift by the management of Carteret than by the RTC after a seizure?
A I think it's possible with a very, very strong person in there that they could have achieved maybe some of the same efficiencies.
I think it's difficult, I think it would have been difficult to achieve the same prices, is my personal opinion.
Q So in your personal opinion, in this case at least that would be a likely cost of seizing the thrift, in light of how well you perceived Carteret to be doing in resolving the troubled assets?
A Yes, I just couldn't say what that cost might be.
Q Isn't there another cost of seizing a thrift in the sense that the possibility of achieving some kind of unassisted recapitalization of the thrift is lost forever and then the RTC and therefore the taxpayers will have to endure the expense of liquidating the institution?
A Well, if you are talking globally, if you are talking about what, in a macro sense what happens, there is a cost obviously in

144

creating the RTC.
But part of what you are talking about is factored into the prior answer, and that is if you are able to generate the prices off of those assets sufficient to meet Debtor obligations and to pay the taxpayers out, pay out the insured funds, that loss theoretically could be zero.
So I mean that's a it depends type of answer, I don't think you can just necessarily assume it.
But I'm not sure I am completely addressing your question.
Q Let me ask you this, how many receiverships -- how many thrifts, to your knowledge, that were seized by the OTS and placed in receivership, in the receivership hands of the RTC, resulted in no cost to the RTC?
A I don't have the information, but I don't think there were too many.
Q Do you have any information about how much the Carteret receivership cost?
A Not specifically.
Q Do you believe it is a receivership that didn't cost the taxpayers any money?
A I think I heard subsequent to the

145

transfer that it did cost money, but I don't have specific recollection of how much.
The fellow that was running the RTC is a counterpart of mine might have had a side bar discussion one day.
So, my recollection is that it was not a no cost resolution, clearly, but I don't know how much ultimately it cost the government to resolve it.
Q Does your recollection even allow you to say that your understanding is that it cost somewhere north of $100 million?
A I don't recall the number that was mentioned. I'm not even sure we got that specific.
It may have been, I don't recall, I honestly don't recall what he said, the individual I was speaking to.
Q Then to descend from the general to the specific, in this case, anyway, the cost of closing Carteret was indeed, and it seems to me that the point that your paragraph is really making at its very core here, is that the cost of transferring the Carteret is to lose any opportunity of there being an unassisted

154

A I would say between 50 and 100.
Q 50 and 100?
I guess I was expecting you to say five.
So these are big meetings?
A It wasn't a meeting, this was -- the decision had been made the institution was going to be seized, and they just don't want everybody strolling in at 1:15, 1:25; everybody would assemble and they would -- I didn't go to a lot of these, but they would assemble and then they would descend upon the institution and take control, yeah.
It's not unlike FDIC seizures of failing banks, that's generally how they are done.
Q Well, earlier you called it a staging meeting, I thought?
A I think that that's what they refer to it as, it sticks in the back of my head.
I guess they all stage, got together and maybe that's the wrong word, but it was the meeting, the gathering in anticipation of seizing the institution.
Q Mr. Albanese, as the principal regulator in the Northeast Region or one of the

155

two principal regulators in the Northeast Region in a sense throughout the '90s, you are familiar with the fact that the thrift industry generally has done very well or did very, very well during the period from beginning early 1993, are you not?
A Yes.
Q If Carteret had been given more time, do you believe that it would have survived?
MS. TORNATORE: I object as to speculation.
You may answer to the extent you can answer.
A I believe that the positive trends that were happening at the time continued and that nothing large and unforeseen in way of a loss, big problem asset loss happened, that given the conversion activity that's happened in the industry, from stock conversions, public IPOs, that Carteret had an opportunity, a good opportunity to raise capital at some point through that process.
The risk would have been, again, if something happened in the early years, the early stages subsequent to any extension we might have given them, it could have taken the institution

156

down, and obviously all bets are off on their ability to raise capital.
But if the positive trends had continued, I think they had an opportunity to raise capital, given what's happened in the past six or seven years.
Q Your opinion at the time was they had a good chance of surviving, obviously, in light of the position that you took, and just so that I am clear on my question, based upon your knowledge of the events that occurred in the industry since the seizure, do you know of anything that would change your mind about that?
A No, I mean I am clearly indicating in this memo that I say December 4th or January 4th, so I am going beyond the date clearly that I have been identified.
What this is saying is that why the emphasis on time?
What's the issue? The institution is improving themselves.
Clearly I am conveying in this memo again that we believe the institution was improving.
So, barring some unforeseen event

157

that would have taken a thinly capitalized institution, and bear with me, I mean even after an outside capital infusion, this institution still would have been barely, barely meeting its minimum capital requirements, so barring something unforeseen, given how positive the stock market has been, I would say that you are correct, that this -- I don't see any reason why this institution would have had a difficult time raising capital, given those assumptions.
But it assumes a continuation of the positive trend.
Q It is also, would you agree, based upon your knowledge of the thrift itself, its management and the other things that you knew about the thrift, and which formed the basis for your opinion at the time?
A Based upon everything we had seen up to that point, I could not have written a memo like this, particularly at this late date, making this kind of a recommendation, unless we thought that progress was being made and a team was in place that could continue the progress.
Q If Carteret had survived, if it were around today and would be managed by -- continued

to be managed by Mr. Bianco and his colleagues, do you believe that it would have prospered in the economic environment that has prevailed since the end of 1992?
MS. TORNATORE: I will object as to speculation. You may answer to the extent you think you can.
A I think I could say that as I have said repeatedly, that we viewed this institution as being well run, and as an institution, a management team that was making progress.
I know of -- to take the other side, I do know of well run institutions that didn't do too well during good times, so you can't say with absolute certainty what would have happened, I certainly can't speculate on that.
Q I am just asking for your best judgment.
A My opinion is that it was a good management team, and a good management team and a good economy ought to be able to do pretty well.
Whether they would have prospered, I think that's -- what is prospered? They would have survived probably? Yes.
Q Do you recall how much the capital



deficit, and now I will just confine the question to the tangible capital deficit of Carteret was at this time, the time it was seized?
A No. Frankly I didn't even think it was negative, but I think it was below the minimum, but I don't recall, actually.
The deficit, I am talking about negative capital, not negative to the requirement.
Q Yes, I am talking, and my question is and I guess my representation is that its regulatory capital was negative?
A Okay.
Q Deficit?
A I don't recall.
Q I am just wondering if you recall.
A No.
Q So you don't recall what it's capital snapshot was at the time, so to speak?
A No.
Q Let me ask the question this way, if Carteret had satisfied at that time its tangible capital requirement, whatever that might have been, let's just say for purposes of this question that it was a $70 million tangible capital requirement, if they had satisfied that, do you



believe that Carteret would have been able to attract an investor to make up the much smaller difference that was then needed?
Do you understand my question?
A No, I don't. If you are asking me if they had a smaller hole to fill was somebody more likely to step in?
Q That's essentially what I am asking you, yes.
A I think that that pretty much goes without saying, for them and any other institution.
Q Do you believe that Carteret would have been seized if they had satisfied their -- its tangible capital requirement rather than having had, as it did, a tangible capital deficit?
A No.
Q If the OTS and the other regulatory authorities had in good faith at this time recognized Carteret's supervisory goodwill as regulatory capital no different from cash, do you believe that Carteret would have been seized at this time?
A You are saying if the supervisory goodwill was not eliminated, therefore bringing



that ratio way down and therefore they would have had somewhere in the neighborhood of 5 percent, based upon the numbers you showed me before?
Q It was actually 3.5, based upon those earlier numbers?
A If that supervisory goodwill was sufficient for them to meet the minimum capital requirements -- let me put it another way -- if the elimination -- if we did not eliminate the goodwill?
Q Yes, that's it.
A If they had enough that their tangible capital requirement would have been met, I think it gets back to your earlier question, I don't think they would have been seized.
Q Did the regulators ever consider infusing some of their own money into this thrift?
A While it was open?
Q Yes, I think that there were programs called open thrift assistance, and frankly I'm not specifically acquainted with them, I am sure you are.
A You are sure.
Q Do you recall if any consideration was given to possibly assisting a transaction in