IN THE COURT OF FEDERAL CLAIMS

----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

----------------------------------------x

October 26, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of ANGELO A. VIGNA,

a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

Page 58

A I believe it is.
Q So in addition to the $250 million that AmBase invested in Carteret, it also agreed with FSLIC to invest an additional, up to an additional $50 million should the thrift's regulatory capital require that?
MR. LEVITT: Objection to the term invested. All AmBase did was buy the stock of Bancorp. You can answer.
THE WITNESS: Could you read that question back, please.
(The question requested was read back by the reporter.)
A Yes.
Q Does reviewing this provision of the RCMA refresh your recollection about that component of the 1988 transaction?
A Yes.
Q If regulatory capital had not included the approximately $180 million, more than $180 million worth of unamortized supervisory goodwill, do you believe that AmBase would have agreed to infuse an additional $50 million into the thrift?
MR. LEVITT: Objection, calls for

Page 59

speculation. You can answer.
A It's not likely.
Q Mr. Vigna, do you recall what FIRREA required with respect to the regulatory capital treatment of supervisory goodwill?
A FIRREA essentially said that in computing regulatory capital, any goodwill on the balance sheet had to be deducted to determine compliance with capital, regulatory capital numbers.
Q Am I correct in saying that it had to be deducted entirely from the tangible capital requirement established under FIRREA?
A My recollection is that there was some phase-out or phase-in of the new standard.
Q Is it your recollection that there was a phase-out with respect to the tangible capital requirement or just with respect to the core capital and the risk-based capital requirements established in FIRREA?
A I don't recall specifically. I know we did have a phase-in.
Q Yes.
A Or phase-out.
Q Would it refresh your recollection

Page 60

if I suggested to you that FIRREA required the complete elimination of supervisory goodwill from a thrift's tangible capital requirement and a phased out elimination over a period of four years, as I recall?
MR. LEVITT: Objection in that it assumes that the tangible capital requirement wasn't phased in, where it was. But you can answer.
MR. COOPER: I didn't finish my question, actually.
Q But that FIRREA required a phase-out of supervisory goodwill for core and risk-based capital? Does that refresh your recollection?
A You could be right. I just don't recall specifically, you know, the details of the phase in/phase-out.
Q Okay. FIRREA had a severe impact, did it not, on a number of thrifts in the New York district?
A Yes, it did.
Q Could you describe essentially what that impact was insofar as FIRREA's provisions concerning supervisory goodwill are concerned?
A Essentially what it did was, again,

Page 61

phase out the permissibility of goodwill as part of capital and essentially abrogate all of the outstanding agreements between the Bank Board and FSLIC and acquiring institutions in terms of the amortization of goodwill and the inclusion of goodwill as capital.
Q When FIRREA was being debated in Congress and its provisions were being formulated, do you recall that period?
A Yes.
Q Is it correct that you were involved in a working group or some kind of a task force within the Bank Board or within the financial institutions, government financial institutions' regulatory agencies concerning the proposed legislation that ultimately became FIRREA?
THE WITNESS: Could you read that question back.
(The question requested was read back by the reporter.)
A Yes.
Q It's my recollection from your common deposition testimony in these Winstar related cases that you had expressed in that context the concern that the proposed treatment of

Page 70

industry in the late 1980s, I guess, mid to late 1980s?
A Well, it was a problem resulting from a number of issues. The real estate market basically crashed in the latter part of the '80s, some was a consequence of tax law changes. Other reasons, economic reasons.
So institutions, particularly those that were involved in construction and development lending and commercial real estate lending, found that in some cases what appeared to be, you know, properly underwritten loans were now not paying, developments weren't selling out, and big losses, large losses were being absorbed on these investments.
Q Was this problem also characterized by a general reduction in the values of real estate pledged to secure loans and general assets that thrifts held?
A Yes.
Q And I take it that is what is effectively being referred to in this reference here about deterioration in the quality of the loan portfolio?
A Yes.

Page 71

Q How widespread was this problem within the Second District at this time? And this is, I take it, sometime in the middle to latter part of 1989?
A It was fairly severe, at least in my judgment and recollection.
Q Were there parts of the country that were even more severely impacted by this problem with real estate, I think you called it a crash essentially in the market?
A That's at least what I believe what occurred. There were some pockets of the country that were more, problems were more severe than others.
It certainly was very severe in New England, the southwest, part of California.
Q Is it a fair statement to make that you and your colleagues in the Second District had your hands full in terms of thrifts that were experiencing this problem?
A Yes.
Q Over on Page 45 of this report of examination there is a section that is entitled "Capital," and it runs for several pages.
It begins with, or at least the

Page 72

second paragraph under the heading "Capital" states, "The conclusion of the report with respect to capital," and it says in the first couple of sentences, "Carteret Savings has experienced declining levels of capital since December 1989."
MR. LEVITT: 87, it says.
MR. COOPER: I'm sorry, thank you. I misread that.
Q "Although the institution will be able to meet the current regulatory minimum required by Section 563.13 of the insurance regulations, it is not likely to meet the tangible leverage ratio and risk-based minimum capital levels required by FIRREA."
I want to skip a sentence, if that's all right, and call your attention to the sentence that reads, "The deficit at August 31, 1989 may be reduced to $110 million due to gains on sale of assets recorded during August."
Mr. Vigna, does this refresh your recollection concerning steps that the management of Carteret was taking as early as August 1989 to sell assets and thus to shrink in order to cope with the impending regulatory capital problems

Page 73

that FIRREA represented?
A No.
Q On the following page, towards the bottom of the page, there's a heading entitled "Financial Institutions Reform, Recovery and Enforcement Act (FIRREA)," and the exam report states as follows:
"A, Tangible Capital. Although the new capital regulations of FIRREA will not become effective until December 7, 1989, initial calculations indicate that the institution will not be able to meet the FIRREA minimum tangible capital requirement of 1.5 percent of total assets."
Then it continues on the next page, "The following schedule approximates the institution's July 30, 1989 and August 31, 1989 tangible capital level (without consideration of additional general valuation allowances) on a consolidated Carteret Savings Bank basis."
Could you take a few moments and look at the schedule that is depicted there.
As I read this schedule it essentially excludes from Carteret's regulatory

Page 78

excluded on this schedule, and for purposes of simplicity I have added back or would suggest to you that we add back $180 million of goodwill, one gets, according to my math, just under $230 million worth of capital.

Is that consistent with your quick math there?

THE WITNESS: I didn't follow.

Would you read that back, please.

(The question requested was read back by the reporter.)

A It sounds correct.

Q So if you add back the excluded goodwill, would Carteret satisfy its tangible capital requirement under FIRREA?

A I believe so.

Q I would like to represent to you that at least according to my math, $230 million of capital would compute to 3.48 percent of Carteret's total assets at that time.

Does that seem generally accurate?

A Yes.

Q So is it accurate to say that if Carteret's tangible capital had included unamortized supervisory goodwill, Carteret would

Page 79

have well exceeded its tangible capital at that point in time?

A Yes.

Q Would you agree that for Carteret the exclusion from FIRREA's regulatory capital requirements of supervisory goodwill was a devastating blow?

MR. LEVITT: Objection, that's a vague question. Can you define a devastating blow?

It still satisfied the other two capital standards, and AmBase still had an obligation to provide capital under the capital maintenance agreement, which it did.

With that you can answer, if you can. Was it a devastating blow is the question.

A I think devastating might be a stronger word than I would use. It certainly was an event that created a lot of problems for the institution.

It changed, certainly changed their financial status from a regulatory standpoint.

Q So you would resist the notion that

Page 80

the loss of at least $180 million of regulatory capital was a devastating blow?

A I guess I don't like the word devastating.

Q Okay.

A It certainly was a very severe consequence of this legislation. As a consequence of this legislation they lost a great deal of regulatory capital, and while it didn't make them insolvent, it certainly put them out of compliance with regulatory requirements and put them into a category, a regulatory category that -- a problem regulatory category, and it certainly also had an impact on their market value.

Q What was the impact on their market value, according to your recollection?

A I don't recall specifically, but obviously now that you're, you know, you're in a different regulatory category the market is going to view you differently.

Although it really shouldn't, because economically nothing really changed, but I think that psychologically it had an impact on the market's view of the value of this company.

Q Well, in this report of examination

Page 81

Carteret is characterized as a macro 4, composite macro 4.

In the prior report of examination do you remember what its composite macro was?

A No, I don't recall.

Q Would it refresh your recollection if I represented to you that it was a 2?

A That would probably be appropriate, yes, as I recall.

Q So, is it accurate to say that the loss of Carteret's supervisory goodwill as regulatory capital had a very substantial impact on the regulators' assessment of its safety and soundness?

A Yes.

Q And that too would naturally be reflected in a loss of market value, would it not?

A Well, you know, the exam ratings are not public, so no one other than those within the regulatory field and the institution itself knew what the exam rating was.

But the fact that now it was publicly known that Carteret and a lot of other institutions were out of regulatory compliance with capital standards I think put them in a

Page 82

different light in terms of their financial worth and their value.

MR. COOPER: It is a quarter 'til noon. We're getting to a new area, David, so it might make some sense if we just break now for lunch for an hour and fifteen minutes or so and come back and start a new area, unless you'd like to push on.

MR. LEVITT: No, that sounds good. Off the record.

(Whereupon, at this point in the proceedings there was a luncheon recess, after which the deposition continued as follows:)

CONTINUED EXAMINATION BY MR. COOPER:

Q I trust, Mr. Vigna, you enjoyed your lunch.

A I did. David really treated me well.

Q Mr. Vigna, is it correct that you were very much involved in the decision-making concerning how to resolve Carteret in the early '90s?

Page 83

A Yes.

Q And in particular, whether to place it in receivership?

A Yes.

Q When did the northeast region -- let me back up on that.

I take it that with FIRREA there were some organizational changes, but is it accurate to say that the bottom line was that you headed the northeast region for OTS?

A Yes.

Q As the Regional Director, that was your title, is that correct?

A Yes.

Q What did the region encompass?

A It encompassed all of New England, New York, New Jersey, Pennsylvania, West Virginia and Delaware; eleven states.

Q Which was a larger geographic area than the old New York district, right?

A Yes.

Q When did the northeast region initially recommend that Carteret be transferred to the RTC, do you recall?

A I don't recall any specific date.

Page 84

MR. COOPER: I'm going to ask the reporter to mark as our next exhibit, Exhibit 9, a document that is probably twenty or so pages and which is Bates stamped on its first page with the number WOP 3440528.

(The above-described document was marked Vigna Exhibit 9 for identification, as of this date.)

Q Again, Mr. Vigna, this is a document that has many pages to it. I'm only going to call your attention to a few of those pages, but when you've had a chance to scan it, would you please identify it for the record.

A Essentially it's the S-Memorandum, which is the recommendation for transfer from the region to Washington.

Q And this S-Memo, S-Memorandum is authored or at least appears to have been initialed and authored by Robert C. Albanese.

A Yes.

Q Through you as Regional Director. And Mr. Albanese was the Deputy Regional Director, is that correct?

A Yes, he was.

Page 85

Q It's to Mr. Thomas A. Loeffler, and it's dated October 25, 1991. There's a number of cc's on the distribution list here.

A Yes.

Q Who was Mr. Loeffler?

A Tom Loeffler worked in OTS Washington, and I forget specifically what his responsibilities were, but he was involved with resolutions, transfers to RTC.

Q Would his responsibility have been geographically based, or would he handle memoranda of this kind from all over the country, do you know?

A I don't recall specifically.

I think in fact it was national, but I don't really recall.

Q So were there other people like Mr. Loeffler who handled resolutions of problem thrifts of this kind?

A There could have been. I don't recall, if there were more than he. I mean, there was a group in Washington which I think he headed.

Q Okay. Was it typical for an S-Memorandum of this kind to be sent through you as the Regional Director but prepared or signed or

Executive Officer and President to replace Robert B. O'Brien and Robert C. Walsh, respectively; J. Wayne Moor as chief loan workout officer to replace Richard Braun."

Then it goes on to identify a few more new management officials of Carteret.

At the time of this S-Memorandum, Mr. Vigna, did you view the change in management as a positive development for Carteret?

A Yes.

Q Could you explain why you did so, what your assessment was of the prior management and the new management?

A We were very suspect about the capabilities of prior management. They certainly had in our view not done a good job in dealing with the institution's problems, particularly its real estate problems.

And as we learned, the people that were brought in turned out to be extremely competent and capable people, did a really good job in a very short period of time.

Q Let me ask you to refer over on Page 18 to the first paragraph on that page where it refers specifically to Mr. Moor.



It states that, "Mr. Bianco attracted Mr. Moor from AmeriFirst to take the chief loan workout officer position.

"Mr. Moor brings a wealth of accounting and real estate experience to Carteret from his past endeavors, including his work at AmeriFirst.

"Mr. Moor has attracted a skilled team of individuals to assist in Carteret's loan review and workout efforts.

"The individuals assisting Mr. Moor for the most part had worked with him while he was at AmeriFirst."

Does that comport with your recollection for your opinion of Mr. Moor and his team at the time?

A Yes, that was the view particularly of our examiners that dealt with him on a day-to-day basis while in the course of examinations, from our people internally or in the office that also reviewed the workouts that he was putting together.

That was our view. I mean, it's there in writing and we signed off. That was our feeling.



Q You shared that view?

A Yes.

Q Back on Page 3, which is also Bates stamped with a long numeral ending in 32, it bears a subheading called "Summary of Capital Position."

That paragraph provides that, "The following chart presents Carteret's capital position as of June 30, 1991 in two formats.

"The first two columns represent Carteret's capital position, including $150.5 million in supervisory goodwill for all calculations, in other words, with the preliminary injunction order issued by U.S. District Court for the District of New Jersey in Carteret Savings Bank V OTS.

"The second two columns represent Carteret's capital position excluding supervisory goodwill."

Earlier I asked you about the preliminary injunction action in the District Court in New Jersey.

Does this refresh your recollection with respect to --

A Yes.



Q Okay. You do recall that action at least generally, right?

A Yes.

Q Does this refresh your recollection concerning how much supervisory goodwill, unamortized supervisory goodwill was remaining on the books of Carteret or would have been remaining on the books of Carteret had FIRREA not eliminated it?

THE WITNESS: Could you read that question back.

(The question requested was read back by the reporter.)

A Yes.

Q I'd like to walk through this chart which compares Carteret's capital profile, including goodwill and excluding goodwill, as of June 30, 1991.

The first column headed "Including Goodwill" says that the GAAP capital was just under $40 million.

Do you see that?

A Yes.

Q And that's the same on both columns, both for including goodwill and excluding

Page 94

goodwill, correct?
A Yes.
Q The next item is tangible capital, and in the column headed "Including Goodwill," it has the figure $78,786,000 of tangible capital.
Do you see that?
A Yes.
Q Do you see what the figure is for tangible capital when you exclude goodwill?
A Yes.
Q What is that?
A A negative $71,739,000.
Q So there is a swing there of roughly $150 million. Is that accurate?
A Yes.
Q The next item is the tangible capital requirement. In the column for "Including Goodwill," the requirement is $81,795,000, or 1.5 percent of Carteret's assets.
Is that accurate?
A Yes.
Q There is a similar though slightly lesser requirement in the column marked "Excluding Goodwill," correct?
A Yes.

Page 95

Q The next column provides the surplus or deficit of tangible capital for both columns, and the column for "Including Goodwill" says there is a positive $3 million tangible capital, but that's, by my reckoning, that's actually inaccurate.
Would you agree that's inaccurate, that that should be a negative $3 million, and in fact the percentage does reflect a negative $3 million?
A Yes, that's right.
Q Because the tangible capital requirement is $81.7 and the tangible capital is $78.7, so that should be a negative, should it not?
A It should. Yes, it should.
Q So if you included goodwill, Carteret's capital snapshot as of June 30, 1991, it would have been slightly out of compliance, is accurate?
A Yes.
Q If you exclude goodwill, however, it's very substantially out of compliance, is it not?
A That's right.

Page 96

Q And how much is that figure?
A Under the tangible requirement, $151,462,000.
Q In the next series of items that deal with core capital, and rather than just walk through the math on each one, when you include goodwill to Carteret's core capital it has a deficiency of '81.7 million. Is that accurate?
A Yes.
Q And if you exclude goodwill it has a deficiency of just under $150 million, is that right?
A That's right.
Q For risk-based, including goodwill, Carteret had a deficiency of $99 million, is that correct?
A That's correct.
Q And when you exclude goodwill, Carteret's deficiency grows to $202 million, is that correct?
A That's correct.
Q As a regulator and professional in this area, is it accurate to conclude that Carteret's capital profile is dramatically different depending upon whether you include or

Page 97

exclude goodwill?
A Yes.
Q Mr. Vigna, do you recall Mr. Bianco and his colleagues making efforts to attract investment and capital to Carteret?
A Yes.
Q What do you recall about that effort? Is it accurate to say that you were personally and substantially involved in cooperating as Carteret's principal regulator with that effort?
A Yes.
Q What do you recall about Mr. Bianco's efforts on that score?
A My recollection is that they were very extensive and they made a very strong and good effort, strong effort to attract capital, talking to some of the more well positioned investors in the country.
Q Returning to the S-Memorandum, on the last page, the second to last page, I apologize, Page 19, at the very end of that page in the concluding paragraph, it's in fact titled "Conclusion," it reads, "The statutory grounds exist for the appointment of a Receiver for

Page 102

Q Have you had a chance to review that?
A Yes.
Q Would you identify this document, please.
A This was a memo from T. Timothy Ryan to John F. Downey regarding status of Carteret Savings and the regional office view as to whether or not some extension of time should be given to Carteret to pursue its workout plans.
Q It's dated January 7, 1992?
A Yes.
Q It's authored by you?
A Yes.
Q Tim Ryan was the Director of OTS at the time?
A Yes, he was.
Q Who was Mr. John F. Downey?
A John was, and I forget exactly his title, but he headed the supervision operations out of Washington for OTS. He might have been Deputy Director.
Q So he would have, I take it, been involved, or it would have been within his scope of responsibilities as Deputy Director to deal

Page 103

with resolution of problem thrifts?
A Yes.
Q With respect to the Carteret resolution, did you have frequent dealings with Mr. Ryan, or would you say they were more frequent with Mr. Downey, or none of the above?
A Well, much more frequent with Mr. Downey than Mr. Ryan.
Q But you had personal and substantial involvement with respect to Mr. Downey specifically on Carteret?
A We had a number of discussions and meetings on Carteret, yes.
Q Was Mr. Ryan involved in them?
A Some of them.
Q Some of them?
A Yes.
Q After having now reviewed this memorandum, do you recall this memorandum?
A I do.
Q I want to ask you some questions about particular parts of the memorandum, just for purposes of my own understanding here.
Let me just ask you this, beginning with the first sentence here, "The northeast

Page 104

regional office recommends that OTS extend to Carteret Savings Bank an additional 90 days, or until April 30, 1992, to pursue capital raising alternatives."
I take it from that recommendation that some predetermined time frame was about to expire on Carteret.
Is that consistent with your recollection?
A I don't recall specifically if there was some date that was sitting out in front of us. There could have been.
There was an S-Memo on file recommending transferring the institution, and a lot of positive changes had occurred since that memo was sent to Washington.
And at this point, after evaluating and reviewing the performance of the new management team, led by Mr. Bianco, that we felt that there was no risk to the RTC and the public taxpayer to allow this institution to continue on in an effort to find capital.
Again, they identified at least in our view all the losses in the portfolio, they were generating operating profits, there was no

Page 105

risk, and we were comfortable, very comfortable with management. They had done an outstanding job.
There was no risk to the fund or the taxpayers by allowing this institution to see if they could raise this capital.
Q You just mentioned the management team, and you make reference here in the last sentence of the first paragraph to, "The strong management team, which is working diligently with this office in an effort to resolve the problems without government assistance."
In the next sentence you make another reference to the new management team, comprised of Messrs. Bianco, Kramer and Moor, and the fact that they assumed the operations of the institution in mid-1991.
Was Carteret's new management consistently cooperative with you and your colleagues at OTS?
A They were extremely cooperative. There was nothing that they did without discussing it with us first, telling us what they were going to do, what they wanted to do. There were no

Page 106

surprises.
Q Mr. Bianco I take it was a regular visitor to your offices, is that accurate?
A We spent a lot of time together. We spent a lot of time together, because when they first came into the institution we frankly didn't, you know, the regulators are always suspect, particularly of somebody on Wall Street.
We didn't know these people, and the fact that they had money at stake here, and we weren't very happy with the existing management.
Q Let me ask you this, as the principal regulator in the northeast region for quite some time, you had lots of and frequent occasion to review and assess management capacity. Is that true?
A Yes.
Q How would you rank Mr. Bianco and his colleagues in terms of management capacity and commitment?
A I would say in terms of, in all the years that I was in the regulatory area, thirty-two, these were as strong not only financially but in terms of their dedication and their diligence, this was for the time, for the

Page 107

situation, a workout, this was as good a team as you'd find.
Now, I don't know, with a lot of capital and no problems they might build the place up, but in terms of working out a very, very difficult financial situation in a very short period of time, they did more than I would have ever, ever expected to be done in a situation like this.
I mean, to get, to turn around this kind of an operation and to start showing some profits was a pretty monumental task in my view, so in a long-winded answer to your question, I found them to be a very, very strong workout team.
Q You just mentioned Carteret's turnaround in terms of profitability, and your memo states in the second paragraph here,
"Carteret recorded net income of $2.2 million for the fourth quarter 1991, exceeding its projected break-even results.
"Carteret's fourth quarter profit was attributable to aggressive expense reductions, improved mortgage banking revenues, better than projected asset dispositions and a generally favorable

Page 108

interest rate environment, which led to reduced deposit costs."
Your reference to generally favorable interest rate environment, is it true or do you recall whether by the date of this memo, around January 1992, that economic conditions generally for the thrift industry were starting to look a little more favorable?
A My best recollection is that at this point in time there were some signs that, small signs that economically things were starting to get a little bit better for thrifts.
I don't have any specific recollection of why, but it's just my general recollection that things very, very slowly were starting to move in a positive vein.
Q On the next page of the memo, really at the end of the carryover paragraph there, the statement is made, "It is our opinion that absent the need for significant additional valuation reserves, Carteret should be able to attain reasonable core profitability in 1992."
Do you recall what you based that opinion on?

Page 109

A No.
Q Was it in part the evidence that Carteret had been restored to at least initial profitability and that things were beginning to look more favorable in the industry generally?
MR. LEVITT: Only if he can remember.
A I don't really recall specifically. I don't think it had anything to do with any views about where the industry was going.
Q Okay.
A My recollection it was just based on what they had done in particular the fourth quarter and what, you know, what we thought the environment for them particularly was going forward.
Q In the next paragraph the statement is made, "In this regard, the bank's valuation allowances already represent 6.09 percent of total assets and 33.4 percent of criticized assets, the highest ratios in the northeast region and approximately triple the pure average for comparable size institutions nationally."
Do you recall why Carteret's

Page 110

valuation allowances were so high?

A They took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally.

Q Did you assess that as being a good thing, a prudent managerial approach?

A I think it was, as I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money that there was no surprises, other big writedowns subsequent to that.

On the other hand, as a consequence, it put them in a more difficult and worse regulatory posture in terms of their capital requirements, their capital position.

Q Because the writedowns eroded capital by a like amount, is that correct?

A Sure. But it was, as I recall, and the view of management, necessary to raise capital.

Page 111

Q In the next sentence there you state, "the combination of A, the bank's already sizable level of reserves; B, the fact that $1 million per month in additional reserves are included in Carteret's 1992 operating results," and I want to ask you to explain that B point that you made.

Was this with respect to Carteret's 1992 projections? Because this is a January 1992 document.

A I'm not following your question.

Q I'm just looking for an explanation, I'm not sure I understand the point stated here under letter B, "$1 million per month in additional reserves are included in Carteret's 1992 operating results."

Does that mean that Carteret, in their projections, projected that they would take additional reserves of $1 million a month throughout 1992 and nonetheless projected a profit despite that fact?

I'm trying to interpret that point. Is that an accurate interpretation?

A I think what this is says is despite the fact that we have a fairly highly reserved

Page 112

bank here, if they're going to take another, they're going to reserve another $1 million a month, that's going to add to this already very high loan loss reserve, and it's already factored into their operations, and even after this $1 million a month they're still anticipating running profits.

Q Okay. The sentence continues, "C, the ongoing conservative practice of allocating gains from sales of disposed troubled real estate back to general reserves instead of income."

Could you explain that point, please?

A When they were selling assets, and selling them above net book, they could have taken those gains and put them through profit and loss, and instead they took those gains and put them back into the loan loss reserves.

So they could have shown, they could have reflected stronger operating position, more profits, if they had done from an accounting point what was very acceptable.

Instead, they took a conservative position and continued to build the loan loss

Page 113

reserve position.

Q So the net income of $2.2 million for the fourth quarter of 1991 referred to on the first page of your memo would have been or could have been higher had Carteret decided to book those profits rather than plow them back into reserves?

A I believe so. I mean, I don't recall specifically what the number is, but based on my reading of this memo, that's probably the case.

Q Okay. You conclude that sentence with, "D, the very favorable track record already established by the troubled asset workout group make us optimistic that significant additional reserves are avoidable in 1992."

This favorable track record I take it is referring to the disposition of troubled assets by Mr. Moor and his workout team?

A Yes.

Q Now, in the next sentence you make specific reference to, I think to a writedown of assets.

The statement reads, "The aggressive assessment and reevaluation of Carteret's

Page 114

commercial real estate portfolio that was done on June 30, 1991 has enabled the institution to dispose of and/or collect upon numerous classified loans and real estate owned, netting $76 million in cash during the second half of the year."

Do you recall what this June 30, 1991 assessment and reevaluation of Carteret's real estate portfolio was that are you referring to there?

A My recollection is back in the middle of June they did a, just what it says here, an aggressive reassessment and reevaluation of the portfolio, and came up with well over $100 million in additional writedowns, $150 million in writedowns over and above what, you know, what came out of the previous examination.

It was a pretty significant number.

Q Yes, $150 million for this thrift you would agree is a very significant writedown.

A Well, particularly after they had done some what we thought were aggressive writedowns at our direction.

I don't know if it was earlier that year, or certainly the latter part of the previous

Page 115

year.

Q Did Carteret's management base that writedown on the same rationale that you described earlier about the need to establish credibility with potential investors?

A I believe that was one of the, if not the most motivating factor for them.

It was a very conservative approach, and I guess it was pretty obvious after they started selling these properties instead of booking the gains.

Some of it was simply a consequence of them valuing them too low on their own books.

Q Is that right?

A That's my recollection, yes.

Q So would you say that with respect to some of these assets they may have been overreserved at that time?

A Probably.

Q Over the course of the next few months, is it accurate, or is it consistent with your recollection that real estate values began, it would probably be an exaggeration to use the word rebound in this time frame, but they began to climb north a bit?

Page 116

A In 1992?

Q Throughout the course of 1992 towards the end of 1992.

MR. LEVITT: If you remember.

A I don't really remember if that was specifically the time when things started to turn back.

Q But they weren't getting worse during that period, were they?

A No.

Q You make reference here to netting $76 million in cash during the second half of the year.

Is that figure, do you recall if that $76 million in cash was, as you describe in the previous paragraph, allocated back to general reserves instead of income?

A I think the reference here is, you know, that this is the cash proceeds received from the sale of assets.

Q Not necessarily the gains.

A That's right.

Q I see, all right.

In the next paragraph, Mr. Vigna, you make the point that, "The aggressive asset

Page 117

writedowns seem to have resulted in a troubled asset portfolio which is being carried at close to market values.

"This has helped to remove the common impediment to commercial asset sales which hinders capital deficient institutions with underreserved portfolios, namely dispositions are less likely to happen if a large loss has to be recorded due to unrealistic, inflated net book values."

Would you explain that point?

A There's a natural tendency, not only with thrifts, but a lot of financial institutions, when writedowns are going to impact their viability, they overvalue them, and rather than sell them and take their losses, they'll carry them and they'll probably experience the same losses and maybe even greater losses over a longer period of time, but stay alive.

So there was, particularly with the thrifts, there was a tendency to overvalue assets, not recognize losses, you know, to stay open.

Q Was it not typical for thrifts experiencing difficulties to resist booking

reserves for their assets?
A Sure, and there was always, you know, not always, but there were a lot of instances where managements differed rather vociferously with our examiners in terms of the classifications they came up with and the adequacy of loan loss reserves.
And a lot of times it was simply their inability to take losses, establish appropriate reserves, because to do so would have put their viability into great question.
In this case they had nothing to lose. They were pretty well -- they were out of capital compliance and -- I shouldn't say they had nothing to lose.
I think it was a strategy that had they gotten capital financing it would have worked.
Q And the strategy was to attract capital, as you described earlier.
A That's my recollection of the fact that a rather overconservative posture was taken as to valuations.
Q Do you recall expressing the view that the reserving policy was overconservative to



management of Carteret?
A I have some recollections of the fact that I did.
Q Was the basis of your concern on that point that it did reduce Carteret's regulatory capital?
A Yes.
Q Why were you concerned about that? What were the implications of that?
A Well, the more out of capital compliance they got your, and the further into negative capital territory, the more imminent the urge from various segments of the regulatory community to take some action with the institution.
FIRREA was fairly specific in terms of how insolvent institutions were to be treated.
So the fact that they took this conservative policy created more, I think more pressure from a regulatory standpoint to do something that was actually consistent with the mandates of FIRREA, and that was essentially a transfer to RTC.
Q On the first page of the memo, the second sentence, we've already been over it, but I



want to ask you another question which I neglected to.
The sentence is, "In my view there is minimal risk that the condition of Carteret will worsen in the next three months."
Did anyone in the northeast region disagree with that view?
A No.
Q Was there any disagreement from Washington that you can recall with that view?
When I say Washington, I mean Washington OTS or FDIC, or FDIC in the region or in Washington?
I've just asked you a very compound question and it's only because your lawyer is being kind to me that he didn't object to that.
So let me take it one by one.
MR. COOPER: I apologize.
MR. LEVITT: No, go ahead. I'm curious about the answer.
A Let's try the one at a time approach.
Q Yes, sir.
Do you recall if anyone in



Washington OTS disagreed with the view you express here as yours?
MR. LEVITT: On the three months, right, the risk in three months?
MR. COOPER: Yes.
A I think that there might have been some people who questioned that statement, but I think that there was, at least in certain elements of Washington, had enough confidence in our agent and analytical evaluation in the region that would accept our position.
But there's always, you know, there's always -- Washington is a place for, I shouldn't say second guessing, but questioning and taking, depending upon the time and the place, and this was a time and place where there was tremendous pressure on the agency, and on the people in Washington to do the right thing.
We had legislation that was pretty stringent in terms of what you had to do. There was very little, very little subjectivity to it.
So kind of a long-winded answer to your question, there might have been some people particularly in Washington that didn't agree with that assessment, but I think they accepted it.

Page 126

because here was someone from a major firm expressing some confidence that he could raise the capital.

I guess I was too naive at the time to realize that these people will always get the deal done for you, but he was certainly a person known to me, I think with a lot of credibility, and he did paint a, I wouldn't say a rosy picture, but I thought he felt a level of confidence that he felt he could raise the capital.

Q Did you think at the time, did you think that his confidence was genuine?

A I don't have any specific recollection of whether I felt it was genuine or not.

You know, I realized that this was, this would be a great transaction for them, certainly a profitable one for them, but particularly at that point in time for Kidder to come in and recapitalize a large failing thrift would be not only very positive from a national standpoint, but for them in terms of marketing other transactions it would be big. So I knew he was going to give it a strong effort.

And again, David Maughan was -- I

Page 127

knew the name, I knew the person, I think we had had some discussions about other institutions, and the fact that he felt confident about raising capital gave me a confidence also.

Q You state in the next sentence that,

"Mr. Maughan based his position primarily on the aggressive posture taken by Carteret to reserve and dispose of problem assets, its return to profitability, strong mortgage banking operations, attractive retail franchise and highly talented management team."

Those were all sentiments that you too have expressed, so is it accurate to say that you agreed with those sentiments?

A Yes.

Q In the last paragraph you conclude your recommendation here and you say, "In conclusion, Carteret has accomplished many of the goals in its recovery plan. It has set in place the foundation for raising external capital. The current management team has the experience necessary to help raise capital.

"Considering the alternative of RTC

Page 128

intervention and the subsequent loss of franchise value, typically 10 to 15 percent ($500 million to $750 million), it is my recommendation that OTS provide Carteret until April 30, 1992 to fully explore the AST&T proposal as well as to allow Kidder Peabody sufficient time to pursue its capital raising alternatives."

Explain the comment that you made here about loss of franchise value, typically 10 to 15 percent.

A Well, when there's an RTC intervention, you transfer the institution to RTC, it's not closed, RTC runs it until they can dispose of it, by basically selling deposits and taking the assets into their fund, and over that period of time it's, it just dissipates the franchise value.

They don't make any loans, they aren't aggressive in terms of liabilities, there's just an automatic diminishment of the franchise value, and that usually, you know, factors into some, into the ultimate cost to resolve an institution.

Q I take it you say typically 10 to 15

Page 129

percent. That was based upon generally regulatory experience in the thrift industry when you had to seize a thrift?

A Yes, and generally, I mean, this is a little extra I'm trying to lay on here, but, because in point of fact that wasn't -- we weren't supposed to consider those issues.

FIRREA was pretty specific. If the institution is inadequately capitalized or insolvent and there's no reasonable prospect for them to raise capital, then you just transfer them to RTC.

So this is a little, this statement, while it may be fact being actually correct, really is not something that the OTS would consider in terms of whether to transfer an institution or not.

Q So OTS was not legally entitled to consider that seizing the bank would result in a loss of a value of the thrift's assets of that magnitude?

A The issue here was can these people raise capital to restore the viability of the institution.

If you can answer that question yes,

Page 130

that there is some reasonable prospective for them to do so and you're not going to dissipate what's there already, then I think you have some flexibility.

Even the fact that by transferring them you're going to lose value, if you don't think they're going to raise the capital to get back into viability, that's not an issue, you have to make the transfer.

Q Is that so -- well, let me ask you this. Is it fair to say that in light of these points that you're making in this memorandum that it simply didn't make sense to transfer the thrift under these circumstances to RTC?

A I think what we're saying here is the institution's operations have been stabilized, we've got a strong management team in here, the assets are adequately, are conservatively valued, and there is in our view some reasonable chance, some reasonable prospect that they can raise capital to restore viability, and that was the issue.

Even if the operations were stabilized and there was no chance to raise capital, well then, you know, you could -- the

Page 131

grounds existed for transfer. You were supposed to transfer the institution.

Q When you say the grounds existed, you mean the legal grounds?

A Yes, I mean -- if they couldn't raise the capital, you couldn't keep them in this posture forever because, you know, there's no way they can recapitalize through internal operations. They had to raise outside capital.

Q Despite the fact that they were profitable?

A Yes. Now, the other side of that is that as long as they're profitable there's a prospect, there's a possibility, a strong possibility they can raise capital at some period of time.

The question is how much time and over what period can they do it.

Q Can you recall what Mr. Ryan's reaction was to this memo?

A I don't know specifically. I think it was supported by John Downey and Ryan agreed.

Q And an extension was in any event granted along the lines that you had recommended?

A Yes.

Page 132

MR. COOPER: It might make sense to take a few minutes' break. We've been at it for an hour and twenty minutes, I guess, or more since we came back from lunch.

Do you want to take about ten minutes?

MR. LEVITT: Sounds good.

MR. COOPER: Okay.

(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)

MR. COOPER: I'd like to ask you to mark this document as Exhibit number 11, please.

It is a three page document, the first page of which is Bates stamped WOP 3340862.

(The above-described document was marked Vigna Exhibit 11 for identification, as of this date.)

Q Mr. Vigna, this is a short document. I'm going to walk through a good deal of it, so if you'll just go ahead and read it I'd appreciate it.

Mr. Vigna, could you identify this

Page 133

document, please?

A This is a letter from Robert C. Albanese, the Regional Deputy Director, to Mr. Nicholas Ketcha, Regional Director for the FDIC, concerning the Carteret Savings Bank and its efforts to recapitalize.

Q It's dated July 7, 1992?

A It is.

MR. LEVITT: Just one second. Off the record.

(Discussion off the record.)

Q Do you recall this letter?

A No.

Q Mr. Albanese was your deputy, right?

A Yes.

Q And earlier you indicated the two of you worked very closely together in connection with the resolution of Carteret, is that right?

A Yes.

Q Is it likely that a letter of this kind responding to the Regional Director of FDIC would have been cleared through you, so to speak?

A I would have reviewed it before it went out.

Q So it presumably reflects your

Page 138

federal assistance has continued to be made since the February 27, 1992 agreement was signed by OTS and Carteret."

Mr. Vigna, was it your conclusion in July of 1992 that the management of Carteret was continuing to make progress in terms of the improvement of the financial condition of Carteret, and in terms of its potential to attract outside investment capital?

A Yes.

Q Is that essentially what stabilizing this institution refers to in that paragraph?

A Yes, I believe so.

Q The next paragraph refers specifically to recapitalization efforts by Carteret's management, and it talks about some meetings, a series of meetings with major investors.

Do you recall if you participated in many of those meetings, or was that primarily Mr. Albanese?

A No, I think I participated in most if not all of these meetings.

Q The next paragraph around the fourth line down makes the point that, "Steady financial

Page 139

improvement has been demonstrated by the new management team as evidenced by a comparison of the six month operating periods ended November 30, 1991 and May 31, 1992.

"Net income for the six months ended May 1992 was $5.4 million, compared to $1.8 million for November 1991.

"More important, core earnings before provision for loan losses, gains/losses on sales of assets and taxes improved by $11.5 million during the December to May period."

And it goes on in the last sentence of that paragraph, "Net income in the $2 1/2 to $3 million range is forecast for the month of July."

Is it consistent, is it your memory that during the period of approximately six months from the time that you wrote the memo that we discussed earlier today, talking about Carteret's turnaround and profitability until the time that this letter was written by Mr. Albanese, that Carteret continued to make significant progress in terms of its return to profitability?

Page 140

A Yes.

Q And these figures are consistent with your recollection on that score?

A Yes.

Q So your expectations with respect to Carteret at least for this six month period were borne out then, is that correct?

A The operational and financial performance, yes.

Q In the next paragraph the point is made that, "Carteret also continues to improve its troubled commercial asset portfolio. Though our current examination is not concluded, a report from examiner Tom O'Rourke disclosed $217.5 million in commercial loan payoffs and repossessed commercial asset sales from June 30, 1991 to May 31, 1992.

"The total net book value of this high risk troubled portfolio declined during the same period from $926.4 million to $574.4 million, and valuation reserves represented 28 percent of gross commercial assets at May 31, 1992."

Would you rate that progress in

Page 141

terms of working out troubled assets and the decline of troubled assets from $926 million to $574 million during that period as being impressive progress?

A I'd say that was, you know, strong effort and good results.

Q The concluding paragraph states, "In conclusion, we believe that the termination of the agreement and the underwriting process while progress is being made to recapitalized a troubled institution with assets of over $5 billion would not be effective supervision or good policy, particularly when we have an executed agreement authorizing the termination of the agreement prior to August 28, 1992."

What does that last phrase mean, referring to the executed agreement authorizing termination of the agreement?

A Basically what it means is that --

THE WITNESS: Read the question back for me if you would, please.

(The question requested was read back by the reporter.)

Page 142

A My recollection is that it means that if we decided at some point before the time period we were giving them that progress wasn't being made or that recapitalization was impossible, we'd terminate the extension of time and move forward to take whatever appropriate action was necessary, including transfer to the RTC.
Q So if Carteret's condition turned south, so to speak, OTS could seize the bank at that moment.
A Yes.
Q So is it an accurate summary to say that Mr. Albanese made many of the same points in July to Mr. Ketcha that you had made earlier in your memorandum of January 1991?
A Yes.
Q And Carteret's condition had improved significantly over that period of time, had it not?
A Yes.
MR. LEVITT: January of 1991 or 1992?
MR. COOPER: Thank you, Mr. Levitt.
Q January of 1992.

Page 143

MR. LEVITT: And that's Exhibit 10, you're talking about.
MR. COOPER: Right. The one before this one.
MR. LEVITT: Could you just read me the last question and answer.
(The portion of the record requested was read back by the reporter.)
Q Mr. Vigna, do you recall if Mr. Ketcha was persuaded by these points?
A I don't know if he was persuaded, but I think he agreed to grant the time extension.
Q Essentially acquiesced in the matter?
A Acquiesced to the posture we were taking.
MR. COOPER: I'd like for the reporter to please mark as Exhibit number 12 a document that is two pages long, and is Bates stamped on its first page WOQ 6791063.
(The above-described document was marked Vigna Exhibit 12 for identification, as of this date.)
Q Have you had a chance to look at

Page 144

this, Mr. Vigna?
A Yes.
Q Would you please identify this document for the record.
A It's a file memorandum written by Bob Albanese regarding a conference call with Jon Fiechter, Deputy Director for Operations, that was held on November 16, 1992.
Q This internal memorandum is dated November 17, 1992, is that correct?
A Yes.
Q In the last paragraph of the memo it mentions your name to the effect that, "A meeting is to be held today between Angelo Vigna and Jonathan Fiechter to discuss an extension of time beyond November 20th."
Let me ask you this, do you recall this memo?
A I don't have any specific recollection of it, no.
Q Do you recall the issues that it addresses?
A I don't have any specific recollection, no.
Q So the conference call that is

Page 145

referenced here between Mr. Albanese and Mr. Fiechter concerning the scheduled transfer date, you don't recall that?
A No. I mean, I recall that there was, as we got closer to the actual transfer date there was, I guess some anxiety on all sides, and, you know, people were setting dates and not coordinating, and I must have been in Washington at the time for some reason or another and set up a meeting with Jonathan Fiechter to discuss this particular timing.
Q The second paragraph refers to, "Concerns about the transfer date for Carteret being moved up to this Friday, November 20th, while due diligence which might lead to an unassisted acquisition by First Gibraltar was only a couple of weeks from completion."
Do you remember why Mr. Albanese and I assume you and the rest of the northeast region became concerned that this date had been moved up?
A I don't recall the specific reasons, other than the fact, as I read the memo, there was still a potential capital investor or acquirer that was engaged in due diligence, and

Page 146

there was no reason to transfer until after this potential acquirer had concluded their due diligence and given us an indication of whether they were interested in a transaction or not.

Q Did you agree at the time with the sentiment expressed in the third paragraph, to the effect that, "We pointed out that in our view the institution's financial condition continued to improve and that supervisory risk of loss, while it remained open, was very low"?

A Yes.

Q The paragraph continues, "We argued that the possible benefit of leaving Carteret open while recapitalization discussions were continuing, namely a possible unassisted resolution of this $5 billion troubled institution, would far outweigh any perceived benefit of an early transfer date.

"Frankly we did not view the transfer date, whether it was November 20th, December 4th or January 4th, to be a critical factor in our analysis of the situation."

Page 147

Did you agree with that assessment?

A Yes.

Q It refers to the perceived benefit of an early transfer date. What was the perceived benefit of an early transfer date, can you recall?

A I don't know what that means here.

Q Is it fair to say that your assessment of the appropriate policy, according to this paragraph we just examined and the previous exhibits as well, was that so long as conditions continued to improve for Carteret and the thrift industry and the risk of loss to the Treasury diminished, why close this institution?

Is that a fair assessment of the position you're outlining?

A My recollection is my position was that we ought to allow as much time as necessary to make sure that every avenue for raising capital has been looked at, and that we ought not to be subject to any restrictive time frames.

Now, having said that, I think we all realized that we couldn't keep this the way it was forever, even though it was showing some small profits, because that would have been inconsistent with FIRREA.

Page 148

Certainly there was a lot of people feeling, whether it was self-imposed or not, heat from what had happened in the past, and, you know, people -- there were also mandates from Washington, from the Congress, from the administration, you know, to transfer thrifts that were no longer viable, that didn't have capital, to RTC.

Q What mandates are you referring to?

A Well, FIRREA, the legislation.

Q Did FIRREA mandate that a thrift that was profitable, that was working out its bad assets in an exemplary fashion, and whose progress was reducing the risk to the taxpayer should be seized notwithstanding those facts?

MR. LEVITT: Objection. He already answered the legal standard related to the reasonable probability of attracting other capital. You can answer.

A Whether you believed that that should be the policy or not, the facts were that the legislation imposed on the regulators a requirement to transfer to RTC any thrift that was by statute in an unsafe and unsound position to operate, and Carteret fit that position.

Page 149

I mean, you can argue either way, but that was the interpretation of the law, and I think that, you know, from my standpoint I was aware of that posture, and that if we couldn't find capital at some reasonable point in time, the transfer was going to happen.

I just, you know, my view is probably that we should have taken more time.

Q This thrift was seized I guess a little over two weeks after this memo was written.

Is it correct that it was your view that Carteret should have been given more time to raise capital?

A Yes.

Q Do you recall anyone in the northeast region who disagreed with that view?

MR. LEVITT: Objection as to relevance.

A In OTS?

Q In OTS.

A No.

Q Do you know who was in favor of closing Carteret at that time?

A Well, obviously the Director felt that it was appropriate, some of his other senior

Page 150

staff.
Q Do you know if Mr. Downey felt that Carteret should be closed at that time or be given more time?
A I think that my recollections of my conversations with John Downey around this point in time was that he was sympathetic to my view, but that the view of the Director and possibly some others at senior levels was that we had exhausted the time to allow the management of Carteret to find capital, and that they were never going to find capital, and that the only alternative we had was to transfer it to RTC.
Q What has happened in the thrift industry since the beginning of 1993?
A The ability to raise capital increased substantially. Institutions with low capital were able, particularly mutuals were able to raise capital in public markets.
Investors and investor groups were willing to put money into thrifts now. The economic environment changed. The financial environment changed.
Q Quite dramatically, did it not?
A I'd say quite dramatically over a

Page 151

three, four year period, because I think part of it was the consequence of the fact that the really hopelessly insolvent and very costly insolvencies have been cleared away and the economy was changing, rates were favorable, there was -- we came out of a recessionary time and the economy just got stronger and capital became more abundant and thrifts became in some circles the real darlings of investors.
Q The real estate market rebounded?
A The real estate market rebounded, yes.
Q Did that have a beneficial effect on the valuation of assets of thrifts?
A Sure. I think some investors felt that now there were bargains out there, that, you know, the real estate was going to come back, and rather than take losses now, big profits were potentially in these portfolios.
Q In your opinion, if Carteret had been given more time, do you believe it would have succeeded in its efforts to recapitalize and thus to survive?
MR. LEVITT: Objection as to relevance. You can answer.

Page 152

A My personal belief is that, yes, at some point in time they would have raised enough capital to restore viability in the institution.
Q If Carteret had survived and had continued to be managed by Mr. Bianco and his colleagues, do you believe that it would have benefited from the economic environment that has occurred in the thrift industry and more generally, as you've previously described, from 1993 on?
A Well, it's hard to crystal ball what someone is -- what's going to happen in the future. They had done a wonderful job in a very, very severe workout situation.
You know, I don't know what they would have done if they had raised capital and managed to operate in a very favorable economic environment.
You know, these people had been successful in all their business careers. I would suspect they would have been successful going forward, but that's crystal balling.
Q But you also are in a position of considerable knowledge and experience with respect to thrift management, and I'm just asking for your

Page 153

basic judgment based upon what you knew about Carteret and about its management and the conditions that prevailed in the industry.
MR. LEVITT: Again I object on relevance. You can answer.
A Again, these were people who had -- were outstanding businessmen, had done a great job here in a very short period of time, and, you know, if I was a betting man I'd say that they were going to be successful.
The economic times, if you look out there, I can point to institutions that recapitalized after Carteret was transferred and some of them are still around and are very successful, others were sold, you know, in a public sale to other institutions at great rewards to investors.
So, you know, if you want me to give you my personal judgment --
Q Yes, sir.
A I think they would have been very successful, very successful.
Q Do you recall that earlier we talked about and went through a comparison from I think the S-Memo of Carteret's capital profile with the

Page 154

goodwill, supervisory goodwill, $150 million or so at that time, and without it.

If instead of having a $70 million deficit in tangible capital, negative tangible capital, Carteret had had $70 million or so in positive tangible capital at the time that it was seized, in your opinion, would it have been seized?

MR. LEVITT: Objection, calls for speculation. You can answer.

A I don't know. I'd have to -- probably not, but I'd have to look at the numbers and, you know, how -- where they measured up in terms of capital compliance and whether they could submit a business plan, a capital plan to recapitalize the institution internally.

I mean, we could accept capital plans. If they had that much capital they might have been able to give us a capital plan that reflected restoring capital through internal operations and maybe with only marginal or no outside capital.

I don't know, I'd have to look at those projections.

Q Well, if I ask you to assume for a

Page 155

moment that Carteret, if Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?

A Probably not.

Q During your time at OTS and its predecessor agencies, how many seizures would you say you were involved in?

A Over what period?

Q The whole time.

A Thirty-two years?

Q Yes, sir.

A Both in Washington and in New York?

Q Scores, maybe?

A A couple of hundred.

Q Really?

A It was over 90, almost 100 institutions in the northeast region, you know, from FIRREA, late '80s.

Q That's in the late '80s.

A Yes.

Q Focusing on then just the late '80s, you say there's approximately a hundred or so?

A Yes, I think, yes. I once counted and I had ninety something. That's the whole

Page 156

region, yes.

Q Can you recall a time when a thrift was seized that had positive tangible capital?

A Yes. I can't recall specifically, but it might have had a little bit of capital but it was going south, the losses, you know, would have dissipated it.

You know, if the losses are dissipating capital, we try to get there sooner rather than later, before all the capital has gone.

Q Can you recall a thrift that was seized that had positive tangible capital and was profitable and whose trends were profitable?

A I can't recall specifically any, that there were any in that condition.

Q Can you recall a thrift that satisfied or nearly satisfied its tangible capital requirement that was seized?

A No.

Q If Carteret in December of 1992, around the time it was seized, had satisfied or nearly satisfied its tangible capital requirement, do you believe that its ability to attract additional capital, additional investment, and

Page 157

raise additional capital would have been very substantially enhanced?

MR. LEVITT: Objection, calls for speculation. You can answer.

A Regardless of the new capital rules, regardless of the new treatment of goodwill?

Q Yes, I'm asking if instead of having $70 million negative tangible capital, Carteret had positive $70 million of tangible capital and was effectively in compliance with its tangible capital requirement, could it have raised capital, in your opinion?

A Well --

Q Additional capital?

A In real economic terms it's the same institution. It's the same value, really.

I would say probably, you know, you're assuming that there's no -- that we still count goodwill.

So probably we could have had other institutions that would have acquired Carteret and would be taking on a little bit more goodwill, but if it was profitable and had some capital, I don't know whether it would have in fact at that point in time attracted capital. That's speculation on

Page 158

my part.
But realistically it's the same institution financially and economically, whether you allow the goodwill or you don't allow the goodwill.
Q Let me ask it in this way. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion?
A No.
Q Would Carteret have been able to attract additional capital in that condition, in your opinion?
A I would say it would be very likely that they could attract more capital.
Q If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing it's not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized, in your opinion?
MR. LEVITT: Objection, asked and answered.

Page 159

THE WITNESS: Would you read that question back.
(The question requested was read back by the reporter.)
A I don't follow that question. It's cash, I mean, it's real capital. We're talking about an intangible. It just --
Q I understand.
A It's an accounting number, not even -- it's not real, it has no return. I mean, cash can be invested for a return.
Q Yes.
A So your question isn't -- it's not realistic.
Q Let me come at it --
A My apologies, but that's not a realistic question.
Q Let me come at it this way.
If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
A No.

Page 160

MR. COOPER: We're at a convenient stopping point if you want to take five or ten minutes, because I think I may be thirty minutes or so away from the end of my questioning.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Vigna, do you recall that AmBase was called upon by the regulators to perform under the RCMA that we reviewed earlier, the regulatory capital maintenance agreement that was executed by --
A Yes.
Q So I'm clear, do you recall that AmBase was called upon to perform under that RCMA?
A Yes, I do have a recollection of that.
Q What do you recall?
A I don't recall the details, just that there was a capital maintenance agreement of some sort and that we did put -- make a call on it.
Q Do you recall what general time frame the initial performance under that RCMA took

Page 161

place?
A No.
Q Do you recall that performance under the RCMA came in two different capital contributions, an initial $20 million one and then a subsequent $30 million capital contribution?
A No, I don't have any specific recollection of that.
Q Let's see if this document helps to refresh your recollection.
MR. COOPER: I'd ask the court reporter to mark as Exhibit 13 a one page document Bates stamped OAM 0040077.
(The above-described document was marked Vigna Exhibit 13 for identification, as of this date.)
Q Would you identify this document, please?
A It's a letter from Joseph P. Kehoe, the OTS Assistant Director, to Bruce Bean, acknowledging receipt of his letter to the effect that AmBase had contributed $20 million in cash to Carteret.
Q Does that refresh your recollection about a $20 million capital contribution in this