UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
\- - - - - - - - - - - - - - - - )

Washington, D.C.
Thursday, March 2, 2006

Deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:38, Thursday, March 2, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 34

in the preparation of RTC tax returns versus an FDIC tax return is in the application of the RTC interagency agreement, close quote.
Is that statement accurate?
A. I believe it would be.
Q. Now, I'd like to turn back to page 6 of chapter 1. And it states under, FFO tax unit -- first let me ask you, what is the FFO tax unit?
A. I had to look that up last night myself. I've never heard that before.
It's in the front, and I'll find it for you. It's chapter 1, page 1, right at the beginning. It's "field financial operations."
Q. So it says, quote: The role of the FFO tax unit is to assist with closing activities, provide compliance with federal and state tax statutes, and provide client services to the other FDIC divisions as needed, close quote.
Is that an accurate statement of policy?
A. Yes, I would say it is.
Q. And so it's the policy of the FDIC to comply with the Internal Revenue Code?
A. Yes, it is.
Q. And in filling out tax returns for failed institutions, does the FDIC have the authority to

Page 35

take actions that are inconsistent with the Internal Revenue Code?
A. I want to say no.
Let me say no. Let my answer be no with respect to the code, the law itself.
Q. And does the FDIC have the authority to take actions that are inconsistent with the regulations that have been finalized?
A. Yes.
We have the right to challenge regulations.
Q. Okay. Has the FDIC during your time there ever done so?
A. I believe we hold certain regulations the IRS wrote being invalid, but the issue has never been, I want to say litigated over -- it's more or less a stalemate. I believe the IRS doesn't press the regs that they wrote, and so it's more or less a dormant issue.
Q. Have you ever prepared a tax return while you're at the FDIC that was inconsistent with the Internal Revenue Code?
A. With the code?
Q. Yes, sir.
A. I don't believe so.

Page 36

Q. Have you ever approved a tax return while you were at the FDIC that was inconsistent with the Internal Revenue Code?
A. Not to my knowledge.
Q. Can you think of any instance in which the FDIC has submitted a tax return to the IRS that was inconsistent with the Internal Revenue Code?
A. You talking about the code?
Q. Yes, sir.
MR. GILBERT: Just let me register an objection to the line of questions to the extent that calls for a legal opinion.
The witness can answer.
A. Have I ever -- what was the question again?
BY MR. THOMPSON:
Q. Are you aware of any instance in which the FDIC has submitted a tax return to the IRS that was inconsistent with the Internal Revenue Code?
A. I have no knowledge that we would have done so knowingly.
Q. Well, do you have any knowledge of it having been done accidentally?
A. I don't believe so, no.
Q. Now, turning to chapter 2 of this

Page 37

manual -- it's the next couple of pages.
At the bottom of page 1, top of page 2, it states, quote: Monthly goals must be established and effectively monitored by tax unit management, slash, supervision in order to support the annual responsibility of completing and submitting all tax returns by the extended filing date of --
A. Where?
I'm sorry.
Q. I'm sorry.
(Gesturing.)
A. Okay.
Q. -- of September 15th.
A. Okay.
Q. Is it FDIC policy to file tax returns within the time provided by the Internal Revenue Code service, including extensions that have been obtained?
A. It is our policy to meet that goal as best we can within the constraints present at whatever time we're talking about.
Q. Why is that the policy of the FDIC?
A. Why is it a policy to file timely returns?
Q. Yes, sir.
A. To comply with the statutes in title 26.

Page 42

A. Well, you're mentioning tax -- net operating loss carry-forwards?
Q. Yes.
A. I don't think we'd be interested that much per se in old returns with respect to carry-forwards, although I guess we could be.
Q. Why wouldn't you?
I mean, you're trying to minimize the tax liability, and if you get NOLs from the past, that's an extremely important piece of information to have, isn't it?
A. Yes.
Generally for the carry-forwards, we'll have the information summarized on the most recent returns filed.
Q. So the key thing -- the key piece of information for the carry-forwards is, what is the NOL available --
A. Yes.
Q. -- for that tax year; is that right?
A. Yes.
Q. Okay. And provided you have the information, then this policy is satisfied; is that right?
A. Well, I told you this needed to be

Page 43

updated.
As of today, I would go back and amend this to gather all tax returns, period, that we could find, all prior tax returns, because it goes toward our -- the new updated model under section 597, it goes toward our best estimate of what the tax basis of remaining equity is.
Q. And do you need those prior tax returns in order to be able to identify what the tax basis is in the assets?
A. It's our best way to establish a proxy for what it might have been.
Q. And would an even better way be to get the work papers behind those tax returns?
A. Yes, it would.
Q. And that would give you the actual answer if those were complete work papers; is that correct?
A. Yes, in theory.
Q. Okay. Can you think of any instance in which it would be consistent with FDIC policy to not carry forward an NOL that was otherwise available under the Internal Revenue Code for shielding income?
A. Not as a policy.
Q. Is there any other reason why the FDIC would not carry forward an NOL?

Page 44

A. Activity, constraints on manpower.
Q. Just if there wasn't enough time to go back and look; is that right?
A. Right.
Going back to this theory of opportunity cost, we used to file carry-backs and carry-forwards if there were refund moneys to be brought into the receivership under the marshaling of all assets, collecting all assets that you can.
Since most receiverships can be terminated and without all the claimants being paid, any tax liability that lingers in a deferred suspended state is probably not going to be paid under the general example of a receivership.
It wasn't until 1998 I believe that we started paying attention to reducing deferred suspended tax liabilities with carry-forwards. And then, that was really based on manpower.
Q. Was that the only reason?
A. Yeah, I would say so. We just had more lucrative areas to spend our time in dollarwise.
Q. What do you mean by that?
Let's say an institution has 91 million dollars in tax liability in a particular year.
What can be more lucrative than checking

Page 45

the prior tax returns to see if there was an NOL that could be carried forward?
A. Right.
Well, it depends on what activity you're choosing as an alternative.
Q. Right.
A. Somebody needs you to do something right away, you're going to go help them and do it because that means dollars coming in or dollars that don't have to be expended versus a tax liability that in 99 percent of cases is never going to be paid.
Q. Is that the operating assumption of the FDIC DRR, that 99 percent of these tax liabilities are not going to be paid?
A. It's not today, but when the activity was much greater, closings were going on say 10 years ago or more, yeah, that became a choice that you had to make, and carry-backs like this would tend to suffer.
Q. And in 1996, was it the operating assumption of the FDIC that the tax liabilities would not be paid?
A. It would be our experience that that's the general case.
Q. And do you have any reason to doubt that that assumption was held by the FDIC people

supervising the preparation of Carteret's tax return for 1995?
A. I really don't know.
Q. And if you were allowed by the statute to go back and look to see if there were carry-forwards available to shield the 1995 taxable income for Carteret, would it be prudent to do so?
A. Yes, I would say so.
Q. Now, I'd like to turn your attention to chapter 4, page 1, of the manual.
Chapter 3 is pretty long, so it takes a while to page there.
A. Okay.
Q. And this introductory couple of paragraphs is talking about the retention of third-party preparors, which we have already touched upon briefly, but it says in the third full paragraph -- it makes reference to bid and contract for the services.
Is that your recollection, that the contracts for preparing returns in 1996 when you had this mandate from the board of directors was to bid out packages of tax returns?
A. Yes, where I was, which I believe would have covered the entire country. Dallas was calling



the shots, and I believe by that time, we're talking about this massive backlog project in 1996.
Q. Yes.
A. Dallas was calling the shots then. I can't speak to Carteret specifically, whether it was in Dallas by then or not, or if it was in Atlanta or where, but, yes, we were told to find preparors, hire them, give them chunks of returns and put them to work.
I will say I don't think we used a basic ordering agreement here, which is where you prequalify a pool of preparors based on technical considerations to make sure they're competent. They submit proposals. You score the proposals. You accept some. You reject some. The ones you accept, you put them into this pool.
And then when you have returns you need prepared, you don't have to form a new technical panel. You can go to this pool and simply get cost bids and select one.
In this case, this project, we didn't have a basic ordering agreement set up per se, so we had to set up technical panels for the different preparors. And I believe they would bid on groups of returns or single returns if they were interested,



and we picked and chose on that basis.
Q. You picked the lowest-cost bidder provided they were qualified to do the work?
A. I believe that we would have, yes, unless there was some reason why we shouldn't.
Q. And do you know if Watkins Meegan was selected for Carteret's '95 return on the basis of a contract that was bid out?
A. I don't know.
Q. Do you know whether the FDIC has the contract between itself and Watkins Meegan that governed the preparation of the '95 return?
A. Did FDIC let the contract?
Q. In other words, do you all still have a physical copy of that contract?
A. I don't know.
MR. THOMPSON: Andrew, it's our position that that falls within our document request. If there is someone within FDIC to check to see if that exists, we'd appreciate it.
MR. GILBERT: We'll look for it.
MR. THOMPSON: If it's all right with everybody, I'd like to take maybe a 5-minute break.
(Recess.)
MR. THOMPSON: We're back on the record.



BY MR. THOMPSON:
Q. Sir, I'd like to direct your attention now to chapter 4, page 1, of the tax manual where it says under -- do you have it?
Yes. Okay. Good.
It says under, tax unit staff 3: Enter pro forma financial statement information into tax unit closing year spreadsheet.
Is that the process you were describing earlier of taking the division of finance numbers and plugging them into the template?
A. Right.
This would be a closing year tax return computation, which is a little more complicated than the norm. You have to string together different periods of the year, preclosing, then preclosing operations, then pro forma adjustments produced at the closing, and then these tax adjustments I'm sure you'll want to talk about, then the liquidation period all in one year.
Q. And so what are pro forma adjustments?
A. The pro forma process produces pro forma adjustments, if there are any. It's a process undergone at the closing to bring the general ledger balance sheet accounts current to the best extent

Page 54

the subsidiary could be used to shield the income from the parent; is that right?
A. Yes.
Q. Okay. Now, let's turn to chapter 7 of this manual.
On page 2 at the bottom, it says, general tax administration issues.
Do you see that?
A. Yes.
Q. Okay. And then underneath, tax management, slash, supervision, point number 2 says, quote: Receive formal referral sheet for referral issues and decide whether to accept or reject. Examples of referral issues include audit questions, goodwill issues, and refund questions.
Does the goodwill issue there refer to supervisory goodwill?
A. I believe it would relate to the goodwill litigation going on, project.
Q. How would that be relevant to the computation of tax?
A. This is a little outdated. It's something we did a few years ago. It was an attempt to compute a database, set up a database for all the issues that were going on. And goodwill was one of those issues.

Page 55

We listed all the different banks involved in the goodwill litigation.
And again, your question was?
Q. Why would it be relevant that a bank was in goodwill litigation when you're filling out the tax return?
A. I see. Okay.
It would be an issue that the tax unit had to spend time on. For instance, the Washington tax unit was the central hub of -- the litigation team I suppose would go to the Washington tax unit saying, we need this, that, and the other thing for tax. They would come to us.
And so I guess the time we spent, we wanted to track and keep track of and update where we were in the issues we process toward these goodwill FINs.
Q. And so were the goodwill tax returns prepared by a separate group of people?
A. No.
That could be part of it -- well, that's part of the issue.
Strike that.
The goodwill tax returns would have been prepared by the same people, but we would expedite

Page 56

them as best we could.
Q. Okay. And was there -- any other than expedition, was there any other way in which those tax returns were treated differently than other tax returns?
A. Not that I know of.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 4 the following document.
(Vordtriede Exhibit No. 4 was marked for identification.)
BY MR. THOMPSON:
Q. And Mr. Vordtriede, would you please identify this document for the record.
A. This appears to be a copy of the interagency agreement between the Internal Revenue Code and the Resolution Trust Corporation, I believe, dated December 10th of '92.
Q. And does this agreement cover Carteret's tax returns that were prepared?
A. I believe it does, except for section 5.
Q. And what does that section pertain to?
A. It has to do with assessments, and I believe the scope is that area -- that section is

Page 57

deleted from the scope of Carteret by section 3 A 1, I believe.
Q. Okay. So let's look at this.
Let's start with section 5, and feel free to take a moment to review this. I don't mean to rush you through this.
What is your understanding of what section 5 labeled, assessment, is intended to accomplish?
MR. GILBERT: Let me render a standing objection to the extent that the line of questions calls for a legal opinion.
MR. THOMPSON: Yes.
A. It appears that -- it looks as though the service was interested in an expedited fashion of having the RTC agree to whatever tax liability was shown on a tax return, in a case where there was no parent corporation, parent company involved with a failed bank, failed thrift.
Q. And because Carteret had a parent company, then that section doesn't apply?
A. That is my understanding, yes.
Q. And what is the practical significance, if any, of this agreement for Carteret's -- for the receivership's tax liability, Carteret's receivership's tax liability?

Page 58

A. My assumption would be that the receivership would have more latitude in challenging any tax liability, all things being equal.
Q. Sorry.
More latitude than what?
A. More latitude in challenging I guess any potential tax liability, all things being equal.
Q. But more latitude than a private party would have, or more latitude than --
A. Not under the agreement versus under the agreement.
Q. Okay. And how does it have more latitude?
A. Somewhere in here, I thought I read that the parties were agreeing to stay out of litigation, although maybe that's under another section.
(Pause.)
A. I'm not seeing what I was thinking of before. I'm not really sure. I can't absorb this quickly.
BY MR. THOMPSON:
Q. That's fine.
We can move on.
A. I'll stand by my general answer that it looks like an expeditious process the IRS was interested in for the RTC to act on the tax return.

Page 59

MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 5 a document that bears the Bates number AM 00096299 through 96319.
(Vordtriede Exhibit No. 5 was marked for identification.)
(Pause.)
BY MR. THOMPSON:
Q. Okay. Mr. Vordtriede, would you please identify this document for the record.
A. The document -- at the very top?
Q. Yes, sir.
A. The overall document?
Q. Well, yes.
A. I'm sorry.
It's the 2003 tax return for Carteret.
Q. And then it has a routing sheet on top?
A. Yes.
Q. Okay. And are those your initials underneath, reviewed by?
A. Yes.
Q. Okay. And also by, signed by?
A. Yes.
Q. And then is that your handwriting underneath where it says, note, colon?

Page 60

A. Yes.
Q. And what does that say?
A. Note, quick review based on time constraints.
Q. All right. And turning to the second page of this exhibit -- that's the first page of the 2003 tax return; is that right?
A. Yes.
Q. And after your -- and you signed this return.
Is that your signature?
A. Yes.
Q. And by, title, what have you written there?
A. The SFMA 400 DRR stands for senior financial management analyst, and then 400 is the location code for the Dallas I guess regional office, and then DRR is the division of resolutions and receiverships.
Q. And the return was signed on August 3rd, 2004; is that right?
A. Yes.
Q. And then after the return is signed, is there anything else left to be done substantively?
A. Copy and mail.

Page 61

Q. Okay. And that happens in the normal course fairly quickly?
A. Yes.
Q. Okay. And what was the due date for this return?
A. I believe we filed an extension here. There's a form 7004 attached which would have extended the statute date through September 15th of 2004.
Q. Okay.
A. I'm sorry.
Extended the due date.
Q. Now, in the upper right-hand corner of the first page of the form 1120, it says, date incorporated, July 10, 1939.
Does that refer to Carteret's date of incorporation?
A. I believe it's intended to.
Q. And for tax purposes, was Carteret in receivership treated as the same tax entity as Carteret before the seizure on December 4, 1992?
A. For tax purposes, yes.
Q. Okay. And now there's a box in the upper left-hand corner for consolidated return.
Do you see that?

Page 70

Correct?
A. Yes.
Q. And the inclusion of this amount of accrued interest is fully consistent with the modified accrual method?
A. Yes.
My answer I guess would be yes.
Q. Okay. And --
A. We're following the books.
Q. And who provides the books to you and your colleagues when you're preparing the tax return?
A. For this return, we would have gone to what we call the financial data warehouse, where they have online all the financials for the different receiverships accessible, and we would print them out.
I believe that's what we would have done for 2004. 2005 is a different story.
Q. 2005 is a different story?
A. Yes.
We're at the end of a new financial system. We haven't experienced what we're going to do there yet.
Q. If you have a question about postinsolvency interest, who would you ask for help

Page 71

in answering that question?
A. Wayne Green.
Q. Have you ever had conversation with anyone at the FDIC about the amount of postinsolvency interest to be included in any of Carteret's tax returns?
A. I don't believe I ever have with respect to Carteret.
Q. Okay. Or with any other institution?
A. Yes.
Q. Tell me about those conversations.
A. From recollection, I believe we can run into a problem with the accrual where all of a sudden, I believe when 95 percent of the claims have been paid, they start accruing postinsolvency interest. That's my understanding of what the policy is or at least what it was.
So you go to prepare a tax return, and all of a sudden, this huge accrual shows up in one year, and you claim it as a deduction. Come 2 years later, some of this accrual isn't -- some of these accruals -- this accrual is not paid.
They turn around and reverse it, and you're hit with a big income item. We had to figure out what we were going to do there, because you would

Page 72

run into alternative minimum tax problems, the flip-flopping, you know, huge deduction, huge income item.
If you'd carry the huge deduction, if it creates a net operating loss, you can carry it forward, but then you only get 90 percent coverage on the alternative minimum taxable income. So we had to decide what to do. And we've never I don't believe truly solved the issue.
I think what we decided to do was, if we could go back -- if we run into this huge income item, we can go back and amend the initial returns, we'll do that. Otherwise, I believe if the claims aren't being paid, and this income item -- the original accrual is reversed, it means you can't pay all the PII. The claims have been paid, but the postinsolvency interest won't be paid.
I suppose that would mean as I sit here that the thrift or the bank in receivership remained insolvent, and so the tax wouldn't be paid anyway, so perhaps you're covered.
Q. All right. And is that the reason -- or you tell me, why is it that accrued interest would be reversed and taken off the books because it was clear that it wasn't going to be paid?

Page 73

A. Yeah. Yes.
What my understanding is, when it's clear that the interest isn't going to be paid. And it might be right at the point where they're ready to fold, reverse all the remaining balances on the financials and terminate the institution, that this income item pops up.
It doesn't happen that often, so I don't have a lot of experience in investigating this.
But I'm losing my train of thought on your question.
Q. That's all right.
Do you recall which institutions had this situation?
A. No, I don't.
It's generally a preparor coming to me saying, what do we do.
Q. And it comes up -- just so the record is clear -- at termination when they're reversing the accrued interest charges on PII, and then they would generate a large taxable income item?
A. I believe that's when it comes up. I'm not certain if it would come up sooner or not.
Q. And the amount of interest that was reported on the 1993 tax return, postinsolvency

Page 78

A. To the best of my knowledge, I believe it is, yes.
Q. And is it consistent with the hybrid or modified accrual method?
A. Yes, I believe it is, in that it properly -- clearly reflects income.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 7 a document that bears the Bates number AM 00096139 through AM 00096149.
(Vordtriede Exhibit No. 7 was marked for identification.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, would you please identify this document for the record.
A. It looks to be the 2002 calendar year tax return form 1120 for Carteret.
Q. Okay. And is that your signature on page 1?
A. Yes.
Q. And what role did you play in the premiums of this return?
A. Looks like the signer.
Q. Okay. And so would you have actually

Page 79

prepared it, or would you have just reviewed it?
A. I believe I would have not prepared it. If I performed a review -- I'm not certain if I did or not -- I'm guessing I did not.
If I did do a review, it would have been a cursory one, compare a few check numbers, and then I was a signer.
Q. Yeah. Okay.
And this return was timely filed; is that correct?
A. It appears it would have been, yes.
Q. Okay. Now, turning to page 96145, there's a deduction for 10,487,526 dollars.
Do you see that?
A. Yes.
Q. And that's intended to reflect the amount of interest that accrued in 2002; is that right?
A. That would be my assumption, yes.
Q. And that's what it's supposed to reflect; is that correct?
A. Yes.
Q. All right. And is this return consistent with the requirements of the Internal Revenue Code?
A. Yes, I believe it is.
Q. And it's consistent with the modified

Page 80

accrual hybrid method?
A. You see, on this one, it says, modified cash. It's the same method.
Q. Okay.
MR. THOMPSON: And then I'd like to ask the reporter to mark as Vordtriede 8 at document that bears the Bates number AM 00096200 through 96214.
(Vordtriede Exhibit No. 8 was marked for identification.)
BY MR. THOMPSON:
Q. Would you please identify Vordtriede 8 for the record, sir.
A. It appears to be the 2001 calendar year form 1120 for Carteret.
Q. Okay. And is this your signature at the bottom of the first page?
A. Yes.
Q. What role did you play in the preparation of this document?
A. Check -- strike that.
Return signer for sure, possibly some type of limited review, although I'm not sure whether I've reviewed it or not.
Q. And turning your attention to page 96208,

Page 81

there's a deduction for postinsolvency interest in the amount of 7,517,430 dollars.
Do you see that?
A. Yes, sir.
Q. Is that intended to reflect the amount of interest that accrued in 2001?
A. Yes.
Q. Okay. And is this return consistent with the requirements of the Internal Revenue Code?
A. Yes, I believe it is, but again, we have the modified cash label on page 4, schedule K, line 1, and it's really the same modified accrual method we were talking about with respect to 2003.
Q. Okay.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 9 a document that bears the Bates number AM 00096046 through 96059.
(Vordtriede Exhibit No. 9 was marked for identification.)
BY MR. THOMPSON:
Q. And would you please identify this document for the record, Mr. Vordtriede.
A. It's the 2000 calendar year-end form 1120 federal income tax for Carteret.

Page 82

Q. All right. Is that your signature on the first page?
A. Yes.
Q. All right. And what role did you play in the preparation of this return?
A. Most likely, I was the signer and not the reviewer. If I reviewed it at all, it would have been a cursory review.
Q. Turning your attention to 96055, do you see the postinsolvency interest of -- deduction of 7,534,166 dollars?
A. Yes.
Q. Was that intended to reflect the amount of interest that accrued in the receivership for calendar year 2002?
A. Yes.
Q. Now, if you'll keep the 2000 tax return before you and go back to what was exhibit 6, which was -- it's right here on top, and I'd like to turn your attention to page 96785.
There's a line item for billings and borrowings. This is as of December 31st, 1999.
Under liability, the third entry is billings and borrowings of about 280,000 dollars.
Do you see that?

Page 83

A. Yes.
Q. Okay. And then let's flip to year-end 2000, which is on Bates number 96822.
And you can see in the third line there that FDIC billings and borrowings are now more than 13 million dollars.
A. Yes.
Q. Okay. So that's an increase of a liability of approximately 13 million dollars.
Do you know what FDIC billings and borrowings reflects?
A. No, I really don't know what accounts roll up into that line item on the return. I'd have to drill down and get a list and tell you.
Q. Right.
And just looking at the total deductions here, do you have -- I mean, is there anyplace where this item, this increase in liability is reflected on this tax return?
A. Other than schedule L on page 4, it will show up on the balance sheet.
Did you mean --
Q. I just didn't know if Carteret was entitled to take a deduction for that increase.
A. That I don't know. I don't believe so,

Page 84

but we'd have to go back and see what accounts are rolling up into that line item and see what the nature was.
Q. Okay. We're going to skip a year and go to the 1998 return now.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 10 a document that bears the Bates number AM 00095513 through 95564.
(Vordtriede Exhibit No. 10 was marked for identification.)
BY MR. THOMPSON:
Q. Now, please identify this document for the record.
A. It looks to be a state of New Jersey state income tax return for Carteret for the calendar year ended 12-31-1998, form BFC, hyphen, 1.
Q. And that -- may I have that for a moment?
A. Sure.
Q. Everyone got the right copy except the court reporter. We've now marked the correct -- got the label on the right document that bears the Bates number that I read into the record.
And, Mr. Vordtriede, sorry about that, but if you would identify this document for the record.

Page 85

A. This looks to be a copy of the 1998 calendar year federal form 1120 for Carteret, plus the control sheet, the routing sheet, plus the blueprint or template used in preparing the return.
Whether the blueprint is here in its entirety, it doesn't look like it is, plus it has some returned work papers, which look to be attachments to the tax return.
Q. Okay. And turning to the tax return itself, this is the form 1120 for 1998 for Carteret; is that correct?
A. Yes.
Q. And it bears your signature on the bottom of that front page?
A. Yes.
Q. And the return was timely filed.
Correct?
A. My guess is, it would have been, yes.
Q. Okay. And the line 30 reflects taxable income of negative 27,667,637 dollars.
Do you see that?
A. Yes.
Q. And that was intended to reflect the taxable income for 1998; is that right?
A. Yes.

Q. All right. Now, let's look at the postinsolvency interest deduction for 1998. It can be found on page 95473.
It's in the amount of 63,737,160; is that right?
A. Yes.
Q. All right.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 11 a document that bears the Bates number AM 00092190 through 92205.
(Vordtriede Exhibit No. 11 was marked for identification.)
BY MR. THOMPSON:
Q. I apologize that the copy is a little bit askew here, but this is the calculation of accrued interest on priority 6 claimants.
Do you see that?
It says, FIN, 1309?
A. Yes.
Q. And FIN 1309, that's Carteret.
Right?
A. Yes.
Q. Okay. And I'll represent to you that this was produced to us by the FDIC back in 1999, and



you'll see that it shows interest that starts to accrue on October 28th, 1994, and then it goes through on the last page, December 31, 1997.
Do you see that?
A. Yes.
Q. Okay. And the total amount of interest that accrued matches to the dollar the amount of interest that was deducted in the 1998 return.
Correct?
A. Looking at the summary on the last page, the accrued interest?
Q. Yes.
A. Yes, it matches the return.
Q. Okay. And the Vordtriede 11, the spreadsheet showing the calculation of interest, it doesn't have any interest for calendar year 1998 in it, does it?
A. No, it does not.
Q. So all the interest relates to '94 through '97; is that right?
A. Yes.
Q. Is it fair to say that the amount of interest that was deducted in the 1998 return accrued at an earlier date, namely '94 through '97?
A. Yes, earlier years.



Q. Okay. And some of the interest accrued during '95; is that right?
A. Yes.
Q. And some accrued during '96?
A. Yes.
Q. And some accrued during '97?
A. Yes.
Q. Okay. Do you know why the interest that accrued in '95, '96, and '97 wasn't deducted until 1998?
A. I don't know specifically.
I'm assuming the computation was done in 1998, but it's an assumption. I don't know the answer.
Q. Okay. Now, the Internal Revenue Code requires taxpayers to reflect expenses in the year in which they were accrued, correct, if they're on the accrual method or the modified accru- --
A. All-events test under -- the standard accrual would be taken into account under an all-events test, section 461, which would be the liability is fixed and the amount is ascertainable.
Q. Okay. And --
A. Whether this deduction meets that standard is arguable.



Q. Well, I mean, the liability was fixed.
Right?
I mean, the money was lent from the RTC to Carteret on the dates reflected in Vordtriede 11?
A. The liability was fixed, yeah.
Q. Yes.
Okay?
A. The liability for the assistance.
Q. Yes, was fixed?
A. The claim was fixed.
Q. Yeah.
And in terms of whether the amount was ascertainable, all you needed is a calculator, right, and you can apply the interest rates and you can fix the amount; isn't that right?
A. Yes.
Q. So the amounts of interest that are reflected in Vordtriede 11 had accrued prior to 1998; is that correct?
A. Correct.
Q. All right. And if the FDIC had become aware of this in 1999, weren't they under an obligation to amend those prior returns to make them accurate?
A. You're asking me if we should have amended

Page 90

'94 and --
Q. Let's take '96 -- 95, '96, and '97.
A. Place the interest accruals under the proper years?
Q. Yes, sir.
A. I don't know that that's the case. You can argue that it was -- you could argue that the liability for the interest wasn't fixed at that time. You could argue it was too contingent.
Q. Why is that?
Why would it have been too contingent?
I mean, that interest is owed. Ambase can't get a dollar out of this receivership until that interest is owed.
Isn't that true?
A. Yeah, you could argue it that way. I'm thinking the -- I'd have to think about it.
Q. Well, I don't understand why, if it accrued in an earlier year, it wouldn't have been appropriate to amend the return to reflect that.
A. I guess I'm thinking in terms of the liability for the interest not being triggered until there's a certainty of the claims being paid off in full.
Q. Where does that concept come from?

Page 91

Is that a GAAP concept?
A. No.
I'm thinking more in terms of the all-events test for 61 fixing the liability.
Q. Well, I mean, if you're -- if we're 2 private parties, and you lend me 1.3 billion dollars, and it's not clear when you lend me that money that I'm actually going to be able to pay it all back, interest and principal, I'm still entitled to deduct the interest that's accruing on that loan, aren't I?
MR. GILBERT: Objection, arguing with the witness.
BY MR. THOMPSON:
Q. You can answer.
A. Say that again.
BY MR. THOMPSON:
Q. Yes.
If there's a transaction between 2 parties, a bank and a lender, and a bank makes a loan of 1.3 billion dollars in 1995, and it's unclear whether the lender is actually going to be able to pay the money back because it starts to experience some difficulties after it receives the loan, if that borrower is on the accrual method of accounting, it is entitled to take a deduction of the interest

Page 92

that's accruing, isn't it?
MR. GILBERT: Objection, compound question.
A. I'm not sure what position I'd take with that.
I mean, you have a valid point. The FDIC began accruing in 1998. I would like to know why the -- why they wait until the trigger point, what the reasoning is on that, and then take that to the tax law and decide.
You might be right.
BY MR. THOMPSON:
Q. You just don't know?
A. I don't know at this point.
Q. Okay. Now, let's look -- let me ask you: When did you personally first become aware of this problem, of this situation where interest is accruing in '95, '96, '97, and it's not being taken as a deduction until '98?
A. First time I've thought about it is right now.
Q. Okay. And to the extent the FDIC had gone back and amended the '95, '96, and '97 returns, the way they would do that is, they'd look at the interest on the spreadsheet, whatever spreadsheet

Page 93

they were using, and they would deduct that -- the interest that accrued in '95 from the '95 taxable income.
Correct?
A. Yeah, assuming you came to the conclusion that that was the proper thing to do and that's what you would do, yes.
Q. Okay. And then for 1996, you'd do the same thing.
Right?
A. Yes.
Q. And '97 you'd do the same thing?
A. Yes.
Q. To the extent this increased the taxable loss in '96 and '97, those losses could be carried back to '95.
Correct?
A. Yes.
I believe there's a 3-year carryback for those years.
Q. Right.
But because the deduction was taken -- wasn't taken until 1998, it couldn't be carried back to '95, could it?
A. 1998, I'm not sure if there was a 3-year

Page 94

or 2-year carryback that year. It changes, went from 10 to 3 to 2 to 5, back to 2.

If it was a 2-year carryback, it would be too far along to carry back. If it was a 3-year carryback, I believe you'd carry it back in '95.

Q. Okay.

MR. THOMPSON: Let's go off the record for a moment.

(Whereupon, at 12:15 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:29 p.m., this same day.)

Page 95

AFTERNOON SESSION

(1:29 p.m.)

Whereupon,

JAMES F. VORDTRIEDE,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

MR. THOMPSON: Welcome back, sir.

We're back on the record.

I'd like to ask the reporter to mark as Vordtriede 12 the following document.

(Vordtriede Exhibit No. 12 was marked for identification.)

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

BY MR. THOMPSON:

Q. Now I'd like to direct your attention, Mr. Vordtriede, to the original message on this chain of emails, which is from Steven Johnston to Elaine Tomma (phonetic).

A. Tomma (phonetic).

Q. Tomma (phonetic). Okay.

Page 96

And who is Mr. Johnston?

A. Steve Johnston is in the Washington tax unit, FDIC.

Q. And is he still with the FDIC?

A. Yes.

Q. Okay. And this is an email of October 9th, 2003; is that right?

A. Yes.

Q. And the email starts, quote: Legal asked that we review Carteret's savings and verify the 76 million-dollar tax liability we reported on our 2002 goodwill estimate, close quote.

Do you know who requested this review?

A. Who specifically in legal?

Q. Yes.

A. No.

Q. Do you know why the review was requested?

A. Other than what's written here, no.

Q. Okay. Then continuing on, it says: This is another case where had we accrued PII from the date of closing, we could have significantly reduced our tax exposure and maybe more importantly our litigation exposure. In this case, the subrogated claim was nearly 1 billion dollars and it closed very early in 1995. Had we accrued PII, the tax liability

Page 97

would have been approximately 9 million dollars instead of 32 million dollars. This 32 million has now grown to over 76 million with interest and penalties -- excuse me -- penalties and interest.

Do you have any reason to disagree with Mr. Johnston's analysis?

A. I have no reason to disagree. I'd have to see how the numbers came out.

Q. Okay. Now, in terms of -- let's say the amount of tax were reduced by 75 percent.

Would the amount of penalties and interest be reduced on a pro rata basis 75 percent?

A. The penalties I believe -- I'd have to look at the penalties. The interest would go down.

Q. On a pro rata basis?

A. Yes.

Q. And the penalties might vary depending on whether it was for late filing or nonpayment?

A. Right.

Q. Would one be reduced pro rata and not the other?

A. I believe so.

Q. Okay. Now, the email continues: While in Dallas, we found a few other examples of where PII accruals from the beginning could have reduced the

Page 98

tax liability.
And let me ask you: Is it fair to assume that "PII" means postinsolvency interest?
A. Yes.
Q. It says Santa Barbara was one.
Do you know who -- what the other examples were?
A. Only one.
Q. What was that?
A. Ben Franklin.
Q. And do you know how much the reduction was in taxable income?
A. For Ben Franklin?
Q. Yes.
A. I do not.
Q. Okay. Do you have a ballpark percentage?
A. My recollection is, it went down from -- the negotiations are still going on. I don't --
MR. GILBERT: I'm going to object to the line of questions and just caution the witness to not provide any information as a result of any conversations with counsel on that case.
BY MR. THOMPSON:
Q. Okay. Go ahead.
A. I don't believe I've had conversations

Page 99

with counsel per se that I can remember. I remember a ballpark -- some kind of spreadsheet showing an approximate -- I think I better not answer, because I don't remember if it was tax or tax plus statutory add-ons, and --
Q. Well, tell me what you do remember.
A. I remember a 90 million-dollar figure falling to something like 14 million dollars. And I don't know if apples are becoming oranges or not.
Q. And then obviously, the 90 million or the 14 million would grow with interest and penalties.
In other words, are these the initial tax liability numbers?
A. That I'm not sure.
Q. Okay.
A. I'm not sure.
Q. All right. Now, then it goes on in this email to state, quotes: It should be noted that the IRS agrees that this is a valid tax deduction available from the date of closing.
Do you have any reason to dispute that this is the IRS's position?
A. I do not know what their position is on that.
Q. And when it says, agrees, that's agrees

Page 100

with the FDIC.
Right?
A. That's what it's saying, yes.
Q. Do you have any reason to dispute that that's the FDIC's position?
A. No.
Q. Okay. Now, in terms of amending the 1995 return, could that have been done in 1999?
A. The 1995 return?
Q. Yes.
Could it have been amended in 1999?
A. Yes, I believe it could have been.
Q. Okay. Now, I'd like to turn -- I'm done with that document -- to the 1999 return.
MR. THOMPSON: I'd like to ask the reporter to mark it as Vordtriede 13.
(Vordtriede Exhibit No. 13 was marked for identification.)
BY MR. THOMPSON:
Q. Okay. Mr. Vordtriede, would you please identify this document for the record.
A. It's the 1999 calendar year-end form 1120 for Carteret and its routing form.
Q. And what role, if any, did you have in the

Page 101

preparation of this return?
A. It looks like everything was done by staff members, so I was just a general overseer from the group.
Q. Mr. Colley, and then who is the other person?
A. I believe that's Judy Fletcher.
Q. Is she still with the FDIC?
Do you know?
A. Yes.
Q. In Dallas?
A. No.
Q. In Washington?
A. No.
Q. Where is she?
A. She's in -- at -- I believe it's either Atlanta or Norcross, Georgia. She's in a different division.
Q. Now, the return shows a loss of 38.3 million dollars on line 30; is that correct?
A. Yes.
Q. And turning your attention to page 95323, there's a deduction for postinsolvency interest of 35,057,729 dollars.
Do you see that?

Page 102

A. Yes.
Q. Okay. And we've just seen that in the '98 return, there was 63 million dollars of interest for '95, '96, '97, a little bit of '94, so that's about 20 million dollars a year of interest when the subrogated claim at least at the beginning of '95 was pretty big.
Do you know why the postinsolvency interest in the 1999 return is higher?
A. No, I don't.
Q. Are you aware of the fact that there came a time when the FDIC changed the way in which it was calculating the interest on the subrogated claim?
A. Only in a general passing sense. I've heard comments from Wayne Green.
Q. What did Mr. Green tell you?
A. I really don't remember other than there was a change.
Q. And you don't know when the change was?
A. No, I don't.
Q. Now, the interest falls to 7 million in 2000 and sort of fluctuates in that range.
Is it fair to assume, then, that the 35 million that's reflected in this '99 return includes some interest that accrued outside of 1999?

Page 103

A. I don't know. It's possible.
Q. Okay. If some of the interest reflected in the 1999 return had accrued in an earlier year, would the same analysis that we talked about with respect to the '98 return apply to the '99 return?
A. The same arguments would hold. I think what we're doing is following our modified accrual system, which the books reflect. We're following the books.
Q. And would there have been any -- at the time the 1999 return was prepared, was there any prohibition on the FDIC amending the 1995 return?
A. I believe it's an open question. It looks like it's close to the 3 years from the date of filing the return, plus extensions, plus I believe the '95 is late. I believe the 150 code, the '95 return is something like February of '97. And this is close -- this looks like it's a little outside of that.
As to the 2 years from the date the tax is paid, I'm not exactly sure how that would work. If the tax is never paid, is the statute open indefinitely, or is it closed until the tax is paid. So that bears on the answer to this question, whether it was open or not.

Page 104

Q. Now, let's turn to -- we're done with that return. Let's turn to the 1997 return.
MR. THOMPSON: I'd like to ask the reporter to mark it as Vordtriede 14.
(Vordtriede Exhibit No. 14 was marked for identification.)
BY MR. THOMPSON:
Q. All right, sir. Would you please identify this document for the record?
A. It looks to be a copy of the 1997 calendar year-end form 1120 federal income tax return for Carteret.
Q. And certainly you're welcome to spend as much time as you like analyzing this document, but let's start with page 90193. The numbers appear on the left-hand side sideways.
A. 193?
Q. Yes, sir.
Now, I've looked at this return. I haven't been able to find anywhere where postinsolvency interest was deducted, and I assumed that it would be under, other deductions, as it was in all the other returns.
Is that a fair assumption, that that's

Page 105

where it would be included?
A. Yes.
Q. And you don't see anywhere there's been postinsolvency interest deducted for that year; is that correct?
A. No, I don't.
Q. Was this return prepared consistently with the Internal Revenue Code?
A. Yes, I believe it would have been, subject again to the modified cash label on schedule K, line 1, page 3.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 15 a document that bears the Bates number AM 00090151 through 90179.
(Vordtriede Exhibit No. 15 was marked for identification.)
BY MR. THOMPSON:
Q. Would you please identify this document for the record.
A. It looks to be a copy of the 1996 calendar year-end form 1120 federal income tax return for Carteret.
Q. Who signed this document?
A. Rick Cywinski.

Page 106

Q. Now, it lists him as a CPA located in Aurora, Colorado.
Do you know whether he was it the FDIC at the time he prepared this?
A. I don't believe he was. I don't know for sure. Rick left the FDIC at the end of '96. I'm not sure when he came back.
Q. Okay. But he is back now?
A. Yes.
Q. Okay. Let's again look at page 90155.
Is it a fair assumption -- actually this one even lists interest as line item 18, and it's listed as zero; is that correct?
A. Yes.
Q. And so there was no deduction for postinsolvency interest taken in '96; is that correct?
A. There's none on line 18.
Q. And again, feel free to look at this return -- I guess that's right.
We should look at the other deductions line item, and there's no line item for postinsolvency interest there, is there?
A. No.
Q. And is that where you would expect to find

Page 107

it?
A. Yes.
Q. And the 1996 return was prepared consistently with the Internal Revenue Code?
A. I didn't have anything to do with its preparation. It more or less preceded my time in Dallas.
My guess is, it would be within the same -- my answer would be I believe the same for this return as it would the others --
Q. Okay.
A. -- until I saw something to the contrary.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 16 a document that bears the Bates number AM 00090578 through -- well, we'll say 90140.
(Vordtriede Exhibit No. 16 was marked for identification.)
BY MR. THOMPSON:
Q. All right. Now, if we look to line -- well, first of all, would you please identify this document for the record.
A. It looks to be a copy of the 1995 calendar year-end form 1120 federal income tax return for

Page 108

Carteret and its subsidiaries.
Q. And this document was prepared by the outside accounting firm of Watkins Meegan & Drury; is that right?
A. Yes.
Q. Can you tell who signed this document on behalf of the RTC -- I guess FDIC?
A. Yeah.
It looks to be David Jones.
Q. And who is Mr. Jones?
A. David Jones was in the tax unit until early 1997, and I believe he crossed over into the division of -- the examination division. DSC is the acronym. And he's in Sacramento, I believe, still today.
Q. Now, this return on line 5 shows interest income of 44.2 million dollars approximately; is that right?
A. Yes.
Q. But if you go down to line 18, you see interest expense of only 584,000 dollars.
Do you see that?
A. Yes.
Q. Have you ever seen a tax return for a financial statement with such a large positive

Page 109

interest spread, almost -- where the interest income is almost 80 times greater than the interest expense?
A. I really can't say that I've ever looked for it.
Q. And normally, isn't there a closer relationship between those numbers, because financial institutions make money, they hope, by lending out the money and then funding those loans, and they have to pay someone to fund those loans?
MR. GILBERT: Objection, outside the scope of the 30(b)(6) deposition.
You can answer.
A. Hypothetically, I would assume there would be narrower spread than we're looking at here.
BY MR. THOMPSON:
Q. And isn't it true that the reason that the interest is so low in this situation because the deposits that were funding Carteret's loans were sold in January of '95 and March '95 and were replaced with an RTC loan, which is the subject of the postinsolvency interest that wasn't deducted?
A. I'd have to look through the work papers, but that would probably be an accurate assumption.
Q. And you have no reason to doubt that assumption?

Page 110

A. No reason to doubt it.
Q. Okay. Now, let's look at the form 8275, which is on page 90089, and again, the numbers are in the left-hand column.
All right. Now, what is the purpose of a form 8275?
A. I haven't filed one in a while, so I haven't looked at it in a while.
My recollection is that it's a disclosure to the commissioner, giving him full disclosure that you're deviating from the regulations in some form or another.
Q. Okay. Now, it says under, tax accounting method -- the second full paragraph reads, quote: For tax year ended December 31, comma, 1994, Carteret Federal Savings Bank was on the accrual method of accounting for tax purposes.
Do you have any reason to doubt the validity of that statement?
A. Let's see here. You're in this second -- third paragraph?
Q. Yeah.
A. This one here?
Q. Yes, sir.
A. I have no reason to think otherwise.

Page 111

Q. Okay. Now, in the next sentence, it reads: For tax year ended December 31, '95, it was impossible to determine the amount of adjustment which would be necessary in order to convert the hybrid method to the accrual method for tax purposes, because the corporation is in the liquidation process, records are not kept by the FDIC, successor of the RTC, as to the income and expense on the accrual method of accounting. Consequently, the hybrid method was used on December 31, '95, federal corporation income tax return.
Do you have any reason to dispute that statement?
A. Yeah, I think I would.
I've never seen things stated quite that way, because the corporation is in the liquidation process, records are not kept by the FDIC, successor of the RTC -- I don't know how the record is transferred over as I sit here as to the income and expense on the accrual method of accounting. Consequently the hybrid method was used -- I don't think I'd have put that statement in this return.
Q. Well, do you think that there was a change in methodology from accrual to a modified hybrid or accrual?

Page 112

A. The -- there was a difference between the modified accrual that we have -- that we follow based on the FDIC accounting system. I suppose here we're talking about the RTC, and I suppose FMS, which the RTC used, was very close to the FIS system that FDIC used, with some differences, but I call them both modified accrual basis.
Q. But it is a change in accounting methodology from what had been used previously.
Correct?
A. The methods are different.
I would not call it a change in accounting method.
Q. Now, it says in the bottom paragraph on this page: The corporation did not receive permission to switch its method of accounting as required by regulation 1.446, et cetera, et cetera.
Do you have any reason to doubt the validity of that statement?
A. No, I have no reason to doubt it.
Q. Was the FDIC required to request the IRS's permission to switch its method of accounting?
A. My position would be that they were not required to ask permission.
Q. Because there wasn't a switch?

Page 113

A. Because the switch was based on a change in the underlying facts.
Q. And if there's a change in the underlying facts under section 446 of the code, there doesn't need to be permission granted by the IRS?
A. Yeah.
I think the regs say, correction of a math error and change in the underlying facts are 2 exceptions to the rule of requesting permission for changing the accounting method.
Q. And what would the change in the underlying facts here have been that would have allowed the FDIC not to ask for permission?
A. Essentially, the closing of the institution, placement into receivership.
Q. Now, Carteret remained a C corporation even after the closing.
Correct?
A. Yes.
Q. All right. And it had more than 5 million dollars of gross income in 1995.
Correct?
You can flip to the first page.
A. I'm sorry.
Q. That's fine.

Page 114

A. Yes.
Q. Okay. And so under section 448 of the code, Carteret was required to utilize the accrual method of accounting; is that correct?
A. They were required to -- the rule states that that C corporation could not use the cash method of accounting.
Q. And is that another way of saying that it was required to use the accrual method of accounting?
A. An accrual method, yes.
Q. Okay. And your position would be that the modified accrual or hybrid method is an accrual-based method of accounting that complies with 448?
A. Yeah.
I would state that the modified accrual method is an accrual method and not a cash method.
Q. Now, do you know who made the decision to file the 1995 tax return on a modified accrual basis?
A. Who specifically?
Q. Yeah.
I mean, was this a policy that was made, you know, across the board at the FDIC or, you know, did someone look at each taxpayer and say, well, this is the best method for this taxpayer, we can really minimize tax by going this route or that route?

Page 115

Do you know?
A. Following the books which are done on a modified accrual method, I believe you could say they were across the board returns started with the method followed by the books.
Q. And so there wasn't any analysis given as to which method would lead to the lowest tax liability?
A. No.
Q. Okay. Now, if a court were to look at this tax return and were to want to put it on a pure accrual basis, not modified in any way, do you have any sense as to how they would go about doing that?
MR. GILBERT: Objection.
BY MR. THOMPSON:
Q. Stated differently, how does this tax return differ -- how does it reflect the modified accrual methodology?
A. I think in a liquidation setting, the accruals for income would be less certain or totally uncertain, so they would -- we would not be accruing income. Similarly, I don't believe we accrued a lot of the expenses that we normally do just by virtue of fact that we're following FDIC's method.
Q. Have you looked at Carteret's 1995 return

Page 116

at all to assess how it would be impacted by the hybrid method of accounting?
A. No, I haven't, not with respect to your question.
Q. So you don't have an opinion on that with respect to the 1995 return?
A. No.
Q. Okay. Now, I'll represent to you that the FDIC is currently attempting to charge Carteret 49 million dollars of interest on the subrogated claim that relates to 1995.
If that amount were taken as a deduction on this return, there -- there wouldn't be any limitation on the ability to take an interest expense deduction, is there, under the code?
A. If we introduced an additional interest deduction of 49 million?
Q. Yes.
A. I don't believe there would be any restriction on it.
Q. Okay. Do you know -- did anyone at the FDIC consider the propriety of failing to deduct the interest on the subrogated claim in the '95 return?
A. Postinsolvency interest?
Q. Yes.

Page 117

A. I don't know.
Q. You're not aware of any such consideration?
A. No.
Q. All right. Now, let's turn back into the middle of the tax return to page 90090.
There's a disclosure statement here, and it reads, quote: The following information was not available in preparing the tax return. 1, information necessary to determine the bad debt reserve, no deduction was computed.
Do you have any reason to doubt the validity of that statement?
A. If it's says no deduction was computed for the bad debt reserve, I believe that's the case, yes.
Q. Okay. And then number 2, it says: Detailed depreciation schedules, no depreciation was computed. Schedules were not available to determine depreciation for alternative minimum tax purposes.
Do you see that?
A. Yes.
Q. Do you have any reason to doubt the validity of that statement?
A. No.
Q. Okay. And if depreciation deductions had

Page 134

we'll try to streamline things so that Wayne does not have to do the data dump, but we definitely need to get the drilldown for this line item, which appears on the 1995 assets and liabilities and liquidation called, noncash adjustment.
BY MR. THOMPSON:
Q. Now, let's switch gears to premiums back on the tax return, and that's 134 million dollars.
Do you know what that represents?
A. I've never seen all the pages of pro forma work papers, which usually generate this amount. But my understanding, it's the premium paid by assuming banks in 3 separate -- I guess you could say 3 separate purchase and assumption transactions.
Q. And I think actually one of them was October 28, '94, so I think this is the 2 in '95, but -- okay.
So these were basically branch sales; is that right?
A. Well, I would say it would be transfer of the deposit base and sales of assets out of the branches, right.
Q. And would the taxpayer be entitled to a deduction of the basis it had in its branches?
A. They would be entitled to an offset for

Page 135

the basis and the assets sold.
Q. And have you found anywhere in this tax return where such a deduction was taken?
A. I believe by virtue of fact that they're reporting the premium as a line item, which agrees to the financials, that would be a figure which took into account book value of the assets that were sold to the different assuming banks.
Q. Well, we'll check the math tonight, but I'm -- let's assume for present purposes that that's the face amount of the premium, the deposit premium, in other words, the acquiror said, you give me all of your deposits and a like amount of cash minus 134 million, et cetera, and I think we'll see that that's what the 134 million, so in that instance, Carteret would be entitled to take a deduction for any assets that transferred in that transaction?
A. With regard to your example?
Q. Yes.
A. Your deposit base transferring over is X plus 134 million dollars?
Q. M-hm.
A. And let's see, we're transferring cash of X amount to go with the deposits?
Q. Right.

Page 136

So we'd also need to transfer the branches, which we did.
A. Well, that is the branch. The deposits are the branch.
Q. Yeah.
A. Piece -- the branches are really just little -- little components of the overall C corporation. They're not entities unto themselves.
Q. Sure.
A. If we put this into the formula for gains and losses under section 1001, we'll say deposits assumed are X plus 134 million.
That's the amount realized.
Okay?
Less the adjusted basis is the cash that's going over. We have a basis in the cash, so that's 100 million. Our gain or loss is 134 million, and that's a net figure.
Q. Okay. Now, are you familiar with the term core deposit intangible?
A. I've heard of it. I'm not --
Q. Okay.
A. -- overly knowledgeable.
Q. That's fine.
Do you know whether there's tax basis in

Page 137

core deposit intangibles?
A. I'm not aware of what the issue is.
Q. Okay. And do you know whether there's -- so you don't know whether a deduction for core deposit intangible was taken on this tax return?
A. No, I don't.
Q. And do you know whether a deduction was taken for supervisory goodwill in connection with this tax return?
A. No, I don't.
Q. But does the FDIC have a position on whether the deduction for supervisory goodwill was appropriate at the time all the branches were sold.
A. I'm sorry?
Q. Does the FDIC have a position on whether it was appropriate to take a tax deduction for the supervisory goodwill carried on the tax books at the time all the branches were sold?
A. I don't ever recall taking a deduction or seeing a return where we took a deduction for supervisory goodwill, so I guess it's something we don't take into account.
Q. But are you sure of that, or are you just drawing an inference from the fact that it hasn't been done?

Page 138

A. I'm just being anecdotal from my own experience I guess.
Q. But you don't know what the policy is of the FDIC?
A. I've never seen one specifically.
Q. Okay. Now, as a general rule, book value should always be deducted from the sales price before the gain is taxed; is that right?
A. We're using book value here as a proxy for tax basis, so, in that context, yes.
Q. All right. Now, let's look back at Vordtriede 6 for a minute, which is right on top there. And we see for the year-to-date a loss for Carteret for 1995 on the first page of approximately 64 million dollars.
Do you see that?
A. Yes.
Q. And yet the tax return has a gain of 91 million dollars.
Do you know why there's such a large discrepancy?
A. Looking at the schedule M 1, there were significant schedule M 1, line 4, adjustments from book to tax.
Q. And that would be the source of this?

Page 139

A. Yeah.
There are also line 5 items, which contribute to the greater taxable income, and minus a smaller amount on line 7, which would bring taxable income closer to book income.
Q. I'd like to take a look for a moment at the 1995 amended return.
MR. THOMPSON: And I'd like to ask the reporter to mark as Vordtriede 17 a document that bears the Bates number AM 00090142.
(Vordtriede Exhibit No. 17 was marked for identification.)
BY MR. THOMPSON:
Q. Would you please identify this document for the record.
A. It looks to be form 1120 X, amended return, amended federal income tax return for Carteret for the year ended December 31st, 1995.
Q. Okay. And you signed this.
Correct?
A. Yes.
Q. And the amendment reflected that there was a tax loss in 1997 that could be carried back?
A. Yes.

Page 140

Q. And was this amendment filed because it was the FDIC's policy to file amendments where possible to reduce taxable income?
A. Yes.
Q. Okay.
MR. THOMPSON: Why don't we take a 5-minute break, and I think I can streamline some of these questions. We're making good progress.
(Recess.)
MR. THOMPSON: So we're back on the record, and I'd like to ask the reporter to mark as Vordtriede 18 a document that bears the Bates number AM 00091187 and 88.
(Vordtriede Exhibit No. 18 was marked for identification.)
BY MR. THOMPSON:
Q. And Mr. Vordtriede, is this your signature on page 2?
A. Yes.
Q. And would you identify this document for the record.
A. It looks like a letter from the FDIC in November of '99 to the IRS service center in Austin, requesting rescission of penalties assessed against

Page 141

Carteret --
Q. Right.
And --
A. -- for 1995.
Q. And you cite some judicial authority for the proposition that it's inappropriate to penalize one group for the actions of others.
Do you see that?
A. Yeah.
That's a -- yes. That's a professional asset management versus Penn Square case.
Q. And so is it the FDIC's position that those penalties should not be due and owing to the IRS?
And by, those penalties, I mean, the penalties that were imposed for the late filing of the 1995 return.
A. Yes, I would say it is.
Q. Okay. And has the IRS ever gotten back to you on this?
A. We haven't heard from the service one way or the other with respect to this letter or to my knowledge any other requests.
Q. Okay. And there have been several requests through the years, haven't there?

Page 154

offset, and we assume there was an income transaction generating the cash brought in that was sent out the door to bring in the asset that was discovered.
Q. Right.
And the authority for this is section 61.
A. Well, that's where I would start, yes.
Q. Is there any other authority you'd point me to?
A. Well, income is income -- taxable unless you can find a reason why it's not.
Q. Like it's not realized?
A. You've realized it. You've got an asset sitting there. It didn't come from thin air.
Q. M-hm. All right.
Well, I think we've discussed that enough for the time being.
MR. GILBERT: Just register the obvious objection that he's not here as an expert witness to respond to academic hypotheticals.
BY MR. THOMPSON:
Q. Okay. Now, I'd like to turn to the documents that you produced this morning, and I'd like to start with -- I guess it will be Vordtriede 19, and I'd like to go off the record for a minute.
(Discussion off the record.)

Page 155

(Vordtriede Exhibit No. 19 was marked for identification.)
BY MR. THOMPSON:
Q. Okay. Sir, so this is Vordtriede 19, and this is one of the documents you produced this morning, and could you walk us through what you're representing on this spreadsheet.
A. This is a summary meant to show the results of a recomputation of federal financial assistance under our new model that we use for all the receiverships for section 597. The summary was a late idea of mine just to try to get a better idea of what the results of the different year computations were.
It's a work in process, I think in answer to your initial set of questions this morning about why you didn't see it long ago. And this is with respect to the different year computations for the assistance itself -- they were really brought forward recently.
And so if months ago if I had produced what I was working on, it wouldn't have been the same product, and I can't exactly say what they would have looked like, but they would have been very

Page 156

incomplete.
Q. Now, is this complete now?
A. The summary is like I said a work in process.
Q. What remains to be done to finish the work in process?
A. Well, I think the center section, tax liability, is a little confusing to look at. I probably want to clarify that.
Q. I mean, in other words, one question is, well, are you just trying to, you know, think of how to present this information in the clearest way possible, and that's why it's a work in process, and another thing would be, okay, well, I'm still crunching numbers and thinking through what the assumptions in the model is, so which category -- is it both -- what is this?
A presentational issue?
Have you finished your substantive analysis?
A. It was really a tool for me to understand what I arrived at in the different annual computations. And since I saw questions in some of the interrogatories of other people on gain or disposition, the equity adjustments, premium, PII, I

Page 157

just put those in a memo of line items just for my own attention.
Q. Sure.
A. Otherwise, there's a taxable income category at the top, and a tax liability section in the middle. And then I added a deferred FFA account recomputation beginning versus ending for each year at the very bottom.
And that was the last thing I did.
Q. So is there anything more substantive that remains to be done to these calculations?
A. I did not concentrate very much on the tax liability section.
Q. I mean, I don't mean to be facile here, but I mean, it doesn't seem like there's much to be done in the sense of, you've got you all the taxable income and it's zero most of the years, and then you take your calculator for 34 percent or whatever it is for the other years.
What more would need to be done for that line item?
A. At this point, I can't tell what else I would do to the tax liability section. But as I look at it, it's somewhat confusing.
Q. Well, now, as a substantive matter,

Page 162

A. And under, recomputed FFA, you have a line item for finalized regs at 12-21-95. And then I had a memo item for proposed regs of -- looks like April 42nd of '92. It should be April 22nd.
Q. Right.
A. And that was merely to look-see for 1992, 3, and 4 what would happen if it was -- the computations were made under the proposed regs instead of the finalized regs. I believe that computation is moot, because I believe the finalized regs were made retroactive to the date of proposed regs.
Q. If they were, then it would be moot.
But if the proposed regs had been followed, what's the difference between the proposed regs and the finalized regs?
A. It looks -- assuming my computations are correct, it looks as though 1993 would have shown 51 million dollars more taxable income, and 1994 would have shown 66 million less taxable income, and 1996 would have shown 6 million dollars less income.
And I believe all the others are the same.
And the difference for 1993 would be subject to that assumption I made for the increase for 1992.
Q. Okay. You lost me.

Page 163

I apologize.
That's me.
But let me just ask: So taxable income as recomputed as 597, that row, is that the number that reflects the finalized regs?
A. Yes.
It includes federal financial assistance computed under the finalized regs.
Q. So if we were to look and we can get -- but the '93 return, does this differ -- let me ask you -- from the way in which FFA was calculated on each of the various returns?
A. Well, we can check for each year.
You see, under the -- you see the first line is taxable income for original return. Then you see the memo items just for my own viewing. And then you see an operative line, less FFA per return.
So that's what showed up on the return --
Q. Okay. Let's take this -- I'm sorry.
A. -- compare that to the finalized regs line.
Q. Okay. So if FFA had been calculated properly, then in 1992, there would have been 557 -- actually the amount of taxable income would not have changed from that which was reported; is that

Page 164

correct?
A. According to the summary, yes.
Q. The summary reflects your opinion, so let me ask it --
A. Yes, assuming my assumption on the increase is right, yes.
Q. Okay. For 1993, if FFA had been calculated properly under the finalized regs, then there would have been an additional 51.4 million dollars of taxable income?
A. Yes.
If my assumption for '92 -- 1992's increase is correct.
Q. What if your assumptions were wrong?
Let's say the right answer is that it was 25 million dollars.
Then would the amount of FFA for that year be 25 million?
A. I think I'd want to punch it into the model and be sure, but that's a plausible assumption.
Q. Okay. Now, in 1994, if the finalized regs had been applied properly in calculating FFA, there would be a deduction of 66 million, is that correct, or a net operating loss for that year of 66 million?
A. Tax return showed zero. My recomputation

Page 165

showed a loss of 66 million.
The reason why is, because the return showed 66 million of FFA, which I believe was the difference between a billion 216 increase and a billion 150 million repay.
Q. But under the finalized regs, that 66.331 million should not have been included as FFA.
Correct?
A. When you start putting increases and repayments into the deferred FFA model, the result for FFA tax currently fell to zero.
Q. Okay. And so let's focus on the period of time before 1995.
If the finalized regs had been properly applied for '92 through '93, there would have been an additional approximately 15 million dollars of NOLs that would have been available to carry forward to '95 to shield taxable income; is that correct?
A. Or to carry back.
Q. Right.
But -- that's right, to carry back I guess 2 years.
So you could carry back the 1994 66 million-dollar NOL and shield the '92 and the '93?
A. (Nodding head.)

Page 166

Q. And then that would leave you approximately 14.9 million dollars of NOLs to carry forward to '95 to shield taxable income; is that correct?
A. Yes.
Q. Okay. And if the FDIC were able to and permitted to amend the returns to reflect these adjustments, should it do so?
A. In an -- I suppose in a pure sense, we would want to do so, yes. I believe the service is on the record as saying they want to arrive at the proper tax liability.
I'm not certain of the statute dates. I suppose 1992, 3, and 4 would be close. 1995 subject to the issue raised. But all things equal, yes, sure.
Q. Sure.
And it's the FDIC's policy to get to the right tax result too, isn't it?
A. Yes, subject to the rules of statute of limitations, et cetera.
Q. All right. And now, let's go ahead.
In 1995, the tax return showed no FFA; is that correct?
A. 1995, correct.

Page 167

Q. And your analysis of the final regulations yields the conclusion that that was the right result?
A. Correct.
Q. Okay. Now, turning to 1996, if the final regs had been properly applied, there would be an additional 6.302 million-dollar operating loss for that year?
A. Yes.
Q. All right. Because the tax return showed zero taxable income; is that right?
A. Yes.
Q. All right. And that would be available to shield taxable income in 1995, 6.3 million of taxable income in 1995?
A. Yes.
Q. Okay. 1997, is there any change to the FFA?
A. No.
Q. All right. 1998, what changes, if any, is there to the FFA?
A. There was a change.
Let's see, FFA per return is 16 million -- no, wait.
I'm getting a little confused as to what I mean by brackets and -- I have less FFA per return,

Page 168

so I'm assuming whatever sign is on the return, I'm reversing. It looks like adding back.
So for 1998, we would have shown a 16 million-dollar deduction. If that's the case, then -- were we talking about 1998?
Q. Yes, sir.
A. Okay. The difference according to the summary was -- I'll look at the '98 return.
Q. I'm looking there too.
It is 27 million dollars of negative taxable income for that year.
(Pause.)
A. Okay. Looks like my formula in Excel is subtracting a positive number to get from 27 million to 44 million, because there's 16 million of income on the return and zero for the model, so the loss increases 27 to 44 million.
BY MR. THOMPSON:
Q. Got you.
So you're just reversing that inclusion of income?
A. Yes.
Q. Okay. Now, if all these tax years were open, could any of that loss be carried back to '95?
A. We're in 1998 -- I'm not certain when the

Page 169

3-year carryback went to the 2-year, but subject to the 3-year carry-back was in existence, yes, it could.
Q. '99, what changes if any should have been made under a proper application of the final regs?
A. It looks as though it was a positive income amount of 152,000 for '99. I'll check that.
I don't think I have the '99 return here.
But assuming that's correct, assuming it's an income item on the return, we are subtracting that out to get to a slightly larger 38 million-dollar loss, and the finalized regs show zero FFA in income leading to a slightly larger 38 million -- 457,000 loss.
Q. And if the final FFA regulations had been properly applied to the 2000 tax return, what changes, if any, would have been made?
A. '98.
Q. '99.
I'm sorry.
A. Taxable income would have fallen by approximately 152,000.
Q. Okay. All right.
And let's go to 2000.
If the final FFA regs had been properly

Page 174

reflects the regulations, but I don't think IRS has ever reviewed it as a specific task where they set out to review the model, so as far as I know, the model is a fair representation of the legislative regs under section 597.
Q. And the assumptions in the model as applied to Carteret are fair and reasonable.
Correct?
A. They would be statutorily correct unless I discover otherwise.
Q. Okay. Now, for 1994, is it a reasonable assumption that the tax preparor simply applied the then extant proposed regs, final regs come in at the end of '95, and that accounts for the discrepancy?
A. Would you state that again.
Q. Yeah.
Is it a reasonable assumption that the reason the 1994 return deviates from the results of the final regs is that the tax preparor was simply adhering to the proposed regs, which was the best guidance at the time?
A. 1994?
Q. Yeah.
A. I believe under 1994, it appears the preparor was adhering to notice 89102, which preceded

Page 175

the proposed regs.
Q. Oh, okay.
So -- and that's the reason why there's a difference there?
A. Yeah.
Under notice 89102, increases were taxable -- payments were deductible, and that appears to be what they were doing in 1994.
Q. Now, if we looked at this model from 1992 through 2004, would there have been any FFA included in income for this period?
A. Not according to the model, no.
Q. Okay. And is that conclusion an accurate conclusion?
A. I believe it is, yes.
Q. Okay. Now, there's just kind of a slew of things that were produced, and we may be able to do this quickly to the extent these are just different iterations of the model.
This happened to be the document that was on top, so I don't know if they were arranged in a particular order, but feel free to expedite these things by just saying, oh, this is a prior version, but is what we've marked as Vordtriede 19 the most recent and best version of the model that you

Page 176

possess?
And maybe what we should do is show you all of these things, but that's going to be the question, is, which one is the one that is currently -- and we would request that we could get it in Excel so that we can see for ourselves what the assumptions are.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 20 the following document.
(Vordtriede Exhibit No. 20 was marked for identification.)
BY MR. THOMPSON:
Q. Okay. I guess my question is, to what extent, if any, is Vordtriede 20 different from Vordtriede 19?
A. I don't believe there's any difference. I think it was just an extra copy I had in the pile. We can look line by line at some point.
Q. That's fine, and we'll do that this evening, and if we see anything, we'll come back.
A. Sure.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 21 the following

Page 177

document.
(Vordtriede Exhibit No. 21 was marked for identification.)
BY MR. THOMPSON:
Q. And what does Vordtriede 21 represent?
A. This looks like the initial gathering process of numbers that I would have needed toward doing the recomputations in the model, 597 model.
Q. And would these numbers -- did they come out of the drilldown reports?
A. Yes.
Q. And are these numbers relevant because they show what the bottom-line contribution was by the government or by the RTC?
A. If we look at the 171170 column and the miscellaneous borrowings column, those are the accounts where we measured increases to FFA for the year.
Q. Right.
A. Beginning versus ending.
The next 2 columns are where we measure repayments.
Q. Right.
And then you can take the difference

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
\- - - - - - - - - - - - - - - - - )

Washington, D.C.
Friday, March 3, 2006

Continued Deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:36 a.m., Friday, March 3, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 217

it's increasing taxable income by 19 million, I can see why the IRS would be perfectly satisfied with this methodology.
Do you know in the other transaction they were looking at whether it increased income or decreased income?
A. The transactions go both ways.
I think what the service was looking for is consistency of treatment, that we weren't treating discovered liabilities one way and then treating discovered assets a different way that was more advantageous to us.
Q. Wouldn't it be consistent to say, well, we're treating it as an item of expense liabilities that we're paying, but we're only going to treat as an item of income assets that we're selling when there's a realizable gain?
A. Well, I don't think that relates to the situation we have here.
Q. Now, why are these debits or credits considered discovered?
A. It's a way I believe the FDIC and the RTC adopted the same process. I don't know the genesis of it, when it started, but I believe the idea was to try and segregate and isolate as best they could in

Page 218

the financials -- what happened purely as a liquidation operation versus preclosing.
And if they found items which should have appeared on the balance sheet as of the date of closing and didn't, then they wanted to post it and somehow segregate it from the liquidation operations later on as if we found it postclosing, but we did find it posting -- as if it occurred postclosing.
So they booked it straight to equity instead of running it through operation on the income statement.
Q. Why would they debit or credit this to the income statement rather than to the balance sheet?
A. Well, they are posting it to the balance sheet and not the income statement. That's why we have -- we want to take it into account for taxable income, we have to run it through schedule M 1.
Q. Okay. Now, as we talked about yesterday, taxpayers are subject to the alternative minimum tax?
A. Yes.
Q. Okay. And could these types of adjustments have an impact on the amount of alternative minimum tax that Carteret would be liable for?
A. I believe they would be -- the way they're

Page 219

treated, they would be a part of regular taxable income, and they would also be a part of alternative minimum taxable income, AMTI, and there are -- I don't think there's an effect as I sit here.
Q. Well, under the alternative minimum tax rules, even if you can use NOLs to shield income in different years, you still can owe 2 percent of the tax; is that right?
A. Yeah, 20 percent times 10 percent, yes.
Q. So in that sense, there could be --
A. You have an exposure.
Q. Okay. There is an exposure, then?
A. I'm not sure how that relates to this.
Q. Well, to the extent there are timing differences of when there was a transaction gain that really occurred in '93, it's not noticed then, so then you need to do a postclosure adjustment in '95 to reflect that?
A. Your point is that if it's discovered later, it's reported in a later year, then perhaps it -- I suppose there could in that sense be an AMT effect, yes.
Q. And if -- in light of that potential alternative minimum tax effect, would it be prudent for the taxpayer to -- if they discovered for example

Page 220

a gain in 1993 and they only discovered it in 1995, would it be prudent to go back and amend the '93 return rather than just booking it in 1995?
A. Yeah.
If you had evidence that the income was attributable to '93 instead of '95, I suppose you could go back and do that. But for our purposes looking at this sort of transaction -- group of transactions, we never had that type of knowledge.
Q. All right. I'd like to move on to more housekeeping type of matters as we wind things down here.
MR. THOMPSON: First I'd like to ask the reporter to mark as exhibit 38 a document that was faxed to us yesterday.
(Vordtriede Exhibit No. 38 was marked for identification.)
(Mr. Cooper left the room.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, this is the 2004 tax return for Carteret; is that correct?
A. Yes.
Q. And you signed this tax return; is that correct?

Page 221

A. Yes.
Q. And it was timely filed.
Correct?
A. Yes.
Q. And what role did you play in the preparation of this return?
A. For 2004, I would have been the signer and the reviewer.
Q. Okay. And is the amount of FFA that's included in this tax return consistent with the final FFA regs?
A. According to the recomputation of this same model, I believe yesterday, we determined that the current FFA reportable would have been 62,000 dollars, 180 dollars less under the new computation.
Q. So there is a slight difference, then?
A. Yes.
Q. Do you know what the nature of that difference -- you know why there is that difference?
A. My -- I have not compared each year by year on the source of the reason why there was a difference in each year, but my guess is for this year, the difference is the activation and the recomputation of the computation of the beginning net equity on a tax basis in this loop 1 -- my term is

Page 222

loop 1 -- and the remaining equity computation activation in this loop 2 down here.
The new computation, we made an effort to go back to the beginning of Carteret's receivership period -- actually I believe the conservatorship period and worked forward, and this computation, we would not have done that.
Q. And so is that the difference?
A. I believe so.
Q. Okay. And are the assumptions that you used in putting together the 2004 return the same assumptions that you used in putting together the model that we discussed yesterday?
A. Yeah.
I believe the model is the same. It's just we went a little farther with the recomputation.
Q. Okay. And do you plan on using the new model that was Vordtriede 19 in the preparation of the 2005 return?
A. For Carteret?
Q. For Carteret.
A. Now, that we have -- let's see, you're asking me if we planned to continue with the new set of computations in 2005?
Q. Yes.

Page 223

A. Yes.
Q. Okay. And are you going to amend the 2004 return?
A. I'd be happy to if there's a tax effect.
I don't think there's a tax effect. I mean, there's additional -- there's a reduction based on the new computation of FFA to be reported.
Q. Well, and is that the general approach to the FDIC, that if there is a tax effect, they'll amend if they're permitted to?
A. More or less, I mean, depending on how much time you have.
Q. Okay.
A. We want to be current with all our returns to be filed for the filing period. That's why we couldn't do, say, the extra computations that would have gone with this return going back all the way to day 1. That's pretty strenuous computation, and multiply it times all the receiverships. You get into a time factor.
So you have a case here with Carteret where you need special attention, so we did the extra computation and will continue with it.
I don't remember your question.
Q. That's fine.

Page 224

MR. THOMPSON: I'd like to ask the reporter to mark as exhibit 39.
(Vordtriede Exhibit No. 39 was marked for identification.)
BY MR. THOMPSON:
Q. And this was another one of the documents that was faxed yesterday.
This is the blueprint for 2004?
A. Yes, I believe it is.
Q. And are the calculations of FFA that are included in this blueprint consistent with the ones that we saw attached to the 2004 return?
A. Yes.
The work paper section of the blueprint or the template is a work paper section SM 1, slash, 2. And the SM 1 refers to schedule M 1, and 2 is just a second series of work papers. The IRS asked I believe in 2003 if we would begin putting copies of our computations into the returns, so I believe a copy of the FFA computation from this template played -- is in the tax return. And they should be the same.
MR. THOMPSON: All right. I'd like to ask the reporter to mark this as Vordtriede 40.

Page 229

Q. And is some of the confusion about FFA and how it's supposed to be treated reflected in the differences that your model now shows of if it had been done consistently with the final regs, then these are the answers you get?
A. I would have to go back and look and see the source of the difference.
1995 is a different case. Perhaps 19- -- I'd have to look and see what happened with 1996. That would have been -- that return would have been prepared in 1997.
I'm not sure how that computation was done. I don't think we'll find a blueprint to go with that return, because they didn't start blueprinting until I got down there. So if we could determine what the computation was for '96, perhaps I could answer your question for '96.
'97 was prepared in '98. That should have been under the model that I prescribed, the earlier model. And I believe it would have been available in its computerized form, so --
Q. Okay. Has your model changed in its understanding of how the FFA regulations work?
A. When I enhanced it?
Q. Yes.

Page 230

A. Yes.
It changed with respect to the way payments were handled.
Q. What was the change that you made?
A. The old model, which I believe I put together on the fly with the advent of the proposed regs, I'm thinking in mid-1993, mid- to late 1993, I applied repayments through the corporation, which is termed I believe an adjustment to FFA -- I applied it against currently taxed FFA -- or FFA to be triggered unless some type of offset was available, and against the deferred balance.
This model was put together in good faith. It went through 10 years of IRS scrutiny, and then I would have changed it if I would have been made aware that somebody thought there was a problem. In 2003, somebody said this application was not right. I went back and looked at section -- I believe it's a paragraph that talks about how these adjustments to FFA are to be computed.
My first look at that section was that what I had done was right. I read it many more times, and I came to the conclusion that I could not figure out what it was saying. It was either saying we were being too aggressive or we were being not

Page 231

aggressive enough.
The legislative history behind the code section, which I'm sure the IRS was trying to reflect in its regulations and in this paragraph, I'm sure corresponded to the more conservative approach. So I built that into the model.
The net result was that I was reducing deferred FFA only and not taking a deduction currently against the FFA that was to be otherwise triggered in the model as current and taxable.
Q. Right.
And when you say, aggressive, how are you using that term?
A. If there would be FFA to be triggered currently, all else being equal, the more aggressive approach would be to take a deduction against that with transfers to the agency, which are repayments. If I -- I could argue solely from what the IRS wrote in its paragraph on how to handle transfers to the agency that one could take a deduction against the current FFA to be triggered and beyond that based on the way IRS wrote its regulation. I'm sure that's not what they intended, but I could argue it.
I don't want to get into a fight about that. It would be I'm sure inconsistent with what

Page 232

Congress intended, so -- but the old model was in between the 2 extremes, the conservative approach that the legislative history perhaps was looking for and the more aggressive approach based on what I thought the IRS was writing.
So it had to change one way or the other. And I changed it toward the more conservative approach.
Q. And now, when you say, the legislative history, was there a conference committee report, or what were you looking at?
A. I believe so.
The idea was that -- I believe in the Congressional Reports, they'll say something like, we believe -- first of all that taxing the liability and the basis for taxing the liability is sort of an upfront forgiveness of indebtedness income item. They're saying, this assistance is coming into the receivership, and it's never going to be repaid back. Therefore, we're going to tax it now. Okay.
Congress said, however, the tax effect shouldn't lead to any additional tax liability, because the assistance is meant to offset the built-in losses, and the bad assets remain in the receivership after the purchase and assumption, so we

Page 233

expect that the 2 are going to just offset one another.
And then the real intent becomes no net operating losses to carry back to the receivership. That's really what they were looking for.
However, with the earliest notice 89102, the assistance was being taxed long before the built-in losses were being triggered, hence the proposed regs came along with the preferred FFA account which tried to remedy that, and then the finalized regs came and remedied that even more by in effect trying to make a difference between temporary assistance, which is like a bridge loan, and permanent assistance, which would not be paid back.
Now I've lost my train of thought.
Q. That's very helpful. I appreciate that.
Now, you said in 2003, someone questioned the prior model.
Who questioned?
A. The query came from our Washington tax unit.
Q. Was that Steve Johnston?
A. I believe it was Rick Cywinski.
Q. And do you know what occasioned Mr. Cywinski to be looking at this issue?

Page 234

A. We were having trouble keeping up with our workload in Dallas, and when a receivership is getting close to termination and there's a -- perhaps it's a receivership they want to terminate, it's getting close to a full payout, perhaps all the postinsolvency interest has been paid, so there's an IRS balance sitting there.
Our claims unit before they pay the IRS anything will come to the tax unit and ask about the veracity of this claim. So they come to us.
Our management wanted a very detailed computation cradle to grave as to how good or not good this IRS claim was. I'm thinking we were probably in the middle of a tax season, so the Dallas personnel had trouble giving this amount of time to this type of detailed computation. And this would have been maybe on 10 receiverships.
So they asked Washington to come in and do a visitation. And I believe in -- as part of that visitation, they made this point about the model.
Q. Now, how many receiverships are there currently that the Dallas office is in charge of preparing the tax returns for?
A. Today it's far fewer. I'm not sure. I'll give you a ballpark of something like 150. A couple

Page 235

years ago, it was maybe a hundred more than that.
Q. Okay.
A. I'm not sure.
Q. And is the Jake that's referred to in exhibit 41 Jake Wright?
A. Yes.
Q. And what's Mr. Wright's position at the FDIC?
A. Jake isn't with the FDIC any longer. I believe he retired in maybe 2002. Jake was -- I don't believe he was a tax accountant. I believe he was one level down, probably an accountant. And he was working under Barbara probably preparing returns.
They assigned tax returns in groups by location code, which all tax activity was centralized to Dallas, but we kept them in a group based on the location code of where they came from. New Jersey would have a certain location code, Atlanta would, Hartford would, et cetera.
Q. All right.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 42 the following document.
(Vordtriede Exhibit No. 42 was marked for

Page 236

identification.)
BY MR. THOMPSON:
Q. And it has a Bates number of AM 52170700. And this is an email from Barbara Stohl to Nancy Applebee. You and Steve Johnston are copied.
It's dated May 4, 1998; is that correct?
A. Yes.
Q. It says: We are in the process of return preparation, and so far, all is going well. 2 of the TOA packages are out to Arthur Andersen and one is out to Jake Wright, close quote.
What does "TOA" stand for?
A. I'm not certain, but it's some type of administrative acronym related to letting out of contracts. I think we talked about BOA yesterday, BOA, so it's some variation of that, probably a smaller, more short-term version.
Q. Okay. Now -- so was Arthur Andersen in 1998 doing some of the tax returns for receiverships?
A. I don't know, but apparently they were.
Q. Did they have any involvement in the Carteret tax returns?
A. That I don't know.
Q. Okay. Do you know whether anyone other than FDIC personnel has had any involvement in the

Page 273

than just one receivership tax return?
A. Usually.
Sometimes the contracting rules operated against us. We would break in a preparor, get them experienced where we could not have to indoctrinate him so much, but then contracting rules would say, you have to spread the returns around, so you'd have to find somebody new to educate, on and on like that.
Q. If a preparor had prepared other receivership returns, would you say that there was a learning curve that would kick in and they would become familiar with the process?
A. Yes.
Q. In your experience with the FDIC, have you ever encountered a situation where the IRS forced the FDIC as receiver to accept a tax calculation that was incorrect?
A. Forced?
Q. Forced.
A. That's hard to say.
"Force" implies almost like they're lining us up against a wall and sign or we'll shoot you.
I would say no. The FDIC is adversarial with the IRS, although we try to cooperate as best we can to do business with one another. The 2 processes

Page 274

don't always mesh perfectly.
To some degree, that's why I have some value to the organization, because I was on both sides, and I speak both languages. We've been to appeals. If we don't like what we get at the field level, we go to appeals although Dallas is very reluctant to send us to appeals.
We've never been to appeals in the 8 years I've been in Dallas. There's give and take, but we're not forced to take their results.
Q. For tax purposes, could a parent holding company choose to disaffiliate itself from a receivership?
A. Yes.
I believe with the finalized regs, there was a provision in one of the sections of the reg -- I want to say section 4, but I might be wrong -- a process of disaffiliation.
Q. For example, let's say if Ambase had elected to disaffiliate itself from Carteret, would it have been appropriate for Carteret to file an unconsolidated return in respect to Ambase?
A. If Ambase properly disaffiliated, I believe there would be a final return filed for the group as of the date of disaffiliation, and Carteret

Page 275

would begin filing on its own, and I believe there are rules calling Carteret a new corporation.
I'd have to look, but I think some of its tax attributes disappeared, that sort of thing, but it would be filing separately after that.
Q. Okay. Now, yesterday, you stated that under the IRS, you recognize an expense on a tax return when it is accrued and ascertainable.
Do you remember talking about that?
A. Yeah.
Section 461 of the Internal Revenue Code --
Q. That's what I want to do ask.
A. -- covers I believe timing for deductions, and they have an all-events test, which I believe for deductions is 3-part, fixation of the liability, ascertainable amount, and they add an extra element for deductions called economic performance.
THE WITNESS: Can we take a 5-minute break?
(Recess.)
MS. HART: We're back on the record.
BY MS. HART:
Q. Okay. Mr. Vordtriede, if we could turn to exhibit -- I should say, if you could reach for

Page 276

exhibit 7 in your pile of exhibits there.
A. Do you know what it is?
Q. It's actually the statement of assets and liabilities -- it's financial statements.
A. A package of financial statements?
Q. Yeah.
Actually, you know what, I have some copies.
A. I should find it.
Q. That's okay. I actually have some copies I can hand out. I'll just mark them as exhibit 46 and exhibit 47.
(Vordtriede Exhibit Nos. 46-47 were marked for identification.)
BY MS. HART:
Q. Okay. Now, if you take a look at exhibit 46, and if you look under the liabilities section on that, and if you go down that row, you'll see there a line item that says, estimated interest on claims, and then next to it, it says, note 6.
A. Yes.
Q. You see how it has a zero there?
A. Yes.
Q. Okay. If you go to exhibit 47 and look

Page 285

probably transferring the loans that this allowance account related to, so we're going to close down our allowance, transfer the loans, and allow the new acquiror to set up his own allowance.
Whatever assets we keep, we at that point know who has gone bad and we don't need an estimate which is what an allowance is, so for book purposes, we're on the specific chargeoff method more or less.
Q. Given the fact that for that particular allowance account, it was reversed, some asset account or a debit had to be made somewhere, right, to increase the asset size?
A. Yes.
Q. And that increase or that debit would really just be a reversal of prior credit that was made to an owner's equity account or some type of account there?
A. Yes.
Q. So the net effect really would kind of be zero in terms of income, right, as a result of those reversals of noncash reserves?
A. So you're saying, these adjustments would not be taken into consideration for income?
Q. No.
All I'm saying is that for these reversals

Page 286

of noncash reserves, any prior decrease that was made to income account would now be reversed and brought back to what it was before?
A. Yes.
Q. Okay. If I could have you go back to exhibit 16 and if you could turn to page AM 00090089.
A. Okay.
Q. And in the middle of that -- I guess -- 1, 2 -- 3 paragraphs down, we've got a one-sentence paragraph there. And it states: For tax year ended December 31st, 1994, Carteret Federal Savings Bank is on the accrual method of accounting for tax purposes.
Okay?
Is that correct?
A. I would -- that's what it says. I would accept that as being true.
Q. And then if you look to the paragraph above that, it says: Upon entering receivership in 1995, the FDIC successor of the RTC adjusted the financial statements for book purposes to a hybrid basis. This hybrid method of accounting is close to the cash basis of accounting. Generally, income is not reported until received, because of the uncertainty of receipt, and expenses are generally recorded only when paid.

Page 287

Do you see that?
A. Yes.
Q. Okay. Now, given the fact that Carteret was on an accrual basis for tax purposes in 1994, and on a modified accrual -- you said it's similar to the modified cash basis or hybrid method that's discussed here -- what impact would that conversion have had on any net operating losses from 1994 that presumably you might have wanted to carry forward to 1995?
A. This is going on in 1995.
What effect would it have on net operating losses from 1994?
Q. Right.
If you had a net --
A. Carry-forward.
Q. -- from 1994 when it was on the accrual basis, what impact would that have trying to carry forward an NOL from accrual basis year to 1995 a hybrid basis year?
A. Chances are, the adjustments here would create income items, which would increase taxable income, which in theory would soak up the NOLs, which would be in carry forward, so there are fewer net operating losses to carry forward.
Q. So it sounds like -- would it be a

Page 288

feasible thing to do to carry forward an NOL from an accrual basis year to a cash basis year without making adjustments?
A. Yeah, I would say so.
Q. Okay. It wouldn't -- in any sense would it be like comparing apples to oranges if you were taking an NOL from an accrual basis year and the numbers were on an accrual basis to a cash basis year where the numbers were on a cash basis?
A. I don't think that's a problem.
I'd have to think about it theorywise, but I don't see where it's a problem. You're adjusting -- you're taking the full cumulative effect, at least we do, in one year, under normal circumstances for a going concern, change of accounting method you get some relief in the form of a spread, 4 years, 6 years, whatever it is, depending on whether it's voluntary, involuntary, whatever, but I believe the change that you're concerned about is taking into consideration simply through taking into account the cumulative effect of all those changes.
Q. Now, it does mention here that because the corporation is in the liquidation process, records are not kept by the FDIC, successor of the RTC, as to the income and expense on the accrual method of

Page 293

Q. Right.
So there wouldn't be a net increase in income because of that reversal of a noncash reserve. It just --
A. Not overall. I mean, in a current period, you could be, but --
Q. Right.
But not when you take into account that initial entry that was made to create the allowance in the first place?
A. Correct.
Q. Okay.
MS. HART: If we could just take a 5-minute break to just confer, make sure we've asked everything, and then we'll be done.
MR. THOMPSON: Sure. Yes.
(Recess.)
MS. HART: We are finished.

FURTHER EXAMINATION BY COUNSEL FOR BY
COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. I think we'll be just a couple quick questions, Mr. Vordtriede.
First of all, has your opinion of

Page 294

Carteret's ability to deduct accrued interest changed since yesterday?
A. No, I don't believe so.
Q. Okay.
A. My opinion is that we should follow the books for tax purposes.
Q. And the 95 percent cutoff rate, is that dictated by the Internal Revenue Code?
A. No.
That's a policy embedded in modified accrual basis, accounting method adopted by the FDIC that we follow for tax.
Q. And would 94 percent be permissible under the Internal Revenue Code?
A. Let's just say that it's our policy for the tax unit to follow the books and we don't want to deviate from it.
Q. Now, you testified -- when Ms. Hart was asking questions, she asked you a question, has the Internal Revenue Service accepted Carteret's FFA calculations, and you answered yes.
But has the IRS ever reviewed those FFA calculations?
A. With respect to Carteret?
Q. Yeah, with respect to Carteret.

Page 295

A. They have never to my knowledge audited the computation.
I suppose you would have to say they've reviewed them by virtue of fact that they accepted the returns that we filed. Not all years had the computation we made as an attachment, but I believe 2 of the years did, so --
Q. Well, when you answered the question that the IRS had accepted the FFA calculation, do you just mean that they hadn't rejected the return?
A. Yes, I would say that's true.
Q. Okay. And if the IRS were to scrutinize those calculations, and the calculations were inconsistent with the final FFA regulations, the IRS would reject those calculations.
Correct?
A. I believe they'd make an adjustment.
MR. THOMPSON: Okay. I have no further questions.
MS. HART: I have 2 quick questions. Sorry.
FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. HART:
Q. Mr. Vordtriede, now, you did state that per the IRS code that you recognize an expense on a

Page 296

tax return when it is both accrued and ascertainable; is that correct?
A. When the liability is fixed, and the amount can be ascertained, plus the economic performance.
Q. I believe yesterday you did also indicate, though, when it's accrued, because you used those financial statements from a receivership to create your tax returns?
A. Right.
The all-events test that we were just talking about is the tax criteria for taking into account a deduction based on accrual. For tax purposes, the tax unit chooses to follow the books with respect to the accrual of postinsolvency interest.
Q. And then just one more question.
Would you be in a position to know what specifically the IRS has reviewed and what they scrutinized or what they looked at?
A. With respect to postinsolvency interest?
Q. No.
Just in general, would you be in position to know what the IRS has specifically -- I should say, pre-1998, would you be in a position to know

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT :
INSURANCE CORPORATION, : No. 93-531
Plaintiff-Intervenor, : Judge Loren Smith
vs. :
THE UNITED STATES OF :
AMERICA, :
Defendant. :

----------------------------X

Washington, D.C.
Friday, April 14, 2006

Continued deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 9:40 a.m., Friday, April 14, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 307


Vordtriede-62 Carteret tax year 12-31-99, April, 2006 updated version, section 597 recomputation of federal financial assistance 335
Vordtriede-63 Carteret tax year 12-31-2000, April 11, 2006 version of section 597 recomputation of federal financial assistance 335
Vordtriede-64 Carteret tax year 12-31-2001, April 11, 2006 updated version of section 597 federal financial assistance recomputation 336
Vordtriede-65 Carteret tax year 12/31/02, date: 4/11/06, computation of FFA taken into account currently 337
Vordtriede-66 Carteret tax year 12-31-2003, April 11, 2006 version of section 597 recomputation of federal financial assistance 339
Vordtriede-67 Pre-1992 attempt to summarize 1988 through 1991 book to tax differences for affiliated group under Carteret Bancorp, Inc. 341
Vordtriede-68 Bates number AM 0013788 342
Vordtriede-69 E-mail from Linda Shaw to Steven Johnston, et al., 2/9/05 342


Page 308


Vordtriede-70 Bates number AM 0010611 344
Vordtriede-71 Bates number AM 0013792 347
Vordtriede-72 Bates number AM 0018 351
Vordtriede-73 Bates number AM 0010654 through 659 353
Vordtriede-74 Bates number AM 0005 356
Vordtriede-75 Drill-down reports, March 7, 2006 367
Vordtriede-76 Bates number AM 0010600 through 602 375
Vordtriede-77 AM 0012814 through 12818 377
Vordtriede-78 Bates number AM 0010691 380
Vordtriede-79 Bates number AM 0010608 through 610 383
Vordtriede-80 E-mail from James Vordtriede to Steven Johnston, 11/14/05 392
Vordtriede-81 Bates number AM 0019 through 21 394
Vordtriede-82 Bates number AM 00091565 396
Vordtriede-83 Bates number AM 0194 through 98 398
Vordtriede-84 Bates number AM 00091635 400
Vordtriede-85 Document produced by James Vordtriede after March 2006 deposition 402


Page 309

PROCEEDINGS

Whereupon,

JAMES F. VORDTRIEDE,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS - Continued

BY MR. THOMPSON:

Q. Good morning, Mr. Vordtriede. I'm David Thompson. Would counsel for FDIC and the Department of Justice like to identify themselves for the record?

MR. KUIPER: I am Gary Kuiper from the FDIC. I represent the witness here today.

MS. HART: I am Melinda Hart with the Department of Justice. We represent the United States in this matter.

MR. BAHLO: I am Thomas Bahlo with the FDIC. I am present at this deposition.

MR. THOMPSON: Present also on the phone is Richard Bianco, the chairman of AmBase Corporation.

MR. BIANCO: Good morning.

BY MR. THOMPSON:

Q. Great. Mr. Vordtriede, we're not here to

Page 310

rehash everything we did five weeks ago. As your counsel may have indicated, there have been additional documents found, especially from Ms. Tama's files, e-mails, and other documents. Those led to some other questions relating to old documents, but that hadn't appeared as relevant before we got the new ones. So that's what we are here to discuss.

In terms of what you've just handed us, let's get this marked and have the court reporter mark the first one as Vordtriede 48.

(A document was marked for identification as Exhibit No. Vordtriede-48.)

BY MR. THOMPSON:

Q. Now, Mr. Vordtriede, this Vordtriede 48 -- read what's on the cover sheet, please.

A. Balance -- beginning deferred balance off on 4-11-2006 model. In other words, the updated FFA model. And this particular correction looks to be for 2003.

Q. Okay. And --

MR. THOMPSON: Gary, I don't happen to have a -- I've given the witness my copy. I can have -- run out and have another one made. It is not

Page 311

a big deal at all.
MS. HART: We can share.
MR. THOMPSON: Okay.
BY MR. THOMPSON:
Q. What is this, Mr. Vordtriede?
A. The cover sheet?
Q. Yes, sir.
A. It's a note to myself indicating that on the new model, as on the model that's updated, the version of the model updated on 4-11-2006, I discovered an error after we transmitted -- our attorneys transmitted the electronic files to you.
And it's -- this sheet looks to be for 2003. I believe the errors were discovered for 2002, 2003, and 2004. And all it is is in section 4, line 4, deferred FFA account, the model computation, the application was picking up the wrong beginning deferred balance, deferred FFA balance.
It looks like it was picking up the increase to FFA for the prior year instead of the ending deferred balance for the prior year. So I made pen and ink changes and notified our attorneys. So here are the pages for you.
Q. Okay. So this -- these changes don't have any impact on the year-to-year results reflected in

Page 312

your model. It just has an impact on the deferred account; is that correct?
A. That's correct.
Q. And let's then also look at -- let's have the court reporter mark as Vordtriede 49 the other document given us to this morning.
(A document was marked for identification as Exhibit No. Vordtriede-49.)
MR. KUIPER: In each case, the new page is page 2 of the handout that we will be seeing.
BY MR. THOMPSON:
Q. So Mr. Vordtriede, do you have -- Vordtriede 49 is right there. What does the cover sheet say?
A. 2002, 4-11-2006 updated model. It doesn't say model. Picked up wrong beginning deferred FFA balance, picked up 57198 rather than 85079107.
In parentheses, I am making a note for myself that the 57198 represents the increase to FFA I believe for 2001.
Q. Okay. If you'd be kind enough to turn to the second page. And is this the same phenomenon that we saw on Vordtriede 48, a change to the deferred account?

Page 313

A. Yes.
Q. Okay.
A. This is marked 2003. This is 2002. This is 2003. That would be 2004.
Q. Okay. That's a good idea.
MR. THOMPSON: Let the record reflect the witness on Vordtriede 48 is writing "2003."
THE WITNESS: At least I believe it is.
MS. HART: 49 --
THE WITNESS: Here is the beginning.
BY MR. THOMPSON:
Q. And then now let's do the third one. Let's ask the court reporter to kindly mark the next one as Vordtriede 50.
(A document was marked for identification as Exhibit No. Vordtriede-50.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, what does the cover note to this one say?
A. This one simply says beginning plus ending deferred balance off, which means that this file also pulled the wrong beginning deferred number. So any balance is wrong, too. The ending balance is simply computational.

Page 314

MR. KUIPER: Did you want that marked 2004?
MR. THOMPSON: I think that makes sense. Let the record reflect Mr. Vordtriede its marking Vordtriede 50 as 2004.
BY MR. THOMPSON:
Q. Again, Mr. Vordtriede, does the adjustment that you're noting on Vordtriede 50, does this simply relate to the balance of the deferred account?
A. Yes.
Q. Okay. And have you updated the actual Excel spreadsheets to reflect these changes?
A. No, I haven't. Because I discovered them yesterday. I wasn't home to change them. I'm sure my counsel would have said don't change anything.
Q. If you do update them, we would appreciate getting a copy of the most current model. I'm sure our friends at the Department of Justice would like that as well.
MS. HART: Yes.
MR. THOMPSON: Okay. At this point, I would like to ask the court reporter to mark as Vordtriede 51, a document bearing the Bates number AM 0011592 through 593.
(A document was marked for

Page 315

(A document was marked for identification as Exhibit No. Vordtriede-51.)

BY MR. THOMPSON:

Q. Mr. Vordtriede, by way of background, can you remind me, have you been on the offensive team of goodwill or the neutral team or both. What team are you on?

A. I believe one day as part of a conference call, I was casually designated as neutral.

Q. Okay. And have you been neutral ever since?

A. Yes.

Q. Okay. And is there anyone within the tax group who is offensive?

A. I really don't know.

Q. Okay. Do you know if there's anyone in the tax group who is defensive?

A. I don't know.

Q. In terms of neutrality, what does that mean? Does that mean you are trying to get the right result? To figure out what Carteret receivership's appropriate tax liability should be?

A. I believe that would be a good interpretation. Perhaps I'm informational to both sides.

Page 316

Q. Okay. That's what's reflected on the second page of this document, when it says neutral team, neutral tax litigation support, Jim Vordtriede?

A. I didn't know it was formalized.

Q. Okay.

MR. THOMPSON: I would like the court reporter to mark as Vordtriede 52, a document bearing the Bates number AM 0011816 through 818.

(A document was marked for identification as Exhibit No. Vordtriede-52.)

BY MR. THOMPSON:

Q. Mr. Vordtriede, this is an e-mail printed out by Elaine Tama, but from Christopher Wood to yourself dated September 3, 1998; and who was Mr. Wood?

A. I don't remember him at all.

Q. Okay.

A. I'm sorry.

Q. Well, it was a long time ago.

By the way, let me ask you, because we did find with Ms. Tama that she had this sort of treasure trove of e-mails, is there a policy at the FDIC about e-mail retention?

A. I don't believe so. If there is a policy,

Page 317

I'm not aware of it.

Q. What is the standard practice in terms of retaining e-mails versus deleting e-mails or printing them out?

A. I tend to keep too many. I'm afraid that the ones I delete will be needed as soon as I delete them. But I tend to keep things longer than not.

MR. THOMPSON: Let the record reflect Mr. Ziegelbauer has just arrived.

BY MR. THOMPSON:

Q. When you say, Mr. Vordtriede, that you print them, keep them, do you print them out or keep them on your hard drive?

A. For me, keeping them would mean not deleting them, which would mean they would remain on the U drive, which is the network drive.

Q. Did you personally search the U drive for e-mails that related in any way to Carteret?

A. Yes.

Q. Okay. Did you search the U drive for issues that would relate to Carteret's tax liability?

A. I believe I searched under Carteret and under FBI number 1309. I believe that's all I searched.

Q. And is it pretty easy to just put in key

Page 318

word searches into the U drive?

A. Assuming I did it right, yes.

Q. All right. That's fine.

A. I did come up with some things and sent them on to counsel.

Q. Yes. No, I appreciate that. We've seen a number of things that were either to you or from you, and I can see -- they don't reference Carteret or 1309. I think that may be where there's the disconnect.

MR. THOMPSON: Mr. Kuiper, we may need to follow up with a letter to make sure we have everything responsive from the U drive. We'll take a look at that. If we think there's some easy key word search that can be done, we'll let you know about that.

BY MR. THOMPSON:

Q. Now, turning to this e-mail, this is a footnote for the Hansen Bank. And about halfway through the footnote -- and take your time, Mr. Vordtriede. Any time you want to read any portion of a document.

I'll let you read the footnote and then I'll have a question.

MR. KUIPER: With all the documents today,

Page 323

Q. Okay.
A. Of the tax liability section.
Q. Good. In terms of the 1993 number, I'm sorry, go ahead. What were you saying?
A. I believe -- I don't have the old spreadsheet here, but I believe I was presenting it as tax per the original return. And it started with 17990967, and then I added a 2093 something to that effect for an 1120X that was filed. I misunderstood what the tax per the return was showing -- what the tax per the return was. The actual tax per the return, I believe was zero. And it was zero per the amendment. But the preparer was making a presentation I believe trying to comply with the regulations, but I believe he misunderstood what the regulations were asking for.
So he was making a memo entry trying to show what the tax would have been without any FFA effect, whereas the IRS was asking for a memo account of what the tax effect of the FFA effect actually was.
So he was actually doing the mirror image of what the IRS was asking for. But the tax in that column would have been zero, and I had in the old spreadsheet, I had numbers in the column which was

Page 324

wrong.
Now, in this case, I'm actually starting with the tax on the recomputed taxable income based on the new computation, the model, the new model computations of FFA. So notwithstanding that, I'm not happy with the captions that I have here right now, the numbers should be right. And again, the operative line would be the increase/decrease in tax liability line at the bottom of the middle section and there's only one tax effect in that line, and that's for 1993.
Q. And just to be clear, when you say one tax effect, under your analysis, the appropriate amount of taxable income that Carteret should have appropriated for 1993 was $51,402,763; is that right?
A. That's what I estimate the tax liability would have been had the section 597 model been used, based on the finalized regulations.
Q. Very good. Okay. Any other changes reflected in Vordtriede 53?
A. I believe so other than in the -- in the numbers, I don't believe so.
MR. THOMPSON: We printed these out -- they came as separate attachments. We kept them that way. That's why there will be multiple ones. We

Page 325

will ask the court reporter to mark the next Excel spreadsheet as Vordtriede 54.
(A document was marked for identification as Exhibit No. Vordtriede-54.)
BY MR. THOMPSON:
Q. Just one last question about Vordtriede 53, just so the record is clear. Under your -- the finalized regulations for FFA, there'd be a tax loss of some 66 million dollars in '94 which would have been available to carry back to '93, and shield that income from tax; is that right?
A. Correct.
Q. Now moving on to Vordtriede 54, what is this document, if you'd identify it for the record since it has no Bates numbers on it?
A. Up in the upper right corner, it's identified as Carteret 12-31-2004, and it is the updated version of the new FFA model for 2004, first two pages.
Q. Okay. Is there anything that's changed since we were together in March?
A. Yes. I believe this one -- let me see.
I believe this one did change -- we've already talked about the deferred balance on line 4-A

Page 326

which carries down. This one has the bad numbers on it.
Q. Right.
A. I believe also for this year, this year, line 5-D on the March version was off. And it was a footing error where all the cells weren't footed which carried forward.
Q. When you say footing error, I'm sorry, I'm not a computer guy. What does that mean?
A. It's not a computer term.
They weren't -- all the figures in the column weren't added. I didn't include all the --
Q. Okay.
A. When I inserted a row, the formula didn't adjust to include all the rows.
So one or -- one of the numbers I believe was left out before it was carried forward.
Q. Okay. But this number of approximately 357 million is accurate in terms of what the remaining equity at the beginning of the tax year was for 2004; is that right?
A. I believe that's the correct number.
Q. Okay. Any other changes?
A. Other than the two we've talked about, I don't believe so.

Page 327

Q. Okay.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 55.
(A document was marked for identification as Exhibit No. Vordtriede-55.)
BY MR. THOMPSON:
Q. So now, Mr. Vordtriede, would you please identify this document for the record?
A. This looks to be for Carteret for 12-31-92, very first year. Updated 4-11-2006 version. The very final page, work sheet of the updated model for FFA computation.
Q. Okay. When it says tax basis beginning net equity for the intervention year, that means how much tax bases there was at the beginning of 1992; is that right?
A. Yes.
Q. And it is 427 million dollars?
A. Yes.
MR. THOMPSON: I would like to ask the court reporter to mark as Vordtriede 56, the next spreadsheet.
(A document was marked for

Page 328

identification as Exhibit No. Vordtriede-56.)
BY MR. THOMPSON:
Q. And Mr. Vordtriede, Vordtriede 56, if you'd please identify this for the record?
A. For Carteret, this is the 12-31-93, April 11, 2006 updated version of the FFA model, the very first work sheet, the lead sheet for -- updated FFA recomputation.
Q. Okay. Has this changed in any way since our March deposition?
A. I don't believe the numbers on this one changed.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 57.
(A document was marked for identification as Exhibit No. Vordtriede-57.)
BY MR. THOMPSON:
Q. And Mr. Vordtriede, would you please identify this document for the record?
A. For Carteret, this is the 12-31-94, April 11, 2006 updated version of the lead work sheet for the FFA recomputation according to FDIC's model.

Page 329

Q. Okay. And does this -- has this changed since the March deposition?
A. I don't believe for '94, the numbers changed.
Q. Okay. By the way, let me just ask generally. What was your purpose and what were you trying to accomplish in doing these updates?
A. For 1996 through '98, the line 3-B-1 -- 3-B-1 wasn't carrying forward. It was that footing error. It wasn't adding all the cells in the formula on the workpaper -- the second to last work sheets, the SM 1-2.3A, all the numbers weren't being footed, added together so the wrong number was appearing on the lead spreadsheet.
Q. When you say the wrong number, the wrong number in terms of continuing equity?
A. Yes. This loop 1, my term, in the section 3, they call it the excess of tax basis of assets over liabilities. But essentially that's what it is, yes.
Q. Okay.
A. And you update it every year.
So some of the updates weren't flowing through for '96, '97, and '98.
Q. So I'm clear on what we're talking about,

Page 330

if you start the year with a tax basis of $400 million and then you have a deduction of 10 million dollars, then at the end of the year, you should have 390 million dollars of remaining tax basis?
A. Right.
Q. So that simple arithmetic computation wasn't occurring; is that it?
A. Right.
Q. But the analytics of your model have not changed since March?
A. No.
MR. THOMPSON: Let's ask the court reporter to mark as the next spreadsheet, Vordtriede 58.
(A document was marked for identification as Exhibit No. Vordtriede-58.)
BY MR. THOMPSON:
Q. All right, Mr. Vordtriede. If you'd please identify this document for the record.
A. For Carteret, this is the 12-31-95 April 11, 2006 updated version of the section 597 recomputation of federal financial assistance.
Q. Have there been any changes to this document since the March deposition?

Page 331

A. For 1995, I don't believe there were any numbers.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 59.
(A document was marked for identification as Exhibit No. Vordtriede-59.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. For Carteret, 12-31-1996 tax year, the updated April 11, 2006 version, it is the lead work sheet of the section 597 federal financial assistance computation under the FDIC model.
Q. Okay. Has this changed since the March deposition?
A. Yes. I believe this one did, with respect to line 3-B-1. For Carteret, no federal financial assistance is triggered as taxable. Line 3-B-1 and 5-D should be the same. One way to quickly determine that things are not right is if they're different. I believe for this year, they were different.
And it was the first number 3-B -- line 3-B-1 that wasn't picking up all the adjustments,

Page 332

annual adjustments before it was carried forward.
Q. So Vordtriede 59, this is now accurate, correct?
A. It should be, yes.
MR. THOMPSON: All right. I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 60.
(A document was marked for identification as Exhibit No. Vordtriede-60.)
BY MR. THOMPSON:
Q. Please identify this document for the record, Mr. Vordtriede?
A. For Carteret, tax year 12-31-97, the updated 4-11-2006 version. It is the lead work sheet of the section 597 federal financial assistance computation under the FDIC model.
Q. Has this changed since the March deposition?
A. I believe 1997 had the same problem for line 3-B-1 where all the adjustments weren't being picked up, so line 3-B-1 didn't agree with line 5-D.
Q. But it does now; is that right?
A. Yes.
Q. So this spreadsheet is now accurate,

Page 333

correct?
A. I believe so.
Q. Okay. I'd like to ask the court reporter to mark as Vordtriede 61, the next spreadsheet.
(A document was marked for identification as Exhibit No. Vordtriede-61.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, if you'd please identify this document for the record?
A. For Carteret tax year 12-31-1998, the updated April 11, 2006 version of the section 597 federal financial assistance recomputation under the FDIC model.
Q. Okay. And what -- has this changed in any way since March?
A. I believe -- it had the same line 3-B-1 problem where it didn't agree with line 5-D, so we knew there was a problem. So it was the same problem of not picking up all the adjustments when the column was added.
Q. Okay. When you say "we", has someone else been looking at this model?
A. The editorial we.
Q. Fair enough. I do that all the time.

Page 334

MR. KUIPER: Trust me. I couldn't figure these numbers out.
BY MR. THOMPSON:
Q. Okay. That's great. So very good. And this spreadsheet is now accurate, right?
A. I believe so, yes.
Q. Okay.
A. Just for the record, somebody might see something, line 3-D equals line 3-A plus line 3-C. If you look line 3-A is zero and line 3-C is zero. 3-D should be zero, yet it is picking up a positive number, a large positive number. What I believe it is doing there is picking up line 3-A plus line 3-C as if this -- as if this loop, this conditional statement didn't apply. I'll have to go in and check the formula on line 3-D.
But it doesn't affect the computation. I just show it as a positive number, then a negative number, instead of zeros.
Q. What you're trying to figure out on these spreadsheets is what's the continuing tax basis; is that right?
A. For section 3, line 3, it is loop 1, this is actually determining the limitation on any taxability of increases to FFA for the year.

Page 335

Q. So you need to know how much FFA was there and how much tax basis is there; is that right?
A. Yes.
Q. Okay. I would like to ask the court reporter to mark the next spreadsheet as Vordtriede 62.
(A document was marked for identification as Exhibit No. Vordtriede-62.)
BY MR. THOMPSON:
Q. Would you please identify this document for the record?
A. For Carteret tax year 12-31-99, the April 11, 2006 version, updated version, section 597 recomputation of federal financial assistance under the FDIC model.
Q. Okay. And has this changed since the March deposition?
A. I don't believe 1999 changed.
Q. Okay. So it is accurate?
A. I believe so.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 63.
(A document was marked for

Page 336

identification as Exhibit No. Vordtriede-63.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. Carteret for the tax year 12-31-2000, the April 11, 2006 version of the section 597 recomputation of federal financial assistance under the FDIC model.
Q. And has this spreadsheet changed since the March deposition?
A. I don't believe 2000 -- the year 2000 changed.
Q. Okay. Is it accurate?
A. It should be, yes.
MR. THOMPSON: I would like to ask the court reporter to mark the next spreadsheet as Vordtriede 64.
(A document was marked for identification as Exhibit No. Vordtriede-64.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. For Carteret, tax year 12-31-2001, the

Page 337

April 11, 2006 updated version of the section 597 federal financial assistance recomputation, under the FDIC model.
Q. Okay. And have there been any changes since the March deposition?
A. I believe for 2001, there were no changes.
Q. So this is accurate now?
A. Yes, it should be.
MR. THOMPSON: Okay. I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 65.
(A document was marked for identification as Exhibit No. Vordtriede-65.)
MR. THOMPSON: What are you noticing?
THE WITNESS: This is 2002. It has the -- it's got the correct beginning deferred number -- looks like it has the correct beginning deferred number in it.
BY MR. THOMPSON:
Q. That is surprising because when we started today we -- we were looking -- we were looking at -- let's go back in time. Vordtriede 49, which on the printout had an incorrect number, and then you had handwritten in 85,079,107 which is exactly what's in

Page 338

this computer printout.
A. Right.
Q. That raises some interesting questions about exactly what Vordtriede 49 is, right?
MR. KUIPER: Take your time to review it, if you need to understand the changes.
BY MR. THOMPSON:
Q. This might clarify. Maybe not. Vordtriede 49, where did this document come from?
A. That was my copy of what was transmitted to Andrew Gilbert, our counsel, to be transmitted to you.
And I -- I made -- had made the corrections to line 3-B-1 and 5-D that I knew -- the errors I knew about, but I did not catch these beginning deferred errors so I didn't know about them.
So yesterday I was going through and found these additional errors, but all I could do was make manual computations because I didn't have my computer. I can't explain --
Q. How --
A. -- the date and the -- unless this somehow super -- I can't explain.
Q. One explanation would be if the printout

Page 339

that you had with you when you were traveling happened to be an older version than what's on your computer; is that one possible explanation?
A. Yes. I only updated the dates as of 4-11-2006; so --
Q. Okay.
A. I don't know.
Q. Well, that is a bit of a mystery. But Vordtriede 65, which is what you have before you, that's, in fact, accurate, isn't it?
A. It looks to be accurate, yes.
Q. And given that this version is accurate, are there any changes from the March deposition?
A. I don't believe so.
Q. Okay.
A. Other than the deferred question.
Q. When you say other than the deferred question, just so the record is clear --
A. Beginning -- the beginning balance for deferred, whether it was the right amount or not.
Q. Okay.
MR. THOMPSON: I'd like to ask the court reporter to mark the final spreadsheet as Vordtriede 66.
(A document was marked for

Page 340

identification as
Exhibit No. Vordtriede-66.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. This is the Carteret tax year 12-31-2003, April 11, 2006 version of the section 597 recomputation of federal financial assistance under the FDIC model.
Q. Has this changed since the March deposition?
A. This one has the same mystery. It appears to have the correct beginning deferred balance on line 4-A, so other than that mystery, this -- everything should be correct on this one. As far as I can tell.
Q. Let's look back for a moment at Vordtriede 54 in your stack.
A. 54?
Q. Yes, sir.
Mr. Vordtriede, does this have the adjustment -- the correct numbers in it?
A. No. This one is wrong.
Q. This one is wrong? Is that reflected in the handwritten notes?

Page 341

Now we really have a mystery. Well, if you'd get the most recent version of the model, sir, we would definitely appreciate receiving a copy of that.

MR. THOMPSON: At this point, Mr. Vordtriede, I'd like to ask the court reporter to mark as Vordtriede 67, another document.
(A document was marked for
identification as
Exhibit No. Vordtriede-67.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, this was a document produced to us subsequent to your last deposition, and I just -- I believe it came from your files; is that correct?
A. Yes.
Q. What is -- if you could just identify this document for the record?
A. It looks to be a pre-1992 attempt to summarize 1988 through 1991 book to tax differences for the entire affiliated group under Carteret Bancorp, Inc.
Q. And did you use this to help inform your calculation of the tax basis in Carteret?

Page 342

A. Yes. I used it to -- for 1992, I used it to attempt a representation of beginning equity in the year of intervention on a tax basis rather than on a book basis.
Q. Very good. I have no further questions about this document.
MR. THOMPSON: At this point, I'd like to ask the court reporter to mark as Vordtriede 68, a document that bears the Bates number AM 0013788.
(A document was marked for
identification as
Exhibit No. Vordtriede-68.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, I'd like to direct your attention to the original message on this e-mail which is from Elaine Tama to yourself dated July 21, 1998, the subject is footnote Carteret. And in particular, the last sentence of Ms. Tama's e-mail to you says, "No IRS proof of claim is currently on file."
Is that correct?
A. I really don't know.
Q. Let me show you another e-mail.
MR. THOMPSON: I'd like the court reporter to mark this next document as Vordtriede 69.

Page 343

(A document was marked for identification as Exhibit No. Vordtriede-69.)

BY MR. THOMPSON:

Q. This is an e-mail from Mr. Johnston to yourself and others dated February 9 of 2005. Mr. Johnston asked, "does anyone know if the IRS has an RC," do you know what RC is?

A. Receivership certificate.

Q. Okay. "On file with us for Carteret's 1995 tax liability. Linda, this is FIN number 1309." And Linda Shaw responds, I guess it was four minutes later, "yes and no. The original claim was $36,317.25. The claim was withdrawn May 19, 1999."

What is Ms. Shaw's role?

A. I think Ms. Shaw is in the claims unit. Her title is probably claims specialist.

Q. Okay. Would she be in a position to know whether a claim had been filed by the Internal Revenue Service?

A. She would be a person who would be asked, yes.

Q. And do you know why the initial claim would have been in the amount of 36,000 dollars?

A. No, I don't.

Page 344

Q. And do you have any reason to doubt that the claim was withdrawn on May 19, 1999?

A. No, I have no reason to doubt what Linda is saying.

Q. Okay.

A. Could be a different type of claim, but that's just speculation.

Q. You just don't know?

A. I don't know.

Q. Okay.

MR. THOMPSON: I'd like to ask the court reporter to mark as Vordtriede 70, a document -- let's see here. This one we're going to have to get a different copy made at the break. We'll come back to that one.

I'd like to have the court reporter mark as Vordtriede 70, a document bearing the Bates number AM 0010611.

(A document was marked for identification as Exhibit No. Vordtriede-70.)

BY MR. THOMPSON:

Q. Mr. Vordtriede, this is an e-mail from Steve Johnston to Ms. Tama and Bob Ferrer. I'd like to direct your attention to the last page of the

Page 345

document where it says, issue 6, so it's the top row, and then the column marked status.

And then it says in the first sentence there, "The IRS recently abated significant penalties on Ben Franklin which was in response to our specific request through the district director's office."

Is it your understanding that the IRS has allowed the FDIC as receiver for Ben Franklin to abate penalties for nonpayment of taxes?

A. Is it my understanding that they have done it?

Q. Yes, sir.

A. What's the date on this thing? 2002.

My knowledge of the IRS attitude with respect to Ben Franklin and waiving of large penalties which were failure to file -- failure to pay penalties, the usual case of a receivership, where we can't pay by law, was that I requested -- I don't know how many times, but it was probably more than once, asking for someone to abate those penalties and nobody in the field seemed to want to do it.

I believe we -- I may have requested through Dallas and I may have requested through the northwest, Portland, where this receivership closed.

Page 346

My recollection might be off, but my -- my recollection is they were very intransigent, and my last meeting where we met with the IRS -- I believe it was in Dallas -- was that nobody had made a decision on waiving any penalties. So this is 2002. So I'm not aware that this status comment is correct or not.

Q. You're just not sure.

A. I'm not sure. It was my understanding that they hadn't waived anything. That it was part of an overall negotiation that would culminate on the amount of tax and -- to be decided on and whether to do away with the penalty or not.

Q. Who was negotiating that for the FDIC?

A. Legal was taking the lead. I can't -- our tax attorney is Richard Peyster, but I don't know if he was the lead attorney. We had Dallas attorneys there, a Washington attorney, claims people there.

Q. Meeting with the IRS?

A. Yes. I'm not exactly sure the date.

Q. Do you know whether it was before 2002?

A. I'm trying to think -- it seems like it was -- might have been the summer of 2002.

Q. This e-mail is --

A. November of 2002.

Page 351

A. Yes.
Q. How does section 7507 work?
A. Section 7507 essentially says as long as assets of the failed financial institution estate are needed to pay claims on deposit -- for the depositors of the failed institution, no federal income tax should be paid.
That's a pretty sketchy paraphrase, but that's essentially what it's saying.
Q. Okay. Is the point that because you're not under an obligation to pay them, you can't be penalized for failing to pay them?
A. Essentially by law we're not allowed to pay the IRS so they shouldn't be penalizing us for following the law.
Q. All right. And so under section 7507, Carteret's penalties for nonpayment should be abated?
A. Yes.
Q. Okay. Now, turning to the IRS and RTC agreement, let me get a document that speaks to that. This is a document that came from Mr. Johnson's files.
MR. THOMPSON: It will be marked as Vordtriede 72, and has a Bates number of AM 0018.
(A document was marked for

Page 352

identification as Exhibit No. Vordtriede-72.)
BY MR. THOMPSON:
Q. Let me ask you, Mr. Vordtriede, this is a footnote or a -- it says that the footnote should read, and in part it says, "an agreement signed between the IRS and the former RTC provides for a deferral of these tax liabilities as long as there are insufficient assets to pay depositor claims in full."
Is this an independent reason why the penalties should be abated against Carteret, this agreement?
A. The interagency agreement -- well, that's a reason why the tax wasn't paid. Therefore, why the RTC and then the FDIC shouldn't be penalized for not paying the tax. We'd be in a lot worse trouble with penalties if we paid the IRS for the claims.
Q. I'm sorry. What's that?
A. Well, if we -- if we violated the priorities set out in Title 12, which is what our claims people have to follow, and we paid the IRS more or less on a discretionary basis, I believe we'd be subject to a lot more complaints than simple failure to pay penalties.

Page 353

MR. THOMPSON: We've been going a little over an hour. Would you like to take a 5-minute break?
The court reporter would like to take a break. That is very reasonable. Let's take a five-minute break.
(Recess.)
BY MR. THOMPSON:
Q. We're back on the record. Let's pick up with Vordtriede 73. It is a document that bears the Bates number AM 0010654 through 659.
(A document was marked for identification as Exhibit No. Vordtriede-73.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, this is a somewhat lengthy memo. I'm going to direct your attention to different portions of it. Of course, if you need to take some time with the context of any of my questions, feel free to do so.
But it is a memo from Jim Anderson to Karen Hughes. Do you recall what Mr. Anderson's role was in 2000?
A. Jim would have been chief of accounting and tax policy section, so essentially the tax

Page 354

manager in Washington would have reported to Jim.
Q. Okay. And then who was the tax manager back then? Do you recall?
A. You know, I'm not really sure.
Q. Who have the tax managers been in recent years?
A. Vicky Faust was through 1998. I believe she was '85 through '98. They might have called the -- called it chief of the tax unit or something like that.
Q. Right.
A. Steve Lower was in that position, but I don't know when he came on, if he came on when Vicky left. Now, Rick Cywinski followed Steve when Steve retired. Rick has moved on and essentially they have nobody in the job right now. There might have been a gap back in 2000 where nobody was in charge or -- I'm just not sure.
Q. Steve who? I'm sorry?
A. Steve Lower, L-o-w-e-r.
Q. Turning to the section of this memo called penalties which starts on the third page of the memo. And it carries on. Take a moment to read the section if you like. Have you reviewed the penalties section?

Page 355

A. Yes.
Q. In the first paragraph, it says in part, "in the April meeting, the IRS indicated that the penalties would probably be eligible for abatement but that this matter should be pursued through the various district directors."
Were you aware that the IRS had indicated that the penalties would probably be eligible for abatement?
A. Where specifically were you just reading?
Q. Sorry.
A. The very bottom? Okay.
Q. Yes.
A. I'm not sure exactly who would have indicated this to Jim, but that's always been their informal indication. They tend to be reasonable with respect to these types of penalties, as they should be.
Q. When you say they, you mean the IRS?
A. Yes.
Q. On the next page of the memo in the second paragraph, it says, "With regard to the late payment penalties, both the interagency agreement for RTC and Internal Revenue Code sense 507 justified deferred payment of income taxes."

Page 356

Do you agree the interagency agreement also justifies deferred payment of income taxes?
A. Yes.
Q. Okay. And then I'd like to -- keep this memo in front of you, if you don't mind. We're going to come back to it. It touches on a number of items.
Just to close the loop on this one subject, I'd like to ask the court reporter to mark as Vordtriede 74, a document with the Bates number AM 0005.
(A document was marked for identification as Exhibit No. Vordtriede-74.)
BY MR. THOMPSON:
Q. So this is an original message from Mr. Johnson to Rick Cywinski saying in part, "are you aware that you still owe me revised tax opinions for the following FINs." These are FINs that were changed due to amended returns, and Carteret is one of the entities that's listed there.
Then he says, "in addition, these two FINs had additional tax on the '98 return that was added to our original estimate." And he says Old Stone, then he concludes, "if it is too late to defer our December '98 estimate, maybe you want to wait until

Page 357

December '99 to reflect these changes?"
Then Mr. Cywinski responds, "it is too late. Besides they're just estimates and we know they are overstated since IRS stated that penalties should probably be abated."
Do you know what Mr. Cywinski's statement that these numbers in the -- for the tax liability are just estimates and are probably overstated because the IRS will abate the penalties?
A. I believe that's a generally accurate statement.
Q. Okay. Let's go back to the memo from Mr. Anderson to Karen Hughes. First, start off with this potential tax liability section and in the second paragraph under potential tax liability --
MR. KUIPER: You are on page 1.
MR. THOMPSON: Oh, yes. Page 1, I'm sorry.
BY MR. THOMPSON:
Q. Page 1, second paragraph under potential tax liability. It states, "in April of 1999, representatives from FDIC legal and DOF met with representatives from the IRS national office and discussed a number of tax issues. One of the issues discussed was the taxability of any goodwill

Page 358

litigation or settlement proceeds. The IRS confirmed that in most cases, any proceeds from goodwill would, in fact, be taxable to the receivership."
Were you part of that meeting?
A. No, sir, I was not.
Q. Okay. And were you aware of that meeting?
A. Very vaguely.
Q. Okay. Do you remember anything about that meeting?
A. All I remember was -- and I -- my recollection is maybe something from Richard Peyster to the effect that what's represented here in this paragraph --
Q. The IRS was taking the position they were going to tax the awards in the Winstar cases?
A. Yes.
Q. Okay. And then -- and do you have an opinion as to whether it is appropriate to tax those awards?
A. I really don't. I haven't studied the issue at all.
Q. Okay. Now, let's turn to the second page of the memo. What this is discussing is what Mr. Anderson calls the problem. It's the third line. It says, "mainly the problem is two-fold, the failure

to file NOL carry-backs to reduce or eliminate prior tax year liabilities" --
A. Where are you?
Q. I'm sorry. (Indicating.)
A. Oh, okay. Okay.
Q. "And two, the inability to file amended returns under the proposed IRS 597 regulations to reduce the liability where applicable."
So then the memo starts to talk about, well, why did this happen? Why weren't NOLs carried back? Why weren't the finalized regs for 597 followed?
And he starts two lines down, he says, "one possible reason for not filing the NOL carry-backs may have been a direct result of the RTC's apparent misapplication of the interagency agreement. Under the agreement, to avoid this circumstance, the RTC agreed to forego the filing of refund claims in exchange for the deferral of tax collection. Tax is still assessed but it is not collected until all depositor claims have been paid in full, including interest. The agreement does not preclude the filing of NOL carry-backs to reduce the assessed but uncollected tax. It appears that the RTC did not recognize or understand this concept.



They apparently interpreted the agreement to mean that since they couldn't seek refunds, they also couldn't or didn't need to file NOL carry-backs to reduce prior year assessments."
Were you aware of this?
A. Of this statement here?
Q. Of the fact that the RTC had this understanding, this apparent understanding of the interagency agreement?
A. Very loosely. My understanding of the RTC's problem was that they didn't pursue refunds. And so in some cases, the parent company did. And we would be of the opinion that it met most of those cases -- the refunds applied for and in some cases received by the parent would belong to the failed bank.
I don't remember ever being aware of the fact RTC misconstrued this with respect to reducing aggregate federal income tax liabilities solely because of the interagency agreement, but intuitively that makes a lot of sense that that was a problem.
Q. Just so the record is clear, are you saying you don't think the RTC did misunderstand the agreement or are you saying you are not aware of what the RTC's understanding of the agreement was?



A. I believe the statement here is plausible, but I'm not aware specifically that they were ever -- they ever misunderstood their own interagency agreement.
Q. But the FDIC takes the position that to the extent a tax year is open, it is permitted to go back and carry back an NOL; is that right?
A. Yes.
Q. Now, let's skip down to the last full paragraph on the page, the last sentence which says, "By the time the 597 regulations were finalized in December 1995, the earliest post-FIRREA tax years were closed" do you see that?
A. Yes.
Q. Is that accurate, that the 597 regulations were finalized in December of 1995?
A. Yes.
Q. Okay. So, for example, tax year 1992 would still have been open for someone -- for a tax preparer who wanted to go back and apply those regs to tax year '92?
A. Yes.
Q. Okay. And then it says in the next sentence, "In other cases, it is less clear as to why amended returns were not filed to comply with the



final regulations. Even after the final 597 regulations were issued, there were opportunities missed."
Would you agree with that statement?
A. Yes, I would agree with that.
Q. Okay. Turning the page, it says in the second paragraph, "Regardless of whatever mistakes may have been made in the past by the RTC or FDIC, or by the IRS in being slow to enact regulations, there are still compelling reasons for the IRS to abate these taxes with or without reopening the statute."
And do you agree with that statement?
A. Yes. In fact, I believe the IRS has paid some lip service -- I can't tell you exactly when -- it is a feeling I get from meetings with them that they were more interested in laying things out and determining the proper tax over the period than they were of hiding behind statute, closed statute dates, old regulation rules which were more punitive than the finalized regs.
Q. And that's certainly the FDIC's position, to work towards the correct number, too?
A. Yes.
Q. That's certainly the IRS's position; is that your understanding?

Page 383

assets." Did that flow through to the tax returns?
A. No, it would not.
Q. Okay.
A. If that's how they're handling it, there would be no tax effect.
Q. Do you know that's how they're handling it or you're not sure.
A. I don't know. I don't know how they record it. How they recorded the write downs.
Q. Were you involved in any way in any of these discussions?
A. No.
Q. How does it work? That the policy is set as policy, and they tell the folks in the field, to the extent it is relevant to you all, this is what you're supposed to be doing?
A. Yes.
MR. THOMPSON: I'd like to ask the court reporter to mark as Vordtriede 79, a document that bears the Bates number AM 0010608 through 610.
(A document was marked for identification as Exhibit No. Vordtriede-79.)
BY MR. THOMPSON:
Q. So this, Mr. Vordtriede, is an e-mail from

Page 384

yourself to Ms. Tama, copy to Mr. Green and Mr. Colley dated March 16, 2004 and under -- and it starts by saying, "Elaine, in answer to your questions."
And then number 3 is the one I'd like to direct your attention to, where it says, "the question is post-insolvency interest, do you agree with the proposal to deduct this as an expense on an accrual basis from year one of the receivership forward? Do you agree with using the PII deduction to generate tax refunds? What if the institution never pays any PII?"
And your answer starts, and I guess it is specifically going to the first of what is three questions under subpart 3, but your answer says -- starts, "Wayne Green was asking this question recently. It's a good question. And probably we ought to ask Rick Cywinski what he thinks, too. The way I see it, we ought to accrue and deduct PII from inception as if it will be paid." And do you see that?
MR. KUIPER: Take whatever time you need to get it in context.
THE WITNESS: Yes.
BY MR. THOMPSON:

Page 385

Q. Okay. In the case of Ben Franklin, the IRS has approved taking PII deductions from the dat of closing as you suggest in this e-mail, right?
A. I believe so, yes.
Q. Okay. And do you still think that that's the correct approach, the approach that's outlined in your e-mail to deduct PII from inception as if it will be paid?
A. My opinion -- I think the issue came up last time when I was here -- was whether a contingency existed, and I am of the opinion that in theory a contingency exists.
However -- and for tax purposes, as a tax person at the FDIC looking at many receiverships, I want to follow the book treatment of the accrual. I don't want to step out for tax and create timing differences.
Q. Wait a minute. That's different than what you're saying in this e-mail, what you've just said? In the e-mail, what you're saying is the way I see it, we ought to go ahead and deduct PII from inception as if it will be paid, right?
A. Yes. I believe what I was saying is that the book side should do that.
Q. Okay. But if the book side does not do

Page 386

that, there are adjustments from book to tax books all the time, aren't there?
A. Yes.
Q. Okay. So if -- regardless of what the book side does, you're telling Ms. Tama here that -- to -- that you -- you know, you -- the way I see it, we ought to go ahead and deduct PII from the date of inception as if it will be paid.
You're talking about deducting from a tax return, right?
A. I don't think that's what I was intending.
Q. You weren't --
A. I don't think I was intending that for tax -- I don't think that's what she was asking me.
Q. Wait a minute. She says post-insolvency interest. "Do you agree with the proposal to deduct this as an expense on an accrual basis from year one of the receivership forward? Do you agree with using the PII deduction to generate tax refunds."
She's clearly asking about tax, isn't she?
A. Yes, she is.
Q. You were answering, deduct PII from inception. You were talking about the tax return, weren't you?
A. Yes, but I don't think I ever intended for

Page 387

her to understand me to say that I wanted to step out and start accruing for tax purposes alone. I believe my feeling at the time was, fine, go ahead and accrue it, but do it on the book side and we'll follow.

I'm trying to think back to my thinking at the time. I do remember writing this, but --

Q. And when you wrote it, did you try to give Ms. Tama your best advice?

A. Yes. Yes.

Q. Okay. In fact, when you go down in this answer, maybe about two-thirds of the way through, there's a sentence that says, "I think more than using PII to generate carry-back refunds, the PII will protect the institution from huge tax liabilities such as with Ben Franklin." Doesn't that confirm that you're talking about tax returns in this answer?

A. Yes. It is almost like a solution in terms of frontier justice, if you will. Set aside the argument of a contingency, which I do believe exists. Take this a little further. I don't believe the IRS themselves had a lot of resistance to us accruing PII from inception. They haven't issued a policy statement in that regard, but this is from a revenue agent out in the field working on Ben

Page 388

Franklin.

Q. Right.

A. And they said they were thinking along the lines of not accruing from day one on the book side and then tax following for all receiverships, but to wait and see which receiverships would be affected.

In other words, I believe by that, she might have meant where PII was all paid and now we're at the Service with a priority claim, so it is between the IRS and shareholders. Then you go back and accrue PII and see what the effect is then. They seemed amenable to that. I think that is more or less my attitude here, to set aside the theory and go ahead to do it to get by some of these large tax balances that were artificially created.

Q. When you say go ahead and do it, the it is take the deduction from the date of closing?

A. Yes.

Q. Okay. Moving ahead to -- let's see. What would be the other questions? All right. Let's see if any of these are particularly momentous. I don't think they are.

MR. THOMPSON: Let us move forward to the next document which will be Vordtriede -- hold on a second.

Page 389

(Pause.)

BY MR. THOMPSON:

Q. Just so the record is clear, when you are talking about there is a contingency, you are saying there is a contingency as to whether the tax liability alone will be paid?

A. No.

Q. Or the post-insolvency interest will be paid?

A. Right. In theory, my understanding of the contingency -- and I glanced at section 461 before, last night, and I didn't see anything much on point. My understanding of the contingency seems to apply in that no PII would be paid until the last dime of the claims were paid. In that sense, it was a contingency.

What the courts would say as to the definition after contingency, I don't know. They're more determinative than my opinion.

Q. Is it a contingency -- do you have an opinion as to whether it's a contingency here within the meaning of 461? Or are you saying, no, I don't have a position under 461?

A. I'm thinking of an intuitive feeling about the word "contingency."

Page 390

Q. Okay. That's what you're basing it on?

A. Yeah. I haven't done extensive research.

MR. THOMPSON: So we move on to Vordtriede 80. By the way -- let's go off the record for a second.

(Discussion off the record.)

(Whereupon, at 12:01 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 12:15 p.m., this same day.)