Page 98

sometime in 1996 when the Supreme Court ruled on the Winstar litigation.
Q. If I may, let me represent to you, Winstar was decided July of 1996.
A. Okay. And it can take a while for documents to work themselves through the approval chain to get to operating committees. I don't know if at that time there would have been a clear understanding about the impacts of that litigation, so professional liability claims would likely be a large contingent claim that receiverships would have been pursuing.
Q. Okay. Turn to page 6. There's a discussion under, analysis options and alternatives considered for interest rate, and then there's a bullet point that says: Maintaining the current practice provides creditors of the estate with maximum amount of interest to which they are legally entitled.
Do you have an understanding for why you believe that maintaining the current practice would provide creditors with the maximum amount of interest to which they were legally entitled?
A. Because the rates that they were charged -- the rate that was used to calculate

Page 99

postinsolvency interest would have been a rate that was rooted in state law, national law, or existing regulation, and I believe therefore then that's the conclusion -- that's what they would have been entitled to as they stood at that point in time.
Q. Okay. Turn to page 8, please.
There's a discussion there under heading paragraph 1, the U.S. Treasury financial manual rate, and there's also a reference under, disadvantages, for that option, to the fact that the FDIC board of directors had approved discontinuing use of that rate for calculating interest on over- and underpayments of deposit insurance assessments.
Were you involved at all in that decision?
A. No, not that I recall.
Q. Okay. At the bottom of that page, there's a footnote, footnote 9.
In the first sentence of that footnote says: NDP does not address the issue of rate payment or priority of postinsolvency interest distributions.
I'll represent to you my understanding is that NDP is a reference to the national deposit preference statute.
In light of that representation, does that statement comport with your understanding of what

Page 100

that statute addressed and did not address?
A. I believe that is correct.
Q. Okay.
A. Which was why there was a question, because we couldn't look to the national depositor preference guidance to answer the specifics that were coming up now that these were receiverships in surplus situations.
Q. Turn to page 9, please.
There's handwriting on both the left and right margin there; is that correct?
A. No.
Q. Do you know whose handwriting that is?
Do you recognize it?
A. I don't recognize it.
Q. Okay. There's a discussion in the middle of that page of an option for use of the FDIC investment rate. And there's a discussion under, disadvantages there about 6 lines down.
It says: Rate will vary with the mix of maturities for U.S. government obligations held in the FDIC's investment portfolio at any given time.
Do you know what at around this time was the average maturity of the investments in the FDIC's investment portfolio?

Page 101

A. No.
Q. Were you involved at all in any policy decisions regarding FDIC investments?
A. No.
Q. Okay.
A. Other than if there were issues related to the accounting for them, but not the investments.
Q. Do you have an understanding about whether the FDIC's investment portfolio was generally limited to investments in U.S. government obligations?
A. It is, yes.
Q. Okay. And it was at that time as well?
A. Yes.
Q. Okay. Do you know what, if any, investment guidelines or criteria applied to the RTC when it was in existence?
A. RTC did not invest funds because it received appropriated moneys, and so it could not invest.
Q. Turn to page 10, please.
There's a discussion middle of the page heading, floating or locked interest rate. And it says there that the FDIC's practice is to lock the rate on the date of insolvency other than for institutions subject to section 360.3.

Page 106

Q. Exhibit 20 is a printout of an email from Michael Caco to a list of recipients, including yourself, dated August 22, 1997, subject, postinsolvency interest. It has an attachment. The document is Bates-stamped AM 0010360 through and including 367.

My only question relates to the discussion that's under paragraph 1 on the cover email. That paragraph begins: Should the postinsolvency interest calculation compound the interest after the principal of claims is paid. Answer, no, because it makes the calculation more conservative -- and there's a parentheses -- then it says: which is in line with FDIC's past and present conservative policy concerning its approach toward the handling of the corporate claim.

And it goes on from there.

My question for you is: In what way was the FDIC's policy regarding the handling of the corporate claim conservative?

I'm trying to get a sense of that.

(Pause.)

A. I don't know what was intended with this.

BY MR. COLATRIANO:

Q. Okay. Leaving aside what may have been

Page 107

intended by this, do you have an understanding or would you characterize the FDIC's policy concerning the handling of the corporate claim to be conservative in any aspects, and if so, can you explain in which aspects?

A. I would say that the handling of the claim is neutral. It is what it is, and there wasn't ever an attempt to sort of unduly favor the FDIC or take advantage of the relationship between receivership and corporate. And so I don't know -- I don't know that that's necessarily conservative or not. Corporate proof of claim represents what it represents.

Q. Let me ask you this, in your capacity to the extent that you're responsible or involved in setting the policy relating to issues involving corporate proof of claim or other issues involved in receiverships, do you consider yourself a fiduciary at all for the interests of the receivership or the shareholders of the receivership?

MS. DOHERTY: You mean herself personally?

MR. COLATRIANO: Yes -- well, obviously in her role at the FDIC, but, yes.

A. I viewed my role as one responsible for trying to achieve the best answer, not necessarily

Page 108

driven by one capacity versus another, recognizing the fact that FDIC as a corporation was the insurer, but then FDIC also had a responsibility for the integrity of executing and managing the receivership estate, and so I always viewed my role as trying to find the right balance of those 2 capacities for the corporation in both of those roles, so -- and, yes, you asked about a fiduciary for the receivership. Yes, we -- I viewed my role as being responsible and answerable to both the receivership as well as corporate.

BY MR. COLATRIANO:

Q. I'm sorry.

You viewed yourself as responsible and answerable to both --

A. -- receivership and corporate.

Q. And corporate?

A. M-hm.

Q. And to the extent that the interests of the receivership or corporate might conflict in any given situation, how did you view your role as to how those conflicts should be resolved?

A. No example necessarily comes to mind with the roles that I would have been involved in that would let me answer that question one way or the

Page 109

other.

Q. If there was, for example, not necessarily to take a random example, but to take an example of what interest should be charged on a corporate claim, obviously it would be in the receiver's interest to pay less interest to corporate, and it would be in the corporation's interest to receive more interest from the receiver.

Would you view that as a fair statement?

A. From just following strictly from the dollars and not honoring the purpose of each side, yes.

Q. Okay. And so in resolving what interest to charge, how would you resolve those -- that conflict in interests between corporation and receiver?

What did you view as your role -- how would you perceive your role in the resolution of that type of conflict?

A. First it would be to look to whatever governing authorities were out there directing the resolution of that conflict one way or the other. And to the extent that there was lack of clarity in that sort of legal or regulatory guidance, to come up with an answer that was sort of fair and balanced and

Page 110

justifiable and able to be applied consistently kind of given the -- given what was -- we were trying to achieve sort of with each entity.
For example on the receiver's side, having something that people could understand and learn the impacts of, so something that was transparent, available to the public when we talk about a rate, for example, that was an important factor in what the decision was, because if we came up with a rate that nobody could calculate or identify, then it clouded the conclusions relative to what the exposure for postinsolvency interest might be.
Q. How did -- was there a person within the receivership structure whose job it was solely to look out for the receiver's interest versus -- as opposed to corporate's interest?
A. I think within the structure of the liquidation division is when you had the -- probably the people who were more hands-on with the receivers, more involved in the day-to-day responsibilities of the receiver, their charge was to manage the receivership estates and liquidate the assets and pay off all the claims.
So the liquidation group tended to be the stronger voice for the receivership views and brought

Page 111

receivership perspectives to the discussion.
Q. Okay. And in the context of the Carteret receivership, who would sort of be the most senior person who would look at it or come to the issue solely from the receivership perspective, if there was such a person?
A. You mean today?
Q. At any time during the Carteret receivership.
A. I don't know anything about the Carteret receivership, so I don't really think I can answer that question.
Q. What about today?
A. The liquidation division today, known as the division of resolution and receiverships, has Carteret as one of the receiverships that it continues to manage, so the degree to which they have active involvement in the remaining activities of Carteret individually, I would look to them.
Q. Okay. And just so I understand your testimony -- and please correct me if I mischaracterize anything you've said -- but to simplify a little bit, is it fair to say that you view your role as -- to a certain extent at least balancing the interests of the receiver and the

Page 112

interests of FDIC corporate?
MS. DOHERTY: At any particular point in time?
BY MR. COLATRIANO:
Q. Well, if that's changed over time, please let me know.
A. I don't know that the point in time has changed, but I think it's sort of driven by the nature of the issue and how clear the guidance is one way or the other that -- I believe there's a whole body of regulation or law or practice that governs receiverships, and there has long-standing been a relationship between FDIC corporate -- FDIC in its corporate capacity and FDIC in its receivership capacity, and how those 2 relationships relate or don't relate and the separateness of each one, so to some degree, it depends on the issue and the -- you know, the specificness or lack of clarity around the -- whatever might be the issue of the day.
Q. Okay. And in general, if it's a gray area where there's not specific or very clear guidance, in that situation, would it be a fair statement that you view your role as trying to balance the interests of the FDIC in its receivership capacity with the interest of the FDIC in its corporate capacity?

Page 113

A. Yes.
Q. Okay. And with respect to the people in the division of liquidation or the division of resolution and receiverships, would that be a fair statement to make with respect to them as well, that in those gray areas, they're trying to balance the interests of both?
A. I think there in the gray areas they serve definitely as a proponent for the receivership, and their role was to bring that perspective to the discussion, but recognizing that in many of these matters, you were dealing with multiple parties needing to listen to multiple perspectives and come to whatever agreed-upon answer.
Q. And who ultimately would have the decision-making authority with respect to a gray area involving both capacities of the receivership -- of the FDIC?
A. I think the practice was typically to come to agreement between the liquidation division and the finance division with the legal division right in the middle of it to make sure that both sides were acting consistent with their capacities and, you know, within the boundaries that had been established.
Q. And to the extent that the division of

Page 118

A. I don't know.
Q. Okay. Do you remember who generally was involved in these discussions?
A. If there was a meeting in Dallas, then it would have been the Dallas accounting staff. I suspect participants like Wayne Green, perhaps Sharon Kelly, the Dallas management, perhaps the Dallas claims -- some of the Dallas claims staff, as well as some of us here in Washington like Michael Caco must have been involved, Elaine Tama would be my guess, Bob Ferrer.
Q. And do you recall what Mr. Green's view was, Wayne Green's view on this issue?
A. No, I don't.
Q. Second paragraph -- second numbered paragraph in your email talks about the option of recognizing PII only to the extent estimated to be paid, and then there's a parentheses that says, this is what RTC receiverships did, although methodology has not been consistently applied since RTC merged with FDIC.
Do you know in what respects that methodology had not been consistently applied?
A. I would read that as saying that the field accounting offices were not keeping the PI

Page 119

calculation current in terms of monitoring the status of a receivership and identifying what is estimated to be paid and recording in the accounting records that amount.
Q. Okay.
MR. COLATRIANO: Let's have this document marked as exhibit 22, please.
(Hughes Exhibit No. 22 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 22 is an FDIC discussion memorandum, discussion memorandum 43, titled, postinsolvency interest and corporate and receivership financial statements. It's dated May 4, 1998. It's Bates-stamped AM 0010297 through and including 305.
To what extent were you involved in the drafting of this discussion memorandum?
(Pause.)
A. I would not have drafted it. I would have been involved in the discussion of -- probably safe to say all of the issues identified.
BY MR. COLATRIANO:
Q. Okay. And who had the responsibility for

Page 120

reviewing and approving this discussion memorandum? Was it Mr. Forkkio?
A. It would have been ultimately Mr. Forkkio, but our practice would have been to circulate drafts to the participants and interested parties in the issue and consider their input --
Q. Okay.
A. -- prior to it being formally signed.
Q. Okay. Do you know whether the policy or the decisions that are reflected in this discussion memorandum were ever formalized in something like a statement position or an accounting bulletin?
A. I don't know.
Q. Okay. Turn to the page that's Bates-stamped 302. There's a discussion on this page of options for recognition in receivership financial statements.
And the first option is: Disclose the total estimated dollar amount for obligation of postinsolvency interest as of the balance sheet date in the footnotes to receivership's financial statements only. The disclosure would begin when the principal of claims is 95 to 98 percent paid.
Then it says: Clearly this accounting treatment would be easier to administer than

Page 121

recording amounts in the accounts, and for that reason has somewhat of a cost benefit advantage.
How would it be easier to administer this issue by disclosing it in a footnote versus in accounts themselves?
A. If you're booking something in the accounts, you have to make journal entries and attach supporting documentation and have those entered into the system and balanced, and all of that versus a disclosure, you would obviously seek to have integrity of the result, but you wouldn't have the mechanical process of putting it into the accounting ledger and monitoring or revising it.
Q. Okay. The second option is, recognize as a receivership liability, i.e., a claim and a reduction of equity when the principal of claims is 95 to 98 percent paid.
I take it, was that the option that was ultimately adopted?
A. I believe so.
Q. Okay. And how was that percentage chosen?
A. I believe we settled on 95 percent. And I don't believe there was a scientific methodology, other than trying to come to some threshold where it was a good indicator recognizing that some of the

value had yet to be realized in receivership because there may have been assets that remained.

So that gave us a little bit of a -- sort of a plus-minus in terms of the potential recovery value of the receivership. As we approached that point in time, we began to be more conservative I guess in the calculation and having that on the face of the statements.

Q. Do you recall there being a discussion about different options as far as percentages, 80 percent or 50 percent or 95 percent?

A. I'm sure there were.

Q. Okay. But you don't recall specifically why 95 percent was chosen over 90 percent for example?

A. No.

Q. Okay. To what extent was this decision based on any accounting -- generally applicable accounting principles or any principles found in accounting literature, the 95 percent standard, I mean?

A. I guess it could have been, because we would -- we could have looked at at what point does something become probably or reasonably estimable, so we could have factored in those concepts and decided



that 95 was maybe more probably than something at 90 percent.

Q. Okay. Is there general accounting -- are there general accounting principles for whether -- for when a recovery is considered probable?

A. It's not specific.

There's accounting guidance that identifies when you have a contingent liability that meets the criteria of probable -- both probable and reasonably estimable, you want to book it in your accounting records.

Q. And what is your understanding of what that general accounting guidance is with respect to when the liability is probable?

A. Depends on the nature of the liability. A liability that was on the books and records of the receivership estate is not a contingent liability. It is a liability in fact.

And so it doesn't really fall within those parameters. The contingent liability concept is more for things that are unknown. The issue with postinsolvency interest from our perspective, that is the liability that starts on day 1.

And so our issue here was at what point do we reflect that, do we show that in the receivership



books and records. We could have reflected it starting day 1 and every day thereafter until the receivership was terminated, recalculate postinsolvency interest, and make the adjustment, and have that be on the face of the financial statements and in the accounting records of the receivership, but there's a huge administrative cost associated with doing that.

And for most of the receiverships, they never got through the deposit claims or other claims such that they would pay postinsolvency interest, so it was an unnecessary burden. What we were trying to do here is setting some kind of a threshold to make the receivership financial statements more meaningful was to come up with the right time frame to recognize and reflect on the face of the statements the liability that had been accruing since day 1.

Q. And in the discussions leading up to the adoption of this policy, were any tax implications of the policy considered?

A. I don't remember.

MR. COLATRIANO: Have this document marked as exhibit 23, please.

(Hughes Exhibit No. 23 was marked for



identification.)

BY MR. COLATRIANO:

Q. Exhibit 23 is an FDIC draft statement of position accounting for postinsolvency interest. The draft is dated January 12, 2004. It's Bates-stamped AM 0010386 through and including 392.

Have you seen this document before, Ms. Hughes?

(Pause.)

A. I don't think so.

BY MR. COLATRIANO:

Q. Okay. In your current position, would this be something you would review?

A. I would say yes.

Q. Okay. Turn to page 2. There's a paragraph in the middle of the page.

It says -- begins: The 95 percent threshold was chosen in order to reduce the administrative burden in calculating the total amount of postinsolvency interest due for all receiverships.

Do you agree with that statement?

A. Best I can recall, yes.

Q. The next paragraph says, third line down: However, by delaying this recognition until the 95 percent threshold was reached, the users were unaware

Page 126

of the amount of interest accruing off-book until the threshold was reached. When the amount was finally recognized, it had often been accruing for several years, causing a significant impact on the financial position of the receivership, which adversely affected lower-priority claimants and all equity holders who had not received distributions until the interest had been paid in full.
Do you agree with the statement that I just read to you?
A. No.
The -- simultaneously with establishing the 95 percent threshold for recognition, we developed a disclosure in the financial statements that talked about postinsolvency interest, specifically in the fact that it does exist and it is a liability of the receivership, and I believe our footnote disclosure even said at what point we would seek to recognize it, reflect it in the financial statements.
So there was an opportunity for readers of the financial statements to know that there was a potential liability that was not reflected. The second part, the recognition of postinsolvency interest had no impact on the financial position of

Page 127

the receivership, because it has -- it perhaps had an impact on what was -- it didn't adversely affect the lower-priority claimants or equity holders, because it was a liability that existed from the start of the receivership that continued to grow as long as claims remain unpaid, so it was a liability that was there, whether or not it was disclosed in the financial statements at 95 percent or 90 percent or from day 1.
So I would not agree with the way that this is characterized here.
Q. Okay. Before the institution would reach the 95 percent threshold, would the amount of postinsolvency interest be disclosed anywhere?
A. No.
Q. Okay. And before the institution reached the 95 percent threshold, would FDIC calculate what the postinsolvency interest was?
A. I don't know, because if FDIC did, it would have been done in the field offices, and I don't know what their methodology was.
Q. Do you know whether there was a policy about whether there should be a calculation before the 95 percent threshold was reached?
A. I don't know.
Q. Okay.

Page 128

MR. COLATRIANO: Have this document marked as exhibit 24, please.
(Hughes Exhibit No. 24 was marked for identification.)
MR. COLATRIANO: Let's go off the record. We'll take a break.
(Recess.)
BY MR. COLATRIANO:
Q. Let's use -- the document that's been marked as exhibit 24 is a document dated October 16, 1998, titled, RTC accelerated dividend case. It's from Irene Sanchez to Thomas O'Keefe. It doesn't have a Bates stamp.
Have you seen documents like this before, dividend cases?
A. I'd say, generally, yes, I've seen this kind of document before.
Q. Okay. And on the second page, there are 5 signatures, 3 signatures in I guess the main body of the document, and then 2 signatures under, approved, under, delegated authority.
Was that to your understanding the typical process, certain people within FDIC would prepare a case and sign off on it, and then it would be

Page 129

approved by more senior personnel?
A. This was prepared out in the field office, and I believe they had very standard procedures for documents such as this, a formal case with signature of preparors all the way up to final case approval.
Q. Okay. And would the signatures -- any of these signatures signify that the people who were signing had reviewed the document and its attachments?
A. I would assume that if someone signed it, they would have reviewed the document and its attachments.
Q. Okay. There's a chart attached to this, or a spreadsheet.
Do you know who prepared that?
Oh, it says right there, Irene Sanchez.
Do you know who Ms. Sanchez was?
MS. DOHERTY: Where are you looking?
MR. COLATRIANO: Up left hand corner of the chart.
MS. DOHERTY: Oh, okay.
Thank you.
A. I don't believe I knew Irene.
BY MR. COLATRIANO:
Q. Okay. Would it be fair -- on the first

Page 130

page of the chart, there's a grouping of institutions that includes Carteret.
Do you see that?
A. I do.
Q. And the heading there for that grouping is, established prior to 8-10-93 nondepositor preference.
Do you see that?
A. I do.
Q. So is it fair to say that at least for the purposes of this document, Carteret was treated as a nondepositor preference institution?
MS. DOHERTY: Without arguing that point, I'll note that that's not the complete title of that portion of the chart. There's a parenthetical after it.
BY MR. COLATRIANO:
Q. Okay. For the record, the parenthetical says, Corp., C-O-R-P, excess and creditors.
A. I agree it looks like from this document that Carteret is presented in the category identified as prior to 8-10-93 nondepositor preference.
Q. Okay. And do you know what the parenthetical is referring to, Corp. excess and creditors?

Page 131

A. Corp. would be the corporate claim, the corporate subrogated claim. Excess would be the excess insured depositor claim. And creditors would typically be the general trade creditors' claims.
Q. Okay. So is it fair to say that for purposes of among other things the corporate claim, Carteret was categorized in this category?
A. It looks like for -- and I would say for all claims, it looked like this institution was categorized as a pre- -- I can't say that. I don't know -- was categorized as a nondepositor preference institution.
Q. Thank you.
That's all for that document.
A. Okay.
MR. COLATRIANO: Let's have this document marked as exhibit 25, please.
(Hughes Exhibit No. 25 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 25 is a printout of a series of emails. The top email is from Elaine Tama to among others Wayne Green, dated December 22, 1999, subject, postinsolvency interest rates and priority of

Page 132

interest. The exhibit is Bates-stamped AM 00096535.
Have you ever seen any of these series of emails before?
(Pause.)
A. I don't remember.
BY MR. COLATRIANO:
Q. Okay. The email from the -- the third email in the string is from Michael Saran to Barbara Starke Tishuk and copied to some other people.
Do you know who Michael Saran is?
A. I don't.
Q. It appears he's answering a question about what postinsolvency interest rates should be applied to a group of 5 institutions, one of which is Carteret.
Do you know why this inquiry came up in December of '99?
(Pause.)
A. I don't know.
BY MR. COLATRIANO:
Q. Did you just review Mr. Saran's email?
A. I skimmed it very quickly to get a sense of what it was.
Q. All right. I take it this doesn't refresh your recollection at all about whether you saw this

Page 133

at the time.
Correct?
A. I don't remember seeing it at the time.
Q. Okay. Do you know why it was Mr. Saran who was asked to perform this analysis?
A. I'm not sure who he is or where he is from, so I don't know.
Q. Just so you know, on the last page, there's a signature block for him.
A. Oh, okay.
Q. He was the senior attorney at the FDIC in East Hartford, Connecticut.
A. It looks like these receiverships would have been in the Hartford service center, in the NESC, northeast service center, so these receiverships would have been assigned to that service center.
If he was an attorney in that area, it would make sense that he would be answering certain questions about the postinsolvency interest legal aspects.
Q. Do you know whether his analysis as reflected in this email was reviewed or approved by anyone in a superior position to Mr. Saran?
A. I don't know.

Page 134

Q. I'm sorry?
A. I don't know.
Q. Okay. Mr. Saran, on the first paragraph of this exhibit, he talks about the postinsolvency interest rate for the class of unpaid creditors of the PTR.
Do you see that?
A. I do.
Q. PTR, is that a reference to pass-through receivership?
A. Yes, sir.
Q. And as I understood it, what he's saying is that creditors of the pass-through receivership, you would apply the policy as of the date of the pass-through receivership inception.
Correct?
A. That is what it looks like.
Q. In your experience or to your understanding, leaving aside administrative expenses, is it fair to say that the majority of creditors of final receivership for an institution would have been creditors of that financial institution before it was seized?
A. I would say yes, because the majority of the claimant class would have been -- would have come

Page 135

about because of the deposit liability.
Q. Okay. If that's the case, do you know what the justification is for treating creditors of the pass-through receivership differently for purposes of interest on their claims than creditors of the final receivership?
A. Vague recollection -- or I guess maybe putting some pieces together for -- to try to reach a conclusion, a logical conclusion. Creditors of the pass-through receivership never made it to the conservatorship, whereas the creditors of the final receivership came out of the conservatorship, so really, the last stop in the cycle of that full resolution for a pass-through receivership creditor was in the PTR, the pass-through, which would then logically sort of associate any postinsolvency interest associated with that claim with the first receivership, whereas the creditors of the second receivership came out of the conservatorship, the conservatorship having held the deposit liabilities, the general trade creditor liabilities, and any other claims that were there.
Q. Okay. But is it fair to say that both classes of creditors, or at least the vast majority of both classes of creditors were at one time

Page 136

creditors of the institution before it was placed into any type of receivership or conservatorship?
A. Correct.
Q. Okay.
A. Of the open institution.
Q. Right.
A. Correct.
Q. And if they were all creditors of the open institution before it was seized, what is the justification for -- is the only justification for treating them differently for purposes of postinsolvency interest is that as a legal matter, one stayed with the pass-through receivership and one did not?
MS. DOHERTY: I'm going to object to form of that question insofar as it appears to assume that in all cases there is a difference in treatment.
BY MR. COLATRIANO:
Q. Can you answer the question?
A. Could you repeat the question?
Q. Well, let's limit it to the institutions that are discussed in Mr. Saran's email.
I believe he says that the pass-through creditors are going to have their interest calculated as of a certain date and the final receivership

Page 137

creditors are going to have their interest calculated based on a different date.
Correct?
A. He states his belief that there would be a different --
Q. Okay.
A. -- calculation used, and perhaps even different governing guidance --
Q. Okay.
A. -- depending on if a creditor was in a pass-through or the second receivership.
Q. And other than legal considerations, do you know of any other reason that would justify that differing treatment of those classes of creditors?
A. I don't know much about pass-through receiverships, so I would say no.
MR. COLATRIANO: Let's have this document marked as exhibit 26, please.
(Hughes Exhibit No. 26 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 26 is a single page. It's titled, draft interest rates set by FDIC. It's dated August 23rd, 2000. It's Bates-stamped AM 0011477.

Page 142

making that was raising some questions for which you were seeking Mr. Bolt's advice?
A. Yes.
Q. Okay. All right.
That's all for that document.
MR. COLATRIANO: Have this document marked as exhibit 28, please.
(Hughes Exhibit No. 28 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 28 is a printout of a series of emails. The top email is from Bobby Bean to Elaine Tama dated May 31, 2001, subject, Wednesday's PII meeting recap and open items, Bates-stamped AM0010242 through and including 243.
My questions are going to relate to your email, which is the third email on the string here. It's from you dated May 30, 2001, same subject, to a long list of recipients.
On the second page of this exhibit, there's -- and your email says: One concern raised at the meeting and also by another voice subsequently had to do with keeping the rate and its application simple to allow for outside parties to check the rate

Page 143

themselves and to minimize calculation errors, parens, past experience with errors leaves bitter memories, close parens.
And my question was, what past experience with errors are you referring to there.
A. I don't remember anything specifically.
Q. Okay. Do you remember any specific institution or any specific type of error, or you just don't recall anything about that?
A. I don't remember anything specifically, but based on that parenthetical insert and the documents we've reviewed so far where we talk about, does the rate change, does it stay the same, what rate is used, what governs what rate is used, when did the institution fail, that in all likelihood as we were reviewing over the many years the issues of postinsolvency interest and as evidenced by the series of questions that we have to figure this one out, we have to figure this one out, that in all likelihood, all of those questions came about as we reviewed different calculations and applications of calculations and found that perhaps some calculations were performed in error.
Q. I'm sorry.
Some calculations were what?

Page 144

A. Were performed in error.
Q. Do you know, what's the reference to, another voice?
Do you remember who you were referring to there, the first line of that bullet point?
A. I don't remember if that was somebody outside of the meeting participants or perhaps someone that was in the meeting had talked to me subsequently to reinforce their point. I believe -- up until fairly recently, and I put a couple years on that "fairly recently," calculations were done manually, so lots of room for error in that situation, and it could have been somebody who was the one who at the end of the line had to do that manual daily calculation or monthly calculation that was an advocate for keeping it simple, keeping it transparent.
MR. COLATRIANO: Okay. Let's have this document marked as exhibit 29, please.
(Hughes Exhibit No. 29 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 29 is a printout of a proposed FDIC rule on payment of postinsolvency interest in

Page 145

receiverships with surplus funds dated December 18, 2001. It's Bates-stamped AM 00096596 through and including 602.
What was your role in the preparation of this proposed rule?
A. This proposed rule is the result of the meetings and the discussions and the issues we worked through as covered in previous exhibits, so my role would have been -- I'm not necessarily sure that I led a group, but participated in the team, provided leadership to the team in certain areas that then led up to this going to the board and ultimately out for public comment.
Q. Okay. The summary on the first page says that: The proposed rule would set an interest rate that would be paid at the coupon equivalent yield of the average discount rate set on the 3-month treasury bill at the last auction held by the United States Treasury Department during the preceding calendar quarter.
Did you agree that that was the appropriate rate to use for purposes of this regulation?
A. If I remember right, we would have evaluated several different options for rates, and

Page 146

that was the one that we had identified as the most reasonable, so, yes, I would have agreed with that going forward.

Q. Okay. And what considerations went into the determination of -- that that was the most reasonable rate to use?

Do you recall?

A. I believe it would have been things such as readily available to the public, easily identified, probably something that was sort of set by an independent party. I don't remember -- okay -- adjusted each quarter, so we were probably looking for something that had some type -- some reasonable time frame around it since we were adjusting.

We were not looking to lock into a longer-term rate.

Q. And why was the decision made to use an adjustable as opposed to a locked rate?

MS. DOHERTY: Do you mean the final decision as reflected in this exhibit, or are you talking about decisions made by the team she worked on?

MR. COLATRIANO: The latter.

A. I was going to read the background to see if it provided any insight as to why.

Page 147

BY MR. COLATRIANO:

Q. You should feel free to. I can point you to where I think the relevant discussion is, although you should feel free to review anything else.

The discussion of what rate to use begins on page 4, the paragraph that begins, another component.

A. Okay.

Q. Then the next paragraph talks about fixed or floating, and the paragraph after that talks about simple or compound.

So if you want to read those 3 paragraphs to yourself, go ahead, and let me know when you're done.

A. Okay.

(Pause.)

A. Okay.

BY MR. COLATRIANO:

Q. The paragraph on page 4 that begins, another component of the proposed rule, does that fairly reflect your own views about why the interest rate chosen was the appropriate interest rate to choose?

A. It does. It looks to be speaking to publicly available.

Page 148

I don't think I used the term market base, but my idea was to try to find something that sort of a common indicator of interest rates for this type of an odd transaction.

Q. I'm sorry.

Did you say for this type of a --

A. -- of an odd transaction.

You don't typically see the concept of postinsolvency interest in normal business.

Q. Okay. The paragraph also talks about this rate being widely recognized as a cash management investment performance benchmark.

Do you see that near the end?

A. I do.

Q. Why is that fact relevant to the selection of an interest rate for postinsolvency interest?

A. I believe our thinking was that we were looking for something that was sort of a time value of money rate or time value of money concept relative to the interest on the outstanding claim.

Q. And does the next paragraph that begins, whether the interest rate should be fixed or float -- does the discussion in that paragraph fairly reflect your thinking regarding why it was appropriate to use a floating interest rate for postinsolvency interest?

Page 149

A. Yes, it does.

Q. Does the following paragraph on page 5 that begins, finally the proposed rule provides -- does the discussion in that paragraph fairly reflect your thinking for why it was appropriate to use a simple interest method?

A. Yes.

Q. Okay. Do you consider yourself or have you considered yourself to be an expert on receivership tax issues?

A. No.

Q. Okay. I think you said at some point that you had responsibility for some tax reporting issues that people reported to you on that topic; is that correct?

A. I did. For tax policy, I had groups of tax policy people over the course of my various capacities that reported to me.

Q. Okay. And -- but is it fair to say that you don't consider yourself personally to be an expert on tax policy as it relates to receivership accounting?

A. Very fair to say.

MR. COLATRIANO: Let's have this document marked as exhibit 30, please.

Page 162

(Hughes Exhibit Nos. 33-34 were marked for identification.)

(The reporter read the last question.)

MS. DOHERTY: Mr. Colatriano, as you may or may not be aware, the Ben Franklin institution is involved in litigation in a case called Seuss, and there's currently a tax litigation, and there's currently pending a goodwill case which has been put on hold while the tax case is going forward.

And I just wanted to let me know in advance that Ms. Hughes as the supervisor of people who are assisting the attorneys on those cases, there may be issues of attorney-client privilege. There probably are, and if not attorney-client privilege, issues of work product that would restrict her ability to answer questions about what she knows about the issues relating to Ben Franklin.

MR. COLATRIANO: Okay. Well, I don't think it would call for privilege just to get a general answer of what the nature of her work on Ben Franklin is. I don't want to get into privileged communications.

MS. DOHERTY: No.

Page 163

If the question -- well, you ask the question.

BY MR. COLATRIANO:

Q. What is the nature of your involvement or your work on matters relating to tax issues as it pertains to Ben Franklin?

A. I have had some discussions with staff members who have been working on the issues, and so therefore have a familiarity with the kinds of things in general that had come up that -- probably not within the past 2-plus years.

Q. Turning back to exhibit 32, there's a third paragraph of Mr. Johnston's email, says: It should be noted that the IRS agrees that this is a valid tax deduction available from the day of closing.

Do you have any reason to disagree with that statement?

A. I have no reason to disagree with it.

Q. The next paragraph says: I'm not sure where your proposal stands, but this should be of interest to the decision-makers.

Do you know what proposal is being referred to there?

A. I don't, no.

Page 164

Q. Okay. You should have -- while you were gone, we marked 2 more exhibits.

A. That's not fair.

Q. Exhibit 33 is a printout of an email from James Vortriede to Elaine Tama copied to Wayne Green and David Colley dated March 16, 2004, subject, questions on tax return preparation for receiverships. It's Bates-stamped AM 0010608 through and including 610.

My question has to do with the numbered paragraph 3, which says, postinsolvency interest.

Do you agree with the proposal to deduct this as an expense on an accrual basis from year 1 of the receivership forward?

Do you know what the status is of that proposal?

A. I do not.

Q. Have you had any discussions or been involved in any meetings regarding that proposal?

A. No.

I did not know that there was a proposal being developed. I knew that the question had come up about the application of the postinsolvency interest accrual back to day 1 of the receivership, but beyond knowing that the issue was there, I didn't

Page 165

know, don't know how that progressed through to perhaps become a proposal that has some status.

Q. Do you have a view yourself regarding whether that's a good idea or a bad idea to deduct postinsolvency interest as an expense on an accrual basis from year 1 of the receivership forward?

A. When we define postinsolvency interest, we define it as a liability that exists on the first day of the receivership. And so therefore, it is reasonable to present it as an expense of the receivership.

How that impacts what IRS allows as deductible expenses for tax return purposes, I don't know.

Q. So are you saying you don't have a view about whether it should be deducted as an expense in receivership tax returns?

A. I'm trying to figure out how to answer your question.

Without knowing the details of the receivership tax return preparation requirements and the IRS allowances for deductible items, I feel like I can't answer that question.

I can say that postinsolvency interest from a calculation perspective is viewed as beginning

Page 166

on the first day of the receivership. And if that's the type of expense that IRS would allow as deductible over the life of a receivership, then, yes, it seems reasonable from a tax filing perspective that it should have been -- could have been part of the tax return preparation.

Q. Okay. Go ahead and turn to exhibit 34, which is a document titled, goodwill issues, payment of dividends, October 17, 2001, meeting minutes. It's labeled, draft, on the bottom. It's Bates-stamped AM 0010003 through and including 0008.

I see that you are not listed as an attendee at this meeting.

Did you typically attend other meetings of this group that's listed here with respect to goodwill issues?

A. It would have depended on the issue or if the meeting -- if it was maybe more to get together to talk about technical details, then perhaps I wouldn't have been. I would have let staff work through.

I tend to like technical things sometimes, so I may have shown up at those types of meetings.

Q. If you turn to page 3, which is Bates-stamped 005, about halfway down the page, it

Page 167

appears to be -- there appears to be a reprint of an email from you documenting the conversation you had with John Thomas.

Go ahead and read that passage that begins there and carries on to the middle of the next page. Let me know when you're ready to proceed.

MS. DOHERTY: We have the same problem here we had with the earlier memo, is that ordinarily this would be privileged. It may be that the privilege has been waived.

I suggest you just go ahead and ask what you want to about it, and I understand that you're not waiving your objection to the concept of our having waived -- not waived the privilege.

MR. COLATRIANO: Okay.

(Pause.)

A. Okay.

BY MR. COLATRIANO:

Q. Does that -- do you recall the discussion that's being referenced in this passage?

A. I generally recall the issue -- issues.

Q. What were the issues?

A. If a receivership was terminated, meaning an FDIC terminology that would mean that the receivership estate was wound down, completely closed

Page 168

out, and so all accounting for it would have been completed-completed.

Receivership issues would have been concluded I guess is the way to say it. And then if there was some type of a goodwill judgment that was found in the receivership's favor, how would we mechanically go through the process of paying that since essentially the receivership estate didn't exist anymore and did legal -- John Thomas was legal, and did he see any issues, or what were his thoughts around paying out the judgment, how would he pay -- how would he see -- or what would he see the issues may be relative to trying to pay a judgment for a receivership that had been terminated.

Q. And there appears to be a discussion here about whether there really were certificates of termination for 9 receiverships.

Do you know how that was resolved?

A. Not that particular issue, no.

Q. Okay. Do you know whether Carteret was one of the 9 inactivations that's being referred to?

A. I don't know for sure, but I would suspect not.

Q. And at the end of this passage, there's -- it says -- you say, that really leaves us as an

Page 169

accounting issue and what we want to do to preserve the trail of activity. I'll leave it to the team to kick around some ideas on what makes sense.

Do you know how that was resolved?

Was there any closure reached on that issue?

A. I don't remember if there was closure reached. I don't know that we've had a case relative to those 9 inactivations such that it would have come up again since raising the issue.

Q. Earlier on in this -- right after lunch, we talked about how you view your role at the FDIC, and we talked about perhaps if there were some gray areas where there wasn't specific guidance to guide you in your role, and -- correct me if I'm wrong -- I think you said what you would try to do in those gray areas is try to strike a balance between the FDIC's interest in its corporate capacity and the FDIC's interest in its receivership capacity.

Fair summary of what we talked about?

A. I guess the FDIC's interest in its receivership capacity, because the FDIC has a responsibility to the integrity of the receivership estate.

Q. Right.

Page 185

AM 0011405, and once you're there, I'm going to lead out loud the first paragraph under the background section photograph?
A. Okay.
Q. It states there, "The current FDIC receivership accounting structure as established by FDIC management can best be described as a combination of the cash and accrual basis such as modified cash, modified accrual or hybrids. For example, certain items are accounted on an accrual basis, while other items are accounted on a cash basis, for example interest income on loans."
My question to you is did the FDIC follow a conservative approach in the recognition of assets and liabilities in receivership financial statements, in your opinion?
A. I would say yes. There was often uncertainty about the collectibility of assets as well as recognition that there were a variety of claims associated with the receivership that could arise at various points along the receivership life cycle; and as best I can recall, our accounting and our reporting philosophy was to be conservative in the recognition of asset value, and to the extent there were liability exposures to try to recognize

Page 186

those at appropriate points in time.
Q. Now, would the recovery of certain liabilities on an accrual basis and other liabilities and assets on a cash basis be consistent with this conservative approach?
A. With the -- I believe you used the word "recovery."
Q. Recording. I'm sorry. Excuse me. I can't read my handwriting. I'll restate that question. Would the recording of certain liabilities on an accrual basis and other liabilities and assets on a cash basis be consistent with this conservative approach?
A. Yes.
Q. Okay. Let's turn to Exhibit 14.
I believe that previously you testified that you didn't believe that this memo provides an interest rate for post-insolvency interest for federal institutions closed after the National Depositor Preference Act. Do you remember testifying about that?
A. Could you repeat that?
Q. Sure. I believe you testified earlier that this particular memo, Exhibit 14, doesn't provide that -- you don't believe at least, that it

Page 187

provided an interest rate for post-insolvency interest for federal institutions closed after the National Depositor Preference Act?
A. I don't think that's correct.
Q. Would you like to take a moment to take a look at the memo? Please feel free to do so.
A. What kind of institutions are you asking me about again?
Q. Federal or national institutions closed after the effective date of the National Depositor Preference Act?
A. As I read items number 3 and 4 they look both to speak to national depositor preference state banks in number 3, as well as national banks in number 4.
Q. Okay.
A. I remember when we were discussing this previous day's testimony, there was a particular category that I was asked about that it looked like was not included but I don't recall that category was national depositor -- institutions that failed after national depositor preference was enacted.
Q. Okay. I have no further questions on that.
The next question I have for you is I

Page 188

believe you testified earlier that the FDIC in its corporate capacity stands in the shoes of the depositor after it pays off insured deposits; is that correct?
A. FDIC in its receiver capacity?
Q. In its receiver capacity.
A. Yes.
Q. Thank you for the correction.
Do you know if this statement that the FDIC in its receiver capacity stands in the shoes of the depositor after paying off insured deposits, is it based upon statute, case law, regulation?
A. I can't answer that.
Q. Okay. And because the FDIC stands in the shoes of the depositor as a separate entity, is it entitled to the same rights that the insured depositor would have been entitled to?
A. I believe it is.
Q. Let me ask you this question: Is the fact that the FDIC stands in the shoes of the depositor, would that be the reason that the FDIC is entitled to post-insolvency interest being calculated on the full amount of an insured deposit, as opposed to a net wire amount where you have an acquirer paying a deposit premium?

Page 189

A. As best I can remember, that was the logic.
Q. Okay.
A. I think I need to go back. I think I more understand the distinction you're making. I would describe -- the FDIC as insurer stands in the shoes of the depositors.
Q. Okay.
A. So I don't know that I would put a -- perhaps that would be the FDIC corporate capacity. Because our insurance responsibility and our corporate capacity were as managing and executing the receivership estate, we tend to term our receiver capacity.
Q. Thank you for that clarification.
A. I definitely was referring to the FDIC in its insurer capacity and using the terminology corporate. That definitely is what I was referring to.
Q. Previously at your deposition, you talked about an escrow funds account. Could you describe what that account is exactly and how it functions in general?
A. I don't really have a strong recollection of the -- of it. It's been quite a long time since

Page 190

I've ever thought about the escrow funds account.
But thinking about the deposition from a few days ago, the recollections that came to mind at that time were the difference between the estimated insured deposits and the amount funded to an acquirer would be established as a liability to the receivership, reflecting the fact that corporate did not outlay the cash but had an obligation to the receivership for the component that cash was not provided for, relative to the total amount of the insured deposits.
And then that liability account was interest-bearing and would continue to exist on the corporate books until the receiver declared and paid a dividend and funds were used to offset that liability.
Q. Okay. I believe you also testified that there can be a differential in the escrow funds rate or interest rate and also the post-insolvency interest rate; is that correct?
A. I believe that that did happen, yes.
Q. Could it -- was it possible -- or is it possible, I should say, for the escrow funds interest rate to be less than the post-insolvency interest rate?

Page 191

A. I would say it would be possible. I don't know of the circumstance necessarily that it was. I believe the rates -- the post-insolvency interest rates would have been established based on whatever the statutory or regulatory or whatever appropriate guidance existed that mandated post-insolvency interest versus the escrow funds rate. I believe that was a rate that was -- we looked more to internal indicators. So they are could have been an imbalance there.
Q. Okay. So both rates could fluctuate and one could be higher than the other at one point in time and vice versa?
A. At a particular point in time, perhaps.
Q. If I could have you turn to Exhibit 23.
MS. DOHERTY: This copy has annotations on it so perhaps if the witness could look at your copy?
MS. HART: Let me make sure mine doesn't have annotations on it. Mine is clean.
BY MS. HART:
Q. Ms. Hughes, I'm going to hand you Exhibit 23. If you could take a look at it and familiarize yourself with it?
It's a statement of position which you may have testified perhaps was written by Elaine Tama,

Page 192

but I'm not certain about that statement.
A. I believe I mentioned that I hadn't seen this before.
Q. Okay. I'll ask you some questions. If you don't know, certainly let me know.
If the payment of post-insolvency interest by a receivership or conservatorship was not reasonably probable until the 95 percent threshold was reached, wouldn't the recording of post-insolvency interest in the first year of the receivership, absent attaining the 95 percent threshold, violate generally accepted accounting principles?
A. My personal opinion is no. It would not. Because post-insolvency interest is defined, by its nature we looked at it as a claim, a valid claim of the receivership estate.
But it was a claim whose value was not known but for the passage of time, because it was -- it was -- it is dependent upon the outstanding -- the outstanding balance due a claimant.
And that was dependent upon the timing of the liquidation of assets and the distribution of dividends; so it's a -- it's a liability that -- and a claim whose amount becomes known and defined over

Page 193

time.
Q. Okay. Let me ask you this question: The FDIC had this policy where upon repayment of 95 percent of the dividend payments by corporate, upon attaining that 95 percent payment threshold, that post-insolvency interest would then be recorded on the books after receivership?
A. Correct.
Q. Correct.
Was the basis of this policy decision the fact that generally accepted accounting principles require that a liability not be recorded until it's reasonably probable and estimable?
A. The probable-estimable criteria factored into the decision about when to reflect post-insolvency interest financial statements of the receivership. So it was more of a presentation issue as opposed to -- as opposed to a reflection on the existence of the claim itself.
Q. And was it because of those generally accepted accounting principles that if a receivership had not attained this 95 percent threshold in the first year of the receivership, post-insolvency interest would not be recorded in the books of the receivership in that year?

Page 194

A. I would say no. I would not go back to generally accepted accounting principles in ascribing that decision.
At the time, if I recall, our thinking on the matter -- and I say this with the recognition that the FDIC had hundreds and hundreds and hundreds of active receiverships for many, many years.
And almost all of those receiverships were receiverships that were significantly in the hole, as we would call them, in terms of the likelihood of making the deposit claims whole, let alone beyond the deposit claims class.
So I don't believe that the FDIC had a practice at the time to record post-insolvency interest on the receivership records. And what we were trying to do was to identify from a reporting perspective, recognizing that there were -- for some receiverships there was interest in the financial statements and from a presentation perspective, we were seeking to provide the best presentation possible for the readers of the statements.
And that's what took us to the discussion about post-insolvency interest. For those very few receiverships that were even possible -- you know -- an impossible situation to achieve the status of

Page 195

paying post-insolvency interest. So that's how the discussion came about relative to what do we do with it in terms of the financial statement presentations.
Q. Okay. Now were there two views regarding the presentation of post-insolvency interest in the financial statements, a minority view, which indicated to present it in the financial statements in the first year of the receivership, regardless of the repayment history, and then a majority view to present it in the financial statements once the 95 percent threshold was reached.
Is that correct?
A. I'm sure there were more than two views on presentation and calculation. I remember from the deposition the other day, again, there was an old e-mail or memo or something put in front of me where there was some reference to a minority view. I don't remember now even what that was speaking to, so I don't remember if that was this particular issue.
We -- when we dealt with these kinds of issues, we would tend to get many, many people together and listen to all of the input; and so again, there were likely many views as to when to recognize and at what point, if we should recognize it at all.

Page 196

And so I'm sure there was the view to record it on day one and that was -- that would have been fine. There was also the view we ultimately decided upon to record it when it became more likely there would be a chance of payment.
Q. Okay. And were there deliberations that occurred analyzing these different alternatives before you selected the 95 percent threshold method?
A. I would say again this was a -- this all occurred a long time ago. But I would say that I'm sure there were.
Q. And upon deciding that this 95 percent threshold method would be used, was it applied across-the-board to all receiverships?
A. I believe it was, but my position was not to do the accounting for the receiverships; so I only say I believe it was from the perspective of knowing that that was the conclusion that we reached, and I remember seeing post-insolvency interest and issues related to it further in financial statements.
Q. Are you familiar with the statement of financial account standards 5 which deals with contingent liabilities?
A. Yes, I am.
Q. Do you know if that particular statement

Page 217

Hughes along with others.
(A document was marked for identification as Exhibit No. Hughes-36.)
MS. HART: And the beginning Bates stamp number on this document is C-AM 9580669 and it goes all the way to C-AM 9580675.
BY MS. HART:
Q. If you want to make a moment to review this, please do so. It is e-mail and other attachments.
(Pause.)
BY MS. HART:
Q. Do you remember receiving this e-mail on Tuesday December 9, 1997 at 12:53 p.m. from Elaine Tama?
A. No.
Q. Do you remember receiving this statement of position dated 5-21-96 entitled Accounting for Receivership Advances?
A. No. But I remember the issues that were raised in the e-mail.
Q. Okay. If you will note in the second paragraph of the e-mail, written by Elaine Tama, it says in December 1996, the LLR -- do you know what

Page 218

that acronym stands for? Is it loan loss reserve?
A. It is.
Q. Okay. So the LLR stands for loan loss reserve?
A. Yes.
Q. Do you recall -- I think you mentioned this already, but to clarify for the record, do you recall discussing the problems that are listed on the -- in this e-mail written by Elaine Tama?
A. No. I don't recall discussing them.
Q. Okay. Do you recall any aspects about any discussions related to these problems that are listed in this e-mail?
A. I recall -- in reading these documents, I have a recollection of the issue, and I can understand the nature of the issue that the statement of position was trying to address.
It looks to me like Elaine Tama subsequently identified some problems that arose as a result of some actions that were taken upon the implementation of this statement of position.
I don't remember specifically one way or the other how the problems she identified were addressed.
Q. Do you know what impact if any the

Page 219

statement of position or discussions regarding these issues had on Carteret, if any?
A. I don't know about Carteret.
Q. Okay.
MS. HART: No further questions from me.
MR. COLATRIANO: Do you have any?
MS. DOHERTY: No. No questions.
MR. COLATRIANO: I'm going to have 10 to 15 minutes maybe, hopefully less. Do you want to take a break or just go right into it?
THE WITNESS: I'm fine.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. COLATRIANO:
Q. Good afternoon, Ms. Hughes. Vince Colatriano representing plaintiffs AmBase Corporation. Let's begin where we left off with Exhibit 36. I believe counsel asked you about whether this issue addressed in this exhibit Accounting for Receivership Advances had any impact on Carteret.
And I think you just testified that you don't know, correct?
A. Correct.
Q. If you look at the three charts that are at the end of this exhibit, Bates stamped last four

Page 220

numbers 0673, 0674, and 0675, each one has a list of loans payable, FDIC, RTC, FINs; and I don't see Carteret's FIN which is 1309 listed on this exhibit.
Do you agree with that?
A. Correct.
Q. This exhibit makes reference to SFAS 5, which I believe counsel also asked you about earlier today, correct?
A. Correct.
Q. I think you said SFAS 5 had, I think the word you used was influenced the discussions within the FDIC that led to the adoption of the 95 percent threshold for recording PII on a receivership balance sheet?
A. The concepts within that statement, correct.
Q. Okay. Does SFAS 5 use a 95 percent threshold or anything like that for determining whether a liability is probable or reasonably estimable?
A. It does not.
Q. Okay. If I give you a hypothetical where a receivership -- let's say a receivership has not yet paid off 95 percent of its -- of the principal amount of the claims against it, let's say it has

Page 221

paid off 90 percent, but you can tell from the balance sheet that it has sufficient assets -- sufficient net assets to pay off the rest of those claims, would you agree with me that in that circumstance, it would be probable that the principal amount of claims against the receivership would be repaid?
A. I would agree that it could be, depending upon the circumstances of the receivership.
Q. What other circumstances could influence that?
A. Other liabilities, the -- the asset valuations, things like that.
Q. Okay. And when I use the term net assets, I was at least intending to refer to all assets, minus all liabilities that had been recognized. So does that influence -- does that affect your answer at all?
A. Repeat the question again.
Q. If the net assets of a receivership that has not yet paid 95 percent of the principal amount of claims, if the net assets are sufficient to indicate that a hundred percent of those claims will eventually be paid off, would you agree with me that in that circumstance it would be probable from an

Page 222

accounting standpoint that the claims would be paid off in full?
A. It seems so. If all of the valuations and the liability identification are such that it looks like the receivership would pay a hundred percent of the claims, then yes.
Q. Okay. And from the standpoint of reasonably estimable, would you agree with me that the amount of post-insolvency interest on a claim is reasonably estimable at a point in time?
A. Post-insolvency interest is a constantly changing amount up until the point that the claim in which the interest is paid has been paid in full.
Q. But at any particular time -- correct me if I'm wrong -- the two components to calculate post-insolvency interest would be -- or I guess three components. The amount of time that has elapsed, correct?
A. Correct.
Q. The principal amount of the claim on which post-insolvency interest would accrue, correct?
A. The net principal amount, correct.
Q. Okay. And the interest rate, correct?
A. Correct.
Q. And if you -- would you agree with me that

Page 223

at any particular point in time, those three variables would be known?
A. They would be known up to the point in time that you were performing the calculation.
Q. Right. Okay. Earlier in today's testimony there was a discussion of the escrow funds rate. Do you recall that?
A. I do.
Q. And I think you said -- please correct me if I'm wrong -- that whereas post-insolvency was governed by statutes or regulations or other legal authorities, the escrow funds rate was determined primarily based on, I think the term you used was internal factors.
Do you recall that?
A. I recall saying that; and that statement is based on my recollection of what was governing those -- the rates at the time.
Q. Okay. What did you mean by internal factors?
A. That there was no -- I don't believe that there was a statute or regulation to point to to identify the interest rate that would be associated with the escrow funds.
Q. Okay.

Page 224

A. So the FDIC used its judgment to come up with the appropriate rate.
Q. And what types of factors would go into that judgment decision?
A. I don't remember.
Q. Okay. If you turn to Exhibit 24? And I'm not sure which copy of that you used. Whether it was Ms. Hart's or Ms. Doherty's. Okay. We have it. This is the dividend case that counsel asked you about. Do you recall that discussion?
A. I do.
Q. And if you turn to the chart which begins on the fourth page of the exhibit, the spreadsheet?
A. Okay.
Q. I think you stated that based on the fact that Carteret failed as that term is -- however it is used in this document, on January 20, 1995, I think you said that the fact that Carteret was categorized for purposes of this chart as established prior to August 10, 1993 was incorrect.
Do you recall that discussion?
A. I do.
Q. Let me represent to you that Carteret was initially seized and placed into a past-due receivership and conservatorship in December of 1992

Page 225

A. Okay.
Q. If that is what is being referred to by established in this chart, then that categorization would not be incorrect, correct?
I used too many corrects in that question. Let me try again for the record.
If the date on which Carteret was initially seized and placed into a past-due receivership and conservatorship was the date that governed for purposes of this categorization reflected in this exhibit, then that categorization would be correct?
Would you agree with that statement?
A. Yes.
Q. And this schedule is attached to the exhibit which is a RTC accelerated dividend case; and I believe at your initial deposition 10 days ago we talked about the fact that this dividend case was approved. If you look at the signatures on the second page of document, correct?
A. Correct.
Q. There are two signatures under the heading Approved Under Delegated Authority, Alan Rouse and Thomas J. O'Keefe; do you see that?
A. I do.

Page 226

Q. And the dividend case itself was signed by three people, Irene Sanchez, Linda Shaw, and Patrick Schoot, correct?
A. Correct.
Q. So presumably all five of those people reviewed this document, correct?
A. If they signed it, I would assume they did --
Q. Okay.
A. -- review the document.
Q. And you don't have any reason to believe all five of those people made a mistake with regard to the categorization of Carteret, do you?
A. I don't know. I guess I want to say this is a document prepared in the field. It would not have come to the Washington office for review or approval. I have seen these types of things before, but I don't know anything about how the decisions that went into the classification or the spreadsheets or the like.
So I wanted to make that clear, okay?
Q. Whatever -- however those decisions were made, the decisions were reflected in a document that was signed off on by three people and approved by two different people, correct?

Page 227

A. That is what the dividend case looks to say. Yes.
Q. Okay. If you could turn to both Exhibit 27, which is the February 22, 2001 memo from Thomas Bolton and Exhibit 35 which is the new exhibit, the chart on the post-insolvency interest?
Again I'm not sure which version of the exhibit you reviewed?
MS. HART: Not mine but the initial one.
BY MR. COLATRIANO:
Q. Exhibit 35, the chart, I believe counsel asked you about the column entitled Applicable FDIC Guidance. And for the line item for all federal and state insured depository institutions the applicable FDIC guidance identified was the February 22, 2001 memo from Mr. Bolton, correct?
A. Correct.
Q. I believe you testified as far as you can tell that's referring to Exhibit 27?
A. Correct.
MS. DOHERTY: Object to the characterization of the witness's prior testimony.
BY MR. COLATRIANO:
Q. Let me ask you, do you have any reason -- which -- do you believe that the chart, Exhibit 35,

Page 228

under applicable FDIC guidance, the February 22, 2001 memo that's being referred to is the document that's been marked as Exhibit 27?
A. It looks to be.
Q. Okay. Now, Exhibit 27 addresses the priority of post-insolvency interest, correct?
A. Per the subject, correct.
Q. And I believe you actually reviewed the memo today as we were talking about, correct?
A. I did.
Q. Does Exhibit 27 establish policy or describe the practice with respect to what interest rate was to be used for post-insolvency interest?
A. No. It looks to really focus on the payment priority of the interest.
Q. Okay.
MR. COLATRIANO: I have no further questions at this time. Thank you very much.
FURTHER EXAMINATION
BY COUNSEL FOR DEFENDANT
BY MS. HART:
Q. Ms. Hughes, turning back to statement of Financial Accounting Standards 5 --
MS. DOHERTY: What exhibit number is that?
MS. HART: It doesn't relate to a specific