UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - | ) | |
| AMBASE CORPORATION and CARTERET | ) | |
| BANCORP, INC., | ) | |
| Plaintiffs, | ) | |
| and | ) | No. 93-531 |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |
| - - - - - - - - - - - - - - - - | ) | |

Washington, D.C.

Friday, April 7, 2006

Deposition of KAREN JEAN HUGHES, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:39 a.m., Friday, April 7, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 10

A. M-hm.
Q. If at any point you need me to clarify or rephrase a question, I'd be happy to at least try to do so.
A. Okay.
Q. I want to make sure you understand the questions.
And also, try not to talk over each other so we can get as clean a record as possible from the court reporter.
What is your current position?
A. Deputy director and controller, division of finance.
Q. At the FDIC?
A. At the FDIC.
Q. And how long have you held your current position roughly?
A. 6 years.
Q. What, if anything, have you done to prepare for today's deposition?
A. Met with attorneys to talk about the process and understand expectations for coming in today, did a file-and-record search to gather whatever documentation I may have had based on the request for documentation and reviewed some materials

Page 11

during the course of the meetings with Ms. Doherty.
Q. Did you have meetings or discussions with anyone else involving either this deposition or Carteret -- the Carteret receivership over the last couple of months?
A. Only that the depositions were being taken and that I was identified as a potential deponent, if that's the right word, and then hearing from others that they have or had not also been identified.
Q. Okay. Have you talked with anyone about the substance of their depositions?
A. No.
Q. Can you briefly summarize for me your educational background, any college degrees or postgraduate degrees you have.
A. Got a degree in accounting, Virginia Tech, passed the CPA exam.
That's it probably for education.
Q. Okay. When did you receive your degree in accounting?
A. '88, 1988.
Q. Are you currently certified as a CPA?
A. No.
Q. Can you now briefly summarize for me in chronological order if you can your professional

Page 12

experience. Let's begin with after you received your accounting degree from Virginia Tech.
A. I was -- started at General Accounting Office as an auditor, and then came over to FDIC in 1987 and started in the finance division, was in the finance division in various capacities until about 1993, and then went over to what was at the time called the division of liquidation, and was there for about 3 years, came back to the finance division in '96 in a special assistant capacity, and then 1 or 2 years after that became I think an assistant director in the reporting branch, and then I believe it was in 1997 where I filled my current position.
Q. Okay. Thank you.
When you first joined the finance division, and until you transferred to the division of liquidation, what were your duties -- what were your responsibilities?
A. I was in the operations area to start with, and then came into a newly formed group, accounting policy, and then eventually the accounting policy area grew to include tax as well as -- I think it was called fiscal control, but it was an internal control type of function.
Q. And what were your responsibilities in the

Page 13

operations area?
A. Loan loss reserve calculation and supporting the financial statement preparation work for the corporation.
Q. Okay. Did you work on receivership matters in the operations area?
A. More from the corporate capacity.
Q. Okay. And then what were your responsibilities in the accounting policy area?
A. Establishing accounting policy for the FDIC as a corporation, and sometimes that would cross over into receivership activities when we were dealing with questions of the relationship between the corporate and receiver.
Q. And then did you say you then went to sort of a tax or an internal control function?
A. Those functions became part of -- sort of merged with accounting policy, so the scope of the area I was in grew.
Q. Okay. All right.
And then in approximately 1993, you transferred to the division of liquidation for about 3 years?
A. (Nodding head.)
Q. What were your responsibilities in that

Page 14

division?
A. I went there initially over the reporting, and then as people left the organization, assumed new responsibilities and eventually had assistance implementation effort under --
(Telephone ringing.)
MR. COLATRIANO: I'm sorry.
Can we go off the record?
(Discussion off the record.)
(Mr. Bianco joined the deposition by telephone.)
MR. COLATRIANO: Dick Bianco has joined us.
Dick, who we have here is obviously Ms. Hughes, the deponent, Ashley Doherty and Andrew Gilbert from FDIC plaintiff, Leslie Conover from FDIC defendant, and Linda Hart from DOJ.
BY MR. COLATRIANO:
Q. I'm sorry.
Ms. Hughes, you were I believe describing your responsibilities in the division of liquidation starting in 1993.
Could you go ahead and pick up with that.
A. M-hm.
So eventually, I was involved in

Page 15

receivership operations as well as some asset services responsibilities.
Q. Okay. And you said first you started in the division of liquidation in a reporting capacity?
A. M-hm.
Q. Is that receivership reporting?
A. It was -- it was summarizing receivership activity from more of a program perspective.
Q. Okay. And when you started doing receivership operations, what does that mean?
A. We were in a policy capacity, so we worked on various receivership issues, whether it was claims-related receivership, termination-related, and worked closely with the field offices where they were actually handling receivership execution.
Q. Okay. And with respect to asset services, was that also in a policy capacity, coming up with -- developing policy for asset services issues?
A. Not so much.
It was more systems support capacity, more from a payment processing perspective.
Q. And then was it approximately in 1996 that you went back to the finance division?
A. Yes.
Q. And I believe you said that you were first

Page 16

there in a special assistant capacity.
A. Correct.
Q. What were your duties and responsibilities in that role?
A. Serve as special assistant to the director of the division of finance, staffing issues, planning issues, just general division coordination issues.
Q. Okay. And who was the director at that time?
A. Paul Sachtleben.
Q. And I'm sorry.
I should have asked you this at the outset: During your entire tenure at the FDIC, were you in the Washington area?
A. I was.
Q. Okay. And then after serving as a special assistant to the director, you became -- I think you said an assistant director in the reporting branch?
A. Yes.
Q. What were your responsibilities in that role?
A. Corporate financial statement reporting, regulatory reporting. I believe at some point in that capacity, accounting and tax policy was moved to become part of my branch, and we also worked on

Page 17

various receivership reporting matters as well in that capacity.
Q. Do you know approximately when the accounting and tax policy function was transferred to your branch?
A. It would have been sometime between '97 and '99.
Q. Okay. And in 1997 or thereabouts, you assumed your current position as deputy director and controller at the division of finance?
A. 1999.
Q. Oh, I'm sorry.
A. I was at the assistant director level for I think 2 years, about 2 years.
Q. Okay. All right.
And what have been your duties and responsibilities in your current position?
And if they've changed since you assumed that position, please walk me through that as well.
A. The -- I'll call it a department that I had was called accounting and reporting, which is probably more descriptive than controller.
We had responsibility for FDIC as a corporate entity in terms of accounting functions as well as again corporate and regulatory reporting

Page 18

functions. We had operations in terms of receivables, disbursement processing, and then accounting and tax policy was also a function of that.

I believe it was close to 2 years ago when accounting and tax policy was pulled out of my group and moved to a different department. And then starting in probably latter part of 2003, my primary responsibility was systems implementation effort, financial systems implementation effort.

Q. Okay. When the accounting and tax policy function was pulled out of your division, what was it transferred to?

A. It was moved to a different department within the finance division.

Q. Okay. And which department is that?

A. I believe it was called DOF operations. We had done a reorganization, and the group was moved.

Q. In your current position, to whom have you reported?

And if that's changed over time, please let me know.

A. I report directly to the director of the division, Fred Selby, and he has been my director I

Page 19

believe for as long as I have been in this position.

Q. At the outset of this deposition, you noted -- you said that other than an EEO matter, you don't recall giving any deposition testimony in any other proceeding.

Have you given any other types of testimony, either in a hearing or a trial or before Congress?

A. No.

Q. Have you ever served as an expert witness involving FDIC receivership issues or accounting issues?

A. No.

Q. Okay. You mentioned that in various capacities, you've had a role in developing policies for the FDIC.

Can you recall specifically what policies you've had a role in developing as it relates to receiverships?

A. Let's see, subsidiary accounting, policy on how the corporation should record and value receiverships.

I wouldn't say they were necessarily accounting policies, but reporting policies and practices for receivership financial statements.

Page 20

Those are what I remember.

Q. Okay. Have you participated in the development of any policies at the FDIC regarding the administration of conservatorships or receiverships?

A. Receiverships.

I remember some dividend policies, termination policies, again, policies relative to asset and liability evaluation matters.

Q. Have you participated in the development of any policies regarding the marketing or sales of assets from receiverships?

A. I don't remember.

Q. Have you participated in the development of any policies regarding the determination of or the calculation of FDIC corporate's subrogated claim against receiverships?

A. I would say yes, and that would define the subrogated claim broadly to include all payable, receivable relationships between corporate and receiver.

Q. What policies regarding payable, receivable relations have you participated in?

A. That would be dividends.

MR. COLATRIANO: Dick, are you still on the line?

Page 21

MR. BIANCO: Yeah.

I can hear you clearly, but I can't hear the person being deposed.

MR. COLATRIANO: Okay.

(Discussion off the record.)

BY MR. COLATRIANO:

Q. At any point while you were at the FDIC, were you ever detailed to the Resolution Trust Corporation?

A. No.

Q. Have you ever participated in the development of any RTC policies?

A. Early on the life of RTC before it separated from the finance division, whatever we were called at the time, we were -- we were responsible for some of the early issues of the RTC from the accounting perspective. So in that capacity, I would say likely, but I don't remember specifics.

Q. Is it fair to say that to the extent you participated in any such policy, it would have been from an accounting standpoint?

A. Yes.

Q. Okay.

A. Yes.

And then when RTC merged back with FDIC,

Page 22

there may have been policy activity at the time, whether it was accounting policy or receivership operations policy and practice, which then would have considered RTC receivership impacts and implications as well.
Q. Okay. Can you describe any role that you had with respect to any issues involving the administration of the Carteret receiver or conservatorship.
A. I had no role in the administration of the Carteret receivership or conservatorship.
Q. Do you recall whether you played any role in any issues involving the final resolution of Carteret?
A. Upon failure?
Q. Yes.
A. No.
I played no role in the resolution of Carteret.
Q. And just to clarify, when you said, upon failure, what did you mean by, failure?
A. At the time Carteret was closed.
Q. Okay.
A. We tend to use the word resolution to describe the life of the receivership at times.

Page 23

Q. Okay. And when you say, Carteret was closed, are you referring -- let me put it this way: Carteret, the thrift, was initially -- was seized by the RTC in December of 1992.
A. Okay.
Q. And then there were a series of what I've been calling resolution transactions in 1994 and 1995.
A. Okay.
Q. But when you say, when Carteret was closed, are you referring to when the RTC initially seized it?
A. I was referring to what would have happened in 1995.
Q. Okay.
A. But with your chain of events, I was not involved in any of those actions or activities.
Q. Do you recall being involved in any issues or matters involving financial reporting as it pertained to Carteret?
A. Not during that time and not until I was assigned reporting responsibilities where we would have begun to prepare goodwill financial reporting packages for the goodwill institutions, of which Carteret was one.

Page 24

Q. Okay. Do you recall working on any matters pertaining specifically to how Carteret's financial reporting should be handled?
A. Only from the perspective of Carteret was one of however many goodwill institutions that we were preparing the financial reporting package for.
Q. Okay. Do you recall being involved in any issues regarding the determination or estimation of claims against the Carteret receivership, including the FDIC corporate subrogated claim against the Carteret receivership?
A. Not individually for Carteret, but to the extent that a particular more global issue would impact Carteret, Carteret as an institution would have been become part of those discussions and the ultimate decision.
Q. Okay. Do you recall offhand any such issues that came up that impacted Carteret in that fashion?
A. I know from looking at documents and preparing for this that I had a refreshed memory. Carteret would be impacted by the -- I don't remember what it stands for, but it was a PSA adjustment. Carteret would have been impacted by decisions relative to goodwill expenses and how they were

Page 25

distributed to the receiverships within the goodwill pool of litigation.
There was a lot of interest in postinsolvency interest in some of the documents I reviewed prior to the depositions, so perhaps Carteret was or was not impacted by those. Carteret would have been impacted by the decisions we made to include or exclude items for the financial reporting package.
Q. A few minutes ago, I was asking you what role you played in the development of FDIC policies. One area I left out was tax policies.
Have you played any role in the development of any FDIC policies regarding tax issues or financial reporting issues as it pertains to taxes?
A. The role from a supervisory perspective -- and because at various points in time tax reported to me or there were issues that were tax-related that may have related to other things such as reporting, I would have been involved in some type of perhaps a leadership perspective of getting the right people together to talk through an issue and help make decisions or recommendations.
Q. Okay. What is your understanding of how

the typical resolution transaction worked when deposits were transferred to an acquiror, deposits of an institution and conservatorship or receivership?
How did that work from the FDIC corporate standpoint?
What funds were expended, those types of things?
A. The FDIC is responsible for funding the insured deposits, and if there is an acquiror who took the deposits, oftentimes in transactions, assets were also passed, and so the corporation would fund the hole if there was a hole difference between the assets and the liabilities taken by the acquiror.
And then from a funds perspective, as I said, FDIC would send money to the acquiror if there was a difference in the assets assumed versus the liabilities. I don't remember -- I believe that was treated as a gross transaction on the corporate's books where corporate would stand in the shoes of the depositors and receive from the receivership estate recovery for the deposit claims of the failed institution.
Q. And I'm sorry.
What do you mean when you say it would be treated as a gross transaction?



A. The corporation's claim relationship with the receivership was for the deposit liabilities of the failed institution, and if assets were also passed to the acquiror, then that would ultimately serve to be -- that meant that corporate put out less cash at the time of that transaction, but that value had to work itself through the receivership, ultimately be recognized as reducing the claim that the corporation had against the receivership for the deposits funded -- for the deposits of the institution.
Q. And what do you mean when you say that the assets had to work their way through the receivership in order for I guess the receivership to get credit for those assets?
Is that what you're saying?
A. For the receivership to -- for the receivership to conduct its operation and to realize and reflect the value for those assets and in their dividend distribution decisions.
Q. Okay. What was the rationale for -- strike that.
Is what you're saying that -- is another way of saying what you just said that the FDIC subrogated claim against the receivership in



connection with this type of transaction would be measured by the gross amount of the liabilities transferred, not by the net amount of the actual wire transfer from the FDIC --
A. Yes.
Q. -- to the acquirors?
A. Yes.
Q. What was the rationale for measuring the subrogated claim by that gross amount rather than by the net amount?
A. I believe it would be that that was the amount of the deposit liability and that that was the amount that initially should be reflected on the corporate books to represent the gross amount of the deposit liability.
Q. And how would deposit premiums factor into this if the acquiror paid a deposit premium?
A. I don't remember specifically, but I believe that the premiums were treated as value at the receivership level.
Q. And what does that mean as it relates to how the subrogated claim is calculated?
A. I don't believe the premiums impacted how the subrogated claim was calculated.
Q. In the situation we've been talking about



where there's a transfer of deposits and a transfer of some assets, also a premium paid for those deposits, what would the economic cost to the FDIC be in that situation, FDIC corporate?
A. I would say from a cash flow perspective, the impact was the net amount that the corporation paid out.
Q. Any other perspective in which the economic cost would be something other than the amount of the wire transfer?
A. There's an adjustment period post the initial transaction where some assets could be returned to the receivership estate for liquidation if the acquiror ultimately decided that they did not want them, so that would factor in, I believe.
That would not influence the subrogated claim that the corporation had established, because that is a reflection of the liabilities of the receivership.
Q. Were you involved in any discussions or policy decisions regarding this issue, by which I mean, subrogated claims going to be measured by the gross amounts of liabilities versus the net wire transfer?
A. I have vague recollections, but I don't

Page 30

remember specifics.
Q. Okay. What are your vague recollections?
A. Just that there were issues that had come up about the -- I believe it was called a net wire transaction and how that would impact -- how that would be reflected on the corporate books.
Q. What was the FDIC's cost of funds, FDIC corporate's?
MS. DOHERTY: When, where?
A. Right.
I don't have --
BY MR. COLATRIANO:
Q. Well, in a situation where there's a wire transfer to an acquiror, corporate is transferring funds to that -- is wiring funds to that acquiror.
Correct?
A. Correct.
Q. Where was it getting those funds from?
Was it borrowing them?
A. The FDIC has a fund balance, so it would have used funds that it had on hand, if it had funds on hand.
Q. And if it doesn't have funds on hand, would it borrow those funds?
A. Yes.

Page 31

Q. Do you know from where?
A. FDIC had borrowing authority from the U.S. Treasury, I believe.
Q. And do you know what the cost of those borrowings was, what it was measured by, what interest rate applied or anything like that?
A. No.
Q. Were you involved in any policies -- were you involved in the formulation or development of any policies regarding what the cost of funds would be or should be for the FDIC?
A. I don't remember.
Q. Okay. Do you know what -- we've been talking about how the FDIC would conduct these types of transactions.
Is your understanding of how the RTC would conduct these transactions any different to the extent you have an understanding of how the RTC did it?
A. I don't know what RTC did.
Q. Okay. Do you know where the RTC got its funds to fund these types of transactions?
Did it borrow from the same source as the FDIC?
A. RTC received appropriated funds as well as

Page 32

funds from the Resolution Funding Corporation.
Q. And do you know whether -- strike that.
Have you seen any documents or have you reviewed any other information which would indicate what the RTC's cost of funds was when it was in existence?
A. No.
Q. Okay. We've marked and you should have in front of you 9 exhibits which are the goodwill financial reporting packages for the Carteret receivership. Let me just go through these for the record. Follow along with me to make sure I got the exhibits right.
Exhibit 1 should be the 1997 financial reporting package.
Correct?
A. So it says.
Q. Okay. And exhibit 2 is the 1998.
Correct?
A. So it says.
Q. And exhibit 3 is 1999?
A. So it says.
Q. And exhibit 4 is 2000?
A. Yes.
Q. Exhibit 5 is 2001?

Page 33

A. Yes.
Q. Exhibit 6 is 2002?
A. Yes.
Q. Exhibit 7 is 2003?
A. Yes.
Q. Exhibit 8 is 2004?
A. Yes.
Q. And exhibit 9 is a restated 2004.
Correct?
A. Yes.
So it says.
Q. Okay. What role did you play in the preparation of these financial reporting packages?
A. Worked with staff to help determine the content that we thought would be most value added to these proceedings, and then reviewed the results in terms of the final signoff for the package.
Q. Okay. And does that apply -- what you just described, does that apply to all of these?
I notice that your name appears on the cover letter through the 2000 report, but not on the subsequent ones.
Has your role in the preparation of these reports changed?
A. The responsibility at the time was still

Page 58

document marked as exhibit 14, please.
(Hughes Exhibit No. 14 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 14 is a memo dated June 8th, 1995, from Stephen Graham, Alvin Kitchen, and Thomas Rose to all regional directors, all regional financial officers, and all regional counsel, subject, receivership's postinsolvency interest. It's Bates-stamped AM 0010339 through and including 340.
Did you play any role in the development of any policies that led to the preparation of this memo?
A. I likely did.
Q. What are you basing that on?
Do you have a recollection of it, or --
A. I was in the liquidation division at the time, involved in receivership operations, and I remember this memo. This was one of the documents that I saw preparing -- or reviewing documents for today. And I remember generally the content.
Q. Okay. So am I to -- I take it it's fair to say that sometime prior to preparing for this deposition, you've seen this document before.

Page 59

Correct?
A. Yes.
Q. And is it fair to say that you -- your recollection is, you played some role in at least the formulation of the policy that's expressed in this document?
A. I would say that I probably did.
Q. Okay. Do you know whether you drafted this document?
A. I would say that I probably did not.
Q. Is it likely you reviewed it at the time it was prepared?
A. Yes, likely.
Q. Okay. The first paragraph says that: The DAS operations section, DOF financial reporting branch, and liquidation branch of the legal division have reviewed and discussed the appropriate interest rate to utilize in making postinsolvency interest distributions from receivership estates.
Do you know what prompted that review that's being referred to here?
A. Don't know with absolute certainty, but believe that issue -- that there were situations where receiverships were approaching surplus situations from the perspective of having the

Page 60

subrogated claim, the deposit claim liabilities paid, and the issue therefore postinsolvency interest as a claim in the scheme of payment priority would have started to surface.
Q. Second paragraph says: The interest rate that should be utilized in making postinsolvency interest distributions to creditors is largely dependent on when the institution failed, the jurisdiction it was in, and whether it had a state or federal charter.
Do you know why the interest rate that should be utilized was dependent on when the institution failed?
A. I would speculate that --
MS. DOHERTY: He asked whether you knew. He didn't ask you to speculate.
BY MR. COLATRIANO:
Q. Well, do you have any understanding of why the interest rate was dependent upon when the institution failed?
A. I believe the time of the failure could have impacted the laws or regulations that governed postinsolvency interest for the particular failure.
Q. And what does this memo mean when it says, when the institution failed?

Page 61

What does, failure, mean in this context?
A. Generally would have meant the date of the final receivership.
FDIC institutions did not have conservatorships generally. Don't want to say that with a hundred percent certainty.
We had -- we used bridge banks, and not every resolution went through a bridge bank before it went into final receivership. I believe we had in relative numbers a few number of bridge bank resolution, so I would interpret this date of failure as the date of the receivership for FDIC institutions would have tended to be the one and only receivership.
Q. Was this memo designed to only address postinsolvency interest rate for FDIC institutions?
A. I believe it would have been.
Q. From the perspective of the FDIC corporate, does the cost of resolution depend at all on when the institution failed?
A. It could have, again, because depending on the laws or regulations governing a particular receivership at the time it failed, there were rules relative to, say, depositor preference or nondepositor preference, and so the extent to which

Page 70

Under what circumstances would that happen?
A. The corporate proof of claim is the -- it represents the balance that's owed from the receivership to the corporation to repay the insured deposit coverage. And I think the term CPOC, corporate proof of claim, was really referring to the amount owed corporate in the deposit insurance capacity.
So that CPOC would be reduced every time the receivership paid a dividend, because the outstanding balance owed would have been reduced by the amount of the dividend. So it sounds like in the actual records of the receivership estate, there was -- corporate proof of claim was reduced as if the dividend had been paid or the dividend adjusted -- dividend paid, but the actual dividend didn't occur until sometime later.
So if you're calculating postinsolvency interest on the CPOC, the timing of all of that makes a difference. And it looks to be saying, shouldn't we go back and adjust the dividend as if it happened on the date of the corporate proof of claim reduction.
Q. Your email says -- on the first page of

Page 71

this exhibit says, the third issue is a Wash -- by which you mean I assume Washington -- biggie that I will discuss with Dennis Nolan, et al., upon his return from the DOF conference next week.
I'm assuming you're referring to the paragraph we've been discussing, paragraph number 3.
Do you know why you said that that issue was a Washington biggie?
What did you mean by that?
A. I would guess that it is, because if that is in fact conveying -- conveying timing issues that we had relative to when all of the pieces of a transaction got recorded and we were trying to figure out how to calculate postinsolvency interest for a receivership, the timing issues of those pieces, we had to come to some conclusion on before we could correctly calculate the interest.
Q. Okay. Who was Dennis Nolan?
A. Dennis was in -- I was in the liquidation division at the time of this email, and Dennis was in the finance division in the group that dealt with the receivership operations issues from an accounting perspective.
Q. Turning back to the attachment on the second page of this exhibit, the fourth numbered

Page 72

paragraph says: How often are interest accruals to be updated for receiverships that have not reached the 100 percent dividend mark.
Does this statement suggest that the practice at this time was to record postinsolvency interest before a hundred percent of the dividends had been paid?
A. That is what it sounds like.
Q. Okay. And I take it from our earlier discussion that you don't have an understanding or you don't have a recollection of what the standard was at this time for when that accrual would actually be booked?
A. Correct.
Q. And the fifth paragraph talks about the fact that some of the postinsolvency interest rates used by the field offices, quote, were not correct, close quote.
Do you know in what respect they were not correct?
A. I don't know, but again, this looks to be a laundry list of issues that arose as the field was looking to do its calculations of postinsolvency interest, so perhaps somewhere in calculations made previously, they had used rates or made decisions

Page 73

that were in error.
Q. But you don't recall specifically how they were wrong?
A. I don't, because all of that would have -- those decisions would have been made out in the field for an individual receivership.
Q. Okay. That's all I have for that document right now.
MR. COLATRIANO: Have this document marked as exhibit 16, please.
(Hughes Exhibit No. 16 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 16 is printout of an email from yourself to a number of recipients, subject, postinsolvency interest calculation, dated December 8th, 1995. It's Bates-stamped AM 010469.
I take it I'm correct, this is an email that you prepared.
Right?
A. It looks like, yes.
Q. Okay. The first paragraph says that: One of my to-do items from the November claims conference was to follow up with DOF on whether a policy

Page 74

statement existed relative to booking in the receivership financial statements, a liability for postinsolvency interest. According to Dennis Nolan, there is no policy statement, and current practice is to only book interest when the FIN turns a surplus.
What did you mean by, surplus, in this context?
A. The point at which the deposit liabilities have been paid or perhaps all of the higher-priority liabilities have been paid.
Q. Okay. In that respect, is that statement that the current practice is to only book interest when the FIN turns a surplus -- is that inconsistent with the statement in our previous exhibit that I think paragraph 4 on attachment to exhibit 15, it seemed to indicate that interest was being booked before the institution reached the hundred percent dividend mark?
I'm trying to see whether those 2 statements can be reconciled.
A. If in fact there was no policy or practice to book interest until the institution turned surplus, then you could look back at the number 4 of the previous document and say that perhaps the answer was, they are not, not how often they are, just, they

Page 75

are not until the institution reaches a hundred percent dividend mark.
Q. Okay.
A. I don't know if this list of questions was prepared by someone who was simply asking a question, or because they didn't know or they were asking the question because they knew.
Q. Okay. I read that question, question 4 in the previous exhibit to be based on a premise that interest accruals were occurring before the institution reached a hundred percent dividend mark.
I take it you're saying that that's not necessarily the case?
A. When I read this by itself, I had the same conclusion as you did, but then I look -- because I had previously commented that I didn't know that there was a particular policy in place. The document number 16 email seems to confirm that there was not.
And then I -- I know the Michael Hughes that this came from, and he was in Washington. He was in the Washington division of finance, not in the field liquidation division, so it isn't difficult for me to interpret this as simply he just didn't know and was asking the question.
Q. Okay. I take it Michael Hughes is no

Page 76

relation?
A. Correct.
Q. Okay. Turning back to exhibit 16, the December 8th email, in the second paragraph, you say: Dennis further explained that there is an issue with the higher-ups on the rate that corporate should be receiving for postinsolvency interest.
What did you mean by that?
A. It seems to be implying that there was still some ongoing discussion about the rate to use. I don't remember anything beyond that.
Q. Okay. And there was still some discussion, even though as we saw in exhibit 14, in June of 1995, the FDIC issued this memo purporting to say which rates should be used in which situations.
Correct?
A. Apparently, yes.
Q. Okay. And what is the reference to higher-ups in this statement?
Do you know who that's referring to?
A. Likely perhaps the signers of the June 8th, 1995, document and above.
Q. I take it you don't recall what the nature of their concern was with the rates that they had set out in that June 1995 memo?

Page 77

A. Vague recollections of many different transactions where interest rates were established. There was the escrow funds component of the net wire that had an interest rate associated with it. If there was an advance to a receivership, there was an interest rate associated with that, and obviously, a rate associated with postinsolvency interest.
A vague recollection of a concern that because sometimes the postinsolvency interest rates could be fairly high if it locked into a date of failure at a particular rate, and if it was not adjusted, governed by whatever guidance said that that was the rate to use, that could be very high in comparison to some of the other rates and what it looked like the FDIC was seeking to benefit itself in a transaction, very vague.
Q. Are you basing that on your discussion with Dennis Nolan, or are you basing that on other discussions that you had?
A. We tended to do things in teams only because we were crossing division lines, and we were crossing both Washington and the field, and we wanted to ensure that all the perspectives got captured as well as any legal directions to follow, and since I'm seeing similar names on a lot of these documents, I

Page 78

would guess that the discussions were those that were involved, but that this group as well as the signers of the June 8, 1995, document.
Q. Okay. Just for the record, that's exhibit 14, the June 8th, 1995, document.
MR. COLATRIANO: Have this document marked as exhibit 17, please.
(Hughes Exhibit No. 17 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 17 is a December 14, 1995, memo from Robert Hartheimer and John Bovenzi to the operating committee regarding advanced dividends and accelerated dividends. It's Bates-stamped AM 0011267 through and including 11286.
Do you recall having any involvement in the preparation of this document or in the formulation of any policies reflected in this document?
A. I believe I would have been involved in the issues that were captured here.
Q. Okay. Do you know what was the nature of your involvement?
A. At the time I was still in the liquidation

Page 79

division. I guess by that time, the name had changed to division of depositor and asset services. John Bovenzi was the director, so I would have been involved from a receivership operations perspective.
Q. Okay. Did you have any role in the drafting of this document?
A. I don't remember specifically.
Q. I have a specific question about a statement that's on the top of page 7, which is Bates number 273, but you might want to review yourself the discussion on the previous page, and obviously, if you need to refer to anything else to put it into context, feel free to do so.
Why don't you go ahead and read to yourself the discussion beginning on page 6 under, uniform approach recommended. Read that section, which continues onto the next page, and let me know when you're ready to proceed.
(Pause.)
A. Okay. It's been a long time since I've reviewed this.
BY MR. COLATRIANO:
Q. Oh, I understand.
My question has to do with page 7, about 6 or 7 lines down, whether you agree with the statement

Page 80

that charging interest on funds that the corporation has not advanced does not appear to accurately reflect the transaction.
(Pause.)
A. Trying to just remember the treatment of the advanced dividend so I can understand the context of that statement.
(Pause.)
A. I think this is speaking to the fact that the subrogated claim and the advanced dividend was basically converted to a loan -- to a loan status, so it was moved from a subrogated claim status to a loan status. It didn't really change the nature of what the subrogated claim was supposed to be, so in that context, it seems like this sentence makes sense.
BY MR. COLATRIANO:
Q. Okay. Well, generally speaking, could you agree that charging interest on funds that the corporation has not advanced would not accurately reflect whatever transaction is being accounted for?
A. I would think some of it had to -- would be based on the nature of the transaction.
Q. Well, can you tell me what type of transaction -- can you describe a transaction in which you would accurately reflect the transaction

Page 81

which you charge interest on funds that the corporation has not advanced?
A. Well, I assume this is looking -- we're looking at the subrogated claim.
Q. Well, I mean, that could definitely be the context, but if you know of another context involving the corporation obviously advancing funds, but in what circumstance would it accurately reflect the transaction to charge interest on funds that have not been advanced by the corporation?
A. The subrogated claim is the only transaction that I can recall, and that's probably because we've been speaking about it in the course of this deposition.
Q. Okay. And why in that circumstance does it accurately reflect the transaction to charge interest on funds that the corporation has not advanced?
A. I believe that practice was put in place to reflect the nature of the corporation's responsibility for the insured deposit liability, so that is truly the claim that the corporation has against the receivership estate.
Q. Okay. And if the corporation never has to do anything to discharge that responsibility other

than advance funds to the acquiror, it would still accurately reflect the transaction to charge interest on funds that have not been advanced?
A. You have to say that again.
Q. Okay. If the corporation never does anything to discharge its deposit insurance liability other than advance funds to an acquiror to assume those liabilities, would it make sense -- would it accurately reflect the transaction to nevertheless charge interest on the portion of that liabilities on which there was no advance of funds?
A. I'm not sure I completely follow all that.
Q. Okay. We talked earlier about the fact that the subrogated claim was typically higher than the amount of the net wire.
Correct?
A. If there was an acquiror, it likely was true.
Q. Okay. All right.
Let's leave this question in that context, where there's an acquiror.
A. Okay.
Q. And let's put numbers on it.
There's a hundred million in deposits, insured deposits.



A. M-hm.
Q. And the acquiror assumes all of those.
A. (Nodding head.)
Q. But the corporation only advances 80 million dollars to the acquiror, and the corporation never has to make up that difference.
Would it accurately reflect that transaction to nevertheless charge interest on that difference in my example of 20 million dollars?
A. The interest on the corporate claim is driven by the existence of the corporate claim, and that claim gets reduced by payments made by the receivership to corporate through the dividend process.
Q. You're going to have to explain to me how that answers my question, because I'm not sure I followed.
A. The practice is that -- the amount from receivership to corporate is the amount of the insured deposits, and that is the amount of the corporate claim against which interest would be calculated as a claim of the receivership estate.
Q. Right.
That sounds a little bit circular to me.
My question is, why would it accurately



reflect the transaction for interest to be charged on funds that the corporation never actually has to spend in that situation?
A. But it was a liability of the receivership estate.
Q. Would it overcompensate the corporation to get interest on funds that it never has to spend?
A. I believe the process was that the receivership would pay dividends that would factor in the value of the assets acquired, and so the value from those assets would be reflected in the amount of funds available to pay dividends and to pay down the claim to the corporation.
Q. Okay. And do you know whether -- was interest charged on that component of it?
Did the receivership get an interest credit for that component?
A. I believe that's what the escrow funds was, if I remember right.
Q. Right.
And if the interest rate on those escrow funds is different -- would there be any justification for the interest rate on those escrow funds to be different than the interest rate on that portion of the subrogated claim that was not covered



by any advance, the 20 million-dollar portion in my hypothetical?
A. The only justification would be from a what drove each rate perspective.
Q. And from the perspective of the economic cost to the corporation, would it over compensate the corporation if the interest rate charged on its portion of the 20 -- of subrogated claim that's the 20 million dollars in my example was higher than the interest rate applied and credited to the receivership for its 20 million-dollar escrow funds?
A. I don't know that I would characterize it as overcompensating.
I think it was the -- it was the defined compensation that was associated with that particular component that drove the result. I don't think there was an intent to over- or undercompensate. It was --
Q. And I'm not asking about intent.
I'm asking about effect.
Let's say the 20 million-dollar part that the FDIC corporate earns interest is earning a 50 percent interest rate and the receivership's earning of 2 percent interest rate on its portion of the 20 percent, would you agree in that situation the FDIC is being overcompensated relative to the

Page 86

receivership?
A. It sounds like it, yes.
Q. And at what point would it not be overcompensated?
When the rates are equal?
A. Well, again, I wouldn't use the term overcompensate.
Q. Okay. But --
A. The interest calculations were driven by whatever was -- whatever was governing the establishment of the rate at the time.
Q. Well, but you agreed I thought a second ago that if whatever policy it was decided that it should be a 50 percent rate, then that situation would be overcompensation, so obviously, you have some measure in your own mind about what's overcompensation and what's not.
MS. DOHERTY: Well, I think the measure was the one you gave her. If we read back the previous question, it had will show your definition.
MR. COLATRIANO: I asked her if there was 50 percent on 1 and 2 percent on the other, would she agree that that's overcompensation.
BY MR. COLATRIANO:
Q. And please correct me if I'm wrong.

Page 87

I think you said yes, you would think that would be overcompensation.
Correct?
A. Yes.
Q. Okay. And on what basis would you agree that that would be overcompensation?
A. I would say that there is -- there appears to be a disparity in the compensation --
Q. Okay.
A. -- driven by those rates.
Q. So are you now saying that that's not necessarily overcompensation, or are you saying it's the disparity that creates the overcompensation?
A. There is a disparity, and that could be considered overcompensation.
Q. And I'm asking you, would you consider that --
A. I would consider that overcompensation.
Q. Okay. At what point -- at what level of disparity would you not -- at what level of disparity would you draw the line between overcompensation and not being overly compensated?
How big is the disparity?
A. I don't know.
MR. COLATRIANO: All right. Let's go off

Page 88

the record.
(Whereupon, at 12:26 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:42 p.m., this same day.)

Page 89

AFTERNOON SESSION
(1:42 p.m.)

Whereupon,
KAREN JEAN HUGHES,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

(Hughes Exhibit No. 18 was marked for identification.)
MR. COLATRIANO: Let's go back on the record.

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)
BY MR. COLATRIANO:
Q. Good afternoon, Ms. Hughes.
A. Hello.
Q. The document that you've been handed is marked exhibit 18. It's a 2-page document entitled, analysis of postinsolvency interest procedure proposals, Bates-stamped AM 0010374 through and including 375.
Do you know who prepared this document?

Page 90

A. I don't.
Q. I take it you did not?
A. I don't remember that I did.
Q. Okay. Do you remember seeing it before?
A. No.
Q. The top right-hand corner has the name Mike Caco.
A. M-hm.
Q. Who is Mr. Caco?
A. He was a senior accountant that used to work with FDIC.
Q. Did he work for you?
A. He did.
Q. Turn to the second page, please. There's a line item -- a heading, corporate financial statement recognition issues.
A. Okay.
Q. And the first paragraph there says: What effect any change in policies and procedures will have on FDIC's position in negotiations with creditors and other parties. FDIC has used postinsolvency interest as a negotiating point in the past.
And do you know what that last sentence means when it says, the FDIC has used postinsolvency

Page 91

interest as a negotiating point in the past?
A. No, I don't know.
Q. Leaving this document aside, do you have any recollection of any occasions on which the FDIC used postinsolvency interest as a negotiating point?
A. I don't know, but -- I don't know specifically.
Vague recollections, there were one or perhaps 2 receiverships where discussions of postinsolvency interest had come up. Don't remember if they were strictly receiverships or if there were elements of corporate nonreceivership assistance, and there may have been some issues relative to postinsolvency interest that factored into how those matters got resolved.
Q. And you're referring to discussions.
Were you referring to discussions within the FDIC or discussions with third parties?
A. I don't know.
Q. And in those discussions, in what respect was postinsolvency interest used as a negotiating point?
A. I don't know. I just have vague recollections of some institutions that we were perhaps in litigation with them and postinsolvency

Page 92

interest was a topic, but nothing -- I don't remember anything specific.
MR. COLATRIANO: Go off the record.
(Discussion off the record.)
MR. COLATRIANO: Let's go back on the record.
Can I have this document marked as exhibit 19, please.
(Hughes Exhibit No. 19 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 19 is a memo dated September 18, 1996, from John Bovenzi, William Kroener, and Paul Sachtleben to the operating committee, subject, options memorandum, postinsolvency interest regulation and amendments to 12 CFR section 360.3. It's Bates-stamped AM 00097047 through and including 065.
Ms. Hughes, were you involved at all in the preparation of this document or in the formulation of any policy that led to this document -- led to the creation of this document?
A. I'd have to say it's likely that I was, but I don't specifically remember.

Page 93

Q. Okay. And I know you said at the beginning of the deposition that you thought sometime in 1996, you began working as a special assistant to Mr. Sachtleben.
Do you know whether it was before September of 1996?
A. It was.
Q. Okay. So at the time this memo was prepared, you were Mr. Sachtleben's special assistant?
A. Correct.
Q. Okay. Is that why you believe it was likely you were involved in this?
A. No.
It's more the topic, because it's postinsolvency interest, and because around this time, I had come over from the liquidation division to the finance division. I was familiar with issues and had worked with some of the finance people while on the other side, and so it's likely that if something was coming forward on the topic, I would have been involved.
Q. Okay. Do you have a recollection of a proposal around this time period to establish a uniform postinsolvency interest rate?

Page 94

A. I remember now that I see this in conjunction with some of the previous memos that we have already talked about that there were discussions and attempts to come to a conclusion about the rate and the timing and the calculation and everything relative to postinsolvency interest.
I believe that was generated -- and I think there's reference in an earlier memo -- there were institutions that were starting to turn surplus, and it was an issue that we now had to come to some type of a conclusion on. And we had internal documents, and the intent was to have something more formal, and I believe that from the legal perspective if we go through a regulation setting process, it gave a policy more weight and more exposure than internal documents, so I believe that our attempt with this was to go down that path of trying to establish some uniformity in the practices.
Q. Do you know why it was considered desirable to have a uniform policy or uniform practice with respect to postinsolvency interest?
A. Because of the issues that we've already covered or the variations that we've seen in the previous documents, that supports the recollection that there was just some confusion, some

Page 95

inconsistency, or just a lack of sort of an established definite treatment for the various postinsolvency interest scenarios that we had to work within for the receiverships.
Q. Okay. If you could turn to page 4 of the document, Bates-stamped 050, there's a discussion in the section headed, business rationale, and the last paragraph of text on that page says, due to existing state and federal law ambiguities, it is difficult for the public receivership creditors and shareholders to determine with any degree of certainty the amount of postinsolvency interest payable to receivership creditors.
Do you know what ambiguities are being referred to there?
(Pause.)
A. I would go back to the previous section on page 3 for the background, and that does seem to capture the likely ambiguities, and again, I think it fits with the paper trail that we've covered, dependent on the date of the failure, the charter, what state laws were in effect at the time, or regulation. There's that 360.3.
So there were so many factors that would define what ultimately the rate of postinsolvency

Page 96

interest should be and the timing, its place in the priority scheme, that it was internal to the agency. We didn't have any consistency or clear definition and guidance relative to it, so how could a third party creditor figure out how that claim fit in the priority scheme. And so I think that that would be the ambiguities being referred to.
BY MR. COLATRIANO:
Q. Thank you.
Turn to page 5, the first full paragraph that begins, FDIC's current guidance.
The end of that paragraph says:
Additionally, reliance upon state judgment rates depending on the circumstances involved may result in what may appear to be overcompensation of creditors to the detriment of an institution's shareholders.
Do you have an understanding for how the FDIC or you would judge what is overcompensation in this context?
A. I would think it would be the imbalance of -- getting back to your earlier question -- the imbalance of the rates that someone would receive versus charge in an interrelated position.
Q. The next paragraph begins a section called, legal rationale, and that paragraph refers --

Page 97

if you see about 8 lines down, it refers to litigation regarding various contingent claims presently being pursued by FDIC receivers.
Do you see that?
(Pause.)
A. What comes to mind --
MS. DOHERTY: Wait. He just asked if you'd seen it. He hasn't asked you anything about it.
A. Oh, I'm sorry.
I thought you did ask me.
Yes, I saw it.
BY MR. COLATRIANO:
Q. My question is, do you know what litigation is being referred to there?
A. My thought is, that likely refers to professional liability claims.
Q. Okay. Do you know whether it's in part a reference to goodwill or Winstar litigation?
A. That's the reason I looked at the date, and I would say -- I would say no.
Q. Why do you say no?
A. I was trying to answer that before I said no.
It wasn't -- I don't believe it was until