UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :

CARTERET BANCORP, INC., :

Plaintiffs, : No. 93-531

and : Judge Loren Smith

FEDERAL DEPOSIT INSURANCE :

CORPORATION, :

Plaintiff-Intervenor, :

vs. :

THE UNITED STATES OF AMERICA :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Tuesday, February 28, 2006

Deposition of WAYNE S. GREEN, a 30(b)(6) witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 Eleventh Street, NW, Washington, D.C., at 9:43 a.m., Tuesday, February 28, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

PROCEEDINGS

WAYNE S. GREEN,

business address at 1910 Pacific Avenue, Dallas, Texas, TX, was called as a witness by counsel for Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. COLATRIANO:

Q. Mr. Green, good morning.
A. Good morning.
Q. Would you state your full name for the record?
A. Wayne Steven Green.
Q. And I think it makes sense given the large crew we have here to go around the table and have everybody introduce themselves.

My name is Vincent Colatriano. I'm with the law firm of Cooper & Kirk and I represent the private plaintiff in this case, Ambase Corporation.

MR. BIANCO: Dick Bianco, chairman of Ambase Corp.

MS. GRONER: Arlene Groner, Department of Justice.

MR. HUTCHINS: Rob Hutchins, Navigant Consulting.



MS. HART: Melinda Hart, Department of Justice.

MS. CONOVER: Leslie Conover, FDIC.

MR. KUIPER: Gary Kuiper, FDIC.

MR. GILBERT: Andrew Gilbert, I'm counsel of record for the plaintiff-intervenor FDIC and also represent the witness here today.

BY MR. COLATRIANO:

Q. For the record, we're here this morning for the Rule 30(b)(6) deposition of the FDIC with respect to certain subject matters which we'll get into in a moment for which Mr. Green has been designated as FDIC's representative.

Mr. Green, have you ever been deposed before?
A. Yes, I have.
Q. Approximately how many times?
A. Approximately 15 times.
Q. When was the most recent?
A. The most recent was June of 2005.
Q. Well, you're a veteran at this, so I wouldn't go over the ground rules ad nauseam, but I want to make a couple of things clear at the outset.

If you need a break at any time, please let me know and I'll be happy to accommodate. My



only request is if there's a question pending, let's answer the question before we take a break, is that --
A. That is fine.
Q. If you need me to clarify any questions, just let me know. If you need me to rephrase or repeat it, let me know, I'll be happy to do so, is that okay?
A. Yes.
Q. Are you under any medication that would impair your ability to testify truthfully or accurately this morning?
A. No.
Q. And as I noted at the outset, you're here to testify pursuant to a notice of deposition under Rule 30(b)(6) of the Rules of the Court of Federal Claims, are you aware of that?
A. Yes, I am.

MR. COLATRIANO: I would like to have marked as Exhibit 1 the rule 30(b)(6) notice.

(Green Exhibit No. 1 was marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Green, you've been handed Exhibit 1, which is Plaintiff's Notice of Deposition of



plaintiff FDIC pursuant to RSC 30(b)(6).

Have you seen this document before?
A. Yes, I have.
Q. When was the first time you saw it?
A. In the spring of 2005.
Q. There's some handwriting on the list of topics which begins about halfway through. That was our effort to kind of -- our -- to reflect our understanding of who is going to be testifying with respect to what at this 30(b)(6) deposition and I just want to make sure that our understanding is correct.

It's my understanding that you've been designated as the FDIC's deponent with respect to the following numbered paragraphs under matters involving which testimony is required, 1, 2, 3, 5, 6 and 7; is that correct?
A. That is correct.
Q. Okay. And in a moment I'm going to get into what you've done to prepare with respect to each of the specific topics, but for now as a general matter, what have you done to prepare for this deposition?
A. To prepare for this deposition I have reviewed certain memos dealing with liquidation

Page 14

office.
Q. You said management of accounting for the liabilities of the receivership. What types of liabilities would that include? Would that include subrogated claim?
A. That is correct.
Q. Does Ms. Kelly have responsibility for accounting for receivership liabilities for the Carteret receivership?
A. It would include the Carteret receivership, yes.
Q. I'd like to you briefly describe for me your educational background, degrees, things like that.
A. I have a bachelor of science degree in accounting from the University of New Orleans.
Q. And when did you receive that degree?
A. 1974.
Q. Any other degrees?
A. No.
Q. Any other certifications?
A. I'm a licensed certified public accountant.
Q. What jurisdictions are you licensed in?
A. State of Georgia.

Page 15

Q. Any other professional certifications?
A. No.
Q. And I'd like for to you briefly describe in chronological order your work history. Let's start with after you got your BS degree in accounting?
A. I started as a bookkeeper for a savings and loan in New Orleans, I spent approximately ten years at that savings and loan, moved to another savings and loan in New Orleans for approximately two years, I then went to work for the Federal Savings & Loans Insurance Corporation in March of 1987.
I stayed with the Federal Savings & Loan Insurance Corporation until we were merged into the FDIC on January 2nd, 1990 and I've been with the FDIC since then.
Q. What was the name of the first S&L?
A. New Orleans Federal Savings & Loan.
Q. And what was the name of the second New Orleans savings and loan?
A. Crescent Federal Savings Bank.
Q. What position did you have with Crescent?
A. I was vice president and comptroller.
Q. So you started with the F-S-L-I-C in March of 1987?

Page 16

A. That's correct.
Q. In what position?
A. As an accountant.
Q. Did you hold any other positions at the FSLIC?
A. Yes, I did.
Q. What were they?
A. Eventually I was a senior accountant.
Q. And were you in a particular division at the FSLIC?
A. In the accounting branch.
Q. Did you specialize in receivership accounting, is that an area you worked in?
A. Yes.
Q. And what positions have you held at the FDIC if you could go in chronological order.
A. I began with the FDIC as a senior accountant, I moved up to a field accounting officer position, I have held a financial manager position, I then became an accounting manager with the FDIC, I then became an a senior accountant with the FDIC, a senior financial management analyst with the FDIC and my current position is senior receivership liability accountant.
Q. Okay. I want to spend a little bit of

Page 17

time with respect to each of these positions just to make sure I understand what your responsibilities were. Let's start with your position as senior accountant.
First of all, when -- during what approximate time frame did you hold that position?
A. From January of 1990 through April 1991.
Q. And what were your responsibilities as a senior accountant?
A. During that period it was principally managing the general ledger unit at the office I was located in.
Q. And which office was that?
A. Atlanta.
Q. When you say managing the general ledger unit, the managing general ledgers for thrift receiverships or for bank receiverships?
A. Yes.
Q. At this time through April of '91, were you concentrating on one or the other banks with thrift receiverships?
A. There was primarily thrift receiverships.
Q. I believe you said your next position was field accounting officer?
A. That is correct.

Page 18

Q. And during what approximate time frame did you hold that position?
A. From April 1991 until August 1994.
Q. And were you in a particular office of the FDIC at that time?
A. Yes.
Q. Which office was that?
A. Franklin, Massachusetts.
Q. And what were your responsibilities as a field accounting officer during that time frame?
A. The field accounting officer is the principal accounting officer for the liquidation accounting. My duties included hiring all staff when that office was created to the establishment of all the various units within the accounting branch of that office, setting policies and procedures, performing pro forma on failed institutions in the Northeast area.
Q. And again, were you working primarily with thrift receiverships, bank receiverships or both?
A. During that period it was banks.
Q. Banks.
And I think you said your next position was financial manager?
A. That is correct.

Page 19

Q. And during what approximate time frame did you hold that position?
A. From August the 1994 until January 1997.
Q. And which office were you working out of at that point?
A. Atlanta.
Q. And what were your responsibilities as financial manager during that period?
A. Included all the duties of the field accounting officer, plus greater administrative and policy duties.
Q. And when you say it included policy duties, what types of policies are you referring to, accounting policies or --
A. Accounting policies.
Q. And the accounting policies related to receivership accounting?
A. Yes.
Q. During that period of time, were you concentrating on bank receiverships or thrift receiverships or something else?
A. During this period it was both.
Q. And I think you said your next position was accounting manager; is that correct?
A. That is correct.

Page 20

Q. During what time frame approximately was that?
A. That began in January 1997 to approximately May 2002.
Q. And which office did you work out of during that time?
A. Initially began in Atlanta and eventually wound up in Dallas.
Q. Can you recall when you went from Atlanta to Dallas?
A. Yes.
Q. When was that?
A. August 1997.
Q. What were your responsibilities as an accounting manager during this time period? If it changed between Atlanta and Dallas please let me know.
A. The principal duties were managing the general ledger units, the forensic accounting units, that was principally it.
Q. What was the forensic accountant?
A. That was the unit that provided litigation support on behalf of receiverships.
Q. And I believe you said your next position was senior accountant; is that correct?

Page 21

A. Correct.
Q. During what approximate time frame did you hold that position?
A. That was approximately May of 2002 until September of 2003.
Q. And I may have written this down wrong, as accounting manager I thought -- did you say you had the position through February '02?
A. I'm sorry, it was May of '02.
Q. I might have written did down wrong, I apologize.
As senior accountant, which office did you work out of?
A. Dallas.
Q. Dallas.
What and what were your responsibilities as senior accountant?
A. The same duties as the accounting manager position.
Q. So that would include the forensic accounting responsibilities?
A. That's correct.
Q. I believe you said your next position was senior financial management analyst; is that correct?
A. Correct.

Page 22

Q. During what time frame did you hold that position?
A. Well, prior to that position, I received a temporary promotion back to a financial manager position in September 2003.
Q. So starting in September'03, you became a financial manager again?
A. Correct.
Q. And how long did you hold that position?
A. I held that position until the end of August of 2005.
Q. Okay. And which office were you working out of then?
A. Dallas.
Q. And what were your responsibilities during that time period as financial manager?
A. In addition to managing the general ledger and forensic accounting unit, I also managed a tax unit and the liability accounting unit.
Q. Just so I understand, after that position you then became a senior financial management analyst?
A. No.
Q. Okay. What did you do after the stint as a financial manager ended in August of '05?

Page 23

A. Correct, my next position was senior receivership liability accountant.
Q. Was that August of '05 through the present?
A. That is correct.
Q. And I take it you're still in Dallas, correct?
A. Correct.
Q. And what are your responsibilities as senior receivership liability accountant?
A. Principally I still oversee. I'm the team leader for the general ledger unit, as well as providing forensic and litigation support.
Q. Is the GL unit separate from the liability accounting unit?
A. Yes, it is.
Q. So you manage both?
A. No.
Q. You manage which one, the accounting liability?
A. The general ledger unit.
Q. Okay. And I'm not sure I nailed down when you served as a senior financial management analyst?
A. That was principally a name change in my position after the senior accountant position.

Page 24

Q. Okay.
A. It was still under the same time frame as the senior accountant portion, but it was a name change of the position.
Q. So that would have been '90 through early 1991?
A. No, that was I believe in May 2002, during that period, it changed from senior accountant to senior account financial management analyst.
Q. I believe you testified at the outset here that you've been deposed approximately 15 times; is that correct?
A. Yes.
Q. Have you testified in any other form like at a trial or for congressional committee or anything like that?
A. Yes, I have.
Q. Approximately how many times?
A. I testified at three trials.
Q. Were all three of these trials was your testimony pertaining to your work at the FDIC?
A. Two of them were pertaining to my work at the FDIC, one was at one of the savings and loans that I worked at.
Q. I take it the one that related to your

Page 25

savings and loan, that was while you were working at those savings and loans or shortly thereafter?
A. It was shortly thereafter.
Q. What was the subject of your trial testimony in the other two, the two pertaining to your work at the FDIC?
A. It was matters dealing with a goodwill claim.
Q. Deal with, I'm sorry?
A. A goodwill claim.
Q. Can you identify those two?
A. One of them was Oaktree and I believe the other one was Western Federal or Western Empire, it was one of the Western receiverships.
Q. Approximately when did you give this trial testimony in those two cases?
A. It would have been roughly 1999 or the year 2000.
Q. And what can you recall about the subject matter of your testimony in those two cases, let's start with Oaktree?
A. I believe Oaktree dealt with the accounting for the liquidation of assets, as well as describing the equity position of the receivership.
Q. And do you recall what court that was in,

Page 26

was that in a Court of Federal Claims or was that in another court?
A. It was the Court of Federal Claims.
Q. And can you describe in general terms what your testimony in the Western Federal case dealt with?
A. I believe my testimony at that trial dealt with the equity position of a receivership.
Q. Was that also testimony at the Court of Federal Claims?
A. Yes.
Q. Your testimony in the third case involving one of the S&Ls you worked for was the New Orleans S&L or the Crescent?
A. The Crescent.
Q. Do you recall approximately when that testimony was?
A. I believe that was in the fall of 1990.
Q. Do you recall what court that was before?
A. It was in the Federal Court in New Orleans.
Q. Do you recall the general subject matter of that testimony?
A. Yes.
Q. What was it?

Page 27

A. That was a directors and officers suit.
Q. Were you a party to that litigation?
A. No.
Q. All right. I know you've been deposed a number of times. Of those depositions, how many have dealt with thrift receivership accounting issues approximately?
A. I would say approximately 12 of them.
Q. And of those how many, if any, dealt with goodwill case thrifts?
A. Nine.
Q. And can you recall the institutions that pertained to those nine?
A. I can recall two of them, one was First Federal Savings & Loan of Jackson, Mississippi and I believe another one was either Karnes or Monycor, M-o-n-y-c-o-r.
Q. Have you ever given expert testimony either in the form of an expert report or deposition testimony or trial testimony?
A. Yes, I have.
Q. On how many occasions?
A. Once.
Q. What was that occasion?
A. That was in the matter of Golden Pacific

Page 28

Receivership.
Q. Do you recall generally what the subject matter was of your testimony in that case?
A. The expert report principally dealt with the liquidation accounting activities of the receivership, in addition to the calculation of post-insolvency interest.
Q. Were you deposed in that case?
A. No.
Q. Did you testify at trial in that case?
A. No.
Q. So your work was limited to preparation of an expert report, is that fair to summarize?
A. Yes.
Q. I'd like to turn back to Exhibit 1, which is the deposition notice for Green deposition, earlier you confirmed the subject matters on which you're here to testify and I just want to get a sense with respect to each one of those subject matters of what you did to prepare for testifying with respect to that matter.
A. Okay.
Q. So let's start with number 1, which is the accounting for the assets, liabilities an net equity or deficit of the Carteret or CFSB

Page 29

receiverships/conservatorships from 1992 to the present, as well as all FDIC/RTC policies and regulations relating thereto.
Can you describe what you did to prepare for education your second with respect to this subject matter?
A. Yes, I reviewed each monthly balance sheet and income statement of Carteret receivership from January 1995 through December 2004. I reviewed certain sections or an entire accounting manual as it related to liquidation accounting, I reviewed certain memos and accounting bulletins as it relates to specific liquidation accounting practices, I reviewed the liability register and the pass through liability register of the Carteret receivership, I reviewed certain transaction histories of certain accounts of the Carteret receivership for the period of January 1995 through December 2004.
Q. And you said that you reviewed certain accounting manuals or certain chapters of accounting manuals pertaining to this topic, can you identify what you reviewed?
A. The FDIC, particularly the accounting branch has a manual that is called the Regional Accounting Manual or the Field Finance Center

Page 30

Accounting Manual, I reviewed those manuals. I reviewed portions thereof of the RTC Field Accounting Manual, certain sections of the Accounting for Liabilities accounting manual.
Q. Any others that you can recall?
A. No.
Q. And just so I'm clear, I think you mentioned the Regional Accounting Manual with a Field Finance Accounting Manual.
A. Yes.
Q. I couldn't tell from your answer if they are the same thing or --
A. They are virtually interchangeable manuals, one was created during what time period of the FDIC and the Field Finance Center Manual came later.
Q. When did the Field Financial Center Manual come into print?
A. That was principally created in 1997.
Q. And did that pretty much supercede the preceding accounting manual?
A. Yes.
Q. And you might have said this, but I might not have written it down quickly enough. You said you reviewed portions of the RTC field accounting,

Page 31

can you identify which portions?
A. I reviewed the portion dealing with securitizations, portions dealing with the write-off of assets, and essentially the first 40 pages of introductory material to the manual, dealing with the background of liquidation accounting.
Q. And you also mentioned the account for liability -- Accounting for Receivership Liability Manual?
A. Accounting for Receivership Liabilities Manual.
Q. Was there a particular section on that you focused on?
A. No.
Q. You also reviewed memos and accounting bulletins as to specific items or specific topics relevant to this subject matter?
A. Yes.
Q. Can you identify as best as you can which memos or accounting bulletins you're referring to?
A. There was a series of memos dealing with the issues of post-insolvency interest. There's one accounting bulletin issue dealing with The National Depositor Preference Act of 1993.
Q. Any other memos or accounting bulletins

Page 32

you recall?
A. There is another -- it is not an accounting bulletin but more a discussion paper on the corporate accounting as it related to the post-insolvency interest of receiverships.
Q. You listed earlier a number of FDIC staff people that you had discussions with generally in preparing for this deposition.
Did you have any specific discussions with people regarding this topic, and if so, did you have discussions with them?
A. Can you explain what you mean by this topic?
Q. Topic 1 in the --
A. No.
Q. Okay.
A. No, I have not.
Q. Okay, let's go to topic 2, which is the preparation of all financial statements, including but not limited to the financial statements contained or referenced in the goodwill financial reporting packages for the Carteret or CFSB receiverships/conservatorships from 1992 to the present, as well as all FDIC/RTC policies and regulations relating thereto.

Page 33

Can you tell me what you did to educate yourself about this topic and to prepare for testimony with respect to this topic?
A. Yes, I have reviewed all of the annual goodwill financial statements for 1997 through the year 2004 as it relates to Carteret receivership.
Q. Anything else?
A. No.
Q. The topic reference to FDIC/RTC policies and regulations related to this topic, is it fair to say that the policies and regulations that might pertain to this topic are ones you talked about with respect to topic 1?
A. No.
Q. What have you done to prepare for testimony regarding FDIC/RTC policies and regulations relating to the preparation of financial statements for receiverships?
A. The FDIC or RTC did not have a stated policy, a written policy in the preparation of financial statements.
Q. You said the FDIC and the RTC did not have a stated or written policy regarding this topic?
A. Correct.
Q. Was there any unwritten policy relating to

Page 34

this topic?
A. Not that I'm aware of, no.
Q. Did you have any discussions with any FDIC staff or anyone else pertaining to this particular topic, topic number 2 on the notice?
A. Yes, I have.
Q. Who have you had discussions with?
A. Robert Ferrar.
Q. And what did your discussions with Mr. Ferrar relate to specifically?
A. My most recent discussion with Bob was regarding the 2005 Carteret goodwill financial statements.
Q. Is it fair to say that your discussions with Mr. Ferrar regarding this issue pertained to the Carteret financial statements as opposed to the policies or any policies or regulations relating to preparation of financial statements?
A. Yes.
Q. You say your most recent discussion dealt with the 2005 goodwill financial statement, how many other discussions have you had with him related to this issue, topic 2?
A. In the course of my employment with the FDIC numerous discussions.

Page 35

Q. What responsibilities, if any, did Mr. Ferrar have for the preparation of Carteret financial statements?
A. Bob was one member of a team of FDIC staff that when the goodwill financial statements first became prepared back in 1997, we as a team produced those financial statements.
Q. You say we as a team, I take it you were a member of that team?
A. Yes.
Q. Were you the manager of a team, were you in charge of that effort?
A. No.
Q. Who was?
A. At the initial point it was an FDIC employee by the name of Gary Bojges, B-o-j-g-e-s, to the best of my spelling.
Q. Did that change over time when was in charge of this effort?
A. Yes.
Q. Can you recall how it changed?
A. I think the next team leader was Bob for it.
Q. Who became team leader, if anybody, after that?

Page 36

A. I know it changed, but I don't know who it currently is.
Q. When did Mr. Ferrar become team leader, do you recall?
A. No, I don't.
Q. Let's go on to topic 3, which is the determination, estimation, prioritization and calculation of any FDIC/RTC subrogated claims again Carteret or CSFB/receiverships and any interest on ANY such claims from 1992 to the present as well as all FDIC/RTC policies and regulations relating thereto.
What, if anything, did you do to educate yourself about this topic in preparation for your testimony today?
A. I have reviewed certain memos dealing regarding the calculation of post-insolvency interest that has in regards to both the method, the interest accrual method, a particular rate that is applicable to the Carteret receivership.
I reviewed all the Excel spreadsheets beginning with the year 1997 through 2004, as well as reviewing the goodwill financial statements that includes the estimated liability for the post-insolvency interest, I reviewed portions of a

Page 37

claims manual that deals with the calculation or the basis of the subrogated claim, I reviewed the subrogated claim amount on the financial statements on the Carteret receivership beginning with the year 1995 through 2004.
I had reviewed particular codes, section 12, Code of Federal Regulations, I had reviewed financial statements from 1997 forward, particularly with emphasis on an accrual of post-insolvency interest, as well as a transaction as interest of the post-insolvency interest, in addition to the changes to the subrogated claim from 1995 through 2004.
Q. You mentioned you reviewed portions of a claims manual dealing with subrogated claims?
A. That is correct.
Q. What is the -- is it FDIC claims manual, what's the name of it?
A. This particular manual was the RTC claims manual.
Q. Does the FDIC have its own manual or policy statement or other document that deals with this issue of subrogated claim and post-insolvency interest?
A. The FDIC has a claims manual, yes.
Q. Did you review that in connection with



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

this topic or any other topic related to this deposition?
A. Not as related to this deposition, no.
Q. How about with respect to any other topic for which you've been listed as a deponent?
A. No.
Q. Does that FDIC claims manual have any obligation to accounting for thrift receiverships managed by the FDIC?
A. It is consistent with the prior RTC method of accounting for subrogated claims.
Q. When you say it is consistent with, what are you basing that judgment on if you didn't review it in connection with this deposition, just your general awareness of what's in that manual?
A. That's correct.
Q. Are you aware of any differences between the RTC changes manual and the FDIC claims manual as it relates to the calculation or accounting for the subrogated claims and/or post-insolvency interest?
A. No.
Q. You also mentioned that you reviewed particular codes and you mentioned 12 C.F.R., do you recall what, if any -- what code you were talking about? Is it a regulation?



A. Yes.
Q. Do you recall what the regulation was?
A. No.
Q. You also said you reviewed the transaction history of post-insolvency interest accrual, that's how I wrote it down. I may have gotten that wrong, is that a fair statement?
A. Yes, it is.
Q. What do you mean by transaction history, is that a document you're referring to or are you referring to something else?
A. That is a drill down listing all the transactions to a particular account.
Q. You said you reviewed changes to the subrogated claim between 1995 and 2004, again, are you referring to a particular document or account or are you referring to something more general?
A. I'm referring to the transaction history for the account of the subrogated claim on the books of the receivership.
Q. By transaction you're referring to a drill down type of report?
A. That is correct.
Q. You mentioned at the outset of our discussion in this topic that you reviewed certain



memos dealing with accounting for the subrogated claim calculation of post-insolvency interest. I have a number of memos that I will be showing you over the next day or two, but do you recall right now what memos you're referred to just so I know I have what I need to show you?
A. I -- the ones that I'm thinking of are the ones that have been provided to counsel.
Q. Did you have any discussions with anybody at the FDIC or else somewhere regarding this particular topic, topic 3 on your deposition notice?
A. No.
Q. The next topic for which you've been designated I think is topic 5 on the deposition notice, which is all payments or dividends to FDIC/RTC in connection with the Carteret or CFSB receivership/conservatorship, including the accounting for such payments or dividends, as well as all FDIC/RTC policies and regulations relating thereto.
What did you do to prepare for or to educate yourself about this topic?
A. I reviewed the liability register of Carteret receivership and the transaction history of the dividends paid to corporate as it relates to the



Carteret receivership.
Q. Did you review anything else in connection with this topic?
A. No.
Q. What, if any, FDIC or RTC policies or regulations relate to this topic, topic 5 of the deposition notice?
A. No, I have not reviewed that.
Q. Are you aware of any?
A. There are policies dealing with dividends to the FDIC and other claimants, yes.
Q. Can you identify what policies those are that you're referring to?
A. Well, it's -- the policy as it's regarding the priority distribution to claimants of the receivership, some those are spelled out in those memos I previously alluded to.
Q. Are you aware of any documents other than the manuals and memos that you've previously alluded to that deal with the policies relating to dividends to FDIC?
A. No.
Q. Did you have any discussions with anybody pertaining to this particular topic, topic 5 on your deposition notice?

Page 42

A. Yes, I did.
Q. Who have you had discussions with during this time?
A. Sharon Kelly.
Q. And can you recall specifically as possible what you discussed with Ms. Kelly about this topic?
A. As it relates to this topic, I asked Sharon for a copy of the liability register of the past receivership.
Q. Did you have any other discussions with Ms. Kelly about this topic?
A. No.
Q. Let's go on to topic 6, which is decisions relating to the borrowing, use and repayment of FDIC/RTC advances or other FDIC/RTC borrowings in connection with the Carteret or CSFB receiverships/conservatorships from 1997 to the present, as well as all FDIC/RTC policies and regulations relating thereto.
What, if anything, did you do to educate yourself regarding this topic in preparation for your deposition testimony?
A. I reviewed the monthly financial statements of the Carteret receivership beginning in

Page 43

January 1995 through December 2004, as well as reviewing the process memo of the FDIC as it relates to advances.
Q. Did you review anything else in preparation for your testimony for this topic?
A. No.
Q. What do you mean by the process memo of the FDIC, can you describe what that is?
A. A process memo is a detailed narrative regarding the procedure and/or policy dealing with a particular event of the receivership, in this case it dealt with borrowings of the receivership from the FDIC's corporate asking.
Q. And do you know approximately when this process memo was prepared?
A. The initial process memos were prepared some five to six years ago.
Q. Do you know whether this process memo that you're referring to has produced in connection with this litigation?
A. I believe it has.
Q. And I think you said that the initial process memo was prepared five or six years ago.
Prior to that time, was there any written guidance or policies regarding this issue?

Page 44

A. There is a written policy as in regards to any borrowings of the receivership from the FDIC.
Q. And where is that written guidance, is it a policy statement or in a manual --
A. It's a policy statement.
Q. Did you review that policy statement in preparing for this deposition?
A. No.
Q. Do you know when that policy statement was issued?
A. To the best of my recollection, that was in early 1990s.
Q. Were you aware of any RTC policies or other documents relating to this topic?
A. I have not seen an RTC policy statement, no, as it relates to borrowings.
Q. Do you know whether this topic is discussed in any RTC manual?
A. That I don't know.
Q. Have you had any discussions with anybody regarding this topic?
A. No.
Q. Topic 7 is a determination, estimation, allocation or potential allocation to the Carteret or CSFB receiverships/conservatorships of direct and

Page 45

indirect administrative and overhead expenses, and direct or indirect expenses related to goodwill litigation, as well as FDIC/RTC policies relating thereto.
What, if anything, did you do to educate yourself about this topic and preparing to testify today?
A. As it relates to direct and indirect administrative and overhead expenses of the receivership, I reviewed the monthly financial statements of the Carteret receivership from January 1995 through December 2004, as well as the annual goodwill financial statements for 1997 through 2004, in addition to I reviewed the transaction history of the indirect charges of the receivership for periods beginning January 1997 through December 2004, as well as I believe there's a two-page narrative describing the overhead allocation process that's been provided to counsel.
Q. When you say there's a two page narrative to describe the allocation process, are you referring to something specific to Carteret or something that's more general?
A. It's general.
Q. And can you describe it in any more detail

Page 46

like who prepared it, what the topic was, when it was prepared?
A. No, I can't.
Q. Anything else you reviewed in connection with this topic?
A. There is a specific memo from the legal division to certain senior FDIC executives dealing with the charge of direct and indirect expenses as it relates to goodwill litigation. I reviewed that memo.
Q. Anything else you reviewed related to this topic?
A. There's one of the footnotes that's an attachment to the standard financial statements deal with the direct and indirect administrative and overhead expenses, I reviewed that footnote as well.
Q. Other than the two-page narrative you mentioned and the memo from the legal division you mentioned, are you aware of any FDIC or RTC policies -- policy documents relating to this topic?
A. I believe there do exist currently FDIC policy documents as it relates to the charging of direct, and indirect expenses to a receivership, yes.
Q. Are you aware of any RTC documents that deal with that topic?

Page 47

A. I'm not aware of that.
Q. The FDIC document you're referring to, the policy document, did you review that in connection with this deposition?
A. No.
Q. Did you have any discussions with anybody regarding this topic, topic 7 on the deposition notice?
A. Yes, I have.
Q. Who have you had discussions with?
A. Robert Ferrer.
Q. And can you recall specifically what you spoke with Mr. Farrar about as it relates to topic 7?
A. My request to Bob was whether or not the Division of Finance had calculated the year end 2005 overhead as related to the goodwill litigation, specifically as it relates to Carteret.
Q. And what did he tell you with respect to that question?
A. No, they had not finished the 2005 goodwill financial statement.
Q. Do you know when the 2005 goodwill financial statement will be completed?
A. No, I don't.
Q. Do you know of any estimate?

Page 48

A. I would say all of the goodwill financial statements probably will be completed within the next 60 days.
Q. Did you have any discussions with anyone else regarding topic 7?
A. No.
Q. Other than preparing for this deposition, what specific personal role have you had with anything having to do with the Carteret receivership?
A. Well, Carteret being one of the goodwill cases, I would have been -- had involvement in the 1997 and annually thereafter of the preparation of the goodwill financial statements, I've also assisted counsel in providing certain input in the answers to certain interrogatories, as well as providing to FDIC counsel certain financial information and documents in response to the document request.
(Green Exhibit No. 2 was marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 2 is a document that Mr. Gilbert gave me prior to this deposition beginning today and I believe he said it was a document you provided to him recently; is that correct?

Page 49

A. That is correct.
Q. Can you identify what this document is?
A. This document is chapter 10 of the RTC claims manual as it relates to the corporate proof of claim.
Q. And why did you give it to Mr. Gilbert to hand over today?
A. Well, because in my opinion I thought it was responsive to one of the document requests that counsel had provided.
Q. There's -- I notice, I haven't had a chance to review this yet; but I notice there's some handwriting on at least one of the pages here.
Do you know whose handwriting that is?
A. No, I don't.
Q. All right. I might have some more questions about that as we get into specific topics and I've had a chance to look at it. But for now, as you answer any questions, if you need to refer to that, let me know so we get it on the record what you're referring to.
A. (The witness nodded.)
Q. Can you identify the offices within the FDIC that are responsible for accounting for FDIC, for RTC receiverships? I want to get a sense for the

Page 58

approved claimant information on claims against a receivership, in addition to it does dividend calculations when dividends are paid. It houses other demographic information of each claimant of a receivership, it also houses any unclaimed funds returned by an assuming bank that has not yet been escheated to the state.

In other words, it is a liability accounting system that feeds accounting information into the books of a receivership.

Q. And I think a moment ago you referred to the fact that the dividend processing system is now sort of a direct feed into the GL system?

A. That is correct.

Q. When did that happen?

A. I -- my best recollection is the year 2000.

Q. And how did it work before that time, how did these liability accounting items get worked into the GL?

A. It would have been through a manual journal entry.

Q. Did something like a dividend processing system exist during that time or was it that it wasn't a direct feed, it was a separate set of books?

Page 59

A. It had a predecessor system.

Q. What was that called?

A. It's called a receivership liability system.

Q. To the extent you know, can you describe what accounting systems the RTC had in place for receivership accounting when it was in charge of receivership accounting?

A. The RTC had a comparable general ledger system, it had a control totals module system, it likewise used the receivership liability system that the FDIC was using during the same time period.

Q. And is it the case that as with the FDIC during this time period, there was not a direct feed between the receivership liability system and the GL system, that the entries had to be manually entered?

A. To my knowledge it wasn't a direct interface.

Q. I think you've alluded to this earlier, but I just want to make sure I have this nailed down as best I can, when did the FDIC as opposed to the RTC become responsible for matters involving receivership accounting for Carteret?

A. January 1996.

Q. And with respect to specifically

Page 60

accounting systems, can you describe how -- describe the process for transitioning from the RTC accounting system to the FDIC accounting system for receiverships such as Carteret?

A. Well, the transition involved the eventual conversion of the accounting information and data from the RTC general ledger to the FDIC's general ledger. The RTC used a similar general ledger system that the FDIC was using. So after the RTC's sunset, in order to get the RTC receiverships and FDIC receiverships on the same system, both FDIC and RTC converted to a new general ledger account structure, but the FDIC's receiverships were still on the same system, the RTC receiverships went from its financial information management system to the financial information system used by the FDIC.

Q. And as a general matter, can you describe whether there were any problems or difficulties in that transition process as it related to receivership accounting?

A. I'm not aware of any major problems.

Q. Okay.

MR. COLATRIANO: We've been going about 90 minutes, why don't we take a short break.

THE WITNESS: That's fine.

Page 61

(Recess.)

(Whereupon, Mr. Hutchins exited the deposition room.)

(Green Exhibit Nos. 3 - 11 were marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Green, can you describe generally what accounting principles govern receivership accounting at the FDIC?

A. The accounting principles is for receivership accounting is best described as a modified accrual base of accounting as opposed to a GAAP basis or Generally Accepted Accounting Principles basis or a pure cash basis of accounting.

Q. And can you describe what you mean by modified accrual basis?

A. As opposed to GAAP accounting, the receiverships only recognize income to the extent that is actually received in cash, it recognizes expenses essentially one that it is paid, it does not set up any permanent write downs on the valuation of any assets. It does recognize certain liability accruals on the books of the receivership when circumstances or -- give rise to that accrual.

Page 62

Q. And I take it that last item, that last feature recognizes certain liabilities as they accrue -- is what prevents the system from being a cash system of accounting?
A. No, that would be more of a difference between GAAP accounting and modified accrual accounting.
Q. And so why -- what is the difference between the accounting system for receiverships at the FDIC and a cash system of accounting?
A. Well a cash system of accounting only represents transactions when actually cash is exchanges either receipt or disbursement.
Q. And modified accrual basis of accounting that you just described, has that always been the FDIC's basis for receivership accounting since the early '90s?
A. Yes, it has.
Q. And how, if at all, does the FDIC's basis of accounting, how if at all does that differ from the FDIC's basis of accounting?
A. It is literally identical.
Q. Were you aware of any changes since the early '90s with regard to specific issues with respect to receivership accounting and the changes

Page 63

and methodology and principles?
A. Since the early 1990s, the only principal change to liquidation accounting has been the recognition of post-insolvency interest on the books of receivership, there were ongoing discussions on income tax liabilities as a -- on the book of the receivership, but that was never decided.
Q. When you say there were ongoing discussions with income tax liabilities, what are you referring to?
A. The discussions essentially centered around should the receivership recognize income tax liabilities when a liability is due on the books of the receivership, as opposed to placing that amount in a memo account on the books of the receivership that would ultimately appear on the financial statements.
Q. And which method did you just describe is the method that the FDIC follows?
A. Only in those instances where the RTC has actually filed a proof of claim for income tax liabilities does that liability appear on the books of the receivership.
Q. And I take it that's been the FDIC's policy throughout this time period with respect to

Page 64

the recognition of a tax income liability?
A. Well, the FDIC recognizes an income tax liability when it is actually paid, in that instance, yes.
Q. I think you referred to the only other change in accounting methodology or principles that you recall is a change relating to post-insolvency interest?
A. That is correct.
Q. Okay. We're going to get into this ad nauseam later, but I want to make sure I understand what you're referring to as a general matter when you talk about that change.
So can you just describe briefly what you're referring to when you say a change in the accounting for post-insolvency interest?
A. Well, it is less of a change and more of an adoption of policy of when to recognize an accrual for post-insolvency interest on the books of the receivership.
Q. And when was -- can you describe what the policy is and when it was adopted?
A. The policy was initially adopted in the fall of 1997, that a receivership would recognize on its books as a liability the calculation of

Page 65

post-insolvency interest when all general subrogated claims in -- except depositors and the general trade creditor claims had been paid 95 percent in dividends.
Q. And was that change in policy, where was that expressed, was it expressed in a policy statement, was it expressed in a manual, was it expressed somewhere else?
A. It was eventually adopted in a policy statement.
Q. And when was that policy statement issued, do you recall?
A. I believe some time in 1998.
Q. And prior to the fall of 1997, what was the policy, the practice with regard to the recognition of the post-insolvency interest on the receivership financials?
A. It is my understanding the recognition only occurred to the extent it was paid, post-insolvency interest.
Q. Do you know why that change was -- why that new policy was adopted in the fall of 1997?
A. At that time it was a matter of developing a policy across both bank receiverships and thrift receiverships.

Q. What was the policy with respect to bank receiverships at that time?
A. The policy was recognizing the post-insolvency interest to the extent it was paid prior to that occurrence.
Q. Prior to the fall of '97, that was the policy?
A. That's correct.
Q. And I take it that from your prior answer that that was also the policy with respect to thrift receiverships prior to fall of 1997?
A. Prior to 1997, I don't know what the thrift policy was.
Q. And so when I asked why that policy was adopted, you said it was a matter of developing a policy of both bank and thrift receiverships, but why was that particular policy adopted, the policy of recognizing it as 95 percent of creditor claims?
A. To the best of my recollection, that policy was adopted because at that point in time there were an increasing number of receiverships that were approaching 100 percent dividends paid, which could eventually and possibly trigger payment of post-insolvency interest so management elected to come up with a policy and an eventual practice of at



what point in the life of a receivership was it most efficient or effective to disclose the amount of outstanding post-insolvency interest, and the eventual outcome of those discussions was had a 90 percent -- 95 percent dividend threshold, the receivership would recognize an accrual of PII on its books.
Q. When you say PII, you're talking post-insolvency interest?
A. Yes, I am.
Q. Any other changes in the accounting policy regarding post-insolvency interest that you can recall?
A. Not in the recognition of post-insolvency interest on its books, no.
Q. Any other with respect to post-insolvency interest, have there been changes in policy?
A. Not from a policy perspective, no.
Q. From another perspective, a change in practice?
A. Not from a practice, no.
Q. What types of financial statements, if any, what other types of financial reporting documents did the RTC maintain for thrift receiverships when it was in charge of thrift



receiverships?
A. The RTC had the ability to produce a balance sheet and income statement for each receivership, in addition to an account trial balance for each receivership, in addition to an annualized transaction account trial balance for each receivership.
Q. You said the RTC had the ability to produce these types of documents, did they have a practice regarding whether it would produce like an annual financial statement or something like that or receivership?
A. It's my understanding they would produce a balance sheet, an income statement upon request by a party.
Q. Did the RTC prepare any different types of financial reports for institutions that were involved in goodwill litigation?
A. Prior to 1997, not to my knowledge.
Q. And after 1997, you weren't dealing with the RTC anymore, correct, were you dealing with the FDIC?
A. That's correct.
Q. What does -- excuse me. What financial statements, if any, does the FDIC prepare for thrift



receiverships?
A. The RTC or the FDIC produces on a monthly basis from the automated system a balance sheet, income statement and cash flow receivership for all bank and thrift receiverships.
Q. You say it produces these documents on a monthly basis, does it also produce an annual financial statement?
A. No, there is no annual financial statement produced by either a bank or thrift receivership, except for the monthly financial statements.
Q. Where is the data drawn from? Let me put it this way. How are those monthly financial statements produced, what's the source of the data?
A. The source of the data are the account balances for each general ledger account within the general ledger system.
Q. And who -- which office is responsible for producing these monthly financial statements, the Dallas office of DRR that you talked about earlier?
A. The financials are produced automatically. No particular office is responsible for triggering the creation of a financial statement.
Q. But the information that is used to create these, is that under the responsibility of the DRR

Page 70

accounting people we talked about earlier?
A. Well, the information that goes into the general ledger as a result of Dallas accounting staff and Washington accounting staff.
Q. Is there any effort to -- are these financial statements audited at all?
A. Receivership financial statements are audited to the extent that either the Office of Inspector General, the internal review branch of the division of resolutions and receivership or the annual GAO audit is completed at a corporate level, which includes review of certain process memos, of policies and procedures of liquidation accounting, in addition to any internal control measures in effect, as it relates to liquidation accounting, in addition to reconciliations of all general ledger accounts of liquidation accounting, in addition to certain transactions that are statistically samples within liquidation accounting.
So while a single receivership may not be audited, certain aspects either at the account level or reconciliation level of a receivership may be audited or across all receiverships.
Q. And who performs that audit?
A. Well, the FDIC in its corporate capacity

Page 71

has an annual audit completed by the Government Accounting Office, it also has intermittent audits done by the FDIC office inspector general as it relates to receivership activities and our own division has an internal control branch that performed certain audits of liquidation activities.
Q. On an institution specific basis such as the Carteret receivership, if the institution's receivership financials are not audited in and of themselves, how are -- how does the FDIC maintain assurances as to the accuracy of institution specific financial statements, what systems are in place to do that?
A. Well, in addition to the actual systems that are used, there are policies and procedures within the accounting manuals, the GAO and OIG may select a particular account of a receivership to review the activity of that account, it looks at the process memos dealing with certain functional processes within liquidation accounting that's used within their audits, that's best described as the scope of the audits as they relate to a receivership.
Q. Has to your knowledge any Carteret receivership financial or accounting information been audited?

Page 72

A. I don't know.
Q. Would there be a record of it if there had been?
A. If there was a specific audit of Carteret as it relates to its receivership activities, yes, there would be a record of it.
Q. And where would that record be maintained, DRR's systems or --
A. No.
Q. GAO's --
A. -- that record would probably be maintained by the office of inspector general.
Q. I've had marked Exhibits 3 through 11, a series of goodwill financial reporting packages for Carteret.
MR. GILBERT: These were all Exhibit 3?
MR. COLATRIANO: No, each one is separate 3 through 11, it should be in chronological order.
MR. GILBERT: Okay.
MR. COLATRIANO: Just for the record, Mr. Green, why don't you go through this with me so it is clear on the record.
BY MR. COLATRIANO:
Q. Exhibit 3 is the 1997 report, correct?
A. That is correct.

Page 73

Q. Exhibit 4 is the 1998 report, correct?
A. Correct.
Q. Exhibit 5 is the 1999 report, correct?
A. Correct.
Q. Exhibit 6 is the 2000 report, correct?
A. Correct.
Q. Exhibit 7 is the 2001 report, correct?
A. Correct.
Q. Exhibit 8 is the 2002 report, correct?
A. Correct.
Q. Exhibit 9 is the 2003 report, correct?
A. Correct.
Q. Exhibit 10 is the 2004 report, correct?
A. Correct.
Q. And Exhibit 11 is a restated 2004 report, correct?
A. That is correct.
MS. GRONER: I'm missing the 1997.
MR. COLATRIANO: Off the record.
(Discussion off the record.)
BY MR. COLATRIANO:
Q. Mr. Green, I'm going to refer to these as goodwill financial reporting packages or goodwill reports; is that okay with you?
A. That's fine.

Page 74

Q. And what responsibility, if any, did you have for the preparation of these reports?
A. Beginning in 1997, I was part of the team that eventually developed the package of the goodwill financial statement reports.
Q. Why was it decided that there would be a separate financial reporting package created for goodwill receiverships?
A. To the best of my recollection, that decision was made because the financial statements, outstanding financial statements may not have included all possible outstanding claims of the receivership.
In addition, since there were multiple users of the goodwill financial statements it was elected to provide further information in a form of other reports that were not of standard financial statement reports.
Q. I think you referred to the fact that there was concern or -- strike that.
I think you stated that one of the factors that led to this was the fact that regular financial reports didn't have all the information that was in need reports, specifically I think you referred to liabilities; is that correct?

Page 75

A. That is correct.
Q. What liabilities are in these reports that are not in the regular financial reports?
A. The liability for post-insolvency interest and any income tax liability that may be outstanding, as well as any pass-through receivership claim information.
Q. To get that type of information, the type of information you just referred to that wasn't in the regular finance statements, how would one get that information before the goodwill packages were created?
A. Well, if one is seeking the information post-insolvency interest, they could have referred to a particular Excel spreadsheet that would have calculated the PII. If one was interested in any income tax liability they could have done an inquiry to our tax unit as far as any outstanding income tax liability.
In addition, if there were any claims of the pass-through receivership, then they could have gone to a liability register that would have housed any of those claims.
Q. How were these reports put together, what was the process for putting together the goodwill

Page 76

financial reporting packages?
A. Okay, I refer you to Exhibit 3 on the third page AM 00097037. That is a report from Excel spreadsheet that begins with the pro forma balances of certain accounts or roll-over accounts from the books of the failed institution.
It also includes any adjustments made during a pro forma process arriving at what FDIC refers to as an inception balance of the receivership. So those are the ending balances at the conclusion of the pro forma process. The inception balances are the beginning balances on the books of the receivership. That is also referred to as report 1 of the goodwill financial statements.
Q. Can I stop you right there for a second? You referred to the pro forma process. Can you describe what that is?
A. The pro forma process is the process that the pro forma team will go through upon the closing ever an institution in preparing a final balance sheet of the institution, it includes the documentation and reconciliation of each general ledger account on the books at the time of failure.
As a result of that process, certain pro forma statements are produced, those statements lead

Page 77

to the inception balance entries of the receivership.
Q. I'm sorry, you were going, I think walking me through Exhibit 3, which is the 1997 goodwill package, can you go ahead with that, please.
A. Yes.
Report 2 begins with inception balances, which was from the balances on report 1 as shown in the inception balances of the receivership. It has the next column just summarizing the activity to date on each line item of the balance sheet, arriving as a year end actual general ledger balance and then there's a column for any changes to the adjustments to the year end balance, leaving an adjusted year end balance.
Q. The information on both report 1 and report 2 -- I take it it is all drawn from the general ledger system for the receivership?
A. On report 1 the inception balances and on report 2, the inception balance and the inception balance to date activity balance does come from the general ledger system of the FDIC/RTC, yes.
Q. Is there anything on report 2 that doesn't come from the general ledger system?
A. No.
Q. Let's move to report 3.

Page 78

A. Report 3 begins with the adjusted year end balances, it gently includes certain liabilities that existed as of a particular date that are not on the FDIC general ledger so those balances are added to the balances of the FDIC general ledger adjusted balances in addition to any other claims of the pass-through receiverships that exists.
Q. And there's a column on report 3 well -- strike that.
What is the purpose of preparing report 3 as opposed to report 2 or report 1?
A. The purpose of report 3 is to disclose to the best of the ability of the receivership what the potential deficit is of the receivership by including those liabilities that are not on the books of the receivership.
Q. And you've referred to several times a pass-through receivership, can you describe what you mean by a pass-through receivership?
A. The pass-through receivership is a receivership created that the closing of an institution where certain assets and liabilities of the failed institution go into a pass-through receivership, then ultimately out of the pass-through receivership to another entity, be it a

Page 79

conservatorship, be it a de novo institution. Certain assets and/or liabilities may be retained within the pass-through receivership.
Q. How is it determined which assets or which liabilities are maintained in the public school through receivership as opposed to passing through to another entity?
A. That determination is made by the franchise marketing section of either the FDIC and/or RTC.
Q. Franchise marketing?
A. Franchise and asset marketing branch.
Q. Do you know what factors, if any, influenced that determination of which assets and liabilities are passed through and which ones are maintained in the pass-through receivership?
A. No, I don't.
Q. Is the franchise marketing section or the asset marketing branch, what division of the FDIC are they housed in?
A. They are housed in the Division of Resolutions and Receiverships.
Q. All right, so I think we've finished the very high level generality of report 3.
Let's continue on Exhibit 3, the 1997

Page 80

report, what's the next report?
A. The next report is titled Statement of Assets and Liability and Liquidation, it's equivalence is a balance sheet.
Q. And how if at all does this relate to the report 1?
A. If you refer back to report 1, the far right column entitled Inception Balance is similar to the inception balance column on the statement of assets and liabilities and liquidation.
Q. The next document in this exhibit is a statement of operations and if you could just describe what that is?
A. The statement of operations is a statement that reflects both the income and expenses and any losses and recognized from the disposition of assets for a receivership from the inception to date and for a particular current period that the statement is being produced for. It's equivalent as an income statement.
Q. Thank you.
I'd like you to turn for a moment to Exhibit 11, which is I believe the most recent goodwill financial reporting package for Carteret, it's the restated 2004 statement.

Page 81

Do you have that in front of you?
A. Yes, I do.
Q. This report has -- this exhibit has an additional report, report 1-A that I don't think was in the 1997 report that you mentioned. Can you just identify for the record what this is and what its purpose is?
A. Report 1-A further clarifies the reclassing of inception balance accounts that was on the RTC's books at time of failure. In other words, it puts into a different classification from what was on the books at time of closing to how it got reclassed with being the inception balances of the receivership.
Q. So it's reclassified from how the institution kept classified assets preclosure to how the RTC classified it at the inception date; is that fair?
A. For certain accounts, yes.
Q. And sticking with Exhibit 11, turning to report 1 of Exhibit 11, pro forma recap is the middle column there is the pro forma adjustments. And I don't want you to go through every line item here, but can you tell me generally what is the nature of these types of adjustments, what is the purpose of

Page 82

these adjustments?
A. The primary purpose of the adjustments is to record any unprocessed work on that final day of closing, as well as if there are any internal reclassifications needed between accounts on the general ledger, as well as writing off certain valuation accounting or accruals, bringing the inception balances to the modified accrual basis.
Q. And with respect to sort of asset values, what does that entail, does it entail putting the assets back at their book value or something else or how does that work?
A. It entails writing off any valuation reserve accounts that were on the books at the time of closing.
Q. Turn to report 2, there's a footnote D and report 2 that reads post-insolvency interest is being revised to reflect $141,756,985 as the best possible estimate of interest of the Carteret receivership claims as of 12/31/04.
Can you describe why this change or this adjustment was made?
A. Well, I -- for the year ending 12/31/2004 I know there was a revision to the post-insolvency interest that was made and recorded on the books for

Page 83

2004.
Q. And what was that change?
A. That change was a revision to the Excel spreadsheet to recognize that the prior calculation wasn't compounding annually.
Q. How was that -- was that in error that it wasn't compounding annually?
A. That is correct.
Q. How was that error discovered?
A. I discovered that error when I reviewed the spreadsheets for 2004.
Q. And who had prepared those spreadsheets?
A. Those spreadsheets had been prepared by one of our accountants in the liability accounting unit for that year.
Q. Let's turn to report 3 within Exhibit 11 and I would like you to kind of walk me through how and let's use for initial purposes the first column here the adjusted 12/31/04 balance, how the net asset or deficit of the receivership is calculated?
A. The net asset or deficit is calculated by including the balance of the equity at time of failure after pro forma adjustments, the results of operations of the receivership from the statement of operations/income statement, plus or minus any

Page 84

premium paid or received, in the case of Carteret was a premium received of 143 million, in addition it to other non-cash adjustments brought directly to adjustment accounts on the book of the receivership in the case of Carteret that's $121 million, so it was the composite of those four line items that make up the deficit of Carteret as of 12/31/04 on the books of the deficit of $170 million.
Q. And what types of adjustments were non-cash adjustments?
A. The principal types of adjustments that go through non-cash adjustments or the reporting of post-insolvency interest and any valuation of assets on the books of the receivership. In this case that valuation was zero as of 12/31/04 because all the assets had been liquidated, plus if there is any discovery liabilities of the receivership or the write off of unproven liabilities of the receivership, that would also flow through the non-cash adjustment line item.
Q. I'm sorry, can you say that last part again?
A. Yes. If their write off of any unproven liabilities of the receivership that would also flow through the non-cash adjustment or if there were any

Page 85

discovered liabilities of the receivership that were reported on the books of the receivership that would also flow through that line item.
Q. Let's take a look at the column, the fourth column, projected receivership results using adjusted 12/31/04 balances. Can you describe what -- how this column differs if at all the column University you've just been working at, kind of walk me through the adjustments that are made to get do?
A. That the projected receivership results column is different from the adjusted 12/31/04 balance column due to the inclusion of the federal income tax liability of the IRS.
Q. That's the $86.8 million figure in this report?
A. That is correct.
Q. There are two line items in the liabilities section, one is called suspense/escrow accounts and the other is FDIC billings and borrowings, can you describe what those line items reflect?
A. The expense escrow accounts principally relate to monies that have come into the receivership that have not been applied to the general ledger accounts. It also normally houses the balance of

Page 86

checks that have been returned in the form of dividends to claimants and that money comes back, it is put into the A liability account until we are able to locate the claimant.

It also could represent just other general items that have come into the receivership and the ultimate disposition is not yet known. The FDIC billings and borrowings typically represents those monies due the FDIC in the receivership capacity for expenses, both direct and indirect charges billed to the receivership, but not yet paid and it would also represent the outstanding principal and interest of any borrowings of the receivership from FDIC corporate and in Carteret's particular case.

It represents a liability to FDIC as a result of an adjustment to a residual interest sale that happened in 1998, as well as an adjustment to a sale of credit enhancement reserve account to the FDIC in 1996. As a result of those sales and any subsequent adjustment to those sale prices a liability arose from the receivership to the FDIC.

What you see on this particular report as of 12/31/04 for that line item, that is what principally represents that line item.

Q. That being these two liabilities relating

Page 87

to the '98 residual sale?

A. The $6.1 million line item amount, the principal amount or the majority of that amount relates to those prior sales, that is atypical of what is generally in that line item.

Q. It is atypical?

A. Yeah.

Q. And I think at the very beginning of your answer on this FDIC billings and borrowings item you say it is principally money due to the FDIC in the receivership capacity, did you mean in its corporate capacity?

A. Yes, in its corporate capacity.

Q. There is a column right to the right of the one we've just been discussing called outstanding claims priority 6 pass-through receivership. And there's a line item of roughly $1.6 million, I think it is approved claims is the line item; do you see that?

A. Correct.

Q. What does that refer to?

A. That line item titled Outstanding Claims represents the unpaid balance of general trade creditor claims from the pass-through receivership or residing in the pass-through receivership.

Page 88

Q. And when you say general trade creditor claims, what are you referring to?

A. I'm referring to claims by individuals, third parties, corporations that have a claim for a good or service that are provided to the institution prior to failure that had not yet been paid.

Q. Were any of the claims that are reflected on this line item held by the FDIC in any capacity?

A. That, I don't know. If it was, it would be reflected on liability register for the pass-through receivership.

Q. Okay.

Next column has post-insolvency interest, priority 7 of the pass-through receivership, there is a line item $1.3 million. What does that represent?

A. That's the post-insolvency interest on the outstanding claims of the pass-through receivership.

Q. Turning to the next page, there's a footnote section the footnote A talks about post-insolvency interest and says that the interest compounds annually and continues to accrual until the unpaid proven claims have been satisfied; do you see that?

A. Yes, I do.

Q. And then in footnote D, there's a

Page 89

discussion of post-insolvency interest on the pass-through receivership claims and it says this post-insolvency interest estimate is compounded daily and continues to accrue until unpaid priority 6 claims have been satisfied; did you see that?

A. Yes, I do.

Q. Why is there a different compounding method for interest on -- the interest -- post-insolvency interest covered by footnote A and post-insolvency interest covered by footnote D?

A. The difference relates to the statute regarding the computation or the priority of post-insolvency interest. In this particular case, pass-through receivership was established on 12/4/92 and the computation is based on the language in the 12 CRF O 360.3 as opposed to the other resolutions of Carteret that the computations based on a different methodology.

Q. I take it that different methodology is reflected in different interest rates; is that true for these two classes of claims?

A. That is correct.

Q. How, if at all, are administrative expenses of the receivership reflected in the financial statements contained in Exhibit 11?

Page 90

A. It would be a mixed trade of expenses of the receivership are recognized in the statement of operations/income statement and they recognize when they are incurred or paid. The expenses associated with the goodwill litigation are not recognized on the books of the receivership.
Q. Are there any other expenses that are not recognized on the books of the receivership that could ultimately be charged against recovery by the receivership?
A. Yes, there is.
Q. What are they?
A. The federal income taxes.
Q. Anything else?
A. Not to my knowledge.
Q. So is it fair to say that all administrative expenses, other than the goodwill litigation expenses are reflected in these financial statements?
A. Also except for any expense associated with the federal income tax, yes.
Q. So the only two exceptions are the goodwill litigation and expense and the federal income tax expense?
A. Yes, as it exists today, yes.

Page 91

Q. I'm sorry, as what exists today?
A. Those that I'm aware of.
Q. I'm getting confused. Those what that you're aware of, those type of expenses?
A. Those type of expenses.
Q. All right. Turn back to Exhibit 3, which is the 1997 goodwill package and -- turn to report 2 of Exhibit 3, there's a column adjustments to 12/31/97 actual GL balances.
A. Um-hum.
Q. And there's a $20 million adjustment on there for an estimated loss on assets and the footnote, C says estimated loss on assets line item is being removed due to an error in the computer program populating this item; do you see that?
A. Yes, I do.
Q. Can you explain to me what the computer error was and what it related to?
A. I didn't know what the computer error was, but as it relates to FDIC maintains an estimated loss on assets through a valuation process, it's my understanding at year end that that process made an error and did not automatically adjust the valuation reserve before the December '97 financials were complete.

Page 92

Q. How was that error discovered?
A. To the best of my recollection, when the financials were being put together, the amount of the valuation reserve for the goodwill financials receiverships were checked against the spreadsheet that the Division of Finance has on each receivership for its valuation calculations.
Q. Do you know who discovered the error?
A. No, I don't.
Q. And I take it on this -- I notice on this report that there's no amount entered for -- under liabilities for estimated interest on claims; do you see that?
A. Yes, I do.
Q. And can you explain briefly why that is?
A. Because as of 12/31/97 Carteret had not met the threshold of 95 percent in dividends.
Q. If you turn the page report 3 does have an estimated of interest on claims FDIC/RTC; do you see that?
A. Yes.
Q. That's roughly $63.7348 as of 12/31/97?
A. Correct.
Q. Turn to Exhibit 4, which is the 1998 year end package -- goodwill package. Report 2 has a line

Page 93

item for estimated interest on claims; do you see that? And in the third column the 12/31/98 GL balance is 63 million -- $63.7 million; do you see that?
A. Yes, I do.
Q. The next column is an adjustment adding roughly $6.5 million to that figure. Do you know -- do you see that?
A. Yes, I do.
Q. Can you explain to me why that adjustment was made?
A. That adjustment was made because as of 12/31/998 the interest accrual had not been brought forward through 1998.
Q. Even though the previous column purported to be a statement of the balance as of 12/31/98?
A. That's correct.
Q. Is that at error that it wasn't accrued through the end of 1998?
A. It's less of an error than it is a timing issue as far as when the calculation was done for the PII through 12/31/1998.
Q. General ledger when it is a 12/31/98 general ledger record it is supposed to be as of that date, correct?