Page 94

A. It is as of that date, yes.
Q. For whatever reason that GL didn't have the updated PII number, correct?
A. Correct.
Q. Why don't you turn to -- let's go off the record.
(Discussion off the record.)
(Whereupon, at 12:34 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:30 p.m., this same day.)

Page 95

AFTERNOON SESSION
(1:35 p.m.)
Whereupon,
WAYNE S. GREEN,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED).
(Whereupon, Ms. Hart exited the deposition room.)
BY MR. COLATRIANO:
Q. Good afternoon, Mr. Green.
A. Good afternoon.
Q. Would you turn to Exhibit 5, which is the 1999 goodwill financial impact and turn to report 3 -- report 2, I'm sorry.
Under liabilities there's a line item pending claims under depositor/creditor claims.
A. Yes.
Q. And it has an adjusted 12/31/99 balances in the far right-hand column, it has a negative item, negative $297,000 roughly; do you see that?
A. Yes, I do.
Q. What does this represent and why is it a negative balance?

Page 96

A. Well, typically that balance would be a credit balance.
What it represents or those claims that that were still on the books at the time of closing that haven't been proven. In other words, someone has not filed a proof of claim for that balance -- for a balance within that line item. Again, typically that would be a credit balance in that account.
What it means by it having a debit balance in that either too much in unproven claims were written off or there was a general trade creditor claim that was moved down to the subrogated claim balance where the liability had not yet been discovered on the books of the receivership. But typically it is those claims that have not yet been proven that were on the books at the time of failure.
Q. What relationship, if any, does it have with the FDIC subrogated claims?
A. Well, if there were general trade creditor claims paid by the FDIC, then that amount would have gone to the payment in the subrogated claim line item.
However, that requires a journal entry to discover the claims on the books of the receivership

Page 97

first, if that's what is happening in this instance. It appears more liabilities were written off than what were on the books at the time of failure as of 12/31/99.
Q. When you say more were written off, does writing off mean paying them as well as other types of write off?
A. No writing means actually writing off the books of the receivership unproven claims.
Q. And I see the inception balance of this is $1.4 million roughly; do you see that?
A. Yes, I do.
Q. Would that have corresponded -- presumably that's a lot more than these general trade creditor claims and things like that, that would that include depositors?
A. Yes. The inception balance of 1,376,000,000 would include deposit liabilities and other liabilities that were on the books at the time of failure.
Q. If you turn the page to report 3 of this exhibit, it has a footnote, footnote A on post-insolvency interest; do you see that?
A. Yes, I do.
Q. And it says in the footnote that -- it

Page 98

talks about how post-insolvency interest was calculated; do you see that?
A. Yes, I do.
Q. It says note that prior to 12/31/99 this post-insolvency interest estimate for FIN 1309 -- FIN 1309 refers to what?
A. That is a numeric number assigned to the Carteret receivership.
Q. Carteret receivership?
A. Yes.
Q. So the post-insolvency interest for FIN 1309 was computer and prioritized in accordance with 12 C.F.R. section 360.3. However, this estimate was recomputed and reprioritized for 12/31/99 after determining that 12 C.F.R. section 360.3 is not applicable to receiverships established after 8/10/93; do you see that?
A. Yes, I do.
MR. GILBERT: I think you misspoke and you said '94.
MR. COLATRIANO: Did I? At the end?
MR. GILBERT: Yeah.
MR. COLATRIANO: It's receiverships established after 8/10/93.
BY MR. COLATRIANO:

Page 99

Q. Who made the determination that post-insolvency interest for Carteret needed to be recomputed and reprioritized?
A. Well, in 1999, we determined that or we questioned whether or not the methodology of calculating post-insolvency interest of Carteret for the years '97 and '98 was correct.
We then, we being the goodwill team sent an E-Mail to the legal division counsel and requesting their opinion on what was the proper methodology for calculating post-insolvency interest. As a result of their response to the goodwill team, the PII in 1999 was recalculated using a different rate and compounding methodology that had been used in 1997 and 1998.
Q. You said that we questioned in 1999 whether the PII methodology was correct. What caused you to question that then as opposed to earlier?
A. I think in the fall of 1999 when the dividend processing system was being modified to calculate post-insolvency interest that we looked into the different methodologies of calculating PII to confirm that the system would be able to handle the calculation.
I think as a result of that inquiry when

Page 100

we were comparing the way we had done it on Carteret and other receiverships that we questioned whether or not the prior methodologies that had been used was the correct methodology.
Q. Okay. But what specifically caused you to raise that question. I understand in what context it was raised, but what caused to you say, gee, are we doing this correctly?
A. I don't remember.
Q. And was this a question that was raised with respect to just Carteret receivership, with respect to all receiverships, with respect to a subset of receiverships?
A. I believe there was a certain subset of receiverships that we questioned the validity of the method of calculating post-insolvency interest.
Q. And what was that subset?
A. Well, that subset included Carteret in addition to four or five our receiverships that we ultimately made adjustments on by changing the methodology.
Q. Was there something about these -- the subset of receiverships that distinguished it from other receiverships that caused to you question how it was calculated for the subset?

Page 101

A. Yes, it was.
Q. And what was that?
A. That the receiverships were closed or created after August 10th of 1993.
Q. And what do you mean when you say the receiverships were closed or created after August 10th of '93?
A. Well, that as it relates to Carteret that specific fundings or insurance determination were made on the Carteret conservatorship after August 10th of 1993.
Q. I'm sorry, you referred to specific fundings or --
A. Well, insurance determinations.
Q. What do you mean by fundings or insurance determinations?
A. Well, the insurance determination is a specific process of claims unit goes through to determine the insurance of accounts.
Q. Can you describe what that is?
A. The process includes grouping accounts by similar ownership and then determining based on ownership of accounts which portion, if any, of an account is insured or covered by insurance. The term funding I was using was the funding by the FDIC/RTC

Page 102

for the deposits of the insured accounts.
Q. Funding for the deposits means funding for how to pay off those deposits or how to assign those deposits to someone else?
A. Funding it in the context of funding actual dollars for the deposits.
Q. And what is the relationship between the determination of funding or instrument determination to date on which a receivership is considered closed for purposes of calculating PII?
A. Well, from the direction we got from our legal division, that based on the three specific closing dates of Carteret that this was the specific interest rate to be used and furthermore this would be the compounding method to be used to calculate the post-insolvency interest.
Q. When -- a couple of times you've referred to a date in the course of this discussion as August 10, 1993. What is the significance of that date?
A. I believe that's the enactment of the National Depositor Preference Act.
Q. When was Carteret the thrift actually placed into receivership?
A. I believe it was placed into a past due

Page 103

receivership in August or December 1992.
Q. Okay. And so that's the date that the RTC came in an effectively took control of the thrift, correct?
A. That's my understanding, yes.
Q. And so obviously that's before August 10th of 1993, correct?
A. Correct.
Q. Why is that date not the relevant date for the purposes of determining which methodology should be used for post-insolvency calculations?
A. Well, from the directions we got from our legal division that the specific subsequent fundings or partial closings of the conservatorship were the proper dates to use in order to trigger the post-insolvency date.
Q. Okay. Do you have an understanding for why they determined that was the date that they were funding instrument determination as opposed to the date the RTC took control of the institution was to be determined?
A. No.
Q. Did you have any discussions with anybody at legal regarding that issue?
A. None other than what's in certain E-mails

Page 104

that we've provided.
Q. And who specifically was providing this guidance to your team as far as this issue, who in the legal division?
A. I believe the attorney by the name of Michael Saran actually offered the E-Mail that actually made it's way to the other parties of the goodwill team.
Q. And do you know of anything other than this E-Mail that actually expresses what this determination was, was there any other document, a memo, a policy statement or any other type of analysis done with respect to this issue?
A. Well, the E-Mail alludes it other memos issued within DRR or Division of Finance and our legal division addressing the computation of post-insolvency interest.
Q. You don't know of any other documents that kind of reflect this determination other than this E-Mail?
A. No.
Q. As we will see, I'm sure on some additional documents later on, the fundings were going to be deposit transactions involving Carteret were undertaken in late 1994, early 1995, correct?

Page 105

A. Correct.
Q. Why is it then that this issue with respect to which date would control the calculation of post-insolvency interest was not flagged until 1999?
A. That, I don't know. When we first began the calculation of PII in '97, the team thought that the applicable method, the first method used was the method to use.
Q. And what was the basis for that determination?
A. Well, in conversations I had with staff in Dallas, as well as goodwill team staff, that it was our opinion that the methodology under I think section 360.3 if I can read it properly was the methodology in fact at that time to calculate post-insolvency interest.
Q. I imagine we're going to come back to this issue when I get some other documents later on.
MR. GILBERT: Sure.
BY MR. COLATRIANO:
Q. But for now, let's turn to Exhibit 6, which is the 1990 -- I'm sorry, which is the 2000 goodwill financial reporting package for Carteret.
Do you have that?

Page 106

A. Yes.
Q. Turn to report 2, please. Report 2 has a line item for FDIC billings and borrowings, roughly $13.3 million as of December 31, 2000.
You referred to this earlier and I want to make sure it is in the record in the right context here, that line item shows significant increase from a prior year when it was, you know, less than $300,000, if you look at Exhibit 5.
So we have this in the right context, can you explain what accounts for the roughly $13 million increase in this line item in the year 2000?
A. Yes, in the year 2000, there was a revaluation of the sale of the residual interest previously owned by Carteret as well as the credit enhancement reserves owned by Carteret that were sold to the FDIC in prior years that. That revaluation resulted in Carteret being overpaid for those interests in the tune ever approximately $14 million in 1998 and 1996. The balance as of 2000 of roughly $13,250,000 is substantially that balance some two years later.
Q. Who made the determination that this item had to be revalued, reassessed?
A. That was done by staff in the Division of

Page 107

Finance in Washington.
Q. Do you recall who specifically was responsible for that determination?
A. No, I don't.
Q. And do you recall what specifically was erroneously -- what was the error that was being corrected here, in what way was Carteret overcompensating for this item?
A. There's a memo that describes a particular error, from my recollection it was when the valuation of the prior sales were made, certain servicing language was not taken into account from those sales, which had it been would have decreased the sales price in the original transaction.
Q. Did you know how that sales price was determined in the original transaction?
A. No, I don't.
Q. I also want to report again line item for estimated interest on claims and there's an adjustment in the fourth column of roughly $5,000 with a footnote D saying the recorded post-insolvency interest amount is being revised to reflect $106,333,946 as the best estimate as of 12/31/2000.
Can you explain what this adjustment is and why it was being made?

Page 108

A. Well, the adjustment is an upward recognition of the estimate of accrued PII. As far as the reason we have a $5,000 adjustment there, I don't know.
Q. Do you know who made a determination that that adjustment needed to be made?
A. No, I don't.
Q. If you look at footnotes to report 3 in this report --
A. Okay.
Q. -- there's footnote C in the middle refers to unallocated indirect expenses for all goodwill litigation as totaling $28.9 million as of 12/31/2000; do you see that?
A. Yes, I do.
Q. If you take a look at the next exhibit, Exhibit 7, the same footnote to the same report, the unallocated indirect expenses for goodwill litigation now is stated as $23.7 million; do you see that?
A. Yes, I do.
Q. Do you know what accounted for the decrease of roughly $5.2 million?
A. I believe it may have been certain receiverships that had goodwill claims no longer had actively goodwill claims and some proportionate share

Page 109

of that indirect expenses were to longer being pooled as part of the allocated process.
Q. Staying with Exhibit 7, which is the 2001 report, turning to report 2, again in the fourth column there seems to be an adjustment to the PII line item of an increase of roughly $1.8 million.
Do you see that?
A. Yes, I do.
Q. And again there's a footnote, footnote D that says the recorded post-insolvency interest amount is being revised to reflect $115,661,941 is the best estimate as of 12/31/01.
Can you explain what the basis was for this adjustment in PII?
A. I don't know.
Q. Do you know who made a determination that PII needed to be increased by $1.8 million through this adjustment?
A. No, I don't.
Q. If you turn to the next exhibit, Exhibit 8, the 2002 report, again if you turn to the footnotes to report 3, footnote C specifically, it now has a number for unallocated indirect expenses for goodwill litigation of $35.8 million, which is an increase roughly $12.1 million over the previous

Page 110

year.
Do you know what accounts for that increase?
A. No, I don't.
Q. If you turn to the next exhibit, Exhibit 9, which is the 2003 goodwill reporting package, and turn to report 2, once again there's an adjustment to post-insolvency interest in the fourth column.
This time it is about $6,400 and with a footnote saying that this is an adjustment designed to reflect the best possible estimate of PII.
Do you know why this adjustment was made?
A. No, I don't.
Q. Do you know who made a determination that this adjustment needed to be made?
A. No, I don't.
Q. And again, turning to the footnotes to report 3 on this document, the number for unallocated indirect expenses for goodwill litigation is down to $7 million as of 12/31/03, do you know when accounts for the drop from the previous year in this figure?
A. For that particular year, I believe there was another determination of an allocated indirect expenses dealing with goodwill receiverships where

Page 111

the number of the receiverships decreased and a proportionate decrease was made.
Q. This footnote also refers to direct expenses related to goodwill litigation efforts, it gives a figure of $1.4 million for that.
Do you see that?
A. Yes, I do.
Q. Just briefly, what is the difference between direct goodwill litigation expenses and incorrect goodwill litigation expenses?
A. Well, the direct expenses are those expenses incurred on a specific receivership, those that can be specifically identified with a receivership. The indirect or those expenses that while they can not be directly charged or identified with a receivership, they are identified with a specific ongoing issue involving the receivership or an aspect of the receivership.
Q. What types of expenses fall under the direct expenses, what types of expense items?
A. It's principally salaries associated with that staff working on a receivership, travel. Direct expenses also include specific charges of a receivership as far as an appraisal or some expense associated with the liquidation of the asset or the

Page 112

management of a receivership, as opposed to an indirect expense that that particular issue being worked on may cross multiple receiverships.
So you can't associate a specific cost with a single receivership in the spread-out against multiple receiverships.
Q. You say direct expenses include salary, how would in the case of somebody -- an employee who works on multiple matters, how would the receivership track which portion of the salary should be considered a direct expense?
A. If there's -- if an employee's working on a matter that crosses multiple receiverships, it's either tracked through what the FDIC calls and organization code or a project code in which internally when it goes through the allocation process, it knows under this project code that this person worked across multiple receiverships, then based on the what I'll title Rules Within That Project Code, it will all locate this much to this receivership and that much to that receivership.
Q. And what generally is the allocation method, on what basis is the allocation determined for -- using your example?
A. Well, in this particular matter, there

Page 113

would be a project code for goodwill expenses that the system knows that this project code is just to be accumulated and not allocated to all the goodwill receiverships as opposed to another project code or a code that tells the system this much is to be recovered from the receiverships and allocate this much to the receiverships.
Q. Okay, but with respect to -- I think you mentioned the direct expenses would include salaries, how would the salary be allocated through that code to a particular --
A. When an individual was doing the time sheet they also put in the FIN number for theirself.
Q. So it is basically on the -- they keep track of their time basically?
A. Yes.
Q. Let's turn to Exhibit 10, Exhibit 10 is the original 2004 goodwill financial package and report 2 has another adjustment to the PII claim of $1.3 million roughly with a footnote.
Explain that, I want to make sure I understand. What is the basis for this adjustment?
A. The basis for that adjustment is that what was recorded on the books of the receivership included the PII on the pass-through claims. It is

Page 114

not the policy of the FDIC to include on the books of the receivership post-insolvency interest on past due claims.
Q. So it was backed out basically?
A. That's correct.
Q. Is that in error that it was included -- that it included a few pass-through interest?
A. That is correct.
Q. And how was that error discovered?
A. I discovered that error.
Q. How did you discover it, what were you reviewing when you discovered it?
A. I looked at the PII calculation on the pass-through receivership and with that the PII on the receivership itself and simple arithmetic to determine that the PII on the books included the PII on the pass-through receivership.
Q. Now, was this error reflected on previous financial statements?
A. I don't believe so, but I'm not certain.
Q. When did you discover that error?
A. Well, it would have had to have been before March 31st of 2005.
Q. So somewhere between December of '04 and March of '05?

Page 115

A. That's correct.
Q. I assume when you backed out the pass-through PII, backed it out, it is a compounded figure that's backed out, right, it's all PII for the pass-through receivership?
A. That is correct.
Q. If you turn to the footnotes to report 3 in this exhibit, Exhibit 10, again there's a footnote C talking about goodwill expenses. And it says the fund has accumulated $5 million in expenses incurred in the receiver's goodwill litigation efforts.
I notice on this version of the footnote there's no distinction drawn or no numbers given regarding direct versus indirect goodwill expenses; do you see that?
A. That is correct.
Q. Can you explain why the footnote is different and why there is not a disclosure of indirect here or is the indirect already in as well?
A. I don't know.
Q. Do you know whether the 5 -- just to be clear because my question was very compound -- the $5 million number that's on here, do you know whether that is limited to direct goodwill litigation

Page 116

expenses or whether it includes indirect goodwill litigation expenses?
A. I don't know.
Q. Who was actually responsible for writing the footnotes in these financial reports?
A. I believe the footnotes were principally authored by Bob Ferrar.
MR. COLATRIANO: Off the record.
(Discussion off the record.)
BY MR. COLATRIANO:
Q. Mr. Green, can you describe what is meant by the term subrogated claim as it relates to the FDIC's subrogated claim?
A. Yes. Subrogated claim is the claim that the FDIC acquires or becomes subrogated to when deposit liabilities are funded by the FDIC. In other words, it steps in to the shoes of depositors that would have a claim against the receivership for their deposits.
Q. And my question and your answer related this to the FDIC, I take it the answer is the same if we're talking about the RTC; is that fair?
A. That's fair.
Q. And for purposes of discussion I might use those two interchangeably FDIC or RTC, let me know if

Page 117

that confuses you. Also let me know if your answers would change depending on which agency we're talking about, okay?
A. Okay.
Q. Now you said that the claim that arises when FDIC acquires -- it's the claim that FDIC acquires when deposit liabilities are funded by the FDIC, we touched upon this earlier, but I want to make sure I understand what you mean by funded by FDIC?
A. Well, funded in this case means an actual corporate funding of the deposit liabilities to a third party.
Q. Okay. You said a corporate funding -- an actual corporate fund to go a third party. How did that work in this case?
A. In this case on each one of the failure dates a pro forma was completed on those accounts involved in the general ledger accounts involved in the transaction and as a result of the pro forma process in conjunction with the agreements with the assuming bank certain sums were calculated to be due the assuming banks as far as acquiring the deposits of Carteret.
So at that juncture monies were actually

Page 118

wired to the assuming bank for the deposits, minus the sum of the premiums and any assets acquired by the assuming bank. It is the total deposits liabilities that were on the books of Carteret as it relates to the three particular closing dates that became the subrogated claim of the FDIC.
Q. What -- I think you've touched upon this earlier. Just so I'm clear, what policy of guidance documents exist that govern, that speak to how the subrogated claim is calculated?
A. I refer you to Exhibit Number 2.
Q. And again Exhibit Number 2 is a chapter of the corporate proof of claims, a chapter from the RTC claims manual, correct?
A. That is correct.
Q. And specifically what in this chapter, in this exhibit especially since I still haven't reviewed it speak to how the subrogated claim is calculated?
A. On the top of page 10-7, the first sentence talks with CPOC and CPOC are the initial for the corporate proof of claim it states CPOC will include the original model liabilities used in calculating the wire, total deposit liability to the acquirer, including any accrued interest and any

Page 119

non-deposit liabilities.
Q. Is the FDIC or the RTC are they subrogated all deposit holders that are transferred?
A. If in a transaction all deposits were funded to a third party, then the FDIC acquires that subrogated claim.
Q. Is the subrogated claim limited to insured deposits?
A. It depends upon the transaction. If it is an insured deposit only transaction, then the FDIC only funded insured deposits, it would not be subrogated to excess deposits.
Q. And in this case do you know whether the FDIC became subrogated only to insure depositors or all deposits or transfers?
A. In the pre-funding the Carter et al funds were deposited.
Q. So it not only to insured deposits but to non-insured deposits; is that correct?
A. It acquired the subrogated claim as a result of its funding.
Q. It acquired the subrogated claim as to non-insured deposits as well as insured deposits, correct?
A. That's correct.

Page 120

Q. And what is the theory do you know of why the FDIC subrogated claim would include non-insured deposits?
MR. GILBERT: Just register an objection to this question and the line of questions to the extent it is soliciting a legal opinion, you can answer the question to the extent you're able.
THE WITNESS: The actual funding of the deposit is based on the agreements with the assuming bank and I don't know why. In this particular transaction, all deposits were funded.
BY MR. COLATRIANO:
Q. In this case, do you know how much the non-insured position of the subrogated claim is?
A. No, I don't.
Q. How would you find that out, would any of the documents that you've looked at thus far break that out?
A. No.
Q. Do think of the general ledger entry items or drill down reports related to subrogated claims break that out?
A. Not on Carteret, no.
Q. Do other receiverships?
A. In those cases where that information was

Page 121

available from a claims unit, we could use a particular priority code for a receivership.
Q. How does priority code result to insured versus not insured?
A. They are similar in dividend information.
Q. Okay.
A. This a notation that this amount is funded by the FDIC for insured deposits and this amount was funded by the FDIC for uninsured deposits, it's a liability classification.
Q. Is there a separate sort of code so you can break that, out at least as to some receiverships?
A. When it is available, yes.
Q. Do you know why it was not available with respect to the Carteret receivership?
A. No.
Q. Was it a function of the RTC that the FDIC inherited here or was it a function of something else?
A. That would have been a function of the franchise and marketing branch, that would have been in existence at the time of closing and made that determination.
Q. Made what determination?

Page 122

A. Whether or not it was an all deposit or an insured deposit transaction.
Q. I was talking about the determination of whether it was coded separately, it is only coded separately when there is different type of treatment with respect to the funding?
A. It is coded separately when the information is available in the event of an all deposit transfer. If the receivership is able to get the information from the claims unit that this much was insured and this much was uninsured, then we're able to put that with in the GL, if it's not available, then it just goes as an all deposit transfer.
Q. When you say if it's not available to the claims unit, I mean what information would they need to know whether this was available, presumably it should be discernible from the records which deposits are insured, which are not; is that correct?
A. It is dependent upon whether or not they did issue a determination.
Q. They being?
A. The claims unit.
Q. And what do you mean by insurance determination?

Page 123

A. Determining the insurability of an account.
Q. And -- okay.
You referred to the fact that in this case the monies that were actually wired to the acquirers as deposits is calculated and please correct me if I'm wrong, on the basis of the liabilities assume minus any premiums paid or the amount of any Carteret assets transferred; is that fair?
A. That is correct.
Q. But the amount of the subrogated claim was not net of those amounts, not net of the premium were of the amount of assets transferred, correct?
A. That is correct.
Q. So now the subrogated claim is the total deposits assumed, correct?
A. Correct.
Q. What is the basis for not taking into account the premium, the A assets transferred in connection with the calculation and subrogated claim?
A. Well, the basis for that is the FDIC/RTC in its corporate capacity is the insurer of accounts, so the gross amount of deposits becomes a claim. As a result of the funding, although less monies are actually sent to the assuming bank, because the

Page 124

premium is deducted, assets acquired by the assuming bank are deducted, other internal entries may on corporate's books and receivership's books gross up a subrogated claim to the total amount of deposits and the receiver recognizes a receivable from corporate for the amount of the premium being deducted and the assets being deducted.
Q. Okay, so I think if I could summarize what you just described to me is how it's done is that there's liability is the full amount -- the subrogated claim amount is the full amount of the liabilities transferred, correct?
A. Correct.
Q. And then there's a receivable or there could be a receivable reporting for the amount of premium or for the amount of the assets transferred; is that correct?
A. That is correct.
Q. So that describes how it's done and I guess my question is, why is it done that way as opposed to just reducing the amount of the subrogated claim to reflect the amount of money transferred or wired by corporate?
A. Because we have different legal entities in different parts of the overall transaction. FDIC

Page 125

or RTC is responsible for funding of the deposits, the premium is coming to the receivership and the assets are being sold by the receivership.
Q. When you say though the RTC or FDIC is responsible, you're referring to corporate?
A. Correct.
Q. When you say they are responsible for funding the transaction, the amount by which they actually funded the transaction is the amount of the wire transfer?
A. Correct.
Q. So why isn't that the measure of the cost to corporate of the transaction?
MR. COLATRIANO: Just the same objection as before to this line of questioning that to the extent it is eliciting a legal opinion, the witness can answer, if he can.
THE WITNESS: The corporate proof of claim reflects the subrogated deposit claim, the actual netting of the premium and the assets is ultimately or does reduce the subrogated claim through the dividend process.
BY MR. COLATRIANO:
Q. Through the dividend process?
A. That is correct.

Page 126

Q. And what is the cost to corporate in connection with this type of transaction, is it reflected by the amount of the wire transfer?
A. Well the ultimate cost to corporate is the unpaid amount of a subrogated claim, et cetera, loss opportunity cost on the initial funding of the claim so that's the ultimate cost to corporate.
Q. The opportunity cost on the funding?
A. Yes.
Q. And in this case the funding is represented by the wire transfer now, correct?
A. In this case, like others, the opportunity cost is on the gross claim, the gross-up claim.
Q. What's the opportunity cost on funds that are not transfers, that are not wired?
A. It's the cost that the receivership has not earned on the receivable due from corporate yet.
Q. How is that a cost to corporate?
A. Well, if the receiver is earning the interest, then ultimately it can use that in order to reduce the subrogated claim or use it to pay billings and borrowings.
Q. Might be and probably is because of a fault of mine, but I'm finding this to be a little circular.

Page 127

A. All right.
Q. We talked about what is the opportunity cost to corporate of this transaction, you said it's the opportunity cost of the funding.
A. Um-hum.
Q. The funding is limited to the wire transfer, correct?
A. Right.
Q. Is there an opportunity cost to corporate for the amount that is not wired, the difference between the liabilities assumed and the wire transfer amount; and if there is an opportunity cost to corporate for that amount, what is it?
A. For the amount not wired, I'd say no.
Q. It is not.
And I think --
A. Well, let me retract that. Let me restate that.
For the amount that is not funded, there is a payable on corporate's books which is a reciprocal account of the receivable on the receivers' books, corporate does pay interest to the receiver on that receivable, so there is costs associated with that.
Q. There's a payable on corporate's books?

Page 128

A. Um-hum.
Q. And it pays interests to the receiver for what amount?
A. For the amount of that part that the wire was reduced by the premium and the assets acquired by the assuming bank.
Q. And where does that interest show up on the financials?
A. It's on the income statement, on the receiverships income statement.
Q. Let's just return to the most recent set of financials in Exhibit 11, and I'd like you to point out to me whether it is payable or the interest on this payable is reflected in the financial statements?
A. On Carteret's financial statements it would be an income item and it's an account that rose up to interest on invested funds.
Q. Let's refer to a specific page.
A. It's the statement of operations, it's Bates number AM 00097041.
Q. Which exhibit are you on?
A. I'm sorry, Ronald.
Q. Let's do it by Exhibit 11.
A. Okay. It's Bates number AM 0097396 and it

Page 129

is a statement of operations for a period ending December 31, 2004.
The interest earned by the receivership on the receivable due from corporate is included in the line item titled Interest on Invested Funds.
Q. Interest on -- oh.
The very first line item?
A. Yes.
Q. How is that interest calculated?
A. That interest is calculated by using the monthly rate of return that the receiver earns on the cash it has at the Federal Home Loan Bank of Chicago.
Q. Is that a simple or compound interest?
A. That I don't know.
Q. Is it floating or a fixed interest rate?
A. I believe the rate being earned at the Federal Home Loan Bank of Chicago was a daily rate.
Q. Would it be considered a risk-free rate?
A. Can you explain risk free?
Q. Well, how would it compare to, say, a rate on treasuries?
A. The monies that our receiverships owned or have is within the account of the Federal Home Loan Bank of Chicago, certain portions of it are in an overnight investment account and certain portions of

Page 130

it are in 30, 60, 90-day Treasury bills. The aggregate return is slightly above the daily Fed fund rate.
Q. You don't know whether it's compounded for purposes of this calculation?
A. No, I don't.
Q. And just so I'm clear this line item is for interest on invested funds.
A. Right.
Q. But you're saying this line item includes an interest on an account payable from corporate to the receivership?
A. It is interest on an accounts receivable from corporate.
Q. Receivable, I'm sorry.
Account payable is from receiverships corporate?
A. From corporate to the receivership.
Q. Thank you.
And where could we fund the backup for what comprises this line item?
A. I believe that was in the drill downs that are provided to counsel they should have received in the last month or so.
Q. Which specific drill down would that be?

Page 131

A. Each packet I prepared had the first drill down page listed all the accounts that comprised that particular line item, the other attachment to that page with the transaction histories of each one of those accounts.
Q. I think you testified earlier that premiums on deposit transfers would be ultimately reflected in -- as a reduction in the subrogated claim through dividends, correct?
A. It could be, yes.
Q. In this case is that true?
A. Well, in this case, consistent with other receiverships, the amount of the premium of the assets that are netted out of the subrogated claim wire is booked as a receivable. That receivable is used to either pay billings and borrowings then it's used to pay dividend payments.
It all goes in to one account. We first use the monies in that account to pay any monthly billings and borrowings amount to corporate, then we use it to pay dividends.
Q. And so to the extent it's not used to pay the dividends, does it reduce the subrogated claim?
A. Can you repeat that, please?
Q. I'm trying to get an understanding of how

Page 132

the accounting would work on a premium, how it relates to the amount of the subrogated claim so if you could walk me through that, I want to know how that is accounted for.
A. Okay.
Q. And let me interrupt. If it is easier to kind of use an example, please do so if you want to assign some numbers for the amount of subrogated claim and the amount of premium feel free.
A. Okay, let's take a hypothetical closing where there is $100 million in deposits and it is an all deposit transfer and there's -- we enter into a transaction with another assuming bank and the premium that they agreed to pay is $2 million and they also acquire $8 million in deposits. So the ultimate during this time frame -- the ultimate wire going to the assuming bank would have been $90 million.
Now, that's $90 million net wire. Subrogated claim would have been recorded on the books of the receivership for $100 million, because that was an all deposit transfer.
The receivership would have recognized the $2 million premium in its equity account and recorded a receivable due from corporate for $2 million. The

Page 133

receivership would have also recorded the sale of assets to the assuming bank to $8 million and booked a receivable on its books due from corporate for $8 million.
So at this juncture on the receivers books, we have $100 million of subrogated claim, we have $2 million premium, 8 million in sales of assets and we have a $10 million receivable due from corporate.
The first month incomes and through the billing process, the receiver owes corporate $300,000 for expenses. The following month, we'll take 300,000 of that $10 million receivable and pay corporate. So now we've paid corporate 300,000 for expenses, we reduce our receivable by 300,000, we now have a 9.7 million in receivable.
Q. And I'm sorry, how if at all is the subrogated claim, is that still on the books of the receivership for $100 million at that point?
A. Yes, it is.
Q. I'm sorry, go ahead.
A. Okay. Second month we have $600,000 of expenses. We pay corporate 600,000, we reduce the receivable by 600,000, now we have 9.1 million in the receivable.

Page 134

Third month we paid a dividend, we have generated 20 million in cash from the liquidation of assets, in a hypothetical situation we're not reserving for operating expenses or anything else, corporate's the only claimant.

Let's say we pay 18 million in cash, plus we pay a non-cash dividend to corporate of the $9.1 million. So the subrogated claim is reduced by the 18 million in cash that we paid, plus it is also reduced by the 9.1 million receivable that was on the books that it received.

So at that juncture, the receivable is zero, corporate subrogated claim has been reduced by 27.1 million.

Q. And during this time period, while there is still a receivable, that receivable is earning interest?

A. Yes, it is.

Q. And during that time period, the subrogated claim is earning interest, correct?

A. That is correct.

Q. And the interest on the receivable is calculated using the -- it's based on the monthly rate of return that the receiver earns on cash at the Federal Home Loan Bank; is that correct?

Page 135

A. That is correct.

Q. And the interest on the subrogated claim is to use the methodology now employed post-1999 based on the federal judgment claim, correct?

A. That is correct.

Q. What is the rationale for having the mismatch order, the distinction between the interest methodology for calculating interest off receivable versus the interest methodology for calculating interest on a subrogated claim?

MR. GILBERT: Objection, objection same as before except he's not a lawyer, he's not an economist and to the extent this is outside the scope of deposition in asking for economic opinion, I object. If the witness can answer, go ahead.

THE WITNESS: I don't know.

BY MR. COLATRIANO:

Q. Just to be clear, one of your topic areas is the termination estimate, prioritization, calculation of interest on subrogated claims?

A. That is correct.

Q. You don't know why there is a different methodology used for one -- strike that.

Another area for which you've been designated is sort of the accounting for the

Page 136

receivership?

A. Correct.

Q. And the interest on this receivable is something that is reflected in the accounting for the receivership?

A. Correct.

Q. But you don't know sitting here today what the rationale is for this difference in interest rate calculation, correct?

A. That is correct.

Q. Who determines what interest rate is going to be paid on the receivable?

A. I believe that was a decision by Division of Finance management, made in the early 1990s.

Q. Is it reflected in any documents?

A. I have searched for those documents, but I couldn't locate any.

MR. GILBERT: This is the receivable at the Federal Home Loan Bank of Chicago's interest rate?

BY MR. COLATRIANO:

Q. Well, it is a receivable under the receivership's books, correct?

A. That is correct.

Q. It is earning interest based on the rate

Page 137

used on receivership money at the Federal Home Loan Bank of Chicago, correct?

A. Correct.

Q. I'm sorry, you said you looked for such a policy statement and couldn't find it, I'm sorry, I lost track.

A. I had looked for in the case of Carteret the actual calculations of the interest on the receivable on its books, but I could not locate it.

Q. If you couldn't locate it, how do you know it's being calculated?

A. Because I no interest is -- or was paid on it, it was a practice of both FDIC and RTC receiverships.

Q. But you can't -- have you seen no reference to that payment of interest in the Carteret books? I'm trying to understand what you said, you said normally you looked for this and you couldn't find it?

A. I looked for the spreadsheet calculations or the actual calculation document itself.

Q. Okay.

A. There are transactions on the book of Carteret that are the interest payments to the Carteret receivership on that receivable.

Page 138

Q. Okay. And I take it from this discussion that the accounting for this is not different with respect to the premium versus with respect to the asset transfer, they both become a receivable on the receiverships books and they both earn interest calculated in the same way; is that correct?
A. That is correct.
Q. With respect to the money actually wired by the RTC in this case to fund the deposit transfers, what was the source of that money, where did it come from?
A. It's my understanding it came from the U.S. Treasury.
Q. And what was the RTC's cost of borrowing that money?
A. I don't know.
Q. Is it your understanding it was basically the RTC borrowed it from Treasury at some point?
A. Yes.
Q. You don't know what the cost was of that borrowing?
A. No, that is correct.
Q. So you don't know what interest rate was paid, correct?
A. Was paid by whom?

Page 139

Q. By the RTC when they borrowed this money?
A. No, I don't.
Q. Or whether that was simple or compounded?
A. That's correct.
Q. And you don't know whether it's a floating or a fixed rate?
A. Correct.
Q. Now, at the time of this deposit transfer, Carteret had a number of assets, correct?
A. To my knowledge, yes.
Q. But only a portion of these assets were transferred in connection with these three transactions; is that your understanding?
A. That is correct.
Q. If the RTC had sold those assets prior to these deposit transfer transactions, how would the proceeds from those sales have been accounted for?
A. Well, we -- are you talking in terms of the conservatorship during the period of the conservatorship?
Q. Yes.
A. Well, it's my understanding they would have used those proceeds and looked -- the operation of the conservatorship, they could have used them to pay off any type of borrowings that weren't on the

Page 140

books of the conservatorship, they could have used those to reduce deposit liabilities of the receivership.
Q. Could they have also used those funds to fund the deposit transfer?
A. I don't know.
Q. If they had used those funds to fund the deposit transfer, presuming that would have reduced by corresponding them out the amount wired by the RTC?
MR. GILBERT: Objection, outside the scope of his deposition, he is a 30(b)(6) witness.
THE WITNESS: I don't know.
BY MR. COLATRIANO:
Q. You don't know whether it could have been used to fund it?
A. Well, that would have been based on the agreement between the receivership, conservatorship, the assuming bank and RTC corporate.
Q. If they had been used to fund the deposit transfers, presumably that would have meant less money would have needed to be wired by RTC corporate?
MR. GILBERT: Same objection.
THE WITNESS: Yes.
BY MR. COLATRIANO:

Page 141

Q. To make sure I understand according to your testimony, that would not have affected at least the initial determination of what the subrogated claim would have been, correct?
A. That is correct.
Q. It could have affected the amount of this receivable we've been talking about, correct?
A. Yes.
MR. COLATRIANO: Why don't we take a break.
(Recess.)
(Green Exhibit No. 12 was marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, you've been handed an exhibit that's been marked as Exhibit 12, it's -- I clipped a couple documents together because that's the way that I was led to believe that they go together, but if they don't, please let me know.
A. All right.
Q. Somehow when they were copied they were not copied together so I just put them together.
Exhibit 12 is an E-Mail, dated July 14, 1998 from Elaine Tama, T-a-m-a, to Mark Strunc, S-t-r-u-n-c, cc'd to you, re: Carteret Number 1 and

through page 9231 with the January 20th, '95 resolution.

And finally at page 00092312 through 2343 would be the October 28th, '94 resolution.

MR. COLATRIANO: Okay.

(Green Exhibit No. 13 was marked for identification.)

BY MR. COLATRIANO:

Q. If you could take a look at the document that's been marked as Exhibit 13, it's actually just another version of this E-Mail with that appears to be different attachments and again this is the way it was produced to me.

So I just have a question about one of the attachments, it's the last page, which is a draft or a version of report 3 for Carteret actually, yeah.

Do you have it?

A. Yes.

Q. Have you seen this document before?

A. Yes, I have.

Q. Can you describe what this is?

A. Report 3 is the projected and receivership results report using 12/31/97 balances, it is the standard report 3 attached to the annual goodwill financial statements package.



Q. This document has an estimate for interest on claims of $55 million; do you see that?

A. That is correct.

Q. And if you want to look back at Exhibit 3, the actual '97 report, the estimated interest there is $63.8 million and I just want to get an understanding, if you have one of what the difference is, what explains this discrepancy?

A. I believe the discrepancy was the interest calculation of the 55 million only went through 1996.

Q. Okay. Even though this was supposed to be a December 31, '97 balance?

A. Correct.

Q. Do you know who prepared this draft of report 3?

A. This one right here?

Q. Yeah.

A. No.

MR. COLATRIANO: That's all I have for that document.

(Green Exhibit No. 14 was marked for identification.)

BY MR. COLATRIANO:

Q. Can you identify for the record the document that's been marked as Exhibit 14?



A. Yes, this is a document that I wrote to Counsel Andrew Gilbert regarding request for a drill down report of balance sheet accounts as of a certain date, and this is in response to that request.

Q. And I think you mentioned this before, but just for the report, what are drill down reports?

A. Well, a drill down report is a transaction history for an account for either a particular year or it could cross multiple years.

Q. And do I take it that you actually generated the drill down reports that have been provided to us over the last few weeks?

A. Yes, I have.

Q. And how do you go about generating those reports?

A. My process was I printed a December 31st, '04 balance sheet, then within our financial data warehouse I drilled down on each line item of the balance sheet to generate the account numbers that comprised the line item. I then either drilled down on that particular account or using a different method did a journal entry inquire on that particular account for the period 1/1/95 through 12/31/04.

Q. That letter refers to something called the financial data warehouse system; did you see that?



A. Yes.

Q. Can you describe what that is?

A. The application in the FDIC that houses data in the general ledger system relative to receiverships.

Q. So I understand is that basically what -- how the general ledger is stored electronically basically?

A. Well, it's not the general ledger itself, the data from the GL is moved from the general ledger platform into this data warehouse.

Q. Gotcha.

So from this data warehouse you could generate the general ledger or these drill down reports?

A. Well, you can't generate the general ledger, you get the general ledger activity.

(Green Exhibit No. 15 was marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Green, could you take a look at the document that's been marked as Exhibit 15 and identify it for the record, please?

A. Yes, this is a document off of the -- or out of the financial data warehouse called Carteret

Page 158

Federal Savings Bank, representing the balance and the claims assigned to corporation, as well as the dividends paid to the corporation.
It also includes a transaction history of all the dividends paid to the FDIC/RTC, it also includes a transaction history of all amounts posted to the subrogated claim beginning with January 1, 1995 through 12/31/04.
Q. So I take it the account number 172210 represents the account that reflects the subrogated claim?
A. That is correct.
Q. Okay. And the account 172120 represents the dividends paid to the corporation?
A. That is correct.
Q. So is it fair to say that any activity, any accounting entry that effects the amount or the balance of the subrogated claim would be reflected on account 172110?
A. That is correct.
Q. And so is it true that to the extent a dividend would be used to reduce the balance of the subrogated claim that would show up on the account 172110?
A. No.

Page 159

Q. How would that happen? How would that be reflected?
A. The dividend shows up in a different account 172120.
Q. But to the extent that reduces the balance of the subrogated claim would it show up in the 172110 account?
A. It reduces the net outstanding subrogated claim.
Q. Right. Is that 172110?
A. No.
Q. What account would that be?
A. 172120.
Q. The dividend account?
A. (The witness nodded.)
Q. So to get the current balance of the subrogated claim you need to have both accounts; is that --
A. To get the current unpaid subrogated claim, yes.
Q. Is that what this $18.8 million figure referred to on the first page of this exhibit?
A. As of 12/31/04, that is correct.
Q. All right. Let's turn to the pages of this report that deal with account 172120, the

Page 160

dividends.
A. Okay.
Q. There's a column there for posting date and effective date; do you see that?
A. Yes.
Q. And how's a determination made for which effective date to give to an entry?
A. You can post to an entry today as long as the month is still open wanting to use a prior date as an effective date.
Q. And how would you determine what the effective date actually is?
A. Well, generally the effective date and the posting date are similar or if you can wire funds out today, but it didn't get reported yesterday, it would be posted -- I'm sorry, it didn't get posted until the following date, but it's effective date, the actual date of the wire.
Q. Okay. For purposes of calculating things like pose insolvency interest on a subrogated claim, I take it that the relevant date is going to be the effective date, not the posted date, correct?
A. Correct.
Q. There are acronyms that show up on this document in the batch number column and I just want

Page 161

to make sure I understand what they are referring to there's one that's CTM, do you know what that's referring to?
A. Yes, CTM is the initials for the control totals modules.
Q. And FAP?
A. FAP is initials for field accounts payable.
Q. And there's I believe one YEB?
A. YEB stands for year end balances.
Q. APF -- actually it might be -- yeah, there's an APF?
A. APF I believe stands for accounts payable form.
Q. Okay, C&V?
A. C&V is conversion of roll over of a balance.
Q. CTX?
A. CTX, that I don't know what the initials stand for.
Q. OPB?
A. OPB stands for or it's related to the conversion of the balances from one location code to another location code within the general ledger system. I don't know what the initials stand for.

Page 166

Q. And in this particular line item it is for 187 million and change; do you see that?
A. Yes, I do.
Q. Do you know what that is relating to?
A. Well, from my review of the transaction of 187 million was approximately the amount of the premiums received and the assets sold and the three transactions.
Q. And so that amount was credited as a dividend basically to RTC corporate, correct?
A. Correct.
Q. And why did the effective data April 20th with respect to that item?
A. I don't understand the question.
Q. Well, the actual deposit transfers and the premiums happened before that, right?
A. That is correct.
Q. One was in October, '94, one was in January of '95 and one was in March of '95, correct?
A. Correct.
Q. And so why was it not until April 20th of '95 that a dividend -- why was it not until then that the receivership got credit for a dividend for those amounts, do you know?
A. No, I don't know.

Page 167

Q. How would we find out, is there a way to find out why there was a delay in that recognition of these items?
A. Unless it's addressed in the dividend case from the claims unit, no, I don't know how you would find out.
Q. And what do you mean by a dividend case, what does that refer to?
A. A dividend case is a written narrative requesting authority to pay a dividend on a receivership.
Q. Have you reviewed any dividend cases in connection with Carteret?
A. No, I have not.
Q. Am I to understand that whenever there is a dividend item on this account, whether it is accelerated dividend or some other dividend, there should be a corresponding dividend case document?
A. No, not necessarily.
Q. What would determine when there would be a dividend case versus when there wouldn't be a dividend case?
A. It would depend on the level of cash that's available on a receivership. In the more later practices an annual authorization is given to

Page 168

account to go pay a dividend when certain threshold amounts of cash on hand are met.
Q. You're saying later periods, what are you referring to? Is that more recent development?
A. Yes.
Q. From approximately when?
A. I'd say the last five years.
Q. Is it fair to say before that time that in order to declare dividends some type of documentation would need to be provided for that case or something like that?
A. That is correct.
Q. And what RTC or FDIC policies or regulations govern the regulations by receivership?
A. Can you explain what you mean by govern the payment of dividends.
Q. Was there any guidance provided in any type of policy statement or regulation about under what circumstances dividends should be declared, when a dividend should be declared or paid?
A. There are FDIC policies addressing the payment of dividends, yes.
Q. Are where are the policies in any manuals, free-standing policy statements, do you know?
A. I believe they are addressed in the claims

Page 169

manual.
Q. And who is responsible for making the decision about whether a dividend should be made or declared, who would --
A. The claims unit staff.
Q. The other report that's part of this exhibit is count 172110 which I take it is for, it kind of tracks of subrogated claim amount, correct?
A. That's correct.
Q. There are a number of entries on this document that have the description router or router, however you say it, generated offset, what does that refer to?
A. What that refers to is an entry that are being made on the books of the receivership as a result of the entries made on FDIC or RTC corporate
Q. Can you give me an example of what you mean by that?
A. Certainly. When the wires are made or funded after the closing, corporate will record that wire on its books as subrogated claim. Using a particular account number on corporate's books, then we create an entry or it routes to certain receivership accounts creating an entry on the receivership.

Page 186

year maturity, do you have a sense for how that worked?
MR. GILBERT: Objection.
THE WITNESS: Typically thrift institutions could have a whole spectrum of deposit maturities depending on the deposit they were offering, it could be as short as 30 days or it could be three years, it depends upon its own individual practice.
BY MR. COLATRIANO:
Q. And why don't you refer back to Exhibit 17 for a second, Exhibit 17 I understand you've not reviewed this document, but it's the summaries of the various deposit transactions, correct?
A. Correct.
Q. And it lists or at least categorizes deposits sold by various types and at least for savings and certificates of deposits it lists the various maturity levels, correct?
A. Correct.
Q. And those maturity levels I mean they range for 1 to 364 day CD all the way up to 36 to 120 month retirement CD, I guess; is that correct?
A. That's correct.
Q. In -- did Carteret or think thrift when it

Page 187

was -- has it's own accounting system correct before it was seized?
A. To my knowledge, yes.
Q. Let me just ask this, in determining what interest rate should be used or calculating what post-insolvency interest should be on the subrogated claim, why did the FDIC or RTC not just use the interest that was being paid interest rate methodology that was being paid by the institution that was placed into receivership?
MR. GILBERT: Objection.
THE WITNESS: Why? Because I think the payment calculation of post-insolvency interest is addressing a particular statute that the FDIC is obligated to use.
BY MR. COLATRIANO:
Q. Statute are you referring to?
A. I think the current statute that is applicable to Carteret was I believe in 12 U.S.C. 1821, which in conjunction with an opinion from legal that the federal judgment rate should be used.
Q. Are you reviewed those statutes?
A. I have looked at the statutes, yes.
Q. Are you referring to the National Depositor Preference Statute when you say 12 U.S.C.

Page 188

1821?
A. Yes, I am.
Q. Do you recall what, if anything, that National Depositor Preference Statute says regarding how interest -- how post-insolvency interest should be calculated?
MR. GILBERT: Outside of 30(b)(6) deposition, he's not here to give legal opinions.
THE WITNESS: It is my recollection that it is silent on the calculation of post-insolvency interest.
BY MR. COLATRIANO:
Q. And I believe he touched upon earlier the fact that 1999 a determination was made that because FDIC made a determination that Carteret was closed for purposes of the PII calculation after the National Depositor Preference Statute was enacted that a particular interest methodology was going to be used, do you recall that discussion?
A. Yes.
Q. And so it's fair to say that the timing of the closure in relation to the enacting of the National Depositor Preference Statute had determinative impact on how interest was going to be calculated, correct?

Page 189

A. It had an impact, yes.
Q. Did the National Depositor Preference Statute to your knowledge mention which interest rate to use?
MR. GILBERT: Same objection as before.
THE WITNESS: Not to my knowledge, no.
BY MR. COLATRIANO:
Q. To your knowledge does the National Depositor Preference Statute specify whether interest should be calculated pursuant to a floating or a fixed rate?
A. To my knowledge no.
Q. To your knowledge does the National Depositor Preference Statute specify whether interest should be calculated based on a compounded basis or on a simple basis?
A. To my knowledge, no.
Q. In light of these facts are you trying to get a sense for why such significance was placed upon whether such an institution closed before or after the National Depositor Preference Statute for purposes of determining how interest was going to be calculated, since the statute to your knowledge doesn't address any of those items, why is the statute relevant?



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 190

MR. GILBERT: I state a standing objection and I won't interrupt again.
THE WITNESS: We received guidance from counsel in the legal division, in addition to there were other memos authored discussed the National Depositor Preference Act that addressed the calculation of post-insolvency interest.
BY MR. COLATRIANO:
Q. And do you have any understanding for why in light of the fact that the National Depositor Preference Statute doesn't address anything regarding how interest was to be calculated why that statute had such significance in this determination of what method was going to be used?
A. I'm sorry, can you repeat that?
Q. Yeah, that was a long one. To your knowledge National Depositor Preference Statute didn't address any of the mechanics of calculating post-insolvency interest, correct?
A. Correct.
Q. It didn't address the rate, didn't address floating or fixed, didn't address simple or compound?
A. Correct.
Q. In light of those facts to your understanding the statute was silent on all that,

Page 191

what is your understanding of why the calculation method turned on whether an institution was closed before or after the National Depositor Preference Statute?
A. It is my understanding it turned because of the opinion from our legal division that since Carteret was closed after August 10th, 1993 because of those events that those failures or the calculation of the post-insolvency interest calculation was different than what we had used previously to calculate post-insolvency interest.
Q. And I take it that other than what you were told by legal you don't have a sense for what the rationale was for why this statute that doesn't address any of these mechanics somehow has determinative relevance to how interest was going to be calculated?
A. No.
(Green Exhibit No. 19 was marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, with respect to Exhibit 19, I'm interested mostly in the first three pages. Is this a document you've reviewed before?
A. The first three pages of Exhibit 19, yes,

Page 192

I've seen those before.
Q. And can you identify for the record what those three pages are?
A. The first page is cover memo from Sharon to regional counsel, dated June 14, 1995 Post-Insolvency Interest Memorandum.
The second and third page is a document from Steve Graham, Alvin Kitchen and Thomas Rhodes, dated June 8, 1995 to regional directors of DAS, DOF and all regional counsel for liquidation and it's subject is Receiverships Post-insolvency Interest.
Q. I think earlier you made reference to the fact that you saw a determination regarding the post-insolvency calculation. There was an E-Mail and then there was references to other memos that dealt with that issue.
Is this one of the memos that you had in mind when we were talking about that?
A. Yes, it is.
Q. And the document beginning on the second page June 8th, 1995 memo talks about the interest -- in the second paragraph is it says the interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the

Page 193

jurisdiction it was in, whether it had a state or federal charter; do you see that?
A. Yes, I do.
Q. What is your understanding of what was meant by when the institution failed?
A. My understanding of that particular phrase would be in the context of when there was a final receivership or there was some other interim resolution when some type of funding occurred giving rise to subrogated claim.
Q. Has that always been your understanding of what this is referring to?
A. Yes.
Q. When I think we talked about earlier that the changes in how post-insolvency interest was going to be calculated with respect to Carteret had occurred in 1999, correct?
A. Correct.
Q. Prior to that time, had you or anyone been responsible for determining which interest rate methodology or which interest calculation methodology should be used for Carteret and anybody who viewed this memorandum?
A. I don't believe anyone on the goodwill team or even myself calculating PII had seen this

Page 194

memo prior to that.
Q. And so what were you relying on prior to the 1999 change, what specifically was the FDIC relying on for determining what's the interest method -- interest calculation method should be used?
A. We -- or I was relying on the discussions with other accounting staff that had previously calculated post-insolvency interest on RTC receiverships.
As a result of that conversation and I believe we also had the similar conversation on the goodwill team, we were provided with the -- an Excel spreadsheet that contained all the interest rates used to calculate PI on RTC receiverships.
Q. And you say were you provided with all the interest rates used, what do you mean?
A. Well, that period or for that spreadsheet it used a different interest rate every month, it was a rolling monthly average of the prior three months 90-day T-Bill, so this spreadsheet contained that particular 90-day T-Bill rate for every month beginning in 1990.
Q. You said you were relying on conversations you had with other accounting staff; is that correct?
A. Yes.

Page 195

Q. Who specifically had you had conversations with?
A. Oh, that I don't remember.
Q. And what was it -- what specifically in those conversations were you relying on in determining that you should be using the interest rates you just referenced as opposed to some other interest rate?
A. Well, my inquiry was -- what was the method of calculating PI and RTC receiverships? In context of goodwill receiverships, as well as other receiverships that needed the calculation prepared.
As a result of that conversation, I was told this is the methodology, this is the spreadsheet to use, it contains all the rates, we get a new rate every month from staff from the Division of Finance in Washington. So based on that, that's what we used to do the initial calculations of the PI.
Q. Okay. And is it fair to say that -- let me ask you this.
Do you remember whether you were talking to somebody within the Division of Finance staff in Washington or were you talking to someone from DRR's staff in Dallas or somebody else?
A. It would have been the Division of Finance

Page 196

staff in Dallas.
Q. And is it fair to say there your last answer that the division finance staff in Dallas were in turn relying on information or guidance that they were getting from Division of Finance staff in Washington?
A. That, I don't know.
Q. You were getting the interest rates from Washington, correct?
A. That is correct.
Q. I'm trying to get an understanding of what this memo means, what it talks about when it says the institution failed and I guess I'm struggling with why it would be more natural to conclude that when an institution failed is referring to a resolution transaction than -- rather than when the institution was seized by the RTC, can you explain that to me why failed is equated in your mind with the resolution transaction as opposed to when the RTC seized the institution?
A. From my standpoint as an accountant being on closed and the term failure has a specific meaning, it's when the institution ceased to be an open thrift or a conservatorship. This context Carteret went into a conservatorship and continues to

Page 197

be an operating going concern during the conservatorship period.
Q. Do you know whether it was contemplated at the time of the pass-through receivership, when it was first instituted, when Carteret was seized whether it was contemplated that Carteret would ultimately come out of that as a stand alone entity or whether it would ultimately be sold or some other resolution; do you know what was contemplated at that time?
MR. GILBERT: Objection.
THE WITNESS: No, I don't.
MR. COLATRIANO: Okay.
BY MR. COLATRIANO:
Q. Thrift receiverships, let's contemplate on post FIRREA, do you know what I'm referring to when I say FIRREA?
A. Yes, I do.
Q. FIRREA was enacted in 1989?
A. August 9th, 1989.
Q. And FIRREA established the RTC, correct?
A. Correct.
Q. So post FIRREA and the thrifts that were placed into receivership were placed into an RTC receivership, correct?

Page 198

A. Correct.
Q. Do you know of any thrifts that were seized post FIRREA that were placed -- that were seized by the RTC that did not go through a pass-through receivership?
A. No, I don't know.
Q. I take it you are familiar with a number of the goodwill thrifts, correct?
A. In the context of working on the goodwill packages, yes.
Q. And in connection with the context of working on the goodwill packages, is it fair to say that all the goodwill packages you've worked on have involved pass-through receiverships?
A. No, I don't think all of them have had a had a pass-through receivership.
Q. Can you identify any that did not?
A. No, I can't at this time.
Q. With respect to any goodwill thrifts that went through a pass-through receivership did you know whether any of them came out of that as an operating stand-alone institution?
A. I don't think so.
Q. Do you know of any other thrifts seized post-FIRREA that came out of a pass-through

Page 199

receivership as an operating stand-alone institution?
A. Can you clarify that?
Q. Yeah, my first question had to do with the goodwill thrifts.
My second question is broader, thrifts seized post-FIRREA that went into a pass-through receivership.
Are you aware of any that went into a pass-through receivership by which I mean conservator was appointed for some -- excuse me, that ultimately came out of that conservatorship as a stand-alone operating institution?
A. Not to my knowledge.
MR. COLATRIANO: Off the record.
(Whereupon, at 5:27 p.m., the deposition adjourned to be resumed on Wednesday, March 1, 2006, at 9:00 a.m.)

Page 200

______________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this _________ day

of ______________________, 200__.

_______________________
NOTARY PUBLIC

My Commission expires: ________________________

Page 227

Q. I take it the use of the dividends with respect to the escrow funds account is how in this case any dividend relating to a premium was recorded?
A. In addition to the premium, the assets also are acquired.
Q. I'd like you to turn back to an exhibit you used yesterday, Exhibit 19, the June 8 the -- one part of the June 8th, 1995 memo from Stephen Graham, Alvin Kitchen and Thomas Rose, Subject: Receivership post insolvency issues; do you have that?
A. Yes, I do.
Q. When we broke off yesterday, we were talking about the second paragraph of this memo which talks about the interest rate being largely dependent on when the institution failed, do you recall that discussion?
A. Yes, I do.
Q. I want to make sure I know for the record -- I'd like you to identify what policy statements, regs, any other documents that you're aware of that defines what it means to fail for purposes of receivership accounting?
MR. GILBERT: Let me register an objection to this line of questioning. That's outside the scope of deposition and he's not here as an attorney

Page 228

to testify as to legal interpretations.
THE WITNESS: For purposes of receivership accounting, the initial accounting for a receivership is dependent upon a closing agreement or in the case of a payoff, there's no closing agreement. That closing agreement triggers the entries on the books of a receivership.
BY MR. COLATRIANO:
Q. And when you say for purposes of receivership accounting, it is triggered by the closing agreement, is there any policy statement or manual or anything, any other document you can point me towards that makes that point that that's the date of fill you are that's triggered by the closing agreement?
A. No, no.
Q. I'm not sure I followed, I think you said in closing agreement, but in cases where there is not a payoff, there's not a closing agreement, is that what you said?
A. There's not a closing agreement with an assuming bank.
Q. And this case, it wasn't a deposit payoff there was a deposit transfer?
A. That's correct.

Page 229

Q. So in this case is it true that there's a closing agreement?
A. There is a closing agreement.
Q. What are you referring to? Is that document called a closing agreement?
A. Yes.
Q. And who is it between in this case, Carteret?
A. In this case it is my understanding it was between the conservatorship, the RTC in its corporate capacity, the RTC in its receivership capacity and the assuming institutions.
Q. And when was that agreement entered into?
A. The agreement I'm referring to was October 28th, 1994, January 20th, 1995 and March 10th, 1995
Q. And so this '03 closing agreements to use your term, does that mean there are three dates of failure for Carteret?
A. There were a partial sale of deposits on October 28th. There was another partial sale of deposits on January 20th and a final receivership was created March 10th.
Q. Okay. My question was for purposes of accounting, are each of those dates considered a

Page 230

failure date?
A. Each of -- for purposes of accounting, each of those dates gave rise to accounting liquidation activity.
Q. And are you saying accounting liquidation activity would only happen when there's a failure?
A. That is correct.
(Green Exhibit No. 22 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 22 is a, it looks to be a memo, dated September 18, 1996 from John Bovenzi, William Kroener and Paul Sachtleben to the operating committee, Subject: Options Memorandum Post-insolvency Interest Regulation and Amendments to 1260 C.F.R. 360.3?
Have you reviewed this document previously?
A. No, I have not.
Q. Were you aware of a proposal around this general time to establish by regulation a uniform interest rate for post-insolvency interest?
A. No, I was not.
Q. Were you generally involved in any discussions during this time that let's just say the

Page 231

1990s, discussions regarding what FDIC's policies should be with respect to post-insolvency interest?
A. No, I was not.
Q. On page 2 of this memo, there's some bullet points. The third bullet point says, that the proposed regulation will establish that the post-insolvency interest rate locks on the date an institution is declared insolvent and remains fixed until the receivership terminates.
What date was Carteret declared insolvent?
A. I believe it was placed into conservatorship 1992.
Q. And on that date was it declared insolvent?
A. To the best of my knowledge, yes.
Q. On page 8 of this memo there's a footnote, footnote 9, the first sentence of which says NDP, do you know what NDP refers to?
A. Yes, I do.
Q. And what's that?
A. Non-deposit preference.
Q. Is it non deposit or national deposit?
A. It could be either one.
Q. Is that the statute we were talking about yesterday?

Page 232

A. I believe so, yes.
Q. It says NDP does not address the issue of rate payment or property of post-insolvency interest distributions.
And I take it that is consistent with what we talked about yesterday, to your knowledge that statute didn't address those items, correct?
MR. GILBERT: Objection to the extent it calls for a legal opinion.
THE WITNESS: To my knowledge, yes.
BY MR. COLATRIANO:
Q. On page 9, there's a discussion under heading 3 that says uniformed rate for all receivership FDIC investment rate, and under advantages it says if rate floats assures that FDIC which usually holds 95 to 98 percent of claims against receivership estate, earns rate it could otherwise have earned on investment -- on invested funds?
My question to you, do you know what types of investments the FDIC typically made?
MR. GILBERT: Excuse me, what was the question?
MR. COLATRIANO: What kinds of investments the FDIC made with its funds.

Page 233

THE WITNESS: It's been my experience in speaking with others and the Division of Finance, the FDIC generally invests its corporate funds in some type of overnight investment account or Treasury bills of some government form of investments.
BY MR. COLATRIANO:
Q. On the next page, page 10, there is a discussion of another option in paragraph 7, federal financing bank, borrowers rate (FDIC cost of funds rate.)
What, to your knowledge, is an interest rate that measures what the FDIC's cost of funds is? Is it this rate, the federal financing bank borrowing rate?
MR. GILBERT: Objection, beyond the scope of the deposition.
THE WITNESS: I'm sorry, can you repeat the question?
BY MR. COLATRIANO:
Q. I want to know what you know about what the FDIC cost of funds is. Is it measured by the federal financing bank borrowings rate or something else?
A. I don't know.
Q. Do you know, what, if any, became of this

Page 234

recommendation that's reflected in this memo?
A. No, I don't.
Q. On page 18 of the memo, there's an Exhibit A that lists FDIC's existing practice for paying interest from receiverships and there are two sections, one is pre-NDP opinion and post-NDP opinion; do you see that
A. Yes.
Q. And under pre-NDP there are three options, there are three practices that are discussed, if we assume for the sake of this question that Carteret is considered a pre-NDP institution, which of these three options would have applied to it?
A. Based on your categorization of Carteret being closed prior to August 10th of 1993, then it would fall under category number 3.
Q. Number 3, which is savings association, Subject: To FHLBB jurisdiction or savings associations liquidated by the RTC, correct?
A. Correct.
Q. Under is that section this says the interest rate is rates where adjusted monthly to reflect the average for U.S. Treasury bills with maturities of not more than 91 days during the preceding three months, correct?