Page 235

A. Correct.
(Green Exhibit No. 23 was
Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 23 is a printout of two E-mails, one of which appears to have been from Elaine Tama to yourself and to James Igo dated November 12, 1999. It has an attached memo from Elaine Tama to Barbara Stake Tishuk, dated November 12, 1999 and my first question is, is this a document that you viewed before
A. Yes, it is.
Q. Who was if you know Barbara Starke Tishuk?
A. I believe Ms. Tishuk was one of our attorneys in our Hartford office.
Q. Hartford?
A. Yes.
Q: And where was Elaine Tama located?
A. She was with the Division of Finance in Washington.
Q. In Washington, all right.
Her E-Mail at the top says, Wayne, thanks for noticing this. Do you know what she's referring to, what's this?
A. Well, I think what this is referring to,

Page 236

to my statements yesterday that some time in late summer or fall of '99 when we were reviewing the dividend processing system in order to make that capable of calculated post-insolvency interest for some reason, Carteret, along with others, we questioned whether the method we were using to calculate PII was the proper method.
So as a result of that and having conversations with Elaine, Elaine sent this E-Mail to the attorney for clarification or an opinion of whether or not this particular statute was the proper statute that post-insolvency interest should be utilized.
Q. You said during the course of that answer, I think that for some reason we questioned how this should be done. And I just want to make sure I understand your recollection for what reason, what caused to you question it?
A. Well, what would have caused us to question it is looking at the date of the receivership on a receivership's books that that date came off the August 10th, 1993, National Depositor Preference Act in conjunction with possibly, then Al Kitchen's memo that was authored back in 1995, I believe that Carteret, along with other receiverships

Page 237

fell after that date.
So we questioned whether or not the method we were using was the proper method in order to calculate post-insolvency interest.
Q. And why was that not questioned until 1999?
A. That, I don't know.
Q. I think you mentioned before that Carteret was initially seized in 1992?
A. That's correct.
Q. And the resolutions happened in late 1994 and early 1995, correct?
A. Correct.
Q. Is that a typical length of time between the date of initial seizure and date of resolution?
A. From what I have seen on dates of conservatorship, it's not completely atypical, I mean it's -- it's really neither, it's -- it depends upon a resolution itself conservatorship.
Q. Do you have a sense for whether or not that's a longer than average resolution time, shorter than average?
A. No, I don't.
Q. Do you have any idea -- do you have any knowledge about why it took that long to resolve?

Page 238

MR. GILBERT: Objection.
THE WITNESS: No, I don't.
BY MR. COLATRIANO:
Q. Have you reviewed any documents that talk about or that suggest a reason for why it took that long to resolve?
A. No, no, I have not.
Q. Would it be fair to say that until late 1999, FDIC personnel treated Carteret as a pre-National Depositor Preference failure for purposes of calculating post-insolvency interest?
A. It treated Carteret in the same methodology as all other RTC receiverships in the calculation of post-insolvency interest.
Q. And were all RTC receiverships effectively treated as pre-NDP failures for purpose of post-insolvency calculation?
MR. GILBERT: Objection, he's not here to testify as to RTC receiverships.
THE WITNESS: To my knowledge we use the same method that were outlined in 360.3 code.
BY MR. COLATRIANO:
Q. And when did RTC stop using the institutions, was there a period after it was no longer the receiver and FDIC was?

A. That is correct.
Q. When did that transition occur, do you know?
A. I believe January 1, 1996.
Q. 1996?
A. (The witness nodded.)
Q. So any thrift seized up to that point was seized by RTC?
A. To my knowledge, yes.
Q. To your knowledge, are there any statutes or regulations that governed the early closing of Carteret?
A. Can you define early closing, please?
Q. Well, should it have been -- are you aware of any statutes or regs or policies that would have required it to have been closed earlier than August 10th, 1993
MR. GILBERT: Objection, beyond the scope of his 30(b)(6) deposition.
THE WITNESS: Not to my knowledge, no.
(Green Exhibit No. 24 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 24 is again a printout of E-mails, first one of which is an E-Mail from



Elaine Tama to yourself, Sharon Kelley, Sharon Eagle and cc'd to Robert Ferrer, dated December 22, 1999 post-insolvency interest rates priority of interest.
Is this a document you reviewed in connection with preparing for this deposition?
A. Yes, it is.
Q. I think we've identified most of the people on this E-Mail string except for a couple, Rhonda Eagle, do you know who she is?
A. Yes, I do.
Q. Who is she?
A. Rhonda Eagle is an accountant in the accounting operation branch of the Division of Resolutions and Receiverships in Dallas.
Q. And how do you know there is an E-Mail from Michael Saran to Barbara Starke Tishuk, I think we've identified both of them during the course of this deposition. Cc'd to a number of people, Peter McDonald, Thomas Hewitt and Thomas Vartelas, John J.
Do you know who any of them are?
A. I know that Peter McDonald worked in the claims unit in the Hartford office, the other names I'm not familiar with.
Q. And focusing on the Michael Saran E-Mail, what is your understanding of what the purpose of



this E-Mail is?
A. The purpose of this E-Mail was to clarify what should have been the interest rate used in calculation of post-insolvency interest on various receiverships, not just Carteret, and this was a clarification for seeking guidance of the legal division staff on why is the correct interest rate used to calculate post-insolvency interest on pre-Carteret failure date.
Q. And is it fair to state that this E-Mail, encompasses the advice that you were relying on in deciding what interest rates to apply to Carteret?
A. Yes.
Q. Are there any other documents that are kind of encompass or reflect the advice you were given with respect to this issue?
A. No, this is the E-Mail that we use in order to recalculate post-insolvency interest on Carteret.
Q. On the second page, there's the beginning of a list of institutions, those lists are -- the institutions are Hanson Federal, Polifly Federal, Security Federal, Vineland, New Jersey, Old Stone Federal and Carteret?
I take it these were -- were these the



institutions with respect to which questions arose in your mind or your opinion's mind and with respect to which you were seeking legal advice?
A. Yes, it is.
Q. And why these five institutions as opposed to others?
A. Well, because these all had closing dates after August 10th, 1993.
Q. Are all of these thrifts, thrifts that are involved in goodwill litigation?
A. I believe they are.
Q. And what role, if any, did that fact play in your seeking advice regarding how to calculate post-insolvency interest?
A. Can you repeat that, please?
Q. What role did the fact that all of these institutions were involved in goodwill litigation have in your decision or your team's decision to seek advice regarding how to calculate post-insolvency interest?
A. The point that they were quote, unquote, goodwill receiverships, and that caused us to prepare goodwill packages where we included the calculation of post-insolvency interest, that triggered us looking further into these receiverships, the

Page 243

calculation of post-insolvency interest.
Q. And once you received this advice, did the FDIC go back and recalculate post-insolvency interest for other thrifts that weren't involved in goodwill litigation?
A. No, these were the only thrifts that we questioned the rates on.
Q. And so, I take it that there are thrifts that were seized or that were closed or that failed post-NDP for which post-insolvency interest was not recalculated after 1999?
A. Well, number 1, I don't that other than this group here, there were other receiverships or thrifts that failed after August 5th of 1993.
As far as other receiverships, if they didn't meet the 95 percent threshold, we don't calculate post-insolvency interest.
Q. Okay, but did you make any effort to make sure there were thrifts that met that criteria post-NDP failure and meeting the 95 percent threshold?
A. I can't say that we did.
MS. GRONER: I would like to note for the record that this document, Exhibit 24 states on it Attorney Communication Privileged and Confidential

Page 244

and I'm not sure why it was turned over in this litigation, but I'd just like to note the -- that it may be privileged and we may move to have this discussion stricken if we can come to the conclusion that it was turned over inadvertently.
MR. COLATRIANO: Well, your comment is noted and I feel compelled to note just so the record is clear that we would agree with any such effort and I don't -- I'm not sure when this was produced, but I am reasonably confident that to the extent it is privileged, any privilege has been waived. So I just didn't want my silence to connote that I agree with you.
MS. GRONER: I understand. I didn't try to interfere with your ability to ask about it, I just want to preserve it.
MR. COLATRIANO: I appreciate that.
(Green Exhibit No. 25 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, the document that's been marked as Exhibit 25 is an E-Mail from you to Howard Finkelstein and Ronald Baker, dated March 20, 2000 with an attachment.
First question is have you reviewed this

Page 245

document in preparing for your deposition?
A. Yes, I have.
Q. And what was the purpose of this E-Mail?
A. The purpose of this E-Mail is I was informing Howard that I placed the proving claim analysis in PI files on the goodwill server for Carteret. And it further states that since we changed the PI calculation that I was now using three different interest rates so Carteret was closed on three separate dates.
Q. Who is Howard Finkelstein?
A. Howard Finkelstein is an accountant in the Division of Finance in Washington.
Q. And who a Ronald Baker?
A. Ron Baker, I don't know his exact position but he was also with the Division of Finance in Washington.
Q. And when you say in here that you placed these files on the goodwill server, what was the goodwill server?
A. Well, on a FDIC server, which is a piece of hardware, I was -- since in Dallas we did part of the goodwill files, we were able to do something in Dallas and copy it on to a server in Washington under the DOF goodwill folder.

Page 246

Q. DOF, D-O-F, Division of Finance?
A. That's correct.
Q. So what was the purpose of DOF having a copy of the goodwill folder? I don't understand why that was broken out like that.
A. Well, the purpose of a DOF goodwill folder is all the files, spreadsheets could be assembled in one central area, that the goodwill team had access to -- so that person working on a particular report or the team working on a collective report would have access to all the goodwill folder.
Q. Are you referring to a goodwill team, you made that reference a couple of times. I want to make sure I understand what you mean by the goodwill team?
A. Well, there were FDIC accounting staff that were designated to be part of the goodwill offensive team, as well as defensive team.
Q. You say that there were FDIC accounting staff who were designated to be part of the offensive team and defensive team, are you referring to the same people being on both teams?
A. No, no. There were people that were also neutral as far as being on either side.
Q. And so I understand this, there are two

Page 247

teams at the FDIC, an offensive goodwill team and a defensive goodwill team, correct?
A. Right. In addition to people being on the goodwill team that were in a neutral capacity.
Q. And what capacity were you in?
A. The offensive side.
Q. The offensive side.
And by offensive, what do you mean? The FDIC was acting as a plaintiff in these cases?
A. I believe so, yes.
Q. And when was this goodwill team formed?
A. Well, the goodwill team itself, a team that was responsible for the preparation of the goodwill financial packages was formed in late 1997.
Q. And I mean are there documents or other -- strike that.
Are there documents that would reflect the formation of this goodwill team and define what its mandate was and who it belonged to?
A. There would probably be some earlier E-mails as far as who was going to serve on the goodwill team, yes.
Q. And who decided who was going to be on the goodwill team and who was going to be on the offensive team and who was going to be defense and

Page 248

who was neutral?
A. Well, let's distinguish between the goodwill team and an individual serving as an offensive capacity -- defensive capacity. I served, I was designated as being on the offensive team, I also served on the goodwill team that was responsible for producing the goodwill set of financial statements.
Q. So there's an offensive goodwill team and a separate team that was preparing the goodwill financial statements; is that what you're saying?
A. Yes.
Q. And you served on both?
A. Yes.
Q. And were there people who served on both the financial reporting team and the defensive goodwill team?
A. I think in subsequent years some people that had been designated on the defensive side did also work on the goodwill team.
Q. And are these teams you're referring to teams within the accounting staff or did this cross over into other types of staff?
A. No, this was all accounting staff.
Q. And again I'd ask who made the decision as

Page 249

to which team you would serve on or which functions you would have with respect to goodwill?
MR. GILBERT: I don't want to interrupt, while it is necessary, I just want to make the objection that this is not part of the 30(b)(6) deposition that he's testifying as to this line of questioning as a fact witness to the extent he has personal knowledge and information he can answer.
MR. COLATRIANO: Just to be clear so that we're on the record with this, I don't want my silence to connote that I agree with your characterization of what's within the scope or outside the scope, we'll deal with that later.
THE WITNESS: Can you repeat the last question?
THE REPORTER: "Question: And again I'd ask who made the decision as to which team you would serve on or which functions you would have with respect to goodwill?"
THE WITNESS: As far as my appointment to the offensive team, that was done by I believe Al Kitchen, the deputy director or Paul Sachtleben, Division of Finance, either in late 1995 or 1996 when I was still in Atlanta.
BY MR. COLATRIANO:

Page 250

Q. And you made reference to the fact that there was an offensive team and defensive team and there was sort of a neutral staff?
A. Correct.
Q. To serve both teams; is that correct?
A. No, they didn't serve both teams, they served on the goodwill financial statement team.
Q. Okay. So when you talked about neutral staff, you're talking about the goodwill financial statement team?
A. Yes.
Q. Did they do any -- were any other type of staff who performed functions for both the offensive and defensive team?
A. Not that I'm aware of, no.
Q. When you sought guidance with respect to things such as post-insolvency interest calculations, were you acting in your capacity as a member of the offensive team or were you acting in your capacity as the mutual goodwill financial reporting staff?
A. I was probably acting in the capacity of whatever position at that time irrespective of whether I was on the offensive side or the goodwill team. It would have been my responsibility to make sure that whatever rate we were using was the proper

Page 251

rate. So in answer to your question, neither.
Q. Okay. And when you sought legal advice with respect to these types of questions, let's say with respect to the post-insolvency interest rate question, do you know whether the attorneys from whom you sought advice were advising the FDIC on its offensive goodwill litigation efforts or as part of its defense against those efforts; do you know?
A. I have no indication that they were advising those capacities, no.
Q. Do you know whether there was any type of segregation of capacities within the legal division with respect to people who were working on the offensive goodwill litigation side or the defensive goodwill litigation side?
A. Yes, there was, to my knowledge.
Q. And how did that segregation work?
A. They were either noted as being on the offensive side or the defensive side.
Q. And I take it when you sought legal advice with respect to the post-insolvency issue, you don't know whether the people you got advice from were on either one of those sides or on either side, do you know?
A. No, I don't.

Page 252

Q. And what functions -- let's leave aside the goodwill financial reporting staff capacity in which you served.
As a member of the offensive goodwill litigation team, what types of functions have you served, what types of responsibilities have you had?
A. Well, in the past seven or eight years, I would have provided documentation to counsel on the offensive side. I would have given depositions, I would have testified at the trials, I would have assisted in providing responses to interrogatories, document requests.
Q. Okay. And have you served in any of those roles in connection with this case?
A. Yes, I have.
Q. And in what roles?
A. Well, I'm serving one here today as 30(b)(6) witness.
Q. What else, if anything?
A. Well, I provided documentation.
Q. In connection with your role on the offensive litigation team or as what I'll refer to as the neutral staff for purposes of the goodwill financial reporting team, have you had any interactions in the course of your duties with in

Page 253

terms of the Department of Justice?
A. I have been deposed by attorneys for the Department of Justice in connection with some goodwill cases, yes.
Q. Other than depositions, have you had any other interactions with Department of Justice attorneys?
A. Not to my recollection, no. I take that back, I -- I am working with some Department of Justice attorneys in Denver, Colorado on another case, a non-goodwill case.
Q. Can you describe generally what that case is about?
A. That's a criminal prosecution case related to the failure of an institution in Denver.
(Recess.)
(Green Exhibit No. 26 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, before we leave the topic of teams at the FDIC, you mentioned the offensive goodwill litigation team and the defensive goodwill litigation team within the accounting branch.
What is the function of the defensive goodwill litigation team?

Page 254

A. It is my understanding their function was to work or provide certain information or documents to the defensive side of the litigation and then particularly the Department of Justice.
Q. And who is in charge of the defensive team, do you know?
A. I don't -- from an accounting perspective, the most single person in charge of a defensive team.
Q. How many people were on the defensive team?
A. Right now, I know of only one individual.
Q. And who is that?
A. If he is still a member on the defensive side, his name is Craig Sweeney.
Q. Is he in Dallas?
A. No, he's in Washington.
Q. Is there any difference -- strike that.
For purposes of any issues regarding the validity with accounting for the receivership deficit for Carteret, is there any difference interest between the offensive goodwill litigation team and the defensive goodwill litigation team?
A. Can you define what you mean by interest?
Q. Difference in goals for how that resolution -- how that issue should be resolved?

Page 255

A. I'm sorry, I don't understand.
Q. There's an issue right now in this case involving the validity of the receivership deficit for Carteret; are you aware of that?
A. Yes, I am.
Q. Okay. And I guess my question is, is, you know, within the FDIC are both the offensive litigation team and the defensive litigation team.
Do they share the same goal with respect to how that issue should be resolved?
A. I can speak only to the offensive litigation team.
Q. And what can you say about what the goal is with respect to that?
A. Well, the goal is to represent the correct amount of the deficit of the receivership.
Q. And I take it that it's your view that the correct amount of the deficit is that stated in the goodwill financial reporting packages?
A. Yes.
Q. Let's move on. I've handed you a document that's been marked as Exhibit 26. It's a printout of a proposed rule by the FDIC, dated September 18, 2001 regarding payment of post-insolvency interest and receiverships with surplus fundings.

Page 256

Have you reviewed this document before?
A. The document does look familiar to one of the documents that the FDIC counsel had provided me with.
Q. Do you know whether this proposal was ultimately adopted?
A. I believe there was an ultimate proposal adopted, yes.
Q. Do you know what the current rule is with respect to payment of post-insolvency interest, how that's calculated with respect to receiverships that are established after the date that that rule was established?
A. Yes, I do.
Q. How does it work for those institutions?
A. For those institutions, it's based on the prior 95 day T-Bill rate in effect at the time of failure and it is adjusted quarterly.
Q. Do you know whether it is simple or compound?
A. To my recollection, it is simple interest.
Q. Were you involved in any capacity in the promulgation of that rule?
A. I had received some E-mails from the Washington DOF about the proposed rule, but had I nc

Page 257

responsibility for the final rule that was adopted.
Q. If you turn to page 4 of this exhibit, the last full paragraph begins another component proposed rule; are you with me?
A. Yes.
Q. This paragraph is discussing the selection of the three-month Treasury bill rather than the federal judgment rate as the rate of interest to be applied; do you see that?
A. Yes.
Q. Near the bottom of that paragraph it says, this rate -- meaning the three-month Treasury bill -- was selected instead of the federal judgment rate, because the three-month Treasury bill was considered to be widely recognized as a cash management investment performance benchmark and it's yield is historically tracked to some degree changes in the rate of inflation.
Do you know what this sentence means when it says that the three-month Treasury bill is considered to be widely recognized as cash management and investment performance benchmark?
A. No, I don't.
Q. Do you have an understanding for why that factor was considered important for purposes of

Page 258

deciding which rate to apply?
MR. GILBERT: Objection.
THE WITNESS: It's my understanding that the election of using a three-month Treasury bill rate is because it would change over time and as there were market changes dealing with items such as inflation, that the rate would change as opposed to a single fixed rate that doesn't change based on any other market factors.
BY MR. COLATRIANO:
Q. Do you understand why it was the FDIC's decision that it was preferable to have a floating rate versus a fixed rate?
A. No.
Q. On the next page, there's a first full paragraph -- there's a discussion of the proposed rule using simple interest rather than compound and did you have an understanding for why the FDIC chose simple versus compound?
A. No.
Q. Is it fair to state the interest rate methodology reflected in this proposed rule is pretty similar to the interest rate methodology that was used to calculate Carteret's post-insolvency interest before the 1999 change to the federal judgment rate?

A. Yes, it would be similar, except for the compounding.
Q. Okay, it was compounded for Carteret before 1999, is that what you're saying?
A. Yes.
Q. But other than that the methodology is similar?
A. Yes.
(Green Exhibit No. 27 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, the document that's been marked as Exhibit 27 is a chart that's labeled Draft 11/13/02, Post-Insolvency Interest, Distribution Priorities and Interest Rates/Federal Income Tax Distribution Priorities.
Have you reviewed this document?
A. Yes, I have.
Q. In preparing for your deposition?
A. Yes, I have.
Q. Do you know who prepared this document?
A. Yes, I do.
Q. Who?
A. Elaine Tama.
Q. Do you know why it was prepared?



A. I think Elaine was simply putting together a matrix of the different methodologies of calculating post-insolvency interest, also factoring in were any federal income tax liability might reside and just trying to summarize the different PI calculation methodologies.
Q. If Carteret were considered -- if it's inception for purposes of this chart were considered pre-National Depositor Preference, which category would it fall into on this chart for purposes of calculating PII?
A. If it's inception date for PI calculations on a subrogated claim fell in between 8/15, '88 and 8/10, '93, it could have been done by the method described on here.
Q. Are you referring to the first row of physical receiverships row?
A. That is correct.
Q. And I take it though that in actuality, Carteret has been categorized under the fourth row here; is that correct?
A. That is correct.
Q. And under the column that says govern law for PII rates, for the fourth row, that column says Federal Judgment for Federalized Receiverships; do



you see that?
A. Yes, I do.
Q. What is your understanding of what that -- what is the source for that determination that that's the rate to use?
A. I believe the source for that comment came from a memo from the legal division.
Q. Have you -- is that a memo other than -- the E-Mail we reviewed earlier from Michael Saran?
A. No, that's a different memo .
Q. Is that one of the memos we've been talking about or mark as an exhibit here?
A. Have you not produced that memo yet.
Q. What do you recall about that memo, date, author, things like that?
A. I think the author was Tom Bolt, B-o-l-t.
Q. Tom?
A. Tom Bolt, I'm not sure of the date. Well the date is on there, February 22 of '01.
Q. Do you know whether that memo has been produced in this litigation ?
A. To my knowledge, it has.
(Green Exhibit No. 28 was Marked for identification.)
BY MR. COLATRIANO:



Q. Mr. Green, the document that's been marked as Exhibit 28 is accounting bulletins and it's RA number 94-003, dated August 30, 1994.
Is this a document you reviewed in connection with preparing for this deposition?
A. Yes, it is.
Q. What generally are accounting bulletins?
A. An accounting bulletin is a document within the Division of Finance that speaking to or addressing certain accounting transactions or positions or policy related to events.
Q. Okay. Are you aware of think accounting bulletins that talk about how PII is to be calculated?
A. No.
Q. What is the purpose of this accounting bulletin?
A. This accounting bulletin was simply setting out in a narrative format the priority order of claims on receiverships established after August 10th, 1993
Q. And it's signed at the top concurrence, is that Alvin Kitchen, it's hard to read the handwriting?
A. That's correct.

Page 263

Q. I take it the policy that's reflected in this accounting bulletin was in effect at the time that Carteret subrogated claim was established, correct?
A. Yes.
Q. So from what we've talked about, it is fair to say that the decision to use the federal judgment grade on a fixed basis to calculate Carteret's PII, that decision was made in late 1999, correct?
A. Yes.
Q. And that decision also included that that rate would be fixed as of the time of each of the three resolutions, correct?
A. Correct.
(Green Exhibit No. 29 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 29 is a post-judgment interest rate table that I will represent to you that we've pulled off the Internet and it's my understanding this is sort of -- that this depicts what the federal judgment rate has been over the time period at issue here.
Have you reviewed any similar types of

Page 264

post-judgment interest rate tables or federal judgment rate tables in preparing for this deposition?
A. Yes, I have.
Q. Can you describe what interest rate tables you've reviewed?
A. I went on to the Internet and inquired into the federal judgment rates.
Q. And is it fair to say that as of late 1999 when the decision was made regarding the adoption of the PII calculation methodology for Carteret, that it was known to the FDIC or knowable by the FDIC that the federal judgment rate at the time of the deposit transfers at issue here was that -- that it was at its highest level at any time sense Carteret was seized?
MR. GILBERT: Objection.
THE WITNESS: I don't know that it was known in that context, it was just relayed to us what it was.
BY MR. COLATRIANO:
Q. Would you dispute that was knowable to the FDIC at that time?
A. Well, the federal judgment rate was knowable to anybody that had access to the Internet

Page 265

or the actual federal judgment rate schedule.
Q. And it's fair to say that regardless of whether it was known or knowable to the FDIC, as a factual matter, the federal judgment rate in the time period late 1994, early 1995 was at its highest level that it was at at any time since the seizure of Carteret?
A. I would say that's factually correct, yes.
Q. So from that, is it fair to say that at the time the decision was made to switch to this new methodology for calculating PII for Carteret, it was known to or knowable by the FDIC that the switch to this new method would have the effect of increasing the post-insolvency interest for Carteret?
A. As a result of recomputing the post-insolvency interest, it led to an increase in the overall amount of post-insolvency interest based on the change of interest rates being used.
Q. And that's something that was knowable at the time that decision was made, that it would have that effect?
A. I think I would have known that, yes.
Q. What practical effect in connection with the accounting for the Carteret receivership did the decision to switch to this new interest calculation

Page 266

methodology have other than to increase post-insolvency interest?
A. It had no other practical effect, other than it created a higher claim above any claim by the IRS.
Q. When you say it created a higher claim above -- what do you known by that?
A. It increased the amount of the post-insolvency interest claim that would have had to have been satisfied before my IRS claim could be made.
Q. What effect would that have with respect to the IRS?
A. Well, more funds would have to be generated by the receivership to fully pay PII before the IRS could be paid any part of its claim.
Q. Is it fair to say if funds had been generated that would have allowed this to be paid, it would have caused the income tax liability to be paid later than it otherwise would have been?
A. It could have, yes.
Q. And what effect, if any, would that have on the income tax liability works it have increased it?
A. Yes, it would have.

Page 267

(Green Exhibit No. 30 was
Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 30 is an E-Mail from Elaine Tama to a number of people including yourself, dated June 16th, 2003, Subject: Summary of Meeting on PII.
Is this a document you've reviewed in connection with preparing for this deposition?
A. Yes, it is.
Q. The E-Mail refers to a meeting that happened on that day. Did you attend that meeting?
A. I potentially did.
Q. What do you mean potentially?
A. Yeah, probably did. I don't remember.
Q. Do you remember what the purpose of the meeting was?
A. Within the Division of Finance staff in Washington and the accounting staff in Dallas, we had some discussions of sending around the practice of recording PI when 95 percent dividends are paid, whether an alternative method should be adopted. And then we also had discussions of whether the recognition of PI on the financial statements go through the income statements as opposed to going

Page 268

directly into an equity account.
Q. What prompted that meaning, what prompted the desire to talk about whether you should change the methodology?
A. I don't remember specifics.
Q. The first paragraph says, The calculation of PII is automatic now, in that there are only about two FINs which can not be calculated, Carteret and Merritt.
What does it mean when it says the calculation of PII is automatic?
A. What that means is the calculation of PII is done through within the dividend processing system.
Q. And I take it that that was not possible for Carteret?
A. And Meritor.
Q. Why was that?
A. On Carteret, the DPS system was not built to accommodate different interest rates on different subrogated claim allowance. Meritor it was not possible because the Meritor receivership had been ordered by the court to pay contract rate on subordinated debt as opposed to the PII rate.
Q. Which court are you referring to?

Page 269

A. I'm sorry?
Q. Which court are you referring to?
A. I don't know.
Q. This paragraph goes on to say, in addition to PII a approval can be done through interface entries.
What does this mean, interface entries?
A. That means after DPS finishes the calculation of PII, it will send an entry from the DPS system to the general ledger, so there is an interface between those two systems.
Q. I take it again since DPS couldn't do it through Carteret, this interface didn't apply to Carteret; is that correct?
A. Right, there should not be any interface entries between DPS and the GL.
Q. What decisions, if any, were ultimately made with respect to the issues that we're discussing regarding how PII would be handled?
A. The ultimate decision was that the current practice for both recording or recognizing the PII on books of a receivership, at least 95 percent dividends is still in effect today, as well as when the liability is recognized, it goes to an equity account as opposed to an income statement account.

Page 270

In other words, there was no change to the policy or the practice.
Q. And is that decision not to adopt these changes in policy or practice, is that reflected and memorialized on any documents?
A. No.
Q. Who made that decision?
A. The group itself couldn't come to a consensus of changing the practice to a different practice.
Q. Without a consensus status quo, is that what you're saying?
A. Yes.
Q. What was this group, was this a formal group that had responsibility for setting policy with respect to these things?
A. No.
Q. Then what was its nature, why was it making this decision?
A. Well, throughout all accounting there are different people involved in different aspects of liquidation accounting and as a general practice, we do discuss the current policies and procedures relative to liquidation accounting.
Q. And who would be -- is there a single

Page 271

person that would ultimately be in charge of making these types of policy decisions?
A. Yes .
Q. Who was that for?
A. For liquidation accounting, it would probably be Karen Hughes.
Q. And what is her position?
A. Karen is the deputy director in the Division of Finance.
Q. And how long has she held that position?
A. Oh, Ms. Hughes has been the deputy director for, I would say ten years now.
Q. And in the discussion under item 4 here, Roman IV, Discussion of Equity Adjustment Versus Income Statement, why was that an issue?
Why -- was there a concern with respect to how it was being reported and what prompted this discussion?
A. Well, different people had different opinions on the way an accounting transaction might be recorded. I know Ms. Tama's position was that PI should flow through the income statement as opposed to an equity adjustment. I felt otherwise.
Q. Why did you feel otherwise?
A. Because I think flowing through the equity

Page 272

account is a more proper way to record the PI as opposed to an income statement, because the income statement is used for the operations of receivership, more specifically in a liquidation of assets so we just simply had a difference of opinion.
Q. Would either method change the amount of the subrogated claim or interest on the subrogated claim?
A. No.
(Green Exhibit No. 31 was Marked for identification.)
BY MR. COLATRIANO:
Q. The document that's been marked as Exhibit 31 is an E-Mail from Rhonda Eagle to yourself dated February 7, 2005.
Is this a document you reviewed in connection with preparing for this deposition
A. Yes, it is.
Q. And the document references an attachment that I don't have, at least it wasn't attached to my copy of this E-Mail.
Do you know what attachment that was?
A. What would have been attached was an Excel spreadsheet containing the calculation of the post-insolvency interest for 2003.

Page 273

Q. And the text of the E-Mail from Ms. Eagle was do you think something is wrong with the PII on Carteret, let me know. What's that referring to?
A. Well, in the course of calculating the PII on Carteret or reviewing the schedules, I asked Rhonda for the 2003 PII spreadsheets, this was simply her response back to me.
Q. Do you know why she was asking if you thought something was wrong with the calculation?
A. By this time I may have suspected that the spreadsheets or the accrual that she was making included the PII and the past due receivership plans.
Q. I take it from that that Ms. Eagle was the one who was preparing the spreadsheets in the first instance?
A. Yes.
Q. And I take it you ultimately concluded that was an error in the spreadsheet, correct?
A. That's correct.
Q. We've gone over a number of documents that relate to the calculation of post-insolvency interest. I think you've referred to one legal memo that's referenced in that chart that we used a few moments ago.
Were there any other documents, other than

Page 274

that legal memo and the exhibits that I've shown you today that you're aware of that pertain to the decision regarding which type of interest in calculation methodology was used for Carteret's post-insolvency interest?
A. No.
(Green Exhibit No. 32 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, have you seen the document that's been marked as Exhibit 32 before?
A. I'm sure I have.
Q. And just for the record, Exhibit 32 is a declaration of Wayne Green in support of FDIC's motion for summary judgment in the Golden Pacific Bancorp. Case, it is dated December 1999 and attached to it is I take it your expert report in that case; is that correct?
A. That's correct.
Q. Did you review this document at all in preparing for this deposition?
A. No, I did not.
Q. We talked previously about this expert report yesterday at your deposition.
A. Yes, I alluded to it, yes.

Page 275

Q. I only have a couple of questions about this.
Turn to page 13. There's a paragraph at the bottom that is under the heading Post-Insolvency Interest, I'd like you to just review that paragraph to yourself and just then my question is can you describe how, if at all, the calculation of post-insolvency interest for Carteret differ from the calculation you're describing here for Golden Pacific?
A. The Carteret calculation is different to the extent that on Golden Pacific, the interest was using a simple interest basis, as opposed to Carteret which was on a compounding annual basis. Also, the interest was calculated on the date following the bank closure of Golden Pacific, as opposed to Carteret interest began on the three failure dates. The rate used on Golden Pacific was applicable to a state court judgment in a particular state as opposed to Carteret, that was a federal judgment.
Q. On the next page, page 14 there's a footnote, footnote 13, it talks about the calculation of interest and why you believe SPCO which was the South Brunswick consolidated office of FDIC was conservative in its calculation of interest.

Page 276

Can you explain to me how it was or why it was you thought that the calculation of interest with respect to this issue was conservative for Golden Pacific?
A. In this context, I don't remember.
Q. What I got from this and maybe this will refresh your recollection is that I think you're saying, correct me if I'm wrong, that a dividend was paid on a certain date, but the institution was given credit for that dividend earlier than the date it was actually paid; is that what this is saying?
A. Yes.
Q. That's conservative because -- well, tell me why that's conservative?
A. That would be conservative because that would decrease the amount of post-insolvency interest overall if you record a payment against a claim at an earlier date it decreases the amount of interest calculation after that.
Q. And conversely would it be conservative to credit a receivership with a payment or dividend payment as of the date after the date that payment was actually made?
A. No.
Q. Would that accounting have the effective

Page 277

increasing or decreasing post-insolvency interest?
A. Well, it will always decrease post-insolvency interest, but it will decrease it at a smaller rate than what it should have.
Q. Right. I wasn't clear in my question. It would have the effective increasing post-insolvency interest as opposed to if it were credited on the date that the payment was actually made, if you compare those two, it would have the effective increase?
A. No, it's not going to increase it, it will --
Q. Again I'm being unclear, I think I will stand with your first answer, because I think I got to that point anyway, but -- I understand.
That's all I have on that document.
Do you know of any accounting or policy rationale for not crediting repayment such as dividend payment on the date it is actually made?
A. When you say not crediting --
Q. Not -- for purposes of post-insolvency income calculation, if a dividend is made on January 1, but it's not credited for purposes of the calculation until March 1, is there any accounting or economic or policy rationale that you know of that

Page 278

would justify that type of treatment
A. No.
Q. Okay.
MR. COLATRIANO: Off the record.
(Discussion off the record.)
(Green Exhibit Nos. 33, 34A, 34B, 34C, 35A, 35B, 35C, 36A, 36B & 36C were marked for Identification.)
BY MR. COLATRIANO:
Q. Mr. Green, you've been given a series of exhibits that reflect -- that are spreadsheets reflecting the calculation of post-insolvency interest for Carteret. And just for the record I will go through them and identify them.
Exhibit 33 is a single spreadsheet that starts with the Bates number AM 00092190 through AM 00092205. And then I think attached to that there's a three-month T-Bill chart; is that correct?
A. That is correct.
Q. And then Exhibit 34 well we've labeled three Exhibits 34A, B and C; 34A is Bates stamped AM 00095020 through and including AM 00095095. 34B is AM 00095096 through and including AM 00095142 and Exhibit 34C is AM 00095143 through and including

Page 287

actual subrogated claim increased during the year.
Q. But I thought the number on 36C is the beginning balance as of March 10th, 1995?
A. That is, the date of calculation on that date.
Q. So why if it had increased during the year 2004, would it show up as an increase on March 10th, 1995?
A. It is just our practice that the interest on the subrogated claim begins on the first day.
Q. When you say that could be what's happening here, have you made any effort to kind of examine why the beginning balance changes between Exhibits 35C and 36C?
A. I believe one of the exhibits would demonstrate whether or note that's the case, that we've already reviewed.
Q. Can you just show me which exhibit you're talking about?
A. Yes, it's Exhibit Green 15.
Q. Okay.
A. The last page of the attachment.
Q. Okay.
A. If you go all the way down to the bottom, the transaction there is a claim adjustment

Page 288

increasing the subrogated claim by $62,180 and ten cents.
Q. Do you know the reason for that claim adjustment?
A. No, not based on what I have before me.
Q. Do you know based on any other documents you've reviewed?
A. Well, it appears to be a payment of either a cashier's check that was outstanding at the time of closing or an unratified account that wasn't escheated to state authorities, that is generally the type of adjustments that are made.
Q. It's my understanding that the spreadsheets that are at Exhibits 35 and 36 were provided to us -- to us, counsel at the same time we got these two sets at once.
I also understand Exhibit 35 spreadsheets calculate interest through the end of 2003, while the Exhibit 36 spreadsheets calculated through the end of 2004. We also just talked about the change in the beginning balance for the third spreadsheet in each group of exhibits.
Are there any other differences that you're aware of in these spreadsheets as it relates to the calculation post-insolvency interest between

Page 289

the Exhibit 35 spreadsheets and the Exhibit 36 spreadsheets?
A. Not that I'm aware of, no.
Q. We had talked earlier about an adjustment that was made to the calculation because pass-through receivership PII was erroneously included in one of the spreadsheets.
A. Correct.
Q. Do you recall that?
A. It was included in the financial statements.
Q. Was it included in the spreadsheets?
A. No, that's a separate spreadsheet.
Q. Let's focus on the Exhibit 36 spreadsheets for a minute and I'd like to you point out to me -- let's use Exhibit 36A as an illustration.
I'd like you to point me to the entry that -- for purposes of the post-insolvency interest calculation provides -- gives credit for the premium and the asset sale that took place in connection with this transaction?
A. Okay, any dividend paid to FDIC/RTC would go on this spreadsheet reducing the subrogated claim, it has the effect of reducing the payment of -- the amount of the calculation of post-insolvency

Page 290

interest.
So you could go to the transaction history of the dividends paid on, look under that description column and the exhibit we looked at that said escrow funds or accelerated pay dividend, then you can take that amount and across the three subrogated claims, that total and these three sheets should equal the amount on the transaction history.
Q. Okay. When I look at Exhibit 36A the first dividend I see I guess dividends show up under the column payments?
A. Correct.
Q. Is on April 20th, 1995, correct?
A. Correct.
Q. Now, the actual branch or deposit transfer in connection with this resolution took place on October 28th, 1994, correct?
A. Correct.
Q. It was on that date that the premium was provided, correct?
A. Correct.
Q. And in the interim between October 28th, 1994 and April 20th, 1995 the subrogated claim is accruing interest, correct?
A. Correct.

Page 291

Q. Do you know why the first dividend that affected the balance of this claim in the calculation of post-insolvency interest was not paid until April 20th, 1995
A. No, I don't know.
Q. Who is the holder of subrogated claim in connection with the FDIC -- in connection with the Carteret receivership?
A. Who is the holder?
Q. Right.
A. In this case the FDIC.
Q. FDIC in its corporate capacity?
A. Yes.
Q. And when dividends were made, the actual Carteret, if it was a cash payment it was paid to FDIC corporate, correct?
A. Correct.
Q. That's 2000 with respect to all three resolution transactions, correct?
A. Correct.
Q. So the payments are all going to the same entity, correct?
A. Correct.
Q. Are they all going into the same fund, do you know?

Page 292

A. No, they go in different funds.
Q. What are the different funds that they are going into?
A. Well, there's a bank insurance fund, there's a savings association insurance fund and there's the FRF resolution fund of the RTC fund.
Q. And are you saying that these three, payments on these through resolutions would go into different funds?
A. No, they could go into the same fund.
Q. Which fund was that?
A. The RTC fund.
Q. From a standpoint of maximizing the value of or the recovery on a receivership or from the standpoint of minimizing cost to the receivership and if you hold all else equal, should the receiver pay down its highest cost debt before it pays down lower cost debt?
A. If that's consistent with the distribution priority, then I would say, yes.
Q. And what do you mean whether you say if it is consistent with the distribution priority, what are you referring to?
A. I'm referring to the priority of funds on the receivership.

Page 293

Q. With respect to the subrogated claim, were these three components of the subrogated claim the -- did they have different priorities?
A. To my knowledge, no.
Q. So they all had the same priority?
A. Yes.
Q. So all else being equal it would make sense from the standpoint of maximizing the recovery in receivership to pay down the highest cost debt first?
MR. GILBERT: Objection.
THE WITNESS: Yes, as long as there wasn't any other priority above paying the subrogated claim, yes.
BY MR. COLATRIANO:
Q. Similarly and let's leave aside questions of priority and again speaking strictly from the standpoint of maximizing the value of the receivership, if the receivership has a certain liability accruing interest at a certain rate and it has a tax liability accruing interest at a higher rate, which liability should be paid down first?
MR. GILBERT: Objection, beyond the scope of his 30(b)(6) deposition.
THE WITNESS: That liability that has a

Page 294

higher priority of distribution of payment.
BY MR. COLATRIANO:
Q. Let's assume they have the same priority.
A. Then, economically it would make most sense to pay off the highest rate liability.
Q. Now, with respect to the three components of the Carteret subrogated claim, they all have different interest rates, correct?
A. That's correct.
Q. And when dividends were declared how were the dividends allocated between the three components of the subrogated claim?
A. The dividends were allocated based on a rated average of -- of a subrogated claim to the total amount of the subrogated claim.
Q. And what was the basis for the decision to allocate the payments in that manner?
A. Well, there were three different subrogated claims. There was no way to determine the assets generated or liquidated or the cash generated to tie it to a particular subrogated claim.
Q. Okay. But I think as we've talked about there were three different subrogated claims all held by the same entity, correct?
A. Yes.

Page 295

Q. And the payments were all going to the same fund, correct?
A. Correct.
Q. And they were all the same priority, correct?
A. Correct.
Q. And so is it also fair to say that the decision to allocate the payments according to this weighted average method that you've described, as opposed to allocating the payments first to the highest cost debt had the effect of increasing the cost of the receivership?
A. To the extent that the interest rates were different that you applied the total dividends against one subrogated claim, to the deference of the others it would have a nominal difference, yes.
Q. Nominal difference?
A. Yes.
Q. What do you mean by nominal?
A. The rates were fairly similar so if you paid down the highest rate, then the overall interest would have been less.
Q. Have you attempted to calculate what the effect would have been?
A. No, I did not.

Page 296

Q. Can you point me to any type of policy at the same time, manual or reg or anything that supports the allocation method that was adopted here, in other words using the weighted average method and allocating each dividend?
A. No, I cannot.
MR. COLATRIANO: For now, we've done with spreadsheets.
(Green Exhibit No. 37 was Marked for identification.)
BY MR. COLATRIANO:
Q. I think yesterday if you recall we talked about I think you said that when premium was ordered in connection with each of the three deposit resolutions that you would have been a receivable recorded on the receivership's books to take that into account and that that receivable would be earning interest, correct?
A. That's correct.
Q. I think you also said that the interest on that receivable would ultimately wind up in the line item in the receivership, goodwill financial reporting package for interest on invested funds; is that correct?
A. That's correct.

Page 297

Q. Exhibit 37, I believe, correct me if I'm wrong, is drill down reports on the interest on investment -- on invested funds in line item; is that correct?
A. That's correct.
Q. All right. I would just like you to walk me through the entries in this drill down, if any, that deal with this account receivable or interest on this account receivable.
A. Okay. The first page ever Exhibit 37 is the drill down on the line item titled interest on invested funds and reflects all the accounts that roll up to that line item on the income statement.
One of those accounts titled interest come from interest on escrow fund account 322911. As of December 31, 2004, the balance on this account represented that the receiver had earned $1,902,413.65 on interest in the escrow funds.
The pages behind the cover page are a further drill down to the journal entry level showing all the journal entries made to that income account. And it's not Bates stamped, but it begins with the second to last page of packet.
Q. Okay. Now, which of the entries on the second to last page deal with the interest on this

Page 298

account receivable we've been talking as opposed to other types of measures, can you tell --
A. This particular account is solely used for the interest on the accounts receivable.
Q. Okay. And so I take therefore that the total interest earned on this account receivable through December 31, 2004 was roughly $1.9 million?
A. Correct.
Q. All right, thank you.
Off the record.
(Whereupon, at 12:10 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:10 p.m., this same day.)

Page 303

Q. And can you describe what this memo -- what the topic that them mow is pertaining to and how it affects accounting for the Carteret receivership?

A. Yes, the topic that this particular memo is related to is the purchase by the FDIC of residual interest held by receiverships. In 1998, multiple receiverships sold multiple residual interest in securitization assets from the receivership to FDIC in its corporate capacity. This memo here outlines the background of that purchase, it also requested the authority to do that.

The effect that this had on Carteret was Carteret was one of those receiverships that held residual interest and securitizations. So as a result of the approval of this memo in late 1998, Carteret's asset of residual interests were sold to the FDIC in its corporate capacity.

Q. On page 2 of this document paragraph in the middle it says the accounting work loads in Washington and Dallas would be reduced by the elimination of receivership allocations of the cash receipts, and in tracking the change in receivership ownership of the residual certificates would also reduce potential for errors in tracking the changes in ownership between receiverships.

Page 304

Do you see that?

A. Yes, I do.

Q. Can you explain to me in layman's terms what this is talking about?

A. What it was talking about is there were hundreds of residual interests from securitization deals, Monday would come in from the trustee as residual interest holders to the receiverships, in order to properly allocate those monies there were numerous certificates that came in and you had to do a spread sleet to make sure each receivership received its proper allocation ever those proceeds.

Q. And was there concern that there were errors in connection with that process?

A. I have not heard of any errors for the accounting for the residuals, no.

Q. Did you have a view about whether the accounting for the residuals, what effect that had on the work load of the accounting staff, was it a difficult task?

A. It was a difficult and labor intensive process to allocate all those proceeds coming in every month on thousands of residual interests.

(Green Exhibit No. 40 was Marked for identification.)

Page 305

BY MR. COLATRIANO:

Q. I show you a document that's been marked as Exhibit 40, it is a memo dated October 16, 1998 from Irene Sanchez at the Dallas field operations branch to Thomas O'Keefe of the Dallas field operations branch, Subject: Accelerated and Post-Insolvency Dividend Case on RTC Receiverships as of October 2, 1998.

Is this a document that you've reviewed in preparing for this deposition?

A. Yes, it is.

Q. And how does this document relate if at all to the subject we were just discussing?

A. As to the residual sale of the interest in the securitizations, it was requested that accounting identify the impact to the receiverships on the dividend process as a result of the sale.

The sale generated X amount of dollars in either cash or non-cash transaction, senior management wanted it know what the receivership received those monies based on each particular receivership, how would that money be potentially allocated, between the payment of billings and borrowings, between dividends on the subrogated claim and in some cases payments on post-insolvency

Page 306

interest, that's what this memo is attempting to explain.

Q. And can you walk me through how the accounting work with respect to Carteret itself -- I notice there's an attachment that has some spreadsheets that hopefully will help you with that?

A. One of the schedules shows I think it's on the fourth page of the exhibit that Carteret had a gross subrogated claim at that point in time of $1,368,000,000 up at the top.

The next schedule shows that Carteret still had unproven claims on its books of a $1,391,000. It had outstanding billings of -- it says net of billings account 0371 was the escrow account and then it had 0215 is the cash account, then the residual value is -- was the purchase price for those residuals. Then it moves on that it had gross funds available for distribution of 39,871,000.

It then I believe was determined a reserve for undetermined claims of 1,322,000 and then it just goes further on. After that reserve, if you go two more pages it had residual to pay to corporate and others and that would include any cash of $38,549,000. So at that point that's what would have been available to pay in terms of dividends.

Q. And I notice on the first page of the schedule that you just talked about, which is on the fourth page of the exhibit, there are three groupings of institutions and Carteret is listed under a head Ing that says, established prior to 8/10/93, non-depositor preference; do you see that?
A. Well, it's not on the first page, it's on the third page.
Q. It was the first page of the schedule?
A. Yes, yes, I have seen that.
Q. And I think it's on the fourth page of the exhibit?
A. That's correct.
Q. But at least for purposes of this document Carteret was placed under the heading of established prior to 8/10/93, correct?
A. For the purpose of this document, yes.
Q. And who made that determination?
A. That, I don't know.
(Green Exhibit No. 41 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 41 is a memo dated November 29, 2000 from Robert Ferrer through Craig Jarvill to Karen Hughes, Subject: Proposed



accounting through net PSA receivable through corporate.
Have you reviewed this document in connection for preparing for your deposition?
A. Yes, I have.
Q. Can you briefly explain how this document relates to the topic we've been discussing?
A. Yes, this memo goes to the issue that I discussed yesterday in that subsequent to the sale of the residual interest in 1998, a redetermination was made in the year 2000 on that sale in 1998 as well as the prior sale of the credit enhancement reserve of 1996.
Subsequently the sales values on certain receiverships, of two certain receiverships were adjusted. This memo describes why the adjustment was made, as well as it reflects the amount of the adjustment made between the receivership and corporate.
Q. And what was your involvement in dealing with this adjustment or the accounting for this adjustment?
A. My involvement would have been limited to the extent of making sure the journal entries would have been booked to the receivers books.



Q. I see that this document talks about separates out at least for some purposes the goodwill institutions from other institutions for purposes of this discussion, do you know why that is?
A. Well, because we were near a year end and it was important that all of these receiverships get recorded and we wanted identify the goodwill receiverships to make sure that they got recorded in time before year end.
Q. And why again was it important for the goodwill receiverships to be recorded before year end as opposed to other receiverships?
A. There really isn't any difference between the two of them.
Q. Okay. So why would goodwill institutions given priority on this?
A. Because we put together a goodwill package, we wanted to make sure that package included the effects of these adjustments.
Q. Like I had to do with the other -- with the last document, I'd like you to kind of walk me through the accounting as it affected Carteret for this adjustment discussed in this memo. And again there's a schedule attached to it, I don't know whether that would reflect -- if you could in any



event describe the accounting and walk me through it?
A. The effect on the books of Carteret as a result of this adjustment was it created a payable to the FDIC, in other words when the original sales occurred, it created a receivable, it was turned out and used to pay dividends to corporate, it was done virtually simultaneous.
Come the year 2000 it is determined that that original sales price was overstated, so entry was made on the books of the receivership, reducing the sales price, thereby creating a payable on the books of the receivership.
That payable was not offset against the prior dividend paid, that payable remained on the book in the year 2000 at approximately $14 million, that was the net effect and as liquidation of the receivership has occurred that payable has decreased, as the receiver repays corporation.
Q. Does that payable affect at all the subrogated claim?
A. No, it does not.
Q. Is there interest charged on that payable?
A. No, there is not.
Q. Are there any other accounting adjustments related to this issue?

Page 311

A. Not that I'm aware of, no.
Q. And I take it that this payable -- I'm sorry has been repaid or paid down as funds become available to the receivership?
A. That's correct.
Q. Is it fair to state that if this payable weren't on the book, these funds as they come into the receivership would be used for other purposes?
A. Yes.
Q. And what are some of those purposes that it would be used for?
A. The general use of funds to pay the operating expenses of the receivership, if there were no other need to reserve any funds for any other purposes, then we go to dividends.
Q. And do you have a sense for the scope or the magnitude of the operating expenses over the receivership over the last five years?
A. No, I don't.
Q. How if at all has the accounting for overhead and administrative expenses of the Carteret receivership changed since the inception of that receivership?
A. The accounting for the overhead has changed through principally the allocation

Page 312

methodology.
Q. Can you describe how that has changed, what it was before and what it is now?
A. The method and effect when Carteret was established and piped into receivership on a free basis, the overhead is generated into a pool of cost, that cost is then allocated to receiverships, the allocation or the methodology that triggers how much is allocated to a particular receivership was based on the amount of direct salaries charged to the receivership and the amount of indirect salaries charged to a receivership.
Q. Okay.
A. And that's what it was for a large part of the life of the receivership. The more current process is service billing rates have been established for different accounting or different units within the Division of Resolutions and Receiverships.
Based on those rates, it triggers an amount of overhead to be charged to a receivership, as opposed to as an example my salary, which would have been charged to a receivership that was part of the pool that triggered X amount of overhead, now a rate is applied for accounting services for claims

Page 313

services, for ORE services, for asset management services.
So we've gone from a salary based charge to a flat rate per hour charge depending upon the type of work being done.
Q. When you say flat rate per hour charge, are we still talking about work that is not directly attributable to a specific receivership?
A. It is work attributed to a direct receivership and it includes work charged or could be charged amongst multiple receiverships based on the program code an individual uses when they do their time sheet.
Q. Now, with respect to work or charges that relate to more than one receivership, I'm not sure I understand how if at all that service fee or service rate is allocated.
Is there an allocation methodology?
A. Yes.
Q. How does that work?
A. Well, if you're charging a program code that will be recovered by the receiverships and it may be 50 percent of that program code or it could be 10 percent or 75 percent, that plus the direct rates being charged to a receivership trigger how much of

Page 314

the overhead is charged to a receivership.
Q. Maybe I need a concrete example to understand this, but if you -- for example, is any part of your salary now allocated to receiverships?
A. If I work on a particular receivership, I charge a particular receivership, yes.
Q. What if you are not working for a particular receivership but matters that benefit all receiverships, is that -- is a portion of your salary allocated to the receiverships then?
A. Yes, it is.
Q. And how is it allocated?
A. It's allocated to the extent that in my particular instance, the accounting support work that we do part of the blended rate of another unit includes our rate as an example.
If asset management is working on a particular asset, well as long as there are assets, there will be some type of accounting work done on the receivership, as long as some claims work, there will be some claims work done on a receivership. So their rates include a portion of the rate for accounting.
Q. Okay.
A. In addition if I worked on a particular

Page 315

receivership, I charged that receivership directly.
Q. When was this change made to go from the other old methodology to the new methodology?
A. 2002.
Q. And why was that change made?
A. It's my understanding that senior management took or revisited the allocation process and felt that an hourly rate what was more efficient or more effective in representing the cost to the receivership as opposed to the prior methodology.
Q. When you say senior management in that decision, who are you referring to?
A. I would refer to the division directors for Division of Finance, Division of Resolutions and Receiverships.
Q. And do you know who those were at the time this decision was made?
A. At that time it would have been Fred Selby, head director of Division of Finance and Mitchell Glassman, a Division Director of Resolutions an Receiverships.
Q. How, if at all, has the accounting for expenses related to goodwill litigation changed since the inception of the Carteret receivership?
A. To my knowledge, the accounting has not

Page 316

changed for the goodwill receiverships as relates to Carteret.
Q. Has it changed with respect to any other institution?
A. No. What has changed is for a period where the accumulation of indirect charges grew and then as cases were dismissed or whatever and it came to that allocation or that pool of indirect cost was reduced.
(Green Exhibit No. 42 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, the document marked as Exhibit 42 is a memo dated December 17, 2003 from Robert Ferrer through Craig Jarvill to Fred Selby, Subject: Removal of Offensive Litigation Expenses Related to Inactive Goodwill Cases and this memo has a couple of attachments.
My first question is, is this a document you reviewed in preparation for this deposition
A. Yes, it is.
Q. Can you describe for me what the purpose of this document is?
A. The purpose of this document is requesting authorization from Fred Selby, the director, that in

Page 317

light of inactive goodwill cases that a write-off of the direct and indirect expenses or a portion thereof associated with inactive goodwill receiverships be written off the books of the FDIC.
Q. The paragraph on the first page, there's a discussion of the cumulative offensive litigation expenses, both direct and indirect as of November 30, 2003; do you see that
A. Yes, I do.
Q. And the total was $89.8 million and that breaks that down to components and then there's a sentence sense that says the remaining $3.2 million consists of charges that are not attributable directly or indirectly to the offensive litigation effort and therefore not considered reimbursable when the goodwill receivership obtains a goodwill outcome.
These amounts would be removed from FIN 7997 in September 2003; do you see that
A. Yes.
Q. What are the expenses referred to here in the $2.3 million?
A. I don't know what the exact expenses are.
Q. Any idea what they were?
A. No, I don't.
Q. Do you know why they were included in

Page 318

cumulative direct, indirect litigation expenses up to that time?
A. No, I don't.
Q. Do you know whether that was in error for them to be included for the $3.2 million to be included of the $89.8 million?
A. No, I don't.
Q. Who would know, if you would know the answers to these questions about the $3.2 million?
A. I think the best individual would be Bob Ferrer.
Q. If a goodwill case results in a recovery 10 percent of the award net of the direct expenses related to that case will go to reduce the unallocated and direct expenses; do you see that?
A. Yes, I do.
Q. Do you know whether that proposal was ultimately adopted by the FDIC?
A. I believe authority was granted by Karen Hughes for this proposal, yes.
Q. Is that the current policy of the FDIC with respect to use of any recovery and goodwill cases?
A. To the best of my knowledge, yes.
Q. What was the basis for this decision to

Page 319

allocate 10 percent of the award for this purpose?
A. I don't know.
Q. Do you know of any accounting, literature, accounting principles that support this decision?
A. No, I don't.
Q. And I want to make sure I understand how it works, there's an unallocated, indirect expense pool for goodwill litigation expenses, correct?
A. Correct.
Q. At the time of this memo that pool was roughly $38 million, correct -- 37.5 million I think it says?
A. Yes.
Q. And let's assume that some receivership -- strike that.
And that unallocated indirect expense pool, what types of expenses are those, those are not directly attributable to a particular receivership; is that correct?
A. That's correct.
Q. And if a particular receivership recovered, say, $400 million in a case, do I take it that under this proposal and under this policy, $40 million of that award would be or let's assume it is a $400 million award net of direct expenses, there's

Page 320

$400 million, am I correct that under this policy, $40 million of that award will go to reduce the indirect -- the unallocated indirect expenses, correct?
A. It will be slightly less than $40 million.
Q. Why could it be slightly less?
A. Because I think the direct expenses would first be deducted interest that $400 million award, then 10 percent of that amount, based on this language would go to the unallocated pool.
Q. Okay. And in my hypothetical, if you assume that the slightly less than $40 million a less than the $37.5 million, the one recovery for one receivership would go to payoff the indirect expenses for all the receiverships; is that correct?
A. That's what the proposal states, yes.
Q. And is there any -- other than this document, this exhibit, are there any documents or policy statements or manuals or regulations or anything that you can point me to that explains the rationale for that policy?
A. No.
(Green Exhibit No. 43 was Marked for identification.)
BY MR. COLATRIANO:

Page 321

Q. Mr. Green, can you identify the document that's been marked as Exhibit 43?
A. Yes, Exhibit 43 contains a cover sheet or the first page is a drill down on a line item from the income statement entitled Indirect Cost with The -- operations and then all the other remaining pages there's a transaction history of that account for the period 1/1/1995 through 1999
Q. And there's a reference to two accounts on this, overhead cost allocation and the FDIC services provided, correct?
A. Correct.
Q. Do those correspond to what we were talking a few minutes ago about the two methods for allocating overhead?
A. No, they don't.
Q. Can you describe for me what these accounts are?
A. Well, they relate to the allocation process, principally account 665112 or ways to that allocation process, the balance in 665114 appears to be an incorrect account number, it should have been to 665112.
Q. How can you tell it appears to be an incorrect account number?

Page 322

A. Well, because all the overhead cost allocation goes to 665112.
Q. Do you know why this error was made or how it was made?
A. No, I don't.
Q. I take it both of these items are overhead items?
A. That is correct.
Q. And actually before we leave that document, am I to understand that total overhead Carteret receivership since its inception is the sum of those two accounts, so roughly $19 million?
A. Yes.
Q. Going back briefly to the issue of goodwill litigation expenses, the goodwill litigation expenses, either the direct or the indirect, do they include attorney time by the FDIC attorneys working on goodwill cases?
A. To my knowledge, they do.
Q. And they include expert fees for experts working for the FDIC in the goodwill cases?
A. To my knowledge, they do.
Q. Do they include your time when you're working on the offensive litigation team?
A. Yes.

Page 323

Q. What else did they include, what other big ticket items do they include?
A. Well, in addition to salary, there would be any travel charges associated with that. If there were any additional outside fees paid in support of the offensive litigation, it would include that, any consultant type fees.
Q. What is a corporate advance as it relates to receivership accounting?
A. A corporate advance is the process of a receivership borrowing money from FDIC in a corporate capacity.
Q. And what policies or regulations or guidelines exist that govern the circumstances under which advances are taken and the circumstances -- and the accounting for such corporate advances?
A. There was a process memo dealing with advances, I believe -- well, it's addressed in the various accounting manuals and I believe there actually is an accounting bulletin that speaks to corporate advances.
Q. And what is the difference between a corporate advance and let's say in this transaction corporate wiring the funds that would fund the deposit transfers?

Page 324

A. The difference is corporate advances are usually made post-closing and corporate advances are collateralized by the assets of the receivership as security, the difference is there's a different interest rate that is used, based on that policy, dealing with corporate advances, corporate advances have a higher priority of payment than a subrogated claim.
Q. And you mentioned that corporate advances have a different interest rate. How is interest calculated on corporate advances?
A. It's calculated monthly on a simple basis.
Q. At what interest rate?
A. I don't know what the current rate is.
Q. Okay. What is it based upon, do you know?
A. Not currently, no.
Q. Do you know what it was based upon at any time during the Carteret receivership?
A. I think the RTC policy would have been possibly based on a 90 day T-Bill rate.
Q. I'm sorry. Did you say simple or compound?
A. I think it is simple interest.
Q. Is it floating or fixed?
A. I think it's floating.

Page 325

Q. Where on receivership financial statements, what line item reflects corporate advances?
A. Of a receivership had borrowed money from corporate, it would be on the line item titled Billings and Borrowings, it would be reflected in there.
Q. And what is the policy with respect to repayment of advances versus repayment of other liabilities. I take it you just said at a high priority there is subrogated claim?
A. That's correct.
Q. Does that mean corporate advances need to be paid off before any part of the subrogated claim could be paid off?
A. That's correct.
(Green Exhibit No. 44 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 44 is a document entitled Receivership Funding by Corporate Advances, Loans and Returns of Dividends, Calendar Year 1999 Process.
Was this a document reviewed in preparing for your deposition?

Page 326

A. Yes, it was.
Q. I think a moment ago you made reference to the fact that you thought there was a process memo on corporate advances, is this to what you were referring?
A. Yes.
Q. What application, if any, does this process memo have with respect to the treatment of corporate advances in the case of Carteret's receivership?
A. Well, to my knowledge the Carteret receivership did not have any advances.
Q. At any time during its existence?
A. During the receivership.
Q. You say during the receivership, I just want to make sure I understand what dates we're talking about, so the receivership starting when?
A. October '94, January '95 and March of '95.
Q. Okay. During that period, to your understanding, the receivership had no corporate advances?
A. That's correct.
Q. The past corporate receivership have any corporate advances?
A. I believe it did.