Page 347

presentation of these assets as they are already assumed to be of diminished value. Do you know what it meant when it says by the RTC is not overly concerned about the financial statement presentation of these assets?
A. No, I don't.
Q. Do you think that's a statement that applies to the FDIC as well? Is the FDIC concerned about the financial statement presentation on performing assets?
A. I think the FDIC is concerned about the financial statements, period.
Q. On the page Bates stamped 92504 there's a reference there to a number of different manuals, are you familiar with all of the manuals listed here?
A. I'm familiar with the RTC pro forma manual, the charter of accounts manual and field accounting manual.
Q. I take it that means that you're not familiar with the 1, 2, 3, 4, 5, 6, 7 other manuals or guides listed on this page?
A. That's correct.
Q. Do you know which, if any, of these manuals has been produced in discovery, obviously the field accounting manual has, because that's what

Page 348

we're looking at, to know whether any of these other manuals have been produced?
A. I believe the -- it may have been on a different manual the asset management and disposition manual or the credit manual, the asset operations manual. I produced the FDIC charter of accounts manual and obviously the field accounting manual. I don't believe the REOMS user procedures manual or the AM S procedure manual or the RTC pro forma manual, RTC settlement manual and CTM users guide manual have been produced.
Q. You say you're familiar with the RTC pro forma manual, what does that manual cover?
A. That manual essentially conversation the accounting aspects of a closing and completing the pro forma and how the accounts are entered into the pro forma program, how the reports are produced, what reports are produced.
Q. And I take it I think you just said you're not aware of that manual being produced to us, correct?
A. That is correct.
Q. So we do this on the record?
MR. COLATRIANO: I would like to make a request for the production of the RTC pro forma

Page 349

manual, as well as we can verify a complete copy of the field accounting manual.
MR. GILBERT: Okay.
MR. COLATRIANO: And we can talk afterwards.
(Interruption by a knock at the door.)
(Whereupon, Mr. Cooper entered the deposition room.)
BY MR. COLATRIANO:
Q. Mr. Green, as you know both on Monday night after business and yesterday morning your counsel provided us with some additional documents, some manuals and things like that, some of which we've already talked about. By our reckoning it amounts to about 2,500 to 3,000 pages worth of materials and as I will get to in a moment, we need to reserve our right to come back once we've reviewed those documents to ask you about them, but for now I have had a chance to review one portion of one of those documents and I want to ask you some questions about that.
MR. GILBERT: Obviously since my silence shouldn't be taken as an agreement or an understanding that he should be compelled to come back to a deposition, but we can discuss it later on.

Page 350

MR. COLATRIANO: Okay, we can discuss it.
(Green Exhibit No. 48 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, the document that's been marked as Exhibit 48 is the chapter from one of the documents that was produced to us either on Monday night or yesterday morning, it is a chapter from the FDIC field accounting manual on liability accounting.
Are you familiar with this -- are you familiar with the FDIC field accounting manual?
A. Yes, I am.
Q. Are you familiar with this chapter in particular?
A. Yes, I am.
Q. What is the application -- what is the applicability of the FDIC field accounting manual to receiverships that began with the RTC?
A. Well, once the receiverships of the RTC came under the purview of the FDIC, the FDIC's current accounting policies and procedures would have covered now RTC receiverships.
Q. Okay. So former RTC receiverships the document that FDIC personnel should be looking at is a field -- is an FDIC field accounting manual as

Page 351

opposed to the RTC field accounting manual?
A. Yes.
Q. I'd like you to turn to page 8 of this document, there's a section definitions, it says corporate proof of claim?
A. That's correct.
Q. I think you've referenced this before, but could you define for the record what a corporate proof of claim is?
A. The corporate proof of claim is that paper document filed by the claims agent on behalf of corporate representing a claim of corporate for the receivership estate.
Q. It could include the subrogated claim by corporate, correct?
A. Correct.
Q. I see reference to this fact, please confirm it for me if it is true that typically the first CPOC number 1 is the subrogated claim, is that typically correct?
A. Well, the CP -- the first CPOC filed would include those transactions up until that time that CPOC is being filed.
Q. And in this case, have you seen references to the CPOC?

Page 352

A. In some of the exhibits, yes.
Q. But you haven't actually seen that document, have you?
A. Unless it's among the documents I've already provided, I don't think all of the CPOC or the changes to the CPOC's were in our records that I copied.
Q. Okay. And just for the record, let me represent that we're pretty confident that we never received that document. So again Andrew we can follow up but I would like to make a request on the record for the production any corporate proof of claim forms that relate to the FDIC subrogated claim and specifically limited number 1, which I think has the lion's share of the subrogated claim in this case?
MR. GILBERT: Aren't some of them exhibits on the corporate proof of claims?
THE WITNESS: Some of them are, but from what I was able to find, this is essentially the changes to the subrogated claim for a specific time period.
MR. COLATRIANO: I haven't seen the first one or any of the early ones. I think one of our exhibits was number 16 or number 17 or something like

Page 353

that.
MR. GILBERT: We'll look for them.
BY MR. COLATRIANO:
Q. Getting back to Exhibit 48 and page 8, this paragraph says that to be included in the corporate proof of claim, the insurance funds must have actually been expended by the corporation (increases the claim) will return to the corporation (reduces the claim.)
What insurance funds -- my question to you is what insurance funds were actually expended by the corporation -- corporation RTC or FDIC in connection with the Carteret resolution transactions?
A. It could have been those funds that were expended through the wire to the assuming banks for those three failure dates.
Q. And so funds actually expended would not include the premiums on those transactions or the asset sales on those transactions, correct?
A. Actual funds were not sent to the extent of those deductions to the wire, yes.
Q. Okay. And so is it fair to state that if this definition had been followed as opposed to the RTC's policy, which I think you showed me yesterday, the subrogated claim would not have included the

Page 354

premium and the asset sale figure, it would have been limited to the wire transfer?
A. No.
Q. Why is that -- why does that not follow?
A. Because we being the accounting staff would have come back and made gross-up entries with the sale to the assuming bank for the assets and the premium.
Q. So why does this say that to be included in the CPOC insurance funds must have actually been expended if what you're saying, if I follow it, is you were would just gross it up anyway by funds that were not expended?
A. That's correct.
Q. Where's the basis in this document, I understand you don't have chapter 8 but chapter and liability category, assuming that's the relevant chapter here, where's the basis for grossing up the subrogated claim to include those items?
A. The basis is what the practice is of the corporation to gross-up the subrogated claim on its books and for the receiver to recognize the premium in the sale to the assuming bank which would reduced the amount of the original wire to the assuming bank.
Q. Other than the practice that you just

Page 355

referred to, can you cite me to any FDIC as opposed to RTC -- FDIC policy statement or manual or regulation or any other document that states what you just said, that the subrogated claim would be grossed up to include the amount of the premium and the assets?
A. I'm confident there are policy statements or there are procedure statements or it could be a component of the claims manual that addresses the subrogated claim at a time of closing that would go to the heart of grossing up on the books of the receiver for the premium and the assets sold.
Q. So you say you're confident, you're telling me the FDIC claims manual will have a statement to that effect?
A. I think the claim manual will state that the subrogated claim to be filed is for the total deposit liabilities, not the net amount.
Q. To the extent that claim manual says that, would it not be inconsistent with what the liability accounting chapter of field accounting manual is saying right here on page 8?
A. In this context as this sentence states yes, that would be inconsistent.
Q. Remind me, is this claim manual, is that

Page 356

one of the documents that was produced to us?
A. No.
Q. To your knowledge, has it been produced to us at any time?
A. Well, a portion, a chapter of the claims manual has been provided.
Q. Do you know when that happened, when that was produced?
A. That's what we covered part of yesterday.
Q. Are you referring to Exhibit 2?
A. Yes.
Q. It was my understanding that this was an RTC manual, correct?
A. That's correct.
Q. My question was related to FDIC policy statements or FDIC manuals, are you aware of any FDIC statements or manuals or regs that state that the amount of the subrogated claim should be grossed up to include the premium and the asset sales?
A. No, as I sit here today, I can't cite as specific memo or policy procedure, but that's not to say one doesn't exist.
Q. What was the -- strike that.
We've had a discussion, a long discussion today about the change in the methodology for

Page 357

calculating post-insolvency interest, you recall that obviously, correct?
A. Yes.
Q. And that change happened in 1999, that's when the decision was made to change that calculation, correct?
A. Correct.
Q. What policies or procedures did you or your office follow when a change like that happened to -- what policies or procedures did you follow to inform or to coordinate with people who were in charge of preparing tax returns or tax documents for receivership of that change?
A. Well, to the extent that the change lead to a change in the calculation, which would have then appeared on the balance sheet, the tax unit would have received the balance sheet and income statement of the receivership for 1999 or 1998 when it was first reported. So they would have noticed an increase in the calculation.
Q. So but other than giving them the balance statement or the financial statement, which I guess is done in the ordinary course; is that correct?
A. That's correct.
Q. Other than that, was there a policy about

Page 358

specifically informing them of the change that could affect the tax liability?
A. No.
Q. Do you know whether or not in this case involving Carteret's change in methodology for calculating post-insolvency interest you or any one in your office had any discussions with the tax people at that time about the tax implications of that change?
A. No.
Q. No, you don't recall or no it didn't happen?
A. I don't believe it happened.
MR. COLATRIANO: Off the record.
(Discussion off the record.)
(Whereupon, Mr. Cooper exited the deposition room.)
(Recess.)
MR. COLATRIANO: Mr. Green, I don't at this time have any further questions with respect to the 30(b)(6) component of this deposition.
I do however as I mentioned a minute ago want to state for the record that in light of the recent production of documents we are holding open the right to ask you some more questions about that

Page 359

in your 30(b)(6) capacity. But I would propose, and Andrew, we can talk about this off the record, is that maybe some time next week, we don't need to do it in person, we can get you on the phone, I don't think it will take long, and I may not have any questions, but I do think we're entitled to an opportunity to review the documents that were recently produced which encompass at least a box full and ask you additional questions about that so I am going to hold open the deposition for that purpose.

MR. GILBERT: One possibility is that he continue tomorrow and give you an opportunity to review the documents --

MR. COLATRIANO: I don't think, A, I think it room is going to be taken tomorrow, so logistically I don't think that's possible, but B, I think I more time -- as you can tell during the day I've been kind of occupied the last couple of days, and giving me one night to review all of those documents I don't think is sufficient.

So I'm happy to work with you logistically. However you want to do it and I have a deposition on Tuesday of next week but maybe Thursday or Friday, get on the phone for an hour and just finish it up that way, if it even needs to be done,

Page 360

did may not, but that's how I would like to handle it.

MR. GILBERT: One concern I would like to state for the record is that it doesn't develop into a second bite at the apple, it would be strictly limited to those materials and not be a situation where you then go back and review and revisit.

MR. COLATRIANO: I have no problem with that. I would review the materials and ask him questions about those materials. Now to the extent those materials reflect on an exhibit that has already been used, I mean perhaps I might need to ask him another question, but I don't anticipate that.

The purpose of this is not to give me more time to prepare for the deposition that we've been conducting, the purpose is to give me time to review the new documents and ask questions about those, that's how I envision it.

So with that understanding, unless someone has a question, I'm ready to move on to the fact portion of the deposition.

MS. GRONER: As I mentioned earlier, we do have some questions about some of the documents that were introduced in this portion of the deposition, but we think it will be more efficient to address it

Page 361

at once after the plaintiff concludes the fact deposition.

MR. COLATRIANO: With that, yeah, this is the conclusion of the 30(b)(6) and we're now beginning the fact portion of the deposition.

(Whereupon, at 3:41 p.m. The 30(b)(6) portion of the deposition ceased and the fact portion of the deposition ensued.)

MR. COLATRIANO: We will continue the document exhibit numbers, I think we're on Exhibit 49.

(Green Exhibit No. 49 was Marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Green, Exhibit 49 is an E-Mail, it is a printout of a couple of E-mails.

The first one of which is an E-Mail from Elaine Tama to you, dated October 9, 2003, it is also addressed to Robert Ferrer, Subject: PII accrual.

Have you reviewed this document to prepare for your deposition?

A. Yes, I have.

Q. Attached to the E-Mail to you is an E-Mail from Steven Johnston to Elaine Tama and Rick Cywinski with the subject: PII approval?

Page 362

First of all, who is Steven Johnston?

A. Steve Johnston is one of the senior tax accountants in the Division of Finance.

Q. And who is Rick Cywinski?

A. Rick is also a tax accountant in the Division of Finance.

Q. Why were you being copied -- why was this E-Mail between -- from Mr. Johnston and Ms. Tama being forwarded to you, do you know?

A. No, I don't.

Q. What if -- take a moment if you need to to review the text of the E-Mail, but what do you recall regarding the issue that's being discussed here?

A. What the issue is is that with the policy of recording PII on the books once 95 percent in dividends have been paid, in those years prior to that while PII has accrued, but not recorded on the books, if not taken into account on the income tax return.

So the effect of in the case of Carteret, there was no PII accrual on the books prior to 1998 so any tax return prior to 1998 didn't have the effect or the benefit recording a PII accrual.

Q. The E-Mail states in the second paragraph that this is another case where had we accrued PII

Page 363

from date of closing, we could have significantly reduced our tax exposure and may be more importantly our litigation exposure.
Do you know what other cases Mr. Johnston is referring to?
A. I believe the one case that he's referring to that I'm familiar with is on the Ben Franklin receivership.
Q. Were there any other cases that you're aware of?
A. No.
Q. And what do you know about status of this issue as it relates to the Ben Franklin receivership?
A. As this issue relates to Ben Franklin both the plaintiff's shareholders, the IRS and the FDIC had come to a tentative agreement on the settlement of the tax liabilities of the receivership.
Q. And have you been involved in that?
A. No, I have not.
Q. Can you disclose what the terms of that settlement are?
MR. GILBERT: I object and just ask that the witness be careful not to disclose the contents of any discussions with counsel about that case.
THE WITNESS: I believe the agreement

Page 364

calls for a payment of $47 million to the Internal Revenue Service from the receivership.
BY MR. COLATRIANO:
Q. What was the -- what was that as settlement from, what was the claim, the tax claim?
A. The income tax claim itself, including penalties an interest at one point was in excess of $900 million.
Q. What discussions, if any, have you had or have you been involved in with respect to this issue as it relates to the Carteret receivership, this issue being the relationship between PII accrual and tax liability?
A. I did ask one of our tax accountants if when it was recorded on the books in 1998 if any of the losses generated in 1998 would have been able to be carried back to prior years.
Q. And what was the tax accountant that you refer to?
A. Dave Collie.
Q. And what did he tell you?
A. If I remember correctly, he was only able to carry back the losses for two years.
Q. Have you been involved in any other discussions where or analyses with respect to this

Page 365

issue?
A. No.
Q. And what, if anything, has been your involvement with respect to the preparation of tax returns for Carteret?
A. None.
(Green Exhibit No. 50 was Marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 50 is an E-Mail string, the first one of which is from Sharon Kelley to Robert Ferrer and yourself, cc'd to Kevin Coston, dated April 13th, 2004 regarding goodwill status.
Was this document reviewed in your preparation of this litigation -- preparing for this deposition, I'm sorry?
A. Yes.
Q. The first line of the first E-Mail says, we still do not want to place a receivership with active goodwill litigation into T-status, right? My question is what is T-status?
A. T-status represents termination status.
Q. And the middle of the page in the shaded discussion it states it is DOF's policy not to place a goodwill case receivership involved in actual

Page 366

goodwill related litigation into T-status, thereby precluding any termination proceedings.
What is the basis for that policy, if you know?
A. I believe the basis for that policy are the directions coming from the legal division.
Q. Do you know what the basis for their advice was?
A. No.
Q. Is this policy reflected in any documents?
A. It may be addressed in a memo dealing with goodwill FINS and termination status.
Q. When is the effect of pleasing receivership into termination status?
A. If it goes into T-status expenses cannot be charged to that receivership any longer.
Q. How if at all would it affect other accounting issues?
A. In T-status?
Q. Yes.
A. Once a receivership goes into T-status and if we receive a termination case, any remaining assets on the books of the receivership were sold tc the FDIC like I stated, expenses are no longer charged to the receivership, final dividends are paid

Page 424

Q. Are you referring to the corporate proof of claims?
A. That is correct.
Q. And do you know whether you found a complete set of those claims?
A. I believe I did.
MR. GILBERT: Just for the record, provided all those to Michael Weitzner.
MR. COLATRIANO: Okay.
BY MR. COLATRIANO:
Q. Since the time -- the first part of this deposition, have you -- let me put it this way. Upon reflection, are there any answers or responses you gave during the first part of this deposition that you would like to clarify or modify or change in any way?
A. Yes, there are.
Q. What are they?
A. One of the questions pertained to the settlement between the FDIC and the IRS regarding the tax matter on then Benjamin Franklin. I believe I stated that the settlement amount was 47 million.
I believe the proper amount is 50 million.
Q. Any other clarifications or corrections in your prior testimony?

Page 425

A. Yes. One of the exhibits that you presented to me on the latter part of the second day of the deposition was regarding a copy from our accounting manual dealing with the subrogated claim amount. I believe I answered that I disagreed with the statement as far as how the subrogated claim was computed as stated in that page.
In retrospect, that was a correct -- a correct process of calculating the subrogated claim.
Q. Why don't we be clear and figure out which exhibit you are talking about.
I don't have copies for everybody, but I have a set of exhibits. Is this the exhibit? I'm directing you to Exhibit 48, is that the exhibit you are referring to?
THE WITNESS: Yes, it is.
BY MR. COLATRIANO:
Q. Okay. Which statement -- if you could direct me to the page, the statement that you were talking about a minute ago, I'd appreciate it.
A. It is Exhibit 48, page 8. The particular sentence is: To be included in the CPOC, the insurance funds must have actually been expended by the corporation, increases the claim, or returned to the corporation, decreases the claim.

Page 426

Q. Okay. So I understand your testimony today, on March 1, you said that you thought you disagreed with that statement as a matter of how the subrogated claim is accounted for, correct?
A. That is correct.
Q. And now you're saying you think that is a correct statement, correct?
A. Yes. It is.
Q. Okay. How, if at all, does that affect your testimony about how the Carteret subrogated claim was calculated? Is this statement consistent or inconsistent with how the Carteret subrogated claim was calculated?
A. Practice in effect for the RTC at the time of Carteret -- when we're talking the net wire concept -- was the practice administered by the RTC.
This practice here relates to the FDIC in -- as of October '96, this would have been the practice of the FDIC. Although the RTC practice was different, that was the practice of the RTC.
Q. I'm sorry. What was the practice of the RTC?
A. To do the net wire concept and create the escrow funds receivable from the corporation.
Q. If I recall your previous testimony, I

Page 427

think you said the Carteret subrogated claim was not limited to the amount of the net wire, but it was the amount of all of the liabilities transferred, correct?
A. That's correct.
Q. Okay. So that practice, the way the Carteret claim was calculated, are you now saying that that is inconsistent with the FDIC practice as reflected in Exhibit 48? I just want to make sure I understand.
A. The FDIC also utilized the net wire method. It changed that practice.
Q. And it changed it to what?
A. To actually doing a second wire to the receivership for the amount that was netted out of the wire to the assuming bank for the assets acquired by the assuming bank of the premium.
Q. Okay. So the FDIC currently or at least since the time of this exhibit -- when you are saying it does two wires, one to the acquirer and one to the receiver?
A. That is correct.
Q. Okay. And how does that affect the calculation of the subrogated claim? Is the subrogated claim the sum of those two wires?

Page 428

A. After some other final adjustments, yes.
Q. Okay. What are those final adjustments?
A. The initial wire to the assuming bank is an estimate as well as the wire to the receiver for the assets and liabilities. Based on that initial wire, before the formal process is completed, it usually creates a difference. There is a subsequent settlement item for those differences.
Q. Okay. Just to make sure I understand, if the RTC had used the method that's reflected in Exhibit 48, would the subrogated claim amount have been higher or lower or the same?
A. I'm sorry. Can you repeat the question?
Q. If the RTC at the time it resolved Carteret had utilized a method for calculating the subrogated claim that's reflected in Exhibit 48, the FDIC's method or the FDIC's current method, would the Carteret subrogated claim have been higher or lower or the same amount?
A. It would have been the same amount.
Q. Okay. Just so I understand it, the difference between the RTC method and the current FDIC method is -- it doesn't have to do with the amount of the final amount of the subrogated claim, it does to do with how many wires there are?

Page 429

A. That is correct.
Q. Do you know if FDIC -- strike that.
Before the time of Exhibit 48, was the FDIC using the same method that the RTC used for Carteret?
A. Up until 1994, yes.
Q. And why did the FDIC change that method?
A. I believe in one of the Tama documents it alludes to that the FDIC got an opinion from FDIC legal that FDIC corporate didn't have statutory authority to create a liability from the receivership.
Q. Okay. I think that's one of the documents I'm going to be showing you. When I do show you the document, if it is the one that you're referring to now, please let me know.
Okay. Are there any other clarifications or modifications you want to make to your testimony from February 28 and March 1?
A. Not as I sit here right now. I can't think of any.
Q. Okay. We're just going to number the exhibits starting with number 59 today and just keep going from there.
(A document was marked for

Page 430

identification as
Exhibit No. Green-59.)
BY MR. COLATRIANO:
Q. Exhibit 59 is a document I believe that is one of the Tama documents.
It is entitled Accounting for Receivership Liabilities, dated May 1, 1998, a FDIC document Bates stamped in the lower right corner AM 0010433 through 440.
Is this one of the documents you reviewed in preparing for this deposition?
A. Yes, it is.
Q. Turn to the page Bates stamped 438.
There's a discussion near the bottom that begins, that is headed Accounting Entries. It says interest on claims is recorded in FIS for actual amounts paid only.
What -- is the reference to actual amounts, is that a reference to the amount paid on the claim or is it an amount -- a reference to amounts of interest paid, do you know?
A. I believe that is a reference to the actual amount of the interest that is paid.
Q. Okay. Is that the current policy of FDIC as reflected in that sentence, do you know?

Page 431

A. That is not the current policy.
Q. Okay. What is the current policy?
A. The current policy is to recognize as an accrual on the books of the receivership the total amount of interest due through a certain period in time, irrespective of whether the receivership has the capability of making that total payment.
Q. When was that policy changed?
A. To the best of my knowledge, that policy changed sometime in 1997.
Q. Okay. When you say the policy was recognize as an accrual the total amount of interest due irrespective of whether the receivership could make total payments on the claim, are you saying that there's no standard of probability for whether interest would need to be paid before it would be recognized?
A. Yes. The receiver must meet a threshold of having paid at least 95 percent.
Q. And I think we talked about that during your -- the prior part of the deposition, correct?
A. Correct.
Q. Okay.
MR. COLATRIANO: I'd like to have this marked as Exhibit of 60, please.

Page 432

(A document was marked for identification as Exhibit No. Green-60.)

BY MR. COLATRIANO:

Q. Exhibit 60 is an RTC document dated January 31, 1992. Subject Dividend Estimates for General Creditors for Past Due Receiverships. Bates stamped AM 0010018 through and including 072.

Is this one of the documents you reviewed in preparing for this deposition?

A. Yes, it is.

Q. And this is also one of the Tama documents, correct?

A. I believe so, yes.

Q. My only question -- I think my only question -- relates to page 7 which is Bates stamped 027. Bottom right-hand corner.

There's a formula there for the interest calculation, and it refers to the standard purchase and assumption agreement between the RTC as receiver of the failed association and the de novo association.

There's a block quote that says that the rate of interest for such payments shall be at a 3 month Treasury Bill rate as of the first auction day

Page 433

of the month in which interest shall begin to accrue adjusted monthly thereafter.

Do you know why that was the rate chosen for the standard purchase and assumption agreement?

A. No, I do not.

Q. Do you know what accounting or economic rationale there may have been for using that rate as opposed to some other rate?

A. No, I don't.

Q. Do you know whether the FDIC has a standard assumption and purchase rate that it uses?

A. Yes, it does.

Q. Do you know what if any interest rate is used in this standard purchase and assumption agreement for this purpose?

A. I don't believe the standard purchase and assumption agreement addresses interest rates --

Q. Okay.

A. -- on claims.

MR. COLATRIANO: Let's mark this as Exhibit 61, please.

(A document was marked for identification as Exhibit No. Green-61.)

BY MR. COLATRIANO:

Page 434

Q. Exhibit 61 is another of the Tama documents that is FDIC accounting bulletin RA 94001 dated June 17, 1994. Subtitle is Deposit Funding Procedures, Bates stamped AM 0011554 through and including 557.

Is this one the documents you reviewed in preparing for this deposition?

A. Yes, it is.

Q. Okay. Is this the document you were referring to earlier about the change in how the -- the change from the net wire transfer concept?

A. This is the procedural document addressing the change in the net wire concept.

Q. Okay. Under background on the first page, there are two paragraphs there. Why don't you go ahead and review those to yourself, let me know when you're ready to proceed.

A. Okay.

Q. Okay. Is that description a fair or accurate summary of how the Carteret transaction was accounted for, the resolution transactions?

A. Yes, it is a fair description.

Q. Okay. And the last sentence in the section says corporate pays the receivership interest monthly on the balance of the escrow funds account.

Page 435

What is the interest rate used for that payment?

A. I believe the interest rate was pegged to the earnings that the receivership was earning on its cash at the Federal Home Loan Bank on a monthly basis.

Q. What are you basing that belief on?

A. Two things. My general knowledge of the process, and I also believe there's a Tama document that actually states something to the equivalent.

Q. Do you know why that was the policy regarding what interest rate to use for this purpose?

A. It is my understanding that that was the basis given the concept, that had the funds been wired to the receivership for the assets and premium initially deducted us -- it would have gone into the account at the Federal Home Loan Bank and could have earned interest at that monthly rate.

Q. Okay. The next page talks about the new procedures that were going to be used for deposit funding and I -- is this consistent with what we talked about at the start of today's deposition regarding what the procedures were changed to?

A. Yes, it is.

Q. Okay. Who made the decision to change to

Page 436

that -- to this new procedure?
A. I believe senior management of the FDIC or specifically Division of Finance made that decision.
Q. Were you involved at all in any of the decision-making process with respect to that decision?
A. No, I was not.
Q. And I believe you stated earlier -- please correct me if I'm wrong -- that the decision was based on a legal opinion the FDIC got regarding its authority to recognize a liability on the receivership books; is that right?
A. I believe that's what one of the Tama documents states.
Q. Okay. Thank you.
MR. COLATRIANO: Exhibit 62 please?
(A document was marked for identification as Exhibit No. Green-62.)
BY MR. COLATRIANO:
Q. Exhibit 62 is an undated document -- of the Tama documents called -- titled Brief Historical Summary of Resolution Funding, Bates stamped AM 0011481 through and including 482.
Is this one of the documents that you

Page 437

reviewed in preparing for this deposition?
A. Yes, it is.
Q. Is this the Tama document you just referred to as the one that refers to a legal opinion?
A. Yes, it is.
Q. Okay. And that's -- do you know who prepared this document?
A. No, I don't.
Q. Do you know when it was prepared?
A. No, I don't.
Q. Do you know why it was prepared?
A. No.
Q. Okay. Have you seen -- the second page, last paragraph on the second page, refers to a legal opinion.
You've been referring to that. Have you seen that legal opinion?
A. No, I have not.
Q. Do you know whether it was a written legal opinion?
A. No, I don't.
Q. Okay. Do you know what prompted the rendering of that legal opinion?
A. No, I don't.

Page 438

Q. Okay.
(A document was marked for identification as Exhibit No. Green-63.)
BY MR. COLATRIANO:
Q. Exhibit 63 is a one-page memo dated April 11, 1995 from Steven Graham to Alvin Kitchen, subject Interest on Corporate Claim, Bates stamped AM 0010345.
Did you review this document in preparing for the deposition?
A. Yes, I did.
Q. This document talks about adjustments to the FDIC subrogated claim, correct?
A. Yes, it does.
Q. And the last paragraph begins it is our position that with the exception of unclaimed and/or unratified deposits, no interest should be calculated on the remaining items from the date of closing to the date they were reversed out of the corporate claim.
Was this a change in policy, do you know?
A. I don't know.
Q. Okay. How does the policy reflected in this memo compare to how interest on the subrogated

Page 439

claim was handled for the Carteret receivership? Was it handled consistent with this memo? Do you know?
A. No. The actual practice of the calculation of interest on the subrogated claim was unaffected by any collections at the closing, preferred claims, operating expenses, settlement items.
Q. Is that because none of those adjustments actually occurred in the case of Carteret?
A. To my knowledge, they did not occur.
Q. Okay. How about the last item, unclaimed or unratified deposits later refunded to corporate? Were there adjustments with respect to that to Carteret?
A. Yes, there were.
Q. Okay. Was the handling of interest with respect to those adjustments handled consistent with -- as -- with the policy expressed in this memo?
A. Yes, it was.
MR. GILBERT: Objection to characterization. "Policy expressed in the memo." The memo is a discussion of a particular position, not policy.
BY MR. COLATRIANO:
Q. Do you know whether this memo reflects the

Page 444

should be booked or what date should be used for purposes of calculating interest with respect to those, correct?
A. Correct.
Q. I couldn't tell whether this last sentence is saying that some offices were using the wrong date?
A. To me, it is not clear exactly what they're stating here.
Q. Has anything been done -- actually, strike that.
The third paragraph -- actually, read the third paragraph to yourself and let me know when you're ready to proceed. The third issue, I'm sorry.
THE WITNESS: Okay.
BY MR. COLATRIANO:
Q. I was hoping you could make this a little more simple for me. Explain what the problem is that's being discussed in this paragraph regarding retrodating of dividend corrections and the problem that that leads to with escrow funds interest.
Can you walk me through what the issue is?
MR. GILBERT: To the extent he knows, of course. He's testifying as a fact witness and has not seen this document and didn't author it.

Page 445

MR. COLATRIANO: Just to be clear, I'm not sure what that has to do with whether he's testifying as a fact witness or a 30(b)(6).
MR. GILBERT: You're asking him for his personal opinions about what this paragraph means, his interpretations.
MR. COLATRIANO: The fact he didn't author it doesn't mean he can't speak to it as a 30(b)(6) witness.
In any event, whatever his interpretation is, he can give it to us; and we can fight later about whether it is a 30(b)(6) opinion.
MR. GILBERT: Okay.
THE WITNESS: It's unclear because it states whether CPOC is financially reduced, shouldn't the dividends be -- shouldn't the dividends paid be restated as of the same date the CPOC is reduced.
If the CPOC is reduced as a result of payment of dividends; then the dividend payment would concerned with that particular transaction.
If the dividend paid is being paid as a result of the use of escrow funds, then the escrow funds would have reduced -- meaning the escrow funds would have earned less interest.
BY MR. COLATRIANO:

Page 446

Q. And why is that a problem?
A. Well, that isn't a problem. I mean, that would -- that the proper -- the dating of the dividend through the use of escrow funds, both accounts would have been posted to simultaneously. So the CPOC would have reduced by the amount of escrow funds; the escrow funds balance would have been reduced by the amounts.
So that isn't a problem.
It's -- it's -- this paragraph is not clear what the problem is.
Q. The cover e-mail has a sentence that says the third issue is a wash -- Washington, I'm assuming that means, biggie that I will discuss with Dennis Nolan et al. upon his return from the DOF conference next week. I'm assuming that's referring to issue three on the attachment.
Do you know what that means when the e-mail says the third issue is a Washington biggie?
A. No, I don't.
Q. Who is Dennis Nolan?
A. Dennis Nolan was a former employee of the Division of Finance in Washington.
Q. What was his position, do you know?
A. Dennis had various positions. He was

Page 447

chief of an accounting unit in the office. He I believe also served as a special assistant to one of the deputy directors.
Q. When did he leave the FDIC?
A. '99, 2000.
Q. The fifth issue on the attachment talks about the interest rate and says in the middle of that paragraph: We have since determined that some rates used by the field offices were not correct.
Do you know what that's referring to?
A. No, I don't.
Q. Do you know how -- in what respect the rates used by some of the field offices were not correct?
A. No, I don't.
(A document was marked for identification as Exhibit No. Green-65.)
BY MR. COLATRIANO:
Q. Exhibit 65 is a printout of an e-mail dated December 8, 1995 from Karen Hughes to a distribution list. Subject Post insolvency Interest Calculation, Bates stamped AM 0010469.
Is this one of the documents you reviewed in preparing for this deposition?

Page 448

A. Yes, it is.
Q. The first paragraph says one of my to do items from the November claims conference was to follow up with DOF on whether a policy statement existed relative to booking in the receivership financial statements a liability for post-insolvency interest. According to Dennis Nolan there is no policy statement and current practice is to only book interest when the FIN, F-I-N, turns a surplus.
Is that consistent with your own recollection about whether there was a policy statement around this time regarding this issue?
A. Well, the actual policy that would have been in effect would have been the one in the accounting for receivership liability manual from I believe 1988.
Q. You are referring to Exhibit 59?
A. That is correct.
Q. Just so I understand that policy, it is what? To not look at it until the interest was actually paid?
A. That is correct.
Q. Okay. So if that was the position statement, this is reference to the current practice being to only book interest when the FIN turns a

Page 449

surplus; is that consistent or inconsistent with that policy reflected in Exhibit 59?
A. I would say that's inconsistent.
Q. Okay. In what respect?
A. Well, if the -- if the policy is to book it -- let me read this.
If the current practice is to only book interest when the FIN turns a surplus, surplus may not accurately mean how much is available to pay as dividends to, pay as post-insolvency interest. Policy in the prior exhibit was to book it to the amount that is paid.
Q. Okay. So you are saying that when a FIN turns a surplus as used in this Exhibit, Exhibit 65, it does not mean when interest is paid? It could happen even without interest being paid, correct?
A. Correct.
Q. Okay. What does it mean for the FIN to turn a surplus in this context?
A. I believe in this context, when all higher -- priority claims had been paid.
Q. And so we talked about the current policy being to book the interest liability when the principal amount of claims have been paid, 95 percent or more, correct?

Page 450

A. That's correct.
Q. What this document, Exhibit 65, is saying is that the practice at that time was not to book it until 100 percent of those claims had been paid; is that right?
A. That's correct.
Q. Okay. Do you know why the policy statement reflected in Exhibit 359 was not being followed as of the time of Exhibit 65?
A. No, I don't.
Q. Okay. The second paragraph says Dennis further explained that there is an issue with the higher-ups on the rate that corporate should be receiving for post-insolvency interest. Do you know what that's referring to?
A. No I don't.
Q. I take it you don't know who is being referenced by the reference to higher-ups?
A. No, I don't.
Q. Is it fair to assume that that's a reference to senior FDIC management in Washington?
A. Yes, that is a fair statement.
Q. I think if you recall from the first part of this deposition on February 28 and March 1 that you reviewed a series of memos and other documents

Page 451

relating to the post-insolvency interest rate. Do you recall that discussion?
A. Yes, I do.
Q. One of those documents was a memo from June of 1995, the Rose-Kitchen somebody else memo that talks about interest rates.
Do you recall that?
A. Yes, I do.
Q. This e-mail in Exhibit 65 is dated December 8, 1995.
Do you know why the interest rate was still an issue even though this exhibit is dated six months after the issuance of that Rose-Kitchen memorandum?
A. No, I don't.
Q. Just to be clear for the record the Graham-Kitchen-Rose memo I am referring to is Exhibit 19. Would you agree with that?
A. Yes. That's the one I was thinking of.
Q. Okay.
MR. COLATRIANO: Let's mark this as Exhibit 66, please.
(A document was marked for identification as Exhibit No. Green-66.)

Page 456

hitting on the general ledger.
Q. Why would there be a difference in those dates? Why wouldn't it hit the general ledger on the as of date from the CPOC?
A. They should be the same.
Q. Okay. Is this saying they weren't always the same?
A. That's correct.
Q. Okay. Do you know how if, at all, this issue effects how Carteret's subrogated claim was accounted for?
A. The issue did not affect the Carteret subrogated claim.
Q. Is that because there are none of these adjustments that are being referred to here? Or is that for some other reason?
A. For some other reason.
Q. What's the other reason?
A. That the date for the interest is the date of failure, date of the closing.
Q. The second page at the top, it says RTC interest compounded daily. (Note: In completing calculations for a project for Karen Hughes and Ken Fitzgerald, the accrual was stopped when the claim was paid 100 percent.)

Page 457

Do you know what project is being referred to there?
A. No, I don't.
Q. Is that statement consistent or inconsistent with how Carteret's post insolvency interest is being calculated, the statement that accrual was stopped when the claim was paid 100 percent?
A. That would be consistent with the calculations for the Carteret receivership when corporate proof of claim was 100 percent paid.
Q. So the policy for the FDIC's accounting for Carteret's post-insolvency interest is that when the principal amount of the subrogated claim was 100 percent paid, interest will stop accruing?
A. From that point forward, yes.
Q. Okay.
(A document was marked for identification as Exhibit No. Green-68.)
BY MR. COLATRIANO:
Q. Exhibit 68 is a chart entitled Post-insolvency Interest Procedures Analysis dated June 26, 1997 and it is Bates stamped AM 0010347 through and including 349.

Page 458

This is one of the documents you reviewed in preparing for this deposition?
A. Yes, it is.
Q. Had you seen this document before preparing for your deposition?
A. Yes, it is.
Q. I'm sorry? You have seen this before?
A. Yes.
Q. Do you know who prepared this document?
A. To the best of my recollection, it was Elaine Tama.
Q. Do you know for what purpose she prepared this?
A. I believe this document was prepared either in preparation for or after a meeting on post-insolvency interest.
Q. Were you involved in that meeting?
A. I did attend one of those meetings, yes.
Q. What was the purpose of that meeting?
A. To discuss the various methods of calculating the post-insolvency interest, define the different methods between RTC and FDIC and eventually to lead to some questions and answers, lead to some consistent method to the extent possible between the RTC and the FDIC receiverships.

Page 459

Q. I think we saw reference in the first part of your deposition to rulemaking between 2001 and 2002 that clarified or made more consistent the post insolvency interest rates. Do you remember that discussion?
A. Yes, I did.
Q. Is that what you are referring to when you say ultimately leading to some type of decision about consistently calculating post-insolvency interest?
A. Yes.
Q. Was anything done along those lines before 2001 or 2002?
A. What do you mean by done?
Q. Were any decisions made or changes in policy announced relating to calculation methods for post-insolvency interest?
A. Not in and of themselves, no.
Q. Do you know why it took until 2001, 2002 to promulgate that regulation?
A. No. It was just so long ago, and our process.
Q. The first page has a line item adjustments/corrections.
Talks about FDIC procedures and former RTC procedures and then procedures applied currently.

Page 468

A. No.
Q. Do you know whether that was just random?
A. It would -- it would probably or would have depended upon how each office that had reviewed the receiverships were conducting the accounting of the receiverships.
Q. The next page, Bates stamped 301, there's a discussion: Options for recognition in corporate financial statements.
Under paragraph 1, there's an option recognized as an asset and income estimate of the amount of post-insolvency interest that will be paid on the presumption that it is probable and reasonably estimable.
The second paragraph under that discussion, the last sentence of which says: Further it should be noted based on FDIC's experience in trying to estimate the amount of post-insolvency interest that will ultimately be paid, it would be difficult to convince FDIC management to accrue such amounts in the financial statements.
Do you know what FDIC experience is being referred to there?
A. No, I don't.
Q. Do you recall whether that was a topic

Page 469

that was discussed at the meetings that you attended on this issue?
A. I don't remember. .
Q. The next page has a discussion of options for recognition of receivership financial statements. This is the page Bates stamped 302.
The first option is disclose the total estimated total amount of the obligation for post-insolvency interest as of the balance sheet date in the footnotes to receivership financial statements only. The disclosure would begin when the principal of claims is 95 to 98 percent paid.
I take it that this option -- was this the option that was ultimately adopted or was it option No. 2 that was ultimately adopted?
A. Option number 2.
Q. Okay. Why was option number 1 not adopted?
A. Well, when the decision was made that we would recognize PII when 95 percent dividends had been paid, that as a result of that we would actually make a entry on the books of the receivership as opposed to only disclosing the amount in the footnotes.
Q. Why was it decided to do it in the

Page 470

financial statement as opposed to the footnotes?
A. Well, the financial statements would then actually reflect the liability itself as opposed to a footnote.
Q. Okay. The first sentence under the option says clearly this accounting treatment would be easier to administer than recording amounts in the accounts. And for that reason has somewhat of a cost/benefit advantage.
Why would this accounting treatment be easier to administer?
A. Well, actually, if you're putting it in a footnote only, then for any receivership that paid the threshold of 95 percent would actually require some type of manual adjustment to the footnote, as opposed to actually going through the mechanics of calculating the PII itself and reporting an entry, which doesn't necessarily actually save you anything in terms of time and effort.
So I don't necessarily agree with that particular statement.
Q. Okay. That was sort of what prompted my question. I would assume that if you're going to recognize it, whether it is in a footnote on the financial statement itself, you need to calculate it

Page 471

and would be still the same amount of time and effort? Is that not right?
A. That is correct.
Q. The second option is recognize as a receivership liability (i.e., a claim) and a reduction of equity when the principal of claims is 95 to 98 percent paid.
How was that percentage chosen?
A. That percentage was chosen because in management's opinion, it gave a -- when it was most closely probable that PII would be paid.
Q. Is that particular percentage based on any accounting principle or accounting literature?
A. No, it is not.
Q. And was there a discussion of why 95 percent as opposed to 90 percent or 80 percent or something like that?
A. I believe different percentages were discussed, yes.
Q. Okay. And why was 95 percent chosen as opposed to, say, 90 percent or 85 percent or something else?
A. I don't know.
Q. Okay. If in a particular receivership 90 percent of the principal has been paid but it is

Page 472

clear that a receiver has enough net assets to ultimately pay 100 percent of the principal amount of claims, I take it that under this policy, the post-insolvency interest would not be booked, correct?
A. That's correct.
Q. Okay. In that situation, isn't it -- wouldn't it be considered probable that post-insolvency interest would have ultimately been paid at some level?
A. If you reviewed the financial statement and it had adequate cash but the cash was still not sufficient to bring it up to the 95 percent and it also had assets that were still unliquidated, depending upon what other operational expenses the receivership may experience, it may not get to 95 percent.
Q. Okay. But let's just assume that you look at the financial statements and you see enough assets there to give yourself assurance that you're going to make the 95 percent threshold, that you're going to make the hundred percent threshold, at some point. You just haven't done it yet.
Would you agree with me then that in that circumstance, it would be probable that

Page 473

post-insolvency interest would ultimately be paid out of that receivership?
A. Yes, I would agree with that.
Q. Who ultimately made the decision that this would be the way it would be treated and 95 percent would be the threshold? Who had that decision-making authority?
A. To the boast of my recollection, it would have been Karen Hughes.
Q. When this policy was adopted in May of 1998 was any consideration given to any effect it might have on tax liabilities of receiverships?
A. No, I don't think we discussed it -- any tax implications.
(A document was marked for identification as Exhibit No. Green-72.)
BY MR. COLATRIANO:
Q. Exhibit 72 is a printout of an e-mail from Elaine Tama to yourself, CC to Howard Finkelstein dated January 14, 1999, subject FIN 1309, and it's Bates stamped AM 0013715.
The e-mail in its entirety reads: The offensive team has requested the complete claims registered for this FIN. Please send to it me and

Page 474

I'll pass it over to them. Thanks.
What's the reference to offensive team mean? Is that the offensive goodwill team within FDIC?
A. Yes.
Q. You're a member of that team, correct?
A. Correct.
Q. Were you a member of that team as of January 14, 1999?
A. Yes, I was.
Q. What is the complete claims register? What does that refer to?
A. The claims register is a product maintained within the claims unit that lists all claims filed against a receivership.
Q. Okay. Why was the offensive team requesting the complete claims register?
A. As a matter of practice, we provided claim registers amongst other documents that we use in the preparation of goodwill financial statements and just any other general requests coming from the offensive team.
Q. Do you know what use was made of the complete claims register for Carteret by the offensive team?

Page 475

A. No, I don't.
(A document was marked for identification as Exhibit No. Green-73.)
BY MR. COLATRIANO:
Q. Exhibit 73 is a document titled Part A Interest Rates Set by the FDIC, a draft dated August 23, 2000 and Bates stamped AM 0011477.
Is this one of the documents you reviewed in preparing for this deposition?
A. Yes, it is.
Q. Have you seen this document before preparing for this deposition?
A. No, I did not.
Q. Okay. Do you know what this document is? Is it part of -- was it meant to be part of something else? Do you know?
A. I believe Elaine Tama was going through the process of developing a paper for the various interest rates set by the corporation.
Q. Do you know whether that paper was ever finalized?
A. No, I don't.
Q. Do you know what the purpose of that effort was? Why was she doing that?

Page 476

A. I don't know.
Q. I take it it was not at your direction?
A. No, it was not.
Q. Do you know at whose direction it was at?
A. No, I don't.
Q. This document talks about the interest rate used for the amount that the corporation owes the receiver as a result of the net wire transaction.
And says under basis for interest rate, the rate is based on the corporate cash management BIF monthly yield on overnight investments. (Average purchase yield -- overnight treasury investment rate.) Decision to base rate on this was made because this is the rate assuming that the funds were invested that the BIF is earning on the funds it held back from the receiver.
Is this an accurate statement for how the interest rate on escrowed funds due to receiver was calculated?
A. It has been my experience and what I have learned, that the interest rate being paid on the escrowed funds were based on the earnings -- the interest rate earnings on the funds of the receivership at the Federal Home Loan Bank in Chicago.

Page 477

Q. So your understanding is inconsistent with what is expressed in this document; is that correct?
A. That's correct.
Q. Do you know where she was getting this information from?
A. No. No, I don't.
Q. And I'm sorry, I know you mentioned it before, but please repeat for me where you are basing -- what you are basing your understanding on? Is it a particular document?
A. No. It's just communications. Speaking with staff in Washington.
Q. Have you had any communications with respect to this issue as it pertains to Carteret?
A. No.
Q. And so is it fair to say that your understanding of how this calculation was performed for Carteret is based on the more general discussions you had with staff?
A. Yes.
Q. Do you know how the rate that in your understanding was used for Carteret compares to the rate reflected in Exhibit 73? Is it higher? Is it lower?
A. Can you repeat, that please?

Page 478

Q. Yes. Your understanding is that the rate used for purposes of this calculation for Carteret -- and I take it for other receiverships -- was based on the rate that the receivership would earn on funds at the Federal Home Loan Bank of Chicago, correct?
A. Correct.
Q. And the understanding reflected in Exhibit 73 was that the rate was -- would be based on the corporate cash management BIF monthly yield on the FDIC corporate's overnight investments, correct?
A. Correct.
Q. Which of those rates generally is higher? How do those rates compare? Do you know?
A. No, I don't.
Q. Okay.
MR. COLATRIANO: Let's have this marked as Exhibit 74, please.
(A document was marked for identification as Exhibit No. Green-74.)
BY MR. COLATRIANO:
Q. Exhibit 74 is a memo dated February 22, 2001 from Thomas Bolt, B-o-l-t, to Karen Hughes, Gale Patelunas, P-a-t-e-l-u-n-a-s and Fred Ozyp, O-z-y-p, subject, Priority of Post-insolvency Interest on

Page 479

National Depositor Preference and it is Bates stamped AM 0010419 through and including 427.
Is this one of the documents you reviewed in preparing for this deposition?
A. Yes it is.
Q. Had you seen this document before preparing for your deposition?
A. Yes, I had.
Q. The only thing that I want to ask you about in this document is just to confirm -- I'd like you to take a look at Exhibit 27 from the first part of your deposition.
There's a chart dealing with post-insolvency interest. Do you remember talking about that chart?
A. Yes, I do.
Q. Okay. There's a reference under the line item All Federal and State Insured Depository Institutions and then under the column Applicable FDIC Guidance, there's a reference to a 2-22-2001 memo from Tom Bolt to Karen Hughes, Gale Patelunas and Fred Ozyp.
Do you see that reference?
A. Yes, I do.
Q. I just want to confirm for the record that

Page 480

the document being referred to in Exhibit 27 is the document that we've now marked as Exhibit 74? Is that right?
A. That is correct.
MR. COLATRIANO: Thank you. That's all I have for that document.
(A document was marked for identification as Exhibit No. Green-75.)
BY MR. COLATRIANO:
Q. Exhibit 75 is a printout of a series of e-mails, the first e-mail is from Bobby Bean to Elaine Tama dated May 31, 2001, subject Wednesday's PII Meeting Recap and Open Items, Bates stamped AM 0010242 through and including 243.
Have you reviewed this document in preparing for this deposition?
A. Yes, I have.
Q. On the second page of this document, the second page includes part of an e-mail from Karen Hughes dated May 30, 2001 to a list of recipients that includes yourself.
And there's a reference, the first bullet point on the second page, it says one concern raised at the meeting and also by another voice subsequently

Page 481

had to do with keeping the rate and its application simple to allow for outside parties to check the rate themselves and to minimize calculation errors (past experience with errors leaves bitter memories.)
Did you participate in the meeting that's being referred to here?
A. It's very possible that I did.
Q. Do you know who's being referred to as the -- another voice in this bullet point?
A. No, I don't.
Q. I take it it was not you, correct?
A. No.
Q. No, it was not you?
A. It was not me.
Q. Okay. Do you know what's being referred to by the parenthetical here, past experience with errors leaves bitter memories?
A. No, I don't.
Q. Do you have any recollection of FDIC having experience regarding errors in the calculation of post-insolvency interest?
A. No, I don't.
(A document was marked for identification as Exhibit No. Green-76.)

Page 482

MR. COLATRIANO: Exhibit 76 is a draft FDIC statement of position. Appears to be dated January 12, 2004, subject Accounting for Post-insolvency Interest, Bates stamped AM 0010386 through and including 392.
Let me just note for the record that our copy of this is missing page 2, which I think is probably just a copying problem, Andrew, on your end. If it is possible to get us that page, we'd appreciate it.
My question is really going to be about the first page anyway. Is this a document that you have reviewed in preparing for this deposition?
THE WITNESS: Yes, it is.
BY MR. COLATRIANO:
Q. Have you been involved at all in any discussions or analyses that led to the preparation of this draft statement position?
A. I was involved in the discussions addressing post-insolvency interest, yes.
Q. Discussions that -- during this time frame, 2003, 2004?
A. Yes.
Q. Okay. What types of discussions have you been involved in?

Page 483

A. Well, just the general issue of when to recognize post-insolvency interest, whether or not to book it as an equity adjustment as opposed to a statement adjustment.
Q. Have -- has the -- has this statement of position been finalized, do you know?
A. No.
Q. Has the FDIC in any other respect resolved the type of issues that you were just talking about that were discussed during these discussions that you've referred to?
A. No. The FDIC has not changed its policy.
Q. Okay. Is that because it's still considering it or has it made a decision not to change its policy?
A. It has made a decision at this point not to change the policy.
Q. Okay. So it's -- this -- it's an issue that is not still currently being discussed or analyzed? Is that a fair statement?
A. That's a fair statement.
Q. Why has it decided not to change its policy?
A. Well, because it felt that the policy in effect was a reasonable method both of calculating o

Page 484

triggering the calculation; and as far as recognition, the equity was consistent with its prior practice, or its current practice. It didn't -- we cannot find any reasonable purposes of changing the practice.
Q. Okay. Who actually drafted -- if you know -- this draft statement of position?
A. I believe Ms. Tama did.
Q. Was she advocating a change in practice or policy with respect to these issues?
A. Yes, she was.
Q. And the -- on the first page, under position, it refers to a new policy, which I take it has not been adopted but that would require that all receiverships recognize accrued post-insolvency interest beginning in the first year of the receivership.
I take it -- how would that have affected Carteret's reporting of post-insolvency interest if this policy had been adopted?
A. The post-insolvency interest would have first then been calculated beginning in 1994 and each year thereafter.
Q. Do you know how if, at all, if this policy had been in place from 1994 on, this policy would

Page 485

have affected Carteret's receivership tax liability?
A. To my knowledge, the amount of the accrual for either '94 and/or '95 would have been available as a deduction on the tax return.
Q. Okay. So is it fair to state, all else being equal, that would have resulted in a reduction in the Carteret receivership tax liability?
A. To my knowledge, yes.
Q. Besides Ms. Tama, did anyone else who was part of these discussions share her view regarding when the post-insolvency receivership liability should be reflected on financial statements?
A. Yes.
Q. Who else?
A. I believe Elaine's supervisor Vanessa Hester had similar views that Ms. Tama did.
Q. Who was the ultimate decision-maker with respect to whether this policy would be changed?
A. Karen Hughes.
Q. I take it that she disagreed with Ms. Tama, correct?
A. I can't say with any certainty that it actually went up to Ms. Hughes for decision either way. Just -- the group that had been discussing PII could not come to an agreement to change the method.

Page 486

Q. Okay. Was one of the considerations discussed or analyzed by the group in connection with this proposed change the effect that the policy would have on receivership tax liabilities?
A. It was discussed, yes.
Q. Okay. What do you recall about those discussions?
A. That the receiverships would be able to take those deductions in the year of the actual accrual as opposed to waiting until they met the 95 percent threshold.
Q. And I take it that that reason was not in and of itself sufficient to cause the group to decide that this policy change needed to be made, correct?
A. Correct.
Q. Why was that?
A. Because so very few receiverships ever reached the point of paying PII. They only reached the next lower level of federal income tax liability.
Q. In analyzing this issue, was there any discussion regarding how this issue would affect receiverships involved in goodwill litigation as opposed to other receiverships?
A. No.
MR. COLATRIANO: I would like to have this

Page 487

document marked as Exhibit 77, please.
(A document was marked for identification as Exhibit No. Green-77.)
BY MR. COLATRIANO:
Q. Exhibit 77 is a printout of an e-mail -- a series of e-mails. The first e-mail is dated February 8, 1999, from Elaine Tama to a distribution list. You are listed as a CC on that distribution list.
Subject: Income tax note to receivership financial statements. It is Bates stamped AM 0010845. Is this one of the documents you reviewed in preparing for this deposition?
A. Yes, it is.
Q. Okay. What generally was your involvement in any discussions or analyses regarding the income tax issue discussed in this exhibit?
A. Well, I had discussions with Bob Ferrer in the development of the footnotes and just over the course of time, we developed the footnotes that are tied to the financial statements and the tax liability is a specific footnote and that's it.
Q. The first paragraph of the e-mail, Ms. Tama says, I also think the generally worded

Page 488

footnote sounds fine for this year except for one glaring problem: All those receiverships which have income tax liability recorded because they have proven income tax claim certificates. I ran a dump of OC3 liability type, and there are some large dollar amounts out there. One of those out there is a goodwill case with a 10 million dollar liability recorded.

Do you know what goodwill case she's referring to?
A. No, I don't.
Q. What is the reference to OC3 liability type?
A. The OC3 is a liability type designation for an income tax liability.
Q. Was Carteret a receivership which had an income tax liability recorded as of the time of this e-mail?
A. No. Carteret did not have an income tax liability recorded.
Q. What is a proven claim certificate in this context?
A. A proven claim certificate is an actual document given to a claimant designating their claim as the receivership.

Page 489

Q. And in the context of tax claims us it would be a document, a certificate given to the IRS?
A. That's correct.
Q. And what was the process for issuing one of those? How was it decided whether or not to issue one of those proven claim certificates?
A. In some of the -- well, FDIC and RTC offices, the best that I can recollect is that the claims department actually issued receiver certificates or the proven claim certificates, to the IRS for the amount of the federal income tax liability.
Q. And how was it decided to do that? I mean, what was the process? Did they just -- the IRS made a claim, they said okay, here's a receiver certificate? Or how was that reviewed?
A. Well, it could be the method you just described; or as a result of the receivership actually completing a tax return, which resulted in a tax liability, and the tax unit would have sent a copy of that return to the claims department, and they would have issued a receiver certificate to the IRS.
Q. Okay. But are you saying that that was not a consistent practice or policy for the claims

Page 490

department to issue a receiver certificate just because the receivership had filed a tax return?
A. That's correct.
Q. Okay. Has a receiver certificate ever been issued to the IRS by the Carteret receivership?
A. Not to my knowledge.
(A document was marked for identification as Exhibit No. Green-78.)
BY MR. COLATRIANO:
Q. Exhibit 78 is a May 17, 2000 memo from James Anderson to Karen Hughes, subject: Tax issues related to the goodwill litigation. Bates stamped AM 0010654 through and including 659.

Have you reviewed this document in preparing for this deposition?
A. Yes, I have.
Q. Is it a document you've seen before preparing for this deposition?
A. No, it is not.
Q. Okay. On the first page, next to the last paragraph refers to an April 1999 meeting between representatives from FDIC legal and DOF and representatives from the IRS national office.

Do you know who from FDIC attended that

Page 491

meeting?
A. No, I don't.
Q. I take it you did not attend that meeting?
A. No, I did not.
Q. Okay. On the second page, top paragraph, it says there are a number of receiverships including several goodwill FINs where the tax liability is greater than it should be if carry backs and amended returns had been filed as permitted by law.

Based on your knowledge, would Carteret be included in that category as a receivership where the tax liability is greater than it should be if carry backs and amended returns had been filed as permitted by law?
A. Yes, it is.
Q. Okay. There's a -- this memo goes on to discuss possible reasons for why such carry backs or amended returns were not filed or not used.

What is your understanding for why a carry back or amended return was not utilized for Carteret?
A. I'm sorry. Repeat that question.
Q. Yeah. The memo goes on to talk about why -- possible reasons why carry backs or amended returns were not utilized for some of the receiverships which resulted in them having a greater

Page 508

AFTERNOON SESSION
(1:12 p.m.)
Whereupon,
WAYNE S. GREEN,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL
FOR PLAINTIFFS (RESUMED)
MR. COLATRIANO: Good afternoon, Mr. Green.
THE WITNESS: Good afternoon.
(A document was marked for identification as Exhibit No. Green-84.)
BY MR. COLATRIANO:
Q. Exhibit 84 is a printout of e-mail, a memo from William Kroener, general counsel, to all employees dated July 23, 1996, subject: Separation of FDIC goodwill litigation groups, Bates stamped AM 0011889 through 893.
Is this a document you reviewed in connection with preparing for this deposition?
A. Yes, it is.
Q. Had you seen this document prior to

Page 509

preparing for this deposition?
A. Yes.
Q. Is this the memo that set up the fire wall between offensive and defensive goodwill teams at FDIC?
A. I believe it is.
Q. At the bottom of the first page, it talks about the fact that since before RTC's sunset, there had been a group at the FDIC assisting the Department of Justice in defending the goodwill suits; do you see that?
A. Yes, I do.
Q. The top of the second page says until recently this arrangement did not present a significant practical problem within the FDIC because the viability of goodwill claims was not established.
Such claims belonged to operating institutions or thrifts under the supervision of the RTC. Do you see that?
A. Yes, I do.
Q. Do you know what's meant by the viability of goodwill claims?
A. No, I don't.
Q. Is it your understanding that prior to this general time period, say July -- June or July of

Page 510

1996, the FDIC was -- to the extent FDIC employees were working on goodwill litigation, it was in a defensive capacity?
A. I don't know.
(A document was marked for identification as Exhibit No. Green-85.)
BY MR. COLATRIANO:
Q. Exhibit 85 is an October 9, 1996 memo from Alvin Kitchen to all units, offices and divisions of the FDIC, subject: Charging of goodwill litigation related expenses, Bates stamped AM 0010898 through and including 899.
This is a document you reviewed in preparation for this deposition?
A. Yes, it is.
Q. Had you reviewed this document before preparing for your deposition?
A. Yes.
Q. Is it fair to say that this memo discusses accounting instructions for coding the expenses related to work on goodwill litigation?
A. Yes, that is a fair statement.
Q. It talks about two groups, the offensive group and the defensive group, correct?

Page 511

A. Correct.
Q. Okay. Under the defensive group on the first page, there's a discussion of coding defensive litigation expenses to something called program code 90. What was program code 90? Do you know?
A. No, I don't.
Q. There's a parenthetical that says using program code 90 will ensure those receiverships not involved in the litigation will not bear any of the expenses.
Do you see that?
A. Yes, I do.
Q. Does this mean that receiverships that were involved in the goodwill litigation were going to bear the expenses of the defensive litigation group?
A. Could you repeat that question?
Q. This parenthetical says that using this code will ensure that those receiverships not involved in the litigation will not bear any of the expenses.
Do you see that?
A. Yes, I do.
Q. I was wondering whether that meant that the converse of that was true? In other words, does

Page 516

preparing for this deposition?
A. Yes, it is.
Q. The third paragraph in the e-mail says, one issue is unclear. Should time spent on preparing the receivership statements supporting documentation, et al., in cooperation with you and Gary (when the firewall is down) be charged to DOJ as each side should share in that administrative cost based on the team members' support or are those costs FDIC/DOF responsibilities and not chargeable to either team.
Do you know how this issue was resolved?
A. In regards to the preparation of financial statements or the goodwill package?
Q. Yeah. The issue discussed here, the time, expense on preparing et cetera of receivership statements and supporting documentation?
A. If you were working on the goodwill financial statements in general, then that is not charged to a receivership. If you were working on the offensive side in relation to a goodwill FIN, you charge that FIN with a project number. To my knowledge, none of that time was charged to DOJ or on the defensive side.
Q. Do you know why that decision was made not to charge the defensive side?

Page 517

A. No, I don't.
Q. What's the reference to when the fire wall is down? What does that mean?
A. When -- I would infer if someone was in a neutral capacity.
Q. Do you know who the Gary is that's being referred to here?
A. During that time frame, I would speculate it would be Gary Bojes.
Q. Was he on one team or the other, offensive or defensive?
A. I think Gary was in the neutral capacity.
Q. Were there times when members of offensive and defensive teams would work with each other on matters involving goodwill financial statements?
A. There may have been times when people on both sides worked on compiling the information or gathering information or documents, yes.
(A document was marked for identification as Exhibit No. Green-90.)
BY MR. COLATRIANO:
Q. Exhibit 90 is a memo dated November 12, 1997 from Alvin Kitchen to all units, offices, and divisions, subject: Charging goodwill litigation

Page 518

expenses in FIMS. It is Bates stamped AM 0010682 through and including 684.
This is a document you reviewed in preparing for this deposition?
A. Yes, it is.
Q. Is this a document you have reviewed previously?
A. I believe I have seen this previously, yes.
Q. On the bottom of the first page is a discussion of offensive litigation and the fund code 9955. It says the expenses in fund 9955 will be reversed and located as direct charges to the specific FINs involved in the litigation on an, it seems to me, annual basis. 50 percent allocated pro rata to those FINs in litigation, currently 42 FINs and 58 percent allocated on direct charges to date.
Who made the decision that this would be the allocation methodology?
A. I don't know.
Q. What was the basis for this 50 percent/50 percent split?
A. I don't know.
Q. With the 50 percent allocated pro rata to

Page 519

the FINs in litigation, what was meant by pro rata? Does that mean each one gets 1/42 of those expenses or is it done on some other basis?
A. I believe it is the 1/42 computation.
Q. This document, you recall Exhibit 85 which was the previous Kitchen memo split up expenses between the offensive and the defensive groups. Do you recall that?
A. Yes.
Q. This memo a year later has a neutral activity category. Do you see that?
A. Yes, I do.
Q. Was this the first time that there was an effort to create a third category for neutral activity?
A. I believe it is.
Q. Are neutral activity expenses located to receiverships?
A. I believe it is.
Q. And how is it allocated?
A. Well, your time that is charged to the 9955 if you're working in a particular office again goes into that pool and that gets allocated to the receiverships.
Q. So if somebody is working on a neutral

Page 520

activity and they charge all their time to 9955, I take it that all that time would then be allocated to receiverships?
A. If you were in a consolidated office, yes. If you were in, say, an office in Washington, then part of your time could get allocated to receiverships through the pool process.
Q. Okay. Is there any intent to allocate any of the neutral activity time to the defensive side?
A. Not to my knowledge, no.
Q. What was the basis for allocating the neutral time that's recorded in 9955 all to the receiverships?
A. Well, I believe that the concept was that a person, particularly in a consolidated office, would be working on receivership issues, period.
Whether it's a non-goodwill receivership issue or not, their time would be charged and allocated to the receiverships.
Q. Is it fair to say that the neutral activities benefitted both the offensive and the defensive sides?
A. Yes. That is a fair statement.
Q. This memo says these changes are effective December 1 of 1997.

Page 521

Was there any effort to reclassify previously incurred expenses to the neutral category?
A. Not to my knowledge, no.
Q. The third page of this exhibit has a chart for goodwill and direct -- excuse me, goodwill, indirect expenses through September 1997.
I take it based on your prior answer that you don't have any way of knowing of the amounts shown here how much of them would qualify as neutral expenses if the new policy had applied when these expenses were incurred?
A. Well, if you were in a neutral position, you would not have been using either one of these project numbers.
Q. Even before this change in policy, is that true?
A. Yes.
Q. And I take it -- was project No. 50057 created at the time this new neutral activity category was created?
A. I believe it was.
Q. Okay. So prior to that time, if somebody performed an activity which, under this policy, would be billed to project number 50057, what project number would it have been billed to?

Page 522

A. I'm sorry? What was that -- I couldn't hear the question.
Q. What project number would it have been billed to prior to this policy, prior to the creation of the 50057 project number?
A. There would not have been a project number for it to have been charged.
Q. So what would have been charged for that activity?
A. Just standard coding, 9955.
Q. Okay. Okay. Thank you.
Have you heard of a document called the Goodwill Executive Report?
A. No, I have not.
(A document was marked for identification as Exhibit No. Green-91.)
BY MR. COLATRIANO:
Q. Exhibit 91 is a document entitled Goodwill Issues Payment of Dividends, October 17, 2001, Meeting Minutes.
It is labeled a draft, and -- at the bottom of the page. It is Bates stamped AM 0010003 through and including 008.
You reviewed this document in preparation

Page 523

for this deposition?
A. I have.
Q. You're listed as an attendee at this meeting held on October 17, 2001. Do you recall attending that meeting?
A. I remember listening in on a telephone call.
Q. Okay. Were there periodic meetings of the -- is this the offensive team?
A. Not necessarily, no.
Q. Okay. Of these attendees listed, are they -- are any of them defensive team?
A. From the names listed on there, I don't believe.
Q. How about neutrals?
A. Yes.
Q. Which ones?
A. I believe Carol Edwards, Clifton Ford, Vanessa Hester, Johnny Wells, Rick Cywinski, Sharon Kelly, Warren McCormick, Geneva Samuels.
Q. The other two attendees are yourself and Elaine Tama, correct?
A. Correct.
Q. You were both offensive team?
A. Yes.

inactive.
Q. And was there an issue about locating such certificates of termination for nine receiverships?
A. I believe there was.
Q. And how was that resolved?
A. I don't know if those were ever located.
Q. Do you know whether the receiverships that are being referred to here are considered inactive today?
A. I believe they are.
Q. And I take it those are nine receiverships that no longer have any litigation pertaining to goodwill claims pending?
A. That I don't know.
(A document was marked for identification as Exhibit No. Green-92.)
BY MR. COLATRIANO:
Q. Exhibit 92 is a document entitled Accounting Concepts, FDIC Receiverships, dated September 30, 2004, Bates stamped AM 0011857 through and including 885.
Have you reviewed this document in preparing for this deposition?
A. Yes, I have.



Q. Have you seen this document before preparing for your deposition?
A. Yes, I have.
Q. Have you played any role in preparing this document?
A. I have seen the document previously, offered some comments on the contents of the document, yes.
Q. What was the purpose of this document?
A. The purpose of this document was Elaine Tama's effort to just formalize in writing the conceptual framework for FDIC receiverships from an accounting perspective.
Q. So Ms. Tama prepared this document?
A. Yes, she did.
Q. Was it approved by anybody above Ms. Tama? What is the status of this document in the FDIC?
A. This document is available on the Division of Finance Web page as just a general information document.
Q. I've seen other documents that are called statements of position or statements of policy or accounting policy statements.
I take that it this document doesn't have that type of authoritative status as one of those



types of documents; is that a fair statement?
A. That's a fair statement.
Q. If you recall on February 28, when you were first deposed in this case, you brought to that deposition a chapter from a RTC manual regarding subrogating claims.
Do you remember that?
A. Yes, I did.
Q. And so we identify it for the record, it is Exhibit 2; is that correct?
A. Yes.
Q. And you testified specifically about a statement in Exhibit 2 regarding the fact that the amount of the subrogated claim is not the amount of the net wire but the gross amount of the liabilities transferred to the acquirer.
Do you remember that discussion?
A. Yes.
Q. That discussion comes in a paragraph that uses the example of a DITA. Take a look. It is right at the bottom of that page.
What is a DITA?
A. I believe that's the initials for a deposit insurance transfer agreement.
Q. How does that differ if, at all, from a



purchase and assumption agreement?
A. A purchase and assumption agreement I believe would also include the acquisition of some assets.
Q. Okay. And have you heard an acronym or seen an acronym DOTA?
A. No, I have not.
Q. Excuse me one second.
On page 10-7 of this exhibit -- if you don't mind I'm going to come over to read over your shoulder for a second.
10-7 of Exhibit 2 has a statement that you referenced in your previous testimony about the amount of the subrogated claim is not the amount of the net wire but the gross amount of the liabilities transferred to the net wire.
You remember that?
A. Yes.
Q. Okay. Later on, on that page, it says in order to be included in the CPOC, insurance funds must have actually been spent.
I was wondering if you could reconcile those two statements for me? Is there a way to reconcile those two statements?
A. No.

Q. You don't know of a way to reconcile those two statements?
A. No.
Q. Okay. And I take it in respect to Carteret, the amount of the subrogated claim was not limited to the amount of funds actually spent, correct?
A. That's correct.
Q. Okay.
MR. COLATRIANO: Let's go off the record.
(Discussion off the record.)
(A document was marked for identification as Exhibit No. Green-93.)
BY MR. COLATRIANO:
Q. Exhibit 93 is a chapter or a portion of one of the manuals that we produced during the week of your initial deposition. This document is labeled Accounting for Receivership Liabilities Bulletin.
Are you familiar with this document?
A. I believe I have seen this in the past, yes.
Q. How are -- how does the FDIC determine whether there are sufficient funds available in a receivership to declare a dividend or pay a dividend?



A. The FDIC looks at the amount of cash on hand; it looks at the -- when it does a quarterly cash flow review, it will look at any pending litigation that's on the books. It looks at other liability accounts that are on the books.
It factors in an estimate, an average of the prior six months operating expenses, so it will set up -- it will come up with a reserve calculation.
Then it will look at the cash assets on hand; and if that net difference equates to either a 2 percent dividend or $500,000 or more, it will pay a dividend.
Q. What you just described, is that the occurrence policy or is that a fair statement or what the policy has been for some time?
A. That's what the policy has been for some time.
Q. And how if, at all, does that relate to the RTC's policy for declaring dividends for its receiverships? Is it a similar type of process?
A. I think it was.
Q. Was this an automated process, the calculations that you just described? Were they done automatically every quarter?
A. There have been reports that actually came



out with that calculation. I don't think it factored in the average of the prior six month expenses, but it would look at certain general ledger accounts that would appear on this report and come up with a net available for cash; then we would have to manually interject the six-month expenses.
Q. Okay. And if -- as a result of that analysis the receivership met the threshold that you talked about -- I think you said ability to pay a 2 percent dividend or 500,000 dollars in available funds -- if it met that threshold, was there any discretion involved about whether to pay a dividend at that point? Or the dividend necessarily needed to be paid at that point?
A. Once it met the threshold, it would go into the pipeline for a dividend to be paid.
Q. What do you mean by pipeline?
A. Well, with the number of receiverships that we deal with, it would be in the pool that an accountant would have to actually go ahead and process the dividend for that quarter.
Q. At that point, if I met the threshold, a dividend would be paid? It wasn't as though somebody else had to make a decision using discretion or some other type of factor, that the dividend should be



paid or should not be paid?
A. No. As long as we had received a dividend case from the claims department, then a dividend would be paid.
Q. Okay. On page 5 of this exhibit, Exhibit 93, there's a discussion Liquidation Accounting. I'm referring to the page number in the upper right-hand side corner.
It says it is extremely important that Liquidation Accounting staff ensure the continuing reconciliation of receivership and Corporate due to/due from accounts, as well as claims paid to date. Then it says dividends should not be distributed without this reconciliation.
What -- can you describe what type of reconciliation you're talking about, this document is talking about?
A. What they're talking about is a reconciliation of all the liability accounts on the books of the receivership. And a reconciliation between the account on the books of the receivership where the corporation had a reciprocal balance account on its books, that they had to be equal. They had to balance to each other.
Q. Okay. And was that something that was

Page 560

A. No. You cannot tell by the account description.
Q. Nor by the account number, correct?
A. Nor by this account number, no.
(A document was marked for identification as Exhibit No. Green-102.)
BY MR. COLATRIANO:
Q. Exhibit 102 is a chapter or an excerpt from the NFSC accounting manual for N series and S sears transactions. We took this out of one of the manuals produced to us the week of your original deposition.
Are you familiar with the accounting for N series and S series transactions?
A. I have read the document. I haven't had the experience of recording any transactions related to S series transactions.
Q. My knowledge is that these transactions were sales or transactions involving pools of assets from various receiverships, correct?
A. Correct.
Q. And they were pooled together and sold as a security; is that correct?
A. Yes.

Page 561

Q. Okay. How -- do you know generally how the accounting worked as far as how proceeds from these sales or any other income related to these sales were allocated to the various receiverships that contributed the assets?
A. The proceeds that were generated from the sales of the securitizations or actually any income generated were handled by a particular unit in Washington that when they got the monthly remittances or the initial sales proceeds, it was my understanding it was allocated based on the weighted average of the receiverships' contribution to the particular securitization.
Q. And how was that contribution determined or calculated or valued? Do you know?
A. No, I don't.
Q. Okay. And who was responsible for that determination?
A. There was a Washington unit that handled the particular sales.
Q. Was that a unit within DRR or within the DOF or do you know?
A. It was within DRR.
Q. Okay. Do you know who headed that unit?
A. Not -- it was either George Alexander or

Page 562

Ralph Malami.
Q. I'm sorry?
A. Ralph Malami.
Q. Do you know when these pools of assets were put together whether there was any effort to compare the comparative quality of the underlying assets being contributed from one institution versus another institution?
A. I don't know.
Q. Do you know whether personnel responsible for particular receiverships had any input in how -- or particular conservatorships -- had any input with respect to how the assets being contributed were valued for purposes of allocating proceeds or income from these sales?
A. I don't know.
Q. Okay.
(A document was marked for identification as Exhibit No. Green-103.)
BY MR. COLATRIANO:
Q. Exhibit 103 is a document entitled Executive Summary, Mortgage Securitization Case, RTC 1993 S2 case. It is Bates stamped AM 55581943 through and including 1959.

Page 563

Have you seen this document before?
A. I don't believe I have.
Q. Turn to the page Bates stamped 1949. There's a discussion that actually begins on the prior page regarding the analysis of proceeds.
But paragraph 9 on page 7 says allocate among the conservatorships and receiverships from which the mortgage loans are delivered to the trust in accordance with applicable accounting principles following: The net proceeds received from the sale the bond and class A certificates and class B certificates.
Do you know what applicable accounting principles are being referred to here?
A. No, I don't.
Q. To your knowledge did the RTC account for these transactions simply to how you described how the FDIC accounted for them?
A. To my knowledge, yes.
(A document was marked for identification as Exhibit No. Green-104.)
BY MR. COLATRIANO:
Q. Exhibit 104 is a document -- I apologize for the quality of the print on it -- it is titled