# EXHIBIT 1

ORIGINAL

FILED
DEC 21 1999
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION AND CARTERET BANCORP, INC.

Plaintiffs,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Intervenor,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No. 93-531
(Chief Judge Loren Smith)

**PLAINTIFF'S MOTION**
**TO SUSPEND THE EXPERT DISCOVERY PERIOD**

1. Pursuant to RCFC 6(b), plaintiffs AmBase Corporation and Carteret Bancorp (collectively, "AmBase") hereby respectfully move the Court to grant a suspension of the discovery of expert witnesses as set forth in paragraph V of Procedural Order No. 2, issued by this Court August 11, 1997. As explained below, this request to suspend expert discovery is based on the desire to control the substantial cost and effort that will be incurred by both the parties and the

Court in undertaking expert discovery on the damages associated with the AmBase Takings Clause claim.

2. The fact discovery period for the above-captioned case ended on November 30, 1999. Under paragraph V(1) of Procedural Order No. 2, AmBase must identify the witnesses it intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence thirty days after the completion of fact discovery, so that the identification deadline as currently formulated is December 30, 1999. The schedule set forth under Procedural Order No. 2 then requires that AmBase deliver to defendant a written report prepared and signed by each expert witness within 60 days of the date of identification, so that the reports would be due February 28, 2000. Finally, paragraph V(3) provides an additional 90 days from the date the defendant receives each report to allow defendant to depose each of AmBase's expert witnesses.

3. On September 9, 1999, AmBase filed a Motion for Partial Summary Judgment On Liability ("the AmBase Summary Judgment Motion"). The AmBase Summary Judgment Motion set forth the facts and legal argument that establish the defendant's liability for taking AmBase's wholly owned subsidiary, Carteret Savings Bank ("CSB"), without payment of just compensation, in violation of AmBase's investment-backed expectations and constitutional rights under the Takings Clause of the Fifth Amendment.

4. The legal arguments advanced in the AmBase Summary Judgment Motion are unique among all *Winstar*-related cases. Specifically, AmBase is not

asserting a breach of contract action against defendant, but rather is asserting a constitutional claim under the Takings Clause of the Fifth Amendment for the taking of its bank, as a direct result of defendant's enactment and implementation of certain provisions in the Financial Institutions Reform, Recovery, and Enhancement Act ("FIRREA").

5. Determining the appropriate damages to be awarded as just compensation for the taking of AmBase's bank will involve the use of both factual evidence and the testimony of bank valuation experts. Given the potential damages at stake, the expert discovery necessary to determine the value of Carteret (and the inevitable discovery skirmishes associated with it) will require substantial resources of both the parties and the Court. These resources will be devoted to developing expert testimony to determine the fair market value of Carteret Savings Bank as of the time of the taking.

6. The costs of pursuing expert discovery, both for the parties and for the Court, may be significantly reduced if this discovery is postponed until after a decision has been rendered on the AmBase Summary Judgment Motion. Once the AmBase takings claim has been decided, the parties will know whether or not to pursue the question of Carteret's fair market value as of the date of the taking, and may, in addition, have further guidance as to the date on which that fair market value should be determined. This increased knowledge as to the dimensions of expert discovery may save substantial resources that might otherwise be wasted.

7. For the foregoing reasons, AmBase respectfully asks the Court to suspend the scheduled timing for Expert Discovery until after the AmBase Summary Judgment Motion has been decided. Accordingly, plaintiff AmBase would identify its experts pursuant to paragraph V(1) of Procedural Order No. 2 within 30 days of the decision of this Court on the AmBase Summary Judgment Motion, and would therefore produce expert reports and make experts available for depositions in accordance with the timeframes set forth in paragraphs V(2) and V(3) of Procedural Order No. 2, respectively.

8. Pursuant to RCFC (6)(b), plaintiffs have discussed this motion with counsel for defendant, who have represented that they do not agree to consent to the motion, and with counsel for FDIC, who have represented that they agree to consent to the motion.

December 21, 1999

Respectfully submitted,

Charles J. Cooper

Counsel of Record

Michael W. Kirk
David H. Thompson
Hamish P.M. Hume

Cooper, Carvin & Rosenthal, PLLC
1500 K Street, N.W.
Suite 200
Washington, D.C. 20005
(202) 220-960

Of counsel:

Laurence H. Tribe
Brian K. Koukoutchos
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-4621

John C. Millian
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5305
(202) 955-8500

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of December, 1999, I caused to be served by hand delivery PLAINTIFF'S MOTION TO SUSPEND THE EXPERT DISCOVERY PERIOD on the following:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

James J. Igo, Esq.
Bruce Taylor, Esq.
FDIC Legal Division
550 17th Street, N.W.
#PA 1730-3046
Washington, DC 20429

Melissa Klein

# EXHIBIT 2

**Ambase v. U.S. No.: 93-531C October 2, 2000**

**Heritage Reporting Corporation**

**Page 1 to Page 146**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 5

Judge Smith. I am Charles Cooper. I represent the two private Plaintiffs in this case, Ambase and Cartaret Bank Corp. I and my colleagues do not represent Cartaret Savings Bank. Cartaret Savings Bank, as the Court knows, is represented by the FDIC, the receiver for Cartaret Savings Bank.

This case, like the Republic case, Your Honor, is unique in the Winstar docket in the sense that the private Plaintiffs are not asserting a contract claim. Our only claim, as our summary judgement motion makes clear, is a takings claim and an illegal exaction claim. But our focus, of course, will be on the takings claim today.

We don't assert a contract claim, Your Honor, because we have none. My clients bought the thrift in 1988, a few years after the goodwill contracts that will be at issue momentarily were enacted – were entered.

Your Honor, I am joined today by co-counsel, Professor Laurence Tribe.

THE COURT: Mr. Tribe, good to have you back in court. It seems like years ago you were here at our initial conference.

PROFESSOR TRIBE: Right. Good to see you.

MR. COOPER: And Professor Tribe and I will be dividing the labors if the Court please on behalf of Ambase. And I will refer to our clients collectively as Ambase as we

Page 6

all will. Also, Mr. John Millian is co-counsel in the matter, as well.

MR. MILLIAN: Good morning, Your Honor.

THE COURT: Mr. Millian, good to see you again.

MR. COOPER: And Mr. Millian is joined by his partner, Paul Blankenstein, also from Gibson, Dunn and Crutcher.

THE COURT: Good to see you. I know all these people from enumerable coordinating committee meetings.

MR. COOPER: That's right. And, Your Honor, Brian Koukoutchos, Mr. – Professor Tribe's colleague, is with us.

THE COURT: Good to have you with us.

MR. COOPER: And I think you will recognize my colleagues, Mike Kirk and Hamish Shoom, also at counsel table with me.

MR. KIRK: Good afternoon, Your Honor.

THE COURT: Good to have you both with us.

MR. COOPER: I would, as well, like to introduce our client, Your Honor, the Chairman and Chief Executive Office of Ambase, Mr. Richard Bianca.

THE COURT: Good to have you here. And, Mr. – that's right. You are –

MR. IGO: I am James Igo with the FDIC, Your Honor, here representing FDIC as successor to the interest of Cartaret Savings Bank. I have with me today Bruce

Page 7

Taylor. I am going to be dealing with the contract issues and Mr. Taylor is going to be responding to the takings claim. And I also have with me Mr. Thomas and John Stuart from the FDIC.

THE COURT: Good to have you all with us. I guess I got to see you a lot in the Sioux's case, but not hear from you very much. But –

MR. IGO: Well, in light of the fact that our time was going to come out of Mr. Wilner's, I thought that discretion was the better part of balancing.

THE COURT: Thank you, Mr. Igo. Good to see you again.

MR. LEVITT: Good afternoon, Your Honor. I am David Levitt representing the United States. And my colleague –

THE COURT: Mr. Melnick, nice to see you.

MR. LEVITT: – I will let him introduce himself, Mr. Mark Melnick.

THE COURT: Mr. Melnick, good to see you again.

MR. MELNICK: Good afternoon, Your Honor.

THE COURT: It has been a while.

MR. MELNICK: It is good to see you, too.

MR. LEVITT: And Mr. Melnick will be dealing with the takings issues and I will be dealing with the contract issues.

Page 8

THE COURT: All right. Let's get underway with Mr. Igo. If you want to lead off on the contract issues.

MR. IGO: Your Honor, some time ago, the FDIC filed its short form motion for summary judgement on contracting breach on two supervisory actions – or two sets of supervisory transactions which took place in 1982 and 1986.

Not withstanding the short form nature of the proceedings, I think the Court has noted that the issues have been pretty extensively briefed. And I think it is fair to say that the major outlines of the transactions, the fact that they were supervisory acquisitions, the fact that goodwill was created, are not in dispute.

And like the other cases that Your Honor has recently looked at, this one is based largely on documents. And there is no dispute about the material dispute of fact about the documents in the case, but only the interpretation of those documents.

In addition, the FDIC has submitted two affidavits, one from Mr. O'Brian who is the former CEO and Chairman of Cartaret which covers the 1982 and the 1986 transaction, and Mr. Fosset who is outside counsel to Cartaret on the 1982 transaction. These affidavits are factually uncontroverted.

Mr. Levitt has filed an affidavit which

Page 37

to the Court that the 3rd Circuit did not really say what counsel for the government says it said. It said as follows, "The language in the documents in the record pertaining to the 1986 transactions makes Cartaret's contract claims somewhat more tenuous. This is on the heels of already saying that the '82 deal" – "there is plenty in the record to support this contract. But OTS has not pressed any distinction between the 1982 and 1986 transactions for this purpose."

Your Honor, I also can't resist but point out that with respect to this disclaimer argument, this offer that says we are not looking for an accounting forbearance, just a written acknowledgement of, and then it cites exactly the accounting forbearances that it wanted and that in every other case have been found a contract.

The reason they said we are not looking for an accounting forbearance is very clear from the context of the negotiations and from the accountants letter that was provided in response to the resolution that required an accountant's letter, Your Honor, on purchase method accounting. And that is the bank and its professionals believed that 25-year amortization was within GAAP. Peat Marwick's letter said that 25-year amortization is within GAAP.

In light of that fact, they were saying we are not

Page 38

looking for some deviation, some ability to deviate from GAAP. We are looking for GAAP. But we want written acknowledgement that we will get this 25-year amortization period. And that is exactly what the regulators gave them.

So this is an expressed contract if I can just perhaps amend slightly I guess my endorsement of Mr. Igo's argumentation. It was an expressed contract in 1986 no less than in 1982. And that is about two minutes of my time, Your Honor.

(Laughter.)

THE COURT: I thought we went over it for you, but permissible. Mr. Levitt, do you want to respond, particularly to those – Mr. Cooper's comments and also Mr. Igo's that the course of conduct seems to indicate that the FSLIC and the Home Loan Bank Board and initially OTS were treating this as a deal, whether it be –

MR. LEVITT: I just want to make a couple of points.

THE COURT: Okay.

MR. LEVITT: One is I am delighted Mr. Cooper announced that there is no – they are not seeking a relief on an expressed contract. I would point out that a complaint they filed had an account for a relief on an expressed contract. So I take it the verbal statement is amending the complaint. That is one thing I wanted to point out.

Page 39

The second thing is I don't agree with the point that there is some kind of GAAP divergence on the interest method versus straight line. If you read FASB-72, it says pretty clearly it is straight line.

It said, "Amortization shall be a constant rate" - - I am reading it now – "when applied to the carrying amount of those interest-bearing assets that based on their terms are expected to be outstanding at the beginning of each subsequent period." It has always been straight line on the – it has been interest method on the accretion of the discount, but always straight line on the amortization.

The third point I might make, and then I will sit down, is that Mr. Cooper points out that – I'm not sure what he pointed out, but it was something like it is true they called it an acknowledgement, but it was really a forbearance. But that is inconsistent with the fact that they sought a forbearance and then they changed it to be an acknowledgement.

And it is also inconsistent – I mean, he also assumes that the government went along with the acknowledgement when he hasn't denied and no one has because it can't be denied, there is no evidence the government ever responded to the acknowledgement by acknowledging it one way or the other.

On the practice issue, it is not relevant. I

Page 40

mean, it is a red herring because they accounted in accordance with GAAP. The Board accepted it in accordance with GAAP. That doesn't mean there was a contract. It meant that there was a regulation that provided GAAP accounting applied and they were applying GAAP accounting. It doesn't cut one way or the other.

THE COURT: I thought GAAP changed at some point near that period. I thought it was September – again, September of '82 that GAAP changed.

MR. LEVITT: Right.

THE COURT: And so the government still allowed Plaintiff, as I understand it, to account for that by the old GAAP. It wasn't GAAP anymore once GAAP had changed.

MR. LEVITT: With respect to the '82, that's right. They solidified that the government would agree that the rendition of GAAP prior to that time would be the rendition that they would apply. That is the only thing that was solidified in, not that purchase accounting would be –

THE COURT: That it was –

MR. LEVITT: – by contract and not that any particular amortization period – the risk was on them.

THE COURT: But that was a forbearance, wasn't it?

MR. LEVITT: The only forbearance – yes. The forbearance was that a certain rendition of GAAP applied.

# EXHIBIT 3

**Winstar v. U.S.   No.: 90-8C   October 17, 2000**

**Heritage Reporting Corporation**

**Page 1 to Page 79**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
PLAINTIFFS IN ALL WINSTAR RELATED )
CASES AT THE COURT. )
Plaintiff. )
v. ) No.: 90-8C, et al.
THE UNITED STATES. )
Defendant. )

Room 201
National Courts Building
717 Madison Place. N.W.
Washington. D.C. 20005
Tuesday.
October 17. 2000

The parties met. pursuant to the notice of the Judge. at 2:15 p.m.

BEFORE: HONORABLE. LOREN A. SMITH
Judge

APPEARANCES:
For the Plaintiffs' Coordinating Committee:
MELVIN C. GARBOW. Esquire
Arnold & Porter
555 Twelfth Street. N.W.
Washington. D.C. 20004-1202
(202) 942-5899
JERRY STOUCK. Esquire
Spriggs and Hollingsworth
1350 I Street. N.W.. Ninth Floor
Washington. D.C. 20005-3305
(202) 898-5839

Page 2

APPEARANCES (Continued):
For the Plaintiffs David Cain. et al.:
ROBERT K. HUFFMAN. Esquire
Miller & Chevalier. Chartered
655 Fifteenth Street. N.W.
Suite 900
Washington. D.C. 20005
(202) 626-5824
For the Plaintiffs Clare Bank. First Federal Bank. Heartland Savings. Hometown Savings and Loan. LSB Industries. Morton Federal Bank:
DANIEL J. GOLDBERG. Esquire
Kutak Rock LLP
1101 Connecticut Avenue. N.W.
Washington. D.C. 20036-4374
(202) 828-2319
For the Federal Deposit Insurance Corporation:
JOHN V. THOMAS. Esquire
Federal Deposit Insurance Corporation
Associate General Counsel
Legal Goodwill Receiver Section
5500 Seventeenth Street. N.W.
PA-1730 Room 3000
Washington. D.C. 20429
(202) 942-3608
For the Defendant:
DAVID M. COHEN. Esquire
JEANNE E. DAVIDSON. Esquire
MARK MELNICK. Esquire
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street. N.W.
Washington. D.C. 20530
(202) 514-7300

Page 3

PROCEEDINGS

(2:15 p.m.)

THE COURT: Please be seated. This is supposed to be committee meeting. We are structured here in a very formal type of committee. I apologize for the why we had trouble getting in. They lock the room up every day. I was also looking at some of my colleagues. I want to introduce three colleagues here who are part of the Winstar Coordinating Committee, the Chief Judge, Larry Baskir, who is standing in the back, and Judge John Weise, who is also standing in the back, and Judge Jim Turner, who we came in is sitting here if Judges Baskir and Weise want to come over here and sit. That's right, you can't get out of – there is also a shielding.

Well, so far we haven't had violence in about three or four committee meetings, so it should be too much. But it is good to have a committee here, and I want to introduce everyone to the committee. As you all know, I have been now presiding in this coordinating committee for 150 years. No. It only seems like that. It has only been about four years since the Supreme Court handed down its decision in Winstar and the government moved for a management process, which we have established, and I think it has worked fairly effectively.

I become a senior judge on July 10th, which I

Page 4

think a few of you are aware of. And on that date, my schedule gets reduced. But this sort of comes at a time when that isn't the principal effect on my management process. One of the goals we had of the management process was always to kind of spread the cases around in some orderly way since it is clear that on liability decisions I couldn't conceivably decide even a fraction of the ones that are remaining, of which there are by the count something over hundred still remaining in the general category.

What I want responses today on, or what the order that set up this meeting – and everyone has responded with briefs, and I have looked at those – giving thoughts on at least two particular areas; one, the distribution of the first 30 cases to trial judges to begin moving these cases to the final stages of liability and trial.

Secondly is the question of the remaining cases, of which there are, in someone's words – I remember the famous line, the trunch – well, Mr. Thomas, I think you have may have up with trunch – added to my vocabulary and the Winstar vocabulary. But we have the second trunch, which is poised for expert discovery, and the third trunch, which is poised for fact discovery, both of which have been stayed, and then a partial trunch, which should be the fourth group, which I think would be something like 15 or 18 cases.

Page 57

notion that even when the law is settled, even when the law is settled, the government is not going to settle these cases, says Mr. Cohen, without massive discovery to find out what the facts are.
I mean, that's what we've been dealing with for a number of years here, and I think, obviously, when the law gets settled, the relevant facts, the salient facts, the dispositive facts, will be well known to both of the parties, and you won't need 20 depositions or 50 depositions to find out what the relevant facts are. We can write them a letter and tell them what the facts of our case are under the controlling cases, and hopefully we will be able to settle some of these cases at that point.
MR. GARBOW: If I may, Your Honor, I would just like to return for a moment to this cohort of about a dozen cases in which there are written assistance agreements in which there is an express and unambiguous incorporation of an accounting forbearance, which the government has acknowledged "does, indeed, render the forbearance contractually enforceable," starting with American Savings and going down the list.
After we were in San Francisco in the coordinated hearing, this Court admonished the government, in some of the toughest language I have ever seen in a court order, saying stop the recycling, stop the endless repetition of

Page 58

losing arguments, and for a while the government lawyers were concerned.
So we had the counsel of record in every case taking shelter behind Mr. Cohen's – I don't want to say "ample girth" – that wouldn't be fair, but Mr. Cohen substituted himself as counsel of record in a courageous effort to blunt the force of a contempt citation if the government should further recycle these discredited arguments.
But that attitude lasted for a few weeks, and gradually we have seen these arguments coming up again and again and again in these cases. Just last week, I had an exchange of correspondence with Mr. Cohen, and I said, look, if you want to preserve your arguments for the Court of Appeals, that's fine. The Plaintiffs don't have any problem with that. Write them out. But for crying out loud, don't expect us all to keep arguing these matters that have been resolved. And what response did I get from the government? 'Well, Mr. Garbow, it is unclear exactly which arguments the Court has rejected.'
Well, it may be unclear to Mr. Cohen and the rest of the Department of Justice, but it's not unclear to this Court, it's not unclear to the Plaintiffs, and, Your Honor, if you would give us one day, less than a day, we would stand up, we would express to you in whatever format you

Page 59

might require what the government's position is, why those issues have been decided, and you could knock off liability decisions in a dozen of these cases, and off they would go to the damages trials.
Now, I think that's the most efficient, simplest, cost-effective thing. It has nothing to do with discovery. It has nothing to do with experts. All that is done. We've spent millions of dollars getting ourselves to this point. All we need is some judicial attention by a sentient, single-minded person who knows these cases and says 'that issue is done. It's been done for three years.' And I urge that you give us that opportunity to capture the final returns on this enormous investment that we've made in the coordination process.
THE COURT: Mr. Thomas.
Mr. THOMAS: Your Honor, I would like to talk about the takings claims in the second 30 cases first. Mr. Cohen and I don't disagree. The order a year ago covered the first 30 cases. It didn't cover the second 30. We think it should be extended to cover the second 30 for the same reasons, and we think that – I believe it was Winstar – I know it was one of the three that went to the Supreme Court. The issue came up, and Your Honor did stay the takings claim for the reasons which I learned in law school, which is you don't reach the constitutional

Page 60

question until you've exhausted the other things that might resolve the case. We think the same ought to apply here. We ought to save some trees, and we ask you to do that.
THE COURT: That's also been the Court's approach. The AmBase case, which dealt with a taking, was one where the plaintiffs contend they don't have a contract claim, which was the only reason we finally have reached that last week, actually.
Mr. THOMAS: We did, by the way, submit a list to the Department of Justice in the first round. We would be happy to submit a list in the second, similarly. I can't speak for whether the Plaintiff's coordinating committee submitted a list or not. I simply don't remember.
The question of the stay of factual discovery in the third 30; the Defendant makes an argument which everyone agrees is a real issue, and that is there are witnesses who are dying. There are witnesses whose memories are fading. There have been some losses of documents, although I would like to believe the latter is not very common. In the dumpster, actually, I think, was OTS and not FDIC. But in any event, it wasn't me. I didn't have to go dumpster diving.
THE COURT: I've never seen you in a dumpster.
Mr. THOMAS: And I hope to keep it that way.
Having said that, and recognizing that it is a