No. 93-531C
(Senior Judge Loren Smith)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMBASE CORPORATION AND
CARTERET BANCORP, Inc.

Plaintiffs,

and

FEDERAL DEPOSIT INSURANCE
CORPORATION,

Plaintiff-Intervenor,

v.

UNITED STATES OF AMERICA

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON DAMAGES

---

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Deputy Director

OF COUNSEL:
TAREK SAWI
Senior Trial Counsel
ARLENE PIANKO GRONER
ELIZABETH M. HOSFORD
F. JEFFERSON HUGHES
DELISA SANCHEZ
AMANDA TANTUM

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309
Fax: (202) 514-7969

Date: January 22, 2008

Attorneys for Defendant

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE ISSUES OF FACT AND LAW REGARDING DAMAGES TO BE RESOLVED BY THE COURT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. ISSUES OF FACT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B. ISSUES OF LAW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

THE FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL... . . . . . . . . . . . . . . . . . . . . . . . 10

A. FACTS RELATED TO THE 1982 TRANSACTIONS.. . . . . . . . . . . . . . . . . . . . . 10

B. FACTS RELATING TO CARTERET’S PERFORMANCE BETWEEN 1981 AND 1986.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C. FACTS RELATING TO THE 1986 SUPERVISORY ACQUISITIONS.. . . . . . . 16

D. FACTS RELATING TO AMBASE’S ACQUISITION OF CARTERET.. . . . . . . 17

E. AMBASE ABUSED ITS OWNERSHIP POSITION BY SIPHONING CAPITAL FROM CARTERET.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

F. DESPITE SIPHONING CARTERET’S CAPITAL FOR ITSELF, AMBASE WAS UNABLE TO IMPROVE ITS OWN DETERIORATING FINANCIAL CONDITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

G. CARTERET’S FINANCIAL CONDITION WORSENED DURING THIS PERIOD AS WELL FOR REASONS TOTALLY UNRELATED TO THE BREACH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

H. THE BREACH HAD LITTLE OR NO IMPACT ON CARTERET’S FINANCIAL PERFORMANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I. BECAUSE OF ITS POOR FINANCIAL PERFORMANCE AND CONDITIONS PRIOR TO AND AFTER THE BREACH, CARTERET WOULD HAVE FAILED IRRESPECTIVE OF THE BREACH. . . . . . . . . . . . . . 31

J. BECAUSE OF THE POOR CONDITION OF CARTERET'S BALANCE SHEET AND OPERATIONS, EVEN WITH REGULATORY FORBEARANCE, CARTERET WAS UNABLE TO RAISE CAPITAL. . . . . . 34

K. EVEN COUNTING GOODWILL AS REGULATORY CAPITAL, CARTERET COULD NOT HAVE RAISED OUTSIDE CAPITAL TO ENSURE SURVIVAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

L. CARTERET COULD NOT HAVE RAISED SUFFICIENT CAPITAL BY SELLING ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

M. CARTERET DID NOT OVER-RESERVE ON ITS COMMERCIAL REAL ESTATE AND CORPORATE LOAN PORTFOLIOS. . . . . . . . . . . . . . . . 42

N. THE RTC DID NOT RECOVER LESS ON ASSET DISPOSITIONS THAN CARTERET WOULD HAVE IN A BUT FOR WORLD.. . . . . . . . . . . . 51

O. CARTERET WOULD NOT HAVE SOLD ITS ASSETS IN BETTER MARKETS THAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

P. AMBASE FAILS TO ACKNOWLEDGE THE BREACH'S POSITIVE EFFECTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Q. AMBASE AND CARTERET WASTED CARTERET'S CAPITAL BY ENTERING INTO UNSOUND EMPLOYMENT CONTRACTS AND ENGAGING IN UNSOUND EMPLOYMENT PRACTICES. . . . . . . . . . . . . . . . 55

DEFENDANT'S CONTENTIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A. INTRODUCTORY LEGAL PRINCIPLES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

B. BECAUSE CARTERET WOULD HAVE FAILED IN THE ABSENCE OF THE BREACH, AMBASE IS NOT ENTITLED TO DAMAGES STEMMING FROM CARTERET'S FAILURE. . . . . . . . . . . . . . . . . . . . . . . . . 63

C. THE ALLEGED DAMAGES WERE NOT AND COULD NOT HAVE BEEN FORESEEABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

D. UNEXPECTED FUTURE CASH FLOWS AND MARKET

APPRECIATION REFLECT INTERVENING CAUSES AND ARE NOT ATTRIBUTABLE TO THE BREACH. . . . . . . . . . . . . . . . . . . . . . . . 76

E. PROFESSOR CALOMIRIS'S MODELS FAIL TO QUANTIFY DAMAGES TO A REASONABLE CERTAINTY.. . . . . . . . . . . . . . . . . . . . . . . 78

1. AMBASE'S ESTIMATE OF UNEXPECTED CASH FLOWS CANNOT BE SUPPORTED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

2. AMBASE'S CLAIM TO PREJUDGMENT INTEREST IS INVALID.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

3. AMBASE'S CLAIM FOR LOST DIVIDENDS INVOLVES DOUBLE COUNTING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

4. CARTERETS' MAXIMUM DAMAGE IS MEASURED BY ITS MARKET VALUE AT THE TIME OF BREACH NET OF SELF IMPOSED LOSSES BETWEEN THE TIME OF BREACH AND THE SEIZURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

5. AMBASE'S WOUNDED-BANK DAMAGES CLAIMS ARE INVALID. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

A. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

B. CARTERET CANNOT RECOVER AMBASE’S COST. . . . . . . . 92

RESPONSE TO AMBASE'S CONTENTIONS OF FACT AND LAW.. . . . . . . . . . . . . . . . . . . . 95

A. AMBASE'S CONTENTIONS RELATING TO DAMAGES. . . . . . . . . . . . . . . . . 95

B. CONTENTIONS RELATING TO THE RECEIVERSHIP DEFICIT.. . . . . . . . . 103

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

## TABLE OF AUTHORITIES

## CASES

Admiral Fin. v. United States, 57 Fed. Cl. 418 (Fed. Cl. 2003), aff'd, 278 F.3d 1336 (Fed. Cir. 2004)........ 3, 64, 69

Alfa Laval Seperation v. United States, 175 F.3d 1365 (Fed. Cir. 1999)........ 105

Am. Fed. Bank , FSB v. United States, 68 Fed. Cl. 346 (2005) ........ 62

Am. Fed. Bank , FSB v. United States, 72 Fed. Cl. 586 (2006), reconsideration denied, 74 Fed. Cl. 208 (2006)........ 73, 78

Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294 (Fed. Cir. 2001)........ 105

Ambase Corporation v. United States, 58 Fed. Cl. 32 (2003)........ 2, 64, 107

Ambase Corporation v. United States, 61 Fed. Cl. 794 (2004)........ 104, 106

American Capital Corp. v. FDIC, 66 Fed. Cl. 315 (2005), aff'd in part, rev'd in part, and remanded, 472 F.3d 859 (Fed. Cl. 2006)........ 93, 102

Bailey v. United States, 341 F.3d 1342 (Fed. Cir. 2003)........ 106, 107

Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310 (2002)........ 68, 74

Bluebonnet Savings Bank v. United States, 67 Fed. Cl. 231 (2005), aff'd, 466 F.3d 1349 (Fed.Cir. 2006)........ 63, 83

Cal. Fed. Bank v. United States, 54 Fed. Cl. 704 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005)........ *passim*

Caroline Hunt Trust Estate v. United States, 470 F.3d 1044 (Fed. Cir. 2006) ........ 102

Carteret Savings Bank v. Office of Thrift Supervision, 762 F. Supp. 1159 (D.N.J.1991), rev'd, 963 F.2d 567 (3rd Cir. 1992)........ 3, 64, 65

Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002) cert denied, 539 U.S. 925 (2003)........ 93

Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct.Cl. 1953)........ 60, 76

Cienega Gardens v. United States, 503 F.3d 1266 (Fed. Cl. 2007)........ 71, 90

Citizens Fin. Servs., FSB v. United States, 64 Fed. Cl. 498 (2005), aff'd 170 Fed. App. 129, 2006 WL 618792 (Fed. Cir. March 9, 2006) (affirmed pursuant to Fed. Cir. R. 36). ......... 62

Commercial Fed. Bank v. United States, 59 Fed. Cl. 338 (Fed. Cl. 2004). ................................ 82

Corbin v. Federal Reserve Bank of New York, 475 F. Supp. 1060 (S.D.N.Y. 1979), aff'd 629 F.2d 233 (2nd Cir. 1989). ........................................................................... 109

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1992). .................................................. 83

Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002). ............................ *passim*

FDIC v. Citizens State Bank of Niangua, 130 F.2d 102 (8th Cir. 1942). ................................ 108

Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223 (2003), aff'd in part and rev'd in part, 402 F.3d 1221 (Fed.Cir. 2005). ............................................................ *passim*

First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633 (2006). ............................................ 62

G.L. Christian & Associates v. United States, 160 Ct. Cl. 1, cert denied 375 U.S. 954 (1963). . 76

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91 (1979). ............................................ 106

Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390 (1999) aff'd in part and vacated in part, 239 F.3d 1374 (Fed. Cir. 2001). ......................................................... 62, 72

Glendale Fed. Bank, FSB v. United States, 54 Fed. Cl. 8 (2002), aff'd, 378 F.3d 1308 (Fed.Cir. 2004). ................................................................................. 62, 63, 79

Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330 (2005), aff'd in part, and remanded, 189 Fed. Appp. 964 (Fed. Cir. 2006). ............................................................. 82

Golden Pac. Bancorp v. FDIC, 2002 WL 31875395 (S.D.N.Y. 2002), aff'd, 375 F.3d 196 (2nd Cir. 2004). ......................................................................................... 108

Granite Management Corp. v. United States, 58 Fed. Cl. 766 (2003) aff'd in part and remand in part 416 F.3d 1373 (Fed. Cir. 2005). ................................................... 92, 103

Granite Management Corp. v. United States, 74 Fed. Cl. 155 (2006) aff'd -- F.3d -- (Fed. Cir. Jan 08, 2008) (NO. 2007-5054). ....................................................... 95, 108

Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411 (2005). ......................................... 89, 91

In re Hartsdale Associates, 452 F. Supp. 67 (S.D.N.Y. 1978). ..... 109

J.D. Hedin Construction Co. v. United States, 197 Ct. Cl. 782 (1972). ..... 76

Home Sav. Of Am., FSB v. United States, 399 F.3d 1341 (2005). ..... 99

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001). . 94, 101

Kidder Peabody & Co., Inc. v. IAG Int'l Acceptance Group, 28 F. Supp. 2d 126 (S.D.N.Y. 1998), aff'd 205 F.3d 1323 (2nd Cir. 1999). ..... 63, 84

Kumho Tire, Co. , Ltd. v. Carmichael, 526 U.S. 137 (1999). ..... 83

LaSalle Talman Bank, F.S.B. v. United States, 64 Fed. Cl. 90 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006). ..... *passim*

Landmark Land Co. v. United States, 256 F.3d 1365 (Fed. Cir. 2003). ..... *passim*

Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 34 Cal. 4th 960, 22 Cal. Rptr. 3d 340, 102 P.3d 257 (2004). ..... 77

Estate of Lillian Berg, v. United States, 687 F.2d 377 (Ct.Cl. 1982). ..... *passim*

Long Island Sav. v. United States, 60 Fed. Cl. 80 (2004), rev'd on other grounds, 503 F.3d 1234 (Fed. Cir. 2007). ..... 88

Longshore v. United States, 77 F.3d 440 (Fed. Cir. 1996). ..... 105

Maher v. United States, 314 F.3d 600 (Fed. Cir. 2002). ..... 104

McAllister v. RTC, 201 F.3d 570 (5th Cir. 2000). ..... 104

Micro Chemical, Inc. v. Lextron, Inc, 317 F.3d 1387 (2003). ..... 83

Mid Jersey National Bank v. Fidelity-Mortgage Investors, 518 F.2d 640 (3rd Cir. 1975). ..... 109

Myerle v. United States, 33 Ct. Cl. 1 (1897). ..... 60, 77, 93

Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491 (3rd Cir. 1987). ..... 77

Neely v. United States, 285 F.2d 438 (Ct.Cl. 1961). ..... 59

Northern Helex Co. v. United States, 207 Ct. Cl. 862 (1975) cert denied, 429 U.S. 866 (1976). 76

O'Melveny & Myers v. United States, 512 U.S. 79 (1994). ..... 104

Old Stone Corp. v. United States, 450 F.3d 1360 (2006). .............................................. 61, 72, 73

Plaintiffs in All Winstar-Related Cases at the Court v. United States, 44 Fed. Cl. 3 (1999). ... 104

Ramsey v. United States, 101 F. Supp. 353 (1951). ........................................................... 60, 76

In Re Receivership Of First Nat'l Bank in Humboldt, 523 N.W.2d 591 (Iowa 1994). ............. 108

Reynolds v. United States, 158 F. Supp. 719 (1958). ............................................................. 74

S. Nat'l Corp. v. United States, 57 Fed. Cl. 24 (2003). ............................................................ 60

Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689 (1933). ......................... 73

Slattery v. United States, 69 Fed. Cl. 573 (2006). ............................................................... 2, 70

Southwest Inv. Co. Inc. v. United States, 63 Fed. Cl. 182 (2004), aff'd,
158 Fed. App. 283 (Fed Cir. 2006). ......................................................................... 3, 64, 69

Suess v. United States, 52 Fed. Cl. 221 (2002). ................................................................. 71, 81

Three Crown Limited Partnership v. Salomon Brothers, Inc., 906 F. Supp.
876 (S.D.N.Y. 1995). ........................................................................................... 63, 83

Tyger Const. Co. v. Pensacola Const. Co., 29 F.3d 137 (4th Cir. 1994). .................................. 84

Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012 (Fed. Cir. 1996), cert denied,
520 U.S. 1116 (1997). ............................................................................................ *passim*

Willems Indus., Inc. v. United States, 295 F.2d 822 (Ct. Cl. 1961). .......................................... 62

## STATUTES

12 C.F.R. § 561.16(c)(d)(2)(1989). ...................................................................................... 46

12 C.F.R. §561.16c(d)(1)(1989). ........................................................................................ 46

12 C.F.R. §561.16c(d)(2) (1989). ........................................................................................ 45

12 C.F.R. §563.160(d)(2)(1992). ........................................................................................ 45

12 C.F.R. §561.16c(d)(3)(1989). ........................................................................................ 46

12 C.F.R.§563.160(d)(1)(1992). ......................................................................................... 46

12 C.F.R. §563.160(d)(2)(1992). .......... 46

12 C.F.R. §563.160(d)(3)(1992). .......... 46

12 U.S.C. § 1821(d)(11). .......... 106, 107

Crime Control Act of 1990, 12 U.S.C. § 1828(k)(4). .......... 56

Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1999). .......... 2

**MISCELLANEOUS**

Corbin on Contracts, § 1012 at 88 (1964). .......... 61

1 Dobbs Law of Remedies, § 3.8(2) (2d ed. 1993). .......... 76

J. Murray, Contracts, § 237 (1974). .......... 74, 89

Restatement of Contracts, § 329 (1932) . .......... 76

Restatement (Second) of Contracts, § 351(l), § 351, 352 .......... 60, 61, 62

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **AMBASE CORPORATION AND CARTERET BANCORP, INC.**, | ) |
| **Plaintiffs**, | ) |
| and | ) |
| **FEDERAL DEPOSIT INSURANCE CORPORATION**, | ) No. 93-531C |
| | ) Senior Judge Loren Smith |
| **Plaintiff-Intervenor**, | ) |
| v. | ) |
| **THE UNITED STATES** | ) |
| **Defendant**. | ) |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW ON DAMAGES**

Pursuant to Appendix A of the Rules of this Court and this Court's Scheduling Order dated April 13, 2007, the defendant, United States, submits its contentions of fact and law on damages.

## INTRODUCTION

The Court should reject Ambase Corporation and Carteret Bancorp, Inc.'s (collectively "Ambase") damage claims as counterfactual, hypothetical, and unsupported by law or evidence. Ambase, joined by the plaintiff-intervenor Federal Deposit Insurance Corporation ("FDIC"), argue that Carteret Federal Savings Bank ("Carteret") would have survived in the absence of the breach and would have grown in market value from $251 million at the time of the breach to between $596 million and $4.7 billion in 2006 as a result of the "golden era of banking growth and profitability." PX 2702 at ¶¶ 24, 34, 36, 37 and 43; DX 5038, Table I. They claim that

Carteret should be compensated for this "golden era of banking growth and profitability." According to Ambase's expert economist, Professor Charles W. Calomiris, "but for" Carteret's damages, resulting from the breaching provisions of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1999), are between $785.7 million and $4.905 billion (without gross up for taxes). DX 5038, ¶ 34.

As we demonstrate, Carteret's book value of equity at the time the regulators approved the acquisitions of Barton Savings & Loan Association of Newark, New Jersey ("Barton") and First Federal Savings and Loan Association of Delray Beach, Florida ("Delray") was $36.4 million. DX 19 at 0390. These two acquisitions are at the heart of Ambase's case.[1] Thus, the assumption of Ambase's damage calculation is that the regulators could have foreseen in 1982 and 1986 that, if goodwill were disallowed as regulatory capital, Carteret would suffer a loss of from $785.5 million to $4.9 billion even though Carteret's book value of equity was only $36.4 million and the amount of goodwill booked in the transactions was only approximately $268 million. As we demonstrate, regulators did not reasonably foresee and could not have reasonably foreseen this amount of damages when they approved the transactions and, therefore, these damages are not recoverable for the breach. See, e.g., Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2003) ("both the magnitude and type of damages [must be] foreseeable"); Slattery v. United States, 69 Fed. Cl. 573, 582 (2006) (same), appeal docketed,

[1] Carteret booked approximately $46 million in goodwill in the Barton transaction and approximately $168 million in goodwill in the Delray transaction; it only booked approximately $21.7 million in the 1986 acquisitions of First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia ("First Federal") and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security"). See Ambase Corp. v. United States, 58 Fed. Cl. 32, 34-37 (2003) ("Ambase I").

Nos. 07-5063, -5064, -5089 (Fed. Cir. 2007).

Further, Professor Calomiris's damage calculation assumes that Carteret would have survived in the absence of the breach. This is contrary to the evidence. As of October 25, 1991, even though the Office of Thrift Supervision ("OTS") was required to count Carteret's goodwill as regulatory capital as a result of an injunction issued by the U.S. District Court for New Jersey in February 1991, see Carteret Sav. Bank v. Office of Thrift Supervision, 762 F. Supp. 1159 (D.N.J. 1991), rev'd, 763 F.2d 567 (3d Cir. 1992), Carteret failed its post-FIRREA regulatory capital requirements. PX 4867a at 3. Because of massive real estate writedowns stemming from poor underwriting and slow economic growth, Carteret was insolvent and OTS recommended a transfer to the Resolution Trust Corporation ("RTC"). Id.

Because Carteret's management changed, OTS allowed the thrift time to recapitalize but, despite letters of intent by three sophisticated investment banking firms, Carteret failed to complete the transactions. DX 8124. Only after these failures, in December 1992, did OTS order a transfer to the RTC. At that time, Carteret failed its regulatory capital requirements by $133.2 million (tangible capital), $157 million (core capital), and $235.4 million (risk-based capital). Even counting goodwill as regulatory capital, Carteret failed all three regulatory capital requirements at the time of transfer. Because the failure would have occurred even if goodwill had counted towards regulatory capital, the effects of the failure cannot be attributed to the breach. See, e.g., Southwest Inv. Co. v. United States, 63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005) (damages could not be awarded because the thrift was insolvent irrespective of the breach); Admiral Fin. v. United States, 57 Fed. Cl. 418, 432 (2003), aff'd, 278 F.3d 1336 (Fed. Cir. 2006) (same).

Even if Carteret would have survived in the absence of the breach and regulators could have reasonably foreseen the "golden era of banking," moreover, Ambase has failed to quantify the alleged damage stemming from the breach. Ambase argues that "but for" Carteret's market value in 2006 can be reasonably quantified by applying the Gordon Growth Model, a mathematical formula to project future earnings where the cost of capital is known. According to Ambase, based upon a capital cost of 12.34 percent, "but for" Carteret would have earned $20.5 million in 1989 and would have grown at a 4.2 percent annual rate between 1989 and 2006. PX 2702 at ¶ 35-36 and pages 26-28 (Tables 5-6). This yields a "but for" book value of $442.9 million in December 2006. Id. at Table 13, page 41. By adjusting "but for" Carteret's estimated book value to market value based upon the rate of increase in book to market ratios from 1989 to 2006 of alleged "peer institutions," Ambase calculates "but for" Carteret's market value in 2006.

Thus, Ambase's damage claim is based upon an estimated book value of "but for" Carteret derived from the application of the Gordon Growth Model to Carteret's estimated market value as of the time of the breach. Rather than basing damages on the loss of Carteret's estimated market value at the time of the breach, Ambase projects what that market value allegedly would have been seventeen years in the future (i.e., in 2006). This futuristic application of economic theory is contrary to well-settled legal precedents, which establish that the market value at the time of the breach is the measure of damage, not a projection of what that market value might have been at some future time. E.g., Estate of Lillian Berg, v. United States, 687 F.2d 377, 379-83 (Ct. Cl. 1982); Energy Capital Corp. v. United States, 302 F.3d 1314, 1330-34 (Fed. Cir. 2002). Further Professor Calomiris's calculation effectively compounds a return on Carteret's estimated 1989 market value to estimate the "but for" thrift's market value as of 2006.

As Professor Saunders observes, "Professor Calomiris's whole approach is trying to engineer additional losses that have the transparent flavor of 'prejudgment interest' add-ons." DX 5038 at ¶ 38. Ambase's method of calculating damages is contrary to precedent and invalid.

Moreover, even if Ambase were entitled to estimate "but for" Carteret's alleged market value as of 2006, the assumptions behind Professor Calomiris's estimates are unsupported. For example, Professor Calomiris assumes that "but for" Carteret's earnings in 1990 and 1991 would have been $21.4 million and $22.3 million respectively. PX 2702 at 28, Table 6. This, however, is counterfactual. As Professor Calomiris concedes, Carteret's actual earnings in those years were negative $131.84 million and negative $160.25 million, respectively. PX 2702 at 26 n.59. Further, the model estimates Carteret's 1989 earnings at approximately $20 million, whereas actual earnings, which ignored a $77 million OTS-mandated write-down, were only $7.6 million. PX 4867a at 11. Thus, the record does not support the model's estimate of earnings for "but for" Carteret. Id. at 26.

Professor Calomiris also concedes that his estimate of "but for" Carteret's earnings in these years is "aggressive." He acknowledges that, even in the absence of the breach, Carteret would have incurred massive losses in its commercial real estate and corporate loan portfolios. Id. Although he argues that "but for" Carteret would not have been as aggressive in writing down its commercial real estate portfolio if it did not have to raise outside capital to meet minimum regulatory capital requirements, this is contradicted by the fully supported report of David M. Kennedy, one of the Government's expert witnesses (DX 7000). As Mr. Kennedy has pointed out, all of the write-downs in the commercial real estate and corporate loan portfolios were required by the appraisals and other indications of value in Carteret's loan and investment

portfolios.

Further, Professor Calomiris's contention that the "but for" thrift would have survived is inconsistent with Professor Calomiris's estimate of Carteret's regulatory capital position in the "but for" world. In short, there is no evidentiary basis for Professor Calomiris's estimate of the "but for" thrift's capacity to avoid transfer to the RTC in the absence of the breach.

Professor Calomiris's methodology for calculating "but for" Carteret's 2006 market value also suffers from other legal infirmities. The estimated cash flow of the "but for" thrift is based entirely upon an arithmetic calculation relating to alleged historical earnings of the actual thrift and the "but for" thrift's estimated cost of capital. Professor Calomiris does not provide balance sheets or profit and loss statements for the "but for" thrift and fails to identify the assets and liabilities of the "but for" thrift. Under relevant case law, however, a damage calculation which simply assumes the existence of "but for" cash flows is invalid. As this Court noted in Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 223, 240-41 (2003), such a model is speculative as a matter of law because it "fails to account for any real-world events other than the profitability of the [actual thrift] . . ."

Even if the validity of Professor Calomiris's model were not dependent upon an analysis of the assets and liabilities of the "but for" thrift, moreover, the model would be unreliable because other internal assumptions contradict the record. For example, according to Professor Anthony Saunders, the Government's expert economist, the regression analysis that leads Professor Calomiris to estimate the "but for" thrift's cost of capital to be 12.4 percent fails to include the proper specification for the actual thrift's net equity, which was negative during the time the cost of capital was estimated. DX 5038 at ¶¶ 163-173. This error tends to dramatically

understate the cost of capital which, in turn, overstates the growth rate of earnings of the "but for" thrift. Id. Further, whereas debt and equity have differing capital characteristics, Professor Calomiris's regression analysis indiscriminately mixes values relating to equity with values relating to debt. Finally, because costs of capital vary over time, a regression analysis which focuses on 1993-1994 is irrelevant for calculating the cost of raising capital in 1989 (the time of the breach).

In estimating "but for" Carteret's book value in 2006, Professor Calomiris also assumes year-by-year "but for" dividend payments of 31.7 percent of earnings based upon his estimation of "the mean annual dividend payout ratio for all publicly traded thrifts with data available in Compustat from August 1989 through December 2006." PX 2702 at 26-27. Professor Calomiris assumes there is some similarity between the average publicly-traded thrift with data available on the Compustat database and "but for" Carteret. Professor Calomiris, however, never makes an effort to support this assumption. More troublesome is the assumption that "but for" Carteret would pay a steady dividend. This assumption is inconsistent with the thrift's historical performance, which involved few if any dividend payments between 1982 and 1988 and none representing 31.7 percent of earnings. Thus, Professor Calomiris's assumption concerning dividend payments in the "but for" world is contrary to the evidence. If his assumption of a steady stream dividend payout equal to 31.7 percent of earnings is invalid, the calculation of damage is invalid as well.

In short, as we will demonstrate at trial, Ambase's damages calculations are contrary to law and lack evidentiary support in the record. Accordingly, this Court should rule that Carteret has failed to prove damages as a matter of law.

**THE ISSUES OF FACT AND LAW REGARDING**
**DAMAGES TO BE RESOLVED BY THE COURT.**

We anticipate that this Court will be required to resolve the following issues of fact and law at the trial on the plaintiffs' claims for damages:[2]

**A. Issues Of Fact**

(1) Whether, in the absence of the breach, OTS would have imposed a conservatorship on Carteret.

(2) Whether regulators foresaw or could have reasonably foreseen that breach-related damages would have exceeded Carteret's book value in 1982 and 1986.

(3) Whether Professor Calomiris accurately estimates Carteret's market value at $251.4 million as of the time of the breach.

(4) Whether, in the absence of the breach, "but for" Carteret would have been profitable and, if so, the quantum of profits it would have earned between 1989 and 2006 or 2008.

(5) Whether the book value of "but for" Carteret in 2006 would have been $442.9 million.

(6) Whether "but for" Carteret would have made the dividend distributions hypothesized by Professor Calomiris in his report.

(7) Whether Professor Calomiris's estimates of the market values of "but for" Carteret in 2006 and 2008 are accurate to a reasonable degree of certainty.

---

[2] Plaintiff-intervenor FDIC has not presented an expert witness to testify concerning Carteret's damages. Accordingly, we assume that the only damage estimates to be presented by plaintiffs at trial will be those advanced by Professor Calomiris.

(8) Whether "but for" Carteret would have required an infusion of outside capital to survive and, if so, how much.

(9) Whether Carteret could have raised this capital in the "but for" world.

(10) Whether "but for" Carteret's losses on commercial real estate and corporate loans would have been less in a "but for" world.

(11) Whether the breach caused the "wounded bank" damages claimed by Professor Calomiris.

(12) Whether the FDIC's estimate of the receiverships deficit as of December 2006 is reasonable.

**B. <u>Issues of Law</u>**

We anticipate that this Court will be required to resolve the following issues of law related to plaintiffs' claims for damages:

(13) Whether the Gordon Growth Model provides an evidentiary basis upon which to calculate "but for" Carteret's market value as of 2006 or 2008.

(14) Whether, if the market at the time of the breach were unable to estimate Carteret's future growth opportunities, as Professor Calomiris alleges, such growth opportunities were reasonably foreseeable to regulators in 1982 or 1986.

(15) Whether Carteret suffered damages relating to the breach when it failed FIRREA regulatory capital requirements as of the second quarter of 1991 and never regained compliance with FIRREA regulatory capital requirements.

(16) Whether Carteret's damages can be measured by its estimated market value in 2006 and 2008 when these estimates exceeded by a large margin its market value

at the time of the breach.

(17) Whether plaintiffs have demonstrated the existence of damages caused by the breach.

(18) Whether plaintiffs have demonstrated the quantum of damages caused by the breach.

(19) Whether the amount of damages can exceed Professor Calomiris's estimate of the market value of Carteret's unamortized goodwill at the time of the breach.

(20) Whether the real estate losses in 1990 and 1991 constitute an offset to Carteret's alleged damages.

## THE FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL

### A. FACTS RELATED TO THE 1982 TRANSACTIONS

1. In 1981, Carteret was a mutual thrift chartered by the Federal Home Loan Bank Board ("FHLBB"). With approximately $1.9 billion in liabilities and a net worth ratio of under 2.1 percent, Carteret's strategy focused on the need to raise capital and regain profitability. DX 9117.

2. As a mutual, Carteret could not raise equity capital without converting to a stock association. DX 9117. Carteret's capital-raising strategy focused upon raising capital in the public marketplace. Carteret was advised by its investment bankers that it should consolidate its deposit base in New Jersey and expand its deposit base to Florida to attract capital. Carteret, therefore, sought opportunities to expand its deposit base to the Florida market. DX 9117.

3. As of August 31, 1982, Delray reported a net worth of approximately $1.2 million. PX 2433 at 1. Delray's Board of Directors agreed to permit FSLIC to seek financial

assistance and FSLIC listed Delray as a troubled association. FSLIC received bids to acquire Deray from five out-of-state institutions, including Carteret. PX 2433 at 9-10. Carteret actively pursued Delray. Delray was particularly attractive to Carteret because the population of Florida and other sunbelt areas was expanding, many people who had lived in New Jersey had retired to Florida, and many New Jersey residents took vacations in, and had second homes in, Florida. DX 9117 at ¶ 13. Carteret's market analysis indicated that 24 percent of all residents in Palm Beach County, Florida, had originally come from either New York or New Jersey. Florida averaged twice the deposits per average depositor as New Jersey and New Jersey was losing population at a rate of about 1.5 percent per year. Carteret could engage in construction lending all year round in Florida whereas it could only do so part of the year in New Jersey. As a condition of acquiring Delray, FSLIC required Carteret to acquire Barton as well. Barton had suffered net losses since 1979 and was of little, if any, interest to other New Jersey associations. DX 9117.

4. Based upon its financial analysis of Delray, Carteret concluded that Delray's operating difficulties were temporary and stemmed from a poor decision relating to the pricing of deposits. DX 9117 at ¶ 17. Delray, however, had "relatively few bad loans and bad assets . . . and [Carteret] thought [its] problems were manageable given time." Id. Thus, Carteret actively pursued the merger with Delray in order to qualify for a conversion.

5. In September 1982, with FSLIC cash assistance of $11.7 million for Barton and no cash assistance for Delray, Carteret acquired Barton and Delray. Carteret booked a total of $214 million in goodwill, approximately $160 million from the Delray acquisition and approximately $40 million from the Barton acquisition. PX 2433. The goodwill resulting from

the Delray and Barton acquisitions constitutes approximately 90 percent of the goodwill at issue in this litigation.

### B. FACTS RELATING TO CARTERET'S PERFORMANCE BETWEEN 1981 AND 1986

6. In 1981, Carteret expanded its asset base by approximately $230 million by acquiring six New Jersey institutions, including River Edge Savings and Loan Association, which was insolvent at the time of the acquisition. PX 2433 at 11. As of August 31, 1982, Carteret's net worth, which was approximately $36.4 million, was only approximately 1.5 percent of assets of approximately $2.3 billion. Id. at 12. Thus, even prior to acquiring Delray and Barton in September 1982, Carteret was extremely undercapitalized.

7. To allow thrifts to become more competitive, Congress, in 1982, expanded thrifts' asset and investment powers through the enactment of the Depository Institutions Act, which provided thrifts with the opportunity to widen interest spreads and potentially reduce interest rate exposure arising from asset-liability mismatching. DX 8000 at n.20. Carteret responded to this new authority by adopting a "vigorous strategy aimed at giving Carteret and its customers the maximum benefits of emerging investment opportunities." Id. at n.21.

8. Carteret's primary strategy was to diversify into new product areas, such as corporate and commercial real estate loans, and expand its geographic franchise by acquiring such institutions as Delray. Although diversifying into higher yielding products such as corporate and commercial real estate loans had the potential to improve interest rate risk and profitability, such new products also exposed Carteret to higher credit risk. DX 8000 at n.20. Under good banking practice, a thrift which diversified into high yield assets had to have

sufficient tangible capital to absorb unexpected losses to be prudent. Id. Carteret, however, failed to raise tangible capital. Further, it failed to recruit competent staff to handle its expanded asset portfolio. DX 5001 at ¶ 22.

9. For example, after its 1982 acquisitions (and the assumption of $229 million of goodwill), Carteret's assets increased by approximately $1 billion (approximately $800 million from Delray and approximately $200 million from Barton). Yet, aside from approximately $16 million contributed by FSLIC, Carteret received no additional tangible capital. Its tangible net worth at the end of 1982 was negative $212 million and the ratio of goodwill to net worth exceeded ten. DX 8000 at ¶ 30. Following the raising of approximately $58.3 million in its conversion, PX 2702 at 9, Table 2, Carteret's equity capital (or net worth) was just $22 million, or 0.67 percent of total assets. Id.

10. Despite its undercapitalized position in 1982, Carteret rapidly exploited its new asset-making powers, converting itself from a traditional thrift into a commercial banking institution virtually overnight. In April 1983, for example, it began commercial real estate lending. Over the next 18 months, it originated approximately $500 million in commercial real estate loans. DX 5001 at ¶ 21. During this period, Carteret had approximately $194 million in corporate loans on its books. DX 8043 at 1188. The explosion in commercial lending happened too quickly to enable the institution to build the infrastructure needed to make correct credit decisions. Corporate and commercial real estate lending went from zero to approximately $500 million over a two year period. DX 5001 at ¶ 21.

11. A due diligence conducted by Peat Marwick in connection with Ambase's acquisition of Carteret in 1988 recognized that Carteret's diversification into commercial bank

like products was imprudent. As noted in the Peat Marwick report:

> We believe that the commercial lending and commercial real estate portfolios represent a relatively high degree of prospective risk for Carteret. The following are contributing factors: the rapid growth in these portfolios over the past four years; a credit process that has not been fully developed in the planning and monitoring segments; the high concentrations within the portfolios in categories generally considered to be of high risk by many financial institutions; [and] specific individual credits in the process of liquidation. In order to at least partially mitigate and close the gap between potential risk and capacity to manage risk and support Carteret's growth plans at a reasonable level of risk, we believe that increased investments in people and processes will be required.

DX 659.

12. In August 1983, Carteret went public by selling 6.82 million shares at $9.50 per share and raising approximately $58.4 million in net proceeds. PX 2702 at Table 2, ¶ 9. Although the conversion was successful, the market's uncertainty regarding the future was reflected in the fact that only 35 percent of the issue was acquired by existing depositors, the price-earnings ratio was less than 2 and the price-to-book ratio was only .55. DX 8000 at ¶ 35. In 1985, Carteret raised approximately $11 million by issuing new shares and, later in that year, raised $21.2 million through the sale of preferred stock. Id.; PX 2702 at Table 2. In 1986, Carteret raised $28.7 million by issuing and selling new shares. Thus, between 1982 and 1986 Carteret raised equity capital of $119.3 million. DX 8000 at ¶ 35; PX 2702 at Table 2. As a result of this capital raising, and by virtue of retaining most of its earnings, between 1982 and 1986 Carteret improved its shareholder's equity to total assets ratio from .7 percent to 4.7 percent, and its tangible net worth improved from negative $212.3 million to $21 million. DX 8000 Exh. 3, Table 1 at 2.

13. Between 1982 and 1986 Carteret's assets grew by approximately $2 billion (i.e., from approximately $3.3 billion to approximately $5.5 billion). DX 8000 Exh. 3, Table 1 at 1. During this period, Carteret's operating earnings remained very low or were negative. For example, for 1982, Carteret's operating earning were approximately negative $25.5 million; for 1983, approximately negative $11.6 million; for 1984, approximately negative $3.7 million; for 1985, approximately $8.2 million; and for 1986, approximately $33.2 million. DX 5038 at n.26. Thus, Carteret had negative operating earnings in three of five years between 1982 and 1986. The ratio of Carteret's operating earnings to assets in 1985 was only .16 percent and in 1986 was only .5 percent. Further, these figures include temporary non-cash operating income resulting from the mismatch between the accretion of the discount on mortgage loans and the amortization of goodwill. See DX 8000 at ¶ 29. This mismatch increased earnings between 1983 and 1987 by approximately $47 million. PX 1601 at CAM524 0836. As the discounts were fully accreted and the goodwill continued to be amortized, Carteret projected a net accretion loss of approximately $137.2 million from 1997 forward. Id.

14. Between 1982 and 1987, Carteret grew at a compound rate of 12.2 percent. DX 8000 at ¶ 31. By the end of 1987, its total assets had increased to 177 percent of what they had been at the end of 1982. Id. Although insured deposits were the lowest cost of funds for savings and loans, during this period Carteret increased its dependence on loans from the FHLBB and other institutional lenders. Id. at ¶ 33. Thus, deposits declined as a percentage of total liabilities from 82 percent in 1982 to 74 percent in 1987. Thus, Carteret's branch network, which spanned four states and the District of Columbia, was not generating sufficient deposits and Carteret had to rely upon Federal Home Loan Bank ("FHLB") loans to support its aggressive

growth. Id.

15. In 1987, the year in which Carteret fully utilized capital markets, its return on assets was .57 percent and its return on equity was 11.5 percent. Tangible net worth was $75.3 million and net interest was 2.2 percent of assets. Net income was boosted by selling loans and securities (mainly mortgage-backed securities) for a gain of $21.8 million. DX 8000 at ¶ 36.

**C. FACTS RELATING TO THE 1986 SUPERVISORY ACQUISITIONS**

16. On June 6, 1986, Carteret acquired three troubled thrifts, namely Mountain Security, First Federal, and Admiral Builders Savings and Loan Association, Parkville, Maryland ("Admiral"). This allowed Carteret to extend its franchise to Virginia, Maryland and the District of Columbia. At the time, First Federal and Mountain Security had negative tangible capital and Admiral had a net worth of only .5 percent of assets. As a state chartered thrift insured by the Maryland Deposit Insurance Fund, Admiral is not at issue in this litigation. DX 9117 at ¶ 26.

17. At the time of the First Federal and Mountain Security transactions, the FHLBB had a policy which allowed a thrift that acquired a troubled out-of-state thrift to have branching rights in the state of the insolvent thrift and two contiguous states as well. Carteret desired to acquire Mountain Security and First Federal to expand its branch network to Virginia, Maryland and the District of Columbia. DX 9118 at 0270-0271. The FHLBB awarded branching rights when it approved these acquisitions. DX 351 at 0331-0333.

18. FSLIC was Mountain Security's receiver and, in that capacity, entered into an acquisition agreement with Carteret. Carteret and First Federal agreed to merge and the agreement was approved by the FHLBB. As a result of the acquisitions of First Federal and Mountain Security, Carteret booked approximately $22 million in supervisory goodwill. DX

9117 at ¶ 25. Carteret booked approximately $20.3 million of goodwill from the Mountain Security acquisition and the remainder of the goodwill from the First Federal acquisition.

19. Carteret's decision to expand its branch network to Maryland, Virginia, and the District of Columbia was premised on its consultant's view that nationwide banking would be the wave of the future. Senior Carteret management was not actively involved in the decision to expand the branch network to these areas. Carteret was particularly interested in opening branches in the District of Columbia because management desired to impress Congressmen, lobbyists and other people in Washington, D.C., because Carteret claimed to have a partnership with them. Carteret opened de novo branches in the District of Columbia, which were expensive to own and operate. Carteret, however, was not able to realize its objective of forming an East Coast brand and it "pulled back" when it saw that it was unable to earn profits on its mid-Atlantic branch system. It sold these underperforming branches in 1990 to a Baltimore institution, Loyola Federal Savings and Loan.

## D. FACTS RELATING TO AMBASE'S ACQUISITION OF CARTERET

20. In early 1987, Ambase, which was a publicly owned insurance holding company (then known as Home Insurance Group), began discussions concerning the acquisition of Carteret. At this time, the CEO of Ambase was Marshall Manley who, from 1966 to the mid-1980's, was counsel to Southern California Savings and Loan Association ("Southern California"), a subsidiary of City Investing Company ("CIC"). CIC was a conglomerate that had owned the Home Insurance Group. Manley was hired by Home Insurance Group to improve the insurance subsidiary (Home Insurance Company or "Home"), which had performed poorly. DX 8000 at 16. At the time Manley was recruited (1985), Home was among the least productive

property casualty insurers in the United States. Before joining Home, Manley had been chairman of Merchant Bank of California, which he founded and which, shortly after he left to join Home, became the target of Federal and state investigations. Manley also was affiliated with Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, a law firm which declared bankruptcy in the late 1980s. While CEO of Home, Manley also received money from Finley, Kumble during the time Finley, Kumble did work for Home.

21. In 1986, Home lost $197 million in its insurance operations. DX 8000 at 17. Home struggled to develop a new corporate strategy and decided to become a diversified financial services company. Manley devised a strategy to improve Home's performance by extending Home's product line into specialty areas such as lawyer malpractice insurance. Manley attempted to improve Home's profit margins by shifting financial assets into so-called "high yield" (junk) bonds. In 1987, Home acquired Gruntal Financial Corp., a retail brokerage and securities firm and announced the proposed acquisition of Carteret Bancorp. DX 8000 at 17.

22. Carteret agreed to the Home acquisition for at a premium of 47.5 percent above the last sale price of Carteret stock before the announcement of the acquisition. The purchase price was $291.9 million in cash, 9.45 times the expected fully-diluted 1987 earnings and 92 percent of year-end book value. Prior to the announcement, Carteret was trading at $15.25 per share, 6.4 times 1987 earnings per share and 62 percent of its 1987 book value. DX 8000 at 17.

23. Two months after Home initiated its efforts to acquire Carteret, on October 19, 1987, the New York Stock Exchange ("NYSE") fell 508 points, or more that 20 percent. Soon thereafter Carteret was trading at $11 5/8 per share and Home, at $14.50 per share, was approximately $4 down from the $18.50 per share it traded at when the merger was announced.

Home sought to renegotiate the deal and Carteret filed suit in Delaware to force Home to complete the merger. In January 1988, the parties agreed to a new price of $19.00 per share. Home received an option to acquire 18.5 percent of Carteret (which it exercised for $11.9 million to deter others from bidding on Carteret), and Carteret was given 30 days in which to seek a better offer. No better offer emerged. DX 8000 at 17-18.

24. By the end of 1987, Carteret was beginning to suffer substantial earnings problems. Net income declined by 28 percent in 1987, and income before gains on securities sales declined by 68 percent, to $11.6 million. Carteret also was losing the benefit of the income spread between accretion and amortization because many of the accreted loans were maturing and the thrift reduced the period over which the goodwill would be amortized from a maximum of 40 years to a maximum of 25 years. Although these changes in Carteret's financial condition may have supported a decision by Ambase to abandon the transaction under the "material adverse changes" clauses in the acquisition contract, Ambase acquired Carteret. The transaction closed in August 1988, a year after Ambase made its initial offer. DX 8000 at 18. The FHLBB approved Ambase's change of control application upon the assumption that Ambase could be a source of capital strength to Carteret. Indeed, under the FHLBB's policy, Ambase's application could not have been approved if it did not appear financially competent to augment Carteret's regulatory capital ratios in the event the thrift suffered losses and lacked sufficient capital. Unfortunately, as future events demonstrated, Ambase's financial condition deteriorated as, or more, quickly than Carteret's and it was unable to provide the financial support Carteret required.

## E. AMBASE ABUSED ITS OWNERSHIP POSITION BY SIPHONING CAPITAL FROM CARTERET

25. While Ambase was fully aware that Carteret was undercapitalized at the time it made the acquisition, DX 8000 at 18, instead of taking immediate steps to improve Carteret's capitalization it drained capital from Carteret to advance its own business objectives. For example, immediately after the acquisition, Ambase caused Carteret to pay a $22.9 million dividend to Ambase and to redeem $11.9 million of stock Ambase had acquired before the acquisition pursuant to the exercise of an option. In 1989, Ambase caused Carteret to upstream another $13 million dividend. Ambase also caused Carteret to acquire one of Ambase's businesses, Imperial Premium Finance ("IPF") for $65 million in cash. This transaction enabled Ambase to record a $10.8 million gain and required Carteret to charge $10.8 million against regulatory capital. DX 7063 at 10. In 1990, Ambase also required Carteret to make an advance of $2.1 million to Chairman O'Brien against his accelerated retirement benefit, to enable Mr. O'Brien to repay a mortgage he held with a Home subsidiary. Further, Carteret agreed to pay Ambase a management fee of $2.5 million in 1989 and in future years. DX 8000 at 18-19.

26. Ambase also misused Carteret's capital by engaging Carteret in transactions with General Development Corporation ("GDC"), a real estate developer and a participant in the time share industry. GDC had been a subsidiary of CIC, and its Board of Directors included four members of Ambase's Board of Directors (Scharffenberger, Hatch, Payne, and Manley). Following Ambase's acquisition of Carteret, Carteret was required to purchase $66.8 million of mortgages from a subsidiary of GDC without the required appraisals. Carteret also participated in a revolving credit agreement that was classified as 100 percent doubtful by OTS and FDIC

examiners. DX 8000 at n.41. The loans to GDC were in excess of permissible loans to a single borrower. Carteret's interest in the credit agreement amounted to approximately $9.5 million. DX 7000 at 79. In December 1989, the U.S. Attorney for the Southern District of Florida charged GDC and various executives with fraud based upon allegations that GDC was using inflated appraisals to sell homes at inflated prices. Id. On March 16, 1990, GDC pleaded guilty to one count of conspiracy and agreed to pay a criminal fine and make restitution to customers. Id. In April 1990, GDC declared bankruptcy in response to the indictment of the company and its two top officers. Carteret suffered a loss of approximately $5 million on its participation in the revolving credit line to GDC. DX 7000 at 83.

### F. DESPITE SIPHONING CARTERET'S CAPITAL FOR ITSELF, AMBASE WAS UNABLE TO IMPROVE ITS OWN DETERIORATING FINANCIAL CONDITION

27. Despite siphoning capital from Carteret for its own corporate purposes, Ambase was unable to achieve stable earnings or provide a reservoir of capital strength for Carteret. For example, between 1986 and 1988, Ambase used substantial leverage to acquire a finance company, a retail brokerage firm (Gruntal Financial Corp.), and Carteret Bancorp. The cost of the acquisitions was approximately $530 million. DX 5001 at 71. These acquisitions increased Ambase's debt load to $2.9 billion, or 60 percent of its total capital, which was about four times the average debt load of other property and casualty insurance companies. During the time Ambase engaged these acquisitions, competition from other insurance companies had driven down premiums and margins tightened. From October 1989 through May 1990, Ambase's stock price fell from $15 per share to approximately $7 per share. Id. As a major holder of Drexel Burnham underwritten "junk bonds," Ambase was one of Drexel Burnham Lambert's largest

unsecured creditors. The week of February 13, 1990, when Drexel Burnham filed for bankruptcy protection, Ambase's stock fell 4 percent. Id. at 72.

28. In order to enhance shareholder value, Ambase decided to sell Home and two smaller insurance units (U.S. International Reinsurance Co. and Commonwealth Insurance Co.). Ambase could not sell Carteret or Gruntal because it had overpaid when it acquired them and did want to have to report a loss on the sale of either firm. DX 5001 at 72. At the time of the sale, many analysts commented that Home's reserves were materially short of legal requirements and Ambase was unlikely to realize the price it anticipated. Id. In fact, the price received ($740 million) was extremely low relative to outstanding debt and prompted a sell-off of Ambase bonds which caused their prices to plunge. Id. at 74. In August 1990, Ambase announced a second quarter loss of $106 million which largely stemmed from the devaluation of junk bonds held by its insurance subsidiaries. This loss of capital caused Ambase to fall out of compliance with the loan agreement to finance the acquisition of Carteret. Id. In the second quarter of 1990, Ambase was forced to cancel a promised extraordinary dividend and its stock price fell to approximately $2.75 per share. PX 2702 at 70.

### G. CARTERET'S FINANCIAL CONDITION WORSENED DURING THIS PERIOD AS WELL FOR REASONS TOTALLY UNRELATED TO THE BREACH

29. By the end of 1987, Carteret was beginning to suffer earnings problems as its net income declined by 28 percent, and income before gains on securities sales declined by 68 percent, to $11.6 million. DX 8000 at 18. The general economy slowed down in 1988 and 1989 and moved into a recession in 1990 and 1991. Id. These events were unrelated to the breach but set the stage for Carteret's eventual demise. Carteret began to experience a severe credit crunch

based primarily upon the inability of its commercial loan customers to satisfy their obligations and the loss in property values caused by the economic slowdown and recession. As late as 1992, the FDIC, in its report of examination, attributed Carteret's real estate losses in large part to "poor underwriting standards and weak credit administration practices . . ." DX 8058 at 1-2. Between December 1987 and June 1989, Carteret's criticized assets increased from $274.6 million to nearly $479 million. DX 7000 at 16. As of June 1989, Carteret's classified assets equaled 5.6 percent of its total assets; this was far in excess of the peer group average of 3.3 percent. In the 1989 report of examination, the FHLBB cautioned that "the level of criticized assets may even increase since numerous loans originated during the review period are located in regions of the country that are experiencing depressed real estate markets." Id. The examiner attributed the decline in asset quality "to the lack of adequate underwriting." DX 7063 at 20.

30. In 1988, Carteret added $14 million to loan loss reserves, and then added another $28 million in 1989. DX 7000 at 22. Despite the $28 million increase in 1989, the FHLBB examiner identified $24.6 million in specific losses and noted that Carteret's reserves had to be increased by an additional $77.2 million. Carteret, however, never booked this additional reserve. Id. at 17.

31. According to the OTS 1990 report of examination ("ROE"), because of the "poor quality of loan underwriting . . . [and] a declining real estate market . . . loan loss allowances are seriously inadequate . . . [and] [t]he bank's viability has deteriorated due to the corrosive effect of its asset problems on its level of capital." DX 7064 at 8. Carteret itself reported criticized assets of $616.9 million as of June 1990; this was a $138 million increase from the $478.9 million identified in the 1989 ROE. DX 7000 at 18. The examiner concluded that Carteret's internal

loan review function was inadequate and that Carteret's criticized assets actually totaled nearly $862 million, which was $245 million more than Carteret had identified. Id. In view of Carteret's deteriorating commercial loan portfolio, the examiner concluded that Carteret carried insufficient general valuation allowances. The examiner ordered Carteret to increase these allowances by $77 million (to $98 million) by September 1990. Id. Carteret recorded a total loan loss provision of $122.3 million in calendar year 1990. Id.

32. Carteret's asset quality continued to deteriorate following the 1990 examination. During the March 1991 quarter, Carteret's classified assets increased by nearly $110 million. DX 7000 at 20. Carteret's management, however, only increased its valuation reserves from $160 million to $169 million. Id. In May 1991, Richard Bianco took over as Chairman and Chief Executive Officer of Carteret. Among other management changes, he appointed Wayne Moor as Executive Vice-President in charge of Carteret's Commercial Asset Division on June 21, 1991. DX 7000 at 20. As of March and June 1991, 61.6 percent and 72.3 percent of Carteret's commercial assets, respectively, were classified. An additional $107.5 million in commercial assets were marked "special mention." As of June 1991, criticized assets totaled nearly $782.8 million or 84 percent of Carteret's total commercial asset portfolio. Id. at 21.

33. As of September 1991, the commercial real estate portfolio deteriorated even further. An incredible 53.6 percent of Carteret's commercial assets were non-performing, while 45.2 percent of its outstanding commercial loans were either in-substance foreclosure or on non-accrual. DX 7000 at 22. Mr. Moor's job was to determine what the aggregate reserves should be and how much of a credit loss Carteret needed to record to cover the losses inherent in its commercial asset portfolio. Id.

34. Based upon Mr. Moor's initial review of 138 borrower relationships accounting for 93.1 percent of the total commercial asset portfolio, Carteret "recorded an additional $120 million of reserves resulting in a total of $150 million for the second quarter" of 1991. DX 7000 at 23. During a meeting on August 13, 1991, attended by Carteret, OTS, and the FDIC, OTS informed Carteret that, based upon the preliminary findings of the ongoing examination, the regulators were recommending that Carteret record $200 million in additional reserves. Id. Carteret informed OTS that it would be recording a $150 million credit loss during the quarter ended June 1991. Id.

35. By the end of September 1991, Mr. Moor had personally inspected the properties covering $620 million of Carteret's $800 million commercial asset portfolio. His on-site inspections validated the previous decision to record $150 million in reserves in the second quarter of 1991. During Carteret's December 16, 1991 Board of Director's meeting, Mr. Bianco stated that "the Board should feel confident with the booked amount and [another director] noted that Price Waterhouse relayed to the Audit Committee its confidence in Mr. Moor's numbers." DX 3398 at 4.

36. Carteret's difficulties with its commercial loan portfolio, combined with added attention to the ailing savings and loan industry, put great pressure on Carteret's funding sources. DX 8000 at 23. As a result of the recession, deposits were reduced from $4.3 billion to $3.0 billion (in part through branch sales). In a year (1990) in which the average Fed Funds rate declined by 111 basis points, Carteret's weighted average cost of Government guaranteed deposits declined by only 49 basis points. Id. Funding from capital market issuances declined from $378.0 million to $182.5 million and consisted only of outstanding New Jersey mortgage-

backed MTNs and Economic Development Bonds. Id. In response to the difficulties of locating appropriate funding sources, Carteret's advances from the FHLB, more than doubled (from $701 million to $1.97 billion). Id.

37. As events demonstrated, Carteret's aggressive lending strategy in the early and mid-1980s failed to produce adequate returns. Indeed, Carteret's pre-tax income from lending was negative $13.6 million in 1988; negative $7.9 million in 1989; negative $119.4 million in 1990; negative $162.3 million in 1991; and negative $3.1 million in 1992. DX 8000 at 24. Although Carteret earned $28.7 million in 1986, and $31.7 million in 1987, this was only because the negative contributions of Carteret's lending did not begin to impact Carteret's financial performance until 1988. Id. at n.51. The losses from 1988 through 1992 totaled $306 million or about 105 percent of Carteret's total capital as of September 30, 1987. Id. at 24.

### H. THE BREACH HAD LITTLE OR NO IMPACT ON CARTERET'S FINANCIAL PERFORMANCE

38. Although Ambase claims the breach was a material factor in the deterioration of Carteret's financial condition, the evidence demonstrates the opposite. The deterioration on Carteret's part began well before the breach and stemmed from losses related to high risk lending activities. For example, OTS commenced an examination of Carteret on May 22, 1989, well before FIRREA's implementation. DX 5001 at 17. The report notes: "Carteret has serious financial problems, with core operating losses over the last four quarters and declining asset quality resulting in a strained capital position." DX 7063 at 1986. The report assigned Carteret a composite rating of "4," which was the second lowest on a scale of "1" to "5," and denoted Carteret as a problem banking institution. Id.

39. The same report contains additional findings documenting Carteret's poor financial condition prior to FIRREA. It stated: "Carteret has experienced a tremendous increase in the amount of criticized assets, now representing 6.7 percent of assets and 154.2 percent of regulatory capital. . . . [A] considerable part of the problem is . . . caused by poor underwriting." DX 7063 at 1984. Carteret's classified assets increased from $9.9 million in 1987 to $174.9 million in 1988 to $307 million in 1989. This was well before FIRREA.

40. The same report indicates that Carteret's capital levels declined well in advance of the breach. For example, from December 1987 to June 1989, the ratio of regulatory capital to total assets declined from 5.7 percent to 4.4 percent. DX 5001 at 18. The ratio for Carteret's peer group declined by much less during this period. Similarly, the estimated ratio of GAAP capital to total assets declined much more rapidly for Carteret than its peer group, namely from 5.1 percent to 3.7 percent for Carteret versus from 4.3 percent to 3.3 percent for the peer group. Id.

41. Carteret's deteriorating financial condition pre-FIRREA also reflected worsening economic conditions both nationally and in Carteret's primary markets. While the recession officially began in 1990, economic activity slowed well before then. DX 5001 at 18. In New Jersey and Florida, the principal areas in which Carteret's branches were located, this slowdown was particularly pronounced. In Florida, the number of single family housing permits issued fell every year from 1986 through 1989. Id. In New Jersey, the decline in housing permits was even more pronounced. The year-over-year percentage change in single family permits turned negative in 1987, with a sharp decline in 1988 (20.5 percent) and an additional substantial decline (25.8 percent) in 1989. Id. Increasing unemployment rates provide additional evidence

of the worsening economic conditions facing Carteret prior to FIRREA. Florida's employment rate was below the national average until late 1988 when it rose above the national average, where it remained through 1990. Id. at 19. New Jersey's unemployment rate was well below the national average until early 1989 when it started to increase at a much faster rate than the national average. Id. By mid-1990, the New Jersey rate was quite close to the national rate. Id.

42. Carteret's financial statements show that the breach did not materially effect Carteret's operations. For 1988 and 1989, Carteret's cash flows were virtually the same. DX 8000 at 25. The largest changes from 1988 involved an increase in loan loss provisions ($27.5 million in 1989 versus $14.1 million in 1988) and a decrease in net accretion/amortization (from $20.1 million to $8.2 million in 1989). DX 8019 at 1265. These changes did not impact Carteret's operations. DX 8000 at 25. There were gains reported on "value of [mortgage] servicing" and "sale of [mortgage] servicing" totaling $12.9 million in 1989 versus $6.2 million in 1988. These gains, however, were immaterial in relation to Carteret's total 1989 cash flows. Id. In 1989, Carteret purchased mortgage servicing rights, net of those sold, for $17.2 million as compared to $38.4 million for 1988. DX 8023 at 13966; DX 9119 at C-AM-A-0394517. This was not a major differential in new investments relative to other cash flow transactions. DX 8000 at 25.

43. Ambase argues, that in a "but for" world, Carteret would not have sold the 23 Florida, New Jersey and Maryland branches in 1990. The evidence demonstrates that these branches were sold primarily because of economic and operational considerations, not the breach. For example, Carteret's 1991 Business Plan, dated April 30, 1991, states:

> By consolidating inefficient neighboring branches, non-earning

> fixed assets were reduced, operating efficiency was improved, and franchise value was increased. The sale of approximately $1.8 billion of deposits in 23 branches . . . allowed operations to be scaled back to strategically important markets. The resulting branch network maintains a solid retail banking franchise . . . Finally, the downsizing also improved capital ratios, reduced annualized operating expenses by approximately $18.1 million, and enhanced both the efficiency and future profitability of the branch system.

DX 7171 at 0994. This ascribes the branch sales primarily to operational concerns.

44. Ambase claims that the breach caused Carteret to incur additional deposit costs because on April 3, 1989, according to Professor Calomiris, Carteret was paying 105.5 basis points less to its holders of 6-month certificates of deposits than the average thrift and this advantage allegedly dissipated following the breach. According to Professor Calomiris, Carteret paid approximately $17 million in higher deposit costs between January 1991 and December 1992 than it would have paid in the absence of the breach. PX 2704 at ¶ 10 and Table 2. The evidence demonstrates, however, that Carteret was not paying 105.5 basis points less than the average thrift on 6-month certificates on April 3, 1989, and that there would not have been any differential between Carteret's costs and those of the average thrift in the absence of the breach. For example, as noted by Professor Saunders, if Carteret had been paying 105.5 basis points less than the average thrift on 6-month certificates on April 3, 1989, Carteret would have been able to borrow money at 12.5 basis points below the United States Government. DX 5001 at 59. As Professor Saunders observes, this ". . . is very wrong." Id. Indeed, based upon Carteret's March 31, 1989 Thrift Financial Report ("TFR"), instead of paying 12.5 basis points less on 6-month Treasury certificates, Carteret was actually paying 35 basis points more. Id. Further, on April 3, 1989, the rates on 6-month certificates of deposits were extremely high and fell dramatically

from 1989 to 1992. DX 5001 at 60. On July 1, 1992, and September 23, 1992, for example, the rates on 6-month certificates were 3.86 percent and 3.27 percent respectively. If, as Professor Calomiris assumes, Carteret's rates would have been 105.5 basis points below the average rate in the absence of the breach, Carteret would have been paying a rate of only 2.795 percent in the absence of the breach which was 37 percent lower than other savings banks were paying in that low rate environment. DX 5001 at 60. As Professor Saunders observes, it is "far fetched" to believe Carteret could have borrowed money at such low rates in the absence of the breach. Id.

45. Ambase also claims that Carteret engaged in asset shrinkage as a result of the breach and incurred lost profits as a result. PX 2704, Table 2. The evidence demonstrates the contrary. Rather than asset shrinkage being related to the breach, Carteret began shrinking its assets before the breach. DX 5001 at 61. Further, as Professor Calomiris acknowledges ". . . a substantial portion of this shrinkage was related to Carteret's efforts to discontinue corporate and commercial real estate lending and to dispose of related assets[.]" PX 2702 at ¶ 65. As acknowledged in the 1991 Business Plan:

> The Bank began exiting the commercial lending and real estate development businesses because they were not consistent with Carteret's traditional strengths in retail and mortgage banking . . . Corporate bank and real estate portfolios were reduced $160 million or 15% during 1990 as a result of payoffs and loan sales. Additionally, $122 million of loan loss provisions were established to maintain reserve ratios on all bank portfolios at adequate levels. To reduce its real estate development investment, the Bank was successful in selling a development project at Jensen Beach, Florida and was able to buy-out an option to purchase Sergi Farm, a parcel of land located in Cherry Hill, New Jersey. This resulted in substantial savings to Carteret.

DX 7171 at 0993-4.

46. Ambase claims the breach resulted in a deposit run-off as well. The evidence demonstrates the contrary. Although, as Professor Calomiris notes, in May 1989, Carteret had $4.72 billion in deposits which fell to $4.35 billion by the fourth quarter of 1990, the comparison is misleading because Carteret enjoyed a bulge in deposits in May 1989 due to a feverish market for certificates of deposits in the Spring of 1989. DX 5001 at 63. Indeed, in March 1989, when FIRREA was also being considered, Carteret deposits were in the $4.3 billion to $4.4 billion range, which was approximately the same level they were in the fourth quarter of 1990. As Professor Saunders notes, the level of Carteret's deposits between 1985 and 1992, which was relatively constant but for the spike in the second quarter of 1989, provides no evidence to suggest that FIRREA "caused any significant deposit run-off." Id. at 63. Although there was a sharp decline in deposits in the fourth quarter of 1990, this was "due to the sale of the 23 branches [in Florida, Maryland and New Jersey]." Id.

## I. BECAUSE OF ITS POOR FINANCIAL PERFORMANCE AND CONDITION PRIOR TO AND AFTER THE BREACH, CARTERET WOULD HAVE FAILED IRRESPECTIVE OF THE BREACH

47. Ambase claims that, due to the strength of Carteret's management and operations, Carteret had "significantly profitable operations for 14 consecutive months through November 1992 . . ." DX 8028. This is the primary basis upon which Ambase claims Carteret would have survived in the absence of the breach. This assertion is contrary to the evidence. For example, a review of quarterly TFR data for core or operating income (line S056 of the Veribanc TFR data) indicates that Carteret in fact lost $206,000 in Q4 1991. DX 5001 at 75. Q4 represented Carteret's fourteenth consecutive quarter of operating losses, stretching back to Q3 1988, which was over a year before the breach. Id. In Q1 1992, Carteret earned a very modest operating

profit of $428,000, and it essentially broke-even with an operating profit of $96,000 in Q2 1992. Id. In Q3 1992, Carteret's operating profit was $2.6 million, which represented a .05 percent quarterly return on $4.9 billion in assets. Id. This performance does not demonstrate a significantly profitable operation immediately prior to seizure. The OTS report of examination which commenced on June 15, 1992, concluded that, despite some modest operational improvements, "significant asset quality and regulatory capital problems persist." DX 7070 at 0007-8. It concluded that "management must affect a substantial outside equity capital infusion in order to augment the rehabilitative process that commenced in June of 1991." Carteret received a composite rating of "5," which it had also received in the 1991 examination. Id.

48. The FDIC's 1992 examination reflects a similar picture of Carteret's financial condition. The report notes that "Carteret's serious asset problems and resultant operating losses have effectively rendered the bank insolvent, and its survival depends entirely on a near-term infusion of at least $200 million in capital . . . Many of the institution's problems are due to the weak underwriting standards and poor loan administration practices of the institution's prior management." DX 8058 at 1. In discussing earnings, the report notes that "the bank's net interest margin is still considered very weak, as it continues to suffer from the very high level of non-performing assets . . . [Further], the improvement [in earnings] is considered delusory, as the OTS examiners have determined that the [loss reserves] were deficient by approximately $8 million after charge-off of loss." Id. at 1-1. As for the quality of assets, the report notes that "[t]he poor underwriting standards and weak credit administration practices of the past continue to cripple the bank's financial viability." Id. at 1-2.

Thus, the Federal examiners concluded that Carteret continued to be a very weak

institution one quarter prior to failure, despite modest gains in operating income. In appraising Ambase's claim that Carteret demonstrated "significantly profitable operations for 14 consecutive months through November 1992 . . .," it is also important to look at Carteret's overall indebtedness and liability structure. As a result of funding provided by the FHLB of New York, Carteret's deposits declined by $1.1 billion while its FHLB advances increased by $1.0 billion. This was equal to approximately 40 percent of Carteret's liabilities. DX 5001 at 26. Most of the FHLB borrowing was on a variable rate basis tied to LIBOR rates. Id. In 1991 and 1992, short-term rates and the cost of FHLB funding declined considerably. Id. The relatively cheap FHLB funding facilitated a favorable interest margin on Carteret's performing assets. This was a highly uncommon situation among banks of Carteret's size. DX 5001 at 27.

49. Although Ambase contends Carteret was healthy compared to other failed thrifts, relevant financial ratios during this period demonstrate that this was not so. Specifically, Carteret's tangible capital ratio, which is the litmus test of financial health, was negative, with a tangible capital to tangible assets ratio of negative 1.29 percent. DX 5001 at 28. This was worse than that of the median failed thrift one quarter prior to failure. Id. at 29. Further, because Carteret was heavily reliant upon real estate assets at the time of failure, the ratio of non-accrual loans plus REO divided by total assets is a key measure of the financial health of the institution. Id. Carteret's ratio one quarter prior to failure compares unfavorably to other failed thrifts; Carteret's was 7.00 percent, as compared to a 6.92 percent mean and 5.94 percent median. Id. Thus, Carteret was a poorly performing thrift even when compared to other failing thrifts. Moreover, this analysis is essentially irrelevant because Carteret was insolvent, its liabilities were heavily interest rate sensitive, its closure was required by the Federal Deposit Insurance

Corporation Improvement Act of 1991 ("FDICIA"), and it was unable to recapitalize. Id.

50. Ambase's contention that Carteret had superior management is also counterfactual. Although Mr. Moor had substantial experience in resolving classified real estate portfolios, Mr. Bianco, Carteret's CEO, 1991, had no prior experience in banking or insurance. Thus, Mr. Bianco lacked the background and experience to run Carteret.

**J. BECAUSE OF THE POOR CONDITION OF CARTERET'S BALANCE SHEET, CARTERET WAS UNABLE TO RAISE CAPITAL**

51. By February 4, 1991, even after Ambase's investment of $20 million in 1990 and $30 million in early 1991, Carteret failed post-FIRREA regulatory capital requirements. On February 4, 1991, OTS transmitted a Capital Directive for execution by Carteret and its Directors by no later than February 28, 1991. DX 7000 at 7. On February 14, 1991, Carteret filed a motion for injunctive, declaratory, and other equitable relief in the United States District Court for the District of New Jersey, requiring OTS to count goodwill as regulatory capital. DX 8027. The district court issued a temporary restraining order on February 19, 1991, and a preliminary injunction on April 12, 1991, requiring OTS to count goodwill as regulatory capital. Id.; DX 4118. As a result, OTS was required to withdraw its Capital Directive. By June 30, 1991, even including all of its supervisory goodwill as regulatory capital, Carteret failed to meet the FIRREA-mandated minimum regulatory capital requirements. DX 7000 at 7. Based upon data contained in Carteret's September 30, 19991 TFR, OTS Regional Director Vigna and Deputy Regional Director Albanese recommended Carteret be transferred to the RTC. PX 4867a. Albanse and Vigna reported that "the detertioration of Carteret's [regulatory capital] position [was] primarily the result of the Savings Bank's unsuccesful extension into corporate and

commercial real estate lending and its failure to internally identify and address problem assets." Id. at 6. Thus, Carteret's failure was a direct result of the collapse of its loan portfolio in 1990 and 1991, rather than the rules relating to regulatory capital compliance. DX 8000 at 26.

52. Following Carteret's lack of compliance with the FIRREA-mandated minimum regulatory capital requirements at the end of Q2 1991, OTS provided a Stipulation of Consent to the Issuance of a Capital Directive and a Capital Directive in September 1991. DX 7000 at 7. Carteret consented to the issuance of the Capital Directive on October 8, 1991, and agreed to file a capital plan. Id. at 7-8; DX 4118. Carteret filed a capital plan that required raising $215 million by December 1992. OTS approved the capital plan, and Carteret entered into an agreement with OTS on February 27, 1992, that permitted OTS to seize Carteret should Carteret fail to meet minimum capital requirements by May 27, 1992. Id.

53. On March 2, 1992, OTS approved Carteret's capital plan requiring infusion of approximately $215 million through a privately-placed equity offering. On February 18, 1992, Ambase retained Kidder, Peabody & Co. ("Kidder") and Merrill Lynch & Co. ("Merrill") to assist with this private placement. DX 4118. A Kidder letter to Carteret dated May 12, 1992, updated Carteret as to the status of the recapitalization efforts. The letter included an attachment listing 17 full and partial potential investors and the status of discussions with each of them. DX 7389. Other institutions, including American Stock Transfer & Trust Company and GE Capital, also expressed interest in investing in Carteret. DX 7358; DX 51.

54. Discussions with two different potential investors resulted in preliminary agreements to recapitalize Carteret. On July 20, 1992, Ambase signed a letter of intent with Kohlberg & Co. ("Kohlberg") to invest $200 million into Carteret pending a satisfactory due

diligence. DX 40; DX 7406. Kohlberg subsequently withdrew its letter of intent on August 14, 1992, after concluding that Carteret was not viable. Id. In the November S-Memorandum recommending Carteret's transfer to the RTC, Messrs. Albanese and Vigna noted that Kohlberg's refusal to invest was "due to Carteret's $502.2 million in nonperforming loans and REO (9.6% of total assets at June 30, 1992), possible overvaluation of purchased mortgage servicing rights, possible additional losses on the commercial loan and real estate owned portfolios, and lack of support for Carteret's financial assumptions and projected earnings." PX 4886 at 2. Carteret also had extensive discussions with representatives from The Carlyle Group regarding Carlyle taking the lead in a consortium of investors to recapitalize Carteret. DX 7409. On October 19, 1992, The Carlyle Group, along with Colony Capital, Inc. signed a letter of intent to invest $200 million in Carteret. DX 9120. After conducting a due diligence, they withdrew the letter of intent. In their memorandum recommending transfer of Carteret to the RTC, Messrs Vigna and Albanese noted that The Carlyle Group and Colony Capital "had concluded [they] could not receive an adequate rate of return on [their] investment and had concerns about 'regulatory risk.'" PX 4886 at 2. After these efforts failed, Messrs Vigna and Albanese recommended that Carteret be transferred to the RTC. They noted Carteret failed to meet its tangible, core, and risk-based capital requirements by $133.2 million, $157 million, and $235.4 million, respectively. Id. at 5. They further noted that their recommendation would not change even if goodwill was counted as regulatory capital because "Carteret's high level of problem assets continue[d] to negatively impact earnings and capital through the loss of interest income, additions to reserves and charge-offs." Id. at 8-9. On December 4, 1992, OTS seized Carteret and placed all Carteret's assets into a newly-chartered Federal mutual association named Carteret

Federal Savings Bank ("CFSB"). DX 7020. OTS appointed the RTC as receiver of Carteret and Conservator of CFSB. DX 2257.

55. Although Carteret was able to raise capital through public offerings in 1983, 1985, and 1986, the deterioration of Carteret's loan portfolio made such borrowing difficult. Id. The tolerance for investment in undercapitalized savings and loans in the mid-1980s did not extend to savings and loans experiencing rapidly deteriorating loan portfolios. Id. Because many banks and savings and loans with troubled loan portfolios were required to restate their financial statements during this period, the market was skeptical of bank and savings and loan accounting. This skepticism was evident in the market's pricing of Ambase stock in February 1991 after Ambase announced the sale of all of its businesses except Carteret; the market priced Ambase stock at only 13.8 percent of Carteret's total net worth. Thus, the market did not believe Carteret's book accounting. DX 8000 at 29.

56. KPMG, Carteret's auditor, qualified its opinion for 1990, raising questions about Carteret's "ability to continue as a going concern." DX 8000; DX 8027. This qualification reflected, among other concerns, the decline in Carteret's tangible capital related to loss provisions. Carteret continued to be in regulatory capital compliance at the time of this qualified opinion; the opinion resulted from Carteret's loan losses and continuing asset quality problems. DX 8000 at 29. The qualified audit discouraged possible investors, as did Carteret's asset quality. Id.

57. Carteret understood that, following the qualified audit, the only way to raise capital was through a private placement. A private placement, in turn, was only possible, if at all, if sophisticated investors were willing to take the risk that a capital infusion would allow

Carteret to wait out the recession. DX 8000 at 29. Private equity investors at this time expected returns of 20 percent to 25 percent or more. DX 8508. Thus, any investor would insist upon a large percentage of the stock of the recapitalized entity in order to satisfy its requirement for a large return. DX 8000 at 30.

58. A number of private equity investors were active in the savings and loan market in the middle and late 1980s, and many profited handsomely. DX 8000 at 30. If these investors feared that a particular savings and loan's business could not be fixed by adding capital (because of a still-deteriorating loan portfolio, for example), they would wait for the RTC to intervene. This would allow investors to avoid the risk that they would lose all their investment by investing before an RTC takeover. Id.

59. If Carteret's problem was only that it was undercapitalized, or appeared to fail compliance because of undercapitalization, one or more investors might have invested in the thrift. DX 8000 at 30. Those investors who expressed initial interest eventually chose not to invest because of the ongoing difficulties in the thrift's loan portfolio and business plan. DX 8000 at 31. Neither Kohlberg, nor The Carlyle Group, nor any other investor declined to invest in Carteret because goodwill could not be counted toward regulatory capital. Id.

## K. EVEN COUNTING GOODWILL AS REGULATORY CAPITAL, CARTERET COULD NOT HAVE RAISED OUTSIDE CAPITAL TO ENSURE SURVIVAL

60. As indicated above, once Carteret's auditors qualified their opinion of Carteret's financial statements in December 1990, Carteret would have been unable to access the public market to raise capital. DX 8000 at 33. Carteret might have been able to raise capital in public markets the prior year, but only if other investment criteria had been met. Id. To make such an

offering, Carteret would have been required to disclose its rapidly-growing problem loan portfolio. Id. It is still possible that an underwriting group might have been willing to underwrite an appropriately priced new issue of equity securities if it was clear that (i) Carteret's loan problems were under control, and (ii) after the investment, Carteret would not be at risk of falling out of compliance with capital requirements. Id.

61. Between the first quarter of 1989 and the fourth quarter of 1992, savings and loans completed only 20 public issues of equity securities and one private placement of equity of $20 million or more. DX 8000, Exh. 4, Table 1. Excluding initial public offerings ("IPO"), there were fifteen public secondary issues of equity and one private placement of equity of $20 million or more. Id. at Table 2. Seven of these issues were by thrifts far better capitalized than Carteret: Washington Mutual (four issues); Great Western (two issues); and Home Savings of America (H.F. Ahmanson). Id. These thrifts were also much larger than Carteret. Id. Excluding the seven issues of these thrifts and the one issue of $75 million in the fourth quarter of 1992 (which was after Carteret had been transferred to the RTC), the average size of the remaining seven issues was $27 million, with the largest of the remaining offerings being approximately $36 million. DX 8000 at 35. If Carteret's financial profile had been similar to these other issuing institutions, it might have been able to raise up to about $35 million in a public secondary offering as these institutions had. Carteret compared unfavorably to all of the savings and loans that were able to raise significant equity capital from 1989 through 1992, in every quarter, in terms of financial strength and performance ratios important to investors. Id. Indeed, for the key measures of net income to total assets, income before gain on sales of assets to total assets, tangible capital to tangible assets, non-accrual loans and real estate owned to total assets, and

core capital to adjusted tangible assets, and in each of the relevant quarterly periods, Carteret's ratios were significantly inferior to the comparable ratios of the thrifts that were able to raise capital. Id.

62. Although, on a narrow regulatory measure, Carteret might have looked stronger in a hypothetical "but for" world than it did in the actual world, there is no evidence that Carteret's true financial condition or real economic performance would have been materially better "but for" FIRREA's breaching provisions. DX 8000 at 36. To the contrary, in a "but for" world in which goodwill counted as capital for regulatory purposes, Carteret still would have looked far worse, in terms of financial condition and economic performance, than thrifts that were able to raise capital from 1989 through 1992. Id. The performance ratios comparing Carteret to the thrifts that raised capital would not have materially changed as a result of the addition of goodwill as regulatory capital to Carteret. Id. Thus, the data strongly indicates that Carteret would not have been able to tap equity markets for capital even in a "but for" environment because of its weak performance indicators and undercapitalization relative to those savings and loans that did attract equity financing. Id.

63. A comparison of the financial characteristics of Carteret with savings and loans having assets greater than $2 billion which did not raise at least $20 million in capital during the third and fourth quarters of 1989 and 1990 demonstrates that, with or without goodwill, Carteret was and would have been unable to attract private equity capital. Thus, by the ratio of Net Interest After Loan Loss Provisions To Total Assets, Carteret ranked in the third quartile in the last two quarters of 1989 and the bottom quartile in the first, third, and fourth quarters of 1990 when compared to other large savings and loans. DX 8000, Exh. 4, Table 3. The fact that these

large savings and loans were not inclined to or unable to raise capital during this period despite vastly exceeding Carteret in this important performance ratio indicates that Carteret would not have been able to attract private equity capital with or without goodwill. Id. at 38. To the contrary, Carteret was unable to attract private equity capital in the real world and its position on this important performance ratio relative to other large savings and loans would not have changed in the absence of the breach. Id. The same is true with respect to the performance ratio of Nonaccrual Loans Plus Real-Estate-Owned to Total Assets where Carteret ranks in the third quartile during all of the relevant quarters. Id. Exh. 4, Table 4.

64. This data refutes Ambase's assertion that Carteret's inability to obtain additional financing after FIRREA changed the method of reporting capital compliance was because of this change. The evidence demonstrates that Carteret's business strategy had failed, and this failure was reflected in the deteriorating performance ratios that any investor would have considered before investing. DX 8000 at 38. The data shows that Carteret was not an attractive investment opportunity. It was a worse-than-average thrift, relative to its peers, and was showing no signs of improving relative to its peers. Id.

## L. CARTERT COULD NOT HAVE RAISED SUFFICIENT CAPITAL BY SELLING ASSETS

65. Professor Calomiris argues that, even if Carteret could not have raised capital from investments in a "but for" world, it could have raised sufficient capital by selling appreciated assets, namely Carteret Mortgage Company ("CMC") and its loan servicing portfolio. According to Professor Calomiris, CMC could have been sold for $18 million to $58 million, and the mortgage servicing portfolio could have been sold for at least $101.6 million.

DX 5038 at ¶¶ 114-116. As Professor Saunders points out, CMC had little value to Ambase or an outside buyer because the affiliate brokers who provided the vast majority of mortgage business to Carteret defected to other institutions after Carteret's ability to finance mortgages was no longer assured. DX 5001 at ¶ 141.

66. The RTC extensively analyzed CMC and concluded CMC could not be sold and should be closed. Donna Cribbs, an RTC asset specialist, summarized the results of her evaluation of CMC by noting its "heavy reliance upon the correspondent network for production" of new business. She further warned that "[a]ny significant attrition [of CMC personnel or the correspondent network] would limit viability of CMC continuance in the originator marketplace." DX 5014. As Professor Saunders has observed, "[i]f CMC was such a thriving entity, why didn't Ambase/Carteret sell it when it needed capital in the 1990-1992 period, preferring instead to sell its branches." DX 5001 at ¶ 115.

67. Likewise, it is unlikely Carteret could have raised substantial capital by selling its mortgage servicing rights. As Professor Saunders questions, if Carteret could have raised over $101.6 million by selling mortgage servicing rights, why did it not do so to avoid seizure by the RTC? He observes that "the value of such rights is highly unstable, varying over time with the level of interest rates and mortgage prepayment behavior." DX 5001 at ¶ 116. In addition, because Carteret's balance sheet already included the value of mortgage servicing rights, only the net gain, net of taxes, would have contributed to Carteret's capital. Id. There is no evidence a transaction of this kind would have improved Carteret's regulatory capital position.

## M. CARTERET DID NOT OVERRESERVE ON ITS COMMERCIAL REAL ESTATE AND CORPORATE LOAN PORTFOLIOS

68. Ambase contends that, because of the breach, Carteret overreserved on its commercial real estate and corporate loan portfolios and this reduction inhibited its ability to raise capital. Ambase also contends that its reserves were sufficient to cover the shortfall between the outstanding principal of commercial real estate and corporate loans and the collateral. The evidence will demonstrate that these contentions are false.

69. Although Ambase's expert, Professor Calomiris, concedes that, apart from the breach, "the biggest challenges facing Carteret in the 1990-92 period related to the asset quality problems inherent in Carteret's corporate and commercial real estate lending portfolios[,]" he argues that Carteret booked larger reserves than it otherwise would have, and that, absent the breach, the thrift would not have sold as many of these assets into a depressed real estate market. PX 2702 at ¶ 82. Carteret, however, identified its corporate loan and commercial real estate exposure in its 1990 Strategic Plan. There it presents three "pie charts" depicting the balance sheet composition of a healthy thrift (Chart I), an insolvent thrift (Chart II), and Carteret (Chart III). DX 8098 at 1634-36. The chart demonstrates that the share in land and commercial assets for a healthy thrift is 6.9 percent, and for an insolvent thrift 13.0 percent. It shows that, for Carteret, the share was 23.6 percent. Id. By its own admission, Carteret's exposure in land and commercial assets was clearly excessive, and this exposure was exacerbated as the economy headed into a recession in 1990 and 1991.

70. The regulators were extremely concerned about the quality of Carteret's commercial loan and real estate portfolios. For example, the FDIC's June 19, 1992 ROE documents the size of Carteret's nonperforming assets from 1990 to 1992, and expresses concern about their "very high level." DX 8058 at 1703. As a percent of total assets, non-performing

assets increased from 12.8 percent on December 31, 1990, to 15.7 percent on December 31, 1991, to 16.1 percent on March 31, 1992. DX 5001 at 81.

71. Carteret's auditors also flagged the thrift's commercial real estate problems. In an April 27, 1990 letter, KPMG Peat Marwick advised the Audit Committee of Carteret's Board of Directors of several instances in which the thrift's underwriting policies were not adhered to or were inadequate. DX 8034 at 0725-6. In addition, KPMG noted that various other control procedures did not appear to be in place once a loan had closed. Id. Even Professor Calomiris acknowledged these problems as he observed that, from 1990 to 1992, "Carteret suffered severe losses on its corporate/commercial real estate portfolios[,]" "due to some underwriting problems and, more importantly, due to the commercial real estate recession of the early 1990s[.]" PX 2702 at ¶ 82.

72. Carteret's commercial asset problems were also highlighted in the Kidder and Merrill description of the company in their March 9, 1992 Investment Opportunity Overview. DX 7375 at 0625. Of $890.7 million in total commercial assets as of December 31, 1991 (before $196.2 million in write downs and $66.4 million in reserves), fully $194.1 million was REO and $329.9 million consisted of non-performing loan principal. Id. Thus, nine months before seizure, close to 60 percent of Carteret's commercial assets were either REO or non-performing loans. Further, as of the end of the quarter prior to failure, Carteret's ratio of nonaccrual loans plus REO divided by total assets compared extremely unfavorably to the mean and median of other thrifts in the quarters before they failed – 7.00 percent for Carteret versus the mean and median of other failed thrifts of 6.92 percent and 5.94 percent respectively. DX 5001 at 81.

73. Despite this exposure in the commercial real estate and corporate loan portfolios,

Ambase argues that in the absence of the breach, as of September 1992, Carteret would have been reserved by $50 million less than it reserved for in the actual world. The evidence demonstrates that Carteret was not overreserved and the appropriate level of reserves would have been no different in the absence of the breach.

74. According to regulatory principles, a valuation allowance is considered adequate if it is sufficient to cover both losses on specifically identified assets and losses inherent in the remaining asset portfolio. DX 7446 at 261.1; OTS Regulatory Handbook 261.1. According to the accounting literature:

> Because the allowance and the related provision for losses are key elements of the financial statements, it is critical that these [reserve] judgments are made in a disciplined manner that is based on detailed analyses of the loan portfolio. Generally, an institution should employ a systematic methodology each period to determine the amount of loan losses to be reported and should document the rationale supporting each period's determination.

AICPA Audit and Accounting Guide - Audits of Savings Institutions With Conforming Changes as of May 1, 1992 ("Audit Guide"; DX 7441), at 7.05; see also DX 7445.

75. The effectiveness and thoroughness of a thrift's asset classification policy and practice play an integral role in ensuring that its valuation allowances are adequate. DX 7000 at 12. This is because an asset's classification impacts the need for, and the appropriate amount of, the valuation allowance or reserve. Id. For example, when a thrift classifies an asset either Substandard or Doubtful, it is required to establish a prudent general valuation allowance. Id. When a thrift classifies an asset Loss, the institution is required to either establish a specific allowance equal to 100 percent of the loss or charge the loss off. 12 C.F.R. §561.16c(d)(2) (1989); 12 C.F.R. §563.160(d)(2)(1992); see also DX 7446. Therefore, if a thrift's classification

process is inadequate, it can result in its valuation allowances being materially understated. DX 7000 at 12.

76. Although thrift management is responsible for establishing valuation allowances, if "an examiner has classified one or more assets, or portions thereof, Substandard or Doubtful and has determined that the existing valuation allowances are inadequate, the insured institution shall establish general allowanes for loan losses in an appropriate amount as determined by the examiner, subject to approval by the Principal Supervisory Agent." 12 C.F.R. § 561.16c(d)(1)(1989); 12 C.F.R. § 563.160(d)(1)(1992); see also DX 7446. Furthermore, when an examiner classifies an asset Loss, the institution is required to either establish a specific allowance equal to 100 percent of the loss or charge-off the amount classified as Loss. 12 C.F.R. § 561.16(c)(d)(2)(1989); 12 C.F.R. § 563.160(d)(2)(1992); see also DX 7446.

77. Thrifts are required to establish adequate valuation allowances in accordance with GAAP. Valuation allowances that are "consistent with the practice of the Federal banking agencies may be used for supervisory purposes." 12 C.F.R. §561.16c(d)(3)(1989); 12 C.F.R. § 563.160(d)(3)(1992). Financial Accounting Standard Board ("FASB") Statement No. 5, Accounting for Contingencies (DX 5047), is the primary authoritative standard on the accounting and reporting of loss contingencies including credit losses. Under FASB 5, a loss should be recognized and charged to income when it is probable and can be reasonably estimated. DX 7441 at 7.03; DX 5047 at ¶ 8. In addition to FASB 5, FASB 15, Accounting by Debtors and Creditors for Troubled Debt Restructurings (DX 7443), provides more specific guidance on how loans that have been foreclosed upon or are considered in-substance foreclosure ("ISF") or troubled debt restructurings ("TDR") should be accounted for and reported.

78. As previously discussed, Carteret brought in new management in the Spring and Summer of 1991. DX 7000 at 20. J. Wayne Moor was appointed Executive Vice President on June 21, 1991, and was placed in charge of Carteret's Commercial Asset Division. DX 4118 at 31. According to Mr. Moor, when he arrived at Carteret, the thrift's commercial asset portfolio was in shambles.

79. Upon arrival at Carteret, Mr. Moor instructed the existing asset managers to prepare write-ups on the 138 relationships that accounted for 93.1 percent of the total commercial asset portfolio. DX 7000 at 23. Mr. Moor, along with Peter Mitchko, Portfolio Manager, and Walter Smith, Internal Review Appraiser (together the "Panel") then "spent eleven days interviewing each responsible officer and visiting as many properties as possible." DX 44. By August 8, 1991, all 138 write-ups had been discussed and 29 percent of the portfolio had been visited. DX 7000 at 23. As each asset was discussed, the Panel "estimated a reserve amount for that asset given the facts at hand." DX 44. Based upon its initial review, the Panel determined that Carteret should record "an additional $120 million of reserves resulting in a total of $150 million for the second quarter [of 1991]." DX 7232 at A-1.

80. As a result of the initial review, "30 of the 55 employees in the Commercial Asset area were terminated and replaced by 15 individuals with workout skills more appropriate for what [was] rapidly becoming a $1 billion real estate company." DX 7341. The new management team, which was in place by early September, began "working on proving out what the reserves should be for each commercial asset." Id. By the end of September 1991, Mr. Moor had "personally inspected" the properties on $620 million of Carteret's $800 million commercial asset portfolio. DX 3387 at 6. By the end of October 1991, 98.5 percent of the assets that had

been classified were documented and the reserves booked as of September 1991. DX 7132 at 2.

81. Despite being based upon an initial review, the total $150 million addition to Carteret's reserves during the June 1991 quarter proved to be fairly accurate. The actual losses on assets that were disposed of between July 1991, and September 1992, equaled 93.0 percent of the total reserves established on these assets as of September 1991. DX 7000, Exh. 7.4. Furthermore, during Carteret's December 16, 1991 Board of Director's meeting, "Mr. Bianco stated that the Board should feel confident with the booked amount and Mr. Burns [a Carteret director] noted that Price Waterhouse relayed to the Audit Committee its confidence in Mr. Moor's numbers." DX 3398 at 4.

82. Although Ambase contends that Carteret was overreserved by $50 million as of September 1992, this argument is inconsistent with contemporaneous evidence. For example, during Carteret's July 29, 1992 Board of Director's meeting, Carteret's Vice Chairman and CFO, Donald Kramer, informed the Board that Carteret's "reserves [were] adequately stated . . ." DX 7142 at 2; see also DX 7121 at 2. In addition, under the terms of the April 21, 1991 Supervisory Agreement, Carteret's Board of Directors was required to submit a quarterly resolution to the OTS certifying that it had "reviewed management's analysis" of Carteret's valuation allowances and concurred that the allowances reported in the TFR "appropriately and adequately address the level of current and anticipated risk exposure of the Association's loan and investment portfolios . . ." DX 7000 at 53. In a resolution dated November 24, 1992, Carteret's Board informed the OTS that it had reviewed and concurred with management's analysis of the valuation allowances. DX 7227.

83. The process Carteret used to determine its reserves validates the valuation

allowance. For example, as of September 1992, Carteret had established total reserves (including charge-offs) of $224.4 million of which commercial assets accounted for $200.6 million or over 89 percent of aggregate reserves. DX 7000 at 28. Of the $200.6 million, $196.1 million was established as a reserve against classified commercial assets while $4.5 million was established as a reserve against non-classified commercial assets. Id. There were 114 specific classified commercial assets against which the $196.1 million was set aside as a reserve. Id. at 29. If Carteret was over-reserved by $50 million, as Ambase contends, than instead of reserving $196.6 against classified commercial assets, it should have reserved $146.6 against these classified commercial assets. Id. at 31.

84. The evidence indicates that 34 of the 114 classified commercial assets accounted for $146.5 million of Carteret's total reserves. These 34 classified commercial assets included 17 loans, 15 REO, and 2 real estate development projects. Rather than simply arbitrarily determining reserves for these assets, as suggested by Ambase, Carteret based its reserves on a Loan Book which documented the recovery value of the collateral based upon standard financial tools for estimating potential cash flows such as appraisals, net realizable value ("NRV"), and fair value calculations or purchase offers. DX 7000 at 51; id. Exhs. 1-3. In situations where this type of financial information was not available, Carteret typically reached out to brokers and appraisers to obtain an indication of market values and market rents. Id. There is no evidence that the breach caused Carteret to underestimate the potential recovery or increase the reserves on any of these 34 assets. Id. Indeed, a retrospective analysis of Carteret's real estate dispositions validates the fact that Carteret properly assessed the value of the reserves that were required for these assets. Rather than over reserving by $50 million, the proceeds from the disposition of the

assets demonstrates that Carteret may have underreserved by $90.6 million. Id. at Exh. 4.5. This is corroborated by Professor Calomiris who has estimated that Carteret was underreserved on its entire commercial real estate portfolio by $38.7 million. PX 2704 at Table 3. The validity of the valuations is also corroborated by Professor Calomiris who admits that "the appraisal reports follow proper appraisal conventions . . . [and] sufficiently support their appraisal decisions with substantiated real estate data." PX 2704 at 11.

85. The implication of Ambase's contention, given the fact that Carteret did not underreserve for the 34 assets comprising $146.5 million of total reserves, is that the reserves on the remaining 80 commercial assets, which had reserves booked at nearly $50 million, would have been booked at "0" absent the breach. Because these assets were all classified Substandard by Carteret and were all problem assets, it would not have been possible in the "but for" world for Carteret to book 0 reserves against these assets. DX 7000 at 52. Indeed, if Carteret had simply assigned a 10 to 20 percent reserve (which is typical for assets classified Substandard) on these assets, that, alone, would have caused Carteret to record a reserve of between $18.4 million and $36.8 million. Id. Further, as with the 34 assets comprising the majority of the reserves, Carteret employed a systematic methodology, based upon a detailed analysis of the individual assets, and documented the rationale supporting the reserves on the loans and REO comprising these 80 assets. Id. at 63. In most cases, the potential recovery estimated by Carteret was based upon standard financial tools for estimating potential cash flows such as appraisals, NRV and fair value calculations, purchase offers, and net proceeds from potential refinancings or payoffs. Id. at 64. When this type of financial information was not available, Carteret typically reached out to brokers and appraisers to obtain an indication of market values and market rents. Id. There is

no evidence any of Carteret's analysis would have been or could have been any different in a "but for" world. Id.

### N. THE RTC DID NOT RECOVER LESS ON ASSET DISPOSITIONS THAN CARTERET WOULD HAVE IN A BUT FOR WORLD

86. Ambase argues that Carteret would have received greater proceeds in disposing of its assets than the RTC received in administering the conservatorship. The evidence does not support Ambase's contention. For example, when the Government Accounting Office ("GAO") analyzed the RTC's 1993 resolution experience, the GAO was positive about the manner in which the RTC resolved thrifts. DX 6189. Specifically, the GAO analyzed three thrifts that were resolved between January 1, 1993, and June 30, 1994. In each case, the GAO found that the RTC had followed the appropriate procedures and guidelines. To the extent that the 1993 resolutions were delayed, this was because the RTC was actively following a "least cost resolution" policy as required by Congress, as well as implementing the depositor preference requirements under the 1993 Depositor Preference Act (essentially giving depositors a higher preference in future resolution proceeds than other creditors, e.g., money market lenders). DX 5038 at 84. To the extent that a minority preference program allowed minority purchasers to "win" if they matched (after the auction) the bid of a non-minority bidder, the GAO did not view this as either delaying the sale/resolution process or producing lower premiums. Id. The GAO concluded that ". . . RTC's implementation of a policy to extend a preference to minority bidders when making resolution decisions appeared consistent with FDICIA's least cost requirements." DX 6189.

87. A second GAO report, prepared near the end of 1995, focused on the

minority preference program ("MPP"). DX 6190. The 1993 RTC Completion Act required the GAO to annually assess the RTC's efforts to sell performing assets to acquirers of failed thrifts under the minority preference program. As there were no transfers of assets under the minority preference program in fiscal year 1994 and the RTC ceased to exist at the end of 1995, the GAO prepared only this one report, covering fiscal year 1995, which was the year that the RTC sold many of Carteret's assets. DX 5038 at 84. The GAO's report stated: "On the basis of our discussions with firms experienced in pricing large volumes of mortgage loans and our review of mortgage loan valuation literature, we found that the RTC had established a reasonable process anchored to agency and mortgage securities market standards." DX 6190 at 1. In the context of pricing mortgage loans, the study also found that the RTC "was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total returns on the disposition of assets as required by law." Id. at 2. By October 1995, 11 minority acquirers had purchased more than 4,000 loans for $289.56 million, and 64 percent of those assets were sold for from between 91 percent and 100 percent of book value. Id. at 11-12.

88. Further, contrary to Ambase's contention, the MPP did not "discourage[] other bidders from participating in the auction of Carteret deposits and assets." PX 2702 at ¶ 92. Indeed, an August 24, 1994 letter from a minority bidder to the RTC stated that "non-minority bidders are motivated by a long-term goal to reduce competition." DX 700. Further, contrary to Ambase's contention, there is no evidence of "flipping" thrift properties that allegedly were underpriced by the RTC. Professor Calomiris suggests one example of "flipping" is the sale by United Bank, a minority acquirer which purchased $30.32 million of Carteret's performing assets

in December 1993, of $13 million of these assets over the following 10 years. PX 2702 at ¶ 93. As noted by Professor Saunders, however, the increase in price received by United Bank was wholly consistent with a rising real estate market and does not suggest "flipping." DX 5001 at 85.

## O. CARTERET WOULD NOT HAVE SOLD ITS ASSETS IN BETTER MARKETS

89. Ambase contends that, in a "but for" world, Carteret would have waited until real estate values improved to dispose of its troubled commercial assets, and, thus, would not have suffered losses on these commercial assets. PX 2702 at ¶ 82. Based upon property value indices tracking hotels and commercial assets held by charitable institutions, Ambase contends Carteret's assets would have increased in value to the outstanding principal amount of the loans by 1997 and that, absent the breach, Carteret would have sold the loans in 1997. Id. at ¶¶ 94-99. The evidence does not support Ambase's contention. First, Carteret disposed of 23 loans, 16 REOs, and 1 real estate development project between July 1, 1991, and September 30, 1992. DX 7000, Table 18. Nine of the 23 loans represent $95.2 million or 78 percent of the total loans compromised by Carteret between July 1, 1991, and September 30, 1992. Id. at 76. Three of the nine loans were not secured by real estate and the recovery would not have been affected by increasing property values. Id. at 83. One borrower was in bankruptcy and there was no choice about the timing of the recovery. Id. Carteret made prudent business decisions to compromise the remaining loans because not doing so would have risked losing its position to a first mortgagee or would have forced a foreclosure into a recessed market. Id.

90. There would have been no reason in a "but for" world to delay disposing of the

REO which Carteret sold between July 1, 1991, and September 30, 1992. When deciding whether to hold or sell REO assets, thrifts consider various costs including completion costs, holding costs, selling costs, and opportunity costs. DX 7000 at 87. All of the REO assets were non-earning assets. As a result, Carteret incurred expenses maintaining these properties. Id. By selling these assets, Carteret eliminated these costs and generated cash that could be invested in earning assets. In addition, selling these assets was consistent with Carteret's objective of reducing its commercial portfolio. Id. at 88. Further, institutions are expected to dispose of REO within five years or risk the REO being considered an equity investment subject to such regulations as loan to one borrower limitations. Id. at 87. There is no evidence that Carteret expected that the benefits, if any, from potential future appreciation in value outweighed the cost of maintaining these assets. In fact, as late as December 1991, Carteret did not believe that property values had stabilized and Mr. Moor did "not have a good feeling about the values in the future." DX 3398 at 4. Therefore, Carteret acted prudently in disposing of these assets and would have done so in the "but for" world as well. DX 7000 at 88.

91. Although Ambase contends Carteret would have received proceeds equaling the principal amount of the loans if it had held them until early 1998, the estimate is based upon the inappropriate use of indices. The National Property and Hotel Valuation Indices upon which Professor Calomiris relies, PX 2702 at ¶¶ 94-99, are not limited to tracking troubled properties. Because Carteret had severe problems in its commercial loan portfolio, these indices are not a proper basis for valuing this portfolio. DX 5038 at 87. Further, while Ambase relies upon the total return NPI tracking index, this includes real estate appreciation ("capital return") as well as income appreciation ("income return"). DX 7000 at 89-90. Because Professor Calomiris was

attempting to calculate the "market value" of Carteret's portfolio, he should have used the "capital return" index. Instead, he erroneously used the "total return" index. Id. Because the "total return" index showed significantly higher values than the "capital return" index, Professor Calomiris's conclusion that the market value of Carteret's commercial assets would have exceeded their principal balance by the beginning of 1998 is erroneous. Id.

### P. AMBASE FAILS TO ACKNOWLEDGE THE BREACH'S POSITIVE EFFECTS

92. Professor Calomiris argues the breach uniformly harmed Carteret and there were no value-enhancing aspects to the post-FIRREA rules for calculating regulatory capital. Professor Saunders, however, notes: "Many provisions of FIRREA had the general support of the thrift industry. Even Carteret Bancorp was optimistic about FIRREA when it prepared its 1990 strategic plan." DX 5001 at ¶ 61. The plan states:

> While the current political/regulatory actions to manage the FSLIC crisis will have a negative short-to-intermediate term impact on the industry, the longer term impact is much brighter. The industry will be trimmed considerably as hopelessly insolvent thrifts are liquidated. The removal of the institutions from the market will relieve overcapacity, ultimately bringing down the cost of funds and widen interest rate spreads.

DX 8098.

93. Thus, Carteret was not alarmed that, under the regulatory provisions of FIRREA, goodwill would not count as regulatory capital. Instead, Carteret misjudged its ability to manage and underwrite commercial real estate and, as a result, became one of the firms trimmed from the industry.

### Q. AMBASE AND CARERET WASTED CARTERET'S CAPITAL BY ENTERING INTO UNSOUND EMPLOYMENT CONTRACTS AND

## ENGAGING IN UNSOUND EMPLOYMENT PRACTICES

94. In January 1990, Ambase, on behalf of itself and its subsidiaries, including Carteret, entered into Severance Agreements with nine Carteret executives and senior officers providing for (i) continued employment and benefits, and (ii) a lump sum payment in excess of three times base salary and bonus, in the event of a change of control of Ambase. DX 9122. The obligation to fund these Severance Agreements was undertaken by the "Company" which is defined as "Ambase and its subsidiaries." Id. Ambase solicited and approved these agreements and litigation to enforce the agreements was prosecuted against Ambase only. Id.; see PX 2702 at 88 n.165. Carteret has not experienced any loss resulting from these agreements. Id. Indeed, as to Carteret, the OTS determined that these agreements provided golden parachute payments barred under the Crime Control Act of 1990, 12 U.S.C. § 1828(k)(4). Id.

95. In 1988, during the course of the Ambase acquisition, three senior Carteret executives, Robert O'Brien, Robert Pierson, and Robert Mueller, negotiated amendments to their employment contracts. Among other things, the amendments created an accelerated benefits provision for their retirement benefits which increased the cost of the employment agreements to Carteret for services already performed. DX 9122 at 3. At the January 18, 1988 Board meeting at which the Carteret directors approved the amendments, the three favored officers failed to disclose the impact of the amendments on their future compensation. All three voted in favor of the amendments. Id. In March 1992, Messrs. Mueller and Pierson consented to the entry of Cease and Desist Orders and to pay restitution to Carteret of $310,000 and $350,000, respectively. Id. Mr. O'Brien did not receive any portion of the accelerated retirement benefit. Id.

96. Beginning in 1990, at the direction of then CEO Robert Walsh, Carteret issued letters to several officers in the loan workout area granting them “stay bonuses.” Carteret issued stay bonus letters to 12 employees providing for approximately $550,000 in total payments. DX 9122 at 4. The stay bonus letters constituted employment contracts which should have been, but were not, approved by Carteret’s Board. Id. Slightly less than $100,000 was actually paid out before OTS directed Carteret not to make any further payments. Id. In 1992, three former Carteret officers sued Ambase in state court to collect the unpaid bonuses. They withdrew their suits after OTS informed them that the stay bonus letters violated OTS regulations. Id.

97. As part of his employment contract, CEO O’Brien was entitled to change of control payments equal to three times his salary, a supplemental retirement benefit valued at approximately $2 million, and an accelerated retirement benefit calculated at between $5 million and $10 million, all upon retirement from Carteret. DX 9122 at 5. Despite continuing to be employed by Carteret, on or about March 31, 1990, Mr. O’Brien sought and received partial payments or “advances” on certain non-qualified retirement benefits. These payments or advances were not provided for in his employment contract or supplemental retirement plan and were not approved by Carteret’s Board. O’Brien received a payment of $2.1 million at the direction of Ambase’s Chairman, George Scharffenberger, as an “advance” on his supplemental retirement benefits. Id. $1.5 million was used to pay off a non-arms-length mortgage held by another Ambase subsidiary, Home, while the remainder was paid directly into Carteret’s tax withholding account as a tax gross-up. Id. In December 1990, Mr. Scharffenberger and the Ambase Personnel Committee approved another advance on retirement benefits to the still employed Mr. O’Brien in the amount of $300,000. These “advances” violated OTS regulations

and were unsafe and unsound practices because they were not authorized by Mr. O'Brien's employment agreement or supplemental retirement plan and were not approved by Carteret's Board at a time Carteret was in financial difficulty. DX 9122 at 7-8. OTS pursued restitution for a portion of the advances to Mr. O'Brien, and its proportionate share of Mr. O'Brien's residual estate in bankruptcy was approximately $16,000. Id.

98. In September 1990, CEO Walsh recommended to Ambase Chairman Scharffenberger that a number of senior Carteret executives receive bonuses. At the time, Carteret lacked a bonus program, and Carteret's Board did not approve the bonuses. DX 9122 at 9. Nevertheless, Carteret paid $965,000 in bonuses on or about October 9, 1990. In 1990, Carteret lost approximately $90 million. Id. Within the next twelve months, new management terminated Carteret's top five officers. Id. Given Carteret's financial deterioration and the absence of an executive performance bonus program approved by Carteret's Board, OTS determined that the payment of bonuses in 1990 was unsafe and unsound and exceeded what was reasonable compensation. Id.

99. In March 1990, certain Ambase officers (Jack R. Plaxe, Bruce W. Bean, Lester J. Mantel, Robert L. Woodrum, and Theodore A. Babcock) entered into severance agreements with Ambase. The severance agreements were authorized and approved by the Directors and CEO Manley. DX 394. On December 28, 1990, the Directors and Manley authorized Ambase to pay, and Ambase did pay, $5,299,849 to the officers pursuant to the severance agreements. Id. These payments occurred at a time when Ambase was bound (1) to indemnify Carteret if it sold Imperial Premium Finance ("IPF") prior to August 8, 1991, for less than $65 million, and (2) to provide $30 million to Carteret if it fell below the minimum regulatory capital requirements. Id.

Additionally, on or about January 31, 1991, the Board authorized Ambase to pay, and Ambase did pay, approximately $3,000,000 to Mr. Manley. Ambase also forgave Mr. Manley a $4,000,000 debt which he owed to Ambase. Id. at 0312 and 0315.

100. On February 14, 1991, OTS issued a Notice of Charges on Temporary Order to Cease and Desist against Ambase and its Directors alleging that payments to Mr. Manley and other officers were unsafe and unsound banking practices. DX 394. OTS also filed a complaint for prejudgment attachment to enforce the Temporary Order to Cease and Desist. The Court granted this motion. On April 25, 1991, OTS, Ambase, and Ambase's Directors entered into a settlement agreement with OTS. The agreement provided that OTS would withdraw the Notice of Charges and voluntarily dismiss the district court action in return for Ambase's commitment to (1) acquire IPF from Carteret for the greater of the appraised value or $65 million, and (2) immediately deposit $12.5 million in escrow which would be forfeited if Ambase was unable to close the transaction by August 9, 1991. DX 732. Despite receiving a series of enlargements of time from OTS, Ambase was unable to close the transaction and forfeited the $12.5 million on deposit with Carteret. Id.

## DEFENDANT'S CONTENTIONS OF LAW

### A. INTRODUCTORY LEGAL PRINCIPLES

101. To prove expectancy damages, Ambase must demonstrate that at the time of contracting, (a) its expectancy damages were reasonably foreseeable; (b) would not have occurred in the absence of the breach; and (c) are calculable with reasonable certainty. See, e.g., California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) ("Cal Fed"); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002); Neely v. United

States, 285 F.2d 438, 443 (Ct. Cl. 1961); Chain Belt Co. v. United States, 115 F. Supp. 701, 714 (Ct. Cl. 1953).

102. According to the time-tested precedent of this Court, for Ambase to prove causation, the alleged damages must flow "inevitably and naturally, not possibly nor even probably" from the breach. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Thus:

> If they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Ramsey v. United States, 101 F. Supp. 353, 357-58 (Ct. Cl. 1951) (quoting Myerle, 33 Ct. Cl. at 26) (cited with approval in Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996); S. Nat'l Corp. v. United States, 57 Fed. Cl. 24, 304 (2003); see also California Fed. Bank v. United States, 54 Fed. Cl. 704, 712-13 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 237 (2003) ("Fifth Third"), aff'd in part and rev'd in part, 402 F.3d 1221 (Fed. Cir. 2005). To prove its claim for expectancy damages, therefore, Ambase must demonstrate that, at the time of the contracts, the type and amount of damages were reasonably foreseeable, would not have occurred in the absence of the breach, and are provable to a reasonable degree of certainty.

103. As noted by the Restatement (Second) of Contracts, § 351(l): "Damages are not recoverable [in contract actions] for loss that a party in breach did not have reason to foresee as a probable result of the breach when the contract was made." Further, "[l]oss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of

events, or (b) as a result of special circumstances, beyond the ordinary course of events, that a party in breach had reason to know." Id. at § 351(2). In order to be entitled to contract damages, "a plaintiff must prove that both the magnitude and type of damages were foreseeable." Landmark Land Co., Inc. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001); see Corbin on Contracts, § 1012 at 88 (1964) ("[In order to have been foreseeable] the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach").

104. As the Federal Circuit observed in Old Stone Corp. v. United States, 450 F.3d 1360, 1475 (Fed. Cir. 2006), when multiple causes contribute to the losses of a financial institution, the doctrines of proximate cause and foreseeability, both of which must be established for an award of damages, "are not meaningfully distinct." In Old Stone, the Federal Circuit rejected a chain of causation which hypothesized that regulators could have foreseen at the time the contracts were signed that, in the event of a breach, the thrift's parent would have to sell its "crown jewels" in order to raise replacement capital for the thrift and that this would prevent the parent from assisting the thrift when the capital proved insufficient to prevent a default. Id. at 1374-78.

105. The Court held that, in these circumstances, the breach was not the proximate cause of the thrift's demise because the sale of the "crown jewels" was not foreseeable. As we will demonstrate in this case, Ambase assumes that regulators would have been able to foresee in 1982 and 1986 that exogenous factors unrelated to the breach would have increased "but for" Carteret's market value between 1989 and 2006 by hundreds of millions of dollars (i.e., from $251.4 million to between $580 million and $4.7 billion). As in Old Stone, however, no

regulator in 1982 or 1986 could have foreseen that the period between 1989 and 2006 would have been so favorable to thrifts.

106. A plaintiff is not entitled to expectancy damages unless it can prove the fact of damage with reasonable certainty and there is some basis upon which the court may make a reasonable estimate of the amount of damages. See, e.g., Energy Capital, 302 F.3d at 1325. As the Restatement notes, "damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of Contracts, § 352. Further, "the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty [is on the plaintiff]." Willems Indus., Inc. v. United States, 295 F.2d 822, 831 (Ct. Cl. 1961).

107. Ambase's expectancy damage claims must be examined in light of the precedent that exists in Winstar-related cases. This Circuit has recognized that substantial obstacles confront plaintiffs who seek to prove "lost profits" because they must establish "what might have been." Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("Glendale I"). The Federal Circuit has observed that, generally, it is a "waste of time and effort" to attempt to prove lost profits in the Winstar-related cases. Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004) ("Glendale II"). Indeed, the Federal Circuit and this Court have repeatedly rejected expectancy damage claims. See, e.g., Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358-59 (2005), appeal docketed, No. 07-5040 (Fed. Cir. 2007); see also First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633, 642-45 (2006), appeal docketed, Nos. 07-5044, -5048 (Fed. Cir. 2007); Citizens Fin. Servs., FSB v. United States, 64 Fed. Cl. 498, 514-15 (2005), aff'd, 170 Fed. Appx. 129, 2006 WL 618792 (Fed. Cir. Mar. 9,

2006) (affirmed pursuant to Fed. Cir. R. 36); LaSalle Talman Bank, FSB v. United States, 64 Fed. Cl. 90, 106 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006).

108. It is well established that theoretical models which purport to measure economic injury are invalid unless the inputs and assumptions are based upon facts in the record and upon realistic projections concerning future events. See, e.g., Bluebonnet Sav. Bank v. United States, 67 Fed. Cl. 231, 239-42 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) (model falsely assumed there would not be an exchange of debt for equity in the "but for" world and that the debt financing would not extend beyond 1992); Three Crown Ltd. P'ship v. Salomon Bros., Inc., 906 F. Supp. 876 (S.D.N.Y. 1955) (the model falsely assumed there was coordinated activity which the record failed to support); Kidder Peabody & Co., Inc. v. IAG Int'l Acceptance Group, 28 F. Supp. 2d 126 (S.D.N.Y. 1998), aff'd, 205 F.3d 1323 (2d Cir. 1999) (same).

109. For example, in Glendale II, the Federal Circuit affirmed this Court's rejection of a reliance damage model focusing upon alleged losses incurred in operating the acquired thrift because the report of plaintiff's expert witness "reflected an absence of an accurate accounting of the actual losses." 378 F.3d at 1312. Thus, the Court underscored the significant problems with experts attempting to predict "what would have happened" to a complex banking organization absent the breach. Id. As the Federal Circuit has observed, "[t]he lost profits theory, though not absolutely barred in Winstar-related cases as a matter of law, has not been susceptible of proof due to its speculative nature." Fifth Third, 402 F.3d at 1236.

### B. BECAUSE CARTERET WOULD HAVE FAILED IN THE ABSENCE OF THE BREACH, AMBASE IS NOT ENTITLED TO DAMAGES STEMMING FROM CARTERET'S FAILURE

110. Under the case law, if, at the time of the breach, the Government's goodwill

promise had no value because the thrift was in an unsafe and unsound condition and would have been in an unsafe and unsound condition even in the absence of the breach, then the breach is at most "technical" and cannot and does not give rise to a claim for damages. See, e.g., Southwest Inv. Co., Inc. v. United States, 63 Fed. Cl. 182, 196 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005) ("FIRREA constituted a technical breach" because, at the time of enactment, the thrift's regulatory capital, even counting the forbearances, was insufficient to satisfy the minimum regulatory capital requirements); Admiral Fin. Corp. v. United States, 57 Fed. Cl. 418, 432 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004) ("We find that Admiral's failure to infuse cash into Haven to bring it into regulatory capital compliance, its futile efforts to find outside sources, and its persistent denial of its ability to supply the needed capital, did indeed substantially impair the value of the contractual exchange to the Government[.]").

111. In this case, Ambase immediately mitigated the breach by substituting enough cash to enable Carteret to be fully compliant with FIRREA-imposed regulatory capital requirements and, when Carteret's continuing losses rendered Ambase's mitigation efforts insufficient to enable the thrift to comply with the FIRREA-imposed regulatory capital requirements, the United States District Court for the District of New Jersey intervened with a preliminary injunction requiring OTS to count the unamortized goodwill as regulatory capital, including approximately $57 million in goodwill which Carteret had written off its books as a result of selling branches in 1990. See Ambase Corp. v. United States, 58 Fed. Cl. 32, 39-40 (2003) ("Ambase I"); Carteret Sav. Bank v. OTS, 762 F. Supp. 1159, 1168-78 (D.N.J. 1991); PX 4867a.

112. The district court's injunction remained in effect until May 1992 when the United

States Court of Appeals for the Third Circuit reversed the judgment excluding goodwill from the calculation of regulatory capital under FIRREA. Carteret Sav. Bank v.OTS, 963 F.2d 567 (3d Cir. 1992). Nevertheless, as of October 25, 1991, OTS Regional Director Vigna and Deputy Regional Director Albanese reported to OTS's Washington Office that, even counting goodwill as regulatory capital, Carteret failed its capital requirements. PX 4867a at 3.

113. The OTS noted that, as of September 30, 1991, Carteret was severely undercapitalized, essentially insolvent, and in an unsafe and unsound condition. PX 4867a at 16-18. Messrs. Vigna and Albanese reported that "the deterioration of Carteret's [regulatory] capital position [was] primarily the result of the Savings Bank's unsuccessful extension into corporate and commercial real estate lending and its failure to internally identify and address problem assets." Id. at 6. They further noted that "Carteret is not currently capable of generating core profits [and it was] unlikely that Carteret will be able to replenish its capital position without a significant external capital infusion." Id. In correspondence with the regulators, Carteret CEO Richard Bianco and the Board of Directors recognized the perilous state of Carteret's financial condition. DX 7351.

114. For example, in a letter to the FDIC responding to the 1991 ROE, Mr. Bianco, joined by other members of the Board, noted that "Carteret continues to experience financial difficulties principally due to deterioration in the first mortgage portfolio . . ." DX 7351 at 2025. Further, Mr. Bianco and the Board acknowledged that "[w]ith the significant increase in reserves for losses on loans and real estate in the second quarter of 1991, Carteret does not meet any of the three minimum capital requirements of FIRREA at June 30, 1991." Id. Further, Messrs. Bianco and the Board acknowledged that, based upon a "rapid and comprehensive review of Carteret's

commercial real estate and corporate loan portfolios and related classifications and reserves," Carteret continued to suffer a "deterioration in its loan portfolios due to the prolonged downturn in the real estate market," and that, out of a commercial real estate portfolio of approximately $1 billion, "Carteret's total internally criticized assets at June 30, 1991, totaled $986 million . . ." Id.

115. In October 1991, Messrs. Vigna and Albanese recommended transferring Carteret to the RTC because it was massively undercapitalized and, therefore, in an unsafe and unsound condition. PX 4867a. Nevertheless, for nine months in 1992, OTS delayed transferring the institution because Carteret's management had changed and the regulators agreed to allow new management an opportunity to locate private funds to recapitalize the institution. See DX 7406. Carteret's Board entered into a Consent Agreement with OTS on February 27, 1992. Id. The Board consented to the institution being placed under the RTC's Accelerated Resolution Program in the event that efforts to effect an unassisted recapitalization failed to proceed in a manner acceptable to the OTS within 90 days (May 28, 1992). Id. By letter dated May 27, 1992, Mr. Vigna extended the deadline to July 6, 1992. Id. On July 3, 1992, Carteret/Ambase representatives met with OTS Director Timothy Ryan and obtained a further extension until August 28, 1992. Id.

116. On July 20, 1992, Ambase signed a conditional letter of intent, DX 40, with a group of investors led by Kohlberg to invest $200 million in Carteret. DX 7406. Kohlberg had proposed serving as the lead investor with a $50 million share, with other $50 million investments provided by each of the following groups: The John D. and Catherine T. MacArthur Foundation ("MacArthur"), a charitable foundation; the Public School Employees Retirement

System of the Commonwealth of Pennsylvania ("PA Teachers"); and a Canadian investor group knows as The Rosdev Group ("Rosdev"). Id. On August 14, 1992, Kohlberg withdrew its letter of intent because of the findings of its due diligence which indicated that Carteret's financial projections were not realistic because (a) interest rate spreads could not be maintained because of the probable lapse in subsidized loans from the RTC/FDIC; (b) the tax shelter effect of real estate loan write-offs was dramatically overstated, thus leading to lower net after tax income; (c) overhead costs would probably prove excessive given the institution's likely size; (d) purchased mortgage servicing rights were overvalued; (e) there would likely be a need to downsize to meet future regulatory capital requirements; (e) concerns regarding high interest rate exposure; (f) questions as to the time it would take to liquidate Carteret's real estate loan and related asset portfolios; (g) a lack of credibility concerning management's financial projections due to constant changes in the projections; and (h) Carteret would likely be subject to more than ordinary supervision even after a $200 million recapitalization. DX 95.

117. On November 13, 1992, Messrs. Vigna and Albanese again recommended that Carteret be placed with the RTC because of a lack of capital and other deficiencies in its financial condition and operations. DX 8124. They noted that the transfer to the RTC recommended in the October 25, 1991 S-Memorandum had been delayed in order to accord Carteret's new management an opportunity to raise capital; however, in August 1992, "the lead investor, Kohlberg & Co. withdrew its July 20, 1992 conditional letter of intent to infuse $200 million into Carteret." Id. at 2. Messrs. Vigna and Albanese further noted that Kohlberg's refusal to invest was "due to Carteret's $502.2 million in nonperforming loans and REO (9.9% of total assets at June 30, 1992), possible overvaluation of purchased mortgage servicing rights,

possible additional losses on the commercial loan and real estate owned portfolios, and lack of support for Carteret's financial assumptions and projected earnings." Id.

118. The S-Memorandum noted that, following the withdrawal of Kohlberg's letter of intent, another group of investors, lead by The Carlyle Group and Colony Capital entered into a conditional letter of intent to invest $200 million in Carteret in exchange for an 80 percent interest in the Association. As with Kohlberg's letter of intent, following the due diligence, The Carlyle Group withdrew its conditional letter of intent because it "concluded that it could not receive an adequate rate of return on its investment and had concerns about 'regulatory risk.'" PX 4886 at 2. Based upon these developments, which indicated that sophisticated investors such as Kohlberg, The Carlyle Group, and Colony Capital were unwilling to invest in Carteret, OTS ordered the institution transferred to the RTC.

119. As of September 30, 1992, immediately before OTS recommended the transfer to the RTC, Carteret had negative tangible capital of $61.7 million, negative core capital of $14 million; and negative risk-based capital of $15.1 million. Id. at 3. Further, Carteret failed to meet its minimum tangible, core, and risk-based capital requirements by $133.2 million, $157 million, and $235.4 million, respectively. Id. at 5. In the four quarters preceding the transfer to the RTC, Carteret's net income was only $520,000. Id. at 3. In recommending the transfer to the RTC, Messrs. Vigna and Albanese stated that "[e]ven if supervisory goodwill were included as of September 30, 1992 for purposes of determining the Association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver [based upon shortfalls in regulatory capital and other operating deficiencies as outlined in the November S-Memorandum]." Id.

120. As Ambase concedes, even counting the goodwill as regulatory capital, Carteret, in the absence of other adjustments, fell short of the risk-based requirement as of November 1992 by at least $95 million and its core-capital requirement by approximately $7 million. PX 2704, Table 2; DX 8124. Moreover, if the amount of goodwill at this point was only approximately $75 million as we contend, rather than approximately $140 million as Ambase contends (to take account of the 1990 branch sale), Carteret failed all three regulatory capital requirements (in the absence of other adjustments) by $58.2 million for tangible capital, $82 million for core capital, and $160.4 million for risk-based capital. Id.

121. Although much of the commercial loan portfolio had been revalued, the report of Kohlberg's due diligence was that Carteret continued to be underreserved by at least $20 to $30 million, which would have exacerbated its capital problem. DX 95 at 1383. The same report also noted that Carteret was likely overvaluing its mortgage servicing portfolio and that another valuation review was necessary to demonstrate the asset was worth the $59 million Carteret asserted. Id. at 1382. Even counting the goodwill as regulatory capital in November 1992, therefore, OTS's decision to transfer the thrift was both compelled by the facts and fully consistent with the statutes and regulations. See Southwest Inv., 63 Fed. Cl. at 195-197 (no effective breach because the thrift was insolvent and there were no identifiable investors at the time of FIRREA); Admiral, 57 Fed. Cl. at 432 (same).

### C. THE ALLEGED DAMAGES WERE NOT AND COULD NOT HAVE BEEN FORESEEABLE

122. Ambase's expert witness, Professor Calomiris, contends that Ambase is entitled to damages consisting of the market value of "but for" Carteret (i.e., a Carteret that would have

survived with goodwill plus "but for" dividends and certain "wounded bank" damages). Professor Calomiris calculated the "but for" dividends to be $188.7 million. PX 2702 at ¶ 46. Further, Professor Calomiris calculates the market value of "but for" Carteret by multiplying its stated market value in the quarter before the breach by the increase in thrift indices and alleged peer market values between 1989 and 2006. This "lost market value," according to Professor Calomiris, is between approximately $597 million and $4.9 billion. PX 2702 at ¶¶ 36, 43, and Tables 7-14. Professor Calomiris also claims that Carteret suffered "wounded bank" damages consisting primarily of severance payments to Carteret employees and administrative costs of $16.8 million. PX 2702 at Table 23.

123. "But for" Carteret's "lost market value" is the largest component of Professor Calomiris's damage calculation. Ambase contends Carteret is entitled to the market value of equity "but for" Carteret would have had if the market in 1989 had fully appreciated Carteret's future potential for growth in the absence of the breach as evidenced by "but for" Carteret's alleged market value in 2006. As Professor Calomiris argues, "[t]he market's predictions of Carteret's future profitability in 1988 and 1989 were, with the benefit of hindsight, unduly conservative if the breach had not caused Carteret to fail." PX 2702 at 28-29. There are numerous legal and technical problems with Professor Calomiris's approach. His estimates are invalid as a matter of law.

124. Under the case law, a plaintiff seeking expectation damages must demonstrate "that both the magnitude and type of damages were foreseeable." Landmark, 256 F.3d at 1378; see Slattery v. United States, 69 Fed. Cl. 573, 582 (2006) ("Foreseeability requires that both the type and amount of damages claimed were, at the time of contract formation, foreseeable

consequences 'in the ordinary course of events' of the breach."). As Professor Calomiris notes, "Carteret had $2.3 billion in assets and a book value net worth of $36.5 million immediately prior to the transactions [in 1982]." PX 2702 at ¶ 10. According to Professor Calomiris, "[i]n connection with the transactions, Carteret recorded supervisory goodwill of $46 million and $168 million respectively" for Barton and Delray. Id.

125. Thus, Professor Calomiris assumes that regulators approving these transactions in 1982 actually foresaw or could have foreseen that, if the Government subsequently disallowed goodwill as an element of regulatory capital, Carteret would suffer an economic loss of between $596 million and $4.9 billion. These amounts are between approximately three and twenty times the amount of goodwill included in the transactions and approximately 16 to 127 times Carteret's book value at the time of the transactions. Further, these amounts exceed by a factor of from ten to seventy-eight Professor Calomiris's estimate of the market value of Carteret's goodwill at the time of the breach (approximately $60 million). As the Federal Circuit recently noted: "Logically speaking, the government cannot take more than what the plaintiffs actually possess. A determination that damages exceed the value of the property should be indicative that the method of computing damage is flawed." Cienega Gardens v. United States, 503 F.3d 1266, 1282 n.13 (Fed. Cir. 2007). Thus, the damages Ambase claims are simply not of a magnitude or type that was reasonably foreseeable at the time of the contract. See, e.g., Suess v. United States, 52 Fed. Cl. 221, 228 (2002); 74 Fed. Cl. 510 (2006) (a damage claim premised upon the assumption that the "but for" thrift's stock would have increased by a factor of 27 from June 30, 1989, to the middle of 1997, which would have made it one of the top best performing stocks in the industry over that period, was implausible given the thrift's substandard historical

performance), appeal docketed, Nos. 07-5070, -5071 (Fed. Cir. 2007); Glendale, 43 Fed. Cl. at 401-02 ("There is something inherently odd about . . . plaintiff . . . contending that its capital cost [is] over two and a half times the capital raised"). As Professor Saunders observed, Professor Calomiris's damage estimates are an "absurd sum for a failing institution that Ambase acquired for $266 million in August 1988, approximately one year prior to the breach, and that no outside investor chose to buy - even when the equity market value of Ambase varied from just $13.2 million to $24.7 million in 1992." DX 5038 at § 34.

126. Ambase assumes that regulators foresaw or could have foreseen at the times they approved the transactions in 1982 and 1986 that Carteret's market value at the time of the breach would have been equal to "but for" Carteret's market value in 2006 even though Carteret's market value at the time of the breach, as estimated by Professor Calomiris, was only approximately $251 million whereas "but for" Carteret's market value in 2006, as estimated by Professor Calomiris, was between $596 million and $4.9 billion. Ambase also assumes regulators would have foreseen that "but for" Carteret would have earned $595 million in income and paid dividends of $188 million even though it was a mutual at the time of the 1982 transactions and had never earned substantial income. Although the breaching party might be able to foresee the loss of market value at the time of the breach, if the market at that time could not foresee future cash flows or market appreciation, as a matter of law, neither could the breaching party. See, e.g., Old Stone, 450 F.3d at 1374-78.

127. In Old Stone, for example, the holding company sought, as reliance and restitution damages, over $118 million in cash and stock it had invested in the troubled thrifts at the time of the transactions. Following the breach, the holding company invested another $75 million,

which it raised by selling assets to mitigate the effects of the breach. Notwithstanding the mitigation, the thrift failed. The Federal Circuit, while allowing the recovery of the $75 million as the cost of mitigation, did not permit recovery of the initial investments because the breaching party could not have foreseen that the loss of cash flows resulting from the mitigation capital would have fatally compromised the holding company's ability to support the thrift in the period after FIRREA. As the Federal Circuit noted, "under well established principles of foreseeability, [the thrift] has completely failed to establish that this extended chain of causation was foreseeable at the time of contract formation." Old Stone, 450 F.3d at 1376.

128. Professor Calomiris's damage theory is contrary to Old Stone because it assumes that the breaching party would have been able to foresee at the time the contracts were formed in 1982 and 1986 that cash flows between 1989 and 2006 or 2008 would have exceeded the market's estimate of the thrift's value as of 1989 by a factor of between approximately three and twenty. In other words, according to Professor Calomiris's assumption, while the market underestimated Carteret's profitability in 1988 and 1989, Carteret's post-1989 profitability would have been foreseeable to the regulators in 1982 and 1986. As in Old Stone, however, it is highly speculative to assume that regulators could have foreseen future developments at the time the contracts were formed that the market could not foresee in 1989. Professor Calomiris's theory, which is to "charge the offender with elements of value non-existent at the time of his offense," Sinclair Ref. Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933), is not permissible in contract actions. Id.; see, e.g., Am. Fed. Bank v. United States, 72 Fed. Cl. 586, 602-03 (2006); 74 Fed. Cl. 208 (2006) (the improved economy broke the chain of causation between the breach and the mitigating event).

129. Under well-established precedent, imputed market values premised upon unexpected cash flows and market appreciation cannot provide a basis for valuing an asset in a contract damage action. See, e.g., Estate of Berg, 687 F.2d at 380 ("the date of the breach is the proper date for establishing fmv"); Reynolds v. United States, 158 F. Supp. 719, 725 (Ct. Cl. 1958) ("The time when performance should have taken place is the time as of which damages are measured"); Energy Capital, 302 F.3d at 1330 (only damages that accrue "on an ongoing basis over the course of the contract" are measured on a continuing basis); J. Murray, Contracts, § 237 (2d rev. ed. 1974) ("As a general rule, our law has adopted the standard of market value at the time and place of the failure to perform as the basis for measuring the compensation to which the injured promisee is entitled"). Contrary to Professor Calomiris's damage theories, there is no case of which we are aware that holds that an upswing in the market value of an asset following a breach is compensable by the breaching party in the absence of a showing of foreseeability and proximate cause between the breach and the market improvement.

130. Indeed, Estate of Berg, 687 F.3d at 379-83, suggests precisely the opposite. In that case, the Treasury Department refused to redeem bonds at par value but, instead, redeemed them at fair market value. This was ruled to be a breach of contract. Between the time the Treasury refused to perform the contract and the time it returned substitute bonds to the non-breaching party at the request of that party, the market value of the bonds had increased. The Treasury Department argued that, in calculating damages, it should benefit from the increase in the market value because the non-breaching party had the bonds and could sell them at the increased market price. The non-breaching party argued that the increase in market value was irrelevant and its damages consisted of the difference between the price at which Treasury had

agreed to redeem the bonds and the market price at the time the non-breaching party had sought to redeem the bonds. This Court ruled that the damages had to be measured as of the time of the breach, and the fact that the market value of the bonds increased after the breach was irrelevant to the determination of damages. Id. at 379-82.

131. Estate of Berg is analogous to this case because Ambase relies upon the unexpected estimated cash flows of the "but for" Carteret and market appreciation between the time of the breach and 2006 or 2008, even though all the market could foresee at the time of the breach were discounted future cash flows Professor Calomiris estimates at $251 million. Just as the Federal Circuit in Berg determined that the increase in the market price of the bonds following the breach was irrelevant to the damages, the increase in anticipated cash flows and market appreciation estimated by Professor Calomiris is irrelevant to the alleged damages caused by the breach.

132. As Professor Saunders observes, it is asymmetrical to award damages for upswings in the market following the breach but not downswings in the market. ("If ex-post the 1990s had turned out to be a difficult period for banking rather than a 'golden era,' would Professor Calomiris have reduced the 1989 value of Carteret accordingly." DX 5038 at ¶ 38). If the market for thrift stocks had decreased in value following the breach, Professor Calomiris would not argue that Carteret's damages should be devalued because of unexpected depreciation in the market value of thrift stocks. Although the devaluation of the commercial loan portfolio might be expected to affect Carteret's market value at the time of the breach, unforeseeable future cash flows and appreciation in the market value of thrift stocks would not.

133. The basic principle of contract recovery is that damages should be awarded to

"put the injured party in as good a position as that in which he would have been put [had the breaching party fully performed]." N. Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975), cert. denied, 429 U.S. 866 (1976) (citing Restatement of Contracts, § 329, Comment a at 504 (1932)); see also J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 803, 456 F.2d 1315, 1327-28 (1972); G.L. Christian & Assocs. v. United States, 160 Ct. Cl. 1, 312 F.2d 418, cert. denied, 375 U.S. 954 (1963). This basic principle demonstrates the folly of awarding damages based upon unforeseeable cash flows and stock market appreciation. See, e.g., Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996), cert. denied, 520 U.S. 1116 (1997) (plaintiff cannot recover damages that are not the "'direct and immediate results'" of the breach) (quoting Ramsey, 101 F. Supp. at 358); LaSalle, 317 F.3d at 1373 ("The general rule is . . . that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong"); 1 Dobbs Law of Remedies, § 3.8(2) (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable"). These factors have little if anything to do with contract performance. Therefore, Professor Calomiris's estimates are contrary to case law and must be rejected.

### D. UNEXPECTED FUTURE CASH FLOWS AND MARKET APPRECIATION REFLECT INTERVENING CAUSES AND ARE NOT ATTRIBUTABLE TO THE BREACH

134. As noted previously, in order for Ambase to satisfy its burden of proof on the cause of the Carteret damages, it must show that the loss of the contractual regulatory capital directly and inevitably resulted in Carteret's unexpected cash flows and market appreciation and was the actual cause of Carteret's claimed harm. See Wells Fargo, 88 F.3d at 1023; Chain Belt,

115 F. Supp. at 714; Myerle, 33 Ct. Cl. at 26. As noted by the Federal Circuit, "[P]recedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or direct consequences of the breach. LaSalle, 317 F.3d at 1273. The LaSalle Court instructed that only direct consequences of the breach can be considered in evaluating damages. The law "does not attribute remote consequences to a defendant." Id.

135. Unexpected cash flows and market appreciation for thrift stocks between 1989 and 2006 or 2008 are too removed from the breach in time and circumstance to be considered proximately related to the breach. As Professor Calomiris concedes, "[t]he fourteen years following Carteret's failure has been a golden era of banking growth and profitability." PX 2702 at ¶ 37. Although Professor Calomiris contends Ambase should be reimbursed because, ex post, these years favored the profitability and growth of thrifts, as Professor Saunders points out: "Nowhere in any of his reports does Professor Calomiris causally link the breach to his ex post estimate(s) of damages." DX 5038 at ¶ 67. Absent such evidence there is simply no basis for awarding Carteret the damages estimated in Professor Calomiris's damage calculations. See, e.g., Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987) (lost profits, to be recoverable, must be a "proximate consequence" and not a "merely remote or possible" result of the breach); Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 34 Cal. 4th 960, 22 Cal. Rptr. 3d 340, 102 P.3d 257, 265 (Cal. 2004) (breach did not "directly or necessarily cause [contractor's] loss," where contractor's alleged breach caused contractor's surety to reduce contractor's "bonding" rating, and that reduction in bonding rating caused loss of other prospective contracts). Therefore, Professor Calomiris's damage estimates are speculative

and must be rejected.

### E. PROFESSOR CALOMIRIS'S MODELS FAIL TO QUANTIFY DAMAGES TO A REASONABLE CERTAINTY

#### 1. AMBASE'S ESTIMATE OF UNEXPECTED CASH FLOWS CANNOT BE SUPPORTED

136. Professor Calomiris advances a lost profits calculation to determine "but for" Carteret's cash flow between 1989 and 2006 and 2008 based upon a simple arithmetic extrapolation of historical earnings using the Gordon Growth Model without any estimates or analysis of what would have happened to the thrift on a year-by-year basis in a "but for" world, assuming Carteret had survived. The Gordon Growth Model can be used to value a firm that is in a "steady state" with earnings or dividends growing at a rate that is expected to stay stable in the long term. The Model is expressed in a mathematical formula: the market value of the thrift at time zero equals the earnings at time zero plus one divided by the discount rate minus the stabilized annual growth rate in earnings. PX 2072 at 26 n.58.

137. Professor Calomiris calculates Carteret's unexpected future cash flows in a "but for" world by growing Carteret's average net income between 1982 and 1988 of $20.5 million at a rate of 4.2 percent per year. PX 2702 at ¶¶ 35-36. Since Professor Calomiris separately calculated Carteret's market value as of July 1989 ($251.4 million), its alleged stabilized earnings (i.e., the $20.5 million) and Carteret's discount rate, which was estimated by a regression analysis of capital raisings by thrifts in 1994, he could use the Gordon Growth Model to solve for the long-term growth rate of 4.2 percent. PX 2072 at ¶ 36 and n.58. Starting with a base year earnings equal to Carteret's average net income between 1982 and 1988 ($20.5 million) and applying the growth rate derived from solving the equation, Professor Calomiris estimates

Carteret's unexpected "but for" earnings (i.e., lost profits) between 1989 and 2006 to be $510.2 million. PX 2702 at 28, Table 6. To obtain "but for" Carteret's book value as of 2006, Professor Calomiris calculates net cash flows by subtracting estimated dividends from estimated earnings. He then adds this to Carteret's 1989 book value to estimate "but for" Carteret's book value in 2006 ($442.9 million, as shown in PX 2702 Table 9 on page 14). Professor Calomiris calculates his preferred market value estimate ($892 million) by multiplying this figure by the market to book ratio Carteret allegedly would have enjoyed if the book to market ratio he calculated for Carteret immediately prior to the breach had appreciated at the same rate as nine thrifts which survived FIRREA as stand alone entities. Id. at ¶ 45 and page 41, Table 13.

138. Professor Calomiris's calculation of "but for" Carteret's book value in 2006, which is the largest element in his calculation of damages, is inconsistent with relevant case law and principles of financial economics. Even if Carteret's "but for" earnings could be estimated by the Gordon Growth Model, which is not possible, under the case law, such "but for" earnings cannot be calculated upon the basis of a theoretical model. See, e.g., Cal Fed, 245 F.3d at 1349-50; Fifth Third, 55 Fed. Cl. at 240-41. Instead, to demonstrate "foregone earnings," a plaintiff must demonstrate by contemporaneous documentation that it would have had specific investment and financing opportunities in the absence of the breach and these would have been profitable. Id. For this reason, as the Federal Circuit has observed, lost profit models do not "fit comfortably with the history of these [Winstar-related] cases in the years following the breach." Glendale, 378 F.3d at 1310.

139. For example, in Cal Fed, the Federal Circuit reversed the trial court's award of summary judgment on a lost profits claim because the thrift had presented substantial evidence of

the nature of its assets and liabilities in a "but for" world. 245 F.3d at 1349-50. As the Court noted:

> Cal Fed presented documentary evidence to show that it sold significant assets in the wake of the breach. Its business plans and Office of Thrift Supervision documents allegedly showed its intent to invest in low risk assets that it claims have proven profitable. It provided specific documentation of 24,664 single-family adjustable rate mortgages worth approximately $4 billion that it claims it was forced to sell to remain in capital compliance after the breach. Cal Fed then provided expert testimony, which traced the actual post-sale performance of these loans and arrived at lost profits of $317 million attributable to these sales. Additional documentary deposition evidence was submitted to support Cal Fed's claim that in 1993 it was forced to sell a profitable business unit, California Thrift & Loan, to meet its capital requirements.

Id. Although evidence at this level of detail supported the lost profits claim in Cal Fed, the Federal Circuit suggested that more general evidence would not. Indeed, Cal Fed ultimately failed to prove lost profits at trial. See id. at 1267-73.

140. In Fifth Third, following Cal Fed's holding concerning the type of evidence necessary to withstand a motion for summary judgment on a "lost profits" claim, this Court awarded summary judgment to the United States on Fifth Third's lost profits claim. The thrift claimed lost profits based upon the assumption that the "but for" thrift would have been larger than the actual thrift and would have achieved the same level of profitability as the actual thrift. Reading Cal Fed as "reflect[ing] the nature and quality of evidence that the Federal Circuit ruled sufficient to withstand a summary judgment action," this Court ruled that the evidence Fifth Third proffered did not meet that standard. Specifically, Fifth Third's evidence consisted of arithmetic projections from the real world to the "but for" world based upon the leveraging of goodwill. As the Court noted:

> Plaintiff's model fails to account for any real-world events other than the profitability of Citizens during the 1990's before its purchase by plaintiff. Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the but for Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

55 Fed. Cl. at 241.

141. Similarly, in this case, Professor Calomiris "fails to account for any real-world events other than the profitability of [Carteret] during the 1990's [through 2006 or 2008]." As Professor Saunders notes, "Although [Professor Calomiris] develops an estimate of lost profits that would have been earned in each year, he fails to develop any foundation for the annual profits in terms of associated but-for revenues and costs." DX 5038 at ¶ 36. To calculate foregone earnings, Professor Calomiris simply engages in an arithmetic exercise which depends upon the assumption that Carteret's historical earnings increased at a steady state and, therefore, unexpected future cash flows can be estimated by the Gordon Growth Model. Even if Carteret had demonstrated a steady growth in historical earnings, the relevant case law does not regard the application of a simple arithmetic formula as credible evidence from which to estimate unexpected future cash flows. To the contrary, lost profits claims have been rejected in most Winstar-related cases because the thrift was unable to demonstrate with the required specificity the financial performance it would have enjoyed in a "but for" world. See, e.g., Cal Fed, 245 F.3d at 1349-50; Suess, 52 Fed. Cl. at 228-30 (detailed model based upon earnings of allegedly

comparable thrifts and financial projections in a capital plan were unrealistic and implausible). Professor Calomiris's model is less specific than already-rejected models because he does not even attempt to establish balance sheets and profit and loss statements for "but for" Carteret.

142. Case law simply does not support a theoretical approach to damages such as that contained in the Calomiris report. Indeed, Professor Calomiris's model is inconsistent with the only cases of which we are aware awarding lost profits. For example, in Globe Savings Bank, FSB v. United States, 65 Fed. Cl. 330, 363-64 (2005), aff'd in part, vacated in part, and remanded, 189 Fed. Appx. 964 (Fed. Cir. 2006), the thrift presented extensive evidence concerning its business plans and the performance of investment vehicles it was forced to sell because of the breach. Id. at 363-64. In this case, by contrast, Professor Calomiris simply uses a theoretical model without identifying any of the assets or liabilities the "but for" thrift would have operated profitably from 1989 to 2006 or 2008. Likewise, in Commercial Federal Bank, FSB v. United States, 59 Fed. Cl. 338, 344-51 (2004), the thrift demonstrated at trial "the types of categories of investment opportunities that [the institution] would have exploited [in the absence of the breach]." Id. at 349 n.29. Further, both before and after the breach, the thrift demonstrated a "record of profitable growth and average asset returns in excess of one percent [of assets]." Id. at 350. Such information does not exist in Professor Calomiris's model relating to the "but for" world. Professor Calomiris's model has none of the indicia of reliability accepted by the courts in Winstar-related cases.

143. Professor Calomiris's model also deviates from basic principles of financial economics relating to the applicability of the Gordon Growth Model and, therefore is not admissible evidence under Rule 702 of the Federal Rules of Evidence. As noted by the Federal

Circuit in Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387 (Fed. Cir. 2003), trial courts must exclude expert testimony at trial unless the expert is able to show a "reliable foundation in principles and method" for the opinions he or she is seeking to present. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-95 (1992); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

144. In this case, Professor Calomoris's application of the Gordon Growth Model is simply outside the accepted practice of financial economics. Professor Calomiris concedes in his report that he used the model to calculate the "implied stabilized annual growth rate in earnings . . ." PX 2702 at ¶ 36. However, Carteret never had a "stabilized annual growth rate in earnings" as indicated by Calomiris Table 5 (page 26) which shows wildly fluctuating earnings in both an upward and downward direction. PX 2702 at 26, Table 5. As Professor Saunders observes: "[T]he Gordon Growth Model only applies to firms that have already achieved 'stable growth' in earnings. Carteret never remotely achieved stable growth of earnings in the 1982-1988 period." DX 5038 at ¶ 36. Thus, the model simply fails to fit Carteret's circumstances and is implausible.

145. Further, even if the model were applicable, as Professor Saunders demonstrates, Professor Calomiris fails to apply the model correctly to the facts of this case. It is well established that theoretical models which purport to measure economic injury are invalid unless the inputs and assumptions are based upon facts in the record. See, e.g., Bluebonnet, 67 Fed. Cl. at 239-42 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) (model falsely assumed that there would not be an exchange of debt for equity in the "but for" world and that the debt financing would not extend beyond 1992); Three Crown Ltd., 906 F. Supp. at 876 (the model falsely assumed there

was coordinated activity which the record failed to support); Kidder Peabody & Co., Inc. v. IAG Int'l Acceptance Group; 28 F. Supp. 2d at 134 (same). A model that is "based on assumptions which find no support in the record," is inadmissible. Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir. 1994).

146. Professor Calomiris misapplies the Gordon Growth Model in a number of respects. First, in calculating earnings in the first year after the breach, he averages Carteret's net income between 1982 and 1988, which results in a projected first year net income of $20.5 million. PX 2702 at ¶ 35. He assumes "but for" Carteret's net income will grow at 4.2 percent per year even though, in the actual world, Carteret recorded losses of $160.25 million and $131.84 million in 1991 and 1990, respectively, because of asset quality problems resulting from poor underwriting prior to FIRREA. PX 2702 at 26 n.59. This counterfactual assumption has the effect of saying that every dollar of loan loss was due to the breach which even Professor Calomiris acknowledges is not correct. As Professor Calomiris admits: "Carteret would likely have eventually suffered some of these same losses even in the absence of the Government's breach." PX 2702 at 74.

147. Moreover, because much of Carteret's net income is non-recurring rather than attributable to operations, it is inappropriate to look at net income rather than net operating income in applying the model. DX 5038 at ¶ 36. The average net operating income for 1982 to 1988 was only $1.7 million, not the $20.5 million calculated by Professor Calomiris for net income. Id. at ¶ 24. Using net operating income rather than net income as an input to the model, and accepting Professor Calomiris's calculations of the discount rate of 12.4 percent and earnings growth rate of 4.2 percent, Carteret's estimated market value as of the date of the breach is $20.9

million rather than the $251.4 million estimated by Professor Calomiris. Id. Indeed, in order to conclude that Carteret's market value at the time of breach was $251.4 million, as Professor Calomiris does, the rate of growth of earning would have to be assumed to be 11.7 percent every year between 1989 and 2008. Historically Carteret never came close to achieving an 11.7 percent per year steady state growth rate of earnings. Indeed, this assumed growth rate of earnings is more than twice the growth rate Professor Calomiris calculated in his analysis. Id.

148. Further, Professor Calomiris estimates a discount rate of 12.34 percent based upon a regression analysis of thrift sales of convertible debentures and preferred stock in 1994. However, the regression is "mispecified and is almost entirely adhoc." DX 5038 at ¶ 36. The reason for this is that Professor Calomiris uses 1994 data to project the discount rate in 1989 when economic conditions were entirely different. Id. at ¶ 168. Further, because the risk and tax characteristics of preferred stock and convertible debentures are entirely different, it was improper to determine the values in the regression model by combining data relating to preferred stock with data relating to convertible debentures. As Professor Saunders notes in this regard, Professor Calomiris's analysis "mix[es] 'apples' and 'oranges.'" Id. at ¶ 169. The sample in the regression is "very small," id. at ¶ 171, and three coefficients, which should be expected to affect the yield, are insignificant at the 95 percent confidence level. Id. at ¶ 172. For one important variable, the ratio of equity to assets, Professor Calomiris "substitutes another company's financial statement values for Carteret's into his model, [thus] no longer estimating Carteret's cost of preferred stock." Id. at ¶ 173. As noted by Professor Saunders: "He [Professor Calomiris] has a jerry-built 'but-for' model of preferred stock cost based on a sample of companies who are unlike Carteret in at least one respect, i.e., companies that are outside the

range of Carteret's actual financial performance and insolvency risk. Thus, Professor Calomiris's estimates [using the results of the regression] . . . are highly speculative." Id.

149. As indicated previously, Professor Calomiris's damage estimate includes estimated dividends Ambase allegedly would have received between 1989 and 2006 in a "but for" world. According to Professor Calomiris, Carteret would have paid annual dividends equal to the same percentage of earnings as healthy thrifts paid during this period (i.e., 31.7 percent). PX 2702 at ¶36. Because Professor Calomiris assumes that "but for" net earnings grew 4.2 percent per annum, he also assumes dividends increased by a like amount. As Professor Saunders points out, however, these assumptions are wholly inconsistent with the dividends Carteret paid in the real world between 1982 and 1988.

> Carteret's pre-FIRREA dividends were paid out on seven occasions, with some dividends being paid in stock and others in cash and with an erratic payout rate. There is no evidence of either a 31.7 percent constant payout rate or of a constant growth rate in dividends in the pre-1989 period. As such, [Professor Calomiris's analysis is highly speculative in nature.

DX 5038 at ¶ 36.

150. Although Professor Calomiris estimates the unexpected future earnings of "but for" Carteret through the application of the Gordon Growth Model, he contends that "damages should be calculated on a market value basis, and market values remain above book values during the relevant period" of analysis. PX 2702 at 27. Thus, he applies a book to market multiplier to "but for" Carteret's estimated book value in 2006 to determine Carteret's estimated market value in 2006. PX 2702 at ¶ 38. This multiplier is derived by assuming that the book to market ratio of Carteret in 1989 would have appreciated between 1989 and 2006 at the same rate

as a sample of thrifts. As Professor Saunders points out, however, Carteret was financially weaker in 1989 than the average thrift, and there is nothing in Professor Calomiris's report to demonstrate that "but for" Carteret's value would have appreciated anywhere near the same rate as that of thrift stocks as a whole or the so-called "peer" thrifts. DX 5038 at ¶¶ 39-46. Further, the rates of appreciation applied by Professor Calomiris are skewed because they do not factor in failed thrifts (i.e., so-called "survivorship bias"). Id. at ¶¶ 64-79.

### 2. AMBASE'S CLAIM TO PREJUDGMENT INTEREST IS INVALID

151. Professor Calomiris's model assumes that Carteret should reap the benefit of favorable economic conditions after 1992, and claims that Carteret's market value at the time of breach did not reflect these favorable economic conditions. According to Professor Calomiris, Carteret is entitled to damages based upon his estimate of the dividends that Carteret would have paid to Ambase ($188.7 million per Table 6, PX 2702 at 28) absent the breach, plus what Carteret's market value allegedly would have been in 2006 or 2008 had it survived. In his preferred approach, Professor Calomiris estimates this market value by compounding "but for" Carteret's earnings net of estimated dividends at 4.2 percent per year after 1989, and then multiplying the estimated book value of the "but for" thrift as of 2006 and 2008 by the average market-to-book value ratio of "peer institutions." Id. at 25-43.

152. Although Professor Calomiris claims his methodology is not tantamount to seeking prejudgment interest on Carteret's market value as of the time of the breach, in effect it is. That is, the methodology adjusts Cartereret's 1989 market value by adding to it an annual compound interest rate of 4.2 percent which is Professor Calomiris's estimated annual rate of return for Carteret absent the breach. Id. at 26. Professor Calomiris contends he is avoiding the

proscription on prejudgment interest by excluding estimated dividends from "but for" Carteret's annual return. Although this may lower the effective rate of prejudgment interest, the award still impermissibly includes prejudgment interest.

153. In effect, Professor Calomiris's estimate simply adds an estimated rate of return to Carteret's market value at the time of breach to calculate "but for" Carteret's estimated market value in 2006 or 2008. DX 5038 at ¶ 63. This principle is well established in the case law. For example, in Long Island Savings v. United States, 60 Fed. Cl. 80, 94 (2004), rev'd on other grounds, 503 F.3d 1234 (Fed. Cir. 2007), the thrift claimed as expectation damages the reduction in interest-bearing liabilities that allegedly would have been realized if lost profits had been earned in the absence of the breach. On cross-motions for summary judgment on damages, this Court ruled that the claim was tantamount to prejudgment interest because the claim was tantamount to the thrift receiving interest on the equity it allegedly would have had in a "but for" world. Professor Calomiris's claim is similar to the claim advanced in Long Island because he, too, seeks a return on Carteret's market value as of the time of breach computed as a function of the estimated growth of earnings net of dividends and compounded annually. As in Long Island, the claim is for prejudgment interest because it seeks, as damages, a return on the estimated value of Carteret at the time of the breach.

### 3. AMBASE'S CLAIM FOR LOST DIVIDENDS INVOLVES DOUBLE COUNTING

154. Under Professor Calomiris's model, Carteret's unrealized market value in 1989 is equal to the estimated market value of "but for" Carteret in 2006 or 2008. Because, according to Professor Calomiris, "but for" Carteret would have paid out 31.7 percent of its net earnings as

dividends to Ambase, these cash flows are not involved in calculating "but for" Carteret's market value in 2006 or 2008. Therefore, even though these amounts are paid to Ambase, Professor Calomiris contends they constitute an additional element of damage to Carteret. As Professor Saunders points out, however, assuming, as Professor Calomiris does, that Carteret's unrealized 1989 market value is based upon future cash flows, the "but for" dividends are part of these cash flows, and are already factored into Carteret's imputed 1989 market value. As noted by Professor Saunders:

> Even the most elementary finance books make it clear that the market value of any company at a point in time is a function of its expected dividends (discounted appropriately). That is, Professor Calomiris's already inflated estimated but-for market value of $251.4 million in July 1989 would already have included any dividends expected between 1989-2008. His suggestion of adding estimated foregone dividends of $188.7 million to his market value estimates is double-counting of the worst kind and breaches the fundamental rules of fair market valuation.

DX 5038 at ¶ 81 (emphasis in original). Therefore, allowing the recovery of alleged dividends constitutes an unjustified windfall and must be avoided. See, e.g., Hansen Bancorp, 367 F.3d at 1345 (given that the investor received substantial benefits in the course of contract performance, the court must ensure that restitution of the initial investment does not "bestow an 'unfair windfall'").

**4. CARTERETS' MAXIMUM DAMAGE IS MEASURED BY ITS MARKET VALUE AT THE TIME OF BREACH NET OF SELF IMPOSED LOSSES BETWEEN THE TIME OF BREACH AND THE SEIZURE**

155. As indicated previously, under the case law, when an asset is injured or destroyed by a breach, the benchmark measure of damage is the market value of the asset at the time of breach. Estate of Berg, 687 F.2d at 380; J. Murray, Contracts, ¶ 237. In this case, although

Professor Calomiris estimates Carteret's market value at the time of the breach to be $251 million, Carteret reported actual net losses of $160.25 million in 1991 and $131.84 million in 1990. PX 0010 at 2. As Professor Calomiris observes, the majority of these losses, $171.634 million in 1991, and $122.349 million in 1990, resulted from Carteret's write-down in its commercial loan portfolio. PX 2702 at 26 n.59. These losses post-dated, and were unrelated to, the breach.[3]

156. Although Professor Calomiris is likely to contend at trial that the real estate losses are, in part, attributable to the breach, as the Federal Circuit recently observed, "actual contemporaneous memoranda are more probative of the cause of losses than expert statements at trial." Cienega Gardens, 503 F.3d at 1291 (litigation-formulated claims concerning the expected value of property in the period following the breach are definitively belied by "contemporaneous offering memoranda"). Because Carteret's contemporaneous financial reports attribute these losses to the recession, these losses are not connected to the breach. PX 0010 at 2.

157. As we have previously noted, "Precedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or a direct consequence of the breach." LaSalle, 317 F.3d at 1273. The law "does not attribute remote consequences to the defendant." Id. The 1990 and 1991 real estate losses are remote consequences of pre-breach defective underwriting and

---

[3] Professor Calomiris erroneously claims that "some of [the] writedowns were made as part of an aggressive effort by Carteret to raise capital from outside investors." PX 2702 at 26 n.59. The Government's real estate valuation expert, David Kennedy has observed that Professor Calomiris's assumptions are "conceptually flawed and . . . based upon counterfactual assumptions." DX 7000 at ¶ 1.3. As the evidence shows and we will demonstrate at trial, even with the massive write-downs in 1990 and 1991, Carteret was underreserved rather than overreserved as contended by Professor Calomiris.

generally adverse economic conditions and are not related to the breach. Accordingly, the Government bears no responsibility for these losses and the benchmark of fair market value at the time of breach must be adjusted for these losses. See, e.g., Hansen Bancorp, 367 F.3d at 1317-19 (only net benefits must be awarded as damages); Landmark, 256 F.3d at 1373-74 (same). Thus, any market value losses attributable to the breach must be adjusted for the 1990 and 1991 real estate writedowns in determining breach-induced damages to Carteret. Id.

### 5. AMBASE'S WOUNDED-BANK DAMAGES CLAIMS ARE INVALID

#### A. FACTUAL BACKGROUND

158. Ambase seeks wounded bank damages of $16.8 million consisting of $12.5 in severance agreement payouts; $2.4 million in costs related to the 1990 branch sales; $600,000 in costs related to attempting to raise capital in 1992; and $1.3 million in fees to defend various regulatory investigations. Although Professor Calomiris did not claim alleged deposit costs of $17 million as "wounded bank" damages, Ambase does in its Memorandum of Contentions of Facts and Law ("Ambase Memorandum"). Ambase Memorandum at 77-79. Approximately $13.3 million of the $16.8 million (i.e., the $12.5 million in severance payments, $600,000 paid to raise capital, and $174,348.10 to defend Ambase officers against OTS investigations) were incurred by Ambase, not Carteret. Yet, Professor Calomiris claims these are "wounded bank" damages because they would not have been incurred in the absence of the breach and that Ambase paid them for Carteret's benefit. As for the remaining costs, Professor Calomiris claims they are wounded bank damages because they would not have been incurred in the absence of the breach. As we demonstrate, the costs incurred by Ambase were not "wounded bank" damages

because they were not losses to Carteret and were unrelated to the breach. As we further demonstrate, the costs incurred by Carteret would have been incurred in the absence of the breach and were the result of Carteret's independent business decisions.

**B. CARTERET CANNOT RECOVER AMBASE'S COSTS**

159. As is evident from Professor Calomiris's May 2007 Declaration, PX 2702, Ambase paid Carteret's officers $12.5 million to settle severance payment litigation. Ambase was the only defendant in the litigation. PX 2702 at ¶ 102, n.165; see DX 9122 ("Carteret did not experience any loss due to these Severance Agreements"). Ambase paid the expenses to defend its officers against OTS investigations relating to 1990 bonus payments ($174,348.10), see PX 6401, and paid investment banking fees ($600,000) relating to Carteret's efforts to raise capital. See, e.g., DX 7406 (Ambase paid the costs of the Kohlberg due diligence report).

160. Under the case law, because Ambase incurred these costs, they are not "wounded bank damages," even if the costs were incurred for Carteret's benefit. For example, in Granite Management Corp. v. United States, 416 F.3d 1373 (Fed. Cir. 2005), the thrift sought to recover costs related to a capital investment by its parent, Ford Motor Company ("Ford"). The Federal Circuit, however, disallowed the recovery because Ford had no direct contract claim and was not a party to the suit. Ambase, like Ford, has no direct contract claim against the United States (it is merely a derivative plaintiff). Like the thrift's claim for parent expenses in Granite, therefore, Carteret's claim for expenses incurred by Ambase is not a cost incurred by the contracting party even if it was incurred for that party's benefit.

161. Similarly, in American Capital Corp. v. FDIC, 472 F.3d 859, 865-67 (Fed. Cir. 2006), the Federal Circuit rejected the thrift's parent's claim for the value of the thrift's equity

upon the ground that "a corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary . . ." Id. at 86. Under American Capital, therefore, the parent is not entitled to recover costs incurred by the thrift because they are separate juridical entities. In this case, if Ambase's equity was reduced by the severance payments and administrative expenses, only Ambase has a claim for these costs (assuming they were related to the breach), not Carteret. As Ambase was not a party to the contract and only is suing in a derivative capacity, these costs are not recoverable.

162. Further, in Castle v. United States, 301 F.3d 1328, 1340-41 (Fed. Cir. 2002) cert. denied, 539 U.S. 925 (2003), contract parties asserted reliance damage claims on behalf of non-parties who had invested in the thrift. The Court, however, rejected the claims because the contract parties "lack standing to assert any reliance interest on behalf of the other shareholders." Id. at 1340. Thus, the contracting party shareholders had standing if they incurred costs pursuant to the contract but not on behalf of other non-contract investors who may have incurred costs in reliance upon the contract. As in Castle, although Ambase may assert Carteret's claims for reliance damages for costs it may have incurred, Ambase lacks standing to assert damages for expenses it may have incurred for the benefit of Carteret.

163. It is well established that losses or expenses stemming from independent business decisions, even if made after the breach, break the chain of causation necessary to recover damages for breach of contract. See, e.g., Myerle, 33 Ct. Cl. at 26 (an "independent and collateral undertaking" is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach"); Wells Fargo, 88 F.3d at 1023 (lost profits stemming from collateral undertakings are "too uncertain and remote to be taken into consideration"); Hughes

Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001) (independent business decisions break the causation chain and negate the recovery of damages). Although Ambase claims that it would not have had to enter into severance agreements, defend against OTS charges relating to the payment of bonuses, sell the branches in 1990, or seek to raise capital in the absence of the breach, these contentions are belied by the record.

164. For example, as Professor Saunders points out, because Professor Calomiris concedes that Carteret would have had to raise external capital in the absence of the breach, the costs of raising capital, even if attributable to Carteret, would have been incurred in the "but for" world. DX 5038 at ¶ 151. Thus, these losses are not avoidable costs. Likewise, the sale of branches stemmed from a pre-FIRREA business plan to reduce overhead as part of the effort to rationalize the branch system and would have been incurred in the "but for" world to the same extent as in the actual world. Id. ("Professor Calomiris provides no convincing evidence that even in a but-for world Carteret would not have sold these branches when it did"). Thus, Carteret would not have avoided the costs in the absence of the breach. Finally, there is no reason to believe the severance contracts and conditions leading to the OTS investigations would not have existed in the "but for" world to the same extent as the actual world. As pointed out in various reports of investigation, both Carteret and Ambase engaged in self-dealing and unsafe and unsound practices which were wholly unrelated to the level of Carteret's regulatory capital. Accordingly, these costs were unavoidable and are not recoverable as a result of the breach.

165. Ambase argues that the alleged deposit expenses between 1990 and 1992 of $17 million resulted from the breach and are additional "wounded bank damages." As we have shown, these alleged deposit expenses are a figment of Professor Calomiris's imagination. See ¶

44 infra. Accordingly, the Court should reject the claim for such deposit expenses as invalid. See, e.g., Granite Mgmt. Corp. v. United States, Slip Op. 2007-5054 (Fed. Cir. Jan. 8, 2008) (in the absence of proof of harm, damages cannot be awarded for breach of contract).

**RESPONSE TO AMBASE'S CONTENTIONS OF FACT AND LAW**

Pursuant to ¶ 14 of Appendix A, RCFC, we provide the following responses to Ambase's contentions of fact and law.

**A. AMBASE'S CONTENTIONS RELATING TO DAMAGES**

166. Ambase argues that regulators in 1982 and 1986 could have reasonably foreseen that Carteret would have suffered a loss of between $1 billion and $4 billion if goodwill were not counted toward regulatory capital. Ambase Memorandum at 35-37. Ambase contends that, in order to approve the transactions, regulators would have anticipated that Carteret would earn sufficient profits to erase the negative tangible capital generated by the acquisitions. Id. As Ambase acknowledges, however, this negative tangible capital amounted to only approximately $236 million, not the $1 to $4 billion Ambase now seeks as damages (not counting the alleged tax gross-up). Thus, even if the regulators could have reasonably foreseen in 1982 and 1986 that Carteret would have had the earning power in future years to erase the tangible capital deficit resulting from the 1982 and 1986 transactions, regulators could not have and would not have foreseen the quantity of damages Ambase seeks in this litigation.

167. Ambase contends that Messrs. Vigna, Albanese, and Simone, senior regulators in OTS's Northeast region, have testified that Carteret would not have been seized in the absence of the breach. Ambase Memorandum at 41-42. To the contrary, as the quotations set forth in the Memorandum make clear, these regulators testified that Carteret would not have been seized if it

had had sufficient tangible capital to satisfy the tangible capital requirement of FIRREA, but not if it had only had goodwill. Id. Ambase argues that regulators considered goodwill as "tangible capital," primarily citing Mr. Vigna's statement that Carteret would not have been seized if the United States District Court for the District of New Jersey's injunction had remained in place. Ambase distorts the record. OTS would have recommended that Carteret be seized even if goodwill had counted as regulatory capital. Vigna Dep. at 199-200. Thus, Ambase is simply incorrect in its characterization of Mr. Vigna's deposition testimony.

168. The contemporaneous evidence shows that Mr. Vigna would have recommended that Carteret be transferred to the RTC in November 1992, even if goodwill had counted as regulatory capital. PX 4886. Likewise, Mr. Albanese joined with Mr. Vigna in the 1991 and 1992 S-Memoranda, both of which explicitly recommend that Carteret should be transferred to the RTC regardless of whether supervisory goodwill were counted as regulatory capital. PX 4867a; PX 4886. Mr. Simone testified that Carteret would not have been seized if it had had "positive tangible capital of $80 million." Ambase Memorandum at 42. Goodwill, however, is not "positive tangible capital." Indeed, Ambase recognizes this very point at page 67 of its Memorandum when it cites deposition testimony from OTS regulators for the proposition that Carteret would have avoided seizure if it had had $150 million in additional tangible capital. Goodwill is simply not "additional tangible capital." DX 5038 at ¶ 94 ("Even at the most basic level, Professor Calomiris's inclusion of all $139.1 million of Carteret's remaining goodwill (as of September 1992) in the calculation of the *tangible capital* ratio doesn't make sense"). Therefore, Carteret would have been seized in the absence of the breach.

169. Ambase argues that Carteret would have survived in the absence of the breach for

three primary reasons. First, according to Ambase, Carteret had a franchise value of approximately $100 million. Second, according to Ambase, Carteret had excellent performance in the year prior to the breach. Third, according to Ambase, Carteret started making a profit in September 1991 despite the recession from 1990 to mid-1991. Ambase Memorandum at 43-46. Further, Ambase argues that Carteret would have survived in the absence of the breach because it was stronger than the average thrift that failed. Id. These arguments are invalid. As Professor Saunders has demonstrated, if Carteret had taken the reserves in 1990 that OTS required, its so-called $100 million in franchise value would not have existed. DX 5038, ¶ 88-89 ("If the commercial loan and commercial real estate portfolios had been marked to market, it is highly likely that Carteret's net worth in 1989 would have been negative").

170. Carteret's so-called excellent performance prior to the breach is a chimera; in the absence of non-cash income relating to the accretion of loan discount and the income generated by one time asset sales, Carteret would have reported losses in two of four years between 1986 and 1989. DX 8000 at ¶ 51 (Carteret's "aggressive lending operations in fact constituted net drains on income (i.e., losses) after 1987"); DX 5038 at ¶ 24. "These losses for 1988 through 1992 totaled $306 million, or about 105% of Carteret's total capital (including goodwill) as of September 30, 1987." DX 8000 at ¶ 51. Further, Carteret's alleged $13 million in profit between September 1991 and November 1992 resulted in large part from subsidized lending by the FHLB of New York. DX 5038 at ¶¶ 42-43. Also, at least $8 million of the alleged income in 1992 would not have existed if Carteret had properly booked reserves in the first six months of 1992. PX 2119. As a matter of economics, therefore, there was no real "net income" nine months prior to the transfer. Even if Carteret had earned $13 million between September 1991

and November 1992, regulators' concerns would not have been addressed. At this alleged rate of income, it would have taken more than 10 years for Carteret to earn sufficient income to make up the regulatory capital shortfall it suffered in 1992, even after counting goodwill as regulatory capital. PX 4886 at 3. Finally, as Professor Saunders has persuasively demonstrated, Carteret was significantly weaker than the average thrift resolved by the Government between 1980 and 1992. DX 5038 at ¶¶ 44-46; DX 5001 at ¶¶ 50-52, ¶¶ 58-68.

171. Ambase argues that Carteret shrunk its balance sheet by approximately $2.3 billion in assets between August 1989 and the date of the seizure. It concedes, however, that a portion of the shrinkage "was related to Carteret's efforts to discontinue corporate and commercial real estate lending, and to dispose of related assets, and thus would have occurred even absent the breach . . ." Ambase Memorandum at 49; see also Ambase Memorandum at 65. This was approximately $1 billion of the alleged $2.3 billion shrinkage. Ambase claims that the remainder of the shrinkage was due to the breach. Its only citation is to the 1990 business plan, which Ambase claims, asserted that "to meet FIRREA's new capital requirements, Carteret's '1989 strategy was altered,' among other things, to 'significantly downsize the balance sheet.'" Ambase Memorandum at 49, quoting PX 1905 at 7. Also, Ambase claims that the 1990 10K (PX 802 at 38) noted that "'[d]uring 1990, in a continuing effort to meet the stringent capital requirements of FIRREA, as interpreted by the OTS, Carteret continued to downsize its balance sheet and restructure its asset mix to facilitate compliance with FIRREA's risk based capital requirement.'" Ambase Memorandum at 49. Professor Saunders points out, however, that the United States was in a recession during this time, and the recession caused lending for home mortgages to drop precipitously. DX 5038 at 29-30. The recession, rather than the breach,

contributed materially to Carteret's asset shrinkage. Indeed, as Ambase points out, the portfolios consisting of residential loans and mortgage backed securities "shrank by over $900 million during the last six months of 1989, and by over $300 million in 1990." Ambase Memorandum at 50. The decision to exit corporate and commercial real estate lending, which Ambase concedes is unrelated to the breach, further contributed. Id. Further, Carteret's 1990 Business Plan and Ambase's 1990 10K do not attribute the shrinkage to the breach, as Ambase suggests. Rather, these documents recognize the difficult operating environment caused by the recession and attribute the shrinkage primarily to the existing business environment. PX 1905; PX 0802.

172. Ambase concedes that, until May 1992, regulators were required to count goodwill as tangible capital as a result of the preliminary injunction. Nevertheless, Ambase contends that thinking the "regulators acted precisely as they would have acted had there been no breach to begin with is fanciful at best." Ambase Memorandum at 59-60. This claim is unsupported. To the contrary, as required by the district court's order, all of Carteret's goodwill, including that written off as a result of the 1990 branch sales, was counted as tangible capital as a result of the preliminary injunction. Ambase also argues that the Federal Circuit's decision in Home Savings of America, FSB v. United States, 399 F.3d at 1351, entitled Carteret to count the goodwill associated with the 1990 branch sales as regulatory capital. That decision, however, addressed whether the elimination of goodwill as a result of branch sales was a form of mitigation. Id. In this case, the Government does not contend the sale of the branches mitigates damages, but that the sale did not stem from the breach. Therefore, Home Savings is irrelevant to the question of whether the branch-related goodwill in this case can be factored into the calculation of damages, if any, flowing from the breach.

173. Ambase argues that the Government exacerbated the breach by "blocking" Carteret's efforts to raise outside capital. Ambase Memorandum at 67-69. This is contrary to the record. Despite finding cause for a seizure in October 1991, PX 4867a, the Government permitted Carteret to attempt to raise capital from outside investors from October 1991 until December 1992. Moreover, the Government did not order Carteret's seizure until three prominent private investment groups, Kohlberg, Carlyle, and Colony Capital, following thorough due diligence examinations, withdrew letters of intent to invest in Carteret. Thus, regulators attempted to accommodate Carteret by allowing it to find capital to replenish its massive real estate losses. Time simply ran out when Carteret was unable to raise outside capital after a number of aborted attempts.

174. Ambase contends that Professor Calomiris's estimate of Carteret's market value on July 31, 1989, ($251 million) is validated by a so-called May 1989 bid from Secretary of State Al Haig and former Chairman of Prudential Bache Securities Harry Jacobs to purchase Carteret for $252 million. Ambase Memorandum at 70. As Professors Saunders and Smith have demonstrated, there was no such bid. DX 5038 at ¶ 51; DX 8000 at ¶ 64. Although Mr. O'Brien may have mentioned bid-related discussions in a letter to Mr. Scharffenberger, there is no evidence Secretary Haig or Mr. Jacobs lined up financing, retained investment bankers, made a written proposal, or otherwise followed through on the so-called "bid." Id. Mr. O'Brien's casual reference to such a bid does not constitute evidence a serious bid was ever pursued. PX 4836.

175. In its damage calculation, Ambase contends that anticipated profits of "but for" Carteret between 1989 and 2008 do not have to be discounted to present value under the Federal Circuit's holding in Energy Capital Corp. v. United States, 302 F.3d 1314, 1330-32 (Fed. Cir.

2002). Ambase Memorandum at 72. Thus, Ambase argues, Carteret should be compensated for the market value it allegedly would have had in 2006 if these profits net of dividends had been added to the balance sheet as retained earnings and capitalized in accordance with book to market ratios of alleged peer institutions. Energy Capital, however, provides no support for Professor Calomiris's valuation methodology. Instead, Energy Capital addresses whether, in determining a loss profits claim, profits that would have been earned prior to trial have to be discounted to the date of the breach in formulating a damage award. The holding is inapplicable in this case because Professor Calomiris asserts a claim for Carteret's lost value and not lost profits. The lost profits are simply an intermediate step which, allegedly, permits Professor Calomiris to calculate the market value of "but for" Carteret in 2006. These lost profits are not claimed as damages but, rather, as an input into the calculation of "but for" Carteret's book value in 2006. Thus, Energy Capital is irrelevant and Ambase's contention that these alleged lost profits do not have to be discounted to determine Carteret's lost value at the time of the breach is simply wrong.

176. Ambase concedes that many of the incidental costs it classifies as "wounded bank damages" were paid by Ambase rather than Carteret, but argues that, under Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1072 (Fed. Cir. 2001), "a non-breaching party to a contract can recover the costs of the breach even if these costs were 'passed through' to a third party." Ambase Memorandum at 79. Under the ruling in Hughes, the breaching party is not entitled to benefit from the fact that the party injured by the breach recovered its costs by passing them on to third-party customers. Id. This case is distinguishable, however, because Carteret never incurred the relevant costs and never recouped such costs from Ambase. Ambase was not a customer, but the owner of Carteret's shares. Thus, the "pass-

through" principles discussed in Hughes are inapplicable in this case.

177. Although not addressed in Professor Calomiris's damage reports, Ambase seeks as reliance damages Carteret's book value at the time of the 1986 acquisition of First Federal and Mountain Security. Ambase alleges this value was $272.5 million. Ambase Memorandum at 80-82. Ambase argues that Carteret's equity value on the date of the transaction . . . 'was the contract price paid as performance for the benefits set forth in the agreement.'" Ambase Memorandum at 80, quoting Am. Capital Corp. v. United States, 66 Fed. Cl. 315, 334 (2005), aff'd in part, rev'd in part, and remanded, 472 F.3d 859 (Fed. Cir. 2007). As the Court of Appeals for the Federal Circuit pointed out in reversing this Court's equity value damage award in American Capital, the contract between the FHLBB and the thrift did not require the holding company to contribute the thrift's equity, as represented by the common stock held by the holding company, to the post-resolution institution. 472 F.3d at 865-67. Ambase contends that the implication of the Federal Circuit's decision is that Carteret, which combined its positive book value with the negative book value of the acquired institutions, is entitled to recoup that value as reliance damages. This is simply untrue. As in American Capital, Carteret's equity interest was represented by Bancorp's shares of Carteret. These shares were not part of the deal by which Carteret acquired First Federal and Mountain Security. Therefore, Carteret did not contribute its equity because its equity was owned by Bancorp which was not a party to the deal between Carteret and the FHLBB. See also Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1053-54 (Fed. Cir. 2006).

178. Ambase also seeks to recover as restitution damages the higher cost Ambase contends the Government would have incurred if it had accepted the next highest bid for the

insolvent institutions in 1982 and 1986 ($48.5 million). Ambase Memorandum at 82. Professor Calomiris does not assert in his damage report that the difference between Carteret's bid and the next highest bid is a measure of the Government's alleged benefit. Indeed, there is no evidence to support this measure of restitution damages. Further, the type of analysis Ambase proposes has been rejected consistently in Winstar-related cases. Most recently, in Granite Management Corp. v. United States, 416 F.3d 1373, 1381 (2005), the Federal Circuit, quoting this Court's decision in Granite Management Corp. v. United States, 58 Fed. Cl. 766, 773 (2003), noted that "it would be 'inherently speculative to try to figure out now what the Government might have done, under different circumstances, nearly a decade and a half ago." Thus, Ambase's supposition that, in the absence of Carteret's bid, the FHLBB would have accepted the next lowest bid is pure speculation and cannot provide the basis for an award of restitution damages. Id.

**B. CONTENTIONS RELATING TO THE RECEIVERSHIP DEFICIT**

179. Ambase argues (1) that this Court has jurisdiction to adjudicate the receivership deficit, and (2) that the deficit, as estimated by the FDIC, is invalid. Ambase Memorandum at 83-85. According to Ambase, the FDIC was not entitled to charge interest on the advances to Carteret, the interest charged was inconsistent with FDIC policy concerning short term variable rates for loans to receiverships, Congress's alleged failure to fund the RTC and to allow minority bidding preferences reduced receivership proceeds, and the FDIC miscalculated the tax the receiver owes to the Internal Revenue Service. Ambase Memorandum at 85-129.

180. As the FDIC demonstrated in its motions to dismiss and motion in limine filed on December 21, 1999, this Court lacks jurisdiction to adjudicate the receivership deficit. Further,

as we demonstrated in our response to Ambase's Statement of Issues ("Government Issues Response"), and as this Court has acknowledged, "the Tucker Act does not grant this Court jurisdiction over tortious claims, nor does it permit this Court to hear claims between private parties." Ambase II, 61 Fed. Cl. at 796-98. In asserting that the FDIC/RTC engaged in self-dealing by charging high interest rates on receivership debt, miscalculated Carteret's Federal tax liability, and failed to obtain maximum value for Carteret's assets, Ambase is asserting tort claims against the FDIC. As receiver, the FDIC "is not the United States." Plaintiffs in All Winstar-Related Cases at the Court v. United States, 44 Fed. Cl. 3, 7 (1999); see also O'Melveny & Myers v. United States, 512 U.S. 79, 85 (1994) (same). Further, tort claims are not cognizable in this Court, even if the FDIC receiver were the United States. See, e.g., Maher v. United States, 314 F.3d 600, 607 n.2 (Fed. Cir. 2002) ("To the extent Maher and Gravee have a claim for breach of their employment contracts, including a claim for payment of the proceeds of the deferred compensation trust established for them by Horizon, such a claim would be directly against Horizon, thorough its receiver, not indirectly through the government"); McAllister v. RTC, 201 F.3d 570 (5th Cir. 2000) (action by former officers and directors of failed thrift seeking retirement funds sounded in tort).

181. The Court should reject Ambase's attempts to avoid the limitations on this Court's jurisdiction by characterizing Carteret's receivership deficit claims as relating to Congress' alleged failure to fund the RTC and to allow minority bidders limited bidding preferences. With respect to the level of RTC funding, Ambase has cited not authority, and we are aware of none, that creates a "legally protected interest" in a particular level of public funding to ensure the successful resolution of an insolvent thrift. By definition, no entity has a

"particularized interest" in public funding or the timely resolution of an insolvent thrift. As the Federal Circuit has noted in analogous circumstances, "[t]o suggest that a court should undertake an inquiry into whether Congress, in [legislating a] fee . . . , did its sums correctly, is to invite an intrusion of the judiciary into the work of Congressional committees and staff, and into the minds of Congress itself, which would be nothing but an invitation to mischief." Longshore v. United States, 77 F.3d 440, 444 (Fed. Cir. 1996). Thus, it is not the Court's place to question the level of funding Congress deems appropriate for particular programs and, therefore, there is no "legally protected interest" in congressional funding of the resolution process for insolvent thrifts.

182. Likewise, Ambase has failed to demonstrate an "injury" to a "particularized legal interest" as a result of the minority preference program. Ambase Memorandum at 113-123. Although Ambase argues that it has a "particularized legal interest" in a potential liquidation surplus from Carteret's resolution, it cites no authority, and we are aware of none, that this contingent right to share in the surplus, assuming there is a surplus, constitutes a "particularized legal interest." Indeed, Ambase was not even a bidder on Carteret's assets which means that it was not and could not have been directly effected by the bidding rules related to these assets. Given the fact that Ambase was not an actual or potential bidder for Carteret's assets, it lacks the requisite "particularized interest" to challenge the bidding rules for those assets. See Alfa Laval Separation v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (a party has no standing to challenge bidding procedures if it is not a plausible candidate for the contract); Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001) (an "interested party" is one who "is an actual or prospective bidder or offeror whose direct economic interest

would be affected by the award of the contract or by the failure to award the contract").

183. The minority preference program did not injure Carteret, and thus it could not have injured Ambase. As Professor Saunders has demonstrated, the enlargement of the potential bidding universe through the minority preference program tended to increase rather than reduce the number of bids, and there was little if any loss as a result of offering the deposits without offering performing conventional mortgage loans as well. DX 5038 at ¶¶ 143-45; DX 5001 at ¶¶ 85-92. Further, there was more value in offering the thrift through branch clusters than there would have been as a whole bank. Id. Therefore, the minority preference program did not give rise to "actual or threatened injury," and Ambase lacks standing to challenge the program. Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979).

184. Contrary to Ambase's contentions, the Federal Circuit's decision in Bailey v. United States, 341 F.3d 1342, 1344-45 (Fed. Cir. 2003), also precludes Ambase's attempt to have this Court adjudicate the receivership deficit. Although this Court stated that it did not believe Bailey required that the Government "be compensated for [opportunity costs lost in the administration of the receivership]," Ambase II, 61 Fed. Cl. at 74, this is simply untrue.

185. The receivership in Bailey, as in this case, primarily resulted from the accrual of interest on loans from the FDIC to the receiver and the liability for taxes. See Bailey, 341 F.3d at 1344-45. Yet, the Federal Circuit rejected the stockholder's claim to recover the receivership deficit and determined that the order of priority in 12 U.S.C. § 1821(d)(11), which foreclosed the recovery, did not constitute a "taking." See Bailey, 341 F.3d at 1347. Although Ambase argues that the enactment of the minority preference statute and the alleged failure to fund the RTC resulted in a taking of its property rights in a potential liquidation surplus, the stockholder in

Bailey made a similar argument and was unable to carry the day.

186. In Bailey, the stockholder contended that "his inability to recover the receivership deficit in combination with the statutory depositor preference priority scheme [took] his contractual remedy to any surplus recovery." Bailey, 341 F.3d at 1347. The Federal Circuit ruled, however, that "the application of the statutory priority scheme" did not take his property interest in the surplus or his right to pursue the remedy. To the contrary, the statute preserved the shareholders' right to a potential recovery, 12 U.S.C. § 1821(d)(11)(A)(v), and the FDIC has pursued contract damages on behalf of Security Savings. Id. The reasoning of Bailey applies with equal force to this case. Indeed, as this Court has observed:

> There is a bitter truth to this logic [i.e., that there is no regulatory taking of a contract if there is a potential for legal redress for breach of contract]. Very few if any legal judgments put the party injured in the same position as if the injury had never occurred. A man who has lost his leg in an auto accident will never be the same no matter how much money he receives in compensation. An opportunity lost can never be regained years later. A money judgment years later is always speculative. And yet that is all that legal redress is about.

Ambase I, 58 Fed. Cl. at 52. Thus, contrary to Ambase's argument, the fact that any recovery Carteret might receive must flow through the receivership does not mean that Ambase's legally protected interests have not been fully protected by the pursuit of the derivative claim on Carteret's behalf.

187. Even assuming Bailey permits a stockholder to recover portions of the deficit relating to allegedly unconstitutional actions or breaches of fiduciary duty, as we demonstrated in our Issues Response and will demonstrate at trial, Ambase has not and cannot prove any evidence of unconstitutional actions or breaches of fiduciary duty which inflated the receivership deficit.

For example, Ambase contends that Carteret would have been able to transfer its goodwill in the absence of the breach. The evidence, however, will show that the goodwill on Carteret's books did not survive the seizure and would not have survived it in the absence of the breach. As reflected on the balance sheet of the pass-through receivership, the RTC wrote off the goodwill when OTS seized Carteret and placed the thrift in a "pass through" receivership. PX 1103-1114. As noted in the Conservatorship Strategic Plan, "The goodwill of the bank [was] . . . written off [at the commencement of the receivership]." PX 4002 at 13. Even if the goodwill had not been written off the receivership's books, moreover, the Federal Circuit has recently reaffirmed that goodwill is not an asset that is transferrable at will. Granite Mgmt. Corp. v. United States, Slip Op. 2007-5054 (Fed. Cir. Jan. 8, 2008); see also Government Issues Response at 22-26.

188. Likewise, Ambase's contention that it was unjustified for the FDIC/RTC to charge interest on the advances to the receivership because Carteret is unable to collect prejudgment interest on its claims against the United States lacks merit. Ambase Memorandum at 96-100. Contrary to Ambase's assertion, relevant legal authority required the FDIC/RTC to charge interest on loans to the receiver. In Golden Pacific Bancorp v. FDIC, No. 95 Civ. 9281, 2002 WL 31875395 (S.D.N.Y. Dec. 26, 2002), aff'd, 375 F.3d 196 (2d Cir. 2004), cert. denied, 546 U.S. 1012 (2005), for example, the court held that the FDIC was required to charge interest on loans to the receiver because the FDIC had a fiduciary duty to maintain the integrity of the insurance fund. As the court noted, "money in the deposit insurance fund [must] bear interest in order to protect the fiscal integrity of the fund . . ." Id. at *6; see In Re Receivership Of First Nat'l Bank in Humboldt, 523 N.W.2d 591 (Iowa 1994) (interest must be charged on loans from the FDIC to the receiver); FDIC v. Citizens State Bank of Niangua, 130 F.2d 102 (8th Cir. 1942)

(same).

189. Even if the Court believes there is an asymmetry between the loans from the FDIC to Carteret and Carteret's Winstar-related claim because of the unavailability of pre-judgment interest, the statute requires that interest be charged on the loans to Carteret. Indeed, as the Eighth Circuit has noted, one cannot find a "philanthropic intent, in a situation such as this, to allow the use of the [FDIC's] funds to become a source of profit to stockholders of a defaulting bank, at the expense of the [FDIC]." Niangua, 130 F.2d at 104 n.6; see Corbin v. Fed. Reserve Bank of New York, 475 F. Supp. 1060, 1065-68 (S.D.N.Y. 1979), aff'd, 629 F.2d 233 (2d Cir. 1989) (the Federal Reserve Bank of New York ("FRB-NY") was required to charge interest on the loans to the receivership in order to protect the fiscal integrity of the national banking system). Ambase has cited no authority, and we are aware of none, that permits the RTC/FDIC to make interest free loans to the receiver. The relevant authorities require precisely the opposite.

190. In addition, Ambase contends that the rate of interest should have been the floating three month Treasury-Bill rate rather than the fixed Federal judgment rate (this is based upon the 52 week Treasury-Bill rate). Ambase Memorandum at 100-110. Contrary to Ambase's contention, the relevant legal authorities justify charging the Federal judgment rate as the post insolvency interest rate on the advances to Carteret. As Judge Milton Pollack has observed: "In determining the fairness of interest rates, courts have looked to the rates set by contract between the parties, prevailing market rates and legal ending rates." Corbin, 475 F. Supp. at 169-70; see also Mid Jersey Nat'l Bank v. Fidelity-Mortgage Investors, 518 F.2d 640 (3d Cir. 1975); In re Hartsdale Assocs., 452 F. Supp. 67 (S.D.N.Y. 1978).

191. For example, the RTC's advances to pay off the FHLB loans in 1992 were priced

to subsidize the resolution (i.e., the three month floating Treasury-Bill rate plus 25 basis points) and therefore are not relevant in determining an appropriate rate for the later advances. Moreover, the rates charged on the loans from the RTC/FDIC to the receiver were generally under the prevailing market rates for prime rate commercial loans and 30-year conventional mortgage loans, both of which are comparable to the loans to Carteret because they involve market risk. DX 5001 at ¶ 30. Further, the rates charged on the Carteret loans were legal because they were established by the Federal judgment rate. Therefore, the loans from the FDIC/RTC to Carteret satisfied the judicially identified criteria for the validity of rates and were less than might have been charged under full economic risk-based pricing. Id.

192. Two of three rates in this case were well below the average rates on prime commercial loans and 30-year conventional mortgage loans and the rate on the third loan was only slightly above these commercial rates. DX 5001 at ¶ 31.

193. Without any support in the record, Ambase argues that the FDIC set the rate at the Federal judgment rate retroactively in order to increase the amount of interest the receivership would be required to pay. It presents precisely the same arguments it presented in its 2006 Statement of Issues, all of which are absolutely devoid of evidentiary support. For the reasons we stated in our Issues Response at 58-62, these arguments should be summarily rejected. Moreover, if necessary, we will demonstrate at trial that the interest rates were not changed retroactively in order to require Carteret to pay additional interest to the FDIC.

194. With respect to taxes, Ambase contends (1) that the FDIC was unjustified in failing to offset the deposit premium income with a post insolvency interest deduction, and (2) that Federal Financial Assistance was improperly calculated. Ambase Memorandum at 87-95.

As with the interest retroactivity claim, these issues are fully addressed in our Issues Response Memorandum which demonstrates that the FDIC conformed its behavior to relevant policy guidelines and treated Carteret's tax liability no differently than it treated the tax liability of any other receivership. Issues Response Memorandum at 68-88. We rest upon the discussion in the Issues Response Memorandum.

200. Finally, Ambase argues that it should be paid directly for any contract damage the breached caused to Carteret. Ambase Memorandum at 124-129. Ambase, however, is a derivative rather than a direct plaintiff and, as the FDIC demonstrated in its motions to dismiss, both general and New Jersey corporate law require that any recovery in a stockholder derivative action be paid to the corporation on whose behalf suit is brought and not the stockholder. See, e.g., Plaintiff-Intervenor FDIC's Motion To Dismiss Carteret Bancorp's Claim For A Direct Award Of Derivative Damages at 6-10. Accordingly, Ambase's plea for a direct payment of any damages is inconsistent with general and New Jersey corporate law and should be rejected. Id.

## CONCLUSION

For these reasons, Carteret should recover nothing for the Government's breach of contract.

Respectfully submitted,

OF COUNSEL:
TAREK SAWI
Senior Trial Counsel

ARLENE PIANKO GRONER
ELIZABETH HOSFORD
F. JEFFERSON HUGHES
DELISA SANCHEZ
AMANDA TANTUM

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309

Attorneys for Defendant

Date: January 22, 2008

## CERTIFICATE OF FILING

I hereby certify that on this 22nd day of January 2008, a copy of the foregoing "Defendant's Memorandum Of Contentions Of Fact And Law On Damages" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt
David A. Levitt