# EXHIBIT A

COURT OF FEDERAL CLAIMS

* * *

AmBASE CORPORATION and FEDERAL:
DEPOSIT INSURANCE CORP.

:

-vs-

:

THE UNITED STATES NO. 93-531C

:

* * *

Oral deposition of THOMAS O'ROURKE, held at the law Clarion Hotel, 1010 Race Street, Philadelphia, Pennsylvania, on Monday, September 27, 1999, beginning at approximately 9:30 a.m., before Audree E. Jones, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

* * *

Page 34

A. No additional risk of capital being depleted.
Q. The second page of this letter refers to a meeting with Kohlberg & Co.
Do you remember meeting with Kohlberg & Co.?
A. Never.
Q. Do you remember Kohlberg was interested in investing in Carteret?
A. I was advised by Mr. Bianco, that was one of his interested investor groups.
Q. Was it part of your job responsibility to know which investors were looking at Carteret?
A. To be aware of the prospect for recapitalization. When it came to following up with investor groups, that was management function, left to Albanese.
MR. HUME: Mark this as O'Rourke-3.
(The above document was marked for identification as O'Rourke-3).
BY MR. HUME:
Q. This letter, does this refresh your recollection as to what occurred in 1992?
Were there any other events it refreshes your recollection about, that I didn't ask you?

Page 35

MR. LEVITT: Objection as to form.
THE WITNESS: It refreshes my memory as to the date Carteret executed what I believe was the accelerated resolution agreement. I believe a consent agreement was also signed.
BY MR. HUME:
Q. What do you mean by consent agreement?
A. Consent, which the board consented to, if they did not raise capital, they were to be placed into receivership.
Q. Do you remember such an agreement being signed?
A. I believe there was one. I'm not certain to the date.
Q. When an institution signs an agreement like that, is it because they were under threat of being placed into conservatorship at that time?
MR. LEVITT: Objection. Vague.
THE WITNESS: My experience is, yes, they are signed by a Board of Directors in facing the prospect of being placed into receivership or conservatorship.
BY MR. HUME:
Q. Is the purpose of the institution's, of management's consent in order to have it given in

Page 36

exchange for the OTS agreement, to give the institution a certain amount of time to raise capital; is that how it works?
A. That's my understanding.
Q. The last paragraph on the second page of the letter says, "In conclusion, we believe the termination of the agreement and the underwriting process while progress is being made to recapitalize a troubled institution which assets of over $5 billion would not be effective supervision or good policy."
Do you remember agreeing with that statement?
A. I would agree with that, yes.
Q. Do you remember agreeing there was progress being made in the summer of 1992 with Carteret?
A. From what I heard, and my limited knowledge, I understood progress was being made. I don't know to what degree, or whether it was satisfactory to the people above me.
Q. Let me refer you to Exhibit 3. This is dated August 26, 1992. It says reply to the attention of Thomas J. O'Rourke. Is this a document you would have written?
A. Yes, it is.

Page 37

Q. It refers to an August 24, 1992 meeting at OTS, where Carteret's capital raising efforts were discussed.
"In the wake of the withdrawal by Kohlberg & Co." Do you remember that meeting?
A. No, but if I wrote the memo, I would have been there. At this point, I can't recall it in my mind as to the particular meeting.
Q. Do you remember Kohlberg had a letter of intent to invest in Carteret?
A. That I remember, yes.
Q. Do you remember thinking it was a high likelihood they would invest in Carteret?
A. I knew it was subject to due diligence, and I was very hopeful something would happen, but I had no expectations.
Q. You didn't expect either way? You didn't know what to expect?
A. Correct.
Q. Did you consider it to be a serious prospect?
A. Yes, due to the fact that Dick Bianco was well regarded. I knew it was in good faith.
Q. Do you recollect why Kohlberg decided to withdraw from the letter of intent?
A. I don't know.

Page 38

Q. Do you remember the LZO report?
A. I remember, yes. I remember that.
Q. What do you remember about their report?
A. They prescribed an additional amount of loan loss reserves. I'm not sure what the basis was.
Q. Page 2 of this letter, it refers to four investors; do you see that?
A. Yes.
Q. The MacArther Foundation, The Pennsylvania Teachers Retirement Fund, RoseDev, and U.S. West Financial.
Do you remember those investors having an interest in infusing capital into Carteret?
A. I remember them being stated. Dick Bianco listed them in the meeting as potential investors.
Q. Do you remember considering them to be serious prospects for a new investment into Carteret?
A. I didn't know their level of interest and how much of the institution they looked at.
Q. Do you remember Mr. Albert of Merrill Lynch?
A. I can't place a face to the name.
Q. With all of these investors, do you remember it being a problem for them, whatever capital they

Page 39

put into Carteret, that OTS said would be sufficient to bring it into compliance? Do you remember them worrying they would be on the hook to put more in shortly after that?
A. I don't know any particular investor's concerns in that regard. They were never voiced to me. If I heard it, it would be secondhand. That's the limit to those concerns. I didn't know the total basis for them.
Q. Further down on the page it discusses the LZO report. It lists four conclusions that the LZO report reached. Do you see where I'm looking on this page?
A. Yes.
Q. Yield curve risks; loan loss reserves; Carteret might face further regulatory mandatory writedowns of its PMSR, even after purchase accounting adjustments were made, and; the regulatory environment would place the investor's capital at risk, due to new regulations, safety/soundness concerns, and other non-defined potential regulatory events.
Do you remember these investors being concerned about the regulatory environment at the time?

Page 40

MR. LEVITT: Irrespective of what he wrote here?
MR. HUME: Whether he recollects having reviewed this document that he wrote, whether these investors were concerned about the regulatory environment at that time?
THE WITNESS: I was capturing what was relayed to me. They were experiencing those concerns, I was documenting them in the meeting memo.
I know on many occasions, Dick Bianco told me they were skidish given FIRREA imposed new requirements, and future regulatory or legislative actions might impose new requirements on an institution. They did not know the size and magnitude of it.
Q. Did you find those statements by Mr. Bianco credible?
A. They were legitimate concerns, given the past. An investor who was going to put money into an institution would have those concerns. I thought they were normal concerns.
Q. Given the ARP program worked, wasn't it incentive for the investor to wait until the institution went into conservatorship, and then

Page 41

infuse capital, so they can get a larger stake at a lower price?
A. Not in my opinion, as an examiner. Any time an institution was intervened on by a regulatory body, I believe it causes damage to the franchise. Subsequently, I believe you're selling, in my opinion, damaged goods.
Q. The publicity effect of the negative supervisory action might outweigh the benefit to the investor; is that correct?
A. That was a very real risk, in my estimation.
Q. Wasn't there some negative publicity on the institution, based on prior supervisory action by the OTS?
A. I heard reports.
Q. In principal, the existence of a supervisory memorandum that states that the institution should be recommended for receivership, being considered for an ARP program, that it's subject to capital directives, operating under a supervisory agreement, all of those things, as they become known to the investing public, would affect the institution negatively as well, wouldn't it?
A. I'm not sure I follow that. The announcement would have a negative impact on the public and

Page 42

investors, unless the investors can look to see what the economic condition of the institution is.
Just because the agreements are in place, I don't believe it will prevent a barrier to come in and take a look, to see if it wants to recapitalize an institution.
MR. HUME: Let's take a break.
(Whereupon, a short recess was taken.)
MR. HUME: Mark this as O'Rourke-4.
(The above document was marked for identification as O'Rourke-4).
BY MR. HUME:
Q. This is a memorandum. It's dated August 28, 1992. It's from Michael J. Zamorski, who I understand was an FDIC employee at the time; do you remember him?
A. Yes.
Q. He was an FDIC employee?
A. Yes.
Q. Do you remember what his position was?
A. I believe he was the equivalent to assistant regional director.
Q. What did that position involve with respect to working on Carteret?
A. I'm not certain how the FDIC hierarchy

Page 43

exists. One of the decision makers at the regional level.
Q. Do you remember working with Mr. Zamorski at all?
A. Attending meetings with him.
Q. Do you remember whether he shared the view of Bob Albanese as to the time Carteret should be given to raise new capital?
A. That I don't recall.
Q. Do you remember how actively he worked on Carteret during 1991 and 1992?
A. That, I don't know.
Q. Would he come out to the institution itself?
A. Only when there was a scheduled meeting.
Q. The memorandum gives a page and a half background discussion on Carteret, and discusses the August 24, 1992 meeting.
It refers to the prior OTS examination and concurrent FDIC Tier III examination disclosed a similarly non-viable condition.
Do you remember when the Tier III examination was?
A. Yes. It's what FDIC calls a piggyback examination. They basically ride off of the OTS

Page 44

field work and do limited field work, and do a Tier III report.
Q. Is it less comprehensive?
A. Yes, my understanding is it is.
Q. Do you remember the reasons for the FDIC choosing the Tier III?
A. At that point, most issues had been surfaced, and the FDIC believed it was capable of examining the institution without FDIC day to day help.
Q. This second paragraph discusses the need for $150 million in external capital to be raised. "Management believed that they had the ability to accomplish this based on their prior investment banking and business backgrounds and contracts. The OTS concluded that the capital plan should be rejected and sent an S-Memorandum recommending appointment of a receiver to their Washington Office on October 25, 1991. The institution was scheduled to go to RTC on November 15, 1991."
Do you remember there was a serious chance Carteret would be placed in receivership in November 1991?
A. The S-Memorandum was sent. When these are sent, it's with the expectation they will be acted upon unless other circumstances arise that would

Page 45

preclude it.
Q. The next one discusses potential unassisted acquisition by American Stock Transfer and Trust Company.
The reason why RTC intervention was postponed; do you remember this?
A. I do now. I remember the entity was surfaced as one that was interested.
Q. Do you remember why it was not consummated?
A. I don't know the particulars as to why.
Q. Do you remember there being any uncertainty on the part of the OTS as to whether or not they wanted American Stock Transfer and Stock Company to become a savings and loan holding institution, or savings and loan institution subject to OTS regulation?
A. I don't recall, although that sounds plausible to me. I do not recall.
Q. Plausible, you mean OTS was concerned with the people and institutions that would invest in the industry?
A. They have to be an approved holding company in that ownership structure. When I say plausible, they would force this entity to meet these requirements.

Page 114

individual named Stanley Moore that was capable of handling those types of assets.
Q. Do you remember that under FIRREA there was prohibition on loans beyond the threshold level being made on entities?
A. I'm aware of limits, 15 percent of capital.
Q. Do you remember that being mentioned by FIRREA?
A. I don't recall. We had it prior to FIRREA. I'm not sure if it's the same one we have now.
Q. Do you remember if the threshold changed as a result of FIRREA, to make it much lower?
A. I believe to standardize the regulation, to get us in line, that was the case.
Q. Do you remember that affecting the portfolio of assets held by Carteret, that rule?
A. I don't recall specific situations where it came into play.
Q. Page 14 of the report. It states here there was a summary of interest of Paul Profeta. Do you remember Paul Profeta?
A. I remember his loans.
Q. Do you remember there being an excess of the single borrower limit, amount of loans controlled by him?

Page 115

A. I recall that being an issue. I'm not certain of all the applicable facts there at this point.
Q. Do you remember there being a criminal referral filed on him?
A. Yes.
Q. Do you remember what the result of that referral was?
A. As far as I know, it's still an active file sitting in front of the U.S. Attorney in Newark.
Q. Still active, still an investigation that you know of?
A. As far as I know, yes.
Q. What do you remember about the properties owned by Mr. Profeta?
A. They were all commercial income producing properties, in which Mr. Profeta brought to Carteret, in order to pull his equity out of them, by obtaining loans in excess of the economic value of the assets.
Q. Do you remember viewing the real estate decline of 1990 and 1991 as a market correction against excessive valuations in the late 1980s?
A. I'm not sure I follow the question.
Q. If the stock market crashes, one might think

Page 116

that's a correction against over valuation in the market today.
Would you agree that might be a conclusion you would draw?
MR. LEVITT: Objection. This is a fact witness, who is here to address what he knows about Carteret.
MR. HUME: He may or may not have had it in the time of examining Carteret.
MR. LEVITT: Did you have in your mind, the downturn of real estate was a correction as opposed to --
THE WITNESS: I didn't know if it was a correction or long-term decline in real estate, or a blip.
It was a decline. I didn't know how long it was going to last. It didn't look like it was getting any better from all the indicators that I saw.
BY MR. HUME:
Q. Wasn't it part of your job to have some assessment as to what was likely to happen?
A. Our job to evaluate management for -- we're not in the business of making projections. Management's job is to make those projections as

Page 117

to the economic environment, it will sell or administer its assets into. We're supposed to evaluate that and see if it's reasonable.
Q. In order to evaluate whether it's reasonable, don't you have to have to have an opinion on what's reasonable and substantiated in fact?
A. We observe from looking at all the players in the industry, and make a decision based on cumulative observations we're seeing out there, as to where we think the market is going. That gives us the background that we need to evaluate management's projections.
Q. At that time in 1990, do you remember when you did that work and made those assessments, whether you thought the real estate market was likely to rebound quickly, or likely to stay at a lower valuation for quite a long period of time?
A. We were not looking for a quick rebound in these markets. We saw a present overhang of supply that would take years to resolve, and ultimately did.
Q. Turn to Page 6 of the examination report. This is the summary of the examination of the management of Carteret at that time, in 1990. I want to refer you to the conclusions paragraph.

Q. This is an exam memorandum written by you, dated November 22, 1991. It's essentially your own summary of the presentation that we just saw the transcript of.
Do you remember writing this memorandum?
A. Yes.
Q. Do you see the paragraph on previous management, it states, "The unsafe and unsound management practices of Messrs. O'Brien, Walsh, Braun, C. McCabe were detailed for the board with emphasis being placed on the initiation of corrective actions and the pursuit of restitution from unjustly enriched parties."
You would have written that sentence?
A. Yes.
Q. Is the meaning of that sentence that the primary emphasis in describing unsafe and unsound management practices of those individuals was their previous compensation packages entered into in 1990, and an attempt to obtain restitution of that money?
A. There was a discussion of unsafe and unsound management practices of that management team, that were documented and discussed on many occasions



with Mr. Bianco and his management team.
We, again, in this meeting, detailed them. There's a chronology that covers all of that. The emphasis we brought forward was to recapture compensation that was paid to these people. There wasn't emphasis on discussing the past sins, but what do we do from here, going forward.
Q. Turn to Page 2 of this document, under capital. Review that first paragraph. The third sentence states, "The board was advised that this deficiency must be addressed through an infusion of equity capital significant enough to restore a stable and adequate stream of operating earnings that would ensure full regulatory capital compliance after giving rise to the FIRREA mandated elimination of goodwill, non-includable subsidiary investments, and other intangibles, as well as the potential negative adjustments to the purchased servicing asset and the likely prospect of an increased core capital standard."
Was it your view at that time that regardless of the status of the judicial order and the injunction that Carteret won in court, that the institution needed to forecast capital



compliance without the use of its goodwill?
A. Yes.
Q. It absolutely was required that the institution be able to maintain compliance?
A. Yes, we expected the capital plan to be tendered, and capital raised in an amount sufficient to meet the requirements.
Q. I want to refer you to the paragraph under risk management. "The board was advised of the examiners' concern with Carteret's level of interest rate risk and the asset/liability management decisions such as the sale of loans to DLJ Mortgage Capital, Inc., that appear to have increased Carteret's exposure to interest rate risk."
Do you remember how it was that Carteret was exposed to interest rate risk?
A. Very generally, it was profitable for them to do so. In the process of doing so, they increased their exposure to fixed rate mortgage loans, which had the effect of increasing exposure to increasing interest rates.
Q. Do you think that was motivated by a desire to show profit?
A. Yes.



Q. Do you think the desire to show short term profit was motivated by a need to improve capital ratios?
A. Yes, in response to our request for increase loan loss provisions.
Q. Wouldn't you agree that was also in response to the loss of goodwill and its treatment of goodwill as capital under FIRREA?
A. That could have been a partial reason. The main motivation was we confronted Mr. Walsh with additional loan loss provisions, and he came back with a couple transactions where he can generate profits from selling assets.
Q. Those loan loss provisions would have been less worrisome to him if he had capital in excess of his regulatory requirements; do you agree with that?
A. I don't know.
Q. Wouldn't they be less worrisome to you if Carteret had excess capital over and above its requirement?
A. When you say excess capital, in my mind, I'm assuming that to mean capital without goodwill. I view goodwill as a non-economic asset. It does nothing to add to interest income, does nothing to

Page 150

buffer loan losses.
In that context, no, I would not view it just because they had stated capital, that included goodwill, that I would consider that to be indicative of their ability to withstand losses.
MR. HUME: Mark this as O'Rourke-14.
(The above document was marked for identification as O'Rourke-14).
BY MR. HUME:
Q. This discusses the discussions of bonuses paid out. It's written by Michael Simone to the Carteret Board of Directors. On the second page it describes the chronology of events that lead to the conclusion that Carteret should have known, according to the letter, that its financial condition was rapidly deteriorating when it decided to pay the bonuses. Please review that chronology.
A. (Witness complies).
Q. Do you remember having reviewed that chronology when AmBase had infused $30 million in cash into Carteret?
A. I still don't know the date the funds were infused. I know the 1990 examination indicated

Page 151

the need for it to be infused. That was transmitted late in 1990. As far as I know, it must have been sometime after that.
Q. Do you remember whether the timing of the $39 million payment coincided with the timing of the preliminary injunction lawsuit by Carteret?
A. I believe it was after that, but my basic answer is, I don't recall. I thought it was part of a global settlement. Global settlement would have been reached after the injunction had been resolved.
Q. The $30 million was paid February 13th, and the lawsuit was filed the next day, essentially. The injunction was granted.
Having had that represented to you, does it refresh your recollection as to what the reaction was at OTS to the filing of the lawsuit by Carteret?
A. It was not viewed positively, I know that. We saw it as a device that old management was using to keep Carteret in existence and taking the focus off.
We should have been seeking new capital. We saw it as a stalling tactic.
Q. Do you remember there being a supervisory

Page 152

agreement under which Carteret had to operate?
A. I'm not aware of the proceedings.
Q. Do you have any other experience with supervisory agreements wherein the OTS sets forth certain parameters how management can manage the institution?
A. My general knowledge of supervisory agreements is that we try to keep management from doing the activities that got us into the problem in the first place, bad lending practices, imprudent investments, speculative type activities, excessive compensation payments. Those are the types of things we usually prescribe in those agreements.
Q. Do you remember whether the existence of a supervisory agreement with Carteret was in part instigated by OTS' reaction to the goodwill lawsuit?
A. I don't recall if that factored into the decision or not. My recollection was that after the 1990 examination Carteret was deemed capital deficient with or without goodwill.
We knew that there were probably more loan losses to be taken. In our criteria we set up, we were very cautious about not going over

Page 153

board. As a consequence, we knew there were more losses there. It ultimately did come to the surface.
Q. If the management was paying unsafe and unsound compensation bonuses and instituting a lawsuit that you viewed as a delay tactic, wouldn't those factors contributed to the reaction of a supervisory agreement?
A. They could have been, but not being the drafter of the agreement, I can't answer that.
Q. Do you remember who the drafter of the supervisory agreement was?
A. I don't recall. Generally, they're drafted by counsel.
MR. HUME: Mark this as O'Rourke-15.
(The above document was marked for identification as O'Rourke-15).
BY MR. HUME:
Q. This is a letter sent to Bob O'Brien dated November 22, 1991 signed by Don Kramer, vice chairman of Carteret. It refers to the advancement of funds by Carteret to an individual to help him purchase the home of Mr. O'Brien.
It goes on to discuss other issues related to the compensation made to Mr. O'Brien.