# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

AMBASE CORPORATION AND :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
v. : Civil Action
UNITED STATES OF AMERICA, : No. 93-531
Defendant. :

\- - - - - - - - - - - - - - - x

Washington, D.C.
Monday, August 23, 1999

Deposition of BRIAN DOUGLAS DITTENHAFER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DOLORES A. BYERS, a Notary Public in and for the Washington, D.C., taken at the offices of Cooper, Carvin & Rosenthal, 1500 K Street, N.W., Suite 200, Washington, D.C., at 10:00 a.m., on Monday, August 23, 1999, and the proceedings being taken down by Stenotype by DOLORES A. BYERS, CSR,

what the accounting industry would do but could influence it a little bit, I guess, and they went along with that at that time.
Q. When you say it could count as goodwill, did you mean to say it would be counted as capital?
A. Yes. It would count as capital. Otherwise many of those institutions would not have been persuaded to take over the nearly insolvent or insolvent institutions because it would have brought their own capital to a point where they would have been subject to much heavier supervisory scrutiny and they would have objected to that.
Q. And in your role as principal supervisory agent when you were president of the Federal Home Loan Bank to the extent you worked as a supervisor, was supervisory goodwill therefore respected on the balance sheet as a reliable asset?
MR. LEVITT: Object. Unintelligible question but you can answer if you understand it.
THE WITNESS: The answer is yes but we didn't count it as collateral. We were looking at the balance sheet of an institution and



determining whether or not we should take collateral. We looked at tangible assets not the goodwill which is an intangible asset.
BY MR. HUME:
Q. That would have been for purposes of the collateral advance --
A. The collateral requirements of the advancement.
Q. But in the role of supervisor which I take it is to be supervising the examination in the evaluation of the bank which had a regulatory function, for that function was supervisory goodwill considered to be an asset that could be relied on as capital?
MR. LEVITT: Objection. Asked and answered.
THE WITNESS: The answer is yes. I will say that we always differentiated between the tangible and the intangible even in the supervisory function.
BY MR. HUME:
Q. And when you say always, you mean prior to the passage of FIRREA?
A. Prior to the passage of FIRREA.
MR. HUME: Please mark this as



AmBase-Dittenhafer 2.
(AmBase-Dittenhafer Exhibit No. 2 was marked for identification.)
BY MR. HUME:
Q. This is a December '88 letter from you to Stuart Root regarding resolution policy.
A. Okay.
Q. Do you remember this letter?
A. No.
Q. Do you remember working with Stuart Root at FSLIC on resolution policy issues?
A. I do not remember ever working with him directly on resolution policy issues. He was the head of FSLIC at the time and his primary responsibility, of course, was to get as many cases resolved as cheaply as possible in a given amount of time. I don't recall working with him directly.
He had -- he was a lawyer and had some ideas about how these things could be done and using FSLIC's tax free status. I do not recall working with him directly on that. No.
Q. And you don't really recall working



with him directly on anything?
A. Before he went to FSLIC he was the director of our bank. So I worked with him. I knew Stuart Root prior to his becoming a director. I have no recollection of working with him on any -- there may be a case. There may be a signature of mine on something but I have no recollection of any particular case that we worked on or policy that we worked on regarding FSLIC resolution of cases.
Q. Reading the letter now, if you look at the second sentence where it says: The outcome of these discussions is to focus our efforts on those cases that provide the greatest cost savings over liquidation.
Is he talking there about supervisory acquisitions and assisted acquisitions as an alternative to liquidation or is it something else?
MR. LEVITT: Objection. I don't see how Mr. Dittenhafer could know what was in Stuart Root's mind.
THE WITNESS: I really don't know what he was thinking about. If you ask what it means to me.

34

the treatment of goodwill?
A. That's correct. I felt very strongly it was a very bad policy. I made no secret of that verbally and that's why the Long Island counsel, I'm sure, called me and said would you put that on paper. And I said write something and send it to me. He was being deferential, I think, and I said I feel stronger than that about it. I didn't change it much but I made it my own.
Q. Is that the only letter you remember writing on capital as such on FIRREA?
A. In another deposition somebody has shown me another letter which was not nearly -- I must have been feeling better about it by that time because it wasn't nearly as strong in the Anchor Savings Bank. I didn't recall that letter. I don't recall any of the letters that I wrote on that.
Q. And your general view of the capital rules and the treatment of goodwill never really changed from that time onward as the implementation of FIRREA was rolled out?
A. That's correct.
Q. We can move on now and ask you a few questions about Carteret Savings Bank, a New

35

Jersey institution. Before I do, I meant to ask you before we began whether you've reviewed any documents in preparation for this deposition?
A. The answer is no.
Q. And have you met with any one to discuss anything that might be relevant?
A. Not for this deposition. I have given another deposition on the same basic issues.
Q. But you didn't meet with any one to prepare for this deposition?
A. No.
Q. Do you remember Carteret Savings Bank?
A. Yes.
Q. What is your general recollection about it?
A. Carteret Savings Bank was a reasonably well run institution in New Jersey beginning with the elimination of the interest rate ceilings on the federal level and both New York and New Jersey had usury ceilings on mortgages that had gone back a number of years. They got into some financial trouble simply because of the interest rate risk inherent in the 30-mortgage rate with short-term funding and those interest rate ceilings being one removed and one remaining.

36

It was an institution, as I say, reasonably well run. It had acquired some other institutions at that time. I do recollect when AmBase -- I was never quite sure what the relationship of AmBase and Carteret was, whether it was a purchase or a partnership or whatever. I wasn't quite sure exactly what the relationship was. I was not part of the supervision at the time that deal went through and I don't believe I can define it to you today.
But the AmBase participation there was originally at least viewed as an effort to strengthen the capital of Carteret because it was in a weakened position because of the interest rate trends that I have just outlined.
So that's my overall view of it. It was one of those institutions which through no fault of its own was weakened financially. They made some efforts to strengthen their capital.
And that's about it. I don't really recollect much more about it.
Q. Do you remember the ultimate fate of the institution?
A. As I recall, the insurance company was supposed to have been the savior and was itself

37

bankrupt. It had taken some capital out of Carteret. I don't think that deal worked out very well and, I guess, eventually Carteret became a ward of the RTC.
Q. Do you remember any specific times in your career at the Federal Home Loan Bank of New York where you worked on Carteret on specific projects whether acquisitions or transactions?
A. I do not.
Q. When you used the word savior and your general recollection of AmBase being viewed as someone who could help the capital of Carteret, are you remember the views of your colleagues and yourself at that time?
A. Yes. There was a picket fence between the supervisory and banking functions of the bank that met only in the office of the president and the presence of the supervisory agent.
But because we were collateralized lenders to institutions of questionable solvency, occasionally we had to say we need to know this or we can't make that loan as bankers.
Occasionally we would get a peak into what the arrangements were. I don't recall that with Carteret though. I'm saying, yeah, AmBase is

recapitalizing Carteret. My reaction when AmBase first went in, I later recall -- again, I don't think I was principal supervisory at the time -- that there was a problem with AmBase and that was to the detriment to Carteret. So the roles had been reversed.

Q. Explain to me, if you could, just a little bit more what your role as president and supervisory agent was in supervision? What were your supervisory responsibilities?

A. I was responsible for the supervisory function. However, as I indicated earlier, I had come up on the banking side of the institution. I had a very strong supervisory agent in charge of that function in Angelo Vigna who later became OTS regional director.

We had lent Angelo to the FSLIC to be acting director for a number of months from the bank. So, as had my predecessor Bryce Curry, he relied on Angelo to handle most of that work. And only when there was a problem were -- was that brought to my specific attention.

I often signed the documents after a 15- or 20-minute briefing on those documents. So as principal supervisory agent I was signing them.



At the time I signed them I felt I had a good understanding of what the documents entailed and that that was the appropriate thing to do relying upon the work of the supervision division to make sure that that was correct and that these agreements were productive.

Q. When you say documents or agreements, are you talking about supervisory --

A. Supervisory letters and things like that.

Q. Assistance agreements?

A. No. The assistance agreements would have always been between the FSLIC and the institutions. I'm talking about the supervisory documents. An examiner went in and found a problem. This is the direction it has to go.

Most of those were done routinely by lower level supervisory agents. Occasionally things rose to the importance that Angelo would be involved in signing them. And even in fewer instance they would rise to the importance where the principal supervisory agent would be involved in signing them.

Q. Would your awareness of what was happening in the supervision of an institution



depend also in part on how big that institution was?

A. That would be part of it. Yes.

Q. Do you remember whether Carteret was one of the biggest that was in your jurisdiction?

A. It was one of the larger institutions in New Jersey. Yes.

Q. So it was one that you were familiar with throughout the time that you're --

A. Yes. Plus their president at that time was active in the industry trade associations.

Q. Is that Bob O'Brien?

A. Bob O'Brien.

Q. Do you remember working with him specifically?

A. Working with is not the right term. I remember seeing him frequently.

Q. As principal supervisory agent, would you be equally involved in a major acquisition whether or not -- if were a supervisory acquisition or a non-supervisory acquisition?

MR. LEVITT: Objection. That's vague. Involved in what way.

BY MR. HUME:

Q. You can answer. If you'd like me to



clarify, I'd be happy to.

A. Yeah. When you say major acquisition --

Q. My question is did you work on both supervisory acquisitions and non-supervisory acquisitions?

A. As principal supervisory agent?

Q. Yes.

A. The answer would be yes but I don't remember a non-supervisory acquisition at the time.

Q. Let's back up a little bit and see if we understand each other because I use terminology that I may not know very well.

How would you define and how would you have understood a supervisory acquisition to be defined during your tenure at --

A. At that time I think any acquisition of institutions that people would come in and talk to us about it. Among other things, we would want to sort of save the strong institutions -- to take over weaker institutions of our design as opposed to having two strong institutions merge and not worry about a non-supervisory acquisition.

So in that term everybody talked to us

people -- especially my predecessor who had a reputation of saying don't do that or we'll get you. And he would get them if they did it.
Q. That's your predecessor --
A. Bryce Curry. People were very respectful, shall we say that.
Q. Do you ever?
A. Which was good for me because they thought I would do the same thing and I never had to.
Q. Do you ever remember the FHLB actually getting to the stage of not approving an acquisition or a sale of branches or any policy that might impinge on your ability to, quote, unquote, save the strong institution --
A. Probably never happened formally. I'm not dredging up anything even informally. But I'm sure it happened informally. More likely we persuaded institutions to do things they probably weren't too thrilled about doing.
I know Bekins Savings in Long Island, for example. Bekin Federal was persuaded to take over three branches of Bekins Savings state chartered in the Hudson Valley, two small institutions. Absolutely no market relation at



all but they had the same name.
Bekin Federal was fairly strong and Bekin Savings was not. Bekin Savings went with Bekin Federal and ultimately Bekin Federal dies because of the goodwill it acquired in Bekins Savings. They did not want to do that deal. There was no reason to do the deal. But it got three branches and a small institution off the table. I didn't do that. My predecessor did.
Q. Is that exemplary of a general tactic of requiring a thrift that wanted to acquire one institution to also take on another failed institution?
A. It's not exemplary of that but, yes, that happened. What you just outlined happened, too.
Q. Do you remember Carteret's acquisition of Barton Savings and Loan Association in Newark, New Jersey?
A. No specific recollection of it. No.
Q. Do you have any recollection of its acquisition of First Federal Savings and Loan of Delray Beach, Florida?
A. I know about that one at least. I don't know what I know about it but I have a



recollection of it. Yes.
Q. Do you have a recollection that those branches were owned by Carteret? Is that what you mean? You just recollect that they owned branches in Florida?
A. Well, the out-of-state acquisitions was -- that policy was designed to give -- it was an enticement to give the institution, Carteret, the incentive to go to Delray Beach. You solve a case in the Atlanta district by having it taken over by a case in the New York district. Institution gets out of it interstate branching which at the time didn't happen for commercial banks. It didn't happen for anybody else except federally chartered savings and loans.
So it was a non-monetary assistance basically, the privilege of being able to branch interstate. So, yes. I know about Carteret and Delray Beach because that policy was discussed. And I think they were one of the first to actually do that kind of interstate transaction. Probably not the first but one of the first.
Q. What do you remember about Carteret's condition, financial and capital condition in the late 1980s?



A. The late 1980s?
Q. Before AmBase's acquisition or after.
MR. LEVITT: What do you mean '88 and '89.
THE WITNESS: I have recollections about Carteret's financial condition going back to 1980 and --
BY MR. HUME:
Q. What do you recollect about its financial condition prior to the AmBase acquisition in 1987 and '88?
A. It was an institution which, because of the goodwill which it had acquired in making, as part of its capital base, in making supervisory mergers was solvent on a supervisory basis, probably struggling on a cash flow and tangible basis to maintain that. But because of the supervisory goodwill, solvent insofar as we were concerned. It was not a strong institution but stronger than many others.
Q. Do you remember receiving the AmBase acquisition -- application to acquire Carteret?
A. No specific recollection of it. No.
MR. HUME: Let me mark this AmBase-Dittenhafer Exhibit 4.

50

(AmBase-Dittenhafer Exhibit No. 4 was marked for identification.)

BY MR. HUME:

Q. This is the transmittal letter with that application from Arnold and Porter. And there's no need to review the whole letter. I just wanted to show it to you to see if it would jar your memory at all in terms of what your role would have been in reviewing this application.

You will see on the last page that you are a CC on the letter.

A. What are you directing my attention to, again?

Q. To the third page, the last page of this letter. You'll see that you are a copy on it -- Brian Dittenhafer, principal supervisory agent.

And I'm simply showing it to you -- you can spend as much time reviewing it as you'd like. But I'm simply showing it to you to see if it will in any way remind you of what your role either typically would have or specifically in this application what your role would have been in

51

reviewing an application to make an acquisition like this.

A. I don't recall any specific role in the AmBase acquisition. I don't recall any specific decision that I would have made. I may have endorsed the decision made by Angelo Vigna or one of his supervisory agents. Even at the time, I don't have any recollection -- I was not clear about the specifics of this transaction.

Q. And as a general --

A. That may be an admission against interest. I just don't have any specific recollection about it.

Q. As a general matter, what would your role have been in approving an application like this?

A. Well, we probably, not probably, we would have investigated the acquiring institution to make sure that they were a management -- or the merging institution to make sure they were a management that was considered -- appropriate is the wrong word but of a character which should be in the savings and loan business, that they had the financial -- we believe they had the financial strength to be an addition to the business and not

52

a problem, that they had intentions of maintaining the appropriate missions of the institution.

There may have been something else on a checklist somewhere. But basically we were trying to make sure that they had the financial strength and that they had the right moral character to be a part of the industry and that they were not trying to buy a savings and loan simply to do something else with it, that they would continue to be principally home finance organizations.

Q. When you say that they would understand the mission of the savings and loan association, was it understood that companies would acquire savings and loans as investments that they wanted to make profitable and simply as business decisions?

A. Yes. But there were restrictions on what you could do with the assets of a savings and loan association and that we wanted to make sure these institutions understood that.

And there were sort of buckets of assets that could be used for other purposes. And that's how a lot of institutions in Texas and some in California turned savings and loans into financial institutions that they used for their

53

own benefit by investing in things which we didn't think were appropriate in New York. Each district did its own analysis of that sort of thing, that is, the moral character and understanding the mission.

Q. In making that assessment and judgment, would you personally have been likely to meet with members of the management of the acquiring institution?

A. Well, in some instances perhaps. Again, I don't recall a meeting -- I never, to my knowledge, met anybody from AmBase. I had a good knowledge of the management of Carteret because I knew the individuals involved going down a couple of layers into their management. But I don't recall ever meeting anybody from AmBase.

Q. Would somebody working for you have either met with people at AmBase or helped you make that assessment?

A. Yes.

Q. Who would that have been?

A. Probably Angelo Vigna or one of his supervisory agents.

Q. You don't recall specifically with respect to the AmBase transaction who you might

have talked to?
A. No.
Q. What was your general assessment of the Carteret management at that time in 1987 and '88?
A. I thought they were doing a pretty good job of running the company. I was, frankly, surprised they managed to keep the institution afloat as long as they did.
I recall a dinner in '81 or '82 that I sat at a table with Bob O'Brien. This was probably at an industry convention, an industry function. My wife was present and his wife was present. On the way home my wife was saying they were nice people. I said don't get too attached to them. They're not going to be around very long.
I didn't think they would survive '81 and '81 and they were still around basically until the RTC put them out of business. So I thought they had done a pretty good job of keeping the institution afloat. Part of it was with this supervisory institution. That was a strategy. They also got into commercial lending to the extent that they could. They did a pretty good job. I thought the management was competent.



Q. But you remember them being still not in the strongest of shape at that time?
A. That's correct.
Q. And to what extent would an acquiring institution from another industry be encouraged to make this acquisition in order to provide capital sort?
A. To my knowledge the bank made no effort to have anybody acquire or get this capital into Carteret. To my recollection Carteret and AmBase, probably Bob O'Brien went out and recruited AmBase to strengthen his capital view. My view is that Bob saw business opportunities that he could not take advantage of because of his capital position and went out and actively recruited an acquirer so that he could have more capital to take advantage of those institutions.
My view may be wrong. It is my view. But that's my impression of how AmBase and Carteret got together.
Q. I guess when you say the bank didn't go out, you mean the Federal HOME Loan Bank?
A. The Federal Home Loan Bank did not go out and recruit AmBase to take over Carteret. It was not a supervisory acquisition in that regard.



It was, as I say, I think Bob O'Brien got together with AmBase and was seeking somebody to contribute capital to the institution so he could take advantage of business opportunities which he saw out there and didn't have the capital to do.
I may be totally wrong but that's my recollection. That's my impression of this marriage.
Q. I guess I wanted to ask more whether at the Federal Home Loan Bank -- excuse us. We're doing a little construction work.
The question I was trying to ask was whether the desire to see a thrift that, although it was in compliance, was still like much of the industry under a lot of pressure to have some capital maintenance support would influence in any way the manner in which the Federal Home Loan Bank dealt with the application, not whether they would go out and recruit or whether they did in this case but whether it would affect how they dealt with and processed the application?
A. I would say that if only to the extent that we had ascertained that the acquirer was a strong company, then it might be encouraged or if it were not a strong company, discouraged.



Now AmBase was an insurance company. And there are lots of problems trying to analyze the balance sheet and income state of an insurance company especially for folks who are used to dealing with institutions which they regulate.
My guess is we made some mistakes in the AmBase case. But we did the best we could in terms of is this a strong institution. If it's a strong institution, it might have encouraged it. If Carteret is a stronger institution, then maybe we can get some more weaker institutions to put into it. That was the whole motivation at the time.
THE WITNESS: Could I take a break.
MR. HUME: Sure.
(Recess.)
BY MR. HUME:
Q. Mr. Dittenhafer, we'll assume. As you know, you'll go back under oath.
I wanted to pick up sort of where we left off but with one of your comments where you had been describing your recollection today of Carteret's general financial health around the time of 1987 and 1988.
First, just to ask you when you stated

58

that you remember being under financial pressure, was it your recollection that vis-a-vis the rest of the industry it was still one of the healthier thrifts?
A. Yes. All things are relative here. I wouldn't say that at that point there were very many thrifts around who would be considered well capitalized today. But relative to the rest of the industry, Carteret was in reasonably good shape. As I say, I was amazed that they got it to that point. In the early eighties I wouldn't have given you $2 for their chances of being around in 1987.
Q. Do you remember its acquisition or merger with Mountain Security Savings Bank of Blacksburg, Virginia, and First Federal Savings and Loan in -- I think you pronounce it White Fall, Virginia? This was in 1986.
A. When you mention the names, I recall them. This brings to mind some questions. I recall some discussions with the Atlanta Bank. These would have been within the Atlanta district.
Q. Right.
A. I think theoretically these were part of a holding company and not branches or

59

subsidiaries. So they theoretically had their own board of directors and theoretically had their own minutes, et cetera and that didn't work very well.
Q. Is it fair to say that Carteret would not have been asked to enter into a supervisory acquisition such as those if it were not among the healthier thrifts in the industry at that time?
MR. LEVITT: Objection. The question said Carteret would not have been asked. But there is no foundation for that assumption that Carteret was asked.
Was Carteret asked, if you know?
THE WITNESS: I don't know the answer to whether they were asked. It's fair to say that they would not have been allowed to complete the acquisition if they were not considered financially viable at the time.
BY MR. HUME:
Q. And would that have been equally true if they were asked to participate in a supervisory acquisition of failed or failing thrifts in the early 1980s and 1982?
A. I'm sorry. Would you repeat that question?
Q. Would it also have been true that the

60

thrifts that were asked to acquire failing institutions in 1981 or '82 were also generally healthier thrifts?
A. Again, in relative terms they were healthier than some of the others but they were considered financially viable with the acquisition. Otherwise the acquisition would not have been allowed to take place.
Q. Do you remember the acquisition of Delray First Federal Savings and Loan Association of Delray, Florida, as a supervisory acquisition?
A. It would have been a supervisory acquisition. Otherwise it would not have been an interstate acquisition.
Q. And as a supervisory acquisition, it would have been one where the goodwill that was created from the acquisition was assured that's something that could be used towards regulatory capital?
A. I have no specific recollection of that but that would generally be the case. Yes.
MR. HUME: To carry on this thread of Carteret's financial condition, I would like to mark this as AmBase-Dittenhafer Exhibit 5.
(AmBase-Dittenhafer

61

Exhibit No. 5 was
marked for
identification.)
BY MR. HUME:
Q. This is the 1988 report of examination. Don't worry. I'm not going to ask you to review the whole thing.
A. I didn't know I had that much to do with AmBase.
Q. The first question on the report of examination is simply this is, as you can see on the second page, would have been concluded May 13, 1988. The acquisition by AmBase was consummated in August of '88 and the recommendation for approval was dated -- the FHLB's recommendation for approval was dated June 30th.
Would this report have been something that you or someone working for you would have been likely to have reviewed in your decision whether or not to recommend approval for the acquisition by AmBase?
A. Yes.
Q. And would it have been something that you personally would have been likely to review or someone working for you?

A. I would not have personally reviewed it.
Q. And you would not generally personally review reports of examination of any thrifts?
A. That's correct.
Q. And who would the person be who would review it and report to you on it?
A. The report of examination, the fact-finding which would have been done by the examination division would be reviewed by a supervisory agent who was specifically charged with maintaining a knowledge of the operations of Carteret.
And by that I mean they would review not only the reports of examination which were infrequent, they would also review the monthly reports of condition which were submitted by Carteret. And if there were any questions that arose on that, they would be responsible for identifying question that arose and getting answers from Carteret verbally or in writing if it required that.
So it would be a supervisory agent who would have been charged with reviewing the report of examination and all the other documents involved. And that would have been somebody who would have been familiar with Carteret because they worked on their report every month.
Q. Do you recollect who that was?
A. No.
Q. Do you recollect Kevin Coit the examiner in charge on this examination?
A. No.
Q. You don't remember him at all?
A. No.
Q. Do you remember Bob Albanese?
A. Yes.
Q. Do you remember his working on Carteret?
A. I don't remember him specifically working on Carteret. But I knew Bob Albanese.
Q. How about Joseph Kehoe?
A. I don't know Joseph Kehoe.
Q. How about Michael Simone?
A. Yes. I knew Michael Simone at the time.
Q. Do you remember Michael Simone working on Carteret?
A. Not specifically.
Q. How would we find out who this supervisory agent was?
A. I would assume the files would be with the OTS office in New York and that the supervisory agent at that time would be listed in those files. It may be -- maybe this is addressed to the supervisory agent. I doubt it.
Q. And would Angelo Vigna have been likely to have reviewed this?
A. He would have reviewed it if a problem was brought to his attention. He would not ordinarily, I believe, reviewed this report of examination. No.
The report of examination would have been reviewed by the supervisory agent charged with Carteret, responsible for Carteret. And they would only bring it to Angelo or even probably Bob Albanese at the time if there were some matter of concern.
Q. And they would only report to you if --
A. If they had a problem that they couldn't resolve themselves.
Q. And when in the course of evaluating the AmBase acquisition application you needed to turn your eyes to Carteret, you would have turned your eyes to the supervisory agent?
A. That's correct.
Q. And relied upon his --
A. That's correct.
Q. Well, I think it will be helpful to look at a few things here to help refresh your recollection as to the state of Carteret at that time. If you go to Page 1, the report summary. I'm going to ask you to review the report summary. The shortest bottom line account of the report.
A. Okay. I've reviewed the summary.
Q. Where it says in the third paragraph that the bank continues to retain an adequate level of capital, would the ability of the supervisory agent or the examiner-in-charge to make that statement about a bank be impacted by the level of capital or the level of capital represented by the supervisory goodwill on the balance sheet?
A. Yes.
Q. Does my question make sense?
A. The answer is yes.
Q. It would be impacted?
A. Yes. They would take supervisory goodwill into consideration when they said it's an adequate level of capital.

and take their accounts with them. That was upsetting to some of the people in the commercial banking industry.

Q. And do you recollect anything specific about Carteret's loan review capabilities?

A. I don't have any specific recollection of it. No. What I've already said about -- I thought that by doing it the way they did it that was -- by hiring a department that was a good way to go about getting a commercial loan department.

Q. And presumably doing that way was good because you would then be able to evaluate the strength of those commercial loans much more accurately than you would if you had people who were new to those type of assets doing it?

A. My feeling was that Carteret would be able to evaluate the commercial loans better. I don't know whether our examiners would be any better at doing it.

Q. That's where I was going. The people in Carteret who had worked in a commercial bank in a commercial industry and were brought into Carteret would have a familiarity with how to evaluate those assets which the regulators would not have?



A. As we were getting into commercial loans, we provided training for examiners on how to evaluate that. But it is a different animal, that is, a commercial loan versus a regular mortgage loan. They're under written differently.

Q. Do you remember when that sort of training philosophy began and when it was that commercial loans were becoming a significant portion of portfolios?

A. They were not a significant -- they're still not a significant portion of most S&L portfolios. The thrust began probably in the early eighties under Dick Pratt when they first acquired the ability to have -- I think it was originally 10 percent of their portfolio in commercial loans.

At that point the examination division was not part of the bank. So I'm not sure what their training was at that point. But we did provide commercial lending training to them after they became part of the bank in '85, I guess, right after I became president or maybe right before I became president they became part of the bank.

Q. When you say they became part of the



bank, who is they?

A. The examination division prior to 1985 were Government employees. And there was a problem at the time in paying them enough to hire enough examiners and to retain the best of the examiners. And so they were terminated from Government employment and became part of the bank. And then we were not subject to Government service pay scale restrictions, et cetera.

That was one of the ways that the Federal Home Loan Banks were trying to help FSLIC solve its problem by funding that operation. And that's when I say they became part of the bank, they had formally been Government service employees working for the Federal Savings and Loan Insurance Corporation and they were terminated there and acquired under an agreement by the bank for the reasons I mentioned.

Q. Right.

Having reviewed this summary of assets -- and if you'd like to review more, please do.

Would you agree that the general conclusion was that there was a high level of bad assets in this thrift but that because of its



capital position and its management it was not a major concern for the regulators?

MR. LEVITT: Objection. The document speaks for itself.

THE WITNESS: The document does speak for itself. I would say I don't think there was a high level of bad assets here. I think they were adequately reserved. That's what the examiner seemed to feel.

BY MR. HUME:

Q. Do you recollect what a composite rating of two signified in 1988?

MR. LEVITT: Is that on page --

MR. HUME: It's not on here. I'm just asking a question.

THE WITNESS: In '88? As I recall, it was a one through five and two would have been pretty good. I don't know exactly what the definition is.

BY MR. HUME:

Q. One would be the best and five would be the worse?

A. That's my recollection of the ratings.

Q. Do you have any recollection of the meaning of that composite rating changing after

AFTERNOON SESSION
(1:10 p.m.)
Whereupon,
BRIAN DOUGLAS DITTENHAFER,
the witness herein, called for examination by counsel for Plaintiff and having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
BY MR. HUME:
Q. Mr. Dittenhafer, welcome back to the deposition. We ended up with me asking you some questions about the 1988 report of examination and its general statement about the health of the bank and its capital adequacy.
Moving on now to look more specifically -- and I have one or two documents to show you on the AmBase acquisition of Carteret.
I guess my first question is if Carteret had been a thrift that was likely to need to be placed into conservatorship or resolved in the near future in 1988, a conclusion that you stated was not in the 1988 ROE, but if it had been, would the Federal Home Loan Bank still been able to recommend approval by an outside party



like AmBase?
A. No. Wait a minute. I'm sorry. I anticipated your question. The last part of it was would we be able to recommend acquisition by an outside party like --
Q. In other words -- yes. There was a recommendation that you could approve the acquisition by AmBase of Carteret. And my question is had Carteret been on the brink of failure or resolution, would that recommendation still have been possible?
A. The acquisition of Carteret by AmBase, we could have approved that.
Q. You --
A. We could have approved it.
Q. You could still have?
A. Yeah. In fact, that was the way a lot of very difficult institutions were resolved not in the second district but in other districts around the country by selling them to outside businesses.
Q. And then that would have been more akin to a supervisory acquisition; is that right?
A. Yes. It probably would have been assisted, an assisted merger.



Q. Assisted, meaning that there would have been some form of FSLIC assistance as part of that whether that would be forbearance or direct cash assistance or whatever?
A. Any number of things from direct cash to supervisory forbearance.
Q. You may recall our looking at the balance sheet in the 1988 ROE and my questions to you about the goodwill on the balance sheet and whether that would have impacted the ability to say that the thrift had adequate capital.
To what extent do you remember as principal supervisory agent that you or the regulators who reported to you distinguished between goodwill generally and goodwill that was supervisory goodwill that had arisen from an assisted transaction?
MR. LEVITT: Objection. Vague.
THE WITNESS: I'm not sure that we distinguished -- that I distinguished between supervisory goodwill and other goodwill. Probably because there wasn't -- it was almost impossible to have anything except supervisory goodwill. The short answer is I don't think I ever differentiated between the two.



To me as somebody on the banking side, tangible versus intangible, was the distinction that had some merit whether it was supervisory goodwill or other goodwill didn't make any difference. It was still goodwill and not tangible asset.
BY MR. HUME:
Q. And as you alluded to, as a general matter the goodwill on the balance sheet of a thrift at that time was more likely than not to be largely supervisory goodwill?
A. That's correct.
Q. And not to belabor this point. But you state that there was a distinction in the minds of you and the minds of other regulators prior to FIRREA between tangible and intangible. And that distinction was what I was trying to flush out in my questions before lunch about how you could state a thrift has adequate capital when it has a huge amount of intangible goodwill on its balance sheet.
So can you give me an idea of how it was that regulators focused on that distinction? How did that manifest itself.
A. Let me distinguish. I said that was my

98

distinction and recall that I said I came up not on the regulatory side of the bank but on the banking side of the bank. I was always concerned with the tangible capital ratio.

And I'm sure that other regulators were aware of it but they may have been less aware of it than I was. I was always concerned with the collateral position of the bank and how strong the institution was in a tangible capital. Listen, I knew we could change the supervisory goodwill provision at any time and it could be changed by ourselves or somebody else.

Q. What do you mean that it could be changed?

A. It was a regulatory position. You can change regulations at any time.

Q. So it was your view that even though there was a Government assurance or promise that this goodwill could be counted towards regulatory capital, that that promise could be abrogated at any time?

A. No. Distinguish between the concept of supervisory goodwill and the contracts under which assisted acquisitions took place. Under the contracts, that was, to me, in violate but it

99

could be changed under the definition of supervisory or regulatory goodwill at any time.

Q. Meaning, I'm just not sure I fully understand what you're saying. Meaning that you could change it that on a going forward basis any goodwill that was created could be treated differently?

A. Yes.

Q. But that the prior arrangements would be honored?

A. Correct.

Q. Would you or anyone reporting to you have been likely to have reviewed Carteret's annual report that it made to its public shareholders for 1987 in evaluating it in 1988?

A. My expectation is that they would have been reviewed by the supervisory agent.

Q. Presumably they would have also reviewed the thrift financial reports that were filed on a quarterly or monthly basis?

A. Yes.

Q. Let's take a quick second to look at the --

(AmBase-Diffenhafer Exhibit No. 6 was

100

marked for identification.)

BY MR. HUME:

Q. I'm going to show you two documents that speak to similar things. I don't want to spend too long on any of them. This is the 1987 annual report. I'm going to refer to the Bates numbers at the bottom of the page that have been stamped there. I will refer to the last five digits. If we could look together at Page 56676 to begin with. You'll see that balance sheet.

MR. LEVITT: Just to clarify for the record. This is the holding company's annual report.

BY MR. HUME:

Q. Correct. The balance sheet and assets lists as excess of cost over fair value of net assets acquired less accumulated amortization a figure of 214.9 million in 1987.

Knowing that Carteret Bancorp is a savings and loan holding company with no other asset other than Carteret Savings Bank, would your review of this balance sheet indicate to you that they had roughly $200 million in supervisory goodwill?

101

A. Yes.

Q. And then if we look to Page 56686, you see a section on stockholders equity. If you look in the right-hand column at the first full paragraph, it discusses regulatory capital. It says the bank -- are you with me where it says the bank is required --

A. The bank is required by FSLIC regulations --

Q. Right -- to meet prescribed net worth requirements. Failure to satisfy such requirements could subject the bank to legal and administrative actions by the Federal Home Loan Bank. The bank's regulatory net worth at September 30, 1987 -- which at that time I believe was the year-end of the fiscal year -- as determined by the rules and regulations of the FSLIC was $332.2 million and satisfied the regulatory net worth requirement, which was 160.6 million.

Looking at those two numbers and having just reviewed the balance sheet, would you agree that it was plain to any one who reviewed this that, or any regulator who reviewed this balance sheet and the financials of Carteret, that

which the Federal Home Loan Bank evaluates the capital position of an institution for purposes of supervisory action and evaluation of risk to the FSLIC.
That doesn't say what the Federal Home Loan Bank as a lender how it evaluates the institution.
Q. Okay. So in a sense you could be saying that as a lender --
A. As a lender, I didn't think it was a strong institution.
Q. Because you were worried, as a lender, about tangible capital?
A. Exactly.
Q. But as a regulator you and your colleagues were satisfied that this institution had ample excess capital under the regulation?
A. Exactly.
Q. Forgive me for pushing on this point. But you represent --
A. I'm bringing it up. I'm trying to make the distinction because you said earlier about you, as a regulator, and I'm trying to be consistent in saying I probably viewed these things more as a banker than as a regulator. And



tangible capital is where it's at if you're a banker. You can push all you want. That's my position. And I think I have been consistent on it. I don't know if that helps or hurts you.
Q. Neither one. I just think it's an interesting duality and you personified both perspectives at that time in the sense that you had both roles professionally.
A. I had both roles to play professionally.
Q. And in the regulatory role by definition relied on the strength of supervisory goodwill as good capital?
A. That's correct.
Q. Let me just show one more document before leaving this point.
(AmBase-Diffenhafer Exhibit No. 7 was marked for identification.)
BY MR. HUME:
Q. Have you had a chance to see this? The parts of this document I want you to look at are the -- I guess the first thing to look at on the second page is the total regulatory capital



excluding general loan loss reserves, the phrase that we talked about, which is the right column a third of the way down the page. It shows 321 million.
A. Right than Line 800.
Q. And at the last page of this document -- yes, the last page. The end of that first cluster of lines "minimum capital requirement" is shown at 169 which I think is roughly the same as what the annual report showed.
And so, again, we have what I'd call excess regulatory capital of 150 million. Would you agree with that statement?
A. Yes.
Q. And on the first page, two-thirds of the way down the right column they show the intangible assets and they show goodwill and other of 200 million. Do you see that?
A. Yes.
Q. And so would it be a fair statement that goodwill represented more than half of the regulatory capital of the institution at that time?
A. Yes.
Q. I guess what's curious is that your



perspective as a lender was focused on tangible capital for reasons you have explained at least a little bit. And yet at the same time in the role of regulator and president of the Federal Home Loan Bank of New York you approved an acquisition of a thrift that was described and was said to be in capital compliance by a substantial amount and that that was what AmBase was acquiring at that time.
Is the regulatory side of that approval cognizant that without its goodwill the thrift would fail its capital requirement?
MR. LEVITT: Objection as to relevance.
THE WITNESS: I'm not sure that that's the case. Is that the case? 169 was its regulatory requirement.
BY MR. HUME:
Q. Right. And it's capital level is 321. So without its -- I'll represent to you and I have a document to help show you that of the 200 million in goodwill, at that time roughly 182 million was based on contractual supervisory acquisitions.
MR. LEVITT: Is there a question.
MR. HUME: I'm clarifying the question.

maintenance obligations of holding companies at this time?
A. No.
Q. Do you remember any general policy towards holding companies at that time?
MR. LEVITT: Objection. Vague.
THE WITNESS: No. I mean, there were lots of policies. If there's a specific reference, maybe it would come back to me.
BY MR. HUME:
Q. Let's turn to --
A. There were concerns -- when you talk about holding companies, there were concerns about the ability of holding companies to shift capital between their subsidiaries. And I'm pretty sure policies were put in place to make sure that that didn't happen. I don't know if that's a direct concern here or not. That's my only recollection about policies and about holding companies and capital.
Q. Would it be fair to say that you needed to scrutinize or examine who was going to be acquiring a thrift and becoming a holding company because of concerns about their extraction of cash?



A. Right.
Q. From that subsidiary?
A. And in the application you will see that we had to approve dividends to the holding company. This would just be another way of transferring cash.
Q. On the other hand is it also fair to say that it was generally a very good thing from the perspective of the Federal Home Loan Bank Board and the FSLIC and regulatory perspective in general was that it was a good thing because you now had somebody who was on the hook to maintain capital compliance in the thrift?
A. That was the perception at the time. Yes.
Q. Balancing those two concerns, would you say that generally regulators were predisposed to look upon acquisitions by holding companies as good things to be encouraged or things to be wary of or is it not possible to generalize?
A. I'd say it's possible to generalize that they were things to be encouraged. There was a concern about the adequacy capital in the industry and bringing in outside capital was a way to increase the capital in the industry. That's



what this transaction was perceived as doing, bringing additional outside capital into the industry.
Q. Okay. Let's look at Page 6 quickly, if we can, where it describes the financing of the subject transaction. We're not going to get too bogged down in the details.
Would it have been one of the things Mr. O'Toole and whoever else were with him might have flagged for you that this was going to be a highly leveraged acquisition?
A. Probably should have. I don't recall at the time.
Q. Meaning that you don't recall one way or the other?
A. I don't recall one way or the other of what happened at that time.
Q. Would you have remembered -- would it have been important to realize that the Home Group or AmBase was going to rely on dividends from Carteret in order to service its debt?
A. Would it have been important? Is that your question?
Q. Yes.
A. It would have been important. I don't



recall anybody bringing it to my attention. I think I said earlier that this deal didn't work out the way at least the way I expected it to work. And that's probably one of the reasons it didn't.
Q. When you say that's probably one of the reasons, do you mean the fact that it required a restructuring of the Home Group's debt and it was highly leveraged and that they were relying on dividends from Carteret put excessive pressure on their ability to maintain Carteret's capital?
A. Yes. The perception on this -- the perception I had on this application was that a -- here we have an insurance company basically with lots of capital. And if we required it, and we could require it as I recall, we could make them put more capital into Carteret. And as it turned out it seemed to go in the other direction.
But my perception was that we could require them to put more capital into Carteret and, therefore, we were getting access to more for Carteret. As I was saying, as it worked out, I don't think it worked out that way at all.
Q. Was that perception hinged upon an expectation that there was a regulator capital

project in the works and there was -- I don't think FIRREA had been discussed yet. But there was a sense that goodwill may be taken away and, therefore, we're going to need someone with a deep pocket to come in and replace it?
A. No.
Q. But rather it was simply that --
A. More capital is better than less capital.
Q. Okay.
A. In fact, I recall a conversation with somebody else who was wondering about -- he didn't want to be embarrassed by appointing this to a position if Carteret was going to be taken over. And I recall that I said, well, AmBase will just put more money in if they need it. Was I wrong? Yes. I was wrong.
Q. That's something you recollect before FIRREA or after FIRREA?
A. Before FIRREA.
Q. Wouldn't it be fair to say that the passage of FIRREA is the largest single factor in terms of what changed your perception from the actual reality in that the amount of capital that AmBase was then required -- would have needed to



put in to replenish Carteret's capital was way beyond what was expected at the time of the acquisition?
A. I don't have any direct knowledge after FIRREA. I mean, I don't have -- I'm telling you I don't have that much direct knowledge of the case while I was principal supervisory agent. After FIRREA, I wasn't. I'm going on my perception.
Q. Look at Page 8, if you would, where it discusses the net worth maintenance agreement and the dividend limitations. It states that the present Bank Board's policy is that a holding company -- do you see where I'm reading?
A. Yes.
Q. -- must agree to maintain the insured subsidiary's net worth at required regulatory levels for as long as it controls the institution. HGI has expressed its unwillingness to execute a standard maintenance agreement. Reasons include HGI's implicit obligation as a public company to support Carteret's viability; the adverse view of its insurance regulators to perpetual and infinite support: creditor's interpretation of net worth maintenance as a, quote, unquote, guarantee within the meaning of various outstanding debt



instruments.
If you skip to the next paragraph, it states: As an alternative, HGI proposes a prenuptial agreement to infuse up to 50 million in additional capital if Carteret falls below its regulatory requirement and to give FSLIC the right to vote and dispose of Carteret's stock and remove Carteret's board if capital falls below 1 percent of liabilities.
So do you remember that limitation on the net worth maintenance promise?
A. Not specifically, no.
Q. Is it consistent with the general perception you remembered?
A. Yes.
MR. LEVITT: Objection. Vague.
THE WITNESS: Yes. Because we had -- as I said earlier, my perception was that if we agreed to this and the next page says 2 percent. But the recommendation was that we approve it based on a 2 percent net worth maintenance. that we could call for additional capital from AmBase.
BY MR. HUME:
Q. Up to a $50 million limit though; isn't that clear?



MR. LEVITT: Not if they wanted to keep the institution.
THE WITNESS: Not if they -- it is not -- again, in terms --
MR. HUME: May I just state for the record that we're disposing Brian Dittenhafer and not Mr. Levitt who just gave an answer to one of my questions.
THE WITNESS: My answer would be if we had a business organization that was going to put $50 million into a savings institution, it was my assumption that if a few more million were required that that would be forthcoming despite the limitations.
These were presented to us as limitations. As I read the document, they were presented to us as limitations to the insurance regulators. And they might have even been stated that way in here. But they were limitations which a company acquiring an institution like Carteret would say, well, if it takes a couple more million, we'll put the couple more million.
Q. Right. In that vein even without a capital maintenance promise of any kind, there could still be some expectation of capital

maintenance?
A. Absolutely.
Q. It's the same point?
A. The same point.
MR. HUME: May we take a break for five minutes.
(Recess.)
BY MR. HUME:
Q. Mr. Dittenhafer --
A. What page are we on now?
Q. We are now back on Page 6 of the O'Toole memo.
A. Okay.
Q. I want to quickly go to Page 7. But I want to highlight and have you review the second paragraph which is discussing the projections for the cash flow needed to cover debt service.
And it says: There are no projections to indicate that sufficient funds will be available. Dividends from both Home which is the insurance subsidiary of Home Group and Carteret will undoubtedly be relied upon.
On Page 8 then discusses, as we have reviewed, the net worth maintenance and dividend limitations.



Given that this memorandum was clearly aware of the need for cash flow from Carteret to be paid up to AmBase of the Home Group to continue to finance this transaction, is it conceivable that the author of this memorandum or any of the regulators involved could have anticipated that Carteret was going to be thrown massively out of capital compliance by the loss of supervisory goodwill?
A. I don't think they would have anticipated that. No.
Q. Is it fair to say that they assumed that that would not happen?
A. I think that's a fair assumption.
Q. So basically both parties to this approval -- well, all three parties to the transaction shared the assumption that Carteret would continue to be able to count its supervisory goodwill toward their regulatory capital?
MR. LEVITT: Object as to the form of the question.
THE WITNESS: I think that's a fair assumption.
BY MR. HUME:
Q. Do you remember it to be the case?



A. No.
Q. And you don't remember it not to be the case?
A. Correct.
Q. But based on your review of the document today and what you do remember about it generally and about your time at the Federal Home Loan Bank, it is your judgment that that was likely to have been the case; is that correct?
A. What was likely to have been the case?
Q. That it is likely that the parties to this transaction including both AmBase, Carteret and the regulators at the Federal Home Loan Bank would have shared the assumption that Carteret could continue to count its supervisory goodwill towards regulatory capital?
MR. LEVITT: Object to the question.
THE WITNESS: That's correct.
MR. LEVITT: It's a party transaction that Carteret and AmBase entered into an acquisition agreement. This document before us clearly states which did not involve the bank or just simply approving or being asked to approve an application. So I object to the form of the question.



BY MR. HUME:
Q. I think you know what I meant but I'll rephrase it so that it's clearly that I mean both the parties to the commercial transaction and the regulators in charge of approving that transaction which approval was required. In your judgment, having reviewed this document, are very likely to have shared the assumption that the supervisory goodwill of Carteret would continue to be counted towards its regulator capital?
A. That's correct.
Q. Were you aware that the Home Group was not itself an insurance company but a holding company that owned an insurance company?
A. No. Not to the best of my recollection. At the time I may have been aware of it. I don't recall at this point. At least I thought of it as an insurance company.
Q. Given the extent of the leverage used by AmBase in this acquisition, the fact that it was likely to rely on dividends from Carteret as well as from its insurance subsidiary, would it have made sense if the regulators had known that goodwill was likely to be disallowed as regulatory capital for them to approve this transaction?

138

Q. Don't weigh them because that's deceptive. Look at the text because you have a huge appendix attached to the '88 one. If you look where the appendix begins, the appendix goes 11 pages, the '88 report.

A. Okay.

Q. This is without appendix and it goes 64 pages. If you want to take a minute, you can see it's essentially analogous in its structure in that there is an asset quality section, a management section, a capital section, an operation section and yet almost six times the length.

Am I making a mountain out of a molehill or does that strike you as indicative of a change in attitude and approach?

A. It's hard to say -- I'm reading the report now on the first page and the conclusion is Carteret has serious financial problems, with core operating losses over the last four quarters and declining asset quality resulting in a strained capital position.

Four quarters of losses would result in a larger document as well.

Q. How about a loss of $180 million in

139

capital, would that result in a longer document as well?

A. I don't think that loss had occurred yet.

Q. Let's turn to the first page.

A. Page 1 of the report itself?

Q. Yes.

A. Last three digits are 595 on protective order.

Q. Correct. At the top of the page it says: This is a full scope examination with emphasis placed on those items of concern noted in the previous report of examination and other areas deemed to be of concern.

Some of those areas included the takeover of the institution by AmBase formerly the Home Group, a noted deterioration in the quality of the loan portfolio and the adequacy of loan loss reserves, net operating losses in the four previous quarters and the adequacy of CSB's capital position particularly in light of the recent legislation of FIRREA.

A. The legislation wasn't signed until August 14th, was it?

Q. I'm aware of that.

140

A. Somebody retyped that first page quickly.

Q. Well, more than the first page.

A. This is -- obviously they have gone from what would be considered a pretty decent supervisory position to somebody's judgment they're less than an adequate supervisory position.

Q. My questions to you are essentially going to be to look at this document and ask you to see what role you think the change in capital compliance rules had in that drastic drop from being a two to a four.

And if you turn to --

MR. LEVITT: When you say capital, do you mean the November regulations.

MR. HUME: You'll see what I mean in one second.

BY MR. HUME:

Q. Look the Page 46 for one second.

Read at the top of the page you'll see it's a description of what it says will be the impact of the new legislation. It reads that as reported on the institution's TFR as of June 30, 1989, regulatory capital totaled 310 million or

141

4.4 percent of total assets. As of the same period, the institution's regulatory capital requirement was $205 million.

The institution's RAP capital level exceeded the regulatory requirement by $104.9 million. However, as a result of the examiner's asset classifications, approximately 24.6 million in loss classifications will reduce the institution's regulatory capital to 286 million which represented 4 percent of total assets.

This reduced level still exceeds the aforementioned capital requirement by $80 million but the RAP capital to total asset ratio compares unfavorably with the peer ratio of 4.7 percent.

Then go to the bottom of the page it has a FIRREA section which begins with the tangible capital discussion which lasts for several pages and then it goes on to discuss risk base and what it calls leveraged capital and this goes all the way through --

MR. LEVITT: Is there a question.

MR. HUME: There is certainly a question.

BY MR. HUME:

Q. The question is if the regulatory

capital level was still $80 million above the requirement, would it have been likely that the institution would have dropped from a two to a four in one year's time?

MR. LEVITT: Objection on the ground that there's no foundation for the question. The material you read pointed out at least six problems with the institution. Any of those problems could have dropped it from a two to a four.

MR. HUME: The material was read for that purpose.

MR. LEVITT: What is your question? Is your question does he know that it wouldn't have dropped from a four if they didn't anticipate in November the requirements would change.

BY MR. HUME:

Q. The question is whether or not it's likely that an institution with an $80 million capital cushion would be viewed to be near or immediate term danger of failing?

MR. LEVITT: Where does it say near or immediate term danger of failing. I object to the question on the ground that it seeks speculation and it's a nonsensical question.



BY MR. HUME:

Q. You can still answer the question.

MR. LEVITT: If you can.

THE WITNESS: The numerical rating dropping from a two to a four could come from a number of problems. There are two of them that I can think of offhand. One is the fact that they had four quarters of core operating losses which was stated in the conclusion here. And, also, in the portion that you read there was an additional write down of some loans of 24 or $26 million.

So that would certainly tend to drop the institution's rating. However, probably the fact that it drops from a two to a four rather than a two to a three, if that's what, in fact, happened, comes from the capital, the drop in capital, the precipitous drop in capital and the fact that they may not make the FIRREA minimum tangible capital requirement. There are factors involved.

Which one of them weighs most heavily, I have no way of knowing. But all three of those would be factors in this. Certainly to say it's in danger of failing which I don't know if it says that or not, but if that's the way it's



characterized, imminent danger of failing, it would be because they couldn't meet the minimum FIRREA capital requirements.

BY MR. HUME:

Q. Can you look to Page 49 where it shows their analysis of Carteret's likely tangible capital and tangible capital deficiency which shortfall from the tangible capital requirement of FIRREA after the loss of its goodwill and it shows two different numbers depending on which quarter it is. But in both of them, as you'll see at the bottom of the page, it's greater than a hundred million dollars short fall of tangible capital.

Does that not describe an institution that is extremely different from the institution that would have $80 million in excess capital.

MR. LEVITT: Objection. It's comparing apples and oranges.

THE WITNESS: I think we're talking about regulatory capital with the excess capital, were we not.

BY MR. HUME:

Q. Isn't tangible capital a form of regulatory capital?

MR. LEVITT: As well as other elements.



THE WITNESS: I'm having trouble answering because I'm not clear on the two things we're comparing here.

MR. HUME: May I ask counsel for the Department of Justice to articulate his legal objections as such and not to suggest --

MR. LEVITT: There is no foundation for your question. I object as to form and I object as to relevancy and I object that it's unintelligible.

THE WITNESS: The 80 million you referred to, may I ask, referred to what? The regulatory or tangible capital.

BY MR. HUME:

Q. The $80 million on Page 46 refers to the excess over the requirement that Carteret had even after taking the regulator's recommended write downs. Please review that first paragraph which describes that on Page 46.

A. So you're taking the 24.6 million from the 104.9 million and saying it has a few million dollars in excess?

Q. Yeah. And the document itself does that. It says this reduced level still exceeds the aforementioned capital requirement by $80

146

million.
A. Right.
Q. So that's one way of looking at this institution?
A. Are we not talking about RAP capital there?
Q. Yes. Absolutely.
A. Okay.
Q. But this is written at a time when RAP capital exists in two universes. There was pre-FIRREA RAP capital and an anticipated assessment of what FIRREA RAP capital would be.
A. Correct.
Q. Which we see for the next several pages including on the bottom of Page 49 results in a deficiency of either 130 or $103 million.
A. That's correct.
Q. I guess my question is don't you think the effect of FIRREA is a whole lot more dramatic than the effect of any of the trailing operating losses or recommended loans reserves that are listed in the paragraph I read?
MR. LEVITT: Objection. Asked and answered. He's already testified to it. And to the extent he hasn't, it calls for blatant

147

speculation. And I think the deposition ought to move forward because this repetition accumulates the number of pages and the expense and the time that we have all to spend. So I think the deposition ought to stop covering the things that have already been covered.
MR. HUME: We also think that when depositions get too important and unfavorable facts, they ought to cease. We share the same view.
THE WITNESS: There's no question that the capital -- that FIRREA and its affect on the capital of this institution would have had a major, in my view, a major impact on the examiner's rating of the institution.
Did they mention tangible capital in the previous report? I don't think they did. But maybe they did. But here it's clearly -- these people have been reading about FIRREA in the American Banker for six months and its tangible capital requirements. Clearly it had a major impact on the examiner and his evaluation.
BY MR. HUME:
Q. In your view, Mr. Dittenhafer, from what you remember about the acquisition and to the

148

extent that recollection has been refreshed today, do you think that it would have been, to coin a phrase, madness for AmBase to have acquired Carteret if it had even an inkling of a suspicion that Carteret's supervisory goodwill would not be allowed to be counted towards its regulatory capital?
MR. LEVITT: Objection. Seeks speculation and is irrelevant.
THE WITNESS: I really can't answer it. There are other institutions that had -- other businesses that acquired institutions with supervisory goodwill. Presumably it was considered a good business decision at the time by those organizations as well. Some of them became very profitable.
BY MR. HUME:
Q. Do you mean there are other institutions that bought thrifts that had a lot of supervisory goodwill? Is that your point?
A. (Witness nods head.)
Q. You need to speak for the record?
A. Oh, yes. That's my point.
Q. Do you have any personal recollection of an acquisition where the thrift's regulatory

149

capital was only two times, over half of it was made up of supervisory goodwill and where the thrift would have been out of capital compliance without the goodwill?
A. I don't have personal knowledge of those other institutions that were in other districts. But you have -- there were acquisitions by companies where they made money on them. To speculate that it would be madness for AmBase to do it, I couldn't say that. It could have been a good business decision.
Q. Even knowing that they would lose $180 million?
A. If they had known that in advance, why would anybody acquire it. But other companies did acquire financial institutions under the same circumstances and made money on it. So the point is I don't know.
Clearly if they knew in advance, it would be madness. Was it crazy for them to take over Carteret? I assume it was a good business decision. Other people made the same sorts of decisions obviously with different facts in each case but made the same sorts of decisions and, in fact, made money on it.

Q. Would you have expected that AmBase would have been willing to sign on to a $50 million or possibly greater net worth maintenance agreement if they had known that the bank could fall out of capital compliance over night as a result of new legislation?

MR. LEVITT: Objection. Seeks speculation.

THE WITNESS: I really can't. Because, as a banker, I've already stated in this deposition that I was looking at tangible capital because I knew that supervisory goodwill could go away at least on a perspective basis.

Now obviously I didn't feel as though it should be taken away after the fact, after a contract was signed. And that's why I wrote the letters that I did about it and that was why I've always had that position about it. But perspectively it can go away. And if it can go away perspectively, then you have to factor that into your business judgment, I guess.

That's my answer. Without elaborating on that -- I don't know how I can elaborate on it.

BY MR. HUME:

Q. Let me see if I can ask one or two more



questions on it. You had discussed earlier in the deposition the different perspectives of a lender and a regulator towards capital in general and supervisory goodwill in particular.

And isn't it the case that even as a lender or an investor you rely to some extent anyway on the strength of an asset -- on the strength of supervisory goodwill as an asset that will be counted as capital even though when there's a run on the bank it may not be easily transferred into cash that can satisfy that run?

Doesn't supervisory goodwill have value to the lender even though it may not be able to be sold in a liquidation?

A. I never considered it as a lender to have value. And I am aware that other lenders felt very much the same way about it and looked at tangible net worth rather than supervisory net worth when they were evaluating whether to make loans to these companies.

My feeling was at the time that the private sector lenders were probably in a better position to rely upon supervisory goodwill because I felt as though if Congress were going to change the rules on this, they would be more likely to



change them to the disadvantage of the Federal Home Loan Banks, a Government entity and somebody who should have known all these things. And at the same time say, well, the private sector company they didn't have access to supervisory documents. They didn't have da, da, da. Therefore, they will get paid and the Federal Home Loan Banks won't.

That's why I was so careful as a lender to be only concerned with tangible net worth. And that's why I'm saying the things I'm saying about the value of supervisory goodwill as a lender.

Q. Right.

A. But private sector lenders didn't place much value on it either.

Q. We will come back to private sector lenders in just one second.

Just as a follow-up to that. You say you would place no value in it and yet isn't that position at least slightly in tension with or at odds with the view that the loss of that supervisory goodwill caused many banks to go under and to be seized? In other words, isn't there at least a value in stabilizing the institution and doesn't that redound to the benefit of the lender?



A. Yes.

Q. So in that sense there was value in it from your perspective, even your perspective as a lender?

A. Yes. The thought the position was a correct one to keep the institutions going. Remember, the origin of the problem for most of the institutions in the second district, their earnings problems were not because they made bad loans. They were because they had made 30-year loans at interest rates which were then below market and this ate up their capital.

And my feeling was, and I think the feeling of most of the people around the country when they had institutions they were regulating like that, was that if you can sustain these institutions with supervisory goodwill with these -- I'm sure there were other accounting gimmicks that aren't coming to my mind right now -- that if we could sustain these institutions, that they could work their way out of this problem by making new loans at current market rates and being able reinvest the principal from their old loans at current market rates and they would work out of this problem.

162

stated.
BY MR. HUME:
Q. Would you like for me to clarify the question, Mr. Dittenhafer?
A. Yes. I think I understand the question. But why don't you further explain it to me.
Q. Let me try again. My question is obviously to try to understand supervisory goodwill better. And having gone through the line ever questions we have, is it fair to say that supervisory goodwill represents a promise from the Government to pay, to make good on that dollar amount in the event of a liquidation?
MR. LEVITT: Objection. Unintelligible.
THE WITNESS: I understand the question. I don't think it's -- I think my answer has to be no despite my sympathies. I don't think that the concept of supervisory goodwill implies directly that the Government will pay that amount. I think that was simply a device to entice the institutions to be merged.
I don't think it implies any kind of contractual agreement on the part of the

163

Government to pay that amount.
BY MR. HUME:
Q. But doesn't it without any implication, isn't it plain on its face and didn't you just testify two or three questions ago that in the event of a liquidation FSLIC would have to pay that amount?
A. That's correct.
Q. And so FSLIC says we're not going to pay the amount now. We're going to respect that amount as capital so that you, healthy institution, can merge instead of our having to liquidate. And we understand that future -- in the future down the road if you go under, then we'll have to pay it.
MR. LEVITT: Is there a question.
THE WITNESS: I'll not sure --
BY MR. HUME:
Q. The question is isn't that essentially what the goodwill promise entails?
MR. LEVITT: Objection. Asked and answered. And it's argumentative.
THE WITNESS: I can simply restate that I don't think it's an obligation that it implies that that is a dollar amount that will be --

164

BY MR. HUME:
Q. Your testimony is that it's not equivalent to cash?
A. That's correct. It's not equivalent to cash. One of the reasons for that is the amount would change, would it not, over time?
Q. That's built into my question. I'm assuming that the amount goes down according to its amortization schedule.
A. Because supervisory goodwill becomes from a mark to market calculation and five years later that mark to market might be different. I just basically don't think it applies that that's a contractual obligation. I don't think you can necessarily measure the damages that way if that's basically the question.
Q. It's not the question.
The question is, as a lender -- this has nothing to do with damages. The question is as a lender when you look at the balance sheet and you see supervisory goodwill and while you may make the judgment as a lender that that can't be sold in the same way that T-bills can be sold and turned into cash that can help shore up a run on the bank which you say is not the concern or a

165

liquidation or whatever it is that you as a lender is concerned about, doesn't it represent a contractual promise on the part of the Government that in the event of dire circumstances such as a liquidation, that amount will be funded?
A. My answer --
MR. LEVITT: For the protection of the lender.
THE WITNESS: My answer still has to be no. I don't see how that's an equivalent.
It's clear that goodwill in these negotiations had a value. I don't believe it ever -- anybody ever deemed it had a dollar for dollar value.
MR. HUME: I have no further questions subject to the potential recross after the Department of Justice lawyer.
MR. TAYLOR: I don't have any questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. LEVITT:
Q. Mr. Dittenhafer, I have a few questions and I appreciate your testimony. This will just elucidate some of the ambiguities I found in some of the prior questioning.

Do you recall testifying that the role of principal supervisory agent was a role that entailed influence and power, in effect, I think was the word you used?
A. Yes.
Q. And did that relate to the fact that under the statutory regulatory scheme when thrift institutions needed to do certain things or desired to, they needed to get the approval of the regulators in many instances?
A. That's correct.
Q. You also talked about supervisory acquisitions. Do I understand that a supervisory acquisition to be one where an insolvent thrift needs to be resolved and the regulators try to deal with that by seeking healthy thrifts to come in and takeover the insolvent thrifts? Is that one definition of a supervisory acquisition?
A. Yes.
Q Now did regulators in the second district affirmatively make suggestions to some healthy thrifts from time to time to seek their assistance in taking over less healthy ones?
A. Yes.
Q. In the end, however, is it your



estimate that it had to be a business decision that the healthy thrift would make whether or not to takeover the insolvent one?
A. In the end, yes.
Q. Do you recall we talked a little bit about the Delray acquisition that Carteret made in 1982?
A. Yes.
Q. And you talked about interstate branching rights as part of that acquisition. Do you recall that?
A. Yes.
Q. What does that mean exactly? What was the value of interstate branching rights?
A. At that time no bank was allowed to branch outside of its own state. And, in fact, it wasn't long before the Delray acquisition that no thrift was allowed to branch outside of its own state.
So that for an institution like Carteret headquartered in northern metropolitan, northern New Jersey, metropolitan New York where a lot of its customers might retire to Delray or in that part of Florida, this ability had some value. To be able to branch, interstate had some value.



It's some probably had some advertising right just to be among the first. It certainly had value in and of itself, the ability to branch interstate.
Q. Was the net result of the Carteret acquisition of Delray that Carteret organized a Florida division? Do you recall?
A. I don't recall specifically. I assume they did.
Q. Do you recall whether there was competition among other solvent institutions to bid on and win Delray?
MR. HUME: Objection. The witness has testified he doesn't remember this transaction.
THE WITNESS: That's correct. I don't recall that specifically.
BY MR. LEVITT:
Q. Now when you spoke earlier in your testimony about the principal supervisory agent having approval authority and, therefore, being in a position of some power within the district, was all that approval authority in rubric of regulations, staff did its reviews and so on and so forth?
A. Yes. The principal supervisory agent was the agent of the FSLIC in the district and



there were certain delegations and they had to be within regulations, et cetera.
Q. And did all decisions have to be justified in written memoranda, all substantive decisions have to be justified in memoranda?
A. Yes. I would say all substantive decisions had to be justified in memoranda as we have seen today with the various memorandum of analysis and concurrence. Certainly in retrospect you had to be able to defend a decision after it was taken because you might be challenged on it.
Q. I'd like for you to refer for a moment, if you would, to what's been marked as Exhibit 8 which is the O'Toole memorandum. And I'd like you to turn to Page 12 of the memorandum, please. In Section 18 it says accounting issues. Do you see that?
A. Yes, I do.
Q. It says that the applicant certified public accountant has submitted an opinion concurring that push down accounting will not be applied in the preparation of Carteret's RAP or GAAP financial statements.
Do you know what that means?
A. I did at the time. I'm trying to

182

A. I think that's --
Q. Excess cost over fair value.
A. I'm sorry. I'm looking at the wrong number.
Q. 214.953, that's on the asset side, the third item up from total assets.
A. Yes.
Q. So that would mean that the tangible equity would be the 290 minus 215 which would be about 75 million; is that correct?
MR. HUME: Objection. Lack of foundation. It could be other intangible assets.
MR. LEVITT: That's a valid objection. So let me rephrase the question.
BY MR. LEVITT:
Q. If you look at the total equity and you take away from the total equity the line item we've identified as goodwill, what would be left would be approximately 75 million; is that correct?
A. That's correct.
Q. Now I want you to just keep this document in front of you but look again at the O'Toole memorandum which is No. 8 and you'll see that the purchase price that AmBase paid for

183

Bancorp was 268 million. That's on Page 1 in the first paragraph under structure. Do you see that?
A. No, I don't.
Q. On the first page of the O'Toole memorandum, it says the transaction --
A. The transaction is structured as a cash merger with a purchase price of 268 million.
Q. So it looks like AmBase has agreed to pay 268 million where the stockholders equity minus the goodwill is about 75 million. Do you agree with that?
A. Yes.
Q. Does that strike you as a risky proposition to pay 260 million for 214 million of the total 290 million of assets as goodwill?
MR. HUME: Objection. Calls for speculation.
BY MR. LEVITT:
Q. If you can answer without speculating.
MR. HUME: It calls for expert testimony.
THE WITNESS: Let me answer it this way. There is a legitimate GAAP accounting principle on goodwill because institutions have franchise value in their name and goodwill does

184

have a value. And certainly a part of the difference between the two numbers you've indicated here can be attributed to the fact that Carteret as a savings bank had a good name in a number of very lucrative markets.
BY MR. LEVITT:
Q. Did the Government have any role in the negotiations that led to this acquisition price of 268 million?
A. I don't know the answer to the question.
Q. Was the Government a party to the acquisition agreement between Carteret Bancorp and AmBase?
A. My recollection is no.
Q. I'd like you to turn again to the O'Toole memorandum, please. Now did you testify or, as I recall, you testified that one of the aspects you looked -- the district looked at in deciding whether to recommend the approval of a proposed acquisition or not to recommend it was the personnel that were going to be involved in operating the savings bank after the acquisition.
Is that an accurate summary of what you said earlier?

185

A. Yes.
Q. Do you recall without having your refreshed by the O'Toole memorandum that there were any sensitive issues with respect to personnel in the proposed acquisition by AmBase or Bancorp?
A. My recollection is -- and a man I never met, a man named Manley who was involved in that. And I don't recall the specifics but there was some concern about his involvement with AmBase and another institution.
Q. Let's look at --
A. I do not recall the specifics of it. But I do remember the certain.
Q. Let's look at the portion of the O'Toole memorandum that talks about that and see if that brings back any of it to you. And I'll direct your attention to Page 7 under five. management resources.
A. Marshal Manley. Okay.
Q. The last paragraph on this page says that Mr. Manley had been an incorporator of First National Bank in Beverly Hills and that they engaged in real estate transactions that the FSLIC regarded or the Comptroller of the Currency

186

regarded as inappropriate for a national bank. It then switched charters to a state bank --

MR. HUME: Are you reading from the document or summarizing the document?

MR. LEVITT: I'm summarizing the document.

BY MR. LEVITT:

Q. And became the Merchant Bank of California. It subsequently went broke and cost the Government money. But Manley resigned prior to it going broke and you didn't believe he had anything to do with that.

Do you recall and debates or discussions within the second district about this issue?

A. I recall discussions, not specifics of the discussions. By I recall a concern on the part of our supervisory agents about that involvement. And basically they must have been satisfied or we would not have gone ahead with the approval.

Q. Did you personally make the final decision that that was okay?

A. No.

Q. On page --

187

A. Personally because I concurred.

Q. But not more than that?

A. Not more than that. I didn't have any part in the investigation per se. But the people who did investigate it were satisfied that that was not a reason to deny the application.

Q. If you'll look at Page 7 of the memorandum once again, Mr. Manley had been a company in Finley, Kumble, Wagner, Heine, Underberg, Manley, Myenson and Carey which was a law firm that went bankrupt in January '86.

Do you recall that?

A. No specific recollection.

Q. If you'll turn to Page 4 of the O'Toole memorandum, please, for just a moment. In paragraph three this memorandum sets out the audited financial data for AmBase which at that time was called a Home Group. Do you see that?

A. Yes.

Q. Was it important to have a true picture, from the standpoint of the regulators in the second district, was it important to have a picture of the financial strength of AmBase in deciding whether or not to recommend the approval of the acquisition of Bancorp?

188

A. Yes.

Q. And was that because it was hoped that the holding company could be a financial reserve to help the savings bank in the event something went bad later?

A. Yes.

Q. According to this memorandum, the audited financial data for HGI as of year-end of 1987 showed a net worth of the holding company of 1.1 billion, I guess. Is that how you read this? Midway down it says total net worth 1.160.

A. Just looking at it right now for the time, yes, that's the way I would read it. Total net worth 1.6.

Q. Did the second district rely in citing that number on the audited financial report of AmBase's certified public accountant? I mean, is that where that number comes from?

A. According to the heading of that "3. Financial Resources," it comes from several places including the audited and unaudited financial statements and 10-Q filings and annual reports.

Q. In accordance with standard protocol, if there was standard protocol for an insurance company taking over an S&L, would the second

189

district have done an independent due diligence of the bona fides of the AmBase financial statements prior to recommending approval of the acquisition?

A. No. The answer is no. We would have relied upon the 10-Q filings, their certified public accountant's reports -- the certified financial statements. It was after all a public company.

Q. Counsel for AmBase on two or three occasions made reference to the fact that this was a highly leveraged transaction, that is, that AmBase needed to borrow a lot of money to make this work and, therefore, would rely on dividends that it had hoped that Carteret Savings Bank would be able to channel to it based on earnings of the savings bank. Do you recall those questions?

A. Yes.

Q. Do you agree that this was a highly leveraged transaction?

A. Based on just a quick cursory examination today, I'd hate to characterize it. Based upon my recollection at the time, I did not think of it as a highly leveraged transaction.

Q. If you'll look at the Page 6 of the O'Toole memorandum, please. It says HGI -- and

standards and yet the second district was having trouble in getting the money from AmBase?
A. I don't have a specific recollection about it but --
Q. A vague one?
A. A vague one which I think was one of the first things that I said here. We thought the capital was going to flow that way and it flowed this way and it flowed that way.
Q. Did it start flowing in the wrong direction immediately when Carteret Savings Bank was told to purchase IPF as we've discussed earlier? Was that an example of the capital flowing the wrong way?
A. Yeah. I took it to be that. Yeah.
Q. If you'll look at the capital paragraph on Page 4, please.
A. Page 4, capital? Yes.
Q. This says that the savings bank met the RAP capital requirements of June 30, 1989. Do you see that?
A. Yes.
Q. Do you know whether they met the RAP capital after FIRREA was enacted in that first quarter as of September '89?

A. I don't know.
Q. The first paragraph that we're looking at under capital says: Although it met its RAP capital as of June 30, 1989, the implementation of FIRREA, continuing operating losses and a substantial increase in classified assets requiring the establishment of additional reserves indicate that the bank will not meet future regulatory capital requirements.
Do you recall that the bank didn't meet future regulatory capital requirements because of the implementation of FIRREA, continuing operating losses and substantial increases in classified assets?
A. That's what the document says.
Q. You have no independent recollection of that?
A. I have no independent recollection.
Q. The examiner then writes drastic changes in operations, a return in core operating profits as well as overall asset shrinkage would be needed. Do you recall discussing that with the examiner-in-charge?
A. At this point I wouldn't have discussed anything with the examiner.

Q. Because at this point you're just on the bank side; is that right?
A. As of February, we were prohibited from any interaction basically on the examination side.
Q. Do you know -- counsel asked you whether you knew about Winstar cases. And I'd just like to just follow-up on that for a moment and then the deposition from my point of view is going to be over.
Do you know AmBase's theory in this case about why the Government owes it damages according to AmBase?
A. No.
MR. LEVITT: That's all the questions I have. Thank you very, very much.
MR. HUME: I have a few re-cross.
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. HUME:
Q. Counsel for the Government began by asking you questions about your testimony as to the power of the position of president of the Federal Home Loan Bank. And he then asked you if -- and he used the phrase and you used it in your answer -- in the end in a supervisory acquisition it was a business decision.

I believe you testified that yes in the end it was. Do you recall that testimony?
A. Yes.
Q. Would you agree that part of that business decision and, indeed, often the most important part by far was a government assurance that the supervisory goodwill treated in the acquisition could be counted towards regulatory capital?
A. Certainly a part. How much of a part would depend on each individual transaction. I'm sure. But certainly a part of it. Yes.
Q. And in a transaction where the acquiring thrift would be insolvent absent that promise, wouldn't it be the most important part?
MR. LEVITT: Objection. Calls for speculation.
THE WITNESS: Each deal is on its own merits.
BY MR. HUME:
Q. Is there anything about your testimony that in the end it was a business decision that distract or alters your earlier testimony that the FSLIC went out and aggressively sought to induce healthy thrifts to enter into these supervisory

whether you have any recollection of this being a highly leveraged transaction to which you responded you had no independent recollection of that; is that correct?
A. That's correct.
Q. Can I refer you back to the O'Toole memorandum on Page 6.
A. That's Exhibit No. 8, Page 6.
Q. Yes.
It states under Paragraph 4 there or Section 4 it says: Due to various restrictions in HGI's present loan agreements, the subject transaction requires a complete restructuring of HGI's outstanding debt. It then goes on to show that restructuring and the sale of senior debt of $145 million.
Would it at least be fair to say that the person who did the work underlying this memorandum which is Charles O'Toole plus potentially another supervisory agent would have understood that this transaction was highly leveraged or at least significantly leveraged?
A. Significantly leveraged. I would point out though that they're talking about senior subordinated debentures. As I recall at that time

subordinated debentures counted as capital and maybe they still do.
Q. There is also a bank term loan of $250 million?
A. Right.
Q. And an extensive discussion in the paragraphs above Section 4 of the funds needed to cover debt service over a short-term period.
MR. LEVITT: I object to this line of this questioning because you're asking him to try to figure out what the writer of the memorandum had in mind. And he said he can't do that. I mean, I think he's answered these questions already.
BY MR. HUME:
Q. I'm simply asking whether your testimony about not recollecting it being highly leveraged means that you don't think it was highly leveraged?
A. I have no independent recollection at this time of the leveraging arrangements involved here.
Q. One way or the other?
A. One way or the other.
Q. You had referred to no doc loans. Did

you say they were or were not per se unsafe and unsound?
A. I considered them to be per se unsafe and unsound.
Q. But notwithstanding that you had had experience where they had actually been profitable?
A. For example, Greenport Savings Bank in New York had a long history of making no doc loans to be profitable.
Q. And was your consideration of their per se unsafe and unsoundness an official policy or simply your view?
A. When any institutions making those kinds of loans was brought to my attention, they received a supervisory letter suggesting at least that they cease and desist with the broad implication. If they didn't take the suggestion, stronger words were to follow.
Q. Counsel for the defendant asked you about the risks assumed by AmBase when they acquired Carteret. Do you recollect those questions?
A. I'm sorry. Would you repeat the question.

Q. Counsel for the defendant referred you back to the annual report of Carteret and calculated out with you the equity less goodwill and compared that to the purchase price and then asked you about the nature of the risks of the acquisition for AmBase.
Do you recollect those questions?
A. Yes.
Q. And you answered that there were no Government guarantees associated with this transaction. Do you recollect that?
A. Did I say that?
Q. You said that the Government didn't make a guarantee in approving the transaction, that Carteret's accounting records were --
A. Okay. I'm saying the Government did not guarantee the accounting records. That's what I intended to express.
Q. Okay.
A. We didn't guarantee anybody's accounting records except our own.
Q. Would it also be fair to say that when you spoke about the risks assumed by AmBase and not by the Government that you did not intend to include in that statement that AmBase took the