# EXHIBIT D

IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

September 29, 1999
9:10 a.m.

200 Park Avenue
New York, New York

DEPOSITION of WILLIAM JAMES DAY, JR., a witness in the above entitled matter, taken before a Notary Public of the State of New York.

Page 90

with the way the OTS, the primary regulator, was regulating the institution?
A That's my opinion. I guess there were other circumstances.
Q But that's how you remember it.
A Yes.
Q Would you agree, Mr. Day, that the process of taking reserves for -- first of all, let me clarify.
When I use the term reserves, I don't know that I use it in a technical sense. I mean to use it in a way that covers what are called a provision against future loan losses, or a general valuation allowance.
Am I using it in a way that makes sense to you, or should we --
A Yes, it gets somewhat complex, but generally yes, you're correct.
Q I basically use it in a way that means that the institution has to take a charge of some kind that will go on its income statement and reduce income and therefore in that way also affect capital, and that it will carry a level of reserves, but will sometimes need to increase that level based on a feeling of future losses, but

Page 91

will also sometimes be able to reduce its reserves if in fact its assets bounce back.
Is that a fair description of what a reserve, how a reserve works?
A Generally, yes, that's the way the FDIC would work. I believe the OTS at that time had, I don't know if it was before or after FIRREA, that they required specific reserves rather than general reserves.
It would be rare, I've only seen it once in my life where they actually took money out of the reserves and put it back into income.
Q Where the OTS did that?
A No, the bank that I was involved with, a commercial bank.
Q But it would be rare in your experience for the OTS to do that.
A I've never -- I don't know what the OTS did, I'm just talking about my experience examining banks.
I've only seen one bank that actually recaptured a provision, and that was a commercial bank.
Q Okay.
Would you agree that the process of

Page 92

determining the appropriate level of reserves is a process that involves a number of different judgments based on a prediction of the performance of assets in a portfolio?
A Yes.
Q Would you agree that that judgment, while there were a lot of mathematical and statistical methods that can be used, ultimately is at least at much art as science?
A If art enters into it it should be to a very small degree.
Q I guess art and science may be slightly confusing terms.
A The art would be in only assessing future economic conditions, as far as I'm concerned.
Q Right, because there is, the science side of it would be based on the historical loss experience of the institution for assets that meet certain definitional criteria?
A Well, that's what the accountants said at the time. That was a problem we had with some accountants, is that for thrifts, is that they based their, and I believe Carteret was one of them, where the allowance was based on what the

Page 93

accountant said was the historical loss.
It was my contention, and I think I represented a general consensus of the FDIC, is when you had an institution like Carteret who changed its business plan very dramatically into commercial lending, that it had a historical loss, that was not the way to assess the allowance, it should be predicated on the quality of the portfolio.
Q Had you worked with other institutions where that had been the case, or because they had shifted into a different line of business --
A Carteret is the one that comes to mind, because I believe, I can't remember the accountants, I think it might have been Peat Marwick, had attested that based on, in their published statements, that their allowance was adequate based on historical loan losses, and I believe we had some discussion at that time about that.
Q So it was your view that because of the line of business being --
A Changed.
Q Different, and --

Page 94

A And the economics being changed.
Q And the economic situation being changed --
A That that wasn't the appropriate way to look at it.
Q So that you needed to do more than just look at the historical loss experience.
A Exactly.
Q In doing more than looking at the historical loss experience -- well, first of all, in deciding to do more than look at historical loss experience, you have to make a judgment, just as the one you just explained, based on your understanding of the industry and of the economic environment.
Would you agree with that?
A That's part of it, but the primary judgment is based on the evaluation of the asset portfolio.
In this case we're talking about loans, so it would be the loan portfolio.
Q And based on that judgment, as well as your judgments about the economic environment and the changed nature of the business, you could conclude, as you did, that you needed to do

Page 95

something more than historical loss experience.
A Yes, and to clarify economic environment, that would have been reflected in the real estate appraisals that were provided at the time.
If the real estate appraisals were done at a significantly prior date, you would have factored that in as well.
Q So you remember having a view as to the method of taking reserves that was different from the view of Carteret's then accountants, Peat Marwick?
A Yes.
Q Do you remember having similar disagreements with Peat Marwick with other institutions?
A Peat Marwick, not specifically. Other accounting firms at other institutions.
Q Or what I guess were then the big six, or who knows how many there were.
A Yes.
Q Did you have better or worse experience with any of those major accounting firms on this issue?
A The experience I had with other

Page 96

accounting firms were based on assessment of the asset quality, not assessment of the historical loans.
See, commercial banks and the banks that we regulated didn't rely on historical loan loss. That was practically primarily thrifts that did that, stayed basically in the residential mortgage market. So it wasn't a big factor in how the allowance was determined.
Q So there was no accounting firm that you remember being more receptive to your view than you remember Peat Marwick being?
A I'm not exactly clear on your question.
Q I guess I'm focusing on the disagreement as to the method of taking reserves and whether to rely purely on historical loss experience, and whether or not some accounting firms shared your view that in an institution like Carteret that had been -- was a thrift but that also had commercial loans, it was not appropriate, whereas Peat Marwick had said that that was.
A I don't believe I ever had a similar situation. In that case I thought the reasoning was fairly specious based on the fact that they

Page 97

had changed their business approach, but apparently that was what accounting guidelines allowed them to do.
Q After making the judgment as to whether or not to rely purely on historical loss experience, would you agree that there are other subjective judgments involved in determining what the appropriate level of reserves is?
A Yes.
Q How are those judgments made?
A It's the evaluation of the quality of the loan portfolio, whether or not the bank has correctly assessed that and provided appropriate reserves.
MR. HUME: Can we mark this AmBase Day Exhibit 5.
(The above-described document was marked AmBase Day Exhibit 5 for identification, as of this date.)
Q Mr. Day, Exhibit 5 is an August 6th, and I believe it's 1990, even though we can't see the last number.
A Yes.
Q Memorandum from you to from Nick Ketcha. It relates to Carteret's reserves. I

Page 106

Q (Continuing) -- the value of the real estate had dropped?
A No.
Q But that would factor into the judgment as to whether or not to make an adverse classification.
A Right.
Q You testified a moment ago that you remember some of the policies at that time.
Do you remember the nature in which assets were classified or the judgments used to determine how to classify assets changing over the last seven years?
A Not significantly. I mean, I have always applied the literal definition. I guess some examiners might have been more conservative.
Q But is the literal definition one that allows for discretionary judgment?
A It shouldn't to any great degree. Two examiners looking at the same loan should come up with the same conclusion.
Q Should that conclusion be the same as what an outside accountant should come up with?
A I have no idea how they come up with their conclusions.

Page 107

Q Do you know what the literal definition is for substandard assets?
A Again, as I said before, something that has a significant operating weakness, it jeopardizes the liquidation of debt with a distinct possibility that if it's not resolved it will result in a loss.
Q Isn't determining the distinct possibility of whether or not it will result in a loss if not resolved a judgment call that requires --
A I guess you could call it an educated judgment that would be based on, as we mentioned before economics, conditions, the financial ability of the borrowers, the guarantors.
Q From the literal definition you just read, it seemed to me it could cover both a loan that was being serviced and one that was past due in servicing.
A Yes. You could technically have a past due loan that wasn't substandard.
Q Just as you could technically have --
A A current loan that is substandard,

Page 108

yes.
Q In terms of evaluating the underlying real estate, would you as an examiner normally rely on an outside appraiser for that?
A That would be our primary reliance.
Q Would it be harder to determine the appropriate classifications if there was no outside appraisal?
A Yes, that's primarily why we have our appraisal regulation that requires an appraisal on real estate loans over a certain size.
Technically the bank, an FDIC supervised bank would be in violation if they didn't conform with that.
Q So you as an examiner need to know what the underlying value of the real estate is if it had to be sold that day, that year, while you were examining it?
A That's a fair statement.
Q If a loan is current, would you still look at whether or not the value of the real estate as of the time of the examination was sufficient to cover the principal of the loan?
A Yes, we would take a sample of loans

Page 109

based on size or statistical sampling and look at current loans.
Q Do you still do that?
A Yes.
Q Do you remember what your view was of the real estate market in 1990 in this region? Did you think it was likely to bounce back soon?
A I can't remember if I had that conclusion. I probably did, and in fact it usually does, and I've been through several business cycles where it has bounced back.
This was my recollection that this was the most prolonged one that we've had in this region in many years.
Q When do you remember the real estate market bouncing back in this region?
A I can't recall the exact date. Bouncing might be the wrong word, adverb. It more likely would be slowly moving towards improvement.
Q When do you think it started to improve?
A It depends on what type of real estate market, whether it's residential or commercial office buildings or commercial projects, but

Page 110

Q When do you remember the residential market in this region starting to improve?
A I don't remember exactly. I assume '95, '96, maybe a little earlier.
Q And what about the commercial real estate market, do you remember it improving around the same time?
A I think it was slightly later. The commercial office buildings market. Then again, it depends on the type of property. There were certain types that were overbuilt.
Q Do you remember the real estate market for either of those two types of markets getting worse during 1993 and 1994?
A I don't recall exactly.
Q Do you remember it getting worse during 1989 to '92?
A I remember it being poor at that time. I don't remember whether it was getting worse, you know, on a year by year basis or on a month by month basis.
I don't recall exactly what that, what it looked like on a graph.
Q But you remember that it got worse during '89 to '92 from what it was prior to 1989?

Page 111

A That's my general recollection.
Q How closely do you remember Nicholas Ketcha monitoring the work you were doing on Carteret during 1990?
A I really don't know how closely he was. I mean, I've known him for almost thirty years, but I mean, he was the Regional Director, he probably had a lot of other issues he was monitoring to one degree or another.
Q Do you remember communicating with him directly frequently during 1990?
A I would say no.
Q Did you communicate with him mostly by memorandum or by phone call?
A By memorandum.
Q Did you occasionally speak to him on the phone?
A With respect to Carteret? I can't recall that.
Q Well, first generally do you remember speaking with him on the phone?
A Generally, about other issues other than Carteret?
Q Yes, I guess just to take it, working as an Examiner-In-Charge on one

Page 112

institution and working as an examiner generally in the region, during 1990, would you have occasion to speak to Nicholas Ketcha in person on or on the phone?
A Working as an examiner, very infrequently.
Q Less than once a month?
A Yes. Probably less than once or twice a year.
Q Would you report to him in person once you concluded the exam?
A No.
Q Would you report to him in person while you were conducting the exam?
A Not generally. I mean, I would report to him if he was going to attend the Board of Directors meeting. I would go over the findings.
You know, he would have a copy of the examination report and we'd go over the findings before he attended the meeting. That was the general practice. And if he was coming to the meeting, yes.
If it was somebody else coming to the meeting to represent the region, I would be

Page 113

reporting to them.
Q Did you work on any savings and loan institutions that were bigger than Carteret?
A No.
Q Do you think Carteret was one of the savings institutions with which Nicholas Ketcha was most concerned?
MR. LEVITT: If you know.
A I don't know.
Q Returning to the subject of taking loss reserves, from the perspective of the institution, are they always, is it your experience that they are always trying to minimize the level of reserves that they take?
A No.
Q Is it sometimes in their interest to take reserves so that they can profitably sell certain assets?
A I don't understand how that would work.
Q Well, it may have been a slightly awkwardly phrased question, so let me try again.
Let me first ask is it sometimes in the interest of the institution from management's perspective to take larger rather than smaller

Page 118

Q You don't remember Carteret shareholders' having a capital maintenance agreement?

A Not specifically, no.

Q If you as an examiner know that an institution or believe that an institution needs additional capital in order to help satisfy its requirements or beef up its regulatory capital, isn't there an interest in making sure that the reserves are sufficiently high enough to show to the shareholder that it needs to invest new capital into that institution?

MR. LEVITT: Objection as to vagueness. You can answer if you can.

A Really from my, from an examiner's perspective that doesn't enter into it. That might be a judgment that is made at a regional level or a Washington level.

We just report our findings and our recommendations to the region and to the bank.

How it's managed as far as a presentation to potential acquirers of the stock, whatever, that's really up to the bank management.

Q So you would say that it would be an improper consideration for a regulator to focus on

Page 119

encouraging a shareholder to pay capital into the institution?

A No, I don't think that would be an appropriate way to do it. You want to look at it objectively.

It's up to the institution after the findings are presented and they determine it, whatever way to market their stock.

Q The reserves should be determined sort of objectively in isolation from that fact?

A That's my opinion.

Q Given the way the real estate market can move, would you not agree that there is an element of gamesmanship in determining what the appropriate reserve is for a real estate loan?

In other words, that today the market says that asset is worth $100, tomorrow it could be $80 or it could be $150, and we need to pin down both the appraiser and the loan officer to determine what reserve is appropriate?

It's obviously an important job and one that you base a lot of your knowledge in doing, but don't you agree that there's an element of flux to it?

A Well, I don't think I'd use the term

Page 120

gamesmanship.

Q I didn't mean to imply it in any negative way. Simply just like pricing an asset is a game, isn't there a game involved in determining how to write down an asset based on the price of an underlying asset?

A You know, you have to make an educated judgment based on reasonable projections, and primarily that's the appraiser's job in coming up with a valuation.

In the case of investments, how fast product can be sold, and that would be based on interest rate projections.

To that extent, you know, there is some subjectivity involved.

But the guidance put out by the Appraisal Institute, there shouldn't be a whole lot of guessing going on about what's going to happen in the markets.

Q But to some extent you can't escape from the fact that the prediction of what's going to happen in the market is important in the analysis of what the reserve is, isn't that right?

A It's a factor, but I mean, it's something that it's a weak argument if you're

Page 121

going to go in and tell management that I think this loan should be classified substandard because I think real estate values are going to decline.

I don't think it's a very defensible argument.

Q What do you remember about Carteret's internal loan review process?

A I remember that I didn't agree with their findings, and I remember I didn't think they were objective.

Q And do you remember thinking that that was because they were incompetent or that they were understaffed?

What was the reason why you thought they weren't accurately reviewing their loan portfolio?

A I can't recall the staffing. I don't think it was that great. But I think I can remember specifically the person in charge of loan review coming to loan discussion, which in my opinion is inappropriate, and arguing on management's side on a classification, which I thought was really inappropriate.

Q Who is that individual that you remember?

Page 122

A The last name was McCabe. I can't think of his first name. Charles?
Q You say you thought it was inappropriate for him to come to a loan discussion, you mean a loan discussion between the examiners and the loan officers?
A Right, and if I recall, he was a former Federal Reserve examiner, and I think he tried to intimidate people by saying I was an examiner and I know more than you do.
Q When you say intimidate people, intimidate the examiners who were actually working on the exam?
A Some of the examiners.
Q Do you recollect that tactic of his being effective?
A Yes -- well, not with me, because I knew him when he was a federal examiner.
Q How do you remember it being effective, then?
A I remember him, you know, using that as the rationale why, that he was an experienced as an examiner, and he was assigning appropriate classifications and that we were all wrong in our judgments.

Page 123

Q And at that period of time you were an experienced examiner, isn't that right?
A I'd been examining banks for twenty years.
Q You started in 1970 and we're talking about '90.
A Right.
Q Do you remember what level you were in the FDIC?
A I was a CG 14.
Q Which is quite a senior level?
A That's the highest field examiner level.
Q Is that what you are today still?
A Yes.
Q Who were the people at Carteret for whom it was appropriate for them to be at these loan discussion meetings?
A It should be the lending officer, you know, or -- generally you have your loan discussions with the person who is the senior credit officer, and more than likely the people who were involved in those particular loans would be involved in the discussion.
Q Do you remember --

Page 124

A My program is normally to give them the written classification, tell them what we think about it, and ask them to rebut our classification.
Q Do you remember any of those individuals at Carteret, those loan officers? Is it correct to call them loan officers?
A Yes.
I remember the senior lending officer, I can't remember his name right now. There were a couple of McCabes there, maybe you can refresh --
Q There was a Leo McCabe and a Charles McCabe.
A Leo McCabe if I recall was involved mainly in residential lending. I don't think I had any significant disagreements with him other than maybe GDC.
The Charles McCabe, was he the senior credit officer?
Q I think you're recollecting him correctly.
A Okay.
Q I'm asking about people to be honest that I don't know the names of right now,

Page 125

specifically the, when I use the term loan officer, I guess I'm not sure I have as clear a perception of what I mean.
I'm thinking of there being a number of these individuals at Carteret who worked on specific loans or a series of loans that they helped actually approve and then I suppose they're responsible for.
Is that a fair description of what a loan officer is?
A Yes, but as I recall --
Q I didn't mean like a chief lending officer.
A Right, but our preliminary discussions, the person who is reading the credit file and reviewing the loan would have talked to the loan officer responsible for that loan, come to a conclusion, brought it back it me for review.
We would have given management our preliminary findings, then if they wished to rebut them, we would have a meeting with the senior staff, which may or may not include the loan officer responsible for that loan.
Q Okay. That meeting was one in which the chief lending officer would come but not

Page 130

in thrifts.
Q What would the actual nature of the inquiry be when the examiner physically showed up to talk to these either workout officers or loan officers who were responsible for a series of loans?
A Well --
Q In Carteret's situation.
A Basically if it's a delinquent loan, can you explain why it's happening, why, what the prospects are, how does it impact the appraisal of the property, do you think maybe if this appraisal was done three years ago you should get a new one based on the fact that the product isn't selling based on the way the original appraiser said, or that kind of discussion, or if you have any more current financial information or any information I don't have that could maybe help me in making my judgment. Basically a fact finding.
Q Would that include questions about what they felt, you made references to the appraisals or references to what the value of the underlying real estate was?
A It should yes.
Q Would you think that that whole

Page 131

process would be intimidating to the loan officer or workout officer working on those loans?
A It shouldn't be. Generally these people are used to having examiners come in on an annual basis and asking about the loans.
Q Do you think they were used to having both FDIC and OTS examiners there at the same time doing the same thing?
A In the case of Carteret no, because this was the first time.
Q Do you ever remember any of them acting as if they were intimidated?
A I don't recall anything like that.
Q Do you remember anyone ever complaining about feeling under pressure or intimidated?
A No, I don't recall.
Q Yet you describe it as a time when the institution was in retrenchment. What did you mean by that?
A That they weren't granting new loans.
Q The reason, is that because of the capital problems?
A The capital problems and more than

Page 132

likely because the real estate market was pretty poor at the time and it didn't make a whole lot of business sense, and it probably, putting myself in their place, they figured they needed more liquidity, and if they had excess cash, they would have been investing in the short term, probably in Treasuries.
Q When do you think that period of retrenchment began, roughly speaking?
A I think it began before I got there in '89, so I don't remember any classifications that we had that were recently granted loans.
Q During that period of retrenchment you say that many of these younger professionals or loan officer professionals left the institution?
A That's my recollection. I recall going into the lending area and seeing empty offices.
Q Do you think that some of those people left because they thought the institution might not survive?
MR. LEVITT: Objection.
A That would be just a guess. It's possible that management told them look, we don't

Page 133

need you anymore.
I would assume -- the other standard in this kind of situation is management has to maximize whatever earnings they can, so they're going to cut their overhead to the extent they can.
Q Do you remember thinking that any of the people who didn't leave were worried that the institution might not survive?
A I think it was, they probably would have had their head in the sand if they didn't think that.
Q Given that and given the nature of the retrenchment and the market and the fact that they had two different examining agencies looking at their work, don't you think they felt a significant amount of pressure?
A I would assume that, and the financial condition of the bank would add pressure.
Q Right. So you think on reflection given all those factors these individuals must have felt a significant degree of pressure?
A Must have maybe is too strong a word. They very well could have.

Q I know, I apologize for that.
It states, "Management anticipated gains from asset sales may help somewhat, but it is evident that a substantial capital infusion will be necessary.
"The only reasonable source of such an infusion would be AmBase Corporation. The prospects for such aid are not encouraging, as AmBase has other financial problems which have placed its own future in jeopardy."
Do you remember thinking that part of AmBase's financial problems at that time was the fact it was not able to receive any cash flow from Carteret to service its debt payments with?
A I don't remember that specifically, but it's probable.
Q Do you recollect that AmBase was a holding company that owned Carteret and other operating subsidiaries?
A Yes, I do.
Q And it relied on dividends and cash from the subsidiaries to service its holding company debt?
A Yes.



Q Why do you think -- well, I should back up.
Would you have been the principal author for this report, or would you have reviewed things that were written by other people?
A The comments on the pages is one that would be primarily mine. The loan writeups and some other comments would probably be prepared by somebody else and reviewed by me.
Q Do you remember why you would have thought that AmBase is the only possible source for an infusion of capital into Carteret?
MR. LEVITT: Objection. It says the only reasonable source.
A Well, the process of elimination, I didn't think, absent a stock offering or something like that, which the bank couldn't do, it would have to be done by AmBase, a sale, there really was no other logical source.
It wasn't like it was an independent bank that could go to the market to recapitalize.
Q Was there any reason or was that sentence meant to indicate that you didn't think it was possible for AmBase or Carteret to raise money from an outside investor, private investor?



A Well, like I said, the prospects weren't encouraging. I didn't presume to know what AmBase's resources were to go either to a private placement or to a public offering.
Again, I was just -- I saw what I saw from their financials and probably had some discussions with senior bank personnel.
Q Do you remember Carteret trying to raise money from other private investors which would have required AmBase to reduce its equity stake?
A I can't remember the exact circumstances. I know at some point in time, I don't know if it was after the examination, I think his name is Dick Bianco, came in and he had some alternate plans, but I can't remember exactly what they were.
Q Do you remember having any reason to doubt the viability of such plans?
A Again, I don't remember what the plans were. I remember being fairly impressed by the individual, Dick Bianco.
If I'm not mistaken he was a partner at Dillon Read or something like that, to that effect. He would have known more about it.



My assumption it was going to be difficult, but he wouldn't be investing his time unless he thought there was some possibility.
Q Do you see the last sentence that states, "The bank's viability is therefore considered to be very precarious with the specter of future deterioration in the real estate marketplace offering little hope for improvement."
Do you remember thinking that the future looked very bleak because of the very bleak future you saw for the real estate market at that time?
A At that time I probably -- it probably would have been more accurate to say the near term future.
I mean, they needed capital then and, the only way that the real estate market would have helped them was if it turned around very fast.
Q Do you remember thinking that because of AmBase's size it was, and for any other reasons, that it was likely to need more than the minimum regulatory capital requirement?
A AmBase or Carteret?

Page 214

MR. HUME: I haven't asked the question. You can't object after the witness answers.

I know you'd like to, but you are not allowed to.

Q The second paragraph on the page numbered 1-2 refers to, "Management's penchant for optimism is entirely inappropriate."

Do you see that sentence?

A Yes.

Q Do you remember feeling that the management had a penchant for optimism?

A That conclusion is based on the opposition to our classifications. And if I remember, certain things I do remember.

The loan review person, the discussion of this one, we talked about this earlier, said that my conclusions were all wet because these houses were going to sell like hotcakes.

Q Do you remember who that was?

A The guy in charge of loan review.

Q Is that who you were saying might have been Mr. McCabe earlier?

A Yes, I forget the guy's name. That

Page 215

was the thing I was saying I didn't think was appropriate, for him to be involved with the loan discussion.

Q In hindsight it clearly wasn't -- would you agree that their optimism was slightly 'less misguided than you thought at the time?

MR. LEVITT: If you have an opinion you can voice it. Otherwise you can't speculate.

A Well, I think the facts bear out it wasn't warranted, and the fact that an independent person came in, evaluated this loan, then management of the bank, I believe it was before it was taken over, sold this loan for even a greater loss than I had had in my examination report.

Q That person obviously shared your view that they were not as optimistic as prior management.

A Right.

Q Or that they had other reasons for wanting to write down the assets?

A Well, he struck me as a reasonably intelligent person. Writing them down is one thing. But taking a big loss on a sale and not having to would not be a really intelligent thing

Page 216

to do.

Q Would you agree that one of the reasons they may have wanted to write down assets in 1991 was in order to establish credibility as you said earlier with Wall Street or with potential investors?

A Well, I mean I guess that's possible, but I don't have any way of knowing that.

Q You don't have any way of knowing whether that was actually the case in 1991?

A No, I don't. I know that typically people do due diligence. If they come into an institution and find out that the assets are not classified correctly, they will not stick around very long.

Q I just want to make sure you understand my question, because I'm not asking you whether or not you think today you made a mistake.

A No, I'm putting myself back in that time frame.

Q Right, but now I want to ask you a question when you're sitting here today in this time frame with the benefit of hindsight and ask you not whether you made a mistake, I want to ask

Page 217

you whether or not you would agree that the optimism of the prior management in 1990 was not as unreasonable with the benefit of hindsight as it seemed to you at that time?

A From today's perspective?

Q That's right.

A No, I think their optimism was still unwarranted. And the case we talked about, about that development, being as optimistic, they barely agreed that that loan was special mentioned versus what the reality was and what you could get on the short term, that is unrealistic.

Q Isn't it true that if the institution had been able to hold onto that loan until two or three years later it would have regained its value, it would not have been a loss asset and would have ended up being a very profitable asset?

MR. LEVITT: Objection as to relevancy, but you can answer.

A I think it would have been a lot longer than two or three years, because that's built into the discounted cash flow.

Q Well, how would we check to see whether or not -- where would you want to look to

Page 238

A I don't remember reviewing it.
Q Did you understand it to be the case that OTS had to reach the conclusion that the AmBase acquisition would not be harmful to Carteret in order to approve it?
A If they followed the same guidelines we would have.
Q Would it have been your operating assumption as of this time that that was the case?
A I would assume they did, yes.
Q On the next page, Page 1-6, it shows the uniform bank rating given to Carteret of 5.
Do you remember that being an issue of debate between you and any of your FDIC colleagues?
A I don't believe so.
Q Do you remember how it is that you came to the conclusion that it should be a 5?
A I haven't looked at the definitions lately, but I think it speaks of imminent danger of failure if the situation is not resolved is the definition of a 5.
Again, this report would have been reviewed in the regional office, and if they didn't agree with my findings, they would have

Page 239

changed it.
Q But you don't remember any discussion about that conclusion?
A I would assume I had verbal discussion with somebody in the regional office, whether it was Dan Dionne or Mike Zamorski, but I don't recall specifically.
Q Was it quite a serious matter to conclude that an institution was a 5?
A Oh, absolutely.
Q So that would be something you would do only after deliberation and discussion?
A Not necessarily. I mean, I would reach my conclusion and send the report to the regional office, but I would certainly carefully consider whatever I was recommending to make sure that I wasn't giving an incorrect evaluation.
Q Do you remember there being any immediate reaction from any of the people you reported to at FDIC?
A I don't remember.
Q You don't remember anyone expressing alarm or concern?
A Well, I believe at the second meeting we had as a result of this exam, and I

Page 240

think Mr. Zamorski was there, and he gave the FDIC's position on the bank. I don't recall exactly his words, though.
Q Sorry, at the presentation of the exam?
A Of this exam report. I think -- let's see, yes, the last sentence on the first paragraph of the presentation.
Mike Zamorski was there. I would have presented my findings. He would have given the regulators' opinion of what the next step was.
Q Would he have told the institution that it was a 5?
A Yes.. I think at that stage. I think at that stage we disclosed the component rating or the composite rating. Subsequently we disclosed all the components.
Well, obviously we did. We gave them the report with the number in it.
Q You did give it to them with the number as you remember?
A Yes, this would have gone to the bank.
Q Do you remember how Bob Walsh, who was the President of Carteret at that time,

Page 241

reacted?
A I don't recall it being an acrimonious meeting, but I can't say exactly what he said. I assume that they responded to the exam report, which is the normal procedure.
Very often in these situations, just for legal reasons, they don't like to give a direct response until they've had a chance to review the written report.
Q Do you remember whether Nicholas Ketcha contacted you after learning that Carteret had been given a 5?
A I don't remember any direct contact with Nick Ketcha on this bank.
Q Do you remember hearing indirectly about his reaction through Mike Zamorski?
A I don't recall.
Q How about through anybody else?
A No.
Q Do you remember Mike Zamorski saying that the key to Carteret's survival was its ability to find additional capital?
A I don't remember him specifically saying that, but I'm sure he did, and that's the logical conclusion as a result of the report.

Page 242

They needed capital.
Q At that stage there was only one way that Carteret could keep going, and that was new capital. Would you agree with that?
A In order to comply with the regulatory requirements, yes.
Q Do you remember thinking that even if Carteret's assets stabilized at that point it wouldn't be able to survive unless it raised more capital?
A I can't recall exactly, but I think that was the general conclusion.
Q Do you think that the shrinkage of institutions that resulted after the passage of FIRREA that you refer to on Page 1-4 in the sentence we discussed a few minutes ago, do you think that that contributed to decline or depression or recession, whatever you want to call it, in real estate prices?
In other words, that there was such a need to offload assets, that some of these institutions were failing, do you feel that that contributed to the depressed real estate market?
A Undoubtedly it had some impact on it, but it depends on what you consider comes

Page 243

first, the chicken or the egg.
The market was depressed to begin with, which resulted in a decline in value of these projects.
Q On the last page of this summary, on I-6 again, I'll refer you again to the statement by Mike Zamorski at the end of the second to last paragraph before the paragraph on the uniform bank rating.
A Okay.
Q It says, "He stated that by any reasonable measure additional capital would be necessary, and that the minimum level would not be appropriate for Carteret in light of the pronounced problems at the institution."
Do you remember how much capital you thought the institution would need at that stage?
A I don't recall us coming up with a number or a ratio.
Q Would that have been something you would have left to OTS, or do you just not remember doing it?
A I think that would -- they would have been the primary regulator involved in that,

Page 244

and if we didn't agree with it, we might have had a discussion about it.
Q When you reach conclusions that were this dire for the institution do you remember, were those conclusions ones that put an onus on OTS to act, or is it really a question of, based on these conclusions, we at the FDIC have to figure out whether we're going to act?
A Well, in this case I think the conclusions of both agencies are similar.
I don't think we had to put an onus on the OTS. I think their conclusions were similar and their concerns were similar.
Q Well, what would the expectation be in terms of who would be likely to take action towards the institution to ensure its recovery, improvement, resolution?
Was there an expectation that FDIC would do something or OTS would do something?
A My personal assumption was OTS would handle that and we would only get involved if we thought their approach was inadequate.
Q Do you remember whether OTS had the authority to demand more capital prior to the passage of FDICIA, the legislation called FDICIA?

Page 245

MR. LEVITT: You mean a higher minimum capital standard?
A I don't recall what their powers were. FDICIA or FIRREA?
Q No, FDICIA. Did they have a right to impose higher than the minimum capital requirement prior to that?
A I don't know if there even was a minimum capital requirement.
Q I'm talking about there's a minimum capital requirement from FIRREA, and I'm asking whether you realize that OTS was not able to demand more capital --
A I don't realize that. I'm not familiar with it
Q Prior to FDICIA. You did not realize that?
A No.
MR. HUME: Why don't we take a short break.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Day, could I refer you to Page 4-2 of the exam report.

Page 274

"The statement does not list Mr. Walosoff's contingent liabilities. This information is not suitable for analysis purposes.

"Substandard classification is therefore reported based on the inability of the properties to support debt service and a questionable collateral value."

Does my reading of that paragraph refresh your recollection at all as to the Wolosoff credits?

A No, but this is not an unusual qualification of financial information.

Q Meaning that it's not unusual to have the credit classified substandard if the borrower doesn't supply adequate and substantiated financial information?

A That would be a factor that this type of information is not acceptable in order to analyze the ability of the principal, the guarantor, to support the credit, because he hasn't even stated, by not signing the document he isn't even attesting that he has these assets.

And the accountant who provided the compilation is not forming any opinion at all that

Page 275

he has these assets, so it basically doesn't tell you anything.

Q I want to refer back to Mr. Walsh. In one of the sentences you reviewed in that middle paragraph on Page a-1 it states that Mr. Walsh thought that the differences in Carteret's IOR reports and the examiner's findings was only a matter of timing and perception.

Do you see that sentence?

A Yes.

Q Isn't it really true that it is all a matter of timing and perception?

A You could take that approach, but I mean, that's not the examining approach. It is what it is at the time we examine the bank.

Q But do you really think, is it really what you're saying that a reserve against future losses which is derived as a percentage on assets that are criticized is the same as a loss?

A No. It's, because it's a general reserve. I mean, this goes back to the debate we mentioned earlier between the SEC and the regulators, what should constitute a general reserve and how you can support what that is.

So that reserve should be a moving

Page 276

target, depending on the assessment of the asset quality at any given point in time.

Q Isn't the question of at what point in time that reserve should be taken a question of timing and perception?

A Timing, perception and evaluation, the actual evaluation of the asset quality.

Q Do you remember Mr. Walsh saying that he thought that 10 percent was not the right percentage for substandard classifications?

A I don't specifically remember it, but I wouldn't have put it in there unless he did say it.

Q Do you remember any other institutions that you examined complaining when you used 10 percent for substandard classifications?

A No. As a matter of fact, as I recall, Howard used even higher.

Q You mean the management voluntarily used higher?

A Yes. What they did is they took each project and assessed the valuation to each project that they criticized, which I think is the preferable way to do it.

Page 277

Q Presumably the 10 percent is not determined, given that it's a round number, I can't believe it's determined based strictly on historical loss experience or any other pure formula of some kind?

A No, I don't think so.

Q Isn't it basically a rough judgment of whoever is setting that percentage that this is the appropriate predicting percentage?

A Yes, but I think it's an educated judgment, in that that 10 percent would have been used probably by all, most if not all of the regulators at that time.

I believe if I'm not mistaken the OTS was using a higher percentage.

Q I would just like to go back to your earlier testimony about art versus science in coming up with the general valuation allowances.

I certainly didn't mean to indicate in my question that the art was uneducated art, but it seems sort of inconceivable to me that the determination of whether something has a distinct possibility of loss and then the application of a percentage based on an educated judgment isn't something that more resembles a subjective