# EXHIBIT E

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

AMBASE CORPORATION and :
CARTERET BANCORP, INC., : No. 93-531
Plaintiffs, : Judge Loren Smith
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA, :
Defendant. : PAGES 1 - {}

- - - - - - - - - - - - - - - - x

Deposition of HERBERT J. HELD, held at the offices of Cooper and Kirk, 1500 K Street, Suite 200, Washington, D.C., commencing at 9:30 a.m., Friday, April 8, 2005, before Elizabeth Mingione, Notary Public.

| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 32 | E-Mail Correspondence Dated January 4, 1995, C-AM-A-0028010 | 125 |
| 33 | RTC Resolution Request for Funding Anticipated Thrift Closing, C-AM-A-0028317 | 126 |
| 34 | Memo to J. Paul Ramey from Herbert Held, C-AM-A-0013421 | 126 |
| 35 | Memo Dated February 16, 1995, C-AM-A-0027853 | 132 |
| 36 | E-Mail Correspondence Dated February 17, 1995 | 133 |
| 37 | Decisional Memorandum, C-AM-A-0013120 | 134 |
| 38 | RTC Resolution Request for Funding Anticipated Thrift Closing, C-AM-A-0028316 | 134 |
| 39 | Memo Dated March 9, 1995 from Sharon Yore | 135 |
| 40 | E-Mail Correspondence Dated December 15, 1994, C-AM-A-0028073 | 136 |
| 41 | E-Mail Correspondence Dated September 15, 1994, C-AM-A-0017208 | 146 |
| 42 | E-Mail Correspondence Dated September 16, 1994, C-AM-A-0014279 | 150 |
| 43 | E-Mail Correspondence Dated September 19, 1994, C-AM-A-0014275 | 152 |
| 44 | E-Mail Dated October 15, 1994, C-AM-A-0028207 | 154 |
| 45 | Asset Valuation Review Request Form | 156 |
| 46 | RTC Net Deposit Calculation Document Dated 1995 | 157 |

\- - -



P R O C E E D I N G S

Whereupon,

HERBERT J. HELD,

having been first duly sworn by Elizabeth Mingione, a Notary Public within and for the District of Columbia, was examined and testified as follows:

\- - -

EXAMINATION CONDUCTED

BY MR. THOMPSON:

Q. Good morning, Mr. Held. I'm David Thompson with the firm of Cooper and Kirk. And I represent the plaintiff in Ambase v. United States. And will you please state your full name for the record?

A. Herbert J. Held.

Q. And would counsel like to identify themselves for the record?

MR. HOFFMAN: Yes. I'm David Hoffman. represent the Department of Justice and the witness. And with me is Leslie Conover from the FDIC.

BY MR. THOMPSON:

Q. Well, Mr. Held, you have been deposed --

MR. HOFFMAN: Let me start off by adding one more thing. I just want to make a precautionary



statement.

I understand that the issue related to the discovery that we are in the process of going through will be argued in the near future as to whether an interlocutory appeal will be taken. And I just want to state that the fact that we are allowing this deposition to go forward doesn't mean that we are waiving any rights to that interlocutory appeal. And we expect that discovery will be stayed if the judge permits that to go forward.

Q. And we fully understand your position Mr. Hoffman, and appreciate your making that statement for the record.

\- - -

(Mr. Kuiper has entered the room.)

\- - -

MR. HOFFMAN: And I assume that this is another FDIC attorney.

MR. KUIPER: Gary Kuiper.

MR. THOMPSON: Mr. Kuiper, welcome. I'm David Thompson, counsel for the private plaintiff. And this is Mr. Held, the deponent.

MR. HOFFMAN: And let me just state for the record that this is an attorney from the FDIC from the other side, from the receivership side;



correct?

MR. KUIPER: That's correct.

BY MR. THOMPSON:

Q. Very good. All right. And, sir, you have been deposed several times before. Is that right?

A. Yes.

Q. Okay. Well, you know the basic background rules. Let's try to talk one at a time so we get a full and complete record. If you don't understand my questions, let me know. I'll try to clarify them if I can. If you would like to take a break at any point, let me know. We can do that.

And I've read through your at least some of your prior depositions, so we don't have to go through all the background, but there are a few background questions I just want to make sure that I'm clear on. You started working for the Federal Home Loan Bank as an examiner in 1971. Is that right?

A. Federal Home Loan Bank Board in 1971.

Q. And you were an examiner at that time?

A. Yes.

Q. And then in 1984 you went to work for the Mergers and Acquisition division. Is that correct?

Page 10

A. That's correct.
Q. And did you become involved in the marketing of institutions at that time?
A. Yes.
Q. And is it fair to say that you have been involved in the marketing of institutions from 1984 to the present?
A. Yes.
Q. And when the RTC was created with FIRREA; is that correct?
A. Yes.
Q. And what was your -- what were your responsibilities at the time FIRREA was passed, after FIRREA was passed with the RTC?
A. After the RTC was formed, I was -- I think the beginning I was one of the managers, first line managers in the large bank resolutions group.
Q. Okay. And so you were attempting to sell either branches or whole banks for large failed institutions. Is that fair?
A. We were resolving the over $500 million banks.
Q. Okay. And do you recall approximately how many there were in the early 1990s that you were working on?

Page 11

A. I don't know the number that we worked on.
Q. Okay. And what do you do now for the FDIC?
A. I'm Assistant Director in the Division of Resolutions and Receiverships and Franchise and Asset Marketing Branch. We are over the resolution of failing institutions and sale of the assets.
Q. Okay. And are there a lot of failed institutions now that are being marketed?
A. No.
Q. Okay. Are there any?
A. No.
Q. Okay.
A. It's very sad.
Q. So, all right, well, let's go to the first exhibit which I'd like to have marked as Held Exhibit 1.
- - -
(A document was marked as Deposition Exhibit Number 1)
- - -
BY MR. THOMPSON:
Q. Now this is a memo from Paul Ramey to those who have been cc'd on the second page. Is

Page 12

that right?
A. Yes.
Q. And it's dated July 13, 1993. Is that correct?
A. Yes.
Q. Who was Mr. Ramey?
A. Ramey.
Q. Ramey. Okay. Good. Thank you.
MR. HOFFMAN: Let me interrupt here and just advise the witness that if you need to take an opportunity to reread it, by all means do that before you answer any questions, if you feel you need to.
BY MR. THOMPSON:
Q. Absolutely. That's a very good and fair admonition, Mr. Held. Certainly I'm going to be showing you a lot of documents today and generally referring you to certain passages in the interest of time. But to the extent you want to read any or all a portion of a document to get the appropriate context, your counsel is absolutely right. You should do so.
But my question was, and it's without prejudice to your ability to read this document, is who Mr. Ramey, what position he had at the time he

Page 13

prepared this document?
A. As it says, he was the the Vice President of the Department of Resolutions, so he was in charge of all resolutions in 1993.
Q. And did he report to you or did you report to him?
A. I reported to him.
Q. How many people -- and do you recall what your title was at that time?
A. I was head of major resolutions. I don't recall whether it was director, well, I don't recall the exact title.
Q. So you reported directly to Mr. Ramey. Is that correct?
A. That's correct.
Q. And was there a director of non major resolutions?
A. Yes.
Q. Who was that?
A. Ron Hoch.
Q. And did you consider Mr. Ramey to be competent in his position?
A. Yes.
Q. How, the first couple of sentences of this document read, quote, "Glen Sergeon, a

Page 14

potential minority bidder/investor from New York called today and faxed the attached to me. We had met with Mr. Sergeon sometime back to discuss the potential for minority participation in the bidding process," closed quote.
Do you recall having met with Mr. Sergeon prior to July of 1993?
A. No.
Q. Do you have any recollection of meeting with or having a conversation with Mr. Sergeon at any time?
A. No.
Q. Now, the second paragraph of this document reads in part, "Mr. Sergeon has an interest in approximately 12 branches of Carteret, predominantly in Essex County, which he reports is approximately 49 percent minority, and including the main office which he apparently considers to be Newark. Our records show Morristown. Newark is predominantly minority; however, Morristown is not," closed quote?
Do you have any recollection as to how the RTC decided whether a community was predominantly minority or not at the time of 1993?
A. I don't remember how we -- the exact way

Page 15

we determined the minority -- what percentage it had to be to be minority.
Q. Okay. Do you recall the extent to which the location of the headquarters was important in determining whether an institution was minority or not?
A. Yes.
Q. And what was the significance of that?
A. Well, I have to look at the policy statement to be sure really. I keep on saying I think, so I don't know.
Q. You can't remember at this time?
A. No. I can't really, right off the top of my head, I can't remember.
Q. Now, the next sentence reads, quote, "Although we have not discussed at length, it is assumed Mr. Sergeon anticipates he will possibly bid with the proposed legislation which gives preference to minorities in predominantly minority neighborhoods, in effect," closed quote.
Do you know what this proposed legislation that's referenced in this document is?
A. I know there was legislation on -- that gave a minority preference at some point around this time.

Page 16

Q. Okay. And we'll be talking about that in some length later on. Now, turning to the second page of this document, you are listed as a CC. Is that correct?
A. Yes.
Q. And it says at the top of the page, though cc'd, quote, "Please review the attached proposed capitalization structure and give me your thoughts as to whether or not this is appropriately considered a minority shop," closed quote.
Do you recall having an opinion as to whether Mr. Sergeon was properly considered a minority shop?
A. No.
Q. All right. At this point, I would like to ask the court reporter to mark as Held Exhibit 2 a document that bears the Bates number C-AM-A-0014581.
\- - -
(A document was marked as Deposition Exhibit Number 2)
\- - -
BY MR. THOMPSON:
Q. And Mr. Held, would you please identify this document for the record, who it's from and

Page 17

where you are one of the people to whom it was addressed, and its date?
A. Memorandum from Paul Ramey to a group of people, Jay Jupiter, myself, Sharon Dunn Yore, Ron Hoch, Greg Smith and Bob Fick.
Q. Okay. And it's dated September 2, 1993. Is that right?
A. That's right.
Q. And is this an e-mail?
A. Yes.
Q. And the beginning of the document reads, quote, "Glen Sergeon called today at about 11:45 a.m. He says he has filed application with FDIC and it is being taken apart by them. Also, he has now occupied office space in NYC. We had a general discussion, and I pointed out that while the legislation current doesn't specifically provide for it, the fact that more than 50 percent of the profits would possibly be going to non-minorities could be a problem," closed quote.
Do you recall having a concern that a minority bidder where 50 percent of the profits would go to non-minorities would not qualify under the statute for it to be a minority bidder?
A. I recall that there was that problem.

Page 18

Q. Did you have an opinion on that issue?
A. I can't recall.
Q. And do you recall whether Mr. Sergeon's bidding group was ultimately deemed to be a minority bidder?
A. I don't recall.
Q. At this point I would like to ask the court reporter to mark as Held Exhibit 3 a document that bears the Bates number C-AM-A-0014578.
- - -
(A document was marked as Deposition Exhibit Number 3)
- - -
BY MR. THOMPSON:
Q. Mr. Held, I'm slightly unfamiliar with the format of these e-mails. It says on the bottom, Original Message, above the top, the last paragraph. Do you see that?
A. Yes.
Q. And so was that original message sent from Mr. Bodi to Donna Pillard and cc'd to a bunch of people?
A. I don't know. This is an old style, isn't it.
Q. It is.

Page 19

A. Well, I don't know.
Q. Okay. And then, because in the middle there's the middle paragraph that says "comments by" "forwarded to". And do you know whether that is a comment on the original message?
A. I don't know.
Q. Okay. Well --
A. I can't remember this far back.
Q. Well, if it comes back to you, we are going to see a lot of e-mails like this today, so certainly if it comes back to you at any point during the deposition, I would appreciate your clarifying that. But, regardless, the middle section, comments by Paul Ramey to Herbert J. Held and others; do you see that?
A. Yes.
Q. It says, "FYI, as I understand it, Carteret loans are to be used for both Chase and Home Unity minority acquisition commitments."
Do you know what that meant, that loans were going to be used for certain acquisition commitments?
A. There was a provision in the minority program that minority acquirers would be able to acquire loans at market value from the RTC.

Page 20

Q. And was there a set amount of loans so that if, for example, a minority bidder was going to buy deposits of $100 million, that they would be entitled to buy assets of $100 million? Do you recall that?
A. I don't recall the extent of the commitment. I knew that it was if you bought so much in deposits you got so much in loans, but I can't remember the ratio.
Q. But there was some ratio?
A. Yeah.
Q. Okay. And in the original message in Held Exhibit 3, it says, "Since we have been unsuccessful in our efforts to negotiate the release of the due diligence from the Carteret loans from First Boston, please issue your own SOS under the National DD TOA and ask John Tierney to waive for use."
And I'm going to ask your assistance in figuring out some of these phrases. Do you know what, Please issue your own SOS, I mean, is that just the colloquial SOS?
A. I don't think so.
Q. Okay.
A. It's different terminology than used

Page 21

today. And that's the asset folk terminology, so I don't really know. I don't know what they are --
Q. What they are talking about. Do you remember this issue of trying to get some documentation from First Boston and being unable to receive it?
A. No.
Q. Can you recall as to why due diligence from certain loans would have even been relevant to the disposition of a thrift and conservatorship?
A. This is related to some kind of securitization. That 93-6 is a securitization number.
Q. Okay.
A. And they were securitizing assets out of the conservatorships.
Q. And just so that I'm clear on what that means, that the asset officials would come in, select certain assets from institutions in conservatorship, package them together and sell them in the secondary markets; is that what you mean by securitization?
A. Yes.
Q. Were you involved in that process at all?
A. No.

Page 22

Q. At this point, I would like to ask the court reporter to mark as Held Exhibit 4 a document that bears the Bates number C-AM-A-0014538

- - -

(A document was marked as Deposition Exhibit Number 4)

- - -

BY MR. THOMPSON:

Q. And this is a letter from Mr. Ramey to a director at the Federal Reserve System. Is that correct?

A. Yes.

Q. Dated March 25, 1994. Is that correct?

A. Yes.

Q. And it reads, the second paragraph reads, quote, "The board of Governors may receive an application from an existing or proposed bank holding company or member bank to acquire Carteret In light of the pending receivership action, the RTC believe that immediate action is required, and recommends that the Board of Governors act immediately to approve applications involving Carteret." Closed quote.

Did you share Mr. Ramey's view that the RTC believed that immediate action was required on

Page 23

any such application?

A. Yes.

Q. And is it fair to say that the RTC was trying to resolve and dispose of the Carteret branches as expeditiously as possible?

A. Yes.

Q. At this point I would like to ask the court reporter to mark as Held Exhibit 5 a document that bears the Bates number C-AM-A-0121157.

- - -

(A document was marked as Deposition Exhibit Number 5)

- - -

BY MR. THOMPSON:

Q. And, Mr. Held, on the second page of this document, is that your signature above your name?

A. Yes.

Q. And this document, well, you signed it on April 7, 1994. Is that correct?

A. Yes.

Q. And this is a memo from William O'Shea to Gene Duncan. Is that correct?

A. Yes.

Q. It talks about, the subject is the waiver of AVR methodology. And my first question is what

Page 24

does AVR stand for? Is that Asset Valuation Review?

A. Yes.

Q. And why would one want to get a waiver of that?

A. Let me read this memo.

Q. Sure. Please.

- - -

(The witness reviews a document)

- - -

BY MR. THOMPSON:

Q. Have you had a chance to review it sir?

A. Okay.

Q. Let me step back and ask you, what is the purpose of the AVR review? What was the purpose in 1994 of an AVR review?

A. To establish the value of the assets of a bank.

Q. And why was a waiver being requested here? Was it to simplify the process of valuation?

A. The memo says that they are looking at substantial cost savings when contracting the AVR.

Q. And was the AVR out sourced?

A. I don't know about the Carteret one, but some were and some weren't.

Q. Okay. And do you know what determined

Page 25

whether AVR was outsourced or not?

A. It generally was our staffing requirements and workload.

Q. Okay. And do you have any opinion on whether it was appropriate to pursue the course of action that's outlined in the final paragraph of this memo?

A. Apparently I did at the time.

Q. You thought you approved it at the time. Is that correct?

A. Yes.

Q. At this point I would like to ask the court reporter to mark as Held Exhibit 6, a document that bears the Bates number C-AM-A-0130479.

- - -

(A document was marked as Deposition Exhibit Number 6)

- - -

BY MR. THOMPSON:

Q. Now this is an e-mail from you to Ann Richards and a Jay Jupiter and Mr. Ramey dated April 11, 1994. Is that right? Or at least that's the header?

A. Yeah, that's -- if the top header is related to the original message, then that's -- I

Page 26

guess it was from me to --
Q. And why don't we proceed on that assumption. I understand the record is clear that you can't recall at this time. Obviously if at any point you think that's an unfair assumption and you have a specific recollection one way or the other, please state it for the record.
But under original message it reads, quote, "Resolutions would not have any objections if Capital Markets sold a non-investment grade security held by Carteret in connection with the sale of a similar security held by the Empire receivership," closed quote.
Do you know what the issues was that was being addressed in that original message?
A. The sale of a security out of the conservatorship.
Q. Okay. And why would you have been involved in that? Were you involved in the sale of assets of out of Carteret's receivership?
A. No.
Q. Or conservatorship?
A. No.
Q. Okay.
A. Well, this is saying we are not objecting

Page 27

to Capital Markets selling it.
Q. And was there a separate Capital Markets division that had the responsibility for selling Carteret assets?
A. There were separate groups that sold various different assets.
Q. Okay. How did that work? I mean, what did Capital Markets sell? Were these, well --
A. Well, each group sold their type of asset. And Capital Markets would have been selling the securities. And I am not sure whether at that time they were doing the securitization also but, I mean, there were various groups throughout the RTC that sold different types of assets. It was a very large organization.
Q. And was that the way it was done so an entity is placed into conservatorship and then there's an assessment of what type of assets the institution has, and then responsibility for selling those assets depends on what type they are?
A. Yes.
Q. And do you recall, there was obviously a capital markets group; can you recall what the other groups were, even if functionally, not necessarily their precise title?

Page 28

A. They were groups that sold loans and real estate. I don't know all of them because it was a very large and specialized organization at that time.
Q. Okay. Now, Ann Richards, do you remember which group she was in at the time of May 1994?
A. No, I don't.
Q. Do you recall whether Ann Richards was competent at what she did?
A. Yes. I think she was very competent.
Q. Okay. At this point I would like to ask the court reporter to mark as Held Exhibit 6 a document that bears the Bates number C-AM-A-0014502.
COURT REPORTER: It's actually going to be seven.
MR. THOMPSON: Seven. Sorry.
- - -
(A document was marked as Deposition Exhibit Number 7)
- - -
BY MR. THOMPSON:
Q. Mr. Held, would you like a moment to review this document?
A. Yes.
Q. Okay.

Page 29

- - -
(The witness reviews a document)
- - -
A. Okay.
Q. And this is a letter from you to a Jerry Greer, G-R-E-E-R, of American Financial Services Corp. dated May 16, 1994. Is that correct?
A. Yes.
Q. And it references the fact that, in the first paragraph, that Carteret was available for minority investors to make bids on. Is that correct?
A. Yes.
Q. And it also says in the second paragraph, quote, "Since, under the Resolutions Minority Programs, each of these institutions is designated as a whole institution located in a predominantly minority neighborhood, PMN, a minority investor may receive interim capital assistance, may purchase loans at market value, and may occupy those RTC-owned association branches located in PMNs for up to five years rent free," closed quote. Do you see that?
A. Yes.
Q. What was interim capital assistance?

Page 30

A. We gave assistance in the form of capital to these minority institutions for a set period of time, a number of years.
Q. And did they -- was it typically a loan?
A. It was a loan to the -- I remember it was a loan to the holding company.
Q. That had to be repaid?
A. That's correct.
Q. Okay. With interest?
A. Yes.
Q. Okay. And was that available to non-minority bidders?
A. No.
Q. Interim capital assistance?
A. No. It was only for minority institutions.
Q. And what about the ability to purchase loans at market value? Is that fair market value?
A. It's market value, fair market value.
Q. And is that something that non-minority purchasers could do?
A. No.
Q. So, and just so that the record is clear on this, and we talked earlier about the fact that there was a ratio, we couldn't remember what it was,

Page 31

but let's just say hypothetically it was 110 percent. And let's say a minority investor was looking at a group of deposits with $100 million of deposits in a branch. And the ratio was 110 percent.
Then the minority investor would have the opportunity to purchase $110 million of loans at market value. Is that right?
A. With all those caveats, yes.
Q. Right. But the non-minority investor looking at the same branch with $100 million of deposits, they would just be bidding on the deposits. Is that correct?
A. That's correct.
Q. And then in terms of -- and let's say the non-minority investor decided that they were willing to pay a premium of 10 percent. Would that mean that then the non-minority investor would require only $90 million of assets to be transferred at the time of the closing?
A. The formula would always be deposits acquired, less whatever premium you pay, equals cash that the RTC would give to the acquiror. Then they could use the cash however they wanted to.
Q. Okay. And it was -- and did the

Page 32

non-minority investor, did they have a right to get cash or was it the RTC's discretion whether to give them cash or loans or something else, some other asset?
A. The way that the purchase assumption agreements worked is it's deposits acquired, less the premium, equals the cash. And then if you buy any assets, you would buy it with the cash.
Q. Okay. But -- and then when you talk about the cash, that's the cash that the RTC would transfer to the acquiror of the deposits. Is that correct?
A. That's correct.
Q. And I guess I'm just trying to understand the distinctions between the opportunities for minority and non-minority investors in a branch. Are you saying that the minority investors had a right to make a bid on a certain amount of assets, of loans?
That, in other words, if the RTC put on the block a branch that was designated as a PMN branch or institution, and minority bidders were bidding under the preference program, that they could -- they could make a bid not only for the deposits but also for a certain amount of loans?

Page 33

A. They were basically two separate things. You would bid on the branch and you would be getting the deposits, cash less the premium. And then you would have the rights that you were given under that minority preference, PMN program, which included the ability to buy loans at market value.
Q. And would these be loans of the institution whose branch you had just acquired or whose deposits you had just acquired?
A. Not necessarily.
Q. It could be, though?
A. It was possible.
Q. Okay. Do you recall, with respect to Carteret, whether minorities were given the opportunity to bid on -- minority bidders were given the opportunity to bid on Carteret assets in connection with their deposit bids?
A. I don't recall whether they got Carteret assets or not.
Q. And just so that I'm clear on the process, did the bid by the minority investors on assets come only after their bid on deposits had been accepted or did they make their bid on the loans contemporaneously with their bid on the deposits?

Page 34

A. Well, they weren't bidding on the loans.
Q. Okay.
A. As I said before, you bid on the branch, you win the branch, and then you get the rights under the program to acquire it at market value.
Q. Okay. Thank you for that clarification. That's clear. So it's sort of like an option to buy loans after you had acquired the branches. Is that fair?
A. Yes.
Q. Okay. At this point I would like to ask the court reporter to mark as Held Exhibit 8 a document that bears the Bates numbers C-AM-A-0130428.
- - -
(A document was marked as Deposition Exhibit Number 8)
- - -
BY MR. THOMPSON:
Q. And Mr. Held, take as much time as you want to look at this document. I'm going to ask you a few specific questions about it. But, first, let's just identify what it is for the record.
It's a blank bid form for Carteret Federal Savings Bank that has a revised date of May

Page 35

20, 1994. Is that correct?
A. That's correct.
Q. And on the second page of the document it says that the bidder must submit both the bid form and all applicable attachments to you. Is that correct?
A. That's correct.
Q. And I have some specific questions. Would you like time to review it now or would you like me to pose my questions?
A. Why don't I just read through it first and then we can --
Q. Sure. Just tell me when you are ready.
- - -
(The witness reviews a document)
- - -
A. Okay.
Q. Now, in the third full paragraph after your name and address, it states, quote, "Under the whole P&A, Core Branch and Limited Branch P&A options, it is required that the bidder submit bids on both All Deposits and Insured Deposits for each transaction desired. The amounts bid for All Deposits and Insured Deposits should not need to be the same. The RTC will select the most cost

Page 36

effective option," closed quote.
Did the RTC attempt to resolve the Carteret conservatorship at the least cost possible to taxpayers?
A. Yes.
Q. And bids were required both for all deposits and for any insured deposits. Is that correct?
A. That's correct.
Q. When would a bid that covered uninsured deposits be cheaper than a bid that covered insured deposits?
A. If the differential in bids for the -- if the all deposits was greater to the extent that it covered the anticipated loss to the uninsured depositors, then the total loss to the RTC would have been less.
Q. Let me give you a hypothetical and see if maybe you can help clarify that. Let's say there's an institution in conservatorship with one branch with $100 million of deposits that are insured. And the bidder comes in and thinks, okay, I'm going to pay a premium of $10 million for those insured deposits.
And then let's say that there's also $10

Page 37

million of uninsured deposits. And the bidder says, And I'm willing to pay a 10 percent premium on those deposits as well. So I'll pay a premium of $11 million for the whole thing.
Isn't it true that for the bid that is just the insured deposits, the RTC only has to send $90 million in cash, assuming no asset purchase, under the formula you articulated of deposits minus premium equals the cash that needs to be transferred?
A. Let me see if I get your example right. I think you said that it was $100 million of insured and 10 million of uninsured.
Q. Yes, sir.
A. And they are willing to pay a $10 million premium for the insured?
Q. Yes, sir.
A. And a one-million-dollar premium for the uninsured?
Q. Yes, sir.
A. So you are correct that the cash out to the -- that the transaction would be 90 million.
Q. Okay. And that's -- if it were just the insured deposits. Now, in this example, if the acquiror bought both the insured and the uninsured

deposits, $110 million, and paid again a premium of 10 percent or $11 million on the whole match, the formula would still apply of deposits assumed minus premium.

So 110 minus 11 would equal $99 million of cash that the RTC would have to send to the acquiring institution. Is that correct?

A. That's correct.

Q. And so in this example, the acquisition by the acquiror of the uninsured deposits would cost the RTC nine million dollars. Is that right?

A. The initial cash outlay would be nine million dollars greater.

Q. Right. Is there any other offsetting benefit to the RTC other than the cash outlay?

A. Remember that when the RTC sells the deposits, it basically stands in the shoes of the depositor in the receivership. So it puts out $90 million and acquires the depositor's claim against the receivership.

So, in the first example, the RTC would have $100 million claim against the receivership. In the second one it would have $110 million claim against the receivership.

Q. Okay. That's interesting. And in the



first example, the RTC would have $100 million claim against the receivership, even though a $10 million premium had been realized. Is that correct?

A. Correct. The -- actually, well, those are the cash numbers. The actual accounting you'll have to talk to the accountants for. And I'm pretty sure I'm actually a little bit wrong on that, that that $10 million in cash, the premium actually would go to the receivership.

I mean, the net was 90 million, but how you account for it is slightly different.

Q. Do you --

A. The premium was an asset of the receivership.

Q. Now, but in terms of the accounting of the subrogated claim, is that something you have any knowledge as to how that was done?

A. The technical accounting, no.

Q. Okay.

A. General, yes. But how they actually booked the debits and credits, no.

Q. Well, just so we make sure that we have your full testimony, what's your general understanding of how the first transaction of just, you know, the insured deposit, $100 million, $10



million premium would be accounted for?

A. Well, my knowledge comes from least cost test which is looking at the net effect of the transaction over the life of the receivership to the RTC.

Q. Yes.

A. As opposed to how the debits and credits run through the receiverships, accounting and where that $10 million goes. So that when you look at the least cost test, you look at all the cash in, and then you look at a distribution to the creditors and their order of preference. And that's how you figure out what the potential loss is to the creditors.

Q. Okay. And would the least cost test be pegged to the United States and to the taxpayers least cost or did it look more globally at all the creditors?

A. The least cost -- the law required that the RTC do the least costly transaction to RTC.

Q. Okay. And I guess that's what I'm getting at which is, I mean, I understand that if the $10 million of uninsured deposits in my hypothetical are not sold, that $1 million premium is lost. But at the same point, isn't it true that



it would cost the RTC on a cash basis $9 million more to ask the acquiror to assume those liabilities?

A. No, not on a net cash.

Q. Well, and that's -- because the RTC isn't on the hook to pay the uninsured depositors; right? You didn't owe them a penny. Is that correct?

A. That's correct.

Q. Okay. So if you had -- if the RTC in this hypothetical just did the insured deposit transaction, it would be out $90 million in cash. Is that right? I mean, I think we've discussed that, that with $100 million in deposits and the $10 million premium, that the cash outlay in connection with this disposition of the liabilities would be $90 million?

A. Net cash at the end of the day.

Q. Is that correct?

A. That's correct.

Q. Now, on the other transaction, though, if all $110 million of deposits are assumed and the same --

A. Wait. That actually is wrong. It's net cash on Day 1. Remember that that is only Day 1. You have got to liquidate the assets of the bank and

then the RTC receives its pro rata share of the distribution of the assets.
And the uninsured depositors are on a par with the RTC. So if it's, say it's a 90/10, to make it easy, split.
Q. Yes.
A. Then for every ten dollars that comes into the receivership, that's distributed to the creditors, nine goes to the RTC, and one dollar goes to the uninsured depositors.
Q. I see. So the RTC did not have priority over the uninsured depositors?
A. No. Because the depositors were a class of creditors.
Q. Sure.
A. The RTC stepped into the shoes of the insured portion of those creditors. And the uninsured depositors were -- could be the same people. And so you distribute it as a class.
Q. Okay. And with respect to the calculation of the subogated claim that is now part of the receivership deficit that the FDIC has calculated, do you have any knowledge about how that number was calculated, either generally or specifically with reference to Carteret?



A. In general, it's the amount of the deposits that the RTC is, you know, paid off.
Q. Okay.
A. Or transferred.
Q. Or has transferred?
A. Right.
Q. So in our example where there's $110 million of insured and uninsured deposits, a 10 percent premium of $11 million with a $99 million cash outlay, the subrogated claim would be the $110 million because that would be the amount of deposits that had been transferred. Is that correct?
A. That's correct.
Q. Okay. Now, turning to the -- later in this document, there's a -- I guess it's -- it says deposit premium at the top. Do you see, yes, sir, you are on the right page.
And this is where the bidder would specify for a given amount of deposits, how much cash they would require. Is that correct? And then the difference would be the premium?
A. No.
Q. Okay. How did this work?
A. This is where they put the premiums.
Q. So they just put the -- in the example



we've been using of $110 million of total deposits with a 10 percent premium or $11 million premium, they would just put down for that branch $11 million premium. Is that right?
A. Under the all column.
Q. Right. All right. I see. And your point is then they would break it out separately for the insured column?
A. Then they would show the $10 million for the insured column.
Q. Okay. And the significance, and I think this is implicit, if not explicit in what we've been talking about, the significance of this premium from the RTC's perspective is it dictated how much in the way of assets had to be transferred to the acquiror; is that correct, cash namely?
A. No. The significance was how much it reduced the ultimate of the receivership.
Q. So the larger the premium, the lower the cost of the ultimate receivership. Is that correct?
A. Correct.
Q. Okay. And so the RTC had an interest in attempting to maximize the premium. Is that correct?
A. Yes.



Q. And I'd like to, well, let me ask you this question. So the premium is calculated in part by reference to the amount of deposits in a particular branch. Is that correct?
A. Premiums calculated by the bidder.
Q. Right.
A. It's a dollar.
Q. Sure. But you were in the business of trying to get bidders to pay -- to make bids with premiums; correct?
A. That's correct.
Q. And so you attempted to understand how they analyzed the amount of the premium they would make, that they would bid?
A. To the extent that you could.
Q. And was one of the variables they looked at the number of deposits that they were bidding on, the absolute number of deposits they were bidding on?
MR. HOFFMAN: Can I ask you to clarify that?
MR. THOMPSON: I can show him a document that I think will illuminate this issue. At this point we'd like to ask the court reporter to mark as Exhibit 9 a document that bears the Bates number

Page 46

C-AM-A-0077379.

- - -

(A document was marked as Deposition Exhibit Number 9)

- - -

BY MR. THOMPSON:

Q. Take a moment, sir, to review this and when you are ready for me to ask you some questions let me know.

A. Okay.

Q. Now, the original message is from Richard Willets to yourself. Is that correct?

A. Yes.

Q. And what was Mr. Willets' position?

A. I don't recall him.

Q. Okay. And he writes, quote, "Herb, do we still have your concurrence on the above subject? You will recall that we wanted to price our rates above the average of CFSB's overall competition, but at no time exceeding the highest rate paid by any surveyed institution in our market survey.

"The reason for this is to try and protect the integrity of the bids in an effort to curtail the outflow of deposits," closed quote. Do you see that?

Page 47

A. Yes.

Q. And is the point that the gentleman is making here is that we don't want a lot of deposit runoff because the more -- the lower the base of deposits, the lower the premium we are going to get, all other things being equal?

A. I don't know. He says the integrity of the bids.

Q. Well, let me ask --

A. That kind of indicates to me that maybe the bids that come in, but I don't know.

Q. Well, let me ask you about your comments where you say, "I concur with your recommendation to raise the interest rates on deposits at Carteret in order to retain more of the deposit base for our acquiror," closed quote. Do you see that?

A. Yes.

Q. And explain what your thought process was in concurring with this recommendation to pay at the top of the market for Carter -- to pay at the depository rate that was at the top of Carteret's market. Isn't it true that you were trying to limit deposit runoff?

A. Well, it says in there to retain more deposits. But it also says for our acquiror so,

Page 48

you, know I don't know the timing of this memo or if this was after the bids or before. So it's hard for me to explain exactly what's going on here.

Q. Well, I'll represent to you that bids went out on and were received on August 25, 1994, and that there were a series of three closings. The Florida branches closed just two days later after this e-mail exchange on October 28. And then there was a closing on January 20, 1995, and then a third closing on March 10, 1995.

But irrespective of the details of this particular message, isn't it true that as a general matter you wanted to maintain a healthy branch network and that one manifestation of a healthy branch network was having depositors.

A. Having core depositors was a -- was something that we tried to maintain. I mean the -- you don't want to have hot money. You don't want to have high rate, you know, the higher the rate above market, the less value with deposits, so.

Q. And is that the point of paying as much as the overall competition but not exceeding the highest rate?

A. Well, I mean, you are telling me that this memo was written after the bids were received.

Page 49

So it doesn't have anything to do with trying to get a higher premium for the deposits.

Q. Well, as will become clear as we look at these other documents, the first bids came in then of course you had the rebidding, or you had bidding with the minorities who were within ten percent of the highest premium. And there were some questions and ultimately some of those transactions fell apart and you had to do some rebidding, which we'll get to.

But that's a fair question though. I mean, if, let's say the bids were already in, why would you pay up on the deposits? Why not pay the least amount possible so that the RTC conserves cash flow and to heck with the acquiror? That's his problem.

A. Well, he hadn't acquired yet is the problem.

Q. But you just said if the bids are in, I mean, if the bids are in, then is it done or do you have an interest in maintaining the deposits during the pendency of the bid? I guess I'm confused then.

A. Well, I was trying to say that the premium we are going get is set by the bids.

Q. Right.

A. And then you want to keep things as about the same as they were.
Q. Okay.
A. You don't want things to change dramatically from what you bid to what you actually delivered.
Q. And is the reason for that because that's one of the relevant metrics that a bidder looks at is the number of deposits they are getting?
A. It's one of them.
Q. Okay. Do you consider yourself an expert on the way in which premiums of deposits were calculated in 1994 and 1995?
A. No.
Q. Okay. By the way, I know we've been going an hour. I'm doing fine, but if anyone wants to take a break?
A. I'm fine.
Q. Okay. Just speak up. At this point I would like to ask the court reporter to mark as Exhibit 10 a document that bears the Bates number C-AM-A-0014281.
- - -
(A document was marked as Deposition Exhibit Number 10)



- - -
BY MR. THOMPSON:
Q. Okay?
A. Okay.
Q. Okay. So the original message is from Sharon Dunn Yore to Mr. Ramey with a cc to yourself and Mr. Smith. Is that correct?
A. Yes.
Q. And what was Ms. Yore's position? Did she report to you?
A. She reported to Jay Jupiter.
Q. Well, how did Mr. Jupiter fit into the hierarchy that we've been discussing? You reported to Mr. Ramey. Did Mr. Ramey report to Mr. Jupiter?
A. No. Mr. Jupiter reported to me.
Q. Okay. I'm sorry. And she reported to Mr. Jupiter?
A. That's correct.
Q. And did you think Ms. Yore was competent?
A. Yes.
Q. And did you think Mr. Jupiter was competent?
A. Yes.
Q. And in the first paragraph of the original message it states, quote, "A conference



call has held at 11:00 today with Midatlantic per their request." Lists several people and says including Herb. Is that you?
A. Yes.
Q. And then in the third full paragraph of the original message it states "they," and the "they" is Midatlantic, "reiterated their concerns, delay in closing, runoff of deposits, the RTC not playing by their own rules, 72 hour clock, et cetera, as pointed out in their letters. They also feel the longer we delay, the more time it allows the minority bidder to raise the capital."
Is it fair to say that Midatlantic was concerned about deposit runoff?
A. That's one of the things mentioned in here.
Q. And would that have been a surprise? Was that a surprise to you?
A. At the time?
Q. Yeah.
A. I don't know.
Q. Okay. I mean, it's just common sense that they would be concerned about the deposit runoff. Isn't that right?
A. That would -- that was one of the



factors.
Q. Okay. Do you know what they were referring to by the RTC not playing by their own rules?
A. No.
Q. And do you know what the 72-hour clock was a reference to?
A. That was the -- that was a 72-hour time limit for the minority bidders to do something in the program.
Q. Okay. Now, on page 2 of this document it states that, quote, "We emphasized that this is a top priority and everyone is devoting 100 percent of their time to it. Herb told them we hoped to achieve -- excuse me -- we hoped to have something decided early," and then the next word is blanked out but early perhaps next week, closed quote.
The question is did you agree that resolving Carteret was a top priority as of the time of this e-mail traffic, September 1994?
A. Yes.
Q. And why was it such a top priority?
A. It was a large case and we were working on it.
Q. Okay. The next exhibit, Exhibit 11 has a

Page 62

Q. And the first sentence references the fact that Mr. Ramey received a phone call from Johnnie Booker. Who was Mr. Booker?
A. It's a Ms.
Q. Oh, a Ms. Booker. Do you recall --
A. She was an officer at the RTC.
Q. Okay. And then the e-mail goes on to describe how F.D. Terrell had asked Glen Sergeon to buy them out. Do you see that?
A. Yes.
Q. Do you recall any of the actions that are described in this e-mail?
A. No.
Q. And when Mr. Ramey in the second paragraph says, "I told Johniie that we would just have to wait and see what Terrell comes up with, but that we cannot flip a bid from one group to another," did you agree that it would have been inappropriate to flip a bid from one group to another?
A. I'm not exactly sure what he means by that.
Q. Well, doesn't it appear that Terrell was suggesting that Sergeon could come in and basically adopt their bid?

Page 63

A. He's talking about selling his bid. I would have agreed that that would have been appropriate. I mean, I think I agree also we have to wait and see would be the appropriate action.
Q. Now, once the bids were received on August 25, 1994, was that the end of the bidding process in terms of Carteret's -- the disposition of its deposits?
A. I don't recall the exact bidding process, but as we've talked earlier, there was some sort of additional process later on.
Q. Well, isn't it true that once the initial bids were gathered on August 25, that pursuant to the minority preference program, that minority bidders had an opportunity to make further bids?
A. If they qualified by being within ten percent of the high bidder.
Q. Right. Okay. So that's the way it works, so that let's say you had a deposit premium from one group of $100 million, and if a minority bidder bid $95 million premium, then they would have an opportunity to bid $100 million. Is that correct? To match the $100 million?
A. I don't, well, I don't recall how exactly the over -- I think we called it over bidding,

Page 64

worked.
Q. Okay.
A. But I don't think it was a match.
Q. What do you mean by that, not a match? I mean, didn't the minority bidders have to match the non-minority bidder in order to --
A. See, I don't recall how -- you would have to look at the program and see how it actually worked.
Q. Okay. But is it true that if they were within ten percent, they had an opportunity to make a second bid?
A. That's correct.
Q. Okay. And just so the record is clear, what you were not 100 percent clear on, but what would be in the policy is what they would have to do in that second bid to actually acquire the deposits. Is that your point?
A. That's correct.
Q. Okay. Was it your understanding that it was -- that the minority preference program, well, actually, strike that.
Do you recall generally when the minority preference program came into being?
A. There was a minority preference program

Page 65

through most of the RTC, but it changed due to -- as a result of legislative changes.
Q. Well, to the best of your recollection, please describe what the preference program was prior to the legislation.
A. We had the interim capital assistance -- I don't know when that started, but it was before the predominant minority neighborhood institutions for minority institutions.
Q. Correct.
A. Historically minority institutions as opposed to predominantly minority and neighborhood institutions.
Q. Okay. So that was one form of preference because the, maybe call them ICA, would it be ICA, Interim Capital Assistance?
A. Right.
Q. The ICA was available to minorities but not non-minorities. Was there any other, before the statute, preference that minorities received over non-minorities?
A. I don't recall exactly how the details of the pilot program worked.
Q. Do you recall anything else about it?
A. No.

Page 66

Q. Okay. And once the statute came into place, were there changes in the minority preference program?
A. Yes.
Q. And was the change that you had this second round of bidding that we've just described? Is that --
A. That was one of the changes.
Q. Can you recall any other changes?
A. The whole concept of the predominantly minority neighborhoods.
Q. Describe how, what the shift was there, what it was prior to the statute and then what it was after the statute, to the best of your recollection?
A. The program only applied to historically minority-owned institutions, prior to this last iteration of the program. And then in the new -- the revision applied to institutions in predominantly -- institutions and branches in predominantly minority neighborhoods.
Q. And so this was a change in the scope and the number of -- or strike that. This is a change in the criteria that were applied to figure out which branches are going to be sold pursuant to the

Page 67

Minority Preference Program?
A. Yes.
Q. Okay. Any other changes that you can recall?
A. I think that was the major change.
Q. Okay. Was Carteret one of the first institutions that had its branches sold pursuant to the new statutory scheme that Congress established?
A. I don't recall.
Q. Do you recall how many other institutions you were involved with in selling branches pursuant to the new congressional mandate?
A. I don't recall the number.
Q. Can you recall any others that you were involved in, even if you don't remember the names but do you know whether you were involved in any other ones or is this the only one you can recall?
A. There were other ones.
Q. Do you have any estimate as to how many?
A. No.
Q. Okay. I don't know if others want to take a break or --
MR. HOFFMAN: Yeah, that would be fine.
- - -
(Recessed at 11:07 a.m.)

Page 68

(Reconvened at 11:20 a.m.)
- - -
BY MR. THOMPSON:
Q. At this point I would like to ask the court reporter to mark as Exhibit 17 a document that bears the Bates number C-AM-A-0131543.
- - -
(A document was marked as Deposition Exhibit Number 17)
- - -
BY MR. THOMPSON:
Q. So now this is a letter from Charlie Rangel to Mr. Ryan dated October 3, 1994. Is that right?
A. That's correct.
Q. And you are listed as a CC in handwriting. Is that correct?
A. Yes.
Q. And it states in the, well, first let me ask you, do you recall any political pressure being placed on you or your colleagues at the RTC to sell branches to minorities?
A. No.
Q. Did you perceive this letter as encouraging you to sell branches to minorities?

Page 69

A. Typical letter from a congressman stating his point of view.
Q. And so is it fair to say that you and your colleagues at the RTC were simply trying to satisfy the congressional mandate in implementing the Minority Preference Program?
A. That's correct. We were implementing the law.
Q. And now in terms of the objectives of the law, Congressman Rangel says in the third full paragraph, "The first goal was to resolve failed institutions in an expeditious manner." And then he says, "The second goal was to promote ethnic diversity in the banking community to better serve communities, including some which I represent that are frequently neglected by banks and thrift institutions," closed quote.
Now, with respect to the first goal, do you have an opinion as to whether the, actually, strike that.
Were you aware of what the goals were of the program?
A. Of the Minority Preference Program?
Q. Yes.
A. The goals were what were, I mean, we

Page 70

were -- the law had certain requirements in it and we were fulfilling them.
Q. So you weren't concerned about what the goals were. You were concerned about what you needed to do and you did it. Is that right?
A. That's true.
Q. Did you have, though, any understanding as to what the goals were?
A. The goals were to promote ethnic diversity in the banking. Yes.
Q. And were you, let me ask you, were you aware of any discrimination by the RTC or any other arm of the federal government in the period prior to the adoption of the Minority Resolution Preference Program in the selling of branches? Any --
A. No.
Q. -- racial discrimination?
A. No.
Q. And were you aware of any racial discrimination by the RTC or any other arm of the federal government in the period prior to the adoption of the Minority Resolution Preference Program in connection with the selling of any financial institution?
A. Well, I can't speak for anything to do

Page 71

with the FDIC. The RTC, I don't know the discrimination of sale of institutions.
Q. And you were involved in the marketing of financial institutions from 1984 through 1994. Is that correct?
A. On the thrift side.
Q. On the thrift side?
A. Only.
Q. And if the federal government had systematically been discriminating against minority bidders on the thrift side in the '80s or '90s, would you have been aware of that?
A. I was not -- I'm not aware of any discrimination against minority bidders.
Q. Okay. All right. And we've touched upon this somewhat, but in terms of the process, the bids were collected on August 25, 1994. Then minority bidders had an opportunity to submit another bid provided they were within ten percent of the high bid.
And my question is do you recall what the typical amount of delay was as you and your colleagues negotiated with the minority bidders?
A. There wasn't any negotiation.
Q. Well, they would submit another bid. Is

Page 72

that right?
A. They would submit another bid.
Q. And would they ever ask for -- were they entitled to limitless interim capital assistance or was that a point that you would discuss with them?
A. The assistance that they were entitled to was set out in the program.
Q. Okay.
A. Specifically.
Q. And so you would just receive their bid and evaluate it. Is that it?
A. That's correct.
Q. Okay. And do you recall whether the other bidders, while that process, well, first of all, let me ask you, do you have a recollection as to how long that process took of the second round of bidding for the minority bidders?
A. For Carteret?
Q. Yes.
A. No.
Q. Okay. Generally, do you have a sense as to the amount of time that resulted from this second round of bidding?
A. They were given a specific amount of time to submit another bid. And how long it took us to

Page 73

analyze and finalize the bid I think varied with the institution and the bidders.
Q. Okay. Were there any rough sense that you have as to how long it typically took to analyze that second round of bidding?
A. There was an analysis of the bids.
Q. Yes.
A. And then there was getting regulatory approval and being able to show they could close it. Enough if the bids on a purely dollar basis was done quickly. And that probably didn't vary very -- didn't vary a whole lot from case to case. Getting regulatory approval and showing that they could close I think varied with each institution.
Q. And when you talk about having the ability to close, you are talking about being able to raise the capital such that they come in and they have a viable, safe and sound institution that results from the transaction they are proposing. Is that what you are talking about?
A. That's correct.
Q. Okay. And there wasn't any particular rule of thumb that you had in 1994 as to how long that should take with respect to a minority bidder. Is that fair?

Page 82

Q. Okay. Good, thank you. Now, in this next paragraph it says, "We discussed the discontent of Midlantic, et cetera, and possibility of dropping and/or bringing suit -- dropping out and/or bringing suit."
Do you recall why Midatlantic was upset?
A. Nothing other than the other memos that you have shown me so far.
Q. Is it a reasonable inference that here it is, September 22, a month after the bid of October 25, Mr. Sergeon's being given until the 14th, presumably October 14th, and they are upset about the delay in the process?
A. I think the other memo showed that they were questioning the delay.
Q. Now the next sentence says, "However, Mr. Ryan is adamant in his feelings that we must be ready to give Bahia whatever information we can if Sergeon falls through," closed quote.
Who is Bahia?
A. Another potential bidder.
Q. Was it a minority bidder?
A. There was another bidder that was looking for minority preference.
Q. Okay. Now he says, "he", and this is

Page 83

Mr. Ryan, "agrees there should be no expenditure of funds," dot, dot, dot, "to price the loans. However, we must be prepared to give them what we can get together. This would include the information on the California loans." And then it goes on.
But my question is what is -- why would the potential bidders be interested in the loans, these minority bidders?
A. These are the loans that they would be buying under the Minority Preference Program loan requirement.
Q. So, in other words, if they are trying to figure out how much of a deposit premium they might be willing to pay, they may look at, well, how much value do I -- would they put on the option to buy loans. And in order to do that they need to know what the loans are. Is that fair?
A. Well, they were getting loans at market value.
Q. As determined by the Resolution Trust Company; right?
A. Right.
Q. And so but isn't it true that the consideration that the minority bidder gets is

Page 84

twofold. Number 1, they get the deposits that they buy; but, Number 2, they get an option to buy some loans. Is that correct?
A. That's correct.
Q. And so in order to value that option was it reasonable for them to want to know, well, what loans are we getting?
A. Yes.
Q. Okay. And is that what this concern and Mr. Ryan is saying we need to provide them whatever information we can without spending a lot of money so they can value the option?
A. We are giving them as much information as possible about what they were going to get.
Q. Right. And that's information that you didn't have to provide to the non-minority bidders because they didn't have the option to buy the assets. Is that correct?
A. That's correct.
Q. Do you have a sense as to what -- how much delay was occasioned in the Carteret case by the need to gather this information on loans for the minority bidders?
A. I don't know.
Q. Do you have a general sense as to how

Page 85

much delay was occasioned by having to gather this information for large institutions that you dealt with during this period of time?
A. For the minority program?
Q. Yes, sir.
A. No.
Q. Okay. And it would only be for the minority program as we just described; right?
A. That's correct.
Q. Okay. Now, towards the end of this it says, "Herb: Make certain Tom Horton, Sandra Nobles, Tim Kruse and whoever else needs to know, that AMSD must be prepared to furnish this material ASAP."
Do you know who AMSD was?
A. The D stands for division and it was one of the --
Q. Asset Management Systems maybe or --
A. Well, whatever it was.
Q. Okay.
A. It was something to do with the asset sales.
Q. Okay. Now, when they talked about the California loans, do you know what loans those were by any chance?
A. No.

Page 86

Q. Okay. Did you interpret Mr. Ryan's adamance that information had to be given to Bahia as his commitment to give minority bidders every opportunity to acquire these branches?
A. I don't -- I don't know. I'm not going to speculate on what he was --
Q. Well --
A. -- feeling at the time.
Q. Well, I'm just asking what your understanding was. I mean, did you have an understanding at the time that this was important that these branches get purchased by minorities, provided it was the least cost alternative in the sense that they matched the highest bid?
A. Well, it was the law.
Q. Okay.
A. So we were definitely going to comply with the law.
Q. And was that true even if it took a few months for this process to play out while you are getting them information about the options because that's contemplated by the law?
A. Well, we tried -- we complied with the law and did the resolutions as expeditiously as possible within the least cost parameters.

Page 87

Q. All right. The next exhibit will be Held 21. And it bears a Bates number of C-AM-A-0077312.
- - -
(A document was marked as Deposition Exhibit Number 21)
- - -
A. Okay.
Q. Okay. So this document is an e-mail from yourself to Mr. Ramey, Mr. Jupiter, Ms. Yore, Mr. Smith, and Penfield Starke, S-T-A-R-K-E. Is that correct?
A. That's correct.
Q. And it's dated October 13, 1994. Is that correct?
A. That's correct.
Q. And it describes a conversation you had with Glen Sergeon. Is that right?
A. Yes.
Q. And this e-mail states, quote, "I told him that his deal was off the table," closed quote. Do you see that?
A. Yes.
Q. What do you mean that his -- the deal is off the table? That you were no longer activity considering his bid?

Page 88

A. That's what it sounds like.
Q. Okay. And the RTC, you and your colleagues at the RTC, did you have the authority to look at a bid and decide that it was not one that you wished to pursue? Wholly apart from what the regulators said about whether they were going to get a charter or get other necessary regulatory approval, could you look at a bid and say we don't want to pursue this, either because their funding's not going to come through, or because they are not genuinely minorities, or some other objective, legitimate criteria?
A. Yes.
Q. Okay. And do you recall why Mr. Sergeon's proposal was taken off the table?
A. No.
Q. At this point I would like to ask the court reporter to mark as Held 22 a document that bears the Bates number C-AM-A-0088740.
- - -
(A document was marked as Deposition Exhibit Number 22)
- - -
A. Okay.
Q. Now, looking at the first paragraph I

Page 89

guess it, let's first identify this document for the record. This is a memo from Jay Jupiter to Mr. Ramey through you. Is that correct?
A. That's correct.
Q. And it's signed by Mr. Ramey on October 14, 1994, as reflected on the last page. Is that correct?
A. That's correct.
Q. Now, let's look at the first full paragraph of text. And skipping down a couple of sentences, talks about, well, actually, we'll just read the paragraph into the record. It says, quote, "Recommendation, accept the bids for the insured deposits of the nine Florida branches of Carteret." Then it gives some detail about that, and it picks up.
"Total premium of $9.5 million in change represents 5.6 percent of total deposits or 6.4 percent of core deposits. The remaining 30 branches of Carteret will be resolved for a premium of $153 million with either a qualified minority bidder who matches the high bid or with the acquirerors of the high bid," closed quote.
"Because of the many unique issues facing a minority de novo institution, the New Jersey

Page 90

franchise will not be resolved before October 28, 1994."
          And my first question is do you have any reason to doubt that the information in this memo about the premiums is accurate?
     A. No.
     Q. And is it fair to say that the reason that the New Jersey branches weren't being resolved at this time in October of '94 was because of the many unique issues facing a minority de novo institution?
     A. That's what it says.
     Q. Do you have any reason to doubt that?
     A. No.
     Q. Okay. And what would the unique issues have been confronting a minority de novo institution?
     A. Raising the capital and the structuring of the institution to meet the definition of minority.
     Q. And is that because it's harder for such entities to raise capital than for an established thrift to raise capital?
     A. Well, they would have to raise capital.
     Q. Okay. Yes.

Page 91

     A. Whereas if you are an established bank, you have the capital.
     Q. So that's time consuming; correct?
     A. Right.
     Q. Okay. Now, then going on, and the paragraph says, "The successful acquirors of the Florida branches, all existing financial institutions, are prepared to move forward on a more timely schedule, primarily because of their concern for the deposit runoff," closed quote.
          Do you have any reason to doubt the validity of that sentence?
     A. No.
     Q. Do you know why they were concerned about deposit runoff?
     A. I don't -- I don't know what they were thinking, since I wasn't them.
     Q. But as a general matter, and this goes back to something that we talked about earlier, but this is a specific manifestation of it; isn't it true that in your experience once an acquiror makes a bid and has looked at the totality of the deposits, provided it's a core deposit, they don't want to see it run off between the time of their bid and the time of closing. Is that fair?

Page 92

     A. Yes.
     Q. Okay. And did you agree with the recommendation that's included in this last sentence. "We recommend that we resolve Florida separately by creating a de novo thrift to transfer Carteret's Florida deposits and simultaneously placing it into a liquidating receivership?"
     A. Signed off on it. I guess I did.
     Q. Okay. Now, the next page includes a justification. And the first paragraph reads, quote, "Carteret Florida can be resolved without waiting for the complete resolution of Carteret. The Florida branches represent a distinct and independent market. The deposit runoff in the Florida branches averaged approximately 3.5 percent a month since July 31, 1994. The most recent deposit date of bidders had available to them when submitting their bids on August 25, 1994.
          "New Jersey is experiencing a slightly lower deposit runoff rate of approximately 3.2 percent a month since July 31, 1994," closed quote.
          Do you -- was it reasonable to assume at the time of this memo that New Jersey's deposits would continue to run off at approximately three percent a month on a going-forward basis?

Page 93

     A. I mean that was the historical number. What they would do in the future I guess is what would happen, I mean --
     Q. Right. Would it have been a reasonable assumption to --
     A. You could have assumed that.
     Q. Would it have been reasonable to have done so?
     A. Well, I don't know what their long-term trends were, but that was ten years ago, so I don't know.
     Q. All right. Now, it says in the next sentence, quote, "Resolving the Florida branches will substantially reduce operating expenses by an estimated $237,000 a month and allow the Florida acquirors to complete the transaction on a timely basis," closed quote.
          Isn't it true that one benefit of closing on this branch sales as expeditiously as possible is that to the extent the branches are losing money on an operating basis, that's useful for the conservatorship to get those operations off their hands?
     A. If you assume all those things, yes.
     Q. Okay. At this point I would like to ask

Page 94

the court reporter to mark as Held 23 a document this bears the Bates number C-AM-A-0130578.
- - -
(A document was marked as Deposition Exhibit Number 23)
- - -
BY MR. THOMPSON:
Q. And is that Mr. Ramey's signature in the bottom left-hand corner, sir?
A. Yes.
Q. And this document is dated October 18, 1994. Is that correct?
A. Yes.
Q. And this is a decisional memo relating to the sale of the Florida branches. Is that correct?
A. Yes.
Q. And under "action requested" it says approval of transaction, but then it goes on to say the New Jersey branches of Carteret will be resolved at a later time. Staff is currently working with a de novo minority acquiror," closed quote. Do you see that?
A. Yes.
Q. And is that an accurate description as to why the New Jersey branches were not being sold at

Page 95

this time?
A. Yes.
Q. Okay.
- - -
(Recessed for lunch at 12:05 p.m.)
(Reconvened at 1:07 p.m.)
- - -
BY MR. THOMPSON:
Q. We've just had marked as Exhibit 24 a document that bears the Bates number C-AM-A-0077217.
- - -
(A document was marked as Deposition Exhibit Number 24)
- - -
BY MR. THOMPSON:
Q. And this is an e-mail from Ms. Yore to yourself and others dated October 17, 1994. Is that correct?
A. Yes.
Q. And it states, quote, "The investment banker for Bahia, Friedman, Billings, is coming in at 4:00 today to discuss Bahia's bid. We will be in Conference Room 421A," closed quote. Do you remember that meeting?
A. No.

Page 96

Q. Are you familiar with the firm of Friedman, Billings, Ramsey?
A. Yes.
Q. And was this meeting, is it fair to assume part of your process of trying to determine whether Bahia would be able in fact to raise the necessary capital to fulfill its bid?
A. Yes.
Q. And now this meeting took place on October 17. So that's some two months almost after the initial August 25 bids. Do you have any reason to believe that this amount of time in which to do your due diligence was out of the ordinary?
A. Well, I don't think there was much in the way of comparable institutions that these were all kind of unique, and this was -- I don't think there were any other institutions of this size with minority branches in this area that you could say that we had something comparable.
Q. Okay. The next document that I'd like to have marked as Held 25 would be Bates marked C-AM-A-0028318.
- - -
(A document was marked as Deposition Exhibit Number 25)

Page 97

- - -
BY MR. THOMPSON:
Q. And Mr. Held, this is an RTC resolution request for funding for an anticipated thrift closing. Is that correct?
A. Yes.
Q. And is that your name handwritten in the bottom left-hand corner, or on the left-hand column, the last name?
A. Yes.
Q. Is that your handwriting?
A. I don't think so.
Q. Okay. Do you know whose handwriting that is?
A. No.
Q. And was it reviewed by Jay Jupiter. Is that the J in the bottom right-hand corner?
A. I don't know.
Q. Now this document is dated October 24, 1994. Is that right?
A. That's correct.
Q. And it relates to the sale of some of Carteret's branches. Is that right?
It says in the very first box, it says Institution Name, slash, location, Carteret FSB,

Newark, New Jersey?
A. Right.
Q. So does that indicate that these are Carteret's branches?
A. Yes.
Q. Okay. And then what is the purpose of this document? What was its purpose?
A. To tell the people who provided funding how much working capital the conservatorship would need to fund the sale.
Q. And does this document reflect the formula you were describing earlier where in order to figure out how much cash was needed to fund the sale, you start with the amount of deposits and then you subtract from that the premium, if any, and the assets, if any; and then that yields the amount of money that the RTC needs to send out in cash?
A. Yes.
Q. And if the conservatorship has cash and the cash isn't necessary to meet liquidity requirements at the branches, would the conservatorship use its own cash rather than borrowing from the RTC?
A. I don't know.
Q. Who would have made that decision; do you



know?
A. I don't know any individuals.
Q. Okay. Do you know what section or department, who would have been charged with that responsibility of deciding whether to use cash or to borrow RTC advances?
A. I don't know -- I can't remember how it worked back then, you know, whether it was probably either one or the other. And I'm not sure how it worked, so.
Q. I am sorry. I don't --
A. I think there was a policy on how you would fund them. And however that was is how you would fund them. We would just figure out how much money you needed.
Q. Okay.
A. I'm sure if it was 1994, I could tell you.
Q. Right. But were you involved in this process in 1994 in terms of deciding where the cash was going to come from?
A. No.
Q. Okay. And so this document, it says, "RTC Resolution Request for Funding." And just so that I'm clear, let's say the conservatorship had



plenty of cash and sold all its assets; it was awash in cash. Would this sort of form still be necessary? Or was this a request to the RTC to advance monies, which is in fact I'll represent to you the funding mechanism that was used in connection with this particular transaction?
A. This form was filled out on every resolution, once the form was developed. But it would have been filled out on every resolution, regardless of how it was funded. And it may have always been funded by an advance from RTC.
Q. Okay. And I want to go back just to something, and I think it's related to this, that we were talking about earlier, but to make sure I understand the economics of the equation and that we've been talking about in terms of how much cash is necessary.
If there were $100 million in deposits, let's say an institution just had one branch and it had $100 million in deposits, that's all it had in the way of liabilities; and it had, let's say fair market value of $90 million of loans. So if you take a snapshot of its balance sheet, it looks like it's $10 million in the red.
And then an acquiror comes along and



decides to purchase the deposits at a 10 percent premium, a $10 million, and is now buying any other assets. The amount of cash that would be necessary to fund the sale of the deposits would be $90 million, right?
A. Net.
Q. Net.
A. Right.
Q. But the amount of the subrogated claim would be 100 $million; correct?
A. Correct.
Q. And was the amount of the subrogated claim, is that something that was set by a statute or by policy; do you recall?
A. Well, it's the statute because it's RTC had to honor the insurance obligation.
Q. Right.
A. So RTC had to make the insured depositors whole.
Q. Right.
A. So they would step into the shoes of the insured depositors.
Q. Okay. And just to follow through the hypothetical, so there's a payment of $90 million in cash. And let's say that that is funded by the $90

Page 102

million in assets that this institution that started with $100 million in deposits, all of its liabilities, and had $90 million in cash. That was the form of its assets.
So it would just sell funds. Then the cost of resolving that receivership is zero on a cash basis. Is that right?
A. $90 million in total deposits?
Q. Yes. Well, it has $100 million in total deposits, but the acquiror is willing to pay a premium of 10 percent.
A. Okay.
Q. So the acquiror says send me $90 million in assets and of course $100 million of liabilities. And if the institution had $90 million in cash, then -- and that were all its assets, then the cost of the receivership would be zero. Is that right, on a cash basis?
A. The cost to --
Q. To the RTC?
A. The depositor class would have been zero.
Q. Yeah.
A. There could have been other claimants subordinate.
Q. And I appreciate that, and let's say

Page 103

hypothetically that there are no other claims. The only liabilities of the institution were the $100 million worth of deposits.
A. Right. If you have $100 million deposits, you have $90 million in cash, then we'd be willing to pay you a $10 million premium.
Q. Yeah.
A. That means the receivership has 100 million in assets and 100 million in claims. The loss is zero.
Q. Okay.
A. And now, but if there were -- and let's change it slightly. Let's say that the institution had $90 million in loans. So it didn't have the cash. And it had to go -- everything else is the same, except instead of having cash, it had 90 million in loans.
So the institution had to go to the RTC. The conservatorship went to the RTC advanced window and said, Please give us $90 million so that we can recognize this $10 million premium. And that's done. And then shortly thereafter, the loans are sold. The cash becomes available. And the RTC is paid back on the advance.
Let's say this all happens the same day,

Page 104

so we don't have to worry about interest on the advance. Would that -- it would be the same economics, no cash cost to the RTC to resolve this institution?
A. Yeah. Whether the assets are $90 million in loans that are worth 90 million that can be liquidated for 90 million, or whether it's cash, should come out with the same number in the equation.
Q. Right. But in terms of the subrogated claim, when the $90 million in assets comes and pays off the advance, is there still a -- how does the subrogated claim get extinguished? I mean, is there still a claim for $10 million?
A. I think the problem is that you are -- that there's a lot of netting here in that -- in order to simplify things were netted. But in reality the -- if there are -- there's nobody else in but the RTC is the depositor class. Effectively the RTC is putting $100 million in to pay off the insured depositors.
Q. Or in my hypothetical, 90 million. They are really paying in 90 million.
A. Well, they are paying -- they are, well, it's 100 million less than you had. What I'm trying

Page 105

to say is there's 100 million less the 10 for a net of 90.
Q. Right. And the question comes in terms of the subrogated claim. If it's only cost the RTC $90 million -- and let's step back. Let's say you have got the $100 million in deposits.
There's a $10 million premium and another institution comes in and says, We will honor these depositors. We will make them whole. We take on this liability. And we only require the payment of $90 million in cash. We are willing to pay a $10 million premium.
Isn't it true that its only cost to the RTC $90 million to fund -- to meet its obligation to the depositors to make them whole?
A. Well, it's cost -- no. It's cost the RTC $100 million to make -- satisfy the obligation.
Q. How is --
A. And then the requirer is willing to give that receivership $10 million in assets which were distributed to the creditors.
Q. I guess where I'm just having trouble is that --
A. For a net of 90 million.
Q. Right. But how does it even, I mean,

Page 106

maybe we are coming out to the same place where we are saying net of 90 million. But how does it even become a cost of 100 to the government if the acquiror is saying I'll take the $100 million debt from you and honor it, Number 1; and Number 2, you only have to pay me 90. Isn't that then just a cost of 90?

A. Well, if you look at the balance sheet, you've got liabilities of 100, and assets; right. So if you have 100 million in liabilities, which is the subrogated account claim or deposits, and $10 million in assets, which is the premium if you actually paid it in dollars; it would be the same net, 90, as 90 and zero, just -- and remember that the subrogated comp claim gets paid by a dividend from the -- out of the receivership.

Q. Right.

A. So that, and even here you have only one creditor, which is the RTC, so they would get 100 percent. If this was -- if there were other creditors in the deposit class, such uninsured depositors, they would get a portion of that premium.

Q. Right.

A. And all the assets that were sold. You

Page 107

have to remember that even if there was cash on the balance sheet, it wouldn't be the beneficial owner would be the class of creditors, generally the deposit class and on a pro rata basis.

So if there was 80 percent RTC and 20 percent insured, even though you had $100 in assets over there on the balance sheet in cash, only 80 of that would go to the RTC.

Q. But, I mean, I understand where there's a payout. Let's say the same institution has $100 million of insured depositors and decides, hey, we are just going to pay these people off. Then that would cost the government $100 million. Is that right?

A. No. You are mixing up the cash outlay with the cost. The cost is, after we've liquidated all the assets, after we've paid dividends to all the creditors, what is left on the balance sheet of the RTC for that claim.

We got paid 90 cents on the dollar for our claim. There's no more assets. The receivership is closed. So we have a loss of whatever.

Q. And so maybe, we may be saying the same thing, and let me try to start a new line of

Page 108

questioning that brings us to a focus and may resolve it. But are we in agreement, do you agree that if an institution has $100 million in deposits, and that's its only liability, and it has $90 million in assets, and that's in cash, and an acquiror comes and says that it would accept -- it will pay a 10 percent premium, that the net cost to the government of resolving that conservatorship is zero?

A. Right.

Q. Okay.

MR. HOFFMAN: And let me throw in a objection that it's based purely on the hypothetical; correct?

MR. THOMPSON: Yes, sir.

A. No operating expenses, no other creditors, no --

Q. Right.

A. Just on those few numbers.

Q. Right. Now, do you have any recollection as to any way in which the Carteret receivership is different from my hypothetical?

A. Well, there's other creditors, there's --

Q. Do you recall that? Do you recall that there were other creditors?

Page 109

A. Do I specifically recall that there were other creditors?

Q. Yes.

A. No.

Q. Okay. You assume that there were other creditors?

A. I assume that there were other creditors.

Q. Now, what what other differences do you have personal knowledge of between my hypothetical and the Carteret receivership?

A. Well, I don't have any knowledge of the accounting for the actual Carteret receivership where we are talking on a hypothetical level of not related to any specific institution.

Q. I know we have been, and now I want to shift gears and just make sure that if you have any information that pertains to why my hypothetical wouldn't apply to Carteret, then I would ask you to share it with me now. And you have provided one assumption that there might be other creditors.

Anything else that you have personal knowledge of, that would distinguish my hypothetical from the actual Carteret receivership?

A. Well, I said that, you know, I don't know how the Carteret receivership went, and it kind of

Page 110

was accounted for. I mean, that's not my area of expertise.
Q. Okay I'd like the next exhibit which is Held Exhibit 26, it has a Bates number of C-AM-A-0125205.
- - -
(A document was marked as Deposition Exhibit Number 26)
- - -
BY MR. THOMPSON:
Q. Do you need a moment to review, sir?
A. (The Witness nods.)
Q. Okay?
A. Okay
Q. Now, in the first paragraph it says -- this is a memo from you to Mr. Ryan dated December 6, 1994. Is that correct?
A. Yes.
Q. And are those your initials above your name?
A. Yes.
Q. And in the first paragraph it references that on Friday, December 2, 1994, Bahia, for the first time acknowledged that they could not meet the agreed-upon closing schedule of December 16, 1994.

Page 111

Do you see that?
A. Yes.
Q. And then in the second paragraph, in the second sentence, it says, "Thus after almost two months of having awarded matching rights to Bahia, they have not been able to perform," closed quote. Do you see that?
A. Yes.
Q. And was this frustrating to have Bahia pull out at the last moment like this? Or to acknowledge that they couldn't meet the schedule?
A. I don't know if -- I have no idea what I was feeling at the time.
Q. Do you have any recollection of this, of Bahia having been given some period of time in which to make a matching bid and then informing you that it would in fact not be able to meet the timetable?
A. Yes.
Q. Okay. And what course of action did you think was appropriate at this time; do you recall?
A. Well, the memo kind of lays out what we said.
Q. Okay.
A. Or I said.
Q. And you say in Point Two, recommended

Page 112

course of action, move to award Carteret to the high bid group and seek to close as soon as possible. Why did you think it was important to seek to close as soon as possible?
A. I think we are always wanting to close these deals as soon as we could.
Q. Why is that?
A. To get the bidders in there and get, you know, get out of institution and move on.
Q. And was that -- did they give you that as part of the fulfillment of your mission to resolve these institutions in the least cost manner possible to the American taxpayer?
A. Yes.
Q. Now, moving on to the next exhibit which will be Exhibit 27.
- - -
(A document was marked as Deposition Exhibit Number 27)
- - -
A. Okay.
Q. Now, this is a letter from you to the Chairman of Hamilton Bank dated December 14, 1994. Is that correct?
A. Yes.

Page 113

Q. And is that your signature that appears at the bottom of your name?
A. Yes.
Q. And in the penultimate paragraph it reads, quote, "While there was a delay in the closing of the sale of the Florida branches, Hamilton was informed during the delay that it was not being held to the bid submitted on August 25, 1994, unless Hamilton wanted to proceed with the acquisition at their bid price. Hamilton was given updated deposit information during the waiting period and consummated the acquisition on that basis," closed quote.
Now, do you recall whether you were giving special treatment to Hamilton by allowing them not to be held to their bid?
A. No.
Q. And do you recall whether a standard operating procedure to allow bidders to not honor their bids?
A. In this case we told them that they, you know, could reaffirm their bid or not.
Q. Right. And what I'm trying to find out, sir, was whether that was standard operating procedure to go to bidders and say, If you want to

Page 114

honor your bid you may, but you don't have to?
A. We did -- in most cases, you know, we closed quickly and we didn't have to do that.
Q. So here it was the delay between the August 25 bid and December that led you to the conclusion that it was appropriate to allow the bidders to reconsider and to reaffirm whether they wanted to stand by their earlier bids. Is that fair?
A. Yes.
Q. Okay Let's move on to the next document which will be Held 28.
- - -
(A document was marked as Deposition Exhibit Number 28)
- - -
BY MR. THOMPSON:
Q. And it bears a Bates number C-AM-A-0028088. And this is an e-mail from you to Jay Jupiter and others dated December 7, 1994. Is that correct?
A. Yes.
Q. And the Paul that's referenced in the first sentence, that's Paul Ramey?
A. That's correct.

Page 115

Q. Okay. And it states, quote, "Paul and I met with Jack Ryan yesterday afternoon to discuss Bahia's latest proposal. Mr. Ryan was not persuaded by the new information that we could count on the transaction closing. He told us to inform Bahia that we were moving on to the next bidder and that they were no longer being considered," closed quote.
Did you agree with that decision?
A. Yes.
Q. And why did you agree with that decision?
A. I don't know what the information was that we got, but Jack was my boss. I agreed with him on this, obviously.
Q. All right. I would like to have at this time the next Exhibit 29 marked. It bears the Bates number C-AM-A-0028037.
- - -
(A document was marked as Deposition Exhibit Number 29)
- - -
A. All right.
Q. And the last sentence says, "he," Mr. Brian Collins it appears, asked, and I confirmed that Carteret was the only depository institution in conservatorship at present. Do you see that?

Page 116

A. Yes.
Q. Now, this is an e-mail from Mr. Hoch to Mr. Ramey and yourself dated December 29, 1994. Is that correct?
A. That's correct.
Q. And Mr. Hoch was the gentleman who was in charge of the non-major dispositions?
A. Field resolutions, as we called it.
Q. Okay. Field resolutions. And do you have any reason to doubt that Carteret was the only depository institution in conservatorship at the time of this e-mail?
A. No.
Q. Do you know why Carteret was the last thrift at this time to have been resolved?
A. No.
Q. At this point I would like to have the next exhibit, 30, marked. It's C-AM-A-0130611.
- - -
(A document was marked as Deposition Exhibit Number 30)
- - -
BY MR. THOMPSON:
Q. As with all the documents, sir, I have some specific questions, but you tell me when you

Page 117

are comfortable with us starting.
A. Okay.
Q. Now, this is a memo from Jay Jupiter to Mr. Ramey through you. Is that correct?
A. Yes.
Q. And does your signature on this document indicate that you agreed with Mr. Jupiter's analysis and recommendations?
A. Yes.
Q. Okay. And then turning to the second page in the first full paragraph, it states that a premium of approximately $65.6 million was going to be garnered from the sale of these 14 branches. Do you have any reason to doubt the validity of that number?
A. No.
Q. Then on page 4 of the document, starting in the first full paragraph on that page, it talks about the following are bids received from minority investor groups that appeared, on the surface, to be the higher or within the ten percent of the high bid. Do you see that?
A. Yes.
Q. And then the first paragraph underneath that reads, "TCB Holdings, Inc, a minority de novo

Page 118

investor group led my Glen Sergeon, bid" around the number, approximately $146 million for New Jersey and was within 10 percent of the high bid.

Then the end of that paragraph it says, "Among other things, more than 50 percent of the thrift's profits were being distributed to non minorities; this not being allowed. On October 12, 1994, the matched bid was rejected," closed quote.

Does that comport with your recollection that at least one of the reasons why Mr. Sergeon's bid was rejected was because 50 percent of the profits were going to non minorities?

A. He didn't meet our definition of what a minority institution was.

Q. That was one of --

A. That was one of the requirements.

Q. Yes. And he didn't satisfy that. Is that correct?

A. Right.

Q. Now the next paragraph talks about a minority investor group headed by F.D. Terrell submitted a bid of, and again I'm going to round the number, $165 million for the Carteret franchise. The bid was submitted with the FDIC regulatory acknowledgement form stating that the applications

Page 119

submitted were substantially incomplete.

When asked for additional information about the capital and proposed structure, they were unable or unwilling to provide it. The bid was disqualified because of lack of regulatory assurances the transaction could be consummated, insufficient structure information and failure to show evidence of funding.

Do you have any reason to doubt the accuracy of that paragraph?

A. No.

Q. Then the next paragraph talks about the Carteret Acquisition Corporation bid. And that's the one that we looked at earlier with the premium of $185.1 million. And this paragraph describes how the bid was conditioned upon acquisition of loans at 9.25 percent discount from fair market value in direct contravention of RTC policy, which is to furnish loans at market value.

An analysis of the transaction, allowing for the required discount on loans, showed that the 9.25 percent discount would have effectively decreased the bid by some $135.8 million and thus decreased the effective amount of the bid to approximately $49.2 million, an amount which was not

Page 120

within the 10 percent margin and substantially less than several bids received.

And do you have any reason to doubt that this paragraph is an accurate description of the reasons why the Carteret Acquisition Corporation's bid was rejected?

A. No.

Q. And we've already talked about Bahia, right, and they didn't -- which was described on page 5 of this memo, and the fact that they were not able to raise the necessary capital by the closing date. And is it true that that's the reason why they did not have their bid accepted?

A. Right. Yes.

Q. Okay. Now, on the final paragraph on page 5, it starts, in the first sentence, "Bahia and the high bid group were then given the opportunity to bid on Midatlantic's 15 branches and Sovereign's 1 branch. They did not reaffirm at the original bid price of approximately $87 million by December 30, 1994."

And first let me just ask you about that $87 million. Do you have any reason to doubt the validity of that number?

A. No.

Page 121

Q. And do you have any reason to doubt that the RTC would have been able to realize that premium if it had not been required under congressional mandate to do a second round of bidding with minority investors?

A. Well, the only thing about that is you don't know whether they would have bid 87 million in the first place, if it hadn't been for the threat of the minority bidders. So it's very hard to say whether something would be there if conditions were not in effect that were, that they bid on, so --

Q. Do you have an opinion on that or are you just saying you don't have an opinion because you think it's hard to --

A. You can't have an opinion.

Q. Well, you don't --

A. I mean nobody -- I don't have an opinion as to what somebody would have done if something hadn't been what it was.

Q. Okay. But let me ask it this way then. Do you have any reason to believe that the high bid group would not have met -- been able to satisfy its obligations and receive the necessary regulatory approvals if their bids had been accepted in a timely fashion?

Page 138

biggest premium consistent with safety and soundness and viability, and you wouldn't really have to know anything about the assets. Is that correct?
A. That's correct.
Q. Now, when -- so the AVR analysis became relevant to your work when you were trying to evaluate between doing a transaction that transferred all depositors as opposed to just the insured deposits. Is that right?
A. That was the, you know, the decision. That was its relevance to decision-making, I mean, that we were required by law, you know, to do the least costly transaction, to do a valuation of assets. And it was set out in the law that you had to use discounted present value, dah, dah, dah, dah. So you had to come up with that number by law.
But when you are dealing with only deposits in the sale, the only relevance was the loss that the insured -- loss that the uninsured depositors would take take in an insured-only deal versus an all deposit.
Q. And in terms of any impact that might have on the RTC's ultimate deficit, how would that impact?
A. Well, you could -- since it has to be the

Page 139

least costly to RTC, you would look at the bids and say surety deposit only, it's going to cost the RTC X; all deposit will cost either X plus or X minus. And you do the one that is least costly to the RTC.
But you have got to remember that you would never go an all deposit -- an all deposit bid required that the RTC cover that loss that the uninsured depositors would incur. So, therefore, if somebody bids for the all deposits, it's not like the receivership that there was like ten dollars receivership in all deposit deal and eight in an insured only deal, and therefore, you know, if there was more than three dollar -- two dollars loss that somehow the receivership was harmed.
The receivership isn't harmed because this deal isn't here unless RTC ponies up the money that the uninsured depositors would have lost. So it's only available if it's the least costly.
Q. Okay. And when you were comparing for purposes of coming up with the least costly, an insured versus an all-deposit resolution, the assets basically stayed the same; whatever the value is is what it is. Is that correct?
A. Yes.
Q. So what really differs is, well, there's

Page 140

the premium may differ, and then the amount of cash that needs to go along to fund the branch sale may differ. Is that right?
A. When comparing the bids?
Q. Yes.
A. Well, no.
Q. Okay. Because we talked earlier about an institution that had $100 million in insured deposits and $10 million of uninsured deposits. And let's say an acquiror put in a bid on both ways as they were required to do and set a 10 percent premium on everything. For the insured deposits, that would mean that that acquiror would want $90 million in cash to take on the $100 million of insured deposits.
And applying the same 10 percent premium, that acquiror would say, okay, now to take on $110 million of deposits, all the deposits, I need $99 million in cash. So the premium's a million dollars more, but the amount of cash that goes out the door is nine million dollars more.
And first -- and so my question is aren't those the only two variables that you are looking at when you are looking at an insured deposit transaction versus an all deposit transaction?

Page 141

A. No. Because the cash out the door on the Day 1 is irrelevant. Remember it's a -- the law says you have to do the least costly transaction, present value, based on all the assets and its net at the end of the day.
So if, for instance, the loss to the depositor class based on the valuation we come up with is 20 percent; right?
Q. Right.
A. And he offers a ten percent premium, it would be more costly for the RTC to do the all-deposit transaction because there's two million dollars of loss that those uninsured depositors would suffer.
Q. Yes.
A. And he's only willing to pay us a million dollar premium.
Q. I see.
A. So, therefore, that's more expensive.
Q. Right. No, I --
A. Than doing the insured-only deed. And, therefore, even though that would require less cash out the door on Day 1, that's irrelevant. It's the net at the end of the day in present value terms. That's the real number that we calculate.

Q. And I understand that. But in terms of trying to say, okay, well, in coming to that bottom line conclusion, what changes between the two bids in my hypothetical, the bid for just the deposits that are insured and the bid for all the deposits, seems to me the only two things that, well, maybe there's three things that change. But one thing that changes is the amount of the premium. Another thing that changes is the amount of the cash that goes out on Day 1.

And the third thing that changes, potentially, if I'm understanding you correctly, is, well, how many other unsecured creditors are there going to be sharing with the RTC?

A. Oh.

Q. I mean you are saying, if I understand you, that the bottom line that we are looking at is on a discounted net present value basis, how much does it cost to do A, and how much does it cost to do B. Is that correct?

A. Correct.

Q. Okay. And what I'm saying, that's fine, I understand that, but in terms of trying to, if you wanted to just focus in on, well, what's different about an all deposit transaction and an insured



deposit transaction, what variables are going to be different in getting to that bottom line; the only two I can think of are, Number 1, that the premium may differ; and, Number 2, that the amount of cash that goes out the door may differ.

And maybe there's a third thing which is there may be a different amount of claimants at the end of the process?

A. Well, if you start with a set amount of deposits.

Q. Right.

A. And a set uninsured and -- uninsured deposits, and insured deposits, then you have to come up with what is the value of the assets.

Q. Sure.

A. And that creates -- the difference between those two creates a loss to the depositor class; right?

Q. Right. And that doesn't change though. The assets doesn't change. In looking at the two bids, the deposit -- and that's what I'm really trying to focus on is what's different in the analysis in the least cost analysis, the test analysis, between these two bids. The assets doesn't change at all. Isn't that right?



A. No. The value of the assets is just held the same.

Q. Right. So that's not something that's different. And that's what I'm really trying to focus on. What's different in the least cost test between an all deposit bid for an institution and an insured deposit bid for an institution?

A. Well, in that.

Q. We agree on that.

A. There's two differences.

Q. Okay.

A. One, is the whatever premium.

Q. Correct.

A. And two is who is suffering the loss. In an all deposit transaction, the RTC is incurring the entire loss of the depository class. And in an insured only transaction, the uninsured depositors are sharing their pro rata share of the loss.

So the more uninsured you have, the more loss they are going to suffer; the higher the loss rate, the more loss they'll suffer.

Q. And just to be clear, your mandate was to do that which was least costly to the RTC and the depositors, including the ininsured depositors. Is that correct?



A. No.

Q. Oh, your mandate was to do what was least costly to the RTC?

A. Yes.

Q. Okay.

A. But in doing that, we were doing the transaction that was least costly, well, the only way you could do an all deposit transaction, by law, was if it was less costly to the RTC than doing insured only. So an acquiror would have to pay for that additional -- somebody has to pay for that loss to the uninsured depositors.

Q. Okay.

A. Either the uninsured depositors pay it or an acquiror ponies up the money and they pay it.

Q. Okay.

A. So the depositor class basically is the same because we can't -- the RTC legally cannot pay the loss to the uninsured. Somebody else had to pay it. And it was either the acquiror or nobody or the uninsured depositors.

Q. Okay. How are people doing on break time? I think we probably have another half an hour or so.

MR. HOFFMAN: Let's keep going, unless

you need a break.
THE WITNESS: I'm ready.
MR. THOMPSON: The next exhibit, 41, bears a Bates number of C-AM-A-0077208.
- - -
(A document was marked as Deposition Exhibit Number 41)
- - -
BY MR. THOMPSON:
Q. And this is an e-mail from Ann Richards to you dated September 15, 1994. Is that correct?
A. Yes.
Q. And Ms. Richards message says, "We are chompint at the bit waiting to sell securities out of Carteret. Should they still remain frozen. Ann."
And I guess my first question is do you have any recollection of the asset freeze at Carteret, the freeze on sale of Carteret's assets?
A. No.
Q. At the time, would you have had any responsibility in connection with the decision to have frozen Carteret's assets?
A. I don't know. I don't recall.
Q. And so do you have any -- can you think



of any reason why their assets would have been frozen?
A. I don't know.
Q. And I'm not -- just to be clear about my question, I'm not asking -- you have been clear that you don't recall specifically about Carteret, but I'm just saying generally, based in your experience of marketing institutions for over 20 years, do you know why these assets might have been frozen?
A. The marketing institutions has changed. I mean, in 20 years we've done things 50 different ways. So what was going on in 1994, I don't know. And it would just be total speculation as to why the assets were frozen.
Q. Well, have you been involved in -- can you think of any other marketing effort you have been involved in where there was a freeze on the sale of assets?
A. Well, in time in the beginning of the RTC we were selling assets with the franchise.
Q. Right.
A. And then after awhile, we weren't. And, you know, today we sell assets with the franchise, some assets. Some assets we don't sell.
I mean, it depends on what the, you know,



the policy is at the time, what the markets, you know, what's the best execution. Is it better to sell with a franchise or without the franchise.
At various times it has been, it hasn't been; it's better to securitize, it isn't to securitize. It's, you know, if this was September of '94, I probably could tell you what the conditions were that caused that.
Q. But do you have an opinion as to whether it was better for Carteret to have had an asset freeze or not?
A. I have no opinion.
Q. Okay. And you have referenced in your answer the fact that sometimes assets are sold with the institution and sometimes they are not sold with the institution. And is that relevant to an asset freeze because if you are going to sell the assets with the institution, you need to wait till you sell the institution?
A. Right.
Q. Okay. I was just trying to understand what your comment was in reference to. Now, so you don't recall how long the asset freeze was at Carteret?
A. No.



Q. And can you, just so the record is clear, can you think of any other instance in which an institution you have been involved in marketing has had its assets frozen?
MR. HOFFMAN: Objection. Asked and answered.
A. I can't cite any specific institutions.
Q. Do you have a general recollection as to whether there was such institution?
A. I've sold institutions with all the assets and with none of the assets and pretty much everywhere in between over time, so.
Q. Now, and you don't know when the asset freeze was lifted or why it was lifted?
A. Or if it was lifted.
Q. Or if it was lifted. And do you have any knowledge of whether it was in any way related to the minorities' bidders option to buy certain assets?
A. No.
Q. Do you know who would have this information?
A. No.
Q. Do you know what division would have had responsibility for making this determination?

Page 150

A. No.
Q. I'd like to ask the court reporter to mark as Held Exhibit 42 a document that bears the Bates number C-AM-A-0014279.
- - -
(A document was marked as Deposition Exhibit Number 42)
- - -
BY MR. THOMPSON:
Q. Now, this is an e-mail from you to Ms. Richards the day after she sent her e-mail to you, which was Held Exhibit 41, and in which you state, quote, "We are still working with a minority whole bank bidder. We still need about 1.4 billion in loans. If Sandra has the loanses and does not need the securities, then we should be able to release the securities."
Do you see that?
A. Yes.
Q. And does this suggest to you that reason there was a freeze and that they were coming to you to ask about this was the fact that the minority bidders would have an option to purchase loans?
A. That's what it says. I forgot why we needed securities, but I guess it's supposed to be

Page 151

loans but doesn't seem right to me.
Q. I'm sorry. What doesn't seem --
A. It's just that there was a loan program and I don't remember anything to do with securities, but obviously somehow securities were being used to satisfy that. But I don't remember anything about that.
Q. So you are picking up on the fact that your e-mail makes reference both to the loans, 1.4 billion in loans, but then it also says, "If Sandra has the loans and does not need the securities, then we should be able to release the securities."
And I take it you are not recalling why the term securities was used in your e-mail?
A. Right.
Q. But you do recall that there was a need for loans, so that's what this e-mail indicates. Is that right?
A. Yes.
Q. And that that need was linked to the fact that there were minority bidders out there who would have an option to buy assets. Is that right in?
A. That's correct.
Q. Okay. And who is Sandra? Sandra Nobles I see actually up there. She's cc'd. Do you recall

Page 152

any interactions with her?
A. She was in Asset Marketing, as I recall.
Q. Okay. And do you recall in the aftermath of this e-mail exchange where Ms. Nobles ever indicated whether she, you know, whether you could lift the freeze or not?
A. I don't recall.
Q. Okay. I'd like to ask the court reporter to mark as Held Exhibit 43 a document that bears the Bates number C-AM-A-0014275.
- - -
(A document was marked as Deposition Exhibit Number 43)
- - -
BY MR. THOMPSON:
Q. And this is an e-mail from you to Paul Ramey dated September 19, 1994. Is that correct?
A. Yes.
Q. And it says, quote, "I talked with Manny Friedman and Karen Edwards this morning," closed quote. Now, Manny Friedman, he's a principal in Friedman, Billings and Ramsey. Is that right?
A. Yes.
Q. "I told them that Jack Ryan was not talking with any of the bidders on Carteret since he

Page 153

may be the deciding party in the case. They wanted to make sure that we weren't giving out any additional information on the assets. I insured them that no information would be given to the bidders until after closing," closed quote.
Do you know what Friedman Billings' concern was? I mean, just conceptually about the release of information on the assets?
A. No.
Q. Do you recall what the process for asset disclosure was in connection with the Carteret transaction?
A. No.
Q. Do you generally have a recollection as to how asset disclosure worked in connection with the Minority Preference Program that was in place with, at the time of Carteret's transactions that we've been discussing today, '94, '95?
A. The cases I -- not even cases, but my recollection is we didn't disclose asset information until after closing.
Q. Okay. So they had an option, but they weren't told what the -- or what it was that they might be able to buy until after they had closed. Is that what you are saying?

Page 158

up to 110 percent of net deposits assumed?
A. I don't remember how much they were supposed to get and how that 110 came into being.
MR. THOMPSON: What I'd like to do, if it's permissible, is just take a two-minute break and just make sure I haven't neglected anything, but I don't think I have any further questions.
- - -
(Recessed at 2:52 p.m.)
(Reconvened at 2:58 p.m.)
- - -
BY MR. THOMPSON:
Q. I did have one last couple of questions which related to our discussion about the competition and minority bidders. And in the absence of the Minority Preference Program passed by Congress, there was no prohibition on minorities bidding for branches; was there?
A. No.
Q. So in terms of this number of entities that were bidding for branches, that wasn't affected by the Minority Preference Program; was it?
A. Yes, it was.
Q. How is that?
A. I mean, it encouraged competition from

Page 159

potential minority bidders.
Q. By providing them with?
A. Capital.
Q. With the ICA?
A. The ICA, and the other incentives.
Q. And, now there were preferences before Congress implemented this statute. Isn't that true?
A. There were preferences for historically minority-owned institutions.
Q. Right. So they were -- and there were incentives before as well, weren't there, for minority institutions to -- or investors to bid on the entities that qualified for the preferences?
A. Yeah.
Q. Including capital?
A. Right.
MR. THOMPSON: Okay. And I don't think I have any further questions.
THE WITNESS: Okay.
MR. HOFFMAN: Okay.
MR. THOMPSON: Thank you very much for your time.
- - -
(The deposition was concluded at 3:00 p.m.)
- - -

Page 160