# EXHIBIT G

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

AMBASE CORPORATION, ET AL. :

Plaintiffs :

and : No. 93-531

FDIC :

Plaintiff-Intervenor :

-vs-

:

UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - - x

April 5, 2006

Washington, D.C.

DEPOSITION OF:

STEVEN JOHNSTON

was called for examination by counsel for the Plaintiffs, pursuant to notice, taken at Cooper & Kirk, 555 11th Street, N.W., Suite 750, Washington, D.C., commencing at 9:37 a.m., before Misty Klapper, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

Page 6

Texas for about two years.
Q. What sort of work were you doing for them?
A. Tax accounting mostly, a little bit of auditing.
Q. Okay. And then what did you go on to?
A. I moved from there to Dallas, Texas, where I worked for another CPA firm for approximately two years.
Q. And what were you doing at that firm?
A. Basically the same thing, tax, mostly tax return preparation.
Q. Very good. And then what did you go on to?
A. I went to a subsidiary of Guaranty Federal Savings Bank called GSC Realty.
Q. All right. And how long were you there for?
A. About a year and a half, I believe.
Q. And what were your responsibilities there?
A. I was a property -- property management accountant.
Q. And what did that entail?
A. Just responsible for, you know, the

Page 7

accounting for different types of real estate property, mostly apartment complexes, that sort of thing.
Q. Okay. Very good. And what did you do when you left there?
A. I left there and went to the FDIC.
Q. And approximately what time was that?
A. That was in September of 1990.
Q. And what were your responsibilities at the FDIC?
A. Initially I was hired to -- as part of a group that oversaw the -- what was known at the time as the Southwest Plan Assistance Agreements.
Q. And in that capacity what were you doing?
A. I had a couple of institutions assigned to me and I would oversee contractors. And the main responsibility was to monitor their contract or what was known as the assistance agreement and the compliance of the agreement by the institution.
Q. Okay. And how long did you stay on in that capacity?
A. Approximately, two years.
Q. All right. And then what did you move on to within the FDIC?
A. I transferred over to the Division of

Page 8

Finance.
Q. And how long were you with the Division of Finance?
A. I'm still with the Division of Finance, but initially I worked in what was known as the liability reconciliation group.
Q. What did you do as part of that group?
A. We were -- we reconciled the inter-company or the -- the balances between corporate and the receivership, made sure that both their books were in agreement.
Q. And just so that I understand this, I mean, let's say a bank is seized and is taken over and it has books and records. Those books and records, would they be converted to, you know, FDIC-type accounting?
A. Yes.
Q. Have you ever heard of the term AGLARS before?
A. No.
Q. Okay. And so the institution would maintain its own books and records, is that right, once it was placed into receivership?
A. I'm not sure.
Q. Well, I guess I'm just trying to

Page 9

understand what was being reconciled with what. And so I'll just let you maybe explain that.
A. Well, the institution would not maintain the books and records. It was still -- as receiver, you know, we would have corporate books and receivership books.
Q. Okay.
A. And there would be certain transactions between the two entities, receivable on, maybe, one book, payable on the other.
Q. Okay.
A. And we just made sure that we could, you know, account for any differences.
Q. Okay. Because -- so the receivership would have its own books and records and I understand how that would work.
A. Right.
Q. But -- and, actually, though, let me ask you a question. I mean, when an institution was in conservatorship, so it was still being run on a day-to-day basis and being prepared for sale, it would have books and records; is that right?
A. I believe so. I'm not -- I'm not real familiar with the conservatorship process.
Q. Okay.

Page 10

A. I never had to directly work with the conservatorship.
Q. Okay. That's fine. Now, did you have any involvement in reconciliations between Carteret's receivership and the FDIC corporate books with respect to Carteret?
A. If I did, I don't recall.
Q. Okay. Go ahead. So how long were you at the liability reconciliation?
A. Approximately a year and a half and from there I moved to the tax unit.
Q. Are you still with the tax unit?
A. Yes. I should add that during this period of time I was in Dallas, Texas.
Q. And did there come a time when you moved to Washington?
A. In August of 1999.
Q. And did that reflect a change in responsibilities?
A. Yes.
Q. Okay. Well, let's talk about your responsibilities from the time you came to the tax unit to the time that you moved to Washington.
A. Okay.
Q. What were those initial responsibilities

Page 11

within tax?
A. My specific responsibilities?
Q. Yes, sir.
A. I did a variety of things, but for the most part during that period I was responsible for subsidiary terminations.
Q. And what did that involve?
A. Filing or making sure final tax returns were filed and working with various states to get tax clearance certificates in order to dissolve or terminate the subsidiary.
Q. Okay. Did that work have any impact on the tax liability for the receiver, receivership?
A. Not that I know of.
Q. Okay. All right. So you did that. And then what were your responsibilities when you moved to Washington, D.C.?
A. I went to work in the tax policy section and my primary responsibilities involved kind of employee benefit type issues.
Q. And what do you mean by employee benefits issues?
A. Well, I -- one of my primary responsibilities is to do annual reviews of our 401(K) plans to make sure that they're in compliance with

Page 12

certain IRS regulations, as well as certain provisions within the plans themselves.
Q. Okay. For current FDIC employees; is that correct?
A. Right.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston Exhibit 1 a document that bears the Bates number AM0011596.
(Thereupon, Johnston Deposition Exhibit Number 1 was marked for identification.)
BY MR. THOMPSON:
Q. And, Mr. Johnston, I've given you a copy of a document that says Division of Finance, Goodwill Team Assignments as of April 24, 2001.
And do you see your name under the neutral column?
A. Yes.
Q. And is this accurate, that as of April 24th 2001 you were neutral with respect to the goodwill team assignments?
A. Yes.
Q. Okay. And have you always been neutral with respect to the goodwill --
A. Yes.
Q. And what was your understanding of your

Page 13

being neutral on the goodwill assignments?
A. There's always a lot of uncertainty. I guess my understanding was is that I could, you know, cooperate with both sides and provide information, you know, to both sides.
Q. So if either side came to you with a tax question, you'd just give them your best advice?
A. Right.
Q. Okay. All right. And how much of your time have you spent on goodwill related issues, would you say, over the last -- well, when did you first start working on goodwill assignments?
A. I don't remember exactly when I started. I've been involved for the last several years.
Q. Okay. And over that time what portion of your time would you say you have spent on goodwill related issues?
A. In terms of hours or a percentage?
Q. Yeah, a percentage.
A. A very small percentage. It's diminished over the years from what it was, you know, four, five, six years ago.
Q. Okay.
A. Right now it's -- you know, there are only a very small number of goodwill receiverships

Page 14

left. When I first got involved there were, you know, quite a few more. I guess in terms of hours currently, you know, maybe three -- three days.
Q. Okay.
A. Approximately.
Q. A year?
A. Yeah.
Q. Okay. All right. And when things were more busy five or six years ago, what sort of issues would come up?
A. Well, my involvement was purely to provide annual estimates of what the potential IRS liability might be --
Q. Okay.
A. -- of the goodwill receiverships.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston Exhibit 2 a document that bears the Bates number AM52170712 through 0713.
(Thereupon, Johnston Deposition Exhibit Number 2 was marked for identification.)
BY MR. THOMPSON:
Q. And, sir, this is an E-mail from Barbara Stohl to Nancy Appleby, copied to you and Jim Vordtriede; is that correct?

Page 15

A. Yes.
Q. And it's dated January 26, 1998; is that right?
A. Yes.
Q. And who was Miss Stohl? What were her responsibilities at the time of this E-mail?
A. Barbara was a staff accountant. And I don't recall her specific responsibilities during this time.
Q. Okay. And it says in the first paragraph we set up 11 TOA packages.
Do you know what a TOA stands for?
A. No, I don't.
Q. With an average of 30 returns per package. We've segregated into separate TOAs those returns which are holding company information only, four; those with a different tax year end which need to be completed earlier, 21; complicated returns, which should be prepared by outside contractors, 27; and REMIC returns, 58.
Do you know what a REMIC return is?
A. I -- we refer to it as REMIC. It's real estate -- it's related to a real estate -- I don't know what the acronym stands for.
Q. Okay. But it has something to do with

Page 16

real estate?
A. Right.
Q. Okay. And what criteria were applied in determining whether a return was sufficiently complicated that it should be sent to an outside contractor?
A. I don't know what the criteria was.
Q. Do you know whose decision that was to send a return out to an outside contractor?
A. No, I don't -- I don't -- I don't remember being intimately involved in that process.
Q. Okay.
MR. THOMPSON: All right. At this point I'd like to ask the Court Reporter to mark as Johnston 3 a document that bears the Bates number AM52170711.
(Thereupon, Johnston Deposition Exhibit Number 3 was marked for identification.)
BY MR. THOMPSON:
Q. Okay. This is an E-mail from Barbara Stohl to Nancy Appleby, copied to yourself and Jim Vordtriede, dated February 2, 1998; is that correct?
A. Yes.
Q. All right. And it says at the bottom of this miscellaneous, Steve is continuing to work on sub dissolutions; however, due to his involvement with

Page 17

W-2s recently, he has been unable to follow up on current requests. We are current in the preparation of tax opinions.
Are you the Steve that's listed under miscellaneous?
A. I believe so.
Q. Okay. And is this the work you were referencing earlier about sub dissolutions?
A. Yes.
Q. Okay. Was there any particular time sensitivity to that work?
A. There was always a certain urgency to dissolve the subsidiaries. The requests would generally come from account officers, people who worked in the other -- other division. So we'd always try to give them priority.
Q. Okay. And could there be tax consequences for the parent company if, you know, a subsidiary was dissolved a year later than it otherwise would have been or not really?
A. By the time the request came, you know, to us, the assets and liabilities, you know, of a subsidiary had been disposed of.
Q. Okay.
A. So it was pretty much -- it was pretty

Page 18

clean. It was just a matter of working with the state to get a tax clearance.

MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 4 a document that bears the Bates number AM52170710.

(Thereupon, Johnston Deposition Exhibit Number 4 was marked for identification.)

BY MR. THOMPSON:

Q. And this is an E-mail from Barbara Stohl to Nancy Appleby, copied to yourself and Jim Vordtriede, dated February 23, 1998; is that correct?

A. Yes.

Q. And then under miscellaneous at the bottom it says Steve is continuing to work on sub dissolutions. And it continues, tax opinions are requiring an increased time commitment. DRR has committed to terminating 263 FINs this year. We are current with respect to tax opinions requested by the DOF terminations group to date.

Were you involved at all in the decision as to which FINs would be terminated in a given year?

A. No.

Q. Okay. Do you know whether any case -- goodwill cases were terminated in 1998?

A. I don't know.

Page 19

Q. Okay.

MR. THOMPSON: All right. At this point I'd like to ask the Court Reporter to mark as Johnston 5 a document that bears the Bates number CAM9580594.

(Thereupon, Johnston Deposition Exhibit Number 5 was marked for identification.)

BY MR. THOMPSON:

Q. And this is an E-mail from Jim Vordtriede to yourself and Eldon Ford, copied to Lee Henderson, and dated March 2nd 1998; is that right?

A. Yes.

Q. Okay. And I guess, actually, that's sort of the second message. Underneath it, under the original message, it's an E-mail from yourself to Mr. Vordtriede, also dated March 2nd 1998, a little bit earlier in the day; is that right?

A. Yes.

Q. Okay. And was Mr. Vordtriede your supervisor at this time?

A. Yes, he was.

Q. Okay. And under point number two, Homefed Bank, it says, quote, this issue involves the re-allocation of NOLs to the holding company.

Is an NOL a net operating loss?

A. Yes, sir.

Page 20

Q. Okay. According to Lee, it may involve preparation of amended returns for two or three years. This appears to be an outgrowth of the 85,000,000 refund that we received a while back. Lee is somewhat familiar with this one, as she was also involved in the refund, closed quote.

In terms of amending returns, what's your understanding about when a return can be amended? Is it within three years of filing the return or payment of the tax, whichever is later?

A. That's the basic Statute of Limitations.

Q. And was it FDIC policy that when you were within the Statute of Limitations and you could lower the tax liability for the entity in receivership to file an amended return?

A. I can only speak for -- you know, from my experience, but, yes, it was.

Q. Okay.

MR. THOMPSON: I'd like to ask the Court Reporter to mark as Johnston 6 a document that bears the Bates number AM52170707.

(Thereupon, Johnston Deposition Exhibit Number 6 was marked for identification.)

BY MR. THOMPSON:

Q. And this is an E-mail from Barbara Stohl

Page 21

to Nancy Appleby, copied to Mr. Vordtriede and yourself, dated March 16th 1998; is that correct?

A. Yes.

Q. In the fourth paragraph under the initial heading of TOA it reads, quote, I already mentioned in an E-mail and will reiterate here that I think it would be a good idea to have a meeting to discuss the return preparation process. In reviewing the returns that Jake prepared for the March 15th deadline, and in discussing with other members of the tax staff, it would appear that there is some confusion over some of the details involved in preparation of the returns. Mostly, it's the little things, what needs to be stamped, what attachments are added, the nuances of the alternative minimum tax, FFA, who signs what and how do returns get routed, et cetera.

Do you recall that there was some confusion over these details?

A. No, I don't recall.

Q. Okay. And do you know what FFA is?

A. Federal financial assistance.

Q. And was Mr. Vordtriede the tax unit's expert on FFA?

A. I think that's fair.

Q. Okay. Are you familiar with the fact

Page 22

that Mr. Vordtriede has recently gone back and calculated ---recalculated FFA for Carteret?
A. No, I did not know that.
Q. Okay. And what is your understanding of -- do you have an understanding of how FFA under the final regs works?
A. Not a real technical -- not a real good understanding. I have a basic understanding.
Q. Okay. Is it -- at a basic level, is it fair to say that it's a limitation on the ability of the parent company to take deductions in excess of their tax basis in the subsidiary?
A. I've never worked with it enough to know.
Q. Fair enough.
MR. THOMPSON: At this point I'd like to mark as Johnston 7 a document that bears the Bates number AM52170706.
(Thereupon, Johnston Deposition Exhibit Number 7 was marked for identification.)
BY MR. THOMPSON:
Q. And this is an E-mail from Barbara Stohl to Nancy Appleby, copied to you and Mr. Vordtriede, dated March 23rd 1998; is that correct?
A. Yes.
Q. And it states in the first paragraph, the

Page 23

emphasis with regards to return preparation this past week was in preparing fiscal year end September 30 returns, Jake, and a balance sheet data input, Roger. We experienced some problems in getting the appropriate financial data for the end of 1996; however, that problem seems to be resolved.
Do you recall what the nature of this problem was with respect to getting financial data for the year end of 1996?
A. No.
Q. Were you being copied on these E-mails because you had some supervisory responsibility over --
A. Yes, I believe that's -- during that period of time that was true, over Barbara.
MR. KUIPER: With all of these documents feel free to read the entire document if you need to.
THE WITNESS: Okay.
MR. THOMPSON: Absolutely.
MR. KUIPER: We'll give you plenty of time to --
MR. THOMPSON: Absolutely, sir.
At this point I'd like to ask the Court Reporter to mark as Johnston 8 a document that bears the Bates number AM52170702.

Page 24

(Thereupon, Johnston Deposition Exhibit Number 8 was marked for identification.)
BY MR. THOMPSON:
Q. And this is an E-mail from Barbara Stohl to Nancy Appleby, copied to you and Mr. Vordtriede, and dated April 20th 1998; is that correct?
A. Yes.
Q. It says in the second paragraph, of the nine TOA packages, the blueprint process is complete except for two TOAs. One has five remaining FINs and the other was just assigned to Arthur Anderson, our new MWEDS team member, who began on Friday.
Now, is this Arthur Anderson a person or is it the company?
A. It's a person.
Q. Okay. And what is MWEDS? Do you know what that means?
A. I don't know what the acronym stands for, but it was a contractor that provided accountants that assisted us with tax return preparation.
Q. Okay. Now, is this a minority or women-owned enterprise? Is that what MW --
A. I don't recall.
Q. Okay.
MR. THOMPSON: At this point I would like

Page 25

to ask the Court Reporter to mark as Johnston 9 a document that bears the Bates number AM52170701.
(Thereupon, Johnston Deposition Exhibit Number 9 was marked for identification.)
BY MR. THOMPSON:
Q. And this is an E-mail from Barbara Stohl to Nancy Appleby, copied to Mr. Vordtriede and yourself, dated April 27th 1998; is that correct?
A. Yes.
Q. And it says under miscellaneous, during the last two weeks, it seemed that the tax department was getting inundated with tax opinion requests, so I added up the numbers and she's got 120 total to date.
Do you have any general recollection as to what sort of issues were raised in these opinion requests?
A. I'm sorry, could you restate the question?
Q. Do you recall what the opinion requests related to?
A. An opinion request was a request to the tax department as to whether or not there were any outstanding tax issues that would be an impediment to terminating a receivership.
Q. Okay. Do you recall whether you ever saw

Page 26

an opinion request with respect to Carteret?
A. I don't recall personally seeing one.
Q. Okay.
MR. THOMPSON: I'd like to ask the Court Reporter to mark as Johnston 10 a document that bears the Bates number CAM9580705.
(Thereupon, Johnston Deposition Exhibit Number 10 was marked for identification.)
BY MR. THOMPSON:
Q. Now, this is an E-mail from yourself to Mr. Vordtriede, dated February 11, 1999, subject tax refund, Central S&L; is that correct?
A. Yes.
Q. Okay. And take a moment to review this, if you don't mind.
A. Okay.
Q. So do you recall what the issue was with respect to Central?
A. Yeah, I remember this case very well, because it's the only time in my experience that we ever paid the IRS, you know, even a dime. And once we did, we, you know, soon discovered that we had done it by mistake.
Q. Okay.
A. So we filed refund claims to get the

Page 27

money back.
Q. And did the IRS give it back?
A. Yes.
Q. Okay. In preparing the tax returns, was it an assumption of the members of the tax unit that the tax liabilities would in all likelihood not be paid by the receiverships that were filing tax returns?
A. I can't speak for the tax unit as a whole.
Q. But from your perspective, then, did you assume that in all likelihood the receiverships would not be paying the tax liabilities reflected on the tax returns that were filed?
A. I think it's fair to say that there was a realization that it was very, you know, unlikely.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark the next exhibit as Johnston 11.
(Thereupon, Johnston Deposition Exhibit Number 11 was marked for identification.)
BY MR. THOMPSON:
Q. Now, the top E-mail is from yourself to Mr. Vordtriede from just a few months ago, November 14th 2005; is that correct?

Page 28

A. Yes.
Q. And it reads, Jim, several years ago, probably 1997/1998, we responded to Interrogatories on Carteret. Do you remember that? Rosalyn helped me and there should be a file or files around somewhere. I don't know if they would be helpful or not.
Who is Rosalyn that you're referring to?
A. It's Rosalyn Butler.
Q. Is she still with the FDIC?
A. As far as I know.
Q. Okay. Do you know what was in these files that you were referencing, generally speaking?
A. They were just responses to the Interrogatories.
Q. Okay. Do you know if they were located?
A. These boxes referred to?
Q. Yes.
A. I don't know.
Q. Okay. And in terms of being helpful, helpful in terms of what? You say I don't know if they would be helpful.
A. Jim's original question, I guess, is whether or not we had done an analysis of the NOLs for Carteret. And my -- my only involvement with Carteret was with these Interrogatories and then with the

Page 29

annual goodwill summaries that we had -- that I mentioned earlier, the tax estimates.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 12 a document that bears the Bates number AM0010643 through 644.
(Thereupon, Johnston Deposition Exhibit Number 12 was marked for identification.)
BY MR. THOMPSON:
Q. Mr. Johnston, you're free to review the whole document if you'd like, but my questions are really going to pertain to the original message, which is from yourself to Rick Cywinski, dated June 13th 2000, subject, claims issues related to tax.
Do you see that?
A. Yes.
Q. And there are several items that are identified there. And my questions -- well, actually, first let me ask with respect to item number one, DOF's recording of tax liabilities, it states current practice is to record only those IRS liabilities where the IRS has a proven claim, i.e. the IRS has filed a claim and it's been accepted by FDIC.
What is involved in the IRS filing a

Page 30

claim? I mean, is there a form that they're supposed to file?
A. Yes.
Q. All right. And is the IRS supposed to file that form in order to get paid?
A. There's a — the claim form refers to the FDIC's claim process that all creditors are subject to when a bank fails.
Q. Okay. Now, this refers to current practice.
Do you know whether there ever came a time after this E-mail of June 2000 where the practice changed?
A. I don't think it ever did.
Q. Okay. And, now, referring to item number six, it says tax claims that include penalties. It says, in part, there are a few instances where an RC has been issued for tax claims that includes penalties. Are we legally obligated for these penalties? We believe that the IRS will abate most penalties if we can show reasonable cause, but does the fact that we've accepted a claim that includes penalties bind us legally.
What was -- why did you think that the IRS would abate penalties if reasonable cause could be

Page 31

shown? Was that based on your experience or --
A. It was based on -- it was based on, you know, kind of things, you know, that were overheard, you know, from other people in the tax department. I don't think the IRS, you know, ever took an official position or officially agreed with us. But there was always a feeling, you know, that they would.
Q. Okay. A feeling within the tax group of the FDIC?
A. Right.
Q. Okay. And do you know, for example, with respect to Ben Franklin whether the IRS has, in fact, abated penalties?
A. I didn't work directly on that. I don't know.
Q. Okay. Can you think of any instance in which the IRS actually insisted upon being paid for penalties?
A. See, the -- in my experience, we never got to the point where we ever had to pay them anything, so the issue never really came to a head.
Q. Okay. I see.
A. It never resolved and that's why it was on this list here.
Q. Okay. Now, you posed the question does

Page 32

the fact that we've accepted a claim that includes penalties bind us.
Do you recall whether you were ever given an answer to that question?
A. Not definitively.
Q. Okay. Do you remember what the tentative answer was?
A. No, I don't.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 13 a document that bears the Bates number AM0010647.
(Thereupon, Johnston Deposition Exhibit Number 13 was marked for identification.)
BY MR. THOMPSON:
Q. And there are a series of E-mail messages on Johnston 13, but I guess it's the -- the first message that shows here at the top is from yourself to Elaine Tama, stating, thought you might be interested, and dated June 28th 2000; is that correct?
A. Yes.
Q. And Ms. Tama -- were you sending this to her because she was knowledgeable about tax issues?
A. No, her involvement was on the accounting policy side.

Page 33

Q. Okay. Was she -- strike that.
Now, with respect to the original message that appears right underneath that, it's from Jonnie Wells.
Do you see that?
A. Yes.
Q. Okay. And what was Ms. Wells' position at this time, June of 2000?
A. I believe she was over Jim Vordtriede or whoever the tax manager was at that time. I don't remember when Jim came to Dallas exactly.
Q. Was she — did she have an expertise in tax?
A. No, she was more of a managerial role.
Q. Okay. And is she still with the FDIC, do you know?
A. I believe so.
Q. In Washington or Dallas?
A. Dallas.
Q. Okay. And then this message from Ms. Wells says Karen, another issue we may want to consider is how we would record these claims on the GL and what impact it may have on the receiverships's financial for both financial and tax purposes; example, colon, now when we accrue for the PII, it

Page 34

causes a debit to equity in the year we accrue. When we do the tax return, this debit to equity increases the receivership's loss, expenses, for that year and is so reflected on the return. However, if we then terminate the receivership in subsequent years and don't actually pay the PII and reverse the entry, it increases equity in the year it is reversed, income, causing a mismatch of income and expenses. Technically, we should go back and amend the prior years' returns or we could analyze equity and do a tax adjustment at that time.
Did you agree with Ms. Wells as to what the technically correct approach would be to the issue she's identified here?
A. Let me have a minute to review it.
Q. Please.
A. I'd say that her position stated here, you know, was a reflection of the -- the attitude of most of the tax accountants.
Q. At the FDIC?
A. At that time.
Q. Okay. Do you think it was the -- well, in any event, then it says in the next sentence either way, it should be noted that this kind of accrual may also need different treatment for financial and tax

Page 35

purposes.
Do you recall there being any discussion about that point?
A. I'm sorry, I'm trying to find where you were reading from.
Q. Oh, sure, it's just the last sentence.
A. Last sentence?
Q. Yes.
A. Okay. Could you restate your question?
Q. Sure. Do you recall whether there was any discussion about this point?
A. No, I don't know where the issue went from there.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 14 a document that bears the Bates number AM0010611 through 10614.
(Thereupon, Johnston Deposition Exhibit Number 14 was marked for identification.)
BY MR. THOMPSON:
Q. And so this is a cover E-mail from yourself to Elaine Tama and Robert Ferrer, subject, tax claims issues, and dated November 20th 2002; is that right?

Page 36

A. Yes.
Q. And then attached to this E-mail was a matrix of different tax claims issues; is that right?
A. Yes.
Q. Okay. I'd like to direct your attention to the last page of this document and specifically to the section the issue tax claims and penalties. And it says status -- first of all, may I ask, is this a document that you prepared, this matrix, do you know?
A. I believe so.
Q. Okay. And it says under status, the IRS recently abated significant penalties on Ben Franklin which was in response to our specific request through the District Director's office. The IRS continues to abate penalties on a case-by-case basis and requests for abatement have to be submitted through the various District offices. However, certain high profile cases in litigation still have substantial penalties which are reflected on IRS transcripts.
Does this refresh your recollection that Ben Franklin did, in fact, have an abatement of penalties?
A. Yes.
Q. Okay. And do you recall whether it was difficult for the FDIC to get that abatement or

Page 37

whether it was, you know, a simple request and the FDIC granted it -- excuse me, the IRS granted it?
A. Yeah, I don't know. I know Ben Franklin is still ongoing and I don't know that -- even though it implies there that it was, you know, a settled thing, I'm not sure that that was necessarily true, you know. It evolved for a few more years, so I was probably referencing something -- you know, information I was given by someone else.
Q. Well, with respect to the issue of penalties -- I mean, I know with Ben Franklin there are a lot of tax issues in that case. But with respect to the penalties, do you have any reason to believe that the statement in your matrix is incorrect?
A. No, it's probably correct.
Q. Okay. And is the IRS's position that there needs to be reasonable cause shown for the nonpayment in order to abate the penalties? Is that your understanding?
A. I don't know. I don't recall ever, you know, having any or receiving any, you know, direct response to anything I worked on, you know, from the IRS that stated their position.
MR. THOMPSON: We've been going about an

Page 38

hour. Is it okay if we take a five-minute break?
MR. HUGHES: Sure.
(Thereupon, a brief recess was taken.)
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 15, then, the next exhibit.
(Thereupon, Johnston Deposition Exhibit Number 15 was marked for identification.)
BY MR. THOMPSON:
Q. Mr. Johnston, I'd like to direct your attention, actually, to the original message on this page, which is from yourself to Elaine Tama, copied to Rick Cywinski, subject PII accrual, and dated October 9th 2003; is that correct?
A. Yes.
Q. And it reads, in part, Elaine, I thought you might be interested in this. Legal asked that we review Carteret Savings and verify the $76,000,000 tax liability we reported on our 2002 goodwill estimate. This is another case where we had -- excuse me -- where had we accrued PII from the date of closing, we could have significantly reduced our tax exposure and, maybe more importantly, our litigation exposure. In this case, the subrogated claim was nearly $1 billion and it closed very early in 1995. Had we accrued PII,

Page 39

the tax liability would have been approximately $9,000,000 instead of $32,000,000. This $32,000,000 has now grown to over $76,000,000 with penalties and interest.
Are you confident that the calculations that you made in this E-mail were correct?
A. I'm sure they were estimates. I don't recall doing the calculation, to be honest.
Q. Do you have any reason to doubt that they were accurate estimates at the time you made them?
A. I have no reason to doubt it.
Q. Okay. And then it says in the next paragraph, while in Dallas, we found a few other examples of where PII accruals from the beginning could have reduced the tax liability. Santa Barbara was one.
Do you recall if there were any other institutions that fell into this category?
A. I don't recall specifically.
Q. Okay. And with respect to where it says we found a few other examples, do you recall who else, while you were in Dallas, was looking at this issue?
A. It's hard to say.
Q. Okay. And then it says it should be noted that the IRS agrees that this is a valid tax

Page 40

deduction available from the date of closing.
Isn't it true that that's the position that the IRS has now taken in the Ben Franklin case, they've allowed the deduction of post-insolvency interest from the date of closing?
A. That's my understanding.
Q. Okay. And are you familiar with any instances in which the IRS has not allowed the deduction of post-insolvency interest from the date of closing?
A. I'm not aware of any other cases of where it was an issue or where it was challenged.
Q. Okay. When you wrote that the IRS agrees that this is a valid tax deduction, do you recall why you had formed that belief? Was it because of Ben Franklin or some other reason?
A. I can't recall any other reason, other than, possibly, the Ben Franklin case. I'm not aware of any other instance where the IRS, you know, specifically agreed to that position.
Q. Okay. And just so the record is clear, you can't recall any other instances in which the IRS took a position on that issue; is that right?
A. That's correct.
Q. Okay. Do you recall whether there was

Page 41

anyone who disagreed with you at the FDIC that the IRS would allow this as a valid deduction from the date of closing?
A. I don't recall anyone disagreeing with that.
Q. Okay. And then it says I'm not sure where your proposal stands, but this should be of interest to the decision makers.
Do you recall who the decision makers were who you were referencing?
A. It was whoever, you know, the accounting managers were in Dallas at that time. This is, you know -- this is, obviously, a receivership issue. By this time, you know, I was in D.C. It was a receivership, you know, decision whether or not to, you know, record this liability.
Q. Okay. And at least in terms of the tax issue and the IRS's position on Ben Franklin and everything, in terms of the accrual method of accounting is it appropriate to take a deduction for post-insolvency interest from the date of a closing?
A. I'm not, you know, an expert on GAAP accounting. From a tax standpoint we, you know -- I -- it was always my position, my belief, that it was a more fair presentation of the receivership's assets

Page 42

and liabilities to accrue it, but it was -- there are accounting issues involved that I'm not, you know, an expert in. And the decision was made, I guess, years ago for whatever reasons not to accrue PII.
Q. For accounting purposes?
A. Accounting purposes.
Q. Right. Okay. Do you know why that decision was made?
A. I don't know.
Q. And do you know who made that decision?
A. I mean, it goes back forever. I mean, there's a zillion people over the years.
Q. Do you know whether -- when you use the term litigation exposure in the first paragraph, do you recall what you were referring to?
A. I think that was just a general, you know, comment. You know, personally I've always had kind of a sympathetic view toward, you know, shareholders and creditors that, you know, we should have a fair -- you know, as accurate a presentation of a receivership's financial status as possible.
Q. Okay.
A. And I understand there's different points of view over the PII and when it's appropriate to accrue.

Page 43

Q. Okay. But can you recall anyone at the FDIC who, with respect to the tax issue and not the accounting issue, took a position different to the one the IRS and you yourself were taking about the validity of deducting PII from the date of closing?
A. I can't speak for everyone. Over the years there were, you know, hundreds of people involved in the receivership tax returns but, no, I don't know of anyone that had a different position.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 16 a document that bears the Bates number AM0010600 through AM0010602.
(Thereupon, Johnston Deposition Exhibit Number 16 was marked for identification.)
BY MR. THOMPSON:
Q. And, in particular, I'd like to direct your attention to the original message. I know you weren't copied on the original message, but it was subsequently, I guess, forwarded to you by Elaine Tama.
But on the original message from Mr. Vordtriede to Miss Tama, copied to Wayne Green, and dated February 20th 2004 it says under item number

Page 44

one, original equity, the net credit or debit effect of pro forma adjustments are picked up in the closing year income tax return as an addition to net book income. Naturally, a net credit is an addition to book income and a net debit a reduction in net book income, closed quote.
Do you see that?
A. Yes.
Q. Is it your understanding that those pro forma adjustments made in the closing year were brought about because of a change in accounting method from an accrual method to a hybrid method?
A. I've never -- I don't recall ever being directly involved with the preparation of the closing year tax return. I -- I don't feel comfortable opining on the process.
Q. Fair enough.
Do you know anything about the next topic, which is discovered assets? And feel free to review that bullet point.
MR. HUGHES: While he's reviewing that, I'll just note this is not the original E-mail. That's the middle E-mail, I guess. It's actually one that starts towards the bottom of the second page.
MR. THOMPSON: Good. Thank you.

Page 45

MR. HUGHES: I think you clarified it.
MR. THOMPSON: Thank you, Mr. Hughes.
THE WITNESS: Could you restate your question?
BY MR. THOMPSON:
Q. Sure. Did you have any involvement in the treatment of discovered assets on tax returns?
A. Not directly. I remember I had one -- we had one receivership that when the tax return was done it generated or it showed a large amount as taxable income. And after investigation it was discovered or, I guess, the cause of that income was, you know, the inappropriate treatment as taxable income of a discovered asset. And it was reversed and the tax return adjusted.
Q. Okay. Do you remember what institution that was?
A. I don't remember. It was several years ago, but it was always unusual whenever a receivership showed taxable income.
Q. Okay.
A. So it was logical to, you know, look into as to what caused it.
Q. Okay. And in terms of the reversal, was it your understanding that it was inappropriate to

Page 46

take a discovered asset into taxable income?
A. That particular asset.
Q. Okay. I mean, generally speaking, if an asset is discovered, there wouldn't be a taxable event until the asset was sold; is that right?
A. Again, I'm not comfortable with the nuts and bolts of receivership, you know, tax return preparation.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 17 the next exhibit.
(Thereupon, Johnston Deposition Exhibit Number 17 was marked for identification.)
BY MR. THOMPSON:
Q. All right. And the original message on this exhibit is an E-mail from yourself to Mr. Green, Mr. Vordtriede, Mr. Colley and Linda Shaw. It's dated February 9, 2005. The subject is Carteret goodwill case; is that correct?
A. Yes.
Q. And it says, does anyone know if the IRS has an RC on file with us for Carteret's 1995 tax liability. Linda, this is FIN number 1309. Steve Johnston.

Page 47

What's an RC?
A. Receivership claim.
Q. Okay. And who is Linda Shaw? What are her responsibilities?
A. She was the claims department manager.
Q. Okay. And so if anyone -- is she the authority on these sorts of issues?
A. That was always my point of contact.
Q. Okay. And she answered yes and no. The original claim was $36,317.25. The claim was withdrawn on May 19th 1999.
Did -- is that your understanding of what happened with the claim?
A. Apparently, if -- I have no reason to think otherwise.
Q. Okay. I just didn't know if there was -- you know, if any of the other recipients of your E-mail had responded with any contrary information.
A. No, it would have been -- Linda -- the other people were probably just copied, you know, just to let them know or be advised. But -- actually, these people represented the people that were working in the Dallas tax group at the time.
Q. Okay.
A. But Linda would have been the primary

Page 48

person that I expected a response from.
Q. Okay. And do you know if there's any IRS claim currently pending?
A. I don't know.
Q. Okay. Do you know why the IRS withdrew the claim?
A. I don't know for certain, but it was always my position that -- and I think the IRS acknowledged this too -- that I didn't want the IRS filing a claim. It wasn't in their best interest and it wasn't in the receivership's best interest. Obviously, if they file a claim today, you know, the amount is different tomorrow because of interest.
Q. Okay.
A. And we also want to preserve our right to go back and file amended returns to carry back net operating losses, et cetera.
Q. Okay.
A. So it works both ways. That's why you won't see a lot of IRS receivership claims.
Q. Okay. Because it wasn't in the FDIC's interest or in the IRS's interest to lock in a final number; is that right?
A. Right.
Q. Okay. And the time that, you know, the

Page 49

number would be finally locked in would be the moment at which there might actually be a prospect of paying the tax liability?
A. Exactly right.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 18 a document -- well, it doesn't have a Bates number, so the next exhibit.
(Thereupon, Johnston Deposition Exhibit Number 18 was marked for identification.)
BY MR. THOMPSON:
Q. Okay. And these are some followup E-mails to the E-mail string that we just looked at. As you predicted, they don't relate to your initial question, but Mr. Green first asks David Colley, David, do we have a recent transcript on Carteret from the IRS, question mark, if not, then we need to request one. Thanks.
And then, again, Mr. Green later, on February 9th, says David, please make an inventory of the tax returns on Carteret that we have here in the office. Also, can you tell me if we filed this return on a consolidated basis with the holding company.
And do you know, Mr. Johnston, whether

Page 50

the Carteret tax return is filed on a consolidated basis with the holding company?
A. I don't recall.
Q. Do you have an opinion as to whether Carteret is consolidated with the holding company?
A. I don't know enough about Carteret. I don't know.
MR. HUGHES: Just a quick question on this exhibit. Is the second page necessarily related to the first page?
MR. THOMPSON: You know, I believe this is how it was produced to us.
MR. HUGHES: Stapled together?
MR. THOMPSON: Yeah -- well, sequential, you know, and I don't know whether it was stapled together. That's -- that's a fair point.
THE WITNESS: It looks to me like it's an inventory listing of Carteret files that were in storage, probably David Colley's response to Wayne Green.
MR. THOMPSON: Right.
MR. KUIPER: It looks like it could not have been connected because at that time it would have shown as an attachment or something.
MR. THOMPSON: Well, yeah. And all I'm

Page 51

thinking is, you know, he was asked to do an inventory of the tax returns. This is printed by Mr. Colley, as reflected on the top line of the thing. And so this may be a hard copy attachment, but not -- but I would agree with you, Mr. Kuiper, it's not -- it doesn't appear to be an electronically attached file.
MR. KUIPER: Right.
MR. THOMPSON: I'd like to ask the Court Reporter to mark as the next exhibit -- mark it as Johnston 19.
(Thereupon, Johnston Deposition Exhibit Number 19 was marked for identification.)
BY MR. THOMPSON:
Q. And then, again, this is a continuation of the E-mail string we've been looking at. You were not copied on this most recent E-mail, but Mr. Green posed the question to Mr. Colley, David, once you locate the 1995 return, please let me know. I need Jim to review the return and determine if the return was filed consistent with applicable tax statutes in effect at the time germane to federal receiverships. Thanks.
Were you ever asked to look at the issue that Mr. Vordtriede is going to be asked to look at, according to Mr. Green, whether the 1995 tax return

Page 52

filed for Carteret was consistent with applicable tax statutes?
A. I don't recall ever being asked to do that.
Q. And do you have an opinion as to whether the 1995 return is consistent with applicable tax statutes?
A. I don't recall ever looking closely at the 1995 return.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as Johnston 20 a document that bears the Bates number CAM9580202.
(Thereupon, Johnston Deposition Exhibit Number 20 was marked for identification.)
BY MR. THOMPSON:
Q. And the original message on this says, I just delivered the zero balance sheet on First State Service Corp to Steve. I know there's a deposit sitting in cash, but I will move it to the receivership as that is where it should have gone in the first place, Mark.
Do you know whether this has anything to do with -- the subject of this E-mail -- has anything to do with Carteret?

Page 53

A. I have no idea, unless First Service (sic) was a subsidiary of Carteret.
Q. Okay.
MR. THOMPSON: At this point I'd like to ask the Court Reporter to mark as the next exhibit -- mark it as Johnston 21.
(Thereupon, Johnston Deposition Exhibit Number 21 was marked for identification.)
BY MR. THOMPSON:
Q. And so the original message on this is from yourself -- excuse me, is from Mr. Vordtriede to yourself, dated November 14th 2005. And he's asking whether you've done a cradle-to-grave analysis of NOLs on Carteret; is that right?
A. Yes.
Q. Do you know why Mr. Vordtriede wanted this information?
A. I don't know.
Q. And so, then, you sent him the attachment to this, which appears as the second page of this exhibit; is that right?
A. Yes.
Q. And to the best of your knowledge, are these numbers accurate as to Carteret's NOLs for the years that are listed?

numbers are unique to that production.
MR. KUIPER: All right. Thank you.
BY MR. THOMPSON:
Q. Now, for 1995 the -- this is the return that was signed on December 20th '96 by the preparer; do you see that?
A. Yes.
Q. So this would be the original '95 return before the amendment; is that right?
A. I believe that's correct.
Q. Okay.
MR. THOMPSON: I don't have any further questions at this time.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
THE UNITED STATES OF AMERICA
BY MR. HUGHES:
Q. I have a couple. Mr. Johnston, I take it from your earlier testimony you were not involved in the original filing of any of the tax returns for Carteret; is that correct?
A. If I was, I don't recall. It's unlikely that I was.
Q. Were you involved in the amended return for 1995, the filing of that?
A. I can't say absolutely, but I doubt that



I was.
MR. HUGHES: With respect to numbering, should we just continue on with the numbers you have?
MR. THOMPSON: That's what we've been doing.
MR. HUGHES: Okay. Let's mark that as Johnston 27, please.
(Thereupon, Johnston Deposition Exhibit Number 27 was marked for identification.)
BY MR. HUGHES:
Q. Johnston 27 is a restated goodwill financial reporting package for Carteret Federal Savings Bank, dated May 10th 2005, numbered from RAM0510351 to 0360.
Mr. Johnston, have you seen this document before?
MR. KUIPER: Take the time to review it.
THE WITNESS: I don't think I've seen this package. Typically, after I provided the federal tax estimate, my involvement pretty much stopped at that point.
BY MR. HUGHES:
Q. So the tax estimates in this package basically come from you or your section?
A. Yes.



Q. Let's take a look at report number three, which is on page 0356. The page numbers I'm referring to are the ones in the far right corner, discovery page numbers.
Now, report three contains projected receivership results using adjusted balances; is that correct?
A. Yes.
Q. And according to this report, as of December 31st 2004 the projected receivership deficit is 259.9 million dollars, is that correct, roughly?
A. 256.9.
Q. I'm looking at the lower right-hand corner.
A. 259.8?
Q. Yes.
A. Yes.
Q. Now, that includes an 86.8 million dollar federal tax claim; is that correct?
A. It looks like a pending claim. I don't know if that's specifically the tax claim or not.
Q. Would that number have come from you or your section?
A. I don't know what that amount -- I don't know if that's the tax amount or not.



Q. Well, let's refer back to Johnston 22. And if you look at the second page of Johnston 22, which is numbered AM0013 --
A. Okay.
Q. -- at the bottom it says the estimated IRS liability at 12-31-04 is $86,803,834.
A. I guess if it's not the tax claim, it would be a major coincidence.
Q. So that number on the report is basically the one that comes from your section?
A. Yes.
Q. Now, let's take a look at page 0360, which is the last page of Johnston 27. And at the footnote 10, is that something that you draft or is that something that is just in there as boilerplate?
A. I have input into it. Usually it runs through and comes from legal.
Q. Okay. I'll just read that into the record. Income taxes, federal tax law requires that receivers of corporations, including depository institutions for which the FDIC serves as receiver, continue to file federal income tax returns for the receiverships they manage. A receivership may, therefore, incur a federal income tax liability from activities that occur during the life of the

Page 66

receivership, as well as during pre-receivership periods. Payment of federal income taxes is deferred until such time as post-insolvency interest is paid in full to depositors, including their subrogee. Federal income tax liabilities are, therefore, paid in full prior to any payment being made to equity holders of the failed institution. Because of the contingent nature of these tax claims, federal income tax liabilities are generally not recognized in these financial statements unless circumstances indicate that there's a high probability that they will be paid. Federal law provides an exemption from income taxes imposed by any state or local taxing authority once FDIC is appointed as receiver.

I read that correctly, I presume.

Wouldn't you agree that post-insolvency interest has not been paid in this case?

A. I don't know that it has. I doubt it.

Q. Do you work with these goodwill packages much, as far as being familiar with them?

A. Only to the extent that I provide the tax estimate.

Q. So you do not know one way or the other whether post-insolvency interest has been paid. You just presume in the normal run of things it has not

Page 67

been paid in this case?

A. That's correct.

Q. And just going to that priority -- in the order of priority, federal tax liabilities are paid after the post-insolvency interest is paid, but before the equity holders are paid; is that correct?

A. Sorry, could you ask that again?

Q. Sure. In that priority set forth in footnote ten, federal tax liabilities are paid after post-insolvency interest is paid, but before equity holders are paid; is that correct?

A. I know there's different rules, you know, based on different laws, based on when a receivership failed, but I'm not sure of the specifics. But I have no reason to question the accuracy of the footnote and the language.

Q. Okay. Do you know why taxes are paid before equity holders?

A. I don't know.

Q. Would you agree that Carteret's unpaid tax represents a contingent liability?

A. I don't know what the accounting definition is of what, you know, a contingent liability means. This is really -- it's really more of an accounting issue as to whether or not -- you

Page 68

know, when to report it in the financial statements more so than a tax issue. I don't know what the criteria is that they use.

Q. Earlier you were asked about requests for abatement of penalties or, perhaps, interest as far as Carteret. To date the IRS has not ruled on any request for abatement on penalties or interest associated with Carteret's 1995 federal income tax return; is that correct?

A. That's correct. I'm not aware of any ruling on it.

Q. Is there any request pending?

A. Not that I know of. But that's something -- if it is, it probably would be -- originated in the Dallas office.

Q. So if it is pending, you would not be involved with the processing of any of those requests or the response from the IRS?

A. Probably not.

Q. Going back to Johnston Exhibit 21 --

A. Okay.

Q. -- in the original message from Mr. Vordtriede to you he refers to a cradle-to-grave analysis of NOLs.

What is a cradle-to-grave analysis of

Page 69

NOLs?

A. I believe it would be one of these spreadsheets that we've been looking at, just from the closing year forward, just an annual summary on a spreadsheet, worksheet format, of taxable income or net operating losses and any tax, if any, for that particular year.

Q. So the cradle is the closing year, in effect, and the grave is whenever the receivership is closed out?

A. That's how I interpret it.

Q. Was this a common analysis that was performed on other receiverships or was it only performed on Carteret, to your knowledge?

A. It's performed on all of the goodwill receiverships. There was a point in time in Dallas early -- in the early couple of years that I was in the tax department that we did the same analysis for all of the receiverships that we were responsible for in Dallas.

After all the other offices rolled in and after the RTC rolled into the FDIC and we had thousands of tax returns to do, instead of just a couple hundred, I think that practice kind of ceased.

Q. And to the best of your knowledge, what

Page 70

was the purpose of this analysis?
A. It's a good way to determine when there's net operating loss, carry forward potential, or the potential to reduce a tax liability.
Q. Do you know how the results of this analysis were used in any way?
A. Which analysis?
Q. The analysis of the Carteret cradle-to-grave NOLs.
A. The one that Mr. Vordtriede requested?
Q. Right.
A. No, I don't know.
MR. HUGHES: Please mark this as Exhibit 28.
(Thereupon, Johnston Deposition Exhibit Number 28 was marked for identification.)
BY MR. HUGHES:
Q. Johnston Exhibit 28 is a document numbered from RAM0540216 to 0218 and a collection of E-mails, the last of which is from James F. Vordtriede to himself, dated November 17th 2005.
Looking at paragraph number three in the previous E-mail to Mr. Vordtriede's E-mail to himself, referring to the FFA model, were you involved in the creation of the FFA model that's referred to here?

Page 71

A. No.
Q. Do you know how this model was used?
A. I believe he's referring to the blueprint and that's a creation of Jim Vordtriede.
Q. What is the blueprint?
A. The blueprint is a package of Excel forms that calculate taxable income and also the M-1 and M-2 schedules on the tax return. It's kind of a mechanical form in that -- in the sense that you drop in account balances and then it, you know, kind of sends them to various other forms and calculates, like I said, taxable income, M-1, M-2, federal financial assistance.
It's really -- it's almost the same as doing the tax return. Once you've done that, then you know what the tax return is supposed to look like once it's prepared. You have numbers to tie into.
Q. Were you involved in the creation of this blueprint model?
A. No. It's something that Jim brought with him from Hartford when he came to Dallas.
Q. But your understanding, based on this E-mail -- and feel free to look through it -- is the reference to the FFA model was to this blueprint that Vordtriede had brought?

Page 72

A. That's my assumption.
Q. What involvement did you have, if any, in the calculation or revision of Carteret's FFA balance?
A. I wouldn't have had any involvement. I was in D.C., you know, by 2005.
Q. Okay. How does FFA affect a receivership's tax liability?
A. Well, to the extent that FFA is recognized as taxable income, it can increase the taxable income on the tax return.
Q. Now, on page 0217 there's a reference in the E-mail from Mr. Green to Mr. Colley asking for a recent transcript on Carteret from the IRS.
What are IRS transcripts?
A. IRS transcripts are a summary by year, the IRS record of what was filed, including any amended returns, any penalties, any interest that was assessed. It's just a picture of what the IRS records are for a particular year for a particular entity.
Q. How does your section use IRS transcripts?
A. When you say my section, what are you referring to?
Q. The tax unit.
A. Well, I can't speak to how Dallas uses

Page 73

it. I use them in my estimates, my annual estimates for goodwill financial statements. I typically request transcripts every two to three years just to make sure that we're in the ballpark.
It's a way of seeing whether or not any penalties have been assessed that I wasn't aware of. If they were assessed, penalties, for instance, on Carteret or any other receivership, the notice would go to Dallas. That doesn't get communicated to me. You know, I wouldn't be able to take it into account when I'm doing my projections.
So typically, I like to get a picture of what the IRS, you know, says. And also, the -- my calculation of interest, you know, could vary with what the IRS has actually assessed.
Q. Now, you had mentioned that it's not in the interest of the IRS to bring a receivership claim until the liability is fully developed, I guess, or determined?
A. (Nodding in the Affirmative.)
Q. Why is it not in the IRS's interest to do so?
A. Well, my understanding of the claims process is if you file a claim for X number of dollars, that -- and it's, you know, approved,

Page 74

ratified -- then it's a fixed amount. Interest can accrue, you know. Interest, you know -- I think it's generally accepted that, you know, the IRS has a right to, you know, assess interest under claims. So by locking into a fixed amount, it would seem to me that they forfeited their right to continue assessing interest.
Q. Now, with respect to the federal tax estimates that you feed into the goodwill reporting package, you may have already testified to this, but were these estimates only performed on institutions that required goodwill reporting packages?
A. That's correct.
Q. Do you know why they're only calculated for those?
A. No.
Q. And how long have you been responsible for performing these tax estimates for the goodwill packages at the FDIC?
A. I've been involved in it since before I moved to D.C. from Dallas, which was August of 1999. So just estimating, I would say my involvement probably began in '98 or, possibly, '97.
Q. Have you had any involvement in computing post-insolvency interest estimates for Carteret?

Page 75

A. No, I don't believe I have.
Q. You were asked a question about the Suess -- S-U-E-S-S -- resolution, the Ben Franklin resolution.
A. Yes.
Q. Just to clarify, you were not involved with that settlement process; is that correct?
A. I had a little bit of involvement at different points just -- I assisted, you know, with different -- preparing different spreadsheets under different scenarios. I can't recall specifically. It's been a few years.
Q. But you were not directly involved in negotiations?
A. No.
MR. HUGHES: No further questions.
MR. THOMPSON: Just one or two very brief questions.
THE WITNESS: Sure.
FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. THOMPSON:
Q. You were asked by Mr. Hughes a question about FFA and whether it can increase taxable income.
Isn't it true that the inclusion of FFA

Page 76

can increase -- can increase taxable income in terms of wiping out an NOL, but it doesn't give rise to positive taxable income in a particular year, does it?
A. I believe that's correct under the current tax regulations. And long ago it could, you know, go up above that point.
Q. Under the proposed regs it could result in positive taxable income, but under the final regs it can't result in positive taxable income; is that right?
A. I believe that's correct.
MR. THOMPSON: I'm finished.
MR. KUIPER: FDIC has no questions. We'll read and sign.
(Thereupon, signature having not been waived, at 11:45 a.m. the deposition concluded.)

Page 77

CERTIFICATE OF DEPONENT

I, Steven Johnston, do hereby certify that I have read the foregoing pages, _____ through _____, inclusive, which contain a correct transcript of the answers given by me to the questions propounded to me herein, except for changes, if any, duly noted on the enclosed errata sheet.

_______________________
WITNESS

Sworn and subscribed to before me this ___ day of _____________, 2006.

My commission expires: Notary Public:
_________________ _________________

_______________________
Witness