# EXHIBIT H

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

- - - - - - - - - - - - - - - x

Washington, D.C.
Friday, March 31, 2006

Deposition of ELAINE TAMA, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:40 a.m., Friday, March 31, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 18

A. The agency's financial statements and reports.
Q. Okay, very good.
And are those prepared on an accrual basis?
A. It depends which statements and which reports.
Q. Do you recall which reports were accrual and which were nonaccrual?
A. Well, at that point I was not preparing the accrual-based financial statements which are the corporate.
Q. So the corporate books and reports were on an accrual basis even if you weren't preparing them?
A. Exactly.
Q. And what were you then working on?
A. I was working on financial reports to the United States Treasury.
Q. And what sort of reports were these?
A. These are mandatory reports which tracked the cash flows, appropriations, et cetera.
Q. So in other words, let's say the Congress appropriates a billion dollars and Congress would like to know at the end of the year what happened to it, and then you do a report on how it was spent?

Page 19

A. Yes, um-hum.
Q. And was that prepared on a cash basis then?
A. Yes.
Q. And how long -- how long did you stay in that job?
A. About a year.
Q. And then what was next?
A. Then I went to the Office of the Inspector General.
Q. Within the FDIC?
A. Yes.
Q. What were your responsibilities there?
A. I was an auditor.
Q. And what were you auditing?
A. FDIC's management of failed banks.
Q. And what aspect of the management of the failed banks?
A. Sales of -- the management of sales of assets acquired from failed banks.
Q. And were you looking to see whether fair market value had been realized?
A. I don't recall.
Q. Do you recall anything about what those audits related to in terms of what you were trying to

Page 20

assess about the management of the failed banks?
A. We were trying to assess if the managers were performing their tasks adequately.
Q. And how did you go about doing that?
A. We looked at documentation, we looked at accounting entries.
Q. Did you make any field visits?
A. Yes.
Q. And do you recall what your conclusions were in auditing, whether you found any institutions where there were problems?
A. Well, the first audit I was on I think we did have a recommendation and a finding.
Q. And do you recall the name of that institution?
A. No, I don't.
Q. What was the recommendation and the finding?
A. It was how an asset was recorded and there was something about the contract.
Q. Okay. All right. And do you recall any other concerns that you unearthed in your capacity as an auditor?
A. I don't recall right now.
Q. Okay. And how long did you remain as an

Page 21

auditor at the OIG?
A. About one year.
Q. And what was next for you within the FDIC?
A. Then I got hired in the receivership operations section.
Q. And what year was that, do you recall?
A. 1994.
Q. And what were your responsibilities in receivership operations?
A. Working on the receivership, general ledger financials, the goodwill cases, policies and procedures, et cetera.
Q. Since I'm a lawyer, I have to ask, when you say et cetera, do you remember any other significant responsibilities you had?
A. Some -- assisting in resolving accounting issues.
Q. All right, well, let's talk for a few moments about each of these. You said receivership general ledger financials, you worked on those. Were those the FDIC's global general ledger for all receiverships or were they specific to specific receiverships that you were working on?
A. Well, both. The specific receiverships and -- well, the receiverships are separate within

Page 22

one general ledger.
Q. Okay. And what were you doing with respect to general ledgers of specific receiverships, what sort of responsibilities did you hold?
A. I worked on the chart of accounts.
Q. What's a chart of accounts?
A. The accounts which are used for the accounting for receivership activities.
Q. Okay.
A. Different accounts.
Q. All right.
Any other responsibilities with respect to the general ledgers with respect to specific institutions?
A. I can't recall all the different things I did.
Q. Okay. Did you get involved in looking at specific line items and trying to reconcile pro forma balances and were you involved at that level of detail?
A. I did do some reconciliations.
Q. Sorry, go ahead.
A. But not pro formas.
Q. When would reconciliations be necessary?
A. Well, being in Washington I would be

Page 23

looking at -- reconciling the receiverships in the corporate general ledgers.
Q. And do you mean the FDIC receivership general ledger and the FDIC corporate general ledger?
A. Yes.
Q. And what sort of things would you be on the lookout for in doing that?
A. Any accounts where the corporation had an interest, a receivable, a payable with the -- with a receivership.
Q. Okay. Now, did you do any work on Carteret's receivership?
A. I don't recall.
Q. Now, you also mentioned that you did some work on goodwill cases, what were your responsibilities in connection with those cases?
A. I was appointed to the offensive side and I prepared the financial reports that were prepared for the offensive team.
Q. When you say the financial reports that were prepared for the offensive time, what are you talking about?
A. The financial statements that have been given out every year by FDIC for every case, for every case.

Page 24

Q. You did them for every case?
A. No, but I did a lot of them.
Q. And what time frame were you preparing those financial statements?
A. I think we started in '96.
Q. And was that because that was the year that the Winstar case was decided?
A. Yes.
Q. And prior to that time, financial statements were not being prepared for those receiverships that were in goodwill litigation?
A. Well, we had financial statements, yes, we always have financial statements -- well, not always, but at some point we had the system produce financial statements, canned financial statements.
Q. When you say canned, what do you mean by that?
A. I mean financial statements that are automatically produced each month by the accounting system.
Q. And then if you had financial statements that were being automatically produced each month, why was there a need to have special financial statements starting in 1996 that were different somehow from what you would previously have?

Page 25

MR. LEVITT: Did they say they were different?
MR. THOMPSON: Well, Mr. Levitt --
MR. LEVITT: You're putting words in the witness's mouth.
MR. THOMPSON: She has an attorney and you're not.
MR. LEVITT: I cross-noticed.
MR. THOMPSON: Yes, you're entitled to ask whatever questions you'd like at the end of my questioning, but you do not represent this witness as I understand the firewall.
MS. DOHERTY: Let's have the question back.
MR. THOMPSON: I can ask the question again.
BY MR. THOMPSON:
Q. Which is, if there were financial statements that were produced on a regular basis prior to the Winstar decision, why was there a need for you to start producing financial statements in 1996?
A. We wanted to capture more information than was shown on the system produced financials.
Q. And do you -- what sort of additional

Page 66

receivership is put into T-status, what has to happen before it becomes terminated?
A. I still don't understand the question.
Q. Well, it sounds like there are two different statuses, there is the T-status --
A. Yes.
Q. -- and then there is actually being terminated; is that right?
A. Right.
Q. And --
MS. DOHERTY: You might want to use the official term, inactive.
MR. THOMPSON: Or inactive.
BY MR. THOMPSON:
Q. And what criteria were applied to decide when a receivership in T-status would be put into a separate category of inactive?
A. When the policy and procedural requirements were met and people in Division of Resolution and Receivership had signed off that everything on the receivership had been resolved and finalized and completed. And the final distribution of the money had been made.
Q. Was that the basic task, if everything is resolved, then it will be terminated?

Page 67

A. Yes.
Q. Now, with respect to the -- Carteret is one of the FINS listed on this Exhibit 15; is that right?
A. That's right.
Q. And do you recall at the time you left the FDIC last year whether for Carteret everything was resolved other than the goodwill litigation?
A. No, I don't.
Q. Okay. If everything for one of the FINS listed on Tama 15 were resolved other than the goodwill litigation, would it be rendered inactive or would it be kept open, do you recall?
A. It would be inactivated.
Q. It would be inactivated?
A. Yes.
Q. That was the FDIC policy while you were there?
A. Yes.
MR. THOMPSON: I'd like at this point to ask the court reporter to mark as Tama 16, a document that bears the Bates number AM 0013396.
(Tama Exhibit No. 16 was Marked for identification.)
BY MR. THOMPSON:

Page 68

Q. Ms. Tama, let me ask you one question, when a receivership is placed into inactive status, does post-insolvency interest continue to accrue?
A. No.
Q. Okay. Now you've been given a copy of Tama 16, which is an E-mail from yourself to Christopher Drown, dated August 28th, 1996; is that right?
A. That's correct.
Q. I'd like to direct your attention to item number 3, which says, "I believe it is confusing for the attorneys involved on our side when DOF and research have different understandings of the numbers. For example, in yesterday's is meeting, Lynn" -- is that Lynn Shibut?
A. Yes.
Q. "Lynn and I had a completely different understanding of what accrued interest represents and what impact the adjustment for FFB interest will have on the recovery values of the receiverships. I would like direction on how to approach this." What does FFB interest stand for?
A. You know, I'm not sure, but I think it is federal financing bank.
Q. What is federal financing bank interest?

Page 69

That's not a term I've heard of.
A. I don't recall right now.
Q. Now, do you recall what the difference of understanding was between you and Ms. Shibut about accrued interest?
A. No, I don't recall.
Q. Who was Mr. Drown, what was his responsibility at the FDIC?
A. He was my supervisor in the receivership accounting section at that time.
MR. THOMPSON: At this point, I'd like to ask the court reporter to mark as Tama 17, a document that bears the Bates number AM 0010491.
THE WITNESS: I need to clarify one thing, Christopher Drown in 1996, I can't be sure whether he was my supervisor at that point or not.
MR. THOMPSON: Okay.
(Tama Exhibit No. 17 was Marked for identification.)
BY MR. THOMPSON:
Q. And again, I believe the original message appears at the bottom of page 1 of this exhibit and then carries over. My question relates to the beginning of that original message which -- this was from yourself to the people -- Paul DiLorenzo and the

Page 70

others listed in the to; is that right?
A. That's right.
Q. It is dated May 15th, 1996; is that right?
A. That's correct.
Q. It says, "In connection with an accounting bulletin being drafted, I would appreciate your comments, suggestions on how to standardize the calculation of post-insolvency interest. Please forward this to anyone who might be interested or who will be working on these calculations."
Was -- were you trying to standardize the approaches to make sure of the consistency?
A. Yes.
Q. And then in the middle section of this document, it looks like it's comments from Karen Hughes to yourself and Jamie Perez, dated May 15th, '96; is that right?
A. That's right.
Q. And it says in the second paragraph there, "I'm not fully clear on the mechanics of all this, sounds like there will need to be two calculations, one for booking the estimated liability, which I think your E-mail speaks to, and a second for actually paying. We'll need to be claimant specific. I think it is the latter situation where treatment of

Page 71

adjustments becomes a factor."
Do you know what Ms. Hughes was referring to as to why there might need to be two calculations?
A. I don't know what she meant by two calculations.
Q. Do you know why there might be one that was for an estimated liability and a second for actually paying?
A. I think she's discussing the treatment in the general ledger.
Q. The general ledger of the specific institution receivership or the general ledger of the FDIC?
A. The institution of receivership and the FDIC, both.
Q. Okay. So -- but if there were a calculation of let's say $10 million of interest on the general ledger of the receivership, why would you need to do a second calculation, do you have any reason -- can you think of any reason why you'd need two?
A. I -- well, I would be -- I would be reading into what she's saying, interpreting, I would be interpreting.
Q. That's okay, you've been clear that you

Page 72

don't know exactly what she's saying.
A. Yes.
Q. But do you have a reasonable inference as to what you think she might have been saying?
A. Yeah, I believe what she was saying was that the estimated post-insolvency interest was calculated as a liability, then when the payment is actually made, the liability would need to be adjusted to the payment date and the amount shown paid would have to be reflected in the general ledger.
Q. Okay. At this point, I would like to ask the court reporter to mark as Tama 18, a document that bears the Bates number AM 0010493.
(Tama Exhibit No. 18 was Marked for identification.)
BY MR. THOMPSON:
Q. So this is an E-mail from yourself to Elena Mueller, M-u-e-l-l-e-r, dated May 30th, 1996 is that right?
A. That's right.
Q. And who was Ms. Mueller or what were her responsibilities at the FDIC at this time?
A. She -- I don't know. She was an accountant in the Irvine office.

Page 73

Q. It says, "to try to answer your questions, who will calculate the interest? I believe DOF should calculate the interest, but with DAS input. I believe the methodology would be for the field office to submit the calculation to Washington where it would be approved before being input into FIS."
What is DAS?
A. I'm not sure what it stood for, but I believe it was the equivalent of the current Division of Resolutions and Receiverships.
Q. And FIS, what does that stand for?
A. That was our general ledger system at the time.
Q. Okay. And is it a fair inference from this discussion about who will calculate the interest and from the prior exhibit what the mechanics of it will be that, in fact, the interest calculations had not yet been made as of May of '96?
A. No, that's not correct. The interest calculations were being made whenever we knew we had to pay interest or whenever there was a strong likelihood that we would have to pay interest. And the field offices at that point would calculate the amount due.
Q. The field office would?

Page 82

the first day of receivership from which interest runs the day of the pass through receivership or is it the day of the final receivership, if you know?
A. It is the day of the final receivership.
Q. Is that because that's the day the funds are lent for the branch sales and whatever other closing costs there are?
A. It is because that's what legal told us.
MR. THOMPSON: At this point, I'd like to ask the court reporter to mark as Tama 21, a document that bears the Bates number AM 0010350.
(Tama Exhibit No. 21 was Marked for identification.)
BY MR. THOMPSON:
Q. So this is a chart that's entitled post-insolvency interest distribution priorities and interest rates; is that right?
A. That's right.
Q. And it says, "federal judgment rate under post-insolvency interest rate for the row," that's through one, national banks, do you see that?
A. Yes.
Q. And then continue, the fifth row, it says, "national banks and federal savings institutions," and again under the rate column it says federal

Page 83

judgment rate; is that right?
A. That's right.
Q. And it has a little asterisk and there are several asterisks, but -- well, is the key date the failure date of the national -- the date of the enactment of the National Depositor Preference Statute?
MS. DOHERTY: Would you read that back?
MR. THOMPSON: Let me ask it -- that was a little confused.
BY MR. THOMPSON:
Q. Under the failure date column, which is the second column there, a series of dates, do you see that?
A. (The witness nodded.)
Q. And it says for the row national banks and federal savings associations, it says after August 10th, '93, do you see that?
A. Yes.
Q. Was that the date of the National Depositor Preference Statute?
A. Yes.
Q. And for purposes of making the post-insolvency interest calculations, did you view the National Depositor Preference Statute as

Page 84

governing those calculations?
A. If it was in the statute.
Q. Do you recall -- did you have any involvement in the actual calculation of Carteret's post-insolvency interest?
A. I don't recall specifically.
Q. And do you recall whether there came a time where the FDIC changed its methodology in terms of how it calculated Carteret's post-insolvency interest?
A. No, I don't recall that.
Q. At this point, I'd like to ask the court reporter to mark as Tama 22, a document that bears the Bates number AM 0010134?
(Tama Exhibit No. 22 was Marked for identification.)
BY MR. THOMPSON:
Q. Now, this is a document dated May 1st, 2002; is that right?
A. That's right.
Q. And the subject is final regulation regarding payment of post-insolvency interest and receivership through surplus funds; is that right?
A. That's right.
Q. And were you involved in the formulation

Page 85

of this regulation, the discussion that led up to its proposal to the board?
A. Yes.
Q. And it says, turning to page 3 of the document, "The final rule further provides for the post-insolvency interest rate for all FDIC administered receiverships to be based on the coupon equivalent yield of the average discount rate set on the 3-month Treasury bill. The 3-month Treasury bill is widely recognized as a performance benchmark for cash investment management, and its yield has historically tracked to some degree changes in the rate of inflation. The post-insolvency interest rate will be adjusted in order to mitigate interest rate risk due to changes in economic conditions during the life of the receivership. Post-insolvency interest distributions will be calculated using a simple interest method, which should provide a reasonable amount of interest to compensate receivership creditors for the time value of money from the time the receivership is established until dividend payments are received."
Do you agree with the last sentence of the paragraph which I just read, the way in which post-insolvency interest was calculated under the

Page 90

FDIC receivership accounting structure as established by FDIC management can best be described as a combination of the cash and accrual basis such as modified cash, modified accrual or hybrid. For example, certain items are recorded on an accrual basis. For example, accrual interest on subrogated claim while other items are recorded on a cash basis, e.g., interest income on loans."

Does this statement accurately describe the accounting method used by the FDIC for receiverships during your tenure at the FDIC?

A. It is correct, it is not complete, but it is correct.

Q. What would you add to it to make it more complete?

A. I would add there was a liquidation basis of accounting.

Q. As opposed to a going concern basis of accounting?

A. That's right.

Q. Oh, and turning to the second page, where it says discussion, it says in the first paragraph, "Normally the proper method of recognizing an accounting transaction is determined by an entity's basis of accounting. When an entity is on the

Page 91

accrual basis, revenues and any related assets are recognized when earned and expenses and any related liabilities are recognized when incurred. Any basis of accounting other than full accrual is not considered GAAP. Therefore, the relevant accounting standards that comprise GAAP are not applicable."

Do you see that?

A. Yes.

Q. Under the full accrual method of accounting, would post-insolvency interest be recognized as a liability?

A. Yes, it would.

Q. And then in the next paragraph it says, "However, since the FDI receiverships are currently utilizing a combination of a modified cash, modified accrual or a hybrid basis of accounting, the answer to when a transaction is recognized becomes more difficult. Furthermore, there are no generalized recognition rules or authoritative standards for entities in receivership. Consequently, recognition of transactions is often a function of operational considerations."

Is that an accurate statement?

MS. DOHERTY: As of when?

MR. THOMPSON: Well, during your time at

Page 92

the FDIC, did this statement obtain at all times or --

THE WITNESS: Yes, it's accurate.

BY MR. THOMPSON:

Q. And given that there were no generally recognized -- excuse me no generalized recognition rules or authoritative standards, where would you turn for guidance in making determinations about recognition?

A. Well, you -- you could look at a bankruptcy -- estate bankruptcy accounting.

Q. Okay. Was that something that you did while you were at the FDIC?

A. Yes, I did that in my last year that I was there.

Q. And how did you utilize bankruptcy accounting principles?

A. Well, I looked at how the FDIC receivership might compare to a Chapter 7 liquidation.

Q. And what did you conclude about that?

A. That there were some similarities, but that FDIC was unique.

Q. Do you recall the ways in which FDIC was unique?

Page 93

A. Well, the chapter -- FDIC is subject to specific laws on how it operates -- the receivership operates, whereas the Chapter 7 bankruptcy estates are subject to different laws.

Q. Okay. Are there any other sources of guidance that you turned to while you were at the FDIC to help apply the hybrid method of accounting?

A. Well, we used GAAP guidance in some instances.

Q. Okay. Any other sources of guidance that you relied upon?

A. I can't think of any at this moment.

Q. All right. I'd like to ask the court reporter to mark as Tama Exhibit 25, a document that bears the Bates number AM 0011857 through 11885?

(Tama Exhibit No. 25 was Marked for identification.)

BY MR. THOMPSON:

Q. This is the accounting concepts, FDIC receiverships, dated September 30, 2004; is that right?

A. That's correct.

Q. And I'd like you to turn to page 19. If you use the numbers in the bottom right-hand corner, its Bates number 11876. At the very bottom of the

Page 118

burden, an administrative burden.
Q. Fair enough. Do you know where the other individuals to whom you addressed this E-mail stood on this issue?
A. Well, I recall that Rick and Steve were in favor of calculating it.
Q. To minimize the tax to liability for the receiverships?
A. I -- I'm not -- I don't know if that date that's what they were thinking, maybe it's the same date, but they were also thinking, to know the numbe and get it on there.
Q. Okay. Which would have -- okay.
Do you recall what the other individuals, what their position was on this?
A. No, I don't.
Q. And seeing this memo, does this refresh your recollection as to whether this was Mr. Green's decision to make?
A. No, this would not be Mr. Green's decision to make.
Q. Do you recall whose decision it would have been after seeing all these names?
A. I don't know whose decision it was.
Q. Was there anyone on this E-mail more

Page 119

senior than Mr. Green?
A. Johnnie Wells was his supervisor.
Q. And is Ms. Wells still with the FDIC?
A. I don't know.
Q. I'm always reluctant to say this, but I have no further questions. But you know our friends at the DOJ may have some questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. LEVITT:
Q. I want to show you a document that we'll mark as Tama 33.
(Tama Exhibit No. 33 was Marked for identification.)
BY MR. LEVITT:
Q. This is an E-mail from Michael Caco to a number of people, Karen Hughes, Dennis Nolan, John Quinn, Martin Becker, James Anderson with cc's to other people including you; do you see that?
A. Yes.
Q. And it's dated August 22nd, 1997; is that right?
A. That's right.
Q. The first paragraph says, "there was a meeting on August 22nd to discuss outstanding issues respective to post-insolvency interest. The issues

Page 120

discussed, the GROUP's consensus concerning each of the following." The first one says, "should the post-insolvency interest calculation compound the interest after the principal claim is paid." What does that mean?
A. I -- that's not clear to me.
Q. Does it -- is an interpretation that once the principal is paid, there's no principal left to continue to charge interest on, therefore interest should not be assessed against the interest that had previously been assessed?
A. Oh, yes, but the problem is the word compound, but if the word were calculate, yes, that's what it would mean.
Q. And the answer is no, because it makes the calculation more conservative; do you see that?
A. Yes.
Q. And it explains what it means by that, that "the total amount of post-insolvency interest accumulated, and the corporation would generally receive less than if compounding were to continue, which is in line with FDIC's past and present conservative policy concerning its approach towards the handling of the corporate claim." Do you see that?

Page 121

A. Yes.
Q. Do you agree with that?
MS. DOHERTY: Well, agree with what? Every portion of that statement? There are a lot of propositions embodied there.
BY MR. LEVITT:
Q. Do you agree hat FDIC had a conservative policy in its approach to handling the corporate claim?
A. No, I don't.
Q. And why not?
A. I don't understand what he means.
Q. And that's the basis for your answer is you don't understand what he means.
If he means that the corporation had a policy that didn't enhance the amount it was due in receivership, would you agree with that?
A. Could you repeat that?
THE REPORTER: "Question: If he means that the corporation had a policy that didn't enhance the amount it was due in receivership, would you agree with that?"
MS. DOHERTY: Agree with the policy or agree that the policy was conservative or what?
THE WITNESS: I don't agree the

Page 122

calculation is based on principal amount of the claim which -- once it's paid, it's gone.
BY MR. LEVITT:
Q. And therefore, no more interest should be charged?
A. Yes.
Q. And that's what this memo is suggesting?
A. Yes.
Q. And you agree with that, with the suggestion in the memo?
A. I don't agree with the wording here.
Q. Well, how about the concept of when the principal's gone, interest should stop accreting?
A. I agree with that.
Q. Now, as I understand your testimony this morning and this afternoon, it is that the -- that until 95 percent of the principal claim is paid, the financial statement would not show post-insolvency interest; is that right?
A. That's right.
Q. And we just looked at a couple of memos that show a down side to that as it relates to the calculation of taxes; is that correct?
A. That's correct.
Q. All right. Do you recall -- do you recall

Page 123

why the policy has been and was that the financial statement not show the post-insolvency interest until 90 percent of the claim was paid?
A. Yeah, I -- I recall the reasoning was twofold, that most receiverships would not -- would never pay and it would be an administrative burden to calculate this interest on all receiverships when most of them would never pay the interest.
Q. And were there any other reasons you recall?
A. No.
Q. Isn't it true it's -- that if it's unlikely a receivership would ever pay the post-insolvency interest under liquidation accounting, it would not be an expense that should be recorded on a financial statement?
A. Can you repeat that?
Q. Isn't it true that if -- it's unlikely a receivership would pay post-insolvency interest under liquidation accounting, that potential liability should not be booked on the financial statement?
A. Yes.
Q. Now, I take it the issue reflected in the memos we just looked at was that if the post-insolvency interest is booked, let's say in --

Page 124

let's say in the fifth year of the receivership, wasn't -- but wasn't booked earlier as accrued, that the tax return for the earlier year would not show that post-insolvency interest as a deduction in terms of the calculation of the tax; is that right?
A. Not necessarily.
Q. Not necessarily because even if the post-insolvency interest is not booked on the financial statement, the tax preparer still could use it as a deduction in the year that it accrued?
A. I think so.
Q. Do you know if that happened at the FDIC?
A. No, I don't know.
Q. We looked at a memo that talked about calculating the post-insolvency interest, even before the principal claim was 95 -- even before the principal claims were 95 percent paid, so that the post-insolvency interest was not recorded on the financial statement. Isn't it a fact that calculations were done that showed what the post-insolvency interest was?
A. Not that I recall.
Q. You don't recall that?
A. I don't recall them doing that.
Q. All right. When you calculate post --

Page 125

take the year prior -- take the year you left the FDIC, which I recall you testifying was what, 2004 --
A. '5.
Q. '5.
A. Um-hum.
Q. Post-insolvency interest is simply a mechanical mathematical calculation done by a computer, isn't it?
A. Yes.
Q. So if the inputs were clear, namely the date you should start the computation, the rate and the principal balance, it is very unlikely there are going to be errors, isn't that right?
A. It's always possible that there will be errors.
Q. But if there is a computer program that is designed to make the calculation, and it has the inputs such as the date the accrual or the computation starts, plus the rate, plus the principal balance, there aren't going to be mathematical -- it is unlikely there will be computational errors, isn't that true?
A. There wouldn't be computational errors, but the principal balance may change.
Q. In which event, to get an accurate number

Page 130

A. That's right.
Q. And so the reason it was changed in 2002 was to achieve uniformity so even state chartered were governed by the same rule as federal chartered?
A. That's right.
Q. Was that the only reason you recall that the change was made?
A. That's the only reason I recall.
Q. You recall there was a point in time where the post-insolvency interest for federally chartered thrifts was calculated pursuant to an earlier rule that the Federal Home Loan Bank Board had issued?
A. Yes, I do.
Q. And you recall that the rate under that rule was the three-month Treasury rate?
A. Yes.
Q. What was the rate under that rule?
A. Also the three-month.
Q. And do you recall when the rate was changed to the federal judgment rate for national banks and federal savings institutions, was it about the time that Congress enacted the preference for depositors?
A. Yes.
Q. Did you have any involvement in that

Page 131

process by which the -- a new rate was imposed for national banks and federal savings institutions?
A. No.
Q. And do you know why they made that change at that time?
A. No, I don't.
Q. I'd like you to look at Tama 22, please. Excuse me, Tama 25, I'd like to you look at page 7, the first paragraph, do you see that?
A. Yes.
Q. It says, "as a result of the FDIC's 70 years of experience in liquidation of thousands of financial institutions, a unique methodology for accounting for receivership financial transactions has evolved, based on the needs of the many users of receivership information. Since little authoritative guidance exists for receivership or liquidation accounting, the FDIC has developed over many years its own accounting principles and guidelines. Generally Accepted Accounting Principles are used for guidance and serve as a foundation for achieving recording objectives."
Do you agree with that last sentence, that the Generally Accepted Accounting Principles are used for guidance and serve as a foundation for recording

Page 132

objectives?
A. Yes, especially since I wrote this.
Q. You did?
A. I wrote this.
Q. I would like you to look at Tama 2 for just a second. Do you recall you were asked about the allocation of annual leave and sick leave to receivership accounts?
A. Yes.
MS. DOHERTY: One moment. This one. Sorry, she was on the wrong exhibit.
MR. LEVITT: Do you have Exhibit 2?
THE WITNESS: Yes, I'm not being asked here --
MS. DOHERTY: Well, wait for a question. He just asked if you remembered the previous examination by Mr. Thompson.
THE WITNESS: All right.
MS. DOHERTY: He'll have his own questions.
BY MR. LEVITT:
Q. Exhibit 3, which was the next exhibit that you were shown, had a criticism of charging receiverships with annual leave and sick leave on the grounds that annual leave or sick leave you're not

Page 133

actually working, do you recall that?
A. Yes.
Q. But isn't it true based on Tama 2 that the allocation was supposed to be not for people who worked intermittently receivership matters, but who worked exclusively for the goodwill effort, that's in Tama 2?
A. Yes, but Tama 2 is from legal, Betty DeRentis, legal.
Q. And legal is talking about how people allocate to receiverships annual and sick leave costs, but only for people who worked exclusively on goodwill cases, isn't that right?
A. Yes.
Q. And we talked about the fact that there's defensive FDIC people, offensive FDIC people and neutral FDIC people.
A. Yes.
Q. With respect to defensive FDIC people, any expenses they incurred working on goodwill matters would be charged against corporate, not against receiverships, isn't that right, if they were working on the defensive side?
A. Yes.
Q. And if neutral people were charged on the

Page 134

defensive side, the same would be true in that case, would it not, that those charges would be against corporate not against receiverships?
A. I'm not -- I don't think so.
Q. You think that if neutral people were charged as defensive people, if people -- if the costs of neutral people were considered as cost of defensive people, those costs would not be charged against corporate?
A. Well, let me back up. Corporate meaning --
Q. FDIC corporate.
A. Which can mean the BIF fund or the FSLIC Resolution, FRF?
Q. Right.
A. I don't recall whether mutual charges were allocated to goodwill receiverships or not.
Q. I want to ask you a question about Tama 14, please, which I guess is an E-mail from Elaine Tama to James Vordtriede, do you see that?
A. Yes.
Q. And the footnote, which I guess is going to be a footnote to the Carteret financial statement, that's going to refer to the tax claim is going to exclude, it says, the penalties. Am I reading that

Page 135

right?
MS. DOHERTY: Would you repeat the question?
THE REPORTER: "Question: And the footnote, which I guess is going to be a footnote to the Carteret financial statement, that's going to refer to the tax claim is going to exclude, it says, the penalties, am I reading that right?"
MS. DOHERTY: It wasn't clear to me whether you were asking whether the footnote was going to include the mentioned penalties.
MR. LEVITT: That's what I'm asking.
THE WITNESS: The footnote is going to be reading the way it's written here.
BY MR. LEVITT:
Q. It says the amount does not include penalties, do you see that?
A. Yes.
Q. It also says there's a potential to lower the IRS claim by filing a carry back refund calculation from calendar year 1997 to 1995; do you see that?
A. Yes.
Q. I'm just curious, on the post-insolvency interest, if it's recorded on the financial

Page 136

statement, let's say in 1998, and some of it relates to interest that accrued in 1995 which was not deducted from the -- not shown as a deduction on the tax return, wouldn't it be possible to go back and amend the 1995 return to make that deduction even though it was only recorded on a financial statement, say, as an example, in 1998?
A. I think so, yes.
Q. And that way you would have the advantage of that deduction; is that right?
A. That's right.
Q. I'd like you to look at Tama 17, please. At the bottom, it says, "in connection with an accounting bulletin being drafted, I would appreciate your comments on how to standardize the calculation of post-insolvency interest." Do you see that?
A. Yes.
Q. What is an accounting bulletin?
A. An accounting bulletin is a statement of accounting procedures that is issued by Division of Finance that covers operational issues, as well as some policy issues.
Q. And how do they get generated?
A. Well, the receivership -- I was in the receivership area then, and in the receivership area

Page 137

we would write the bulletins and then we would circulate them. And then after receiving comments, then they would be signed by at that time Al Kitchen, who was the deputy director.
Q. And they would reflect policies and operations procedures about how to account for various things; is that right?
A. That's right.
Q. So there was a formalized process, then, for determining how the accounting would be done for receiverships, isn't that right?
A. That's right.
Q. And the policy involved lots of people within the FDIC, I take it, making suggestions of what the policy ought to be?
A. Yes.
Q. And the policy would only become effective once an accounting bulletin was issued, is that right?
A. That's right. Well, or a policy statement.
Q. It was a formalized procedure, it was a -- in other words, it wasn't helter skelter accounting, it was through formalized procedures, is that a fair statement?

Page 138

A. That's a fair statement.
Q. Now, when you talked about the fact you were on the offensive firewall, you referred to preparing financial statements for receiverships, do you recall that?
A. Yes.
Q. Is it fair to say when you prepared those financial statements, you followed what these formalized procedures told you to do?
A. If there were formalized procedures in place, yes.
MS. DOHERTY: Mr. Levitt.
(Recess.)
BY MR. LEVITT:
Q. The next document I'd like to show you is marked Tama 35.
(Tama Exhibit No. 35 was Marked for identification.)
BY MR. LEVITT:
Q. You can thumb through this, but I'll direct you to specific pages after we get the document identified. It is dated May 4th, 1998 and it's an accounting and tax policy section discussion memorandum; do you see that?
A. Yes.

Page 139

Q. It looks like a formalized issuance by the accounting and tax policy section; is that correct?
A. Yes.
Q. And it says in the box on the first page, "this discussion memorandum presents neutral discussion of identified issues." Do you see that?
A. Yes.
Q. What does neutral discussion mean? Does it mean --
A. I --
Q. Go ahead and answer.
A. That this was issued to formalize thinking about certain topics, but it was a lower level than actual policy statement.
Q. When it says neutral, does it mean more on the merits more or less as these people who wrote it see it?
A. It sounds that way.
Q. And it said, "a statement of accounting policy could result, dependent upon the scope and" -- oh, it says, "a statement of accounting policy or a statement of position could result dependent upon the scope and content of comments received." Does that mean that after the discussion memorandum was circulated and comments were received, it might lead

Page 140

to a statement of accounting policy or a statement of position?
A. Yes.
Q. And is this a reflection of the deliberative process used by the FDIC to formulate accounting policy?
A. Yes.
Q. Now, this discussion memorandum is on post-insolvency interest in corporate and receivership financial statements; is it not?
A. Yes.
Q. And the date is May 4th, 1998, isn't it?
A. Yes.
Q. And if you look at the two -- well, the second and third paragraphs on page 1, it describes a slight difference in the financial statement treatment of post-insolvency interest between the FDIC and the RTC. And I wonder if you could read these two paragraphs to yourself and just describe for us the difference that these two paragraphs are illustrating."
A. Well, the -- the FDIC, the wording in here, only when it became clear did some of or all of the PII would be paid, I just know from this and from what I also know that that meant -- what that means

Page 141

is that was very probable.
Q. I understand these two paragraphs to be saying that the FDIC would record post-insolvency interest on the income -- on the financial statement when it was probable that it would be paid. And that it would record the entire accrued amount, whereas the RTC also would also record it on the financial statement when it was probable to be paid, but even at that point would not record the entire amount, but only an amount equal to what it perceived to be the equity of the receivership at that point. Is that a fair statement of the difference between the FDIC and the RTC?
A. Yes.
Q. Does that mean the FDIC would have recorded more post-insolvency interest than the RTC would have for the same receivership?
A. Yes.
Q. Okay. And you see on the summary of the of the issues on page 2 --
A. Yes.
Q. -- there are two issues as I read this. If you look at the first sentence in the first paragraph on the summary of issues, it says, "at issue is whether the FDIC should continue its current

Page 142

policy of recognizing post-insolvency interest in its corporate financial statements only on a cash basis." I take it that that means with respect to the corporation's financial statements, should it wait until it gets the money and only recognize that money on its financial statements once the money is received; is that what that refers to?
A. Yes.
Q. So that doesn't have anything to do with the receiver, that has to do with FDIC corporate; is that right?
A. That's right.
Q. The second issue -- back up a step, there's two levels here, isn't there, the FDIC corporate's financial statements and then there are individual receivership financial statements?
A. That's right.
Q. And they intersect in a way, in the sense that there are transactions oftentimes between FDIC corporate and FD -- and the receiverships, isn't that right?
A. That's right.
Q. So the first issue is when the FDIC corporate should recognize post-insolvency interest on its financial statements, correct?

Page 143

A. Yes.
Q. And I would say it's taking a conservative position in the sense that it doesn't want Congress to think that it has more money than it has, so it wants to wait until it actually gets the money before it records it on a financial statement. Is that a layman's way to describe what's going on in the first paragraph?
A. Yes.
Q. The second paragraph says, "the second issue, given the lack of authoritative guidance for liquidation basis accounting, as well as the above noted differences of the accounting of post-insolvency to receiverships, the second issue is determining the most appropriate accounting treatment for post-insolvency interest in FDIC receiverships."
So is this -- does this say that this discussion memorandum is looking again at how the FDIC was dealing with post-insolvency interest with respect to the financial reports of the receiverships and analyzing whether it was doing it correctly or not doing it correctly or doing it a way that was logical or not doing it a way that was logical? Isn't it fair to say that's what these people were focusing their attention on in this memorandum?

Page 144

A. Yes.
Q. And if you'll look at page 5 under conclusions and recommendations, the first paragraph which is recognition in corporate financial statements says in the first sentence that "the current policy and procedures for recognizing post-insolvency interest on a cash basis in the corporate financial statement should generally be continued." Do you see that?
A. Yes.
Q. And it says it's justified because until the money is received, "the amount that the corporate level is going to receive is not reasonably estimable." Do you see that?
A. Yes.
Q. Then it says, "while the SAVE/LLR process has been determined to be statistically valid at the corporate level, it does not result in absolutely reliable estimates of asset values at an individual receivership level."
What is the SAVE, do you know?
A. SAVE was the new process to calculate the estimated loss on the corporate subrogated claim.
Q. The LLR refers to the same thing, does it not?

Page 145

A. Yeah, the LLR is the -- is part of the process.
Q. So in other words, there was a system there at the FDIC to determine the loss on the subrogated claim in a mega sense, but because -- which was a -- judged to be statistically accurate. But because from an individual receivership point of view it might not be statistically accurate, the division that was writing this memorandum said it would be wrong to recognize the post-insolvency interest on the corporate financial statements until the money is actually received; is that what it's saying?
A. Yes.
Q. And that's -- isn't -- wouldn't that be regarded as an exceedingly careful and conservative position on the accounting?
A. Well, there were accruals at year end, but yes, it would be a careful -- a careful position in accounting.
Q. In general, weren't the technical professional people at the FDIC in accounting careful and conservative based on your experience?
A. Yes.
Q. If you look at the next page, we come to

Page 146

the recognition and receivership financial statements; do you see that?
A. Yes.
Q. It says, "the FDIC's responsibility for the accounting receiverships are only generally defined by either the FDI or authoritative accounting literature, essentially insofar as explaining the objectives for financial reporting for them."
So this means, does it not, that the FDIC had no choice but to develop reasonable accounting procedures to fill in the gaps that were not addressed by the FDI or the authoritative accounting literature, there was no choice, isn't that true?
A. That's true.
Q. And then it says that there's an objective or goal for the financial statements, which is "to provide sufficient financial information to estimate or determine asset types and values of respective cash flows from asset liquidations and what the result of the liquidation process had been."
Do you agree that information on these issues is a goal, an objective of the financial statements through receivership?
A. Yes.
Q. Then it says -- and I want emphasize the

Page 147

first word, "clearly the obligations for paying post-insolvency interest is relevant to the users of the financial statements only when there is a possibility that at least some of it will be paid i.e., when there's a prospective cash flow implication." Do you agree with that?
A. No.
Q. And why not?
A. Well, because if you're a claimant of the receivership, it would be good to know what all the claims are above you.
Q. Well, if a -- I mean, won't -- wouldn't it overstate the liabilities of the receivership if all the equity or all the asset values are going to be taken up by prior classes of claims, and so claimants to post-insolvency interest would never receive any dividend for the post-insolvency interest?
A. Well, are you asking my opinion?
Q. I'm asking your opinion.
A. Well, my opinion is that the liabilities should be shown or disclosed if possible.
Q. And what did the management, what position did the management take in this formal memorandum we're looking at?
A. Well, this was a discussion, so I think

Page 148

this is -- there was not a position at this point in time.
Q. You see the sentence says, "accordingly, we conclude" -- the second sentence in that same paragraph, "accordingly, we conclude that the obligation for paying post-insolvency interest calculated as of a balance sheet date should be recognized as a liability in any given FDI receivership financial statements only when the principal of that receiver's claims have been at least 95 percent claimed." Wasn't that a conclusion of the management of the division at this time?
A. Yes.
Q. I take it what you're saying is, had you been there, you would have voiced a different view?
A. I was there.
Q. Is that what you're saying? I guess if you voiced that, you were in the minority at that time?
A. Yes.
Q. So since people who were in accounting at the FDIC are reasonable people, this was a difference among some reasonable people; is that right?
A. That's right.
Q. But the majority of the reasonable people

Page 149

went for the 95 percent rule, right?
A. Well, it was an upper level decision.
Q. But the recommendation from the staff was the 95 percent rule?
MS. DOHERTY: Read that question back, please.
THE REPORTER: "Question: But the recommendation from the staff was the 95 percent rule?"
THE WITNESS: Yes.
BY MR. LEVITT:
Q. All right, give me one second.
Then in the next paragraph, if you look at it, it says that once -- "once the point is reached at which the financial statement begins to recognize and record the post-insolvency interest, it will be recorded on the entire legal balance." Do you see that?
A. Yes.
Q. In other words, the RTC had done it slightly differently. This memorandum says we did it right before and we're going to continue doing it that way, isn't that right?
A. What was your question again?
Q. I'll rephrase the question.

Page 150

We talked about the difference between the FDIC and the RTC, that the RTC, once it recorded post-insolvency interest, would only record an amount equaling the perceived equity in the receivership, whereas the FDIC had recorded the entire legal balance and this memorandum says in this paragraph we're going to continue doing that. Do you agree that that's what this paragraph says?
A. What was your question again?
Q. My question is, is the staff saying that once we recognize on the financial statement the post-insolvency interest, we should recognize it as calculated on the entire sum of the FDIC balances, what they call their legal balance, not as the RTC was doing it, limit it only to the perceived equity, remaining equity of the receivership.
A. Yes.
Q. And you talked about your -- that you would have dissented or you did dissent from the division's point of view at this time because you were worried about disclosures. But doesn't the last paragraph say that there should be a footnote added explaining the policy which in itself would be a disclosure?
A. Yes, um-hum.

Page 151

Q. So the disclosure objective is not compromised by the policy being advocated by the staff in this memorandum, isn't that right?
A. The disclosure -- repeat that.
Q. The disclosure objective which is dear to you is not being compromised by the policy recommendation of the staff in this memorandum, isn't that right?
A. That's right. I'm saying that because now that I'm thinking about this -- well, the disclosure is a verbal statement.
Q. A written statement?
A. Yeah, yeah, a written statement. The disclosure, if my memory is correct, does not include a number. So when I say disclosure, I'm talking a number also.
Q. The disclosure is a disclosure of the fact that there is post-insolvency interest, but we're not including it because we don't know whether it will ever be paid or not paid, that's what the disclosure is?
A. Yes, um-hum.
Q. The next one I'm just going to ask you a few questions on this Tama 36, it is called post-insolvency interest procedures analysis and it's

Page 152

dated June 26th, 1997?
(Tama Exhibit No. 36 was Marked for identification.)
BY MR. LEVITT:
Q. This document is dated June 26th, 1997, do you see that?
A. Yes.
Q. And it says it's a post-insolvency interest procedures analysis. And at the top, it says, FDIC procedures, former RTC procedures, procedures applied currently, proposed regulation and applied prospectively, procedures to be applied after regulations approval; do you see that?
A. Yes, so this looks --
Q. Do you know who wrote this or who it came from?
A. I think this was prepared by Mike Caco.
Q. Where was he working at the time?
A. He was in accounting policy.
Q. So is this an analysis of how the various regulatory authorities such as FDIC and RTC have dealt with the issue of post-insolvency interest?
A. Yes.
Q. So in other words, this is again an example of consideration of the issue by the FDIC in

Page 153

a careful, methodical way; isn't that right?
A. Yes.
Q. I think most of the substance on here we've already addressed, so we don't have to do that again so that's it for that copy.
(Tama Exhibit No. 37 was Marked for identification.)
BY MR. LEVITT:
Q. Do you recognize this document, Ms. Tama?
A. Yes.
Q. The first page is a memo from Steve Johnston to you, and he asked you to have a look at the matrix, which is attached to the E-mail; do you see that?
A. Yes.
Q. What was the -- do you recall the genesis of this matrix?
A. Steve was working, we had a working group that Steve and Karen Hughes and myself and a few other people, we were working on various tax issues together to try to resolve these issues that Steve had raised.
MS. DOHERTY: Hold on a second, this is one of these things that seems to have slipped through. There are legal opinions in it and it