# EXHIBIT I

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

AMBASE, et al., : Case No:
Plaintiff : 93-531C
vs. :
THE UNITED STATES, :
Defendant :

------------------------------X

PHILADELPHIA
JULY 13, 1999

Page 46

surrounding the 1989 examination were simply to attend the meeting with the board of directors in early 1990.
BY MR. HUME:
Q. And after attending that meeting, was there any follow-up work that you were involved in relating to recommendations contained in the '89 exam?
A. Yes, I believe there were.
Q. And what would the nature of this follow-up work have been?
A. I recall meeting with members of management regarding progress reports on how they were dealing with problem assets. And if there were issues in the examination report that required a response by Carteret to the OTS as to what needed to be done to address the issues that were cited Mike Finn and myself would have reviewed those responses and gotten back to management at Carteret.
Q. Do you recall working on the recommended reserves that were in the exam report whether Carteret had adequately accounted for them?
A. No.
MS. FRANK: Objection as to form.

Page 47

MR. HUME: Mark this Kehoe Five.
(Kehoe Exhibit No. 5 was marked for identification.)
BY MR. HUME:
Q. Reviewing this letter of March 5th that you sent to the Carteret board. As you can see there are a number of issues in this letter. I'm going to spend a little time asking you about each one of them. Does reading it over refresh your recollection of having written it?
A. No.
Q. I realize it's a long time ago.
A. No, I don't recall writing the letter.
Q. But you have no reason to doubt that you did it?
A. That's correct.
Q. In the second paragraph you state that having reviewed the Thrift's General Valuation Allowance. And you say based on agreed upon methodology that Thrift ought to increase its allowance by $9.1 million. Am I right in saying that this is follow-up work from the $77 million recommended in the report of examinations?
MS. FRANK: Objection as to form.

Page 48

BY MR. HUME:
Q. I mean, it's the same issue?
MS. FRANK: Objection as to form.
THE WITNESS: It's the same issue. I don't recall if what we were doing was changing the $77 million number that was in the report.
BY MR. HUME:
Q. Well, that's what I'm trying to understand. The Thrift took a total reserve provision against future loan losses in 1989 of about $26 to $27 million. And there were $77 million recommended in the report of exam for 1989. And this letter is written in the first quarter asking for an additional $9 million. So I'm wondering if knowing that and reading this and remembering back, can you tell me was there an adjustment made in OTS as to the amount of reserves that should be taken by the 5th?
A. I don't recall. All I can tell you from reading this letter is that apparently we and management agreed on a number, whatever that number might be, and as a result of that they needed to increase the general allowance by $9 million.
Q. And they needed to increase that for the 1989 year, is that right?

Page 49

MS. FRANK: If you know.
THE WITNESS: I don't know.
BY MR. HUME:
Q. It's not possible to tell from this letter?
A. The letter indicates that the review is conducted for the period of December 31st, '89 but since there is no statements saying that the reserves should be added as of that date I'm not sure when it was done.
Q. Can you explain to me how the methodology works for determining General Valuation Allowances?
MS. FRANK: Objection, vague.
THE WITNESS: I can explain how it's done today but I don't know if that's necessarily how it was done.
BY MR. HUME:
Q. No. I mean, do you remember how it was done back in 1989, '90 and '91?
A. No.
Q. Not even generally?
A. Generally, if an asset of Carteret's was classified as either special mentions, substandard doubt for a loss, a portion of that dollar amount

Page 66

payment of management fees to AmBase?
A. No.
Q. I show you a document that might refresh your recollection.
(Kehoe Exhibit No. 9 was marked for identification.)
BY MR. HUME:
Q. Having reviewed that letter, do you remember this issue?
A. Yes.
Q. What was the concern of OTS about these management fees?
A. My recollection is that was twofold. Since Carteret was a problem institution the fact that it was paying fees to the parent was further contributing to its poor condition. And I also recall that the examination disclosed that the basis or the reason that the fees were being paid were not well-documented or clear to the examiners.
Q. Was it unusual for Thrift to pay management fees to a holding company?
A. No.
Q. Was there any reason to suspect that AmBase may be just using this as a way to bypass

Page 67

their dividend limitations?
MS. FRANK: Objection.
BY MR. HUME:
Q. Let me back up on that. Were you aware that AmBase like many holding companies have a limitation on the dividends that they receive from the Thrift that it owned?
A. Yes.
Q. Was there a concern on the part of OTS that these management fees might be a way to bypass the limitations?
A. I don't recall that being the case.
Q. Was your judgment about the management fees impacted by the fact that at this time was actually the case that AmBase should have been putting money into Carteret rather than taking money out of Carteret?
MS. FRANK: Objection as to form.
THE WITNESS: I don't --- I may have concluded that ultimately. My recollection of this issue is that we sent this letter based on what was reported in the examination report that the fees were hurting the institution and they weren't documented so that they should stop. Apparently, from having read this letter, we received some

Page 68

additional information from Carteret or AmBase describing why the fees were being paid and we then came to the conclusion that we still thought that they weren't properly documented and it was still hurting the institution. So stop doing it.
BY MR. HUME:
Q. And you don't have any reason to question whether the judgment would have been different if Carteret would have been a one or two composite rating at that time with ample capital?
MS. FRANK: Objection as to form. Also calls for speculation.
THE WITNESS: We would still be critical of the institution, of any institution regardless of its rating, if there was no documentation and/or basis for fees that are paid to the holding company.
BY MR. HUME:
Q. Right. Although it sounds like there was documentation, simply that it was not sufficient to convince the regulators or convince you that it was a legitimate payment?
A. I don't know if ---
MS. FRANK: Objection.
THE WITNESS: --- it's necessarily a

Page 69

legitimate payment. I think from having read this, yes, there was documentation, apparently the quality of the documentation was lacking.
BY MR. HUME:
Q. Right. But if it was simply a problem of documentation presumably that wouldn't be too hard to cure. Isn't there really a judgment that was made that it simply wasn't in the Thrift's interest for these payments to be made?
MS. FRANK: Objection as to form. It misstates prior testimony.
THE WITNESS: No, I don't think that's accurate. I think that the basis or the reason why the fees were being paid to AmBase were not clear and neither Carteret or AmBase could clear it up or support those payments. So this letter went out saying, well, that being the case then don't --- just stop the practice.
BY MR. HUME:
Q. Well, given that Carteret had its own management and board, why would it not have been able to decide for itself that these payments were not in its interest?
A. They should have decided that on their own, I agree. Our examiners reviewed the situation

Page 74

I recall.
BY MR. HUME:
Q. During the ---?
A. During the early '90s.
Q. After the past FIRREA?
A. Yes.
Q. And would you say the strategy was one that they undertook because of the capital requirements of FIRREA?
MS. FRANK: Objection as to form.
THE WITNESS: Some did because of the capital requirements and some did just because it made economic sense to dispose of facilities that were outside of their market area that weren't --- either weren't profitable or were not very profitable.
BY MR. HUME:
Q. What was your understanding of what Carteret's motivation was?
A. I don't recall --- the only branch sale that I recall with any knowledge was the Florida operations. And my recollection is that they wanted to get rid of the Florida operation because it was not a profitable operation and with the attendant benefit of downsizing that would help

Page 75

their capital ratios as well.
BY MR. HUME:
Q. Right. What was your role in approving these branch sales?
A. I don't recall.
Q. You mean you don't recall your role in these specific branch sales by Carteret?
A. That's correct.
Q. Would you recall what your role would have been in that position generally in approving branch sales?
A. Yes. We would have reviewed the branch sale and either signed off or disapproved of it.
Q. And would that sign-off or disapproval process take a long time?
MS. FRANK: Objection, vague.
THE WITNESS: There were and are standard time frames that we have to follow as far as acting upon applications like branch sales. I don't recall the specifics of what they are but normally I wouldn't anticipate that they would be more than a couple of months, two or three months tops.
BY MR. HUME:
Q. Would that approval or disapproval process be any different if you're dealing with a

Page 76

Thrift that was in excellent shape and had no capital problems versus if you're dealing with a Thrift that had severe capital pressure?
A. Yes.
Q. The reason for that was what?
A. Just in general we would want to look at any corporate application like a branch approval for any problem institution. We want to look at it much more closer than we would with an institution that's not a problem.
Q. What were the kinds of reasons that would cause you not to approve a branch loan application?
A. If the transaction would result in the institution being less profitable or being more leveraged in having less capital, that would present a concern.
Q. If you were selling assets to improve capital, presumably it's easier to do if you sell an asset for a profit so it will immediately have a positive impact on your capital; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: Could you repeat the question?
BY MR. HUME:
Q. Sure. In other words, if a Thrift is

Page 77

trying to improve its capital position by selling off branches, the reduction of its assets from the sale will help but it will also help if it sells profitably because the profit will help improve its capital position; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: Yes, that's right.
BY MR. HUME:
Q. But presumably to sell assets or branches profitably means you are selling assets that would make a profit for you or that it would be expected to make a profit for you on an ongoing basis; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: Generally speaking that's accurate, yes.
BY MR. HUME:
Q. So I understand, I think, what you were saying earlier which was that one reason you wouldn't want to approve a branch sale application is if the Thrift is getting rid of some of its better assets, more profitable assets. But isn't there almost a catch-22 problem there in the sense that if you want an immediate effect, improvement effect on your capital you would sell your most

Page 98

Carteret. But it doesn't appear to have been prepared by him either because I sent him the — that E-mail the next day to start working on. So I'm confused as to who prepared the response to Mr. McQuown.

Q. So your answer is you think it might have been Mike McQuown but you're not sure?

A. You asked me who I believe it would have been, I would say normally it would have been Mike Finn. But given that it appears that I forwarded that E-mail to Mike Finn a day after the message had been received, I'm confused. I don't know who would have prepared the response.

Q. Not only that, your E-mail says to please prepare a response?

A. Right.

Q. If you turn to the third page of this document and the response to question number three, the question is, what action has been taken by the association to the correct and major problems. Can you just read over all of those actions and could you tell me whether those were all things you were aware of Carteret having done at that time period?

MS. FRANK: Objection as to form.

THE WITNESS: I believe that the first

Page 99

two bullet points they did because I saw in previous documents that they indicated that they had taken those actions. I don't know for sure if they — from the third bullet point down if they had actually done what was listed in this memo.

BY MR. HUME:

Q. Of course the second one established per the 5/22/88 ROE as we discussed earlier I don't understand because the ROE recommended $77 million as we reviewed. And as I represented to you they only reserved $26 or $27 million in 1989. What does that sentence mean?

MS. FRANK: Objection as to the form.

THE WITNESS: I believe that they did what we asked because an earlier document, which I believe was from me to the institution, indicated that we had agreed on a number totalling about $9 million as to what was required in additional reserves. And then a subsequent letter back from the institution indicated that they had made an additional $9 million reserve plus apparently even a little bit more.

BY MR. HUME:

Q. Okay. So it sounds like there was a modification of the reserve requirement recommended

Page 100

in the 1989 report?

MS. FRANK: Objection as to form.

BY MR. HUME:

Q. Would you agree with that?

A. I don't remember having done that but that appears to have happened based on that correspondence indicating that we agreed on a reserve.

Q. And the remaining points here you would not have been aware of at this time or you don't recall being aware of at this time?

A. I might have been aware of it but I don't recall if they, in fact, ever occurred and I don't remember.

Q. Turning your attention to the point four from the bottom, it says, Carteret redesigned its loan review and reserve calculation procedures in 9/89, September '89, and developed a new General Valuation Allowance output report. That seems to me to have been a pretty important part of the complaints that OTS had registered with Carteret. Do you remember that continuing to be a problem in the 1990 examination?

MS. FRANK: Objection as to form.

BY MR. HUME:

Page 101

Q. Their loan review procedures?

MS. FRANK: Objection as to form.

THE WITNESS: I believe it continued to be a problem based on the fact that additional loan loss reserves were needed following the 1990 examination.

BY MR. HUME:

Q. In other words, the existence of additional reserves being recommended indicates that their loan review was found still to be inadequate?

MS. FRANK: Objection as to form.

THE WITNESS: Yes.

BY MR. HUME:

Q. And yet it says here that they had redesigned it in accordance with the procedures --- well, I guess it says that they had redesigned its loan review and reserve procedures as of September '89. Wouldn't that have been likely to have been something done in conjunction with the regulators?

MS. FRANK: Objection as to form.

THE WITNESS: It could have been. Again, I don't know who wrote this or if what they wrote is accurate or not other than the first two bullet points.

Page 118

MS. FRANK: Objection as to form.
THE WITNESS: My understanding is that as a result of the examination and the need for additional reserves Carteret then didn't meet its capital requirement. Because of that we decided then to request that AmBase infuse the additional amounts that were listed under the capital maintenance agreement.
BY MR. HUME:
Q. Right. But you knew that if you recommended in your report that Carteret take certain reserves, Carteret was essentially obligated to take those reserves; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: I wasn't the individual that was making the determination as to what the reserves should be.
BY MR. HUME:
Q. No. I don't mean you individually making the determination. But you as a regulator would have known that what was going to be in the report of examination; wouldn't you?
MS. FRANK: Objection as to form.
BY MR. HUME:

Page 119

Q. Wouldn't you have been monitoring through Scott Smith and Russ Meyer or whomever the examiner in charge was?
A. Yes. They would have kept us notified as to how the exam findings were going and what, if any, additional reserves would have been needed.
Q. And would they have been cognizant of AmBase's requirements to infuse capital?
MS. FRANK: Objection, calls for speculation.
THE WITNESS: I think they were because I think that a discussion in the prior in the examination talked about it — maybe I'm wrong, but I think it talked about the net worth maintenance agreement.
BY MR. HUME:
Q. All I'm getting at isn't there — if there was a concern that AmBase may not be able to pay the $30 million, and didn't OTS have an incentive to try to accelerate their payment of that $30 million by recommending loan loss provisions during the report of examination?
A. No.
MS. FRANK: Objection as to form.
THE WITNESS: I have to disagree with

Page 120

that. The responsibility of the examiners assigned to the asset quality and the EIC are to first sit there, make a determination, what's the condition of the loan portfolio, and then what additional reserves are required. Once you go through that process and determine what the impact is on capital then you sit down and try to figure out and decide what the next step is. I don't think the examiner is sitting there in an examination and concentrating on anything more other than just reviewing the loans and trying to assess what the loan loss reserves should have been.
(Kehoe Exhibit No. 15
was marked for
identification.)
BY MR. HUME:
Q. This is another E-mail from Ed McQuown which we're going to mark Kehoe Exhibit 15. This was sent five days later than the previous one which was itself sent, it looks like a week after the August 8th message which we reviewed. Doesn't this series of E-mails from Ed McQuown suggest that he had very serious concerns about Carteret and about AmBase's ability to infuse $30 million into Carteret?

Page 121

MS. FRANK: Objection as to form.
THE WITNESS: I think his concerns were with the financial condition of AmBase.
BY MR. HUME:
Q. And the reason he was concerned for that was what?
A. That the sale of the Home Insurance Company would leave AmBase without sufficient resources to infuse money into Carteret.
Q. Wasn't the sale of an unrelated subsidiary that wasn't a regulated Thrift normally something that the OTS didn't concern itself with?
MS. FRANK: Objection as to form.
THE WITNESS: Well, we --- they're a holding company and they're subject to our supervision so there is some regulatory authority over a company like AmBase. It depends on the circumstances. If it's another wise, strong company that isn't dependent on another subsidiary for its financial strength then it's not an issue. With AmBase it was.
BY MR. HUME:
Q. Do you ever remember responding to the question what legal action you could take to restrict the sale of the subsidiary?

Page 130

the additional loan loss reserve, if I recall correctly, was a lesser amount. But I think ultimately it was more than that and I ---.
BY MR. HUME:
Q. And you suspected that that would be the case from the moment you started working on it?
A. No. I said that when I first started working with Carteret, my initial reaction was that the asset quality problems was the biggest problem that the institution faced.
Q. Right. And you said that would mean that it was a bigger problem in your mind at that time than the loss of goodwill as a result of FIRREA?
A. Yes.
Q. And that was true even though at that time it was a smaller amount of money than the amount of goodwill that was lost from FIRREA?
MS. FRANK: Objection as to form.
THE WITNESS: Yes. Because you don't look at it as to the amount of money. If an institution has asset quality problems and it's in a poor economic environment it's probable that you haven't seen the end of loan losses, and given the extent of asset quality problems that Carteret had my recollection was that they would be suffering

Page 131

from the asset quality problems for probably an extended length of time.
BY MR. HUME:
Q. Do you think your assessment of the importance of those asset problems would have been different if Carteret had had excess regulatory capital?
MS. FRANK: Objection as to form.
THE WITNESS: It would have been different to the extent that they would have had additional cushion to absorb the loan losses. Now, the degree to which it would have been different I don't know.
BY MR. HUME:
Q. All right. So it may not have affected the loan loss provisions recommended or taken but it might have affected the ultimate judgment about the health of the institution. In other words, whether it's a 4 or 3 or a 2 or whatever its ultimate rating is?
MS. FRANK: Objection as to form and I think it mischaracterizes his testimony.
THE WITNESS: I don't know if — well, you're asking me to speculate what would happen. If I were to speculate and Carteret had more

Page 132

capital than it showed on its books, it's with the degree of asset quality problems that they had and it probably still would have been very adversely rated, even with the additional capital, just because of the magnitude and the long terms.
BY MR. HUME:
Q. You surely make it sound like it must have been a sense that this was the tip of the iceberg in terms of asset problems. Was that your sense at that time?
A. No. My sense at the time is that they had a large volume of problem assets. And given the current economic environment and seeing what was occurring throughout the industry it was going to be a long road to recovery for the institution just because of the number of problem assets that they had.
Q. So maybe not the tip of the iceberg but the top half of the iceberg?
MS. FRANK: Objection as to form.
THE WITNESS: I didn't have any good understanding of the depth or degree of loans that had been identified as problems. My sense at the time was just based on what we know and what type of economic environment wherein Carteret was going

Page 133

to be suffering with trying to resolve those problem assets.
BY MR. HUME:
Q. But if it had had $180 million excess capital over and above its capital requirement at that time, wouldn't your judgment have been different about its long-term prospects?
MS. FRANK: Objection.
THE WITNESS: My judgment would have been it maybe would have more staying power.
BY MR. HUME:
Q. Maybe it would have more staying power or certainly it would have more staying power?
A. It would have — it may have more staying power if it's able to successfully resolve a lot of the problem loans. But from what I saw going back reviewing those two examination reports, the dollar amounts that were required to absorb the losses were substantial. So it may be even $180 million wouldn't have made much of a difference, you know. I don't know. That's — what I'm telling you is what my observations were at a time.
MR. HUME: Okay. Why don't we break?
(Short break taken.)
BY MR. HUME:

Page 170

refers to a conversation with Bob Walsh of Carteret. And Mr. Walsh refers to two different explanations for the difference in reserves taken by Carteret and recommended by OTS. Having reviewed it, do you recollect that argument being made by Bob Walsh and Carteret?
A. I don't recall the specifics. I don't recall these specific explanations being discussed at the meeting. I do recall management at Carteret disagreeing with our loan loss reserve totals.
Q. Can you explain to me what the differences between using a six-percent GVA, which was apparently taken from the 5/89 examination, and using a ten-percent GVA, which was apparently used by OTS in the 1990 examination?
A. The examiner simply required a higher level of General Valuation Allowances against loans classified substandard at the 1990 examination than they did at the 1989 examination.
Q. And how would they have made that decision?
A. Using the guidelines that I had discussed earlier about percentage allocations that examiners should use for classified assets and then adjusting those numbers as deemed appropriate.

Page 171

Q. You mean the difference between the six percent and ten percent would have been a difference initiated by Washington?
MS. FRANK: Objection as to form.
THE WITNESS: No, not that I'm aware of.
BY MR. HUME:
Q. Well, then wouldn't there have been a difference based on the discretion of the regional regulators involved in the exam?
A. Yeah. Primarily the examiner in charge and the examiners reviewing the loans. The six percent number is extremely lenient in my view, even today. And even the ten percent is on the low side. We use --- the current OTS policy is to use a 15 percent factor for substandard loans today.
Q. And is the definition of a substandard loan today the same as it was back then?
A. Yes.
Q. And at that time would ten percent have been lenient?
A. In retrospect, yes, considering the real estate market conditions and the economy.
Q. And at that time, not in retrospect but actually what was happening at that time, would it be lenient compared to the percentages used with

Page 172

other Thrifts?
A. I believe so, yes.
Q. Given that ten percent would have been lenient and they used six percent in 1989, doesn't that indicate that the reserves taken in '89 were inadequate?
MS. FRANK: Objection as to form.
THE WITNESS: It indicates to me that the examiners gave the institution the benefit of the doubt on a lot of classified assets and then in 1990 as conditions worsened decided that it was appropriate to boost the reserves.
BY MR. HUME:
Q. Do you remember working with Bob Walsh when you worked on Carteret in 1990 and '91?
A. Yes.
Q. Do you remember whether you had a good working relationship with him?
A. I wouldn't characterize it as a good working relationship. It was a professional relationship. He, too, was very responsive to regulatory requests, but I don't think he was effective in his position in addressing the problems at Carteret.
Q. What specifically did you work with him

Page 173

on?
A. We discussed the loan portfolio on different occasions. There were a series of meetings between ourselves and Carteret. I do remember the asset quality, a couple of meetings concerning asset quality.
Q. What other members of Carteret Management do you remember working with ---?
A. Mr. McCarthy and Rick Braun the chief financial officer, those were the primary contacts.
Q. What about Bruce Bean?
A. I dealt an occasion with Bruce Bean. I believe he was at AmBase, the attorney for AmBase.
Q. Did you have any especially difficult working relationships that you had to deal with with either Carteret or AmBase?
A. No.
Q. And when you say that both Bob McCarthy and Bob Walsh were responsive but not particularly effective, were there things that you think they could have done that would have helped Carteret?
A. At the time I --- especially in the lending area I think that they could have strengthened their credit administration process that could have helped resolve some of the loan