UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

\- - - - - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, February 28, 2006

Deposition of WAYNE S. GREEN, a 30(b)(6) witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 Eleventh Street, NW, Washington, D.C., at 9:43 a.m., Tuesday, February 28, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 62

Q. And I take it that last item, that last feature recognizes certain liabilities as they accrue -- is what prevents the system from being a cash system of accounting?
A. No, that would be more of a difference between GAAP accounting and modified accrual accounting.
Q. And so why -- what is the difference between the accounting system for receiverships at the FDIC and a cash system of accounting?
A. Well a cash system of accounting only represents transactions when actually cash is exchanges either receipt or disbursement.
Q. And modified accrual basis of accounting that you just described, has that always been the FDIC's basis for receivership accounting since the early '90s?
A. Yes, it has.
Q. And how, if at all, does the FDIC's basis of accounting, how if at all does that differ from the FDIC's basis of accounting?
A. It is literally identical.
Q. Were you aware of any changes since the early '90s with regard to specific issues with respect to receivership accounting and the changes

Page 63

and methodology and principles?
A. Since the early 1990s, the only principal change to liquidation accounting has been the recognition of post-insolvency interest on the books of receivership, there were ongoing discussions on income tax liabilities as a -- on the book of the receivership, but that was never decided.
Q. When you say there were ongoing discussions with income tax liabilities, what are you referring to?
A. The discussions essentially centered around should the receivership recognize income tax liabilities when a liability is due on the books of the receivership, as opposed to placing that amount in a memo account on the books of the receivership that would ultimately appear on the financial statements.
Q. And which method did you just describe is the method that the FDIC follows?
A. Only in those instances where the RTC has actually filed a proof of claim for income tax liabilities does that liability appear on the books of the receivership.
Q. And I take it that's been the FDIC's policy throughout this time period with respect to

Page 64

the recognition of a tax income liability?
A. Well, the FDIC recognizes an income tax liability when it is actually paid, in that instance, yes.
Q. I think you referred to the only other change in accounting methodology or principles that you recall is a change relating to post-insolvency interest?
A. That is correct.
Q. Okay. We're going to get into this ad nauseam later, but I want to make sure I understand what you're referring to as a general matter when you talk about that change.
So can you just describe briefly what you're referring to when you say a change in the accounting for post-insolvency interest?
A. Well, it is less of a change and more of an adoption of policy of when to recognize an accrual for post-insolvency interest on the books of the receivership.
Q. And when was -- can you describe what the policy is and when it was adopted?
A. The policy was initially adopted in the fall of 1997, that a receivership would recognize on its books as a liability the calculation of

Page 65

post-insolvency interest when all general subrogated claims in -- except depositors and the general trade creditor claims had been paid 95 percent in dividends.
Q. And was that change in policy, where was that expressed, was it expressed in a policy statement, was it expressed in a manual, was it expressed somewhere else?
A. It was eventually adopted in a policy statement.
Q. And when was that policy statement issued, do you recall?
A. I believe some time in 1998.
Q. And prior to the fall of 1997, what was the policy, the practice with regard to the recognition of the post-insolvency interest on the receivership financials?
A. It is my understanding the recognition only occurred to the extent it was paid, post-insolvency interest.
Q. Do you know why that change was -- why that new policy was adopted in the fall of 1997?
A. At that time it was a matter of developing a policy across both bank receiverships and thrift receiverships.

Page 66

Q. What was the policy with respect to bank receiverships at that time?
A. The policy was recognizing the post-insolvency interest to the extent it was paid prior to that occurrence.
Q. Prior to the fall of '97, that was the policy?
A. That's correct.
Q. And I take it that from your prior answer that that was also the policy with respect to thrift receiverships prior to fall of 1997?
A. Prior to 1997, I don't know what the thrift policy was.
Q. And so when I asked why that policy was adopted, you said it was a matter of developing a policy of both bank and thrift receiverships, but why was that particular policy adopted, the policy of recognizing it as 95 percent of creditor claims?
A. To the best of my recollection, that policy was adopted because at that point in time there were an increasing number of receiverships that were approaching 100 percent dividends paid, which could eventually and possibly trigger payment of post-insolvency interest so management elected to come up with a policy and an eventual practice of at

Page 67

what point in the life of a receivership was it most efficient or effective to disclose the amount of outstanding post-insolvency interest, and the eventual outcome of those discussions was had a 90 percent -- 95 percent dividend threshold, the receivership would recognize an accrual of PII on its books.
Q. When you say PII, you're talking post-insolvency interest?
A. Yes, I am.
Q. Any other changes in the accounting policy regarding post-insolvency interest that you can recall?
A. Not in the recognition of post-insolvency interest on its books, no.
Q. Any other with respect to post-insolvency interest, have there been changes in policy?
A. Not from a policy perspective, no.
Q. From another perspective, a change in practice?
A. Not from a practice, no.
Q. What types of financial statements, if any, what other types of financial reporting documents did the RTC maintain for thrift receiverships when it was in charge of thrift

Page 68

receiverships?
A. The RTC had the ability to produce a balance sheet and income statement for each receivership, in addition to an account trial balance for each receivership, in addition to an annualized transaction account trial balance for each receivership.
Q. You said the RTC had the ability to produce these types of documents, did they have a practice regarding whether it would produce like an annual financial statement or something like that or receivership?
A. It's my understanding they would produce a balance sheet, an income statement upon request by a party.
Q. Did the RTC prepare any different types of financial reports for institutions that were involved in goodwill litigation?
A. Prior to 1997, not to my knowledge.
Q. And after 1997, you weren't dealing with the RTC anymore, correct, were you dealing with the FDIC?
A. That's correct.
Q. What does -- excuse me. What financial statements, if any, does the FDIC prepare for thrift

Page 69

receiverships?
A. The RTC or the FDIC produces on a monthly basis from the automated system a balance sheet, income statement and cash flow receivership for all bank and thrift receiverships.
Q. You say it produces these documents on a monthly basis, does it also produce an annual financial statement?
A. No, there is no annual financial statement produced by either a bank or thrift receivership, except for the monthly financial statements.
Q. Where is the data drawn from? Let me put it this way. How are those monthly financial statements produced, what's the source of the data?
A. The source of the data are the account balances for each general ledger account within the general ledger system.
Q. And who -- which office is responsible for producing these monthly financial statements, the Dallas office of DRR that you talked about earlier?
A. The financials are produced automatically. No particular office is responsible for triggering the creation of a financial statement.
Q. But the information that is used to create these, is that under the responsibility of the DRR

Page 98

talks about how post-insolvency interest was calculated; do you see that?
A. Yes, I do.
Q. It says note that prior to 12/31/99 this post-insolvency interest estimate for FIN 1309 -- FIN 1309 refers to what?
A. That is a numeric number assigned to the Carteret receivership.
Q. Carteret receivership?
A. Yes.
Q. So the post-insolvency interest for FIN 1309 was computer and prioritized in accordance with 12 C.F.R. section 360.3. However, this estimate was recomputed and reprioritized for 12/31/99 after determining that 12 C.F.R. section 360.3 is not applicable to receiverships established after 8/10/93; do you see that?
A. Yes, I do.
MR. GILBERT: I think you misspoke and you said '94.
MR. COLATRIANO: Did I? At the end?
MR. GILBERT: Yeah.
MR. COLATRIANO: It's receiverships established after 8/10/93.
BY MR. COLATRIANO:

Page 99

Q. Who made the determination that post-insolvency interest for Carteret needed to be recomputed and reprioritized?
A. Well, in 1999, we determined that or we questioned whether or not the methodology of calculating post-insolvency interest of Carteret for the years '97 and '98 was correct.
We then, we being the goodwill team sent an E-Mail to the legal division counsel and requesting their opinion on what was the proper methodology for calculating post-insolvency interest. As a result of their response to the goodwill team, the PII in 1999 was recalculated using a different rate and compounding methodology that had been used in 1997 and 1998.
Q. You said that we questioned in 1999 whether the PII methodology was correct. What caused you to question that then as opposed to earlier?
A. I think in the fall of 1999 when the dividend processing system was being modified to calculate post-insolvency interest that we looked into the different methodologies of calculating PII to confirm that the system would be able to handle the calculation.
I think as a result of that inquiry when

Page 100

we were comparing the way we had done it on Carteret and other receiverships that we questioned whether or not the prior methodologies that had been used was the correct methodology.
Q. Okay. But what specifically caused you to raise that question. I understand in what context it was raised, but what caused to you say, gee, are we doing this correctly?
A. I don't remember.
Q. And was this a question that was raised with respect to just Carteret receivership, with respect to all receiverships, with respect to a subset of receiverships?
A. I believe there was a certain subset of receiverships that we questioned the validity of the method of calculating post-insolvency interest.
Q. And what was that subset?
A. Well, that subset included Carteret in addition to four or five our receiverships that we ultimately made adjustments on by changing the methodology.
Q. Was there something about these -- the subset of receiverships that distinguished it from other receiverships that caused to you question how it was calculated for the subset?

Page 101

A. Yes, it was.
Q. And what was that?
A. That the receiverships were closed or created after August 10th of 1993.
Q. And what do you mean when you say the receiverships were closed or created after August 10th of '93?
A. Well, that as it relates to Carteret that specific fundings or insurance determination were made on the Carteret conservatorship after August 10th of 1993.
Q. I'm sorry, you referred to specific fundings or --
A. Well, insurance determinations.
Q. What do you mean by fundings or insurance determinations?
A. Well, the insurance determination is a specific process of claims unit goes through to determine the insurance of accounts.
Q. Can you describe what that is?
A. The process includes grouping accounts by similar ownership and then determining based on ownership of accounts which portion, if any, of an account is insured or covered by insurance. The term funding I was using was the funding by the FDIC/RTC

Page 102

for the deposits of the insured accounts.
Q. Funding for the deposits means funding for how to pay off those deposits or how to assign those deposits to someone else?
A. Funding it in the context of funding actual dollars for the deposits.
Q. And what is the relationship between the determination of funding or instrument determination to date on which a receivership is considered closed for purposes of calculating PII?
A. Well, from the direction we got from our legal division, that based on the three specific closing dates of Carteret that this was the specific interest rate to be used and furthermore this would be the compounding method to be used to calculate the post-insolvency interest.
Q. When -- a couple of times you've referred to a date in the course of this discussion as August 10, 1993. What is the significance of that date?
A. I believe that's the enactment of the National Depositor Preference Act.
Q. When was Carteret the thrift actually placed into receivership?
A. I believe it was placed into a past due

Page 103

receivership in August or December 1992.
Q. Okay. And so that's the date that the RTC came in an effectively took control of the thrift, correct?
A. That's my understanding, yes.
Q. And so obviously that's before August 10th of 1993, correct?
A. Correct.
Q. Why is that date not the relevant date for the purposes of determining which methodology should be used for post-insolvency calculations?
A. Well, from the directions we got from our legal division that the specific subsequent fundings or partial closings of the conservatorship were the proper dates to use in order to trigger the post-insolvency date.
Q. Okay. Do you have an understanding for why they determined that was the date that they were funding instrument determination as opposed to the date the RTC took control of the institution was to be determined?
A. No.
Q. Did you have any discussions with anybody at legal regarding that issue?
A. None other than what's in certain E-mails

Page 104

that we've provided.
Q. And who specifically was providing this guidance to your team as far as this issue, who in the legal division?
A. I believe the attorney by the name of Michael Saran actually offered the E-Mail that actually made it's way to the other parties of the goodwill team.
Q. And do you know of anything other than this E-Mail that actually expresses what this determination was, was there any other document, a memo, a policy statement or any other type of analysis done with respect to this issue?
A. Well, the E-Mail alludes it other memos issued within DRR or Division of Finance and our legal division addressing the computation of post-insolvency interest.
Q. You don't know of any other documents that kind of reflect this determination other than this E-Mail?
A. No.
Q. As we will see, I'm sure on some additional documents later on, the fundings were going to be deposit transactions involving Carteret were undertaken in late 1994, early 1995, correct?

Page 105

A. Correct.
Q. Why is it then that this issue with respect to which date would control the calculation of post-insolvency interest was not flagged until 1999?
A. That, I don't know. When we first began the calculation of PII in '97, the team thought that the applicable method, the first method used was the method to use.
Q. And what was the basis for that determination?
A. Well, in conversations I had with staff in Dallas, as well as goodwill team staff, that it was our opinion that the methodology under I think section 360.3 if I can read it properly was the methodology in fact at that time to calculate post-insolvency interest.
Q. I imagine we're going to come back to this issue when I get some other documents later on.
MR. GILBERT: Sure.
BY MR. COLATRIANO:
Q. But for now, let's turn to Exhibit 6, which is the 1990 -- I'm sorry, which is the 2000 goodwill financial reporting package for Carteret.
Do you have that?

Page 190

MR. GILBERT: I state a standing objection and I won't interrupt again.
THE WITNESS: We received guidance from counsel in the legal division, in addition to there were other memos authored discussed the National Depositor Preference Act that addressed the calculation of post-insolvency interest.
BY MR. COLATRIANO:
Q. And do you have any understanding for why in light of the fact that the National Depositor Preference Statute doesn't address anything regarding how interest was to be calculated why that statute had such significance in this determination of what method was going to be used?
A. I'm sorry, can you repeat that?
Q. Yeah, that was a long one. To your knowledge National Depositor Preference Statute didn't address any of the mechanics of calculating post-insolvency interest, correct?
A. Correct.
Q. It didn't address the rate, didn't address floating or fixed, didn't address simple or compound?
A. Correct.
Q. In light of those facts to your understanding the statute was silent on all that,

Page 191

what is your understanding of why the calculation method turned on whether an institution was closed before or after the National Depositor Preference Statute?
A. It is my understanding it turned because of the opinion from our legal division that since Carteret was closed after August 10th, 1993 because of those events that those failures or the calculation of the post-insolvency interest calculation was different than what we had used previously to calculate post-insolvency interest.
Q. And I take it that other than what you were told by legal you don't have a sense for what the rationale was for why this statute that doesn't address any of these mechanics somehow has determinative relevance to how interest was going to be calculated?
A. No.
(Green Exhibit No. 19 was marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, with respect to Exhibit 19, I'm interested mostly in the first three pages. Is this a document you've reviewed before?
A. The first three pages of Exhibit 19, yes,

Page 192

I've seen those before.
Q. And can you identify for the record what those three pages are?
A. The first page is cover memo from Sharon to regional counsel, dated June 14, 1995 Post-Insolvency Interest Memorandum.
The second and third page is a document from Steve Graham, Alvin Kitchen and Thomas Rhodes, dated June 8, 1995 to regional directors of DAS, DOF and all regional counsel for liquidation and it's subject is Receiverships Post-insolvency Interest.
Q. I think earlier you made reference to the fact that you saw a determination regarding the post-insolvency calculation. There was an E-Mail and then there was references to other memos that dealt with that issue.
Is this one of the memos that you had in mind when we were talking about that?
A. Yes, it is.
Q. And the document beginning on the second page June 8th, 1995 memo talks about the interest -- in the second paragraph is it says the interest rate that should be utilized in making post-insolvency interest distributions to creditors is largely dependent on when the institution failed, the

Page 193

jurisdiction it was in, whether it had a state or federal charter; do you see that?
A. Yes, I do.
Q. What is your understanding of what was meant by when the institution failed?
A. My understanding of that particular phrase would be in the context of when there was a final receivership or there was some other interim resolution when some type of funding occurred giving rise to subrogated claim.
Q. Has that always been your understanding of what this is referring to?
A. Yes.
Q. When I think we talked about earlier that the changes in how post-insolvency interest was going to be calculated with respect to Carteret had occurred in 1999, correct?
A. Correct.
Q. Prior to that time, had you or anyone been responsible for determining which interest rate methodology or which interest calculation methodology should be used for Carteret and anybody who viewed this memorandum?
A. I don't believe anyone on the goodwill team or even myself calculating PII had seen this

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

| | |
|---|---|
| AMBASE CORPORATION and | : |
| CARTERET BANCORP, INC., | : |
| Plaintiffs, | : No. 93-531 |
| And | : Judge Loren Smith |
| FEDERAL DEPOSIT INSURANCE | : |
| CORPORATION, | : |
| Plaintiff-Intervenor, | : VOL. II |
| Vs. | : |
| THE UNITED STATES OF AMERICA | : |
| Defendant. | : |

\- - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, March 1, 2006

Continued deposition of WAYNE S. GREEN, CPA, a 30(b)(6) witness herein, recalled for further examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:11 A.M., Wednesday, March 1, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 235

A. Correct.
(Green Exhibit No. 23 was
Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 23 is a printout of two E-mails, one of which appears to have been from Elaine Tama to yourself and to James Igo dated November 12, 1999. It has an attached memo from Elaine Tama to Barbara Stake Tishuk, dated November 12, 1999 and my first question is, is this a document that you viewed before
A. Yes, it is.
Q. Who was if you know Barbara Starke Tishuk?
A. I believe Ms. Tishuk was one of our attorneys in our Hartford office.
Q. Hartford?
A. Yes.
Q. And where was Elaine Tama located?
A. She was with the Division of Finance in Washington.
Q. In Washington, all right.
Her E-Mail at the top says, Wayne, thanks for noticing this. Do you know what she's referring to, what's this?
A. Well, I think what this is referring to,

Page 236

to my statements yesterday that some time in late summer or fall of '99 when we were reviewing the dividend processing system in order to make that capable of calculated post-insolvency interest for some reason, Carteret, along with others, we questioned whether the method we were using to calculate PII was the proper method.
So as a result of that and having conversations with Elaine, Elaine sent this E-Mail to the attorney for clarification or an opinion of whether or not this particular statute was the proper statute that post-insolvency interest should be utilized.
Q. You said during the course of that answer, I think that for some reason we questioned how this should be done. And I just want to make sure I understand your recollection for what reason, what caused to you question it?
A. Well, what would have caused us to question it is looking at the date of the receivership on a receivership's books that that date came off the August 10th, 1993, National Depositor Preference Act in conjunction with possibly, then Al Kitchen's memo that was authored back in 1995, I believe that Carteret, along with other receiverships

Page 237

fell after that date.
So we questioned whether or not the method we were using was the proper method in order to calculate post-insolvency interest.
Q. And why was that not questioned until 1999?
A. That, I don't know.
Q. I think you mentioned before that Carteret was initially seized in 1992?
A. That's correct.
Q. And the resolutions happened in late 1994 and early 1995, correct?
A. Correct.
Q. Is that a typical length of time between the date of initial seizure and date of resolution?
A. From what I have seen on dates of conservatorship, it's not completely atypical, I mean it's -- it's really neither, it's -- it depends upon a resolution itself conservatorship.
Q. Do you have a sense for whether or not that's a longer than average resolution time, shorter than average?
A. No, I don't.
Q. Do you have any idea -- do you have any knowledge about why it took that long to resolve?

Page 238

MR. GILBERT: Objection.
THE WITNESS: No, I don't.
BY MR. COLATRIANO:
Q. Have you reviewed any documents that talk about or that suggest a reason for why it took that long to resolve?
A. No, no, I have not.
Q. Would it be fair to say that until late 1999, FDIC personnel treated Carteret as a pre-National Depositor Preference failure for purposes of calculating post-insolvency interest?
A. It treated Carteret in the same methodology as all other RTC receiverships in the calculation of post-insolvency interest.
Q. And were all RTC receiverships effectively treated as pre-NDP failures for purpose of post-insolvency calculation?
MR. GILBERT: Objection, he's not here to testify as to RTC receiverships.
THE WITNESS: To my knowledge we use the same method that were outlined in 360.3 code.
BY MR. COLATRIANO:
Q. And when did RTC stop using the institutions, was there a period after it was no longer the receiver and FDIC was?

Page 255

A. I'm sorry, I don't understand.
Q. There's an issue right now in this case involving the validity of the receivership deficit for Carteret; are you aware of that?
A. Yes, I am.
Q. Okay. And I guess my question is, is, you know, within the FDIC are both the offensive litigation team and the defensive litigation team.
Do they share the same goal with respect to how that issue should be resolved?
A. I can speak only to the offensive litigation team.
Q. And what can you say about what the goal is with respect to that?
A. Well, the goal is to represent the correct amount of the deficit of the receivership.
Q. And I take it that it's your view that the correct amount of the deficit is that stated in the goodwill financial reporting packages?
A. Yes.
Q. Let's move on. I've handed you a document that's been marked as Exhibit 26. It's a printout of a proposed rule by the FDIC, dated September 18, 2001 regarding payment of post-insolvency interest and receiverships with surplus fundings.

Page 256

Have you reviewed this document before?
A. The document does look familiar to one of the documents that the FDIC counsel had provided me with.
Q. Do you know whether this proposal was ultimately adopted?
A. I believe there was an ultimate proposal adopted, yes.
Q. Do you know what the current rule is with respect to payment of post-insolvency interest, how that's calculated with respect to receiverships that are established after the date that that rule was established?
A. Yes, I do.
Q. How does it work for those institutions?
A. For those institutions, it's based on the prior 95 day T-Bill rate in effect at the time of failure and it is adjusted quarterly.
Q. Do you know whether it is simple or compound?
A. To my recollection, it is simple interest.
Q. Were you involved in any capacity in the promulgation of that rule?
A. I had received some E-mails from the Washington DOF about the proposed rule, but had I nc

Page 257

responsibility for the final rule that was adopted.
Q. If you turn to page 4 of this exhibit, the last full paragraph begins another component proposed rule; are you with me?
A. Yes.
Q. This paragraph is discussing the selection of the three-month Treasury bill rather than the federal judgment rate as the rate of interest to be applied; do you see that?
A. Yes.
Q. Near the bottom of that paragraph it says, this rate -- meaning the three-month Treasury bill -- was selected instead of the federal judgment rate, because the three-month Treasury bill was considered to be widely recognized as a cash management investment performance benchmark and it's yield is historically tracked to some degree changes in the rate of inflation.
Do you know what this sentence means when it says that the three-month Treasury bill is considered to be widely recognized as cash management and investment performance benchmark?
A. No, I don't.
Q. Do you have an understanding for why that factor was considered important for purposes of

Page 258

deciding which rate to apply?
MR. GILBERT: Objection.
THE WITNESS: It's my understanding that the election of using a three-month Treasury bill rate is because it would change over time and as there were market changes dealing with items such as inflation, that the rate would change as opposed to a single fixed rate that doesn't change based on any other market factors.
BY MR. COLATRIANO:
Q. Do you understand why it was the FDIC's decision that it was preferable to have a floating rate versus a fixed rate?
A. No.
Q. On the next page, there's a first full paragraph -- there's a discussion of the proposed rule using simple interest rather than compound and did you have an understanding for why the FDIC chose simple versus compound?
A. No.
Q. Is it fair to state the interest rate methodology reflected in this proposed rule is pretty similar to the interest rate methodology that was used to calculate Carteret's post-insolvency interest before the 1999 change to the federal judgment rate?

Page 259

A. Yes, it would be similar, except for the compounding.
Q. Okay, it was compounded for Carteret before 1999, is that what you're saying?
A. Yes.
Q. But other than that the methodology is similar?
A. Yes.
(Green Exhibit No. 27 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, the document that's been marked as Exhibit 27 is a chart that's labeled Draft 11/13/02, Post-Insolvency Interest, Distribution Priorities and Interest Rates/Federal Income Tax Distribution Priorities.
Have you reviewed this document?
A. Yes, I have.
Q. In preparing for your deposition?
A. Yes, I have.
Q. Do you know who prepared this document?
A. Yes, I do.
Q. Who?
A. Elaine Tama.
Q. Do you know why it was prepared?

Page 260

A. I think Elaine was simply putting together a matrix of the different methodologies of calculating post-insolvency interest, also factoring in were any federal income tax liability might reside and just trying to summarize the different PI calculation methodologies.
Q. If Carteret were considered -- if it's inception for purposes of this chart were considered pre-National Depositor Preference, which category would it fall into on this chart for purposes of calculating PII?
A. If it's inception date for PI calculations on a subrogated claim fell in between 8/15, '88 and 8/10, '93, it could have been done by the method described on here.
Q. Are you referring to the first row of physical receiverships row?
A. That is correct.
Q. And I take it though that in actuality, Carteret has been categorized under the fourth row here; is that correct?
A. That is correct.
Q. And under the column that says govern law for PII rates, for the fourth row, that column says Federal Judgment for Federalized Receiverships; do

Page 261

you see that?
A. Yes, I do.
Q. What is your understanding of what that -- what is the source for that determination that that's the rate to use?
A. I believe the source for that comment came from a memo from the legal division.
Q. Have you -- is that a memo other than -- the E-Mail we reviewed earlier from Michael Saran?
A. No, that's a different memo .
Q. Is that one of the memos we've been talking about or mark as an exhibit here?
A. Have you not produced that memo yet.
Q. What do you recall about that memo, date, author, things like that?
A. I think the author was Tom Bolt, B-o-l-t.
Q. Tom?
A. Tom Bolt, I'm not sure of the date. Well the date is on there, February 22 of '01.
Q. Do you know whether that memo has been produced in this litigation ?
A. To my knowledge, it has.
(Green Exhibit No. 28 was Marked for identification.)
BY MR. COLATRIANO:

Page 262

Q. Mr. Green, the document that's been marked as Exhibit 28 is accounting bulletins and it's RA number 94-003, dated August 30, 1994.
Is this a document you reviewed in connection with preparing for this deposition?
A. Yes, it is.
Q. What generally are accounting bulletins?
A. An accounting bulletin is a document within the Division of Finance that speaking to or addressing certain accounting transactions or positions or policy related to events.
Q. Okay. Are you aware of think accounting bulletins that talk about how PII is to be calculated?
A. No.
Q. What is the purpose of this accounting bulletin?
A. This accounting bulletin was simply setting out in a narrative format the priority order of claims on receiverships established after August 10th, 1993
Q. And it's signed at the top concurrence, is that Alvin Kitchen, it's hard to read the handwriting?
A. That's correct.

Page 263

Q. I take it the policy that's reflected in this accounting bulletin was in effect at the time that Carteret subrogated claim was established, correct?
A. Yes.
Q. So from what we've talked about, it is fair to say that the decision to use the federal judgment grade on a fixed basis to calculate Carteret's PII, that decision was made in late 1999, correct?
A. Yes.
Q. And that decision also included that that rate would be fixed as of the time of each of the three resolutions, correct?
A. Correct.
(Green Exhibit No. 29 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 29 is a post-judgment interest rate table that I will represent to you that we've pulled off the Internet and it's my understanding this is sort of -- that this depicts what the federal judgment rate has been over the time period at issue here.
Have you reviewed any similar types of

Page 264

post-judgment interest rate tables or federal judgment rate tables in preparing for this deposition?
A. Yes, I have.
Q. Can you describe what interest rate tables you've reviewed?
A. I went on to the Internet and inquired into the federal judgment rates.
Q. And is it fair to say that as of late 1999 when the decision was made regarding the adoption of the PII calculation methodology for Carteret, that it was known to the FDIC or knowable by the FDIC that the federal judgment rate at the time of the deposit transfers at issue here was that -- that it was at its highest level at any time sense Carteret was seized?
MR. GILBERT: Objection.
THE WITNESS: I don't know that it was known in that context, it was just relayed to us what it was.
BY MR. COLATRIANO:
Q. Would you dispute that was knowable to the FDIC at that time?
A. Well, the federal judgment rate was knowable to anybody that had access to the Internet

Page 265

or the actual federal judgment rate schedule.
Q. And it's fair to say that regardless of whether it was known or knowable to the FDIC, as a factual matter, the federal judgment rate in the time period late 1994, early 1995 was at its highest level that it was at at any time since the seizure of Carteret?
A. I would say that's factually correct, yes.
Q. So from that, is it fair to say that at the time the decision was made to switch to this new methodology for calculating PII for Carteret, it was known to or knowable by the FDIC that the switch to this new method would have the effect of increasing the post-insolvency interest for Carteret?
A. As a result of recomputing the post-insolvency interest, it led to an increase in the overall amount of post-insolvency interest based on the change of interest rates being used.
Q. And that's something that was knowable at the time that decision was made, that it would have that effect?
A. I think I would have known that, yes.
Q. What practical effect in connection with the accounting for the Carteret receivership did the decision to switch to this new interest calculation

Page 266

methodology have other than to increase post-insolvency interest?
A. It had no other practical effect, other than it created a higher claim above any claim by the IRS.
Q. When you say it created a higher claim above -- what do you known by that?
A. It increased the amount of the post-insolvency interest claim that would have had to have been satisfied before my IRS claim could be made.
Q. What effect would that have with respect to the IRS?
A. Well, more funds would have to be generated by the receivership to fully pay PII before the IRS could be paid any part of its claim.
Q. Is it fair to say if funds had been generated that would have allowed this to be paid, it would have caused the income tax liability to be paid later than it otherwise would have been?
A. It could have, yes.
Q. And what effect, if any, would that have on the income tax liability works it have increased it?
A. Yes, it would have.

Page 295

Q. And the payments were all going to the same fund, correct?
A. Correct.
Q. And they were all the same priority, correct?
A. Correct.
Q. And so is it also fair to say that the decision to allocate the payments according to this weighted average method that you've described, as opposed to allocating the payments first to the highest cost debt had the effect of increasing the cost of the receivership?
A. To the extent that the interest rates were different that you applied the total dividends against one subrogated claim, to the deference of the others it would have a nominal difference, yes.
Q. Nominal difference?
A. Yes.
Q. What do you mean by nominal?
A. The rates were fairly similar so if you paid down the highest rate, then the overall interest would have been less.
Q. Have you attempted to calculate what the effect would have been?
A. No, I did not.

Page 296

Q. Can you point me to any type of policy at the same time, manual or reg or anything that supports the allocation method that was adopted here, in other words using the weighted average method and allocating each dividend?
A. No, I cannot.
MR. COLATRIANO: For now, we've done with spreadsheets.
(Green Exhibit No. 37 was Marked for identification.)
BY MR. COLATRIANO:
Q. I think yesterday if you recall we talked about I think you said that when premium was ordered in connection with each of the three deposit resolutions that you would have been a receivable recorded on the receivership's books to take that into account and that that receivable would be earning interest, correct?
A. That's correct.
Q. I think you also said that the interest on that receivable would ultimately wind up in the line item in the receivership, goodwill financial reporting package for interest on invested funds; is that correct?
A. That's correct.

Page 297

Q. Exhibit 37, I believe, correct me if I'm wrong, is drill down reports on the interest on investment -- on invested funds in line item; is that correct?
A. That's correct.
Q. All right. I would just like you to walk me through the entries in this drill down, if any, that deal with this account receivable or interest on this account receivable.
A. Okay. The first page ever Exhibit 37 is the drill down on the line item titled interest on invested funds and reflects all the accounts that roll up to that line item on the income statement.
One of those accounts titled interest come from interest on escrow fund account 322911. As of December 31, 2004, the balance on this account represented that the receiver had earned $1,902,413.65 on interest in the escrow funds.
The pages behind the cover page are a further drill down to the journal entry level showing all the journal entries made to that income account. And it's not Bates stamped, but it begins with the second to last page of packet.
Q. Okay. Now, which of the entries on the second to last page deal with the interest on this

Page 298

account receivable we've been talking as opposed to other types of measures, can you tell --
A. This particular account is solely used for the interest on the accounts receivable.
Q. Okay. And so I take therefore that the total interest earned on this account receivable through December 31, 2004 was roughly $1.9 million?
A. Correct.
Q. All right, thank you.
Off the record.
(Whereupon, at 12:10 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:10 p.m., this same day.)

Page 355

referred to, can you cite me to any FDIC as opposed to RTC -- FDIC policy statement or manual or regulation or any other document that states what you just said, that the subrogated claim would be grossed up to include the amount of the premium and the assets?
A. I'm confident there are policy statements or there are procedure statements or it could be a component of the claims manual that addresses the subrogated claim at a time of closing that would go to the heart of grossing up on the books of the receiver for the premium and the assets sold.
Q. So you say you're confident, you're telling me the FDIC claims manual will have a statement to that effect?
A. I think the claim manual will state that the subrogated claim to be filed is for the total deposit liabilities, not the net amount.
Q. To the extent that claim manual says that, would it not be inconsistent with what the liability accounting chapter of field accounting manual is saying right here on page 8?
A. In this context as this sentence states yes, that would be inconsistent.
Q. Remind me, is this claim manual, is that

Page 356

one of the documents that was produced to us?
A. No.
Q. To your knowledge, has it been produced to us at any time?
A. Well, a portion, a chapter of the claims manual has been provided.
Q. Do you know when that happened, when that was produced?
A. That's what we covered part of yesterday.
Q. Are you referring to Exhibit 2?
A. Yes.
Q. It was my understanding that this was an RTC manual, correct?
A. That's correct.
Q. My question was related to FDIC policy statements or FDIC manuals, are you aware of any FDIC statements or manuals or regs that state that the amount of the subrogated claim should be grossed up to include the premium and the asset sales?
A. No, as I sit here today, I can't cite as specific memo or policy procedure, but that's not to say one doesn't exist.
Q. What was the -- strike that.
We've had a discussion, a long discussion today about the change in the methodology for

Page 357

calculating post-insolvency interest, you recall that obviously, correct?
A. Yes.
Q. And that change happened in 1999, that's when the decision was made to change that calculation, correct?
A. Correct.
Q. What policies or procedures did you or your office follow when a change like that happened to -- what policies or procedures did you follow to inform or to coordinate with people who were in charge of preparing tax returns or tax documents for receivership of that change?
A. Well, to the extent that the change lead to a change in the calculation, which would have then appeared on the balance sheet, the tax unit would have received the balance sheet and income statement of the receivership for 1999 or 1998 when it was first reported. So they would have noticed an increase in the calculation.
Q. So but other than giving them the balance statement or the financial statement, which I guess is done in the ordinary course; is that correct?
A. That's correct.
Q. Other than that, was there a policy about

Page 358

specifically informing them of the change that could affect the tax liability?
A. No.
Q. Do you know whether or not in this case involving Carteret's change in methodology for calculating post-insolvency interest you or any one in your office had any discussions with the tax people at that time about the tax implications of that change?
A. No.
Q. No, you don't recall or no it didn't happen?
A. I don't believe it happened.
MR. COLATRIANO: Off the record.
(Discussion off the record.)
(Whereupon, Mr. Cooper exited the deposition room.)
(Recess.)
MR. COLATRIANO: Mr. Green, I don't at this time have any further questions with respect to the 30(b)(6) component of this deposition.
I do however as I mentioned a minute ago want to state for the record that in light of the recent production of documents we are holding open the right to ask you some more questions about that

Page 359

in your 30(b)(6) capacity. But I would propose, and Andrew, we can talk about this off the record, is that maybe some time next week, we don't need to do it in person, we can get you on the phone, I don't think it will take long, and I may not have any questions, but I do think we're entitled to an opportunity to review the documents that were recently produced which encompass at least a box full and ask you additional questions about that so I am going to hold open the deposition for that purpose.

MR. GILBERT: One possibility is that he continue tomorrow and give you an opportunity to review the documents --

MR. COLATRIANO: I don't think, A, I think it room is going to be taken tomorrow, so logistically I don't think that's possible, but B, I think I more time -- as you can tell during the day I've been kind of occupied the last couple of days, and giving me one night to review all of those documents I don't think is sufficient.

So I'm happy to work with you logistically. However you want to do it and I have a deposition on Tuesday of next week but maybe Thursday or Friday, get on the phone for an hour and just finish it up that way, if it even needs to be done,

Page 360

did may not, but that's how I would like to handle it.

MR. GILBERT: One concern I would like to state for the record is that it doesn't develop into a second bite at the apple, it would be strictly limited to those materials and not be a situation where you then go back and review and revisit.

MR. COLATRIANO: I have no problem with that. I would review the materials and ask him questions about those materials. Now to the extent those materials reflect on an exhibit that has already been used, I mean perhaps I might need to ask him another question, but I don't anticipate that.

The purpose of this is not to give me more time to prepare for the deposition that we've been conducting, the purpose is to give me time to review the new documents and ask questions about those, that's how I envision it.

So with that understanding, unless someone has a question, I'm ready to move on to the fact portion of the deposition.

MS. GRONER: As I mentioned earlier, we do have some questions about some of the documents that were introduced in this portion of the deposition, but we think it will be more efficient to address it

Page 361

at once after the plaintiff concludes the fact deposition.

MR. COLATRIANO: With that, yeah, this is the conclusion of the 30(b)(6) and we're now beginning the fact portion of the deposition.

(Whereupon, at 3:41 p.m. The 30(b)(6) portion of the deposition ceased and the fact portion of the deposition ensued.)

MR. COLATRIANO: We will continue the document exhibit numbers, I think we're on Exhibit 49.

(Green Exhibit No. 49 was Marked for identification.)

BY MR. COLATRIANO:

Q. Mr. Green, Exhibit 49 is an E-Mail, it is a printout of a couple of E-mails.

The first one of which is an E-Mail from Elaine Tama to you, dated October 9, 2003, it is also addressed to Robert Ferrer, Subject: PII accrual.

Have you reviewed this document to prepare for your deposition?

A. Yes, I have.

Q. Attached to the E-Mail to you is an E-Mail from Steven Johnston to Elaine Tama and Rick Cywinski with the subject: PII approval?

Page 362

First of all, who is Steven Johnston?

A. Steve Johnston is one of the senior tax accountants in the Division of Finance.

Q. And who is Rick Cywinski?

A. Rick is also a tax accountant in the Division of Finance.

Q. Why were you being copied -- why was this E-Mail between -- from Mr. Johnston and Ms. Tama being forwarded to you, do you know?

A. No, I don't.

Q. What if -- take a moment if you need to to review the text of the E-Mail, but what do you recall regarding the issue that's being discussed here?

A. What the issue is is that with the policy of recording PII on the books once 95 percent in dividends have been paid, in those years prior to that while PII has accrued, but not recorded on the books, if not taken into account on the income tax return.

So the effect of in the case of Carteret, there was no PII accrual on the books prior to 1998 so any tax return prior to 1998 didn't have the effect or the benefit recording a PII accrual.

Q. The E-Mail states in the second paragraph that this is another case where had we accrued PII

from date of closing, we could have significantly reduced our tax exposure and may be more importantly our litigation exposure.
Do you know what other cases Mr. Johnston is referring to?
A. I believe the one case that he's referring to that I'm familiar with is on the Ben Franklin receivership.
Q. Were there any other cases that you're aware of?
A. No.
Q. And what do you know about status of this issue as it relates to the Ben Franklin receivership?
A. As this issue relates to Ben Franklin both the plaintiff's shareholders, the IRS and the FDIC had come to a tentative agreement on the settlement of the tax liabilities of the receivership.
Q. And have you been involved in that?
A. No, I have not.
Q. Can you disclose what the terms of that settlement are?
MR. GILBERT: I object and just ask that the witness be careful not to disclose the contents of any discussions with counsel about that case.
THE WITNESS: I believe the agreement



calls for a payment of $47 million to the Internal Revenue Service from the receivership.
BY MR. COLATRIANO:
Q. What was the -- what was that as settlement from, what was the claim, the tax claim?
A. The income tax claim itself, including penalties an interest at one point was in excess of $900 million.
Q. What discussions, if any, have you had or have you been involved in with respect to this issue as it relates to the Carteret receivership, this issue being the relationship between PII accrual and tax liability?
A. I did ask one of our tax accountants if when it was recorded on the books in 1998 if any of the losses generated in 1998 would have been able to be carried back to prior years.
Q. And what was the tax accountant that you refer to?
A. Dave Collie.
Q. And what did he tell you?
A. If I remember correctly, he was only able to carry back the losses for two years.
Q. Have you been involved in any other discussions where or analyses with respect to this



issue?
A. No.
Q. And what, if anything, has been your involvement with respect to the preparation of tax returns for Carteret?
A. None.
(Green Exhibit No. 50 was Marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 50 is an E-Mail string, the first one of which is from Sharon Kelley to Robert Ferrer and yourself, cc'd to Kevin Coston, dated April 13th, 2004 regarding goodwill status.
Was this document reviewed in your preparation of this litigation -- preparing for this deposition, I'm sorry?
A. Yes.
Q. The first line of the first E-Mail says, we still do not want to place a receivership with active goodwill litigation into T-status, right? My question is what is T-status?
A. T-status represents termination status.
Q. And the middle of the page in the shaded discussion it states it is DOF's policy not to place a goodwill case receivership involved in actual



goodwill related litigation into T-status, thereby precluding any termination proceedings.
What is the basis for that policy, if you know?
A. I believe the basis for that policy are the directions coming from the legal division.
Q. Do you know what the basis for their advice was?
A. No.
Q. Is this policy reflected in any documents?
A. It may be addressed in a memo dealing with goodwill FINS and termination status.
Q. When is the effect of pleasing receivership into termination status?
A. If it goes into T-status expenses cannot be charged to that receivership any longer.
Q. How if at all would it affect other accounting issues?
A. In T-status?
Q. Yes.
A. Once a receivership goes into T-status and if we receive a termination case, any remaining assets on the books of the receivership were sold to the FDIC like I stated, expenses are no longer charged to the receivership, final dividends are paid

Page 371

Q. What is an RC?
A. Yes.
Q. What is an RC?
A. An RC is a receiver certificate.
Q. And what is that?
A. That's a document representing someone -- a claim against a receiver.
(Green Exhibit No. 52 was Marked for identification.)
BY MR. COLATRIANO:
Q. Before we turn to 52, going back to Exhibit 51, there's -- in reference to RC that comes in the context of a question of whether anyone knows if the IRS had an RC on file with us for Carteret's 1995 tax liability.
And then I mail right above that says yes and no the original claim amount was 36,000, the claim was withdrawn on 5/19/99. Is that the answer to this RC question?
A. Yes, it is.
Q. Do you know why the claim was withdrawn?
A. No, I don't.
Q. Do you know whether there's any current RC on file in connection with Carteret's tax liabilities?

Page 372

A. There's not a current claim in a form of a receipt of certificate on the books of the receivership, there may be one within the claims unit.
Q. I need you to description that distinction?
A. Well, if the claims unit received a proof of claim from the IRS and it went through their process and approved, it would be sent to accounting to record on the books of receivership.
Q. And what, if anything, do you know about what that type of process is underway with respect to Carteret?
A. I know the transcripts reflect an outstanding liability, federal income tax liability.
Q. Do you know whether a claim has been processed for that liability?
A. No, I don't.
Q. Who would be the person to ask about that?
A. That would be whatever claim agent is handling the Carteret receivership.
Q. Do you know who that is?
A. No.
Q. Is that someone in Dallas, or someone in Washington?

Page 373

A. It's in Dallas.
Q. Let's turn to Exhibit 52, which is another E-Mail string top one is an E-Mail from David Collie to yourself and James Vordtriede, dated February 10, 2005.
The second E-Mail in this string is an E-Mail from you to Mr. Collie and Mr. Vordtriede, you say I need Jim to review the return and determine if the return was filed and consistent with applicable statutes in effect at the time germane to federal receiverships.
The Jim you're referring to, is that Mr. Vordtriede?
A. That's correct.
Q. Why did you ask Mr. Vordtriede to conduct that review?
A. Well, I knew that the tax returns were being produced and I was interested in knowing beginning with the 1995 return of the receivership whether or not that was done inconsistent with the applicable tax statutes.
Q. And did Mr. Vordtriede conduct such a review?
A. I don't think Jim actually got around to doing that.

Page 374

Q. Do you know whether anyone else has done that?
A. I don't believe so.
Q. Do you know why he has not gotten around to doing that?
A. There are other receiverships that Jim was involved in.
(Green Exhibit No. 53 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 53 is another series of E-mails, the first one is from James Vordtriede to yourself, dated Friday, February 11th, 2005. Re: Carteret goodwill case.
Have you reviewed this document in preparing for this deposition?
A. I believe I have.
Q. The first line, first paragraph says the initial look at the handling of the FFA for the 1995 Carteret closing year suggests an under statement.
First of all, what is FFA?
A. FFA stands for Federal Financial Assistance.
Q. And what's that?
A. That is a term used within the tax

Page 375

statutes representing for tax return basis how much a receivership recognizes as income based on the proposing transactions, particularly the net wires.
Q. This says the initial look suggests an under statement. An under statement of what?
A. The recognition of FFA on the return.
Q. Okay. And how would that effect tax liability?
A. I believe that would have -- the under statement caused the tax liability to be less.
Q. Walk me through that a little bit, why does the under statement of FFA cause the tax liability to be less than it should have been?
A. It is my understanding that FFA is a component of the tax return and represents some type of income to the receivership. So the income is understated, then the tax liability is understated.
Q. And then paragraph 1 talks about the fact that there are no return work papers or supporting documents for 1995 and 1996 return in your file, is that unusual?
A. The work papers?
Q. Or supporting documents?
A. Yes, I would say that would be unusual since that return was filed while it was in the RTC

Page 376

receivership.
Q. What, if anything, have you done to see if such work papers or supporting documents could be located?
A. Other than the pro forma statements, nothing else.
Q. What do you mean other than the pro forma statements?
A. Well, Jim is alluding to pro forma adjustments, those are available.
Q. I want to make sure I understand if you've done anything to see if you could locate anything else?
A. No, I have not.
Q. And this E-Mail says that it's an initial look at the handling of the FFA. Has any further work been done on that issue, on this issue?
A. Not to my knowledge.
Q. And is it fair to state that this initial look was performed by Mr. Vordtriede in the course of basically a day and a half?
A. From the timing of the E-Mail it would give that appearance, yes.
Q. Do you know whether that appearance was accurate, you got the return on February 10th or you

Page 377

asked for the return on February the 10th and he's telling you that the results of his initial look at the return on February 11th, is that the sequence?
A. Yes, it is.
Q. Do you know when he actually got the return?
A. Which return? I'm sorry.
Q. The return you're asking for in the E-mail at the bottom of the page, the 1995 return?
A. No, I don't.
(Green Exhibit No. 54 was Marked for identification.)
BY MR. COLATRIANO:
Q. The document that's been marked as Exhibit 54 is an E-mail from Mr. Vordtriede to you dated Friday, November 18th, 2005, subject: Status report tax, November 30, 2005.
Is this a document you've reviewed in preparing for this deposition?
A. I produced this document, yes.
Q. Has -- why is Mr. Vordtriede giving you a status report on tax issues?
A. Because I'm the team leader in the tax unit.
Q. And he says in this E-mail in paragraph 1

Page 378

that "the quantity and quality of tax records gathered by Valley Forge on this bank are very poor." Do you see that?
A. Yes, I do.
Q. When he says Valley Forge, what is he referring to?
A. He's referring to the RTC site that performed the initial liquidation accounting on the Carteret receivership.
Q. And is it unusual that Valley Forge would have a very poor -- would be very poor when it comes to the quantity and quality of the records maintained?
A. He's referring to the tax records and I -- you know, that's his editorial on that line.
Q. Do you have a view as to the quantity and quality of the tax records maintained with respect to Carteret?
A. No, I don't.
Q. Do you know whether Mr. Vordtriede was concerned with the quality and quantity of the tax records have anything to do with the fact that he's not completed the review of the tax return that we discussed a few minutes ago?
A. It may have some bearing on it, but I -- I

Page 383

A. No.
Q. Were you responsible to provide Carteret's accountants income statements that were used to prepare its tax returns?
A. Can you specify what period?
Q. At any point in time, did you provide information to anyone with respect to Carteret's preparation of tax returns?
A. No.
Q. I'd like to ask the reporter to mark a document as the next exhibit.
(Green Exhibit No. 56 was Marked for identification.)
BY MS. GRONER:
Q. I've asked to be marked as Exhibit 56 a document that states Carteret Federal Savings Bank, Carteret at a Glance. At the bottom, it says consolidation plan.
Mr. Green, have you seen this document before?
A. No, I have not.
Q. Are you familiar with this type of document?
A. No, I am not.
MS. GRONER: Let's ask the reporter to

Page 384

mark another document.
(Green Exhibit No. 57 was Marked for identification.)
BY MS. GRONER:
Q. I'd like to ask the reporter to mark as Exhibit 57 a document Bates numbered RAM 0501653 through 1655, it is a statement of operations for the period ending December 31, 1995.
Have you seen this document before?
A. Yes, I have.
Q. And what is this?
A. This is a system-produced statement of operations program for an income statement of the Carteret receivership. The second page is a statement of assets and liabilities and liquidation equivalent to a balance sheet of Carteret as of December 31, 1995, and the third page are the notes to the financial statements.
Q. And who would have generated this document?
A. This is an automatic system generated document from our financial data warehouse.
Q. And when would it have been generated?
A. It's available to be printed at each month end.

Page 385

Q. So where it says for a period ending December 31, 1995, would it have been available in the next quarter or --
A. Yes.
Q. At what point in time would it have been available?
A. It's available every month.
Q. Please turn to the second page, 1654, does this page summarize the assets and liabilities part as of the inception date, December 31, 1995?
A. Yes, it does.
Q. Is the inception date the date Carteret was converted to a receivership?
A. Yes.
Q. And the inception date identified at the top of the page is January 20th, 1995?
A. That is correct.
Q. And as of the receivership date, it had total assets of $1.266 billion, do you see that?
A. That's correct.
Q. As of December 31, 1995, Carteret had total assets of $302.3 million; is that correct?
A. That is correct.
Q. So the total assets declined by $963.7 million between January 20th, 1995 and December 31,

Page 386

1995; isn't that correct?
A. The total assets from conception balances to assets and liquidation, which excludes cash, declined from 1,265,000,000 down to 105,000,000. So the assets in liquidation declined $1,160,000,000.
Q. And why was there such a large decline?
A. Well, it is due to a liquidation of assets.
Q. Is that due to asset sales?
A. Yes.
Q. So a substantial portion of the receivership's assets were sold during the first year of the receivership?
A. That is correct.
Q. Was this a common occurrence at the time?
A. It's dependent upon each individual receivership's asset, composition, asset quality. So for Carteret it -- while the decrease of 1,160,000,000, that may have been common for the Carteret receivership.
Q. But based on your experience at the time at the FDIC, was it common for a substantial portion of the assets of the receivership to be disposed of in the first year?
A. Yes.

Page 387

Q. Is it also common for receiverships to have assets after the first year?
A. Yes, it is.
Q. Turn back to the first page of this document, Exhibit 57. There's an entry for interest and fees, do you see that, it's like the fourth line down.
A. Yes.
Q. Do the eight rows directly below that heading reflect the actual interest and fees the receivership earned during 1995?
A. That represents the interest and fees collected during 1995.
Q. So the receivership continued to collect interest and fees on the assets during this time?
A. While it held the assets, yes, it did collect interest and fees to the extent it was paid.
Q. Two-thirds of the way down, there is an entry net income (loss) from operations. What does that line represent?
A. In the year to date column, it represents the loss of the receivership for 1995, and the inception to date column represents from the inception of the receivership which includes the activity on the prior receivership of 64 million

Page 388

161,000.
Q. The receivership reported operating income during its first year, correct?
A. It reported operating revenues during its first year.
Q. So would you agree that the cost of operating the receivership were less than the interest and fees earned on the assets of the receivership during the first year of the receivership?
A. Yes.
Q. Now look at the line toward the bottom, income (loss) of the liquidation; do you see that?
A. Yes, I do.
Q. During the first year of the receivership, the receivership reported a loss of $63.9 million, do you see that?
A. Yes, I do.
Q. And what was the cause of that loss?
A. Well, the principal cause of that loss was the loss due to the disposition of assets.
Q. So would you agree that the cost of operating the receivership was not what caused the $63.9 million loss for the first year?
A. Yes.

Page 389

Q. Now, I'd like to ask you to go back to one of the exhibits that you used previously, Deposition Exhibit 11. Restated goodwill financial reporting package for Carteret, as of December 31, 2004, are you with me?
A. Yes, I am.
Q. Can you turn to page that down at the bottom that says 97396, this was the statement of operations?
A. Yes.
Q. Is that the same as an income statement?
A. Yes, it is.
Q. Look at the column entitled inception to date, does that column reflect the income and losses of the receivership since the inception date of January 20th, 1995?
A. Yes, it does.
Q. Now, according to the statement of operations, Carteret realized net income from operations of $23.2 million during the receivership; is that correct?
A. That's correct.
Q. So during the duration of the receivership, the receivership realized a profit from operations, correct?

Page 390

A. That's correct.
Q. So that the net deficit of the receivership decreased because it operated profit -- it was operated profitably by the FDIC?
A. I'm sorry, can you restate that?
Q. Sure. Did the net deficit of the receivership decrease because the FDIC operated it profitably?
A. I don't understand the question.
Q. The receivership had a net deficit at the inception date, correct?
A. That's correct.
Q. And as a result of the FDIC's operation, did that deficit decrease because the FDIC operated it profitably?
A. The actual deficit increased during the life of the conservatorship through December 31st, 2004.
Q. And why was that?
A. Well, when you look at the income statement in total, including all sources of income and expenses and losses, there's an operating loss of $82 million.
Q. That all comes from the sale of the assets; is that correct?

Page 391

A. That's correct.
Q. Did losses on the disposition of the assets account for the entire loss?
A. Yes, it did.
Q. Did the duration of the receivership impact the losses realized on the sale of the assets?
A. That depends upon the receivership itself.
Q. How about in the case of Carteret?
A. Well, if you compare the 12/31/04 income statement in Exhibit 57 to the 12/31/95 income statement doing the additional nine-year period, the operating loss should have increased $18 million.
Q. Would you return to report number 1 in Exhibit 11 and that's at page AM 0097390. And I think you testified previously that one of the adjustments you made to arrive at the inception balance was to convert the balances from an accrual basis of accounting to a cash basis of accounting; is that correct?
A. It's a conversion from an accrual basis to a modified accrued basis of accounting, yes.
Q. Did that require all the pre-receivership valuation allowances to be reversed?
A. Yes, it does.
Q. Do valuation allowances reflect estimated

Page 392

losses on assets?
A. Yes, they do.
Q. Are valuation allowances similar to bad debt?
A. It could be a research for 100 percent after bad debt or a partial research for a bad debt.
Q. Does the reversal of the allowances increase the book value of an asset that had a pre-receivership loss allowance associated with it?
A. It increases the net book value of a receivership, it doesn't increase the book value.
Q. When an asset is sold during a receivership, is the gain or loss calculated based on the book value of the asset?
A. Yes, it is.
Q. And is any loss allowance that had been recorded prior to the receivership excluded?
A. Yes, it is.
Q. Are you familiar with the tax term net operating losses?
A. Yes, I am.
Q. And what is your understanding of an NOL?
A. An NOL represents the operating losses of an entity. I'm familiar with the net operating losses of a receivership.

Page 393

Q. Is an NOL a tax loss that can be used to offset prior -- or future -- I'm sorry, that can be used to offset future tax year income?
A. If a net operating loss is recognized as a result of a tax return, then yes, it can be.
Q. Let's go back to report 1 we're looking at here, there's a category furniture, fixtures, autos; do you see that in the middle of the page?
A. Yes.
Q. Is that a depreciable category?
A. Yes, it is.
Q. And office premises and equipment, is that also a depreciable category?
A. Yes, it is.
Q. Is depreciation expense reflected in the results contained in the statement of operations?
A. Which statement of operations?
Q. The statement of operations included in Exhibit 11?
A. No, it is not.
Q. And why is that?
A. The FDIC and the RTC does not depreciate assets in liquidation.
Q. Why not?
A. That's a GAAP basis type of accounting.

Page 394

Q. Going back to the furniture, fixtures and auto and the office equipment, premises, are those the only depreciable assets listed in report 1?
A. Based on the descriptions I'll say on report 1, yes.
Q. The total inception balance leaves those categories at about 7.3 million?
A. That's correct.
Q. If these assets were sold, would the receivership report a gain or a loss on the sale?
A. That depends upon the sales price.
Q. And would that gain or loss be reported in this statement of operations?
A. Yes, it would.
Q. If these assets were not sold, would they be written off?
A. If they were not liquidated, it's possible they could be written off, yes.
Q. And would the loss realized on a write off be reported in the statement of operations?
A. Yes, it would.
Q. At the time of the receivership, how much real estate owned did Carteret have?
A. According to this statement, other real estate owned was $2,787,000. Office premises might

Page 399

Q. And would this write off be reflected in the statement of operations?
A. Yes, it would.
Q. Now, is it your understanding that when branches are sold the seller has to transfer both the deposits and the assets to the buyer?
A. Can you state that over, please?
Q. I'll try again. When deposits are sold, does the seller transfer both the deposits and the assets to the buyer?
A. Not necessarily, no.
Q. What does that depend upon?
A. Well, it depends upon if the buyer is acquiring assets from the receivership.
Q. Were FDIC deposit sales typically funded by borrowing money from the FDIC?
A. Can you say that over, please?
Q. How were FDIC deposit sales typically funded?
A. FDIC deposit sales are funded from proceeds within a particular insurance fund.
Q. And which fund -- how did you determine which fund?
A. That went to the -- what regulatory agency that chartered the institution.

Page 400

Q. And which regulatory agency funded the sales of Charter's assets?
A. The RTC funded the sale of the deposits.
MR. COLATRIANO: I'm sorry, I think you referred to Charter --
MS. GRONER: I'm sorry, too many cases. I'm sorry, Carteret, Carteret.
THE WITNESS: The RTC.
BY MS. GRONER:
Q. If a receivership borrowed money from the FDIC, how is the loan from the FDIC repaid?
MR. GILBERT: Objection, beyond the scope of this deposition, his presence here as a witness as a 30(b)(6) witness or a fact witness. You may answer.
THE WITNESS: It is paid from the proceeds generated from the liquidation of assets or the operation of assets are the principal methods that borrowings are repaid.
BY MS. GRONER:
Q. Let's go back to the Exhibit 57, which was the financial statement for December 31, 1995 and look at the second page, 1654. There's a line in the middle of the page, under depositor creditor claims titled FDIC subrogated claims. Does this line item

Page 401

represent the outstanding balance on the funds borrowed from the FDIC?
A. On funds borrowed from the FDIC? No.
Q. What does it represent?
A. That balance represents the amount of the unpaid subrogated claim to the FDIC.
Q. Let's go back to where we were in Exhibit 11. Now I'd like to turn to report 3, page 97393. What is report 3?
A. Report 3 is one of the reports produced for the goodwill financial statements, it includes liabilities that are not recorded on books for receivership. And in this particular instance, it includes a federal income tax liability, as well as the outstanding passed through receivership claims, in addition to a post-insolvency interest on those claims.
Q. The column on the far left titled adjusted 12/31/2004 balance, did that come from report 2?
A. It -- yes, it did.
Q. Is the federal tax claim included in the deficit calculated in report 2?
A. No, it is not.
Q. Why not?
A. Because the federal income tax claim is

Page 402

not recorded until it's paid.
Q. And why is that?
A. Because -- pursuant to an interagency agreement between the IRS and the RTC that income tax liabilities aren't paid until all higher priority claims are satisfied.
Q. I'd like to ask you to turn back to Exhibit 12, and then I'm going to ask the reporter to mark another document.
(Green Exhibit No. 58 was Marked for identification.)
BY MS. GRONER:
Q. Exhibit 12, you recall, was an E-mail and then behind it there were some reconciliation statements; do you recall that?
A. Yes, I do.
Q. And I've asked the reporter to now mark as Exhibit 58 several additional reconciliation statements that start at page RAM 0490506 through RAM 0490579. I just want to ask you to take a moment and tell us if the documents that I've marked as Exhibit 58 relate to the reconciliation statements that were marked as Exhibit 12?
A. Yes, they do.
Q. And what is the relationship?

UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------x
AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
and : No. 93-531
FEDERAL DEPOSIT INSURANCE : Judge Loren Smith
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF :
AMERICA, :
Defendant. :
---------------------------x

Washington, D.C.
Wednesday, April 5, 2006

Continued 30(b)(6) deposition of WAYNE S. GREEN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 9:27 a.m., Wednesday, April 5, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 504

A. No. I don't remember.
Q. Do you remember, recall generally talking about this issue with anyone about whether the FDIC should approach the IRS on this topic?
A. That topic being?
Q. About whether Carteret or other receiverships should be allowed to take deductions for post-insolvency interest from the date of closing?
A. As -- as opposed to actually taking a deduction in the year that the PII is accrued?
Q. Right. We've had discussions about the fact that Carteret could have had its tax liability reduced if it had accrued a PII at the time of the closings in 1994 and 1995 as opposed to waiting until '98 or '99, whenever it did ultimately approve a liability for PII.
Is that a fair statement?
A. Yes.
Q. Had there been -- have you been involved in any discussions about whether the FDIC should go to the IRS and ask about abatement, some other mechanism by which the tax liability could be reduced, in other words, to treat the receivership as though it had accrued interest as of 1994 or 1995?

Page 505

A. No.
Q. Okay. Are you aware of anyone else at the FDIC having such discussions or analyzing such a proposal?
A. To approach the IRS about taking the deduction from a different year? That would have been a topic that -- for the tax folks, that they always talk about.
Q. Do you know whether that -- do you know specifically whether such discussions were held with respect to Carteret?
A. On Carteret? No.
Q. No, you don't know? Or no, they weren't?
A. I know of no discussions held with the IRS regarding Carteret.
Q. And do you know of any discussions within FDIC about whether the FDIC should approach the IRS on this issue with respect to Carteret?
A. No.
(A document was marked for identification as Exhibit No. Green-83.)
BY MR. COLATRIANO:
Q. Exhibit 83 is a printout of an e-mail from James Vordtriede to Elaine Tama. You are listed as a

Page 506

CC. Dated March 16, 2004, subject questions on tax return preparation for receiverships, Bates stamped AM 0010608 through and including 610.
Have you reviewed this document in preparing for your deposition?
A. Yes, I have.
Q. I take it -- do you recall receiving this e-mail in March of 2004?
A. Yes.
Q. There's a discussion of a number of topics, the second topic being post-insolvency interest, are we currently deducting this as an expense when we accrue it on our books (with 95 percent of subrogated claims paid) or do we deduct it when it is paid on a cash basis?
What is the FDIC's policy regarding that issue? To deduct it when accrued as opposed to paid?
A. That is correct.
Q. There is a reference here where Mr. Vordtriede says we are in our infancy regarding this issue. Do you know when this issue was first analyzed? The issue of when to deduct PII?
A. No.
Q. Do you know what Mr. Vordtriede meant whe[n] he said we are in our infancy regarding this issue?

Page 507

A. No, I don't.
Q. The next item says post-insolvency interest. Do you agree with the proposal to deduct this as an expense on an accrual basis from year one of the receivership forward? Do you agree with using the PII deduction to generate tax refunds? What if the institution never pays any PII? He goes on to say Wayne Green was asking this question recently.
Who was making the proposal to deduct PII on an accrual basis from year one of the receivership?
A. Elaine. Ms. Tama.
Q. Did you agree with that proposal?
A. No, I did not.
Q. Why not?
A. Because I supported the position of only recognizing it on the books of the receivership when 95 percent dividends had been paid.
MR. COLATRIANO: Let's go off the record.
(Whereupon, at 12:14 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:15 p.m., this same day.)