# EXHIBIT K

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
\- - - - - - - - - - - - - - - - - )

Washington, D.C.
Friday, April 7, 2006

Deposition of KAREN JEAN HUGHES, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:39 a.m., Friday, April 7, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 22

there may have been policy activity at the time, whether it was accounting policy or receivership operations policy and practice, which then would have considered RTC receivership impacts and implications as well.
Q. Okay. Can you describe any role that you had with respect to any issues involving the administration of the Carteret receiver or conservatorship.
A. I had no role in the administration of the Carteret receivership or conservatorship.
Q. Do you recall whether you played any role in any issues involving the final resolution of Carteret?
A. Upon failure?
Q. Yes.
A. No.
I played no role in the resolution of Carteret.
Q. And just to clarify, when you said, upon failure, what did you mean by, failure?
A. At the time Carteret was closed.
Q. Okay.
A. We tend to use the word resolution to describe the life of the receivership at times.

Page 23

Q. Okay. And when you say, Carteret was closed, are you referring -- let me put it this way: Carteret, the thrift, was initially -- was seized by the RTC in December of 1992.
A. Okay.
Q. And then there were a series of what I've been calling resolution transactions in 1994 and 1995.
A. Okay.
Q. But when you say, when Carteret was closed, are you referring to when the RTC initially seized it?
A. I was referring to what would have happened in 1995.
Q. Okay.
A. But with your chain of events, I was not involved in any of those actions or activities.
Q. Do you recall being involved in any issues or matters involving financial reporting as it pertained to Carteret?
A. Not during that time and not until I was assigned reporting responsibilities where we would have begun to prepare goodwill financial reporting packages for the goodwill institutions, of which Carteret was one.

Page 24

Q. Okay. Do you recall working on any matters pertaining specifically to how Carteret's financial reporting should be handled?
A. Only from the perspective of Carteret was one of however many goodwill institutions that we were preparing the financial reporting package for.
Q. Okay. Do you recall being involved in any issues regarding the determination or estimation of claims against the Carteret receivership, including the FDIC corporate subrogated claim against the Carteret receivership?
A. Not individually for Carteret, but to the extent that a particular more global issue would impact Carteret, Carteret as an institution would have been become part of those discussions and the ultimate decision.
Q. Okay. Do you recall offhand any such issues that came up that impacted Carteret in that fashion?
A. I know from looking at documents and preparing for this that I had a refreshed memory. Carteret would be impacted by the -- I don't remember what it stands for, but it was a PSA adjustment. Carteret would have been impacted by decisions relative to goodwill expenses and how they were

Page 25

distributed to the receiverships within the goodwill pool of litigation.
There was a lot of interest in postinsolvency interest in some of the documents I reviewed prior to the depositions, so perhaps Carteret was or was not impacted by those. Carteret would have been impacted by the decisions we made to include or exclude items for the financial reporting package.
Q. A few minutes ago, I was asking you what role you played in the development of FDIC policies. One area I left out was tax policies.
Have you played any role in the development of any FDIC policies regarding tax issues or financial reporting issues as it pertains to taxes?
A. The role from a supervisory perspective -- and because at various points in time tax reported to me or there were issues that were tax-related that may have related to other things such as reporting, I would have been involved in some type of perhaps a leadership perspective of getting the right people together to talk through an issue and help make decisions or recommendations.
Q. Okay. What is your understanding of how

Page 50

Q. And when roughly did that happen?
It was in early this decade?
A. Correct.
I want to say 2001.
Q. Okay. Taking a look at this -- I take it you don't know who prepared this.
Correct?
A. Correct.
Q. I will represent to you that it was produced to us by the FDIC.
A. Okay.
Q. Taking a look at this chart, can you tell me whether you think it fairly depicts the typical conservatorship process?
A. It looks to, yes.
Q. Okay. From what you've -- from what you knew or what you've learned about the Carteret conservatorship process, does this chart fairly depict how that process unfolded?
A. I didn't know anything about the Carteret conservatorship process or how it unfolded, so I don't know.
Q. Okay. I also asked from what you've learned.
I take it you haven't really learned

Page 51

anything about how that process unfolded; is that correct?
A. For Carteret specifically?
Q. Yes.
A. That is correct.
Q. Okay.
MR. COLATRIANO: I'd like this document marked as exhibit 12, please.
(Hughes Exhibit No. 12 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 12 is an accounting bulletin by the FDIC number 94, dash, 001 dated June 17th, 1994, entitled, deposit funding procedures. It's Bates-stamped AM 0011554 through and including 557.
Have you seen that document before?
A. I'm not sure I did, but I don't remember.
Q. Do you remember whether you would have had any role in the preparation of this document?
A. I may have, but I don't remember.
Q. Okay. There's a description on the bottom of page 1 under background -- there's 2 paragraphs that talk about something that I'll just call the net wire process.

Page 52

A. Okay.
Q. Do you see that?
A. M-hm.
Q. Go ahead and review those 2 paragraphs to yourself and let me know when you're ready to proceed.
(Pause.)
A. Okay.
BY MR. COLATRIANO:
Q. Does that description comport with your understanding of how the process worked, this net wire process?
A. From what I remember of it, yes.
Q. Okay. At the bottom of this page, it says -- it talks about an entry for escrow funds due from corporate, and at the end of that paragraph, it says: Corporate pays the receivership interest monthly on the balance of the escrow funds account.
Do you know how interest on that balance was calculated, what type of interest rate was used?
A. I don't.
Q. Okay. Do you recall ever being -- either at this time or subsequently ever being involved in any discussions regarding how that interest should be calculated or what interest rate should be used for

Page 53

that purpose?
A. I may have been, but I don't recall.
Q. The next page talks about new procedures for the deposit funding process, and obviously take as much time as you need to familiarize yourself with this discussion.
The question is going to be: Do you know why this change was made.
(Pause.)
A. I don't remember why.
BY MR. COLATRIANO:
Q. Does this refresh your recollection at all whether you were involved in this change in policy?
A. I could have been, but I don't know for sure.
Q. Okay. Do you know how if at all this change in practice or change in procedures affected the calculation of or determination of the FDIC subrogated claim against the receivership?
A. I don't remember, but it does not look to me that it would have impacted the subrogated claim.
Q. Why do you say that?
A. Because it looks like the subrogated claim would still reflect the deposit liabilities of the failed institution at the time of closing.

Page 138

Go ahead and review that to yourself. Let me know when you're ready to proceed.
(Pause.)
A. Okay.
BY MR. COLATRIANO:
Q. Have you seen that document before?
A. Not that I recall.
Q. Okay. The last paragraph of the document talks about the rate used to compensate the receiver. And it says that the rate would be based on the corporate cash management BIF monthly yield on overnight investments.
Do you agree with that statement, that that was the right interest rate -- that that was the interest rate used for this purpose?
A. I don't know.
Q. I'm sorry?
A. I don't know.
Q. Okay. Do you know whether the rate -- the interest rate used for this purpose was floating or whether it was locked as of a particular date?
A. I don't know.
Q. Okay.
MR. COLATRIANO: Could I have this document marked as exhibit 27, please.

Page 139

(Hughes Exhibit No. 27 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 27 is a memo from Thomas Bolt to yourself, Gail Patalunas and Fred Ozyp dated February 22, 2001, subject, priority of postinsolvency interest under national depositor preference. It's Bates-stamped AM 0010419 through and including 427.
The first paragraph of this document says that: This memorandum responds to your request for our views regarding the payment of postinsolvency interest with respect to solvent receiverships subject to the national depositor preference statute.
Do you recall making such a request?
MS. DOHERTY: Before she answers the question, I'm going to make the obvious point that in normal circumstances, this would be covered by attorney-client privilege. As the new kid on the block, I do not know whether some decision was made to waive attorney-client privilege in this particular case.
In order to move the deposition along and not have people come back another day, I would like to proceed on the understanding that if it turns out

Page 140

that attorney-client privilege was not waived here, then we just strike this line of questioning. For now, we'll go ahead, and if it turns out there isn't any attorney-client privilege, it's been asserted or is assertable with respect to this document, then never mind.
MR. COLATRIANO: Okay.
MS. HART: DOJ will keep its options open in that regard too.
MR. COLATRIANO: That's fine.
Let me just say what I've said in previously depositions, which is, it would be our position to the extent that comes up that the privilege has been waived, and I don't want my silence to be understood as agreement that DOJ has any right to assert a position with respect to waiver of interest in this context.
MS. DOHERTY: Understood.
MR. COLATRIANO: But let's just proceed.
MS. DOHERTY: Move along.
BY MR. COLATRIANO:
Q. My questions are just going to be very general about this document, but do you recall making a request for Mr. Bolt's views regarding this issue?
(Pause.)

Page 141

A. I don't recall specifically, but given the nature of the document, it doesn't surprise me that I may have.
BY MR. COLATRIANO:
Q. Okay. The national depositor preference statute was enacted in 1993, correct, roughly?
A. Roughly.
Q. Okay. Why, then, was -- were questions being raised about priority under that statute in 2001?
Do you know?
A. I was reading the document to try to look at the timing. At some point, Congress passed legislation that authorized -- authorized the FDIC to establish a position -- a regulation on postinsolvency interest.
I don't remember if perhaps that was December of 2000, and therefore, in early 2001, we were trying to begin the process on the regulation.
Q. Okay. And I think if you turn to page 8, there is a reference to that statute that you're referring to being passed in December of 2000.
A. Okay.
Q. So are you saying it's your recollection that it was that authorization to conduct a rule

Page 142

making that was raising some questions for which you were seeking Mr. Bolt's advice?
A. Yes.
Q. Okay. All right.
That's all for that document.
MR. COLATRIANO: Have this document marked as exhibit 28, please.
(Hughes Exhibit No. 28 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 28 is a printout of a series of emails. The top email is from Bobby Bean to Elaine Tama dated May 31, 2001, subject, Wednesday's PII meeting recap and open items, Bates-stamped AM0010242 through and including 243.
My questions are going to relate to your email, which is the third email on the string here. It's from you dated May 30, 2001, same subject, to a long list of recipients.
On the second page of this exhibit, there's -- and your email says: One concern raised at the meeting and also by another voice subsequently had to do with keeping the rate and its application simple to allow for outside parties to check the rate

Page 143

themselves and to minimize calculation errors, parens, past experience with errors leaves bitter memories, close parens.
And my question was, what past experience with errors are you referring to there.
A. I don't remember anything specifically.
Q. Okay. Do you remember any specific institution or any specific type of error, or you just don't recall anything about that?
A. I don't remember anything specifically, but based on that parenthetical insert and the documents we've reviewed so far where we talk about, does the rate change, does it stay the same, what rate is used, what governs what rate is used, when did the institution fail, that in all likelihood as we were reviewing over the many years the issues of postinsolvency interest and as evidenced by the series of questions that we have to figure this one out, we have to figure this one out, that in all likelihood, all of those questions came about as we reviewed different calculations and applications of calculations and found that perhaps some calculations were performed in error.
Q. I'm sorry.
Some calculations were what?

Page 144

A. Were performed in error.
Q. Do you know, what's the reference to, another voice?
Do you remember who you were referring to there, the first line of that bullet point?
A. I don't remember if that was somebody outside of the meeting participants or perhaps someone that was in the meeting had talked to me subsequently to reinforce their point. I believe -- up until fairly recently, and I put a couple years on that "fairly recently," calculations were done manually, so lots of room for error in that situation, and it could have been somebody who was the one who at the end of the line had to do that manual daily calculation or monthly calculation that was an advocate for keeping it simple, keeping it transparent.
MR. COLATRIANO: Okay. Let's have this document marked as exhibit 29, please.
(Hughes Exhibit No. 29 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 29 is a printout of a proposed FDIC rule on payment of postinsolvency interest in

Page 145

receiverships with surplus funds dated December 18, 2001. It's Bates-stamped AM 00096596 through and including 602.
What was your role in the preparation of this proposed rule?
A. This proposed rule is the result of the meetings and the discussions and the issues we worked through as covered in previous exhibits, so my role would have been -- I'm not necessarily sure that I led a group, but participated in the team, provided leadership to the team in certain areas that then led up to this going to the board and ultimately out for public comment.
Q. Okay. The summary on the first page says that: The proposed rule would set an interest rate that would be paid at the coupon equivalent yield of the average discount rate set on the 3-month treasury bill at the last auction held by the United States Treasury Department during the preceding calendar quarter.
Did you agree that that was the appropriate rate to use for purposes of this regulation?
A. If I remember right, we would have evaluated several different options for rates, and

UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT INSURANCE : No. 93-531
CORPORATION, : Judge Loren Smith
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA,:
Defendant. :

------------------------------X

Washington, D.C.
Monday, April 17, 2006

Continued deposition of KAREN HUGHES, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 1:50 p.m., Monday, April 17, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 193

time.
Q. Okay. Let me ask you this question: The FDIC had this policy where upon repayment of 95 percent of the dividend payments by corporate, upon attaining that 95 percent payment threshold, that post-insolvency interest would then be recorded on the books after receivership?
A. Correct.
Q. Correct.
Was the basis of this policy decision the fact that generally accepted accounting principles require that a liability not be recorded until it's reasonably probable and estimable?
A. The probable-estimable criteria factored into the decision about when to reflect post-insolvency interest financial statements of the receivership. So it was more of a presentation issue as opposed to -- as opposed to a reflection on the existence of the claim itself.
Q. And was it because of those generally accepted accounting principles that if a receivership had not attained this 95 percent threshold in the first year of the receivership, post-insolvency interest would not be recorded in the books of the receivership in that year?

Page 194

A. I would say no. I would not go back to generally accepted accounting principles in ascribing that decision.
At the time, if I recall, our thinking on the matter -- and I say this with the recognition that the FDIC had hundreds and hundreds and hundreds of active receiverships for many, many years.
And almost all of those receiverships were receiverships that were significantly in the hole, as we would call them, in terms of the likelihood of making the deposit claims whole, let alone beyond the deposit claims class.
So I don't believe that the FDIC had a practice at the time to record post-insolvency interest on the receivership records. And what we were trying to do was to identify from a reporting perspective, recognizing that there were -- for some receiverships there was interest in the financial statements and from a presentation perspective, we were seeking to provide the best presentation possible for the readers of the statements.
And that's what took us to the discussion about post-insolvency interest. For those very few receiverships that were even possible -- you know -- an impossible situation to achieve the status of

Page 195

paying post-insolvency interest. So that's how the discussion came about relative to what do we do with it in terms of the financial statement presentations.
Q. Okay. Now were there two views regarding the presentation of post-insolvency interest in the financial statements, a minority view, which indicated to present it in the financial statements in the first year of the receivership, regardless of the repayment history, and then a majority view to present it in the financial statements once the 95 percent threshold was reached.
Is that correct?
A. I'm sure there were more than two views on presentation and calculation. I remember from the deposition the other day, again, there was an old e-mail or memo or something put in front of me where there was some reference to a minority view. I don't remember now even what that was speaking to, so I don't remember if that was this particular issue.
We -- when we dealt with these kinds of issues, we would tend to get many, many people together and listen to all of the input; and so again, there were likely many views as to when to recognize and at what point, if we should recognize it at all.

Page 196

And so I'm sure there was the view to record it on day one and that was -- that would have been fine. There was also the view we ultimately decided upon to record it when it became more likely there would be a chance of payment.
Q. Okay. And were there deliberations that occurred analyzing these different alternatives before you selected the 95 percent threshold method?
A. I would say again this was a -- this all occurred a long time ago. But I would say that I'm sure there were.
Q. And upon deciding that this 95 percent threshold method would be used, was it applied across-the-board to all receiverships?
A. I believe it was, but my position was not to do the accounting for the receiverships; so I only say I believe it was from the perspective of knowing that that was the conclusion that we reached, and I remember seeing post-insolvency interest and issues related to it further in financial statements.
Q. Are you familiar with the statement of financial account standards 5 which deals with contingent liabilities?
A. Yes, I am.
Q. Do you know if that particular statement

Page 197

was linked or had any impact in any way upon your decision for choosing the 95 percent threshold?
A. The concepts of probable and reasonable and estimable were -- I'm sure -- I was going to say I remember, but I don't really remember.
I would think those would have influenced the discussion because again those were common accounting principles relative to the decisions around recording liabilities.
Q. Okay. If we could turn to Exhibit 24? If you will -- it doesn't have Bates stamped page numbers on it. If you look at the first page, you'll notice this memo was from an Irene Sanchez, claims specialist, Dallas field operations branch?
A. Okay.
Q. Do you know whether or not Ms. Sanchez had a policy level position as a claims specialist?
A. I don't know.
Q. And then if I could have you turn to the fourth page where the spreadsheet chart begins?
A. Okay.
Q. And it indicates in the left -- pretty much upper left-hand corner this was prepared by Ms. Irene Sanchez, correct?
A. Yes.

Page 198

Q. Also if you look at this chart, you see that Carteret is listed under receiverships that were established prior to 8-10-93, and then it says non-depositor preference.
Would you know if Ms. Sanchez's classification of Carteret in that particular list represents a finalized determination by FDIC management?
A. I don't know the spreadsheet was anything other than a -- some type of a dividend calculation. I don't know how the determination or the classification of Carteret relative to the 8-10-93 date impacted anything.
Q. Okay. And given the fact that it states here Carteret failed on January 20, 1995, would you disagree with this classification as being established prior to 8-10-93?
A. Yes. I would say that heading or that category is incorrect for Carteret.
Q. No further questions for that document. If I could have you take a look at Exhibit 27, Ms. Hughes? Do you know why this memo was sent to you?
A. I believe it was because at the end of 2000, the FDIC received congressional -- or

Page 199

authority -- congressional authority is what I would say, to establish uniform post-insolvency interest guidelines; and the Division of Finance would have been working with the Division of Resolutions and Receiverships to -- and legal -- to work on drafting the regulations that we would ultimately submit for comment and seek approval upon.
Q. What was your role in the development of FDIC policies and procedures regarding the calculation of post-insolvency interest?
A. At this time, accounting -- the -- I believe this would have been when accounting policy as well as corporate operations reported to me; and as the deputy director of those areas, it would have been my charge to make sure I had the right representatives participate in a working group to develop the ultimate recommendation.
You mentioned Elaine Tama before. I believe Elaine Tama was part of that working group. I believe she was reporting within my group at that time.
Q. And you mentioned that you had different factions including account reporting to you.
Did you have people who specialized in account who gave you recommendations regarding the

Page 200

accounting aspects of PII and when it should be recorded?
A. This wasn't specifically addressing so much when it should be recorded. This was more addressing uniformity. This being the exhibit, the actual document, was addressing uniformity across all types of receiverships.
Q. Okay. In terms of the accounting aspects of post-insolvency interest, were there particular persons with a specialty in accounting who worked on that piece -- I guess you could say -- of post-insolvency?
A. I believe we had a few people that tended to be part of the group from the accounting side. Elaine Tama was one; Bob Ferrer from our Washington area as well. Participants from the field accounting function, I believe Wayne Green, perhaps Sharon Kelly. Likely others, but I don't recall.
Q. Okay. If I could have you read to yourself the first paragraph of this memo on page Bates stamped RAM 0501555.
MR. COLATRIANO: We're on Exhibit 27?
MS. HART: I'm sorry. There's another Bates stamp number on my copy. I'll use the one you have. Excuse me for that. AM 00096542.

Page 201

MR. COLATRIANO: No.
MS. HART: Let me get the actual exhibit that was handed out.
Okay. The first page of Exhibit 27, which is Bates stamped AM 0010419. Does that comport with everyone's --
MR. COLATRIANO: Works for me.
MS. HART: All right. If I could have you look at the first paragraph on that page.
THE WITNESS: To include the bullets?
BY MS. HART:
Q. We'll get to that in a moment. You are certainly welcome to look at that. Actually, if you'd like to review the entire memo at this time, feel free to do so. I will be asking you a series of questions regarding the memo.
A. Okay.
Q. But as we go along, I'll also ask you to read it again just to be sure.
(Pause.)
THE WITNESS: Okay.
MS. HART: Can we go off the record for a moment?
(Discussion off the record.)
MS. HART: We are back on the record. We

Page 202

are currently discussing Exhibit 27. Ms. Hughes had a chance to review that memo and refamiliarize herself with it.
BY MS. HART:
Q. First, if we look at the first sentence on the first page of that memo which is Bates stamped AM 0010419.
It states this memorandum responds to your request for our views regarding the payment of post-insolvency interest with respect to solvent receiverships subject to the National Depositor Preference statute; am I correct?
A. Yes.
Q. Okay. To your knowledge does this memo represent the FDIC's most current position regarding the payment of PII?
A. I interpret this memo as various legal staff responding to -- presumably responding to a request for some legal assessment or legal options relative to post-insolvency interest, perhaps to include current status. I don't know if this reflects FDIC's current position on post-insolvency interest.
Q. Okay. And what is your understanding of post-insolvency interest?

Page 203

A. Post-insolvency interest is an interest calculation on outstanding -- outstanding claim balances from the receivership. It is governed -- it has been governed over the years that I've been involved in it by various either regulations or statutes, I believe -- depending upon when it failed -- when the institution failed and how it was chartered originally.
And that the FDIC attempted over many years to come up with some type of standard, guidance, or answer the questions that were beginning to surface relative to receiverships in a surplus situation, and therefore being in a position to pay post-insolvency interest.
Q. Do you know what liabilities are generally assessed post-insolvency interest?
A. I would describe post-insolvency interest as being more associated with claims of the receivership estate; so claims that have gone through some variation of the claims process different than administrative liabilities of the receivership.
Q. Okay. And do you know why these certain claims are assessed PII? Is it based upon statute? Regulations? Or some other reason?
A. It's always been my understanding that the

Page 204

concept of post-insolvency interest was driven by either statute or regulation, depending upon what was governing that receivership at the time.
Q. Now, read from the second paragraph on the first page of this memo which is preceded by a bullet point.
It states that in federal and federalized receiverships, post-insolvency interest would be paid pro rata to all claimants regardless of priority after the principal amounts of all claims have been paid in fall.
Is that correct?
A. Correct.
Q. You see that. Is this your understanding of the FDIC's policy regarding payment of post-insolvency interest?
MS. DOHERTY: Object to the question because it mischaracterizes what you just read which spoke of FDIC practice at a certain point in time, 2001. It's not clear to me whether you're making a distinction between policy and practice and if so at what time.
BY MS. HART:
Q. Okay. It says practice here, but is it your understanding that this practice constitutes a

Page 205

current policy of the FDIC?
A. I don't remember what the current policy of the FDIC is relative to post-insolvency interest.
Q. Do you know if it represented the policy of the FDIC at any point in time? And if so, what points in time?
A. If the legal staff had characterized this as the FDIC practice at whatever point in time they're referencing, I would have no reason to not believe that they were capturing that correctly.
What I don't know myself, I don't remember the kinds of institutions that the concept of paid pro rata to all claims -- claimants, regardless of priority, applies to.
Q. Okay. At the bottom of this first page, it states in the last paragraph on the bottom of the page, in our view the FDIC's present method of paying post-insolvency interest as described above is the most legally supportable approach.
Do you agree with that statement?
MS. DOHERTY: Object to the statement insofar as it asks this witness to draw a legal conclusion. You can go ahead and answer it.
THE WITNESS: I can't comment on whether it is the most legally supportable approach or not.

Page 206

BY MS. HART:
Q. Do you remember at the time that you first -- let me mention one other thing. The next sentence states this memorandum sets forth the legal basis for this method.
At the time that you first received this memorandum, February 22, 2001, do you remember if at that time you agreed that consistent with the analysis in this memorandum, that the practices described here were the most legally supportable?
MS. DOHERTY: Same objection insofar as it calls for a legal conclusion.
THE WITNESS: And I would not have been in a position to draw a conclusion as to whether something was legally supportable. I would have relied on the input from the counsel who was participating in preparing the document.
BY MS. HART:
Q. The recommendation that legal counsel gave you regarding post-insolvency interest, would that have been based upon their analyses and what they felt was the most legally supportable approach?
A. I don't know this document is given a recommendation. I almost read this document as describing scenarios and the legal basis for

Page 207

scenarios for options relative to post-insolvency for different kinds of institutions. And what stands out from this document to me is the reference to now we have authority for FDIC itself to issue a uniform practice and approach via the regulation process.
So I don't remember what recommendations or conclusions came out of this other than this serving as input ultimately for the drafting and the ultimate approval of the regulation.
Q. If you could turn to the next page of the memo, Bates stamped AM 0010420?
If you will read to yourself the first paragraph under the analysis section that begins with national depositor preference statute?
A. Okay.
Q. Would you agree that the national depositor preference statute provides for the priority order for the payment of unsecured claims against any insured depository institution that fails after August 10, 1993?
MS. DOHERTY: Same objection. Calls for a legal conclusion.
THE WITNESS: That is what it says here, and that is what I recall.
BY MS. HART:

Page 208

Q. Okay. Now, if you will take a look at the next full paragraph under the analysis section which begins with the priority scheme. And read that out loud. It states there the priority scheme does not include post-insolvency interest. Therefore, the FDIC must interpret the statute in this regard.
Do you agree with that statement?
MS. DOHERTY: Same objection.
THE WITNESS: Yes. I believe that that was the void that had been identified in the depositor preference statute; so, yes.
BY MS. HART:
Q. Would you agree that Carteret was placed into receivership in January 1995?
A. I don't know.
Q. Let me draw your attention to Exhibit 1, which is the goodwill reporting package dated September 30, 1998 for 1/9/97?
MS. DOHERTY: What exhibit number?
MS. HART: Exhibit 1.
BY MS. HART:
Q. If you notice it has -- 2-95 and for the Carteret Federal Savings Bank receivership?
A. Correct. What is what it says.
Q. Does this refresh your recollection as to

Page 213

A. Okay.
Q. Do you agree that the federal rate would control for federal/federalized receiverships in terms of determining the PII rate?
MS. DOHERTY: Object to that question as also calling for a legal conclusion.
THE WITNESS: I would say I don't know but that's what it says.
BY MS. HART:
Q. Okay.
A. I don't know.
MS. HART: Those are all the questions I have on that chart. If you could go ahead and get Exhibit 9. That should be the restated goodwill financial reporting package dated May 10, 2005.
BY MS. HART:
Q. Ms. Hughes, if I could direct your attention to page 03 -- actually, wait a minute.
No. Got different numbers here. All right. Just a second. To AM 0097393.
THE WITNESS: Okay.
BY MS. HART:
Q. If you take a look at the left-hand column, and if you go to the liabilities section?
A. Okay.

Page 214

Q. And if you go to that line item just above the total claims amount. It says estimated interest on claims, FDIC/RTC.
A. Okay.
Q. And it totals approximately 145.3 million?
A. I see that.
Q. Would you agree that this line item represents the post-insolvency interest estimate for Carteret as of 12-31-2000?
A. I haven't seen this report before, so I would -- I would state that that's what I would expect that number to represent, but I don't know for sure.
Q. Okay. Next to this amount, you see a footnote A, correct?
A. Correct.
Q. If I could direct your attention to footnote A, which would be on the very next page. And if you could read footnote A to yourself?
A. Okay.
Q. Now, the first sentence of footnote A states financial institution 1309 is subject to the order of claims priority contained in 12 USC section 1821(d)(11) which applies to RTC receiverships commenced after 8-10-1993. Would you agree this is a

Page 215

correct statement?
MS. DOHERTY: Object insofar as it calls for a legal conclusion.
THE WITNESS: And I don't know. I don't remember.
BY MS. HART:
Q. Okay. Would you agree the FDIC is within its legal authority to assess post-insolvency interest against institutions like Carteret?
MS. DOHERTY: Object because it calls for a legal conclusion.
MS. HART: I should say based upon the fact that it stands in the shoes of the depositor to which it pays off insured claims.
MS. DOHERTY: Same objection.
THE WITNESS: Post-insolvency interest is an obligation of the receivership that has become an obligation because of applicable statutes or regulations or laws or common laws, or whatever the interpretation was, that gave us the concept of post-insolvency, so responsibility of the receivership to pay that to the claimants.
BY MS. HART:
Q. What was the purpose of the various reports that are contained in the goodwill reporting

Page 216

package?
A. We were attempting to provide various pieces of information. I believe it was generally based on the kinds of questions that were coming up early on in the cases, and the thought was if we could provide information to show various -- show the life of the receivership at various points in time, that would be useful information to whoever wanted to see the report.
Q. Now, if you will notice on Exhibit 9, under the subject line on the first page, which is AM 0097388, it has there restated goodwill financial reporting package.
And my question is when would the FDIC prepare a restated goodwill financial reporting package as was done for this particular year?
A. In reading the first page here, it looks like there was an identification of an error in what was in the initial report. And the restated package was an attempt to correct that error.
Q. Okay.
MS. HART: The last thing I have I will mark as -- have the court reporter mark as Exhibit 36, and it is an e-mail from Elaine Tama sent to various persons and a copy of which was sent to Karen