# EXHIBIT L

UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------------x

AMBASE CORPORATION and CARTERET BANCORP, INC.,

Plaintiff,

-and-

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Intervenor,

-versus-

THE UNITED STATES OF AMERICA,

Defendant.

--------------------------------------x

600 Fifth Avenue
New York, New York
March 31, 2006
9:35 a.m.

Deposition of MICHAEL SARAN, pursuant to Notice, before Sophie Nolan, a Notary Public of the State of New York.

Page 6

MICHAEL SARAN, called as a witness,
having been first duly sworn, was
examined and testified as follows:
EXAMINATION BY
MR. COLATRIANO:
Q. Good morning, Mr. Saran.
A. Good morning.
Q. My name is Vincent Colatriano. I'm with the law firm of Cooper & Kirk and we represent the private Plaintiffs in this matter.
MR. COLATRIANO: Can counsel please identify themselves for the record?
MR. KUIPER: Gary Kuiper from FDIC representing the witness, Mr. Saran.
MS. HART: I'm Melinda Hart with the Department of Justice representing the United States.
Q. Mr. Saran, have you ever been deposed before?
A. No.
Q. You are an attorney; correct?
A. Yes.
Q. Just a couple of basic groundrules here, if you need to take a break at any time,

Page 7

please let me know, I'd be happy to take a break whenever you'd like. I'll try to take periodic breaks anyway, but if you need to take a break, let me know.
My only request is if a question is pending when you want to take a break, I'd appreciate if you'd answer the question before we'd take a break. If you need me to rephrase or clarify a question at any point, please let me know. I'll be glad to attempt to, so just let me know if you don't understand a question.
Is that acceptable to you?
A. Yes.
Q. Where are you currently employed?
A. Federal Deposit Insurance Corporation, New York regional office.
Q. And what is your position there?
A. I'm a senior attorney.
Q. What, if anything, have you done to prepare for this deposition?
A. I spoke to my counsel, Andrew Gilbert. He provided a copy of an e-mail that I had written, and that's about it.
Q. Did you have a discussion with anyone else about the deposition or about

Page 8

Ambase or Carteret?
A. No.
Q. Did you review any other documents other than the e-mail you just mentioned?
A. There was one other memo that was provided yesterday about 4 o'clock. I think I reference it in my e-mail. It's referred to or I refer to it in an e-mail as a policy memo. I think one of the authors is Tom Rose, I think.
Q. Could you briefly describe for me your educational background, college degrees, post-graduate degrees?
A. Sure. I graduated from Tulane University in New Orleans. Do you want the dates as well?
Q. Approximate.
A. 1974, I believe it was, with a BA. I graduated from Rutgers Graduate School of Business in -- I think it was 1975. That is a in Newark, and I graduated and attended from Seton Hall Law School 1980.
Q. You mentioned you're an attorney. Do you hold any other professional certifications?
A. No.

Page 9

Q. Okay. Can you briefly summarize for me your professional career and let's begin when you graduated from Seton Hall Law School? Just give me in chronological order your places of employment?
A. I worked for an accounting firm. It was called Price Waterhouse at that time. I left Price Waterhouse early 1980s. I don't recall the exact date. I became a senior tax advisor with another accounting firm by the name of Coopers & Lybrand.
I joined a law firm as an associate in or about 1985. The law firm's name at that time was Starr, Weinberg & Fradkin in Roseland, New Jersey.
I left Starr, Weinberg & Fradkin and joined the Resolution Trust Corporation in, I believe April of 1991, and -- do you want me to go through the offices I've been with the RTC and the FDIC?
Q. Yes, actually I do.
A. I joined the Resolution Trust Corporation, RTC, in Somerset New Jersey which was the metropolitan field office in 1991. I was at that location until that office was

Page 126

the receiver to raise capital.
So, other institutions had expressed some interest, to my recollection, in acquiring Carteret and, again, I don't know if it was the full franchise or what we would refer to as the entire institution or if it was just part of a, you know, a piecemeal. Like I said, to my recollection they had branches in Virginia. They had branches, I believe, in Maryland. I believe they had a much more extensive branch network in Florida that had been sold prior to the appointment of the RTC as receiver, all in the hope or anticipation that they would be able to raise sufficient capital as a result of those sales.
Now, again, the due diligence or what I referred to previously as the war room. I don't know if it was just for those branch acquisitions or if it was intended to potentially a full franchise acquisition, I don't recall.
Q. Do you know whether those -- the institution doing the due diligence whether that culminated in the sale of any assets?
A. I don't recall. I do know or I do

Page 127

recall that certain branches -- again, Carteret had a fairly extensive branch network along the east coast, but at the point of the appointment of the receiver, the Resolution Trust Corporation as receiver, they had sold a significant number of their branches in Florida.
I believe they had also sold a number of branches in New Jersey. I don't recall who specifically the acquirers were, but I do know there was an intent or a hope, I suspect, to raise additional capital.
MR. KUIPER: No further questions.
MR. COLATRIANO: I have one follow-up on that discussion.
FURTHER EXAMINATION
BY MR. COLATRIANO:
Q. I just want to make sure I understand the timeframes correctly. You were discussing prior to the appointment of a receiver there was these efforts to sell branches or perhaps the whole institution.
Are you referring to prior to the December 1992 initial appointment of a receiver for Carteret Savings Bank?

Page 128

A. Yes, yes, I am.
Q. So you're not referring to the conservatorship period?
A. No, I'm referring to prior to the appointment of the RTC as receiver. It is my recollection that Carteret had disposed of a branch or of branches through Florida, throughout Florida and other states as well.
Q. Okay. And your recollection of that is based on what? You weren't involved in anything happening --
A. I was not. It's just that I remember either claims or other issues had arisen that, again, the room, which was referred to as the war room or these lateral file cabinets in terms of the subsidiary operations of Carteret, all the records were maintained in one area along with a lot of other records that, again, it was -- if I recall correctly it was explained it was part of when banks -- prospective acquirers might have reviewed these records.
Whether it was for a partial branch acquisition or whether it was intended to be an entire franchise, that, I don't recall.

Page 129

MR. COLATRIANO: I have no furthe[r] questions.
FURTHER EXAMINATION
BY MS. HART:
Q. Just to clarify, you did have involvement with the Carteret conservatorship?
A. Yes, I did.
Q. And your main involvement with the conservatorship was reviewing claims against the conservatorship and analyzing those claims?
A. Well, I -- in addition -- I actually provided -- in addition to claims, there was lots of other questions that would come up. Things in just some of these and I can't recall which exhibits specifically, but I would try to identify what the issue was and then refer the matter -- if it was a litigation matter, and you may say, well, why was I doing anything with respect to a litigation role, I was providing legal services to the managing agent and if they had matters or calls involving pending litigation at the institution they had been involved with prior to the appointment of the receiver, I would know who the matter should be referred to.

Page 130

Q. Did you have any involvement with the Carteret receivership?
A. Well -- well --
Q. Its conversion from conservatorship to receivership?
A. Just in terms of either responding to claims or other receivership operation issues. There may have been branch questions. You know, I don't recall any specific, but anything -- you know, if it was assigned to me, yes, I would have, but I don't recall anything specific.
Q. Okay. So your role with the conservatorship was commensurate with your role with the Carteret receivership?
A. Yeah, I just provided legal services, depending -- for instance, they had, if I recall correctly, a very large servicing -- a very large mortgage servicing operation in Clearwater, Florida.
I never want to Florida, but there were lots of questions involving mortgage satisfaction and that's -- one of these documents was general rated because as a mortgage servicer they had in various states

Page 131

statutory responsibilities and when I say "they," the institution, be it the conservator and/or the receiver, whoever ended up with the servicing portfolio, had to discharge mortgages in a certain timely manner. I'm using it as an example.
They had subsidiary operations that -- again, depending on the nature of the question, I may respond if was, you know, referred to me.
MS. HART: No further questions from the United States.
MR. KUIPER: We're finished.
(Time noted: 2:05 p.m.)

Page 132

ACKNOWLEDGMENT

STATE OF )
:ss
COUNTY OF )

I, MICHAEL SARAN, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

____________________
MICHAEL SARAN

Signed and Subscribed to before me, this day of , 2006.

____________________
Notary Public, State of New York

Page 133

CERTIFICATE

STATE OF NEW YORK )
:ss
COUNTY OF NEW YORK)

I, SOPHIE NOLAN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That MICHAEL SARAN, the witness whose examination is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of April, 2006.

____________________
SOPHIE NOLAN