# EXHIBIT M

IN THE COURT OF FEDERAL CLAIMS

--------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

--------------------------------------x

September 3, 1999
10:00 a.m.

200 Park Avenue
New York, New York

DEPOSITION of MICHAEL SIMONE, a witness in the above entitled matter, before a Notary Public of the State of New York

Q But it's a reasonable conclusion to draw from this?
A Yes.
MR. THOMPSON: We are actually going to be referring back to this document frequently through the next period of time, so don't flip it over and put it in the stack.
But I am going to mark at this time another document and I would like to have marked as Simone Exhibit 9 a document that bears the Bates number WOP 3330463.
(The above described document was marked Simone Exhibit 9 for identification, as of this date.)
Q Will you please identify this document for the record, sir?
A It appears to be another report from Examiner O'Rourke dated June 1, 1992 and it's addressed to me, John Griffin, Scott Smith and Donald Horn.
Q Now, was Mr. Horn, when his title says Analytical Supervisor, is that what was previously known as a Supervisory Analyst?
A Or a Senior Supervisory Analyst,



yes.
Q Will you please take a moment to review the second paragraph of this document, please?
A All right
Q Did you agree with Mr. O'Rourke's conclusion that core earnings would be enhanced as earning status return for $30 million of commercial assets and as operating expenses were reduced?
A That's -- if that's the case, yes, absolutely.
Q Now, turning back to the S Memo for a second, to Page 5 of that document, under the heading "capital position," it states in the second full paragraph "capital erosion has been halted, largely due to management's reduction of operating costs, balance sheet restructuring and disposition of problem assets".
Did you agree with that statement?
A My recollection, yes, yes.
Q So essentially because the institution had core operating profits and its asset quality had been improved, there wasn't a



substantial likelihood that its capital position would deteriorate in the immediate future, is that correct?
MS. TORNATORE: Objection, mischaracterizes the testimony and the document, I think.
A What it's saying is that the institution's capital position is no longer deteriorating.
The hemorrhaging has stopped, that's what's being indicated here.
Q Yes, and my question to you is do you have any reason to believe that the hemorrhaging might begin in the near future after preparation of this document?
A No.
Q Can you recall any other thrift during your tenure as a bank and thrift regulator being seized when it had core earnings and profitability and its asset quality had been substantially improved?
A I don't recall. It's possible during this period of time that there were institutions with negative capital that were still, seized even though their operations may



have been positive.
Q But you can't recall any?
A I don't recall it specifically.
Q And you are not sure that there was?
A No
MR. THOMPSON: At this point I would like to take a five minute break, if that's okay with you, and we can go off the record.
(At this point in the proceedings there was a recess, after which the deposition continued as follows:)
MR. THOMPSON We are back on the record.
Q I'd like to turn at this point to Page 6 of the document
A Document S Memo?
Q The S Memo, exactly, that you have before you.
I would like to turn to the interest rate risk section, which reads in part "Carteret is operating with an unsafe level of interest rate risk The OTS market value of portfolio equity model reveals that any significant increase in interest rates from

existing levels will compound the existing capital shortfall."
Do you see that, sir?
A Yes.
Q This goes back to a question that we were talking about earlier.
I take it that the level of interest rate risk was unsafe in light of the amount of capital that Carteret had at the time, isn't that right?
A They didn't have capital to absorb losses as a result of interest rate risk movement, so that makes it doubly bad, yes.
Q I take it from this that the interest rate risk that Carteret had assumed at this time was that essentially they had positioned themselves such that they would take a loss if interest rate risk went up, is that what you understand this to indicate?
A I would say so, yes.
Q So doesn't it follow that if interest rates were to go down, then Carteret would be in a position to profit from that environment?
A It doesn't really say, and without



somebody actually indicating that, I wouldn't want to say that based on that statement.
Q No, I understand that this statement doesn't speak to that at all?
A It's possible that there is a window period if rates were to drop 100 basis points an institution could be very profitable, but I don't know beyond that if it continued to drop it could continue to incur losses again.
So it doesn't necessarily mean that it will go one way or the other.
Depending on how an institution's assets may be hedged, it would make a difference.
Q But to some extent the institution would be able to profit to some level, they didn't have interest rate risk, you couldn't have interest rate risk going both ways?
A You could depending on your hedges and the types of assets and liabilities.
Q You lose if it goes up or you lose if it goes down?
A Yes, but that's not what is said here.
Q And you don't recall Carteret?
A I do not.



Q Having this double exposure?
A No, I do not.
Q Were you of the view if interest rates remained low that Carteret was well positioned to take advantage of that?
And that the concern was more that they were in a difficult position if rates went up?
A That's my recollection.
Q Do you recall that interest rates in 1991 to 1992 were falling and remained at low levels from '92 on through 93?
A Yes.
Q Now, I would like to turn to the asset quality discussion that's on Page 5 of this document.
It's on the bottom of the page, and it says, "Carteret's asset quality has improved since the June 17, 1991 examination due to an intensive effort by management to liquidate nonperforming assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructurings."
Do you see that?



A Yes.
Q Did you agree with that statement?
A That's my recollection.
MR. THOMPSON: At this point I would like to have the court reporter mark as Simone examine Exhibit 10 a document that bears the Bates number WOP 3330449.
(The above described document was marked Simone Exhibit 10 for identification, as of this date.)
Q Sir, will you please identify the document for the record?
A It's an interoffice memorandum prepared by Donald Horn to Jim Winning, I am copied on it and it deals with Carteret.
Q Do you remember who Mr. Winning was?
A He worked in the Washington office and I believe it was in the financial analysis and oversight area.
I don't recall what the specific name of his area was, but that's what he was involved in.
Q Do you recall why he would have been given updates on Carteret's financial condition?
A My recollection is that he was

114

A It was an issue as to whether or not a deal could be structured during a set period of time, but a set period of time is all that they were given.
Q Do you recall whose decision it was to give them that set period of time?
A My recollection was Mr. Ryan's decision.
MR. THOMPSON: I think we are actually at a convenient stopping point for lunch, and if you don't have an objection, we would like to go off the record.
(At this point in the proceedings there was a luncheon recess, after which the deposition continued as follows.)
Q We are back on the record, sir.
I would like to pick up again back to the S Memo.
Prior to the lunch break we were discussing the Carlisle group's Letter of Intent to acquire or to make a capital contribution into Carteret.
I would like to direct your attention to the third paragraph on Page 2 of this document.

115

The second paragraph -- the second sentence of that paragraph reads, "On November 11, 1992 OTS received verbal notification that the Carlisle Group was withdrawing its conditional Letter of Intent, because following due diligence it had concluded that it could not receive an adequate rate of return on its investment and had concerns about regulatory risk."
Do you recall who received the verbal notification from the Carlisle Group that it was withdrawing its Letter of Intent?
A No.
Q Do you know who the most likely candidate would have been to receive that sort of notification?
A It could have been Angelo, it could have been Bob, it could have been me, one of the three of us.
Q Now, in terms of the reasons that were given here, they appear to be two-fold, number one, an inadequate rate of return, and number two, regulatory risk.
Do you recall what was intended by the phrase which is in quotes in the memo.

116

regulatory risk?
A I do not recall specifically.
Q Do you have any general recollection as to the types of concerns that the Carlisle Group may have had?
A It may have had something to do with the amount that they would invest and the fact that the institution may not have been fully capitalized, and what restrictions they would have to operate under and so forth.
That sort of sticks out in my mind.
Q And that makes sense.
I take it that there was a prospect that there might be some restrictions placed on the institution even after it got the capital infusion, and that's what raised the concern?
A If it were not fully capitalized, yes.
Q Do you recall what type of -- what form those restrictions might have taken?
A Well, I think it would be similar to restrictions placed on any institution that failed to meet its full capital requirement.
Probably limited the amount of growth, or payments, compensation.

117

Q Dividends?
A Definitely dividends, yes. I would say, absolutely.
Q And there would also be close scrutiny as to the lines of business that an enterprise might go into, is that correct?
A Possibly, yes, possibly.
Q Now, so that was one reason that was given.
The second reason that was given was that they didn't believe they would receive an adequate rate of return.
Do you recall what the Carlisle Group -- whether they ever indicated to you or your colleagues what they believed an adequate rate of return to be?
A I don't recall.
Q Now in assessing a rate of return and its adequacy, is it true that an investor would look at number one, the amount of income that it would receive, and number two, the risk that they would actually receive it, is that a fair statement?
A I would say so.
Q In this instance, one of the reasons

122

A I would say so.
Otherwise there would be some sort of a conditional type of agreement that they would put on the table.
MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 31 a document that bears the Bates number WOP 3340683.
(The above described document was marked Simone Exhibit 31 for identification, as of this date.)
Q Sir, will you please identify this document for the record?
A It's an internal memo from Bob Albanese to Angelo, I am copied on it, along with John Griffin and Sharon Frid, it's dated November 27, 1992.
Q Then referring to the first paragraph, it states that, "Dick Bianco advised me," Robert Albanese, "that he has been in contact with the CFO at PNC and probably will be meeting with senior PNC representatives this weekend."
Do you recall this activity at the end of November '92?

123

A I do not.
Q But it's consistent with your general recollection that there were investors out there who were still very interested?
A Yes.
Q Now, in the last paragraph Mr. Albanese states, "If PNC still is interested and only needs a few days to firm up a decision, it would be foolish to rush a transfer on December 4th".
Did you agree with that assessment?
A That makes sense, yes.
Q Did you feel that in light of the extremely compressed time for due diligence that these investors were being put under significant time constraint in terms of making their decision?
A It's a short period of time. Looking at it from an agency perspective, several extensions had been granted, and at some point enough is enough, and the agency needed to move forward with what it needed to accomplish.
I think that was the position that was taken at the time.
Q That was the agency position?
A That was the agency position.

124

MR. THOMPSON: At this point I would like to have marked as Simone Exhibit 32 a document that bears the Bates number WOP 3340685.
(The above described document was marked Simone Exhibit 32 for identification, as of this date.)
Q Sir, the document is just a page long, will you please identify it for the record?
A Yes, this is an internal memorandum prepared by Robert Albanese dated November 17, 1992.
Q Would you just take a moment to review the memo?
A Okay.
Q Sir, do you recall participating in a conference call with Mr Victor on or about November 16 of '92 of with Mr. Albanese?
A Not really, but I have no reason to suspect this is incorrect
Q Fair enough
Where it says that, in the second paragraph, "we strongly recommended that more time be given to Carteret's management because there was still considerable interest being

125

expressed by investors in the institution and there were no compelling reasons for not leaving the institution open for the few weeks needed to consider a possible offer from First Gibraltar."
I take it you and Mr. Albanese were strongly of the view that this matter ought to be resolved in the most cost efficient manner possible, and that an artificial deadline shouldn't be placed on allowing investors to do the due diligence necessary; is that right?
A Yes. Based on what we were aware of, at the time we thought that there would be no harm leaving the institution intact for another several weeks to see if this investor stepped up to the plate, yes.
Q Exactly. It is that kind of the point where it says at the end of the third paragraph, "frankly, we did not view the transfer date, whether it was November 20, December 4 or January 4th, to be a critical factor in our analysis of the situation."
Was that because it had -- Carteret had solid management in place and because it was operating on a profitable basis and wasn't in

jeopardy of having its capital further eroded at that time?
A Yes. As I indicated before, the hemorrhaging had stopped, so we didn't expect to have a worsening situation that would end up costing the insurance fund additional monies.
Q So while it was the agency position that December 31, '92 had some magical significance, it was your view and Mr. Albanese's view that more time should have been given to Carteret, is that correct?
A Yes, at least to see where the investors would end up in this particular case, yes.
Q Do you recall what Mr. Victor, what his response was when you called, and I take it, sir, that this call was three days after the S Memo was prepared making the recommendation, do you recall what Victor said to you?
A No, I don't, I really don't.
Q What was Mr. Victor's position at the time, do you recall?
A No
Q Do you recall why he was contacted as opposed to some of the other gentlemen whom we



have been talking about, Mr. Fonkel or Mr. Downing?
A Victor had a high position within the agency, I don't recall if Tim Ryan left by this point in time, and Jonathan may have been the Acting Director for the agency; that's a possibility
Q Just so the record is clear, Mr. Ryan actually left on December 4, 1992, the same day that Carteret was seized.
Let me just ask you that question, do you recall whether there was any correlation between the date of the actual closure and the date that Mr Ryan left?
A Not that I can recall
Q Was that anything that anyone ever suggested to you all that, well, Mr Ryan wants to clean his desk off this has been lingering around a long period of time, and we would just like to close the books?
A That's a possibility, but I don't recall that specifically.
Q Do you recall any governmental agency putting pressure on you all to come up with the recommendation in the S Memo of all right, put



the paper in place, we want to take the institution down and we can't do it until we have an S Memo. So go ahead and fill out the S Memo.
Is that something that you recall?
A You mean arm twisting from Washington or something like that? No.
Q I wouldn't want to use a negative word like that.
A No. Not at all.
Q And nothing from the Resolution Trust?
A Let me clarify that, not at my level.
If it happened at a higher level, I am not aware of it.
Q Do you recall whether the Resolution Trust Company was bringing any pressure to bear of hey, we've got resources and we want to deploy them and close this now?
A Not that I recall, no.
Q Are you aware, sir of any other instance in which the regional regulators were telling the agency officials in Washington, D.C. give this institution a few more weeks and we think we can resolve the situation in a cost free



manner, where that advice and counsel was not followed?
A I don't recall another situation where any extension was granted.
If an institution met the criteria to a point of a conservator or receiver, we just did it.
Best of my recollection this is the only institution that ever got any extensions.
Q Right, okay.
A In the northeast region.
Q Given your advice of give the institution a few more weeks and given the low interest rate environment that was prevailing at the time, isn't it true that if your advice and Mr. Albanese's advice had been heeded, the government would have been able to save itself a considerable amount of money because Carteret never would have had to have been liquidated in the first place?
MS. TORNATORE: Objection, speculation. You may answer it.
A I can't say that, simply because several extensions were granted and none of the previous people who stepped up to the plate to

take a look at this institution went forward with the transaction.
So if history wanted to repeat itself, the possibility exists that maybe this investor would also walk.
What was at risk here was the several additional weeks, that's all.
Q But if Carteret had been given several additional weeks, just given the favorable economic conditions that were prevailing and the low interest rate environment that we spoke about earlier, isn't it true that Carteret was well positioned to take advantage of that and might have been able to make itself sufficiently attractive that it would have been able to receive a capital infusion?
A Possibly, possibly.
Q And do you think that that was more likely than not?
And is that why you made the recommendation to Mr. Victor that hey, give these guys some time, we think they can make it work out?
A That's right, based on my universe within the region. You had other people outside



the region looking at it from a wider universe.
Q And I understand that, but from your perspective, that was the most likely scenario?
A Yes.
Q And just so that I understand all the players and what everyone's respective roles were, within senior management at the OTS, northeast regional office here, were you the person who was most intimately familiar with the operations of Carteret?
A No.
Q Who would have been the -- and I don't mean sort of at the field examiner level or the analyst level, but I mean senior management?
A Right, John Griffin.
Q John Griffin?
A Yes.
Q But you were very familiar with Carteret and its management?
A Yes.
Q I take it Mr. Griffin reported to you?
A Yes, he did.
Q So he kept you apprised of any significant developments at Carteret?



A That's correct, yeah, he was -- the first line office supervisor, there were field managers, there were examiners, but he would have been the first line office supervisor overseeing Carteret
MR. THOMPSON: I see. Thank you, that helps clarify.
At this point we are getting close to the end of proceedings. I know that's going to break you up, but I would like to take a five-minute break and also just arrange a few more exhibits so that I don't detain you unduly, but we are getting close to the end.
(At this point in the proceedings there was a recess, after which the deposition continued as follows:)
MR. THOMPSON: Let's go back on the record.
There are a few miscellaneous documents that are more in the nature of just random items that I would like to clean up.
Q Before we do that, we have had a lot of conversation today about supervisory goodwill



and capital requirements.
I just want to be clear, after FIRREA, did the regulatory officials view supervisory goodwill as different than cash in terms of assessing the capital position of an institution?
A What do you mean by that?
It was certainly excluded from the capital calculation.
Q Right, and I suppose even if a Court Order were to require it to be included in capital, I take it that in assessing the financial health of the institution and the restrictions that ought to be placed on it, that the capital, the supervisory goodwill and the cash were not deemed to be equivalent; is that right?
A Yes. Even before I don't -- I wouldn't say it carried the same weight that cash did.
We recognized it for what it was. Regulations allowed for it to be included in capital, but nevertheless it wasn't like having cash in the till.
Q I understand.
A And that continues.