# EXHIBIT N

UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

\- - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 170

this memo was concerned and what, if anything, you did to address any concerns she was raising?
A. Well, I haven't read it yet so --
Q. Why don't you just take a quick look at it and while you do that let's go off the record. Because I think I'm more or less done, but I just want to review my notes. You review that and I'll review my notes and we'll come back.
THE WITNESS: Is that okay with you?
MR. KUIPER: Yes.
(Discussion off the record.)
(Recess.)
BY MR. COLATRIANO:
Q. Mr. Mindnich, you've had a chance now to read this exhibit, correct?
A. Yes.
Q. Does it refresh your recollection about any other analyses that Ms. Cribbs was brought in to do over that first weekend?
A. Well, we had, I mean we, she -- this was written on the 7th and we had talked about it, it was directed to my attention because I was at that point leading the credit team on the weekend, okay? So she had to attract it to my attention. However, we had had these discussions and we had sent somebody to

Page 171

Florida I believe on the Saturday and Sunday we sent people down to Florida and we were already working on this by the time the memo was written.
Here again it was just, you know, another area to attack. I would say we had our hands full.
Q. Do you know whether Fannie Mae/ Ginnie Mae ever threatened to withdraw Carteret's certification?
A. If they did, they didn't.
Q. If they did threaten, they didn't do it?
A. They didn't do it.
Q. Do you recall whether they --
A. I don't recall.
Q. Do you recall them expressing any concerns about this issue?
A. You know, if they did it, they didn't call me, let me put it that way, okay? They might have called Washington or they might have called Valley Forge or Atlanta or somebody else.
MR. COLATRIANO: I have no further questions at this time.
(Whereupon, Leslie Conover exited the deposition room.)
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. HUGHES:
Q. I have some questions, hopefully brief.

Page 172

First of all, let's take a look at the memo we're looking at, Mindnich Exhibit 48?
A. Yes.
Q. With respect to these problems, these loan pools, was that the loan servicing function of Carteret that was in question?
A. Well, it's significant when there is sufficiencies and things of that nature and the processing of the mortgages, you know, I've done a couple mortgages myself and I know what it's like to have to sign everything. And you don't get a piece of paper signed, you may be out of luck.
It was a volume situation here, they had hundreds of millions of dollars in processing all the time, all the time. And we closed the approved, there were very few mortgages that were not closed out of processing. As I said the in process we just let it go, because we couldn't -- we weren't going to fund it. We ended up selling the mortgage company and all the mortgages that went with it at a rather handsome price.
So I would say that while there was a significant problem that we tended to it and worked it out, but this is, this is Monday morning. We haven't slept since Thursday night at this point,

Page 173

okay?
Q. Now she raised the concern that if Ginnie Mae or Fannie Mae had understood the magnitude of the problem, that would have created issues?
A. She was correct.
Q. And if those issues had become well-known or at least raised to Ginnie Mae or Fannie Mae, would that also have created difficulties in any possible sale of Carteret's mortgage origination operations?
A. There was no sale of an organization because there wasn't quote, an organization. There were people on the street referring mortgages into the Carteret. I don't think any of them were -- I'm just reflecting back. I don't believe that many of them were actually -- probably selling, employees. Some of them, this is what they did for a living, they found mortgages and took them to Carteret, as they did to City Fed and one of the other banks.
Q. Speaking in terms of -- those are correspondents?
A. You can use that term.
Q. Mindnich Exhibit 47, I think that's a previous exhibit.
A. Okay.
Q. Now, there's a chart in the middle of the

Page 174

first page and that shows the dollar volume and the number of loans and I guess the percentage of the loans being originated.
A. Um-hum.
Q. -- that are being closed at least by both the retail branches and the wholesale departments.
A. Um-hum.
Q. And the wholesale departments were basically loans that came in from correspondents ?
A. Yeah, they were the guys on the street, they were not -- to my recollection they were not employees, they were referrals.
Q. So looking at the retail branch and the wholesale departments, the majority of the loans in dollar volume were being generated by the wholesale departments?
A. Yeah, that's right in front of us.
Q. Right and --
A. That was the whole reason to have a wholesale department was to generate the mortgages.
Q. Looking at the paragraph just below that chart it states: As represented by volume statistics, there is heavy reliance upon the correspondent network for production. Business has been booked from 244 correspondent relationships this

Page 175

year. Now this corresponds to the people on the street you were talking about?
A. I believe that's who they were referring to.
Q. And those people would refer loans to processing for funding by Carteret?
A. Yes. The company I work for, Advisors Mortgage, would fit that bill because what we do is we bring mortgages in and we have 30 or 40 banks that we sell them to. Same thing here, except Carteret was -- had the money, we had the money; bring them to us. If Carteret was still in existence, we would be bringing to Carteret as well.
Q. Now, going to the last page of Mindnich Exhibit 47.
A. Um-hum.
Q. Paragraph 4 states the valuation must be made of the opportunity to retain CMC personnel and correspondent relationships related to production. Any significant attrition would limit viability of CMC continuance in the origination marketplace. In other words, that business would fall apart if there weren't these correspondents referring loan originations into Carteret; is that correct?
A. Yeah, but Carteret was no longer in the

Page 176

lending business.
Q. Let's take a look at the page previous to that, the next to the last page. Under recommendations it says as decisioning has been made to fully fund the existing pipeline, which you testified about earlier, sir; is that correct?
A. Excuse me?
Q. That decision was made to fully fund the existing pipeline, correct?
A. No, we -- we -- we made a decision to fund the approved pipeline. There's a difference.
Q. Continuing on to the second line of that same sentence, and consideration is being made to continue operations, the following recommendations were made.
So would you agree that it appeared that Ms. Cribbs believed at least that there was still a thought process going on as to whether or not to continue to originate loans?
A. No, the thought process was what we determined was that we would not -- that we would not -- we would not fund a mortgage if it had not been approved as of the 4th of December 1992. If it was not approved to fund, it would not be looked at, all right? And we funded a portion of those

Page 177

mortgages that were there. I'm not -- if you ask me did they all close? I don't know.
Q. Let me try one more document and this will be my only exhibit, I don't care if it is called 49 or Defendant's Exhibit 1.
MR. COLATRIANO: Let's just call it 49.
(Mindnich Exhibit No. 49 was marked for identification.)
BY MR. HUGHES:
Q. Mindnich Exhibit 49 is a Carteret Savings Bank memorandum, dated March 10th, 1993 to George M Gross, Jr., managing agent from James R. Mindnich, credit specialist, subject: Credit pipeline.
Do you need a minute to look it over, sir?
A. Yeah, I'd like to read it.
Q. Certainly.
A. Your question, sir?
Q. Did you indeed prepare this memorandum?
A. It has my initials on it, yes.
Q. Do you recall preparing this at all?
A. Yeah, I -- you know, I -- yeah, this is what I was all about that weekend.
Q. And now is it accurate to say this memo summarized the events that led to the decision to cease further loan originations?

Page 178

A. Yes.
Q. And just with respect to the second page, the next to last paragraph, on Thursday morning, December 10th, Donna Cribbs presented her findings to Donna Pillard, Jim Powers, Bob Smedley, Gene Yalicki and those present.
Were you present?
A. Yeah, I believe I was there.
Q. And interviews with various association staff members in conjunction with the funding and secondary market situation were held. It was determined that the applications generated from date of conservatorship was less than $10 million, an indication of the correspondent relationship 60 percent of the volume had already moved.
Is that a reflection that that $10 million indicated that the correspondents were already funneling their originations elsewhere?
A. Absolutely, yes.
Q. And it goes on to say this combined with the interviews taken, the decision was made on December 11th to cease all further acceptance of mortgage applications.
Would it be accurate to say that one reason it was decided to shut off mortgage

Page 179

originations is that it appeared the correspondents had already moved to other banks?
A. I think it was our time frames. We -- we felt Mary Wether who ran -- excuse me, Mary Wetherly who ran this facility I guess was absolutely out of her mind when we came in. As I stated previously, our original feelings were and they were maintained and sustained, to close the approved mortgages and not to move forward on any new applications, whether they were in the bank or not.
Q. Now looking on the first page, the third paragraph down it states, at the team leaders' meeting on Saturday morning, December 5, Messrs.. Smedley, Ford, Gross, et al., with verbal concurrences from Carol Wetherly, reaffirmed the funding of the committed mortgages. Based on information regarding a case to continue funding 1 to 4's in process for Home Federal in California, Mr. Ford requested that Carteret continue to act in an ongoing fashion accepting applications for at least the next week ending Friday, December 11th. During that period of time, Mr. DiGiondomenico was instructed to update all parties regarding the flow of applications and overall effect on the correspondents.

Page 180

Is it accurate to say that in effect they were going to -- you as a group were going to study how many applications came in that first week to see if the operation was -- if the volume was still there?
A. There was -- if you look at the paragraph above that, failure to do so would create a significant void in mortgage dollars available based on Carteret's monthly production. Well, obviously that wasn't correct and the balance of the documents were, you know -- the balance of the conversations was based upon his predictions and what was going to take place.
What actually happened is there were a thousand banks out there who gobbled up those applications quicker than you could blink your eye. What he was concerned about was never a factor. There were plenty of banks that were willing to do these mortgages and these guys couldn't get the applications to them quick enough and that's basically the bottom line. Time frames and so on and so forth, you know, that was the bottom line.
We -- we did not take in any of those applications to process to the best of my recall. Anything -- anything that had not been approved was

Page 181

not funded.
Q. With respect to that next to last paragraph on page 2 of Exhibit 49, where the applications generated from apparently the fourth to the 11th were less than $10 million, where were those applications coming from?
A. I don't know. Where did they come from?
Q. Were they come from branches and the correspondents?
A. Yeah, probably, yeah. I mean I -- if you asked me if I looked at them, no, I didn't look at them.
Q. But that drop off in volume --
A. As soon as -- as soon as the word went out that Carteret had been taken over by the RTC, 90 percent of those guys never showed up again or whatever, you know, but they knew, you know, they'd been down that road before with several of the other institutions around that had been closed and there's nothing coming out of here. So they automatically took their mortgages someplace else. We didn't have to tell them that.
Q. So in effect there was, as far as the mortgages origination business there was nothing to sell?

Page 182

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.
Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?
A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.
Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?
A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

Page 183

saved 20, $25 million of monies.
MR. HUGHES: I have no further questions.
MR. COLATRIANO: I have a couple of follow-up questions.
FURTHER EXAMINATION
BY COUNSEL FOR PLAINTIFFS
BY MR. COLATRIANO:
Q. Based on Exhibit 49 that counsel has just been going over with you. You stated a few minutes ago that the correspondent relationships, they all knew once the RTC came in to go elsewhere; is that a fair statement?
A. Yeah, yes.
Q. How much of that was related to the fact that it was RTC's policy to stop lending; was that well-known among correspondents?
A. Oh, sure, oh, sure.
Q. Okay.
A. I mean, what we did -- again as I said in the beginning, you had a mortgage commitment to close on your house from Carteret and why should you suffer.
Q. All right.
A. Right? And you couldn't close, you could have gone bankrupt because of that. Our feeling was

Page 184

that, you know, our intent is not to do that, to 10,000 families in New Jersey or wherever else the mortgages were, we would not -- we didn't feel that that was what we're here for. And we had to go and get approval to do that, but we went and just said we're not going to sit here and not fund -- we're just not going to do that.
Q. Okay. Now, leaving aside again --
A. And we funded every one that wanted to close. Of that portfolio, anybody that wanted to close, closed.
Q. Right. Let's leave aside again mortgages that were already in process and had already been approved. I think counsel asked you about new applications dried up from correspondents after the RTC came in; is that correct?
A. Um-hum.
Q. And is it fair to say that the reason it dried up is because the correspondents knew that it was RTC's policy to stop lending; is that a fair statement?
A. Yes, yes.
Q. This document also refers to the fact that between Friday December 4th and Thursday morning December 10th, there was still approximately $10

Page 185

million in new mortgage applications had come in, correct?
A. That's what I said, that's approximately correct, that's what the memo says.
Q. So in less than a week there was still $10 million in new applications, correct? And so if the correspondent relationships had dried up is it fair to say most of that $10 million was coming from the retail side of the origination --
A. I don't know the breakdown.
Q. The memo does say, if you look at the second page March 10th, it's the next to the last paragraph, the paragraph that begins on Thursday morning, it says in the middle it was determined that the applications generated from date of conservatorship?
A. That the corresponding -- I see it had already moved.
Q. Had already moved. Is it fair to say the bulk of that $10 million was in the retail side of the origination network?
A. I -- no, I think this -- I think this -- the correspondent relationships that -- it was determined that the applications generated from date of conservatorship were less than $10 million, an