# EXHIBIT O

UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT INSURANCE : No. 93-531
CORPORATION, : Judge Loren Smith
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF :
AMERICA, :
Defendant. :

---------------------------X

Washington, D.C.
Tuesday, March 7, 2006

Deposition of DONNA L. CRIBBS, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 10:17 a.m., Tuesday, March 7, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 34

Q. What were your responsibilities when you started and what are they now?
A. Okay. When I started with Homebanc, I was in charge of the post-closing, funding, deliver, equal control areas of the company. All residential.
Q. What does that mean, post-closing funding?
A. Once the loans close they have to be delivered to a warehouse bank and delivered to an investor into the securities for funding.
Q. Okay.
A. Okay.
Q. And then, all right, how did your responsibilities change?
A. I've done -- I had a number of positions with Homebanc. I currently am head of corporate closing and product development, which is getting new investors and rolling out new products to our sales organization.
Q. When you say corporate closing, what does that mean?
A. All of the closing activity, all of the closing agent relationships with the attorneys, et cetera.
Q. Okay. And how many -- what's the volume of business that Homebanc does?

Page 35

A. Homebanc does 7 billion dollars a year.
Q. And is it profitable?
A. Yes.
Q. Okay. Okay. Well, thank you very much for running through that. And let us get to the reason why we're here.
A. Okay.
Q. Which is Carteret Mortgage Company. And let me start by representing to you that Carteret was seized by the federal government on December 4, 1992?
A. Okay.
Q. I'd like to ask the court reporter to mark as Cribbs Exhibit I, a document that bears the Bates number C-AM-A-0399086.
(A document was marked for identification as Exhibit No. Cribbs-1.)
BY MR. THOMPSON:
Q. Ms. Cribbs, have you had an opportunity to review the document?
A. Yes.
Q. Okay. And this is a memo dated December 7, 1992; is that correct?
A. Yes, it is.
Q. And it is from you and Mr. William Bailey

Page 36

to James Mindnich; is that right?
A. Uh-huh. Yes.
Q. At the time you prepared this document, you were working at Cowger and Fidelity; is that right?
MS. DOHERTY: Excuse me. Object to the form of the question. It makes an assumption that she, in fact, prepared the document, which we don't know.
BY MR. THOMPSON:
Q. At the time this document was prepared, December -- dated December 7, 1992, you were working at Cowger and Fidelity; is that right?
A. Yes.
Q. Okay. And that was -- those were full-time jobs, collectively, correct?
A. Yes.
Q. Okay. And do you recall which days of the week December 4, 5, and 6, and 7th, 1992 were?
A. No. But I -- go ahead.
Q. Well, go ahead. What do you recall about the process of this memo being put together?
A. Okay. I was asked to go in and review the subsidiary for Carteret, specifically Carteret Mortgage Company, which was a division, and assess

Page 37

the risk. And it was go in, review the operations in a short period of time.
Q. So was it a -- you know, necessarily a preliminary analysis?
A. I would say yes.
Q. And did you do the analysis over the weekend, do you recall?
A. I don't recall what days of the week it was.
Q. Okay. Now, what was Mr. Bailey's involvement in this analysis?
A. We worked cooperatively to review the current -- the then-current state of affairs in Carteret in this division; so we both aggregated information.
Q. And Mr. Bailey, was --do you know what his responsibilities were at the RTC?
A. No.
Q. Do you know whether he had any special background in mortgage company operations?
A. No, I don't.
Q. Okay. And Mr. Mindnich, what was his role at the RTC, do you know?
A. I believe that he was the site manager of Carteret.

Page 38

Q. Do you recall with whom you spoke -- if anyone -- at Carteret about Carteret Mortgage Company?
A. Actually, I would not recall the names.
Q. Do you recall if you had any conversation with top executives who were in charge of operating and supervising Carteret Mortgage Company?
A. Actually, I can't say that I had those conversations or did not have the conversations. I recall I was more focused on actually the associates that did -- that were working in these areas.
Q. I'm sorry. When you say "associates."
A. The employees, the staff that were in these areas.
Q. What if anything do you recall about those conversations with the staff?
A. Just basically -- you know -- how do you do your job; just -- again aggregating information and documentation as to how these areas performed
Q. Okay.
A. And expectations of continued performance
Q. Do you have any recollection of what your impressions were based on those interviews or that aggregation of information?
A. That they had to tighten up.

Page 39

Q. Okay. In what --
A. That there was --
Q. -- ways?
A. -- the recommendation in this document was tighter controls be placed. For continued operations, there needed to be a change in how the operation was -- the controls that were in place.
Q. Did you make any assessment as to what the financial performance of Carteret Mortgage Company had been in the time prior to your review?
A. No.
Q. Okay. And if the tightening up that is reflected in your recommendations in this memo had been effectuated, do you believe that Carteret Mortgage Company had a viable business?
A. Only -- I mean -- and this would be an opinion only -- is that if -- I perceived that if they tightened controls, it was a viable company.
Q. Okay.
A. And properly managed it, going forward.
Q. Okay. And just -- let's talk for a minute about what sort of tightening would need to take place.
Under Recommendations on page 2 of this memo, it says active hands on pipeline management

Page 40

should be developed immediately to assure timely purchase of sale commitments and execution of trades.
Is that the process we were talking about earlier, of you've got the pipeline and you need to be able to hedge by selling a portion of that?
A. Right.
Q. Okay. And what was your concern about the way the pipeline was being managed?
A. There was more trading activity than I felt the pipeline warranted. So there were a number of pair-offs where you actually created a position and you can't deliver into that position, so you financially have to pair it off to get out of the obligation.
Q. Okay. And I apologize to make you walk through this. Can you give me an example of how a pair-off works?
A. Say I positioned 5 million dollars, but I wasn't able to deliver 5 million dollars.
Q. Yes.
A. Okay. Then I still have this obligation. At this specific rate. And then I would have to buy my way out of that position, and that would be a pair-off.
Q. Okay. So you would perhaps go out and

Page 41

have to buy the loans from somebody else to deliver them? Would that be a pair-off?
A. Physically, you don't -- typically, it is only a financial transaction. You don't really go out and find replacement loans. For a fee or a penalty, you are -- you pay as opposed to deliver.
Q. I see. Okay.
Now, the point number 2 is pricing should be conservative and origination product types should be limited to readily marketable loan programs, modifications to current menu where necessary to accomplish this.
What did you mean by this?
A. Okay. Gearing it more towards agency product which is -- rather than private sector product. Which would be the Fannie Mae, Freddie Mac, Ginny Mae that you get out of sort of the niche products.
Q. Okay. Do you recall what sort of niche products they had?
A. No.
Q. Okay. Now, point number 3 is it is essential to ascertain the willingness of the agencies and private investors to continue committing for purchase, accepting for delivery, and funding of

Page 58

at the time of intervention.
Q. So you don't recall any involvement prior to intervention?
A. No. I was aware through just industry -- again knowing that Carteret existed as a financial institution, et cetera, that I may have conducted secondary transactions with them or at least where they were the buyer side of my sales transaction, something in the past.
Q. When you say you may have, do you recall any --
A. Specifically, a lot of the northeastern financial institutions, City Federal, et cetera, were very large players in the mortgage market in the years predating the RTC intervention.
Q. Do you recall what year your responsibilities with respect to Carteret ceased?
A. Well, actually, it was -- probably in the span of less than a week. Other than if there were Carteret assets, loan assets that later came in to transactions in the -- through the sales center, the securitization. Because we took -- we aggregated assets from all institutions.
Q. Just to make sure we don't have to do this deposition again, I'm going to make sure I flesh out

Page 59

your background. Please just bear with me.
A. No problem.
Q. What was your -- besides Carteret, what was your next position at the RTC? Going back to your position as an asset specialist in Atlanta in '96? Would that have been your last position at the RTC?
A. My last position with the RTC was the financial instruments coordinator of the sales center.
Q. Okay. And what year did you -- I'm sorry. What were your duties in that position?
A. Again, that was to manage the -- all of the asset marketing specialists in the loan, sales, and securitizations, performing and not performing residential and commercial loan sales that went through the sales center.
Q. After that position, you worked for -- you went into the private sector?
A. Yes, I did.
Q. What year did you join Homebanc Mortgage Corporation, your current employer?
A. I joined Homebanc in 1999.
Q. And you mentioned your first position was with respect to post-closing funding; is that

Page 60

correct?
A. Right.
Q. What was your job title?
A. Vice president of post-closing.
Q. If you could just take me through your various positions at Homebanc until the current day briefly?
A. Okay. I ran the post-closing area for about a year and a half.
And then we were in a position to separate ourselves from a parent -- our parent corporation, and we were purchased; and so I spent approximately nine months getting the -- working behind the scenes on a team to prepare the company for the separation from the parent.
And then I ran the government insuring area of Homebanc and then I ran the construction/perm department of Homebanc where we originate, process, and underwrite construction/perm loans and then moved into the private development. I've had corporate closing for about four years along with the other responsibilities.
Q. How many years were you in the previous position regarding construction lending? How many years --

Page 61

A. About two years.
Q. -- were you in that position?
If you could look at Exhibit 1? Do you know who drafted this document?
A. I believe that I did.
Q. And what role did Mr. Bailey have with respect to the drafting?
A. I don't remember precisely. I do remember we may have worked on this cooperatively. I do believe that I drafted this document, though.
Q. Do you recall what portions if any Mr. Bailey would have been involved with?
A. Not specifically. It was very -- our time at Carteret was a very short period of time, at least from my viewpoint. I don't know what it was for Mr. Bailey.
Q. Now, if you look at -- on that first page, paragraph 3, the sentence starting, as represented by volume statistics, there is heavy reliance upon the correspondent network for production.
What's the significance of that?
A. When you do both retail and wholesale, if do you retail business, you're dependent on your own employee base, loan officers, et cetera. On a correspondent network, you're dependent on other loan

Page 62

brokers or mortgage bankers to bring the business into you.
Q. And with respect to Carteret, what -- which entities were in the correspondent network based on this document?
A. Well, it says that there were 244 correspondent relationships, so there were 244 different entities that were contributors to the business base of Carteret at the time.
Q. Would those have all been wholesalers?
A. That's the correspondent network, yes.
Q. Could the correspondent network originate loans from other banks or thrifts if it chose?
A. Which is -- contributes to the attrition rate, yes. They -- typically, you're not a correspondent for one bank or entity. You have different outlets for your loans.
Q. And you said this contributes to the attrition rate. You testified earlier that 58.6 percent attrition as indicated in the next sentence is very high; is that correct?
A. Yes, it is.
Q. So what was your -- when you said it is very high, you were testifying as to industry standards?

Page 63

A. Industry standards or -- you know -- depending upon the marketplace and what interest rates are doing. When interest rates are declining, the attrition rate is higher. People are getting better deals. If interest rates are rising, you probably will have more loans close.
Q. And what was the importance of this attrition rate in relationship to your recommendation here?
A. I think this goes hand in hand with the pair-off and the hedging activity. Perhaps the thought was that they were hedging against loans that would not come to fruition for them.
Q. And when you say pair-off, you're actually referring to not replacing the loan but paying a penalty for undelivered loan?
A. Right. Right.
Q. If you go to that next paragraph, it says in the last sentence of the second to the last paragraph on page 1, approximately 66 percent of loan closings are related to refinancing of existing mortgages.
66 percent of which loan closings? If I can clarify, meaning all the loan closings that were taking place or a smaller subgroup of that?

Page 64

A. 66 percent of the loan closings, I would believe that it was related to these statistics that -- of the closed loan activity.
Q. And how does that statement relate to your recommendation?
A. That would have -- there would be more pressure on refinancing of existing mortgages if interest rates declined; and if interest rates rose, refinancing is more cyclical to purchase transaction business, so there would be -- there is always a greater risk when you are dependent on that aspect of the market.
Q. So did that greater risk apply to this situation?
A. A perceived risk, because you don't recall interest rates.
Q. Was this 66 percent figure higher or lower than the industry norm at the time?
A. There was a fairly significant refinance market in 1992. One of the cycles -- I couldn't say whether or not this represented a consistent level of production for the other companies.
Q. If you could look on the next page, page 2 of this document?
A. Uh-huh.

Page 65

Q. The third paragraph which starts, the secondary marketing efforts.
A. Uh-huh.
Q. And referring to the second sentence, in seeking a mark to market of loans presently locked within the pipeline -- excuse me. I'm on the wrong paragraph.
Actually the paragraph starting, a display of CMC's position. The paragraph above that. I wanted to ask about that second sentence. Please, if you need to take time to read the whole context, please take that time.
But the second sentence says, as an adjunct to this trading activity, there exists certain mandatory and optional master delivery commitments for closed loan product with varying expiration dates.
What's the significance of that statement?
A. Again, of course, I don't have any of the exhibits attached to this; but it -- that was part of the hedging strategy that they had, mandatory commitments which they would have to pair-off if they didn't deliver, optional or they would lose perhaps an up-front fee from non-delivery of those.
They actually had commitments that they

Page 66

had negotiated with investors with different delivery deadline dates, different expiration dates.
Q. And how is that relevant to the recommendation?
A. That those commitments would either have to be billed or paired off. You either have to deliver loans or have a financial consequence.
Q. And you mentioned that there are no exhibits attached to Cribbs 1 or no attachments. At the time, do you recall if there were attachments to this memo?
A. Yes, there were.
Q. And how many attachments were there?
A. I would have to go back and look through -- you know -- the sequence. There was an Exhibit 1. I don't know. But there was supporting documentation attached to this memo.
Q. And would you know where that supporting documentation is? In other words, would you still have possession of this supporting documentation?
A. I have no documentation related to this matter.
Q. Okay. Looking at the next paragraph, the second sentence, and this is on page 2, the -- in seeking to mark to market of loans presently locked

Page 67

within the pipeline, there is a disparity in between the dollar volumes reflected in the reports prepared by the Treasury Department and those coming from the mortgage production system.
What's the significance of that statement?
A. Well, I don't recall at this point whether that was related to which side had more activity or not.
It would indicate that the reports themselves probably had information -- in a pipeline management -- I don't know how else to explain it -- in pipeline management you have a certain level of attrition unless you status loans in or out of the pipeline. There is information that can -- can become static and then it can't be relied on in terms of, you may show a pipeline of 10 million. The reality is that part of that pipeline has been withdrawn, cancelled, or declined.
So if you're not maintaining that on a current basis, you can have issues in determining what you're going to have at the end of the month to deliver.
Q. You go on to say there appears to be no hands on pipeline management. How is that relevant to the recommendation you make in this memo?

Page 68

A. Part of that is you have to scrub your pipeline report. You need to separate the reality from the potential, particularly when you're dealing with a correspondent lending base, whether or not those loans are actually going to be delivered to you.
Q. If we can move on to the same page but the last paragraph. This last paragraph before the recommendation section. It appears from review that the traders positioned or hedged the pipeline in terms of the market conditions and projected volumes. However, do not manage the flow and phase status of the production inventory.
What does that mean? What's the significance of their failure to manage the flow and phase status?
A. Okay. Again it goes to the -- whether or not you have the ability to deliver the closed loans on a timely basis, if you can flow those through your post-closing area of the company.
And also whether or not your pipeline is reliable, whether or not you have -- you know -- -- are the closed loans truly closed loans or are they still in a underwriting status?
Again it goes to cleaning up the reports

Page 69

and giving an accurate status of the loans.
Q. When you go on to say at the end of that sentence this weakness can be devastating when interest rates begin trending upward or spike in the short-term, why can it be devastating?
A. Because you have no coverage for those loans. You're either -- it appears from memory now, and looking at this memo, is that they actually over -- the market position was greater than their ability to deliver.
So they had a lot of pair-offs. What happens is if you don't have -- the financial impact is greater when the market is moving.
So they could be caught with a -- you know, a pipeline that they did not have covered.
Q. Under the recommendations section, it states a decision has been made to fully fund the existing pipeline. Do you know who made the decision to fully fund the existing pipeline?
A. That would have been the on-site RTC management.
Q. And do you recall any of the individuals' names?
A. Specifically, no.
Q. Would Mr. Mindnich be one of those

Page 70

individuals?
A. Yeah. He would have played a role in that, yes.
Q. What -- do you recall how often you conferred with Mr. Mindnich regarding this subject?
A. No.
Q. If you look under recommendation 2, your second recommendation is pricing should be conservative, and continues on to say modifications to the current menu are necessary to accomplish this.
What do you mean by current menu?
A. In a mortgage banking entity, you have a menu of products; and depending on the documentation type, whether or not they are ARM or fixed rate products, what type of loans you originate, whether they are second home investment properties or owner occupied properties, whether they are one units or four units.
So that's basically what you offer to -- either your retail customers or to your correspondents that they -- you know, you may have a special ARM product that has -- that was a one-year adjustable or one-year adjustable. Those are the different products.
Q. If you look on the third page. The fourth

Page 71

recommendation? That second sentence says any significant attrition would limit viability of CMC continuance in the origination marketplace.
What did you mean when you wrote that?
A. Okay. If you had a significant number of your top originators leave the company, you don't have the same company that you had the day before.
I mean, if you don't have the same opportunity to bring the loan volume in, it is not unusual in the industry for a whole office to defect to another company.
So whatever your network is, then -- you know -- you lose your hold. So if you had a -- you know, that stands today. If you have a top originator leave the company, that's business that your company has lost.
In the correspondent relationship, too, if those correspondents are taking their business from you, then you don't have the same business that you had before. So you -- it is imperative to preserve the internal and external relationships to be a successful company.
Q. And the last paragraph of this document, you say overall extensive effort will be required to maintain operational production at current level

Page 72

while minimizing the inherent risk associated with such continuance.
What are the inherent risks mentioned there?
A. Okay. You have the market, interest rate risk, hedging risk. You have the risk of loss of business.
Q. Any others?
A. I mean, because overall, this division had servicing, it's pretty much the whole company concept, and the interdependencies between preserving the level of servicing. You can't preserve that if you shut down -- if you shut down mortgage operations, you're not feeding into servicing but you're paying off loans every month.
So those are the risks associated. If you close this down, you're going to have an attritting servicing portfolio. You have to bring this in line so you are controlling the interest rate risk and at some level, it is affecting the end result or what you have in your servicing portfolio.
It has an impact on earnings, on both sides of that. You're not getting the fees bringing loans in. You're not getting a gain on sale for selling loans. You're not getting monthly income

Page 73

from the servicing portfolio.
Q. Do you recall how long it took to create this memo?
A. In actual time?
I mean partly this was done I believe around the time of intervention in Carteret. And you know, at those times, at that time, I mean you pretty well went in and -- you know, you had a lot of interviews and conversations and analyzed a lot of reporting and historical data.
So in terms of time, I believe that I was at Carteret something short of a week. I don't think I was there for an extended period of time.
Q. Could you say how much hours within that week you worked on this issue?
A. Probably -- I don't know. I don't even know that it was a week, but on an intervention, I mean we went in early in the morning and left late at night. I think we were booking 12, 14 hours a day.
Q. So is it fair to say 60 to 80 hours?
A. Well, I don't know if anything is fair because I don't recall the number of days that I was there.
By these documents it looks like it was the intervention weekend. And I did some of that

Page 74

activity for the RTC where I went in on intervention weekends or when we converted the conservatorship to receivership, I actually went in and this is the type of work I did. I analyzed the mortgage operation.
Q. And how would the time spent on this Carteret issue analyzing relate to the time spent on other interventions?
A. Probably comparable.
Q. So in your recollection, it was probably the average amount of time that would be spent on such an intervention?
A. Well, actually, what I believe is that it was the amount of time that I was given to review the operations. So it wasn't an elective necessarily that is going to take me 30 days to do this. It's going to be go in, do an assessment, and then -- you know -- -- and this is the period of time you have to do it in.
Q. You mentioned that usually you would conduct interviews and conversations. Do you recall if you had conducted such interviews and conversations on this project?
A. Well, I spoke -- I know that I spoke -- and I don't remember individual names. But I actually went into their post-closing department and

Page 75

looked at their delivery process, looked at what their backlog was. Looked at -- I believe they had internal lines of credit. Looked at the aging of the loans in their -- what typically from mortgage bankers would be the warehousing line. If you have an internal line where you are funding the loans, look at the aging of the loans in the pipelines.
And spoke to the management, the supervisory level in the different disciplines.
Q. Would Mr. Bailey have been with you when you did these interviews or conversations?
A. I don't recall if we divided and conquered or he was -- you know, that we did everything jointly. I don't recall that we did everything together.
Q. If we could look at Exhibit 2?
I just want to ask you have you seen this document before today?
Please take time to review it before you answer.
(Pause.)
A. I can't say that I have not seen it but I can't verify that I have seen it prior to today. It would have been somewhat in this time frame in context of when it was prepared.

Page 76

Q. You don't recall specifically whether you saw it or not?
A. No. But it was not uncommon for me to see documents such as this for institutions.
MR. ABRAHAM: I'm handing the court reporter what I'd like marked Cribbs Exhibit 3.
(A document was marked for identification as Exhibit No. Cribbs-3.)
BY MR. ABRAHAM:
Q. Let me know when you have had an opportunity to review it.
A. I'm finished.
Q. For the record this is Bates CAM 3200535 and continues on to 0536. Have you seen this document before?
A. I prepared this document.
Q. Okay. And would those be your initials at the top next to your name?
A. Yes.
Q. And what role did Mr. Bailey have in the preparation of this document, if you know?
A. Again, I only have -- I actually only have vague memories of Mr. Bailey, period. Okay? So that's all I can say about that.

Page 77

Q. And how does this document relate to Exhibit 1, if at all?
A. It's tied in to Exhibit 1, but from a different aspect in terms of the overall operation of this division of Carteret.
This is related to loans that were closed and shipped to investors either in securitizations where there was an obligation by Carteret to certify the pools by obtaining certain documentation.
Q. And would this document have been created in that same time period you referred to, that was less than a week?
A. Yes.
Q. And what background would you have done to create this document?
A. It is to actually go in and -- this is the post-closing loan delivery review documentation control. I cite names in this, so I would assume these are people that I actually interviewed.
But repeat your question. I just lost sight of it.
MR. ABRAHAM: Could you read it back?
THE REPORTER: "Question: And what background would you have done to create this document?"

Page 78

THE WITNESS: Okay. The background would have been interviewing the associates. Reviewing the reports. It does say I actually reviewed reports from -- Ginny Mae has an exception report, the custodian produces exception reports, what documents are outstanding. There's a specific period of time in which to certify and recertify transfer pools.
So those were the documents that I reviewed, the actual exception reports, et cetera.
BY MR. ABRAHAM:
Q. Okay.
A. When you transfer a pool -- which it sounds like there were pools from prior companies that were transferred into Carteret -- a recertification process has to occur. That's what this is about.
Q. And what mandates that recertification process? Is it an agency --
A. It is an agency requirement, Ginny Mae, Fannie Mae is required to do that; and, of course, for the protection of its ultimate investors in the mortgage backed securities.
Q. And when the memo refers to agency guide requirements, are those the requirements you are speaking of?

Page 79

A. Right. Yes.
Q. If you look at the last sentence of the first paragraph, the department appears newly formed and management emphasis on problem resolvement recently developed.
What's the significance of that?
A. That they were new to addressing this issue, these issues. It was a relatively new development.
Q. When it says problem resolvement recently developed, does this mean that it was also new? Their actual addressing of the problem was recent?
A. I would take it to mean that.
Q. Looking on the third paragraph, the first sentence, the most significant adverse finding centers around the recertification process involving Fannie Mae and Ginny Mae pools.
Were there other adverse findings that you recall besides the recertification issue?
A. Partly that as I remember it, it -- other adverse finding were related to their obtaining the MIP certificate or MIC certificate on FHA loans and the VA certificate on VA loans, which is what impeded their ability to recertify the pools because they had to secure those documents and they had a fairly

Page 80

significant backlog, as I remember.
Q. And please forgive my lack of knowledge on banking, but when you say MIC certificate?
A. Mortgage insurance certificate.
Q. That would be --
A. Part of the Ginny Mae.
Q. That's part of the documents mentioned here that are missing?
A. Right.
Q. Also the FHA and VA, what's the significance of those?
A. FHA, VA loans go into Ginny Mae pool. Conventional loans go into Fannie Mae pool.
Q. It is again a way of referring to missing insurance documents?
A. Right. Or other documents.
Q. Now the last paragraph on that page, first sentence, the reports at pool and loan level detail outlining the individual documentation deficiencies and necessary corrections are voluminous; however, it appears there is no singular report which fully tallies the number of loans requiring follow-up.
What's the relevance of that statement to your recommendation in this memo?
A. Other than they were looking or looking at

Page 81

the deficiency reports or the exception reports from multiple sources, internal and external as opposed to having any vehicle that consolidated the documentation, that didn't exist.
So if you -- if you had X number of Ginny Mae pool, there was nothing that brought all the information into one consistent document. So I would say at any one time that you would have -- 'cause I think I approximated the number of outstanding loans because there was no way to get a handle on the number of loans that were outstanding.
Q. Was that -- and how did that impact your recommendation in the memo?
A. Part of I want was just -- the recommendation was actually just to pull everything together so you knew what exposure existed or didn't exist. I mean, it was -- it was not something that could -- was easily documented; but to go and appeal to a Fannie Mae or Ginny Mae and ask for an extension of time and a partnership, you would have to pool that information together to do that.
Q. And was this lack of a singular report unusual in this industry?
A. I think reporting even today continues to be something that's -- that is an opportunity within

Page 82

the industry. To be able to consolidate reports and to -- management reports.
Q. How did your other interventions you worked on at the RTC compare to this with respect to their reporting?
A. Carteret was a larger sized institution; and their reporting would be more complex than perhaps some of the other institutions that I worked on.
Q. Just looking at that next sentence, an estimate of the count would be placed at 5,600 files exclusive of loans originated in the last 90 days and loans in pools not yet reviewed by First National may substantially increase the loan files outstanding.
What's the significance of that last part?
A. First National was their custodian so they would have had a custodial arrangement where First National would have been reporting on the documents and any -- you know, defects in those documents, missing documents, et cetera.
It appears to me that there still were more questions and answers here. This was just an approximation of what the position would be. It could have been better or not.
Q. Do you remember if subsequent to this you

Page 83

discovered whether the position was better or not?
A. I'm trying to recall. I may have gone back for a follow-up visit. I don't recall specifically; but I did not participate in the decision making nor do I believe that I saw any supporting information one way or the other in terms of what was found.
This was basically to scope out the areas that needed to have attention paid to them.
Q. Now, at the top of the second page, it says the scope of deficiencies related to the loan files include but are not limited to such items as missing notes, mortgages, title policies, intervening and agency assignments, corrections to such documents, incorrect or missing mortgage insurance certificates, HUD/MIC and loan guarantee certificates, VA/LGC.
How would the lack of this documentation impact the RTC's ability to sell this servicing business?
A. Partly that would be based on impairment of the ability to foreclose or file claims. If you don't have mortgage insurance certificates on an FHA loan from HUD, basically, that's the insurance that pays if the customer defaults. The same thing with

Page 84

the LGC. That's guarantee for that loan to perform, basically.
If you don't have -- if you're in a position where you have to foreclose, you would bear all the loss as the servicer if you do not have those -- if you do not have the insurance in place. The only evidence of the insurance is to have those certificates.
Q. And that last sentence, approximately a hundred loans are presently lacking appropriate mortgage insurance and loan guarantee, that's what you're talking about right now in that situation?
A. Right.
Q. How would that affect an attempt by RTC to sell the servicing?
A. I think you always -- there is always some potential litigation of any portfolio that has missing or incomplete documents, and I think that -- you know -- you also would have to take the hundred loans against, say, a 30,000 loan portfolio.
I mean you have to put it in perspective as to -- this document is pointing out weaknesses that need to be addressed. That doesn't necessarily impair a -- I don't know how many loans were in Carteret's servicing portfolio, but -- I mean, you

Page 85

have to dimension the problem against the entire -- you know -- -- you have to be here, as opposed to looking at a hundred loans that need somebody to pay attention to them.
Q. Do you know how these hundred loans compared against the entire portfolio?
A. Carteret had what, a 6 or 7 billion dollar servicing portfolio, which -- the average loan in those days was not that high. I would say that -- you know -- you probably are looking at -- I don't know -- 80, a hundred -- I don't know.
I would only be -- it would be speculation on my part. A hundred loans compared to the entire portfolio was probably not a very high percentage --
Q. Okay.
A. -- of the total portfolio.
Q. The second sentence of that same paragraph, as receipt and correction of such documentation is imperative to the issue of full compliance with agency requirements, it is equally essential to the proper servicing of loans by Carteret.
First explain why is it important to the agency requirements?
A. Well, first of all, in any preservation

Page 86

scenario, you have to honor your commitments which -- you know -- there was -- to my knowledge -- no repudiation of any of the agency or contemplated repudiation of any of the agency contracts.
These were longstanding contracts, and you had to preserve both the relationship and the ongoing basis partnership with the agencies to be successful and to preserve -- you know -- the value.
Q. And then how would it also be essential, as you say, to the proper servicing of the loans by Carteret itself?
A. Okay. Again, you have to have had to perfect the title to be able to file the foreclosure or, in the instance of a bankruptcy, to defend your position as a creditor or lender -- you know -- so you always want to have the best documentation you can have to defend your position and also to be able to pursue those rights as a lender.
Q. Let's move to the third paragraph of that page. That first sentence, as non-conformance to the standards related to mortgage backed securities places the agencies and security holders at risk, discovery by Fannie Mae and Ginny Mae of the extensiveness of Carteret's problems may result in the imposition of sanctions or lead to discussions of

Page 87

suspension or termination of the relationship.
How is that relevant to the recommendation you made?
A. Part of this is that -- I would say that it would impact the relationship with Fannie Mae and Ginny Mae were these issues not to be addressed. Now, I can't now, and I couldn't forecast then, whether or not the agencies would sanction at all.
They would operate, too, under a supervisory type agreement, give you a period of time to cure. I think this was just an indication that it was problematic and that it needed to be addressed.
Q. Do you know if the problems were addressed?
A. I do not know.
Q. Do you know if Fannie Mae and Ginny Mae discovered the problems?
A. I do not know.
Q. Are you aware whether sanctions were imposed by Fannie Mae or Ginny Mae?
A. I do not know.
Q. If these problems were not addressed, would the RTC have been able to sell the business?
A. Yes.
Q. Would the value of the business have

Page 88

suffered as a result?
A. Potentially.
Q. How so?
A. Because any buyer, potential buyer of the company or the company's assets would have to deal with these issues; so to the extent that the companies could come in and do due diligence, it would have either had to be disclosed in the sale or they would have found it through due diligence discovery and it would have addressed -- had to have been addressed and would have probably had a pricing impact.
Additional resources would have to be put in place by the buyer.
Q. If we move on to your recommendation, and this is the first paragraph, first sentence says that it is recommended that staff of Carteret be directed to immediately assign additional employees to the department with an initial and primary focus upon full identification of the existing problems and the development of a composite report detailing by investor the number of loans outstanding, the new loans added, and loans cleared.
Are you aware of whether further identification took place?

Page 89

A. No.
Q. Are you aware of whether a composite report was created?
A. No.
Q. On the second paragraph, it says that in that second sentence, that the RTC legal will review the agreements, and I'm paraphrasing here, for possible recourse action against such parties.
Are you aware of any recourse action that was taken?
A. No. And these would be the agreements for purchases made by Carteret from the other entities, the First Jersey, United Jersey, et cetera.
Q. So you would not have been involved in analyzing those agreements?
A. No. Huh-uh.
Q. I may have already asked you this, but your last recommendation is that when reasonable reliability and facts surrounding the agency problems is outlined and a business plan developed, action and remedies, a meeting should be scheduled with Ginny Mae and Fannie Mae representatives to discuss and disclose the issues surrounding these matters.
You are not aware of whether that recommendation was followed or not?

Page 94

somebody that you worked with?
A. I don't recall working with him. That doesn't mean I didn't speak with him, but I don't recall working with him.
Q. If you look at the next page?
I'm sorry. Go back to the first page, your name appears at the bottom of the first page?
A. Uh-huh.
Q. The copy -- the best copy I have, it is a little unclear what that sentence says, but it starts Donna Cribbs and Bill Bailey were preparing an analysis of Carteret's position -- and -- on which we -- and then I can no longer read it.
It continues on the next page and says Monday, December 7.
Is this referring to the analysis from the prior exhibit?
A. Possibly.
Q. And when I say the prior exhibit, I am referring to Exhibit 1, which is dated December 7, correct?
A. Uh-huh. Yes.
Q. So it's possible that this letter is referring to that analysis that was also the same date?

Page 95

A. Possibly.
Q. Now, if you look at the second page, it refers to a conference call. Were you a participant in the conference call?
A. No.
Q. And that -- the rest of that sentence regarding the conference call says that there was an apparent lack of control regarding the hands on management of the pipeline and market sales.
Would you agree with that statement based on your analysis?
A. Yes.
Q. And what's the relevance of that statement?
A. Again, in any decision of a continuance of business, it would have to be something that was addressed and managed.
Q. The next paragraph refers to a Thursday morning, December 10 meeting. It says your name again and says you presented your findings to Donna Pillard, Jim Powers, Bob Smedley, Gene Yalicki -- Y-A-L-I-C-K-I -- and those present.
Do you recall what those findings were?
A. It would have been information that would have been documented in my prior memos.

Page 96

Q. When you say prior memos, are you also including Exhibit 1 and 2?
A. And 2, right.
Q. Okay.
A. Actually 1 and 3.
Q. Excuse me. 1 and 3?
A. Yes.
Q. Are you aware of any other findings outside of those two exhibits you would have been presenting?
A. There are, obviously related to Exhibit 1, there were exhibits attached to that. There was additional documentation presented.
Q. But aside from Carteret Mortgage Company's -- and the recertification issue, those two issues, do you recall any other issues that would have been presented at that time?
A. Outside of those issues or issues related to those issues, no.
Q. Do you recognize any of the names of the audience listed there?
A. Yes.
Q. And please identify which ones and who they were, if you know?
A. Bob Smedley and Gene Yalicki. I had other

Page 97

occasions to work with those gentlemen on other RTC subsidiary circumstances.
I do recall Donna Pillard. I don't remember Jim Powers. This was probably the only communication that I had with Donna Pillard, was related to Carteret.
Q. Were all of these individuals members of the RTC Somerset office?
A. I could not say that reliably.
Q. Were -- let me back up. Were they all RTC employees?
A. To my knowledge, Smedley and Yalicki were. I would not -- I could not possibly confirm that the other two were or were not.
Q. Regarding Smedley and Yalicki, what other RTC subsidiaries did you work on with them?
A. Smedley on the Standard Federal out of Frederick, Maryland.
Then in terms of -- I had some other intervention activity where they were present.
Q. Anything else related specifically to Carteret?
A. No.
Q. The next sentence says interviews with various association staff members in conjunction with

Page 102

was shared with me or not.
Again I wasn't looking at it -- I was looking at it more from a risk/take care of business perspective than a continuation of business perspective.
Q. According to the last sentence of this paragraph, the reduction in volume combined with the interviews taken, it says the decision was made on December 11 to cease all further acceptance of mortgage applications?
MS. DOHERTY: Just a moment. I'm going to object to that characterization of the document because it says "this" and it is not clear to me that "this" has the antecedent that you assumed it does. Aside from that, you can go ahead and answer based on your understanding of what the author is referring to -- the author who is not you is referring to.
BY MR. ABRAHAM:
Q. I can rephrase that. Based on the last sentence, saying this combined with the interviews taken, the decision was made on December 11 to cease all further acceptance of mortgage applications.
Do you know who made the decision to cease acceptance of mortgage applications?
A. No. And I didn't participate in that

Page 103

decision.
Q. That last paragraph, says that all APS, meaning applications, in the bank as of December 11 would be processed in accordance with the established standards of Carteret, would be approved and funded having met those guidelines.
Are you aware of who made the decision, that decision referred to there?
A. No.
Q. Once again, you did not participate in that decision?
A. That's correct.
MR. ABRAHAM: At this point, I have no further questions.
MR. THOMPSON: Okay.
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. While we have it before us, let's take a quick look at Cribbs 4.
In terms of the fact that a portion of the correspondent relationships were moved as of the December 10, according to this memo, that fact wouldn't have any impact on retail origination, correct?
A. That's correct.

Page 104

Q. You testified earlier the high attrition rate was the result of the wholesale piece of the operation; is that right?
A. A big contributor, yes.
Q. To the extent the correspondents had moved on, that would have made the remaining piece of Carteret Mortgage Company less risky, is that right? Because it would have been more focused retail?
A. In a manner of speaking retail has less risk associated with it because you control the volume.
Q. During your involvement -- strike that. You already testified to that.
Let's see. There's discussion about the pipeline.
Did you have an opportunity to review the asset and liability reports of management?
A. No.
Q. And did you -- strike that.
In terms of the choices that were available to the conservatorship if the originations were shut down, would -- how would that impact the ability to fund the pipeline?
A. If origination were shut down, there would be less potential cash used in the funding of the

Page 105

loans.
So as an ongoing basis, they would not have the need for cash to fund additional loans.
Q. Okay. During the time frame that's covered in this memo, Cribbs 4, December of 1992, early December 1992, was there any discussion given to trying to sell Carteret Mortgage Company?
A. Not that I was involved in.
Q. Okay. Now, let's see, moving on to another document, in particular Cribbs 3, the beginning of that document says in the first sentence, excuse me, the last sentence of the first paragraph, the department appears newly formed and management emphasis on problem resolvement recently developed.
Was that a positive that management was trying to resolve these problems?
A. First steps in the right direction, I would say.
Q. Okay. And in terms of -- let's say if the problems in this memo -- Cribbs 3 -- had not been corrected in terms of recertification of certain pools that originated in 1987 to 1989 had not been fixed, what would the consequence have been to Carteret Mortgage Company?