# EXHIBIT P

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

AMBASE CORPORATION and : Civil Action
CARTERET BANCORP, INC., :
Plaintiffs :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor :
vs :
THE UNITED STATES OF AMERICA, :
Defendant : No. 93-531

- - - - - - - - - - - - - - - -x

Thursday, March 23, 2006
Allentown, Pennsylvania

- - -

Oral deposition of GLORIA MALIGAYA, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:30 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

- - -

Page 38

conservatorship, do you know?
A. No, I don't know.
Q. Okay. Do you know what -- strike that.
The next page, the page Bates stamped 801, has a discussion of hedges, and again, there's a chart, and then right underneath that chart, there's a sentence, "The cost to unwind the interest rate swap agreements is currently estimated to be in excess of $6 million." Do you know why a decision was made to unwind swap agreements --
A. No.
Q. -- for Carteret?
A. No.
Q. Okay. Was that something that typically would have been supported by any type of analysis of whether the cost to unwind the swaps was justified?
A. I did not know. I was not involved with that.
Q. Okay. And I take it that that type of analysis was not something you would review in connection with reviewing

Page 39

this plan?
A. No.
Q. Okay. Do you know whether there was RTC policy regarding whether these types of swap agreements should be unwound?
A. No, I don't know.
Q. Turn to the page that's Bates stamped 805. Go ahead and read to yourself the last paragraph on that page, the paragraph under the heading "Carteret Financial Services." Just let me know when you've read it.
A. Yes.
Q. Okay. There's a reference in this paragraph to a decision to -- or to the fact that the subsidiary that's being discussed in the paragraph stopped marketing annuities the morning following the date of intervention. Do you know why that decision was made?
A. No.
Q. Are you aware of any analysis that supported that decision?
A. No.
Q. Okay. Turn to the page that's

Page 40

Bates stamped 825, please. There's a discussion here of recommendations, the first one of which is "The preservation of the retail banking franchise value by maintaining the New Jersey retail branch network intact. The Florida branches should be marketed as three separate packages."
Do you know why it was recommended that the New Jersey branch network be maintained intact?
A. No.
Q. Was that a typical policy or practice with respect to conservatorship, to try to maintain the branch network intact?
A. Carteret is not typical. Most of the banks that was taken over only operate in New Jersey. City Federal had Florida branches, but I don't know. I don't know.
Q. Okay. When you say Carteret was not typical, in what way do you mean that?
A. Meaning most of the banks that we took over just operate in New Jersey.
Q. Okay. But was it typical for the

Page 41

banks that you worked or that were taken over for the RTC to try to maintain that branch network intact?
A. They tried to. They tried to, yeah. All the retail branches they tried to maintain.
Q. Okay. Turn to the page that's Bates stamped 827, please. In the middle of the page, there's a section "Managed Downsizing." My question is going to be about the last sentence in that section, but if you need to review anything else, feel free to do so. That sentence says, "Increasing operating profits has not been established as a major strategy because the operating expenses are appropriate for an institution of this size." Do you see that?
A. Yes. I do not know what he means by that, the one who wrote this.
Q. You just anticipated my question. Do you know whether it was concluded that Carteret's operating expense levels were in line with what they should be for an institution of that size?

Page 66

typical. I guess in this instance, they were asking for a 1.3 million increase in expenses. That's why they had to do this.
Q. And you're basing that on the discussion --
A. On the cover. On the cover, thing here.
Q. The page Bates stamped 51 --
A. Page 1217.
Q. All right. And that says, "This represents a $1.3 million increase in operating expenses primarily attributable to an increase to the Satisfaction Project and increased mortgage securitization expense."
I had asked you about this earlier, and I don't know whether this puts it in any better context for you, but do you recall what the Satisfaction Project was?
A. No, I do not.
Q. Do you know, do you have a recollection for whether it was a Carteret-specific program or whether it was an RTC program more generally applicable

Page 67

to --
A. No, I do not recall.
Q. Turn to the page that's Bates stamped 51221, and if you need to review the previous page to put that in context, obviously feel free to do so. Once you read that paragraph to yourself, let me know when you're ready to proceed.
A. Yes.
Q. What was the RTC Contracting HUB?
A. I don't know. This is the first I heard of that term. There must have been a department in RTC that reviews contracts, RTC Contract HUB.
Q. From the context, I'm assuming that this is something that was just being established around this time, October of 1993; is that right, do you know?
A. I do not know exactly.
Q. Okay. It says, "The RTC Contracting HUB will provide services to 19 conservatorships to be phased in between mid-October and the end of November. The allocation to conservatorships, which includes compensation and related costs and

Page 68

telephone, postage and supplies, will be based on support time spent by the contracting staff."
How was that allocation actually done? I mean, when it says it's based on support time spent by the contracting staff, did the staff keep track of their time and allocate it to specific conservatorships, do you know?
A. I do not know.
Q. I'm sorry?
A. I do not know.
Q. Okay. It then says, "Office occupancy expense will be absorbed by Carteret since such amounts are primarily fixed in nature." I read that to --
A. Meaning no allocations for occupancy.
Q. No allocations to who, to other conservatorships?
A. It seems to be, yeah.
Q. Okay. And I take it this RTC Contracting HUB was physically based at Carteret's headquarters; is that right?
A. I do not know.

Page 69

Q. Okay.
A. I do not know all the employees of -- or that contractors especially, I do not know.
Q. Okay. When it says, "Office occupancy expense will be absorbed by Carteret," why was Carteret absorbing all of the occupancy expense related to the contracting HUB?
A. I do not know what kind of space RTC Contracting HUB would have occupied in Carteret. They're saying here that those expenses are spent by Carteret are contracting HUB or not.
Q. I'm sorry?
A. They're saying here that the occupancy costs are fixed in nature, meaning it's spent by Carteret whether there was a contracting HUB or not.
Q. Right.
A. That's what it says here.
Q. Right. But even if they're fixed in nature, the Contracting HUB was providing services to at least 18 other conservatorships; correct?

Page 82

A. No, I'm not.
Q. Okay. Do you have any recollection for why approvals for the sale of IPF could not be obtained as of the date of this document?
A. No.
Q. Okay. Turn to the next page, the page Bates stamped 063. This page has some assumptions for the income statement. The last one is, "The RTC Contracting Hub is anticipated to be phased out by March 31, 1994. Expenses connected with the Contracting Hub have been eliminated for April through December."
Earlier, we saw a document that referred to the contracting HUB. Do you know why it was anticipated to be phased out by March of 1994?
A. I do not know.
Q. Okay. Do you know who made that decision?
A. No.
Q. I think one of the earlier documents that referred to the contracting HUB, which was Exhibit 9, appeared to be

Page 83

suggesting, if you look on page 221 of Exhibit 9, that --
MR. KUIPER: I don't think it's Exhibit 9.
MR. COLATRIANO: Okay. I marked it wrong. Exhibit 10 then.
MR. KUIPER: What page?
MR. COLATRIANO: Yeah, it's Exhibit 10. I apologize. It's page 221. I apologize about that.
BY MR. COLATRIANO:
Q. Talks about the contracting HUB to be phased in between mid-October --
A. What page?
Q. 221. We had talked about this discussion earlier. And it talked about the contracting HUB was to be phased in between mid-October and the end of November of 1993. And now Exhibit 14 is talking about the contracting HUB being phased out by March 31, 1994. So if I'm reading these documents correctly, it was in existence for roughly six months or so, or even less than six months. Do you know why it was phased out so quickly?

Page 84

A. I do not know.
Q. I'm sorry?
A. I do not know.
Q. Okay. Were you involved in any decisions regarding either the phasing in or the phasing out of the contracting HUB?
A. No.
MR. COLATRIANO: Let's go off the record.
(Whereupon, a discussion was held off the record.)
(Brief pause.)
MR. COLATRIANO: Back on the record.
Ms. Maligaya, I have no further questions at this time.
THE WITNESS: Thank you.
BY MS. HART:
Q. Ms. Maligaya, as I indicated earlier, my name is Melinda Hart and I am with the Department of Justice representing the United States in this litigation. I just have some follow-up questions based upon questions you got earlier from Mr. Colatriano, and then just a couple of

Page 85

new issues.
A. Okay.
Q. And we'll just follow the same ground rules that Mr. Colatriano mentioned to you this morning, if that's acceptable to you.
A. Yes.
Q. Okay. If I could have you get Exhibit 2, the document that was marked earlier as Exhibit 2.
A. Yes.
Q. And once you have that document, if you could turn to the page that is marked as C-AM-A0400840. Do you have that page?
A. Yes.
Q. Okay. Now, if you look on there, these numbers are all in thousands. You'll notice that the total assets for Carteret Federal Savings Bank as of December 1992 was approximately 5.3 billion?
A. Yes.
Q. Okay. Do you know how that asset size for Carteret compared to the asset size for other institutions that were

Page 86

placed in conservatorship?
A. This is probably one of the bigger ones.
Q. One of the bigger ones?
A. Yes. City Federal was the biggest in the Northeast. Next, I guess, is Carteret. City Federal was in the 10, 10 billion.
Q. Okay. Well, in comparison --
A. But a lot of the others are very small.
Q. Okay. So Carteret you would consider to be one of the larger institutions placed in conservatorship?
A. Yes.
Q. Do you know if the asset size of a conservatorship or institution would affect the duration of the conservatorship?
A. My opinion, I would think so.
Q. Okay. What about the quality of the assets that an institution possesses, would that also impact the duration of a conservatorship?
A. Having seen some of the conservatorships that went under because of

Page 87

other things rather than operational, in resolving a bank, it's REOs that will take longer. The loans, you'll always have a market for those, but if there's bad REOs, that takes longer to turn around.
Q. Okay. Let's say if you have a thrift that has multiple branches in multiple states, is that another factor that would impact the duration of a conservatorship?
A. I think so, yeah. You're right.
Q. Can you think of any other factors that would impact the duration of a conservatorship?
A. Maybe the locations could also -- the locations of some of the branches could also.
Q. Okay. Could you explain that further, what you mean by that?
A. Maybe some of their branches are not in prime locations.
Q. And also, do you know that if a conservatorship had a more complex financial condition or had more complex operations --

Page 88

A. Meaning lot of subsidiaries.
Q. Right. Subsidiaries, multiple operations, subsidiaries, would that also impact the duration of a conservatorship?
A. I think so.
Q. Okay. How often were operating budgets prepared for conservatorships?
A. Once a year. Once a year. And in cases where there are material change, then they would do a revision.
Q. Okay. And you mentioned earlier that there are also variance reports that were done on a quarterly basis; is that correct?
A. Yes.
Q. Now, were these operating budgets and variance reports a tool for monitoring and controlling --
A. For managing and controlling expenses.
Q. I'm going to say it one more time. Just so we have it clear for the record, I'll ask the question one more time.
Were these operating budgets and variance reports used as a tool to

Page 89

monitor and control the expenses of a conservatorship?
A. Yes.
Q. Okay. If I could have you take a look at Exhibit 8 again. And if I could have you take a look at page 1452 in Exhibit 8.
A. Yes.
Q. And we have a comparison of actual numbers to budgeted numbers and then a variance percentage. And I believe you testified earlier that if there is a variance of 10 percent or greater than 10 percent --
A. Greater than 10 percent.
Q. Okay. If there was a variance of greater than 10 percent, then that indicated that that was something that should be looked into and investigated?
A. Yeah.
Q. Do you know how the RTC came up with that 10 percent threshold for determining --
A. I don't know. Even we make threshold. I don't know.

Page 90

Q. Okay. If there was a variance of 10 percent or greater for a variance report, was that variance then investigated by the RTC?
A. Explained, yes.
Q. It was explained?
A. Yes.
Q. Okay. And by explained, do you mean there was a determination made as to whether that variance was justifiable --
A. Yes.
Q. -- under the circumstances?
A. Yes.
Q. Okay. Was that another method for controlling the expenses and monitoring the expenses of a conservatorship?
A. The assets of, yes.
Q. Okay. And I just have one more question and it's related to Exhibit 10. And if I could have you turn to page 1220, or 51220, Exhibit 10.
A. Yes.
Q. Earlier we were talking about the office occupancy expenses that were allocated to Carteret. And you testified

Page 91

earlier that the RTC actually occupied the former premises of Carteret; is that correct?
A. Yes.
Q. Okay. Do you know then if Carteret would have incurred these office occupancy expenses even if it hadn't been placed into conservatorship?
A. Absolutely.
Q. Okay.
MS. HART: Those are the only questions that I have.
MR. KUIPER: I just have a couple questions to follow up.
BY MR. KUIPER:
Q. How many conservatorships did you work with?
A. Maybe 30 or so.
Q. Okay. And the average size is much smaller than Carteret?
A. Yes.
Q. Now, you told Ms. Hart that the size of the conservatorship would impact on how long the conservatorship would run?
A. Yes.

Page 92

Q. And how would it impact it?
A. Just unwinding or dissolution is much more difficult. A bank with a lot of REOs, a lot of construction loans and a lot of subsidiaries, that takes longer to sell.
Q. And you also said that an institution that has bad assets would affect -- how would that affect it?
A. It will take it longer to get rid of those assets.
Q. And conservatorship with multiple locations you said would affect the length of time. How would that affect --
A. Yeah. Sometimes the locations are not in the prime areas, so it will take longer to sell a branch not in a prime location.
Q. Okay. And also you said that the number of subsidiaries, that affects the time?
A. Yes.
Q. How does that affect the time?
A. Just that there are -- there could be -- it's not always marketable. I mean, the market for different subsidiaries could

Page 93

be limited, could be limited. Like, what's an example? If they had a -- like, a leasing -- a small leasing company, and if the leased item is not very popular, not marketable, it will take long. It's just the subsidiaries have very different natures. I can't think of a perfect example right now, but --
Q. Well, that's fine.
A. -- certainly it will take longer.
Q. Okay.
MR. KUIPER: That's all I have.
MR. COLATRIANO: I had a couple follow-ups.
BY MR. COLATRIANO:
Q. How long did the City Federal conservatorship last?
A. I think four years.
Q. Four years. Okay.
A. I think. And I'm not particularly -- I do not particularly know, but 1991 was when it was finally resolved, I think. Oh, I don't know. Forget. I don't know.