# EXHIBIT Q

SlimScript

UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------------x

AmBASE CORPORATION and CARTERET BANCORP, INC., :

Plaintiffs, :

-against- 93-531C

FEDERAL DEPOSIT INSURANCE CORPORATION, :

Plaintiff-Intervenor, :

-against- :

UNITED STATES, :

Defendant. :

-----------------------------------------x

DEPOSITION of RUSSELL J. MEYER, taken by the Plaintiffs, pursuant to Notice, held at the offices of Gibson, Dunn & Crutcher, Esqs., 200 Park Avenue, New York, New York, on September 10, 1999, at 10:35 a.m., before a Notary Public of the State of New York.

*********************************************

BARRISTER REPORTING SERVICE, INC.
120 Broadway
New York, N.Y. 10271
212-732-8066

Meyer
it?
A. I am done.
Q. Footnote 2 you had a chance to review?
A. Yes.
Q. Do you see that the goodwill number is $187.4 million?
A. Yes.
Q. Do you see that the capital goes from 264 million to 49.6 million under this calculation of tangible capital? Do you see that?
A. Yes.
Q. If you turn over to page 49, last three Bates stamp numbers 642, you can see that it then -- and it is no secret; I am showing you the bad stuff -- there was significant valuation allowances that this exam recommended Carteret take, and specifically if you see the line of $77 million there, you will see the valuation allowance recommended.
Do you see that at the bottom of the page? Maybe I wasn't being clear.



Meyer
A. Yes, I see, yes.
Q. This exam recommended that there was a $77 million writeoff that reduced the tangible capital from 49.6 million to negative 27.5 million?
A. Yes.
Q. Leading to a capital deficiency of $132 million?
A. Right.
Q. Do you recall Carteret being thought to be that far out of capital compliance at the time of this exam?
MR. LEVITT: Objection. It is a vague question.
Q. Do you recall when you worked on this exam, that it reached conclusions that Carteret was out of capital compliance on an order of magnitude around $100 million?
MR. LEVITT: Does he remember these numbers besides refreshing his recollection with this document?
Q. Having had your memory refreshed, do you recall that?
A. Yes.



Meyer
Q. Do you recall thinking that that was a very serious problem?
A. Yes.
Q. Do you recall thinking that Carteret was in danger of failing?
A. Yes.
Q. Do you recall thinking that the reason it was in danger of failing was that a major reason -- that one major reason it was in danger of failing was the new capital requirements imposed by FIRREA?
A. Yes.
Q. One major reason that the capital requirements by FIRREA were caused to fail was that they disallowed goodwill to be treated as capital?
A. Yes.
Q. Would you agree that not being able to treat $187.4 million of goodwill as capital is more damaging than having a reserve of $77.1 million, more damaging to capital?
MR. LEVITT: Objection, vague.
You may answer.



Meyer
A. Yes, specifically the numbers, but the 77 million represents a potential requirement in the loan portfolio, which could be more damaging. That is a number that is pretty impressive.
Q. Do you recall whether Carteret agreed with that number?
A. Agreed with it, I think so, yes. As I recall, they did.
Q. Do you recall whether they followed the recommendation and took the reserves recommended here?
A. I would -- I don't recall, but I would assume they did. I don't recall specifically.
A lot of times when I leave, I am gone. I don't want to --
Q. My question was whether the goodwill being greater than capital was more significant in impact than the $77 million in reserves that were recommended here.
Am I correct that your answer was yes, it is on a mathematical basis?
A. Right, that is just math. It is

Meyer
more money and it is reducing capital, but the 77 million is a very significant number based on the size of the institution and the loan portfolio.
Q. It is clearly very significant. Isn't it true that the 77 million is reached through a process of asset analysis that is debatable?
MR. LEVITT: Objection. Vague.
A. Everybody has a scientific way to calculate it, and that is the problem. It is debatable, yes.
Q. The goodwill calculation, in terms of whether the goodwill can be treated as capital or not was following the plain language of the institute. As a legal matter seemed to be not required. It wasn't the amount of money --
A. Assuming the money was calculated proper, yes.
Q. In measuring the health of the institution, isn't the impact even more pronounced, the impact of the goodwill even



Meyer
more pronounced than the loss valuation allowance is?
MR. LEVITT: Objection. Vague. Asked and answered.
MR. HUME: Let me see if I can clarify the question.
Q. If this institution had been seized because it was $133 million out of tangible compliance, wouldn't you agree that the major reason was its inability to treat goodwill in its regulatory capital and the attributing reason is the writedown in assets recommended here?
MR. LEVITT: Before you answer, can you read it back, please?
MR. LEVITT: Objection. It is a hypothetical question. It wasn't seized at this time, but answer if you can.
A. Again, it is just numbers. Definitely, that number is higher than the 77 million. However, in my mind the 77 million was more -- regulatory capital,



Meyer
somebody could assign another law and made it okay the next day.
It is there. It is a serious issue, but the concern that I had was the 77 million, the asset quality.
Q. That was more related to the actual job you were doing of reviewing the portfolio?
A. Right. Somebody is going to tell me what the regulatory capital should be, and there is nothing that I can do about it.
The absolute number is greater than that number, and if you want to say that that is the prime reason, that is fine.
Let's move on. I am with you. I disagree with it.
Q. Do you recall any other examiners disagreeing with the requirement of goodwill in FIRREA?
MR. LEVITT: Objection as to relevance of who disagreed with what, when and where, but answer if you want to.
A. I don't recall particularly.



Meyer
Q. Do you recall if Angelo Vigna specifically shared that view?
A. No.
Q. You don't know?
A. I didn't talk to Angelo Vigna. One or two social occasions, but that was all. Not about this institution that I can remember.
Q. How about Thomas O'Rourke?
MR. LEVITT: The question is does he know O'Rourke's attitude about FIRREA?
MR. HUME: That is correct.
A. I don't know Tom's opinion about FIRREA. I think Tom was on this job.
Q. Tom became Examiner-in-Charge after you?
A. Yes.
Q. In '91?
A. He might have assisted me in '89. I am not sure. He was new to us.
Q. Let's quickly try to get through some of the rest of the report before we break for lunch.

82

Meyer

On page 1, again, last three numbers of the Bates stamp 594, there is a discussion of activities that must be ceased in the draft. It discusses these former fees, manager fees to holding company.

Do you recall anything about those fees?

A. Just what I am reading here. I remember there was a concern about transactions between institution and AmBase, and I don't recall specifically, except as I just read here, that they were fees.

Q. Turn the page. Paragraph 4, that is labeled, "Commercial/Construction Loans," stating that, "All lending of this type must cease" --

MR. LEVITT: -- "until such time as adequate underwriting policies are developed and approved by the Board."

Q. Do you recall what you thought about Carteret's commercial loan division?

83

Meyer

A. Yes. We didn't think too highly of them at this point by the end of the exam.

Q. Do you recall Rob Muller?

A. Yes.

Q. Do you recall him as someone who was in charge of the commercial loan division?

A. I don't remember specifically. He was in charge of pretty much everything, I think. I don't remember.

There were two guys that I would go and talk to. You didn't talk to O'Brien. You talked to Muller and some other guy. I believe the second year they were both gone or they moved on.

I am sorry. Go ahead.

Q. That is okay.

Do you recall that Carteret, in establishing or in starting up a commercial loan division, essentially acquired a commercial loan department of another bank?

A. Right. There was a whole team of guys that came from somewhere else. I don't recall where.

Q. Do you recall whether that was

84

Meyer

something that was unusual for thrift institutions that started to get into the commercial loan business at that time?

A. No. It was a standard practice and actually something I considered good, prudent.

Some places were trying to take a residential mortgage guy and trying to tell them to run out and make commercial loans when he knew nothing about them. Many of the smaller places, that is all they could do. A bigger place like Carteret could afford to have a department, so to speak.

Q. It was a more prudent way to get into a new line of business?

A. I thought so, yes.

Q. Do you recall thinking that the actual people who came in with that group into Carteret to undertake its commercial loan business were generally competent?

A. Initially I thought they were competent at that time. Even maybe by the end of this exam I might have thought they were competent. By the time I was done, I

85

Meyer

didn't have a very good opinion of it.

Q. Do you recall why that was?

A. We found fraudulent documents, and just that they were working to achieve bonuses, but nothing that they could -- as I recall, they just weren't doing what they had to do, as I recall, identifying the proper loans.

Q. Do you recall specifically what you mean by fraudulent documents?

A. I remember some loans. I can't think of the name. We found criminal referrals, phony rent rolls and things like that.

Q. Do you recall individuals specifically who were involved in that?

A. I am going to say Profetta, I believe, was one of the borrowers who had loans.

Q. I guess I meant individuals -- I am sorry --

A. Loan officers?

Q. When you refer to fraudulent documents, do you refer to fraud on the

part of borrowers or Carteret as creditor or both?
A. I would say both, specifically for the personnel at the bank. I don't recall anything specifically.
I remember the one borrower, Profetta, the loan officer, Tappon, I believe his name was, and I believe we found criminal referral forms on those. I don't recall specifics, though.
I remember something, the rent rolls, and Profetta submitted it --I don't know. I don't know. I don't recall all the specifics.
Q. Would you characterize the problem as more a question of fraud at the bank or more a question of the bank's inability to detect fraud?
A. Probably the bank's inability to detect fraud.
Q. These restrictions listed here at the beginning of the exam report, if you need to take some time to look at them, they are calling for a ceasing in this



commercial and construction loan business requiring an appraisal report, requiring an assessment of the internal loan review and a number of other restrictions.
Are those the type of things that were done to a thrift as a matter of cause or only when it was a thrift that had a vulnerable capital position?
A. It had nothing to to with capital. It had to do with their lending policies and procedures, and as I said, here is one thing I could have answered on before about fraud in the institution.
They weren't doing their own appraisals. They were just accepting what the borrowers submitted to them. There was fraud -- as I recall now, there was fraud at the institution. They were just saying, "Send us an appraisal. Come in at so much money and we can get you this amount," that sort of thing.
Q. Were they required by law at that time to independently evaluate all appraisals to have an outside appraisal?



What were they required to do?
A. The law changed. I am not sure. They definitely had to have an appraisal prepared for them and they weren't doing that, as I recall.
Q. If you turn to the page 3 of the report, look at the bottom, the last paragraph which states, "It should be noted that management has been very responsive and has already taken some of these steps as well as others to address the substantive weaknesses cited in this report."
Do you recall that as an accurate description of management's responsiveness to the concerns raised in this exam report?
A. I guess so, yes.
Q. Do you recall that generally during the period that you were Examiner-in-Charge in 1989 and '90 working on Carteret that is an accurate description of the management's responsiveness?
A. Yes. I wouldn't have wrote it, but we're talking like senior management.



Q. When you say you wouldn't have wrote it, you wouldn't have wrote it otherwise unless you thought that?
A. Yes.
Q. Turn to the next page under the capital section, it refers in the second paragraph to additional capital contributions of 50 million committed by AmBase.
It states -- I will read the whole paragraph -- it states, "Drastic changes in operations, a return to core operating profits as well as overall asset shrinkage will be needed. Otherwise, additional capital contributions of $50 million committed by AmBase will not be sufficient to meet the future capital needs of the bank."
Do you remember AmBase having a capital maintenance obligation towards Carteret?
A. Yes. I don't recall what the amounts were.
Q. You remember them being legally

Meyer
required to maintain capital?
A. I don't recall the specifics. I remember they were required to maintain capital up to a certain amount, maybe. I don't recall the details. A certain amount on their part. I don't recall the details.
Q. Do you recall it being an issue of concern whether or not AmBase would be able to live up, to make those capital contributions?
A. I don't recall being too concerned one way or the other.
Let's see. I remember something about Sterling Forest. That was their key asset. They were going to sell that. It was worth 200 million, the largest piece of undeveloped land in the New York City area.
Q. AmBase or Carteret?
A. AmBase owned it, that I recall.
Q. I have more documents that may refresh your recollection.
A. I would rather not, but go ahead. I believe that was their big chunk.
MR. HUME: Let me ask you a



Meyer
question here. It is 12:15. I would be happy to either break for lunch or what I would propose is an abbreviated break, or there is a proposal that we could have lunch ordered in to save time.
THE WITNESS: That is fine with me.
MR. LEVITT: Fine.
(Brief recess taken.)
MR. HUME: We're back on the record.
Q. We were talking about the 1989 report of examination as we discussed earlier in the deposition, and as you saw in this report, Carteret was given a macro rating of 4.
Do you ever remember if you or anyone else considered rating Carteret a 5 at this stage in 1989?
A. I remember a lot of discussion -- well, not a lot. I remember a discussion about it and I am sure it came up, yes.
Q. How would a determination like that



Meyer
be made as to which it is, a 4 or a 5?
A. Just weighing the whole report and trying to see if you fill in the definition at certain points that have to be -- I am trying to think if there were guidelines for the rating.
If percentage of assets was classified, it would maybe help you rate the assets section, and if capital was certain levels, this would help you rate the capital section.
I don't know that there were things for the composite. The composite would be maybe up of -- there were guidelines for the composite, as I recall.
For example, the composite could never be higher than, say, the management rating or something like that. There was some guidelines.
Q. Did those guidelines change after FIRREA in 1989?
A. They always changed.
Q. They were changing all the time?
A. Yes.



Meyer
Q. Could you turn to page 8 of the exam report? Under the conclusions in the last sentence of that first paragraph, it states, "Operating strategies developed by management have reduced the bank's exposure to interest rate risk, but they have not returned the bank to profitability and have increased the bank's exposure to credit risk."
Do you remember after having had that sentence read to you what the management of Carteret was trying to do to reduce exposure to interest rate risks?
A. No, I don't recall specifics, but generally at that time everybody was trying to push ARM loans, reduce the maturities. I don't recall the specifics, probably in their investments.
Q. You don't recall how that strategy impacted its exposure to credit risks?
A. No. It is probably in here somewhere.
Q. There is a lot in here. The next paragraph states --

94

Meyer
A. Wait. You just said -- what did you say?
Q. You don't know how that would have impacted its exposure to credit risks?
A. To credit risks?
Q. Do you recall how that happened?
A. They have increased by the commercial the questionable loans, the questionable --
Q. Do you recall how its attempt to reduce exposure to interest rate risks increased its exposure to credit risks?
MR. LEVITT: Objection. It assumes facts not in evidence.
Q. If it did.
A. It was separate operations. On one hand they were trying to reduce their exposure to interest rate risks. Like I said, I don't recall specifically, but reduce the maturities on the loans and the assets going out, and they increased their exposure to credit risk by the types of commercial lending that they were doing.

95

Meyer
Q. The next sentence, the next paragraph reads, "The bank's management team appears capable and is qualified to deal with the current problems. They have acted decisively when they felt the need to change and should continue to do so in the future."
When you say, "The bank's management team," in that sentence and in this context, does it refer to the senior management?
A. Yes.
Q. Do you recollect having a positive feeling towards their ability to handle the problems in the institution at that time?
A. That is what I said, yes.
Q. Do you recall your feelings about senior management changing after this time?
A. Yes, there were major changes. I don't remember the time frames, but O'Brien left and Muller eventually left.
There was another guy. There was a tribunal of three guys, Pierson. He might have been the last one to go, but I thought

96

Meyer
they were all capable and would do the right thing.
I don't know, maybe they didn't have the ability to handle the commercial lending they got into as you look back on it, but at the time I felt very confident of those three men and the heads of the department also.
Q. Turn to page 9 of the report. In the middle of that page in paragraph 3, in the third sentence it states, "Compounding the decision to venture into riskier lending areas is management's failure to properly read," in quotes, "'the softening commercial real estate market resulting in continued investment through June of 1989.'"
Do you recall the commercial real estate market taking a downturn around that time in 1989?
A. Yes.
Q. Do you recall whether or not there were many thrift managers who foresaw that downturn?

97

Meyer
A. Many thrift -- I don't recall. At that time I was only on one or two other.
Q. This sentence states that, "The management failed to read softening market," and I guess my question is simply whether you know of anyone who did properly read this softening commercial real estate market.
A. I didn't care. I was only worried about here. They didn't.
Q. Do you recall thinking that they didn't because they were negligent or simply because they couldn't see what was going to happen in the market?
A. I don't recall. They just didn't see what was happening. I don't think they were negligent that I can recall.
Q. In the reference to riskier lending areas, do you recall that being more interest rate risks or are we talking about junk bond risks?
A. This was --
Q. What kind of risks do you recall there being?

102

Meyer

even before FIRREA. If you were in trouble with capital, one of the things you could do was shrink assets.

Q. Do you recall a larger number of institutions having a problem with passage of FIRREA?

A. Of course, there were more. Anyone that had a goodwill wiped out would have capital problems.

Q. Those institutions would need to undertake an asset shrinkage even if they had previously planned to grow; isn't that what happened?

A. They may have had to do it even with just the collapse of the real estate market at that time. Like I said, it is one way to address the problem asset shrinkage, change in your business playing.

Q. Would you look at the bottom of page 10? I will not go through all 64 pages.

At the bottom of page 10, the second-to-last paragraph right above the section entitled, "Management fee," I will read the two sentences in that paragraph.

103

Meyer

Let me ask you, do you recall the company named Imperial Premium Finance?

A. Yes.

Q. Do you recall when AmBase acquired Carteret? Carteret purchased Imperial Finance?

A. Yes.

Q. I will now call it IPF.. Let me read this sentence that refers to that acquisition in paragraph:

"By the end of August, 1988 AmBase received $24 million in funds from Carteret, 13 million in dividends declared and 11 million on profits on the sale of IPF. Additional dividends were declared subsequent to the consummation of the acquisition."

Do you recall having a concern with the purchase price AmBase Carteret paid for IPF?

A. Yes.

Q. What was the nature of your concern?

A. Just whether they overpaid the valuation, as I recall. Any time there is

104

Meyer

a transaction between affiliates, we have those concerns..

Q. Do you recall whether your concerns were ever appeased or did they get worse?

A. I thought IPF was a pretty good company. I was not familiar with insurance premium financing up to that point, and when I was looking into it, I thought it was a rather good business.

Q. Having had me refresh your recollection by reading this paragraph, do you recall that the purchase price Carteret paid for IPF was comprised of several different components including dividends?

MR. LEVITT: Where does it say the purchase price involved dividends?

Q. Review the paragraph previous to the one I just read.

A. They wrote 65 million.

MR. LEVITT: What is the question?

Q. The question is do you recall that part of that purchase price of 65 million

105

Meyer

was paid in the form of a dividend?

MR. LEVITT: Where does it say that?

MR. HUME: When did I say that it said that? I am asking a question.

MR. LEVITT: You are asking whether he remembers that part of the 65?

(Whereupon the record was read back by the reporter.)

A. No.

Q. Do you recall how it was paid?

A. No.

Q. Do you have any recollection of the way the deal was structured?

A. No.

Q. Reading this paragraph doesn't help you remember that?

A. No.

Q. Do you recall anything about Carteret paying what were termed stay payments or stay bonuses to some of its officers and directors?

Meyer

A. It sounds familiar, but I don't recall specifically.

Q. Refer to page 13, it may refresh your recollection.

You can see at the bottom of the page there is a list of bonuses to specific officers of Carteret. I am not sure if they are referred to as stay payments in this paragraph or not, but more generally, do you recall that institutions had to pay out bonuses in order to try to keep their officers and directors employed?

MR. LEVITT: Bonuses or stay bonuses?

MR. HUME: I am talking about stay bonuses or stay payments.

MR. LEVITT: Not bonuses of doing a job over the course of the year with the change of control? Were stay payments made? Is that what you're talking about? I am trying to get the question.

MR. HUME: Who is being deposed here?



Meyer

MR. LEVITT: The witness is.

MR. HUME: Why are you asking for clarification?

MR. LEVITT: I am the lawyer. I instruct him not to answer.

MR. HUME: Is there an objection?

MR. LEVITT: Yes. It is an unclear question.

MR. HUME: Normally lawyers say, "Objection, vague."

MR. LEVITT: I disagree. Normally lawyers ask for a clarification.

MR. HUME: Are you suggesting what the witness should say?

MR. LEVITT: Can you give us a clarification?

Q. My question, Mr. Meyer, is do you recall generally the existence of stay bonuses or stay payments in the industry at that time?

A. I remember contracts. I don't know when they were awarded to keep people, to



Meyer

keep them on.

I seem to recall a problem at the time because a lot of them were for five years, six years, and we did not think that was appropriate because the Board only had three-year terms in committing the future board of directors to these things, but other than that, any time there is a transaction, a merger or takeover, the key people sometimes were awarded those things.

Q. Do you ever remember stay bonuses needing to be paid because people simply didn't want to be directors of a savings and loan institution?

A. Specifically, no.

Q. Were you aware that there was a view in the industry on the part of some, at least, that it was ill-advised to be a director of the S&L after the passage of the FIRREA?

A. Yes.

Q. What was the reason for that perspective?

A. Because of the possibility of



Meyer

lawsuit. The government was going around suing everybody now.

Q. Do you recall that some of the directors were being sued personally and were being held personally accountable?

A. At Carteret?

Q. Generally in the industry at that time.

A. I don't recall any specifics.

Q. You do recall that --

A. I remember it happened. I just don't recall who specifically, anybody.

Q. You remember the threat of accountability and of lawsuits against the personal assets of directors as a reason why some people thought it was not wise to be a director of an S&L?

A. Yes, exactly, as I recall.

Q. Is that a perspective that existed prior to FIRREA?

A. As I recall, I don't think so, no.

Q. Turn to page 16. You can see some documentary support for some questions that I asked you. Item number 4, it says,

"Increase asset size to $10 billion."
Do you ever remember thinking that Carteret's asset size plans were unrealistic?
MR. LEVITT: Before this exam or after this exam or what?
A. Going in, I did not think they were unrealistic.
Q. You did at one time think that they could grow to the size of $10 billion?
A. Yes.
Q. During the course of this exam you came to change that view?
A. Yes.
Q. The reason you changed that view was because --
MR. LEVITT: Ask him the reason you changed the view. Why do we need testimony?
MR. HUME: I can ask questions the way I want to ask questions.
MR. LEVITT: Go ahead.
MR. HUME: Do you want to ask the questions? Are you proposing



that you cross-examine the deposition before I am finished?
MR. LEVITT: I am proposing that you finish and ask direct questions.
MR. HUME: Your lawyer is going to prevent this deposition from ending today. I want you to know that there is no way this deposition can be finished if this is the way he chooses to defend it, which is to testify.
MR. LEVITT: Ask your question.
MR. HUME: You won't let me ask the question that I am trying to ask.
I am happy for you to call the judge and complain about the way that I am conducting this deposition. I will have the court reporter read back the way you are objecting should we do that.
MR. LEVITT: I would like the



deposition to continue.
MR. HUME: I would like to take a break.
(Brief recess taken.)
(Whereupon the record was read back by the reporter.)
Q. I think the question was whether during the course of the 1989 exam you came to view that the business plan to grow to an asset size of $10 billion was unrealistic. Do you remember that?
A. I believe I came to that conclusion. What does it say in here?
Are you asking me a question that is answered in the next page?
Q. I am asking you what you remember, that is all.
MR. LEVITT: What page was that?
MR. HUME: Page 16.
A. As I recall, I didn't think it was realistic at that time.
Q. Do you recall you thought that the enactment of FIRREA and change of the



capital rules were going to necessitate a change in the business plan of this institution?
A. Among other things, yes. They were going to require a change in the business plan of every institution, probably.
Q. Do you think that would have been true even if the institution had not had asset problems?
A. Yes, sure.
Q. Turn to page 20 of this report. The second-to-last paragraph it notes that the bank had a concentration -- do you see where I am in the paragraph that begins, "Finally, it was noted that the bank has a concentration of credit to certain borrowers FL Industries and P. Profetta. If either of these borrowers experienced financial difficulty, it would" -- I think you referred to Profetta earlier.
Do you recall FL Industries?
A. Off the top of my head, no. Did they have another name?
MR. LEVITT: Forstman and

Meyer

Little.

THE WITNESS: Yes, I remember.

Q. What do you recall about that, anything?

A. They had a large concentration of loans with Carteret. I don't recall specifics about Forstman.

Q. Can you look at the top of that page or where it describes the volume of criticized assets? It describes at first 6.7 percent of total assets and then also states they represented 154.2 percent of regulatory capital?

A. Yes.

Q. Do you recall analyzing criticized assets in terms of those two ratios, ratio of total assets and ratio to regulatory capital?

A. Yes, I think they were required to be mentioned. They were required to be calculated and mentioned in the reports.

As I recall, like I said, our procedures changed very often.

Q. Would you agree that the percentage



Meyer

of regulatory capital represented by criticized assets is a very clear measure of identifying how serious a problem criticized assets represented?

A. Do you mean this percentage here --

Q. I mean in general. Does the percentage of regulatory capital really sum up what the extent of the problem is with criticized assets?

A. The percentage of regulatory capital has nothing to do with criticized assets.

Q. No, I am sorry. My question is unclear.

In other words, if you look at what percentage of regulatory capital criticized assets constitutes, in other words, are they ten percent of regulatory capital, 500 percent of regulatory capital? Would you agree that was a very good measure of how serious a problem they are?

A. Yes, it is one of the indications, right.

Q. Would you agree that it is a better measure of how serious a problem the



Meyer

criticized assets are compared to the percentage of total assets?

A. If you get back to the bottom line that capital is everything, yes, but it might not necessarily be so.

Q. You could have criticized assets that are seven percent of total assets or 6.7 percent of the assets, but because it is a very small percentage of your regulatory capital, because you have, let's say, regulatory capital equal to ten or fifteen percent of assets -- let's say it is fifteen percent -- then it is not such a big concern, is it?

A. I am sorry. You lost me there. Say that again.

Q. All I am saying is that while it may be useful to look at what percentage of total assets is constituted by criticized assets, don't you really need to know what the regulatory capital level is first before you know just how serious a problem that is?

A. Again, if you are basing everything



Meyer

on the total level of capital, yes, that is very important, but just percentage of total assets that are criticized is important in itself without even comparing it.

Q. We looked earlier at the general valuation reserves taken in this report of 77 million. Do you remember that?

A. Yes.

Q. Do you recall that at that time, the real estate decline in the beginning of a general recession contributed to underperforming assets?

A. Yes.

Q. Do you recall thinking that that was the major reason for underperforming assets?

A. I think it was a reason, maybe not the major reason. The lack of policies, procedures, other issues that came up, that were reasons.

Q. It was a reason, but an extremely conservatively managed institution may have been able to avoid those problems?

118

Meyer
A. Yes, some did.
Q. There were many institutions that had to take increased valuation reserves as a result of the recess and the real estate decline; is that right?
A. Yes.
Q. Do you recall that there was anything atypical about Carteret's underwriting policies?
MR. LEVITT: Objection to the word "atypical."
Q. Let me clarify what I mean by atypical.
Do you recall that Carteret had underwriting policies that were very different from other thrifts in the industry at that time?
A. No.
Q. Do you recall anything else about Carteret that was very different from anybody else in the industry at that time?
MR. LEVITT: Vague, general, broad.
A. This was a big institution. I said

119

Meyer
we thought -- I thought very highly of Carteret going in, even after this, as I wrote; some of the senior management I still considered capable.
Q. Turn to page 53 of this exam report section entitled, "Ability of AmBase to Infuse Capital." Do you see that?
A. Yes.
Q. First sentence states, "Based upon the conclusion that Carteret will not be able to meet FIRREA's minimal capital requirement, AmBase's ability to assist the institution in increasing its capital level was reviewed."
Do you recall participating or overseeing that review of AmBase's ability to infuse capital?
A. I remember, yes, we did some things with AmBase. I don't recall what we did specifically to this.
Q. Do you recollect that AmBase had a very high debt burden?
A. I don't recall.
Q. You don't remember that it borrowed

120

Meyer
a lot of money to purchase Carteret?
A. Like I said, off the top of my head I don't recall. Whatever we wrote in here.
Q. I think that you may be concerned about something that I don't want you to be concerned about.
I am not asking you questions to try to trick you by showing you something in the document. I am using the document to refresh your recollection where I think it is helpful.
As I stated earlier, if you feel that you really want to look at more of the document or that without spending hours reviewing it, you can't answer one of my questions, then please say so.
I sense that the way I am using it is a little confusing to you, so please don't let it be.
A. I don't recall them having a huge level.
Q. Do you have any recollection that they were relying on Carteret's dividends from Carteret in order for their cash flow

121

Meyer
needs?
A. I think that was the concern we had, yes, like I said, as any transaction between any affiliates is also looked on.
Q. Do you recall whether AmBase did, in fact, pay money into Carteret at any time, as an infusion?
A. I don't recall. I seem to think, I seem to recall they did, but it wasn't during the exam. I heard of it later on, but I don't specifically remember saying, "Okay, we have a check from AmBase," or something.
Q. Was it less or part of your job, since your job -- I don't mean to say "simply"; it is a huge job -- it was to examine the institution and the supervisory regulators as opposed to the examining regulators were in charge of worrying whether or not AmBase was paying money?
A. No, I think we did a whole in-company exam of AmBase also. Just general, their balance sheet and things like that.

130

Meyer
(Time noted: 1:55 p.m.)

MR. HUME: We'll resume the deposition.

EXAMINATION CONTINUED
BY MR. HUME:
Q. This morning or earlier in the deposition I showed you the 1989 report of examination. In that showed some of the tangible capital calculations done in that report. It showed a deficiency from the capital requirement on the order of 100 or 130 million.
Do you recall that?
A. Yes.
Q. Do you recall generally that in the 1989 exam report you considered the impact of FIRREA regulations on capital as applied to Carteret?
A. Yes.
Q. That the conclusions reached was Carteret was very unlikely to meet any of those requirements?

131

Meyer
A. Going forward, yes.
Q. Given the extent of their potential capital deficiency envisioned in that report, do you recall thinking that Carteret was very likely to need to raise new capital, to have a capital infusion?
A. Yes.
Q. They would not be able to continue in business unless they raised new capital?
A. Yes, they would be capital deficient. Whether that happened depended on FDIC, whatever.
Q. Did you ever think that they could continue to survive without having problems with either the RTC or the FDIC if they did not raise capital?
A. Yes, I thought they still had chances to shrink and go forward. I think there was a strong thought at the time that AmBase had money and was going to put it in.
Q. Do you recall the recession improving at all after 1989 and 1990 or '91?

132

Meyer
A. Not as far as the lending loans.
Q. Not as far as it impacted the thrift industry?
A. Right.
Q. Given Carteret's need to raise capital coupled with the recession, do you recall thinking that it was almost inevitable that this thrift was going to continue to decline unless it had new equity infused into it?
A. Again, they had to shrink. They had to do a lot of things than get new equity. It was probably a key component, yes.
Q. I guess my question is, do you recall thinking that if they were not able to get new equity of substantial amounts, that it was almost inevitable that they would continue to decline?
A. Yes.
Q. Do you recall what their composite rating was in the 1990 report?
A. No.
Q. Why don't we look at the 1990 report. It is on page 4 of the report.

133

Meyer
Do you see the composite rating assigned to Carteret is 5? Do you recall being involved in the decision to give Carteret a rating of 5?
A. Yes.
Q. Do you recall whether there was much debate about that rating?
A. I don't recall.
Q. Do you recall what was significantly different about the institution in 1990 versus how it looked in 1989?
A. I don't recall. I would have to read the report. I don't recall any specifics.
Q. Do you recall generally that it was the same problems it had in '89, there had not been sufficient new capital to counteract those problems?
A. Definitely I believe there was still asset problems. There were more concerns with the assets, of course, than the capital.
Q. Obviously, a lot of my questions have related to impact of FIRREA on

134

Meyer
Carteret and its new capital requirements. We reviewed that in the 1989 report.
Would you consider it a fair characterization that the effect of FIRREA's capital requirements on Carteret was similar to removing some level of insurance or some level of cushion to protect against recesses and declining real estate markets such as those that occurred in 1989 to '92, '93, in the early '90s?
A. I never thought of it that way. It was just -- I just never considered it that way as a form of insurance against recession, no.
Q. You never thought of a capital cushion as something that protected you in the event of a declining market?
A. A capital cushion would protect you against anything. Declining markets, I didn't think --
Q. Maybe my question was too specific. All I meant was would you agree that a capital cushion, excess capital of the requirements served as a cushion against

135

Meyer
unforeseen events that would negatively impact capital?
A. Yes.
Q. To take that away at the time that a recession comes along is, at the very least, extremely bad luck for the institution?
A. It didn't help.
Q. Wouldn't you agree that it made the institution extra sensitive to any such market downturns?
A. Sensitivity remained. It just reduced capital.
There was a line that regulators put up there as a regulatory capital, and their assets was just as sensitive to them whether they had a lot of capital or a little capital. They would fall under the regulatory capital without the cushion.
Q. In that sense it would be more sensitive? That is what I meant.
A. In that sense, yes.
Q. Could you refer to page 9 of the 1990 exam report? There is a description

136

Meyer
here of trend of criticized assets at Carteret and a chart that shows three different accounts of those criticized assets, the 1990 ROE, the 1989 ROE and in the middle Carteret as of June of 1990. Do you see that?
A. Yes.
Q. Do you see that the numbers for each of those three reporting events are quite different?
A. Yes.
Q. I asked you earlier about how criticized events or valuation allowances are determined. This chart gives us the bottom line for three different reporting events. If you compare them, I have a hard time understanding how the GVA is derived from the total level of classified assets.
Is there a set formula that makes that derivation that determines the level of GVA from classified assets?
A. There is no regulations formula. There is just general guidelines and examiner's evaluation of each loan.

137

Meyer
I am not sure; at that time we might have just said set a certain amount for the different levels of classifications, and the institution did it differently or took different amounts.
Q. The ROE in '89 also did it differently. I guess what I am focusing on is the percentage of total classified assets that ends up as a GVA requirement, and it is a much higher percentage for the ROE in 1990 than it is for either the other two reporting events. Would you agree with that?
A. It is much higher, but I don't think that it is calculated differently. You can't get that out of that.
Q. When you say you don't think it is calculated differently --
A. You said they were arrived at differently.
Q. I don't know how they were arrived at. I am actually trying to find out how they were arrived at, since it clearly is not a straightforward percentage

Meyer
did achieve profitability or return to profitability after this exam?
A. I think I heard they did, yes.
Q. Do you recall what happened to Carteret?
A. Yes, I was there. RTC took them over.
Q. Do you recall when that was?
A. No, I don't recall. I don't recall what date it was.
Q. How about what year?
A. It had to be '92, I guess.
Q. When you say you were there, did you actually play a role? Were you still working on Carteret at that time?
A. Like I said, I went back and I assisted O'Rourke and I did the asset review. I was in charge of the asset review.
I had about ten examiners under me. I was impressed with what they had done. I thought they did a good job.
They had these guys -- what was that guy's name -- they came in and they



Meyer
really -- they had nothing to lose. They went in and did a good job, and I was against anybody taking them over.
I always liked Carteret. I thought they could still make it.
Q. Did you think that if they had been given a little more time that, that maybe they could make it?
MR. LEVITT: Objection to relevancy.
You may answer.
A. In my opinion, yes.
Q. Do you have some recollection that they returned to profitability at that time?
A. As far as I think, they did the last TFR or the last one or two before they were taken off. They showed a profit. I don't remember how much or if it was just a dollar, but I do remember I know that it was good.
Q. It was about $10 million over the first nine or ten months.
A. Okay.



Meyer
Q. The real estate market was at that time rebounding a little bit, was it not?
A. I think so, yes.
Q. Recession was easing and the economy starting to gradually improve?
A. I don't recall all of the external things. I was deeply involved with the real estate assets. I always thought that was their main problem, and I think they did what they had to do.
They cut out all of the crap. They wrote everything down to what it was really worth and they were finally on the right track, I thought. The external things sure played a part, but the management at that time, Bianco brought in these guys, Moore and Fernandez. They really did a great job.
Q. Do you recall that the one thing they really needed to be able to do was to raise new capital even during that period when they were returning to profitability?
A. Again, every institution has to raise capital. It is the bottom line.



Meyer
When I examine a place, I am looking at five individual areas and I am not worried about saving the insurance fund. Like I mentioned, if capital is done, it is done. It is just one component of the exam to me.
I am not in supervision. I am not in insurance. I am concerned about it and that is what I write, and that is what affects my decision, but it is just one component of the five, and their problem was the asset quality. Then we had management concerns after that.
Q. Did those management concerns subside or lessen or go away after Dick Bianco came in and brought new people?
A. I think so, yes.
(Brief recess taken.)
MR. HUME: We'll resume the deposition.
As I mentioned earlier, I do have a number of documents that I would like to show you and ask you really only one or two questions on

182

Meyer

MR. LEVITT: To the last question. It is a post-question objection.

Q. As a bank examiner, savings and loan examiner you presumably throughout this period had a good sense of what was going on at least regionally in the real estate market?

A. Yes.

Q. Did you think during that period when the RTC was taking over a number of thrift institutions and resolving them through conservatorships and receiverships and selling wholesale a lot of their assets; did you think that that compounded the real estate to decline in the depression in those years?

A. Yes.

Q. In this region in particular or as much this region as anywhere?

A. I know of this region, yes, it did.

Q. When do you think the effects of that started to subside?

A. I don't know. The real estate

183

Meyer

market has been on a recovery since the past five years, maybe even more than that. It all hit the fan.

Q. This document I promised to go through so quickly, the bottom that refers to in section 4 the "No doc" loans.

Why don't you review that paragraph real quick on your own, if you would, please? Have you had a chance to review that paragraph?

A. Yes.

Q. Do you recall Carteret's use of what are called "no doc" loans?

A. No, I don't specifically recall it except what I am reading here.

Q. You don't have any independent recollection?

A. No, I just recall something about Florida. No, I don't.

(Whereupon a memorandum of oral communication from Scott Smith dated October 13, 1989 was marked AmBase Meyer Exhibit 6, for identification as of this date.)

184

Meyer

Q. This is a memorandum of oral communication by someone with the initials SBS.

A. Scott Smith.

Q. The conversation he is memorializing is with you; is that right? Am I reading the document correctly?

A. Yes.

Q. In the middle of this page under the section entitled, "Business Plan," it states -- let me first say the document is dated October 13, 1989, and under "Business Plan" it states, "Russ received a draft on Tuesday. Walsh told him this morning that it is being revised to include specifically" -- obviously a typo -- "to specifically include the following which was apparently only alluded to in the draft. Carteret plans to sell its Florida and Virginia operations, essentially pulling back to operate as a New Jersey community thrift. This is essentially just a plan to sell branches. Carteret will retain the following in Florida: (1) loan

185

Meyer

office -- to workout problem credits currently on the books, (2) loan servicing operations, and (3) EDP and check processing operations."

Do you recall Carteret's sale of branches in 1989 or 1990 specifically?

A. I don't remember them selling branches. I remember that was a plan that was one of the asset shrinkage to consolidate into New Jersey. I don't particularly remember the sale of the branches itself.

Q. You don't have any recollection as to what led to the decision to sell those branches?

A. I think, as I recall, we were trying to determine if they were profitable and they couldn't determine that.

They didn't have the necessary records to say, "We got this, this much deposits. We're making this much money on these branches," and we wanted them to tell us are they worth keeping, and I don't think they could.

186

Meyer

Q. It was simply impractical? They didn't have the necessary record keeping or data processing.--
A. Not that it was impractical. I don't think they thought it was worth it.
Q. They didn't think it was worth finding out --
MR. LEVITT: Let him finish.
A. I don't think they thought it was worth going through the effort, to be honest with you. That is my personal opinion.
They shouldn't have had the operation unless they were keeping track of its profitability.
Q. Just to clarify, when you say you didn't think it was worth the effort, when you say you think that they thought that it wasn't worth the effort, you mean the effort to determine whether they were profitable?
A. Right. I think O'Brien had a goal to be the East Coast king of savings and loans, and he was going to keep them in no

187

Meyer

matter what, I think.
I don't think they were profitable based on deposit size, and they couldn't come up with the information to show us that they were worth it. Plus, like I said, they were going to do asset shrinkage anyway, so it was just stood to reason that they would do that.
Q. When you say they were going to do asset shrinkage otherwise in October of 1989, that was still a pretty recently developed strategy, wasn't it?
A. That is -- like I said before, that is a basic strategy any time it looks like you're going to be in capital trouble, and apparently we must have been talking about it or maybe they didn't have a business plan until we asked for it.
Q. The 1989 report that we looked at showed the business plan with the plan to get to 10 billion in assets?
A. Correct. This one here they probably might not even had a business plan, or I don't know --

188

Meyer

Q. It states that you received a draft on Tuesday?
A. Right.
Q. Do you think they may have modified their business plans because of their need --
A. I don't recall. If they didn't have one to begin with, that seems like it would be comment worthy if they didn't have a business plan and they were doing all of this.
Q. If they had a business plan to grow to $10 billion in assets?
A. In '89?
Q. I believe so.
A. Now, apparently -- I wish I could go back in time. Apparently they all probably agreed that it is not realistic. I don't know what Walsh's position was at that time.
Q. Do you recall John Mackerey?
A. Yes, I believe he was the internal loan review guy at Carteret.
Q. He would have been this person that

189

Meyer

was responsible for analyzing the adequacies of Carteret's loan review program?
A. He was the internal loan review program, John Mackerey or something like that, Mackefey.
Q. If you look at the last paragraph here it says, "Analyst on site." It says, "John Mackerey will spend most of next week at the institution."
Was he an OTS employee?
A. I can't remember that guy. He must be.
It says, "Supervision." He must have been from the office. I can't recall him.
Q. Do you remember there being an on-site examiner, someone that would go to work every day at Carteret for six months?
A. Yes. I am not sure after this one. Maybe after the '90 one. I think O'Rourke was up there. He was up there a lot. He might have been on site.
Q. Do you not understand this paragraph

Meyer
you a few more questions, I am done with my questioning.
I thank you again for making yourself available today.
THE WITNESS: You're welcome.
MR. IGO: I have no questions.
MR. LEVITT: I will be brief, but I have a couple of questions.
EXAMINATION BY
MR. LEVITT:
Q. You recall that you testified that personally you felt that it was a bit premature to impose a conservatorship on Carteret in December of '92?
A. Yes.
Q. Why was it that you said that?
A. I think they had done everything we asked them to do. They had shrunk, they had written off all of the assets and they had started to make a profit. I thought they had turned the corner.
Q. Were you involved with the institution in '92 in any way?
A. I don't recall. Again, Tom O'Rourke



Meyer
did an exam. I may have assisted him somewhere along the line.
I was there when the RTC went in. I just asked if they were going to do this, I wanted to be there.
Q. Is it fair to say -- and if it isn't, say so -- is it fair to say that the beginning of your personal opinions were based on your impressions of what was going on at the time?
A. My impressions, yes, plus what I thought they had done.
Q. Could you make a statement about your feelings on Mr. O'Rourke's professional competence as an examiner?
A. Tom is excellent. He is one of our best examiners. I think highly of him. I enjoyed working with him. I think he does a good job. We might have differences, but I think he is an excellent examiner.
Q. Let me represent to you that the exam that he did in '92 when he was examiner commenced June 15, '92 and ended July '92. I will read you a couple of



Meyer
statements from the report.
MR. HUME: Do you have a copy?
MR. LEVITT: I have one copy.
MR. HUME: Should you make it an exhibit?
MR. LEVITT: I can. I thought I would read the statements.
MR. HUME: I was required to make copies and mark it as an exhibit. I tried to do it on my deposition Wednesday and I was not allowed to.
MR. LEVITT: By whom?
MR. HUME: Tony Cornicor (phonetic).
MR. LEVITT: Do you want to make copies?
MR. HUME: Read it. Then if I feel we need to look at it, we will.
MR. LEVITT: If you want me to show you at the point that I am reading it, I will.
Q. I will represent to you that what I have in front of me is the June 15, 1992



Meyer
report of examination done by Mr. O'Rourke, and I only have the one copy.
I will read to you some sentence from the report summary. I will ask you if you agree with them or don't agree with them.
MR. HUME: I would like to object to the line of questioning, since the witness testified that he was not working on the examination report in 1992.
MR. LEVITT: Let's get that out of the way.
Q. You said you thought you might be looking at some assets; is that correct?
A. I assisted Tom O'Rourke in an exam. I don't know in it was '91 or '92.
MR. LEVITT: With that objection, I will ask these questions. We'll see what your responses are.
Q. On page 1, it states, "Carteret's asset quality has improved due to an intensive effort by management to liquidate

Meyer

nonperforming assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructuring."

Is that consistent with your understanding and your recollection?

A. Yes.

Q. It goes on to say, "Criticized assets have decreased by 20.9 percent since the June 17, 1991 examination with assets classified 'substandard' down by 28.9 million (4.7 percent), assets classified 'doubtful' down by 46.5 million (84 percent) and assets classified 'loss' down by 154.6 million (77.4 percent)."

Is that consistent with your understanding that they got a bit better?

A. Yes.

Q. "Notwithstanding" -- I am reading from the report -- "notwithstanding this improvement in the level and trend in criticized assets portfolio, Carteret is in need of an additional 8 million in general valuation allowances to account for the



Meyer

residual risk inherent it its commercial assets portfolio and certain segments of its residential portfolio."

Do you have any reason to doubt that it was a correct determination to insist on an additional 8 million in general valuation allowances as a result of this exam?

A. No, I might have came up with the number.

Q. Then you recall counsel for AmBase represented that -- I believe he said through ten months of 1992, the company made, I believe he said around $10 million in operating profit?

A. Yes.

Q. Let me address some of the exam report here.

Mr. O'Rourke writes -- this is the second paragraph in the bottom of page 2 -- "Carteret management projects a 13.7 million profit for 1992; however, the 8 million in additional GVA's required by this ROE will require a re-evaluation of



Meyer

that projection."

Do you have any reason to doubt the accuracy of what he writes here?

A. No.

Q. Mr. O'Rourke goes on to say, "Notwithstanding the improvement noted in operations, Carteret's viability is in serious doubt without a sufficient equity capital infusion."

Do you agree with that?

MR. HUME: Objection. It calls for speculation.

Q. Don't speculate.

A. I have no basis. I need further information.

Q. Mr. O'Rourke assigned the 5 rating to Carteret as a result of this examination.

Do you have any opinion on whether that was an accurate rating based on your possible participation in reviewing assets during that examination?

A. I don't recall.

Q. Do you know whether efforts were



Meyer

made by Carteret to rate capital in '92?

A. I don't recall.

Q. Do you recall whether there were a number of solicitations made by Carteret and a number of due diligences undertaken by investment banks and other potential providers of capital on each occasion they refused to get involved with Carteret?

A. I remember having to provide information with due diligence taking place. I don't recall who it was or how many there were or why nothing went forward.

Q. You recall nothing went forward?

A. They would still be here.

Q. Do you recall that the government extended the time a couple of times by which they could obtain outside help before imposing the conservatorship?

A. No.

Q. I want to ask you one other subject area. Then I will be finished.

You did the examination as Examiner-in-Charge in '89; is that right?

250

Meyer
'89, June, probably.
MR. HUME: Can I object? Because although it is commenced in '89. The examination took six months, and you don't know when the page was written.
Q. Do you recall what you meant when you said there were core operating losses over the last four quarters?
A. Probably March '89, December '88, September '88, June '88.
Q. If that is correct, then there would have been operating losses as of June, beginning as of June of '88?
MR. HUME: Objection. It calls for speculation.
A. That is correct, yes.
Q. Is that your understanding of what you meant when you wrote it here?
MR. HUME: Objection. It calls for speculation. There is no foundation for it. It is mischaracterizing the document.
A. It would be in the appendix of the

251

Meyer
report, probably. Generally in an exam that is what it would be, but I don't think we changed the financials going forward.
It is probably -- we may have moved it to March, June, September and December '88.
Q. Do you recall that Carteret tended to mask the net operating losses by trading securities --
MR. HUME: Objection.
Q. Do you recall that Carteret tended to mask its operating losses by realizing trading gains which would net-out against the losses so the financials could show overall profits?
MR. HUME: Objection to form. It mischaracterizes documents.
A. As I recall, it was a question as to them booking profits on trading. I don't recall the specifics I just noticed.
Q. I will ask you one last thing: We saw a document that was a status report. As I recall, it was marked AmBase Meyer 11.
In number 4 on page 3 of the

252

Meyer
document -- it is from you to Dorgan -- you suggest that with respect to the trading, Carteret was giving preferences to Gruntal because Gruntal was an affiliate or a subsidiary; not a subsidiary, an affiliate. Do you see that on point 4 of AmBase Meyer 11?
A. Yes.
Q. Did you come to any conclusions whether that was correct or not correct?
A. I don't recall what was in the report, if anything.
Q. You recall being concerned about this issue, though, about the relationship between Gruntal and Carteret?
A. Yes. Like I said, any transaction with affiliates, we were always concerned.
I believe Gruntal was an affiliate common ownership maybe to AmBase, and in that case we called in the capital markets specialists, and that might have been Eric Saltzman at the time.
There were a lot of people going in and out of that job, so I don't recall who

253

Meyer
was there.
Q. The last question is this: In the O'Rourke report he writes on page 1, "As calculated under FIRREA capital requirements" --
MR. HUME: What document is this?
MR. LEVITT: The '92 exam, O'Rourke's report.
Q. He writes, "As calculated under FIRREA imposed capital requirements (adjusted for additions to GVA's indicated in this ROE) Carteret is insolvent as of June 30, 1992 by 72.7 million on a tangible basis and faces regulatory capital shortfalls of approximately 150.1 million of its existing minimum tangible requirement, 175.8 million on its core capital requirement and 233.2 million on its risk-based capital requirement."
Do you have any independent recollection of Carteret having that dimension of minimal capital deficiency at this time?

Meyer
A. No.
Q. If we assume the supervisory goodwill at the time was around 150 million -- which it wasn't; it was less than that -- but based on some of representations counsel has made, and it had a capital shortfall of approximately 150 million on the tangible requirement, wouldn't that mean that even if you added in the goodwill, it would not be meeting its tangible capital requirement?
MR. HUME: Objection. It mischaracterizes our representations.
A. If one was 150 and the other was 150, it is just -- it could be zero.
(Whereupon the record was read back by the reporter.)
MR. HUME: I want to note the objection as to the statement that the goodwill was not at that level.
Q. Likewise, Mr. O'Rourke writes that the core capital requirement was deficient by 175 million, so if he added 150 million



Meyer
into that, what would the core capital be if you added back 150 million? What would the core capital be?
A. Minus 25.
Q. Would that be below minimal standards?
A. Yes.
Q. Likewise, on a risk base they are short 233 million.
If you added 150 million into that as goodwill, what would they have?
A. They would be short.
MR. LEVITT: No further questions.
Thank you.
EXAMINATION CONTINUED
BY MR. HUME:
Q. Would you agree that a change in your composite rating in one year's time from being a 2 to a 4 is a dramatic change?
A. Sure. It is a forty percent change.
Q. Counsel for the United States asked you if the loss of 160 million in '91 was significant. I will represent to you there



Meyer
were reserves taken that year of 150 million, and that obviously contributed to the loss.
Would you agree that a loss that is largely attributable to general valuation allowances and loan loss reserves is in some sense at least a more arguable or more debatable loss while its effect on capital and its effect on the requirements is the same?
What it represents is different from a normal operating loss resulting from your interest spread and your expenses?
A. Yes.
MR. LEVITT: Thank you very much.
(Time noted: 5:00 p.m.)

---------------------------
RUSSELL J. MEYER

Subscribed and sworn to before me this day of , 1999.

---------------------------
Notary Public



INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| RUSSELL J. MEYER | MR. HUME | 5, 244, 255 |
| | MR. LEVITT | 234, 247 |
| | MR. IGO | 247 |


EXHIBITS


| AmBASE MEYER FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 1988 report of examination of Carteret Savings Bank | 25 |
| 2 | 1989 exam board | 34 |
| 3 | 1990 examination report | 124 |
| 4 | A letter dated May 15, 1991 to Mr. Griffin, with attachments | 147 |
| 5 | A memorandum dated July 12, 1989 from Mr. Meyer to Robert Albanese | 166 |
| 6 | A memorandum of oral communication from Scott Smith dated October 13, 1989 | 183 |
| 7 | An interoffice memorandum dated October 5, 1989 from David Dorgan | 191 |
| 8 | A memorandum of oral communication dated October 4, 1989 from Scott Smith | 197 |