# EXHIBIT R

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and )
CARTERET BANCORP, INC., )
Plaintiff, )
and FEDERAL DEPOSIT )
INSURANCE CORPORATION )
Plaintiff Intervenor, )
vs ) Case No. 93-531C
UNITED STATES OF AMERICA ) Chief Judge Loren A. Smith
Defendant. )
FIRST FEDERAL SAVINGS )
BANK OF HEGWISCH )
Plaintiff, )
vs ) Case No. 93-162C
UNITED STATES OF AMERICA )
Defendant, ) Chief Judge Loren A. Smith
O. BRUTON SMITH and BILL )
SMITH, )
Plaintiffs )
and FEDERAL DEPOSIT )
INSURANCE CORPORATION )
as successor to the rights)
of North Carolina Federal )
Saving & Loan Association,)
Plaintiff Intervenor )

6

let me know, and I'd be happy to accommodate that.
If my questions aren't clear, just let me know, and I'll do my best to clarify them. Counsel may interpose objections, but if you understand the question, please go ahead and answer the question.
And just to clarify the record, are you represented today by the Department of Justice or are you here by yourself?
A No. I'm by myself.
(A discussion was held off the record.)
Q (By Mr. Thompson) As we were mentioning prior to the commencement of the deposition, the testimony that you provided back on July 26th in your common deposition is a part of the record of the AmBase case and, for that matter, every other Winstar case, so we will not be retrudging your educational background or your history at Heritage or your tenure at FSLIC as a general matter. I just have a few specific targeted questions about Carteret Savings Bank and its acquisition of two troubled thrifts in 1982, Barton Savings & Loan in Newark, New Jersey, and First Federal in Delray, Florida. And I'll be referring today, just for ease of reference, to

7

First Federal of Delray as Delray.
And I'd like to start by asking the court reporter to mark as AmBase Beesley 1 a document that bears the Bates No. OAM0051757.
(A discussion was held off the record.)
(AmBase Beesley Exhibit 1 was marked.)
Q (By Mr. Thompson) And I'd like to apologize for the poor quality of this copy, but would you please identify the document for the record, sir?
A This appears to be a memorandum from the Federal Home Loan Bank of Atlanta to Tom Timmins, Deputy Director of OES at the office of FSLIC.
Q And does the date seem to be March 23, 1982?
A Yes.
Q Okay. And you could please flip to page 7, which is the last page of this document, and take a moment to review the first full paragraph on the page.
A Okay.
Q Do you have any recollection of the troubles that beset Delray in 1982?
MS. WILLIAMS: Let me object,

8

foundation, first of all, and second of all, vague.
THE WITNESS: I have no current recollection relating to the specific shop, no.
Q (By Mr. Thompson) Okay. And do you know who Thurman Connell is?
A Yes.
Q And does he go by Sam Connell?
A Yes.
Q And Mr. Connell at this time was with the Federal Home Loan Bank of Atlanta; is that correct?
A That's correct.
Q Will you please just briefly describe to me what the relative responsibilities were of Mr. Connell and his colleagues at the Federal Home Loan Bank of Atlanta as compared to your responsibilities in Washington, D.C.?
MS. WILLIAMS: Objection, foundation.
THE WITNESS: The 12 regional banks had supervisory authority delegated to them from the FSLIC. They were, in effect, our agents in the field and acted on behalf of the FSLIC in their local areas pursuant to those delegations.
Q (By Mr. Thompson) All right. And did

9

it fall upon Mr. Connell to actively go out and seek a merger partner for an institution such as Delray or would that be done in connection with the predecessor to the mergers and acquisitions division?
MS. WILLIAMS: Objection, foundation.
THE WITNESS: It was a coordinated effort, but yes, he would have had responsibilities to seek solutions to the cases in his -- in his jurisdiction.
Q (By Mr. Thompson) And do you recall who had responsibility for negotiating the specifics of the actual assistance agreement and other relating contractual documents? Would that have been someone in the Federal Home Loan Bank of Atlanta? Would that have been someone in your office?
A As the cases became more serious and if it started to appear that there would be financial assistance of any size required, people in my office would become involved and ultimately would -- would do the final negotiating, at this point in time, anyway. As the years went by or the months went by, greater delegations did occur. However, in March of 1982, the serious negotiations

A Yes.
Q And would you have expected at this time for the actual value of the assets and the net worth to have been lower than is stated on these book numbers?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Yes.
Q (By Mr. Thompson) Now, do you recall the fact, sir, that Carteret was located in New Jersey?
A Yes.
Q And so for this merger to be consummated, isn't it true that certain prerequisites would have to be satisfied for interstate branching?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Certain policy prerequisites, yes.
Q (By Mr. Thompson) Okay. And turning to page 2 of the document, at least three of these prerequisites are laid out, and if you'd take a moment just to review the last paragraph on this page.
A Okay.
Q So, now, just that I'm clear on what



these prerequisites are, with respect to the first one, is the point of that -- is it fair to assume that you had reached the conclusion that Delray was about to fail --
MS. WILLIAMS: Objection, vague.
Q (By Mr. Thompson) -- and that made it an appropriate target for an interstate merger?
A Well, I think -- I think it's fair to assume that it was about to fail and that absent other alternatives it could become an appropriate target for an interstate merger.
Q And by the term "failure," did that mean insolvent on a book basis?
A Yes.
Q And in your opinion was that the best measure of an institution's health or would you have preferred a measure that was more tied to the economic realities of each institution?
MS. WILLIAMS: Objection, vague. Also, are you asking him as he sits here today or are you asking him specifically with respect to this transaction back in 1982?
MR. THOMPSON: Well, at the time.
THE WITNESS: At the time and as I sit here today, I felt and feel that the methods of



accounting that were in effect in 1981, 1980, 1982 were wholly inadequate, and I would have much preferred focusing on a true economic test of value rather than historical cost accounting which camouflaged to a large degree the problems in these institutions.
Q (By Mr. Thompson) Okay. Now, the second prerequisite states, "the transaction will reduce the FSLIC's insurance liability or risk," and when Carteret acquired Delray, do you recall how that transaction reduced the FSLIC's risk? Was it because Carteret was putting its equity in between the net liability of Delray and the FSLIC?
MS. WILLIAMS: Well, objection. The question is compound. I think you're asking him two questions in one.
MR. THOMPSON: Well, if the witness understands the question, he may answer it.
THE WITNESS: Well, not exactly, because Carteret also had a negative net worth on a true economic basis if I -- if I'm not mistaken. But what it did is it bought time for Carteret, as a combined entity, through the use of goodwill and as shown by our viability analysis to work through these problems in a manner which, as it says here,



reduced the risk. I mean we were faced with an immediate outlay with First of Delray, and as a result of this merger, if -- if things went according to the assumptions in our model, we would not have any further outlays in this situation.
Q (By Mr. Thompson) And was one of the reasons that you were in favor of this transaction was because you had confidence in Carteret's management and its ability to adequately work its way out of the problems that Delray and Barton had?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Well, we -- we had confidence in their management and with, as I say, some favorable economic conditions, had every expectation that they'd be able to complete their -- or that the outcome would be similar to what was shown on the analysis.
Q (By Mr. Thompson) And in one of your recent answers you stated that Carteret also was insolvent, and do you have a specific recollection of that or is that just your general sense given its capital position and the interest rate environment in which it was operating?
A The latter.
Q Okay. And then turning to page 3 of

34

this document, would you please take a moment to review the first paragraph above the section, Compliance With New Jersey Law?
A The paragraph above that?
Q Yes.
A In other words, the first paragraph on page 3?
Q Exactly right.
A I've reviewed it.
Q Okay. And do you have any reason to doubt the validity of the conclusions that are set forth there?
A No.
Q All right. And I'd like at this time, sir, to direct your attention to page 4 of the memo and to the second paragraph, and I'd just like to ask you to take a moment to review that paragraph, please.
A Okay.
Q Do you have any reason to doubt the validity of the conclusion that Delray's decline was irreversible?
A No.
Q And given the fact that its decline was irreversible and it was suffering, in the words of

35

this memo, large operating losses, did you consider it to be a pressing and urgent matter to find a merger partner for Delray?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Well, those are relative terms. And I don't remember where it fit on our list of problems, but certainly it would have been one of them.
Q (By Mr. Thompson) Um-hum. (Affirmative.) And having book assets of approximately $800 million, it would have been one of the larger institutions at that time, in 1982, that you had to resolve?
MS. WILLIAMS: Objection, vague. You mean in the Atlanta area or across the country?
MR. THOMPSON: Across the country.
THE WITNESS: Well, again, I don't remember specifically how it would stack up. We had some pretty big -- but it would have been -- it would have been a serious problem, I'm sure.
Q (By Mr. Thompson) Okay. Now, reference is made in the memo to the fact that the -- that Delray was suffering from savings outflows, and do you recall whether it was your hope that Carteret would be able to bring its

36

marketing skills to bear and reverse that situation and show the same ability to attract deposits that it had in New Jersey?
MS. WILLIAMS: Objection --
THE WITNESS: I don't remember -- I don't remember thinking one way or the other.
MS. WILLIAMS: Okay.
Q (By Mr. Thompson) Okay. Now, I'd like to ask you to take a moment to review the last paragraph on page 4.
A Okay.
Q Does this paragraph accurately reflect your understanding that the two acquisitions -- and by that I mean the Barton and the Delray acquisitions -- were inextricably linked and that Carteret was only willing to acquire Barton if it got Delray and the government was only willing to approve the acquisition of Delray if Carteret took Barton?
MS. WILLIAMS: Objection, vague. Objection, foundation.
THE WITNESS: Well, I have no recollection other than what's in this memo, but I believe the memo to accurately describe the situation which I think you have accurately

37

restated.
Q (By Mr. Thompson) And isn't that why there is one memo relating to both transactions?
A Yes.
Q Okay. At this point I'd like to turn to page 5 of the memo and to the section that states, "Accounting Treatment By Carteret." And the first sentence there reads, quote, Carteret proposes to account for the transactions by use of the purchase method of accounting.
Did you understand this proposal by Carteret to mean that it would be able to use purchase method of accounting with respect to both its acquisition of Delray and Barton?
A Yes.
Q And was it your understanding that if Carteret received this treatment, it would be able to utilize the resulting supervisory goodwill towards its regulatory capital requirements over a 40-year period?
MS. WILLIAMS: Objection, vague. Objection, calls for a legal conclusion as well.
THE WITNESS: I -- I don't remember whether it was 40 years because there's nothing here that says that, but assuming that that is what

38

the actual document says, then that would be my understanding.
Q (By Mr. Thompson) Well, I think that's a fair point. Let's leave the amortization period aside for a minute. It is your understanding that Carteret, if it received this right to utilize this accounting treatment, would be able to use the resulting supervisory goodwill towards its regulatory capital requirements for whatever amortization period was agreed to?
MS. WILLIAMS: Same objection.
THE WITNESS: Yes.
MR. THOMPSON: All right. And at this point I'd like to have marked as AmBase Beesley 10 a document that bears the Bates No. C-AM-A-0205984.
And we're actually going to come back to that in a moment.
(AmBase Beesley Exhibit 10 was marked.)
Q (By Mr. Thompson) And would you please identify this document for the record?
A This appears to be a resolution of the Federal Home Loan Bank Board dated September 30, 1982 regarding the Carteret, Barton, Delray matter.
Q All right. And I'd like to direct your attention to the third page of this document and to

39

the first sentence that reads, "RESOLVED FURTHER, that the mergers shall be accounted for using the purchase method of accounting in accordance with generally accepted accounting principles."
And, sir, do you understand this provision of the Federal Home Loan Bank Board resolution to confer upon Carteret the contractual right to use the purchase method of accounting and -- with respect to both its acquisition of Barton and Delray and to count any resulting supervisory goodwill towards its regulatory capital requirements?
MS. WILLIAMS: Objection. Calls for a legal conclusion.
THE WITNESS: Well, I -- I do feel uncomfortable answering that. I believe that it says what it says. And I -- I don't know what the legal meaning of that is relative to contract law, but it was certainly the board's resolution that the merger could be accounted for using the purchase method of accounting in accordance with generally accepted accounting principles. And there's no doubt that that's what that says.
Q (By Mr. Thompson) And doesn't it follow from that fact that any supervisory goodwill

40

resulting from these transactions would be counted towards Carteret's regulatory capital requirements?
MS. WILLIAMS: Objection. Calls for a legal conclusion.
THE WITNESS: Well, at the time certainly it was my recollection that under generally accepted accounting principles that that was the case.
Q (By Mr. Thompson) Okay. And, in fact, wasn't it a standard provision of supervisory transactions at this time that the acquiring institution would request and receive the right to utilize purchase method of accounting and to count the supervisory goodwill towards its regulatory capital requirements?
A I believe that's correct.
Q And wasn't one of the reasons that that was generally agreed to by the Federal Home Loan Bank that it was an item of value to the acquiring institution that essentially cost the government nothing?
MS. WILLIAMS: Objection, vague. Objection, also calls for a legal conclusion.
THE WITNESS: Could you restate the question?

41

(The question was read.)
THE WITNESS: Well, from our point of view at the FSLIC, the use of purchase accounting improved the viability of the combined institutions because of the benefits to the income stream on a short-term basis, at least, and I suspect that that was also a motivating factor for the acquirers or the parties involved in these things. There -- there's no inherent value other than the difference between the two -- the difference between the accretion of the discount versus the amortization of the goodwill.
MR. THOMPSON: All right. And at this point I'd like to step back for a moment and look at the economic reality surrounding this transaction and ask your opinion as to that.
And I'd like to ask the court reporter to mark as AmBase Beesley 11 a document that bears the Bates No. C-AM-A-0403574.
(AmBase Beesley Exhibit 11 was marked.)
Q (By Mr. Thompson) And, sir, I'll represent to you that this is a true and correct copy of a decision rendered by the United States District Court for the District of New Jersey in the matter of Carteret Savings Bank versus Office

of Thrift Supervision, and in this decision the district court judge concluded that Carteret had a contractual right to utilize its supervisory goodwill resulting from these transactions towards its capital requirements.
But what I'd like to ask you to look at is the bottom of page 6 of the decision, picking up with the very last sentence that carries over, and that reads, "As of the acquisition date, Barton had assets with a fair market value of $126 million and liabilities with a fair market value of $172 million, such that the acquisition left $46 million of goodwill."
Do you see that, sir?
A Yes.
Q And then it goes on to state, Similarly, Delray had assets with a fair market value of 644 million and liabilities valued at 812 million, such that it had 168 million in goodwill.
Do you see that, sir?
A Yes.
Q And I'd like to flip back to your memo of September 30, 1982, and in particular, to page 12, the second to last page of the memo, where it states that Carteret's net worth as of August 31,



1982 was approximately $36.4 million. Do you see that? It's on the third line down --
A It's book net worth?
Q Yes, that's correct, the book net worth.
A Um-hum. (Affirmative.)
Q And isn't it fair to say that it would have been madness for an institution with only 36.4 million of book net worth to have acquired net liabilities of 46 million and 168 million, respectively, if it didn't receive the contractual right to utilize the supervisory goodwill towards its regulatory capital requirements?
MS. WILLIAMS: Objection, vague. Objection, foundation, and objection, it calls for a legal conclusion.
THE WITNESS: I think -- I think it would have certainly been the intent of Carteret to utilize purchase accounting in its transaction. There's no doubt about that in my mind. I don't -- I don't want to deal with the contractual issue, which it sounds to me like the court has dealt with anyway, because I just don't know.
Q (By Mr. Thompson) Well, let me ask this way: In terms of recommending that the



transaction be approved, you'd have to conclude that the resulting institution is viable; isn't that right?
A Yes.
Q And isn't it true that this institution, once the mark to market had been done and a negative liability of 46 million from Barton and negative 168 million from Delray, would not have been viable had the resulting supervisory goodwill not been included in the regulatory capital of the resulting institution?
A Absolutely correct.
Q Okay. So, in fact, not only would it have been Carteret's expectation that it would have this contractual right, but it was also the FSLIC's expectation as well; is that right?
A Well, it was the --
MS. WILLIAMS: Object --
THE WITNESS: -- it was the FSLIC's expectation they would use purchase accounting. Again, I think the contractual right issue versus what's in the resolution and the expectations just goes beyond what I am comfortable testifying to because I know in a lot of these agreements we had actual contracts that specified one way or the



other how the accounting was.
I don't know what -- what's at stake here, but I can tell you that -- that it's clear that absent the use of purchase accounting that neither side would have wanted -- neither side being Carteret or the FSLIC, would have wanted to do this transaction, or the transaction could not have occurred, as you pointed out, because Carteret would have immediately had a negative net worth even on a book basis.
Q (By Mr. Thompson) All right. And you've referenced earlier and in some of your prior testimony as well in the common portion of the deposition the benefits of purchase method of accounting to the acquiring institutions, and I just want to quickly make sure that the record is clear on this. Are there two principal benefits, one, that the discount will be accreted and that there will be -- and that income will be recognized on that basis as loans come in and the amortization of the goodwill is written off over a longer period of time?
A That's -- that's the main benefit, yes.
Q And then is there also a benefit that Carteret would be able to take this supervisory

46

goodwill and leverage it in an attempt to make profits and fill the tangible hole that it had?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Well, I think -- yes, I think the answer is yes.
Q (By Mr. Thompson) All right. Now, I'd like to turn back for a few minutes to page 7 of this document, and by "this document," I mean the September 30, 1982 memo with the district court's decision. And do you see the chart that says Barton Savings & Loan Association Selected Financial Data as Reported?
A Yes.
Q And do you have any independent recollection as to the troubles that were afflicting Barton at this time?
A No.
MS. WILLIAMS: Objection, vague.
THE WITNESS: No.
Q (By Mr. Thompson) Do you have any independent recollection as to how Carteret was identified as a potential acquirer for Barton?
A No.
Q And do you have any recollection as to how Carteret was identified as a potential acquirer

47

for Delray?
A Only from the documents we've reviewed this morning. Prior to -- prior to this morning I had no recollection.
Q All right. And do you see on this chart that Barton had suffered a steady record of losses from December 31, 1980 through the time that this memo was prepared?
MS. WILLIAMS: Objection, vague. What do you mean by "steady record of losses"?
THE WITNESS: Well, according to the chart, they had losses in each of the periods that were reported here, as well as a decline in their savings balances.
Q (By Mr. Thompson) And did you have any reason to believe that Barton would be able to turn itself around?
MS. WILLIAMS: Objection, vague.
THE WITNESS: I don't remember one way or the other anything about Barton.
Q (By Mr. Thompson) All right. Now, at the bottom of this page, the present value cost of the Carteret bid is listed as approximately $11.76 million. Do you see that, sir?
A Yes.

48

Q Okay. And then let's step over to page 8 where there are cost estimates for immediate liquidation. And under Immediate Liquidation it states, "The estimated present value comparative cost to the FSLIC of a payout of the insured accounts of Barton is $42.6 million."
And let me first ask you this question: The district court decision which we just looked at said that the mark to market of Barton had resulted in a $46 million net liability, and this document estimates the value of the -- or the cost of liquidation as being approximately $42 million. Does it surprise you that there's a rough symmetry between the two numbers?
MS. WILLIAMS: Objection, vague.
THE WITNESS: No.
Q (By Mr. Thompson) And would you expect that same symmetry to hold for Delray and the cost of its liquidation as compared to the net liability that resulted when there had been a mark to market of its assets and liabilities?
A No, because liquidation essentially is the -- is essentially that, plus or minus any costs of the liquidation and plus any premium one might receive from the deposits.

49

Q Okay. And I may have asked that question inartfully. Just so that the record is clear, you would, in fact, expect the cost of the liquidation of Delray to be close to the net liability that was generated after purchase method of accounting was applied?
A It would be close.
Q Okay. Now, looking at -- comparing the cost of liquidation to the cost of doing these -- the Barton transaction, is it fair to say that you were attracted to Carteret's bid both because it was less expensive than liquidation and because it required less of an initial cash outlay?
A Yes.
Q Now, in the next subparagraph it says, Income Maintenance. The estimated present value comparative to the FSLIC of operating Barton at a 1 percent reserve level for 10 years is $32.7 million with a total cost over the 10-year term of 87.4 million.
Can you tell me what it means to operate Barton at a 1 percent reserve level?
A It means that the FSLIC would put cash or paper into Barton to make a -- a 1 percent -- such that it had a net worth of 1 percent on a book

concern.
Q Yes, yes, exactly.
All right. Turning to The Resulting Association on page 11, the second full paragraph there says, "Carteret, like other associations, has experienced operating losses which have eroded net worth. However, its operating ratios are generally more favorable than those of like-sized institutions."
Do you recall what operating ratios would have been relevant at this time?
A No. I'd be guessing.
Q Is it return on assets and return on equity? Is that what you looked at, do you recall, or --
MS. WILLIAMS: Objection. He's just testified he'd be guessing. Asked and answered.
THE WITNESS: Well, I would -- I would -- if I had to guess, I would guess that those were among the ones we looked at.
Q (By Mr. Thompson) Okay. And are there any other ones that might have been relevant in terms of operating ratios that you would have looked at? Would operating expenses have been another bracket?



A Yes, operating expenses, assets per employee. There's a whole bunch of different ratios --
Q That you would have looked at?
A Well, we might have looked at them.
Q Might have looked at, exactly.
A I don't remember what we looked at.
Q Okay. All right. Then turning to page 12 of this document under Viability, if you'd just take a moment to review that paragraph or the two paragraphs on this page.
A Okay.
Q Isn't it fair to say given that you recommended that the bank board approve these transactions, that you did, in fact, have confidence in Carteret's management's ability to run a healthy and sound institution after it acquired Delray and Barton?
MS. WILLIAMS: Objection, vague.
THE WITNESS: I think the answer is yes.
Q (By Mr. Thompson) Okay. Perhaps if we could just take a short two- or three-minute break. I think we're almost finished.
A Okay.



(A short recess was taken.)
MR. THOMPSON: Back on the record.
Q A few more minutes of questioning, sir.
I wanted to ask you whether in your opinion it would be reasonable for a subsequent acquirer of Carteret to rely upon the fact that the supervisory goodwill would continue to count towards Carteret's regulatory capital requirements.
MS. WILLIAMS: Objection, vague. Objection, calls for speculation.
THE WITNESS: Well --
MS. WILLIAMS: I'm sorry. Could rely upon it for what purposes?
THE WITNESS: I really don't know how to answer the question because the Financial Accounting Standards Board changes their ways of doing things all the time, which is a great frustration to any banker. The government changes its capital rules and standards all the time, which is a great frustration to bankers. So I think -- I think it would probably be reasonable to assume that some changes could occur. I don't know whether it would be foreseeable that the congress would step in as they did in 1989, but I -- I'd have to leave it to others to decide what's



reasonable and what isn't.
Q (By Mr. Thompson) Okay. Now, with respect to FIRREA, at the time FIRREA was passed, you were an executive in the savings and loan industry; is that right?
A That's right.
Q And did you have occasion to observe any change in regulatory attitude once FIRREA was passed and specifically whether the regulators became more critical of institutions that had a problem capital profile?
MS. WILLIAMS: Objection, vague. Objection, calls for speculation.
THE WITNESS: Yes, I observed -- I observed changes in the regulatory attitude relative to savings and loans particularly from the FDIC specifically.
Q (By Mr. Thompson) And what was the change that you observed?
A Well, the FDIC, I think, wanted to show the world how tough they were.
Q And did they have -- was one manifestation of that propensity the fact that if you had assets and they thought they weren't of a -- reflected on the books at the right valuing,

they'd tell you, You've got to mark down assets, they'd be heavy-handed in that regard?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Well, I don't know specifically what they did, but there were a lot of complaints of heavy-handedness within the industry that I was privy to.
Q (By Mr. Thompson) All right. Did you or your institution ever have or receive such treatment from the FDIC?
A Well, they were -- they were certainly more heavy-handed than we were used to, yes.
Q All right. And was the OTS likewise, if not as bad as the FDIC, also chastened by FIRREA and more heavy-handed than its predecessor had been?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Not in my personal experience.
Q (By Mr. Thompson) Did you hear of any of your other fellow executives who had such experiences?
MS. WILLIAMS: Objection, speculation.
THE WITNESS: No. I think most of the criticism was aimed at the FDIC.



Q (By Mr. Thompson) Okay. In trying to quantify the benefits that the FSLIC received from Carteret's assumption of Delray and Barton. I'd like to represent to you that Carteret was seized by the federal government on December 4, 1992, so approximately 10 years after it acquired Barton and Delray. And is it fair to say that one benefit to the government would be the fact that rather than having to resolve Barton and Delray in 1982, it was able to put that problem off until 1992?
MS. WILLIAMS: Objection. Calls for a legal conclusion, and it's also vague.
THE WITNESS: Well, I think to properly answer that question you'd have to know the costs that were incurred in 1992, but certainly all things being equal, the fact that no outlays were required during the intervening 10 years would have been a benefit to the FSLIC.
Q (By Mr. Thompson) And holding everything else equal in terms of the amount of outlays that would have been required in 1982 as opposed to 1992, how would you quantify that benefit?
MS. WILLIAMS: Objection, vague. Objection, calls for speculation.



Q (By Mr. Thompson) Would it be the savings on the money that would have had to be expended that the government could have invested during that time period?
MS. WILLIAMS: Same objection.
THE WITNESS: Well, this is a very difficult question that I've struggled with in prior depositions because had we not had Carteret, it's -- it's very difficult to say what we would have done with these institutions. And the reason for that is because when we find a solution that we're willing to go forward with, we, in essence, stopped looking at that point for alternative solutions and we compared the proposed solution with, say, Carteret with the others that are on the table. But if we hadn't done Carteret, it's not clear that we wouldn't have continued to struggle to find some solution that might have been better than the ones that were on the table at the time we did the Carteret transaction. So it's very difficult to give you a straight answer as to what -- what might have happened.
Q (By Mr. Thompson) Okay. Well, let me ask you a couple of questions about that. Is it fair to say, though, that if there had been another



merger partner found for Delray and Barton in 1982 that that merger partner would have insisted upon utilizing the purchase method of accounting?
MS. WILLIAMS: Objection. Calls for speculation.
THE WITNESS: I think it's highly likely that would have been the case.
Q (By Mr. Thompson) Okay. So let's put that issue to the side. Let's say for the purposes of this analysis that the inquiry is what was the benefit to the government of not having to liquidate Delray and Barton in 1982, just assuming that to be what would have happened, as compared to liquidating them as part of Carteret in 1992, and let's also say that the cost was the same face amount of dollars in '82 and '92. How would you quantify that benefit to the government?
MS. WILLIAMS: Objection. Calls for speculation. It also calls for a legal conclusion.
THE WITNESS: Well, first of all, I think it's very unlikely we would have ever liquidated them in 1982. But in answer to your question, you would simply do a present value analysis. And picking a discount rate would be problematic, but you'd pick one and you'd come to

the conclusion that 1982 dollars are more dear than 1992 dollars. So under those facts, which as I say are unlikely, it would have been the difference in the present value of the two cases, which would have been substantial.

MR. THOMPSON: All right, sir. Well, I have no further questions for you. I'd like to thank you very much for taking the time to come down this morning and chat with me.

THE WITNESS: Glad to do it.

MS. WILLIAMS: Actually, I do have a couple of questions.

EXAMINATION

BY MS. WILLIAMS:

Q Mr. Beesley, earlier you had testified -- Mr. Thompson had asked you some questions about benefits to the government of purchase accounting, and I think you testified about -- he asked you some questions about leveraging and obtaining profits. And what I'd like to ask you is is your testimony that the transactions that Mr. Thompson has discussed here this morning guaranteed the institutions profits?

A No. That isn't my testimony. In theory, generally, if you have capital and you have



the ability to leverage, your hope and expectation is there will be a positive spread. That doesn't always occur, and, in fact, the fact that we had the S&L crisis during the early '80s is evidence that all spreads are not always positive. But with capital you have the option of leveraging and the expectation and hope of a positive spread.

Q And then I only have I think one other question. Earlier Mr. Thompson asked you some questions about confidence in Carteret's management and the belief that it would create a healthy and sound institution. But I just wanted to ask you, your analysis of the ultimate let me say progress of Carteret was contingent on all of the assumptions set forth in the viability analysis; is that correct?

A Yes. I think -- I think both cases are -- both scenarios or both situations are correct. In other words, we -- we did have a positive level of confidence regarding the management at Carteret --

Q Um-hum. (Affirmative.)

A -- and the viability was also contingent on the assumptions in the model, in reality being no worse than the assumptions in the



model.

MS. WILLIAMS: Okay.

(Concluded at 10:59 a.m.)

* * *



Monday, September 27, 1999; 11:21 a.m.

PROCEEDINGS

MR. RABINOWITZ: Let the record reflect that this is the deposition upon oral examination of Brent Beesley being taken pursuant to the Federal Rules of Civil Procedure and the Case Management Order and Procedural Order No. 2 in this instance.

HORACE BRENT BEESLEY,
called as a witness,
having been previously duly sworn,
was further examined and testified as follows:

EXAMINATION

BY MR. RABINOWITZ:

Q Good morning, Mr. Beesley.

A Good morning.

Q My name is Mark Rabinowitz. I represent the plaintiff, in this instance First Savings Bank of Hegewisch, against the United States government.

I understand you've been deposed before; is that correct?