# EXHIBIT S

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------:

PLAINTIFFS IN ALL :
WINSTAR-RELATED :
CASES AT THE COURT, : No. 90-8C et.
al : (Chief Judge
Plaintiffs, : Loren A.
Smith)
Vs. :
:
THE UNITED STATES, : VIDEOTAPE
: DEPOSITION OF
Defendant. : THURMAN C.
---------------------------------: CONNELL

DEPOSITION OF THURMAN C. CONNELL, taken before Jill Madsen, Certified Shorthand Reporter and Notary Public, at the University Park Holiday Inn, Chamber Room, West Des Moines, Iowa, commencing at 9:11 a.m., on June 28, 1999.

Reported by: Jill Madsen, CSR, RPR

Page 70

from that period of time until the time you left?
A. Yes, he was.
MR. MANNING: This is a good time for a break.
THE VIDEOGRAPHER: We're off the record at 10:35.
(Recess taken.)
(Comments off the record.)
MR. MANNING: Now, was anyone else unable to hear me, or is it just Gaston?
MS. JOWAISAS: This is Marion Jo Jowaisas in Dallas. I wasn't able to hear your questions real well.
MR. MANNING: Well, life is full of people who don't speak up. If you don't speak up, we can't fix it.
Is that better?
MS. JOWAISAS: Yes.
THE VIDEOGRAPHER: Back on the record at 10:50.
Q. We're back on, again, Mr. Connell. And I -- we have everyone by phone who wants to be here.
I would like to focus for a bit on mergers between healthy institutions and failing

Page 71

institutions that required assistance from the Federal Savings Loan Insurance Corporation or FSLIC.
Okay?
A. All right, sir.
Q. In connection with that process, was there a requirement at any time that the acquiring institution's financials be reviewed to determine whether they had financial and managerial capabilities sufficient to handle the acquisition?
A. Yes.
MR. PIVNICK: Objection. Vague. Sorry.
A. Yes, sir, there would have been.
Q. And what was the purpose of that, as you understood it?
A. Well, basically, if you're going to have two institutions merging either with or without assistance, you want to make sure that the financial and managerial capability is there, that you're not creating a larger problem for the FSLIC down the road.
So you do review their financials, their management capability. You know, you want

Page 72

to get a sense of what their lending portfolio is like, et cetera, so that you're not creating another problem for yourself down the road.
Q. Now, was there any effort by either the FSLIC or the Federal Home Loan Bank Board to determine the viability of the merged entities when they're combined in the future?
MR. PIVNICK: Objection. Vague and lack of foundation.
A. Part of the FSLI -- well, one of the divisions of the FSLIC was the quantitative and analysis division, and that was their primary function.
The FSLIC had developed a model that they used for mergers, and they inputted the information that was provided to them by the supervisory agent regarding the financials of each of the institutions, the acquirer, and the failing institution.
They also inputted whatever financial arrangements may have been negotiated up to that point so they would get an idea that, okay, if -- if these provisions are agreed to and are granted, how will that impact the transactions.
So they had a model that you inputted

Page 73

all this information, and you would at least then be able to do some analysis as to whether or not from a financial point of view the merger made sense.
Q. Okay. Now, would that analysis from -- can I call it a viability analysis?
A. Yes, that's essentially what it was.
Q. Did that project into the future the viability of the combined institutions, and if so, how long a projection was it, if you recall?
A. It did project into the future. And my recollection is vague, but it seems like it was either 10 to 20 years in there. So it was a significant period of time beyond when the analysis was done.
Q. Now, you talked about the financial arrangements that had been negotiated up to that point in time.
Do you remember talking about that a minute ago?
A. Yes.
Q. For example, if FSLIC was going to contribute cash, that would be put into the viability model; is that correct?
A. That's correct.

Page 90

Now that -- see, that -- that may just be a personal thing, that definition, so to speak, because there could possibly be a definition of someone -- another supervisory agent that says as long as we participated in there or we jawboned or cajoled or had any role in that, they may not have called it, quote, a voluntary merger. Then they would have only looked at as long as there was no assistance, you know, but --
Q. Well, let's take the examples we've discussed before.
A. Okay.
Q. Okay. If you got materials together to create a bidders' package and sent that bidders' package out to third-party thrifts --
A. Uh-huh.
Q. -- would you believe that that was a supervisory merger?
A. Probably so, yeah.
Q. And I use that to distinguish between jawboning versus going out and actively soliciting an acquirer?
A. Yeah.
Q. Okay. Did there come a time in your

Page 91

experience in the fourth district in the 1980s, when thrifts were -- acquiring thrifts were asked to consider acquiring multiple thrifts at the same time as part of a package?
A. Yes, they were.
Q. Okay. And why was that, sir?
A. I think we may have covered this --
Q. Touched on it.
A. -- a little bit. Essentially the same answer in the sense that as we -- as the crisis unfolded, at that time it became obvious that doing a one-on-one merger was not going to help -- help us get through the caseload and still survive, have the FSLIC managed to not go bankrupt itself, which it did later.
So, you know, we again were using every kind of innovative thought process that we could to see how can we -- how can we preserve the assets of the FSLIC and use them most efficiently.
And so there began to be multiple deals where we had -- you know, we still had some fairly strong thrifts that had started out into the bad period of economic times with good strong net worth and capital.

Page 92

And as long as taking on the multiple thrifts wouldn't jeopardize their viability, then -- then there were a number of cases where they were asked to take more than one.
Q. Okay. Would you discuss with other supervisory agents in other districts what thrifts they had that were possible acquirers for thrifts of your region?
A. Yes. And that became -- you know, if someone came to us particularly from another district, then I would -- I or one of my counterparts would normally then call somebody from that district to find out whether this was going to be a waste of time or not to consider them a candidate.
Q. You had dealings with Mr. Vigna in the second district; correct?
A. That's correct.
Q. And several of the thrifts, including Anchor Savings, were thrifts that were viewed as having the managerial and financial capability to do mergers; correct?
A. That's correct.
Q. Others included Citifed in New Jersey and Carteret; correct?

Page 93

MR. PIVNICK: Objection. I think this gets beyond common and --
MR. MANNING: Not even close.
MR. PIVNICK: If you're asking if a specific institution that --
MR. MANNING: Forget it. You're wasting time with this.
MR. PIVNICK: Making my objection.
MR. MANNING: This will take two minutes. You're wasting time by doing this.
A. Yes.
Q. Okay.
A. To answer the question.
Q. Fine. Do you know whether thrifts from outside of your district viewed the Florida franchises as being important and valuable?
MR. PIVNICK: Objection. Lack of foundation.
A. Based on my experience and conversations with thrift executives, they certainly viewed Florida as a very attractive market.
Q. And did you use that view in negotiating with these potential acquirers to take thrifts outside of Florida as well as

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------:

| | |
|---|---|
| ANCHOR SAVINGS BANK FSB, | : |
| Plaintiff, | : No. |
| Vs. | : 95-39C |
| | : VIDEOTAPE |
| THE UNITED STATES OF AMERICA, | : DEPOSITION OF |
| Defendant. | : THURMAN C. |
| ----------------------------------- | : CONNELL |
| SOUTHERN CALIFORNIA SAVINGS & | : |
| LOAN ASSOCIATION, et al., | : |
| Plaintiff, | : CASE NO. 93-52C |
| | : |
| Vs. | : |
| | : |
| UNITED STATES OF AMERICA, | : |
| Defendant. | : |

-----------------------------------:

DEPOSITION OF THURMAN C. CONNELL, taken before Delayne M. Johnson, Certified Shorthand Reporter and Notary Public, at Chamber Conference Room, University Park Holiday Inn, West Des Moines, Iowa, commencing at 8:20 a.m., on June 30, 1999.

that were closed during your tenure?
A. Yes.
MS. JOHNSON: Objection. Vague.
THE WITNESS: Sorry.
A. Yes, it was.
Q. Under what circumstances would you not be the person who signed the documents?
A. More than likely only if I was not available due to travel or other logistical reasons.
MR. THOMPSON: Okay. All right, sir, at this time I'd like to have the reporter mark as AmBase Connell 13 a document that bears the Bates No. WOR0640001 through WOR0640097.
(AmBase Connell Deposition Exhibit No. 13 marked for identification.)
Q. And would you please identify this document for the record.
A. It's entitled Assistance Agreement between The Federal Savings and Loan Insurance Corporation and Carteret Savings Bank, Morristown, New Jersey, and it's dated June 6, 1986.
Q. And sir, on the very last page of this document, is that your signature?
A. Yes, sir, it is.



Q. And I'd like to direct your attention to page 70 of the document.
And would you take a moment, sir, to please review Section 18 of the assistance agreement which is entitled "Accounting Principles"?
A. All right.
Q. And did you understand this section to confer upon Carteret a contractual right to treat the supervisory goodwill resulting under the accounting of this transaction toward its regulatory capital requirements?
MS. JOHNSON: Objection. Leading, and the document speaks for itself.
A. Well, I'm not sure of, you know -- The language here says that it will be computations made in accordance with GAAP. And so it doesn't specifically refer to the goodwill itself, but if you go to the rules, then that would have been the case as we applied it in those days.
Q. And so it was your understanding at the time that you signed the document that Carteret would in fact -- to the extent goodwill was created, be able to count it toward its regulatory capital requirements?



MS. JOHNSON: Objection. Leading.
A. Yes.
Q. At this point I only have a few more questions on the AmBase case and I'd like to jump ahead in time to 1988, which was the year that the Home Group, which is now known as AmBase, acquired Carteret.
And were you aware of that fact prior to today's deposition that Carteret had been acquired by the Home Group?
A. You know, you hear about these things in conversations or read about them in the trade journals, et cetera.
I recollect that they — that there had been some disposition with the Carteret, but I wouldn't have been able to tell you exactly what.
Q. Right. Okay. And did you have any official involvement in the approval of the Home Group's application to acquire Carteret or any other official involvement in connection with that transaction?
A. No.
Q. At that time I take it, of 1988, you were president of the Federal Home Loan Bank of Des Moines; is that right?



A. That's correct.
MR. THOMPSON: Okay. At this point I wrote like to have marked as AmBase Connell 13 a document that bears the Bates No. FAM001005 through 0019.
MS. JOHNSON: I believe that would be Exhibit 14. I think the last exhibit was Exhibit 13.
(AmBase Connell Deposition Exhibit No. 14 marked for identification.)
Q. Sir, would you please identify this document for the record.
A. This is a Federal Home Loan Bank Board document.
It's from the supervisory agent in the Second District in New York.
It is an Application H-(c)1 filed by the Home Group, Inc., New York, New York to acquire control of Carteret Bancorp, Incorporated, Wilmington, Delaware, and its wholly-owned subsidiary, Carteret Savings Bank, Newark, New Jersey.
Q. Have you ever seen an application like this one, an Application H-(c)1?
A. I've seen them in my career, yes.

Page 427

MR. THOMPSON: Okay. That concludes my questioning on the AmBase case, and would you like to cross-examine the witness in connection with this case?
MS. JOHNSON: Could I have one minute?
THE WITNESS: Do you want to take more than that at this time?
MS. JOHNSON: Do you want to take a break?
THE WITNESS: Well --
MS. JOHNSON: Just a few minutes.
THE WITNESS: Well, let's just go ahead and finish. I'm getting a little seat-weary.
MR. THOMPSON: And then we'll take a break.
THE WITNESS: Fine.
MR. THOMPSON: Off the record.
(An off-the-record discussion was held.)
CROSS-EXAMINATION
BY MS. JOHNSON:
Q. Mr. Connell, what was the scope of your involvement in the negotiations of the acquisition of First Federal Savings and Loan by Carteret?

Page 428

A. Well, probably as the supervisory agent, I was -- you know, involved in very early discussions in trying to generate interest in doing the acquisition.
It's hard to kind of go back and put myself in the realm to know actually how involved because there was some cases where we did it almost completely in the district bank, but then because it was an interstate acquisition, then the FSLIC staff obviously becomes more involved, but I would have had considerable conversations and meetings with the potential acquirers, not only Carteret but the others that at some point had expressed some interest.
Q. And what would be the scope of those conversations?
A. Well, they would be pretty broad insofar as trying to explain FSLIC policy regarding, you know, what we were trying to accomplish at that time.
You know, the supervisory agents really were viewed as an extension of FSLIC staff, if you would, and -- but just like any other organization like that, you have the home office, so to speak, and then trying to control 12

Page 429

different other suboffices out in the field.
At a time where the financial system was undergoing a lot of stress, you know, sometimes you didn't exactly always get it right, and that's why you had to have memorandums going out from the home office explaining procedures and the guidelines, et cetera, so I'm not sure where you want me to go with this.
Q. Did the office in Washington handle the actual negotiations with Carteret?
A. I really don't recall. Quite often these things go through various stages.
You have the initial stage where the supervisory people are very heavily involved, and so there's some cases where you handle it all the way through and then you really submit it to the FSLIC staff although you've kept them apprised of what's going on all along, but then there would be high profile cases where the district bank supervisory people would be involved initially, and then there would be where you would kind of hand the case off to staff in Washington and then they would take over the negotiations.
This was early enough, and I don't think the world had started collapsing on us as

Page 430

badly at this time because Delray, I think, was fairly early into this process, so we would have been involved pretty extensively.
But quite often, particularly out-of-state acquirers, would use legal firms in Washington to represent them.
It was very easy for those firms just to go over physically to the Bank Board, have meetings, either with the Office of Examination and Supervision or with the FSLIC staff.
So, you know, it's hard for me to go back and really remember how involved I was in those negotiations.
Q. Okay. Did you or anyone who worked for you ever promise anyone from the thrift that even if the law and the regulations change, the thrift or the acquirer would be able to count supervisory goodwill toward regulatory capital for the life of the goodwill, and I'm referring to Carteret, First Federal Savings and Loan?
MR. THOMPSON: Objection to the form.
A. We never really felt a need to do that at that particular time so we wouldn't have.
Q. Do you recall any documents that promise that?

Page 431

MR. THOMPSON: Objection to the form.

A. No documents that would have said that specifically.

I think, you know, certain documents would certainly infer that, but that's a legal issue.

Q. After the acquisition did FSLIC still insure the deposits of the institution?

A. Yes, they would have with the caveat that I've said before assuming that they would have insured the accounts up to the limits allowed by law.

MS. JOHNSON: That concludes my questions.

MR. THOMPSON: There's no redirect examination and that concludes the AmBase portion of the deposition and at this time I'd like to take a short break.

(Short recess.)

MR. THOMPSON: We're back on the record.

Page 432

THURMAN C. CONNELL,

called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. THOMPSON:

Q. And Mr. Connell, we are now to the third of the cases, third and final cases that I'm going to be asking you about, and this one is Citizens Federal Savings Bank of Miami, Florida v. United States.

The lawsuit involves Citizens' acquisition of Equitable Savings Bank of Lancaster, Ohio, in 1986, July of 1986, and Citizens' acquisition of American Saving Bank of Springfield, Illinois, in December of 1988.

And do you recall having any role in the resolution of Equitable Savings Bank of Lancaster, Ohio, during your tenure at the FSLIC?

A. Not specifically, Mr. Thompson.

Q. Okay. And do you recall having any involvement?

A. Do we have still have anybody on the phone so that we have to speak up?

MR. THOMPSON: Off the record.

(An off-the-record discussion was held.)

Page 433

(No parties appearing by telephone right now.)

MR. THOMPSON: Back on the record.

Q. And your answer is that you don't recall at this time?

A. No, sir, I don't.

Q. Do you recall having been involved with the resolution of American Savings Bank of Springfield, Illinois?

Although it wasn't ultimately sold to Citizens until December of 1988, there were several bid conferences as early as 1987. I don't know if you recall being involved in that process.

A. Not at this time.

MR. THOMPSON: At this point I would like to have marked as Citizens Connell 1 a document that bears the Bates No. WOM0100502 and through 508.

(Citizens Connell Deposition Exhibit No. 1 was marked for identification.)

Q. And sir, would you please identify this document for the record.

A. This is the Issues Memorandum from

Page 434

myself as Acting Director of the FSLIC to the Federal Home Loan Bank Board. The date June 27, 1985.

Q. And that's -- why don't we stop there. The subject is Citizens' acquisition of Equitable Federal Savings Bank of Lancaster; is that right?

A. That's correct.

Q. Okay. Now, the date says 1985, but do you see underneath the listing of the Assets for Equitable where it says "as of April 30, 1986"?

A. Yes, sir, I do.

Q. And I'll represent to you that this deal closed on July 9, 1986.

Does that lead you to conclude that the date of this document ought to be June 27, 1986?

A. That would be a logical conclusion.

Q. Okay. Now, turning to the seventh page of this document, seventh and final page of this document, whose signature is that, sir?

A. Probably Mr. Daniel J. Kaschmitter.

Q. Okay. And that's very good deciphering?

A. He was the Director of the Mergers and Acquisition Division at that time or shortly