# EXHIBIT T

IN THE COURT OF FEDERAL CLAIMS

---------------------------------------x

AMBASE CORPORATION, et al.

v.

THE UNITED STATES OF AMERICA

---------------------------------------x

October 15, 1999

8:30: a.m.

200 Park Avenue

New York, New York

DEPOSITION of ROBERT ALBANESE, a witness in the above entitled matter, before a Notary Public of the State of New York

6

Corporation in this case, AmBase against the United States. With me today is Mr. Hamish Hume, he is absent at the moment, but he's my colleague.

Also here is Mr. Michael Carenzo, he represents the client, AmBase.

As I mentioned to you earlier, the FDIC as Receiver is a party Plaintiff in this case, as well as, as you know, having a dual role participating on the Defendant's side in other capacities.

But the FDIC will be represented here in due time, we expect, by Mr. Igo, Jim Igo.

Are you represented by counsel today?

A Yes.

Q Will counsel introduce herself?

MS. TORNATORE: Yes, my name is Toni Tornatore and I am with the Department of Justice, representing the United States.

Q Mr. Albanese, have you ever been deposed before?

A Yes.

Q Have you been deposed in connection with any of the so-called Winstar cases?

A No.

7

Q Would you describe for me the occasions on which you have been deposed?

A I have been a witness for the government in a number of criminal trials against CEO's of financial institutions who were charged with, obviously, criminal offenses, and I have been a government witness.

Q Were these criminal offenses in connection with the operation of federally insured savings and loan institutions?

A Yes.

Q What was the time frame? About how many of these cases have you been involved in?

A I have been involved in two, I would say the time frame was about -- most recent one was probably ten years ago.

Q Did those cases result in your testimony at a trial?

A Yes, both times.

Q Do you recall the name of those cases?

A I know that they were cases in which an individual named Carl Cardacio was the Defendant.

I don't recall which court or who

8

actually brought the action. It was a federal court, but it was Carl Cardacio was the Defendant.

Q Having been deposed and having actually been a witness at trial, you are experienced at this routine, so I am sure it's redundant to you for me to say just a few words about the ground rules, essentially.

But any time you don't fully understand any question I may ask you, don't hesitate to ask me to clarify it or otherwise to elaborate.

Your attorney may interject objections as we go, but unless your attorney actually instructs you not to answer on some appropriate grounds, such as attorney-client privilege or something, then you are nonetheless required to answer the question.

If at any time you need a break, just let me know.

So with those ground rules, could you describe or state what your title is?

A I am the Regional Director Northeast Region for the Office of Thrift Supervision.

Q What are your responsibilities, in summary?

9

A I am responsible for just about all the activity, supervisory activities of the OTS regulated institutions in the 13 states which comprise the Northeastern Region, basically the northeast United States and certain middle Atlantic states.

Those activities are examinations, supervision, corporate activities, processing of applications, enforcement; just about anything that we do as an agency with respect to insured savings institutions, regulated by the OTS, all within my responsibility in the northeast region.

MR. COOPER: Let the record show that Mr. Bianco has joined us, Mr. Dick Bianco.

Q I take it you know Mr. Bianco?

A Yes, I do.

Q The Northeast Region you say stretches from Maine, does it include Maine?

A Yes, it does.

Q And stretches all the way to?

A It's New England and some of the middle Atlantic states, as far south and west as West Virginia. It also includes Delaware, there are 13 states.

A Just Toni.
Q Do you know of anyone else within the OTS who has been deposed in connection with this particular case?
A Yes. I just happened to ask Toni this morning.
Q If the information came from your lawyer, I don't want to know the answer.
Tell me what you know about this case, Mr. Albanese.
A Well, I know it's one of many of what we call the goodwill cases.
It has to do with the failure of Carteret Savings Bank and the fact that the bank and the holding company are making a claim against the government because of the failure of the institution, and in some ways some of the actions that the government took, at least legislatively to eliminate goodwill, what we referred to I guess at the time as supervisory goodwill.
I don't know how much more specific I can get.
Q Are you familiar with the fact that the goodwill, the supervisory goodwill at issue in this case that was eliminated by the FIRREA



legislation arose out of acquisitions by the Carteret?
A That is almost always how it arose. I don't remember the acquisitions or the amounts, but I would -- I can't imagine how it would have arisen any other way.
Q Have you read any of the filings in this case?
A No.
Q Are you familiar with the Supreme Court's decision in the Winstar case?
A Only what I read in the paper, the newspaper.
Q How would you describe that decision?
A To my recollection, based upon what I read, the Plaintiff in that case, the government is the Defendant, was awarded a sizable sum by the courts in connection with the case.
Q Were you aware that it was just a breach of contract action?
A No.
Q A breach of contract for --
A I don't remember the specifics of why the judge would have or the court would have



reached the decision that it reached.
I recall reading an article about it and I recall certainly that there was what appeared to be a sizable sum involved in the damages part of the case.
Q Were you aware that the claim -- excuse me, that the claim for damages in the Winstar cases or in the Winstar case, and there were three related cases that were consolidated under the name Winstar, but they all alleged that the government had breached contracts to accord regulatory capital treatment to goodwill that had been bargained for in connection with acquisitions; were you aware of that?
A Well, I am aware of that argument generally. I have heard it naturally in my position, but I am not aware of anything specific involving Winstar and what might have happened in that case.
I didn't read anything about it, but I mean I know.
Q You know that's the general gravamen of these cases?
A Right, correct.
Q I think you suggested a moment ago



that you were not familiar with Carteret's acquisitions in 1982 and 1986 that gave rise to the supervisory goodwill that is involved in this case, is that correct?
A That's correct.
Q In your official capacities at the Bank Board and the New York bank I guess, I can't remember whether you had gone to the New York bank by then, by '82, but I guess you were certainly there by '86?
A I was there in '82.
Q But in connection with your responsibilities, you had, I take it, nothing to do with those acquisitions, Carteret's acquisitions?
A I don't believe so.
Certainly not -- I would not have been involved with Carteret in 1982.
In 1986, that was about the time I was -- I became the Director of Examinations, and the examination function had nothing to do with acquisitions, other than perhaps we might have done an eligibility -- we might have done an examination of the disappearing institution, but I don't recall having done anything like that.

42

Federal Savings Bank would have been the largest failure we would have had in the northeast, or in the New York District, and I think I was the Director of Examinations at that time, so I would not have been involved in the supervisory process.

But I'm not sure exactly the dates of the failure, so it could have been I was involved in the supervisory process, but City Federal would have been the largest one I think that we would have handled.

Q How large was City Federal?

A City Federal was probably in the neighborhood of $15 billion in assets. I could be wrong, but that's my recollection.

Q How -- was the Carteret failure one of the bigger failures in your supervisory responsibility?

A Yes.

Q What criteria in terms of capital, regulatory capital status was applied generally to determine whether or not to place a thrift in receivership?

A Again, I think we need to pinpoint a time, because we had a statutory change that happened somewhere in the early '90s which

43

Congress stepped in and pretty much gave us marching orders on what we needed to do at certain levels of capitalization with respect to institutions, and certainly that same type of statute didn't exist prior to 1990.

So it probably would depend upon what period of time we are talking about.

Q Well, describe that statutory change, let's start there.

A There is something called prompt corrective action, that's what it's referred to, which was basically passed by the Congress in the early '90s, which directs regulatory agencies to take certain actions with respect to getting institutions recapitalized, or if they are not recapitalized, if they can't be recapitalized, they can't themselves recapitalize, that we are supposed to move in and take certain actions.

Depending upon the capital level of the institution, the lower the capital goes, the less time the institutions are generally given to correct the problem and get back into capital compliance.

At a certain point, we would be expected to move the institution into

44

conservatorship or receivership, if the institution does not attain satisfactory capital levels.

Now, that's by statute post-FIRREA, I think was the Act.

Prior to the law, that wasn't the case, we didn't have those kinds of statutory directives from the legislature.

Q Are you referring now to the FDICIA, the statute known as FDICIA?

A Yes.

Q It goes by the acronym FDICIA?

A Yes. I said FIRREA?

Q I think you said post-FIRREA, meaning it came after the passage of FIRREA?

A No, it's FDICIA.

Q Well, prior to the enactment of this statute you are referring to, what were the criteria, capital?

A We always looked at capital and capital of the institutions, and we looked at the performance of the institutions, as to whether or not we felt as though they were improving/not improving.

I mean I should clarify that -- you

45

know, the impression that's created probably by my earlier comments is that the district or the region is operating as a feifdom.

It's something, when an institution is troubled, you are in constant conversation with the folks in D.C., the people at supervisory in DC, you are working on these things together, but we would look at capital and certainly we would look at trends, earnings trends, problem asset trends, management, many, many different criteria that would affect your judgment as a regulator as to whether or not an institution ought to be closed or ought not to be closed at a certain point in time.

Q With respect to regulatory capital, can you recall closing an institution that had positive tangible capital?

A I don't recall.

Q Do you not recall, or do you think it likely that you closed an institution that had positive tangible capital?

MS. TORNATORE: Objection, speculation. You may answer to the extent you can.

A Positive tangible capital?

46

Q Yes.
A I don't know. Honestly, I don't recall what -- whether we did that or we didn't.
Q Can you recall closing institutions that had negative tangible capital?
A Yes.
Q I take it you have closed many institutions in that profile?
A Yes. Getting back to your question.
Q Yes?
A Your earlier question, post-FDICIA you asked me to speculate, and I know my counsel has said not to speculate; but since the Congress at the time pretty much directed us to take certain actions at certain levels of capital and certainly we would have been expected to take action above -- at times when there was positive tangible capital, I think the answer to your question probably was yes.
Q After FDICIA you believe that you did close?
A I believe it's likely. I don't recall anything specifically, but I believe that it is contemplated in the Act that we would close an institution even if it had positive tangible

47

capital, if that tangible capital was so low as to present a risk or serious potential problem to the government and a risk to the taxpayers.
Q Prior to FDICIA, can you recall having closed an institution that was profitable?
MS. TORNATORE: Objection, vague as to profitable. You may answer, to the extent you can.
A I don't recall.
Q Do you recall having closed institutions that were not profitable?
A Often.
Q Do you think it was likely after enactment of FDICIA if you -- that you may have closed an institution that actually satisfied its tangible capital requirement?
A No.
Q How about prior to FDICIA?
A I don't recall prior to FDICIA any specific cases, so it's really hard for me to answer the question.
I think it's possible, I think there was serious management problems and serious loan problems where we had doubts. Maybe more than doubts, facts as to the potential losses in the

48

institution and potential losses in assets that hadn't yet been completely pinned down with formal appraisals, that we may have acted on on an institution knowing that it was insolvent.
Q Knowing that what?
A It was insolvent, that the losses were so severe, and that time was of the essence. But I can't recall specific cases.
The only case, like I said before that I can specifically recall right now, pre-FDICIA that I was involved with is Flushing Federal.
Q Well, if a -- if an institution was insolvent, then presumably it wouldn't satisfy its tangible capital requirement?
A That's correct.
MR. COOPER: Mr. Albanese, I would like to hand you -- I would actually like to have marked first as an exhibit a document that is stamped with number WOP 9161048.
(The above described document was marked Albanese Exhibit 1 for identification for identification.)
MR. COOPER: If you will review

49

that, please.
Q Mr. Albanese, will you identify this document, please?
A This is what's referred to as an informational report from the examiner in charge, Kevin Hoyt to me, Director of Examinations, that's what DE after my name is, it's dated April 8, 1988 and it's in reference to Carteret Savings Bank, F.A.
Q What were your responsibilities as DE? This was Director of Examinations you have referred to earlier, I take it?
A Yes. This is when I was in charge of the examination function, when I was put in charge of the examination function at the Federal Home Loan Bank for that three or four year period subsequent to 1986.
Q The second paragraph of that, of this informational report states that "As of this date, the examination has extended thoroughly into all major operating areas of the bank.
"The examiners are satisfied that management at all levels is competent. In addition, adequate procedures and controls

are incorporated in well-defined policy manuals to ensure continued safe and sound operations."
Did you agree with that judgment?
A Well, my responsibilities at the time would have not been to question the comments of the Examiner in Charge, particularly as you see there, it's initialed by TPM, he would have been the manager, that's Tim Murphy, would have been the manager.
So I would have had no reason to disagree with it.
Q The second paragraph makes reference to the acquisition of the Carteret Bancorp by the Home Group, and incidentally the Home Group became AmBase ultimately, the Plaintiff in this case.
Do you recall this acquisition in 1988?
A Yes.
Q By Home Group of Carteret?
A I recall that the Home Group acquired Carteret.
Q Were you involved in that acquisition?
A I don't believe so; other than in



the examination sense where we go in, as we did here, and did some kind of a field visit.
Q So you were not involved in the negotiation of the acquisition?
A I don't believe so.
Q The very last sentence on this informational report states that "based on examination findings thus far, the institution will receive an overall macro rating of 2."
I take it you would have no reason to disagree with that judgment?
A That's correct.
Q But if you had any involvement in connection with the Home Group's acquisition of Carteret, you don't recall it; is that right?
A Yes. Just so you know, again to clarify, at this time we were, this is the period of time where the departments were segregated and the Supervision Division of the Home Loan Bank would have been the group that would have evaluated and recommended approval of the acquisition.
The examination function would have done just the examination part of it, that's why I say what I say.



It's inconceivable to me that I would have had involvement outside of the examination process because of the way in which we were structured and what our responsibilities were.
Q I see. Were you aware at the time of the general terms of the acquisition?
A No.
Q Did you at any subsequent time become aware of any of the terms of the Home Group's acquisition of Carteret?
A Not that I recall.
Q Do you recall that Home Group, later AmBase, signed a regulatory capital maintenance agreement in connection with its 1988 acquisition of Carteret?
A I don't recall specifically, no.
MR. COOPER: I would like to suggest a short break. Would you be amenable to that?
THE WITNESS: Good by me.
(At this point in the proceedings there was a recess, after which the deposition continued as follows:)
MR. COOPER: I would like for the



reporter to mark as Exhibit 2 a document that is many pages, but the first page of which is stamped C-AM-A-0339588.
(The above described document was marked Albanese Exhibit 2 for identification, as of this date.)
Q Mr. Albanese, when FIRREA was enacted, how many thrifts would you say in your region were impacted by the provisions eliminating goodwill from tangible capital, and otherwise limiting goodwill in the calculation of regulatory capital?
A I couldn't tell you, I don't know.
Q But it was a substantial number of them?
A Well, again, I think we had to define substantial.
There were -- I really don't -- I don't know how many, but we are talking about 1989, 1990, that period.
Q FIRREA was enacted?
A Or FDICIA.
Q FIRREA, FIRREA was enacted in August of 1989.
A Okay.

58

them.
But I don't have a specific recollection beyond that, and I'm not even sure when that letter may have been written.
Q I take it it would have been after enactment of FIRREA in August, but prior to the effective date of the capital regulations in December?
A I don't know, it conceivably could be back to your earlier question, we could have sent it before the enactment, I don't recall.
Q But in any event, and I guess all I am getting at here is your best recollection for the kind of steps that you as a regulator and your colleagues took to help the members of the industry that were going to be severely impacted by the goodwill provisions of the new legislation.
Have you now provided me with all of your recollections on that?
A Yes.
Q Do you recall when Carteret itself began taking steps to cope with the regulatory capital provisions of FIRREA?
A My recollections of what happened with Carteret start to get real clear around the

59

time that Mr. Bianco took over.
Between 1989 and 1992 or so I have no recollection of what was happening with that case, and I don't think I had responsibility for it.
Q But you do recall that Mr. Bianco and his colleagues came to Carteret and assumed management of Carteret some time in the middle of 1991?
A I recall it being about that time. I'm glad you told me, because I just got through a minute ago saying I couldn't remember what year it was.
If it's 1991, thank you.
Q So, I take it your answer is you just don't recall what Carteret may have done to deal with the -- with FIRREA prior to the effective date of the regulations?
A No, nothing specific.
Q Mr. Albanese, Exhibit number 2 has been placed before you.
Would you identify that document, please?
A It's a Report of Examination dated May 22, 1989 done on Carteret Savings Bank, F.S.,

60

this was right about the time when OTS was created, interestingly.
It's a -- what we refer to as a full scope regular examination and it was done by Russell Meyer, Examiner in Charge.
Q His signature appears, I take it, on a page that has no number other than the Bates stamp number which the last two digits of which are 90.
A Yes, his name is stamped.
Q Who would a Report of Examination go to?
A At that time we would still have had separate functions, so this would have gone through a what we refer to as a field manager, and I think from another document I saw Tim Murphy's name, so I assume he was the field manager.
Then it would have gone through -- from him it would have gone up through an Assistant Director, I think that was the title, who put another layer of review.
On rare occasions it would get to me.
Q What would determine whether in the rare occasion a Report of Examination would

61

actually get to you, the Director of Examinations at that time, I take it?
A My recollection is that at the time we didn't have anything formal, but that I had told staff, basically told staff that reports that had major findings or problems, I wanted to know about it.
So, a report of a failing institution certainly would have gotten to me, or very adversely rated examination report.
And again, I don't even recall at the time whether we had four or five rating factors, because it changed, but one that had the worst rating factor would have come to me.
I basically left it to the judgment of the Assistant Director in any other case he thought it was something I ought to review.
Q In all other cases the Assistant Director was the final level of review for an examination report?
A Yes.
Q Once it was finalized within your shop, then where would it go?
Who would get a copy of an examination report?

A A report, again I don't remember the specific flow, because for certain reports there may have been a requirement that it go down to Washington, even for a certain rating.

I know at one time there was that situation, but I don't know, it could have been 1985, I mean I just recall generally.

I do know it would have gone to the Supervision Division, supervisory agent that I referred to before, and they would have gotten a report and reviewed it, because I believe, at this time anyway, in 1989, we were still separate functions and they would have been drafting a letter to the Board of Directors.

The report then would have been bundled together with the corrective action that the supervisory staff thought was necessary and sent to the Board of Directors.

I am sure a copy would have been sent to Washington.

Q A copy of all reports, or just a copy of the reports involving troubled thrifts?

A I believe a copy of all reports, I'm not 100 percent certain, but I believe a copy of all reports. It was discontinued at some point,



but I think in 1989 a copy of all reports may have still been being sent to Washington.

Q During this period of time, 1988, '89, is it correct to suggest that you were seeing more reports than perhaps in previous years because of the fact that those were difficult times for many thrifts in the country, but in your region as well?

A Certainly between 1986 when there was a period in there where things improved for a year or two with the industry, until 1989, 1990, this would have been, as you state, I would have been looking at more.

I would have certainly been looking at more than that, though, in the early to mid-'80s in my function in the Supervision Division, because problems were extremely severe then, too.

But yes, in '88 and '89 I would have been looking -- that probably was the busiest period subsequent to my being placed in charge of the Examination Division.

Q Is it also correct to suggest that one of the principal reasons for the troubles that many thrifts were experiencing were -- was the



real estate market and its recession during that period?

A Yes.

Q Does that contrast with the kind of difficulties the thrift industry experienced in the early '80s that you just referred to?

A Yes.

Q In what way?

A In the early '80s, the thrift industries experienced most of its problems due to a very -- due to interest rate risk, for the most part.

Balance sheets were much more fixed in term on the asset side, and institutions had huge negative spreads as the market interest rates rose to levels almost at 20 percent, yield curve inverted.

So the problems in the early '80s, while there were asset problems, most of the asset problems that we talk about '88, '89, institutions weren't even authorized to make in 1980 and 81, that was authorized for them in '82 with legislation.

So, in the early '80s the problems were mostly driven by negative spreads, high



interest rates and the fact that they were paying far higher rates for deposits than they were able to earn on the assets.

In the late '80s the primary problems were related to real estate losses and devaluations.

Q Which manifested itself in troubled assets owned by the thrift?

A That's correct.

Q Let me refer you to Page 8 of this document. The document is thick, but you will be happy to know there are only a few pages I am going to actually ask you to focus on.

Page 8, right around the middle of the page, what looks like the second paragraph after the term, after the word "conclusion," the statement reads, "The bank's management team appears capable and is qualified to deal with the current problems. They have acted decisively when they felt the need to change and should continue to do so in the future."

Do you have any reason to disagree with that statement?

A Do I have reason to disagree then or

it.
If you will mark that as Exhibit 3, please.
(The above described document was marked Albanese Exhibit 3 for identification, as of this date.)
Q If you will just take a look at that, Mr. Albanese, and identify it for me when you can.
A This is an S Memorandum prepared by -- actually I'm not sure who prepared it, it's signed by Angelo Vigna, and signed for me by Michael Simone.
It's dated October 25, 1991 and it's addressed to Tom Loeffler, who is the Assistant Director for Supervision Operations of OTS.
It basically covers the grounds for the appointment of a Receiver, lays out the grounds.
Q What was Mr. Loeffler's responsibilities at that time?
A I'm not sure.
He obviously was a person in our Washington headquarters who was involved in resolutions, and probably some interaction with



the RTC; kind of a liaison, perhaps.
I don't have a great recollection of spending much time or talking much with Tom Loeffler, so -- where I do with others.
Q I notice that there are copies sent to other personnel of the OTS, as well as personnel for the RTC and the FDIC.
Was that standard practice?
A Yes.
Q Was it also the typical practice, Mr. Albanese, that an S Memorandum, as this is denominated, would come from you through Mr. Vigna?
A Yes, I think that's correct.
Q What is an S Memorandum?
A Well, it pretty much -- as it indicates a footnote -- actual actually it doesn't on the surface.
This is a document that would be prepared to establish that grounds, in fact, exist for the appointment of a Receiver, and it would have gotten legal review.
It is something that would be sent to our Washington office, because decisions of this office would not have been delegated, meaning



the actual appointment of a Receiver, would not have been delegated to a Regional Director, it would have been required -- it would have required Washington approval, as you would suspect.
Q Well, what were the -- did S memoranda cover other subject matters or did they only deal with resolution type issues?
A I don't recall, I think -- I could look through it, if you want.
Q I don't mean this one in particular, I mean --
A No, my recollection is that S memoranda, that was the document, that was what the document was called when grounds for a Receiver or Conservator, I don't recall any other use of an S Memorandum. That's not to say that there wasn't.
If you had asked me I would have told you, if I hadn't looked at this document I wouldn't have known what this was, until looking at it.
Q You referenced earlier, if I heard you correctly, that an S Memorandum or at least some type of recommendation for appointment of a Receiver was called for from -- by Washington.



Did I hear you correctly?
A Well, that was the process, yes, the process was.
Q Tell me what the process was?
A The process was that grounds had to be established for the appointment of a Receiver, and that responsibility, the documentation of it would be given -- would rest with the regional office.
The document would be sent to Washington, it would be reviewed, the decision to actually appoint the receiver, the party that would make that decision would be outside the regional office, as I recall. It wasn't delegated.
Q Could the decision to prepare an S Memorandum be made in Washington or in the region?
A Well, when an institution was troubled, and at the point where a document like this would be prepared, clearly there was discussion back and forth. We wouldn't do this in a vacuum.
There would be staff in Washington, that also would be looking at institutions that potentially could be failing and be candidates

86

certainly for receivership and transferred to the RTC.

So we would have been in discussions with them, yes. It was a collaborative process.

Q Are you suggesting that a document of this kind would require the agreement of both the region and Washington before it would be prepared?

A Well, the document sometimes would be prepared, I'm not sure if I am getting to -- let me just say this, the document at times would be prepared because the grounds existed for the appointment of a Receiver.

That does not mean that there still wasn't the possibility of avoiding the receivership and that the region might not be working still to try to find a resolution that did not require a Receiver.

So, that's a different way of answering it, perhaps, but yes.

I mean the grounds could exist for the appointment of a Receiver for a considerable period of time while the region still was working a case, and that you would establish the grounds and perhaps still be working the case, but at some

87

point, at some point the receivership happened, so it was decided to go forward with the receivership.

Q That ultimate decision is made in Washington, I take it?

A The ultimate decision is made in Washington, yes.

A But the region would have heavy input into it.

Q Of course.

A And there isn't always complete agreement, sometimes as you are going through that process.

Otherwise you don't need people in the regions, frankly.

Q Is the ultimate decision maker on that the director of OTS?

A I don't recall.

At the time the Director of OTS or still a very strong deputy, at the time I believe the Director was Tim Ryan and Deputy Director was John Downey, I believe John Downey would have had a lot to say in it.

Clearly if the Director wanted or established that they were -- that something was

88

going to be done and that the grounds for the Receiver existed, obviously the Director being the head of the agency can make it happen.

Q Can you recall an occasion when your region, anyway, as opposed to any other region, but when your region made a recommendation in an S Memorandum such as this, for the appointment of a Receiver, that it was rejected in Washington?

A No, but I can -- I don't recall a specific case, but it would be likely though, in my opinion, that there could be cases where the grounds for the appointment of a Receiver were established and we did not have a Receivership.

Q Sure.

When you say the grounds for the establishment of a Receiver, could you describe generally what you are referring to?

A Well, what's contained in this S Memorandum of 19 pages is a lot of different things that go into it, but it is essentially establishing that one of the major findings, certainly, is that an institution is not meeting capital standards, and has got significant problems which we drew the conclusion that the Receiver is the best approach or an appropriate

89

approach.

Q When you are speaking of grounds for the appointment of a Receiver, am I correct in understanding that you mean the legal grounds as established by the governing statutes and regulations that guide the regulator's analysis on such issues as that?

A Yes.

Q On Page 2 of this document, which bears the Bates stamp ending in the numerals 31, the second paragraph after the heading "summary," the statement is made "mostly during the quarter

> ended June 30, 1991, Carteret experienced nearly a complete turnover in its executive management team and Board of Directors.
>
> "New individuals participating in the affairs of Carteret include Richard A. Bianco as Chairman of the Board, Chief Executive Officer and President to replace Robert B. O'Brien and Robert C Walsh, respectively, J. Wayne Moor, as chief loan workout officer to replace Richard Braun, Donald Kramer" -- and it goes on and names several more new management.

Turn now also to Page 18, if you

will, and I would like for you to note the first full paragraph on that page.
It states, "Mr. Bianco attracted Mr. Moor from AmeriFirst to take the Chief Loan Workout Officer position. Mr. Moor brings a wealth of accounting and real estate experience to Carteret from his past endeavors, including his work at AmeriFirst.
"Mr. Moor has attracted a skilled team of individuals to assist in Carteret's loan review and workout efforts.
"The individuals assisting Mr. Moor for the most part have worked with him for the most part while he was at AmeriFirst".
You mentioned that you recalled well when Mr. Bianco and his colleagues took over the management of Carteret?
A Yes.
Q Do you believe that was a positive development for the Carteret?
A Yes.
Q Why is that?
A There was a vast improvement in management over the prior management team.



Q So, it was your judgment as the principal regulator for this institution that Mr. Bianco and his colleagues provided good management to this institution?
A Yes.
Q How would you rate their management of the institution during the time they were there?
A Rate them as a management team or rate them –
Q Yes.
A They were a very strong management team.
Mr. Bianco brought in a good, solid Chief Financial Officer in Mr. Kramer, Mr. Moor was very well respected by our examination team in his resolution of problem assets, and Mr. Bianco himself was a pretty dynamic Chief Executive Officer.
Q Mr. Albanese, could you please turn to Page 19, and I will draw your attention to the final statement which is under the heading conclusion.
The statement is, "The statutory grounds exist for the appointment of a



Receiver for Carteret. We recommend that the Director take immediate action to appoint the RTC as Receiver for Carteret."
It bears a signature line for Mr. Vigna, although at least my copy and the copies that we are aware of don't have his signature.
Does yours?
A My copy does not.
Q Carteret wasn't seized at that time, was it?
A No.
Q Do you recall why?
A My recollection is that we were still on – working with the institution's management team, and the number of outside investors in order to try to raise – in order for them, frankly, to raise enough capital to meet a minimum standard that had been established which would have been necessary for the institution to remain independent and not transferred to the RTC.
I don't recall specifically, there were many different investor groups, and I don't recall the sequence of them, which ones we might have been talking to or they might have been talking to, although frankly we were all talking



to them at that time. We were pretty actively involved in the process.
Q You personally were actively involved in that process?
A Yes, I was involved.
Q Do you recall who the underwriters were that Mr. Bianco brought in to assist in that effort?
A You mean the different groups that came in?
The different -- the potential investor groups?
Q Well, actually here I am more referring to perhaps the investment bankers who assisted in trying to find interested and capable investors?
A No.
A I don't recall the underwriters.
MR. COOPER: If the reporter will please mark this as the next exhibit.
(The above described document was marked Albanese Exhibits 4 and 5 for identification, as of this date.)
MR. COOPER: Mr. Albanese, the reporter has just marked a document as

98

investor groups.
Q The investor groups are actually listed on the next page of Exhibit 5, and I am not going to name all these investor groups, but as you look down these names, it looks like there are roughly 20 names.
Do you recall any of these potential investors and having had contact yourself with any of them?
A Yes.
Q Which ones do you recall particularly?
A I specifically recall a meeting which we had in Jersey City with GE Capital and again, the Carteret team, management team there.
I think it's misspelled, but down in the third group, Cargill, there was a group that came in, it is misspelled, right?
It was the former Secretary of Defense or somebody in that group, I remember that one. I think we met with U.S. West, but I'm not sure about that.
We had some telephone conversations from time to time with other groups, but I couldn't say specifically which ones; maybe

99

Pennsylvania Teachers, we might have called them and talked to them, trying to determine just how serious groups were.
Q Mr. Albanese, would you say that you were impressed by the efforts that Mr. Bianco and his colleagues were making to find investors for this bank?
A Yes.
Q Were you impressed as well by the kind of contacts that Mr. Bianco had in the capital markets and the number of potential investors that he discussed this with?
A Yes, I believe we had discussions among ourselves.
That was one of the strengths that was -- that this team, this particular team brought in, and that was the ability to make contact with large investor groups and have those kinds of contacts.
I do recall that kind of discussion.
Q Do you think that there is anything more that Mr. Bianco and his colleagues could have done in order to attract interest in -- interested investors to possibly recapitalizing Carteret?
A I really couldn't say, I think

100

that's probably a good question to ask Mr. Bianco, but I could tell you that the honest answer to this is that we were not disappointed in the efforts that were being made to raise the capital. Whether he could have done more, I couldn't tell you.
Q Is it accurate to say that the effort, including your personal effort to find investors, was a very active and energetic one?
A Yes.
Q Did it involve Washington personnel of OTS, were they involved or knowledgeable of the efforts that were being made?
A They certainly were very aware of what we are doing, because we were briefing them very frequently by telephone or by memo.
But many, many phone calls, so they were involved actively.
I don't recall if anybody in our Washington office may have met with an investor group or not. It's possible, but I don't recall.
It wasn't typically done, but it's possible in this case it was done, I just don't recall.
MR. COOPER: I ask the reporter to

101

mark this document which bears Bates stamp WOP 3340714 as Exhibit 6, please.
(The above described document was marked Albanese Exhibit 6 for identification, as of this date.)
Q Mr. Albanese, can you identify Exhibit 6 for me, please?
A I'm not sure.
It's in a format, but I don't recall ever seeing like this, but it seems to be a memorandum that Rock Tonkel sent to Timothy Ryan.
Rock Tonkel, I don't remember what his position was, but Mr. Ryan had brought him in, he worked out of our Washington office and he did work on troubled cases and raising capital.
Mr. Ryan was the head of the agency.
It appears to be a memorandum from Mr. Tonkel to Mr. Ryan regarding the current status of Carteret Savings, which then was forwarded to us, I guess, because five days later it's forwarded from Angelo Vigna to myself, Michael Simone and Robin Snyder.
Q So then the author, I take it, of this memorandum or of the substantive part of the memorandum, is Mr. Tonkel?

126

A Well, whether we establish reserves, you generally establish them in two ways, you establish them against specific troubled assets, then you have a general reserve that's established against the entire portfolio.

The point that was trying to be made here is that this number, and when you look at this number, you measure it against gross assets, it's 28 percent, and I don't recall what the industry standards were at the time.

But obviously we were trying to make a point that it had a -- the New York Director of the FDIC that if you actually looked at the level of reserves against the part of the portfolio that was not performing, that number was significant.

I assume that's the point I was trying to make there, versus just looking at the entire asset portfolio, because some of the assets in there were performing, but I don't know what I was thinking beyond that at the time.

I clearly made a distinction.

Q So, then I take it the 28 percent of gross commercial assets, if you applied the valuation reserves against only the part that was not performing, the valuation reserves would

127

constitute a percentage of the nonperforming assets, that's considerably higher than 28 percent?

A Yes, but that's always the case, just so we are clear here.

If they are establishing a general reserve against -- and they are required to, against a performing portfolio, if you take that out the percentage is going to be higher.

That's why I say I'm not exactly sure why I made this point, but I made it consciously.

But your statement is correct.

Q Is it fair to say that in light of these points and the achievements that are noted in this paragraph, that you were comfortable at that time with the adequacy of the valuation reserve against the remaining troubled asset portfolio?

A It certainly follows that if I am making that point to the Regional Director for the FDIC, yes, we were comfortable or we wouldn't have made a point for the reason for granting the extension, so we were comfortable, yes.

Q The next paragraph, Mr. Albanese,

128

states, "In conclusion, we believe that the termination of the agreement and the underwriting process, while progress is being made to recapitalize a troubled institution with assets of over $5 billion, would not be effective supervision or good policy, particularly when we have an executed agreement authorizing the termination of the agreement prior to August 28, 1992."

Is it correct to read that paragraph to say, or am I correct in understanding that you were simply making the point that pursuant to the agreement, you can halt the underwriting process and transfer the thrift to the RTC, essentially at will, and why do that while it's not representing a threat to the insurance fund?

A Well, I wouldn't say it that way.

I would say that an institution that's thinly capitalized represents a threat.

A better way to say it is why do that when the institution is improving.

Q Fair enough.

A And we don't see a need at this time for an immediate transfer.

129

Q If the institution starts to trend south instead of north, so to speak, you can take action at a moment's notice under this agreement?

A Or if the investors dry up, right. That's correct.

Q Do you recall in light of this correspondence if Mr. Ketcha's objection, if he basically removed his objection?

A I don't believe he removed his objection, I don't recall anything where he would have removed his objection.

I also don't recall getting any calls from our Washington office about calls they may have gotten from the FDIC headquarters.

I don't know what happened, but I don't recall getting those kinds of calls which we might have gotten.

Q In other words you would have expected to get a call if the FDIC's or Mr. Ketcha's objections were adamant or strenuous, notwithstanding this correspondence?

A Yes, I would expect that we would have gotten a call if it got that serious, but I don't know.

There may have been calls and our

138

date.
"Frankly we did not view the transfer date, whether it was November 20, December 4 or January 4th, to be a critical factor in our analysis of the situation."
Now, at the beginning of that paragraph you say the institution's financial condition continued to improve.
In what way, do you recall how it continued to improve?
A My recollection generally is that it continued to be more profitable as time went on, and the problem assets continued to decline. Those are the two things I remember.
Q I take it also that the as time went on during it period, the economy generally for thrift businesses was improving as well, is that true?
A Again, based upon what you showed me before, that would be a fact, I don't know whether I factored that into the thinking then when I wrote this.
I believe I was focused more on the critical factors that we looked at while an institution was still open, I don't know if I

139

would have factored that into my thinking.
Q Really?
A I may have, but -- I don't recall that being -- I do recall those two other things.
Q Would it be fair to say that improvement in a general climate of industry improvement might be more meaningful than some idiosyncracy of a thrift institution that was going against the otherwise trend?
A I wouldn't necessarily agree with that. We have situations where the economy is improving, interest rates are coming down and institutions are going to hell in a handbasket.
Q And you say that, "supervisory risk of loss, while it remained open, was very low."
Again, is that because -- well, just could you elaborate on that?
A Well, our view was that the institution was profitable, it was improving and that a lot of the trends that we look at were going in the right direction, and so that the likelihood of a costly failure was not great, we didn't see anything that would create that scenario, other than the fact that the institution was very thinly capitalized.

140

But the trends were very positive, so we -- that must have been, that's my thinking now, I think that was my thinking then.
Q Is it accurate that if the trends that you cite here continue, that the risk of loss to the insurance fund would continue to be diminished as long as the thrift improved?
A That's a big if, though.
The flip side of this, is that different people viewed this and different people had different views.
I mean obviously I wrote this, obviously we felt that way.
Other people perceived the risk, higher levels in the organization differently, and that because the institution is thinly capitalized, there is so little margin for error, if we as a supervisory group miss something and something negative were to happen, then perhaps we wouldn't be correct in our view, and that's the way the process works; we make the recommendation, somebody else goes, makes the decision.
Our view was that clearly and my view was, I wrote the memo, that the risk of loss was low and that the situation was improving.

141

Obviously if the profitability continued to improve and the problem assets continued to decline, which probably would enhance profitability, and nothing else unforeseen happened, given the tenuous capital position of this institution, negative happened, then I would say your statement is correct. But it's somewhat complicated.
Q This makes reference to the perceived benefit of an early transfer date.
Do you know what perceived benefit might have been in the minds of anyone interested in seizing the institution?
A I don't know why I wrote that that way. I could speculate, but that would be speculation.
Q Let me ask you this, what are the costs of transferring an institution to the RTC -- of placing an institution in receivership?
A Well, the costs of actually doing the action isn't very great, there are obviously costs subsequent to the transfer of running the institution, the number of employees you need to run the institution.
The other costs that has been

recapitalization of the bank and, in fact, when that opportunity was lost, the taxpayers had to spend some amount of money in resolving this institution?

A Clearly that was the intent of the memo in that particular section. I am not going to disagree with you.

We operated under the assumption that transferring the institution, taking it out of the private sector, so to speak, given the progress that was being made, one, eliminated -- would eliminate the opportunity to bring that capital in, and two, based upon our experience at that time, was likely to result in assets being sold at discounts in such a way that would result in losses to the government.

That's clearly what this memo is getting at.

Q Do you recall what Mr. Fiechter's response was to these points in your telephone conference?

A My only recollection about this, and I don't know if it was in response to this particular memo or a subsequent call, was that at some point, it may have been right around this



time, the discussion was that we don't have an unlimited number of extensions that we can make, that we are expected by statute to do something, and that while we hear what you are saying, there is going to come a point at which we have to transfer the institution.

Q So, at the end of the day, so to speak, your view did not prevail and the decision was taken to go ahead and seize the bank on December 4th?

A Correct. I do think there was subsequent discussion, I don't think that this was the last discussion, I believe we had subsequent discussions even to this memo where we talked about it.

Q Where you talked about the pros and cons of the decision?

A Yes, particularly with respect to the bank, was it PNC or First Gibralter -- there were a number of banks that were out there, and -- so we had subsequent discussions.

I don't recall if this particular memo precipitated those calls or if it was a week later.

Q Well, you mentioned PNC? You have a



recollection of that, why don't I see if I can assist your recollection of the PNC piece.

MR. COOPER: I am going to ask the reporter to mark this document, which is Bates stamped AMBO 78491 as Exhibit 10.

(The above described document was marked Albanese Exhibit 10 for identification, as of this date.)

MR. COOPER: If you might take a look at that, please.

Q Mr. Albanese, this is a letter written by Mr. Bianco to Mr. Ryan, Timothy Ryan and I notice that you are not copied on here, but Mr. Vigna is, so I guess it's possible you got a copy of it.

Do you recall this letter?

A I don't recall this letter.

Q It references PNC Financial Corp. and a possible deal that Mr. Bianco was trying to put together on December 2nd and in which Mr. Bianco urgently seeks time to work that deal through.

Does that refresh your recollection about PNC, since you mentioned that?

A Yes.



Q Who made the decision to seize Carteret?

A Well, the way the process works is we make recommendations and we are obviously involved right up to the end in making recommendations.

The way the process works is eventually somebody at the D.C. level will make the decision to close the institution, to seize the institution.

I don't know who ultimately had that responsibility, whether it was John Downey, or Tim Ryan himself.

Q Well, the decision couldn't possibly be made without Mr. Ryan's acquiescence at least, is that true?

A Well, it wasn't going to be made over his objection.

Q Yes, that's for sure. Is it safe to say that the decision had his knowledge?

A I would assume so, yes, particularly since he got this letter.

Q You don't have any independent knowledge, or at least recollection right now as to whether or not he was the specific individual

150

who made this decision to close Carteret?
A Let me just say I don't even know if our process was the Director of the agency will sign off on all transfers, I don't know that.
I do believe he knew about it, based upon other conversations that he had discussions with Jonathan Fiechter and conversations which were conveyed back to us which indicated to us that he knew, certainly, and was involved in a decision.
Q Did you have any conversations with him?
A No.
Q Did you have discussion conversations with Mr. Downey about this at this eleventh hour time frame?
A I believe we had -- I recall a conversation, a conference call that Angelo Vigna and I had with John Downey very late discussing PNC, whether it was December 2nd or November 30th I couldn't tell you, but it was pretty late; talking about what was the real possibility that a deal like this could get done.
Q What do you recall about that conversation?

151

A My recollection is that time was an issue, clearly.
That we were going to start another round of due diligence, essentially, and it was going to take some time.
And that people in leadership positions in the agency, the top levels of the agency had reached a decision that they did not want to have any further time extentions.
Q In that conversation, did you make essentially the same points that you had made in your letter concerning the possible benefits of pursuing these recapitalization possibilities?
A I recall very late in the process still, not just myself, but both Angelo Vigna and myself making the statement that we did not see the time urgency, despite the statute, but that there was a difference of opinion clearly and that's what those people in those specific processes is supposed to be, that we make the recommendations, but the decision is someone else's, we can easily be overruled on those types of things.
Q Let me ask you this, do you recall anybody in the Northeast Region, any of your

152

subordinates who disagreed with your view that as you put it, you didn't see the time urgency of transferring Carteret?
A I don't know if they would tell us that if they did, but no.
Q I will send some of my associates over then.
A I would tell you, though, that I can't say with certainty that there was not disagreement, I'm not aware of any.
Q You don't recall any?
A Right.
Q Well, let me ask you this, do you recall whether subordinates of yours who had any direct supervisory responsibility for Carteret agreed with that, with your view?
A That?
Q Your view that Carteret should not be transferred at this date?
A Geez, let me think.
I believe at the RTC closing meeting, the day the RTC took control, there was one manager or one person that reports to me who felt that way, yes, who expressed it.
It might have been John Griffin, I

153

don't recall.
I recall having -- there was a discussion at what they call the staging meeting.
Q Staging?
A Before the RTC took over an institution, people that would be going in to do the takeover action would meet and then would leave from a central location to go to the institution at the same time, so everybody arrived at the same time, and we were at that meeting.
Q I see, that would have been then on either December 4th or perhaps the day before?
A It would have been the day of the actual.
Q The actual day of the seizure?
A Yes.
Q And your best recollection is that Mr. Griffin may have expressed that sentiment to you?
A Somebody at the table did, there were five or six OTS people at the table.
But I don't know if there was disagreement or if others felt differently.
Q How many RTC people were at the table, at the staging meeting?

A I would say between 50 and 100.
Q 50 and 100?
I guess I was expecting you to say five.
So these are big meetings?
A It wasn't a meeting, this was -- the decision had been made the institution was going to be seized, and they just don't want everybody strolling in at 1:15, 1:25; everybody would assemble and they would -- I didn't go to a lot of these, but they would assemble and then they would descend upon the institution and take control, yeah.
It's not unlike FDIC seizures of failing banks, that's generally how they are done.
Q Well, earlier you called it a staging meeting, I thought?
A I think that that's what they refer to it as, it sticks in the back of my head.
I guess they all stage, got together and maybe that's the wrong word, but it was the meeting, the gathering in anticipation of seizing the institution.
Q Mr. Albanese, as the principal regulator in the Northeast Region or one of the



two principal regulators in the Northeast Region in a sense throughout the '90s, you are familiar with the fact that the thrift industry generally has done very well or did very, very well during the period from beginning early 1993, are you not?
A Yes.
Q If Carteret had been given more time, do you believe that it would have survived?
MS. TORNATORE: I object as to speculation.
You may answer to the extent you can answer.
A I believe that the positive trends that were happening at the time continued and that nothing large and unforeseen in way of a loss, big problem asset loss happened, that given the conversion activity that's happened in the industry, from stock conversions, public IPOs, that Carteret had an opportunity, a good opportunity to raise capital at some point through that process.
The risk would have been, again, if something happened in the early years, the early stages subsequent to any extension we might have given them, it could have taken the institution



down, and obviously all bets are off on their ability to raise capital.
But if the positive trends had continued, I think they had an opportunity to raise capital, given what's happened in the past six or seven years.
Q Your opinion at the time was they had a good chance of surviving, obviously, in light of the position that you took, and just so that I am clear on my question, based upon your knowledge of the events that occurred in the industry since the seizure, do you know of anything that would change your mind about that?
A No, I mean I am clearly indicating in this memo that I say December 4th or January 4th, so I am going beyond the date clearly that I have been identified.
What this is saying is that why the emphasis on time?
What's the issue? The institution is improving themselves.
Clearly I am conveying in this memo again that we believe the institution was improving.
So, barring some unforeseen event



that would have taken a thinly capitalized institution, and bear with me, I mean even after an outside capital infusion, this institution still would have been barely, barely meeting its minimum capital requirements, so barring something unforeseen, given how positive the stock market has been, I would say that you are correct, that this -- I don't see any reason why this institution would have had a difficult time raising capital, given those assumptions.
But it assumes a continuation of the positive trend.
Q It is also, would you agree, based upon your knowledge of the thrift itself, its management and the other things that you knew about the thrift, and which formed the basis for your opinion at the time?
A Based upon everything we had seen up to that point, I could not have written a memo like this, particularly at this late date, making this kind of a recommendation, unless we thought that progress was being made and a team was in place that could continue the progress.
Q If Carteret had survived, if it were around today and would be managed by -- continued