# EXHIBIT U

IN THE COURT OF FEDERAL CLAIMS

----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

----------------------------------------x

October 26, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of ANGELO A. VIGNA, a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

That actually was a criminal action. I don't recall the others.

Q Do you remember what general time frame that those trials took place?

A One was in the '70s, probably all, maybe one of them was in the '80s, early '80s

Q Early '80s?

A Yes, or '70s.

Q So to your recollection you haven't testified at trial since the early '80s?

A Yes.

Q Mr. Vigna, how did you prepare for this deposition today?

A I haven't done any preparation.

Q Have you talked about the deposition with anybody?

A No.

Q Other than your counsel.

Have you reviewed any documents in preparation for this deposition?

A No.

Q Did you review documents in preparation for your deposition that you gave previously in the so-called common discovery deposition?



A No.

Q Have you spoken with anybody who has previously been deposed in connection with this case, the AmBase Corporation case?

A In regards to the case itself?

Q Yes.

A No.

Q Can you tell me what you know about this case?

MR. LEVITT: Objection on the ground that it's vague and overbroad, but do what you can.

A Well, certainly a significant amount about the case. I was involved with Carteret for many years, from its hey-days to its problem days to its final ending.

Q I well understand your involvement as a regulator. I apologize, my question was vague.

About the particular claims in this action, this action pending in the Court of Federal Claims.

MR. LEVITT: Same objection, you can go ahead and answer.

A I'm not sure what the specific



claims are. I mean, I haven't looked at the case from that respect at all. I can imagine what it is, but I haven't -- I don't know specifically.

Q Do you recall an action brought by Carteret in early 1991 seeking injunctive relief against the government and OTS in particular?

MR. LEVITT: Objection on the grounds of relevance, but you can answer.

A I have some recollection of some kind of action that was taken.

Q Do you remember the court entering a temporary restraining order and a preliminary injunction?

A Yes.

Q Do you recall what the nature of that injunction was?

A I don't recall specifically, no.

Q If I suggested to you that the case involved the exclusion under FIRREA and its implementing regulations of supervisory goodwill from regulatory capital, would that refresh your recollection?

A Probably.

Q Does it?

A Yes, it does.



Q What is your recollection as refreshed?

A Simply that that action was filed.

Q Do you recall that the court essentially enjoined OTS, the regulators, to accord regulatory capital treatment to unamortized supervisory goodwill in that case?

A Yes.

Q I take it you have not read any of the filings that have been made in connection with this case.

A I have not.

Q Are you familiar with the Supreme Court's decision in a case called Winstar Corporation against the United States?

A Yes, generally.

Q Could you describe your general knowledge about that case?

MR. LEVITT: Objection as to relevance, but go ahead.

A My best recollection is that essentially the court said that the government didn't have the right to withhold goodwill as part of capital as per contractual agreement between the government and the acquiring institutions.

14

Q Can you recall whether or not the District Court in the injunction action in this case that we referred to just a moment ago in which the District Court concluded in that case as well that Carteret had a contractual right to include its supervisory goodwill, unamortized supervisory goodwill in regulatory capital?

THE WITNESS: Could you read that question back.

(The question requested was read back by the reporter.)

MR. LEVITT: Objection, because it implies that the District Judge and the Supreme Court came out the same way, when they came out diametrically opposite each other, and further, it's a vague question.

But to the extent you can answer, please do so.

A No.

Q No, you don't recall the --

A No.

Q Do you have any recollection, Mr. Vigna, of the acquisitions made by Carteret in which the supervisory goodwill at issue in this case arose?

15

A Yes.

Q Do you recall when those acquisitions took place?

A Well, all through the '80s, mostly in the mid to late 1980s.

Q Do you recall the 1982 acquisition of, by Carteret, of a thrift called Barton Savings and Loan of Newark, New Jersey?

A Yes.

Q Do you also recall that in connection with that acquisition Carteret also acquired First Federal Savings and Loan of Del Rey Beach, Florida?

A Yes.

Q Could you describe for me, please, your involvement in that 1982 transaction.

MR. LEVITT: If you had any.

A Well, I was involved, since I was the senior regulator out of the Federal Home Loan Bank of New York.

Del Rey was a Washington transaction, because I think it was assisted. Barton was an institution in our district, so at least, the best of my recollection at least we made a recommendation on the transaction.

16

Q Do you recall what that recommendation was?

A We recommended approval.

MR. COOPER: I'd like the reporter please to mark as Exhibit 1 a document that is stamped C-AM-A 0385267 on its first page, and it's a two page document.

(The above-described document was marked Vigna Exhibit 1 for identification, as of this date.)

Q Mr. Vigna, would you please identify this document?

A Well, it appears to be a letter from Robert O'Brien, President and CEO of Carteret Savings, to myself as supervisory agent in regards to the Barton transaction.

Q Dated July 7, 1982?

A Yes.

Q Do you have any present recollection of this document?

A No.

Q Do you recall the nature and extent of Barton's problems at the time that its acquisition was being contemplated and ultimately transacted in 1982?

17

A No.

Q Mr. Vigna, in the first paragraph of this letter the statement is made, "In response to a request from the Federal Home Loan Bank Board, the officers and staff of Carteret have prepared a purchase of assets FSLIC assistance bid which we presented to our Board of Directors today and which they approved unanimously."

Do you recall the request that was made by the Bank Board to Carteret that is referred to here?

A No, I don't.

Q Was Carteret on a list of healthy acquirers of sick thrifts at this time?

A Yes, it was.

Q Tell me about the list that you're referring to.

MR. LEVITT: Objection, vague, but go ahead.

A I don't think it was a -- I don't know if we formalized a list, writing names down on a piece of paper, we might have, but it was those institutions in the region that were healthy and had the financial and management resources to

acquire other institutions, particularly in this period of time when we had a lot of unhealthy and troubled institutions.

Q This was a period of time where the thrift industry, the regulated thrifts, were having great difficulties, is that accurate?

A Yes.

Q What were the nature of those problems at that time?

A It was primarily negative interest rate spreads, cost of funds exceeding their return on their assets, a consequence of the old savings and loan structure.

Q How so?

A Well, you know, savings and loans primarily could only make fixed rate loans, and for many years they were protected on both the asset side and liability side so that there was -- it was control of rates on both sides, so there was always a positive spread between the two.

But when interest rates, when the liability side was deregulated, interest rates rose and we had a situation where their cost of funds greatly exceeded their return on their assets, and as a consequence, it eroded the



capital of a lot of institutions and they became insolvent.

That was the primary problem around this time.

Q I see. Do you recall if that was essentially Barton's problem at that time?

A My recollection is that that was the problem. They may have had a problem asset or two, but I think it was primarily a negative spread problem.

Q You mentioned earlier and it's obvious that the Del Rey thrift was a Florida thrift outside of your regulatory geography, geographic area.

A Yes.

Q But do you recall if the problems that the Del-Rey thrift had were of this negative spread variety that you've just described?

A I don't recall specifically whether it was or not.

Q What was the time frame, to the best of your recollection, that this particular problem was plaguing the industry?

A Well, I think it started in the late '70s and it ran into the early '80s.



Q Were you and your colleagues in the, I take it what was called the New York district, experiencing a lot of insolvencies in connection with this?

A A significant amount, yes.

Q When a thrift like Barton got in trouble, started heading south, so to speak, what kinds of actions would you, Mr. Vigna, and your colleagues as the regulators take?

A We would, initially we would try to see if there was a way to resolve the problem.

There would generally be some enforcement action taken, some kind of agreement to control the institution's operations, and if the institution wasn't able to come up with a recovery plan that made sense, or in our view the performance indicated they were going to run out of capital, we would try and find an acquirer for them.

Q In attempting to find an acquirer, I take it you were making reference to another healthy thrift or some other type of financial institution, someone with the wherewithal to acquire a sick thrift?

A Yes.



Q And Carteret was viewed at this time as this kind of healthy thrift?

A Yes.

Q Was Carteret one of the larger savings and loan institutions in your area?

A Yes.

Q Relatively speaking, was it the largest?

A No, I think it was probably at least behind City Federalin New Jersey. City Federal was a little bit bigger. There might have been a few institutions in New York that were bigger than Carteret also.

Q Would you say it was in the top five percent in terms of size of the total number of thrifts that you regulated?

A Yes.

Q You do not have any recollection of shopping Barton, so to speak, to healthy acquirers?

A No.

Q The second paragraph, Mr. Vigna, of the letter, states, "Our proposal consists of a purchase of assets of Barton Savings and Loan Association under acceptable

Home Loan Bank Board.
A That's correct.
Q Is this what is typically referred to in connection with these supervisory transactions as a forebearance letter?
A Yes. This is a forebearance letter.
My previous answer was incorrect. I referred to this as the approval document. It isn't.
Q Okay. As you mentioned earlier, this document was issued in connection with the mergers of both First Federal S & L Association of Del Rey Beach and Barton Savings, and throughout the document it refers to both Del Rey and Barton.
Does this document confirm that Del Rey and Barton were both part of the same transaction?
A Yes.
Q The first sentence of Paragraph numbered 1 says, "The assets acquired by Carteret from Del Rey and Barton will be deemed to have been acquired in mergers instituted for supervisory reasons."
The term "supervisory reasons," is that a term consistent with our earlier discussion



about the nature of supervisory acquisitions and mergers?
MR. LEVITT: Would you read that back, please.
(The question requested was read back by the reporter.)
MR. LEVITT: Objection on the grounds of unintelligibility.
MR. COOPER: Let me withdraw the question.
Q What were supervisory reasons?
A It's a broad term. It would cover financial as well as management reasons for a -- or operational reasons for being considered a supervisory case.
Q But as I understood your earlier testimony, a supervisory case was one in which the thrift was in trouble and whose acquisition was being promoted and encouraged by the regulators.
A A supervisory case was one in which the institution was unable to continue to act independently for a variety of reasons, financial, management, regulatory.
Q Okay. On Page numbered 3 and Bates stamped WOF 0112102, in Paragraph 10 it makes



clear there, does it not, Mr. Vigna, that the transaction was to be accounted for, and now I'm going to quote from the document, "In accordance with generally accepted accounting principles as GAAP existed at the time of the Bank Board's approval of the mergers."
MR. LEVITT: What's the question?
Q Is that, number 1, accurate?
A Based on my reading of item 10 here, yes.
Q This forebearance letter is dated September 30, 1982. Was that prior to the effective date of FASB 72, to your recollection?
A I really don't recall when FASB 72 was effective.
Q Was it common for transactions, supervisory acquisitions like this one, to specify by date the accounting principles that would be applied to account for the acquisition?
A No.
Q It was not?
A No.
Q What would have been the purpose of specifying the date in this acquisition?
MR. LEVITT: Objection. I don't



think he can know that.
A My assumption is that, that in fact the Carteret people as a condition to the, their acquisition, wanted to use the old purchase accounting standards and that's why that's here.
But that's just based on my reading and not my recollection of the facts as they occurred at the time.
Q That's fair enough. Thank you.
Mr. Vigna, I recall from your common deposition that you were the Acting Director of FSLIC during a period of time in 1985 or in 1986.
Can you refresh my recollection for the dates when you were at FSLIC?
A I was at FSLIC from the latter part of November 1985 into May of 1986.
Q Do you recall that in June of 1986 Carteret acquired First Federal Savings and Loan of Blacksburg, Virginia and Mountain Security Savings Association of Wytheville, Virginia?
A Yes.
Q You do recall that?
A Yes.
Q Were you involved in that?
A Yes.

Q You were?
A As the Acting Director. I wasn't involved specifically in the negotiations, but I was well aware of what was going on in the case.
Q What is your recollection in terms of what was going on in the case?
A Well, my recollection is that they were really interested in one of those two, and that we were interested in getting rid of the other one also, so we kind of linked them together.
Q Do you remember which one was which?
A No.
Q You don't?
A No.
Q When you say you linked them together, would you explain that?
A Well, one of them was what we'd call a real dog. Nobody under any condition wanted it. And there were situations where we had a healthy institution interested in an acquisition, and FSLIC policy at the time was that as -- in order to acquire a desirable institution, they'd have to take one that was less desirable that we had trouble finding a solution for short of



liquidation.
Q And your recollection is that was this kind of case?
A That's my recollection.
Q Let me ask you this, with respect to the 1982 transaction of Barton and Del Rey, do you recall whether or not either one of those thrifts would fall into the category of one that fell under the description that you have just provided with respect to the '86 transaction?
A My best recollection is that wasn't the case with Barton and Del Rey.
Q Do you recall how much goodwill was booked by Carteret, supervisory goodwill was booked by Carteret in connection with the 1982 transaction?
A No.
Q Do you recall how much supervisory goodwill was booked by Carteret in connection with the 1986 transaction?
A No.
Q Mr. Vigna, in the summer of 1988 do you recall what your position was in the New York district?
I guess what I'm asking is were you



still the senior regulator in the New York district at that time?
A Yes.
Q Do you recall AmBase or what is now known as AmBase but at that time was called Home, The Home Group, do you recall when -- and I'm going to refer for our purposes to it at least usually as AmBase, if that's all right -- do you recall when AmBase acquired Carteret?
A I recall the acquisition, I forget exactly what the date was.
Q Do you remember that transaction?
A Yes.
Q Is it consistent with your recollection that it occurred in the summer of 1988?
A That's my general recollection, yes.
MR. LEVITT: Objection, because the agreement was signed in the summer of '87, and I know there was a large amount of time between the signing of the agreement and the transaction date, which was in 1988, just to clarify.
Q Did Charles O'Toole work for you at that time?



A Yes.
Q What was his position?
A Mr. O'Toole was in our corporate activities group. His job was to review corporate transactions and to draft recommendations.
Q So he would have been, I take it, involved in supervisory mergers and acquisitions?
A Yes, that was part of his, that would have been part of his job.
Q Was he one of your senior officers?
A He was a person with a great deal of regulatory experience, yes.
MR. COOPER: I'd like to have another document marked as an exhibit. This would be Exhibit number 5, and it is what looks like about twenty pages, the first page of which is stamped F AM 0010005.
(The above-described document was marked Vigna Exhibit 5 for identification, as of this date.)
Q I'm only going to ask you about a few of the references made in this rather lengthy document, but when you have reviewed it well enough to identify it, would you do that?

66

MR. COOPER: I'm just asking for the witness' memory.

A I don't recall any kind of -- if people were doing anything prior to enactment.

Q So you then specifically wouldn't recall whether Carteret was trying to take some steps prior to enactment or around the time of enactment to deal with the problem?

A They could have. I just don't recall.

Q Okay.

MR. COOPER: I'd like the reporter to mark as Exhibit 8 what looks like about a 50 page document, the first page of which is stamped C-AM-A 0339588.

(The above-described document was marked Vigna Exhibit 8 for identification, as of this date.)

Q Again, Mr. Vigna, I only have a few pages that I'm going to call your attention to in this very long document, but based upon your review of the face of it here, can you identify it for me, please?

A This is the May 22, 1989 report of examination of Carteret Savings Bank.

67

Q I note that it bears a date on the cover page here in the lower left-hand corner of August 1989, yet the date of the examination is May 22, 1989.

Could you explain that discrepancy?

A I don't know what that August '89 date is, unless it's the completion date.

Q Is the date of examination when the examination essentially begins?

A Yes.

Q So the report itself would typically come out some two or three months after that?

A Depending upon the size of the institution.

Q And how long it takes to complete the examination and get a report written?

A That's correct.

Q So this would have been, the examination begun then on May 22, 1989 with a report that was filed in August of 1989.

Is that an accurate reading on my part?

A I don't know, I'm looking here on the second page, Carteret Savings Bank, F.A. It says the exam was concluded in November of '89, so

68

again, I don't know what the August '89 date is, to be honest with you.

Q Okay, I appreciate you pointing that out. I hadn't noticed that either.

I want to refer your attention to the page that is number 1 and also bears the Bates stamp ending in the numerals 94, and in particular the first paragraph under "Scope." This is a page that is entitled "Report Summary."

Beginning with the second sentence in the paragraph entitled "Scope" it is stated,

"Some of these areas included the takeover of the institution by AmBase, Inc., formerly The Home Group, a noted deterioration in the quality of the loan portfolio and the adequacy of loan loss reserves, net operating losses in the four previous quarters, and the adequacy of CSB's," which stands for Carteret's, "capital position, particularly in light of the recent legislation, FIRREA."

That would certainly suggest this report came out after FIRREA was enacted. Would you agree?

A Yes.

69

Q Do you recall when the regulations that implemented FIRREA's commands became effective?

A No, my best recollection is sometime in the latter part of '89.

Q Would it refresh your recollection if I suggested December 7, '89?

A That sounds like a good date.

Q The statement that I just read into the record concerning a noted deterioration in the quality of the loan portfolio, isn't it accurate that in the late '80s that the thrift industry was experiencing a widespread problem concerning asset quality?

A Yes.

Q It is also my understanding, and correct me if I'm wrong, that that problem was really different in nature from the problem that you earlier described with respect to the thrift industry's difficulties in the early '80s and late '70s, is that right?

A Yes. This was a totally different problem than the disintermediation of the '70s.

Q Could you describe the nature of the problem concerning asset quality that plagued the

industry in the late 1980s, I guess, mid to late 1980s?

A Well, it was a problem resulting from a number of issues. The real estate market basically crashed in the latter part of the '80s, some was a consequence of tax law changes. Other reasons, economic reasons.

So institutions, particularly those that were involved in construction and development lending and commercial real estate lending, found that in some cases what appeared to be, you know, properly underwritten loans were now not paying, developments weren't selling out, and big losses, large losses were being absorbed on these investments.

Q Was this problem also characterized by a general reduction in the values of real estate pledged to secure loans and general assets that thrifts held?

A Yes.

Q And I take it that is what is effectively being referred to in this reference here about deterioration in the quality of the loan portfolio?

A Yes.



Q How widespread was this problem within the Second District at this time? And this is, I take it, sometime in the middle to latter part of 1989?

A It was fairly severe, at least in my judgment and recollection.

Q Were there parts of the country that were even more severely impacted by this problem with real estate, I think you called it a crash essentially in the market?

A That's at least what I believe what occurred. There were some pockets of the country that were more, problems were more severe than others.

It certainly was very severe in New England, the southwest, part of California.

Q Is it a fair statement to make that you and your colleagues in the Second District had your hands full in terms of thrifts that were experiencing this problem?

A Yes.

Q Over on Page 45 of this report of examination there is a section that is entitled "Capital," and it runs for several pages.

It begins with, or at least the



second paragraph under the heading "Capital" states, "The conclusion of the report with respect to capital," and it says in the first couple of sentences, "Carteret Savings has experienced declining levels of capital since December 1989."

MR. LEVITT: 87, it says.

MR. COOPER: I'm sorry, thank you. I misread that.

Q "Although the institution will be able to meet the current regulatory minimum required by Section 563.13 of the insurance regulations, it is not likely to meet the tangible leverage ratio and risk-based minimum capital levels required by FIRREA."

I want to skip a sentence, if that's all right, and call your attention to the sentence that reads, "The deficit at August 31, 1989 may be reduced to $110 million due to gains on sale of assets recorded during August."

Mr. Vigna, does this refresh your recollection concerning steps that the management of Carteret was taking as early as August 1989 to sell assets and thus to shrink in order to cope with the impending regulatory capital problems



that FIRREA represented?

A No.

Q On the following page, towards the bottom of the page, there's a heading entitled "Financial Institutions Reform, Recovery and Enforcement Act (FIRREA)," and the exam report states as follows:

"A. Tangible Capital. Although the new capital regulations of FIRREA will not become effective until December 7, 1989, initial calculations indicate that the institution will not be able to meet the FIRREA minimum tangible capital requirement of 1.5 percent of total assets."

Then it continues on the next page, "The following schedule approximates the institution's July 30, 1989 and August 31, 1989 tangible capital level (without consideration of additional general valuation allowances) on a consolidated Carteret Savings Bank basis."

Could you take a few moments and look at the schedule that is depicted there.

As I read this schedule it essentially excludes from Carteret's regulatory

authored by one of your subordinates?
A I don't recall if this was, if we did it just for this case or there were others. I think we probably did it before this particular case.
Q But you had a substantial personal involvement in the Carteret resolution.
A Yes.
Q And Mr. Albanese was also personally and substantially involved?
A He was very much involved, yes.
Q Along with you.
A Yes.
Q What is an S-Memorandum?
A S for supervisory. It was a memorandum providing the grounds and the recommendation for transfer to RTC.
Q Was that the only function of an S-Memorandum, to recommend transfer to the RTC, or did other types of recommendations go from the regional offices to Washington in the form of S-Memoranda?
A I think it was predominantly for this purpose, transfer.
Q What was the criteria that was used,



in the northeast region anyway, to determine when, and perhaps I should say whether, to send an S-Memorandum recommending transfer of an institution to the RTC?
A I forget the legal, specific language, but it was essentially inadequate capital to operate independently in a safe and sound manner, and no prospect for replenishing that capital or raising capital.
Q So there were standards set forth in some kind of regulatory format, then, for this?
A Well, there were legal grounds, in the statute, that prescribed the grounds for the appointment of a Receiver or a Conservator.
Q Who would decide, Mr. Vigna, whether or not an S-Memorandum should be submitted to the officials of OTS in Washington?
A It was essentially the responsibility of the Regional Director, however, there was always some considerable overview out of Washington, and so there were always discussions about particular cases, whether in fact the grounds exist and whether or not the Regional Director ought to make that kind of a recommendation.



Q So there would be collaboration between the region and Washington in connection with whether or not an S-Memorandum should be prepared and forwarded?
A That's correct, yes.
Q Is it correct to say that Washington would have the last word on that?
MR. LEVITT: As to whether an S-Memorandum be prepared?
MR. COOPER: Yes.
A I always liked to have thought that the primary responsibility was that of the Regional Director, but there was always discussion with Washington, and that while we could vigorously debate whether the grounds existed or not or whether we should or shouldn't, but ultimately we should reach a joint decision and do or don't do it.
Q Can you recall an occasion when an S-Memorandum was forwarded to Washington from the northeast region and the recommendation to transfer the institution to the RTC was rejected by Washington?
A Not in the northeast region. It could have happened someplace else, but we never



had that situation.
Q Were there ever any instances in which an S-Memo was, the preparation and forwarding of an S-Memo was requested by Washington over the objection of the northeast region?
A I wouldn't say an objection. A difference of opinion. I guess if you want to use it in that connection you can use that word.
There were situations where we differed in terms of what was the appropriate course of action.
Q On Page 2 of this S-Memorandum, there is a subheading called, well, the major heading is "Grounds for the Appointment of a Receiver," then the subheading I is "Summary."
The second paragraph under that I states, in its first sentence, "Mostly during the quarter ended June 30, 1991 Carteret experienced nearly a complete turnover in its executive management team and Board of Directors.
"New individuals participating in the affairs of Carteret include Richard A. Bianco as Chairman of the Board, Chief

Executive Officer and President to replace Robert B. O'Brien and Robert C. Walsh, respectively; J. Wayne Moor as chief loan workout officer to replace Richard Braun."

Then it goes on to identify a few more new management officials of Carteret.

At the time of this S-Memorandum, Mr. Vigna, did you view the change in management as a positive development for Carteret?

A Yes.

Q Could you explain why you did so, what your assessment was of the prior management and the new management?

A We were very suspect about the capabilities of prior management. They certainly had in our view not done a good job in dealing with the institution's problems, particularly its real estate problems.

And as we learned, the people that were brought in turned out to be extremely competent and capable people, did a really good job in a very short period of time.

Q Let me ask you to refer over on Page 18 to the first paragraph on that page where it refers specifically to Mr. Moor.



It states that, "Mr. Bianco attracted Mr. Moor from AmeriFirst to take the chief loan workout officer position.

"Mr. Moor brings a wealth of accounting and real estate experience to Carteret from his past endeavors, including his work at AmeriFirst.

"Mr. Moor has attracted a skilled team of individuals to assist in Carteret's loan review and workout efforts.

"The individuals assisting Mr. Moor for the most part had worked with him while he was at AmeriFirst."

Does that comport with your recollection for your opinion of Mr. Moor and his team at the time?

A Yes, that was the view particularly of our examiners that dealt with him on a day-to-day basis while in the course of examinations, from our people internally or in the office that also reviewed the workouts that he was putting together.

That was our view. I mean, it's there in writing and we signed off. That was our feeling.



Q You shared that view?

A Yes.

Q Back on Page 3, which is also Bates stamped with a long numeral ending in 32, it bears a subheading called "Summary of Capital Position."

That paragraph provides that, "The following chart presents Carteret's capital position as of June 30, 1991 in two formats.

"The first two columns represent Carteret's capital position, including $150.5 million in supervisory goodwill for all calculations, in other words, with the preliminary injunction order issued by U.S. District Court for the District of New Jersey in Carteret Savings Bank V OTS.

"The second two columns represent Carteret's capital position excluding supervisory goodwill."

Earlier I asked you about the preliminary injunction action in the District Court in New Jersey.

Does this refresh your recollection with respect to --

A Yes.



Q Okay. You do recall that action at least generally, right?

A Yes.

Q Does this refresh your recollection concerning how much supervisory goodwill, unamortized supervisory goodwill was remaining on the books of Carteret or would have been remaining on the books of Carteret had FIRREA not eliminated it?

THE WITNESS: Could you read that question back.

(The question requested was read back by the reporter.)

A Yes.

Q I'd like to walk through this chart which compares Carteret's capital profile, including goodwill and excluding goodwill, as of June 30, 1991.

The first column headed "Including Goodwill" says that the GAAP capital was just under $40 million.

Do you see that?

A Yes.

Q And that's the same on both columns, both for including goodwill and excluding

surprises.
Q Mr. Bianco I take it was a regular visitor to your offices, is that accurate?
A We spent a lot of time together. We spent a lot of time together, because when they first came into the institution we frankly didn't, you know, the regulators are always suspect, particularly of somebody on Wall Street.
We didn't know these people, and the fact that they had money at stake here, and we weren't very happy with the existing management.
Q Let me ask you this, as the principal regulator in the northeast region for quite some time, you had lots of and frequent occasion to review and assess management capacity. Is that true?
A Yes.
Q How would you rank Mr. Bianco and his colleagues in terms of management capacity and commitment?
A I would say in terms of, in all the years that I was in the regulatory area, thirty-two, these were as strong not only financially but in terms of their dedication and their diligence, this was for the time, for the



situation, a workout, this was as good a team as you'd find.
Now, I don't know, with a lot of capital and no problems they might build the place up, but in terms of working out a very, very difficult financial situation in a very short period of time, they did more than I would have ever, ever expected to be done in a situation like this.
I mean, to get, to turn around this kind of an operation and to start showing some profits was a pretty monumental task in my view, so in a long-winded answer to your question, I found them to be a very, very strong workout team.
Q You just mentioned Carteret's turnaround in terms of profitability, and your memo states in the second paragraph here,
"Carteret recorded net income of $2.2 million for the fourth quarter 1991, exceeding its projected break-even results.
"Carteret's fourth quarter profit was attributable to aggressive expense reductions, improved mortgage banking revenues, better than projected asset dispositions and a generally favorable



interest rate environment, which led to reduced deposit costs."
Your reference to generally favorable interest rate environment, is it true or do you recall whether by the date of this memo, around January 1992, that economic conditions generally for the thrift industry were starting to look a little more favorable?
A My best recollection is that at this point in time there were some signs that, small signs that economically things were starting to get a little bit better for thrifts.
I don't have any specific recollection of why, but it's just my general recollection that things very, very slowly were starting to move in a positive vein.
Q On the next page of the memo, really at the end of the carryover paragraph there, the statement is made, "It is our opinion that absent the need for significant additional valuation reserves, Carteret should be able to attain reasonable core profitability in 1992."
Do you recall what you based that opinion on?



A No.
Q Was it in part the evidence that Carteret had been restored to at least initial profitability and that things were beginning to look more favorable in the industry generally?
MR. LEVITT: Only if he can remember.
A I don't really recall specifically. I don't think it had anything to do with any views about where the industry was going.
Q Okay.
A My recollection it was just based on what they had done in particular the fourth quarter and what, you know, what we thought the environment for them particularly was going forward.
Q In the next paragraph the statement is made, "In this regard, the bank's valuation allowances already represent 6.09 percent of total assets and 33.4 percent of criticized assets, the highest ratios in the northeast region and approximately triple the pure average for comparable size institutions nationally."
Do you recall why Carteret's

that there is some reasonable prospective for them to do so and you're not going to dissipate what's there already, then I think you have some flexibility.

Even the fact that by transferring them you're going to lose value, if you don't think they're going to raise the capital to get back into viability, that's not an issue, you have to make the transfer.

Q Is that so -- well, let me ask you this. Is it fair to say that in light of these points that you're making in this memorandum that it simply didn't make sense to transfer the thrift under these circumstances to RTC?

A I think what we're saying here is the institution's operations have been stabilized, we've got a strong management team in here, the assets are adequately, are conservatively valued, and there is in our view some reasonable chance, some reasonable prospect that they can raise capital to restore viability, and that was the issue.

Even if the operations were stabilized and there was no chance to raise capital, well then, you know, you could -- the



grounds existed for transfer. You were supposed to transfer the institution.

Q When you say the grounds existed, you mean the legal grounds?

A Yes, I mean -- if they couldn't raise the capital, you couldn't keep them in this posture forever because, you know, there's no way they can recapitalize through internal operations. They had to raise outside capital.

Q Despite the fact that they were profitable?

A Yes. Now, the other side of that is that as long as they're profitable there's a prospect, there's a possibility, a strong possibility they can raise capital at some period of time.

The question is how much time and over what period can they do it.

Q Can you recall what Mr. Ryan's reaction was to this memo?

A I don't know specifically. I think it was supported by John Downey and Ryan agreed.

Q And an extension was in any event granted along the lines that you had recommended?

A Yes.



MR. COOPER: It might make sense to take a few minutes' break. We've been at it for an hour and twenty minutes, I guess, or more since we came back from lunch.

Do you want to take about ten minutes?

MR. LEVITT: Sounds good.

MR. COOPER: Okay.

(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)

MR. COOPER: I'd like to ask you to mark this document as Exhibit number 11, please.

It is a three page document, the first page of which is Bates stamped WOP 3340862.

(The above-described document was marked Vigna Exhibit 11 for identification, as of this date.)

Q Mr. Vigna, this is a short document. I'm going to walk through a good deal of it, so if you'll just go ahead and read it I'd appreciate it.

Mr. Vigna, could you identify this



document, please?

A This is a letter from Robert C. Albanese, the Regional Deputy Director, to Mr. Nicholas Ketcha, Regional Director for the FDIC, concerning the Carteret Savings Bank and its efforts to recapitalize.

Q It's dated July 7, 1992?

A It is.

MR. LEVITT: Just one second. Off the record.

(Discussion off the record.)

Q Do you recall this letter?

A No.

Q Mr. Albanese was your deputy, right?

A Yes.

Q And earlier you indicated the two of you worked very closely together in connection with the resolution of Carteret, is that right?

A Yes.

Q Is it likely that a letter of this kind responding to the Regional Director of FDIC would have been cleared through you, so to speak?

A I would have reviewed it before it went out.

Q So it presumably reflects your

sentiments as well as Mr. Albanese's.
A Yes.
Q In the opening paragraph of the letter it refers to, "A letter from Mr. Ketcha dated July 2, 1992, objecting to additional extensions of time by this office, which would allow Carteret Savings Bank and its underwriters additional time to continue efforts to achieve an unassisted recapitalization of the association."
Do you recall Mr. Ketcha's letter expressing those objections?
A No, I don't.
Q Do you recall about this time there being an apparent disagreement between OTS and FDIC with respect to whether or not additional time should be accorded to the Carteret management to raise capital?
A My recollection is that we did have over periods of time differences of agreement as to the success or lack of success of capital raising efforts.
Q By Carteret specifically?
A Yes. Well, you know, Carteret wasn't alone, but we're talking about Carteret, so



we had some differences over time.
Q But it was not uncommon, I take it, for there to be different viewpoints with respect to thrifts generally in terms of what the best resolution approach might be?
A Yes, I think, you know, I think that for a number of reasons the FDIC's posture was much more conservative than OTS' in terms of insolvent or marginally capitalized institutions raising outside capital.
Q Do you know why that was?
A Well, I think they just -- it's a philosophical approach. Theirs is generally, you know, theirs is the cup is half empty and ours was more, at least in this case, half full.
I mean, I'll have to say we were in agreement at least in our region with the FDIC in 90 percent of the cases, and even in this case I think that there were rational differences of viewpoint.
Not that they were threatening to do anything or we were threatening to do anything. We just had some, you know, very academic, philosophical discussions as to whether in fact this institution could reverse itself and raise



outside capital.
Q About the middle of the paragraph it states, "As you are aware, however, an agreement executed by Carteret's Board of Directors on February 27, 1992 provides for the termination of the underwriting process at any time," and the words at any time are underlined, "if the Regional Director determines that acceptable progress towards effecting an unassisted recapitalization no longer has been demonstrated."
Do you recall that February 27th agreement that is being referred to there?
A I don't have any specific recollection of it.
Q Okay.
A I mean, I have a recollection of some different agreements that we entered into, but I can't say I specifically recall this one.
Q Would it refresh your recollection if I suggested to you that it authorized the Regional Director under the circumstances outlined here to place Carteret in the Accelerated Resolution Program, so-called?
A I don't have any specific



recollection of that but, you know, that's probably reasonable, that that's included.
Q In underscoring "at any time" here, the underwriting process could be terminated at any time by you, the Regional Director, I take it that the point is here that at such time as OTS is not pleased with the progress that's being made, it can transfer the bank to RTC at that moment.
Is that accurate?
A Yes.
Q The letter goes on to say, "Your recommendation seems to have been based on the premise that there has been a lack of demonstrated progress by the association to raise capital since January 1991, as well as insufficient financial improvement by the institution to actually attract a firm commitment from investors.
"We believe to the contrary, that progress in stabilizing a large troubled institution has been made by the new management team since taking control of Carteret in July 1991, and that reasonable progress toward achieving a recapitalization of Carteret without

A My recollection is that it means that if we decided at some point before the time period we were giving them that progress wasn't being made or that recapitalization was impossible, we'd terminate the extension of time and move forward to take whatever appropriate action was necessary, including transfer to the RTC.

Q So if Carteret's condition turned south, so to speak, OTS could seize the bank at that moment.

A Yes.

Q So is it an accurate summary to say that Mr. Albanese made many of the same points in July to Mr. Ketcha that you had made earlier in your memorandum of January 1991?

A Yes.

Q And Carteret's condition had improved significantly over that period of time, had it not?

A Yes.

MR. LEVITT: January of 1991 or 1992?

MR. COOPER: Thank you, Mr. Levitt.

Q January of 1992.



MR. LEVITT: And that's Exhibit 10, you're talking about.

MR. COOPER: Right. The one before this one.

MR. LEVITT: Could you just read me the last question and answer.

(The portion of the record requested was read back by the reporter.)

Q Mr. Vigna, do you recall if Mr. Ketcha was persuaded by these points?

A I don't know if he was persuaded, but I think he agreed to grant the time extension.

Q Essentially acquiesced in the matter?

A Acquiesced to the posture we were taking.

MR. COOPER: I'd like for the reporter to please mark as Exhibit number 12 a document that is two pages long, and is Bates stamped on its first page WOQ 6791063.

(The above-described document was marked Vigna Exhibit 12 for identification, as of this date.)

Q Have you had a chance to look at



this, Mr. Vigna?

A Yes.

Q Would you please identify this document for the record.

A It's a file memorandum written by Bob Albanese regarding a conference call with Jon Fiechter, Deputy Director for Operations, that was held on November 16, 1992.

Q This internal memorandum is dated November 17, 1992, is that correct?

A Yes.

Q In the last paragraph of the memo it mentions your name to the effect that, "A meeting is to be held today between Angelo Vigna and Jonathan Fiechter to discuss an extension of time beyond November 20th."

Let me ask you this, do you recall this memo?

A I don't have any specific recollection of it, no.

Q Do you recall the issues that it addresses?

A I don't have any specific recollection, no.

Q So the conference call that is



referenced here between Mr. Albanese and Mr. Fiechter concerning the scheduled transfer date, you don't recall that?

A No. I mean, I recall that there was, as we got closer to the actual transfer date there was, I guess some anxiety on all sides, and, you know, people were setting dates and not coordinating, and I must have been in Washington at the time for some reason or another and set up a meeting with Jonathan Fiechter to discuss this particular timing.

Q The second paragraph refers to, "Concerns about the transfer date for Carteret being moved up to this Friday, November 20th, while due diligence which might lead to an unassisted acquisition by First Gibraltar was only a couple of weeks from completion."

Do you remember why Mr. Albanese and I assume you and the rest of the northeast region became concerned that this date had been moved up?

A I don't recall the specific reasons, other than the fact that, as I read the memo, there was still a potential capital investor or acquirer that was engaged in due diligence, and

146

there was no reason to transfer until after this potential acquirer had concluded their due diligence and given us an indication of whether they were interested in a transaction or not.

Q Did you agree at the time with the sentiment expressed in the third paragraph, to the effect that, "We pointed out that in our view the institution's financial condition continued to improve and that supervisory risk of loss, while it remained open, was very low"?

A Yes.

Q The paragraph continues, "We argued that the possible benefit of leaving Carteret open while recapitalization discussions were continuing, namely a possible unassisted resolution of this $5 billion troubled institution, would far outweigh any perceived benefit of an early transfer date.

"Frankly we did not view the transfer date, whether it was November 20th, December 4th or January 4th, to be a critical factor in our analysis of the situation."

147

Did you agree with that assessment?

A Yes.

Q It refers to the perceived benefit of an early transfer date. What was the perceived benefit of an early transfer date, can you recall?

A I don't know what that means here.

Q Is it fair to say that your assessment of the appropriate policy, according to this paragraph we just examined and the previous exhibits as well, was that so long as conditions continued to improve for Carteret and the thrift industry and the risk of loss to the Treasury diminished, why close this institution?

Is that a fair assessment of the position you're outlining?

A My recollection is my position was that we ought to allow as much time as necessary to make sure that every avenue for raising capital has been looked at, and that we ought not to be subject to any restrictive time frames.

Now, having said that, I think we all realized that we couldn't keep this the way it was forever, even though it was showing some small profits, because that would have been inconsistent with FIRREA.

148

Certainly there was a lot of people feeling, whether it was self-imposed or not, heat from what had happened in the past, and, you know, people -- there were also mandates from Washington, from the Congress, from the administration, you know, to transfer thrifts that were no longer viable, that didn't have capital, to RTC.

Q What mandates are you referring to?

A Well, FIRREA, the legislation.

Q Did FIRREA mandate that a thrift that was profitable, that was working out its bad assets in an exemplary fashion, and whose progress was reducing the risk to the taxpayer should be seized notwithstanding those facts?

MR. LEVITT: Objection. He already answered the legal standard related to the reasonable probability of attracting other capital. You can answer.

A Whether you believed that that should be the policy or not, the facts were that the legislation imposed on the regulators a requirement to transfer to RTC any thrift that was by statute in an unsafe and unsound position to operate, and Carteret fit that position.

149

I mean, you can argue either way, but that was the interpretation of the law, and I think that, you know, from my standpoint I was aware of that posture, and that if we couldn't find capital at some reasonable point in time, the transfer was going to happen.

I just, you know, my view is probably that we should have taken more time.

Q This thrift was seized I guess a little over two weeks after this memo was written.

Is it correct that it was your view that Carteret should have been given more time to raise capital?

A Yes.

Q Do you recall anyone in the northeast region who disagreed with that view?

MR. LEVITT: Objection as to relevance.

A In OTS?

Q In OTS.

A No.

Q Do you know who was in favor of closing Carteret at that time?

A Well, obviously the Director felt that it was appropriate, some of his other senior

staff.
Q Do you know if Mr. Downey felt that Carteret should be closed at that time or be given more time?
A I think that my recollections of my conversations with John Downey around this point in time was that he was sympathetic to my view, but that the view of the Director and possibly some others at senior levels was that we had exhausted the time to allow the management of Carteret to find capital, and that they were never going to find capital, and that the only alternative we had was to transfer it to RTC.
Q What has happened in the thrift industry since the beginning of 1993?
A The ability to raise capital increased substantially. Institutions with low capital were able, particularly mutuals were able to raise capital in public markets.
Investors and investor groups were willing to put money into thrifts now. The economic environment changed. The financial environment changed.
Q Quite dramatically, did it not?
A I'd say quite dramatically over a



three, four year period, because I think part of it was the consequence of the fact that the really hopelessly insolvent and very costly insolvencies have been cleared away and the economy was changing, rates were favorable, there was -- we came out of a recessionary time and the economy just got stronger and capital became more abundant and thrifts became in some circles the real darlings of investors.
Q The real estate market rebounded?
A The real estate market rebounded, yes.
Q Did that have a beneficial effect on the valuation of assets of thrifts?
A Sure. I think some investors felt that now there were bargains out there, that, you know, the real estate was going to come back, and rather than take losses now, big profits were potentially in these portfolios.
Q In your opinion, if Carteret had been given more time, do you believe it would have succeeded in its efforts to recapitalize and thus to survive?
MR. LEVITT: Objection as to relevance. You can answer.



A My personal belief is that, yes, at some point in time they would have raised enough capital to restore viability in the institution.
Q If Carteret had survived and had continued to be managed by Mr. Bianco and his colleagues, do you believe that it would have benefited from the economic environment that has occurred in the thrift industry and more generally, as you've previously described, from 1993 on?
A Well, it's hard to crystal ball what someone is -- what's going to happen in the future. They had done a wonderful job in a very, very severe workout situation.
You know, I don't know what they would have done if they had raised capital and managed to operate in a very favorable economic environment.
You know, these people had been successful in all their business careers. I would suspect they would have been successful going forward, but that's crystal balling.
Q But you also are in a position of considerable knowledge and experience with respect to thrift management, and I'm just asking for your



basic judgment based upon what you knew about Carteret and about its management and the conditions that prevailed in the industry.
MR. LEVITT: Again I object on relevance. You can answer.
A Again, these were people who had -- were outstanding businessmen, had done a great job here in a very short period of time, and, you know, if I was a betting man I'd say that they were going to be successful.
The economic times, if you look out there, I can point to institutions that recapitalized after Carteret was transferred and some of them are still around and are very successful, others were sold, you know, in a public sale to other institutions at great rewards to investors.
So, you know, if you want me to give you my personal judgment --
Q Yes, sir.
A I think they would have been very successful, very successful.
Q Do you recall that earlier we talked about and went through a comparison from I think the S-Memo of Carteret's capital profile with the

goodwill, supervisory goodwill, $150 million or so at that time, and without it.

If instead of having a $70 million deficit in tangible capital, negative tangible capital, Carteret had had $70 million or so in positive tangible capital at the time that it was seized, in your opinion, would it have been seized?

MR. LEVITT: Objection, calls for speculation. You can answer.

A I don't know. I'd have to -- probably not, but I'd have to look at the numbers and, you know, how -- where they measured up in terms of capital compliance and whether they could submit a business plan, a capital plan to recapitalize the institution internally.

I mean, we could accept capital plans. If they had that much capital they might have been able to give us a capital plan that reflected restoring capital through internal operations and maybe with only marginal or no outside capital.

I don't know, I'd have to look at those projections.

Q Well, if I ask you to assume for a



moment that Carteret, if Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?

A Probably not.

Q During your time at OTS and its predecessor agencies, how many seizures would you say you were involved in?

A Over what period?

Q The whole time.

A Thirty-two years?

Q Yes, sir.

A Both in Washington and in New York?

Q Scores, maybe?

A A couple of hundred.

Q Really?

A It was over 90, almost 100 institutions in the northeast region, you know, from FIRREA, late '80s.

Q That's in the late '80s.

A Yes.

Q Focusing on then just the late '80s, you say there's approximately a hundred or so?

A Yes, I think, yes. I once counted and I had ninety something. That's the whole



region, yes.

Q Can you recall a time when a thrift was seized that had positive tangible capital?

A Yes. I can't recall specifically, but it might have had a little bit of capital but it was going south, the losses, you know, would have dissipated it.

You know, if the losses are dissipating capital, we try to get there sooner rather than later, before all the capital has gone.

Q Can you recall a thrift that was seized that had positive tangible capital and was profitable and whose trends were profitable?

A I can't recall specifically any, that there were any in that condition.

Q Can you recall a thrift that satisfied or nearly satisfied its tangible capital requirement that was seized?

A No.

Q If Carteret in December of 1992, around the time it was seized, had satisfied or nearly satisfied its tangible capital requirement, do you believe that its ability to attract additional capital, additional investment, and



raise additional capital would have been very substantially enhanced?

MR. LEVITT: Objection, calls for speculation. You can answer.

A Regardless of the new capital rules, regardless of the new treatment of goodwill?

Q Yes, I'm asking if instead of having $70 million negative tangible capital, Carteret had positive $70 million of tangible capital and was effectively in compliance with its tangible capital requirement, could it have raised capital, in your opinion?

A Well --

Q Additional capital?

A In real economic terms it's the same institution. It's the same value, really.

I would say probably, you know, you're assuming that there's no -- that we still count goodwill.

So probably we could have had other institutions that would have acquired Carteret and would be taking on a little bit more goodwill, but if it was profitable and had some capital, I don't know whether it would have in fact at that point in time attracted capital. That's speculation on

my part.
But realistically it's the same institution financially and economically, whether you allow the goodwill or you don't allow the goodwill.
Q Let me ask it in this way. If Carteret had cash, tangible capital, for example, Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion?
A No.
Q Would Carteret have been able to attract additional capital in that condition, in your opinion?
A I would say it would be very likely that they could attract more capital.
Q If OTS had in good faith accorded full regulatory capital treatment to Carteret's supervisory goodwill and effectively treated it as though it was cash, knowing it's not, as you pointed out earlier, but had in good faith have treated it as cash, would Carteret have been seized, in your opinion?
MR. LEVITT: Objection, asked and answered.



THE WITNESS: Would you read that question back.
(The question requested was read back by the reporter.)
A I don't follow that question. It's cash, I mean, it's real capital. We're talking about an intangible. It just --
Q I understand.
A It's an accounting number, not even -- it's not real, it has no return. I mean, cash can be invested for a return.
Q Yes.
A So your question isn't -- it's not realistic.
Q Let me come at it --
A My apologies, but that's not a realistic question.
Q Let me come at it this way.
If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized, in your opinion?
A No.



MR. COOPER: We're at a convenient stopping point if you want to take five or ten minutes, because I think I may be thirty minutes or so away from the end of my questioning.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Vigna, do you recall that AmBase was called upon by the regulators to perform under the RCMA that we reviewed earlier, the regulatory capital maintenance agreement that was executed by --
A Yes.
Q So I'm clear, do you recall that AmBase was called upon to perform under that RCMA?
A Yes, I do have a recollection of that.
Q What do you recall?
A I don't recall the details, just that there was a capital maintenance agreement of some sort and that we did put -- make a call on it.
Q Do you recall what general time frame the initial performance under that RCMA took



place?
A No.
Q Do you recall that performance under the RCMA came in two different capital contributions, an initial $20 million one and then a subsequent $30 million capital contribution?
A No, I don't have any specific recollection of that.
Q Let's see if this document helps to refresh your recollection.
MR. COOPER: I'd ask the court reporter to mark as Exhibit 13 a one page document Bates stamped OAM 0040077.
(The above-described document was marked Vigna Exhibit 13 for identification, as of this date.)
Q Would you identify this document, please?
A It's a letter from Joseph P. Kehoe, the OTS Assistant Director, to Bruce Bean, acknowledging receipt of his letter to the effect that AmBase had contributed $20 million in cash to Carteret.
Q Does that refresh your recollection about a $20 million capital contribution in this

the stock of publicly traded thrifts improved in 1993?

A Yes.

Q Did it improve?

A I believe it did, yes.

Q Wouldn't that improvement have redounded to the benefit of Carteret in its efforts to raise capital?

A I believe it would, yes.

MR. IGO: I believe that's all I've got.

MR. LEVITT: Just let me ask you two or three, okay?

THE WITNESS: Okay.

EXAMINATION BY MR. LEVITT:

Q I just want to clarify one or two things.

If you'll look at the S-Memorandum which is Exhibit 9, Page 3 of Exhibit 9, and if you look at the column "Including Goodwill," this shows, does it not, that there's a deficit of $3 million, even including goodwill as of this date, which is June 30, 1991?



A Yes.

Q In tangible capital?

A Yes.

Q There's a deficit even including goodwill of $81.7 million in core capital?

A Yes.

Q And that there's a deficit even including goodwill of $99.4 million in risk-based capital?

A Yes.

Q Now, counsel for AmBase asked you some hypothetical questions about what you think would have occurred in December of 1992 had the injunction that required OTS to view goodwill as part of regulatory capital been in place, and I believe your response was, and he dwelled on the tangible capital element of regulatory capital, and I believe your response was you thought that the decision to impose the receivership might not have been taken.

Is that a fair recollection of your testimony?

A Yes.

Q But this memo we're looking at now, which is AmBase Vigna 9, which occurred at a time



that you were required to include goodwill in regulatory capital, and the result of that still showed a deficit in all three capital measures, at this point in time you did recommend a receivership, did you not?

The purpose of this memo is to recommend a receivership.

A Yes.

Q Why then would it have been any different in December of 1992 if goodwill would have been included then?

A It probably wouldn't have.

Q Now let me show you, let me refresh your recollection on some things that occurred that counsel for AmBase didn't go over with you and that's reflected in FDIC Vigna 1.

I just want to have you turn to Page 9. Just look at the first full paragraph.

The second sentence says, "Despite the intensive efforts of management, Carteret has been unable to secure outside investors to cure the association's capital deficiencies.

The withdrawal of both Kolberg & Company and the Carlisle Group of their



letters of intent to infuse $200 million is clear evidence that Carteret's problems are too severe for the association to attract outside capital on an unassisted basis."

Do you recall that Kolberg & Company did a due diligence of Carteret because it executed the letter of intent to make a capital contribution?

A Yes.

Q What was the result of the due diligence? What was Kolberg's position following the due diligence? Was it that they would make the investment or not?

A No, I think they decided not to make the investment.

Q Do you recall there was a due diligence by the Carlisle Group?

A Yes.

Q What was the result of their due diligence?

A The same result. They decided not to pursue a transaction.

Q Did that indicate to you that whatever management of Carteret felt about its institution, and the ability of the institution to

202

raise capital, the market were telling you that after two due diligences, the investment banking firm decided not to invest capital?
A At that point in time, yes.
Q We looked at a document that talked about a possible capital infusion from a bank and that was the one where Albanese asked for a little more time.
I'm just curious, it was First Gibraltar. What happened with that, if you recall?
A I don't recall.
Q I just want to ask you just two more things.
You recall counsel asked you about whether OTS, about whether the agreement wherein AmBase agreed it acquire IPF was forced on AmBase by OTS.
Do you recall questions about that?
A Yes.
Q Do you recall the origins of the enforcement action that gave rise to that agreement?
A Which enforcement action?
Q Counsel referred you to an

203

enforcement action against AmBase officers. Do you recall what gave rise to that enforcement action?
A No.
Q You do recall, don't you, that under the keep well agreement AmBase had an obligation to pay to Carteret the difference between $65 million and the amount it would sell IPF for prior to August of 1991, as I recall?
A Yes.
Q You also recall that there was an obligation to provide $50 million under a capital maintenance agreement.
A Yes.
Q And do you recall that toward the end of 1990 AmBase's financial position went south and they were required to put the Home Insurance Company, their major asset, on the block?
A That's right.
Q Do you recall that they needed stockholder approval after they found a buyer, which was a Swedish consortium, to buy the Home Insurance company, they needed the stockholders' approval?
A Yes.

204

Q Do you recall there was a proxy statement that described the financial condition of AmBase and what it would look like after the sale of The Home?
A Yes.
Q Do you recall that late in that year, after that sale was made, certain directors, who were later named in an enforcement action, voted themselves $9 million in bonuses?
A Yes.
Q To be taken out by the end of the year?
A Yes.
Q Do you recall being alarmed that if that $9 million was taken out of AmBase there might not be money to live up to the keep well agreement or the capital maintenance agreement?
A I recall that we were concerned that that would certainly impact their ability to meet those obligations.
Q Do you recall that in light of the fact that the taking away of the $9 million would jeopardize the ability of AmBase to satisfy the keep well agreement and the capital maintenance agreement you regarded it as an unsafe and unsound

205

practice for the directors to have awarded those $9 million in bonuses?
A Yes.
Q Was that the basis for the enforcement action?
A I believe it was.
Q Wasn't IPF a money making business?
A Yes, at some point it was very profitable, yes.
Q Do you have any recollection whether AmBase affirmatively wanted to buy IPF at that point?
In other words, the enforcement action related to the $9 million in bonuses, and we saw that part of the settlement was that AmBase buy IPF.
Did AmBase want to buy IPF at that point, do you have any recollection?
A I don't have any recollection.
Q Do you have any recollection of forcibly telling AmBase that we won't settle the enforcement action unless you buy IPF?
Do you have any recollection of that?
A No.

Angelo Vigna CONFIDENTIAL February 3, 1999

*Page 1 to Page 223*

CONDENSED TRANSCRIPT AND CONCORDANCE

*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

Page 13

For the first day my guess is we'll be on the common deposition part of this case.

Following that we'll switch to what's called case specific, where individual cases will have an opportunity to ask some questions about their particular case, what you recall and what you don't recall.

MR. MANNING: I ask the reporter to mark as Vigna Common Exhibit 1 a Notice of Common Deposition for Mr. Vigna.

(The above-described document was marked Vigna Common Exhibit 1 for identification, as of this date.)

Q. This is the deposition notice. Do you recognize that, sir?

A. Yes.

Q. That's why you're here today, at least for this portion of the deposition.

I'll be asking you questions, today, Mr. Vigna. If you don't understand any of my questions, please tell me.

Sometimes since we're close together our voices will drop, so tell me if you can't hear me

Page 14

or if you don't understand what I say, okay?

A. Sure.

Q. Mr. Vigna, could you please give me your educational background, where you graduated from college and the degrees you got.

A. I'm a 1963 graduate of St. Peter's College in Jersey City with a BS degree in accounting and a minor in philosophy.

I'm also a graduate of the Savings and Loan Graduate School of Indiana University, class of '75. That's my formal education.

I've taken many courses, participated in many seminars over the years, but that's my formal education.

Q. Could you give us a brief description of your work history starting after graduation from St. Peter's?

A. Yes. I joined the FDIC in 1964 as a Field Examiner and worked with them until 1968, at which time I joined the Federal Home Loan Bank of New York as a Supervisory Analyst and spent the next twenty-two years with the Federal Home Loan Bank of New York, progressing through various levels.

In '89, '90, when we were transferred to

Page 15

OTS, I was the Senior Executive Vice President and Director of Agency Functions at the Federal Home Loan Bank of New York.

In 1989, with the FIRREA legislation, we were all transferred to the Office of Thrift Supervision, where I began as the District Director in New York, and then when we consolidated, I became the Northeast Regional Director, I guess that was in about 1990, '91, and stayed, was there until 1996, March of '96, at which time I left and joined my current firm, Sandler, O'Neill & Partners, an investment banking firm in New York City.

Q. If you could take me through what positions you had at the FDIC in addition to Field Examiner, if you had any?

A. That would have been the position. I worked as a Field Examiner.

Q. Is that a bank examiner?

A. Yes.

Q. Out in the field doing OCC examinations?

A. No, doing examinations of state chartered non-fed member banks, primarily in the northeast, New York, New Jersey, Pennsylvania and Puerto Rico.

Page 16

Q. When you went to the Federal Home Loan Bank of New York as a Supervisory Analyst, what were your responsibilities then and how long did you have that position, as an analyst?

A. My responsibility was to review reports of examination and draft the covering letter transmitting the report to the Board of Directors of the institution examined. That was my first responsibilities.

I guess I did that for several years, and it came to the point where I became what was called a Supervisory Agent, which I then had the responsibility for signing letters, transmitting the reports, and ensuring that appropriate corrective action was taken.

Q. Did you progress beyond Supervisory Agent?

A. Well, at some point in, I guess it was in the early '70s, I became the Senior Supervisory Agent in the district.

Q. You had other Supervisory Agents reporting to you?

A. Yes.

Q. When you were an analyst, if we could go back, did you have specific banks that were

Page 21

Federal Home Loan Bank of New York?
A. During the period I worked there?
Q. Yes.
A. Yes. Well, I have to qualify that a little bit. There was about a six month period, November of '85 to May of '86, where I served as the Acting Director of the FSLIC, but I was still at the time an employee of the Federal Home Loan Bank of New York, but serving on the Bank Board as the Acting Director.
Q. Of the Federal Savings and Loan Insurance Corporation?
A. Yes.
Q. That's called FSLIC. May I use FSLIC?
A. Sure.
Q. What function does FSLIC have?
A. Had.
Q. Okay. When you first started what function did they have?
A. They were the insurance arm of the federal loan bank system. They provided deposit insurance to savings and loans, government insurance, comparable to the FDIC for banks.
Q. The Federal Savings and Loan Insurance Corporation, or FSLIC, disappeared with FIRREA, is

Page 22

that correct?
A. That's correct.
Q. FIRREA was a law that was passed in August of 1989?
A. That's correct.
Q. After FIRREA was passed, you took a position with the Office of Thrift Supervision, is that correct?
A. Yes.
Q. Prior to that time, did you only work for the Federal Home Loan Bank of New York?
MR. LEVITT: Objection, that was asked and answered. You can answer.
Q. Did you only work for the Federal Home Loan Bank of New York?
A. During what period?
Q. Prior to the time that FIRREA was passed, did you only work for the Federal Home Loan Bank of New York after working for the FDIC?
A. Yes.
Q. What geographic area, and if it changed, could you tell me what it was, was included in the Federal Home Loan Bank of New York?
A. The geographic area was New York, New Jersey and Puerto Rico, and it didn't change

Page 23

during the 22 years I was at the bank.
Q. Did you have responsibility for all three of those areas, the two states and the territory?
A. Yes.
Q. Was there a territory, when you initially became a Supervisory Agent, that you focused most of your attention on?
A. My best recollection is I had a caseload to work on. It covered New York, New Jersey and Puerto Rico.
Q. So you had cases in all of the three areas, correct?
A. Yes.
Q. That didn't change over time, correct?
A. It changed in the sense that as I got more responsibility, at one point I was responsible for the whole district.
Q. Responsibility for the whole district, that means as a supervisor of other Supervisory Agents, is that correct?
A. That's correct.
Q. Were there any banks or thrifts that you maintained primary responsibility for for the entire time you were a Supervisory Agent, that were always in your caseload?

Page 24

A. I don't recall.
Q. Once you started working for the OTS, was the geographic territory that you covered increased?
A. At some point in, I believe it was 1990, when we reconfigured the twelve districts, the old Home Loan Bank districts into five regions, and I became the Regional Director for the Northeast.
Q. Did you acquire additional states other than New York, New Jersey and Puerto Rico?
A. Yes.
Q. What additional states did you inherit or acquire?
A. All the New England states, Pennsylvania, West Virginia, Delaware, I think that covers them all, actually, and we lost Puerto Rico. That was distributed to the Atlanta region.
Q. Did your responsibilities increase in ways other than just additional states coming under your ambit?
A. I'm not sure I understand that question.
Q. You were a Supervisory Agent up until 1989.
A. Yes.
Q. Then you became a District Director of

Page 25

OTS. With that change in title, did you get additional responsibilities?
A. Not -- to the extent that we had an expanded number of states to deal with, yes.
Q. That's the only change in responsibilities, the additional states covered?
A. Yes.
Q. When you became a Senior Executive Vice President of the OTS in the Northeast Region, did your responsibilities increase?
A. I wasn't the Senior Executive Vice President.
Q. Okay. What was your title?
A. My first title was District Director, and then it subsequently was changed to Regional Director when we consolidated the districts into regions.
Q. Did your responsibilities increase with the change in title as Regional Director?
A. Yes.
Q. How?
A. We had more, I had more institutions to regulate.
Q. Did the functions that you performed increase?

Page 26

A. No.
Q. When you first started as a Supervisory Analyst, who was the President of the Federal Home Loan Bank of New York?
A. Bryce Curry.
Q. As a Supervisory Analyst, did you report directly to him or to someone else?
A. Someone else.
Q. Who would you report to?
A. Harold Puchalsky.
MS. LICHSTEIN: Sorry, I didn't hear that.
MR. MANNING: Puchalsky, P-u-c-h-a-l-k-y.
MS. LICHSTEIN: Thank you.
Q. Did the person you reported to change from Mr. Puchalsky at any time when you were a Supervisory Analyst?
A. No.
Q. When you became a Supervisory Agent, to whom did you report?
A. Same person.
Q. Did there come a time when you stopped reporting to Mr. Puchalsky?
A. Yes.

Page 27

Q. When was that, sir, approximately?
A. Probably sometime in the '70s he left, he retired. He didn't retire, he left, resigned. Then I eventually took over all his responsibilities.
Q. Was he the Principal Supervisory Agent?
A. No.
Q. He was just --
A. He was the Senior Supervisory Agent.
Q. Did you become a Senior Supervisory Agent at that point?
A. Yes.
Q. To whom did you report then?
A. Bryce Curry, who was the President and the Principal Supervisory Agent.
Q. For how long did you report to Mr. Curry?
A. Well, until his death in '85.
Q. Following Mr. Curry's death, to whom did you report?
A. To Brian Dittenhafer.
Q. Was Mr. Dittenhafer the President of the Federal Home Loan Bank of New York?
A. He succeeded Bryce Curry, yes.
Q. He also became the Principal Supervisory Agent?

Page 28

A. Yes.
Q. For how long did you report to Mr. Dittenhafer?
A. Until 1989, until the passage of FIRREA, and later on in early '90s before we were transferred to OTS.
Q. At that point to whom did you report?
MR. LEVITT: After OTS?
MR. MANNING: Yes.
A. I reported to John Downey.
Q. Was he located here in New York?
A. No, he was in Washington.
Q. What part of OTS was Mr. Downey in?
A. I forget his title, but he headed up the regulatory end, had supervisory responsibilities.
Q. If we could focus on the time when you were a Supervisory Agent, did you have any reporting responsibility to anyone at the Federal Home Loan Bank in Washington?
A. Bank Board?
Q. Yes.
A. When I was Supervisory Agent?
Q. Yes.
A. What period, throughout the whole time?
Q. The whole time period.

Page 29

A. What was the question again?
Q. When you were a Supervisory Agent, did you have any reporting responsibility to the Federal Home Loan Bank Board in Washington, and if so, to whom, in terms of function?
A. There were people, you know, there were different people I worked with, and my reporting relationship was up through the bank, in other words, through the Principal Supervisory Agent, but I did – we certainly worked with people at the Bank Board who were in senior regulatory positions.
So I wouldn't say I reported to them, but we worked together in resolution of different situations.
Q. Was your communication, for lack of a better word, with the Federal Home Loan Bank Board primarily in connection with resolution of cases as opposed to some other function?
A. No, you know, there was also policy issues that we were involved in, sometimes operational issues and the structure of the division.
Q. Did you communicate with representatives of FSLIC?

Page 30

A. Yes.
Q. While you were a Supervisory Agent?
A. Yes.
Q. Was that in connection with resolution issues as well?
A. That's correct.
Q. By resolution issues, what do you mean?
A. Cases in which an institution had financial problems that could not be resolved without some financial assistance from the FSLIC.
Q. Did you also deal with the FSLIC on resolution issues where you were able to resolve it short of financial assistance?
A. Yes. Well, it depends upon what you mean by financial assistance.
Q. Cash.
A. Cash, yes. Very simple, understandable.
Q. Forebearances, do you understand what forebearances are?
A. Yes.
Q. Income capital certificates?
A. Some would consider that, some people would consider that cash.
Q. We certainly do.
A. I will not respond to that one.

Page 31

Q. It wasn't a question.
A. I didn't think so.
Q. Let's step back. Did there come a time when the Federal Home Loan Bank Board in Washington or functions under them in Washington would provide the districts with guidelines about how to deal with resolution cases?
A. Yes.
Q. What form did that information come in?
A. The best of my recollection, I think it was usually some form of a memo, we had different regulatory memo systems, or it might just come as a, you know, a memo outside of, in other words, the structured memo system.
Q. If we could look back, Mr. Vigna, to the late 1970s, early 1980s, was that a period in which there was what's called interest rate disintermediation?
A. Yes.
Q. What is your understanding of that?
A. Those were situations in which financial institutions, particularly thrifts, because of rising interest rates and the fixed nature of fixed returns on their assets, found themselves in a situation where their returns on their

Page 32

investments were significantly less than the cost of their liabilities.
Q. Did that cause supervisory problems for those institutions?
A. Yes, it did.
Q. What role did you have as a Supervisory Agent in attempting to work with those thrifts suffering from interest rate disintermediation?
A. Well, you know, our responsibilities were to see if there was some way that they could restructure their balance sheets, raise capital, in some way stem the losses without running out of capital.
Q. Were there instances in the Second District where there were savings and loans which were unable to restructure their balance sheet and obtain capital?
A. Yes.
Q. Were those activities noticed in examination reports?
A. Yes.
Q. Were they also noticed in the monthly, quarterly or semi-annual financial reports that the thrifts gave to the Federal Home Loan Bank Board?

Page 117

Q. Do you know how FSLIC was able to reduce the cost of resolution when compared to the cost of liquidation from 70 percent to less than 15 percent?
A. Well, part of it was due to the use of goodwill, number one. Number two, incidents like issuing capital certificates, yield maintenance agreements instead of taking the assets and replacing them with cash, you know, we would let the institution manage the assets and provide some yield maintenance on them so that the cash outlay was nominal, those kinds of methods to reduce the initial cash outlay.
Q. Did yield maintenance basically provide the acquiring institution with some protection for additional losses on assets that it acquired?
A. Well, yes. I mean, what it did was provide a yield on these assets to the extent that they, you know, they yielded more they kept more.
To the extent they yielded less, they were at least provided a floor.
Q. It was a form of indemnification, right, with respect to those losses?
A. No, it provided a certain amount of yield on acquired assets.

Page 118

Q. Prior to the 1982 period, in resolving supervisory cases, did FSLIC provide for indemnification of the acquiring institution with respect to the assets of the supervisory thrift?
A. I'm not sure what you mean by indemnification of the assets.
Q. Indemnification against losses.
A. Loss coverage?
Q. Yes, sir.
A. I don't recall. Prior to '82?
Q. Yes.
A. There might have been, but I don't think there was. There wasn't an asset quality problem until after '82, '83, '85.
Before that it was a yield problem, spread problem. So there wasn't a question of requiring loss protection on assets.
Q. If I heard you correctly, you said there was a difference in the type of problems the thrift industry faced in '79 to '82 than they did in the mid-'80s, is that correct?
A. That's correct.
Q. You referred to asset quality problems. What are you referring to?
A. Deterioration in the quality of assets

Page 119

from a value standpoint and from the ability of borrowers to pay, construction loans that couldn't be completed or sold out, commercial real estate properties where for various reasons the tenants in these properties weren't able to make their businesses and weren't able to make payments to keep the loans current.
We had, you know, a terrible, terrible deterioration in the real estate markets in the late '80s and early '90s.
Q. Those are more complex problems than the interest rate disintermediation problems, correct?
A. I would think so, yes.
Q. They would certainly require more management attention, correct?
A. Considerably more, yes.
Q. And more supervisory attention as well?
A. I'm sorry?
Q. More supervisory attention as well?
A. Yes.
Q. When you became the Acting Director of FSLIC, were most of the problems asset based problems?
A. Yes, I would say so.
Q. Did that affect the cost of resolution?

Page 120

A. Yes.
Q. Was purchase accounting and goodwill used in connection with supervisory mergers with institutions having asset problems as well?
A. Yes.
Q. Because the asset problems would be written down to fair value, right?
A. Yes.
Q. For the purchase accounting?
A. Yes.
Q. If you could turn your attention to Page 4 at the bottom, Page 225, the fifth page of the exhibit, Page 4 of the text. Do you see that, sir, the last paragraph?
It says, "It is in no one's best interest to have non-viable associations maintained in some crippled existence forever.
"The associations are often the most foolish competitors. They are a drag on the resources of the Federal Home Loan Bank System, and impose an even greater risk to FSLIC the longer they linger."
Do you agree with that statement?
A. Yes.
Q. What is the adverse effect on FSLIC and

Page 213

A. What percentage? I have, I really -- I'd be guessing. I mean --

MR. LEVITT: Don't guess.

A. So I'm not going to guess.

Q. Of those institutions that weren't profitable, generally what were the reasons for the lack of profitability?

We're talking again post-FIRREA.

A. Most of it was due to writeoff on non-performing assets.

Q. Can you tell me what these institutions did to try to regain profitability?

A. A lot of them, you know, to the extent that these assets, once the write-downs were taken, they disposed of the assets and redeployed them into interest earning assets. That helped quite a bit.

Rates started to move down, real estate markets picked up and, you know, the spreads between your bankable assets and your liabilities got a little wider, and a lot of them returned to profitability.

Q. So in the '90s the interest rate decline, coupled with an improving real estate and economic environment, allowed most of these institutions to

Page 214

return to profitability?

A. Yes.

Q. Post-FIRREA, how close to the capital requirements did an institution have to be to avoid being shut down?

A. Well, you know, I don't think you can generalize about that. There are some institutions that had, you know, were just under the capital requirement, but in terms of their financial condition were going south, continuing to experience losses, continuing to have to write down assets and, as compared to some other institution who might have had less capital, but had pretty well identified all their losses and were starting to turn it around.

So I don't think you can be, you can generalize in terms of what level of capital would have to be achieved before you started transferring them. We transferred institutions with 2, 3 percent, and we transferred some with 3 percent negative capital.

Q. So close enough depended upon the institution?

A. I think, you know, close enough, it was not a game of horse shoes, it's are they in

Page 215

capital compliance. If they're not in capital compliance, can they get back in, within a reasonable time, using a realistic capital plan.

If the answer is no, then we had very little alternative other than to transfer them to RTC, which is what we did.

Q. Can you take me through the process of the OTS preparing one of the S Memoranda to shut down an institution?

A. Well, as I recall, we went through, you know, the capital plan process, and determined if it was feasible.

If it wasn't, then we would then notify the RTC that this is an institution that's probably going to get transferred.

We would set up the recommendation using the supervisory memo prepared by staff that were working at the particular institution and supported by the regional lawyers.

We would send it to Washington for the Director's signoff and coordinate the transfer date with RTC.

Q. Who would make the decision that one of these memos recommending closure would be drafted?

A. The ultimate decision, in the Northeast

Page 216

Region the ultimate decision was mine, based on recommendations from staff.

Q. Who had the authority to approve those memos?

A. Regional memos?

Q. Yes, sir.

A. Me.

Q. How long did it take from the beginning of the S Memo process, creation, until it was approved?

A. At the regional level?

Q. Through the whole approval process.

A. Well, it depended upon, you know, the condition of the institution. It could -- and it depended upon the workload of the RTC.

It involved a lot of people, and we had to coordinate with them. So it could take a few weeks, it could take, you know, thirty to sixty days.

Q. Once an S Memo process started for the closing of an institution, in your experience, did it ever happen where the institution was not closed, the memo was withdrawn or for some other reason it didn't result in the closure of the institution?

Page 217

A. I don't have any recollection of any particular case where the Northeast Region recommended a transfer that didn't occur.

Q. When in the process was the RTC notified?

A. Once we decided that the institution was no longer viable, we would let the RTC know that they were going to get this institution.

Q. When in that S Memo process, was it before the beginning of the drafting of it?

A. We had a lot of conversation and a good relationship, working relationship with the RTC, so we would sit down, have periodic meetings and go over potential cases, so that when we said ABC institution is going to be transferred, they knew, it wasn't a surprise to them, generally, and it was just a matter of based on size and their resources, you know, when to do it.

MR. PLAISANCE: I'd like the court reporter to mark as Vigna Common 40 a document dated March 25, 1991 purporting to be a memo from Angelo Vigna to All OTS-Regulated Institutions - Northeast Region.

(The above-described document was marked Vigna Common Exhibit

Page 218

40 for identification, as of this date.)

Q. Mr. Vigna, this document purports to bear your signature. Do you recognize it?

A. I signed it. Let me read it and I'll tell you if I remember it at all.

I have a general recollection of this memo.

Q. Is your recollection that it purports to be what the title read, the different activities that were affected by FIRREA relating to maintaining adequate capital?

A. Yes.

MR. PLAISANCE: That's all I have, Mr. Vigna. Thank you.

MR. LEVITT: Pursuant to the amended Master Protective Order, Provision 6(d) on Pages 7 and 8, counsel for any party is permitted to state on the record during the deposition that specific questions and answers, or an entire line of inquiry, involves attorneys only material, and then confirm promptly after receipt of the transcript that the court reporter has marked the relevant portions

Page 219

of the deposition transcript with the designation "attorneys only material, subject to protective order."

I represent the United States and the witness, Mr. Vigna, and I've reviewed the exhibits that have been appended or will be appended to the transcript, submitted into evidence, and about which there have been a series of questions asked and answered.

These exhibits in part state on their face that they have been labeled "attorneys only material." The numbers that I have are 10, 11, 11 A, 12, 13, 15, 16, 18, 20, 24, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37 and 38.

Therefore, I state on the record that any questions and answers relating to these exhibits be classified "attorneys only material," and that the court reporter, when she prepares the transcript, make a note that the designation "attorneys only material" has to be on the pages of the transcript that relate to these exhibits.

Page 220

I suggest, however, that in view of the fact that there are 40 exhibits and over half of them, the ones I noted, contain attorneys only material, that a simpler solution to this is simply to have the entire transcript designated "attorneys only material," and in accordance with the Master Protective Order, I will endeavor upon receipt of the transcript to review it and then circulate a letter, if that's the appropriate procedure, undesignating portions that have been designated attorneys only as not being attorneys only when it appears that the material does not have to have that level of privilege at this point.

MR. MANNING: I have one comment, Mr. Levitt, and that is that my recollection is that the vast majority of the documents that contain "attorneys only material" labeling are from the Glendale and Statesman productions, as to which the government had an obligation to state that privilege within a period of

Angelo Vigna CONFIDENTIAL February 4, 1999

*Page 224 to Page 254*

CONDENSED TRANSCRIPT AND CONCORDANCE

*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

## Page 236

that with a yes or a no, which would be in addition to the explication of your previous testimony.

A. Yes.

Q. Were a number of thrifts whose capital fell below minimum standards after FIRREA able to come back into capital compliance?

MR. MANNING: Object to the form.

THE WITNESS: I'm sorry, could you read that back to me, please.

(The following question was read back by the reporter:

"Q. Were a number of thrifts whose capital fell below minimum standards after FIRREA able to come back into capital compliance?")

A. Yes.

Q. In the time period immediately after FIRREA, such as in or about early 1990, were there other factors wholly aside from the write-down of goodwill that would have negatively impacted the capital position of many thrifts?

A. Yes.

Q. What were some of these factors?

A. The major factor was the collapse of the

## Page 237

real estate market and the substantial increase in non-performing loans on many balance sheets.

Q. For the first three years following FIRREA, could an eligible thrift still count supervisory goodwill as regulatory capital up to an amount equalling 1.5 percent of its assets?

A. My recollection is that it could not.

Q. Do you recall that FIRREA contained a phase-out of the supervisory goodwill?

A. No.

Q. What is your recollection about what happened to the goodwill after FIRREA came into force?

A. My recollection is that it was no longer counted as capital. I don't recall any phasing. It could have been, but I just don't recall.

Q. Now I'd like to show you a second exhibit that Mr. Manning showed you yesterday and was introduced into evidence which was marked 27.

This is a letter from you to Shannon Fairbanks, the Executive Director in the office of the Chairman of the Board dated May 27, 1987.

Would you mind reviewing that, please.

Mr. Vigna, at the time you wrote this letter, had you completed your service as the

## Page 238

Acting Director of FSLIC?

A. Yes.

Q. Do you recall whether at or about the time you wrote this letter the Board was reviewing the operations of FSLIC, or some working group of the Board was reviewing the operations of FSLIC and was asking you your advice, having just served as Acting Director?

A. Yes.

Q. I'd like to direct your attention to the second paragraph on the first page. In it you state that, and I quote, "It could be argued that presently the investment of receivership assets is being handled extremely well internally by FSLIC."

Did you believe that receivership assets were being handled extremely well internally by FSLIC?

MR. MANNING: Object to the form.

A. I don't recall.

Q. During your tenure as Acting Director of FSLIC, did you find that the investment of receivership assets was being handled extremely well internally by FSLIC?

A. I don't recall.

Q. Now I'd like to show you an exhibit that

## Page 239

was marked yesterday as number 28, Mr. Vigna, and ask you to review it, please.

Mr. Vigna, this is a letter dated June 1st to the same person to whom you wrote the prior letter that we just examined, Shannon Fairbanks.

You state on Page 2 of the letter that, and I quote, "The first priority," and I would add for you, for resolving insolvent institutions, that's what your were talking about. "The first priority should always be institutions with liquidity problems."

Was it your experience that there tended to be a correlation between an institution having liquidity problems and an institution whose regulatory capital consisted primarily of supervisory goodwill?

MR. MANNING: Object to the form.

THE WITNESS: Could you read that question back, please.

(The following question was read back by the reporter:

"Was it your experience that there tended to be a correlation between an institution having liquidity problems and an institution whose regulatory capital

Angelo Vigna February 5, 1999

CONFIDENTIAL

*Page 198 to Page 419*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

Page 326

(The following question was read back by the reporter:

"Q. From the standpoint of the acquiring thrift, didn't it make little or no difference, with respect to the investment it was being required to make in the insolvent thrift, whether the net worth deficit of the insolvent thrift was filled with cash or goodwill?")

A. I think the preference obviously would be for cash, because, you know, they could use that and redeploy it and increase their earnings.

So, you know, cash and goodwill weren't on equal terms.

Q. In some cases, wouldn't the acquiring thrift be better off having the net worth deficit be filled with supervisory goodwill rather than cash, in that it was guaranteed a positive cash flow as a result of the mismatch between the accretion of the discount on long term mortgages and the long term amortization of the supervisory goodwill?

MR. MANNING: Object to the form.

A. From an accounting standpoint, that's correct. You know, the books would reflect

Page 327

positive earnings. But from an economic standpoint, it's just bookkeeping.

There's no substitute for cash and investment of cash for income. So on economic terms, while the accounting for goodwill was positive during the years of accretion, of discount accretion, it still is book entries as opposed to real economic earnings.

Q. Now I'd like to show you Exhibit 12, sir, from yesterday.

Have you been able to review Exhibit 12, Mr. Vigna?

A. Yes.

Q. This is a letter from the Secretary of the Board of the Federal Home Loan Bank Board to Mr. Thomas relating to the New York and Suburban Federal transaction, is that correct?

A. Yes, it is.

Q. Item 1 on the first page states that, "Scheduled assets acquired from New York and Suburban by Anchor did not have to be considered scheduled assets of Anchor for purposes of applying the Board's regulations."

Didn't this advantage Anchor in that the Board's regulations provided that an

Page 328

institution with too large a percentage of scheduled assets was considered to be in an unsafe and unsound condition?

A. Yes.

Q. Didn't this provision benefit Anchor as well in that there were additional minimum capital requirements in the Board's regulations to cover scheduled assets?

THE WITNESS: Could you read that question back, please.

(The following question was read back by the reporter:

"Q. Didn't this provision benefit Anchor as well in that there were additional minimum capital requirements in the Board's regulations to cover scheduled assets?")

A. I don't know if benefit is the right word. I think what it did was it didn't penalize them for the non-performing assets they acquired in this transaction.

Q. Item 2 in the exhibit provides that, "For five years the Board will not exercise its authority to enforce the minimum net worth requirement when Anchor's failure to satisfy the

Page 329

minimum net worth requirement is due to the lack of value in the scheduled assets acquired from New York and Suburban Federal."

Wasn't this another protection Anchor was receiving to give it the best opportunity possible to make good on the New York and Suburban Federal assets?

A. Yes.

Q. Isn't this another example of the acquiring company getting the most bargaining advantages it could to maximize the possibility that it would profit from the acquisition of FSLIC assets?

MR. MANNING: Object to the form.

A. Yes.

Q. Now I'd like to show you Exhibit 19, please.

I'm not going to ask any detailed questions, but I'd like you to just quickly review that, if you would.

A. I'm sorry, I can't read it.

Q. This exhibit apparently reflects that monthly reports were compiled on the status of so-called Category I cases, is this correct?

A. Yes.