# EXHIBIT V

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
- - - - - - - - - - - - - - - - )

Washington, D.C.
Thursday, March 2, 2006

Deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:38, Thursday, March 2, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 6

PROCEEDINGS

Whereupon,
JAMES F. VORDTRIEDE
was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:

Q. Mr. Vordtriede, when did you prepare these documents that your counsel has just provided to us?
A. I believe I prepared -- I started preparing them when I was asked to be deposed in May of 2005. I was partially finished with them -- I was in progress with them when the deposition was postponed, so when we got a new date for this -- the deposition today, I started over with them, or resumed with them, and brought them to the current state.
Q. What is your understanding of your obligation to produce documents to the plaintiff that are responsive to our document requests?
I mean, are you aware of the fact that in early last year, we asked for all documents relating

Page 7

to the calculation of Carteret's tax liability from 1992 to the present?
A. Not specifically.
If I did, I would not have understood them to have applied to these calculations I was making.
Q. Is that because these calculations don't pertain to Carteret's tax liability from '92 to the present?
A. They do pertain to Carteret's tax liability. I can't remember what my thought process was back then insofar as coming forward with the documents. I wasn't sure if they'd be applicable or not.
Q. When did you first surface the -- why are we getting these documents now this morning at the commencement of this deposition?
Why didn't we get them months ago?
A. I wasn't aware of the need to come forward with them. I was merely trying to run the FFA calculations, federal financial assistance, through our new model that's updated to say what the results would have been.
Q. And this is -- how did you come up with the idea to do that?
Was that your idea, to run these numbers?

Page 8

A. Yes.
Q. And why were you doing this?
A. Questions would have come up in the deposition with respect to the federal financial assistance shown on the tax returns.
Q. And so you were trying to assess whether those tax returns were accurate?
A. Yes.
Q. Did you look at any other aspects of the tax returns to assess their accuracy?
A. Well, I looked at the returns. I don't believe any of the years -- the earlier years in particular had work papers, so it was more or less a general review. I realized the questions were going to come up on things like the premium in 1995 and gains and losses on disposition of assets, so I believe I made a line item in the summary I show there.
But as to their accuracy, I believe it was just a general review.
Q. You made reference to your new computer model for FFA.
Is that software that's publicly available?
Could I go down and buy that software?

Page 9

A. It's self-authored.
Q. Self-authored.
Is there a handbook that explains how to use the software?
A. It's in Excel.
Q. It's in Excel.
MR. THOMPSON: We'd like to request a copy of that software be produced immediately. Obviously, we can't have -- we can't ask meaningful questions about these documents if we don't understand the program that generated them, and we're going to hold the deposition open until we get that.
BY MR. THOMPSON:
Q. But what are the assumptions that go into that model?
A. I tried to take the regulations as finalized under section 597 -- I believe it's 1.597, hyphen, 2. And I tried to model line by line through the regs toward the determination of what federal financial assistance, FFA, would be taxed currently in each year.
Q. And was this a model that you authored?
A. Yes.
It was an update from an earlier model.
Q. Did you update it for the purposes of this

Page 18

When we reorganized -- and I'm not sure of the date. It might have been Labor Day, which would put this after the reorganization date -- I report to a different person officially now, but I still more or less unofficially report to Wayne Green. Wayne generally gives me marching orders if he wants me to do something.
Q. What is your official title at the FDIC?
A. Officially my title is senior financial management analyst.
Q. And what part of the FDIC are you in?
A. Division of resolutions and receiverships -- called DRR, the acronym. I believe it's in the general accounting section. They change it all the time -- and the tax unit.
Q. Now, it says in your email that the parent company would like to eliminate the large tax liability.
Wouldn't the FDIC like to eliminate that tax liability as well to the extent it was possible?
A. Well, all things equal, it would be, yes, but I mean, it's 1995, and it's 10 years later. I suppose we would not at this point be thinking in terms of amending the return, because the statute date has lapsed.

Page 19

Q. You mean the statute for the Internal Revenue Service to come after the FDIC for violating the Internal Revenue Code?
A. To file an amended return if you could reduce the tax liability.
Q. There's a statute that would preclude the FDIC from amending the 1995 return today?
A. It would be the general statute of limitations for amending a tax return once it's filed.
Q. What's the source of authority for that?
Do you happen to know?
A. It's one of the sections. I'm not sure of the exact code section. It's entitled 26 USC, the Internal Revenue Code.
Q. It's the FDIC's position that it's precluded by law from amending the 1995 return?
A. Except at the discretion of the service, yes.
Q. Okay. And have you approached the service for such -- to ask for such discretion?
A. No.
Q. Okay. Do you have any reason to believe the IRS would you turn you down if you sought leave to amend the 1995 return to make it more accurate?

Page 20

A. If I approached them asking them if we could amend the 1995 return through normal channels like say through the center, yes, they would turn us down.
Q. What happens if then -- you'd have the right to appeal that, wouldn't you?
A. Yeah, but you need a basis to appeal upon.
Q. Right.
And if the statute would not prohibit you from filing the amended return, is there any other reason -- is there any reason not to amend it to make it -- if you concluded amendment would make it more accurate?
A. If the return was open for amendment under the statute of limitations, if you were still within the statute of limitations, it would be available to be amended if you had a reason to do so.
Q. And would the FDIC do so if amending it would conserve assets for the creditors?
A. Yes.
Q. And when you talk about the statute of limitations, is that the statute of limitations for the IRS to come after the FDIC for filing an inaccurate return?
A. Yeah.

Page 21

I believe it's essentially the same statute, although I'd have to look at the code. It's a statute that says the IRS cannot come after the receivership for more taxes for an additional assessment, and the FDIC as receiver also cannot go back and ask for more money through an amendment.
This doesn't include assets under a different statute.
Q. What was your understanding of what the statute of limitations is for the FDIC's ability to amend returns?
A. In general terms?
Q. Specifically vis-a-vis the Carteret 1995 return.
A. What the statute of limitations means?
Q. How long was it?
A. Oh.
The standard statute date is 3 years plus -- 3 years from the due date of the return plus extensions.
Q. Plus extensions that were obtained?
A. Right.
Q. So if for example the -- an extension had been obtained until September 15th, 1996, for the 1995 return, then you could make amendments until

Page 70

Correct?
A. Yes.
Q. And the inclusion of this amount of accrued interest is fully consistent with the modified accrual method?
A. Yes.
My answer I guess would be yes.
Q. Okay. And --
A. We're following the books.
Q. And who provides the books to you and your colleagues when you're preparing the tax return?
A. For this return, we would have gone to what we call the financial data warehouse, where they have online all the financials for the different receiverships accessible, and we would print them out.
I believe that's what we would have done for 2004. 2005 is a different story.
Q. 2005 is a different story?
A. Yes.
We're at the end of a new financial system. We haven't experienced what we're going to do there yet.
Q. If you have a question about postinsolvency interest, who would you ask for help

Page 71

in answering that question?
A. Wayne Green.
Q. Have you ever had conversation with anyone at the FDIC about the amount of postinsolvency interest to be included in any of Carteret's tax returns?
A. I don't believe I ever have with respect to Carteret.
Q. Okay. Or with any other institution?
A. Yes.
Q. Tell me about those conversations.
A. From recollection, I believe we can run into a problem with the accrual where all of a sudden, I believe when 95 percent of the claims have been paid, they start accruing postinsolvency interest. That's my understanding of what the policy is or at least what it was.
So you go to prepare a tax return, and all of a sudden, this huge accrual shows up in one year, and you claim it as a deduction. Come 2 years later, some of this accrual isn't -- some of these accruals -- this accrual is not paid.
They turn around and reverse it, and you're hit with a big income item. We had to figure out what we were going to do there, because you would

Page 72

run into alternative minimum tax problems, the flip-flopping, you know, huge deduction, huge income item.
If you'd carry the huge deduction, if it creates a net operating loss, you can carry it forward, but then you only get 90 percent coverage on the alternative minimum taxable income. So we had to decide what to do. And we've never I don't believe truly solved the issue.
I think what we decided to do was, if we could go back -- if we run into this huge income item, we can go back and amend the initial returns, we'll do that. Otherwise, I believe if the claims aren't being paid, and this income item -- the original accrual is reversed, it means you can't pay all the PII. The claims have been paid, but the postinsolvency interest won't be paid.
I suppose that would mean as I sit here that the thrift or the bank in receivership remained insolvent, and so the tax wouldn't be paid anyway, so perhaps you're covered.
Q. All right. And is that the reason -- or you tell me, why is it that accrued interest would be reversed and taken off the books because it was clear that it wasn't going to be paid?

Page 73

A. Yeah. Yes.
What my understanding is, when it's clear that the interest isn't going to be paid. And it might be right at the point where they're ready to fold, reverse all the remaining balances on the financials and terminate the institution, that this income item pops up.
It doesn't happen that often, so I don't have a lot of experience in investigating this.
But I'm losing my train of thought on your question.
Q. That's all right.
Do you recall which institutions had this situation?
A. No, I don't.
It's generally a preparor coming to me saying, what do we do.
Q. And it comes up -- just so the record is clear -- at termination when they're reversing the accrued interest charges on PII, and then they would generate a large taxable income item?
A. I believe that's when it comes up. I'm not certain if it would come up sooner or not.
Q. And the amount of interest that was reported on the 1993 tax return, postinsolvency

Page 86

Q. All right. Now, let's look at the postinsolvency interest deduction for 1998. It can be found on page 95473.
It's in the amount of 63,737,160; is that right?
A. Yes.
Q. All right.
MR. THOMPSON: I'd like to ask the reporter to mark as Vordtriede 11 a document that bears the Bates number AM 00092190 through 92205.
(Vordtriede Exhibit No. 11 was marked for identification.)
BY MR. THOMPSON:
Q. I apologize that the copy is a little bit askew here, but this is the calculation of accrued interest on priority 6 claimants.
Do you see that?
It says, FIN, 1309?
A. Yes.
Q. And FIN 1309, that's Carteret.
Right?
A. Yes.
Q. Okay. And I'll represent to you that this was produced to us by the FDIC back in 1999, and

Page 87

you'll see that it shows interest that starts to accrue on October 28th, 1994, and then it goes through on the last page, December 31, 1997.
Do you see that?
A. Yes.
Q. Okay. And the total amount of interest that accrued matches to the dollar the amount of interest that was deducted in the 1998 return.
Correct?
A. Looking at the summary on the last page, the accrued interest?
Q. Yes.
A. Yes, it matches the return.
Q. Okay. And the Vordtriede 11, the spreadsheet showing the calculation of interest, it doesn't have any interest for calendar year 1998 in it, does it?
A. No, it does not.
Q. So all the interest relates to '94 through '97; is that right?
A. Yes.
Q. Is it fair to say that the amount of interest that was deducted in the 1998 return accrued at an earlier date, namely '94 through '97?
A. Yes, earlier years.

Page 88

Q. Okay. And some of the interest accrued during '95; is that right?
A. Yes.
Q. And some accrued during '96?
A. Yes.
Q. And some accrued during '97?
A. Yes.
Q. Okay. Do you know why the interest that accrued in '95, '96, and '97 wasn't deducted until 1998?
A. I don't know specifically.
I'm assuming the computation was done in 1998, but it's an assumption. I don't know the answer.
Q. Okay. Now, the Internal Revenue Code requires taxpayers to reflect expenses in the year in which they were accrued, correct, if they're on the accrual method or the modified accru- --
A. All-events test under -- the standard accrual would be taken into account under an all-events test, section 461, which would be the liability is fixed and the amount is ascertainable.
Q. Okay. And --
A. Whether this deduction meets that standard is arguable.

Page 89

Q. Well, I mean, the liability was fixed.
Right?
I mean, the money was lent from the RTC to Carteret on the dates reflected in Vordtriede 11?
A. The liability was fixed, yeah.
Q. Yes.
Okay?
A. The liability for the assistance.
Q. Yes, was fixed?
A. The claim was fixed.
Q. Yeah.
And in terms of whether the amount was ascertainable, all you needed is a calculator, right, and you can apply the interest rates and you can fix the amount; isn't that right?
A. Yes.
Q. So the amounts of interest that are reflected in Vordtriede 11 had accrued prior to 1998; is that correct?
A. Correct.
Q. All right. And if the FDIC had become aware of this in 1999, weren't they under an obligation to amend those prior returns to make them accurate?
A. You're asking me if we should have amended

Page 90

'94 and --
Q. Let's take '96 -- 95, '96, and '97.
A. Place the interest accruals under the proper years?
Q. Yes, sir.
A. I don't know that that's the case. You can argue that it was -- you could argue that the liability for the interest wasn't fixed at that time. You could argue it was too contingent.
Q. Why is that?
Why would it have been too contingent?
I mean, that interest is owed. Ambase can't get a dollar out of this receivership until that interest is owed.
Isn't that true?
A. Yeah, you could argue it that way. I'm thinking the -- I'd have to think about it.
Q. Well, I don't understand why, if it accrued in an earlier year, it wouldn't have been appropriate to amend the return to reflect that.
A. I guess I'm thinking in terms of the liability for the interest not being triggered until there's a certainty of the claims being paid off in full.
Q. Where does that concept come from?

Page 91

Is that a GAAP concept?
A. No.
I'm thinking more in terms of the all-events test for 61 fixing the liability.
Q. Well, I mean, if you're -- if we're 2 private parties, and you lend me 1.3 billion dollars, and it's not clear when you lend me that money that I'm actually going to be able to pay it all back, interest and principal, I'm still entitled to deduct the interest that's accruing on that loan, aren't I?
MR. GILBERT: Objection, arguing with the witness.
BY MR. THOMPSON:
Q. You can answer.
A. Say that again.
BY MR. THOMPSON:
Q. Yes.
If there's a transaction between 2 parties, a bank and a lender, and a bank makes a loan of 1.3 billion dollars in 1995, and it's unclear whether the lender is actually going to be able to pay the money back because it starts to experience some difficulties after it receives the loan, if that borrower is on the accrual method of accounting, it is entitled to take a deduction of the interest

Page 92

that's accruing, isn't it?
MR. GILBERT: Objection, compound question.
A. I'm not sure what position I'd take with that.
I mean, you have a valid point. The FDIC began accruing in 1998. I would like to know why the -- why they wait until the trigger point, what the reasoning is on that, and then take that to the tax law and decide.
You might be right.
BY MR. THOMPSON:
Q. You just don't know?
A. I don't know at this point.
Q. Okay. Now, let's look -- let me ask you: When did you personally first become aware of this problem, of this situation where interest is accruing in '95, '96, '97, and it's not being taken as a deduction until '98?
A. First time I've thought about it is right now.
Q. Okay. And to the extent the FDIC had gone back and amended the '95, '96, and '97 returns, the way they would do that is, they'd look at the interest on the spreadsheet, whatever spreadsheet

Page 93

they were using, and they would deduct that -- the interest that accrued in '95 from the '95 taxable income.
Correct?
A. Yeah, assuming you came to the conclusion that that was the proper thing to do and that's what you would do, yes.
Q. Okay. And then for 1996, you'd do the same thing.
Right?
A. Yes.
Q. And '97 you'd do the same thing?
A. Yes.
Q. To the extent this increased the taxable loss in '96 and '97, those losses could be carried back to '95.
Correct?
A. Yes.
I believe there's a 3-year carryback for those years.
Q. Right.
But because the deduction was taken -- wasn't taken until 1998, it couldn't be carried back to '95, could it?
A. 1998, I'm not sure if there was a 3-year

Page 110

A. No reason to doubt it.
Q. Okay. Now, let's look at the form 8275, which is on page 90089, and again, the numbers are in the left-hand column.
All right. Now, what is the purpose of a form 8275?
A. I haven't filed one in a while, so I haven't looked at it in a while.
My recollection is that it's a disclosure to the commissioner, giving him full disclosure that you're deviating from the regulations in some form or another.
Q. Okay. Now, it says under, tax accounting method -- the second full paragraph reads, quote: For tax year ended December 31, comma, 1994, Carteret Federal Savings Bank was on the accrual method of accounting for tax purposes.
Do you have any reason to doubt the validity of that statement?
A. Let's see here. You're in this second -- third paragraph?
Q. Yeah.
A. This one here?
Q. Yes, sir.
A. I have no reason to think otherwise.

Page 111

Q. Okay. Now, in the next sentence, it reads: For tax year ended December 31, '95, it was impossible to determine the amount of adjustment which would be necessary in order to convert the hybrid method to the accrual method for tax purposes, because the corporation is in the liquidation process, records are not kept by the FDIC, successor of the RTC, as to the income and expense on the accrual method of accounting. Consequently, the hybrid method was used on December 31, '95, federal corporation income tax return.
Do you have any reason to dispute that statement?
A. Yeah, I think I would.
I've never seen things stated quite that way, because the corporation is in the liquidation process, records are not kept by the FDIC, successor of the RTC -- I don't know how the record is transferred over as I sit here as to the income and expense on the accrual method of accounting. Consequently the hybrid method was used -- I don't think I'd have put that statement in this return.
Q. Well, do you think that there was a change in methodology from accrual to a modified hybrid or accrual?

Page 112

A. The -- there was a difference between the modified accrual that we have -- that we follow based on the FDIC accounting system. I suppose here we're talking about the RTC, and I suppose FMS, which the RTC used, was very close to the FIS system that FDIC used, with some differences, but I call them both modified accrual basis.
Q. But it is a change in accounting methodology from what had been used previously.
Correct?
A. The methods are different.
I would not call it a change in accounting method.
Q. Now, it says in the bottom paragraph on this page: The corporation did not receive permission to switch its method of accounting as required by regulation 1.446, et cetera, et cetera.
Do you have any reason to doubt the validity of that statement?
A. No, I have no reason to doubt it.
Q. Was the FDIC required to request the IRS's permission to switch its method of accounting?
A. My position would be that they were not required to ask permission.
Q. Because there wasn't a switch?

Page 113

A. Because the switch was based on a change in the underlying facts.
Q. And if there's a change in the underlying facts under section 446 of the code, there doesn't need to be permission granted by the IRS?
A. Yeah.
I think the regs say, correction of a math error and change in the underlying facts are 2 exceptions to the rule of requesting permission for changing the accounting method.
Q. And what would the change in the underlying facts here have been that would have allowed the FDIC not to ask for permission?
A. Essentially, the closing of the institution, placement into receivership.
Q. Now, Carteret remained a C corporation even after the closing.
Correct?
A. Yes.
Q. All right. And it had more than 5 million dollars of gross income in 1995.
Correct?
You can flip to the first page.
A. I'm sorry.
Q. That's fine.

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
- - - - - - - - - - - - - - - - - - )

Washington, D.C.
Friday, March 3, 2006

Continued Deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:36 a.m., Friday, March 3, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 253

page shows 160 million. Unfortunately there isn't a page number on this.
Go to the line 10, other income detail, right behind the tax return.
A. I'll find it.
Q. It's 1, 2, 3 -- 4 pages in.
If you look at line 10, other income, and you look at all the different line items that are there which are going into a portion of that 160 million and other income that shows up on the tax return, would you agree that the majority of Carteret's 1995 taxable income resulted from premiums?
A. Yes.
Q. Now, do you believe that income resulting from premiums is taxable?
A. Yes.
Q. And according to this schedule, the amount of premiums realized was 134 million; is that correct?
A. Yes.
Q. All right. Mr. Vordtriede, who at the FDIC and I guess previously the RTC would be responsible for the filing of Carteret's 1995 tax return?

Page 254

A. That's a good question.
I believe since it was signed in late 1996, it would have been the Dallas tax unit. The 2 main tax people there were David Jones, who signed one of the returns -- was it this one? -- he signed this return -- and Rick Cywinski, and they reported to Sharon Kelly, who reported to Johnny Wells, but I think the 2 main tax people were Rick Cywinski and David Jones.
Q. You indicated that there were contractors who were preparing these tax returns.
Correct?
A. Yes.
Q. Would these tax returns have been reviewed by an RTC person or FDIC person before being approved for filing?
A. Yes.
Q. And is that why it's signed by an RTC person or FDIC person, to signify that?
A. Yeah.
That would not necessarily mean a review took place, but -- well, it should indicate a review took place and the person signing is satisfied that the return was correct, so I would say yes.
Q. I understand that you weren't there at

Page 255

that time, so you don't have personal knowledge as to what occurred, but it would have been standard practice, though, for a return to be reviewed by an FDIC or RTC person that was prepared by a contractor?
A. Yes.
Q. You also mentioned yesterday that there was a technical review board that was involved in the selection of accounting firms; is that correct?
A. Yes.
Q. Now, was the purpose of this technical review board to assure that there is a certain level of competence and technical ability for the firms that were selected?
A. Yes.
Q. Okay. I'm going to go back to the 1995 tax return, which is exhibit 16.
If you look at the first page of that tax return, you'll see that it indicates on line 31 of the tax return calculated total taxes of 32.1 million.
Do you see that on line 31?
A. Yes.
Q. Okay. And you also notice that there's a zero that has been handwritten there, and it refers to the IRS-RTC interagency agreement; is that

Page 256

correct?
A. Yes.
Q. All right. Now, I'm not sure if you also remember -- we can get this exhibit out if you need -- but on the amended 1995 tax return, it also indicates zero taxes and it refers to the IRS-RTC interagency agreement?
A. I believe that's correct.
Q. Okay. Now, why did you write that the 1995 tax liability was uncollectible for -- per the IRS-RTC interagency agreement?
A. Basically according to the interagency agreement, there is a deferral mechanism in place until the institution -- in the case of the RTC receiverships under the interagency agreement -- there's a deferral in existence until the institution can no longer be certified by the RTC, subsequently the FDIC.
Certification is 3-part, and its all 3 parts need to be satisfied in the affirmative to certify the institution. Basically you're certifying that the institution is insolvent, assets are less than liability, and that I believe if any federal income tax would be paid with an RTC institution, additional treasury funds would have been necessary

Page 257

and so they wanted to avoid paying taxes to the treasury, which would necessitate the same funds coming back to the institution.

So they basically adopted section 7507 and called it something else in the interagency agreement. It's the same type of deferral, which says, if all assets are not adequate to satisfy demands of depositors, the claims of depositors, the federal income tax will be deferred.

Q. So this federal income tax for 1995 becomes a deferred contingent liability of the receivership?

A. Essentially, yes.

Q. Let me have you turn back to the goodwill reporting package, which is exhibit 45, I believe and if I could have you turn to page 357 of that, bottom right-hand corner, and I'm going to read out loud footnote -- a part of footnote 3, rather, to report 3.

Starting with the second sentence: An agreement signed between the IRS and the former RTC provides for a deferral of these tax liabilities as long as there are insufficient assets to pay depositor claims in full. Once depositor claims are paid in full, the tax liability becomes due and will

Page 258

be paid in accordance with the order of priority contained in 12 USC, section 1821 D 11. The potential tax effect of any pending litigation settlement has not been considered at this time.

Now, is this footnote referring to that IRS-RTC interagency agreement?

A. Yes.

Q. When it says here, depositor claims, do you know what it's referring to?

A. Yes.

The RTC in this case would have paid off depositors, giving them a check up to 100,000 dollars on their deposit accounts. And then RTC would be subrogated to their claim against the receivership estate.

Q. So it's referring really to the subrogated claim of the FDIC?

A. Yes.

Q. Is the IRS-RTC interagency agreement still binding upon the IRS and the FDIC as successor to the RTC?

A. I believe the FDIC views it as such.

Q. Okay. Have you heard anything different from the IRS, that it wouldn't be binding upon them?

A. No.

Page 259

I believe the IRS would want it to stay in place even though things are winding downwards, not as important to them. I've never heard anything from the IRS that they'd like to do away with it.

Q. Mr. Vordtriede, could you explain, what exactly is FFA?

A. The acronym stands for federal financial assistance.

Q. And how was it utilized by thrifts?

A. Basically, when a thrift was deemed to be insolvent by bank examiners, by what banking authority is at issue, assistance is needed to recapitalize the institution such that it can be the subject of a purchase and assumption agreement, which is a lower cost way of closing an institution than a full payout where you line up depositors outside the doors of the bank and start writing them checks.

And in the case of Carteret, it was cheaper because of the premium involved, and that's usually the case. So basically, the assistance will roughly equate to the fair market value of the assets minus liabilities of the institution such that negative equity can be brought to zero.

And the assuming banks can bid on the parts of the failed bank that they're interested in.

Page 260

Usually they'll assume the deposit balances and pick whatever assets they want to purchase and then accept cash for the difference plus or minus a premium.

Q. Okay. And what is the difference between the proposed and finalized FFA regulations?

A. The proposed regulations came out in April of '92 -- they're really a trial balloon, a set of proposed regs the IRS is presenting to the industry, to all users of these regulations, soliciting comments. I believe when the regulations are in proposed form, you have the option of using them or not, if I remember correctly.

The finalized regs came along in 1995, December. And there are probably other differences than the one I'll mention, but the main feature of the finalized regs was the provision for what we call remaining equity, and that was an attempt to defer the taxation on federal financial assistance on what we would call temporary assistance, which would be assistance over and above permanent assistance, and permanent assistance defined as the fair market value of the assets minus liabilities.

In other words, that would be the amount of assistance that the institution, failed institution could not repay from its own assets.

Page 261

Temporary assistance was looked upon as more of a bridge loan, and so the IRS agreed that the assistance shouldn't be taxed because at some point it would be repaid. The assets would be available.
Q. Okay. I'm going to have you turn back to exhibit 16, which is the 1995 federal income tax return. Turn to page 86, which is near to the back. It's in small numbers on the left-hand side.
A. Yep.
Q. Now, at the bottom of this page, you can see that the federal financial assistance as of December 31st, 1995, totaled approximately 305,387,229 dollars.
Correct?
A. Correct.
Q. Do you know if this is the remaining balance of the FDIC borrowings for the subrogated claim?
A. I believe -- this is the RTC version of the FFA computation, which was different than the one I prescribed. This one came from Jim Small, the RTC, and I believe it shows up for 1995 only.
Your question was --
Q. I was wondering if you happen to know if this balance of FFA at this point in time was the

Page 262

remaining balance of the borrowings from FDIC corporate?
A. I believe his formula for computing the total FFA -- I guess we would call it the deferred balance at the time --
Q. Actually I wouldn't need you to get into the -- because you didn't do the calculation.
MR. GILBERT: Let the witness finish his answer, please.
BY MS. HART:
Q. Sure.
A. I believe the accounts that he measured this number from were -- might go a little broader than the subrogating claim, although I'd have to sit down and actually study the accounts he used.
Q. Would you know whether or not this balance equals the remaining balance of the subrogated claim?
A. I would have to check, but I don't think it does. I think it's a different amount.
I think he's picking up other accounts that I don't use, like receivership billings and repayments of receivership billings. The definition of FFA is sort of a broad term, and you can interpret it more broadly or more narrowly.
For instance, if you take into account

Page 263

receivership billings and repayments, you could define that as FFA, but I've never taken them into account because they seem to amount to white noise, just a lot of static. The receivership is billed by the corporation, and the amounts are repaid right away.
So I thought it was an unnecessary detail. Jim Small went farther and included that in his computations. So when you're asking if this amount corresponds to a subrogated claim, it's probably different because of different accounts that he used, which didn't necessarily relate to a subrogated claim.
Q. But since you didn't do that calculation, you're not absolutely certain?
A. Right.
It depends on how we define subrogated claim. Any claim in the name of RTC, if you're going to define that as subrogated claim might go beyond depositors.
I'm not an expert on liability accounting. It depends on how you define subrogated claim, and then I'd have to sit down and look at the numbers and the accounts used.
Q. Okay. Staying on the topic of the FFA

Page 264

just for a moment, you had mentioned earlier that in coming up with your changed model for FFA that that was based upon your reading of the legislative history of the FFA statute, regulation?
A. Right.
We had the issue that the old model might not be correct. I went back to look and see if they were right.
I determined that the model wasn't correct. It was either too aggressive or not aggressive enough.
In deciding which way to go, the minority view was, it was not aggressive enough, because I thought according to the committee reports, the consensus of what the regs were actually trying to say, whether they were saying it or not, was the less aggressive approach, which would end up potentially to report more FFA faster. So we changed it in that direction.
Q. Okay. Just to clarify: Your new determination for FFA was based upon the committee notes you indicated for a regulation or statute?
A. I believe the committee reports would support the statute, and Congress and the statute delegated writing the rules on how this statute is

Page 265

going to work, ultimately the commissioners. So commissioner's regs in effect become equal to the statute.
I think they call them legislative regs instead of merely interpretive. They're heavier, more authoritative.
Q. It sounds like based upon this process you used, there isn't really a general consensus on one particular way or the other to calculate these numbers.
A. I'll tell you, if I had taken a more aggressive approach, I think I would have gotten IRS attention probably pretty quick. The new model has never been reviewed as yet, although it's in a 2003 return and a 2004 return, and we're using it for 2005 as well. But no one has actually sat down, IRS or otherwise, and reviewed what I've done.
So essentially you've got almost a consensus of one as to what the regs mean. And you hear all the time that tax law is getting so complicated that nobody can agree on what it means. And here is a perfect example. These regs are very, very difficult to interpret.
Q. So at this point in time, no one has agreed with or reviewed the FFA calculations that

Page 266

you've made now?
A. I don't believe anyone has formally reviewed them. When -- strike that.
I won't say what I was going to say.
Q. Okay. Did the IRS ever object to the prior way that FFA was being calculated?
A. I started using the model, and this was my model. It became the FDIC's model when I got to Dallas and all of tax was in Dallas. It was used from 1993 through 2003, and it survived many audits, and no revenue agent ever made a complaint about it until 2003. Then we got the -- the issue came up, so we took a look at it.
Q. When that issue came up in 2003, it was actually the Washington, D.C., tax unit that brought the issue up.
Correct?
A. Yes.
I believe what prompted their complaint was in regard to computations being done I believe by a revenue agent working on a different receivership with the Washington tax unit, how they were applying repayments in whatever model they were using.
So Washington saw what they were doing and compared it in their visitation up to Dallas, saw we

Page 267

were doing something else, and raised the issue.
Q. Has there ever been a comparison between -- first of all, do you have any personal knowledge of an IRS agent having some issues and bringing it to the attention of the Washington tax unit?
A. As to how the repayments were being handled?
Q. No.
Do you have any personal knowledge as to the IRS bringing up this issue in 2003?
A. You're asking, did IRS prompt the Washington inquiry by raising the issue first?
Q. You mentioned that you weren't sure if the IRS had brought up this issue in 2003, but you had heard that maybe a revenue agent working on another receivership could have brought it up.
Do you have any personal knowledge about that actually happening?
A. No, I don't.
It could have been merely that the Washington people were watching what the IRS was doing and saw I was doing something different and raised the issue.
Q. You indicated that perhaps the IRS could

Page 268

be using some type of model that differs from the model that the FDIC uses.
Correct?
A. Yes.
I can't give you any detail, but I'm guessing that their model is much simpler than the newest model that we have now, especially for the enhancements for the last 2 pages of the model where we were explaining the enhancement we did for the special calculations for this deposition, beginning equity on a tax basis, and the remaining equity.
In the tax returns, we didn't do that computation. For purposes of this deposition and ascertaining the veracity of what the FFA quoted in the returns, we did do the computation.
Q. Has there been any comparison between the models that the IRS would use and the model that you are currently using now?
A. I would hope they'd be close.
I don't know what the IRS is doing with these 2 extra elements that I mentioned. They might be taking a more conservative approach than I am. The book to tax adjustments, trying to go from book equity and these 2 elements to a tax basis equity that the regs call for, I'm using a computation of

Page 269

cumulative schedule M 1 adjustments going as far back as I can.

In Carteret's case, I believe we could go back to 1939, but I have back to 1980. That is something I saw the IRS accept with respect to another receivership, and Deloitte & Touche did the computation. They were doing it I believe with respect to something else. Maybe it was with respect to FFA and maybe it wasn't. But IRS accepted it.

It took them a while to understand what was going on. So I decided to apply it here so that rather than using book value for these 2 elements to try and get closer to a tax basis number, which I believe would be more beneficial to the receivership, not necessarily, but --

Q. As to Carteret, though, the IRS has also accepted the FFA calculations that were done previously too.

Correct?

A. Say that again.

Q. With respect to the Carteret receivership, the IRS has accepted the FFA calculations that were done previously?

A. Yes, they have.

Q. I want to have one more followup question

Page 270

to the IRS-RTC interagency agreement. Let's say a receivership becomes solvent, actually can pay the debts that it owes.

Per or pursuant to the interagency agreement, at that point in time, the deferred tax liability would then become due, wouldn't it, because the receivership had become solvent?

A. Yes.

At the point it becomes solvent, however, I think there's some cloudiness as to how you're going to measure solvency, but let's just say it comes off the financial statements, the FDIC could no longer certify that institution as being I guess certifiable, and tax would be no longer deferred, and it would become collectible.

And I believe at that point, it would be -- the IRS would take the amount -- they've already assessed it, because they can assess under the interagency agreement, whereas section 7507 said technically they shouldn't assess or collect. The IRS always assesses anyway because that's the only way they can track it.

At that point they've assessed the tax. Now they're going to contact our claims division in theory and update their claim by putting the tax onto

Page 271

their proof of claim. Then they sit and wait according to their priority to collect or not.

Q. Okay. And as to the receivership, pursuant to the rules of priority, that deferred tax would then be collectible and due at that point in time?

A. Yes, according to the priority.

Q. Okay. Another question concerning the contractors that you obtained to prepare tax returns. I do realize that a lot of this occurred before you were at Dallas and involved with Carteret.

Do you know if it would have been standard practice to provide blueprints and templates to the contractors that prepared returns for receiverships?

A. If they were being prepared, they would be provided to the preparor. That was one of the main reasons it came about.

This goes back to 1988 when I was in Kansas City. They told me to get the returns filed. I couldn't -- I didn't have time to do it myself. I didn't want them to come in a hundred different ways. If I hired 10 different contractors, you get 10 different types of returns.

So I decided, well, I'm going to give them something they have to follow. So we gave them

Page 272

basically a schedule M 1 to show them book-tax reconciliation. They could explode that onto a tax return.

But this was something unique to wherever I was. When I got to Dallas, they adopted it because I made them adopt it. So I believe you're talking about before I got down there. I don't think they would have been doing blueprint then.

What instructions they gave to the preparor, it might have been just verbal, and then Q and A after that, which is rather tough on a preparor.

Q. You mentioned Q and A.

Was the RTC staff available to answer questions for preparors?

A. Yes, they were.

Q. Okay. And did they in fact answer questions that preparors might have had in preparing the tax returns?

A. I'm sure they tried their best.

Q. Okay.

A. I mean, these are very strange type of returns to outside preparors, very unique, and it takes a while to understand exactly what's going on.

Q. But these preparors would prepare more

Page 277

once again to the liabilities there, and go ahead down to the line item that says, estimated interest on claims, and then in parentheses, note 6, then you'll notice it has 63,737,160?
A. Yes.
Q. Now, let's turn back to exhibit 45, which is the May 10, 2005, goodwill reporting package.
A. This one here?
Q. Yeah.
If you can go ahead to the very last page of that, and I'm going to read what note 6 says to the financial statements: Estimated interest on claims, applicable law governs or directs the payment of postinsolvency interest to creditors holding proven claims against the receivership estate, including the claims held by the FDIC in its corporate capacity. Postinsolvency interest is the interest paid on proven creditor claims under certain circumstances after a receivership is appointed. Uncertainties exist as to the universe of creditors whose claims will ultimately be allowed and whether creditors will receive the full principal amount of proven claims again the receivership estate or any postinsolvency interest. No distribution will be made to holders of equity interest until after

Page 278

allowed creditor claims have been paid principal and any postinsolvency interest in full.
This is the important part.
Generally the estimated liability for the total amount of postinsolvency interest payable respective to creditor claims is recognized in these financial statements when at least 95 percent of the principal of proven creditor claims has been paid.
Okay?
Now, I will represent to you that in November 30th, 1998, that 95 percent payment threshold had been reached.
Okay?
And at that point in time, we see postinsolvency interest being accrued on the financial statements for the first time.
A. It was in 1998?
Q. November 1998.
Okay?
Now, assuming the truth of that representation that I just made to you, was the accrual of postinsolvency interest in November 1998 by Carteret consistent with this 95 percent payment policy?
A. Was the accrual consistent?

Page 279

Q. M-hm.
A. Yes, I believe it would be.
Q. Would you also agree that consistent with the IRS code and RTC, FDIC policy, it would not have been appropriate to recognize postinsolvency interest for tax purposes prior to its accrual by Carteret on these financial statements?
A. Yes, I think I would take that position.
Q. Okay. And also, do you know if this 95 percent threshold payment policy was followed only for Carteret or for receiverships in general?
A. I have no specific knowledge about a PII accrual, but I'm certain it would have been applied across the board. There's no set policy such as that for Carteret alone.
Q. Mr. Vordtriede, I believe you testified earlier that at the inception of a receivership or pass-through receivership that the RTC or FDIC begins with the actual and final general ledger balance from the institution prior to its closing?
A. Yes.
It's actually at the commencement of the liquidating receivership and not the pass-through. Pass-through is kind of a strange legal animal that we don't recognize for tax. It's a splitting of the

Page 280

conservatorship that they want to market, the elements that they want to market, and whatever is left behind is in this pass-through.
For tax purposes, the 2 elements are considered one and the same. It's as if it doesn't exist. It's a fiction.
So it's at the commencement of the liquidating receivership. As of the date of the resolution, we begin our computations with the balances I believe our computer people give us of the financials as of close of business on that final date the bank is in existence.
Q. So when you said, the bank is in existence, these would be the balances that existed from the personnel that worked at the bank at the time that it was open?
A. Yes.
Q. Okay.
A. I believe their charter is yanked when the institution is resolved, so that's what I'm saying by, existence. I think the receivership exists, obviously.
Q. Okay. And would those numbers that you obtain off of that general ledger incorporate all the prior financial history that that institution placed

Page 293

Q. Right.
So there wouldn't be a net increase in income because of that reversal of a noncash reserve. It just --
A. Not overall. I mean, in a current period, you could be, but --
Q. Right.
But not when you take into account that initial entry that was made to create the allowance in the first place?
A. Correct.
Q. Okay.
MS. HART: If we could just take a 5-minute break to just confer, make sure we've asked everything, and then we'll be done.
MR. THOMPSON: Sure. Yes.
(Recess.)
MS. HART: We are finished.

FURTHER EXAMINATION BY COUNSEL FOR BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. I think we'll be just a couple quick questions, Mr. Vordtriede.
First of all, has your opinion of

Page 294

Carteret's ability to deduct accrued interest changed since yesterday?
A. No, I don't believe so.
Q. Okay.
A. My opinion is that we should follow the books for tax purposes.
Q. And the 95 percent cutoff rate, is that dictated by the Internal Revenue Code?
A. No.
That's a policy embedded in modified accrual basis, accounting method adopted by the FDIC that we follow for tax.
Q. And would 94 percent be permissible under the Internal Revenue Code?
A. Let's just say that it's our policy for the tax unit to follow the books and we don't want to deviate from it.
Q. Now, you testified -- when Ms. Hart was asking questions, she asked you a question, has the Internal Revenue Service accepted Carteret's FFA calculations, and you answered yes.
But has the IRS ever reviewed those FFA calculations?
A. With respect to Carteret?
Q. Yeah, with respect to Carteret.

Page 295

A. They have never to my knowledge audited the computation.
I suppose you would have to say they've reviewed them by virtue of fact that they accepted the returns that we filed. Not all years had the computation we made as an attachment, but I believe 2 of the years did, so --
Q. Well, when you answered the question that the IRS had accepted the FFA calculation, do you just mean that they hadn't rejected the return?
A. Yes, I would say that's true.
Q. Okay. And if the IRS were to scrutinize those calculations, and the calculations were inconsistent with the final FFA regulations, the IRS would reject those calculations.
Correct?
A. I believe they'd make an adjustment.
MR. THOMPSON: Okay. I have no further questions.
MS. HART: I have 2 quick questions. Sorry.
FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. HART:
Q. Mr. Vordtriede, now, you did state that per the IRS code that you recognize an expense on a

Page 296

tax return when it is both accrued and ascertainable; is that correct?
A. When the liability is fixed, and the amount can be ascertained, plus the economic performance.
Q. I believe yesterday you did also indicate, though, when it's accrued, because you used those financial statements from a receivership to create your tax returns?
A. Right.
The all-events test that we were just talking about is the tax criteria for taking into account a deduction based on accrual. For tax purposes, the tax unit chooses to follow the books with respect to the accrual of postinsolvency interest.
Q. And then just one more question.
Would you be in a position to know what specifically the IRS has reviewed and what they scrutinized or what they looked at?
A. With respect to postinsolvency interest?
Q. No.
Just in general, would you be in position to know what the IRS has specifically -- I should say, pre-1998, would you be in a position to know

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT :
INSURANCE CORPORATION, : No. 93-531
Plaintiff-Intervenor, : Judge Loren Smith
vs. :
THE UNITED STATES OF :
AMERICA, :
Defendant. :

----------------------------X

Washington, D.C.
Friday, April 14, 2006

Continued deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 9:40 a.m., Friday, April 14, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 347

Q. Okay.
A. I was not aware they had given ground on the penalties. Maybe my meeting was ahead of this and this is correct, but I'm not aware of it.
Q. Okay. You're just not sure.
A. I'm not sure.
Q. Okay.
MR. THOMPSON: Then let's go to the next document, Vordtriede 71. It bears a Bates number of AM 0013792.
(A document was marked for identification as Exhibit No. Vordtriede-71.)
BY MR. THOMPSON:
Q. This is a series of e-mails between yourself and Elaine Tama. And the first message, the original message is from Ms. Tama to yourself dated July 12, 1998, and says that it is for the footnotes. "I see 8 million in penalties are included in the 45.6 million IRS claim for Carteret. However, no penalties were included for Old Stone, and I don't think that we included them on Ben Franklin, I guess because they were minor or non-existent. In the case of Oak Tree, we did include penalties because a proof of claim was given to the IRS. Should we also

Page 348

include penalties for Old Stone still or should we consider not including penalties for Carteret?"
Let me just -- we'll get to your answer in a minute, but one question is, should there be consistency in these footnotes from one receivership to the other in terms of, you know, treating penalties the same?
A. I'm not sure exactly what footnote she's talking about. I'm not sure of the context of what we're talking about here. I would answer in the abstract yes, there should be consistency.
Q. Okay. Well, are you familiar with the fact that Ms. Tama wrote the footnotes to the financial statements and those footnotes would have a footnote about taxes?
A. I guess it is a rule for each being rolled up for the corporate financial statements. I think that's what she's talking about.
Q. Aren't you familiar with the fact there are these goodwill financial statements that get produced for each receivership that's in goodwill litigation?
A. I'm not overly familiar with what they do with goodwill in Washington.
Q. Okay.

Page 349

A. Sorry.
Q. Fair enough. Let's see what your answer was. Okay. July 21, 1998, you respond, "we can estimate penalties but my preference is to go with what information we know until the transcripts come in and tell what actually is shown as outstanding. Returns were filed at different times. We don't know if IRS would have asserted penalties or not. Penalties are not automatic. Estimating would be a very inexact science."
Do you agree that estimating is an inexact science?
A. Estimating penalties should be computational. Estimating what the IRS -- how the IRS may compute a penalty may be an inexact science.
Q. Okay. Now, in -- let me go back to this U drive issue. This is an e-mail that if -- you know, a key word search were done for Carteret, if it were on the U drive, it should come up.
Do you know why, you know, we didn't get this from your search of the U driver?
A. I probably deleted it.
Q. Okay. Okay. Do you go back periodically and just say anything from the '90s is gone? Or do you just not -- as e-mails come in, you make a

Page 350

determination, this one is not so important, so I'm going to delete it? How do you operate?
A. Both. Ad hoc.
Q. Okay. Have you -- have you gone back -- can you recall whether there's, you know, a period before which there are no e-mails for you on the U drive because you just went back and said okay, anything before that date is presumptively --
A. I don't believe specifically. I'm trying to think if I have any going back to '98. I might have some in some folder someplace that I'm sentimental about, maybe. But I wouldn't keep one like this.
I was fairly remote from the goodwill process. They'd come to me from time to time. I don't think I would have felt the need to keep these type e-mails because I keep too much stuff anyway.
Q. Let's continue on. It says, "we in tax have to see what type of penalties have been asserted as well. If they are failure to file penalties for a late return, we might not have much to argue about. But if the penalties are for failure to pay, I would argue they are not proper in view of the deferral allowed under section 7507."
And do you still hold to that view?

Page 351

A. Yes.
Q. How does section 7507 work?
A. Section 7507 essentially says as long as assets of the failed financial institution estate are needed to pay claims on deposit -- for the depositors of the failed institution, no federal income tax should be paid.
That's a pretty sketchy paraphrase, but that's essentially what it's saying.
Q. Okay. Is the point that because you're not under an obligation to pay them, you can't be penalized for failing to pay them?
A. Essentially by law we're not allowed to pay the IRS so they shouldn't be penalizing us for following the law.
Q. All right. And so under section 7507, Carteret's penalties for nonpayment should be abated?
A. Yes.
Q. Okay. Now, turning to the IRS and RTC agreement, let me get a document that speaks to that. This is a document that came from Mr. Johnson's files.
MR. THOMPSON: It will be marked as Vordtriede 72, and has a Bates number of AM 0018.
(A document was marked for

Page 352

identification as
Exhibit No. Vordtriede-72.)
BY MR. THOMPSON:
Q. Let me ask you, Mr. Vordtriede, this is a footnote or a -- it says that the footnote should read, and in part it says, "an agreement signed between the IRS and the former RTC provides for a deferral of these tax liabilities as long as there are insufficient assets to pay depositor claims in full."
Is this an independent reason why the penalties should be abated against Carteret, this agreement?
A. The interagency agreement -- well, that's a reason why the tax wasn't paid. Therefore, why the RTC and then the FDIC shouldn't be penalized for not paying the tax. We'd be in a lot worse trouble with penalties if we paid the IRS for the claims.
Q. I'm sorry. What's that?
A. Well, if we -- if we violated the priorities set out in Title 12, which is what our claims people have to follow, and we paid the IRS more or less on a discretionary basis, I believe we'd be subject to a lot more complaints than simple failure to pay penalties.

Page 353

MR. THOMPSON: We've been going a little over an hour. Would you like to take a 5-minute break?
The court reporter would like to take a break. That is very reasonable. Let's take a five-minute break.
(Recess.)
BY MR. THOMPSON:
Q. We're back on the record. Let's pick up with Vordtriede 73. It is a document that bears the Bates number AM 0010654 through 659.
(A document was marked for
identification as
Exhibit No. Vordtriede-73.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, this is a somewhat lengthy memo. I'm going to direct your attention to different portions of it. Of course, if you need to take some time with the context of any of my questions, feel free to do so.
But it is a memo from Jim Anderson to Karen Hughes. Do you recall what Mr. Anderson's role was in 2000?
A. Jim would have been chief of accounting and tax policy section, so essentially the tax

Page 354

manager in Washington would have reported to Jim.
Q. Okay. And then who was the tax manager back then? Do you recall?
A. You know, I'm not really sure.
Q. Who have the tax managers been in recent years?
A. Vicky Faust was through 1998. I believe she was '85 through '98. They might have called the -- called it chief of the tax unit or something like that.
Q. Right.
A. Steve Lower was in that position, but I don't know when he came on, if he came on when Vicky left. Now, Rick Cywinski followed Steve when Steve retired. Rick has moved on and essentially they have nobody in the job right now. There might have been a gap back in 2000 where nobody was in charge or -- I'm just not sure.
Q. Steve who? I'm sorry?
A. Steve Lower, L-o-w-e-r.
Q. Turning to the section of this memo called penalties which starts on the third page of the memo. And it carries on. Take a moment to read the section if you like. Have you reviewed the penalties section?

Page 383

assets." Did that flow through to the tax returns?
A. No, it would not.
Q. Okay.
A. If that's how they're handling it, there would be no tax effect.
Q. Do you know that's how they're handling it or you're not sure.
A. I don't know. I don't know how they record it. How they recorded the write downs.
Q. Were you involved in any way in any of these discussions?
A. No.
Q. How does it work? That the policy is set as policy, and they tell the folks in the field, to the extent it is relevant to you all, this is what you're supposed to be doing?
A. Yes.
MR. THOMPSON: I'd like to ask the court reporter to mark as Vordtriede 79, a document that bears the Bates number AM 0010608 through 610.
(A document was marked for identification as Exhibit No. Vordtriede-79.)
BY MR. THOMPSON:
Q. So this, Mr. Vordtriede, is an e-mail from

Page 384

yourself to Ms. Tama, copy to Mr. Green and Mr. Colley dated March 16, 2004 and under -- and it starts by saying, "Elaine, in answer to your questions."
And then number 3 is the one I'd like to direct your attention to, where it says, "the question is post-insolvency interest, do you agree with the proposal to deduct this as an expense on an accrual basis from year one of the receivership forward? Do you agree with using the PII deduction to generate tax refunds? What if the institution never pays any PII?"
And your answer starts, and I guess it is specifically going to the first of what is three questions under subpart 3, but your answer says -- starts, "Wayne Green was asking this question recently. It's a good question. And probably we ought to ask Rick Cywinski what he thinks, too. The way I see it, we ought to accrue and deduct PII from inception as if it will be paid." And do you see that?
MR. KUIPER: Take whatever time you need to get it in context.
THE WITNESS: Yes.
BY MR. THOMPSON:

Page 385

Q. Okay. In the case of Ben Franklin, the IRS has approved taking PII deductions from the date of closing as you suggest in this e-mail, right?
A. I believe so, yes.
Q. Okay. And do you still think that that's the correct approach, the approach that's outlined in your e-mail to deduct PII from inception as if it will be paid?
A. My opinion -- I think the issue came up last time when I was here -- was whether a contingency existed, and I am of the opinion that in theory a contingency exists.
However -- and for tax purposes, as a tax person at the FDIC looking at many receiverships, I want to follow the book treatment of the accrual. I don't want to step out for tax and create timing differences.
Q. Wait a minute. That's different than what you're saying in this e-mail, what you've just said? In the e-mail, what you're saying is the way I see it, we ought to go ahead and deduct PII from inception as if it will be paid, right?
A. Yes. I believe what I was saying is that the book side should do that.
Q. Okay. But if the book side does not do

Page 386

that, there are adjustments from book to tax books all the time, aren't there?
A. Yes.
Q. Okay. So if -- regardless of what the book side does, you're telling Ms. Tama here that -- to -- that you -- you know, you -- the way I see it, we ought to go ahead and deduct PII from the date of inception as if it will be paid.
You're talking about deducting from a tax return, right?
A. I don't think that's what I was intending.
Q. You weren't --
A. I don't think I was intending that for tax -- I don't think that's what she was asking me.
Q. Wait a minute. She says post-insolvency interest. "Do you agree with the proposal to deduct this as an expense on an accrual basis from year one of the receivership forward? Do you agree with using the PII deduction to generate tax refunds."
She's clearly asking about tax, isn't she?
A. Yes, she is.
Q. You were answering, deduct PII from inception. You were talking about the tax return, weren't you?
A. Yes, but I don't think I ever intended for

Page 387

her to understand me to say that I wanted to step out and start accruing for tax purposes alone. I believe my feeling at the time was, fine, go ahead and accrue it, but do it on the book side and we'll follow.
I'm trying to think back to my thinking at the time. I do remember writing this, but --
Q. And when you wrote it, did you try to give Ms. Tama your best advice?
A. Yes. Yes.
Q. Okay. In fact, when you go down in this answer, maybe about two-thirds of the way through, there's a sentence that says, "I think more than using PII to generate carry-back refunds, the PII will protect the institution from huge tax liabilities such as with Ben Franklin." Doesn't that confirm that you're talking about tax returns in this answer?
A. Yes. It is almost like a solution in terms of frontier justice, if you will. Set aside the argument of a contingency, which I do believe exists. Take this a little further. I don't believe the IRS themselves had a lot of resistance to us accruing PII from inception. They haven't issued a policy statement in that regard, but this is from a revenue agent out in the field working on Ben

Page 388

Franklin.
Q. Right.
A. And they said they were thinking along the lines of not accruing from day one on the book side and then tax following for all receiverships, but to wait and see which receiverships would be affected.
In other words, I believe by that, she might have meant where PII was all paid and now we're at the Service with a priority claim, so it is between the IRS and shareholders. Then you go back and accrue PII and see what the effect is then. They seemed amenable to that. I think that is more or less my attitude here, to set aside the theory and go ahead to do it to get by some of these large tax balances that were artificially created.
Q. When you say go ahead and do it, the it is take the deduction from the date of closing?
A. Yes.
Q. Okay. Moving ahead to -- let's see. What would be the other questions? All right. Let's see if any of these are particularly momentous. I don't think they are.
MR. THOMPSON: Let us move forward to the next document which will be Vordtriede -- hold on a second.

Page 389

(Pause.)
BY MR. THOMPSON:
Q. Just so the record is clear, when you are talking about there is a contingency, you are saying there is a contingency as to whether the tax liability alone will be paid?
A. No.
Q. Or the post-insolvency interest will be paid?
A. Right. In theory, my understanding of the contingency -- and I glanced at section 461 before, last night, and I didn't see anything much on point. My understanding of the contingency seems to apply in that no PII would be paid until the last dime of the claims were paid. In that sense, it was a contingency.
What the courts would say as to the definition after contingency, I don't know. They're more determinative than my opinion.
Q. Is it a contingency -- do you have an opinion as to whether it's a contingency here within the meaning of 461? Or are you saying, no, I don't have a position under 461?
A. I'm thinking of an intuitive feeling about the word "contingency."

Page 390

Q. Okay. That's what you're basing it on?
A. Yeah. I haven't done extensive research.
MR. THOMPSON: So we move on to Vordtriede 80. By the way -- let's go off the record for a second.
(Discussion off the record.)
(Whereupon, at 12:01 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 12:15 p.m., this same day.)

Page 411

time and then I'm moving on to questioning. That is, we haven't produced any documents to him at this point in time. We're just simply asking him questions. It is follow up on NOLs, questions related to NOLs that were asked earlier. Okay?
BY MS. HART:
Q. So, Mr. Vordtriede, my question was, earlier if you were aware that new tax rules concerning NOL -- net operating losses, rather, went into effect in late 1997. I believe you answered yes?
A. Yes.
Q. And is it your recollection that these new tax rules stated for tax years starting after August 5, 1997, NOLs could only be carried back two years?
A. Yes.
Q. Okay. So in the case of Carteret, if it had, let's say, net operating losses in 1998, those could only be carried back for two years, to 1996; is that correct?
A. That's correct.
Q. Okay. Earlier, you indicated that with regard to the abatement of penalties, you said it has always been the IRS's informal indication that it would abate penalties; is that correct?

Page 412

A. Yes.
Q. But in the case of Carteret, the IRS has never come out with an official decision regarding the abatement of penalties with regard to Carteret?
A. Not to my knowledge.
Q. And in the case of Carteret, isn't it true that the calculated penalties are not merely an estimate but an actual calculation that you have received from the IRS regarding penalties?
A. I'm not sure that -- the word "estimate" came up and I think it was included in things I wrote. I'm not quite sure what I meant by that.
It might be referring to estimates of penalties in the IRS proof of claim, where they're filing a claim with the FDIC. But you are right, the answer to your question is they are not estimates, they are computations.
Q. And to your knowledge, has the IRS ever objected to the FDIC's 95 percent policy with regard to regarding post-insolvency interest given its contingent nature?
A. Not to my knowledge.
MR. THOMPSON: Objection to that question and answer. It is not something that was addressed during my questioning and doesn't relate to any

Page 413

documents that were produced after Mr. Vordtriede's deposition.
MS. HART: And the government would answer to that that issues did come up with regard to recording post-insolvency interest and it is related to that topic.
BY MS. HART:
Q. And is it your belief that the tax returns should track a receivership's books in terms of recording contingent liabilities? By that, I mean if something is considered to be a contingent liability pursuant to a statement of financial accounting standards 5 for book purposes, should it also be considered that for tax purposes, too?
A. In a general sense, yes.
Q. Okay. I'd like to have you get Exhibit 75 from your -- the pile of exhibits?
A. Okay.
Q. If you'll look on the second page of Exhibit 75, under the net assets deficit, you'll see the non-cash adjustments line?
A. Yes.
Q. And you see it has 19,393,038 dollars?
A. Yes.
Q. Correct? If you take a look at -- four

Page 414

pages in, to the drill-down?
A. Yes.
Q. For that account, would you agree this is the drill-down where it says 19,393,000?
A. Yes.
Q. For that?
If you go back to the second page, you'll notice for that line item, next to non-cash adjustments, it says note 8; is that correct?
A. Yes.
Q. And in your mind, does that mean note 8 pertains to that line item?
A. I didn't --
Q. Okay. Now, if we go to note 8, I'm going to read that aloud. Note 8 indicates "non-cash adjustments, unrecorded assets and claims determined to have existed as of the institution's failure are deemed discovered assets and liabilities respectively and are recorded as non-cash equity adjustments. Other non-cash adjustments include the estimated loss on assets in liquidation, the estimated interest on claims as well as other estimated receivership liabilities. Note, certain non-cash adjustments such as the estimated loss on assets, probable litigation are reversed when they are recognized as liquidation