# EXHIBIT W

# In The Matter Of:

*Ambase Corp.; Bancorp, Inc. & F.D.I.C. v.*
*United States of America*

---

*Deposition of Robert Brownel O'Brien*
*November 9, 1999*

---

*Miller Reporting Company, Inc.*
*507 "C" Street, N.E.*
*Washington, DC 20002-5897*
*(202) 546-6666 FAX: (202) 546-1502*

*Original File 1109OBRI.ASC, 334 Pages*
*Min-U-Script® File ID: 3917397150*

**Word Index included with this Min-U-Script®**

Page 6

Q: What year was your BA?
A: '57.
Q: And what was the year you last attended classes at New York University?
A: '59 or '60.
Q: In summary would you tell us your work experience since finishing your formal education.
A: I was employed at Bankers Trust Company for seven years. Bowery Savings Bank, B-O-W-E-R-Y, for I think about seven years. Then became director of the Federal Savings and Loan Insurance Corporation and chairman of the advisory — excuse me — executive committee of the Federal Home Loan Bank Board from '69 to '71. Then I went back to Bowery Savings Bank for approximately two years. I became executive vice president of First Federal Savings of New York for approximately two years. And then became president of Carteret Savings Bank and its later holding company and other subsidiaries, until 1991. And then was president of Governors Bank Corporation of West Palm Beach, Florida for two years and have not worked in the

Page 7

financial services business since.
Q: Did you say you were president of Governors Bank Corporation?
A: Yes.
Q: Between 1991 and 1993?
A: Yes. Approximately.
Q: Was that a state-chartered bank?
A: It was a state-chartered commercial bank in the state of Florida.
Q: And its home office is where?
A: West Palm Beach. It doesn't exist anymore. It got merged out of existence.
Q: Is that when you discontinued working for that institution, when it got merged out of existence?
A: No. I left just before the merger, in effect. You might say that, yes.
Q: And did you take the job with Governors Bank Corporation right after you left your work at Carteret?
A: No. After I left Carteret, I was a consultant, I think it would be proper to say, for

Page 8

an investment house called Printon-Kane, K-A-N-E, Inc. in Short Hills, New Jersey. They had offices in Florida and after a year, roughly, I moved to Florida to be their head man in the state of Florida. And Governors Bank was a client that needed management skills and capital and so forth; and as I was advising Governors Bank, they ultimately hired me to be their chairman.
Q: And when you said you joined Carteret as president — and you called it Carteret Savings Bank — was the name at that time Carteret Savings and Loan Association?
A: Yes.
MR. LEVITT: Let me show you a document that we will mark as O'Brien Exhibit 1.
(O'Brien Exhibit No. 1 was marked for identification.)
THE WITNESS: Well, it is accurate to the point when this was done, which is — I don't know when. There is no date on it, I don't think. This resume was done prior to my termination from Carteret.

Page 9

BY MR. LEVITT:

Q: Is Exhibit 1 then a biographical resume that was done sometime prior to your termination from Carteret?
A: Yes.
Q: Is it accurate insofar as it goes?
A: It appears to be, yes.
Q: You see the second line under business experience, May 1990 to the present, on the left margin?
A: Yes.
Q: It appears the resume was done sometime after May 1990. Is that fair inference?
A: I would guess so. It was probably 1990, yes.
Q: I want to ask you a couple questions about the resume. The first is, you see from September '81 to April '90 on the left margin of the document you were chairman and chief executive officer of Carteret Savings Bank?
A: Right.
Q: And then from May 1990 to present, which

Page 10

is the line above, you were chairman of the board of Carteret Savings Bank?

A: Yes.

Q: When you designate yourself as chairman and chief executive officer from September '81 to April '90, is that designation of chairman the same as chairman of the board which is the designation you used from May 1990 to present?

A: Well, chairman of the board is of the savings bank and chairman and chief executive officer is Bancorp.

Q: So the resume is inaccurate in that it says Carteret Savings Bank in both lines?

A: No. I was not CEO of the bank at that time. I had been replaced as CEO of the bank. I was chairman of the board, but not the CEO or president any longer.

Q: And when you say you were chairman and CEO from September '81 to April '90 — you see that on the resume?

A: Yes.

Q: When you use the word "chairman" there,

Page 11

do you mean chairman of the board?

A: Yes.

Q: So you were both chairman of the board and CEO from September '81 to April 1990 and just chairman of the board from May 1990 to the present?

A: Right.

Q: Now, at the bottom of this first page of the exhibit, you say you were chairman of the executive committee of the Federal Home Loan Bank Board from '69 to '71. Do you see that?

A: Yes.

Q: What is the executive committee of the Federal Home Loan Bank Board or what was it between '69 and '72?

A: It was a committee made up of all of the office directors, the senior members of the staff and we met at least once a week at 8:00 a.m., sometimes every day, depending on whether there were crises or special situations. And we administered the agency. All policy was made by the three members of the Federal Home Loan Bank Board who were appointed by the President.

Page 12

Q: And this executive committee consisted of the director of FSLIC, which was you?

A: Yes.

Q: And who else did it consist of, if you can recall?

A: Well, the general counsel, director of the office of examinations and supervision, the chief economist, I can't remember the exact title, but the person who interfaced with the 12 Federal Home Loan Banks that were dispersed around the nation. And there were two or three other office directors that I can't recall their titles, and then there were three administrative assistants to each of the Board members. So we were the senior staff.

Q: And on the resume it says that you were chairman of the executive committee from '69 to '71 and also director and chief executive and administrative officer of FSLIC from '69 to '71.

Why did you leave FSLIC when you did?

A: Because my former employer asked that I return to take on a special assignment.

Page 13

Q: What was the special assignment?

A: To make the bank number one in terms of assets and deposits in the nation. We were number one when I left and they slipped to number two in my absence.

Q: So you left FSLIC in order to take on what you considered a challenging opportunity at the Carteret Bank?

A: Very much of a challenge, yes.

MR. LEVITT: I would like to show you the next exhibit which we will mark as O'Brien 2.

(O'Brien Exhibit No. 2 was marked for identification.)

BY MR. LEVITT:

Q: I would like you to review the exhibit and I am particularly interested in page 2.

MR. KIRK: You want him to read the whole thing?

MR. LEVITT: I would like him to at least skim through it, and I can ask my questions.

And if you need more time, I will give you more time.

Page 14

MR. KIRK: I would note apparently the letter is not signed, for whatever that is worth.

BY MR. LEVITT:

Q: Can you identify this exhibit, Mr. O'Brien?

A: Yes.

Q: Please do so just for the record by the form it is. It is a letter dated what?

A: It is a letter dated July 14th, 1982, to the then director of the Federal Savings and Loan Insurance Corporation, reviewing our qualifications, reviewing Carteret's qualifications to be the successful bidder for First Federal of Delray Beach, Florida.

Q: And I take it from this letter that Carteret was aggressively seeking to be chosen to take First Federal of Delray over, is that correct?

MR. KIRK: Objection to the form of the question. It is vague and ambiguous and it is not clear what you mean by "aggressively."

MR. LEVITT: I think you can answer.

MR. KIRK: I object.

Page 15

Unless I instruct you not to answer, you can go ahead if you understand his question and answer it as best you can.

THE WITNESS: We were interested in getting into the Sun Belt, and we were made aware by the Federal banking authorities of the possible failure or potential failure of First Federal of Delray, so we went down and did some due diligence and decided that we would like to buy it. I would not say "aggressive" is the right adjective.

BY MR. LEVITT:

Q: In this letter are you touting your merits to Beesley so you are trying to make yourself look favorable in his eyes?

A: Yes. We had met personally with him prior to this letter, and he asked us to document, in effect, what we had said in the prior meeting with him, and that's what this is.

Q: And who was the toughest competitor you had in New Jersey at the time, meaning Carteret Savings Bank?

A: City Federal.

Page 16

Q: Was City Federal also interested in Delray?

A: No.

Q: Were they interested in moving to the Sun Belt?

A: They had already moved to the Sun Belt by buying a savings and bank in Boca Raton.

Q: Was this playing catch up with your competitor?

MR. KIRK: Object to the form of the question. It assumes things not in evidence.

BY MR. LEVITT:

Q: Were you interested in maintaining your competitive strength vis-a-vis City Federal?

A: No. That was not our primary motivation.

Q: What was your primary motivation to go into the Sun Belt?

A: We had done some market analysis which showed that 24 percent of everybody in Palm Beach County had originally come from either New York or New Jersey, and we were interested in following our customer base. New Jersey was losing population

Page 17

then at a rate of about a point and a half a year, and it was simply a business strategy.

It had nothing to do with City Federal, except that we saw that they had, indeed, done this, had employed the techniques that we ultimately employed, so we had a model to copy. But that was not — I mean we weren't competing with them that vigorously.

Q: Was another business reason for wanting Delray because you felt Florida was a booming place in terms of commercial lending, construction lending and you could get into that?

A: Not at all. We had been advised by our investment bankers that it was a growth state. Deposits in Florida averaged twice that of our average deposits in New Jersey, taking the whole banking system as a whole. And it was a tremendous place to not only gather deposits but also make first mortgage loans on owner-occupied homes.

Q: Well, look at page 4 of the exhibit, if you would. In the second sentence, it says — I will start with the first sentence.

Page 18

"Any northeastern institution has a limited market for home loans and home building. Very little local lending is done during the winter months. With Delray, we could engage in construction lending and home finance all year round and could take fuller advantage of the profitable home building opportunities of a state which is the fastest growing in the United States."

Q: Doesn't that indicate you were interested in at least the construction lending possibilities of the Florida market?

A: Yes. You said, I think, commercial loans, which we categorized differently. Those were the loans to commercial corporations, businesses. Construction lending to builders, we had been doing it for 100 years almost.

Q: I think I used the words "commercial real estate lending." That would be construction lending —

A: We characterized commercial lending on nonresidential structures, stores, factories, buildings that people didn't live in, and we were

Page 19

not heavily engaged in that practice at that time. This meant loans to builders for houses.

Q: Housing communities?

A: We did not do any lending on condominium communities. They were one family.

Q: How about multi-unit development?

A: We didn't do any rental units.

Q: I am not talking about rental. Projects of single family homes that builders want to engage in?

A: Possibly later we got into that, but not at this time.

Q: So what is your interpretation of the term "we could engage in construction lending and home finance"? Construction lending you interpreted to mean single family houses?

A: Single family houses.

Q: Where one builder want to build one single family house?

A: Not necessarily. Up to six.

Q: If you will turn to page 2 of the document, please, eleventh line. I have counted

Page 20

the lines. And the sentence I am looking at says, "In fact."

Do you see that?

A: Yes.

Q: You are talking about the profitability of Carteret and you had talked about the fact that '81 was not a good year but things were coming back, and you say in this sentence we are looking at, "due to the consummation of commitments which will trigger over the next ninety days, we are estimating a Third Quarter profit of $3.6 million."

You see that?

A: Yes.

Q: And then you say, "All of this is real income."

You see that?

A: Uh-huh. Yes.

Q: When you referred to the fact that commitments would consummate over the next 90 days or, as you put it there, "due to the consummation of commitments which will trigger over the next ninety days," what did you mean?

Page 21

A: Well, a builder comes in with a loan request, and we analyze it and issue him a commitment to fund the loan. Most of the time the builder will take that commitment and shop it with other financial institutions; and if he can get a better deal in his opinion, you don't make the loan. And so you often put out a substantial number of commitments and they don't close.

I was trying to make the point here that we reckoned in verbal negotiations with these customers that they were going to close and, therefore, this would be ordinary income, not sales of assets. Some savings and loans were inflating their earnings or adding to their earnings by selling assets; and we, indeed, did sell a building, and I wanted to highlight that. But aside from that, that was just normal operating income.

Q: Would the income that the consummation of the commitments lead to be the fee income?

A: There would be some fee income, yes, but possibly it would be interest income on the

Page 38

they whittled us down. I don't think we got 17. We got 10.7 or 11. But this was earlier in the negotiations, this letter.

Q: You wouldn't have overtly sought Barton, but under the conditions you felt you were getting a decent deal in the aspect of getting Barton, is that correct?

A: Correct.

Q: You didn't mind Barton being tagged on to Delray under those conditions?

MR. KIRK: Object to the form of the question. I don't what you meant by "didn't mind." They were willing to do the deal.

MR. LEVITT: You can answer.

THE WITNESS: Well, as I said, we didn't really want an enhanced presence in Newark, but we felt that we could close some of their branches and pare the place back and live with it, under the terms of the agreement with FSLIC in order to get into the state of Florida.

BY MR. LEVITT:

Q: Did the FSLIC tell Carteret that unless

Page 39

you agree to — unless Carteret agrees to take on Barton, that Delray would go to the other bidder?

A: Well, they didn't say that, but they said, I mean, you have to do something to enhance your bid for Delray and we suggest that you take Barton. They came up with it. We never came up with it at all.

Q: After they said we suggest you think about Barton, did you then come up with a financial package that you offered to them?

A: I don't know how the financial package was construed. Tony Majeski worked on it; but when I was director of FSLIC, 10, 11 years earlier Barton was a problem and was on our problem list then. So no one wanted Barton.

Q: Do you recall that taking Barton with what turned out to be 11 million in financial assistance because it was whittled down in negotiation improved Carteret's regulatory capital because the assistance was agreed to be a credit to capital? You know what I am talking about?

A: No.

Page 40

Q: So you don't recall that the acquisition of Barton by virtue of the financial assistance enhanced Carteret's regulatory capital?

A: I don't recall that.

Q: Well, maybe this letter will refresh your recollection because —

A: I hope it did.

Q: I assure you it did.

A: Good. But I don't remember.

Q: Look in the same paragraph, the seventh line. You say, or the letter says, "If we are the successful bidder for Barton, our return to profitability plus FSLIC assistance could boost our net worth to approximately $60 million by September 1st."

Does that indicate that the FSLIC assistance was going to be an element that you thought would boost your net worth?

MR. KIRK: Objection to the form.

BY MR. LEVITT:

Q: That you thought would boost Carteret's net worth?

Page 41

MR. KIRK: Objection to the form. The document speaks for itself.

THE WITNESS: I would have to agree. I don't know. But the presumption is yes.

BY MR. LEVITT:

Q: And in the fourth line from the bottom on the same paragraph, you say, "our proven record of savings acquisition would put the Delray branch system substantially in the black."

You see that?

A: Yes.

Q: And what did you mean by that? What do you understand this letter to mean by that?

A: In these days, competition for deposits was very, very vigorous. And it was usual to offer premiums, incentives to people to open accounts, and we were very skilled in that and had done it for years. And Delray had never offered premiums, and we reckoned that if we were to employ our deposit acquisition marketing talents in Delray that the tens of millions of dollars that had flown out would come back. And that's the point I was

Page 42

reinforcing.

Q: I take it Carteret believed it could return Delray to profitability without FSLIC assistance, is that right?

A: Yes.

Q: And you just mentioned a strategy you thought would be helpful. Was there anything beyond that that made you so sanguine about being able — Delray was a loss proposition at the time. You thought you could offer premiums and get more deposits.

Was there any strategy beyond that that led you to believe you would get into this without FSLIC assistance and turn Delray around?

MR. KIRK: I take it when you use the phrase "FSLIC assistance" you mean FSLIC cash assistance?

MR. LEVITT: Yes.

THE WITNESS: Again, we were informed about Delray by the Government regulators. And when they informed us of it, they said right off the bat no cash assistance would come with it. We

Page 43

will employ our purchase accounting techniques and so forth, but no cash assistance.

So my then chief financial officer, Anthony Majeski, went down and did some due diligence for a week; and he came back and said this is a company that does not have any bad assets. They made a marketing mistake and they are losing 10 million a month in deposits; and if we get those deposits back over time, the company will return to profitability.

Most failed savings and loans at that time failed because of poor asset quality. This was not the case in Delray. They also had 12 excellent, well-located branches, so we thought that we could employ our deposit gathering marketing expertise and eventually turn it around.

BY MR. LEVITT:

Q: Did Carteret obtain an explicit promise from FSLIC that supervisory goodwill could be counted as regulatory capital when it acquired Delray?

MR. KIRK: Objection to the form of the

Page 44

question. The documents fully cover the explicit promises that were given.

But go ahead and answer the question.

THE WITNESS: I would say yes.

BY MR. LEVITT:

Q: From whom at FSLIC did Carteret obtain this promise?

MR. KIRK: You mean the documents or in terms of negotiating —

BY MR. LEVITT:

Q: I said an explicit promise and you said you thought you got an explicit promise. Who gave that explicit promise?

A: I think it was director Beesley and the Federal Home Loan Bank Board.

Q: Did Carteret explicitly obtain a promise that goodwill could be amortized for 40 years?

A: In my recollection, yes.

Q: Why did it want this latter promise?

A: We wanted the maximum term to amortize the goodwill, obviously.

Q: And why? What were the advantages?

Page 45

A: Good business sense.

Q: Because you realized income from the mismatch between the accreting of discount and the amortization of the goodwill?

MR. KIRK: Objection to the form of the question. I think he testified earlier he didn't even recall that that was the case with Delray's goodwill. And I think he has also testified that it was the value of the capital that made the goodwill valuable.

MR. LEVITT: Can you answer?

THE WITNESS: Correct.

BY MR. LEVITT:

Q: When you said it made "business sense," do you know what you mean when you said "business sense"?

A: No.

Q: Is that something the CFO would know more about?

A: Yes. This is an arcane accounting matter.

Q: I won't dispute you on that.

Page 126

A: It was the branch managers who were
branch managers, Mr. Trotter and that was it.
Q: Did this division do commercial real
estate and corporate lending?
A: No. They referred borrowers to our
normal corporate lending departments. Depending on
where the property was, it either went to New
Jersey or if Albano did it, it went to Florida. It
mostly went to New Jersey.
Q: And that would have been under Mueller?
A: Mueller and Redfern.
Q: Was one of the entrees Carteret used to
get in though this Mid Atlantic region the
acquisition of a Maryland institution called the
Admiral?
A: Admiral Builders Savings, yes.
Q: And did Admiral have like three offices
in the suburbs of Baltimore at the time Carteret
took over?
A: I think so. I don't remember.
Q: Do you remember whether Carteret retained
the Admiral offices or didn't retain them and also

Page 127

do you remember whether Carteret opened new offices
in the Baltimore area?
A: I do not remember, quite honestly.
Q: Do you remember two Virginia acquisitions
at the same time as Carteret acquired Admiral?
A: Yes.
Q: I will represent to you one was called —
A: First Federal of Blacksburg in Montgomery
County, and Wytheville, W-Y-T-H-E-V-I-L-L-E, I
guess. Wytheville, Virginia.
Q: And do you recall one was a Federal
charter and one was a state charter?
A: Oh, yes. One was Mountain Security
Savings Bank of Wytheville and the other was First
Federal of Blacksburg. That's correct, one was Fed
and one was state.
Q: Was Wytheville a state charter, as you
recall?
A: Yes.
Q: Mountain Security of Wytheville?
A: Yes.
Q: Was First Federal of Blacksburg, as you

Page 128

recall, a Federal charter?
A: Yes.
Q: Was Wytheville, as you recall, the larger
of the two?
A: I don't remember which one was larger,
but Wytheville probably was.
Q: Do you recall whether Carteret retained
the office locations of these institutions when it
acquired these institutions?
A: I think we did retain a presence in both
communities. I don't know if we kept all of the
offices.
Q: Do you recall whether you were allowed to
branch throughout Virginia as a result of obtaining
those offices of Wytheville and Blacksburg?
A: Yes.
Q: Yes, that you were allowed to branch?
A: Yes.
Q: Do you recall branching out from the
original offices of —
A: Well, our objective was to get a branch
in Washington, D.C., which was not permitted as a

Page 129

New Jersey or Florida company. So Trotter noticed
that there was reciprocity to cross the District
lines from Maryland or Virginia, a D.C. association
could branch into Virginia or Maryland or vice
versa. So he conjured up a Maryland and a Virginia
company that we could absorb and then, therefore,
would have the rights to open a branch in the
District which we did.
Q: Do you recall that the sequence was that
Carteret went after Admiral and then needed to get
Federal insurance for the Admiral accounts which
had been state-insured and then had discussions
with FSLIC about that, and in the course of those
discussions these Virginia branches or Virginia
banks came up or, if not, how do you remember it?
A: I do not recall the sequence, the direct
sequence. I didn't recall it as you just said,
although that could exactly have been the case.
This was not a big deal to me at the time. It was
a project of Trotter's. He brought it to the board
as a fait accompli for us to bless or not. We did,
and he made it happen.

Page 130

And I was not directly involved. In fact, I don't think I ever visited Wytheville or Blacksburg. I think I might have visited Admiral Builders to cut a ribbon or something. But it was not high on my priority list.
Q: Do you recall Carteret discovering that the cost of operating branches in the Baltimore area and Virginia and D.C. was a higher cost than it was used to with respect to operating its Jersey branches?
A: I don't recall that, but it might possibly have been the case.
Q: Do you recall whether Carteret had any major startup costs to start new branches in any of those Mid Atlantic areas after it made the initial acquisitions in '86?
A: Well, of course, we had to change the signs and advertise the fact that we were there, and typically we did a premium promotion to gather deposits. But aside from that, I don't recall any extraordinary startups.
Q: I am referring to the difference between

Page 131

the de novo branch and taking over a location that is already a bank. Were there de novo branches involved in making your presence felt in Maryland and Virginia?
A: I don't think we did any de novos except for D.C. However, I think the answer to your question is, it is less expensive to take over an existing branch than to start up a new one.
Q: Do you recall whether within a certain amount of time after making these Virginia and Maryland acquisitions there were internal studies at Carteret about the cost Carteret was incurring to operate the branches of these institutions?
A: I don't recall, but I am sure we did it.
Q: Do you recall whether there were any efficiencies gained by these institutions becoming part of the Carteret system or the Carteret institution?
A: Well, the major efficiency was that they could plug into our —
Q: Computer system?
A: — very efficient computer system.

Page 132

Q: Were there any other efficiencies that you can recall?
A: That was the major one.
Q: Did Carteret eventually move out of these geographical areas, maybe the D.C. and Maryland?
A: I think so. I don't remember. Did we?
Q: Yes, I think so.
A: I think so too, but I don't recall.
Q: Do you remember how it moved out? Did it sell the properties to another bank or did it close branches down or what?
A: There was a very big company in Baltimore, I think called Loyola Federal, and I believe that they made an unsolicited offer for our presence in this region and we accepted it and sold them to them.
Q: Would that include all three areas; namely, the District of Columbia and Virginia and Maryland?
A: I really don't remember.
Q: You don't recall.
Prior to disengaging from these areas do

Page 133

you recall whether in your mind it had been a good investment because you made money or in your mind it wasn't a very good investment and you were glad to get rid of it.
MR. KIRK: Objection to form of the question. What is in his mind is really irrelevant. Again, if you could show him —
MR. LEVITT: That's not very complimentary to your client. It is a joke.
THE WITNESS: I know.
MR. KIRK: What counts is what is in accounting records and financial statements of the company and that would reveal whether or not it made money or not. Asking Mr. O'Brien to remember, you know, the financial performance of these three or five or however many branches 15 years later is a waste of his time.
MR. LEVITT: You can answer, if you have a comment to make.
THE WITNESS: My only comment would be that as a public company, which we then were, we were constantly being questioned and advised by the

Page 134

major Wall Street financial analysts, and every house had a person who followed the savings and loan business. And it was the advice or theory that nationwide banking was just over the horizon and that this was a good thing and that anyone who could get a jump on nationwide banking would profit by it.

So we decided to form an East Coast chain. We wanted to stay in the East Coast time zone, and we thought because we were, as I said before, flying over this territory anyway, it would be relatively easy to administer, which I don't think proved to be the case.

But, anyway, we were ahead of our time. Nationwide banking still hasn't come. Maybe it will as a result of the President signing the recent reform bill, but we were a decade ahead of our time and we saw that and pulled back, just stayed with Florida and New Jersey.

BY MR. LEVITT:

Q: So I infer from that it was a good idea that was consistent with what people thought, but

Page 135

it didn't work out?

A: It wasn't a complete flop, but it wasn't — we wanted a presence in Washington, D.C. to impress Congress people, lobbyists and other people in Washington, D.C. We almost had a partnership with them. They ran our business whether we liked it or not. And for a variety of reasons that were economic and some not, we wanted a presence here. So it was worth it for that reason alone if no other. The analysts thought it was great we were in Washington, D.C.

Q: Did the price of your stock get a blurp up after you did that?

A: Yes, our stock did well.

Q: I guess maybe in your position as a chief executive officer of a publicly-held institution that one of your primary things, primarily on your mind as you were operating, is the price of stock to keep up to the stockholders.

MR. KIRK: Object to form of the question.

BY MR. LEVITT:

Page 136

Q: Is that correct?

A: That's always a concern as the CEO, but it is not your primary job.

Q: In the last column of this same exhibit, midway down, let's see, it is the third full paragraph, it says, "In getting Mountain Security, Carteret, which already has a mortgage company, will also be acquiring Mountain Security Mortgage Co. of Scottsdale, Arizona."

Do you see that?

A: Yes.

Q: Do you recall acquiring Mountain Security Mortgage Company and thereby extending to the West the business of Carteret Mortgage Security Company?

A: I do recall it, but I don't think we retained the Scottsdale operation very long. I think we sold it off.

Q: And do you recall why you sold it off? You didn't like the assets?

A: No. It was an expense flying people out to supervise an office in Scottsdale that I didn't think made good economic sense. It was an outpost

Page 137

way out of our management geographic reach.

Q: In the far right column again, same column we were looking at, in the next paragraph down, it says, "Carteret is recording its acquisitions under the purchase method of accounting, according to O'Brien. The excess of cost over the net value of assets being acquired, which is not expected to exceed 12 million, will be amortized over a 25-year period."

Do you recall whether goodwill was regarded as a negative element of the acquisition, that the objective was to minimize the amount of goodwill being created as a result of these acquisitions?

MR. KIRK: Objection to the form of the question. I don't know what you mean by "negative."

BY MR. LEVITT:

Q: It would be a drain to Carteret and not a positive. The reason I ask that, the way the sentence reads that's how it strikes me. I wonder if you have any recollection of it?

Page 170

Q: I am going show you documents subsequent to this that show that you did make some money in '86, some of which was nonrecurring income, but you flattened out and made less in '87 and made even less moving forward.

My question is, was one of the reasons, in addition to the reason you have just stated, that you went forward to examine this AmBase deal is that you were afraid business-wise of some of the risks that might lie ahead of operating independently?

A: No.

Q: How about any other board members? Did you have any discussions with any of them to indicate they had that feeling?

A: No. I don't —

Q: Do you know, aside from discussions with him, if any did have that feeling, if you know?

A: I don't know. I don't think so.

Q: In the document that we are looking at, you say or you report to Pierson and Mueller in the first or the second paragraph that Mr. Manley

Page 171

wanted Carteret to develop "a retail bank along the Citicorp model."

You see that?

A: Yes.

Q: What does that mean, "along the Citicorp model," if you can recall?

A: I don't really recall, but Citicorp at that point in time, particularly, was —

Q: A financial supermarket like they are getting into today?

A: A very, very good term. A financial supermarket I think is exactly the term he used.

Q: Was that consistent with what you were doing before he came on?

A: We were starting to develop that, yes, but he wanted us —

Q: Isn't it fair —

MR. KIRK: Could you let him finish his answer.

BY MR. LEVITT:

Q: Isn't it fair to say you were becoming less and less like the old fashioned S&L and

Page 172

becoming more of a financial supermarket?

A: Yes, and he liked that, but he wanted us to accelerate the pace as Citicorp was then doing, selling every financial product that was allowable by law under one roof of a branch.

Q: Did that appeal to you?

A: In theory it did, but, as you can see by reading the rest of the memo, he was suggesting things that we, as bankers — remember, he was not a banker. He —

Q: He was a lawyer.

A: — was a lawyer. He is a lawyer. So he was, you know, coming up with this, got to do that, blah blah, and Mueller and Pierson and I were sitting back saying to ourselves, we know from experience that some of this stuff is not as great as he thinks it is.

So I am just reporting what he said and you can see by implication in some of these sentences and paragraphs to my two trusted advisors and henchmen, if you will, that we were skeptical of some of it. So the allover theory was good, but

Page 173

some of the things he was suggesting we never did and never would have.

Q: If you will look at the third paragraph, I want to go through and get your comments on some of the things in here.

You say that he said that he admired "our concept of generating assets out of the branches."

A: Yes.

Q: What does that mean? To get deposits?

A: No. Deposits or liabilities.

Q: What does that mean?

A: We were encouraging our branch employees to cross sell, to suggest consumer loans, home equity loans, and we were also starting to experiment with the sale of life insurance in the branches.

Q: How about securities?

A: No. It was not a permitted activity until after we had the Gruntal, G-R-U-N-T-A-L, affiliation.

Q: Didn't Gruntal replace a prior —

A: Just prior to the acquisition we got

Page 174

approval to sell —
Q: Securities?
A: — securities. And we did it, I think, only in Florida. I don't remember. We had a very infantile start prior to the acquisition by AmBase. But we were consciously trying to generate assets, and this was Mueller's project and he was very correct in this, because the deposits, as is mentioned in here, we could have gotten many more than we wanted, but there was no way to employ — Senator Bradley had instituted the Tax Reform Act of '86 which killed the commercial real estate business. The retroactivity, the disallowance of depreciation, and so forth killed the commercial real estate business, and sowed the seeds of the collapse of the savings and loan business several years later.
Q: You are not in favor of Bradley for President?
A: I am, in fact. My son-in-law is his chauffeur. He was misguided in this particular action of his.

Page 175

We were seeing the decline of loan demand due to the change in tax policy and, therefore, a concomitant resulting economic decline that was starting.
So here he is saying, get all these deposits in; and we were saying why. We can't deploy them.
He said, well, you got to get into this and that and do other kinds of investing, some of which he didn't even realize were not legal under that regulatory framework at the time.
Q: But he is saying he admired what you had done independently in the branches, just selling all the different products?
A: Yes, we were on the right track, but we weren't moving fast enough in his opinion.
Q: In the fifth paragraph, and this may be consistent with what you are talking about, he says or you report he said that you should get more into corporate bonds.
You see that?
A: Yes.

Page 176

Q: Did you start doing this after the acquisition?
A: A little bit. But the other term for these is junk bonds, and the media and the regulatory framework made a big thing out of one of the things that killed the savings and loan business was overreliance on junk bonds. It was never a big part of our portfolio. Maybe one or two percent.
Q: Is that what he was talking about?
A: Yes, he would have loved to have had us to have 40 percent of our assets in junk bonds.
Q: Did Home Insurance Company have a lot of junk bonds?
A: I think so, but I don't know.
Q: Was Home Insurance Company allied with Drexel in any way, buying junk bonds from Drexel?
A: I think so.
Q: Did Carteret Savings Bank buy junk bonds, even though a small amount?
A: No.
Q: Did you have any junk bonds before this

Page 177

or just a small —
A: Our definition of the junk bonds was Ford Motor Credit. We didn't refer to them as junk bonds although generically they were. We specifically cherry picked AAA, if you will, corporate bonds and we had a very modest portfolio, but we did have some.
Q: Had you been involved in lending for leveraged buy-outs?
A: No. We did do, after the AmBase transaction, I think we did do a loan to a big LBO firm in New York, but it was not —
Q: Was that Foresman?
A: I guess it was.
Q: And did Manley suggest he wanted to expand the business of lending for leveraged buy-outs?
A: You can see from this memo he wanted to expand everything we are doing, yes.
Q: On the paragraph where it says he likes consumer lending — you see that?
A: Yes.


Min-U-Script® Miller Reporting Company (202) 546-6666

Page 178

Q: It says he thought it might be a good idea to develop a private banking service for wealthy individuals?
A: Yes. Did Carteret ever enter into that line of business?
A: No.
Q: Under "Income Property," I am just wondering what loans you were referring to under the category of "Income Property."
A: Is this on the first page?
Q: Yes, second-from-the-last paragraph.
A: Oh, yeah. Well, that's commercial real estate, nonresidential.
Q: And that was flat at the time, I take it?
A: Yes, because of the change in the tax law.
Q: You are attributing it to the change in the tax law?
A: Yes.
Q: What was Carteret doing about that flatness?
A: Relying more on consumer lending and the

Page 179

retail side.
Q: Did it pull in its commercial lending as of this time, '86?
A: Yes, it did. But we didn't have to because there was no demand. I mean it just dried up.
Q: So if I were to look at the data on, let's say, the dollar amount in commercial lending in, say, '87, '88 versus '86, it would be less in '87, '88, that's your recollection?
A: I can't say for sure, but it would be a reasonable assumption. You see, the Florida operation —
MR. KIRK: Wait until he asks you a question.
BY MR. LEVITT:
Q: Did the Florida operation run into trouble around this time?
A: No. Because 600 people a day moved to Florida or in those times they did.
Q: The tax change didn't affect them as much?

Page 180

A: No, and it didn't affect one family or multi-family residential structures. So that business continued to be good in the state of Florida.
Q: Your testimony is affected more like shopping centers and that sort of thing, hotel construction?
A: Yes. Office buildings and commercial structures like warehouses and so forth.
Q: In the second-from-the-last paragraph under "Income Property" it suggests that Mr. Manley wanted to go more on the basis of a vision and less by the book?
You see that?
A: Like to see more aggression.
Q: "Greater reliance on the particular individual or corporate project team and their vision rather simply cranking out numbers."
A: Yes.
Q: Did Carteret sort of embrace that idea?
A: No, we didn't.
Q: Did you like that idea personally?

Page 181

A: No.
Q: And why not?
A: Because it would have led to unsound lending practices, we thought. As we spoke about earlier, our commercial loan department was a seasoned group of individuals who had worked together for 20 years and they went by the book and they did not cotton to wild visionary schemes that were brought in by aggressive builders who said, trust me, this will work out.
Q: What about builders likes Profetta?
A: He was one of them that got us.
Q: That was an exception?
A: Well, he lied to us. He was a pretty good borrower, by the way, and we got paid, but we had a little problem with him.
Q: In the same paragraph, which is the last paragraph on page 1 of the document, you are reporting that Mr. Manley "has heard about our very long response time" in commercial lending.
A: Yes.
Q: Was there a long response time as you

Page 182

understood it?
A: Not as I understood it. But because we went by the numbers and by the book, it took time to analyze a credit and to say yes or no; and, of course, the borrower wanted an instant answer, and we just were not going to do that.
One of the reasons we ultimately all got fired is because we didn't do what he wanted us to do, with the speed and rapidity and, I almost want to say, recklessness that he was asking for.
Q: So you believe when AmBase came in they were reckless?
MR. KIRK: Objection.
THE WITNESS: No.
MR. KIRK: Objection to form of the question.
THE WITNESS: No. But Manley's vision of new business development was not the way a prudent banker would develop business.
BY MR. LEVITT:
Q: Was it reckless?
MR. KIRK: Objection. This has been

Page 183

asked and answered.
THE WITNESS: No.
BY MR. LEVITT:
Q: It wasn't reckless, but not prudent either?
A: I withdraw the word "reckless."
Q: This wasn't prudent either?
A: It was more aggressive than was customary.
Q: In the first full paragraph on the second page of the document, you are talking about what you report Mr. Manley said about the mortgage banking business.
A: Right.
Q: And to summarize, he liked it, but he said he thought it was less sophisticated than he would like and there needed to be more gray-haired people in it?
A: Yes.
Q: But I don't understand from that — what does that mean exactly? What was the precise problem he was articulating to you —

Page 184

MR. KIRK: If you know.
BY MR. LEVITT:
Q: — in the mortgage banking area, if you can recall?
A: I better say that I don't recall precisely what it was, but, you see, he had sent in, let's say, Salomon Brothers to do due diligence on the bank.
Q: It was actually Peat Marwick, by Salomon was the investment banker.
A: And they wrote him a report which we never saw, and I think he was summarizing their report to me verbally, which I just stored in my head and came back to Morristown and wrote this memo from.
Now, it is true that the mortgage company was in its infancy. Walsh had been there maybe a year or 10 months, and truly it was a relatively young group of people. And because of that, they did do things by the book. They weren't seasoned professionals. They were perfectly adequate to underwrite one family house loans and did.

Page 185

But maybe we gave a commitment in 15 days instead of five, and he wanted to see us commit in five and do more and accelerate the process, and this would have happened and did happen over time. But this was just an observation that he was making.
Q: The last paragraph on this page that goes over to the next page has a list of things that you say you wanted, that you touched upon at a staff meeting. Let me ask you about a couple things on the list.
The first one is number (4), which is "The ability to prospect the one hundred thousand lawyers that Home Insurance Company employs at any given time with customer products, credit cards, et cetera."
Did Carteret start sending credit cards and consumer products to attorney employees of the Home Insurance Company?
A: No.
Q: Did it have a credit card business at the time?

Page 190

Q: Did there come a time where the management at Carteret wanted to get rid of Imperial Premium Finance?
MR. KIRK: Ever?
MR. LEVITT: While he was in.
THE WITNESS: I don't remember it, no. The only thing I remember that we wanted to get rid of, and did, was the leasing company. My memory is that every other division we were relatively pleased with or felt we could grow it or nuture it.
BY MR. LEVITT:
Q: Number (7) on this page, it talks about "Participations in loans to be offered to us by Morgan Guarante and Chase, who are Home Group's principal bankers."
Did Carteret strive to do this?
A: No. First of all, Morgan and Chase looked down their very long noses at us. It would be beneath their dignity to participate along with a lowly savings and Loan. This was the pecking order. And also they didn't need us.
Q: You don't recall any participations by

Page 191

Carteret in syndications by Morgan and Chase?
A: No. There may have been some. I think there might have been one with Chase. I don't remember anything with Morgan. But there may have been some. I don't know. I was not, you know, involved in every single loan.
Q: (8), number (8) on this page, refers to Gruntal apparently getting its financing from Irving Trust and perhaps Carteret could help out.
You see that?
A: Yes.
Q: Did Carteret once the acquisition occurred loan money to Gruntal?
A: No. My recollection is that we were prohibited by the Federal authorities from doing inter-company transactions.
Q: Did it ever seek approval?
A: I don't think they ever asked us to make any loans to them, and I don't think we ever did. That's my recollection. I may be wrong.
You see, Manley had this vision of a huge financial supermarket which interfaced. The laws

Page 192

did not allow that yet. In fact, it is just happening now. So a lot of what he envisioned he later found out after the acquisition, as did we, that you couldn't do it.
Q: Is it fair to say —
MR. KIRK: Just answer his question.
BY MR. LEVITT:
Q: Are you done finished?
A: I am.
Q: Do you recall there was a bank statute being enacted around the time this was going on called the Competitive Equality in Banking Act, CEBA, which would address some of the cross-marketing issues?
A: Yes.
Q: Was AmBase keeping track of that?
A: Yes.
Q: Did they advise Carteret they were keeping track of it?
A: I don't think so, but I was aware of it.
Q: From your point of view AmBase at some point tried to back out of the deal, the deal to

Page 193

acquire Carteret at 22.50 a share?
A: Of course, yes.
Q: Do you recall that AmBase stated reasons why it felt justified in doing that?
A: The only one that I remember is the crash of October '87.
Q: That's the only one you remember?
A: Yes.
Q: You don't remember another one being that the new statute was going to limit cross-marketing as Manley envisioned it when he first made the deal?
A: No. He kept that to himself.
Q: Did you have the opinion AmBase was sophisticated in the ways of Washington and had lawyers and people keeping track of what was going on?
MR. KIRK: Objection to the form of the question.
If you understand what he is talking about, go ahead and answer.
THE WITNESS: Well, Manley had a former

Page 194

partner named Bob Washington who was at that time a fairly influential lawyer/lobbyist in this town, and he also employed other lobbyists and law firms in connection with their business here in Washington. So he gave us the impression, only with no specificity, that —

BY MR. LEVITT:

Q: He was in the know?

A: — he was in the know, yes.

Q: You had some dealings personally with Manley, did you not, at least the breakfast meeting and I assume some subsequent meetings?

A: Well, we had this meeting after the due diligence; and during the negotiations when they tried to back out and we sued for performance, we had no conversation.

Q: How about on the settlement —

A: Then when he came back and offered the $19, then we fell back in love again and we started meetings like this where he would call me over to New York and say what he hoped we would do, and I would go back and we would either try to do it or

Page 195

not. Some of the things he wanted to do were not permissible, as I said.

Q: Did you regard Manley as sharp? He ran a $6, 7, 8 billion business including the Home Insurance Company, so the assumption is he has to be sharp.

MR. KIRK: Objection to the form of the question.

BY MR. LEVITT:

Q: Did you have any other opinion, sharp, sophisticated?

A: I think he was a sharp lawyer. He was not a sharp businessman and he was not a sharp banker. I shouldn't say he wasn't a sharp businessman. He was not a sharp banker. He was not steeped in the traditions or the rules and regulations of banking.

Q: Did he have people around him though who were?

A: No.

Q: Or that he paid to be?

A: No, he did not.

Page 196

Q: Would you have regarded him as a risk taker?

A: Yes.

MR. KIRK: Objection to the form of the question.

BY MR. LEVITT:

Q: More so than you, yourself, were a risk taker?

A: Yes.

Q: Because you were more steeped in the traditions of banking than he was?

A: Yes.

Q: Would you say Mr. Manley relished risk taking?

MR. KIRK: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. LEVITT:

Q: We talked about whether Carteret made loans to Gruntal and you said they never asked. Did it ever provide financing to customers of Gruntal who wanted to buy stock on margin?

Page 197

A: No.

Q: Also Mr. Manley said he would like Home to be able to tap into Carteret's low cost deposits. I guess insured money could be acquired at lower cost than on the market?

A: Right.

Q: Did this ever happen?

A: No, not to my knowledge.

Q: Do you know whether Home Insurance Company's borrowing costs went down as a result of AmBase acquiring Carteret?

A: I don't know, but it would be very surprising if they would have.

Q: If you look at number (13), which is the on the last page of the document, he wanted Carteret to get into southern California with LPOs, it says.

A: Loan production offices.

Q: I was going to ask you what LPOs were. Loan production offices?

A: Yes.

Q: Did Carteret ever do this?

Page 218

talking about the merger, three months later and where do we go from here.

Q: And is the date November 16, 1988?

A: Yes, November 16th, 1988.

Q: Is it fair to say this document is trying to encourage people in the bank to watch the costs because the costs were becoming too high?

A: Yes.

Q: And you were saying that you needed to remain profitable and there might be a risk you wouldn't unless the costs came down?

A: Well, the department heads had asked for increases in budgets of the $10 million, and I denied that and said I want you to cut a million each. And we wanted to not only — not only did we not want to increase but we want to decrease by 12.

Q: Each department head asked for 10 million in his department?

A: All together.

Q: If you look at page 2, the second full paragraph, third paragraph on the page —

A: Yes.

Page 219

Q: — you say, "In 1988, which admittedly was an unusual year due The Home Group merger which resulted in extremely costly one-time merger-related expenses, the company made $31,803,000 before taxes and about $23,000,000 after taxes."

I will represent to you, because I know from the financial statements, that, in fact, the company made 19 million after taxes in '88.

If you look at the top of the page, the company made 33 million after taxes in '87. You see that?

A: Yes.

Q: You talk about there being one-time merger-related expenses.

My question is, did the income in '88 drop from the income in '87 because of these one-time merger-related expenses or were there other things going on as well?

MR. KIRK: Objection to the form of the question. I think we previously established that Mr. O'Brien didn't prepare the financial

Page 220

statements; and the kind of an analysis you are asking him to perform using only a memo that was sent to officers, not showing him the financial documents for those years, I think makes it almost impossible to ascertain what particularly led to changes in income from one year to the next.

BY MR. LEVITT:

Q: Let me ask it this way. The net income drop from 33.4 million in '87 to 23 million in '88 — it was actually 19 million in '88 — why did it drop?

MR. KIRK: Same objection. It is impossible for him to look at this and determine that.

BY MR. LEVITT:

Q: Do you know?

A: All I know is that the environment for lending was greatly diminished in those years after after the '86 Tax Act.

Q: And do you recall whether at about this time, which is November 16th, '88, a problem was arising with nonperforming loans that was reducing

Page 221

the income?

MR. KIRK: Objection to the form of the question. "A problem arising" is vague and ambiguous.

MR. LEVITT: The problem being nonperforming loans.

MR. KIRK: Are you asking if they had nonperforming loans at this time?

MR. LEVITT: I am asking whether he recalls that a reason for the drop in the income between '87 and '88 was that in '88 the company suffered from an increasing amount of nonperforming loans. It is not in the memo.

BY MR. LEVITT:

Q: I am asking you independently.

A: I am looking to see if it is in the memo.

MR. KIRK: Again I would object. You could determine whether nonperforming loans increased from '87 to '88 simply by looking at the financial statements.

BY MR. LEVITT:

Q: I am asking about your recollection.

Page 226

must remain a profitable company.
Then you go on to say we need to trim expenses by a million dollars per month.
What costs were too high?
A: I don't recall all of them.
Q: It sounds to me like you are saying here unless we pull in our belts, we may go under and not be a profitable company anymore. Is that what you're saying here?
MR. KIRK: Objection to the form of the question. The document speaks for itself.
BY MR. LEVITT:
Q: Is that what you thought in your head?
A: No, not quite, but —
Q: You said it to alert people, is that it?
A: Right.
MR. KIRK: He didn't say it. There is no place in here where it says if we don't trim costs the company will go out of business. He is saying, we should trim costs.
THE WITNESS: Right.
BY MR. LEVITT:

Page 227

Q: Did Manley tell you to write this memo?
A: No.
Q: Was Manley complaining at this point about the performance of the company and so you had to do something and so you wrote this memorandum to try to start cutting costs?
A: No. Three months into the merger he was not complaining.
Q: You say in the fourth line up from the bottom "The Company costs at present about $14,000,000 per month to operate and at that rate of expense we cannot make a profit."
Were you worried that you wouldn't remain profitable?
MR. KIRK: Objection to the form of the question.
THE WITNESS: I don't think I was worried. I was concerned that we do everything that we could to make sure that we made a profit.
BY MR. LEVITT:
Q: Look for a second at the first paragraph on the page, and this the first full sentence, "In

Page 228

1985, the Company made $3,495,000 before taxes and $25,222,000 after taxes." You say that the reason you were more profitable after taxes than before was that you had "net operating loss carryforward tax adjustments.
Where did those net operating loss tax adjustments — did they relate to these acquisition adjustments from FSLIC?
A: I don't even know. I don't know where you are. On page 2?
Q: Yes. The first paragraph on page 2. It says, the first sentence says, in 1984, you made 7.5 million before taxes and 7.5 million after taxes.
A: I don't know where the carry forward came from.
Q: If you will look at page 3, please. "What are we going to do" to cut expenses? That's what you ask on the first sentence on page 3.
"What are we going to do?"
A: Yes.
Q: And to cut expenses you say you will

Page 229

eliminate positions and close some branches. And the goal was to save 12 million a year.
You see that?
A: Yes.
MR. KIRK: It says, "close, consolidate or sell some branch offices."
MR. LEVITT: Right.
BY MR. LEVITT:
Q: I take it closing or consolidating or selling branches would save expenses, net expenses if they weren't profitable operations, right?
A: Right.
Q: So you had some branches that were not profitable and you were thinking about selling those off?
MR. KIRK: David, you are misrepresenting the document. The very next sentence says, "Most of these branches are fine, well run and profitable."
BY MR. LEVITT:
Q: "But we cannot be all things to all people and all markets," so some of the branches

Page 230

weren't good?
A: Well, we had ranked our branch system, A branches, B branches and C branches. Now, the C branches were profitable for the most part, but they were smaller, they were in emerging areas, sometimes out in the country, and all things being equal we would have kept them and nutured them until they reached a certain level of deposit total.
But I am saying by implication here that we have to evaluate all of these and trim some of the not-as-profitable ones. Frankly, the Cs and the Bs were the candidates to sell off and we kept all the As.
Q: Did you begin to feel a need to kind of scale back at this point?
A: Yes.
Q: To sort of look inward a little bit and become more —
A: Well, yes.
Q: And this is, as I said, November of '88. That's when you wrote this?

Page 231

A: Uh-huh.
Q: Did this feeling you had that you needed to scale back have anything to do with FIRREA, which wasn't passed until August of '89?
A: Well, it had — no, but capital concerns were the number one issue in the savings and loan business at that time.
Q: Even before FIRREA?
A: Yes. And since earning possibilities were diminishing as a result of tax policy, and other economic issues driven by the Fed, we decided to shrink our asset base so that we would more easily comply with the capital requirements.
Q: But at this point since FIRREA hadn't been enacted, you weren't shrinking because of FIRREA?
MR. KIRK: I object to the form of the question in that it is misleading in that while it is true FIRREA hadn't been enacted in November of 1988, by this point the early proposals that ultimately led to the Bush proposal in February 1989 were in play, and I think your question is a

Page 232

little misleading on the time line leading up to FIRREA.
MR. LEVITT: With the objection you can repeat the question, and you can give the answer you gave before.
MR. KIRK: I don't remember the answer he gave before.
You can answer the question truthfully, regardless of what you said before.
MR. LEVITT: I assume what he said before was truthful and uncoached.
MR. KIRK: I object to the comments of counsel for the Government in that it is very argumentative. Certainly Mr. O'Brien has been truthful throughout his deposition, and I think you are being insulting to him with those comments.
MR. LEVITT: She can read the question back and you can answer however you answer.
(The reporter read the requested portion of the record.)
THE WITNESS: Well, I think I said that although FIRREA had not been enacted, capital

Page 233

concerns were paramount in the industry and most companies that did not have the earning potential that they had previous due to market conditions, mostly the tax policy, decided to shrink their asset base so that they could more easily comply with the new capital directives.
BY MR. LEVITT:
Q: So the answer is you weren't shrinking because of the FIRREA because FIRREA wasn't enacted, but you needed to shore up your capital because of capital requirements that were in existence or anticipated? Is that your answer?
MR. KIRK: Objection to the form of the question. His answer was what he said it was. And I think you are mischaracterizing it.
BY MR. LEVITT:
Q: You want to just rest on your prior answer?
A: Yes.
Q: Look at page 4, if you would, of the document.
A: Yes.

Page 234

Q: The third line from the top says we "will soon be managing a California thrift and loan to be known as Carteret Thrift and Loan Association, which we expect will be the beginning of our entry into the California one to four family loan mortgage market."
Did that ever occur?
A: No.
Q: In the next paragraph you announce some personnel changes?
A: Yes.
Q: And the first one is Mahoney "left to accept a senior position with a smaller New Jersey thrift"?
A: Yes.
Q: Was he fired?
A: No, we were very sorry to lose him.
Q: Were there any treasury losses at about this time that were blamed ed on him?
A: No, not that I recall.
Q: I know Mueller was fired because he told me that. Do you recall that?

Page 235

A: Yes. Well, he was asked to resign.
Q: He didn't shy away from saying he was fired.
A: No, he was, you're right.
Q: Whose idea was it to get rid of Mueller?
A: Manley.
Q: Was Manley unhappy that the commercial lending was going bad and he blamed Mueller for it?
A: I think in part, yes.
Q: Did Manley express to you that he thought there had been problems with the underwriting of the commercial lending and Mueller was responsible for that?
A: He never expressed that to me, but I think he felt that was the case.
Q: If you look at page 5, please, in the first full paragraph beginning "Our financial strategy," it says, "Our financial strategy will be to shorten up the duration of our corporate portfolio and to remove interest rate risk."
You see that?
A: Uh-huh.

Page 236

Q: When you say, "shorten up on the duration of our corporate portfolio," does that mean that the maturities — you try to make loans that had a shorter maturation time?
A: Yes.
Q: And was there a problem with that?
A: No.
Q: Did you have an interest rate risk problem at the time beyond what you should have had?
A: Not that I recall. But if you will go on, you will see that I say, "we are one-half of Home Group, the other half primarily consists of Home Insurance Company, which by its very nature means that it is a long-term investor. We therefore should be short-term like a California savings and loan with all of our mortgages adjustable in rate and flexible in term."
This is just adopting to the new corporate strategy.
Q: You say two sentences down, "We will generate profits this winter by prudently selling

Page 237

off much of our long-term, fixed rate portfolio while at the same time generating and buying over two billion in one to four family house loans between now and December 31, 1989."
Were those mortgages to be variable rate mortgages?
A: Yes.
Q: So I can show you documents about your interest rate gap at that point which was like 20, 25 percent. Every point was about $9 million from your equity. Did you know that?
A: No. I mean I probably did at the time, but I don't know it now.
Q: So you have no recollection right now that you believed there was a problem with the interest rate gap at the time?
MR. KIRK: He just testified that he doesn't recall.
THE WITNESS: I don't recall right now.
BY MR. LEVITT:
Q: In the second paragraph, *in the second* full paragraph, that begins "About 80," you see

Page 238

that?

A: Yes.

Q: The second sentence says we "will continue to do commercial real estate loans although we will continue to be wary of speculative office buildings, hotels, restaurants and other types of non-residential single purpose homes."

Hadn't you been in lending to hotels prior to this memo?

A: A little bit, yes.

Q: How about restaurants?

A: I don't think we ever made a restaurant loan — yes, we did. One.

Q: Had you had a feeling that you needed to tighten up on the underwriting because some of those prior commercial loans had been speculative?

MR. KIRK: Objection to the form of the question.

THE WITNESS: No.

MR. KIRK: It says, "we will continue to be wary of speculative loans."

THE WITNESS: Right.

Page 239

BY MR. LEVITT:

Q: What was the purpose of circulating this memo at this time?

A: Well, mostly to bring the senior staff up to date on what was happening, how we were changing as a result of being owned by Home Group, to reinforce the idea of trimming the budget by a million a month and to remind the people of their primary focus and mission.

Q: Which was?

A: Many of which had not changed, which is to either continue doing what you are doing or change as indicated in this memo.

Q: And as indicated in this memo, does that mean you go back to your roots more so; that is, to focus on residential single family lending?

A: Not necessarily. I say here let's continue to look for acquisitions and so forth.

Q: At least to sort of pull in your belts?

MR. KIRK: Objection to the form of the question. There is notation in here that says "pull in your belts."

Page 240

THE WITNESS: No, other than the paragraph about trimming the budget.

BY MR. LEVITT:

Q: Was there any precise, precipitating event for this memo that you can recall?

A: No. I just thought it was prudent three months into the merger to tell everybody what is going on.

Q: "What was going on." That's what I am trying to get at from you.

A: Well, obviously the entire industry was deteriorating.

Q: Including you?

A: Including us, yes.

Q: So you wanted to advise people you were deteriorating and you got to do something about it?

A: Yes, and we were going to do something about it.

MR. LEVITT: Let's go on to the next one.

(O'Brien Exhibit No. 20 was marked for identification.)

BY MR. LEVITT:

Page 241

Q: I am really going to focus on the components of the net worth you identify in the first page of the document and that sort of condensed, indented portion.

Can you identify this letter? Is it a letter from you to the Honorable Jim Saxton?

A: Yes.

Q: Dated July 7th, '89?

A: Yes.

Q: Are you commenting about proposed legislation and FIRREA, in fact, and voicing alarm at some provisions?

A: Yes.

MR. KIRK: F-I-R-R-E-A, all caps.

BY MR. LEVITT:

Q: On page 1 of the letter, you express concern that under FIRREA core capital would not include all the capitalized mortgage servicing, the capital of some subsidiaries and the goodwill.

You see that?

A: Yes.

Q: Do you recall which of these you regarded

Page 250

educated at all.
Marshall did go on to Brooklyn College and Brooklyn Law School, but both of them are from the same mold and they loved each other. And they acted intuitively, instinctively and they were both very bright. So they related well to each other.
Q: And is it fair to say neither went blue at the sight of a risk, they were comfortable with that?
MR. KIRK: Objection to the form of the question. It is highly ambiguous to say "went blue at the sight of a risk."
THE WITNESS: I would not characterize them as risk takers. But they did not, as most bankers of that era did, methodically analyze something and then come to a conclusion over a week's time. They made a fast decision, maybe not instantaneous, but in a day's time decided to go do something that most of us would have taken that week to analyze.
Now you might say that I am opposed to a certain amount of risk taking, but I wouldn't

Page 251

characterize it necessarily as that.
BY MR. LEVITT:
Q: And the memo in the second-from-the-last paragraph says that Pierson "has elected to take early retirement. Bob has made a valuable contribution" and would be missed. Was Pierson fired?
A: Yes.
Q: And who fired him?
A: Manley.
Q: And why?
A: I don't really know, but they never got along too well; and at this point the officers of AmBase were saying, I think, we can do just as good a job, if not better, as those people over at Carteret. And one by one they put themselves or their friends into all of the senior positions and the board.
Q: And the memo indicates that Richard Braun was coming down. Brown or Braun?
A: Braun.
Q: Richard Braun was coming down to be the

Page 252

chief financial officer?
A: Yes.
Q: Whose idea was that?
A: Manley's.
Q: Did you disagree with that?
A: I don't think I was happy about it because it was more of the fox-in-the-henhouse kind of instruction. But we were 100 percent owned by them, so I mean it didn't make any difference. We had no choice in the matter.
Q: The last paragraph, as your counsel pointed out, refers to "an inverted yield curve."
A: Yes.
Q: It says, "an inverted yield curve has limited core profitability."
You see that?
A: Yes.
Q: Does that mean that the period was a period of upwardly sloping interest rates?
A: Yes, it means that short-term interest rates were higher than long-term interest rates which is a bad thing for the savings and loan

Page 253

business. And it is a temporary —
Q: Because it is more expensive to borrow as contrasted to what you are getting in from your assets?
A: Right.
Q: But that is minimized by the Board's requirements that there be some balance in the repricing over time periods, what they call the gap analysis?
A: If you can do that, yes.
Q: I think it is fair to say Carteret was moving to do that, but had recognized it had problems on that?
A: Right.
MR. KIRK: Objection to the question. I don't think that has been asked and answered anywhere in the record.
BY MR. LEVITT:
Q: Isn't that true, what I just said?
MR. KIRK: Could you repeat the question.
THE WITNESS: I don't know if it is completely true. We were starting to see some

Page 254

concern in that area, yes.

BY MR. LEVITT:

Q: You talked about the Tax Act that Bradley pushed forward, who was from your own state of New Jersey?

A: Yes.

Q: But that Florida wasn't impacted as much on the commercial real estate, as I understood your testimony?

A: It was on the commercial real estate side, but as a whole, I would say 80 percent of all building in Florida at that time was residential and 20 percent was commercial; and we were not deeply involved in the commercial side. So it didn't impact us negatively as much as it did in, let's say, New Jersey.

Q: This memo says, "The real estate recession is causing our problem assets to soar"?

A: Yes.

Q: The problem assets were commercial loans essentially, weren't they?

A: Yes.

Page 255

Q: Were they also corporate loans?

A: No. Mostly commercial real estate loans.

Q: Are you saying, as we sit here, that you believe the recession was caused by this tax statute?

A: Definitely.

Q: Any other causes?

A: Yes.

Q: Was overbuilding, overlending a cause?

MR. KIRK: Overbuilding or overlending?

MR. LEVITT: Overlending for overbuilding.

MR. KIRK: As a macroeconomic matter?

THE WITNESS: Not at Carteret, but in some savings and loans, yes.

BY MR. LEVITT:

Q: What was the main geographical area, if there was one, where the preponderance of the commercial Carteret loans were located?

A: In New Jersey.

Q: Did New Jersey get hit bad by the recession?

Page 256

A: And we were second to Massachusetts which was the worst state.

Q: Why did you think it got hit so bad? Was the tax law at fault?

A: There were a lot of things happening. Governor Florio put a huge tax on the communications industry which caused AT&T and other like companies to move out of the state, taking 22,000 jobs with them. There were huge consolidations on Wall Street and in the New York money center banking industry, which were causing in the case of Chase and Chemical, 13,000 layoffs. Most of these people lived in New Jersey.

So people were under stress as a result of this so-called recession and were delinquent in paying their mortgages; builders were delinquent in paying their payments. It was a temporary thing, but the regulators did not give us enough time to wait it out.

Q: Is it your testimony today that you don't think there were any imprudent commercial loans on Carteret's books but for —

Page 257

A: I don't think there were.

Q: — what you termed in this memo the recession? There wouldn't have been any defaults or minimal defaults?

A: I wouldn't want to say that. There is always some mistakenly made loans, but I would not characterize our portfolio as imprudent.

Q: Were you aware of the Government examiners who looked at the bank in '89 and '90 and what they demanded with respect to classifying?

A: Yes.

Q: Classifing loans?

A: Yes.

Q: Is it fair to say you didn't agree with any of that?

A: Absolutely. They came in and appraised loans on what we call a liquidation basis rather than a going concern basis. And it was two entirely different methods of evaluating the same credit. And so loans were overnight bad that the night before had been good.

The fundamental collateral was there.

Page 286

than an unfavorable one.
MR. KIRK: I object to your highly argumentative way of interrupting the witness whenever you think he is going to say something that perhaps you don't like.
Mr. O'Brien, finish your answer, hopefully without further interruption.
BY MR. LEVITT:
Q: I think your own lawyer is interrupting you more than me, but go on.
A: I think it is recognized now, and it certainly was then, that there was tremendous regulatory overreaction to the so-called thrift crisis, and it was bruited about wildly in the press and they read it in Toronto.
If the regulatory climate had been more friendly and more nuturing, they might have convinced themselves that 1) and 2) were something they could live with because they were less significant than 3).
Q: How did they get the perception that Carteret was broke?

Page 287

A: They didn't. I said that's my word in quotes.
Q: So you told them Carteret was broke?
A: No, I didn't. I am making a joke up to these guys. We weren't broke.
Q: You are making a joke?
A: Yes.
Q: Why would you tell the guy who might want to buy you —
MR. KIRK: This memo isn't addressed to a guy who might want to buy him.
THE WITNESS: It is a colloquial phrase.
BY MR. LEVITT:
Q: It is a joke — you are writing to Scharffenberger and the others when you told them that the analysts recommended not buying Carteret because it was broke.
A: It doesn't say that.
Q: He didn't really say broke to you?
A: No.
Q: He said what? Financially troubled?
A: I don't know. I don't remember.

Page 288

Q: Let's look back, if you would, at the prior exhibit, 24, which is the February 23rd, 1990 memo. I want to finish my questioning on that.
Why were you so aggressive about needing to pay off that mortgage on the Florida property?
MR. KIRK: Objection to the form of the question. I don't know where you got "aggressive."
BY MR. LEVITT:
Q: Excuse me. Strike that. I made a mistake, a factual mistake.
I understand that the 1.5 million loan from the Home Group or the Home Insurance Company — I guess it was Home Insurance Company, was it?
A: Yes.
Q: — was to finance the New Jersey house that you bought when you moved back?
A: Yes.
Q: Why was it so important to you to pay that off so fast? I mean I have seen memo after memo where you were anxious to get rid of that loan. My question is why?

Page 289

A: Because Home Insurance was being sold to a Swedish group and the investor banker said all insider loans have to be paid or the sale won't take place.
Q: In other words, you were doing AmBase a favor?
A: Yes.
MR. LEVITT: Off the record.
(Discussion off the record.)
MR. LEVITT: We are finished with Exhibit 24. Let me see if I have anything else on 25.
BY MR. LEVITT:
Q: Just one or two things about 25. Did SunLife actually do a due diligence of Carteret?
A: We provided them with detailed financial information and other examination reports and so forth. I don't think they ever came to New Jersey with a due diligence team. But, you know, a savings and loan at that point was an open book. Your financials were a matter of public record. And they did do substantial due diligence.
Q: Did they have an investment banker?

A: Yes.
Q: Was it serious enough on their side to retain an investment banker?
A: Yes.
Q: Do you know if a report was done on what the investment banker said?
A: I am sure there was, but I never saw it.
MR. LEVITT: That's all for this one.
(O'Brien Exhibit No. 26 was marked for identification.)
BY MR. LEVITT:
Q: The next one is 26. I am going to ask you briefly about page 2. I will tell you this is a letter to Mr. Dorgan from all the directors.
You see that on the last page?
A: Yes.
Q: All the directors of Carteret, taking issue with the '89 reported examination.
A: Right.
Q: This is a complicated letter and we don't have time to go into all of it, but I want to ask you a couple things to give you a chance to explain



some of the elements of this.
On page 2, in the first full paragraph it starts with the word "Carteret."
A: Yes.
Q: And I am looking at the next sentence. It says, "Obviously, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) has placed a severe strain on Carteret's operations, but the impact of FIRREA has been universal throughout the thrift industry."
You see that?
A: Yes.
Q: Precisely what strain on Carteret's operations did FIRREA place?
MR. KIRK: If you look at the next sentence, that lists one of them.
BY MR. LEVITT:
Q: I know the regulatory capital was reduced. But now I am asking about operational strains that FIRREA placed as contrasted with your early memo about needing to reduce expenses and to pull in because you weren't making money and so



forth.
MR. KIRK: I object to the form of the question. Among other things you haven't established that Mr. O'Brien recalls reviewing this document. It is a 17-page document.
MR. LEVITT: I am trying to save time.
BY MR. LEVITT:
Q: Is your answer you can't recall?
A: Yes, it is.
Q: You left in about May of '91?
A: Right.
Q: Wasn't Carteret always in capital compliance even with FIRREA up until the time you left?
A: Yes.
Q: If you will look at the first full paragraph on page 2, it says in the second-to-the-last sentence, "In the wake of the substantially increased requirements of FIRREA, Carteret has met and continues to meet all of the significantly more stringent requirements."
You see that?



A: Yes.
Q: So, as we sit here today, that's an accurate statement as far as you know?
A: Yes.
Q: And that's another reason I ask, what were these serious operational impacts you talked about earlier?
MR. KIRK: He didn't talk about that.
MR. LEVITT: That the letter talks about.
MR. KIRK: He said he didn't recall.
BY MR. LEVITT:
Q: Is your recollection refreshed at all by this later letter?
A: There was a substantial real estate recession that had nothing to do with FIRREA except that FIRREA retarded the thrifts' abilities to lend and that action exacerbated the real estate recession.
Q: Is that accurate, when you state in compliance with FIRREA regulatory standards which is what you —
A: We are talking about capital compliance.

Page 298

MR. KIRK: It is not the same thing.
MR. LEVITT: You reduce to 11.8. "At December 31, 1988, Carteret's one-year GAP was 11.8" and reduced to .8.
MR. KIRK: "This was reduced to a negative .8 by December 31, 1989."
MR. LEVITT: Where does it say that?
MR. KIRK: The next sentence.
BY MR. LEVITT:
Q: Negative .8. So, in other words, that meant there was more — there were more — what does that mean? There were more liabilities, repricing and assets repricing?
A: Right.
Q: I take it you as a member of the board were agreeing that there had been a problem interest rate risk and this rectified the problem?
MR. KIRK: Object to the form of the question. It does not say anywhere there was a problem. It says certain things were made that reduced interest rate risk.
BY MR. LEVITT:

Page 299

Q: Did you believe there was a problem with what was a 16.8 percent gap?
A: I think it was a matter of concern.
Q: 16.2 percent gap. You thought it was a matter of concern?
A: Yes.
Q: So the comment of the examiner was justified on that?
A: In your opinion?
A: Yes.
Q: Do you know who wrote this letter which was signed by all the board members? My question is specifically did Walsh write the letter?
A: Walsh wrote the paragraph that we are just finishing discussion on about interest rate risk and the mortgages and so forth.
Q: At the end of the report, the Board said it believed that the rating should be three instead of four?
A: Right.
Q: That's in the last sentence?
A: Yes.

Page 300

Q: Did you agree with that?
A: Yes.
Q: Did you agree that the bank — oh, well, the letter is telling OTS this bank is fundamentally sound at this point. Therefore, it shouldn't be a four. It should be a three. Maybe there are some things to look at which we are improving, we know what is going on. It should be a three. Did you agree with that point of view?
A: Yes.
Q: Did anybody on the board disagree with that point of view that you recall?
A: No. Some of them thought we should still have been a two.
Q: And the last question is, as we sit here, do you recall disagreeing with anything in this letter?
A: No.
MR. LEVITT: Let's rush through the rest of this.
(O'Brien Exhibit No. 27 was marked for identification.)

Page 301

BY MR. LEVITT:
Q: This is a letter from you to Scharffenberger?
A: Right.
Q: March 23rd, 1990, which was about a year before you left. I will start going through with my questions and if you want to pause to read some more —
A: Go ahead.
Q: To expedite this, do you recall this letter now you looked through at least some of it?
A: Yes.
Q: One question I have is, were you writing these letters because you thought AmBase might want to get rid of you and claim it was for cause and you wanted to avoid — you wanted to defend yourself against that issue when it came time to settling your employment contract?
A: Not primarily. Marshall Manley was starting to stonewall me on the issue of compensation and retirement and so forth, as you could tell by my memo to Walsh, where I am begging

Page 310

valuable than the New Jersey franchise and we should do everything we could to keep it. But because it was so valuable, this was a quick way for AmBase to raise some funds for Carteret, I guess.

Q: This is AmBase, the board of directors of AmBase considering selling these branches, right?

A: No, this is the board of directors of Carteret. However, you will notice —

Q: The board of directors of Carteret?

A: Except for me and Walsh, who had already turncoated, there are no Carteret people here. These are all AmBase people.

Q: You mean with the exception of you and Walsh all the members of the Carteret board were employees of AmBase?

A: Were AmBase employees, except for Mr. — no, they were all AmBase employees. And —

MR. KIRK: There is no question pending.

MR. LEVITT: Let's skip this one in the interest of saving time.

MR. KIRK: Excellent.

Page 311

MR. LEVITT: But I want to show you this one.

(O'Brien Exhibit No. 30 was marked for identification.)

BY MR. LEVITT:

Q: I am going to direct your attention to paragraph two on the first page.

A: Right.

Q: This is a letter dated August 29th, 1990, from you to Mr. Scharffenberger. You signed it "Bob" at the end. Is that your signature?

A: Yes.

Q: The second sentence in the second paragraph on the first page says, "In September of 1989, at a regularly scheduled Board of Directors meeting of Carteret, the numbers concerning classified assets were starting to mount."

You see that?

A: Yes.

Q: "In addition, we were in the last stages of our federal examination and the examiners were corroborating and enhancing our estimates of future

Page 312

problem loans."

Then it says, "Marshall became quite incensed at the increases and accused management and me specifically of concealing this situation and springing it on him at the last minute. This is a subject of several lawsuits, as you know."

Had you hid these problems from Marshall and only sprang them on him at the last minute?

A: No.

Q: Did he make that accusation though at a board meeting?

A: I don't remember him making that accusation, but I do remember him being exorcised.

Q: Is it unlikely you would have wrote he made the accusation to Mr. Scharffenberger if he didn't make the accusation?

A: No. So he probably made it, but I just don't recall it.

Q: Then you say in the same paragraph, "The facts are that no one in New Jersey saw the real estate recession coming."

So I take it you are blaming the mounting

Page 313

of the numbers on classified assets on this real estate recession. Is that right?

A: Yes.

Q: And you mentioned there were lawsuits. Were those stockholders against AmBase?

A: No. I don't think these were lawsuits against us. I don't remember specifically what I mean by that sentence.

Q: Were there lawsuits against AmBase by its own stockholders based on not disclosing Carteret was in poorer shape?

A: Yes.

Q: In the third paragraph on page 2, you say, "Throughout December of 1989 and into January of 1990, my relationship with Marshall chilled as the examiners hit us with an especially damaging audit which we now know was contrived to trigger the AmBase keepwell agreement. And, in fact, $20 million was infused into Carteret before year end 1990."

What was the basis for your charge against the examiners that the damaging audit was,