# EXHIBIT X

**Depo of: Marshall Manley (Ambase v. USA) 11-23-99**

**ACE-FEDERAL REPORTERS, INC.**

**Page 1 to Page 199**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**ACE-FEDERAL REPORTERS, INC.**
**1120 G Street, N.W.**
**Suite 500**
**Washington, DC 20005**
**Phone: 800-336-6646**
**FAX: 202-737-3638**

Page 1

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x
AMBASE CORP. & CARTERET BANCORP., :
INC., :
Plaintiffs, :
AND :
FEDERAL DEPOSIT INSURANCE CORP., :
Plaintiff-Intervenor, : Civil Action Number
vs. : CA 93-531
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - - x

DEPOSITION OF MARSHALL MANLEY

Los Angeles California
Tuesday, November 23, 1999

REPORTED BY:
SHARYN L. BAMBER

Page 2

Deposition of MARSHALL MANLEY, called for examination pursuant to subpoena, on Tuesday, November 23, 1999, in Los Angeles, California, at 1840 Century Park East, Third Floor, beginning at 9:00 a.m., before SHARYN L. BAMBER, a Certified Shorthand Reporter, when were present on behalf of the respective parties:

MICHAEL W. KIRK, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Suite 200
Washington, D.C. 20005
(202) 220-9671
On behalf of Plaintiffs

– continued–

Page 3

APPEARANCES (CONTINUED):

DAVID A. LEVITT, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20001
(202) 307-0309
On behalf of Defendant

Page 4

PROCEEDINGS
Whereupon,
MARSHALL MANLEY
was called as a witness and, having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. LEVITT:
Q State your name, please.
A Marshall Manley, M A N L E Y.
Q What is your occupation?
A Retired.
Q By training, are you a lawyer, an accountant?
A I went to law school and I practiced law for 20 years and then I was a business executive.
Q How long have you been retired?
A I haven't drawn a salary since 1990.
Q When you retired you retired from the employment of AmBase Corporation?
A That's correct.
Q And you haven't worked in an active job since then for a salary?

Page 5

A That's correct.
Q Just to have the record be complete, would you just summarize your educational credentials following high school.
A Graduated from Brooklyn College in 1962; graduated from NYU Law School in 1965 with a JD; attended classes at USC for a Master's in political science, but never completed it, and that's it. USC is University of Southern California.
Q Likewise, to have the record be complete, could you just outline your professional career in terms of the positions you've held since finishing your education?
A 1965, I became an associate at a law firm of McKenna & Fitting, F I T T I N G. 1970, I became a partner in that firm. In 1973, I left and became a partner in the firm which was eventually known as Manatt, M A N A T T, Phelps, Rothenberg, Manley, M A N L E Y, & Tunney. In 1978, I left there and became a California managing partner and started the firm in California, eventually became co-managing partner of a firm called Finley,

Page 6

Kumble, Heine, H E I N E, Underberg, Manley &

Casey, Finley, Kumble, Wagner. And continued thereon until I believe it was beginning of '86 – end of '86, beginning of '87 when I became of counsel to the firm.

Q How long did you continue as of counsel to the firm?

A Until the firm broke up. Sometime in '87 I believe it broke up.

Q Are you familiar with a company called City Investing Company?

A Yes, sir.

Q Did there come a point in your career when you became employed by City Investing Company or involved with City Investing Company?

A I became involved with City Investing Company in 1986 – I'm sorry, 1966.

Q '66?

A Yes, sir.

Q How did you become involved with City Investing at that time in 1966?

A I was an attorney at McKenna & Fitting.

Page 7

They represented a savings and loan called Southern California Savings and Loan, which was a subsidiary of City Investing Company. And I began to do work for City Investing Company and certain of its subsidiaries and for personal work for certain of the individuals who were executive officers of City Investing Company.

Q Did that include Mr. Scharffenberger?

A Yes, sir.

Q Did you serve as Mr. Scharffenberger's personal attorney during part of that time?

A Yes, sir.

Q Then, did there come a point in time when instead of being an attorney with McKenna & Fitting that helped City with Southern California Federal Savings, you became a staff person at City or an executive of City?

A It was not Southern California Federal Savings, it was Southern California Savings and Loan. It was a California State Charter Association.

Point of clarification, when you say

Page 8

"City Investing Company," are you including its subsidiaries or are you only talking about the parent?

Q Parent or subsidiaries.

A March 8, 1985, I became president and a director of The Home Group and chairman of Home Insurance Company. Home Group was a subsidiary of City Investing Company at that time and Home Insurance Company was a subsidiary of Home Group.

Q When you were a practicing attorney, did you do work for Home Group?

A I did work for its subsidiary Home Insurance Company, yes. I'm sure when I practiced, the law firm did work for Home Group, too. When you say me, I include the law firm.

Q And did Mr. Scharffenberger have a position with Home Group?

A Yes.

Q Was he chairman of the board of Home Group?

A He was chairman and CEO of Home Group.

Q And you were the president of Home Group?

Page 9

A At that time, yes, sir.

Q Also the president of Home Insurance Company?

A Chairman of Home Insurance company. Mr. O'Neil – not O'Neil, Mr. Newman was president of Home Insurance Company at that time.

Q Did you know anything about insurance when you became chairman or president of Home Group?

A Yes.

Q From the practice of law, in the course of practicing law, you became conversant with the issues that insurance companies typically deal with, is that how?

A By 19 – in 1984, October of '84, Mr. Scharffenberger asked me to do an investigation of a Home Insurance Company and its litigation posture claims handling in conjunction with a proposed liquidation of City Investing Company, and the Home Insurance Company was a major subsidiary and he wanted to get a handle on it. During the course of my practice from '65

Page 10

to this March '85 time period, I was involved in a significant number of litigation and corporate matters as an attorney and as a managing partner of what at that time was the largest law firm in the country. I, therefore, became very familiar with business in general and also with the operations of insurance companies and other financial service companies.

Q As I understand it, in or around 1985, City Investing Company determined to reorganize by a liquidation; is that correct?

A In September of 1984, if my recollection is correct as to dates, the shareholders of City Investing Company approved the plan of liquidation under a section of the Internal Revenue Code 3 something or other, which provided for a tax-free liquidation. And City Investing Company then had one year in which to complete that liquidation.

Q Was that idea put to the stockholders by the board of directors of City Investing Company?

A Yes, sir.

Q What prompted that, if you know?

Page 11

A I was not an officer or director of City Investing Company at that time. My understanding

of Mr. Scharffenberger and what happened was that the Home Insurance Company was such a poorly performing company that because of its problems, it was felt that it would better – in the interest of the shareholders to liquidate the entire City Investing Company operation rather than to continue it on as an ongoing entity.

Q Was City's major asset the Home Insurance Company?

A It was a significant asset. It had a number of other assets that were major companies which would be recognizable to most people in the United States.

Q Was one, for example, Sterling Forest?

A That was a subsidiary of the Home Insurance Company. I would not have considered that a major asset. Other major assets that come to mind would have been Motel 6; Wood Brothers, which was the seventh largest home builders in the United

Page 12

States; General Development Corporation, which was the largest real estate developer in the Southeast; Remanufacturing Company, which was the largest manufacturer of steel drums, and a major manufacturer of air conditioners and water heaters; Euroco, which I believe was the third largest printer of business forms; World Color Press, which was the largest printer of magazines; Hayes International, which was the largest refurbisher of jet aircraft. And there were many others.

Q Before the liquidation, say, in 1984, what was the value of the assets in total, let's say, of City Investing?

A You mean the asset value?

Q Yeah.

A I know the company, if I remember correctly, had $8 billion in sales.

Q In sales. So the assets were larger than that?

A I do not recall the assets size.

Q So it was a conglomerate company?

A It was a conglomerate.

Page 13

Q As I understand the liquidation, Home Group, with the Home Insurance Company, was spun off and taken over by shareholders of City Investing and the rest of it was put into a liquidating trust; is that accurate?

A No.

Q Could you tell us – correct me, if you could, please.

A Home Group, its major subsidiary was Home Insurance Company, had been up for sale for a year and nobody – because of its poor performance, poor record, nobody would buy it and therefore it was spun off to the shareholders of City Investing Company, who became shareholders of Home Group, which was then a public entity, which was listed at that time on the American Stock Exchange. Ream, Motel 6, Euroco, World Color Press, Hayes were sold to various entities such as KKR, who then owned them privately and eventually some of them became public entities listed on New York Stock Exchange Company. Wood Brothers was spun off to the shareholders, and it eventually was sold to

Page 14

a company called MDC. General Development was sold publicly and it became I believe a New York Stock Exchange listed company. It was public offering through Merrill Lynch. Various transactions took place, selling various parts of City Investing Company. I was present in the room the other day when Mr. Scharffenberger had testified that City operated in 50 states and 13 countries. So it was a fairly large operation. The assets which were not disposed of, as of the September 1985 date, were gathered together and put into a liquidating trust and subsequently that liquidating trust was supposed to settle those assets.

Q Did I understand Mr. Scharffenberger yesterday correctly that he resigned as chairman of City before these transactions, that you just described, occurred?

A No. He resigned during the time the transactions occurred. If my recollection is that sometime in May of 1985 – I have some notes as to

Page 15

my dates. If you permit me to look at them, I could probably refresh –

Q Sure. If you have them with you.

A I do. I became president and chief operating officer of City Investing Company on May 1, '85 and I became CEO of City Investing Company on May 22, '85. I would assume that Mr. Scharffenberger resigned as an officer, not necessarily as a director, I don't think, in May of 1985.

Q You succeeded him, is that it?

A I was CEO, yes.

Q Why did he do that, if you know? Why did he resign as CEO in May of '85, if you know? He wanted to go into retirement or were there business reasons or –

A The reason I'm reluctant to answer is some of this may come under the attorney-client privilege.

Q You mean you were his attorney at that time?

A Yeah. I was also practicing law at the

Page 16

time, as the law firm was. I know Mr. Revitch was advising him as to why he shouldn't resign from City Investing Company and continue on with Home

Group.

Q If he told –

A The answer is I do know, and I'm just not quite sure if he wants to assert the privilege or not. We can have Mr. Revitch come in and tell me whether he wants to assert the privilege.

Q If he conversed that way with Revitch, but also told you in the capacity where you weren't his lawyer, then it's not a privilege. But if you may have been the lawyer, I don't want to go into it any more.

A You have to understand, at that time I was not only an officer of Home Group, but I was also a partner at Finley, Kumble. That area becomes an area in which I believe I –

Q Let's leave it that way and not risk breaching that.

A The answer is I do know why he resigned. And if you want Mr. Revitch, who was his lawyer,

Page 17

and is his lawyer at that time, he can decide whether it's privileged or not. Okay?

Q Yes.

But when you succeeded to the job of chief executive officer of City Investing Company, upon Mr. Scharffenberger's resignation, you were wearing two hats, that is, you were an attorney for City Investing – three hats, an attorney for City Investing Company, an attorney for Mr. Scharffenberger and chief executive officer for City all at once?

A In May of 1985, I was president and CEO of City Investing Company. I was the co-managing partner of Finley, Kumble, Wagner, et al. Okay? I was president and chief operating officer of the subsidiary of Home Group. Okay? One of the clients that Finley, Kumble had was Mr. Scharffenberger. One of the clients that Finley, Kumble had was City Investing Company. I don't know how many hats I was wearing.

Q Okay. All right.

Page 18

Now, when The Home Group and its main subsidiary Home Insurance Company were spun off, did you acquire stock in Home Group?

A Me personally?

Q Yes.

A Yes, I acquired stock in Home Group.

Q Which you paid for?

A Yes.

Q How much stock did you acquire?

A I don't recall at this time.

Q And did Mr. Scharffenberger also acquire stock in Home Group, do you know?

A Mr. Scharffenberger had a lot of shares of City Investing Company, and because the company was – because Home Group was spun off to the shareholders, he would have obtained – he would have had shares of Home Group, which he did not necessarily purchase, but they came as a result of his City Investing Company holdings.

Q In other words –

A If I were a shareholder of City Investing Company and I had one share of City Investing

Page 19

Company, when Home Group was spun off, I would have then obtained one share of Home Group, which was a public entity of American Stock Exchange.

Q Did you also have stock in City?

A If I did, it was a relatively minor position. But I did acquire shares of Home Group afterwards with the purchase.

Q Okay. Now, when General Development Corporation, which you mentioned, was spun off and, as I understand it, was sold publicly to shareholders – was that your testimony?

A General Development was not spun off. What happened with General Development Corporation, it was a wholly-owned subsidiary of City Investing Company. City Investing Company sold a portion of its ownership through a public offering, which was conducted with Merrill Lynch being the underwriter, and it became then a freestanding of New York Stock Exchange listed company. If I recall correctly, the portion of ownership, which City Investing Company did not sell to the public, and General Development at that time went into the liquidating

Page 20

trust and subsequently the liquidating trust disposed of those shares.

Q Were you a director of General Development Corporation after City sold some of its shares to the public and other of its shares went to the liquidating trust?

A I became a director of General Development Corporation on May 22, 1985, the same day I believe I became CEO of City Investing Company. So that would have been at or immediately preceding the public offering of General Development.

Q I just want to focus on the period of time between 1986, roughly, and 1988, roughly, when you were CEO of Home Group, Inc. and Home Insurance Company.

A I became CEO of Home Group, Inc. in December of '86. I do not recall whether I was CEO of Home Insurance Company that whole time or whether Mr. Meenaghan was CEO at a certain time. But I was CEO of the parent from December of '86 forward.

Page 21

Q Let's think in terms of that time frame then, December '86 through December of '88.

A Before that Mr. Scharffenberger was CEO

the discussions with Carteret Savings.

Q When you say "The Home Group," was it you personally who called O'Brien?

A I don't recall if it was me or it was an investment banker on our behalf.

Q I'm just trying to – I mean, I don't have much experience in this, but to me, you know, at the level you were operating at, before you would call someone like O'Brien, you would want to have under your belt a pretty conversant understanding of the facts relating to Carteret and so forth, otherwise why would you call him. Is that true? Do you recall that?

A I don't understand the question, because you had all that in there –

MR. LEVITT: Why don't you read it back.

THE WITNESS: You're asking me before I contacted somebody like O'Brien if I would want under my belt to know the facts about Carteret?

BY MR. LEVITT:

Q Yeah.

A Yeah, I'd like to know the facts about

Page 27

Carteret before I contacted somebody about possible acquisition. It's a hypothetical question.

Q Is it fair to say you had studied the material before calling O'Brien?

A Studied the material? What material are you talking about?

Q The material that would allow you to begin to understand how good Carteret was or what the problems with it were and so forth.

A Are you trying to find out how this came about?

Q Yeah.

A Can I tell you that?

Q Yeah. Tell me the story.

A Various – Home Group had made a decision that it wanted to become a diversified financial services company. It was apparent that because of Glass-Steagall that it was at that time difficult to own a bank, an insurance company and what we call a stock brokerage firm because of Glass-Steagall. There was a methodology, however, which

Page 28

I –

Q You mean a way to do it and accommodate Glass-Steagall at the same time?

A There was a methodology in order to achieve the business purposes of getting around Glass-Steagall without violating the law. Because the savings and loan industry was expanding its powers and was essentially beginning to operate like banks, it was possible to become this one-stop-shopping financial services company, which seems to be popular now, but we were on the cutting edge at that time by acquiring a major savings and loan having a brokerage firm, and we already had a property and casualty insurance company and a reinsurance company. In various discussions I had with lawyers and investment bankers at that time and with the board of directors and Mr. Scharffenberger, it was decided that it would be in the interest of the shareholders of Home Group to go forward to attempt to acquire a major savings and loan, which was a deposit-taking institution. If you recall, I

Page 29

believe prior to this we had acquired a good old bank in California called Bank of the Ocean, which was a deposit-taking institution. Various investment bankers had recommended this course of conduct to us and began to show us various savings and loans which they thought would be appropriate. Carteret was a savings and loan which the investment bankers told us would make the most sense for us. When the contact was made with Mr. O'Brien, and I don't recall if I made it personally or whether it was made by an investment banker, or it may have been made by our accountants, which were Peat Marwick & Mitchell in those days, who were also Carteret's accountants. We had a general knowledge as to Carteret, but not the full details that you would have, you know, in conjunction with an acquisition. Because, remember, even when this agreement was signed, it was subject to due diligence. I hope that answers your question.

Q It does. Thank you. It was a very

Page 30

cogent answer. Was Salomon the investment banker you were talking about?

A Eventually it was Salomon, but there were others who recommended Carteret. It was a feeding frenzy by the investment bankers. There was Merrill Lynch recommended them; Salomon recommended them; Kidder, Peabody recommended them; First Boston recommended them, there was a whole series of them. But eventually we did use Salomon Brothers, because of a relationship I had with Hira Harris.

Q Who was a partner at –

A Hira Harris was a partner at Salomon Brothers in Chicago and I had met him when I got the Horatia Algora (phonetic) award. He was the person who gave me the award itself, and we became somewhat friendly. And Salomon Brothers had a fine reputation in the financial institution section and they had somebody in New York who was supposed to have been very good.

Q I'm not familiar with the award. Can you

Page 31

It talks about shareholder approval from Carteret, our due diligence and regulatory authority approval. But it is standard to enter into an agreement subject to.

Q Just say for the record, if you would, what a due diligence means from your point of view, just in brief.

A A due diligence essentially, as I understand it, involves certain selected officers of the acquiring company, certain experts, legal and accounting experts having access to documents, operations and personnel of the acquired – of the company to be acquired and going through all of those operations to insure that the entity to be

Page 52

acquired is actually in reality what it appears to be and also to insure that there are no hidden problems which would adversely affect the future of the entity. And based upon that, assuming you do not find any such problems, then you go forward. If you find problems, then you don't go forward. Or you find problems and you adjust the price based upon those problems.

Q Is it your experience as a business person that it can happen, that the appearance of an acquisition target from the financial and so forth and the reality can be two different things?

A Yes, sir.

Q That's all for this record. Thank you very much.

The next one will be Manley No. 2.

(M. Manley Exhibit 2 identified.)

BY MR. LEVITT:

Q I'm going to focus on the first page.

A I see it.

Q Again, if I ask specific things on the later pages, I'll go to specific sentences and you

Page 53

can read it at that time.

This is a memo from O'Brien to his two cohorts, who were in the office of the president of Carteret, called Pierson and Mueller, dated August 12, '87, which is around the time that the agreement was announced. And O'Brien purports to be recapping for his lieutenant's a discussion he says he had with you. That's in the first sentence.

Do you see that?

A Yes.

Q Do you recall a discussion with O'Brien about what you hoped would happen in the future if the acquisition went through that occurred sort of in or about this time which was right after the agreement was negotiated? It's a long time ago.

A I had several discussions with O'Brien. I have seen this memo before. I recall seeing this memo before. I recall that – this memo does not reflect the conversations I had with O'Brien. I was not in the position at that time to tell Mr. O'Brien how to operate Carteret.

Page 54

When we saw it, which we believed that it was essentially O'Brien using it as a political tool in order to move what we call the other two Bobs – you notice everybody was called Bob there – the other two Bobs in the direction he wanted. I tried to be very, very cautious before an acquisition was completed to tell the people who operated it, which is an entity we did not own subject to all sorts of things, how to operate and how not to operate.

MR. KIRK: Excuse me. When you said "when we saw it," were you referring to the memo?

THE WITNESS: That's correct.

MR. KIRK: Thank you. Sorry to interrupt.

BY MR. LEVITT:

Q With that as background, and I'm not surprised at what you just said. I have interviewed O'Brien, also, earlier in this process, but still I want to ask you about a couple of sentences, and then you can reaffirm that you never said that, if that's the case or explicate

Page 55

further.

But he says in the second paragraph, O'Brien says in the second paragraph that you wanted to develop a retail bank along the Citicorp model. Now, that specific thing, do you recall telling that to O'Brien?

A I don't recall specifically saying that to O'Brien. I do know that we looked upon Citicorp as a successful company, but I don't recall specific saying that to O'Brien.

Q Do you know now what it means – what a Citicorp model refers to?

A No.

Q In the fifth paragraph on this page, he says you felt the Treasurer's Division was acting too conservatively and you wanted a greater amount of corporate bonds in the portfolio; is that true?

MR. KIRK: It doesn't actually say that. He said he was surprised that the Treasurer's Division was so conservative.

MR. LEVITT: "And wondered why we didn't have a greater amount of corporate bonds."

Page 56

Q My question is, is that true that you said that?

A I don't recall saying that. I may have asked him questions as to why he did this and why he did other things, but none of it was questions – in my mind was not indications of desires. They're questions to find out information.

Q At this point in time, which was August of '87, was Home Insurance Company or Home Group

dealing with Drexel Burnham in buying high-yield bonds or carrying high-yield bonds in the portfolio? I'm just wondering if that's a model that you were looking at in sort of thinking through how Carteret's Treasurer's Division was doing.

A Home Insurance Company's portfolio were run by managers, in-house managers. They dealt with almost any brokerage firm that would approach them, if my recollection is correct. They had some high-yield bonds, they had some not high-yield bonds. I remember – I think at one time our

Page 57

heaviest concentration of high-yield bonds was a company called Union Carbide, which was a high-yield bond in those days.

So the answer is Home Insurance Company had various items in its portfolio. With respect to Drexel Burnham, I know The Home did some business with Drexel Burnham. How much, I don't recall.

Q Did you have personal friends at Drexel Burnham, like Michael Milken?

A No. I did not have personal friends at Drexel Burnham. I had met Mr. Milken. He was not a personal friend.

To put it in a context so you'll understand, when I got to Home Group, Mr. Scharffenberger and his financial advisers recognized that The Home Insurance Company needed more capital. They had apparently made an arrangement with Mr. Milken for him to raise $50 million of additional capital and some type of preferred stock offering or something like that for The Home Insurance Company.

Page 58

I had never met Mr. Milken, although I came from Los Angeles where I practiced law. I didn't know the gentleman.

When I got involved in the management of Home Group and Home Insurance Company, I went out to California and met with Mr. Milken. During that conversation, I advised him that we would not be using Drexel Burnham and we would not be using him to raise that capital. Instead, I shifted it to Merrill Lynch, and we did a $285 million preferred stock offer through Merrill Lynch. So the answer is I did not have any personal friends at Drexel.

Q But there were times when you did buy – or when Home Group or the portfolio managers did buy high-yield bonds through Drexel?

A I know they dealt with Drexel. Whether they bought high-yield bonds through Drexel or whether they bought stock through Drexel, I don't know. I know I dealt through Merrill Lynch. I was not involved in the day-to-day operations of the portfolio. The individual who ran the portfolio reported to me.

Page 59

I recall at one time there was a time that we were looking for a new person to run the portfolio and we interviewed certain people; interviewed a Hai Moody; interviewed a fellow called Alan Greenspan, and we decided to hire Mr. Moody instead of Mr. Greenspan.

Q That's when he was with his own company on Wall Street?

A Mr. Moody or Mr. Greenspan?

Q Greenspan.

A Mr. Greenspan, he ran a 50 or $75 million portfolio and not very successfully, I gathered. And we hired Mr. Moody, who was, I think, from Bankers Trust.

Q Why did you reject Milken to raise the 250 million for Home Insurance Company?

A Milken was going to raise 50 million.

Q 50 million. It wasn't enough?

A Well, one, it wasn't enough. I really didn't know much about Drexel Burnham. It's just that Merrill Lynch seemed to be a –

Q A blue blood, standard –

Page 60

A Not blue blood – I really didn't know much about Drexel Burnham. Merrill Lynch had been one of the major investment banking firms for The Home. And if I recall correctly, they also had a major retail operation in addition to an institutional operation. I thought that Merrill Lynch could do a better job at raising larger sums of money, hopefully, at a cheaper price.

Q I think I had asked this before, but just to make sure, am I correct your testimony earlier today was that when The Home Insurance Company acquired Drexel and we think IPF, which is Imperial Premium Finance, as a result of those acquisitions, it was not highly leveraged and it never was? It had no debt on its balance sheet or little debt on its balance sheet?

A Home Insurance Company never acquired Drexel.

Q Did I say "Drexel"?

A Yes.

Q I meant Gruntal. Excuse me.

A My understanding is that the insurance

Page 61

company did not have any debt on its balance sheet.

Q At some point in '87 or '88, did the casualty insurance business that Home Insurance was in go flat or get beat up because of calamities that claims to be above what you expected?

A Again, let me explain.

Q Do.

A 1985, when I came to Home Group, Home Insurance Company was among the worse performing

around those losses.
For example, attorneys doing business for clients was an area that was great exposure; attorneys in major cities had more claims than attorneys in minor cities, law firms more than 25 versus less than 25, different types of things.
And we began to write insurance within certain parameters and make exclusions for the policy which would avoid those losses.
And because the areas were areas in which

Page 67

the competition was leaving, we were able to raise the prices dramatically, because the competition wasn't there. It was supply and demand.
Attorney malpractice was an area I recall at one time we raised the price in California, I think, 600 percent or maybe twice in one year. We wrote I think at one time over 10 percent of the attorneys in the United States with a combined ratio in the high 80s or low 90s, and that was a dramatic improvement for The Home.
And there were claims made policies as opposed to occurrence policies, which meant that if you didn't make the claim during a certain time period, the claim was wiped out. Whereas an occurrence policy could last 20, 30 years, whenever the event took place.
Q That's occurrence, O C C U R R E N C E?
A Yes.
And that was dramatic improvement.
In another area I recall that we wrote, was oil refineries. A lot of people were getting out of the oil refinery business, and Mr. Phillips

Page 68

did a very good job, and we insured oil refineries, but we reinsured them a hundred percent. So essentially we were sort of acting as a broker.
We would collect the premiums from the primary insurer, we would lay off the entire liability to the reinsurer and we would keep a fee in between. So we were collecting money to no exposure. We had combined ratios there of zero essentially almost. So there were various areas.
We got into the reinsurance business.
So the answer is, yes, we tried to make dramatic changes in order to reduce our exposure and increase or premiums and reduce our expenses.
Q And what does this combined ratio mean?
A Combined ratio is on one side you take the premiums you collect on a policy and the other side you take your expenses and the amount you pay out on the policies. If the combined ratio was a hundred, then you are paying out an amount equal to – you're paying out, plus your expenses, equal to the amount of premiums you have.
If you have a combined ratio of a

Page 69

hundred, you are going to make a lot of money as an insurance company, because the money gets invested in the portfolio. The portfolio brings in income, stock appreciation, and you do not usually pay out the claims at the same time you receive the money.
Q Until later?
A Yes.
Q All right. Directing your attention again to the exhibit that's in front of you. I'm looking at the –
THE WITNESS: Can I ask if we take a break –
MR. LEVITT: Absolutely.
(Recess.)
MR. LEVITT: Back on the record.
Q In the sixth paragraph in this exhibit it says – again, O'Brien is reporting on what he says is a conversation he had with you.
And he says here:
"He" – meaning you – "likes consumer lending and would love to see us develop that portfolio to the

Page 70

1 billion dollar size. We discussed the idea of broadening consumer lending away from exclusive reliance on second deeds of trust into unsecured, personal-private banker type lending."
Do you recall whether you indicated to O'Brien you wanted to get into unsecured, personal-private banker type lending?
A I did not indicate that to Mr. O'Brien.
As I said before, I did not tell him what I wanted Carteret to do before we acquired it. And even afterwards, we acquired it, we relied essentially on the management of Carteret to run Carteret.
Q And under "Income Property," which is the next paragraph, it says:
"You realize that the income property portfolio will remain flat to down this year due to market conditions."
Is this income property commercial loans, as you understand it?

Page 71

A I don't understand it. I don't recall having the conversation. I know I didn't have the conversation. In fact, I know for sure I didn't have this conversation.
Q Let me ask, then, in general.
After you looked at Carteret, initially before you talked to O'Brien and then people did a due diligence and then you made a decision to move forward, which had some bumps in it which we will discuss in a minute, and eventually it closed, despite closing and doing it, does anything strike you now as sort of concerns you had about the operation of Carteret? You wanted to do it anyway, but you had these concerns?
A No. Let me explain to you.

Home Insurance Company was a poorly performing insurance company when we got there. The board had decided that the number one task was to fix The Home Insurance Company. Number two task was to surround it with other financial services companies, which were strong in and of themselves so that The Home Insurance Company went down.

Page 72

These other companies could maintain value for the shareholders of Home Group. We didn't know whether we could fix The Home Insurance company, we thought we could, and we tried and I think we did, but the essential concept of acquiring Carteret and the other things were these were strong companies in and of themselves that supposedly had good management, good business operations and they could earn money and they could carry the day if we had to. So the answer is we relied more on management to operate – them telling them. They would give us a budget. We would talk about their results and everything, about their problems, but we did not operate the savings and loan, the savings and loan people operated the savings and loan.

Q In this concept of expanding out into becoming a kind of a financial services supermarket with a securities company, an insurance company, a savings and loan association, a reinsurance company, did you envision synergies between the

Page 73

groups, between the entities and the family that could help the overall bottom line of the group?

A Yes.

Q What did you envision Carteret could do, for example, for Gruntal's business?

A Could do for Gruntal?

Q Yeah.

A Well, Carteret bought bonds. They could buy from Gruntal. Carteret had a personnel department. There are various common expenditures, insurance, personnel, various types of back office operations that could be combined. We envisioned those types of things. Carteret was a public entity. By ceasing to become a public entity, all that money spent to be a public entity would drop right to the bottom line. What Carteret could do for Gruntal specifically is not the time of thing that we would think about when we think about in a totality of context what Gruntal could do for – what could each of them do for each other. And we recognized that there was some limitations that the regulators

Page 74

had as to what kind of business you could do with related companies and we'd have to operate within that framework. But Carteret, for example, if it eventually was – if it could have retail Gruntal offices in its buildings and stuff like that.

Q In the second page of this letter under No. 9 in the last paragraph it says: "When will we be able to handle Home, Home Group's, Gruntal's and other related companies checking accounts, loans, claims payments, etc.? Obviously, Home, if legal, would love to borrow from us" – meaning from Carteret – "or access our low deposit costs versus their cost of funds which generally averages the commercial rate plus 75 basis points." This seems to me an indication that an idea might be that some of the financing that Home Insurance Company needed could come from Carteret

Page 75

deposits which were low cost to Carteret. Do you recall anything about that?

A Absolutely do not recall that at all. Home Insurance Company didn't borrow money.

Q I guess Imperial Premium Finance – do you recall that Imperial Premium Finance borrowed money to finance its business of lending to customers who wanted to buy insurance?

A I recall that.

Q Excuse me?

A I recall that.

Q Did you recall envisioning that Carteret could be a source of funds for the financial needs of Imperial Premium Finance?

A I know at one time we merged Imperial Premium Finance to Carteret or gave it to them, and as a wholly-owned subsidiary of Carteret, they would probably have access to lower funds. And if I recall correctly, Imperial Premium Finance, the loans that they made were extremely safe, safer than The Home mortgages, because they lent on essentially the security of

Page 76

the insurance company. So that seemed to be a good business for them. I don't know whether it was – if we considered it before or after the acquisition, but I know it took place.

Q In No. 7 on the same paragraph, O'Brien writes: "An idea might be that Carteret would participate in loans" –

A I've read that.

Q Is that true? Did you envision that?

A I envisioned that The Home – that the family at The Home Group, whether it was Gruntal or, et cetera, would make available to each of the other entities opportunities, and then the entities

would have to decide whether those opportunities made sense in the context of what they did.
I know – for example, it is talk here about the lawyers who Home Insurance Company insured, and I think lawyers in the main tend to have major deposit relationships that would have probably have been good to see if we could expose them to Carteret. It was all an effort to make

Page 77

available opportunities to the management of the subsidiaries, not to tell them what to do. And if they handled it – if they wanted it, that's great; if they didn't, that's okay, too.
Q On the next page under 16, if you would just read that at the bottom of that full paragraph.
A It's absolutely not true.
Q So it wasn't like you were pushing for immediate – hyping and squeezing –
A Absolutely not true at all.
Q We talked about a due diligence earlier. Do you recall that the accountant that you and Carteret shared, namely, Peat Marwick, was the company that was going to do the due diligence on Home Group's behalf?
A I recall we had Peat Marwick. And the financial due diligence was headed up by our chief financial officer, and I'm sure he used Peat Marwick.
Q You recall – are you saying there was a financial due diligence, and separate from that

Page 78

there was kind of an operational due diligence? Is that how it works?
A There were various people on the staff of Home Group, who were involved in this due diligence, and they would have natural areas of primary responsibility. Certainly the general counsel would be more involved in reviewing the lawsuits and litigation that Carteret had and the chief financial officer would be more involved in the numbers.
Q Do you recall –
A But I don't recall which individual was in charge of the overall due diligence. It could have been the chief financial officer, but I don't recall.
Q Do you recall Peat Marwick making a report after it examined Carteret for Home Group?
A I'm pretty sure they reported. Whether it was in writing or orally, I'm sure they reported.
The details of the due diligence did not come to me. It was the overall conclusions that

Page 79

came to me –
Q Thank you for this –
A – to my recollection.
Q Let me show you the next document, which will be a report from Peat Marwick. I'll just see if it refreshes your recollection. It's a summary of the report. I have the full report, which I can show you later, if you want, but it's a lot thicker.
So this one will be Manley 3.
(M. Manley Exhibit 3 identified.)
BY MR. LEVITT:
Q Is this a summary of what appears to be a Peat Marwick due diligence report on Carteret?
A That's what the document says.
Q It's dated August 14, 1987. First of all, who is Jack Plaxe?
A Chief financial officer.
Q If you look at Page 3, please, of the summary.
A I see it.
Q They say at the top:

Page 80

"We believe that the commercial lending and commercial real estate portfolios represented relatively high degree of prospective risk for Carteret."
If you'll just read to yourself the bullet points, if you would. "Rapid growth, insufficiently developed credit process, high concentration in certain categories, specific credits."
Do you see that?
A Mm-hmm.
Q So to me this is a warning to Home Group that the commercial lending is high risk. Is that how you would have read it at the time?
A Relatively high degree of prospective risk.
Q Right.
A It doesn't say "high risk," it says "relatively high degree of prospective risk."
Q Right. What would that have meant to you

Page 81

at the time as someone thinking about whether to make the deal or not? A warning?
A We have to look into it to see what it's all about and to see what – you know, whether or not – what the conclusions are.
I mean, what it says is it's a relatively high degree of prospective risk. It doesn't say that there is a risk now. That there's a high degree that there might be a risk in the future, is the way I read that.
It doesn't say in plain English, you've got this commercial lending and real estate portfolio and it's very risky and stuff like that.
That's plain English. This is saying this is something you've got to worry about sometime in the future. Prospective means potential, it means future.

would somehow take things out on them because they filed the lawsuit and, therefore, they wanted the note to make sure that they didn't have to go through litigation if certain events took place. That's why you get a letter of credit.

Q You get a letter of credit to make sure the money is there; right?

A No, sometimes you get a letter of credit so you don't have to go through law lawsuits.

Page 128

Because if a condition to call a letter of credit takes place, the issuer of the letter of credit has to pay you the money as opposed to having to go through litigation. Sometimes you get it in order to make sure the money is there. It's two factors.

Q That's what I was wondering about, whether they thought the money wasn't there at Carteret so they wanted to make sure there was additional credit provided by the Home Group. But you don't recall anything like that?

A If they thought the money wasn't there at Carteret, and we knew about that, we would not have gone through with the deal. If management didn't have confidence in Carteret, we wouldn't have gone through with it. When I say "management," the management of Carteret.

Q The last full paragraph on Page 2 of the letter we're looking at, you're saying – it's stated here:

"You have asked for a statement of The Home Group's reasons for amending the terms of the proposed

Page 129

acquisition..."

And you're going to read the rest to yourself.

A I read it.

Q Was the passage of the Competitive Clause and Banking Act in August of '87 an incident that materially adversely affected the value of Carteret to The Home Group?

A If it says that, then it was true.

Q Do you recall how it materially affected the value due to The Home Group, as we sit here today?

A No.

MR. LEVITT: Off the record.

(Discussion off the record.)

MR. LEVITT: Back on the record.

Q Let me show you No. 11.

(M. Manley Exhibit 11 identified.)

BY MR. LEVITT:

Q It says "AB" in handwriting. Does that mean American Banker? Do you recognize this article?

Page 130

A It may be American Banker, I don't know. I don't know.

Q In the third column it says that your tenure at Manatt, Phelps ended abruptly in '78. Tensions had been growing for a long time –

MR. KIRK: It says "for some time."

BY MR. LEVITT:

Q Well, tension was growing for some time. "His departure was touched off by comments he made in a magazine interview that his colleagues considered self-serving and derogatory..."

Is that true?

A What?

Q That you made comments that your colleagues considered self-serving and derogatory and that resulted in your leaving Manatt, Phelps?

A I have no idea what they felt about the comments that were made in the magazine or whether the quotes were accurate or not. It was an issue that the law firm grew by acquiring clients and

Page 131

that everybody who was a client was – already had another lawyer, because otherwise they wouldn't be worth getting as clients. If you begin to represent a company, that company has a previous lawyer.

Q Right.

A Therefore people came to us because they thought we'd do a better job.

Q Why did you leave Manatt, Phelps?

A Better opportunity.

Q No problem with people at Manatt, Phelps?

A We had disagreements as to the methodology of how the firm was going to operate.

Q There is a bank mentioned in the second column called The First Los Angeles Bank in Century City.

A Yes.

Q It was sold to an Italian concern? Do you recall that? Did you own part of that bank?

A I bought shares in that bank after it was organized and I sold my shares before it was sold.

Q You were not an organizer of that one?

Page 132

A No.

Q In the first column it talks about the Merchant Bank of California.

A Yes.

Q Were you an organizer of that one?

A Yes.

Q And did that one eventually have the insurance taken away by the FDIC or threatened to be taken away?

A I left the Merchant Bank of California in 1985, when I went to New York. Thereafter, there was some regulatory issues and I was not involved in that.

Q Did you own part of the Merchant Bank?

A Yes.

Q Did you lose money on your investment in Merchant Bank?
A Yes.
Q I know Finley, Kumble grew gargantuanly and then crumbled as fast as it grew, I guess. Why did that happen?
A I can tell you why the Los Angeles office

Page 133

grew. We grew – in 1978 we were one lawyer and myself. And in '85 when I left, there were about 160 lawyers, when I left to go back to New York. Thereafter, I resigned as a co-managing partner and eventually resigned the partnership. Why the firm failed, you would have to talk to people who were there when it failed.
Q Did you get money as a prior participant in Finley, Kumble when Finley, Kumble did work for Home Insurance Company?
A I got money as a partner in Finley, Kumble during that time Finley, Kumble did work for Home Insurance Company, but I had nothing to do with the choosing of Finley, Kumble as lawyers for Home Insurance Company.
Q So part of the time you were chief executive of Home Insurance Company you were also a partner at Finley, Kumble?
A That's correct.
Q And, therefore, entitled to some of the money that the partners at Finley, Kumble split up at the end of the year?

Page 134

A I was entitled to a partnership share, yes. Fully revealed.
Q And that was consistent with the charter of Finley, Kumble, I take it?
A Fully revealed and fully approved by everybody.
Q I guess the thought –
A I stayed at Finley, Kumble at the request of AmBase.
Q Why would they want you at Finley, Kumble?
A You're getting into the subject of a lawsuit I have against AmBase. If it's relevant, I would certainly answer the question.
Q I don't want to intrude on any privileges or areas that could be detrimental to the lawsuit from any party's side.
A I don't see how it's relevant to this case.
Q Let's go on. And also there is a time constraint, so it makes sense to go on. Let's look at the next one. It's just a

Page 135

Chronology Report on the contacts between Home Group and Carteret, and I just want to ask you about No. 1A. I think this was something that the New York Stock Exchange required and this is a draft of it. But you can see if you know. It will be Manley 12.
(M. Manley Exhibit 12 identified.)
BY MR. LEVITT:
Q Do you know what this is? Is this something the stock change requires when companies merge?
A I don't know what this is.
Q Do you recall as 1A says on or about July 21st, when you met with O'Brien for the first time, was it a breakfast meeting?
A I don't recall.
Q Was Paul Dodick of Cravath AmBase's chief lawyer on this?
A Where is that?
Q I don't know that that's in here, but I'm asking?
A Paul Dodick is a litigator. I'm not sure

Page 136

if he would be the chief lawyer in the acquisition of Carteret. David Olmsby was the corporate lawyer from Cravath that we used.
Q And refresh my recollection, was Salomon, as you recall it, the investment banker? That's not in here either.
A My recollection it was.
Q There is a thicker version of this that I showed to one of the Bobs, Pierson. But I couldn't find it for your deposition. So this is all I have. I think this may have been from the Carteret side. Okay. Let's go on to the next one. I want to ask you about David Brown, who was the chief executive of GDC and had been, I guess, a lawyer at Cravath according to Scharffenberger; is that correct?
A I don't know what Scharffenberger told you, but David Brown had been an associate at Cravath, Swaine and eventually became general counsel at City Investment Company.
Q And then president of GDC?

Page 137

A Chairman of the board of General Development.
Q Let me show you this exhibit that will be No. 13.
(M. Manley Exhibit 13 identified.)
BY MR. LEVITT:
Q My question is, whether this is accurate that you helped him get a mortgage on a house from Carteret.
A I have no reason to think it isn't accurate. I am sure I introduced him to Carteret for a mortgage. The Carteret people made the decision whether to give the mortgage, but I introduced him, I'm sure.
Q This was after the deal had closed between AmBase and Carteret, but you're saying you had no influence on the mortgage?

over the same period."

Page 148

Is that accurate? That as of April 1990, AmBase was seriously overleveraged?
A I don't know where the $2.3 billion figure comes from. I don't see that.
Q Putting the exact number.
A The answer is I don't know. I – you know, I just don't know where it comes from.
Q As we sit here, without having a document in front of you, do you know what the financial performance of AmBase was in 1990?
A 1990?
Q Yeah.
A I was gone in 1990, so I don't know.
Q As I recall from Mr. Scharffenberger's testimony, you did leave the position as chief executive in March, but you stayed on as an employee through the end of the year.
A It's not true.
MR. KIRK: I also don't believe Mr. Scharffenberger said that.
BY MR. LEVITT:
Q What is true?

Page 149

A In March of 1990, I left as chief executive officer and they kept me on the salary, but I was not active as an employee. They paid me, but I didn't – I had no management functions and I was not in my office at all, I was kicked out of my office.
Q When you resigned as chief executive, you were kicked out of your office?
A That's correct.
Q Independently of that, do you recall what the financial performance of the company was in 1990?
A In 1990, Mr. Scharffenberger was CEO of the company. He made all sorts of – there were all sorts of things that happened, and I have no recollection of what happened. My last full year of responsibility was 1989. I recall in 1989 we made a significant amount of money.
Q How about in 1988, do you recall that?
A We made a significant amount of money.
Q They lost over a billion in 1990. Now that I tell you that, do you recall that?

Page 150

A I know that Mr. Scharffenberger took various steps and write-downs and stuff like that, which I don't think those losses reflected the operations that went on before, that was Mr. Scharffenberger's reorganization efforts. I think if you look into the operational performance of the insurance companies, stuff like that, you would have a better idea. He had decided to liquidate the companies again.
Q If you'll look at the same exhibit we're looking at, if you'll look at the right-hand column on the first page.
A I see it.
Q It says:
"During Manley's tenure, AmBase shares have plummeted from a high 31 1/2 in 1986 to 7 3/8 in February of '90, just before the three insurance entities inside Home were put on the block."
And then it says:
"Baird, Patrick analyst Charles

Page 151

Ronson complains that Manley 'junked up the Home's portfolio' with $400 million in high-yield bonds."
Is that true that you were responsible for the Home portfolio containing 400 million in high-yield bonds?
A No. I had no – I never made any independent decisions what we would buy or not buy; what we would sell or not sell.
Q There were professional managers who did that?
A That's correct.
Q How about the movement of stock prices, is that accurate, from 31 1/2 in '86 to 7 3/8?
A I don't recall.
Q Do you see it says, according to the article:
"General Development Corp. recently pleaded guilty to mail fraud."
Did you see that?
A Yes, I see it.
Q Do you know if that's accurate?

Page 152

A I don't recall.
Q On the third page of the exhibit in the left column it claims – the article claims that a vice president of Gruntal named you in a racketeering suit, and the guy's name was Geller?
A It's true. He named me. We terminated him and he sued us because we terminated him.
Q Was the suit thrown out?
A It was settled. I don't recall if he had a RICO charge in there or not.
Q That was in like '89, do you recall, when you terminated him?
A I don't recall. There may be other – Mr. Silverman and everybody else involved in RICO.
Q Also, this article says on the third page in the left column, it said that you described the Gruntal acquisition as a "terrible acquisition"?
MR. KIRK: Can you point to where that is?
MR. LEVITT: In the first column on the left, the left-hand column.
Q Is that true?

Page 153

A No.

BY MR. LEVITT:

Q This article also says that in the same place, same column, that Scharffenberger and you resigned from General Development a week after – right around the time General Development pleaded guilty to one count of conspiracy.
And I asked Scharffenberger whether he didn't want to be tainted by being on the board at that point. And he said he resigned for other reasons, saying that he was busy with selling the home insurance company. So I want to ask you the same question.
Why did you resign from General Development around that time?

A We resigned from General Development because Scharffenberger decided that he was going to sell The Home Insurance Company and that was really where we had been.

Page 159

Q This article always says that Brown pled guilty to fraud and conspiracy.
Do you know if that's accurate?

A I know it's not accurate. And this article is replete with lies and inaccuracies. And for sure that's not accurate. If you know that's inaccurate and if you know that The Home never owned anybody $2.3 billion, then if I were you, I would not rely on anything in the article.

Q I don't know that, that's why I'm asking you whether it's accurate or not. I'm going to double-check it now.

A Sir, may I suggest to you that what you do is you look at the criminal record, you look at the record of the court proceedings. I would also suggest to you that with respect to $2.3 billion of debt, look at the financial statements.

Q That I have here.
Let's go on. This is a letter dated January 31, 1991. I'm also happy to report we're moving toward the end of this deposition.
Let's mark this one as Manley 17.

Page 160

(M. Manley Exhibit 17 identified.)

BY MR. LEVITT:

Q Just a couple of particular questions.
On Page 2, Paragraph, 2, would you please identify for the record, just so we have it on the record, identify the exhibit.

A It's a settlement letter between me and AmBase.

Q Is it your signature at the end?

A Yes.

Q Along with Bruce Bean's?

A Yes.

Q If you'll look at Page 2, Paragraph 2 of the letter, it says:
"You shall resign as an employee of AmBase and AmBase Corporation of New York."
I just had a technical question. Are those different companies?

A Apparently, yeah.

Q Do you recall what the business of AmBase Corporation of New York was as distinguished from

Page 161

AmBase Corporation?

A No.

Q On Page 3, Paragraph 4, you can see that in settlement of your contract claims against AmBase, AmBase agreed to cancel some notes. And I added it all up, it's over 3 million.
The question is, did this actually happen, did they actually cancel those notes pursuant to this?

A Yes.

Q On Page 4 of the document it talks about cancelling your rights under various incentive plans and other plans that you were entitled to when you were an employee, but there are some exclusions, and one is for vested shares you had in AmBase, as I understand it.
My question is, when you left AmBase, did you continue to hold stock shares, common stock shares in AmBase?

A Yes.

Q Do you own them even today?

A No.

Page 162

Q You own no shares in AmBase, as we sit here?

A That's correct, I own no shares in AmBase.

Q On Page 5, Paragraph 7, it's an indemnification provision.
Do you see that?

A Yes.

Q Were there any disagreements between you and AmBase on your contention that they weren't abiding by this Paragraph 7 of this agreement?

A Yes.

Q What was that about? That there were suits and you were named as a defendant and you thought your attorneys fees should be indemnified and they said no? I'm asking.

A There was a lawsuit against AmBase by me which related to indemnity. What that was about, you can find out by looking at the complaint. That lawsuit was settled.
There is present an existing lawsuit by me against AmBase, which relates to their failure

Page 163

to indemnify me under applicable contract, and you can look at that, also.

Q All right. I'll do that. Thank you.
And the last question on this is Page 10, Paragraph 14. Would you just read the first few sentences of that to yourself, and I'll ask you one or two questions.

A Yes, I have.
Q Do you regard yourself as appearing here today pursuant to the terms of this paragraph of this agreement?
MR. KIRK: I will state, before the witness answers his question, on behalf of AmBase that AmBase has not requested that Mr. Manley appear today pursuant to this paragraph. But with that, the witness can certainly answer.
THE WITNESS: Sir, if you look at the lawsuit which exists between myself and AmBase, you will see that contained in there is a document which was a settlement agreement of a previous lawsuit I had between myself and AmBase. In that previous settlement document,

Page 164

there was a release that I gave to AmBase, except for certain indemnity provisions that were obtained in the document. The documents speak for themselves. I have not considered whether or not I am appearing here in conjunction with Paragraph 14 of Manley No. 17. If you wish me to tell you whether I am or am not, I would have to consult with my lawyers and give you some advice. Okay?
MR. KIRK: I want to add one other thing. As far as I know, Mr. Manley was required by a subpoena that the Department of Justice issued to him to appear here today. Is that not accurate, David?
MR. LEVITT: It is accurate.
MR. KIRK: Well, then that should answer your question.
BY MR. LEVITT:
Q The question was whether you regard yourself as bound by this paragraph in your appearance here today.
A I regard myself bound by al: my contractual obligations that I have with AmBase and

Page 165

that AmBase has with me except for those contractual obligations which I have been excused from performing as a result of AmBase's breach of its contracts with me.
Q Do you regard this No. 14 as one of those?
A I am not in a position at this stage to draw that legal conclusion, especially in light of the pending lawsuit –
Q Just one other –
A – I have against AmBase.
MR. KIRK: Again, please don't interrupt the witness.
BY MR. LEVITT:
Q Do you recall there was an explicit release of your obligation to AmBase as set forth in this Paragraph 14?
A There is a written contract between me and AmBase that is subsequent to this document. And what that document does is – it does – I have always attempted as best I could to fulfill my obligations to AmBase and to cooperate with them

Page 166

where I am required to cooperate.
Q And the last question is, did Cravath write this Paragraph 14, do you know?
A I believe – I did not write this, this was written by AmBase. This, I believe was probably written by Paul Weiss. Probably.
Q Thank you.
MR. LEVITT: Let's break for lunch.
(Whereupon, the deposition was recessed, to be reconvened on this same day.)
25
AFTERNOON SESSION (12:53 p.m.)
Whereupon,
MARSHALL MANLEY
resumed the stand and, having been previously duly sworn, was examined and testified further as follows:
EXAMINATION (Continued)
BY MR. LEVITT:
Q Just a few more documents and we will be done. I just want to show you some financial materials and ask for your comment about them. This is the 1988 Home Group, Inc. Annual

Page 167

Report, and it will be No. 18.
(M. Manley Exhibit 18 identified.)
BY MR. LEVITT:
Q I'm going to ask you about the fifth page of the document which is marked 3 in the upper right-hand corner. It's a chart. Do you see the net income line which is the fourth line?
A Mm-hmm.
MR. KIRK: Which page are we on, I'm sorry?
MR. LEVITT: It's marked 3 in the upper right-hand corner. It's the fifth page of the document.
MR. KIRK: Got it.
BY MR. LEVITT:
Q Why did the net income go from 172 in '87 to 87 in '88?
A Because we didn't sell securities. The important figure there is the operating income.
Q The operating income went from 119 to 81.

Page 168

A The operating income before taxes went from 108 to 126.
Q That's my next question. Uncle Sam paid money back to The Home Group?
A Yes.
Q Why would that be?
A Ask the accountants. You have to understand what happens in insurance companies, is there are two sources of income, one is the

which recognizes goodwill in the determination of Carteret's regulatory capital." I'm not aware that– again, you may not have written this, so you don't know, but I understand that you testified earlier that in the early '80s and the mid '80s, Carteret entered into these agreements for the 40-year amortization. Am I missing something or was there some

Page 174

other agreement between AmBase and the Government that you're referring to here?

A I don't know what it's referring to. I didn't write this.

Q The next sentence in the same paragraph I was looking at says: "The Company continues to rely upon such agreements with the Federal Home Loan Bank Board and believes these agreements are enforceable." Do you recall anything about the genesis of this sentence?

A I didn't write this.

Q If you'll look at 0938 just forward in the document. It says Page 45 in the upper right-hand corner. In the first paragraph on the left column it says at the end of that paragraph: "Based on Carteret's regulatory net income through December 31, 1988, the Company has the ability to require payment of dividends from Carteret in the amount of $11

Page 175

million." Do you see that?

A I see that.

Q Do you know of your own knowledge whether AmBase ever caused Carteret to pay the dividend of 11 million in the beginning of 1989?

A I don't recall.

Q Thank you. That's all for this document.

MR. LEVITT: Let me show you the 1989 AmBase Report, please. This will be Manley 19.

(M. Manley Exhibit 19 identified.)

BY MR. LEVITT:

Q I'm looking at Page 2 of the document, which is Mr. Scharffenberger's letter to – I guess, to the stockholders?

A Mm-hmm.

Q He says in the middle of the letter – he says they're going to sell The Home Insurance Company and two other insurance companies that they owned, US Re and Commonwealth. And he says:

Page 176

"AmBase took the action because it believes the company's shares continue to be significantly undervalued." My question is, how would selling these insurance companies increase the stockholders' value?

A Ask Mr. Scharffenberger.

Q Did you disagree with that decision?

A Yes.

Q Is that the reason that you left or were asked to leave as chief executive of AmBase in March of 1990?

A Ask Mr. Scharffenberger.

Q If you'll look at Page 21, please. It's in the lower left-hand corner or the lower right-hand corner of the page.

A Yes.

Q The print – the xeroxing is hazy, but I just want to ask you about the paragraph that begins in the left-hand column. "Carteret continued its program of

Page 177

downsizing its retail branch system in 1989." Do you see that?

A Yes.

Q It says that it closed 15 branches to improve profitability. Do you recall this downsizing its retail branch system that Carteret was going through in '89?

A Yes.

Q Do you recall the reason for that?

A Yes.

Q What do you recall about that?

A It's my business philosophy to encourage all of the executives to have what I call a zero base thinking. Which is essentially to look at each aspect of their operations and consider whether they should continue doing it in the same way or a better way to do it. But the mere fact that they did it one way the previous year doesn't mean that it was the appropriate way to do it now. In conjunction with that, one of the

Page 178

things the people of Carteret had to consider was the cost of gathering deposits and whether or not a particular branch was an appropriate way to gather deposits. Whether or not that physical point the employees, the location made sense and the decision was made that these branches that were closed did not make sense, that they were not bringing in deposits at a sufficiently cheap rate in order to justify their existence.

Q That's why they embarked on this policy or plan to close some of them?

A They should be it. Because somebody believed that they could perform the same functions

in a better and cheaper fashion.

Q That's a sensible business – it was a business decision. That's a sensible business decision. If you can gather deposits more cheaply for the branches, it's better to do it the cheaper way?

A I hope they have made reasonable and sensible business decisions, yeah.

Q I want to ask you sort of an aside

Page 179

question. I remember reading that AmBase brought McKinsey in in 1990 to have a look at things and the reason was, according to things I've read, the financial behavior went south in '90.

Do you recall Scharffenberger bringing McKinsey in?

A I recall bringing in McKinsey during 1989.

Q You personally?

A Yeah. If you look at the second page of this –

Q Of –

A – your Exhibit No. 19, it says:

"During July of 1989 company retained McKinsey for various operations."

Q Why did you do that?

A I personally brought McKinsey in. And my reasoning, again, was to bring in fresh thinking from the outside to see how the companies would operate, to see if we can improve.

Again, in conjunction with this zero base

Page 180

philosophy, it makes sense at various times to bring in outsiders who have broad experience to look at what you're doing and seeing if you can do it better. McKinsey is a well-respected business consulting firm.

Q If you'll look at the same document 1317, the Bates stamp. It's two pages beyond where we were before, 1317.

A Okay. I have that.

Q I asked you about this before. I think you didn't recall it. It says "Toward the 1990's" and then it says "Carteret expects to prosper in the new thrift industry."

Would you just read that to yourself for a moment?

A I see it.

Q Remember I asked you whether you thought FIRREA could help you because the high interest paying thrifts that were marginally capitalized might go under and therefore make it cheaper to get deposits? This appears to say that, doesn't it?

A It says what it says, yeah.

Page 181

Q Does this refresh your recollection that you viewed that aspect of FIRREA as being positive for Carteret?

A I did not write this. I was not active in management when this was done. I was not responsible for this.

The answer is I never really thought about this item. You should ask Mr. Scharffenberger, who was CEO, when this was written.

Q Look at 1360, please, Bates stamp 1360. The last paragraph.

A I see it.

Q Why would The Home and its subsidiaries advance Drexel 43 million under an unsecured demand note?

A Because the people who ran the portfolio believed that it was in the financial interest of The Home to do it. My recollection is that they recovered all that money.

Q I was going to ask, did they get the money back, and your recollection is that they

Page 182

did.

A Yes. This is this overnight cash thing that they did. It was all secured. It was all taken care of.

Q That's all. Thanks. Two more exhibits and then we're finished.

(M. Manley Exhibit 20 identified.)

BY MR. LEVITT:

Q I would like you to turn to Page 4 of the exhibit. It's the minutes of the directors of Home, July 22, 1987, which was about the time you were considering bidding on Carteret. The president that it refers to is you.

A Okay.

Q It says here that you:

"Discussed with the board your concept for the strategic growth and development of the company from a property and casualty insurance holding company to a diversified financial services entity with access to selected segments of the retail market."

Page 183

Do you see that?

A I see it.

Q It says you discussed Imperial, Gruntal and Carteret.

A Mm-hmm.

Q My question maybe is simpleminded in some ways, but it is this: Didn't you regard it as sort of moving so quickly to do so much, did you ever regard that as kind of risky?

A I don't understand.

Q You bought Gruntal for, I don't know how much it cost, but maybe like 700 million, as I recall, and you bought –

How much did Gruntal cost?

A It's in the documents. About 150

he was removed from Bancorp. But I guess that wasn't you who did that?

A Tell me what year it was and I'll tell you.

Page 189

Q Walsh became president of the savings bank, I think, in November of '89.

A When I say "remove," I mean remove.

Q He was removed from that position.

MR. KIRK: Although he continued as chairman of the board.

THE WITNESS: He continued as chairman. He was still there. No.

BY MR. LEVITT:

Q Did you have high confidence in Walsh?

A I had confidence in Walsh at that time, yes.

Q Did you think he was the most capable executive at Carteret?

A It appeared to me that his – that the area that he was operating in, mortgage origination, mortgage servicing, they kept on telling me he was the most profitable and the highest growing and it appeared to me that he was the appropriate person to move forward, yes. Based upon the reports I was getting, he was the person. Mr. O'Brien was the one who pushed him.

Page 190

Q Mr. O'Brien pushed him, also?

A Yeah.

MR. LEVITT: That's all I have for this document. The last document, and then we'll end the deposition is, a year later board of directors meeting for July 25, 1990. This is the board of AmBase.

This is 21.

(M. Manley Exhibit 21 identified.)

BY MR. LEVITT:

Q I'm looking at Page 2 of this one. The first full paragraph on Page 2 says:

"Mr. Jack R. Plaxe, reviewed with the Board the financial results of the Company."

The date of this is July 25, 1990.

"As reflected in the financial data that had been distributed to the Board at the meeting. Mr. Plaxe noted that, because of a material deterioration in these financial results, the Company had failed in

Page 191

the second quarter to achieve compliance with one of the financial covenants contained in its May 1990 bank credit agreement."

This strikes me as sort of the serious.

Do you recall this board meeting? You were there according to these minutes, under present.

A So?

Q The question is, do you recall deteriorating financial results prior to July 25, 1990, and it being discussed with some seriousness at a board meeting?

A I have no independent recollection of this discussion at that board meeting.

Q Do you have an independent recollection of financial covenants with lenders getting out of compliance with financial covenants to lenders because of poor financial performance prior to July 25, 1990?

A I don't have any independent recollection. I just know that when Mr. Scharffenberger took over, things went south.

Page 192

Understand, apparently there was a change in philosophy in 1990 from becoming an ongoing operating company to a liquidating company. Mr. Scharffenberger selling the major subsidiaries. Financial results change completely when you become a liquidating company. You should talk to some accountants about this.

Q Okay. The tenor of this is that, you know, prior to July 22 – July 25, 1990, all of the subsidiaries essentially, and I know it's true of Carteret, and I know that Home recorded a loss of over a billion dollars in 1990, I don't know about the securities for Gruntal, but it looks like everything at one time started going south. Is that how you remember it?

MR. KIRK: I think he has already testified –

THE WITNESS: Sir, let me explain something to you.

In March of 1990, I got terminated. I was cut out of the loop. Okay? I was in a dispute with the company with respect to what I was going to get as a result of my wrongful termination.

Page 193

What Mr. Scharffenberger and the executives did at the company, whether it was adding to reserves, selling bonds, whatever they did, it was between Mr. Scharffenberger, his financial people and the managers of the individual subsidiaries. I was out of the loop.

BY MR. LEVITT:

Q Do you recall whether it was the position of the company that you were terminated with cause?

A No, it was not the position of the company, I was terminated with cause.

Q Were you told why you were terminated?

A No.

Q Did you ever learn why you were terminated?

A No.

Q As we sit here today looking back, do you know why you were terminated?

A I can speculate.

Q You can't – but you don't know?

A No. I only know what the public

statement said. That's all I know.
Q Public statements published in the

Page 194

reports to the SEC?
A Public statements, press releases and stuff like that. Mr. Scharffenberger's statement when I was terminated.
Q What was the statement?
A Positive. I did a terrific job, all that kind of stuff.
Q They just wanted new blood?
A I have no idea. Ask Mr. Scharffenberger.
Q I just want to ask if you have knowledge of what's discussed in the second paragraph on Page 6. It starts with "Mr. Bruce W. Bean." About the SEC.
A General knowledge.
Q This appears to suggest that at the year end '89, Home Group Trust mutual fund participated in the Drexel matter; right?
A Mm-hmm.
Q In 1990 we saw Drexel sought protection from the bankruptcy court.
A Mm-hmm.
Q What was the SEC investigating?
A SEC was investigating everything that

Page 195

Drexel did. The SEC was investigating because it was in the newspaper as the appropriate thing for them to do. My experience is that Government agencies often investigate things that have major publicity factors.
Q Your testimony is you had nothing personal to do with participation in the Drexel matter?
A Absolutely not.
MR. LEVITT: Thank you very, very much for your testimony and your cooperation. That's the end of the deposition. And your counsel can ask questions if he has any.
THE WITNESS: He's not my counsel.
MR. KIRK: I'm not Mr. Manley's counsel. And I also don't have any questions of the witness. I absolutely do not waive any signature or signing.
(Whereupon, at 1:45 p.m., the deposition was recessed.)

MARSHALL MANLEY

Page 196

C O N T E N T S

WITNESS EXAMINATION
Marshall Manley
by Mr. Levitt 4, 166

E X H I B I T S

DEPOSITION NUMBER IDENTIFIED
Exhibit 1 Document dated August 4, 1987 25
Exhibit 2 Memorandum, dated August 12, 1987 52
Exhibit 3 Executive Summary, dated 10/12/87 79
Exhibit 4 Report on Review Procedures Carteret Savings Bank, FA and Subsidiaries 96

Page 197

Exhibit 5 Letter to Marshall Manley from Robert B. O'Brien, Jr. dated October 22, 1987 101
Exhibit 6 Letter to Robert B. O'Brien, Jr. from Marshall Manley dated October 28, 1987 108
Exhibit 7 Letter to Mr. Robert B. O'Brien, Jr. from The Home Group, dated October 28, 1987 108
Exhibit 8 Article from Miami Review, dated Thursday, November 19, 1987 116
Exhibit 9 Letter to Home Group Shareholder from Marshall Manley, dated December 14, 1987 121
Exhibit 10 Letter to Mr. Robert B. O'Brien, Jr., from Marshall Manley, dated January 7, 1988 123
Exhibit 11 Article entitled "LA Law Firm Linked to String of Troubled Banks Closes Up Shop" 129
Exhibit 12 Draft Chronology Report, dated 3/21 135

Page 198

Exhibit 13 Letter to Marshall Manley from David F. Brown, dated November 7, 1988 137
Exhibit 14 Letter to Marshall Manley from Messrs. R.D. Pierson and R.C. Walsh, dated May 8, 1989: 140
Exhibit 15 News Release entitled "Carteret Meets New Federal Capital Standards" 142
Exhibit 16 Article from Financial World, dated April 17, 1990 147
Exhibit 17 Letter to Marshall Manley, dated January 31, 1991 160
Exhibit 18 The Home Group, Inc. 1988 Annual Report 167
Exhibit 19 AmBase Corporation 1989 Annual Report 175
Exhibit 20 Minutes of Meeting held on July 22, 1997 182
Exhibit 21 Minutes of Meeting held on July 25, 1990 190

Page 199