# EXHIBIT Y

**Depo of: Robert C. Walsh (Ambase Corp. v. USA) 11-19-99**

**ACE-FEDERAL REPORTERS, INC.**

**Page 1 to Page 218**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**ACE-FEDERAL REPORTERS, INC.**
**1120 G Street, N.W.**
**Suite 500**
**Washington, DC 20005**
**Phone: 800-336-6646**
**FAX: 202-737-3638**

A. That is correct. I think it was FASB 65.

Q. I want to ask you now about the year you served or spent at Reserve Financial Management Corporation. That is on your resume. Do you see that?

A. Yes, I do.

Q. It says that Reserve was a financial adviser to major financial institutions in all aspects of mortgage-related assets?

MR. HUME: Doesn't that say what he did at Reserve?

Q. Is that what you did at Reserve?

A. Yes, it is.

Q. Is that what Reserve did as a company?

A. Yes.

Q. What types of financial institutions were Reserve's primary clients, S&Ls or commercial banks?

A. Both, as well as mortgage companies.

Q. Did Reserve have an asset portfolio, an

Page 17

investment portfolio, for its own account?

A. No, we did not.

Q. I understand you joined Carteret Savings Bank sometime in '84, so I guess Walsh & Company was between '82 and '84; is that right?

A. That's right.

Q. What kind of institutions were Walsh & Company's primary clients?

A. Same. The thrift industry, commercial banks and mortgage banking companies.

Q. Did Walsh & Company originate mortgages?

A. No, we did not.

Q. Did it deal at all in mortgage servicing?

A. Yes, we did. We were advisers on many sales of servicing from institutions to institutions, we didn't actually service loans.

Q. I take it it was not involved in securitizing mortgage portfolios as a principal?

A. That's correct.

Q. Did Walsh & Company have Carteret Savings Bank as a client?

A. Yes, we did.

Page 18

Q. And how did that come about, that you retained or were retained by Carteret Savings Bank, if you recall?

A. Yes. Back in the early '80s, late '70s, there was state usury loss that commercial savings and loans could only charge X percent in the State of New Jersey, I think it was 8 percent on conventional loans, they could buy loans out-of-state at the current interest rate. So an awful lot of thrifts during that period of time went out and bought loans from other mortgage banking companies. And Carteret had about 150 various different companies that they purchased loans from. So what we did, we came in, Walsh came in, and consolidated about 100 of the 150, terminated their agreements, Carteret did, and put it out for bid on one servicing block of $100 million and Carteret was paid a fee for doing that.

Q. Walsh was paid a fee?

A. Carteret was paid a fee for selling the

Page 19

servicing, and we were paid a fee from Carteret.

Q. Carteret would buy –

A. Only the loans.

Q. And sold the servicing?

A. Yes. They then ultimately – we consolidated 100 of the 150 servicers into one. I think it was Fleet at the time. And Fleet paid Carteret about 100 basis points, about $1 million for the right to service those loans.

Q. At some point in time, did you join Carteret as an employee of Carteret?

A. Yes, I did.

Q. When was that?

A. Approximately April of '84.

Q. And at that time, did you dissolve Walsh & Company?

A. Not – we did not – we still had some ongoing deals, but ultimately it was dissolved.

Q. Were any of your relatives with you in Walsh & Company?

A. Jimmy, my brother.

Q. How about your sister?

Page 20

A. No.

Q. When it was dissolved, did Jimmy go to Carteret also?

A. Yes, he did.

Q. Whose invitation was it, that caused you to join the staff at Carteret?

A. Bob Mueller.

Q. Did you say it was November of '84?

A. No, April of '84.

Q. Was Mueller a vice president, do you recall?

A. I think he was an executive vice president at the time.

Q. Was he basically in charge of corporate and commercial lending, do you recall?

A. Yes.

Q. At the time, did Carteret do any mortgage origination activities?

A. For their own account, yes, they did.

Q. Meaning that they didn't sell the pools or the individual mortgages, but rather they were considered –

Page 21

A. Portfolio.
Q. Hold them to maturity and collect the interest?
A. Correct.
Q. And either servicing themselves –
A. They serviced them themselves.
Q. They serviced them themselves?
A. Yes.
Q. And what size institution was Carteret in April of '84, approximately; 3 million, 4 billion, do you recall?
A. I don't.
Q. Do you recall what percentage of the assets were in this mortgage portfolio we're talking about?
A. I don't.
Q. Was it all one single family mortgages or could it be one to four family mortgages?
A. Could be one to four family mortgages.
Q. But it wasn't mortgages for apartment complexes?
A. No, it was not.

Page 22

Q. Which are called multifamily mortgage?
A. Correct.
Q. So when you joined Carteret, putting aside – well, when you joined Carteret, was it a relatively traditional S&L, meaning most of its assets were in home loans? Or would you characterize it differently than that?
A. I don't recall.
Q. But it did have a commercial and a corporate lending function?
A. Yes, it did.
Q. And Mueller was in charge of that?
A. That is correct.
Q. Why did Mueller hire you when you were coming in to do something on the residential side when he was commercial and corporate?
A. I believe he was –
MR. HUME: I would just like to object to the extent it asks the witness to testify as to Bob Mueller's state of mind at that time.
Q. You can answer.
A. I believe he was in charge of the asset

Page 23

side of the bank.
Q. And you were being brought on to develop the asset side of the bank, namely the residential mortgage side?
A. Correct.
Q. What position did you join – when you first joined Carteret, what position did you have at Carteret?
A. I believe I was executive vice president of the bank, and president of the mortgage division.
Q. We're talking April of '84. I know you left Carteret in I think May of '91 or April of '91?
A. Correct.
Q. So we're talking seven years?
A. Yes.
Q. Simply and chronologically outline and state the various job positions you held at Carteret from April of '84 to May of '91.
A. I became CFO of the bank in approximately November of '88.
I became president of the bank in approximately November of '89.

Page 24

And in April of 1990, I became CEO of the bank.
Q. CEO in April of '90, is that what you said?
A. Yes, sir.
Q. Can you recall, you referred to the mortgage function at Carteret as being a division of Carteret?
A. Correct.
Q. How much in assets were there in that division, or was that division responsible for approximately when you joined?
MR. HUME: If you recall.
A. I don't recall.
Dennis Mahoney was the CFO, and Dennis was in charge of the portfolio of residential loans.
Q. And did the division deal in servicing when you joined, servicing rights?
A. It was servicing for its own account.
Q. How about for outsiders or third parties?
A. Very small amount.
Q. Did it do any pooling of securities,

Page 25

pooling of mortgages and securitizing the pools when you joined?
A. Before I joined?
Q. Before you joined.
A. To my knowledge, no.
Q. Is that one of the things you brought to the company?
A. Yes, sir.
Q. Do you know where in its investment account at the time you joined, Carteret held any mortgage-backed securities?
A. I don't know, sir.
Q. How about whether it held derivative products, mortgage-backed derivatives?
A. When I joined, I'm not sure, sir, I was not in charge of that.
Q. Would Mahoney have been the guy who would have been in charge of that?
A. Correct, sir.
Q. While you were executive vice president of the bank and in charge of the mortgage division, did the mortgage division grow?

Page 26

A. Yes, it did.
Q. With numbers, where possible, tell us

operating profits had started to slip around this time, which would have been the fourth quarter of calendar year 1988?

MR. HUME: Objection. Asked and answered. That was my recollection, but –

A. I don't recall.

Q. If you look at page 3 of the memo, the second paragraph he says, Mr. O'Brien, "We expect to

Page 62

close, consolidate or sell some branch offices. Most of these branches are fine, well run and profitable but we cannot be all things to all people and all markets. And we must operate in these locations that are best for us and our customers." What did you think of the branch system when you became CFO, or later in November of '89, when you became president? In other words, O'Brien is saying he's got to cut costs and sell branches. I don't know if he sold any right then or there or not. When you would – let me ask a prefatory question: Did you look at the branches when you came onto the presidency.

MR. HUME: When you say the branches?

Q. The branch structure of the institution, did you analyze it and examine it when you became president?

A. I don't recall. Maybe you can help me.

Q. Let me ask you: Even at the time of this memo when you were CFO, just became CFO, did you

Page 63

have a view of whether the branches were, in general, profitable, contributed to the profits of the bank?

MR. HUME: The branches in a general – as a general matter?

A. I don't think I had a chance to observe before becoming CFO, I had nothing to do with the branches and I wasn't involved.

Q. What about becoming CFO and learning about different aspects of the bank, at that point did you come to learn about the operations of the branches?

A. I don't recall.

Q. Well, at any point in your career there, do you recall having a view of the branch structure, whether it was a profitable branch structure?

A. I think that some of the branches didn't make sense.

Q. Didn't make sense?

A. Right.

Q. Which ones?

A. I think there were small ones.

Page 64

MR. HUME: If you recall.

A. And I think they were closed or consolidated during this period of time.

Q. They didn't make sense as a business matter? It doesn't make sense to run a branch that doesn't make money, right?

MR. HUME: Objection as to mischaracterization of testimony.

A. It would be correct on the surface but there may be more. All the potential requirements. I don't know the answer. It's not, unfortunately, it's not just black or white during this period of time especially. We wanted to make sure of CAR requirements, we were doing what was necessary.

Q. Did you have a view about whether the branches in Maryland were sensible branches for Carteret to have?

MR. HUME: If you recall?

Q. If you recall?

A. During what time frame?

Q. Whenever you got knowledgeable about the

Page 65

branches, either at the end of your tenure as CFO or when you became president, did you come to have a view about whether the Maryland branches were sensible.

MR. HUME: In general.

Q. Sensible as part of the Carteret business?

A. I don't think that I really drew a conclusion. I think that we were looking into what branches would make sense, for what. And I think some of the branches, if they were isolated didn't necessarily make sense.

Q. How about the branches in Virginia, did they make sense? Did you come to a view at any point whether they made sense to you?

A. I don't specifically remember which branches. I know we were taking a look at what branches, and I think Art Gilgar was given the task with Bob Pierson to go and take a look at all the individual branches and try to come up with a profitability model.

Q. I take it, when O'Brien is talking about

Page 66

pulling in the belt as he's doing in this memo, and in that context he's talking about closing or consolidating some branches, the point of that is to reduce the cost and maybe redirect the assets to something more profitable, right? The point of closing a branch that isn't making money is because it's not making money, right?

MR. HUME: Objection as to mischaracterization of the document, assumes facts not in evidence.

Q. Can you answer?

A. Again, if a branch isn't making money there may be other reasons why it would make sense to keep that branch open.

dated November 8, 1989.
MR. LEVITT: Please mark this as Walsh 9.
(Walsh Exhibit Number 9 was marked for identification.)
Q. This is a request to pull in the belts again. And you want to control expenses.
Were you feeling pressure at this point

Page 92

because of the poor performance of the core operation of the bank?
MR. HUME: When you say "again," was it a reference to something –
Q. O'Brien was pulling in the belt in November of '88, now we are in November of '89.
Put the "again" out of it. My question is: Were you feeling pressure at this point because of the poor core earnings at the bank.
MR. HUME: If you recall.
Q. If you recall?
A. I was feeling pressure based on FIRREA and what it was doing to the balance sheet of the bank and the position of the bank. And it was an attempt to get everybody's attention to focus in on expense reductions.
Q. What did FIRREA have to do with core earnings?
A. Just that capital requirements that were going to be necessary –
Q. I'm not talking about capital, I'm talking about earnings?

Page 93

A. Earnings translates into capital.
Q. The better the earnings, the better the capital. If your earnings were bad that eroded the capital.
You're saying you want to do improve the earnings so you can increase the capital?
A. Correct.
Q. But if there were no FIRREA, wouldn't you also want to improve the earnings if they were bad?
A. Absolutely.
Q. You were the chief man under O'Brien, when you got to look at things and figure out what was going on and use the skills you had obviously been successful in using for the mortgage company and the rest of the institution, did you make a conclusion what you felt was wrong, why the earnings were not good, the core earnings were not good?
MR. HUME: Objection. It assumes facts not in evidence.
A. I thought our expenses needed to be rectified.
Q. Anything else, how about interest rate

Page 94

risk? The balance sheet, was it, too risky a balance sheet, a balance sheet that could fluctuate too much on interest rate movements and it needed to
be rectified?
MR. HUME: If you recall.
A. I think by November of 1989, I think we had pretty much readjusted the balance sheet, and I think it was more concentrating on the expense side of the bank.
I think we focused in most on the early part of '89 on the asset side of the balance sheet, then it was time to take a look at the expense side of the balance sheet.
Q. That included branches, didn't it?
A. It included everything.
Q. I know that FIRREA caused you to need more capital therefore you needed to generate more earnings. Reducing expenses is sensible, FIRREA or no FIRREA, isn't it?
A. Absolutely. If you take a look at a lot of the things I'm recommending here, it's symbolic.
It was a wake up call to people. It was saying

Page 95

that: Okay, we are all going to pitch in. Some of these expenses may not look like it's much we will be cutting back, but it was symbolic that it was time for everybody to pitch in, for everybody to tighten the belts and for us to examine all expenses.
Q. When you moved upstairs, so to speak, you strike me as someone who is no nonsense, the bottom line is what you're after.
Did it seem bloated to you when you moved upstairs a little bit?
MR. HUME: Objection.
Q. Was the operation bloated to you?
MR. HUME: I object to the word bloated.
Q. Meaning too many seminars, too many chauffeured limousines, I'm using a generic term "bloated."
A. I am not sure that was necessarily hurting the bank.
I think it was more a wake up call for everybody. If you just picked head count, people say: Here we go again.

Page 96

My decision was that I wanted to get down to it. I wanted to get down to it in a hurry and I wanted to take a look at everything. And I am putting these things on the table to show that I'm serious.
Q. Did you ever come to a conclusion why it took you to do that?
A new face comes in, he finally says:
We're going to do it, why didn't someone do it before you came to the job, if you know?
MR. HUME: Objection.
Calls for speculation.
A. I don't know.
Q. I want to follow through on something I started to ask you before, you used the term core earnings here, you see?
A. Yes.

A. Yes.
Q. Also, that's reflected on the income
statement; isn't it?
A. That's correct.
MR. LEVITT: The next one is December 28,
1990 from Walsh to Dorgan, Exhibit 22.
(Walsh Exhibit Number 22 was
marked for identification.)
Q. I just want to say, I think in the second
paragraph it says: December 31, 1991, but I think

Page 153

it means December 31, 1990?
A. It says 1990, right – yes, you're right.
Q. Should that be 1990?
A. Yes, to my knowledge, yes.
Q. This is a letter discussing compliance
with capital requirements.
On page 1, the second paragraph, the
final sentence, it says: The projected shortfall in
risk-weighted capital is principally attributable to
excess GA reserves required to be booked as a
consequence of the OTS exam rather than a shortage
of core capital on the high risk-weighted
requirement at December 31, 1990.
Is what you're saying here, risk based
would have been satisfied also had you not booked
about 77 million in reserves?
A. Correct.
Q. But is that relevant to anything, though?
A. I think what we were trying to point out
here is that we reduced risk based capital
dramatically during the course of the year. Our
need because of shifting of assets. Basically we

Page 154

were just trying to point out that by adding the
reserves, that's what caused it to be out by that
much.
Is it relevant? No. But it was just
stating a point.
Q. When you reduce risk based assets, you
become a less risky enterprise?
A. Correct.
Q. Is that good or bad and is there an easy
way to answer that?
A. There isn't, but I will answer it.
Q. Do, give me your opinion.
A. There is a medium. What we had
unfortunately to do was to try to get all our assets
into the low risk weight category and get a lower
interest rate on those.
So we had to give up interest rate, but
we had to do it to save what our risk based capital
would be.
So there would have been in my
estimation, we probably would have been a little
towards this way in keeping some of the whole loans

Page 155

that had a high risk capital but gave us a better
yield than necessarily going out and buying agency
eligible collateral that had a lower risk base, if
that helps.
Q. Yes, yes.
If you look at page 2 of the letter,
which is the third page in the document, it says
page 2 at the bottom?
A. Right.
Q. In the big paragraph in the center it
talks about IPF, selling IPF?
A. Right.
All of IPFs assets were in the 100
percent risk factor.
Q. So when it says the need to dispose – et
cetera, to streamline and consolidated its future
operations around its mortgage and banking
operations, was exacerbated by the technical
requirement to exclude certain of IPF's intangible
assets from all capital calculations – what did you
mean by Carteret's overall strategy to streamline
and consolidate its future operations around its

Page 156

mortgage banking operations, if you recall?
A. Basically, what we tried to do under new
set of rules, was to become more of a mortgage
banking type entity, that when we put on assets, we
could get fee income by selling those assets rather
than just becoming a portfolio lender of assets.
IPF, by eliminating the good well of IPF
as well, that was a pretty big drain on core capital
as well.
Q. Was IPF profitable for Carteret when it
owned it, do you know?
A. To my knowledge, it was.
Q. It's almost like the mortgage division
that you started would become the entire bank or
majority of the bank under this vision.
My question is: Within the vision what
would the retail branch network look like, would it
be just in New Jersey. Was that part of this
vision?
MR. HUME: To the extent you recall.
A. I don't recall. But the retail branch
would be generating assets through the branches

Page 157

rather than just taking the deposits. And we would
try to take advantage more of the brick and mortar
that we had there by getting additional fee income
through the branches.
Q. How does the branch generate assets, like
selling insurance and selling security and that sort
of thing?
A. Yes.
Q. And also enticing people to come in to
take mortgages?
A. Correct.
Q. The actual work would be done by an
origination center; right?
A. Yes.
Q. That's all, thank you.

Do you recall the so-called goodwill
litigation in February of '91 or March of '91, where
Carteret sued OTS to try to require OTS to count the
goodwill in capital?
A. Yes.
Q. Do you recall submitting an affidavit in
support of Carteret's position?

Page 158

A. I do.
Q. I will give you a copy and ask you a
couple of questions about your affidavit.
A. Okay.
MR. LEVITT: Please mark this as Walsh
23.
(Walsh Exhibit Number 23 was
marked for identification.)
Q. If you'll turn to page 3, feel free to
review it, first.
A. Yes. Thank you.
Q. Carteret pre-FIRREA, paragraph 7 at the
bottom. Prior to the enactment of FIRREA, Carteret
had established the following major goals and
objectives: To originate and purchase over 2
billion in one to four family first mortgage loans.
To consolidate and/or sell certain banking branches
with the purpose of enhancing the value of its
franchise.
What does that mean, number 2, to
consolidate and/or sell certain banking branches
with the purpose of enhancing the value of the

Page 159

franchise.
MR. HUME: I believe that's been asked
and answered in this deposition.
Q. I want to ask what you meant in this
affidavit by that, if you can recall, this is by
you?
A. We were going to try to consolidate some
of the branches with some of our other branches to
become more efficient. And having them become
more
profitable would enhance the value of the branch
system.
Q. You had that plan prior to FIRREA,
according to the affidavit?
A. That's correct.
Q. You had a goal prior to FIRREA as set
forth in number 3 to expand the corporate banking
commercial real estate loan portfolios, that goal
was aborted, though, I take it?
A. That's correct.
Q. Because things went bad and there were a
lot of bad loans in that portfolio, is that why the
plan was aborted?

Page 160

A. I think it was a combination. I think
one of the things was because of the high risk
capital that was required against these. And during
the period of time, from '89 until then, it's
correct. A lot of the loans started going down.
Q. If you will look at paragraph 10, the
second sentence?
A. Yes.
Q. This is talking about Carteret's capital
position for the enactment of FIRREA to date.
It says, "Quarterly calculations for the
period ending December 31, 1989 through and
including December 31, 1990 demonstrate that with
the addition to capital of all of Carteret's
supervisory goodwill Carteret always meets and often
exceeds by substantial margin all the statutorily
required ratios for tangible core and risk based
capital.
Do you know whether when you made this
sentence you included the contribution of 50 million
that Ambase made at the end of '89 and then in early
'91?

Page 161

A. I don't recall.
Q. If you look at paragraph 15, I don't know
who made the marginal note but I want to ask you
about the text, of the underlining sentence which is
not yours, "Carteret was forced to achieve
compliance with the three requirements as
interpreted by the regulators, however, Carteret was
forced to forego various investment opportunities,
downsize its operations more than would otherwise
be
necessary and liquidate various assets in a fashion
that would otherwise be disadvantageous to the
institution."
What does that sentence mean, what are
you referring to?
A. Again, pretty much what we discussed a
little while ago. Some whole loans that had to be
sold.
Q. Those were the investment opportunities?
A. I'm sorry, I thought you were going from
the bottom up.
Q. Either way.
The whole loans refers to what, liquidate

Page 162

various assets?
A. Correct.
And also, in corporate and commercial, we
were probably liquidating some of the assets to get
them off the books quicker than if we had enough
capital, we probably would have held on to them, we
were taking some discounts on some of these
properties.
We were selling some of the commercial
loans at discounts to get them off the books.
Q. Even if you had capital, how would you
know keeping them on the books longer would be
better or worse, maybe the market would get worse?
A. I agree. This is a snap shot in time.
We were taking some hits that we probably would not
have done if –

at that time.
Q. Only if you have knowledge of whether Ambase wanted to.
A. I have no knowledge of it.
Q. Do you know whether Ambase ever did acquire IPF from Carteret?
A. I don't know.
Q. If you look at page 2, the first paragraph, the second from last sentence in the first paragraph, it says, "Net interest income increased slightly in 1990 inspite of increased non-performing assets and a reduced balance sheet." Does that reflect progress in reducing cost?
A. No. That's only interest income. Interest income would be defined as the interest between earning assets, less our liabilities, our interest expense liabilities.
Q. But not including overhead liabilities?
A. No.
Q. Or overhead costs?

Page 189

A. No.
Q. So does that mean, since there was an increase in non-performing assets, and fewer assets, does that mean that the return on the performing assets was – there was an increased return?
A. Yes.
Q. Does that reflect an upward – can you infer the slope of the interest rate, of interest rates at that point from that sentence?
A. No, I can't.
Q. You can't necessarily say it would have been an upward sloping interest rate?
A. No.
Q. I guess that's because the configuration of the assets might have changed over an earlier period?
A. Correct. Also, the liabilities changed.
Q. How can you reconcile this with getting out of risk based assets, that would bring higher interest?
A. Correct, we would have had a higher net

Page 190

interest income number.
Q. The net interest number improved anyway, even though you were going out of risk based assets?
A. Correct, because of the reduction liabilities on some of our home loan bank advances against some of the interest expenses.
Q. Your risk base capital requirement went down because you wanted risk based assets reduced and you wanted it again because you still had increased income because the cost of liabilities went down because of the federal home loan bank borrowings, is that what this is saying?
A. At that point in time, that snapshot point in time.
Q. That's all. The next one is a news article with a picture of you and Mr. O'Brien.
MR. LEVITT: Please mark this as Exhibit 27.
(Walsh Exhibit Number 27 was marked for identification.)
Q. This announces your stepping down from

Page 191

your position, from your post?
A. Yes.
Q. According to this news article it was announced that the Ambase annual stockholders meeting that Walsh and you are leaving. My question is: Why did you resign at this point, May of '91?
A. I think that there was a definition. If I resigned or it was a joint effort.
Q. Did Ambase say they didn't want you there any more?
A. Not necessarily. It was –
Q. Bianco and Mr. Purcell were in at that point?
A. Correct.
Q. They wanted to manage it themselves?
A. No, I felt it would be crowded at the top. And maybe it was time for some new management to come in. And it was pretty much a joint decision. I was pretty tired of going through the

Page 192

last couple of exams.
Q. In that it was emotionally draining to go through those exams from your point of view?
A. Yes.
Q. That's all. The last exhibit, then I want to ask you a couple of questions about your RTC exam, but the last exhibit will be Walsh 28.
(Walsh Exhibit Number 28 was marked for identification.)
Q. This is Donald Kramer, one of the new people at Ambase and Carteret, writing to you on November 27, 1991, requesting that you pay back a $400,000 bonus that you got in the calendar year that ended December 31, 1990. Did you pay the money back?
A. No, I did not.
Q. What happened to the demand?
A. My attorney at the time, Larry Orloff handled it. He was involved with people from the OTS as well as people from Carteret. I think Sills Cumis firm represented Carteret.

Page 193

Q. Did it go to court?
A. No.
Q. So they never sued you for the money even

though you never gave the money back?
A. No, they did not.
Q. This letter says that as of December 31, 1990 in the second paragraph, "Carteret was in an impaired condition." Do you agree with that?
A. No, I don't.
Q. It also says such payment violated safety and soundness prudential principals and regulations. Do you agree with that?
A. No, I don't.
Q. And lastly, was the payment authorized by the board of directors?
A. Yes, it was.
Q. Why would Kramer say it wasn't?
A. I'm not sure. It was authorized by the board of Ambase, as well as the board of directors. To the best of my knowledge, the best

Page 194

that I could recall.
Q. Just a couple of questions. Do you recall being examined by a private lawyer working for the RTC in 1995?
A. Yes, I do.
Q. I am going to read you some testimony and ask you the you continue to endorse it. Remember we talked about the term rationalization retail branch system?
A. Yes.
Q. On page 72 of the transcript it reflects that McKinsey & Company was hired in late '89 or early' 90. The question is: And they were hired to do what? And you answered: To evaluate Carteret and to evaluate other Ambase companies. They were hired by Ambase. The question says: Continue, please. Then you answered: I share with them my vision – I shared with them my vision for Carteret for 1990 which also included the rationalization of

Page 195

the retail branch system. The retail branch system had gotten out of control at Carteret, because of the way that failed S&Ls were acquired by Carteret. There was a handful of branches in Virginia and Maryland. There was more than a handful of branches but a fair amount of branches in Florida that were unprofitable. There were branch systems in New Jersey that were unprofitable. So one of the "strategums" for the 1990s was going to be streamlining the retail branch system and in conjunction with McKinsey and company we implemented a man to streamline the operation and we started by hiring Shearson to represent us in selling some of the branches. Do you agree or endorse that testimony?
MR. HUME: Is that testimony –
MR. LEVITT: July 31, 1995.
MR. HUME: Is it relating to 1990? What is the time?
MR. LEVITT: They were hired in 1989 and early 1990.

Page 196

MR. HUME: I would like to – this is the RTC deposition of 1995 that you are reading from?
MR. LEVITT: Yes.
Q. I'm asking whether you endorse that testimony.
MR. HUME: If the witness would like to read it, you're free to read it.
Q. Do you want to see –
A. No, I heard what you said.
Q. And it's accurate?
A. Yes.
Q. Here I want to ask you another question. You are talking in this part about the 1990 OTS exam. The question says: We are now again toward the end of your tenure, you were president and CFO. What was the condition of Carteret at the time. Specifically in terms of had you been successful in doing what you had hoped to do. You answered: Yes, and just to clarify things, I was president and CEO, not CFO, we are now

Page 197

in late 1990 and we accomplish an awful lot of what we were looking to accomplish in rationalizing the branch system. We were able to reduce expenses by approximately $50 million annualized. And we had reconstructed the balance sheet to where net operating income core bases for 1990 was $60 million which was probably the best year in a long period of time, we disposed of 22 percent of the commercial and corporate real estate portfolio so we were getting pretty close to business strategy plus we were adding significantly to the loan loss provision. I am going to go on in a second but the first question is this 16 million, is that without the reserve set aside, if you recall?
MR. HUME: I object. If you recall.
A. I don't recall.
Q. You say: During the year of 1990 I believe we added approximately $122 million to the loan loss provision, that was up from $20 million the previous year.

Page 198

The $122 million was a number that the OTS had recommended of $77 million in conjunction with Peat Marwick they believed that the number was probably closer to 100 and we all sat down and

Q. What do you recall about how it went from 77 to 27? That is what I don't understand.
A. I'm not sure where the 77 came from. I know it said it in the exam report. I don't know how they arrived at those numbers.
And when we sat down to review it, with them, it became a lesser number. And again, I don't know – I take your word that it says an additional 77, but I don't know if they made a mistake by saying additional or it's supposed to be gross. I don't recall that.
All I know is in 1990 when they came in they reviewed the same exact assets and came up with a $77 million addition. It says addition to the reserves of where we were at that particular time.
Where we were at that time didn't include any carryover of 1989's exam. It was what we had

Page 204

booked.
So, no. I think we booked in excess of $50 million over what their suggested $77 million was.
Q. So your testimony is that you did what they asked you to do in '89 in terms of additional reserves?
A. Yes.
Q. That was 27 more in additional reserves?
A. If that was the number.
Q. If that was the number?
A. Yes, correct.
Q. And that if there was an initial request for 77 initial reserves in the course of discussions and analysis, it went down from 77 to 27?
A. That is –
Q. That is your recollection?
A. That is correct.
One last point, that wasn't the end of it.
It was now to review it on a quarterly basis.

Page 205

Q. And they came back – for you, internally for you to review it on a quarterly basis?
A. Yes.
Q. That is true as a matter of regulation, I suppose?
A. Absolutely, correct.
MR. LEVITT: That is all the questions I have.
Thank you very, very much.
THE WITNESS: Can I clarify one point?
Again, not to confuse the issue: I have testified several times on several of the questions.
One of the things about the branch system in Maryland when McKinsey came in, McKinsey worked an awful lot with Bob Pierson and Art Gilgar on the branches. And my involvement was really more as an oversight. They identified some of the branches that were not profitable that recommended closing and consolidating.
Clearly at the particular time in Virginia and Maryland, they were not producing income for us.

Page 206

I want to be consistent. And I think I'm being consistent.
MR. LEVITT: Thank you. With that I have no further questions. Your counsel can ask questions if he would like.
MR. HUME: I have three or four or a handful of very brief questions.
BY MR. HUME:
Q. Mr. Walsh, do you recall counsel for the government asking you questions about the affidavit that you submitted in the 1991 goodwill litigation?
A. Yes, I do.
Q. It's Exhibit 23, if you want to pull it out, I want to refer you to one paragraph?
A. All right.
Q. If you turn to page 4 and paragraph 8 – let me first ask: Based on this deposition and your recollection of this document, are you generally now feeling familiar with the contents of this affidavit?
A. A little more than when I first looked at it.

Page 207

Q. It's been a while?
A. It's been eight years.
Q. Could I ask you to review paragraph 8?
(Pause.)
A. Okay.
Q. It states, "Carteret has been required to change this course, meaning the course of business plans it had that was listed in the paragraphs above, radically; however, due in significant part for the misinterpretation of FIRREA by the OTS we have also been forced to make fundamental changes in the structure and size of Carteret's balance sheet in order to comply with the new capital requirements."
Does your statement the misinterpretation of FIRREA by the OTS, refer to the treatment of supervisory goodwill and its elimination from capital?
A. That's what our position was at the time.
Q. It was your position that it was a misinterpretation?
A. That is what our position was.

Page 208

Q. And the basic gist of this paragraph I take it, please tell me if this is correct, is that the loss of over $170 million of goodwill at the time of FIRREA from tangible capital phased out from the other capital requirements and the pressure put

on the management of the thrift caused the thrift and the management to completely alter or radically alter its business plans going forward; is that correct?

A. That is correct.

Q. That is the basic meaning of this paragraph?

A. Yes, correct.

Q. Is there anything that you have learned subsequent to signing this affidavit from that date up until the present that causes you in any way to doubt the accuracy of that basic proposition?

A. I'm not sure if I understand the question.

Q. Has anything happened subsequent to your signing and swearing to this affidavit that in any way – let me make it clearer, I'll phrase the

Page 209

question this way: Is it correct there has not been anything that has happened since you signed this affidavit and swore to it that has in any way changed your view as to the accuracy of the statement you made here, am I right that you continue to hold this view?

A. Yes, I do.

Q. That will be the only questions I have on this exhibit.

Do you recall counsel for the government asking you questions about the Summit Bank Corp. proposed sale of branches?

A. Yes.

Q. Do you recall that that was a sale of branches that was ultimately not approved by the regulators?

A. Correct.

Q. Do you recall that it took several months from the time which Carteret management first proposed the idea of selling those branches to the time in which it became clear that it was not going to be approved and that Carteret would not go

Page 210

forward with the sale?

Do you recall that period of time it took?

A. I don't recall the period of time.

Q. You don't recall the period of time?

A. No.

Q. If I represent to you that it was at least a matter of three or four months, then can I ask you this question: Is it possible that whatever liquidity concerns or decisions as to whether it was in the thrift's best interest could have been different over that period of time?

In other words, that it might make a lot of sense at one point in time and after four or five months might not make sense?

A. That is possible.

Q. I want to clarify that one point in the record. You answered this question, but just to be 100 percent clear.

When counsel for the government asked you about the compensation practices at the thrift, that were alluded to in the supervisory agreement am I

Page 211

correct in understanding your testimony to have been that you did not agree with the OTS's position regarding that compensation?

A. I did not agree, correct.

Q. With the OTS?

A. Correct.

Q. Finally, on this matter that counsel with the government was most recently asking you on the $77 million reserve recommendation in 1989, you recall that the exam report initially called for a level of reserves of 77 million, at least the number being used in the exam report, is that correct?

A. That's correct.

Q. And you recall that there was discussion between the OTS and the thrift as to the appropriate level of reserves that took place subsequent to the exam report?

A. That's correct.

Q. And you recall, I take it from your earlier testimony, that there was an agreement between – that there was an understanding that the amount of reserves that were taken was the

Page 212

appropriate level in 1989, at that time?

A. At that snapshot in time, yes.

Q. You also recall that in 1990, the OTS instituted another complete comprehensive exam report?

A. Yes.

Q. Exam, sorry, which had an exam report?

A. Yes, I do.

Q. Do you recall that in that exam they also recommended the same number, an additional 77 million in reserves?

A. Yes, I do.

Q. While a strange coincidence that they reached the same number, given that there were 27 million in additional reserves taken in '89, and that the assets six months later probably changed, would it be fair to say that the numbers seem to bear a strange resemblance and coincidence, but that you misspoke when you said it is the same 77 million in '89 and 90? Isn't it really two different judgments that the regulators made?

A. Yes, and I thought I clarified that

Page 213

point.

Q. I think you did too but it's my job to make sure it's 100 percent clear.

You would agree you misspoke when you said it's the same 77 million and the rest of your testimony explaining it would be more accurate?

A. I don't recall my exact testimony, but it was $77 million in '89 and $77 million in '90, and