# EXHIBIT Z

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Civil Action No: 93-531
Chief Judge Loren A. Smith

AMBASE CORPORATION AND CARTERET BANCORP, INC.,

Plaintiffs,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff - Intervenor,

vs.

UNITED STATES OF AMERICA,

Defendants.

_______________________________/

West Palm Beach, Florida
November 23, 1999
9:15 o'clock A.M.

_______________________________

DEPOSITION

OF

JOEL WAYNE MOOR



APPEARANCES:

COOPER, CARVIN & ROSENTHAL
Attorneys for Plaintiffs
1500 K Street, N.W. - Suite 200
Washington D.C. 20005
BY: HAMISH P.M. HUME, ESQ.

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
Attorneys for Defendant
1100 L. Street
Washington, D.C. 20530
BY: TONIA J. TORNATORE, ESQ

* * *



INDEX


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Tornatore | 5 |
| Mr. Hume | 150 |




EXHIBITS


| Deposition Exhibit Nos. | Page No. |
|---|---|
| 1 | 25 |
| 2 | 27 |
| 3 | 32 |
| 4 | 44 |
| 5 | 58 |
| 6 | 71 |
| 7 | 74 |
| 8 | 78 |
| 9 | 83 |
| 10 | 88 |
| 11 | 93 |
| 12 | 97 |
| 13 | 100 |
| 14 | 111 |
| 15 | 114 |
| 16 | 118 |
| 17 | 123 |
| 18 | 130 |
| 19 | 133 |
| 20 | 140 |
| 21 | 146 |

A. Yes.
Q. You mentioned Carteret. When did you start working at Carteret?
A. It was the summer of 1991.
Q. Do you recall the month in 1991?
A. It was right around July 4th. I don't know if it was immediately before July 4th or immediately after, but sometime in the first of July, end of June. I don't remember the exact date.
Q. And when you first started at Carteret, what was your position?
A. I believe my title was executive vice-president.
Q. And what were your duties as an executive vice-president?
A. I was in charge of understanding the problems in the commercial real estate portfolio, and dealing with them.
Q. What were your responsibilities as to any of the retail or residential type of loan programs at Carteret?
A. None.
Q. Who was in charge of those?
A. I believe the fellow's name was McCabe, Leo McCabe. Understand, it's been eight and a half years so I'm not crystal clear on everything, but I think McCabe was in charge of that. I believe that was his name.
Q. While you were at Carteret -- how long were you at



Carteret?
A. I was at the thrift from the summer of '91 until it was taken over in I believe it was December of '92. I stayed on for at least a year and a half after intervention.
Q. So probably through '93, maybe into the summer of '94?
A. I was there into the summer of '94, I believe.
Q. That's when you returned to Florida?
A. Yes.
Q. For self employment?
A. Right.
Q. While you were at Carteret, did your duties change over time?
A. No.
Q. You were always responsible for the commercial loan assets?
A. Yes.
Q. Prior to your employment at Carteret, where were you employed?
A. I had the same position at Amerifirst Savings Bank in Miami, Florida.
Q. When did you start there?
A. I started very early 1989. Either January or February. It was right after the new year.
Q. And who at Amerifirst asked you to come in and be



responsible for the commercial loan portfolio?
A. It's a fairly complicated story. It's not that easy to explain, but if you want me to, I will.
Q. Yes, please.
A. And, once again, this is even further back. Amerifirst, I believe it was called American Capital, was in the process of attempting to buy Amerifirst. I think American Capital owned a thrift in Ohio. As I recall, American Capital -- and they had offices in Miami as well -- had doubts about the information they were getting about the commercial real estate portfolio and/or the captive development subsidiary at Amerifirst. They wanted to do the deal, but they weren't sure of the real estate. Somehow someone at American Capital before they bought the thrift, forced the bank to hire me to be the chief financial officer for the development company. And, literally, the day I started all management was fired or forced out. I was in isolation for a brief period. There was a coup at the board. Another CEO was brought in. He interviewed management and realized who I was and he put me in charge of commercial real estate to figure out what the problem was. I already knew sort of what the problem was, because I had access to the Peat Marwick papers that was prepared in conjunction with the proposed acquisition. So I knew there were real problems. And essentially I had the same job at



Amerifirst that I did at Carteret; how big was the hole, calculate the problem and deal with it. I was at Amerifirst from early '89 until it was taken over in March of 1991.
Q. Do you recall who that new CEO at Amerifirst was?
A. It was a guy named Al Tatie (phonetic).
Q. Do you recall a gentleman by the name of Ron Burns?
A. Oh, very well, yes.
Q. How do you recall Mr. Burns?
A. Let's back up a while. Tatie was hired as the CEO. I think while they were looking for a CEO, Burns was the temporary CEO. He was on the board of Amerifirst. I don't think he was CEO very long. His job was primarily to find another one.
Q. He was an interim type of CEO?
A. Oh, yes. It was obvious. Burns was a director at Amerifirst and Carteret.
Q. Is that how you came to be employed at Carteret, that Mr. Burns knew your work?
A. Yes, he was aware of what we had done at Amerifirst. And by we, there's a whole group of people that was brought in. And he was instrumental in getting me to go to Carteret, along with all my people.
Q. You mentioned something about American Capital having an indication that the real estate problems at

Page 17

Amerifirst were perhaps not being recognized timely. Is that a fair characterization?

A. Well, I think the feeling was they were severely under-reserved and they didn't know how much it was or what the problem was. They weren't really satisfied with the Peat Marwick report. Management was saying one thing, auditors another. They didn't know exactly what the situation was, and that was their concern.

Q. Okay. Did American Capital eventually purchase Amerifirst?

A. No.

Q. Did another institution or investor purchase Amerifirst?

A. Amerifirst was taken over by the RTC.

Q. Do you recall the timing on that?

A. March 1991.

Q. March 1991?

A. Yes.

Q. That was just before you moved to Carteret; is that right?

A. Yeah. I stayed on after intervention, and probably would have continued to stay, but I got the offer from Carteret. It seemed like a much better situation.

Q. Now, I want to go back to when you first were engaged as CFO at Amerifirst.

Page 18

A. CFO of Amerifirst Development Corp, the real estate development subsidiary.

Q. What was your title at Amerifirst, the thrift?

A. I believe my title was senior vice-president. I don't think there was any EVPs at Amerifirst. It's hard to remember. I think I was senior vice-president over commercial real estate lending.

Q. Over the commercial real estate?

A. Right, which also included the development subsidiary.

Q. What were the economic conditions at that time?

A. At Amerifirst or generally?

Q. At Amerifirst.

A. Well, I can only talk about real estate. Real estate was depressed. There were problems. Lot of loan defaults.

Q. Were the depressed real estate conditions, were those, I suppose, widespread?

A. Nationwide, yes.

Q. When did you first pick up on the fact that this real estate depression had occurred?

MR. HUME: Objection as to the use of the word depression, and ask for a clarification as to what it means.

A. I can't really say specifically. Again, it's hard

Page 19

to remember. In the late '80s there were problems in the real estate market. When I was aware, I'm not exactly sure. There were some problems for quite some time, and, I mean, it's fairly well documented, the thrifts had some problems, as well as the commercial real estate portfolios. It's essentially what brought them all down.

Q. When you started at Amerifirst, was it clear to you that the economic conditions would have an impact on your job in commercial lending?

A. I'm not sure I'd put it in that perspective. They clearly had problem loans. It needed to be dealt with and accounted for. I wasn't really worried about general economic conditions. It was pretty obvious that loans, people weren't making the payments. If that be the case, you got to deal with it.

Q. Throughout your time at Amerifirst, how would you characterize the economic conditions in the commercial real estate area?

MR. HUME: Objection since that's been asked and answered already.

A. There were problems everywhere you looked.

Q. Was it difficult trying to sell properties or to lease properties?

A. Yeah. It was overbuilding, lease problems. Every kind of problem you can think of.

Page 20

Q. And this was throughout 1991 when you ultimately went to Carteret?

A. I went to Amerifirst in 1989, and there were problems in 1989. So obviously there were problems before that. What time, I can't really say, but there were problems with commercial real estate nationwide.

Q. Where were you employed prior to your work at Amerifirst?

A. Oh, my God. Let's see, from 1987 until 1989 I was chief financial officer for a company called Wolper Ross & Company. I'll run the movie backward and get through all this. I have a long resume. Do you want to get into it?

Q. I'm just trying to clarify actually your experience in the commercial real estate area, so to the extent --

A. If you want, let me just give you the whole thing soup to nuts. I graduated from college in 1974 and worked for Arthur Anderson & Company, CPA, in Miami, Florida. I worked there for seven years. I was primarily involved in real estate audits. I did extensive work for the developers all over the state, as well as a lot of bank work when they had their review for commercial real estate loans. I would come in to look at the commercial real estate loans. So my background was almost exclusively real estate for seven years in Arthur Anderson.

I left there in 1981 to go into the development business with a client who built condominiums in North Miami Beach. We purchased and operated a hotel in Key Biscayne outside of Miami, Florida and borrowed very heavily from a money center bank to do that. The bank failed. The bank was taken over by the FDIC. I essentially did my own workout for the buildings and rebuilt with the FDIC.

I left there after five years after working out our problems and went to work for the remnants of a collapsed REIT known as Senior Corp. Senior Corp was previously as CMI, second largest real estate investment trust in the country. It was a problem of there was booming bust cycles in real estate. It was a victim of a previous bust. It had been a REIT that 130 banks had an interest in. I was hired by the company that recently purchased the remnants of the REIT in an LBO. Worked there a little over a year while we packaged and resold all the assets and paid the LBO debt.

Q. Do you recall the name of the company that purchased the remnants?

A. It was an individual that was the former head of lending at Continental Illinois, and the largest home builder in California, a guy by the name of Bill Lyon that bought Senior Corp. And I believe it was 140 million dollar LBO. It's hard to remember the exact numbers. He had



properties coast to coast from Hawaii to Puerto Rico and all points in between. It was sold off in short order. And as assets started to dwindle down, I took the job as CFO with Wolper, Ross, because it was obvious there wasn't anything to do quickly. What had happened, the real estate market had turned and it was easy for them to sell property. And it was getting ready to turn again.

My experience in real estate has been over a twenty-five-year period. I've seen a lot of ups and downs, and usually in the down periods I've found employment as CFO of non-real estate companies so I could feed my family, which is what I'm doing now. Hopefully that answers all the background questions.

Q. I think we got through the work history there. Let me just clarify a point. Do you have any graduate degrees?

A. I'm a CPA., B.S. in accounting.

Q. Is your CPA license current?

A. Yes, unfortunately. I hate accounting.

Q. Through your work at Carteret, did you ever hold a title at AmBase Corporation?

A. Not that I recall. I worked only for the thrift.

Q. Do you recall any other titles or positions you held at Carteret?

A. I really don't.



Q. Do you recall as part of your compensation at Carteret that you would receive stock in AmBase Corporation or stock options in AmBase?

A. My agreement was only with the thrift. I had no agreement with AmBase, as I recall. No arrangements, nothing. Because had I had one, I think the RTC would have escorted me out the door on takeover. I think that's proof enough.

Q. That was because AmBase was still --

A. It was the parent of the thrift, and had I had any strings with AmBase, they would not have kept me, I think, after takeover, because there was -- there would be a conflict because they took the child from the parent, so no.

Q. Do you currently own any shares in AmBase stock?

A. I have never owned a share of stock in my life.

Q. Mutual fund shares?

A. Never owned a share of stock in my life.

Q. Have you worked for any subsidiaries or affiliates of AmBase?

A. No, I have not.

Q. The company for which you are currently employed, do you do any business with AmBase?

A. No.

Q. To your knowledge, do you have any financial interest in the outcome of this case?



A. None.

Q. When you first considered taking a role in the management of Carteret, what was your knowledge of the commercial loan portfolio at Carteret?

MR. HUME: Prior to his coming to Carteret?

MS. TORNATORE: Yes.

Q. When you were considering the decision.

A. I can only tell you what Ron Burns told me. And it's really anecdotal. He indicated that there was a thrift in New Jersey in which he was involved with as a board member that had very good franchise, that had problems in the commercial real estate area that needed attention, but in the long run it could probably be saved. And it would be a nice place to go after going through the failure and demise of Amerifirst, which was a very painful experience. And it seemed like after talking to Ron and Dick Bianco, it really seemed like there was hope, because Bianco and those people were very savvy Wall Street types, and there was a hope to recapitalize. The game then was to recapitalize the thrifts and get them back to health and sell them down the road, and it appeared as though that could happen. There were problems in the commercial real estate. I didn't know how big, I hadn't looked at any of the loans.

Q. Do you remember that Mr. Burns and Mr. Bianco had a realistic sense of the problems in the commercial loan

portfolio?
MR. HUME: Objection. It calls for the witness to testify as to the understandings of other people and calls for speculation.
A. They said they don't know, that we want to hire you, so you tell us. It was very clear they didn't know. They said we think there are problems, but we need somebody like you to look at them, so --
Q. They needed to bring you in to clarify?
A. Yes.
Q. Were there any other sources of information that you used to evaluate before coming into Carteret?
A. No, took it on a flyer.
Q. It was just your discussions with Bianco and Mr. Burns?
A. Right. I liked Burns a lot, and after meeting Dick Bianco, I liked him too. We hit it off.
MS. TORNATORE: If we could mark this as Deposition Exhibit 1.
MR. HUME: Do you want to give the witness the marked version?
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 1.)
Q. Mr. Moor, I'm going to show you what has been marked as Deposition Exhibit 1. There is an ADDIIS number



on the document, PAM005 0035. If you want to take a moment just to look over that document.
A. I have.
Q. Do you recognize that document?
A. No, but I know what it is.
Q. Can you just describe what it is for us then?
A. I think it's a report that Peat Marwick did on the lending function before I got there. Never read it, never thought five minutes about it.
Q. Why was that?
A. I thought Peat Marwick was lost. I wouldn't care what they said. Bunch of idiots.
Q. What do you mean by lost?
A. Well, after I got there and realized there were problems, and they just audited the company, I didn't care what they thought. A bunch of kids wrote a report. I just wouldn't have read it.
Q. In your opinion they were unaware of the problems in the commercial loan area?
A. I don't know what they did. I have no idea. I've never spoken to any of them.
Q. To your recollection, did the management at Carteret discuss the report, Exhibit 1?
A. I don't know, it was done before I got there. And I knew there was a report. I never read it, I can assure



you.
Q. Did Mr. Burns or Mr. Bianco ever make any comments to you about KPMG efforts?
MR. HUME: Objection. Asked and answered.
A. Not that I recall.
Q. Were there any other members of the management at Carteret who commented to you on KPMG's --
MR. HUME: Objection. Asked and answered several times now.
Q. -- review?
A. We got rid of everybody. I didn't talk to anyone. I just fired them all.
Q. KPMG was removed as the auditors at Carteret?
A. I think before I got there.
Q. Do you recall having an opportunity to review KPMG work papers for the year end financial statements, 1990?
A. Never saw them. Never asked for them.
Q. Were you involved in responding to the management letter with respect to the 1990 financial statements?
A. No.
MS. TORNATORE: If we could mark this as Deposition Exhibit 2.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 2.)
Q. I'm going to show you what we marked as Deposition



Exhibit 2. The ADDIIS number on that document is FAM002 2361. If you want to take a moment just to look at that.
A. I understand what it is.
Q. Do you recognize Exhibit 2?
A. I've never seen it before.
Q. Do you recall in discussions with either the board or senior management at Carteret responding --
MR. HUME: Objection. I think you asked him already.
A. I don't recall anything about the letter.
MR. HUME: He said he didn't take part in this.
Q. Were you involved in the discussions of KPMG's performance?
MR. HUME: Same objection.
A. No.
Q. You were not then included in the decision to remove KPMG?
A. No.
Q. Who were the new auditors that were brought in?
A. Price Waterhouse.
Q. Whom do you recall at Price Waterhouse?
A. I don't remember the names. The partner was a very nice fellow, but I don't remember the names. I guess I'm getting senile.
Q. Does the name Bob Flaum sound familiar?

Page 29

A. Yes. Nice guy.
Q. Any other individuals at Price Waterhouse?
A. No, I don't remember the senior or the manager. I really don't. Every year you have auditors. I don't remember the ones we had last year where I'm at now. They come and go. They're like dentists.
Q. When you first started working at Carteret, what was Price Waterhouse's involvement?
A. They were the outside auditors. I don't think they were actively doing anything, it was in the middle of the year.
Q. Were they specially engaged to do any type of review at Carteret?
A. I remember their presence when we first looked at the portfolio. They went around with me and looked at the properties.
Q. Do you recall who had requested that they perform that?
A. I really don't. They were there. They did their own work. We discussed the loans in great length, both Price Waterhouse and examiners in the early days.
Q. Was their review of the commercial loan portfolio, was that independent of your own?
A. Yes. They were allowed to reach their own conclusions. We visited the property. They had their own

Page 30

staff, one running discounted cash flows, whatever. We had to look at them in a rapid manner. Time was of the essence. It wasn't like they were using my work. We'd look at the same property, do the same work. And they'd come up with their estimate and I'd come up with mine.
Q. Do you recall them preparing any type of written report?
A. I don't know that they did. If they did, I never saw it. This was preliminary work. As I recall, the mission was more to get a sense as to what the hole was, how big a problem was there. We knew that we didn't have the time to do detailed work for each and every property, but we had to make some guess as to how much of a deficiency there would be, because you have to book something if there's a problem. You have to refine your estimate as time goes on. It takes many, many months to get an appraisal. You can get a sense of what the property is worth and book an estimate as you're doing that. And that's what we did, and they did that. They came up with a number and I came up with a number.
Q. As part of the review that Price Waterhouse or perhaps yourself were doing over the commercial loan portfolio, do you recall when or if appraisals were ordered on properties?
A. Well, I didn't have a staff of any size until I

Page 31

got up there and fired everybody and hired a lot of the people that I had at Amerifirst. The appraisals came in over an extended period of time. When you're doing a hundred appraisals, it doesn't happen in one day. First you got to find the people to do the work. I had to hire my own internal guy to review appraisals. He would contract with the people to do them. To get appraisals on everything we needed might have taken a year. As I recall, we did the really big ones and the troublesome ones first. You can't get 100 appraisals in one day. You can't find the people to do them. It's a long involved process.
Q. Over a period of time you were requesting that appraisals be done on certain properties?
A. Definitely every one that had a problem.
Q. Any loan that was classified then?
A. Well, I don't get into classification. If it had a problem, not paying, or if we visited it and it had deferred maintenance, we got it appraised. Classifications were done with someone else. I don't really care.
Q. What do you mean by problem? Do you mean repayment was in question or there was delinquency on the account?
A. If they're not paying, that's a problem. If you're actively involved in foreclosure, that's a problem. If you visited the property and it's totally rundown and

Page 32

you're still making payments, that's a problem because that means sooner or later you're going to stop making payments because you have no tenants. Problems. Common sense problems. Or if there's one under construction and there's no tenants, then that's a problem.
Q. Vacancy rates or something like that?
A. Well, if you go out and visit a property and it's 90 percent done and you ask for the tenant list and there's none, that's a problem.
Q. Even if payments are current on the account?
A. During construction period usually there were no payments, so you expect them to be current.
MS. TORNATORE: If we could mark this as Deposition Exhibit 3.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 3.)
Q. Mr. Moor, I'm going to show you what we've marked as Exhibit 3. The ADDIIS number on that document is WOQ672 1032. Do you recognize Exhibit 3?
A. No.
Q. Do you want to take a minute just to review it?
A. I see what it is.
Q. Can you identify Exhibit 3?
A. Looks like a list of properties that appraisals had been ordered on it.

Q. Do you recall who Mr. Haines was?
A. I fired him. Braun I think I fired, too. I don't remember him. Who was he? Can I ask you that? I forget who he was.
Q. I'm afraid you're here to answer the questions.
A. I probably fired Braun as well.
Q. What were their positions at Carteret?
A. Haines was in the commercial lending. He was a lender that was kind of working in the commercial real estate area. I'm not exactly sure what he was doing.
Q. And Mr. Braun, what do you recall that Mr. Braun was doing?
A. That name just totally escapes me. I'm sure I fired him. I must have fired him the first day. I think I kept Haines a minute or two. I don't remember Braun.
Q. Would Exhibit 3 just be a typical list of appraisal requests that were made?
A. It may be. I don't know how they did business before I got there.
Q. Do you see that you're cc'd on the bottom?
A. Yeah. July 11, 1991. I had probably been there maybe a week, I guess.
Q. Do you recall making any requests of the existing personnel in the commercial loan area of what appraisals had been requested?



A. No.
Q. On the second page of Exhibit 3, there's a list there. I was wondering if you can tell me what that list is?
A. Looks like a list of loans to one borrower for three borrowers.
Q. Do you recall issues concerning Carteret's loans to one borrower?
MR. HUME: What do you mean by issues? Do you mean regulatory requirements?
A. We had a lot of these. The portfolio was full of them.
Q. How many, to your recollection?
A. I don't remember. It was a lot.
Q. Do you recall a number of these borrower relationships exceeded the regulatory requirement?
A. I don't recall that at all. The money was out. I mean, none of that would have mattered to me. The question is how big is the hole. The money is gone, can't get it back. I remember Profeta was a crook. He belongs in jail. Weingarten was a nice man. The Forstmann Little relationship, I don't remember much about that. I think we did a criminal referral on Profeta.
Q. Do you recall what type of perhaps special review the loans to one borrower relationships received?



A. All of the loans were reviewed the same way. How big was the hole, what was the problem.
Q. Was there any information that you had to convey to the regulators with respect to the loans to one borrower?
A. No.
Q. Would you have had to made them aware of loans to one borrower which exceeded the regulatory requirements?
A. Never thought two seconds about it. The money was already out. I was just there to try to figure out how much we were going to get back. These deals were done before I had got there.
Q. With respect to your work, your review of the commercial loan portfolio, I was interested in if you could describe structurally what you did when you came into Carteret?
MR. HUME: What do you mean by structurally?
Q. Were there changes to the organization of the commercial loan area that you made?
A. I fired most of the people there. I interrogated them to see if they were willing to -- a lot of them made the loans. That's usually a problem. People who make the loans are very hesitant to admit they made a mistake. Anyone that didn't look right, I just got rid of, and proceeded to look at the loans and visited the property. A lot of these guys never seen the property.



Q. They hadn't made any type of site visits?
A. A lot of them weren't familiar with their own portfolio. If they couldn't answer questions, I fired them on the spot. I think I got rid of about 50 people.
Q. You mentioned bringing some of the personnel at Amerifirst you had worked with?
A. Yes.
Q. Do you recall how many you brought?
A. Not exactly. Maybe 20. It's hard to remember.
Q. Were many of them brought up to New Jersey or did some of them remain in Florida?
A. Carteret had a significant portfolio in Florida. And we were able to keep the biggest chunk of people in Florida at a location in Delray. The legal guy, I guess you would call him general counsel for the real estate group, went to Jersey with me. The guy that did the reconciliation of our work to the TFR, Thrift Financial Reporting, a guy named Bruce Campbell, went to New Jersey with us. The rest traveled back and forth. The properties were all over the country, it didn't matter where we were. I was able to use the people at Amerifirst who knew the rules for evaluating troubled assets. The OTS looked at loaning, and had an accountant. We did this before on a large scale so it was easy to fire it up again.
Q. Who was in charge of the REO properties?

Page 37

A. Sales was handled by a guy named Stanley Mohr. I tried to get the fellow who worked with me at Amerifirst to move up to Jersey and he refused. He's a good friend of mine and he said I'm not going to do it again. I met him at Senior Corp and took him to Amerifirst with me. He said no, I'm not going to work for any more thrifts. Stanley Moore did the sales, but the REO was handled by a number of different people. Groups of properties would be handled by a manager, and he might be responsible for 10 REO properties; management, the upkeep. But just to explain it, the way we were organized, I had people in appraisals, I had a legal department, I had an accounting department, loan servicing department. So we had a discipline so there was somebody -- there was a lot of overlap in terms of responsibility. Somebody might be evaluating it from an accounting point of view, somebody might be looking at it from a managing point of view, somebody might be worrying about it from an appraisal point of view, somebody might be worrying about it from a foreclosure point of view. And oh, by the way, when we get title, Stanley will sell it. So that's how it worked. It was organized like a real estate company.

Q. Who was in charge of the accounting in the commercial loan area?

A. Jose Garcia.

Page 38

Q. Do you recall the gentleman's name I think you mentioned was the general counsel?

A. John Mudd.

Q. How about the loan servicing group?

A. I don't remember, because keep in mind that a lot of times I get the Amerifirst and Carteret experiences and loans confused. Because we had loans in the same area, I had a lot of the same people. Sometimes I think it was an Amerifirst loan, and actually it was Carteret. To the extent I make mistakes, you have to forgive me. It's been 10 years.

As I said, the faces were the same. The loan servicing at Carteret, I don't remember specifically who handled it. That was done in Jersey on the same floor as me, but who was the person in charge of the actual loan servicing, I'm not sure. Bruce Campbell could answer that question because he's the person who talked to the loan servicing people to get the reports to do the TFR. It would have been one notch down.

Q. Who was Peter Mitchko?

A. He was kind of my right-hand man for active loans. He didn't do REO. He did the loan administration work. He would have assigned the individuals to loans.

Q. And under each of these, I suppose, group heads, you had individuals doing their work?

Page 39

A. Yes.

Q. Approximately how many people were in the commercial loan group?

A. At Amerifirst I know it was about 50. I have a feeling in total it was probably about the same in Carteret when you added everybody up, the servicers, the appraisers, in Jersey, Florida, legal, it was probably around 50, 55 people.

Q. Now, following your review of the commercial loan portfolio, what type of action did Carteret's management take?

MR. HUME: Could you clarify the time frame?

Q. Just after you were done with your review, you were reporting things --

MR. HUME: Object in the sense there was action taken before their review was 100 percent complete.

A. I want to make that clear. The review continued to the day we were taken over. We never stopped. We were continually having to reevaluate the estimates, lease up properties. It never ended. The process was just refined as time went on. There was an initial pass at a guess as to how big the hole would be, and that was continually refined with each passing day. It never ended.

Q. What was your estimate of the deficit?

A. As I recall, it was 150 million dollars from the

Page 40

get-go. That number proved to be fairly accurate. It went up and down. I don't remember there were any material changes to it as long as I was there.

Q. Do you recall the time frame when Carteret recognized that 150 million dollar deficit in the commercial loan portfolio?

A. Not precisely. It was rather quick because I don't think they wanted to put out a 10 Q without recognizing the problem they felt intuitively we all knew was there. We didn't want to take ownership of a big problem. It was quick. I think a month maybe. Maybe a little longer. I know I was on a plane nearly every day.

Q. Would it have been a June '91, 10 Q?

A. Yes, June 30. So that would have been 45 days. I'm not sure if we got it done by August 15 or not. It might have been the third Q, because I didn't start until the second quarter was over. The time, I'm unclear. I just know it was important to get it done quickly. We didn't want to get ownership on this. It was a problem that had to be recognized, and we were going to attempt to do it, with the caveat it had to be refined and refined and refined.

Q. Constant review?

A. Constant. Never ending.

Q. In the course of your review, did you have an opportunity to evaluate whether this deficit or parts of

Page 41

this deficit would have been recognized in prior quarters or in prior periods of time?

A. It wasn't recognized at all or it wouldn't have had to take the 150 million dollar hit. It wasn't there.

Q. Was it apparent if anyone had done the review previously, that they would have seen this deficit?

MR. HUME: It calls for speculation as to prior management's review.

A. I don't know what they did. I did what I had to do. I don't know what the others did. I wouldn't have done it the same way, but --

Q. Do you recall what impact this 150 million dollar deficit had on Carteret's capital position?

A. It was a significant number. And it was an important decision. I think Price Waterhouse agreed that the number was somewhere in the ball park. I think the OTS did as well. It was a tough decision to make. I took the job with the understanding that if it was a problem we were going to recognize it the way it had to be recognized. I wasn't going to do it half way. They knew that going in. It was also very clear to me Bianco wanted to know what the problem was. He didn't want to pussy foot around it. You tell me what it is and we're going to deal with it, don't lie to me. It was a tough decision and one we knew was coming. It had a significant impact. 150 million dollars

Page 42

is significant to nearly anybody, at least to me.

Q. Do you recall if that increase in the loan loss reserves, did that place Carteret out of regulatory capital compliance?

A. See, now we're getting into an area, was the goodwill in and out. I don't remember. I think the assumption was we had goodwill. There was no -- I didn't care what the capital was. I wanted to find out what the hole was. My estimate on the hole was 150 million dollars. They had to deal with whatever that was. If there was a problem, they'd deal with it. I was never put into a position, if you do that -- nobody ever said a word to me. They said go out and kick the tires and tell me what this mess is worth. To the extent there were regulatory issues or problems, I didn't deal with it because I didn't want to hear about it. I wasn't going to let anything about the regulatory environment color the truth. And they never put that pressure on me. Never even said a word.

Q. No one ever asked you to revise your 150 million dollar figure?

A. Never. I can tell you everyone was shocked and upset, but there was never any pressure, well, if you make it this -- nothing. This is what you say it is, we're going to deal with it, which is why I took the job. And why I still think for a lot of these guys it was a difficult

Page 43

decision.

Q. With respect to Price Waterhouse, did they concur in your assessment of 150 million dollar deficit in the commercial loan portfolio?

A. Yes. You know, it's a subjective exercise. I think we were not materially different. I think we were in the same ball park. And OTS -- I don't think they ever wrote anything down, but, believe me, I talked to O'Rourke nearly every day. We all knew what was going on. I have discussed the loans at great length with Price Waterhouse and the OTS. If you turn the lights on, there's not a lot of mystery. If there's a problem, it's not that difficult to get your hands around what you think it's going to be. It takes a while to get the absolute proof, but most of it is common sense.

Q. Was that Tom O'Rourke at OTS?

A. Yes.

Q. Do you recall anyone else performing a review of Carteret's commercial loan portfolio at this time?

A. It's difficult to remember who all the players were. Keep in mind that Bianco and Kramer were actively trying to recapitalize the thrift, so they were constantly exposing the thrift to outsiders to see if they can interest them in making an investment. There were other people who looked at the loans other than OTS, Price Waterhouse and

Page 44

me. I don't remember what firms were used, there were a lot -- it's difficult. But other people did look at them. Were official studies ever done? I never saw any, but that didn't mean there weren't. Certainly I made a lot of presentations to people they were trying to interest in investing.

MS. TORNATORE: Let me see if we can mark Exhibit 4 I think we're up to now.

(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 4.)

THE WITNESS: Can I ask something? Are you guys cold? I'm freezing.

MS. TORNATORE: Let's take a break.

(SHORT RECESS TAKEN.)

MS. TORNATORE: We're back on the record.

Q. I'm going to show you a document we've marked as Exhibit 4. There is an ADDIIS number on the bottom there. FAM002 2407. If you want to take a few minutes and just familiarize yourself with Exhibit 4?

A. Okay.

Q. Do you recognize Exhibit 4?

A. I don't remember it specifically. I know what it is. It's a management letter.

Q. And who is the letter from?

A. Price Waterhouse.

Page 45

Q. Do you recall Price Waterhouse doing a review of the commercial asset management division?
A. No. They did an audit of the bank these are management letters they generated as a result of their audit work.
Q. Do you recall being asked questions about the commercial asset management division?
A. Not specifically, no.
Q. If you could turn the page where there's an ADDIIS number on the bottom 2411.
A. Yes.
Q. And if you would just read the two pages there addressing the commercial asset management division, to yourself.
A. Okay.
Q. Have you had an opportunity to read those two pages there?
A. Yes.
Q. Do you recall Price Waterhouse making a comment as to the management that the bank was doing of real estate properties and those properties that were managed by others?
A. I really don't.
Q. Do you recall that they expressed concern about the efforts that other, I suppose, contractors or outside consultants were retained to manage the properties?

Page 46

A. Not really. I'd like to make it clear that I probably received one of these every year in my professional existence. I generally ignore them. They're required to do this. You have to come up with points to suggest improvement to management. And I'll be perfectly candid, I never really look at them and I don't care what they say.
Q. Was Carteret, I suppose, out-sourcing a lot of the management of properties?
A. They had to. A lot of these properties were thousands of miles away so there had to be somebody on site collecting rents, dealing with the maintenance problems. You always have to have a management company.
Q. Who in your commercial loan group was responsible for administering or reviewing the work by outside property managers?
A. It would have been the asset manager. Asset manager may have five or six properties where there was a management company involved. That asset manager would have to deal with whatever management company was there doing the work for his property.
Q. Was this someone in Mr. Mitchko's group?
A. No, this would be REO, because you wouldn't be managing property unless you owned it. It would be somebody, not necessarily understanding more. but most of the asset managers that did REO were in Florida. Steve

Page 47

Ferreira, Craig Rosen, Andy Bowes, Marsha Morgan. There were a whole host of them.
Q. And the individual loan officer or asset manager would be responsible for supervising outside property management?
A. Yes.
Q. Do you recall Kenneth Leventhal performing a review of Carteret's commercial loan area?
A. I remember them specifically looking at the Amerifirst portfolio in great detail. I didn't remember them at Carteret. Maybe they did there as well. I know Kenneth Leventhal very well. I've had a lot of work with him over the years. I don't remember them in Carteret, but I guess they probably were there.
Q. You recall them because they kind of specialize in real estate?
A. Oh, yeah. They were our auditors at Senior Corp. I don't recall if they were there for a potential investor. If they were there, I don't remember why.
Q. You don't recall if Carteret had retained them?
A. I remember them specifically at Amerifirst because my friend was the partner in the engagement. I don't remember them at Carteret. That doesn't mean I'm not senile.
Q. We might get to a document later on.

Page 48

A. That's fine. I get the two confused readily.
Q. We'll hopefully clarify that with a few of the documents.
A. Okay.
Q. Do you recall in 1991 having an opportunity to review any of the reports of examination by either OTS or the FDIC?
A. I don't specifically remember being provided any such documents. I had a lot of conversations with Tom O'Rourke. He may have shown me a specific write-up on a specific loan.
Q. Do you recall any of the examinations staff at the FDIC?
A. At the FDIC? I do at Amerifirst, but not at Carteret.
Q. Okay?
A. Were they there? I don't remember. I do specifically recall meeting with them at great length at Amerifirst, but I don't remember at Carteret.
Q. We'll, get to some documents later on that might refresh your memory on FDIC.
I want to go back to the initial review that you performed over the commercial loan portfolio when you first started at Carteret. Who asked you to perform this review''
A. I'm not sure I was asked to perform a review. I

was hired to run commercial real estate lending. And it was very clear that I was going to get no direction from Bianco, and I didn't need any. I don't think anybody told me to do it, I just did it.
Q. He just said --
A. It's my bag of assets, you got to figure out what it's worth.
Q. Give me a number, kind of?
A. What's the hole. That was the question for all the thrifts; how big is the problem.
Q. Who did you ask to assist you in your specific review of the commercial loan portfolio?
A. I interrogated all loan officers that were there, quickly decided most of them were worthless and fired them. Mitchko was there, and a few others I kept. And over time I started backfilling with the Amerifirst employees. A lot of the early work was done just Peter Mitchko and me. Price Waterhouse were there. We discussed information with the OTS, visited the properties. Mostly like kicking tires. You have to look at it to understand what the problem is.
Q. Was Mr. Mitchko part of management before you became employed at Carteret?
A. He was hired just a few weeks before I was.
Q. Do you recall who had hired Mr. Mitchko?
A. I really don't.



Q. In your opinion, was Mr. Mitchko, his qualifications, sufficient to do the work that you were doing in the commercial loan portfolio?
A. For a bank examiner, he's a very experienced fellow, good guy, extensive banking background.
Q. What was the scope of your review?
A. To look at all the properties trying to figure out what they were worth, if there was a problem with them.
Q. Did you go about and look at all of the commercial loans irrespective of their delinquency status?
A. Yes.
Q. How did you go about selecting properties for review?
A. If it's important, we made a list from the biggest to smallest, tried to group them geographically and got on planes and started looking at properties. If there were two small ones and one big one in an area, we'd cover that. I forget what percentage of the portfolio we looked at before we came up with a number, but it was pretty big.
Q. Pretty extensive in terms of numbers?
A. Yes.
Q. Do you recall if there were subsidiaries of Carteret involved in your review?
A. There was a development subsidiary of Carteret, as there was at Amerifirst. I don't recall it was as large as



Amerifirst. I know they had a couple of projects, as I recall.
Q. Were those projects included in your review?
A. Oh, yes.
Q. Were there equity type of investments that were included in your review?
A. Not that I recall. Either a straight loan or a project owned by the development sub.
Q. And all real estate owned properties were included in the review?
A. Yes.
Q. What information did you initially gather when trying to decide which properties to go visit, when and that type of thing?
A. Just trial balance of the loan.
Q. You just got a computer printout on the trial balance?
A. I think Mitchko summarized if for me, grouped it by borrower, tried to get it into descending dollar order, trying to identify geographical areas that we could knock off a bunch of them at one time.
Q. Did you use any information that prior management had evaluated with respect to reserves or classifications?
A. Absolutely not.
Q. Just started fresh, clean slate?



A. Yes.
Q. Why didn't you use anything that the prior management had come up with in terms of reserves or classifications?
A. I would never do such a thing. The guys who made the loans, they don't do any work. I would have never listened to them. Never read a loan file, nothing. Started totally fresh.
Q. Did you consider the information that prior management had prepared as reliable?
MR. HUME: Objection. He never looked at it.
A. Never looked at it.
Q. Do you recall speaking -- well, you mentioned speaking with loan officers regarding the different properties?
A. Yes.
Q. Would you have spoken with borrowers individually?
A. Not initially. When you visit properties, you might see them, but there wouldn't have been time to call them in and interrogate them. And generally they're the last sort of information you wanted to get.
Q. Little bias?
A. Essentially when they're not paying, why would you need to talk to the guy? What is he going to tell you, you're going to get paid. Eventually I probably met with

Page 53

just about all the borrowers. I can't say that any of the meetings were pleasant. That was part of the refining process; you meet with the borrower and see what they're going to do, surrender or fight. But for the first pass, no. Very few.
Q. Typically just the loan officers?
A. Even those, mostly it was just to meet them and fire them.
Q. Do you recall in terms of percentage how many of the loan officers you let go?
A. No. I just remember after it was over the floor was empty. Just a few of us on the floor.
Q. Do you recall any of the loan officers or a member of prior management making these site visits or site inspection on the properties?
A. I don't recall that. I didn't go with any of them.
Q. Do you recall taking any of the loan officers with you when you did site inspections?
A. I don't think there were hardly any to take. I only kept a few guys.
Q. The rest of them weren't there any longer?
A. No.
Q. Do you recall if at the time that you arrived there was an independent internal loan review area?

Page 54

A. If there was, didn't do much. I don't recall it at all.
Q. Do you recall if there was a credit review department that would evaluate the underlying credit before the loan was made?
A. I wouldn't know what that is. I don't know.
Q. Did you do any reorganization on the credit review side of Carteret's commercial loan area?
A. I don't know what that is. I had a real estate company. I came in and organized the real estate. The loans were made.
Q. Typically when you would, I suppose, work in a commercial loan area, would you have a separate department from the loan officer who would actually extend the credit, you would have a separate department?
A. We weren't making loans. We were foreclosing loans or hoping desperately to get paid. We didn't make any loans. There was no credit to give, it was over. We wanted the money back.
Q. Why wasn't Carteret making loans in terms of the commercial loan area?
MR. HUME: Objection. Speculation as to a decision made in 1989.
A. They weren't. There was no reason to. My job was to get the money back, as much as possible.

Page 55

Q. Why didn't you recommend that Carteret start lending in the commercial loan area?
MR. HUME: Objection. Asked and answered. In terms of what his job was when he was hired, it had nothing --
A. I'd rather die than make a loan. I'm not a lender. I don't like people. I would never give anybody a loan. I wouldn't loan my mother money. I've seen too much.
Q. That's some pretty tough standards.
A. All borrowers are essentially swine. They needed to be treated as such. I couldn't lend money. I'm psychologically incapable of doing it.
Q. You typically come into institutions --
A. I'm a workout guy.
Q. To do workouts?
A. Yes.
Q. Do you recall the amount of time you would have spent reviewing individual properties?
A. Never stopped. Looked at them continuously as long as I was there. Traveled constantly.
Q. So it was a full-time task for you, this review?
A. More than full-time. Worked around the clock. That first month I don't think I had a day off.
Q. That includes weekends?
A. We worked 30, 40 straight days trying to come up

Page 56

with a number. Weekends, nights. Never stopped.
Q. Do you recall whether or not the corporate lending was included in your review? Do you understand what I mean?
A. Yes. There was a small amount of commercial loans. I don't remember the dollar amount, but that fell under my purview. Most of them were kind of real state related. They called them corporate loans, but they were really real estate backed, so same drill.
Q. They then were included in your analysis?
A. Yes. Oh, one of them is right here. That was -- I believe that was in the corporate area. Forstmann Little.
Q. Forstmann Little credit on Exhibit 3?
A. Yes. I think that might have been performing, that's why I don't remember it.
Q. Perhaps a restructuring situation?
A. The fact I don't remember much about it tells me it was probably okay. There weren't a lot of them okay, but this must have been, because I don't really have much of a memory about it.
Q. Do you recall your findings with regard to reserves?
MR. HUME: Objection. Asked and answered.
A. 150 million dollars.
Q. The 150 million dollars was the reserve that needed to be taken?

A. In my opinion, yes.
Q. Do you recall this amount being the minimum that you thought needed to be taken?
MR. HUME: Objection. Asked and answered.
A. I thought it was a prudent amount. Neither to little nor too much.
Q. Did anyone disagree with your evaluation that 150 million was the prudent reserve?
MR. HUME: Asked and answered. He already said no one attempted to influence him.
Q. Do you recall if Price Waterhouse was concerned about if Carteret did not take a significant reserve amount, that their sign off on the financial statements would be in question?
MR. HUME: Objection. Asked and answered.
A. I don't remember anything specific. I can put myself in their position and tell you what I would have thought as a public accountant, but I don't remember it coming up. They were new like me. They could see what we were going to do. So there was no threat, if you don't do this -- it was, let's figure it out and see what we're going to do. It was kind of a team effort.
Q. Was there any pressure on Price Waterhouse to your recollection about we're going to take this amount of reserve, will you sign off on the financial statements if we



do that?
A. None. Because we reached a consensus essentially.
Q. Everyone was in agreement?
A. Yeah. Well, everyone that looked at the assets. And I think -- I don't want to speak for the OTS, but I don't know, I don't think they disagreed with us either.
Q. Do you recall the Carteret management being concerned that if the 150 million dollar reserve was not recognized, that the financial statements would be inaccurately disclosed?
MR. HUME: Objection. Asked and answered.
A. I don't remember any discussion about it at all. My main thing was to figure out how big was the problem, and they were going to deal with it. That's all there was to it.
Q. Do you recall having performed any type of review to determine when the reserves should have been taken, if at all, in a prior financial period?
A. I never looked at anything on the past. I wanted a snapshot of what the problem was. Never even thought about it.
Q. Do you recall who may have done such a review?
A. No.
MS. TORNATORE: Let's mark Deposition Exhibit 5.
(Whereupon, the document referred to was marked



for identification as Deposition Exhibit Number 5.)
Q. I'm going to show you what we've marked as Deposition Exhibit 5. There is an ADDIIS number, WOQ666 1770. Take a few minutes to read through that document. It's not too long.
A. Gosh, I've forgotten Walter.
Q. Was that Walter Smith?
A. Yes.
Q. He was in the appraisal area?
A. Well, no. He was with me at Amerifirst and he initially took the job. But after seeing the demand, he decided not to take it. I had forgotten about him. He actually ended up going to work for the RTC, if I recall.
Here's that Braun name again. What was his deal? Braun.
Q. Okay. Do you recognize Exhibit 5?
A. I do now. I just read it.
Q. What is Exhibit 5?
A. It's a memo I wrote in August 1991 to Dick Bianco. Appears to have been written about a month after I started.
Q. What's the general subject matter of the memo?
A. The commercial real estate portfolio and the problems therein.
Q. On Page 1, the second paragraph there toward the



bottom, it indicates that you reviewed almost 94 percent of the commercial loan portfolio.
A. Uh-huh, yes.
Q. Does that refresh your recollection as to the scope of your review?
A. Vaguely. It's been eight years.
Q. Little over eight years?
A. Yeah. Getting old.
Q. With respect to on Page 2 there, I want to focus your attention on the fourth paragraph in there. You indicated in the first sentence that current reserves were materially understated?
A. Yes.
Q. Is that your opinion today, that the reserves that the prior management had made were materially understated?
A. I think that's very clear from the document.
Q. On the third paragraph on that same page, Page 2, you seem to talk a little bit there about your impressions of the loan officers that were at Carteret prior to your employment?
MR. HUME: Which paragraph is this?
MS. TORNATORE: Third.
MR. HUME: Third of the second page?
MS. TORNATORE: Yes, that's where it starts out.
Q. When you indicated that many of the loan officers

addition to an appraisal, is an environmental study. If you make a loan, it should be done before you make the loan. If there are problems you should do one to determine if there are environmental problems, which can be very expensive to fix. And that document speaks for itself. There were not a sensitivity to this issue. I think it was a big issue at the time, and I'm sure it still is.
Q. Is that because the bank in certain situations in which they took title to the property would then be liable for --
A. Yeah, there is always the risk that you can be liable. There's also the financial risk associated for the clean up, if you're going to be the one to clean up, it has to be calculated into the value of the property. There were properties that had environmental problems.
Q. There's also a statement in that third paragraph with respect to the regulatory and accounting issues and, again, loan officers not being sensitive to those issues. Does that comport with your recollection today?
A. Well, they had done no NRVs, no fair values, not sensitive to environmental issues. And those are the things that are required.
Q. Do you recall any findings that you made with respect to Carteret's appraisals or appraisals that had been provided to Carteret on properties?



A. I don't think I ever looked at any of the old appraisals. We ordered new ones.
Q. Why was that?
A. I just didn't trust the appraisals that other people did. Particularly if the borrower was involved.
Q. You would have preferred to have reviewed the appraisal in-house?
A. I would have preferred to have my guy contract for the appraisal, review the appraisal and talk to me about it rather than have something in the file that somebody else had provided by whatever means, I had no idea.
Q. Do you recall there being any disagreements between Carteret and the regulators regarding the appraisal methodology that Carteret was using?
A. I don't recall any.
Q. Any problems with respect to the NRV or fair value methodology?
A. No.
Q. On Page 3, and I think it's a continuation from the bottom there of Page 2, you indicate that the portfolio problem is not just a year or so of carry. What did you mean by that?
A. I think I'm relating the 17 percent to a year of carry on the portfolio. Loans generally bore interest at 10 to 12 percent. I think that's what I relate it to. The



logic there escapes me at this point eight years later. I'm sure it made sense at the time.
Q. And that 17 percent refers back to the reserves?
A. If it's a billion dollars and you have 17 percent, that's like a year carry, maybe a little more.
Q. The problem was just more extensive?
A. Yes.
Q. Do you recall if there were questions about the timing of Carteret carrying the REO properties?
A. I don't understand.
Q. Was there a question about how long Carteret would have to work out some of the REO properties?
A. Some you'd have to own a long time, others might sell quickly. I don't remember any specific issues associated with them. Once you got it, you had to fix it up and sell it. Some were easier than others.
Q. When you performed your review, you've indicated that you were mindful of regulatory and accounting issues. And I take it perhaps you were referring specifically to net realizable and fair value rules. Do you recall any additional type of rules that you were particularly mindful of?
A. No. Anything I was referring would be related to valuation. How they got reported on the TFR is somebody else's problem. Once again, how big was the hole. That's



all. How do you come up with that number. There's a specific methodology you have to use, and we used it.
Q. In reviewing what the prior management had done with respect to reporting under these rules, in your opinion, had prior management been mindful of these rules?
MR. HUME: Objection. Asked and answered. The document speaks for itself.
A. I have to stand on what I said here.
Q. And the document indicates that prior management had not been mindful?
A. It says most were not sensitive to regulatory and accounting issues regarding carrying values for troubled assets. It was written at the time. It's probably as good as an assessment as I can give you today.
Q. In the course of your review, what do you recall about the corporate lending side of Carteret?
A. Not very much, actually.
Q. You mentioned that it was perhaps a less significant part of the commercial loan portfolio?
A. I don't recall it was a real big piece of it. As I said earlier, most had a real estate hook. The collateral generally turned out to be real estate.
Q. Do you generally recall the performance in the corporate loan area?
A. Not specifically. I really don't.

THE WITNESS: Can we take another break?
MS. TORNATORE: Yes. Let's go off the record.
(DISCUSSION HELD OFF THE RECORD.)
MS. TORNATORE: Back on the record.
Q. Mr. Moor, I think we were just getting into the commercial or the corporate lending aspect of Carteret. Do you recall having reviewed the policies with respect to the corporate lending area?
A. No.
Q. Do you recall Carteret extending corporate loans outside of its local market area?
A. Well, that was the case generally with both pieces of the portfolio. They had loans all over the country.
Q. The commercial real estate side of the portfolio?
A. Yes, and corporate.
Q. How would Carteret monitor loans that were not in its local markets?
A. I'm not sure before I got there what they were doing. I'm really not.
Q. In your opinion, were they monitoring the credits that were outside of the local markets adequately?
A. Well, let me explain. Generally Carteret would not be the lead on a large corporate deal, they would be a participant. I think they would rely mostly on the shared national credit review more than anything, because they



didn't have the horsepower of these giant credits. Some of deals Mani Hani were involved, Chemical. They weren't the lead. So I don't know how to answer the question. They were like the end, the tail. And they had to be happy with what they got either from the lead bank and/or the shared national credit review, if that answers the question.
Q. What evaluation would they make with respect to the shared national credit?
A. I don't know. I'm sure they just bought into whatever came out. I didn't really have the right to even disagree. They just put it into a file.
Q. All they did was buy the participation?
A. Yeah. It my knowledge Carteret was not the lead on any of these. They were generally a small slice of the huger credit.
Q. With respect to commercial real estate lending outside of its local markets, do you recall how Carteret was able to monitor those particular loans?
MR. HUME: You're asking before his time at the bank, at the thrift?
MS. TORNATORE: Based on his review, yes.
A. I don't know what they did. And I didn't spend a lot of time reviewing what they did in the past because, once again, my mandate, what was the problem, figure it out. So I didn't really spend a lot of time playing the



movie backward. It's what do we got here, are we going to get the money back, and, if not, how much are we going to lose.
Q. Let me step back a minute. I'm going to ask you some more specific questions about particular credits now. Do you recall a loan that was known as the Maitland Properties Investors, Limited loan?
A. I don't remember the loan specifically. Maitland is a suburb of Orlando. I'm guessing. It might have an office building. I don't really remember it specifically. I do remember going to Maitland many times because Amerifirst had loans there as well. I don't remember anything specific about the loan.
MS. TORNATORE: Let's go ahead and mark Exhibit 6.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 6.)
Q. I'm going to show you what we've marked as Deposition Exhibit 6. There is an ADDIIS number W0Q654 2108. Do you want to take a moment or two and just familiarize yourself with that document.
A. Now I see why I don't remember it.
Q. Why is that?
A. Obviously this loan was compromised early on in the game. And I had other loans at Maitland with



Amerifirst. The comment about the market being overbuilt is definitely true. And this is a shared national credit. Somebody else had cooked up a deal and we bought into it. Michigan National was the lead on this.
Q. Now do you recognize this document?
A. Not really. I see what it is. I don't remember it specifically.
Q. What is this document?
A. It's a write-up to accept a compromise of a loan that was constructed by the lead lender, Michigan National, on an office building in Maitland, Florida. I'm familiar with the area.
Q. Do you recall William Sawchyn?
A. I hate to admit it, I don't remember him either. Sawchyn I really don't remember. Bill Sawchyn. I vaguely remember the name. I can't place the face.
Q. Would you concur with Mr. Sawchyn's opinion that Orlando was a tremendously overbuilt office space area?
A. Definitely. We owned a giant hospital in the middle of downtown; one of the landmark buildings we foreclosed on.
Q. That was in the Orlando area?
A. Yeah. In Amerifirst we had a lot of properties that were troubled.
Q. And Carteret obviously had some properties there

Page 73

as well?
A. I don't think as many as Amerifirst, but there were some.
Q. I want to ask you, on the second page there's an indication of -- left-hand side toward the bottom there -- the Carteret Savings Bank Credit Committee.
A. Yes.
Q. What do you recall about the credit committee?
A. It was a committee that voted on this. It was a committee that voted on these kinds of proposals.
Q. Restructuring loans?
A. Yes. Compromises.
Q. Who were the members of the committee?
A. Would have been me, Dick Bianco, I think Donald Kramer. I'm not sure if Ron Burns was or not. I don't really remember. And it might have been the residential guy, too. What was his name? McCabe. I think, but I'm not sure. You have access. I don't remember it exactly.
Q. Do you recall there being authority limits on what the committee could approve in terms of restructuring a problem loan?
A. Well, the credit committee was the chairman of the board and board members --
Q. Were there certain restructurings that had to go to the board level?

Page 74

A. That kind of was the board level. I know at least two of the board committee members were on the committee and I think we only had four members on the board, or five.
Q. Who else had to make the decision?
A. That was pretty much it. They had a lot of trouble attracting board members, as you can imagine.
Q. Do you recall the credit committee's approval going to the board for the ultimate resolution by the board?
A. It may have. I don't know what the threshold was. If it needed to be approved at the board, I guess somebody would have said it to us, but I don't recall.
MS. TORNATORE: Let's mark this as Deposition Exhibit 7.
(Whereupon, the document referred to was marked for identification as Defendant's Exhibit Number 7.)
Q. Mr. Moor, I'll show you what we've got marked as Deposition Number 7 with an ADDUS number of PAM010 1225.
A. I see it.
Q. Do you recognize Exhibit 7?
A. No.
Q. Do you recall who Mr. Mudd was or, actually, we've already discussed?
A. John Mudd worked for me. He was the legal counsel for the real estate group. And this was something he would have done.

Page 75

Q. What is the subject matter of Exhibit 7?
A. It seems to be credit committee approvals, board of directors approvals or notice, OTS approvals or notice. In other words, how you proceed with modifications, workouts. He would have done all the legal minutiae for getting anything approved.
Q. Why was it important to have these types of authority levels?
A. Just documents the procedure, I imagine. And since Mudd would have to actually place up the document, we want to make sure all the approvals were in the right place, whatever he did had been properly approved. Very meticulous guy.
Q. It was important that the larger restructuring go to some type of committee as opposed to an individual loan officer making decisions?
A. Obviously it would have to go to the committee. Loan officers didn't have authority to accept or deny, only propose. They would write it up and the loan committee would decide. If it was big enough, the board would get it. The distinction between the board and credit committee, it was the same pea. If it was a board committee or the credit committee, I wouldn't have noticed the difference, frankly. I think a lot of the time it was done concurrently.

Page 76

Q. Because some of the individuals were involved in both?
A. I'm sure the credit committee had a quorum with the board. You had to.
Q. Just based on the number of board members?
A. Yes.
Q. I want to return back to Exhibit 6 very briefly on Page 2.
A. It's the Maitland property memo from Mr. Sawchyn.
Q. On that second page there under collateral values, there's some comments about the appraisal that had been performed on the property.
A. I see it.
Q. Were those comments typical of the types of comments that you would make with respect to the appraisals that had been requested by prior management?
A. Well, this wasn't by prior management. This was done by the lead bank.
Q. And that was?
A. MNB is Michigan National Bank. Generally as a participant you don't have authority to do anything. You can get their appraisal and agree or disagree. Frankly, we were in a lot of deals with Michigan National Bank, and I didn't like those guys at all.
Q. Part of the reason being that their appraisal

Page 77

methodology was --
A. We were in a lot of bad deals with them where they were the lead. Didn't have a good experience with Michigan National as the lead in any of our deals. Although at the time this looks like a pretty good deal to me, 75 percent of loan on something this bad.
Q. On the dollar?
A. Yeah.
Q. So Carteret was still going to take a loss, but it was not as significant as perhaps --
A. Carteret already had taken a loss. At this time we already booked the reserve.
Q. With respect to the NRV and fair value methodologies, do you recall there ever being a change in the regulatory requirements with respect to use of those methods?
A. I don't recall anything like that.
Q. Carteret was, during your employment, just simply trying to comply with what was the existing regulation?
A. Yes. And we used the same methodology there as we would use at Amerifirst.
Q. What do you recall about Crystal Springs or the Swedeland loan?
A. It was pretty much a joke.
Q. What was?

Page 78

A. Borrower was an idiot from the get-go. Or the loan from the get-go, it was a joke. Probably one of the worst loans ever made. Over-financed beyond any belief or description.
Q. What type of project was it?
A. Golf course community located in north central New Jersey, far off the beaten path. Borrower was a congenital idiot. Just a remarkable chain of events, obviously agreed to by the resident golfers. I don't think golfers are bad people, I like golf too. But these people seem to have an affinity to golf course loans, and they never made it.
Q. That was a participation by Carteret?
A. No, they were the lead on this baby.
Q. They were the lead on this?
A. Yes.
Q. How extensive was their involvement in the Swedeland loan?
A. Gargantuan.
Q. Was there a significant expected loss on the Swedeland loan?
A. Nearly infinite.
MS. TORNATORE: We'll mark this as Exhibit 8.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 8.)
Q. I'm showing you what we've marked as Exhibit 8,

Page 79

with the ADDIIS number WOP292 1187. If you just want to take a moment and familiarize yourself with Exhibit 8.
A. I want to see who signed it, if it's anybody I know. I do remember this vaguely. There's no signature page.
MR. HUME: It was just signed by someone from the company on Page 17.
A. Yeah.
Q. Do you recognize Exhibit 8?
A. I know what it is. I vaguely remember it now.
Q. And how do you remember Exhibit 8?
A. I think at some point there was a decision made to have somebody independently evaluate this thing. Because it was so bad it looked like maybe there was some dirt. I guess we hired Kenneth Leventhal, I just forgot.
Q. Is Exhibit 8 the Kenneth Leventhal report to Carteret?
A. I assume so. I don't remember the report specifically, but it looks like it must be.
Q. On Page 6 of Exhibit 8 under the loan application and the underwriting there, they seem to be very critical about the poor loan documentation and the underwriting due diligence that had been performed. Were you in general agreement with their comments on the lack of documentation?
A. I can't tell you, I never looked at any. This

Page 80

thing was a giant pit. I'm trying to remember. Part of the reason for this may have been suspected fraud at Swedeland, and I think the OTS was nervous about this one. The deal was really a joke. It was horrible.
Q. Do you recall what aspect of the credit led you to believe that there might be suspected fraud?
A. It had something to do with I think they were dummying sales. I don't think there were any sales. I think they may have committed fraud at the residential level. There was some nastiness with this, and I've forgotten exactly what it is. The borrower was trying to paint a picture that didn't exist. This thing was a disaster from many different angles. And some of the sales they had claimed I believe turned out not to be real. They were done to insiders.
Q. Do you recall any concerns about the draws that were made on the credit?
MR. HUME: Object to the question. Calls for speculation.
A. All of them.
Q. On the basis that no sales had been made, there should not have been a draw?
A. The borrower should have been thrown out of the bank on his first visit. It was a joke.
Q. Because of the feasibility of the project?

Q. Would you generally do credit committee meetings telephonically?
A. No, face to face.
Q. So you all would travel to the offices?
A. We'd go to Morristown. Our office was in Parsipanny. We had to go over to Morristown to the headquarters. For instance, Steve would have flown up for this.
Q. What was Mr. Ferreira indicating in his memo to the credit committee here?
MR. HUME: Objection. The document speaks for itself. You're asking the witness to speculate.
A. I can tell you what we did with this specific property. We owned it, we fixed it up and leased it and sold it. It was in a sad condition.
Q. Was that typical of the properties when you went out and did site inspections, that there was poor condition?
A. The borrower had taken all the money, put nothing back, lost his tenants and foreclosed on it.
Q. Walked away from the property?
A. I'm not familiar of how it was foreclosed, but obviously we got him out. And the reason generally is because he took all the money, didn't put anything back.
Q. Was it typical that Carteret would then have to incur the repair and maintenance expense to bring the



property up to a certain level?
A. Yes, if it was worthwhile from the collateral perspective. And believe me, this was worthwhile. This thing would have been a gold mine if this guy hadn't been greedy. I'm sure it still is for someone.
Q. If it was upgraded?
A. Yes. Very large property. This was the kind of deal you wish you could buy. It would be an annuity for life.
Q. Were environmental problems associated with the Bel-Air Apartments?
A. Yes.
Q. What were those?
A. There was asbestos in the popcorn ceilings, as I recall.
Q. Was Carteret going to have to incur additional expense to have that removed?
A. We removed it.
Q. Do you recall it as being a problem in other properties?
A. I do, but I forget which ones were Amerifirst and which were Carteret. We had to abate asbestos, and Ferreira was our guy. Anything that had asbestos was his deal. I forget which ones were Amerifirst and which ones were Carteret. We did both.



Q. So Carteret had asbestos abatements?
A. This one for sure. It's hard to remember if the others were Carteret or Amerifirst. As I said, I get the two portfolios confused.
Q. Do you recall at this time whether or not Carteret was in a position to incur these additional maintenance and asbestos expenses?
A. Certainly it was not in a position to do so. It would have lost its entire investment, and this thing would have shut it down and had bulldozers there. I don't remember what happened, because it was probably sold for a pretty penny. Once this was done, it would have filled up instantly.
Q. Location-wise it was very attractive?
A. This was a tragedy. And that goes back to what I said about the loan officers. Had somebody been visiting this thing regularly, they would have seen what was happening. When a guy owns a commercial piece of property, if he's not putting money back, once it starts showing, the tenants move out. If this was a deferred maintenance, there's a problem. That means the guy's taking the money, and at some point he's got to stop paying. That's what happened here. I know damn well as soon as we got this thing completed it went back up. The apartments were gigantic. I'm sure the OTS bought into this one. I'm sure



you can find what this thing was sold for eventually. I'm sure it was sold.
Q. It was ultimately sold later on?
A. I'm sure it was. I would have bought it had I had been allowed to.
Q. I was going to say, a little conflict there?
A. Yeah.
Q. Do you recall a CSB Northern real estate?
A. No.
Q. How about La Mirada Shopping Center?
A. I don't remember that. Do you have the borrower's name?
Q. I don't have the borrower's name in front of me.
A. I don't remember that specifically. There were a lot of strip centers.
Q. Strip mall type properties?
A. Yes. I don't recall. Do you know where it is?
Q. Let's see if we can mark Exhibit 10. I think that will tell us.
(Whereupon, the document referred to was marked for identification as Defendant's Exhibit Number 10.)
Q. We've got marked Exhibit 10 there. If you want to just take a moment to review Exhibit 10?
A. CSB, that stands for Carteret Savings Bank.
Q. Well, I presume. I didn't want to presume

Page 89

anything.
A. I guess this is the company that took title to the REO.
Q. Perhaps that's it.
A. Yeah, that's what it is. We ended up having separate subsidiaries, I believe, for most of the REO. This was REO. When you see CSB Northern -- La Mirada. I wonder if that was in Orlando, too. I see it.
Q. Do you recognize Exhibit 10?
A. I don't remember it.
Q. Is that your signature at the bottom?
A. Yes.
Q. You've mentioned Mr. Rosen before.
A. Yes.
Q. Was Mr. Rosen one of the asset managers who worked for you?
A. Yes, it was like Steve. He was with me at Amerifirst.
Q. And you generally trusted his opinion and his judgement?
A. Yes.
Q. Does Exhibit 10 refresh your recollection as to La Mirada?
A. I'm guessing here. I think this shopping center was in the southern part of Orlando. I think. But I'm not

Page 90

a hundred percent sure. It says CSB Northern, so maybe it wasn't. We had them all over.
Q. And it appears as though in the third full paragraph there -- actually in the first full paragraph also, Mr. Rosen was requesting additional funds be contributed to the subsidiary?
MR. HUME: No.
A. No. The funds would be spent improving it. If it needed repair, for parking lot patch. Generally Craig handled the smaller deals. He didn't mind traveling, he was single at the time. I don't think this was a big -- this was probably a small strip center somewhere that needed some work. That was not unusual. You have to protect your collateral.
Q. So there was expenses and maintenance type of things?
A. You know how it is, if you don't spend money on your house, you can't sell it. It's very simple.
Q. Do you recall at the time if any of these properties were able to generate sufficient cash flow to pay for these expenses?
A. Some would, some wouldn't.
Q. And the ones that would not be able to fund these maintenance and expenses, where would that money come from?
A. Obviously from the thrift.

Page 91

Q. What do you recall about the Moore Estates loan?
A. Moore Estates, that was outside of Morristown. Another really ugly deal. That might have been one started by the development subsidiary, I'm not really sure. It may have been. It was near the bank. Generally the development subsidiary was in an immediate area. There was another condo project on the other side of town, forget the name of it. So my best guess is that's a development company deal.
Q. Do you recall what type of loan it was?
A. I don't think it was a loan. I think it was one that was actually property was purchased and developed by the development subsidiary. I think. I'm not --
Q. So this was an equity development investment by the thrift in its own development subsidiary?
A. It wasn't an investment. I think the development subsidiary actually acquired certain properties and tried to develop them.
Q. Do you recall the performance on the Moore Estates?
A. I know it was a real problem. It was really a stupid deal.
Q. Where was it?
A. It was kind of in the country. In wide open country and attached housing. It was stupid. It was very expensive attached housing. It was four, five hundred

Page 92

thousand duplexes in a place where land was not rare. You'd look at it and say why would anybody want to do this. Why would you want to live in the country and live elbow to elbow with people? The thing was dead in the water.
Q. What were the sales like on the Moore Estates?
A. As I recall, it was partially completed see-through mess on the outside of town.
Q. So they hadn't at that point started building?
A. It was an abandoned construction site crumbling. It was very ugly.
Q. Were there questions regarding the administration of the Moore Estates loan?
A. I can't remember exactly. It was just -- it was a very ugly deal. When you drove buy it, it was just an eyesore. I don't know if they had any sales. There might have been one, but essentially it was an abandoned construction site. A partially completed mess with the topsoil washing away.
Q. Was Carteret in a position to go ahead and inject new funds to complete the construction?
A. Not on that one. It would have been very expensive, very risky. That was not something we would have spent money on. I think we sold on that. Some developer fell in love and bought it. That's not the kind of deal that Carteret would have put money into. The project, to

me, wasn't viable.
Q. Do you remember who the loan officer was who actually extended the credit on it?
A. I'm telling you I don't think it was a loan. I think Carteret bought the land and tried to develop it. I could be wrong, but that's my recollection.
Q. Do you recall who at Carteret was responsible for the development?
MR. HUME: Object, as to it was before Mr. Moor came to Carteret.
A. No recollection at all. I'm pretty sure Stanley Mohr, a guy that worked for me, sold this to somebody. I don't remember a lot.
Q. Do you recall the name John Powers?
A. No, I do not.
MS. TORNATORE: Let's go ahead and mark Exhibit 11.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 11.)
THE WITNESS: Can we take a break?
MS. TORNATORE: Yes.
(SHORT RECESS TAKEN.)
MS. TORNATORE: Back on the record.
Q. Mr. Moor, you've had placed in front of you there Exhibit 11. If you want to take a few minutes just to read



that?
A. I get the drift.
Q. Does Exhibit 11 refresh your recollection as to the Moore Estates loan?
A. It looks like they got title to this around 1990 maybe.
Q. Does Exhibit 11 refresh your recollection as to who John Powers might have been?
A. No. Obviously he was a bank employee. I remember nothing about him. He wasn't there when I got there, I don't think. I don't remember. Nice looking deal.
Q. Do you recall from the first paragraph on Page1 there, I think it indicates that there was a sale pending with respect to the Moore Estates property?
A. Yes.
Q. And that Carteret's loss on this would be approximately 62 percent of book value?
A. Yes.
Q. What do you recall about loans or loan portfolios that Carteret had purchased from Western Federal?
A. Ugly.
Q. Why is that?
A. Terrible loans in California, marginal neighborhoods, small to medium size rental apartments and crack houses and stuff. Pretty bad.



Q. Was there poor payment history on the loans?
A. I got involved with it rather late. It wasn't in my portfolio. It was treated as an investment, and as I recall, I think there was a movement to try to put the whole thing back to Western Federal. I think I visited it once prior to intervention, just to get a feel for what it was. It was hard to tell from the documentation. It had been a brokered deal sold through Carteret by Western Federal. There was sort of a backstop or something with the deal. I think the feel was they were going to sue us and make us take it back. There was some sting on that one.
Q. When you mentioned there was a backstop about the deal, what do you mean by that?
A. It was a layer of bad loans that they would just take automatically. I forget what the number was. I don't remember much of the specifics, but I do know it was a feeling that Western Federal had to either take this back or get sued. And I think since Western Federal essentially got taken over in the same day, I think it was a mute point.
Q. What do you recall about the classification as an investment?
A. Really nothing. Stumbled across it. They asked me to take a look at it and I did.
Q. Do you recall if there was a time when Carteret reclassified it in the commercial loan side of the balance



sheet?
A. I really don't remember. I'm not sure.
Q. Do you recall when it had been booked as an investment?
A. Prior to me getting there. What year, I don't know.
Q. It was purchased prior to your employment at Carteret?
A. Yes.
Q. And it was, to your knowledge, an investment on Carteret's --
A. It was accounted for an as investment. I'm not saying that was the right treatment. That was what it was accounted as. I didn't like it.
Q. In your opinion, was it actually just a set of commercial loans?
A. Packaged to look as an investment. Sold I think through, I don't know, it was Drexell or DLJ, one of those bag of jerks.
Q. Do you recall if Carteret had any recourse against the broker?
MR. HUME: Objection. Asked and answered.
A. I don't recall. I think hopefully they would have. Those are legal issues. I just looked at it to see if it was a problem with it. There was a feel we had to do

Page 97

something with the broker or Western. At intervention I don't know what the status of that was. I don't recall.

MS. TORNATORE: Let's mark Exhibit 12.

(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 12.)

Q. Mr. Moor, I'm going to show you what we've marked as Deposition Exhibit 12. Do you recognize Exhibit 12?

A. No.

Q. Can you describe Exhibit 12 for the record?

A. Looks like the deposition that I gave to the attorneys in Newark back in '95.

Q. And this statement was made to the RTC, the Resolution Trust Corporation?

A. Excuse me?

Q. This statement was made to the Resolution Trust Corporation?

A. No, these were attorneys in Newark. I think they represented the RTC or they worked for the RTC. It's hard to remember.

Q. On the second page of the document there it has an ADDIIS number, CAM357 2054. It kind of gives you an indication there of who the attorneys were present in the deposition. I just wanted to point that out.

A. Now you're asking me to read something without my reading glasses. This is small print.

Page 98

Q. I just wanted to point that out to see if you recall who the attorneys were.

A. I can't read the print on the left. I can read it on the right.

Q. Well, I'm going to ask you about the larger print text. If you could turn to Page 114. And that's the Page 114 that is marked as deposition Page 114.

MR. HUME: This is the whole mini transcript?

MS. TORNATORE: Yes. The deposition page as opposed to document page.

MR. HUME: There are four deposition pages per page.

Q. It's 114.

MR. HUME: She's going to refer --

Q. At line 11.

A. Okay?

Q. I just wanted to see if any of this text there refreshed your recollection about recourse on the Western Federal loans?

MR. HUME: Are you asking him to read line 11?

Q. If you would mind reading that line 11 going through to Page 115?

A. Down?

Q. That's right.

A. Okay.

Page 99

Q. Does that fresh your recollection?

A. Yeah, it does. I'd forgotten the particulars. I guess I was smarter in 1995 than 1999.

Q. Or perhaps it was just nearer in time?

A. It was closer to it, obviously.

Q. That might be it. Does it appear as though there was some recourse that Carteret could take against the broker?

A. As I recall, there was talk about the broker. And I had forgotten there was two brokers. I guess there was two pieces of this, Goldman and DLJ and Western Federal. I think the opinion was it could be put back to all three.

Q. In reading on through to Page 116 there, does that refresh your recollection as to when or if Carteret reclassified it as a commercial loan?

A. I don't remember them reclassifying it. I really don't. I think it's pretty clear what I thought.

Q. So it wasn't until about a year after you started at Carteret that these loans came to your attention?

A. Yes. I was totally unaware of them.

Q. Do you recall any other members of management at Carteret performing a review of Western Federal's loans?

A. No, I really don't.

Q. Do you recall a gentleman by the name of Bill Brennan?

Page 100

A. Vaguely, yeah. A heavyset fellow.

Q. Do you recall whether Mr. Brennan was involved in reviewing the Western Federal loans?

A. I don't recall. Wasn't he the internal auditor or something? I forget exactly what his position was.

MS. TORNATORE: Let's go ahead and mark Exhibit 13.

(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 13.)

Q. Mr. Moor, I'm going to put in front of you there Exhibit 13. The ADDIIS number is RAM037 0078. If you want to take a moment just to familiarize yourself with Exhibit 13.

Do you recognize Exhibit 13?

A. No, I don't. I see what it is. It's a memo from the internal auditor. Obviously they're the ones that first brought up the issue.

Q. And the memo is dated May 29, 1992?

A. Yes.

Q. And you were cc'd on a copy?

A. I see that.

Q. Does Exhibit 13 refresh your recollection on who Mr. Brennan was?

A. He obviously worked for Fleming, or at least at that time he did.

Page 109

Q. So it was not a factor in your analysis?
A. Probably 700 million dollars worth of portfolios, the only guy that probably paid me anything was Burt Reynolds. That was the only money I collected on a personal guarantee. Because they can always hire attorneys. Reynolds was the only one ever, and that was on a shopping center deal for Amerifirst. But he's the only one ever. Could have been Carteret.
Q. In your analysis the guarantee situation is not an important factor?
A. It's important. It makes a guy feel good. When push comes to shove, they never pay. It never fails. It's surprisingly difficult to collect on a personal guarantee. When I first got into this, I thought it really meant something. It's my experience it really doesn't. Loan on collateral. A personal guarantee is never paid.
Q. Do you recall who your predecessors were in the commercial lending area?
A. I don't remember the names, but if you told me I'd remember.
Q. Do you recall a Charles McCabe?
A. Yes, I remember that name.
Q. Was Mr. Charles McCabe, was he in charge of the commercial loan area prior to your employment?
MR. HUME: If you recall.

Page 110

A. Yes, he was.
Q. Were there any other individuals who were similarly responsible for the commercial loan area?
A. I don't know. I remember McCabe's name. I met him on his way out the door. Shook hands with him, that was it.
Q. Having had reviewed the Carteret commercial loan portfolio, what was your opinion of Mr. Charles McCabe's performance?
MR. HUME: If you have one, based on never having worked with him.
A. Portfolio had problems. I would assume he had to be the one to find them. I don't know what he did or didn't do.
Q. Do you recall a Mr. Welle, W-E-L-L-E?
A. Welle.
Q. Welle?
A. Yeah. I fired him.
Q. What was Mr. Welle's role at Carteret?
A. He might have been REO, might have been a loan administrator, I don't remember which one. Clueless.
Q. Do you recall Mr. Welle's responsibility with respect to the FSLIC assistance?
A. I don't know what that is.
MS. TORNATORE: Let me go ahead and mark Exhibit

Page 111

14.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 14.)
Q. Mr. Moor, I'm going to show you what we've marked as Exhibit 14, the ADDIIS number WOQ646. And I ask if you recognize Exhibit 14?
A. No.
Q. If you could identify Exhibit 14 for the record?
A. Give me a chance to look at it. I'm not exactly sure what it is.
Q. Okay.
A. I see I was copied on it. Who wrote it? Oh, it's from McCarthy. Okay.
Q. Have you had an opportunity to review Exhibit 14?
A. Yes.
Q. And do you recall the substance of Exhibit 14?
A. Vaguely.
Q. What is the general subject matter of Exhibit 14?
A. I think prior management had given some people the promise of severance money. We fired some individuals, they wanted their money. I don't recall that we paid any of this.
Q. Page 3 of Exhibit 14, that first full paragraph there, is a discussion of Mr. Welle?
A. Uh-huh.

Page 112

Q. That particular paragraph mentions something about the 1986 assistance agreement with FSLIC.
A. I see that.
Q. And Mr. Welle's administration of those agreements. Do you recall what findings or what review you made of Mr. Welle's administration of the assistance agreement?
A. I don't know that.
MR. HUME: Objection to the form of the question.
A. January of '91 he was transferred to the commercial real estate portfolio. That's where I bumped into him. It had nothing to do with this other job.
Q. There's a statement, Mr. Moor has indicated there are certain potential problems with -- I'm assuming it's the manner, in which Mr. Welle administered the 1986 assistance agreements with FSLIC.
A. That is incorrect. My problem with Welle is the way he was running REO, which had nothing to do with FSLIC.
Q. You don't have the recollection of evaluating --
A. Absolutely not. He was in charge of REO and he was clueless. That's my only beef with him.
Q. Following your employment at Carteret, how would you characterize your relationship with the regulators from the Office of Thrift Supervision?

A. We got along great both at Amerifirst and Carteret.
Q. How about the regulators at FDIC?
A. I don't remember any specific names. I spoke to a lot of them during my Amerifirst days. They came into look at us at the Amerifirst intervention and to get ideas of what we were doing and the problems we had. I don't recall meeting anyone at the FDIC while I was at Carteret. Because sometimes they switch examiners and they cross-train. I'm not sure if I met any.
Q. Do you recall a gentleman by the name of Bill Day?
A. No.
Q. How about a Dan Dion (phonetic)?
A. No.
Q. Mike Zamorski?
A. No. My day-to-day contact would have been with Tom O'Rourke. There's a number of people that worked for him, and those names I don't remember and generally I wouldn't have contact with them. The contact with the examiners would be through Tom.
Q. You've indicated that the relationship was pretty good between the regulator, the OTS --
A. I certainly thought so, yes.
Q. Were there disagreements regarding the classification of the assets?



A. Not that I recall. We had a pretty open and frank dialog on anything we needed to have it about. Tom pretty much knew what we were doing and thinking at all times.
Q. Were there disagreements about the level of reserves that Carteret had made?
A. I can't imagine, no.
Q. Do you recall a time in 1991 when the regulators came in to discuss the examination findings?
A. Not really. But I had nearly daily contact with O'Rourke, so one particular meeting I'm not going to remember. He was there a lot.
MS. TORNATORE: Let's see if we can mark I think we're up to Exhibit 15 now.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 15.)
Q. Mr. Moor, I'm going to show you what we've marked there as Deposition Exhibit 15. The ADDIIS number, CAM152 1290. If you want to take a moment and familiarize yourself with that document?
A. I see what it is. Strange enough, I don't remember the meeting though.
Q. Do you recall from time to time the examiners coming in and conveying their findings?
A. I mean, they were there so much, it's hard to remember a time when they weren't around. I'm sure we had



this meeting. Funny, I really don't remember it.
Q. Could you identify for the record what is Exhibit 15?
A. Well, it looks like a presentation that Tom O'Rourke made to the board and members of management
Q. And were you present at that meeting?
A. I'm sure I must have been. Am I listed?
MR. HUME: Yes.
A. Yeah. I really don't remember it though. That's funny.
Q. On Page 29 of Exhibit 15 toward the middle of that page there, Mr. Bianco is speaking?
A. Okay.
Q. And he states, Point 4 addresses the internal loan review program, and it's the Peter Mitchko situation we talked about, stealing from Peter to pay Paul. Do you recall what the Peter Mitchko situation was?
A. Let me speculate a little here. It might have been that Peter was hired to be an internal auditor and then I deputized him because there was nobody else. That's what I think that means.
Q. Instead of him performing some type of independent loan review position, he basically could no longer perform that because he was working under you?
A. Right. I needed help and there weren't many



bodies left, and he was a very experienced guy. I don't remember specifically if he was hired as internal auditor. I get the drift he must have been. I had forgotten that.
Q. Do you recall at the time of Exhibit 15 that there were discussions about the infusion of outside capital?
A. Not specifically. There was always the plan there before I took the job of we would fix it, recapitalize and more forward.
Q. Do you recall the infusion of the outside capital, basically that would be the make or break for Carteret?
A. Well, certainly there was always that issue, but the plan was clean the place up. And with Dick's contact and Kramer's contact we were very optimistic that if all the problems were out on the table, the franchise was valuable, no more hits to be taken from the commercial real estate position, the dream would be infuse capital and it would be a viable entity resolved and managed for profit.
Q. If Carteret would not have obtained that outside capital, what were Carteret's likelihood to continuing?
MR. HUME: Objection. It calls for the witness to speak about matters not within his job purview or description. Speculation.
A. I can't speculate. I thought we were going to be fine. I never focused on the fact that the goodwill is going to be thrown out. We do what we need to do. We had a

Page 117

good relationship with the regulators. It seemed like the thing was going to make it. We had taken the hits that we needed to take and it seemed like the place, to me, had plenty of liquidity. Fun place to work. There was a lot of tough issues like Profeta, but the job was fun. We felt we were doing something. I saw myself being there for a long time. I just never had any short term perspective.
Q. This was all assuming that outside capital would come in at some point?
MR. HUME: Objection. Mischaracterization.
A. I thought the bank itself was fine. The real estate commercial problems had been identified. I don't think I ever focused on how much capital we had. It was a lot. I think the goodwill was being counted as capital. Infusion was to make it really good so we can make this thing either a bigger bank or make it so nice somebody would pay a giant premium. The number crunching I didn't get into. Believe me, they kept me in a vacuum. Tell us what the problem is, we'll deal with it. I never got into it. I never felt any pressure in that regard. Tell us the truth and we'll do what needs to be done.
Q. So you never focused on the capital levels at Carteret?
A. Start focusing on that, it might affect what you're doing in the reserves. It was clear I was going to

Page 118

be independent on that from the get-go. Nothing I did was going to be a focus on in any of those issues. It never was.
Q. Do you recall at the time of Exhibit 15 whether the board at Carteret expressed disagreement with the examiner's findings?
A. I don't remember there ever being any disagreements with the examiners. After we got there and started doing our work, I thought we had a good relationship. I'm telling you, we were kind of pulling in harness with them. We shared information with them obviously. We had total access to them at all times. Never gypped anybody. We had complete access to everyone.
MS. TORNATORE: Let's go ahead and mark Exhibit 16.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 16.)
Q. Mr. Moor, we've marked as Deposition Exhibit 16 a document with the ADDIIS number WOQ690 1402. If you want to take a minute to just familiarize yourself with it.
A. On the record I'd like to state we're looking at a document that is probably 200 pages long.
Q. Not quite, but close.
A. I see what it is. It's the report of examination of the Office of Thrift Supervision. I'm not sure I would

Page 119

ever have time to read this whole thing.
Q. What was the date of this examination?
A. June 1991. This is before I got there.
Q. And do you see that Mr. O'Rourke was the examiner in charge?
A. Yes.
Q. Do you recall if Exhibit 16 was the examination results that were discussed in the board meeting that was recorded in Exhibit 15?
A. No, I really don't. I'm sorry, but I don't.
Q. Do you recall any other examinations that may have been done?
A. As I said, they never really left. This is dated June. The meeting that you showed me was when? November. I'm not sure that they would have been presenting this. It was probably stale by the time of this meeting, because we had done a lot more. I can only guess that we were discussing something else.
Q. Okay. Let's turn to Page 17 and the BATES number WOQ690 1421. Last section there for asset quality, I was wondering if you can read the scope of review?
A. Yes.
Q. Do you recall if there was any criticism by Carteret or the management at Carteret regarding the scope of the OTS's review?

Page 120

A. No.
Q. In your opinion, was the scope of the OTS's review adequate?
A. You're talking about 1991, before I got there?
Q. Yes.
A. I don't know. I really don't.
Q. When working with Mr. O'Rourke, did you find him to have competent knowledge about the commercial loan portfolio?
A. Tom is a very competent, likable guy. My feeling was he was glad we were there. He felt he hadn't been able to get to the bottom with old management and he welcomed our endeavors. My feeling was Tom felt that -- let me make this clear. If you don't have the total cooperation of management, it's hard to get the truth. The information you have to collect to do this is incredible. So if they're not working with you, it's difficult. So my impression was thank God you're here, let's go get to it. It's that simple. I don't think I ever read this.
Q. I don't know if you had perhaps had an opportunity to contribute any type of comments that Mr. O'Rourke would have made? Would he have come to you if he had a report?
A. This report was issued before I started. This was June 17, 1991.
Q. That is when the examination commenced.

Page 121

A. This is the report that -- do you know when this was issued?
Q. I don't have an exact date when it was --
A. I'm sorry. I misunderstood what I was looking at. Tom and I had nearly daily contact. As a result of their examinations they have to write a report. So I'm sure that he discussed many of these issues with me and the people that worked for me and used the information that we generated to prepare the report.
Q. On Pages 23 and 24 there's a discussion that begins on Page 23 regarding the Western Federal loans.
A. Okay.
Q. If you wouldn't mind reading just those few paragraphs to yourself. I just want to see if they refresh your recollection.
A. I don't remember thinking about Western Federal until sometime the next summer. Because, frankly, in November 1991 we were still digging into the pile of stuff I had. I don't think we had of bulk of appraisals into the spring of '92. We were doing NRV, staffing up. And some other problem on the horizon is not something I would have jumped into.
Q. You were focusing on the NRV --
A. There was a whole pile of stuff that needed to be worked on like a dickens, and we were doing that. I see

Page 122

this here. I don't think I was cognizant of this until much later.
Q. On Page 24 toward the middle of the page there's a comment there regarding the carrying value of goodwill. What was your involvement in evaluating the carrying value of goodwill?
A. None whatsoever. Absolutely none.
Q. Do you recall any of the findings with respect to the 1992 examination of Carteret by the Office of Thrift Supervision?
A. Excuse me? You lost me.
Q. Do you recall any of the findings in the 1992 examination of Carteret by the OTS?
A. I don't remember. Was this report issued in '91 or '92?
Q. The report was actually issued in '91.
A. There was another one too, '92.
Q. I'm moving on to a new report.
A. I don't remember.
Q. Do you recall disagreements in 1992 with the regulators regarding clarifications of loans?
A. I don't recall any disagreements, frankly. And we would have resolved whatever came up. It's logical. We weren't there to -- I really don't remember any disagreements at all. And I don't just think I'm being

Page 123

senile either.
Q. That was just your working relationship with Mr. O'Rourke?
A. Yeah. Hand in hand.
Q. Do you recall any discussions in which Carteret was evaluating whether to restate prior financial statements?
A. No. I would not have been privy to that.
MS. TORNATORE: Let's mark Exhibit 17.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 17.)
Q. Mr. Moor, I'm going to show you what we've marked as Deposition Exhibit 17. The ADDIS number on the document is RAM011 0296. If you could take a look at that document for a moment.
A. Yes. Okay.
Q. Do you recognize Exhibit 17?
A. No. I wasn't on the audit committee.
Q. Were you present when audit committee meetings would occur?
A. No.
Q. Were you generally included in board meetings?
A. I had an open invitation to attend. Generally I did not. We were very busy. I would go to the board meetings and make the presentation that I needed to make and

Page 124

then excuse myself. It's just that they tended to go on for a while and a lot of issues were covered. I wasn't excluded, I was always welcome to stay. But to tell you the truth, I never did.
Q. On Page 2 of Exhibit 17, the first full paragraph there --
A. I see what you mean.
Q. There was a discussion there about restating earnings?
A. Yes.
Q. I'm just curious as to whether that refreshes your recollection?
A. I never had the discussion with anybody about it. The issue is going to come up. You had a 150 million dollar hit. It didn't occur yesterday. First start playing the movie all the way backward. You take the medicine and move on. Unless it was something specific, unless there was a specification you can identify on a specific day, and most of these things occurred over a period of time, it's hard to say when. I wasn't here for any of the discussions associated with this issue.
Q. Would the underestimate of reserves be significant enough to restate the earnings?
A. It could be, yes. You have to go back and recalculate the reserves somewhere in the past. When you

don't have appraisals that day, it's almost impossible.
Q. So logistically it wouldn't --
A. I've been associated with only one during my career.
Q. Was that at Amerifirst?
A. No, that was at US Diagnostic.
Q. Where you're currently employed?
A. As a matter of fact, that was what I was hired to do initially.
Q. Were you generally familiar with the goodwill litigation that Carteret had initially given the Office of Thrift Supervision?
A. Only peripherally.
Q. What do you recall about the litigation?
A. Nothing specific. I was aware of it just vaguely. I don't recall ever having any specific conversations with Dick. I know there was an issue about goodwill. It was my impression that we had a pretty good position. I had more than enough to deal with, trust me.
Q. How important was the success of the goodwill litigation to Carteret's future financial condition?
MR. HUME: Objection. Blatantly calls for speculation given his prior answer.
A. I really didn't pay any attention to it. Truly, I did not. I figured there was something here. My job is get



to the truth and some way these guys would work it out. I was there to evaluate and deal with commercial real estate problems, period.
Q. Did Mr. Bianco ever convey to you the importance of the goodwill litigation?
A. No. It's just my general impression that we had a good position. I never really thought about it. We had a problem, we were going to figure it out and move on and have a happy life in New Jersey.
Q. I'm going to move into a new area about the capital raising efforts that Carteret started on -- I was just wondering if you want to take a break before we get into a new area.
A. Okay. Sure.
(SHORT RECESS TAKEN.)
MS. TORNATORE: Back on the record.
Q. Mr. Moor, I'm just going to cover a new area with you now, the capital raising efforts at Carteret. What was your role in the capital raising efforts?
A. Dick Bianco and Don Kramer were fairly well connected guys in Wall Street, long term contact, knew a lot of people. My role, I would come in at the end of the day and give a presentation on the commercial real estate. Because most investor's question was do you recognize your problems. So generally it was a sales job to say who this



is, who I am, this is the team we brought in, this is what we think. I didn't go out and seek the people to talk to. Frankly, Dick and Don did all that. And it appeared to me like they were going to be successful. I thought we had a pretty good story.
Q. Do you recall the type of information that was given to the potential investors?
A. I had a book of every property, maps, narrative, calculations of the values, discounted cash flows. Just giving the potential investors this huge book. I gave that so many times we just made about 50 copies of it.
Q. How often would you update that book?
A. Quarterly.
Q. Quarterly?
A. It look a long time. It took a whole quarter to update it, frankly.
Q. Just to keep the summaries current and the figures current and everything?
A. Yeah.
Q. Do you recall the amount of capital that Carteret was seeking from an outside investor?
A. I really don't. I hate to admit that. I probably should remember, but I really don't.
Q. Do you recall if investment bankers were retained to assist Carteret?



A. I think there were bankers. I don't remember who they were. I only vaguely remember some of the meetings. We had so many it was just like it almost became rote. Took a couple of hours, drag in a couple of my guys.
Q. It was kind of like a road show presentation then?
A. Exactly.
Q. Would you individually have meetings with the board members to keep them apprised of how things were going in terms of talking to outside investors?
A. Not me.
Q. Who would generally do that?
A. Dick and Don were on the board, and I think there were only four or five members. I think they pretty much all knew at all times.
Q. So they would convey to the board members who were not actually working at Carteret what was going on in terms of the capital raising?
A. I assume so.
Q. Do you recall if there was a certain amount of time in which Carteret needed to obtain this outside capital?
A. Not that I recall.
Q. Do you recall if the regulators were asking them to get the capital by a certain period of time?
A. I really don't recall.

Page 129

Q. Do you recall what the involvement Kidder, Peabody had with the capital raising efforts?
A. Sounds familiar. Over the years you deal with all of them. I think they were probably involved. It's really hard to remember. I remember Carlile, I remember Kohlberg. There were so many trips. The way it worked generally, I'd be doing something, get a call, you have a presentation in Philly tomorrow, bring your book. I go make my presentation and leave. I don't remember -- half the time I don't even know who I was talking to. I didn't care. I had other problems. I knew I was there to raise capital, that we had done the right thing with the real estate. After I made the presentation, it was up to them to close the deal.
Q. Were you involved in structuring the form of capital?
A. Absolutely not.
Q. Were you there to answer any questions that the potential investor would have about the commercial loan portfolio?
A. I was there to explain generally what we had done and why I thought we evaluated it properly. If they really wanted to get into due diligence, they would talk to my team of loan officers associated with the deal. If you really wanted to get into the nitty gritty, you could come to our office. We had accounting information, etcetera, etcetera.

Page 130

Q. Was there a room at Carteret that was used to allow these potential investors to come in and review that detailed information?
A. I believe there was.
Q. Were you periodically or were you responsible for periodically updating the information that was given to potential investors?
A. They just used what we used, internally updated it once a quarter. Just if you looked at it, you -- I mean, it's not like something you'd update every day.
Q. Because of the volume of the report?
A. Yes.
Q. Do you recall what involvement Merrill Lynch had in the capital raising efforts?
A. No.
Q. Do you recall a gentleman by the name of Kevin Albert?
A. No.
MS. TORNATORE: If we could mark Exhibit 18.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 18.)
Q. Mr. Moor, we've placed in front of you Deposition Exhibit 18. There's an ADDIIS number CAM132 1086. If you want to take a moment and review that document.
A. I see it.

Page 131

Q. Do you recognize Exhibit 18?
A. No.
Q. Were you cc'd to get a copy of Exhibit 18?
MR. HUME: The document speaks for itself, and he is.
A. Yes, I was. Amongst others.
MR. HUME: Amongst others.
Q. Does Exhibit 18 refresh your recollection as to who Mr. Albert was?
A. Not at all.
Q. On Page 1 of Exhibit 18 Mr. Bianco appears to be responding to some of Mr. Albert's questions?
A. I think the letter is written by Kramer.
Q. I'm sorry. Mr. Kramer appears to be responding to some of Mr. Albert's questions there. Do you recall Mr. Kramer coming to you and asking specific questions about the --
A. No. This would not be unusual. We're talking about so many people, and they all essentially had the same question. He probably had copies of this thing.
Q. Were you the one to respond directly to these investors or would it be through Mr. Kramer?
A. If somebody wanted to look at our stuff, we get a call, they're coming to look at the portfolio, set them up in the conference room.

Page 132

Q. Would investors typically have questions about the loan loss reserves?
A. To tell you the truth, I don't remember specific questions. I know a lot of people looked at the portfolio. They had questions, they would get directed to people. You put the nickel in the slot and we get the movie. We did it so many times it became sort of automatic. My eyes glazed over and I gave the speech. The questions were always the same. Have you figured out what the problem is and is that really all there is. That was the issue. Our job was to convince them we did a good and right job. Hopefully we did. I don't remember getting much feedback, to tell you the truth.
Q. Do you recall whether investors would have questions about the timing of the liquidation of the commercial loan portfolio?
A. Not specifically.
Q. Do you remember the term black book?
A. That's generally referred to as the real estate book.
Q. I see. This was the book that was given to the potential investor?
A. For the commercial real estate. It was in a black binder. A big three-ring binder, and it was about two or three inches thick. It eventually became two, about three

inches thick. It was huge. I don't think it fit into one after a while because there accumulated more information.

Q. More updates in the properties and that type of thing?

A. Right.

Q. Who was generally responsible for preparing the black book?

A. Mitchko.

Q. Would you have an opportunity to review the black book?

A. Oh, yeah. I used it on my desk. A lot of time you get some calls, you open the book and you've got the whole thing in front of you. So if a borrower called up and called on a deal, wait a minute, read it and talk to him. I used it literally every day. By the end of my update period mine was so tattered it was almost unusable.

Q. It was a resource you relied on continuously?

A. Oh, yes.

MS. TORNATORE: Let's mark this as Exhibit 19.

(Whereupon, the document referred to was marked for identification as Defendant's Exhibit Number 19.)

Q. I'm going to show you what we've marked as Exhibit 19. There is an ADDIIS number on there, RAM034 0714. Now, although Exhibit 19 is not in a three-ring binder, do you recognize Exhibit 19?



A. Yes, I do.

Q. How do you recognize Exhibit 19?

A. Well, it's the index for the book, or at least the loan portion of the book and a lot of -- bunch of write-ups as of May 31.

Q. 1992?

A. Yes.

Q. Was this typically the format that the book itself was in when it was given to potential investors?

A. It involves a little more with every reiteration. I don't think this includes the REO though. I think the REO finally ended up with another binder.

Q. A separate binder then?

A. Yeah. I'm trying to think if -- well. The Moore Estates is Number 144 on page 0720 at the bottom there. I'm just curious. Maybe it is. It was still REO in May. Maybe it is here. Yeah, it is. I stand corrected.

Q. I don't think this would fit in one binder anyway. I don't think you would want to carry it in just one binder for that matter.

I just want to go over some basics on how Exhibit 19 was organized. First, I guess it's the first seven pages there, BATES number 0714 through 0720?

A. Yes.

Q. Can you tell me what those pages represent?



A. It's the index to the book and lists the loans in descending dollar order grouped by dollar where you had more than one loan by the dollar. For instance, Profeta is the first one.

Q. And the 5/31/92 reserve, was that a special evaluation allowance?

A. No, that's just the amount of reserve in total.

Q. Okay. Would that include any general reserve?

A. We didn't really have general reserve.

Q. You focused more --

A. On the specification.

Q. On Page Number 0771 --

MR. HUME: 0771.

A. Yes.

Q. -- of Exhibit 19 there's a spreadsheet there. I was wondering if you can describe for me what this spreadsheet was used for?

MR. HUME: This particular spreadsheet?

A. This was a summary of fair value analysis.

Q. Was page number 0771, was this typical, the fair value analysis that was performed on the property in the commercial assets?

A. This was the summary page. There would be a lot behind this.

Q. Was the summary generally included in the black



book?

A. Yes, they were.

Q. But this particular page is pretty typical of if a fair value analysis had been performed on a property?

A. Yeah, right. It has a summary and some of the notes on the file, what kind of shape the property was in. There would be a whole loan file.

Q. Backup for --

A. This book was a summary book. So you can use the loan files to cover half the floor, they were huge. This is the summary.

Q. Who generally prepared the fair value analyses? I know you mentioned Jose?

A. Marta worked for Jose. And she's a terrible person. I ended up marrying her because she was terrible. She's my wife.

Q. So this, of course, then is correct?

A. Probably. Actually, she's a better accountant. She did them at Carteret, another guy did this. It would be Marta, Jose or somebody in that department. Generally the work would be -- all the information would be gathered by the loan officer. Accountant would sit down and extract it from the file using the fair values, using the appraisals. The appraiser would also use this. When you evaluate the property for appraisal, it's not necessarily in this

Page 137

format. This is how you evaluate the loan for thrift reports purposes, not necessarily the same as an appraisal. Appraiser would review it to make sure this was correct. It was a tedious process.
Q. How did the accounting group come up with the market risk rate on Page 0771?
A. Generally that was agreed to by the OTS. There was a publication out that gives the ranges you can use.
Q. And that's the discount rate on the cash flow; is that right?
A. Yes.
Q. Was there anyone particular that you discussed the market risk rate with? That was Mr. O'Rourke?
A. Mitchko would come up with a number. Generally the OTS had publications out that we would use. It was a blended rate based on cost of funds and equity, and there were tables out you can use. And it was agreed upon by the OTS to buy into whatever rate you used.
Q. When would you perform a fair value analysis versus the net realizable value analysis?
A. A fair value analysis would be performed for a piece of REO. Somebody's not paying, he's foreclosing, you do a fair value analysis. If it appears that the loan can probably make it, you can do an NRV.
Q. And these are based on -- I'm sorry, your response

Page 138

was based on the accounting literature that is in existence, troubled debt restructuring?
A. The OTS had come up with the methodology they expected you to use for each category. It was a mixture of the accounting literature and their perception of how that accounting literature should be applied. It was a reasonable methodology. I still use it.
Q. The individual write-ups that are listed for each borrower, in Exhibit 19, were those prepared by the asset manager responsible for those particular loans?
A. Yes.
Q. Would you have an opportunity to comment upon their summaries?
A. It really depended on the asset manager. For instance, I just flipped by accident to Steve Cole. I haven't reviewed his. Some of the lesser experienced people I might have looked at it first to see -- to make sure they were going in the right direction. Cole I never would have. Some of these guys are just better than others.
Q. Ed DiSalvio, is he one that you would have reviewed or not?
A. Probably not, because that meant I had to deal with him. And I didn't like him, so --
Q. Was he down in Florida?
A. No, he was up in Jersey.

Page 139

Q. Do you recall any other names for write-up summaries that you would have reviewed?
A. I mean, a lot of times they would come in and ask me questions. What do we do about this, what do you think. I would give input. Often times I see the property with them and we discuss it together. They go back and write up their write-up. Sometimes I'd review it, sometimes I wouldn't. There were certain guys, did the work, whatever they did, they'd say I did this. So the less experienced people, they would want to talk to you. So the amount of input really varied depending on the loan officer.
Q. How was a loan selected to have been included in the black book?
A. They're all in there. This is everything.
Q. This is all the loans in the commercial loan portfolio?
A. Which makes me wonder, because something seems to be missing. I remember it being thicker. Maybe the paper is thinner. We have write-ups on everything. This is everything. That's why it took a while. It doesn't get created in one day. And this is a summary.
Q. Nothing left uncovered?
A. Right.
Q. What type of reporting would be performed on a monthly basis?

Page 140

A. Report? Mostly just an exception kind of report, something bad happened. If you visited a property and noticed a problem. If you got bad call, if it was a developer's problem. As I said, the book was created only once a quarter. We get monthly updates where you know the loan balance. This front sheet would be updated each month so you knew on that date what the loan balance was. But the write-up, only once a quarter. Everyone knew that if anything developed, they had to tell me. If there was a problem, I had to hear about it. I met with Cole, for instance, probably twice a week to hear what's happening with Profeta. How are we being stymied today.
Q. You were looking to facilitate the free flow of communication?
A. Everyone knew they could come see me any time. No such thing as a stupid question. Total access. We had the kind of relationship where it was kind of a team really. Everybody talked all the time.
MS. TORNATORE: Let's go ahead and mark Exhibit 20.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 20.)
Q. Mr. Moor, I've showed you what we've marked as Deposition Exhibit 20. There's a BATES number on there, CAM089 287. Do you recognize Exhibit 20?

Page 141

A. Not particularly. This looks like one of Bruce Campbell's converse reports where he takes what we do and convert it into bank speak. This looks like his work anyway. I suspect it is.
Q. Would Mr. Campbell rely upon the internal reports generated on the commercial loan portfolio?
A. Bruce knew how the TFR worked and he knew how what we had had to be converted into the TFR. When you're working on the deal, you don't care about this. At some point it has to get into the bank report. That was his job. As you see, it's tedious. And he knew how to report. I'm sure this is his report. So he was the bridge between our group and the accounting group.
Q. The controller's office perhaps?
A. Yes, because they filled out the TFR. We just couldn't give them this book. There were categories we had to have and Bruce would go through and agonize over each one. As a matter of fact, he still works for me.
Q. At US Diagnostic?
A. Yeah. I got 600 loans there on the other side where we're the borrower, and he handles those.
Q. He was with you at Amerifirst; is that right?
A. Yeah.
Q. You mentioned previously some of the potential investors. You mentioned Carlile.

Page 142

A. It seemed like we talked to Carlile.
Q. What do you recall about the interest by Carlile in Carteret?
A. You have to understand, I wasn't talking with these guys about how much they were interested. I was giving them information and they were interrogating me. The decision to invest or not to invest, whether they liked it or not, that would have been between Dick and Donald Kramer. It's not that they excluded me from those conversations, I would have done it myself. I didn't have time. I wasn't there talking to them every day. What about the investors, no. As you can see, we had way more than we could handle every day. I don't know how many pieces of litigation we had. It was endless. Problems with borrowers, appraisals, constantly the examiners were there, auditors were there, people dropping through looking at our financials. I didn't have the time to get into all that. They kept me out of it, not because they wanted to, just because I didn't have the time to devote to it and they didn't want to disrupt me. We had a pretty good working relationship and it worked the way it should.
Q. Do you recall working with any of the potential investors who were performing due diligence at Carteret?
A. Not specifically. But I've dealt with due diligence people all my life and it's always the same. Here

Page 143

are my people, here they are, go talk to them. If you can't get a result, come see me. That's how I always do it. I do it now. I can't recall anybody coming to me. There was enough information in my file, they could make their own determinations. You read the summary, whatever was there and you say, well, they're either right or wrong. So I never got much input. It was here's the information, whatever you need ask me. And make your own decision. That's the way we approach it with the auditors and OTS. The decision was pretty much the same. It's common sense. If you have enough information, you make an informed decision.
Q. Were you ever given an opportunity to get some feedback on the potential investors on their opinion of the commercial loan portfolio?
A. Never did. I mean, I can tell you that every time we went you could always tell they were doubtful. I always felt I made a good impression because the initial resistance and hostility, I felt it probably went okay. They never said great job, poor job. None of that. There's always resistance. Here's the problem guy, and it better be good, better have the story down. My job is to convince the investors we're real estate professionals and we have the problem identified and we're dealing with it. That's it in a nutshell.

Page 144

Q. You mentioned Kohlberg & Company. What do you recall about them?
A. I just remember going to their rather inordinate office and they were famous at the time, in the paper. And I remember the movie with James Gardner that stuck in my mind --
Q. Barbarians at the Gate? Is that the movie?
A. Yeah.
Q. Was that in connection with making a presentation?
A. Yes.
Q. Do you recall whether Kohlberg performed due diligence at Carteret?
A. I think they did. They must have because I remember going there once, maybe twice, and the place made an impression on me.
Q. So they were one of the more serious investors?
A. Seemed to be to me. There were others. There was some outfit in Pennsylvania, Pension Fund, I think made a couple trips, too. There were others. They've faded into my memory. Kohlberg I remember because of the timing. And Carlile I remember because we talked to him here.
Q. Was there a time when you were made aware of why Kohlberg did not invest in Carteret or why Carlile did not invest?
A. Only anecdotal information, and I don't know if

Page 149

A. What page was that?
Q. It's Page Number 12, I'm sorry.
A. Okay, I see it.
Q. Do you recall Carteret periodically revised the projections that were given to potential investors?
A. This is obviously referring to Kramer's projections. I never reviewed them. It was for the whole bank. This wouldn't have affected me.
Q. Did you have any involvement in the preparation of the projections with Mr. Kramer?
MR. HUME: Asked and answered.
A. No. I'm sure he used our information, but I don't remember having a discussion with him at all.
Q. Mr. Moor, did you understand the questions that I've asked of you today?
A. Yes.
Q. And you have answered truthfully to each of my questions?
A. Oh, yes.
Q. Do you have any changes to any of the answers that you've given today?
A. No.
Q. Has anyone offered you a fee to testify or consult in this case?
A. You're going to do that, aren't you?

Page 150

Q. I'm afraid not. We are precluded from --
A. That's most unfortunate. No, the potato chips and the coke is all I received.
MS. TORNATORE: I want to thank you for appearing today. I'll give Mr. Hume an opportunity to ask you some questions at this time.
MR. HUME: I'm afraid I'm going to ask you just a few questions. It's not going to last long at all.
EXAMINATION BY
MR. HUME:
Q. Mr. Moor, the attorney for the government asked you a number of questions about the decisions made in taking reserves against -- provisions against future loan losses at Carteret. Would it be accurate to say that your approach in the job that you did was very unusual for the thrift industry at that time in the early 1990s?
A. Yes, definitely.
Q. You saw that almost all other institutions' management were taking less conservative reserves, to say the least?
A. Let me answer that another way. Because of my involvement at Amerifirst and Carteret and with the RTC people, some of which I hired from Amerifirst to go with me to Carteret, I was access and privy to a lot of information and a lot of the other bank thrift failures. The work was

Page 151

unusual because it was done by non-bankers and it was a common sense approach. So generally the thrifts were under-reserved and that triggered the takeover because it was a fight over valuation reserves. So the answer to your question is kind of yes. I had an unusual situation with Carteret, that's why I took the job. I knew going in that I didn't have any vested interest in touting the numbers that existed. Bianco was new, Kramer was new. They wanted to know the truth. They didn't have a magical number in mind that would make life easy. That's why I took the job.
Q. When you were asked about the timing of that first initial pass you took on the assets in deciding to take the 150 million dollar hit, you said you didn't really recall whether it was in the second or third quarter of '91. I can represent to you, it's not a matter of dispute, it was the second quarter of '91. The decision was made in the first or second week of August.
A. I guess the second week of August. I forgot that Q is due 45 days, it was due August 15. That must have been the time the decision was made. Most people would not have made that decision. The longer you wait, the more it becomes your problem.
Q. You stated that -- you used the phrase earlier in this deposition that you didn't want to have ownership of this problem. Am I right in saying that as someone new to

Page 152

the thrift, you didn't want -- someone new to the thrift you did not have an incentive to see these reserves taken gradually, you wanted them recognized as soon as possible so you could move forward?
A. If you don't recognize reserves, you can't compromise loans, you're paralyzed. Then you have to explain why is it such a huge loss. If you wait too long, the question is what have you been doing. It's a public company. As long as you have an indication there's a problem, you're required to do something about it. And we did it pretty quickly.
Q. So rather than having an incentive to string things out as existing management generally would have in any financial institution, your incentive was to come in and recognize it as soon as possible so you can work it out effectively?
A. Right.
Q. Would you say that that was part of the reason, in addition to perhaps your personal attributes, why your approach was distinct in, you know, almost, if not completely unique, amongst the financial services sector that had commercial real estate?
A. It was rare for these institutions for complete new management to come in after the loans got really sick. Most of the management were escorted out the door in

Page 153

takeover. Carteret was an unusual situation. Often times I said if I got there a couple months earlier, it would be very different. To see the problems and not be able to do anything about it, you would have to resign. This occurred on many different stops in my career. And your timing of employment, it is important. I'm telling you that's what attracted me to Carteret. I realized I would not have to fight every inch of the way to get the truth.
Q. Do you think that -- well, am I right in saying that in terms of it being unusual and distinct, your approach and the job that you did, you say it was unusual and distinct not only amongst the thrifts, but amongst financial services including banks?
A. My experience with the banks was a very negative one. We had a lot of deals at Carteret and Amerifirst where it was either a shared national credit or a bank was the lead. Almost without exception banks had little or no reserves on deals that I had significantly resolved. As a result it was very difficult to compromise anything. I yelled and screamed so much that they became so sick of me they bought me out just to shut me up. If you want me editorialize, I would. The banks were not subject to the same rules that the thrifts were. They did not take the same reserves on the same loans, and I can name you bunches of them. It was a frustration to me, an irritation to me.

Page 154

I bent my spleen on this with the FDIC after the Amerifirst takeover. It was disgusting. We had loans with Chemical, Mani Hani, all of them. None of them had the reserves I did. And it was a mystery to me, but really not. Because if you think about it, the thrifts were destined to die.
Q. Do you think there is something to it that the financial services sector, the banks you've mentioned, that by virtue of not taking the Wayne Moor approach, managed to not take nearly as large a reserve and eventually survived and profited from that?
A. Yes. It's obvious. If you wait long enough if you have a hole, that never goes away, but it stops growing. And if you don't have to take the hit, at least that loss can be absorbed over a long earnings period of time. The real estate market comes back, you can live through it. The rules the thrifts operated under were very punishing. I'm not saying they were wrong, but you can see what the effect was, it nearly killed all of them. Banks, I'm telling you, were not subject to the same rules. This I will say into my dieing day. I had too many deals with those guys.
Q. Even thrifts could have ridden out the storm if they had adequate capital?
A. Some, yes, sir. I will be the first to argue Amerifirst needed to be taken out. There was no way to save

Page 155

it, the loan problems were just too big. Carteret, in my opinion, that wasn't the case. The failure at Carteret was a major disappointment in my life, and I wish it hadn't have happened. I really don't think it needed to happen. To tell you the truth, I think O'Rourke nearly cried. It was really a shock to us. It was a bad day, and it's kind of a black mark on my resume. And I still have to explain it because it was a thrift. What were you doing there.
Q. Were you a part of the problem or solution?
A. There was no solution. I did a lot of the work there and I'm never going to get credit for it, and I'll have to explain it the rest of my life. And that's an irritation to me. Had I thought the thing would have failed, I would not have taken the job. I really thought we could save it. Until the 11th hour I couldn't believe they would take it over. We were liquid, making money. We hid nothing from anyone. We were doing the best we could. I don't think it would have cost the government a nickel, ever. That's may own personal opinion. Any time you want me to vent on this, I will because it affected me in a very personal way.
Q. Just one or two more questions. Do you recall a gentleman named Vigna?
A. I believe I met him once.
Q. Never worked with him directly?

Page 156

A. I believe he worked one time in our office.
Q. You stated a few times earlier in deposition that you didn't remember any disagreements with OTS during your tenure in Carteret?
A. Right.
Q. You mentioned your day-to-day working relationship with Tom O'Rourke, you shared a lot of information and worked towards the same conclusions?
A. Yes.
Q. With Tom O'Rourke?
A. Yes. I can't speak for Vigna. He might not have liked what he did, I don't know. O'Rourke saw everything I saw and I don't think we differed materially on any subject. Losses that we took were there. The rules that we operated under required us to take the hits regardless of the impact, and we did.
Q. In conducting workouts of problem commercial real estate assets, would you agree that having more capital generally will allow you more time to workout other assets?
A. In time they all get better. Bel-Aire Apartments is a classic example. I can see a day where that thing would have a significant more value than what we had to write it down to. When we got it, it was in need of work. We did the work and started leasing it up. And there was a lot of that type deal, that time and work, they were going

to get better. How much, I can't say, but like Bel-Aire, there were many of them. Very frustrating experience.

MR. HUME: Thank you. I'm done.

MS. TORNATORE: I have no follow-up. Thank you, Mr. Moor.

(Thereupon, the deposition was concluded at 2:00 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF BROWARD:

I, the undersigned authority, certify that JOEL WAYNE MOOR personally appeared before me and was duly sworn.

WITNESS my hand and official seal this _______ day of _________, 1999.

DEBRA MCMANUS
Notary Public
State of Florida

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY OF BROWARD

I, DEBRA MCMANUS, a Shorthand Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DEBRA MCMANUS



CORRECTION SHEET

RE: AMBASE vs. UNITED STATES OF AMERICA

CIVIL ACTION NO.: 93-531
DEPOSITION OF: JOEL WAYNE MOOR

| PAGE NO. | LINE NO | CORRECTION OR CHANGE |
| --- | --- | --- |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |

------------------------

Sworn to and subscribed before me this ______ day of ____________, 1999 by ____________________, who produced ________________________ as identification.

Notary Public-State of Florida
My Commission No.:
Exp.: