# EXHIBIT AA

IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

November 12, 1999

10:15 a.m.

200 Park Avenue

New York, New York

DEPOSITION of DONALD KRAMER, a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York

18

company called NAC Re., which is a reinsurance company, and stayed as Chairman and chief executive of that company and remained its Chairman until June of 1993, when I started to form Tempest.
I also, Kramer Capital also owned and acquired the National American Insurance Company of California, of which I was chief executive, and stayed with that company until roughly I guess 1990 or 1991. I don't remember when I went to Carteret.
But then spent about 18 months at Carteret, and when I left Carteret in March of 1993, I started Kramer Capital again.
Q What do you recall about any positions that you held at AmBase?
A I was only a director of AmBase. I never held a position at AmBase.
Q No operational responsibilities at AmBase?
A No.
Q Do you recall when you became involved in evaluating AmBase?
A Oh, at different times over many years I was aware of AmBase, when they owned the

19

Home Insurance Company.
Q Let's talk about I suppose the time frame when you were evaluating AmBase.
Do you recall what drew your interest to that particular company?
MR. HUME: Could I just object and ask for a clarification of what it means to be evaluating AmBase.
Q If you understand my question, Mr. Kramer, you can answer it.
A Well, I mean, it would help to hear exactly what evaluate means.
Q Sure. Just trying to determine when you had a particular interest in the company, evaluating their financial condition or their management responsibilities, execution --
MR. HUME: So you mean prior to investing?
Q This would be at a point where you were evaluating perhaps whether to invest in AmBase, purchase shares or anything.
A Well, some of it goes back quite a ways. I was familiar with the Home Insurance Company going back to 1968, and again, in the '80s looked at the Home Insurance Company when the City

20

Investing Corp. was liquidating, and subsequently therefore I was aware of the company when they became AmBase.
They became AmBase following the spinoff of Home Insurance from City Investing. They became The Home Group, and I guess Home Group became AmBase when it became a publicly traded company, it was spun off from City.
Then Home Insurance got into a great deal of difficulty, and I had owned some shares in the company and was what you might call an unhappy shareholder.
Q Had you been acquiring those shares over a period of time?
A Relatively short period of time, at that time, yes, but I was a shareholder of AmBase Corporation.
Q Do you recall the relatively short period of time in which you were accumulating shares?
A Not exactly, but it was certainly about the time that the Home Insurance Company got taken over by the New Hampshire Insurance Department.
Q I see. This was about perhaps in

21

the late '80s, then?
A It had been to be '80s, I guess it must have been late '80s.
Q Were you ever employed by the Home Insurance Company?
A Never.
Q Or AmBase on a consulting basis?
A Never.
Q What information did you use to evaluate AmBase?
A Publicly traded information, SEC documents, 10-Ks, 10-Qs, registration statements.
Q Did you have access to any information from management, did you go to analysts' meetings or anything like that?
A I did, but I certainly didn't have any inside information, all I had was what was publicly available.
Q If you can describe your involvement with Carteret at this point.
A At that point I had no involvement with Carteret.
Q When did you first become involved with Carteret?
A There was a period of time when

22

AmBase lost the Home Insurance Company to the New Hampshire Insurance Department, and the company's only remaining asset was Carteret, and Dick Bianco and I, as what you might call dissident stockholders, became directors of AmBase Corporation.
At some point after that I obviously became, first, Carteret was its only asset, so I began to study the financial statements of Carteret, but somewhere along that point Dick became the Chief Executive Officer of AmBase.
And somewhere after that he asked me if I would, as a favor to him, come over to Carteret and help him, since I had a great deal of background in turnarounds.
Q What positions did you assume at Carteret?
A I became the President and Chief Financial Officer.
Q This was following Mr. Bianco's tenure as the CEO at Carteret?
A That's correct.
Q Can you tell me what compensation you received as a director at AmBase and Carteret?
A I don't remember that I received

23

directors' fees, because I was an inside director. I received a salary from Carteret.
Q Primarily for your operational duties?
A Yes.
Q Do you recall receiving any shares or options in AmBase stock?
A I do believe I purchased some shares in AmBase, as part of a stock grant, but I don't remember the exact time or date. It may have been later on.
Q Do you recall if they were options, or was it --
A No, I never had options that I recall. I had stock.
Q Did you receive any stock or options in any other subsidiaries of AmBase Corporation?
A No.
Q Are you a current shareholder in AmBase stock?
A Yes.
Q Do you have any stock in any other companies affiliated with AmBase?
A No.
Q How significant is your shareholder

24

stake in AmBase right now?
A In my terms it's immaterial.
Q Do you have a percentage that you can identify?
A Of my net worth?
Q Of your holdings in AmBase stock.
A My percentage of the company?
Q Yes.
A Oh, I don't think it would make a half of a percent.
Q Do you know approximately how many shares you own?
A I do. I own about 300,000 shares, 290,000, something like that, out of the 44 million.
Q Do you know what AmBase does today in terms of operations?
A Not really. I haven't followed it very closely. I know it hasn't done much.
Q Do you know what the primary assets are of AmBase?
A I read its balance sheet, it has some cash and that's pretty much it.
Q Does it perform any type of insurance operations or anything like that?

25

A Not that I'm aware of.
Q Are you aware of any operational revenue that it generates?
A No.
Q It just has this cash asset, to your knowledge?
A I presume so. I really haven't looked at it very closely.
Q Okay. Do you know who the other shareholders of AmBase are today?
A Other than Mr. Bianco?
Q Yes.
A I have no idea.
Q Do you know what percentage of shares Mr. Bianco holds in AmBase?
A Not precisely. I know he owns a fair amount.
Q Would it be over 50 percent?
A I don't think so.
Q Let me show you a document.
MS. TORNATORE: If we could have this marked as Exhibit 1.
(The above-described document was marked Kramer Exhibit 1 for identification, as of this date.)

Q Mr. Kramer, I'm going to show you what has been marked as Kramer Exhibit 1.
A Yes.
Q Do you recognize that document?
A No.
Q Can you describe what is Exhibit 1?
A It's a listing of large AmBase common shareholders, and it seems to be a memo from -- to Bianco and Neil Cohen from Bill Purcell.
Q What is the date of Exhibit 1?
A July 1992, July 29th.
Q In reviewing Exhibit 1, do any of those names appear as though they might be present shareholders in AmBase?
MR. HUME: Objection in that he's already said he doesn't know who the shareholders are.
A I don't have a clue.
Q I'm just seeing if it refreshes your recollection.
A I only know what I have. I know some of the people, I know some of the names, but I don't have a clue whether they have stock.
Q Do you attend the shareholder



meetings of AmBase?
A No.
Q Mr. Kramer, does the company that you're affiliated with today, does that company do any consulting services or work for AmBase?
A No.
Q I need to jump back to some additional background questions. If you could describe your college education.
A I have a BA in economics, an MBA in finance and investments, I'm a chartered financial analyst, CFA, and I have 40 years of working experience in various financial trades.
Q Your CFA designation, is that current?
A Yes, I guess so. I paid my last dues.
Q Do you recall when you obtained the CFA designation?
A Yes, my MBA in '64, my CFA in '66.
Q Do you have a financial interest in the outcome of this case?
A To the extent that I own shares I presume I do.
Q I want to focus your attention now



to that time period when you were evaluating AmBase Corporation.
What was the level of your knowledge of Carteret when you were initially evaluating AmBase?
A Initially relatively little. I began to learn about it as it became a more important part of the residual assets of AmBase Corporation.
Q What information did you rely on?
A Again, published reports, filed reports with the government, various statutory reports that the company made, banking reports to the examiners and the like, but principally published information.
Q What did that information tell you about the quality of Carteret's asset portfolio?
A It told me some. I mean, it had been audited by accounting firms and had a large mortgage portfolio. The assets seemed to be fairly straightforward.
Q Any significant items that jumped out at you when you were reviewing Carteret?
A Not especially. I mean, it was a thrift, I had looked at various thrifts before,



and some 25 years earlier I was a securities analyst and thrifts were one of my specialties.
So I knew a little bit about the background and financial characteristics of the company, and it seemed to be a reasonably important New Jersey financial institution with a very strong penetration of the New Jersey mortgage market.
Q What other thrifts had you evaluated at this time?
A Oh, going back 25 years ago, Great Western Financial, First Charter Financial, some of these names doesn't even exist anymore. H.F. Amenson.
Q At the time you were evaluating AmBase and Carteret, had you had an opportunity to review any other thrifts?
A I hadn't done a great deal at that time. I maybe might have looked at one or two for reference, Westco Financial, which is the subsidiary of Berkshire Hathaway and one or two others just for background, and I guess H.F. Amenson, which is a company I was reasonably close to.
Q Were those reviews of other

institutions very in-depth?
A No, they were analysis for reference purposes.
Q Kind of a cursory review?
A Just to get standards, frame of reference to understand what the norms were in the industry.
Q I'm going to show you what we'll mark as Exhibit 2.
(The above-described document was marked Kramer Exhibit 2 for identification, as of this date.)
Q Mr. Kramer, have you had an opportunity to review Exhibit 2?
A I have.
Q Do you recognize Exhibit 2?
A I don't remember it, but I do recognize it. I'm trying to recall actually who did the, all of detailed work here, because I see some of these charts and graphs look like they were prepared by somebody other than myself, but I don't remember who.
Q Is that your signature on the first page of Exhibit 2?
A Yes.



Q What did you mean when you said that you were a total babe in the woods in the savings and loan industry?
A Well, I had never operated a savings and loan and really didn't -- my specialty had been insurance company turnarounds, so I, you know, I wasn't current with a lot of things that were affecting the thrift industry at that time.
Q And you had to then seek some type of outside assistance to evaluate Carteret?
A I believe I did. I just don't remember who.
Q We'll see if we can, I'll show you a document, maybe that will refresh your recollection on that name.
Do you recall the extent of that outside analysis?
A The extent, I'm not sure I understand.
Q Was there a report prepared, any type of formal presentation?
A Well, certainly there was this material prepared which I said I don't recognize. Certainly the charts don't look like they're my work, so they must have been prepared for me.



Q To your recollection, the outside analysis was based on publicly available information?
A Yes.
Q Do you recall that the outside analysis indicated that AmBase was not able to generate core earnings?
A AmBase was not able to generate core earnings? I'm not sure what you mean by that.
Q Well, at this point in time AmBase had sold the Home Insurance Company, correct?
A It was taken away, whatever -- it didn't have it.
Q Okay. And Carteret would have been then AmBase's principal asset, is that right?
A I believe that's right.
Q So I guess perhaps I should get more specific and say that was Carteret unable to generate core earnings?
A I think Carteret probably needed some management attention to generate core earnings.
I don't remember the details of it, but it certainly needed a fair amount of work. Even this, as far as I've been able to read



through it, reflects the fact that it needed some expense reductions and some changes in its mix.
Q In terms of your or the outside analysis that was performed for you on Carteret, do you recall that analysis concluded that Carteret was not able at the present time to generate those core earnings?
A Well, it wasn't at the time, but remember, these are dynamic situations, they're not static.
So changes in spreads could affect it, changes in the level of overhead could affect it, market conditions, sales of non-performing assets could affect it.
So there were many things that would affect the ability of the company to generate core earnings.
What it did have was a strong mortgage origination capability, a large servicing capability, something non-related to the business, which was a premium finance company, that was profitable, so there were other factors out there.
You know, to say core earnings over any period of time, I don't know.
Q Okay. If you could turn to Page,

there's an ADIIS number at the bottom, it's in the right-hand corner, PAN 0023581.
A Okay. Right.
Q At the first bullet point on that page, the outside analysis appears to indicate that Carteret was not making money on an ongoing basis and that the core business appeared to be in trouble.
Could you tell me what that refers to?
A I'd have to go back and look at the income statement, but it's clear that in the first year we looked at Carteret it did take a large loss on writing off a substantial amount of its loan portfolio, the bad loan portion of it.
Q What was the extent of your review at this particular point in time of Carteret's loan portfolio?
A Well, I didn't do a loan portfolio review at that time. When I became more involved with the company, we ordered a loan review be done on several levels.
Q This was subsequent to your appointment as a Board member?
A Something in that area. Again, just



about at the time we came into the company we asked for -- we hired Wayne Moor to do a loan review, we hired Kenneth Leventhal, a real estate accounting firm with a specialty in real estate to do a loan review, and we asked the then -- the new accountants, Price Waterhouse, to do a loan review.
So we had three different opinions on the loans, because certainly I wanted to feel comfortable that the reserves were properly stated before I would get involved with the company.
Q What were the results of Mr. Moor's review of Carteret?
A The result is I believe that the company wrote down a number of the assets, took some charges.
Q Do you recall how significant those charges were?
A They were significant. I don't remember whether they were -- I don't remember the number, it was either $65 million or $165 million, but it was somewhere in that range.
Q It was material to Carteret's financial condition?
A It was material.



Q Do you recall the results of Price Waterhouse's review?
A Well, they came within similar ranges, so the net number was the result of a composite of those three reviews to get us to a level that we felt the reserves were adequately stated.
Q Were there large differences between those three reviews?
A Not material. I mean, the ranges could have been wider in different cases, but it pretty much, they confirmed each other.
Q They were consistent?
A Fairly, fairly consistent. You could look at a piece of property and say it's worth $10 million and someone else says $13 million.
That's a thirty percent difference, but it's not material when you get to the portfolio.
Q An overall perspective, okay.
I just need to refer you briefly back to Page 1. In the third full paragraph on Page 1 of Exhibit 2 there's a reference there to Bob Walsh.



Do you recall who Mr. Walsh was?
A Yes.
Q What do you recall about Mr. Walsh?
A Walsh I think was President at the time I became involved, got to know the company.
Q Mr. Walsh was President of Carteret?
A I believe that's his title.
Q What did you mean when you said that his reputation precedes him?
A Walsh had a very good reputation as a manager of financial assets. He had a good understanding of interest rates, interest rate spreads, and in matching assets and managing interest rate types of situations.
Q Duration matching and those things?
A Duration matching, it would be origination, sales to the Fannie Mae, Ginnie Mae of fixed rate mortgages, a whole variety of strategies that he was working on.
He had a close relationship to a number of trading houses and understood the financial markets very well.
Q Had you worked with Mr. Walsh prior to your involvement at Carteret?
A Not really.

Q You were just aware of his reputation in the business community?
A At Carteret, yes. That's where he was working.
Q I want to move a little later on in your evaluation of Carteret.
At the time that you became a Board member or very near that time, do you recall doing an additional detailed review of Carteret?
A I don't remember exactly. I certainly would have read the financials and everything I could to know as much about the institution as I could.
And I'm sure by the time I was a Board member I was given information that a Board member would appropriately receive, but I don't remember the details of it.
Q Do you recall following the time when you were given that information as a Board member at Carteret having an opinion of the management at Carteret?
A An opinion of management, I guess so. As I indicated, I thought, I had heard that Walsh was a good person, good executive, knowledgeable executive, and my meetings with him



I found nothing to dissuade me from that.
I didn't get to know a lot of other people. I did get to know the line management, the people who were the Chief Financial Officer and the various accounting people and operating people.
So that part of management I got to meet, but again, more once I got in than before.
Q When you started to review the information as a Board member at Carteret, what types of findings were you discovering?
MR. HUME: Objection as to the vagueness of the question, but you can answer.
A I found that the company had a, first a decent asset gathering network of branches.
I found that it had a strong mortgage origination capability and a very good mortgage loan department.
I found that it had reasonably good data processing facilities for managing and keeping control of information, and was fairly efficient.
I found that it probably had



slightly too much staff for the size of the institution.
I found, as I said, it had certain other businesses not correlated with the savings and loan, the thrift business, which was the servicing business, but it was independent of banking, and the premium finance company was relatively attractive on its own.
I found that the company was struggling under inadequate capital and that it required, I felt that it required some form of capital infusion, because its capital had been stripped away as a result of the change in the government regulations.
Q Do you recall if the analysis of the loan portfolio at Carteret, did that have an impact on your evaluation of the management at Carteret?
A Well, not exactly, because the loan portfolio had been originated at a time prior, and a lot of those people had already left the bank.
There was a Mr. O'Brien who had been chief executive for a number of years, he was no longer there, and there were people who worked for the company who were involved in creating that



loan portfolio that none of whom were there when I got there.
Q What was your opinion of the prior managers?
A I can't have an opinion of somebody I really don't know, but some of the results were not great, certainly the loan portfolio was not a stellar performer, because it generated large losses, the commercial loan portfolio. The mortgage loans were okay.
Q Do you recall why the loan portfolio was not stellar?
A I'm not sure. They made loans to propositions that didn't turn out well, a golf course in northern New Jersey, a number of other commercial loans that were -- a hotel in Orlando, Florida.
Q Do you recall any problems with the underwriting standards of the prior management?
A Again, I had hired three different groups to go in and look at the portfolio, but I didn't get into the underwriting of those loans, because the loans weren't being made anymore.
The only loans that were being made by Carteret at the time I got in were straight

42

mortgage loans.
Q But as a Board member and the Chief Financial Officer at Carteret, you would still have to manage those problem assets.
A But those were assets in a closed block of liquidating assets. There were no new assets being added, so how they were created was not as important to me as what the disposition of them would be and their effect on the bank.
I mean, they're there. I couldn't undo it, I couldn't change it, and the only thing I could do was manage what we had.
We managed to hire people, we sold the hotel in Orlando and things like that. We liquidated those assets as best we could, having marked them to what we thought was the appropriate market price.
Q That was part of Mr. Moor and Price Waterhouse's review?
A Yes.
MS. TORNATORE: If we could mark this as Exhibit 3.
(The above-described document was marked Kramer Exhibit 3 for identification, as of this date.)

43

Q Mr. Kramer, I'm going to show you what we've marked as Kramer Exhibit 3.
If you want to just take a few minutes to familiarize yourself with that document.
A Where was this taken, in Jersey City?
Q Yes. I believe the document indicates the location was around Jersey City.
A Oh, this is the application to become a director. Okay, this was the application for, to become involved with the thrift.
Q Exhibit 3, then, was an interview that the Office of Thrift Supervision conducted in connection with your appointment as a director at Carteret?
A Yes. As I had mentioned to you earlier, I was a disgruntled shareholder, to say the least.
Q Why were you a disgruntled shareholder of AmBase?
A Simple, the stock declined, took massive losses and failed to live up to any of the things that they had previously either disclosed or talked about.

44

They lost their insurance company, they failed to liquidate appropriately, they were going to pay a special dividend, they didn't.
They lost a horrendous amount of money, and I personally lost a great deal of money in the transaction.
Q Do you recall that the interview by the Office of Thrift Supervision that you were represented by Mr. Clive Cummis?
A I see that. Yes, I remember Mr. Cummis.
Q Was Mr. Cummis then appearing as your attorney at that interview?
A I believe he was.
Q You were under oath when you gave your statement to the Office of Thrift Supervision?
A I believe so.
Q I'm going to direct your attention to Page 12 of Exhibit 3.
A Okay.
Q Although I want you to feel free to read any pages prior to that time to give some context to it.
I was interested in your answer to

45

the last question on Page 12 there.
A How did I get involved in the process?
Q Yes, you described yourself as a horrified observer of the process to recapitalize AmBase, and I'm just curious, we were discussing earlier about you being a disgruntled shareholder.
Is that what you were referring to when you said you were a horrified observer?
A Yes, absolutely.
Q To what did you primarily attribute the precarious financial condition?
A Well, I feel they certainly mismanaged the insurance company. That they, I don't know, they took excessive compensation, executive compensation for inadequate performance, and I think that they just did a horrendous job and lost their principal asset.
They had announced publicly they were going to pay a special dividend, and then, when it was all over, they didn't have any cash to pay any dividend.
They borrowed money and within the first quarter of the loan they defaulted on the loan.

I mean, it was just horrendous, and the Home Insurance Company continued to deteriorate.
Q Did you feel as though the management practices at AmBase, were they in the best interests of the shareholders?
A As a shareholder I didn't think so. I wouldn't be horrified if it were.
Q Let me see if you recall a Mr. Scharfenberger at AmBase.
A Yes.
Q Was Mr. Scharfenberger a member of this prior management team at AmBase?
A Yes.
Q Do you recall having an opinion about Mr. Scharfenberger?
A An opinion as to?
Q The quality of his management skills?
A I thought his management skills were deficient.
Q How about a Mr. Manley, do you recall a Mr. Manley?
A Yes, I knew Mr. Manley.
Q How do you recall Mr. Manley?



A Mr. Manley was a lawyer, he was Mr. Scharfenberger's lawyer, and he came in to be the chief executive of the company following the liquidation of City Investing, and I didn't think he was a great manager.
Q Let's turn to Page 15 on Exhibit 3 there.
Toward the middle of Page 15 there's a paragraph that starts with, "The other thing I did is I engaged a consultant to help me understand something about Carteret."
A Right. That was Todd Connover.
Q Do you recall retaining Mr. Connover?
A Yes, and I guess that's who prepared this background for me.
Q Would that be Exhibit 2?
A It could well be, yes. Connover was terrific.
Q Why did you feel it necessary to retain Mr. Connover?
A Well, I wanted to get as much expertise as I could get. I wanted someone qualified. Todd was certainly as good as they come.



Q Had you had any previous experience with Mr. Connover?
A Yes, I knew Mr. Connover from before.
Q Had you retained his services previously?
A No, I knew him when he was Controller of the Currency, and his partner was an associate of mine, a director of my company as well, who was Deputy Secretary of the Treasury before he retired.
Q Do you recall what analysis Mr. Connover performed?
A As I said, I didn't remember exactly, but clearly he did the kind of work that we saw in this report.
Q Exhibit 2?
A Yes, he helped me understand the dynamics of the thrift business in its current environment.
Q Do you recall if Mr. Connover's findings were that Carteret was unable to generate core earnings?
A Well, I think, if this is correct in his report, the answer would be I believe he felt



that.
Q And the information that Mr. Connover used, again, this was all public information, is that correct?
A Yes.
Q Did Mr. Connover have access to exam reports of Carteret?
A I'm not sure. I just don't know what the regulatory community made available, but he certainly tried to take whatever was available. They do file, the thrift agency does file reports, and I think they are public documents.
Certainly Todd knew what those documents were and where they were.
Q Do you recall having any response to Mr. Connover's conclusions about Carteret?
A When you say response --
Q Did you ask him to do some additional research on particular areas of Carteret?
A I don't recall that I did.
Q Do you recall making a note of any particular areas at Carteret that you thought needed work?
A I think I looked at it and took it

50

seriously. I don't remember that I did anything specifically about it at that time.
That was the analysis. I was trying to figure out what the residual value of AmBase was worth, since Carteret was its only asset.
Q In retrospect, do you think that the information that Mr. Connover had available to him was sufficient to adequately and accurately evaluate Carteret?
A I think his evaluation was reasonably well done, even with the benefit of hindsight.
Q Now, we've discussed the auditors briefly here. You mentioned Price Waterhouse, is that right?
A Yes.
Q Do you recall when Price Waterhouse was retained by Carteret?
A Just about the time I came in. We felt that Peat Marwick had been their auditors for many years, and we felt if we were going to come in, it would be useful to have just someone who was not wedded to any past decisions or past analysis, just start with a clean slate, let them start fresh so we'd get a fresh view.

51

It didn't matter who the auditor was, we would have changed them simply to get a fresh view, and Price Waterhouse was particularly well versed in that area and skillful in the banking area.
Q So the change from Peat Marwick to Price Waterhouse was not an indication of I suppose the quality of service that Peat Marwick was providing?
A No, it was principally again to get someone who was not wedded to any past decisions or numbers or reserves or anything else. I wanted a complete fresh pair of eyes.
Q Do you recall having any contact with anyone at Peat Marwick?
A Sure.
Q What names do you recall?
A I don't remember offhand, but there were quite a few. I forget who the engagement partner was. He was pretty upset with me.
Q Why was that?
A It was a long-standing account of theirs, I think it was one of their oldest accounts, and being discharged from any account is certainly not a pleasant task. I just don't

52

remember the names.
Q Do you recall the name Henry Kaiser?
A Vaguely. I just don't remember well enough. Probably.
Q Do you recall having any Board meetings in which Peat Marwick was present?
A It's possible there were early on Board meetings, because the accountants would have been present at meetings. It was part of the routine.
Q I'm going to show you what we'll mark as Exhibit 4.
(The above-described document was marked Kramer Exhibit 4 for identification, as of this date.)
Q I'm going to show you what we've marked as Kramer Exhibit 4. If you want to take a few minutes and just familiarize yourself with Exhibit 4.
A Okay, I have a fair idea.
Q Okay. Do you recognize Exhibit 4?
A No, I don't.
Q Could you briefly identify Exhibit 4?
A Yes, it's a report on the lending

53

and credit functions of Carteret Savings Bank, and it's dated April 17, 1991.
Q Do you recall Exhibit 4 being discussed in any credit Board meetings?
A I really don't remember. It's very possible. I certainly would have been at a Board meeting with a review of this type.
I just don't remember whether I was on the Board at this time.
THE WITNESS: Was I?
MR. HUME: No, I don't believe so.
Q At the time that you became a Carteret director, were there detailed discussions about lending functions?
A There were discussions about lending functions. Again, the commercial loan operations had been discontinued, so those were out, and the balance of the activity was principally mortgage loans, and the rest of the stuff we dealt with was workouts of prior problems.
Each one of these particular problems came up to the committee. We had a Credit Committee.
Q Do you recall how significant to Carteret's total asset portfolio the workout loans

were?
A My guess is they were, of the commercial loan portfolio, I don't know, 30 percent or something like that.
Q Do you recall any meetings with regulators at the time of Exhibit 4?
A I don't remember at the time of Exhibit 4, but subsequently I virtually lived with the regulators. We worked hand in glove on this thing.
Q Trying to turn around Carteret?
A And trying to make sure they had full disclosure of everything we were doing.
Q Do you recall if there were examination findings by the regulators regarding Carteret's lending activities?
A Well, there were examinations of the bank, Office of Thrift Supervision examinations. Those I had seen, examination reports.
Q Did those exam reports include an analysis of the asset portfolio?
A Oh, they had to.
Q Do you recall the findings of the regulators in respect to the asset portfolio at the time?



A I don't recall the specific findings. I do know that they looked at the reserves, and they looked at the loan loss reserves we were carrying and what we were carrying them for, and we discussed them at various times I'm sure subsequent to this report.
Q Do you recall if the findings in the examination reports, were they consistent with the findings by Mr. Moor and Price Waterhouse regarding the lending functions?
A I think they were. I think the examiners felt that we did a credible job of evaluation, yes.
MS. TORNATORE: If we could mark this as Exhibit 5.
(The above-described document was marked Kramer Exhibit 5 for identification, as of this date.)
Q I'm going to show you what we've marked as Exhibit 5. If you want to take a minute to just review that.
A All right.
Q Do you recognize Exhibit 5?
A No, I don't.
Q Do you recall if Exhibit 5 were the



or the issues addressed in Exhibit 5 were discussed at Board meetings of Carteret?
A I believe they were or would have been, certainly. Certainly an exception to an auditor's report would be discussed.
Q Do you recall that at the time that the findings were noted with respect to the evaluation and recognition of loan loss reserves?
A Well, I see that here. As I made clear when you asked me earlier, that was my great concern when we came in. That's why we had three different people do it, different than Peat Marwick.
Q Okay. So in addition to KPMG doing the review of the audited financial statements, these three additional firms came in to do an analysis?
A I don't think the timing is the same. I think they came in after.
Q I see.
A I'm just trying to work backwards. If I left in March of '93, I was there in '92, possibly a drop of '91, September, October, something like that. It couldn't be more than that.



I guess it was August, it must have been August of '91, so it was subsequent to this (indicating). In fact, a month subsequent, probably.
MR. HUME: I would just like to point out also for the witness to the extent he doesn't recollect, there's no need to speculate if the questions aren't clear.
Q I want to address some of the other issues that are discussed in Exhibit 5 there.
Do you recall that there were findings noted with respect to the classification of in substance foreclosed loans at Carteret?
MR. HUME: Where is this on the document?
MS. TORNATORE: I'm sorry, this is on Page 1 in the section entitled "The Allowance for Losses on Loans and Investment in Real Estate." The second bullet point there.
MR. HUME: The question is?
MS. TORNATORE: Whether he recalled discussions of Carteret's inability to identify in substance foreclosed loans.

58

A Not as described here. We might have done some subsequent stuff, but I don't remember this specific, an action against this specific paragraph.
Q Do you recall findings with respect to the appraisal process at Carteret?
MR. HUME: Can I ask at what time?
Q At the time of Exhibit 5?
A I just don't remember.
Q If I could focus your attention to Page 3 of Exhibit 5, there's a section toward the bottom there entitled "Appraisals."
A Yes, I see the paragraph.
Q Does that refresh your recollection regarding the weaknesses noted in the appraisal process at Carteret?
A This specifically, no, because I just don't remember the report. But, you know, I would take no issue with some of these, some of the findings.
Q Now, you mentioned that Carteret brought in these three I suppose reviewers of the asset portfolio.
I just want to get into a little more detail on what each of these firms or

59

individuals did. If you could describe how you came to know Mr. Moor.
A I guess I was introduced to him when he was hired by the bank. I didn't find him, but I forget who did, someone did and said that he was, had done a great job of real estate work in Florida on portfolio, and so Mr. Bianco interviewed him, hired him, and to my recollection he did a superb job.
Q Was Mr. Moor's review very detailed?
A I believe it was, absolutely.
Q Do you recall what percentage of the portfolio he had reviewed?
A No, but we had hoped it was a very, very large percentage.
Q With respect to the Price Waterhouse review of Carteret's loan portfolio, do you recall the names of any individuals at Price Waterhouse?
A You know, it's funny, I'm trying to remember as we speak the fellow who was the account partner, and I cannot remember his name. A good guy, and I know he's somewhere in my phone book.
Q Was the review by Price Waterhouse a very thorough, detailed review?

60

A We asked for a very thorough, detailed review.
Q Do you recall the findings of the Price Waterhouse report?
A I -- only in general terms, I remember basically that we would take some substantial loan reserves, which we did.
Q Do you recall Price Waterhouse criticizing the internal asset review structure at Carteret?
A I don't remember the details of it, of that, that level of detail.
Q Do you recall there being findings noted with respect to the internal asset review function?
A Again, I just don't recall. There was a lot of detail. I probably looked at it at the time, I just don't remember now.
Q When Mr. Moor was hired, what types of steps did he take to correct Carteret's loan workout situation?
MR. HUME: I'm going to object as to vagueness, but you can answer if you can.
A I don't think it was steps to correct as much as it was to deal with. I think

61

there's a difference.
He visited the properties physically, he inspected them. He reviewed the documents associated with the loans. He looked at the valuations. He hired appraisers where appropriate. He took efforts to dispose of property where he could. So I think he took actions.
Q To correct as opposed to --
A I guess to correct or deal with. I think deal with is more than correct. How can I correct a bad loan? I can only get out of it, dispose of it.
Q You could simply manage it.
A Manage and get rid of in some cases, or at least maximize the return to the institution.
Q I'm sorry, I forget the third firm that was reviewing Carteret.
A Kenneth Leventhal.
Q Kenneth Leventhal. What was the scope of the Kenneth Leventhal review?
A They were to look at loss reserves as well.
Q Were they assisting Mr. Moor?

A I believe we kept them apart, because we didn't want one to affect the other.
Q There was a degree of independence that you wanted to retain?
A Yes, we kept all three, you do your thing, don't ask us, just come back and tell us what you think.
Q And each of their findings were generally consistent with one another?
A Reasonably, yes, as I recall.
MS. TORNATORE: If we could mark as Exhibit 6 this document.
(The above-described document was marked Kramer Exhibit 6 for identification, as of this date.)
Q I'm going to show you what we've marked as Exhibit 6. If you want to take a moment or two to read it, it's really not very long, but I do want to go through it in some detail.
A Okay.
Q Do you recognize Exhibit 6?
A I believe so.
Q How do you recognize Exhibit 6?
A It was a press release, I just remember, announcing the loan loss reserves,



announcing my appointment, and others as well.
Q Exhibit 6 was issued by Carteret?
A I believe it was, yes.
Q The information in Exhibit 6 pertaining to the $150 million reserve amount, do you recall if that was in response to Mr. Moor and Price Waterhouse and Kenneth Leventhal's review?
A I believe it was a combination of those things, yes.
Q Do you recall that management had any disagreement with the Board of Directors in the amount of reserve that needed to be taken?
A I don't recall disagreement. I certainly knew that Mr. Bianco and myself both felt that it was appropriate.
Q Was there perhaps any disagreement with the FDIC or the OTS regarding the amount of the reserve?
A I don't remember any disagreement.
Q The loan losses, were the reserves that were taken at this time, was that in response to loans that were -- these are existing loans on Carteret's books, is that right?
A Yes.
Q So the losses were inherent in the



portfolio.
A The losses were inherent in the portfolio, well, I guess the losses were what the market value of those assets were, and if they were below the --
Q Book value?
A (Continuing) -- the book value, they were inherent. If that's what you mean.
Q In your opinion should those losses have been taken prior to the second quarter of '91?
A I don't know, because really what happens in these things, you make estimates, and you take the losses as soon as you determine or your best guess what this is worth, you should mark it to market.
We did the analysis and that was our conclusion. If we had done the analysis earlier and come to that conclusion, we would have taken it earlier, I just wasn't there at the time, but we took it as soon as we knew it.
That's the only way I can describe it.
Q Okay. What impact did the economy have on Carteret at this time?



A I guess a mixed impact. We were going through a period where real estate values appeared to be declining, and so that affected the existing portfolio, but we were also going through a period of interest rates starting to fall, and that was very beneficial.
Carteret had a, principally a variable rate portfolio, and had matched against deposits or Federal Home Loan Bank advances, so the spread probably would improve, so it had a mixed effect.
But generally conditions were sort of bottoming in the real estate market, and the interest rate environment was getting better.
Q On Page 1 of Exhibit 6 Mr. Bianco indicates that there were indeed in fact harsh economic conditions in both of the markets in which Carteret operated.
What was the impact of the economy on the Florida markets, was there any difference between the Florida markets and the New Jersey?
A I don't think materially. Again, we said real estate values had declined, and I think that's the harsh market he's talking about, but as far as interest rates were concerned, they had

66

risen previously and were now pretty much topping out, looking like they were improving somewhat.
Q Do you recall in discussions following the second quarter of '91 additional reserves needing to be taken?
A I don't recall. We would have taken our best shot straight out of the box, because if we're going to do it, we ought to do it as right as we can.
Q Was it a possibility that additional reserves would need to be taken?
A I wouldn't dismiss it as a possibility. They could be greater or less, there's no question.
If real estate values turned, maybe those reserves were totally excessive, but we gave it our best shot, as I said.
Q What effect did the increase in the reserves have on Carteret's regulatory capital position?
A It put the company out of compliance with regulatory capital requirements.
Q Was that even including the supervisory goodwill at Carteret?
A Had the supervisory goodwill been

67

restored, no, the company would have been in compliance.
Q What other actions did the Carteret Board take with respect to Carteret's financial condition, improving Carteret's financial condition?
MR. HUME: Objection, vagueness.
You can answer if you know.
A I'm not sure what other actions the Board took. The Board is supervisory and reviews things. Management basically takes and implements the actions. So I don't know what we would have done.
I mean, we hired consultants, we hired reviewers, we hired a management team to run it, I became part of that team, and we did the best we could to make this bank successful. I mean, that was our mandate.
Q Do you recall Carteret proposing the sale of Imperial Premium Finance?
A Yes, I do.
Q Was that in connection with trying to improve Carteret's financial performance?
A Not performance, condition. I just said that the company, when it took the loan loss

68

reserves, was out of capital compliance.
As I recall, and again, going from some memory, Imperial Premium Finance was not capitalized on the books of the bank, and we felt the sale of it to the holding company would put admitted capital back into the subsidiary and move it up to the AmBase level.
That was a proposal. It never was implemented, it never occurred.
Q So the sale of Imperial Premium Finance would have actually benefited Carteret's capital position?
A On a reported capital basis, yes. In economic substance, Imperial was better served in Carteret than out, because it was generating non-correlated profits, but that's definitional.
Q Do you recall your focus at this time was to try to increase Carteret's capital?
A Yes, absolutely.
Q That was the priority over the earnings that Imperial Premium Finance was providing?
A Yes, we were engaged in trying to increase capital, get the company back into regulatory compliance as quickly as possible.

69

Q What efforts were made to sell Imperial Premium Finance?
A Well, it was, that was an intercompany sale, so as I recall, some report was drafted on the value of the company, it was submitted to the Office of Thrift Supervision, because it was a transaction between affiliates and required extensive approval.
And as I say, as I recall, it never occurred. The transaction never took place. It was attempted in concept, but never executed.
Q I'm going to show you what we'll mark as Exhibit 7.
(The above-described document was marked Kramer Exhibit 7 for identification, as of this date.)
Q I'm going to show you what has been marked as Kramer Exhibit 7. If you want to take a minute and just familiarize yourself with it.
A Okay.
Q Do you recognize Exhibit 7?
A I believe I do.
Q Can you identify Exhibit 7, please?
A It's a letter from Deloitte & Touche regarding the appraisal of Imperial Premium

Finance.
Q Do you recall any of the members of Deloitte & Touche who performed the evaluation of Imperial Premium?
A Just vaguely. I don't remember, I mean --
Q Do you recall whether or not the management at Carteret disputed the valuation by Deloitte & Touche?
A No, I don't recall anybody disputing the valuation.
Q I just want to return back to the press release, Exhibit 6, and ask you about some additional efforts at Carteret to improve financial condition.
On Page 3 of Exhibit 6 there's an indication there that management and the Board was interested in reducing operating expenses.
How did Carteret go about reducing operating expenses?
A Through personnel reductions.
Q Okay. Were there branch locations that were closed as a result of that?
A I believe there were, but principally we reduced staff.



Q Do you recall if any of the mortgage production offices were closed in addition?
A Not that I recall.
Q Do you recall the sale of branches in Florida to reduce operating expenses?
MR. HUME: At what time are you talking about?
A There were sales before I got involved to, I believe to, was it Amenson? Possibly Amenson.
Q Do you recall if those sales were to reduce operating expenses?
MR. HUME: Objection, he wasn't at the thrift at that time.
A I don't recall what they were for.
Q While you were at Carteret, were there any additional sale of Florida branches?
A I believe we tried to sell a branch, but not in Florida, in Maryland or Washington, sort of an odd ball piece.
I don't recall that we sold the other Florida branches, not while I was there, but I just don't remember that.
Q But when you were there the sale of branches was an attempt to try to reduce the



operating expenses?
MR. HUME: Objection, mischaracterizes his testimony.
A The sale of branches was, I mean, we wanted to be efficient. If a branch wasn't producing a profit, certainly we wouldn't want to keep it.
That's why it says, "consolidation of some branches."
Q Okay, I'm going to show you another document.
MS. TORNATORE: I think we're up to Exhibit 8.
(The above-described document was marked Kramer Exhibit 8 for identification, as of this date.)
A Okay.
Q Do you recognize Exhibit 8?
A It -- just vaguely, yes. I see I signed it, so.
Q That's your signature on the last page there?
A Yes.
Q What is Exhibit 8?
A It's a letter to the FDIC, the



Regional Director, and it's a response to the report of examination by the FDIC regarding Carteret.
Q What do you recall about the report of examination by the FDIC at this time?
A I recall they had some problems with Carteret and were negative. What happened was the FSLIC had been supplanted by the FDIC at some point, so in order for Carteret to continuing to operate, it needed to be able to have insured deposits.
FDIC was an important institution, and they were critical of Carteret, and this letter was a response from the directors pointing out the changes that had been made and the examination report was of a prior group and this group was coming in to make improvements, and it outlined improvements we were making and the things we were doing to assure the FDIC that it wouldn't be the insurance company of last resort.
Q The Board was simply trying to reassure the FDIC that ongoing efforts --
A I think it was more than just reassure. I think we were informing them of things that were taking place, expense reductions,

74

and a variety of other things, dealing with loan loss reserves.

It was a substantive response to point out that the bank was now being managed on what we thought was a much better basis.

Q Do you recall if the examination findings, were they consistent with Mr. Moor and Price Waterhouse and Kenneth Leventhal's reviews?

A I don't remember. I think they covered a lot of other areas besides loss reserves. The loss reserve was only one part of their review.

Q Do you recall if there was any difference of findings with respect to the loss reserves?

A I don't recall a huge difference.

Q If I could focus your attention to Page 3 of Exhibit 8.

A Yes.

Q Let me see if I can find the reference here.

The third full paragraph there, it starts with the phrase, "With the significant increase in reserves."

A Yes.

75

Q If you would read that paragraph to yourself, please.

A Yes.

Q Was Carteret in capital compliance even including the supervisory goodwill?

MR. HUME: I would object, because the document speaks for itself. I think 1.4 percent is only 1/10 of a percent short of the requirement.

A I don't remember whether it was with or without supervisory goodwill.

Q The document seems to indicate here that the Board of Directors at Carteret thought at this time that Carteret was not in capital compliance including the supervisory goodwill.

Do you have any information that is any different from that?

A No, we said we didn't meet the minimum tests, and I had said earlier we were out of capital compliance following the take down of the loan reserves.

Q Under the asset quality section there, do you recall if there were any disagreements amongst the FDIC's classification of assets and Carteret's own classifications?

76

A I don't recall, but I don't know that anybody disputed our evaluations.

Q In the earnings section which starts on Page 4, it's toward the bottom there of Page 4.

A Right.

Q It indicates that Carteret was attempting to improve earnings from the sale of branches, reduction of operating expenses and consolidation of certain bank functions and withdrawal from certain lending activities.

Generally was that Carteret's business plan going forward?

A That was a part of the business plan. I remember some of them preceded me, some of them were implemented when we came in.

Q Were all of these options available to the management of Carteret when you were the Chief Financial Officer?

A Were these options available? These were strategies we employed, yes.

Q Okay. Do you recall the OTS or FDIC recommending any of those strategies?

A I don't -- we talked with the OTS on a very frequent basis, and discussed anything we did in advance with them and had an examiner

77

virtually living on-site, and so at least with them we had a very close dialogue.

As far as the FDIC, we did everything we could to keep them informed and hopefully keep them happy, because they handled the insurance, and the institution would not be viable without it.

So we certainly made disclosures to Mr. Ketcha at the FDIC and worked closely with the OTS on everything.

Q Do you recall if these strategies were the result of management's own business judgment?

A They certainly were part of our efforts to make sure this bank could restore itself to financial health.

The bank had a huge earning power, we wanted to capitalize on it, and we needed time, and being out of capital compliance puts a great deal of pressure on a management team.

Q I want to focus on a new area.

If you could, I know we've talked briefly about your opinions about the AmBase management prior to becoming a director at AmBase and Carteret.

82

A I think the document looks familiar to me.
Q Okay. Can you identify Exhibit 9 for us?
A It appears to be the minutes of the Carteret Board meeting.
Q What's the date of Exhibit 9?
A September 23, 1992.
Q Were you in attendance at that Board meeting?
A I certainly believe I was.
Q On Page 8 of Exhibit 9, the first full paragraph there starts out with "Mr. Samlin then discussed the Walsh investigation."
A Yes.
Q If you would just go ahead and read that paragraph to yourself.
A Yes.
Q Do you recall an investigation of the prior management at Carteret?
A I guess I do. I hadn't until I saw the paragraph, but yes.
Q Who performed that investigation?
A Well, I guess it's a Mr. Humphries, I see it here. I didn't remember him, but I do

83

remember that vaguely we looked into some matters of the prior management.
Q Who was Mr. Hummer affiliated with?
A I don't remember exactly.
Q Do you recall if Mr. Hummer was an attorney at Sills, Cummis?
A Maybe he was. I think that may have been. I don't remember that we went to anybody else.
Q Do you recall the extent of the investigation?
A Not in detail. We looked into some practices, we looked into some relationships. They looked into a variety of things in regard to how loans were made and who they were made to and whether or not there was any, I don't know, collusion or other things. I don't remember the details.
Q Do you recall one of the subjects of the investigation was the compensation practices?
A Yes.
Q What do you recall about that part of the investigation?
A Again, not a great deal, but it had to do with, as I see here, just refreshing my

84

memory from the document, it had to do with stay bonuses and whether they were paid when they knew the bank was in difficult shape.
Q Do you recall an analysis of the bonuses that were paid and then relating that to the financial condition of Carteret?
A I don't remember an analysis precisely. What I remember I guess was that we came in and increased the loan reserves by some $150 million, $160 million, I don't recall, it was in one of the documents, and management had not recognized that and they took substantial bonuses for what they thought may have been performance, and we wanted to make sure or at least see that they didn't know in advance that this was the case.
Q Do you recall what the conclusion of the investigation was?
A Not in detail, I don't remember. I don't remember that we found anything that we acted on.
Q Do you see the reference there that the investigation was turned over to Milberg, Weiss?
A Yes.

85

Q Do you recall Carteret taking any legal action with respect to the conclusions of the investigation?
A Again, I don't remember that we did. We went to Milberg, Weiss because they were a very aggressive firm and were particularly good at this, but I don't recall the outcome.
I don't remember that any lawsuits were filed.
Q Do you recall Mr. Humphries preparing a report of his investigation?
A I don't. He might have, I suspect he did. I just don't remember the details.
Q Okay. In the second full paragraph on Page 8 there are some statements there in the first few sentences by Mr. Burns. Would you please read those to yourself.
A Okay. That's down at the bottom?
Q Yes, it starts out with, "Mr. Burns said."
A "Mr. Burns acknowledged receipt of the report"?
Q Yes, "Mr. Burns said that it appears to be a very thorough" --
A I'm sorry, I'm with you. All right.

Q Would you agree with Mr. Burns when he said that the prior management had made massive bonuses at a time that Carteret was in a precarious financial condition?
A I certainly with the benefit of hindsight would, and I did suspect at the time when we -- that's what caused the report to be instituted in the first place.
Q That was the initiative in conducting the investigation?
A I believe so.
MS. TORNATORE: Let's go to Exhibit 10.
(The above-described document was marked Kramer Exhibit 10 for identification, as of this date.)
MR. HUME: Is there a question?
MS. TORNATORE: I'm just giving him some time to familiarize himself with the document.
A Okay.
Q Do you recognize Exhibit 10?
A I vaguely do. I don't recall much about it.
Q Can you identify Exhibit 10, please?



A It seems to be an attorney work product, which is a report regarding investigation of former officers.
Q Is Exhibit 10 the Sills, Cummis report that was referred to in Exhibit 9?
A I believe it is.
Q On Page 10 of Exhibit 10 --
A Yes.
Q (Continuing) -- there's a section there entitled "Bonus Payments."
A Yes.
Q I just wanted to see if that section refreshed your recollection regarding the payment of bonuses in relation to Carteret's financial condition.
A I mean, not really. I recognize it to see it. I accept the data as being correct.
Q On Page 20 of Exhibit 10, I just wanted to focus your attention to the third paragraph up from the bottom. It starts with the phrase, "The payments to McCabe."
A "The payments to McCabe were in settlement"?
Q "The payments to McCabe may have been" --



A Oh, right, from the bottom.
Q Yes, from the bottom, I'm sorry.
A Okay.
Q Do you recall whether the Board thought that the bonus payments were an unsafe and unsound banking practice?
A I don't think it was an unsafe banking practice, or just a management practice. We thought they were inappropriate, probably. I guess McCabe was the guy who drove the Porsche.
Q Charles McCabe?
A Right, not Leo.
Q Right. Just so we're very clear, there were two McCabes at Carteret. We're referring to Charles McCabe in Exhibit 10.
A Yes, Charles.
Q On Page 25 and continuing into Page 26 there, there's a discussion there about Mr. Walsh.
A Right.
Q And Mr. Walsh's management practices.
Do you recall that some of the management practices of Mr. Walsh were characterized as an unsafe and unsound banking practice?



MR. HUME: Characterized by whom?
MS. TORNATORE: I think the document characterizes them as such.
A I really don't remember the details of this. Some of it does square with what I said. Walsh was considered a terrific trader of fixed income securities. As far as his qualities as a manager, I didn't see any great difficulties at the time.
Q Do you recall any disagreements with the conclusions of the Sills, Cummis report?
A I didn't find anybody who was dissenting. We took it as given and evaluated it as some third-party testament to what was going on, but I don't think that we disagreed with it.
I don't think anybody stood up and said no, this is not correct.
Q Do you recall any details about Mr. Walsh's trading practices?
A Not in detail, no.
Q Do you recall his relationship to Donaldson Lufkin & Jenrette?
A I believe it was very close.
Q Why was that?

A I'm not sure. They were one of the leading mortgage related securities trading firms, certainly had an important practice. I don't remember whether he had a relative over there or not, that's possible.
Q Do you recall if Carteret was selling loan portfolios to Donaldson, Lufkin & Jenrette?
A I'm sure they were. They were working with DLJ, they were working with Goldman Sachs, that was standard in the business.
Q Do you recall any questions about Mr. Walsh not obtaining competitive bids on some of those portfolios?
A Only vaguely. I don't remember the details. I do know we looked into it, but I just don't remember the outcome.
Q Do you recall if there were a number of transactions in which that was the case?
A Again, I just don't remember. Other than what I say I remember vaguely, I just don't remember the details.
Q On Page 9 of Exhibit 9, going back to the Board of Directors minutes, the first full paragraph on Page 9 starts out, "Mr. Kramer said



that he had had" --
A "Discussed with Mr. Humphries"?
Q Yes. Does that refresh your recollection regarding Mr. Walsh's relationship to Donaldson, Lufkin & Jenrette?
A Not a great deal, no. I'm just reading it now.
Q All right, take your time.
A Okay.
Q Would you agree with Mr. Bianco, who felt that he thought that Mr. Walsh may have violated his fiduciary duty to Carteret?
A I certainly queried it. I don't know that I concluded that he did, but I certainly asked the question, yes.
Q It was a very high concern to the present Carteret Board of Directors?
A Yes, we were concerned that prior management didn't do anything wrong.
Q I'm going to show you Exhibit 11.
(The above-described document was marked Kramer Exhibit 11 for identification, as of this date.)
A Okay.
Q I'm going to show you what the



reporter has marked as Exhibit 11. Have you had a chance to read through that?
A Yes.
Q Do you recognize Exhibit 11?
A Yes.
Q How do you recognize Exhibit 11?
A My signature, but it's a letter from me to Mr. Walsh.
Q Why were you writing to Mr. Walsh?
A We were requesting he return the bonus payment that he took for himself.
Q Do you recall if Mr. Walsh ever did return that bonus payment?
A No, he did not.
Q In the second paragraph of Exhibit 11 you indicate that the bonus payment violated safety and soundness principles.
A Yes.
Q Is that your opinion today?
A I would guess so. In retrospect without question, because the bank is gone.
But at the time, it's also, you know, a statutory term you'd use in these things, but we certainly wanted Walsh to pay the money back.



Q And you don't recall whether or not Carteret initiated any legal proceeding against Mr. Walsh?
A No, we initially did. As I said, Mr. Weprin of Milberg, Weiss was engaged and he was going to give a budget on what it would cost, but I don't recall any action beyond that.
Q You don't recall the resolution of that legal action?
A No, I don't. I'm sure we didn't get any money from Walsh. That I feel reasonably confident about, but I don't recall the details.
Q Do you recall pursuing any legal action against Donaldson, Lufkin & Jenrette?
A I don't recall. We might have, but I don't think so. I don't know that we had anything, you know, that they necessarily did.
We were concerned maybe that Walsh had given them favors without bidding, but I don't recall that DLJ themselves did anything we had deemed improper.
Q Do you recall taking any legal action against Western Federal Savings and Loan?
A No, I don't. Western Federal, it was a bad loan, but I don't remember the details

regulators and the previous management?
A Not a great deal.
Q What did you hear?
A In terms of?
Q Just the nature of the relationship with the regulators.
A As I said, I don't recall a great deal. I don't think they'd come in and tell us a great deal about the things prior management had done.
It was basically the institution and not the individuals. I think they may have to the extent that they had any angst against the prior management or any objections, they would have wanted us to pursue it, but I don't remember, again, details specifically from management to management point of view.
Q What regulatory action had been taken with respect to Carteret at the time that you initially became a director?
A I don't remember, but shortly, somewhere in that area we were under a supervisory order or something like that. I don't remember the terms.
Q Why was the supervisory order



entered into?
A Because we were out of the capital compliance.
Q Do you recall the effect on Carteret of that supervisory order?
A Well, is certainly restricted many things we could do. We couldn't enter into many transactions without prior approval of the OTS.
Q Any other effects on Carteret?
A I'm sure there were, I don't recall specifically what you're looking at in the way of effect.
It constrained things we could to, it affected things we could do. We had to have approval, we had to file reports. It consumed a lot of time. But I don't know it affected in terms of operations, I can't really comment.
Q Do you recall subsequent to the supervisory order any other regulatory action?
A I don't know. Action, I just don't recall what action it was. We filed a plan, but I don't remember any specific action.
Q Do you recall when you filed a plan?
A Somewhere mid-term when I was there, so it had to be probably March of the following



year, that would be March of '92.
Q Why was a plan filed?
A In order to show how we would restore capital adequacy and to project budgets and forecasts.
Q So it was just conveying information to the regulators?
A Yes, but also it was trying to get a plan of how we were going to get the bank back in capital compliance.
Q Do you recall the specifics of the plan?
A I recall the plan reasonably well, because I wrote it, but I don't remember the specific details.
We told them about asset/liability management. We told them about profitability. We told them about the value of certain assets. We told them about loan loss reserves and liquidation and charges. We told them about personnel reductions.
And we had a forecast of our results and we told them the efforts we were making to raise capital.
Q Was part of Carteret's plan the idea



to raise external capital?
A Yes.
Q How significant was raising external capital to Carteret?
A I thought it was significant. I thought it was important.
Q Could Carteret have come into capital compliance internally generating earnings?
A Given time, yes.
Q Over what period of time could Carteret have internally generated enough earnings to come into capital compliance?
A Probably 18 to 24 months, I would guess 24 months at the outside. Carteret was starting to earn substantial money.
Q When you say substantial, what do you mean by that?
A Well, after the year of the write-offs, the following year Carteret earned approximately $35 million.
The forecast for the following year, the year in which the company was taken, the company was earning at the rate of probably $100 million.
Q So in 1991 Carteret earned $35

million?
A I believe that's correct. '91 or '92. I think it's '92, would have been. That year ended, but it would have earned about $35 million in '92. Didn't they take the write-offs in '91? So it would be '92.
In '93 they would have earned I guess about $100 million.
Q Why was Carteret seeking outside capital?
A Because it was out of capital compliance, it didn't have, it didn't meet the standards.
Q Do you recall how much outside capital Carteret was seeking?
A We were looking for $200 million.
Q How did you come up with the $200 million figure?
A That was sufficient to get the ratios back into compliance.
Q That was sufficient to put Carteret in capital compliance?
A Yes, because I don't think a prospective buyer would want to put $200 million into a company that was out of compliance and then



at the time, one, be subject to all the restrictive rules that the OTS had put in, and two, if they failed to meet a forecast, suddenly be taken over or out of compliance.
So the deal had to be to get the company out of OTS direct supervision.
Q So there had to be enough external capital to put Carteret into capital compliance, that was what the investors were looking for?
A Yes, that was pretty much the objective.
MS. TORNATORE: Let's go to, I think we're up to Exhibit 13.
(The above-described document was marked Kramer Exhibit 13 for identification, as of this date.)
A Okay.
Q Do you recognize Exhibit 13?
A I do by my signature, yes.
Q What is Exhibit 13?
A It's a directive, a capital directive from the Office of Thrift Supervision.
Q Why was the Office of Thrift Supervision issuing a capital directive?
A Because the company was out of



capital compliance and it directed them to get the capital compliance back.
Q Do you recall the basis on which the capital directive was issued?
MR. HUME: What do you mean by basis?
Q Well, particularly with respect to the supervisory goodwill, do you recall if for purposes of the capital directive if supervisory goodwill was included as regulatory capital?
A I don't remember the details of supervisory goodwill. I do know that they ordered us to get our capital into compliance, and the directive did three things, that's the supervisory order I referred to.
I guess that's what I was referring to when I said we were placed under a supervisory order.
One, we were obligated to file a plan, two, we were obligated to restrict all transactions without prior approval, so it gave them oversight authority over everything we did, and I guess pretty much ordered us to get and maintain and bring capital back.
It gave us time, if you will, to get



the capital back into compliance.
Q Okay. If I can turn your attention to the capital directive which is toward the back there. It's actually on Page 1 of the capital directive.
In the third full paragraph there it starts, "Whereas, after including all of the goodwill at issue."
A Right.
Q Do you recall that for purposes of the capital directive that supervisory goodwill was included as a component of regulatory capital?
A Again, I don't remember, because there's a detail here that I just, I'm not sure about in remembering.
Some goodwill had already been charged off, some goodwill was admitted. It wasn't the full supervisory goodwill that was there. There was some residual -- I just don't remember. I'd have to find some old documents.
But this referring to the supervisory goodwill. It says, "After including all of the goodwill at issue," and I'm not sure what the goodwill at issue was, I just don't remember, but it wasn't all the goodwill as far as

I know.
Q If there was goodwill at issue that Carteret thought should have been included in regulatory capital, would that not have been included in the litigation, in the District Court litigation?
A You see, I just don't remember. The litigation -- remember, the litigation preceded me. There was litigation against the government in the Third Circuit Court or something that I forget his name now, the New York law firm, LeBoeuf, Lamb, Judge Lacey had, and then that got appealed somewhere.
So that preceded me, but that was the principal goodwill litigation that I recall.
Q Were there additional disputes with OTS regarding goodwill?
A I just don't remember the details. I don't know that we ever disputed anything with the OTS. We were taking circumstances as they were and trying to come out of this thing.
Q What was the Board's response to the capital directive in Exhibit 13?
A We complied. We signed it and complied, cooperated.



Q You've indicated that the Board submitted a capital plan.
A The Board or the management. I think the management did, because I worked on it and I know.
Q Do you recall meetings with regulators regarding the capital plan when it was initially submitted?
A Absolutely. We met with regulators on everything, so sure. There's no question that I shared the capital plan in its entirety with the regulators.
Q Do you recall a Board meeting in the fall of '91 that would have discussed examination findings?
A I'm sure there was. I don't recall a specific meeting, but I know we would have discussed at any Board meeting examination findings.
Q Do you recall members of the Office of Thrift Supervision being present during some of those Board meetings?
A I don't recall.
MS. TORNATORE: Let's mark this as Exhibit 14.



(The above-described document was marked Kramer Exhibit 14 for identification, as of this date.)
Q I'm going to show you what has been marked as Exhibit 14.
A Yes.
Q Do you recognize Exhibit 14?
A It seems to be the minutes of a Board meeting, November 20th.
Q Were you present at that Board meeting?
A I believe I was, yes.
Q On the first page there's a heading there, "OTS 1991 Examination Presentation."
A Yes.
Q Do any of the names of the members of OTS, do those appear familiar to you?
A Yes, of course.
Q Do you recall Mr. O'Rourke?
A Very much so, yes.
Q What do you recall about Mr. O'Rourke?
A Mr. O'Rourke was the OTS examiner, and he was the person who spent the most time at Carteret.



He virtually had an office there and was the one who worked on a daily basis with us on virtually everything.
Q In your opinion he was very knowledgeable of Carteret?
A O'Rourke was a first class examiner. He was very competent.
Q How about John Griffin, do you recall Mr. Griffin?
A I remember Mr. Griffin, yes.
Q What do you recall about Mr. Griffin?
A In terms of?
Q Contacts with him, meetings.
A We met him, we knew him. I don't recall that we had any great detailed work with him, but Griffin was one of the people. You know, all the names are pretty much familiar to me.
Q In second paragraph under that section entitled "The OTS 1991 Examination Presentation" --
A "Concluded at 4/20"?
Q It actually starts with, "Mr. Bianco asked whether" --
A Right.

114

concerns about the review, no. I mean, there were things that we might have taken issue with or disagreed with in how they valued, but again, I just don't recall the details of it.
Q How about any concerns that the regulators might have had with the review by Hamilton, Carter & Smith?
A I don't remember. I really don't.
Q Okay. I'd like to get more into the area of how important the external capital was to Carteret's capital plan.
At this time would you agree that Carteret's future capital compliance had to have the external capital infusion?
A I felt we needed it to get within the time frame that we were given. We couldn't do it internally, we'd need more time. You had asked me that question previously, and I said probably two years to get there.
But yes, you couldn't -- it was not not possible to get there in that short of time that was required to get us into capital compliance, so external capital was essential.
Q Would you agree that if Carteret was unable to obtain that external capital infusion

115

that the viability of the institution was in jeopardy?
A Not the viability -- the viability was in jeopardy only by direct actions of the government.
It wasn't in jeopardy because of an inability to pay its depositors or to meet its commitments or to pay its claims or salaries.
It was only in jeopardy because it was operating with too small a capital base for a very large financial base.
Q What actions of the government jeopardized Carteret?
A It's not jeopardize, it was a seizure. You seize the bank, it's over. As I said, if Carteret were allowed to operate, I did believe it could repair its capital deficiency, but it would have to operate in what one would call a hazardous financial condition for a period, because it had inadequate capital.
Q Do you recall if during the meeting that there were disagreements about the factual issues regarding Carteret's financial condition?
A I don't think we had a great disagreement. I suspect that we all saw things

116

the same way.
Again, I told you, Mr. O'Rourke as living with us, we were living with the examination. We never disputed his findings nor did I think he dispute ours.
Q Do you recall if a potential investor regarding the external capital infusion, if that potential investor would have been interested in the goodwill of Carteret?
A Interested in the goodwill? I don't know. Interested in Carteret, for sure. I mean, that's what we were trying to find, someone who was interested in the institution, with or without the goodwill.
The goodwill itself was not an issue. They wanted an institution who had future earnings power and that was in capital compliance and therefore not under regulatory supervision.
I don't think, as I said a few minutes ago, no one would buy into a thrift that was impaired, financially impaired or out of capital compliance because they couldn't control it.
How would you put money up and still be under the OTS? You had to take it out of that

117

supervisory, what we called it, the capital compliance order or capital directive.
Q How would a potential investor value the goodwill at Carteret?
A I don't know. I mean, it's an asset that would have to be amortized. You value Carteret based on its future earning power, for example, if Carteret acquired a branch from someone that was a failing branch and the government allowed them to book supervisory goodwill, which would be amortized over time.
That isn't necessarily economic value. What the value is is the branch's ability to generate deposits and on the deposits generate income and invest the funds and generate spread.
So I'm not sure how you would, how an investor would value the goodwill, and what they value is the branch.
If I'm acquiring a branch that has $200 million in deposits and is able to earn significant returns on the deposits and run the branch at a low cost, that's what I value.
Q Would the goodwill have contributed to Carteret's earnings power?
A It can't. It's quite the contrary.

It would reduce it, you amortize it.
Q Do you recall the approval of the capital plan that Carteret submitted?
A I recall we got favorable comments on it and we did try to implement it, so I guess we did receive approval and we did try to implement the plan.
Q Were there conditions under which the plan could operate?
A Well, we were under a capital directive. I think that set the conditions. The plan was simply the execution of those issues under the capital directive.
The capital directive said you get your capital. The capital plan is here is how we're going to do it, here is who we're going to see, tell them this is what we're predicting as profits and this is how much money we need.
I think you must have a copy of the plan.
Q I think I must in this large box myself. Let's see if we can get to that.
First I want to focus your attention on Exhibit 16.
(The above-described document was



marked Kramer Exhibit 16 for identification, as of this date.)
A Oh, Bob Flaum, that was the name I was trying to remember.
Q Mr. Flaum was there at Price Waterhouse?
A Yes.
Q I'm going to show you what we've marked as Kramer Exhibit 16. Do you recognize that document?
A It looks like the Audit Committee meeting minutes.
Q What's the date of Exhibit 16?
A December 16, 1991, and I was present.
Q Do you recall there being discussion among the directors regarding the restatement of earnings for Carteret?
A I vaguely do. I was involved in that discussion about restating earnings.
Q What was the discussion of restating earnings?
A Well, as you recall, we took loan loss, substantial loan loss reserves, and the issue is were they the result of actions that



occurred this year or should they have been appropriately restated to prior periods.
And as I said, from my vantage point, once we discover them, we're obligated to book them.
Whether it makes any difference whether they were from '89 or '90 or '91 I had no great feeling for, as long as our current financial statement, the one going forward, was correct.
My only concern was is our balance sheet true today going forward, and I felt we were, so the rest of it, I really didn't have any great --
Q Why was there a discussion of restating earnings? Was it to make it appear as though Carteret had resolved these loan loss reserve questions and was moving forward?
A Make it appear is probably a bad way to state it.
It was simply to allocate to the appropriate period the losses, the timing recognition of profits, which as a historical fact had no great significance for me.
Q In your experience in financial



markets would you consider a restatement of earnings to be a significant event in a company's history?
A It depends, not necessarily.
Q How often have you been involved in companies that have restated earnings?
A Well, you restate earnings for different reasons. In this particular case it was to allocate losses, but you restate earnings as a result of an acquisition where you have to restate because you've acquired a company and you have to include their results in yours.
You restate when you change your fiscal year. That we've done many times.
But as far as restate because of losses, I don't think I ever did that before. I don't think I ever did that.
Q Do you recall if Carteret actually did go ahead and restate earnings?
A I don't think we did. I'm pretty sure we didn't. Again, I'm not a hundred percent sure, but I don't think so.
Q Do you recall why you all declined to restate earnings?
A As I said, I'm not sure, but -- no,

I really don't remember why we didn't, but I never considered it particularly important.
Q Were you generally familiar with the litigation regarding the supervisory goodwill claim in the District Court in New Jersey?
A I, unfortunately I was more familiar with the billing than I was with the actual facts of the case, but I was familiar, yes, with Judge Lacey's, Frederick Lacey's work.
Q Were you involved in initiating that claim?
A No, I came in after. It was already underway.
Q Had you heard who was involved in initiating the claim?
A I don't remember exactly. I do think it preceded us.
Q Subsequent to your tenure on the Board at Carteret, were you involved in evaluating whether or not to continue pursuing that claim?
A Subsequent to my tenure?
Q Yes.
A No -- when I stayed on the Board, I stayed there for three months longer. I was asked to stay at the bank following its takeover and I



did for what I felt was an appropriate period of time, but no, I don't remember --
Q Okay. Subsequent to when you actually first became a director at Carteret, were you involved in evaluating whether or not to continue pursuing the goodwill claim?
A Not in evaluating it, no. I knew it to be ongoing, and I presume it was running its course.
Q Do you recall the Board aggressively pursuing the claim?
A I don't think the Board pursues the claim. It's the attorneys. So I mean, I hope the attorney was certainly aggressive and an advocate and doing the right thing.
Q Did the Board think that the supervisory goodwill claim was important to Carteret?
MR. HUME: Objection, it's been asked and answered several times.
A I thought it was important.
Q Was the goodwill claim important in recapitalizing Carteret?
A I'm not sure what outcome would have come about as a result of it, so I don't know.



Q Was the capital plan that was submitted to OTS, did that include supervisory goodwill as a component of regulatory capital?
A I'm not sure. I'm sure we used what we could use. We took every capital that would be admitted, but I know -- as far as the lawsuit or anything like that, I don't know that there was anything that we could have ever included for that.
It was strictly a financial plan based on earning power, capital infusion and reaching capital compliance as early and as quickly as we could.
Q Was the goodwill claim more important than the capital infusion?
A I don't understand how you make relative judgments. The capital infusion would have put us into capital compliance. The bank would never have been taken. It's important.
If the supervisory goodwill would have put us in capital compliance and the bank would have not been taken, it still -- it would have been equally important.
I just can't evaluate that.
Q Do you recall a Mike Simone with the



Office of Thrift Supervision?
A Yes.
Q What do you recall about Mr. Simone?
A He again was one of the people, one of the executives over at OTS that was working with us on our case.
Q Would you say that he was very knowledgeable about Carteret's financial condition?
A I think Michael Simone knew our company pretty well.
Q I'm going to show you what we'll mark as Exhibit 17.
(The above-described document was marked Kramer Exhibit 17 for identification, as of this date.)
Q I'm going to show you what we've marked as Exhibit 17. Just take a few minutes to read through that. It's not terribly long.
A Okay.
Q Do you recognize Exhibit 17?
A I don't recognize the document, it's not my document, but its contents are familiar.
Q You've indicated that you had a number of meetings with members of the OTS in the

fall of 1991.
Do you recall specifically a meeting on November 5th?
A I pretty much recall this meeting that's described in the document, yes.
Q Do you recall expressing the view that you were not a proponent of the supervisory goodwill case?
A I see it says so here, yes, and I guess that would probably be right.
Q Do you recall what your assessment of the outside counsel was handling the goodwill claim?
A Well, I think I said, testified just earlier that it was expensive and that I was -- I knew more about the bills than I knew about the case, and this just confirms that view. We were concerned about the cost.
Q And at this time I take it Carteret was taking aggressive action to try to reduce operating expenses.
A That's correct.
Q And the legal fees were significant enough to play into that decision?
A Yes.



MS. TORNATORE: If we could mark Exhibit 18.
(The above-described document was marked Kramer Exhibit 18 for identification, as of this date.)
Q Mr. Kramer, I'm going to show you what we've marked as Kramer Exhibit 18.
If you want to take a moment to read through that document.
A Okay.
Q Do you recognize Exhibit 18?
A I think I do.
Q What is Exhibit 18?
A It's a January 14th letter to Nicholas Ketcha of the Federal Deposit Insurance Corporation, and it was jointly authored by Mr. Bianco and myself.
Q That's your signature on the last page of Exhibit 18?
A It is.
Q On Page 2 there's a discussion there regarding Carteret's capital ratios. In that discussion it indicates that Carteret is not in capital compliance with or without consideration of the goodwill suit.



What was the goodwill suit?
A It wasn't the goodwill suit, it's the permission to use the supervisory goodwill.
Q I see.
A So we said even if you allowed us to use the supervisory goodwill, we still wouldn't be capital compliant.
And in fact, that's how we came up with the number for the amount of money we needed, if you notice, $206 million, we said we needed to raise about $200 million to be in compliance.
Q I see.
MR. HUME: I would just like to note for the record the numbers here do not reflect goodwill, right?
THE WITNESS: Right.
A For purposes of correcting we said, in this case we said without -- we're going to measure its future capital without supervisory goodwill.
That's why I said we wanted to be in compliance and out of the OTS supervisory directives.
Q Okay. On Page 4 of Exhibit 18, at the sixth point within the document there.



A Right.
Q I guess the comment had been made by Mr. Ketcha that the viability of the institution is dependent on this outside capital.
And the response was, "There is no comment necessary."
What did you mean in your response there?
A Well, the capital plan is to put the company in compliance. If you're not in compliance -- he's saying the viability is dependent on outside capital.
We said the capital plan will put us in compliance. That was the whole capital plan. If you buy into our capital plan, you'll be in compliance.
Q So the foundation of the capital plan was the outside infusion.
A Right.
Q Do you recall what the results of the goodwill claim was at the Third Circuit?
A As I recall, the company won the initial case and then it was reversed on appeal. That's what I remember.
Q Do you recall the timing of the

Third Circuit decision?
A Not exactly.
Q Do you recall if there was an effect of the reversal on Carteret?
A No, I don't think there was an effect from that, because only if Carteret won would it have had an effect. There was nothing in there for it initially, if I remember.
Q I'm going to show you Exhibit 19.
(The above-described document was marked Kramer Exhibit 19 for identification, as of this date.)
Q And I have no doubt that you will recognize this document.
A "From the desk of." I must have really been mad.
Q Do you recognize Exhibit 19, Mr. Kramer?
A It's a letter that I wrote, yes.
Q That's your signature on the last page there?
A That's my signature.
Q Can you identify Exhibit 19?
A It's a letter to Donald C. Greene, senior partner at LeBoeuf, from me dated May 12,



1992.
Q LeBoeuf, Lamb was handling the goodwill litigation for Carteret?
A Yes, Judge Lacey, Frederick Lacey.
Q Does Exhibit 19 pretty much sum up your opinion of the counsel handling the goodwill claim?
A Well, I was angry about the fact that we weren't informed I think more than anything else.
It wasn't the outcome per se. I felt we were billed tremendous amounts of fees. LeBoeuf would charge us for things like coffee and stuff with an override.
So I mean, they were creating a profit center even out of their cafeteria. I was furious.
Q They were billing their overhead expenses to their clients?
A Overhead with a margin. I think that's outrageous.
Q On the third page of Exhibit 19 there, the second paragraph there it starts out with, "By failing to communicate" --
A Yes.



Q (Continuing) -- "with its client." You indicate that there were some press articles.
A Right.
Q That had I suppose described the decision at the Third Circuit level.
Do you recall that having an impact on Carteret's capital raising efforts?
MR. HUME: What having an impact?
Q The press attention on the Third Circuit decision.
A Well, we think that first of all, it couldn't help us as an institution having unfavorable press on this thing and showing that we're capital impaired or whatever, but also not giving us a chance to prepare for it, or deal with things.
There were situations that we could deal with that were crisis type if we had just had an indication they were coming.
Q And LeBoeuf, Lamb was inadequate in providing that?
A It's not inadequate. They just didn't. They should have. They didn't. As I said in the memo, I could see my anger.
In fact, it reminds me of it, I'm



getting angry again that they could track me down on vacation when they were looking to get a bill paid.
Q I saw your reference to three faxes or something along those lines, being pulled out of meetings and such.
I want to go into a little more detail about the capital plan and the capital raising efforts now.
Who was primarily responsible for coordinating the capital raising efforts at Carteret?
A Well, Dick and I did it together.
Q It was a joint effort on your part?
A Yes, we worked well together and we tried to pool our contacts and relationships. Some people were people I knew, some people were people he knew.
Q Were other employees at Carteret involved at a pretty detailed level?
A Well, I had staff working for me producing numbers, figures, schedules and the like, helping me with the writing of the plan, but as far as the actual contacts with prospective investors, until they got to a point where they

134

would want to do due diligence, Dick and I were their points of contact.
Q Who were the staff members who were working with you?
A There was Lee, I forget his last name, the head of my accounting and financial department, but also just about everybody, McCabe, Mary Reither, just about anybody who could give me information.
I took the entire resources of the bank in getting me information.
Q Mr. Moor was a participant in that effort?
A Yes, Mr. Moor as well.
Q When you and Mr. Bianco started formulating a list of prospective investors, did you simply just kind of come up with some names that you thought might be interested?
A Well, we sat around and first decided who possibly could be a prospect. As you know, we engaged Merrill Lynch as well to help us in those efforts as placement agent, and I guess that's pretty much what we did.
We sat and decided to we know, who we should get to know, who would be interested in

135

buying the thrift.
Q When did you first start formulating this list of prospective investors?
A Just about the time that we prepared the capital plan, because the capital plan itself became the basis for the document to describe to them how we could recapitalize the bank and how viable it could be.
Q Do you recall if this would have been the fall of 1991 when prospective investors were contacted?
A I'm not sure of the date. Certainly we made an effort on it. When did I submit the capital plan? It's about that time.
Q Okay.
A Let me just take a look. It would be November of '91.
Q Okay. Was the capital plan actually given to the investors, or was there other information?
A We were preparing a document based on the capital plan, but yes, I think we disclosed the capital plan itself.
Q Do you recall any other investment banking firms other than Merrill Lynch, as you've

136

indicated?
A As far as representing us, I think Merrill did, tried to put it together. I knew many other investment banking firms, so I talked to them, but I don't know that we engaged anybody other than Merrill.
I'm sorry, we did talk to, what is it, the GE Capital subsidiary, Kidder Peabody.
Q Do you recall the names of anyone at Merrill Lynch?
A Yes, I do. Kevin Albert.
Q What do you recall about Mr. Albert?
A He was head of their private placements.
Q You worked with him on a one on one basis?
A Well, we worked with him, he was the placement agent. He was the fellow who tried to get us the money, and he was the one that would introduce us to the clients and hopefully try to close the deal.
Through Merrill we met people.
Q Anyone else at Merrill Lynch?
A I'm sure there were, I just don't remember all the names, but certainly Kevin Albert

137

was one. I think maybe Steve Goulard, but I don't remember.
Q How about any names at Kidder Peabody, do you recall anyone from that firm?
A Yes, vaguely I just can't remember. It's in here, I just can't remember. A tall, thin fellow.
Q We'll get to some documents, I think I can help you out there.
A Okay.
Q Do you recall a company named American Stock Transfer?
A Yes, I do.
Q How do you recall that company?
A Their chief executive, a Michael, what's his name? -- was also interested in acquiring Carteret. We tried to convince him to put up the money.
Q Is that Michael Kurfunkel?
A Yes.
Q What inquiry did AST make of you or Mr. Bianco?
A Oh, they met with us, they came in and visited the institution. I think they did some due diligence, they had some people for them

138

at our company. They took a serious interest.
Q Was this in 1991, late 1991?
A Probably, yes, it had to be around that time.
Q Do you recall what the result of their due diligence was?
A They never -- I don't know about the due diligence, but they never really committed to the deal.
They were interested, they were trying to find a way to do it on something of a shoe string, borrowing money or finding other ways.
American Stock Transfer was a very nice business, and very profitable, but not particularly big, and this would have leveraged them into the big leagues financially, because they'd be acquiring a $5 billion depositary institution, and from an earnings point of view, that could send them to the moon, but I think they were trying to bootstrap the deal.
So they were interested, but they really weren't -- they didn't have the ready cash to do the deal.
Q They didn't have the resources to do

139

the deal?
A No, not like what a GE Capital could have done.
Q Do you recall any objection by the OTS to American Stock Transfer?
A Not initially. I think they checked them out, I think they would be concerned be anyone who would do the deal would have to pass muster with the OTS as an approved person to do the deal, so yes.
Q Do you recall the OTS objecting to any prospective investors that you or Mr. Bianco discussed?
A I don't think so, I don't think so. I don't think we got far long enough to really actually file the application to get the answer to that question.
But again, we were in full disclosure with the OTS, so they knew what we had in prospect. They knew everything we did. We didn't do anything without disclosing it.
Q Do you recall a company named the Carlyle Group?
A Yes, I do.
Q How do you recall the Carlyle Group?

140

A They were a prospective investor. They were a former -- Frank Carlucci, former Secretary of Defense, was the principal.
Another fellow who looked at us, together with a fellow named David Bonderman, who is the owner of Continental Airlines.
Q What was the extent of Carlyle's interest in Carteret?
A They're a venture capital investment firm. They had principally invested in defense industries, given Carlucci's background, but they looked at an investment in the thrift and heard our presentation and visited our company.
But my feeling was the government sort of scared them away. They were told don't go near a thrift, the government is savage and it goes after thrift directors, and you have to be crazy to get into this business, and so they finally walked away.
Carlucci said I've done a lot of investments, never once was I so warned away from investments like this one.
Q Who was warning Carlyle?
A People who were friends of the company telling them stay away from a thrift, the

141

government is just impossible to deal with.
It was really awful. It was not fun to hear.
Q Even though the Carlyle Group would invest in defense contractors?
A Yes, that's exactly right. "Given the controversial stuff we've done, nobody called us more than when we talked about the prospective possibility about putting money in a thrift."
Q Do you recall any names at the Carlyle Group, any individuals?
A Vaguely, I just can't remember offhand, but there was a second guy who was the principal operating officer.
I'm sure there are documents, we'll find it.
Q Angel DiNello?
A DiNello was one, but there was another one.
Q David Dupree?
A No, still another one besides him. Those two now I remember.
Q Those are the only names that I was able to come up with.
A There was somebody senior to both of

them, it was Carlucci's partner in the company, and he's the one who told me that.
Q Let me show you Exhibit 20.
(The above-described document was marked Kramer Exhibit 20 for identification, as of this date.)
A Okay, I recognize in as a letter I wrote to David Dupree on September 30, 1992.
Q When providing information to a prospective investor in Carteret, would the list of information include various detail as you've indicated here in the letter?
A I presume it would, sure.
Q Financial report projections?
A Yes.
Q Information on the origination and servicing side of the institution?
A Yes.
Q Toward the bottom of that first page there the paragraph starts, "We will write down or eliminate all intangibles."
A Yes.
Q Do you recall that in the capital plan that the intangible assets of Carteret would be written off?



A Yes, we'd use purchase accounting. Under purchase accounting you could only take the fair value of the assets acquired, and anything above that becomes goodwill.
Forget supervisory and other goodwill, this is accounting goodwill.
Q GAAP goodwill.
A Yes.
Q Do you recall a company named Colony Capital?
A Colony I'm not sure I remember.
Q Thomas Berrick?
A Maybe, but I don't remember having much to do with them. I think Dick may have handled that.
Q Mr. Bianco was more familiar perhaps with those people?
A Very likely, because Colony I don't remember well.
Q Okay. How about Kohlberg & Company?
A Yes.
Q What do you recall about that firm?
A I know them very well. Jerry Kohlberg was one of the founders of Kohlberg Kravis & Roberts, and one of the most successful



businessmen.
He retired from the firm and formed his own firm, Kohlberg & Company, and he and his son Jim had a venture capital firm for investments.
We knew each other for years, so I went to him soliciting his interest, because I believed it was a sound investment for him to make, and he could buy the thrift at what I thought was a terrific price, so we did negotiate with them.
Q What response did you get from Kohlberg & Company?
A They showed interest. They came around, they visited Bianco and myself, he and another associate, and they did some due diligence, and we went fairly far along the road of trying to bring them in as a capital provider.
Q What due diligence did Kohlberg & Company do?
A They visited us, management, looked at the books, looked at our plans. They hired some experts I believe to look at the company and a variety of other things, and they tried to come up with some method for which they could put the



money in and still be secured.
Remember, AmBase still owned it, and they had to work something out with AmBase, but again, it was an investment of we hoped approximately $200 million.
Q Do you recall the interest by Kohlberg & Company as being one of the firms that expressed a stronger interest in Carteret?
A I would say they went further than almost anybody else, yes.
Q Do you recall that their level of review of Carteret was more detailed perhaps than some of the otherss?
A Yes, they incurred some serious expenses in trying to get this out, yes.
Q Do you recall the name of the firm that they retained to do the due diligence review?
A It had a funny name. Z something.
Q Lyons, Zaumbach & Ostrowski?
A Yes, LZO, that was the way we called it, yes.
Q Do you recall the names of any of the principals at LZO?
A I guess the named principals all pretty much worked on it, was it Dan Lyons?

Q John Lyons?
A Yes. Anyway, they were supposedly experts in the savings and loan business.
Q What was your opinion of LZO?
A Candidly not particularly high. They seemed to be tainted by prior experience and really didn't look at this thing I think objectively.
They had some biases on a lot of areas. For example, we spent a lot of time before telling you that we thought the reserves were well done.
They just generically said they can't be, they have to be twenty percent understated, because everybody else's is, and not giving us credit for what we did and not looking at them as they should have, because we were liquidating loans constantly, equal to the reserve.
They said but you're going to take twenty percent hits and things like that.
We never really saw their final report, but they were negative on thrifts generally, negative on real estate, negative on thrifts.



And like our friends at Carlyle, they were very cynical about the government's relationship. They said you just don't want to get into this thing.
Q What views had they expressed about the government relationship?
A Again, just the fact that it wasn't a desirable thing to do, to get involved with a thrift.
Q Do you recall a Mr. David Maughan at Kidder Peabody?
A Yes. That's the tall, thin guy I referred to.
Q Do you recall what your opinion of Mr. Maughan was?
A I thought he was a competent investment banker.
Q How about a Matthew Lindland at Kidder Peabody?
A I don't remember him.
Michael Carpenter was the other name at Kidder Peabody. Michael is now I believe the head of Salomon Brothers, part of Citigroup.
Q What was Mr. Carpenter's involvement?



A He was chief executive at Kidder Peabody. He came out of GE Capital, who was the owner of Kidder Peabody, and he was the most senior executive at the company.
Dick and I knew him, we wanted to -- he knew us on favorable terms, that we were responsible and good guys, and so we talked to him about getting Kidder to back this deal.
Q Was GE Capital a prospective investor in Carteret?
A Yes.
Q What was the level of GE Capital's inquiry?
A It never got very far. I don't think they wanted to do a thrift.
Q They just weren't interested in a thrift investment?
A That's my guess. I never got it up to Gary Wendt, who I knew. We dealt with a lady named Nori Cunio. She was Hawaiian, I believe.
MS. TORNATORE: Let's go ahead and mark Exhibit 21.
(The above-described document was marked Kramer Exhibit 21 for identification, as of this date.)



Q Do you recognize Exhibit 21?
A Yes, it's a letter from Kidder Peabody to Neil Cohen and myself from, I guess it's Matthew Lindland, and it sets forth a time schedule for the private placement.
Q Do you recall that Carteret was given specific amounts of time within which the capital plan was to be executed?
A I think we were, yes.
Q Do you recall how much time that was?
A Not exactly, but I knew we had a time stamp on it.
Q Were there extensions that were granted with respect to the timing of the capital plan?
A I believe there were at some point. We were making pretty good progress, but couldn't quite close.
Some for the reasons I told you, some for just time to get people going through the holidays, Christmas, New Years, a whole variety of things, but I believe we were given some additional time.
Q Do you recall that the estimate of

150

capital raising efforts by Kidder Peabody was a realistic effort or a realistic schedule?
A It was realistic, but in my recollection, and I'm not a hundred percent sure, I thought that basically Merrill took it over and Kidder dropped out. That's somehow what I remember.
But I do remember the real effort was made by Merrill, by Kevin Albert.
Q Merrill Lynch was more of the lead?
A Yes, I believe so.
MR. HUME: I'm sorry, was the last question, did it have something to do with the documents or just about the effort in general?
MS. TORNATORE: I was just trying to get Mr. Kramer's impression of the schedule, time schedule.
MR. HUME: The schedule on this document?
MS. TORNATORE: The schedule on the document.
A The schedule is not in the control of Carteret. It was in the control of the prospective investor.

151

We'll do everything we can, but if the investor needs more time, we're governed by that.
Q You've mentioned Kevin Albert's name a number of times, and you've indicated that he seemed to take more of a lead role in terms of the go-between with the prospective investors.
A Yes.
Q Would Mr. Albert typically request specific information of either yourself or Mr. Bianco?
A Kevin was a facilitator, not -- he would take us to the marketplace. He knew the clients. He knew who invested in what.
Basically it was our job to sell ourselves. His job was just to get us there, into the right place.
Q There were times, though, when Mr. Albert would have a prospective investor asking for specific information and you would forward that?
A He might come back to us and say so and so wants to know about this, or he'll tell us their preferences or vice versa.
Q Was it either yourself or Mr. Bianco

152

who would provide that response?
A We worked as a team. There was no difference.
Q In some situations would the specific area managers at Carteret provide a response?
A Well, the money -- the information would come from management, but basically we provided it, Dick and I.
Q Do you recall investors having questions about the adequacy of loan losses?
A Absolutely.
Q It was one of those key issues that a prospective investor had?
A It was of course a key issue.
Q How about the composition of deposits and fluctuations in deposits?
A People were interested in deposits and cost and duration and time.
Q Did investors have questions about the value of the servicing portfolio at Carteret?
A Yes.
Q What questions would they have about that?
A Well, its duration, its performance

153

under different interest rate scenarios, our ability to contain costs, because it's a heavy processing business where costs are critical.
Our ability to continue to increase the loan portfolio, the servicing portfolio, because remember, it runs off in time as loans get paid off.
The effect of an interest rate change, and would it cause refinancing in the portfolio.
So investors were concerned about the viability of that.
Q Prepayment fluctuations?
A A whole variety of things, sure.
Q Would investors have questions about delinquency rates on the loan portfolio?
A Absolutely.
Q Collection efforts?
A Absolutely.
Q That kind of thing, okay.
How about the liquidation time on the problem loans, were there questions about being able to I suppose market properties within a certain amount of time?
A That was probably a tertiary issue

and not a primary issue.
The issue was do we have it reserved adequately. If we have it reserved adequately, then if we dispose of it in a week, a year, a month, it should be appropriately valued.
And to the extent we can dispose of it and put a non-performing asset into a performing asset t, hat's just a win for the bank.
So they were interested in it, but I don't think the question of how fast we liquidated it, because if we're willing to take very huge losses, they could be liquidated in a flash, but you'd take more losses.
We were trying to get the best price we could get. We'd negotiate and hold out. The negotiation in the Orlando hotel, it took us nine months to a year. The guy walked away, he came back, he walked away, he came back, and finally we closed the deal, in fact above the carrying value.
So it was our job to get the best possible value out of everything we liquidated.
Q And in some situations it took a number of months to go through that process?
A Absolutely.
Q Do you recall if investors were



concerned about, I suppose AmBase as a holding company of Carteret?
A I think it was clear that AmBase would only have a small minority interest in the company and not be the principal owner, because if they're putting in the money and AmBase is contributing the bank, they're putting in most of the capital.
And they would want to have, whether it be 90 or 80 percent or whatever the appropriate value was, and they wanted to be sure that they'd get first crack before either AmBase or management or anybody else.
Q Do you recall any investors expressing concerns about contingent liabilities at the AmBase level?
A I think a few people were concerned. Again, I think the contingent liabilities were possible government suits or actions or whatever more than they were -- I don't know what other contingent liabilities there were.
Q Were there any shareholder derivative claims at the AmBase level?
A AmBase had shareholder claims, not derivative, but shareholder suits, yes. But that



was AmBase, certainly not against Carteret.
Q Did that have an effect on whether AmBase would issue the stock or Carteret would issue the stock?
A I think the issue -- there was never an issue. Maybe we thought about it once or twice, but it was always to issue it as a discrete thrift, to take Carteret public the way it was before.
Q So it was always the issuance of stock at the Carteret level, okay.
Do you recall in some situations where investors would put together their own group to perhaps take over or to acquire Carteret?
A I don't recall a group in that sense. We were trying to put the group together. If we couldn't do it individually, to find several people, but I don't recall any group itself that would try to do that.
Q Were there cases in which investors were not willing to put in the whole $200 million, but they were willing to put in some portion of it?
A That's why I say, that's where Kevin Albert came in. That was the kind of thing he had



to do, get an aggregate of $200 million by assembling it from pieces.
Q He could find people who were willing to put in pieces of the $200 million?
A That's what he was trying to do.
Q If he couldn't find someone to put in the whole $200 million?
A Another option was to do a public offering, and unfortunately the window didn't open until a few weeks after they took the bank, then bam, The Dime Savings Bank came out and got its money.
Q Would in your opinion Carteret have been successful in a public offering?
A The answer is six weeks later, yes. Initially, probably not.
Q Was that pursued as an alternative, perhaps?
A We looked at it, but as I say, the window didn't seem to be open at the time.
Q Was that because there were restraints in the, I don't know, the IPO market?
A The IPO market was not buoyant at the time, yes, but it turned very quickly thereafter.

That's why I say the minute The Dime Savings Bank went, the whole market just went, and the thrifts traded in a whole new valuation.
Q Why do you think that was, that time period there?
A It's timing, it's interest rates. Interest rates continued to decline. They declined right through October of '93.
Carteret was taken over in December of '92. And decline in interest rates was a bonanza for the thrifts. They made a fortune.
Q Let me see if I can pull out an additional document here.
MR. HUME: Counsel, can we go off the record for one second.
MS. TORNATORE: Certainly.
(Discussion off the record.)
MS. TORNATORE: Let's go ahead and mark Exhibit 22.
(The above-described document was marked Kramer Exhibit 22 for identification, as of this date.)
Q Mr. Kramer I'm going to show you what we've marked as Exhibit 22.
If you want to take a few moments



and just familiarize yourself with it.
A Okay.
Q Have you had an opportunity to review Exhibit 22?
A Yes.
Q Do you recognize Exhibit 22?
A Yes, I do.
Q How do you recognize Exhibit 22?
A This is a forecast I had prepared for the capital plan basically contemplating a $200 million capital contribution and the restoration of the bank to capital compliance; core capital.
Q You seem to have recognized Ledyard Smith's name.
A Yes.
Q Do you recall Mr. Smith?
A Yes, he was the Controller and he worked directly for me.
Q What was your opinion of Mr. Smith?
A He was a good guy. I liked him.
Q Very competent in his knowledge of Carteret?
A I thought he was competent, yes.
Q Was Exhibit 22 typically the type of



forecast information that was provided to a prospective investor?
A It was in this case. Typically I don't know, but it was certainly in this case.
By the time I had prepared this, I had on my own financial models actually been able to match every asset and liability with its allocated cost.
So I had very good feeling and knowledge of both the cost and the income from every single asset and liability of the bank.
Q You were able to match those two?
A Yes, and our forecasts were really quite good. We never missed, that I recall, ever missed a forecast that we gave the OTS.
There were variables you can't control, interest rates, spread, et cetera, but on the stuff we knew, we were right on.
Q I want to go through the names of some additional investors.
Do you recall PNC being a prospective investor in Carteret?
A Oh, yes, I certainly do.
Q How do you recall PNC?
A PNC was very interested in the



thrift. Pennsylvania was a neighboring state, PNC was a major aggressive bank, and they had a real interest in it.
We worked out several different concepts or plans for working it out for the things they wanted.
One of them was to split the bank, get back in capital compliance, leave us with, I believe it was a New York region, and we'd come up with a smaller but viable thrift.
We had a whole variety different concepts with them. They were very anxious.
Q There were a number of different alternatives that were discussed with them?
A Yes.
Q Do you recall when you first approached PNC?
A I don't. It was toward the tail end of things. Things were winding down, so it had to be late in 1992.
We were already, had struck out with a number of investors, and we were pretty far down the road in time, and this was late in that game, but they were very seriously interested.
Q Do you recall any of the names at

162

PNC?
A I don't exactly, but it's funny, because I -- we sponsored a golf tournament last year, and PNC was on the Board, our co-sponsor, and the guy recognized my name from Carteret and he said, "Oh, we were so interested in your bank."
Q Do you recall Walter Gregg?
A Vaguely I do.
Q Was he affiliated with PNC?
A I think so. I just, again, it's funny, I'm usually good at names. So much was happening. I remember right now numbers better than I remember names.
Q How about David Williams?
A I don't remember him.
Q Do you recall why the PNC deal never went through?
A No, I'm not sure, I'm not sure, but I think we were running out of time, it was getting late in the game.
I think we had gone past the deadline, so we were under a lot of pressure from the Office of Thrift Supervision, and I think we just sort of ran out of time.
Q Had PNC gotten to the level of

163

performing a due diligence on Carteret?
A They came in and did some work. I don't remember how far they went, but they did a fair amount of work.
I just don't remember -- I remember, it's funny, because I remember us being locked up in a conference room for nearly 20 hours working with them trying to go through all the details.
Q How about the Pennsylvania Teachers Fund?
A They were one of the prospective capital investors as opposed to a -- they wouldn't have taken the whole thing.
They would have been one of the people who syndicated, but they wouldn't have done the whole thing, they couldn't have.
Q They weren't an operational investor?
A No, they had a venture capital arm. It was a multi-billion dollar pension fund. A couple of billion was hived off for private placements, and there was a fellow named Kent Weimouth, who was head of their private placement operation. He took a serious interest in us.
Q Do you recall what due diligence if

164

any at all Pennsylvania Teachers Fund did?
A They came in and looked at all of our plans, got to know Dick and myself, went through the various models and financial analysis they had.
They were very good in their analysis, but they would never be a lead investor. They would be a following investor.
Most venture deals, you need someone who is the lead, then a bunch of other guys come around and follow.
Q Do you recall Pennsylvania Teachers Fund approaching anyone to become that lead investor?
A Not -- I don't think they tried to do it, but I think Merrill tried to work around them, saying they were in, probably they were about a $25 million player, so they'd take 10, 12 percent of it.
We needed some others to be core.
Q To be the lead investors?
A Yes. I forget, we talked to a guy who was the emissary, he was the investment manager for Sheik Al-Wali, who is the guy who invested in Citibank, and we talked to him.

165

I forget his name now, but he looked at us as a possible investor, and he would have led with Weimouth, but I don't think that ever materialized. He made a fortune with Citibank.
Q Do you recall why the Saudi Prince was not particularly interested in Carteret?
A Oh, I just think we didn't get far enough with his young fellow who did it.
He didn't have that level of authority. He was sort of out there as the exploratory factor, but we didn't get too serious.
We were exploring every avenue we could. Dick and I wanted to get it done.
Q Do you recall the name John Lane?
A I'm not sure, no.
MS. TORNATORE: Let's mark This as Exhibit 23.
(The above-described document was marked Kramer Exhibit 23 for identification, as of this date.)
A Now I remember John Lane.
Q Mr. Kramer, I'm going to show you Exhibit 23. Do you recognize Exhibit 23?
A Vaguely I do, yes. It's a memo from Merrill Lynch.

Q To yourself and Mr. Bianco?
A Yes.
Q The date on that is August 10, 1992.
A Yes.
Q Does Exhibit 23 refresh your recollection about the interest in investing in Carteret by the Pennsylvania Teachers Fund?
A That's the same, that was the Kent Weimouth, same thing. Lane was Weimouth's boss. Lane ran the whole fund, Weimouth ran a portion of private investments, he and Win Churchill.
Q Just a few questions about Mr. Albert's memo here. Mr. Albert seems to indicate that Pennsylvania Teachers Fund had some questions.
A Yes.
Q Regarding Carteret.
A Yes.
Q I just wanted to ask if I could see if you recall what response you gave to the questions that Pennsylvania Teachers raised regarding asset disposition?
A We indicated clearly that we thought we sold the assets as they came due. We weren't picking the low hanging fruit.



We played the game straight. We sold some tough stuff, actually.
Q Do you recall other investors expressing a concern that the easier marketable assets were --
A No, but if I were in their shoes, I'd probably ask the same question, but the fact is we were really working hard to market that portfolio. We sold some very tough stuff where we had to bite the bullet.
No, I thought, I really did believe in the integrity of our marketing program. As I say, somebody said to me how come you guys are selling assets and nobody could sell them, and it was because we marked them down to what the market value really was.
Everybody tried to defer the losses and not recognize them and keep them in abeyance, because it obviously affects your capital.
We just didn't play that game. Dick and I came in our, and job was to do it right and make the balance sheet true.
Q Do you recall the firm of Tory, Tory, Deslauriers & Binnington?
A I don't recall those names.



Q David Elrich?
A No.
Q The MacArthur Foundation?
A Yes.
Q What do you recall about MacArthur?
A MacArthur Foundation had been the largest land owner in Palm Beach. They were one of the largest private foundations.
We thought that they along with Teachers could be part of a syndicated group. That was part of the Merrill Lynch marketing issue.
We went down to, I forget, somewhere in the Palm Beach area, and visited with them and tried to discuss with them that possibilities of investing.
I think at the same time I think we also spoke to, while we were down in Florida, the Teachers Florida Pension Fund, something like that.
Q Do you recall the level of interest that the MacArthur Foundation had in Carteret?
A They listened. Because they were a local institution, because we had branches in Boca and nearby, they took an interest in us, but they



didn't go much further than that.
Q Do you recall why they declined to invest in Carteret?
A No. I really can't tell you why someone doesn't.
Q Do you recall the names of anyone affiliated with the MacArthur Foundation?
A Vaguely. I just can't remember his name.
Q Brad Heppner?
A Yes, that's it; a bright young fellow, very enthusiastic.
Q Do you recall a gentleman by the name of Philip Grace?
A No. I think that was probably Heppner's boss, but I don't remember.
Q How about U.S. West Capital, do you recall their level of interest in Carteret?
A Again, yes, I do. That was Ted Berger and James Osan. Osan ran the company. They looked as part of the group as well, but, and I must say, they were really smart guys, you know, they asked us a lot of good questions, they focused on the material, the important stuff, and not on the junk and peripheral.

174

Q Do you recall any further interest that was expressed?
A No, I didn't get very far on that.
Q Was there a reason given?
A No, I think I couldn't get Henry interested, he was doing other things.
Q Was Exhibit 24 typically the type of letter that you would send out to a prospective investor?
A No, no. I just looked at the date. This was early in the process, so we were really soliciting interest.
It was later in the process when we had culled the list of people who were really interested.
Q You got down to a much shorter list?
A A shorter list and more interest. I mean, initially Dick and I were just trying to find out who we knew. We were trading off all our contacts from a lifetime in the business.
We both had good backing, good followings, good reputations. We tried to trade off that.
Q Do you recall a pitch book being sent out to prospective investors?

175

A You mean a private placement memorandum?
Q Something along those lines, yes.
A Pitch book is just sort of not the way I would say it. We did prepare documents. I don't remember exactly, but I think we used the capital plan as the basis for it, because we were consistent with -- what we told the OTS is what we told our investors.
Q Financial statements would have been included in that?
A Absolutely, and updated, and the projections, the kind of stuff we saw.
Q You've indicated that this external capital infusion would be accounted for in the purchase accounting method basis, is that right?
A Yes.
Q So the financial statements would conform to that method of accounting.
A Right, a new holding company, and they would purchase the assets of Carteret, and anything above the fair value would be goodwill, and anything less than that would be of course negative goodwill.
Q Let me show you Exhibit 25.

176

(The above-described document was marked Kramer Exhibit 25 for identification, as of this date.)
A Okay.
Q Do you recognize Exhibit 25?
A Yes, I guess I do. This is the, one of the short versions of the memos done early on in the process.
Q Would Exhibit 25 have been a document that was typical to send out to a prospective investor in Carteret?
A This would have been, yes.
Q On the first page of Exhibit 25, the page marked 1 at the bottom, there is an executive summary there.
A Yes.
Q In the right-hand column on that particular page it indicates that an infusion of approximately $215 million --
A Right.
Q (Continuing) -- would be required.
Do you recall the amount of outside capital that Carteret was pursuing, do you recall that fluctuating?
A Not materially. I mean, it was $200

177

million, $215 million. It's not a material difference.
215 is a calculation calculated backwards. Find out what compliance is, then come back to find what you needed, but if you took time.
But by the end of the year you would have been well above compliance, because you had retained earnings, but it's a fluid number.
But it's pretty much in the $200 million range that we kept talking about.
Q On Page 10 of Exhibit 25, there's a table there that shows the pro forma balance sheet of Carteret.
A Yes.
Q On a projected basis following the capital infusion, Carteret would not have given value to goodwill, or it was significantly decreased?
A I presume under purchase accounting it wouldn't have been counted.
Q Under the footnote number 2 with respect to that table there, if you would read that footnote to yourself.
A Right.

182

contact, because I know a lot of these people, but I certainly didn't.
Q I suppose that was more the role of the Merrill Lynch and Kidder people?
A Yes, but we were not standing on ceremony, we were all trying to do the best we could, and certainly if we had relationships. Odyssey Partners, they were my old partners.
Anyway, that was part of our efforts to syndicate the deal.
Q Okay.
MS. TORNATORE: If we can take a break I can go over my questions and see what might be left.
THE WITNESS: Sure.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
Q Mr. Kramer, I did come up with a follow-up question that I need to ask, and I apologize if perhaps you've already responded to it, but I do not recall the name of the company that you were affiliated with which took legal action against KPMG or Peat Marwick.
A It was NAC Re, a large reinsurance

183

company.
Q Was that a malpractice claim?
A I believe so.
Q Do you recall the years in which that claim was pursued?
A '82 -- no, I'm sorry, it was circa '85, so it must have been '88, '89, and by NAC Re lost, as they appropriately should have. It was a terrible case.
Q I take it you weren't involved in the decision to initiate that claim?
A I was Chairman of the Board, but no, I did not. It was our Chief Executive Officer at the time, our President, who issued the Complaint and the Board went along.
So I guess I was part of it, but I hated it.
Q To that extent, at least.
Mr. Kramer, did you understand the questions that I asked of you today?
A I think I did, yes.
Q And you responded truthfully to each of my questions?
A I believe I did, yes.
Q Do you have any changes or

184

supplements to any of your responses?
A I don't think so. I'll read the transcript, but I don't think I do.
Q Has anyone offered you a fee to testify in this case?
A No.
Q Has anyone offered you a fee as a consultant in this case?
A No.
MS. TORNATORE: I want to thank you for appearing. I'll let Mr. Hume ask any questions that he might have at this time.

EXAMINATION BY MR. HUME:

Q Mr. Kramer, I'm going to ask you three or four very quick questions so we can depart as quickly as possible.
Do you recall during your deposition when counsel for the government asked you about the $150 million reserve taken in 1991?
A Yes.
Q I think counsel for the government asked you whether that reserve reflected inherent losses on the balance sheet.

185

Do you remember that question?
A Inherent losses?
Q Yes.
A I guess they're losses.
Q Do you remember that the $150 million writedown would have included reserves taken as a provision against future losses?
Would you agree that that's a fair description of what a reserve is?
A Well, I would describe it as a mark to market of the assets.
Q Which means that not all of those assets are necessarily going to be worth zero, they may simply be worth at that time less than their carrying values?
A That's what we said. We tried to find out what they were worth and mark them to market.
Q And the reason for doing so is so that the balance sheet of the thrift is less vulnerable to future losses if those assets would be sold later?
A I would say so the balance sheets reflects the true value.
Q Do you remember when counsel for the

186

Department of Justice asked you whether or not you remembered whether anyone disagreed with your decision, the decision of Carteret management at that time to take this writeoff?
A Yes.
Q Is it possible in your mind that Angelo Vigna may, as he testified in his deposition, have recommended to Dick Bianco that he not take this full amount of reserves at that time, all at once?
A Yes, it's possible. I just don't remember.
Q Would you agree that the decision as to what is a mark to market, a true mark to market is inevitably a subjective decision, it's always open to some judgment and finesse?
A Yes. It's open to also empirical result, if you really sell it for what you think it's worth.
Q Do you recollect that a lot of those assets had real estate as collateral, so that a tough real estate market at that time would have led to quite tough valuations? And by tough, I mean low.
A Again, whatever the market was at

187

the time we reflected it, so if it was a tough market, by definition we reflected it to the market.
Q Do you think that your decision to take that sizable reserve in the second quarter of 1991 helped you in establishing credibility with investors on Wall Street?
A I think it was part and parcel of what we do. We want to keep a true and honest balance sheet. They're going to come in and do due diligence. If we haven't marked it properly, they're going to mark us down.
Q Do you remember when counsel for the government asked you about the value of goodwill to Carteret?
A Yes, I do.
Q Would you agree that supervisory goodwill, if it was included in capital and allowed you to stay in business had very significant value to Carteret?
A Well, I think I testified as I recall that whether we stayed in business because of goodwill or whether we stayed in business because of a capital infusion, either one of them, as long as we stayed in business, would have been

188

valuable to the company, because we could have earned back our future income.
MR. HUME: I don't have any more questions.
MS. TORNATORE: Thank you for appearing today, Mr. Kramer.
THE WITNESS: Thank you.
MS. TORNATORE: I appreciate it.

________________________
DONALD KRAMER

Subscribed and sworn to before me
this ________ day of____________, 1999.

________________________
NOTARY PUBLIC

189

E_X_H_I_B_I_T_S

| KRAMER | | FOR_IDENT. |
|---|---|---|
| 1 | Document Bates stamped AMP 071861 - 62 | |
| 2 | Document Bates stamped A 003360 - 82 | |
| 3 | Document Bates stamped WOP 7700451 - 546 | |
| 4 | Document Bates stamped A 006697 - 727 | |
| 5 | Document Bates stamped FAM 0022361 - 65 | |
| 6 | Document Bates stamped WOP 2910518 - 21 | |
| 7 | Document Bates stamped WOQ 6922182 - 88 | |
| 8 | Document Bates stamped WOQ 6002024 - 31 | |
| 9 | Document Bates stamped C-AM-A 0180801 - 09 | |
| 10 | Document Bates stamped C-AM-A 0361954 - 87 | |
| 11 | Document Bates stamped WOP 3251570 | |
| 12 | Document Bates stamped WOQ 6972212 - 14 | |
| 13 | Document Bates stamped WOP 3440587 - 603 | |
| 14 | Document Bates stamped AM 00065167- 74 | |
| 15 | Document Bates stamped C-AM-A 0213912 - 65 | |
| 16 | Document Bates stamped AM 00060877 - 80 | |
| 17 | Document Bates stamped WOQ 6530277 - 80 | |
| 18 | Document Bates stamped AM 0048418 - 24 | |
| 19 | Document Bates stamped E-AM-A 0000003 - 5 | |
| 20 | Document Bates stamped C-AM-A 0178322 - 3 | |