# EXHIBIT BB

UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------x

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
:
Plaintiff :
:
vs. : NO. 93-531
:
THE UNITED STATES OF AMERICA :
:
Defendant :
----------------------------------x

The deposition of J. PAUL RAMEY, JR., was held on Tuesday, April 12, 2005, commencing at 10:00 a.m., at the Radisson Hotel, 210 Holiday Lane, Annapolis, Maryland, before Ronald E. Bennett, Notary Public.

APPEARANCES:
DAVID THOMPSON, ESQUIRE
On behalf of Ambase Corporation

DAVID C. HOFFMAN, ESQUIRE
On behalf of U.S.A.

ALSO PRESENT: LESLIE A. CONOVER, ESQUIRE
GARY A. KUIPER, ESQUIRE

Page 22

A. Yes.
Q. In 1994 was Mr. Held, Herb Held, was he the head of the Office of Major Resolutions?
A. I believe he was.
Q. The RTC was pursuing the congressional mandate to implement. One question I had; are you aware of any discrimination by the RTC, racial discrimination, in selling of branches or any aspect of selling financial institutions during your tenure at the RTC?
A. No.
Q. During your tenure at the FDIC, were you aware of any racial discrimination in the federal government in selling branches or failed institutions?
A. No.
Q. We are done with that document.
I would like to ask the court reporter to mark as Ramey Exhibit 2, a document that bears the Bates number WOP2990739. And it extends through WOP2990800.
(Deposition Exhibit Number 2 marked for purposes of identification.)
BY MR. THOMPSON:
Q. I know this is a long document. I only

Page 23

have a few specific questions about it. So the record is clear, the title page states that this is a Resolution Trust Corporation, Division of Resolutions is the header. Summary of RTC Minority Preference Resolution Programs, amended February 28, 1994. Is that correct?
A. Yes.
Q. Turning to what is the second page of text, the third page of the exhibit, in the first paragraph under Subheading C. These efforts by the RTC to enhance participation in the resolution process and to increase the viability of minority institutions shall be hereinafter referred to as minority preference residence resolutions.
In conjunction with all of these marketing efforts, the RTC may make interim capital assistance available. Let's stop there.
Is interim capital assistance, was that ever shorthanded ICA?
A. I don't recall.
Q. We'll call it interim capital assistance. Was that essentially a loan from the RTC to the minority bidder that would facilitate an acquisition?
A Yes.

Page 24

Q. You know minorities were not eligible to get interim capital assistance; is that correct?
A. Not that I recall.
Q. Continuing on in that paragraph. Performing loans and other performing assets may be made available to eligible minority acquirers in Resolutions covered by B and C above.
Is the way this part of the program worked that they would have the option to acquire certain loans after they closed on the branches?
A. That's my understanding, but not in all instances. It says they may make -- let's see. Performing loans and other performing assets may be made available. It means what it says.
Q. You don't have a recollection that is inconsistent with this?
A. No. Or consistent.
Q. Okay. Fair point. Let's turn to what is designated page 6. Paragraph under asset sales. First couple of sentences talk about the asset option that we just described. The second sentence reads; in addition, the RTC may make available on a rent-free basis, to any minority depository institution or woman-owned depository institution any branch office facility owned by a failed savings

Page 25

association located in a predominantly minority neighborhood.
Do you recall this feature ever being used?
A. No, I don't recall it.
Q. Okay. You don't recall whether Carteret's branches were ever subject to this rent free situation?
A. No.
Q. I have no further questions of this document.
I would like to ask the court reporter to mark as Ramey Exhibit 3 a document that bears the Bates number C-AM-A-0130527.
(Deposition Exhibit Number 3 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Mr. Ramey, I'm going to represent to you that the e.mail has -- the way these e.mails appear to be formatted -- certainly, if you have a different understanding at anytime today, let me know, but it appears that in the top box you have the to, the copies and the from. Then you have to go down to the bottom, original message. Those two correspond. To the extent people have comments or

A. No.
MR. THOMPSON: I would like to ask the court reporter to mark as Ramey Exhibit 10 a document C-AM-A- 001-275.
(Deposition Exhibit Number 10 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from Herb Held to yourself and Mr. Jumpiter. September 19, 1994?
A. Yes.
Q. I talked with Manny Friedman and Karen Edwards this morning. I told them that Jack Ryan was not talking with any of the bidders on Carteret since he may be the deciding party on the case. They wanted to make sure that we weren't giving out any additional info on the assets. I assured them that no information would be given to the bidders until after closing.
Do you recall whether it was the standard procedure of the RTC not to disclose information on the assets, that the minorities would have an option to acquire until after the closing on the branches themselves?
A. I don't recall.
Q. If that were the policy, you don't recall



the reasons for it?
A. No.
Q. I'm about to leap into some documents that pertain directly to the sale of Carteret's branches. I don't know whether you would like to take a short break now?
A. Now would be a good time.
(Brief Recess)
MR. THOMPSON: I would like to ask the court reporter at this time to mark as Ramey Exhibit 11 a document that has the Bates number C-AM-A- 0120028.
(Deposition Exhibit Number 11 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from Darryl Burton to Mr. Held, copied to yourself and several other people. January 26, 1993. Is that correct?
A. Yes.
Q. Do you recall what Mr. Burton's responsibilities were at this time?
A. No.
Q. Do you have any recollection of Mr. Burton?
A. No.



Q. The e.mail reads; it is my understanding Tommie Thompson and Paul Ramey met last week to discuss among other things the operational side of resolution preparedness. Who is Mr. Thompson?
A. I believe he worked with Ed Mahaney. I'm not certain.
Q. Out of this conversation came the message to Mr. Ramey that the major resolution case prioritization was open to revision if there are justifiable reasons.
It was in this light that Steve Haley and I called you today to request Carteret-4-92 DOC 12-4-92, less than two months since intervention be moved from Round A to Round B.
And my question is; what did it mean to be moved? Did you have targets -- we want to sell these institutions first and the second and the third?
A. That's correct.
Q. And?
A. A would be the first.
Q. Over one year since intervention was proposed as a placement for Carteret in round A. The rationale is Hansen's MAPP is done with AGLARS completion scheduled for April 30th, 1993. This is



ideal for Round A which will commence within 30 days of funding.
Do you recall what the MAPP and AGLARS, what those acronyms stand for?
A. No.
Q. Conceptually can you explain what the point that the author is trying to make here as to why Hansen should go in front of Carteret?
A. It would be speculation if I said anything. It would be because Hansen had been over one year since its intervention.
Q. You don't have an independent recollection of this decision?
A. No.
Q. When it says this is ideal for Round A which will commence within 30 days of funding. Is the funding referred to there congressional funding?
A. Yes.
Q. Was the funding necessary so that, if you are doing branch sales, you have got cash to give the acquirer?
A. The funding was necessary to do any resolutions period. We never knew what the requirements would be, cash requirements for any individual institutions. Once we used the

appropriated funding, we had to stop period.
Q. Do you recall whether there were such periods while you were at the RTC?
A. Oh, yes.
Q. How frequently did this happen?
A. Not very often. I don't recall how frequently. It was infrequently.
Q. Do you recall what the gap tended to be?
A. No.
Q. To the extent you could do a resolution that didn't cost any money, say someone were going to pay a big enough premium, could you pursue those sorts of opportunities?
A. I don't recall any such times like that.
Q. Okay.
A. There may have been.
Q. Right. I understand. Continuing on. On the other hand, Carteret's MAPP and AGLARS are not projected for completion until June 25th, '93 and May 31st, '93 respectively.
Again, were these the target dates for resolution? Is that a fair inference of what these dates mean?
A. I wouldn't assume those dates are resolution dates. They needed to be completed



before the resolution.
Q. You can't recall what these things are?
A. No.
MR. THOMPSON: At this point I would like to ask the court reporter to mark as Ramey Exhibit 12 a document that bears Bates number C-AM-A- 0125185.
(Deposition Exhibit Number 12 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a memo from yourself to Mr. Horton, dated October 26, 1995; is that correct?
A. Yes.
Q. The opening paragraph states; as requested in your memorandum of October 23, 1995k, I offer the following observations/comments on the hypothesis list which was attached. It must be taken into consideration in all my comments that I have absolutely no idea as to what the circumstances were that led to the individual items on the hypothesis list attached to your memorandum. However, it appears to me the list was put together to come up with something skewed to support FDIC methodology. I have only commented on the Resolutions section. Do you see that?



A. Yes.
Q. That is your signature on the first page of this document?
A. Yes.
Q. Do you have any recollection of preparing this document?
A. No.
Q. Do you recall whether it was typical at the end of the resolution to do this sort of postmortem analysis?
A. There were postmortems done. I don't know how often or in how many instances.
Q. Do you have a recollection as to whether they were only done when there was a sense that there was a problem that needed to be fixed?
A. I don't recall.
Q. I have a couple of things that I wanted to understand here. On the second to last page of the document, Bates number 188 at the bottom. It's the last comment. First comment Resolution costs increase significantly the longer the institution is in conservatorship.
And your comment was, I doubt that anyone at RTC would dispute this and it certainly was not the intent of any RTC officials or personnel to



continue conservatorships any longer than was necessary. As stated earlier, use of the conservatorship vehicle was not the RTC's preferred method of moving forward toward resolution.
Do you agree with that assessment?
A. That was my assessment at the time. I don't recall -- it's logical is all I can say.
Q. Okay. Is the reason it's logical that the longer an institution is in conservatorship, its deposits run off, its key managers leave, its loan operations slow down or shut down, and those things taken together negatively impact the franchise value?
A. Those could be some of the reasons. But I would assume that one of the main reasons would be that, first of all, the institution is going down hill to begin with and was in bad shape, was not being, probably not being run correctly. And so conservatorship would not necessarily cure these ills.
So, conservatorship cannot cure that necessarily. So the institution is going to continue to go down hill and could lose value, as it would if it were still an opening operating institution.

Page 70

enough for them no matter who it was. But I don't recall any specifics in the minority community.
Q. Okay. Do you recall any complaints about the Carteret bidding process?
A. No.
Q. This memo continues; to ensure that the efforts of the RTC are coordinated and that the program is administered in a manner that fully implements the spirit and intent of the law, I am requesting that the three of you serve as members of a special purpose task force.
The mission of the minority resolution task force is to, one, outreach to potential minority acquirers; 2, answer questions and provide direction regarding policies and procedures; 3, arrange consortia of minority and majority bidders where appropriate; 4, promote post resolution sale of PMN offices; and 5, ensure that the resolution process is administered consistently and make recommendations for changes where appropriate.
I expect the task force will remain in place until all resolutions have been completed. By working together we should be better able to ensure the success of this important effort.
Do you recall having been a member of the

Page 71

minority resolution task force?
A. No. No.
Q. Do you recall ever having any meetings with Ms. Booker or Mr. Horton about this task force?
A. I recall that we did meet. I recall this. But I don't recall specifics.
Q. What do you recall about the minority resolution task force? Do you have one meeting or several meetings?
A. I have no idea.
Q. Do you have any recollection of what sorts of things you would have talked about generally?
A. I know that Johnnie Booker, Tom Horton and I met regularly about minority resolutions. I don't think we ever necessarily said this is a task force meeting. We met as the task force to discuss the issues. I don't think we had scheduled formal meetings.
Q. Okay. What were the issues that you all focused on at a high level of generality to the extent you can recall?
A. To increase the minority participation in the process was -- I think was the primary focus.
Q. Do you recall what you did to try to effectuate that?

Page 72

A. No.
Q. Do you recall how that impacted Resolution of Carteret in any way?
A. No.
Q. One of the purposes of this task force was to outreach to potential minority acquirers; is that right?
A. Which in turn would reduce the cost to the RTC and taxpayer. The more bidders, whether minority or non-minority, increases the chances of you getting more and better bids.
Q. Well, let me ask you, did the minorities, do you think that they competed effectively against the non-minorities?
A. That I couldn't answer. In certain instances they had the ability to match bids. So it would stand to reason, the more you had as far as minority bidders, the more participation you would have. I don't have any specific recollection.
Q. Let's look back at Ramey Exhibit 12, and specifically the second to last page of that exhibit. 188 Bates number. The last hypothesis. And comment reads; pre-screening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received.

Page 73

Although the statement may be true, I believe apples and oranges have been mixed here.
What do pre-screening of bidders and minority bidder preference programs have in common. Pre-screening, if you are talking about up-front disqualification from bidding, would likely result in a lesser number of initial attendees at a bidders' meeting and theoretically decrease the competition.
As for any type of bidding preferences, it has been my personal opinion that this is a deterrent to the competitive aspect of bidding process; however, this is not been definitively proven to be the case.
Now, do you have any, at the time you wrote this, do you believe that you had this opinion?
A. I'm sure I did.
Q. Was the reason that you had that opinion that, if one group knows that another group has a preference, and is going to be able to come in and match the bid at the end of the day, there's going to be concern in that first group they are going to do a lot of due diligence, spend a lot of time and still not going to get to close even if they had the

unfair or is this just another delaying tactic for some who probably won't be able to do a deal anyway.
Do you see that?
A. Yes.
Q. Was the concern that you were expressing here about a potential delaying tactic by those who wouldn't be able to do a deal anyway, was that based on your experience that the minority bidders who were de novo had a harder time closing deals than established financial institutions?
A. I don't recall.
Q. Is that a reasonable inference from this?
A. Not knowing who the other groups were. I probably wouldn't know who they were if you told me. It could have been someone that I was familiar with that had possibly tried a delaying tactic some other time and it was not able to consummate a transaction. It could have been something like that. But I don't know.
Q. You were concerned with delay? You didn't want a delaying tactic. Is that fair?
A. Not for the sake of delaying, when we had everyone ready to go. It was in the form of a question. I was asking them what did they think.
Q. Sure. The next document that I would like



to have marked as Ramey 27 is a document that bears the Bates number C-AM-A- 0014370.
(Deposition Exhibit Number 27 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Mr. Ramey, the original message is from Mr. Hambric to yourself, dated August 16, 1994. You can see that at the bottom. Then you make some comments to Mr. Hambric. Rather than reading this into the record, if you wouldn't mind taking a moment to read this, I'll ask you a question or two.
(Pause)
A. Okay. Go ahead.
Q. In your comments you are making the point that putting the bid off from August 15th to August 26th is going to be beneficial because it will allow potential acquirers to focus on the northern and southern franchises separately. Is that the point you are making in this e.mail?
A. Give me your question again.
Q. Let me strike that and ask the question this way. Are you explaining in your comments in this e.mail that one of the reasons, and the quote real problem, close quote, was that a minority group working either alone or with non-minorities would



not have been able to close on the entire franchise?
A. In part. Because we feel we are going to get a better transaction by delaying.
Q. Just so I'm clear. The delay that's contemplated here on your August 16th memo is pushing the bidding back from August 15th, which had been planned, to August 26. Is that correct?
A. I believe so.
Q. And then you're making the point here that, look, the minority bidders under the new regime we will be able to bid on the southern and northern portions of the franchise; is that correct?
A. I think so.
Q. Okay. And was the concern that, if it was a whole, if the entire New Jersey franchise were sold, that it would be difficult for a minority group to participate as one of the new owners?
A. And that we might not have as much interest -- the more options we could give bidders, the better chance we had of doing a deal, a better deal.
Q. Okay. It was a combination of those two things?
A. I think so.
Q. Let's move on to Ramey 28, Bates number



C-AM-A- 0077122.
(Deposition Exhibit Number 28 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is e.mail from you to Herb Held, Mr. Jupiter, Ms. Yore, dated August 30th, 1994. Is that correct?
A. That's correct --
Q. Okay. This is just five days after the bids have come in. And the e.mail reads in part; Johnnie Booker just called me, 5:45 p.m. Tuesday. Glen Sergeon just called and reported that Mike Berman... with FD Terrell had called him and said they had been notified by us that they were in the running, and had to show evidence of something to us by tomorrow. They are asking Sergeon to buy them out or come in with them. Because they, FD, don't have money or regulatory approvals.
I told Johnnie that we would just have to wait and see what it really comes up with, but we can not flip a bid from one group to another. Also, I would assume that Terrell would want Sergeon's money, if he has any, that Booker would want to maintain control. I doubt that Sergeon would be too respective to this.

Page 106

just to review this. And then I'll ask you some questions.
(Deposition Exhibit Number 32 marked for purposes of identification.)
A. Okay.
Q. This is e.mail from yourself to Mr. Held and Ms. Yore, dated September 6, '94; is that correct?
A. Yes.
Q. It references a conversation with Mike Burgee. You reference a couple of problems that you had with Terrell. Is it fair to say one of the problems was the fact that they were talking to other bidders?
A. That's correct.
Q. Is the concern there basically a concern over potential, I would call it price fixing, but a coordinated bid so rather than competitive process --
A. That was a concern.
Q. And then the second thing that you reference here is the fact that his statements about how much cash he had appear to be a false statement. Was that a concern?
A. Yes.

Page 107

Q. The third thing was, he breached confidentiality agreements. Was that a concern?
A. Yes.
Q. Were all these reasons to reject his bid?
A. So far as I can tell.
Q. Let's mark as Ramey 33, Bates number C-AM-A- 0131553. This is a letter from yourself to Mr. Burgee, September 6, '94; is that right?
A. Yes.
(Deposition Exhibit Number 33 marked for purposes of identification.)
Q. Okay. And the first sentence says; I am writing in response to a letter that he had written. But my question really refers to the second page, the second paragraph.
We do understand that it is difficult for any de novo or private investor group to complete this process based upon the amount of capital and structure required. However, we began this process in mid-April and worked very closely with all minority groups in an attempt to accommodate their needs.
What were the difficulties that a de novo minority investor would face?
A. Raising capital and getting regulatory

Page 108

approval. Among other things. That just comes to mind.
Q. In terms of the regulatory approval, the regulators would do a lot more due diligence for someone who wasn't an established player. Is that it?
A. That's correct. Especially if it's not an established player -- checking backgrounds and so forth.
Q. In the second part of that sentence. We began this process in mid-April and have worked very closely with all minority groups in an attempt to accommodate their needs. Was the work that you did with the minority groups and outreach that you did, was that an attempt to satisfy the congressional mandate?
A. In part. And in part it was to try to get as good a deal as we could. We would be working with minority groups and others prior to even scheduling a resolution. We might not have one scheduled.
If we had an institution in conservatorship, then people would know sooner or later we are going to resolve it. They might come to us ahead of time and say, when you get ready to

Page 109

resolve this institution, we want to be considered. What do we need to do. We would work with them, whether it be a minority or otherwise. Because of congressional mandate we were, I won't say we worked harder with them. We didn't. We want to be sure that we did everything that we were mandated to do, plus try to get the best deal.
We are talking about all minority groups. That's because he is involved in a minority group. Had this been someone other than a minority group, we would have probably said we have worked with all bidders in attempting to do this.
Q. One question I had was, in terms of the outreach, did that take extra time to the minority community? Did you spend more time, and did that extend the process, because you were trying to be inclusive and reach out to as many minority bidders as possible?
A. It may have taken more time indirectly, but it also widened our, broadened our base of bidders. You might think that it was a detriment to the resolution process; whereas, there were times when it probably benefitted the process because we did bring more groups to the table.
Q. With respect to Carteret, do you have an

Page 110

opinion as to whether the bids would have been the same with or without the Minority Preference Program I still don't know anything about Carteret. We are talking about Carteret here. I don't even know how big it was. I don't know -- I don't remember anything about -- Leslie told me where it was a few days ago. I just don't remember.

Q. I understand. I'm just trying to make sure we have a full record. It's not a problem.

We were going to look at this one, which was -- we are done with 33.

We are going to go to the next Exhibit, Ramey 34, and it has a Bates number of C-AM-A- 0014288.

(Deposition Exhibit Number 34 marked for purposes of identification.)

BY MR. THOMPSON:

Q. This is a letter from MidLantic to Mr. Ryan. You're a cc on it; is that right?

A. Yes.

Q. It's dated September 14th, '94. I would like to direct your attention to the second paragraph towards the end where it says; in spite of RTC bidding procedures for minority preference resolutions, bidding rules which provide for a 72

Page 111

hour match period, see bid overview,... the RTC provided the minority match bidder over 120 hours or until 5:00 p.m. on Wednesday, September 14, 1994, to provide a matching bid and proof of capital. Do you see that?

A. Yes.

Q. Do you have any reason to doubt the accuracy of that factual statement?

A. No. Nor to agree with it.

Q. If it were true, would it be evidence of the resolution's department commitment to try to get a minority investor to acquire Carteret?

A. Not necessarily. It could be evidence of us doing what we try to do, is to try to do is to get the most cost effective resolution. So is the 72 hour match period is not mandated by Congress. That was a guideline that we went by. If it took less or more time, if we thought that the resolution process would benefit by it, then we would probably do it.

Q. Let's look at the next exhibit, which would be Ramey 35. And it bears Bates number C-AM-A- 0131544.

(Deposition Exhibit Number 35 marked for purposes of identification.)

Page 112

BY MR. THOMPSON:

Q. This is a letter from Peter Knight, Director of the office of Governmental Relations to representative Peter King. Did you ever have any dealings with Peter Knight?

A. Yes.

Q. This is dated September 27, 1994, a couple weeks after the events we have been looking at. First paragraph makes reference to a letter that Representative King had sent on behalf of Francis Terrell.

Do you have any recollection of congressmen contacting your office about the Minority Preference Program?

A. No.

Q. Mark as Ramey 36 a document that bears the Bates number C-AM-A- 0131543.

(Deposition Exhibit Number 36 marked for purposes of identification.)

BY MR. THOMPSON:

Q. This is a letter from Representative Rangel to Mr. Ramey. You are listed as the copy in the bottom left-hand corner. First sentence makes reference to the fact that Mr. Rangel is writing in response to Mr. Terrell concerning the RTC policy

Page 113

implementing the Minority Resolution Preference Program. Do you have any recollection of seeing this correspondence?

A. No.

Q. Does this refresh your recollection that Members of Congress were keenly interested in minorities acquiring Carteret?

A. Not Carteret specifically. I just know they were interested in minorities in general.

Q. Were they applying pressure for you all to sell institutions to minorities?

A. I was never involved in any pressure from any congressman. We may have had meetings and they would express concerns. In no way was I ever pressured from any congressional office to do other than what we were supposed to do.

Q. Okay. In the third paragraph Representative Rangel says; as you know, in creating the RTC's Minority Resolution Preference Program Congress's intent was clear. The first goal was to resolve failed thrift institutions in an expeditious manner.

As I understand this process of the Minority Preference Program, it adds on a second layer of bidding. Do you think that the Minority

Page 114

Preference Program really expedited the resolution of conservatorship?
A. In certain instances it did. Yes; I'm sure it did.
Q. Can you name any?
A. I can't name any institutions specifically. But there were times we didn't get any bids to help minorities acquire institutions.
Q. Can you recall any instance in which the only bids you all received were pursuant to the Minority Preference Program?
A. I believe there were some. I cannot remember any specifically.
Q. Wouldn't those bidders have won anyway? There is not a second round of bidding.
A. There is more to the minority preference bidding procedures than matching bids.
Q. The interim capital assistance?
A. Yes. I don't know what else. There are a lot of factors involved in the minority preference. The matching bid ability was just a portion of that. This would delay the bidding, the final bidding process. There were times when we never received any matching bids.
Q. Then it's irrelevant.

Page 115

A. Yes. Also, I don't know, in all due respect to Congressman Rangel, it sounds like he's preaching to us that here's what the intent was. I don't know that that was the intent. I'm not sure he knows what the intent was. That's his opinion. He's free to write that down on a piece of paper.
The first goal to receive a failed thrift in an expeditious manner. I don't know, I don't think that had anything to do with their intent. That is his opinion.
Q. Let's look at the second goal that he references.
A. To promote ethic diversity in the banking community to better serve communities, including some which I represent that are frequently neglected by banks and thrift institutions.
Q. Do you believe that was one of the goals of Congress?
A. I don't know. Except I don't see where acquiring an institution that's not in one of those areas helps that area.
Q. I'm sorry?
A. In other words, he says ethic diversity in the banking community to better serve communities, including some I represent that are neglected by

Page 116

banks and thrift institutions. When you do this, you are not establishing an institution in an area that's neglected. You're going into an area that exists with a banking institution.
Q. I understand. Mark this as number 37.
(Deposition Exhibit Number 37 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is e.mail from yourself to Mr. Held, Mr. Jupiter, Ms. Yore, Mr. Smith and Ms. Starke.
A. Yes.
Q. It's dated September 22, 1994?
A. Right.
Q. It's just after, shortly after the Terrell bid has been rejected. It references some concerns about Mr. Sergeon. Even though we have put a 14th deadline on Sergeon, it won't be done by then and the end of the month is likely, if at all. On the 14th probably the best we can hope for is, some sort of indication from the regulators that he can possibly be approved with some background checks still outstanding.
Money in the bank for the capitalization but not for the debt to be raised by ML. Also, that investors aren't as firm as we would have liked to

Page 117

believe. Sergeon is scurrying around trying to get replacements. ML indication, more than now, that they can get remainder of the money prior to the end of the month. And approval of structure by MWOB, which is in state of flux now. What is MWOB?
A. Minority and women --
Q. Opportunity Bureau.
A. It would be Johnnie Booker's office, whatever that stands for.
Q. Is it fair to say at the time you wrote this e.mail, you were beginning to have concern as to whether Mr. Sergeon would ultimately be able to close on this deal?
A. It appears so.
Q. Next paragraph. We discuss the discontent of MidLantic, et cetera and possibility of dropping out and/or bringing suit. However, Mr. Ryan is adamant in his feelings that we must be ready to give Bahia whatever information we can, if Sergeon fails and falls through. Bahia -- was that another minority investment group?
A. I don't know.
Q. Do you recall Mr. Ryan's adamance about giving information to another group a month after the bids had closed. Is it fair to infer that it

Page 118

was because of his desire to see a minority investor group?
A. This may have been a backup bidder. I just don't know.
Q. I'll represent to you it's a minority bidder. When your e.mail refers to Mr. Ryan as being adamant in his feelings that we must be ready to give Bahia whatever information we can, if Sergeon falls through, is it reasonable to infer from that statement that Mr. Ryan was very committed to having a minority investor acquire Carteret?
A. I don't think I can say that. Because right here, he agrees there should be no expenditure of funds. I don't think I can agree to that. He's still doing the same thing we have been doing, trying to get the most cost effective resolution. I can't speak to what -- I don't remember this memo. I don't know what his adamant feelings were.
Q. If this had been a non-minority bid who wasn't in the high bid group, would it have been extraordinary for a month after the bids were closed to be providing this person information for the first time?
A. I don't know about a month after. If we had a bid all through, we would do whatever it took

Page 119

to try to get resolution.
Q. My point is here, the high bids are all out there. MidLantic is discussing suing you all, so upset about not being able to close. And yet Mr. Ryan, that is in that sentence I just read, we discussed the discontent of MidLantic. And possibility of dropping out and/or bringing suit.
A. I don't know. I can't answer.
Q. You just don't recall?
A. I do not recall.
Q. Okay. At this point I would like to ask the court reporter to mark as Ramey 38 a document that bears the Bates number C-AM-A-0088740.
(Deposition Exhibit Number 38 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a memo from Mr. Jupiter to yourself. Subject. Carteret Florida. The recommendation is acceptance of the bids to ensure deposits of the nine Florida branches. Is that what is indicated in the first sentence.
A. Yes.
Q. You don't have any reason to doubt the premium amount in the second sentence; do you?
A. No.

Page 120

Q. Now it says, two sentences after that, because of the many unique issues facing a minority de novo institution, the New Jersey franchise will not be resolved before October 28, 1994. Was that an accurate statement?
A. I don't know. I would assume so. Jay wrote the memo. I have to assume that it was true.
Q. You don't have any basis for disputing that statement?
A. No.
Q. Now the next sentence. The successful acquirers of the Florida branches, all existing financial institutions, are prepared to move forward on a more timely schedule primarily because of their concern for the deposit runoff. Do you see that?
A. Yes.
Q. Was that an accurate statement at the time it was written?
A. I would assume so.
Q. Turning to the next page. Justification. Carteret Florida can be resolved without waiting for the complete resolution of Carteret. The Florida branches represent a distinct and independent market. The deposit runoff in the Florida branches averaged approximately 3.5 percent a month since

Page 121

July 31, '94, the most recent deposit data bidders had available to them when submitting their bids August 25, 1994.
New Jersey is experiencing a slightly lower deposit runoff rate of approximately 3.2% a month since July 31, '94.
Would it have been fair to assume at the time that this memo was put together, October of '94, that New Jersey would continue to experience this level of deposit runoff approximately?
A. I don't know.
Q. You don't have an opinion on that?
A. No.
Q. Okay. When it says resolving the Florida branches will substantially reduce operating expenses by an estimated 237,000 a month, and allow the Florida acquirers to complete the transaction on a timely basis, do you have any reason to doubt the accuracy of that statement?
A. No.
Q. Does it comport with your general sense that, when the branches are being operated as a conservatorship, they lose money?
A. No. I don't believe this one was.
Q. Do you know whether Carteret's other

Page 122

branches were losing money?
A. No.
Q. On the last page is that your signature?
A. Yes.
Q. At this point I would like to ask the court reporter to mark as Ramey 39 a document that bears the Bates number C-AM-A-012-5118.
(Deposition Exhibit Number 39 marked for purposes of identification.)
Q. This is a letter from Mr. Jupiter to Mr. Sergeon, dated October 12th, '94; is that right?
A. Yes.
Q. Take a moment to review the letter. My question is, whether you agree with Mr. Jupiter's analysis?
A. Okay.
Q. Do you agree with Mr. Jupiter's analysis?
A. I don't know what that structure was. He says that the institution would not meet the statutory definition of minority investor. I would have to assume that it doesn't meet the requirements. And I see here that he did copy Mr. Ryan, Ms. Booker and general counsel. I'm sure he would not have sent this out without having everyone on board.

Page 123

Q. Okay. Now let's look at what Mr. Sergeon has to say a few days later. We'll have this marked as Ramey 40. Bates number C-AM-A-0028150.
(Deposition Exhibit Number 40 marked for purposes of identification.)
A. I do note in here, where it says we have worked with you. We have kept several weeks to conform this structure. Which is what we would do with any bidder that came to us for help. Ask them -- how can I make this work.
BY MR. THOMPSON:
Q. This is a letter to Mr. Ryan from Mr. Sergeon, dated October 17th, 1994. You're a copy.
A. Yes.
Q. Turning to the last paragraph. I am not a lawyer, but it seems to me that the RTC's treatment of TCB to date has been arbitrary and capricious and without any basis in law or fact. The RTC has approved a structure, then retracted its approval, retracted its retraction, then denied that it was doing so.
It is now in the process of negotiating with a minority bidder which submitted a lower bid for Carteret than TCB, in apparent disregard of the

Page 124

RTC's own bidding procedures. At each stage, TCB have endeavored to comply with all demands made and has done so at great expense.
How do you respond to those allegations?
A. Sore loser.
Q. You think --
A. No doubt in my mind. I'm not familiar with this exact situation. But from the documentation I've seen before, I think, assuming TCB is Mr. Sergeon's group, then it has absolutely no basis for his comments.
Q. The same day that that letter came in you sent an e.mail to Mr. Hambric. I would like the court reporter to Ramey Exhibit 41, the document that has Bates number C-AM-A-0077327.
(Deposition Exhibit Number 41 marked for purposes of identification.)
A. Yes.
Q. It says in part; we continue to work toward a minority resolution. Cautiously optimistic but you never can tell. I do have the have a time frame.
My question is; was it a cause for concern here two months after the bids had come in, bids from people who were prepared to close, for example,

Page 125

MidLantic, you still didn't have a time frame for the minority bidder?
A. We didn't have a time frame for anything. Whether it be minority resolution or non-minority.
Q. You were closing the Florida ones. Florida is closing in 11 days. You had a time frame for that. You got people like MidLantic who are complaining about the delay. Then you are dealing with Mr. Sergeon and Mr. Mr. Terrell, and then with the Bahia Group.
My question is; was it a source of concern for you that here you are two months into the process and you still don't have a time frame for New Jersey?
A. That would be a concern. However, from what I've seen, we did have interest in this institution. My concern would be that we would get to the point where was not the least costly resolution.
I think we had a resolution somewhere. And I think we were -- because of the congressional mandates in the minority resolution area we had to do all we could and still have the least costly resolution. The minority resolution mandates did not change the mandate that we do the least costly

Page 126

transaction.
So here we were working toward a minority resolution that will be the least costly transaction for the taxpayer and RTC and cautiously optimistic but I don't know.
Q. The least costly because, by law it must be or we aren't going to do it?
A. That's correct.
Q. But do you have any concerns that, if this process went on too long, the original bidders would pull their bids and say forget it, we are not honoring those first bids, we are not going to reconfirm those bids?
A. I don't know. We may have had to rebid.
Q. We'll get there.
A. I just don't know.
Q. Now, let's continue on. We are in October. This next document.
(Discussion off the record)
BY MR. THOMPSON:
Q. I would like to ask the court reporter to mark as Ramey 42 a document that bears the Bates number C-AM-A-0028318.
(Deposition Exhibit Number 42 marked for purposes of identification.)

Page 127

BY MR. THOMPSON:
Q. That's an RTC resolution request for funding, anticipated thrift closing. It was submitted on October 24, 1994, with respect to Carteret; is that right?
A. Yes.
Q. It actually probably makes sense for us to go ahead and mark Ramey 43. C-AM-A-0130578.
(Deposition Exhibit Number 43 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is Ramey 43, decisional memo submitted on October 18th, 1994, that you signed with respect to Carteret's nine Florida branches; is that correct?
A. Yes.
Q. Was the Ramey 42, which is the RTC request for funding, is that the document that accompanies the decisional memo?
A. That I don't know. I mean, I don't know where these went when they left me. This was prepared by J. Jupiter. Herb concurred. I approved. Here I got a copy of this for the file. But --
Q. Let me rephrase my question. I didn't

Page 128

mean in the sense that, in order to do a branch sale, there are at least two things that need to happen; one of them is, a decisional memo. Second is, a request for funding?
A. Yes.
Q. Is that correct?
A. Yes.
Q. In terms of the way in which the request for funding is calculated, is the relevant equation basically the liabilities assumed by the acquirer minus assets that the acquirer is receiving, minus the premium they are willing to pay, equals the amount of funds the acquirer needs to receive.
A. Yes.
Q. Okay. That's what is reflected in $158,756,000 for funding required at resolution?
A. I would assume so; yes.
Q. In terms of calculating the RTC's subrogated claim with respect to this transaction, do you know whether it would be calculated with respect to the liabilities assumed by the acquirer or whether it would be reflective of funds that were actually necessary to be transferred?
A. I don't know.
Q. Do you have any knowledge about how

Page 129

subrogated claims, either from the RTC or the FDIC were calculated?
A. I don't recall. I'm sure at one time I probably did know. I just don't know.
Q. You don't know, therefore, the role, if any, that the premium would have played in the calculation of the subrogated claim?
A. No.
Q. Do you know what the subrogated claim was supposed to represent as a conceptual matter in terms of why the RTC had a subrogated claim?
A. Well, in general; yes. I mean, in other words, whenever the RTC would put out money, then they had the right to recover what they had put out in general. That's what I was talking about earlier. If you had uninsured depositors, they have a claim also. What is your question again? I'm sorry.
Q. My question is -- maybe it might make sense to look at this concretely. If $168 million of liabilities are transferred, but it only cost $158 million to get them transferred, because the person is willing to pay a $10 million premium, do you have a sense as to whether the RTC was entitled to be paid back 168 or 158?

Page 130

A. I would think it would be the 168. But the premium represents part of it. They are recovering. And, if all of the deposits were transferred, then any uninsured depositors would stand to recover part of that also.
Q. The premium -- explain what you mean by that. The RTC only has to pay 158 out, but they get a claim on the estate of 168?
A. No. They effectively paid out 168 but they got 10 back at the same time. In other words so the 10 that came back is part of the 168, which would have been a total outlay had it been a payoff say.
Q. It would have been total outlay of 168. They get $10 million back. That comes in. Does that reduce the subrogated claim then?
A. I would think so. I'm not sure.
Q. As a matter of economics that would make sense?
A. Yes. I don't know that the FDIC gets the benefit of that entire premium. If there are other creditors that are on equal footing with the RTC.
Q. Now let's look at the next document, which is Ramey 43. C-AM-A-0125205.
MR. SNET: I think it's 44.

Page 131

(Deposition Exhibit Number 44 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a memo from Mr. Held to Mr. Ryan, dated December 6, 1994. Is that correct?
A. Yes.
Q. The first sentence -- we are now two months past the Sergeon incident. And we are into December. On Friday, December 2nd, 1994, Bahia, for the first time, acknowledged that they could not meet the agreed upon closing schedule of December 16, 1994.
Then skipping down to the second paragraph. While Bahia is optimistic at arranging the financing for the acquisition of Carteret they were unable to demonstrate that, in fact, any investor has firmly committed to provide any funds. Thus, after almost two months of having awarded matching rights to Bahia, they have not been able to perform.
Bahia now asks that we delay closing to at least January 20, 1995 in order to give them time to obtain funds. We have no assurances that they can meet the schedule.
At this point were you frustrated with the

Page 132

process and the fact that you had bidders who August 25th said, we will close; we are ready to close. And here you have gone to Sergeon and to Mr. Terrell and Bahia four months into this process and you don't have a minority investor who can close?
A. I don't know what my state of mind was. I don't recall any of these memos specifically, but I don't remember this one either. For some reason my note is not on here. It should have been.
Q. Let me show you an e.mail that you sent this same day, the 6th.
(Deposition Exhibit Number 45 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is the same day, December 6, 1994. E.mail from yourself to Mr. Held and others; is that correct?
A. Yes.
Q. Lee Lassiter, OTS, called inquiring about the status of Carteret. They had received a fax laying out the time frames for various commitments. Lee said that, should we agree to this, the OTS would likely have problems in determining control issues, et cetera, in the timeframes allotted. I told Lee we had called Bahia and cut them off. And

Page 133

would call MidLantic before the end of the day to offer the deal to them and others.
Does this in any way refresh your recollection that Bahia is out of the running?
A. It sounds like it is here.
Q. Would it have been reasonable for you to be concerned that, here you are four months into this process and it's been a waste of time essentially to be talking to Sergeon and Mr. Terrell and Bahia?
A. I don't know what my frame of mind was then. I don't know what was going on with the other bidders. Apparently, from what I see, they were still very much interested. So I don't know.
Q. Would it be fair to say, that Mr. Terrell and Bahia and Sergeon had wasted the Resolution Department's time?
A. I don't know that's a fair statement. It was time spent in trying to comply with congressional mandates and -- I don't know.
Q. I'm not asking whether you wasted time. I'm asking whether they wasted your time?
A. I don't know that they did. Because I don't know what their state of mind was. I don't know how sincere they were and how close they were

Page 138

Q. You said earlier that you had resolved over 700 institutions, the RTC?
A. Yes.
Q. Do you know why Carteret was one of the last ones to be resolved, taken out of conservatorship?
A. No. I don't know why it was one of the last ones. I don't know why it was probably one of the last ones to be put in. We took them as they came to us.
Q. Sure. This one came to you on December 4th, 1992. Do you have a rule of thumb, when you were the head of resolutions, as to how expeditiously consistent with getting the least cost resolution you wanted to see these institutions moved out of the conservatorship?
A. I don't recall, but it would be the function of what funding we had also with what institutions were losing the most money. We had to make a decision, if two institutions were equal in size and whatever, and one was losing money quicker than the other one, I would probably try to resolve the one that was losing the most money first.
Q. Okay.
A. It would be a function of the size also.

Page 139

Takes longer to resolve a larger institution, and a more complex institution, especially one that goes across state lines, than it does a smaller institution.
Q. Is it fair to say, you were trying to minimize the aggregate exposure of the RTC, and hence the taxpayer to all the institutions under your purview?
A. I don't know. That's a reasonable statement, but I never had the final say in which institutions we did resolve.
Q. Weren't you very involved in prioritizing, as we saw, when you put Hansen in front of Carteret. And I thought I heard you to just be saying, and one of the important things you looked at was, which is losing the most money. Let's get that off our books first?
A. All things being equal, that's the way we would try to do it. All things being equal.
Q. Is the reason you would try to do it that way, because you were trying to minimize the cost to the American taxpayer of cleaning up all of the thrifts that were put into conservatorship?
A. I think that is a reasonable statement.
(Discussion off the record)

Page 140

BY MR. THOMPSON:
Q. At this point I would like to ask the court reporter to mark as Ramey 49, Bates number C-AM-A-0130611.
(Deposition Exhibit Number 49 marked for purposes of identification.)
MR. THOMPSON:
Q. Carteret's branches were sold in three waves on October 28, '94, as we saw, the nine Florida branches. Then, after MidLantic subsequently reaffirmed a few, but not many of the branches, and so basically anyone who reaffirmed moved forward on January 20th, 1995. The remaining 16 branches were sold on March 10th, 1995, to totally new bidders. In any event --
A. I have been wondering what happened. I have no idea who the bidders were or what happened with this institution.
Q. We have a few more that will show this. Just looking under the justification section on page 2, it references the fact deposit runoff in the 14 offices aggregated approximately 8 percent of the total between August 31 and November 30, 1994. Is that number surprising to you in any way?
A. No. That was over a three month period.

Page 141

Q. Does that seem about right?
A. I don't know what's right. It doesn't seem that it's all that much.
Q. Does it seem out of the ordinary?
A. I don't know. I don't know what the ordinary is.
Q. Okay.
A. I just remember we were talking about something was running off at a 3.2, 3.5 percent. Is that a month. So over 10 percent in three months. This was 8 percent total. I don't know.
Q. Now, sale of the 14 branches will reduce monthly operating expenses by an estimated $612,000 You don't have any reason to dispute that; do you?
A. No.
Q. Turn to page 5 of this document. Specifically to the last paragraph. Bahia and the high bid group were then given the opportunity to bid on MidLantic's 15 branches and Sovereign's one branch they did not reaffirm, at the original bid price of approximately $87 million, by December 30, 1994. Do you see that?
A. Yes.
Q. Do you have any reason to doubt that if MidLantic and Sovereign had been permitted to close

Page 142

in a timely fashion after their August 25th, 1994 bids, in other words, if there hadn't been the need to satisfy the congressional mandate, that they would have been able to close and provide the premium of $87 million?
A. I don't know.
Q. Do you have any reason to doubt that in the absence of the congressional mandate MidLantic and Sovereign would have paid a premium of $87 million on these 16 branches?
A. I don't know. Because one big thing in here is, there was a minority preference in there. That could have caused them to increase their bid to keep the minority bidders out. Had there not been minority bidders there, they may have paid a substantially lesser premium knowing that the competition wasn't there. They didn't know if those minority bidders could or would match their bid. So they may have bid a higher amount than they normally would have. I just don't know.
Q. Are you speculating on that?
A. Yeah, I am. You were asking me to speculate on would they.
Q. Do you have an opinion on this subject as to whether they would have? I refer you back to

Page 143

your postmortem analysis of October '95. This is Ramey 12. That we looked at earlier. Where you said; as for any type of bidding preferences it's been my personal opinion that this is a deterrent to the competitive aspect of bidding process?
A. At that time that was my opinion. But as I looked at it, you know, in the overall concept, in general, it probably was a deterrent to some bidders.
Some bidders, and this is speculation on my part now, but I did feel the same way later on at the RTC, that some bidders may be turned off because another group may be allowed to match their bid. Other bidders could be the reverse. They may bid higher because they think or know that that minority bid, the other bidder, is not going to be able to match theirs.
So they may bid the absolute maximum that they are prepared to bid; whereas, when you go to a bidder's meeting, you look around that room and you know who is there. You have seen those faces before. You know who is going to be bidding. You know who us interesting. Whenever you add an unknown, it may make you bid more.
Q. With respect to MidLantic and Sovereign

Page 144

and the 16 branches, you don't have an opinion as to what $87 million would have been higher or lower?
A. I just don't know. Therefore, I couldn't say without the minority preferences would they have been willing to go forward with 87 million. I don't know. That didn't happen. That would be pure speculation on my part.
Q. Okay. I would like to ask the court reporter to mark as Ramey 50 a document that bears the Bates number C-AM-A-0077742.
(Deposition Exhibit Number 50 marked for purposes of identification.)
Q. This is the original message. From Mr. Jupiter to yourself, January 18, 1995. It references the fact that there is a call from the Oversight Board. Take a moment to read this.
(Pause)
A. Okay.
Q. It says; Mr. Jupiter says; we believed any further delay would be very costly both in image and money to the RTC, and briefly explained the history of the delays already experienced.
Do you have any reason to doubt Mr. Jupiter's conclusion that it would have been very costly in terms of money to the Rtc to have further

Page 145

delay?
A. I don't know. This is something he's telling me. So I don't know how valid it is.
Q. It's an e.mail to you?
A. Well, I don't have any reason to say it's not true. I don't know how true it is. If we had a valid reason to delay, then whether it was an image thing or not, we probably should delay.
Q. I'm asking about the money.
A. The money?
Q. Yes.
A. We were having operating losses. I had no reason to dispute that -- 621,000 or whatever. I don't know how much was involved here. I would assume that any delay in the resolution, unless we were able to rebid it and get a better premium would be more costly.
Q. Is one piece of supporting evidence for Mr. Jupiter's statement here the fact that you did have to rebid some of the deposits, branches, 16 of them specifically. I'll represent to you that the premium received was $19 million lower.
A. There is no way to know that. Even had we known it, we couldn't -- we still had the least costly resolution that was available to us based

Page 146

upon when we had to do.
Q. Under the congressional mandate?
A. That's correct.
Q. Okay.
A. And here this memo was Tom Elzey. I would agree, he probably should not have called us directly. So I don't know. Jay may have been couching his comments because of who he was talking to. I just don't know.
Q. Now, let's move on to Ramey 51 C-AM-A-0028317.
(Deposition Exhibit Number 51 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Is this document an RTC resolution request for funding, anticipated thrift closing submitted on January 17th, 1995 for Carteret?
A. Yes.
Q. Is the amount of funding required at resolution namely the amount of cash that had to go to the acquirer $555,844,000?
A. That's correct.
Q. That's all I have for that document. The next exhibit will be Ramey 52, C-AM-A-0013420.

Page 147

(Deposition Exhibit Number 52 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a decisional memo dated March 1, '95. And it bears your signature; is that right?
A. That's correct, sir.
Q. This references the sale for the remaining 16 branches of Carteret. Do you have any reason to doubt the calculation of the premium of $68.4 million that's on this document?
A. No.
Q. I would like at this point to ask the court reporter to mark as Ramey 53 a document that bears the Bates number C-AM-A-0028316.
(Deposition Exhibit Number 53 marked for purposes of identification.)
(Discussion off the record)
BY MR. THOMPSON:
Q. We have now got Ramey 53. This is an RTC resolution request for funding, anticipated thrift closing, March 6, 1995. It was submitted. And it shows that the funding required for these branch sales in the amount of cash that had to be sent to the acquirer was $512,591,000; is that correct?
A. Yes.

Page 148

Q. I ask the court reporter to mark as Ramey 54 a document bearing Bates number C-AM-A-0013421.
(Deposition Exhibit Number 54 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a memo from Mr. Jupiter to yourself. You signed at page 5. Is that correct?
A. Yes.
Q. You don't have any reason to doubt the premiums that are listed on page 1?
A. No.
Q. On page 2 in the last full paragraph reference is made to Home Owners Equity Lines of Credits. HELOCs. Do you know what those are?
A. No. I do know what they are. I just read right before it.
Q. Okay.
A. That's all I know though.
Q. Okay. My question is; if I have a line of credit or a home equity line on my home, let's say for $100,000, but I've only drawn down on it $10,000, do you know whether this is $33 million of credit limit or $33 million of actual borrowings?
A. I know out of say this $33 million, if it's line of credits, and there's only been three

Page 149

million dollars put out, there's only three million dollars in cash outlay required to fund them.
Q. With respect to these particular HELOCs, do you know whether this represents actual lending as opposed to commitments to allow that level of funding?
A. I don't know from reading this.
Q. With respect to the issue of a lead acquirer. Is that a term that has any significance to you?
A. One that basically --
Q. Is that the one that does the data processing?
A. They do -- everything is funneled through them. I don't know how the cash transfers would work. But they would do the accounting. They manage the data center. Basically, if you have a check clearing point, they would serve as that until it could be distributed among the acquirers. So they had responsibility for coordinating that part of it.
Q. Did you have any involvement when there was a branch sale and the economic terms had been negotiated, and you knew how much money had to be sent to the acquirer, how much cash, did you have

Page 150

any involvement in the decision as to -- well, how much cash should we borrow from the RTC advance window as opposed to how much cash in the conservatorship we should use?
A. No.
Q. Do you know who would have been involved in that decision?
A. I don't know. Operations possibly.
Q. So maybe Mr. Mahaney?
A. Possibly.
Q. Let's mark as Ramey 55 a document that bears the Bates number C-AM-A-0077208.
(Deposition Exhibit Number 55 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Looking at Ramey 55, this is an e.mail from Ann Richards to Herb Held. She writes; we are chomping at the bit waiting to sell securities out of Carteret. Should they still remain frozen?
Ann Richards. Do you know this lady?
A. Yes.
Q. Do you have any recollection of the freeze of Carteret's assets?
A. No.
Q. Was it standard operating procedure to

Page 151

have a freeze on the sale of assets of a conservatorship?
A. I'm not familiar with this. I don't know why there would have been or why there would not have been. I just don't know -- unless they were needed for other things. I just don't know.
Q. Do you know why they would have been asking your department resolutions whether it was okay?
A. What date is this? September 15th. '94.
Q. So it's about a month after the bids?
A. It's before the resolution.
Q. Yes. Exactly right.
A. At times we would freeze the assets because the purchasers might want them to pass.
Q. The minority purchasers?
A. Any purchasers. Some purchasers earning assets as opposed to cash. If we had earning assets that were of good quality, we may hold on to them to pass that resolution.
Q. Would you have been involved in that decision?
A. It's possible.
Q. Okay. Do you have any recollection as to the reasons why Carteret's assets were frozen or

Page 152

securities frozen?
A. It would be purely speculation. If you have got an earning asset, it cuts your operating losses. It's an asset; it requires no maintenance.
Q. Let's go on to the next exhibit, which will be Ramey 56, C-AM-A-0014279.
(Deposition Exhibit Number 56 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Later on the day of September 16, Mr. Held wrote Ms. Richards and responded, we are still working with a minority hole bank bidder. We will need about $1.4 billion dollars in loans. If Sandra has the loans and does not need the securities, then we should be able to release the securities.
Is the point here that's being made that as long as a minority might want to exercise its option to buy performing assets, we aren't going to sell these assets?
A. That sounds reasonable. If we did not have other assets to give them. If they have a right to ask us for assets, then, and we don't have loans, we have got performing assets there that we could pass at probably what we could sell them for in the market. They are not losing anything there.

Page 153

The asset people, Ann Richards, she was dealing with Sandra Nobles. When they get the assets, they try to liquidate them normally. Not in all cases necessarily. We would have probably been acting in bad faith had we knowingly exhausted our asset pool, had a minority bidder that needed assets. I don't know.
Q. Three more exhibits and about as many questions. Let's say Ramey 58 will bear Bates number C-AM-A-03028207.
(Deposition Exhibit Number 57 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from Mr. Held to Mr. Jupiter and others. It references the fact that major resolutions had never given out loan information on any of our deals except for the info on the Western loans given out on Transohio.
The question is; do you know why there was this policy not to give out information on loans?
A. I don't know what loan information they are talking about. Because I know bidders were allowed to do due diligence so they had to get loan information. But --
Q. The question is; were the bidders the

Page 154

minority bidders who were going to get an option who weren't necessarily saying we are going to do, you know, a whole bank P&A, but we get, under the statute we get an option to buy performing loans. And were they in fact given access to the loan information beforehand?
A. On loans that they may be allowed to purchase?
Q. Correct.
A. Not that I'm aware of.
Q. That's what I thought. My question is; do you know what the policy behind that was?
A. No.
Q. Okay. Let's look at Ramey 58, which bears a Bates number of C-AM-A-0014297.
(Deposition Exhibit Number 58 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Is this your handwriting, sir?
A. Oh, it is.
Q. It says that -- item number 1 is the only thing I'm going to ask you about. First of all, it says, Ramey's miscellaneous notes. September 8, 1994.
A. Right.

Page 155

Q. Item 1 is; Freidman, can't raise money without the assets out of the balance sheet. Do you see that?
A. Yes.
Q. Is that a reference to the fact that from their perspective the Bahia's Group and their investment bankers Friedman, Billings, Ramsey that if they are not shown what assets they might have an option to buy, it's going to be very difficult to get people to give them the money?
A. That's what Friedman say to Jay Jupiter, Sharon and her.
Q. Doesn't that make sense though, that if a group is coming to investors saying please give us the money to buy a bank, we don't really have any assets yet, but we are going to get these liabilities. We'll have the opportunity to buy some loans.
And the investors say, okay, what do your loans look like. We don't know. We aren't allowed to find out. Would that be --
A. We are not allowed to look at the specific loans. However, they will be performing loans sold at market value from the RTC to us.
Q. They won't know whether they are fixed, or

Page 156

variable, whether they are in California or in Florida. There are a lot of different things other than whether they are performing or not, and the impact on whether a group of assets fits into a good strategic mix.
Isn't it a fair point that Friedman is making, it's just going to be lot more difficult to raise capital if investors don't know what the assets side of the balance sheet is going to look like?
A. I don't know. I just know there were many, many, many, many deals done without anyone knowing what the final assets side of the balance sheet was going to look like. There was a lot of capital raised. For de novo institutions, new institutions. This was Friedman was representing that group that wanted to know. That's logical statement for him to make; true or not.
MR. THOMPSON: At this point I don't have any more questions. I would like to thank you, very much, Mr. Ramey, for your patience, endurance, and your testimony today.
(At 4:02 p.m. the deposition was concluded.)
(Reading and signing is waived.)