# EXHIBIT F

UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

AMBASE CORPORATION and CARTERET BANCORP, INC.,

Plaintiff,

-and-

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Intervenor,

-versus-

THE UNITED STATES OF AMERICA,

Defendant.

-------------------------------------x

600 Fifth Avenue
New York, New York
March 30, 2006
9:40 a.m.

Deposition of EDWARD GRIFFIN, pursuant to Subpoena, before Sophie Nolan, a Notary Public of the State of New York.

| | | |
|---|---|---|
| 57 | Document Bates stamped CAM 0591090 through CAM 0591099 | 166 |
| 58 | Document Bates stamped CAM 8090345 | 168 |
| 59 | Document Bates stamped CAM 8090340 through CAM 8090343 | 168 |
| 60 | Document Bates stamped CAM 8090322 through CAM 8090323 | 169 |
| 61 | Document Bates stamped CAM 0320492 through CAM 0320495 | 170 |
| 62 | Document Bates stamped CAM 0470167 through CAM 0470185 | 171 |



E D W A R D G R I F F I N, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

MR. THOMPSON:

Q. Please state your name, sir.

A. Edward J. Griffin.

Q. Good morning. I'm David Thompson. I represent Ambase Corporation in the suit of Ambase versus the United States and with counsel for the FDIC --

MR. KUIPER: Gary Kuiper from the FDIC and I represent Mr. Griffin.

MS. PIANKO GRONER: Arlene Pianko Groner. With me is Melinda Hart representing the United States.

Q. Good. Well, good morning, sir. Thank you for coming down today.

Have you been deposed before?

A. Yes, I have.

Q. Okay. So you understand that this is a question and answer format. I certainly want your full testimony today and if at any time I cut you off, please just let me know. That's not my intention.



If you need to take a break at any point today, just let me know and I'm happy to do that.

MR. THOMPSON: Why don't we just dive right in then and I'd like to start by asking the court reporter to mark as Griffin Exhibit 1 a document that bears the Bates number C-AM-A-005380. I have to apologize. It has some handwritten scribblings of my own in the upper right-hand corner. So, just ignore those.

(Griffin Exhibit 1, document Bates stamped C-AM-A-005380, marked for identification.)

Q. Mr. Griffin, is this a copy of your resume?

A. May I read it, please?

Q. Sure. In fact, Mr. Griffin, let me just say that throughout the day I've got a lot of documents and I'm typically going to point you to a particular portion of them, but if at any time you want to take more time to read more, absolutely take more time?

A. Thank you.

Q. Let me know when you're ready.



A. (Reviewing.)

Yes, this is a copy of my resume.

Q. When did you leave the employment of the RTC or FDIC?

A. December 1995.

Q. When the RTC suns setted?

A. Correct.

Q. And what have you done since that time?

A. Since that time I have worked for the World Bank in Tanzania and U.S. Aid in Bosnia Herzegovina and to current, financial manager of the Two Rivers Water Reclamation Authority located in Monmouth Beach, New Jersey.

Q. Broadly speaking, what were your responsibilities at the World Bank?

A. The responsibilities at the world bank were training prospective bank examiners to audit banks in the new emerging market economy.

Q. All right. And what years were you at the World Bank, approximately?

A. From 1996 to 1997.

Q. All right. And then how long were you at U.S. Aid?

A. 1997 to 1998.

Page 14

Q. And, broadly speaking, what were your responsibilities with U.S. Aid?
A. Those responsibilities were the same as those with the World Bank and they were training prospective bank examiners to examine, audit banks in the new emerging market economy.
Q. All right. And after you left U.S. Aid, did you go immediately to the Two Rivers Reclamation --
A. Yes, I did.
Q. And what are your responsibilities there?
A. Financial manager.
Q. What does that entail?
A. That entails managing all the financial aspects of a state authority including budgeting, billing, customer service, auditing.
Q. Now, you mentioned earlier that you had been deposed before. Have you ever been deposed in connection with Carteret?
A. No.
Q. Okay. And were these depositions in connection with business or of a personal nature?
A. There were two personal depositions and approximately four to five government

Page 15

depositions of a minor nature.
Q. Okay. I'm not so interested in the personal ones, but the government ones, what did they relate to, to the extent you can recall?
A. Giving a deposition with relation to the bid proposals received for the sale of association liabilities and assets.
Q. Was there a specific association that was at issue in that deposition?
A. I can't recall.
Q. Okay. Any others that you can recall?
A. No, all the depositions involved the qualification of bid proposals received from private entities bidding on the asset and liabilities of an association.
Q. Do you recall the nature of the dispute that gave rise to these depositions?
A. The dispute -- the disputes involved a proposal, whatever that right word is, the A saying, I should have gotten it, why did B get it.
Q. Okay. Did any of those involve minority preference programs?
A. No.
Q. Okay. Now, turn ing back to your

Page 16

resume and it looks like your first job in the financial institution sector was at First Pennsylvania Bank; is that right?
A. That is correct.
Q. And what were your responsibilities at that bank?
A. I had two basic over my career there, those 17 years. They were managing a bank, data processing subsidiary, providing data processing services to other banks in a two-state area, New Jersey and Pennsylvania.
The second main function was what is known in banking as a corresponding -- a correspondent bank officer where I was responsible for a geographic territory in Pennsylvania and New Jersey to control, maintain depository and loan relationships from the banks that I covered in my areas in Pennsylvania and New Jersey.
Q. Okay. Then you moved on to Central Jersey Bank in 1977?
A. That is correct.
Q. What were your responsibilities there?
A. My responsibilities there were in business development functions which involved

Page 17

maintaining relationships with and gathering new relationships from corporate customers in the trade area that Central Jersey Bank managed.
Q. Now, it says on your resume that you "Directed retention program resulting in a 96 percent customer stay rate."
Do you see that?
A. Yes.
Q. Was that important to Central Jersey?
A. Yes, it was.
Q. And was that because an important element of their franchise value was their depositor base and maintaining it?
A. Yes, it was.
Q. Was that true also for Summit Bank Corporation when you were with them, that an important part of their franchise value was their depositor base?
A. Yes, it was.
Q. Was it true for Carteret when you were with Carteret, that an important aspect of Carteret's franchise value was its depositor base?
A. Yes, it was.
Q. Now, after you left Central Jersey Bank, you went to Summit Bank Corporation and wha

Page 18

were your responsibilities there?
A. I was executive vice president in charge of the overall management of the bank.
Q. So, you had responsibilities for all aspects?
A. Yes.
Q. Why did you leave Summit Bank Corporation?
A. I left Summit Bank Corporation due to their consolidation of operations in the existing banking environment in the State of New Jersey.
Q. Okay.
A. I lost my job.
Q. Okay. And then you went to the RTC and it says that you "Managed the planning, directing and controlling of the daily operations of institutions, ranging in asset size from 200 million to 4.9 billion."
Do you recall when you got to the RTC what your first assignment was?
A. Yes, it was in Masalon, Ohio in a failed institution there as the operations specialist.
Q. And what were your responsibilities as an operations specialist?

Page 19

A. Operation specialist maintained the control of safeguarding the liabilities, deposits, and packaging the assets, loans.
Q. For sale?
A. For sale.
Q. Do you recall the name of that institution?
A. No, I do not.
Q. Approximately how long were you with that institution?
A. Approximately three to four months.
Q. All right. And do you recall what your next assignment was?
A. I have a hard time remembering the sequence of the assignments, but I do remember most of the towns without the name of the banks that I was associated with.
Q. All right, well, why don't you just tell me, prior to coming to Carteret, what you can recall about the institutions where you worked for the RTC?
A. I was in Ewing Township, New Jersey. Hyannis, Massachusetts, Plymouth, Massachusetts, Toms River, New Jersey, Paterson, New Jersey, Carteret, New Jersey.

Page 20

Q. And what were your responsibilities? Were they consistent in these various assignments?
A. They changed after Masalon to become a managing agent for each institution while in conservatorship.
Q. Was the managing agent the equivalent of a CEO in the private sector?
A. Yes, it was.
Q. And do you recall that George Gross was your predecessor --
A. Yes.
Q. Do you recall whether Mr. Gross was relieved of his responsibilities?
A. Yes.
Q. And do you recall whether Mr. Gross was charged with having or was thought to have stolen from Carteret?
A. Yes.
Q. What is your understanding of what the accusations against Mr. Gross were?
A. There were two accusations, one of which was what you might term stealing. He was filling his personal car with the gas tank -- the gas supplies from Carteret.
The second was purely internal. It

Page 21

was how he brought certain people into the conservatorship who, in the opinion of the management of RTC, were not qualified to perform the job and who were overpaid.
Q. Okay. Do you recall who the individuals who were deemed to be unqualified were?
A. I recall one. Her name was Debra Thornton.
Q. Do you recall what Ms. Thornton's responsibilities were?
A. I am going to say control of asset management now.
Q. It says on your resume under the "FDIC/RTC," the second bullet point is, "Organized residential and commercial loans, securitizations."
Do you see that?
A. Yes.
Q. And what is a securitized sale?
A. A securitized sale is a group of loans anywhere from 5 to 500, secured by notes, government notes.
Q. And did the securitization make the loans more attractive to acquirers?

Page 22

A. Yes.
Q. And was it RTC policy to securitize, where possible, in order to get the greatest return on those assets?
A. Yes.
Q. And wherever possible, were the loans in the securitized pool sold in an auction or competitive bidding process?
A. In a competitive bidding process.
Q. Was the purpose behind that policy to maximize the return to the RTC?
A. I can't answer that.
Q. Okay. During your tenure at Carteret, did you endeavor to sell the assets pursuant to competitive bidding processes where permissible?
A. I never did. The securitization program was run by another section of the RTC out of the regional headquarters in Valley Forge, Pennsylvania.
Q. Okay. So, that was not something you had responsibility for?
A. No, none whatsoever.
Q. Okay. Did you have any involvement in the sale of the Clearwater servicing center?

Page 23

A. Only that I knew it happened. Again, those things were handled by a separate section of the RTC headquartered either in or -- or out of Valley Forge, Pennsylvania or Atlanta, Georgia.
Q. Do you recall who the individuals were there who were in charge of selling Carteret's assets?
A. Only one I could think of that and that would be a man by the name of Dennis Lauria, L-A-U-R-I-A.
Q. And did you have any involvement in the sale of IPF or Imperial Premium Finance?
A. No.
Q. And when you were at Summit Bank Corporation as CEO, were any loans sold through securitizations?
A. No.
Q. Did you ever sell any of your loans, of Summit Bank Corp.'s loans?
A. No.
Q. Is that because you were in a growth mode?
A. Yes.
Q. Okay. When you were the managing agent of the other institutions in the towns that

Page 24

you identified, was it the same sort of structure where you as managing agent were not responsible for selling the assets?
A. No.
Q. Okay. So, at some of those institutions you did have responsibility for selling assets?
A. Yes.
Q. And did you sell the assets there pursuant to a competitive bidding process?
A. Yes.
Q. And was that to maximize the return to the RTC?
A. Yes.
Q. When you were selling assets at these other institutions, did you ever just set a price and tell a bidder, if you need this price it's yours, without having a competitive bidding process?
A. No.
Q. Is the reason you wouldn't do that is because they might be willing to pay more as revealed through a competitive bidding process?
A. I can't answer that.
Q. All right.

Page 25

MR. THOMPSON: At this point I'd like to ask the court reporter to mark as Griffin Exhibit 2 a document that bears the Bates number AM 50860069.
(Griffin Exhibit 2, document Bates stamped AM 50860069, marked for identification.)
Q. So, this is a chart that comes out of the field accounting manual for the RTC and it shows securitization transactions, proceeds flow, and what I'd like you to do, Mr. Griffin, if you can, is to describe how for Carteret when it sold its assets through securitization how the process worked and in particular when did Carteret -- when would it get paid -- and let me further add, I'll represent to you, that Carteret's assets were securitized in connection with the assets of other institutions in national auctions.
Do you have any recollection as to how that process worked?
A. Yes. The conservatorship or receivership would package -- would package loans submit them to the Valley Forge office who would ultimately decide which loans would remain in there and which loans would come back to the

Page 26

conservatorship/receivership.
All the conservatorship/receivership did was, excuse the term, the grunt work of putting together the loan packages. Decisions were made in other offices as to which would stay in, what other institution loans would be put in there and they then would tell Carteret which loans are going into this next auction.
That's really the only involvement that the managing agent would have in the conservatorship/receivership other than being told the loan sale went through, you will receive the proceeds on a certain date.
Q. And in terms of receiving the proceeds, I mean -- let's say, just to use a simple example, to illustrate the point that there were loans from Carteret with a book value of $50 million and then there was one other institution with loans that had a book value of $50 million and the people in Valley Forge said, okay, let's do a -- let's package these together and do a $100 million securitization and they sell that and get only $98 million because the bidding process people decide it's not quite worth the book value.
Do you recall how the RTC decided

Page 27

which institution got what percentage of the proceeds?
A. Definitely out of my claw.
Q. Okay.
A. No, the answer is no.
Q. And do you recall anything about the timing, whether there were significant timing lags between when the loans would be packaged and there would be a securitization and when Carteret would actually be paid?
A. Not specific.
Q. Okay. Do you -- were there holdbacks in securitizations where if someone would come in and buy the loan packages, but then would say we want to keep a certain portion of the proceeds back?
A. Not known to me.
Q. Okay.
MR. THOMPSON: I'd like to ask the court reporter to mark as Griffin Exhibit 3 a document that bears the Bates number C-AM-A-0160023 through 024. Let me change that for the record. The exhibit that I'm going to provide actually has a third page which is C-AM-A-0159924.

Page 28

(Griffin Exhibit 3, document Bates stamped C-AM-A-0160023 through C-AM-A-0160024 and C-AM-A-0159924, marked for identification.)
Q. Mr. Griffin, this document is entitled "Securitization Reconciliation Report." It's for the month end December 31, 1993 and on page two at the bottom where it says "Confirmed By," is that your signature?
A. That is my signature.
Q. Okay. And this says "Reconciliation Status." Do you have any recollection of seeing these types of forms?
A. No, I do not.
Q. Okay. Do you know, for example, looking on page two by the "1993," it's I guess the third-to-last row, "1993/S-2," then in -- there's a column that says "In Trans, Y/N."
Do you know what "In Trans" means?
A. No, I don't.
Q. Okay. Do you have any recollection of what the purpose of this document was?
A. No, I don't.
Q. Now, turning to the third page of this exhibit, this is a report date according to

Page 29

the upper right-hand corner of December 31, 1993, and again in the upper right-hand corner it says "Run Date January 20, 1994." And at the bottom of the page it says "Verified."
Is that your signature?
A. That's my signature.
Q. Okay. And do you recall -- I mean, looking, for example, at the first line it says, "Real estate assets" and then it says 405 instruction and it has several columns and then there's a "TFR GL" which I assume is general ledger balance, $17.6 million. And then the right hand column is "Difference, $17.6 million" with more detail in the numbers, but do you have any recollection --
Does this refresh your recollection as to what the purpose of this document was?
MS. PIANKO GRONER: I'd like to note for the record that I object to this being characterized as a document. It appears to be two different documents. The first two pages have a date on the second page of January 6, '94 and the third document has a -- the third page has a run date of January 20, '94, so it appears there are

Page 30

two different documents here.
MR. THOMPSON: Right, and just -- that's absolutely correct, and I appreciate that clarification and by way of explanation it says on the second page of this exhibit, "See attached Exhibit 1," and we are providing the third page of this because it may be the attached Exhibit 1.
MS. PIANKO GRONER: Well, I don't see how a document that was produced on January 20, '04 could have been attached to a document dated January 6, '94.
MR. THOMPSON: So be it. Okay.
Q. When you arrived at Carteret, Mr. Griffin, what were your impressions of the state of the conservatorship?
A. The conservatorship, in my opinion, was well managed, well organized, according to RTC standards and adequately staffed to continue the conservatorship in going into the receivership.
Q. Do you recall who the key staff members were?
A. The chief accountant or chief financial officer and, I apologize, I only remember his first name, Lee --

Page 31

Q. Smith maybe?
A. Yes, Smith. The executive vice president, once again, Leo --
Q. McCabe?
A. Right, McCabe. Data processing bad no recollection of the name and several key loan individuals who, once again, I cannot recall their names.
Q. Was Wayne Moore one of those individuals?
A. Wayne Moore was one of them, yes.
Q. And what were Mr., and I may mispronounce this, but Dean Digiondomenico's responsibilities?
A. Dean Digiondomenico was the credit specialist, the RTC credit specialist, for the conservatorship and receivership. He controlled the assets of the institution.
Q. Were you satisfied that Mr. Smith was performing his responsibilities adequately?
A. Yes.
Q. And was that true throughout your time at the conservatorship?
A. Yes.
Q. And were you satisfied that

Page 32

Mr. McCabe was performing his responsibilities adequately?
A. Yes.
Q. And was that true throughout your time at the conservatorship?
A. Yes. Although Leo left the employment of the association a short time into my tenure there.
Q. Okay. Was that your decision?
A. No.
Q. But while he was there, he did a good job?
A. Absolutely.
Q. And Wayne Moore, were you satisfied with his performance of his responsibilities?
A. Yes.
Q. Was there anything that you thought could be improved when you arrived at Carteret, that you can recall?
A. Yes.
Q. And what was that?
A. Reduction of contract employees that were brought into the conservatorship.
Q. What would be the advantage of reducing these contract employees?

Page 33

A. The association staff could handle the responsibilities.
Q. So, it was a way to cut expenses without impairing --
A. Yes, yes.
Q. And were some of the contract employees part of the Midland Servicing Group?
A. I don't recall Midland Servicing Group, that name.
Q. Okay. Were any of the contract employees whom you're referencing a part of Watkins Meagan Financial Services?
A. I don't recall their responsibility.
Q. Do you recall the functionality, not the names of the employees, but what functions they were performing?
A. These contract employees?
Q. Yes, sir.
A. Oversight management of particular projects.
Q. Did they come from a particular company that -- from whom they were hired?
A. Yes.
Q. And do you remember the name of that company?

Page 42

(Griffin Exhibit 6, document Bates stamped C-AM-A-0400938 through C-AM-A-0400940, marked for identification.)

Q. Just so you know, Mr. Griffin, I just have one question about this in the first paragraph. You're free to review the whole document though.

A. (Reviewing.)

I'm ready.

Q. Now, in this first paragraph it says in the fourth sentence, "As far as funding goes, Rich advised that the funding bills have passed both the senate and the house and are expected to be acted upon today."

I know you weren't at this meeting, but do you have any recollection as to what the issue was with respect to funding?

A. Yes.

Q. What was the issue?

A. Advancing monies to fund the operating losses at the various institutions.

Q. Did the funding also relate to the ability to resolve an institution in the sense that when you sold branches you'd have to fund those liabilities for an acquirer?

Page 43

A. Could you restate the question, please?

Q. Yes. Did the Congressional funding also have ramifications for the ability of a conservatorship to sell its branches because when the conservator went to sell the branches the acquirer would want assets of a like amount other than the premium and if the conservator didn't have the assets, they'd need them from the RTC?

A. Yes.

Q. And do you recall whether the sale of Carteret's branches was delayed in 1993 because of a lack of Congressional funding?

A. I do recall, yes.

Q. Okay. And do you believe it's reasonable to assume, given that Carteret was seized on December 4, 1992, that in the absence of a lack of Congressional funding, Carteret's branches could have been sold by the end of '93?

A. I couldn't answer that. That's speculation.

Q. You don't have an opinion one way or the other?

A. No, I do not.

Q. Okay.

Page 44

MR. THOMPSON: At this point I'd like to ask the court reporter to mark as Griffin 7 a document with the Bates numbers C-AM-A-0132882 through 884.

(Griffin Exhibit 7, document Bates stamped C-AM-A-0132882 through C-AM-A-0132884, marked for identification.)

Q. Take as much time as you'd like with this. My questions are going to be confined to the top two paragraphs on page two.

A. (Reviewing.)

I'm ready.

Q. All right. Now, turning to the second page to the first paragraph, and in particular starting with the second sentence it says, "Jim Mindnich said he thought Carteret might be receiving about $100 million from the Home Unity deal by the end of the year. Jim said he was not certain if we would be getting par, but felt close to par is probably in the ballpark."

And then it says in the next paragraph, "Regarding the Home Unity deal, George Gross said we are being directed by Washington and at this point no one knows what value we will receive. Leo McCabe felt we should get the asset

Page 45

priced by Wall Street."

Do you recall whether the Home Unity deal was a sale of Carteret's assets to a minority bidder?

A. No, I do not.

Q. Okay. And do you have any recollection as to how the Home Unity assets were priced?

A. No, I do not.

Q. Okay.

MR. THOMPSON: At this point I'd like to ask the court reporter to mark as Griffin 8 a document that Bates the Bates number C-AM-A-0132744 through 746.

(Griffin Exhibit 8, document Bates stamped C-AM-A-0132744 through C-AM-A-0132746, marked for identification.)

Q. Mr. Griffin, my questions will pertain solely to the second paragraph on page two.

A. (Reviewing.)

I'm ready.

Q. In the second paragraph, "In answer to an inquiry from Ed Griffin regarding the RTC policy on deposit pricing, Rich Willets set

Page 106

they would -- they could be produced last night, but it wasn't possible.
MR. KUIPER: We faxed it to them, but, yeah.
Q. So, tell me what this document is. Did you prepare it, the Carteret At-a-Glance?
A. Yes.
Q. And when did you prepare it?
A. December 4, 1992.
Q. And that says "DOC." What does DOC mean?
A. Date of consolidation.
Q. So, this document, the Carteret At-a-Glance was prepared on the date of the consolidation?
A. Yes.
Q. Okay. Did other people assist you in the preparation of this document?
A. Yes.
Q. And who were they?
A. They would be -- the major contributor is Richard Willets. The other major contributor was Dean Digiondomenico and they had various assistance from other RTC operation and loan specialists and an RTC contract employee.

Page 107

Q. And who was that?
A. Patricia Nyholm.
Q. And is this type of document -- at that time, was this done in every conservatorship?
A. Yes.
Q. Now, do you see on this first page it says, "Assets at DOC 5.1 billion"?
A. Yes.
Q. Do you know how Carteret's asset size at this time compared to the asset size of other conservatorships between 1990 and 1992?
A. Would your question embrace the entire country?
Q. The ones that you're familiar with.
A. It was close to the top for the eastern region.
Q. Was it the largest one that you worked on?
A. Yes.
Q. Okay. Turn to the -- I think it's the fourth page in and it has a number one at the bottom.
A. Yes.
Q. Under "DOC" the next line says "DOR" --

Page 108

A. I'm sorry.
Q. What is DOR?
A. Date of resolution.
Q. Okay. And is the date of resolution the same as date of receivership?
A. Yes.
Q. And can you tell me what's the difference between a receivership and a conservatorship?
A. A conservatorship commenced the first day of intervention and ran until that point in which all parties agreed that it was ready to go into receivership, which, of course, is various for various institutions.
Q. When you say "all parties," who do you mean?
A. All RTC parties.
Q. So, just comparing the DOC date and the DOR rate, it looks like Carteret remained in conservatorship for a little over two years?
A. Yes.
Q. Do you know how that duration compares to the average durations of other conservatorships at the time?
A. Longer.

Page 109

Q. And why was that?
A. Size.
Q. How does asset size impact the duration of a conservatorship?
A. The components of the assets dictate the length of the conservatorship. For example, hypothetically an institution could have $500 million in loans and no subsidiaries, whereas another one might have 500 million in total assets, but 250 million of that might be in subsidiaries.
Q. What would the effect of having subsidiaries be?
A. Getting your arms around the operations of the subsidiary and making a determination whether or not the subsidiary should continue, continue under present management, continue under RTC management or to be liquidated.
Q. So, does the presence of subsidiaries usually lengthen the time it takes to get to receivership?
A. Yes.
Q. What about asset quality? What effect does that have on the length of the conservatorship?

Page 110

A. It lengthens.
Q. And how come?
A. I have a difficult time in answering this with a definite statement because in the beginning of the RTC, the managing agent was responsible for individually trying to sell the assets. This attempt by all of the managing agents was very poor in many different ways, time to get it done, return on the dollar, and the RTC, I would say maybe in 1992 to 93, decided we are going to assist -- we're going to take that responsibility away from the managing agent and put it in the hands of our specialized units who can -- who know more about it and who can get a better return to the government and I forget the figures, but we were consistently being told that under your -- under the managing agent receivership, you're getting 22 cents on the dollar and the figures after these specialized RTC units took over, it at least jumped 100 percent to the high 40 percent return on the dollar.
Q. Do you think that the size of a thrift's branch network also impacted the duration of a conservatorship?
A. No.

Page 111

Q. And why not?
A. The branch systems are easy to run, easy to control and do not present any problems whatsoever as far as complexity is concerned.
Q. What about thrifts that had branches in multiple states, did that affect the duration of the conservatorship?
A. Yes.
Q. And why was that?
A. Because of the difference in operations, the distance between the home office and where these branches were located, because of the home office's unfamiliarity with the geographic area, the banking needs for those types of reasons.
Q. When you say "home office," you mean the RTC home office?
A. Well, not RTC. The bank itself.
Q. Okay.
A. RTC, no, because we had the ability, again being a national outfit, to control and monitor in a much better fashion, far-flung branch systems.
Q. Are there any other factors that you think impacted the duration of a conservatorship?

Page 112

A. I think the minority bidding process held it up. I think that's -- that would be the main factor. In my tenure there, the main factor was the sale to -- the considerations given to the minority groups.
Q. When you say "the main factor," what do you mean?
A. The main factor in extending the sale, the ultimate sale of the franchise.
Q. That was more important than asset size?
A. No, definitely not.
Q. So, that's what I'm trying to --
A. I'm sorry.
Q. I don't understand what you mean by "the main factor" then.
A. Could you rephrase your question?
Q. Sure. We've talked about a variety of factors, we talked about asset size, asset quality, having branches in multiple states and minority preferences, right? Is that all the ones we've talked about?
A. Yes.
Q. So, could you rank those in terms of, in your opinion, the impact that they had on the

Page 113

duration of the Carteret conservatorship?
A. Asset size, number one; minority last, a factor but last; and the others somewhere in the middle.
Q. When you say "the last," it had the least impact?
A. The least.
Q. While you were working for the RTC, did you try to minimize the cost of operating the conservatorship?
A. Yes.
Q. And was that the RTC policy at the time?
A. Yes.
Q. And at that time, was it the RTC policy to keep a thrift in conservatorship if it believed it was increasing the cost of resolving the thrift?
A. Please rephrase the question.
Q. Sure. At the time that you worked on Carteret, was it RTC's policy to keep a thrift in conservatorship if doing so would increase the cost of resolving the thrift?
A. No.
Q. Okay. Let's go back to this page.

Page 114

We're on page one. And look at item 1.2, "Projected Consolidation Date."
What does that mean?
A. That means for that period listed as 180 days after the date of resolution, the managing -- the field site manager would have consolidated all of the remaining components of the franchise.
Q. And what happens between the date of resolution and the consolidation date, during those 180 days.
A. A tremendous period of accumulating and preparing reports of what is left in the franchise.
Q. And what role did you play during this period in the case of Carteret?
A. Directing the RTC and remaining staff members in preparing all of this information, according to the RTC written procedures.
Q. And was the 180 days that's projected here typical during that period?
A. It would be a longer period than it was in smaller franchises.
Q. Does it -- does the 120 -- does the 180-day projection indicate that at the time you

Page 115

expected Carteret to be a difficult thrift to consolidate?
A. Yes.
Q. What role did the FDIC play in overseeing the receivership?
A. I don't recall any role the FDIC played.
Q. And what did the receivership do with the assets and liability of Carteret after it was converted to a receivership?
A. We held an auction under the dictates of the RTC headquarters in Valley Forge where a bidding process was done through an auctioneer for everything remaining in the association.
Q. Do you believe that the RTC did its best to maximize the value of the receiverships assets in the case of Carteret?
A. Yes.
Q. And why did the RTC want to maximize the value it received on the assets of Carteret?
A. My opinion and recollection of that would be to offset the funding that had been infused into Carteret from data conservatorship through the last days, the last day.
Q. Did the receiver have a fiduciary

Page 116

duty to liquidate the receiver in a prudent manner?
A. Yes.
Q. And did they?
A. Yes.
Q. Did the receivership have a obligation to sell the assets at fair market value?
A. Yes.
Q. And did they?
A. Yes.
Q. Was there a requirement to liquidate the assets of the receivership within a certain timeframe?
A. Not a certain -- no, not a certain timeframe.
Q. And why not?
A. No one knew at the beginning how long it would take to accomplish this.
Q. What factors impact the time it takes to liquidate the assets of a receivership?
A. Accumulating all of the assets from pencils to buildings; tremendous staff reductions. I would say they're the two major reasons.
Q. Do you believe that in the case of

Page 117

the Carteret receivership a reasonable amount of time was taken to liquidate the assets?
A. Yes.
Q. Let's turn to page three of your document. At the top it says "Assets." Are you with me?
A. Yes.
Q. According to the first bullet point, what were the total assets?
A. Total states as of March 10, 1995 were $1,234,422,000.
Q. And how much did Carteret have in loans at that time?
A. 727,701,000.
Q. And are loans readily salable?
A. Yes.
Q. Do loans require more time to sell than, say, mortgage backed securities?
A. Yes.
Q. And why is that?
A. Because of the amount of time involved to put all the loans into these various packages and different units looking at loans and taking them out and putting other ones in, whereas MBSs are MBSs. They sit on the balance sheet and

Page 118

you have possession of them and you just go to the marketplace.
MS. PIANKO GRONER: I have nothing further on Exhibit 37. You can put it away.
Q. Let's go back to Exhibit 1 from this morning. This you identified as your resume.
A. Yes.
Q. Do you recall approximately when you prepared this resume?
A. It would have to be late 1995, early 1996. I'm guessing.
Q. What's your basis for guessing that?
A. Only because it lists the FDIC Resolution Trust Corporation, but it says "to present," so -- but I would still say this was towards the end of my career with the FDIC -- I'm sorry, with the RTC. So, I would say mid-'95, early '96 -- no, mid-'95 to the end of '95. It can't be '96.
Q. And you mentioned this morning that you gave depositions in other cases.
Have you ever testified at trial in any case?
A. No.

Page 119

Q. I'm finished with Exhibit 1. Thank you.
You mentioned this morning that Mr. Gross was terminated?
A. Yes.
Q. Did you have any involvement in his termination?
A. No, none whatsoever.
Q. So, you were -- were you retained after he was terminated?
A. Yes.
Q. Do you recall if there was any criminal referral made by Carteret with respect to his termination?
A. I don't recall.
Q. Do you recall if Mr. Gross was ever prosecuted for his involvement with Carteret?
A. To the best of my recollection he was not prosecuted.
Q. And what do you recall about the allegations with respect to Debra Thornton?
A. Quite a bit.
Q. Was she terminated?
A. My recollection is she was.
Q. And was she terminated while you were

Page 120

managing agent?
A. Yes.
Q. Were you responsible for that decision to terminate her?
A. Yes.
Q. And why did you terminate her?
A. The -- the amount of her compensation measured with the responsibilities, in my opinion, was too high, far too high.
Q. Do you recall if there was any criminal referral with respect to Debra Thornton?
A. I don't recall any.
Q. Do you recall if she was ever prosecuted in connection with her work for Carteret?
A. I don't recall any, no.
Q. And what were her responsibilities while she worked for Carteret?
A. She was the subsidiary asset manager. She was a -- an accounting-type person who prepared the various reports on the status of all of Carteret's subsidiaries.
Q. And how long did she work for Carteret?
A. My recollection would be from the

Page 121

date of conservatorship until possibly 1992 or '3.
Q. Did -- in your opinion, did Ms. Thornton's work for Carteret have any effect on the duration of the conservatorship?
A. No.
Q. And, in your opinion, did Ms. Thornton's work increase the -- the cost to the RTC in relation to the conservatorship?
A. To a slight degree, yes.
Q. And how is that?
A. Her salary.
Q. Just her salary?
A. Just her salary.
Q. What about Mr. Gross? In your opinion did Mr. Gross' performance in any way increase the cost to the RTC of the Carteret conservatorship?
A. No, it did not.
Q. Now, did you play any role in the preparation of Carteret's tax returns?
A. None whatsoever.
Q. Did you sign any of the tax returns?
A. I can't recall, but as managing agent or field site manager, the ultimate signer may have been me, but I can't recall.

Page 130

primarily located in New Jersey and Florida."
Was that still the case when you became managing agent?
A. Yes.
Q. And then the next paragraph, the second sentence says, "At December 4, 1992, residential mortgage loans receivable net were $1,563,000,000."
Do you see that?
A. Yes.
Q. "CSB was servicing 7.3 billion of loans which included 6.2 billion of loans serviced for others."
Do you see that?
A. Yes.
Q. Was that still the case when you became managing agent?
A. Substantially so, yes.
Q. Turn to the next page. The second-to-last paragraph on page AM 50872869, it says "Total nonperforming assets decreased from $484.9 million at December 31, 1991 to $416.9 million at December 31, 1992.
A. Yes.
Q. Do you see that?

Page 131

A. Yes.
Q. When you took over as managing agent, did Carteret still have a substantial number of nonperforming assets?
A. Yes.
Q. Do you think the factors that we've just discussed had an effect on the duration of Carteret's conservatorship?
A. No.
Q. And why not?
A. With respect to nonperforming loans, the -- if you mean by the factors we just discussed, such as timing and time to do -- get things done, decrease in personnel, I don't think that had any effect on the amount and number of nonperforming assets.
Q. Let's turn to page AM 50872894. The second paragraph states, "CSB's condition was primarily due to heavy losses on poorly underwritten commercial real estate and residential development loans originated under former management. Many of the loans were poorly documented and lacked adequate appraisals."
Do you see that?
A. Yes.

Page 132

Q. Was that still the case when you took over as managing agent?
A. Yes.
Q. And then the next paragraph says, "As of September 30, 1992, assets of $523.9 million or 11 percent of total assets were classified as substandard, doubtful or loss. CSB reported net losses of $131.8 million in 1990 and $160 million in 1991."
Is that a significant percentage of total assets to be classified as substandard, doubtful or loss?
A. Yes.
Q. And was that still the case when you became managing agent?
A. For the most part, yes.
Q. So, after you arrived at Carteret, was it still facing asset quality issues?
A. Yes.
Q. I have nothing further on this document. I'd like to go back to Exhibit 6 from this morning. I'm trying to do this in chronological order. That was the November 22, 1993 operating -- operations committee meeting minutes.

Page 133

A. Yes.
Q. Do you recall this morning you discussed the delay in funding from Congress?
A. Yes.
Q. Do you recall how long that delay lasted?
A. I don't exactly but it may have been a two-month period.
Q. And what impact, if any, did that have on the conservatorship?
A. It extended it.
Q. Did it extend it by two months or more or what do you recall?
A. I would say -- in -- my recollection would be that it extended it approximately two months, the same period.
Q. Turn to Exhibit 11, which was the Alco committee minutes of January 12, 1994.
A. Yes.
Q. And turn to page two. Do you recall this morning you talked about the RTC pricing policy and how Carteret obtained permission to deviate?
A. Yes.
Q. Do you recall how long the RTC polic

Page 142

A. Yes, that -- that whole paragraph represents the OTS's examination and constant review of not only the Office of Thrift Supervision Regulations, but the operating plan and procedures of the RTC and the reason they were able to do that is because they had a resident examiner pretty much there all the time.
Q. And what was your understanding about what was meant by the phrase "orderly downsizing of the institution's liabilities"?
A. This -- I remember questioning this because of the use of the term "liabilities" and "asset" and the man explained to me, the resident man, not the fellow that wrote this memo, that he was talking about the balance sheet liabilities were being reduced because you were disposing of various assets.
Q. Turn to the next page and the second paragraph says, "From the date of conservatorship DOC until November 29, 1993, the managing agent was George M. Gross, Jr. He has been succeeded by Edward J. Griffin, the present managing agent. Messrs. Gross and Griffin have appropriately discharged their assigned responsibilities and have operated the institution in a manner that is

Page 143

in keeping with stated conservatorship objectives."
At the time you read this, did you agree that Mr. Gross had appropriately discharged his assigned responsibilities?
A. Yes.
Q. And do you still believe that?
A. Yes.
Q. Do you believe Mr. Gross operated Carteret in a manner that is -- that was in keeping with stated conservatorship objectives?
A. I guess I'm going to have to reverse myself because one of the conservatorship -- when I answered your question previously, and that question this time, I had in mind the conservatorship rules and regulations for procedures.
However, there was a code of ethics involved with all of us that we signed off on that we would adhere to also. Obviously, George Gross did not adhere to those codes of ethics, that code of ethics with respect to his misdemeanor.
Q. Do you think the termination of Mr. Gross was commiserate with his infraction?
A. Yes.

Page 144

Q. Now, the next paragraph states, "Both managing agents have successfully utilized the experience and ability of Carteret's former officers and employees to run the institution in a manner that has been both orderly and efficient, conducive to the goal of downsizing the institution in a controlled manner, and consistent with protecting Carteret Federal's depositors."
Was it your goal to downsize the institution in a controlled manner?
A. Yes.
Q. Why?
A. In order to make it more attractive to franchise bidders ultimately.
Q. What steps did you take to accomplish this goal?
A. With the assistance of my RTC staff, I downsized -- or we downsized the institution's assets in a controlled fashion and, in my opinion, protected the remaining Carteret depositors, ultimately resulting in a attractive franchise for bid purposes.
Q. Why did you want to protect Carteret's depositors?
A. I wanted to protect Carteret's

Page 145

depositors by keeping somewhat attractive deposit rates so that -- and not reducing deposit rates, which we had the power to do mainly in the CDs and on the various passbooks accounts and the money market accounts, as a responsibility to these depositors and still trying to conform to the rules and procedures of the RTC.
Q. Turn to the next page and this page discusses lending and problem assets. The first paragraph notes that "sufficient progress has been made in the orderly reduction of problem assets." Is that right?
A. Yes.
Q. Would you characterize Carteret as having a large number of problem assets during the conservatorship?
A. Yes.
Q. And what steps did you take to reduce these problem assets?
A. We -- we tried to negotiate with individual nonperforming loan principles to a great degree with the major thrust there to try and get them to honor their commitment.
Q. And did your efforts to reduce these problem assets have any effect on the earnings of

Page 146

the conservatorship?
A. Very negligible.
Q. And why was that?
A. Very unsuccessful in dealing with the nonperforming loan customers.
Q. And did these problem assets generally result in losses for the conservatorship?
A. Yes.
Q. Did you consider the orderly reduction of problem assets important?
A. Very important.
Q. Why?
A. Once again so that at resolution time, we would have a sufficient amount of performing assets to fund the successful bidder's liability purchases.
Q. Turn to the last page of this exhibit. It says "Conclusion." And the first paragraph says, "Due primarily to the reduction of key Carteret employees," the conservatorship has been well-managed. For the most part, the institution's franchise has been preserved as well as can be expected, given the limitations placed on the conservator. Nonperforming assets have

Page 147

been liquidated and the objectives of the CSP have been and continue to be met by management."
Do you agree with that conclusion?
A. Yes, I do.
Q. What did you do to preserve the franchise?
A. Protected the outflow or stopped the outflow of depositors, deposits, retained key employees, Carteret staff to do the work, and prepared the performing assets for sale.
Q. And what was your understanding of the phrase, "given the limitations placed on the conservator"?
A. In that man's opinion, the RTC policies and procedures were somewhat restrictive as they had to be compared to limitations, if any, placed upon a performing institution that they regulate.
Q. And did you feel constrained by the limitations placed on the conservator?
A. No.
Q. And why not?
A. Because I understood why they had to be in place.
Q. And why did they have to be in place?

Page 148

A. In order to protect the franchise value, to stop -- wrong term. To correct the -- to reduce cost as best could be done and they're the two main reasons.
Q. And would those same limitations have arisen from safety and soundness considerations?
A. Yes.
Q. Okay. I have another document.
MS. PIANKO GRONER: I'm going to ask the reporter to mark as Exhibit 46 a March 30, 1994 memo from Mr. Griffin to Mr. Smedley and it attaches a revised 1994 operating plan budget section of the conservatorship strategic plan.
(Griffin Exhibit 46, document Bates stamped CAM 3670057 through CAM 3670103, marked for Identification.)
Q. Would you take a look at this document and tell me if that's your signature on the first page?
A. Yes, it is.
Q. Can you tell me what Exhibit 46 is?
A. Exhibit 46 is a revised operating plan budget for the year 1994.
Q. How often was the budget reviewed?

Page 149

A. The budget was prepared annually, reviewed annually and in our case in Carteret it was revised multiple times due to delayed asset sales, increased asset sales, I don't know what the -- I can't recall the specific reasons for this revision.
Well, I do now reading --
Q. What page?
A. On page CAN 3670058. "This plan and budget revision is based on updated assumptions which includes the subsidiary operations of Imperial Premium Finance during 1994 due to the lack of the necessary approvals for this transaction. Other budget changes include decreases in net interest income due to the replacement of maturing higher yield investment securities and an increase in the cost of retail and wholesale funds due to the recent rise in fed funds and prime rates."
Q. Does this refresh your recollection of any involvement you may have had in the Imperial Premium Finance sale?
A. Not in Imperial Premium Finance. No, it does not.
Q. What does it refresh your