IN THE COURT OF FEDERAL CLAIMS

----------------------------------------x

AMBASE CORPORATION, et al.

v.

THE UNITED STATES OF AMERICA

----------------------------------------x

October 15, 1999

8:30: a.m.

200 Park Avenue

New York, New York

DEPOSITION of ROBERT ALBANESE, a witness in the above entitled matter, before a Notary Public of the State of New York

Page 46

Q Yes.
A I don't know. Honestly, I don't recall what -- whether we did that or we didn't.
Q *Can you recall closing institutions* that had negative tangible capital?
A Yes.
Q I take it you have closed many institutions in that profile?
A Yes. Getting back to your question.
Q Yes?
A Your earlier question, post-FDICIA you asked me to speculate, and I know my counsel has said not to speculate; but since the Congress at the time pretty much directed us to take certain actions at certain levels of capital and certainly we would have been expected to take action above -- at times when there was positive tangible capital, I think the answer to your question probably was yes.
Q After FDICIA you believe that you did close?
A I believe it's likely. I don't recall anything specifically, but I believe that it is contemplated in the Act that we would close an institution even if it had positive tangible

Page 47

capital, if that tangible capital was so low as to present a risk or serious potential problem to the government and a risk to the taxpayers.
Q Prior to FDICIA, can you recall having closed an institution that was profitable?
MS. TORNATORE: Objection, vague as to profitable. You may answer, to the extent you can.
A I don't recall.
Q Do you recall having closed institutions that were not profitable?
A Often.
Q Do you think it was likely after enactment of FDICIA if you -- that you may have closed an institution that actually satisfied its tangible capital requirement?
A No.
Q How about prior to FDICIA?
A I don't recall prior to FDICIA any specific cases, so it's really hard for me to answer the question.
I think it's possible, I think there was serious management problems and serious loan problems where we had doubts. Maybe more than doubts, facts as to the potential losses in the

Page 48

institution and potential losses in assets that hadn't yet been completely pinned down with formal appraisals, that we may have acted on on an *institution knowing that it was insolvent.*
Q Knowing that what?
A It was insolvent, that the losses were so severe, and that time was of the essence. But I can't recall specific cases.
The only case, like I said before that I can specifically recall right now, pre-FDICIA that I was involved with is Flushing Federal.
Q Well, if a -- if an institution was insolvent, then presumably it wouldn't satisfy its tangible capital requirement?
A That's correct.
MR. COOPER: Mr. Albanese, I would like to hand you -- I would actually like to have marked first as an exhibit a document that is stamped with number WOP 9161048.
(The above described document was marked Albanese Exhibit 1 for identification for identification.)
MR. COOPER: If you will review

Page 49

that, please.
Q Mr. Albanese, will you identify this document, please?
A This is what's referred to as an informational report from the examiner in charge, Kevin Hoyt to me, Director of Examinations, that's what DE after my name is, it's dated April 8, 1988 and it's in reference to Carteret Savings Bank, F.A.
Q What were your responsibilities as DE? This was Director of Examinations you have referred to earlier, I take it?
A Yes. This is when I was in charge of the examination function, when I was put in charge of the examination function at the Federal Home Loan Bank for that three or four year period subsequent to 1986.
Q The second paragraph of that, of this informational report states that "As of this date, the examination has extended thoroughly into all major operating areas of the bank.
"The examiners are satisfied that management at all levels is competent. In addition, adequate procedures and controls

Page 98

investor groups.
Q The investor groups are actually listed on the next page of Exhibit 5, and I am not going to name all these investor groups, but as you look down these names, it looks like there are roughly 20 names.
Do you recall any of these potential investors and having had contact yourself with any of them?
A Yes.
Q Which ones do you recall particularly?
A I specifically recall a meeting which we had in Jersey City with GE Capital and again, the Carteret team, management team there.
I think it's misspelled, but down in the third group, Cargill, there was a group that came in, it is misspelled, right?
It was the former Secretary of Defense or somebody in that group, I remember that one. I think we met with U.S. West, but I'm not sure about that.
We had some telephone conversations from time to time with other groups, but I couldn't say specifically which ones; maybe

Page 99

Pennsylvania Teachers, we might have called them and talked to them, trying to determine just how serious groups were.
Q Mr. Albanese, would you say that you were impressed by the efforts that Mr. Bianco and his colleagues were making to find investors for this bank?
A Yes.
Q Were you impressed as well by the kind of contacts that Mr. Bianco had in the capital markets and the number of potential investors that he discussed this with?
A Yes, I believe we had discussions among ourselves.
That was one of the strengths that was -- that this team, this particular team brought in, and that was the ability to make contact with large investor groups and have those kinds of contacts.
I do recall that kind of discussion.
Q Do you think that there is anything more that Mr. Bianco and his colleagues could have done in order to attract interest in -- interested investors to possibly recapitalizing Carteret?
A I really couldn't say, I think

Page 100

that's probably a good question to ask Mr. Bianco, but I could tell you that the honest answer to this is that we were not disappointed in the efforts that were being made to raise the capital. Whether he could have done more, I couldn't tell you.
Q Is it accurate to say that the effort, including your personal effort to find investors, was a very active and energetic one?
A Yes.
Q Did it involve Washington personnel of OTS, were they involved or knowledgeable of the efforts that were being made?
A They certainly were very aware of what we are doing, because we were briefing them very frequently by telephone or by memo.
But many, many phone calls, so they were involved actively.
I don't recall if anybody in our Washington office may have met with an investor group or not. It's possible, but I don't recall.
It wasn't typically done, but it's possible in this case it was done, I just don't recall.
MR. COOPER: I ask the reporter to

Page 101

mark this document which bears Bates stamp WOP 3340714 as Exhibit 6, please.
(The above described document was marked Albanese Exhibit 6 for identification, as of this date.)
Q Mr. Albanese, can you identify Exhibit 6 for me, please?
A I'm not sure.
It's in a format, but I don't recall ever seeing like this, but it seems to be a memorandum that Rock Tonkel sent to Timothy Ryan.
Rock Tonkel, I don't remember what his position was, but Mr. Ryan had brought him in, he worked out of our Washington office and he did work on troubled cases and raising capital.
Mr. Ryan was the head of the agency.
It appears to be a memorandum from Mr. Tonkel to Mr. Ryan regarding the current status of Carteret Savings, which then was forwarded to us, I guess, because five days later it's forwarded from Angelo Vigna to myself, Michael Simone and Robin Snyder.
Q So then the author, I take it, of this memorandum or of the substantive part of the memorandum, is Mr. Tonkel?

Page 126

A Well, whether we establish reserves, you generally establish them in two ways, you establish them against specific troubled assets, then you have a general reserve that's established against the entire portfolio.

The point that was trying to be made here is that this number, and when you look at this number, you measure it against gross assets, it's 28 percent, and I don't recall what the industry standards were at the time.

But obviously we were trying to make a point that it had a -- the New York Director of the FDIC that if you actually looked at the level of reserves against the part of the portfolio that was not performing, that number was significant.

I assume that's the point I was trying to make there, versus just looking at the entire asset portfolio, because some of the assets in there were performing, but I don't know what I was thinking beyond that at the time.

I clearly made a distinction.

Q So, then I take it the 28 percent of gross commercial assets, if you applied the valuation reserves against only the part that was not performing, the valuation reserves would

Page 127

constitute a percentage of the nonperforming assets, that's considerably higher than 28 percent?

A Yes, but that's always the case, just so we are clear here.

If they are establishing a general reserve against -- and they are required to, against a performing portfolio, if you take that out the percentage is going to be higher.

That's why I say I'm not exactly sure why I made this point, but I made it consciously.

But your statement is correct.

Q Is it fair to say that in light of these points and the achievements that are noted in this paragraph, that you were comfortable at that time with the adequacy of the valuation reserve against the remaining troubled asset portfolio?

A It certainly follows that if I am making that point to the Regional Director for the FDIC, yes, we were comfortable or we wouldn't have made a point for the reason for granting the extension, so we were comfortable, yes.

Q The next paragraph, Mr. Albanese,

Page 128

states, "In conclusion, we believe that the termination of the agreement and the underwriting process, while progress is being made to recapitalize a troubled institution with assets of over $5 billion, would not be effective supervision or good policy, particularly when we have an executed agreement authorizing the termination of the agreement prior to August 28, 1992."

Is it correct to read that paragraph to say, or am I correct in understanding that you were simply making the point that pursuant to the agreement, you can halt the underwriting process and transfer the thrift to the RTC, essentially at will, and why do that while it's not representing a threat to the insurance fund?

A Well, I wouldn't say it that way.

I would say that an institution that's thinly capitalized represents a threat.

A better way to say it is why do that when the institution is improving.

Q Fair enough.

A And we don't see a need at this time for an immediate transfer.

Page 129

Q If the institution starts to trend south instead of north, so to speak, you can take action at a moment's notice under this agreement?

A Or if the investors dry up, right. That's correct.

Q Do you recall in light of this correspondence if Mr. Ketcha's objection, if he basically removed his objection?

A I don't believe he removed his objection, I don't recall anything where he would have removed his objection.

I also don't recall getting any calls from our Washington office about calls they may have gotten from the FDIC headquarters.

I don't know what happened, but I don't recall getting those kinds of calls which we might have gotten.

Q In other words you would have expected to get a call if the FDIC's or Mr. Ketcha's objections were adamant or strenuous, notwithstanding this correspondence?

A Yes, I would expect that we would have gotten a call if it got that serious, but I don't know.

There may have been calls and our

Page 150

who made this decision to close Carteret?
A Let me just say I don't even know if our process was the Director of the agency will sign off on all transfers, I don't know that.
I do believe he knew about it, based upon other conversations that he had discussions with Jonathan Fiechter and conversations which were conveyed back to us which indicated to us that he knew, certainly, and was involved in a decision.
Q Did you have any conversations with him?
A No.
Q Did you have discussion conversations with Mr. Downey about this at this eleventh hour time frame?
A I believe we had -- I recall a conversation, a conference call that Angelo Vigna and I had with John Downey very late discussing PNC, whether it was December 2nd or November 30th I couldn't tell you, but it was pretty late; talking about what was the real possibility that a deal like this could get done.
Q What do you recall about that conversation?

Page 151

A My recollection is that time was an issue, clearly.
That we were going to start another round of due diligence, essentially, and it was going to take some time.
And that people in leadership positions in the agency, the top levels of the agency had reached a decision that they did not want to have any further time extentions.
Q In that conversation, did you make essentially the same points that you had made in your letter concerning the possible benefits of pursuing these recapitalization possibilities?
A I recall very late in the process still, not just myself, but both Angelo Vigna and myself making the statement that we did not see the time urgency, despite the statute, but that there was a difference of opinion clearly and that's what those people in those specific processes is supposed to be, that we make the recommendations, but the decision is someone else's, we can easily be overruled on those types of things.
Q Let me ask you this, do you recall anybody in the Northeast Region, any of your

Page 152

subordinates who disagreed with your view that as you put it, you didn't see the time urgency of transferring Carteret?
A I don't know if they would tell us that if they did, but no.
Q I will send some of my associates over then.
A I would tell you, though, that I can't say with certainty that there was not disagreement, I'm not aware of any.
Q You don't recall any?
A Right.
Q Well, let me ask you this, do you recall whether subordinates of yours who had any direct supervisory responsibility for Carteret agreed with that, with your view?
A That?
Q Your view that Carteret should not be transferred at this date?
A Geez, let me think.
I believe at the RTC closing meeting, the day the RTC took control, there was one manager or one person that reports to me who felt that way, yes, who expressed it.
It might have been John Griffin, I

Page 153

don't recall.
I recall having -- there was a discussion at what they call the staging meeting.
Q Staging?
A Before the RTC took over an institution, people that would be going in to do the takeover action would meet and then would leave from a central location to go to the institution at the same time, so everybody arrived at the same time, and we were at that meeting.
Q I see, that would have been then on either December 4th or perhaps the day before?
A It would have been the day of the actual.
Q The actual day of the seizure?
A Yes.
Q And your best recollection is that Mr. Griffin may have expressed that sentiment to you?
A Somebody at the table did, there were five or six OTS people at the table.
But I don't know if there was disagreement or if others felt differently.
Q How many RTC people were at the table, at the staging meeting?