CERTIFIED COPY




IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and )
CARTERET BANCORP, INC., )
Plaintiff, )
and FEDERAL DEPOSIT )
INSURANCE CORPORATION )
Plaintiff Intervenor, )
vs ) Case No. 93-531C
UNITED STATES OF AMERICA ) Chief Judge Loren A. Smith
Defendant. )

FIRST FEDERAL SAVINGS )
BANK OF HEGWISCH )
Plaintiff, )
vs ) Case No. 93-162C
UNITED STATES OF AMERICA )
Defendant, ) Chief Judge Loren A. Smith

O. BRUTON SMITH and BILL )
SMITH, )
Plaintiffs )
and FEDERAL DEPOSIT )
INSURANCE CORPORATION )
as successor to the rights)
of North Carolina Federal )
Saving & Loan Association,)
Plaintiff Intervenor )

would have likely taken place in Washington.

Q Okay. And you have no recollection as to why Great Western's bid for Delray was not consummated?

A The only thing I could say on that is what I've read in this paragraph. I have no current recollection about it.

MR. THOMPSON: Okay. Fair enough.

At this time I'd like to ask the court reporter to mark as AmBase Beesley 2 a document that bears the Bates No. WOQ1050002.

MS. WILLIAMS: Could you give me the source of the first document just so I'll know? The OAM, what's the source of it?

MR. THOMPSON: Just off the record.

(A discussion was held off the record.)

(AmBase Beesley Exhibit 2 was marked.)

Q (By Mr. Thompson) And, sir, would you please identify this document for the record.

A This is a request that I made to the Federal Home Loan Bank Board via the secretary, J. J. Finn, that the Federal Home Loan Bank of Atlanta be given a guaranty whereby the FSLIC would guaranty advances from the Federal Home Loan Bank of Atlanta to First Federal Savings & Loan

Association of Delray Beach.
Q And I take it that this step of FSLIC providing a guaranty to the Federal Home Loan Bank of Atlanta was necessary in light of that institution's concerns about Delray's health?
A Yes.
Q And was this common for the FSLIC, to have to make a guaranty to a regional Federal Home Loan Bank on its advances?
MS. WILLIAMS: Objection, vague.
THE WITNESS: Well, it wasn't exactly common in that for the most part, most institutions had enough collateral to secure their own advances. However, it was not unusual in a situation where liquidity posed a problem, and where the institution lacked adequate collateral, we would provide these kinds of guaranties so that there would also be sufficient cash at the window to handle withdrawals, the theory being that we were already responsible for the deposits in any event.
Q (By Mr. Thompson) Okay. And is it fair to say, based on the fact that Delray required a guaranty, that it was a particularly troubled thrift at the time?

MS. WILLIAMS: Objection on vague.
THE WITNESS: Yes, I think it's a fair assumption that this would have been one of our serious problem cases.
Q (By Mr. Thompson) Okay.
A Of which there were many.
MR. THOMPSON: At this point I'd like to ask the court reporter to mark as AmBase Beesley 3 a document that bears the Bates No. WOR0590419.
(AmBase Beesley Exhibit 3 was marked.)
Q (By Mr. Thompson) And, sir, would you please identify this document for the record in terms of its date and the addressee and the author?
A Well, it's addressed to me from a Mr. Britt Evans of Homestead Savings regarding Homestead Savings' proposal to acquire First Federal Savings & Loan of Delray Beach and others in what we would call an assisted merger.
Q All right. And in the second paragraph of this letter in the second sentence, do you see the reference to the purchase method of accounting would be used for the acquisitions?
A Yes.
Q And I know you provided testimony on

transaction be approved, you'd have to conclude that the resulting institution is viable; isn't that right?

A Yes.

Q And isn't it true that this institution, once the mark to market had been done and a negative liability of 46 million from Barton and negative 168 million from Delray, would not have been viable had the resulting supervisory goodwill not been included in the regulatory capital of the resulting institution?

A Absolutely correct.

Q Okay. So, in fact, not only would it have been Carteret's expectation that it would have this contractual right, but it was also the FSLIC's expectation as well; is that right?

A Well, it was the --

MS. WILLIAMS: Object --

THE WITNESS: -- it was the FSLIC's expectation they would use purchase accounting. Again, I think the contractual right issue versus what's in the resolution and the expectations just goes beyond what I am comfortable testifying to because I know in a lot of these agreements we had actual contracts that specified one way or the

other how the accounting was.

I don't know what -- what's at stake here, but I can tell you that -- that it's clear that absent the use of purchase accounting that neither side would have wanted -- neither side being Carteret or the FSLIC, would have wanted to do this transaction, or the transaction could not have occurred, as you pointed out, because Carteret would have immediately had a negative net worth even on a book basis.

Q (By Mr. Thompson) All right. And you've referenced earlier and in some of your prior testimony as well in the common portion of the deposition the benefits of purchase method of accounting to the acquiring institutions, and I just want to quickly make sure that the record is clear on this. Are there two principal benefits, one, that the discount will be accreted and that there will be -- and that income will be recognized on that basis as loans come in and the amortization of the goodwill is written off over a longer period of time?

A That's -- that's the main benefit, yes.

Q And then is there also a benefit that Carteret would be able to take this supervisory

goodwill and leverage it in an attempt to make profits and fill the tangible hole that it had?

MS. WILLIAMS: Objection, vague.

THE WITNESS: Well, I think -- yes, I think the answer is yes.

Q (By Mr. Thompson) All right. Now, I'd like to turn back for a few minutes to page 7 of this document, and by "this document," I mean the September 30, 1982 memo with the district court's decision. And do you see the chart that says Barton Savings & Loan Association Selected Financial Data as Reported?

A Yes.

Q And do you have any independent recollection as to the troubles that were afflicting Barton at this time?

A No.

MS. WILLIAMS: Objection, vague.

THE WITNESS: No.

Q (By Mr. Thompson) Do you have any independent recollection as to how Carteret was identified as a potential acquirer for Barton?

A No.

Q And do you have any recollection as to how Carteret was identified as a potential acquirer