00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS )

) )

PLAINTIFFS IN ALL )WINSTAR-RELATED CASES )

AT THE COURT, ) )

Plaintiffs, ) )

vs. ) Case No. 90-8C, et al. )

THE UNITED STATES OF )AMERICA, )

) Defendant. )

)-----------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION OF: HORACE BRENT BEESLEY

-----------------------------------------------------

TAKEN AT: 185 South State Street, Suite 500 Salt Lake City, Utah

DATE: July 26, 1999

REPORTED BY: Susette M. Snider, CSR, RPR

00004

Monday, July 26, 1999; 9:52 a.m.

P R O C E E D I N G S

HORACE BRENT BEESLEY,

called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. FOUNTAIN:

Q Mr. Beesley, good morning. Could you state your full name for the record, please.

A It's Horace, H-o-r-a-c-e, Brent Beesley, B-e-e-s-l-e-y.

Q And could we have your present home and business addresses?

A My home address is 1492 K-r-i-s-t-i-a-n-n-a Circle, Salt Lake City, Utah. My business address is 95 East Tabernacle Street, St. George, Utah 84770.

Q And again, Mr. Beesley, I'm Edwin Fountain. I'm with the law firm of Jones, Day, Reavis & Pogue in Washington, D.C. I represent Anchor Savings Bank in its goodwill suit against the United States.

00049

changes in accounting that allowed institutions more flexibility in restructuring, including appraised equity capital and the deferral of losses on the sale of mortgages.

Q I'm going to come back later, and we'll explore purchase accounting and goodwill. But for now, can you explain to me what were the changes in policy with respect to purchase accounting in thrift mergers?

A Well, I'm not -- I'm not absolutely clear at this point what the prior policies were. But at some point we allowed the acquirer in a purchase-accounting-type transaction to amortize the goodwill over a period of up to, I believe, 40 years and to create the discount on the mortgages acquired over the life of the mortgages. And like I say, I'm not exactly sure how that differed from what was being done previously, but I assume that previously those were more closely aligned so that the amortization of the discount and the accretion of the income were more aligned.

After the change in policy, it would allow the mergers to occur and for income to be generated for book purposes in the early years, and then there would be offsetting losses occur in the

00050

outer years. And that was a significant inducement for mergers as many managers were looking for ways to buy time during this crisis, and so was the FSLIC. So there was a convergence there of interests in finding a way to buy time.

And these mergers were instrumental in giving institutions greater income than they would have otherwise had and thereby helping them through this period.

Q And you're referring both to the acquiring institution in addition to the acquired institution in talking about greater income; is that right?

A Well, the -- the greater income would occur to the resulting institution. In fact, there were ideas being explored as to how you could have this same effect without going through a merger, because in order to get this benefit, you needed to have a merger, and so that's probably one of the great driving forces for the consolidation that occurred during that time. But as I say, there was even discussions on if there were any ways in which you could have this benefit without having to do a merger, and my recollection is that nothing came of that.

00069

interest rates were to fall and the fair market value of these loans was greater than what they were shown on the books at the time of the acquisition, then those loans were then sold, there would also be a very large income amount recognized. And that income could be taken immediately.

So purchase accounting, in short, allowed the goodwill to be amortized over 40 years and the income to be accreted over the life of the mortgage which could be substantially shortened if the loan were sold or prepaid. If it simply was paid off over its contractual life, then that income would be accreted over a longer period, up to -- conceivably maybe even up to 30 years.

Q And you testified previously that the income boost, if you will, created by the difference between the accretion and the amortization that you've just described, allowed thrifts in the early 1980s to buy time?

A Yeah. It -- it -- to the extent they had income or to the extent they had less loss than they would have otherwise had, their capital, their book capital or regulatory capital, would be diminished at a lesser rate or perhaps even

00070

increased, and therefore, their standing relative to the regulators would be increased and their potential for failure would be diminished. So even though there might not be any economic change -- I mean obviously if you take two institutions, institution A and B, and merge them together, the economics -- the real economics of the two are the same after the merger as they were before. But from an accounting standpoint in a regulatory capital standpoint, the outcome is substantially different than if they had not gone through this process.

Q In the early 1980s while you were director of the FSLIC, the bank board permitted goodwill to be counted as an asset for purposes of determining a thrift's capital; is that right?

A Yes.

Q And that was so even though the goodwill was a nonearning asset?

A That's correct.

Q Was there a policy justification at that time, in the early 1980s, for including goodwill in assets for purposes of calculating regulatory capital even though the goodwill was a nonearning asset?

00071

MR. HUGHES: Objection, form.

THE WITNESS: Yes, I believe there was. I think the -- the policy justification was, is that it -- it allowed the industry to, as I said before, buy time, which means to slow its slide into insolvency and with the hope and expectation that interest rates would moderate and that the industry could then move forward. And it reduced the cost of assistance to the FSLIC. It facilitated mergers and consolidations which had benefits beyond goodwill. I mean to the extent you can reduce overhead, reduce redundancy in the branch network, increase efficiencies, economies of scale and so forth.

So I think there were several reasons why at that time the bank board considered it appropriate to allow goodwill to be considered as an asset, even though it was a nonearning asset.

Q (By Mr. Fountain) Now, over time the amortization of the goodwill would become an annual expense; is that right?

A That's right.

Q And how did the regulators at the time of approving these mergers anticipate that the surviving institution would be able to carry that

00072

expense in the out years?

A They anticipated that the mortgages which were underwater would have been paid off or substantially reduced and that those funds could then be lent out again at higher rates, that interest rates would likely moderate because they were at such far greater levels than historic levels, historic norms, and that the profits that would be generated in normal operating circumstances, together with growth that might reasonably occur, would be sufficient to carry the drag that would be associated with the write-off of goodwill in the out years.

Q And would the growth and profitability that were anticipated also include the benefits of whatever synergies and economies of scale that might result from the merger?

MR. HUGHES: Objection, form.

THE WITNESS: Well, I -- I'm not sure that it was always as well thought out as to calculate each of those benefits individually, but we believed that there was an overall benefit of some degree associated with consolidation, particularly if it was in-market consolidation. And I don't know what weight was given to that

00077

earnings and return on capital. To the extent you have a negative spread, which was the situation in the early '80s, leverage can be a detrimental situation. But under normal operating conditions, leverage allows institutions to make a relatively narrow spread on their assets relative to their liabilities and yet still have a reasonable return on their capital.

Q And to the extent that the addition of goodwill as an asset results in an increase in the institution's capital, that increased capital can be leveraged in the way you just described?

MR. HUGHES: Objection, form.

THE WITNESS: Yes.

Q (By Mr. Fountain) In recommending supervisory mergers involving goodwill for approval by the bank board, did the FSLIC expect that the surviving institution could leverage the goodwill generated from the transaction to hold more income producing assets?

MR. HUGHES: Objection, form.

THE WITNESS: Well, we would expect -- I think we had every expectation that the goodwill would count as an asset which would, by the formula, result in capital being there that would

00078

be leveraged, yes.

Q (By Mr. Fountain) Rather than tax your memory more than I might already have done, Mr. Beesley, let me have the reporter mark what we'll call Beesley Common Exhibit 1, a document that is Bates numbered OGC036 0001 through 0006 that purports to be a February 2, 1982 memo from H. Brent Beesley and D. James Croft and Thomas P. Vartanian to Supervisory Agents, OES staff, FSLIC staff and OGC staff.

(A discussion was held off the record.)

(Beesley Common Exhibit 1 was marked.)

Q (By Mr. Fountain) Mr. Beesley, I'll hand you what the reporter has marked as Beesley Common Exhibit 1. I'll ask you to look over the document briefly, and then I'll direct your attention to some specific portions of it.

A Okay.

Q And at any time as I show you documents, Mr. Beesley, and ask you questions about specific portions, by all means if you want to read more of it to get context, do so.

But to begin with, the subject line of Beesley Common 1 is titled"Guidelines & Procedures For the Resolution of Supervisory Cases." Do you

00094

goodwill?

A I don't think there's a huge difference. There are probably some subtle differences, but, in effect, it would probably be pretty close, with one exception, the -- in a liquidation you would pay out the depositors, so you would know that its the face value of the deposits, whereas in the computation of goodwill, you might have -- for example, if you had some deposits that were long-term, fixed-rate deposits, they may have a value in a goodwill computation that's different than their book value.

Q And what did the viability analysis measure?

A Well, its -- it measured whether or not the acquiring institution, or the combined institution is a better way of saying it, would continue throughout the period of the analysis to maintain at least its minimum capital requirements, and -- and that was the definition of viability. I don't remember exactly what that period of time was, and I don't remember exactly what capital requirements were used. But the theory was they wouldn't fail their regulatory capital requirements during the period that was examined.

00095

Q Do you recall whether the period examined was at least 10 years?

A Seems to me it would have been. I just -- I don't remember, but I'd be very surprised if it weren't at least 10 years. It would be spelled out in the memorandum.

Q Was it a requirement that the institution -- that the combined institution be projected to be viable over the period examined in order for the bank board to approve a merger?

A Yes.

Q And I take it that you never -- you never recommended a merger to the bank board when viability was not projected for the period examined?

A No, I don't think I did.

Q And what sorts of assumptions went into the viability analysis?

A Well, there would have been the key assumption, which overarched all other assumptions, was the level of interest rates going forward, and we -- we worked hard to try to come up with that guess. In hindsight there are better ways of doing it than we did it. We might have used a variety of interest rates to see if the viability would have

00097

A I don't remember how that was calculated, but -- but somehow we tried to be uniform in terms of the assumptions so that we could compare apples to apples. And I do think the model changed from time to time. I know we've had people look at the model from the outside just to help us make sure that it was a reasonable model. Any time you're trying to predict the future, you've got to recognize the weaknesses. But that's what we did.

Q You referred to a growth factor. Do you recall whether there was a standard growth factor plugged into each bid or was it tailored to the particular bidding institution?

A I don't remember, but -- I don't remember. I think it would have been standard, but it may have been modified based on a business plan or something.

Q You defined viability as maintaining minimum capital over the -- over the period examined?

A There may be a more sophisticated definition in something, but that's the gist of it.

Q And by "minimum capital" you're referring to the minimum capital ratios established

00098

by the bank board's regulations?

A Yes.

Q In performing viability analyses on mergers where goodwill was generated, did the viability analysis include the goodwill in the calculation of capital for purposes of making the determination whether the institution met its minimum capital requirements?

A Yes.

Q And did it assume amortization over whatever period provided for by the application?

A Yes.

Q And what was the source of the information plugged into the viability analysis as to the amount of goodwill and the time period of amortization?

A Well, as to the time period, it would have probably been the maximum time period allowed by the bank board's policy, unless it were specifically stated otherwise in the agreements. And as to the amount of goodwill, unless at the time of the analysis there had been an appraisal done and all the work done to determine actual, it would have been based on estimates, which we've already discussed how those values were

ascertained.

So this analysis was done I believe at different times for different deals. I mean if we're all ready to go to the bank board and all our work has been done and the institution has already done a thorough evaluation and so forth, I mean maybe some of those assumptions would have been used. If we're in the initial stages just trying to figure out if something's available, there might have been some rather gross assumptions made.

But we tried -- we would try to get it as close to reality as possible in terms of the evaluations used, and in most cases probably, I would like to assume, at least, that the numbers we used in our analysis were very close to the actual numbers that were ultimately used in the institution's books. There may be some variances, but I mean that would have been the idea.

Q If there was an expectation that goodwill would be excluded from the capital calculation at some point within the time period analyzed, would that be important to the viability analysis?

MR. HUGHES: Objection, form.

THE WITNESS: Yes, I think it would be

00100

important.

Q (By Mr. Fountain) And at the time that you were director of the FSLIC and recommending mergers to the bank board for approval, did you have the expectation that goodwill would be excluded from the capital calculation within the time periods analyzed for any of the mergers that you recommended?

A No.

Q Did the FSLIC ever establish loss reserves?

A Yes, in the sense of -- when we did a deal, we would establish a reserve for our expected losses or outflows related to every deal, whether we had cash out or not.

Q Based on the expected cost of assistance in that particular deal?

A Yes.

Q And did the FSLIC ever establish loss reserves based on projected or potential failure of the surviving institution resulting from the supervisory merger?

A I don't think so. I mean I would -- I would think not. We didn't expect them to fail.

Now, let me -- let me say in a