IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------:

PLAINTIFFS IN ALL :
WINSTAR-RELATED :
CASES AT THE COURT, : No. 90-8C et.
al : (Chief Judge
Plaintiffs, : Loren A.
Smith)
Vs. :
:
THE UNITED STATES, : VIDEOTAPE
: DEPOSITION OF
Defendant. : THURMAN C.
--------------------------------: CONNELL

DEPOSITION OF THURMAN C. CONNELL, taken before Jill Madsen, Certified Shorthand Reporter and Notary Public, at the University Park Holiday Inn, Chamber Room, West Des Moines, Iowa, commencing at 9:11 a.m., on June 28, 1999.

Reported by: Jill Madsen, CSR, RPR

Page 10

called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MANNING:

Q. Now, Mr. Connell, if at any time I ask you questions that you don't understand, which happens from time to time, please tell me. I'll try to restate them.

If at any time you're unclear about what I'm asking, tell me, and I'll try to straighten it out for you.

A. Okay. Thank you.

Q. This is the common deposition notice. Wonder if you've ever seen that before?

I know we subpoenaed you to appear after we had arranged the time.

Have you ever seen that before, sir?

A. I don't recall having seen it. I did receive a subpoena. Whether it's this one or not, I didn't pay that much attention to it.

Q. Very good. Do you have a name that you go by other than Thurman, a nickname of any type?

A. Commonly called Sam Connell. So you can see that name from time to time.

Q. Could you describe for us a bit your

Page 11

educational background, college and beyond?

A. I'm a graduate of Emory University in 1961 with a bachelor's of arts degree.

I attended the University of Florida School of Law for approximately two years after that, but did not obtain a degree.

So that's the extent of my education.

Q. You were wiser than the rest of us sitting at this table.

A. I'm not sure about that.

Q. When was the first job that you had, sir, following your two years of law school?

A. Actually, I started work at the Federal Home Loan Bank of Greensboro in June of 1964 as a management trainee.

Q. And have you worked -- how long did you work at the Federal Home Loan Bank in Greensboro?

A. Well, actually, the Home Loan Bank of Greensboro was moved to Atlanta in 1972. And I continued employment with the Atlanta bank until 1987 when I moved to Des Moines, Iowa, to become president of the Federal Home Loan Bank of Des Moines.

Q. Now, could you describe your responsibilities while working with the Federal

Page 12

Home Loan Bank, what is it in the fourth district?

A. Yes.

Q. That would have been first Greensboro then Atlanta?

A. Correct. In my first few years I was, basically, an analyst. Well, after the management training program, which was about two years, and in that program I worked in each of the departments of the bank. Actually, was assigned to work in a savings and loan for about six months, traveled with the examining division personnel for about six months.

And when I finished that program, began work in the supervision department of the bank as an analyst. And in that capacity I reviewed examination reports of member savings and loans and prepared rough draft of a letter that would go to the savings and loan board of directors. That letter was reviewed by the supervisory agents at the bank and ultimately sent on to the board of directors of that thrift.

Q. This would be the covering letter that went to the board?

A. That's correct.

Page 13

Q. Covering the exam report?

A. Yes. With experience, my responsibilities gradually expanded. And probably in about 1970 the bank recommended to the Federal Home Loan Bank Board that I be made a supervisory agent, which then gave me the authority to sign the letters that went to the board of directors which conveyed any supervisory concerns based upon the examination report. I continued to review those reports.

And in 1972, when the bank moved, it was a very significant change in the personnel of the bank itself and particularly our department as many staff members opted to remain in North Carolina as opposed to moving to Atlanta. I don't recall all the dates of the various promotions that I received.

But because of that move, I was one of the more experienced personnel. And so I began to take on more the -- a little more difficult examination reports and be responsible for communication with that institution concerning that examination report and any actions that we might feel would be appropriate based on that report.

Page 14

Ultimately, in 1986 I was made an executive vice president of the bank as well as remaining a supervisory agent.
At that time I had responsibility for the supervision department for the applications department and for the examinations division.
Q. And did there come a time when you left Federal Home Loan Bank of Atlanta on additional responsibilities?
A. Well, actually, the arrangement was supposed to be one that I would be on loan to the Federal Savings Loan Insurance Corporation for a very limited period of time in 1986 which started about April of that year.
And the purpose was to have someone with experience in the field that could help guide the very numerous cases that the FSLIC was considering at that time.
And the idea was to have an acting director until such time as the Bank Board found a full-time director of the FSLIC.
Q. Okay.
A. What was supposed to be up to six months lasted from April of '86 until June of '87.

Page 15

Q. And what were your -- what turned out to be your responsibilities at Federal Savings Loan Insurance Corporation during that period?
A. Well, basically, to guide the resolution of the caseload that -- that the FSLIC was incurring at that time which meant that our division would make recommendations to the Bank Board as to the course of action that might be deemed most appropriate under the circumstances.
So I had number of divisions that reported to me which would have been the administrative division. It would have been the division that looked after the properties that the FSLIC had taken into its possession, the qualitative analysis division, and the case resolution people.
So they -- those division leaders did report to me during that period of time.
Q. Now, did there come a time when you left the Federal Savings Loan Insurance Corporation either as an acting director or as the director and took on another position, sir?
A. Yes. I guess I officially started here July the 1st of 1987 as president of the Federal Home Loan Bank of Des Moines, and I remained

Page 16

there until June of this year as the president when I retired.
Q. Now, did the functions you have as president of the Federal Home Loan Bank of Des Moines differ from those you had working for the Federal Home Loan Bank of Atlanta?
A. Yes.
Q. And we'll do this in spots.
A. Okay.
Q. Up until the passage of FIRREA in 1989, where I think things did change a bit?
A. From you could say 1987 until the passage of FIRREA, the bank presidents really wore what we call two hats. One, we were called the principal supervisory agent which meant we acted on behalf of the Federal Home Loan Bank Board in regulatory matters.
The supervision department and the examination division reported in most banks, as was the case in Des Moines, to an executive vice president who was also a supervisory agent.
But the president had the ultimate responsibility although that does not necessarily mean he was involved in the day-to-day decisions that related to each of the cases under his

Page 17

jurisdiction.
So that was one hat.
On the other side, he was president of the bank and related to the functions to the membership of that bank which at that time were still all savings and loan associations.
And here in Des Moines, that would have been the eighth Federal Home Loan Bank district. And I believe when I came in 1987, there were about 175 thrifts that were still members of the bank at that time.
Our primary purpose was to provide credit to the members for either liquidity purposes or for the purpose of making home loans.
Q. Now, what do you mean by liquidity purposes?
A. Well, just being able to furnish a member with money to meet daily cash needs, for example.
Q. And are those needs met through the form of Federal Home Loan Bank Board advances?
A. Yes, they would have been.
Q. And --
A. Rather than call it a loan,

Page 26

1980 and 1981 there were a number of thrifts that were having difficulty with the interest rate problems at that point in time?
A. That's correct.
Q. Okay. Was -- did there ever come a time when -- in your role as a supervisor of thrifts you were encouraged by the FSLIC as well the Federal Home Loan Bank Board to seek mergers of thrifts that were having financial difficulties with thrifts that were healthier than that?
MR. PIVNICK: Objection. Vague. Sorry. I'm just making an objection. Keep on answering the questions to the extent you know, of course.
Q. If you can. And when that happens, if you can't remember the question, I'll restate it.
A. Well, as part of how we dealt with all the -- the problems that were being incurred because of the earnings situation, oh, obviously, at that time most of the thrifts or savings and loans were mutual institutions, so they did not have the ability to go to the capital markets and raise additional capital. So they had to do it,

Page 27

basically, through earnings.
And in some instances the thrifts went into this period of time with -- with less capital reserves than others.
And as your earnings began to deteriorate, your capital position could begin to deteriorate. And particularly if you also happened to incur some loan problems at the same time and didn't -- weren't getting paid on your loans for delinquent loans, then you were going to have a problem.
Well, some of the solutions that we had would be to take the institution over and either liquidate it or take it over and sell it to another in -- to a healthier institution or we could encourage healthy institutions to voluntarily merge with this, assuming that the analysis would show that it wouldn't hurt the stronger, healthier institution so significantly that it would become a problem too.
Q. You didn't want to compound your problem by making two thrifts in worse shape than the one thrift you're trying to save; right?
A. That's correct, yes.
Q. Is that right? Did there come a time

Page 28

in the late '70s, late 1970s, when if you had a problem thrift and in lieu of closing it down of taking -- putting it into receivership, it was -- a merger was encouraged with FSLIC assistance.
MR. PIVNICK: Objection. Vague.
A. Okay.
MR. PIVNICK: Sorry.
A. If -- in the late '70s, I mean, I'm here as a factual witness, so --
Q. Yes, sir.
A. -- I'm probably going to sometimes say more than what you've asked for, so --
Q. That's okay. That's why I'm sitting here.
A. But the thing we -- in those days we did not liquidate many savings and loans. We found a -- some other type of financial solution.
And so if we couldn't find a voluntary merger, then some form of FSLIC assistance was worked out at that time.
Q. Well, at that point in time, in the late 1970s, the assistance that was included -- withdrawn.
Did the assistance include at that

Page 29

point in time yield maintenance, as an example?
A. Mr. Manning, I -- you know, that was one of the tools that -- that we did use.
If you say late '70s, I really can't recall whether it was 1978 or '79, but that was a tool that we used as opposed to just paying cash all the time, because cash would ultimately drain the FSLIC's reserves to be able to do that.
So in that period we began to look for ways that we could kind of spread our own financial capabilities around, and yield maintenance would have been one of those options available to us.
Q. But there was a point in time in the 1970s when if a thrift was failing and wanted to seek a merger, they would fill the gap between the mark of the assets and liabilities with some form of cash or cash equivalent; is that correct?
A. That's correct, yes.
Q. Okay. And those were expensive forms of assistance at that point; correct?
A. Yes.
MR. PIVNICK: Objection. Vague.
A. Okay.
Q. And as a result of that and other

Page 30

factors, the FSLIC Insurance Fund began to run out of money given the -- given the level of potential failures in the system; correct?
MR. PIVNICK: Objection. Lack of foundation.
Q. Go ahead.
A. Okay. It became obvious that the number of problems were growing to the extent that unless we did something innovatively, that the cash would not be available forever.
And, you know, those were probably higher level discussions that took place at the Bank Board. As -- in 1979 or '80, I don't know that we knew the full extent of the problems that we would ultimately face, but it was pretty serious. And there was a lot of concern there.
And -- and so we did look for ways in which we could, you know, extend our financial ability to resolve the cases.
Q. Okay. I'm going to give you a point in time, and I will represent to you this is about the right time. In late April of 1981, Dick Pratt came in as chairman of the Federal Home Loan Bank Board?
A. Okay.

Page 31

Q. Okay. And at approximately that time Mr. Beesley came in with the president or the head of FSLIC?
A. Yes.
Q. Do you recall there being any change in the way that FSLIC resolved cases following Mr. Pratt and Mr. Beesley's arrival at the Bank Board and at FSLIC?
MR. PIVNICK: Objection. Lack of foundation.
A. Basically, the use of goodwill came in to play during probably the late '81, I believe. And I -- I don't remember whether our case in Florida or where the Glendale being the second case that I was involved in in Florida, whether that was the first or second cases or whether there were others prior to that or not, but it began to be used as a tool to help in that regard.
Q. Could you describe for me as best you can how goodwill was used in resolving problem FSLIC cases?
A. Well, basically, you marked the assets and the liabilities of the failing institution. And then that difference was determined to be the

Page 32

goodwill or the -- kind of the purchase price that if it were kind of -- if it were truly a purchase price, that might be the difference there.
Then that really became an asset of the combined institution, and the goodwill would have been an expense that could have been amortized.
I think early on some of that was allowed to be amortized over 40 years. Subsequently, policy change was made, and there were some maybe at 30 years. But then it became, I think, fairly common at 25 years.
So then, you know, that way you could -- the acquiring institution would count that as an asset. It would then enable them to be able to maintain whatever capital that they brought to the acquisition, because in the marking to market of the assets and the liabilities and when you put the two together, the capital of failing institution disappeared.
So I guess the one other piece that made this viable was that when you did mark the loans to market, they still remained on the books, and so you were still getting income from those. And you were allowed to recognize that

Page 33

income over a shorter period of time than whatever time you agreed upon to amortize the goodwill.
So you did get something of a benefit from the differences in those transactions that helped to make up for the fact that you weren't getting any capital, so to speak, with that -- with that deal.
Q. So let me start back a little bit. At the beginning -- you did a wonderful job. Thank you. I still don't understand the whole ramifications.
When -- in the transaction you just described, was that a transaction that would be accounted for as a purchase transaction with the use of purchase accounting under GAAP?
A. Yes, it would have because in a pooling you really just combine the two, and you don't do the more to market.
Q. And was there a time when the Federal Home Loan Bank Board changed its rules and allowed the goodwill generated from the use of purchase accounting to be counted as regulatory capital?
MR. PIVNICK: Objection. Lack of

Page 70

from that period of time until the time you left?
A. Yes, he was.
MR. MANNING: This is a good time for a break.
THE VIDEOGRAPHER: We're off the record at 10:35.
(Recess taken.)
(Comments off the record.)
MR. MANNING: Now, was anyone else unable to hear me, or is it just Gaston?
MS. JOWAISAS: This is Marion Jo Jowaisas in Dallas. I wasn't able to hear your questions real well.
MR. MANNING: Well, life is full of people who don't speak up. If you don't speak up, we can't fix it.
Is that better?
MS. JOWAISAS: Yes.
THE VIDEOGRAPHER: Back on the record at 10:50.
Q. We're back on, again, Mr. Connell. And I -- we have everyone by phone who wants to be here.
I would like to focus for a bit on mergers between healthy institutions and failing

Page 71

institutions that required assistance from the Federal Savings Loan Insurance Corporation or FSLIC.
Okay?
A. All right, sir.
Q. In connection with that process, was there a requirement at any time that the acquiring institution's financials be reviewed to determine whether they had financial and managerial capabilities sufficient to handle the acquisition?
A. Yes.
MR. PIVNICK: Objection. Vague. Sorry.
A. Yes, sir, there would have been.
Q. And what was the purpose of that, as you understood it?
A. Well, basically, if you're going to have two institutions merging either with or without assistance, you want to make sure that the financial and managerial capability is there, that you're not creating a larger problem for the FSLIC down the road.
So you do review their financials, their management capability. You know, you want

Page 72

to get a sense of what their lending portfolio is like, et cetera, so that you're not creating another problem for yourself down the road.
Q. Now, was there any effort by either the FSLIC or the Federal Home Loan Bank Board to determine the viability of the merged entities when they're combined in the future?
MR. PIVNICK: Objection. Vague and lack of foundation.
A. Part of the FSLI -- well, one of the divisions of the FSLIC was the quantitative and analysis division, and that was their primary function.
The FSLIC had developed a model that they used for mergers, and they inputted the information that was provided to them by the supervisory agent regarding the financials of each of the institutions, the acquirer, and the failing institution.
They also inputted whatever financial arrangements may have been negotiated up to that point so they would get an idea that, okay, if -- if these provisions are agreed to and are granted, how will that impact the transactions.
So they had a model that you inputted

Page 73

all this information, and you would at least then be able to do some analysis as to whether or not from a financial point of view the merger made sense.
Q. Okay. Now, would that analysis from -- can I call it a viability analysis?
A. Yes, that's essentially what it was.
Q. Did that project into the future the viability of the combined institutions, and if so, how long a projection was it, if you recall?
A. It did project into the future. And my recollection is vague, but it seems like it was either 10 to 20 years in there. So it was a significant period of time beyond when the analysis was done.
Q. Now, you talked about the financial arrangements that had been negotiated up to that point in time.
Do you remember talking about that a minute ago?
A. Yes.
Q. For example, if FSLIC was going to contribute cash, that would be put into the viability model; is that correct?
A. That's correct.

Page 82

Q. Does that refresh your recollection at all as to how the accounting should be done with respect to the fair value of assets and liabilities?
A. I am -- I'm not an accountant by trade or nature. And the description here certainly would seem to be appropriate.
Q. Okay. All right. If I could turn your attention to page 6 of the attachment, which is page 7 of the exhibit, at the bottom of the page, it refers to "amortizing intangible assets."
Do you see that, sir?
A. Yes.
Q. Okay. We had discussed earlier the amortization period with respect to the goodwill which started up to 40 years and then was reduced at some point later.
Do you recall talking about that, sir?
A. Yes, sir, I do.
Q. Okay. Is it your recollection that at the time that goodwill was used in merger cases, at least in the beginning that amortization period was up to 40 years?
A. Yes, I do.
Q. Okay. At any time do you recall

Page 83

discussions by Federal Home Loan Bank in the fourth district or the Federal Home Loan Bank Board in the supervisory section about the possibility of shortening the amortization period at some point in time of the merger transactions?
MR. PIVNICK: Objection. Vague and lack of foundation.
A. I -- I don't know that I had personal discussions.
Q. Uh-huh.
A. But I know the discussions took place mainly because the accounting profession felt like the 40 years was -- was too extensive.
Q. Now, was there not an effort in 1981 and 1982 to make sure that the purchase accounting that was used was in accordance with GAAP, generally accepted accounting principles?
MR. PIVNICK: Objection. Vague. Lack of foundation.
A. It was the desire of the Bank Board that those accounting issues should conform with GAAP.
Q. Okay.
A. And I think that's why they made some

Page 84

changes that they did to help their relationship with the accounting profession.
Q. Well, at some point in time GAAP changed with respect to the application of the amortization period; correct?
A. Yes.
Q. Through the introduction of File 72?
A. Could --
Q. Could be?
A. I'd have to take your word for that.
Q. Okay.
A. I don't recall.
Q. At any time to your knowledge in institutions that you were involved with was a viability analysis run on the institutions that had a 40-year amortization period where the amortization period was shortened --
MR. PIVNICK: Objection. Vague.
Q. -- arbitrarily?
MR. PIVNICK: Objection. Vague.
A. No. I don't recall, Mr. Manning.
Q. Do you recall any instance in what I will call balloon amortization occurred; in other words, you could amortize it for a 40-year level for five years and all of a sudden you had to pay

Page 85

down the entire amount and take it into expenses on the sixth year?
Was that ever thought about or discussed?
MR. PIVNICK: Objection. Vague.
A. Not that I recall.
Q. If the institution acquired a failing institution and GAAP allowed it to amortize the goodwill over a period of 40 years, what would the effect be if the amortization period was reduced in, say, year five or six?
MR. PIVNICK: Objection. Lack of foundation.
Q. To the balance of the amortization in one year, what effect would that have on the viability?
MR. PIVNICK: Same objection.
A. It would have a very dramatic impact in it because you're -- as we've discussed so far, you're, basically, taking that expense in over that 40-year period. And the model has been run with that 40 years in there or whatever period was agreed to.
And so if you reduced it to your five years or eight years or whatever, then you would

Page 90

Now that -- see, that -- that may just be a personal thing, that definition, so to speak, because there could possibly be a definition of someone -- another supervisory agent that says as long as we participated in there or we jawboned or cajoled or had any role in that, they may not have called it, quote, a voluntary merger. Then they would have only looked at as long as there was no assistance, you know, but --
Q. Well, let's take the examples we've discussed before.
A. Okay.
Q. Okay. If you got materials together to create a bidders' package and sent that bidders' package out to third-party thrifts --
A. Uh-huh.
Q. -- would you believe that that was a supervisory merger?
A. Probably so, yeah.
Q. And I use that to distinguish between jawboning versus going out and actively soliciting an acquirer?
A. Yeah.
Q. Okay. Did there come a time in your

Page 91

experience in the fourth district in the 1980s, when thrifts were -- acquiring thrifts were asked to consider acquiring multiple thrifts at the same time as part of a package?
A. Yes, they were.
Q. Okay. And why was that, sir?
A. I think we may have covered this --
Q. Touched on it.
A. -- a little bit. Essentially the same answer in the sense that as we -- as the crisis unfolded, at that time it became obvious that doing a one-on-one merger was not going to help -- help us get through the caseload and still survive, have the FSLIC managed to not go bankrupt itself, which it did later.
So, you know, we again were using every kind of innovative thought process that we could to see how can we -- how can we preserve the assets of the FSLIC and use them most efficiently.
And so there began to be multiple deals where we had -- you know, we still had some fairly strong thrifts that had started out into the bad period of economic times with good strong net worth and capital.

Page 92

And as long as taking on the multiple thrifts wouldn't jeopardize their viability, then -- then there were a number of cases where they were asked to take more than one.
Q. Okay. Would you discuss with other supervisory agents in other districts what thrifts they had that were possible acquirers for thrifts of your region?
A. Yes. And that became -- you know, if someone came to us particularly from another district, then I would -- I or one of my counterparts would normally then call somebody from that district to find out whether this was going to be a waste of time or not to consider them a candidate.
Q. You had dealings with Mr. Vigna in the second district; correct?
A. That's correct.
Q. And several of the thrifts, including Anchor Savings, were thrifts that were viewed as having the managerial and financial capability to do mergers; correct?
A. That's correct.
Q. Others included Citifed in New Jersey and Carteret; correct?

Page 93

MR. PIVNICK: Objection. I think this gets beyond common and --
MR. MANNING: Not even close.
MR. PIVNICK: If you're asking if a specific institution that --
MR. MANNING: Forget it. You're wasting time with this.
MR. PIVNICK: Making my objection.
MR. MANNING: This will take two minutes. You're wasting time by doing this.
A. Yes.
Q. Okay.
A. To answer the question.
Q. Fine. Do you know whether thrifts from outside of your district viewed the Florida franchises as being important and valuable?
MR. PIVNICK: Objection. Lack of foundation.
A. Based on my experience and conversations with thrift executives, they certainly viewed Florida as a very attractive market.
Q. And did you use that view in negotiating with these potential acquirers to take thrifts outside of Florida as well as

Page 94

thrifts in Florida in resolving cases?
A. Yes, we did.
Q. Why did you do that?
A. To save the FSLIC money.
Q. Okay.
A. In other words, if they found the Florida market attractive, there was a price to be paid for that.
Q. It's just part of the regular negotiating --
A. Yeah.
Q. -- and bargaining that you were doing; correct?
A. Yes. Not particularly proud of it. But we were -- our backs were to the wall, and, you know, we strong-armed a lot of people.
Q. Do you believe you were able to successfully use the lure of the Florida franchises to take care of thrifts in Georgia and Alabama and other places?
A. Absolutely.
Q. Okay. Was it the view -- withdrawn.
Was it your view in dealing with potential resolutions in the fourth district that you wanted a permanent solution to the problem?

Page 95

A. Absolutely.
Q. What does that mean?
A. That means that we would not have to deal with that case again.
Q. In this change of -- withdrawn.
We talked earlier about in the late '70s if a merger occurred, the FSLIC would use cash to make up the difference between the assets and liabilities; correct, sir?
A. Yes, sir.
Q. And we discussed the fact that in order to conserve FSLIC's cash, additional methods, including goodwill, was used; is that correct, sir?
A. Yes, sir.
Q. In what instances where FSLIC avoided using cash to resolve a matter -- what did FSLIC do with the cash it saved?
MR. PIVNICK: Objection. Lack of foundation.
Q. That it didn't have to spend in making the assistance?
MR. PIVNICK: Same objection.
A. Well, I -- I guess the short answer would be they saved it for another day, because

Page 96

ultimately we did use up all our resources. But, obviously, by not having to spend cash in one particular instance, they were able to continue their own investments because there was a time when, you know, we didn't know how long this might last.
And if FSLIC remained viable itself, then that was the idea is to keep it going.
So we kept our cash fully invested at that time, and so we were continuing to earn off of that, modest as it was, in, basically, Government securities.
But it gave them also more money to use in maybe a more difficult case in that you may not be able to negotiate as good of terms as the Florida market might present it.
Q. Do you recall whether there were any so-called Phoenix transactions?
Why don't we take a break? Our tape is running out.
A. Okay.
THE VIDEOGRAPHER: We're off the record at 11:24.
This is the end of tape No. 1.
(Recess taken.)

Page 97

MR. MANNING: Back on.
THE VIDEOGRAPHER: This is tape No. 2. It's the deposition of Thurman Connell. We're back on the record at 11:26.
Q. Thank you. Mr. Connell, before we were so rudely interrupted by the tape ending, I was going to ask you about Phoenix transactions.
Do you know what a Phoenix transaction is, as best you can recall?
A. That was another method that the FSLIC used to help resolve some of our problem cases.
Q. Could you describe as best you can what went into making up a Phoenix transaction?
A. It seemed like, basically -- and I'm not as firm in my recollection of this as I could be on some other parts.
But, basically, you took a troubled institution that -- and in some cases you felt very comfortable with the management there -- and that there were some operating difficulties that were creating the problem, and base -- and then there would be the other type where you were not comfortable with the management.
And what you would essentially do is the FSLIC would enter into an agreement with that

Page 114

conferences that we've talked about before?
A. Yes.
Q. Okay. And then you go on to say, "And offered them the opportunity to acquire troubled thrifts in exchange for the right to carry the resulting supervisory goodwill on their books as an asset for regulatory capital purposes."
Do you see that, sir?
A. Yes.
Q. Do you think that ability to carry the resulting supervisory on the merged entity's books is an asset for regulatory capital purposes was an important part of your ability to get healthy thrifts to acquire failing thrifts?
A. Yes, I do.
Q. Okay. And if you turn to paragraph No. 8, I will read it to you into the record, so that we've got it here.
It says, "If an institution agreed to acquire an insolvent thrift, the deal was formalized by way of a merger agreement, which was thereafter approved by the Federal Home Lank Bank Board by way of resolution. Included within the standard merger agreement were references to

Page 115

the resulting supervisory goodwill created by the merger, which would then be treated as an asset for regulatory capital purposes."
Do you see that, sir?
A. Yes, I do.
Q. Okay. "As senior vice president of the Federal Home Loan Bank of Atlanta, I considered the merger agreements to be binding agreements. I did not believe and to my knowledge it was not the position of the Federal Home Loan Bank or the Federal Home Loan Bank of Atlanta that supervisory goodwill was something that could be withdrawn from the acquiring institution after the merger was finalized."
Do you see that, sir?
A. Yes, I do.
Q. Do you agree with those statements?
A. Yes, I do.
Q. Thank you. The rest of the paper, Connell Exhibit 5, goes on to talk about another transaction, specific transaction which someone may get to later, but not me.
A. Okay.
Q. As I recall your testimony, you went initially for a temporary basis but then on a

Page 116

longer term basis to the FSLIC in about April of 1986; is that correct?
A. That's correct.
Q. What was your job at FSLIC at that point in time?
You talked about having various groups report to you.
What were your responsibilities?
A. Well, the idea in bringing someone in on a temporary basis was to bring someone in that had some experience in how cases were resolved.
And the -- so the primary reason that I was asked to assume this temporary role was to keep the cases moving.
And while there may have been four or five different divisions of the FSLIC that reported to me, my primary role was to work with that division that was the case resolutions and to keep that flow going to the Bank Board for action.
Q. Okay. Now, you replaced Mr. Vigna in that acting role, did you not, sir?
A. That's correct.
Q. And you held that role until June of 1987?

Page 117

A. That's correct.
Q. And who replaced you, if you recall?
A. I can't recall his name right now, but I -- Stewart.
Q. Root?
A. Root from New York. He was an attorney that -- that, I believe, was brought in by Mr. Wall who was the new chairman at that time.
Q. Who was chairman of the Federal Home Loan Bank Board when you first took on this job?
A. Mr. Ed Gray.
Q. And he continued throughout your tenure?
A. Yes. His term expired at the end of June 1987.
Q. Okay. So in your role as acting director and then director of FSLIC, you reported directly to him?
A. That's correct.
Q. Okay. In nine -- in April -- withdrawn.
Following April of 1996, in that role, had the type of --
A. I think you said '96.
Q. Sorry.

Page 407

was certainly involved in conversations like that on most all of these cases. I was a busy person.
Q. Okay. Now, let's turn to page 10 and the entry for December 10, which reads, "Visit with Connell and Mason, go through what has transpired over the past 90 days. Present Carteret proposal on Hagerstown. Connell questions why Carteret has not made a capital contribution to solve an ailing FSLIC problem. Raises questions concerning the sharing of" -- I'm not sure what that word is, but "with regard to problem assets. Connell suggests that we might make a proposal with regard to Mountain Security."
Do you recall this visit of December 10, 1985 with representatives of Carteret?
MS. JOHNSON: Objection. Lack of foundation.
A. Not specifically, no.
Q. And do you know -- Do you recall questioning why a capital contribution had not been made to an ailing institution?
A. No, sir, I don't.
MS. JOHNSON: Objection. Lack of foundation.
Q. Do you know what was meant by the

Page 408

remarks the that are attributed to you, in other words, were you suggesting that -- Well, withdraw that.
Do you recall proposing to Carteret that they consider Mountain Security?
A. No, sir, I don't.
Q. But you have no reason to doubt that this entry represents an accurate summary of the visit?
MS. JOHNSON: Objection. Lack of foundation.
A. No, I really wouldn't. You know, although people do put their own characterization like I suggested or that I encouraged and so forth, and sometimes those are nice ways of stating what took place and sometimes they are maybe a little bit more of an embellishment too.
Q. And do you have a recollection in connection with this transaction, you know, whether this is a fair characterization or --
A. I will just say that this would not have been unlike me to have made such a suggestion.
MR. THOMPSON: Off the record for a quick moment.
(An off -the-record discussion was

Page 409

held.)
MR. THOMPSON: At this point I would like to have marked as AmBase Connell 11 a document that bears the Bates No. C-AM-A-0361694.
(AmBase Connell Deposition Exhibit No. 11 marked for identification.)
Q. And sir, would you please identify this document for the record.
A. This is the A Memorandum that was from myself as the acting director of the Office of the FSLIC to the Federal Home Loan Bank board dated June 5, 1986, and the subject was the "FSLIC-assisted acquisition of Mountain Security Savings Bank Wytheville, Virginia, and the supervisory conversion and FSLIC-assisted merger of First Federal Savings and Loan, Blacksburg, Virginia, and the issuance of insurance to and the merger of Admiral-Builders Savings and Loan Association, Parkville, Maryland, by and into Carteret Savings Bank, Morristown, New Jersey."
Q. And sir, directing your attention to the eighth and final page of this exhibit, is that your signature?
A. Yes, sir, it is.
Q. Okay. And going back to the first

Page 410

page of the document, are the numbers and in particular the asset numbers that appear on the first page book value numbers, or did they reflect a marked to market?
A. They would be the book value.
Q. And now turning to the third page, which is a continuation of the Background Section of Mountain Security Savings Bank, the fist full paragraph there states that according to "The most recent examination report dated September 15, 1985, listed substandard assets and scheduled items totaling $18.4 million or 14.9 percent of assets."
Is that in your opinion an unacceptably high percentage of assets to have been classified as scheduled?
MS. JOHNSON: Objection. Speculation.
A. Based on, you know, experience at that time, that would have been a very high amount of scheduled items.
Q. And the scheduled items and that asset quality problem would not be affected by a change in interest rates, would it?
MS. JOHNSON: Objection. Leading.
A. Not sufficient to really help with the problem.

Page 415

a very substantial benefit to the FSLIC in a measure sufficient to constitute a compelling factor in determining to make an aware to the applicant," resulting from the acquisitions outlined herein?

MS. JOHNSON: Objection. Lack of foundation.

A. Yes, it would.

Q. And was the very substantial benefit conferred upon the FSLIC here the fact that Carteret had agreed to assume the net liabilities of Mountain Security and First Federal?

MS. JOHNSON: Objection. Leading and lack of foundation.

A. The answer would be yes.

Q. And sir, turning to page 8 of this document, there is a listing of several other bids for both First Federal and Mountain Security, and do you know whether a Viability Analysis was, in fact, prepared for any of these institution's bids?

A. No, I don't, but the general practice would have been not to have run a Viability Analysis on each one of these, but analysis would have been done.

Q. Yes. But the formal Viability

Page 416

Analysis that was a prerequisite to the closure of a deal was generally only done for the lowest cost bid; is that correct?

A. Yes.

Q. Now, referring to the final paragraph which reads "Viability," and it states, "The Analysis and Evaluation Division of the OFSLIC indicated that Carteret is projected to be a viable institution as a result of the acquisition of Mountain Security and First Federal," and I take it that you concurred in that conclusion?

A. Yes, I did.

Q. And by the term "viable," did you mean that Carteret had the managerial and financial and capitol capabilities to successfully acquire Mountain Security and First Federal?

MS. JOHNSON: Objection. Leading. Lack of foundation.

A. Yes.

MR. THOMPSON: At this point I would like to have marked as AmBase Connell 12 a document that bears the Bates No. C-AM-A-0386235 through 242.

(AmBase Connell Deposition Exhibit No. 12 marked for identification.)

Page 417

Q. And sir, would you please identify this document for the record?

A. This is the Issues Memorandum from myself as the acting director of FSLIC to the Federal Home Loan Bank Board dated June 5, 1986, and the subject matter is the "Appointment of FSLIC as receiver for and the FSLIC-assisted acquisition of the Assets and Liabilities of Mountain Securities Savings Bank, Wytheville, Virginia, and the supervisory conversion and FSLIC-assisted merger of First Federal Savings and Loan, Blacksburg, Virginia, and the issuance of insurance to and merger of New Admiral-Builders Savings and Loan Association, Parkville, Maryland, by and into Carteret Savings Bank, Morristown, New Jersey."

Q. All right, sir, and could you please tell me what the purpose of having both an Issues Memorandum and an A Memorandum was as the two, I'll represent to you, are almost verbatim, the same?

A. Well, the Issues Memorandum would specifically identify any issues that the Board members should be made aware of in their consideration as to whether or not to approve whatever package was before them at that time.

So although a lot of the information

Page 418

was exactly the same, the Issues Memorandum was intended to focus solely on those for highlighting it for the benefit of the Board members.

And then A Memorandum, the purpose there would have been to focus on the financial aspects of the proposed transaction.

Q. Okay. Thank you. Now, turning to the eighth page of this document, eighth and final page of the document, is that your signature, sir?

A. Yes, it is.

Q. Now, the very last line of the document reads "These transactions will resolve two problem cases in the Southwestern part of Virginia."

And did you consider this resolution or these two cases to be permanent?

A. Yes, we did.

Q. And was that because you had satisfied yourself that Carteret had the financial strength to absorb these institutions?

MS. JOHNSON: Objection. Leading.

A. Yes, we would have.

Q. Okay. Was it a common practice for you, during your tenure as the director of the FSLIC, to sign the actual assistance agreements

Page 419

that were closed during your tenure?
A. Yes.
MS. JOHNSON: Objection. Vague.
THE WITNESS: Sorry.
A. Yes, it was.
Q. Under what circumstances would you not be the person who signed the documents?
A. More than likely only if I was not available due to travel or other logistical reasons.
MR. THOMPSON: Okay. All right, sir, at this time I'd like to have the reporter mark as AmBase Connell 13 a document that bears the Bates No. WOR0640001 through WOR0640097.
(AmBase Connell Deposition Exhibit No. 13 marked for identification.)
Q. And would you please identify this document for the record.
A. It's entitled Assistance Agreement between The Federal Savings and Loan Insurance Corporation and Carteret Savings Bank, Morristown, New Jersey, and it's dated June 6, 1986.
Q. And sir, on the very last page of this document, is that your signature?
A. Yes, sir, it is.

Page 420

Q. And I'd like to direct your attention to page 70 of the document.
And would you take a moment, sir, to please review Section 18 of the assistance agreement which is entitled "Accounting Principles"?
A. All right.
Q. And did you understand this section to confer upon Carteret a contractual right to treat the supervisory goodwill resulting under the accounting of this transaction toward its regulatory capital requirements?
MS. JOHNSON: Objection. Leading, and the document speaks for itself.
A. Well, I'm not sure of, you know -- The language here says that it will be computations made in accordance with GAAP. And so it doesn't specifically refer to the goodwill itself, but if you go to the rules, then that would have been the case as we applied it in those days.
Q. And so it was your understanding at the time that you signed the document that Carteret would in fact -- to the extent goodwill was created, be able to count it toward its regulatory capital requirements?

Page 421

MS. JOHNSON: Objection. Leading.
A. Yes.
Q. At this point I only have a few more questions on the AmBase case and I'd like to jump ahead in time to 1988, which was the year that the Home Group, which is now known as AmBase, acquired Carteret.
And were you aware of that fact prior to today's deposition that Carteret had been acquired by the Home Group?
A. You know, you hear about these things in conversations or read about them in the trade journals, et cetera.
I recollect that they -- that there had been some disposition with the Carteret, but I wouldn't have been able to tell you exactly what.
Q. Right. Okay. And did you have any official involvement in the approval of the Home Group's application to acquire Carteret or any other official involvement in connection with that transaction?
A. No.
Q. At that time I take it, of 1988, you were president of the Federal Home Loan Bank of Des Moines; is that right?

Page 422

A. That's correct.
MR. THOMPSON: Okay. At this point I wrote like to have marked as AmBase Connell 13 a document that bears the Bates No. FAM001005 through 0019.
MS. JOHNSON: I believe that would be Exhibit 14. I think the last exhibit was Exhibit 13.
(AmBase Connell Deposition Exhibit No. 14 marked for identification.)
Q. Sir, would you please identify this document for the record.
A. This is a Federal Home Loan Bank Board document.
It's from the supervisory agent in the Second District in New York.
It is an Application H-(e)1 filed by the Home Group, Inc., New York, New York to acquire control of Carteret Bancorp, Incorporated, Wilmington, Delaware, and its wholly-owned subsidiary, Carteret Savings Bank, Newark, New Jersey.
Q. Have you ever seen an application like this one, an Application H-(e)1?
A. I've seen them in my career, yes.