UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT INSURANCE : No. 93-531
CORPORATION, : Judge Loren Smith
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF :
AMERICA, :
Defendant. :

----------------------------X

Washington, D.C.
Tuesday, March 7, 2006

Deposition of DONNA L. CRIBBS, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 555 11th Street, N.W., Washington, D.C. at 10:17 a.m., Tuesday, March 7, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

scenario, you have to honor your commitments which -- you know -- there was -- to my knowledge -- no repudiation of any of the agency or contemplated repudiation of any of the agency contracts.
These were longstanding contracts, and you had to preserve both the relationship and the ongoing basis partnership with the agencies to be successful and to preserve -- you know -- the value.
Q. And then how would it also be essential, as you say, to the proper servicing of the loans by Carteret itself?
A. Okay. Again, you have to have had to perfect the title to be able to file the foreclosure or, in the instance of a bankruptcy, to defend your position as a creditor or lender -- you know -- so you always want to have the best documentation you can have to defend your position and also to be able to pursue those rights as a lender.
Q. Let's move to the third paragraph of that page. That first sentence, as non-conformance to the standards related to mortgage backed securities places the agencies and security holders at risk, discovery by Fannie Mae and Ginny Mae of the extensiveness of Carteret's problems may result in the imposition of sanctions or lead to discussions of



suspension or termination of the relationship.
How is that relevant to the recommendation you made?
A. Part of this is that -- I would say that it would impact the relationship with Fannie Mae and Ginny Mae were these issues not to be addressed. Now, I can't now, and I couldn't forecast then, whether or not the agencies would sanction at all.
They would operate, too, under a supervisory type agreement, give you a period of time to cure. I think this was just an indication that it was problematic and that it needed to be addressed.
Q. Do you know if the problems were addressed?
A. I do not know.
Q. Do you know if Fannie Mae and Ginny Mae discovered the problems?
A. I do not know.
Q. Are you aware whether sanctions were imposed by Fannie Mae or Ginny Mae?
A. I do not know.
Q. If these problems were not addressed, would the RTC have been able to sell the business?
A. Yes.
Q. Would the value of the business have



suffered as a result?
A. Potentially.
Q. How so?
A. Because any buyer, potential buyer of the company or the company's assets would have to deal with these issues; so to the extent that the companies could come in and do due diligence, it would have either had to be disclosed in the sale or they would have found it through due diligence discovery and it would have addressed -- had to have been addressed and would have probably had a pricing impact.
Additional resources would have to be put in place by the buyer.
Q. If we move on to your recommendation, and this is the first paragraph, first sentence says that it is recommended that staff of Carteret be directed to immediately assign additional employees to the department with an initial and primary focus upon full identification of the existing problems and the development of a composite report detailing by investor the number of loans outstanding, the new loans added, and loans cleared.
Are you aware of whether further identification took place?



A. No.
Q. Are you aware of whether a composite report was created?
A. No.
Q. On the second paragraph, it says that in that second sentence, that the RTC legal will review the agreements, and I'm paraphrasing here, for possible recourse action against such parties.
Are you aware of any recourse action that was taken?
A. No. And these would be the agreements for purchases made by Carteret from the other entities, the First Jersey, United Jersey, et cetera.
Q. So you would not have been involved in analyzing those agreements?
A. No. Huh-uh.
Q. I may have already asked you this, but your last recommendation is that when reasonable reliability and facts surrounding the agency problems is outlined and a business plan developed, action and remedies, a meeting should be scheduled with Ginny Mae and Fannie Mae representatives to discuss and disclose the issues surrounding these matters.
You are not aware of whether that recommendation was followed or not?

Page 90

A. No.
MR. ABRAHAM: I'd like the court reporter to mark Cribbs Exhibit 4.
(A document was marked for identification as Exhibit No. Cribbs-4.)
MR. ABRAHAM: We're back on the record at 12:50.
BY MR. ABRAHAM:
Q. Ms. Cribbs, you are aware that you are still under oath?
A. Yes.
Q. Have you had an opportunity to review Cribbs Exhibit 4?
A. Yes.
Q. Is there anything in this document that prompts you to correct or change prior testimony?
A. No.
Q. Would you have seen this document before today?
A. No.
Q. That first paragraph says Carteret's ability to fund -- excuse me, first paragraph, first sentence, says the initial meeting held with the association employees raised many concerns concerning

Page 91

Carteret's ability to fund its current pipeline.
Would you have been at that initial meeting?
A. I may have been but I don't recall.
Q. And another banking question, when it says "uncommitted pipeline APS in process," what is APS?
A. Applications.
Q. These are applications that had not yet been approved?
A. The terminology committed and uncommitted would be I believe from the locked position and the float position.
Q. And what are the locked and the float position?
A. Locked means you've committed to an interest rate for a customer and a price, or a correspondent. And float would mean that you have an application; however you have not committed to a price.
Q. And of the names mentioned in this memorandum, could you just tell me which -- besides your own name, which of the people you remember or which of the people you knew?
A. Okay. I recall Smedley, Ford, Hallenbach, and Haley.

Page 92

Q. And what were their positions?
A. Okay. I believe this was Ross Ford who headed up the Somerset, New Jersey office of the RTC.
The other gentlemen were all on the conservatorship side of managing the savings and loans.
Q. Were they all RTC employees?
A. Yes.
Q. And would you have had any discussions with any of these individuals regarding Carteret?
A. Yes.
Q. And what discussions specifically?
A. I couldn't recall. I know that -- the gentleman that called me in to Carteret is not on this list, but it was at the direction of Ross Ford that I was involved. But specific conversations, I do not remember.
Q. Who would the gentleman that called you in have been?
A. Ross Ford.
Q. And would he have been your supervisor on this task?
A. Yes.
Q. So generally, your discussions with him would have been reporting your findings and

Page 93

recommendations?
A. Yes.
Q. And what was his position in relation to the author of this memo, James R. Mindnich?
A. I don't remember specifically the reporting queues, but there was a conservatorship side of the house and the receivership side of the house, which were not necessarily the same employees. So I'm not certain what the reporting queue for Mr. Mindnich was.
Q. Would he have been on the conservatorship side?
A. I believe that he was.
Q. So the recipient of this memo, George M. Gross, you don't recall meeting that individual?
A. No.
Q. In the last paragraph on page 1, it states in conjunction with this decision, was the study of Carteret's secondary marketing program operated in the Treasury area by Greg Fuhrmann.
How was that study related to the analysis you did on this issue?
A. I believe that they were independent of one another.
Q. And Greg Fuhrmann then would not be

was shared with me or not.
Again I wasn't looking at it -- I was looking at it more from a risk/take care of business perspective than a continuation of business perspective.
Q. According to the last sentence of this paragraph, the reduction in volume combined with the interviews taken, it says the decision was made on December 11 to cease all further acceptance of mortgage applications?
MS. DOHERTY: Just a moment. I'm going to object to that characterization of the document because it says "this" and it is not clear to me that "this" has the antecedent that you assumed it does. Aside from that, you can go ahead and answer based on your understanding of what the author is referring to -- the author who is not you is referring to.
BY MR. ABRAHAM:
Q. I can rephrase that. Based on the last sentence, saying this combined with the interviews taken, the decision was made on December 11 to cease all further acceptance of mortgage applications.
Do you know who made the decision to cease acceptance of mortgage applications?
A. No. And I didn't participate in that



decision.
Q. That last paragraph, says that all APS, meaning applications, in the bank as of December 11 would be processed in accordance with the established standards of Carteret, would be approved and funded having met those guidelines.
Are you aware of who made the decision, that decision referred to there?
A. No.
Q. Once again, you did not participate in that decision?
A. That's correct.
MR. ABRAHAM: At this point, I have no further questions.
MR. THOMPSON: Okay.
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. While we have it before us, let's take a quick look at Cribbs 4.
In terms of the fact that a portion of the correspondent relationships were moved as of the December 10, according to this memo, that fact wouldn't have any impact on retail origination, correct?
A. That's correct.



Q. You testified earlier the high attrition rate was the result of the wholesale piece of the operation; is that right?
A. A big contributor, yes.
Q. To the extent the correspondents had moved on, that would have made the remaining piece of Carteret Mortgage Company less risky, is that right? Because it would have been more focused retail?
A. In a manner of speaking retail has less risk associated with it because you control the volume.
Q. During your involvement -- strike that. You already testified to that.
Let's see. There's discussion about the pipeline.
Did you have an opportunity to review the asset and liability reports of management?
A. No.
Q. And did you -- strike that.
In terms of the choices that were available to the conservatorship if the originations were shut down, would -- how would that impact the ability to fund the pipeline?
A. If origination were shut down, there would be less potential cash used in the funding of the



loans.
So as an ongoing basis, they would not have the need for cash to fund additional loans.
Q. Okay. During the time frame that's covered in this memo, Cribbs 4, December of 1992, early December 1992, was there any discussion given to trying to sell Carteret Mortgage Company?
A. Not that I was involved in.
Q. Okay. Now, let's see, moving on to another document, in particular Cribbs 3, the beginning of that document says in the first sentence, excuse me, the last sentence of the first paragraph, the department appears newly formed and management emphasis on problem resolvement recently developed.
Was that a positive that management was trying to resolve these problems?
A. First steps in the right direction, I would say.
Q. Okay. And in terms of -- let's say if the problems in this memo -- Cribbs 3 -- had not been corrected in terms of recertification of certain pools that originated in 1987 to 1989 had not been fixed, what would the consequence have been to Carteret Mortgage Company?

Page 106

Would they have just banked those loans?
A. There would be a number of potential impacts.
Firstly would be the obligations to the security holders, the Ginny Mae, Fannie Mae securities, whether or not the agency was going to require a wholesale repurchase of loans or the withdrawal, basically, to make themselves whole.
Q. And just to -- I know that there may be other consequences, I don't mean to cut you off, but just so the record is clear on that one, in other words, if the security holders discovered these problems that you have not recertified, then Carteret would get the loans back, right?
A. Potentially. That rarely happens, but potentially.
Q. Okay. But in other words, the people who received this money -- in other words the borrowers, their credit risk does not change depending upon this recertification process, right?
A. But the security holders' position does change.
Q. Right.
A. So when -- the interest in the Ginny Mae securities that were supported by this loan

Page 107

population -- that's where the risk was.
Q. Well, but from Carteret's perspective, I mean either they sell that loan to Fannie Mae and Ginny Mae and it stays there or they take it back; is that correct?
MS. DOHERTY: Go ahead. I was just waiting for a question.
THE WITNESS: Okay. Yeah. I mean in a manner of speaking, they would have to repurchase the loan.
BY MR. THOMPSON:
Q. Okay. And this recertification process, it wouldn't have any impact on servicing, right?
A. Indirectly, because part of the deficiency in the recertification is having the appropriate documents, and part of those documents were the MICs and LGCs we discussed, which is, you have to process that with HUD and VA to have evidence of insurance on those loans, which is the risk or default insurance on those loans.
Q. If an acquirer had come in and bought Carteret Mortgage Company, could it have put controls in place on a prospective basis to maintain a good relationship with Fannie Mae and Ginny Mae?
A. Absolutely.

Page 108

Q. During the questioning with the Department of Justice they asked if there were any exhibits to your Cribbs 1, your memo, one of your memos of December 7.
MR. THOMPSON: I'd like to ask the court reporter to mark as Cribbs 5 a document bearing the Bates number CAM-A-03 the 9089.
(A document was marked for identification as Exhibit No. Cribbs-5.)
BY MR. THOMPSON:
Q. Ms. Cribbs, this has what we call a Bates number at the bottom. It is actually the numbers that are immediately -- that immediately follow the page numbers, Bates numbers from Cribbs 1. And we just wanted to ask whether it's reasonable to assume that this is the exhibit 1 that's referenced in that memo?
MS. DOHERTY: Would you be able to direct us right to the reference to 1?
MR. THOMPSON: Sure. Let me see. Actually, you know what, I think this may be Exhibit 2. If you turn to page 2 of Cribbs 1, and it is the second paragraph under the first chart.
MS. DOHERTY: The paragraph

Page 109

beginning, "the display of"?
MR. THOMPSON: Yes. It says a display of CMC's position effective December 4, '92 was contained in the mortgage pipeline hedge position report, attached as Exhibit 1.
Well, this isn't that, is it?
THE WITNESS: Actually, it is.
BY MR. THOMPSON:
Q. Is it? Okay. It goes on to say as an adjunct to this trading activity, there exists certain mandatory and optional delivery master commitments for closed loan product with varying expiration dates. The outstanding scale commitment details CMC commitment activity.
Do you see that?
A. Yes. You are correct.
MR. ABRAHAM: To interrupt, are we talking about this being Exhibit 1 or Exhibit 2?
MR. THOMPSON: That's what my questions pertain to.
MR. ABRAHAM: Okay.
THE WITNESS: I believe it is Exhibit 2. This is Exhibit 2. (Indicating.)
BY MR. THOMPSON:
Q. Very good. Going back to the underlying

Page 110

memo itself, Cribbs 1, reference is made in the first -- on page 1, first full paragraph, under the chart to the fact that there was an attrition rate of 58.6 percent which we've talked about.
Is the key factor in assessing risk this -- the ability to predict the pipeline? In other words, if that attrition rate stays fairly constant, is it manageable?
A. Subject to -- yes, it is subject to any market pressure, any change in the market.
Q. And what do you mean by subject to change in the market?
A. That the rates go up or down. Rates start -- increasing, you're going to have more fallout. And if they decrease -- excuse me.
If the rates increase, there will be less fallout. If the rates go down, there will be more fallout. More -- go ahead.
Q. Okay.
But the bottom line is that if you can predict based on a stable attrition rate what the magnitude of your pipeline is going to be, then you can manage your risk effectively; is that right?
A. Yes.
Q. And then turning to the paragraph right

Page 111

above Recommendations, it -- the sentence says right above Recommendations this weakness can be devastating when interest rates begin trending upward or spike in the short term.
In making that sentence where you are making -- were you making the general observation that spikes in interest rates can be a problem if you are not hedging properly --
A. Yes.
Q. -- did you have any reason to believe at the time you authored this memo that there would be such a spike in interest rates in the near term?
A. No one has that knowledge to my knowledge. Okay?
MR. THOMPSON: We don't have any further questions.
MS. DOHERTY: No questions.
(Whereupon, at 1:28 p.m., the taking of the instant deposition ceased.)

Page 112

________________________.
Signature of the Witness.

SUBSCRIBED AND SWORN to before me this

_______ day of ______________, 20_____.

________________________
Notary Public

My Commission Expires:______________