IN THE COURT OF FEDERAL CLAIMS

---------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

---------------------------------------x

September 29, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of WILLIAM JAMES DAY, JR., a witness in the above entitled matter, taken before a Notary Public of the State of New York.

Q Instituted as to FIRREA?
MR. LEVITT: You can answer.
A I really don't have an opinion on that. The most significant change as far as I was concerned was that we were involved in examining institutions that we hadn't examined prior to that.
Q Do you remember understanding FIRREA as legislation that was going to significantly impact the savings and loan industry?
A Yes.
MR. LEVITT: Objection as to relevance.
Q How was it that you understood FIRREA to have an impact on that industry?
MR. LEVITT: Objection, asked and answered. You can answer.
A Would you repeat that question once more?
Q Sure. In what way was it that you understood FIRREA was going to have an impact on this industry, the savings and loan industry?
A Well, I believe the intent of FIRREA was to resolve some of the problems that were perceived to exist in some of the thrifts and some



of their activities that they were performing, and to in effect recapitalize their insurance fund.
Q When you say recapitalize their insurance fund, it was essentially merging their insurance fund into the FDIC.
A Right.
Q When you say address some of the problems in the industry, does that include the problems like the nature of assets that the institutions could invest in?
A That's my recollection, as far as what I read at the time. Again, the passage -- as an examiner, I wasn't involved in the legislation.
Q I understand.
A I didn't know any more than the general public did, what I read in the paper.
Q Did you understand that FIRREA, one of the problems FIRREA was intended to address was previous forebearances that had been given to some thrifts that allowed them to stay in existence?
MR. LEVITT: Objection as to relevance. You can answer.
A I knew that there was an issue. I didn't know the motivation behind it.
Q Do you remember knowing what



supervisory goodwill was in 1989?
A Yes.
Q Do you remember thinking that supervisory goodwill was one of the problems FIRREA was intended to resolve?
A Not necessarily.
Q Do you remember there being a number of institutions that had a large amount of supervisory goodwill on their balance sheets?
A Yes.
Q Do you remember that FIRREA changed, made it no longer possible to count that supervisory goodwill towards regulatory capital?
A Yes.
Q Do you remember that having an effect on those institutions that caused some of them to fail?
A Yes.
Q Do you remember whether Carteret Savings Bank was one of the those institutions?
MR. LEVITT: That what, had supervisory goodwill or failed?
Q That had supervisory goodwill that it could no longer treat as capital?
A Do I recollect that when, at the



time or now?
Q Do you recollect today that Carteret was one of those institutions?
A Yes. Not the sole reason for it failing, as far as I know. Again, as an examiner, that was all set out by memoranda and instructions whereby adjustments to the institution's capital were prescribed by the regulations.
Q Do you remember whether the changed treatment of goodwill was a substantial factor in why Carteret ended up being placed into conservatorship?
MR. LEVITT: Before you answer, would you read that back, please.
(The question requested was read back by the reporter.)
MR. LEVITT: Objection, vagueness, on the ground that the word substantial is undefined. To the extent it seeks a legal conclusion, that's a second, separate objection.
To the extent you have an opinion about that based on your examination, you can answer. If you have no opinion, you can say that.

THE WITNESS: Well, I was just going
to say what you said.
A It was a factor, but the significance of that factor, I'd have to review the exam report and actually what those numbers meant to the institution as far as the level of capital.
There were also asset quality problems that required adjustments to capital.
Q All I'm asking you is what your recollection is independently as to whether or not it was a substantially contributing factor.
A It was definitely a contributing factor. There was other factors as far as our evaluation, including asset evaluation and evaluation of management.
Q Do you remember whether any commercial banks or FDIC insured institutions had supervisory goodwill on their books?
A They may have had supervisory goodwill, or goodwill, possibly supervisory goodwill, but we would not have included that in our calculation of capital. It would have been eliminated.
Q That would have been the treatment



of it even prior to the passage of FIRREA?
A Yes.
Q That would have been pursuant to regulation?
A Yes, well, instructions and I presume regulations.
Q Policy.
A Policy.
Q Either policy or regulation.
When you say it had goodwill and possibly supervisory goodwill, how do you understand the difference between supervisory goodwill and goodwill?
A Goodwill could be just acquiring an institution whose liabilities exceeded the value of their assets when they're priced if they do it as purchase accounting versus pooling of interest accounting.
Q I'm sorry, is that your definition of goodwill generally, or supervisory goodwill?
A Goodwill generally.
Q How would supervisory goodwill differ from that?
A Essentially probably it doesn't differ. It's just who gives the stamp of approval



on it.
Q Was supervisory goodwill different only in that it arose in transactions that were called supervisory transactions?
A It could be. I don't know the answer to that.
Q Did you ever work on any supervisory transactions?
A No.
Q Did the FDIC use conservatorships as one resolution method for troubled institutions?
A Would you --
Q Let me clarify the question.
During the pre-FIRREA period, do you remember the FDIC using conservatorships as one resolution method for troubled institutions?
A Not that I was involved in. I don't recall.
Q What were the resolution methods that you recollect being used?
A It was either basically using our enforcement action, termination of insurance, requiring, generally at that time what we called purchase and assumptions transactions.
Essentially the state chartered



agency would close the bank and it would be sold to somebody else.
Q When you closed --
A We didn't close the bank. We don't charter. But we insured. We would take steps to eliminate the insurance, to take away the insurance.
Q When the state chartering agency closed the bank, didn't that require you as the insurer, the FDIC as the insurer, to hold the bank in some form of conservatorship in order to --
A Not the ones I was involved in.
Generally it was, I believe, and this is only going by recollection, we were appointed the Receiver by the state or the chartering agency, and then almost immediately transferred ownership to the acquiring institution.
And I'll say again as an examiner I wasn't directly involved in that.
Q I understand. And I should say at the beginning that this is -- I'd like to ask you, do you understand what this litigation is generally about?
A Generally, yes.

Federal Home Loan Bank Board --
MR. HUME: I'm not asking you a question. If you keep answering --
MR. LEVITT: You're badgering the witness.
MR. HUME: I'm not, I'm trying to get a straight answer.
MR. LEVITT: You can answer.
A Would you repeat the question?
Q The question is how would you have understood the transfer of the examination function from the Federal Home Loan Banks to the OTS to have served the purpose of helping resolve problems in the industry?
A Generally I probably learned more about the situation by reading the newspaper than I would have through internal sources.
Q It doesn't matter how you learned it, I'm simply asking you how you understood what was happening at that time.
MR. LEVITT: Objection as to vagueness.
Q You're allowed to testify as to your understanding at that time.
A My understanding is that there



was -- one of the primary purposes, as Congress made us the insuring agency, as that insuring agency responsible for those institutions' insurance, we wanted to go in and get our own independent look at the institution.
Q Who is "we" in that sentence?
A The FDIC.
Q What does that have to do with how the OTS examined the institution?
A I don't know what you're getting at. I have no opinion on how they examined the institution.
Q You have no opinion on how the OTS examined those institutions?
A No.
Q You don't recollect having any opinion at that time about how the OTS examined those institutions?
A No, I do not.
Q Did you think the OTS examined those institutions properly?
A I have no way of knowing. I've never seen their examination reports. And even seeing the reports, I wouldn't know.
Q Let me make sure I am being clear on



my question.
During the post-FIRREA period, the institutions that you as an FDIC examiner examined that were also subject to OTS examination jurisdiction, you don't have any recollection as to your opinions as to how the OTS examined those institutions?
A Well, I think now you've clarified your question.
Yes, I do have an opinion of the institutions that I had participated with the OTS in the examinations, and I was in agreement with their conclusions.
Q You testified earlier that you do recollect that the Federal Home Loan Banks were lenders to FSLIC insured thrifts prior to the passage of FIRREA, is that correct?
A I believe so, yes.
Q Do you recollect that?
A I recollect that, yes.
Q Do you recollect that the Federal Home Loan Banks, while being lenders to these FSLIC insured thrifts, were also charged with the responsibility of examining and regulating these thrifts?



MR. LEVITT: At what point in time are you talking about?
Q Prior to the passage of FIRREA?
A That was my understanding, yes.
Q Do you remember thinking that being both a regulator and a lender affected the way in which the Federal Home Loan Banks examined and regulated those FSLIC insured institutions prior to the passage of FIRREA?
A Not really, because the same situation exists with Federal Reserve Banks in some cases.
Q When you say because -- you're saying because the same situation exists with the Federal Reserve Banks in neither situation did it affect the examination function?
A I have no way to reach a conclusion on that. I wasn't involved.
Q I'm not asking you to reach a judgment that is true as the word of God, I'm simply asking you to tell me what your recollection of your impression was at that time.
A I don't recall having any specific impression at that time.
Q Do you think that the transfer of

a stock ownership.
In that case, because Carteret I believe was the first or second mutual to convert, I had looked at their SEC statements.
Q When you say that you were examining them as a state chartered mutual association, do you mean that you were actually, you had examination responsibility for them at FDIC?
A For the state chartered mutual savings bank, in particular the Morris County Savings Bank, which was right down the street from Carteret.
Q But did you have examination responsibility for Carteret?
A No.
Q So when you said you were examining them, what did you mean?
A I was examining Morris County Savings Bank, who was in the process of converting to a stock ownership.
In order to get a feel for how that process worked, I reviewed some of the SEC documents that were public information from Carteret.
Q So you never --



A That's when I first became familiar with them, because the management of the bank I was examining said this institution down the street has converted, maybe you want to look at their stuff.
Q Do you remember whether you had an impression of Carteret as a healthy institution prior to the passage of FIRREA?
A It seemed that way to me.
Q When you were first instructed --
A Let me back up. When I looked at those documents, I'm guessing now, this would have been '83 or '84, based on the public information, I mean, I had no way to reach a conclusion.
The reason I had that opinion is they were fairly successful in selling their stock, so I assumed the financial markets considered them a worthy investment.
Q So you looked at them after they were publicly traded?
A Yes.
Q When is the first time that you remember thinking of Carteret as an institution that might have financial problems?
A I didn't really think about Carteret



until I was told to go in for an examination.
Q Do you remember having an understanding that Carteret would be negatively impacted by FIRREA, the passage of FIRREA?
A I don't remember that.
Q You don't have any specific recollection of that?
A No.
Q So when you went in to work as an examiner of Carteret, do you remember what year that was?
A I was there twice and I don't recall -- the first time that we went in it was more of a visitation than an examination, and you probably have the information, it was with an examiner named Russ Meyer.
The second time it was with an examiner named Tom O'Rourke, where we actually did an examination.
I don't remember the exact years.
Q Do you remember why there was a change from Russ Meyer to Tom O'Rourke?
A No idea.
Q Did you have an opinion of Russ Meyer?



A Yes.
Q Did you think he was a competent examiner?
A Very competent.
Q Did you have an opinion of Tom O'Rourke?
A Yes.
Q Did you think he was a competent examiner?
A One of the most competent I've met in the last thirty years.
Q Could you describe what you mean, what the difference is between a visitation and an examination?
A I believe when we first went in there, the clarification of exactly what our responsibilities were had not been set, and it was still being discussed at a higher level.
So I did, you know, as best I could on the information, the authority that was given to me.
Q So you mean when you first went in you remember doing an abbreviated exam, or was a visitation something other than an exam?
A Essentially an abbreviated exam,

because I was not told that I had full authority to examine every aspect of the bank.
The OTS -- I was basically reviewing or piggybacking on the OTS findings. They evaluated, essentially they evaluated the loan portfolio.
I just reviewed their evaluation the first time.
Q Do you remember thinking it was strange that you needed to go and do an examination at all given that the OTS was doing an examination?
A The whole situation was strange. I mean, I didn't know -- there were no clear cut rules as far as examining the bank, and I didn't know what my position was the first time.
It was a fluid state, and I don't think it had been resolved exactly what the FDIC's position was going to be in these examinations at that stage.
Q Are there other examples where you or any of your colleagues who were examiners at the FDIC have examined institutions side by side with another regulatory body other than savings and loan institutions examined by the OTS, other



than this type of situation?
A Yes.
Q What are those situations?
A In the past, I don't know if they still do it, we actually used to do a joint examination with the New York State Banking Department of New York State chartered thrifts.
Currently, if an institution is, has a rating of 3 or below, we usually do a joint examination or a concurrent examination with the state regulators. Other than that, we alternate years.
Q So you would do a side by side examination for an institution that was in trouble, but otherwise you would alternate, is that essentially --
A That's the present program, yes.
Q Was it ever the case that you would go side by side in every year no matter what?
A Yes.
Q When was that?
A At the time when I was working in New York, in Manhattan, in the New York based savings banks it was almost always joint examinations or concurrent examinations.



Q For those institutions that are regulated in that manner, that have state regulatory bodies as well as FDIC bodies regulating them, are there state insurance funds that insure those institutions?
A Not in New York, in New Jersey.
Q But they are state chartered?
A Yes.
Q Is there any example of an institution, a type of institution that would be regulated by one body as well as by the FDIC other than savings and loan associations?
MR. LEVITT: Could you read the question.
(The question requested was read back by the reporter.)
MR. LEVITT: Objection as to vagueness, but you can answer.
A Commercial banks, it's essentially the same situation.
Q Because they are regulated by whom as well as the FDIC?
A The state chartering agencies.
And you're aware we also have insurance on national banks and federally



chartered banks.
Q Do you remember when you last worked on Carteret?
A I'd have to look at the examination report.
Q You remember that Carteret was placed into conservatorship?
A Yes.
Q Do you remember when that happened?
A I don't remember the exact date.
Q Do you remember what year it was?
A No, I don't.
Q Do you remember whether you had any involvement with the institution after it was placed into conservatorship?
A I never had any involvement with the institution after I sent in the examination report and met with the Board of Directors.
Q So the answer is no, you didn't?
A No, I didn't have any involvement.
Q Can you explain to me what the difference, and this may go back to your discussion of visitation versus examination, but can you explain to me the difference between a Tier I and a Tier III exam?

Q (Continuing) -- the value of the real estate had dropped?
A No.
Q But that would factor into the judgment as to whether or not to make an adverse classification.
A Right.
Q You testified a moment ago that you remember some of the policies at that time.
Do you remember the nature in which assets were classified or the judgments used to determine how to classify assets changing over the last seven years?
A Not significantly. I mean, I have always applied the literal definition. I guess some examiners might have been more conservative.
Q But is the literal definition one that allows for discretionary judgment?
A It shouldn't to any great degree. Two examiners looking at the same loan should come up with the same conclusion.
Q Should that conclusion be the same as what an outside accountant should come up with?
A I have no idea how they come up with their conclusions.



Q Do you know what the literal definition is for substandard assets?
A Again, as I said before, something that has a significant operating weakness, it jeopardizes the liquidation of debt with a distinct possibility that if it's not resolved it will result in a loss.
Q Isn't determining the distinct possibility of whether or not it will result in a loss if not resolved a judgment call that requires --
A I guess you could call it an educated judgment that would be based on, as we mentioned before economics, conditions, the financial ability of the borrowers, the guarantors.
Q From the literal definition you just read, it seemed to me it could cover both a loan that was being serviced and one that was past due in servicing.
A Yes. You could technically have a past due loan that wasn't substandard.
Q Just as you could technically have --
A A current loan that is substandard,



yes.
Q In terms of evaluating the underlying real estate, would you as an examiner normally rely on an outside appraiser for that?
A That would be our primary reliance.
Q Would it be harder to determine the appropriate classifications if there was no outside appraisal?
A Yes, that's primarily why we have our appraisal regulation that requires an appraisal on real estate loans over a certain size.
Technically the bank, an FDIC supervised bank would be in violation if they didn't conform with that.
Q So you as an examiner need to know what the underlying value of the real estate is if it had to be sold that day, that year, while you were examining it?
A That's a fair statement.
Q If a loan is current, would you still look at whether or not the value of the real estate as of the time of the examination was sufficient to cover the principal of the loan?
A Yes, we would take a sample of loans



based on size or statistical sampling and look at current loans.
Q Do you still do that?
A Yes.
Q Do you remember what your view was of the real estate market in 1990 in this region? Did you think it was likely to bounce back soon?
A I can't remember if I had that conclusion. I probably did, and in fact it usually does, and I've been through several business cycles where it has bounced back.
This was my recollection that this was the most prolonged one that we've had in this region in many years.
Q When do you remember the real estate market bouncing back in this region?
A I can't recall the exact date. Bouncing might be the wrong word, adverb. It more likely would be slowly moving towards improvement.
Q When do you think it started to improve?
A It depends on what type of real estate market, whether it's residential or commercial office buildings or commercial projects, but

What happened prior to that, I would be only guessing.
Q Was it your impression that they hung on too long when told to change the treatment of something, or that they disagreed and then adjusted?
A You know, my impression was it was probably a reasonable disagreement and, you know, we agreed to disagree, and if they wanted to appeal the conclusion, that was their right.
Q Do you remember them ever appealing?
A I heard that they appealed loan classifications. I don't recall hearing that they appealed this one.
MR. HUME: Why don't we take a break for lunch and reconvene, can we shoot for forty-five minutes?
MR. LEVITT: Sure.
(Whereupon, at this point in the proceedings there was a luncheon recess, after which the deposition continued as follows:)
MR. HUME: Let's go back on the record.



CONTINUED EXAMINATION BY MR. HUME:

Q Mr. Day, I hope you had a good lunch.
A Yes, thank you.
Q I want to begin this afternoon looking at the FDIC exam report from 1990. As you remember, this was a Tier I report.
MR. HUME: I'd ask this to be marked as AmBase Day Exhibit 10.
(The above-described document was marked AmBase Day Exhibit 10 for identification, as of this date.)
Q Mr. Day, this is the version of the 1990 exam report that was produced to us. I think it has some repetitive pages, but it appears to be comprehensive and in final form. Its Bates number on the first page is WOQ 6981432.
If you look at the Bates stamp that ends with the four digits 1443, it is also Page 1-6 of the exam.
Do you see that page?
A Yes.
Q Do you see your signature at the



bottom of that page?
A Well, technically it's not my signature, but it --
Q That's because it's computer generated, or why is it --
A No, it's because it's signed in the office. They have my power of attorney to sign these reports.
Q So that's technically not your handwriting, but it's signed for you?
A Right.
Q Is the same true for Nicholas Ketcha?
A That I don't know.
Q Well, having seen that signature page, would you agree that this is a final version of the report, likely to be?
A Likely to be, yes. Undoubtedly it is.
Q You authorized someone to sign it, is that how it works?
A Yes.
Q On the cover page of the report it states, "Tier I Examination." Do you see that?
A Yes.



Q Did our conversation this morning, does seeing this help refresh your recollection as to exactly what Tier I examination referred to versus Tier II or Tier III?
A Tier I to the best of my recollection at the time, we've gone through various iterations of this, but at that time it was a full scope examination.
Q Did you have the same classifications of examinations for commercial banks?
A The same definitions?
Q For Tier I, Tier II, Tier III exams?
A I believe so, yes.
Q Does the certificate number 30080 have any significance to you?
A Not at all.
Q Do you have any idea what that refers to?
A Well, when banks are first chartered there's assigned a certificate, they're given a certificate of insurance with a number on it, but I thought you meant what that number particularly meant.
It's the number that's assigned

Page 218

know whether or not the real estate market had turned by 1993?
A I don't think the project's completed to this day.
Q Well, it may not have been, but it may still be worth far in excess of what it was worth at that time.
A Well, again, that's a hypothetical. Real estate values change greatly in eight or nine years.
Whether the investor has the wherewithal to hold onto that versus placing his investment in another type of financial instrument and making a return is the crux of the matter.
Q That is the crux of the matter, and that's what I'm asking you, which is if this credit investor, Carteret, had had the ability to hold on, if it had had sufficient capital to hold onto some of these assets, wouldn't the optimism have been with the benefit of hindsight much less unreasonable than it appeared at the time?
MR. LEVITT: On all assets, or you're talking just about Swedeland now?
Q I'm talking about its general penchant for optimism that you referred to in this

Page 219

summary.
MR. LEVITT: For all its --
A It would have caught up with them one way or the other. If they have all these non-earning assets they're just holding onto, they're still going to suffer losses.
Q I don't understand the answer, because if the assets aren't generating income in the short term, it's clearly going to hurt them.
A Right.
Q It depends on whether they have the capital to withstand that. Would you agree with that?
Whether or not they're going to be able to withstand that depends on how much capital they have?
A To a degree, yes.
Q And all I'm saying is wouldn't you agree that if they had sufficient capital, that the fact that the real estate market did in fact turn and turned dramatically a few years later --
A I think it was more than a few years later.
Q Well, neither one of us have in front of us the information.

Page 220

A Okay.
Q As a general matter, with the benefit of capital they could have waited longer and enjoyed the upside of the real estate market. Isn't that correct?
A But over that period they would have suffered losses because they've got expenses on the liability side that they've got to pay for and no income coming in on the asset side.
Q That's why they would have needed capital to absorb that, I agree.
But with the capital, as you say the crux of the matter is the ability of the investor to hold on, and if they had held onto a lot of these assets, wouldn't they have done very well?
MR. LEVITT: Objection, the witness --
A Could have done very well. I mean, I don't know if they would have.
MR. LEVITT: He's also pointed out that the increase in the value may have been more than offset by the expenses between the day when it was, had a low value and when it --
MR. HUME: Are you testifying or

Page 221

objecting after the fact? Which thing that you're not allowed to do are you doing?
MR. LEVITT: All I'm doing I'm allowed to do, and it's an objection.
A I think despite my disagreement with the accounting profession I think that they would have had them recognize the problem regardless and they would have had to take some kind of adjustment to capital.
Q I really think that my question didn't make sense.
I'm not asking whether they could have avoided ever having to feel or recognize the losses on any of these assets in the years that followed and thereafter whether all these reserves could have been or were completely avoidable.
I'm simply asking with capital, with the benefit of your hindsight today they could have absorbed some of those losses and then ridden them out for the upswing in the business cycle.
It seems to me not to be a controversial question. Would you agree that that could have been possible if they had had more capital than they did?
A Yes, it could have been possible.

A Again, I remember they were working on it, on whatever regulatory response that they were going to take, but I'm not sure I ever saw the final result.
Q Do you recollect whether or not Carteret submitted a capital plan to OTS?
A I don't -- I would assume that that was a part, if they did issue an enforcement action regarding a capital plan that they would have had to submit one, but I don't recall seeing it.
Q Do you have any recollection of why it was that the capital plan was originally not accepted by OTS?
A I wasn't involved in that.
Q Do you have any recollection of why OTS changed the amount of capital it thought needed to be infused into Carteret from $150 million to $200 million?
A I wasn't aware of that.
Q Was it your opinion that Bob Walsh should be removed as President and CEO of Carteret?
A No, I don't think I ever came to the conclusion that he should be removed. Personally



I don't think I ever had anything in my exam report about that.
I personally thought they probably could have had somebody better there, but no, I had nothing personally against the guy.
Q You said you do have some recollection of the severance payments to Bob O'Brien.
Do you recollect that OTS asked for those payments to be paid back to Carteret?
A Yes, I do. I think the way that they were made apparently was irregular. I don't know if the Board approved the actual payment of it.
Q Do you remember whether you yourself ever looked at that or formed an opinion as to the propriety of those payments?
A I remember talking to Tom O'Rourke, and I believe they had an attorney on-site from Washington who was working on that, but I don't remember the specifics.
Q So do you think at the time that you did look at it closely enough to form an opinion of it that you just don't remember now, or you don't think you did?



A What I remember is the payment was irregular. He might have been entitled to that pursuant to some kind of employment contract, but what I recall is that somebody may have exceeded his authority by writing the actual check.
Q How does that basically work in the sense that if it was clear under the contract that the Board of Directors didn't have to approve anything, that he was entitled to a payment under his employment contract, but the regulators both at OTS and maybe at FDIC saw that as a payment that should not be made at a time when the institution is undercapitalized and therefore came to their conclusion that it's unsafe and unsound, how does that get analyzed and what happens?
A Again, I don't know the particulars of why they came to that conclusion or whether they would have come to the same conclusion if the bank was adequately capitalized.
What I recall about it is that it was done like in-house without a full disclosure, that somebody signed a check that maybe didn't go to the Board that they were going to disburse those funds. I guess -- I never looked at the contract.



Q Do you recall whether there were any other compensation payments made at Carteret that were thought to be possibly unsafe or unsound?
A That's the only one I recall.
Q And you don't remember FDIC getting deeply involved in any of those issues?
A I didn't get involved, and I don't recall -- I mean, it's possible our attorneys did, Mike Simone or whoever was talking to Mike Zamorski, but that I'm not aware of.
MR. HUME: Should we take a short break.
(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)
MR. HUME: Could you mark this document, please, as Day Exhibit 13.
(The above-described document was marked AmBase Day Exhibit 13 for identification, as of this date.)
Q Mr. Day, this is a copy of the 1991 FDIC Report of Examination. It lists your name on the cover as the Examiner-In-Charge and it describes itself as a Tier III examination on the cover.

FIRREA legislation.
Q I guess this is prior to the actual passage of FIRREA, that the FDIC moved in as the Conservator?
MR. LEVITT: You mean in state chartered thrifts?
MR. HUME: No.
A I'm unfamiliar with that, if that situation did exist, I don't know.
Q That it that took over some of the FSLIC insurance obligations and therefore took over some of those thrifts?
A I'm just not familiar with it. I'm not saying it didn't, I just don't know.
Q Who in the New York region would know if the FDIC had done something like that in 1989?
A I assume whoever was the Regional Director at that time if that happened would have to know about it.
MR. HUME: Off the record.
(Discussion off the record.)
MR. HUME: Please mark this as AmBase Day Exhibit 15.
(The above-described document was



marked AmBase Exhibit 15 for identification, as of this date.)
Q Mr. Day, this is the FDIC 1992 Report of Examination. Do you see your name on it as the Examiner-In-Charge?
A Right.
Q Do you remember now that you did work as the Examiner-In-Charge at that time?
A Yes.
Q Do you remember that by 1992 Carteret had stabilized in most of its major problems?
A I'm just reading the comments regarding the Board of Directors meeting. At the beginning I didn't remember this, but that's the conclusion of Mr. O'Rourke.
Q Which is expressed where in this report?
A The comments regarding the Board of Directors meeting. 1-3.
Q Can you turn to Page 1-2. Can you review the asset quality section.
A Yes.
Q Do you remember the pool of loans purchased from Western Federal Savings and Loan



Association?
A Not specifically, no.
Q So you don't remember Carteret possibly having a claim of action against Western Fed?
A Well, based on reading what I've put in this report, yes, they did, but before I read this I didn't remember that.
Q And even having read it, you don't have an independent recollection of that, it doesn't refresh your recollection?
A No.
Q Do you see just below the asset quality writeup on the allowance for loan and lease losses where, that's where it says that OTS examiners determined that an additional $8 million loan loss provision would be necessary?
A Right.
Q Do you remember that the additional loan losses required by OTS was relatively small in comparison to the previous two years?
A Yes.
Q And in general did you think that Mr. Moore, Mr. J. Wayne Moore had done a good job in working out asset problems at the institution?



A Yes.
Q As you testified earlier you thought that Dick Bianco had also done a good job in trying to realistically improve the institution and find new capital?
A Again, I was present a couple of times when he met with the OTS examiners or came into the room where they were working, and it appeared to me he was a realistic man, that he was doing whatever he could to keep the institution going.
Q I'd ask you to turn back to Page 1 of this report. It describes in those two paragraphs management's efforts to find a new investment group and refers to Kolberg & Co. and states that they have recently recanted OTS' proposal to inject $200 million.
Do you see that?
A Yes.
Q Beginning in the next paragraph, it states that, "The principal stumbling block appears to be potential investors' reticence to invest the needed $200 million, the minimum that would be acceptable to the OTS without some form of