IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

AMBASE CORPORATION AND :
CARTERET BANCORP, INC., :
Plaintiffs, :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
v. : Civil Action
UNITED STATES OF AMERICA, : No. 93-531
Defendant. :

\- - - - - - - - - - - - - - - x

Washington, D.C.
Monday, August 23, 1999

Deposition of BRIAN DOUGLAS DITTENHAFER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DOLORES A. BYERS, a Notary Public in and for the Washington, D.C., taken at the offices of Cooper, Carvin & Rosenthal, 1500 K Street, N.W., Suite 200, Washington, D.C., at 10:00 a.m., on Monday, August 23, 1999, and the proceedings being taken down by Stenotype by DOLORES A. BYERS, CSR,

Page 62

A. I would not have personally reviewed it.
Q. And you would not generally personally review reports of examination of any thrifts?
A. That's correct.
Q. And who would the person be who would review it and report to you on it?
A. The report of examination, the fact-finding which would have been done by the examination division would be reviewed by a supervisory agent who was specifically charged with maintaining a knowledge of the operations of Carteret.
And by that I mean they would review not only the reports of examination which were infrequent, they would also review the monthly reports of condition which were submitted by Carteret. And if there were any questions that arose on that, they would be responsible for identifying question that arose and getting answers from Carteret verbally or in writing if it required that.
So it would be a supervisory agent who would have been charged with reviewing the report of examination and all the other documents

Page 63

involved. And that would have been somebody who would have been familiar with Carteret because they worked on their report every month.
Q. Do you recollect who that was?
A. No.
Q. Do you recollect Kevin Coit the examiner in charge on this examination?
A. No.
Q. You don't remember him at all?
A. No.
Q. Do you remember Bob Albanese?
A. Yes.
Q. Do you remember his working on Carteret?
A. I don't remember him specifically working on Carteret. But I knew Bob Albanese.
Q. How about Joseph Kehoe?
A. I don't know Joseph Kehoe.
Q. How about Michael Simone?
A. Yes. I knew Michael Simone at the time.
Q. Do you remember Michael Simone working on Carteret?
A. Not specifically.
Q. How would we find out who this

Page 64

supervisory agent was?
A. I would assume the files would be with the OTS office in New York and that the supervisory agent at that time would be listed in those files. It may be -- maybe this is addressed to the supervisory agent. I doubt it.
Q. And would Angelo Vigna have been likely to have reviewed this?
A. He would have reviewed it if a problem was brought to his attention. He would not ordinarily, I believe, reviewed this report of examination. No.
The report of examination would have been reviewed by the supervisory agent charged with Carteret, responsible for Carteret. And they would only bring it to Angelo or even probably Bob Albanese at the time if there were some matter of concern.
Q. And they would only report to you if --
A. If they had a problem that they couldn't resolve themselves.
Q. And when in the course of evaluating the AmBase acquisition application you needed to turn your eyes to Carteret, you would have turned your eyes to the supervisory agent?

Page 65

A. That's correct.
Q. And relied upon his --
A. That's correct.
Q. Well, I think it will be helpful to look at a few things here to help refresh your recollection as to the state of Carteret at that time. If you go to Page 1, the report summary. I'm going to ask you to review the report summary. The shortest bottom line account of the report.
A. Okay. I've reviewed the summary.
Q. Where it says in the third paragraph that the bank continues to retain an adequate level of capital, would the ability of the supervisory agent or the examiner-in-charge to make that statement about a bank be impacted by the level of capital or the level of capital represented by the supervisory goodwill on the balance sheet?
A. Yes.
Q. Does my question make sense?
A. The answer is yes.
Q. It would be impacted?
A. Yes. They would take supervisory goodwill into consideration when they said it's an adequate level of capital.

Page 66

Q. That's not what I meant. I kind of meant the opposite. In other words, if you have an institution that was in regulatory capital compliance but only because of its supervisory goodwill, in other words, if you took its supervisory goodwill out of the calculation, it would be noncompliant; would that make it more difficult to say that it has an adequate level of capital than if it were some other asset, if there was no supervisory goodwill?
A. I'm not sure I understand your question. Will you rephrase it.
Q. Sure. I'm asking whether or not the assessment of the strength of the capital of the institution was sensitive to the fact that a very large asset is supervisory goodwill and so that, okay, yes, it's in capital compliance but if you eliminated the goodwill tomorrow, it would be out of compliance and, therefore, we don't want to say that it's adequate. We would hedge our bets a little bit.
Was that the attitude or was that not the attitude?
First of all --
A. I think I understand the question now.

Page 67

My response is that in reading that sentence my judgment is that the examiner-in-charge was including supervisory goodwill because he would be going on the supervisory accounting system. And, therefore, he would, when he says the institution has an adequate level of capital, he would be including the supervisory goodwill.
Q. Okay. Let me follow on --
A. I may be wrong but that would be my reading of it and that would be my understanding of that sentence.
Q. Right.
Turn, if you would, to Page 7 which is the capital summary and you can review all three paragraphs there.
(Witness reviewed document.)
A. The capital section?
Q. Yes. Once you've reviewed it.
A. Okay. I've had a chance to review it.
Q. I'm just trying to follow this same question. It states that the present capital base is sufficient to provide protection against classified assets and reasonable adverse changes in the interest rate scenario.
And basically it flushes out the

Page 68

statement in the summary as to the adequacy of Carteret's capital. Would you agree with that?
A. Yes. It certainly expands that and I'm reading this. I can give you my interpretation of it if that's where we're going.
Q. I want to specifically stay on this one question about the extent to which this capital analysis that we've just looked at is sensitive or would have been sensitive in 1988 to the level of goodwill on the balance sheet.
And to do that let me, if I could, refer you to the appendix Page A-4.1. And there you have a balance sheet for Carteret. And if you look at the second to the last asset towards the top of the page, it says intangible assets 323 million. That's broken out for us on the next page in a chart that I don't fully understand but which does say other assets, paren, goodwill, 207 million. And these are year-end 1987 numbers.
Are you following?
A. Yes.
Q. So I'm simply showing -- the report clearly is cognizant of the level of goodwill on the balance sheet. Would you agree with that statement?

Page 69

A. That's correct.
Q. And the report, correct me if you think I'm mischaracterizing it, also concludes that the capital base of the thrift is adequate?
A. Correct.
Q. And I suppose my question is doesn't that show that the regulator's attitude toward the thrift -- that the regulator's attitude in 1988 was that supervisory good was a reliable asset that counted towards regulatory capital?
MR. LEVITT: He already said that.
THE WITNESS: Absolutely.
BY MR. HUME:
Q. And that there was no sensitivity on the part of regulators to, well, it technically counts but we don't think much about it. We don't really want to rely on it.
MR. LEVITT: Objection as to relevancy.
THE WITNESS: In this case they would have had to be sensitive to that because it says here under the capital that they're both RAP and GAAP compliant.
BY MR. HUME:
Q. So you're saying they would have had to have been sensitive or would not have had to have

Page 70

been sensitive?
A. It wouldn't have made any difference in this case because it's GAAP compliant and RAP compliant.
Hypothetically, if they were RAP compliant and not GAAP compliant, then the question might have arisen.
Q. I'm not sure what GAAP compliant means. Could you tell me what that means?
A. They're adequately capitalized under generally accepted accounting principles. Six percent GAPP capital asset ratio. That's adequate even today. In those days it was a bonanza.
But it says they're RAP compliant as well. Now they have -- they have some risk management. They had some interest rate GAAP. I'm just reading from the report now. I remember seeing earlier, as we went through, that they had some hedge positions. And so all those things would go into their definition of are they RAP and GAAP compliant.
Q. I am asking a slightly subtle and a slightly different question from the one I think you may think I'm asking. So let me try again.
A. Okay.

Page 71

Q. I'm asking whether at this time the regulators, whatever their technical -- in other words, answering a question as to how they technically treated goodwill on the balance sheet and, therefore, came to the conclusion that the institution technically had an adequate capital position.
I'm saying in addition to that doesn't it also indicate that they didn't believe there was anything suspect about this asset?
A. That is correct.
Q. Can you explain one other technical thing to me that I just don't understand on Page A-4.1. I sometimes see this and I know you're not an accountant. But can you explain to me towards the bottom of the page where it says total regulatory capital excluding GLLR which I assume is general loan loss reserves.
Can you explain to me why it's titled that way? And the footnote just explains that the title has been changed by a new regulation. The footnote, you have to turn over to -- Page A-6.3 gives you the footnote.
A. You're right. I'm not an accountant and, frankly, this has changed recently. This

Page 72

regulation has been changed recently for FDIC insured institutions -- SAFE insured institutions as well.
Q. Recently now or recently then?
A. Recently now. It's one of those things that floats around because it deals with loan loss reserves. Loan loss reserves if they're specific -- as I recall at the time before this change took place, we were allowed general loan loss reserves to be counted as capital.
But if you had a specific loan that allocated a specific amount of the reserve to that loan, that was no longer capital. And probably the change we're talking about here is general loan loss reserves are no longer capital either.
Q. So your understanding of the title total regulatory capital excluding general loan losses would be that this is the capital level after, the way I would say it, it would be after reducing capital for general loan loss reserves?
A. That's correct. That's my understanding of that phrase.
Q. Because they don't list a different regulatory capital level without it. It's just that's the level --

Page 73

A. And that's --
Q. That would have been the level of regulatory capital; isn't that right?
A. Yes. At that point.
Q. Do you ever remember them having two levels of regulatory capital with or without --
A. No. It depended on whether general loan loss reserves were considered capital or not. And people would put general loan loss reserves in some days -- one of the reasons for the change in that regulation is it was a way to hide income. In a mutual institution you can hide income and put it in general loan loss reserves and not pay income taxes on it.
Q. I was going to say there's only one reason to hide income and that's for taxes.
A. Right.
Q. But the concerns were the opposite in terms of maintaining compliance for the regulators?
A. Exactly. Again, there's dispute about that today because to the extent that you have general loan loss reserves, you don't pay taxes on that money. The Treasury would like those to be as low as possible to give tax revenue. A

Page 74

division of the Treasury, the OTS, would rather have it higher.
I don't recall the motivation for that change but I know that at the time it was considered as a way -- especially a mutual. A mutual doesn't care. It doesn't have any stockholders. It doesn't care what its income is as long as it's positive. The more you put away into those general reserves, the money still earns money for you. And it makes it easier to run the institution profitably.
MR. LEVITT: Just to note that there is a memo at the bottom of Page A-4.1 that says general loan loss reserves is 21,118,000.
MR. HUME: Right.
BY MR. HUME:
Q. And just to close off on our understanding of what the total regulatory capital excluding general loan loss reserves signifies, is that that level is 317 million -- I'm sorry. Are you on the page? This is A-4.1.
A. Yes. I just got back to it.
Q. As David points out, the memo shows the general loan loss reserves to be 21 million. Does that signify that if your description of what

Page 75

total regulatory capital excluding general loss loan reserves is correct, doesn't that mean that the total regulatory capital and not being reduced for the general loan loss reserves would be something like 338 million?
A. Yes.
You'll notice that that memo is zero in the other two accounting periods ending December 31, '85, and '86 and that wasn't changed at that point.
Q. Right.
A. And you'll notice also that between '85 and '86 the total regulatory capital grew by far more than it did between '86 and '87 and that would fit with what we're talking about here, that it's excluding the general loan loss reserves in the '87 accounting period.
Q. Can you explain why that would fit? I'm not sure I follow you.
A. If you add back the general loan loss reserves to the regulatory capital, you would have, as you said, 338 million and that would be closer to what you might expect on a year-to-year increase for an institution of this size.
Q. In other words, the rate of growth

Page 76

would look more normal if you didn't produce --
A. Right.
Q. Let's look at the assets summary on Page 3 to 4.
Maybe the best is just to begin by reviewing the first two paragraphs there and then I'll point you to a few things I have questions about.
A. Are you looking under asset quality?
Q. Exactly. Yes.
(Witness reviewed document.)
Q. Have you reviewed that first page?
A. The first page, yes.
Q. Let me, if I could, just ask you a couple of questions. The last paragraph there reads: As detailed on Pages A-12.1 through A-12.6, these commercial type loans and properties amounted to 150.2 million in substandard, 1.1 million doubtful, 1.7 million loss for a total of 153.4 million classifications.
Can you explain to me what the significance of those categories is?
A. Well, the loss is clear. There are -- there were definitions and there are definitions of substandard and doubtful in the regulations.

Page 77

And I don't recall what those specific definitions are.
But generally the classifications are administered -- it's more of an art than a science. But if there have been some slow payments or they become substandard and if a few payments are missed, they become doubtful assets. And you'd know the condition of the borrower and that helps with the classification as well.
It's just a progression down to loss of these loans. And, as I say, I'm sure there are very precise definitions of it. Examiners will sometimes come into an institution and nitpick about whether this loan should be classified at all, whether not classified as it should be or whether it should be a substandard and a loss. But it's more of an art than a science.
Q. That was what my follow-up question is. Whether or not you remember ever being involved as a principal supervisory agent in overseeing or resolving those kinds of conflicts?
A. No. I do not recall ever being involved in something like that.
Q. Do you recall that at times in the examinations regulators and thrift professionals

would disagree over the level of classifications?
A. Yes, they would.
Q. Did that happen frequently?
A. Probably every time there's an examination. I mean, it's one of those -- as I say, it's more of an art than a science. So an examiner can come into a perfectly clean institution and nitpick about the loan portfolio if he can't find anything else.
Q. When you say it's more an art than a science, do you mean it's more subjective than mathematically determined?
A. That's correct. Although I'm sure, as I say, there are very precise definitions for it but you still have to apply those definitions to individual loans and payment schedules and payment records and collateral. Sometimes the collateral becomes a reason to classify a loan.
Q. The first sentence on the next page, Page 4 states: Although this represents a significant increase from prior periods, the negative effect of large amounts of classified assets has been minimized by (1) Carteret's continued strong capital position after charge offs; (2) their earnings generated from the


quality portion of commercial and income property portfolio reflected in continued positive net operating income; and (3) the historical success the bank has experienced in working out of large problem assets.
Having reviewed this, does it change in any way your earlier understanding of the strength of Carteret at this time in 1988?
A. Having reviewed the examiner's report of their GAAP capital position, yes, it does. I would say that Carteret was better capitalized than was my recollection based on this examination report.
Q. Do you remember Bob Mueller?
A. I know the name. I'm not personally familiar with him. He was a man who joined Carteret as a commercial lender from Commercial Bank in New Jersey and he, in fact, that's how Carteret got into the commercial lending business.
So he was not a traditional savings and loan executive or someone I would have known for a long time. But he was considered to be a professional in the commercial lending operations and brought, as I recall, a couple of the people from that banking commercial lending department


with him to Carteret.
Q. The next paragraph states that while management is in general agreement with the examiners on assets identified for classification, they are in serious disagreement with the dollar amount assigned. Management is taking a firm position that the amounts of 6.4 million substandard and 3.4 million doubtful identified by its internal loan review department and reported in Section K of the December 31, '87, thrift report accurately reflects Carteret's risk exposure.
It then goes down a couple of paragraphs and states with respect to President Mueller's position the examiners feel that they're method is accurate and consistent with regulatory and industry practices.
Would this be the type of dispute that would be typical that you were referring to earlier?
A. Yes. Probably this would be a little stronger dispute because the examiner would have been -- the examiners would have been more accustomed to dealing with mortgage type collateral and consumer lending type collateral.


And the collateral they're talking about here that's in dispute is commercial lending.
And there is a difference in those two types of collateral. And, therefore, Mueller who would have considered himself an expert in commercial lending would say we're going to get paid on those loans even though we know we're going to have to restructure them. We're going to get that money. The examiner would say if you have to restructure them, you're probably already looking at a loss.
So that this dispute would probably arise to a little higher level of strength than the typical one I was describing earlier where you might nitpick a loan here or there.
Q. And that's because of the different nature of the assets?
A. Because of the different nature of the assets. Yes.
Q. In the second to the last paragraph it states that total classifications represent 55.9 percent of regulatory capital.
On the previous page it states underneath a section entitled "Classified Assets." It states that classified assets totalled $177

and take their accounts with them. That was upsetting to some of the people in the commercial banking industry.
Q. And do you recollect anything specific about Carteret's loan review capabilities?
A. I don't have any specific recollection of it. No. What I've already said about -- I thought that by doing it the way they did it that was -- by hiring a department that was a good way to go about getting a commercial loan department.
Q. And presumably doing that way was good because you would then be able to evaluate the strength of those commercial loans much more accurately than you would if you had people who were new to those type of assets doing it?
A. My feeling was that Carteret would be able to evaluate the commercial loans better. I don't know whether our examiners would be any better at doing it.
Q. That's where I was going. The people in Carteret who had worked in a commercial bank in a commercial industry and were brought into Carteret would have a familiarity with how to evaluate those assets which the regulators would not have?


A. As we were getting into commercial loans, we provided training for examiners on how to evaluate that. But it is a different animal, that is, a commercial loan versus a regular mortgage loan. They're under written differently.
Q. Do you remember when that sort of training philosophy began and when it was that commercial loans were becoming a significant portion of portfolios?
A. They were not a significant -- they're still not a significant portion of most S&L portfolios. The thrust began probably in the early eighties under Dick Pratt when they first acquired the ability to have -- I think it was originally 10 percent of their portfolio in commercial loans.
At that point the examination division was not part of the bank. So I'm not sure what their training was at that point. But we did provide commercial lending training to them after they became part of the bank in '85, I guess, right after I became president or maybe right before I became president they became part of the bank.
Q. When you say they became part of the


bank, who is they?
A. The examination division prior to 1985 were Government employees. And there was a problem at the time in paying them enough to hire enough examiners and to retain the best of the examiners. And so they were terminated from Government employment and became part of the bank. And then we were not subject to Government service pay scale restrictions, et cetera.
That was one of the ways that the Federal Home Loan Banks were trying to help FSLIC solve its problem by funding that operation. And that's when I say they became part of the bank, they had formally been Government service employees working for the Federal Savings and Loan Insurance Corporation and they were terminated there and acquired under an agreement by the bank for the reasons I mentioned.
Q. Right.
Having reviewed this summary of assets -- and if you'd like to review more, please do.
Would you agree that the general conclusion was that there was a high level of bad assets in this thrift but that because of its


capital position and its management it was not a major concern for the regulators?
MR. LEVITT: Objection. The document speaks for itself.
THE WITNESS: The document does speak for itself. I would say I don't think there was a high level of bad assets here. I think they were adequately reserved. That's what the examiner seemed to feel.
BY MR. HUME:
Q. Do you recollect what a composite rating of two signified in 1988?
MR. LEVITT: Is that on page --
MR. HUME: It's not on here. I'm just asking a question.
THE WITNESS: In '88? As I recall, it was a one through five and two would have been pretty good. I don't know exactly what the definition is.
BY MR. HUME:
Q. One would be the best and five would be the worse?
A. That's my recollection of the ratings.
Q. Do you have any recollection of the meaning of that composite rating changing after

the passage of FIRREA?
A. I guess -- if I understand the question, I don't think it changed, that is, the rating system didn't change to my knowledge. The rating of the institution might have changed.
Q. Right. But I mean the significance of being a two or a three or a four held the same significance after the passage of FIRREA. My question is: Is that your recollection?
A. I'm not sure --
Q. The question doesn't make sense or you're just --
A. The question doesn't make sense to me. No.
Q. It doesn't make sense.
All I'm asking is if it meant something to be a two, it meant you were the second best category and it meant that you were pretty sound and all the rest of that. Did that basic significance hold and carry the same significance in 1989 and '90 as it did in 1988?
A. As a classification system, yes. I think after FIRREA part of that composite rating would be capital adequacy.
Q. Right.



A. And if after FIRREA you eliminate supervisory goodwill, you eliminate goodwill from the balance sheet and maybe they're no longer adequately capitalized, then a two might become a four. The classification system didn't change. A two would still be good. But an institution might change its rating simply because it didn't have adequate capital anymore.
Q. That's one point I certainly want to talk to you about. This is more mundane. It's simply that the composite ratings are not listed in this report '88 prior to FIRREA and in '89 they are including their definitions. So we have a definition for what it means to be two in '89 which we'll look at in a few minutes.
A. Is there any reason to think the classification system changed? To my recollection it did not change.
Q. That caption of what it was to be a two --
A. My recollection is it did not change.
Q. To your other point which when he look at the '89 exam in a few minutes, we'll talk more about -- is it your -- I don't want to ask you to repeat yourself.



But do you recollect that thrifts dropped from a two to a four or a one to a four or two to a five as a direct result of the change in the capital rules in 1989?
A. After the passage of FIRREA. In fact, beginning in February of 1989 when all the principal supervisory agents were relieved of their duties and became simply presidents of the banks. We were no longer privy to the examination reports or those classification numbers or rating numbers. So I have no specific knowledge of whether or not institutions went from a two to a four.
I would assume that they would be drops in classification because of the capital adequacy changes brought about by FIRREA.
Q. Looking at this ROE and what you've seen of it, would you say that it indicates a bank that might be in need of resolution in the near future?
A. No.
Q. Is there anything else you would want to look at before -- that might change that answer? I don't mean it to be cute. I just mean is there something that could be buried in here



that would show that, in fact, it was a bank that was in danger of needing resolution?
A. No. From the summary and the capital adequate position and the examiner's comments, it seems as though this was a reasonably strong institution at the time and, in fact, maybe stronger than reasonably strong. It had 6 percent capital according to this.
Q. Okay. Let's move on although we may want to look back at it at some point.
THE WITNESS: Can I take another break.
MR. HUME: Absolutely. Before you do, off the record.
(Discussion off the record.)
(Whereupon, at 12:22 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:00 p.m., this same day.)

Page 94

AFTERNOON SESSION
(1:10 p.m.)
Whereupon,
BRIAN DOUGLAS DITTENHAFER,
the witness herein, called for examination by counsel for Plaintiff and having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
BY MR. HUME:
Q. Mr. Dittenhafer, welcome back to the deposition. We ended up with me asking you some questions about the 1988 report of examination and its general statement about the health of the bank and its capital adequacy.
Moving on now to look more specifically -- and I have one or two documents to show you on the AmBase acquisition of Carteret.
I guess my first question is if Carteret had been a thrift that was likely to need to be placed into conservatorship or resolved in the near future in 1988, a conclusion that you stated was not in the 1988 ROE, but if it had been, would the Federal Home Loan Bank still been able to recommend approval by an outside party

Page 95

like AmBase?
A. No. Wait a minute. I'm sorry. I anticipated your question. The last part of it was would we be able to recommend acquisition by an outside party like --
Q. In other words -- yes. There was a recommendation that you could approve the acquisition by AmBase of Carteret. And my question is had Carteret been on the brink of failure or resolution, would that recommendation still have been possible?
A. The acquisition of Carteret by AmBase, we could have approved that.
Q. You --
A. We could have approved it.
Q. You could still have?
A. Yeah. In fact, that was the way a lot of very difficult institutions were resolved not in the second district but in other districts around the country by selling them to outside businesses.
Q. And then that would have been more akin to a supervisory acquisition; is that right?
A. Yes. It probably would have been assisted, an assisted merger.

Page 96

Q. Assisted, meaning that there would have been some form of FSLIC assistance as part of that whether that would be forbearance or direct cash assistance or whatever?
A. Any number of things from direct cash to supervisory forbearance.
Q. You may recall our looking at the balance sheet in the 1988 ROE and my questions to you about the goodwill on the balance sheet and whether that would have impacted the ability to say that the thrift had adequate capital.
To what extent do you remember as principal supervisory agent that you or the regulators who reported to you distinguished between goodwill generally and goodwill that was supervisory goodwill that had arisen from an assisted transaction?
MR. LEVITT: Objection. Vague.
THE WITNESS: I'm not sure that we distinguished -- that I distinguished between supervisory goodwill and other goodwill. Probably because there wasn't -- it was almost impossible to have anything except supervisory goodwill. The short answer is I don't think I ever differentiated between the two.

Page 97

To me as somebody on the banking side, tangible versus intangible, was the distinction that had some merit whether it was supervisory goodwill or other goodwill didn't make any difference. It was still goodwill and not tangible asset.
BY MR. HUME:
Q. And as you alluded to, as a general matter the goodwill on the balance sheet of a thrift at that time was more likely than not to be largely supervisory goodwill?
A. That's correct.
Q. And not to belabor this point. But you state that there was a distinction in the minds of you and the minds of other regulators prior to FIRREA between tangible and intangible. And that distinction was what I was trying to flush out in my questions before lunch about how you could state a thrift has adequate capital when it has a huge amount of intangible goodwill on its balance sheet.
So can you give me an idea of how it was that regulators focused on that distinction? How did that manifest itself.
A. Let me distinguish. I said that was my

Page 98

distinction and recall that I said I came up not on the regulatory side of the bank but on the banking side of the bank. I was always concerned with the tangible capital ratio.
And I'm sure that other regulators were aware of it but they may have been less aware of it than I was. I was always concerned with the collateral position of the bank and how strong the institution was in a tangible capital. Listen, I knew we could change the supervisory goodwill provision at any time and it could be changed by ourselves or somebody else.
Q. What do you mean that it could be changed?
A. It was a regulatory position. You can change regulations at any time.
Q. So it was your view that even though there was a Government assurance or promise that this goodwill could be counted towards regulatory capital, that that promise could be abrogated at any time?
A. No. Distinguish between the concept of supervisory goodwill and the contracts under which assisted acquisitions took place. Under the contracts, that was, to me, in violate but it

Page 99

could be changed under the definition of supervisory or regulatory goodwill at any time.
Q. Meaning, I'm just not sure I fully understand what you're saying. Meaning that you could change it that on a going forward basis any goodwill that was created could be treated differently?
A. Yes.
Q. But that the prior arrangements would be honored?
A. Correct.
Q. Would you or anyone reporting to you have been likely to have reviewed Carteret's annual report that it made to its public shareholders for 1987 in evaluating it in 1988?
A. My expectation is that they would have been reviewed by the supervisory agent.
Q. Presumably they would have also reviewed the thrift financial reports that were filed on a quarterly or monthly basis?
A. Yes.
Q. Let's take a quick second to look at the --
(AmBase-Diffenhafer Exhibit No. 6 was

Page 100

marked for identification.)
BY MR. HUME:
Q. I'm going to show you two documents that speak to similar things. I don't want to spend too long on any of them. This is the 1987 annual report. I'm going to refer to the Bates numbers at the bottom of the page that have been stamped there. I will refer to the last five digits. If we could look together at Page 56676 to begin with. You'll see that balance sheet.
MR. LEVITT: Just to clarify for the record. This is the holding company's annual report.
BY MR. HUME:
Q. Correct. The balance sheet and assets lists as excess of cost over fair value of net assets acquired less accumulated amortization a figure of 214.9 million in 1987.
Knowing that Carteret Bancorp is a savings and loan holding company with no other asset other than Carteret Savings Bank, would your review of this balance sheet indicate to you that they had roughly $200 million in supervisory goodwill?

Page 101

A. Yes.
Q. And then if we look to Page 56686, you see a section on stockholders equity. If you look in the right-hand column at the first full paragraph, it discusses regulatory capital. It says the bank -- are you with me where it says the bank is required --
A. The bank is required by FSLIC regulations --
Q. Right -- to meet prescribed net worth requirements. Failure to satisfy such requirements could subject the bank to legal and administrative actions by the Federal Home Loan Bank. The bank's regulatory net worth at September 30, 1987 -- which at that time I believe was the year-end of the fiscal year -- as determined by the rules and regulations of the FSLIC was $332.2 million and satisfied the regulatory net worth requirement, which was 160.6 million.
Looking at those two numbers and having just reviewed the balance sheet, would you agree that it was plain to any one who reviewed this that, or any regulator who reviewed this balance sheet and the financials of Carteret, that

Carteret would not have been able to remain in
capital compliance absent its ability to use its
supervisory goodwill towards regulatory capital?
A. That would appear to be the case. Yes.
Q. And would that fact have been
recognized, been likely to have been recognized by
any one working on this transaction or anyone
reviewing Carteret at that time?
A. I'm not sure. Recognized -- certainly
anybody working on the case would have been aware
of what the supervisory goodwill was if that's
really your question.
Q. I guess that's really my question.
A. Yes.
Q. Do you think you personally would have
been made cognizant of that when you turned to
look at the AmBase acquisition of Carteret?
MR. LEVITT: Objection to the extent it
implies he had hand-ons relationship --
THE WITNESS: I'm not sure I knew that
specifically. I probably would have asked the
question are they in capital compliance. And I
would have known their tangible net worth because
of the banking side of the business. The lending
operation did its own calculations on tangible net


worth. And by implication the two, the difference
between the two is basically the supervisory net
worth or the supervisory goodwill.
BY MR. HUME:
Q. The difference between the tangible net
worth and the regulatory capital?
A. Yeah. It would be an item or two in
there but -- I would not have been that
specifically, you know, what is the specific net
worth. Are they compliant or not.
Actually, looking at the numbers at
this point it seems to me to reinforce my original
impression of Carteret that they were working
themselves out of a problem. They didn't have a
lot of tangible capital and they had supervisory
goodwill. They were still around. They were a
pretty decently managed institution or they
wouldn't have been in the position they were in.
They wouldn't have survived that long.
When I'm looking at these numbers and
the point you just made I think back to what was
my initial impression, I think it fits.
Q. But it is in a sense two different
things because you agreed in looking at the '88
ROE and the discussion there that the bank was


actually in a stronger financial shape and in
better capital position than you originally
remembered?
A. Right. Based on the examiner's report.
Q. And the examiner's report also showed
the level of goodwill?
A. At that point we considered any
institution that had 3 percent to be strongly
capitalized and they had six.
Q. My questioning now is focusing you on
the level of goodwill and therefore intangible
capital that the thrift had at that time. And I
assume, am I right in saying, that that is why
you're now saying that's why you remember the
thrift as in need of more tangible capital?
A. Right.
Q. And yet at the same time in reviewing
the report of examination and presumably the
figures were basically the same in the annual
report, you're also reading it to state that the
bank was essentially a healthy institution with a
strong level of capital? In other words, there
was a slight tension between the two forms of
analysis?
A. That's correct. There's no question


about that.
Q. Okay.
A. You recall I was surprised at the
examination report --
Q. And how strong it was?
A. How strong it was. Right. Because my
recollection was not that.
Q. And the strength in the report of
examination is the same as the strength in the
annual report that I have focused you --
A. Except for the fact that a lot of it is
intangible capital and therefore --
Q. Right. But that was in the report of
examination. It's just simply that I'm focusing
my questions on it. Is that a fair point?
A. Fair point.
Q. Let's look at one more document.
A. The following paragraph there: Reports
furnished to the Federal Home Loan Bank Board are
based on regulatory accounting methods which in
some cases differ from generally accepted
accounting principles.
Since this was a public company, they
had generally accepted accounting principles.
Quoting further: Regulatory capital is a basis by

Page 106

which the Federal Home Loan Bank evaluates the capital position of an institution for purposes of supervisory action and evaluation of risk to the FSLIC.
That doesn't say what the Federal Home Loan Bank as a lender how it evaluates the institution.
Q. Okay. So in a sense you could be saying that as a lender --
A. As a lender, I didn't think it was a strong institution.
Q. Because you were worried, as a lender, about tangible capital?
A. Exactly.
Q. But as a regulator you and your colleagues were satisfied that this institution had ample excess capital under the regulation?
A. Exactly.
Q. Forgive me for pushing on this point. But you represent --
A. I'm bringing it up. I'm trying to make the distinction because you said earlier about you, as a regulator, and I'm trying to be consistent in saying I probably viewed these things more as a banker than as a regulator. And

Page 107

tangible capital is where it's at if you're a banker. You can push all you want. That's my position. And I think I have been consistent on it. I don't know if that helps or hurts you.
Q. Neither one. I just think it's an interesting duality and you personified both perspectives at that time in the sense that you had both roles professionally.
A. I had both roles to play professionally.
Q. And in the regulatory role by definition relied on the strength of supervisory goodwill as good capital?
A. That's correct.
Q. Let me just show one more document before leaving this point.
(AmBase-Diffenhafer Exhibit No. 7 was marked for identification.)
BY MR. HUME:
Q. Have you had a chance to see this? The parts of this document I want you to look at are the -- I guess the first thing to look at on the second page is the total regulatory capital

Page 108

excluding general loan loss reserves, the phrase that we talked about, which is the right column a third of the way down the page. It shows 321 million.
A. Right than Line 800.
Q. And at the last page of this document -- yes, the last page. The end of that first cluster of lines "minimum capital requirement" is shown at 169 which I think is roughly the same as what the annual report showed.
And so, again, we have what I'd call excess regulatory capital of 150 million. Would you agree with that statement?
A. Yes.
Q. And on the first page, two-thirds of the way down the right column they show the intangible assets and they show goodwill and other of 200 million. Do you see that?
A. Yes.
Q. And so would it be a fair statement that goodwill represented more than half of the regulatory capital of the institution at that time?
A. Yes.
Q. I guess what's curious is that your

Page 109

perspective as a lender was focused on tangible capital for reasons you have explained at least a little bit. And yet at the same time in the role of regulator and president of the Federal Home Loan Bank of New York you approved an acquisition of a thrift that was described and was said to be in capital compliance by a substantial amount and that that was what AmBase was acquiring at that time.
Is the regulatory side of that approval cognizant that without its goodwill the thrift would fail its capital requirement?
MR. LEVITT: Objection as to relevance.
THE WITNESS: I'm not sure that that's the case. Is that the case? 169 was its regulatory requirement.
BY MR. HUME:
Q. Right. And it's capital level is 321. So without its -- I'll represent to you and I have a document to help show you that of the 200 million in goodwill, at that time roughly 182 million was based on contractual supervisory acquisitions.
MR. LEVITT: Is there a question.
MR. HUME: I'm clarifying the question.

Page 122

project in the works and there was -- I don't think FIRREA had been discussed yet. But there was a sense that goodwill may be taken away and, therefore, we're going to need someone with a deep pocket to come in and replace it?
A. No.
Q. But rather it was simply that --
A. More capital is better than less capital.
Q. Okay.
A. In fact, I recall a conversation with somebody else who was wondering about -- he didn't want to be embarrassed by appointing this to a position if Carteret was going to be taken over. And I recall that I said, well, AmBase will just put more money in if they need it. Was I wrong? Yes, I was wrong.
Q. That's something you recollect before FIRREA or after FIRREA?
A. Before FIRREA.
Q. Wouldn't it be fair to say that the passage of FIRREA is the largest single factor in terms of what changed your perception from the actual reality in that the amount of capital that AmBase was then required -- would have needed to

Page 123

put in to replenish Carteret's capital was way beyond what was expected at the time of the acquisition?
A. I don't have any direct knowledge after FIRREA. I mean, I don't have -- I'm telling you I don't have that much direct knowledge of the case while I was principal supervisory agent. After FIRREA, I wasn't. I'm going on my perception.
Q. Look at Page 8, if you would, where it discusses the net worth maintenance agreement and the dividend limitations. It states that the present Bank Board's policy is that a holding company -- do you see where I'm reading?
A. Yes.
Q. -- must agree to maintain the insured subsidiary's net worth at required regulatory levels for as long as it controls the institution. HGI has expressed its unwillingness to execute a standard maintenance agreement. Reasons include HGI's implicit obligation as a public company to support Carteret's viability; the adverse view of its insurance regulators to perpetual and infinite support; creditor's interpretation of net worth maintenance as a, quote, unquote, guarantee within the meaning of various outstanding debt

Page 124

instruments.
If you skip to the next paragraph, it states: As an alternative, HGI proposes a prenuptial agreement to infuse up to 50 million in additional capital if Carteret falls below its regulatory requirement and to give FSLIC the right to vote and dispose of Carteret's stock and remove Carteret's board if capital falls below 1 percent of liabilities.
So do you remember that limitation on the net worth maintenance promise?
A. Not specifically, no.
Q. Is it consistent with the general perception you remembered?
A. Yes.
MR. LEVITT: Objection. Vague.
THE WITNESS: Yes. Because we had -- as I said earlier, my perception was that if we agreed to this and the next page says 2 percent. But the recommendation was that we approve it based on a 2 percent net worth maintenance, that we could call for additional capital from AmBase.
BY MR. HUME:
Q. Up to a $50 million limit though; isn't that clear?

Page 125

MR. LEVITT: Not if they wanted to keep the institution.
THE WITNESS: Not if they -- it is not -- again, in terms --
MR. HUME: May I just state for the record that we're disposing Brian Dittenhafer and not Mr. Levitt who just gave an answer to one of my questions.
THE WITNESS: My answer would be if we had a business organization that was going to put $50 million into a savings institution, it was my assumption that if a few more million were required that that would be forthcoming despite the limitations.
These were presented to us as limitations. As I read the document, they were presented to us as limitations to the insurance regulators. And they might have even been stated that way in here. But they were limitations which a company acquiring an institution like Carteret would say, well, if it takes a couple more million, we'll put the couple more million.
Q. Right. In that vein even without a capital maintenance promise of any kind, there could still be some expectation of capital

information after the separation. And, therefore, after the separation we had nothing to talk about as far as the institutions were concerned.
Q. Do you remember any of Angelo Vigna's views towards Carteret specifically?
A. I couldn't characterize them.
Q. In general, did Angelo Vigna share your view as to the poor public policy connected with FIRREA and its elimination of goodwill on balance --
A. I honestly don't know that. I honestly don't know that. But, as I said, our relations were somewhat strained. I don't know how he felt about it.
Q. And none of what we've talked about today has refreshed your recollection to know how closely he did or did not work on the '88 acquisition?
A. I have no idea how closely he worked on it.
Q. Do you remember Russ Meyer?
A. No. I have no recollection of an individual by that name. Should I have?
Q. Probably not. If you turn the page, you'll see his name or at least I think you will.



Turn two pages and I think you will see his full name, Russell J. Meyer.
A. No.
Q. You were looking at the date of this document earlier and you were recollecting at what point you had lost your privilege of having access to these documents.
Do you remember connected possibly to that shift a policy shift in how thrifts were examined in light of the -- at that stage impending passage of FIRREA?
A. I don't believe anything significantly changed until after FIRREA. The supervisory agent examiners were all still physically housed in the same place. I think until after the passage of FIRREA nothing much changed. With the passage of FIRREA obviously a lot changed. But until the law was actually enforced nobody really knew exactly what was going to transpire. So I don't think much changed.
Q. Would this be the first 1989 report of examination you ever looked at?
A. Yes. So a lot changed. I told you at the outset I'm not privileged to this.
Q. I understand.



When you say a lot changed, regardless of when, but when you say that it did change, do you mean simply the rules were different or was there, in addition to different technical rules, a change in attitude and approach?
A. What I was referring to was a change in attitude and approach. Clearly the Treasury Department felt as though the relationship of the regulator who was also the lender and, let's face it, a booster for the savings and loan industry at that time was inappropriate.
And, therefore, if you suddenly -- if you're suddenly no longer a bank employee and perhaps even when you're still a bank employee but you believe you're suddenly going to be part of the Treasury Department, your attitude changes. And suddenly maybe you're a lot tougher.
What I was speaking of, because I have no direct knowledge of the technical part of the supervision after that point, the attitude certainly changed. That's what I was referring to, to the attitude change.
Q. In what way did you personally get that sense or come to know about that?
A. From dealing with the individuals



themselves just in casual conversations. I said they occupied the same work space actually for another year after that, mostly for another year after the passage of FIRREA. So I saw them in the lunchroom and in the hallways in the same way that I had before.
Obviously they didn't brief me and I didn't concur. And I didn't sign off on things. That, and also the reports that I was getting from the industry people that I talked to -- when I say reports, I mean conversations I had with the industry people gave me that impression.
Q. Well, what is your impression now that you've look at your first 1989 report of examination which was, again, completed according to the third page here on May 22nd, 1989? So a couple of months before the legislation was passed.
My first question is really a mundane one. It's 64 pages long. If you can reach to your 1988 report, I think it was a total of 11 pages -- it's going to seem the same. That's because it has the appendix with that. I'm sorry to make you reach into that pile.
A. I can weigh them.

Page 138

Q. Don't weigh them because that's deceptive. Look at the text because you have a huge appendix attached to the '88 one. If you look where the appendix begins, the appendix goes 11 pages, the '88 report.
A. Okay.
Q. This is without appendix and it goes 64 pages. If you want to take a minute, you can see it's essentially analogous in its structure in that there is an asset quality section, a management section, a capital section, an operation section and yet almost six times the length.
Am I making a mountain out of a molehill or does that strike you as indicative of a change in attitude and approach?
A. It's hard to say -- I'm reading the report now on the first page and the conclusion is Carteret has serious financial problems, with core operating losses over the last four quarters and declining asset quality resulting in a strained capital position.
Four quarters of losses would result in a larger document as well.
Q. How about a loss of $180 million in

Page 139

capital, would that result in a longer document as well?
A. I don't think that loss had occurred yet.
Q. Let's turn to the first page.
A. Page 1 of the report itself?
Q. Yes.
A. Last three digits are 595 on protective order.
Q. Correct. At the top of the page it says: This is a full scope examination with emphasis placed on those items of concern noted in the previous report of examination and other areas deemed to be of concern.
Some of those areas included the takeover of the institution by AmBase formerly the Home Group, a noted deterioration in the quality of the loan portfolio and the adequacy of loan loss reserves, net operating losses in the four previous quarters and the adequacy of CSB's capital position particularly in light of the recent legislation of FIRREA.
A. The legislation wasn't signed until August 14th, was it?
Q. I'm aware of that.

Page 140

A. Somebody retyped that first page quickly.
Q. Well, more than the first page.
A. This is -- obviously they have gone from what would be considered a pretty decent supervisory position to somebody's judgment they're less than an adequate supervisory position.
Q. My questions to you are essentially going to be to look at this document and ask you to see what role you think the change in capital compliance rules had in that drastic drop from being a two to a four.
And if you turn to --
MR. LEVITT: When you say capital, do you mean the November regulations.
MR. HUME: You'll see what I mean in one second.
BY MR. HUME:
Q. Look the Page 46 for one second.
Read at the top of the page you'll see it's a description of what it says will be the impact of the new legislation. It reads that as reported on the institution's TFR as of June 30, 1989, regulatory capital totaled 310 million or

Page 141

4.4 percent of total assets. As of the same period, the institution's regulatory capital requirement was $205 million.
The institution's RAP capital level exceeded the regulatory requirement by $104.9 million. However, as a result of the examiner's asset classifications, approximately 24.6 million in loss classifications will reduce the institution's regulatory capital to 286 million which represented 4 percent of total assets.
This reduced level still exceeds the aforementioned capital requirement by $80 million but the RAP capital to total asset ratio compares unfavorably with the peer ratio of 4.7 percent.
Then go to the bottom of the page it has a FIRREA section which begins with the tangible capital discussion which lasts for several pages and then it goes on to discuss risk base and what it calls leveraged capital and this goes all the way through --
MR. LEVITT: Is there a question.
MR. HUME: There is certainly a question.
BY MR. HUME:
Q. The question is if the regulatory

Page 142

capital level was still $80 million above the requirement, would it have been likely that the institution would have dropped from a two to a four in one year's time?
MR. LEVITT: Objection on the ground that there's no foundation for the question. The material you read pointed out at least six problems with the institution. Any of those problems could have dropped it from a two to a four.
MR. HUME: The material was read for that purpose.
MR. LEVITT: What is your question? Is your question does he know that it wouldn't have dropped from a four if they didn't anticipate in November the requirements would change.
BY MR. HUME:
Q. The question is whether or not it's likely that an institution with an $80 million capital cushion would be viewed to be near or immediate term danger of failing?
MR. LEVITT: Where does it say near or immediate term danger of failing. I object to the question on the ground that it seeks speculation and it's a nonsensical question.

Page 143

BY MR. HUME:
Q. You can still answer the question.
MR. LEVITT: If you can.
THE WITNESS: The numerical rating dropping from a two to a four could come from a number of problems. There are two of them that I can think of offhand. One is the fact that they had four quarters of core operating losses which was stated in the conclusion here. And, also, in the portion that you read there was an additional write down of some loans of 24 or $26 million.
So that would certainly tend to drop the institution's rating. However, probably the fact that it drops from a two to a four rather than a two to a three, if that's what, in fact, happened, comes from the capital, the drop in capital, the precipitous drop in capital and the fact that they may not make the FIRREA minimum tangible capital requirement. There are factors involved.
Which one of them weighs most heavily, I have no way of knowing. But all three of those would be factors in this. Certainly to say it's in danger of failing which I don't know if it says that or not, but if that's the way it's

Page 144

characterized, imminent danger of failing, it would be because they couldn't meet the minimum FIRREA capital requirements.
BY MR. HUME:
Q. Can you look to Page 49 where it shows their analysis of Carteret's likely tangible capital and tangible capital deficiency which shortfall from the tangible capital requirement of FIRREA after the loss of its goodwill and it shows two different numbers depending on which quarter it is. But in both of them, as you'll see at the bottom of the page, it's greater than a hundred million dollars short fall of tangible capital.
Does that not describe an institution that is extremely different from the institution that would have $80 million in excess capital.
MR. LEVITT: Objection. It's comparing apples and oranges.
THE WITNESS: I think we're talking about regulatory capital with the excess capital, were we not.
BY MR. HUME:
Q. Isn't tangible capital a form of regulatory capital?
MR. LEVITT: As well as other elements.

Page 145

THE WITNESS: I'm having trouble answering because I'm not clear on the two things we're comparing here.
MR. HUME: May I ask counsel for the Department of Justice to articulate his legal objections as such and not to suggest --
MR. LEVITT: There is no foundation for your question. I object as to form and I object as to relevancy and I object that it's unintelligible.
THE WITNESS: The 80 million you referred to, may I ask, referred to what? The regulatory or tangible capital.
BY MR. HUME:
Q. The $80 million on Page 46 refers to the excess over the requirement that Carteret had even after taking the regulator's recommended write downs. Please review that first paragraph which describes that on Page 46.
A. So you're taking the 24.6 million from the 104.9 million and saying it has a few million dollars in excess?
Q. Yeah. And the document itself does that. It says this reduced level still exceeds the aforementioned capital requirement by $80

Page 150

Q. Would you have expected that AmBase would have been willing to sign on to a $50 million or possibly greater net worth maintenance agreement if they had known that the bank could fall out of capital compliance over night as a result of new legislation?

MR. LEVITT: Objection. Seeks speculation.

THE WITNESS: I really can't. Because, as a banker, I've already stated in this deposition that I was looking at tangible capital because I knew that supervisory goodwill could go away at least on a perspective basis.

Now obviously I didn't feel as though it should be taken away after the fact, after a contract was signed. And that's why I wrote the letters that I did about it and that was why I've always had that position about it. But perspectively it can go away. And if it can go away perspectively, then you have to factor that into your business judgment, I guess.

That's my answer. Without elaborating on that -- I don't know how I can elaborate on it.

BY MR. HUME:

Q. Let me see if I can ask one or two more

Page 151

questions on it. You had discussed earlier in the deposition the different perspectives of a lender and a regulator towards capital in general and supervisory goodwill in particular.

And isn't it the case that even as a lender or an investor you rely to some extent anyway on the strength of an asset -- on the strength of supervisory goodwill as an asset that will be counted as capital even though when there's a run on the bank it may not be easily transferred into cash that can satisfy that run?

Doesn't supervisory goodwill have value to the lender even though it may not be able to be sold in a liquidation?

A. I never considered it as a lender to have value. And I am aware that other lenders felt very much the same way about it and looked at tangible net worth rather than supervisory net worth when they were evaluating whether to make loans to these companies.

My feeling was at the time that the private sector lenders were probably in a better position to rely upon supervisory goodwill because I felt as though if Congress were going to change the rules on this, they would be more likely to

Page 152

change them to the disadvantage of the Federal Home Loan Banks, a Government entity and somebody who should have known all these things. And at the same time say, well, the private sector company they didn't have access to supervisory documents. They didn't have da, da, da. Therefore, they will get paid and the Federal Home Loan Banks won't.

That's why I was so careful as a lender to be only concerned with tangible net worth. And that's why I'm saying the things I'm saying about the value of supervisory goodwill as a lender.

Q. Right.

A. But private sector lenders didn't place much value on it either.

Q. We will come back to private sector lenders in just one second.

Just as a follow-up to that. You say you would place no value in it and yet isn't that position at least slightly in tension with or at odds with the view that the loss of that supervisory goodwill caused many banks to go under and to be seized? In other words, isn't there at least a value in stabilizing the institution and doesn't that redound to the benefit of the lender?

Page 153

A. Yes.

Q. So in that sense there was value in it from your perspective, even your perspective as a lender?

A. Yes. The thought the position was a correct one to keep the institutions going. Remember, the origin of the problem for most of the institutions in the second district, their earnings problems were not because they made bad loans. They were because they had made 30-year loans at interest rates which were then below market and this ate up their capital.

And my feeling was, and I think the feeling of most of the people around the country when they had institutions they were regulating like that, was that if you can sustain these institutions with supervisory goodwill with these -- I'm sure there were other accounting gimmicks that aren't coming to my mind right now -- that if we could sustain these institutions, that they could work their way out of this problem by making new loans at current market rates and being able reinvest the principal from their old loans at current market rates and they would work out of this problem.

Page 166

Do you recall testifying that the role of principal supervisory agent was a role that entailed influence and power, in effect, I think was the word you used?
A. Yes.
Q. And did that relate to the fact that under the statutory regulatory scheme when thrift institutions needed to do certain things or desired to, they needed to get the approval of the regulators in many instances?
A. That's correct.
Q. You also talked about supervisory acquisitions. Do I understand that a supervisory acquisition to be one where an insolvent thrift needs to be resolved and the regulators try to deal with that by seeking healthy thrifts to come in and takeover the insolvent thrifts? Is that one definition of a supervisory acquisition?
A. Yes.
Q. Now did regulators in the second district affirmatively make suggestions to some healthy thrifts from time to time to seek their assistance in taking over less healthy ones?
A. Yes.
Q. In the end, however, is it your

Page 167

estimate that it had to be a business decision that the healthy thrift would make whether or not to takeover the insolvent one?
A. In the end, yes.
Q. Do you recall we talked a little bit about the Delray acquisition that Carteret made in 1982?
A. Yes.
Q. And you talked about interstate branching rights as part of that acquisition. Do you recall that?
A. Yes.
Q. What does that mean exactly? What was the value of interstate branching rights?
A. At that time no bank was allowed to branch outside of its own state. And, in fact, it wasn't long before the Delray acquisition that no thrift was allowed to branch outside of its own state.
So that for an institution like Carteret headquartered in northern metropolitan, northern New Jersey, metropolitan New York where a lot of its customers might retire to Delray or in that part of Florida, this ability had some value. To be able to branch, interstate had some value.

Page 168

It's some probably had some advertising right just to be among the first. It certainly had value in and of itself, the ability to branch interstate.
Q. Was the net result of the Carteret acquisition of Delray that Carteret organized a Florida division? Do you recall?
A. I don't recall specifically. I assume they did.
Q. Do you recall whether there was competition among other solvent institutions to bid on and win Delray?
MR. HUME: Objection. The witness has testified he doesn't remember this transaction.
THE WITNESS: That's correct. I don't recall that specifically.
BY MR. LEVITT:
Q. Now when you spoke earlier in your testimony about the principal supervisory agent having approval authority and, therefore, being in a position of some power within the district, was all that approval authority in rubric of regulations, staff did its reviews and so on and so forth?
A. Yes. The principal supervisory agent was the agent of the FSLIC in the district and

Page 169

there were certain delegations and they had to be within regulations, et cetera.
Q. And did all decisions have to be justified in written memoranda, all substantive decisions have to be justified in memoranda?
A. Yes. I would say all substantive decisions had to be justified in memoranda as we have seen today with the various memorandum of analysis and concurrence. Certainly in retrospect you had to be able to defend a decision after it was taken because you might be challenged on it.
Q. I'd like for you to refer for a moment, if you would, to what's been marked as Exhibit 8 which is the O'Toole memorandum. And I'd like you to turn to Page 12 of the memorandum, please. In Section 18 it says accounting issues. Do you see that?
A. Yes, I do.
Q. It says that the applicant certified public accountant has submitted an opinion concurring that push down accounting will not be applied in the preparation of Carteret's RAP or GAAP financial statements.
Do you know what that means?
A. I did at the time. I'm trying to

Page 206

the examiner-in-charge there was a requirement that Carteret write down a large portion of its consumer loan portfolio?
A. I don't have a specific recollection of that. I guess that was the document we looked at. I don't have any personal recollection of it other than that.
Q. Do you recall that document indicating that prior to the examination there were four consecutive quarters of operating losses?
A. Yes.
Q. Do you know why the savings bank incurred four consecutive quarters of operating losses?
A. I do not.
Q. Was that a bad sign for the institution from a regulators point of view, that is, that the business of the institution was not on a good footing at that point?
A. I'm trying to recall '89. I don't have a firm recollection of it. No.
Q. Okay.
A. I'm afraid I spent a lot of '88 in Washington.
Q. Let me just take a two-minute recess

Page 207

and then I will review my notes and wind up.
A. Okay.
(Recess.)
BY MR. LEVITT:
Q. I want to wind up by just asking you to look once again at Exhibit No. 9 and I'd like you to turn to Page 1.
A. Page 1.
Q. This is the May 22nd, 1989, ROE. I'm asking you to look at Page 1 which is Bates No. 0339594.
MR. HUME: Sorry. This is the '88 or '89?
MR. LEVITT: '89 unless I mis-marked them.
THE WITNESS: No. That's correct.
MR. HUME: What page is that?
THE WITNESS: It's Page 1, 9594.
BY MR. LEVITT:
Q. If you'll look at Paragraph 1 on that page, I'll represent to you that the examiner is commenting on the following: That Carteret had a plan whereby it paid former directors who were not inside directors but outside directors retirement money or a stipend and the examiner is saying he

Page 208

didn't know whether that was legal and the OTS ought to look at that.
Do you see that in Paragraph 1?
A. Yes.
Q. Do you recall that issue or that controversy about whether those payments for former directors who were involved anymore with the bank were valid or invalid?
MR. HUME: Object to the characterization of the facts.
BY MR. LEVITT:
Q. You can answer. My question is do you have a recollection of that issue?
A. I don't have a recollection of that issue as it regards Carteret. I would say it was not terribly unusual.
Q. You would say it's not terribly unusual for a savings institution in the second district to make payments to former directors?
A. As part of a retirement program, no, it's not unusual. In fact, in the early eighties we encouraged such things to get new blood onto the boards, to get old directors off and new blood on.
Q. Do you recall other institutions in the

Page 209

second district who did that?
A. I couldn't give you a specific name. But, as I say, I don't think it was an unusual practice because the purpose was to encourage these people who were hanging on and barely -- sleeping through the meetings to get off and get useful directors on there. That was the purpose. The stipends were usually relatively small.
Q. Did the second district have the power to insist that an outside director would be removed from the board if he was sleeping in a meeting?
A. I don't think --
Q. And there was evidence of that?
A. I don't think we did that.
Q. If you'll look at Paragraph 2?
A. Management fee to the holding company?
Q. Yes.
A. The examiner demands that the payments be stopped. I asked you about whether you were aware of payments to either Carteret Bancorp which we've seen is a shell or to AmBase and you didn't recall that.
Does this refresh your recollection that there were payments from the savings bank to

Page 218

acquisitions?
A. No. People try to induce me into business deals every day. It's a business deal. You still have a look at the bottom line.
Certainly in a regulated industry the position of the regulator is going to influence that decision but basically people have to do what they think is best.
In the one instance I outlined about Bekin Federal Savings Bank and Bekin Savings State Charter, the acquirer simply said no. Take your problem elsewhere. That was his decision that he would in the long run be better off if he had the goodwill and the principal supervisory agent on his side.
Q. In short you would agree that the business decisions in supervisory acquisitions that involves supervisory goodwill rested in part on the ability to treat that supervisory goodwill towards regulatory capital?
A. That's true.
MR. LEVITT: Objection. Asked and answered.
MR. HUME: Did you record the witness's answer?

Page 219

BY MR. HUME:
Q. Okay. Then there were some questions that counsel for the Government asked you about the IPF purchase. Do you have any independent recollection of IPF?
A. No.
Q. You don't remember the name or the company?
A. No.
Q. And, therefore, is your knowledge of that transaction limited to what you saw in the documents today?
A. That's correct.
Q. You testified -- strike that.
Counsel for the Government asked you if the excess over book value paid by Carteret for IPF was a drain on capital. And it was to be, as the document showed, to be treated essentially as a dividend and you answered yes.
Can I just ask you. Did your testimony, your affirmative answer to that question mean that it was a drain in that it caused a dramatic drop in capital or did it simply mean that it reduced capital?
MR. LEVITT: Objection. Lacks

Page 220

foundation and mistakes the prior testimony. We talked about $12 million.
THE WITNESS: My response was that the $12 million had to come from some place in capital. As I recall, I did not specify where. It has to come from some place. It has to come from capital. I don't recall whether it was tangible or intangible capital. I'm not enough of an accountant to be able to do it off the top of my head.
BY MR. HUME:
Q. My focus is on counsel's use of the word drain and whether or not you intended your testimony to signify a recollection you have that there were dramatic drops in Carteret's capital position due to money flowing up to AmBase?
MR. LEVITT: Objection. Misstates the testimony and lacks a foundation. Again, we talked about a $12 million drain.
THE WITNESS: I have no specific recollection of the $12 million itself or that this was a particular drain at the time.
MR. HUME: I just would like to object to counsel's objection stating that we spoke about a drain. He spoke about a drain.

Page 221

BY MR. HUME:
Q. And while we're on the subject of drain, I'm going to ask you one or two more questions. The same characterization was used by the counsel for Government with respect to compensation paid to AmBase as a management fee. Do you recollect that question?
A. I recollect questions about it. As I recall, I didn't have a specific answer for that.
MR. LEVITT: Objection to the extent it's implying that the word drain was used on that. I don't recall the word drain although it's not inappropriate.
BY MR. HUME:
Q. And do you recall testimony and questions relating to the flow of capital from AmBase to Carteret versus from Carteret to AmBase and your testimony that you had a general -- you have a general recollection of having the perception at the time of the acquisition that one of the major attributes and benefits of it will be AmBase's ability to provide capital support and for there to be a flow of capital from AmBase to Carteret.
And you have testified today that, as

Page 226

Charles O'Toole's memorandum.
Does that suggest to you that it was an acquisition that raised special concerns?
A. No, not necessarily. Carteret had been an institution which had a number of different transactions. Some of them probably did involve the FSLIC -- no. It would not signify anything specific.
Q. And do you have any recollection of any holding company that refused to pay in money under a capital maintenance agreement after the passage of FIRREA?
A. I wouldn't have any specific recollection. No.
Q. You testified earlier that you agreed that there was a shared assumption on the part of AmBase and the regulators in entering into a capital maintenance agreement that supervisory goodwill will be counted towards regulatory capital. Do you recollect that and have I characterized your testimony correctly?
MR. LEVITT: Objection. Misstates the testimony.
THE WITNESS: Would you restate it?
BY MR. HUME:

Page 227

Sure. I was recollecting your testimony that you had stated affirmatively that there was in your recollection -- that it would be fair to describe the regulators and AmBase as having a shared assumption in entering into the capital maintenance agreement that supervisory goodwill will be treated towards regulatory capital?
MR. LEVITT: Objection. There hasn't been testimony on that at all. If you want to ask him the question.
BY MR. HUME:
Q. Let me ask you the question. Maybe I'm recollecting it incorrectly. So let me ask the question.
A. I don't think the question was asked directly that way.
Q. Maybe the question was asked that in approving the transaction did the regulators as well as AmBase operate on that assumption?
A. Yes.
Q. And let me -- and I believe you did answer yes to that?
A. Yes.
Q. So le me now ask a further related

Page 228

question which is in entering into the capital maintenance agreement did AmBase and the Government -- would it be fair to say that they operated under the shared assumption that supervisory goodwill will be counted towards regulatory capital?
MR. LEVITT: Objection. He said he had no involvement in the negotiation of the agreement and it calls for speculation.
You can answer it if you can but no speculation, please.
THE WITNESS: I have no first-hand knowledge of it. My assumption would be yes.
BY MR. HUME:
Q. And you would base that assumption on what you've learned today about that transaction?
A. No. I would base that assumption on what I know about how these negotiations were conducted with institutions over the years.
Q. And is that the basis for your assumption about mind set of the regulators in approving the transaction in general?
A. Yes.
Q. And would the same assumption also state that there would be an expectation that if

Page 229

the supervisory goodwill were eliminated, that AmBase would not be required to pay in the $50 million?
MR. LEVITT: Objection. Calls for a legal conclusion. Speculation. Again, he has no personal knowledge. He has said that two or three times.
THE WITNESS: No way.
BY MR. HUME:
Q. Was there at least -- would it at least be fair to say that it would be your understanding the regulators at that time understood that if supervisory goodwill were not counted towards regulatory capital, that would harm not only Carteret but also AmBase?
A. If supervisory goodwill were not counted capital that would harm --
Q. -- both Carteret and AmBase.
MR. LEVITT: What's the question again?
THE WITNESS: Is that my understanding or is that my assumption?
BY MR. HUME:
Q. Would it be fair to say that?
A. Yes.
Q. Counsel for the Government asked you

whether you have any recollection of this being a highly leveraged transaction to which you responded you had no independent recollection of that; is that correct?
A. That's correct.
Q. Can I refer you back to the O'Toole memorandum on Page 6.
A. That's Exhibit No. 8, Page 6.
Q. Yes.
It states under Paragraph 4 there or Section 4 it says: Due to various restrictions in HGI's present loan agreements, the subject transaction requires a complete restructuring of HGI's outstanding debt. It then goes on to show that restructuring and the sale of senior debt of $145 million.
Would it at least be fair to say that the person who did the work underlying this memorandum which is Charles O'Toole plus potentially another supervisory agent would have understood that this transaction was highly leveraged or at least significantly leveraged?
A. Significantly leveraged. I would point out though that they're talking about senior subordinated debentures. As I recall at that time



subordinated debentures counted as capital and maybe they still do.
Q. There is also a bank term loan of $250 million?
A. Right.
Q. And an extensive discussion in the paragraphs above Section 4 of the funds needed to cover debt service over a short-term period.
MR. LEVITT: I object to this line of this questioning because you're asking him to try to figure out what the writer of the memorandum had in mind. And he said he can't do that. I mean, I think he's answered these questions already.
BY MR. HUME:
Q. I'm simply asking whether your testimony about not recollecting it being highly leveraged means that you don't think it was highly leveraged?
A. I have no independent recollection at this time of the leveraging arrangements involved here.
Q. One way or the other?
A. One way or the other.
Q. You had referred to no doc loans. Did



you say they were or were not per se unsafe and unsound?
A. I considered them to be per se unsafe and unsound.
Q. But notwithstanding that you had had experience where they had actually been profitable?
A. For example, Greenport Savings Bank in New York had a long history of making no doc loans to be profitable.
Q. And was your consideration of their per se unsafe and unsoundness an official policy or simply your view?
A. When any institutions making those kinds of loans was brought to my attention, they received a supervisory letter suggesting at least that they cease and desist with the broad implication. If they didn't take the suggestion, stronger words were to follow.
Q. Counsel for the defendant asked you about the risks assumed by AmBase when they acquired Carteret. Do you recollect those questions?
A. I'm sorry. Would you repeat the question.



Q. Counsel for the defendant referred you back to the annual report of Carteret and calculated out with you the equity less goodwill and compared that to the purchase price and then asked you about the nature of the risks of the acquisition for AmBase.
Do you recollect those questions?
A. Yes.
Q. And you answered that there were no Government guarantees associated with this transaction. Do you recollect that?
A. Did I say that?
Q. You said that the Government didn't make a guarantee in approving the transaction, that Carteret's accounting records were --
A. Okay. I'm saying the Government did not guarantee the accounting records. That's what I intended to express.
Q. Okay.
A. We didn't guarantee anybody's accounting records except our own.
Q. Would it also be fair to say that when you spoke about the risks assumed by AmBase and not by the Government that you did not intend to include in that statement that AmBase took the