Michael Edward Finn June 9, 1999

Jersey City, New Jersey

*Page 1 to Page 265*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

## Page 13

He stated that he has an understanding of accounting, and I think your questions are more in the nature of asking for an expert opinion.

Q I am not asking for your expert opinion, I am trying to understand the way you understood and viewed and perceived a thrift balance sheet which you were reviewing in the course of your job, and which obviously was central to your job, as well as this asset of goodwill.

I am asking to understand if you are asked to compare it in your mind how you think about it, not what's expertly correct from an accounting perspective, and what the PhD's in accounting would say, but how you understand it, if you see a patent on a balance sheet, it's an intangible asset, do you see that as something that's different from an intangible, like goodwill?

A I wouldn't -- I don't know how patents are treated. I have never come across it on a thrift balance sheet.

Q What about goodwill, where an acquirer pays in cash more money than the book

## Page 14

value of an acquired thrift, have you ever seen that before?

A Yes.

Q And that's called goodwill on a balance sheet?

A Correct.

Q And that's essentially what supervisory goodwill was called on a balance sheet?

MS. FRANK: Objection, these are asked and answered. He's already given you his definition of goodwill and supervisory Goodwill.

Q You can still answer.

A As I mentioned before, goodwill is goodwill.

Supervisory goodwill just designated as a point in time within the thrift industry.

It was specific, I guess you could call it a regulatory accounting principle, as opposed to a generally accepted accounting principle, but goodwill was goodwill.

It was the difference between the value of the assets and the price that was paid, or the value of the institution and the price that

## Page 15

was paid.

MS. FRANK: Counsel, before we go further, there is one preliminary thing I forgot to say at the beginning of the deposition.

The government's position is that this deposition should be treated as attorney only work product for purposes of the litigation. I just wanted to get that on the record, that that's the government's position.

MR. HUME: I am not sure I understand that point. It was made in a prior deposition.

MS. FRANK: With respect to the treatment, what -- the use of the deposition and that its use is similar to attorney only product, so that it is not released out to the public.

That's my understanding, without discussion and agreement of the parties.

MR. HUME: My understanding is that it is a deposition that's an out of court statement under oath, that would be admissible in court for all the standard

## Page 16

reasons that would allow out of court statements under oath to be admissible under the standard rule of Court of Federal Claims and the Federal Rules of Evidence.

I'm not saying that's inconsistent with what you are saying, I'm saying I want my understanding to be on the record.

MS. FRANK: It's on the record.

MR. HUME: So I can continue?

MS. FRANK: Yes. I meant to say that at the beginning beginning, and we running late because of the court reporter, so --

Q Can you explain to me now just a few very general questions I have about the way you did -- the way regulatory exams and supervision worked.

There are a few terminology and concepts I wanted to understand at the outset. One of them is the concept of a MACRO rating, can you explain what that means?

A The MACRO acronym stands for management asset quality capital risk management and operating results.

It's similar to the CAML rating that

## Page 33

GAAP would have not allowed them to record the goodwill.

I think it was just the time frame for amortization that would have been different.

Q What is your general recollection of the institution I alluded to earlier, Carteret Savings Bank?

A A Morristown based $5 or $6 billion institution that was very much part of my caseload at that point in time.

Q So you remember it quite well?

MS. FRANK: Objection, that's not his testimony.

Q It's a question, do you remember it quite well?

A I remember very much of it. Not specifically in detail, but just in broad terms of dealing with many people and issues.

Q I am not trying to trap you on your memory, I just wanted to understand, we have some documents here that may refresh your recollection.

But just siting here today, what is your earliest recollection of Carteret?

A Being assigned that in my caseload circa 1989, and just trying to become familiar

## Page 34

with what was going on at that point in time.

Q *Do you have a recollection of it at* that time as especially strong, weak, troubled, not troubled?

MS. FRANK: Objection as to form.

A My recollection at that time was there was an ongoing examination, I believe it was being performed by Russell Meyer, which had adverse findings.

So at that point we knew that there were issues -- that it was an institution that was going to warrant concern.

I don't recall what the exam rating was prior to Russell, Russell Meyer's examination, and I don't even recall what his rating was, but that's about the time frame.

Q Were there any particular regulators that you remember as having worked on Carteret or having special knowledge of Carteret at any time?

MS. FRANK: Objection as to form.

A Are you talking within OTS?

Q Could have been -- no, I mean generally, government regulators that spring to your mind when I mention the institution Carteret?

A The regulators that would come to

## Page 35

mind are us as the primary regulator and the FDIC.

Q I'm sorry, individual regulators.

A With Carteret, the stream of people involved with Carteret during my tenure was Scott B. Smith, who was the, I guess, team leader when we were with the Federal Home Loan Bank, field manager when it became OTS.

Russell Meyer, as I mentioned, EIC the 1989 exam, Tom O'Rourke I believe was the EIC of the next two exams and very actively involved in the on-site work.

John Griffin, who is a supervisory agent when we were with the Federal Home Loan Bank and was the AD on the case when we came here to OTS.

Joe Kehoe, I believe was another Assistant Director who had limited involvement with Carteret, at a time when John's caseload had shifted.

Q John Griffin's?

A Yes. Because of its scope of operation and size, obviously senior management at OTS and the FHLB was party to many discussions on Carteret, including Mike Simone, Bob Albanese, Angelo Vigna, and then our regional counsel's area

## Page 36

would be involved as well.

*From the FDIC primary contacts in* dealing with Carteret would have been Bill Pollack, a review examiner based out of the office and Dan Deon. I don't know what his title was at that point in time, but he was a senior regulator with the FDIC.

Eventually Mike Zimorsky and Ketcha, Nick Ketcha became involved at the FDIC as well.

Q When do you remember stopping work on Carteret?

A I don't know specifically. It's a '91 to '92 range.

I know I was involved in '91, I couldn't tell you if I was involved in 1992, *because I was taking on field examination* assignments outside of Carteret at that point.

Q Can you just explain again, you may have already done so, exactly what the distinction is between the work you were doing as a supervisory analyst and as a field examiner, is that the correct term?

A Yes. When we were at the Federal Home Loan Bank we were split into two groups, supervision and examinations.

**Page 41**

they acquired Carteret, they signed on with an agreement that, in short, they would keep the capital above a certain level.
So, there was a sense of support that we expected out of them based on that agreement.
So their ability to make good on that agreement was important to us.
Q Do you recall how much AmBase paid for Carteret?
A I don't.
Q Would you have been likely to have known that at the time?
A Yes, I would have.
Q So at the time, do you recall when AmBase acquired Carteret, in what year?
A I believe it was 1987.
Q And you would have known that when you started -- you would have known the year it was acquired -- just let me tell you it was 1988.
A Okay.
Q And you would have certainly known at least the basic details of that acquisition when you started working on Carteret, is that correct?

**Page 42**

MS. FRANK: Objection as to form.
A I wouldn't have known when I first assumed the caseload, it was something I would have become aware of most likely reading through the examination reports, which would have talked about the arrangements.
Q And at that time you then would have known how much they paid, as you testified earlier?
A Correct.
Q Do you remember thinking that AmBase had paid too much for Carteret?
MS. FRANK: Objection as to form.
A No, I don't remember thinking that.
Q Or that they had made a really stupid investment?
A No, I don't remember thinking that.
Q Were you aware of AmBase's dependence on dividends from Carteret to help pay down and service debt in AmBase?
A Yes, I was.
Q And you were aware of the fact that those dividends would not be available after the passage of FIRREA?
A I don't recall specifically what the

**Page 43**

regulatory framework would have been.
It would make sense if it caused them to be undercapitalized, the dividends would be restricted, but I don't recall a specific regulatory framework.
Q So you would have started working at Carteret right around the time that FIRREA was either about to be passed or right after it was passed?
A Correct.
Q Do you remember any general change in regulatory attitude as a result of the passage of FIRREA?
MS. FRANK: Objection, vague.
A Not a change in attitude, no, I don't recall a change in attitude. A change in volume of work, but not in attitude.
Q Do you remember thinking that one of the major impacts of FIRREA was its impact on the treatment of supervisory goodwill?
MS. FRANK: Objection as to form.
A I do recall supervisory goodwill as being one of the -- one of the major components of FIRREA in terms of its impact on the thrift industry.

**Page 44**

Q And so the concept of supervisory goodwill would have been a concept you were familiar with even before FIRREA was passed?
A I was familiar with supervisory goodwill from the first month that I was working at OTS, because it was slightly different from the accounting that you would learn in college.
You knew supervisory goodwill was on thrift balance sheets.
The impact was not -- in 1986, you know, we didn't know FIRREA was coming, so when FIRREA came, I was aware of how much goodwill was out there and what the potential impact was.
Q Was it considered to be a suspect asset?
MS. FRANK: Objection, vague.
A Goodwill is an asset that if there is a high concentration, would cause general regulatory concern, because of its non-earning and intangible nature.
Suspect asset, I mean I don't know what you mean by that.
Q I guess I mean was there a general consensus it was basically worthless?
MS. FRANK: Objection, vague.

**Page 45**

The witness can testify as to his recollection, but he's not -- I will leave it at that.
Q That's all I am asking you for.
A I don't recall it in my recollection as being worthless.
It was an asset that had -- the value was not strongly supported in all cases, and was cause for a concern.
Whether or not it needed to be written off as worthless, I don't recall that being the case.
Q Do you remember thinking, or other people thinking or stating that wow, as a result of FIRREA some of these banks are really going to get whopped upside the head?
MS. FRANK: Objection as to form, compound and vague.
A People at OTS had an understanding that supervisory goodwill was going to negatively impact many institutions.
Q And some would be more sensitive than others, right?
A Depending upon the level of goodwill relative to capital.

**Page 46**

Q Do you remember Carteret particularly as one that would be especially sensitive to that?
A I don't recall at the enactment of FIRREA exactly what Carteret's goodwill position was relative to capital.
I know goodwill was a significant asset at Carteret, so it's likely it was a significant impact, but I don't know what its capital level was at the time they started with that.
Q In your experience, do you remember any banks that were completely put out of business as a result of the loss of goodwill?
A Put out of business, as in taken over by the RTC?
Q Essentially, yes.
A Yes, I do do recall banks being taken over by the RTC.
Q Would Carteret be one of those banks?
A If I can just clarify the question, because I don't recall exactly what you had asked. I do recall banks being taken over by the RTC, but are you saying specifically because of goodwill?

**Page 47**

Q Yes, my question was do you remember institutions that were put out of business or taken over by government regulators as a result of their loss of goodwill?
A Okay, and as I stated, I do recall institutions that were taken over because of their loss of goodwill.
In terms of with Carteret, I do recall them being taken taken over by the RTC, but not necessarily strictly because of their loss of goodwill.
Q Do you remember when they were taken over?
A December '92, I believe it was.
Q Is that from memory, or something that's been refreshed recently?
A I think it was mentioned yesterday, because I wouldn't have recalled that.
Q I would like to maybe show you some documents that may refresh your memory about that time period.
MR. HUME: I would like to mark this as AmBase Finn Exhibit 1.
(The above described document was marked AmBase Finn Exhibit 1 for

**Page 48**

identification, as of this date.)
Q I am not going to ask you to read the entire 1989 ROE, but if you look at Page 47.
MS. FRANK: Counsel, can we just have a second to look at the whole document and see what it is?
MR. HUME: Sure. Okay.
Q Let's turn to Page 46 and look down to the bottom, and you can read to yourself the paragraph underneath paragraph A, tangible capital, and then maybe read over to Page 47.
Read down the page, if you would like to familiarize yourself, refresh your memory.
A Okay.
Q Having reviewed that briefly, do you recollect being involved in the '89 exam?
A I don't recall specifically whether or not I did field work on that examination.
I know I visited the exam site for meetings and discussions, but I don't recall specifically whether or not I performed field work on that assignment.
Q Right, but you may have been involved in the traditional supervisory analyst role?

**Page 69**

A I think the periods were different, but yes, the numbers do look different.

Q Right, I am not asking for an exact comparison, because they are from slightly different time periods, but they both are capital calculations under FIRREA immediately after passage or soon after the passage of the new requirements.

Having reviewed this document, what are you remembering about whether or not Carteret was thrown out of compliance by the passage of FIRREA?

MS. FRANK: Objection as to form.

A Looking at the December 31, 1989 presentation by Carla O'Connor, they show compliance with tangible -- they show compliance with core and they show compliance with risk based capital as well.

Q And yet they were extremely out of compliance under the Report of Examination.

How do you explain that discrepancy?

MS. FRANK: Objection as to form.

A I haven't compared the two documents.

If you want, I can compare the

**Page 70**

periods and try to do a calculation as to why they are different.

Q It's Page 46 to 48.

MS. FRANK: I would like to caution the witness that it's his recollection of what the differences are; the documents speak for themselves.

If you have any recollection, though, of what difference, any recollection that would answer the question, then you should answer.

A I don't recall.

Q So, at this point you do not recall whether FIRREA made Carteret fall out of compliance under the capital requirements under FIRREA?

A Looking at this document, it brings back a memory that they did marginally comply based upon their own calculations as of December 31st.

But my specific recollection as to whether or not as of the enactment of FIRREA they were thrown out of capital compliance, I don't recall.

Q Do you remember it being an area of

**Page 71**

concern right around the passage of the legislation?

A Listen --

MS. FRANK: Objection as to form.

A Capital was a concern around the passage of the legislation at Carteret.

Q Would it impact a thrift's or an institution's capital rating and overall MACRO rating if its capital were barely in compliance as opposed to substantially in compliance?

MS. FRANK: Objection as to form; vague.

A It could have a very great impact on the rating.

Generally, if you were not within capital compliance I don't believe you could receive a 3 exam rating.

But if you were substantially or excessively out of capital compliance, you would probably not be able to receive a 4 rating, you would probably be given a 5, if the viability of the institution's capital seemed like it was in threat of an imminent failure.

Q Doesn't it help your overall rating if you are substantially in compliance, so that

**Page 72**

you have a large cushion to absorb future losses?

MS. FRANK: Objection as to form.

A Capital -- the adequacy of capital is very important, and it would help your rating, but you could have a 25 percent intangible capital ratio and still be rated a 3 if management was crooked or there were other issues at hand, there were other issues at hand that would cause us concern about the operating of the institution.

So capital doesn't necessarily save the rating, but it would have a big impact on alleviating it.

Q I understand all of these five factors contribute to the overall analysis, but isn't the ultimate concern in the base line thrust of all of the work that you are doing is to assess the security of the risk that the insurance fund has in this institution?

MS. FRANK: Objection as to form.

Q Isn't that the mandate of the regulators?

MS. FRANK: Objection as to form.

A There are two areas. If you talk about the broad concept of what we are here to do, yes, it's to protect the insurance fund.

Page 137

for it.

Q Really? You think it will not impact the price for an asset you will get if you are forced to sell it?

A If you have a willing buyer and a willing seller, you are going to get market value, you should get market value for it.

If you are selling in a depressed environment you might not be able to get the highest market value you would hope to get for it.

Q If you are forced to sell assets in order to meet your capital requirements and -- assets that you would not otherwise sell, isn't it true that you are likely to have to take a hit on the price that you get?

MS. FRANK: Objection as to form.

A You are going to be able to sell an asset or liability at market value when you go to sell it.

It's going to be determined by what the market condition is at the time you are selling.

Q Right, but if you have to sell an asset by a certain deadline in time and you have no ability to wait beyond that time, isn't that

Page 138

going to affect your ability to get the price you really want and the price you really deserve?

MS. FRANK: Objection, vague.

A My response is still it depends upon the market conditions at the time, because the market is going to dictate the price and the value that somebody is willing to pay for it.

Q So the market works in abstract and is independent from the particular position of the seller, is that your testimony?

In other words, the real estate market is what it is today in New Jersey.

Your house being on the sale market will not affect it, is that correct?

A No. If everybody's house is on the market, it's going to depress prices.

Q I didn't say everybody's house.

I said -- here is my hypothetical question for you.

You have to sell your house in the next 30 days.

Is it going to affect your ability to get a good price for that?

A Does the buyer know the specifics about whether it has to be sold?

Page 139

Q Maybe he does, maybe he doesn't.

Let's assume that he doesn't.

Would it affect the price that you could get?

A There would be a liquidity premium to sell a house within 30 days, because typically it would take 60 days to get financing, so yes, typically that would have some depression in the price because of the liquidity premium.

Q Do you not remember thinking that with respect to Carteret's sale of its branches it was going to have to sell them off cheaply in order to generate the cash and the capital to maintain it's capital compliance?

MS. FRANK: Objection as to form.

A I don't recall them having to sell them off cheaply.

I remember them using that as a strategy to come into capital compliance, but I don't know what you are getting at with selling them cheaply.

Q Do you remember them deciding to sell the assets because of their need for capital compliance?

A The assets or the liabilities?

Page 140

Are we talking about the branches?

Q Right, and branches would involve both, I am talking about both branch sales and asset sales?

MS. FRANK: Objection as to form.

A I'm sorry, could you repeat the question before I asked to clarify.

Q I will try to clarify it for you.

Do you remember Carteret's strategy of selling both branches and assets throughout the post-FIRREA period as something which was undertaken in order to help it meet capital requirements?

A I do recall that that was their broad strategy.

Q Do you therefore recall that absent problems with its capital requirements, Carteret would not have undertaken that strategy?

MS. FRANK: Objection as to form.

A I don't know what strategy they would have undertaken if they were healthy, I would be speculating.

Q Do you remember the issue of the use of real estate service corporations to foreclose on real estate assets by Carteret?

**Page 161**

million would be added to the reserve requirement and written off to deplete capital?
A It's not written off, you set up a set -- it would affect your earnings, so it would reduce capital, but it's much different from a loss classification.
Q It's a reserve against a future loss rather than a loss in this period, that's the difference, right?
A Correct. And also GVA's are added back in for regulatory capital calculations.
So you don't actually have a dollar for dollar hit when you are establishing a GVA, whereas if you classified an asset loss and you were required to write it off, you would dollar for dollar take a hit to capital.
Q And the GVA is added back to regulatory capital for all three purposes?
A Not for tangible, not for core, but for risk based it is.
Q One for one?
A Up to 1 at that basis points of risk weighted assets.
Q And you remembered that was the case at this time as well?

**Page 162**

A I don't recall, I don't know if they achieved that maximum or if they had more than the maximum.
Q So even though you don't remember why they would have used -- Carteret would have used 6 percent GVA and OTS 10 percent GVA, is it correct from your earlier testimony that that difference would reflect a difference in the way OTS evaluated Carteret's assets?
A Not a difference in the way we evaluated the assets, a difference in time, because over a year you have more loss experience history and economic factors change, market conditions change.
It's not -- you are not at the same point of time with the same exact portfolio, so it's not a difference in methodology, it's a difference in time and considerations regarding what period you are in.
Q Are you familiar with conservatorship accounting?
A No, I am not.
Q Do you remember whether Carteret followed the recommendation to writeoff the $77 million?

**Page 163**

A As I mentioned before, I don't recall which exam it was associated with, but there was a -- in the September calendar quarter of one of the years I know they didn't fully reserve as they were instructed, but it could have been associated with the 1989 or '90 exam.
Q Do you remember anything about clearing Carteret for entering into the brokerage service business?
A Vaguely.
Q Do you remember it being an issue of particular controversy or relevance to its capital health?
MS. FRANK: Objection, compound.
A I don't really recall any great detail about it.
MR. HUME: Let's mark this AmBase Finn 8.
(The above described document was marked AmBase Finn Exhibit 8 for identification, as of this date.)
Q If you could just review this document.
A Do you want me to go through the entire document?

**Page 164**

Q Having reviewed it as much as you have in one or two minutes, do you recollect this issue any better?
A I recollect the Wall Street Financial Services name.
I recollect there being a relationship with Gruntal, and side from what I am reading on the paper, I didn't really recall any of the individual factors.
Q Was it unusual for thrift institutions to offer brokerage services through wholly owned subsidiaries?
A I don't know how many institutions did that.
I think I may have been involved in two or three in my experience, so it wasn't unheard of, but I don't know approximately how many did.
Q Do you remember being involved in the creation of a regulatory plan for Carteret around the end of 1990, beginning of 1991?
A That would be something I will do on an ongoing basis with my caseload on an institution. It would not be surprising, I don't recall it specifically.

**Page 169**

Carteret?

A Yes, I testified I did do field work on several exams, never -- I never ran the exam, but did work while I was an analyst.

I mentioned that I was doing a transition between analytical and field work.

Q Right, sorry, I guess I meant after that switch to pure field work did you do field work then on Carteret?

A Yes. I think I participated in the last exam, which probably would have been the '91 exam.

Q I think the '92 would have been the last one?

A Maybe I didn't participate in that, then, because I think by '92 I was doing other work.

Q Just having read this, can I ask you in your own words, based on your refreshed recollection from this document, to tell me what you think the role of capital compliance had in the general demise of Carteret?

MS. FRANK: Objection as to form.

A I'm sorry would you read back the question.

**Page 170**

(The question requested was read back by the reporter.)

A When you talk about demise, you talk about failure, or the institution being taken over, I am assuming?

Q Yes, that's correct, I would say when I use the word demise, I mean the institution's loss of independent viability separate from supervisory control, which is ultimately consummated in a conservatorship.

I mean in other words, I am introducing it as a concept that in a spectrum, that demise begins when the regulators are basically telling you what to do, and ends, or is consummated when they actually physically put it in conservatorship.

A Okay.

Q So I am using it, I guess, in that broad sense.

A Capital was definitely a big component of the demise, as you term it, of Carteret, as well as the unsafe and unsound conditions that existed in the lending function, which again resulted in tremendous losses which impaired capital.

**Page 171**

They are all -- most of the issue is related to capital, whether it be supervisory goodwill or the unsafe and unsound conditions that the institution was in.

Q So, in a sense it all kind of ties in together all of these concerns in a way?

A I think that they all drove the capital number down.

A I think that was all that was mentioned as part of this memo.

Q If you were asked to what extent did the loss of the ability to use supervisory goodwill cause the demise of Carteret, what would your answer be?

MS. FRANK: Objection as to form.

A If I can qualify it pre-injunction, it played maybe half the role, because it was one of the factors that drove capital down.

But there were, you know, as you can see from the exam report, many, many other issues in Carteret that we felt were unsafe and unsound conditions in terms of lending, poor policies and procedures, inadequate asset loan review and other areas that we were very concerned with.

So it was a combination of things.

**Page 172**

Post the injunction when we gave them credit as the court ordered for the regulatory capital for supervisory goodwill, the concerns that we expressed were 100 percent non-supervisory goodwill related, and again most of those related with asset quality, operating losses, poor loan review and the like.

Q That seems reasonable to me.

To what extent does the answer get complicated when you think causation sort of more narrowly and say, well, what happened to Carteret because it was out of compliance, what was it forced to do, and how did that serve to escalate or at least to change the nature of its financial and capital position after FIRREA?

MS. FRANK: Objection, vague and ambiguous.

Q Would you like me to clarify the question?

A Well -- no, because I think I can answer the capital noncompliance causes a series of actions from the regulatory perspective, and one of those being to submit a capital plan showing how you are going to come back into capital compliance.

**Page 173**

So at that point in time that was the main vehicle for creating a supervisory restraint on the institution.

They could choose how to operate within the confines of that capital plan, but they would somehow have to demonstrate as part of the capital plan that they would achieve capital compliance.

So that becomes the restraint.

Q That becomes kind of the operating goal, is to bring themselves back into compliance, so to speak?

A And it also puts them within certain parameters, because under a capital plan, growth is limited, dividend -- I think there are dividend restrictions, and you can get waivers from some of these, but there are limitations as part of that process on what they could do, beyond just bringing their capital back up to speed.

So it's an operating restriction as well.

So that was the main impact, I believe.

Q If we can flip back to the second page here of the regulatory plan.

**Page 174**

Look at it just down the line here, you see, take any of the quarters will basically have the same dynamic here, I won't ask you about them all, interest income will be greater than interest expense, and will equal net interest margin, then you will have a provision for loan loss that at least reduces that margin or possibly as in the third quarter of 1990 makes it a negative.

Is it at all curious that you have such large provisions for loan losses when you are still generating positive earnings on your net interest, on your net interest margin?

MS. FRANK: Objection as to form.

A No, it's not.

I think typically the only time in my experience in the thrift industry when you saw negative net interest margin was back in the early '80s, when you had a deregulation of the liability side of the balance sheet and interest rates drove up in excess of 20 percent.

There you actually had a flippage where your cost of funds exceeded your interest income.

But this again, provision for loan

**Page 175**

losses, occurred around this time at Carteret and other institutions because the real estate market was driving down extremely quickly, so you had what had been generating assets, that were generating income, that all of a sudden became nonperforming and were being foreclosed upon within a year, where typically you would have a much longer workout period, but people were walking away from properties.

. So this does happen, and again, it's not typical to see a net interest margin go negative, it's very unusual, and that was a unique time in the thrift industry, back in the early, early '80s.

Q I understand that, but I guess if -- if a loan is nonperforming and it's nonperforming in the strictest sense, in the sense that the borrower is just not paying the interest, is defaulted, so it's at least a doubtful and maybe a loss asset, it will not generate interest income for the lender, isn't that correct?

A That is correct.

Q I guess the only point I am trying to ask you about is even though they had significantly large loan loss provisions, they

**Page 176**

still had on their performing loans enough interest to cover the interest expense that they had.

I don't want to make too much of this, I am sort of making a simplistic point here.

Given that, doesn't that sort of highlight what a provision for loan loss is, which is that it is a conservative accounting mechanism to help cushion the institution against future losses?

MS. FRANK: Objection as to form.

A Provision for loan losses is made up of two things, it's actual losses and it's general valuation allowances, general valuation allowances are a provision against future potential losses.

Losses or specific reserves, specific valuation as they are also called would be actual writedowns of assets.

So that is an immediate permanent impairment as opposed to a reserve for future losses.

So I'm not sure what's in these numbers, but it's a combination.

Q I guess the point I am trying to ask you about, Mr. Finn, is that at least with respect

Page 189

your same asset size, or would you rather shrink because it's more financially advantageous to remove if it was a high interest environment some high cost funds?

So you still have a business decision in that matter.

I mean if they didn't have cash and liquid assets which may have been a concern at Carteret and they had to borrow, then it would have been a financial hardship for them to borrow so that they could pay cash with the deposits.

But if they were doing it as part of a business strategy to maintain size, then it's just a business decision.

Q I think maybe I wasn't very clear in my question.

I didn't really mean isn't the fact that they had to borrow a hardship on the business.

I meant that given a certain level of borrowing, and in this case let's agree that the reason for that increased level of borrowing was to fund the branch sales, isn't it a hardship or a constraint on the bank that they also have to face a higher collateralization requirement?

Page 190

MS. FRANK: Objection as to form.

A To use FHLB advances, it would have been a constraint because they required a higher level of collateralization based on their condition.

Q I mean in a sense it sort of highlights this question, which is that for the bank to earn earnings, as in all of life, you have to take risks, would you agree with that?

A Yes.

Q And that when you are constrained against taking risks, it's harder to earn money?

MS. FRANK: Objection as to form.

Q I am not saying it's impossible to earn money, I am saying it's impossible to earn more money?

A It's harder to earn it faster, because you have to take more risk.

Q And if you are constrained against taking that risk, then it's harder to do that?

A Which is -- yes, the regulatory framework that you deal with in an undercapitalized institution.

Q Do you remember anything on this issue of liquidity problems faced by Carteret?

Page 191

A I remember ongoing liquidity reports that would come in through Bob Loskowski, but specific points of crisis or non-crisis, I don't recall.

Q And Bob Loskowski was at Carteret or at OTS?

A I'm sorry, he was at Carteret. I thought he was Treasurer or Assistant Treasurer.

Q He would send liquidity reports to you?

A To OTS. I think typically I would review them.

Q Why would liquidity have been a problem with respect to branch sales? I just don't understand that.

A Because you need cash, you are selling a liability, so somebody assumes that liability. You have to give them cash or some other form of compensation to accept that liability.

MS. FRANK: I am going to object, I don't think you have the foundation that this liquidity is related to branch sales.

Q As to this issue of the need for increased FHLB advances during this 1990 to '91

Page 192

period, do you recollect any specific reason why Carteret needed it?

A I don't specifically recall why.

Q Can you look at the first page of this MOC I have given you, and I guess the first two pages.

If you just look, it's obviously an analysis of liability, the ups and downs throughout January, February of 1991.

If you run along the total deposit line, if I'm reading it correctly, which please correct me if I am not, seems to be saying that in January and then again on each of the days featured here in February, the total deposits, total liabilities of Carteret went up.

Am I reading it correctly?

A Just from reading above, I mean I don't recall specifically how this report was set up, but it sounds like it's cumulative.

Q Cumulative through January, right, for January, and then the daily for all the other ones.

I'm not so interested in the amounts, but anyway --

A It says -- the columns beginning

**Page 209**

you cannot operate in a capital deficient position, and the regulation states how quickly you need to achieve compliance again under the terms of the plan.

Q So you don't think the institution would take the same course of action required under the capital directive if left to its own devices?

MS. FRANK: Objection as to form.

A An institution may choose to enhance income in many different ways to make themselves more profitable, or to generate improved dividends for the parent, it can do things for any number of reasons.

But it doesn't necessarily -- their interest in maintaining a high capital position is not necessarily going to reconcile with ours.

Typically you would want to leverage your capital to the nth degree to maximize earnings, but that's not satisfactory from a regulatory and statutory perspective.

So our interests don't always agree with management.

Q Do you think that your interests do no always converge with management?

**Page 210**

Would it be fair to say that your interests tend to be more short term in an attempt to insure against any catastrophic loss or run on the bank?

MS. FRANK: Objection as to form.

It's vague and it -- when you say your, are you referring to his personally?

Q You as a regulator, you, what is your understanding of the regulatory interest which you describe as not wholly convergent with the institution's?

A The regulatory intent would be to ensure capital compliance in the short term and over the long term.

We don't necessarily do anything extraordinary in the short term to ensure capital compliance more than we do so in the long term.

Q Would you turn to the first page TO 41496.

MS. FRANK: Counsel, I am trying to figure out exactly what this document is.

MR. HUME: This document is produced to us in this form by the government.

I mean it's in a series of Bates numbers.

**Page 211**

What is it that you don't understand about it?

MS. FRANK: Well, we have a cover letter from Mr. Vigna and then Page 1 is a stipulation and consent to the issuance of a capital directive, that's unsigned, then we have a capital directive.

A couple of --

MR. HUME: Would you like to break it up into separate documents?

MS. FRANK: Or just know exactly what it is, all that we've got here.

MR. HUME: I think it's the enclosures of the letter.

If there is more than one fax.

MR. CARENZO: There is a fax encryption showing it's coming from the OTS.

MS. FRANK: It looks to me like we have two capital directives, one that's dated and one that's undated, one that's signed and one that's unsigned.

I'm not trying to be difficult, I am just trying to understand and I think it would help the witness, as well.

**Page 212**

MR. HUME: I will do anything I can to help move this along.

Let's go to Page T 041053, then there is a second fax cover sheet at T 041504.

Let's rip that off and excise it from the exhibit.

A I am extremely confused now, you are dealing with an unissued, unauthorized document, it was never signed by the Regional Director, so it could be just a draft product.

Q I will stipulate that it's a draft product. I have no problem with that.

All I want to ask you about on this draft product that's not signed by anyone is the liquidity requirements introduced in section 2.04.

If you get out your other draft product from June of '91, you will not find that provision at Section 2.04.

MR. CARENZO: Finn 12.

Q I am simply using the document to try to refresh your recollection.

If you would rather not use it, I will simply ask you do you recollect the reason why a liquidity requirement was added to the

**Page 221**

Q Following up on that, do you recollect specific impact that Dick Bianco had when he joined Carteret?

MS. FRANK: Objection, vague.

A It was a new management team and philosophy.

It was a turning of a corner from a management perspective.

Not necessarily that that was the salvation, but it was -- you moved from a Robert Walsh who was -- who was defending the institution and fighting with the OTS to maintain the Temporary Restraining Order and its benefits and not necessarily trying to address our -- to the degree of our concern the other issues at the bank, and Dick Bianco came in and tried to actually take a new approach with the OTS and work with OTS outside of the capital issues to deal with the institution's problems itself.

Q So was he viewed more favorably than prior management by OTS?

MS. FRANK: Objection. He doesn't speak for OTS, he can give his own view.

Q Right, sorry, by you?

A By me it seemed like a positive

**Page 222**

change.

Q And you testified earlier to the writedown of certain assets by Mr. Moore who was part of this new management with Dick Bianco.

Do you remember why he wrote down, took a large writeoff in 1991?

A I believe their strategy was to clean the balance sheet up, and they believed that by setting more realistic values, they could move the assets faster and get back on to -- get the assets back on to an earnings status, by liquidating them, by selling them.

So, they chose to write down to what they perceived to be the market value at that point in time.

Q Wasn't part of what they were trying to do to raise capital in the market?

A Yes, but I don't know how that ties in with writing down assets to market value.

Q You did not at that time, and don't now see any connection between writing the assets down to market value and raising money on the capital markets?

A Well --

MS. FRANK: Objection as to form.

**Page 223**

A Writing down assets creates a need for capital, because you suffer losses.

So, it is tied, but you don't -- you wouldn't necessarily want to be writing down assets as a positive to looking to raise capital.

The writing down of assets created a larger hole than existed, and precipitated the need for a capital infusion.

But it wasn't necessarily a positive thing to say let's write these down and that will draw new capital in.

It created a need for more capital.

Q So you were never aware that it might help Carteret raise money on the capital markets by their ability to represent that the balance sheet they presented was rock solid?

MS. FRANK: Objection as to form.

A I was -- I don't recall being aware that their writing down assets was going to make their balance sheet rock solid, or that that's what they were claiming as part of their capital raising efforts.

Q Do you remember the amendment by Judge Bissel of his Preliminary Injunction Order that allowed Carteret to include an extra $15

**Page 224**

million of goodwill that had been written off previously under GAAP?

A Not specifically. I do recall it, but not specifically what the impact was or why they did it, why he did it.

Q Do you recall the disclosure in 1991, it was in August of 1991, that Carteret had fallen out of compliance under both versions of FIRREA, meaning whether or not goodwill was counted?

A I recall that did happen, yes.

Q Do you recall it as a significant event?

MS. FRANK: Objection, vague.

A I believe it would have required certain actions that were prevented by the court order, so yes, it would have been significant because it would have now been a capital failure, even given the judge's rulings, and would have fallen back into the capital directive route and other operating restrictions.

Q Do you recall what led to them falling out of compliance under both versions?

A No, I don't.

Q Do you remember the accelerated