UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and | : | |
| CARTERET BANCORP, INC., | : | |
| Plaintiffs, | : | No. 93-531 |
| And | : | Judge Loren Smith |
| FEDERAL DEPOSIT INSURANCE | : | |
| CORPORATION, | : | |
| Plaintiff-Intervenor, | : | VOL. II |
| Vs. | : | |
| THE UNITED STATES OF AMERICA | : | |
| Defendant. | : | |

Washington, D.C.

Wednesday, March 1, 2006

Continued deposition of WAYNE S. GREEN, CPA, a 30(b)(6) witness herein, recalled for further examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:11 A.M., Wednesday, March 1, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Page 323

Q. What else did they include, what other big ticket items do they include?
A. Well, in addition to salary, there would be any travel charges associated with that. If there were any additional outside fees paid in support of the offensive litigation, it would include that, any consultant type fees.
Q. What is a corporate advance as it relates to receivership accounting?
A. A corporate advance is the process of a receivership borrowing money from FDIC in a corporate capacity.
Q. And what policies or regulations or guidelines exist that govern the circumstances under which advances are taken and the circumstances -- and the accounting for such corporate advances?
A. There was a process memo dealing with advances, I believe -- well, it's addressed in the various accounting manuals and I believe there actually is an accounting bulletin that speaks to corporate advances.
Q. And what is the difference between a corporate advance and let's say in this transaction corporate wiring the funds that would fund the deposit transfers?

Page 324

A. The difference is corporate advances are usually made post-closing and corporate advances are collateralized by the assets of the receivership as security, the difference is there's a different interest rate that is used, based on that policy, dealing with corporate advances, corporate advances have a higher priority of payment than a subrogated claim.
Q. And you mentioned that corporate advances have a different interest rate. How is interest calculated on corporate advances?
A. It's calculated monthly on a simple basis.
Q. At what interest rate?
A. I don't know what the current rate is.
Q. Okay. What is it based upon, do you know?
A. Not currently, no.
Q. Do you know what it was based upon at any time during the Carteret receivership?
A. I think the RTC policy would have been possibly based on a 90 day T-Bill rate.
Q. I'm sorry. Did you say simple or compound?
A. I think it is simple interest.
Q. Is it floating or fixed?
A. I think it's floating.

Page 325

Q. Where on receivership financial statements, what line item reflects corporate advances?
A. Of a receivership had borrowed money from corporate, it would be on the line item titled Billings and Borrowings, it would be reflected in there.
Q. And what is the policy with respect to repayment of advances versus repayment of other liabilities. I take it you just said at a high priority there is subrogated claim?
A. That's correct.
Q. Does that mean corporate advances need to be paid off before any part of the subrogated claim could be paid off?
A. That's correct.
(Green Exhibit No. 44 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 44 is a document entitled Receivership Funding by Corporate Advances, Loans and Returns of Dividends, Calendar Year 1999 Process.
Was this a document reviewed in preparing for your deposition?

Page 326

A. Yes, it was.
Q. I think a moment ago you made reference to the fact that you thought there was a process memo on corporate advances, is this to what you were referring?
A. Yes.
Q. What application, if any, does this process memo have with respect to the treatment of corporate advances in the case of Carteret's receivership?
A. Well, to my knowledge the Carteret receivership did not have any advances.
Q. At any time during its existence?
A. During the receivership.
Q. You say during the receivership, I just want to make sure I understand what dates we're talking about, so the receivership starting when?
A. October '94, January '95 and March of '95.
Q. Okay. During that period, to your understanding, the receivership had no corporate advances?
A. That's correct.
Q. The past corporate receivership have any corporate advances?
A. I believe it did.

Page 327

Q. And --
A. I stand corrected, conservatorship had advances.
Q. I'm sorry?
A. The conservatorship had advances.
Q. And when were those advances to be paid, do you know?
A. Prior to the October '94 closing date.
Q. Would the same policies that we've been talking about regarding corporate advances during receiverships also applied to corporate advances to conservatorships?
A. That, I don't know.
Q. Page 6 of this document, there's a discussion near the bottom of the page regarding accrual of interest and what, if anything, does this discussion reveal about the interest rate that was going to be used for corporate advances?
A. Well, this states the fund accounting section account obtained the average overnight Treasury investment rate each month from the chief of Securities Operations, FDIC DOF Treasury.
This is the basis for the rate that is used to calculate the interest on the outstanding advances.

Page 328

Q. Can you explain the rationale for using the interest rate used here on corporate advances as opposed to using a federal judgment rate for interest on subrogated claim?
A. No, I can't.
Q. Okay. And who is responsible for the decision on what interest rate to use on corporate advances? Who makes that decision?
A. That decision would be made by senior management of Division of Finance.
(Green Exhibit No. 45 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 45 is an excerpt from a much larger document, if you want to look at I have right here, but to safe some trees I copied the first few pages of it and, first of all, can you identify what this document is for the record?
A. Yes, this document represents a report of the financial data warehouse in response to a document request from counsel to represent the balances of each particular account as of a certain month and period.
Q. And for the record part of this document that has been made an exhibit is in two parts, it is

Page 329

a two-page printout relating to FIN 1306 and then correct me if I'm wrong, the first 17 pages of a printout relating to FIN 1309; is that correct?
A. That's correct.
Q. And FIN 1306 was one of the FIN numbers used for the Carteret resolution?
A. For the initial resolution, yes.
Q. The October '94 resolution?
A. Correct.
Q. There are a number of account numbers on here, I'm going ask you some specific questions about some of them, but more generally, is there a document, a source that would identify all of these account numbers and provide any information, other than the account name, which is also listed on this document?
A. Yes, there is.
Q. What document is that?
A. Its titled The Charter of Accounts.
Q. And I know Monday evening, we were given a box of documents which I think is labeled Charter of Accounts.
Are you familiar with what we were provided on Monday?
A. Yes.

Page 330

Q. Is that the charter of accounts that you were talking about?
A. Yes.
Q. A couple of questions about the FIN 1306 spreadsheet and the first two accounts there, account 34996 and 34997, can you briefly describe what accounts they are?
A. Those two accounts essentially represent the receivable due from corporate for the amount of the premium paid and the assets sold to the assuming bank for that particular transaction.
Q. And down on line 24, there's an account 168205; do you see that?
A. Yes, I do.
Q. Funds borrowed from corporate, you don't know what the P stands for?
A. I don't.
Q. What is this account ?
A. That account reps account number used if a receivership borrows any money from corporate, that represents the liability to corporate.
Q. Okay. Is this different from a corporate advance?
A. No, it is not.
Q. There is an $800 million figure listed

Page 371

Q. What is an RC?
A. Yes.
Q. What is an RC?
A. An RC is a receiver certificate.
Q. And what is that?
A. That's a document representing someone -- a claim against a receiver.
(Green Exhibit No. 52 was Marked for identification.)
BY MR. COLATRIANO:
Q. Before we turn to 52, going back to Exhibit 51, there's -- in reference to RC that comes in the context of a question of whether anyone knows if the IRS had an RC on file with us for Carteret's 1995 tax liability.
And then I mail right above that says yes and no the original claim amount was 36,000, the claim was withdrawn on 5/19/99. Is that the answer to this RC question?
A. Yes, it is.
Q. Do you know why the claim was withdrawn?
A. No, I don't.
Q. Do you know whether there's any current RC on file in connection with Carteret's tax liabilities?

Page 372

A. There's not a current claim in a form of a receipt of certificate on the books of the receivership, there may be one within the claims unit.
Q. I need you to description that distinction?
A. Well, if the claims unit received a proof of claim from the IRS and it went through their process and approved, it would be sent to accounting to record on the books of receivership.
Q. And what, if anything, do you know about what that type of process is underway with respect to Carteret?
A. I know the transcripts reflect an outstanding liability, federal income tax liability.
Q. Do you know whether a claim has been processed for that liability?
A. No, I don't.
Q. Who would be the person to ask about that?
A. That would be whatever claim agent is handling the Carteret receivership.
Q. Do you know who that is?
A. No.
Q. Is that someone in Dallas, or someone in Washington?

Page 373

A. It's in Dallas.
Q. Let's turn to Exhibit 52, which is another E-Mail string top one is an E-Mail from David Collie to yourself and James Vordtriede, dated February 10, 2005.
The second E-Mail in this string is an E-Mail from you to Mr. Collie and Mr. Vordtriede, you say I need Jim to review the return and determine if the return was filed and consistent with applicable statutes in effect at the time germane to federal receiverships.
The Jim you're referring to, is that Mr. Vordtriede?
A. That's correct.
Q. Why did you ask Mr. Vordtriede to conduct that review?
A. Well, I knew that the tax returns were being produced and I was interested in knowing beginning with the 1995 return of the receivership whether or not that was done inconsistent with the applicable tax statutes.
Q. And did Mr. Vordtriede conduct such a review?
A. I don't think Jim actually got around to doing that.

Page 374

Q. Do you know whether anyone else has done that?
A. I don't believe so.
Q. Do you know why he has not gotten around to doing that?
A. There are other receiverships that Jim was involved in.
(Green Exhibit No. 53 was Marked for identification.)
BY MR. COLATRIANO:
Q. Mr. Green, Exhibit 53 is another series of E-mails, the first one is from James Vordtriede to yourself, dated Friday, February 11th, 2005. Re: Carteret goodwill case.
Have you reviewed this document in preparing for this deposition?
A. I believe I have.
Q. The first line, first paragraph says the initial look at the handling of the FFA for the 1995 Carteret closing year suggests an under statement.
First of all, what is FFA?
A. FFA stands for Federal Financial Assistance.
Q. And what's that?
A. That is a term used within the tax

Page 391

A. That's correct.
Q. Did losses on the disposition of the assets account for the entire loss?
A. Yes, it did.
Q. Did the duration of the receivership impact the losses realized on the sale of the assets?
A. That depends upon the receivership itself.
Q. How about in the case of Carteret?
A. Well, if you compare the 12/31/04 income statement in Exhibit 57 to the 12/31/95 income statement doing the additional nine-year period, the operating loss should have increased $18 million.
Q. Would you return to report number 1 in Exhibit 11 and that's at page AM 0097390. And I think you testified previously that one of the adjustments you made to arrive at the inception balance was to convert the balances from an accrual basis of accounting to a cash basis of accounting; is that correct?
A. It's a conversion from an accrual basis to a modified accrued basis of accounting, yes.
Q. Did that require all the pre-receivership valuation allowances to be reversed?
A. Yes, it does.
Q. Do valuation allowances reflect estimated

Page 392

losses on assets?
A. Yes, they do.
Q. Are valuation allowances similar to bad debt?
A. It could be a research for 100 percent after bad debt or a partial research for a bad debt.
Q. Does the reversal of the allowances increase the book value of an asset that had a pre-receivership loss allowance associated with it?
A. It increases the net book value of a receivership, it doesn't increase the book value.
Q. When an asset is sold during a receivership, is the gain or loss calculated based on the book value of the asset?
A. Yes, it is.
Q. And is any loss allowance that had been recorded prior to the receivership excluded?
A. Yes, it is.
Q. Are you familiar with the tax term net operating losses?
A. Yes, I am.
Q. And what is your understanding of an NOL?
A. An NOL represents the operating losses of an entity. I'm familiar with the net operating losses of a receivership.

Page 393

Q. Is an NOL a tax loss that can be used to offset prior -- or future -- I'm sorry, that can be used to offset future tax year income?
A. If a net operating loss is recognized as a result of a tax return, then yes, it can be.
Q. Let's go back to report 1 we're looking at here, there's a category furniture, fixtures, autos; do you see that in the middle of the page?
A. Yes.
Q. Is that a depreciable category?
A. Yes, it is.
Q. And office premises and equipment, is that also a depreciable category?
A. Yes, it is.
Q. Is depreciation expense reflected in the results contained in the statement of operations?
A. Which statement of operations?
Q. The statement of operations included in Exhibit 11?
A. No, it is not.
Q. And why is that?
A. The FDIC and the RTC does not depreciate assets in liquidation.
Q. Why not?
A. That's a GAAP basis type of accounting.

Page 394

Q. Going back to the furniture, fixtures and auto and the office equipment, premises, are those the only depreciable assets listed in report 1?
A. Based on the descriptions I'll say on report 1, yes.
Q. The total inception balance leaves those categories at about 7.3 million?
A. That's correct.
Q. If these assets were sold, would the receivership report a gain or a loss on the sale?
A. That depends upon the sales price.
Q. And would that gain or loss be reported in this statement of operations?
A. Yes, it would.
Q. If these assets were not sold, would they be written off?
A. If they were not liquidated, it's possible they could be written off, yes.
Q. And would the loss realized on a write off be reported in the statement of operations?
A. Yes, it would.
Q. At the time of the receivership, how much real estate owned did Carteret have?
A. According to this statement, other real estate owned was $2,787,000. Office premises might

Page 403

A. The document or Exhibit 58 includes pro forma statements for the three different dates of closing, in addition to RTC cash based adjustment listings, in addition to a copy of an entry posted to CTM, control totals module.

The pro forma statements attached to Exhibit 12 are only the March 10th, '95 pro forma statements. The pro forma statements in Exhibit 58 would have been used to complete the computation of ending balances on the receivership for the three different dates that's in Exhibit 12.

Q. And do you know who prepared these reconciliation statements, the ones in Exhibit 58 or the ones in Exhibit 20?

A. The ones in Exhibit 58, the pro forma statements would have been done by the pro forma team and signed at each closing.

Q. At the time of the closings?

A. That's correct.

MS. GRONER: I have nothing further, thank you very much.

MR. GILBERT: I have no questions.

MR. COLATRIANO: I have a couple.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. COLATRIANO:

Page 404

Q. Referring to Exhibit 57, this is the statement of operations as of -- for the period ending December 31, 1995, correct?

A. That's correct.

Q. Was this prepared by the FDIC or by the RTC?

A. This statement here is actually coming out of an FDIC system, financial data warehouse.

Q. And just to clarify, I think you testified that this type of statement, you could have produced it from the FDIC system a month after the period at issue, correct?

A. Yes.

Q. But in this case, was the FDIC -- did the FDIC system have anything to do with Carteret in 1996? When would it have been able to generate this document?

A. It would have first been able to physically generate it in January of 1996.

Q. The FDIC had responsibility at that point?

A. That's correct.

Q. And I think in the course of discussing this document, counsel asked you -- counsel made the statement and I think you agreed that a substantial part of the assets were sold in the first year of the

Page 405

Carteret receivership, correct?

A. That's correct.

Q. But if you assume for the moment that the receivership was actually instituted in December of 1992 when the RTC was appointed as receiver for Carteret, 1995 would have been the third year of receivership, correct?

A. That goes to the date of the receivership.

Q. Right.

A. As opposed to the time it was in conservatorship.

Q. Okay, but the RTC was appointed receiver for Carteret in 1992, correct?

A. Yes, it was.

Q. And the statement of operations was -- there were questions about whether the statements showed profitable operations for the year in question; do you remember that discussion?

A. Yes, I do.

Q. This is not -- the statement of operations that's a GAAP -- that's in Exhibit 57, that's not prepared in accordance with GAAP, right?

A. That is correct.

Q. So there could be expense items or income items that would be relevant to profit or loss on a

Page 406

GAAP financial statement that doesn't necessarily show up here, correct?

A. That's correct.

MR. COLATRIANO: That's all I have.

MR. GILBERT: I just have a question.

EXAMINATION BY COUNSEL FOR PLAINTIFF-INTERVENOR

BY MR. GILBERT:

Q. When the thrift -- the Carteret thrift was closed in 1992, there were two entities formed, one a receivership and the other a conservatorship; is that correct?

A. That's correct.

Q. And that initial receivership is what we are referring to as the pass through receivership?

A. That's correct.

Q. And that pass through receivership is separate and different from the subsequent receivership formed in 1995; is that correct?

A. That's correct.

MS. GRONER: I have one follow up.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. GRONER:

Q. You just testified there could be expense items or income items that could be relevant on a GAAP financial statement; do you recall that?

A. Yes, I do.
Q. Are you aware of any?
A. I'm knowledgeable in the method of accounting that the receiverships performed accounting under a GAAP basis. There was -- the receiver did not recognize income before it is earned or expenses before they are paid. There could be items under that description that are not on the financial statements.
Q. Do you have the present knowledge that there were any? I know you're testifying there could be, I want to know if you are aware of any such items that actually existed?
A. No, I'm not.
MR. COLATRIANO: Can I follow up on the follow up to the follow up?
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. COLATRIANO:
Q. Wouldn't one such item be the interest on the subrogated claim?
A. Yes, it could be.
Q. The interest on the subrogated claim to the extent it is accruing GAAP would require that to be recognized, would it not?
A. Yes.



Q. But it's not showing up on this document, on the statement of operations that's in Exhibit 57, correct?
A. That's correct.
Q. And it's not showing up on the statement of operation that's in Exhibit 11, correct?
A. Correct.
Q. Following up on Mr. Gilbert's question, the RTC was appointed receiver for Carteret in 1992, correct?
A. Correct.
Q. At that point, the RTC also created a conservatorship for a portion of Carteret, correct?
A. Correct.
Q. It was within the RTC's discretion at any time after that to convert that conservatorship into a receivership, correct?
A. That, I don't know.
Q. Do you know why it took until late 1994, early 1995 for the RTC to decide in conjunction with the OTS or anybody else to convert the Carteret conservatorship into a receivership?
A. No, I don't.
Q. For all you know, RTC could have been seeking to sell the institution for two years,



correct?
A. Yes.
MR. COLATRIANO: I have no further questions.
MS. GRONER: Nothing further.
MR. GILBERT: No further questions.
(Whereupon, at 5:14 p.m., the taking of the instant deposition ceased.)

____________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

____________________________
Notary Public

My Commission Expires:_______________