UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------------x
AMBASE CORPORATION and CARTERET
BANCORP, INC.,
Plaintiff,
-and-
FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,
-versus-
THE UNITED STATES OF AMERICA,
Defendant.
--------------------------------------x

600 Fifth Avenue
New York, New York
March 30, 2006
9:40 a.m.

Deposition of EDWARD GRIFFIN, pursuant to Subpoena, before Sophie Nolan, a Notary Public of the State of New York.

Page 94

standpoint would have differed from, you know, the RTC's standpoint? Were there different objectives?
A. My recollection of that situation in Florida was it was our opinion, the RTC's opinion, that our existing rates were competitive, and that several of the potential acquirers felt that if they were successful in the bid process, they would hurt their existing customers. That's my recollection.
Q. Okay.
MR. THOMPSON: When you say it would hurt their existing customers, do you mean that their existing customers would be -- it would erode their base if they were -- well, actually, how would it -- explain that. How would it hurt the customers.
A. They'd have a two-tiered -- my recollection is they would have a two-tiered rate, favoritism, whatever you want to call it. You brought in X millions of dollars at this rate. I was -- I can remember the conversation by phone with me; my customers have been with me for years and you're hurting me.
Q. And I guess the only thing I'm

Page 95

missing is if the customer who's been with him for years is getting a higher interest rates on deposits, I don't see how the customer could complain that these new customers are getting a lower rate?
A. You're benefiting yourself Mr. Banker, not the customer. You're benefiting -- you're getting these tremendous deposits in at a much lower rate and you're benefiting ourselves only.
Q. Okay. Was Carteret's deposit franchise a vibrant, you know, valuable asset?
A. Carteret's franchise was extremely valuable.
Q. Was that because of the longstanding nature of its relationships with its customers?
A. Yes, among many other reasons.
Q. What were the other reasons?
A. Location, branch location, consistency. Those are the two main reasons.
Q. When you say "consistency," what do you mean by that?
A. They supported their customers consistently over the years in many ways.
Q. And that led to a loyal customer

Page 96

base?
A. Yes.
Q. And were the locations very good both in New Jersey and in Florida?
A. I can't speak to Florida at all. New Jersey, yes, very definitely.
Q. Very definitely that they were very good?
A. Yes.
MR. THOMPSON: I'd like to ask the court reporter to mark as Griffin 34 a document that bears the Bates number C-AM-A-0154783 through 784.
(Griffin Exhibit 34, document Bates stamped C-AM-A-0154783 through C-AM-A-0154784, marked for identification.)
Q. Mr. Griffin, this is the Alco committee minutes from November 9, 1994 and my questions again are going to relate to the "Savings Products" section on page two.
A. (Reviewing.)
I'm ready.
Q. It says under "Savings Products" in the second full paragraph, "As a result of the Florida branch, sales deposit outflow in New

Page 97

Jersey has been reduced. Outflow is now 25 percent rather than 40 percent."
How would the Florida branch sales stem deposit outflow in New Jersey?
A. My recollection is that the highest proportional percentage of outflow was coming from the Florida branches and, therefore, it reduced the overall Carteret, New Jersey outflow.
Q. Okay. That's --
MR. THOMPSON: I'd like to ask the court reporter to mark as Griffin 35 a document that bears the Bates number C-AM-A-0154698 through 0154699.
(Griffin Exhibit 35, document Bates stamped C-AM-A-0154698 through C-AM-A-0154699, marked for identification.)
Q. And, Mr. Griffin, my questions are going to relate to the "Old Business" section of this November 22, 1994 Alco committee minute meeting.
A. (Reviewing.)
I'm ready.
Q. It says, in the third sentence, "The potential acquirers and their investors are very concerned about Carteret's runoff and, therefore,

our case to protect the bids was on target."
Do you see that?
A. Yes.
Q. Is that consistent with your recollection that there was -- that the potential of buyers and their investors were concerned with the runoff?
A. Yes.
(Recess taken.)
Q. Mr. Griffin, switching gears a little bit, do you recall that Carteret had a mortgage portfolio called Western Federal?
A. Yes.
Q. And it was a problem mortgage portfolio?
A. Yes.
Q. And do you recall that there was litigation between Carteret and Western Federal?
A. Yes, I do.
Q. Do you recall that a member of the swat team was put in charge to try to arbitrate this dispute?
A. I do vaguely, yes.
Q. And do you recall that that individual was Christian Yates?



A. That -- yes.
Q. Were you aware at the time that Mr. Yates had been a Carteret employee and had been terminated by Carteret prior to the conservatorship?
A. No, I can't recollect that.
Q. Do you recall that the case was settled between Carteret and Western Federal?
A. I vaguely recall that, yes.
Q. Do you recall that -- whether, you know, there was a sense that, look, both these institutions are in receivership; we'd just be moving money from one treasury account to the other, why are we fighting? Was that something that was discussed at all?
A. I vaguely remember that, yes, yes.
Q. Okay. And was that one of the factors that led to the settlement of that case?
A. I recall that it was.
Q. Okay. Now, another question relates to Ambase and do you recall that Ambase requested some document relating to, you know, the sale of assets in the branches?
A. No, I don't.
MR. THOMPSON: I'd like to ask the



court reporter to mark as Griffin 36 a document that bears the Bates number C-AM-A-0352266.
(Griffin Exhibit 36, document Bates stamped C-AM-A-0352266, marked for identification.)
Q. I apologize that this is kind of a blurry copy, but it's a letter to you dated October 7, 1994 from a William H. Purcell of Ambase Corporation and it states in the first paragraph, "During our conversation yesterday, you stated that Ambase Corporation, Ambase, is legally entitled to a full accounting of the Carteret receivership and that the RTC must respond to any questions by Ambase pursuant to the rules of the Freedom of Information Act. We agree with your statement." It goes on.
Does this refresh your recollection at all that Ambase was requesting certain documents?
A. No, it does not.
Q. Okay. Now, we talked a little while ago about the branches of Carteret. When you were at Summit Bank Corporation, did Summit purchase any branches from Carteret?



A. My recollection is that they did not.
Q. The second of the New Jersey resolutions of the branch sales took place on March 10, 1995, and at that time did your title switch from managing agent to field --
A. Field site manager.
Q. Field site manager?
A. Yes.
Q. And did you remain a field site manager through to the end of, I guess, it would be 1995?
A. Yes.
Q. Okay. And what were your responsibilities as field site manager?
A. The majority of the responsibility was preparing the remaining assets which were basically furniture and equipment, laying off employees, terminating employees, doing various reporting functions, culling information together, that sort of thing.
Q. Okay. And did you know that the tax return that was filed for calendar year 1995 showed taxable income of $90 million?
A. No, I didn't know that.
Q. I'll represent to you that that tax

Page 102

return took into taxable income the interest on the earning assets, but there was no deduction for the funds that were funding those earning assets because this was the money that came from the RTC to fund the branch sales since there were no deposits left.
Are you familiar with any tax return during your many years in the banking industry where a financial institution would file a tax return taking into income, income on its earning assets without a deduction for the cost of funds?
A. No, I am not aware.
MR. THOMPSON: Just give me two minutes to make sure I didn't forget something.
(Recess taken.)
MR. THOMPSON: I have no further questions. Thank you, sir.
MS. PIANKO GRONER: Off the record.
(Discussion off the record.)
EXAMINATION BY
MS. PIANKO GRONER:
(Griffin Exhibit 37, series of documents consisting of various departmental exit memos, marked for

Page 103

Identification.)
Q. Good afternoon, Mr. Griffin.
A. Good afternoon.
Q. My name is Arlene Pinako Groner, and I'm an attorney with the United States Department of Justice.
While we were off the record, I asked the reporter to mark as Exhibit 37 documents that were produced to me this morning before the deposition and I'd ask you to look at Exhibit 37 and tell me what it is.
A. Exhibit 37 is composed of three or four components. The first component which are titled Exhibit B, C -- they all have reference to various departmental exit memos and the exit memos refer to the day of intervention, when the various RTC teams evaluated on the day of intervention the status of the various units of the institutions such as the legal, any claims, investigations such as legal or criminal, public confidence, accounting, and a subsidiary -- the status of the subsidiaries if there were any.
Q. And were these documents documents you retained in your own possession after you left the RTC?

Page 104

A. These documents I retained in my possession, yes.
Q. And why did you keep these documents?
A. I kept these documents to prepare myself for the future knowing I would -- hoping that I would be involved in this type of work in the future.
Q. And did you have any use -- did you use any of these documents from the time you left the RTC until you were preparing for this deposition?
A. No.
Q. What else is in the package?
A. The second unit or component is a memo from Gene Euliki, a UTC oversight manager with responsibilities for various RTC conservatorships with instructions on how to reduce cost in the conservatorships.
The third component is a document from the field site manager suggesting how to -- how to summarize the activities in the receivership when it terminated.
The fourth component is a multiple page document telling you, the field site manager and the receivership how to organize your files

Page 105

that would be sent to the RTC general office.
The fifth document is peculiar to Carteret Federal Savings Bank and represents the managing agent's overview of the institution and what he recommends to consolidate the various units of the institution.
Q. And that's called the Carteret At-a-Glance Consolidation Plan?
A. Yes.
Q. Okay. I have some questions on that document so why don't you keep the one that's in Exhibit 37, but I have a few extra copies for everybody.
MR. KUIPER: I'd just like to note for the record that for all of these documents, Mr. Griffin was under an obligation to produce these upon this morning but when we became aware of them yesterday we got copies and offered them to the parties for their convenience to review prior to this morning.
MS. PIANKO GRONER: And I just want to note for the record that I received a copy this morning. I was en route yesterday. I did get a phone call that