UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

AMBASE CORPORATION and :

CARTERET BANCORP, INC., : No. 93-531

Plaintiffs, : Judge Loren Smith

and :

FEDERAL DEPOSIT INSURANCE :

CORPORATION, :

Plaintiff-Intervenor, :

vs. :

THE UNITED STATES OF AMERICA, :

Defendant. : PAGES 1 - {}

\- - - - - - - - - - - - - - - - x

Deposition of HERBERT J. HELD, held at the offices of Cooper and Kirk, 1500 K Street, Suite 200, Washington, D.C., commencing at 9:30 a.m., Friday, April 8, 2005, before Elizabeth Mingione, Notary Public.

Page 30

A. We gave assistance in the form of capital to these minority institutions for a set period of time, a number of years.
Q. And did they -- was it typically a loan?
A. It was a loan to the -- I remember it was a loan to the holding company.
Q. That had to be repaid?
A. That's correct.
Q. Okay. With interest?
A. Yes.
Q. Okay. And was that available to non-minority bidders?
A. No.
Q. Interim capital assistance?
A. No. It was only for minority institutions.
Q. And what about the ability to purchase loans at market value? Is that fair market value?
A. It's market value, fair market value.
Q. And is that something that non-minority purchasers could do?
A. No.
Q. So, and just so that the record is clear on this, and we talked earlier about the fact that there was a ratio, we couldn't remember what it was,

Page 31

but let's just say hypothetically it was 110 percent. And let's say a minority investor was looking at a group of deposits with $100 million of deposits in a branch. And the ratio was 110 percent.
Then the minority investor would have the opportunity to purchase $110 million of loans at market value. Is that right?
A. With all those caveats, yes.
Q. Right. But the non-minority investor looking at the same branch with $100 million of deposits, they would just be bidding on the deposits. Is that correct?
A. That's correct.
Q. And then in terms of -- and let's say the non-minority investor decided that they were willing to pay a premium of 10 percent. Would that mean that then the non-minority investor would require only $90 million of assets to be transferred at the time of the closing?
A. The formula would always be deposits acquired, less whatever premium you pay, equals cash that the RTC would give to the acquiror. Then they could use the cash however they wanted to.
Q. Okay. And it was -- and did the

Page 32

non-minority investor, did they have a right to get cash or was it the RTC's discretion whether to give them cash or loans or something else, some other asset?
A. The way that the purchase assumption agreements worked is it's deposits acquired, less the premium, equals the cash. And then if you buy any assets, you would buy it with the cash.
Q. Okay. But -- and then when you talk about the cash, that's the cash that the RTC would transfer to the acquiror of the deposits. Is that correct?
A. That's correct.
Q. And I guess I'm just trying to understand the distinctions between the opportunities for minority and non-minority investors in a branch. Are you saying that the minority investors had a right to make a bid on a certain amount of assets, of loans?
That, in other words, if the RTC put on the block a branch that was designated as a PMN branch or institution, and minority bidders were bidding under the preference program, that they could -- they could make a bid not only for the deposits but also for a certain amount of loans?

Page 33

A. They were basically two separate things. You would bid on the branch and you would be getting the deposits, cash less the premium. And then you would have the rights that you were given under that minority preference, PMN program, which included the ability to buy loans at market value.
Q. And would these be loans of the institution whose branch you had just acquired or whose deposits you had just acquired?
A. Not necessarily.
Q. It could be, though?
A. It was possible.
Q. Okay. Do you recall, with respect to Carteret, whether minorities were given the opportunity to bid on -- minority bidders were given the opportunity to bid on Carteret assets in connection with their deposit bids?
A. I don't recall whether they got Carteret assets or not.
Q. And just so that I'm clear on the process, did the bid by the minority investors on assets come only after their bid on deposits had been accepted or did they make their bid on the loans contemporaneously with their bid on the deposits?

A. Well, they weren't bidding on the loans.
Q. Okay.
A. As I said before, you bid on the branch, you win the branch, and then you get the rights under the program to acquire it at market value.
Q. Okay. Thank you for that clarification. That's clear. So it's sort of like an option to buy loans after you had acquired the branches. Is that fair?
A. Yes.
Q. Okay. At this point I would like to ask the court reporter to mark as Held Exhibit 8 a document that bears the Bates numbers C-AM-A-0130428.
- - -
(A document was marked as Deposition Exhibit Number 8)
- - -
BY MR. THOMPSON:
Q. And Mr. Held, take as much time as you want to look at this document. I'm going to ask you a few specific questions about it. But, first, let's just identify what it is for the record.
It's a blank bid form for Carteret Federal Savings Bank that has a revised date of May



20, 1994. Is that correct?
A. That's correct.
Q. And on the second page of the document it says that the bidder must submit both the bid form and all applicable attachments to you. Is that correct?
A. That's correct.
Q. And I have some specific questions. Would you like time to review it now or would you like me to pose my questions?
A. Why don't I just read through it first and then we can --
Q. Sure. Just tell me when you are ready.
- - -
(The witness reviews a document)
- - -
A. Okay.
Q. Now, in the third full paragraph after your name and address, it states, quote, "Under the whole P&A, Core Branch and Limited Branch P&A options, it is required that the bidder submit bids on both All Deposits and Insured Deposits for each transaction desired. The amounts bid for All Deposits and Insured Deposits should not need to be the same. The RTC will select the most cost



effective option," closed quote.
Did the RTC attempt to resolve the Carteret conservatorship at the least cost possible to taxpayers?
A. Yes.
Q. And bids were required both for all deposits and for any insured deposits. Is that correct?
A. That's correct.
Q. When would a bid that covered uninsured deposits be cheaper than a bid that covered insured deposits?
A. If the differential in bids for the -- if the all deposits was greater to the extent that it covered the anticipated loss to the uninsured depositors, then the total loss to the RTC would have been less.
Q. Let me give you a hypothetical and see if maybe you can help clarify that. Let's say there's an institution in conservatorship with one branch with $100 million of deposits that are insured. And the bidder comes in and thinks, okay, I'm going to pay a premium of $10 million for those insured deposits.
And then let's say that there's also $10



million of uninsured deposits. And the bidder says, And I'm willing to pay a 10 percent premium on those deposits as well. So I'll pay a premium of $11 million for the whole thing.
Isn't it true that for the bid that is just the insured deposits, the RTC only has to send $90 million in cash, assuming no asset purchase, under the formula you articulated of deposits minus premium equals the cash that needs to be transferred?
A. Let me see if I get your example right. I think you said that it was $100 million of insured and 10 million of uninsured.
Q. Yes, sir.
A. And they are willing to pay a $10 million premium for the insured?
Q. Yes, sir.
A. And a one-million-dollar premium for the uninsured?
Q. Yes, sir.
A. So you are correct that the cash out to the -- that the transaction would be 90 million.
Q. Okay. And that's -- if it were just the insured deposits. Now, in this example, if the acquiror bought both the insured and the uninsured

A. And then you want to keep things as about the same as they were.
Q. Okay.
A. You don't want things to change dramatically from what you bid to what you actually delivered.
Q. And is the reason for that because that's one of the relevant metrics that a bidder looks at is the number of deposits they are getting?
A. It's one of them.
Q. Okay. Do you consider yourself an expert on the way in which premiums of deposits were calculated in 1994 and 1995?
A. No.
Q. Okay. By the way, I know we've been going an hour. I'm doing fine, but if anyone wants to take a break?
A. I'm fine.
Q. Okay. Just speak up. At this point I would like to ask the court reporter to mark as Exhibit 10 a document that bears the Bates number C-AM-A-0014281.
- - -
(A document was marked as Deposition Exhibit Number 10)



- - -
BY MR. THOMPSON:
Q. Okay?
A. Okay.
Q. Okay. So the original message is from Sharon Dunn Yore to Mr. Ramey with a cc to yourself and Mr. Smith. Is that correct?
A. Yes.
Q. And what was Ms. Yore's position? Did she report to you?
A. She reported to Jay Jupiter.
Q. Well, how did Mr. Jupiter fit into the hierarchy that we've been discussing? You reported to Mr. Ramey. Did Mr. Ramey report to Mr. Jupiter?
A. No. Mr. Jupiter reported to me.
Q. Okay. I'm sorry. And she reported to Mr. Jupiter?
A. That's correct.
Q. And did you think Ms. Yore was competent?
A. Yes.
Q. And did you think Mr. Jupiter was competent?
A. Yes.
Q. And in the first paragraph of the original message it states, quote, "A conference



call has held at 11:00 today with Midatlantic per their request." Lists several people and says including Herb. Is that you?
A. Yes.
Q. And then in the third full paragraph of the original message it states "they," and the "they" is Midatlantic, "reiterated their concerns, delay in closing, runoff of deposits, the RTC not playing by their own rules, 72 hour clock, et cetera, as pointed out in their letters. They also feel the longer we delay, the more time it allows the minority bidder to raise the capital."
Is it fair to say that Midatlantic was concerned about deposit runoff?
A. That's one of the things mentioned in here.
Q. And would that have been a surprise? Was that a surprise to you?
A. At the time?
Q. Yeah.
A. I don't know.
Q. Okay. I mean, it's just common sense that they would be concerned about the deposit runoff. Isn't that right?
A. That would -- that was one of the



factors.
Q. Okay. Do you know what they were referring to by the RTC not playing by their own rules?
A. No.
Q. And do you know what the 72-hour clock was a reference to?
A. That was the -- that was a 72-hour time limit for the minority bidders to do something in the program.
Q. Okay. Now, on page 2 of this document it states that, quote, "We emphasized that this is a top priority and everyone is devoting 100 percent of their time to it. Herb told them we hoped to achieve -- excuse me -- we hoped to have something decided early," and then the next word is blanked out but early perhaps next week, closed quote.
The question is did you agree that resolving Carteret was a top priority as of the time of this e-mail traffic, September 1994?
A. Yes.
Q. And why was it such a top priority?
A. It was a large case and we were working on it.
Q. Okay. The next exhibit, Exhibit 11 has a

Page 118

investor group led my Glen Sergeon, bid" around the number, approximately $146 million for New Jersey and was within 10 percent of the high bid.
Then the end of that paragraph it says, "Among other things, more than 50 percent of the thrift's profits were being distributed to non minorities; this not being allowed. On October 12, 1994, the matched bid was rejected," closed quote.
Does that comport with your recollection that at least one of the reasons why Mr. Sergeon's bid was rejected was because 50 percent of the profits were going to non minorities?
A. He didn't meet our definition of what a minority institution was.
Q. That was one of --
A. That was one of the requirements.
Q. Yes. And he didn't satisfy that. Is that correct?
A. Right.
Q. Now the next paragraph talks about a minority investor group headed by F.D. Terrell submitted a bid of, and again I'm going to round the number, $165 million for the Carteret franchise. The bid was submitted with the FDIC regulatory acknowledgement form stating that the applications

Page 119

submitted were substantially incomplete.
When asked for additional information about the capital and proposed structure, they were unable or unwilling to provide it. The bid was disqualified because of lack of regulatory assurances the transaction could be consummated, insufficient structure information and failure to show evidence of funding.
Do you have any reason to doubt the accuracy of that paragraph?
A. No.
Q. Then the next paragraph talks about the Carteret Acquisition Corporation bid. And that's the one that we looked at earlier with the premium of $185.1 million. And this paragraph describes how the bid was conditioned upon acquisition of loans at 9.25 percent discount from fair market value in direct contravention of RTC policy, which is to furnish loans at market value.
An analysis of the transaction, allowing for the required discount on loans, showed that the 9.25 percent discount would have effectively decreased the bid by some $135.8 million and thus decreased the effective amount of the bid to approximately $49.2 million, an amount which was not

Page 120

within the 10 percent margin and substantially less than several bids received.
And do you have any reason to doubt that this paragraph is an accurate description of the reasons why the Carteret Acquisition Corporation's bid was rejected?
A. No.
Q. And we've already talked about Bahia, right, and they didn't -- which was described on page 5 of this memo, and the fact that they were not able to raise the necessary capital by the closing date. And is it true that that's the reason why they did not have their bid accepted?
A. Right. Yes.
Q. Okay. Now, on the final paragraph on page 5, it starts, in the first sentence, "Bahia and the high bid group were then given the opportunity to bid on Midatlantic's 15 branches and Sovereign's 1 branch. They did not reaffirm at the original bid price of approximately $87 million by December 30, 1994."
And first let me just ask you about that $87 million. Do you have any reason to doubt the validity of that number?
A. No.

Page 121

Q. And do you have any reason to doubt that the RTC would have been able to realize that premium if it had not been required under congressional mandate to do a second round of bidding with minority investors?
A. Well, the only thing about that is you don't know whether they would have bid 87 million in the first place, if it hadn't been for the threat of the minority bidders. So it's very hard to say whether something would be there if conditions were not in effect that were, that they bid on, so --
Q. Do you have an opinion on that or are you just saying you don't have an opinion because you think it's hard to --
A. You can't have an opinion.
Q. Well, you don't --
A. I mean nobody -- I don't have an opinion as to what somebody would have done if something hadn't been what it was.
Q. Okay. But let me ask it this way then. Do you have any reason to believe that the high bid group would not have met -- been able to satisfy its obligations and receive the necessary regulatory approvals if their bids had been accepted in a timely fashion?