IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

AMBASE, et al., : Case No:

Plaintiff : 93-531C

VS. :

THE UNITED STATES, :

Defendant :

------------------------------X

PHILADELPHIA

JULY 13, 1999

Page 30

Q. Did you view it as particularly strong in light of its origins?
MS. FRANK: Objection, vague.
THE WITNESS: I don't understand the question.
BY MR. HUME:
Q. Can you tell me how you understand the term supervisory goodwill?
A. My understanding of the supervisory goodwill is that would be the amount that an institution could count in capital as a result of an acquisition of a problem institution representing the amount that it paid over and above the assets and liabilities of the institution.
Q. And that means could count prior to FIRREA; right?
A. Yes.
Q. And it could count it based on agreements with the government?
MS. FRANK: Objection as to form.
THE WITNESS: Yes.
BY MR. HUME:
Q. And given that they were allowed to count it based on the government promise, doesn't that mean it was an asset that was particularly strong

Page 31

and particularly reliable from a regulatory standpoint?
MS. FRANK: Objection as to form and vague.
THE WITNESS: Could you repeat the question, please.
BY MR. HUME:
Q. Well, if the asset was an asset on the balance sheet that had a government promise behind it, doesn't that mean that in assessing the strength of the capital of the institution the extent to which it was supervisory goodwill should be something that was stronger than other forms of capital?
MS. FRANK: Objection as to form.
THE WITNESS: No, that's not an accurate statement.
BY MR. HUME:
Q. How is it inaccurate?
A. The strongest capital that a financial institution could have generally would be tangible capital which would come in the form of either cash or assets that could be converted to cash and then could be used to hopefully be invested properly. That form of capital would be viewed by a regulator

Page 32

as stronger than an intangible, generally speaking, stronger than an intangible form capital.
MR. HUME: Okay. Please mark this as Kehoe Two.
(Kehoe Exhibit No. 2 was marked for identification.)
BY MR. HUME:
Q. Mr. Kehoe, this is the 1989 report of examination of Carteret without the appendices. Before we look at this, Mr. Kehoe, can I just ask you one last question on pre-FIRREA examination of a Thrift with supervisory goodwill.
Would it ever be possible to conclude that a Thrift prior to FIRREA had insufficient capital even though it met technically its capital requirements?
MS. FRANK: Objection as to form. It calls for speculation.
THE WITNESS: I don't recall any instances of that occurring but, yes, it would be possible.
BY MR. HUME:
Q. And would one of the reasons that would make it be possible would be the existence of a

Page 33

large amount of supervisory goodwill on this fellowship?
MS. FRANK: Objection as to form.
THE WITNESS: More like --- that's a possibility. More likely there would be other factors that would cause a regulator to conclude the capital is inadequate even though the capital requirement is being met.
BY MR. HUME:
Q. What other factors?
A. Asset quality is poor or management is poor, interest rate exposure is a problem.
BY MR. HUME:
Q. So in other words, it would be given what's likely to happen in the future with your asset problems and your other problems, your capital is not sufficient to withstand that, would that be the reasoning of the regulators?
MS. FRANK: Objection as to form. It calls for speculation.
THE WITNESS: No, I don't think that's accurate. I think that as a regulator you can conclude that an institution's capital is inadequate not that there's potential problems down the road with asset quality or other issues but

Page 34

that those problems exist in the time being and if that were the case you could conclude that capital was inadequate.
BY MR. HUME:
Q. Right. But would you agree that benefit of having excess capital over the regulatory requirement is that it serves as a cushion against future losses for asset writedowns?
MS. FRANK: Objection as to form.
THE WITNESS: Having extra capital is a benefit. If it's in the form of intangible capital that benefit may be negligible.
BY MR. HUME:
Q. Mr. Kehoe, could you turn to the section of this report that deals with capital calculations and specifically to page 46. If you can just glance through the calculations on the three following pages.
(Witness reviews document.)
BY MR. HUME:
Q. You'll see the date on this report is May 22nd, 1989 but as made clear on the second page it was concluded November 14th, 1989. So this exam was done in light of the impending or recent passage of FIRREA. And it shows the tangible

Page 35

capital calculations for the institution based on FIRREA. And as you'll see if you look both on page 47 and then again on page 49 shows significant tangible capital deficiencies. Do you ever remember reviewing this document?
A. No, I don't remember reviewing it. I believe that at some point in time in my supervision of Carteret that I did review it or was aware of the contents of it.
Q. As you can see it indicates significant shortfall from the tangible capital requirement, doesn't that indicate that the effect of FIRREA on this Thrift was quite drastic?
MS. FRANK: Objection as to form.
THE WITNESS: My impression from reading this comment is that the impact, and when I say the comment, the portion of the report referred to as capital, is that the impact on Carteret's capital position was twofold. The disallowance of the supervisory goodwill had an adverse impact as did the need to establish additional loan loss reserves.
BY MR. HUME:
Q. Right. And if we look at page 47 and you look at note two you can see the breakdown of the

Page 36

intangibles tracked out of the capital. It shows the goodwill number to be $187 million. Do you see that?
A. Yes.
Q. And then if we look on page 49 you can see the number taken out of tangible capital to reflect appropriate General Valuation Allowances of $77 million?
A. Yes.
Q. So you're right, they both are obviously contributing to this assessment of $133 or $103 million shortfall. But wouldn't those two numbers indicate that the larger contribution was made by a change in the rules created by FIRREA?
MS. FRANK: Objection as to form. The witness is reminded that the document is used to refresh his recollection.
THE WITNESS: The larger number of the two is the supervisory goodwill. My recollection is that the amount that was required as additional General Valuation Allowances ultimately increased to much more than $77 million.
BY MR. HUME:
Q. Could you explain generally what a General Valuation Allowance is?

Page 37

A. The examination staff after reviewing the assets of an institution have to determine if there's sufficient reserves in place to provide for losses on loans or other assets. And if they believe that it's insignificant they request the institution to increase those reserves. The amount of reserves that have been established against assets on a bank or a savings and loan's books is --- at that point in time was referred to as a General Valuation Allowance.
Q. And does that mean that it's possible to take a General Valuation Allowance for an asset that looks problematic but then to recover it in the future when and if the asset becomes performing again?
MS. FRANK: Objection as to form.
THE WITNESS: I don't understand the question.
BY MR. HUME:
Q. I thought you said that a General Valuation Allowance is a reserve taken against a potential future loss; is that right?
A. Yes.
Q. So what if the potential future loss turns out to not have been a loss?

Page 66

payment of management fees to AmBase?
A. No.
Q. I show you a document that might refresh your recollection.
(Kehoe Exhibit No. 9 was marked for identification.)
BY MR. HUME:
Q. Having reviewed that letter, do you remember this issue?
A. Yes.
Q. What was the concern of OTS about these management fees?
A. My recollection is that was twofold. Since Carteret was a problem institution the fact that it was paying fees to the parent was further contributing to its poor condition. And I also recall that the examination disclosed that the basis or the reason that the fees were being paid were not well-documented or clear to the examiners.
Q. Was it unusual for Thrift to pay management fees to a holding company?
A. No.
Q. Was there any reason to suspect that AmBase may be just using this as a way to bypass

Page 67

their dividend limitations?
MS. FRANK: Objection.
BY MR. HUME:
Q. Let me back up on that. Were you aware that AmBase like many holding companies have a limitation on the dividends that they receive from the Thrift that it owned?
A. Yes.
Q. Was there a concern on the part of OTS that these management fees might be a way to bypass the limitations?
A. I don't recall that being the case.
Q. Was your judgment about the management fees impacted by the fact that at this time was actually the case that AmBase should have been putting money into Carteret rather than taking money out of Carteret?
MS. FRANK: Objection as to form.
THE WITNESS: I don't --- I may have concluded that ultimately. My recollection of this issue is that we sent this letter based on what was reported in the examination report that the fees were hurting the institution and they weren't documented so that they should stop. Apparently, from having read this letter, we received some

Page 68

additional information from Carteret or AmBase describing why the fees were being paid and we then came to the conclusion that we still thought that they weren't properly documented and it was still hurting the institution. So stop doing it.
BY MR. HUME:
Q. And you don't have any reason to question whether the judgment would have been different if Carteret would have been a one or two composite rating at that time with ample capital?
MS. FRANK: Objection as to form. Also calls for speculation.
THE WITNESS: We would still be critical of the institution, of any institution regardless of its rating, if there was no documentation and/or basis for fees that are paid to the holding company.
BY MR. HUME:
Q. Right. Although it sounds like there was documentation, simply that it was not sufficient to convince the regulators or convince you that it was a legitimate payment?
A. I don't know if ---
MS. FRANK: Objection.
THE WITNESS: --- it's necessarily a

Page 69

legitimate payment. I think from having read this, yes, there was documentation, apparently the quality of the documentation was lacking.
BY MR. HUME:
Q. Right. But if it was simply a problem of documentation presumably that wouldn't be too hard to cure. Isn't there really a judgment that was made that it simply wasn't in the Thrift's interest for these payments to be made?
MS. FRANK: Objection as to form. It misstates prior testimony.
THE WITNESS: No, I don't think that's accurate. I think that the basis or the reason why the fees were being paid to AmBase were not clear and neither Carteret or AmBase could clear it up or support those payments. So this letter went out saying, well, that being the case then don't --- just stop the practice.
BY MR. HUME:
Q. Well, given that Carteret had its own management and board, why would it not have been able to decide for itself that these payments were not in its interest?
A. They should have decided that on their own, I agree. Our examiners reviewed the situation

and came obviously to a different conclusion than the management at Carteret.
Q. And isn't it part of the reason why you would do that because it's also not in the regulatory interest, the interest of the regulators to see these payments made?
MS. FRANK: Objection as to form.
THE WITNESS: It's not objectionable for an institution to pay reasonable and legitimate fees to its parent holding company if the services that are being rendered are reasonable and a benefit to the Thrift. If that's not the case which apparently it wasn't the case here then, yes, we would say it's not in the best interest of the institution to continue to make those payments.
BY MR. HUME:
Q. I mean, if that's not the case the payments become equivalent to dividends; isn't that right?
MS. FRANK: Objection as to form.
BY MR. HUME:
Q. Unauthorized dividends?
MS. FRANK: Objection as to form.
THE WITNESS: I've seen cases where unjustified dividends have been interpreted to be



--- or, I'm sorry, unjustified fee payments have been interpreted to be dividends or even an authorized loan to the parent, yes.
BY MR. HUME:
Q. I guess what I'm also getting at is to ask you as someone whose position and duty was to be a regulator, didn't you have to make a decision based on your interest as a regulator at the time in determining whether or not these payments should be allowed or not?
MS. FRANK: Objection to the form.
THE WITNESS: Yes. I would consider that decision to be part of our regulatory responsibility.
BY MR. HUME:
Q. I mean, ordinarily we let private parties in our system decide what's in their own interest. If we regulate them it's because we think there is a regulatory interest in doing so. So wouldn't you agree that your judgment as to whether these payments should be allowed was made in order to protect the regulatory interests at stake?
A. I don't understand your question. You lost me on that.
Q. Well, in other words, it's not simply a



judgment this wasn't in Carteret's interest. It's also a judgment this isn't in the interests that are protected by our regulations by what we do as regulators. It is a risk to the insurance fund for this money to be coming out of Carteret when it is in need of capital?
MS. FRANK: Objection as to form. And I'm not sure there is a question out there.
BY MR. HUME:
Q. No, there is a question. The question is, isn't part of the judgment as to why these payments should not be allowed that Carteret needs money and that it poses a greater risk to the insurance fund if Carteret is paying money out to its holding company rather than receiving money from the holding company?
MS. FRANK: Objection as to form.
THE WITNESS: I think I answered the question. I said that there were two reasons why we sent the letter. Carteret was in poor condition and fees were being paid to the parent. And secondly, the fees that were being paid were not supported and documented. My recollection it was because of those two issues is why we sent the letter.



BY MR. HUME:
Q. Okay. What do you remember about the branch sales that Carteret undertook during 1990?
A. My recollection is that they have offices in Florida, a group of offices in Florida, and also a group of offices elsewhere on the east coast. And they had determined that those offices weren't working out well for them and that they would sell them.
Q. Do you remember part of the motivation or a large part of the motivation being an attempt to improve their capital position?
MS. FRANK: Objection as to form.
THE WITNESS: I don't recall specifically what Carteret's intentions were but at that period of time several institutions were trying to dispose of branch offices or other lines of businesses to improve their financial condition. And I think that's what Carteret's thinking may have been.
BY MR. HUME:
Q. In other words, the Thrift that was in trouble might try to downsize to help meet its capital requirements; is that right?
MS. FRANK: Objection as to form.
THE WITNESS: Several Thrifts did that as

Page 74

I recall.
BY MR. HUME:
Q. During the ---?
A. During the early '90s.
Q. After the past FIRREA?
A. Yes.
Q. And would you say the strategy was one that they undertook because of the capital requirements of FIRREA?
MS. FRANK: Objection as to form.
THE WITNESS: Some did because of the capital requirements and some did just because it made economic sense to dispose of facilities that were outside of their market area that weren't --- either weren't profitable or were not very profitable.
BY MR. HUME:
Q. What was your understanding of what Carteret's motivation was?
A. I don't recall --- the only branch sale that I recall with any knowledge was the Florida operations. And my recollection is that they wanted to get rid of the Florida operation because it was not a profitable operation and with the attendant benefit of downsizing that would help

Page 75

their capital ratios as well.
BY MR. HUME:
Q. Right. What was your role in approving these branch sales?
A. I don't recall.
Q. You mean you don't recall your role in these specific branch sales by Carteret?
A. That's correct.
Q. Would you recall what your role would have been in that position generally in approving branch sales?
A. Yes. We would have reviewed the branch sale and either signed off or disapproved of it.
Q. And would that sign-off or disapproval process take a long time?
MS. FRANK: Objection, vague.
THE WITNESS: There were and are standard time frames that we have to follow as far as acting upon applications like branch sales. I don't recall the specifics of what they are but normally I wouldn't anticipate that they would be more than a couple of months, two or three months tops.
BY MR. HUME:
Q. Would that approval or disapproval process be any different if you're dealing with a

Page 76

Thrift that was in excellent shape and had no capital problems versus if you're dealing with a Thrift that had severe capital pressure?
A. Yes.
Q. The reason for that was what?
A. Just in general we would want to look at any corporate application like a branch approval for any problem institution. We want to look at it much more closer than we would with an institution that's not a problem.
Q. What were the kinds of reasons that would cause you not to approve a branch loan application?
A. If the transaction would result in the institution being less profitable or being more leveraged in having less capital, that would present a concern.
Q. If you were selling assets to improve capital, presumably it's easier to do if you sell an asset for a profit so it will immediately have a positive impact on your capital; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: Could you repeat the question?
BY MR. HUME:
Q. Sure. In other words, if a Thrift is

Page 77

trying to improve its capital position by selling off branches, the reduction of its assets from the sale will help but it will also help if it sells profitably because the profit will help improve its capital position; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: Yes, that's right.
BY MR. HUME:
Q. But presumably to sell assets or branches profitably means you are selling assets that would make a profit for you or that it would be expected to make a profit for you on an ongoing basis; isn't that right?
MS. FRANK: Objection as to form.
THE WITNESS: Generally speaking that's accurate, yes.
BY MR. HUME:
Q. So I understand, I think, what you were saying earlier which was that one reason you wouldn't want to approve a branch sale application is if the Thrift is getting rid of some of its better assets, more profitable assets. But isn't there almost a catch-22 problem there in the sense that if you want an immediate effect, improvement effect on your capital you would sell your most

the industry as a whole as a result of FIRREA. I think that there was negative publicity cast on the industry as a result of the poor condition of many of the institutions that popped up in the late '80s and the early '90s because of real estate and problems and other economic problems.
BY MR. HUME:
Q. And also because of problems in meeting regulatory capital requirements after FIRREA?
MS. FRANK: Objection as to form.
THE WITNESS: I'm not sure I understand your question.
BY MR. HUME:
Q. Well, wouldn't part of that negative publicity on the Thrift industry as a whole in that period of time have been a response, and have been caused by the fact that FIRREA rendered many of these institutions non-compliant with their capital project?
A. Yes.
MS. FRANK: Objection as to form.
THE WITNESS: I would agree with that.
BY MR. HUME:
Q. Let me go back a little bit now to the commencement of the 1990 examination of Carteret.



Do you remember what it was that triggered the beginning of that examination?
A. No.
Q. Do you remember there being any pressure from either the FDIC or from the OTS in Washington to watch Carteret more closely?
MS. FRANK: Objection as to form.
THE WITNESS: I don't recall any pressure from anybody to go in and do another exam. But I'm sure that we were cautioned by both our Washington office and the FDIC to watch the institution closely. That would have been warranted.
BY MR. HUME:
Q. And you're sure of that because you remember that specifically?
A. No, I don't remember any specific comments like that. But I'm sure that those comments were expressed by both entities to somebody at the regional office at OTS.
(Kehoe Exhibit No. 12 was marked for identification.)
BY MR. HUME:
Q. Do you remember who Ed McQuown was?
A. No.



Q. You don't remember Mr. McQuown?
A. No.
Q. You don't remember the name?
A. I recognize the name. I don't --- this indicates ---.
Q. So you remember the name but not the person, is that what your earlier answer meant?
A. I've never met him or I don't know if I recall him. This indicates that he was with our Washington office.
Q. But you remember the name but not the person?
A. Yes.
Q. That wasn't clear from your earlier response. Apparently it amuses your Counsel. Do you remember receiving E-mails from the name Ed McQuown?
A. No.
Q. Why don't you review this one that you apparently received.
(Witness reviews document.)
BY MR. HUME:
Q. Is there any reason to doubt that this is, in fact, E-mail that you received from Ed McQuown?



A. It doesn't look like an E-mail, a printout of a hard copy of an E-mail similar to what I've seen previously.
(Kehoe Exhibit No. 13 was marked for identification.)
BY MR. HUME:
Q. Look at Kehoe 13. Does this look more like a printout of an E-mail?
A. Yes.
Q. I don't really understand who wrote what here. It looks like it is in the form of somebody responding to Ed McQuown's questions. Could you clarify for me what you think at least the second one is, what's written underneath response to Ed McQuown?
A. I don't know.
Q. Would you agree that the E-mail was sent to you?
A. Yes, the second one was.
Q. Who do you think would have written the responses to Ed McQuown in this E-mail based on reviewing this document?
A. Mike Finn, because he would have had the most knowledge concerning what was going on in the

Page 98

Carteret. But it doesn't appear to have been prepared by him either because I sent him the --- that E-mail the next day to start working on. So I'm confused as to who prepared the response to Mr. McQuown.
Q. So your answer is you think it might have been Mike McQuown but you're not sure?
A. You asked me who I believe it would have been, I would say normally it would have been Mike Finn. But given that it appears that I forwarded that E-mail to Mike Finn a day after the message had been received, I'm confused. I don't know who would have prepared the response.
Q. Not only that, your E-mail says to please prepare a response?
A. Right.
Q. If you turn to the third page of this document and the response to question number three, the question is, what action has been taken by the association to the correct and major problems. Can you just read over all of those actions and could you tell me whether those were all things you were aware of Carteret having done at that time period?
MS. FRANK: Objection as to form.
THE WITNESS: I believe that the first

Page 99

two bullet points they did because I saw in previous documents that they indicated that they had taken those actions. I don't know for sure if they --- from the third bullet point down if they had actually done what was listed in this memo.
BY MR. HUME:
Q. Of course the second one established per the 5/22/88 ROE as we discussed earlier I don't understand because the ROE recommended $77 million as we reviewed. And as I represented to you they only reserved $26 or $27 million in 1989. What does that sentence mean?
MS. FRANK: Objection as to the form.
THE WITNESS: I believe that they did what we asked because an earlier document, which I believe was from me to the institution, indicated that we had agreed on a number totalling about $9 million as to what was required in additional reserves. And then a subsequent letter back from the institution indicated that they had made an additional $9 million reserve plus apparently even a little bit more.
BY MR. HUME:
Q. Okay. So it sounds like there was a modification of the reserve requirement recommended

Page 100

in the 1989 report?
MS. FRANK: Objection as to form.
BY MR. HUME:
Q. Would you agree with that?
A. I don't remember having done that but that appears to have happened based on that correspondence indicating that we agreed on a reserve.
Q. And the remaining points here you would not have been aware of at this time or you don't recall being aware of at this time?
A. I might have been aware of it but I don't recall if they, in fact, ever occurred and I don't remember.
Q. Turning your attention to the point four from the bottom, it says, Carteret redesigned its loan review and reserve calculation procedures in 9/89, September '89, and developed a new General Valuation Allowance output report. That seems to me to have been a pretty important part of the complaints that OTS had registered with Carteret. Do you remember that continuing to be a problem in the 1990 examination?
MS. FRANK: Objection as to form.
BY MR. HUME:

Page 101

Q. Their loan review procedures?
MS. FRANK: Objection as to form.
THE WITNESS: I believe it continued to be a problem based on the fact that additional loan loss reserves were needed following the 1990 examination.
BY MR. HUME:
Q. In other words, the existence of additional reserves being recommended indicates that their loan review was found still to be inadequate?
MS. FRANK: Objection as to form.
THE WITNESS: Yes.
BY MR. HUME:
Q. And yet it says here that they had redesigned it in accordance with the procedures --- well, I guess it says that they had redesigned its loan review and reserve procedures as of September '89. Wouldn't that have been likely to have been something done in conjunction with the regulators?
MS. FRANK: Objection as to form.
THE WITNESS: It could have been. Again, I don't know who wrote this or if what they wrote is accurate or not other than the first two bullet points.

Page 130

the additional loan loss reserve, if I recall correctly, was a lesser amount. But I think ultimately it was more than that and I ---.

BY MR. HUME:

Q. And you suspected that that would be the case from the moment you started working on it?

A. No. I said that when I first started working with Carteret, my initial reaction was that the asset quality problems was the biggest problem that the institution faced.

Q. Right. And you said that would mean that it was a bigger problem in your mind at that time than the loss of goodwill as a result of FIRREA?

A. Yes.

Q. And that was true even though at that time it was a smaller amount of money than the amount of goodwill that was lost from FIRREA?

MS. FRANK: Objection as to form.

THE WITNESS: Yes. Because you don't look at it as to the amount of money. If an institution has asset quality problems and it's in a poor economic environment it's probable that you haven't seen the end of loan losses, and given the extent of asset quality problems that Carteret had my recollection was that they would be suffering

Page 131

from the asset quality problems for probably an extended length of time.

BY MR. HUME:

Q. Do you think your assessment of the importance of those asset problems would have been different if Carteret had had excess regulatory capital?

MS. FRANK: Objection as to form.

THE WITNESS: It would have been different to the extent that they would have had additional cushion to absorb the loan losses. Now, the degree to which it would have been different I don't know.

BY MR. HUME:

Q. All right. So it may not have affected the loan loss provisions recommended or taken but it might have affected the ultimate judgment about the health of the institution. In other words, whether it's a 4 or 3 or a 2 or whatever its ultimate rating is?

MS. FRANK: Objection as to form and I think it mischaracterizes his testimony.

THE WITNESS: I don't know if --- well, you're asking me to speculate what would happen. If I were to speculate and Carteret had more

Page 132

capital than it showed on its books, it's with the degree of asset quality problems that they had and it probably still would have been very adversely rated, even with the additional capital, just because of the magnitude and the long terms.

BY MR. HUME:

Q. You surely make it sound like it must have been a sense that this was the tip of the iceberg in terms of asset problems. Was that your sense at that time?

A. No. My sense at the time is that they had a large volume of problem assets. And given the current economic environment and seeing what was occurring throughout the industry it was going to be a long road to recovery for the institution just because of the number of problem assets that they had.

Q. So maybe not the tip of the iceberg but the top half of the iceberg?

MS. FRANK: Objection as to form.

THE WITNESS: I didn't have any good understanding of the depth or degree of loans that had been identified as problems. My sense at the time was just based on what we know and what type of economic environment wherein Carteret was going

Page 133

to be suffering with trying to resolve those problem assets.

BY MR. HUME:

Q. But if it had had $180 million excess capital over and above its capital requirement at that time, wouldn't your judgment have been different about its long-term prospects?

MS. FRANK: Objection.

THE WITNESS: My judgment would have been it maybe would have more staying power.

BY MR. HUME:

Q. Maybe it would have more staying power or certainly it would have more staying power?

A. It would have --- it may have more staying power if it's able to successfully resolve a lot of the problem loans. But from what I saw going back reviewing those two examination reports, the dollar amounts that were required to absorb the losses were substantial. So it may be even $180 million wouldn't have made much of a difference, you know. I don't know. That's --- what I'm telling you is what my observations were at a time.

MR. HUME: Okay. Why don't we break?

(Short break taken.)

BY MR. HUME: