IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

November 12, 1999

10:15 a.m.

200 Park Avenue

New York, New York

DEPOSITION of DONALD KRAMER, a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York

A I believe we kept them apart, because we didn't want one to affect the other.
Q There was a degree of independence that you wanted to retain?
A Yes, we kept all three, you do your thing, don't ask us, just come back and tell us what you think.
Q And each of their findings were generally consistent with one another?
A Reasonably, yes, as I recall.
MS. TORNATORE: If we could mark as Exhibit 6 this document.
(The above-described document was marked Kramer Exhibit 6 for identification, as of this date.)
Q I'm going to show you what we've marked as Exhibit 6. If you want to take a moment or two to read it, it's really not very long, but I do want to go through it in some detail.
A Okay.
Q Do you recognize Exhibit 6?
A I believe so.
Q How do you recognize Exhibit 6?
A It was a press release, I just remember, announcing the loan loss reserves,



announcing my appointment, and others as well.
Q Exhibit 6 was issued by Carteret?
A I believe it was, yes.
Q The information in Exhibit 6 pertaining to the $150 million reserve amount, do you recall if that was in response to Mr. Moor and Price Waterhouse and Kenneth Leventhal's review?
A I believe it was a combination of those things, yes.
Q Do you recall that management had any disagreement with the Board of Directors in the amount of reserve that needed to be taken?
A I don't recall disagreement. I certainly knew that Mr. Bianco and myself both felt that it was appropriate.
Q Was there perhaps any disagreement with the FDIC or the OTS regarding the amount of the reserve?
A I don't remember any disagreement.
Q The loan losses, were the reserves that were taken at this time, was that in response to loans that were -- these are existing loans on Carteret's books, is that right?
A Yes.
Q So the losses were inherent in the



portfolio.
A The losses were inherent in the portfolio, well, I guess the losses were what the market value of those assets were, and if they were below the --
Q Book value?
A (Continuing) -- the book value, they were inherent. If that's what you mean.
Q In your opinion should those losses have been taken prior to the second quarter of '91?
A I don't know, because really what happens in these things, you make estimates, and you take the losses as soon as you determine or your best guess what this is worth, you should mark it to market.
We did the analysis and that was our conclusion. If we had done the analysis earlier and come to that conclusion, we would have taken it earlier, I just wasn't there at the time, but we took it as soon as we knew it.
That's the only way I can describe it.
Q Okay. What impact did the economy have on Carteret at this time?



A I guess a mixed impact. We were going through a period where real estate values appeared to be declining, and so that affected the existing portfolio, but we were also going through a period of interest rates starting to fall, and that was very beneficial.
Carteret had a, principally a variable rate portfolio, and had matched against deposits or Federal Home Loan Bank advances, so the spread probably would improve, so it had a mixed effect.
But generally conditions were sort of bottoming in the real estate market, and the interest rate environment was getting better.
Q On Page 1 of Exhibit 6 Mr. Bianco indicates that there were indeed in fact harsh economic conditions in both of the markets in which Carteret operated.
What was the impact of the economy on the Florida markets, was there any difference between the Florida markets and the New Jersey?
A I don't think materially. Again, we said real estate values had declined, and I think that's the harsh market he's talking about, but as far as interest rates were concerned, they had

risen previously and were now pretty much topping out, looking like they were improving somewhat.
Q Do you recall in discussions following the second quarter of '91 additional reserves needing to be taken?
A I don't recall. We would have taken our best shot straight out of the box, because if we're going to do it, we ought to do it as right as we can.
Q Was it a possibility that additional reserves would need to be taken?
A I wouldn't dismiss it as a possibility. They could be greater or less, there's no question.
If real estate values turned, maybe those reserves were totally excessive, but we gave it our best shot, as I said.
Q What effect did the increase in the reserves have on Carteret's regulatory capital position?
A It put the company out of compliance with regulatory capital requirements.
Q Was that even including the supervisory goodwill at Carteret?
A Had the supervisory goodwill been



restored, no, the company would have been in compliance.
Q What other actions did the Carteret Board take with respect to Carteret's financial condition, improving Carteret's financial condition?
MR. HUME: Objection, vagueness.
You can answer if you know.
A I'm not sure what other actions the Board took. The Board is supervisory and reviews things. Management basically takes and implements the actions. So I don't know what we would have done.
I mean, we hired consultants, we hired reviewers, we hired a management team to run it, I became part of that team, and we did the best we could to make this bank successful. I mean, that was our mandate.
Q Do you recall Carteret proposing the sale of Imperial Premium Finance?
A Yes, I do.
Q Was that in connection with trying to improve Carteret's financial performance?
A Not performance, condition. I just said that the company, when it took the loan loss



reserves, was out of capital compliance.
As I recall, and again, going from some memory, Imperial Premium Finance was not capitalized on the books of the bank, and we felt the sale of it to the holding company would put admitted capital back into the subsidiary and move it up to the AmBase level.
That was a proposal. It never was implemented, it never occurred.
Q So the sale of Imperial Premium Finance would have actually benefited Carteret's capital position?
A On a reported capital basis, yes. In economic substance, Imperial was better served in Carteret than out, because it was generating non-correlated profits, but that's definitional.
Q Do you recall your focus at this time was to try to increase Carteret's capital?
A Yes, absolutely.
Q That was the priority over the earnings that Imperial Premium Finance was providing?
A Yes, we were engaged in trying to increase capital, get the company back into regulatory compliance as quickly as possible.



Q What efforts were made to sell Imperial Premium Finance?
A Well, it was, that was an intercompany sale, so as I recall, some report was drafted on the value of the company, it was submitted to the Office of Thrift Supervision, because it was a transaction between affiliates and required extensive approval.
And as I say, as I recall, it never occurred. The transaction never took place. It was attempted in concept, but never executed.
Q I'm going to show you what we'll mark as Exhibit 7.
(The above-described document was marked Kramer Exhibit 7 for identification, as of this date.)
Q I'm going to show you what has been marked as Kramer Exhibit 7. If you want to take a minute and just familiarize yourself with it.
A Okay.
Q Do you recognize Exhibit 7?
A I believe I do.
Q Can you identify Exhibit 7, please?
A It's a letter from Deloitte & Touche regarding the appraisal of Imperial Premium

regulators and the previous management?
A Not a great deal.
Q What did you hear?
A In terms of?
Q Just the nature of the relationship with the regulators.
A As I said, I don't recall a great deal. I don't think they'd come in and tell us a great deal about the things prior management had done.
It was basically the institution and not the individuals. I think they may have to the extent that they had any angst against the prior management or any objections, they would have wanted us to pursue it, but I don't remember, again, details specifically from management to management point of view.
Q What regulatory action had been taken with respect to Carteret at the time that you initially became a director?
A I don't remember, but shortly, somewhere in that area we were under a supervisory order or something like that. I don't remember the terms.
Q Why was the supervisory order



entered into?
A Because we were out of the capital compliance.
Q Do you recall the effect on Carteret of that supervisory order?
A Well, is certainly restricted many things we could do. We couldn't enter into many transactions without prior approval of the OTS.
Q Any other effects on Carteret?
A I'm sure there were, I don't recall specifically what you're looking at in the way of effect.
It constrained things we could to, it affected things we could do. We had to have approval, we had to file reports. It consumed a lot of time. But I don't know it affected in terms of operations, I can't really comment.
Q Do you recall subsequent to the supervisory order any other regulatory action?
A I don't know. Action, I just don't recall what action it was. We filed a plan, but I don't remember any specific action.
Q Do you recall when you filed a plan?
A Somewhere mid-term when I was there, so it had to be probably March of the following



year, that would be March of '92.
Q Why was a plan filed?
A In order to show how we would restore capital adequacy and to project budgets and forecasts.
Q So it was just conveying information to the regulators?
A Yes, but also it was trying to get a plan of how we were going to get the bank back in capital compliance.
Q Do you recall the specifics of the plan?
A I recall the plan reasonably well, because I wrote it, but I don't remember the specific details.
We told them about asset/liability management. We told them about profitability. We told them about the value of certain assets. We told them about loan loss reserves and liquidation and charges. We told them about personnel reductions.
And we had a forecast of our results and we told them the efforts we were making to raise capital.
Q Was part of Carteret's plan the idea



to raise external capital?
A Yes.
Q How significant was raising external capital to Carteret?
A I thought it was significant. I thought it was important.
Q Could Carteret have come into capital compliance internally generating earnings?
A Given time, yes.
Q Over what period of time could Carteret have internally generated enough earnings to come into capital compliance?
A Probably 18 to 24 months, I would guess 24 months at the outside. Carteret was starting to earn substantial money.
Q When you say substantial, what do you mean by that?
A Well, after the year of the write-offs, the following year Carteret earned approximately $35 million.
The forecast for the following year, the year in which the company was taken, the company was earning at the rate of probably $100 million.
Q So in 1991 Carteret earned $35

fall of 1991.
Do you recall specifically a meeting on November 5th?
A I pretty much recall this meeting that's described in the document, yes.
Q Do you recall expressing the view that you were not a proponent of the supervisory goodwill case?
A I see it says so here, yes, and I guess that would probably be right.
Q Do you recall what your assessment of the outside counsel was handling the goodwill claim?
A Well, I think I said, testified just earlier that it was expensive and that I was -- I knew more about the bills than I knew about the case, and this just confirms that view. We were concerned about the cost.
Q And at this time I take it Carteret was taking aggressive action to try to reduce operating expenses.
A That's correct.
Q And the legal fees were significant enough to play into that decision?
A Yes.



MS. TORNATORE: If we could mark Exhibit 18.
(The above-described document was marked Kramer Exhibit 18 for identification, as of this date.)
Q Mr. Kramer, I'm going to show you what we've marked as Kramer Exhibit 18.
If you want to take a moment to read through that document.
A Okay.
Q Do you recognize Exhibit 18?
A I think I do.
Q What is Exhibit 18?
A It's a January 14th letter to Nicholas Ketcha of the Federal Deposit Insurance Corporation, and it was jointly authored by Mr. Bianco and myself.
Q That's your signature on the last page of Exhibit 18?
A It is.
Q On Page 2 there's a discussion there regarding Carteret's capital ratios. In that discussion it indicates that Carteret is not in capital compliance with or without consideration of the goodwill suit.



What was the goodwill suit?
A It wasn't the goodwill suit, it's the permission to use the supervisory goodwill.
Q I see.
A So we said even if you allowed us to use the supervisory goodwill, we still wouldn't be capital compliant.
And in fact, that's how we came up with the number for the amount of money we needed, if you notice, $206 million, we said we needed to raise about $200 million to be in compliance.
Q I see.
MR. HUME: I would just like to note for the record the numbers here do not reflect goodwill, right?
THE WITNESS: Right.
A For purposes of correcting we said, in this case we said without -- we're going to measure its future capital without supervisory goodwill.
That's why I said we wanted to be in compliance and out of the OTS supervisory directives.
Q Okay. On Page 4 of Exhibit 18, at the sixth point within the document there.



A Right.
Q I guess the comment had been made by Mr. Ketcha that the viability of the institution is dependent on this outside capital.
And the response was, "There is no comment necessary."
What did you mean in your response there?
A Well, the capital plan is to put the company in compliance. If you're not in compliance -- he's saying the viability is dependent on outside capital.
We said the capital plan will put us in compliance. That was the whole capital plan. If you buy into our capital plan, you'll be in compliance.
Q So the foundation of the capital plan was the outside infusion.
A Right.
Q Do you recall what the results of the goodwill claim was at the Third Circuit?
A As I recall, the company won the initial case and then it was reversed on appeal. That's what I remember.
Q Do you recall the timing of the

at our company. They took a serious interest.
Q Was this in 1991, late 1991?
A Probably, yes, it had to be around that time.
Q Do you recall what the result of their due diligence was?
A They never -- I don't know about the due diligence, but they never really committed to the deal.
They were interested, they were trying to find a way to do it on something of a shoe string, borrowing money or finding other ways.
American Stock Transfer was a very nice business, and very profitable, but not particularly big, and this would have leveraged them into the big leagues financially, because they'd be acquiring a $5 billion depositary institution, and from an earnings point of view, that could send them to the moon, but I think they were trying to bootstrap the deal.
So they were interested, but they really weren't -- they didn't have the ready cash to do the deal.
Q They didn't have the resources to do



the deal?
A No, not like what a GE Capital could have done.
Q Do you recall any objection by the OTS to American Stock Transfer?
A Not initially. I think they checked them out, I think they would be concerned be anyone who would do the deal would have to pass muster with the OTS as an approved person to do the deal, so yes.
Q Do you recall the OTS objecting to any prospective investors that you or Mr. Bianco discussed?
A I don't think so, I don't think so. I don't think we got far long enough to really actually file the application to get the answer to that question.
But again, we were in full disclosure with the OTS, so they knew what we had in prospect. They knew everything we did. We didn't do anything without disclosing it.
Q Do you recall a company named the Carlyle Group?
A Yes, I do.
Q How do you recall the Carlyle Group?



A They were a prospective investor. They were a former -- Frank Carlucci, former Secretary of Defense, was the principal.
Another fellow who looked at us, together with a fellow named David Bonderman, who is the owner of Continental Airlines.
Q What was the extent of Carlyle's interest in Carteret?
A They're a venture capital investment firm. They had principally invested in defense industries, given Carlucci's background, but they looked at an investment in the thrift and heard our presentation and visited our company.
But my feeling was the government sort of scared them away. They were told don't go near a thrift, the government is savage and it goes after thrift directors, and you have to be crazy to get into this business, and so they finally walked away.
Carlucci said I've done a lot of investments, never once was I so warned away from investments like this one.
Q Who was warning Carlyle?
A People who were friends of the company telling them stay away from a thrift, the



government is just impossible to deal with.
It was really awful. It was not fun to hear.
Q Even though the Carlyle Group would invest in defense contractors?
A Yes, that's exactly right. "Given the controversial stuff we've done, nobody called us more than when we talked about the prospective possibility about putting money in a thrift."
Q Do you recall any names at the Carlyle Group, any individuals?
A Vaguely, I just can't remember offhand, but there was a second guy who was the principal operating officer.
I'm sure there are documents, we'll find it.
Q Angel DiNello?
A DiNello was one, but there was another one.
Q David Dupree?
A No, still another one besides him. Those two now I remember.
Q Those are the only names that I was able to come up with.
A There was somebody senior to both of

Q John Lyons?
A Yes. Anyway, they were supposedly experts in the savings and loan business.
Q What was your opinion of LZO?
A Candidly not particularly high. They seemed to be tainted by prior experience and really didn't look at this thing I think objectively.
They had some biases on a lot of areas. For example, we spent a lot of time before telling you that we thought the reserves were well done.
They just generically said they can't be, they have to be twenty percent understated, because everybody else's is, and not giving us credit for what we did and not looking at them as they should have, because we were liquidating loans constantly, equal to the reserve.
They said but you're going to take twenty percent hits and things like that.
We never really saw their final report, but they were negative on thrifts generally, negative on real estate, negative on thrifts.



And like our friends at Carlyle, they were very cynical about the government's relationship. They said you just don't want to get into this thing.
Q What views had they expressed about the government relationship?
A Again, just the fact that it wasn't a desirable thing to do, to get involved with a thrift.
Q Do you recall a Mr. David Maughan at Kidder Peabody?
A Yes. That's the tall, thin guy I referred to.
Q Do you recall what your opinion of Mr. Maughan was?
A I thought he was a competent investment banker.
Q How about a Matthew Lindland at Kidder Peabody?
A I don't remember him.
Michael Carpenter was the other name at Kidder Peabody. Michael is now I believe the head of Salomon Brothers, part of Citigroup.
Q What was Mr. Carpenter's involvement?



A He was chief executive at Kidder Peabody. He came out of GE Capital, who was the owner of Kidder Peabody, and he was the most senior executive at the company.
Dick and I knew him, we wanted to -- he knew us on favorable terms, that we were responsible and good guys, and so we talked to him about getting Kidder to back this deal.
Q Was GE Capital a prospective investor in Carteret?
A Yes.
Q What was the level of GE Capital's inquiry?
A It never got very far. I don't think they wanted to do a thrift.
Q They just weren't interested in a thrift investment?
A That's my guess. I never got it up to Gary Wendt, who I knew. We dealt with a lady named Nori Cunio. She was Hawaiian, I believe.
MS. TORNATORE: Let's go ahead and mark Exhibit 21.
(The above-described document was marked Kramer Exhibit 21 for identification, as of this date.)



Q Do you recognize Exhibit 21?
A Yes, it's a letter from Kidder Peabody to Neil Cohen and myself from, I guess it's Matthew Lindland, and it sets forth a time schedule for the private placement.
Q Do you recall that Carteret was given specific amounts of time within which the capital plan was to be executed?
A I think we were, yes.
Q Do you recall how much time that was?
A Not exactly, but I knew we had a time stamp on it.
Q Were there extensions that were granted with respect to the timing of the capital plan?
A I believe there were at some point. We were making pretty good progress, but couldn't quite close.
Some for the reasons I told you, some for just time to get people going through the holidays, Christmas, New Years, a whole variety of things, but I believe we were given some additional time.
Q Do you recall that the estimate of

That's why I say the minute The Dime Savings Bank went, the whole market just went, and the thrifts traded in a whole new valuation.
Q Why do you think that was, that time period there?
A It's timing, it's interest rates. Interest rates continued to decline. They declined right through October of '93.
Carteret was taken over in December of '92. And decline in interest rates was a bonanza for the thrifts. They made a fortune.
Q Let me see if I can pull out an additional document here.
MR. HUME: Counsel, can we go off the record for one second.
MS. TORNATORE: Certainly.
(Discussion off the record.)
MS. TORNATORE: Let's go ahead and mark Exhibit 22.
(The above-described document was marked Kramer Exhibit 22 for identification, as of this date.)
Q Mr. Kramer I'm going to show you what we've marked as Exhibit 22.
If you want to take a few moments



and just familiarize yourself with it.
A Okay.
Q Have you had an opportunity to review Exhibit 22?
A Yes.
Q Do you recognize Exhibit 22?
A Yes, I do.
Q How do you recognize Exhibit 22?
A This is a forecast I had prepared for the capital plan basically contemplating a $200 million capital contribution and the restoration of the bank to capital compliance; core capital.
Q You seem to have recognized Ledyard Smith's name.
A Yes.
Q Do you recall Mr. Smith?
A Yes, he was the Controller and he worked directly for me.
Q What was your opinion of Mr. Smith?
A He was a good guy. I liked him.
Q Very competent in his knowledge of Carteret?
A I thought he was competent, yes.
Q Was Exhibit 22 typically the type of



forecast information that was provided to a prospective investor?
A It was in this case. Typically I don't know, but it was certainly in this case.
By the time I had prepared this, I had on my own financial models actually been able to match every asset and liability with its allocated cost.
So I had very good feeling and knowledge of both the cost and the income from every single asset and liability of the bank.
Q You were able to match those two?
A Yes, and our forecasts were really quite good. We never missed, that I recall, ever missed a forecast that we gave the OTS.
There were variables you can't control, interest rates, spread, et cetera, but on the stuff we knew, we were right on.
Q I want to go through the names of some additional investors.
Do you recall PNC being a prospective investor in Carteret?
A Oh, yes, I certainly do.
Q How do you recall PNC?
A PNC was very interested in the



thrift. Pennsylvania was a neighboring state, PNC was a major aggressive bank, and they had a real interest in it.
We worked out several different concepts or plans for working it out for the things they wanted.
One of them was to split the bank, get back in capital compliance, leave us with, I believe it was a New York region, and we'd come up with a smaller but viable thrift.
We had a whole variety different concepts with them. They were very anxious.
Q There were a number of different alternatives that were discussed with them?
A Yes.
Q Do you recall when you first approached PNC?
A I don't. It was toward the tail end of things. Things were winding down, so it had to be late in 1992.
We were already, had struck out with a number of investors, and we were pretty far down the road in time, and this was late in that game, but they were very seriously interested.
Q Do you recall any of the names at

Department of Justice asked you whether or not you remembered whether anyone disagreed with your decision, the decision of Carteret management at that time to take this writeoff?
A Yes.
Q Is it possible in your mind that Angelo Vigna may, as he testified in his deposition, have recommended to Dick Bianco that he not take this full amount of reserves at that time, all at once?
A Yes, it's possible. I just don't remember.
Q Would you agree that the decision as to what is a mark to market, a true mark to market is inevitably a subjective decision, it's always open to some judgment and finesse?
A Yes. It's open to also empirical result, if you really sell it for what you think it's worth.
Q Do you recollect that a lot of those assets had real estate as collateral, so that a tough real estate market at that time would have led to quite tough valuations? And by tough, I mean low.
A Again, whatever the market was at



the time we reflected it, so if it was a tough market, by definition we reflected it to the market.
Q Do you think that your decision to take that sizable reserve in the second quarter of 1991 helped you in establishing credibility with investors on Wall Street?
A I think it was part and parcel of what we do. We want to keep a true and honest balance sheet. They're going to come in and do due diligence. If we haven't marked it properly, they're going to mark us down.
Q Do you remember when counsel for the government asked you about the value of goodwill to Carteret?
A Yes, I do.
Q Would you agree that supervisory goodwill, if it was included in capital and allowed you to stay in business had very significant value to Carteret?
A Well, I think I testified as I recall that whether we stayed in business because of goodwill or whether we stayed in business because of a capital infusion, either one of them, as long as we stayed in business, would have been



valuable to the company, because we could have earned back our future income.
MR. HUME: I don't have any more questions.
MS. TORNATORE: Thank you for appearing today, Mr. Kramer.
THE WITNESS: Thank you.
MS. TORNATORE: I appreciate it.

____________________
DONALD KRAMER

Subscribed and sworn to before me this ________ day of ____________, 1999.

____________________
NOTARY PUBLIC



E_X_H_I_B_I_T_S

| KRAMER | | FOR_IDENT. |
|---|---|---|
| 1 | Document Bates stamped AMP 071861 - 62 | |
| 2 | Document Bates stamped A 003360 - 82 | |
| 3 | Document Bates stamped WOP 7700451 - 546 | |
| 4 | Document Bates stamped A 006697 - 727 | |
| 5 | Document Bates stamped FAM 0022361 - 65 | |
| 6 | Document Bates stamped WOP 2910518 - 21 | |
| 7 | Document Bates stamped WOQ 6922182 - 88 | |
| 8 | Document Bates stamped WOQ 6002024 - 31 | |
| 9 | Document Bates stamped C-AM-A 0180801 - 09 | |
| 10 | Document Bates stamped C-AM-A 0361954 - 87 | |
| 11 | Document Bates stamped WOP 3251570 | |
| 12 | Document Bates stamped WOQ 6972212 - 14 | |
| 13 | Document Bates stamped WOP 3440587 - 603 | |
| 14 | Document Bates stamped AM 00065167- 74 | |
| 15 | Document Bates stamped C-AM-A 0213912 - 65 | |
| 16 | Document Bates stamped AM 00060877 - 80 | |
| 17 | Document Bates stamped WOQ 6530277 - 80 | |
| 18 | Document Bates stamped AM 0048418 - 24 | |
| 19 | Document Bates stamped E-AM-A 0000003 - 5 | |
| 20 | Document Bates stamped C-AM-A 0178322 - 3 | |