UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

| | |
|---|---|
| AMBASE CORPORATION and | : Civil Action |
| CARTERET BANCORP, INC., | : |
| Plaintiffs | : |
| and | : |
| FEDERAL DEPOSIT INSURANCE | : |
| CORPORATION, | : |
| Plaintiff-Intervenor | : |
| vs | : |
| THE UNITED STATES OF AMERICA, | : |
| Defendant | : No. 93-531 |

\- - - - - - - - - - - - - - -x

Thursday, March 23, 2006

Allentown, Pennsylvania

\- - -

Oral deposition of GLORIA MALIGAYA, taken pursuant to Notice, at the Crowne Plaza Hotel of Allentown, 904 Hamilton Street, Allentown, Pennsylvania, beginning at approximately 9:30 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

\- - -

Page 26

Q. Okay. And how typical was it for a conservatorship to last more than one year in your experience?
A. It seems like they lasted more than one year.
Q. Okay. And I take it -- you've made reference to a variance report?
A. Yes.
Q. How often were those prepared?
A. Quarterly.
Q. Okay. And was that something that you reviewed as well?
A. Yes. They submit it to me.
MR. COLATRIANO: I'd like to have this document marked as Exhibit 2, please.
(Whereupon, a document was marked for identification as Exhibit Maligaya-2.)
MR. COLATRIANO: Exhibit 2 is a document, the first page of which says, "Carteret Federal Savings Bank Conservatorship Strategic Plan, Volume 1 of 2." It's Bates stamped. The Bates stamp is the number on the bottom of the page.

Page 27

That's a stamp for our purposes. It's stamped C-AM-A-0400781 through, and including, 400869.
BY MR. COLATRIANO:
Q. This document is called a Conservatorship Strategic Plan. Is that the same type of --
A. Yeah, it's the same.
Q. The same as the operating plan you referred to earlier?
A. Yes.
Q. The second page of this, the page that's Bates stamped that ends 782 at the bottom, has a memo dated February 1, 1993 with some signatures on it. And one of those signature lines is reviewed by Gloria Maligaya. Is that your signature?
A. Yes.
Q. Okay. And there's another line for concurred by, and it looks like the name there is Eugene Yalicki?
A. Yalicki.
Q. Who is Mr. Yalicki? Is that somebody to whom you reported?
A. No. He must have been assigned to

Page 28

Carteret as an oversight manager.
Q. Okay. And do you know --
A. My dealings would have been with George Gross.
Q. George Gross was the managing agent for the Carteret conservatorship?
A. Yes.
Q. Do you know where Mr. Yalicki was based?
A. No.
Q. Okay. And then there's a signature line for Robert Smedley, the supervisory managing agent. Was he someone you reported to?
A. Not directly, no. My dealings was with Atlanta mostly.
Q. Okay. Was there a particular person that you reported to in Atlanta?
A. I wish I could remember the name. It's always on the phone.
Q. Okay.
A. I can't remember their name.
Q. Okay. Was it a man or a woman?
A. In the beginning, it was a man -- it was a woman, and then later on, it was a

Page 29

man.
Q. Okay. If you go in a couple more pages, the page that's Bates stamped that ends 784, there's a memo there dated February 25, 1993 from yourself to Mr. Smedley. Was this a memo that you typically --
A. Like a summary. Like a summary of what the plan has.
Q. Okay. And was that what you typically did when you reviewed these plans?
A. Yeah. This is like a proforma.
Q. Okay. When you say "like a proforma," what do you mean?
A. It's like a -- which I drafted myself. This is like a standard that I used for everything else.
Q. Okay. The first paragraph of this memo notes that the plan had been reviewed for compliance with the guidelines set forth in the Conservatorship Operating Manual. I take it, were you the one who conducted that review?
A. Yes.

Page 38

conservatorship, do you know?
A. No, I don't know.
Q. Okay. Do you know what -- strike that.
The next page, the page Bates stamped 801, has a discussion of hedges, and again, there's a chart, and then right underneath that chart, there's a sentence, "The cost to unwind the interest rate swap agreements is currently estimated to be in excess of $6 million." Do you know why a decision was made to unwind swap agreements --
A. No.
Q. -- for Carteret?
A. No.
Q. Okay. Was that something that typically would have been supported by any type of analysis of whether the cost to unwind the swaps was justified?
A. I did not know. I was not involved with that.
Q. Okay. And I take it that that type of analysis was not something you would review in connection with reviewing

Page 39

this plan?
A. No.
Q. Okay. Do you know whether there was RTC policy regarding whether these types of swap agreements should be unwound?
A. No, I don't know.
Q. Turn to the page that's Bates stamped 805. Go ahead and read to yourself the last paragraph on that page, the paragraph under the heading "Carteret Financial Services." Just let me know when you've read it.
A. Yes.
Q. Okay. There's a reference in this paragraph to a decision to -- or to the fact that the subsidiary that's being discussed in the paragraph stopped marketing annuities the morning following the date of intervention. Do you know why that decision was made?
A. No.
Q. Are you aware of any analysis that supported that decision?
A. No.
Q. Okay. Turn to the page that's

Page 40

Bates stamped 825, please. There's a discussion here of recommendations, the first one of which is "The preservation of the retail banking franchise value by maintaining the New Jersey retail branch network intact. The Florida branches should be marketed as three separate packages."
Do you know why it was recommended that the New Jersey branch network be maintained intact?
A. No.
Q. Was that a typical policy or practice with respect to conservatorship, to try to maintain the branch network intact?
A. Carteret is not typical. Most of the banks that was taken over only operate in New Jersey. City Federal had Florida branches, but I don't know. I don't know.
Q. Okay. When you say Carteret was not typical, in what way do you mean that?
A. Meaning most of the banks that we took over just operate in New Jersey.
Q. Okay. But was it typical for the

Page 41

banks that you worked or that were taken over for the RTC to try to maintain that branch network intact?
A. They tried to. They tried to, yeah. All the retail branches they tried to maintain.
Q. Okay. Turn to the page that's Bates stamped 827, please. In the middle of the page, there's a section "Managed Downsizing." My question is going to be about the last sentence in that section, but if you need to review anything else, feel free to do so. That sentence says, "Increasing operating profits has not been established as a major strategy because the operating expenses are appropriate for an institution of this size." Do you see that?
A. Yes. I do not know what he means by that, the one who wrote this.
Q. You just anticipated my question. Do you know whether it was concluded that Carteret's operating expense levels were in line with what they should be for an institution of that size?

Page 94

Q. You don't know how long it took?
A. I don't know how long it took.
Q. Okay.
A. Definitely longer.
Q. I'm sorry?
A. Definitely longer than most.
Q. Longer than most?
A. Um-hmm.
Q. We've seen references in the exhibits to decisions to freeze or to slow down the sales of Carteret assets; correct?
A. Have seen it, yeah.
Q. Did that freeze -- I'll just call it a freeze for lack of a better term. Did that apply to performing assets as well as bad assets?
A. I do not know for sure.
Q. Okay. But if there are references in the documents that say it applied to performing assets, you don't have a basis to dispute that; correct?
A. No basis to refute nor confirm.
Q. Right. Okay. And so to the extent that the duration of a conservatorship was impacted by the quality

Page 95

of the assets, that really has nothing to do with a policy on freezing sales of good assets; correct?
A. Correct. Good assets, correct.
Q. Were the Carteret branches -- you made reference to the fact that if the branches of a thrift were located in a prime location, it could be easier to sell than if they weren't in a prime location. Where were Carteret's branches located? Would you consider them --
A. I do not know all of them, all of the locations.
Q. In general, was it considered that it had a pretty good branch network?
A. I do not -- yes, I guess so.
Q. And to the extent that the strategic plan made any assessments regarding the locations of Carteret's branch network or the quality of that branch network, you wouldn't have a basis to dispute those --
A. The strategic plan wouldn't have that -- wouldn't have taken that into consideration. It's more current expenses

Page 96

versus planned expenses. I mean, I do not even know how many branches there were.
Q. Okay. Well, I don't want to have to go through this again, but to the extent that it does have a discussion, I'm referring to Exhibit 2, of Carteret's branch network and the location of its branches, you wouldn't have a reason to dispute the statements in here about that; correct?
A. No.
Q. Okay.
MR. COLATRIANO: I have no further questions at this time. Thank you very much.
MS. HART: I'm sorry, I do have one follow-up.
BY MS. HART:
Q. Just to clarify for the record, you mentioned earlier that you believe City Federal had about 10 billion in assets?
A. I think so, yeah. Even more. I don't know.
Q. Even more. Okay.
A. Could be more.

Page 97

Q. And that's as compared to the five billion in assets Carteret had?
A. Yes.
MS. HART: No further questions.
MR. COLATRIANO: Thank you very much, Ms. Maligaya.
THE WITNESS: You're welcome.
(Whereupon, the deposition concluded at 12:00 p.m.)

______________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ________

day of ____________________, 20__.

______________________
NOTARY PUBLIC

My Commission expires: ____________