SlimScript

UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------x

AmBASE CORPORATION and CARTERET BANCORP, INC., :

:

Plaintiffs,

93-531C

-against-

:

FEDERAL DEPOSIT INSURANCE CORPORATION,

:

Plaintiff-Intervenor,

:

-against-

:

UNITED STATES,

:

Defendant.

:

-------------------------------------------x

DEPOSITION of RUSSELL J. MEYER, taken by the Plaintiffs, pursuant to Notice, held at the offices of Gibson, Dunn & Crutcher, Esqs., 200 Park Avenue, New York, New York, on September 10, 1999, at 10:35 a.m., before a Notary Public of the State of New York.

***********************************************

BARRISTER REPORTING SERVICE, INC.
120 Broadway
New York, N.Y. 10271
212-732-8066

Meyer

at the deposition.

Could you state your name for the record?

THE WITNESS: Russell Meyer.

MR. HUME: Could you state your address for the record?

THE WITNESS: 35 7th Street, Belford, B-E-L-F-O-R-D, New Jersey.

MR. LEVITT: I am David Levitt for the United States.

MR. IGO: I am James Igo from Federal Deposit Insurance Company, representing plaintiff-intervenor.

MR. CARENZO: I am Michael Carenzo from AmBase Corporation.

Q. Have you ever had your deposition taken before?

A. Yes.

Q. Was it in conjunction with one of the so-called Winstar docketed cases?

A. No.

Q. What was it in conjunction with?

A. Outside of work. It was a personal lawsuit, injury.



Meyer

Q. You may remember there are some formalities to go through. To begin with, I will remind you of those.

First of all, have you ever been convicted of a felony?

A. No.

Q. Have you done anything to prepare for this deposition today?

A. No -- I met with Beth Frank, a DOJ attorney, for about an hour or so.

Q. In Washington?

A. She came to Jersey City.

Q. Have you reviewed any documents in preparation for this?

A. No.

Q. Could you begin by giving me a description of your academic background of how you came to work as a regulator?

A. I have a bachelor of science degree in management from Rutgers University, and how I came to work -- I worked for Manufacturers Hanover Trust for fifteen years. I went to school at night, getting my degree.



Meyer

I left the bank in '79, worked for the IRS for two years and then came here.

I worked for the Federal Home Loan bank board for one year.

I left and worked for two years across the street at Curtis, Mallet, Prevost, Golt & Mosle as a fiduciary accountant of taxes, and then I came back to the Federal Home Loan Bank Board in '84 or so.

Q. Do you have formal training in accounting?

A. No, other than just required two credits to get.

Q. Do you recall what year you came to the Federal Home Loan Bank?

A. I came to the Bank Board in '81. Then I left for two years. I worked for one year, to '82, left for two years and worked at Curtis and came back to the Bank Board in '84.

In '85 they became -- we were rift from the Bank Board and worked for the Federal Home Loan Bank of New York until



Meyer

'89. They put us back to the OTS. I had the same job, but three or four different employers.

Q. Were all of those positions with either the Bank Board or Federal Home Loan or OTS in New Jersey?

A. Well, no, the whole region. The office was originally in the World Trade Center. We moved to New Jersey when we became OTS in '89. I worked in New York, New Jersey, Puerto Rico, the whole region.

Q. Do you have a basic understanding of what this litigation is about?

A. Just basically. I don't pay too much attention to it.

Q. You understand that it is litigation between savings and loan associations and the U.S. government?

A. Right, the holding companies, correct.

Q. Or the holding companies and major shareholders of those savings and loans associations?

A. Right.

10

Meyer
Q. You understand that one of the things it relates to is the treatment of supervisory goodwill?
A. Yes.
Q. Can I ask you to give me your definition of what supervisory goodwill is?
A. Basically the institutions were given money to put into net worth to take over failing institutions. That is the nutshell without going into the details of accounting.
Q. Does the goodwill relate to the money that they were given to enter into those transactions?
A. They weren't given money; they were just given the opportunity to take over institutions and other areas, enter other areas.
Q. Were they given goodwill as an accounting forbearance in exchange for entering into those transactions?
A. Yes.
Q. Do you recall that those transactions were generally induced by the

11

Meyer
government in order to resolve failed or failing institutions?
MR. LEVITT: Objection to form.
You may answer.
A. Yes.
Q. Do you recollect that in undertaking those transactions, some institutions generated a large amount of supervisory goodwill on their balance sheet?
A. Yes.
Q. Do you recall that in 1989 Congress passed legislation by its acronym, FIRREA?
A. Yes.
Q. Do you recall that FIRREA changed the accounting treatment for purposes of determining regulatory capital by disallowing those institutions to use supervisory goodwill towards regular trade capital?
A. Yes.
Q. Do you recall that prior to the passage of FIRREA, those institutions had supervisory goodwill towards regulatory

12

Meyer
capital?
A. Yes.
Q. Do you recall that when entering into these assisted transactions or supervisory transactions, those institutions were assured that they would be able to use account supervisory goodwill towards regulatory capital?
MR. LEVITT: Objection. It asks for a legal conclusion. I object to the form of the question.
You may answer.
A. I wasn't there, but I assume that was the inducement, yes.
Q. Were you aware at any time that the Federal Home Loan Board or the Federal Home Bank of New York were ever involved in work on supervisory transactions?
A. No.
Q. Was your role always in examination of institutions --
A. Yes.
Q. -- rather than in any acquisitions?
A. Right. I was a field examiner.

13

Meyer
Q. Throughout your whole career there?
A. Yes.
Q. I am sorry. I should have asked you, you are still an employee of the OTS; is that correct?
A. Yes.
Q. You have been continuously over the last, since --
A. Since '89, yes.
Q. Do you recall the institution Carteret Savings Bank?
A. Yes.
Q. Do you recall AmBase Corporation?
A. Yes.
Q. Do you recall that AmBase became the 100 percent owner of Carteret?
A. Yes, I remember they were the owner. I don't recall if it was a hundred percent, but probably, yes.
Q. Do you recall when that acquisition of Carteret by AmBase took place?
MR. LEVITT: You mean what year?
MR. HUME: Yes, what year.

22

Meyer

Q. Do you recall if prior to FIRREA, prior to the passage of FIRREA, you or other regulators ever analyzed whether an institution could remain in capital compliance if -- absent the use of its supervisory goodwill? In other words, if goodwill was not allowed, to be treated as good capital?

A. Yes, at that time there were a few things that were done to help capital position, appraised equity capital, for example. I remember we used to analyze that, so I am sure we analyzed the ratio of goodwill also.

Q. Do you recall Kevin Hoyt?

A. Yes.

Q. Do you recall that he was the examiner in charge in 1988 for Carteret?

A. No, not particularly.

Q. Do you recall him working on Carteret?

A. Yes.

Q. During what time period do you recall that?

23

Meyer

A. I don't know specifically. I just remember Kevin and Carteret. I don't remember if I was assisting him or he was assisting me.

Sometimes we would go up there; if we didn't have a place to go, they would send us up there for a week or two to fill up time. I might have been in and out of there when Kevin was the EIC. I don't recall.

Q. Going back to my earlier questions, if an institution prior to the passage of FIRREA were in a position similar to what Carteret was in, they would not have been able to meet the regulatory capital requirement if supervisory goodwill was not treated as good capital, something you testified was likely to have been analyzed by some people, would that have been considered an important problem?

MR. LEVITT: Objection to form.

I don't understand it. If you do, you may answer or ask that it be

24

Meyer

rephrased.

A. I don't recall. Regulatory capital was being changed all the time, so as long as I made regulatory capital, I think we were satisfied, but of course, in the overall operations you are going to look and see if there is enough regular capital or GAAP capital.

Q. I guess another way of asking the question is, an institution that has 180 or $170 million of capital over and above their capital requirement would generally be considered to be a healthy institution, wouldn't it?

A. It depends. If their capital requirement was a billion, that might not be much.

Q. If they had more than their double capital requirement?

A. It would depend on the trend, on the composition.

MR. HUME: I would like to show you some documents that might help you with my questions and your

25

Meyer

recollection.

MR. HUME: We'll introduce this as AmBase Meyer Exhibit 1. This is the 1988 report of examination of Carteret.

(Whereupon the 1988 report of examination of Carteret Savings Bank was marked AmBase Meyer Exhibit 1, for identification as of this date.)

Q. This is the 1988 report of examination for Carteret Savings Bank. If you look, the first page number is AMB019331, Bates stamped. I will refer to the last three Bates stamp numbers.

On the one with 33, you will see that Kevin Hoyt is listed as the examiner in charge. Your name is not on this document, at least not as far as I know, nor do I know whether or not you worked on the 1988 report of examination.

Does seeing this refresh your recollection that Kevin Hoyt was the EIC and remind you whether you did work on this ROE?

Meyer
A. I don't know if I worked on it or not.
Q. You mentioned that you recollected you may have become EIC in 1989. I have here the 1989 ROE, and you were the EIC. I will represent to you that you were.
Would you have been likely to review this in beginning the exam or undertaking the exam in 1989?
A. Yes.
Q. If I could direct your attention to page 3, let me refer to the Bates stamp number, to the asset section that begins on Bates stamp, last three digits 342. That is the Asset Quality section that covers the next four pages or four and a half pages to Bates stamp number 346.
Do you see that?
A. Yes.
Q. If you look halfway down the Asset Quality page on page 342, or I guess two thirds of the way down where it says, "Classified assets," it states the classified assets totalled $177.8 million



Meyer
dollars, representing three percent of total assets.
Do you recollect Carteret having a high level of classified assets at that time?
A. In '88, no. I don't recollect that this -- it was high, but I don't recollect except what I am reading here.
Q. Turn to page 346, it is page 7 on the document. You will notice the capital section, three paragraphs on that page.
In the middle paragraph there it reads, "The present capital base is sufficient to provide protection against classified assets and reasonable adverse changes in the interest rate scenario, with its negative earnings impact on the remaining asset/liability mismatch."
Do you recall that when you first started working on Carteret, it was your understanding that they had sufficient capital base?
A. As an assistant, yes. When I became the EIC, I didn't know when I walked in.



Meyer
Q. When you say you recollect that that had a sufficient capital base while you were an assistant, do you recollect what time frame that was?
A. Before '89, that is all I recollect. I don't recall the '88 exam specifically. I just knew when I walked in in '89, it was considered adequate capital. The capital was not a concern going in.
Q. It was a concern?
A. It was not a concern.
Q. In '89?
A. Right.
Q. How do you recall that?
A. I just remember. I remember going in that there was just some concern about assets, and assets were the biggest problem. That is all I recall going in.
I reviewed this. I reviewed the correspondence and their financials and stuff before we went in, but I just recall that assets were going to be the major phase of the examination and the biggest problem.



Meyer
Q. Do you recall what time of year that was in 1989?
A. No, but I remember it was nice weather.
Q. Probably not the winter?
A. Right.
Q. Before the winter?
A. I don't know. Whatever date the exam was. I might have looked at it the week before.
Q. Would part of the reason why you might not have been worried about capital going in in 1988, you received a report that said the capital base is sufficient?
A. Yes.
Q. Do you ever remember conferring with Kevin Hoyt regarding his role as EIC? Would that have been natural, given that you were the EIC that succeeded him?
A. No, we don't really see one another, and I would have read the report if I had any questions. I may or may not have called Kevin. I don't recall.
Q. You mean it doesn't really work the

98

Meyer
A. This would be saying riskier lending, that is credit risk.
Q. Is that referring to junk bonds? Is that what you remember?
A. I would say no, I would say lending. It says lending. I would have put investments.
Q. Was the institution undertaking higher risk investments like that in order to make bigger profits?
A. Like what? The credit risk or the junk bond?
Q. Was it your recollection that institutions entered into riskier lending areas in order to increase profitability?
A. Yes, and to address the interest rate risk, because they could adjust the rate on the commercial lending where a mortgage would be mostly thirty years fixed.
When I say ARM lending, most of the commercial lending was adjustable rates also.
Q. I guess the problem is trying to

99

Meyer
make more money by taking more risk, but because of the risk, you can also lose money; isn't that right?
A. Right.
Q. When you lose money, it depletes capital; isn't that the effect on the balance sheet?
A. Yes, sure.
Q. Wouldn't an institution have been more likely to engage in riskier activities if it had a large excess of capital over its requirement than if it did not?
MR. LEVITT: Objection.
I don't know whether that is within the witness's expertise, but if you have expertise, go ahead.
Q. It is not calling for your expertise. It is simply calling for your experience.
Was it your experience that you thought institutions-- let me put it this way -- was it your regulatory view that it was more acceptable for institutions to engage in high-risk lending activities if

100

Meyer
they at least had excess capital of the requirement than if they did not?
A. Yes, but that didn't stop places with no excess.
Q. At the bottom of page 9 it states that, "Management has implemented the strategy of moderate shrinkage via asset sales to produce nonoperating profits and to achieve the capital requirements specified by FIRREA."
Do you recall that as a result of its new capital requirements, Carteret decided that it needed to shrink in size?
A. That is what it says.
Q. Do you recollect that fact independently?
A. Specifically, yes. They knew they had to shrink.
Q. Do you remember that they had originally had a plan to try to grow that they then had to change?
A. I don't specifically recall, but I believe that my impression is that, yes, they were trying to grow all along prior to

101

Meyer
this report, this exam.
Q. When an institution loses a large amount of capital, is one way that it can try to maintain compliance by reducing assets so that its capital retirement will move down?
A. Yes.
Q. Was this a standard response to the new capital requirements that thrift institutions that were severely affected by it needed to shrink assets?
MR. LEVITT: Objection.
It assumes that the only reason is because of the new requirements of FIRREA. In fact, there were a lot of reasons.
MR. HUME: Object to the testimonial nature of the objection.
MR. LEVITT: Objection.
You may answer.
Q. Do you recall other institutions taking that course of action after the passage of FIRREA in 1989?
A. Specifically, no. That was general,

Meyer
subject of much discussion?
A. Yes, as I --
Q. Just to be clear, aside from debates about the treatment of supervisory goodwill which was contested, but not out of complication, simply out of disagreement, was it just complicated?
A. I just remember that we had training. We had to have specific training for it and things like that. I think we generally felt that it made regulatory capital more simple.
Once you added risk base and all of that other stuff, you are right, it was more confusing. That was at that same time, right. It is still confusing.
Q. With respect to goodwill, do you recall there being active disputes as to how it should be treated under FIRREA?
A. No, I don't recall disputes about it.
Q. Do you recollect Carteret filing a lawsuit in New Jersey, getting an injunction against the OTS?



Meyer
A. No, you'd think I would remember that. I don't recall that.
Q. It may have been after you were working on it?
A. I don't recall that. Did they do that in 1990?
Q. 1991.
A. Okay. I was gone.
Q. Do you recall when you did stop working on Carteret? I have a few documents that may help you.
A. I went back and helped Tom O'Rourke head up the asset review. He might have done one or two. I went back and helped him on one of them. I am not sure how many exams he did. I may have helped on two, if we did two.
MR. HUME: I will refer back to this, but if I could, I would like to introduce this now as AmBase Meyer Exhibit 4.
(Whereupon a letter dated May 15, 1991 to Mr. Griffin, with attachments, was marked AmBase Meyer



Meyer
Exhibit 4, for identification as of this date.)
Q. I am jumping forward in time a little bit, showing you a document that does not have your name on it. It is a letter addressed to Mr. Griffin -- who you do remember; is that right?
A. That is correct.
Q. -- assistant director, and who was supervising the regulations of Carteret at that time, from Carteret, attaching revised thrift financial reports. It is dated May 15, 1991.
I will read the paragraph that is the bulk of the letter here:
"Enclosed please find amended Thrift Financial Reports for Carteret Savings Bank, FA, for the quarters ending December 31, 1989 through December 31, 1990. These changes reflect the exclusion of Imperial Premium Finance intangibles from regulatory capital, the inclusion of supervisory goodwill in regulatory capital as well as changes made to September 1990 and December



Meyer
1990, ending balances after the reports were submitted to the Office of Thrift Supervision."
I would like to refer you in the last few pages of this package on page Bates stamp AM046324. It is about three or four pages from the end, last three digits are 324. Do you see that page?
A. Yes.
Q. Would you look at the top left corner? It states it is the TFR schedule CCR for December 1990. Do you see that?
A. Yes.
Q. Did you see down in the main part of the document where it says, "Tangible capital requirement"?
A. Yes.
Q. If you run down halfway through the page, a little more than half, it has a line item that states, "Amount of tangible capital greater than or," in parentheses, "less than requirement." Do you see that?
A. Yes.
Q. I am assuming it seems pretty

158

Meyer
an extremely high immediate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from the shareholders or other sources. Such institutions require immediately corrective action and constant supervisory attention. Obviously, formal administrative action is presumed necessary. The probability of failure is high for these institutions. Institutions with negative regulatory capital and those with negative generally accepted accounting principles (GAAP) capital and experiencing operating losses would normally be assigned this rating."
Given that description, isn't it extremely unlikely that an institution that had $135 million of excess tangible capital could be assigned a 5?
A. It is not likely.
Q. You mean you don't know of any institutions that something like that would have happened?
A. Right, I don't know.

159

Meyer
Q. Do you know of any institutions like that that would have been rated a 4?
A. I know of institutions that had capital and were rated 4's.
Q. That had excess capital?
A. Yes, because of poor management.
Q. That would have had excess capital of over 100 million with assets of 5 billion?
A. I don't know what capital was in issue.
Q. Can you remember any of the institutions by name?
A. No, not specifically.
Q. Can I refer you back to page 35 of the report, please, the first paragraph.
This is a discussion of the net interest margin, and the first paragraph states, "The bank's net interest margin for the YTD, June 30, 1990, totaled $49 million, 1.63 percent annualized as a percentage of average assets in 1990."
Do you recall whether that is a good or poor interest margin?

160

Meyer
A. I don't recall at that time.
Q. It notes then that it improved over 1989 and states that the improvement is attributable to the bank's efforts in restructuring and reducing its asset base as well as lowering its overall cost of funds.
Do you recall that the institution was trying to restructure its assets in order to improve its interest margin?
A. Yes.
Q. Do you recall thinking that it was achieving success in those efforts?
A. Yes.
Q. On page 34 -- I apologize for jumping back and forth here -- this is the conclusion of the section of the report that talks to you, operating results that I guess comes up front so that the bottom lines comes up first.
The last sentence of the conclusion reads, "Future projections of the bank returning to core operating profits in the near future are not considered realistic by

161

Meyer
the examiners given the level and trend of criticized assets."
Do you have a recollection of thinking that Carteret was unlikely to be able to turn a profit in the near future as of 1990?
A. I don't have a specific recollection of that. I do always remember thinking that they could pull out of this if they really shrunk -- and they did.
Based on what they had at the time, we obviously didn't think it was realistic, and the trend, I think, was still going up.
Q. When you say, "The trend," the trend in classified assets?
A. Yes.
Q. Do you recall that being primarily the result of declining real estate market and a recession?
A. The same, everything. We found more problems of poor underwriting, I believe, and just the general market, projects that weren't selling.
Q. Do you recall whether Carteret ever

162

Meyer
did achieve profitability or return to profitability after this exam?
A. I think I heard they did, yes.
Q. Do you recall what happened to Carteret?
A. Yes, I was there. RTC took them over.
Q. Do you recall when that was?
A. No, I don't recall. I don't recall what date it was.
Q. How about what year?
A. It had to be '92, I guess.
Q. When you say you were there, did you actually play a role? Were you still working on Carteret at that time?
A. Like I said, I went back and I assisted O'Rourke and I did the asset review. I was in charge of the asset review.
I had about ten examiners under me. I was impressed with what they had done. I thought they did a good job.
They had these guys -- what was that guy's name -- they came in and they

163

Meyer
really -- they had nothing to lose. They went in and did a good job, and I was against anybody taking them over.
I always liked Carteret. I thought they could still make it.
Q. Did you think that if they had been given a little more time that, that maybe they could make it?
MR. LEVITT: Objection to relevancy.
You may answer.
A. In my opinion, yes.
Q. Do you have some recollection that they returned to profitability at that time?
A. As far as I think, they did the last TFR or the last one or two before they were taken off. They showed a profit. I don't remember how much or if it was just a dollar, but I do remember I know that it was good.
Q. It was about $10 million over the first nine or ten months.
A. Okay.

164

Meyer
Q. The real estate market was at that time rebounding a little bit, was it not?
A. I think so, yes.
Q. Recession was easing and the economy starting to gradually improve?
A. I don't recall all of the external things. I was deeply involved with the real estate assets. I always thought that was their main problem, and I think they did what they had to do.
They cut out all of the crap. They wrote everything down to what it was really worth and they were finally on the right track, I thought. The external things sure played a part, but the management at that time, Bianco brought in these guys, Moore and Fernandez. They really did a great job.
Q. Do you recall that the one thing they really needed to be able to do was to raise new capital even during that period when they were returning to profitability?
A. Again, every institution has to raise capital. It is the bottom line.

165

Meyer
When I examine a place, I am looking at five individual areas and I am not worried about saving the insurance fund. Like I mentioned, if capital is done, it is done. It is just one component of the exam to me.
I am not in supervision. I am not in insurance. I am concerned about it and that is what I write, and that is what affects my decision, but it is just one component of the five, and their problem was the asset quality. Then we had management concerns after that.
Q. Did those management concerns subside or lessen or go away after Dick Bianco came in and brought new people?
A. I think so, yes.
(Brief recess taken.)
MR. HUME: We'll resume the deposition.
As I mentioned earlier, I do have a number of documents that I would like to show you and ask you really only one or two questions on

Meyer

A. No.

Q. If we assume the supervisory goodwill at the time was around 150 million -- which it wasn't; it was less than that -- but based on some of representations counsel has made, and it had a capital shortfall of approximately 150 million on the tangible requirement, wouldn't that mean that even if you added in the goodwill, it would not be meeting its tangible capital requirement?

MR. HUME: Objection. It mischaracterizes our representations.

A. If one was 150 and the other was 150, it is just -- it could be zero.

(Whereupon the record was read back by the reporter.)

MR. HUME: I want to note the objection as to the statement that the goodwill was not at that level.

Q. Likewise, Mr. O'Rourke writes that the core capital requirement was deficient by 175 million, so if he added 150 million



Meyer

into that, what would the core capital be if you added back 150 million? What would the core capital be?

A. Minus 25.

Q. Would that be below minimal standards?

A. Yes.

Q. Likewise, on a risk base they are short 233 million.

If you added 150 million into that as goodwill, what would they have?

A. They would be short.

MR. LEVITT: No further questions.

Thank you.

EXAMINATION CONTINUED

BY MR. HUME:

Q. Would you agree that a change in your composite rating in one year's time from being a 2 to a 4 is a dramatic change?

A. Sure. It is a forty percent change.

Q. Counsel for the United States asked you if the loss of 160 million in '91 was significant. I will represent to you there



Meyer

were reserves taken that year of 150 million, and that obviously contributed to the loss.

Would you agree that a loss that is largely attributable to general valuation allowances and loan loss reserves is in some sense at least a more arguable or more debatable loss while its effect on capital and its effect on the requirements is the same?

What it represents is different from a normal operating loss resulting from your interest spread and your expenses?

A. Yes.

MR. LEVITT: Thank you very much.

(Time noted: 5:00 p.m.)

---------------------------

RUSSELL J. MEYER

Subscribed and sworn to before me this day of , 1999.

----------------------------

Notary Public



INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| RUSSELL J. MEYER | MR. HUME | 5, 244, 255 |
| | MR. LEVITT | 234, 247 |
| | MR. IGO | 247 |


EXHIBITS


| AmBASE MEYER FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 1988 report of examination of Carteret Savings Bank | 25 |
| 2 | 1989 exam board | 34 |
| 3 | 1990 examination report | 124 |
| 4 | A letter dated May 15, 1991 to Mr. Griffin, with attachments | 147 |
| 5 | A memorandum dated July 12, 1989 from Mr. Meyer to Robert Albanese | 166 |
| 6 | A memorandum of oral communication from Scott Smith dated October 13, 1989 | 183 |
| 7 | An interoffice memorandum dated October 5, 1989 from David Dorgan | 191 |
| 8 | A memorandum of oral communication dated October 4, 1989 from Scott Smith | 197 |