UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X

AMBASE CORPORATION and :
CARTERET BANCORP, INC., :
Plaintiffs, : No. 93-531
and : Judge Loren Smith
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff-Intervenor, :
vs. :
THE UNITED STATES OF AMERICA :
Defendant. :

- - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, March 16, 2006

Deposition of JAMES R. MINDNICH, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice and subpoena, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, 1500 K Street, NW, Washington, D.C., at 9:33 a.m., Thursday, March 16, 2006, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

Q. If something jogs your memory or you see the name and you remember it all of a sudden, just let me know.
(Mindnich Exhibit No. 14 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 14, MAPP minutes of the MAPP Credit Committee, dated May 20, 1993. You're listed as attending. My questions are going to be focused on the third page of the document and specifically the third to the last bullet point beginning soon McCarthy asked. So read that to yourself and let me know when you're ready to proceed.
A. Was that the second page now?
Q. Third page, it's the third to the last bullet point, Sue McCarthy.
A. Yeah.
All right.
Q. That bullet point says Sue McCarthy asked if she could send the WRAP loans to another servicing, Wrap is WRAP all caps. Jim Mindnich said it cannot be done if the word sale is involved. What are WRAP loans?
A. I don't recall.
Q. Do you remember who Sue McCarthy was?



A. Yeah, I can picture her.
Q. Did she work for you?
A. No, she was a bank -- she worked for Carteret.
Q. Okay. Did she work in the --
A. She was involved in the operations the mortgage and the consumers, more of the operations than the actual lending aspects.
Q. Do you know what you're referring to when you said cannot be done if the word sale is involved?
A. Other than the fact that we were not able to sell anything at that point.
Q. That's reference --
A. We were on a freeze.
Q. The asset freeze?
A. (The witness nodded.)
Q. I'm sorry, you need to --
A. Yes.
Q. Since you can't remember what the WRAP loans were, I'm not sure you will know the answer to this question. Do you know what happened with reference to the WRAP loans?
A. No.
(Mindnich Exhibit No. 15 was marked for identification.)



BY MR. COLATRIANO:
Q. Exhibit 15 is MAPP Credit Committee minutes, dated June 24, 1993. For the record you're listed as absent from this meeting, but I'm still going to ask you a couple of questions about this document, specifically about the first page of it, the second and third bullet points relating to Midland. Go ahead and read those to yourself and let me know when you're ready to proceed.
A. You're going to question me on the first page?
Q. Just the first page. Are you ready?
A. Yeah, why not?
Q. There's a discussion on the first page, second and third bullet points especially about issues with respect to Midland. Does that discussion refresh your recollection at all about what Midland was doing for Carteret?
A. The third line: Due to Midland's "system change" the lateness of the report -- relating to interest rate changes, appears to be a servicing group.
Q. Okay.
A. There was a group of loans handled by Pete Schaeffler and he's the only name on this list that



reflects back to that group. They had a small, small pool, I don't know how many loans it was, but they were straight commercial type financing business loans, working capital, lines of credit, that kind of stuff. And that was something that these guys were doing and it was just a group of them in Carteret, it wasn't a large portfolio, but it was something that we had to deal with and I know that that was -- that was one of the first that we dealt with. That's all I can remember is that most of the people in that group were gone in six months pretty much. The name Peter Schaeffler is still a personal friend.
Q. All right.
A. That's why I mention that.
Q. What was your involvement if any in the efforts to deal with that portfolio that you've been talking about?
A. What we did with that pool, they were performing loans, and again we felt that it was not the proper thing to do to cut them off, which you really can't do -- or you could, but you can. And in our effort to downsize the institution, all the members of the team that were there, we called up our friends in the banking community to review this pool and take whatever loans they wanted out at face

Page 74

value. So we got paid in full and they got a good loan.
Q. Does this discussion in this exhibit refresh your recollection about whether there were any concerns or problems with what Midland was doing with respect to these loans?
A. As a servicer.
Q. Right, but were there problems with what Midland's performance?
A. Well, they are talking here in line 2 about some of the exceptions so I guess there were some problems.
Q. What is an exception?
A. Interest charges, payments being made, not -- not posted properly, things of that nature.
Q. Do you know how any issues or concerns regarding Midland were resolved? There is a reference to pooling the contract if quality is not improved, do you know what happened with that?
A. I think the bottom line answer to that was we got the loans taken care of, we sold most of them or had people take them over. That doesn't pertain to what happened to Midland and I really don't remember that.
Q. Okay.

Page 75

A. But we got rid of the problem and that was having the loans on the books.
(Mindnich Exhibit No. 16 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 16 is a three-page document, the first two pages of which are labeled Executive Summary Conservatorship Monthly Asset Summary Reports, dated June 30, 1993. And the last page of which is a Carteret status report, dated June 30, 1993. My questions will be about the first pages of the document, specifically about --
A. IPF?
Q. Exactly. The paragraph that begins the increase in the number of assets. My first question though is, was this a report that you prepared or had responsibility for preparing?
MS. GRONER: Just ask you a question about the document?
MR. COLATRIANO: Ask me a question?
MS. GRONER: Yes.
MR. COLATRIANO: Okay.
MS. GRONER: Are these two different documents or one?
MR. COLATRIANO: This is how I got it

Page 76

stapled together, I think this is how it was produced to us. If it should be different, you can let me know.
MR. KUIPER: There are different dates on it.
MR. COLATRIANO: Different prepare dates are you referring to?
MR. KUIPER: There is June 30, '93 at the bottom -- at the top. The bottom talks about July 16, 1993, and the third one is July 14th.
MR. COLATRIANO: Right.
MS. GRONER: Also the first document refers to two exhibits, Exhibit 1, Exhibit 2.
MR. COLATRIANO: All I can tell you is this is how I got it, so --
THE WITNESS: I don't really specifically recall having anything to do with the IPF situation at this point, that's why I didn't recognize the name in the beginning.
MR. COLATRIANO: Okay.
BY MR. COLATRIANO:
Q. Leaving aside IPF for a second, is this a report that you had responsibility for preparing?
A. This one. (Indicating)
Q. The third page?

Page 77

A. Yes, yes.
Q. How about the first two pages, do you know who prepared that?
A. I -- I would say that it appears to have been something that would have been generated from the asset side of the bank. Just who did it -- I don't recall doing it. I don't know who did it.
Q. Okay.
A. The other report I saw it.
Q. The third page of this exhibit, the status report, that's where you saw it?
A. Yeah.
Q. Turning to the paragraph on the first page about IPF, the first sentence says, the increase in the number of assets is due to Carteret, in accordance with an approved case, honoring a commitment to purchase loans from Imperial Premium Finance (IPF) an insurance premium finance subsidiary of Carteret.
I take it, a moment ago you said that you don't recall having anything to do with resolving or selling IPF; is that correct?
A. Yeah, this -- IPF is a subsidiary it says here.
Q. Right.

A. The subsidiaries were taken out of our hands, okay?
Q. Okay. Do you know why the decision was made to honor a commitment to purchase loans from IPF?
A. No.
Q. Do you know who would have made that decision, was that at the Carteret level or in Washington or somewhere else?
A. I really don't know, I just -- maybe something will pop up that will refresh my memory, but right now with this, no.
Q. Fair enough, thank you.
(Mindnich Exhibit No. 17 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 17 appears to be a printout of an E-Mail from Alfred Bowers to Dennis O. Lauria, L-a-u-r-i-a, upon which you and Susan O. Doherty were cc'd, dated July 12th, 1993, subject: Carteret. It is pretty short, why don't you read it to yourself.
A. Okay.
Q. Who is Alfred Bowers, do you know?
A. He was an oversight employer of the RTC, he came out of Valley Forge office and he would come



out to see how we were doing from time to time, under the direction of Jay Hambric, who ran the Valley Forge office of the RTC.
Q. And do you know who Dennis Lauria was?
A. Yes -- Al Bowers's boss.
Q. Jim and Susan have been sitting on a consumer portfolio under the impression that Washington Resolutions has put a hold on all assets. Was that -- do you know whether that impression was wrong? I mean had Washington put a hold on all assets?
A. Put a freeze -- they froze all assets at the bank. We previously discussed that.
Q. Right. I was wondering why this says impression as opposed to -- it suggests to me like you might have been mistaken?
A. I didn't write the memo.
Q. I understand, I understand.
Then it says they think they can sell the portfolio and they should. Was that an accurate statement that you thought you should be selling the portfolio at this time?
A. Yes.
Q. Did you think that the freeze on selling the portfolio -- what effect did you think on selling



the portfolio was having on the ultimate resolution of this aspect of the portfolio?
A. Do you want to repeat that? The last part of that threw me.
Q. I was wondering what you thought the effect of the freeze was with respect to the consumer portfolio, were you concerned it was going to hamper, you know, the -- maximizing the value on the portfolio or something like that?
A. Washington says don't sell any assets, we weren't selling any assets.
Q. So why did you think you should be selling those assets notwithstanding the freeze?
A. I didn't -- because that was our job. And further explanation if I can?
Q. Sure.
A. Washington didn't normally step in and put a freeze on all assets, there were people -- there were questions raised as to what freeze meant. And we as employees who were working for a living there took them verbally and said they said assets, any loan was an asset.
Q. So I want to make sure I understand, you were told verbally that there was a freeze on all asset sales; is that correct?



A. Sure. It was in writing someplace from Washington.
Q. Do you remember what type of document it was, was it a memo, a policy statement, an E-Mail?
A. We discussed the freeze on sales previously and it was involved in that.
Q. Right. And I've seen references where the freeze is discussed in a lot of these documents. I'm not sure I've seen a document that was the freeze, in other words, a document instructing everybody there is a freeze.
A. I didn't personally get one.
Q. How did you learn of the freeze?
A. My boss told me.
Q. Your boss being?
A. Dean.
Q. Dean was Mr. DiGiondomenico?
A. Yeah.
Q. Do you know what happened as a result of this E-Mail? Did you get the signal to go ahead with the consumer portfolio sale?
A. There was -- I really don't know the answer to that because there were various sales and -- I'm not sure which -- but the bottom line was yes, we sold all those assets.

Page 82

Q. You sold all the consumer loans?
A. Yes. The bottom line was yes, we did.
Q. Do you know when?
A. After this memo.
Q. How did I know you were going to say that?
Sitting here today you don't remember if it was shortly after this or a long time after this?
A. It was very -- it was early on in the conservatorship.
Q. That you sold --
A. Yes, yes.
Q. Sitting here today do you have any opinion or do you remember having an opinion on whether the delay in selling the portfolio had any impact on the proceeds or a return on the portfolio once you sold it?
A. I don't believe so.
Q. You don't believe it had an impact?
A. (The witness nodded.)
Q. Why is that?
A. My recollection is it was a fairly decent portfolio so it would retain its value. It wasn't made a distress pool.
(Mindnich Exhibit No. 18 was marked for identification.)

Page 83

BY MR. COLATRIANO:
Q. Exhibit 18 are MAPP Credit Meeting Minutes, dated July 15, 1993, you're listed as attending. My only questions are going to relate to the third bullet point on the first page, the bullet point beginning Jim Mindnich stated RTC loan auction is official. Read that to yourself and let me know when you're ready to proceed.
A. Regarding the loan auction?
Q. Yes. Have you read that part?
A. (Indicating)
Q. Have you read it?
A. Yes.
Q. Do you know what loan action this is referring to?
A. They were -- the RTC and loan auctions were all handled out of Washington, okay? They were run by that group I just told about with pools going in, and you didn't ask, you just gave it to them.
Q. I think earlier on today you said the policy was that you could not do asset auctions; do you remember saying something along those lines? Was that because there was handled by D.C.?
A. Yeah, we didn't do any auctions.
Q. Okay.

Page 84

A. I mean -- no, we didn't -- this was an auction, this was in The Wall Street Journal auction.
Q. All right, of the --
A. We didn't do anything on a conservatorship basis.
Q. Did you know how this RTC auction was handled with respect to, for example whether there was any type of minority preference program?
A. I have no idea, we responded only.
Q. I'm sorry?
A. We responded to the pool, that was it.
Q. When you say you responded to the pool --
A. We gave them what they asked for. It really was none of our business what they were doing.
(Mindnich Exhibit No. 19 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 19 is MAPP Credit Committee Minutes, July 22, 1993, you're listed as attending, my question is going to be about the first and the fourth bullet points on page 2.
A. The fourth being Rich Willets?
Q. Yes.
A. The first and the fourth?
Q. The first and the fourth, yes. Let me

Page 85

know when you're ready to proceed.
A. Okay.
Q. On page 2 the first bullet point refers to the non-performing S1, S2 and N3 and my question is, do you know what those -- what that's referring to, S1, S2 and N3?
A. They were the designation given to the pack of pools for loans that were sold.
Q. Was there a reason why some were designated S and some N?
A. Maybe. I guess N might be non performing. Other than that, I really don't know.
Q. Is says that you stated there's been no success in taking any loans out. What does that refer to, taking any loans out?
A. There might have been questions raised internally at Carteret by some of the people there stating that these loans shouldn't be sold and that we should remove them from the pool and we were told that you can't do that.
Q. You can't take any out?
A. You can't take any out.
Q. Who told you that?
A. Washington.
Q. Do you know why they told you that?

structure that they had set up?
Q. Right.
A. I mean if the structure was set up, that -- if you brought mortgages in you got paid. If you didn't bring any in you didn't get paid. So you know, it was a question of -- it wasn't something that was marketable is I guess what I'm saying. Because everybody -- everybody that was involved on that end of the bank was leaving anyway, the bank was closed.
Q. When you say everybody --
A. They were out of a job, the people who were origination -- the origination people were out of a job because there was no -- no bank to send the mortgage to anymore.
Q. They are out of a job because the decision was made to shut it down --
A. No, they were out of a job because the bank was closed.
Q. And was part of that decision was to shut down lending, correct?
A. Yes.
Q. Was any attempt made to value that aspect of the business?
A. If it was, I wasn't involved.



(Mindnich Exhibit No. 47 was marked for identification.)
BY MR. COLATRIANO:
Q. Exhibit 47 is a memo, dated December 7th, 1992 from Donna Cribbs and William Bailey to yourself, subject: Summary of Mortgage Banking Operations at Carteret. My first question is, do you remember who Donna Cribbs was or who William Bailey was?
A. Do I remember Donna Cribbs?
Q. Yes.
A. I remember the name. She was -- she was at the bank when we closed it.
Q. At Carteret?
A. Yes. I mean she was part of the team that went in.
Q. Oh, okay?
A. That's how I knew her.
Q. She was part of the RTC team that went in?
A. Yes. For the -- for the closing process.
Q. For the closing process. She didn't stay after that?
A. No.
Q. December 7th. It is my understanding that the bank was seized on a Friday, December 4th.



A. Um-hum.
Q. This is dated the Monday, December 7th. What was the process -- is it fair to state that over that weekend Ms. Cribbs and Mr. Bailey were reviewing and analyzing the mortgage banking operations; is that what they were brought in to do?
A. Why don't you ask me that question again?
Q. Were -- well, let me back up a second. You described what you recall about Ms. Cribbs. Who was Mr. Bailey, do you know?
A. He was another guy from Valley Forge.
Q. Were Ms. Cribbs and Mr. Bailey, were they brought in to over the first weekend after Carteret was seized to perform an analysis of mortgage banking operations?
A. No, she was around, she was -- she was -- I guess you might say she was -- she was looking for the, you know, the exotic kind of stuff. You know, things that were not -- because of the size of the bank they were involved in, especially at the investment end of it, they were involved in stuff that some banks never heard of, nor had half of the guys that were there. And she was asked to prepare this document.
I know she uncovered some things along the



areas of, type of investments that they were doing and how they were tying them into all these exotic kinds of things. I mean, to the point where if there were five guys that knew what she was talking about, that was a lot, she had that talent.
Q. Okay, so is it fair to state that she had a fair amount of expertise in these types of issues --
A. Oh yes. She was very competent, yeah.
Q. At the bottom of the first page this memo states overall the production activity of CMC -- and if you look at the top CMC is Carteret Mortgage Company. It says, overall the production activity of CMC is well managed and recent years' repurchase activity has been minimal.
A. What page are you on?
Q. First page, very bottom of the first page?
A. Oh, the last sentence?
Q. Yes.
A. Oh, all right.
Q. Based on your -- strike that.
Is that a statement that you would agree with regarding CMC?
A. The bank failed.
Q. I understand that, but this is a question

Page 182

A. Yeah, yeah. I mean they were -- they disappeared. And don't forget now, we're talking two years into the -- from City Fed which was things giving weekend in 1990 or '99 -- excuse me, '89, I think it was '89 maybe, or closer to '89, '90 to Carteret which was two years later. And then you had 20 banks in the state of New Jersey in between there, you know, one by one these guys have been down the road 19 times. Well, you know. When this happened they just -- they just left.

Q. And just a general question, sir, I think you've referred to this several times, but your goal was to get the most -- the greatest possible return out of Carteret for the conservatorship; is that correct?

A. Yeah, we were -- we -- we wanted -- we liquidated the assets of the institution and did our best to get the best return on the assets that we could.

Q. And in doing so you used your business judgment as to what was the most lucrative way to do that for the conservatorship?

A. Well, there was a lot of written memorandums as to how we were able and allowed to do that, okay? Securitization in this case probably

Page 183

saved 20, $25 million of monies.

MR. HUGHES: I have no further questions.

MR. COLATRIANO: I have a couple of follow-up questions.

FURTHER EXAMINATION
BY COUNSEL FOR PLAINTIFFS
BY MR. COLATRIANO:

Q. Based on Exhibit 49 that counsel has just been going over with you. You stated a few minutes ago that the correspondent relationships, they all knew once the RTC came in to go elsewhere; is that a fair statement?

A. Yeah, yes.

Q. How much of that was related to the fact that it was RTC's policy to stop lending; was that well-known among correspondents?

A. Oh, sure, oh, sure.

Q. Okay.

A. I mean, what we did -- again as I said in the beginning, you had a mortgage commitment to close on your house from Carteret and why should you suffer.

Q. All right.

A. Right? And you couldn't close, you could have gone bankrupt because of that. Our feeling was

Page 184

that, you know, our intent is not to do that, to 10,000 families in New Jersey or wherever else the mortgages were, we would not -- we didn't feel that that was what we're here for. And we had to go and get approval to do that, but we went and just said we're not going to sit here and not fund -- we're just not going to do that.

Q. Okay. Now, leaving aside again --

A. And we funded every one that wanted to close. Of that portfolio, anybody that wanted to close, closed.

Q. Right. Let's leave aside again mortgages that were already in process and had already been approved. I think counsel asked you about new applications dried up from correspondents after the RTC came in; is that correct?

A. Um-hum.

Q. And is it fair to say that the reason it dried up is because the correspondents knew that it was RTC's policy to stop lending; is that a fair statement?

A. Yes, yes.

Q. This document also refers to the fact that between Friday December 4th and Thursday morning December 10th, there was still approximately $10

Page 185

million in new mortgage applications had come in, correct?

A. That's what I said, that's approximately correct, that's what the memo says.

Q. So in less than a week there was still $10 million in new applications, correct? And so if the correspondent relationships had dried up is it fair to say most of that $10 million was coming from the retail side of the origination --

A. I don't know the breakdown.

Q. The memo does say, if you look at the second page March 10th, it's the next to the last paragraph, the paragraph that begins on Thursday morning, it says in the middle it was determined that the applications generated from date of conservatorship?

A. That the corresponding -- I see it had already moved.

Q. Had already moved. Is it fair to say the bulk of that $10 million was in the retail side of the origination network?

A. I -- no, I think this -- I think this -- the correspondent relationships that -- it was determined that the applications generated from date of conservatorship were less than $10 million, an

Page 186

indication that correspondent relationships had already moved. Meaning that the 10 million could have been in there that week from the correspondents and I would say that probably the bulk of that was correspondents, and the branches as I recall were not that, were not that strong in developing the mortgages.

Q. If you look at Exhibit 47 --

A. I said just the opposite.

Q. Not at all. I don't want to characterize what you said. But there are numbers on Exhibit 47 and I look at those numbers saying that the retail branches generated approximately 45 percent of the origination, of the mortgage loan closings year to date?

A. Well, since we were in the beginning of the month I would say that the greater portion would have been the wholesale office.

Q. The greater proportion of what, the $10 million?

A. Yes.

Q. What did that have to do with the beginning of the month versus the end of the month?

A. Because I would say, you know, these guys generated 5 to 4, 5 for every 4. So if you wanted to

Page 187

look at it that way, the wholesale were the primary generators.

Q. The $10 million --

A. The answer to the question is I don't know what the breakdown was.

Q. Okay, all right.

A. All right.

Q. But the memo says an indication -- I'll leave that aside.

Was there any -- counsel asked you about the correspondent relationship drying up and that being a factor in the decision. Was there any analysis of whether -- strike that.

Let me put it this way, what relevance does the correspondent relationship drying up have to do with whether the retail origination capacity had value and should be continued?

A. We put an end to funding mortgages except for those that were already approved.

Q. All right.

A. So an application coming into the bank was not an approved mortgage, okay?

Q. Right.

A. It was something to be processed and we were not processing any more mortgages for anybody.

Page 188

MR. COLATRIANO: Thank you very much. I have no further questions.

MR. HUGHES: No further questions.

MR. KUIPER: FDIC has no questions.

(Whereupon, at 5:55 p.m., the taking of the instant deposition ceased.)

________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ______ day of ______________, 20____.

________________________
Notary Public

My Commission Expires:______________