IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Civil Action No: 93-531
Chief Judge Loren A. Smith

AMBASE CORPORATION AND CARTERET BANCORP, INC.,

Plaintiffs,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff - Intervenor,

vs.

UNITED STATES OF AMERICA,

Defendants.
_______________________________/

West Palm Beach, Florida
November 23, 1999
9:15 o'clock A.M.

DEPOSITION

OF

JOEL WAYNE MOOR



APPEARANCES:

COOPER, CARVIN & ROSENTHAL
Attorneys for Plaintiffs
1500 K Street, N.W. - Suite 200
Washington D.C. 20005
BY: HAMISH P.M. HUME, ESQ.

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
Attorneys for Defendant
1100 L. Street
Washington, D.C. 20530
BY: TONIA J. TORNATORE, ESQ.

* * *



INDEX


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Tornatore | 5 |
| Mr. Hume | 150 |




EXHIBITS


| Deposition Exhibit Nos. | Page No. |
|---|---|
| 1 | 25 |
| 2 | 27 |
| 3 | 32 |
| 4 | 44 |
| 5 | 58 |
| 6 | 71 |
| 7 | 74 |
| 8 | 78 |
| 9 | 83 |
| 10 | 88 |
| 11 | 93 |
| 12 | 97 |
| 13 | 100 |
| 14 | 111 |
| 15 | 114 |
| 16 | 118 |
| 17 | 123 |
| 18 | 130 |
| 19 | 133 |
| 20 | 140 |
| 21 | 146 |

Q. That was not any expert testimony, to your recollection?
A. No.
Q. You mentioned something about giving a statement to the RTC, the Resolution Trust Corporation?
A. Seemed like they had an attorney that I spoke to, and I believe it was in New York. It was doing work for the RTC, as I recall.
Q. Do you recall the time frame of that statement?
A. I would say about four years ago, maybe five.
Q. Do you recall giving that statement under oath?
A. Not specifically. I'm sure it was, but I don't recall specifically. I remember flying to New York and I remember spending some time with an attorney in a setting like this. I think there was probably a reporter there, but a specific recollection --
Q. Did you have counsel present with you at that statement?
A. No.
Q. Do you recall having an opportunity to have an attorney represent you in that?
A. I'm sure. I always have the opportunity. I don't remember ever thinking I needed one.
Q. Let me just explain the procedure that we're going to use in this deposition. I know you have been through



this a number of times, but I just want to lay down some basics for us today.
I'm going to be asking you a series of questions to which you are under oath to answer truthfully and completely. If you don't understand any of my questions, please just stop me and let me know I need to rephrase something or clarify something. When you do respond to a question, I will assume that you've understood my question.
As you can see, the court reporter is making a transcript of all that we say. It's important that we try not to speak over one another. And I would also ask that you provide an audible response instead of a gesture.
A. I understand.
MS. TORNATORE: Will Mr. Moor read and sign the deposition?
MR. HUME: Yes.
Q. Mr. Moor, your attorney has indicated that you will be signing the deposition transcript that's made today. To the extent that you may make substantive changes, I'll have an opportunity to comment on those.
First, let me just make very clear, any time you need a break, please let me know. I would ask that we answer any pending questions before we do take that break.
Second, I understand that many of the questions and responses that we go through here today, something may



come back to you over a course of a few hours after our discussion. So to the extent that you recall something after you've given a response, please just let me know that you've recalled something and we can go ahead and add that to the record to make sure everything is complete there.
Do you have any questions before I begin?
A. No.
Q. What did you do to prepare for today?
A. Really nothing. Hamish spent a few minutes with me yesterday to give me a brief outline to let me know what this was. I spoke to you briefly on the phone. I have spoken with no one at AmBase. I don't have a lot of time, so nothing.
Q. You anticipated my next question. I was going to ask if you had spoken with any of your former employers at AmBase?
A. No, I have not.
Q. Did you review any documents to prepare?
A. No, and I have none.
Q. If you can please state your full name for the record.
A. Full name is Joel Wayne Moor.
Q. And where do you live?
A. The exact address?
Q. Yes, sir.



A. I live at 113 Cypress Point, Palm Beach Gardens, and I believe the zip code is 33418.
Q. What do you do for a living?
A. I'm a chief financial officer for US Diagnostic, Inc., a public company at West Palm Beach Florida.
Q. What does US Diagnostic, Inc. do?
A. We own imaging centers, primarily MRI imaging centers in about 18, 19 states.
Q. Do you operate those as, I suppose, your operations or how --
A. We own the centers. We contract the radiologists to do reads and provide services to patients that need to be scanned.
Q. How long have you been working at US Diagnostic?
A. Approximately three years.
Q. Where were you employed prior to that time?
A. Well, officially, the last time I was officially employed was at Carteret. Between Carteret and here I did consulting work and got into the boat rehab business; purchased vessels and rehabed them, and didn't make any money. Then I got back into the accounting business primarily as a consultant for this company, and they hired me as CFO.
Q. So you were self-employed in between the time you worked at Carteret and US Diagnostic?

Page 13

A. Yes.
Q. You mentioned Carteret. When did you start working at Carteret?
A. It was the summer of 1991.
Q. Do you recall the month in 1991?
A. It was right around July 4th. I don't know if it was immediately before July 4th or immediately after, but sometime in the first of July, end of June. I don't remember the exact date.
Q. And when you first started at Carteret, what was your position?
A. I believe my title was executive vice-president.
Q. And what were your duties as an executive vice-president?
A. I was in charge of understanding the problems in the commercial real estate portfolio, and dealing with them.
Q. What were your responsibilities as to any of the retail or residential type of loan programs at Carteret?
A. None.
Q. Who was in charge of those?
A. I believe the fellow's name was McCabe, Leo McCabe. Understand, it's been eight and a half years so I'm not crystal clear on everything, but I think McCabe was in charge of that. I believe that was his name.
Q. While you were at Carteret -- how long were you at

Page 14

Carteret?
A. I was at the thrift from the summer of '91 until it was taken over in I believe it was December of '92. I stayed on for at least a year and a half after intervention.
Q. So probably through '93, maybe into the summer of '94?
A. I was there into the summer of '94, I believe.
Q. That's when you returned to Florida?
A. Yes.
Q. For self employment?
A. Right.
Q. While you were at Carteret, did your duties change over time?
A. No.
Q. You were always responsible for the commercial loan assets?
A. Yes.
Q. Prior to your employment at Carteret, where were you employed?
A. I had the same position at Amerifirst Savings Bank in Miami, Florida.
Q. When did you start there?
A. I started very early 1989. Either January or February. It was right after the new year.
Q. And who at Amerifirst asked you to come in and be

Page 15

responsible for the commercial loan portfolio?
A. It's a fairly complicated story. It's not that easy to explain, but if you want me to, I will.
Q. Yes, please.
A. And, once again, this is even further back. Amerifirst, I believe it was called American Capital, was in the process of attempting to buy Amerifirst. I think American Capital owned a thrift in Ohio. As I recall, American Capital -- and they had offices in Miami as well -- had doubts about the information they were getting about the commercial real estate portfolio and/or the captive development subsidiary at Amerifirst. They wanted to do the deal, but they weren't sure of the real estate. Somehow someone at American Capital before they bought the thrift, forced the bank to hire me to be the chief financial officer for the development company. And, literally, the day I started all management was fired or forced out. I was in isolation for a brief period. There was a coup at the board. Another CEO was brought in. He interviewed management and realized who I was and he put me in charge of commercial real estate to figure out what the problem was. I already knew sort of what the problem was, because I had access to the Peat Marwick papers that was prepared in conjunction with the proposed acquisition. So I knew there were real problems. And essentially I had the same job at

Page 16

Amerifirst that I did at Carteret; how big was the hole, calculate the problem and deal with it. I was at Amerifirst from early '89 until it was taken over in March of 1991.
Q. Do you recall who that new CEO at Amerifirst was?
A. It was a guy named Al Tatie (phonetic).
Q. Do you recall a gentleman by the name of Ron Burns?
A. Oh, very well, yes.
Q. How do you recall Mr. Burns?
A. Let's back up a while. Tatie was hired as the CEO. I think while they were looking for a CEO, Burns was the temporary CEO. He was on the board of Amerifirst. I don't think he was CEO very long. His job was primarily to find another one.
Q. He was an interim type of CEO?
A. Oh, yes. It was obvious. Burns was a director at Amerifirst and Carteret.
Q. Is that how you came to be employed at Carteret, that Mr. Burns knew your work?
A. Yes, he was aware of what we had done at Amerifirst. And by we, there's a whole group of people that was brought in. And he was instrumental in getting me to go to Carteret, along with all my people.
Q. You mentioned something about American Capital having an indication that the real estate problems at

Page 21

I left there in 1981 to go into the development business with a client who built condominiums in North Miami Beach. We purchased and operated a hotel in Key Biscayne outside of Miami, Florida and borrowed very heavily from a money center bank to do that. The bank failed. The bank was taken over by the FDIC. I essentially did my own workout for the buildings and rebuilt with the FDIC.

I left there after five years after working out our problems and went to work for the remnants of a collapsed REIT known as Senior Corp. Senior Corp was previously as CMI, second largest real estate investment trust in the country. It was a problem of there was booming bust cycles in real estate. It was a victim of a previous bust. It had been a REIT that 130 banks had an interest in. I was hired by the company that recently purchased the remnants of the REIT in an LBO. Worked there a little over a year while we packaged and resold all the assets and paid the LBO debt.

Q. Do you recall the name of the company that purchased the remnants?

A. It was an individual that was the former head of lending at Continental Illinois, and the largest home builder in California, a guy by the name of Bill Lyon that bought Senior Corp. And I believe it was 140 million dollar LBO. It's hard to remember the exact numbers. He had

Page 22

properties coast to coast from Hawaii to Puerto Rico and all points in between. It was sold off in short order. And as assets started to dwindle down, I took the job as CFO with Wolper, Ross, because it was obvious there wasn't anything to do quickly. What had happened, the real estate market had turned and it was easy for them to sell property. And it was getting ready to turn again.

My experience in real estate has been over a twenty-five-year period. I've seen a lot of ups and downs, and usually in the down periods I've found employment as CFO of non-real estate companies so I could feed my family, which is what I'm doing now. Hopefully that answers all the background questions.

Q. I think we got through the work history there. Let me just clarify a point. Do you have any graduate degrees?

A. I'm a CPA., B.S. in accounting.

Q. Is your CPA license current?

A. Yes, unfortunately. I hate accounting.

Q. Through your work at Carteret, did you ever hold a title at AmBase Corporation?

A. Not that I recall. I worked only for the thrift.

Q. Do you recall any other titles or positions you held at Carteret?

A. I really don't.

Page 23

Q. Do you recall as part of your compensation at Carteret that you would receive stock in AmBase Corporation or stock options in AmBase?

A. My agreement was only with the thrift. I had no agreement with AmBase, as I recall. No arrangements, nothing. Because had I had one, I think the RTC would have escorted me out the door on takeover. I think that's proof enough.

Q. That was because AmBase was still --

A. It was the parent of the thrift, and had I had any strings with AmBase, they would not have kept me, I think, after takeover, because there was -- there would be a conflict because they took the child from the parent, so no.

Q. Do you currently own any shares in AmBase stock?

A. I have never owned a share of stock in my life.

Q. Mutual fund shares?

A. Never owned a share of stock in my life.

Q. Have you worked for any subsidiaries or affiliates of AmBase?

A. No, I have not.

Q. The company for which you are currently employed, do you do any business with AmBase?

A. No.

Q. To your knowledge, do you have any financial interest in the outcome of this case?

Page 24

A. None.

Q. When you first considered taking a role in the management of Carteret, what was your knowledge of the commercial loan portfolio at Carteret?

MR. HUME: Prior to his coming to Carteret?

MS. TORNATORE: Yes.

Q. When you were considering the decision.

A. I can only tell you what Ron Burns told me. And it's really anecdotal. He indicated that there was a thrift in New Jersey in which he was involved with as a board member that had very good franchise, that had problems in the commercial real estate area that needed attention, but in the long run it could probably be saved. And it would be a nice place to go after going through the failure and demise of Amerifirst, which was a very painful experience. And it seemed like after talking to Ron and Dick Bianco, it really seemed like there was hope, because Bianco and those people were very savvy Wall Street types, and there was a hope to recapitalize. The game then was to recapitalize the thrifts and get them back to health and sell them down the road, and it appeared as though that could happen. There were problems in the commercial real estate. I didn't know how big, I hadn't looked at any of the loans.

Q. Do you remember that Mr. Burns and Mr. Bianco had a realistic sense of the problems in the commercial loan

portfolio?
MR. HUME: Objection. It calls for the witness to testify as to the understandings of other people and calls for speculation.
A. They said they don't know, that we want to hire you, so you tell us. It was very clear they didn't know. They said we think there are problems, but we need somebody like you to look at them, so --
Q. They needed to bring you in to clarify?
A. Yes.
Q. Were there any other sources of information that you used to evaluate before coming into Carteret?
A. No, took it on a flyer.
Q. It was just your discussions with Bianco and Mr. Burns?
A. Right. I liked Burns a lot, and after meeting Dick Bianco, I liked him too. We hit it off.
MS. TORNATORE: If we could mark this as Deposition Exhibit 1.
MR. HUME: Do you want to give the witness the marked version?
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 1.)
*Q. Mr. Moor, I'm going to show you what has been* marked as Deposition Exhibit 1. There is an ADDIIS number



on the document, PAM005 0035. If you want to take a moment just to look over that document.
A. I have.
Q. Do you recognize that document?
A. No, but I know what it is.
Q. Can you just describe what it is for us then?
A. I think it's a report that Peat Marwick did on the lending function before I got there. Never read it, never thought five minutes about it.
Q. Why was that?
A. I thought Peat Marwick was lost. I wouldn't care what they said. Bunch of idiots.
Q. What do you mean by lost?
A. Well, after I got there and realized there were problems, and they just audited the company, I didn't care what they thought. A bunch of kids wrote a report. I just wouldn't have read it.
Q. In your opinion they were unaware of the problems in the commercial loan area?
A. I don't know what they did. I have no idea. I've never spoken to any of them.
Q. To your recollection, did the management at Carteret discuss the report, Exhibit 1?
A. I don't know, it was done before I got there. And I knew there was a report. I never read it, I can assure



you.
Q. Did Mr. Burns or Mr. Bianco ever make any comments to you about KPMG efforts?
MR. HUME: Objection. Asked and answered.
A. Not that I recall.
Q. Were there any other members of the management at Carteret who commented to you on KPMG's --
MR. HUME: Objection. Asked and answered several times now.
Q. -- review?
A. We got rid of everybody. I didn't talk to anyone. I just fired them all.
Q. KPMG was removed as the auditors at Carteret?
A. I think before I got there.
Q. Do you recall having an opportunity to review KPMG work papers for the year end financial statements, 1990?
A. Never saw them. Never asked for them.
Q. Were you involved in responding to the management letter with respect to the 1990 financial statements?
A. No.
MS. TORNATORE: If we could mark this as Deposition Exhibit 2.
(Whereupon, the document referred to was marked *for identification as Deposition Exhibit Number 2.)*
Q. I'm going to show you what we marked as Deposition



Exhibit 2. The ADDIIS number on that document is FAM002 2361. If you want to take a moment just to look at that.
A. I understand what it is.
Q. Do you recognize Exhibit 2?
A. I've never seen it before.
Q. Do you recall in discussions with either the board or senior management at Carteret responding --
MR. HUME: Objection. I think you asked him already.
A. I don't recall anything about the letter.
MR. HUME: He said he didn't take part in this.
Q. Were you involved in the discussions of KPMG's performance?
MR. HUME: Same objection.
A. No.
Q. You were not then included in the decision to remove KPMG?
A. No.
Q. Who were the new auditors that were brought in?
A. Price Waterhouse.
Q. Whom do you recall at Price Waterhouse?
A. I don't remember the names. The partner was a very nice fellow, but I don't remember the names. I guess I'm getting senile.
Q. Does the name Bob Flaum sound familiar?

Page 29

A. Yes. Nice guy.
Q. Any other individuals at Price Waterhouse?
A. No, I don't remember the senior or the manager. I really don't. Every year you have auditors. I don't remember the ones we had last year where I'm at now. They come and go. They're like dentists.
Q. When you first started working at Carteret, what was Price Waterhouse's involvement?
A. They were the outside auditors. I don't think they were actively doing anything, it was in the middle of the year.
Q. Were they specially engaged to do any type of review at Carteret?
A. I remember their presence when we first looked at the portfolio. They went around with me and looked at the properties.
Q. Do you recall who had requested that they perform that?
A. I really don't. They were there. They did their own work. We discussed the loans in great length, both Price Waterhouse and examiners in the early days.
Q. Was their review of the commercial loan portfolio, was that independent of your own?
A. Yes. They were allowed to reach their own conclusions. We visited the property. They had their own

Page 30

staff, one running discounted cash flows, whatever. We had to look at them in a rapid manner. Time was of the essence. It wasn't like they were using my work. We'd look at the same property, do the same work. And they'd come up with their estimate and I'd come up with mine.
Q. Do you recall them preparing any type of written report?
A. I don't know that they did. If they did, I never saw it. This was preliminary work. As I recall, the mission was more to get a sense as to what the hole was, how big a problem was there. We knew that we didn't have the time to do detailed work for each and every property, but we had to make some guess as to how much of a deficiency there would be, because you have to book something if there's a problem. You have to refine your estimate as time goes on. It takes many, many months to get an appraisal. You can get a sense of what the property is worth and book an estimate as you're doing that. And that's what we did, and they did that. They came up with a number and I came up with a number.
Q. As part of the review that Price Waterhouse or perhaps yourself were doing over the commercial loan portfolio, do you recall when or if appraisals were ordered on properties?
A. Well, I didn't have a staff of any size until I

Page 31

got up there and fired everybody and hired a lot of the people that I had at Amerifirst. The appraisals came in over an extended period of time. When you're doing a hundred appraisals, it doesn't happen in one day. First you got to find the people to do the work. I had to hire my own internal guy to review appraisals. He would contract with the people to do them. To get appraisals on everything we needed might have taken a year. As I recall, we did the really big ones and the troublesome ones first. You can't get 100 appraisals in one day. You can't find the people to do them. It's a long involved process.
Q. Over a period of time you were requesting that appraisals be done on certain properties?
A. Definitely every one that had a problem.
Q. Any loan that was classified then?
A. Well, I don't get into classification. If it had a problem, not paying, or if we visited it and it had deferred maintenance, we got it appraised. Classifications were done with someone else. I don't really care.
Q. What do you mean by problem? Do you mean repayment was in question or there was delinquency on the account?
A. If they're not paying, that's a problem. If you're actively involved in foreclosure, that's a problem. If you visited the property and it's totally rundown and

Page 32

you're still making payments, that's a problem because that means sooner or later you're going to stop making payments because you have no tenants. Problems. Common sense problems. Or if there's one under construction and there's no tenants, then that's a problem.
Q. Vacancy rates or something like that?
A. Well, if you go out and visit a property and it's 90 percent done and you ask for the tenant list and there's none, that's a problem.
Q. Even if payments are current on the account?
A. During construction period usually there were no payments, so you expect them to be current.
MS. TORNATORE: If we could mark this as Deposition Exhibit 3.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 3.)
Q. Mr. Moor, I'm going to show you what we've marked as Exhibit 3. The ADDIIS number on that document is WOQ672 1032. Do you recognize Exhibit 3?
A. No.
Q. Do you want to take a minute just to review it?
A. I see what it is.
Q. Can you identify Exhibit 3?
A. Looks like a list of properties that appraisals had been ordered on it.

Q. Do you recall who Mr. Haines was?
A. I fired him. Braun I think I fired, too. I don't remember him. Who was he? Can I ask you that? I forget who he was.
Q. I'm afraid you're here to answer the questions.
A. I probably fired Braun as well.
Q. What were their positions at Carteret?
A. Haines was in the commercial lending. He was a lender that was kind of working in the commercial real estate area. I'm not exactly sure what he was doing.
Q. And Mr. Braun, what do you recall that Mr. Braun was doing?
A. That name just totally escapes me. I'm sure I fired him. I must have fired him the first day. I think I kept Haines a minute or two. I don't remember Braun.
Q. Would Exhibit 3 just be a typical list of appraisal requests that were made?
A. It may be. I don't know how they did business before I got there.
Q. Do you see that you're cc'd on the bottom?
A. Yeah. July 11, 1991. I had probably been there maybe a week, I guess.
Q. Do you recall making any requests of the existing personnel in the commercial loan area of what appraisals had been requested?



A. No.
Q. On the second page of Exhibit 3, there's a list there. I was wondering if you can tell me what that list is?
A. Looks like a list of loans to one borrower for three borrowers.
Q. Do you recall issues concerning Carteret's loans to one borrower?
MR. HUME: What do you mean by issues? Do you mean regulatory requirements?
A. We had a lot of these. The portfolio was full of them.
Q. How many, to your recollection?
A. I don't remember. It was a lot.
Q. Do you recall a number of these borrower relationships exceeded the regulatory requirement?
A. I don't recall that at all. The money was out. I mean, none of that would have mattered to me. The question is how big is the hole. The money is gone, can't get it back. I remember Profeta was a crook. He belongs in jail. Weingarten was a nice man. The Forstmann Little relationship, I don't remember much about that. I think we did a criminal referral on Profeta.
Q. Do you recall what type of perhaps special review the loans to one borrower relationships received?



A. All of the loans were reviewed the same way. How big was the hole, what was the problem.
Q. Was there any information that you had to convey to the regulators with respect to the loans to one borrower?
A. No.
Q. Would you have had to made them aware of loans to one borrower which exceeded the regulatory requirements?
A. Never thought two seconds about it. The money was already out. I was just there to try to figure out how much we were going to get back. These deals were done before I had got there.
Q. With respect to your work, your review of the commercial loan portfolio, I was interested in if you could describe structurally what you did when you came into Carteret?
MR. HUME: What do you mean by structurally?
Q. Were there changes to the organization of the commercial loan area that you made?
A. I fired most of the people there. I interrogated them to see if they were willing to -- a lot of them made the loans. That's usually a problem. People who make the loans are very hesitant to admit they made a mistake. Anyone that didn't look right, I just got rid of, and proceeded to look at the loans and visited the property. A lot of these guys never seen the property.



Q. They hadn't made any type of site visits?
A. A lot of them weren't familiar with their own portfolio. If they couldn't answer questions, I fired them on the spot. I think I got rid of about 50 people.
Q. You mentioned bringing some of the personnel at Amerifirst you had worked with?
A. Yes.
Q. Do you recall how many you brought?
A. Not exactly. Maybe 20. It's hard to remember.
Q. Were many of them brought up to New Jersey or did some of them remain in Florida?
A. Carteret had a significant portfolio in Florida. And we were able to keep the biggest chunk of people in Florida at a location in Delray. The legal guy, I guess you would call him general counsel for the real estate group, went to Jersey with me. The guy that did the reconciliation of our work to the TFR, Thrift Financial Reporting, a guy named Bruce Campbell, went to New Jersey with us. The rest traveled back and forth. The properties were all over the country, it didn't matter where we were. I was able to use the people at Amerifirst who knew the rules for evaluating troubled assets. The OTS looked at loaning, and had an accountant. We did this before on a large scale so it was easy to fire it up again.
Q. Who was in charge of the REO properties?

A. Sales was handled by a guy named Stanley Mohr. I tried to get the fellow who worked with me at Amerifirst to move up to Jersey and he refused. He's a good friend of mine and he said I'm not going to do it again. I met him at Senior Corp and took him to Amerifirst with me. He said no, I'm not going to work for any more thrifts. Stanley Moore did the sales, but the REO was handled by a number of different people. Groups of properties would be handled by a manager, and he might be responsible for 10 REO properties; management, the upkeep. But just to explain it, the way we were organized, I had people in appraisals, I had a legal department, I had an accounting department, loan servicing department. So we had a discipline so there was somebody -- there was a lot of overlap in terms of responsibility. Somebody might be evaluating it from an accounting point of view, somebody might be looking at it from a managing point of view, somebody might be worrying about it from an appraisal point of view, somebody might be worrying about it from a foreclosure point of view. And oh, by the way, when we get title, Stanley will sell it. So that's how it worked. It was organized like a real estate company.

Q. Who was in charge of the accounting in the commercial loan area?

A. Jose Garcia.



Q. Do you recall the gentleman's name I think you mentioned was the general counsel?

A. John Mudd.

Q. How about the loan servicing group?

A. I don't remember, because keep in mind that a lot of times I get the Amerifirst and Carteret experiences and loans confused. Because we had loans in the same area, I had a lot of the same people. Sometimes I think it was an Amerifirst loan, and actually it was Carteret. To the extent I make mistakes, you have to forgive me. It's been 10 years.

As I said, the faces were the same. The loan servicing at Carteret, I don't remember specifically who handled it. That was done in Jersey on the same floor as me, but who was the person in charge of the actual loan servicing, I'm not sure. Bruce Campbell could answer that question because he's the person who talked to the loan servicing people to get the reports to do the TFR. It would have been one notch down.

Q. Who was Peter Mitchko?

A. He was kind of my right-hand man for active loans. He didn't do REO. He did the loan administration work. He would have assigned the individuals to loans.

Q. And under each of these, I suppose, group heads, you had individuals doing their work?



A. Yes.

Q. Approximately how many people were in the commercial loan group?

A. At Amerifirst I know it was about 50. I have a feeling in total it was probably about the same in Carteret when you added everybody up, the servicers, the appraisers, in Jersey, Florida, legal, it was probably around 50, 55 people.

Q. Now, following your review of the commercial loan portfolio, what type of action did Carteret's management take?

MR. HUME: Could you clarify the time frame?

Q. Just after you were done with your review, you were reporting things --

MR. HUME: Object in the sense there was action taken before their review was 100 percent complete.

A. I want to make that clear. The review continued to the day we were taken over. We never stopped. We were continually having to reevaluate the estimates, lease up properties. It never ended. The process was just refined as time went on. There was an initial pass at a guess as to how big the hole would be, and that was continually refined with each passing day. It never ended.

Q. What was your estimate of the deficit?

A. As I recall, it was 150 million dollars from the



get-go. That number proved to be fairly accurate. It went up and down. I don't remember there were any material changes to it as long as I was there.

Q. Do you recall the time frame when Carteret recognized that 150 million dollar deficit in the commercial loan portfolio?

A. Not precisely. It was rather quick because I don't think they wanted to put out a 10 Q without recognizing the problem they felt intuitively we all knew was there. We didn't want to take ownership of a big problem. It was quick. I think a month maybe. Maybe a little longer. I know I was on a plane nearly every day.

Q. Would it have been a June '91, 10 Q?

A. Yes, June 30. So that would have been 45 days. I'm not sure if we got it done by August 15 or not. It might have been the third Q, because I didn't start until the second quarter was over. The time, I'm unclear. I just know it was important to get it done quickly. We didn't want to get ownership on this. It was a problem that had to be recognized, and we were going to attempt to do it, with the caveat it had to be refined and refined and refined.

Q. Constant review?

A. Constant. Never ending.

Q. In the course of your review, did you have an opportunity to evaluate whether this deficit or parts of

Page 41

this deficit would have been recognized in prior quarters or in prior periods of time?
A. It wasn't recognized at all or it wouldn't have had to take the 150 million dollar hit. It wasn't there.
Q. Was it apparent if anyone had done the review previously, that they would have seen this deficit?
MR. HUME: It calls for speculation as to prior management's review.
A. I don't know what they did. I did what I had to do. I don't know what the others did. I wouldn't have done it the same way, but --
Q. Do you recall what impact this 150 million dollar deficit had on Carteret's capital position?
A. It was a significant number. And it was an important decision. I think Price Waterhouse agreed that the number was somewhere in the ball park. I think the OTS did as well. It was a tough decision to make. I took the job with the understanding that if it was a problem we were going to recognize it the way it had to be recognized. I wasn't going to do it half way. They knew that going in. It was also very clear to me Bianco wanted to know what the problem was. He didn't want to pussy foot around it. You tell me what it is and we're going to deal with it, don't lie to me. It was a tough decision and one we knew was coming. It had a significant impact. 150 million dollars

Page 42

is significant to nearly anybody, at least to me.
Q. Do you recall if that increase in the loan loss reserves, did that place Carteret out of regulatory capital compliance?
A. See, now we're getting into an area, was the goodwill in and out. I don't remember. I think the assumption was we had goodwill. There was no -- I didn't care what the capital was. I wanted to find out what the hole was. My estimate on the hole was 150 million dollars. They had to deal with whatever that was. If there was a problem, they'd deal with it. I was never put into a position, if you do that -- nobody ever said a word to me. They said go out and kick the tires and tell me what this mess is worth. To the extent there were regulatory issues or problems, I didn't deal with it because I didn't want to hear about it. I wasn't going to let anything about the regulatory environment color the truth. And they never put that pressure on me. Never even said a word.
Q. No one ever asked you to revise your 150 million dollar figure?
A. Never. I can tell you everyone was shocked and upset, but there was never any pressure, well, if you make it this -- nothing. This is what you say it is, we're going to deal with it, which is why I took the job. And why I still think for a lot of these guys it was a difficult

Page 43

decision.
Q. With respect to Price Waterhouse, did they concur in your assessment of 150 million dollar deficit in the commercial loan portfolio?
A. Yes. You know, it's a subjective exercise. I think we were not materially different. I think we were in the same ball park. And OTS -- I don't think they ever wrote anything down, but, believe me, I talked to O'Rourke nearly every day. We all knew what was going on. I have discussed the loans at great length with Price Waterhouse and the OTS. If you turn the lights on, there's not a lot of mystery. If there's a problem, it's not that difficult to get your hands around what you think it's going to be. It takes a while to get the absolute proof, but most of it is common sense.
Q. Was that Tom O'Rourke at OTS?
A. Yes.
Q. Do you recall anyone else performing a review of Carteret's commercial loan portfolio at this time?
A. It's difficult to remember who all the players were. Keep in mind that Bianco and Kramer were actively trying to recapitalize the thrift, so they were constantly exposing the thrift to outsiders to see if they can interest them in making an investment. There were other people who looked at the loans other than OTS, Price Waterhouse and

Page 44

me. I don't remember what firms were used, there were a lot -- it's difficult. But other people did look at them. Were official studies ever done? I never saw any, but that didn't mean there weren't. Certainly I made a lot of presentations to people they were trying to interest in investing.
MS. TORNATORE: Let me see if we can mark Exhibit 4 I think we're up to now.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 4.)
THE WITNESS: Can I ask something? Are you guys cold? I'm freezing.
MS. TORNATORE: Let's take a break.
(SHORT RECESS TAKEN.)
MS. TORNATORE: We're back on the record.
Q. I'm going to show you a document we've marked as Exhibit 4. There is an ADDIIS number on the bottom there, FAM002 2407. If you want to take a few minutes and just familiarize yourself with Exhibit 4?
A. Okay.
Q. Do you recognize Exhibit 4?
A. I don't remember it specifically. I know what it is. It's a management letter.
Q. And who is the letter from?
A. Price Waterhouse.

Page 45

Q. Do you recall Price Waterhouse doing a review of the commercial asset management division?
A. No. They did an audit of the bank these are management letters they generated as a result of their audit work.
Q. Do you recall being asked questions about the commercial asset management division?
A. Not specifically, no.
Q. If you could turn the page where there's an ADDIIS number on the bottom 2411.
A. Yes.
Q. And if you would just read the two pages there addressing the commercial asset management division, to yourself.
A. Okay.
Q. Have you had an opportunity to read those two pages there?
A. Yes.
Q. Do you recall Price Waterhouse making a comment as to the management that the bank was doing of real estate properties and those properties that were managed by others?
A. I really don't.
Q. Do you recall that they expressed concern about the efforts that other, I suppose, contractors or outside consultants were retained to manage the properties?

Page 46

A. Not really. I'd like to make it clear that I probably received one of these every year in my professional existence. I generally ignore them. They're required to do this. You have to come up with points to suggest improvement to management. And I'll be perfectly candid, I never really look at them and I don't care what they say.
Q. Was Carteret, I suppose, out-sourcing a lot of the management of properties?
A. They had to. A lot of these properties were thousands of miles away so there had to be somebody on site collecting rents, dealing with the maintenance problems. You always have to have a management company.
Q. Who in your commercial loan group was responsible for administering or reviewing the work by outside property managers?
A. It would have been the asset manager. Asset manager may have five or six properties where there was a management company involved. That asset manager would have to deal with whatever management company was there doing the work for his property.
Q. Was this someone in Mr. Mitchko's group?
A. No, this would be REO, because you wouldn't be managing property unless you owned it. It would be somebody, not necessarily understanding more, but most of the asset managers that did REO were in Florida. Steve

Page 47

Ferreira, Craig Rosen, Andy Bowes, Marsha Morgan. There were a whole host of them.
Q. And the individual loan officer or asset manager would be responsible for supervising outside property management?
A. Yes.
Q. Do you recall Kenneth Leventhal performing a review of Carteret's commercial loan area?
A. I remember them specifically looking at the Amerifirst portfolio in great detail. I didn't remember them at Carteret. Maybe they did there as well. I know Kenneth Leventhal very well. I've had a lot of work with him over the years. I don't remember them in Carteret, but I guess they probably were there.
Q. You recall them because they kind of specialize in real estate?
A. Oh, yeah. They were our auditors at Senior Corp. I don't recall if they were there for a potential investor. If they were there, I don't remember why.
Q. You don't recall if Carteret had retained them?
A. I remember them specifically at Amerifirst because my friend was the partner in the engagement. I don't remember them at Carteret. That doesn't mean I'm not senile.
Q. We might get to a document later on.

Page 48

A. That's fine. I get the two confused readily.
Q. We'll hopefully clarify that with a few of the documents.
A. Okay.
Q. Do you recall in 1991 having an opportunity to review any of the reports of examination by either OTS or the FDIC?
A. I don't specifically remember being provided any such documents. I had a lot of conversations with Tom O'Rourke. He may have shown me a specific write-up on a specific loan.
Q. Do you recall any of the examinations staff at the FDIC?
A. At the FDIC? I do at Amerifirst, but not at Carteret.
Q. Okay?
A. Were they there? I don't remember. I do specifically recall meeting with them at great length at Amerifirst, but I don't remember at Carteret.
Q. We'll, get to some documents later on that might refresh your memory on FDIC.
I want to go back to the initial review that you performed over the commercial loan portfolio when you first started at Carteret. Who asked you to perform this review?
A. I'm not sure I was asked to perform a review. I

Page 53

just about all the borrowers. I can't say that any of the meetings were pleasant. That was part of the refining process; you meet with the borrower and see what they're going to do, surrender or fight. But for the first pass, no. Very few.
Q. Typically just the loan officers?
A. Even those, mostly it was just to meet them and fire them.
Q. Do you recall in terms of percentage how many of the loan officers you let go?
A. No. I just remember after it was over the floor was empty. Just a few of us on the floor.
Q. Do you recall any of the loan officers or a member of prior management making these site visits or site inspection on the properties?
A. I don't recall that. I didn't go with any of them.
Q. Do you recall taking any of the loan officers with you when you did site inspections?
A. I don't think there were hardly any to take. I only kept a few guys.
Q. The rest of them weren't there any longer?
A. No.
Q. Do you recall if at the time that you arrived there was an independent internal loan review area?

Page 54

A. If there was, didn't do much. I don't recall it at all.
Q. Do you recall if there was a credit review department that would evaluate the underlying credit before the loan was made?
A. I wouldn't know what that is. I don't know.
Q. Did you do any reorganization on the credit review side of Carteret's commercial loan area?
A. I don't know what that is. I had a real estate company. I came in and organized the real estate. The loans were made.
Q. Typically when you would, I suppose, work in a commercial loan area, would you have a separate department from the loan officer who would actually extend the credit, you would have a separate department?
A. We weren't making loans. We were foreclosing loans or hoping desperately to get paid. We didn't make any loans. There was no credit to give, it was over. We wanted the money back.
Q. Why wasn't Carteret making loans in terms of the commercial loan area?
MR. HUME: Objection. Speculation as to a decision made in 1989.
A. They weren't. There was no reason to. My job was to get the money back, as much as possible.

Page 55

Q. Why didn't you recommend that Carteret start lending in the commercial loan area?
MR. HUME: Objection. Asked and answered. In terms of what his job was when he was hired, it had nothing --
A. I'd rather die than make a loan. I'm not a lender. I don't like people. I would never give anybody a loan. I wouldn't loan my mother money. I've seen too much.
Q. That's some pretty tough standards.
A. All borrowers are essentially swine. They needed to be treated as such. I couldn't lend money. I'm psychologically incapable of doing it.
Q. You typically come into institutions --
A. I'm a workout guy.
Q. To do workouts?
A. Yes.
Q. Do you recall the amount of time you would have spent reviewing individual properties?
A. Never stopped. Looked at them continuously as long as I was there. Traveled constantly.
Q. So it was a full-time task for you, this review?
A. More than full-time. Worked around the clock. That first month I don't think I had a day off.
Q. That includes weekends?
A. We worked 30, 40 straight days trying to come up

Page 56

with a number. Weekends, nights. Never stopped.
Q. Do you recall whether or not the corporate lending was included in your review? Do you understand what I mean?
A. Yes. There was a small amount of commercial loans. I don't remember the dollar amount, but that fell under my purview. Most of them were kind of real state related. They called them corporate loans, but they were really real estate backed, so same drill.
Q. They then were included in your analysis?
A. Yes. Oh, one of them is right here. That was -- I believe that was in the corporate area. Forstmann Little.
Q. Forstmann Little credit on Exhibit 3?
A. Yes. I think that might have been performing, that's why I don't remember it.
Q. Perhaps a restructuring situation?
A. The fact I don't remember much about it tells me it was probably okay. There weren't a lot of them okay, but this must have been, because I don't really have much of a memory about it.
Q. Do you recall your findings with regard to reserves?
MR. HUME: Objection. Asked and answered.
A. 150 million dollars.
Q. The 150 million dollars was the reserve that needed to be taken?

Page 61

were just not conversant in the assets under their management, what did you mean by not being conversant?
MR. HUME: Objection. The document speaks for itself.
A. I think it really does. They just couldn't give me the information quickly that I wanted, that I thought they should have had.
Q. They didn't have information on the current value of the property?
A. Probably hadn't even thought about it.
Q. Cash flows on the property?
A. Asleep at the wheel.
Q. Condition of the property?
A. Right.
Q. In that paragraph you also indicated there was some filtering of information to the regulators and the former auditors. Do you recall where you got that impression from?
A. Not specifically.
Q. Generally?
A. I spoke to everybody there. Yeah, generally, there had to have been, in my opinion.
Q. That was just through conversations that you would have with the regulators or --
A. Well, the regulators were, in my opinion, unhappy

Page 62

with the way they had been treated the prior year. I don't know what their own write-ups say, but I now what O'Rourke thought, that he wasn't getting the straight scoop from some of these guys. And when I talked to the loan officers, I didn't have a good feeling about any of them. That's why I got rid of them. I didn't like them.
Q. There's also a statement in that Paragraph 3 there regarding there are a few, if any, net realizable value or fair value analyses on troubled assets.
A. I see it, yes.
Q. Are those, I guess generally, appraisals of properties?
A. No. That's an accounting construct that's required for troubled assets.
Q. What or how do you calculate the net realizable value?
A. The primary difference between net realizable value and fair value is the discount rate you use in bringing the cash flows back to the present. If it's not too troubled, the rule allows you to use the cost of funds. If it's REO or foreclosed or otherwise severely tainted, you have to use the market risk rate when you discount cash flows. That's the distinction.
Q. And the market risk rate would be much higher?
A. Oh, yeah. Double, maybe even more.

Page 63

Q. Hence the fair value analysis would be much smaller?
A. Much more punishing.
Q. The value would be much smaller than an NRV?
A. Yes.
Q. Do you recall which method Carteret used when you were in charge of the commercial loan area?
MR. HUME: Objection. He just --
A. We followed the rule specifically. Where NRVs were called for, we used NRVs. Where fair values were called for, we used fair values.
Q. I think you indicated that there was a certain individual who was responsible for regulatory and accounting compliance?
A. Well, you're referring to Bruce Campbell, who would convert our records to the format required for the TFR. There was an entire accounting group who did the fair values and NRVs, accumulated the information to prepare the books. For a lot of the properties, we owned them, we had to do the accounting. And from the accounting it's very easy to do a fair value and NRV, you have access to all the information. We do all that. We had a whole group of people.
Q. Mr. Campbell was more responsible for the regulatory --

Page 64

A. He was more responsible for the reconciliation of our real estate world to the TFR. He was the bridge.
Q. TFR being the thrift financial report?
A. Thrift financial report. Because it's important to understand, we were organized as a real estate company We were pretty blind to the thrift implications, except as it related to we followed the rules for valuing assets. At some point all our information had to be in different format to go into the TFR. Bruce Campbell, former bank examiner, did that work.
Q. So there was a difference between your internal reporting and your regulatory reporting?
A. Yes. We were organized as a very simple straight forward real estate company.
Q. Let's see if I can find the paragraph. I think it's in that same third paragraph there. You indicate that the loan officers were not sensitive to environmental issues.
A. I see it, yes.
Q. What did you mean by that statement, environmental issues?
MR. HUME: If you recall.
A. Well, I do recall. The environmental issues on commercial loans can be a big deal. And generally if there's a problem, one of the things you have to order, in

THE WITNESS: Can we take another break?
MS. TORNATORE: Yes. Let's go off the record.
(DISCUSSION HELD OFF THE RECORD.)
MS. TORNATORE: Back on the record.
Q. Mr. Moor, I think we were just getting into the commercial or the corporate lending aspect of Carteret. Do you recall having reviewed the policies with respect to the corporate lending area?
A. No.
Q. Do you recall Carteret extending corporate loans outside of its local market area?
A. Well, that was the case generally with both pieces of the portfolio. They had loans all over the country.
Q. The commercial real estate side of the portfolio?
A. Yes, and corporate.
Q. How would Carteret monitor loans that were not in its local markets?
A. I'm not sure before I got there what they were doing. I'm really not.
Q. In your opinion, were they monitoring the credits that were outside of the local markets adequately?
A. Well, let me explain. Generally Carteret would not be the lead on a large corporate deal, they would be a participant. I think they would rely mostly on the shared national credit review more than anything, because they



didn't have the horsepower of these giant credits. Some of deals Mani Hani were involved, Chemical. They weren't the lead. So I don't know how to answer the question. They were like the end, the tail. And they had to be happy with what they got either from the lead bank and/or the shared national credit review, if that answers the question.
Q. What evaluation would they make with respect to the shared national credit?
A. I don't know. I'm sure they just bought into whatever came out. I didn't really have the right to even disagree. They just put it into a file.
Q. All they did was buy the participation?
A. Yeah. It my knowledge Carteret was not the lead on any of these. They were generally a small slice of the huger credit.
Q. With respect to commercial real estate lending outside of its local markets, do you recall how Carteret was able to monitor those particular loans?
MR. HUME: You're asking before his time at the bank, at the thrift?
MS. TORNATORE: Based on his review, yes.
A. I don't know what they did. And I didn't spend a lot of time reviewing what they did in the past because, once again, my mandate, what was the problem, figure it out. So I didn't really spend a lot of time playing the



movie backward. It's what do we got here, are we going to get the money back, and, if not, how much are we going to lose.
Q. Let me step back a minute. I'm going to ask you some more specific questions about particular credits now. Do you recall a loan that was known as the Maitland Properties Investors, Limited loan?
A. I don't remember the loan specifically. Maitland is a suburb of Orlando. I'm guessing. It might have an office building. I don't really remember it specifically. I do remember going to Maitland many times because Amerifirst had loans there as well. I don't remember anything specific about the loan.
MS. TORNATORE: Let's go ahead and mark Exhibit 6.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 6.)
Q. I'm going to show you what we've marked as Deposition Exhibit 6. There is an ADDIIS number W0Q654 2108. Do you want to take a moment or two and just familiarize yourself with that document.
A. Now I see why I don't remember it.
Q. Why is that?
A. Obviously this loan was compromised early on in the game. And I had other loans at Maitland with



Amerifirst. The comment about the market being overbuilt is definitely true. And this is a shared national credit. Somebody else had cooked up a deal and we bought into it. Michigan National was the lead on this.
Q. Now do you recognize this document?
A. Not really. I see what it is. I don't remember it specifically.
Q. What is this document?
A. It's a write-up to accept a compromise of a loan that was constructed by the lead lender, Michigan National, on an office building in Maitland, Florida. I'm familiar with the area.
Q. Do you recall William Sawchyn?
A. I hate to admit it, I don't remember him either. Sawchyn I really don't remember. Bill Sawchyn. I vaguely remember the name. I can't place the face.
Q. Would you concur with Mr. Sawchyn's opinion that Orlando was a tremendously overbuilt office space area?
A. Definitely. We owned a giant hospital in the middle of downtown; one of the landmark buildings we foreclosed on.
Q. That was in the Orlando area?
A. Yeah. In Amerifirst we had a lot of properties that were troubled.
Q. And Carteret obviously had some properties there

as well?
A. I don't think as many as Amerifirst, but there were some.
Q. I want to ask you, on the second page there's an indication of -- left-hand side toward the bottom there -- the Carteret Savings Bank Credit Committee.
A. Yes.
Q. What do you recall about the credit committee?
A. It was a committee that voted on this. It was a committee that voted on these kinds of proposals.
Q. Restructuring loans?
A. Yes. Compromises.
Q. Who were the members of the committee?
A. Would have been me, Dick Bianco, I think Donald Kramer. I'm not sure if Ron Burns was or not. I don't really remember. And it might have been the residential guy, too. What was his name? McCabe. I think, but I'm not sure. You have access. I don't remember it exactly.
Q. Do you recall there being authority limits on what the committee could approve in terms of restructuring a problem loan?
A. Well, the credit committee was the chairman of the board and board members --
Q. Were there certain restructurings that had to go to the board level?



A. That kind of was the board level. I know at least two of the board committee members were on the committee and I think we only had four members on the board, or five.
Q. Who else had to make the decision?
A. That was pretty much it. They had a lot of trouble attracting board members, as you can imagine.
Q. Do you recall the credit committee's approval going to the board for the ultimate resolution by the board?
A. It may have. I don't know what the threshold was. If it needed to be approved at the board, I guess somebody would have said it to us, but I don't recall.
MS. TORNATORE: Let's mark this as Deposition Exhibit 7.
(Whereupon, the document referred to was marked for identification as Defendant's Exhibit Number 7.)
Q. Mr. Moor, I'll show you what we've got marked as Deposition Number 7 with an ADDIIS number of PAM010 1225.
A. I see it.
Q. Do you recognize Exhibit 7?
A. No.
Q. Do you recall who Mr. Mudd was or, actually, we've already discussed?
A. John Mudd worked for me. He was the legal counsel for the real estate group. And this was something he would have done.



Q. What is the subject matter of Exhibit 7?
A. It seems to be credit committee approvals, board of directors approvals or notice, OTS approvals or notice. In other words, how you proceed with modifications, workouts. He would have done all the legal minutiae for getting anything approved.
Q. Why was it important to have these types of authority levels?
A. Just documents the procedure, I imagine. And since Mudd would have to actually place up the document, we want to make sure all the approvals were in the right place, whatever he did had been properly approved. Very meticulous guy.
Q. It was important that the larger restructuring go to some type of committee as opposed to an individual loan officer making decisions?
A. Obviously it would have to go to the committee. Loan officers didn't have authority to accept or deny, only propose. They would write it up and the loan committee would decide. If it was big enough, the board would get it. The distinction between the board and credit committee, it was the same pea. If it was a board committee or the credit committee, I wouldn't have noticed the difference, frankly. I think a lot of the time it was done concurrently.



Q. Because some of the individuals were involved in both?
A. I'm sure the credit committee had a quorum with the board. You had to.
Q. Just based on the number of board members?
A. Yes.
Q. I want to return back to Exhibit 6 very briefly on Page 2.
A. It's the Maitland property memo from Mr. Sawchyn.
Q. On that second page there under collateral values, there's some comments about the appraisal that had been performed on the property.
A. I see it.
Q. Were those comments typical of the types of comments that you would make with respect to the appraisals that had been requested by prior management?
A. Well, this wasn't by prior management. This was done by the lead bank.
Q. And that was?
A. MNB is Michigan National Bank. Generally as a participant you don't have authority to do anything. You can get their appraisal and agree or disagree. Frankly, we were in a lot of deals with Michigan National Bank, and I didn't like those guys at all.
Q. Part of the reason being that their appraisal

Page 97

something with the broker or Western. At intervention I don't know what the status of that was. I don't recall.
MS. TORNATORE: Let's mark Exhibit 12.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 12.)
Q. Mr. Moor, I'm going to show you what we've marked as Deposition Exhibit 12. Do you recognize Exhibit 12?
A. No.
Q. Can you describe Exhibit 12 for the record?
A. Looks like the deposition that I gave to the attorneys in Newark back in '95.
Q. And this statement was made to the RTC, the Resolution Trust Corporation?
A. Excuse me?
Q. This statement was made to the Resolution Trust Corporation?
A. No, these were attorneys in Newark. I think they represented the RTC or they worked for the RTC. It's hard to remember.
Q. On the second page of the document there it has an ADDIIS number, CAM357 2054. It kind of gives you an indication there of who the attorneys were present in the deposition. I just wanted to point that out.
A. Now you're asking me to read something without my reading glasses. This is small print.

Page 98

Q. I just wanted to point that out to see if you recall who the attorneys were.
A. I can't read the print on the left. I can read it on the right.
Q. Well, I'm going to ask you about the larger print text. If you could turn to Page 114. And that's the Page 114 that is marked as deposition Page 114.
MR. HUME: This is the whole mini transcript?
MS. TORNATORE: Yes. The deposition page as opposed to document page.
MR. HUME: There are four deposition pages per page.
Q. It's 114.
MR. HUME: She's going to refer --
Q. At line 11.
A. Okay?
Q. I just wanted to see if any of this text there refreshed your recollection about recourse on the Western Federal loans?
MR. HUME: Are you asking him to read line 11?
Q. If you would mind reading that line 11 going through to Page 115?
A. Down?
Q. That's right.
A. Okay.

Page 99

Q. Does that fresh your recollection?
A. Yeah, it does. I'd forgotten the particulars. I guess I was smarter in 1995 than 1999.
Q. Or perhaps it was just nearer in time?
A. It was closer to it, obviously.
Q. That might be it. Does it appear as though there was some recourse that Carteret could take against the broker?
A. As I recall, there was talk about the broker. And I had forgotten there was two brokers. I guess there was two pieces of this, Goldman and DLJ and Western Federal. I think the opinion was it could be put back to all three.
Q. In reading on through to Page 116 there, does that refresh your recollection as to when or if Carteret reclassified it as a commercial loan?
A. I don't remember them reclassifying it. I really don't. I think it's pretty clear what I thought.
Q. So it wasn't until about a year after you started at Carteret that these loans came to your attention?
A. Yes. I was totally unaware of them.
Q. Do you recall any other members of management at Carteret performing a review of Western Federal's loans?
A. No, I really don't.
Q. Do you recall a gentleman by the name of Bill Brennan?

Page 100

A. Vaguely, yeah. A heavyset fellow.
Q. Do you recall whether Mr. Brennan was involved in reviewing the Western Federal loans?
A. I don't recall. Wasn't he the internal auditor or something? I forget exactly what his position was.
MS. TORNATORE: Let's go ahead and mark Exhibit 13.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 13.)
Q. Mr. Moor, I'm going to put in front of you there Exhibit 13. The ADDIIS number is RAM037 0078. If you want to take a moment just to familiarize yourself with Exhibit 13.
Do you recognize Exhibit 13?
A. No, I don't. I see what it is. It's a memo from the internal auditor. Obviously they're the ones that first brought up the issue.
Q. And the memo is dated May 29, 1992?
A. Yes.
Q. And you were cc'd on a copy?
A. I see that.
Q. Does Exhibit 13 refresh your recollection on who Mr. Brennan was?
A. He obviously worked for Fleming, or at least at that time he did.

Page 101

Q. Do you recall any conversation you would have had with Mr. Brennan about the Western loans?
A. Not really. I assume I did. I vaguely remember him. I think he was an internal auditor. It appears he actually did the field work.
Q. On the third page in the memo there, it's got the ADDIIS number RAM037 0080.
A. Yes.
Q. That's the last full paragraph there at the bottom.
A. Yes.
Q. Mr. Brennan notes that there were low debt service ratios used in extending the loans on the properties.
A. Uh-huh, yes.
Q. What's the significance of debt service ratio?
A. That's not something I would have cared about. That's the credit gobbledegook speak. I don't care.
Q. What would you have cared about?
A. Were they paying and what were they worth, if they were not.
Q. What was your evaluation of that?
A. There were problems. Properties were in bad parts of town. The portfolio was falling apart. And Western Federal, it almost looked like Western Federal had perpetuated fraud on this. As I recall now, Walsh's brother

Page 102

was a commissioner who got a commission on this deal.
Q. Who was Walsh?
A. I think he was the commissioner before Bianco.
Q. Do you recall what Mr. Walsh's involvement was?
A. His brother sold the portfolio and didn't run it through commercial real estate division, which is a no no.
Q. Or didn't run it through a committee type of approval?
A. Now I remember this. It was bad. Of course Walsh is probably out making a lot of money today. I remember now bringing this up in --
Q. You recall discussing this in a deposition?
A. I may have. There were so many things. And Walsh -- definitely there was something to this. Fact that it did not go through -- it was purchased in bulk as an investment. This was commercial loans dressed up to look like an investment. And this was wrong what he did.
Q. In bypassing --
A. Yes.
Q. I'm going to go into another specific loan relationship which I think you might have some recollection of. Paul Profeta relationship?
A. Yes.
Q. What do you recall about that particular borrower?
A. Bad guy. Liar. Probably a crook. Creep.

Page 103

Q. Why is that?
A. Just a dirt bag, a scum bag. No morals, no ethics. Nothing.
Q. Would you have meetings with Mr. Profeta?
A. I had one or two, and they got rather heated and never spoke again. Real ugliness with this boy.
Q. What type of lending did Carteret extend to him?
A. It was kind of a situation where they made him loans and he didn't want to pay anything, ever. There was some real ugliness going on. This man is nothing. He will do anything including, I think, bribe judges. So this was a bad boy. I'm sure he's super wealthy now and nothing happened to him either.
Q. What in particular led you to believe that Mr. Profeta was not forthcoming in his representation to Carteret?
A. Just meeting him. When I shook his hand I wanted to go wash it. This was a bad boy. This was a criminal that they loaned money to.
Q. What type of loans was he seeking or had been made to him?
A. As I recall, he had a series of office buildings that were primarily medical. It was incomprehensible. It was like dealing with -- how could you describe this? We had difficulty foreclosing, difficulty with the court

Page 104

orders. There was so much here. It was really beyond us to deal with him. There was a criminal referral done on him and I really had doubts about the court system we were dealing with in New Jersey. I think he got to the judge. That's my personal opinion. I think he did. We couldn't get control of these deals. He wouldn't pay. His deal, he was going to get them for free, and I recall it was close to 60 million dollars. And it was extremely frustrating. All you had to do was mention him and my blood pressure would go up. I believe I may have dragged him out of my office by his tie. He got -- well, really violent. This was a bad, bad man. He could out maneuver just about anybody. And I'm telling you, he would do anything.
Q. Do you recall him filing suit against Carteret?
A. I'm sure he did. He would do anything. He would muddy anything. Anything. It was very simple. He had a bunch of loans and he wasn't going to pay them. He was going to keep all of the money and spend it. It was bad. This was a bad man.
Q. So he wasn't going to repay the money and he was going to keep the collateral, too?
A. Yeah. That was his goal, it appeared to me, was to get all this stuff for free. Sue us for liable, lender's liable. I've been around a lot of real bad situations, a lot of foreclosures. This was the worst I ever stumbled

Page 113

A. We got along great both at Amerifirst and Carteret.
Q. How about the regulators at FDIC?
A. I don't remember any specific names. I spoke to a lot of them during my Amerifirst days. They came into look at us at the Amerifirst intervention and to get ideas of what we were doing and the problems we had. I don't recall meeting anyone at the FDIC while I was at Carteret. Because sometimes they switch examiners and they cross-train. I'm not sure if I met any.
Q. Do you recall a gentleman by the name of Bill Day?
A. No.
Q. How about a Dan Dion (phonetic)?
A. No.
Q. Mike Zamorski?
A. No. My day-to-day contact would have been with Tom O'Rourke. There's a number of people that worked for him, and those names I don't remember and generally I wouldn't have contact with them. The contact with the examiners would be through Tom.
Q. You've indicated that the relationship was pretty good between the regulator, the OTS --
A. I certainly thought so, yes.
Q. Were there disagreements regarding the classification of the assets?

Page 114

A. Not that I recall. We had a pretty open and frank dialog on anything we needed to have it about. Tom pretty much knew what we were doing and thinking at all times.
Q. Were there disagreements about the level of reserves that Carteret had made?
A. I can't imagine, no.
Q. Do you recall a time in 1991 when the regulators came in to discuss the examination findings?
A. Not really. But I had nearly daily contact with O'Rourke, so one particular meeting I'm not going to remember. He was there a lot.
MS. TORNATORE: Let's see if we can mark I think we're up to Exhibit 15 now.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 15.)
Q. Mr. Moor, I'm going to show you what we've marked there as Deposition Exhibit 15. The ADDIIS number, CAM152 1290. If you want to take a moment and familiarize yourself with that document?
A. I see what it is. Strange enough, I don't remember the meeting though.
Q. Do you recall from time to time the examiners coming in and conveying their findings?
A. I mean, they were there so much, it's hard to remember a time when they weren't around. I'm sure we had

Page 115

this meeting. Funny, I really don't remember it.
Q. Could you identify for the record what is Exhibit 15?
A. Well, it looks like a presentation that Tom O'Rourke made to the board and members of management
Q. And were you present at that meeting?
A. I'm sure I must have been. Am I listed?
MR. HUME: Yes.
A. Yeah. I really don't remember it though. That's funny.
Q. On Page 29 of Exhibit 15 toward the middle of that page there, Mr. Bianco is speaking?
A. Okay.
Q. And he states, Point 4 addresses the internal loan review program, and it's the Peter Mitchko situation we talked about, stealing from Peter to pay Paul. Do you recall what the Peter Mitchko situation was?
A. Let me speculate a little here. It might have been that Peter was hired to be an internal auditor and then I deputized him because there was nobody else. That's what I think that means.
Q. Instead of him performing some type of independent loan review position, he basically could no longer perform that because he was working under you?
A. Right. I needed help and there weren't many

Page 116

bodies left, and he was a very experienced guy. I don't remember specifically if he was hired as internal auditor. I get the drift he must have been. I had forgotten that.
Q. Do you recall at the time of Exhibit 15 that there were discussions about the infusion of outside capital?
A. Not specifically. There was always the plan there before I took the job of we would fix it, recapitalize and more forward.
Q. Do you recall the infusion of the outside capital, basically that would be the make or break for Carteret?
A. Well, certainly there was always that issue, but the plan was clean the place up. And with Dick's contact and Kramer's contact we were very optimistic that if all the problems were out on the table, the franchise was valuable, no more hits to be taken from the commercial real estate position, the dream would be infuse capital and it would be a viable entity resolved and managed for profit.
Q. If Carteret would not have obtained that outside capital, what were Carteret's likelihood to continuing?
MR. HUME: Objection. It calls for the witness to speak about matters not within his job purview or description. Speculation.
A. I can't speculate. I thought we were going to be fine. I never focused on the fact that the goodwill is going to be thrown out. We do what we need to do. We had a

Page 121

A. This is the report that -- do you know when this was issued?
Q. I don't have an exact date when it was --
A. I'm sorry. I misunderstood what I was looking at. Tom and I had nearly daily contact. As a result of their examinations they have to write a report. So I'm sure that he discussed many of these issues with me and the people that worked for me and used the information that we generated to prepare the report.
Q. On Pages 23 and 24 there's a discussion that begins on Page 23 regarding the Western Federal loans.
A. Okay.
Q. If you wouldn't mind reading just those few paragraphs to yourself. I just want to see if they refresh your recollection.
A. I don't remember thinking about Western Federal until sometime the next summer. Because, frankly, in November 1991 we were still digging into the pile of stuff I had. I don't think we had of bulk of appraisals into the spring of '92. We were doing NRV, staffing up. And some other problem on the horizon is not something I would have jumped into.
Q. You were focusing on the NRV --
A. There was a whole pile of stuff that needed to be worked on like a dickens, and we were doing that. I see

Page 122

this here. I don't think I was cognizant of this until much later.
Q. On Page 24 toward the middle of the page there's a comment there regarding the carrying value of goodwill. What was your involvement in evaluating the carrying value of goodwill?
A. None whatsoever. Absolutely none.
Q. Do you recall any of the findings with respect to the 1992 examination of Carteret by the Office of Thrift Supervision?
A. Excuse me? You lost me.
Q. Do you recall any of the findings in the 1992 examination of Carteret by the OTS?
A. I don't remember. Was this report issued in '91 or '92?
Q. The report was actually issued in '91.
A. There was another one too, '92.
Q. I'm moving on to a new report.
A. I don't remember.
Q. Do you recall disagreements in 1992 with the regulators regarding clarifications of loans?
A. I don't recall any disagreements, frankly. And we would have resolved whatever came up. It's logical. We weren't there to -- I really don't remember any disagreements at all. And I don't just think I'm being

Page 123

senile either.
Q. That was just your working relationship with Mr. O'Rourke?
A. Yeah. Hand in hand.
Q. Do you recall any discussions in which Carteret was evaluating whether to restate prior financial statements?
A. No. I would not have been privy to that.
MS. TORNATORE: Let's mark Exhibit 17.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 17.)
Q. Mr. Moor, I'm going to show you what we've marked as Deposition Exhibit 17. The ADDIIS number on the document is RAM011 0296. If you could take a look at that document for a moment.
A. Yes. Okay.
Q. Do you recognize Exhibit 17?
A. No. I wasn't on the audit committee.
Q. Were you present when audit committee meetings would occur?
A. No.
Q. Were you generally included in board meetings?
A. I had an open invitation to attend. Generally I did not. We were very busy. I would go to the board meetings and make the presentation that I needed to make and

Page 124

then excuse myself. It's just that they tended to go on for a while and a lot of issues were covered. I wasn't excluded, I was always welcome to stay. But to tell you the truth, I never did.
Q. On Page 2 of Exhibit 17, the first full paragraph there --
A. I see what you mean.
Q. There was a discussion there about restating earnings?
A. Yes.
Q. I'm just curious as to whether that refreshes your recollection?
A. I never had the discussion with anybody about it. The issue is going to come up. You had a 150 million dollar hit. It didn't occur yesterday. First start playing the movie all the way backward. You take the medicine and move on. Unless it was something specific, unless there was a specification you can identify on a specific day, and most of these things occurred over a period of time, it's hard to say when. I wasn't here for any of the discussions associated with this issue.
Q. Would the underestimate of reserves be significant enough to restate the earnings?
A. It could be, yes. You have to go back and recalculate the reserves somewhere in the past. When you

don't have appraisals that day, it's almost impossible.
Q. So logistically it wouldn't --
A. I've been associated with only one during my career.
Q. Was that at Amerifirst?
A. No, that was at US Diagnostic.
Q. Where you're currently employed?
A. As a matter of fact, that was what I was hired to do initially.
Q. Were you generally familiar with the goodwill litigation that Carteret had initially given the Office of Thrift Supervision?
A. Only peripherally.
Q. What do you recall about the litigation?
A. Nothing specific. I was aware of it just vaguely. I don't recall ever having any specific conversations with Dick. I know there was an issue about goodwill. It was my impression that we had a pretty good position. I had more than enough to deal with, trust me.
Q. How important was the success of the goodwill litigation to Carteret's future financial condition?
MR. HUME: Objection. Blatantly calls for speculation given his prior answer.
A. I really didn't pay any attention to it. Truly, I did not. I figured there was something here. My job is get



to the truth and some way these guys would work it out. I was there to evaluate and deal with commercial real estate problems, period.
Q. Did Mr. Bianco ever convey to you the importance of the goodwill litigation?
A. No. It's just my general impression that we had a good position. I never really thought about it. We had a problem, we were going to figure it out and move on and have a happy life in New Jersey.
Q. I'm going to move into a new area about the capital raising efforts that Carteret started on -- I was just wondering if you want to take a break before we get into a new area.
A. Okay. Sure.
(SHORT RECESS TAKEN.)
MS. TORNATORE: Back on the record.
Q. Mr. Moor, I'm just going to cover a new area with you now, the capital raising efforts at Carteret. What was your role in the capital raising efforts?
A. Dick Bianco and Don Kramer were fairly well connected guys in Wall Street, long term contact, knew a lot of people. My role, I would come in at the end of the day and give a presentation on the commercial real estate. Because most investor's question was do you recognize your problems. So generally it was a sales job to say who this



is, who I am, this is the team we brought in, this is what we think. I didn't go out and seek the people to talk to. Frankly, Dick and Don did all that. And it appeared to me like they were going to be successful. I thought we had a pretty good story.
Q. Do you recall the type of information that was given to the potential investors?
A. I had a book of every property, maps, narrative, calculations of the values, discounted cash flows. Just giving the potential investors this huge book. I gave that so many times we just made about 50 copies of it.
Q. How often would you update that book?
A. Quarterly.
Q. Quarterly?
A. It look a long time. It took a whole quarter to update it, frankly.
Q. Just to keep the summaries current and the figures current and everything?
A. Yeah.
Q. Do you recall the amount of capital that Carteret was seeking from an outside investor?
A. I really don't. I hate to admit that. I probably should remember, but I really don't.
Q. Do you recall if investment bankers were retained to assist Carteret?



A. I think there were bankers. I don't remember who they were. I only vaguely remember some of the meetings. We had so many it was just like it almost became rote. Took a couple of hours, drag in a couple of my guys.
Q. It was kind of like a road show presentation then?
A. Exactly.
Q. Would you individually have meetings with the board members to keep them apprised of how things were going in terms of talking to outside investors?
A. Not me.
Q. Who would generally do that?
A. Dick and Don were on the board, and I think there were only four or five members. I think they pretty much all knew at all times.
Q. So they would convey to the board members who were not actually working at Carteret what was going on in terms of the capital raising?
A. I assume so.
Q. Do you recall if there was a certain amount of time in which Carteret needed to obtain this outside capital?
A. Not that I recall.
Q. Do you recall if the regulators were asking them to get the capital by a certain period of time?
A. I really don't recall.

format. This is how you evaluate the loan for thrift reports purposes, not necessarily the same as an appraisal. Appraiser would review it to make sure this was correct. It was a tedious process.

Q. How did the accounting group come up with the market risk rate on Page 0771?

A. Generally that was agreed to by the OTS. There was a publication out that gives the ranges you can use.

Q. And that's the discount rate on the cash flow; is that right?

A. Yes.

Q. Was there anyone particular that you discussed the market risk rate with? That was Mr. O'Rourke?

A. Mitchko would come up with a number. Generally the OTS had publications out that we would use. It was a blended rate based on cost of funds and equity, and there were tables out you can use. And it was agreed upon by the OTS to buy into whatever rate you used.

Q. When would you perform a fair value analysis versus the net realizable value analysis?

A. A fair value analysis would be performed for a piece of REO. Somebody's not paying, he's foreclosing, you do a fair value analysis. If it appears that the loan can probably make it, you can do an NRV.

Q. And these are based on -- I'm sorry, your response



was based on the accounting literature that is in existence, troubled debt restructuring?

A. The OTS had come up with the methodology they expected you to use for each category. It was a mixture of the accounting literature and their perception of how that accounting literature should be applied. It was a reasonable methodology. I still use it.

Q. The individual write-ups that are listed for each borrower, in Exhibit 19, were those prepared by the asset manager responsible for those particular loans?

A. Yes.

Q. Would you have an opportunity to comment upon their summaries?

A. It really depended on the asset manager. For instance, I just flipped by accident to Steve Cole. I haven't reviewed his. Some of the lesser experienced people I might have looked at it first to see -- to make sure they were going in the right direction. Cole I never would have. Some of these guys are just better than others.

Q. Ed DiSalvio, is he one that you would have reviewed or not?

A. Probably not, because that meant I had to deal with him. And I didn't like him, so --

Q. Was he down in Florida?

A. No, he was up in Jersey.



Q. Do you recall any other names for write-up summaries that you would have reviewed?

A. I mean, a lot of times they would come in and ask me questions. What do we do about this, what do you think. I would give input. Often times I see the property with them and we discuss it together. They go back and write up their write-up. Sometimes I'd review it, sometimes I wouldn't. There were certain guys, did the work, whatever they did, they'd say I did this. So the less experienced people, they would want to talk to you. So the amount of input really varied depending on the loan officer.

Q. How was a loan selected to have been included in the black book?

A. They're all in there. This is everything.

Q. This is all the loans in the commercial loan portfolio?

A. Which makes me wonder, because something seems to be missing. I remember it being thicker. Maybe the paper is thinner. We have write-ups on everything. This is everything. That's why it took a while. It doesn't get created in one day. And this is a summary.

Q. Nothing left uncovered?

A. Right.

Q. What type of reporting would be performed on a monthly basis?



A. Report? Mostly just an exception kind of report, something bad happened. If you visited a property and noticed a problem. If you got bad call, if it was a developer's problem. As I said, the book was created only once a quarter. We get monthly updates where you know the loan balance. This front sheet would be updated each month so you knew on that date what the loan balance was. But the write-up, only once a quarter. Everyone knew that if anything developed, they had to tell me. If there was a problem, I had to hear about it. I met with Cole, for instance, probably twice a week to hear what's happening with Profeta. How are we being stymied today.

Q. You were looking to facilitate the free flow of communication?

A. Everyone knew they could come see me any time. No such thing as a stupid question. Total access. We had the kind of relationship where it was kind of a team really. Everybody talked all the time.

MS. TORNATORE: Let's go ahead and mark Exhibit 20.

(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 20.)

Q. Mr. Moor, I've showed you what we've marked as Deposition Exhibit 20. There's a BATES number on there, CAM089 287. Do you recognize Exhibit 20?

A. Not particularly. This looks like one of Bruce Campbell's converse reports where he takes what we do and convert it into bank speak. This looks like his work anyway. I suspect it is.
Q. Would Mr. Campbell rely upon the internal reports generated on the commercial loan portfolio?
A. Bruce knew how the TFR worked and he knew how what we had had to be converted into the TFR. When you're working on the deal, you don't care about this. At some point it has to get into the bank report. That was his job. As you see, it's tedious. And he knew how to report. I'm sure this is his report. So he was the bridge between our group and the accounting group.
Q. The controller's office perhaps?
A. Yes, because they filled out the TFR. We just couldn't give them this book. There were categories we had to have and Bruce would go through and agonize over each one. As a matter of fact, he still works for me.
Q. At US Diagnostic?
A. Yeah. I got 600 loans there on the other side where we're the borrower, and he handles those.
Q. He was with you at Amerifirst; is that right?
A. Yeah.
Q. You mentioned previously some of the potential investors. You mentioned Carlile.



A. It seemed like we talked to Carlile.
Q. What do you recall about the interest by Carlile in Carteret?
A. You have to understand, I wasn't talking with these guys about how much they were interested. I was giving them information and they were interrogating me. The decision to invest or not to invest, whether they liked it or not, that would have been between Dick and Donald Kramer. It's not that they excluded me from those conversations, I would have done it myself. I didn't have time. I wasn't there talking to them every day. What about the investors, no. As you can see, we had way more than we could handle every day. I don't know how many pieces of litigation we had. It was endless. Problems with borrowers, appraisals, constantly the examiners were there, auditors were there, people dropping through looking at our financials. I didn't have the time to get into all that. They kept me out of it, not because they wanted to, just because I didn't have the time to devote to it and they didn't want to disrupt me. We had a pretty good working relationship and it worked the way it should.
Q. Do you recall working with any of the potential investors who were performing due diligence at Carteret?
A. Not specifically. But I've dealt with due diligence people all my life and it's always the same. Here



are my people, here they are, go talk to them. If you can't get a result, come see me. That's how I always do it. I do it now. I can't recall anybody coming to me. There was enough information in my file, they could make their own determinations. You read the summary, whatever was there and you say, well, they're either right or wrong. So I never got much input. It was here's the information, whatever you need ask me. And make your own decision. That's the way we approach it with the auditors and OTS. The decision was pretty much the same. It's common sense. If you have enough information, you make an informed decision.
Q. Were you ever given an opportunity to get some feedback on the potential investors on their opinion of the commercial loan portfolio?
A. Never did. I mean, I can tell you that every time we went you could always tell they were doubtful. I always felt I made a good impression because the initial resistance and hostility, I felt it probably went okay. They never said great job, poor job. None of that. There's always resistance. Here's the problem guy, and it better be good, better have the story down. My job is to convince the investors we're real estate professionals and we have the problem identified and we're dealing with it. That's it in a nutshell.



Q. You mentioned Kohlberg & Company. What do you recall about them?
A. I just remember going to their rather inordinate office and they were famous at the time, in the paper. And I remember the movie with James Gardner that stuck in my mind --
Q. Barbarians at the Gate? Is that the movie?
A. Yeah.
Q. Was that in connection with making a presentation?
A. Yes.
Q. Do you recall whether Kohlberg performed due diligence at Carteret?
A. I think they did. They must have because I remember going there once, maybe twice, and the place made an impression on me.
Q. So they were one of the more serious investors?
A. Seemed to be to me. There were others. There was some outfit in Pennsylvania, Pension Fund, I think made a couple trips, too. There were others. They've faded into my memory. Kohlberg I remember because of the timing. And Carlile I remember because we talked to him here.
Q. Was there a time when you were made aware of why Kohlberg did not invest in Carteret or why Carlile did not invest?
A. Only anecdotal information, and I don't know if

Page 145

you want to even go there. I know the impression I got. No distinct discussion, but just by being around.
Q. What was the impression?
MR. HUME: Objection. Speculation.
A. Do you want me to speculate or not?
Q. Yes, go right ahead.
A. It seemed to me there was concern the government was going to change the rules on them. They'd put the money in and then say it's not enough or we want something different, we're going to change the way you do this. My impression, a lot of people were very leery the government was not going to be consistent in the way they approached this. And I think that proved to be the case. That was my impression. No one ever told me that, it's just from being around you develop a sense of what was happening. That's what I thought. I thought we were very close. A lot of them seemed to be very interested. But I had a lot of faith in Dick and Don. I don't know if you've met them yet, but very credible, very ethical. I was surprised. I kind of knew that going in. But I was pleased to see that my first impression was right. So I thought it was a slam dunker, going to be up here forever, we're going to make a lot of money and life would be good.
Q. Do you remember any of the investors who had performed due diligence expressing a concern for the loan

Page 146

loss reserves?
A. As I said, they had enough information, they could draw their own conclusions. As I said, after a while they really didn't need me. We had the information there in its plain unvarnished form, and you can decide. We had rental information, financial statements, bank records conciliations. It was there. Do your own work.
Q. Do you recall any potential investors expressing a concern about additional losses that would need to be worked into the commercial loan portfolio?
MR. HUME: Objection. Asked and answered.
A. Not specifically, no. They may have felt that way, but if they did, I never heard about it.
MS. TORNATORE: If we could mark Exhibit 21, I think we're up to.
(Whereupon, the document referred to was marked for identification as Deposition Exhibit Number 21.)
Q. Mr. Moor, I'm going to show you what we've marked as Deposition Exhibit 21. The ADDIIS number on the document is WOP338 1374. If you want to take a moment just to review that.
A. It's interesting. Okay, I see it.
Q. Do you recognize Exhibit 21?
A. I've never seen this, no.
Q. Please identify Exhibit 21 for the record.

Page 147

A. It looks like a report done by a firm for Kohlberg, obviously had access to our information, but I don't remember them.
Q. You don't remember the firm Lyons, Zomback & Ostrowski?
A. No, sure don't. These are our reports in a different format. I see Profeta gets a big -- okay.
Q. I would like to focus your attention to finding Number 2 in the document. It's on Page 5, BATES number WOP338 1379. If you could read finding number 2 there to yourself.
A. Okay.
Q. Are you familiar with the issues that are discussed in finding number 2 there?
A. No.
Q. So this is something new to you, the issues that are discussed in finding number 2?
A. Yes.
Q. Do you recall there being questions about how Carteret was accounting for charge-offs versus losses in the portfolio, commercial loan portfolio?
A. No, but in reading this, it almost seems -- our reserves were specific by loan. They're talking about a general reserve. They may be talking about another part of the bank.

Page 148

Q. Something other than the commercial loan portfolio?
A. Possibly. Although that's not to say -- I had no information about how our work was handled in the tax return. Maybe there was some twist there that I was unaware or didn't care about, but now this is something I would have been blind to. They're talking about general. That's meaningless. We had each loan analyzed specifically.
Q. So perhaps it was referring to the residential portfolio?
A. May have, I don't know.
Q. On Page 9 there's another finding there, finding number 6. If you would go ahead and read finding number 6 to yourself?
A. I've already read that one.
Q. Are you familiar with the issues that LZO brought to the attention of Kohlberg in finding number 6?
A. I'm not familiar with this. When I saw that I focused on that, and it interested me to see what loan they were talking about, which is Profeta and Swedeland and a couple of others. There was about three hundred million dollars in reserves. It's subjective. That's their opinion. I can't say if they're right or wrong.
Q. I think the next finding that I wanted to ask you about was finding number 7.

Page 149

A. What page was that?
Q. It's Page Number 12, I'm sorry.
A. Okay, I see it.
Q. Do you recall Carteret periodically revised the projections that were given to potential investors?
A. This is obviously referring to Kramer's projections. I never reviewed them. It was for the whole bank. This wouldn't have affected me.
Q. Did you have any involvement in the preparation of the projections with Mr. Kramer?
MR. HUME: Asked and answered.
A. No. I'm sure he used our information, but I don't remember having a discussion with him at all.
Q. Mr. Moor, did you understand the questions that I've asked of you today?
A. Yes.
Q. And you have answered truthfully to each of my questions?
A. Oh, yes.
Q. Do you have any changes to any of the answers that you've given today?
A. No.
Q. Has anyone offered you a fee to testify or consult in this case?
A. You're going to do that, aren't you?

Page 150

Q. I'm afraid not. We are precluded from --
A. That's most unfortunate. No, the potato chips and the coke is all I received.
MS. TORNATORE: I want to thank you for appearing today. I'll give Mr. Hume an opportunity to ask you some questions at this time.
MR. HUME: I'm afraid I'm going to ask you just a few questions. It's not going to last long at all.
EXAMINATION BY
MR. HUME:
Q. Mr. Moor, the attorney for the government asked you a number of questions about the decisions made in taking reserves against -- provisions against future loan losses at Carteret. Would it be accurate to say that your approach in the job that you did was very unusual for the thrift industry at that time in the early 1990s?
A. Yes, definitely.
Q. You saw that almost all other institutions' management were taking less conservative reserves, to say the least?
A. Let me answer that another way. Because of my involvement at Amerifirst and Carteret and with the RTC people, some of which I hired from Amerifirst to go with me to Carteret, I was access and privy to a lot of information and a lot of the other bank thrift failures. The work was

Page 151

unusual because it was done by non-bankers and it was a common sense approach. So generally the thrifts were under-reserved and that triggered the takeover because it was a fight over valuation reserves. So the answer to your question is kind of yes. I had an unusual situation with Carteret, that's why I took the job. I knew going in that I didn't have any vested interest in touting the numbers that existed. Bianco was new, Kramer was new. They wanted to know the truth. They didn't have a magical number in mind that would make life easy. That's why I took the job.
Q. When you were asked about the timing of that first initial pass you took on the assets in deciding to take the 150 million dollar hit, you said you didn't really recall whether it was in the second or third quarter of '91. I can represent to you, it's not a matter of dispute, it was the second quarter of '91. The decision was made in the first or second week of August.
A. I guess the second week of August. I forgot that Q is due 45 days, it was due August 15. That must have been the time the decision was made. Most people would not have made that decision. The longer you wait, the more it becomes your problem.
Q. You stated that -- you used the phrase earlier in this deposition that you didn't want to have ownership of this problem. Am I right in saying that as someone new to

Page 152

the thrift, you didn't want -- someone new to the thrift you did not have an incentive to see these reserves taken gradually, you wanted them recognized as soon as possible so you could move forward?
A. If you don't recognize reserves, you can't compromise loans, you're paralyzed. Then you have to explain why is it such a huge loss. If you wait too long, the question is what have you been doing. It's a public company. As long as you have an indication there's a problem, you're required to do something about it. And we did it pretty quickly.
Q. So rather than having an incentive to string things out as existing management generally would have in any financial institution, your incentive was to come in and recognize it as soon as possible so you can work it out effectively?
A. Right.
Q. Would you say that that was part of the reason, in addition to perhaps your personal attributes, why your approach was distinct in, you know, almost, if not completely unique, amongst the financial services sector that had commercial real estate?
A. It was rare for these institutions for complete new management to come in after the loans got really sick. Most of the management were escorted out the door in

Page 153

takeover. Carteret was an unusual situation. Often times I said if I got there a couple months earlier, it would be very different. To see the problems and not be able to do anything about it, you would have to resign. This occurred on many different stops in my career. And your timing of employment, it is important. I'm telling you that's what attracted me to Carteret. I realized I would not have to fight every inch of the way to get the truth.

Q. Do you think that -- well, am I right in saying that in terms of it being unusual and distinct, your approach and the job that you did, you say it was unusual and distinct not only amongst the thrifts, but amongst financial services including banks?

A. My experience with the banks was a very negative one. We had a lot of deals at Carteret and Amerifirst where it was either a shared national credit or a bank was the lead. Almost without exception banks had little or no reserves on deals that I had significantly resolved. As a result it was very difficult to compromise anything. I yelled and screamed so much that they became so sick of me they bought me out just to shut me up. If you want me editorialize, I would. The banks were not subject to the same rules that the thrifts were. They did not take the same reserves on the same loans, and I can name you bunches of them. It was a frustration to me, an irritation to me.

Page 154

I bent my spleen on this with the FDIC after the Amerifirst takeover. It was disgusting. We had loans with Chemical, Mani Hani, all of them. None of them had the reserves I did. And it was a mystery to me, but really not. Because if you think about it, the thrifts were destined to die.

Q. Do you think there is something to it that the financial services sector, the banks you've mentioned, that by virtue of not taking the Wayne Moor approach, managed to not take nearly as large a reserve and eventually survived and profited from that?

A. Yes. It's obvious. If you wait long enough if you have a hole, that never goes away, but it stops growing. And if you don't have to take the hit, at least that loss can be absorbed over a long earnings period of time. The real estate market comes back, you can live through it. The rules the thrifts operated under were very punishing. I'm not saying they were wrong, but you can see what the effect was, it nearly killed all of them. Banks, I'm telling you, were not subject to the same rules. This I will say into my dieing day. I had too many deals with those guys.

Q. Even thrifts could have ridden out the storm if they had adequate capital?

A. Some, yes, sir. I will be the first to argue Amerifirst needed to be taken out. There was no way to save

Page 155

it, the loan problems were just too big. Carteret, in my opinion, that wasn't the case. The failure at Carteret was a major disappointment in my life, and I wish it hadn't have happened. I really don't think it needed to happen. To tell you the truth, I think O'Rourke nearly cried. It was really a shock to us. It was a bad day, and it's kind of a black mark on my resume. And I still have to explain it because it was a thrift. What were you doing there.

Q. Were you a part of the problem or solution?

A. There was no solution. I did a lot of the work there and I'm never going to get credit for it, and I'll have to explain it the rest of my life. And that's an irritation to me. Had I thought the thing would have failed, I would not have taken the job. I really thought we could save it. Until the 11th hour I couldn't believe they would take it over. We were liquid, making money. We hid nothing from anyone. We were doing the best we could. I don't think it would have cost the government a nickel, ever. That's may own personal opinion. Any time you want me to vent on this, I will because it affected me in a very personal way.

Q. Just one or two more questions. Do you recall a gentleman named Vigna?

A. I believe I met him once.

Q. Never worked with him directly?

Page 156

A. I believe he worked one time in our office.

Q. You stated a few times earlier in deposition that you didn't remember any disagreements with OTS during your tenure in Carteret?

A. Right.

Q. You mentioned your day-to-day working relationship with Tom O'Rourke, you shared a lot of information and worked towards the same conclusions?

A. Yes.

Q. With Tom O'Rourke?

A. Yes. I can't speak for Vigna. He might not have liked what he did, I don't know. O'Rourke saw everything I saw and I don't think we differed materially on any subject. Losses that we took were there. The rules that we operated under required us to take the hits regardless of the impact, and we did.

Q. In conducting workouts of problem commercial real estate assets, would you agree that having more capital generally will allow you more time to workout other assets?

A. In time they all get better. Bel-Aire Apartments is a classic example. I can see a day where that thing would have a significant more value than what we had to write it down to. When we got it, it was in need of work. We did the work and started leasing it up. And there was a lot of that type deal, that time and work, they were going

to get better. How much, I can't say, but like Bel-Aire, there were many of them. Very frustrating experience.

MR. HUME: Thank you. I'm done.

MS. TORNATORE: I have no follow-up. Thank you, Mr. Moor.

(Thereupon, the deposition was concluded at 2:00 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF BROWARD:

I, the undersigned authority, certify that JOEL WAYNE MOOR personally appeared before me and was duly sworn.

WITNESS my hand and official seal this _______ day of _________, 1999.

DEBRA MCMANUS
Notary Public
State of Florida

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY OF BROWARD

I, DEBRA MCMANUS, a Shorthand Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DEBRA MCMANUS



CORRECTION SHEET

RE: AMBASE vs. UNITED STATES OF AMERICA

CIVIL ACTION NO.: 93-531
DEPOSITION OF: JOEL WAYNE MOOR

| PAGE NO. | LINE NO. | CORRECTION OR CHANGE |
| --- | --- | --- |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |
| ------ | ------ | ------------------------ |

------------------------

Sworn to and subscribed before me this _____ day of ____________, 1999 by ________________, who produced ______________________ as identification.

Notary Public-State of Florida
My Commission No.:
Exp.: