IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBASE CORPORATION and BANCORP, INC., Plaintiffs, -and- FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervenor, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 93-531 |

Washington, D.C.
Tuesday, November 9, 1999

The deposition of ROBERT BROWNEL O'BRIEN, JR., called for examination by counsel for Defendant in the above-entitled matter, pursuant to Notice, in the offices of Cooper, Carvin & Rosenthal, Suite 200, 1500 K Street, N.W., Washington, D.C., convened at 10:20 a.m., before Emma N. Lynn, a notary public in and for the District of Columbia, when were present on behalf of the parties:

then at a rate of about a point and a half a year,
and it was simply a business strategy.
It had nothing to do with City Federal,
except that we saw that they had, indeed, done
this, had employed the techniques that we
ultimately employed, so we had a model to copy.
But that was not -- I mean we weren't competing
with them that vigorously.
Q. Was another business reason for wanting
Delray because you felt Florida was a booming place
in terms of commercial lending, construction
lending and you could get into that?
A. Not at all. We had been advised by our
investment bankers that it was a growth state.
Deposits in Florida averaged twice that of our
average deposits in New Jersey, taking the whole
banking system as a whole. And it was a tremendous
place to not only gather deposits but also make
first mortgage loans on owner-occupied homes.
Q. Well, look at page 4 of the exhibit, if
you would. In the second sentence, it says -- I
will start with the first sentence.

will employ our purchase accounting techniques and so forth, but no cash assistance.

So my then chief financial officer, Anthony Majeski, went down and did some due diligence for a week; and he came back and said this is a company that does not have any bad assets. They made a marketing mistake and they are losing 10 million a month in deposits; and if we get those deposits back over time, the company will return to profitability.

Most failed savings and loans at that time failed because of poor asset quality. This was not the case in Delray. They also had 12 excellent, well-located branches, so we thought that we could employ our deposit gathering marketing expertise and eventually turn it around.

BY MR. LEVITT:

Q. Did Carteret obtain an explicit promise from FSLIC that supervisory goodwill could be counted as regulatory capital when it acquired Delray?

MR. KIRK: Objection to the form of the

question. The documents fully cover the explicit promises that were given.

But go ahead and answer the question.

THE WITNESS: I would say yes.

BY MR. LEVITT:

Q. From whom at FSLIC did Carteret obtain this promise?

MR. KIRK: You mean the documents or in terms of negotiating --

BY MR. LEVITT:

Q. I said an explicit promise and you said you thought you got an explicit promise. Who gave that explicit promise?

A. I think it was director Beesley and the Federal Home Loan Bank Board.

Q. Did Carteret explicitly obtain a promise that goodwill could be amortized for 40 years?

A. In my recollection, yes.

Q. Why did it want this latter promise?

A. We wanted the maximum term to amortize the goodwill, obviously.

Q. And why? What were the advantages?

Q. Did you start doing this after the acquisition?
A. A little bit. But the other term for these is junk bonds, and the media and the regulatory framework made a big thing out of one of the things that killed the savings and loan business was overreliance on junk bonds. It was never a big part of our portfolio. Maybe one or two percent.
Q. Is that what he was talking about?
A. Yes, he would have loved to have had us to have 40 percent of our assets in junk bonds.
Q. Did Home Insurance Company have a lot of junk bonds?
A. I think so, but I don't know.
Q. Was Home Insurance Company allied with Drexel in any way, buying junk bonds from Drexel?
A. I think so.
Q. Did Carteret Savings Bank buy junk bonds, even though a small amount?
A. No.
Q. Did you have any junk bonds before this

A. No, and it didn't affect one family or multi-family residential structures. So that business continued to be good in the state of Florida.

Q. Your testimony is affected more like shopping centers and that sort of thing, hotel construction?

A. Yes. Office buildings and commercial structures like warehouses and so forth.

Q. In the second-from-the-last paragraph under "Income Property" it suggests that Mr. Manley wanted to go more on the basis of a vision and less by the book?

You see that?

A. Like to see more aggression.

Q. "Greater reliance on the particular individual or corporate project team and their vision rather simply cranking out numbers."

A. Yes.

Q. Did Carteret sort of embrace that idea?

A. No, we didn't.

Q. Did you like that idea personally?

understood it?

A. Not as I understood it. But because we went by the numbers and by the book, it took time to analyze a credit and to say yes or no; and, of course, the borrower wanted an instant answer, and we just were not going to do that.

One of the reasons we ultimately all got fired is because we didn't do what he wanted us to do, with the speed and rapidity and, I almost want to say, recklessness that he was asking for.

Q. So you believe when AmBase came in they were reckless?

MR. KIRK: Objection.

THE WITNESS: No.

MR. KIRK: Objection to form of the question.

THE WITNESS: No. But Manley's vision of new business development was not the way a prudent banker would develop business.

BY MR. LEVITT:

Q. Was it reckless?

MR. KIRK: Objection. This has been

asked and answered.

THE WITNESS: No.

BY MR. LEVITT:

Q. It wasn't reckless, but not prudent either?

A. I withdraw the word "reckless."

Q. This wasn't prudent either?

A. It was more aggressive than was customary.

Q. In the first full paragraph on the second page of the document, you are talking about what you report Mr. Manley said about the mortgage banking business.

A. Right.

Q. And to summarize, he liked it, but he said he thought it was less sophisticated than he would like and there needed to be more gray-haired people in it?

A. Yes.

Q. But I don't understand from that -- what does that mean exactly? What was the precise problem he was articulating to you --

Q. Would you have regarded him as a risk taker?

A. Yes.

MR. KIRK: Objection to the form of the question.

BY MR. LEVITT:

Q. More so than you, yourself, were a risk taker?

A. Yes.

Q. Because you were more steeped in the traditions of banking than he was?

A. Yes.

Q. Would you say Mr. Manley relished risk taking?

MR. KIRK: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. LEVITT:

Q. We talked about whether Carteret made loans to Gruntal and you said they never asked. Did it ever provide financing to customers of Gruntal who wanted to buy stock on margin?

A. No.
Q. Also Mr. Manley said he would like Home to be able to tap into Carteret's low cost deposits. I guess insured money could be acquired at lower cost than on the market?
A. Right.
Q. Did this ever happen?
A. No, not to my knowledge.
Q. Do you know whether Home Insurance Company's borrowing costs went down as a result of AmBase acquiring Carteret?
A. I don't know, but it would be very surprising if they would have.
Q. If you look at number (13), which is the on the last page of the document, he wanted Carteret to get into southern California with LPOs, it says.
A. Loan production offices.
Q. I was going to ask you what LPOs were. Loan production offices?
A. Yes.
Q. Did Carteret ever do this?

must remain a profitable company.
Then you go on to say we need to trim expenses by a million dollars per month.
What costs were too high?
A. I don't recall all of them.
Q. It sounds to me like you are saying here unless we pull in our belts, we may go under and not be a profitable company anymore. Is that what you're saying here?
MR. KIRK: Objection to the form of the question. The document speaks for itself.
BY MR. LEVITT:
Q. Is that what you thought in your head?
A. No, not quite, but --
Q. You said it to alert people, is that it?
A. Right.
MR. KIRK: He didn't say it. There is no place in here where it says if we don't trim costs the company will go out of business. He is saying, we should trim costs.
THE WITNESS: Right.
BY MR. LEVITT:

eliminate positions and close some branches. And the goal was to save 12 million a year.
You see that?
A. Yes.
MR. KIRK: It says, "close, consolidate or sell some branch offices."
MR. LEVITT: Right.
BY MR. LEVITT:
Q. I take it closing or consolidating or selling branches would save expenses, net expenses if they weren't profitable operations, right?
A. Right.
Q. So you had some branches that were not profitable and you were thinking about selling those off?
MR. KIRK: David, you are misrepresenting the document. The very next sentence says, "Most of these branches are fine, well run and profitable."
BY MR. LEVITT:
Q. "But we cannot be all things to all people and all markets," so some of the branches

A. Yes. Well, he was asked to resign.

Q. He didn't shy away from saying he was fired.

A. No, he was, you're right.

Q. Whose idea was it to get rid of Mueller?

A. Manley.

Q. Was Manley unhappy that the commercial lending was going bad and he blamed Mueller for it?

A. I think in part, yes.

Q. Did Manley express to you that he thought there had been problems with the underwriting of the commercial lending and Mueller was responsible for that?

A. He never expressed that to me, but I think he felt that was the case.

Q. If you look at page 5, please, in the first full paragraph beginning "Our financial strategy," it says, "Our financial strategy will be to shorten up the duration of our corporate portfolio and to remove interest rate risk."

You see that?

A. Uh-huh.

Q. When you say, "shorten up on the duration of our corporate portfolio," does that mean that the maturities -- you try to make loans that had a shorter maturation time?

A. Yes.

Q. And was there a problem with that?

A. No.

Q. Did you have an interest rate risk problem at the time beyond what you should have had?

A. Not that I recall. But if you will go on, you will see that I say, "we are one-half of Home Group, the other half primarily consists of Home Insurance Company, which by its very nature means that it is a long-term investor. We therefore should be short-term like a California savings and loan with all of our mortgages adjustable in rate and flexible in term."

This is just adopting to the new corporate strategy.

Q. You say two sentences down, "We will generate profits this winter by prudently selling

A. And we were second to Massachusetts which was the worst state.

Q. Why did you think it got hit so bad? Was the tax law at fault?

A. There were a lot of things happening. Governor Florio put a huge tax on the communications industry which caused AT&T and other like companies to move out of the state, taking 22,000 jobs with them. There were huge consolidations on Wall Street and in the New York money center banking industry, which were causing in the case of Chase and Chemical, 13,000 layoffs. Most of these people lived in New Jersey.

So people were under stress as a result of this so-called recession and were delinquent in paying their mortgages; builders were delinquent in paying their payments. It was a temporary thing, but the regulators did not give us enough time to wait it out.

Q. Is it your testimony today that you don't think there were any imprudent commercial loans on Carteret's books but for --

A. I don't think there were.
Q. -- what you termed in this memo the recession? There wouldn't have been any defaults or minimal defaults?
A. I wouldn't want to say that. There is always some mistakenly made loans, but I would not characterize our portfolio as imprudent.
Q. Were you aware of the Government examiners who looked at the bank in '89 and '90 and what they demanded with respect to classifying?
A. Yes.
Q. Classifing loans?
A. Yes.
Q. Is it fair to say you didn't agree with any of that?
A. Absolutely. They came in and appraised loans on what we call a liquidation basis rather than a going concern basis. And it was two entirely different methods of evaluating the same credit. And so loans were overnight bad that the night before had been good.
The fundamental collateral was there.