COURT OF FEDERAL CLAIMS

* * *

AmBASE CORPORATION and FEDERAL:
DEPOSIT INSURANCE CORP.

:

-vs-

:

THE UNITED STATES NO. 93-531C

:

* * *

Oral deposition of THOMAS O'ROURKE, held at the law Clarion Hotel, 1010 Race Street, Philadelphia, Pennsylvania, on Monday, September 27, 1999, beginning at approximately 9:30 a.m., before Audree E. Jones, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

* * *

Page 18

Q. Do you remember working on this document?
A. Yes.
Q. Who did you work on it with?
A. Michael Finn, Sharon Freed. I can't recall any others.
Q. Sharon Freed is an examiner?
A. Attorney.
Q. Attorney at OTS?
A. Regional counsel's office.
Q. Would the three of you jointly written this memo?
A. I wrote portions where I had knowledge, and submitted them. I believe that Mike Finn was the person putting the whole document together.
Q. I want to refer you to the chart showing the capital position of the institution. I'd like to focus on the tangible capital.
Excluding goodwill surplus of $3 million; do you see that?
A. Yes.
Q. Excluding a deficit of $151 million; do you see that?
A. Yes.
Q. Would you agree those two numbers describe a very different institution?

Page 19

A. I would not agree. Economically it's the same, in my eyes.
MR. LEVITT: The document speaks for itself.
BY MR. HUME:
Q. Would it be your testimony that the injunction did not affect how you understood the financial health of the institution?
MR. LEVITT: Objection. Asked and answered.
THE WITNESS: My assessment of Carteret, the injunction did not add any financial strength to the institution. The institution was still in economic distress, and had an inability to post profits which would have eroded any profit on paper.
Q. Would you agree the existence of $150 million of tangible capital would normally help this institution?
MR. LEVITT: Real tangible? Not adding back the goodwill? We don't understand the question.
MR. HUME: The witness can ask for clarification.
MR. LEVITT: I don't understand the

Page 20

question.
MR. HUME: It's not your place to make an objection as a testimonial.
MR. LEVITT: It's an objection based on clarity.
THE WITNESS: I believe capital, what form it was -- I'm used to asset invested, loaned out. If that's what you mean, then I agree. If you do not mean that, then I disagree.
BY MR. HUME:
Q. $150 million of cash between the two, it would make a big difference in how you viewed the institution?
A. Yes.
Q. $150 million of cash that could not earn income, that had to be held in reserve, would that change how you viewed the institution?
MR. LEVITT: That's nonsensical. I never heard of cash not earning income. If you can answer, go ahead.
THE WITNESS: If cash cannot be deployed into an interest earning asset, it's of no use.
BY MR. HUME:
Q. Not to absorb losses or meet the regulatory capital requirements?

Page 21

A. I'm not sure I understand where that comes into play. Any time cash is placed into an institution it has to be deployed into an interest earning asset for it to have an economic impact, in my estimation.
Q. Your view, goodwill has no economic value, did you have that before FIRREA?
A. In certain cases, yes.
There are a number of factors, and you have to look at it case by case.
Q. How do you remember supervisory goodwill having come into existence?
MR. LEVITT: With respect to Carteret?
BY MR. HUME:
Q. In general, how was it created?
MR. LEVITT: Asked and answered.
THE WITNESS: I believe it exists, that it was allowed to include in its capital base for regulatory purposes.
BY MR. HUME:
Q. Do you remember having something to do with an institution taking part in supervisory acquisitions?
A. In some cases, yes.
Q. Those were transactions that the institution

A. No additional risk of capital being depleted.
Q. The second page of this letter refers to a meeting with Kohlberg & Co.
Do you remember meeting with Kohlberg & Co.?
A. Never.
Q. Do you remember Kohlberg was interested in investing in Carteret?
A. I was advised by Mr. Bianco, that was one of his interested investor groups.
Q. Was it part of your job responsibility to know which investors were looking at Carteret?
A. To be aware of the prospect for recapitalization. When it came to following up with investor groups, that was management function, left to Albanese.
MR. HUME: Mark this as O'Rourke-3.
(The above document was marked for identification as O'Rourke-3).
BY MR. HUME:
Q. This letter, does this refresh your recollection as to what occurred in 1992?
Were there any other events it refreshes your recollection about, that I didn't ask you?



MR. LEVITT: Objection as to form.
THE WITNESS: It refreshes my memory as to the date Carteret executed what I believe was the accelerated resolution agreement. I believe a consent agreement was also signed.
BY MR. HUME:
Q. What do you mean by consent agreement?
A. Consent, which the board consented to, if they did not raise capital, they were to be placed into receivership.
Q. Do you remember such an agreement being signed?
A. I believe there was one. I'm not certain to the date.
Q. When an institution signs an agreement like that, is it because they were under threat of being placed into conservatorship at that time?
MR. LEVITT: Objection. Vague.
THE WITNESS: My experience is, yes, they are signed by a Board of Directors in facing the prospect of being placed into receivership or conservatorship.
BY MR. HUME:
Q. Is the purpose of the institution's, of management's consent in order to have it given in



exchange for the OTS agreement, to give the institution a certain amount of time to raise capital; is that how it works?
A. That's my understanding.
Q. The last paragraph on the second page of the letter says, "In conclusion, we believe the termination of the agreement and the underwriting process while progress is being made to recapitalize a troubled institution which assets of over $5 billion would not be effective supervision or good policy."
Do you remember agreeing with that statement?
A. I would agree with that, yes.
Q. Do you remember agreeing there was progress being made in the summer of 1992 with Carteret?
A. From what I heard, and my limited knowledge, I understood progress was being made. I don't know to what degree, or whether it was satisfactory to the people above me.
Q. Let me refer you to Exhibit 3. This is dated August 26, 1992. It says reply to the attention of Thomas J. O'Rourke. Is this a document you would have written?
A. Yes, it is.



Q. It refers to an August 24, 1992 meeting at OTS, where Carteret's capital raising efforts were discussed.
"In the wake of the withdrawal by Kohlberg & Co." Do you remember that meeting?
A. No, but if I wrote the memo, I would have been there. At this point, I can't recall it in my mind as to the particular meeting.
Q. Do you remember Kohlberg had a letter of intent to invest in Carteret?
A. That I remember, yes.
Q. Do you remember thinking it was a high likelihood they would invest in Carteret?
A. I knew it was subject to due diligence, and I was very hopeful something would happen, but I had no expectations.
Q. You didn't expect either way? You didn't know what to expect?
A. Correct.
Q. Did you consider it to be a serious prospect?
A. Yes, due to the fact that Dick Bianco was well regarded. I knew it was in good faith.
Q. Do you recollect why Kohlberg decided to withdraw from the letter of intent?
A. I don't know.

Page 42

investors, unless the investors can look to see
what the economic condition of the institution is.
Just because the agreements are in
place, I don't believe it will prevent a barrier
to come in and take a look, to see if it wants to
recapitalize an institution.
MR. HUME: Let's take a break.
(Whereupon, a short recess was taken.)
MR. HUME: Mark this as O'Rourke-4.
(The above document was marked
for identification as O'Rourke-4).
BY MR. HUME:
Q. This is a memorandum. It's dated August 28,
1992. It's from Michael J. Zamorski, who I
understand was an FDIC employee at the time; do
you remember him?
A. Yes.
Q. He was an FDIC employee?
A. Yes.
Q. Do you remember what his position was?
A. I believe he was the equivalent to assistant
regional director.
Q. What did that position involve with respect
to working on Carteret?
A. I'm not certain how the FDIC hierarchy

Page 43

exists. One of the decision makers at the
regional level.
Q. Do you remember working with Mr. Zamorski at
all?
A. Attending meetings with him.
Q. Do you remember whether he shared the view of
Bob Albanese as to the time Carteret should be
given to raise new capital?
A. That I don't recall.
Q. Do you remember how actively he worked on
Carteret during 1991 and 1992?
A. That, I don't know.
Q. Would he come out to the institution itself?
A. Only when there was a scheduled meeting.
Q. The memorandum gives a page and a half
background discussion on Carteret, and discusses
the August 24, 1992 meeting.
It refers to the prior OTS
examination and concurrent FDIC Tier III
examination disclosed a similarly non-viable
condition.
Do you remember when the Tier III
examination was?
A. Yes. It's what FDIC calls a piggyback
examination. They basically ride off of the OTS

Page 44

field work and do limited field work, and do a
Tier III report.
Q. Is it less comprehensive?
A. Yes, my understanding is it is.
Q. Do you remember the reasons for the FDIC
choosing the Tier III?
A. At that point, most issues had been surfaced,
and the FDIC believed it was capable of examining
the institution without FDIC day to day help.
Q. This second paragraph discusses the need for
$150 million in external capital to be raised.
"Management believed that they had the ability to
accomplish this based on their prior investment
banking and business backgrounds and contracts.
The OTS concluded that the capital plan should be
rejected and sent an S-Memorandum recommending
appointment of a receiver to their Washington
Office on October 25, 1991. The institution was
scheduled to go to RTC on November 15, 1991."
Do you remember there was a serious
chance Carteret would be placed in receivership in
November 1991?
A. The S-Memorandum was sent. When these are
sent, it's with the expectation they will be acted
upon unless other circumstances arise that would

Page 45

preclude it.
Q. The next one discusses potential unassisted
acquisition by American Stock Transfer and Trust
Company.
The reason why RTC intervention was
postponed; do you remember this?
A. I do now. I remember the entity was surfaced
as one that was interested.
Q. Do you remember why it was not consummated?
A. I don't know the particulars as to why.
Q. Do you remember there being any uncertainty
on the part of the OTS as to whether or not they
wanted American Stock Transfer and Stock Company
to become a savings and loan holding institution,
or savings and loan institution subject to OTS
regulation?
A. I don't recall, although that sounds
plausible to me. I do not recall.
Q. Plausible, you mean OTS was concerned with
the people and institutions that would invest in
the industry?
A. They have to be an approved holding company
in that ownership structure. When I say
plausible, they would force this entity to meet
these requirements.

Q. Problems with your capital could spill over into creating new problems?
MR. LEVITT: Objection. That's a hypothetical, that doesn't apply in this case.
BY MR. HUME:
Q. How does this tactic work?
MR. LEVITT: Objection, to the extent the implication is the government makes the decision on what gets sold and what doesn't.
THE WITNESS: Sale of assets. I lost the essence of the question.
BY MR. HUME:
Q. The question is, following the tactic that you explained to me of selling assets in order to improve capital ratios, and given that particular scenario, it will cause you to sell some of your best assets, isn't it correct that following that tactic can mean capital problems will create asset problems for the institution, or contribute?
A. I wouldn't define it as an asset problem. A sale of good assets will ultimately sustain profitability problems.
You're selling them and replacing them with assets that yield lower spreads and reduce overall profitability. That's what is



damaging in the long run to many institutions.
Q. Turn to Page 5 of the November 1992 memo. Look under the paragraph capital position; do you see that?
A. Yes.
Q. In the middle of the page heading, "Capital Position," do you see that?
A. Yes.
Q. Second paragraph, "Capital erosion has been halted largely due to management's reduction of operating costs, balance sheet restructuring and disposition of problem assets."
Do you remember that was the case by November 1992?
A. I do recall due to management's efforts, post May of 1991, that improvement had been made in stabilizing the losses and producing modest profits.
Q. "The association continues to suffer from poor asset quality and interest rate risk that pose a threat to future earnings."
A. Yes.
Q. Asset quality. "Carteret's asset quality improved since the June 17, 1991 examination due to an intensive effort by management to liquidate



non-performing assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructurings."
Do you remember thinking that by November 1992 Carteret's asset quality improved?
A. It had definitely improved. There's no question about that.
Q. Do you remember thinking that it improved, based on the efforts of its new management team?
A. Yes.
Q. Do you remember thinking that it improved sufficiently in the right economic environment, the institution could continue to generate profits in the future years immediately following future years?
MR. LEVITT: With a capital investment or without?
BY MR. HUME:
Q. I didn't mention anything about capital investment.
A. Given the way they were operating at that point, profitability would be hit or miss. Certain months could have been profitable, other months, losses.



The commercial asset portfolio was being well managed. There was risk. It was very tenuous.
Q. Do you remember feeling that the profits they were generating in 1992 were in any way not real profits?
A. I wouldn't use that word. They were tenuous. They can be there one month and not the next month. That was stated over and over to management. They were doing well in managing the portfolio, they were not magicians.
Q. Would the resolution of those assets and the tenuousness of the profits be impacted by changes in the economic environment?
A. Yes. Those were changes that would have required hindsight on our part, which we didn't have.
Q. With the hindsight that you have today, does the improved economic environment and real estate market since late 1992 mean those profits were actually less tenuous than they were at the time?
MR. LEVITT: Objection as to relevance.
THE WITNESS: I don't know if I can say that. You have to go through 1993, 1994. There was a transition period there. I'm not sure they

as regulatory capital subject to pre FIRREA's 25-year amortization schedule?
A. No, I was never -- I never concluded they would be able to string this capital out that long, no.
Q. Do you remember the lawsuit involved reinstituting or affirming, not only allowing them to treat supervisory goodwill as regulatory capital for all three requirements, but included, subject to the amortization schedule that was much longer, 25 years from the starting point rather than an accelerated phase out under FIRREA?
A. No. My belief was the provisions of FIRREA would be upheld, even though they temporarily won injunctive relief. There were other factors that would come into play.
Q. I want to refer you to bottom the part of Page 6. It describes an overview of what management was trying to do. Please review that.
A. (Witness complies).
Q. It describes a series of things in which management was immersed in doing.
Do you remember, essentially, being 100 percent occupied with attempting to recapitalize this institution, and to do such



other things as the OTS thought needed to be done?
A. These items listed here in the paragraph is what I believe management was immersed in.
Q. Would you say they were responsive to OTS concerns and view as to what needed to be done?
A. Yes.
Q. What do you remember generally about the IPF?
A. That it was a company financing insurance premiums. We did not deem it to be fit with traditional savings and loans going forward. We did request it be sold. They did not have the capital to generate the receivables generated by IPF.
Q. Do you remember thinking it could be a profitable business for Carteret to be in if they had sufficient funds to operate it?
A. If Carteret was sufficiently capitalized, yes, it could give them a good source of earnings.
Q. Do you remember your views as to the valuation of Carteret when it came time to sell it, of IPF?
A. I don't recall the particulars. I knew there was a dollar figure, $65 million we were seeking, a minimum. I'm not sure what it was ultimately sold for.



Q. What do you remember about the sale of certain receivables from IPF to Carteret; do you remember that?
A. Yes, I remember they were financing the receivables, providing working capital for IPF.
Q. Did you put a stop to that?
A. I don't believe it was stopped. That would have shut down IPF.
There was no interest in shutting down a company that needed to be sold. I believe it was allowed to continue, but Carteret was advised we need to seek alternative financing.
Q. Turn to Page 7. Current management complies with supervisory agreement. It lists the areas of the agreement in which current management addressed in the second sentence.
"All applicable sections have been addressed, with corrective action having been implemented in key areas such as loan workout, the establishment of more realistic loan loss allowances, the required sale of IPF and the cessation of mortgage trading activities."
Do you recollect what current management took with respect to loan workouts?
A. Yes, it basically took a very aggressive



posture toward getting proper reserves put in place which enabled them to negotiate.
Q. The loan workouts connected to reserves because it allowed them to sell and reappraise the asset for them, it was easier for them to sell it?
A. Yes.
Q. Was it, therefore, easier to sell it profitably?
A. I can't say. I believe at that point the objective was to get the portfolio reduced. Profitability was not a consideration at that time.
Q. What do you remember about Carteret's cessation of mortgage trading activities?
A. I believe that had to do with Mr. Walsh's activities while he was still on the board, buying and selling mortgage back securities and taking a speculative position in the mortgage markets in anticipation of rates changing.
Q. "Areas in which the examiners have noted deficiencies are in liquidity management, the documentation of the duties and responsibilities of former Chairman O'Brien and the negotiations conducted between Carteret and O'Brien related to the settlement of his contract."