UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., | |
| Plaintiff | |
| vs. | NO. 93-531 |
| THE UNITED STATES OF AMERICA | |
| Defendant | |

The deposition of J. PAUL RAMEY, JR., was held on Tuesday, April 12, 2005, commencing at 10:00 a.m., at the Radisson Hotel, 210 Holiday Lane, Annapolis, Maryland, before Ronald E. Bennett, Notary Public.

APPEARANCES:

DAVID THOMPSON, ESQUIRE
On behalf of Ambase Corporation

DAVID C. HOFFMAN, ESQUIRE
On behalf of U.S.A.

ALSO PRESENT: LESLIE A. CONOVER, ESQUIRE
GARY A. KUIPER, ESQUIRE

Page 6

A. Yes.
Q. Has it been a while?
A. A long while. Over ten years.
Q. Okay. Do you recall what case you were deposed in?
A. No.
Q. Was it a Windstar case?
A. I don't know.
Q. Let me go over the basic background rules. If you answer one of my questions, I'm going to assume you understood it. If it's not clear, let me know. If I think it can be clarified, I will endeavor to do so. We can take a break anytime you would like to take a break today. So really just feel free to speak up, if you want to take a five or ten minute break.
With that, why don't we dive in. Could you first sketch what your educational background is, where you went to college, when you graduated?
A. East Carolina University. Graduated in 1967 with a bachelor of science degree in business administration.
Q. When you graduated from there, do you take employment?
A. Two weeks later I began working with FDIC.

Page 7

Q. In what capacity?
A. As an assistant examiner.
Q. How long did you remain an examiner approximately?
A. About five years.
Q. After you ceased being an examiner, what responsibilities do you undertake?
A. I was a review examiner in the regional office in Atlanta.
Q. How long did you have those responsibilities?
A. About four years, I believe.
Q. Then what responsibilities do you undertake?
A. Then I was assistant regional director in Omaha, Nebraska.
Q. Was that still in an examination capacity?
A. Yes. It was safety and soundness.
Q. How long did you stay on with, in that capacity in Omaha?
A. I was there about two years.
Q. All right. And then what did you move on to?
A. I went to Washington as assistant director in the Failing Banks and Assistance Transactions

Page 8

section.
Q. Approximately what year was that?
A. It was '84.
Q. What were your responsibilities in that position?
A. Working with failing commercial banks, resolution of them, trying to get a purchaser to take the deposits and possibly some of the assets.
Q. Was that banks that you were dealing with or --
A. Commercial banks.
Q. That was at the FDIC?
A. Yes.
Q. So you were there. Did you have responsibility for selling branches as well in these failed banks?
A. Yes.
Q. Did you sell any other types of the operations, did you ever do a whole bank transaction?
A. Yes.
Q. How long did you stay on with those responsibilities?
A. Until August of '89.
Q. When FIREA was passed?

Page 9

A. Yes.
Q. At that time did you go to the Resolution Trust Company?
A. Yes. On detail.
Q. How long do you stay on detail to the RTC?
A. I think it was 'til the end of the year. Transferred permanently.
Q. How long did you stay with the RTC?
A. December 31st of '95.
Q. And then where did you go?
A. Home.
Q. Very good. Did you retire at that time?
A. Yes, I did.
Q. So you are not currently employed?
A. No.
Q. In terms of your responsibilities at the RTC, from August of '89 through December 31st, '95, what were your responsibilities?
A. Pretty much the same as they were at FDIC, in that what we were, when an institution was failing or scheduled to fail, we would try to put together a package to offer to other institutions or individuals that might be interested in purchasing it.
Q. Do you have a title when you were at the

Page 10

RTC?
A. Yes. I don't remember all the titles. I think the first one was, director field Resolutions, I believe it was.
Q. To whom did you report?
A. When I first went to the FDIC -- to RTC, to Bill Roelle.
Q. Do you recall what his position was -- not the title, but what his responsibilities were?
A. He was -- he shared -- not shared. He was one of the top two individuals in the organization that answered to the executive director, who was David Cook eventually.
Q. At any point did your responsibilities change while you were at the RTC?
A. Yes; eventually. Field Resolutions were the smaller institutions. That's what I worked with. Eventually I became vice president of Resolutions, which included all of the institutions.
Q. So you have the director of field Resolutions reporting to you. Also the director of major Resolutions reporting to you?
A. Yes.
Q. Was the cut off approximately $500 million?

Page 11

A. I believe so.
Q. So how long did you, approximately, stay in your role as Director of Field Resolutions?
A. I don't remember the exact time period, but probably three, three and a half years.
Q. So that would place it end of '92, beginning of '93, when you became director of Resolutions approximately?
A. I don't remember. That is approximately. It could be off a year. I just don't know.
Q. Sure. And then once you became vice president of Resolutions, to whom did you report?
A. In the beginning it was still Bill Roelle and then to Jack Ryan.
Q. Mr. Ryan -- was he head of --
A. CEO or executive. He was the -- yes, he was the head of the RTC. He answered to the board of directors.
Q. Did Mr. Roelle have that same role or did you just stop --
A. Bill Roelle, the duties -- I pretty much took over the duties of Bill Roelle in the Resolutions area. There was another side, the asset side, that I did not deal with. You still had the two branches reporting to the executive director or

Page 12

CEO.
Q. When you talk about the asset side, were those the people in charge of selling the loans, securities, and other assets in the failed institution?
A. Right.
Q. On the Resolution side, were your responsibilities confined to selling the branches and the deposits?
A. Yes. Well, when you say the branches, do you mean the physical structures?
Q. You tell me. What came within your purview when you are Director of Resolutions?
A. We would try to resolve the institution to sell anything from the deposits only. That would be one extreme. And the other extreme would be, an entire institution with all but minimal assets. That would be the other extreme.
Q. Okay. When we talk about there being the asset side of the RTC, they would get involved only if you were going to sell the assets and the liabilities separately. If it was going to be a whole bank transaction, would you all --
A. They were always involved.
Q. Assets being sold, they were going to be

Page 13

involved?
A. Because we never knew.
Q. In terms of divisions, the thrift we are here to talk about is Carteret Bancorp, Inc. Carteret had a division that did loan servicing down in Clearwater, Florida and it was sold. Would the sale of a servicing division be something that Resolutions people that reported to you would have been in charge of or would that have been a different group within RTC?
A. We may have been in charge of selling the entity itself or including it in a transaction. We would not have been involved in evaluating whatever it was, any of the assets.
Q. Okay. If there was a sale of a division, it wouldn't have been you or your subordinates who were valuing, for example, the loan servicing business, and trying to figure out how much you should get for it?
A. That's correct.
Q. And, likewise, Carteret also had a origination business. Is that something you would have been involved in, the decision making as to whether you should try to sell it or just shut it down?

Page 22

A. Yes.
Q. In 1994 was Mr. Held, Herb Held, was he the head of the Office of Major Resolutions?
A. I believe he was.
Q. The RTC was pursuing the congressional mandate to implement. One question I had; are you aware of any discrimination by the RTC, racial discrimination, in selling of branches or any aspect of selling financial institutions during your tenure at the RTC?
A. No.
Q. During your tenure at the FDIC, were you aware of any racial discrimination in the federal government in selling branches or failed institutions?
A. No.
Q. We are done with that document.
I would like to ask the court reporter to mark as Ramey Exhibit 2, a document that bears the Bates number WOP2990739. And it extends through WOP2990800.
(Deposition Exhibit Number 2 marked for purposes of identification.)
BY MR. THOMPSON:
Q. I know this is a long document. I only

Page 23

have a few specific questions about it. So the record is clear, the title page states that this is a Resolution Trust Corporation, Division of Resolutions is the header. Summary of RTC Minority Preference Resolution Programs, amended February 28, 1994. Is that correct?
A. Yes.
Q. Turning to what is the second page of text, the third page of the exhibit, in the first paragraph under Subheading C. These efforts by the RTC to enhance participation in the resolution process and to increase the viability of minority institutions shall be hereinafter referred to as minority preference residence resolutions.
In conjunction with all of these marketing efforts, the RTC may make interim capital assistance available. Let's stop there.
Is interim capital assistance, was that ever shorthanded ICA?
A. I don't recall.
Q. We'll call it interim capital assistance. Was that essentially a loan from the RTC to the minority bidder that would facilitate an acquisition?
A. Yes.

Page 24

Q. You know minorities were not eligible to get interim capital assistance; is that correct?
A. Not that I recall.
Q. Continuing on in that paragraph. Performing loans and other performing assets may be made available to eligible minority acquirers in Resolutions covered by B and C above.
Is the way this part of the program worked that they would have the option to acquire certain loans after they closed on the branches?
A. That's my understanding, but not in all instances. It says they may make -- let's see. Performing loans and other performing assets may be made available. It means what it says.
Q. You don't have a recollection that is inconsistent with this?
A. No. Or consistent.
Q. Okay. Fair point. Let's turn to what is designated page 6. Paragraph under asset sales. First couple of sentences talk about the asset option that we just described. The second sentence reads; in addition, the RTC may make available on a rent-free basis, to any minority depository institution or woman-owned depository institution any branch office facility owned by a failed savings

Page 25

association located in a predominantly minority neighborhood.
Do you recall this feature ever being used?
A. No, I don't recall it.
Q. Okay. You don't recall whether Carteret's branches were ever subject to this rent free situation?
A. No.
Q. I have no further questions of this document.
I would like to ask the court reporter to mark as Ramey Exhibit 3 a document that bears the Bates number C-AM-A-0130527.
(Deposition Exhibit Number 3 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Mr. Ramey, I'm going to represent to you that the e.mail has -- the way these e.mails appear to be formatted -- certainly, if you have a different understanding at anytime today, let me know, but it appears that in the top box you have the to, the copies and the from. Then you have to go down to the bottom, original message. Those two correspond. To the extent people have comments or

letting me know. Why don't we move on.
I would like to ask the court reporter to mark as Ramey 4 a document that bears C-AM-A-0130546.
(Deposition Exhibit Number 4 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from you to Mr. Mahaney.
A. Yes.
Q. It's dated August 20th, 1993. Do you see that?
A. Yes.
Q. I checked and we do have substantial interest in Carteret. A normal resolution under our current guidelines and policies would not require that we furnish loans to an acquirer if we are successful in obtaining bids on the first round offering.
However, under our current policies, should we not be successful on the initial offering we would be obligated to fall back to an offering of the remaining offices to minority acquirers, offering interim capital assistance and loans to fill the hole.
In terms of filling the hole, is that a



reference to some of these institutions had negative capital?
A. I would assume so. It would be to balance the books. We would need more assets to balance the books. That would equate to capital deficit, I would assume.
Q. Right. Let's continue. There is just no way of telling what will happen; additionally, no doubt new legislation will be passed in conjunction with any funding we get. Who knows what the requirements of this will be.
Since this is new to us, this is only the second transaction we have done to date, if it goes through I would think that Bodi and company should get whatever consideration they need to make this go as smoothly as possible. That is, these loans are packaged and have had a certain amount of due diligence performed. This would make our obligation to furnish loans in the Home Unity deal about $100 million less painful than having to go elsewhere and start from scratch. I leave this to your infinite wisdom in these matters.
When you talk about, this is new to us, and only the second transaction you have done to date. You had done many Resolutions by '93; is that



correct?
A. Yes.
Q. Were you referring to the minority bidding process that's described here as the new feature?
A. I believe that is correct.
Q. When you talk about the obligation to furnish loans, are you talking about the practical problems of having to start due diligence from scratch?
A. It would be easier to facilitate. I believe.
Q. That's a fair reading of it?
A. Yes.
Q. Do you have any independent recollection of the Home Unity deal and the decision to take loans out of the Carteret conservatorship?
A. No.
Q. Do you know when the loans left the Carteret conservatorship, whether it received cash for the loans or would have been some--
A. I don't have any recollection.
Q. Either as a general matter or specific matter?
A. No. I don't believe I would have been involved in the actual transaction itself. I don't



know what the consideration would have been.
MR. THOMPSON: At this point let's have marked as Ramey Exhibit 5 a document C-AM-A-0014578.
(Deposition Exhibit Number 5 marked for purposes of identification.)
Q. I believe, Mr. Ramey, when you read this, if you have a different recollection, let me know. This is an e.mail from Dave J. Bodi to Donna Pillard and others. The original message of Mr. Bodi's e.mail from September 15, '93 is referenced in the bottom of the page. And then in the middle are your comments to Herb Held, and others.
Let's start with the original message. Since we have been unsuccessful in our efforts to negotiate the release of the due diligence for the Carteret loans from First Boston, please issue your own SOS under the National DD TOA and ask John Tierney to waive for use.
Do you have any recollection of what the alphabet soup of SOS and DD TOA?
A. I believe SOS was solicitation of services. The others I don't know.
Q. I discussed this with Tom Horton and he has concurred. Tom also stated that we should not pay First Boston for due diligence on this product

Page 42

A. No.
MR. THOMPSON: I would like to ask the court reporter to mark as Ramey Exhibit 10 a document C-AM-A- 001-275.
(Deposition Exhibit Number 10 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from Herb Held to yourself and Mr. Jumpiter. September 19, 1994?
A. Yes.
Q. I talked with Manny Friedman and Karen Edwards this morning. I told them that Jack Ryan was not talking with any of the bidders on Carteret since he may be the deciding party on the case. They wanted to make sure that we weren't giving out any additional info on the assets. I assured them that no information would be given to the bidders until after closing.
Do you recall whether it was the standard procedure of the RTC not to disclose information on the assets, that the minorities would have an option to acquire until after the closing on the branches themselves?
A. I don't recall.
Q. If that were the policy, you don't recall

Page 43

the reasons for it?
A. No.
Q. I'm about to leap into some documents that pertain directly to the sale of Carteret's branches. I don't know whether you would like to take a short break now?
A. Now would be a good time.
(Brief Recess)
MR. THOMPSON: I would like to ask the court reporter at this time to mark as Ramey Exhibit 11 a document that has the Bates number C-AM-A- 0120028.
(Deposition Exhibit Number 11 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from Darryl Burton to Mr. Held, copied to yourself and several other people. January 26, 1993. Is that correct?
A. Yes.
Q. Do you recall what Mr. Burton's responsibilities were at this time?
A. No.
Q. Do you have any recollection of Mr. Burton?
A. No.

Page 44

Q. The e.mail reads; it is my understanding Tommie Thompson and Paul Ramey met last week to discuss among other things the operational side of resolution preparedness. Who is Mr. Thompson?
A. I believe he worked with Ed Mahaney. I'm not certain.
Q. Out of this conversation came the message to Mr. Ramey that the major resolution case prioritization was open to revision if there are justifiable reasons.
It was in this light that Steve Haley and I called you today to request Carteret-4-92 DOC 12-4-92, less than two months since intervention be moved from Round A to Round B.
And my question is; what did it mean to be moved? Did you have targets -- we want to sell these institutions first and the second and the third?
A. That's correct.
Q. And?
A. A would be the first.
Q. Over one year since intervention was proposed as a placement for Carteret in round A. The rationale is Hansen's MAPP is done with AGLARS completion scheduled for April 30th, 1993. This is

Page 45

ideal for Round A which will commence within 30 days of funding.
Do you recall what the MAPP and AGLARS, what those acronyms stand for?
A. No.
Q. Conceptually can you explain what the point that the author is trying to make here as to why Hansen should go in front of Carteret?
A. It would be speculation if I said anything. It would be because Hansen had been over one year since its intervention.
Q. You don't have an independent recollection of this decision?
A. No.
Q. When it says this is ideal for Round A which will commence within 30 days of funding. Is the funding referred to there congressional funding?
A. Yes.
Q. Was the funding necessary so that, if you are doing branch sales, you have got cash to give the acquirer?
A. The funding was necessary to do any resolutions period. We never knew what the requirements would be, cash requirements for any individual institutions. Once we used the

Page 46

appropriated funding, we had to stop period.
Q. Do you recall whether there were such periods while you were at the RTC?
A. Oh, yes.
Q. How frequently did this happen?
A. Not very often. I don't recall how frequently. It was infrequently.
Q. Do you recall what the gap tended to be?
A. No.
Q. To the extent you could do a resolution that didn't cost any money, say someone were going to pay a big enough premium, could you pursue those sorts of opportunities?
A. I don't recall any such times like that.
Q. Okay.
A. There may have been.
Q. Right. I understand. Continuing on. On the other hand, Carteret's MAPP and AGLARS are not projected for completion until June 25th, '93 and May 31st, '93 respectively.
Again, were these the target dates for resolution? Is that a fair inference of what these dates mean?
A. I wouldn't assume those dates are resolution dates. They needed to be completed

Page 47

before the resolution.
Q. You can't recall what these things are?
A. No.
MR. THOMPSON: At this point I would like to ask the court reporter to mark as Ramey Exhibit 12 a document that bears Bates number C-AM-A- 0125185.
(Deposition Exhibit Number 12 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a memo from yourself to Mr. Horton, dated October 26, 1995; is that correct?
A. Yes.
Q. The opening paragraph states; as requested in your memorandum of October 23, 1995k, I offer the following observations/comments on the hypothesis list which was attached. It must be taken into consideration in all my comments that I have absolutely no idea as to what the circumstances were that led to the individual items on the hypothesis list attached to your memorandum. However, it appears to me the list was put together to come up with something skewed to support FDIC methodology. I have only commented on the Resolutions section. Do you see that?

Page 48

A. Yes.
Q. That is your signature on the first page of this document?
A. Yes.
Q. Do you have any recollection of preparing this document?
A. No.
Q. Do you recall whether it was typical at the end of the resolution to do this sort of postmortem analysis?
A. There were postmortems done. I don't know how often or in how many instances.
Q. Do you have a recollection as to whether they were only done when there was a sense that there was a problem that needed to be fixed?
A. I don't recall.
Q. I have a couple of things that I wanted to understand here. On the second to last page of the document, Bates number 188 at the bottom. It's the last comment. First comment Resolution costs increase significantly the longer the institution is in conservatorship.
And your comment was, I doubt that anyone at RTC would dispute this and it certainly was not the intent of any RTC officials or personnel to

Page 49

continue conservatorships any longer than was necessary. As stated earlier, use of the conservatorship vehicle was not the RTC's preferred method of moving forward toward resolution.
Do you agree with that assessment?
A. That was my assessment at the time. I don't recall -- it's logical is all I can say.
Q. Okay. Is the reason it's logical that the longer an institution is in conservatorship, its deposits run off, its key managers leave, its loan operations slow down or shut down, and those things taken together negatively impact the franchise value?
A. Those could be some of the reasons. But I would assume that one of the main reasons would be that, first of all, the institution is going down hill to begin with and was in bad shape, was not being, probably not being run correctly. And so conservatorship would not necessarily cure these ills.
So, conservatorship cannot cure that necessarily. So the institution is going to continue to go down hill and could lose value, as it would if it were still an opening operating institution.

Page 50

Q. So you would look at the institution's earnings trend in the period prior, and it's reasonable to assume those would continue?
A. I wouldn't look at the earnings trends.
Q. Just in terms of the conceptual point you were making, the longer the conservatorship, I understand what you are saying, if the institution is losing money right before you take it, it's probably going to keep losing money during conservatorship. Is that a fair point?
A. Yes.
Q. Are there any other factors that you think support this logical proposition, that the longer the institution is in conservatorship, the more costs it is to its owner?
A. Any delay in resolution, whether it be in conservatorship or the closing of an operating institution, any delay will likely cost more as time goes by through no ones fault except whoever causes the problem.
Q. Okay. Let's set Ramey 12 aside. We may come back to that. Let's continue on here.
Ask the court reporter to mark as Ramey Exhibit 13 a document that bears the Bates C-AM-A- 0126412.

Page 51

(Deposition Exhibit Number 13 marked for purposes of identification.)
Q. This is a memo from Jay Jumpiter to Robert Smedley. Subject; Carteret's Bernardsville Branch Sale. It's dated November 12, 1993. There's a concur signed by you and Mr. Horton. Is that correct?
A. Yes.
Q. Your concurrence is dated November 16, '93.
A. Yes.
Q. This memo recommends the sale of the Bernardsville branch in the first couple of paragraphs. The last paragraph; we recommend as an exception to current policy of limiting branch sales, that the deposits of Bernardsville be marketed immediately to all parties expressing interest in both Carteret or in the state of New Jersey.
My question is; do you recall anything about the current policy of limiting branch sales that was in effect in November of '93?
A. No.
Q. Would that have been a policy that your office would have set?

Page 52

A. I don't recall.
Q. Do you recall whether it was common to have policies that limited branch sales? Do you have any recollection as to whether this was typical or atypical?
A. That limited branch sales?
Q. Yes.
A. I don't recall anything that limited branch sales.
Q. That's why this document struck me. I was wondering whether --
A. I don't know what that policy was.
Q. Okay. You don't know how common it was to have such a policy?
A. I do not.
MR. THOMPSON: I would like to ask the court reporter to mark as Ramey Exhibit 14 a document that bears the Bates number C-AM-A- 0131492.
(Deposition Exhibit Number 14 marked for purposes of identification.)
Q. This is letter from David Chafey, executive vice president of Banponce Corporation to yourself, dated November 7, 1994. Is that correct?
A. That's correct.

Page 53

Q. Is that your handwriting in the right-hand corner of this document?
A. Yes.
Q. Your handwriting says; Sharon. Original file received earlier by fax. Letter has been responded to. Then your initials.
A. Yes.
Q. In the third paragraph. We are sure you realize that Carteret FSB was experiencing a significant run-off in deposits prior to July 31, which certainly will have a serious negative impact in the profitability of many of these branches, with a corresponding impact to its ultimate acquirer.
Do you have any reason to doubt the validity of that statement, either the fact that the deposits were running off or the fact that it would have a serious negative impact?
A. I don't have any reason to believe it's true or not true. I just don't know. That was his comment, whoever wrote the letter.
Q. Then he says; for this reason, our bids cannot remain open indefinitely, and we must reserve the right to cancel them at anytime.
Do you think that was a reasonable position for him to take?

Page 58

72 hour clock, et cetera, as pointed out in their letters.
And is it fair to say, based on this e.mail, that MidLantic was concerned about the run-off of deposits that was occurring during the bidding process?
A. That's what they said apparently.
Q. You don't have any reason to doubt that they actually believed that; do you?
A. Nor agree with it.
Q. Okay. Do you know what they are referring to when they say the 72 hour clock?
A. I don't recall.
Q. Okay.
A. Was there a reference earlier about 72 hours? That number just seems familiar.
Q. Right. I think that it was the reference that we saw earlier that after the first bids come in, the high bid, any minority that is within 10 percent of it, then had 72 hours to make the second bid. Presumably that is what they are referring to here.
A. Okay.
Q. Okay. Turning to the next page here, second to last paragraph. We emphasized that this

Page 59

is a top priority and everyone is devoting 100 percent of their time to it.
Do you have any reason to doubt that dissolving Carteret at this time was a top priority?
A. I don't know that it was the top priority.
Q. You can't think of anything that was a higher priority?
A. No. I just don't know.
Q. Do you know why it was a top priority?
A. No.
Q. Was Ms. Yore a competent employee?
A. Very competent.
Q. And I would like to ask the court reporter to mark at this time Ramey 17, a document with Bates number C-AM-A- 0131444.
(Deposition Exhibit Number 17 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a letter dated October 13, 1994, to a Stanley McNeese from yourself; is that right?
A. Yes.
Q. Okay. And it says in the second sentence of the first paragraph; I assure you that the Resolution staff is 100 percent committed to resolving Carteret as soon as possible and do

Page 60

understand your concern with the delay in closing the institution.
Was that an accurate statement, that you and your staff were working to resolve Carteret as soon as possible?
A. I would assume so.
Q. Do you have anything to add?
A. No.
Q. When it says that you understood Mr. McNeese's concern with the delay in closing, was that the delay and cost associated with it in terms of impact on franchise value?
A. I don't know. I don't know what his concern was with the delay. It could have been a self-serving concern that he had that I did understand. I just don't know.
Q. Okay. I would like to ask the court reporter to mark as Ramey Exhibit 18 a document that bears Bates number C-AM-A- 0077166.
(Deposition Exhibit Number 18 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a document from Ms. Yore to yourself, dated September 6, 1994. The subject is update status of minority bids for Carteret FSB and

Page 61

closing; is that correct?
A. Yes.
Q. And turning to the last page of the last paragraph of this. Carteret is currently losing approximately one million dollars a day in deposits. Several bidders have already complained about the delay in closing and loss in the deposits. Bidders were given July 31, 1994 deposit numbers to base their bids on.
Do you have any reason to doubt the accuracy of Sharon Yore's statements here?
A. I have no reason to believe differently, I mean that they complained. I don't know their complaints were justified. I have no reason to disagree with that statement.
Q. You just don't recall whether the complaints were justified?
A. No, I do not.
Q. Can you think of any reasons why these bidders were complaining about the deposits, that they were generally concerned about the deposit run-off of a million dollars a day?
A. That would be speculation. There could be a case where a bidder would complain about the deposits running off so we would go ahead and do

Page 70

enough for them no matter who it was. But I don't recall any specifics in the minority community.
Q. Okay. Do you recall any complaints about the Carteret bidding process?
A. No.
Q. This memo continues; to ensure that the efforts of the RTC are coordinated and that the program is administered in a manner that fully implements the spirit and intent of the law, I am requesting that the three of you serve as members of a special purpose task force.
The mission of the minority resolution task force is to, one, outreach to potential minority acquirers; 2, answer questions and provide direction regarding policies and procedures; 3, arrange consortia of minority and majority bidders where appropriate; 4, promote post resolution sale of PMN offices; and 5, ensure that the resolution process is administered consistently and make recommendations for changes where appropriate.
I expect the task force will remain in place until all resolutions have been completed. By working together we should be better able to ensure the success of this important effort.
Do you recall having been a member of the

Page 71

minority resolution task force?
A. No. No.
Q. Do you recall ever having any meetings with Ms. Booker or Mr. Horton about this task force?
A. I recall that we did meet. I recall this. But I don't recall specifics.
Q. What do you recall about the minority resolution task force? Do you have one meeting or several meetings?
A. I have no idea.
Q. Do you have any recollection of what sorts of things you would have talked about generally?
A. I know that Johnnie Booker, Tom Horton and I met regularly about minority resolutions. I don't think we ever necessarily said this is a task force meeting. We met as the task force to discuss the issues. I don't think we had scheduled formal meetings.
Q. Okay. What were the issues that you all focused on at a high level of generality to the extent you can recall?
A. To increase the minority participation in the process was -- I think was the primary focus.
Q. Do you recall what you did to try to effectuate that?

Page 72

A. No.
Q. Do you recall how that impacted Resolution of Carteret in any way?
A. No.
Q. One of the purposes of this task force was to outreach to potential minority acquirers; is that right?
A. Which in turn would reduce the cost to the RTC and taxpayer. The more bidders, whether minority or non-minority, increases the chances of you getting more and better bids.
Q. Well, let me ask you, did the minorities, do you think that they competed effectively against the non-minorities?
A. That I couldn't answer. In certain instances they had the ability to match bids. So it would stand to reason, the more you had as far as minority bidders, the more participation you would have. I don't have any specific recollection.
Q. Let's look back at Ramey Exhibit 12, and specifically the second to last page of that exhibit. 188 Bates number. The last hypothesis. And comment reads; pre-screening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received.

Page 73

Although the statement may be true, I believe apples and oranges have been mixed here.
What do pre-screening of bidders and minority bidder preference programs have in common. Pre-screening, if you are talking about up-front disqualification from bidding, would likely result in a lesser number of initial attendees at a bidders' meeting and theoretically decrease the competition.
As for any type of bidding preferences, it has been my personal opinion that this is a deterrent to the competitive aspect of bidding process; however, this is not been definitively proven to be the case.
Now, do you have any, at the time you wrote this, do you believe that you had this opinion?
A. I'm sure I did.
Q. Was the reason that you had that opinion that, if one group knows that another group has a preference, and is going to be able to come in and match the bid at the end of the day, there's going to be concern in that first group they are going to do a lot of due diligence, spend a lot of time and still not going to get to close even if they had the

Page 74

highest bid as initial matter. Is that a legitimate concern?
A. That's a legitimate comment.
MR. HOFFMAN: Let me object. Does your question relate to what he's saying here?
BY MR. THOMPSON:
Q. Let me ask you. With respect to the comment that you made here, it has been my personal opinion that bidding preferences of any type are a deterrent to the competitive aspect of the bidding process.
Is one of the reasons you had that opinion the fact that a bidding preference makes it less attractive to those who don't have the preference because they may waste a lot of time and money on due diligence?
MR. HOFFMAN: Can you point out the statement that you are referring to.
BY MR. THOMPSON:
Q. As for any type of bidding preference my personal opinion this is a deterrent to the competitive aspect of the bidding process. However, this has not been definitively proven to be the case. Do you see that sir?
A. Yes.

Page 75

Q. That was your opinion at the time you wrote this document; correct?
A. I would assume so.
Q. And is one of the reasons you had that opinion at that time because if you have a bidding preference, those that do not have the preference will be concerned that they may waste time and, therefore, money doing due diligence, make the highest bid and still not get to close?
A. That is a logical statement. I would assume that that is at least part of my reasoning here.
Q. Isn't in fact that was one of the reasons why minority bidders had to be within 10 percent of the high bid. Because otherwise, it would just be carte blanche for minority bidders on the due diligence of the high group bid and therefore be a significant deterrent to the high group bidder?
A. I don't know.
Q. Okay. Is that a reasonable inference as to why there was that 10 percent requirement that minority bidders had to be within 10 percent?
A. That is reasonable; yes.
Q. Can you think of any other reason why you would have that sort of requirement?

Page 76

A. No.
Q. Can you think of any other reason why a bid preference would be a deterrent to the competitive aspect of the bidding process?
A. I can't think of any. That doesn't mean there are not some.
Q. Okay. Let's put 12 to the side. We may or may not come back to that.
A. It's been over nine years since I have considered bidding rationale. I just don't know a lot of times whenever you ask me this. It may sound reasonable now. But at the time when it was really going on maybe it wasn't really reasonable. I just don't know. When you ask me is this reasonable, it sounds reasonable now. Whether it was or not I just don't know.
Q. That's fair. One of the reasons, Mr. Ramey, we ask you these questions is because there will be a trial in this case in all likelihood. Certainly, if you were to come in, you know, six months from now and say, give opinions, make statements about what your opinion is now, we would want to know about that beforehand. It's perfectly legitimate for you to say, you know, to qualify it in the way you have.

Page 77

A. That will be going forward.
Q. Right. We are just trying to get a complete record here. I appreciate the comment you have made.
Now let's mark at this point Ramey Exhibit No. 23. Which has a Bates number of C-AM-A- 0014502.
(Deposition Exhibit Number 23 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a letter from Mr. Horton, dated May 16, 1994, to American Financial Services Corp by Mr. Greer. Do you see that?
A. Yes.
Q. It starts by saying; there are new opportunities available for minority investors to purchase deposits, and it lists Carteret there, and then it says, since, under the Resolutions minority programs, each of these institutions is designated as a whole institution located in a predominantly minority neighborhood.
A minority neighborhood may receive interim capital assistance, may purchase loans at market value, and may occupy those RTC owned association branches located in PMNs for up to five

Page 82

funding. If we have 10 million outlay on institution. Yet we have assets held back that are going to recover is $900,000. The loss is $100,000 there. In very general terms.
Q. That was one of the things when we come back from lunch I'll try to have a hypothetical that focuses. Just assets are cash. Take that piece out. We'll come back to that. I don't want to waste your time.
I did want to go to this bid document for one moment. And to the 4th page of it. The premium -- the bidder had to list the premium for each cluster of branches they were bidding on; is that right?
A. From this document I would assume so. But also, perhaps I would have to assume that this is the final document. This was revised May 20th. I don't know if there was a further revision.
Q. Is it consistent with your recollection that, whether this was the exact form or not, you wanted to know what the premium was going to be in evaluating the least cost solution to taxpayers?
A. Yes.
Q. And the premium, how does that work? Let's say it's a branch with $100 million of insured

Page 83

deposits. There are no uninsured deposits. And acquirer comes in and looked and says, this looks like there is some value here. I'm willing to pay a 10 percent premium. Is the way the transaction would work, the acquirer would say, okay, I'll take on that 100 of deposits. Pay me $90 million in assets. That difference between the 10 million would be the premium. Is that a fair statement?
A. Yes.
Q. Okay. All other things being equal, the RTC wanted to get the biggest premium possible; is that correct?
A. That's correct.
Q. The reason for that is, the fewer assets that had to transfer, the more assets there would be to cover all the other expenses in receivership?
A. Sometimes we were indifferent whether assets would pass or not or whether it was funded in cash.
Q. I mean cash is an asset too.
A. Okay.
Q. Isn't it true that the RTC wanted to get the biggest premium possible, and the reason is because, if an acquirer is willing to pay a higher premium, that is another way of saying they are

Page 84

demanding for your assets, whether they be loans or cask?
A. Your statement is correct in all cash transaction.
Q. Provided the loans are properly valued, why would it really matter to the RTC whether it was being funded with loans or with cash?
A. Everything being exact, I don't know why there would be a difference. We prefer to pass assets.
Q. You mean loans?
A. Loans. Securities. Everything.
Q. That was the RTC's preference?
A. Yes.
Q. Why was that?
A. I don't know how to answer. Normally an ongoing institution would be better qualified to collect assets than the RTC. We would prefer to shorten the term of the receivership to get the best return on the assets by passing them to an ongoing institution.
Q. Because the sooner they are in an institution, the easier it is to preserve the value of those assets. Is that right?
A. In some cases; yes. I can't give you

Page 85

definitive yeses in every case. We resolved over 700 cases.
Q. You had made a general statement that the RTC preferred to fund the branch sales with assets with loans rather than with cash. I wanted to get --
A. Also, it makes it more attractive to a bidder in a lot of cases if they are able to acquire the assets that are in the institution.
Q. Wouldn't the bidder be indifferent unless there was, if you give them mortgage securities, they could go out and buy in the open markets at the same time; what do they care?
A. You're getting out of my field. I don't know. I'm thinking about whatever you talk about servicing needs of your community, whatever that loan is, stays in that acquiring institution and you have an ongoing depositor loan relationship with the community that can be attractive to a bidder.
Q. It would depend on the type of loan?
A. Yes.
Q. All right. And with respect to most of the transactions that you supervised as a general matter, most of the branch sales were funded with cash?

Page 94

unfair or is this just another delaying tactic for some who probably won't be able to do a deal anyway.
Do you see that?
A. Yes.
Q. Was the concern that you were expressing here about a potential delaying tactic by those who wouldn't be able to do a deal anyway, was that based on your experience that the minority bidders who were de novo had a harder time closing deals than established financial institutions?
A. I don't recall.
Q. Is that a reasonable inference from this?
A. Not knowing who the other groups were. I probably wouldn't know who they were if you told me. It could have been someone that I was familiar with that had possibly tried a delaying tactic some other time and it was not able to consummate a transaction. It could have been something like that. But I don't know.
Q. You were concerned with delay? You didn't want a delaying tactic. Is that fair?
A. Not for the sake of delaying, when we had everyone ready to go. It was in the form of a question. I was asking them what did they think.
Q. Sure. The next document that I would like

Page 95

to have marked as Ramey 27 is a document that bears the Bates number C-AM-A- 0014370.
(Deposition Exhibit Number 27 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Mr. Ramey, the original message is from Mr. Hambric to yourself, dated August 16, 1994. You can see that at the bottom. Then you make some comments to Mr. Hambric. Rather than reading this into the record, if you wouldn't mind taking a moment to read this, I'll ask you a question or two.
(Pause)
A. Okay. Go ahead.
Q. In your comments you are making the point that putting the bid off from August 15th to August 26th is going to be beneficial because it will allow potential acquirers to focus on the northern and southern franchises separately. Is that the point you are making in this e.mail?
A. Give me your question again.
Q. Let me strike that and ask the question this way. Are you explaining in your comments in this e.mail that one of the reasons, and the quote real problem, close quote, was that a minority group working either alone or with non-minorities would

Page 96

not have been able to close on the entire franchise?
A. In part. Because we feel we are going to get a better transaction by delaying.
Q. Just so I'm clear. The delay that's contemplated here on your August 16th memo is pushing the bidding back from August 15th, which had been planned, to August 26. Is that correct?
A. I believe so.
Q. And then you're making the point here that, look, the minority bidders under the new regime we will be able to bid on the southern and northern portions of the franchise; is that correct?
A. I think so.
Q. Okay. And was the concern that, if it was a whole, if the entire New Jersey franchise were sold, that it would be difficult for a minority group to participate as one of the new owners?
A. And that we might not have as much interest -- the more options we could give bidders, the better chance we had of doing a deal, a better deal.
Q. Okay. It was a combination of those two things?
A. I think so.
Q. Let's move on to Ramey 28, Bates number

Page 97

C-AM-A- 0077122.
(Deposition Exhibit Number 28 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is e.mail from you to Herb Held, Mr. Jupiter, Ms. Yore, dated August 30th, 1994. Is that correct?
A. That's correct --
Q. Okay. This is just five days after the bids have come in. And the e.mail reads in part; Johnnie Booker just called me, 5:45 p.m. Tuesday. Glen Sergeon just called and reported that Mike Berman... with FD Terrell had called him and said they had been notified by us that they were in the running, and had to show evidence of something to us by tomorrow. They are asking Sergeon to buy them out or come in with them. Because they, FD, don't have money or regulatory approvals.
I told Johnnie that we would just have to wait and see what it really comes up with, but we can not flip a bid from one group to another. Also, I would assume that Terrell would want Sergeon's money, if he has any, that Booker would want to maintain control. I doubt that Sergeon would be too respective to this.

just to review this. And then I'll ask you some questions.
(Deposition Exhibit Number 32 marked for purposes of identification.)
A. Okay.
Q. This is e.mail from yourself to Mr. Held and Ms. Yore, dated September 6, '94; is that correct?
A. Yes.
Q. It references a conversation with Mike Burgee. You reference a couple of problems that you had with Terrell. Is it fair to say one of the problems was the fact that they were talking to other bidders?
A. That's correct.
Q. Is the concern there basically a concern over potential, I would call it price fixing, but a coordinated bid so rather than competitive process --
A. That was a concern.
Q. And then the second thing that you reference here is the fact that his statements about how much cash he had appear to be a false statement. Was that a concern?
A. Yes.



Q. The third thing was, he breached confidentiality agreements. Was that a concern?
A. Yes.
Q. Were all these reasons to reject his bid?
A. So far as I can tell.
Q. Let's mark as Ramey 33, Bates number C-AM-A- 0131553. This is a letter from yourself to Mr. Burgee, September 6, '94; is that right?
A. Yes.
(Deposition Exhibit Number 33 marked for purposes of identification.)
Q. Okay. And the first sentence says; I am writing in response to a letter that he had written. But my question really refers to the second page, the second paragraph.
We do understand that it is difficult for any de novo or private investor group to complete this process based upon the amount of capital and structure required. However, we began this process in mid-April and worked very closely with all minority groups in an attempt to accommodate their needs.
What were the difficulties that a de novo minority investor would face?
A. Raising capital and getting regulatory



approval. Among other things. That just comes to mind.
Q. In terms of the regulatory approval, the regulators would do a lot more due diligence for someone who wasn't an established player. Is that it?
A. That's correct. Especially if it's not an established player -- checking backgrounds and so forth.
Q. In the second part of that sentence. We began this process in mid-April and have worked very closely with all minority groups in an attempt to accommodate their needs. Was the work that you did with the minority groups and outreach that you did, was that an attempt to satisfy the congressional mandate?
A. In part. And in part it was to try to get as good a deal as we could. We would be working with minority groups and others prior to even scheduling a resolution. We might not have one scheduled.
If we had an institution in conservatorship, then people would know sooner or later we are going to resolve it. They might come to us ahead of time and say, when you get ready to



resolve this institution, we want to be considered. What do we need to do. We would work with them, whether it be a minority or otherwise. Because of congressional mandate we were, I won't say we worked harder with them. We didn't. We want to be sure that we did everything that we were mandated to do, plus try to get the best deal.
We are talking about all minority groups. That's because he is involved in a minority group. Had this been someone other than a minority group, we would have probably said we have worked with all bidders in attempting to do this.
Q. One question I had was, in terms of the outreach, did that take extra time to the minority community? Did you spend more time, and did that extend the process, because you were trying to be inclusive and reach out to as many minority bidders as possible?
A. It may have taken more time indirectly, but it also widened our, broadened our base of bidders. You might think that it was a detriment to the resolution process; whereas, there were times when it probably benefitted the process because we did bring more groups to the table.
Q. With respect to Carteret, do you have an

Page 110

opinion as to whether the bids would have been the same with or without the Minority Preference Program I still don't know anything about Carteret. We are talking about Carteret here. I don't even know how big it was. I don't know -- I don't remember anything about -- Leslie told me where it was a few days ago. I just don't remember.

Q. I understand. I'm just trying to make sure we have a full record. It's not a problem.

We were going to look at this one, which was -- we are done with 33.

We are going to go to the next Exhibit, Ramey 34, and it has a Bates number of C-AM-A- 0014288.

(Deposition Exhibit Number 34 marked for purposes of identification.)

BY MR. THOMPSON:

Q. This is a letter from MidLantic to Mr. Ryan. You're a cc on it; is that right?

A. Yes.

Q. It's dated September 14th, '94. I would like to direct your attention to the second paragraph towards the end where it says; in spite of RTC bidding procedures for minority preference resolutions, bidding rules which provide for a 72

Page 111

hour match period, see bid overview,... the RTC provided the minority match bidder over 120 hours or until 5:00 p.m. on Wednesday, September 14, 1994, to provide a matching bid and proof of capital. Do you see that?

A. Yes.

Q. Do you have any reason to doubt the accuracy of that factual statement?

A. No. Nor to agree with it.

Q. If it were true, would it be evidence of the resolution's department commitment to try to get a minority investor to acquire Carteret?

A. Not necessarily. It could be evidence of us doing what we try to do, is to try to do is to get the most cost effective resolution. So is the 72 hour match period is not mandated by Congress. That was a guideline that we went by. If it took less or more time, if we thought that the resolution process would benefit by it, then we would probably do it.

Q. Let's look at the next exhibit, which would be Ramey 35. And it bears Bates number C-AM-A- 0131544.

(Deposition Exhibit Number 35 marked for purposes of identification.)

Page 112

BY MR. THOMPSON:

Q. This is a letter from Peter Knight, Director of the office of Governmental Relations to representative Peter King. Did you ever have any dealings with Peter Knight?

A. Yes.

Q. This is dated September 27, 1994, a couple weeks after the events we have been looking at. First paragraph makes reference to a letter that Representative King had sent on behalf of Francis Terrell.

Do you have any recollection of congressmen contacting your office about the Minority Preference Program?

A. No.

Q. Mark as Ramey 36 a document that bears the Bates number C-AM-A- 0131543.

(Deposition Exhibit Number 36 marked for purposes of identification.)

BY MR. THOMPSON:

Q. This is a letter from Representative Rangel to Mr. Ramey. You are listed as the copy in the bottom left-hand corner. First sentence makes reference to the fact that Mr. Rangel is writing in response to Mr. Terrell concerning the RTC policy

Page 113

implementing the Minority Resolution Preference Program. Do you have any recollection of seeing this correspondence?

A. No.

Q. Does this refresh your recollection that Members of Congress were keenly interested in minorities acquiring Carteret?

A. Not Carteret specifically. I just know they were interested in minorities in general.

Q. Were they applying pressure for you all to sell institutions to minorities?

A. I was never involved in any pressure from any congressman. We may have had meetings and they would express concerns. In no way was I ever pressured from any congressional office to do other than what we were supposed to do.

Q. Okay. In the third paragraph Representative Rangel says; as you know, in creating the RTC's Minority Resolution Preference Program Congress's intent was clear. The first goal was to resolve failed thrift institutions in an expeditious manner.

As I understand this process of the Minority Preference Program, it adds on a second layer of bidding. Do you think that the Minority

Page 114

Preference Program really expedited the resolution of conservatorship?
A. In certain instances it did. Yes; I'm sure it did.
Q. Can you name any?
A. I can't name any institutions specifically. But there were times we didn't get any bids to help minorities acquire institutions.
Q. Can you recall any instance in which the only bids you all received were pursuant to the Minority Preference Program?
A. I believe there were some. I cannot remember any specifically.
Q. Wouldn't those bidders have won anyway? There is not a second round of bidding.
A. There is more to the minority preference bidding procedures than matching bids.
Q. The interim capital assistance?
A. Yes. I don't know what else. There are a lot of factors involved in the minority preference. The matching bid ability was just a portion of that. This would delay the bidding, the final bidding process. There were times when we never received any matching bids.
Q. Then it's irrelevant.

Page 115

A. Yes. Also, I don't know, in all due respect to Congressman Rangel, it sounds like he's preaching to us that here's what the intent was. I don't know that that was the intent. I'm not sure he knows what the intent was. That's his opinion. He's free to write that down on a piece of paper.
The first goal to receive a failed thrift in an expeditious manner. I don't know, I don't think that had anything to do with their intent. That is his opinion.
Q. Let's look at the second goal that he references.
A. To promote ethic diversity in the banking community to better serve communities, including some which I represent that are frequently neglected by banks and thrift institutions.
Q. Do you believe that was one of the goals of Congress?
A. I don't know. Except I don't see where acquiring an institution that's not in one of those areas helps that area.
Q. I'm sorry?
A. In other words, he says ethic diversity in the banking community to better serve communities, including some I represent that are neglected by

Page 116

banks and thrift institutions. When you do this, you are not establishing an institution in an area that's neglected. You're going into an area that exists with a banking institution.
Q. I understand. Mark this as number 37.
(Deposition Exhibit Number 37 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is e.mail from yourself to Mr. Held, Mr. Jupiter, Ms. Yore, Mr. Smith and Ms. Starke.
A. Yes.
Q. It's dated September 22, 1994?
A. Right.
Q. It's just after, shortly after the Terrell bid has been rejected. It references some concerns about Mr. Sergeon. Even though we have put a 14th deadline on Sergeon, it won't be done by then and the end of the month is likely, if at all. On the 14th probably the best we can hope for is, some sort of indication from the regulators that he can possibly be approved with some background checks still outstanding.
Money in the bank for the capitalization but not for the debt to be raised by ML. Also, that investors aren't as firm as we would have liked to

Page 117

believe. Sergeon is scurrying around trying to get replacements. ML indication, more than now, that they can get remainder of the money prior to the end of the month. And approval of structure by MWOB, which is in state of flux now. What is MWOB?
A. Minority and women --
Q. Opportunity Bureau.
A. It would be Johnnie Booker's office, whatever that stands for.
Q. Is it fair to say at the time you wrote this e.mail, you were beginning to have concern as to whether Mr. Sergeon would ultimately be able to close on this deal?
A. It appears so.
Q. Next paragraph. We discuss the discontent of MidLantic, et cetera and possibility of dropping out and/or bringing suit. However, Mr. Ryan is adamant in his feelings that we must be ready to give Bahia whatever information we can, if Sergeon fails and falls through. Bahia -- was that another minority investment group?
A. I don't know.
Q. Do you recall Mr. Ryan's adamance about giving information to another group a month after the bids had closed. Is it fair to infer that it

Page 134

to getting capital. I don't know.
Q. Fair enough.
A. It's hard to believe that someone would go to all that trouble knowing that they didn't have a chance.
Q. Okay. Let's go to the next exhibit, Ramey 46, Bates number C-AM-A-0028076.
(Deposition Exhibit Number 46 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is a memo from Mr. Jupiter to yourself, dated December 14, '94; is that right?
A. Yes.
Q. It says in the first sentence; Wednesday, December 7, 1994, bidders in the high bid group were asked to reaffirm their bids of August 25th, '94 on Carteret FSB by Monday, December 12, 1994. Four of the six bidders did reaffirm their bid for one branch and MidLantic's bid for 18 branches, 57 percent of the total will not be reaffirmed. However, MidLantic had requested an extension to December 21 to reaffirm their bid. They will use the extension to perform due diligence.
Why were certain bidders were the bidders in the high bid group allowed to reaffirm or

Page 135

disavowal their prior bids?
A. Why were they?
Q. Yes. Isn't it because the deposits had run off to such an extent that it wouldn't have been fair to hold them to something from four months prior?
A. I don't know. Common sense would tell me that after a time period goes by, if I had submitted a bid, it's based on information that's given to me. If you don't accept it, then I may not have to live up to that bid. It doesn't go on forever.
I don't know if our terminology here is exactly correct. To reaffirm, are you ready to go, you have got the bid. I just don't know. But --
Q. Whatever terminology you use, some said yes and some said no?
A. Apparently so.
Q. That was deemed -- you have no reason to doubt that was appropriate. You were not contemplating suing MidLantic?
A. Not that I'm aware of.
Q. Quite to the contrary. It says they were asked to reaffirm?
A. Right. I don't know about quite the contrary. It's not that we were considering suing

Page 136

them. Because we would not consider suing them before we asked them if they are going to stand by their bid. If they didn't, I don't know if we would have or not. I just don't know.
Q. Let me first show you a document that will eliminate that. Ramey 47. C-AM-A-0125093.
(Deposition Exhibit Number 47 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Ramey 47 is a letter from Mr. Held to the chairman of Hamilton Bank. Same date as 46. December 14. In the third paragraph. While there was a delay in the closing of the Florida branches, Hamilton was informed during the delay that it was not being held to the bid submitted on August 25th, '94, unless Hamilton wanted to proceed with the acquisition at their bid price.
Does that refresh your recollection?
A. No.
Q. It is consistent with understanding the Ramey 46, the December 14th, 1994, memo from Mr. Jupiter to yourself, where you are saying they were asked to reaffirm that they were given a choice. Isn't that right? These two documents taken together would suggest it was up to the bidders?

Page 137

A. Yes.
Q. The reason they were given that choice was because of the time delay that had resulted from pursuing the minority bid. Isn't that right?
A. Because of the time period.
Q. The time period resulting from --
A. That's your words. Resulting from the time period in the past as a result of us trying to comply with our congressional mandates. And --
Q. The congressional mandates under the Minority Preference Program?
A. Correct.
Q. Fair enough. I have got another document. This is going to be Ramey 48. And it bears a Bates number of C-AM-A-0028037.
(Deposition Exhibit Number 48 marked for purposes of identification.)
BY MR. THOMPSON:
Q. The last line. It says he. It's referring to a Brian Collins. He asked and I confirmed that Carteret was the only depository institution in conservatorship at present.
Do you have any reason to doubt that Carteret was the only depository institution --
A. No, I don't have any reason to doubt that.

Page 142

in a timely fashion after their August 25th, 1994 bids, in other words, if there hadn't been the need to satisfy the congressional mandate, that they would have been able to close and provide the premium of $87 million?
A. I don't know.
Q. Do you have any reason to doubt that in the absence of the congressional mandate MidLantic and Sovereign would have paid a premium of $87 million on these 16 branches?
A. I don't know. Because one big thing in here is, there was a minority preference in there. That could have caused them to increase their bid to keep the minority bidders out. Had there not been minority bidders there, they may have paid a substantially lesser premium knowing that the competition wasn't there. They didn't know if those minority bidders could or would match their bid. So they may have bid a higher amount than they normally would have. I just don't know.
Q. Are you speculating on that?
A. Yeah, I am. You were asking me to speculate on would they.
Q. Do you have an opinion on this subject as to whether they would have? I refer you back to

Page 143

your postmortem analysis of October '95. This is Ramey 12. That we looked at earlier. Where you said; as for any type of bidding preferences it's been my personal opinion that this is a deterrent to the competitive aspect of bidding process?
A. At that time that was my opinion. But as I looked at it, you know, in the overall concept, in general, it probably was a deterrent to some bidders.
Some bidders, and this is speculation on my part now, but I did feel the same way later on at the RTC, that some bidders may be turned off because another group may be allowed to match their bid. Other bidders could be the reverse. They may bid higher because they think or know that that minority bid, the other bidder, is not going to be able to match theirs.
So they may bid the absolute maximum that they are prepared to bid; whereas, when you go to a bidder's meeting, you look around that room and you know who is there. You have seen those faces before. You know who is going to be bidding. You know who us interesting. Whenever you add an unknown, it may make you bid more.
Q. With respect to MidLantic and Sovereign

Page 144

and the 16 branches, you don't have an opinion as to what $87 million would have been higher or lower?
A. I just don't know. Therefore, I couldn't say without the minority preferences would they have been willing to go forward with 87 million. I don't know. That didn't happen. That would be pure speculation on my part.
Q. Okay. I would like to ask the court reporter to mark as Ramey 50 a document that bears the Bates number C-AM-A-0077742.
(Deposition Exhibit Number 50 marked for purposes of identification.)
Q. This is the original message. From Mr. Jupiter to yourself, January 18, 1995. It references the fact that there is a call from the Oversight Board. Take a moment to read this.
(Pause)
A. Okay.
Q. It says; Mr. Jupiter says; we believed any further delay would be very costly both in image and money to the RTC, and briefly explained the history of the delays already experienced.
Do you have any reason to doubt Mr. Jupiter's conclusion that it would have been very costly in terms of money to the Rtc to have further

Page 145

delay?
A. I don't know. This is something he's telling me. So I don't know how valid it is.
Q. It's an e.mail to you?
A. Well, I don't have any reason to say it's not true. I don't know how true it is. If we had a valid reason to delay, then whether it was an image thing or not, we probably should delay.
Q. I'm asking about the money.
A. The money?
Q. Yes.
A. We were having operating losses. I had no reason to dispute that -- 621,000 or whatever. I don't know how much was involved here. I would assume that any delay in the resolution, unless we were able to rebid it and get a better premium would be more costly.
Q. Is one piece of supporting evidence for Mr. Jupiter's statement here the fact that you did have to rebid some of the deposits, branches, 16 of them specifically. I'll represent to you that the premium received was $19 million lower.
A. There is no way to know that. Even had we known it, we couldn't -- we still had the least costly resolution that was available to us based

Page 150

any involvement in the decision as to -- well, how much cash should we borrow from the RTC advance window as opposed to how much cash in the conservatorship we should use?
A. No.
Q. Do you know who would have been involved in that decision?
A. I don't know. Operations possibly.
Q. So maybe Mr. Mahaney?
A. Possibly.
Q. Let's mark as Ramey 55 a document that bears the Bates number C-AM-A-0077208.
(Deposition Exhibit Number 55 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Looking at Ramey 55, this is an e.mail from Ann Richards to Herb Held. She writes; we are chomping at the bit waiting to sell securities out of Carteret. Should they still remain frozen?
Ann Richards. Do you know this lady?
A. Yes.
Q. Do you have any recollection of the freeze of Carteret's assets?
A. No.
Q. Was it standard operating procedure to

Page 151

have a freeze on the sale of assets of a conservatorship?
A. I'm not familiar with this. I don't know why there would have been or why there would not have been. I just don't know -- unless they were needed for other things. I just don't know.
Q. Do you know why they would have been asking your department resolutions whether it was okay?
A. What date is this? September 15th. '94.
Q. So it's about a month after the bids?
A. It's before the resolution.
Q. Yes. Exactly right.
A. At times we would freeze the assets because the purchasers might want them to pass.
Q. The minority purchasers?
A. Any purchasers. Some purchasers earning assets as opposed to cash. If we had earning assets that were of good quality, we may hold on to them to pass that resolution.
Q. Would you have been involved in that decision?
A. It's possible.
Q. Okay. Do you have any recollection as to the reasons why Carteret's assets were frozen or

Page 152

securities frozen?
A. It would be purely speculation. If you have got an earning asset, it cuts your operating losses. It's an asset; it requires no maintenance.
Q. Let's go on to the next exhibit, which will be Ramey 56, C-AM-A-0014279.
(Deposition Exhibit Number 56 marked for purposes of identification.)
BY MR. THOMPSON:
Q. Later on the day of September 16, Mr. Held wrote Ms. Richards and responded, we are still working with a minority hole bank bidder. We will need about $1.4 billion dollars in loans. If Sandra has the loans and does not need the securities, then we should be able to release the securities.
Is the point here that's being made that as long as a minority might want to exercise its option to buy performing assets, we aren't going to sell these assets?
A. That sounds reasonable. If we did not have other assets to give them. If they have a right to ask us for assets, then, and we don't have loans, we have got performing assets there that we could pass at probably what we could sell them for in the market. They are not losing anything there.

Page 153

The asset people, Ann Richards, she was dealing with Sandra Nobles. When they get the assets, they try to liquidate them normally. Not in all cases necessarily. We would have probably been acting in bad faith had we knowingly exhausted our asset pool, had a minority bidder that needed assets. I don't know.
Q. Three more exhibits and about as many questions. Let's say Ramey 58 will bear Bates number C-AM-A-03028207.
(Deposition Exhibit Number 57 marked for purposes of identification.)
BY MR. THOMPSON:
Q. This is an e.mail from Mr. Held to Mr. Jupiter and others. It references the fact that major resolutions had never given out loan information on any of our deals except for the info on the Western loans given out on Transohio.
The question is; do you know why there was this policy not to give out information on loans?
A. I don't know what loan information they are talking about. Because I know bidders were allowed to do due diligence so they had to get loan information. But --
Q. The question is; were the bidders the