UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------x

AMBASE CORPORATION and CARTERET BANCORP, INC.,

Plaintiff,

-and-

FEDERAL DEPOSIT INSURANCE CORPORATION,

Plaintiff-Intervenor,

-versus-

THE UNITED STATES OF AMERICA,

Defendant.

---------------------------------------x

600 Fifth Avenue
New York, New York
March 31, 2006
9:35 a.m.

Deposition of MICHAEL SARAN, pursuant to Notice, before Sophie Nolan, a Notary Public of the State of New York.

Page 26

of 1992 is when, to my understanding, a receiver was initially appointed for Carteret Savings Bank.
Was this part of the closing that you were referring to, this purchase and assumption agreement, or were you referring to something else?
A. I believe it was.
Q. Okay. And at the bottom left-hand corner of the first page, there's a block for the RTC and it has, "Attention legal" with your name on it.
What role, if any, did you play in preparing this document? Do you recall?
A. I do not recall.
Q. Okay.
MR. KUIPER: Counsel, do you know what's crossed out there?
MR. COLATRIANO: It was crossed out on our copy, but I think if you look to the last page, it has the same legend and it says, "Record and return to."
MR. KUIPER: Thank you.
MR. COLATRIANO: I didn't know whether this was a legend that was put on

Page 27

here afterwards or whether this indicates that you were working on this agreement at the time it was prepared.
Q. Do you know, Mr. Saran?
A. To the best of my recollection, I did not prepare the document. The notation on the last page "Record and return to" refers to the fact that the document, to the best of my recollection, was recorded in the Morris County clerk's office on December 7, 1992.
Q. Do you know why it was recorded in the Morris county clerk's office?
A. To the best of my recollection, Carteret Savings Bank's charter was located, I believe, in Morristown, New Jersey, which is in Morris County, New Jersey. I believe or my recollection is it was recorded in the county where the institution was headquartered as a document to indicate or put on notice third-parties that the receiver had been appointed.
Q. Okay. If you look at the -- a few pages in, a page Bates stamped 378 are the last three numbers.
A. Okay, yes.

Page 28

Q. There's some recitals there. The first one is "Whereas, Carteret Savings Bank has been closed by the Office of Thrift Supervision" and the second one is, "Whereas, the OTS has appointed the RTC as receiver for the failed association."
Do you see that?
A. Yes, I do.
Q. Okay. I just want to make -- does this comport with your recollection that this is the approximate timeframe when the RTC was appointed as receiver for Carteret, December of 1992?
A. Yes.
Q. Do you know at what point the RTC stopped being appointed as receiver for institutions that were not already in conservatorship?
A. No, I do not.
Q. Okay. But at some point, I take it, the RTC was dissolved or folded into the FDIC and at that point, certainly no later than that point, to the extent a receiver was appointed, it would be the FDIC, correct, for thrift?

Page 29

A. To the best of my recollection, and it would be just conjecture on my part, but I believe it was December of '95 was when the RTC was merged, so I suspect or assume subsequent to that point in time the RTC was no longer in existence.
Q. And the reference in that first recital to "Closed" -- "Carteret Savings Bank has been closed by the OTS," is that a reference to a receiver has been appointed for Carteret or does that mean something else?
A. I do not know what that means.
Q. This is an agreement between the RTC as -- in its capacity as a receiver for Carteret and the RTC in its capacity as conservator for a new institution, Carteret Federal Savings Bank; correct?
A. That is my understanding, correct.
Q. And it's my understanding that this was a fairly typical structure when an institution was placed into receivership; is that correct?
A. As to the appointment of the receiver, yes. As to the document itself, I do not know.

Page 98

perspective of a conservator from Carteret that it was suing an open insured institution?
A. I do not know. I didn't write it, so I don't know what he meant by it.
Q. Did you have any discussions with Mr. Feeney about that issue?
A. Not to my recollection, no.
MR. COLATRIANO: Let's have this document marked as Exhibit 24, please.
(Saran Exhibit 24, document Bates stamped C-AM-A-0240929, marked for identification.)
Q. Exhibit 24 is a printout of an e-mail with some attachments. I'm not going to ask you about the attachments. The e-mail is from Cindy Rheaume to Jack Davis, Subject, Western Federal Portfolio." It's dated August 3, 1994. It's Bates stamped C-AM-A-0240929. At least according to a handwritten CC list on the first page, it appears you were CC'D on the document.
Go ahead and review the e-mail and let me know when you're ready to proceed.
A. (Reviewing.)
I've read it.

Page 99

Q. This talks about a February 8, 1994 meeting in which representatives of Carteret and Western came to an agreement.
Do you know whether you participated in that meeting?
A. I don't recall participating in that meeting.
Q. In the first paragraph, the first numbered paragraph refers to the net amount due from Western to Carteret, roughly $730,000.
Do you know how it was determined that that would be the net amount due from Western to Carteret?
A. I can just restate what the paragraph itself states in the e-mail. It says, "This amount was basically REO sales. Proceeds and reserve fund balances due to Carteret net of Western's P&I advances," but I don't have any other recollection or understanding of what that means.
Q. And do you have a recollection or understanding of why it was that calculation that was determined to be the amount that would resolve the litigation?
A. No, I do not.

Page 100

Q. Was it by this time that Western had itself with placed in receivership or conservatorship?
A. I don't recall what the status of Western was.
Q. Just to be clear, you don't recall whether you were at this meeting. Do you recall generally whether you were involved in the settlement of the Western dispute?
A. I don't recall if I was involved in the settlement, no. I don't recall.
MR. COLATRIANO: I'd like this marked as Exhibit 25, please.
(Saran Exhibit 25, document Bates stamped C-AM-A-0335570 through C-AM-A-0335573, marked for identification.)
Q. Exhibit 25 is a memo from John Davis to distribution dated August 11, 1994, "Subject, Western Federal Savings Bank/Carteret Federal Savings Bank." The memo is on Carteret Savings Bank letterhead. You are listed on the last page as part of the distribution list, the third name from the bottom. And the document is Bates stamped C-AM-A-0335570 through and

Page 101

including 573.
It's a longish memo, but if you would like to skim it before we talk about it, that's fine. My questions are going to be about the second and the fourth page.
A. Give me a moment and I'll review it. Thank you.
Q. Thank you.
A. (Reviewing.)
Okay I've reviewed it.
Q. Okay. Does this document refresh your recollection about your work on this matter involving Western?
A. No, it does not.
Q. On the second page under -- after the fourth numbered paragraph, there's a paragraph that says, "Six months have passed since the Washington meeting and nothing has been accomplished. Drafts of the proposed new agreement have been prepared but not executed. No money has been forwarded to Carteret from Western. Cash due to Carteret now approximates $1 million."
Do you know why nothing had been accomplished, at least according to this memo,

in the six months since the Washington meeting?
A. No.
Q. Were you involved in any discussions regarding that delay or why nothing had been accomplished?
A. Not to my recollection.
Q. On the last page and there's a reference in the next-to-last-paragraph to SWAT relinquishing its responsibilities and the proposed SWAT action plan is now to be implemented by the alternate dispute resolution group.
Do you know why that change was made?
A. I can speculate. I will assume it references the fact that you had two receiverships involved so I will -- again, it's pure speculation but I will assume that as a result of dealing with two receiverships, it was transferred from SWAT to ADR, alternate dispute resolution group.
Q. Okay. Did you have any involvement in any work done by the alternate dispute resolution group?
A. I don't recall any, no.



Q. Okay. Do you know how that process worked within the ADR group?
A. No, I do not.
Q. Okay. The last paragraph says, "It certainly would appear that any additional losses and the potential sale of Carteret's assets as a result of technical differences between two government-managed conservatorships would be an embarrassment to the RTC."
Do you know what the concern being expressed here -- how were additional losses or how was it feared that additional losses could result from this disagreement between the two conservatorships?
A. I didn't write it and I don't know what he's referencing.
Q. Okay. Do you know whether there was any concern regarding this dispute hindering efforts by Carteret to sell its assets?
A. I don't recall any.
MR. COLATRIANO: I'd like this document marked as Exhibit 26, please.
(Saran Exhibit 26, document Bates stamped C-AM-A-0240906 through



C-AM-A-0240908, marked for identification.)
Q. Exhibit 26 is a -- two memos. The cover memo is a memo from yourself to Dean Digiondomenico dated November 1, 1994, "Subject, Carteret Federal Savings Bank, Western Federal Savings Bank and Carteret servicing issues and pending litigation." It's Bates stamped C-AM-A-0240906 through and including 908.
My questions are going to be about the attached memo dated October 28, 1994. Go ahead and read that memo to yourself and let me know when you're ready to proceed.
A. (Reviewing.)
I've read it.
Q. The second paragraph of the October memo says, "Thus far, Western appears to have taken full advantage of the gentlemen's agreement without bothering to abide by any of its obligation under that agreement."
Do you know how Western was taking full advantage of the agreement?
A. I do not. I don't recall.
Q. Okay. It goes on to say that,



"Under such circumstances, it seems to me that we may need a neutral third-party to review this situation to determine how it should be resolved."
Do you know whether that was actually done?
A. I do not know.
Q. Okay. It then says, "Of course, I agree with you that it makes little sense to continue to pursue our rights in the federal courts, but it does seem to me that Western owes Carteret a substantial amount of money and I would hesitate to walk away from this money merely because of the fact that the dispute is between two RTC-controlled institutions."
Was it being proposed at this time that the RTC just let this matter drop?
A. I don't know what was meant by the comment. I didn't write the memo, so I don't know what was meant by it.
Q. Right. I wanted to know whether you had an independent recollection if that was being discussed.
A. No, other than the fact that Western at one point or another apparently --

Page 106

in Exhibit 25 it references the fact that the RTC apparently was appointed receiver for Western in June of '93.

The memo which you provided as part of Exhibit 26 dated October 28, 1994 was subsequent to the appointment of the RTC as receiver for Western, so I suspect and, again, it's pure speculation, that you would not want two receivers or two conservators whatever the appropriate status was at the time to be suing each other, but, again, it's -- in federal court when -- it most likely would not result in -- you know, it's unclear the expense and whether or not it was appropriate to continue to utilize federal courts to pursue the respective party's rights when you had two receiverships or two conservatorships involved.

MR. COLATRIANO: I'd like this document marked as Exhibit 27, please.

(Saran Exhibit 27, document Bates stamped C-AM-A-0335139 through C-AM-A-0335140, marked for identification.)

Q. Exhibit 27 is a memo to the Carteret Western file from Steven Burnes,

Page 107

senior counsel, SWAT dated May 19, 1995, "Subject, Conversations with Bill Elsbury, Esquire." It's Bates stamped C-AM-A-0335139 through and including 140.

Go ahead and review that to yourself and let me know when you're ready to proceed.

A. (Reviewing.)

I read it.

Q. Do you recall having seen this document before?

A. I do not recall seeing it before.

Q. Okay. There's a reference in here to an accounting error being discovered for which Carteret was due credit from Western?

Do you recall what the accounting error was?

A. I do not recall. To the best of my recollection, I don't know what the accounting error is in reference to.

Q. Okay. Do you know how -- I presume that also means you don't know how it was discovered?

A. I do not.

Q. There's a reference in the second

Page 108

paragraph to the Newport Beach Junior CRC. Do you know what that is?

A. Well, CRC is another acronym that stands for Credit Review Committee, so I will assume -- again, it's speculation, but in order to approve the settlement, if that's what this references, that it needed -- it required a full credit review committee approval.

Q. Do you know how the issue discussed in this memo was resolved?

A. I do not.

Q. Do you know more generally how the dispute between Western and Carteret was resolved?

A. I don't have any recollection.

Q. Okay.

MR. COLATRIANO: I'd like this document marked as Exhibit 28, please.

(Saran Exhibit 28, document Bates stamped AM 43070087 through AM 43070090, marked for identification.)

Q. Exhibit 28 is a memo from you to Walter Lucenko dated February 24, 1993, "Subject, Carteret Federal Savings Bank in conservatorship." It has an attachment. The

Page 109

exhibit is Bates stamped AM 43070087 through and including 0090.

I am most interested in the last two pages of this exhibit which are a copy of a letter dated February 10, 1993 to George Gross and Richard Bianco from Jeffrey Connor. So, go ahead and read that attachment and let me know when you're ready to proceed.

A. (Reviewing.)

I read it.

Q. Did the RTC, while it was conservator or receiver for Carteret perform an analysis about whether to pursue a goodwill claim on behalf of Carteret?

A. I don't recall if that analysis was done.

Q. Would that have been something you would have seen if it had been done?

A. Possibly, but I really don't have an answer. I doubt it -- it would not have been something that in my capacity as a senior attorney that I would have been asked to consult on.

MR. COLATRIANO: Off the record.

(Discussion off the record.)

Page 118

the dollars involved, I'm going to simplify the process, is that when you hit a certain dollar amount you generally would require -- again, I don't recall what it was, but credit review committee was a part of the process whereby, again, depending on the delegations of authority that someone may have to -- a committee would have to approve a particular decision.
Q. Okay. Now, if you look at exhibit 24, you'll see that it's written by a Cindy A. Rheaume.
Do you know who Cindy A. Rheaume is?
A. I do not.
Q. If I could have you now turn to Exhibit 23, you could turn to the second page of that exhibit and if you could direct your attention to the second paragraph on that page where it begins, "This asset should go to a SWAT."
A. Okay.
Q. If you'll go to the third sentence in that paragraph and also would you agree that -- actually, let me backtrack just for a

Page 119

second.
Would you agree that this memo discusses two suits, litigation, a Profeta suit and also Western Federal litigation?
A. It appears to do that, yes.
Q. And would you agree that this particular paragraph that we're focusing our attention on is discussing the Western Federal litigation?
A. It does.
Q. Go back to the third sentence of that second paragraph which it says, "Among other things, we are suing an open insured institution which I've been told is not in the best health."
Do you believe that that would have been a factor because perhaps over time there may be less assets for payment of a monetary judgment or settlement amount?
A. I don't know. I think I previously stated I don't know what was meant by that statement, but, again, I suspect it factors into the equation of the decision process.
I don't know exactly what they mean by that, but, again, I'm speculating but I'm

Page 120

assuming that the time value of -- that there was a decision made based upon the health of the institution or the -- I'm reading, "We are suing an open insured institution which I'm told is not in the best of health. The suit is far from open and shut on the merits."
I really can't -- you know, I don't know what the thought process was.
Q. Let me ask you this question, if you are contemplating settlement of a matter, would -- among the many factors that you would consider, among those factors, could it possibly include the fact that a suit, as it says here in this fourth sentence of this paragraph, "the suit is far from open and shut on the merits" or "the institution is not in the best of financial health," for example, may not have assets for payment of a judgment, would those be factors that you would consider?
A. Certainly.
MS. HART: No further questions.
MR. COLATRIANO: I have one follow-up on this paragraph we've been discussing.
FURTHER EXAMINATION

Page 121

BY MR. COLATRIANO:
Q. What's the relevance to the fact that it was an insured institution from this sentence?
A. I'm -- I don't know. I'm not familiar with uninsured institutions, so I just think that's the author's -- I assume what they're saying is that it's an institution insured by the FDIC as opposed to an uninsured institution which we had very little or no involvement with at the RTC.
Q. Why would the fact that it was insured make -- have any relevance in how this claim against it should be handled?
A. Just -- I don't know. I assume it has to do -- I believe -- again, it's speculation that it's insured by the FDIC -- to the extent -- I assume that's what he's referencing when he says, "Open insured institution," that there's FDIC insurance and that to the extent the institution were to fail, the claim most likely would have to be processed differently. It would have to go through a claims process and would delay the resolution of the claim most likely.

Page 122

Q. Could it also be referring to the fact that a claim against an insured institution which was not in the best of health could push it to failure?
A. I don't know. I don't really have any opinion on that. I'm speculating it could, but I don't really know.
MR. COLATRIANO: I have no further questions.
MS. HART: One follow up to that.
FURTHER EXAMINATION
BY MS. HART:
Q. Could that reference to "open insured institution" refer to the fact that there is a priority payment scheme and it maybe could impact the payment of this particular claim vis-a-vis these other claims against an institution?
A. That, I don't know.
MR. KUIPER: I have a couple of questions.
EXAMINATION BY
MR. KUIPER:
Q. Mr. Colatriano this morning asked you if you were aware of institutions coming in

Page 123

to do due diligence on Carteret and you replied that you were not aware of that.
What were you assuming at the time you answered the question as to what time period he was referring to?
A. Well, my recollection was or the time period, if I understood the question correctly, was when Carteret was resolved and what I mean by that is post the initial appointment of the receiver of the RTC as receiver for Carteret Federal Savings Bank, subsequent to that date, which I believe was in '92 or '93, I don't recall exactly, that in each resolution or when the assets and branches were sold, I don't recall any due diligence, and what I mean by that is where prospective purchasers would come to the institution and examine its books and records. That was generally provided.
Prior to the appointment, I was aware or based on the records to my recollection that were in the possession of the bank, that there had indeed been prospective purchasers of the institution, but, to my understanding and recollection, none of those

Page 124

prospective purchasers -- so, in terms --
The reason I base that is that I recall there was a -- a file room or a -- a room with lateral file cabinets in it that I think personnel of the bank referred to as the war room, which was an office where records were maintained for purposes of what I believe, if I recall correctly, was used for or maintained records that prospective purchasers, prior to the appointment of the receiver, would perform due diligence.
So, it's a little different than the concept of due diligence that is associated with a resolution of a -- of a receivership or a conservatorship.
Q. Do you know how many institutions had come in to do due diligence?
A. I don't recall specifically. The reason I -- what I'm basing it on is my recollection, and I'm going back a number of years, was that the schedule or the appointment, if I recall correctly, that Carteret, because of its capital levels, had been identified as an institution that was -- was weak and hadn't -- if I recall correctly,

Page 125

there was a potential of appointment of the receiver prior to the actual date it was done.
So, I believe that the delay and I don't recall specifically, but there was, to my recollection, if I recall correctly, a hope that the bank would be acquired but I don't recall -- what I mean by that, prior to the appointment of the receiver, is that the real estate or I should say the institution was -- was teetering -- its capital levels were deteriorating, I believe, if I recall correctly, and I believe, if I recall correctly, there had been other institutions prior to the appointment of the receiver that had considered acquiring potentially, I don't know if it was a full institution or a branch because I do recall that Carteret had sold a significant number of its Florida branches as well as branches that it had maintained in, I believe, Maryland and possibly Virginia. I'm trying to recall.
I'm not certain that they had a branch network there, but I do recall that they had a substantial branch network in Florida that had been sold prior to the appointment of