IN THE COURT OF FEDERAL CLAIMS

-----------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

-----------------------------------------x

September 3, 1999
10:00 a.m.

200 Park Avenue
New York, New York

DEPOSITION of MICHAEL SIMONE, a witness in the above entitled matter, before a Notary Public of the State of New York

Page 62

existing levels will compound the existing capital shortfall."
Do you see that, sir?
A Yes.
Q This goes back to a question that we were talking about earlier.
I take it that the level of interest rate risk was unsafe in light of the amount of capital that Carteret had at the time, isn't that right?
A They didn't have capital to absorb losses as a result of interest rate risk movement, so that makes it doubly bad, yes.
Q I take it from this that the interest rate risk that Carteret had assumed at this time was that essentially they had positioned themselves such that they would take a loss if interest rate risk went up, is that what you understand this to indicate?
A I would say so, yes.
Q So doesn't it follow that if interest rates were to go down, then Carteret would be in a position to profit from that environment?
A It doesn't really say, and without

Page 63

somebody actually indicating that, I wouldn't want to say that based on that statement.
Q No, I understand that this statement doesn't speak to that at all?
A It's possible that there is a window period if rates were to drop 100 basis points an institution could be very profitable, but I don't know beyond that if it continued to drop it could continue to incur losses again.
So it doesn't necessarily mean that it will go one way or the other.
Depending on how an institution's assets may be hedged, it would make a difference.
Q But to some extent the institution would be able to profit to some level, they didn't have interest rate risk, you couldn't have interest rate risk going both ways?
A You could, depending on your hedges and the types of assets and liabilities.
Q You lose if it goes up or you lose if it goes down?
A Yes, but that's not what is said here.
Q And you don't recall Carteret?
A I do not.

Page 64

Q Having this double exposure?
A No, I do not.
Q Were you of the view if interest rates remained low that Carteret was well positioned to take advantage of that?
And that the concern was more that they were in a difficult position if rates went up?
A That's my recollection.
Q Do you recall that interest rates in 1991 to 1992 were falling and remained at low levels from '92 on through 93?
A Yes.
Q Now, I would like to turn to the asset quality discussion that's on Page 5 of this document.
It's on the bottom of the page, and it says, "Carteret's asset quality has improved since the June 17, 1991 examination due to an intensive effort by management to liquidate nonperforming assets and to work out deteriorating problem assets by negotiating mutually agreeable discounted payoffs or restructurings."
Do you see that?

Page 65

A Yes.
Q Did you agree with that statement?
A That's my recollection.
MR. THOMPSON: At this point I would like to have the court reporter mark as Simone examine Exhibit 10 a document that bears the Bates number WOP 3330449.
(The above described document was marked Simone Exhibit 10 for identification, as of this date.)
Q Sir, will you please identify the document for the record?
A It's an interoffice memorandum prepared by Donald Hom to Jim Winning, I am copied on it and it deals with Carteret.
Q Do you remember who Mr. Winning was?
A He worked in the Washington office and I believe it was in the financial analysis and oversight area.
I don't recall what the specific name of his area was, but that's what he was involved in.
Q Do you recall why he would have been given updates on Carteret's financial condition?
A My recollection is that he was

Page 114

A It was an issue as to whether or not a deal could be structured during a set period of time, but a set period of time is all that they were given.
Q Do you recall whose decision it was to give them that set period of time?
A My recollection was Mr. Ryan's decision.
MR. THOMPSON: I think we are actually at a convenient stopping point for lunch, and if you don't have an objection, we would like to go off the record.
(At this point in the proceedings there was a luncheon recess, after which the deposition continued as follows.)
Q We are back on the record, sir.
I would like to pick up again back to the S Memo.
Prior to the lunch break we were discussing the Carlisle group's Letter of Intent to acquire or to make a capital contribution into Carteret.
I would like to direct your attention to the third paragraph on Page 2 of this document.

Page 115

The second paragraph -- the second sentence of that paragraph reads, "On November 11, 1992 OTS received verbal notification that the Carlisle Group was withdrawing its conditional Letter of Intent, because following due diligence it had concluded that it could not receive an adequate rate of return on its investment and had concerns about regulatory risk."
Do you recall who received the verbal notification from the Carlisle Group that it was withdrawing its Letter of Intent?
A No.
Q Do you know who the most likely candidate would have been to receive that sort of notification?
A It could have been Angelo, it could have been Bob, it could have been me, one of the three of us.
Q Now, in terms of the reasons that were given here, they appear to be two-fold, number one, an inadequate rate of return, and number two, regulatory risk.
Do you recall what was intended by the phrase which is in quotes in the memo,

Page 116

regulatory risk?
A I do not recall specifically.
Q Do you have any general recollection as to the types of concerns that the Carlisle Group may have had?
A It may have had something to do with the amount that they would invest and the fact that the institution may not have been fully capitalized, and what restrictions they would have to operate under and so forth.
That sort of sticks out in my mind.
Q And that makes sense.
I take it that there was a prospect that there might be some restrictions placed on the institution even after it got the capital infusion, and that's what raised the concern?
A If it were not fully capitalized, yes.
Q Do you recall what type of -- what form those restrictions might have taken?
A Well, I think it would be similar to restrictions placed on any institution that failed to meet its full capital requirement.
Probably limited the amount of growth, or payments, compensation.

Page 117

Q Dividends?
A Definitely dividends, yes, I would say, absolutely.
Q And there would also be close scrutiny as to the lines of business that an enterprise might go into, is that correct?
A Possibly, yes, possibly.
Q Now, so that was one reason that was given.
The second reason that was given was that they didn't believe they would receive an adequate rate of return.
Do you recall what the Carlisle Group -- whether they ever indicated to you or your colleagues what they believed an adequate rate of return to be?
A I don't recall.
Q Now in assessing a rate of return and its adequacy, is it true that an investor would look at number one, the amount of income that it would receive, and number two, the risk that they would actually receive it, is that a fair statement?
A I would say so.
Q In this instance, one of the reasons