IN THE COURT OF FEDERAL CLAIMS

---------------------------------------x

AMBASE CORPORATION

v.

THE UNITED STATES OF AMERICA

---------------------------------------x

October 26, 1999

9:10 a.m.

200 Park Avenue

New York, New York

DEPOSITION of ANGELO A. VIGNA, a witness in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

Page 74

capital profile the amount of the supervisory goodwill, and that FIRREA is going to, when it becomes effective --

MR. LEVITT: Objection. Footnote 2 includes other things.

MR. COOPER: Yes, yes, it does. It does, but it does include goodwill, and I'm going to try to get specific on that.

Q Is that accurate?

A Would you rephrase that question?

Q Let me start over.

A Could you start it anew?

Q Let me start over.

Does this schedule on Page 47 of the examination report attempt to summarize the impact that FIRREA, and in particular its exclusion of supervisory goodwill from tangible capital, is going to have on Carteret's regulatory capital profile?

A Yes, I believe it does.

Q Just to walk through the example here, the scenario that is denominated 6/30/89, the schedule reflects that Carteret had equity capital at that date of $264 million, and it then deducts from that equity capital intangibles of

Page 75

$214 million, actually effectively $215 million.

Now, there is a footnote 2 as Mr. Levitt has pointed out which identifies what intangibles are composed of, and as I read that footnote it calculates the goodwill component of the intangibles to be $187 million.

Is that your reading?

A Yes.

Q Once the intangibles of $214 million, $215 million are deducted from Carteret's equity capital, it has tangible capital according to this schedule of just under $50 million.

Is that an accurate reading?

MR. LEVITT: Objection. It also includes the additions to the GVAs that the inspector insisted Carteret book which Carteret's internal loan review function did not book.

MR. COOPER: And which entry are you referring to, Mr. Levitt?

MR. LEVITT: The 88.

MR. COOPER: Yes, it does require that 88,000 be --

MR. LEVITT: 88 million.

MR. COOPER: That's 88,000.

Page 76

MR. LEVITT: It is?

MR. COOPER: Yes, it is. This is in thousands.

MR. LEVITT: Excuse me.

Q So it does also include a deduction of $88,000, as Mr. Levitt has pointed out, but once the deduction for intangibles and the GVA difference is completed, according to this schedule Carteret's tangible capital is going to be just under $50 million, is that accurate?

A I believe it is.

Q Okay. And the schedule states that as a result of the deduction of these items from Carteret's equity capital, Carteret's only going to have .70 of total assets, and that compares to a regulatory tangible capital requirement of 1.50 of tangible assets, is that correct?

A Yes.

Q Something less than half of Carteret's tangible capital requirement.

A Yes.

MR. LEVITT: Could you just read that back.

(The portion of the record requested was read back by the reporter.)

Page 77

MR. LEVITT: Objection, it doesn't seem to me that line is clear or equal 1.09 of tangible assets, which is also below, unless you can explain that.

MR. COOPER: I think it is unclear, but let me tell you how I read that, David. I think those numbers, the .70 of total assets refers to Carteret's tangible capital at 6/30/89, and I think the 1.09 percent of total assets refers to Carteret's capital at 8/31/89.

MR. LEVITT: Okay.

MR. COOPER: Which is a larger number. I haven't gotten to that column yet.

MR. LEVITT: Okay.

Q So staying on the column for the numbers as of 6/30/89, Mr. Vigna, do you agree that this schedule reflects that as a result of FIRREA, Carteret's tangible capital of $50 million will comprise only .70 of the total assets and therefore be something less than one half of Carteret's 1.50 percent regulatory requirement?

A Yes.

Q If you add back the goodwill that is

Page 94

goodwill, correct?
A Yes.
Q The next item is tangible capital, and in the column headed "Including Goodwill," it has the figure $78,786,000 of tangible capital.
Do you see that?
A Yes.
Q Do you see what the figure is for tangible capital when you exclude goodwill?
A Yes.
Q What is that?
A A negative $71,739,000.
Q So there is a swing there of roughly $150 million. Is that accurate?
A Yes.
Q The next item is the tangible capital requirement. In the column for "Including Goodwill," the requirement is $81,795,000, or 1.5 percent of Carteret's assets.
Is that accurate?
A Yes.
Q There is a similar though slightly lesser requirement in the column marked "Excluding Goodwill," correct?
A Yes.

Page 95

Q The next column provides the surplus or deficit of tangible capital for both columns, and the column for "Including Goodwill" says there is a positive $3 million tangible capital, but that's, by my reckoning, that's actually inaccurate.
Would you agree that's inaccurate, that that should be a negative $3 million, and in fact the percentage does reflect a negative $3 million?
A Yes, that's right.
Q Because the tangible capital requirement is $81.7 and the tangible capital is $78.7, so that should be a negative, should it not?
A It should. Yes, it should.
Q So if you included goodwill, Carteret's capital snapshot as of June 30, 1991, it would have been slightly out of compliance, is accurate?
A Yes.
Q If you exclude goodwill, however, it's very substantially out of compliance, is it not?
A That's right.

Page 96

Q And how much is that figure?
A Under the tangible requirement, $151,462,000.
Q In the next series of items that deal with core capital, and rather than just walk through the math on each one, when you include goodwill to Carteret's core capital it has a deficiency of '81.7 million. Is that accurate?
A Yes.
Q And if you exclude goodwill it has a deficiency of just under $150 million, is that right?
A That's right.
Q For risk-based, including goodwill, Carteret had a deficiency of $99 million, is that correct?
A That's correct.
Q And when you exclude goodwill, Carteret's deficiency grows to $202 million, is that correct?
A That's correct.
Q As a regulator and professional in this area, is it accurate to conclude that Carteret's capital profile is dramatically different depending upon whether you include or exclude goodwill?

Page 97

A Yes.
Q Mr. Vigna, do you recall Mr. Bianco and his colleagues making efforts to attract investment and capital to Carteret?
A Yes.
Q What do you recall about that effort? Is it accurate to say that you were personally and substantially involved in cooperating as Carteret's principal regulator with that effort?
A Yes.
Q What do you recall about Mr. Bianco's efforts on that score?
A My recollection is that they were very extensive and they made a very strong and good effort, strong effort to attract capital, talking to some of the more well positioned investors in the country.
Q Returning to the S-Memorandum, on the last page, the second to last page, I apologize, Page 19, at the very end of that page in the concluding paragraph, it's in fact titled "Conclusion," it reads, "The statutory grounds exist for the appointment of a Receiver for

that there is some reasonable prospective for them to do so and you're not going to dissipate what's there already, then I think you have some flexibility.

Even the fact that by transferring them you're going to lose value, if you don't think they're going to raise the capital to get back into viability, that's not an issue, you have to make the transfer.

Q Is that so -- well, let me ask you this. Is it fair to say that in light of these points that you're making in this memorandum that it simply didn't make sense to transfer the thrift under these circumstances to RTC?

A I think what we're saying here is the institution's operations have been stabilized, we've got a strong management team in here, the assets are adequately, are conservatively valued, and there is in our view some reasonable chance, some reasonable prospect that they can raise capital to restore viability, and that was the issue.

Even if the operations were stabilized and there was no chance to raise capital, well then, you know, you could -- the



grounds existed for transfer. You were supposed to transfer the institution.

Q When you say the grounds existed, you mean the legal grounds?

A Yes, I mean -- if they couldn't raise the capital, you couldn't keep them in this posture forever because, you know, there's no way they can recapitalize through internal operations. They had to raise outside capital.

Q Despite the fact that they were profitable?

A Yes. Now, the other side of that is that as long as they're profitable there's a prospect, there's a possibility, a strong possibility they can raise capital at some period of time.

The question is how much time and over what period can they do it.

Q Can you recall what Mr. Ryan's reaction was to this memo?

A I don't know specifically. I think it was supported by John Downey and Ryan agreed.

Q And an extension was in any event granted along the lines that you had recommended?

A Yes.



MR. COOPER: It might make sense to take a few minutes' break. We've been at it for an hour and twenty minutes, I guess, or more since we came back from lunch.

Do you want to take about ten minutes?

MR. LEVITT: Sounds good.

MR. COOPER: Okay.

(Whereupon, at this point in the proceedings there was a recess, after which the deposition continued as follows:)

MR. COOPER: I'd like to ask you to mark this document as Exhibit number 11, please.

It is a three page document, the first page of which is Bates stamped WOP 3340862.

(The above-described document was marked Vigna Exhibit 11 for identification, as of this date.)

Q Mr. Vigna, this is a short document. I'm going to walk through a good deal of it, so if you'll just go ahead and read it I'd appreciate it.

Mr. Vigna, could you identify this



document, please?

A This is a letter from Robert C. Albanese, the Regional Deputy Director, to Mr. Nicholas Ketcha, Regional Director for the FDIC, concerning the Carteret Savings Bank and its efforts to recapitalize.

Q It's dated July 7, 1992?

A It is.

MR. LEVITT: Just one second. Off the record.

(Discussion off the record.)

Q Do you recall this letter?

A No.

Q Mr. Albanese was your deputy, right?

A Yes.

Q And earlier you indicated the two of you worked very closely together in connection with the resolution of Carteret, is that right?

A Yes.

Q Is it likely that a letter of this kind responding to the Regional Director of FDIC would have been cleared through you, so to speak?

A I would have reviewed it before it went out.

Q So it presumably reflects your

federal assistance has continued to be made since the February 27, 1992 agreement was signed by OTS and Carteret."

Mr. Vigna, was it your conclusion in July of 1992 that the management of Carteret was continuing to make progress in terms of the improvement of the financial condition of Carteret, and in terms of its potential to attract outside investment capital?

A Yes.

Q Is that essentially what stabilizing this institution refers to in that paragraph?

A Yes, I believe so.

Q The next paragraph refers specifically to recapitalization efforts by Carteret's management, and it talks about some meetings, a series of meetings with major investors.

Do you recall if you participated in many of those meetings, or was that primarily Mr. Albanese?

A No, I think I participated in most if not all of these meetings.

Q The next paragraph around the fourth line down makes the point that, "Steady financial



improvement has been demonstrated by the new management team as evidenced by a comparison of the six month operating periods ended November 30, 1991 and May 31, 1992.

"Net income for the six months ended May 1992 was $5.4 million, compared to $1.8 million for November 1991.

"More important, core earnings before provision for loan losses, gains/losses on sales of assets and taxes improved by $11.5 million during the December to May period."

And it goes on in the last sentence of that paragraph, "Net income in the $2 1/2 to $3 million range is forecast for the month of July."

Is it consistent, is it your memory that during the period of approximately six months from the time that you wrote the memo that we discussed earlier today, talking about Carteret's turnaround and profitability until the time that this letter was written by Mr. Albanese, that Carteret continued to make significant progress in terms of its return to profitability?



A Yes.

Q And these figures are consistent with your recollection on that score?

A Yes.

Q So your expectations with respect to Carteret at least for this six month period were borne out then, is that correct?

A The operational and financial performance, yes.

Q In the next paragraph the point is made that, "Carteret also continues to improve its troubled commercial asset portfolio. Though our current examination is not concluded, a report from examiner Tom O'Rourke disclosed $217.5 million in commercial loan payoffs and repossessed commercial asset sales from June 30, 1991 to May 31, 1992.

"The total net book value of this high risk troubled portfolio declined during the same period from $926.4 million to $574.4 million, and valuation reserves represented 28 percent of gross commercial assets at May 31, 1992."

Would you rate that progress in



terms of working out troubled assets and the decline of troubled assets from $926 million to $574 million during that period as being impressive progress?

A I'd say that was, you know, strong effort and good results.

Q The concluding paragraph states, "In conclusion, we believe that the termination of the agreement and the underwriting process while progress is being made to recapitalized a troubled institution with assets of over $5 billion would not be effective supervision or good policy, particularly when we have an executed agreement authorizing the termination of the agreement prior to August 28, 1992."

What does that last phrase mean, referring to the executed agreement authorizing termination of the agreement?

A Basically what it means is that --

THE WITNESS: Read the question back for me if you would, please.

(The question requested was read back by the reporter.)

A My recollection is that it means that if we decided at some point before the time period we were giving them that progress wasn't being made or that recapitalization was impossible, we'd terminate the extension of time and move forward to take whatever appropriate action was necessary, including transfer to the RTC.

Q So if Carteret's condition turned south, so to speak, OTS could seize the bank at that moment.

A Yes.

Q So is it an accurate summary to say that Mr. Albanese made many of the same points in July to Mr. Ketcha that you had made earlier in your memorandum of January 1991?

A Yes.

Q And Carteret's condition had improved significantly over that period of time, had it not?

A Yes.

MR. LEVITT: January of 1991 or 1992?

MR. COOPER: Thank you, Mr. Levitt.

Q January of 1992.



MR. LEVITT: And that's Exhibit 10, you're talking about.

MR. COOPER: Right. The one before this one.

MR. LEVITT: Could you just read me the last question and answer.

(The portion of the record requested was read back by the reporter.)

Q Mr. Vigna, do you recall if Mr. Ketcha was persuaded by these points?

A I don't know if he was persuaded, but I think he agreed to grant the time extension.

Q Essentially acquiesced in the matter?

A Acquiesced to the posture we were taking.

MR. COOPER: I'd like for the reporter to please mark as Exhibit number 12 a document that is two pages long, and is Bates stamped on its first page WOQ 6791063.

(The above-described document was marked Vigna Exhibit 12 for identification, as of this date.)

Q Have you had a chance to look at



this, Mr. Vigna?

A Yes.

Q Would you please identify this document for the record.

A It's a file memorandum written by Bob Albanese regarding a conference call with Jon Fiechter, Deputy Director for Operations, that was held on November 16, 1992.

Q This internal memorandum is dated November 17, 1992, is that correct?

A Yes.

Q In the last paragraph of the memo it mentions your name to the effect that, "A meeting is to be held today between Angelo Vigna and Jonathan Fiechter to discuss an extension of time beyond November 20th."

Let me ask you this, do you recall this memo?

A I don't have any specific recollection of it, no.

Q Do you recall the issues that it addresses?

A I don't have any specific recollection, no.

Q So the conference call that is



referenced here between Mr. Albanese and Mr. Fiechter concerning the scheduled transfer date, you don't recall that?

A No. I mean, I recall that there was, as we got closer to the actual transfer date there was, I guess some anxiety on all sides, and, you know, people were setting dates and not coordinating, and I must have been in Washington at the time for some reason or another and set up a meeting with Jonathan Fiechter to discuss this particular timing.

Q The second paragraph refers to, "Concerns about the transfer date for Carteret being moved up to this Friday, November 20th, while due diligence which might lead to an unassisted acquisition by First Gibraltar was only a couple of weeks from completion."

Do you remember why Mr. Albanese and I assume you and the rest of the northeast region became concerned that this date had been moved up?

A I don't recall the specific reasons, other than the fact that, as I read the memo, there was still a potential capital investor or acquirer that was engaged in due diligence, and

Page 146

there was no reason to transfer until after this potential acquirer had concluded their due diligence and given us an indication of whether they were interested in a transaction or not.
Q Did you agree at the time with the sentiment expressed in the third paragraph, to the effect that, "We pointed out that in our view the institution's financial condition continued to improve and that supervisory risk of loss, while it remained open, was very low"?
A Yes.
Q The paragraph continues, "We argued that the possible benefit of leaving Carteret open while recapitalization discussions were continuing, namely a possible unassisted resolution of this $5 billion troubled institution, would far outweigh any perceived benefit of an early transfer date.
"Frankly we did not view the transfer date, whether it was November 20th, December 4th or January 4th, to be a critical factor in our analysis of the situation."

Page 147

Did you agree with that assessment?
A Yes.
Q It refers to the perceived benefit of an early transfer date. What was the perceived benefit of an early transfer date, can you recall?
A I don't know what that means here.
Q Is it fair to say that your assessment of the appropriate policy, according to this paragraph we just examined and the previous exhibits as well, was that so long as conditions continued to improve for Carteret and the thrift industry and the risk of loss to the Treasury diminished, why close this institution?
Is that a fair assessment of the position you're outlining?
A My recollection is my position was that we ought to allow as much time as necessary to make sure that every avenue for raising capital has been looked at, and that we ought not to be subject to any restrictive time frames.
Now, having said that, I think we all realized that we couldn't keep this the way it was forever, even though it was showing some small profits, because that would have been inconsistent with FIRREA.

Page 148

Certainly there was a lot of people feeling, whether it was self-imposed or not, heat from what had happened in the past, and, you know, people -- there were also mandates from Washington, from the Congress, from the administration, you know, to transfer thrifts that were no longer viable, that didn't have capital, to RTC.
Q What mandates are you referring to?
A Well, FIRREA, the legislation.
Q Did FIRREA mandate that a thrift that was profitable, that was working out its bad assets in an exemplary fashion, and whose progress was reducing the risk to the taxpayer should be seized notwithstanding those facts?
MR. LEVITT: Objection. He already answered the legal standard related to the reasonable probability of attracting other capital. You can answer.
A Whether you believed that that should be the policy or not, the facts were that the legislation imposed on the regulators a requirement to transfer to RTC any thrift that was by statute in an unsafe and unsound position to operate, and Carteret fit that position.

Page 149

I mean, you can argue either way, but that was the interpretation of the law, and I think that, you know, from my standpoint I was aware of that posture, and that if we couldn't find capital at some reasonable point in time, the transfer was going to happen.
I just, you know, my view is probably that we should have taken more time.
Q This thrift was seized I guess a little over two weeks after this memo was written.
Is it correct that it was your view that Carteret should have been given more time to raise capital?
A Yes.
Q Do you recall anyone in the northeast region who disagreed with that view?
MR. LEVITT: Objection as to relevance.
A In OTS?
Q In OTS.
A No.
Q Do you know who was in favor of closing Carteret at that time?
A Well, obviously the Director felt that it was appropriate, some of his other senior

Page 150

staff.
Q Do you know if Mr. Downey felt that Carteret should be closed at that time or be given more time?
A I think that my recollections of my conversations with John Downey around this point in time was that he was sympathetic to my view, but that the view of the Director and possibly some others at senior levels was that we had exhausted the time to allow the management of Carteret to find capital, and that they were never going to find capital, and that the only alternative we had was to transfer it to RTC.
Q What has happened in the thrift industry since the beginning of 1993?
A The ability to raise capital increased substantially. Institutions with low capital were able, particularly mutuals were able to raise capital in public markets.
Investors and investor groups were willing to put money into thrifts now. The economic environment changed. The financial environment changed.
Q Quite dramatically, did it not?
A I'd say quite dramatically over a

Page 151

three, four year period, because I think part of it was the consequence of the fact that the really hopelessly insolvent and very costly insolvencies have been cleared away and the economy was changing, rates were favorable, there was -- we came out of a recessionary time and the economy just got stronger and capital became more abundant and thrifts became in some circles the real darlings of investors.
Q The real estate market rebounded?
A The real estate market rebounded, yes.
Q Did that have a beneficial effect on the valuation of assets of thrifts?
A Sure. I think some investors felt that now there were bargains out there, that, you know, the real estate was going to come back, and rather than take losses now, big profits were potentially in these portfolios.
Q In your opinion, if Carteret had been given more time, do you believe it would have succeeded in its efforts to recapitalize and thus to survive?
MR. LEVITT: Objection as to relevance. You can answer.

Page 152

A My personal belief is that, yes, at some point in time they would have raised enough capital to restore viability in the institution.
Q If Carteret had survived and had continued to be managed by Mr. Bianco and his colleagues, do you believe that it would have benefited from the economic environment that has occurred in the thrift industry and more generally, as you've previously described, from 1993 on?
A Well, it's hard to crystal ball what someone is -- what's going to happen in the future. They had done a wonderful job in a very, very severe workout situation.
You know, I don't know what they would have done if they had raised capital and managed to operate in a very favorable economic environment.
You know, these people had been successful in all their business careers. I would suspect they would have been successful going forward, but that's crystal balling.
Q But you also are in a position of considerable knowledge and experience with respect to thrift management, and I'm just asking for your

Page 153

basic judgment based upon what you knew about Carteret and about its management and the conditions that prevailed in the industry.
MR. LEVITT: Again I object on relevance. You can answer.
A Again, these were people who had -- were outstanding businessmen, had done a great job here in a very short period of time, and, you know, if I was a betting man I'd say that they were going to be successful.
The economic times, if you look out there, I can point to institutions that recapitalized after Carteret was transferred and some of them are still around and are very successful, others were sold, you know, in a public sale to other institutions at great rewards to investors.
So, you know, if you want me to give you my personal judgment --
Q Yes, sir.
A I think they would have been very successful, very successful.
Q Do you recall that earlier we talked about and went through a comparison from I think the S-Memo of Carteret's capital profile with the

though, were not 10 to 15 percent, were they? Did you ever get core deposits that commanded that 10 percent premium?
A Yes.
Q Where was that?
A All over the country, in given periods of time.
Q The 10 to 15 percent on all of the assets or all of the liabilities of the thrift, wouldn't that, doesn't that presuppose that selling the assets out of government conservatorship you'd get 10 to 15 percent less than you would get selling them out of a going concern, and it would be intertwined, as you said, both the branch network, the deposits, and the assets, is that --
A Yes, I think we're talking about, you know, the RTC process, because of the -- I mean RTC, they didn't just close the doors the day they were transferred to RTC.
Somebody from RTC would come in and manage the institution and it would stay alive for a period of time until they could set up a sale of the deposits.
Q Did they continue lending? When you



say they stayed alive --
A I think they probably just continued funding commitments. Other times they'd just shut the whole thing down. Sometimes they would do some nominal lending.
Q During the period that the Bank Board and the FSLIC, do you recall Stewart Root?
A I certainly do.
Q What was his position with the FSLIC?
A He was the Director of the FSLIC.
Q Do you recall that he was of the opinion at the time he was Director of the FSLIC that assets sold out of a government conservatorship or receivership commanded about 10 percent less than if they were sold in the private sector?
A I don't recall him saying that, but I believe that's probably the way he felt.
Q Do you know if the FDIC analyzed their caseload that way?
A I don't know.
Q If you would take a look at the $500 to $750 million number, which is basically the effect of the government takeover on this



franchise, let's assume that there's $50 million worth of capital in this institution, and we'll call it thinly capitalized. There's a little capital, maybe it doesn't meet its capital requirements by $50 million.
You close it down, and we're talking about at a minimum, at least under this analysis, everything else being the same, a hole of $450 million, aren't we?
I mean, you go from a positive $50 million to negative $450 million.
A That's assuming that, you know, this is accurate, and this is an average. Maybe in this case there would be, you know, considerably less loss of franchise value. Maybe more. I don't know. I think this was, you know --
Q Typically --
A Typically it's 10 to 15 percent.
Q So if it was typically 10 percent, we would go to about $450 million in the hole.
A That's right.
Q This has got to be based on the experience of the FSLIC and the Bank Board in closing institutions, doesn't it?
A I don't know if that's the case



or --
Q Based on your experience with the OTS?
A I don't recall where that came from, whether it was something that was generated out of RTC. I don't know, I don't recall.
Q But at the time you wrote this, this was your best estimate of what the typical case would look like?
A Apparently so.
Q Well, by December of 1992, I mean, let's assume that Carteret needed about $200 million in capital.
If it behaved like a typical case, wouldn't it cost the taxpayers $300 million less just to write them a check for $200 million?
A Who was going to write the check?
Q RTC, FSLIC?
A But that's not -- there was no FSLIC at the time. And RTC's role was to act as Conservator, Receiver of these institutions.
Q Well, just assuming for a moment that there was money available from some source, $200 million, wouldn't it have been cheaper just to give them the money?

Page 190

A Absolutely, sure. Sure.
Q So typically it would have been $300 to $550 million cheaper?
A Under the old standards that's possibly what could have been done, yes.
FIRREA changed it all.
Q Okay. So pre-FIRREA -- I mean, this just doesn't make any sense. If you looked at the situation and said $200 million or the estate suffers a $500 million loss, that wouldn't have worked at FSLIC?
MR. LEVITT: Objection. That assumes it would have been viable and profitable with the investment. There was no guarantee of that.
MR. IGO: Well, I think his testimony on that front stands.
MR. LEVITT: My objection also stands.
Q Let me ask you about a different institution. Was OTS the primary regulator for Crossland Savings Bank?
MR. LEVITT: Objection as to relevance.
A Yes.

Page 191

Q And was that an FDIC insured savings bank?
A Yes, it was.
Q Do you recall what sort of resolution Crossland went through?
A Yes, they were, I recall that they received open bank assistance from the FDIC, until they could raise some outside capital, then the company was sold, and I forget who the acquirer was, but they were sold.
There was some cost to FDIC, but it was considerably less than what would have happened had they taken the normal posture of closing the bank and putting it into conservatorship and finding a buyer, or liquidating it.
Q Do you know what role did OTS play in the Crossland Savings Bank resolution?
A Well, as the primary federal regulator, those were our recommendations, but the FDIC as the insurer played a strong part in the final resolution.
Q Do you know to what extent Chairman Ryan was involved in the resolution? Was it the same as your last answer?

Page 192

A Yes, the FDIC took the lead in that, they were the primary federal regulator, but we had to concur on the actions they took and there was a lot of -- I was involved in a lot of discussion with the New York Regional Director for the FDIC and for the Washington people on the eventual resolution of that case.
Q Do you know if there was a lot of criticism of the bank hospital plan or the Crossland deal, do you recall?
A There was, yes, there was. There was some Congressional inquiries and, you know, GAO actually did a study of it.
Q Do you remember about what time period this criticism was?
A It was probably not too much after this, '92, '93, '94.
MR. IGO: Why don't we actually just mark this FDIC Vigna 2.
(The above-described document was marked FDIC Vigna Exhibit 2 for identification, as of this date.)
MR. IGO: For the record, this is a March 12, 1992 Washington Post story which has been printed off Lexis or Nexis or

Page 193

something.
Up in the right-hand corner you'll see it starts Page 5, 6, it goes through 9. It's a story by Jerry Knight and it's entitled "FDIC's 'Hospital' Plan, a Bitter Pill for Some."
Q If you want to take a quick look at that, I've just got a few questions about what went on.
Have you had a chance to take a look at that?
A Yes. Not the whole thing, but, you know.
Q I'm more interested in the front part.
A Okay.
Q If you want to, if you need to look at the rest of it.
If you take a look at the first page of this, it says, "Under FDIC's old policy," this is the second paragraph there, "Crossland would have been shut down, its employees fired and what would have been left would have been sold to another bank.
"Instead, Taylor," and I assume

that's then Chairman of the FDIC, Taylor?
A No -- I'm sorry, yes, yes.
Q "Taylor decided to pump in $1.2 Billion of agency money and keep Crossland open."
Does that refresh your recollection as to what happened?
A Yes.
Q Just above that at the end of that first paragraph it says that, "Chairman William Taylor decided to use the opportunity to demonstrate that the FDIC had found a better and cheaper way to clean up failed banks."
Do you recall him thinking this was a better way to clean up a failed bank?
A In some cases it is, yes.
Q I'm more interested down in the, about the fifth paragraph, it says, "Taylor, however, may not get the chance to see if the new policy will work. An unexpected backlash of criticism of the Crossland deal is fueling opposition to the approach, leading even some of its proponents, including Office of Thrift Supervision


Director Timothy Ryan, who was pushing a similar strategy to rescue several good California savings and loans, to acknowledge the policy may be in trouble."
Do you recall Chairman Ryan being a being proponent of this resolution methodology?
A No.
Q And wanting to use it out in California?
A No.
Q Did you ever have any discussions with him about the backlash to this Crossland resolution?
A No.
Q So you wouldn't know whether it affected his judgment about what could or couldn't be done --
A No.
Q (Continuing) -- with SAIF insured thrifts?
A No.
Q If you take a look at the second paragraph on the top of the page, the second page, I'm sorry, Page 6, it says, that paragraph mentions that, "The Chairman of the House and


Senate Banking Committees who have ordered the General Accounting Office to investigate what committee aides contend are unrealistically optimistic estimates of the advantages of the Crossland action."
Do you remember the GAO investigating?
A Yes.
THE WITNESS: I've got about four or five more minutes left. I'll be glad to come back tomorrow if you need more time.
MR. IGO: I only have about four or five more minutes.
This is the last exhibit, FDIC 3.
(The above-described document was marked FDIC Vigna Exhibit 3 for identification, as of this date.)
MR. IGO: For the record, this FDIC Vigna 3 is the GAO report, and it's GAO/GGD 94-109.
Q I had asked you before about whether the FDIC based any assumptions on whether they could recover more out of the private sector rather than out of the government conservatorship or receivership.


If you'd look at the bottom of Page 4 of the report, the page number is down at the bottom of the document, it says, "FDIC is taking steps to improve its resolution process."
A I'm sorry, where are you?
Q The last section on Page 4.
A Okay.
Q It says, "We have concluded that certain assumptions were not supported with empirical evidence, such as the assumption that FDIC wouldn't recover 10 percent more on $4.4 billion in troubled assets if Crossland were privately managed in a conservatorship."
Does that refresh your recollection that the FDIC thought if it was privately managed rather than government managed that the assets would throw off 10 percent more?
A No.
Q It doesn't ring a bell? Okay.
Do you recall whether in early 1993 that the market for publicly traded thrift stock improved?
A I'm sorry?
Q Do you recall whether the market for

the stock of publicly traded thrifts improved in 1993?
A Yes.
Q Did it improve?
A I believe it did, yes.
Q Wouldn't that improvement have redounded to the benefit of Carteret in its efforts to raise capital?
A I believe it would, yes.
MR. IGO: I believe that's all I've got.
MR. LEVITT: Just let me ask you two or three, okay?
THE WITNESS: Okay.

EXAMINATION BY MR. LEVITT:

Q I just want to clarify one or two things.
If you'll look at the S-Memorandum which is Exhibit 9, Page 3 of Exhibit 9, and if you look at the column "Including Goodwill," this shows, does it not, that there's a deficit of $3 million, even including goodwill as of this date, which is June 30, 1991?



A Yes.
Q In tangible capital?
A Yes.
Q There's a deficit even including goodwill of $81.7 million in core capital?
A Yes.
Q And that there's a deficit even including goodwill of $99.4 million in risk-based capital?
A Yes.
Q Now, counsel for AmBase asked you some hypothetical questions about what you think would have occurred in December of 1992 had the injunction that required OTS to view goodwill as part of regulatory capital been in place, and I believe your response was, and he dwelled on the tangible capital element of regulatory capital, and I believe your response was you thought that the decision to impose the receivership might not have been taken.
Is that a fair recollection of your testimony?
A Yes.
Q But this memo we're looking at now, which is AmBase Vigna 9, which occurred at a time



that you were required to include goodwill in regulatory capital, and the result of that still showed a deficit in all three capital measures, at this point in time you did recommend a receivership, did you not?
The purpose of this memo is to recommend a receivership.
A Yes.
Q Why then would it have been any different in December of 1992 if goodwill would have been included then?
A It probably wouldn't have.
Q Now let me show you, let me refresh your recollection on some things that occurred that counsel for AmBase didn't go over with you and that's reflected in FDIC Vigna 1.
I just want to have you turn to Page 9. Just look at the first full paragraph.
The second sentence says, "Despite the intensive efforts of management, Carteret has been unable to secure outside investors to cure the association's capital deficiencies.
The withdrawal of both Kolberg & Company and the Carlisle Group of their



letters of intent to infuse $200 million is clear evidence that Carteret's problems are too severe for the association to attract outside capital on an unassisted basis."
Do you recall that Kolberg & Company did a due diligence of Carteret because it executed the letter of intent to make a capital contribution?
A Yes.
Q What was the result of the due diligence? What was Kolberg's position following the due diligence? Was it that they would make the investment or not?
A No, I think they decided not to make the investment.
Q Do you recall there was a due diligence by the Carlisle Group?
A Yes.
Q What was the result of their due diligence?
A The same result. They decided not to pursue a transaction.
Q Did that indicate to you that whatever management of Carteret felt about its institution, and the ability of the institution to