IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x
PLAINTIFFS IN ALL WINSTAR-RELATED
CASES AT THE COURT,
Plaintiffs, No. 90-8C et al.
(Chief Judge
v. Loren A. Smith)
THE UNITED STATES,
Defendant.
---------------------------------x

February 3, 1999
9:30 a.m.
599 Lexington Avenue
New York, New York 10022

CONFIDENTIAL DEPOSITION of ANGELO VIGNA, testifying on behalf of the Defendant in the above-entitled matter, taken pursuant to Notice of Common Deposition, before Suzanne F. Moore, R.P.R., C.R.R., a Notary Public of the State of New York.



A P P E A R A N C E S :

JONES, DAY, REAVIS & POGUE, ESQS.
Attorneys for Plaintiffs Coordinating Committee, Anchor Savings Bank and Dime Savings Bank of New York
Metropolitan Square
1450 G Street, N.W.
Washington, D.C. 20005-2088

BY: GEORGE T. MANNING, ESQ.
- A N D -
BY: C. THOMAS LONG, ESQ.

MILBANK, TWEED, HADLEY & McCLOY LLP
Attorneys for Plaintiff Long Island Savings Bank
1 Chase Manhattan Plaza
New York, New York 10005-1413

BY: RUSSELL E. BROOKS, ESQ.
- and -
BY: TONI LICHSTEIN, ESQ.



A P P E A R A N C E S (Continued):

ARNOLD & PORTER, ESQS.
Attorneys for Plaintiff Old Stone Corporation
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202

THE WITNESS: Could you read that back to me, please.

(The following question was read back by the reporter:

"Q. Do you know whether it was in excess of 90 percent of the cost of liquidation?")

A. No, I don't recall if it was or not.

Q. Do you know whether the cost of



resolution following Brent Beesley's arrival as the head of FSLIC in 1981 went down for a period of time as opposed to the cost of liquidation?

A. I don't recall if it did or not.

Q. And in 1981, what was the condition of the FSLIC fund?

A. In '81, my recollection is that the fund was inadequate to deal with all the insolvent and potentially insolvent thrifts that were insured by the FSLIC.

MR. MANNING: I ask the reporter to mark as Vigna Common Exhibit number 4 a document bearing the date August 13, 1981 and number 81-463, bearing Bates numbers AB 00041673 through 677.

(The above-described document was marked Vigna Common Exhibit 4 for identification, as of this date.)

Q. I ask you to look at what's been marked as Vigna Common Exhibit 4 and ask you whether, first whether you've ever seen this document before?

A. I don't recall.

Q. Looking at Vigna Common Exhibit 4, you



may read it in any way you want, does this refresh your recollection as to whether there was a change in the way in which the Federal Home Loan Bank Board treated goodwill as a component of net worth?

MR. LEVITT: This is --

MR. MANNING: Excuse me, let this witness read the exhibit without coaching.

A. Are these the best copies you can get?

Q. Yes. Wait until you see some of the stuff the government produced.

A. Yes.

Q. How does this document refresh your recollection?

A. Only to the extent that there was changes, and that we adopted, at least in terms from an accounting standpoint, GAAP rather than regulatory accounting.

Q. The application of GAAP in 1981 permitted amortization of goodwill up to forty years, correct?

A. Yes.

Q. Was the number of years that goodwill would be amortized a component of the negotiations

in supervisory transactions?
A. Yes, in some cases, yes.
Q. What difference did the length of time of amortization make on the pro forma of the combined institution?
A. Well, the longer -- the goodwill amortization is an expense item, and the increasing of discount is an income item, so if you treat the discount faster than the goodwill amortization, you show profits on those transactions a lot faster.
Not immediately, but you do show, you accrete the discount in faster than you write off the expense.
Q. One of the purposes of having the earlier accretion was to generate profits, correct?
A. Well, it was, you know, in terms of reporting, balance sheet presentation, you know, it did show the impact of this large goodwill was essentially negated.
Q. Let me see if I understand your answer.
The impact of the goodwill was negated because it was to be amortized over a long period of time?
A. Yes, you're taking in these discounts a



lot faster, so at least until these discounts were taken in, you generally show a net earnings, you know, it's positive. At some points the discounts will eliminated, then you have the rest of the goodwill.
Q. If the institution that resulted from the supervisory merger were applying purchase accounting and resulting goodwill, if that's a mutual institution, what effect does the increased earnings have on the institution?
A. Simply internal. They don't have any shareholders, no stockholders, so there's no -- they're not concerned about return on equity.
Q. It increases the capital, doesn't it, of the institution through the profits?
A. It would, yes. But you also, you know, in taking in the -- writing off the goodwill, an expense, that comes back into earnings, to capital, anyway.
MS. LICHSTEIN: Can you two just try and keep your voices up.
MR. MANNING: Sure.
Q. Did you view goodwill as an important component in resolving supervisory cases?
A. Yes.



Q. Why?
A. It was used specifically in lieu of financial assistance.
Q. Prior to the amendment which is reflected in Vigna Common Exhibit number 4, was more financial assistance required to resolve thrifts?
A. To the best of my recollection my answer

would be yes.
Q. Is that the result of the requirement that the resulting thrift be a viable entity in the future?
THE WITNESS: Could you read that question back.
(The following question was read back by the reporter:
"Q. Is that the result of the requirement that the resulting thrift be a viable entity in the future?")
MR. LEVITT: Do you want her to read the prior one back, too?
A. I don't understand the question.
Q. Okay. Prior to the use of goodwill as a component of regulatory capital, when a troubled thrift was acquired, there would be greater liabilities on fair market value than assets on

60

fair market value, correct?
THE WITNESS: Would you read that back again.
(The following question was read back by the reporter:
"Q. Okay. Prior to the use of goodwill as a component of regulatory capital, when a troubled thrift was acquired, there would be greater liabilities on fair market value than assets on fair market value, correct?")
A. Generally, you know, in the case of a troubled thrift, there's more liabilities than assets, and throughout the late '70s, early '80s, it was in most cases fairly severe.
There was always a negative fair market position in terms of fair market value of the assets and liabilities.
Q. When you merged an acquiring thrift with a troubled thrift, prior to the use of goodwill, how would the Federal Savings and Loan Insurance Corporation fill the gap between the fair value of assets and the fair value of liabilities?
A. Is your question prior to '81?
Q. Yes.

61

A. In most cases with cash assistance.
Q. Following the use of goodwill, was there less cash assistance required?
A. Yes.
Q. Why?
A. Because the negative net worth was treated as goodwill and allowed to be amortized over a long period of time.
Rather than provide that negative net worth in cash, the Bank Board would permit the acquiring institution to use goodwill accounting as well as not penalize capital because of the, of this large intangible asset now going on that balance sheet.
Q. Mr. Vigna, we can take a break any time you want, you tell me.

A. No, I'm fine.
Q. I hand you what's been marked previously as Pratt Exhibit 28.
This is a document which has at the top number R 31b. Do you recall ever having seen this before?
A. Oh, yes.
Q. What is this?
A. This was the internal memorandum dealing



with the treatment of goodwill.
Q. At the top it is from L. David Taylor. Who is he or who was he, if you remember?
A. David Taylor was, I don't recall his specific title, but he was the senior supervisory person at the Washington office.
Q. This memo is addressed to "OES Professional Staff."
A. Yes.
Q. Is that Office of Examinations and Supervision?
A. Very good, yes.
Q. Would these memoranda come to you as a Supervisory Agent?
A. Yes, they would.
Q. Did you review them when they came in?
A. Yes.
Q. Do you recall what effect if any the receipt of what's been marked as Pratt Exhibit 28 had on your ability to resolve failing or troubled thrifts?
A. I'd like to read this before I respond.
Q. Of course.
MR. MANNING: Would you read back the question, please.



(The following question was read back by the reporter:
"Q. Do you recall what effect if any the receipt of what's been marked as Pratt Exhibit 28 had on your ability to resolve failing or troubled thrifts?")
A. No. I don't recall specifically whether this changed our --
Q. Did there come a time -- I'm sorry, were you finished?
A. Yes.
Q. Did there come a time when a pecking order was established in terms of which was the preferred method of resolution, intrastate, interstate, for resolving thrifts that were troubled?
A. No, I don't recall any pecking order.
Q. Was there a policy at the Federal Home Loan Bank Board at any time that the first choice would be unassisted merger with an intrastate thrift?
THE WITNESS: Could you read that back to me again, please.
(The following question was read back by the reporter:

were more delegations to the regional banks during the Pratt administration. I don't have a specific recollection of that, though.
Q. In the instances where authority was delegated to the districts, did the Federal Home Loan Bank Board have to approve each transaction?
THE WITNESS: Could you read that question back, please.
(The following question was read back by the reporter:
"Q. In the instances where authority was delegated to the districts, did the Federal Home Loan Bank Board have to approve each transaction?")
A. I'm not sure of the question. It's a contradiction in terms. If it's delegated it doesn't have to be approved in Washington, so.
Q. So the answer to my question is no?

74

A. No, I'm saying your question is conflicting. I mean, if it's delegated, then it was, you know, delegated to the region, to the districts to resolve without Washington Board approval.
My recollection is there was some situations like that, but there were others where even if, whatever the decision was in the region, I mean the district, had to be approved by the full Bank Board.
Q. In instances where the transaction could not be approved by delegation at the district level, what involvement did the local district have in recommending or reviewing a proposed supervisory merger?
A. Well, it was our responsibility to review it in terms of whether the resulting institution was going to be adequately capitalized, had adequate managerial and financial resources and was not a threat to the safety or soundness.
Q. In supervisory mergers that were proposed, was a viability study ever done?
A. My recollection is it was, yes.
Q. What do you understand a viability study to be?

75

A. It was a technical analysis, a financial analysis to project the operations out over a period of time, assuming the merger of the two institutions or how many institutions were involved, and then a projection of their capital levels and earnings and profitability over a given period of time.
Q. Was that done at the district level?
A. My recollection is that most times it was done in Washington.
Q. What part of Washington, the Federal Home Loan Bank Board, did the viability studies, if you remember?
A. I forget what they call themselves, but there was a group down there, the early computerites, they had the machines and did all

the computerized analysis.
Q. Did you ever have occasion to have contact with Bernard McKee?
A. Yes.
Q. Who was he?
A. Bernard McKee, Bernie, I thought, my recollection worked with, I don't recall whether he actually worked in the OES, the Office of Examinations and Supervision, or FSLIC. I think

76

it was OES.
Q. In what instances would you have dealings with Mr. McKee?
A. Again, my memory is, I can't recall whether he was worked for FSLIC or the Examinations and Supervision.
If it was Examinations and Supervision, then we'd talk about specific cases and resolution prospects. If it was with FSLIC, then we'd actually work on resolution cases.
Q. I'll show you some papers later that will maybe help your recollection on this.
I'll hand you what's been marked as Pratt Exhibit 16. It's a document dated December 29, 1981 entitled "SP 24."
Have you ever seen what's been marked as Pratt Exhibit number 16 before?
A. I don't have any specific recollection of this document.
Q. Do you know what an SP memorandum is?
A. Yes.
Q. What is that?
A. Supervisory practice, I forget exactly. It was a series of memos dealing with regulatory and supervisory issues.

77

Q. Do you recall ever having seen SP 24 before, what's been marked as Pratt Exhibit 16?
A. I'm sure I have, but at this point in time I don't have any specific recollections.
Q. When you would receive supervisory memos like Pratt Exhibit 16, would you review them?
A. Yes.
Q. Is there someone in the staff in the Second District in the New York office of the Federal Home Loan Bank Board who would be responsible for dealing with accounting issues specifically, or who was responsible for that?
A. I don't recall that on the regulatory side that we had any specific accounting technical expertise or persons.
Q. Would you look to Washington for that expertise?
A. Yes, yes, we would.
Q. By look to Washington, I mean the Federal Home Loan Bank Board in Washington.
A. Yes.
Q. And would you look to the accounting staff of the Federal Home Loan Bank Board?
A. Yes.
Q. Was the accounting staff different than

Q. The next item down, D, is acquisitions by banks and bank holding companies. Do you see that, sir?
A. Yes.
Q. Did there come a time when the Federal Home Loan Bank Board approved the acquisition of supervisory institutions by banks and bank holding companies?
A. My recollection is yes, that at some point in time that did begin to occur.
Q. The next item is a Phoenix plan. What's a Phoenix plan?
A. Oh, I thought you'd never ask.
The Phoenix plan was very unique, and the first one was done in New York.
It involved merging two or more, and in the case of the first one, it involved about a six way merger between --

88

Q. Was that Rochester?
A. First Federal Rochester, and there were four or five other institutions located in New York City.
The objective was to put them all together, reduce the overhead, provide some marginal assistance, with the expectations that they could work with goodwill as a substitute for cash, to eventually reverse the negative spreads, and at some point in time later on, recapitalize.
The expectation held was that this longer term solution would be less costly than an immediate liquidation.
My recollection was that at the time of the first Phoenix, if we resolved them all at that point through the liquidation process, it probably would have been well over a billion dollars, a billion and a quarter, a billion and a half.
That institution, the final resolution cost was somewhere in the neighborhood of $300 million to $400 million. It eventually was recapitalized, it was bought by a Canadian bank and sold about a year and a half ago to the Marine bank. So that was the Phoenix.
Then we did it a couple more times. We

89

did it in Puerto Rico, we did it out in Long Island, put a couple of institutions that were insolvent together.
The other feature of it was we felt, at least in some cases, one of the institutions had a very strong management which we did have in First Federal Rochester.
Q. Did you participate in the Rochester Phoenix?
A. I did.
Q. What was your level of participation?
A. I was part of the regulatory team that brainstormed it and developed it and put the whole concept together.
Q. Would that transaction have been possible without the use of goodwill as regulatory capital?

A. No.
Q. Why not, sir?
A. Because no one, you wouldn't -- you couldn't do the transaction without writing off the cost over an extended period of time.
The loss was, as I said, it was well over a billion dollars, and the insurance corporation with every other, with all the other potential resolutions out there, couldn't afford to spend

90

that kind of money without going bust and having to go to Congress to ask for more funds which would come from the Treasury and ultimately the taxpayers.
Q. F is clean balance sheet acquisitions. Do you recall what those were, sir?
A. I don't recall exactly what that was.
Q. And G is liquidation and payout of insurance. What is that?
A. That was exactly what it says. Close the institution, pay off the depositors and liquidate the assets. That was always the highest cost solution.
Q. In your time with the Federal Home Loan Bank Board prior to FIRREA, was there ever a liquidation of a thrift in your district?
THE WITNESS: Could you, please?
(The following question was read back by the reporter:
"Q. In your time with the Federal Home Loan Bank Board prior to FIRREA, was there ever a liquidation of a thrift in your district?")
A. I don't have any recollection that there was.

91

Q. In connection with the First Rochester Phoenix, do you recall the length of the amortization period of the goodwill?
A. I believe it was forty years, but I'm not sure.
Q. If that amortization period had been shortened to let's say ten years, would that have affected the viability of that Phoenix transaction?
A. No. I mean, the FSLIC did put a little bit of capital in there, too. I mean, the idea was to wring out as much reduction in overhead and generate, hopefully regenerate better returns as these old fixed rate mortgages came off the books.
Certainly it would have been harder in terms of the financial presentation of the institution, but that wasn't the issue.
The issue was how can we stretch this out, use goodwill accounting, grant forebearances in terms of capital compliance, while at the same time maintaining a very, very hands-on regulatory approach with good management.
The objective was to, if this thing was going to have to be paid for, paid for later on at a lesser cost, because of all the positive things

that were done in the interim period.
Q. But the Phoenix transaction did require a substantial amount of monitoring by your group.
A. Yes.
Q. If you could look on Page 2 of this exhibit, number II, it talks about procedures to be followed by Supervisory Agents in resolving problem cases, and it lists a series of steps, steps 1 through 7.
If you could glance over those three pages, I'll ask you whether you recall these particular steps being used at least in the period following February of 1982?
A. Do you want me to read this whole thing?
Q. My question was the procedures.
A. Okay.
THE WITNESS: Could you read back the question, please.
(The following question was read back by the reporter:
"If you could glance over those three pages, I'll ask you whether you recall these particular steps being used at least in the period following February of 1982?")



A. Yes.
Q. Do you recall in and around February of 1982 what procedures were used to refer to FSLIC a supervisory case? How did you refer a case to FSLIC?
A. My recollection was the general rule was the case went to FSLIC if there was no way, if you couldn't find a resolution without financial assistance.
Q. Would a case go to FSLIC to be bid out-of-state?
A. No, unless, again, assistance was required.
Q. How could you determine whether assistance would be required without bidding it out-of-state?
A. I don't think you can. I mean, you'd have to look at the -- you'd have to shop it out-of-state and determine if there were any out-of-state bidders who felt there was value to them that precluded the need for assistance.
Q. Would the district Supervisory Agents prepare the bid packages for interstate solicitations?
A. My recollection is that we did, yes.



Q. Did you have any participation in that exercise with the Federal Home Loan Bank Board in Washington?
A. Yes.
Q. Did FSLIC keep a list of potential bidders, acquirers that were willing to do interstate mergers?

Q. Was this procedure, this delegation, a method of expediting resolution of thrifts that didn't require a substantial amount of assistance?
A. Yes.
MR. MANNING: I ask the reporter to mark as Vigna number 13 a document bearing the number D3-006221 through 37. It purports to be a speech by Mr. Beesley before the Savings and Loan League in Denver, Colorado on October 11, 1982.
(The above-described document was marked Vigna Common Exhibit 13 for identification, as of this date.)
Q. Do you recall that in the fall of 1982 Mr. Beesley made a series of speeches in Colorado, the west coast, San Francisco, Chicago, about the merger program?

116

A. I don't have any specific recollection of it.
Q. Did Mr. Beesley come and speak to the savings and loan industry and the regulators in New York in 1982?
A. He could have. I don't have any specific recollection of that, though.
Q. Okay. If I could direct your attention to the bottom of the second page of this exhibit which bears the Bates number 6222, do you see that, sir?
A. Yes.
Q. In the last paragraph, it says, "FSLIC is required every failure at a cost no greater than the cost of liquidation, i.e., the cost of paying the insured depositors in cash, closing the association and selling its assets.
"Historically, FSLIC assisted mergers cost about 70 percent of this cost of liquidation.
"We are pleased to have cut this to an average of less than 15 percent over the last seventeen months, or one-fifth of the historical level."
Do you see that, sir?
A. Yes.

117

Q. Do you know how FSLIC was able to reduce the cost of resolution when compared to the cost of liquidation from 70 percent to less than 15 percent?
A. Well, part of it was due to the use of goodwill, number one. Number two, incidents like issuing capital certificates, yield maintenance agreements instead of taking the assets and replacing them with cash, you know, we would let the institution manage the assets and provide some yield maintenance on them so that the cash outlay was nominal, those kinds of methods to reduce the initial cash outlay.
Q. Did yield maintenance basically provide the acquiring institution with some protection for additional losses on assets that it acquired?

A. Well, yes. I mean, what it did was provide a yield on these assets to the extent that they, you know, they yielded more they kept more.
To the extent they yielded less, they were at least provided a floor.
Q. It was a form of indemnification, right, with respect to those losses?
A. No, it provided a certain amount of yield on acquired assets.

118

Q. Prior to the 1982 period, in resolving supervisory cases, did FSLIC provide for indemnification of the acquiring institution with respect to the assets of the supervisory thrift?
A. I'm not sure what you mean by indemnification of the assets.
Q. Indemnification against losses.
A. Loss coverage?
Q. Yes, sir.
A. I don't recall. Prior to '82?
Q. Yes.
A. There might have been, but I don't think there was. There wasn't an asset quality problem until after '82, '83, '85.
Before that it was a yield problem, spread problem. So there wasn't a question of requiring loss protection on assets.
Q. If I heard you correctly, you said there was a difference in the type of problems the thrift industry faced in '79 to '82 than they did in the mid-'80s, is that correct?
A. That's correct.
Q. You referred to asset quality problems. What are you referring to?
A. Deterioration in the quality of assets

119

from a value standpoint and from the ability of borrowers to pay, construction loans that couldn't be completed or sold out, commercial real estate properties where for various reasons the tenants in these properties weren't able to make their businesses and weren't able to make payments to keep the loans current.
We had, you know, a terrible, terrible deterioration in the real estate markets in the late '80s and early '90s.
Q. Those are more complex problems than the interest rate disintermediation problems, correct?
A. I would think so, yes.
Q. They would certainly require more management attention, correct?
A. Considerably more, yes.
Q. And more supervisory attention as well?
A. I'm sorry?
Q. More supervisory attention as well?
A. Yes.
Q. When you became the Acting Director of FSLIC, were most of the problems asset based problems?
A. Yes, I would say so.
Q. Did that affect the cost of resolution?

shouldn't say confusing. It depended upon, you know, what stage the other transactions were at, whether -- the size, you know.

It could get a little compounding in terms of, you know, the work, trying to now add other institutions to the viability runs and views.

It could be, could add some more difficulty to the original transaction, but



sometimes it was doable and saved FSLIC some money.

Q. Are there times when you knew that a particular acquirer was very interested in a particular target, a supervisory acquisition?

A. Yes.

Q. And you asked them to take on other failing thrifts in the process?

A. Yes. Yes, I remember some of those transactions, yes.

Q. How did that work, how did you do that?

A. Well, if we knew that a particular institution had a strong interest in another, a failing institution or a particular area or a particular state, we would help them achieve their objectives if they would help us by taking some other insolvent problem or difficult to dispose of institutions, maybe in the same state, maybe in other states.

It was a quid pro quo, you know.

Q. Did you do that both for interstate transactions as well as intrastate transactions?

A. Yes.

Q. In this period that we're talking about now, '82, '83, who did you perceive to be strong



intrastate acquirers in New York and New Jersey?

A. Are we talking about institutions that would acquire?

Q. Yes.

A. In New York and New Jersey?

Q. Yes, that were potential acquirers.

A. From out-of-state?

Q. No, if you had a problem intrastate and you had to look intrastate, who did you perceive to be the stronger acquirers who fit all the qualifications of the Bank Board's requirements, the acquirers intrastate?

A. Intrastate?

Q. Intrastate, within the state.

A. Within the state. During what period?

Q. '82 and '83.

A. Primarily the larger institutions. You want me to name institutions?

Q. Yes, sir.

MR. LEVITT: Can you remember institutions from '82, '83?

THE WITNESS: Sure.

A. Astoria Federal, Long Island Savings Bank, City Federal, Carteret, they were the bigger institutions and, you know, they were, by the

capital standards of the time, they were well capitalized.
Q. Was Anchor amongst that group?
A. Anchor Savings Bank, yes.
Q. When you were asked by other districts whether there were New York or New Jersey potential acquirers in your region, were those among the people you named or institutions that you named?
A. My recollection is they were.
Q. Did there come a time when there was a bidders' list created in either Washington or the regions so any thrift anywhere in the country that was a problem thrift would be run past those potential acquirers?
A. Yes.
Q. When did that occur, if you remember?
A. My best recollection is probably in the early '80s, '81, '2, '3.
Q. Did you have instances where a thrift within your district would be looking at potential acquisitions in three or four other states at the same time?
THE WITNESS: Could you read that question back.



(The following question was read back by the reporter:
"Q. Did you have instances where a thrift within your district would be looking at potential acquisitions in three or four other states at the same time?")
A. Yes.
Q. How did you, from a supervisory perspective, deal with these multiple approaches and multiple bids?
A. It was essentially a coordination effort between the district office and the Washington office of FSLIC.
We certainly coordinated our efforts so that we weren't working at cross purposes.
Q. Did you also coordinate with the district where the failing thrift was located?
A. Sure.
Q. You would have, for example, conversations with Sam Connell in the Georgia area?
A. Yes.
Q. Whatever that district was.
A. Atlanta.



Q. Or Lou Roy in Dallas?
A. Yes.
Q. Would you do an analysis in the home district of the acquirer with respect to the viability of a potential transaction?
A. We would certainly look at it, but we'd have -- it was generally done in Washington,

Q. What other large institutions that were acquirers converted from mutual to stock during your time?
A. Carteret Savings, City Federal, Astoria Federal, Empire of America, Dime Savings Bank. I am sure I missed somebody, I probably missed quite a few.
Q. In each instance of conversion did you approve the capital position of the thrift?
A. Yes.
Q. At any time prior to the passage of FIRREA, did you advise associations that had been acquirers in supervisory mergers that the amortization period permitted under GAAP would possibly be shortened?
A. I don't recall if I did or not.
Q. Do you recall at the time when FIRREA was being discussed in Congress being asked to comment on the effect of the revised capital provisions in FIRREA?
A. My recollection is we were asked to evaluate or analyze the impact of eliminating or netting the goodwill against the capital, where would that put institutions that had goodwill on their books in terms of their capital compliance.



Q. What was the conclusion of that analysis by you and other regulators?
A. The result was that we would have a number of institutions that formerly were considered in capital compliance out of capital compliance, and in some cases we'd have them with negative capital positions.
Q. Were there any institutions which had been asked by the Bank Board to acquire supervisory acquisitions in the 1980s which as a result of FIRREA went into negative capital positions?
A. I believe there was, yes.
Q. Were any of those institutions prior to FIRREA in a position of having substantial excess capital?
A. I don't know what you mean by substantial excess capital.
Q. I mean --
A. Do you want to define that?
Q. There was a minimum capital compliance.
A. Yes.
Q. And $200 million or $300 million or 400 million over that?
A. I don't recall. It could be, I just



don't recall whether anyone was that far over in absolute dollars.
Q. Was there any discussion in your analysis of the effect of revised capital requirements with respect to a phase-in of the capital requirements in terms of eliminating goodwill as a component of net worth?

A. I recall that there was discussion of a phase-in, taking that position with Congress, or trying to get the Congress to, rather than eliminate it entirely, to do some kind of a phase-out.
Q. Was there any discussion of the fairness to those institutions which had been asked to do supervisory acquisitions in the '80s from eliminating goodwill as a component of regulatory capital?
A. Yes.
Q. What was that discussion?
A. Well, the discussion was that this was, to now impose a capital requirement that required netting out of goodwill was unfair, it was inconsistent with the understandings and agreements that had been made in the past with these institutions.

179

Q. Do you remember the last month in which you were an acting head of FSLIC?
A. Do I remember the last month? Sure.
Q. Was it in '86?
A. Yes.
Q. Once you ceased being the acting head of FSLIC, who took your place?
A. Sam Connell.
Q. Did you then return to the Second District and resume your duties as Supervisory Agent?
A. I did.
Q. That was at a time Mr. Dittenhafer was the President of the Federal Home Loan Bank of New York?
A. Yes.
Q. And the Principal Supervisory Agent?
A. Yes.
MR. MANNING: I ask the reporter to mark as Vigna Exhibit 26 a one page document bearing the Statesman number 136475.
(The above-described document was marked Vigna Common Exhibit 26 for identification, as of

180

this date.)
Q. Is that your initials beside "A. Vigna"?
A. Yes.
Q. Who was Shannon Fairbanks?
A. Shannon Fairbanks was Ed Gray's chief of staff.
Q. This was at a time when you were no longer at FSLIC, but were back in New York, correct?
A. Correct.
Q. What role did you have, if any, in dealing with FSLIC and the Bank Board after having been acting head of FSLIC?
Did that increase your responsibilities at all?
A. I'm not sure I understand the question.

These appear to be notes of that meeting. You appear from time to time.
Does this refresh your recollection as to whether you participated in a regulatory capital meeting in the spring of 1988?
A. I guess I did participate.
Q. If you could turn to the page marked 446, which is three pages into Exhibit 33, about a third of way down there's, "Vigna - problem with culling goodwill out on practical basis, grandfather?"
Do you see that, sir?
A. Yes.
Q. Do you recall having discussions about pulling goodwill out and whether there should be a grandfathering of those institutions that had goodwill on their books?
A. I recall that was an issue, that was a method of dealing with eliminating goodwill without impacting those that already had it, through supervisory acquisitions particularly.
Q. Look down about another five or six lines, Vigna, again, "How treat baggage from past, treat institutions fairly?" Do you see that?
A. That's me.



Q. Is that consistent with what you had told us before about the fairness of taking away goodwill from those institutions who had engaged in supervisory acquisitions?
A. Yes.
Q. If I could fast forward you, please, Mr. Vigna, do you recall migrating into a group called the Risk Based Capital Working Group with Mr. Fishman involved?
A. Yes, Robert.
MR. MANNING: I ask the reporter to mark as Vigna Common Exhibit 34 for identification a document bearing Glenfed numbers 55123 through 131.
(The above-described document was marked Vigna Common Exhibit 34 for identification, as of this date.)
Q. Do you see that, sir?
A. Yes.
Q. Who is Mr. Fishman?
A. Robert Fishman was one of the senior people in the Office of Policy, I believe.
Q. This document is dated May 8, 1989, with a line at the top saying "5/10/1989." Do you see that, sir?



A. Yes.
Q. On the first page there's an issue, "What is the appropriate treatment of goodwill?" Do you recall that being discussed by the members of the Risk-Based Capital Working Group?
A. Not specifically.

Q. If you could turn to the page numbered 55127, which is further on in the document, it says, "Major issue - Treatment of Goodwill. Summary of concerns raised by commenters."
The bullets say, "Unfair to deals done in the early 1980s. Will increase cost of future FSLIC assistance. Will discourage consolidation in industry."
A. Right.
Q. Were those issues which you had identified in connection with eliminating goodwill as a component of regulatory capital?
A. I believe those were points that I had thought about and expressed.
Q. Did you believe that it would be unfair to those who had acquired goodwill in supervisory transactions to have goodwill eliminated in computing capital?



A. Yes.
Q. Did there come a time when the Congress passed FIRREA?
A. Yes.
Q. After the passage of FIRREA you became employed by the Office of Thrift Supervision, correct?
A. I did.
Q. You became the District Director, at least in the early stages, correct?
A. Correct.
MR. MANNING: I ask the reporter to mark as Vigna Exhibit number 35 for identification a document bearing the number Statesman 129680 through 681.
(The above-described document was marked Vigna Common Exhibit 35 for identification, as of this date.)
Q. Handing you what's been marked as Vigna Common Exhibit number 35, do you recall having sent out this memo?
A. Yes.
Q. Did you participate in the development of the new minimum capital regulations promulgated by



the Office of Thrift Supervision?
A. Peripherally, yes.
Q. But at this point in time you were sending out notices to the various institutions under your supervision to deal with those regulations, correct?
A. Yes
Q. Mr. Vigna, I'm going to hand you what I'll ask the reporter to mark as Vigna Common Exhibit 36, bearing Statesman's numbers 129694 through 713.
(The above-described document was marked Vigna Common Exhibit 36 for identification, as of this date.)
Q. Do you recall having seen these documents

entered into earlier?
A. Well, I'd like to read this document. I'm not sure.
Q. Please do.
Does this refresh your recollection?
A. It appears that we did have a cashout policy.
Q. Do you recall attempting to cash out any FSLIC agreements in your district?



A. I don't have any specific recollection of individual cases, but based on this memo I assume we did.
MR. MANNING: Mr. Vigna, at this point I have no further questions for you on behalf of the Plaintiffs' Coordinating Committee, and I turn you over to the next person.
EXAMINATION BY MR. PLAISANCE:
Q. Mr. Vigna, unless I state otherwise, I'm going to ask you questions and the period I'm concerned with is post-FIRREA through the time period up through 1993.
You were asked about capital plans and the OTS' involvement in them. Would someone at the OTS prepare a recommendation memo on whether or not a capital plan submitted would be accepted?
A. Yes.
Q. In general, would those recommendation memos have a time frame allocated to achieve compliance with that capital plan?
A. Yes.
Q. Approximately how long would the recommended time period be?
A. I don't recall what it was at the time.



Q. Six months, a year, can you give me a time frame?
A. I think it depended upon the level of capital in the institution. Some were six months, some were probably eighteen months.
Six months I think was kind of short. Probably it was twelve to eighteen months.
Q. In general would an institution be allowed that time frame that it was recommended to achieve the capital compliance?
A. If the capital plan was accepted, yes.
Q. Since the passage of FIRREA, is it the case that financial institutions were closed because of lack of capital compliance?
A. Yes.
Q. Can you think of any other reason that institutions were closed?
A. There may have been an isolated case of liquidity problems, but generally almost exclusively it was inadequate capital, inability to raise capital to capital requirement levels.
Q. So if an institution was in capital compliance with its regulatory capital requirements it wasn't closed?
A. Absent other problems, that's correct.

Q. During the same time period that we're talking about, prior to closing an institution, did the OTS prepare some type of memo?
A. Yes.
Q. What was that memo called?
A. Prior --
Q. Post-FIRREA.
A. Post-FIRREA, I guess we used to call it a Transfer Memo. Actually there were several memos.
Q. S Memo, possibly?
A. S Memo, there was L Memo.
Q. Did you prepare any of those memos?
A. I signed off on an awful lot of S Memos prepared by my staff and reviewed by me before sending them to Washington.
Q. In those memos the reason the institution was being closed would be stated?
A. That's correct.
Q. Post-FIRREA, what were the different types of capital requirements?
A. Oh, we went from -- we went to basically the commercial bank capital requirements.
Q. The three tiers?
A. Yes, tangible, core and risk-based.
Q. Who at the OTS was responsible for



promulgating the regulations adopted by the OTS to implement the capital requirement provisions of FIRREA?
A. That role primarily fell on the Policy office. They would draft the regulations that would go out for comment and eventually be approved by the Director's office.
Q. I'd like to go back to the pre-FIRREA period. What did the term capital credit mean in the context of a regulatory assisted financial institution acquisition?
A. I don't recall the term capital credit.
Q. Going back to the post-FIRREA time period, can you tell me how many thrifts your office supervised in your geographic area?
Approximately will do.
A. Are we talking about the district or the region? There was a period when FIRREA was first passed when we were called districts, then we were reconfigured into five regions.
When I was the Regional Director, I'd say we probably had 325 to 350 institutions.
Q. And for the post-FIRREA years, can you tell me approximately what percentage of those institutions made money?



A. What percentage? I have, I really -- I'd be guessing. I mean --
MR. LEVITT: Don't guess.
A. So I'm not going to guess.
Q. Of those institutions that weren't profitable, generally what were the reasons for the lack of profitability?

We're talking again post-FIRREA.
A. Most of it was due to writeoff on non-performing assets.
Q. Can you tell me what these institutions did to try to regain profitability?
A. A lot of them, you know, to the extent that these assets, once the write-downs were taken, they disposed of the assets and redeployed them into interest earning assets. That helped quite a bit.
Rates started to move down, real estate markets picked up and, you know, the spreads between your bankable assets and your liabilities got a little wider, and a lot of them returned to profitability.
Q. So in the '90s the interest rate decline, coupled with an improving real estate and economic environment, allowed most of these institutions to

214

return to profitability?
A. Yes.
Q. Post-FIRREA, how close to the capital requirements did an institution have to be to avoid being shut down?
A. Well, you know, I don't think you can generalize about that. There are some institutions that had, you know, were just under the capital requirement, but in terms of their financial condition were going south, continuing to experience losses, continuing to have to write down assets and, as compared to some other institution who might have had less capital, but had pretty well identified all their losses and were starting to turn it around.
So I don't think you can be, you can generalize in terms of what level of capital would have to be achieved before you started transferring them. We transferred institutions with 2, 3 percent, and we transferred some with 3 percent negative capital.
Q. So close enough depended upon the institution?
A. I think, you know, close enough, it was not a game of horse shoes, it's are they in

215

capital compliance. If they're not in capital compliance, can they get back in, within a reasonable time, using a realistic capital plan.
If the answer is no, then we had very little alternative other than to transfer them to RTC, which is what we did.
Q. Can you take me through the process of the OTS preparing one of the S Memoranda to shut down an institution?
A. Well, as I recall, we went through, you know, the capital plan process, and determined if it was feasible.
If it wasn't, then we would then notify the RTC that this is an institution that's probably going to get transferred.
We would set up the recommendation using