UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - )
AMBASE CORPORATION and CARTERET )
BANCORP, INC., )
Plaintiffs, )
and ) No. 93-531
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
Plaintiff-Intervenor, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )
- - - - - - - - - - - - - - - - )

Washington, D.C.

Thursday, March 2, 2006

Deposition of JAMES F. VORDTRIEDE, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of COOPER & KIRK PLLC, 555 11th Avenue, Suite 750, Washington, D.C., at 9:38, Thursday, March 2, 2006, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 18

When we reorganized -- and I'm not sure of the date. It might have been Labor Day, which would put this after the reorganization date -- I report to a different person officially now, but I still more or less unofficially report to Wayne Green. Wayne generally gives me marching orders if he wants me to do something.
Q. What is your official title at the FDIC?
A. Officially my title is senior financial management analyst.
Q. And what part of the FDIC are you in?
A. Division of resolutions and receiverships -- called DRR, the acronym. I believe it's in the general accounting section. They change it all the time -- and the tax unit.
Q. Now, it says in your email that the parent company would like to eliminate the large tax liability.
Wouldn't the FDIC like to eliminate that tax liability as well to the extent it was possible?
A. Well, all things equal, it would be, yes, but I mean, it's 1995, and it's 10 years later. I suppose we would not at this point be thinking in terms of amending the return, because the statute date has lapsed.

Page 19

Q. You mean the statute for the Internal Revenue Service to come after the FDIC for violating the Internal Revenue Code?
A. To file an amended return if you could reduce the tax liability.
Q. There's a statute that would preclude the FDIC from amending the 1995 return today?
A. It would be the general statute of limitations for amending a tax return once it's filed.
Q. What's the source of authority for that?
Do you happen to know?
A. It's one of the sections. I'm not sure of the exact code section. It's entitled 26 USC, the Internal Revenue Code.
Q. It's the FDIC's position that it's precluded by law from amending the 1995 return?
A. Except at the discretion of the service, yes.
Q. Okay. And have you approached the service for such -- to ask for such discretion?
A. No.
Q. Okay. Do you have any reason to believe the IRS would you turn you down if you sought leave to amend the 1995 return to make it more accurate?

Page 20

A. If I approached them asking them if we could amend the 1995 return through normal channels like say through the center, yes, they would turn us down.
Q. What happens if then -- you'd have the right to appeal that, wouldn't you?
A. Yeah, but you need a basis to appeal upon.
Q. Right.
And if the statute would not prohibit you from filing the amended return, is there any other reason -- is there any reason not to amend it to make it -- if you concluded amendment would make it more accurate?
A. If the return was open for amendment under the statute of limitations, if you were still within the statute of limitations, it would be available to be amended if you had a reason to do so.
Q. And would the FDIC do so if amending it would conserve assets for the creditors?
A. Yes.
Q. And when you talk about the statute of limitations, is that the statute of limitations for the IRS to come after the FDIC for filing an inaccurate return?
A. Yeah.

Page 21

I believe it's essentially the same statute, although I'd have to look at the code. It's a statute that says the IRS cannot come after the receivership for more taxes for an additional assessment, and the FDIC as receiver also cannot go back and ask for more money through an amendment.
This doesn't include assets under a different statute.
Q. What was your understanding of what the statute of limitations is for the FDIC's ability to amend returns?
A. In general terms?
Q. Specifically vis-a-vis the Carteret 1995 return.
A. What the statute of limitations means?
Q. How long was it?
A. Oh.
The standard statute date is 3 years plus -- 3 years from the due date of the return plus extensions.
Q. Plus extensions that were obtained?
A. Right.
Q. So if for example the -- an extension had been obtained until September 15th, 1996, for the 1995 return, then you could make amendments until

Page 74

interest, was intended to reflect the amount of
interest that accrued in that year.
Correct?
A. Right.
Q. And under the Internal Revenue Code,
Carteret can only deduct interest expense in the 2003
tax return that occurred in 2003.
Right?
A. Right.
Q. Oh.
I'm not sure if I --
A. Yes.
I think I've been calling it the 2004
return. This is the 2003 return.
I'm sorry.
Q. Let me restate the question.
MR. GILBERT: You just misspoke. It's
1993.
BY MR. THOMPSON:
Q. I meant 2003.
Let me try that again.
I apologize.
A. Okay.
Q. So under the Internal Revenue Code,
Carteret can only deduct interest expense accrued in

Page 75

its 2003 tax return interest that accrued in that
year; is that right?
A. Yes.
Q. Okay. And if you were to learn let's say
today that the 2003 accrued interest that was
reported in this tax return were incorrect, then
you'd be under a duty to go back and amend it; is
that correct?
A. That would probably be what we would do,
yes.
Q. Well, you'd be under a duty to do it,
wouldn't you, under the Internal Revenue Code?
A. Well, it depends on what I found out.
If someone came to me and said, wait a
minute, wait a minute, we posted the wrong amount to
the financials, it should have only been 4 million 6
6 8 3 6 7, we would change it.
Q. Because that would be increasing tax
income, and otherwise, you'd be cheating the
government.
If you were to find out actually it should
be 12 million, wouldn't you also be under a duty to
amend because you'd want to conserve assets for the
creditors?
A. Yeah, assuming the statute is open.

Page 76

Q. And I'd like to turn to another document.
Keep this one out if you don't mind.
MR. THOMPSON: I'd like to ask the
reporter to mark as Vordtriede 6 a document that
bears the Bates number AM 0096640, and I won't read
all the Bates numbers. It skips around, but the last
Bates number is 96975.
(Vordtriede Exhibit No. 6
was marked for
identification.)
BY MR. THOMPSON:
Q. Now, these are the statements of
operations that have been produced to us in this
litigation, and if you turn to the back -- and what
I've done is, I've just put in one exhibit, the
year-end statements for both balance sheet and income
statements for '95 through to 2004, which is the most
recent information we have.
But if you look at the third-to-last
page -- it's 96973 --
A. Yes.
Q. -- you'll see -- oh, I'm sorry.
I'm doing it the wrong way.
Let's keep flipping forward to 2003,
December 31st, 2003, which appears on page 96936.

Page 77

A. Okay.
Q. And do you see the line item for estimated
interest on claims?
A. Yes.
Q. Okay. And it's 133,002,377 dollars?
A. Yes.
Q. And then you might want to keep your
finger there, but let's flip to December 31st, 2002,
which appears at 96896.
Do you see where it says, estimated
interest on claims, 124,334,011 dollars?
A. Yes.
Q. I'll represent to you that if you subtract
one from the other, you get 8,668,366 dollars, so
within a dollar of what was subtracted. And I'll
further represent to you, and I'm happy to do the
math with you, if you do it each year, you look at
the end of '95 and the end of '96, whatever that
difference is is what's reflected on the tax return.
Does that reflect the fact that your
division takes the division of finance numbers at
face value and plugs them into the tax return?
A. Yes.
Q. Okay. Is the 2003 tax return consistent
with the requirements of the Internal Revenue Code?

Page 134

we'll try to streamline things so that Wayne does not have to do the data dump, but we definitely need to get the drilldown for this line item, which appears on the 1995 assets and liabilities and liquidation called, noncash adjustment.
BY MR. THOMPSON:
Q. Now, let's switch gears to premiums back on the tax return, and that's 134 million dollars.
Do you know what that represents?
A. I've never seen all the pages of pro forma work papers, which usually generate this amount. But my understanding, it's the premium paid by assuming banks in 3 separate -- I guess you could say 3 separate purchase and assumption transactions.
Q. And I think actually one of them was October 28, '94, so I think this is the 2 in '95, but -- okay.
So these were basically branch sales; is that right?
A. Well, I would say it would be transfer of the deposit base and sales of assets out of the branches, right.
Q. And would the taxpayer be entitled to a deduction of the basis it had in its branches?
A. They would be entitled to an offset for

Page 135

the basis and the assets sold.
Q. And have you found anywhere in this tax return where such a deduction was taken?
A. I believe by virtue of fact that they're reporting the premium as a line item, which agrees to the financials, that would be a figure which took into account book value of the assets that were sold to the different assuming banks.
Q. Well, we'll check the math tonight, but I'm -- let's assume for present purposes that that's the face amount of the premium, the deposit premium, in other words, the acquiror said, you give me all of your deposits and a like amount of cash minus 134 million, et cetera, and I think we'll see that that's what the 134 million, so in that instance, Carteret would be entitled to take a deduction for any assets that transferred in that transaction?
A. With regard to your example?
Q. Yes.
A. Your deposit base transferring over is X plus 134 million dollars?
Q. M-hm.
A. And let's see, we're transferring cash of X amount to go with the deposits?
Q. Right.

Page 136

So we'd also need to transfer the branches, which we did.
A. Well, that is the branch. The deposits are the branch.
Q. Yeah.
A. Piece -- the branches are really just little -- little components of the overall C corporation. They're not entities unto themselves.
Q. Sure.
A. If we put this into the formula for gains and losses under section 1001, we'll say deposits assumed are X plus 134 million.
That's the amount realized.
Okay?
Less the adjusted basis is the cash that's going over. We have a basis in the cash, so that's 100 million. Our gain or loss is 134 million, and that's a net figure.
Q. Okay. Now, are you familiar with the term core deposit intangible?
A. I've heard of it. I'm not --
Q. Okay.
A. -- overly knowledgeable.
Q. That's fine.
Do you know whether there's tax basis in

Page 137

core deposit intangibles?
A. I'm not aware of what the issue is.
Q. Okay. And do you know whether there's -- so you don't know whether a deduction for core deposit intangible was taken on this tax return?
A. No, I don't.
Q. And do you know whether a deduction was taken for supervisory goodwill in connection with this tax return?
A. No, I don't.
Q. But does the FDIC have a position on whether the deduction for supervisory goodwill was appropriate at the time all the branches were sold.
A. I'm sorry?
Q. Does the FDIC have a position on whether it was appropriate to take a tax deduction for the supervisory goodwill carried on the tax books at the time all the branches were sold?
A. I don't ever recall taking a deduction or seeing a return where we took a deduction for supervisory goodwill, so I guess it's something we don't take into account.
Q. But are you sure of that, or are you just drawing an inference from the fact that it hasn't been done?

Page 190

page, you've got columns of the book gain in the left-hand column and then the tax gain in the right-hand column; is that right?
A. Yes.
Q. And for '92, '93, '94, you don't have the information for the book gain or loss; is that right?
A. That would be my assumption. I just couldn't find it in whatever financial statement I was trying to use.
Q. Right. Okay.
Now, in 1995, there's about a million-dollar difference where the book loss is a million dollars bigger than the tax loss, and is that because some of the basis wasn't deducted for tax purposes?
A. I don't know.
Q. Okay. And do you know why there's also a discrepancy in 1996?
A. No, I don't.
Q. Okay. Now, let's turn to the next page.
What does this document show?
A. This was an attempt to summarize the elements that were going to be fed into the section 597 model that we were just looking at for the various years, basically increases and repayments of

Page 191

federal financial assistance.
Q. Now, how has your model been affected by the fact that RTC notes payable are 1.766 billion but according to this chart only 1.7 billion has been repaid?
Does that factor into your calculations at all?
A. I believe the difference would be an element of -- carried over to 1995 of deferred FFA.
Q. That's taken into account in your model?
A. It should be, yes.
Q. Now, turning back to the 1995 tax return -- just turning back to Vordtriede 35 for one second, the last page of the document.
It says -- on 1994, it suggests -- under column, bank subgroup taxable income before FFA, shouldn't that be a negative 66 million dollars under 1994?
A. The last page?
Q. Yeah.
The last page on 1994, I had thought your summary had shown that there should be positive taxable income of 51 million in '93 and negative taxable income of 66 million.
A. We're looking at an old document.

Page 192

Q. Okay. Yeah.
A. Per the return, the Carteret subgroup taxable income before FFA would have been 66 million. They took a net deduction for FFA on the return for 6 million, which brought this amount to zero.
Q. I thought it was the other way around.
I thought that in 1993, there was positive taxable income of 51 million and then they improperly took a deduction of 51 million.
A. This is 1994.
Q. Right.
But then in '94, they made the opposite mistake, where there was a loss of 66 million, but they improperly included 66 million of FFA?
A. This is per the return.
Q. Oh, this is per the return?
A. I haven't --
Q. All right. That's fine.
Now, turning back to the 1995 tax return, this was signed on -- by -- it may be hard to read, but Mr. Feit on December 20th, 1996, and it was signed by -- Mr. Door, did you say?
A. I believe his -- I believe it was David Jones.
Q. Oh, Jones. Sorry.

Page 193

-- Mr. Jones the next day.
Do you know when the '95 return was due?
A. With extensions, the date -- the final due date would have been extended to September 15th of 1996.
Q. And do you know whether it was Watkins Meegan's fault that it was late or whether it was the FDIC's fault that it was late?
MR. GILBERT: Objection to characterization.
You can answer.
A. I suppose the late date -- are we talking about the 12-96 date?
BY MR. THOMPSON:
Q. Yes.
A. I would imagine it was a cumulation of records-gathering problem, but I have no specific knowledge.
Q. Do you know when Watkins Meegan started their work?
A. No, I don't.
MR. THOMPSON: I'd like to ask the reporter to mark the following document as Vordtriede 36. It bears a Bates number 91145.
(Vordtriede Exhibit No. 36

Page 194

was marked for
identification.)
BY MR. THOMPSON:
Q. Now, this document, Mr. Vordtriede, is from the IRS, and the date of the notice is February 17, 1997; is that right?
A. Yes.
Q. Okay. And this is a notice of a penalty; is that right?
A. Yes.
Q. Okay.
A. In part.
Q. Does it indicate when the return was received?
Does the notice date of February 17 indicate that's when the IRS got the return?
A. The date of the notice is February 17th of 1997. That would not necessarily correlate to the date the IRS counted as filed. That date would be derived from the 150 code in the BMF transcript.
Q. Does this document in any way indicate when the IRS -- well, if you look at page 91150, about two-thirds of the way down it says, transactions, and it says, code 150.
Is that what you were referring to?

Page 195

A. Yes.
This is the transcript --
Q. Okay.
A. -- I'm talking about.
Q. All right.
A. For 1995.
Q. For 1995. All right.
And it says, returned, filed, and tax assessed.
A. That's correct.
Q. February 17th, 1997.
And so that's the day that it was filed?
A. That's the date IRS counted it as being filed.
Q. How much discretion does the IRS have?
I mean, if it were mailed, let's say on December 21st, can they say, okay, well, we appreciate that, we got it on the 23rd, but it is the holidays, so we're going to not assess -- not deem it filed for another 2 months?
Do they have discretion to do that?
A. I really don't know.
Q. Okay. Has anyone ever challenged this as not being -- that this is a tardy and unacceptably late filing date?

Page 196

A. I don't believe we have per se for that issue. We're challenging the penalty period, and the interest will follow from whatever tax is due.
So the answer to your question I believe would be no.
Q. And is there any reason why the -- well, strike that.
Is it fair to assume that the FDIC did not promptly mail the return in after it was signed on December 21st, given the fact that the IRS is saying that it wasn't filed until February 17th?
A. I don't know what the exact situation is.
However, I would say the return was probably mailed before the end of 1996 solely because we had a definite mandate to be current as of the end of the year of 1996, and we took it very seriously.
Q. And "current" meant having mailed it?
A. Yes.
That would mean "filed" to us.
Q. In your experience, how long does it typically take the IRS from the date it receives a tax return to the date it deems it filed?
A. I've never really tried to ascertain what the answer to that was, because we really

Page 197

look at transcripts in a limited number of circumstances.
MR. THOMPSON: It's about 5 minutes to 5. We've made terrific progress, Mr. Vordtriede. I really appreciate your answers today.
And what I'd like to do if it's all right is to try to streamline my remaining questions, because we've covered a lot of ground, and I think that will be more efficient. And I'd like to have an opportunity to review all the things in Vordtriede exhibits 20 through 35, make sure that there's not something else in there that we need to cover, but I would think there would be an hour or 2 more of questioning from Ambase in the morning if that's acceptable.
MR. GILBERT: Certainly.
Does the Justice Department expect questions?
MS. HART: We definitely will, so once you conclude, to be a transition.
MR. THOMPSON: Do you have a rough sense as to --
MS. HART: It shouldn't take more than a couple of hours I would say, an hour maybe.

Page 221

A. Yes.
Q. And it was timely filed. Correct?
A. Yes.
Q. And what role did you play in the preparation of this return?
A. For 2004, I would have been the signer and the reviewer.
Q. Okay. And is the amount of FFA that's included in this tax return consistent with the final FFA regs?
A. According to the recomputation of this same model, I believe yesterday, we determined that the current FFA reportable would have been 62,000 dollars, 180 dollars less under the new computation.
Q. So there is a slight difference, then?
A. Yes.
Q. Do you know what the nature of that difference -- you know why there is that difference?
A. My -- I have not compared each year by year on the source of the reason why there was a difference in each year, but my guess is for this year, the difference is the activation and the recomputation of the computation of the beginning net equity on a tax basis in this loop 1 -- my term is

Page 222

loop 1 -- and the remaining equity computation activation in this loop 2 down here.
The new computation, we made an effort to go back to the beginning of Carteret's receivership period -- actually I believe the conservatorship period and worked forward, and this computation, we would not have done that.
Q. And so is that the difference?
A. I believe so.
Q. Okay. And are the assumptions that you used in putting together the 2004 return the same assumptions that you used in putting together the model that we discussed yesterday?
A. Yeah.
I believe the model is the same. It's just we went a little farther with the recomputation.
Q. Okay. And do you plan on using the new model that was Vordtriede 19 in the preparation of the 2005 return?
A. For Carteret?
Q. For Carteret.
A. Now, that we have -- let's see, you're asking me if we planned to continue with the new set of computations in 2005?
Q. Yes.

Page 223

A. Yes.
Q. Okay. And are you going to amend the 2004 return?
A. I'd be happy to if there's a tax effect.
I don't think there's a tax effect. I mean, there's additional -- there's a reduction based on the new computation of FFA to be reported.
Q. Well, and is that the general approach to the FDIC, that if there is a tax effect, they'll amend if they're permitted to?
A. More or less, I mean, depending on how much time you have.
Q. Okay.
A. We want to be current with all our returns to be filed for the filing period. That's why we couldn't do, say, the extra computations that would have gone with this return going back all the way to day 1. That's pretty strenuous computation, and multiply it times all the receiverships. You get into a time factor.
So you have a case here with Carteret where you need special attention, so we did the extra computation and will continue with it.
I don't remember your question.
Q. That's fine.

Page 224

MR. THOMPSON: I'd like to ask the reporter to mark as exhibit 39.
(Vordtriede Exhibit No. 39 was marked for identification.)
BY MR. THOMPSON:
Q. And this was another one of the documents that was faxed yesterday.
This is the blueprint for 2004?
A. Yes, I believe it is.
Q. And are the calculations of FFA that are included in this blueprint consistent with the ones that we saw attached to the 2004 return?
A. Yes.
The work paper section of the blueprint or the template is a work paper section SM 1, slash, 2. And the SM 1 refers to schedule M 1, and 2 is just a second series of work papers. The IRS asked I believe in 2003 if we would begin putting copies of our computations into the returns, so I believe a copy of the FFA computation from this template played -- is in the tax return. And they should be the same.
MR. THOMPSON: All right. I'd like to ask the reporter to mark this as Vordtriede 40.

Page 225

(Vordtriede Exhibit No. 40
was marked for
identification.)
BY MR. THOMPSON:
Q. Now, Mr. Vordtriede, this is a letter from you to Debra Nolan dated March 15th, 1999; is that right?
A. Yes.
Q. Now, this is an unexecuted version.
Do you know whether you sent this letter?
A. I believe I did.
Q. Okay. And it says in the first line: By this letter, the FDIC requests copies of the consolidated federal income tax returns for the subject taxpayer for the years 1986 through and including 1993.
A. Yes.
Q. And did you receive those?
A. I believe we did.
Q. And again, you know at this point, Mr. Vordtriede and Mr. Gilbert, we do request the production of any and all material that hasn't been produced that relates to Carteret's taxes, but specifically the schedules and the tax returns relating to 1992. We do have some questions about

Page 226

1992 and just want to make sure, but before we get into those questions, we need to see the documents. And perhaps when we see the documents, we won't have any questions, but -- so we're going to hold this deposition open until we get those documents.
We're happy to do the followup by phone. I wouldn't expect it would be very lengthy. We'll do it promptly as soon as we get the documents. But that is going to be the process for moving forward.
MR. GILBERT: If we have them, we'll turn them over.
MR. THOMPSON: Okay. Now, there are a few more things.
Let's have marked as exhibit 41 a document that bears the Bates number AM 52170707.
(Vordtriede Exhibit No. 41
was marked for
identification.)
BY MR. THOMPSON:
Q. Okay. Mr. Vordtriede, this is an email from Barbara Stohl to Nancy Applebee, and you and Steve Johnston are copied; is that right?
A. Yes.
Q. And it comes from March 16th, 1998.
Correct?

Page 227

A. Yes.
Q. And who was Ms. Stohl?
A. Barbara was -- she was -- I believe a tax accountant was her title. Maybe it wasn't. But she was in the tax unit functioning as a tax accountant. I believe she would have been also termed a team leader.
This system was set up when I got to Dallas in 1998. And Barbara reported to Nanci Applebee. The tax unit was split into 2 parts. Nancy and I were co-managers, Nancy over the operations section, which did more compliance-type activities, filing returns, and my group was issues group dealing with audits and things like that.
So Barbara is sending correspondence to Nancy as her manager.
Q. Okay. And it says in the fourth full paragraph of the text: I already mentioned in an email and will iterate here that I think it would be a good idea to have a meeting to discuss the return preparation process. In reviewing the returns that Jake prepared for the March 15th deadline and in discussing with other members of the tax staff, it would appear that there is some confusion over some of the details involved in preparation of the

Page 228

returns. Mostly it's the little things, what needs to be stamped when attachments are added, the nuances of the alternative minimum tax, FFA, who signs what, and how do returns get routed, et cetera, close quote.
Do you recall that there was some confusion at the time of this email about how to prepare tax returns?
A. I arrived in Dallas the first week of January 1998, so I'm just getting down to Dallas. I'm looked upon as the technical as the technical source for all these types of things, although some of them have to do with processing, routing sheets and things like that.
So we're probably in the process of switching over from what was being done to what I wanted done, and that's probably the type of confusion. We had the FFA model in its earlier version simplified form, and we hadn't computerized it yet and placed it into the blueprint, so that was coming up.
So here is a preparor and a return reviewer who is probably asking for a meeting to put all the heads together and see if everybody is on the same page.

Page 315

identification as
Exhibit No. Vordtriede-51.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, by way of background, can you remind me, have you been on the offensive team of goodwill or the neutral team or both. What team are you on?
A. I believe one day as part of a conference call, I was casually designated as neutral.
Q. Okay. And have you been neutral ever since?
A. Yes.
Q. Okay. And is there anyone within the tax group who is offensive?
A. I really don't know.
Q. Okay. Do you know if there's anyone in the tax group who is defensive?
A. I don't know.
Q. In terms of neutrality, what does that mean? Does that mean you are trying to get the right result? To figure out what Carteret receivership's appropriate tax liability should be?
A. I believe that would be a good interpretation. Perhaps I'm informational to both sides.

Page 316

Q. Okay. That's what's reflected on the second page of this document, when it says neutral team, neutral tax litigation support, Jim Vordtriede?
A. I didn't know it was formalized.
Q. Okay.
MR. THOMPSON: I would like the court reporter to mark as Vordtriede 52, a document bearing the Bates number AM 0011816 through 818.
(A document was marked for
identification as
Exhibit No. Vordtriede-52.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, this is an e-mail printed out by Elaine Tama, but from Christopher Wood to yourself dated September 3, 1998; and who was Mr. Wood?
A. I don't remember him at all.
Q. Okay.
A. I'm sorry.
Q. Well, it was a long time ago.
By the way, let me ask you, because we did find with Ms. Tama that she had this sort of treasure trove of e-mails, is there a policy at the FDIC about e-mail retention?
A. I don't believe so. If there is a policy,

Page 317

I'm not aware of it.
Q. What is the standard practice in terms of retaining e-mails versus deleting e-mails or printing them out?
A. I tend to keep too many. I'm afraid that the ones I delete will be needed as soon as I delete them. But I tend to keep things longer than not.
MR. THOMPSON: Let the record reflect Mr. Ziegelbauer has just arrived.
BY MR. THOMPSON:
Q. When you say, Mr. Vordtriede, that you print them, keep them, do you print them out or keep them on your hard drive?
A. For me, keeping them would mean not deleting them, which would mean they would remain on the U drive, which is the network drive.
Q. Did you personally search the U drive for e-mails that related in any way to Carteret?
A. Yes.
Q. Okay. Did you search the U drive for issues that would relate to Carteret's tax liability?
A. I believe I searched under Carteret and under FBI number 1309. I believe that's all I searched.
Q. And is it pretty easy to just put in key

Page 318

word searches into the U drive?
A. Assuming I did it right, yes.
Q. All right. That's fine.
A. I did come up with some things and sent them on to counsel.
Q. Yes. No, I appreciate that. We've seen a number of things that were either to you or from you, and I can see -- they don't reference Carteret or 1309. I think that may be where there's the disconnect.
MR. THOMPSON: Mr. Kuiper, we may need to follow up with a letter to make sure we have everything responsive from the U drive. We'll take a look at that. If we think there's some easy key word search that can be done, we'll let you know about that.
BY MR. THOMPSON:
Q. Now, turning to this e-mail, this is a footnote for the Hansen Bank. And about halfway through the footnote -- and take your time, Mr. Vordtriede. Any time you want to read any portion of a document.
I'll let you read the footnote and then I'll have a question.
MR. KUIPER: With all the documents today,

Page 319

if you feel you need to read other pages to put them in context, take whatever time you need.

BY MR. THOMPSON:

Q. My question, Mr. Vordtriede, relates to the sentence in the middle of this paragraph, where it states, "However, as a member of a consolidated group, the failed institution is subject to the intentions of the parent."

Is that an accurate statement of tax law?

MR. KUIPER: Objection, counsel, to the extent you're asking for a legal opinion from this witness, who is not a lawyer.

MR. THOMPSON: He's a CPA. He's been designated as the person who's most knowledgeable at the FDIC about the codes. I know there's sort of an intersection between accountants know a lot about the code and lawyers know a lot about the code. And certainly, you know, I understand, Mr. Kuiper, your objection.

MS. HART: I have to object, too. Just because somebody is a CPA does not mean they have a specialty in tax.

MR. THOMPSON: I understand. In these depositions, we've had the FDIC interposing the objections, not multiple objectors. But let me ask

Page 320

it this way.

BY MR. THOMPSON:

Q. This is an accurate statement that was in this footnote?

A. It's a little vague.

Q. Okay. Well, how is it vague, do you think?

A. I believe I know what the person is trying to say.

Q. What do you think the person is trying to say?

A. Whether -- I believe it is trying to say whether or not the receivership files on a consolidated basis or not is up to whether the parent wants to file on -- wants to fulfill its compliance obligations or not. Not all of them do.

Q. Is that an accurate statement, what you just said?

A. I hope so, yes.

Q. Okay. Would that be true for Carteret and AmBase?

A. Yes.

Q. All right. Now I'd like to go to the Excel spreadsheets that your counsel forwarded to us I guess a couple of days ago.

Page 321

And really, Mr. Vordtriede, I'm going to show you these, have them, Bates number AM 0011816 through 818, marked for the record. To the extent there are any differences from what we were looking at in March, if you can indicate that, that would be great. The first one will be Vordtriede 53.

(A document was marked for identification as Exhibit No. Vordtriede-53.)

BY MR. THOMPSON:

Q. Looking at Vordtriede 53, is the key line in terms of how your model would impact Carteret's tax liability the shaded line about halfway through the page which says, "increase (decrease) to taxable income via recomputed FFA"?

A. (Indicating).

Q. Yes, sir.

A. Yes, that's right.

Q. Those numbers look, anyway, familiar to me from our March deposition of the positive 51 million or so for '93, negative 66 million for '94, no change in '95. '96, negative 6.3 million and on down the line.

Have your bottom line numbers changed since the deposition in March?

Page 322

A. I believe for 2000, we found that the sign needed to change, I changed that one. 3522828 became a positive instead of a negative adjustment. An increase to taxable income instead of a decrease.

Are we just speaking about the top now?

Q. Why don't we start with the top and we can go elsewhere. For that top sort of key bottom line row, is that the only change for March?

A. I believe so, yes.

Q. Now, what other changes are reflected in Vordtriede 53?

A. Other than the captions, which are a little better, but this middle section, I'm still not very comfortable -- happy with what I did there. I think I could simplify it a great deal. The tax numbers for 1993 on the March spreadsheets were wrong.

Q. Let's just take this one at a time. When you say the middle section, you're not -- and that you think you could simplify it, the substance of your model is accurate; is that correct?

A. Yes.

Q. What you're talking about is presentation only?

A. Presentation, yes.

Page 323

Q. Okay.
A. Of the tax liability section.
Q. Good. In terms of the 1993 number, I'm sorry, go ahead. What were you saying?
A. I believe -- I don't have the old spreadsheet here, but I believe I was presenting it as tax per the original return. And it started with 17990967, and then I added a 2093 something to that effect for an 1120X that was filed. I misunderstood what the tax per the return was showing -- what the tax per the return was. The actual tax per the return, I believe was zero. And it was zero per the amendment. But the preparer was making a presentation I believe trying to comply with the regulations, but I believe he misunderstood what the regulations were asking for.
So he was making a memo entry trying to show what the tax would have been without any FFA effect, whereas the IRS was asking for a memo account of what the tax effect of the FFA effect actually was.
So he was actually doing the mirror image of what the IRS was asking for. But the tax in that column would have been zero, and I had in the old spreadsheet, I had numbers in the column which was

Page 324

wrong.
Now, in this case, I'm actually starting with the tax on the recomputed taxable income based on the new computation, the model, the new model computations of FFA. So notwithstanding that, I'm not happy with the captions that I have here right now, the numbers should be right. And again, the operative line would be the increase/decrease in tax liability line at the bottom of the middle section and there's only one tax effect in that line, and that's for 1993.
Q. And just to be clear, when you say one tax effect, under your analysis, the appropriate amount of taxable income that Carteret should have appropriated for 1993 was $51,402,763; is that right?
A. That's what I estimate the tax liability would have been had the section 597 model been used, based on the finalized regulations.
Q. Very good. Okay. Any other changes reflected in Vordtriede 53?
A. I believe so other than in the -- in the numbers, I don't believe so.
MR. THOMPSON: We printed these out -- they came as separate attachments. We kept them that way. That's why there will be multiple ones. We

Page 325

will ask the court reporter to mark the next Excel spreadsheet as Vordtriede 54.
(A document was marked for identification as Exhibit No. Vordtriede-54.)
BY MR. THOMPSON:
Q. Just one last question about Vordtriede 53, just so the record is clear. Under your -- the finalized regulations for FFA, there'd be a tax loss of some 66 million dollars in '94 which would have been available to carry back to '93, and shield that income from tax; is that right?
A. Correct.
Q. Now moving on to Vordtriede 54, what is this document, if you'd identify it for the record since it has no Bates numbers on it?
A. Up in the upper right corner, it's identified as Carteret 12-31-2004, and it is the updated version of the new FFA model for 2004, first two pages.
Q. Okay. Is there anything that's changed since we were together in March?
A. Yes. I believe this one -- let me see.
I believe this one did change -- we've already talked about the deferred balance on line 4-A

Page 326

which carries down. This one has the bad numbers on it.
Q. Right.
A. I believe also for this year, this year, line 5-D on the March version was off. And it was a footing error where all the cells weren't footed which carried forward.
Q. When you say footing error, I'm sorry, I'm not a computer guy. What does that mean?
A. It's not a computer term.
They weren't -- all the figures in the column weren't added. I didn't include all the --
Q. Okay.
A. When I inserted a row, the formula didn't adjust to include all the rows.
So one or -- one of the numbers I believe was left out before it was carried forward.
Q. Okay. But this number of approximately 357 million is accurate in terms of what the remaining equity at the beginning of the tax year was for 2004; is that right?
A. I believe that's the correct number.
Q. Okay. Any other changes?
A. Other than the two we've talked about, I don't believe so.

Q. Okay.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 55.
(A document was marked for identification as Exhibit No. Vordtriede-55.)
BY MR. THOMPSON:
Q. So now, Mr. Vordtriede, would you please identify this document for the record?
A. This looks to be for Carteret for 12-31-92, very first year. Updated 4-11-2006 version. The very final page, work sheet of the updated model for FFA computation.
Q. Okay. When it says tax basis beginning net equity for the intervention year, that means how much tax bases there was at the beginning of 1992; is that right?
A. Yes.
Q. And it is 427 million dollars?
A. Yes.
MR. THOMPSON: I would like to ask the court reporter to mark as Vordtriede 56, the next spreadsheet.
(A document was marked for



identification as Exhibit No. Vordtriede-56.)
BY MR. THOMPSON:
Q. And Mr. Vordtriede, Vordtriede 56, if you'd please identify this for the record?
A. For Carteret, this is the 12-31-93, April 11, 2006 updated version of the FFA model, the very first work sheet, the lead sheet for -- updated FFA recomputation.
Q. Okay. Has this changed in any way since our March deposition?
A. I don't believe the numbers on this one changed.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 57.
(A document was marked for identification as Exhibit No. Vordtriede-57.)
BY MR. THOMPSON:
Q. And Mr. Vordtriede, would you please identify this document for the record?
A. For Carteret, this is the 12-31-94, April 11, 2006 updated version of the lead work sheet for the FFA recomputation according to FDIC's model.



Q. Okay. And does this -- has this changed since the March deposition?
A. I don't believe for '94, the numbers changed.
Q. Okay. By the way, let me just ask generally. What was your purpose and what were you trying to accomplish in doing these updates?
A. For 1996 through '98, the line 3-B-1 -- 3-B-1 wasn't carrying forward. It was that footing error. It wasn't adding all the cells in the formula on the workpaper -- the second to last work sheets, the SM 1-2.3A, all the numbers weren't being footed, added together so the wrong number was appearing on the lead spreadsheet.
Q. When you say the wrong number, the wrong number in terms of continuing equity?
A. Yes. This loop 1, my term, in the section 3, they call it the excess of tax basis of assets over liabilities. But essentially that's what it is, yes.
Q. Okay.
A. And you update it every year.
So some of the updates weren't flowing through for '96, '97, and '98.
Q. So I'm clear on what we're talking about,



if you start the year with a tax basis of $400 million and then you have a deduction of 10 million dollars, then at the end of the year, you should have 390 million dollars of remaining tax basis?
A. Right.
Q. So that simple arithmetic computation wasn't occurring; is that it?
A. Right.
Q. But the analytics of your model have not changed since March?
A. No.
MR. THOMPSON: Let's ask the court reporter to mark as the next spreadsheet, Vordtriede 58.
(A document was marked for identification as Exhibit No. Vordtriede-58.)
BY MR. THOMPSON:
Q. All right, Mr. Vordtriede. If you'd please identify this document for the record.
A. For Carteret, this is the 12-31-95 April 11, 2006 updated version of the section 597 recomputation of federal financial assistance.
Q. Have there been any changes to this document since the March deposition?

Q. So you need to know how much FFA was there and how much tax basis is there; is that right?
A. Yes.
Q. Okay. I would like to ask the court reporter to mark the next spreadsheet as Vordtriede 62.
(A document was marked for identification as Exhibit No. Vordtriede-62.)
BY MR. THOMPSON:
Q. Would you please identify this document for the record?
A. For Carteret tax year 12-31-99, the April 11, 2006 version, updated version, section 597 recomputation of federal financial assistance under the FDIC model.
Q. Okay. And has this changed since the March deposition?
A. I don't believe 1999 changed.
Q. Okay. So it is accurate?
A. I believe so.
MR. THOMPSON: I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 63.
(A document was marked for



identification as Exhibit No. Vordtriede-63.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. Carteret for the tax year 12-31-2000, the April 11, 2006 version of the section 597 recomputation of federal financial assistance under the FDIC model.
Q. And has this spreadsheet changed since the March deposition?
A. I don't believe 2000 -- the year 2000 changed.
Q. Okay. Is it accurate?
A. It should be, yes.
MR. THOMPSON: I would like to ask the court reporter to mark the next spreadsheet as Vordtriede 64.
(A document was marked for identification as Exhibit No. Vordtriede-64.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. For Carteret, tax year 12-31-2001, the



April 11, 2006 updated version of the section 597 federal financial assistance recomputation, under the FDIC model.
Q. Okay. And have there been any changes since the March deposition?
A. I believe for 2001, there were no changes.
Q. So this is accurate now?
A. Yes, it should be.
MR. THOMPSON: Okay. I'd like to ask the court reporter to mark the next spreadsheet as Vordtriede 65.
(A document was marked for identification as Exhibit No. Vordtriede-65.)
MR. THOMPSON: What are you noticing?
THE WITNESS: This is 2002. It has the -- it's got the correct beginning deferred number -- looks like it has the correct beginning deferred number in it.
BY MR. THOMPSON:
Q. That is surprising because when we started today we -- we were looking -- we were looking at -- let's go back in time. Vordtriede 49, which on the printout had an incorrect number, and then you had handwritten in 85,079,107 which is exactly what's in



this computer printout.
A. Right.
Q. That raises some interesting questions about exactly what Vordtriede 49 is, right?
MR. KUIPER: Take your time to review it, if you need to understand the changes.
BY MR. THOMPSON:
Q. This might clarify. Maybe not. Vordtriede 49, where did this document come from?
A. That was my copy of what was transmitted to Andrew Gilbert, our counsel, to be transmitted to you.
And I -- I made -- had made the corrections to line 3-B-1 and 5-D that I knew -- the errors I knew about, but I did not catch these beginning deferred errors so I didn't know about them.
So yesterday I was going through and found these additional errors, but all I could do was make manual computations because I didn't have my computer. I can't explain --
Q. How --
A. -- the date and the -- unless this somehow super -- I can't explain.
Q. One explanation would be if the printout

Page 339

that you had with you when you were traveling happened to be an older version than what's on your computer; is that one possible explanation?
A. Yes. I only updated the dates as of 4-11-2006; so --
Q. Okay.
A. I don't know.
Q. Well, that is a bit of a mystery. But Vordtriede 65, which is what you have before you, that's, in fact, accurate, isn't it?
A. It looks to be accurate, yes.
Q. And given that this version is accurate, are there any changes from the March deposition?
A. I don't believe so.
Q. Okay.
A. Other than the deferred question.
Q. When you say other than the deferred question, just so the record is clear --
A. Beginning -- the beginning balance for deferred, whether it was the right amount or not.
Q. Okay.
MR. THOMPSON: I'd like to ask the court reporter to mark the final spreadsheet as Vordtriede 66.
(A document was marked for

Page 340

identification as
Exhibit No. Vordtriede-66.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, please identify this document for the record?
A. This is the Carteret tax year 12-31-2003, April 11, 2006 version of the section 597 recomputation of federal financial assistance under the FDIC model.
Q. Has this changed since the March deposition?
A. This one has the same mystery. It appears to have the correct beginning deferred balance on line 4-A, so other than that mystery, this -- everything should be correct on this one. As far as I can tell.
Q. Let's look back for a moment at Vordtriede 54 in your stack.
A. 54?
Q. Yes, sir.
Mr. Vordtriede, does this have the adjustment -- the correct numbers in it?
A. No. This one is wrong.
Q. This one is wrong? Is that reflected in the handwritten notes?

Page 341

Now we really have a mystery. Well, if you'd get the most recent version of the model, sir, we would definitely appreciate receiving a copy of that.

MR. THOMPSON: At this point, Mr. Vordtriede, I'd like to ask the court reporter to mark as Vordtriede 67, another document.
(A document was marked for
identification as
Exhibit No. Vordtriede-67.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, this was a document produced to us subsequent to your last deposition, and I just -- I believe it came from your files; is that correct?
A. Yes.
Q. What is -- if you could just identify this document for the record?
A. It looks to be a pre-1992 attempt to summarize 1988 through 1991 book to tax differences for the entire affiliated group under Carteret Bancorp, Inc.
Q. And did you use this to help inform your calculation of the tax basis in Carteret?

Page 342

A. Yes. I used it to -- for 1992, I used it to attempt a representation of beginning equity in the year of intervention on a tax basis rather than on a book basis.
Q. Very good. I have no further questions about this document.
MR. THOMPSON: At this point, I'd like to ask the court reporter to mark as Vordtriede 68, a document that bears the Bates number AM 0013788.
(A document was marked for
identification as
Exhibit No. Vordtriede-68.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, I'd like to direct your attention to the original message on this e-mail which is from Elaine Tama to yourself dated July 21, 1998, the subject is footnote Carteret. And in particular, the last sentence of Ms. Tama's e-mail to you says, "No IRS proof of claim is currently on file."
Is that correct?
A. I really don't know.
Q. Let me show you another e-mail.
MR. THOMPSON: I'd like the court reporter to mark this next document as Vordtriede 69.

Page 355

A. Yes.
Q. In the first paragraph, it says in part, "in the April meeting, the IRS indicated that the penalties would probably be eligible for abatement but that this matter should be pursued through the various district directors."
Were you aware that the IRS had indicated that the penalties would probably be eligible for abatement?
A. Where specifically were you just reading?
Q. Sorry.
A. The very bottom? Okay.
Q. Yes.
A. I'm not sure exactly who would have indicated this to Jim, but that's always been their informal indication. They tend to be reasonable with respect to these types of penalties, as they should be.
Q. When you say they, you mean the IRS?
A. Yes.
Q. On the next page of the memo in the second paragraph, it says, "With regard to the late payment penalties, both the interagency agreement for RTC and Internal Revenue Code sense 507 justified deferred payment of income taxes."

Page 356

Do you agree the interagency agreement also justifies deferred payment of income taxes?
A. Yes.
Q. Okay. And then I'd like to -- keep this memo in front of you, if you don't mind. We're going to come back to it. It touches on a number of items.
Just to close the loop on this one subject, I'd like to ask the court reporter to mark as Vordtriede 74, a document with the Bates number AM 0005.
(A document was marked for identification as Exhibit No. Vordtriede-74.)
BY MR. THOMPSON:
Q. So this is an original message from Mr. Johnson to Rick Cywinski saying in part, "are you aware that you still owe me revised tax opinions for the following FINs." These are FINs that were changed due to amended returns, and Carteret is one of the entities that's listed there.
Then he says, "in addition, these two FINs had additional tax on the '98 return that was added to our original estimate." And he says Old Stone, then he concludes, "if it is too late to defer our December '98 estimate, maybe you want to wait until

Page 357

December '99 to reflect these changes?"
Then Mr. Cywinski responds, "it is too late. Besides they're just estimates and we know they are overstated since IRS stated that penalties should probably be abated."
Do you know what Mr. Cywinski's statement that these numbers in the -- for the tax liability are just estimates and are probably overstated because the IRS will abate the penalties?
A. I believe that's a generally accurate statement.
Q. Okay. Let's go back to the memo from Mr. Anderson to Karen Hughes. First, start off with this potential tax liability section and in the second paragraph under potential tax liability --
MR. KUIPER: You are on page 1.
MR. THOMPSON: Oh, yes. Page 1, I'm sorry.
BY MR. THOMPSON:
Q. Page 1, second paragraph under potential tax liability. It states, "in April of 1999, representatives from FDIC legal and DOF met with representatives from the IRS national office and discussed a number of tax issues. One of the issues discussed was the taxability of any goodwill

Page 358

litigation or settlement proceeds. The IRS confirmed that in most cases, any proceeds from goodwill would, in fact, be taxable to the receivership."
Were you part of that meeting?
A. No, sir, I was not.
Q. Okay. And were you aware of that meeting?
A. Very vaguely.
Q. Okay. Do you remember anything about that meeting?
A. All I remember was -- and I -- my recollection is maybe something from Richard Peyster to the effect that what's represented here in this paragraph --
Q. The IRS was taking the position they were going to tax the awards in the Winstar cases?
A. Yes.
Q. Okay. And then -- and do you have an opinion as to whether it is appropriate to tax those awards?
A. I really don't. I haven't studied the issue at all.
Q. Okay. Now, let's turn to the second page of the memo. What this is discussing is what Mr. Anderson calls the problem. It's the third line. It says, "mainly the problem is two-fold, the failure

Page 367

just touched on, Roman IV of tax liabilities on solvent banks.
What is the issue here, do you recall?
A. When a receivership turns solvent, in essence under the interagency agreement, we cannot -- quote, unquote -- certify the bank as insolvent. And at that point, the IRS in theory can pursue collection of its priority 8 claim.
Q. Okay.
A. And I suppose -- there's no certification process under section 7507, but I suppose it would essentially work the same way, although the IRS may not become as instantly aware of the fact that the receivership has turned solvent.
Q. All right. I have no further questions about that document.
MR. THOMPSON: I would like to ask the court reporter to mark as Vordtriede 75, some drill-down reports that have the date of March 7, 2006 on them.
(A document was marked for identification as Exhibit No. Vordtriede-75.)
BY MR. THOMPSON:
Q. Mr. Vordtriede, during our last

Page 368

deposition, we talked about how there might be drill-down reports for the post-resolution equity adjustment that were included in the 1995 tax return. You were kind enough to provide these. We appreciate that.
I just wanted to, if you could, briefly walk through what we're looking at here and how it translates to that piece of the '95 tax return. The first three pages I take it, are the balance sheet as of December 31, 1995 for the receivership; is that right?
A. Yes.
Q. If we turn to the fourth page of this document, it shows a total of some 19.3 million dollars?
A. Yes.
Q. Okay. And now it says equity discovered assets, L/N. Do you know what the L/N is for?
A. I don't know. The L might refer to liquidation versus corporate, but I'm not sure what the N means.
Q. Okay.
A. It might mean something else.
Q. Fair enough. It says equity discovered assets. What does that reflect, 352,000 dollars?

Page 369

MR. KUIPER: Negative.
MR. THOMPSON: Oh, negative 352.
THE WITNESS: Yes.
BY MR. THOMPSON:
Q. Is that an increase of assets?
A. I'm not sure. I believe from the balance sheet to these drill-downs, the sign might switch.
Q. I think it does. As you recall from the '95 tax return, there was an increase of taxable income of exactly the amount that's reflected as the total for the, you know, post-resolution equity adjustment. Right. I think the signs are reversed?
A. So we're thinking here that the brackets mean credits instead of contra --
Q. Yes.
A. I generally use contra versus the normal account balance.
Q. Right.
A. Assuming these brackets mean credit versus debit, this would mean they discovered 19 million dollars in equity posted to a discovered asset account on the asset side of the balance sheet. So here is the corresponding set of accounts measuring the equity effect of those discoveries.
Q. We talked a long time about oil wells,

Page 370

Fannie Mae certificates, titles in drawers, that sort of thing. We're not going to go back over that, which was on the discovered assets and liabilities side.
But there's 22 million dollars here that says equity adjustments to assets that's different from discovered assets. In other words, it is broken out of the discovered assets. That piece of it is about 350,000 dollars and the equity adjustments to assets is 22 million dollars.
Do you know what that equity adjustments to assets is referring to?
A. I'm sorry. My prior answer, I misread this form. The deferred -- it is not just the discovered assets with the effect -- the equity effect shown here. The discovered assets, adjusted assets, discovered liabilities, adjusted liabilities.
Your question is, do I know the difference between adjustments to assets versus discovery of assets.
Q. Yes.
A. My understanding is that the adjustment to asset is that the asset was there, but it was booked incorrectly, so it's being increased or decreased versus the discovery of an asset which wasn't there.

Page 371

Q. Is that because, one, the pro forma adjustments are made at the time of closing? There is an attempt to get the fair market value of the asset?
A. No, I don't believe so. I'd have to look at an account description to talk about adjustments to assets, to see exactly what it's trying to measure. I don't believe it is tied to fair market value.
Q. Okay.
A. I believe there's another series of accounts tied to estimated loss -- trying to measure some kind of drop from book value to liquidation value. I can't tell you exactly what the name of the account is, but I don't believe that type of computation which is statistical, as I understand -- I don't believe that computation enters into entries to these four accounts here.
Q. Okay. Well, in terms of equity adjustment to assets, do you have any sense as to what sort of things would occasion the need to change the carrying value of the asset?
A. I really don't. As I sit here, I really don't know what type of transaction it would be.
Q. If you were given this as a research

Page 372

assignment and you were asked by your -- the tax manager, who doesn't exist, of course, but by the tax manager to go and figure this out, I mean, is there a set of manuals that would inform, you know, what equity adjustments to assets means?
A. I would get the account description from the chart -- I'm not sure if I want to say chart of accounts or the manual. It is on our system, but I would go to account 27121 and look up what the description of the account is.
Q. Okay.
A. If I didn't understand it, I would probably go to Wayne Green.
Q. Okay. Very good.
MR. THOMPSON: Mr. Kuiper, I'm going to double-check on this. We've been racking our brains trying to figure out what these various accounts are. I'm not at all sure we have the chart of accounts that Mr. Vordtriede referenced. We'll double-check but if we don't, we'll send an e-mail or letter over to you all and request it.
BY MR. THOMPSON:
Q. Turning the page in this exhibit, what are these entries? Obviously, we can read the entries. I'm not asking you to do that. But beyond the text

Page 373

that appears here, do you have any understanding of what any of these entries represent?
A. Obviously, it is the journal entries making up the 352,000 for the account 271120, the discovered asset effect on equity.
Q. Okay. Let's look at the first one for these discovered assets of 350,000 dollars. So now it is -- there are document numbers that are referenced. What do those refer to, do you know?
A. No, I don't.
Q. If -- again, if you were asked, you know, to figure that out, where would you look or go to try to figure out what is that referring to?
A. Who would I go to? I would probably go to Wayne Green and ask who I should ask.
Q. Okay. Is there a manual or a -- you know, a book or something that would explain this?
A. That I'm not sure.
Q. Okay. Now, when it says JNTV and VF, is that presumably Valley Forge?
A. I don't know. That's very possible.
Q. Do you know what JNTV stands for?
A. I know what it sounds like, but I have no idea.
Q. Turning to -- when it says JDC transfer

Page 374

number 12. Any idea what that is?
A. No, sir.
Q. Okay. And then when it says Windover remittance from May 8, '95, 125,000 dollars, Windover I'll tell you was the servicer for Carteret, one of the servicers. Any idea what that is?
A. Intuitively, it sounds like a remittance that wasn't originally booked.
Q. Adjustments to reps and warranties. Do you know what that would relate to?
A. No, I don't.
Q. Okay. Now that we have this drill-down, I don't know this will help us or not, but we did spend some time talking last time about these 1993-S2 securitizations that had taken place. And there are a variety of adjustments that relate to the securitizations. Do you have --
A. Which page are you on?
Q. Let's look at the page -- it is a little bit hard. Let's go to period 6 totals. This is -- okay. Page 2 of 3.
MR. KUIPER: Top left, period 7, total?
MR. THOMPSON: Exactly. Thank you, Mr. Kuiper.
BY MR. THOMPSON:

Page 411

time and then I'm moving on to questioning. That is, we haven't produced any documents to him at this point in time. We're just simply asking him questions. It is follow up on NOLs, questions related to NOLs that were asked earlier. Okay?
BY MS. HART:
Q. So, Mr. Vordtriede, my question was, earlier if you were aware that new tax rules concerning NOL -- net operating losses, rather, went into effect in late 1997. I believe you answered yes?
A. Yes.
Q. And is it your recollection that these new tax rules stated for tax years starting after August 5, 1997, NOLs could only be carried back two years?
A. Yes.
Q. Okay. So in the case of Carteret, if it had, let's say, net operating losses in 1998, those could only be carried back for two years, to 1996; is that correct?
A. That's correct.
Q. Okay. Earlier, you indicated that with regard to the abatement of penalties, you said it has always been the IRS's informal indication that it would abate penalties; is that correct?

Page 412

A. Yes.
Q. But in the case of Carteret, the IRS has never come out with an official decision regarding the abatement of penalties with regard to Carteret?
A. Not to my knowledge.
Q. And in the case of Carteret, isn't it true that the calculated penalties are not merely an estimate but an actual calculation that you have received from the IRS regarding penalties?
A. I'm not sure that -- the word "estimate" came up and I think it was included in things I wrote. I'm not quite sure what I meant by that.
It might be referring to estimates of penalties in the IRS proof of claim, where they're filing a claim with the FDIC. But you are right, the answer to your question is they are not estimates, they are computations.
Q. And to your knowledge, has the IRS ever objected to the FDIC's 95 percent policy with regard to regarding post-insolvency interest given its contingent nature?
A. Not to my knowledge.
MR. THOMPSON: Objection to that question and answer. It is not something that was addressed during my questioning and doesn't relate to any

Page 413

documents that were produced after Mr. Vordtriede's deposition.
MS. HART: And the government would answer to that that issues did come up with regard to recording post-insolvency interest and it is related to that topic.
BY MS. HART:
Q. And is it your belief that the tax returns should track a receivership's books in terms of recording contingent liabilities? By that, I mean if something is considered to be a contingent liability pursuant to a statement of financial accounting standards 5 for book purposes, should it also be considered that for tax purposes, too?
A. In a general sense, yes.
Q. Okay. I'd like to have you get Exhibit 75 from your -- the pile of exhibits?
A. Okay.
Q. If you'll look on the second page of Exhibit 75, under the net assets deficit, you'll see the non-cash adjustments line?
A. Yes.
Q. And you see it has 19,393,038 dollars?
A. Yes.
Q. Correct? If you take a look at -- four

Page 414

pages in, to the drill-down?
A. Yes.
Q. For that account, would you agree this is the drill-down where it says 19,393,000?
A. Yes.
Q. For that?
If you go back to the second page, you'll notice for that line item, next to non-cash adjustments, it says note 8; is that correct?
A. Yes.
Q. And in your mind, does that mean note 8 pertains to that line item?
A. I didn't --
Q. Okay. Now, if we go to note 8, I'm going to read that aloud. Note 8 indicates "non-cash adjustments, unrecorded assets and claims determined to have existed as of the institution's failure are deemed discovered assets and liabilities respectively and are recorded as non-cash equity adjustments. Other non-cash adjustments include the estimated loss on assets in liquidation, the estimated interest on claims as well as other estimated receivership liabilities. Note, certain non-cash adjustments such as the estimated loss on assets, probable litigation are reversed when they are recognized as liquidation

Page 415

transactions in the statement of operations."
And you can certainly take a moment to review that for yourself.
A. Okay.
Q. My question is per note 8, would the non-cash adjustments account of 19. -- approximately 19.4 million represent corrections of errors that were made by the institution prior to its closing which you all are now correcting for balances to the receivership?
A. I don't know if the two would be synonymous. I think it could include the other.
Q. Okay. So that 19.4 million balance could include errors by the institution of assets that hadn't been recorded properly which you all are then correcting?
A. Yes.
Q. Okay. Once you had -- assuming let's say that you discovered some assets or adjustments that had not been properly recorded by that institution prior to its closing, if you had failed to record these, would the financial statements have been misstated?
A. Yes. I would say so.
Q. Okay.

Page 416

A. Depending upon materiality.
Q. Another question I have for you, if you look at Vordtriede 76, and go ahead and hold on to this exhibit, 75. If you go to the second page of that exhibit?
A. Okay.
Q. Earlier we were talking about rebates of unearned interest equity. And there was I guess -- how can I say this? This item, rebates of unearned interest was almost somehow tied to this account with this 19.4 million balance in earlier questioning?
A. Right.
Q. My question to you is, are you aware if this 19.4 million balance includes a substantial portion of unearned interest equity adjustments or not?
A. No, it shouldn't include any.
Q. Okay.
MS. HART: I believe that is it for me.
I have no further questions.
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. THOMPSON:
Q. Mr. Vordtriede, just one question.
Ms. Hart asked you about the 1995 practices of the RTC and FDIC. Was the -- was financial -- FFA

Page 417

treated properly on the Carteret 1995 return?
A. I don't know if they were using the exact model -- a model which was exactly correct, but the bottom line was correct because zero was reported.
MR. THOMPSON: I have no further questions.
MS. HART: I have one follow-up to that question.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. HART:
Q. At our last deposition, you indicated there is no consensus as to the proper way to calculate federal financial assistance. This is a gray area. Do you still --
A. I wouldn't go quite that far. If I said -- if I said something like that, I'd probably want to clarify that the regs are very difficult to interpret in some areas. We talked about the method of applying payments called transfers to the agency last time, my old model versus the new model.
And in the area of remaining equity, it is very, very difficult to ascertain just what they're trying to get at there.
I could -- as I sit here, I believe there are three possible errors or omissions creating

Page 418

discontinuities in the regs that you have to make certain assumptions to get past. But I guess the consensus would be one's best interpretation of those regulations. One could end up with differences of opinion as to what they're saying.
Q. Is it fair to say that your interpretation -- I think you termed it as being based -- or should I say, do you believe your interpretation is based on a more conservative reading of the statute and legislation, whereas the prior calculation was based upon a more aggressive reading of the statute?
A. Yes. With respect to transfers to the agency. Yes. There is a more conservative approach associated with the new model. Based on the legislative history, what the section was trying to accomplish. It is a very difficult concept, taxing a liability which is what the assistance is.
Q. Okay.
A. It is basically saying we know you are a liable, we know you have a liability, but since we know you're not going to pay any of it, we're going to treat it as income, just like an up-front forgiveness of indebtedness. It is an acceleration of the forgiveness of indebtedness treatment, because