**Depo of: Robert C. Walsh (Ambase Corp. v. USA) 11-19-99**

**ACE-FEDERAL REPORTERS, INC.**

**Page 1 to Page 218**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**ACE-FEDERAL REPORTERS, INC.**
**1120 G Street, N.W.**
**Suite 500**
**Washington, DC 20005**
**Phone: 800-336-6646**
**FAX: 202-737-3638**

operating profits had started to slip around this time, which would have been the fourth quarter of calendar year 1988?
MR. HUME: Objection. Asked and answered. That was my recollection, but –
A. I don't recall.
Q. If you look at page 3 of the memo, the second paragraph he says, Mr. O'Brien, "We expect to

Page 62

close, consolidate or sell some branch offices. Most of these branches are fine, well run and profitable but we cannot be all things to all people and all markets. And we must operate in these locations that are best for us and our customers." What did you think of the branch system when you became CFO, or later in November of '89, when you became president? In other words, O'Brien is saying he's got to cut costs and sell branches. I don't know if he sold any right then or there or not. When you would – let me ask a prefatory question: Did you look at the branches when you came onto the presidency.
MR. HUME: When you say the branches?
Q. The branch structure of the institution, did you analyze it and examine it when you became president?
A. I don't recall. Maybe you can help me.
Q. Let me ask you: Even at the time of this memo when you were CFO, just became CFO, did you

Page 63

have a view of whether the branches were, in general, profitable, contributed to the profits of the bank?
MR. HUME: The branches in a general – as a general matter?
A. I don't think I had a chance to observe before becoming CFO, I had nothing to do with the branches and I wasn't involved.
Q. What about becoming CFO and learning about different aspects of the bank, at that point did you come to learn about the operations of the branches?
A. I don't recall.
Q. Well, at any point in your career there, do you recall having a view of the branch structure, whether it was a profitable branch structure?
A. I think that some of the branches didn't make sense.
Q. Didn't make sense?
A. Right.
Q. Which ones?
A. I think there were small ones.

Page 64

MR. HUME: If you recall.
A. And I think they were closed or consolidated during this period of time.
Q. They didn't make sense as a business matter? It doesn't make sense to run a branch that doesn't make money, right?
MR. HUME: Objection as to mischaracterization of testimony.
A. It would be correct on the surface but there may be more. All the potential requirements. I don't know the answer. It's not, unfortunately, it's not just black or white during this period of time especially. We wanted to make sure of CAR requirements, we were doing what was necessary.
Q. Did you have a view about whether the branches in Maryland were sensible branches for Carteret to have?
MR. HUME: If you recall?
Q. If you recall?
A. During what time frame?
Q. Whenever you got knowledgeable about the

Page 65

branches, either at the end of your tenure as CFO or when you became president, did you come to have a view about whether the Maryland branches were sensible.
MR. HUME: In general.
Q. Sensible as part of the Carteret business?
A. I don't think that I really drew a conclusion. I think that we were looking into what branches would make sense, for what. And I think some of the branches, if they were isolated didn't necessarily make sense.
Q. How about the branches in Virginia, did they make sense? Did you come to a view at any point whether they made sense to you?
A. I don't specifically remember which branches. I know we were taking a look at what branches, and I think Art Gilgar was given the task with Bob Pierson to go and take a look at all the individual branches and try to come up with a profitability model.
Q. I take it, when O'Brien is talking about

Page 66

pulling in the belt as he's doing in this memo, and in that context he's talking about closing or consolidating some branches, the point of that is to reduce the cost and maybe redirect the assets to something more profitable, right? The point of closing a branch that isn't making money is because it's not making money, right?
MR. HUME: Objection as to mischaracterization of the document, assumes facts not in evidence.
Q. Can you answer?
A. Again, if a branch isn't making money there may be other reasons why it would make sense to keep that branch open.

Q. Putting that aside, though?

A. Yes, if a branch wasn't making money, there wouldn't be a whole lot of reason to keep it open.

Q. Whether you were infinitely well-capitalized or undercapitalized, it still wouldn't make any difference in terms of the

Page 67

sensibility of keeping that branch or not keeping that branch, right?

MR. HUME: Objection. The sensibility is meant to be irrespective on the effect of capital.

In other words, if the sale of the branch doesn't affect the capital.

A. I think I understood it.

I'm going to answer you yes and no, unfortunately.

Q. Then please explain as well.

A. I will.

If you had a lot of capital and you are able to go into a marketplace and spend a lot of marketing dollars, and you believed in that general location that could ultimately produce consumer loans, deposits, just taking a look and saying that a branch today is not profitable, what is the likelihood that it can become profitable, how much money would it cost to make that branch become profitable. It could be a little easier decision if you had all the capital that you wanted.

Page 68

Q. Because you could invest more in there and maybe turn the corner at some point?

A. Correct.

MR. HUME: Let the witness finish.

A. If that was the market that you wanted to be in.

But if you are restrained on capital, sometimes the decisions became tougher, because if the branch wasn't necessarily producing immediate impact for you, maybe you wouldn't have the patience or the time that was necessary to turn the corner.

Q. Isn't there a downside on that scenario as well, which is that you could be throwing good money after bad if you have capital?

A. Again, I think we're both just supposing.

And basically what I'm saying is that your question was that it didn't really matter if you had all the capital or no capital, it makes sense to close branch that are losing money.

All I was trying to point out is that, yes, and no.

Because sometimes if there's a really

Page 69

good branch in a marketplace that you want to expand upon, it may make sense to put more capital into that branch or more resources allocated to that branch to try to make it more profitable.

But if it's a flat out loser, you're right, there is no reason to throw additional capital at it.

Q. Did you think Carteret when you came to know the branches had some flat out losers?

MR. HUME: Objection.

Asked and answered. He already testified he doesn't recall.

Q. You can answer, if you recall.

A. I think by that particular time, Art Gilgar and Bob Pierson had gone through what they thought were whatever should be closed, closed.

So my term when I became CFO, and when I had other additional responsibilities, a lot of these decisions were pretty much made on which were non-profitable ones and what they should have been netting. And I didn't really get involved with that, that was Bob Pierson and Art Gilgar.

Page 70

Q. Were there some branches where you knew that the cost structure was too high of operating the branch?

MR. HUME: Objection.

Asked and answered.

Q. That is, let's say, where branches were near each other in New Jersey, the cost per dollar department would be X whereas the cost for dollar of deposit for a branch farther away in Maryland might be Y and the Y was a lot higher than the X, is this scenario I'm painting for you accurate in terms of Carteret in '88.

MR. HUME: Objection. Assumes facts that are not provable.

A. I wasn't -- I wasn't really involved with the branches back in '88. That was Art Gilgar and Bob Pierson and they were doing a study. I think they even brought in outside consultants to help them understand a profitability model.

I was really working on more of the asset side of the bank.

Q. In the same document, the same paragraph,

Page 71

O'Brien says -- this is the ninth line down --

A. What page?

Q. Page 3, the second paragraph, the ninth line down, "I have asked department heads to review all products and services and budget director William Coman has developed a fine profitability analysis model that we will use in the future to measure the efficiency of our company."

Is this the model you just referred to to determine the profitability of branches?

MR. HUME: If you know and remember.

A. I'm not sure.

Q. If you will now turn to page 4, please and look at the second full paragraph.

It starts, "I will remain chairman and be president and chief executive officer of Carteret."

Do you see that?

Do you recall the so-called goodwill litigation in February of '91 or March of '91, where Carteret sued OTS to try to require OTS to count the goodwill in capital?
A. Yes.
Q. Do you recall submitting an affidavit in support of Carteret's position?

Page 158

A. I do.
Q. I will give you a copy and ask you a couple of questions about your affidavit.
A. Okay.
MR. LEVITT: Please mark this as Walsh 23.
(Walsh Exhibit Number 23 was marked for identification.)
Q. If you'll turn to page 3, feel free to review it, first.
A. Yes. Thank you.
Q. Carteret pre-FIRREA, paragraph 7 at the bottom. Prior to the enactment of FIRREA, Carteret had established the following major goals and objectives: To originate and purchase over 2 billion in one to four family first mortgage loans. To consolidate and/or sell certain banking branches with the purpose of enhancing the value of its franchise.
What does that mean, number 2, to consolidate and/or sell certain banking branches with the purpose of enhancing the value of the

Page 159

franchise.
MR. HUME: I believe that's been asked and answered in this deposition.
Q. I want to ask what you meant in this affidavit by that, if you can recall, this is by you?
A. We were going to try to consolidate some of the branches with some of our other branches to become more efficient. And having them become more profitable would enhance the value of the branch system.
Q. You had that plan prior to FIRREA, according to the affidavit?
A. That's correct.
Q. You had a goal prior to FIRREA as set forth in number 3 to expand the corporate banking commercial real estate loan portfolios, that goal was aborted, though, I take it?
A. That's correct.
Q. Because things went bad and there were a lot of bad loans in that portfolio, is that why the plan was aborted?

Page 160

A. I think it was a combination. I think one of the things was because of the high risk capital that was required against these. And during the period of time, from '89 until then, it's correct. A lot of the loans started going down.
Q. If you will look at paragraph 10, the second sentence?
A. Yes.
Q. This is talking about Carteret's capital position for the enactment of FIRREA to date. It says, "Quarterly calculations for the period ending December 31, 1989 through and including December 31, 1990 demonstrate that with the addition to capital of all of Carteret's supervisory goodwill Carteret always meets and often exceeds by substantial margin all the statutorily required ratios for tangible core and risk based capital.
Do you know whether when you made this sentence you included the contribution of 50 million that Ambase made at the end of '89 and then in early '91?

Page 161

A. I don't recall.
Q. If you look at paragraph 15, I don't know who made the marginal note but I want to ask you about the text, of the underlining sentence which is not yours, "Carteret was forced to achieve compliance with the three requirements as interpreted by the regulators, however, Carteret was forced to forego various investment opportunities, downsize its operations more than would otherwise be necessary and liquidate various assets in a fashion that would otherwise be disadvantageous to the institution."
What does that sentence mean, what are you referring to?
A. Again, pretty much what we discussed a little while ago. Some whole loans that had to be sold.
Q. Those were the investment opportunities?
A. I'm sorry, I thought you were going from the bottom up.
Q. Either way.
The whole loans refers to what, liquidate

Page 162

various assets?
A. Correct.
And also, in corporate and commercial, we were probably liquidating some of the assets to get them off the books quicker than if we had enough capital, we probably would have held on to them, we were taking some discounts on some of these properties.
We were selling some of the commercial loans at discounts to get them off the books.
Q. Even if you had capital, how would you know keeping them on the books longer would be better or worse, maybe the market would get worse?
A. I agree. This is a snap shot in time.
We were taking some hits that we probably would not have done if --

Q. You would have sat on it longer, certainly?
A. Potentially, yes, correct.
Q. All right.
A. There was obviously several very attractive situations that were going on during

Page 163

FIRREA, that we could have taken advantage of. There was a lot of thrifts for sale, there was a lot of branch opportunities for sale. There was a lot of subs of the banks for sale.
So those were the investment opportunities. We were constantly – Bob O'Brien was constantly bringing in a whole laundry list of things that he was being shown that Goldman had out for bid and other people had out for bid.
Downsizing the operations, during this period of time, if we could have been growing the balance sheet, it would have improved core earnings, one of the things that hurt core earnings was when we reduced the balance sheet.
We went from a $6 billion institution down to a $4.5 billion institution, whatever that was. I don't know if it was 4-1/2 or what the number was.
And that put a squeeze on the margins, because on that $1.5 billion we were making a net interest come on that disappeared because we had to down size to meet capital requirement.

Page 164

Q. You also reduced costs by downsizing?
A. Correct.
Q. How do you know that it didn't contribute to profits in that what you downsized was not profitable?
A. That is a good point but there are other ways to increase your balance sheet, borrowings from the federal home loan bank, there were different ways synthetically that you could have grown your balance sheet without increasing your expense side.
Q. Didn't you do that, didn't you say that that was something you were proud of, as one of your achievements, borrowing from the federal home loan?
A. Yes.
Q. That reduced liabilities because you got a better rate on them than you had from your deposits, apparently?
A. Absolutely, that's correct.
Q. Look at paragraphs 17 through 21. Just read them to yourself. The ongoing business strategy.
(Pause.)

Page 165

A. Okay.
Q. My question is: As you read through the strategy now, it strikes me that it's a sensible strategy whether or not you could include goodwill in the computation of regulatory capital.
The question is: Would the strategy have been any different if you could have included goodwill and regulatory capital?
MR. HUME: I would like to object.
Q. Or the part that was phased out because it was a phased system.
MR. LEVITT: You can read that back, please and you can object.
MR. HUME: My objection is that I think this document speaks for itself, in that the question calls for speculation.
Q. Don't speculate.
MR. LEVITT: Read back the question.
(Question read.)
A. I don't know if I could answer that today.
Q. Paragraph 22 says – on page 9 – "Our

Page 166

projections of Carteret's capital position at March 31, 1991 and June 30, 1991 indicate that including supervisory goodwill and providing for increases in loan loss reserves, Carteret will post ratios in excess of the standards required by FIRREA."
Do you know if that came to pass, that is if you look at the ratios and add back in the goodwill whether you would have been in compliance or out of compliance as of, say, June 30, 1991?
A. I don't know the answer to that.
Q. Paragraph 24 talks about Carteret is working on selling IPF, and you project how that would enhance your capital?
A. Excuse me, 25.
Q. Let me turn to 24 for a second, excuse me, I went to the wrong one.
This is about the Summit branch, the sales to Summit, do you see that?
A. Yes, I do.
Q. Do you recall having a deal with Summit that needed approval from the government?
A. Yes, I do.

Page 167

Q. What happened with that?
A. They did not approve it.
Q. And was the reason that they felt it would result in a lack of liquidity, do you recall?
A. That is what the market says.
Yes, I do believe that what they stated.
MR. HUME: Can I note for the record that these marginal comments are comments of someone that none of us know who they are?
MR. LEVITT: Right, I don't either.
Q. Do you know whether the board of Carteret came to agree with OTS' judgment about that, it was a better idea not to sell Summit because of the liquidity compromise than it would have been to sell Summit?
A. I believe the board voted to withdraw the application.

reviewed everything, we came up with $122 million total.

My question is: Is some of that additional reserve related to what OTS had wanted you to do in 1989, which was to increase your reserve by 77 million, and you said: Let us do some of that in 1990?

MR. HUME: Objection.

Q. I'm asking, do you recall an incident where in '89 they wanted you to increase the reserve to 77 million but you said: Let us report it, some of it, anyway, in 1990 rather than 1989, and so when you reserved an additional amount in 1990, it was beyond the 77 million OTS wanted in 1990 because you were adding on what you should have done in '89?

I'm asking whether you recall that.

MR. HUME: Your question is whether – there are two questions there.

Page 199

Is the question whether he recalls asking them whether he could defer the reserve? Or is it –

MR. LEVITT: I can break it up.

Q. Number one, do you recall that there was a request by OTS following the '89 exam that you reserve 77 million more than you had done internally and in response you requested some of that not have to be reserved until 1990?

MR. HUME: Is there any foundation for this question?

MR. LEVITT: It's in the transcript.

MR. HUME: I would like to see any foundation that relates to that request. I don't believe there is any.

MR. LEVITT: Let me find it.

(Pause.)

A. Can I save a little time?

Q. If you know what I'm talking about and can remember, tell me.

A. I'll answer part B first.

Q. All right.

Page 200

A. $77 million in 1990 was a collective amount that the OTS had suggested based upon those existing assets in 1990. It had nothing to do with 1989.

They did an individual loan valuation and came up with $77 million.

So the 122 that we booked was almost $50 million more than what they suggested that we book.

But it had nothing to do with '89. They came in and did a complete new valuation in 1990.

Q. I understand that, my question is: Did they also do an evaluation in '89 that asked you to book 77 million additional in '89?

A. Yes, they did. That is what the exam report suggested, we book an addition $77 million.

Q. Were you under the impression after discussing it with them they reduced what they said should be reserved from 77 to, like, 20?

MR. HUME: Objection. In that it's unclear from the record whether the 77 or the 20 refers to additional or final carried level of reserves.

Page 201

Q. I can't find it in the transcript right now. I recall reading that – it seemed to me there was confusion in this transcript or I wasn't understanding, that's why I'm asking.

I know that the report says you should reserve 77 additional for 89. The transcript seemed to indicate that you only ended up reserving 20 additional more, 1977 more.

I just wondered how it came about that that was the case.

My assumption was the other 50 you reserved later in '90, and that is how the 77 from '90, jumped to 120?

A. No, the 77 was the same 77 in '89 as it was in 1990.

Q. They asked for 77 in each year?

A. Yes, they did.

Q. What happened to the '89, 77?

A. They came back and said, if you get back $20 million, if you set aside 20 million in reserves, that will be sufficient for now.

And the $20 million made us at one of our

Page 202

ratios of capital compliance, that is when Ambase contributed the $20 million.

Q. In addition, did they say: Forget about the other 57 million for '89?

MR. HUME: Objection. These numbers are not – the record does not make it sound like they were requesting additional reserves.

Q. You can answer.

A. It was my belief that that satisfied the reserve requirements at the end of 1989.

Q. In other words, your belief was that the initial request for 77 was reduced to a request for only 20 based on these conversations?

A. I don't know if it was 20. I don't recall if the 77 was a gross number. If it was an additional 77 –

Q. It was?

A. It was.

Q. It was. But it ended up being 20?

A. An additional 20?

Q. Right.

MR. HUME: I object to the

Page 203

representation. The thrift took an additional 27 million, not 20?

Q. Or 27.

MR. HUME: In 1989 and carried a balance of 49?

they were different 77 millions.
Q. And there were two different exams?
A. Correct.
MR. HUME: I don't have any other questions.
BY MR. LEVITT:
Q. I have one or two follow-ups: On the affidavit, again, you said that after FIRREA the goodwill couldn't be included in tangible capital which is accurate, right –
A. Yes.
Q. – but isn't it true you recall, tell me, do you recall, that as of December 31, 1989, without the goodwill as tangible capital, Carteret met the

Page 214

tangible capital requirement?
MR. HUME: What time?
Q. December 31, 1989.
A. I believe that's correct.
Q. Do you recall what it didn't meet was the risk based requirement?
A. That is where the additional $20 million came in, I believe that is correct.
Q. It came from Ambase because of the risk based?
A. Yes.
Q. The real problem at least at that point, was that there was a risk based standard, a risk based standard was imposed and Carteret's assets were risky, that gave rise to the problem in '89, isn't that true?
A. It's partly true, yes. But also part is that I think under risk based capital, a small portion of goodwill was allowed to be utilized. And the rest was eliminated under risk based capital. I think I recall that.

Page 215

Q. Well, do you recall that the supervisory goodwill could all be counted except the amount that was more than 50 percent of the total requirement, that is it was a 3 percent – well –
A. I think risk based capital at the time may have been 8 percent.
Q. Of risk based assets. But the measure of non-includable supervisory goodwill was based on the fact that it couldn't exceed 1.5 percent of core capital. Do you recall that?
A. Yes, I do.
Q. And do you recall the actual number as of December 31, 1989, the number, the amount of excludable capital, excludable supervisory goodwill from risk based?
A. No, I don't. Sorry.
Q. Do you recall the number that was excludable as of December 31, 1990?
A. No, I don't.
Q. Do you recall that as of December 31,

Page 216

1990, even without the goodwill, Carteret complied with the tangible capital requirement?
A. I don't recall 1990, '89 I know we did.
Q. And you've testified, have you not, that helping you on the risk based standard is achieved by reconfiguring your assets so you have fewer risk based assets?
A. That's correct.
MR. LEVITT: That is all I have.
BY MR. HUME:
Q. Mr. Walsh, just following up on those questions by Mr. Levitt, do you recall that the lost 100 percent of your goodwill in 1989 for purposes of tangible capital, do you recall that causing you and the other Carteret senior managers concern that you were in danger of failing all of your capital requirements?
A. Yes.
Q. And isn't it accurate to say that it's that thin level of capitalization, regardless of whether you were literally just over or just below

Page 217

the requirement, but the thin level of capitalization absent the goodwill, is the motivating factor that caused you to be concerned about capital and that is referred to in this affidavit?
A. That's correct.
MR. HUME: No further questions.
MR. LEVITT: Nothing further. Thank you very much.
(Time noted: 2:18 p.m.)

Subscribed and sworn to before me this day of , 1999.

Notary Public

Page 218

CERTIFICATION

I, ROBERT BLOOM, a Shorthand Reporter and notary public, within and for the State of New York, do hereby certify:
That ROBERT C. WALSH, the witness whose examination is hereinbefore set forth, was first duly sworn by me, and that transcript of said testimony is a true record of the testimony given by said witness.
I further certify that I am not related