**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC., Plaintiffs, and FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervenor, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 93-531 (Judge Loren Smith) |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S IN LIMINE MOTION TO EXCLUDE EXPERT TESTIMONY CONCERNING AN EX ANTE DAMAGE CALCULATION <u>AND MOTION FOR LEAVE TO DEPOSE PROFESSOR CALOMIRIS</u>**

Plaintiffs' AmBase Corporation and Carteret Bancorp., Inc. ("AmBase") respectfully submit this response to Defendant's In Limine Motion to Exclude Expert Testimony Concerning an Ex Ante Damage Calculation and Motion for Leave to Depose Professor Calomiris (Doc. 259). At the outset, it is important to note that there is common ground among the parties: AmBase has already invited the government to depose Professor Calomiris regarding his ex ante damage and cost of funds calculations, all of which are derived from information contained in his May 19, 2007 report ("May Report") or track the methodology preferred by the government's own expert. Although the government did not accept this invitation, AmBase is still willing to agree to a limited

deposition of Professor Calomiris. However, because neither the methodologies nor the data presented in Professor Calomiris's slides are new, the government's further protestations are overwrought. Indeed, allowing Professor Calomiris to testify as to the contents of these slides would be well within the bounds of expert practice sanctioned by both this and other federal courts. Accordingly, AmBase respectfully submits that the Court should deny Defendant's Motion in Limine.

## FACTUAL BACKGROUND

On January 29, 2008, AmBase transmitted to the Defendant and Plaintiff-Intervenor updated damages calculations, as well as four charts prepared by its expert, Professor Charles Calomiris. Relying solely on data disclosed in Professor Calomiris's May Report, the first chart calculates AmBase's expectancy damages based on the ex ante methodology preferred by the government's expert, Professor Anthony Saunders. Similarly, the other three charts adopt Professor Saunders's preferred methodology of using Thrift Financial Reports ("TFRs") to assess the relative cost of funds for purposes of analyzing the impact of the breach on Carteret's deposit costs. The TFRs relied upon were produced during discovery and have been in the possession of all parties for years.

In a letter transmitting these charts (attached as Ex. A), AmBase offered to set aside the afternoon of February 4, 2008, for a deposition of Professor Calomiris. On January 30, 2008, the government stated that it would "let [AmBase] know our side's position on this after we have had an opportunity to conduct a review." *See* Email from David Levitt, Esq. to Vince Colatriano, Esq. (Jan. 30, 2008) (attached as Ex. B). The government did not follow up on that email and did not accept AmBase's offer for a deposition of Professor Calomiris. Instead, on the day AmBase reserved for the

deposition, the government filed its Motion in Limine and requested that the Court order the very deposition to which AmBase had already consented.

## ARGUMENT

### I. THE CHARTS TRACK THE GOVERNMENT'S PREFERRED METHODOLOGIES AND DO NOT RELY ON NEW DATA

#### A. The Ex Ante Chart

The ex ante damages chart contains nothing new. It is comprised of four values, each of which comes *directly* from Professor Calomiris's May Report. The first value—"intervening cash flows from breach through 2008"—is found in table 6 at page 28 of the May Report. The second value—"book value at breach"—is found in table 9 at page 34 of the May Report. The third value—"franchise value at breach"—is found in table 15 at page 45 of the May Report. And the fourth value—"amortized goodwill from breach"—was reported through 2006 on page 34 of the May Report.[1] Admittedly, Professor Calomiris has updated the fourth value to reflect market conditions through 2008, but he has made many such updates to reflect the lapse of time between the creation of the May Report and the start of trial. The government has not objected to such updates.[2]

Because the ex ante damages chart merely restates values already found in the May Report, Professor Calomiris was free to testify about these values *without* producing this chart to the government. AmBase produced the chart as a courtesy and out of an abundance of caution.

---

[1] The referenced pages are attached hereto as Exhibit C.

[2] The government argues that Professor Calomiris "does not . . . explain the basis upon which he contends the calculations are ex ante" and does not explain the meaning of certain terms in his charts. Doc. 259 at 2. All the concepts found in these charts, however, are also found in the May Report. And the calculations are ex ante because an investor in 1989 would have expected cash flows from 1989 to the present, and also would have expected Carteret to have some value today even on the conservative assumption that neither franchise nor book value would grow during that period.

Moreover, the need for Professor Calomiris to revisit these values arose upon discovering the government's heavy reliance on ex ante methodology in its pretrial brief. *See, e.g.*, Doc. 254 at 77. Because the Federal Circuit has rejected this methodology, *see Home Savings of America v. United States*, 399 F.3d 1341 (Fed. Cir. 2005); *Lasalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003), AmBase was not certain the government would continue to champion this position at trial. Because the government is, in fact, relying so heavily on this methodology, Professor Calomiris simply prepared a chart that uses previously-disclosed values to perform the ex ante analysis the government calls for. As is discussed below, courts recognize that experts routinely make such adjustments to their analyses in preparation for trial.

### B. <u>The Cost of Funds Chart</u>

In its pretrial brief, the government maintains that TFR data is the best source for assessing the relative cost of funds. *See* Doc. 254 at 29. The three remaining charts transmitted on January 28 adopt this very methodology. Given that this is Professor Saunders's proffered methodology, AmBase would have been—and is—free to present through rebuttal the very analysis depicted in Professor Calomiris's slides. AmBase felt, however, that it would be more helpful to the Court to hear this analysis explained by Professor Calomiris at the outset. The analysis reflected in the cost of funds charts is classic rebuttal testimony. The government, however, is trenchant in its assertion that rebuttal be limited to matters that could not have been anticipated during direct. Thus, AmBase seeks to present this testimony during its case-in-chief to avoid an inevitable and time-consuming dispute over what is properly included in its rebuttal case.

## II. AN EXPERT ACTS WELL WITHIN THE BOUNDS OF STANDARD PRACTICE WHEN HE REVISES HIS ANALYSIS IN PREPARATION FOR TRIAL AND TO RESPOND TO ANOTHER PARTY'S ARGUMENTS

Given that Professor Calomiris is merely tracking the government's preferred methodologies, and given the government's recognition that "the material Professor Calomiris now seeks to present has been in the record since the beginning of expert discovery," Mot. in Limine (Doc. 259) at 5, its claims regarding "manifest prejudice" ring hollow. This is especially so in light of the many cases—in this Court and other federal courts—recognizing that experts sometimes tweak their analyses during the run-up to trial to respond to the opposing party's arguments or to events that occurred subsequent to the writing of the expert report.

For example, in *Newell Puerto Rico, Ltd. v. Rubbermaid Inc.*, "Rubbermaid challenge[d] the admission at trial of [expert] testimony on grounds of surprise." 20 F.3d 15, 20 (3d Cir. 1994). Rubbermaid argued that Newell's expert "was presenting new computations to the jury not contained in his first or second report." *Id.* The trial court overruled the objection, finding that Newell's expert "was entitled to criticize constructively" another expert report that took issue with his own report. *Id.* The Third Circuit affirmed, noting that the objecting party—Rubbermaid—"was very familiar with the subject matter upon which [Newell's expert] would render his testimony. Rubbermaid had ample opportunity to cross-examine [the expert]." *Id.* *See also Yankee Atomic Electric Co. v. United States*, 2004 WL 1535686 (Fed. Cl. 2004) (Merow, J.) (finding that inadequacies in an expert report can be addressed by cross-examination).

Rubbermaid also objected to the expert's testimony under Fed. R. Civ. P. 26, arguing that the expert's "opinion testimony proffered during trial was different from the opinions he rendered during the pretrial litigation and that Newell failed to supplement and amend its discovery responses as required by Rule 26(e) to reflect those differences." *Id.* at 21. The Third Circuit rejected this argument out of hand. The court explained that "*[i]t is not unusual for*

*experts to make changes in their opinion and revise their analyses and reports frequently in preparation for, and sometimes even during, a trial.*" *Id.* at 22 (emphasis added). The court also noted that the expert's testimony was permissible because he was "Newell's only expert on damages," and hence his "testimony was a very important part of Newell's case." *Id.*

*Newell*'s cogent analysis is applicable here. As with the expert in *Newell*, Professor Calomiris is simply responding to the contentions of another expert. Indeed, he has merely "revise[d] his analyses and reports . . . in preparation for . . . trial." *Id. See also La Van, et al v. United States*, No. 90-581C (Fed. Cl.), Order of Aug. 16, 2000 (attached hereto as Ex. D) ("We would not oppose amendments or refinements to an existing report; such is the obligation of any expert."). This, as the Third Circuit explained, is a "frequent[]" and uncontroversial practice, especially where the objecting party has full knowledge of the subject matter of the expert's testimony and a chance to engage in robust cross examination and the presentation of rebuttal evidence. The government fits that profile exactly. Accordingly, the government can hardly make a credible claim of "manifest prejudice." In fact, this case presents much less potential for prejudice than did *Newell*, since, as discussed above, virtually all, if not all, of the data used by Professor Calomiris in his "new" analysis was either already disclosed in his previous reports or can be found in TFRs which have been in the government's possession for years and with which the government and its experts are intimately familiar.

Nonetheless, the government contends that the Rules of this Court counsel in favor of disallowing Professor Calomiris's testimony about the charts in dispute. This Court's cases applying those Rules, however, suggest otherwise. Indeed, in situations where an expert's opinions were *completely* undisclosed—and were not merely, as here, a response to an opposing

expert disclosed *in advance* of trial—the Court has found the lack of disclosure "harmless" under RCFC 37(c)(1).

For example, in *Banks v. United States*, 75 Fed. Cl. 294 (2007) (Hewitt, J.), the plaintiffs argued that the defendant's expert report "should be struck from the record because [among other reasons] his model equations and parametric input have not been made known to plaintiffs." *Id.* at 297. The court adopted a four-factor test to evaluate whether the testimony should be admitted: (1) prejudice of the party against whom the evidence will be admitted, (2) ability of the party at fault to cure the prejudice, (3) the extent to which allowing the testimony would disrupt the orderly and efficient trial of the case, and (4) the offering party's willfulness in failing to disclose the information. *Id.* at 298-99. As in *Banks*, each of these factors cuts in favor of admissibility here. As to the first factor, and as discussed above, the government has no legitimate claim to prejudice given that Professor Calomiris is merely responding to and adopting the government's own preferred methodology. As to the second and fourth factors, and as in *Banks*, AmBase has attempted to cure any potential prejudice by providing the government with Professor Calomiris's new slides in advance of trial and by consenting to a deposition. *Id.* at 299 (noting that "defendant has attempted to clarify plaintiffs' confusion surrounding [the expert] report by offering another deposition" and has "exchanged letters with plaintiffs in which it provides additional information"). As to the third factor, and as in *Banks*, allowing Professor Calomiris to testify about the content of the charts would cause no disruption to the orderly and efficient trial of this case. *Id.* ("Plaintiffs do not present any evidence that demonstrates that admitting [the expert report] would disrupt the trial of this case."). The government has a full opportunity to cross-examine Professor Calomiris and to present any rebuttal testimony it deems proper.

Similarly, in *Sparton Corp. v. United States*, 77 Fed. Cl. 1 (2007), the government contended that the plaintiff's expert report failed to comply with Rule 26(a)(2)(B) in that it did not provide the basis and reasons for the expert's opinions. *Id.* at 3. Chief Judge Damich held that "though [the report is] perhaps not as comprehensive and helpful as might be desired," "Defendant can glean enough information from [it] to effectively cross-examine [the expert] at trial and that Defendant has not been prejudiced by the deficiencies in the report." *Id.* at 5. If the United States was not manifestly prejudiced in *Sparton*, it certainly cannot claim such prejudice here.

*Alost v. United States*, 73 Fed. Cl. 480 (2006) (Firestone, J.) is to the same effect. The government cites to this case for the proposition that "'the goal of [RCFC 26(a)(2)(B)] is disclosure of . . . all the opinions and analysis to be presented at trial.'" Doc 259 at 3 (quoting *Alost*, 73 Fed. Cl. at 504) (ellipses in original). Conveniently, however, the government fails to discuss the actual holding of *Alost*—namely, that the technical failure to comply with RCFC 26(a)(2)(B) was harmless and therefore the court would consider the challenged report. *Id.*[3]

---

[3] The other cases cited by the government are easily distinguishable or provide little helpful analysis. *Rushing v. Kansas City S. Rwy. Co.*, 185 F.3d 496 (5th Cir. 1999) involved a party's complete failure to designate an expert within the time established by the trial court's case management plan. That is hardly the situation here, where the government merely complains about the timing of updates to the analysis of an already-disclosed expert.

In *Cooper Distributing Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542 (3rd Cir. 1999), the Third Circuit merely noted in passing, in a footnote, that it "f[ound] no defect *in the procedure* by which the motion to amend the report was denied." *Id.* at 549 n.1. The opinion gives no details as to the precise nature of the appellant's challenge, but the quoted passage suggests that the issue was not with the merits of the decision, but with the underlying procedure. In any event, the Third Circuit's full-throated analysis in *Newell* of a situation precisely analogous to the one here is the controlling authority from that Circuit.

The government also cites to a four-sentence order in *La Van, et al v. United States*, No. 90-581C (Fed. Cl.), in which "discovery was excluded because 'plaintiffs were seeking to raise new theories in their expert report.'" Doc. 261 at 4 (quoting Order of Aug. 16, 2000). The order goes on to state, however, that the Court "would not oppose amendments or refinements to an existing report; such is the obligation of any expert." Professor Calomiris is not seeking to ad-

Here, Professor Calomiris has merely responded to the government's critiques of his initial report. As the Third Circuit noted, a rule of evidence that required his opinions to remain utterly static—from the close of expert discovery through the close of trial—would make little sense, and would impede the Court's ability to render a fully-informed decision in this case. Indeed, the government would go even further: the preclusion of direct testimony during a party's case-in-chief by an expert regarding issues that the party he represents can elicit during cross examination and present in rebuttal. Such a rule would make little sense and would cut against the grain of this Court's jurisprudence regarding expert testimony.

## III. AMBASE IS WILLING TO CONSENT TO A LIMITED DEPOSITION OF PROFESSOR CALOMIRIS

Even though Professor Calomiris's ex-ante and cost-of-funds analyses are well within the bounds of what he may testify to at trial, and even though the government has already passed on the opportunity to depose Professor Calomiris, AmBase is willing to consent (again) to a deposition of Professor Calomiris, limited in scope to the January 28 charts, and to take place on the evening of Tuesday, February 12. Given the extremely limited nature of any even arguably "new" opinions or data in Professor Calomiris's analysis, any such deposition should be limited to one hour. And AmBase should have the opportunity to take an hour-long deposition of the government's expert if it decides to offer rebuttal of Professor Calomiris's analysis.

## CONCLUSION

For the foregoing reasons, AmBase respectfully submits that the Defendant's Motion in Limine should be denied.

---

vance a *new* theory, but is responding to *the government's* theory by using the very methodologies they purport are proper in this case. The same fact distinguishes this case from *Microstrategy, Inc. v. Business Objects, S.A.*, 439 F.3d 1344 (Fed. Cir. 2005).

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:

Vincent J. Colatriano
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

Dated: February 11, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of February 2008, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

Andrew Gilbert, Esq.
FDIC Legal Division
550 17th Street, N.W.
Room 2098
Washington, DC 20429

/s/ Jesse Panuccio
Jesse Panuccio

# Exhibit A:

Letter to David Levitt from Vincent J. Colatriano
(January 29, 2008)

# Cooper & Kirk
Lawyers
A Professional Limited Liability Company

Vincent J. Colatriano
(202) 220-9656
vcolatriano@cooperkirk.com

1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

(202) 220-9600
Fax (202) 220-9601

January 29, 2008

**BY HAND DELIVERY**

David Levitt, Esq.
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch, Civil Division
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, DC 20005

Re: *Ambase Corp. v. United States*, No. 93-531

Dear David,

Enclosed please find a disc containing the updates to Professor Calomiris's damages calculations. The tables simply bring the calculations in his 2007 report up to date by reflecting current market data. For example, the stock market indices are brought forward from December 31, 2006 to December 31, 2007. So too are the book values.

The three power point slides respond to points made by Professor Saunders: (1) his argument that damages should be measured *ex ante* -- the chart shows how Professor Calomiris would calculate the *ex ante* value of Carteret; and (2) Saunders' argument that the cost of funds should be calculated off of a TFR, not a single newspaper ad of April 3.

We are in the process of preparing a document that identifies and further explains the changes from the 2007 calculations. In addition, we are happy to have a call with one of our consultants and one of your consultants at any time. We will also set aside the afternoon of Feb. 4 for a deposition of Professor Calomiris if we are unable to satisfactorily answer all your questions.

Please let me know if you have any questions.

Sincerely,

Vince Colatriano /plh

Vincent J. Colatriano

Enclosure
cc: Andrew Gilbert, Esq. (by hand delivery, with enclosure)

# Exhibit B:

## Email From David Levitt to Vincent Colatriano
## (January 30, 2008)

**Vince Colatriano**

---

**From:** Levitt, David (CIV) [David.Levitt@usdoj.gov]
**Sent:** Wednesday, January 30, 2008 9:51 AM
**To:** Vince Colatriano
**Subject:** RE: The Disc Updating Tables in Prof. Calomiris's Receivership Deficit Report

Thanks, Vince. I'll let you know our side's position on this after we have had an opportunity to conduct a review. Regards. David

---

**From:** Vince Colatriano [mailto:vcolatriano@cooperkirk.com]
**Sent:** Wednesday, January 30, 2008 9:29 AM
**To:** Levitt, David (CIV); Gilbert, Andrew
**Cc:** David Thompson; Jesse Panuccio
**Subject:** RE: The Disc Updating Tables in Prof. Calomiris's Receivership Deficit Report

David and Andrew –

Attached please find the promised explanation of the changes reflected in Professor Calomiris's updated damages calculations. Please let us know if you have any questions.

Take care,

Vince

Vincent J. Colatriano
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: 202-220-9600
Fax: 202-220-9601
www.cooperkirk.com

# Exhibit C:

## Excerpts from Report of Charles W. Calomiris
## (May 19, 2007)

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., Plaintiffs, and FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervenor, v. THE UNITED STATES OF AMERICA, Defendant. | ) | No. 93-531 Judge Loren Smith |

**DECLARATION OF CHARLES W. CALOMIRIS OF MAY 19, 2007**


Qualifications

Introduction

I. Carteret's Value at the Time of the Breach and the Subsequent Increase in Its Value But-For the Breach
- A. Carteret Was Sold to AmBase for $266 Million in August 1988—One Year Before the Breach
- B. Carteret's Value Did Not Substantially Change Between the Time of Its Sale to AmBase and the Breach
  - 1. In May 1989, a Bid of $252 Million Was Made to Purchase Carteret




PLAINTIFF'S EXHIBIT 2702 tabbies

proper measure of damages due in 2008 would include the sum of dividends received in the but-for world that were not received in the actual world through 2008, and the 2008 but-for market value of the bank.

TABLE 6: BUT-FOR UNDISCOUNTED CASH FLOWS FROM AUGUST 9, 1989 TO DECEMBER 31, 2008

| Period | Net Income (Million $) [A] | Dividends Distributed (Million $) [B] = 31.6% × [A] | Cash Flows Net of Dividends (Million $) [C] = [A] – [B] |
|---|---|---|---|
| 8/9/1989 - 8/8/1990 | $20.5 | $6.5 | $14.0 |
| 8/9/1990 - 8/8/1991 | $21.4 | $6.8 | $14.6 |
| 8/9/1991 - 8/8/1992 | $22.3 | $7.1 | $15.2 |
| 8/9/1992 - 8/8/1993 | $23.2 | $7.4 | $15.9 |
| 8/9/1993 - 8/8/1994 | $24.2 | $7.7 | $16.5 |
| 8/9/1994 - 8/8/1995 | $25.2 | $8.0 | $17.2 |
| 8/9/1995 - 8/8/1996 | $26.2 | $8.3 | $17.9 |
| 8/9/1996 - 8/8/1997 | $27.3 | $8.7 | $18.7 |
| 8/9/1997 - 8/8/1998 | $28.5 | $9.0 | $19.5 |
| 8/9/1998 - 8/8/1999 | $29.7 | $9.4 | $20.3 |
| 8/9/1999 - 8/8/2000 | $30.9 | $9.8 | $21.1 |
| 8/9/2000 - 8/8/2001 | $32.2 | $10.2 | $22.0 |
| 8/9/2001 - 8/8/2002 | $33.5 | $10.6 | $22.9 |
| 8/9/2002 - 8/8/2003 | $34.9 | $11.1 | $23.9 |
| 8/9/2003 - 8/8/2004 | $36.4 | $11.5 | $24.9 |
| 8/9/2004 - 8/8/2005 | $37.9 | $12.0 | $25.9 |
| 8/9/2005 - 8/8/2006 | $39.5 | $12.5 | $27.0 |
| 8/9/2006 - 8/8/2007 | $41.1 | $13.0 | $28.1 |
| 8/9/2007 - 8/8/2008 | $42.8 | $13.6 | $29.3 |
| 8/9/2008 - 12/31/2008* | $17.7 | $5.6 | $12.1 |
| Total 8/9/1989 – 12/31/2008 | $595.6 | $188.7 | $406.9 |
| | | | |
| 8/9/2006 - 12/31/2006 | $16.3 | $5.2 | $11.2 |
| Total 8/9/1989 – 12/31/2006 | $510.2 | $161.6 | $348.6 |

*Note*: * For the final partial periods, August 9, 2008 to December 31, 2008 and August 9, 2006 to December 31, 2006, I assume that net income is distributed evenly throughout the year.

## D. But-For the Breach, Carteret's Value Can Be Estimated Based on the Performance and Growth of the Thrift Industry

### 1. The Growth in Market Values of the Thrift Industry

37. The market value of any firm represents a discounted prediction of the firm's future cash flows. The market's predictions of Carteret's future profitability in 1988 and 1989 were, with the benefit of hindsight, unduly conservative if the breach had not caused Carteret to

estimate the goodwill amortized from July 31, 1989 to August 31, 1989).[64] I then assume that the retained earnings from August 9, 1989 to December 31, 2006 that I estimated in Table 6 ($348.6 million) would have been added to Carteret's book value. This calculation results in a but-for book value for Carteret of $442.9 million as of December 31, 2006 (equal to $269.3 million of book value in July 1989, minus $175.0 million of goodwill amortization, plus $348.6 million of retained earnings). Finally, I estimate Carteret's but-for market value as of the end of 2006 using the same market-to-book ratios estimated in Table 8, where I assumed that Carteret's market-to-book ratio would have increased from July 1989 to December 2006 at the same rate as the average market-to-book ratio for all thrifts. Table 9 summarizes the calculations.

TABLE 9: BOOK VALUES AND MARKET-TO-BOOK RATIOS OF ALL THRIFTS IN JULY 1989 AND DECEMBER 2006, ADJUSTED FOR GOODWILL & RETAINED EARNINGS

| | Equal Weight | | | Market Value Weight | | |
|---|---|---|---|---|---|---|
| | July 31, 1989 (Obs=49) | Dec. 31, 2006 (Obs=175) | % Change | July 31, 1989 (Obs=49) | Dec. 31, 2006 (Obs=175) | % Change |
| Mean Market-to-Book Ratio | 0.627 | 1.553 | 148% | 1.023 | 1.815 | 77% |
| But-For Carteret Book Value without Goodwill (Million $) | 269.3 | 442.9 | | 269.3 | 442.9 | |
| But-For Carteret Market-to-Book Ratio without Goodwill | 0.934 | 2.313 | | 0.934 | 1.657 | |
| But-For Carteret Market Value (Million $) without Goodwill | 251.4 | 1,024.4 | | 251.4 | 733.9 | |

*Sources*: Compustat; TFR data.

As Table 9 shows, Carteret's but-for market value at the end of 2006 would have been $1.024 billion (using the increase in the equal-weighted mean market-to-book ratios for all thrifts) or $733.9 million (using the increase in market value-weighted mean market-to-book ratios for all thrifts). The market value-weighted results in Table 9 are significantly lower than the corresponding result in Table 8 ($3.839 billion). In Table 8, I increased Carteret's book value by the increase in weighted average mean book values for the industry. This weighted average gave

64. Goodwill Amortization Schedule (Historical), August 1989 (CAM5300023).

of the market value of goodwill, then the market value of Carteret's franchise was equal to $99.9 million as of the breach. Table 15 summarizes this calculation.

TABLE 15: ESTIMATING CARTERET'S FRANCHISE VALUE AS OF DATE OF THE BREACH

| Category | | Million $ |
|---|---|---|
| Carteret's Total Market Value as of July 31, 1989 | [A] | $251.4 |
| Market Value of Supervisory Goodwill as of July 31, 1989 | [B] | $66.2 |
| Face Value of Total Assets as of June 30, 1989 | [C] | $7,286.1 |
| Goodwill as of June 30, 1989 | [D] | $185.1 |
| Face Value of Non-Goodwill Assets as of June 30, 1989 | [E] = [C] – [D] | $7,101.0 |
| Face Value of Liabilities as of June 30, 1989 | [F] | $7,015.6 |
| Market Value of Franchise as of the Breach | [G] = [A] – ([B] + [E] – [F]) | $99.9 |

*Sources*: TFR data; Carteret Bancorp Inc. and Subsidiary, Consolidated Statements of Financial Condition (June 30, 1989) (CAM4470985); 1989 Goodwill Amortization Schedule (AM050531); August 1989 Goodwill Amortization Schedule (CAM5300023); Carteret Savings Bank, FA, Thrift Financial Report, Jun. 30, 1989, at Q-1 (AM050308); Calomiris calculations.

51. Even though Carteret's market-to-book ratio in 1988 was less than 1, Carteret's implied franchise value was enormous once one has taken into account that supervisory goodwill was such a significant part of its book value. The market clearly understood that these intangible assets were valuable. Further evidence of Carteret's large franchise value is found in independent analysis of the thrift at the time it was acquired by AmBase. Peat Marwick Main & Co. estimated the value of Carteret's deposit base intangible asset to be $53.9 million in August 1988.[70]

52. Furthermore, support for a high franchise value of Carteret can be found in the RTC's post-seizure observations that Carteret's competitive deposit interest rates reflected its high quality of retail banking relationships and effective marketing strategy:

> In recent years, CSB has generally outperformed competitive financial institutions in attracting retail deposits. During the past year, the Bank did experience a decline in deposits. However, this was more symptomatic of the interest rate environment than the negative publicity pertaining to the Bank's financial condition.
>
> CSB regularly tracked competitive retail deposit rates and had a practice of paying among the most competitive rates. However, the Bank rarely offered the highest rate among competitive financial institutions on any retail deposit product. In addition to competitive factors, CSB evaluated its own internal cash needs and rates available on alternative sources of funds when setting rates for retail deposit products. CSB has a

70. Valuation of the Deposit Base Intangible Asset from the Acquisition of Carteret Savings Bank (Aug. 8, 1988), at III-1 (PM 004486).

# Exhibit D:

Order of August 16, 2000
United States, No. 90-581C

# In the United States Court of Federal Claims

Brown, G.

RECEIVED

17 A 7 52

CASE PROCESSING UNIT
CIVIL DIVISION/OM

FILED
AUG 16 2000
U.S. COURT OF FEDERAL CLAIMS

* * * * * * * *

LA VAN, et al., *

Plaintiffs, *

and *

FEDERAL DEPOSIT INSURANCE CORPORATION, * No. 90-581C

*

Plaintiff-Intervenor, Filed: August 16, 2000

*

v. *

UNITED STATES OF AMERICA, *

Defendant. *

* * * * * * * *

## ORDER

Our ruling on defendant's motion was based on its representation that plaintiffs were seeking to raise new theories in their expert report. We would not oppose amendments or refinements to an existing report; such is the obligation of any expert. This is an issue that should be resolved by the presiding judge, but it is not clear when an assignment will be made in this case. Therefore, if defendant wishes to respond to plaintiff FDIC's arguments that it will not be prejudiced, we will consider this issue once again.

Robert H. Hodges, Jr.
Judge