# Exhibit A

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMBASE CORPORATION and CARTERET BANCORP, INC., | ) | |
| Plaintiffs, | ) | Case No. 93-531 |
| and | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | ) | |
| Plaintiff-Intervenor, | ) | |
| vs. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

---------------------------*

Tuesday, October 16, 2007
New York, New York
Time: 12:55 p.m.
Day 1, Volume 1
Pages 1-193

Day 1, Volume 1 of the deposition of PROFESSOR ROY C. SMITH, taken by Plaintiffs, pursuant to Notice, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, on Tuesday, October 16, 2007 at 12:55 p.m. before Josephine H. Fassett, a Certified Shorthand Reporter and Notary Public of the State of New York.



47e53af0-7c47-43f8-b5ce-12d94a7e6f74

APPEARANCES:

COOPER & KIRK, PLLC
Appearing for Plaintiffs
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
BY: DAVID H. THOMPSON, ESQ.

FEDERAL DEPOSIT INSURANCE CORPORATION
Appearing for Plaintiff-Intervenor
550 17th Street, N.W.
Room 6030
Washington, D.C. 20429
BY: GARY A. KUIPER, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
Appearing for Defendant
1100 L Street, N.W.
Room 7024
Washington, D.C. 20530
BY: ARLENE PIANKO GRONER, ESQ.

ALSO PRESENT:

RICHARD A. BIANCO, Ambase Chairman

JOHN P. FERRARA, Ambase

RICHARD BIANCO, Son



INDEX


| WITNESS | PAGE |
|---|---|
| PROFESSOR ROY C. SMITH | |
| By Mr. Thompson | 4 |


EXHIBITS


| SMITH | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Expert Report of Professor Roy C. Smith | 4 |
| No. 2 | Errata to Smith Declaration dated October 15, 2007 | 52 |




(Expert Report of Professor Roy C. Smith marked as Exhibit Saunders 1, as of this date.)

PROFESSOR ROY C. SMITH,
the witness, having been duly sworn by a Notary Public, was examined and testified under Oath as follows:

EXAMINATION BY
MR. THOMPSON:

Q Good afternoon. Please state your name.

A Roy Smith.

Q Mr. Smith, or Professor Smith, I'm David Thompson with the firm of Cooper & Kirk. I represent Ambase Corporation. With me today are the Chairman of Ambase, Richard Bianco, and John Ferrara also with Ambase.

MR. THOMPSON: And would counsel, or Mr. Kuiper, would counsel like to identify themselves for the record?

MS. GRONER: Sure. I'm Arlene Pianko Groner and I'm representing the United States and I'm also counsel for Professor Smith who's our expert in this case.

MR. KUIPER: And I'm Gary Kuiper with



the FDIC.

MR. THOMPSON: Off the record for a moment.

(Whereupon, off the record.)

(Whereupon, resumed.)

BY MR. THOMPSON:

Q Professor, have you ever been deposed before?

A No.

Q Okay. And have you ever been retained as an expert witness in a case before?

A No.

Q Well, let's go over some ground rules then.

We can take a break any time you like, my only request is that if there's a question pending, that you'd go ahead and answer that question.

Let's try to talk one at a time since we have a court reporter here trying to create an accurate record.

If I cut you off at any point during this deposition, just let me know that you weren't finished with your answer. It's certainly my intention to get your full and complete testimony





47e53af0-7c47-43f8-b5ce-12d94a7e6f74

Page 6

and not truncated.
And, if I ask you a question and you answer it, I'm going to assume you understood the question.
So, with that, why don't we just jump in and let me ask you: Does the market value of any firm represent the discounted prediction of the firm's future after-tax cash flows?
A It can reflect that.
Q Does it normally reflect that?
A It might.
Q In what circumstances --
A In other words, there are other factors that might influence it.
Q What would influence a firm's value other than the predicted future after-tax cash flows?
A Market conditions.
Q Anything else?
A That's a large one, but --
Q Well, let me ask you: When you say market conditions, do you mean macroeconomic conditions, is that one of the factors?
A I mean the conditions of the market to determine whether a buyer wishes to buy the thing

Page 7

you're trying to sell and that could be, you know, reflecting many different elements.
Q Would that be factored into the discount rate?
A If you could figure out what it was, if it changed instantly, you might be able to do so, but people don't always agree on what discount rates are, but there will be a buyer or there won't be at the price you wish to sell and those will be affected by the things.
Q Do investors look at after-tax cash flows as opposed to pre-tax cash flows?
A I would suppose they usually do.
Q Why is that?
A Because cash flow isn't cash flow if it has to take part of it and give it to the Government.
Q When selecting a discount rate for a government security, what's the appropriate discount rate?
A That's the maturity of the security.
Q Well, would you add a risk premium?
A For a government security generally not.
Q Why not?

Page 8

A Because it's considered to be a risk-free investment.
Q And that's because it's backed by the United States Government?
A Yes.
Q Is that a reasonable assumption in your opinion that investors can rely on --
A It's a reasonable assumption as long as we're staying within the United States.
Q Okay. And sorry about that, I think you accurately anticipated what my question was, but because we have a court reporter here, just as I'm going to try to let you finish your answers, if you'll try to let me finish my questions, but let me just get that on the record so that it's all accurate.
But is it reasonable for investors to rely upon a guarantee of the United States Government?
A Yes.
Q Okay. Now you attended the Naval Academy; is that right?
A Yes.
Q Graduated 1960?
A Yes.

Page 9

Q And then you served our country for four years?
A Yes.
Q And went to Harvard Business School?
A Yes.
Q And then you went to Goldman?
A Yes.
Q And was Goldman a trading firm at that point?
A It did some trading.
Q What else did Goldman do in 19 --
A It was principally an investment banking firm with some trading activities.
Q When you say investment banking firm, what do you mean by that?
A It did underwritings, it did mergers, it did other corporate finance transactions.
Q How many employees were there at Goldman approximately when you started?
A I don't know, I'd have to guess, I would say probably 400.
Q What position did you have when you first started at Goldman in 1966?
A I was an associate.
Q And what were your areas of

Page 54

opposed to mismanagement and bad underwriting standards?
A I couldn't allocate a certain percentage --
Q Okay.
A -- to you. The economic conditions were worsening in that period, as everyone knows, but there were plenty of S&L's that didn't suffer the same degree as they did.
Q But there were a lot of other financial institutions that were experiencing heavy losses in '90 and '91, correct?
A That's correct.
Q And Citibank had big losses, didn't it, at that time?
A It did.
Q And it was technically insolvent, wasn't it?
A Technically it wasn't but it was functionally insolvent if you regard the regulators presence in their life as being very substantial in order to hold them up, but -- anyway, that's how it came out.
Q And did some sort of Arab sheik make an investment in Citibank in the year '91?

Page 55

A Yes, in '91. He's still there, by the way.
Q And he's made out pretty well, right?
A He has.
Q All right. Now in '90 and '91 the RTC was selling hundreds of billions of dollars of commercial real estate; is that right?
A That is my understanding but I don't have information available to me at the moment to say.
Q Okay. Did the RTC's sale of assets in '90 and '91 exert downward pressure on the commercial real estate market?
A It's possible.
Q Isn't it likely just from supply and demand?
A The commercial real estate market is a very large market and it does include many things that weren't in the portfolios of the RTC, so to some degree large parts of it were not affected, other parts were, so when you blend them, you get some effect.
Q Okay. But do you believe that Carteret's strategy of rapidly expanding its asset base was ill-advised in the early eighties, '81,

Page 56

'82?
A No.
Q Why not?
A It's perfectly acceptable to have an aggressive strategy, that of course means it's a risky strategy, but then it's up to you to execute it correctly, and you could have an aggressive strategy for the purpose of making money but aggressive strategies are riskier than others and may fail.
Q So on a prospective basis sitting in 1982 what Carteret did was not irrational?
A Not per se. One would have to know more about what their plans for executing their strategy were at the time when they announced it in '82, that's information I don't have.
Q Now in the mid 1980s the stock market had a favorable view of Carteret; is that right?
A I don't know what you mean by favorable.
Q Well, the market capitalization was increasing?
A Yes, from a very low level. It went public at a price-to-earnings ratio of about two, which most people would not think to be a very

Page 57

favorable rating but it was at least a rating, and it improved from that somewhat during those years you mentioned but it wasn't as high as some that would be considered outstanding companies.
Q But the stock market capitalization doubled in the first couple of years?
A I think we have a table on this, but I get what you're saying.
It did increase.
MS. GRONER: Could you just identify for the record the table you're looking at?
THE WITNESS: I'm looking at Exhibit 3. I can't find the part I'm looking for.
BY MR. THOMPSON:
Q I don't think it has the stock market capitalization, I may have missed it, but.
A Well, it has the stock price, that's probably a proxy for the question.
This is page 3 of 3, Table 1, Exhibit 3. It has some stock prices here.
Q Okay.
A So that's a proxy for the market cap in this case.
Q Right. So it starts off in '83 trading nine to eleven and then by --

Page 58

A And then it goes down to six and three-eighths to 10 and five-eighths and then it goes to -- then it goes back. Then it goes up to six and five-eighths to 18 and one-eighth and so on, then back, then down to -- so it has increased, the stock market has increased.
Q Okay. And Carteret was repeatedly able to access the capital markets in the 1980s; is that right?
A It was.
Q Okay. Now you conclude Paragraph 9, turning to page 4, by saying, quote, these losses depleted Carteret's regulatory capital and substantially reduced the market value of the company. Are the losses you're referring to there the 1990 and '91 losses?
A Yes.
Q Why would an investor have cared about those losses?
A Well, how about because it depleted the regulatory capital and it substantially reduced the market value. That's one reason they would care.
Q And what would you expect the stock of a company that announced such losses to do, would it

Page 59

go up or down or stay the same?
A It's difficult to say, it depends on what, to what extent that information had already been in the market and had been able to be priced by that.
Q And do you have an opinion as to whether Carteret's stock price in 1989 and the end of 1989 had taken into account the magnitude of those future losses?
A I would suspect not.
Q Okay.
A They appear to have been a surprise to Carteret.
Q And was it --
A Therefore, they wouldn't have been announced.
Q So it would have been a surprise to investors too?
A Yes.
Q Okay. Now, let's look at Paragraph 10 and the first sentence, and it says, quote, I find that Carteret's loan losses and Carteret's failure to build sufficient capital to cushion against such losses were the direct result of mistaken and misguided strategic and management decisions made by

Page 60

Carteret and its parent Ambase.
Is it true that losses at a bank are only a problem if the bank doesn't have sufficient capital to absorb them?
A If a bank doesn't have sufficient capital to absorb losses, it may become bankrupt, it may become insolvent. If it does have sufficient capital, it may escape insolvency but that doesn't mean it doesn't have problems caused by the bank loss -- by the loan losses. Loan losses are not greatly desirable.
Q But in order to understand the seriousness of loan loss, of any particular loan loss it's measured against the capital of the bank; is that right?
A It's an indicator of the ability to tolerate the pain before you die.
Q Nicely put.
Now, what mistaken and misguided management decisions by Carteret are you referring to in this sentence?
A Well, those are enumerated in the rest of the paragraph.
Q Okay. So that's -- let me ask you just so the record's clear on this.

Page 61

Can you point to any strategic decision that was made during Mr. Bianco's tenure at Carteret with which you disagree?
A No.
Q Okay. Now, in the middle of the paragraph in point 1 you say Carteret decided to, quote, engage in rapid expansion of its asset base by acquiring large amounts of assets and liabilities from failing S&L's without commensurately increasing its capital. Please explain what you are referring to here.
A The acquisitions of Delray and the other failing S&L assets which was done with consent and in some cases cooperation of the thrift regulators, done on a basis without Carteret having put up any additional capital really at all, though the FDIC or FSLIC put up 16 million, I believe, and there was some additional borrowings from the Federal Home Loan Bank Board, the addition of these risky assets were not accompanied by a comparable amount of underpinning capital.
Q Underpinning tangible capital?
A Tangible capital.
Q Were the capital markets accessible to Carteret in 1982?



Alderson Court Reporting
1-800-FOR-DEPO

47e53af0-7c47-43f8-b5ce-12d94a7e6f74

Page 70

A The footnotes of the financial statements usually have some information about it or as in any -- in terms of the disclosure item in any offering of securities and something the companies report on.
Q And so when they report the mismatch do they tell you, can you then figure out how much money they're going to make or lose if interest rates move a hundred basis points this way or that?
A I believe you can.
Q Is that something you typically do when you invest in a bank's stocks?
A I do not.
Q Okay.
A I do not make that calculation.
Q Okay. How do you -- to what extent do you then try to figure out -- figure in interest rate risk when you're making an investment in a bank stock?
A I try to make an assessment to the extent that I can of what degree of exposure they have to serious capital losses because of interest rate mismatching. I may get that information casually or I may get it through the disclosures that they already have but I don't make independent

Page 71

efforts to perform my own due diligence on it, however, I don't buy failing S&L assets.
Q And just so the record is clear. Have you analyzed Carteret's interest rate risk profile at any point from 1981 through 1992?
A I only looked at the information that I saw in the financial statements and the Report of Examinations.
Q Okay.
A Which were reasonably quiet on these issues during this period because it was not thought to be a particularly serious exposure.
Q Okay. Do you consider yourself an expert in interest rate risk?
A Not as you would define an expert.
Q Okay. Now as for credit risk, it's perfectly acceptable for a thrift to have some credit risk; isn't that right?
A Of course.
Q And as an investor how do you measure credit risk?
A With great difficulty. It's very hard to know what a bank is worth from the outside because all of the information is on the inside about the credit exposures. Banks and S&L's have

Page 72

the accounting custom of recording the value of loans that they're holding for investment at their historical cost, which is to say, the par, whereas in reality a variety of factors can change that, interest rate changes could make the value of those things go down or up and any change in the perception of credit exposure relative to what it was at the time when the loan was originally priced could also change it. These things are not going to be known by outside observers or readers of financial statements, they're often not known by even the auditors until they do sample test performances to find them out and, therefore, it's difficult to know what the credit risk is, you really have to rely on the management to tell you this in the form of how much they have set aside for reserves or writeoffs on an annual basis and the record will tell us that frequently these are not aggressively taken.
Q All right. How frequently what are not aggressively taken?
A Loan losses and writeoffs.
Q Managements are loathe to --
A They would prefer not to take them to the full extent that they might.

Page 73

Q Okay. And they often don't take them to the full extent they should?
A They often don't, and maybe they should, but usually it's when they get into subsequent trouble that you discover there was this difference in reporting, but that could be explained as management judgment at the time, it's just difficult to know.
Q And is there some discretion afforded management as to how much of a loan loss they have to take here or there?
A Yes, and their auditors have to consent to it or they won't issue a clean opinion.
Q Okay.
A And the auditors are to some degree flexible within limits as to what should and shouldn't be taken.
Q Okay.
A There's usually a discussion.
Q All right. Is it, do you think it's fair to say in your experience a 10 percent range of reasonableness or 20 percent range of flexibility?
A I would hope it would be better than, smaller than 10 percent would be the range.
Q You'd hope?





47e53af0-7c47-43f8-b5ce-12d94a7e6f74

Page 82

these loans and so many of them failed they must have been doing something wrong.
Q I understand.
A Whether it was poor credit standards, poor execution of existing standards that went poor or whatever, there are many things that go into how they do it but they did it in a way that had terrible results.
Q Understood, your point, but -- and you've also made the point that Carteret waited too long to go to the capital markets. Are there any other instances of mismanagement at Carteret that you can identify?
A I've chosen to identify these in Paragraph 10.
Q Anything that's not in Paragraph 10?
A No, if there were more, I probably would have added it.
Q Now, were Carteret's loans different than other, the loans that other S&L's were making at the time?
A Well, I'm not aware of any other S&L with the same track record on their loan portfolio, there may have been some but I'm not aware of it, but it was an unusually poor record, so they had --

Page 83

it probably has to stand out as an example of loan management that was, that was on the lower end of the whole industry. We have data on this, you may realize, we'll come to later.
Q All right. Okay. Do you think the regulators should have approved Carteret's acquisition of Barton and Delray in 1982?
A Well, I find that question somewhat outside the scope of my assignment here.
Q Well, you talk about the number of instances about lagging regulators and inefficient regulators and so you're not --
A Yes.
Q You know, you made statements about the regulators so --
A Well, there was -- that's factually demonstrated. You asked me in particular whether I thought they should or should not have approved this thing.
Q Right. If you don't have an opinion, it's okay, but you make a number of statements about the regulators in the S&L industry and so, you know, I want to know whether those general statements had any application for this case.
A I believe that the regulators at the

Page 84

time felt that they had a burden, and it was considerable, because there were so many loans, so many S&L's in trouble and they had to do the best they could to prevent an industry collapse and to minimize the taxpayer burden of insuring the whole industry collapse and they were certainly frightened that the whole industry might in effect have a run on the bank causing difficulties that would be extremely serious for the country. They felt this burden. I think they felt that they should follow a strategy that would do its best to protect or to move along or to delay any worsening of circumstances that might protect, for example, 85 percent of the industry even if it meant that some part of the industry would be given one drink, one free drink too many and therefore be endangered by it.
So I think there's a certainly rational basis for why the regulators did what they did, but in doing it they may have engaged in particular policy making on the spot which obscured financial transparency and engaged in a kind of calculation of regulatory capital in particular that would be unrealistic.
Q Was the Government advantaged by

Page 85

delaying the day of reckoning?
A They thought so, I believe, because they thought if it all happened in an accelerated form that would make the fear of the industry such that it could have had a stampeding effect, I think they thought that.
Q And with the benefit of hindsight, and I know they didn't have that advantage but you do, do you think they were right?
A I think you could make the case that they were right. I have looked at this over the years and I've felt that way but there are others who don't.
Q Okay. Why did the other S&L's present a burden to the FSLIC in 1982?
MS. GRONER: Excuse me. Ambiguous. Who do you mean by the other S&L's?
BY MR. THOMPSON:
Q I thought you had said, Professor, that there were other S&L's that were presenting a burden?
A Yes, at that time the S&L industry had a number of S&L's suffering from mainly asset liability mismatches which was threatening their capital, including Delray.

Page 90

but on the other hand maybe they missed it.
Q Do you have an opinion on that with respect to Carteret as to whether you are in a better position to evaluate management as opposed to the OTS officials?
A I do not.
Q Okay. And what about with respect to the FDIC, do you have any opinion on who's in a better position to judge the institution, yourself --
A I do not. I do not.
Q Okay. All right. Now, turning to Paragraph 13 of your report on page 5, the first sentence says, quote, The United States experienced a severe crisis in its savings and loan industry commencing in 1979 and continuing through the 1980s. Please explain, how did this crisis come about?
A It was predominantly a crisis in the mortgage industry, thrift industry, caused by a rapid increase in short-term interest rates which was the method used by these institutions to fund long-term fixed-rate loan portfolios, which is to say, they were borrowing very short to fund very long which most students of banking understand to be an unsound way to run a business in that sense. But

Page 91

the S&L industry, it existed since colonial days and it was very distributed throughout the United States and had a lot of political support and this practice was tolerated up until the time when it became problematic.
Q Well, and wasn't there a period of time where the Government regulated what the rates were on the deposits?
A Yes.
Q And so in that regard would there have been any interest rate risk back when the deposits were regulated?
A Ironically, had they been restricted by these regulations, then nobody would have deposited their money there because they would have gone elsewhere to get their deposits at higher rates and as a result they wouldn't have made these loans. Or loans would have to be refinanced in some other way at the time.
Q Now, did the Government also restrict the rates the S&L's could charge on the loans they made, was that also regulated?
A I'm not aware of that.
Q Okay. So the deposits were at one point regulated but the loans were --

Page 92

A Free market.
Q -- free market? Okay. And when --
A Another example of an awkward regulatory constraint on an industry.
Q That had, ultimately had a very negative effect?
A If you're going to regulate, you ought to regulate both the same way so they don't get into these mismatch situations, but in this case the spike in interest rates was accompanied by refinancing of the loans at higher interest rates that became higher than the yields they were receiving on the mortgage portfolio they owned, and because they were leveraged more than 10 times to one, sometimes 20 times to one, the rate at which capital was eroded was very rapid.
Q And when you say, you know, you should regulate both the same way, is this similar to what happened in the California energy market?
A Yes, it is actually. I was going to think about it but I decided it was probably an unnecessary contribution by me anyway so why should I lead you to another thing that --
Q So the regulators should have had a more sensible regime in place for the S&L's in the

Page 93

late seventies; is that fair to say?
A Plenty of people have said so.
Q Okay. Now you say in the second sentence of Paragraph 15 that, quote, This crisis ultimately cost taxpayers approximately $250 billion and was the most significant financial catastrophe since the collapse of 9,000 banking and thrift organizations in 1931 to '34. Closed quote. The $250 billion number, where does that come from?
A Where did it come from? It's an estimate that I and some others have used to try to determine the actual cost to the Government of both insuring the deposits and then receiving the recovery subsequently. There are estimates of the net cost that range from somewhere between 150 million and 300 million or so.
Q Billion?
A Billion.
Q Yeah.
A And I don't know what it really was but frankly I'm not sure anyone else does either because it's hard to know what all those recoveries were and when they were received and how they got accounted for, but that's our guess.
Q And just help me out. Why is it hard

to know what was received?
A Because the receipts from loans and real estate that was recovered by the FDIC and the OTS took years to work out of and involved interest charges and, you know, all kinds of things, so. I haven't seen a clean accounting on it, and I'm not sure there is one, but some academics have studied it and they have made this range of estimates.
Q And have you written on this, I mean this $250 billion number, is that --
A I haven't written about the number per se, I've included it in things I've had to say about it, I didn't think it made too much difference if it was 200 or 250 million so I didn't bother to make a further investigation.
Q Okay. When you did the calculation were you trying to basically bring it to present value and add on interest?
A No, this was meant to be the cost at the time it was incurred.
Q Okay.
A Most of those estimates were made at the time rather than now looking backwards and then putting it in term at any time.
Q Okay.



A But when we compare it to the thirties, we take the 1930s number and adjust it for the present, for the money value in about 1990 which would make it more comfortable.
Q Okay. And how much did that cost?
A It came out the same as I recall.
Q Okay. And the $250 billion, is that the total 1981 through, you know, 1995 number?
A It's supposed to be.
Q Okay. I note you cite a number of times to Mr. White's book. Have you found that generally to be reliable?
A I have.
Q Okay. And is it reasonable to assume --
A Professor White is a distinguished professor of economics at the Stern School where I teach and he was a member of the Federal Home Loan Bank Board at the time that this was going on. His book on it has been regarded as a very authoritative source.
Q Okay. Now let's look at Paragraph 14.
A (Complies.)
Q In the last -- you talk in the beginning about the interest rate mismatch, which



we've talked about, and how it affected 90 percent of the S&L's by 1981 were losing money, and then in the last sentence you say, quote, The problem was exacerbated by accelerated deregulation of the thrift industry which permitted thrifts to diversify into non-home mortgages and other assets and by lagging ineffective regulators efforts by the FHLBB and the FSLIC which allowed thrifts to attempt to grow out of their problems without adding sufficiently to equity capital and accelerated deregulation. What are you talking about?
A Starting with the 1992 Act --
Q '82 I think you meant?
A '82, yes, sorry. Did I say '92?
Q I think you did.
A '82 Garn-St Germain I think it was called.
Q Yes. Yes.
A And then there were, of course, a little bit of piecemeal deregulation as they went along at the regulator, regulator level itself, for example, deciding on policies relating to goodwill.
Q Right.
A But the idea was to let the S&L's escape the problems they were in by attempting to



compete in other businesses that they had never been in.
Q And wasn't the idea also to try to get the healthy thrifts in to help the sicker thrifts?
A To the extent there were healthy thrifts. I mean you're talking about, many of these thrifts weren't very much healthier than the ones they were rescuing, but yes, there was some effort to consolidate the thrifts on a basis in which the surviving enterprise would be less likely to fail than the one that was being rescued, which may not be a great improvement in the overall survivability factor, but that's what they were trying to do.
Q And if the healthy thrift had positive tangible capital that it was bringing to the table then that would be a benefit to the insurance fund that now there's an additional buffer between it and the losses, right?
A It could be, as long as it didn't deplete that capital by investing it in a vast amount of losses that were out there somewhere else.
Q But even if those losses were huge and ultimately doomed the whole project, at least the Government would be better off for having had that tangible capital that the healthy thrift brought to

the table; is that true?
A Yes, but the healthy thrift might not enjoy the process if that took place.
Q Right. Fair enough.
A Serve your country by dying for us, not necessarily a strategy everybody likes to follow.
Q Right. And the new types of lending and assets that were permitted, this was commercial real estate lending?
A Those are the ones which we have discussed, yes.
Q Okay. And that was all part of the 1982 legislation?
A Yes.
Q And the regulators understood that commercial real estate lending was riskier, right?
A They did. They did. But, you know, there were many things. Some S&L's engaged in a great deal of investment in junk bonds, for example, they're among Michael Milken's greatest clients were several junk bond -- or several S&L's. And there were some who took their right privilege to invest in commercial lending and invested in very expensive risky resorts that failed. I think there was a



famous one in Arizona called The Venetian that failed. So in some ways it forced the S&L's to be yield chasers and to accept a greater amount of risk in order to get a higher amount of interest income so as to offset their other problems.
Q They were yield chasers because they had these huge problems and --
A They needed yield.
Q Right. The only way --
A The only way they could get yield in a sense was they were let out of the box and go get yield, okay, so we're going to get it from whomever we can and we like the ones with the most amount of yield and some of us were not able to tell the difference in the risk.
Q And the reason they were in this profile was because they had huge negative tangible net worth and to get out of that situation they needed yield; is that right?
A I think so, yes.
Q Okay. Now when you say that there were lagging and ineffective regulatory -- regulator -- is there maybe a typo, should that be regulatory efforts?
A Is that the question, is there a typo



there?
Q Well, yeah, I just was going to fix it but I didn't want to --
A You can say, I suppose you could say it either way. If you prefer to say regulatory efforts, that would be alright with me, it means the same thing.
Q Yes. Right. Okay. What are you talking about with respect to the Federal Home Loan Bank there, how was it lagging and ineffective?
A Well, it was my understanding at the time, and partly based on my discussions with Professor White, that the regulatory population was quite small and it had been subject to some efforts by the Reagan Administration to, you know, cut back on government and budget restrictions and that the regular -- the inspections that were required to be made were often made late and that the reports of inspections took longer than they might have otherwise done until there was a general recognition that the thing was falling behind schedule and, therefore, when you're regulating something that gets in trouble and the time it takes to regulate them is widening, you're losing control of that part.



Q And your basis for making those statements is Professor White's --
A Well, yes, but it was --
Q Okay.
A -- as far as my understanding was concerned, it was pretty widely accepted, it was generally known.
Q Well, what about the FSLIC, same story?
A I don't know for sure --
Q Okay.
A -- whether it fits exactly in there or not, but it was -- I don't know.
Q Okay. Was the regulation of Carteret in 1982 in any way flawed through ineffective efforts?
A I didn't detect any sign of that when I was looking at it.
Q Okay. Did FIRREA fix the regulatory problems that you identify in Paragraph 14?
A I believe that FIRREA was an effort to tighten the regulatory standards because there was some concern about the extent of which the Government was having to pay for deposits, so they're insured by the Government, and that many

Page 110

repriced.
Q And does that delay in disposal tend to depress the price?
A It might.
Q With respect to --
A It depends. The delay actually might take the pressure off the market. If you try to accelerate the disposal and sell everything at once at any price anybody would pay, the prices would be perhaps lower, the sales at the lower price. So if you delay it a bit, you might be trying to keep some of the supply off the market so as to avoid having to take as big losses as you might otherwise have to do.
Q And was that a conscious decision of the regulators the strategy that you were just articulating?
A I don't know but I believe it was something they certainly had the ability to choose and consider as they went along.
Q Okay. I mean, other than the natural fact that, okay, you can't sell these assets overnight, what's your basis for saying things were running late?
A Well, I think that I was referring

Page 111

principally to the fact that in order to force a disposal you had to have the information that enabled you to decide to do so, and if that information was late because of later examiner reports or other reasons, then it would simply take longer to know when to do it.
Q Now you say "accounting information was inaccurate because of special treatments allowed by regulators," what are you referring to there?
A Well, I would be happy to use supervisory goodwill as an example.
Q When you say it was inaccurate, I mean, it was fully disclosed.
A Well, that's true, it was disclosed, someone could look through it and make his own judgment.
Q Right, so I don't understand how that would be inaccurate.
A Was that a question?
Q Is it? I mean, you think that the use of supervisory goodwill was inaccurate?
A It gave, it gave a coloration to the financial statement that capital was present when it wasn't, real capital was not there, and that contributed to an inaccurate reading of it by some,

Page 112

could have done.
Q So you don't think supervisory goodwill was real capital?
A I don't.
Q Okay. Now, in terms of delaying tactics employed by well-connected S&L owners.
A There's some anecdotal evidence of prominent politically connected S&L owners who were able to intervene with the Government to delay regulatory actions or postpone them or one way or another.
Q Mr. Keating?
A That's right. Well, his is among others but he wasn't the only one.
Q Okay. But Carteret wasn't involved in that?
A No.
Q All right. Now, let's see. The regulators --
A This paragraph, by the way, refers to the industry not to Carteret.
Q Okay. And regulators were inefficient, what did you have in mind when you wrote that?
A I think efficient regulators would

Page 113

have detected some of these problems sooner and been able to act on them quicker than they did do. We have evidence that many regulators detected them but as they passed the information up the chain of command to where the, you know, the authority to conduct actions occurred, they didn't result in actions being taken, they were either delayed or postponed or forgotten about it or whatever, and as a result the overall process of administering regulation to this industry became affected by it in such a way you could call it inefficient.
Q Okay. Anything else you had in mind when you wrote that?
A No more than that, I was making general statements about what I think are generally understood characteristics of the industry at the time which I derived from sources that I have looked at.
Q Okay. Now you state that 55 percent of all S&L assets had been taken over by the RTC. Approximately how much in the way of assets are we talking about here, hundreds of billions?
A Yeah.
Q And was --
A I don't know more precisely than that

Page 114

at the moment.
Q Well, was it, were a lot of these assets commercial real estate assets?
A I assume that some were, I would imagine the majority were not.
Q What do you think the majority were?
A Mortgage-related loans.
Q Okay. But Carteret certainly wasn't alone in having commercial loans that went bankrupt?
A No, after 1982 many people followed the perfectly permitted regulatory pathway to become engaged in commercial loan.
Q Right. Now you state where I wanted to skip ahead to Footnote 18 for a moment and explore a few thematic points that you've invested extensively in financial service industry securities and is that on behalf of yourself and your family?
A Yes, that's what this footnote refers to.
Q Okay. Have you ever been engaged to provide investment advice to anyone else?
A No.
Q Okay. And what's the largest percentage of a financial institution you've ever owned, I mean, have you ever owned more than 5

Page 115

percent?
A No. No.
Q Did you purchase stocks in any S&L's or banks in the period 1989 through 1992?
A No.
Q Okay. Why not?
A I wondered if you'd ask me that question.
Well, first of all, it was an industry I didn't know sufficiently well to want to bother with having to educate myself about it.
Secondly, I mean, it was a troubled industry and in order to invest in a troubled industry you'd have to know more about it than I did and I wasn't willing or had the time to take to put into learning about it, nor was I motivated because I thought it was such a great investment opportunity for me. So that's the answer to that. But I didn't get access to my own capital until I left Goldman Sachs, I had only small amounts of capital before that, and so in 1988 I began to have access to my partnership capital as it was returned to me. I began to invest that in a portfolio of public and private investments of various types. By then, there wasn't much of an S&L industry left and I

Page 116

wasn't ready or did I have an opportunity to engage in private equity investments of the sort that were going on at that time, so the opportunity never presented itself.
Q Well, I mean, there were some publicly-traded thrifts at the time?
A There were, but they didn't interest me at the time. The thing that would have interested me, if anything, would have been the opportunity to come into a private equity arrangement that would do the sort of things that Mr. Perelman and others have done that were very successful investments, but I didn't have an option to do that, nobody invited me to join them so I --
Q Right.
A -- wasn't there myself in that industry, so it didn't happen.
Q Okay.
A But I could have. I mean, I have invested in banks before that are in private equity situations, so that these opportunities come from time to time.
Q When you say you've done it before, just so we are --
A Not before that period, I've done

Page 117

before now but not then.
Q Right. Okay. So when did you first make an investment in a bank stock or thrift stock? Or let me rephrase that.
When did you first make an equity investment --
A In banks?
Q -- in a bank or a thrift?
A Probably in 1991 and 1992 I bought a substantial portfolio of bank stocks including Citigroup and some others, Bank of America, and those, you know, those rose in value considerably from that time on.
Q Yeah, those were good investments, right?
A And the reason I did it was that I had just finished writing a book about the American banking industry and how it had returned to some assemblance of health after having gone through the gates of hell in the prior years, the ones you mentioned before with respect to Citigroup and others who were in a, you know, on the ropes for some years but recovered, and so as a result of my research in this industry I decided that investing in those banks would be an interesting thing to do,

so I made the investment.
Q And you did that in '91 and '92?
A Around that time.
Q Okay. Any other thrifts or banks?
A Not thrifts.
Q Okay.
A Well, I was invited onto a board of a thrift with the intention that I would be given some stock when the company demutualized and became a public company, I considered it but I declined the opportunity.
Q Okay. What thrift was that?
A It was Montclair Savings Bank in Montclair, New Jersey.
Q Why did you decline?
A I wasn't convinced that the S&L crisis was over, I didn't want to be exposed to any personal liability as a director, I just got my capital out of Goldman Sachs and I didn't want to give it back to some litigant.
Q I won't take that personally.
But was that a period of time where the regulators really were going after directors, Neal Bush and Silverado?
A Yes. At that time in general terms



'89 or thereabouts, yes, there were those things going on.
Q Yeah, and so it was a difficult environment?
A Well, it was not considered a place for wise adults to go, so I didn't.
Q Okay. And with respect to the banks were there any other banks that you bought in '91 or '92?
A Well -- '91, '92?
Q Yeah.
A I think I just bought a series of several banks, it was a portfolio of banks, and then I sat on it for a long number of years and then sold it down later, but I also have invested in private banks, startup banks.
Q Okay.
A You're going to ask me who was that bank and frankly I've forgotten, I bought it from a private equity into a private equity deal. It came, it was -- it did its job, it got sold and I've forgotten about it.
Q And what were the years approximately of when you were in that private equity bank deal?
A Probably about five years ago.



Q What was the geographic location?
A It was a Florida S&L, thrift. I mean it was a thrift-like bank, I think it was actually a bank but it was indistinguishable from a thrift.
Q Was it a startup?
A It had been a startup.
Q And was it a good investment?
A Yes.
Q Okay. And why did you -- how did you evaluate the opportunity to invest in that?
A I was approached by a good friend who worked at Keefe Bruyette, which is one of the leading experts on bank reorganizations and recapitalizations, and I decided that if he was going to invest in it, then I could do too. I didn't perform any special due diligence, though I did carefully read the materials given to, me and then there was a, there was an incident when the bank lost some money on a loan matter which I investigated subsequently. I wasn't entirely a passive investor.
Q Okay. So you tried to get to the bottom of why did this loan go bad and are there going to be more?
A Yes. And I talked to the CEO about



things of this kind and I got a better understanding of it. Basically I thought they made a mistake, and they did.
Q Okay. Now, when you were thinking about whether to do this investment, were there certain ratios that you were looking at in terms of valuations? I mean, do you look at multiple to book that you were being able to buy in at?
A That was one of the multiples that one looks at.
Q And did you look at price-earnings ratio?
A Yes.
Q And what other ratios, return on assets?
A Return on assets, yes.
Q Anything else that was important to your decision?
A Well, I like to look at performance indicators other than return on capital numbers such as the net interest income minus loan losses divided by assets or something like that to indicate it.
Q I'm sorry, net interest income minus losses?
A Minus loan losses or charge-offs then

Page 122

divided by the asset, so what's the, what's the revenue return on assets and compare that to some others.
Q And what's the difference between a loan loss and a charge-off?
A Maybe none.
Q Okay. I've never understood that.
A There's a lot of vocabulary in this stuff that is not necessary but there may be a technical distinction but it basically means that we're setting aside some of our income to cover our estimate as to how much of the losses of -- how much the loan portfolio losses will be increased by.
Q Okay. So now when you bought Bank of America and Citicorp?
A Citicorp then, yeah.
Q And do you remember any of the other banks that were in that portfolio?
A I think Bank One was in there and maybe one more.
Q But you can't recall right now?
A Not right now.
Q If you do remember --
A It was 15 years ago.
Q Yeah. Okay. And these were good

Page 123

investments, were they not?
A Yes, I held them till the end of the decade and they were a very good investment by that time.
Q And why did you think they were good investments in '91 and '92?
A Because the best I could tell the pig passed through the python. The loan loss problems which had held them back were being absorbed and digested and excreted and, therefore, the rest of the snake was coming back to be, coming back into business again, and I thought that the prices of these places had been or had been knocked down sufficiently to not take all that into account, so I was making a judgment that the worst had been behind them and that they were going to come out of it better. I did some analysis of ratios and such but I was largely working on the kinds of analyses that I just described, the net income, the net interest income minus loss charge-offs divided by assets seeing the trends in that and what was evident to me was that the commercial lending business of these banks was very strong and healthy, credit cards and all those things, and that the quantity of exposure in wholesale lending was very small and pretty much

Page 124

written off as much as it needed to be, so they would be able to come back to being strong and competitive banks again, which they were.
There was also a very substantial amount of management turnover and change in toughening up that took place in those banks during that time. Almost every bank had totally new management which were devoted to bottom-line management in trying to demonstrate that they could, you know, make a high level of return on assets, which I believe was a principal benchmark return, I'm going to go from something well below 1 percent to something close to two. Now that meant we had a different management approach and they were showing signs of being less interested in diversifying into too many other businesses than they had done before which suggested a focus on the main basics of the business which I thought was healthy. So they had learned a lesson from their mistakes and it seemed to be they had adjusted to that by management changes and other necessary steps.
Q Okay. Now, you talked about the net income minus loan loss over assets is one ratio, did you also look at market to book?
A Yes.

Page 125

Q And price-earnings ratios?
A Yes.
Q And ROA?
A Yes.
Q Any other ratios that you would have looked at?
A Those are prominent ones most people use when looking at banking values, there may be others if you want to drill down deeper you can look at.
Q Okay. But those were the ones you looked at?
A I was particularly interested in those.
Q Yeah.
A Along with the one I just mentioned.
Q Yes, sir, right. Now you mentioned trends, so why were you looking at trends?
A Why was I looking at trends?
Q Yeah.
A Well, trends are an indicator of the future, of what the future is likely to be, and a trend, of course, would be the ability to, you know, regain lending business to corporations, for example, on a more solid basis than had been used





47e53af0-7c47-43f8-b5ce-12d94a7e6f74

Page 126

before but also it was a trend in interest rates, a trend in the market for banking products and in industrial expansion. Remember, these were good years after the '91 recession, the industry improved.
Q And then the industry started improving in '92?
A I would guess somewhere around there. And there was a modest recession in '91, it was over by that, in that year and it took a little while for the rest of it to get going but, you know, the American technology and economic growth was very strong in those years and the banks were coming back to being main players in it, so that was the trend, the change from what they were to something they were going to be in the future.
Q Okay. Any other investments in banks that you've made through the years?
A Well, that plus the Alliance Mezzanine Capital which is a private equity limited partnership which effectively operates as if it were a bank, it is an SBIC.
Q Okay.
A I'm an investor in that company too.
Q Right. When you look at market to

Page 127

book ratios, are you looking at the book value on a fair market basis or on a historical basis?
A Well, there's some difficulty in looking at it in the future because you don't know what the future of value is. You can make estimates of earnings for the next several months, you could make an estimate for what, say, you know, 2008 will be and you could do your market to book by adjusting book value but you won't always get that right because there are many other things that adjust book value, so mostly book value is used in the current context rather than the forward-looking context.
Q And, I'm sorry, I might not have been clear, but I meant, you know, when you talk about a market to book of let's say two, the book of the denominator, is that done on a historical basis or is there an attempt to mark that book to market as of the time you're doing the investment?
A Oh, I'm sorry, you meant historical accounting as opposed to --
Q Fair market value --
A -- the clock?
Q Fair market value accounting, yes.
A It's generally done in banks by historical accounting.

Page 128

Q Okay.
A Banks of course are changing as they become more involved with deregulated investment banking activities which mean a larger portion of their asset base must be mark to market than was the case before, so they are evolving into a different sort of species than what they were, but at the time of the Carteret matter almost all book values of banks were based on historical accounting. And there was no other way to do it because they didn't tell you what the, if you didn't think the reserves were adequate, you had to guess.
Q Right. And so when you made your investment in Citicorp and Bank of America you were relying on the historical book values signed off on by the auditors; is that right?
A Yeah. But as I recall, the market to book value was below one at that time reflecting the fact that the stock market had looked through what the historical accounting for book value was and it discounted it by some amount which it assumed to be the mark to market writedown.
Q So the stock market was basically saying we think you haven't written off as much of your loans as you should have?

Page 129

A Yeah, of course the stock market was just making an approximation and that's generally where it went to.
Q Okay.
A But it was trading below book for a time.
Q Okay. When you make an investment in a bank do you try to think about franchise value too?
A Yes. There are other intangibles besides goodwill.
Q Okay. And what is franchise value?
A I think a definition of it would be the value, the going-concern value of an enterprise taking into account the quality of its brands, its customer base, and the probability that it will continue to serve this market efficiently and well in the future.
Q And in the banking industry a bank's relationship with its customers can be valuable; is that right?
A Yes, it can be valuable, it doesn't necessarily have to be a great premium, I mean you may have a poor relationship with your customers.
Q Right. Do you have an opinion whether

Page 134

Q But in terms of just buying a particular branch do you think there would be a control premium with respect to a single branch?
A Not in theory there would be but it's hard to say that one would make a big deal out of it.
Q Right.
A And particularly when branches are often sold for mutual accommodation reasons. You know, you may be required by a regulator to sell a branch or somebody may want a branch in your neighborhood that would be willing to pay you more for it than you think it's worth, those kinds of factors get in there, it's difficult to generalize and say that all branch premiums are a result of franchise premiums, though they might be.
Q Okay. Do you have an opinion as to whether the branch premiums that were realized by the sale of Carteret's branches were related to franchise value?
A I don't have an opinion though I would accept that it might be so.
Q Okay. Do you have an opinion as to whether Carteret sold branches in 1990 because of the breaching provisions of FIRREA?

Page 135

A I don't have a -- I haven't thought that one out, I don't know that I could tell from studying it. What I do know is that they needed to shore up the capital base and they had to, to the extent that they could shrink assets and turn it into cash to improve the ability of the service to endure the loan offers they were taking would be the first priority.
Q Is it reasonable to assume that the asset shrinkage that Carteret went through in '90, '91, '92 that's reflected in your Exhibit 3 was attributable to the need to raise additional capital?
A That would certainly be a principal reason.
Q Okay.
A If not the only reason, it could have been the only reason, but it was also clear that the bank was generally under-capitalized regardless of whether you count goodwill or not.
Q With respect to the assets that were disposed of in '90, '91, '92 do you know whether there was a positive spread income on those assets?
A I don't recall.
Q Okay. Now with respect to the

Page 136

branches that were sold in 1990, do you have an opinion as to whether those branch sales had any impact on Carteret's net income in '91 or '92?
A No.
Q Okay. Now, as deposits run off, does that generally decrease franchise value?
A Well, not necessarily, it might. Certainly if you're having a run on the bank and deposits are running off, people are worried about you and therefore your franchise value would disappear, but if you're simply adjusting for some reason or another, you have too many branches in Morristown and not enough in Jersey City, you might switch and that could have no effect on it.
Q Okay. Now when you were evaluating banks to invest in did you look at the dividends they pay?
A Yes.
Q Why do you do that?
A Money they're giving me.
Q What does the --
A Part of the return that you get for investing in it.
Q What would it tell you about a bank if it cut its dividend?

Page 137

A It would probably tell me that the bank had a good reason to cut it, principally that it needed to conserve the capital.
Q Would it be cause for concern?
A Yes, generally.
Q Okay. And if a bank increases its dividend on a regular basis --
A Excuse me, may I add to my last answer?
Q By all means.
A It would be cause for concern but it might also be a cause for concern if they didn't cut it. If I knew they were in difficulty and they were paying a dividend, I would consider that possibly to be irresponsible.
Q Okay.
A So we have to have the correct dividend policy, that's what we're looking for.
Q Sort of like GM had a big dividend a few years ago?
A Well, this happens periodically in big companies and they reduce dividends because they are going through some sort of transition and need to have to retain the capital. This was true for the American big banks that went into the trouble during

Page 138

the same time we're talking about.
Q And if a bank increases its dividend on a regular basis is that a good thing?
A Same answer, it's got to be the right dividend policy, not one that seems to be inappropriate. If there are many investment opportunities and they're instead paying out dividends instead of taking those opportunities, you might want to wonder whether the management has, you know, a business plan that is consistent with what you think it should be.
Q Okay. What's more important to you as an investor, a cash dividend or a stock dividend?
A Well, a cash dividend is real money and a stock dividend, which is paid to everybody, it's just a form of dilution.
Q Is a stock dividend just like a stock split?
A Yes.
Q Now as an investor in a bank what relevance do you or weight do you give to one-time gains or losses on assets?
A It depends what they're from. For the most part banks must now account for, I think all companies must now account for so-called

Page 139

extraordinary items above the bottom line so that you still get the bottom line there. There was a time in the past when you could report net income and then subtract from it items you really wanted to charge-off directly to your retained earnings, you can't do that anymore, so whatever you do it's going to be net income after you take all these things out of there. So an extraordinary gain or loss is only extraordinary if it's coming from something that, you know, appears to be non-recurring. Like Citigroup sells the Travelers Insurance business, that's not going to be a repeating event, so they have a large gain from doing so, that essentially is returning capital to the bank to be redeployed. If they made a large profit on it, I like that better than if they made a loss, but either way I don't get too emotional about it because I see this as money coming back into the system.
Now if you have something like gains from the sale of securities and you have them every year because your policy is to create cash by taking advantage of the market opportunities you have from a portfolio, then I accept that as a recurring source of income but I look at it in terms of trying to, you'll see how much of the total income on the

Page 140

enterprise is made up by this source of income which comes from a different source than the main business of the bank.
Q Well --
A If my business is lending, it ought to be where I get most of my income from.
Q So in terms of -- I mean, Goldman Sachs they book a lot of profits from sales, right?
A Goldman Sachs is a little more complicated than savings and loan, I can tell you that, but they are in the business of investing as they go so they always have some amount of capital gains they're reporting, in addition to their regular income, but one of the businesses of Goldman Sachs is to be a proprietary trader and investor.
Q Right. Now, with respect to Carteret, I mean they were generating a lot more loans than they could keep on their balance sheet and then packaging them and selling them, would you view that as a recurring source of income?
A I think what they were doing was selling mortgage-backed securities which is an investment gain as opposed to a gain from underwriting loans which you are reselling, but I'm not sure I know the quantities of the syndicated

Page 141

resales.
Q Well, with respect to -- well, I don't know my terminology, but with respect to the originated loans that they're packaging and reselling, is it fair to say that's a recurring source of income?
A Yes, that would be recurring, sure.
Q And with respect to the gains on sales of mortgage-backed securities, if they were booking those year after year after year wouldn't it be fair to say that those would be recurring too?
A They are.
Q Okay.
A But those are gains from a source other than the main business.
Q Well, I mean, isn't a bank in the business of buying and selling loans?
A Well, these are -- yes, you could say that.
Q So now --
A But if you think the main business is making loans with the depositors' capital --
Q Yeah, right.
A -- which they were to the extent of at least two-thirds of their business, you would





47e53af0-7c47-43f8-b5ce-12d94a7e6f74

Page 142

subtract those other gains in order to find out how the lending business was doing on a standalone basis.
Q Would that be the most important issue for you as an investor how the lending business was --
A In the case of Carteret it was very important to me --
Q Okay.
A -- to determine whether or not the main business of the firm was healthy.
Q Okay.
A Which I concluded it was not.
Q And have you ever heard of the term core earnings?
A Yes.
Q What does that mean to you?
A That's a regulatory term for what they come from but I can't define it anymore than that.
Q As a financial economist is that not a term that's used --
A It's a regulatory, it's a regulatory term and beyond that it's whatever you want to think the core business is. I would say a core business of Carteret would be making loans.

Page 143

Q Okay. And certainly when an institution is booking gains on sales of mortgage-backed securities that flows through to the book value and then would get factored in in a multiple to book; is that right?
A Well, that contributes, yes, that gets counted as retained earnings which is what you're valuing it as, yes.
Q Okay. And is that appropriate?
A Yes, that's where it goes, it should go there.
Q Is capital important for a thrift?
A Sure.
Q Why?
A Because you have borrowed approximately 95 percent of the assets that you are relending in order to make a profit and that means that you are very highly leveraged, 95 percent of the assets being borrowed, you've only got about 5 percent of it in capital or less in the case of Carteret, so that if anything goes wrong, your supply of capital is too small to be able to absorb what might be recorded as normal business losses. And if you are going to be under-capitalized to too great an extent, you will become insolvent, plus

Page 144

you're in a regulated industry which means that they can blow the whistle on you.
Q So is it fair to say that capital serves as a buffer against risks that turn into losses?
A Yes.
Q And what are the types of risks that a prudent thrift management would be concerned about in setting its capital level?
A Well, you're looking for a list of different types of risks, there's a different issue about how you set the capital, but let's take the risks first.
Q Okay, good.
A Obviously there's interest rate risk, obviously there's credit risk, obviously there's something called operational risk.
Q What does that mean?
A Operational risk is essentially the risks that people and systems that you have employed for the execution of your strategy underperforms the goals of the strategy and gets you into trouble. A computer breaks and nobody knows how to fix it, the telephone doesn't work, or somebody ran off with the money or made bad loans or lied to regulators,

Page 145

things of this kind that clearly are hazards of the business but they are important ones and they can affect you in terribly drastic ways, especially if you don't have much capital.
Q Right.
A But there are probably a few other classifications of risk, but the ones I mentioned I'd say are the most important ones.
Q What about regulatory risk, the fact that your capital requirement, you know, might go from 3 percent under FIRREA to 4 percent under FDICIA?
A Well, most people don't expect the regulators to be a source of risk. I understand why you're asking the question. But for the most part it's not on your list of things. We have political risk, if you want to call it that, you know, the Government decides that S&L's are illegal, it could do, so you could have political risk. It generally wasn't considered to be too severe a risk exposure in the banking industry because it was thought to be well regulated, but yes, there could be a regulatory risk.
Q As a financial economist, do you think investors should look at regulatory risk?

Page 146

A They have to consider all risk appropriately to the circumstances in which they find themselves. In times when there doesn't appear to be much of a hazard to either interest rate risk or perhaps regulatory risk they can set them aside to some decree and worry about other ones that are more important. But times change and so do the prominence of these different risks on the menu.
Q In the fourth quarter of 1992 would any investor in Carteret have to look at the regulatory risk that Carteret could be seized at any moment?
A They would.
Q Okay.
A That in particular applies to an investor in equity because when you do get seized, it's the equivalent of, financial equivalent of bankruptcy and the common stockholders' interest is reduced to nothing.
Q Right.
A So you don't want to make an investment in something only to find that it is bankrupt.
Q I don't know much but I understand that.

Page 147

All right. Now capital also constrains the amount -- well, actually, let's back up.
We had gone through the list of risk and then you had said, but now setting the optimal level of risk, this is a different issue.
A Yes.
Q And so how would one go about doing that?
A Well, there are two ways that this seems to be done in the banking industry. One is what do you think the right level of capital is and the other is what do your regulators think it is.
Q Okay.
A Now the regulators in general tend to be acting to ensure that the risk is not greater than it should be, you don't want to have a whole lot of guaranteed institutions with very little capital that could fail at any minute.
Q Right.
A However, the S&L industry in particular tolerated what we can say in retrospect was a very low level of capital as being an ordinary level of capital, somewhere around 5 percent they thought it was okay, as you probably know, because

Page 148

you've had Professor Saunders here and I'm sure he told you about Basel, Basel 1 and Basel 2.
Q At length.
A I thought so.
Well, the main thing you should know about Basel is that it is a system for determining risk adjusted capital adequacy for all of the banks in the developed world, which is to say, bearing in mind that they're all very competitive and they all want to be trading at 20 times earning because they're growing so fast, we want to make sure that they have approximately the same level, minimum level of risk adjusted capital so that we don't have people out there, you know, causing systemic risk by lending with different constraints upon themselves. In other words, the regulator should insist on at least an 8 percent total capital ratio, which most banks and most regulators now keep close to 10 percent, and this is after adjusting for the differential risk between the different kinds of assets. Now if you'd done that for the S&L industry, they would have been, probably the risk adjustment factor would not have been too penalizing because mortgage risks were considered a good quality risk but not so much the other things they

Page 149

got into, but they would have required more of it. And I think the proof is in the pudding, we saw an awful lot of banks fail because of interest rate exposures which simply was an example of how capital gets eroded very fast when you have to address these realities of mismatched assets and liabilities. For some reason regulators weren't listening to that frequency very much, they didn't understand that risk as much as they should have done. But it wasn't just them, big banks and insurance companies didn't understand that risk either, the interest rate risk just sort of popped up all of a sudden when the interest rates became so different. But at the same time, probably in the more recent periods after the fall of Enron, people were probably under estimating the importance of operational risk where, you know, people were doing things that got their banks into trouble. Big judgments and penalties have been assessed for this so obviously in the future we watch operational risk which we weren't watching very carefully before that. So, and the banking problem, not the S&L but the commercial banking problem in the eighties was credit risk because they're all in such great competition with each other to grow and be valued at high levels in

Page 150

the market following Citigroup's initial sprint in that direction, they lowered credit standards too much and to put loans on the book rapidly. So we have different kinds of risk can be epidemic at a time, that doesn't mean that we have to be aware of all the risks all the time but some are more important than others at any given set of circumstances.
Q Okay. Did the regulators have a bias in terms of wanting to have more capital than, all other things being equal, regulators would want to have more capital?
MS. GRONER: At what point in time?
MR. THOMPSON: At any point in time as a general matter.
A I don't know.
Q Okay.
A Because I've always thought they didn't have enough capital. So they may have wanted to have more capital than the entrepreneurs wanted, but maybe they thought it was a negotiation and maybe they were regulators, maybe they were Congress people who brought them up and beat up on them because they were too tough on the nice little S&L's run by Jimmy Stewart. So you had these realities

Page 151

that were not exactly enabling the market to set the ratio that should have been.
Q Do financial institutions voluntarily keep more capital than they think they need?
A They are now. I mean, you could say that all they have to have is whatever the Basel standard requires plus a certain fudge factor number in case, you know, some valuation models change, but many banks have more capital than that.
Q Well, don't the banks assess this is how much capital we think we prudently need, oh, it's higher than Basel, so we're going to go with this level but they don't add on top of that to the amount they think they prudently need, do they?
A If they already have more than they need, they probably will not, or they use it to buy back their stock, which Citigroup has just decided not to do, discontinued its program because of its exposure to loan losses.
Q And when you were at Goldman did Goldman keep excess capital?
A They kept all the capital. I didn't get to take any of my capital until I retired. So for 15 years they were eating up, they got my capital, I didn't get any. They were greedy for

Page 152

capital because they thought they could make more money on the capital than I could, and they were right.
Q Okay. So it worked out.
MS. GRONER: Is this a good time for a break?
MR. THOMPSON: Oh, sure, yeah.
THE WITNESS: I'm alright, if you want to keep going. I'd like to get through before too long.
MS. GRONER: Oh, okay.
MR. THOMPSON: Well, I mean, we're going to go to --
THE WITNESS: We're going to go to six anyway whether we have a break or not?
MR. THOMPSON: Yes.
THE WITNESS: I don't care if we break.
MR. THOMPSON: Why don't we take a five --
MS. GRONER: Five minutes?
MR. THOMPSON: Yeah.
(Whereupon, off the record.)
(Whereupon, resumed.)

Page 153

BY MR. THOMPSON:
Q So how do banks calculate the cost of their capital?
A Well, I don't know that I'm able to generalize on how they do it.
Q Okay.
A But there is regulatory capital which usually requires some formula that they must adhere to. Banks would be different from S&L's in that respect, they're now subject to Basel which requires them to go through a different regime, including the possibility of calculating their, using their own risk models which being more sophisticated than the regulators wants may come up with a different level of capital that's required.
Cost of capital, in general, is a financial economics matter that can be calculated by assessing the cost of the debt and the cost of the equity in appropriate proportions. The debt being an after-tax cost and that would be a function of the interest rates paid by all the different forms of capital that they have including deposits.
Q How do you calculate the cost of equity capital?
A You can -- there are a variety of

Page 154

formulas for doing that, there's some dispute over which is best.
Q Do you have an opinion on that?
A Yes. My opinion is I take the inverse of the PE ratio, that gives me the return on market value, and I think that is a -- you understand what I mean?
Q I think so.
A Okay. Price to earnings, you turn around and take earnings to price, it's the return that the earnings are as a percentage of the market value of the company and I use that as an indicator of what the cost of capital would be.
Q Okay.
A I know everybody does. Professor Saunders probably has a much more elaborate system he uses. Calomiris too.
Q Now you mentioned that banks have their own models of risk.
A Well, banks do, I don't know what the current or past practice for S&L's but there is a regulatory regime which you know FIRREA changed and required the regulatory capital to be calculated very differently.
Q Right.

Page 155

A Banks have a similar kind of need to calculate regulatory capital, but the present form gives them the option to use their own models, I guess they have to get permission to use their own models, for determining the value at risk and other interest rate exposures and so forth.
Q Well, when they use their own models, do they then have to conform their accounting statements, you know, their loan loss reserves to what the risk model says?
A I don't think they do that, the regulatory capital is one thing, the generally accepted accounting principles capital is probably another that may not be at all similar. The regulatory capital is risk adjusted for one thing and it's in response to these various models which in turn requires three different types of regulatory capital to be assessed, so it's an entirely complicated thing, and financial accounting doesn't work like that, so financial accounting would require capital to be consistent with those things which they call capital, basically cash capital and intangible capital.
Q For a thrift such as Carteret would its cost of deposits be lower than its cost of

Page 156

equity capital?
A Yes, it should be.
Q And is that because deposits are insured by the United States Government?
A Well, that's a big factor, isn't it? If Uncle Sam is going to guarantee it, then, as we stated before, it would be considered a risk-free investment, therefore it gets the lowest possible rate. If you were trying to borrow without the Government guarantee, you would pay a market rate which would reflect your particular creditworthiness in the market for banks.
Q And so if a --
A By the way, banks do this when they issue debentures or notes or other things that are not deposits, they have to pay market rates.
Q Right.
A And Carteret did too.
Q So now let's say you had a thrift that had a hundred million dollars in assets and it had a 10 percent capital requirement, so it has 10 percent paid-in equity capital and it's funding the rest of the loans with $90 million of deposits, and they get a call from their regulators saying Congress just passed a law, now you only need to have 5 percent

Page 157

capital, so they pay off 5 percent of the equity capital and put in 5 percent of deposits, would that be, would that reduction in the capital requirements be a benefit to that thrift?
A In theory the way you put it I think it would be but that assumes the regulators knew what they were doing in lowering the capital requirement to a level which they thought was adequate but might not be, and if it weren't adequate and people made mistakes and didn't have a sufficient amount of capital to cover it, then the consequences could be severe.
Q Right. So provided they still had an optimal reasonable amount of capital at the end of --
A From time to time banks find themselves with excess capital or over-capitalized from time to time they do find that, it doesn't, it's not a condition that lasts very long.
Q And why is that?
A Oh, they find something to acquire, buys them goodwill, or they buy their stock back in the market with a stock repurchase program or maybe they increase the dividends. They can find ways to recycle that excess capital.

Page 158

Q And that's because they don't want to just have excess equity capital laying around?
A That lowers your return on investment.
Q And that's a bad thing?
A Yes.
Q Okay. Is it fair to say that supervisory goodwill had the effect of lowering Carteret's capital requirement?
A It appears to have lowered the requirement for cash capital in the sense that they were satisfied with supervisory goodwill as if it were cash capital, therefore, raising the question I just posed, did they allow it to be too little.
Q And you think the answer is yes?
A I do.
Q Right. What is the significance of -- well, actually I think we've covered that.
Do you have an opinion as to how the passage of FIRREA affected the economy?
A No.
Q Will you expect the raising of capital requirements to lower the amount of lending and, therefore, lower economic activity?
A I did not expect that at the time.
Q With the benefit of hindsight, which I

Page 159

know the regulators didn't have at the time and either did Congress, do you think that's right?
A Neither did I or anyone else.
Q Of course.
A I think the benefit of hindsight suggests that the effect on the economy was more favorable than unfavorable.
Q Even in the short term?
A It may have been a transition period where people are getting used to having to recapitalize themselves but after that the industry was on a sounder basis and therefore able to develop itself better, though there was some triage applied when this occurred, weak ones were eliminated in the process.
Q And so during the transition period did FIRREA at first have a negative effect on economic growth and then it was a positive?
A I have a hard time valuating the effect on macroeconomic growth in the United States, I think they were, within the S&L industry, it probably had the effect first, the triage effect, making it more difficult for some who in turn became insolvent but those who didn't did better.
Q Is a 4 percent rate of unemployment

Page 160

fairly benign do you think?
A I do.
Q Okay. What is structural unemployment?
A I'm not sure I know. I'm not a macroeconomist and what I believe it is is probably of not any great importance to you.
Q Now with respect to in your Documents Considered one of the things is the Court's opinion in Slattery and Suess. As a financial economist, I'm not asking for a legal opinion, but as a financial economist, do you agree with the approach to damages that the Court took in Slattery?
A I'm not familiar with that sufficiently to have an opinion.
Q Okay. Do you have an opinion as to whether the Court's approach to damages in Suess was appropriate as a financial economist?
A I have to give you, I have to give you the same answer, I don't, I don't know.
Q If the Court concludes here of that but for the breach Carteret would have survived, and I know you disagree with that, but for the breach Carteret would have survived, do you have an opinion as to the appropriate way to measure damages to

Page 161

Carteret, wouldn't it be to look at the value of Carteret today?
A I have not considered this before, so I cannot give you a thoughtful answer. My view is that you'd have to be very careful in how you decided to assess those damages and I would say knowing what it was today would be a very difficult number to know and it would be therefore almost entirely speculative and therefore not as helpful as it would be to start with what it was at the time.
Q So you'd start with what it was at the time and then couldn't you just find an SNL index and say look, you know?
A I don't think I would do it that way. First of all, if I had to determine the value of the company at the time it was, you know, it was affected by this, I would probably start with the value that it appeared to have somewhere around January of 1991 after Ambase sold its insurance businesses and, as I understand it, its remaining asset was Carteret at which point its market value was about $26 million and I'm not sure I would simply index that from then on, I'd need to ask myself what I thought of the prospects and so forth.
Q Do you have an opinion on that or --

Page 162

A I don't have an opinion as to what it would be.
Q Okay.
A I don't even have an opinion yet on the methodology, but you asked me where I would muck around with it and I've just given you where I thought I'd start.
Q And why would you start in January of '91?
A That's a pretty -- we have a definitive number that we get from a market valuation at the time, people bought Ambase stock at the time and that's all it owned is Carteret so that's putting the value on Carteret.
Q Do you have an opinion as to whether it's possible to a reasonable degree of certainty to try to disaggregate how much of Ambase's market capitalization was attributable to Carteret prior to January of '91?
A No, I found that difficult to do, I tried but I couldn't find a satisfactory way to do it.
Q Okay. What were the methods that you tried?
A I just found the situation too unclear

Page 163

to be able to try anything.
Q Okay. In your opinion was Carteret harmed by the breach of contract?
A Not materially so.
Q Was it harmed in any way?
A It might have been.
Q How?
A In a non-material way.
Q I mean, do you think it was in a non-material way or --
A It could have been but I'm not so sure it was. The ways in which such a harm could come is if it was required as one of the executives said to engage upon, you know, sort of a lot of firefighting to change things to be in sudden compliance when it hadn't prepared for it beforehand, whether they might have anticipated this is another issue, probably they should have. But also there's a question about, you know, did they have many options that they could follow at that point when they got into this business of having to write off all those big loans, and that was happening. By the time that Ambase sold Home or the insurance businesses, then Carteret had already been through a pretty bad year in terms of writeoffs, that was the sudden sharp

Page 164

shock that came when they wrote off a hundred-and-twenty or whatever it was million dollars of loan losses, that had already impacted the situation, so what they could have done subsequent to that to improve the value is hard to know.
Q When those loan losses were written off, 120 million in 1990, would you expect those to have a dollar-for-dollar impact on the stock market capitalization of Carteret?
A I would think it would be greater than that because the fear was that it wasn't all, there was more to come, as there was.
Q Okay. Now, with respect to Carteret's capital deficiency, do you have an opinion as to how much capital Carteret would have had to raise in a non-breach world in order to survive?
A Well, insofar as I don't think the supervisory goodwill counted very much for capital at all, I would say that the same amount would be necessary in the non -- in the but for as well as the real world, another 150 million or so, which I believe was about the -- maybe it was 120 million they first suggested but it increased it to a larger number than that before long, but something of that

Page 165

magnitude would have been necessary to withstand the problems of the bank.
Q So if Carteret had gotten $150 million in real hard cash capital, it could have survived?
A It could have, yes.
Q Okay. And it would have survived?
A Did they make any other mistakes, I mean, you know, we didn't know about the mistakes that they just finished writing off, so I don't know, but I assume that they could have.
Q Okay.
A If they had run the bank well, and as I understand the bank was run well after Mr. Bianco got in. I'll give, I'll give him that.
Q Have you analyzed the value of Carteret's servicing portfolio as of any point in 1992?
A No. No.
Q Have you analyzed the value of Carteret Mortgage Company at any point in 1992?
A No. I assume that they're all part of this, the entire enterprise including these assets.
Q Right. Do you have any reason to doubt that Carteret could have sold its servicing portfolio in 1992 if it had wanted to?

Page 166

A I don't have any reason to doubt that it might have been able to sell it.
Q Okay.
A I don't know the market condition for that thing, so there are things I don't know, but I don't have any reason to doubt it.
Q Okay. And do you have any reason to doubt that Carteret could have sold its mortgage company in 1992?
A Same answer.
Q Okay. Do you think it was reasonable for Carteret's management to rely upon the supervisory goodwill to meet its regulatory capital requirements?
A Well, they were the regulatory capital requirements, so one must comply with the regulatory regime when it's in.
Q Well, if the regulatory regime didn't require them to rely on supervisory goodwill, they could have gone out and, you know, tried to get tangible capital?
A Well then if your question is, do I think they needed more capital than they had?
Q Yes.
A I would say yes, they did and that

Page 167

they probably could have raised it without offending the regulators, but they didn't.
Q And do you think it was reasonable for them in, you know, 1983 through '89 to operate the bank with the level of tangible capital that they did?
A Well, we discussed that earlier and I said I thought they were under-capitalized and I would have warned them that they were taking a great risk to run the bank that way because I thought the proportion of total capital that was contributed by goodwill was excessive. That doesn't mean that it could not under any circumstances have succeeded and, you know, I can understand people ignoring advice like that, but that does mean that the burden of performance is on those who ignored the advice.
Q Now, all other things being equal, it's easier for a company to raise a smaller amount of capital than a larger amount of capital; isn't that true?
A Probably.
Q Do you have an opinion as to when it became clear that FIRREA was going to eliminate supervisory goodwill?
A I've tried to find that out but I

Page 168

haven't been able to do so. There's a lot of rumor and, you know, speculation in the press and elsewhere about that, I suppose people who were close to the legislative process in Washington might have had a much better idea than the average investor would do, but there wasn't a clear indicated date, so it was my understanding that it would have been reasonable to expect tightening of the regulatory requirements for S&L's and for banks as a result of FIRREA, and whether that meant that the capital ratios would be increased or whether other characteristics of it would occur, it's hard to say, but on balance the participants in this industry had every reason to expect the regulatory glove to be gripped tighter after that and capital adequacy is a very obvious place in which they might go to work.
Q Right. Have you ever made an investment in the cable industry?
A Yes, I've bought stock from time to time in cable companies but not a significant amount.
Q What about public utilities, have you ever acquired any of them?
A I don't think so.

Page 169

Q Airlines?
A I don't think so.
Q Telephone long distance providers?
A Yes, I have had such investments.
Q When making an investment in a regulated industry, is it important to understand the regulatory environment confronting the company?
A Certainly if you were a professional investor you would.
Q Okay.
A If you were a small investor buying a one of many stocks in a portfolio, you might not feel that the cost of that undertaking was worth the effort but you hope somebody's doing it.
Q And do you fit into that latter category?
A I have on occasion, yes.
Q Okay.
A I am not an institutional investor operating on the same scale as others.
Q Right. And would you agree that excessive regulation can hurt the value of a company?
A Yes.
Q And, in fact, poor regulatory

Page 170

decisions can have a devastating impact on an industry; isn't that right?
A They might.
Q And is the S&L industry in the early eighties an example of that?
A I would have to have a better idea of what you mean by that to be able to agree with you.
Q Okay.
A Regulatory regime in S&L began somewhere in the thirties and tolerated a lot of things that seemed benign at the time but which permitted this interest rate and this batching to occur when it did, that's probably an example, benign but poor regulation if you want to anticipate an interest rate spike.
Q Okay.
A So they go through different periods when the regulation seemed to be good and effective and other times when it is embarrassed for what happens under its watch. It's an argument for reducing regulation.
Q We've covered a lot of this you'll be glad to know.
A I am glad to know.
Q Do you have an opinion as to what the

Page 171

correct discount rate would be for an investor looking to make an investment in Carteret in 1988, August of 1988?
A No.
Q Is there even a range of appropriate discount rates you could give for that time period?
A I'd have to go see what interest rates were and what risk, comfortable risk premiums were for an industry, companies in this industry to give you a range.
Q In picking comparable --
A This is a company that already had a market value in 1988 so --
Q Right.
A -- it is before the acquisition.
Q Yes.
A So we can assume that this number is already in there.
Q Now would your EP ratio be relevant to this?
A In what way?
Q Well, wouldn't that be the cost of capital and isn't the discount rate --
A I might use it that way but I would want to look at other ones as well.

Page 172

Q And if you were looking at comparable institutions what ratio would you be looking at with respect to them to figure out the discount rate for Carteret?
A I would probably take a peer group of S&L's that I thought were comparable to them and I would see what their capital ratios were and their PE ratios and I would come up with some sort of a judgment as to what an appropriate rate would be for Carteret taking into account how the market was valuing others.
Q Right.
A It may be that the market already values it where it should, if it doesn't, then we, you know, I have a disagreement in what that number would be with the rest of the market in which case I might choose to make an investment or sell it short. If I were such an investor, I could do that, but.
Q In selecting a peer group what would be the most important criteria, would you be looking at size or geography?
A Those would be important factors.
Q And would you be trying to have as many, I mean, you could fine-tune the number of criteria saying well, it has to be a New Jersey

Page 173

thrift that has $5 billion in assets that's --
A It doesn't have to be a New Jersey thrift, it has to be probably some thrift, a thrift that don't have distinguishing disqualifiers for geographic composition of the mortgage portfolio they're exposed to. For example, there was a time when Texas thrifts had a very high rate of mortgage foreclosures which was not shared by New England thrifts, so I'd want to make sure I had that accounted for that difference, if there was such a difference. But I'd also look for companies that were already public so I had, you know, market information as to what these values would be and they would have much better disclosure because they're public companies than they would if they were not. It's very hard to be able to determine what a mutual savings and loan in California would look like as compared to Carteret at the time, so I'd want to be sure that the peer group had comparable kinds of investment opportunities. So if I was trying to make a judgment to invest in the S&L industry in this particular quarter of it, this particular size bracket, what would I consider to be the likely candidates, that would be how I would select the peer group.

Page 174

Q And in terms of size what would be, what size thrifts would you consider peers of Carteret?
A Well, when we did this study in the back we did that.
Q Is that 2 billion of assets?
A Yeah, something like that.
As we looked before Table 1 was offering thrifts at least 20 million which excludes, basically, it's smaller enterprises, and then we go to other comparisons in which the total assets are over 2 billion but I would eliminate those which were over 50 billion or something like that.
Q Okay.
A I'd want to have some approximate size parameters that were the same.
Q Now, do you consider the institutions that are in Table 1 of Exhibit 4 to be peers of Carteret?
A Well, they begin as peers in the sense that except for size, you know, they appear to be seeking capital about that time, they're in the same industry, they're more or less regulated the same way, but as I said in the report we eliminated some of them because they were too big and better

Page 175

capitalized in various ways. This is the one about -- which one -- Table 1 of Exhibit 3.
Q Right.
A Sorry, Exhibit 4.
Q Yeah.
A We eliminated for the most part the larger ones in trying to judge how much capital we thought they might raise.
Q But is it fair to consider these institutions peers of Carteret?
A I would assume so.
Q Okay. Now --
A You might narrow it further if you're going to try to pick which of those to invest in, but this is a start because it gives you information about who could finance.
But then we have -- we had a couple of other cuts at it if we also use different criteria for judging between them in terms of their capital adequacy, in terms of their operational performance and so forth.
Q Well, it seems like in some of these you've included a lot of thrifts and then you look at the ratios and then in others you have a smaller subset and I just didn't know if you thought one was

Page 176

a better cut at peers than another.
A I think Table 1 is a better cut at peers. Table 4 -- sorry. Table 3 and I think Table 2 include -- let me take a look at this, I don't want to get off track.
The Table 1 would be a better peer group, the others go up to 2 billion.
Q Okay.
A And that's, you know, the larger number of banks appear in that table. But, again, you know, we're looking at peers who are available to give us information about themselves.
Q Right. Now, do you have an opinion as to what the correct discount rate for an investor looking to infuse equity capital into Carteret would have been in 1989?
A I think I have a footnote in my report someplace that refers to discussions by investment bankers who were seeking to raise private equity fund to invest in the restructured S&L's at that time, maybe a little earlier than 1989, I don't remember exactly when that period was in which they were looking for returns of 20, 25 percent for the investors.
Q Do you think that's about the right

Page 177

number?
A That was, I do.
Q Okay.
THE WITNESS: Do you know that footnote?
MS. GRONER: No, but why don't you just take a moment to find it so that the record will be clear.
A (Complies.)
MR. THOMPSON: I think it's --
MS. GRONER: Sixty-two --
MR. THOMPSON: -- 62 --
MS. GRONER: -- I think.
MR. THOMPSON: -- on page 30.
MS. GRONER: We all found it at the same time.
A Yes, that's the one.
Q And in your opinion would those same rates of return had been required in 1992 by a privity equity investor?
A Yes.
Q Do you have an opinion as to when in the absence of a breach of contract Carteret would have been seized by the OTS?
A I don't know exactly why they get





47e53af0-7c47-43f8-b5ce-12d94a7e6f74

Page 178

seized when they do get seized, I'm not sure anybody really knows, somebody makes a judgment that we've waited long enough for them to try to turn things around and so let's do it, and it's made by a government committee of some kind so it's real hard to be sure how that is done. But the condition of the bank, certainly after the second or those two big years of writeoffs, was very fragile, very delicate and there was a general consensus that capital had to be raised, which it was not. So whether it was but-for or not, it needed capital, and it needed a lot of capital, and the only place it could get it at that time was from these private equity investors who were not prepared to pay more than about $22 million for it, and they would want at least 90 percent of the stock, so it would be entirely different kinds of capital raising than they had thought about before. And if they had raised it, I'm sure that they would not have been seized, but they didn't raise it. So whether the timing of when this was done was appropriate or not is not something I have any way of judging.
Q Okay. Would there have been any harm to the system to allowing Carteret to operate for another three months?

Page 179

A It's hard for me to answer that, I don't know exactly what they considered harm to be, but it could have got worse, that may be something they were worried about, and the insurance bill could have been greater. I'm sure reasonable people might have disagreed about these issues but I wasn't aware of the discussions. I've never been a regulator so I'm not sure how they would do that.
Q Do you have an opinion on whether -- well, let me ask it this way: Are you aware that there was an injunction entered in this case?
A Yes.
Q Do you have an opinion as to whether that's in any way relevant to damages analysis?
A I would say that to me the fact is that they were allowed to -- the injunction allowed them to ignore FIRREA.
Q From February of '91 until?
A Until they got, when they got the injunction until they fell out of capital compliance on the pre-FIRREA basis which was by the end of '91 I think.
Q And the injunction was taken away from them?
A I believe so, but it was in place for

Page 180

several months, was it not, six months or so?
Q Yes. Well, actually it was in place, I believe from February of '91 there was an oral argument in the Third Circuit Court of Appeals which Ken Starr argued in December of 1991 and then the ruling I believe came down in May of '92. But, I mean, a prudent manager would try to assess the likelihood that they were going to be able to keep that injunction, right?
A I guess.
Q Yeah. Okay. Do you have an opinion as to how likely it was that Carteret as a matter of law was going to be able to keep that injunction?
A I don't have an opinion about a matter of law.
Q Okay. Now --
A I just might add the thought that during the time the injunction was on it was, it was they were living in a but-for time.
Q Provided management was acting as though -- was relying on it as opposed to thinking Ken Starr's going to get this thing reversed in a New York minute?
A Yes. Yes. Providing all of those things.

Page 181

Q Right.
A But they were effectively allowed to ignore the rule, the pre- or the post-FIRREA capital requirements for a time during which they might have made an effort to shore up the balance sheet.
Q But wasn't it too late by '91? By the time they got the injunction in February of '91, wasn't it too late?
A Well, I believe it was, it was too late to raise capital from the public market, I believe that, as it turned out, it was probably too late to raise it from the private market as well. Conceivably there may have been some other private equity solution to the problem but I believe they canvassed the market rather thoroughly and got everybody who might make an offer to do so but those people found out, they were uncomfortable with what they found out so they backed away, which would suggest that the effort was too late.
Q Okay. You state in Footnote 9 of your report --
A Sixty-two to nine?
Q Sorry. On page 7.
A (Complies.)
Q The first sentence, quote, The thrift

Page 204

FIRREA was passed, at the end of 1989, I believe they were in compliance. So they came out of compliance subsequently.
Q Now, you begin this sentence by talking about your experience. Have you ever invested in a company that had supervisory goodwill?
A I don't believe so.
Q And do you have any experience prior to this case in valuing supervisory goodwill?
A No.
Q When you say that supervisory goodwill was not viewed as valuable as its accounting value, are you saying that it wasn't viewed as being worth, a dollar of supervisory goodwill was not worth a dollar of tangible capital?
A Yes.
Q Now, in terms of the value of goodwill, would it be fair to say that it might differ from one institution to another in the sense of, if you have an institution that needs the goodwill to stay in business, it might be more valuable to it than an institution that has an abundance of capital and doesn't need the supervisory goodwill to stay in business?
A The value of goodwill varies between

Page 205

companies and over time, and depending on the circumstances, so it's continuously changing.
Q And would that be true of supervisory goodwill as well?
A Yes.
Q Okay. And with respect to a company that needed the supervisory goodwill to survive, would it be fair to say that such a company would value it more than a company that didn't need it?
A Well, my comments are related to how the investor would value this, not how the company would value it. The investor is not going to be sympathetic as to whether or not the company needs it or doesn't need it, it would be a question of how much of the capital is in this form that is not considered to be tangible capital. Allowances will be made for other factors which might encourage some positive valuation to be given to the goodwill, but then again if circumstances are different, are more negative, then the allowances might go the other way.
Q Well, let's look at your Exhibit 3 for a moment.
A (Complies.)
Okay.

Page 206

Q The first table there.
A Uh-hum.
Q And let's look at 1985 for example.
Now that's a year in which -- you might need to look at Table 2 for this -- but that Carteret had net income of $46 million. I think that's on the second page.
A Uh-hum.
Q And --
A That's '86.
Q I'm sorry, okay.
A The remainder -- are you asking me about '86?
Q Let's see. Yes, that would be fine, we could, yes, '86.
So in '86 there's net income of $46 million, right?
A Right.
Q Okay. And there's tangible capital of only $21 million at the end of '86, right?
A Right.
Q Okay. And the capital requirement for 1986, do you remember what that was?
A I don't. I believe we have the ratios, we may have the ratios here.

Page 207

On page, what is it, page 3 of 3, Table 1, Exhibit 3, I'm sorry, the regulatory ratios, okay, we see something about regulatory ratios. The liquidity ratio, 5 percent is required, it showed that it had 10, and you see there are other, a limited number of other items there under Liquidity under Regulatory Ratios suggesting that the capitalization was satisfactory from the standpoint of regulators.
Q Now what does Excess Reg NW mean?
A That's regulatory net worth, that's to say, to the extent that Carteret had net worth in excess of the amount required by the regulators, that amount would be listed here.
Q Okay. So this is the excess amount?
A What they call excess.
Q Right. Okay. Do you recall how the capital ratios were calculated?
A I'm sorry, I do not.
Q If I were to say that it was 3 percent of liabilities, would that sound about right?
A I would think that would be low, but I don't remember.
Q Okay. Now, just for clarification while we're on Exhibit 3, Table 1, page 3 of 3, the

Page 208

one with the capital ratios on it, there's a line item, it's the second row, Price/EPS?
A Yes, that's the price range ratio.
Q Of --
A Risk divided by earnings per share.
Q Okay. And so this shows us the range for each year?
A Yes.
Q Okay. All right. So -- in fact now let's look at the net income for 1985.
A Excuse me, you're wearing me out.
Q It's so early.
So 1985 there's net income of $25.2 million; is that right?
A Yes.
Q Okay. And if you were an investor in 1985 might you think that those earnings and this prospect of future earnings in Carteret would have had value?
A Yes, I might have thought that.
Q Okay. And that would be reasonable, wouldn't it, in 1985?
A It would be, although you can see that that means that the good news is it's recovered from seven and a half million the year before, but the

Page 209

bad news is that even so it's well behind the year before that which was 35 million.
Q Right.
A So it doesn't exactly tell me that the bank is returned to some sort of predictable growth pattern that could be sustained over any period of time.
Q It's hard to know?
A It would be hard to know.
Q Okay. Now, but in 1985 if you were an investor isn't it true to say that -- well, if we look at the tangible net worth on the prior page it was negative $55.5 million; is that right?
A That's what it says, yes.
Q Okay. And so this was an institution that was entirely dependent upon supervisory goodwill in order to be able to stay in business to continue to generate positive cash flow; is that right?
A No, not exactly.
Q Okay. Tell me where I went wrong.
A It is under-capitalized to the extent that we see here, but at the time the capital base wasn't under strain because of operating difficulties, it was, operating difficulties were

Page 210

beginning to contribute to its capital base, and in the absence of any claim on the capital, there could be assumed that these guys were swimming well while holding their breath.
Q But the point is that without supervisory goodwill, if Congress had passed a law on December 31st, 1985 saying supervisory goodwill no longer counts, then Carteret would have been -- and there's a tangible capital requirement --
A Well, Carteret would have been in business, it would have been a going-concern in business but it would have been in default of its regulatory requirements, which is not a good thing to be in. It would therefore have to address those defaults. It would have to remedy that issue if it's going to continue to have a license to do that business.
Q And that's my point. Isn't the supervisory goodwill really akin in 1985 to a license to continue to do business, notwithstanding the fact that there are capital requirements that without the goodwill Carteret would not have met?
A Yes.
Q Okay. Now --
A To the extent that we are assuming

Page 211

that the regulators would, you know, we're assuming something about what the regulators would do if you were out of compliance.
Q Right.
A They don't always shut you down. It's probably a case-by-case workout as to how they decide to do it. They may say raise some more capital, we'll give you time, do this, merge with them, there are a variety of different things that might be imposed on the bank by the regulators, but the essential point is, if you're going to be in this business, it's a regulated business, you have to comply with the regulations or you won't be in the business.
Q And do you -- I mean, in 1985, if on December 31st, 1985 supervisory goodwill had been eliminated as a component of regulatory capital and, if I'm right, that the requirement was essentially 3 percent of liabilities, then that would mean a capital requirement of about 150 million and Carteret would have, without the goodwill, what, about zero?
A Well, they had -- what year are we talking about?
Q December 31st, 1985.

Page 232

therefore, you got a capital problem, as evidenced by the ratios in the previous sentence.
Q Now, in Paragraph 29 in the last sentence you say, quote, One of the inducements offered by the FSLIC to get other S&L's to buy the assets of failing S&L's, and then is this non-cash income effect from the accretion of loans, and we talked a little bit about this yesterday, but why would this non-cash income effect be an inducement to a thrift acquirer?
A Essentially it means that if you make this deal, after doing so you will have a positive addition to your earnings that you wouldn't have had otherwise.
Q Okay. But from an investor's perspective --
A The investor has a hard time unbundling this one because it's the result of two different amortization streams and they are buried into the expense accounts of the bank in such a way that it's difficult to know. You can sometimes find enough footnote information or some other capital transactions in the back of the financials, which is what we did to dig this out, but it can be obscured easily, and it looks good.

Page 233

Q Well, would it look good if the investor were able to figure out that this is a non-cash accretion item?
A The investor would probably set that aside as an example of the income of the enterprise.
Q Maybe this is just my caffeine hasn't kicked in.
When you say the investor would set it aside, the investor would ignore --
A The investor is going to invest in the enterprise because the investor believes that the enterprise is in a business, a good business that's going to generate income flow, cash flows from the business it's supposed to be in. If you're a bank, then you're supposed to generate your business, a good business from the banking business.
Now, in addition, every business has a few other things that affect its income stream one way or the other, but those aren't meant to be the principal drivers of the business. You probably would not invest in a banking business in which two-thirds of its income came from lending if the other one-third was doing well but the first two-thirds was not, you would say, well, this isn't a healthy good bank so I'll buy something else.

Page 234

Now, we are making an effort to determine the so-called core business performance by setting aside things that aren't part of it, such as these accounting income flows, so we would set those aside.
We would set aside the gains from the sales of securities as well in order to evaluate how much of what's left is going into the core business of the enterprise.
Q Would you also set aside the losses on sales of assets?
A Yeah.
Q Okay. Now with respect to -- though, a rational investor would basically have ignored this non-cash effect of accretion; is that true?
A Well, they're setting aside from the standpoint of evaluating the main business, they're not saying it's useless, it has some value to the, to the bank in the sense that it has a legitimate accounting flow that, you know, does count, but it counts for technical reasons and not really the reasons you are trying to get at when you evaluate the bank.
Q And it counts for meeting regulatory capital requirements; is that true?

Page 235

A Yes.
Q And so that would be something of value?
A It would.
Q Okay. Have you seen any evidence that Carteret valued the opportunity to have this accretion effect? That Carteret in 1982 thought this was an inducement to buy Barton and Delray.
A I'm not familiar with any statement they made to that effect that would give us evidence that they were excited about it.
Q Okay. All right. Now in Paragraph 30 you make reference to the fact in the first sentence that Carteret's equity capital or net worth was just $22 million. Let's flip to your Exhibit 3 just so that I can see where this number comes from.
A (Complies.)
Q Okay. So I think I see it, it's maybe in the --
A It's in the Federal Savings Association -- sorry, beg your pardon.
It's in the year before -- I'm sorry.
It's in the column entitled 1982 under the general label of Federal Savings Association. After the conversion from the Mutual Association to

Page 280

things that you could adjust it for but you're making an effort to find the real cash flow that is available to service the business.
Q Do you have an opinion as to what peers -- excuse me -- what the peers were of Carteret at the end of 1992 that a private equity investor should have been looking at to look at comparable cash flow multiples?
A I would suggest that they would probably look at the population of peer of S&L's in the size range of approximately two to five, two to ten billion dollars.
Q Okay.
A And they may exclude some even so. But understanding that the private equity investor is going to make an investment in a distressed situation, knowing it's a distressed situation, he will probably look at other distressed or poorly performing ones to see what they're like at the time and he would prefer to pick those that have some sort of public market information as opposed to privately held ones which would be hard to get information. They would get some indication of the value to be paid. Then there is a question of how do we deal with the question of servicing the debt.

Page 281

Do we refinance the debt? Can it be refinanced? Can we engage in financial engineering practices that might reduce the burden of the debt service? Those sort of things.
Q Now, with respect to the multiples to cash flow, so how does that work, if the peers have a multiple of cash flow of 10 to 1 hypothetically, then are you looking to see if --
A Well, it gives you some idea as to what a sort of sensible market value for an enterprise of this type would be.
Q Okay.
A Why would you want to pay 30 times if there was a market at 10.
Q Okay. All right. Now, in terms of Carteret, do you have an opinion as to whether any of its debt as of the end of 1992 could have been refinanced in a way that would have been sensible for a private equity investor?
A It would be a difficulty to determine this with a starting point in which more than or almost half of the total liabilities was in the form of loans from the FLH -- from Federal Home Loan Bank Board.
Q Well, those could be repaid?

Page 282

A It could be, but one would have to negotiate it.
Q What do you mean negotiate it, it's right in the contract, you can repay it?
A But I want to know to what extent can I refinance debt to get this bank on a more normal basis so that I'm not either paying a penalty for this or being subject to other burdens. The average S&L does not choose to have half of its funding from the lender of last resort, so I would pick some better way if I could, but it would have to be negotiated, it's not something I can just do by myself.
Q That's, and I don't mean to be difficult, but that's what I'm not understanding in the sense of, if you could raise the debt, if you could raise $2.6 billion from some other source, couldn't Carteret have just showed up at the Federal Home Loan Bank window and said here's your money back?
A But Carteret couldn't because Carteret had no capital, Carteret was basically in jail, I am going to take it out of jail with my $200 million of equity and I'm going to have a different enterprise and I have to have some expectation of being able to

Page 283

change things so as to make it better to justify my doing this. If I find that I can't do anything that makes it any better, maybe I'm not interested in making the investment.
Q Well, that's what we're exploring, and so the question is: With respect to this 2.635 billion dollars of Federal Home Loan advances, do you have an opinion as to whether Carteret could have refinanced that debt?
A I have an opinion that would suggest that they could have probably negotiated with them to come up with something, something that they would regard as preferable to what they're doing.
Q Something that -- who's the "they," is that Carteret?
A That a private equity investor could have engaged in a negotiation that would have anticipated refinancing that debt and getting the thing back to normal, including asking for incentives.
Q Right. And so what would the negotiation have looked like between a private equity investor and the Federal Home Loan Bank?
A I don't know.
Q Okay.

Page 304

A I mean risk-free rates and such are not often terms used by practicing investment bankers, we understand the concept, of course, there is a premium over the risk-free rate for all investments, debt as well as equity, equity you have a higher premium because they're subject to higher perception of risk but it tends to be used academically as grouping together the whole market or segments of the market to indicate the relative risk appetite in the market at the time which isn't of much interest to individual cases in which they're dealing with the specifics of their own situation.
Q So, I mean, if you were looking at some junk bonds, if an institutional, let's say a pension fund came to you in 1992 and said "We're looking at buying some low-grade debt," one of the things you'd look at is the risk of default, correct?
A Right.
Q And you might look at interest rate risk too?
A You might.
Q And would those be the two main things?

Page 305

A Yes, I'd say so.
Q Okay. And with respect to the default risk that doesn't in any way depend on --
A No, it doesn't.
Q -- the risk-free rate?
And with respect to the interest rate risk does that depend --
A Well, interest rate risk is not equivalent danger to everybody. To S&L's, which live by the mindless practice of borrowing 30 days to lend fixed rate 30 years is a very important factor, so if I'm going to make an investment in the S&L industry, I want to find out what the interest rate exposure is before I even get my pen out of my pocket and I have to ask myself whether this is a situation which could change for the worst given the structure of their particular exposures at the time, but it's not something that you would worry about as so much with say the regular commercial banking industry.
Q Okay. So for a regular investor that would be less of a concern?
A You mean for an investor in something other than S&L's it would be less of a concern?
Q Yeah, well, I mean for an investor,

Page 306

this hypothetical investor looking at low graded debt offering --
A A low-grade debt offering of almost anything other than an S&L wouldn't worry about interest rate risk very much.
Q Okay. Now, you note in Paragraph 35 that Carteret was able to raise $467 million in the debt markets in 1986.
A Yes.
Q Okay. And do you know what type of debt that was?
A Yes, it's all -- it's explained in our favorite table in Exhibit 3, the last table.
Page 1 of 2, Table 2, Exhibit 3.
Q All right. Now, if you had been approached by an investor in 1986 who was thinking of buying some of these debt instruments that Carteret had been able to sell into the market, would you have advised an investor that this was a sensible investment? Take for example --
A It would be very dependent upon what the interest rate was.
Q Okay. So, for example --
A I mean there is a rate for everything.
Q Right.

Page 307

A So I know what I got here, but what's the rate, and some of these rates look pretty thin to me, one-sixteenth over six-month LIBOR for a six- to eight-year collateralized floating rate note issue may seem to be a little low for my thinking.
Q What about the one-eighth?
A That's a little better but it's still I think on the low end.
Q All right. So you would be --
A But, again, this is the stuff that's in the news today, this is, the investors in this paper were thinking that because there was a collateralized mortgage-backed obligation that it was a very high quality and very low risk of default and therefore it could be priced at a very low risk of, you know, a competitive low interest rate. What we know and have known before, and we knew in 1989 for sure when we saw the illiquidity problems come into the junk bond market, similar to the illiquidity problems coming to the mortgage market today, that illiquidity could make a big, very big difference in terms of the value of the asset collateral and the market price of those loans. So in 1986 they weren't thinking about liquidity issues, they probably would have given it pretty

Page 312

appears that the only capital that was raised in the markets was that New Jersey Mortgage Finance?
A Well, there's also a little bit more in the Student Loan Marketing Association.
Q Fair point.
A A little less of other borrowings, and they paid off the commercial paper.
Q Okay.
A And they did not have any collateralized borrowings from the -- sorry -- any Federal funds borrowed.
Q If a investor had come to you in 1987 and asked you what sort of return on equity they should require in order to make an equity investment in Carteret, would you have an opinion on that?
A Well, as we indicate in Paragraph 36 the best year they had from the standpoint of investment performance numbers was 1987 and that year their return on investment was 11 and half percent which I don't consider to be particularly impressive considering the amount of leverage they had, but it was better than what they had in the prior years. I would wonder whether this bank was sufficiently profitable to make it worth investing in.

Page 313

Q Well, at some level there would have been -- it would have been attractive, right?
A Yeah, if you lowered the price.
Q Yeah, and I guess that's my question: At what price what sort of required return do you think would have been an appropriate value for Carteret?
A Higher than 11.5.
Q Fourteen percent? You don't really have an opinion?
A I don't have -- I haven't made an effort to calculate an opinion.
Q Okay. Do you have an opinion as to whether Marshall Manley was a good manager?
A I don't know Mr. Manley and I don't know what went on at Home that was attributable to him so I don't have an opinion as to whether he was a good manager or not.
Q Okay. In Paragraph 38 in the first sentence you say, quote, in 1986 Home was a very troubled company, why do you say that?
A In the second sentence it says the company lost 197 million in its insurance operations in that year and struggled to come up with new management and a new business strategy, that would

Page 314

suggest to me it was very troubled.
Q All right. And do insurance companies have capital requirements?
A Yes.
Q How are they measured?
A I'm not able to tell you that.
Q You don't have, you know, a high level of generality, is it measured --
A Against their assets.
Q Okay. When Ambase went to acquire Carteret, what role, if any, did the thrift regulators play in that process?
A I don't know.
Q Do you know what the Source of Strength Doctrine is?
A No.
Q Okay. Do you know what type of insurance company Home Insurance was?
A I believe it was involved with various types of insurance, property and casualty as well as life but I haven't studied it.
Q Do you know how it compared to Farmers?
A No.
Q Okay. Now, when you were at Goldman

Page 315

Sachs had you ever heard of Gruntal?
A Yes.
Q What was your opinion on them?
A It was below the radar screen.
Q In terms of size or quality or both?
A Both. It was too far below to have an opinion.
Q And do you have an opinion as to whether $145 million was a reasonable price for Gruntal?
A I do not.
Q Carteret was owned by, Carteret Bank was owned by Carteret Bancorp?
A Yes.
Q Does that fact have any relevance for any of the opinions in your report?
A Not really.
Q Okay. Was a premium of 47 and a half percent a reasonable premium for Home to have offered for Carteret in August of 1987?
A I believe it was a very high premium.
Q But within the realm of reason?
A Within the realm of reason in the context that this was a time when acquisitions were being made at such levels of premiums.

Page 348

Q Yes.
A -- I would think that was a reasonable amount.
Q Okay. Now, have you ever been involved in situations where an acquirer is not given as much time as they would like to do due diligence?
A It happens all the time with hostile takeover efforts, they are not given any information to speak of because their efforts are being resisted, all they have is publicly-available information and whatever else they may extract from some effort to litigate.
Q Well, that's an instance in which they get no due diligence.
A Well, they get a little bit, and they can do due diligence from the public records and things of this kind, you know, there's a lot of information there if you go through it all.
Q Okay.
A And you can hire experts who understand these things. So you can get a fair amount, particularly from a regulated industry, but you just don't get enough to really know.
Q Okay. Now, have you ever been

Page 349

involved in situations where it wasn't a hostile deal but that the acquirer was not getting as much time as they wanted to do due diligence?
A I can't think of any.
Q Okay.
A If I were advising such a company and they didn't get enough time to do due diligence, I would tell them to threaten to call it off, but the usual practice is to sign some sort of a letter of intent and then wait while the lawyers prepare the definitive contract and during that period conduct as much due diligence as you want. That might take a month or two, depending upon how complicated the deal is. And so in that time most acquirers are able to satisfy their needs.
Bank deals, as you know, take much longer to close because of regulatory permissions that are required, so usually there's plenty of time for due diligence.
Q Longer than a month or two?
A Far longer. This one took a year.
Q And do acquirers typically in the bank context take advantage of having, you know, being able to do due diligence over three or four months?
A I think they do, and not only that,

Page 350

they have to make sure the thing don't deteriorate after they did the due diligence before the time comes to close, what we call bringing down context. We want to be sure that the information we have hasn't change adversely since we got it.
Q Makes sense. All right. You said -- well, actually strike that.
What's the basis for your saying that Ambase should have been aware of Carteret's deteriorating lending position?
A Well, because they closed the deal in August of '88 and they had entered into this arrangement in a year before, and although it may have been contentious while they were renegotiating it, that was over by, you know, before Christmas of '87 I believe, and they had access to information about the calendar year, the fiscal year '87, and the quarterly reports as they came along during which time they could easily see that there was a deterioration in the lending portfolio.
Q Well, let's look at our favorite chart. Where is this reflected?
A That would be reflected in the provision for loan losses as a start. 1988 it goes from -- it goes to 14.1 from 8.4. That would be

Page 351

certainly a material adverse change and you would want to know more about it, but you also see the income, if you want, dropping down, and when you look down and see that the amount of income coming from 50, from a gain of the sale of securities is over 50 million, you have a major distortion in the actual lending business of the company.
And if you turn to page 24 in this report, you'll see this table which it estimates the, you know, the income contribution of lending operations of an aggregation and you see there's a huge shift between '87 and '88 in the pretax income from lending, plus 32 to minus 13 and a half.
Q What basis do you have for allocating two-thirds of the cash operating expenses to lending?
A I think we say in here -- I allocate two-thirds of Carteret's total cash operating expenses to its lending business and to the sourcing of funds to support lending operations including deposit gathering from branches a difference -- bup, bup, bup, bup -- it goes on and talks about that.
Q Yeah, but my question is: Why did you pick two-thirds? If you had picked 50 percent, the analysis would look very different.

there supervisory goodwill?
A That and the overall capitalization ratio which I pointed out to you has been lowered.
Q You mean the 3 percent of liabilities?
A Yes.
Q Now you say that Ambase overvalued Carteret; is that true?
A That's my view.
Q Okay. How much did Ambase pay to acquire Carteret?
A About 290 million including the preferred stock.
Q Okay. And that was an arm's length transaction, correct?
A Uh-hum. Yes.
Q Now, there was a Regulatory Capital Maintenance Agreement that was entered into between Ambase and Carteret?
A Yes, it required them to put up additional money if asked.
Q Do you know how much?
A I believe it was 50 million.
Q Okay. And that represented an obligation for Ambase, right?
A Yes.



Q So in thinking about how much Ambase paid for the acquisition would it be appropriate to take the $291 million and add some factor for the value of that obligation that was assumed?
A You could do that.
Q Would that be appropriate from a valuation perspective?
A It's a contingent liability and the contingent liability isn't worth as much as an actual liability so you would have to give it a different valuation but it would not be inappropriate to do that.
Q And, in fact, when you were at Goldman and advising acquirers, you would value contingent liabilities, wouldn't you?
A Contingent liabilities were on the balance sheet of these companies that you're referring to but generally only as a footnote and they were not on the face of the balance sheet and unless they were extraordinary we probably wouldn't pay too much attention to them.
Q It would depend on the magnitude of them?
A Yes, the magnitude and the probability but we would take a look at them.



Q Okay. And if you wanted to value from Ambase's perspective the cost of that obligation under the Regulatory Capital Maintenance Agreement, as a valuation expert, how would you have done that, if you had been advising them?
A I'd have to think about that. I would find it difficult to value it through some formulaic arrangement.
Q You couldn't view it just plug in Black-Schoals?
A I wouldn't want to do that.
Q Why not?
A Because I would be very uncertain as to what the probabilities of these things occurring would be.
Q The probability of the triggering event?
A Yeah.
Q Well, do you think it was high, from the perspective of August 1988, do you think there was high, medium or low probability that the 50 million would be called on?
A Bearing in mind that it's a low, it's an under-capitalized business that I'm already planning to take capital out of it, I mean, I guess



I would have to assume it's a high probability.
Q So it would be, if you would had been advising Ambase, you'd say this is a material liability, we better think about this?
A I would probably say that.
Q Okay.
A But I don't know exactly how I would calculate it.
Q Because of the uncertainty of figuring out what the probability was --
A I would tell my client it probably doesn't matter exactly what number you put down as being attributed to this continued liability because it would be an inexact number no matter how it's calculated. What you should know is that it's here and that it could be more and you should make your judgments accordingly.
Q Well, if they were to say, you're our expert, we're in your hands, we need your help --
A You probably better assume you're going to put it up.
Q And value it at close to $50 million, because the range is zero to $50 million, right?
A I would say you ought to assume that you're going to probably have to pay it.

Page 382

Q Okay. So if we're thinking about how much Ambase actually paid -- and they did actually pay the $50 million, right?
A In time.
Q In time.
A Stretched out.
Q Yes. And so would that be part of your valuation calculus the fact that they didn't have to make the payment for several years?
A I wouldn't know that, would I, at the time.
Q Right.
A These are all reasons why the number wouldn't have a great deal of meaning to me.
Q Well, but for your client, if you had been advising Ambase and you told them it's likely you're going to have to put this $50 million in that, that would have been a lot of money for Ambase, right?
A Well, it would be.
Q Okay. And whatever number was put on it would be in excess of the $291 million purchase price, correct? If they're thinking about how much are we putting into this deal and trying to calculate returns on equity and that sort of thing,

Page 383

the value they put on this option would be in addition to the 291 million?
A I suppose.
Q But you haven't valued this option?
A Nope.
Q Okay. Now, Ambase was able to go to Chase Manhattan and borrow $250 million in June of 1988, correct?
A Yes.
Q And doesn't that reflect the fact that -- strike that.
And Chase's security was Carteret's stock, correct?
A Yes.
Q And so doesn't that show that Chase believed that there was significant value to Carteret's stock as of June of 1988?
A Yes.
Q And do you have an opinion as to what sort of loan-to-value ratio Chase would have insisted on at that time, you know, given the general market conditions?
A No, I don't have an opinion about that.
Q Is it fair to say that Chase would

Page 384

have been valuing the stock at at least, you know, $150 million if they're willing to take that as collateral?
A You might say that.
Q Okay. Well, would it have been more, I mean, would they have wanted really to get dollar-for-dollar collateralization?
A I don't know, they were looking also at the fact that it was Ambase's name on the loan, so Ambase was obligated to pay it. They were looking at the balance sheet of Ambase first.
Q But the balance sheet of Ambase in August of '88, if you had been advising as a valuation --
A It wasn't a very strong balance sheet but it was there.
Q It was there. But if you had been advising Chase, would you have told them it's very important to ensure that -- would you have told Chase "Don't do this deal if you don't think the Carteret stock is worth a significant amount of money"?
A Yes, I would have told them that.
Q Okay. And is there a number you would have told them if you had been their investment

Page 385

advisor as unless you think this Carteret stock is worth 150 million --
A I haven't made that analysis and I'm unable to respond to that question without having to refresh myself as to what the balance sheet of Ambase looked like at the time and what the other features of the loan contained. But I do recall that loan did not rely on goodwill in calculating capital ratios, it excluded goodwill.
Q Right. And isn't that just because Chase couldn't, if there was a default, Chase couldn't seize the goodwill and sell it and be made whole, right?
A It probably means to me that they didn't value the goodwill at all.
Q Well, they weren't doing a fair market valuation of supervisory goodwill, were they?
A They weren't valuing it, they were not giving it any credit at all.
Q Is it your sense of that that Chase was looking at the goodwill, doing a fair market valuation of it and saying it has no value, not only to us but to Carteret?
A I don't know that they said all that, nobody said it, they just didn't -- they had a loan

Page 398

started, so we had a great supply of these documents.
Q Did you -- but there's no document that you personally considered that isn't on that list?
A I think that's true.
Q Okay. Now, do you have an opinion as to what the value of Ambase's insurance operations were at any point in time?
A I never developed my own opinion about that.
Q Wouldn't the actual sales price be the best indication of the value of the company?
A That's the way I would start my thinking.
Q What other adjustments would you make if it was an arm's length transaction?
A Well, I don't know, I'd have to be familiar with the details to decide whether there were any other adjustments I might want to make, but in general I'm happy to accept the market's, you know, the arm's length market price seems to me to be a good starting point to say what it was worth.
Q Okay. Why would it take -- you suggest that it would be a time-consuming process to

Page 399

review Ambase's junk bond holdings, why is that?
A What is your reference here?
Q Okay. So Paragraph 48, second sentence, quote, The process of selling these operations could be time-consuming, some stock analyst said, as buyers reviewed its loss reserves in Ambase's junk bond holdings. And maybe I misunderstood what you were saying here, but I would have thought evaluating junk bonds, you go see what they're trading for --
A I believe that I am making a reference to some analyst's comments more so than my own. The process of selling these operations could be time-consuming, some analyst said, and they explain that by saying as the buyers reviewed its loss reserves in Ambase's junk bond holdings. That could be if these would become necessary items of due diligence to do. If you're going to buy a troubled insurance business, you'd want to look at all these things.
Q Now, before you were retained in this case had you ever heard of Charles Ronson?
A I don't know him.
Q And what sort of reputation did the firm of Baird Patrick have?

Page 400

A I don't know.
Q Was it like Gruntal, too little for you to form an opinion of?
A Probably.
Q Okay. And as an investor, how much weight would you put into statements made by analysts in newspapers at companies that you had not, investment houses that you had not heard of?
A Well, I wouldn't put no weight on it.
Q You wouldn't put much weight on it, though?
A I might not. I would use it as a starting to point to see what they're talking about and this was a company which was very well reported on by lots of analysts at the time who were complaining about many things in the insurance business that they had, and this notion of an institutional shareholder revolt was mentioned a couple of times I believe, so I'm simply referring to the environment in which the investors were looking at their own company at that point, point in time.
Q You've never made an investment in the real world based on what an analyst at a company that you've never heard of said in a newspaper, have

Page 401

you?
A Not on that basis only.
Q Okay. Has that ever even factored into your analysis of an investment opportunity, a comment by an analyst at a company maybe you've never heard of?
A If an analyst said something that I didn't know that I thought might be material if I knew it, I would want to find out more about it.
Q Which is sensible.
A Doesn't matter who it is.
Q But I'm just asking has that ever happened that it's an analyst in a company you've never heard of who said something that was material enough for you to investigate it?
A I can't think of a time when it's happened.
Q Okay.
A But I have to say that in some industry sectors like insurance and banking and such there are specialists who follow these companies and unless you are a -- you know, a general purpose analyst might not, a general investor who doesn't specialize in these things might not know about them at all, but they -- the research coverage given to

Page 406

getting it because you're forgiving them or tolerating them or putting up with them while they try to work out the mess they're in, but rather than completely default the loan, take it over and work out of it yourself, you let the people who took the loan out in the first place try to do that for you but you may have to renegotiate the terms in order to give them breathing space to do so.
Q But how did you calculate the $17 million?
A That's a number from their financial report.
Q Okay.
A The reference here is to the 1990 Annual Report.
Q Okay. Now you say in Paragraph 50 in the first sentence, quote, These difficulties, combined with added attention to the ailing S&L industry, put great pressure on Carteret's funding sources. What's the added attention that you're referencing there?
A The S&L industry was going through another difficult period in which case they were being taken over by the regulators or otherwise dealt with in some way and it's getting attention

Page 407

and the public knew it.
Q And it was bad attention?
A Yeah, adverse.
Q And then when you say there was great pressure on Carteret's funding sources, are you referring there to the fact that it was harder for Carteret to keep its deposits at reasonable rates?
A It was harder for Carteret to access all of its funding sources including its deposits.
Q Okay. And the time period you're referring to here is '90 through '92?
A I think so, yes.
Q Now, in the next sentence you say, quote, Deposits were reduced to 3 billion from 4.3 billion, in part through sales of branches, in a year in which the average Fed funds rate declined by 111 basis points, Carteret's weighted average cost of its Government guaranteed deposits declined only 49 basis points. So Carteret's relative cost of funds is getting worst during this period?
A Correct.
Q And was --
A It's not only getting worse but their access to the market's been reduced by 25 percent.
Q Yes. And what year is this statement

Page 408

about the 111 basis points versus 49 basis points, is this 1990?
A I think this is probably 1990.
Q Okay. What is the significance of the fact that funding from capital market issuances declined to 182 and a half million from 378 million?
A This is another piece of evidence to confirm the statement about the pressure on the funding sources.
Q How does it confirm that?
A The markets that they had been accessing before they were no longer able to access to the same degree.
Q Okay. And why would that have been the case?
A Because of the pressure on the markets not to invest in worrisome S&L's which had large loan loss problems.
Q Now, why were they able to raise 182 and a half million dollars of capital then?
A Well, that's a good question to ask the citizens of New Jersey which has a state-sponsored entity which buys these things apparently without any regard whatsoever to their creditworthiness. I am a resident of New Jersey so

Page 409

I can point out to you that I was surprised to discover this.
And this is finally points out that they had to go to their lender of last resort to make up the difference in their shortfall, doubling their money from, borrowed from the Home Loan Bank Board.
Q Okay. And what's the significance of that?
A Generally speaking you'd go to the lender of last resort last.
MR. THOMPSON: Do you want to take a five-minute break?
THE WITNESS: If you'd like.
MR. THOMPSON: Yeah, okay, we're at a good breaking point.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q Now, if you were looking to do an evaluation of Carteret in 1989, you would have looked at the total business?
A I would.
Q Including the servicing portfolio?
A Yes, I'd look at it.

Page 418

we can't infer from your table that Carteret's lending strategy was successful in the early 1980s and then soured in the late 1980s, this is because from an economic point of view a significant portion of the negative contributions associated with Carteret's lending operations in later years, 1981 to 19 -- excuse me -- 1989 to 1991 are attributable to Carteret's lending activities earlier in the period, '86 to '87 and to earlier. If that's true, doesn't it also follow that in looking at the success of Carteret's lending activity in 1992 from an economic perspective we shouldn't be taking loan loss provisions out of the cash flow because those are attributable to loans that were made earlier?
A No, it doesn't mean that, what it means is that probably this is lumped somewhat more heavily in the years in which the loan losses were recognized, but because the loans were infected with a serious disease, if they had known about that sooner, they would have taken the loan losses earlier and that would have spread this charge-off over a longer period of time.
Q Well, if they had taken them earlier, then we wouldn't have as much in 1992, correct?
A Possibly not.

Page 419

Q Okay.
A But they did take them then, they were still there to be taken.
Q Right. But I thought your point in Footnote 51 was as an economist we should be, if we're trying to judge the success of the bank at any particular point in time, we should look at the loans that were made, for example, in 1985, and then if there were losses in later years, then you subtract them from --
A Well, and if you did that, that might make the number for 1992 different from what it shows here.
Q It would make it better, wouldn't it?
A It might.
Q I think it would, because these loan losses --
A Well, I'd have to look at the numbers to tell you that it would, but I'd say it might.
Q Okay.
A We had no basis in which to be able to perform that, so we're just announcing that spread over a longer time it would be a little more linear. I had some help from a forensic economist nitpicker on this one.

Page 420

Q Do you have any reason to doubt that Carteret's cash flows from lending operations would have continued to increase into 1993 given the condition of the bank and the economy?
A Do I have reason to doubt they would have improved?
Q Yeah, in the future.
A I don't know very much about 1993, and I would say they could have but I don't really know enough to say.
Q Okay. Now in Paragraph 53 in the first sentence you mention, quote, By December 31, 1990 Carteret was out of compliance with each of the post-FIRREA capital requirements. Was Carteret's failure to comply with regulatory capital requirements something that would be of interest to an investor?
A It would.
Q Why is that?
A No investor wants to be ignorant of the company's existence in default of rules designed to regulate it, that would be material information for an investor to have.
Q Whether the company was going to continue to exist or not?

Page 421

A Well, the investor would consider being out of compliance with regulatory standards in such a way as the regulators would declare such, then that would be a material piece of information to investors, you'd want to know that before you made an investment in the company.
Q I understand, and my question is why?
A Well, there are all sorts of difficulties that can accrue to a company who's out of compliance.
Q Such as?
A Such as being forced to do certain things and prohibited from doing other things in order to regain compliance, which may be good for the investor in the sense that it regains solvency sooner, but one doesn't know.
Q Or it could be fatal?
A It could be whatever it is, those circumstances must vary case to case.
Q It's generally, though, a negative for a thrift to be out of capital compliance from the perspective of an investor, right?
A Well, the investor ought to have had enough sense to realize that the company was highly under-capitalized anyway. But if in addition it's

Page 422

now known that the regulators have declared it to be out of compliance, then that subjects the company to sanctions of various kinds which are not going to necessarily be good for the investor.
Q Generally regulatory sanctions aren't good for an investor?
A Yes.
Q Okay. Do you know what regulatory sanctions befell Carteret when it fell out of capital compliance?
A Well, there were a series of regulatory requirements imposed on Carteret once these large loan losses started to appear ranging from being told they couldn't make anymore commercial loans to efforts to recapture capital from its parent and so forth. And of course in 19, December or so of 1992 it was seized, so seizure is a big factor. But it wasn't seized for a while, it was out of compliance in December of 1990 and it wasn't seized for almost two years later.
Q Do you think that was reasonable to give Carteret some time to try to raise the capital and clean its act up?
A I do, but I'm not a regulator, and I'm not able to speak from the regulator's point of

Page 423

view.
Q Now, there were restrictions on Carteret's ability to pay dividends; is that right?
A Yes.
Q All right. Now, as an investor, that would be a big negative; isn't that right?
A As an investor in a company that was highly under-capitalized I wouldn't expect them to pay dividends anyhow.
Q But all other things being equal, if you were an investor in a company and it couldn't pay dividends, that would be a negative?
A If I'm prohibited from jumping 10 feet in the air, it doesn't matter much because I can't jump 10 feet in the air.
Q I understand the point you're trying to eloquently make, but I'm trying to figure out exactly why that analogy isn't apt, but let me, let me ask: Have you ever made an investment in a company that was forbidden from paying dividends?
A Not that I know of.
Q Okay. Did you ever have a client at Goldman Sachs who made an investment in a company that was forbidden from making dividends?
A Probably.

Page 424

Q Do you recall?
A Not particularly, but it wasn't uncommon for banks, for example, to have covenant structure with loans it made to clients which would prohibit dividends under some circumstances, and the companies could achieve, they could enter into those circumstances and seek to reorganize themselves or restructure it or to attract capital to improve their situation so that that capital would be aware of such restrictions and might still come in.
Q Did the companies who were under those types of restrictions view them as a negative?
A Not always.
Q But often?
A They accepted them as being a sign of the state of condition that the company was in and trying to get out of, and they would recognize the investment opportunity in approaching the company to be a function of what could be done with it, not what was going to be done, you know, not what had to be put up with it, if it had to be put up with it for a long time and expected to change things. And that's the essence of these privity equity investments in S&L's is that they would provide the capital, if the rest of the business is healthy

Page 425

enough, it would be able to work out over time some of the other issues and take advantage of the opportunities available.
Q And when I was a little my mother gave me cod liver oil, which I accepted, but --
A Cod liver oil, I thought you were younger than that. Cod liver oil hasn't been given to any human being as far as I know for 25, 35 years.
Q I really think I was on the cutting edge.
A You must have been.
Q I was the last person I know to have it too. But, all right.
Do you have an opinion as to why Carteret was unable to find a buyer for Imperial Premium Finance?
A No, I don't have an opinion.
Q Do you have an opinion as to whether Carteret would have been better off if it had been able to sell Imperial Premium Finance in 1991 at whatever its fair market value was?
A To the extent that it returned capital to the company, I think it would have been beneficial.

Page 426

Q All right. Let's look at Paragraph 55.
A (Complies.)
Q You state in the last sentence, quote, The collapse of the loan portfolio in 1990 and 1991 effectively rendered Carteret insolvent, it was not the change of rules relating to regulatory compliance that did so. Now, with respect to the first half of that sentence, did Carteret become insolvent on a fair market value basis in 1990 or 1991?
A Well, this sentence refers to the two years together. Many investors would have regarded it as virtually insolvent after the first year, but perhaps it took two years to convince all of them.
Q And by the first year you mean 1990?
A Yeah.
Q Okay. Now, in Paragraph 56 you state, and this is in the fifth line down, If the investment were a large one, I would have recommended an extensive effort to conduct due diligence through interviews with management and Carteret's accountants, and to the extent possible with regulators. Why would you want to speak with regulators if you were advising a client?

Page 427

A Among other things, I would like to know what the attitude of the regulators was to my being on the scene and whether I might be able to negotiate with them some favorable matter, and I'd also like to know whether the regulators were planning to shut them down the day after tomorrow, particularly if my money went in tomorrow. I think those are material things to know. I might not succeed in negotiating anything and I might not learn whether they're going to shut me down or not but I would want to try to learn those things.
Q Would you want to know if there were going to be some sort of restrictions on your ability to operate even after the capital went in?
A I would want to discuss that.
Q And would you want to discuss whether there were going to be restrictions on your ability to pay dividends even after the capital went in?
A I would like to know whether they were.
Q And why is that?
A Well, if I'm making an investment, I'm going to be looking at a plan for turning it around and how I plan to benefit from turning it around. Most likely I'll sell it to somebody else or perhaps

Page 428

take it public, go get my money back through a public offering, or maybe I'll sell it to another private equity group. But, in any event, I want to have as few constraints on my operations as I can because I don't really know what I'm going to do in the future. But if I'm buying into a regulated thrift industry in distress, I would be very naive if I didn't expect to have a lot of regulatory constraints imposed upon me until the company was out of regulatory distress.
Q What could regulators have said to an investor that would have facilitated an infusion of capital?
A We love you. Welcome aboard. What would you like to have us -- how can we make you more comfortable? Those would be the sort of things I would like to hear from them, one might not. Not all of these investors are regarded as being able to pull off what they may think themselves are capable of doing.
Q Now, the regulators wanted tangible capital to come into Carteret, is that your understanding?
A That is my understanding, among other things, that's what they would want.

Page 429

Q Now, if the tangible capital came in the form of the net worth of another company that wanted to merge with Carteret, would that have been the equivalent of cash in your opinion from a financial economist's perspective?
A Well, it depends on what's in the net worth. We don't want more goodwill coming in the back door.
Q Tangible net worth.
A Tangible net worth. Tangible net worth would be appropriate, but what is the form in which this transaction is going to take place? Am I going to be an under-capitalized subsidiary of a well-capitalized parent? That may not be enough to protect me from being insolvent.
Am I going to be a consolidated part of the parent company in which my balance sheet and it will be merged? That would be a debtor issue.
Am I going to have some kind of guarantee from the parent as to capital continuance, capital minimum, capital maintenance arrangements, those would be another set of circumstances.
But combining with a larger and healthier company would certainly be a desirable solution for these ailing thrifts. There weren't

Page 434

so than times of normality, but it even happens in times of normality, but especially in this time because people had discovered that their accounting practices were inappropriate for the circumstances they were in and had to adjust them.
Q And by "this time" you mean --
A Well, by the early 1990s, I think that's the period that's referred to here.
Q Okay.
A And there's one other factor that is very important, which I didn't mention, and that is, that during this period when there was so much distress in the banking industry, and so many loans were thought to be not worth the historical cost because of either interest rate changes or credit changes, these loans were not required to be mark to market. If they were a securities firm holding them, they would have to mark them to market. They may not always get the exact mark correct, but they'd have to make an effort to do so, whereas in the banking industry, and the S&L industry, regardless of what changes took place to the market, to creditworthiness or to interest rates, they didn't change the value at which they carried these loans on their books.

Page 435

Q In the early nineties you're talking about?
A Well, throughout, they still don't, but there ever been some modifications to accounting practices since. But in principle that meant that accounting wasn't reliable in the sense that people knowing that this is an industry with a lot of loan distress that the books didn't reflect it, so you had to make your own guess as to what the market value of that historically recorded loan portfolio would be, and you didn't know what it was but you knew it wasn't a hundred, so there was going to have to be some sort of discount, how big a discount it was, it could be quite a big discount.
Q Now, you mentioned about all the loans in distress. The RTC was selling a lot of loans in '91, right?
A They were making their best effort to recover the investments they made in having to take over some of these.
Q And with respect to the types of asset classes that the RTC was selling, say mortgage-backed securities, certain types of commercial real estate, was the RTC's selling activities driving the prices down?

Page 436

A I'm not familiar with it enough to be able to know.
Q Okay. Now, you mentioned that the private equity investors would like to get a return of 20 to 25 percent in a footnote, don't you?
A I do mention that.
Q Yeah. And so would that mean that on a $200 million investment the private equity investor would want to get a 40 to $50 million return?
A That's per year --
Q Annual.
A -- annualized compounded rate of return.
Q Yes. And that's a pretax number?
A Yes.
Q Okay. Now, let's look -- oh, I'm sorry, we've already covered that.
Is it fair to say that the reason that Carteret could not raise capital in 1992 was its loan portfolio?
A That would be a very important reason.
Q And the rest of the bank was pretty much healthy, right?
A The rest of the bank was comparatively healthy.
Q I mean, the rest of the bank was healthy, wasn't it?
A Well, it would appear so but we know that the loan commercial lending portfolio on real estate losses were by far the most conspicuous element in this bank.
Q Well, I know, but I'm saying --
A I haven't examined the rest to know how healthy it was or wasn't.
Q Okay. Now, let's see.
With respect to Footnote 63 you say, Kohlberg's offer valued Carteret post new money investment at 222 million. Its contribution would have been 200 million, leaving 22 million as Kohlberg's valuation of the Carteret business to be acquired. Closed quote. So Kohlberg's not viewing Carteret as insolvent in '92, is that fair to say, they put in 200 million and they get 222 million valuation?
A Well, the word insolvent may not apply to what they were trying to do. They recognized the condition that the bank was in at the time and they decided that if they were going to invest, they would want to get 90 percent of the shares of the

Page 437

Page 438

company that they invest in. They're going to put up 200 million, and divide that by .9, and you get 222 million. So the pre-money, the money, the value of the money before you -- the value of the company before you put the 200 million in is 22, that's how you get there.
Q Now, if Carteret had hired you in 1992 to help them raise capital and they had said, "Look, we have some bad commercial real estate loans and we're writing them down," would you have -- and they had said, "And we're thinking of writing them down on an ultra-conservative basis so that if someone comes in here and does a sample, they'll look at our valuations and they'll think 'These guys are not playing games, they've written them down to fair market value or maybe even below fair market value,'" would you have said that's a sensible strategy to raise capital?
A Well, my advice to the client at that time would be to mark them correctly. Mark them to market as best you can judge.
Q Okay.
A Not necessarily do it more than that but I would mark it to market as best we could judge. It would have to be credible and defensible.

Page 439

Q So that when the sampling is done of the loan portfolio --
A When all the skeptical nonbelievers come in to ask questions about why you've done it the way you did, you want to be able to leave the room at the end of the day having them still believe it.
Q And to do that on these questions which requires some judgments, you can't just look in the Wall Street Journal to see what these properties are worth, it's better to be conservative, is that right, if you're trying to raise capital?
A Yes, I want to be as close to the correct number as I could possibly be and that probably means getting rid of any sense of denial about these things which is why people don't mark them down enough.
Q But reasonable people can disagree about --
A They can.
Q So if you're trying to satisfy the skeptic, you better be on the low end of the reasonable range, right?
A Probably.

Page 440

Q Okay. Now, with respect to Paragraph -- I guess we've already covered Chase, so we don't need to do that.
Let's go to Paragraph 67.
A You're skipping General Haig?
Q We might come back to that.
Let's see. I'm looking at the sentence that starts, oh, five lines from the bottom of the page, quote, Investors understood goodwill and could discount it appropriately. Consequently, if the pricing were sufficiently attractive, and if other investment criteria were met, then a small equity offering by Carteret might have found buyers. What other investment criteria are you referring to?
A This is with reference to the period, the window when I thought they might have been able to sneak in a public offering. Right?
Q Right.
A Well, pricing of course is important but we have to be sure that the investors feel that they are getting a board of directors that they are going to be satisfied with. They're going to get adequate governance, you know, conduct. They're going to get -- they're going to get explanations for what happens and what has happened and so forth

Page 441

and not feel like they're being in the hands of a management that's trying to obscure things from them. Those kinds of criteria are rather abstract but they are important if you are going to compete for capital in a market which is already constrained and normally available to a few.
And in addition to those things you're going to have to demonstrate that you are not a company which is substantially out of alignment with those who are financing in terms of other terms and ratios and performance features that the market has become accustomed to.
Q Now, if you had been advising an investor who looked at Carteret, looked at the financials and said "I want to do it, I want to make" --
A You're talking about a public market investor?
Q Well, let's say even a private equity investor who says "I like this business, I think they've marked things down right, I think the rest of it's healthy but I'm concerned about the regulator's attitude." If they had gone in and reported back to you that the regulator said "After you put in your $200 million, we can seize you

Page 442

tomorrow, there are no guarantees, we make no guarantees that we won't seize you tomorrow," would you have told them "Don't put the money in," even if everything else made sense to you and to them, would that fact alone have been enough for you to advise them don't put the money in?
A Yes, with some modest qualifications. Differentiating between a public investment in which the investor does not achieve the rights of control and those in which the investor might, such as a private investment or a private equity investment.
Q Tell me about those modifications just so the record's clear.
A Well, I mean, if I'm going to be negotiating with the regulators as a control buyer, I'm going to be running the company from now on.
Q Right.
A I want to be sure that I have an understanding of the regulator that my best efforts are going to be accepted as an effort to restore this company to health and I'm not going to be undermined by the regulators in some way. And if I do not achieve that understanding, I'm very likely to go look for another S&L or none at all. That would be foolish. You put your money in and, as you

Page 443

phrased it, I'll shut you down tomorrow, means I have lost all my money because a seizure is equivalent to a complete loss of your investment if you are an equity investor.
In the case of a public market investor, these things would not be accessible to me, I wouldn't be able to know what a regulator thought, I'd have to make an estimate of what I thought the regulator might say and that might be something I'd have to rely on on broad generalities in order to know. I think if I were making a modest investment from an insurance company portfolio in a public offering of Carteret at that time that I referred to, that window time, then I might think that the upside outweighed the downside but it was risky and I might lose a fair amount of it, but I'm not making a $200 million investment, I'm making a modest one.
Q Now, if you had been advising a private equity investor who was looking for control and just --
A That's the only way a private equity investor would have invested you understand?
Q Right. Yes. So let's say you were advising -- I just want the record to be clear -- a

Page 444

private equity investor who was looking for control and the regulators said, not that they were going to shut Carteret down the day after the $200 million came in, but that there could be no guarantees that they wouldn't.
A Well, I would expect them to say something lawyer-like like that, but I would have an understanding as to what I thought I could reasonably expect would be with regard to their, their role in this. If the company doesn't improve and the company's imperiled, I would expect them to do what they're supposed to do. But on the other hand I would expect them to provide some time to let this be tested to see how I did before they shut me down.
Q Some breathing room?
A Some sort of breathing room and some sort of arrangement that I'd have to be satisfied with, but it depends on what you could negotiate. If I could not negotiate a sufficient, you know, satisfactory arrangement, I probably wouldn't make the investment.
Q All right. Now -- let's see.
A And, by the way, there are many private equity investors who'd prefer to just wait

Page 445

for them to die and then they would buy the corpses, take the assets and fix them up and sell them. At big discounts. So, you know, that's always the alternative to these guys. So they're not going to satisfy themselves, they're not going to be easily satisfied, and it's very evident I think that the RTC understood this.
Q But from the RTC's perspective why would they want to let it die and then sell it at a great big discount?
A They don't. They don't, which is why they might be willing to be a little more cooperative than you may have suggested by your, you know, your tough talk.
Q Well, they should have been more cooperative.
A Well, if they weren't, then we probably don't stay, but there were some signs that they were cooperative. Certainly in the beginning of this era they were very cooperative with some investors such as Perelman and Simon and others.
Q Okay. In Paragraph 68 why did you select a threshold of $20 million?
A Well, that was a minimal amount of capital for them to, you know, to be able to raise,

Page 446

they needed much more capital than that, and we left off very small S&L's who were raising money of two or three million or something like that thing and they were simply not an appropriate peer group.
Q Okay. I just didn't know if there were some larger S&L's who went out and raised 10 million because that's all they wanted.
A It's pretty rare for anybody to raise amounts that small if they were bigger companies.
Q Why --
A The cost of financing is higher, difficulty in doing it.
Q When you say the "cost of financing is higher," you mean sort of the transactions cost as a percentage?
A Yes. Yes.
Q Okay.
A You have pay the lawyers all the time and the accountants and the --
Q Investment bankers.
A Well, they're a bargain.
Q Why did you pick the first quarter of 1989 as your starting point for your capital raising analysis?
A Well, we could have started at the

Page 447

second quarter in the sense that that's when FIRREA was, that was just at the brink of FIRREA's coming in the following month I think, but we wanted to, you know, take a look at the market when FIRREA was in the works, it was being considered in Congress, though, obviously at the very beginning of the first quarter it wasn't much thought about but as that quarter developed FIRREA became material. Whatever it was going to be wasn't entirely known at the time, but everybody who knew that this bill was working its way through Congress knew that it was going to be an effort to tighten regulations, not to weaken it, so whatever it was it was going to make the regulatory posture more difficult from the standpoint of investors in troubled thrifts.
Q And one of the real battlegrounds was going to be over supervisory goodwill?
A There were several battlegrounds as I understand it, that was certainly one.
Q Okay. And so sophisticated investors by the end of the first quarter of 1989 would have realized that there's a likelihood that supervisory goodwill could be eliminated?
A Or if not, something else bad might be added, so we have the air is flavored by the fear of

Page 448

FIRREA.
Q Okay.
THE WITNESS: Could we stop for a minute?
MR. THOMPSON: Sure.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q Now -- and actually we'll even move to 69.
Is the fact that there were only 20 public issuances of equity securities for thrifts from 1989 through 1992 indicative of an extremely difficult environment for thrifts attempting to raise capital at this time?
A Yes.
Q Were there any IPOs of thrifts conducted?
A There were a few, largely conversions, most IPOs of thrifts were conversions.
Q From an investor's perspective, is there any difference in making an investment in an IPO as opposed to, you know, buying a stock that's already traded?
A Unless you're a depositor, which is

Page 449

what the conversion part is about, the practice was to go from a mutual organization to a company and the equity in the mutual organization was deemed to be owned by the depositors. So if you were a depositor and took the amount of goodwill or the amount of equity capital in the company and divided it by the number of shares, it gave you a pro rata amount of the stock, which you got for nothing, and if you wanted to, you could subscribe to buy more. So they allowed many people to subscribe on the hope that the stock would go up, like many IPOs are supposed to do. So as a result, a large part of the investment conversion transactions involved depositors, many of whom were speculators who just bought deposits and everything hoping for there being conversion. So they got something for nothing out of it, and maybe some gain or pop-up on the IPO. Now, by this time there weren't too many pops, but there were some of these smaller ones that were less affected by these problems so they were still coming along.
Q Okay.
A We probably would not have excluded them if there weren't so many of them involved with the conversions which make them a little different

Page 450

from the rest.
Q Now to the extent, though, investors are buying in who aren't depositors, then that would be --
A That would be like buying a stock anyway.
Q Okay. Now please explain what these databases were that you selected on the top of page 35 or reference there, the databank.
A Yeah, these are commercially-available databanks which have securities issues of all types. All securities issues for all periods for all classifications with all sorts of information are in this database which is something you can purchase from an organization called Securities Data Corporation.
Q And it's reliable data?
A It's considered to be the best in the business and to be reliable.
Q Now, at the end of Paragraph 69 you make statements about the average size of these offerings, do you see that?
A Yes.
Q Now, these thrifts that were raising this capital weren't trying to sell 90 percent of

Page 451

their equity, were they?
A No, they weren't.
Q And so if you wanted to translate these amounts into an apple to apple to what Carteret was trying to do, wouldn't you want to gross these amounts up so that they reflected 90 percent of the equity?
A No, because this is an analysis of public market access and not the analysis of private equity investing if you're talking about the 90 percent issue we determined.
Q You could sell 90 percent of your stock in a secondary offering in the public markets, couldn't you?
A Probably not.
Q Why not?
A It probably would be too large an issue if your company was capitalized at some level around where it had been capitalized when it was acquired by Ambase.
Q Well, but leave aside Carteret for a moment. I mean, is there any reason why a company that's already publicly traded couldn't sell 90 percent of it, dilute itself?
A If it's not too large for the market,

Page 452

they could do it.
Q Okay. But isn't it a fair point that to really understand what these numbers of an average size of 27 million that you'd want to know what percentage of the equity had been sold?
A Well, my view was is that there was a limit on just how much the market would buy of any of these at the time and that the 30 million or so issue would be considered about as much as someone, other than one of the very large S&L's, could expect to get regardless of whether it was 5 percent of the equity or 50 percent.
Q Did the market's appetite for these types of securities increase as the economy improved?
A Well, as the market distanced itself from the miseries of the S&L industry, yes, it did, but this was a time when the S&L industry was still pretty highly populated by ones in difficulty.
Q By, though, '92 almost all of the thrifts that were going to be seized had been seized, isn't that true?
A Probably, but this is a period that goes back before that. It ends in '92 and by '92 they hadn't forgotten about it, it was still close

Page 453

enough on them so that seizures were occurring and people realized that this was a risky business, so they didn't want to buy shares of a company they thought might be in trouble with its capitalization base or its regulators.
Q Now let's look at --
A This, of course, is why the market was as difficult as it was because the market was making this differentiation between those which could be qualified for investment and those who couldn't be.
Q Now let's look at your Exhibit 4, Table 2.
A (Complies.) Okay.
Q And my question is: What are the key ratios for an investor and with respect to each why is it important for an investor?
A Well, we've listed the ones we think are important.
Q Why would each be important?
A Well, the first is because, you know, investors want, who understand the difference between tangible and intangible capital want to have some idea how much tangible capital is there.
The next one I think Professor Saunders explained when he talked to you, the core

Q Now, on a recurring basis would it be fair to reverse out those loan losses and say that the recurring net income for Carteret as of '92 was $37.6 million?

A That would be an indicator of what the net interest income and income from other services would be, and that would be, that would be a way of knowing that. What am I comparing it to? You would have to compare it to the same thing for the prior years when we had very large loan losses, but we had -- we have in my table on page 24 we have some idea of what the net interest income is.

So you see net interest income in 1992 reflecting new management and other important considerations was significantly improved, and as you have pointed out before, the total base of the business was lower, therefore, the allocated expenses were less, and so the cash flow from lending operations rose to 36 million from a little over 9 million, however, there still were some loan loss reserves to take, which may have been attributed to loans that were put on the books years before.

Q All right. Do you have any understanding of what Carteret's tax profile was in



1992?

A I do not.

Q Do you think that if Carteret had been a recipient of a private equity investment and had stayed in business that it could have grown through the acquisition of branches from other distressed institutions?

A Well, this is a hypothetical situation -- question.

Q Well, yeah, let's --

A If they didn't die, could I have assumed that they lived?

Q Well, let's say Kohlberg had hired you as their investment advisor and said "Look, you know, we're thinking of putting 200 million in, but we want to grow the business, we want" --

A Kohlberg would have had that -- excuse me.

Q -- "we want to grow the deposits and take more advantage of low-cost Government deposits," and if they had asked you "Do you think we can do that by buying up branches from the RTC," would you have had an opinion on that?

A That would have been the sort of business plan I would have expected someone like



Kohlberg to come up with.

Q And do you think it would have been a reasonable one?

A Yes, and he wouldn't have invested without a reasonable plan, but it would have involved the notion that he would stabilize the company's capital with his investment, use the capital to be able to make investments that would improve the earnings of the business and benefit from the ability to turn it around. And, of course, once you can start to show you're turning these things around, then good things start to happen to you where maybe bad things happened to you prior to that. So that's the idea. But working out of bankruptcy situations or near bankruptcy situations sounds very easy in the classroom to do but in the real world it's often very difficult and a great many of them don't succeed, which is why investors like Kohlberg are quite canny about being as sure as they can be that they are comfortable in the risks and the task of turning it around won't be beyond what they think they can reasonably expect to do.

Q What are the sorts of risk that a company that's on the brink of insolvency faces that a normal company doesn't?



A There are a great many risks associated with near bankruptcy that most people don't always appreciate. Suppliers don't sell you anything on credit. People don't want to work for you. You know, the electric company wants you to pay in advance for your, for your light bulb. There are various things that are harassments you might call them. But, you know, they involve an aggregation of costs which academics have studied actually to try to estimate the cost of bankruptcy which increase in periods, you know, they're quite high just before bankruptcy or in bankruptcy but they spike up in anticipation of bankruptcy. So if you're in that zone, you have to deal with a certain amount of this stuff. Now you might be able to abate that by putting in a lot of capital and making everybody feel that everything's okay, but that depends on whether you found all of the problems and addressed them, whether you don't have surprises.

Q When doing a fair market valuation of its balance sheet is it appropriate -- well, strike that.

From an investor perspective, if you're looking, trying to do a fair market valuation of a balance sheet, would it be appropriate





77f7863c-3e49-479c-be5e-f0600fdeec68

Page 466

sometimes to rather than saying, well, how much could I sell this asset for because it's a depressed market, think about it in terms of how much cash flow is that asset going to generate because you think there's a disconnect?
A Well, you have to look at both things when you're making investment decisions. But as we have said before, one of the problems with this industry has been the practice of relying entirely on historical cost accounting. So if you don't know what the market value of a loan portfolio would be, in order to make an investment like Kohlberg was considering, you'd have to make some pretty good estimate that you have now marked down these assets to a level that reflects the market value so you don't have to mark them down further later on. You'd want to know that, and be as comfortable with that as you could be. That may require due diligence, sampling, it may require having some holdback provisions where you could put the bad loans back to somebody like the RTC, which was done. If you found a surprise that you didn't expect, those were the areas of negotiations that were possible.
But when we look at the P&L, which is

Page 467

the profit and loss statement, not the balance sheet, we're looking at the income flows that come from the enterprise and we will be able to have a pro forma estimate as to what the cash flow is but just depends upon the loans being, you know, healthy and being able to generate the cash flow that it's supposed to. So you have to be sure we have judged that correctly.
Q Now, when you were at Goldman, did you do a lot of negotiating?
A Yes.
Q All right. And when you were negotiating to raise capital, would you want the other side, the provider of capital to know if you were desperate for the capital?
A This is a hypothetical question?
Q Yeah, hypothetical.
A It's not in my experience useful to be negotiating with somebody who believes you're desperate.
Q And that's because if they know you can't walk away then --
A Desperation is not a normally good negotiating posture but you know every now and then desperate people tell you that if you don't lend me

Page 468

money, I'll die on your doorstep and then you'll have all the problems of explaining this and cleaning it up and everything else, so at least there ought to be some value, a dollar or two less than that that you'll pay me to go away. That's the value of desperation.
Q Now, is it fair to say that valuing a thrift's branch network is an important part of the overall valuation exercise of a thrift or a bank?
A You mean separately from the loan portfolio?
Q Right.
A It may be.
Q Is that what's typically done today, people look at the value of branch networks as well as loan portfolios and the other aspects of the business?
A Well, the branch network may not be a net positive value, so to the extent that you want to make some sort of an estimate as to the value that the branches themselves contribute to the process, you know, it's the value of the deposits that generates minus the cost of these things, and so you have to make some judgment as to whether the branches are worth it if you're going to buy

Page 469

somebody with branches or if you buy branches separately, but I think when valuing an enterprise you don't value the branch network separately.
Q But you'd want to consider the value of it, wouldn't you?
A If I'm going to look at the bank as it is, I'm happy to just deal with the cash flow per se, capitalize that. If I'm thinking about acquiring it and having control over the thing, in which case I have the power to change the branch arrangements, then I might want to know whether there is excess value or not or negative value in the branch structure as it exists. But generally speaking, that's a comparatively small value relative to the overall value, so I'm not going to be driven too much by it.
Q Do you have an opinion as to what the value of Carteret's branches were in '92?
A I do not.
Q Do you know what a cap rate is on real estate?
A Probably, but I'm not sure what the definition you have in mind is.
Q Well, let me ask it this way.
A Capitalization rate?

Page 506

taken off the books of Carteret and instead $200 million of Treasury bonds --
A Marketable Treasury bonds.
Q -- marketable Treasury bonds are put into Carteret, would that have been sufficient tangible capital?
A Probably.
Q Okay.
MR. THOMPSON: I'd like to take a five-minute break because I think we're getting close to the end perhaps.
THE WITNESS: Okay.
MS. GRONER: Great.
(Whereupon, off the record.)
(Whereupon, resumed.)
MR. THOMPSON: All right. We're back on the record.
BY MR. THOMPSON:
Q A couple of follow-ups.
On Whitehall Capital I'll represent to you that Goldman put in $150 million of the partners' money into that in 1991 and does that refresh your recollection as to whether --
A I was a limited partner by then, so I wouldn't have had anything to do with it, I wouldn't

Page 507

have followed it, I wouldn't have been an investor in it so I wouldn't have a way to know. I know that this real estate investment trust or real estate investment partnership existed and it was likely to make investments of this kind, but I don't know enough about them to be able to say anything else.
Q Did you have the opportunity as a limited partner to put some of your capital in that?
A I think I probably did, I don't recall that I thought about it.
Q Okay.
A I just got my capital and I wasn't about to put it all into risky private equity deals.
Q Okay.
A I subsequently did but I didn't then.
Q Now, I want to do a variant. I'd like you to ask you to mentally go back as an advisor to Carteret helping it to raise capital as an expert in the area and to the idea of Ambase doing a bond offering, and I want to change a couple of the facts.
Let's say that Ambase covenants to the bondholders that it will put the money into Carteret and that Carteret will invest that in U.S. Government Treasuries of a similar maturity, and I

Page 508

would say they're both.
A They're going to put the proceeds of the bond issue into --
Q Into Carteret.
A -- Carteret.
Q In government bonds.
A Carteret has to take that money and buy government bonds with it?
Q Yes. And upstream every year the proceeds of those government bonds to Ambase.
A You mean the income from the government bonds?
Q The income. And then Ambase will use its cash to make up the difference between what the government bond rate is and what these bondholders would want; and let's say that the numbers work out so that there's five years worth of coverage and you make it a five-year note, wouldn't that make it a lot easier to sell that debt?
A Easier to do that than --
Q The prior hypothetical.
A Which is to just have it in the capital of --
Q Yeah, without any covenants.
Well, forget whether it's easier, let

Page 509

me just ask you: Wouldn't that be something that would have been feasible in that the capital's then in government bonds, the investors know it's safe and secure, Ambase has its cash, it could give a covenant too that it would put its cash into government bonds?
A Based on what you said, which I never thought about before, and I may change my mind on, it would seem that if you're offering a bondholder to invest in essentially a stream of interest which is secured by government bonds and which is supplemented by some, some portion of the interest due is supplemented by Ambase, then you might find investors for that.
Q Okay. But the investors would only come if they were confident that the regulators would allow the dividends to be upstreamed, correct?
A Well, the assumption is that the issue could never happen if the regulators didn't permit it.
Q Right.
A But you've put me in the shoes of an advisor to Carteret, so I'm not worried about the regulator, we're trying to make the bond offering -- bond investor happy first.