**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 93-531C<br>(Judge Loren Smith) |

**PLAINTIFFS' MOTION TO SUBMIT PARTY**
**ADMISSIONS OF JOHN RYAN AS SUBSTANTIVE EVIDENCE**

In anticipation of the Defendants' Rule 52(c) motion, and pursuant to FED. R. EVID. 801(d), Plaintiffs AmBase Corporation and Carteret Bancorp, Inc. ("AmBase"), hereby move for leave to file excerpts of John E. Ryan's deposition testimony, taken on May 25, 1999, for use as substantive evidence in this case. Specifically, AmBase wishes to submit the following portions of Mr. Ryan's deposition (attached hereto as Ex. A): 12:20-14:1; 51:18-52:4; 53:21-54:13; 125:17-126:16; 128:2-128:4; 128:20-128:23; 132:5-132:25. Because Mr. Ryan was an employee of the federal government at the time of his deposition, his testimony is admissible as an admission of a party opponent under FED. R. EVID. 801(d)(2)(D).

## DISCUSSION

### I. Under this Court's Rules, the Motion is Timely

On December 21, 2007, AmBase moved to designate the deposition testimony of several government officials under Fed. R. Evid. 801(d). The testimony qualified as admissions of a party opponent, and the Court granted AmBase's motion. *See* Doc. 250. This Court's rules, however, did not require all deposition designations to be submitted at that time. *See* RCFC Appendix A, ¶15(b) ("Any party intending to present substantive evidence by way of deposition testimony, *other than as provided by Fed. R. Evid. 801(d)*, shall serve and file a separate motion for leave to file the transcript of such testimony.") (emphasis added). *See also Globe Sav. Bank, F.S.B. v. United States*, 61 Fed. Cl. 91, 96 (2004) (noting that "this Court's case management procedures . . . specify that a separate motion be filed for admission of a deposition pursuant to RCFC 32(a) but not under Fed. R. Evid. 801(d)(2)"); Order Granting-In-Part Plaintiff's Motion to Admit Deposition Testimony as Substantive Evidence at 2-4, *Anchor Sav. Bank v. United States*, No. 95-39C (Fed. Cl. May 17, 2005) ("*Anchor* Order") (attached to Doc. 267 as Ex. B) ("Paragraph 15 by its own terms does not apply to deposition testimony that is presented at trial pursuant to Fed. R. Evid. 80 1 (d), *i.e.*, deposition testimony that is characterized as non-hearsay . . . ."); *Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 425 (1997) (admitting expert witness' deposition testimony "as admissions against the Defendant" pursuant to Fed. R. Evid. 801(d)(2)(C) without referring to RCFC 32(a)). Accordingly, in its December 21 motion, AmBase provided notice that it might seek to introduce additional party admissions at a later point. *See* Pls.' Mot. to Designate Dep. Test. for Trial (Doc. 244) at 7 n.1("AmBase nevertheless reserves the right to move for leave to designate additional deposition testimony that may be admissible under FED. R. EVID. 801(d).").

## II. The Requirements for Admissibility Under Rule 801(d)(2)(D)

FED. R. EVID. 801(d) provides, in relevant part:

> (d) Statements which are not hearsay. A statement is not hearsay if—
> . . . .
> (2) Admissions by party-opponent. The statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . .

Deposition testimony satisfying the requirements of this rule need not "fall within a provision of RCFC 32 to be admissible," for "Fed. R. Evid. 801(d)(2) provides an independent ground for admission of deposition testimony." *Globe*, 61 Fed. Cl. at 95-96 (quotation marks omitted). *See also* RCFC 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, *or for any other purpose permitted by the Federal Rules of Evidence*.") (emphasis added); *Anchor* Order at 4-6. Thus, so long as AmBase can demonstrate that designated deposition testimony satisfies the requirements of Rule 801(d)(2), it may be admitted as evidence at trial. *See Long Island Sav. Bank, F.S.B. v. United States*, 63 Fed. Cl. 157, 163-65 (2004); *Globe*, 61 Fed. Cl. at 94-97; *Anchor* Order at 4-6.

"It is a widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility." *Globe*, 61 Fed. Cl. at 96 (quotation marks omitted). Thus, deposition testimony may be used at trial as the admission of the United States as party opponent under Rule 801(d)(2)(D) so long as it meets three requirements. First, the testimony must be "offered against a party, in this case the United States" and consist of "statements by the party's agent or servant." *Long Island Sav. Bank*, 63 Fed. Cl. at 164 (quotation marks omitted). Such statements need not be "against interest" or "inculpatory," however. *Globe*, 61 Fed. Cl. at 97.

Second, the agent or servant's statement "must concern[] a matter within the scope of the agency or employment." *Long Island Sav. Bank*, 63 Fed. Cl. at 164 (quotation marks omitted) (alteration in original). This requires only "that the subject matter of the admission match the subject matter of the employee's job description." *Id*. (quotation marks omitted).

Finally, the deponent's statement must have been made "during the existence of [his] relationship with the United States." *Id*. at 164-65 (quotation marks omitted). "There is no requirement," however, "that the particular agency at which a deponent was employed at the time of the deposition match the subject matter of the admissions," for "[t]he party-opponent is the United States, not a particular agency." *Id*. at 165 Thus, as long as the deponent is employed or retained by the United States at the time of the deposition, the deponent's statements may constitute admissions against the United States with respect to the subject matter of any federal capacity in which the deponent was previously retained or employed.

Deposition testimony satisfying these requirements is admissible as substantive evidence without further showing. The movant "need not demonstrate that any of the declarants whose deposition testimony it seeks to admit at trial . . . will be unavailable as witnesses at trial." *Long Island Savings Bank*, 63 Fed. Cl. at 164; *accord Globe*, 61 Fed Cl. at 95.[1] Rule 801(d)(2) is not

---

[1] In response to AmBase's Motion to Designate Deposition Testimony for Trial (Doc. 244), which relied in part on Rule 801(d)(2) and the analyses of that Rule in *Globe* and *Long Island*, the government stated that it "respectfully disagree[d] with the[se] cases . . indicating th[at] Fed. R. Evid. 801(d)(2)(D) constitutes an independent basis for admitting deposition testimony as evidence." Doc. 248 at 6 n.1. The government may well disagree with these decisions, perhaps because they force the government to grapple with the implications of its own admissions, but it offered no reasons why the opinions are erroneous under the Rules they interpret. Faced with the cogent analysis of *Long Island* and *Globe*, the Government is left to invent nonexistent requirements under the Rules and to appeal to a common law preference for live testimony—a preference, which as explained above, does not even apply to admissions. *Long Island*, *Globe*, and the other sources cited in this filing effectively and fully rebut these arguments. In any event, this Court rejected the government's arguments and granted AmBase's motion to designate. *See* Doc. 250. AmBase respectfully submits that the same course is appropriate here.

a rule of convenience or necessity justified by witness unavailability. Instead, Rule 801(d)(2) recognizes that party admissions have circumstantial guarantees of reliability that substitute for the guarantees of *in camera* observation, oath, and cross examination. Thus, admissions constitute, and the Federal Rules treat them as, reliable and independent substantive evidence. Accordingly, the concerns that motivated the common law's preference for live testimony are not implicated by designations under Rule 801(d)(2). As this Court has recognized, "admissions of a party opponent are not hearsay. The common law's preference for live testimony has no bearing on the use of party admissions as evidence." *Long Island Savings Bank*, 63 Fed. Cl. at 163. *See also Globe*, 61 Fed. Cl. at 94-95 ("As Professor Wigmore explains, admissions 'pass the gauntlet of the hearsay rule, which requires that extra-judicial assertions be tested by cross-examination, because the declarant, in the circumstance of making an admission, is "the only one to invoke the hearsay rule and because he *does not need to examine himself*.'") (quoting 4 John Henry Wigmore, Evidence in Trials at Common Law § 1048, at 4 (James H. Chadbourn ed., 1972)). The Advisory Committee's Note to Rule 801(d) explicitly makes this point: "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission." Indeed, even if a witness has testified or will testify at trial, his out-of-court admissions constitute admissible substantive evidence. *See, e.g., Cmty. Counseling Serv. v. Reilly*, 317 F.2d 239, 243 (4th Cir. 1963) ("[I]t is quite immaterial that the adversary is available to testify at the trial or has testified here. Thus applied, the Rule is a restatement of the long recognized rule of evidence that statements of a party which are inconsistent with his claim in litigation are substantively admissible against him.")

## III. Mr. Ryan's Testimony Satisfies the Requirements of Rule 801(d)(2)(D)

Mr. Ryan's deposition testimony satisfies the three requirements of Rule 801(d)(2)(D). First, the testimony is "offered against a party, in this case the United States," and was tendered by an employee of the United States. *Long Island Sav. Bank*, 63 Fed. Cl. at 164 (quotation marks omitted). Second, the designated statements fall squarely within the scope of Mr. Ryan's employment. Mr. Ryan served as the Deputy CEO and CEO of the Resolution Trust Corporation, and the designated testimony pertains generally to his "involvement with Carteret" while serving in those capacities, and particularly to the "implementation of the minority owned institution rules." Dep. at 51:18-52:4. Third, Mr. Ryan's statements were made during the existence of his relationship with the United States. At the time of his deposition, Mr. Ryan was the Regional Director of the Atlanta office of the Office of Thrift Supervision. *See* Dep. at 13:5-13:21. Accordingly, Mr. Ryan's statements qualify as classic admissions by a party opponent and are admissible as substantive evidence at trial.

## <u>CONCLUSION</u>

For the foregoing reasons, AmBase respectfully requests that the Court enter an order admitting the deposition testimony identified herein as substantive evidence at trial.

Respectfully submitted,

/s/ Charles J. Cooper_______________

Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:

Vincent J. Colatriano
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

Dated: February 22, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February 2008, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

Andrew Gilbert, Esq.
FDIC Legal Division
550 17th Street, N.W.
Room 2098
Washington, DC 20429

/s/ Jesse Panuccio
Jesse Panuccio

# Exhibit A

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X
CITIZENS FEDERAL BANK, a :
Federal Savings Bank, :
and CSF HOLDINGS, INC., :
Plaintiffs, :
v. : Civil Action No.
UNITED STATES OF AMERICA, : 92-656C
Defendant. :
- - - - - - - - - - - - - - - - - - X
AMBASE CORPORATION :
Plaintiff, :
v. : Civil Action No.
UNITED STATES OF AMERICA, : 93-531C
Defendant. :
- - - - - - - - - - - - - - - - - - X
FIRST ANNAPOLIS BANCORP, :
INC., :
Plaintiff :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff Intervenor :
v. : Civil Action No.
UNITED STATES OF AMERICA, : 94-522-C

Defendant :

\- - - - - - - - - - - - - - - X

BRUTON SMITH, :

Plaintiffs, :

v. : No. 92-540 C

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - X

May 25, 1999 9:20 a.m. Atlanta, Georgia

This is the deposition of JOHN E. RYAN, taken at 1475 Peachtree Street, N.E., Atlanta, Georgia; testimony is given before Diane Dorsey, Certified Court Reporter, B-1708. Signature to the deposition is reserved.

college.

A All right. I went to work for the Federal Reserve Bank of Chicago.

Q When was that?

A Oh, golly, I don't know. 1962, I'm guessing, as a bank examiner and worked there for -- until '69, and at that point went to Washington where I was a member of the Federal Reserve Board staff as an analyst. And then I guess it was about 1978 something like that that I became the director of the Boards Division of Banking Supervision and Regulation.

Q This was the Federal Reserve still?

A Federal Reserve Board. And I served in that capacity until about 1985. 1985 I left the Fed, joined the Miami law firm as a consultant.

Q Which law firm was that?

A It was an Arkyfreed in Miami, A-R-K-Y-F-R-E-E-D, was there for about 18 months, '86 sometime. Left '86 and went to the Federal Home Loan Bank of Boston as a senior vice president, served as acting president of that bank for about eight months. 1989 when FIRREA passed and created the OTS, we were -- most of us that were on the regulatory side were inscripted into government

service then. I went to -- I then was moved from Boston to Atlanta which was the largest supervisory area we had at the time. In 1989, probably November. In 19 --

Q What position did you have at OTS Atlanta?

A They were districts at the time. District director.

Q I'm sorry, go ahead.

A And then in 1993, late '93, early '94, I was asked by the Treasury to serve as the Deputy CEO of the RTC, and the CEO left and I became the acting CEO of the RTC and served in that capacity until its sun set.

Q When was that?

A The end of '96. So I was there two years. And I came back to Atlanta.

Q As?

A Regional director.

Q Is that the position you hold today?

A That is.

Q I take it that functionally the regional director is the same as the district director position that you had held previously?

A Fairly much, yeah. There were 12

districts, and they combined them into five regions.
Q During the three years that you were off at the RTC --
A Two.
Q I'm sorry, two years.
A Yeah. Early '94, late '93, something like that. It was only two. '94 and '95.
Q So you came back to Atlanta at the beginning of '96?
A That's correct.
Q I apologize, I had that wrong.
During the two years that you were off at the RTC, who filled your position here in Atlanta?
A Rick Riccobono, who was the deputy director.
Q Could you spell Mr. Riccobono's name?
A R-I-C-C-O-B-O-N-O.
Q And was he acting regional director?
A He was.
Q So it was understood that you were sort of temporarily on leave at the RTC?
A Yes.
Q Is Mr. Riccobono still here in Atlanta?
A No. He's in Washington as the deputy director of the OTS.

Q I don't think I have any further questions on Citizens.

MR. FIREHOCK: Great.

MR. KIRK: I take it you have none?

MR. FIREHOCK: No.

BY MR. KIRK:

Q Mr. Ryan, again, I'm Michael Kirk; we're now beginning the second case that we're on today, the AmBase Corporation versus the United States, and I represent AmBase Corporation and Carteret Bank Corp. in that case.

Other than your tour with the RTC, in any of the jobs that you've held in your career, did you have anything at all to do with either AmBase Corporation or Carteret Savings Bank or Carteret Bank Corp?

A Not that I recall.

Q When you were at the RTC, did you have some involvement with Carteret?

A I did.

Q Could you describe that for me.

A I was involved with the resolution and sale of the Carteret Thrift to its ultimate acquirer.

Q What was your involvement in that?

A The involvement was largely related to implementation of the minority owned institution rules or law that we were given by the Congress in, I believe, late '93.

Q Was this law passed before or after you went over to the RTC?

A Before.

Q And how did this law affect what you were doing at the RTC?

A The law stated, as I recall, in general terms that when the RTC sold an institution or a branch of an institution that was located in a low and moderate income area that it had to give preference in the bidding process to minorities -- to minorities, to minority buyers, and that bill was in that form. And then just before it was passed into law, an amendment was added that said but it can't cost anything. So we were in a dilemma as to how we were going to give someone a preference in the bidding process without it costing anything.

Q You said this program applies when the thrift is in a lower moderate income area?

A Yes. Or an area that is predominantly minority.

Q That was going to be my question.

A It's an area that is predominantly minority. As I remember, Carteret at one point moved its headquarters to downtown New York and it technically qualified under that, under that statute.
Q It had moved its headquarters there before this law was passed; is that right?
A Yes.
Q So when you were charged with implementing this law, Carteret, I think you said, technically fell within it?
A That's correct.
Q Was that a close technical call or was there any controversy as to whether or not it belonged in the program?
A No.
Q Who decided that it belonged in the program?
A I don't remember who. I think the legal staff at the RTC made the call.
Q What kind of preferences were you required to give to minorities in the sale of --
A As I said, that's what the statute said that we had to give preference.
Q Did the statute identify what preference

you were supposed to give?

A No.

Q So you were supposed to figure that out for yourself?

A We were supposed to figure that out for ourselves, right. And it had to be resolved at the lowest possible cost to the taxpayers.

Q Did you have problems resolving those two objectives?

A They are irreconcilable.

Q Why do you think that?

A Preference by its nature seems to me requires some cost. We were -- we had to design a system that would minimize that cost.

Q Did your experience in your years at the RTC bear out your opinion that those two objectives were irreconcilable?

A Not necessarily. We came up with a system of bidding that I think got a good price for the institutions that we sold.

Q It at least minimized the cost of providing the preference?

A I think that's right or in some cases may have eliminated it.

Q How would you determine whether that was

A No.
Q Was Mr. Horton?
A I don't think so.
Q So you think this was something that the FDIC just sent over for you all's information?
A The FDIC, you may recall that when -- that the RTC was, by statute, going out of existence on December 31st, '95, and any unfinished business of the RTC was going to be handed over to the FDIC to complete. We were all, throughout the latter half of '95, we were working closely with the FDIC to familiarize them with what we had and to turn over the keys as it were.
Q Do you recall reviewing this document?
A No, I don't. I don't recall the document.
Q If you take a look at the first page of the document, there is a number of statements under the heading "hypothesis list," and then under the subheading "resolutions" and about halfway down the page, there is a suggestion that by announcing government intervention through the use of conservatorships, the market value of thrifts are diminished more than if they had been closed and resolved through the typical resolution process. Do

you agree with that?

A Yes.

Q Why do you think that is?

A I think the way the conservatorships were operated, that is, operated in a way so that they stopped lending that the attrition in the customer base of the institution occurred and the value of the institution was less.

Q If you look two bullet points down, the suggestion is made that resolution costs increase significantly the longer the institution is in conservatorship.

A I think that's right.

Q That follows from what you were just explaining?

A Yes.

Q And further down the page, the second to last item, it's suggested that prescreening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received.

A I don't understand it.

Q It's grammatically challenged, as they say.

Let me suggest and ask my question based

bidders.

You do agree that the minority preference programs may discourage bidder interest, correct?

A Yes.

Q You also agree that as a result, you may -- RTC may get lower premiums, correct?

A They may. Not necessarily. May.

Q If you take a look at a couple of pages in, there is a -- I don't have page numbers. I guess if you look at the bottom of the page, the page numbered 0125181 and headed "what we have learned thus far interviews." Do you see that page?

A Yes.

Q Do you know who they interviewed?

A No.

Q If you look at the first bullet point under there, the statement is made many people at high levels believe that it is more cost-effective to keep assets out of the hands of the government liquidators. First, do you agree that it's more cost-effective to keep assets out of the hands of government liquidators?

A Yes.

Q Was that a view that was generally shared among high officials in the government?

best price. And there are those that are saying you're going too fast, you're destroying the market, you're not going fast enough. There is always a debate.

Q When the RTC started into action, it's fair to say that the economic conditions were at a fairly low point; isn't that right?

A Terrible.

Q And by the time you reached your sunset, things had turned around and were looking better; isn't that also correct?

A Partly because there wasn't the volume of assets in the hands of the government, it had been sold.

Q Could you explain that? I didn't understand what you meant by that.

A One of the serious factors depressing the real estate market when the RTC started was the fact that the government agency held billions of dollars worth of assets, and the market was discontinuing those assets because they were in the hands of the government. And this was having a depressing effect, not only on the assets that were in the hands of the government, but everyone else's real estate at the same time. So it was important to