# Exhibit A

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - x

CITIZENS FEDERAL BANK, a :
Federal Savings Bank, :
and CSF HOLDINGS, INC., :
Plaintiffs, :
v. : Civil Action No.
UNITED STATES OF AMERICA, : 92-656C
Defendant. :

\- - - - - - - - - - - - - - - - - - x

AMBASE CORPORATION :
Plaintiff, :
v. : Civil Action No.
UNITED STATES OF AMERICA, : 93-531C
Defendant. :

\- - - - - - - - - - - - - - - - - - x

FIRST ANNAPOLIS BANCORP, :
INC., :
Plaintiff :
and :
FEDERAL DEPOSIT INSURANCE :
CORPORATION, :
Plaintiff Intervenor :
v. : Civil Action No.
UNITED STATES OF AMERICA, : 94-522-C

Defendant :

- - - - - - - - - - - - - - - X

BRUTON SMITH, :

Plaintiffs, :

v. : No. 92-540 C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - X

May 25, 1999 9:20 a.m. Atlanta, Georgia

This is the deposition of JOHN E. RYAN, taken at 1475 Peachtree Street, N.E., Atlanta, Georgia; testimony is given before Diane Dorsey, Certified Court Reporter, B-1708. Signature to the deposition is reserved.

college.

A All right. I went to work for the Federal Reserve Bank of Chicago.

Q When was that?

A Oh, golly, I don't know. 1962, I'm guessing, as a bank examiner and worked there for -- until '69, and at that point went to Washington where I was a member of the Federal Reserve Board staff as an analyst. And then I guess it was about 1978 something like that that I became the director of the Boards Division of Banking Supervision and Regulation.

Q This was the Federal Reserve still?

A Federal Reserve Board. And I served in that capacity until about 1985. 1985 I left the Fed, joined the Miami law firm as a consultant.

Q Which law firm was that?

A It was an Arkyfreed in Miami, A-R-K-Y-F-R-E-E-D, was there for about 18 months, '86 sometime. Left '86 and went to the Federal Home Loan Bank of Boston as a senior vice president, served as acting president of that bank for about eight months. 1989 when FIRREA passed and created the OTS, we were -- most of us that were on the regulatory side were inscripted into government

service then. I went to -- I then was moved from Boston to Atlanta which was the largest supervisory area we had at the time. In 1989, probably November. In 19 --

Q What position did you have at OTS Atlanta?

A They were districts at the time. District director.

Q I'm sorry, go ahead.

A And then in 1993, late '93, early '94, I was asked by the Treasury to serve as the Deputy CEO of the RTC, and the CEO left and I became the acting CEO of the RTC and served in that capacity until its sun set.

Q When was that?

A The end of '96. So I was there two years. And I came back to Atlanta.

Q As?

A Regional director.

Q Is that the position you hold today?

A That is.

Q I take it that functionally the regional director is the same as the district director position that you had held previously?

A Fairly much, yeah. There were 12

districts, and they combined them into five regions.
Q During the three years that you were off at the RTC --
A Two.
Q I'm sorry, two years.
A Yeah. Early '94, late '93, something like that. It was only two. '94 and '95.
Q So you came back to Atlanta at the beginning of '96?
A That's correct.
Q I apologize, I had that wrong.
During the two years that you were off at the RTC, who filled your position here in Atlanta?
A Rick Riccobono, who was the deputy director.
Q Could you spell Mr. Riccobono's name?
A R-I-C-C-O-B-O-N-O.
Q And was he acting regional director?
A He was.
Q So it was understood that you were sort of temporarily on leave at the RTC?
A Yes.
Q Is Mr. Riccobono still here in Atlanta?
A No. He's in Washington as the deputy director of the OTS.

Q I don't think I have any further questions on Citizens.

MR. FIREHOCK: Great.

MR. KIRK: I take it you have none?

MR. FIREHOCK: No.

BY MR. KIRK:

Q Mr. Ryan, again, I'm Michael Kirk; we're now beginning the second case that we're on today, the AmBase Corporation versus the United States, and I represent AmBase Corporation and Carteret Bank Corp. in that case.

Other than your tour with the RTC, in any of the jobs that you've held in your career, did you have anything at all to do with either AmBase Corporation or Carteret Savings Bank or Carteret Bank Corp?

A Not that I recall.

Q When you were at the RTC, did you have some involvement with Carteret?

A I did.

Q Could you describe that for me.

A I was involved with the resolution and sale of the Carteret Thrift to its ultimate acquirer.

Q What was your involvement in that?

A The involvement was largely related to implementation of the minority owned institution rules or law that we were given by the Congress in, I believe, late '93.

Q Was this law passed before or after you went over to the RTC?

A Before.

Q And how did this law affect what you were doing at the RTC?

A The law stated, as I recall, in general terms that when the RTC sold an institution or a branch of an institution that was located in a low and moderate income area that it had to give preference in the bidding process to minorities -- to minorities, to minority buyers, and that bill was in that form. And then just before it was passed into law, an amendment was added that said but it can't cost anything. So we were in a dilemma as to how we were going to give someone a preference in the bidding process without it costing anything.

Q You said this program applies when the thrift is in a lower moderate income area?

A Yes. Or an area that is predominantly minority.

Q That was going to be my question.

A It's an area that is predominantly minority. As I remember, Carteret at one point moved its headquarters to downtown New York and it technically qualified under that, under that statute.
Q It had moved its headquarters there before this law was passed; is that right?
A Yes.
Q So when you were charged with implementing this law, Carteret, I think you said, technically fell within it?
A That's correct.
Q Was that a close technical call or was there any controversy as to whether or not it belonged in the program?
A No.
Q Who decided that it belonged in the program?
A I don't remember who. I think the legal staff at the RTC made the call.
Q What kind of preferences were you required to give to minorities in the sale of --
A As I said, that's what the statute said that we had to give preference.
Q Did the statute identify what preference

you were supposed to give?

A No.

Q So you were supposed to figure that out for yourself?

A We were supposed to figure that out for ourselves, right. And it had to be resolved at the lowest possible cost to the taxpayers.

Q Did you have problems resolving those two objectives?

A They are irreconcilable.

Q Why do you think that?

A Preference by its nature seems to me requires some cost. We were -- we had to design a system that would minimize that cost.

Q Did your experience in your years at the RTC bear out your opinion that those two objectives were irreconcilable?

A Not necessarily. We came up with a system of bidding that I think got a good price for the institutions that we sold.

Q It at least minimized the cost of providing the preference?

A I think that's right or in some cases may have eliminated it.

Q How would you determine whether that was

A No.

Q Was Mr. Horton?

A I don't think so.

Q So you think this was something that the FDIC just sent over for you all's information?

A The FDIC, you may recall that when -- that the RTC was, by statute, going out of existence on December 31st, '95, and any unfinished business of the RTC was going to be handed over to the FDIC to complete. We were all, throughout the latter half of '95, we were working closely with the FDIC to familiarize them with what we had and to turn over the keys as it were.

Q Do you recall reviewing this document?

A No, I don't. I don't recall the document.

Q If you take a look at the first page of the document, there is a number of statements under the heading "hypothesis list," and then under the subheading "resolutions" and about halfway down the page, there is a suggestion that by announcing government intervention through the use of conservatorships, the market value of thrifts are diminished more than if they had been closed and resolved through the typical resolution process. Do

you agree with that?
A Yes.
Q Why do you think that is?
A I think the way the conservatorships were operated, that is, operated in a way so that they stopped lending that the attrition in the customer base of the institution occurred and the value of the institution was less.
Q If you look two bullet points down, the suggestion is made that resolution costs increase significantly the longer the institution is in conservatorship.
A I think that's right.
Q That follows from what you were just explaining?
A Yes.
Q And further down the page, the second to last item, it's suggested that prescreening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received.
A I don't understand it.
Q It's grammatically challenged, as they say.
Let me suggest and ask my question based

bidders.

You do agree that the minority preference programs may discourage bidder interest, correct?

A Yes.

Q You also agree that as a result, you may -- RTC may get lower premiums, correct?

A They may. Not necessarily. May.

Q If you take a look at a couple of pages in, there is a -- I don't have page numbers. I guess if you look at the bottom of the page, the page numbered 0125181 and headed "what we have learned thus far interviews." Do you see that page?

A Yes.

Q Do you know who they interviewed?

A No.

Q If you look at the first bullet point under there, the statement is made many people at high levels believe that it is more cost-effective to keep assets out of the hands of the government liquidators. First, do you agree that it's more cost-effective to keep assets out of the hands of government liquidators?

A Yes.

Q Was that a view that was generally shared among high officials in the government?

best price. And there are those that are saying you're going too fast, you're destroying the market, you're not going fast enough. There is always a debate.

Q When the RTC started into action, it's fair to say that the economic conditions were at a fairly low point; isn't that right?

A Terrible.

Q And by the time you reached your sunset, things had turned around and were looking better; isn't that also correct?

A Partly because there wasn't the volume of assets in the hands of the government, it had been sold.

Q Could you explain that? I didn't understand what you meant by that.

A One of the serious factors depressing the real estate market when the RTC started was the fact that the government agency held billions of dollars worth of assets, and the market was discontinuing those assets because they were in the hands of the government. And this was having a depressing effect, not only on the assets that were in the hands of the government, but everyone else's real estate at the same time. So it was important to