**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**AMBASE CORPORATION AND CARTERET BANCORP, INC.,**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS

---

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**DAVID A. LEVITT**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor, 1100 L Street**
**Washington, D.C. 20530**
**Tele: (202) 353-7972**
**Fax: (202) 514-8640**

**Attorneys for Defendant**

**OF COUNSEL:**
**TAREK SAWI**
**Senior Trial Counsel**

**ARLENE PIANKO GRONER**
**ELIZABETH HOSFORD**
**F. JEFFERSON HUGHES**
**DELISA SANCHEZ**
**AMANDA L. TANTUM**

**February 24, 2008**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

APPLICABLE LEGAL STANDARDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. AMBASE HAS NOT DEMONSTRATED THAT CARTERET WOULD HAVE SURVIVED IN THE ABSENCE OF THE BREACH. . . . . . . . . . . . . . . . . . . . . . . 4

A. Mr. Bianco Is Not A Credible Witness And Lacks Knowledge Key To An Understanding Of Carteret's Demise . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. The Facts Demonstrate That Carteret's Desperate Need For Capital Resulted From Its Overwhelming Asset Problems, Not The Passage Of FIRREA .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1. Documents And Testimony Presented By Ambase At Trial Show That FIRREA Was Not The Cause Of Carteret's Difficulties .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2. Mr. Bianco's And Carteret's Contemporaneous Statements Regarding The Reasons For Carteret's Capital Shortfall Contradict Mr. Bianco and Professor Calomiris's Assertions At Trial. . . . . . . . . . . . . ..8

3. The Record Does Not Support Ambase's Claims That Carteret's Failure Resulted From FIRREA's Negative Publicity.. . . . . . . . . . . . . . . . 10

4. Plaintiffs Failed To Provide Support For Their Claims That FIRREA Caused Carteret To Shrink Its Assets . . . . . . . . . . . . . . . . . . . . . 11

5. The Evidence Refutes Plaintiffs' Claims That FIRREA Forced Carteret To Sell Branches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C. Ambase And Carteret Wasted Carteret's Capital By Entering Into Unsound Employment Contracts And Engaging In Unsound Business Practices . . . . . . . . 14

D. The Evidence Presented Demonstrates That Investors' Unwillingness To Invest In Carteret Resulted From Factors Unrelated To The Breach . . . . . . . 16

E. Plaintiffs Have Also Failed To Prove That The Regulators Acted Improperly Or Caused Carteret's Demise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1. The Record Does Not Support Plaintiffs' Assertion That The OTS Blocked Carteret's Efforts To Raise Outside Capital . . . . . . . . . . . . . . . . 17

2. The Evidence Demonstrates That The OTS Reasonably Decided To Recommend Receivership For Carteret. . . . . . . . . . . . . . . . . . . . . . . . . . 18

3. Plaintiffs' Repeated References To Carteret's Excellent Performance Over Fourteen Months Ending In 1992 Ignore The Conclusions Of The OTS And A Private Investor That Carteret Continued To Be Underreserved. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4. Plaintiffs Have Failed To Demonstrate That The OTS Caused Carteret To Over-Reserve For Losses In Its Commercial Real Estate And Corporate Loan Portfolios. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

F. Given That Carteret Was Overvaluing Its Mortgage Servicing Portfolio, The Evidence Does Not Support Plaintiffs' Argument That Carteret Could Have Sold This Portfolio To Raise Capital . . . . . . . . . . . . . . . . . . . . . . . . 21

II.. AMBASE HAS FAILED TO PROVE THAT REGULATORS COULD HAVE FORESEEN OR DID FORESEE ITS ALLEGED DAMAGES .. . . . . . . . . . . . . . . . . . . 22

III. AMBASE HAS FAILED TO SHOW THAT UNEXPECTED FUTURE CASH FLOWS AND MARKET APPRECIATION ARE ATTRIBUTABLE TO THE BREACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV. AMBASE HAS PRESENTED NO CREDIBLE EVIDENCE CONCERNING THE QUANTUM OF INJURY RESULTING FROM THE BREACH .. . . . . . . . . . . . . . 26

A. Professor Calomiris's "But For" World Does Not Allow Carteret To Survive The Massive Real Estate Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B. Professor Calomiris's Estimate Of Unexpected Cash Flows Is Not Supported By Testimony Or Documents Presented At Trial . . . . . . . . . . . . . . . . . . . . . . . . 27

C. Plaintiffs Have Failed To Demonstrate Carteret's Damages As Measured By Its Market Value At The Time Of The Breach Net Of Self-Imposed Losses Between The Time Of Breach And The Seizure. . . . . . . . . . . . . . . . . . . . . 32

D. Professor Calomiris's Evaluation Of Carteret's Market Value Based Upon Growth Of Peer Institutions Is Not Supported By The Record .. . . . . . . . . . . . . . . 34

V. AMBASE HAS FAILED TO DEMONSTRATE THAT THE FDIC'S ESTIMATE OF THE RECEIVERSHIP DEFICIT IS INVALID . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004). ............................................... 3, 4

Alfa Laval Separation v. United States,
175 F.3d 1365 (Fed. Cir. 1999)......................................................................................... 36

Am. Fed. Bank v. United States,
72 Fed. Cl. 586 (2006). ..................................................................................................... 25

Am. Fed'n of Gov't Employees v. United States,
258 F.3d 1294 (Fed. Cir. 2001)......................................................................................... 36

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341, 1355 (Fed. Cir. 2003) ............................................................................... 26

California Fed. Bank, FSB v. United States,
245 F.3d 1342 (Fed. Cir. 2001)......................................................................................... 28

Cienega Gardens v. United States,
503 F.3d 1266 (Fed. Cir. 2007)...................................................................................... 2, 33

Citizens Financial Services, FSB v. United States,
64 Fed. Cl. 498 (2005), aff'd, 170 Fed.
Appx. 129, 2006 WL 618792 (Fed. Cir. Mar. 9, 2006). .................................................. 29

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2003) (en banc) ................................. 26

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). ......................................................................................................... 3

Cooper v. United States,
37 Fed. Cl. 28 (1996). ......................................................................................................... 3

Corbin v. Fed. Reserve Bank of New York,
475 F. Supp. 1060 (S.D.N.Y. 1979), aff'd, 629 F.2d 233 (2d Cir. 1989)................................... 37

FDIC v. Citizens State Bank of Niangua,
130 F.2d 102 (8th Cir. 1942). ........................................................................................... 37

Fifth Third Bank of W. Ohio v. United States,
55 Fed. Cl. 223 (2003). ........................................................ 28, 29

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999), aff'd in part, vacated in part, & remanded,
239 F.3d 1374 (Fed. Cir. 2001)........................................................ 24

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374, 1380 (Fed. Cir. 2001) ........................................................ 26

Glendale Fed. Bank, FSB v. United States,
378 F.3d 1308 (Fed. Cir. 2004)........................................................ 28

Golden Pac. Bancorp v. FDIC,
No. 95 Civ. 9281, 2002 WL 31875395 (S.D.N.Y. Dec. 26, 2002),
aff'd, 375 F.3d 196 (2d Cir. 2004), cert. denied, 546 U.S. 1012 (2005). ................ 36

Hansen Bancorp, Inc. v. United States,
367 F.3d at 1297 (Fed. Cir. 2004)........................................................ 33

In re Hartsdale Assocs.,
452 F. Supp. 67 (S.D.N.Y. 1978)........................................................ 37

Howard Indus., Inc. v. United States,
115 F. Supp. 481 (Ct. Cl. 1953)........................................................ 3

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2003)........................................................ 4, 23, 33, 34

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003)........................................................ 35

La Van v. United States,
382 F.3d 1340 (Fed. Cir. 2004)........................................................ 25

Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.,
102 P.3d 257 (Cal. 2004). ........................................................ 24

Estate of Lillian Berg v. United States,
687 F.2d 377 (Ct. Cl. 1982). ........................................................ 4, 32

Longshore v. United States,
77 F.3d 440 (Fed. Cir. 1996)........................................................ 35

Mid Jersey Nat'l Bank v. Fidelity-Mortgage Investors,
518 F.2d 640 (3d Cir. 1975)........................................................................................ 37

Nat'l Controls Corp. v. Nat'l Semiconductor Corp.,
833 F.2d 491 (3d Cir. 1987)........................................................................................ 24

In Re Receivership Of First Nat'l Bank in Humboldt,
523 N.W.2d 591 (Iowa 1994). ..................................................................................... 37

Reynolds v. United States,
158 F. Supp. 719 (Ct. Cl. 1958)..................................................................................... 4

Slattery v. United States,
69 Fed. Cl. 573 (2006). ................................................................................................ 23

Southern National Corp. v. United States,
57 Fed. Cl. 294 (2003). ................................................................................................ 29

Southwest Inv. Co., Inc. v. United States,
63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005). ....................................... 3, 4

Standard Federal Bank v. United States,
62 Fed. Cl. 265 (2004). ................................................................................................ 29

Suess v. United States,
52 Fed. Cl. 221 (2002), appeal docketed, Nos. 07-5070, -5071 (Fed. Cir. 2007)................. 24, 30

United States v. Winstar Corp.,
518 U.S. 839 (1996)...................................................................................................... 30

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (2002) ................................................................................................... 26

## STATUTES, RULES, AND REGULATIONS

12 U.S.C. § 1828(k)(4). ................................................................................................ 14

## MISCELLANEOUS

J. Murray, Contracts, § 237 (2d rev. ed. 1974). ............................................................. 32

Restatement (Second) of Contracts § 344(a)(1981) .............................................................. 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **AMBASE CORPORATION AND CARTERET BANCORP, INC.**, | ) | |
| **Plaintiffs**, | ) | |
| and | ) | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION**, | ) | No. 93-531C<br>Senior Judge Loren Smith |
| **Plaintiff-Intervenor**, | ) | |
| v. | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant**. | ) | |

**DEFENDANT'S MOTION FOR**
**JUDGMENT BASED UPON PARTIAL FINDINGS**

Defendant, the United States, respectfully requests the Court to enter judgment pursuant to Rule 52(c) of the Rules of the United States Court of Federal Claims ("RCFC") against plaintiffs, Ambase Corporation and Carteret Bancorp, Inc. (collectively "Ambase"), and plaintiff-intervenor Federal Deposit Insurance Corporation ("FDIC"). During the past two weeks, plaintiffs have been fully heard on their claims that Carteret Savings Bank ("Carteret") would have survived in the absence of the breach and suffered damages of between approximately $1 billion and $4 billion. Rather than demonstrating that Carteret would have survived and prospered in the absence of the breach, however, the contemporaneous documents demonstrate unequivocally that Carteret failed its minimum regulatory capital requirements as of June 30, 1991, even counting goodwill, and never regained regulatory capital compliance prior to seizure. After Ambase was unable to raise sufficient capital to bring Carteret into regulatory capital

compliance, the Office of Thrift Supervision ("OTS") had no choice but to order Carteret be transferred to the Resolution Trust Corporation ("RTC"). The contemporaneous evidence plaintiffs presented demonstrates that Carteret's condition and performance had deteriorated to a state of insolvency because of losses in the commercial real estate portfolio and would have been no different in a "but for" world than it was in the real world. The self-interested attempts of plaintiffs' witnesses to rewrite history retrospectively are incompatible with the contemporaneous record.

Further, plaintiffs' evidence demonstrates that Carteret would not have been injured by $1 billion to $4 billion even if it had survived. Professor Calomiris estimates the market values of goodwill and the thrift at the time of the breach were $69 million and $251 million, respectively. These measures are absolute ceilings on the damage Carteret could have suffered as a result of the breach. Cienega Gardens v. United States, 503 F.3d 1266, 1282 n.13 (Fed. Cir. 2007) ("A determination that damages exceed the value of the property should be indicative that the method of computing damages is flawed."). Even if this were not the case, there is no basis in the evidence to support Professor Calomiris's claim that "but for" Carteret suffered alleged "lost income" of approximately $596 million between 1989 and 2008; that Ambase lost dividends of approximately $189 million between 1989 and 2008; or that Carteret suffered "wounded bank" damages of approximately $35 million. Thus, we respectfully request that the Court dismiss plaintiffs' damage claims.

## APPLICABLE LEGAL STANDARDS

Pursuant to RCFC 52(c), the Court should enter judgment against plaintiffs following the presentation of their case-in-chief if, under controlling law, they have failed to present sufficient

evidence to prevail on their contention that Carteret would have survived in the absence of the breach and suffered quantifiable damages. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 101-102 (2004). At this point in the proceedings, the question is not whether the plaintiffs have made a prima facie case, as it would be for a directed verdict motion in a jury trial, Cooper v. United States, 37 Fed. Cl. 28, 35 (1996), but, instead, whether "plaintiff[,] who has had full opportunity to put on his own case and has failed to convince the judge, . . . has [a] legal right . . . [to] hear the defendant's case[.]" Howard Indus., Inc. v. United States, 115 F. Supp. 481, 484-85 (Ct. Cl. 1953). Because this Court serves "as both the trier of fact and the trier of law," Rule 52(c) permits weighing the evidence and, in contrast to a summary judgment motion, does not require that the Court resolve all credibility determinations in favor of the plaintiffs. Cooper, 37 Fed. Cl. at 35.

Under the caselaw, if, at the time of the breach, the Government's goodwill promise had no material value because the thrift was insolvent or destined to become insolvent as a result of operational difficulties unrelated to the breach, then the breach is at most "technical" and cannot give rise to a claim for damages. See, e.g., Southwest Inv. Co., Inc. v. United States, 63 Fed. Cl. 182, 196 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005) ("FIRREA constituted a technical breach" because, at the time of enactment, the thrift's regulatory capital, even counting the forbearances, was insufficient to satisfy the minimum regulatory capital requirements); Admiral Fin. Corp. v. United States, 57 Fed. Cl. 418, 432 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004) ("We find that Admiral's failure to infuse cash into Haven to bring it into regulatory capital compliance, its futile efforts to find outside sources, and its persistent denial of its ability to supply the needed capital, did indeed substantially impair the value of the contractual exchange

to the Government[.]"). Further, in calculating damages for loss of an asset, the Court of Appeals for the Federal Circuit has explained that "both the magnitude and type of damages [must be] foreseeable." Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2003). Thus, under well-established precedent, imputed market values premised upon alleged "unexpected cash flows" and market appreciation cannot provide the bases for valuing an asset. Estate of Lillian Berg v. United States, 687 F.2d 377, 380 (Ct. Cl. 1982) ("the date of the breach is the proper date for establishing fmv"); Reynolds v. United States, 158 F. Supp. 719, 725 (Ct. Cl. 1958) ("The time when performance should have taken place is the time as of which damages are measured"). For these two reasons, the Court should reject plaintiffs' claims that Carteret would have survived in the absence of the breach and that damages can be quantified by reference to unanticipated cash flows nineteen years in the future.

## ARGUMENT

### I. AMBASE HAS NOT DEMONSTRATED THAT CARTERET WOULD HAVE SURVIVED IN THE ABSENCE OF THE BREACH

Under the case law, if the thrift would have been in an unsafe and unsound condition even in the absence of the breach, then the breach is at most "technical" and cannot give rise to a claim for damages. See, e.g., Southwest Inv., 63 Fed. Cl. at 196; Admiral, 57 Fed. Cl. at 432 (2003).

#### A. Mr. Bianco Is Not A Credible Witness And Lacks Knowledge Key To An Understanding Of Carteret's Demise

In presenting its case, plaintiffs have relied virtually entirely on Richard Bianco, former CEO of Carteret and current CEO, President, and Chairman of the Board of Ambase. Mr. Bianco testified regarding Carteret's activities after entering into the supervisory agreements in

1982, as well as the environment following the passage of FIRREA, and Carteret's commercial loan portfolio. Mr. Bianco, however, first became an officer at Carteret in May 1991. Tr. 157:15-158:10 (Bianco). Indeed, he was not even an investor in Ambase until 1990. Tr. 155:1-5 (Bianco).

The OTS concluded that the key year of Carteret's troubles was 1990, when the OTS determined that Carteret should have allocated approximately $77 million in additional loan loss reserves. PX 5331 at KH 033535. Mr. Bianco acknowledged that he was not at Carteret in 1990 and therefore was not certain whether the additional reserves required by OTS were allocated or not. Tr. 332:17-333:6 (Bianco). Mr. Bianco therefore lacks personal knowledge of events in 1989 and 1990, key periods for the Court's analysis of Carteret's difficulties.

Mr. Bianco also made a number of unsupported and incorrect statements in his testimony. For example, when discussing a July 6, 1992 deadline, he claimed that the OTS gave Carteret "no leniency" in its deadlines for raising capital. Tr. 299:10-300:19 (Bianco). In fact, after Mr. Bianco met with OTS Director Timothy Ryan in Washington, D.C., the OTS gave Carteret an extension until August 28, 1992. DX 8202; Tr. 340:18-341:11 (Bianco).

Most importantly, Mr. Bianco has acknowledged that he has a direct personal stake in the outcome of this litigation. Tr. 368:13-18 (Bianco). He has acquired a large amount of Ambase's stock since it became a non-functioning company, DX 9132 at 4, apparently in the expectation that the Court will award damages to Ambase. Thus, although Mr. Bianco owned less than one percent of Ambase's stock in 1990, he now owns more than 30 percent. Tr. 155:6-11 (Bianco). Moreover, Ambase terminated Mr. Bianco's pension plan, replacing it with a new employment contract that grants him a percent of any damages that Ambase may recover in this action. Tr.

365:2-8 (Bianco). Under the new, long-term incentive award, Mr. Bianco will receive five percent of the first $50 million of an Ambase recovery; an additional eight percent of any recovery exceeding $50 million but not greater than $150 million; and ten percent of any recovery exceeding $150 million but not greater than $250 million. DX 9133 at 23-24; Tr. 365:19-366:12 (Bianco). Should Ambase recover over $250 million, Mr. Bianco would receive the amounts described above and a discretionary amount of no less than ten percent of the amount above $250 million to be determined by Ambase's Board. DX 9133 at 23-24; Tr. 366:13-19 (Bianco). Therefore, if Ambase were awarded $1 billion, Mr. Bianco would receive $100 million. Tr. 366:25-367:5 (Bianco). Were Ambase awarded $8 billion, Mr. Bianco would receive $800 million. Tr. 367:9-11 (Bianco). Mr. Bianco also testified that he owns thirty percent of Ambase's stock, which provides an even greater incentive than his long-term incentive award contract, and that he would therefore receive a percentage of the remainder of the award as well. Tr. 366:20-24, 367:7-12 (Bianco).

Therefore, Mr. Bianco's financial position, as well as his lack of involvement with Carteret or Ambase in periods critical to the plaintiffs' claims render his testimony unhelpful and make him a less-than-credible witness. Given that Ambase has presented no other fact witnesses to testify about the core events in this litigation,[1] the Court should reject plaintiffs' claims as unfounded.

---

[1] Plaintiffs presented the testimony of FDIC official Wayne Green concerning the post-receivership accounting of Carteret, but this testimony bore no relation to the reasons for Carteret's failure. Likewise, the deposition testimony that plaintiffs designated involved government regulators, all of whom recognized the precarious condition of Carteret at the time of transfer, with or without counting the goodwill as regulatory capital.

### B. The Facts Demonstrate That Carteret's Desperate Need For Capital Resulted From Its Overwhelming Asset Problems, Not The Passage Of FIRREA

#### 1. Documents And Testimony Presented By Ambase At Trial Show That FIRREA Was Not The Cause Of Carteret's Difficulties

Despite Ambase's arguments and the assertions of Messrs. Bianco and Calomiris that FIRREA caused Carteret's need for capital, the documents presented by Ambase demonstrate that Carteret's own ventures in commercial lending combined with poor underwriting led to its undercapitalization. Kidder Peabody & Co. ("Kidder"), Carteret's own investment advisor, recognized in October 1991 that Carteret had no capital after "new management [conducted] a severe and comprehensive review of the loan portfolio." DX 49 at WOT692 1486.

In an overview prepared by Kidder, along with Merrill Lynch & Co. ("Merrill"), to attract investors for Carteret, Kidder and Merrill concluded that, as of December 31, 1991, the principal amount of Carteret's non-performing loans in its commercial asset portfolio was almost as great as the principal amount of its performing loans. PX 2807 at WOP332 2088; Tr. 348:6-16 (Bianco). Kidder and Merrill also noted that "[a]s a result of the losses incurred in establishing the loan loss reserves, Carteret is not in compliance with regulatory capital requirements and has committed to its primary regulator, the Office of Thrift Supervision ('OTS'), that it will raise sufficient capital to achieve compliance with all such requirements." PX 2807 at WOP332 2082 (emphasis added). Kidder and Merrill at no point stated that conditions would differ if Carteret had supervisory goodwill, and Mr. Bianco could not point to any such statement by his investment advisors. Tr. 349:11-22 (Bianco).

Moreover, a memorandum introduced by plaintiffs reported that the OTS concluded that the main cause of Carteret's demise was poor underwriting of loans. PX 5331 at KH 033535.

The OTS also felt that 1990 was the key year of the institution's troubles. At that time, Carteret failed to allocate $77 million in additional loan loss reserves required by the OTS. Id. Further, the additional reserve requirement resulted from "continual discovery of poorly underwritten loans which began as early as 1986 and continued until lending activity was terminated in 1989." PX 5331 at KH 033535. Mr. Bianco had no knowledge of Carteret's activities or condition during this time period and could not refute these conclusions. Tr. 331:19-333:6 (Bianco).

Finally, comments by Mr. Bianco during his testimony demonstrate his understanding that Carteret's problem assets and general economic conditions caused the institution's capital shortfall. He admitted that Ambase put $62.5 million into Carteret because Carteret was taking reserves and writing off commercial real estate assets, not because of FIRREA's impact. Tr. 267:2-17 (Bianco). "[I]f we continued to write off commercial real estate as we did" and "knew we were falling below the capital ratios," he understood that Ambase had an obligation to infuse $62 million into Carteret pursuant to the regulatory capital maintenance agreement. Id. (Bianco). Furthermore, Mr. Bianco agreed that Carteret's troubles with its commercial loan portfolio were due to a "business cycle problem," that is, the economic conditions of the time, and further attributed them to "bad underwriting[,]" "moving into a business that really didn't have synergies with other businesses[,]" and "[b]ad timing[.]" Tr. 355:10-19 (Bianco).

### 2. Mr. Bianco's And Carteret's Contemporaneous Statements Regarding The Reasons For Carteret's Capital Shortfall Contradict Mr. Bianco and Professor Calomiris's Assertions At Trial

Although Mr. Bianco now attributes Carteret's capital shortfall to FIRREA, from 1991 through 1992, Mr. Bianco and the institution's Board of Directors recognized that Carteret's financial condition resulted from its ruinous commercial and corporate loan portfolios and the

necessity of reserves. PX 2212. For example, in a letter to the FDIC responding to the 1991 Report of Examination ("ROE"), Mr. Bianco, joined by other members of the Board, noted that "Carteret continues to experience financial difficulties principally due to deterioration of its commercial real estate and commercial loan portfolios, with some deterioration in the first mortgage portfolio as well." PX 2212 at C-AM-A-0231763. Further, Mr. Bianco and the Board acknowledged that "[w]ith the significant increase in reserves for losses on loans and real estate in the second quarter of 1991, Carteret does not meet any of the three minimum capital requirements of FIRREA at June 30, 1991." Id. at C-AM-A-0231765

Mr. Bianco and the Board also acknowledged that economic conditions, including a poor real estate market, had played a major role in the decline of its assets. They stated that, based upon a "rapid and comprehensive review of Carteret's commercial real estate and corporate loan portfolios and related classifications and reserves," Carteret continued to suffer a "deterioration in its loan portfolios due to the prolonged downturn in the real estate market," and that, out of a commercial real estate portfolio of approximately $1 billion, "Carteret's total internally criticized assets at June 30, 1991, totaled $986 million . . ." Id.

Although Mr. Bianco had no involvement with Carteret prior to May 1991, upon joining the company, he received information about the origins of the institution's troubles. His current testimony contradicts that information. For example, shortly after Mr. Bianco joined Carteret, the former CEO of Carteret informed him that "1990 was a difficult environment for the entire thrift industry and, indeed, for the entire banking industry." DX 7340 at WOQ678 1962; Tr. 428:6-12 (Bianco). This is contrary to his trial testimony that Carteret would have survived in the absence of the breach.

### 3. The Record Does Not Support Ambase's Claims That Carteret's Failure Resulted From FIRREA's Negative Publicity

Mr. Bianco and Professor Calomiris attributed the decline in Carteret's financial decline to negative publicity regarding FIRREA's passage and implementation. These claims were unsupported by testimony or documents. Instead, Mr. Bianco noted that the difficult commercial real estate environment was "very much in the news" in 1991 and 1992. Tr. 253:19-22 (Bianco). Mr. Bianco, therefore, acknowledged the existence of other news events unrelated to FIRREA that may have affected Carteret's financial health.

Furthermore, plaintiffs' documents demonstrate that publicity related to FIRREA's enhanced capital requirements had no effect on Carteret's deposits. Mr. Bianco asserted that Carteret experienced deposit run-off as a result of negative publicity following FIRREA. Plaintiffs' counsel questioned Mr. Bianco regarding a February 19, 1992 news article from a New Jersey newspaper, the Bergen Record, summarizing Carteret's need for capital to fulfill regulatory requirements and its search for investors. DX 55. Mr. Bianco claimed that the media's interest in Carteret's search for investors stemmed from the loss of supervisory goodwill and that this press coverage caused concerns among depositors. Tr. 179:13-180:15, 181:4-24 (Bianco).

In contrast, an investment company review by Kidder and Merrill, introduced by plaintiffs at trial, stated that "Carteret has not experienced any material deposit run-off generally associated with negative publicity." PX 2807 at WOP332 2085 (emphasis added). When questioned about his investment advisors' conclusions, Mr. Bianco conceded that the publicity had, at most, a de minimus effect on deposits. Tr. 345:8-346:2 (Bianco) (noting that "[m]aterial is the key word").

In fact, the news article relied upon by Ambase at trial notes that Carteret "fell below federal standards last August [1991], when it added $150 million to reserves covering losses on $544 million in problem loans and foreclosed real estate. The addition brought reserves up to $302 million but sapped the thrift's capital." DX 55 at WOP332 2017. Contrary to plaintiffs' assertions, therefore, this article reveals to the public that it was Carteret's losses on problem loans and foreclosed real estate that caused its financial difficulties and need for capital, not FIRREA. Mr. Bianco admitted that reserves were "one of the components" of Carteret's lack of capital, but insisted that the exclusion of supervisory goodwill was the main reason for the lack of capital and the negative publicity. Tr. 351:9-18 (Bianco).

Mr. Bianco, however, also acknowledged that Carteret would have had approximately $100 million in supervisory goodwill as of the date of the article; despite Mr. Bianco's protests to the contrary, this level of supervisory goodwill could not have counterbalanced the serious need for $302 million in reserves described by the article. Tr. 351:19-352:2 (Bianco). Mr. Bianco would not answer why he believed that the issue of $300 million in reserves was less important for Carteret's health than the loss of $100 million in goodwill. Tr. 352:12-353:18, 354:18-25 (Bianco).

#### 4. Plaintiffs Failed To Provide Support For Their Claims That FIRREA Caused Carteret To Shrink Its Assets

Plaintiffs failed to establish that FIRREA caused the asset shrinkage. Professor Calomiris testified that the breach caused Carteret to switch from a strategy of asset growth to one of asset shrinkage. Tr. 957:25-958:7 (Calomiris). Ambase also claims that Carteret lost profits as a result of the asset shrinkage. PX 9053. Professor Calomiris acknowledged, however, that ". . . a

substantial portion of this shrinkage was related to Carteret's efforts to discontinue corporate and commercial real estate lending and to dispose of related assets[.]" PX 2702 at ¶ 65.

Other evidence also demonstrates that Carteret's asset shrinkage was unrelated to FIRREA. First, Carteret began shrinking its assets before the breach. DX 7175 at C-AM-A-0361389. Further, as acknowledged in a letter from Carteret's Board to the FDIC, in response to the deterioration of its commercial real estate and corporate loan portfolios, "in the Fall of 1989, Carteret ceased all new commercial real estate and corporate lending." PX 2212 at C-AM-A-0231766. In addition, Carteret's Board recognized that the additional $161 million in reserves for losses on loans and real estate taken in the first half of 1991 occurred because "[m]anagement realizes that the commercial and corporate real estate markets have remained weak in New Jersey and Florida which has caused Carteret's loan portfolios to deteriorate further." PX 2212 at C-AM-A-0231764.

Plaintiffs also claim that Carteret sold $300 million in mortgage loans in 1989 and $900 million in mortgage loans in 1990. They concede, however, that the profits of those sales added to capital and presented no evidence of how they could have met minimum regulatory requirements with an additional $1.2 billion in assets even counting goodwill as regulatory capital.

Professor Calomiris admitted that if its mortgages had been retained, Carteret would have been required to hold an extra $30 million in regulatory capital as of September 30, 1992, and an extra $40 million in regulatory capital after Decmeber 31, 1992. Tr. 1272:1-8 (Calomiris). Further, Professor Calomiris admitted that if Carteret had not sold the mortgages, it would have been unable to book $60 million in gains in 1989, $5 million in gains in 1990, or $10 million in

gains in 1991, and would have been deprived of the income on those gains. Tr. 1275:13-1277:10 (Calomiris). Thus, in the real world, the sale of the mortgages enhanced Carteret's income and capital, and plaintiffs presented no evidence of how Carteret would have compensated for these advantages in the "but for" world.

### 5. The Evidence Refutes Plaintiffs' Claims That FIRREA Forced Carteret To Sell Branches

Ambase argues that, in a "but for" world, Carteret would not have sold 23 Florida, New Jersey, and Maryland branches in 1990. The evidence demonstrates that Carteret sold these branches primarily because of economic and operational considerations, not the breach. For example, a September 30, 1991 Capital Plan prepared by Carteret and submitted to the OTS, states:

> In 1990, Carteret implemented a program to restructure its retail branch network. As part of this program, several less efficient branches in New Jersey and Florida were consolidated into existing branches while other branch offices were sold and the related deposits transferred to the acquiring institutions. Carteret has reduced operating expenses as a result of these branch sales and consolidations.

DX 7175 at CAM218 0023. This ascribes the branch sales primarily to operational concerns.

According to Ambase's Form 10-Q for the period ended September 30, 1990, Carteret "implemented a program to restructure and enhance significantly its retail branch network." PX 1506 at WOQ620 2012. This program was "designed to create a more concentrated and efficient retail system as well as generate additional regulatory capital[.]" PX 1506 at WOQ620 2012; Tr. 400:8-14 (Bianco).

Mr. Bianco acknowledged that Ambase had described this as the purpose of the branch

sales. Tr. 400:8-14 (Bianco). Ambase also stated in its 10-Q that, due to the branch sales, Carteret "expect[ed] to benefit from a future reduction in operating expenses, while at the same time, replacing deposits with similar or lower cost funding, primarily adjustable-rate Federal Home Loan Bank Advances." PX 1506 at WOQ620 2013. In fact, in a June 14, 1991 memorandum, Carteret's management noted that "[t]he sales also resulted in reduced annualized operating expenses of approximately $18 million and enhanced both the current efficiency and future profitability of the branch system." DX 7340 at WOQ678 1963.

### C. Ambase And Carteret Wasted Carteret's Capital By Entering Into Unsound Employment Contracts And Engaging In Unsound Business Practices

In January 1990, Ambase, on behalf of itself and its subsidiaries, including Carteret, entered into Severance Agreements with nine Carteret executives and senior officers providing for (i) continued employment and benefits, and (ii) a lump sum payment in excess of three times base salary and bonus, in the event Ambase changed control. DX 9122 at WOR081 0285-86. The obligation to fund these Severance Agreements was undertaken by the "Company[,]" which is defined as "Ambase and its subsidiaries." Id. at WOR081 0286. Ambase solicited and approved these agreements and litigation to enforce the agreements was prosecuted against Ambase only. Id.; see PX 2702 at 88 n.165. Carteret has not experienced any loss resulting from these agreements. DX 9122 at WOR081 0286; PX 2702 at 88 n.165. Indeed, as to Carteret, the OTS determined that these agreements provided golden parachute payments barred under the Crime Control Act of 1990, 12 U.S.C. § 1828(k)(4). DX 9122 at WOR081 0286. The change in control that prompted the litigation under the agreements related to the Bianco group taking control of Ambase in 1990.

In addition, Carteret paid $875,000 in bonuses to certain senior officers pursuant to action taken on September 30, 1990, by Carteret's Board of Directors (Compensation Committee). PX 4860 at WOP334 0604. The OTS noted that "Carteret's board knew, or should have known, that Carteret's financial condition was rapidly deteriorating at the time when it took the extraordinary measures necessary to approve the bonuses." PX 4860 at WOP334 0605; Tr. 426:3-13 (Bianco). The OTS concluded that given Carteret's financial deterioration, increasing level of criticized assets, and regulatory capital deficiency, the payment of bonuses in 1990 was an unsafe and unsound practice and violated Section 563.161(b) of the OTS Regulations. PX 4860 at WOP334 0605; Tr. 426:14-25 (Bianco).

Ambase also misused Carteret's capital by engaging the thrift in transactions with General Development Corporation ("GDC"), a real estate developer and a participant in the time share industry. GDC had been a subsidiary of City Investing Company, Ambase's predecessor, and GDC's Board of Directors included four members of Ambase's Board of Directors (George Scharffenberger, Edwin Hatch, Eben Pyne, and Marshall Manley). Following Ambase's acquisition of Carteret, Carteret was required to purchase $66.8 million of mortgages from a subsidiary of GDC without the required appraisals. Carteret also participated in a revolving credit agreement that was classified as 100 percent doubtful by OTS and FDIC examiners. PX 403 at 0335; Tr. 433:16-434:18 (Bianco).

Therefore, Ambase and Carteret's employment and business practices wasted the thrift's capital.

### D. The Evidence Presented Demonstrates That Investors' Unwillingness To Invest In Carteret Resulted From Factors Unrelated To The Breach

Plaintiffs asserted at trial that the regulatory environment following FIRREA, and Carteret's inability to provide dividends, deterred investments by potential investors in Carteret. Tr. 744:3-8 (Calomiris).

Mr. Bianco, however, testified that both Carteret and its possible investors faced a "very difficult commercial real estate environment" and a "very, very difficult economic environment." Tr. 162:13-14, 253:19-22 (Bianco). Indeed, Mr. Bianco testified that the United States was "in a recession or about to go into a recession" in 1991 and 1992. Tr. 162:12-14 (Bianco). Carteret, therefore, "had to kind of convince investors to make an investment in a company that was stagnant at best and operating in a very difficult economic environment[.]" Tr. 162:8-12 (Bianco) (emphasis added). Mr. Bianco's own testimony demonstrates that the company's financial condition and the economic environment played major roles in the failure of investors to support a merger or acquisition of Carteret, and that these same factors would have affected Carteret's efforts even in a non-breach world.

On July 20, 1992, Ambase signed a conditional letter of intent with a group of investors led by Kohlberg to invest $200 million in Carteret. DX 62. Mr. Bianco testified that, after signing the letter of intent with Carteret, Kohlberg performed due diligence and "significant studies of Carteret[,]" which convinced it not to pursue the transaction. Tr. 301:21-302:11 (Bianco). Kohlberg's unwillingness to invest resulted from "Carteret's $502.2 million in nonperforming loans and REO (9.6 percent of total assets at June 30, 1992), possible overvaluation of purchased mortgage servicing rights, possible additional losses on the

commercial loan and real estate owned portfolios, and lack of support for Carteret's financial assumptions and projected earnings." DX 8124 at FAM002 0532.

Subsequently, The Carlyle Group did due diligence and also withdrew its letter of intent. Tr. 338:7-339:8 (Bianco). Carlyle informed OTS that it withdrew because "it had concluded that it could not receive an adequate rate of return on its investment and had concerns about 'regulatory risk.'" DX 8124 at FAM002 0532. Although Kidder informed Carteret that "[i]f we accept what you say about a $30 million annual earnings run rate, then the 150 million capital raising target is feasible[,]" DX 49 at WOT692 1487, Mr. Bianco admitted that Carteret never came close to a $30 million annual earnings run rate. Tr. 335:15-19 (Bianco).

### E. Plaintiffs Have Failed To Prove That The Regulators Acted Improperly Or Caused Carteret's Demise

#### 1. The Record Does Not Support Plaintiffs' Assertion That The OTS Blocked Carteret's Efforts To Raise Outside Capital

Ambase argues that the Government exacerbated the breach by "blocking" Carteret's efforts to raise outside capital. Ambase Contentions of Fact and Law ("Ambase Mem.") at 67-69. This is contrary to the record. Despite finding cause for a seizure in October 1991, PX 4867a, the Government permitted Carteret to attempt to raise capital from outside investors from October 1991 until December 1992. In October 1991, Messrs. Vigna and Albanese recommended transferring Carteret to the RTC because it was massively undercapitalized and, therefore, in an unsafe and unsound condition. PX 4867a. Nevertheless, for nine months in 1992, OTS delayed transferring the institution because regulators sought to provide Carteret's new management with an opportunity to locate private funds to recapitalize the institution. On February 27, 1992, Carteret's Board entered into an agreement with the OTS, consenting to the

institution being placed under the RTC's Accelerated Resolution Program in the event that efforts to effect an unassisted recapitalization failed to proceed in a manner acceptable to the OTS within 90 days (May 28, 1992). DX 8202 at PAM010 1923. By letter dated May 27, 1992, Mr. Vigna extended the deadline to July 6, 1992.

On July 3, 1992, Carteret/Ambase representatives met with OTS Director Timothy Ryan and obtained a further extension until August 28, 1992.[2] DX 8202; Tr. 340:18-341:11 (Bianco). In October 1992, the OTS gave Carteret additional time to allow The Carlyle Group to complete due diligence, but Carlyle withdrew its letter of intent after completing its review. PX 4879; Tr. 338:20-339:8 (Bianco). Moreover, the Government attempted to facilitate these discussions and did not order Carteret's seizure until three prominent private investment groups, Kohlberg & Co., The Carlyle Group, and Colony Capital, following thorough due diligence examinations, withdrew letters of intent to invest in Carteret.

### 2. The Evidence Demonstrates That The OTS Reasonably Decided To Recommend Receivership For Carteret

Plaintiffs have asserted that the OTS's decision to place Carteret in receivership was without justification, relying on comments made years later by OTS regulators and on improvements in the economy months after the decision was made and therefore unknown to the OTS regulators. Plaintiffs, however, have distorted the comments made by Messrs. Vigna and Albanese. Mr. Vigna testified at his deposition that the OTS would have recommended that

[2] In fact, the OTS was extremely helpful in extending deadlines, contrary to Ambase's assertions. As noted above, Mr. Bianco claimed that the OTS gave Carteret "no leniency" in its deadlines for raising capital when addressing a July 6, 1992 deadline, Tr. 299:10-300:19 (Bianco), when, in fact, the OTS gave Carteret an extension until August 28, 1992. DX 8202 at PAM010 1923.

Carteret be seized even if goodwill had counted as regulatory capital. JX 1 at Vigna, Tr. 199:11-200:12. He also noted that the institution was the same financially, regardless of the goodwill. Id. Tr. 158:2-5.

Furthermore, the contemporaneous comments made by the OTS regulators during 1991 and 1992 do not support plaintiffs' claims. Mr. Bianco acknowledged that the first time he met with Mr. Vigna, Mr. Albanese, and Mr. Simone in January 1991 that Messrs. Vigna and Albanese told him Carteret needed "a lot of capital, to the tune of about 100, $150 million." Tr. 158:11-159:8 (Bianco). Many comments by Mr. Vigna at an October 16, 1992 meeting with the Ambase Board make it entirely clear that "[a]bsent a letter of intent, he will recommend to the OTS Director that the Bank be put into receivership . . . immediately[,]" and the Board understood, based on Mr. Vigna's comments, that "the Company does not have much more time and as of December the Bank could be placed into receivership[.]" DX 8202 at PAM010 1923, PAM010 1932.

The November 13, 1992 S-Memo resulted from the breakdown of investor interest. Messrs. Vigna and Albanese again recommended that Carteret be placed with the RTC because of a lack of capital and other deficiencies in its financial condition and operations. DX 8124. They noted that the transfer to the RTC recommended in the October 25, 1991 S-Memorandum had been delayed in order to accord Carteret's new management an opportunity to raise capital; however, when it became clear that sophisticated investors such as Kohlberg, The Carlyle Group, and Colony Capital were unwilling to invest in Carteret, the OTS ordered the institution transferred to the RTC.

### 3. Plaintiffs' Repeated References To Carteret's Excellent Performance Over Fourteen Months Ending In 1992 Ignore The Conclusions Of The OTS And A Private Investor That Carteret Continued To Be Underreserved

Professor Calomiris asserted that Carteret's performance for fourteen months ending in 1992 demonstrated that it was turning the corner. Tr. 978:15-23, 979:15-980:13 (Calomiris). Both Professor Calomiris and Mr. Bianco failed to mention, however, that the OTS determined, in 1992, that an additional $8 million in reserves were needed to account for problem loans, an amount that would wipe out the tiny profit. In addition to the OTS, Kohlberg concluded that, even given the large reserves already taken, Carteret continued to be underreserved and faced possible additional losses in its commercial loan and real estate owned portfolios, which would have exacerbated its capital problem. DX 8124 at FAM002 0532. Professor Calomiris admitted at trial that Carteret's financial report for the period ending December 31, 1992 indicates that Carteret suffered a net loss of $1.4 million during the period. Tr. 1243:8-16 (Calomiris); PX 3804 at AM00086963.

### 4. Plaintiffs Have Failed To Demonstrate That The OTS Caused Carteret To Over-Reserve For Losses In Its Commercial Real Estate And Corporate Loan Portfolios

Plaintiffs have argued that Carteret over-reserved in response to OTS requirements and due to the need to attract investors and could have met its capital requirements had such reserves not been imposed. Nevertheless, the amount of reserves was based upon Mr. Moor's initial review of 138 borrower relationships accounting for 93.1 percent of the total commercial asset portfolio. DX 44 at WOQ666 1770; Tr. 253:25-254:11 (Bianco).

By the end of September 1991, Mr. Moor had personally inspected the properties covering $620 million of Carteret's $800 million commercial asset portfolio. DX 7175 at CAM218 0055. His on-site inspections validated the previous decision to record $150 million in reserves in the second quarter of 1991. JX 1 at Moor, Tr. 39:9-40:21. In his testimony, Mr. Bianco described the analysis performed by Mr. Moor in his August 8, 1991 memorandum outlining his portfolio analysis, DX 44, as "phenomenal." Tr. 494:10-12 (Bianco). During Carteret's December 16, 1991 Board of Directors' meeting, Mr. Bianco stated that "the Board should feel confident with the booked amount and [another director] noted that Price Waterhouse relayed to the Audit Committee its confidence in Mr. Moor's numbers." PX 2986 at C-AM-A-0241641. This was supported by a plethora of additional evidence in the record. See, e.g., DX 7142 at 2 ("reserves [were] adequately stated . . ."); Tr. 506:15-19 (Bianco) (admitting that he did not know if "the board would have had any confidence in the numbers if they were 20 million to 50 million less than Mr. Moor recommended").

### F. Given That Carteret Was Overvaluing Its Mortgage Servicing Portfolio, The Evidence Does Not Support Plaintiffs' Argument That Carteret Could Have Sold This Portfolio To Raise Capital

Professor Calomiris asserted that, even if Carteret could not have raised capital from investments in a "but for" world, it could have raised sufficient capital by selling appreciated assets, namely Carteret Mortgage Company ("CMC") and its loan servicing portfolio. According to Professor Calomiris, Carteret could have sold CMC for $18 million to $58 million, and sold the mortgage servicing portfolio for at least $101.6 million. PX 2702 at ¶ 70-72. CMC, however, had little value to Ambase or an outside buyer because the affiliate brokers who provided the vast majority of mortgage business to Carteret defected to other institutions after

Carteret's ability to finance mortgages was no longer assured.

As noted above, Kohlberg concluded that this portfolio appeared to be overvalued. DX 8124 at FAM002 0532. In addition, the RTC extensively analyzed CMC and concluded that CMC could not be sold and should be closed. JX 1 at Cribbs, Tr. 36:23-37:2 ("any significant attrition [of CMC personnel or the correspondent network] would limit viability of CMC continuance in the originator marketplace"). CMC clearly was not the thriving entity that Ambase has attempted to portray, which explains why Ambase did not sell it when it needed capital between 1990 and 1992.

## II. AMBASE HAS FAILED TO PROVE THAT REGULATORS COULD HAVE FORESEEN OR DID FORESEE ITS ALLEGED DAMAGES

Ambase's expert witness, Professor Calomiris, contends that Ambase is entitled to damages consisting of the market value of "but for" Carteret (i.e., a Carteret that would have survived with goodwill plus "but for" dividends and certain "wounded bank" damages). Professor Calomiris calculated the "but for" dividends to be $188.7 million. PX 2702 at ¶ 46. Further, Professor Calomiris calculates the market value of "but for" Carteret by multiplying its stated market value in the quarter before the breach by the increase in thrift indices and alleged peer market values between 1989 and 2006. This "lost market value," according to Professor Calomiris, is between approximately $597 million and $4.9 billion. PX 2702 at ¶¶ 36, 43, and Tables 7-14. Professor Calomiris also claims that Carteret suffered "wounded bank" damages consisting primarily of severance payments to Carteret employees and administrative costs of $16.8 million. PX 2702 at Table 23.

Carteret's "lost market value" is the largest component of Professor Calomiris's damage

calculation. Ambase contends Carteret is entitled to the market value of equity "but for" Carteret would have had if the market in 1989 had fully appreciated Carteret's future potential for growth in the absence of the breach as evidenced by "but for" Carteret's alleged market value in 2006. As Professor Calomiris argues, "[t]he market's predictions of Carteret's future profitability in 1988 and 1989 were, with the benefit of hindsight, unduly conservative if the breach had not caused Carteret to fail." PX 2702 at 28-29. There are numerous legal and technical problems with Professor Calomiris's approach. His estimates are invalid as a matter of law.

Under the case law, a plaintiff seeking expectation damages must demonstrate "that both the magnitude and type of damages were foreseeable." Landmark, 256 F.3d at 1378; see Slattery v. United States, 69 Fed. Cl. 573, 582 (2006) ("Foreseeability requires that both the type and amount of damages claimed were, at the time of contract formation, foreseeable consequences 'in the ordinary course of events' of the breach."). As Professor Calomiris notes, "Carteret had $2.3 billion in assets and a book value net worth of $36.5 million immediately prior to the transactions [in 1982]." PX 2702 at ¶ 10. According to Professor Calomiris, "[i]n connection with the transactions, Carteret recorded supervisory goodwill of $46 million and $168 million respectively" for Barton and Delray. Id.

Thus, Professor Calomiris assumes that regulators approving these transactions in 1982 actually foresaw or could have foreseen that, if the Government subsequently disallowed goodwill as an element of regulatory capital, Carteret would suffer an economic loss of between $596 million and $4.9 billion. These amounts are between approximately three and twenty times the amount of goodwill included in the transactions and approximately 16 to 127 times Carteret's book value at the time of the transactions. Further, these amounts exceed by a factor of from ten

to seventy-eight Professor Calomiris's estimate of the market value of Carteret's goodwill at the time of the breach (approximately $69 million).

Thus, the damages Ambase claims are simply not of a magnitude or type that was reasonably foreseeable at the time of the contract. See, e.g., Suess v. United States, 52 Fed. Cl. 221, 228 (2002); 74 Fed. Cl. 510 (2006) (a damage claim premised upon the assumption that the "but for" thrift's stock would have increased by a factor of 27 from June 30, 1989, to the middle of 1997, which would have made it one of the best-performing stocks in the industry over that period, was implausible given the thrift's substandard historical performance), appeal docketed, Nos. 07-5070, -5071 (Fed. Cir. 2007); Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 401-402 (1999) ("There is something inherently odd about . . . plaintiff . . . contending that its capital cost [is] over two and a half times the capital raised"). Plaintiffs have presented no testimony that regulators approving these transactions in 1982 or 1986 could have foreseen the magnitude of losses now claimed by the plaintiffs.

## III. AMBASE HAS FAILED TO SHOW THAT UNEXPECTED FUTURE CASH FLOWS AND MARKET APPRECIATION ARE ATTRIBUTABLE TO THE BREACH

For Ambase to prove that Carteret is entitled to market appreciation and unanticipated cash flows as damages, Ambase must show that these conditions would not have existed in the absence of the breach. See, e.g., Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987) (lost profits, to be recoverable, must be a "proximate consequence" and not a "merely remote or possible" result of the breach); Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 34 Cal. 4th 960, 22 Cal. Rptr. 3d 340, 102 P.3d 257, 265 (Cal. 2004) (breach did not "directly or necessarily cause [contractor's] loss," where contractor's alleged

breach caused contractor's surety to reduce contractor's "bonding" rating, and that reduction in bonding rating caused loss of other prospective contracts).

Plaintiffs have presented no evidence that, in the absence of the breach, the so-called "golden age of banking" would not have existed. Although Professor Calomiris states that "[t]he fourteen years following Carteret's failure has been a golden era of banking growth and profitability[,]" PX 2702 at ¶ 37, nowhere in his expert report or trial testimony did he contend that the golden age of banking was dependent upon the breach. Professor Calomiris contends that the breach caused Carteret to fail, but not that it caused other thrifts to do well. Thus, Professor Calomiris never causally links the breach to his ex post estimates of damages. Absent such evidence of a causal relationship between the breach and the "golden age of banking," of which there is none, there is simply no basis for awarding Carteret hypothetical damages based upon Professor Calomiris's estimates of market conditions. See, e.g., La Van v. United States, 382 F.3d 1340, 1350-52 (Fed. Cir. 2004) (lower stock price resulting from a falling market rather than from the phase-out of goodwill does not constitute recoverable damages); Am. Fed. Bank v. United States, 72 Fed. Cl. 586, 602-603 (2006) (where an increment of additional capital was raised to mitigate the breach because of a rising market for stock issuances, losses related to that cpaital are not proximately caused by the breach). Therefore, Professor Calomiris's damage estimates are speculative and must be rejected.

## IV. AMBASE HAS PRESENTED NO CREDIBLE EVIDENCE CONCERNING THE QUANTUM OF INJURY RESULTING FROM THE BREACH

### A. Professor Calomiris's "But For" World Does Not Allow Carteret To Survive The Massive Real Estate Losses

Plaintiffs seek expectancy damages. Bluebonnet Sav. Bank, FSB v. United States ("Bluebonnet V"), 339 F.3d 1341, 1355 (Fed. Cir. 2003). Courts award these damages to put the non-breaching party "in as good a position as he would have been in had the contract been performed." Id. (citing Restatement (Second) of Contracts § 344(a)(1981)). The non-breaching party, however, "should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet V, 339 F.3d at 1345 (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (2002)).

It is undisputed that a plaintiff must prove all elements of its damage claim before it is entitled to a recovery. With respect to an expectancy claim, a plaintiff must demonstrate that its costs in the actual world exceed the costs it would have incurred absent the breach. Thus, a plaintiff pursuing expectancy damages must prove what "might have been." Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001); see also Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 430 n.25 (2000), aff'd, 323 F.3d 1035 (Fed. Cir. 2003) (en banc) (with respect to expectancy damages, plaintiff bears the burden of propounding a realistic "but-for" scenario).

Professor Calomiris has postulated a "but for" world in which Carteret would have reduced reserves by $50 million; refrained from selling branches in 1990; retained the goodwill as an asset for sale; reduced deposit costs by $17 million; received a $36 million investment from Ambase; and counted certain general valuation allowances as capital. PX 9053; PX 9043; PX

9087; PX 9057; PX 9064. Even with these adjustments to Carteret's balance sheet, Professor Calomiris's calculations demonstrate that "but for" Carteret would have failed the risk-based capital requirement by $18.2 million and the core capital requirement by $10.8 million. PX 9054. Professor Calomiris conceded that he did not know how much larger Carteret would have been in the "but for" world or what profits would have been earned by reducing deposit run-off. Tr. 1270:11-12 (Calomiris). Thus, plaintiffs' "but for" world is as debilitating for Carteret as the actual world, and there is no basis for Professor Calomiris's assumption that Carteret would have survived in the "but for" world.

### B. Professor Calomiris's Estimate Of Unexpected Cash Flows Is Not Supported By Testimony Or Documents Presented At Trial

Professor Calomiris advances a lost profits calculation to determine "but for" Carteret's cash flow between 1989 and 2006 and 2008 based upon a simple arithmetic extrapolation of historical earnings using the Gordon Growth Model, without any estimates or analysis of what would have happened to the thrift on a year-by-year basis in a "but for" world. The Gordon Growth Model can be used to value a firm that is in a "steady state" with earnings or dividends growing at a rate that is expected to stay stable in the long term. The Model is expressed in a mathematical formula: the market value of the thrift at time zero equals the earnings at time zero plus one divided by the discount rate minus the stabilized annual growth rate in earnings. PX 2072 at 26 n.58.

Professor Calomiris calculates Carteret's unexpected future cash flows in a "but for" world by growing Carteret's average net income between 1982 and 1988 of $20.5 million at a rate of 4.2 percent per year. PX 2702 at ¶¶ 35-36. As Professor Calomiris separately calculated

Carteret's market value as of July 1989 ($251.4 million), its alleged stabilized earnings (i.e., the $20.5 million), and Carteret's discount rate, which was estimated by a regression analysis of capital raisings by thrifts in 1994, he used the Gordon Growth Model to solve for the long-term growth rate of 4.2 percent. PX 2072 at ¶ 36 and n.58. Professor Calomiris calculates his preferred market value estimate ($892 million) by multiplying this figure by the market to book ratio Carteret allegedly would have enjoyed if the book to market ratio he calculated for Carteret immediately prior to the breach had appreciated at the same rate as nine thrifts which survived FIRREA as stand alone entities. Id. at ¶ 45 and page 41, Table 13.

Professor Calomiris's calculation is inconsistent with case law and principles of financial economics. Even if Carteret's "but for" earnings could be estimated by the Gordon Growth Model, which is not possible, such "but for" earnings cannot be calculated upon the basis of a theoretical model. See, e.g., California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1349-50 (Fed. Cir. 2001) ("Cal Fed"); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 240-41 (2003). Instead, to demonstrate "foregone earnings," a plaintiff must demonstrate by contemporaneous documentation that it would have had specific profitable investment opportunities in the absence of the breach. Fifth Third, 55 Fed. Cl. at 240-41. For this reason, as the Federal Circuit has observed, lost profit models do not "fit comfortably with the history of these [Winstar-related] cases in the years following the breach." Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1310 (Fed. Cir. 2004).

As Professor Calomiris conceded at trial: "No. I didn't do a thorough but-for analysis of each quarter trying to carry the bank forward, figure out what its profits would be and its balance sheet. I didn't do that." Tr. 1265:8-11 (Calomiris). Further, Professor Calomiris admitted that

he could not even opine as to how much larger the "but for" thrift would have been than the actual thrift. Tr. 1270:11-12 (Calomiris). Thus, Professor Calomiris simply assumes "but for" Carteret would have generated $595.6 million in profits between 1989 and 2008 because it would have survived the breach and other thrifts realized profits during this period.

This Court noted in Fifth Third that, to assume profits "without identifying any specific investments or opportunities, . . . renders plaintiff's model speculative as a matter of fact and law." Fifth Third, 55 Fed. Cl. at 241. Indeed, in Citizens Financial Services, FSB v. United States, 64 Fed. Cl. 498 (2005), aff'd, 170 Fed. Appx. 129, 2006 WL 618792 (Fed. Cir. Mar. 9, 2006), plaintiff's expert assumed that there were unlimited assets and liabilities available to enable the plaintiff to leverage all of its capital and realize a 1.1 percent return. The Court rejected the model because the expert failed to identify the assets and liabilities that would support such growth, and failed to take into account the well-established principle that returns upon incremental assets cannot emulate returns upon existing assets. Id. at 511-12. Thus, the Court rejected the model upon the ground that it was too speculative and, in so holding, reasoned that the model suffered from the same flaws that resulted in rejection of similar models upon summary judgment in Fifth Third, Southern National Corp. v. United States, 57 Fed. Cl. 294 (2003), and Standard Federal Bank v. United States, 62 Fed. Cl. 265 (2004).

Even if it were permissible for Professor Calomiris to estimate future earnings on the basis of a theoretical model, the testimony demonstrates that "but for" Carteret could not have had the future earnings estimated by the model. For example, even though Professor Calomiris estimates that Carteret's book value, which he estimates to be $269.3 million as of July 31, 1989, would have grown by approximately $28 million by the end of 1991, PX 2702 at 28, Table 6, in

fact, because Carteret lost $160.25 million and $131.84 million in 1991 and 1990, respectively, Carteret's book value would have been negative as of 1992 rather than in excess of $330 million as estimated by Professor Calomiris. Tr. 1320:13-1321:7 (Calomiris); PX 2702 at 28, Table 6.

Moreover, because much of Carteret's net income was non-recurring rather than attributable to operations, the model is inapplicable to Carteret's financial condition. Indeed, Professor Calomiris admitted that, in determining future cash flows upon the basis of alleged net income between 1982 and 1988, he failed to "take out from the reported income the income that results from gains on sales of the loans that were acquired in the '82 transaction, and the gains that resulted from the different schedule, amortizing the goodwill expense over 40 years and booking the accreted gain over 7." Tr. 1337:16-24 (Calomiris). This is contrary to United States v. Winstar Corp., 518 U.S. 839, 852 (1996), in which the Court emphasized that the accreted gain "resulted in a net paper profit over the initial years following the acquisition . . . [and] allowed acquiring thrifts to seem more profitable than they in fact were." This Court acknowledged the same point in Suess, 52 Fed. Cl. at 226, when it noted that "gains on the sale of assets and accounting income created from the amortization-of-goodwill/accretion-of-discount mismatch" were "not reflective of the econmic earnings of the thrift."

Further, Professor Calomiris's estimate of a discount rate of 12.34 percent is based upon a regression analysis of thrift sales of convertible debentures and preferred stock in 1994. PX 2702, Appx. A. The regression, however, is mispecified and is almost entirely ad hoc because Professor Calomiris uses 1994 data to project the discount rate in 1989 when economic conditions were entirely different. PX 9021; Tr. 697:17-19 (Calomiris). Further, because the risk and tax characteristics of preferred stock and convertible debentures are different, it was

improper to determine the values in the regression model by combining data relating to preferred stock with data relating to convertible debentures. Professor Calomiris could not demonstrate the similarities between them.

The sample in the regression is very small, and three coefficients, which should be expected to affect the yield, are insignificant at the 95 percent confidence level. For one important variable, the ratio of equity to assets, Professor Calomiris substitutes another company's financial statement values for Carteret's into his model, thus no longer estimating Carteret's cost of preferred stock. In addition, Professor Calomiris's "but-for" model of preferred stock cost is based upon a sample of companies that are outside the range of Carteret's actual financial performance and insolvency risk in at least one respect. Professor Calomiris did not explain why the Court should consider these companies comparable to Carteret. PX 9021; Tr. 697:17-19 (Calomiris). Thus, Professor Calomiris's estimates using the results of the regression are highly speculative.

Professor Calomiris's damage estimate also includes estimated dividends Ambase allegedly would have received between 1989 and 2006 in a "but for" world. According to Professor Calomiris, Carteret would have paid annual dividends equal to the same percentage of earnings as healthy thrifts paid during this period (i.e., 31.7 percent). PX 2702 at ¶36. Professor Calomiris's estimate of the constant payout rate or constant growth rate was unsupported by the evidence. In fact, Carteret's pre-FIRREA dividends were paid out on seven occasions, with some dividends being paid in stock and others in cash and with an erratic payout rate. Thus, there is no evidence Ambase would have received dividends even if Carteret would have survived the breach.

### C. Plaintiffs Have Failed To Demonstrate Carteret's Damages As Measured By Its Market Value At The Time Of The Breach Net Of Self-Imposed Losses Between The Time Of Breach And The Seizure

As indicated previously, under the case law, when an asset is injured or destroyed by a breach, the benchmark measure of damage is the market value of the asset at the time of breach. Estate of Berg, 687 F.2d at 380; J. Murray, Contracts, § 237 (2d rev. ed. 1974). In this case, Professor Calomiris estimates Carteret's market value at the time of the breach to be $251 million. He admitted, however, that the estimate is based upon increasing Carteret's book to market ratio as of the time of the breach by the increase in ratios of 46 "comparable" thifts. Tr. 1386:3-11 (Calomiris). Although he assumed that Carteret's ratio would increase at the rate of these "comparable" thrifts, he admitted that they were not comparable because none of them had experienced anywhere near a 4000 percent increase in unreserved classified assets, as Carteret had between January 1, 1988, and June 30, 1989. Tr. 153:11-15 (Calomiris). Further, Professor Calomiris admitted that this increase in unreserved classified assets would have negatively impacted Carteret's market value as of the time of the breach. Tr. 151:21-25 (Calomiris). He also admitted that he failed to take the unreserved increase into account when he estimated Carteret's market value at the time of the breach. Tr. 152:3-8 (Calomiris). Thus, the estimate diverges from the facts and is not credible.[3]

[3] Ambase contends that Professor Calomiris's estimate of Carteret's market value on July 31, 1989, ($251 million) is validated by a so-called May 1989 bid from Secretary of State Al Haig and former Chairman of Prudential Bache Securities Harry Jacobs to purchase Carteret for $252 million. PX 9014; Ambase Mem. at 70. Plaintiffs, however, have presented no evidence demonstrating that there was such a bid. Although Mr. O'Brien may have mentioned bid-related discussions in a letter to Mr. Scharffenberger, there is no evidence Secretary Haig or Mr. Jacobs lined up financing, retained investment bankers, made a written proposal, or otherwise followed through on the so-called "bid." Mr. O'Brien's casual reference to such a bid does not constitute evidence a serious bid was ever pursued. PX 4836.

Even if Professor Calomiris's estimate of Carteret's market value at the time of the breach were a credible benchmark for the calculation of damages, Carteret reported net losses of $160.25 million in 1991, and $131.84 million in 1990, which Professor Calomiris admits were unrelated to the breach.[4] PX 0010 at 2. Because Carteret's contemporaneous financial reports attribute these losses to the recession, these losses are not connected to the breach. PX 0010 at 2; Cienega Gardens, 503 F.3d at 1291 (litigation-formulated claims concerning the expected value of property in the period following the breach are definitively belied by "contemporaneous offering memoranda").

As we have previously noted, "precedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or a direct consequence of the breach." LaSalle Talman Bank v. United States, 317 F.3d 1363, 1373 (Fed. Cir. 2003). The 1990 and 1991 real estate losses are remote consequences of pre-breach defective underwriting and generally adverse economic conditions and are not related to the breach. Accordingly, the Government bears no responsibility for these losses and the benchmark of fair market value at the time of breach must be adjusted for these losses. See, e.g., Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1317-19 (Fed. Cir. 2004) (only net benefits must be awarded as damages); Landmark, 256 F.3d at 1373-74 (same). Thus, any market value losses attributable to the breach must be adjusted for the 1990 and 1991 real estate writedowns in determining breach-induced damages to Carteret. Hansen Bancorp, 367

---

[4] Professor Calomiris erroneously claims that "some of [the] writedowns were made as part of an aggressive effort by Carteret to raise capital from outside investors." PX 2702 at 26 n.59. Professor Calomiris's assumptions, however, are counterfactual. Even with the massive write-downs in 1990 and 1991, Carteret was underreserved rather than overreserved as contended by Professor Calomiris.

F.3d at 1317-19; Landmark, 256 F.3d at 1373-74.

### D. Professor Calomiris's Evaluation Of Carteret's Market Value Based Upon Growth Of Peer Institutions Is Not Supported By The Record

Professor Calomiris's preferred estimate of Carteret's 2008 market value is based upon the book-to-market ratios of nine thrifts in the Compustat database. PX 2702 at ¶ 34. Plaintiffs, however, have failed to demonstrate why the Court should believe that Carteret would have behaved like the average of these nine thrifts. In fact, the testimony demonstrates that Professor Calomiris's reliance upon the growth in book-to-market ratios of these nine thrifts is misplaced.

At trial, Professor Calomiris admitted that none of these nine "peer" thrifts is comparable to Carteret. As he admitted, not one of the nine is headquartered in New Jersey. Tr. 159:7-11 (Calomiris). Six of the nine had very small book valuees in 1989, and only three had book values exceeding $100 million, like Carteret. Tr. 160:2-9 (Calomiris). Only two of the nine, Downey Financial and FirstFed, had anywhere near the market value estimated for Carteret in 1989. Id.

Because, between 1989 and 2008, the market to book value of these two thrifts decreased by 13 percent rather than increased by the average of the nine (67 percent), if Professor Calomiris had used these "comparables" rather than the average of the nine, Carteret's purported market value in 2008 would have been considerably less than estimated by Professor Calomiris. Tr. 163:19-164:15 (Calomiris). Further, Professor Calomiris admitted that if he had used a weighted average of the change in book values of the nine rather than a straight average, his damage estimate would be reduced by $250 million. Tr. 1400:25-1402:8 (Calomiris). Given the sensitivity of Professor Calomiris's analysis to changes in data inputs, the analysis is not credible.

## V. AMBASE HAS FAILED TO DEMONSTRATE THAT THE FDIC'S ESTIMATE OF THE RECEIVERSHIP DEFICIT IS INVALID

As the FDIC demonstrated in its motions to dismiss and motion in limine filed on December 21, 2008, this Court lacks jurisdiction to adjudicate the receivership deficit. Accordingly, the Court should reject Ambase's attempts to avoid the limitations on this Court's jurisdiction by characterizing Carteret's receivership deficit claims as relating to Congress' alleged failure to fund the RTC and to allow minority bidders limited bidding preferences. Ambase has cited no authority, and we are aware of none, that creates a "legally protected interest" in a particular level of public funding to ensure the successful resolution of an insolvent thrift. In fact, no entity has a "particularized interest" in public funding or the timely resolution of an insolvent thrift. As the Federal Circuit has noted in analogous circumstances, "[t]o suggest that a court should undertake an inquiry into whether Congress, in [legislating a] fee . . . , did its sums correctly, is to invite an intrusion of the judiciary into the work of Congressional committees and staff, and into the minds of Congress itself, which would be nothing but an invitation to mischief." Longshore v. United States, 77 F.3d 440, 444 (Fed. Cir. 1996). Thus, it is not the Court's place to question the level of funding Congress deems appropriate for particular programs and, therefore, there is no "legally protected interest" in congressional funding of the resolution process for insolvent thrifts.

Likewise, Ambase has failed to demonstrate an "injury" to a "particularized legal interest" as a result of the minority preference program. Ambase Mem. at 113-123. Although Ambase argues that it has a "particularized legal interest" in a potential liquidation surplus from Carteret's resolution, it cites no authority, and we are aware of none, that this contingent right to

share in the surplus, assuming there is a surplus, constitutes a "particularized legal interest." Indeed, Ambase was not even a bidder on Carteret's assets, which means that it was not and could not have been directly effected by the bidding rules related to these assets. Given the fact that Ambase was not an actual or potential bidder for Carteret's assets, it lacks the requisite "particularized interest" to challenge the bidding rules for those assets. See Alfa Laval Separation v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (a party has no standing to challenge bidding procedures if it is not a plausible candidate for the contract); Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1300-02 (Fed. Cir. 2001) (an "interested party" is one who "is an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by the failure to award the contract").

Apart from its lack of standing, the evidence demonstrates that the minority preference program did not injure, but instead benefitted, Carteret. The minority preference program broke up the near-monopoly that non-minority banking institutions had exercised over troubled institutions. Further, the evidence demonstrates that Carteret received a larger premium for its separate branch system than it would have received as a whole institution. Finally, the evidence demonstrates that the time it took to bid Carteret benefited Carteret because the market for deposit premiums was on an upward path.

Likewise, Ambase's contention that it was unjustified for the FDIC/RTC to charge interest on its advances to the receivership because Carteret cannot collect prejudgment interest lacks merit. Ambase Mem. at 96-100. Contrary to Ambase's assertion, relevant legal authority requires the FDIC/RTC to charge interest on loans to the receiver. See, e.g., Golden Pac. Bancorp v. FDIC, No. 95 Civ. 9281, 2002 WL 31875395, at *5 (S.D.N.Y. Dec. 26, 2002), aff'd,

375 F.3d 196 (2d Cir. 2004), cert. denied, 546 U.S. 1012 (2005) ("money in the deposit insurance fund [must] bear interest in order to protect the fiscal integrity of the fund . . ."); see In Re Receivership Of First Nat'l Bank in Humboldt, 523 N.W.2d 591 (Iowa 1994) (interest must be charged on loans from the FDIC to the receiver); FDIC v. Citizens State Bank of Niangua, 130 F.2d 102 (8th Cir. 1942) (same); Corbin v. Fed. Reserve Bank of New York, 475 F. Supp. 1060, 1065-68 (S.D.N.Y. 1979), aff'd, 629 F.2d 233 (2d Cir. 1989) (finding that the Federal Reserve Bank of New York ("FRB-NY") was required to charge interest on the loans to the receivership in order to protect the fiscal integrity of the national banking system).

Further, contrary to Ambase's contention that the rate of interest should have been the floating three month Treasury-Bill rate rather than the fixed Federal judgment rate (based upon the 52 week Treasury-Bill rate), Ambase Mem. at 100-110, the FDIC determined that the Federal judgment rate was applicable to failed savings and loan institutions under the depositor preference statute. PX 5022. This was consistent with relevant legal authorities, which recognize that charging the Federal judgment rate advances the financial interests of institution receiverships. As Judge Milton Pollack has observed: "[C]ourts have looked to the rates set by contract between the parties, prevailing market rates and legal lending rates." Corbin, 475 F. Supp. at 169-70; see also Mid Jersey Nat'l Bank v. Fidelity-Mortgage Investors, 518 F.2d 640 (3d Cir. 1975); In re Hartsdale Assocs., 452 F. Supp. 67 (S.D.N.Y. 1978). This is precisely what the FDIC did in setting rates for the advances to Carteret and other post-depositor preference receiverships.

Finally, Ambase contends that the FDIC was unjustified in failing to offset the deposit premium income with a post insolvency interest deduction, and that Federal Financial Assistance

was improperly calculated. Ambase Mem. at 87-95. As with the interest claim, the FDIC conformed its behavior to relevant policy guidelines and treated Carteret's receivership no differently than it treated any other receivership. Accordingly, there is no evidence to support Ambase's claim.

**CONCLUSION**

For these reasons, we respectfully request that the Court grant our motion for judgment upon partial findings.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ David A. Levitt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 307-0309

Attorneys for Defendant

OF COUNSEL:
TAREK SAWI
Senior Trial Counsel

ARLENE PIANKO GRONER
ELIZABETH HOSFORD
F. JEFFERSON HUGHES
DELISA SANCHEZ
AMANDA L. TANTUM

Date: February 24, 2008

**CERTIFICATE OF FILING**

I hereby certify that on this 24th day of February, 2008 a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David A. Levitt by Amanda L. Tantum
David A. Levitt