# EXHIBIT A

UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and )
CARTERET BANCORP, INC., )
)
Plaintiffs, ) Case No. 93-531
)
and )
)
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
)
Plaintiff- )
Intervenor, )
)
vs. )
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )
-----------------------------*

Tuesday, October 16, 2007
New York, New York
Time: 12:55 p.m.
Day 1, Volume 1
Pages 1-193

Day 1, Volume 1 of the deposition of PROFESSOR ROY C. SMITH, taken by Plaintiffs, pursuant to Notice, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, on Tuesday, October 16, 2007 at 12:55 p.m. before Josephine H. Fassett, a Certified Shorthand Reporter and Notary Public of the State of New York.

Page 6

and not truncated.
And, if I ask you a question and you answer it, I'm going to assume you understood the question.
So, with that, why don't we just jump in and let me ask you: Does the market value of any firm represent the discounted prediction of the firm's future after-tax cash flows?
A It can reflect that.
Q Does it normally reflect that?
A It might.
Q In what circumstances --
A In other words, there are other factors that might influence it.
Q What would influence a firm's value other than the predicted future after-tax cash flows?
A Market conditions.
Q Anything else?
A That's a large one, but --
Q Well, let me ask you: When you say market conditions, do you mean macroeconomic conditions, is that one of the factors?
A I mean the conditions of the market to determine whether a buyer wishes to buy the thing

Page 7

you're trying to sell and that could be, you know, reflecting many different elements.
Q Would that be factored into the discount rate?
A If you could figure out what it was, if it changed instantly, you might be able to do so, but people don't always agree on what discount rates are, but there will be a buyer or there won't be at the price you wish to sell and those will be affected by the things.
Q Do investors look at after-tax cash flows as opposed to pre-tax cash flows?
A I would suppose they usually do.
Q Why is that?
A Because cash flow isn't cash flow if it has to take part of it and give it to the Government.
Q When selecting a discount rate for a government security, what's the appropriate discount rate?
A That's the maturity of the security.
Q Well, would you add a risk premium?
A For a government security generally not.
Q Why not?

Page 8

A Because it's considered to be a risk-free investment.
Q And that's because it's backed by the United States Government?
A Yes.
Q Is that a reasonable assumption in your opinion that investors can rely on --
A It's a reasonable assumption as long as we're staying within the United States.
Q Okay. And sorry about that, I think you accurately anticipated what my question was, but because we have a court reporter here, just as I'm going to try to let you finish your answers, if you'll try to let me finish my questions, but let me just get that on the record so that it's all accurate.
But is it reasonable for investors to rely upon a guarantee of the United States Government?
A Yes.
Q Okay. Now you attended the Naval Academy; is that right?
A Yes.
Q Graduated 1960?
A Yes.

Page 9

Q And then you served our country for four years?
A Yes.
Q And went to Harvard Business School?
A Yes.
Q And then you went to Goldman?
A Yes.
Q And was Goldman a trading firm at that point?
A It did some trading.
Q What else did Goldman do in 19 --
A It was principally an investment banking firm with some trading activities.
Q When you say investment banking firm, what do you mean by that?
A It did underwritings, it did mergers, it did other corporate finance transactions.
Q How many employees were there at Goldman approximately when you started?
A I don't know, I'd have to guess, I would say probably 400.
Q What position did you have when you first started at Goldman in 1966?
A I was an associate.
Q And what were your areas of

Page 50

Q Okay. That's a nice place to spend a sabbatical.
Now, Venture Capital, what's --
A This is the first half of the Entrepreneurial Finance course which largely deals with the startup phase, early phase of company development, it doesn't go into leveraged buyouts, for example.
Q Right. And Professional Responsibility?
A That is another word for Markets, Ethics and Law.
Q Okay.
A The students seem to turn off when you use the word ethics, so we tried to trick them into using the word Professional Responsibility, I thought that that works, unfortunately they saw through the scheme, just like goodwill.
Q So now previous teaching at Stern you have Mergers and Acquisitions, was there a course book that was used for that?
A No, that was a case course.
Q Okay. And what about International Corporate Finance, was that a case course?
A It was -- there may have been a textbook, that was co-taught with another fellow who taught a foreign exchange part of it, he may have used a textbook, I don't recall, but I used cases.
Q Have you ever worked on a project for a company in bankruptcy?
A I have never been involved with a company which was undergoing bankruptcy.
Q Okay.
A Though I teach bankruptcy reorganization cases occasionally so I have some familiarity with it partly because some of the guests who have come to our classes over the years have been emanant experts in that workout area.
Q Okay. Have you ever valued an asset that was being sold as part of a bankruptcy or liquidation process?
A No.
Q Are you a CPA?
A No.
Q Do you consider yourself an expert on accounting issues?
A Largely, I'm a consumer of accounting information prepared by CPAs.
Q Are you offering any opinions in this case about what generally accepted accounting principles may or may not require?
A I don't believe so.
Q Are you an expert on generally accepted accounting principles?
A I'm assuming the definition of the word expert when I say that, and I would say no, I'm not a certified expert on that.
Q Okay. Let's turn to what's been marked as Smith Exhibit 1 and that's a copy of your report.
MS. GRONER: Could we take a short break before we start?
MR. THOMPSON: Yes.
(Whereupon, off the record.)
(Errata to Smith Declaration dated October 15, 2007 marked as Exhibit Smith 2, as of this date.)
(Whereupon, resumed.)
MR. THOMPSON: We're back on the record.
BY MR. THOMPSON:
Q And, Professor, let's look at Paragraph 9, page 3 of your report.
A (Complies.)
Q And in this paragraph you talk about losses that were suffered by Carteret in its --
MS. GRONER: One second. Where in the report?
A I'm sorry, I thought you were looking at the errata. Now, what page?
Q Page 3, Paragraph 9.
MR. THOMPSON: And while the Professor is turning to that portion, just let the record reflect that we've marked as Exhibit 2 to the deposition an errata that was provided to us, so thank you for providing that, Professor.
BY MR. THOMPSON:
Q Now, with respect to this Paragraph 9 and the second sentence you say, quote, This deterioration, in the value of the loan portfolio, was caused in part by adverse economic conditions but also was the foreseeable consequence of Carteret's aggressive and poorly executed growth strategy which resulted in substantial non-performing and restructured loans as economic conditions worsened in 1990 and '91, and my question is: Do you have an opinion as to how much of Carteret's losses in its loan portfolio were attributable to the bad economic conditions as

Page 54

opposed to mismanagement and bad underwriting standards?
A I couldn't allocate a certain percentage --
Q Okay.
A -- to you. The economic conditions were worsening in that period, as everyone knows, but there were plenty of S&L's that didn't suffer the same degree as they did.
Q But there were a lot of other financial institutions that were experiencing heavy losses in '90 and '91, correct?
A That's correct.
Q And Citibank had big losses, didn't it, at that time?
A It did.
Q And it was technically insolvent, wasn't it?
A Technically it wasn't but it was functionally insolvent if you regard the regulators presence in their life as being very substantial in order to hold them up, but -- anyway, that's how it came out.
Q And did some sort of Arab sheik make an investment in Citibank in the year '91?

Page 55

A Yes, in '91. He's still there, by the way.
Q And he's made out pretty well, right?
A He has.
Q All right. Now in '90 and '91 the RTC was selling hundreds of billions of dollars of commercial real estate; is that right?
A That is my understanding but I don't have information available to me at the moment to say.
Q Okay. Did the RTC's sale of assets in '90 and '91 exert downward pressure on the commercial real estate market?
A It's possible.
Q Isn't it likely just from supply and demand?
A The commercial real estate market is a very large market and it does include many things that weren't in the portfolios of the RTC, so to some degree large parts of it were not affected, other parts were, so when you blend them, you get some effect.
Q Okay. But do you believe that Carteret's strategy of rapidly expanding its asset base was ill-advised in the early eighties, '81,

Page 56

'82?
A No.
Q Why not?
A It's perfectly acceptable to have an aggressive strategy, that of course means it's a risky strategy, but then it's up to you to execute it correctly, and you could have an aggressive strategy for the purpose of making money but aggressive strategies are riskier than others and may fail.
Q So on a prospective basis sitting in 1982 what Carteret did was not irrational?
A Not per se. One would have to know more about what their plans for executing their strategy were at the time when they announced it in '82, that's information I don't have.
Q Now in the mid 1980s the stock market had a favorable view of Carteret; is that right?
A I don't know what you mean by favorable.
Q Well, the market capitalization was increasing?
A Yes, from a very low level. It went public at a price-to-earnings ratio of about two, which most people would not think to be a very

Page 57

favorable rating but it was at least a rating, and it improved from that somewhat during those years you mentioned but it wasn't as high as some that would be considered outstanding companies.
Q But the stock market capitalization doubled in the first couple of years?
A I think we have a table on this, but I get what you're saying.
It did increase.
MS. GRONER: Could you just identify for the record the table you're looking at?
THE WITNESS: I'm looking at Exhibit 3. I can't find the part I'm looking for.
BY MR. THOMPSON:
Q I don't think it has the stock market capitalization, I may have missed it, but.
A Well, it has the stock price, that's probably a proxy for the question.
This is page 3 of 3, Table 1, Exhibit 3. It has some stock prices here.
Q Okay.
A So that's a proxy for the market cap in this case.
Q Right. So it starts off in '83 trading nine to eleven and then by --

Page 58

A And then it goes down to six and three-eighths to 10 and five-eighths and then it goes to -- then it goes back. Then it goes up to six and five-eighths to 18 and one-eighth and so on, then back, then down to -- so it has increased, the stock market has increased.
Q Okay. And Carteret was repeatedly able to access the capital markets in the 1980s; is that right?
A It was.
Q Okay. Now you conclude Paragraph 9, turning to page 4, by saying, quote, these losses depleted Carteret's regulatory capital and substantially reduced the market value of the company. Are the losses you're referring to there the 1990 and '91 losses?
A Yes.
Q Why would an investor have cared about those losses?
A Well, how about because it depleted the regulatory capital and it substantially reduced the market value. That's one reason they would care.
Q And what would you expect the stock of a company that announced such losses to do, would it

Page 59

go up or down or stay the same?
A It's difficult to say, it depends on what, to what extent that information had already been in the market and had been able to be priced by that.
Q And do you have an opinion as to whether Carteret's stock price in 1989 and the end of 1989 had taken into account the magnitude of those future losses?
A I would suspect not.
Q Okay.
A They appear to have been a surprise to Carteret.
Q And was it --
A Therefore, they wouldn't have been announced.
Q So it would have been a surprise to investors too?
A Yes.
Q Okay. Now, let's look at Paragraph 10 and the first sentence, and it says, quote, I find that Carteret's loan losses and Carteret's failure to build sufficient capital to cushion against such losses were the direct result of mistaken and misguided strategic and management decisions made by

Page 60

Carteret and its parent Ambase.
Is it true that losses at a bank are only a problem if the bank doesn't have sufficient capital to absorb them?
A If a bank doesn't have sufficient capital to absorb losses, it may become bankrupt, it may become insolvent. If it does have sufficient capital, it may escape insolvency but that doesn't mean it doesn't have problems caused by the bank loss -- by the loan losses. Loan losses are not greatly desirable.
Q But in order to understand the seriousness of loan loss, of any particular loan loss it's measured against the capital of the bank; is that right?
A It's an indicator of the ability to tolerate the pain before you die.
Q Nicely put.
Now, what mistaken and misguided management decisions by Carteret are you referring to in this sentence?
A Well, those are enumerated in the rest of the paragraph.
Q Okay. So that's -- let me ask you just so the record's clear on this.

Page 61

Can you point to any strategic decision that was made during Mr. Bianco's tenure at Carteret with which you disagree?
A No.
Q Okay. Now, in the middle of the paragraph in point 1 you say Carteret decided to, quote, engage in rapid expansion of its asset base by acquiring large amounts of assets and liabilities from failing S&L's without commensurately increasing its capital. Please explain what you are referring to here.
A The acquisitions of Delray and the other failing S&L assets which was done with consent and in some cases cooperation of the thrift regulators, done on a basis without Carteret having put up any additional capital really at all, though the FDIC or FSLIC put up 16 million, I believe, and there was some additional borrowings from the Federal Home Loan Bank Board, the addition of these risky assets were not accompanied by a comparable amount of underpinning capital.
Q Underpinning tangible capital?
A Tangible capital.
Q Were the capital markets accessible to Carteret in 1982?

Page 62

A No, because it was still a mutual company in 1982, it became a public company the following year at which point it had access to the capital markets.
Q So a mutual company couldn't do a preferred stock offering?
A It might have but there was -- I'm not aware of any market for such things at the time.
Q Okay. To what extent, if any, did the 1982 acquisition of Barton and Delray ultimately lead to the failure of Carteret in your opinion?
A It was a contributor, but not as serious a contributor as the failure of the commercial lending activities which were commenced about the same time. The acquisitions of the S&L's only put additional stress on the ability of the capital base to absorb unexpected losses in the future and it was of course, you know, coming from a sector of the banking business that was known to be struggling with bad loans.
Q How did the acquisition of Barton and Delray contribute to Carteret's future ill health?
A Well, by putting additional stress on the capital base as I said.
Q Okay. Now, if we look at your Exhibit

Page 63

3, which is behind Tab 3, we see that Carteret had negative tangible net worth of $161.9 million as of the end of 1982; is that right?
A Yes, that's after the acquisition of these failed S&L's.
Q Right.
A Failing S&L assets.
Q Right. What strategic options did Carteret have at that point?
A Well, they didn't have to do those deals.
Q Okay. So they would have been smarter not to do the deals, is that the point you're making?
A It would have been less risky. I'm not saying it's smarter because it's perfectly acceptable to have a smart but risky strategy, but that depends on your ability to be able to handle all the consequences of having a risky strategy.
Q Do you have an opinion, if they had come to you in the middle of 1982 and said, Professor -- I guess it would have been Mr. back then -- Mr. Smith, do you think we should do these deals, what would you have told them?
A I would have reminded them that they'd

Page 64

just been through a rather difficult patch of their own in which the S&L's had had, they themselves at Carteret had had some difficult times with their earnings -- asset liability mismatching problems and that though it was true that the regulatory action of 1982, the bill was passed, Garn-St Germain I think it was, was offering more opportunity, they didn't have to overindulge in it at a time when they still had a relatively very weak capital base and by entering into a transaction in which 80 percent of your capital was intangible would be considered by almost anyone to be an extremely risky strategy to expose yourself to. You don't know in 1983 and 1984 you will be able to raise additional capital, the markets might not have permitted it. So what would you do then, you'd still be walking around with 162 minus capital without much prospect for improving it. That could have been very difficult for a mutual savings and loan operation. Now, that is, my advice would be to consider those things carefully before you plunge.
Q Okay. Now, if they took the plunge and they --
A Clients do.
Q -- and they came to you on December

Page 65

31st, '82 and they said, "Wow, we now have negative $161 million of" --
A Actually 212. If you look at the 1983 numbers, I believe -- sorry. The 1982 numbers when they're listed under the Federal Savings Association rubric, you see?
Q I see.
A That was when they had to restate the capital in order to become a public company.
Q Okay.
A So there are accounting adjustments that had to be made that you transferred from one regime to the other which were adverse to them, further adverse.
Q Okay.
A So I would say that would be, if they told me that "we've taken the plunge and the result is that we have increased our negative net worth by $50 million, what would you advise," I would say, "I would advise you to be careful because you are -- you've pretty much extended whatever safety net you have to almost nothing."
Q So, I mean, what strategic options did the bank have at that point?
A Having already committed to this?

Page 66

Q Yes, sir.
A They could have perhaps tried to be sold to someone else.
Q Who would want a bank with negative $212 million of tangible capital?
A Maybe not very many but there could have been one. They were putting together groups of S&L's around that time by private equity investors who were looking for the -- they were going to provide the capital shortfall makeup and expect the business itself to be able to generate with leverage, you know, returns resulting from the recovery of the mortgage portfolio, and that was the essence of some of these deals done, for example, by Perelman and William Simon and some other of these entrepreneurs at that time, but so there's a possibility, I don't know that anybody would have bought it but it's possible.
Q Those private equity investors, did they have a good --
A What we would call today private equity investors.
Q Yes. Did they have a good investment strategy, did that work out for Perelman and Simon?
A It did.

Page 67

Q Okay. And now, if no one wanted to buy Carteret on December 31st, '82, what other options did they have?
A Certainly they could have undertaken an aggressive commercial lending plan which I'm sure is what you're waiting, wanting for me to say.
Q Well, that's one thing they could have done --
A They could.
Q -- but if they had just said, well, that's risky, we better stick to what we know which is residential one to four --
A Yes, but I did not say that because it's risky it's a bad strategy, I said if it's risky, it needs to be understood as such and, therefore, one must be sure that one has the capacity to implement it without exaggerating the risk or causing the risk to be operative.
Q And I understand that point, and I guess my question is: Did they have any other path available to them other than aggressive growth in areas with higher yields, the possibility of higher yields?
A I think they probably could have gone more slowly in order to build up their capital base

Page 68

on a more secure basis, but that's my observation from afar both in time and in proximity to that particular industry at the time.
Q Okay. All right. Do you have an opinion as to whether Carteret had undo interest rate risk during the 1980s?
A My observation based on what I studied is that the principal interest rate risk exposures during the period from about 1983 till about 1990 were greatly diminished.
Q Okay. And is that because they're originating more floating rate product?
A That would be one reason for it. They may have sold off some assets and diminished the portfolio weighting in various ways that were available to them as risk managers.
Q Okay. Now, if you're looking at interest rate risk and whether it's acceptable, is that always measured by reference to the amount of capital?
A No. Well, maybe if you would rephrase the question.
Q Yeah, let me ask you: I mean, so you look at a future interest rate scenario and you say, ah, if that happens and there's a move of a hundred

Page 69

basis points this way or that, there's going to be a loss of $10 million and it's sort of like the credit loss situation we were talking about.
A Well --
Q In that, in order to assess the seriousness of that level of interest rate risk that was assumed, you'd want to know, well, how much capital does the institution have; is that fair?
A Yes.
Q Okay. Now, do you think interest rate risk -- excuse me.
Do you think interest rate shock tests with 200 basis point shifts are a good way to measure interest rate risk?
A It can be.
Q When -- you've invested on your own account in banks, haven't you?
A Yes.
Q Okay. And do you do interest rate shock tests on their portfolios?
A Not personally.
Q Okay.
A I am interested to know the extent to which they have an interest rate mismatch issue.
Q And how do you assess that?

Page 74

A I would expect a well-managed bank to be not outside of that bracket.
Q Okay. In your experience, though, have some banks been outside of that bracket?
A Well, after we saw what happened to banks from about 1984 when Continental failed until about 1994 we learned a lot about banks and their reporting of loan loss provisions that convinced us that they had underreported.
Q Okay. Now, you also point in Paragraph 10 to Carteret's decision, and this is your point 3, with Carteret's decision to, quote, withdraw capital in multiple ways to provide funds to Ambase, closed quote. What are you talking about there?
A I'm talking about Ambase's decision to remove capital from Carteret after it acquired it.
Q Right. But Ambase put the capital back, didn't it?
A No.
Q Okay. How much money, I mean, was it a material amount?
A Yes. They didn't have much tangible capital and what they're -- and they took 65 million to buy IPF, they paid two rounds of dividends, they

Page 75

agreed to pay a management fee, they had some other transactions involving management, and there was a repayment of an investment in Carteret stock which was undertaken as a part of the acquisition agreement prior to the closing. So those things in aggregate added up to almost a hundred million dollars. That was a material amount of capital relative to the tangible capital of that company at the time.
Q If Ambase hadn't sucked that hundred million dollars out of Carteret, do you think it would have survived?
A I don't know if I could judge that, it would have helped.
Q Okay. Now, turning to the final sentence of point 4, I guess, of Paragraph 10 where you're discussing Carteret's decision to, quote, delay entering the capital market until well after its loan loss problems made it virtually impossible to raise capital in the public markets or from private investors. When do you think Carteret should have attempted to raise capital?
A Well, in my view it would be very difficult for them to have attempted to raise capital in public markets after they got a qualified

Page 76

opinion from their auditors in December 1990. From then on I would think it would be subjected only to private capital, I doubt the SEC would have allowed a public offering to go through with a qualified opinion, I've never seen one in my however many years I've been dealing with the financial markets.
Q And again apologies that I, you know, don't have your experience, but why would the SEC care if there's full disclosure that, hey, there are a lot of problems here --
A The SEC essentially exists to protect small investors and it would almost certainly feel that a small investor wouldn't quite comprehend what a qualified opinion meant. They would know that a qualified opinion essentially was saying that there's significant doubts that this company will be in existence by the next annual report, so they wouldn't want to allow investors to enter willy-nilly into purchase agreements with that outstanding on it. I've never heard of it to be done, it's conceivable but unlikely. Which means that after that point you're in the hands of the private equity guys, and that's a different subject we can come back to I'm sure. But prior to 1990 they might have made an effort to go to the capital

Page 77

markets. It probably would have been very difficult for Ambase to consent to their going to the capital market prior to their acquisition of the company in 1988 because that would just have increased the size of the company they'd have to acquire.
Q Right.
A And they probably would have objected to that considering that they were pretty parsimonious about capital anyway. So that means you have a window possibly from mid-1988 until the end of 1990 to do a public offering, and let's assume that by the middle of 1990 the loan loss issues, which resulted in a huge writeoff that year, would have been sufficiently clear that it would have been unwise to go public and do a public offering, that's something like a year from, or two years from '88 to mid-1990 possibly. In that time period it may have been possible to do one or more small offerings of equity.
Q But once that time period had come and gone it was too late?
A Well, for a public offering. Now, if you're talking about privity equity, you're talking about a little different arrangement where people might have been willing to make the investment, even

Page 78

knowing that the company was suffering from difficulties.
I think the point here is they didn't make an effort, they didn't make an effort to attract capital during that time, whether it would have been easy or not, they didn't make an effort. Certainly it was easier then than it was to try to raise public capital in 1991 when they, when they made an effort to do so.
Q But at the end of '89 it would have been possible in your opinion?
A Possibly, might be.
Q Is that because the capital markets wouldn't have been so negative on Carteret as they became?
A The capital markets were reasonably accommodating for equity issues, as you may recall, because the stock market peaked at the end of December and then it was followed by distress in the junk bond market, the collapse of the leveraged bond market, Michael Milken's indictment, Drexel's indictment, those things had very negative effects on the risky end of the investment spectrum, debt or equity, and the S&L's would have been sucked up into that fear of risky investment, I think. But up

Page 79

until the latter part of 1989 the markets were, I think, more or less willing to try things. We have evidence of others doing deals at that time.
Q All right. Now, looking at the first sentence of Paragraph 11 on page 4 of your report it says, quote, Carteret was unable to raise capital from 1990 through 1992, not because of regulatory changes in capital standards implemented in the wake of FIRREA, but because it had pursued unsuccessfully a risky strategy despite being significantly under-capitalized resulting in massive losses, and what's the risky strategy you're pointing to here?
A This is referring in particular to the commercial lending strategy.
Q Okay. And moving into a different product line, shouldn't that diversification of assets lower risk?
A You don't lower the risk of assets if you acquire riskier assets.
Q Even if it's just the fact of being diversified it doesn't have any tendency to lower risk?
A You have a technical possibility of lowering risk because you have to wait for independent possibly unconnected, uncorrelated

Page 80

failures, but in this case adding an extremely risky commercial lending business did not reduce the risk of the portfolio in that bank.
Q Now you say extremely risky, was Carteret's lending extremely risky?
A Yes.
Q The types of lending Carteret was engaged in was consumer lending?
A I'm not objecting to the types of lending, I'm objecting to the loans.
Q I understand. But I just, to help me out in terms of ranking the riskiness of different lines of business, you've got commercial lending?
A Yes, these are also eliminated -- they're enumerated in Exhibit 3. I think the balance sheet is broken down by types of loan assets.
Q Okay. Let's see.
A We can see what they were and what their relative proportions were, if you go down, this is information that was disclosed, you can see we have mortgage loans, mortgage-backed securities second mortgage loans, consumer loans, higher education loans and so on. These were the different classifications of loans.

Page 81

Q How risky is consumer lending?
A It depends. I mean, it all depends on who you lend it to and whether they pay it back. But credit card lending, automobile lending may not be so bad in generic terms, but if you deal with nobody but the sub-prime market it might be.
Q And what about commercial lending, is it the same answer that it's not necessarily that risky?
A Yeah, same answer.
Q Okay.
A You realize that they made somewhere around 650 million of those loans from the time they began the strategy until they stopped it and about more than half of those loans became problem loans. Now, more than 50 percent of any loan portfolio becoming a problem loan is a serious example of poor management of a loan portfolio.
Q Now, you've referenced poor management and you've noted the loan portfolio and the results and you've noted that they waited too long to go to the capital markets, any other instances of poor management at Carteret that you can identify?
A Well, what I'm just saying, I believe is that the proof being in the pudding, they made

Page 82

these loans and so many of them failed they must have been doing something wrong.
Q I understand.
A Whether it was poor credit standards, poor execution of existing standards that went poor or whatever, there are many things that go into how they do it but they did it in a way that had terrible results.
Q Understood, your point, but -- and you've also made the point that Carteret waited too long to go to the capital markets. Are there any other instances of mismanagement at Carteret that you can identify?
A I've chosen to identify these in Paragraph 10.
Q Anything that's not in Paragraph 10?
A No, if there were more, I probably would have added it.
Q Now, were Carteret's loans different than other, the loans that other S&L's were making at the time?
A Well, I'm not aware of any other S&L with the same track record on their loan portfolio, there may have been some but I'm not aware of it, but it was an unusually poor record, so they had --

Page 83

it probably has to stand out as an example of loan management that was, that was on the lower end of the whole industry. We have data on this, you may realize, we'll come to later.
Q All right. Okay. Do you think the regulators should have approved Carteret's acquisition of Barton and Delray in 1982?
A Well, I find that question somewhat outside the scope of my assignment here.
Q Well, you talk about the number of instances about lagging regulators and inefficient regulators and so you're not --
A Yes.
Q You know, you made statements about the regulators so --
A Well, there was -- that's factually demonstrated. You asked me in particular whether I thought they should or should not have approved this thing.
Q Right. If you don't have an opinion, it's okay, but you make a number of statements about the regulators in the S&L industry and so, you know, I want to know whether those general statements had any application for this case.
A I believe that the regulators at the

Page 84

time felt that they had a burden, and it was considerable, because there were so many loans, so many S&L's in trouble and they had to do the best they could to prevent an industry collapse and to minimize the taxpayer burden of insuring the whole industry collapse and they were certainly frightened that the whole industry might in effect have a run on the bank causing difficulties that would be extremely serious for the country. They felt this burden. I think they felt that they should follow a strategy that would do its best to protect or to move along or to delay any worsening of circumstances that might protect, for example, 85 percent of the industry even if it meant that some part of the industry would be given one drink, one free drink too many and therefore be endangered by it.
So I think there's a certainly rational basis for why the regulators did what they did, but in doing it they may have engaged in particular policy making on the spot which obscured financial transparency and engaged in a kind of calculation of regulatory capital in particular that would be unrealistic.
Q Was the Government advantaged by

Page 85

delaying the day of reckoning?
A They thought so, I believe, because they thought if it all happened in an accelerated form that would make the fear of the industry such that it could have had a stampeding effect, I think they thought that.
Q And with the benefit of hindsight, and I know they didn't have that advantage but you do, do you think they were right?
A I think you could make the case that they were right. I have looked at this over the years and I've felt that way but there are others who don't.
Q Okay. Why did the other S&L's present a burden to the FSLIC in 1982?
MS. GRONER: Excuse me. Ambiguous. Who do you mean by the other S&L's?
BY MR. THOMPSON:
Q I thought you had said, Professor, that there were other S&L's that were presenting a burden?
A Yes, at that time the S&L industry had a number of S&L's suffering from mainly asset liability mismatches which was threatening their capital, including Delray.

Page 86

Q So it was mostly an interest rate risk problem at that point in 1982?
A Mostly, yes. That was mostly the cause of the S&L collapse, it wasn't bad credit decisions, it was interest rate problems.
Q Now, you've made some statements about Carteret's commercial lending, and my question is: Do you have any experience in formulating underwriting standards for a savings and loan institution?
A No.
Q Do you have any experience in formulating underwriting standards for a thrift -- for a bank?
A Yes. This relates to what we talked about earlier in my various encounters with banks in my days as an investment banker. During almost all of those occasions one had to perform some kind of due diligence, so if that's what you mean by underwriting standards, yes.
Q Well, you didn't formulate the standards when you were --
A You mean we didn't create them de novo?
Q Right.

Page 87

A No, we did not. We -- well, we might have but we create our own within our firm and we talk to each other and people who have done it before contributed their views but it wasn't entirely de novo.
Q Okay. And with respect to the banks that you were doing due diligence on how would you assess their underwriting standards, would you just look at the results?
A You're using the word underwriting in the context of a bank's credit reviews and the decision to take on loans and make loans and then maybe redistribute the loans later, is that what you mean?
Q Yes, and in particular --
A As opposed to underwriting securities?
Q Yes, sorry for the ambiguity. Should we start again?
A No, I understand what you mean.
Q Okay.
A But it makes my previous answer irrelevant.
Q Okay. Well, then why don't I just, so we have the record clear --
A Start again.

Page 88

Q Yeah, let me.
Do you have any experience in formulating underwriting standards for a commercial bank?
A Not in formulating them, no.
Q Do you have any experience in evaluating the efficacy and appropriateness of underwriting standards of a commercial bank?
A Not personally, but institutionally yes.
Q Meaning there were other people at Goldman who did that?
A Yes, and often people under my supervision. There were quite a few of them, so as a result we were doing these things. And if there was a problem with the quality of the credit policies or the suspicion of loan loss problems in a bank we were doing business with, it would become a serious discovery item for us and, therefore, we would have to deal with it.
Q Do you recall that ever happening?
A It did happen in the case of Continental Illinois, though, it happened as that firm tended to, you know, evolve into trouble, and I can't exactly recall when Goldman Sachs began to

Page 89

question the whole thing.
Q What would your role have been with respect to Continental's underwriting problems?
A Well, they had sold issues in the Euro market and they had been around to meet people who were investing in their stock and things of this kind and that was of some interest to me.
Q We're talking about what you understand but in terms of what you personally --
A I said I hadn't personally engaged in this but institutionally in the sense of it going on in the firm and I was aware of some of it. Sometimes, you know, part of a group who would discuss it that's how I would know.
Q Okay. Do you consider yourself an expert in the loan underwriting procedures for a thrift or a bank?
A No.
Q Okay. Now, let's look at the -- we've talked a bit about the management of Carteret. Would you concede that the OTS is in a better position to assess the quality of management at Carteret than you are?
A They should be. They should have better information at the time than I, certainly,

Page 90

but on the other hand maybe they missed it.
Q Do you have an opinion on that with respect to Carteret as to whether you are in a better position to evaluate management as opposed to the OTS officials?
A I do not.
Q Okay. And what about with respect to the FDIC, do you have any opinion on who's in a better position to judge the institution, yourself --
A I do not. I do not.
Q Okay. All right. Now, turning to Paragraph 13 of your report on page 5, the first sentence says, quote, The United States experienced a severe crisis in its savings and loan industry commencing in 1979 and continuing through the 1980s. Please explain, how did this crisis come about?
A It was predominantly a crisis in the mortgage industry, thrift industry, caused by a rapid increase in short-term interest rates which was the method used by these institutions to fund long-term fixed-rate loan portfolios, which is to say, they were borrowing very short to fund very long which most students of banking understand to be an unsound way to run a business in that sense. But

Page 91

the S&L industry, it existed since colonial days and it was very distributed throughout the United States and had a lot of political support and this practice was tolerated up until the time when it became problematic.
Q Well, and wasn't there a period of time where the Government regulated what the rates were on the deposits?
A Yes.
Q And so in that regard would there have been any interest rate risk back when the deposits were regulated?
A Ironically, had they been restricted by these regulations, then nobody would have deposited their money there because they would have gone elsewhere to get their deposits at higher rates and as a result they wouldn't have made these loans. Or loans would have to be refinanced in some other way at the time.
Q Now, did the Government also restrict the rates the S&L's could charge on the loans they made, was that also regulated?
A I'm not aware of that.
Q Okay. So the deposits were at one point regulated but the loans were --

Page 92

A Free market.
Q -- free market? Okay. And when --
A Another example of an awkward regulatory constraint on an industry.
Q That had, ultimately had a very negative effect?
A If you're going to regulate, you ought to regulate both the same way so they don't get into these mismatch situations, but in this case the spike in interest rates was accompanied by refinancing of the loans at higher interest rates that became higher than the yields they were receiving on the mortgage portfolio they owned, and because they were leveraged more than 10 times to one, sometimes 20 times to one, the rate at which capital was eroded was very rapid.
Q And when you say, you know, you should regulate both the same way, is this similar to what happened in the California energy market?
A Yes, it is actually. I was going to think about it but I decided it was probably an unnecessary contribution by me anyway so why should I lead you to another thing that --
Q So the regulators should have had a more sensible regime in place for the S&L's in the

Page 93

late seventies; is that fair to say?
A Plenty of people have said so.
Q Okay. Now you say in the second sentence of Paragraph 15 that, quote, This crisis ultimately cost taxpayers approximately $250 billion and was the most significant financial catastrophe since the collapse of 9,000 banking and thrift organizations in 1931 to '34. Closed quote. The $250 billion number, where does that come from?
A Where did it come from? It's an estimate that I and some others have used to try to determine the actual cost to the Government of both insuring the deposits and then receiving the recovery subsequently. There are estimates of the net cost that range from somewhere between 150 million and 300 million or so.
Q Billion?
A Billion.
Q Yeah.
A And I don't know what it really was but frankly I'm not sure anyone else does either because it's hard to know what all those recoveries were and when they were received and how they got accounted for, but that's our guess.
Q And just help me out. Why is it hard

Page 98

the table; is that true?
A Yes, but the healthy thrift might not enjoy the process if that took place.
Q Right. Fair enough.
A Serve your country by dying for us, not necessarily a strategy everybody likes to follow.
Q Right. And the new types of lending and assets that were permitted, this was commercial real estate lending?
A Those are the ones which we have discussed, yes.
Q Okay. And that was all part of the 1982 legislation?
A Yes.
Q And the regulators understood that commercial real estate lending was riskier, right?
A They did. They did. But, you know, there were many things. Some S&L's engaged in a great deal of investment in junk bonds, for example, they're among Michael Milken's greatest clients were several junk bond -- or several S&L's. And there were some who took their right privilege to invest in commercial lending and invested in very expensive risky resorts that failed. I think there was a

Page 99

famous one in Arizona called The Venetian that failed. So in some ways it forced the S&L's to be yield chasers and to accept a greater amount of risk in order to get a higher amount of interest income so as to offset their other problems.
Q They were yield chasers because they had these huge problems and --
A They needed yield.
Q Right. The only way --
A The only way they could get yield in a sense was they were let out of the box and go get yield, okay, so we're going to get it from whomever we can and we like the ones with the most amount of yield and some of us were not able to tell the difference in the risk.
Q And the reason they were in this profile was because they had huge negative tangible net worth and to get out of that situation they needed yield; is that right?
A I think so, yes.
Q Okay. Now when you say that there were lagging and ineffective regulatory -- regulator -- is there maybe a typo, should that be regulatory efforts?
A Is that the question, is there a typo

Page 100

there?
Q Well, yeah, I just was going to fix it but I didn't want to --
A You can say, I suppose you could say it either way. If you prefer to say regulatory efforts, that would be alright with me, it means the same thing.
Q Yes. Right. Okay. What are you talking about with respect to the Federal Home Loan Bank there, how was it lagging and ineffective?
A Well, it was my understanding at the time, and partly based on my discussions with Professor White, that the regulatory population was quite small and it had been subject to some efforts by the Reagan Administration to, you know, cut back on government and budget restrictions and that the regular -- the inspections that were required to be made were often made late and that the reports of inspections took longer than they might have otherwise done until there was a general recognition that the thing was falling behind schedule and, therefore, when you're regulating something that gets in trouble and the time it takes to regulate them is widening, you're losing control of that part.

Page 101

Q And your basis for making those statements is Professor White's --
A Well, yes, but it was --
Q Okay.
A -- as far as my understanding was concerned, it was pretty widely accepted, it was generally known.
Q Well, what about the FSLIC, same story?
A I don't know for sure --
Q Okay.
A -- whether it fits exactly in there or not, but it was -- I don't know.
Q Okay. Was the regulation of Carteret in 1982 in any way flawed through ineffective efforts?
A I didn't detect any sign of that when I was looking at it.
Q Okay. Did FIRREA fix the regulatory problems that you identify in Paragraph 14?
A I believe that FIRREA was an effort to tighten the regulatory standards because there was some concern about the extent of which the Government was having to pay for deposits, so they're insured by the Government, and that many

Page 102

people thought that better regulation requiring more urgent and earlier intervention would have helped to defray the cost of this situation. So FIRREA was largely affected by that. But remember, FIRREA also affected the commercial banking industry as well, so they had all depository institutions were meant to be covered by this, and the idea was to strengthen and to improve regulatory basis so that they would be better enabled to escape these problems in the future.
Q Was FIRREA successful in creating a better regulatory regime in your opinion?
A Yes.
Q How so?
A Well, it put banks and S&L's on notice that they were likely to be intervened on more quickly than they had been before and it put higher standards in accounting and other, other reporting matters on the table, which they had to comply with, and indeed there haven't been very many bank failures since.
Q Well --
MS. GRONER: Is this a good time for a break?
MR. THOMPSON: Sure, yeah, absolutely.

Page 103

We'll take a 10-minute break.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q Professor, do you have an opinion as to whether Angelo Vigna was a competent regulator?
A I don't have an opinion.
Q Okay.
A I don't have enough information to have an opinion.
Q Do you have an opinion as to whether Bob Albanese was a competent regulator?
A That I don't have an opinion.
Q Do you have an opinion as to whether Michael Simone was a competent regulator?
A No.
Q Do you have an opinion as to whether Tim Ryan was a competent regulator?
A No.
Q Do you have an opinion about the competence of the FDIC?
A No.
That last question was in the context of Carteret?
Q Yeah, and its treatment of Carteret.

Page 104

A (Nods.)
Q Okay. Were there any equity issuances by savings and loans in 1981 or '82?
A I don't recall.
Q Any subordinated debt issuances by savings and loans in 1981 and 1982?
A I don't recall that either. We didn't study that period so I don't know.
Q Okay. Is it fair to say there wasn't much external capital flowing into the S&L industry in '81 and '82?
A Certainly.
Q Okay. Now, when the Government was confronted with Barton and Delray, two massively insolvent institutions, what options did the Government have to deal with it?
A Again, this is beyond the scope of my report but I assume you're asking my personal opinion from what I know about it at the time, right?
Q Right. I mean, I guess we could quibble and a court will figure out whether it's beyond the scope or relevant or what. But in other words, you talked about lagging and ineffective regulatory efforts and about, you know, the 1982

Page 105

deals and --
A Well, but you asked me if they had other options to take of this kind --
Q Right.
A -- which I suppose that they did have other options, as one usually does, but they chose this option, which was not an unreasonable thing to do, if that's where you're going.
Q Well, one of the things they could have done is just liquidate the thrift, paid off the depositors and send them on their way; is that right?
A They could have done that.
Q But did they have sufficient cash to do that?
A Well, they certainly may have had sufficient cash to do these two but not to extend this to the entire industry, as I was referring before, they were concerned that the whole industry would go up and they would not have enough money without having to go back to Congress to get more.
Q Okay. And the Government theoretically also could have put more cash into Barton and Delray to get its tangible capital up, right?

Page 106

A They could have done that.
Q But again at least on a system-wide basis the Government didn't have the cash to do that, or the FSLIC didn't have the cash to do that?
A That's probably true.
Q Okay. So were there any options other than trying to, viable options other than trying to sell the institution?
A Well, it's my understanding of that period is that the regulators, the FSLIC and the FDIC in their joint efforts to minimize the depository insurance bill did many things to find their way through this difficult time. They closed some down, they kept some on a short leash, they did some mergers, they did quite a few mergers, and they also sold some to private equity investors in what you might call a bundling together of several thrifts at once.
Q Okay.
A And did some large deals that were, so I believe that the record would show they tried a lot of different things, whether all of this would have applied to Barton and Delray I don't know, but.
Q Okay. Do you have any opinion as to how much money, if any, the Government saved by

Page 107

consummating the Barton and Delray merger with Carteret as opposed to the Government's next best alternative?
A I don't know that.
Q Okay. Let's turn to Paragraph 15, maybe you're already there, but in the third sentence you make reference to disposals equaling 2.5 percent of insured S&L assets, what do you mean by that?
A The insured S&L assets were the assets by S&L's whose deposits were insured.
Q Okay. So if you took all the assets of all the S&L's who had insured deposits, 2.5 percent of them were being disposed of?
A That's right.
Q Okay. In the fourth sentence of Paragraph 15 you say, quote, From 1983 through 1986 there was a modest reversal in interest rate movements which temporarily eased the difficult environment for S&L's somewhat but the negative interest rate cap reappeared in 1987. Please explain what you're talking about there.
A Interest rates began to spike upwards again in 1987 creating the same imbalance that existed before so I believe that by this time many

Page 108

of the S&L's had learned something about managing the interest rate gap risks and had moderated the exposure.
Q Including Carteret?
A Including Carteret.
Q Okay. And was branching out into other lines of lending beyond residential helpful in terms of lowering interest rate risk?
A Yes, it could be.
Q Okay.
A If they're shorter maturity loans, for example, or if they were floating rate or variable rate which most of them would have been.
Q Okay. All right. Now you say in the next sentence of Paragraph 15, By the end of 1988, 7.5 percent of all thrift assets were in disposal. Is that the same calculation as the 2.5 percent?
A Yes.
Q And how were the assets being disposed of?
A Well, there was a variety of ways I understand including direct sales of the collateral involved, the mortgage assets, sales of whole institutions such as Delray and so on, and probably some combination in which you sell off a bunch of

Page 109

assets to somebody else, branch sales and so forth.
Q Who was doing that at this time?
A I guess this was the OTS doing it, I'm not sure exactly which regulatory nomenclature applies but I think they were replaced by the RTC, so it's probably the OTS.
Q In the next sentence of Paragraph 15 you state, quote, The pace of disposals would have been greater but for the fact the Government examinations were running late, accounting information was inaccurate because of special treatments allowed by regulators and because of delaying tactics employed by well-connected S&L owners or because the regulators were inefficient. What's your basis for saying that disposals were running late?
A Well, they didn't happen right away, I mean it takes a while to sell some of these things, you have to put them in inventory until you can find a buyer, that was one problem.
Q And did that problem persist even while the RTC was operating?
A Well, it's a generic problem of trying to sell off a whole lot of assets which are deemed to be, you know, in need of being completely

Page 110

repriced.
Q And does that delay in disposal tend to depress the price?
A It might.
Q With respect to --
A It depends. The delay actually might take the pressure off the market. If you try to accelerate the disposal and sell everything at once at any price anybody would pay, the prices would be perhaps lower, the sales at the lower price. So if you delay it a bit, you might be trying to keep some of the supply off the market so as to avoid having to take as big losses as you might otherwise have to do.
Q And was that a conscious decision of the regulators the strategy that you were just articulating?
A I don't know but I believe it was something they certainly had the ability to choose and consider as they went along.
Q Okay. I mean, other than the natural fact that, okay, you can't sell these assets overnight, what's your basis for saying things were running late?
A Well, I think that I was referring

Page 111

principally to the fact that in order to force a disposal you had to have the information that enabled you to decide to do so, and if that information was late because of later examiner reports or other reasons, then it would simply take longer to know when to do it.
Q Now you say "accounting information was inaccurate because of special treatments allowed by regulators," what are you referring to there?
A Well, I would be happy to use supervisory goodwill as an example.
Q When you say it was inaccurate, I mean, it was fully disclosed.
A Well, that's true, it was disclosed, someone could look through it and make his own judgment.
Q Right, so I don't understand how that would be inaccurate.
A Was that a question?
Q Is it? I mean, you think that the use of supervisory goodwill was inaccurate?
A It gave, it gave a coloration to the financial statement that capital was present when it wasn't, real capital was not there, and that contributed to an inaccurate reading of it by some,

Page 112

could have done.
Q So you don't think supervisory goodwill was real capital?
A I don't.
Q Okay. Now, in terms of delaying tactics employed by well-connected S&L owners.
A There's some anecdotal evidence of prominent politically connected S&L owners who were able to intervene with the Government to delay regulatory actions or postpone them or one way or another.
Q Mr. Keating?
A That's right. Well, his is among others but he wasn't the only one.
Q Okay. But Carteret wasn't involved in that?
A No.
Q All right. Now, let's see. The regulators --
A This paragraph, by the way, refers to the industry not to Carteret.
Q Okay. And regulators were inefficient, what did you have in mind when you wrote that?
A I think efficient regulators would

Page 113

have detected some of these problems sooner and been able to act on them quicker than they did do. We have evidence that many regulators detected them but as they passed the information up the chain of command to where the, you know, the authority to conduct actions occurred, they didn't result in actions being taken, they were either delayed or postponed or forgotten about it or whatever, and as a result the overall process of administering regulation to this industry became affected by it in such a way you could call it inefficient.
Q Okay. Anything else you had in mind when you wrote that?
A No more than that, I was making general statements about what I think are generally understood characteristics of the industry at the time which I derived from sources that I have looked at.
Q Okay. Now you state that 55 percent of all S&L assets had been taken over by the RTC. Approximately how much in the way of assets are we talking about here, hundreds of billions?
A Yeah.
Q And was --
A I don't know more precisely than that

Page 118

so I made the investment.
Q And you did that in '91 and '92?
A Around that time.
Q Okay. Any other thrifts or banks?
A Not thrifts.
Q Okay.
A Well, I was invited onto a board of a thrift with the intention that I would be given some stock when the company demutualized and became a public company, I considered it but I declined the opportunity.
Q Okay. What thrift was that?
A It was Montclair Savings Bank in Montclair, New Jersey.
Q Why did you decline?
A I wasn't convinced that the S&L crisis was over, I didn't want to be exposed to any personal liability as a director, I just got my capital out of Goldman Sachs and I didn't want to give it back to some litigant.
Q I won't take that personally.
But was that a period of time where the regulators really were going after directors, Neal Bush and Silverado?
A Yes. At that time in general terms

Page 119

'89 or thereabouts, yes, there were those things going on.
Q Yeah, and so it was a difficult environment?
A Well, it was not considered a place for wise adults to go, so I didn't.
Q Okay. And with respect to the banks were there any other banks that you bought in '91 or '92?
A Well -- '91, '92?
Q Yeah.
A I think I just bought a series of several banks, it was a portfolio of banks, and then I sat on it for a long number of years and then sold it down later, but I also have invested in private banks, startup banks.
Q Okay.
A You're going to ask me who was that bank and frankly I've forgotten, I bought it from a private equity into a private equity deal. It came, it was -- it did its job, it got sold and I've forgotten about it.
Q And what were the years approximately of when you were in that private equity bank deal?
A Probably about five years ago.

Page 120

Q What was the geographic location?
A It was a Florida S&L, thrift. I mean it was a thrift-like bank, I think it was actually a bank but it was indistinguishable from a thrift.
Q Was it a startup?
A It had been a startup.
Q And was it a good investment?
A Yes.
Q Okay. And why did you -- how did you evaluate the opportunity to invest in that?
A I was approached by a good friend who worked at Keefe Bruyette, which is one of the leading experts on bank reorganizations and recapitalizations, and I decided that if he was going to invest in it, then I could do too. I didn't perform any special due diligence, though I did carefully read the materials given to, me and then there was a, there was an incident when the bank lost some money on a loan matter which I investigated subsequently. I wasn't entirely a passive investor.
Q Okay. So you tried to get to the bottom of why did this loan go bad and are there going to be more?
A Yes. And I talked to the CEO about

Page 121

things of this kind and I got a better understanding of it. Basically I thought they made a mistake, and they did.
Q Okay. Now, when you were thinking about whether to do this investment, were there certain ratios that you were looking at in terms of valuations? I mean, do you look at multiple to book that you were being able to buy in at?
A That was one of the multiples that one looks at.
Q And did you look at price-earnings ratio?
A Yes.
Q And what other ratios, return on assets?
A Return on assets, yes.
Q Anything else that was important to your decision?
A Well, I like to look at performance indicators other than return on capital numbers such as the net interest income minus loan losses divided by assets or something like that to indicate it.
Q I'm sorry, net interest income minus losses?
A Minus loan losses or charge-offs then

Page 122

divided by the asset, so what's the, what's the revenue return on assets and compare that to some others.
Q And what's the difference between a loan loss and a charge-off?
A Maybe none.
Q Okay. I've never understood that.
A There's a lot of vocabulary in this stuff that is not necessary but there may be a technical distinction but it basically means that we're setting aside some of our income to cover our estimate as to how much of the losses of -- how much the loan portfolio losses will be increased by.
Q Okay. So now when you bought Bank of America and Citicorp?
A Citicorp then, yeah.
Q And do you remember any of the other banks that were in that portfolio?
A I think Bank One was in there and maybe one more.
Q But you can't recall right now?
A Not right now.
Q If you do remember --
A It was 15 years ago.
Q Yeah. Okay. And these were good

Page 123

investments, were they not?
A Yes, I held them till the end of the decade and they were a very good investment by that time.
Q And why did you think they were good investments in '91 and '92?
A Because the best I could tell the pig passed through the python. The loan loss problems which had held them back were being absorbed and digested and excreted and, therefore, the rest of the snake was coming back to be, coming back into business again, and I thought that the prices of these places had been or had been knocked down sufficiently to not take all that into account, so I was making a judgment that the worst had been behind them and that they were going to come out of it better. I did some analysis of ratios and such but I was largely working on the kinds of analyses that I just described, the net income, the net interest income minus loss charge-offs divided by assets seeing the trends in that and what was evident to me was that the commercial lending business of these banks was very strong and healthy, credit cards and all those things, and that the quantity of exposure in wholesale lending was very small and pretty much

Page 124

written off as much as it needed to be, so they would be able to come back to being strong and competitive banks again, which they were.
There was also a very substantial amount of management turnover and change in toughening up that took place in those banks during that time. Almost every bank had totally new management which were devoted to bottom-line management in trying to demonstrate that they could, you know, make a high level of return on assets, which I believe was a principal benchmark return, I'm going to go from something well below 1 percent to something close to two. Now that meant we had a different management approach and they were showing signs of being less interested in diversifying into too many other businesses than they had done before which suggested a focus on the main basics of the business which I thought was healthy. So they had learned a lesson from their mistakes and it seemed to be they had adjusted to that by management changes and other necessary steps.
Q Okay. Now, you talked about the net income minus loan loss over assets is one ratio, did you also look at market to book?
A Yes.

Page 125

Q And price-earnings ratios?
A Yes.
Q And ROA?
A Yes.
Q Any other ratios that you would have looked at?
A Those are prominent ones most people use when looking at banking values, there may be others if you want to drill down deeper you can look at.
Q Okay. But those were the ones you looked at?
A I was particularly interested in those.
Q Yeah.
A Along with the one I just mentioned.
Q Yes, sir, right. Now you mentioned trends, so why were you looking at trends?
A Why was I looking at trends?
Q Yeah.
A Well, trends are an indicator of the future, of what the future is likely to be, and a trend, of course, would be the ability to, you know, regain lending business to corporations, for example, on a more solid basis than had been used

Page 134

Q But in terms of just buying a particular branch do you think there would be a control premium with respect to a single branch?
A Not in theory there would be but it's hard to say that one would make a big deal out of it.
Q Right.
A And particularly when branches are often sold for mutual accommodation reasons. You know, you may be required by a regulator to sell a branch or somebody may want a branch in your neighborhood that would be willing to pay you more for it than you think it's worth, those kinds of factors get in there, it's difficult to generalize and say that all branch premiums are a result of franchise premiums, though they might be.
Q Okay. Do you have an opinion as to whether the branch premiums that were realized by the sale of Carteret's branches were related to franchise value?
A I don't have an opinion though I would accept that it might be so.
Q Okay. Do you have an opinion as to whether Carteret sold branches in 1990 because of the breaching provisions of FIRREA?

Page 135

A I don't have a -- I haven't thought that one out, I don't know that I could tell from studying it. What I do know is that they needed to shore up the capital base and they had to, to the extent that they could shrink assets and turn it into cash to improve the ability of the service to endure the loan offers they were taking would be the first priority.
Q Is it reasonable to assume that the asset shrinkage that Carteret went through in '90, '91, '92 that's reflected in your Exhibit 3 was attributable to the need to raise additional capital?
A That would certainly be a principal reason.
Q Okay.
A If not the only reason, it could have been the only reason, but it was also clear that the bank was generally under-capitalized regardless of whether you count goodwill or not.
Q With respect to the assets that were disposed of in '90, '91, '92 do you know whether there was a positive spread income on those assets?
A I don't recall.
Q Okay. Now with respect to the

Page 136

branches that were sold in 1990, do you have an opinion as to whether those branch sales had any impact on Carteret's net income in '91 or '92?
A No.
Q Okay. Now, as deposits run off, does that generally decrease franchise value?
A Well, not necessarily, it might. Certainly if you're having a run on the bank and deposits are running off, people are worried about you and therefore your franchise value would disappear, but if you're simply adjusting for some reason or another, you have too many branches in Morristown and not enough in Jersey City, you migh switch and that could have no effect on it.
Q Okay. Now when you were evaluating banks to invest in did you look at the dividends they pay?
A Yes.
Q Why do you do that?
A Money they're giving me.
Q What does the --
A Part of the return that you get for investing in it.
Q What would it tell you about a bank if it cut its dividend?

Page 137

A It would probably tell me that the bank had a good reason to cut it, principally that it needed to conserve the capital.
Q Would it be cause for concern?
A Yes, generally.
Q Okay. And if a bank increases its dividend on a regular basis --
A Excuse me, may I add to my last answer?
Q By all means.
A It would be cause for concern but it might also be a cause for concern if they didn't cut it. If I knew they were in difficulty and they were paying a dividend, I would consider that possibly to be irresponsible.
Q Okay.
A So we have to have the correct dividend policy, that's what we're looking for.
Q Sort of like GM had a big dividend a few years ago?
A Well, this happens periodically in big companies and they reduce dividends because they are going through some sort of transition and need to have to retain the capital. This was true for the American big banks that went into the trouble during

Page 138

the same time we're talking about.
Q And if a bank increases its dividend on a regular basis is that a good thing?
A Same answer, it's got to be the right dividend policy, not one that seems to be inappropriate. If there are many investment opportunities and they're instead paying out dividends instead of taking those opportunities, you might want to wonder whether the management has, you know, a business plan that is consistent with what you think it should be.
Q Okay. What's more important to you as an investor, a cash dividend or a stock dividend?
A Well, a cash dividend is real money and a stock dividend, which is paid to everybody, it's just a form of dilution.
Q Is a stock dividend just like a stock split?
A Yes.
Q Now as an investor in a bank what relevance do you or weight do you give to one-time gains or losses on assets?
A It depends what they're from. For the most part banks must now account for, I think all companies must now account for so-called

Page 139

extraordinary items above the bottom line so that you still get the bottom line there. There was a time in the past when you could report net income and then subtract from it items you really wanted to charge-off directly to your retained earnings, you can't do that anymore, so whatever you do it's going to be net income after you take all these things out of there. So an extraordinary gain or loss is only extraordinary if it's coming from something that, you know, appears to be non-recurring. Like Citigroup sells the Travelers Insurance business, that's not going to be a repeating event, so they have a large gain from doing so, that essentially is returning capital to the bank to be redeployed. If they made a large profit on it, I like that better than if they made a loss, but either way I don't get too emotional about it because I see this as money coming back into the system.
Now if you have something like gains from the sale of securities and you have them every year because your policy is to create cash by taking advantage of the market opportunities you have from a portfolio, then I accept that as a recurring source of income but I look at it in terms of trying to, you'll see how much of the total income on the

Page 140

enterprise is made up by this source of income which comes from a different source than the main business of the bank.
Q Well --
A If my business is lending, it ought to be where I get most of my income from.
Q So in terms of -- I mean, Goldman Sachs they book a lot of profits from sales, right?
A Goldman Sachs is a little more complicated than savings and loan, I can tell you that, but they are in the business of investing as they go so they always have some amount of capital gains they're reporting, in addition to their regular income, but one of the businesses of Goldman Sachs is to be a proprietary trader and investor.
Q Right. Now, with respect to Carteret, I mean they were generating a lot more loans than they could keep on their balance sheet and then packaging them and selling them, would you view that as a recurring source of income?
A I think what they were doing was selling mortgage-backed securities which is an investment gain as opposed to a gain from underwriting loans which you are reselling, but I'm not sure I know the quantities of the syndicated

Page 141

resales.
Q Well, with respect to -- well, I don't know my terminology, but with respect to the originated loans that they're packaging and reselling, is it fair to say that's a recurring source of income?
A Yes, that would be recurring, sure.
Q And with respect to the gains on sales of mortgage-backed securities, if they were booking those year after year after year wouldn't it be fair to say that those would be recurring too?
A They are.
Q Okay.
A But those are gains from a source other than the main business.
Q Well, I mean, isn't a bank in the business of buying and selling loans?
A Well, these are -- yes, you could say that.
Q So now --
A But if you think the main business is making loans with the depositors' capital --
Q Yeah, right.
A -- which they were to the extent of at least two-thirds of their business, you would

Page 142

subtract those other gains in order to find out how the lending business was doing on a standalone basis.
Q Would that be the most important issue for you as an investor how the lending business was --
A In the case of Carteret it was very important to me --
Q Okay.
A -- to determine whether or not the main business of the firm was healthy.
Q Okay.
A Which I concluded it was not.
Q And have you ever heard of the term core earnings?
A Yes.
Q What does that mean to you?
A That's a regulatory term for what they come from but I can't define it anymore than that.
Q As a financial economist is that not a term that's used --
A It's a regulatory, it's a regulatory term and beyond that it's whatever you want to think the core business is. I would say a core business of Carteret would be making loans.

Page 143

Q Okay. And certainly when an institution is booking gains on sales of mortgage-backed securities that flows through to the book value and then would get factored in in a multiple to book; is that right?
A Well, that contributes, yes, that gets counted as retained earnings which is what you're valuing it as, yes.
Q Okay. And is that appropriate?
A Yes, that's where it goes, it should go there.
Q Is capital important for a thrift?
A Sure.
Q Why?
A Because you have borrowed approximately 95 percent of the assets that you are relending in order to make a profit and that means that you are very highly leveraged, 95 percent of the assets being borrowed, you've only got about 5 percent of it in capital or less in the case of Carteret, so that if anything goes wrong, your supply of capital is too small to be able to absorb what might be recorded as normal business losses. And if you are going to be under-capitalized to too great an extent, you will become insolvent, plus

Page 144

you're in a regulated industry which means that they can blow the whistle on you.
Q So is it fair to say that capital serves as a buffer against risks that turn into losses?
A Yes.
Q And what are the types of risks that a prudent thrift management would be concerned about in setting its capital level?
A Well, you're looking for a list of different types of risks, there's a different issue about how you set the capital, but let's take the risks first.
Q Okay, good.
A Obviously there's interest rate risk, obviously there's credit risk, obviously there's something called operational risk.
Q What does that mean?
A Operational risk is essentially the risks that people and systems that you have employed for the execution of your strategy underperforms the goals of the strategy and gets you into trouble. A computer breaks and nobody knows how to fix it, the telephone doesn't work, or somebody ran off with the money or made bad loans or lied to regulators,

Page 145

things of this kind that clearly are hazards of the business but they are important ones and they can affect you in terribly drastic ways, especially if you don't have much capital.
Q Right.
A But there are probably a few other classifications of risk, but the ones I mentioned I'd say are the most important ones.
Q What about regulatory risk, the fact that your capital requirement, you know, might go from 3 percent under FIRREA to 4 percent under FDICIA?
A Well, most people don't expect the regulators to be a source of risk. I understand why you're asking the question. But for the most part it's not on your list of things. We have political risk, if you want to call it that, you know, the Government decides that S&L's are illegal, it could do, so you could have political risk. It generally wasn't considered to be too severe a risk exposure in the banking industry because it was thought to be well regulated, but yes, there could be a regulatory risk.
Q As a financial economist, do you think investors should look at regulatory risk?

Page 162

A I don't have an opinion as to what it would be.
Q Okay.
A I don't even have an opinion yet on the methodology, but you asked me where I would muck around with it and I've just given you where I thought I'd start.
Q And why would you start in January of '91?
A That's a pretty -- we have a definitive number that we get from a market valuation at the time, people bought Ambase stock at the time and that's all it owned is Carteret so that's putting the value on Carteret.
Q Do you have an opinion as to whether it's possible to a reasonable degree of certainty to try to disaggregate how much of Ambase's market capitalization was attributable to Carteret prior to January of '91?
A No, I found that difficult to do, I tried but I couldn't find a satisfactory way to do it.
Q Okay. What were the methods that you tried?
A I just found the situation too unclear

Page 163

to be able to try anything.
Q Okay. In your opinion was Carteret harmed by the breach of contract?
A Not materially so.
Q Was it harmed in any way?
A It might have been.
Q How?
A In a non-material way.
Q I mean, do you think it was in a non-material way or --
A It could have been but I'm not so sure it was. The ways in which such a harm could come is if it was required as one of the executives said to engage upon, you know, sort of a lot of firefighting to change things to be in sudden compliance when it hadn't prepared for it beforehand, whether they might have anticipated this is another issue, probably they should have. But also there's a question about, you know, did they have many options that they could follow at that point when they got into this business of having to write off all those big loans, and that was happening. By the time that Ambase sold Home or the insurance businesses, then Carteret had already been through a pretty bad year in terms of writeoffs, that was the sudden sharp

Page 164

shock that came when they wrote off a hundred-and-twenty or whatever it was million dollars of loan losses, that had already impacted the situation, so what they could have done subsequent to that to improve the value is hard to know.
Q When those loan losses were written off, 120 million in 1990, would you expect those to have a dollar-for-dollar impact on the stock market capitalization of Carteret?
A I would think it would be greater than that because the fear was that it wasn't all, there was more to come, as there was.
Q Okay. Now, with respect to Carteret's capital deficiency, do you have an opinion as to how much capital Carteret would have had to raise in a non-breach world in order to survive?
A Well, insofar as I don't think the supervisory goodwill counted very much for capital at all, I would say that the same amount would be necessary in the non -- in the but for as well as the real world, another 150 million or so, which I believe was about the -- maybe it was 120 million they first suggested but it increased it to a larger number than that before long, but something of that

Page 165

magnitude would have been necessary to withstand the problems of the bank.
Q So if Carteret had gotten $150 million in real hard cash capital, it could have survived?
A It could have, yes.
Q Okay. And it would have survived?
A Did they make any other mistakes, I mean, you know, we didn't know about the mistakes that they just finished writing off, so I don't know, but I assume that they could have.
Q Okay.
A If they had run the bank well, and as I understand the bank was run well after Mr. Bianco got in. I'll give, I'll give him that.
Q Have you analyzed the value of Carteret's servicing portfolio as of any point in 1992?
A No. No.
Q Have you analyzed the value of Carteret Mortgage Company at any point in 1992?
A No. I assume that they're all part of this, the entire enterprise including these assets.
Q Right. Do you have any reason to doubt that Carteret could have sold its servicing portfolio in 1992 if it had wanted to?

Page 166

A I don't have any reason to doubt that it might have been able to sell it.
Q Okay.
A I don't know the market condition for that thing, so there are things I don't know, but I don't have any reason to doubt it.
Q Okay. And do you have any reason to doubt that Carteret could have sold its mortgage company in 1992?
A Same answer.
Q Okay. Do you think it was reasonable for Carteret's management to rely upon the supervisory goodwill to meet its regulatory capital requirements?
A Well, they were the regulatory capital requirements, so one must comply with the regulatory regime when it's in.
Q Well, if the regulatory regime didn't require them to rely on supervisory goodwill, they could have gone out and, you know, tried to get tangible capital?
A Well then if your question is, do I think they needed more capital than they had?
Q Yes.
A I would say yes, they did and that

Page 167

they probably could have raised it without offending the regulators, but they didn't.
Q And do you think it was reasonable for them in, you know, 1983 through '89 to operate the bank with the level of tangible capital that they did?
A Well, we discussed that earlier and I said I thought they were under-capitalized and I would have warned them that they were taking a great risk to run the bank that way because I thought the proportion of total capital that was contributed by goodwill was excessive. That doesn't mean that it could not under any circumstances have succeeded and, you know, I can understand people ignoring advice like that, but that does mean that the burden of performance is on those who ignored the advice.
Q Now, all other things being equal, it's easier for a company to raise a smaller amount of capital than a larger amount of capital; isn't that true?
A Probably.
Q Do you have an opinion as to when it became clear that FIRREA was going to eliminate supervisory goodwill?
A I've tried to find that out but I

Page 168

haven't been able to do so. There's a lot of rumor and, you know, speculation in the press and elsewhere about that, I suppose people who were close to the legislative process in Washington might have had a much better idea than the average investor would do, but there wasn't a clear indicated date, so it was my understanding that it would have been reasonable to expect tightening of the regulatory requirements for S&L's and for banks as a result of FIRREA, and whether that meant that the capital ratios would be increased or whether other characteristics of it would occur, it's hard to say, but on balance the participants in this industry had every reason to expect the regulatory glove to be gripped tighter after that and capital adequacy is a very obvious place in which they might go to work.
Q Right. Have you ever made an investment in the cable industry?
A Yes, I've bought stock from time to time in cable companies but not a significant amount.
Q What about public utilities, have you ever acquired any of them?
A I don't think so.

Page 169

Q Airlines?
A I don't think so.
Q Telephone long distance providers?
A Yes, I have had such investments.
Q When making an investment in a regulated industry, is it important to understand the regulatory environment confronting the company?
A Certainly if you were a professional investor you would.
Q Okay.
A If you were a small investor buying a one of many stocks in a portfolio, you might not feel that the cost of that undertaking was worth the effort but you hope somebody's doing it.
Q And do you fit into that latter category?
A I have on occasion, yes.
Q Okay.
A I am not an institutional investor operating on the same scale as others.
Q Right. And would you agree that excessive regulation can hurt the value of a company?
A Yes.
Q And, in fact, poor regulatory

Page 170

decisions can have a devastating impact on an industry; isn't that right?
A They might.
Q And is the S&L industry in the early eighties an example of that?
A I would have to have a better idea of what you mean by that to be able to agree with you.
Q Okay.
A Regulatory regime in S&L began somewhere in the thirties and tolerated a lot of things that seemed benign at the time but which permitted this interest rate and this batching to occur when it did, that's probably an example, benign but poor regulation if you want to anticipate an interest rate spike.
Q Okay.
A So they go through different periods when the regulation seemed to be good and effective and other times when it is embarrassed for what happens under its watch. It's an argument for reducing regulation.
Q We've covered a lot of this you'll be glad to know.
A I am glad to know.
Q. Do you have an opinion as to what the

Page 171

correct discount rate would be for an investor looking to make an investment in Carteret in 1988, August of 1988?
A No.
Q Is there even a range of appropriate discount rates you could give for that time period?
A I'd have to go see what interest rates were and what risk, comfortable risk premiums were for an industry, companies in this industry to give you a range.
Q In picking comparable --
A This is a company that already had a market value in 1988 so --
Q Right.
A -- it is before the acquisition.
Q Yes.
A So we can assume that this number is already in there.
Q Now would your EP ratio be relevant to this?
A In what way?
Q Well, wouldn't that be the cost of capital and isn't the discount rate --
A I might use it that way but I would want to look at other ones as well.

Page 172

Q And if you were looking at comparable institutions what ratio would you be looking at with respect to them to figure out the discount rate for Carteret?
A I would probably take a peer group of S&L's that I thought were comparable to them and I would see what their capital ratios were and their PE ratios and I would come up with some sort of a judgment as to what an appropriate rate would be for Carteret taking into account how the market was valuing others.
Q Right.
A It may be that the market already values it where it should, if it doesn't, then we, you know, I have a disagreement in what that number would be with the rest of the market in which case I might choose to make an investment or sell it short. If I were such an investor, I could do that, but.
Q In selecting a peer group what would be the most important criteria, would you be looking at size or geography?
A Those would be important factors.
Q And would you be trying to have as many, I mean, you could fine-tune the number of criteria saying well, it has to be a New Jersey

Page 173

thrift that has $5 billion in assets that's --
A It doesn't have to be a New Jersey thrift, it has to be probably some thrift, a thrift that don't have distinguishing disqualifiers for geographic composition of the mortgage portfolio they're exposed to. For example, there was a time when Texas thrifts had a very high rate of mortgage foreclosures which was not shared by New England thrifts, so I'd want to make sure I had that accounted for that difference, if there was such a difference. But I'd also look for companies that were already public so I had, you know, market information as to what these values would be and they would have much better disclosure because they're public companies than they would if they were not. It's very hard to be able to determine what a mutual savings and loan in California would look like as compared to Carteret at the time, so I'd want to be sure that the peer group had comparable kinds of investment opportunities. So if I was trying to make a judgment to invest in the S&L industry in this particular quarter of it, this particular size bracket, what would I consider to be the likely candidates, that would be how I would select the peer group.

Page 174

Q And in terms of size what would be, what size thrifts would you consider peers of Carteret?
A Well, when we did this study in the back we did that.
Q Is that 2 billion of assets?
A Yeah, something like that.
As we looked before Table 1 was offering thrifts at least 20 million which excludes, basically, it's smaller enterprises, and then we go to other comparisons in which the total assets are over 2 billion but I would eliminate those which were over 50 billion or something like that.
Q Okay.
A I'd want to have some approximate size parameters that were the same.
Q Now, do you consider the institutions that are in Table 1 of Exhibit 4 to be peers of Carteret?
A Well, they begin as peers in the sense that except for size, you know, they appear to be seeking capital about that time, they're in the same industry, they're more or less regulated the same way, but as I said in the report we eliminated some of them because they were too big and better

Page 175

capitalized in various ways. This is the one about -- which one -- Table 1 of Exhibit 3.
Q Right.
A Sorry, Exhibit 4.
Q Yeah.
A We eliminated for the most part the larger ones in trying to judge how much capital we thought they might raise.
Q But is it fair to consider these institutions peers of Carteret?
A I would assume so.
Q Okay. Now --
A You might narrow it further if you're going to try to pick which of those to invest in, but this is a start because it gives you information about who could finance.
But then we have -- we had a couple of other cuts at it if we also use different criteria for judging between them in terms of their capital adequacy, in terms of their operational performance and so forth.
Q Well, it seems like in some of these you've included a lot of thrifts and then you look at the ratios and then in others you have a smaller subset and I just didn't know if you thought one was

Page 176

a better cut at peers than another.
A I think Table 1 is a better cut at peers. Table 4 -- sorry. Table 3 and I think Table 2 include -- let me take a look at this, I don't want to get off track.
The Table 1 would be a better peer group, the others go up to 2 billion.
Q Okay.
A And that's, you know, the larger number of banks appear in that table. But, again, you know, we're looking at peers who are available to give us information about themselves.
Q Right. Now, do you have an opinion as to what the correct discount rate for an investor looking to infuse equity capital into Carteret would have been in 1989?
A I think I have a footnote in my report someplace that refers to discussions by investment bankers who were seeking to raise private equity fund to invest in the restructured S&L's at that time, maybe a little earlier than 1989, I don't remember exactly when that period was in which they were looking for returns of 20, 25 percent for the investors.
Q Do you think that's about the right

Page 177

number?
A That was, I do.
Q Okay.
THE WITNESS: Do you know that footnote?
MS. GRONER: No, but why don't you just take a moment to find it so that the record will be clear.
A (Complies.)
MR. THOMPSON: I think it's --
MS. GRONER: Sixty-two --
MR. THOMPSON: -- 62 --
MS. GRONER: -- I think.
MR. THOMPSON: -- on page 30.
MS. GRONER: We all found it at the same time.
A Yes, that's the one.
Q And in your opinion would those same rates of return had been required in 1992 by a privity equity investor?
A Yes.
Q Do you have an opinion as to when in the absence of a breach of contract Carteret would have been seized by the OTS?
A I don't know exactly why they get

Page 178

seized when they do get seized, I'm not sure anybody really knows, somebody makes a judgment that we've waited long enough for them to try to turn things around and so let's do it, and it's made by a government committee of some kind so it's real hard to be sure how that is done. But the condition of the bank, certainly after the second or those two big years of writeoffs, was very fragile, very delicate and there was a general consensus that capital had to be raised, which it was not. So whether it was but-for or not, it needed capital, and it needed a lot of capital, and the only place it could get it at that time was from these private equity investors who were not prepared to pay more than about $22 million for it, and they would want at least 90 percent of the stock, so it would be entirely different kinds of capital raising than they had thought about before. And if they had raised it, I'm sure that they would not have been seized, but they didn't raise it. So whether the timing of when this was done was appropriate or not is not something I have any way of judging.

Q Okay. Would there have been any harm to the system to allowing Carteret to operate for another three months?

Page 179

A It's hard for me to answer that, I don't know exactly what they considered harm to be, but it could have got worse, that may be something they were worried about, and the insurance bill could have been greater. I'm sure reasonable people might have disagreed about these issues but I wasn't aware of the discussions. I've never been a regulator so I'm not sure how they would do that.

Q Do you have an opinion on whether -- well, let me ask it this way: Are you aware that there was an injunction entered in this case?

A Yes.

Q Do you have an opinion as to whether that's in any way relevant to damages analysis?

A I would say that to me the fact is that they were allowed to -- the injunction allowed them to ignore FIRREA.

Q From February of '91 until?

A Until they got, when they got the injunction until they fell out of capital compliance on the pre-FIRREA basis which was by the end of '91 I think.

Q And the injunction was taken away from them?

A I believe so, but it was in place for

Page 180

several months, was it not, six months or so?

Q Yes. Well, actually it was in place, I believe from February of '91 there was an oral argument in the Third Circuit Court of Appeals which Ken Starr argued in December of 1991 and then the ruling I believe came down in May of '92. But, I mean, a prudent manager would try to assess the likelihood that they were going to be able to keep that injunction, right?

A I guess.

Q Yeah. Okay. Do you have an opinion as to how likely it was that Carteret as a matter of law was going to be able to keep that injunction?

A I don't have an opinion about a matter of law.

Q Okay. Now --

A I just might add the thought that during the time the injunction was on it was, it was they were living in a but-for time.

Q Provided management was acting as though -- was relying on it as opposed to thinking Ken Starr's going to get this thing reversed in a New York minute?

A Yes. Yes. Providing all of those things.

Page 181

Q Right.

A But they were effectively allowed to ignore the rule, the pre- or the post-FIRREA capital requirements for a time during which they might have made an effort to shore up the balance sheet.

Q But wasn't it too late by '91? By the time they got the injunction in February of '91, wasn't it too late?

A Well, I believe it was, it was too late to raise capital from the public market, I believe that, as it turned out, it was probably too late to raise it from the private market as well. Conceivably there may have been some other private equity solution to the problem but I believe they canvassed the market rather thoroughly and got everybody who might make an offer to do so but those people found out, they were uncomfortable with what they found out so they backed away, which would suggest that the effort was too late.

Q Okay. You state in Footnote 9 of your report --

A Sixty-two to nine?

Q Sorry. On page 7.

A (Complies.)

Q The first sentence, quote, The thrift

Page 182

industry was almost certain to revive at some point after the weaker players had been taken over or restructured. By "weaker players" what are you talking about?
A They were the ones most likely to be seized.
Q All right. So now turning to Paragraph 17 you say in the first sentence, quote, Some regulators recognized the coming storm as passbook deposit rates began to sore in the late 1970s. What's your basis for that statement?
A I believe that that is a sense of the situation that I received from discussing it with Professor White who was on the scene and from a certain amount of anecdotal reports that were available. I met or I think I even watched someone on television tell me that the regulators who were called on to television to explain that it wasn't our fault, we saw it coming, but what could we do, so that would be the source of my information for that statement.
Q In the second sentence you say, "However, taking action to avert the crisis was difficult in part because S&L's had existed for many years only to take local deposits and to provide

Page 183

local mortgage financing and Congress was unwilling to allow things to be changed very much." What could have been done to avert the crisis?
A Well, you could change regulatory regime to require mismatching to come to an end. It wouldn't happen overnight but it could happen in due period, indeed it did, but it needed to be acted on more quickly than it was. And there probably could have been some effort to reduce growth or, you know, sell off some assets to create cash to have available for the difficulties. And there could have been ways to provide for more interest rate swaps and other kinds of conversion functions to take place that were just beginning to develop at that time, but the regulators were not drivers of change during this period, they were, change was happening and they were responding to it, as I have said before, somewhat slowly.
Q Turning to Paragraph 18 you say in the first sentence, "Regulators did what they could with the resources available to them." What period of time are you talking about?
A The eighties.
Q And --
A Particularly the beginning of the

Page 184

eighties.
Q And how did these resource constraints affect regulatory behavior that it encouraged the regulators to try to extend the crisis and let thrifts try to grow out of?
A I think it did that but, you know, the limited resources were a low budget, not enough people and a very deep concern that the whole thing was turning into a big problem and we don't have enough capital in the FSLIC to be able to deal with it. So given that, you know, what do we do, we do the best we can, and that's why I refer to stretching it out or trying to resolve it on piecemeal basis so as to keep it from falling apart.
Q Why was -- you refer to supervisory goodwill as an incentive, why was it an incentive?
A Well, it was an incentive in the sense that they counted it as capital, it didn't have to be replaced by cash capital in determining capital adequacy for the thing, and because the goodwill was going to be allowed to be amortized over 40 years, which was the accounting provision given to goodwill in mergers and acquisitions. And they had at the same time taken on loans which were recorded at a discount, so they knew they were getting a cash flow

Page 185

advantage -- a non-cash advantage in the sense that they would have a accretion that was greater than the amount of devaluation of goodwill.
Q Was that --
A The amortization of goodwill was less than the amount of accretion which gave them a plus number in their earnings, even though it wasn't cash, and it looked like earnings to everybody else so this would be a way of saying you get an earnings pickup by doing the deal with us this way and you get credit for real capital from something that isn't real.
Q So did the accretion represent cash flow or was it purely --
A No, it was not cash flow, it was an amortization of goodwill and accretion is the amount of the discount that you take back into income every year that goes by until the loan is paid off.
Q Okay. Now --
A It was a nifty trick. It made a big difference in Carteret's case for several years, but then it ran out, it began to turn around about the time that Ambase acquired them I believe.
Q If the breached hadn't occurred, do you think things would have worked out for Carteret

Page 186

in the sense of, if it had been allowed to make it through the early nineties, then by the mid to late nineties the regulatory vision of 1982 would have actually been vindicated?
A Well, to do that they'd have to survive what is effectively a virtual state of insolvency which they found themselves in by the end of 1991, it had nothing to do with goodwill, simply the fact that a huge amount of loan writeoffs submerged the capital.
Q Well, weren't they in a virtual state of insolvency in '83, '84 and 85?
A Yes, but they weren't having to write off loan losses, they were in a -- they were in a paper ship but they weren't sinking.
Q But they, I mean, in some ways they were, weren't they in a better position in, you know, even at the end of '91 they didn't have as big a tangible hole as they did in '82, did they?
A Not in terms of tangible capital but they had a huge hole in terms of income. Their earnings were big losses and that was depleting what capital they had very fast. So if you have a choice between being under-capitalized and not having losses and being better capitalized but having huge

Page 187

losses, you'll take the former.
Q Okay. So you don't think the supervisory goodwill would have worked out?
A I don't think that supervisory goodwill had very much to do with the ultimate insolvency once the loan losses started to occur, but it made it worse because they had less capital than the amount that the regulators might have thought they did have.
Q I mean, I guess, wasn't the whole point of these transactions was, Barton and Delray are insolvent, we need to give the acquirer time to generate enough earnings, 40 years to work this problem out, it's a huge problem and, you know, if --
A It might have been a reasonable thing to do from the standpoint of the regulators' agenda at the time but that doesn't mean it is going to reduce the probability of insolvency if you have massive losses that are generated by entering the commercial lending business. If they hadn't had those losses from the commercial lending business, things would be very different.
Q But I guess I'm really not understanding why they were, if they had -- I mean,

Page 188

let's just look at it, it's Exhibit 3, I think.
And you can see that in 1991, the end of '91, even after all the bad loans had been written off and the pain endured, they had negative tangible net worth of $47 million, but at the end of 1982 they had negative $212 million, and I guess my question is: Why --
A Why didn't Kohlberg invest?
Q Kohlberg probably wishes he did invest, doesn't he, given that the guys who did invest made a lot of money?
A Well, did they, did anybody make any money on Carteret?
Q Well, Carteret was shut down and, you know, liquidated --
A So nobody made any money on that and what he was afraid of was that it would be shut down after he put his money in. Why would that happen? Even though they would then be satisfactorily capitalized because there were still loan loss problems that hadn't yet surfaced.
Q Was that the main impediment to raising capital the loan loss, the uncertainty?
A I believe it was.
Q Okay.

Page 189

A Because after you look at the two prior years and the amount of loan loss writeoffs and the experience they had with their commercial lending portfolio, which is still at half, you wonder whether they've got everything under control or not.
Q But haven't things stabilized for Carteret?
A They appear to be more stabilized but there's some doubt about it.
Q Well, there's always some doubt, isn't there?
A Well, but these are very sophisticated investors who weren't convinced. They chose to back away rather than to accept that it was sufficiently turned around. They didn't believe so, enough to put their money up. It happened twice. There's not much more evidence than that that you need to get a feeling that the concern was is that there was a lot -- there were more problems out here which could endanger their investment.
Q But from a regulatory perspective why would the regulators have allowed the institution and been comfortable with it operating in 1982 with negative net tangible capital of $212 million and

Page 190

then it's basically improved $180 million over the first 10 years of what was supposed to be a 40-year deal and so why lower the boom then?
A I don't know.
Q But does it make sense, I mean you as a financial economist, does this make sense?
A But I'm not a regulator, I don't know why regulators chose to do that. I believe that they had essentially said I think we've had enough of this, you know, we're going to either pay more out later or, you know, maybe we could have got through, but if you don't get more capital, then this is an insolvent situation. We gave them a chance they would say to raise more capital but they didn't get it.
Q Well, they raised 180 million.
A When?
Q Look at it, they were at 212 --
A No, no, no, they raised that money in the eighties, I'm talking about in the time when they chose to shut them down they had said, did they not, here's a capital plan, go out and raise the capital, you don't raise it, they shut you down. Now is that illogical from their point of view, probably not.

Page 191

Q But wasn't this deal working just the way it was supposed to in the sense if you start with negative 212 --
A I believe that the plan would have been not to have the minus 43.
Q Well, at the end of the 40 years it wasn't supposed to be minus --
A Well, who knows 40 years, 40 years is a great concession, nothing was going to last for 40 years. I'm simply using merger accounting to give them the extra benefit of a lower amortization rate and I believe that they didn't have 40-year mortgages probably, they all could be gone by then, that was just -- that was a concession on accounting practices that they allowed them to do, which was reversed later on.
Q To 25 years?
A Yes.
Q Yes.
A But what I'm saying, they probably didn't think it should turn out to be minus 47 million in 1991. And they probably figured that, if you were a regulator you'd say, we gave them a chance to go into other businesses to try to work their way out of this thing, and we gave them a

Page 192

chance to raise other capital, we gave them a chance to merge with somebody who might be useful to them, none of these things worked, you know, here we are all these years later and they -- and we're back in jeopardy again, so this time we think it's time to close it off.
I assume that regulators are like everybody else, people disagree as to whether we should do it today or tomorrow and they ultimately went through their process which they do.
MR. THOMPSON: We've kind of got into a convenient stopping point, I'm happy to keep going, but --
THE WITNESS: All right, another 25 minutes and then we get to stop?
MS. GRONER: No, he's proposing to stop for the evening now.
THE WITNESS: Oh --
MR. THOMPSON: If that's okay.
THE WITNESS: -- stop for the evening?
MR. THOMPSON: Yes.
THE WITNESS: That would be great.
(Whereupon, off the record 5:35 p.m., to be continued.)

Page 193

SIGNATURE PAGE

______________________
SIGNATURE OF WITNESS

SUBSCRIBED AND SWORN TO before me this ________ d
________________, 2007.

______________________
NOTARY PUBLIC

My Commission Expires:

UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and )
CARTERET BANCORP, INC., )
)
Plaintiffs, ) Case No. 93-531
)
and )
)
FEDERAL DEPOSIT INSURANCE )
CORPORATION, )
)
Plaintiff- )
Intervenor, )
)
vs. )
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )
-----------------------------*

Wednesday, October 17, 2007
New York, New York
Time: 8:04 a.m.
Day 2, Volume 2
Pages 195-356

Day 2, Volume 2 of the continued deposition of PROFESSOR ROY C. SMITH, taken by Plaintiffs, pursuant to Notice, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, on Wednesday, October 17, 2007 at 8:04 a.m. before Josephine H. Fassett, a Certified Shorthand Reporter and Notary Public of the State of New York.

Page 208

one with the capital ratios on it, there's a line item, it's the second row, Price/EPS?
A Yes, that's the price range ratio.
Q Of --
A Risk divided by earnings per share.
Q Okay. And so this shows us the range for each year?
A Yes.
Q Okay. All right. So -- in fact now let's look at the net income for 1985.
A Excuse me, you're wearing me out.
Q It's so early.
So 1985 there's net income of $25.2 million; is that right?
A Yes.
Q Okay. And if you were an investor in 1985 might you think that those earnings and this prospect of future earnings in Carteret would have had value?
A Yes, I might have thought that.
Q Okay. And that would be reasonable, wouldn't it, in 1985?
A It would be, although you can see that that means that the good news is it's recovered from seven and a half million the year before, but the

Page 209

bad news is that even so it's well behind the year before that which was 35 million.
Q Right.
A So it doesn't exactly tell me that the bank is returned to some sort of predictable growth pattern that could be sustained over any period of time.
Q It's hard to know?
A It would be hard to know.
Q Okay. Now, but in 1985 if you were an investor isn't it true to say that -- well, if we look at the tangible net worth on the prior page it was negative $55.5 million; is that right?
A That's what it says, yes.
Q Okay. And so this was an institution that was entirely dependent upon supervisory goodwill in order to be able to stay in business to continue to generate positive cash flow; is that right?
A No, not exactly.
Q Okay. Tell me where I went wrong.
A It is under-capitalized to the extent that we see here, but at the time the capital base wasn't under strain because of operating difficulties, it was, operating difficulties were

Page 210

beginning to contribute to its capital base, and in the absence of any claim on the capital, there could be assumed that these guys were swimming well while holding their breath.
Q But the point is that without supervisory goodwill, if Congress had passed a law on December 31st, 1985 saying supervisory goodwill no longer counts, then Carteret would have been -- and there's a tangible capital requirement --
A Well, Carteret would have been in business, it would have been a going-concern in business but it would have been in default of its regulatory requirements, which is not a good thing to be in. It would therefore have to address those defaults. It would have to remedy that issue if it's going to continue to have a license to do that business.
Q And that's my point. Isn't the supervisory goodwill really akin in 1985 to a license to continue to do business, notwithstanding the fact that there are capital requirements that without the goodwill Carteret would not have met?
A Yes.
Q Okay. Now --
A To the extent that we are assuming

Page 211

that the regulators would, you know, we're assuming something about what the regulators would do if you were out of compliance.
Q Right.
A They don't always shut you down. It's probably a case-by-case workout as to how they decide to do it. They may say raise some more capital, we'll give you time, do this, merge with them, there are a variety of different things that might be imposed on the bank by the regulators, but the essential point is, if you're going to be in this business, it's a regulated business, you have to comply with the regulations or you won't be in the business.
Q And do you -- I mean, in 1985, if on December 31st, 1985 supervisory goodwill had been eliminated as a component of regulatory capital and, if I'm right, that the requirement was essentially 3 percent of liabilities, then that would mean a capital requirement of about 150 million and Carteret would have, without the goodwill, what, about zero?
A Well, they had -- what year are we talking about?
Q December 31st, 1985.

that a statement for throughout the 1980s investors would have known this stuff could be taken away at any moment or is it really more of a 1989 statement about, well, FIRREA's coming down the pike?

A In general investors look through intangibles to find what they think the real capital is, so I believe I said before, intangible capital doesn't have to have no value, it's worth something, depending upon what it is, are you talking about franchise value, are you talking about patents, are you talking about something or other, and there are a great many corporations which have goodwill on their books as a result of acquisitions which are being amortized as you know. Some amount of that is certainly tolerated, some amount of that is understood to be part of the way things go, but to the extent that they are concerned about solvency they're going to eliminate the intangible assets in order to find out what the true capital that is available to support solvency would be. At times when the industry was under great stress this would be more urgently done, in times when it's under less stress it will be less urgently done. So, for example, you asked about 1984 and 1985, 1986, the industry was not under the same degree of stress as



it came to be subsequently and as a result the focus on this issue of do we really count this stuff or not became more intense as they began to concern themselves, these investors, with questions of solvency.

Q And just so the record's clear. In that answer you said "they" --

A Investors.

Q Okay. Good.

A "They" being investors.

Q Yeah, I thought so.

And did investors, do you believe, have an understanding in 1989 that supervisory goodwill could be eliminated from Carteret's regulatory capital?

A Well, I can't speak for all investors or even for what I assumed to be an average view of investors at that time but it would have been reasonable for investors in this industry following it reasonably closely to realize that this regulatory change was in discussion and that the purpose of the regulatory change was to tighten up the reins so as to, as to provide for a more arduous regulatory standard and, therefore, one of the things they might very well have considered to be in



the works would be a change in the accounting practices for supervisory goodwill which most investors might have realized to be rather generous.

Q Now, have you read Professor Calomiris' report?

A I read through it. I'm not familiar with all of it.

Q Okay. Now he talks about the Hyde Amendment and notes that there was a story on the front page of the New York Times about its defeat. Is it fair to say that if a business story makes it to the front page of the New York Times, it's a pretty important story?

A You could make that assumption, although I can't recall the Hyde Amendment.

Q Okay. Well, it was a long time ago. But, you know, the way Professor, assuming Professor Calomiris' account of it is correct that it was an effort by Congressman Hyde to get the supervisory goodwill, the breaching provision pulled out of the bill, and the fact that it was a tie vote so that it didn't, number one, is it fair to assume that if it was a tie vote 17/17 that the outcome was --

A This is on the committee.

Q -- in the committee that the outcome



wouldn't have been crystal clear to investors?

MS. GRONER: Objection. This is beyond the scope of his report and he already said he didn't remember it so now you're testifying.

MR. THOMPSON: Well, he's here to talk about what investors knew on what their view of what Carteret would have been and it's obviously what they knew about FIRREA and when they knew it is relevant. If the Professor says he doesn't know about, you know, any of those subjects, then okay, you know, then that will be something the court takes into account, but. Your objection is noted, I think --

MS. GRONER: His testimony, though, was "I can't recall the Hyde Amendment," so.

MR. THOMPSON: So I'm trying to refresh his recollection rather than, you know --

BY MR. THOMPSON:

Q Professor Calomiris had a long report, so let's just proceed, and let's proceed on the assumption that it was a tie vote, is that the sort of --

Page 232

therefore, you got a capital problem, as evidenced by the ratios in the previous sentence.
Q Now, in Paragraph 29 in the last sentence you say, quote, One of the inducements offered by the FSLIC to get other S&L's to buy the assets of failing S&L's, and then is this non-cash income effect from the accretion of loans, and we talked a little bit about this yesterday, but why would this non-cash income effect be an inducement to a thrift acquirer?
A Essentially it means that if you make this deal, after doing so you will have a positive addition to your earnings that you wouldn't have had otherwise.
Q Okay. But from an investor's perspective --
A The investor has a hard time unbundling this one because it's the result of two different amortization streams and they are buried into the expense accounts of the bank in such a way that it's difficult to know. You can sometimes find enough footnote information or some other capital transactions in the back of the financials, which is what we did to dig this out, but it can be obscured easily, and it looks good.

Page 233

Q Well, would it look good if the investor were able to figure out that this is a non-cash accretion item?
A The investor would probably set that aside as an example of the income of the enterprise.
Q Maybe this is just my caffeine hasn't kicked in.
When you say the investor would set it aside, the investor would ignore --
A The investor is going to invest in the enterprise because the investor believes that the enterprise is in a business, a good business that's going to generate income flow, cash flows from the business it's supposed to be in. If you're a bank, then you're supposed to generate your business, a good business from the banking business.
Now, in addition, every business has a few other things that affect its income stream one way or the other, but those aren't meant to be the principal drivers of the business. You probably would not invest in a banking business in which two-thirds of its income came from lending if the other one-third was doing well but the first two-thirds was not, you would say, well, this isn't a healthy good bank so I'll buy something else.

Page 234

Now, we are making an effort to determine the so-called core business performance by setting aside things that aren't part of it, such as these accounting income flows, so we would set those aside.
We would set aside the gains from the sales of securities as well in order to evaluate how much of what's left is going into the core business of the enterprise.
Q Would you also set aside the losses on sales of assets?
A Yeah.
Q Okay. Now with respect to -- though, a rational investor would basically have ignored this non-cash effect of accretion; is that true?
A Well, they're setting aside from the standpoint of evaluating the main business, they're not saying it's useless, it has some value to the, to the bank in the sense that it has a legitimate accounting flow that, you know, does count, but it counts for technical reasons and not really the reasons you are trying to get at when you evaluate the bank.
Q And it counts for meeting regulatory capital requirements; is that true?

Page 235

A Yes.
Q And so that would be something of value?
A It would.
Q Okay. Have you seen any evidence that Carteret valued the opportunity to have this accretion effect? That Carteret in 1982 thought this was an inducement to buy Barton and Delray.
A I'm not familiar with any statement they made to that effect that would give us evidence that they were excited about it.
Q Okay. All right. Now in Paragraph 30 you make reference to the fact in the first sentence that Carteret's equity capital or net worth was just $22 million. Let's flip to your Exhibit 3 just so that I can see where this number comes from.
A (Complies.)
Q Okay. So I think I see it, it's maybe in the --
A It's in the Federal Savings Association -- sorry, beg your pardon.
It's in the year before -- I'm sorry.
It's in the column entitled 1982 under the general label of Federal Savings Association. After the conversion from the Mutual Association to

closer to 5 percent.
Q Now in your table of ratios or your excess capital you seem --
A Well, excess capital again is just a number, it's just provided to regulators by subtracting the required capital from what they call capital.
Q Sure. I understand. But there's no number for 1987, why is that?
A I don't think they provided it.
Q But you put all the information you could find in this?
A Yes.
Q Okay.
A I couldn't find it for them, I don't know why, but I couldn't find it.
MR. THOMPSON: Off the record for a moment.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q Now, you note that Carteret, you note this in Paragraph 31 that Carteret added $648 million of commercial real estate loans, corporate loans, second mortgage loans through 1987; is that



right?
A Yes.
Q And so over a five-year period that's about $130 million a year of new loans?
A (Nods.)
Q Is that imprudent for that level of lending in new areas for a $5 billion institution?
A It would appear the quantity per se is not imprudent.
Q In your opinion were the underwriting, the loan underwriting standards that Carteret had improper?
A I only can judge those standards by the results which is that more than half of those 648 million seem to be troubled problem loans by the end of the period and that is an unusually high rate, problem loan rate.
Q In a well-functioning thrift who would have responsibility for ensuring that the underwriting standards were effective and were followed?
A Well, it begins with the CEO but it's delegated by him to somebody who runs the corporate lending business.
Q Would there be a credit committee?



A Should be.
Q What does a credit committee do?
A I have never experienced a credit committee at an S&L, so I can only assume that they do what they do elsewhere which is to examine and approve the credits based on an analysis which their people have made of the credit risk and other factors to be thought about before giving it any money.
Q And so if loans go bad ultimately it's the credit committee should have stopped it if it was foreseeable?
A The credit committee is not in the business of trying to create bad loans, so --
Q Right.
A -- bad loans is a mark against them. There are always going to be a few but there shouldn't be an overwhelming amount of them.
Q Loan documentation, how important is that for credit standards and quality?
A Well, credit committees decide the initial decision to invest in a loan but subsequently it's necessary to monitor the loan and they do that through documentation and other procedures which are set out to be sure that they



know what's going on at the company that they've loaned to so as to be able to exercise their rights in the loan or to intervene as appropriate to be able to protect themselves against deterioration in the credit quality. So it's a complicated process but it requires good loan documentation and further follow-up.
Q Now you say that Carteret was engaged in this activity in an effort to achieve higher lending spreads and to capture the asset liability matching advantages of shorter maturity loans at shorter interest rates, so was this an effort to reduce interest rate risk then?
A It did that, but whether this was the purpose of it or not it's hard to know, but it certainly did that.
Q But you say in an effort to so --
A It appears to be an effort to do.
Q Now when you're looking at the relative maturity of different loans, would you look at the stated maturity or the expected maturity?
A Well, you look at both. Some portion of the loan is going to be paid off at the end of it.
Q Well, like in the 1980s time you're

Page 276

made all those changes. This is something Kohlberg would have been thinking about, it's not something that an ordinary investor would think about.
Q Well now let's look for December of, or 1992, these numbers in your chart, Exhibit 3, Table 1, page 1 of 3 are year-end numbers?
A Yes.
Q Okay. And for 1992 are these December 4th, '92 numbers? You know, because Carteret was seized on December 4th, '92.
A I guess that's what they are.
Q Okay. So in terms of what the enterprise value would be of Carteret -- hold on one second, please.
It's safe to assume that the value of Ambase by the end of '92 reflected the stock market capitalization of Carteret; is that right?
A Yes.
Q Okay. So if we were looking at the enterprise value of Carteret in December of 1992, we'd need to know, number one, stock market capitalization. Let's assume that it's approximately $25 million.
A Okay.
Q Does that sound about right to you?

Page 277

A It was.
Q Okay.
A Well, maybe less than that but it was that the year before.
Q Okay.
A I would say probably you would have to assume that the best signature of, or best indication of a value would be at the time of the Kohlberg offer which was withdrawn, in which case the value of the equity was 22 million.
Q Okay. So let's use 22 million then.
And was there any preferred stock outstanding then?
A I suppose -- well, it looks like it wasn't.
MS. GRONER: I have a clarification.
A The preferred stock was redeemed at the time of the acquisition.
MS. GRONER: One question. When you use the word "then," are you talking about the time of the Kohlberg offer or 1992?
MR. THOMPSON: Well, I --
THE WITNESS: The Kohlberg offer was in '92, so sometime in '92.

Page 278

BY MR. THOMPSON:
Q Okay. Is it reasonable to assume that the stock market capitalization of Carteret at year-end '92 was -- or why don't we say December 30th, '92 before the seizure was $22 million?
A Yes.
Q Okay. Now, no preferred stock, and then what debt would be added?
A 5.3 billion.
Q Okay. And so if a private equity investor were coming to you for advice as to what price they should pay for Carteret and they were discussing the concept of enterprise value, will you be looking to see whether Carteret could generate sufficient cash flows to service this debt, number one, and therefore -- and increase capital, what's tangible capital?
A Well, those would be elements of a discussion we would have, yes.
Q Would those be the key elements?
A Depends. We would probably begin by saying what is the enterprise value of the S&L community peer group in terms of a multiple of the cash flow, how are other S&L's valued according to

Page 279

this at the moment.
Q Have you done that analysis?
A I have not.
Q Okay. And so you'd look at multiples to cash flow?
A Cash flow multiples not price-to-earnings multiples, so it's the total cash flow times the multiple equals an enterprise value.
Q So, just so that I understand this, sorry, but for the peers would you go to their statement of cash flows or how would you figure out? You'd identify the peers.
A You would have to agree to a particular way of calculating the cash flow for this purpose, so there may be some things you would exclude or add back.
Q Do you have an opinion on things from a statement of cash flows that should be excluded or included?
A Well, to some degree they are case by case because there are things that you know the cash won't be around or you'll use it for some other purpose or there was excess compensation which you will adjust for because you won't pay excess compensation in the future. You have a variety of

Page 280

things that you could adjust it for but you're making an effort to find the real cash flow that is available to service the business.
Q Do you have an opinion as to what peers -- excuse me -- what the peers were of Carteret at the end of 1992 that a private equity investor should have been looking at to look at comparable cash flow multiples?
A I would suggest that they would probably look at the population of peer of S&L's in the size range of approximately two to five, two to ten billion dollars.
Q Okay.
A And they may exclude some even so. But understanding that the private equity investor is going to make an investment in a distressed situation, knowing it's a distressed situation, he will probably look at other distressed or poorly performing ones to see what they're like at the time and he would prefer to pick those that have some sort of public market information as opposed to privately held ones which would be hard to get information. They would get some indication of the value to be paid. Then there is a question of how do we deal with the question of servicing the debt.

Page 281

Do we refinance the debt? Can it be refinanced? Can we engage in financial engineering practices that might reduce the burden of the debt service? Those sort of things.
Q Now, with respect to the multiples to cash flow, so how does that work, if the peers have a multiple of cash flow of 10 to 1 hypothetically, then are you looking to see if --
A Well, it gives you some idea as to what a sort of sensible market value for an enterprise of this type would be.
Q Okay.
A Why would you want to pay 30 times if there was a market at 10.
Q Okay. All right. Now, in terms of Carteret, do you have an opinion as to whether any of its debt as of the end of 1992 could have been refinanced in a way that would have been sensible for a private equity investor?
A It would be a difficulty to determine this with a starting point in which more than or almost half of the total liabilities was in the form of loans from the FLH -- from Federal Home Loan Bank Board.
Q Well, those could be repaid?

Page 282

A It could be, but one would have to negotiate it.
Q What do you mean negotiate it, it's right in the contract, you can repay it?
A But I want to know to what extent can I refinance debt to get this bank on a more normal basis so that I'm not either paying a penalty for this or being subject to other burdens. The average S&L does not choose to have half of its funding from the lender of last resort, so I would pick some better way if I could, but it would have to be negotiated, it's not something I can just do by myself.
Q That's, and I don't mean to be difficult, but that's what I'm not understanding in the sense of, if you could raise the debt, if you could raise $2.6 billion from some other source, couldn't Carteret have just showed up at the Federal Home Loan Bank window and said here's your money back?
A But Carteret couldn't because Carteret had no capital, Carteret was basically in jail, I am going to take it out of jail with my $200 million of equity and I'm going to have a different enterprise and I have to have some expectation of being able to

Page 283

change things so as to make it better to justify my doing this. If I find that I can't do anything that makes it any better, maybe I'm not interested in making the investment.
Q Well, that's what we're exploring, and so the question is: With respect to this 2.635 billion dollars of Federal Home Loan advances, do you have an opinion as to whether Carteret could have refinanced that debt?
A I have an opinion that would suggest that they could have probably negotiated with them to come up with something, something that they would regard as preferable to what they're doing.
Q Something that -- who's the "they," is that Carteret?
A That a private equity investor could have engaged in a negotiation that would have anticipated refinancing that debt and getting the thing back to normal, including asking for incentives.
Q Right. And so what would the negotiation have looked like between a private equity investor and the Federal Home Loan Bank?
A I don't know.
Q Okay.

Page 300

another English company and Goldman Sachs was retained to find alternatives, and among those alternatives was the consideration of doing a leveraged buyout of the company, or a portion of it, so we were very actively engaged in that.
Q And when was that?
A I think that was probably about 1984 when this period began.
Q And Tillig, what line --
A Tilling, T-i-l-l-i-n-g, it's a conglomerate.
Q Okay. Did they have any banking exposure?
A No.
Q Any S&L exposure?
A No.
Q Okay. What ended up happening with Tilling?
A They were -- the buyer had to raise the price considerably because of fear that we would find such a higher priced buyer, which we didn't do.
Q So Tilling was pleased with --
A They got a higher price. They weren't pleased to be taken over, they thought they lost, but their shareholders got a much better price.

Page 301

Q Okay. Any other types of or instances in which you --
A Well, I cite that as an example because this was happening in the period from 1984 to 1990 regularly and so except for very large transactions, it was almost always the need to calculate some alternative value that could be put on the table by a leveraged buyout operator using an enterprise value sort of approach. So it became routine to do these analyses almost all the time. Generally speaking, a subordinate to mine was performing these analyses but I was familiar with what they were doing which was standard procedure.
Q And when you say very large do you mean more than that $30 billion?
A In those days 30 billion was a very large deal, but yes. Remember, RJR-Nabisco, which was then the largest deal, was 30, so you can say anything above about 5 billion was generally not worrying about a leveraged buyout alternative, though, RJR did, so there were some that managed to creep up there by the end of that period.
Q Okay.
A I wrote a book on this subject too, by the way.

Page 302

Q Oh, which book is that?
A This is one called Money Wars which was about the leveraged buyout experience in the 1980s.
Q Oh, there it is. Do you talk about banks at all in that?
A Well, banks, as I have said, they're not much of a -- they're not frequently or even rarely are they targets for these things because they're already so leveraged, but they are of course providers of capital to those who make leveraged loans for these purposes, so they are discussed in that context.
Q Okay.
A That's not something Carteret did.
Q Why was Carteret as successful in accessing the capital markets in the mid 1980s?
A I think we discussed this earlier. There were I'd say two factors involved.
One is that they had appeared to have survived the interest rate crisis of the earlier years and were heading off to take advantage of the so-called opportunities that were made available to S&L's that were the result of the Garn-St Germain bill in which Carteret announced that it was going

Page 303

to actively pursue.
And second was that the market had put a comparatively low price on the stock leaving room for upside value if they were able to achieve what they were considering to do in that period of time which was relatively benign from the standpoint of the S&L industry.
Q Now, when calculating a risk premium for an investment, does the absolute value of the risk-free rate matter?
A Well, arguably it doesn't, of course in the end you have a number and that number will be largely affected by the absolute value of the risk-free rate.
Q Right, but I'm talking about the risk premium, what's the argument as to why it wouldn't be affected by whether the risk-free rate is 2 percent or 5 percent say?
A I don't know that there should be any reason for it to be different but I'm not as much of an expert on this financial theory stuff as some of the other experts you're familiar with.
Q Well, and I'm not interested in the theory, I'm interested in, you know, the practice as an investment banker. I mean if you're --

Page 316

Q Okay.
A But not necessarily because it was, you know, they needed to pay that high a price. There wasn't any evidence of any other buyer on the scene and the presumption is, the presumption I have made is that they probably could have got it for a lesser price.
Q Do you have an opinion as to how much of a lesser price?
A Well, something between 47 and a half percent and zero, but maybe something in the zone of half of that premium.
Q It would have been, do you think that would have been a better reflection of the value of Carteret?
A Well, I think if I had been a buyer or an advisor in a transaction, I wouldn't want to pay such a high premium for such a low-quality business.
Q Let's say you had been advisor to the seller, and you did that, didn't you, in your --
A I have been advisor to a seller many times.
Q Okay. And were you able to do transactions where you were able to get premiums of this level?

Page 317

A Yes.
Q All right. And were some of those companies not triple A rated?
A Yes.
Q And how would you generally go about trying to get the premiums up when you were advising companies who were selling?
A Well, I would probably make an argument as to why I thought it was a very good company and very good business and make the most of what I had but I would also try to explain that based on a peer group study and other acquisitions that have occurred that somebody else would come along and buy at such-and-such a price, so we'd probably try to establish some sort of, you know, value that might be paid by other people if we set up an auction system, so if you want me to set up an auction, sir, I will, but you can avoid that by paying the price I suggest.
Q And isn't that sometimes what bidders do too, they come out with a big number out of the box to try to avoid an auction?
A Yes, we call that a preemptive bid.
Q Did you ever advise clients who made preemptive bids?

Page 318

A Yes.
Q Was that strategy sometimes sound?
A Sometimes, but it was very often it endangered the whole acquisition in the sense that it would make it difficult to get a return on the investment sufficient to satisfy the shareholders. You risk paying too much when you do it that way.
Q Right. Do you recall what sort of premium BAT paid for Farmers?
A I don't but it wasn't this high.
Q Do you recall --
A That was a healthy company much in demand, Farmers was.
Q Now, do you recall who was representing Carteret in this M&A transaction?
A Which investment bank?
Q Yeah.
A I do not.
Q Okay. Did you look at the materials provided by Salomon, that Salomon Brothers prepared?
A I believe I reviewed them briefly.
Q Okay. Salomon Brothers is a well-respected investment bank, at least it was in '87, right?
A Yes.

Page 319

Q Okay. And do you have any reason to doubt the analysis that Salomon Brothers put together?
A It was a sales pitch so I would certainly be skeptical of a sales pitch.
Q But much like those types of sales pitches you put together at Goldman?
A Yes.
Q Okay.
A But if you ask me as a neutral observer would I suspect it, I would, I would naturally want to see for myself.
Q Caveat emptor?
A Exactly.
Q All right. But the analytics and the numbers that are in the Salomon report are presumptively correct?
A I can't recall but I'd give them the benefit of the doubt.
Q Yeah. They're a reputable firm?
A Yeah.
Q They were.
Was 9.45 times fully diluted earnings, 1987 earnings a reasonable purchase price?
A Well, as I have explained, I thought

Page 320

it was a bit on the high side, and they could have done it for better than that, and it was a big premium over what the stock was already being evaluated at in the market, which is to say, if you're going to acquire this company, you pay the premium in order for the right to have control of it. What you're going to do with the control, once you have it, is going to have to make an economic proposition different enough from what you had going on before so as to repay you for the premium and then start to add value to your investment, and it's very hard to do that if you're paying half as much for the stock as you should.
Q Well, now, you talk about the multiple to 1987 earnings, normally wouldn't you look at a multiple to the next year's estimated earnings?
A If you can get that information.
Q Okay. Do you have an opinion in 1987 what the 1988 estimated earnings were?
A No.
Q Do you have an opinion in 1988 as to what the 1989 estimated earnings were?
A No.
Q Do you have an opinion in 1989 as to what the estimated 1990 earnings were?

Page 321

A No.
Q Okay. Now, do you know what Carteret's peers were trading for in 1987?
A I think we can -- I do not know because I didn't do such a study.
Q Okay.
A What I do know is that Carteret was trading at 6.4 times earnings in the market without a control premium.
Q Okay.
A So the difference between 6.4 and 9.4 is the control premium.
Q Right.
A The question is: What are you going to do with it that's going to make you earn back the control premium? This is a company that you cannot improve by leverage, it's already leveraged, all you could do is make it do what it does better.
Q Now you talk about fully diluted earnings, why is that?
A Well, you want to know effective stock options and other things that will be converted to dilute the existing shareholders before you, before you calculate that.
Q Were there options outstanding for

Page 322

Carteret do you know?
A I presume so.
Q How will you take those options into account?
A Well, you would just assume they were exercised.
Q Okay. Now Paragraph 40 talks about the stock market crash in October of 1987, was that crash driven in large part by portfolio insurance?
A I don't think so, portfolio insurance was there, it was a factor in the market practice at the time and it didn't work.
Q But didn't it drive down the prices on October 19th?
A There were some elements that were driving down the prices which were largely related to the fact that the futures market reached its limits and closed leaving the cash market unhedgable and that caused imbalances which were greatly exaggerated because of the panic.
Q Do you think this selling on October 19th, 1987 was overdone?
A I don't know how I would be able to answer that.
Q Well, in other words, sometimes you

Page 323

look at the market and you think it's oversold and it's a good entry point and I'm just asking you back then did you think, you know, on October 20th, 1987 this could be a good entry point?
A After, after the fact did it look like a good time to buy securities?
Q Yeah, at that time.
A Yes, it could have been, many people did buy securities then.
Q Did you?
A I did not. I had no money, I was still part of the --
Q That's quite an irony.
A And I just lost a lot the day before.
Q Right. But it would have been a good time to buy Carteret October 20th, 1987?
A It might have been.
Q Well, with the benefit of hindsight we know it was.
A It was, yes.
Q Okay. If an investor had come to you on October 20th, 1987 and said "Hey, I'd like to buy some of this Carteret," would you have told him, you know, for you, you wouldn't want to have an undo amount of your portfolio in any one company but it's

Page 340

clearly material, clearly adverse, clearly a change.
Q Doesn't it have to be an unanticipated change?
A It has to be demonstrated that they expected the thing to go down by about that amount which is unlikely given what they paid for it.
Q What is the -- based on your experience as an investment banker do you have a view as to, you know, what would be material and what wouldn't and this is a 68 percent decline but, you know, would a 50 percent decline be material?
A As you know as a litigator materiality is always disputed, but there are some rule of thumb conventions that would probably suggest it somewhere between 5 and 10 percent would be tolerable on a change and a change greater than that might questionably become material.
Q Okay. Now at the time that Ambase acquired Carteret, Ambase itself was under-capitalized, correct?
A Apparently so.
Q Now, why would a business that is itself under-capitalized buy another business that is allegedly under-capitalized?
A That's of course a question to be

Page 341

answered by Ambase. But in general --
Q Yeah.
A -- which you're fishing for, I would say because they believed that the business is sufficiently stable and improvable so as to be able to benefit from the leverage that it has. It's a risky business but the platform could be managed and, therefore, the rewards would be seen in a higher return on shareholders' equity.
Q And, in fact, Ambase wanted to acquire Carteret so that it could take capital out of Carteret; isn't that right?
A As it proved to be the case.
Q But that was part of the plan, is that your view?
A I don't know what their plan was but I just know what they did.
Q And that's what they did?
A That's what they did.
Q And they needed that capital?
A Apparently they needed it or wanted it or believed that Carteret was, you know, a useful source of capital.
Q Now, when you talk about Carteret being under-capitalized, you're talking on a

Page 342

tangible basis, right?
A Tangible and in the context that their total amount of capital was still less than probably what it should be without necessarily less than what the regulators wanted it to be. We discussed this before.
Q Yes, sir. Now, there was no tangible requirement, capital requirement in 1988, was there?
A By the regulators?
Q Right.
A No.
Q Okay. And was there any discussion of the possibility of eliminating supervisory goodwill as a component of regulatory capital in 1988?
A I don't know.
Q What --
MR. THOMPSON: Off the record for a moment.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q What due diligence did Ambase perform on Carteret?
A I don't know.
Q What should it have done?

Page 343

A It should have done the kind of due diligence that companies do when they conduct mergers which is to understand the operating business well, to investigate and verify many aspects of the balance sheet, and to know about the loan portfolio in particular, to know about interest rate risk in particular, to know about their operational capability, the kinds of things that they apparently asked Peat Marwick -- was it Peat Marwick? PriceWaterhouse. The auditor whose comment we cited before.
Q That was Peat Marwick.
A They asked them to conduct some due diligence and the report that they provided was part of that due diligence.
Q All right. Now, with respect to the loan portfolio, what, if you had been advising an acquirer of Carteret, how would you have gone about setting up the team to do that due diligence?
A I think what they do is they do samples. They can't inspect every loan because there's too many, and they wouldn't have probably spent as much time sampling the mortgage portfolio. They could probably aggregate that in some way and make judgments as to what they thought the

Page 348

Q Yes.
A -- I would think that was a reasonable amount.
Q Okay. Now, have you ever been involved in situations where an acquirer is not given as much time as they would like to do due diligence?
A It happens all the time with hostile takeover efforts, they are not given any information to speak of because their efforts are being resisted, all they have is publicly-available information and whatever else they may extract from some effort to litigate.
Q Well, that's an instance in which they get no due diligence.
A Well, they get a little bit, and they can do due diligence from the public records and things of this kind, you know, there's a lot of information there if you go through it all.
Q Okay.
A And you can hire experts who understand these things. So you can get a fair amount, particularly from a regulated industry, but you just don't get enough to really know.
Q Okay. Now, have you ever been

Page 349

involved in situations where it wasn't a hostile deal but that the acquirer was not getting as much time as they wanted to do due diligence?
A I can't think of any.
Q Okay.
A If I were advising such a company and they didn't get enough time to do due diligence, I would tell them to threaten to call it off, but the usual practice is to sign some sort of a letter of intent and then wait while the lawyers prepare the definitive contract and during that period conduct as much due diligence as you want. That might take a month or two, depending upon how complicated the deal is. And so in that time most acquirers are able to satisfy their needs.
Bank deals, as you know, take much longer to close because of regulatory permissions that are required, so usually there's plenty of time for due diligence.
Q Longer than a month or two?
A Far longer. This one took a year.
Q And do acquirers typically in the bank context take advantage of having, you know, being able to do due diligence over three or four months?
A I think they do, and not only that,

Page 350

they have to make sure the thing don't deteriorate after they did the due diligence before the time comes to close, what we call bringing down context. We want to be sure that the information we have hasn't change adversely since we got it.
Q Makes sense. All right. You said -- well, actually strike that.
What's the basis for your saying that Ambase should have been aware of Carteret's deteriorating lending position?
A Well, because they closed the deal in August of '88 and they had entered into this arrangement in a year before, and although it may have been contentious while they were renegotiating it, that was over by, you know, before Christmas of '87 I believe, and they had access to information about the calendar year, the fiscal year '87, and the quarterly reports as they came along during which time they could easily see that there was a deterioration in the lending portfolio.
Q Well, let's look at our favorite chart. Where is this reflected?
A That would be reflected in the provision for loan losses as a start. 1988 it goes from -- it goes to 14.1 from 8.4. That would be

Page 351

certainly a material adverse change and you would want to know more about it, but you also see the income, if you want, dropping down, and when you look down and see that the amount of income coming from 50, from a gain of the sale of securities is over 50 million, you have a major distortion in the actual lending business of the company.
And if you turn to page 24 in this report, you'll see this table which it estimates the, you know, the income contribution of lending operations of an aggregation and you see there's a huge shift between '87 and '88 in the pretax income from lending, plus 32 to minus 13 and a half.
Q What basis do you have for allocating two-thirds of the cash operating expenses to lending?
A I think we say in here -- I allocate two-thirds of Carteret's total cash operating expenses to its lending business and to the sourcing of funds to support lending operations including deposit gathering from branches a difference -- bup, bup, bup, bup -- it goes on and talks about that.
Q Yeah, but my question is: Why did you pick two-thirds? If you had picked 50 percent, the analysis would look very different.

UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and CARTERET BANCORP, INC.,
Plaintiffs,

and

FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Intervenor,

vs.

THE UNITED STATES OF AMERICA,
Defendant.

Case No. 93-531

Thursday, October 18, 2007
New York, New York
Time: 1:08 p.m.
Day 3, Volume 3
Pages 357-520

Day 3, Volume 3 of the continued deposition of PROFESSOR ROY C. SMITH, taken by Plaintiffs, pursuant to Notice, held at the offices of Navigant Consulting, 666 Third Avenue, New York, New York, on Thursday, October 18, 2007 at 1:08 p.m. before Josephine H. Fassett, a Certified Shorthand Reporter and Notary Public of the State of New York.

Page 358

APPEARANCES:

COOPER & KIRK, PLLC
Appearing for Plaintiffs
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
BY: DAVID H. THOMPSON, ESQ.

FEDERAL DEPOSIT INSURANCE CORPORATION
Appearing for Plaintiff-Intervenor
550 17th Street, N.W.
Room 6030
Washington, D.C. 20429
BY: GARY A. KUIPER, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
Appearing for Defendant
1100 L Street, N.W.
Room 7024
Washington, D.C. 20530
BY: ARLENE PIANKO GRONER, ESQ.

ALSO PRESENT:

RICHARD A. BIANCO, Ambase Chairman

JOHN P. FERRARA, Ambase

Page 359

INDEX


| WITNESS | PAGE |
|---|---|
| PROFESSOR ROY C. SMITH | |
| By Mr. Thompson | 360 |
| By Ms. Groner | 513 |


EXHIBITS


| SMITH | DESCRIPTION | PAGE |
|---|---|---|
| No. 3 | 1984 Report of Examination by the Federal Home Loan Bank Board of Carteret Savings & Loan | 512 |


Page 360

PROFESSOR ROY C. SMITH,
the witness, having been previously sworn by a Notary Public, resumed, was examined and continued to testify under Oath as follows:

CONTINUED EXAMINATION
BY MR. THOMPSON:

A Mr. Thompson, may I supplement something --
Q Sure.
A -- I said yesterday after thinking about it last night?
You asked me if I recalled the percentage of liabilities that was the capital standard for S&L's in 1982 and I said I could not recall, so I went and looked it up to see what it was, and it's complicated.
Before 1980 the standard was 5 percent of liabilities, between 1980 and 1982 the Bank Board lowered it to 4 percent, and after 1982 they lowered it again to 3 percent. Obviously this the time when banks were, S&L's, thrifts were suffering from some distress and many of them were in different stages of difficulty so the capital adequacy standards were lowered to accommodate them, not because they thought they weren't needed. In fact, the FDIC, I

Page 361

believe, had much higher standards for capital adequacy for the banks, commercial banks, than did the same insurer but different standards. So I just wanted to make that.
Q Well, I appreciate that. And that stayed in place for thrifts until FIRREA; is that right?
A That's my understanding.
Q Okay.
A Although there was one other element to it which is I think important, and that is, in calculating your net worth and your liabilities you could use averages of the prior five years if you wanted to which in the case where things were deteriorating was favorable to you.
Q The average of your -- for the numerator or the denominator or both?
A Well, I'm not sure of how it works.
Q Okay.
A Whether you had a choice or what, they could be very accommodating.
Q Okay.
A But there are those kinds of things which explain why in my table in Exhibit 3 shows a very low level of net assets or net worth divided by

Page 362

assets or liabilities sufficient to wonder whether they would be in compliance, but they were in compliance during those years and it's because the standards were lowered and because they were loosely applied, but they were still under-capitalized.

Q But just -- well, when you say "they were loosely applied," I mean, the regulators did lower the boom on someone who didn't comply with the rules?

A What I meant to say was that the ability to calculate your net worth through a system of averaging prior years and so forth made it less stringent than it would be if it were here-and-now capital.

Q Okay.

A Now I stated my opinion that this was an under-capitalized industry and that Carteret was an under-capitalized, sometimes I say substantially under-capitalized entity. It may not have seemed so much under-capitalized relative to the standards of the regulator but I'm looking at it from the standpoint of investors and those outside of the regulatory world.

Q Okay. Good. Thank you.

Let's turn to page 18 of your report.

Page 363

A (Complies.)

Q Now, in Paragraph 42 in the first sentence you conclude by saying that Ambase should have been aware of Carteret's deteriorating lending position, what is your basis for saying that?

A Well, I'm sure that Ambase conducted due diligence in order to complete this transaction and that in view of the deterioration in the loan portfolio of the bank at the time they should have been able to see it, and we went through that with Exhibit 3 yesterday indicating that the change between 1987 and 1988, particularly in terms of net interest income after loan write-offs, were significantly lower than the year before.

Q Now what is the significance of the dividends that were paid by Carteret to Ambase after the acquisition by Ambase?

A They paid them I think in two years. There was a $22.9 million dividend paid right away, and another smaller one in 1989. I would say the significance of them was that they removed a considerable amount of capital from an under-capitalized enterprise that needed to be capitalized well in order to have a successful hope -- hope for successful operations.

Page 364

Q Why would Ambase have done that then?

A You'd have to ask Ambase.

Q Okay. What sort of business was Imperial Premium Finance?

A I'm not entirely sure. I was aware of it, it was some -- I'd rather just either go back and look it up or tell you that I can't remember.

Q Do you know what a premium finance company is?

A Vaguely, but I don't know much more than vaguely at this point.

Q Okay. Do you have any experience in the premium finance business?

A No.

Q Have you ever valued a premium finance company?

A No.

Q And do you have an opinion as to what the value of IPF was at the time of Ambase's acquisition of Carteret?

A I make a reference. I don't have an opinion other than the information I was able to pick up from the financial statements and the Report of Examination in which they refer to a goodwill charge being taken by Carteret on the sale -- sorry,

Page 365

should we find the note?

Q Sure.

A Let me just stop here until I find the note to get it exactly right.

Here, Note 39. The ROE said that when Carteret acquired IPF it gained a 10.8 billion -- million was recorded by Ambase and a comparable loss was taken by Carteret and goodwill of that amount was charged off to capital.

Q Now, that's an accounting --

A That would suggest that the accounting value for this transaction was different from the 65 million at which it was booked.

Q From an accounting perspective what would this suggest about the value of IPF, wouldn't the gain be measured against Ambase's historical basis?

A I suppose.

Q All right. And then now what can you infer from the fact that goodwill was charged off by Carteret?

A I don't know what to infer from that, it might have been kept on the books, but it wasn't, so I don't know why it was.

Q So is it fair to say you don't have an

Page 366

opinion as to the fair market value of IPF as of August of 1988?
A Correct.
Q Okay. And you don't have an opinion as to the fair market value of IPF at any point from '88 through '92; is that correct?
A Yes.
Q Now, Carteret had the right to sell --
A Excuse me, one addition to that thought.
I believe that Ambase attempted to sell it, at least it entered into an arrangement with the regulators in which it would sell it, and they were unable to sell it.
Q Do you know why?
A No.
Q Now, Carteret had the right to sell IPF back to Ambase; is that right?
A Well, that's what I'm talking about I believe in that the regulators wanted them to do it but it never happened.
Q Would that be considered a put option that Carteret would have to put that asset back to Ambase?
A You conceivably could call it that but

Page 367

generally speaking a put option is exercisable. If you have an option to put it back to them and they can't buy it, then it's not exercisable.
Q Well, with the benefit of hindsight, right, I mean ex-ante it's a put option?
A Well, it's always a factor.
Q Right. I mean, because a put option, like any other contract, the other party might not be able to perform, right?
A That's right.
Q Okay. But at the time of the 1988 acquisition by Ambase of Carteret it would have been a put option that Carteret had?
A You could construe it that way.
Q Do you know from Ambase's perspective what the value of that put option would be?
A No.
Q What's the significance of the management fee from Carteret to Ambase that you reference in your report?
A Well, it's another form of transferring capital from Carteret to its buyer.
Q Is there anything inappropriate about that?
A The regulators deemed it to be

Page 368

inappropriate because it stripped capital from Carteret which was in need of it and therefore they prohibited it.
Q Do you have an opinion one way or the other yourself, apart from what the regulators were dictating, as to whether it was reasonable for that sort of a payment to be made from Carteret to Ambase?
A Such payments are made from time to time in comparable types of transactions then and now but they generally aren't made if they place the payer of the fee in some sort of financial jeopardy either in terms of covenants, restrictive covenants of any debt financings or any other reason why it might do so.
Q Well, what's the theory -- do you think that -- so what role have these payments played in your analysis, if any?
A I simply point out that they removed cash from a very under-capitalized company engaging in a high-growth strategy of which was meaning that it had less and less, you know, of a reserve to protect themselves with in case things went wrong.
Q Okay. What is the theory of these types of arrangements, is it services are being

Page 369

provided by a holding company and so there should be some sort of allocation of overhead in this sort of thing?
A To the extent that there is a theory that may be it. I think in practice it was that parent companies find that having the cash convenient and take it for no theoretical reason whatsoever, they take it because it's there.
Q Sort of like the Roman Empire where the parents can, you know, do whatever they want?
A That's how you get returns back to the shareholder to the parent company is to get control of the cash but it's not inappropriate in the sense that it's bad investment theory to do it, it's just that it is it should not be done if it puts the asset in jeopardy from which the capital is being taken.
Q Was there anything inappropriate about the accelerated retirement benefits being paid to Mr. O'Brien?
A That was a matter that was dealt with between Ambase, O'Brien and the regulators and they thought it was worth attempting to reverse or rescind.
Q Do you have an opinion on whether it

Page 370

was inappropriate?
A Inappropriate in what sense, immoral or --
Q Immoral, okay, we can start there.
A Well, I don't have a view about what's moral or not moral in these transactions.
Q Do you have an opinion as to whether it was bad business to pay the --
A It was another form of transferring capital from an under-capitalized high-growth risky business which made it more risky.
Q Do you have an opinion as to whether the bonuses paid to Ambase and Carteret officials were excessive?
A I do not have an opinion on that.
Q Okay. I mean, you've written Worth Every Last Million.
A Oh, you're very clever, you saw that.
Q Well, I like, I like the title.
A That's good.
Q It's catchy. But, I mean, you're on record as saying, look, if you want good people, you have to pay for good people to be CEO's; isn't that right?
A Yes.

Page 371

Q Okay. So the fact --
A I don't know whether the bonuses paid were a correct level or not, I don't know to what extent they were, you know, set at the right level, I haven't examined it, so I don't know.
Q But we can't infer just because someone is making a million dollars a year in 1989 that they're being overpaid, on that fact alone?
A That's right.
Q Okay. And it's also not fair to judge a CEO based solely on the performance ex-post of his tenure, is that fair, like Nardelli?
A Good. In general there are -- there have to be reasonable standards to judge performance, performance has a lot to do with performance. By that I mean producing earnings growth and things of this kind, which in Mr. Nardelli's case was achieved, but performance can also involve other things so they're judged in ways that may be adverse, so case by case is the way you'd have to look at it.
Q And is it also to fair to take into account best efforts, in other words, if there's terrible performance at a company but you feel like the executive was talented and did everything they

Page 372

could and maximized the likelihood of coming out of the tailspin, would that be an instance where you could pay?
A You might, but you should be skeptical before you award such large bonuses in the back of bad performance.
Q Now, but for a troubled company, wouldn't they have to pay a significant amount of compensation to senior executives to keep them?
A I think you need to pay them a fair market value to get the most out of them.
Q But I mean in --
A The idea that you have to pay somebody a great deal to keep them from resigning, it may be true in some cases but it often is overstated.
Q But I mean thinking about this from the perspective of the CEO, you know, you've talked about how the capital markets wouldn't want to invest in Carteret because it was so risky, and if you're the CEO, wouldn't that same sort of calculation in terms of the riskiness of staying at this place and having options go under water weigh on one's mind?
A Yes, but if I were the CEO of this case I also would be concerned about my record as a

Page 373

commercial lender which is abysmal and I believe that that would have a lot to do with the fair value of my performance.
Q Right. Now, with respect to the senior management team, would it have been a negative for Carteret if the entire senior management team in 1990 had left?
A It's hard to know. They weren't in the end valued very highly by either the regulators or by the market, so there might have been a benefit if we got rid of them all.
Q But how could Carteret have attracted new good managers, do you think it could have?
A I think it could have, yes.
Q Even though the investors are staying away they could get good managers?
A Well, if you found good managers and give them the appropriate incentive, you might very well get ones who are better than the ones who were there.
Q But in terms of appropriate incentive basically it would have to be fair market salary adjusted up for the risk premium that Carteret would fail; is that fair?
A No, I wouldn't calculate it that way.

Page 374

Q Well, they'd have to have some compensation for the risk they were assuming by coming to Carteret, don't you think?
A Maybe, depends where they're coming from. I might hire you and pay you double the salary that you're presently making and you might think that was a lot, and I might be taking a chance that you were capable of doing this but I thought you had good qualities, so I would do that for you and give you this chance, but I'm still paying you less than I might have to pay somebody who was already in such a job in another location which was being compensated for based on good performance, so it's case by case.
Q Okay. You say Ambase's acquisition of Carteret was impulsive, but it took over a year to consummate the transaction, didn't it?
A The impulsiveness wasn't the closing, it was the making the offer in the first place.
Q But then wasn't there a significant, a significant window of several months where after the market crashed then there's a negotiation and they decide to deter other bidders with the option, I mean, they had time to think about this, didn't they?

Page 375

A Yes.
Q So why do you say it was impulsive?
A I was referring to the decision to acquire it in the first place and to commit themselves publicly to this line of business and this particular company at this particular time and for this particular price level. That was a big decision made in I think August of 1987, and though it's true it didn't close for a year and it was true they had some possibilities of getting out of it, the impulsive part was choosing those four things I just mentioned.
Q But just to be clear. Even with respect to that decision in August of '87 why was that decision impulsive?
A Well, they had never been in the savings and loan business before. They were -- they apparently decided to get into it rather quickly. This was an industry that was very complex and filled with many distressful situations at the time. It didn't change the management, they just sort of bought it as if it were able to operate on the shelf. It appeared not to have a very comprehensive plan for what to do with it once they did buy it except to continue whatever it was doing which they

Page 376

should have recognized was a risky strategy.
Q Why from the perspective of August '87 was Carteret engaged in a risky strategy?
A It was still very under-capitalized by ordinary investment standards and it was still engaging in a very rapid rate of growth of commercial and real estate loans which were beginning to leak.
Q Now you say they acted rather quickly, what's your point of reference there?
A Well, I don't see very -- I don't know when they began to study Carteret as a possible acquisition but they were under some pressure because of the deterioration in their insurance business to adopt a new kind of investment strategy which led them off into Gruntal and to Carteret and that appeared to me to be a decision they made rather quickly.
Q Now, when you were at Goldman, did you ever work with conglomerates?
A Yes.
Q That were buying up companies and industries with which they had no familiarity?
A Yes.
Q And sometimes did your clients leave

Page 377

the management team in place?
A Yes.
Q And that's what Warren Buffett does, doesn't he?
A He does.
Q And that's a pretty good strategy, isn't it?
A If it's that well executed, yes.
Q Okay. Why would it not have been a good strategy here, from the vantage point of 1987?
A Well, this is going to become one of their principal lines of business and this was going to be a company which presumably they saw upside potential in by virtue of being able to take advantage of opportunities that the S&L industry then presented, including some regulatory forbearance on capitalization and the opportunity to invest in different quadrants than they had been in before, and some other entrepreneurs that are making money on these kinds of investments, maybe they could too. That is not a simple task of just buying a company and letting it run itself, it's more complicated.
Q Is one of the regulatory forbearances or is the regulatory forbearance you're referencing

Page 378

there supervisory goodwill?
A That and the overall capitalization ratio which I pointed out to you has been lowered.
Q You mean the 3 percent of liabilities?
A Yes.
Q Now you say that Ambase overvalued Carteret; is that true?
A That's my view.
Q Okay. How much did Ambase pay to acquire Carteret?
A About 290 million including the preferred stock.
Q Okay. And that was an arm's length transaction, correct?
A Uh-hum. Yes.
Q Now, there was a Regulatory Capital Maintenance Agreement that was entered into between Ambase and Carteret?
A Yes, it required them to put up additional money if asked.
Q Do you know how much?
A I believe it was 50 million.
Q Okay. And that represented an obligation for Ambase, right?
A Yes.

Page 379

Q So in thinking about how much Ambase paid for the acquisition would it be appropriate to take the $291 million and add some factor for the value of that obligation that was assumed?
A You could do that.
Q Would that be appropriate from a valuation perspective?
A It's a contingent liability and the contingent liability isn't worth as much as an actual liability so you would have to give it a different valuation but it would not be inappropriate to do that.
Q And, in fact, when you were at Goldman and advising acquirers, you would value contingent liabilities, wouldn't you?
A Contingent liabilities were on the balance sheet of these companies that you're referring to but generally only as a footnote and they were not on the face of the balance sheet and unless they were extraordinary we probably wouldn't pay too much attention to them.
Q It would depend on the magnitude of them?
A Yes, the magnitude and the probability but we would take a look at them.

Page 380

Q Okay. And if you wanted to value from Ambase's perspective the cost of that obligation under the Regulatory Capital Maintenance Agreement, as a valuation expert, how would you have done that, if you had been advising them?
A I'd have to think about that. I would find it difficult to value it through some formulaic arrangement.
Q You couldn't view it just plug in Black-Schoals?
A I wouldn't want to do that.
Q Why not?
A Because I would be very uncertain as to what the probabilities of these things occurring would be.
Q The probability of the triggering event?
A Yeah.
Q Well, do you think it was high, from the perspective of August 1988, do you think there was high, medium or low probability that the 50 million would be called on?
A Bearing in mind that it's a low, it's an under-capitalized business that I'm already planning to take capital out of it, I mean, I guess

Page 381

I would have to assume it's a high probability.
Q So it would be, if you would had been advising Ambase, you'd say this is a material liability, we better think about this?
A I would probably say that.
Q Okay.
A But I don't know exactly how I would calculate it.
Q Because of the uncertainty of figuring out what the probability was --
A I would tell my client it probably doesn't matter exactly what number you put down as being attributed to this continued liability because it would be an inexact number no matter how it's calculated. What you should know is that it's here and that it could be more and you should make your judgments accordingly.
Q Well, if they were to say, you're our expert, we're in your hands, we need your help --
A You probably better assume you're going to put it up.
Q And value it at close to $50 million, because the range is zero to $50 million, right?
A I would say you ought to assume that you're going to probably have to pay it.

Page 382

Q Okay. So if we're thinking about how much Ambase actually paid -- and they did actually pay the $50 million, right?
A In time.
Q In time.
A Stretched out.
Q Yes. And so would that be part of your valuation calculus the fact that they didn't have to make the payment for several years?
A I wouldn't know that, would I, at the time.
Q Right.
A These are all reasons why the number wouldn't have a great deal of meaning to me.
Q Well, but for your client, if you had been advising Ambase and you told them it's likely you're going to have to put this $50 million in that, that would have been a lot of money for Ambase, right?
A Well, it would be.
Q Okay. And whatever number was put on it would be in excess of the $291 million purchase price, correct? If they're thinking about how much are we putting into this deal and trying to calculate returns on equity and that sort of thing,

Page 383

the value they put on this option would be in addition to the 291 million?
A I suppose.
Q But you haven't valued this option?
A Nope.
Q Okay. Now, Ambase was able to go to Chase Manhattan and borrow $250 million in June of 1988, correct?
A Yes.
Q And doesn't that reflect the fact that -- strike that.
And Chase's security was Carteret's stock, correct?
A Yes.
Q And so doesn't that show that Chase believed that there was significant value to Carteret's stock as of June of 1988?
A Yes.
Q And do you have an opinion as to what sort of loan-to-value ratio Chase would have insisted on at that time, you know, given the general market conditions?
A No, I don't have an opinion about that.
Q Is it fair to say that Chase would

Page 384

have been valuing the stock at at least, you know, $150 million if they're willing to take that as collateral?
A You might say that.
Q Okay. Well, would it have been more, I mean, would they have wanted really to get dollar-for-dollar collateralization?
A I don't know, they were looking also at the fact that it was Ambase's name on the loan, so Ambase was obligated to pay it. They were looking at the balance sheet of Ambase first.
Q But the balance sheet of Ambase in August of '88, if you had been advising as a valuation --
A It wasn't a very strong balance sheet but it was there.
Q It was there. But if you had been advising Chase, would you have told them it's very important to ensure that -- would you have told Chase "Don't do this deal if you don't think the Carteret stock is worth a significant amount of money"?
A Yes, I would have told them that.
Q Okay. And is there a number you would have told them if you had been their investment

Page 385

advisor as unless you think this Carteret stock is worth 150 million --
A I haven't made that analysis and I'm unable to respond to that question without having to refresh myself as to what the balance sheet of Ambase looked like at the time and what the other features of the loan contained. But I do recall that loan did not rely on goodwill in calculating capital ratios, it excluded goodwill..
Q Right. And isn't that just because Chase couldn't, if there was a default, Chase couldn't seize the goodwill and sell it and be made whole, right?
A It probably means to me that they didn't value the goodwill at all.
Q Well, they weren't doing a fair market valuation of supervisory goodwill, were they?
A They weren't valuing it, they were not giving it any credit at all.
Q Is it your sense of that that Chase was looking at the goodwill, doing a fair market valuation of it and saying it has no value, not only to us but to Carteret?
A I don't know that they said all that, nobody said it, they just didn't -- they had a loan

Page 386

covenant that excluded it, that's all I'm saying, they didn't consider it to be worth much from the standpoint of complying with their loan covenants.
Q And they didn't think it was worth much to them; is that right?
A Right, or presumably to anyone else, but that's --
Q Well, Carteret can count it towards its regulatory capital requirements, Chase could not, so there's the distinction there, isn't there?
A Certainly there is that distinction but Chase wouldn't have been expecting to consolidate this with their own balance sheet, in any event, that's an irrelevant factor.
Q And Chase was a sophisticated commercial lender in 1988, wasn't it?
A It was.
Q Now, you make reference to --
A Though Chase made a lot of loans which were written off during that period.
Q Right, but not this one, this one paid, didn't it?
A I don't know.
Q Okay. Now, what's the significance of this whole General Development Corporation that you

Page 387

go into in your report?
A Well, there's a footnote, that's all there is. Footnote number 41 you mean?
Q Yes, that's right.
A Well, the footnote is attached to this sentence, though it's not directly related to the sentence itself other than to point out that another form of capital transfer from Carteret to Ambase was through this transaction.
Q Do you know how much Carteret ultimately lost on this transaction?
A I do not.
Q So in order to assess the magnitude of the capital transfer we need to know how much Carteret lost, though, right?
A Well, I don't know, they were required to purchase it.
Q Right. And if they were ultimately able to get their money out of it, it wouldn't have been a capital transfer?
A That would be true.
Q And what's the significance of the tax overpayment that you reference in your report?
A Probably the same thing, it's another form of capital transfer.

Page 388

Q Okay. Do you know --
A It gives the impression that the management of Ambase was seeking to use every opportunity to send money from Carteret to it. It may have had good reasons for doing so, but it didn't do anything other than weaken the capacity of Carteret to be able to deal with the risks of its own business.
Q Were any of these capital transfers, the General Development Company loans, IPF, the bonuses, the overpayment of taxes, would any of these have had a material impact on Carteret's ability to survive in 1992 if these had not been done?
A Well, I think these were material amounts of capital transfers if you aggregate them relative to their capital. Now, we know that they didn't have enough capital to be able to escape insolvency, but, so I would assume that they were, they were a significant amount.
Q But do you think Carteret would have been able to survive if these capital had not been taken out of Carteret by Ambase?
A Well, I don't know.
Q All right.

Page 389

A It's possible that they could, it's possible that they couldn't.
Q Okay. Now, but with respect to this tax issue, do you even know what the issue was?
A Not really.
Q Do you know who owned General Development Corporation?
A Well, all I know is what it says in the footnote.
Q Okay.
A This suggests that they were connected to Ambase.
Q Now let's turn to Paragraph 45 on page 20.
A (Complies.)
Q In looking at the attractiveness of Ambase's takeover bid you seem to suggest that one way to look at this is the return that a Carteret shareholder would have realized from the time of the IPO until the time of the merger with Ambase; is that right?
A I made that observation.
Q Connect the dots for me. I don't understand what the historic rate of return would have to do with the fair market value of Carteret in

Page 390

1988.
A Well, it only demonstrates that it was a very good value from the standpoint of Carteret.
Q Well, that's what I don't understand. In other words, you might have a negative return in a stock but the deal you get is still really good.
A You might.
Q So that's why I'm not understanding why there's a connection between what one's historical basis is in an asset and what its fair market value is five years later.
A I think the shareholders of Carteret who bought into the company at the time of the initial public offering would be very contented with this arrangement and happy to vote for it.
Q Well, they'd be happy because they made money.
A They made money, and they made a fair amount of money at a time when it was very unlikely they would in the sense of looking at the rest of the industry's performance. So they should consider themselves very fortunate.
Q A 15 percent rate of return is a good rate of return in the public markets?
A In those particular years it was.

Page 391

Q What about in, you know, the time period 1992, would that have been a good rate of return?
A Yes.
Q In the public markets?
A Yes.
Q All right. Now, let's look at Paragraph 46.
A (Complies.)
Q With respect to IPF, did Carteret make money on IPF while it owned it?
A Well, apart from this, you know, they wrote off the goodwill, there was that, as far as I know there's no indication that they did or didn't.
Q You just don't know whether --
A No.
Q Okay. Now, let's look at the last sentence of Paragraph 46 which is on the top of page 21. And it says, "Further, by having such a troubled parent, Carteret was blocked from pursuing other avenues that might have enabled it to gain access to capital," please explain that statement.
A Well, it wasn't up to Carteret, for example, to find another parent. It couldn't have gone into the market to find -- to sell the company

Page 392

to somebody. They might have had a great deal of difficulty in persuading the parent that they needed to have a private equity investment of the sort we've discussed before. They might have a difficult time doing any other kind of corporate combination simply because they had a parent that had its own interests that were different from their own and would have the power to block whatever Carteret might want to do if it wasn't consistent with their own interests.
Q Would Carteret have access to capital markets on reasonable terms in 1988 if there had not been an acquisition by Ambase?
A I think it's possible, yes, and I think we discussed yesterday that during the time when they were, this acquisition was pending, they weren't able to address the capital markets without consent of Ambase and Ambase no doubt would have preferred to not have to buy back the stock which they might issue which was the idea of this acquisition was to buy the whole company.
Q Now, but for the acquisition by Ambase, could Carteret have had access to the capital markets at reasonable rates in 1989 in your opinion?

Page 393

A I thought that they could probably do this until about the end of 1989 or early part of 1990 after which the loan loss problems would be so considerable that they would interfere with the public offering.
Q Right. And that was your judgment even in the real world, right? My question is going to a world in which there hasn't been an acquisition by Ambase.
A I don't think Ambase added anything to Carteret and therefore -- at least they did subtract some things from them. Those subtractions might have been tolerated to some degree even, even in the first years, if we could, if they had been able to come to the market, or do something else.
Q But I guess --
A And if they hadn't had Ambase, they would have had more resources to work with.
Q And would it have been easier for them -- would they have been able to access the capital markets in 1989 on reasonable terms but for Ambase extracting capital from Carteret, do you have an opinion?
A I think so.
Q Okay.

Page 394

A Up until, as I said, somewhere around the early part of 1990 they would be, they had enough room to think that they could probably try it. Now, the market might not have been persuaded by their investment proposition, but they had a sufficiently, what, they had a record that looked like it could probably persuade people to invest.
Q Okay. Now you --
A At some price.
Q Now you say in Footnote 44 -- well, and actually let me say, but at a reasonable price?
A Well, what does that mean?
Q I don't know, 15 percent rate of return.
A The investors would want it to be reasonable from their point of view which might mean it could be a lower price than Carteret might like, and Carteret would have, whatever options it had to raise money in the market, would have to be at the price the market would then put on which might not make them as happy as they would like to be but they'd have to do it anyway you might say.
Q Do you have an opinion as to, in the real world, what Carteret's cost of capital was in 1989?

Page 395

A I didn't attempt to calculate that.
Q Okay. So you don't have an opinion on it?
A No.
Q Okay. Now in Footnote 44 you say "From August 1987 until the acquisition was completed in August 1988 Carteret was virtually prohibited from accessing the capital markets."
A The other reason I just mentioned, they couldn't really raise money and then have expected Carteret or Ambase to buy it back.
Q Okay. Now the first sentence of Paragraph 47 says, "Upon the acquisition of Carteret by Ambase, all but three of Carteret's directors resigned," what's the significance of that?
A Simply to indicate that Ambase exercised control of the Board by putting their people on it.
Q Isn't that suggestive that, you know, they weren't just leaving this as an on-the-shelf operation to keep going, they wanted to closely monitor this?
A It might suggest that but you have to judge what else they did.
Q What else did they do?

Page 396

A Extracted capital. They didn't change the business strategy or the operating results or the principal managers of the bank for some time.
Q Now, do you know Mr. Mueller?
A I do know him but I don't know him in the context of this situation, I happen to know him socially.
Q Okay. He's at Bank of New York, right?
A He was.
Q And he had a very distinguished career there at Bank of New York, didn't he?
A He did.
Q And he's a very fine banker, isn't he?
A I don't know his professional reputation well enough to say much more about it than that.
Q Okay.
A He was at these places, I don't -- he was a senior guy at Bank of New York, so he must have been a good banker, that's all I can tell you because I don't know any more.
Q Now, in Paragraph 48 -- well, let me just ask you: Do you happen to know O'Brien?
A I do not.

Page 397

Q Or Pearson?
A No. I don't know anyone else associated with this. I met Mr. Scharffenberger once or twice but he's no longer a factor.
Q Right. Did you have any opinion of him when you met him?
A Not an opinion that would be of any --
Q Relevance to these proceedings. Okay.
Okay. Now in Paragraph 48 you make reference to a study by McKinsey, have you seen that study?
A I don't recall that I have.
Q Is everything that you've considered in formulating your opinions in this case, every document listed in your Documents Considered?
A I don't believe there's any document anywhere that isn't on that list, it's a very long list and I didn't consider -- I didn't read every one of them, I read a good many of them, and the group that was working under my supervision would have put the other documents in there because they had read them and would have brought to my attention important matters if they thought they should, if it intersected with the material in my report. Nobody knew what the report was going to be when we got

Page 406

getting it because you're forgiving them or tolerating them or putting up with them while they try to work out the mess they're in, but rather than completely default the loan, take it over and work out of it yourself, you let the people who took the loan out in the first place try to do that for you but you may have to renegotiate the terms in order to give them breathing space to do so.
Q But how did you calculate the $17 million?
A That's a number from their financial report.
Q Okay.
A The reference here is to the 1990 Annual Report.
Q Okay. Now you say in Paragraph 50 in the first sentence, quote, These difficulties, combined with added attention to the ailing S&L industry, put great pressure on Carteret's funding sources. What's the added attention that you're referencing there?
A The S&L industry was going through another difficult period in which case they were being taken over by the regulators or otherwise dealt with in some way and it's getting attention

Page 407

and the public knew it.
Q And it was bad attention?
A Yeah, adverse.
Q And then when you say there was great pressure on Carteret's funding sources, are you referring there to the fact that it was harder for Carteret to keep its deposits at reasonable rates?
A It was harder for Carteret to access all of its funding sources including its deposits.
Q Okay. And the time period you're referring to here is '90 through '92?
A I think so, yes.
Q Now, in the next sentence you say, quote, Deposits were reduced to 3 billion from 4.3 billion, in part through sales of branches, in a year in which the average Fed funds rate declined by 111 basis points, Carteret's weighted average cost of its Government guaranteed deposits declined only 49 basis points. So Carteret's relative cost of funds is getting worst during this period?
A Correct.
Q And was --
A It's not only getting worse but their access to the market's been reduced by 25 percent.
Q Yes. And what year is this statement

Page 408

about the 111 basis points versus 49 basis points, is this 1990?
A I think this is probably 1990.
Q Okay. What is the significance of the fact that funding from capital market issuances declined to 182 and a half million from 378 million?
A This is another piece of evidence to confirm the statement about the pressure on the funding sources.
Q How does it confirm that?
A The markets that they had been accessing before they were no longer able to access to the same degree.
Q Okay. And why would that have been the case?
A Because of the pressure on the markets not to invest in worrisome S&L's which had large loan loss problems.
Q Now, why were they able to raise 182 and a half million dollars of capital then?
A Well, that's a good question to ask the citizens of New Jersey which has a state-sponsored entity which buys these things apparently without any regard whatsoever to their creditworthiness. I am a resident of New Jersey so

Page 409

I can point out to you that I was surprised to discover this.
And this is finally points out that they had to go to their lender of last resort to make up the difference in their shortfall, doubling their money from, borrowed from the Home Loan Bank Board.
Q Okay. And what's the significance of that?
A Generally speaking you'd go to the lender of last resort last.
MR. THOMPSON: Do you want to take a five-minute break?
THE WITNESS: If you'd like.
MR. THOMPSON: Yeah, okay, we're at a good breaking point.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q Now, if you were looking to do an evaluation of Carteret in 1989, you would have looked at the total business?
A I would.
Q Including the servicing portfolio?
A Yes, I'd look at it.

Page 410

Q And form a judgment as to the value of it?
A Perhaps.
MS. GRONER: Can I just have a clarification? The transcript says evaluation, did you use the word valuation or evaluation in your question?
MR. THOMPSON: I guess valuation of it. Why don't I try it again just to --
BY MR. THOMPSON:
Q So if you were doing a valuation of Carteret in 1989, you'd look at the entire business; is that right?
A I would, but I might not do a complete valuation of each of the segments --
Q Why not?
A -- if I was going to try to sell it today as a public stock offering.
Q Let's say you were advising someone who wanted to buy it.
A If I were advising somebody in a merger business or in a private equity situation, it would probably be broken up into its parts and I'd look at each part separately to see whether the parts had more value than the market value.

Page 411

Q Okay. Is that often the case?
A It is sometimes the case.
Q Even in with respect to banks?
A It's often the case with respect to banks.
Q And thrifts?
A I haven't performed this analysis on thrifts and I'm not sure I would consider a mortgage servicing or origination business to be a separate line of business from the mortgage lending business anyway.
Q Okay. You're not sure or you wouldn't, would you consider mortgage servicing and mortgage lending to be part of a mortgage business?
A I would start there.
Q Okay. And that assumption is fair for Carteret, isn't it?
A Yes, that's how I would probably start.
Q Okay. Now we talked a little bit about why you had allocated two-thirds of the cash expenses to net interest income and that was based on the proportionate share of the assets on the balance sheet?
A Balance of the proportionate size of

Page 412

total assets.
Q All right. If you hadn't done it on a proportionate basis and you really decided let's try to figure out what part, you know, line by line, you know, which of these expenses should be part of the lending and which shouldn't, what sort of things would you exclude from the lending operation of Carteret's expenses? Would payments to Ambase be something to exclude?
A Yes.
Q And what about the cost of running the mortgage company?
A It would depend to what degree I determined that the mortgage company was separate from the lending business.
Q But, and with respect to -- well, let me ask this: I mean, but if you did reach the conclusion that the mortgage company should be part of the lending business, then the income from the mortgage company would also be added to net interest income, correct?
A Yes, I think that might be consistent.
Q Okay. I mean, it would be consistent. Wouldn't it?
A Yes, it would be consistent under that

Page 413

set of circumstances.
Q Okay.
A But I didn't do that.
Q I know. Now, with respect to a bank, have you ever seen the type of analysis that you do that's presented in your chart on page 24 allocating on a pro rata basis cash expenses, have you ever seen that done with respect to a bank before?
A Well, I can't recall. Generally speaking, one doesn't see this stuff in terms of internal cost expense allocations unless one's part of the internal management of that business or have access to it or gain it in some way. I've seen it done to businesses I have been part of the management of in which case it's fairly common to try to determine the approximate profitability of one line of business as compared to another.
Q Have you ever seen this done for a thrift before?
A I've not.
Q Okay. Now, with respect to when you were making your investment in Citicorp, did you do an analysis like the one that appears on page 24?
A I believe that I did. It was a long time ago and I don't have any records to demonstrate

Page 422

now known that the regulators have declared it to be out of compliance, then that subjects the company to sanctions of various kinds which are not going to necessarily be good for the investor.
Q Generally regulatory sanctions aren't good for an investor?
A Yes.
Q Okay. Do you know what regulatory sanctions befell Carteret when it fell out of capital compliance?
A Well, there were a series of regulatory requirements imposed on Carteret once these large loan losses started to appear ranging from being told they couldn't make anymore commercial loans to efforts to recapture capital from its parent and so forth. And of course in 19, December or so of 1992 it was seized, so seizure is a big factor. But it wasn't seized for a while, it was out of compliance in December of 1990 and it wasn't seized for almost two years later.
Q Do you think that was reasonable to give Carteret some time to try to raise the capital and clean its act up?
A I do, but I'm not a regulator, and I'm not able to speak from the regulator's point of

Page 423

view.
Q Now, there were restrictions on Carteret's ability to pay dividends; is that right?
A Yes.
Q All right. Now, as an investor, that would be a big negative; isn't that right?
A As an investor in a company that was highly under-capitalized I wouldn't expect them to pay dividends anyhow.
Q But all other things being equal, if you were an investor in a company and it couldn't pay dividends, that would be a negative?
A If I'm prohibited from jumping 10 feet in the air, it doesn't matter much because I can't jump 10 feet in the air.
Q I understand the point you're trying to eloquently make, but I'm trying to figure out exactly why that analogy isn't apt, but let me, let me ask: Have you ever made an investment in a company that was forbidden from paying dividends?
A Not that I know of.
Q Okay. Did you ever have a client at Goldman Sachs who made an investment in a company that was forbidden from making dividends?
A Probably.

Page 424

Q Do you recall?
A Not particularly, but it wasn't uncommon for banks, for example, to have covenant structure with loans it made to clients which would prohibit dividends under some circumstances, and the companies could achieve, they could enter into those circumstances and seek to reorganize themselves or restructure it or to attract capital to improve their situation so that that capital would be aware of such restrictions and might still come in.
Q Did the companies who were under those types of restrictions view them as a negative?
A Not always.
Q But often?
A They accepted them as being a sign of the state of condition that the company was in and trying to get out of, and they would recognize the investment opportunity in approaching the company to be a function of what could be done with it, not what was going to be done, you know, not what had to be put up with it, if it had to be put up with it for a long time and expected to change things. And that's the essence of these privity equity investments in S&L's is that they would provide the capital, if the rest of the business is healthy

Page 425

enough, it would be able to work out over time some of the other issues and take advantage of the opportunities available.
Q And when I was a little my mother gave me cod liver oil, which I accepted, but --
A Cod liver oil, I thought you were younger than that. Cod liver oil hasn't been given to any human being as far as I know for 25, 35 years.
Q I really think I was on the cutting edge.
A You must have been.
Q I was the last person I know to have it too. But, all right.
Do you have an opinion as to why Carteret was unable to find a buyer for Imperial Premium Finance?
A No, I don't have an opinion.
Q Do you have an opinion as to whether Carteret would have been better off if it had been able to sell Imperial Premium Finance in 1991 at whatever its fair market value was?
A To the extent that it returned capital to the company, I think it would have been beneficial.

Page 426

Q All right. Let's look at Paragraph 55.
A (Complies.)
Q You state in the last sentence, quote, The collapse of the loan portfolio in 1990 and 1991 effectively rendered Carteret insolvent, it was not the change of rules relating to regulatory compliance that did so. Now, with respect to the first half of that sentence, did Carteret become insolvent on a fair market value basis in 1990 or 1991?
A Well, this sentence refers to the two years together. Many investors would have regarded it as virtually insolvent after the first year, but perhaps it took two years to convince all of them.
Q And by the first year you mean 1990?
A Yeah.
Q Okay. Now, in Paragraph 56 you state, and this is in the fifth line down, If the investment were a large one, I would have recommended an extensive effort to conduct due diligence through interviews with management and Carteret's accountants, and to the extent possible with regulators. Why would you want to speak with regulators if you were advising a client?

Page 427

A Among other things, I would like to know what the attitude of the regulators was to my being on the scene and whether I might be able to negotiate with them some favorable matter, and I'd also like to know whether the regulators were planning to shut them down the day after tomorrow, particularly if my money went in tomorrow. I think those are material things to know. I might not succeed in negotiating anything and I might not learn whether they're going to shut me down or not but I would want to try to learn those things.
Q Would you want to know if there were going to be some sort of restrictions on your ability to operate even after the capital went in?
A I would want to discuss that.
Q And would you want to discuss whether there were going to be restrictions on your ability to pay dividends even after the capital went in?
A I would like to know whether they were.
Q And why is that?
A Well, if I'm making an investment, I'm going to be looking at a plan for turning it around and how I plan to benefit from turning it around. Most likely I'll sell it to somebody else or perhaps

Page 428

take it public, go get my money back through a public offering, or maybe I'll sell it to another private equity group. But, in any event, I want to have as few constraints on my operations as I can because I don't really know what I'm going to do in the future. But if I'm buying into a regulated thrift industry in distress, I would be very naive if I didn't expect to have a lot of regulatory constraints imposed upon me until the company was out of regulatory distress.
Q What could regulators have said to an investor that would have facilitated an infusion of capital?
A We love you. Welcome aboard. What would you like to have us – how can we make you more comfortable? Those would be the sort of things I would like to hear from them, one might not. Not all of these investors are regarded as being able to pull off what they may think themselves are capable of doing.
Q Now, the regulators wanted tangible capital to come into Carteret, is that your understanding?
A That is my understanding, among other things, that's what they would want.

Page 429

Q Now, if the tangible capital came in the form of the net worth of another company that wanted to merge with Carteret, would that have been the equivalent of cash in your opinion from a financial economist's perspective?
A Well, it depends on what's in the net worth. We don't want more goodwill coming in the back door.
Q Tangible net worth.
A Tangible net worth. Tangible net worth would be appropriate, but what is the form in which this transaction is going to take place? Am I going to be an under-capitalized subsidiary of a well-capitalized parent? That may not be enough to protect me from being insolvent.
Am I going to be a consolidated part of the parent company in which my balance sheet and it will be merged? That would be a debtor issue.
Am I going to have some kind of guarantee from the parent as to capital continuance, capital minimum, capital maintenance arrangements, those would be another set of circumstances.
But combining with a larger and healthier company would certainly be a desirable solution for these ailing thrifts. There weren't

Page 430

too many such companies interested in them though
they were to sell.
Q But tangible net worth of another company would be the equivalent from a financial economist's perspective of cash; is that fair to say?
A As modified by what I just answered, which is to say, it depends on how it's supposed to be reaching to the thrift.
Q Well, let's say two entities are going to be combined so they'll have one balance sheet.
A They're going be integrated and they're going to be consolidated into one balance sheet?
Q Yes. Would the tangible net worth of the acquirer then be the equivalent of cash?
A Composed of retained earnings and such things?
Q Yes.
A It would be considered to be adequate capital.
Q Okay. And the equivalent of cash?
A I'm not sure where you're going with that because the cash doesn't get valued always the same way.

Page 431

Q Oh, for the risk based?
A Well, for that, and it also isn't valued by the market the same way, cash may have less value in some instances than retained earnings.
Q Why would that be?
A I know it may be hard to understand but there are companies that have large cash balances that don't use them very effectively and therefore it's considered to be assets on the books that don't produce much and therefore lower the return on equity -- return on assets.
Q And now in the next sentence you say that you have deeply questioned, among other things, the dependence that Carteret had developed on non-cash income from securities sales and net accretion of loan discounts. Now, Carteret's dependence on net accretion of loan discounts was really an underlying feature and a result of its acquisition of Barton and Delray; is that right?
A Yes, and other such transactions in the early days of this history.
Q Now let's flip to Paragraph 58.
A (Complies.)
Q You state in the middle of the paragraph the sentence that begins "Furthermore."

Page 432

A Uh-hum.
Q "Furthermore, Carteret's access to low-cost Government-guaranteed deposits gave it a highly-leveraged advantage in capitalizing its loan spread which was a favorable 2.2 percent in the market conditions that prevailed in 1987." Please explain this sentence.
A Well, the loan spread was made up of the return on the assets invested minus the cost of the capital used to make the loans and that spread was widened by the fact that they had these Government-guaranteed deposits which were much lower cost than Carteret would have been able to obtain in the market on its own name. So they had the benefit of the government insurance, the so-called moral hazard factor. And because the whole thing was leveraged so highly, that it is to say, so much under-capitalized, that any, any profit that comes through was equally leveraged in terms of the return on equity ratios, which are important to investors. So you could say that Carteret's appeal to investors at this time might have been seen as the ability to take advantage of an artificially large loan loss spread and the regulatory forbearance that allowed them to be so under-capitalized that they could

Page 433

really crank it up, really crank up the leverage and therefore create a return on investment that would be greater than they might do outside of this industry.
THE WITNESS: New York. Usually they're sirens.
BY MR. THOMPSON:
Q And now let's look at Paragraph 59.
A (Complies.)
Q And on the first line on page 29, if you'd turn the page, you talk about many banks and S&L's restated their financial statements. First of all, what do you mean by "restated their financial statements," did they retroactively --
A Yes, retroactively changed them.
Q Okay. Can you recall any ones that did this?
A Not by name but it was very common at a time when they're subject through to challenge by either regulators or by other factors including a different investor community or different merger situations in which they go back and make adjustments to the prior years and restate them.
Q Why is this so common?
A It's common in times of distress more

Page 434

so than times of normality, but it even happens in times of normality, but especially in this time because people had discovered that their accounting practices were inappropriate for the circumstances they were in and had to adjust them.
Q And by "this time" you mean --
A Well, by the early 1990s, I think that's the period that's referred to here.
Q Okay.
A And there's one other factor that is very important, which I didn't mention, and that is, that during this period when there was so much distress in the banking industry, and so many loans were thought to be not worth the historical cost because of either interest rate changes or credit changes, these loans were not required to be mark to market. If they were a securities firm holding them, they would have to mark them to market. They may not always get the exact mark correct, but they'd have to make an effort to do so, whereas in the banking industry, and the S&L industry, regardless of what changes took place to the market, to creditworthiness or to interest rates, they didn't change the value at which they carried these loans on their books.

Page 435

Q In the early nineties you're talking about?
A Well, throughout, they still don't, but there ever been some modifications to accounting practices since. But in principle that meant that accounting wasn't reliable in the sense that people knowing that this is an industry with a lot of loan distress that the books didn't reflect it, so you had to make your own guess as to what the market value of that historically recorded loan portfolio would be, and you didn't know what it was but you knew it wasn't a hundred, so there was going to have to be some sort of discount, how big a discount it was, it could be quite a big discount.
Q Now, you mentioned about all the loans in distress. The RTC was selling a lot of loans in '91, right?
A They were making their best effort to recover the investments they made in having to take over some of these.
Q And with respect to the types of asset classes that the RTC was selling, say mortgage-backed securities, certain types of commercial real estate, was the RTC's selling activities driving the prices down?

Page 436

A I'm not familiar with it enough to be able to know.
Q Okay. Now, you mentioned that the private equity investors would like to get a return of 20 to 25 percent in a footnote, don't you?
A I do mention that.
Q Yeah. And so would that mean that on a $200 million investment the private equity investor would want to get a 40 to $50 million return?
A That's per year --
Q Annual.
A -- annualized compounded rate of return.
Q Yes. And that's a pretax number?
A Yes.
Q Okay. Now, let's look -- oh, I'm sorry, we've already covered that.
Is it fair to say that the reason that Carteret could not raise capital in 1992 was its loan portfolio?
A That would be a very important reason.
Q And the rest of the bank was pretty much healthy, right?
A The rest of the bank was comparatively healthy.

Page 437

Q I mean, the rest of the bank was healthy, wasn't it?
A Well, it would appear so but we know that the loan commercial lending portfolio on real estate losses were by far the most conspicuous element in this bank.
Q Well, I know, but I'm saying --
A I haven't examined the rest to know how healthy it was or wasn't.
Q Okay. Now, let's see.
With respect to Footnote 63 you say; Kohlberg's offer valued Carteret post new money investment at 222 million. Its contribution would have been 200 million, leaving 22 million as Kohlberg's valuation of the Carteret business to be acquired. Closed quote. So Kohlberg's not viewing Carteret as insolvent in '92, is that fair to say, they put in 200 million and they get 222 million valuation?
A Well, the word insolvent may not apply to what they were trying to do. They recognized the condition that the bank was in at the time and they decided that if they were going to invest, they would want to get 90 percent of the shares of the

Page 438

company that they invest in. They're going to put up 200 million, and divide that by .9, and you get 222 million. So the pre-money, the money, the value of the money before you -- the value of the company before you put the 200 million in is 22, that's how you get there.
Q Now, if Carteret had hired you in 1992 to help them raise capital and they had said, "Look, we have some bad commercial real estate loans and we're writing them down," would you have -- and they had said, "And we're thinking of writing them down on an ultra-conservative basis so that if someone comes in here and does a sample, they'll look at our valuations and they'll think 'These guys are not playing games, they've written them down to fair market value or maybe even below fair market value,'" would you have said that's a sensible strategy to raise capital?
A Well, my advice to the client at that time would be to mark them correctly. Mark them to market as best you can judge.
Q Okay.
A Not necessarily do it more than that but I would mark it to market as best we could judge. It would have to be credible and defensible.

Page 439

Q So that when the sampling is done of the loan portfolio --
A When all the skeptical nonbelievers come in to ask questions about why you've done it the way you did, you want to be able to leave the room at the end of the day having them still believe it.
Q And to do that on these questions which requires some judgments, you can't just look in the Wall Street Journal to see what these properties are worth, it's better to be conservative, is that right, if you're trying to raise capital?
A Yes, I want to be as close to the correct number as I could possibly be and that probably means getting rid of any sense of denial about these things which is why people don't mark them down enough.
Q But reasonable people can disagree about --
A They can.
Q So if you're trying to satisfy the skeptic, you better be on the low end of the reasonable range, right?
A Probably.

Page 440

Q Okay. Now, with respect to Paragraph -- I guess we've already covered Chase, so we don't need to do that.
Let's go to Paragraph 67.
A You're skipping General Haig?
Q We might come back to that.
Let's see. I'm looking at the sentence that starts, oh, five lines from the bottom of the page, quote, Investors understood goodwill and could discount it appropriately. Consequently, if the pricing were sufficiently attractive, and if other investment criteria were met, then a small equity offering by Carteret might have found buyers. What other investment criteria are you referring to?
A This is with reference to the period, the window when I thought they might have been able to sneak in a public offering. Right?
Q Right.
A Well, pricing of course is important but we have to be sure that the investors feel that they are getting a board of directors that they are going to be satisfied with. They're going to get adequate governance, you know, conduct. They're going to get -- they're going to get explanations for what happens and what has happened and so forth

Page 441

and not feel like they're being in the hands of a management that's trying to obscure things from them. Those kinds of criteria are rather abstract but they are important if you are going to compete for capital in a market which is already constrained and normally available to a few.
And in addition to those things you're going to have to demonstrate that you are not a company which is substantially out of alignment with those who are financing in terms of other terms and ratios and performance features that the market has become accustomed to.
Q Now, if you had been advising an investor who looked at Carteret, looked at the financials and said "I want to do it, I want to make" --
A You're talking about a public market investor?
Q Well, let's say even a private equity investor who says "I like this business, I think they've marked things down right, I think the rest of it's healthy but I'm concerned about the regulator's attitude." If they had gone in and reported back to you that the regulator said "After you put in your $200 million, we can seize you

Page 442

tomorrow, there are no guarantees, we make no guarantees that we won't seize you tomorrow," would you have told them "Don't put the money in," even if everything else made sense to you and to them, would that fact alone have been enough for you to advise them don't put the money in?
A Yes, with some modest qualifications. Differentiating between a public investment in which the investor does not achieve the rights of control and those in which the investor might, such as a private investment or a private equity investment.
Q Tell me about those modifications just so the record's clear.
A Well, I mean, if I'm going to be negotiating with the regulators as a control buyer, I'm going to be running the company from now on.
Q Right.
A I want to be sure that I have an understanding of the regulator that my best efforts are going to be accepted as an effort to restore this company to health and I'm not going to be undermined by the regulators in some way. And if I do not achieve that understanding, I'm very likely to go look for another S&L or none at all. That would be foolish. You put your money in and, as you

Page 443

phrased it, I'll shut you down tomorrow, means I have lost all my money because a seizure is equivalent to a complete loss of your investment if you are an equity investor.
In the case of a public market investor, these things would not be accessible to me, I wouldn't be able to know what a regulator thought, I'd have to make an estimate of what I thought the regulator might say and that might be something I'd have to rely on on broad generalities in order to know. I think if I were making a modest investment from an insurance company portfolio in a public offering of Carteret at that time that I referred to, that window time, then I might think that the upside outweighed the downside but it was risky and I might lose a fair amount of it, but I'm not making a $200 million investment, I'm making a modest one.
Q Now, if you had been advising a private equity investor who was looking for control and just --
A That's the only way a private equity investor would have invested you understand?
Q Right. Yes. So let's say you were advising -- I just want the record to be clear -- a

Page 444

private equity investor who was looking for control and the regulators said, not that they were going to shut Carteret down the day after the $200 million came in, but that there could be no guarantees that they wouldn't.
A Well, I would expect them to say something lawyer-like like that, but I would have an understanding as to what I thought I could reasonably expect would be with regard to their, their role in this. If the company doesn't improve and the company's imperiled, I would expect them to do what they're supposed to do. But on the other hand I would expect them to provide some time to let this be tested to see how I did before they shut me down.
Q Some breathing room?
A Some sort of breathing room and some sort of arrangement that I'd have to be satisfied with, but it depends on what you could negotiate. If I could not negotiate a sufficient, you know, satisfactory arrangement, I probably wouldn't make the investment.
Q All right. Now -- let's see.
A And, by the way, there are many private equity investors who'd prefer to just wait

Page 445

for them to die and then they would buy the corpses, take the assets and fix them up and sell them. At big discounts. So, you know, that's always the alternative to these guys. So they're not going to satisfy themselves, they're not going to be easily satisfied, and it's very evident I think that the RTC understood this.
Q But from the RTC's perspective why would they want to let it die and then sell it at a great big discount?
A They don't. They don't, which is why they might be willing to be a little more cooperative than you may have suggested by your, you know, your tough talk.
Q Well, they should have been more cooperative.
A Well, if they weren't, then we probably don't stay, but there were some signs that they were cooperative. Certainly in the beginning of this era they were very cooperative with some investors such as Perelman and Simon and others.
Q Okay. In Paragraph 68 why did you select a threshold of $20 million?
A Well, that was a minimal amount of capital for them to, you know, to be able to raise,

Page 446

they needed much more capital than that, and we left off very small S&L's who were raising money of two or three million or something like that thing and they were simply not an appropriate peer group.
Q Okay. I just didn't know if there were some larger S&L's who went out and raised 10 million because that's all they wanted.
A It's pretty rare for anybody to raise amounts that small if they were bigger companies.
Q Why --
A The cost of financing is higher, difficulty in doing it.
Q When you say the "cost of financing is higher," you mean sort of the transactions cost as a percentage?
A Yes. Yes.
Q Okay.
A You have pay the lawyers all the time and the accountants and the --
Q Investment bankers.
A Well, they're a bargain.
Q Why did you pick the first quarter of 1989 as your starting point for your capital raising analysis?
A Well, we could have started at the

Page 447

second quarter in the sense that that's when FIRREA was, that was just at the brink of FIRREA's coming in the following month I think, but we wanted to, you know, take a look at the market when FIRREA was in the works, it was being considered in Congress, though, obviously at the very beginning of the first quarter it wasn't much thought about but as that quarter developed FIRREA became material. Whatever it was going to be wasn't entirely known at the time, but everybody who knew that this bill was working its way through Congress knew that it was going to be an effort to tighten regulations, not to weaken it, so whatever it was it was going to make the regulatory posture more difficult from the standpoint of investors in troubled thrifts.
Q And one of the real battlegrounds was going to be over supervisory goodwill?
A There were several battlegrounds as I understand it, that was certainly one.
Q Okay. And so sophisticated investors by the end of the first quarter of 1989 would have realized that there's a likelihood that supervisory goodwill could be eliminated?
A Or if not, something else bad might be added, so we have the air is flavored by the fear of

Page 448

FIRREA.
Q Okay.
THE WITNESS: Could we stop for a minute?
MR. THOMPSON: Sure.
(Whereupon, off the record.)
(Whereupon, resumed.)
BY MR. THOMPSON:
Q Now -- and actually we'll even move to 69.
Is the fact that there were only 20 public issuances of equity securities for thrifts from 1989 through 1992 indicative of an extremely difficult environment for thrifts attempting to raise capital at this time?
A Yes.
Q Were there any IPOs of thrifts conducted?
A There were a few, largely conversions, most IPOs of thrifts were conversions.
Q From an investor's perspective, is there any difference in making an investment in an IPO as opposed to, you know, buying a stock that's already traded?
A Unless you're a depositor, which is

Page 449

what the conversion part is about, the practice was to go from a mutual organization to a company and the equity in the mutual organization was deemed to be owned by the depositors. So if you were a depositor and took the amount of goodwill or the amount of equity capital in the company and divided it by the number of shares, it gave you a pro rata amount of the stock, which you got for nothing, and if you wanted to, you could subscribe to buy more. So they allowed many people to subscribe on the hope that the stock would go up, like many IPOs are supposed to do. So as a result, a large part of the investment conversion transactions involved depositors, many of whom were speculators who just bought deposits and everything hoping for there being conversion. So they got something for nothing out of it, and maybe some gain or pop-up on the IPO. Now, by this time there weren't too many pops, but there were some of these smaller ones that were less affected by these problems so they were still coming along.
Q Okay.
A We probably would not have excluded them if there weren't so many of them involved with the conversions which make them a little different

Page 450

from the rest.
Q Now to the extent, though, investors are buying in who aren't depositors, then that would be --
A That would be like buying a stock anyway.
Q Okay. Now please explain what these databases were that you selected on the top of page 35 or reference there, the databank.
A Yeah, these are commercially-available databanks which have securities issues of all types. All securities issues for all periods for all classifications with all sorts of information are in this database which is something you can purchase from an organization called Securities Data Corporation.
Q And it's reliable data?
A It's considered to be the best in the business and to be reliable.
Q Now, at the end of Paragraph 69 you make statements about the average size of these offerings, do you see that?
A Yes.
Q Now, these thrifts that were raising this capital weren't trying to sell 90 percent of

Page 451

their equity, were they?
A No, they weren't.
Q And so if you wanted to translate these amounts into an apple to apple to what Carteret was trying to do, wouldn't you want to gross these amounts up so that they reflected 90 percent of the equity?
A No, because this is an analysis of public market access and not the analysis of private equity investing if you're talking about the 90 percent issue we determined.
Q You could sell 90 percent of your stock in a secondary offering in the public markets, couldn't you?
A Probably not.
Q Why not?
A It probably would be too large an issue if your company was capitalized at some level around where it had been capitalized when it was acquired by Ambase.
Q Well, but leave aside Carteret for a moment. I mean, is there any reason why a company that's already publicly traded couldn't sell 90 percent of it, dilute itself?
A If it's not too large for the market,

Page 452

they could do it.
Q Okay. But isn't it a fair point that to really understand what these numbers of an average size of 27 million that you'd want to know what percentage of the equity had been sold?
A Well, my view was is that there was a limit on just how much the market would buy of any of these at the time and that the 30 million or so issue would be considered about as much as someone, other than one of the very large S&L's, could expect to get regardless of whether it was 5 percent of the equity or 50 percent.
Q Did the market's appetite for these types of securities increase as the economy improved?
A Well, as the market distanced itself from the miseries of the S&L industry, yes, it did, but this was a time when the S&L industry was still pretty highly populated by ones in difficulty.
Q By, though, '92 almost all of the thrifts that were going to be seized had been seized, isn't that true?
A Probably, but this is a period that goes back before that. It ends in '92 and by '92 they hadn't forgotten about it, it was still close

Page 453

enough on them so that seizures were occurring and people realized that this was a risky business, so they didn't want to buy shares of a company they thought might be in trouble with its capitalization base or its regulators.
Q Now let's look at --
A This, of course, is why the market was as difficult as it was because the market was making this differentiation between those which could be qualified for investment and those who couldn't be.
Q Now let's look at your Exhibit 4, Table 2.
A (Complies.) Okay.
Q And my question is: What are the key ratios for an investor and with respect to each why is it important for an investor?
A Well, we've listed the ones we think are important.
Q Why would each be important?
A Well, the first is because, you know, investors want, who understand the difference between tangible and intangible capital want to have some idea how much tangible capital is there.
The next one I think Professor Saunders explained when he talked to you, the core

Page 462

Q Now, on a recurring basis would it be fair to reverse out those loan losses and say that the recurring net income for Carteret as of '92 was $37.6 million?

A That would be an indicator of what the net interest income and income from other services would be, and that would be, that would be a way of knowing that. What am I comparing it to? You would have to compare it to the same thing for the prior years when we had very large loan losses, but we had -- we have in my table on page 24 we have some idea of what the net interest income is.

So you see net interest income in 1992 reflecting new management and other important considerations was significantly improved, and as you have pointed out before, the total base of the business was lower, therefore, the allocated expenses were less, and so the cash flow from lending operations rose to 36 million from a little over 9 million, however, there still were some loan loss reserves to take, which may have been attributed to loans that were put on the books years before.

Q All right. Do you have any understanding of what Carteret's tax profile was in

Page 463

1992?

A I do not.

Q Do you think that if Carteret had been a recipient of a private equity investment and had stayed in business that it could have grown through the acquisition of branches from other distressed institutions?

A Well, this is a hypothetical situation -- question.

Q Well, yeah, let's --

A If they didn't die, could I have assumed that they lived?

Q Well, let's say Kohlberg had hired you as their investment advisor and said "Look, you know, we're thinking of putting 200 million in, but we want to grow the business, we want" --

A Kohlberg would have had that -- excuse me.

Q -- "we want to grow the deposits and take more advantage of low-cost Government deposits," and if they had asked you "Do you think we can do that by buying up branches from the RTC," would you have had an opinion on that?

A That would have been the sort of business plan I would have expected someone like

Page 464

Kohlberg to come up with.

Q And do you think it would have been a reasonable one?

A Yes, and he wouldn't have invested without a reasonable plan, but it would have involved the notion that he would stabilize the company's capital with his investment, use the capital to be able to make investments that would improve the earnings of the business and benefit from the ability to turn it around. And, of course, once you can start to show you're turning these things around, then good things start to happen to you where maybe bad things happened to you prior to that. So that's the idea. But working out of bankruptcy situations or near bankruptcy situations sounds very easy in the classroom to do but in the real world it's often very difficult and a great many of them don't succeed, which is why investors like Kohlberg are quite canny about being as sure as they can be that they are comfortable in the risks and the task of turning it around won't be beyond what they think they can reasonably expect to do.

Q What are the sorts of risk that a company that's on the brink of insolvency faces that a normal company doesn't?

Page 465

A There are a great many risks associated with near bankruptcy that most people don't always appreciate. Suppliers don't sell you anything on credit. People don't want to work for you. You know, the electric company wants you to pay in advance for your, for your light bulb. There are various things that are harassments you might call them. But, you know, they involve an aggregation of costs which academics have studied actually to try to estimate the cost of bankruptcy which increase in periods, you know, they're quite high just before bankruptcy or in bankruptcy but they spike up in anticipation of bankruptcy. So if you're in that zone, you have to deal with a certain amount of this stuff. Now you might be able to abate that by putting in a lot of capital and making everybody feel that everything's okay, but that depends on whether you found all of the problems and addressed them, whether you don't have surprises.

Q When doing a fair market valuation of its balance sheet is it appropriate -- well, strike that.

From an investor perspective, if you're looking, trying to do a fair market valuation of a balance sheet, would it be appropriate

Page 482

Q Okay.
A And they had some management problems, and they had some issues with their insurance parent and various other things which got them into trouble, and perhaps not every employee was first rate but they have -- that doesn't mean that particular employees were not capable of meeting the standards that they were in.
Q Okay.
A Even so, they were in a bracket above Gruntal.
Q And what did they, what did they do, I mean, what was their business?
A Prudential is in the retail brokerage business with an investment banking part.
Q Were they publicly traded, do you know?
A They were owned by Prudential Insurance Group at that time, I believe.
Q But they've been spun out subsequently?
A Yes.
Q Is it publicly traded now?
A Oh, I'm not sure where it is. It was acquired I think by Wachovia.

Page 483

Q Okay.
A But I'm not certain.
Q Do you have an opinion as to what Carteret's fair market value was as of August 1988?
A As of the time of the purchase by Ambase?
Q Right.
A I haven't made an effort to make an independent judgment but I have to assume that the market valuation was a representatively fair value.
Q Now, Mr. Jacobs, do you know Harry Jacobs?
A I don't know him.
Q Okay. Was he Mr. Simmons predecessor?
A One or two removed.
Q Okay.
A Harry Jacobs had been there before a couple of other guys, at least one other guy between him and Simmons.
Q Did he have a good professional reputation?
A I don't know enough about his reputation to give you an appraisal of it. The company had some difficulties while he was there so you'd have to infer what you'd like from that.

Page 484

Q And just at a general level, I'm not saying that these were his problems, but what was the nature of the problems they had, was it fraud or something?
A Well, I can't differentiate in my memory when he was there and when he wasn't --
Q All right.
A -- and which problems came before and which came after so I'd rather not respond to that question.
Q Well, and I'm not saying as to whether it was on his watch or someone else's watch but, you know, what sort of problems?
A Well, Prudential was a firm that tried to compete with Merrill Lynch and Shearson Lehman and big brokerage firms and it had been, you know, 30 years before somewhat stronger and a little more important than it became, and so it lapsed and shrunk and had unprofitable periods, and that combined with some effort to try to gin it up when it was sold to Prudential that Prudential was unable to benefit from and caused it to run into regulatory difficulties of several kinds and they had to make rather substantial payments to litigants and to regulators as a result, and they changed management

Page 485

during this period. Wick Simmons came in at the end of that period, I think probably Harry Jacobs was there before the deal was approved and I think may not have had anything to do with it, but that's kind of how I remember it.
Q Okay. Now, do you have any reason to doubt that in fact Mr. Jacobs and General Haig made a bid in May of 1989 for $252 million for Carteret?
A I have no reason to believe that ever happened.
Q Well, why would Mr. O'Brien lie about it in writing?
A Well, I don't know what Mr. O'Brien meant when he wrote what he said.
Q Well, he said that they had made a bid for it.
A What does that mean?
Q Well, you know what a bid is, I mean --
A I know what a bid is.
Q Right.
A And I know that a proper well-founded bid would have been presented in writing and it would have been questionably circulated in writing to the Ambase Board and it would have been

Page 486

discussed.
Q So --
A There's no evidence that that occurred. There's no evidence of a written bid or anything else.
Q So in all your years at Goldman there was never an informal oral bid that you can recall?
A There are informal discussions which might lead to such a bid but not actually bids.
Q What do you --
A It all starts someplace, somebody says why don't we get together.
Q Yes.
A That's not a bid.
Q A bid is what, is a formal offer to acquire?
A Yes.
Q And it's reasonable to assume that that's what Mr. O'Brien would have meant in his letter?
A I don't know what Mr. O'Brien meant. Mr. O'Brien may have been confused as to whether it was a true bid or whether it was a fishing expedition or whether it was an aspiration or whether it was an invitation to discuss things

Page 487

further, none of which is clear from his letter, and it would be surprising to me to think that Mr. Jacobs and General Haig would be content to have a real bid that they had intended to make be dismissed so easily so that it never went anywhere.
Q But isn't the letter clear on that? The letter indicates they withdrew it during May which, I might add, is when the Hyde Amendment fails.
A Well --
Q And they make a bid just for the Florida branches at the end of May.
A Yeah, but what happened, when you said they withdrew it, what was the "it"?
Q Whether you want to call it an informal discussion or whether Mr. O'Brien's bid, but they made it clear, according to Mr. O'Brien, they didn't want all of Carteret anymore --
A That's what they did when they so-called withdrew it --
Q Right.
A -- but there wasn't an "it".
Q Well, whether you want to call it a bid or an informal discussion, but the concept of them paying $252 million, they were no longer

Page 488

interested in the concept of paying $252 million; isn't that right?
A Well, they did withdraw whatever it was that they'd submitted but I don't know that what they submitted was a bid.
Q Well, that's why I'm using the word concept, okay, so that we can --
A Well, a concept you don't take to the bank, so it's not a real thing.
Q Well, the concept, you said every bid starts with informal discussions, so that's a necessary precondition.
A Yeah, but if it were a serious bid and it was one that was taken seriously by Scharffenberger and the others, they would have done something to be sure that it was.
Q Aren't there sometimes informal discussions that would have led to a bid but an intervening event kills it in the cradle before it becomes a bid, that happened at Goldman, didn't it?
A Could do. Could do. Intervening events could come between but it was my understanding that that intervening event didn't occur the day after the first discussion about this occurred.

Page 489

Q It happened, but the intervening event is the Hyde Amendment, doesn't that make perfect sense?
A No, not to me, I don't know much about the Hyde Amendment, but I do know that I wouldn' believe a letter like O'Brien's letter signified a serious bid.
Q He's writing the letter to someone who is there, so how would it make any sense for him to lie to Scharffenberger --
A I didn't he say he was lying.
Q Okay.
A I'm saying maybe he misunderstood it or he may have exaggerated its importance, Scharffenberger apparently gave it very little thought.
Q What's your basis for saying that?
A That nothing else happened. There's no evidence in the record that anything else happened except that they withdrew the thing.
Q Okay.
A It wasn't presented to the board.
Q My question is that there's nothing for Scharffenberger to do if they've withdrawn it.
A Well, they had to make it first before

Page 490

they withdrew it.
Q Well, and according --
A What they made was a concept drill discussion which if I were Scharffenberger I would think I'd like to see if it's real, so I would ask for it to be followed up in some way. Submit it in writing. Do you have financing? Tell us the things that are material to deciding whether we should pay any attention to it or not. That apparently never happened, there was no other reference to it.
Q Because they withdrew it.
A They withdrew it later.
Q A couple of weeks later.
A Weeks.
Q Two weeks.
A Two weeks. You can decide -- listen, if someone's going to offer to buy something from me for $250 million, I just don't go to sleep for two weeks and wait for something to happen that makes them withdraw it, I'm going to try to get it pinned down to find out what it really is, is it real or is it not. I'm not sure I have any reason to think that those guys have access to that amount of money.
Q Well, the former chairman of Prudential Bache can't raise money?

Page 491

A $250 million?
Q Right.
A How's he going to do that?
Q He's the chairman of a large company.
A Was.
Q Was the chairman of a large company.
A So, do you give money to people just because they used to be the chairman of a large company?
Q Well, it's an easier buyer to raise capital.
A To buy an S&L in a difficult market situation.
Q Who would know, is it fair to say that Mr. Jacobs as director of Carteret had a better sense of its value than you do today, that he sitting in 1989 had a better sense of the value of Carteret in May of 1989 than you do today?
A I don't know.
Q Okay. Now --
A I've been a member of boards where people don't know very much about the subsidiaries or companies that they're involved with, and I don't have any reason to think that Mr. Jacobs had any experience in this industry to know enough about it

Page 492

to be able to root out all the difficulties that would have to satisfy a group of investors. I don't know that he had any access to raising the kind of money that Ambase was able to raise from Chase, which relied a lot on the Ambase entity as part of the deal, and I have no reason to know that General Haig knew how to spell, you know, a loan agreement, not to mention have any access to one. So no, I don't think that they had a real bid.
Q Okay. But my question was actually, do you think, is it fair to say -- strike that.
Is it fair to say that as directors of Carteret or as a director of Carteret Mr. Jacobs would have more information about Carteret in May of 1989 than you do today?
MS. GRONER: He already answered that question.
MR. THOMPSON: And then he went on with a long speech that potentially changed the answer, so I want to get the answer cleanly.
A I don't know.
Q Okay. Thank you.
And you've used the term moral hazard during our conversation over the last few days, what

Page 493

do you mean by that term?
A I used it once about an hour ago. It's generally understood I think in economics that the provision of insurance sometimes increases the risk of the event against which the insurance is taken out, and for some obscure reason I can't quite explain to you, this is called moral hazard. Maybe it means there's a hazard that the holders of the insurance will act immorally against the interests of the insurance company.
Another example here would be, if the FDIC is going to guarantee my deposits, and I get deposits at a cheaper rate, then I'm able to use that money in any way I want to be able to increase the gains to me, such as by increasing the profits of an enterprise that may be the business it's in so as to improve the price-to-earnings ratio and such, but I participated in the direct profits from this, from this money that's insured. That's what they mean by moral hazard.
Q Now the regulators -- do you know of any regulators who are criticized in the early nineties for shutting down an institution too soon?
A I know that -- I don't know of any in particular, I know this criticism was around.

Page 494

Q What was the nature of the criticism?
A What you just said, that the regulators acted too soon to close down S&L's or even commercial banks.
Q Do you think that was a valid criticism for the '91 to '92 time period?
A In general I probably do not but I'd have to say it depends very much on the specifics of the particular case.
Q Okay. And in this case was it too soon in your opinion?
A I don't think so.
Q What was the risk to the insurance company, insurance fund of having an institution on the trends that Carteret was on no longer engaging in the risky type of lending, you know, continuing to operate and --
A Well, this is a judgment that they make, but it was out of compliance.
Q Right, but my question --
A It was out of compliance, it had been out of compliance for a lengthy time. Nobody knows what market conditions will be like tomorrow that could make things worse. There is a case of you know where you are, you take your medicine and you

Page 495

get on with life, and the regulators on the whole had been stretching these things out for a long time but it was getting to the point where this was they were looking for solutions to get the problems behind them. So I'm not able to put myself in the regulators' shoes at this point because they decide these things within the powers granted to them. But I can understand that someone who said that, you know, five years is long enough to lose all the capital, even though it may be doing a little better now, it's still very fragile and it hasn't been able to replace the capital that's been lost by efforts to raise the money, so maybe that's the precipitating event. After a while you can't raise the money, that's it, your time's up. That would not be an unreasonable position for a regulator to take even though some, I can assume, would disagree with that view.
Q Now, I would like you to put yourself in the shoes as an advisor to Carteret in 1992 trying to help them raise the capital necessary to survive. Would one possibility have been for Ambase to issue debt and downstream the money into Carteret?
A How would they do that, because the

Page 496

only assets of Ambase at that time in 1992, as I understand it, was their ownership of Carteret.
Q Well, they also had $35 million in cash, so if they go out and they raised 20 -- 200 million in debt --
A Well, why don't they just send the cash down?
Q Well, because -- let's think about this as an advisor who's trying to help them and an expert in this field and one who could make a fee by consummating a transaction.
So if they go out and they raise $200 million of debt, Ambase does, do you have an opinion as to what the rate on such debt would have been in the end of '92, is it 10 percent?
A I think that would be very hard debt to raise.
Q Well, and that's what I want to ask you.
A Which means maybe it's not raisable. I mean at what rate, 30 percent?
Q Well, with Ambase having 35 million in cash, doesn't that, wouldn't that basically -- let's say it was -- I know you're not agreeing with this but just so that we can keep the hypothetical

Page 497

going -- say it's 11 percent debt and Ambase itself would be able to service that debt for the first three years of the -- no, excuse me -- year and a half of the loan, so basically what it would be allowing the debt holders to do is see if Carteret can turn itself around in a year and a half, if it does, then Carteret can start paying dividends up, and it's basically given some breathing room, it becomes an option on the value of Carteret for the debt holders, would that have been something that would have been possible?
A I don't know if it would have been possible, but it's something perhaps to look at.
Q And the key to it would be --
A Michael Milken unfortunately is now in jail or in the courts and he can't help you, he's the kind of guy you'd take that sort of problem to because he has investors who might have bought those things, many of them being other S&L's, who unfortunately are also in difficulty at this time. So that market isn't as robust as it was in 1988 to 1989 in 1992.
Q But if it was going to work, the debt holders would have to be confident that if --
A They would have to be confident

Q Okay. But now I mean if you're selling it to the bond investor, the bond investor is going to want to know whether the regulators are going to --

A The regulators could prevent it, you'd have to have the consent of the regulator to do that.

Q Okay.

A Remember, this is a form of capital transfer out, they would be --

Q Right.

A Now, they wouldn't regard this as very useful capital because it's essentially liquid.

Q But it's there, and if Carteret has big losses and they shut it down, then they're $200 million, the Government is $200 million better off than they were before.

A And the investors in the bond don't get what they think they're getting.

Q That's right, I mean that's why they're getting, that's why they're getting their risk premium.

A Well, but they're not getting the security of the principal.

Q They get the security to the extent



Ambase has 35 million in cash and it's got that in T-bills, you know, they have some downside protection.

A Well, let's just summarize this by saying it's a very complex thing and it takes some consideration to be sure that this thing seems to work. All I can say is, based on what you've told me is it might, it might be a possible solution to this complex problem.

Q But it would depend on the regulators agreeing to it?

A That, and investors being satisfied that what they get is enough at the right price for them to be willing to invest in it, and the market conditions in 1992 were not great for this kind of junk bond and, you know, I don't know what they'd do.

Q Why would it be a junk bond if it's invested in government bonds?

A Because it's a second claim on the government. Government bonds. The first claim is the FDIC. And they might close me down, so I'm basically investing in the recoverability of the S&L which has a record of being in distress and we hope it's getting better but who knows.



MR. THOMPSON: Professor, thank you. Now Ms. Groner will have some questions.

MS. GRONER: Well, I guess first the FDIC.

MR. THOMPSON: Oh, Mr. Kuiper?

MR. KUIPER: The FDIC has no questions.

MS. GRONER: Just a few questions. I'd like to ask the reporter to mark an exhibit.

(1984 Report of Examination by the Federal Home Loan Bank Board of Carteret Savings & Loan marked as Exhibit Smith 3, as of this date.)

MS. GRONER: Let me just note that this is on the list of materials considered. Let me find the place.

On Exhibit 2, page 2 there's a category Reports of Examination and I would just like to identify this for the record. This is the 1984 Report of Examination by the Federal Home Loan Bank Board of Carteret Savings & Loan.



EXAMINATION BY

MS. GRONER:

Q And I'm just going to ask you to turn to Table 3 -- Exhibit 3 of your report, Table 1, page 1.

A You're speaking to me?

Q Yes.

A Table 1, page 1, yes.

Q And that's the balance sheet data that you compiled?

A Right.

Q Okay. And I'm going to direct your attention to page WOR9611188 just to source some of the data.

A You're talking about this report now?

Q Yes.

MS. GRONER: All right. I'm going to ask everybody, under -- well, let's just start with Exhibit 3, Table 1, page 1 of the report. There's a category one, two, three, like about four items down under Loans, under Assets under Loans it says -- no, excuse me. One, two, three, four, five, six, seven, eight -- eight items down it says Commercial Loans. You all with me?

Page 514

BY MS. GRONER:
Q Did you find Commercial Loans?
A Yes, I see it.
Q And if you look at 1984, the data for December 1984.
A 193.5?
Q Million. Is that correct?
A That's what it says here.
Q Okay. And so now I'd like you to look at this Report of Exam to show the source of that, and now this is on the page that says WOR9611188 which is page 202, if you'd look at the paragraph in the middle of the page that begins "During the review period," are you with me?
A Yes.
Q Okay. So if you go down -- let me read that whole paragraph into the record.
It says, "During the review period, the Association purchased and sold loans totaling $2,719,942,000 and $1,283,993,000 respectively and originated $1,866,120,000. Significant in the amount of originations are activities of the recently formed Income Property and Corporate Banking divisions. Since its inception in April 1983, the Income Property division has

Page 515

originated approximately $500,000,000 in loans primarily on projects located in New Jersey covered by its Northeast division and in Florida by the Southeast division. The Corporate Banking division with $193,500,000 in commercial loans outstanding as of the same date operates in the same manner through northeast and southeast loan production offices."
So does this $193.5 million confirm the $193.5 million that's reflected on your chart?
A Yes.
Q Okay. When you use the term Commercial Loans on your chart, what do you mean by commercial loans?
A Well, loan to corporations and businesses.
Q Does that also --
A Other than first mortgage loans to house mortgages.
Q So does that Commercial Loan entry of $193.5 million include commercial real estate loans?
A It would appear not.
Q And if as the examiner notes here the commercial real estate loans increased from zero to $500 million in 18 months, would that be an excessive growth?

Page 516

A These are loans which I believe are included in first mortgage loans on this table but which were not separately identified as being real estate, commercial real estate secured loans as opposed to house loans. So you have the real estate loans of 500 million up there included in this big loan category and then you have the 193 separately held out as ones which presumably are not first mortgage guaranteed but are commercial loans.
Q Well, would commercial real estate loans increasing over 18 months from zero to about $500 million be excessive growth in your opinion?
A It's an extraordinary fast rate of growth. Excessive would suggest that it's too fast to be able to keep up or build the infrastructure you need to make the correct credit decisions, collateral valuation decisions and loan administrations, follow-up and so forth.
Q And if the --
A That's putting loans on the book in those months as fast as you possibly can, so it would suggest to me that they're getting ahead of themselves and therefore it would be excessive growth in that context.
Q How about the corporate loans growth

Page 517

from zero to 193.5 million, do you consider that to be excessive growth?
A Well, that's a comparable situation. It could very well be excessive growth to go from zero to 200 million in 18 -- well, that's a little longer, two years. A little longer. But you have to build these infrastructures up to be able to be sure you're making good loans, and if you grow the loans faster than you can, then it would suggest that you're growing excessively.
Q Okay. And one last line I'd like to look at. The Consumer Loan --
A May I add one thought?
Q Sure.
A I think you asked me this question the last time we were together which is whether I thought that the loan rate of growth for this sector, you know, was somehow excessive or too fast relative to the overall asset base of the enterprise. I think I said it probably wasn't because relative to 5 billion this wasn't such a large number, but relative to its own setup it would be a very rapid rate of increase of loans of this category.
Q And the last item I wanted to talk

Page 518

about was the Consumer Loans entry, and do you see that in 1982 it shows $23.5 million in consumer loans?
A Yeah.
Q And then if you look at 1986 --
A Yes.
Q -- they're up to $274.9 million?
A Right.
Q Do you consider that to be excessive growth?
A That's a ten-fold increase in four years which very well could be.
Q And --
A It certainly appears to be excessive relative to the ability to build up the infrastructure to cope with it.
Q Okay. And then my final question to you -- you don't need the document anymore.
Mr. Thompson asked you a lot of scenarios about possible ways to raise capital that perhaps you would have advised if you were a consultant to Carteret in 1992, do you remember that?
A Yes.
Q Do you think the regulators were

Page 519

precipitous in closing down Carteret?
A I don't think so but, you know, I haven't been asked to testify on that matter so I haven't really studied whether they were precipitous or not, but in my general view they probably had reason to do what they did.
MS. GRONER: Okay. I have nothing further.
MR. THOMPSON: I have no follow-up.
THE WITNESS: We're done?
MS. GRONER: We're done.
MR. THOMPSON: Thank you, Professor.
(Whereupon, witness excused, to read and sign.)
(Whereupon, deposition concluded and adjourned 5:08 p.m.)

________________________
SIGNATURE OF WITNESS

SUBSCRIBED AND SWORN TO before me this _______ of _____________, 2007.

________________________
NOTARY PUBLIC

My Commission Expires:

Page 520

CERTIFICATE

I, JOSEPHINE H. FASSETT, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify that the witness, whose continued deposition is hereinbefore set forth, was previously sworn by me on the date indicated, and that the foregoing continued deposition is a true and accurate record of the testimony given by such witness.

I FURTHER CERTIFY that I am not employed by nor related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

________________________
JOSEPHINE H. FASSETT, CSR, CLR
New York Notary Public