# EXHIBIT C

John E. Ryan May 25, 1999

*Page 1 to Page 215*

CONDENSED TRANSCRIPT AND CONCORDANCE
*PREPARED BY:*

*ALDERSON REPORTING CO. INC.*
*1111 14th St, N.W.*
*4th Floor*
*Washington, DC 20005*
*Phone: 1-800-FOR-DEPO*
*FAX: 1-800-367-3310*

Page 53

A It's an area that is predominantly minority. As I remember, Carteret at one point moved its headquarters to downtown New York and it technically qualified under that, under that statute.
Q It had moved its headquarters there before this law was passed; is that right?
A Yes.
Q So when you were charged with implementing this law, Carteret, I think you said, technically fell within it?
A That's correct.
Q Was that a close technical call or was there any controversy as to whether or not it belonged in the program?
A No.
Q Who decided that it belonged in the program?
A I don't remember who. I think the legal staff at the RTC made the call.
Q What kind of preferences were you required to give to minorities in the sale of –
A As I said, that's what the statute said that we had to give preference.
Q Did the statute identify what preference

Page 54

you were supposed to give?
A No.
Q So you were supposed to figure that out for yourself?
A We were supposed to figure that out for ourselves, right. And it had to be resolved at the lowest possible cost to the taxpayers.
Q Did you have problems resolving those two objectives?
A They are irreconcilable.
Q Why do you think that?
A Preference by its nature seems to me requires some cost. We were – we had to design a system that would minimize that cost.
Q Did your experience in your years at the RTC bear out your opinion that those two objectives were irreconcilable?
A Not necessarily. We came up with a system of bidding that I think got a good price for the institutions that we sold.
Q It at least minimized the cost of providing the preference?
A I think that's right or in some cases may have eliminated it.
Q How would you determine whether that was

Page 55

so?
A I don't know.
Q What system of preferences did you ultimately decide to give?
A There was a – what we decided to do was that we would hold a bidding conference with minorities, and if there were minorities interested in bidding along with all the other interested parties and if the minority buyer came within 10 percent of the highest bid, they could then up their bid to that highest bid and take it.
Q How did that work out in practice?
A In practice, the minorities did not win the Carteret bid as I remember.
Q How did this program work out?
A It worked out, I think, all right. We actually got the concern was that if you – if you just gave the minorities the right to match the highest bid, that you would chill the bid because the other bidders wouldn't want to be a stalking horse and set the price and spend all the money on due diligence and so forth. The 10 percent range seemed to deal with that program and maybe in some cases we got a little more.
Q How do you think – let me try that

Page 56

again.
Why do you think the 10 percent rule dealt with your concern that the preference was chilling regular bidders?
A Because you had to have a very serious minority bidder, and they had to do their due diligence and come in with a fair bid in order to even have a chance of buying.
Q Did you do any kind of surveys or any other kind of investigation to determine whether nonminority bidders were chilled by this preference program?
A No, except we had plenty of bids.
Q Relative to the number of resolutions you were closing during this period, how big a portion was the minority cases?
MR. FIREHOCK: That's a little ambiguous.
BY MR. KIRK:
Q Do you understand my question?
A I don't remember exact numbers.
Q Order after magnitude?
A Between 5 and 10 percent of the cases, something like that.
Q So in 90 percent of the cases, you were

Page 61

from anyone else?
A Yeah. I was visited by a group of African-American ministers including the head of the south leadership conference, Lowery, and a number of others. I can't remember all their names, but they were the head of the AME Church Baptist organization.
Q And I take it they too were interested in ensuring that we were providing preferences to minorities bidding on RTC's that were for sale?
A Yes.
Q Did you get any kind of political interests or visits or anything of the like from anybody that was interested in making sure that you fulfilled the objective of least cost to the taxpayer?
A Not that I recall.
Q All these folks that visited you to urge you to make sure that you gave a good preference to minority bidders, were they happy with what you ended up doing, or were they unhappy?
A I can't characterize it. I can simply say it was not -- everyone wasn't universally happy. There were some that accepted it, and there were some that didn't like it.

Page 62

Q And the ones that didn't like it wanted you to give more of a preference, is that basically it?
A Wanted to be able to match the highest bid.
Q I thought that's what your program allowed; is that not right?
A Only if they came within 10 percent on the initial bid.
Q I see. So the fight over this was over whether for the opening bid they had to --
A Come within 10 percent.
Q Come within 10 percent.
Why did you decide to impose that 10 percent rule?
A Because it wouldn't in our view have a chilling effect on the other bidders that they wouldn't be simply acting as a stalking horse setting the price so that somebody could match it.
Q Is the reason for that the belief that anybody who spends the money to gather financing and have a full arrangement to put in an initial bid is likely to be serious?
A That's correct.
Q So you were concerned that if you didn't

Page 63

have the 10-percent rule a minority bidder could simply put a number in and then scramble around and try to find the financing?
A Or might even have it but wouldn't have to do the kind of due diligence necessary.
Q What kind of due diligence?
A Whenever you buy a financial institution, you have to look at the location of the branches and analyze the deposits and the rate paid on the deposits and whether it's a core based deposits or whether it's more volatile deposits, whether the branch locations are desirable, whether it's a good franchise, and that always involves a considerable amount of homework.
Q So by putting the 10-percent rule in, you were, in effect, requiring minority groups to do all that work and also to go to the trouble of actually lining up dollars to close on the deal if they are the winner?
A That's right.
Q And if you didn't have the 10-percent rule, they could simply sit back and do nothing, wait until the majority bidder has put his number in and then just say, oh, well, match that and then scramble and do all that. Do I have that right?

Page 64

Tell me if I have it wrong.
A I think that what we're saying what we decided was that somebody would -- any bidder would have to do a lot of serious groundwork before they submitted a bid that would be within 10 percent of the highest bidder, if you presume that the highest bidder if you have a large enough group, and in most cases we did, that that represents the market valuing of that institution. For someone to come within 10 percent, its going to require a considerable amount of work and the highest bidder can assume that if a minority gets it, the minority has done that work and has -- is serious enough about it so that they are not just sitting around waiting for the market to set the price so they can come in and buy it.
Q So the theory was that the majority bidders would feel comfortable enough participating not withstanding this preference because they would feel that the minorities had to do some work before they could play?
A Yeah, and they wouldn't be just a stalking horse. I must say it turned out that that was the case.
Q Now, would you require some kind of

Page 125

A No.
Q Was Mr. Horton?
A I don't think so.
Q So you think this was something that the FDIC just sent over for you all's information?
A The FDIC, you may recall that when -- that the RTC was, by statute, going out of existence on December 31st, '95, and any unfinished business of the RTC was going to be handed over to the FDIC to complete. We were all, throughout the latter half of '95, we were working closely with the FDIC to familiarize them with what we had and to turn over the keys as it were.
Q Do you recall reviewing this document?
A No, I don't. I don't recall the document.
Q If you take a look at the first page of the document, there is a number of statements under the heading "hypothesis list," and then under the subheading "resolutions" and about halfway down the page, there is a suggestion that by announcing government intervention through the use of conservatorships, the market value of thrifts are diminished more than if they had been closed and resolved through the typical resolution process. Do you agree with that?

Page 126

A Yes.
Q Why do you think that is?
A I think the way the conservatorships were operated, that is, operated in a way so that they stopped lending that the attrition in the customer base of the institution occurred and the value of the institution was less.
Q If you look two bullet points down, the suggestion is made that resolution costs increase significantly the longer the institution is in conservatorship.
A I think that's right.
Q That follows from what you were just explaining?
A Yes.
Q And further down the page, the second to last item, it's suggested that prescreening of bidders and minority bidder preference programs may discourage bidder interest and lower premiums received.
A I don't understand it.
Q It's grammatically challenged, as they say.
Let me suggest and ask my question based on the following premise: I think what they are saying is that the prescreening of bidders in the minority bidder preference programs may discourage bidders' interest; and as a result, RTC may receive lower premiums. Assuming that's right, do you agree with that?

Page 127

MR. FIREHOCK: You're asking him to agree with that general statement you just made?
MR. KIRK: What I'm asking is the document is a touch unclear. I'm offering him my interpretation and asking him if that is clear.
MR. FIREHOCK: Why don't you just ask --
MR. KIRK: I didn't ask if he agreed with the interpretation.
BY MR. KIRK:
Q Here is the question: Do you agree that the prescreening procedures and the minority bidder may discourage bidder interest?
A I believe that minority bidder preference programs may discourage bidder interest and lower premiums. Prescreening of bidders, I don't know what the hell that means.
Q Fine. I don't know what the hell that means either. Let's forget the prescreening of bidders.

Page 128

You do agree that the minority preference programs may discourage bidder interest, correct?
A Yes.
Q You also agree that as a result, you may -- RTC may get lower premiums, correct?
A They may. Not necessarily. May.
Q If you take a look at a couple of pages in, there is a -- I don't have page numbers. I guess if you look at the bottom of the page, the page numbered 0125181 and headed "what we have learned thus far interviews." Do you see that page?
A Yes.
Q Do you know who they interviewed?
A No.
Q If you look at the first bullet point under there, the statement is made many people at high levels believe that it is more cost-effective to keep assets out of the hands of the government liquidators. First, do you agree that it's more cost-effective to keep assets out of the hands of government liquidators?
A Yes.
Q Was that a view that was generally shared among high officials in the government?