**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC., Plaintiffs, | ) |
| and | ) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Intervenor, | ) Civil Action No. 93-531 |
| v. | ) (Judge Loren Smith) |
| UNITED STATES OF AMERICA, Defendant. | ) |

**<u>PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>**

Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:
Vincent J. Colatriano
David H. Thompson
Jesse Panuccio

COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

July 1, 2008

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

I. THE SUPERVISORY GOODWILL CONTRACTS ........................................................1

A. Carteret Acquires Failing Thrifts, Saving the Government the Cost of Resolution ........................................................................................1

B. Government Regulators Knew Supervisory Goodwill Was Indispensible.............3

II. CARTERET'S VALUE WAS LOST AS A RESULT OF THE BREACH........................7

A. Sustained Profitability Prior to the Breach ..........................................................7

B. AmBase's Acquisition of Carteret ..........................................................................8

C. Carteret's Market Value at the Time of the Breach: $251.4 Million.....................11

D. Carteret's Loan Losses Were Not Apparent in 1989 and Did Not Cause Market Decline.........................................................................................14

E. The Value of Carteret's Undiscounted Cash Flows: $782.2 Million.....................17

F. The Present-Day Value of Carteret in the Nonbreach World: $904 Million..........................................................................................22

III. THE BREACH AND ITS DEVASTATION OF CARTERET........................................36

A. The Importance of Supervisory Goodwill to Carteret ..........................................26

B. The Breach's Devastating Effect on Carteret ......................................................27

1. The Breach Devastated Carteret's Capital Profile and Regulatory Posture.............................................................................29

2. The Breach Sparked a Downward Spiral Resulting in Seizure .................32

3. The Breach Caused Carteret to Shrink its Asset Base ..............................35

4. The Breach Prevented Expansion ...........................................................38

5. The Breach Caused Substantial Deposit Run-off .....................................38

6. The Breach Caused an Increase of Carteret's Cost of Funds and a Loss of Relative Advantage..................................................................41

7. The Breach Caused Carteret to Sell Branches in 1990 .............................43

8. The Breach Caused Carteret to Take Ultraconservative Loan Loss Reserves ...............................................................................47

9. The Breach Caused a Variety of Other Harms ........................................56

C. The Injunction....................................................................................................58

IV. CARTERET WOULD HAVE THRIVED IN THE NONBREACH WORLD.................59

A. Carteret Would Never Have Fallen Out of Capital Compliance in the

Nonbreach World ....................................................................................59

1. A Conservative Counter-factual Picture of Carteret ..................................59

2. Assuming the Need, Capital Easily Could Have Been Raised ..................63

a. AmBase Could Have Raised Capital in the Nonbreach World .....64

b. Carteret Could Have Raised Capital in the Nonbreach World ......67

c. Carteret Could Have Securitized and Sold Residential Loans.......68

d. Carteret Could Have Merged ......................................................68

e. Carteret Could Have Sold Its Servicing and Origination Businesses ......................................................................................68

f. Carteret Could Have Unlocked its Substantial Franchise Value ...70

g. Carteret's Trends Demonstrate Sustainable Profitability ..............72

B. The Government's Contentions Regarding Survival Are Incorrect .......................79

V. WOUNDED BANK DAMAGES .........................................................................81

VI. EXACERBATING THE BREACH BY PREVENTING MITIGATION .........................82

A. The Date of Carteret's Seizure was Arbitrary and Unreasonable..........................82

B. Government Regulators Inhibited Recapitalization of Carteret............................91

VII. CONGRESS AND THE RTC CREATE A RECEIVERSHIP DEFICIT .........................97

A. The FDIC Has Inappropriately Accounted For, and Artificially Inflated, the "Post-Insolvency Interest" ..................................................................97

B. The Mere Transfer of Carteret to the RTC was a Value-destroying Event .........110

C. The Breach Prevented the RTC from Realizing the Value of Carteret's Supervisory Goodwill ..........................................................................111

D. Congress's Failure to Fund the RTC Increased the Cost of the Carteret Liquidation ...........................................................................................113

E. The Minority Preference Program Substantially Inflated the Receivership Deficit...........................................................................113

F. The Tax Liability Is a Chimera of the FDIC's Own Making .............................117

G. The RTC Squandered the Value of Carteret Mortgage Company .......................121

H. The Receivership Deficit Includes Questionable Administrative Expenses........122

VIII. PROFESSOR SAUDNERS WAS NOT A CREDIBLE WITNESS ...............................123

IX. TAX GROSS UP ..........................................................................................124

# TABLE OF AUTHORITIES

**Cases** **Page**

*AmBase Corp. v. Commissioner*, 2001 T.C.M. (CCH) 1657 ....... 65

*Ambase Corp. v. United States*, 58 Fed. Cl. 32, 44 (Fed. Cl. 2003) ....... 2, 3

*Bank of America v. United States*, 67 Fed. Cl. 577 (2005) ....... 64

*Carteret Sav. Bank v. OTS*, 963 F.2d 567 (3d Cir. 1992) ....... 59

*Carteret Sav. Bank, FA v. OTS*, 762 F. Supp. 1159 (D.N.J. 1991) ....... *passim*

*Carteret Sav. Bank, F.A. v. OTS*, No. 91-661, slip. Op. (D.N.J. July 8, 1991) ....... 59

*Northeast Sav., F.A. v. OTS*, 770 F. Supp. 19, 23-25 (D.D.C. 1991) ....... 59

*Slattery v. United States*, 69 Fed. Cl. 573, 585 (2006) ....... 1, 19

*United States v. Winstar Corp.*, 518 U.S. 839, 845 (1996) ....... 113

**Other**

12 U.S.C. § 1464 (t)(2)(A) ....... 30

12 U.S.C. § 1464(t)(3)(A) ....... 29

12 U.S.C. § 1441a(w)(17)(C) ....... 113

26 U.S.C. § 172 ....... 120

12 C.F.R. § 360.3 ....... 102, 104

12 C.F.R. § 360.3(b) ....... 100

12 C.F.R. § 360.7(b)(3) ....... 106

12 C.F.R. § 567.8 (1990) ....... 30

RTC Completion Act, Pub. L. No. 103-204, § 3(a), 107 Stat. 2369, 2375-76 (1993)
(codified at 12 U.S.C. § 1441a(w)(17)(A) ....... 113

# I. THE SUPERVISORY GOODWILL CONTRACTS

## A. Carteret Acquires Failing Thrifts, Saving the Government the Cost of Resolution

1. As of August 1982, Carteret had total assets of $2.3 billion and positive net worth of $36.4 million.[1] Up to that point, Carteret had "operated relatively free of supervisory concern" and had "operating ratios [that were] generally more favorable than those of like-sized institutions." PX 2433 (Mem. from H. Beesley, 9/30/82) at OAM0060026. Many of Carteret's peer institutions were not so well situated. As interest rates rose in the early 1980s, "some 435 thrifts failed between 1981 and 1983." *United States v. Winstar Corp.*, 518 U.S. 839, 845 (1996). This parade of failures left the federal government in a bind. The Federal Savings and Loan Insurance Corporation (FSLIC) "lacked the funds to liquidate all of the failing thrifts." *Id.* at 847. To solve this problem, the Federal Home Loan Bank Board (FHLBB) "encourag[ed] healthy thrifts . . . to take over ailing institutions in a series of 'supervisory mergers.' " *Id.*

2. Accordingly, in the spring and summer of 1982, government regulators began soliciting potential acquirers to take over two FSLIC-insured failing thrifts, Barton Savings & Loan Association of Newark, New Jersey ("Barton"), and First Federal Savings and Loan Association of Delray Beach, Florida ("Delray"). *See* PX 2433 (Beesley Mem.) at OAM0060022, 24. Both institutions had recorded significant operating losses that had completely eroded their capital, and rendered them insolvent. *Id.* at OAM0060021, 23. By the fall of 1982, the total amount of

[1] *See* PX 2433 (Mem. from H. Beesley, 9/30/82) at OAM0060016. Carteret Building and Loan Association of Newark, New Jersey, a successor to thrift institutions dating back to 1888, was incorporated as a state-chartered savings and loan association on September 15, 1939. *See* PX 6 (Carteret Bancorp, Inc. 1987 Annual Rpt.) at AMB013909; DX 8124 (OTS "S" Mem., 11/22/92) at FAM0020549. The thrift converted to a federally chartered mutual association on May 5, 1982, and to a federally chartered stock association on September 7, 1983. DX 8124 at FAM0020549. On January 15, 1986, the thrift was renamed Carteret Savings Bank, F.A. *Id.*

the insolvency of Delray and Barton was $168 million and $46 million, respectively.[2]

3. On September 29, 1982, Carteret and FSLIC entered into an Assistance Agreement whereby Carteret agreed to acquire Barton and Delray in return for certain benefits. *See* PX 2429. Because the failing thrifts' net liabilities far eclipsed Carteret's positive net worth, the government promised Carteret that it could include the supervisory goodwill resulting from the acquisitions in the calculation of its regulatory capital, to be amortized over a period of up to forty years.[3] The ability to use supervisory goodwill was the *sine qua non* of the bargain between Carteret and the government. As this Court found in the liability phase of this case, "it would have been irrational . . . for [Carteret] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." *AmBase Corp. v. United States*, 58 Fed. Cl. 32, 45 (2003). The supervisory goodwill that arose from the 1982 acquisitions was approximately $214 million. *Id.* at 36; PX 2702A (Calomiris 5/07 Rpt.) at ¶ 10; PX 9001; Tr. 656:2-13 (Calomiris); DX 7000A (Kennedy Rpt.) at 4.

4. Carteret acquired two additional FSLIC-insured failing thrifts on June 6, 1986—First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia ("First Federal"), and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security"). PX 5 (1986 CSB Annual Rpt.) at AMB013889. In that transaction, the federal government again promised, *inter alia*, that Carteret would be permitted to include supervisory goodwill in calculating its regulatory capital, this time for a period of up to twenty-five years. *AmBase*, 58 Fed.

---

[2] DX 7368 (Mem. from J. Carfora, 1/14/92) at CAM2460220; PX 2702A (Decl. of Charles W. Calomiris, 5/19/07) at 9 [hereinafter "Calomiris 5/07 Rpt."]; DX 7000A (Expert Report of David A. Kennedy) [hereinafter "Kennedy Rpt."] at 3-4; *AmBase Corp. v. United States*, 58 Fed. Cl. 32, 36 (2003).

[3] *AmBase*, 58 Fed. Cl. at 35-36, 43; PX 2433 at OAM0060020; PX 504 (1984 CSB Annual Rpt.) at AMB 030000; PX 1601 (Carteret Offering Circular, 8/30/83) at CAM5240896; PX 2441 (J. Finn to R. O'Brien, 9/30/82; L. Hayes to R. O'Brien, 10/12/82); Connell Dep. 32:8-9 (JX 1 at 23); Tr. 656:14-17, 1329:15-22 (Calomiris).

Cl. at 36-37, 46; PX 2483 (Letter from Peat Marwick, 6/4/86); PX 6845 ("S" Mem. from M. Simone, 5/30/86) at WOR0630891. Carteret booked a total of $21.7 million in supervisory goodwill—$20 million from Mountain Security and $1.7 million from First Federal. PX 9002; Tr. 657:8-14 (Calomiris); DX 7000A at 4. As this Court has noted, "[w]ithout the goodwill, it is likely Carteret would not have entered the transaction." *AmBase*, 58 Fed. Cl. at 49. Indeed, absent supervisory goodwill, Carteret would have been out of capital compliance immediately upon absorbing First Federal and Mountain Security.

5. By acquiring Barton, Delray, First Federal, and Mountain Security, Carteret relieved the government of the substantial cost of liquidating these thrifts. The total avoided cost was $187.4 million.[4] With debt servicing costs factored in, the total savings comes to $709 million. Tr. 1053:22-1054:4 (Calomiris).

**B. <u>Government Regulators Knew Supervisory Goodwill Was Indispensible</u>**

6. Before approving the 1982 acquisitions, the government conducted a viability analysis to assess Carteret's prospects for longer-term success. *See* PX 2433 (Beesley Mem., 9/30/82). As FSLIC Director Beesley acknowledged: "the purpose of [the viability analysis] was to make sure that the resulting institution would be healthy and would be able to stay in compliance with its minimum capital requirements." Dep. 22:22-23:2 (JX 1 at 15); *see also id.* at 43:24-44:4 (JX 1 at 16).[5]

7. FSLIC concluded that "Barton and First will be absorbed without detrimental affect

[4] *See* PX 2702A (Calomiris 5/07 Rpt.) at 10 n.15; PX 9102; Tr. 1050:1-1053:21 (Calomiris); PX 2481 (First Federal and Mountain Security Cost Summary) at WOR990240; PX 2433 (Beesley Mem., 9/30/82) at OAM0060023.

[5] *See also* Beesley Common Dep. at 94:13-95:16 (JX 1 at 20-21) ("[the viability analysis] measured whether or not . . . the combined institution . . . would continue throughout the period of the analysis to maintain at least its minimum capital requirements, and—and that was the definition of viability. . . . [T]he theory was they wouldn't fail their regulatory capital requirements during the period that was examined.").

[sic]," and "project[ed] that the resulting association will report a profit during the second year after the merger and remain profitable thereafter. Net worth is projected to remain positive at all times." PX 2433 at OAM0060027-28. In other words, the government concluded that Carteret would make sufficient profits—more than $300 million after the merger—to fill the tangible hole created by the acquisitions, meet the three-percent capital requirement, and thus "absorb[]" Barton and First "without detrimental effect."[6] Moreover, the FSLIC viability conclusion was "[b]ased upon," *inter alia*, Carteret's "historical growth rate," which was 22%. PX 2433 at OAM0060028. Even assuming a much more conservative long-term growth rate, the government necessarily foresaw that Carteret would grow—meaning that the government foresaw that Carteret would make even more than $300 million in order to meet its increasing capital requirement as the supervisory goodwill amortized over the forty-year period. *See* Tr. 3756:3-11 (R. Smith) (stating that he "understand[s]" that "it was the expectation of Carteret that it would grow after the 1982 acquisitions" and that he "assume[s]" the government understood this "because, otherwise, why would they do this?"). The government could also have reasonably foreseen that Carteret would pay dividends, and in that event, more than $300 million in profits would be needed to keep Carteret in capital compliance.[7] Thus, the government actually foresaw

[6] The acquisitions left Carteret with negative tangible capital of approximately $212 million and total liabilities of approximately $3.3 billion. *See* DX 8000A (Decl. of Professor Roy C. Smith, 9/21/07) [hereinafter "Smith Rpt."], Ex. 3 at 1. Thus, assuming *no* growth, Carteret would need to make $212 million plus 3% of $3.3 billion (that is, $90 million) to meet its capital requirement over the course of the amortization period. *See* 47 Fed. Reg. 10511 (Mar. 11, 1982) ("By Resolution No. 82-19, the Federal Home Loan Bank Board lowered the net worth requirement, 12 C.F.R. 563.13, for insured institutions from 4% to 3% of liabilities.").

[7] The government based its analysis on predicted profits of $4.6 million for the last half of 1982. PX 2433 at OAM0060028. Even assuming Carteret had *no* growth over the following 40 years, the government had reason to believe the thrift would make $4.6 million every six months for the next 40 years—*i.e.*, $360 million over the amortization period. In light of Carteret's historical growth, the government had reason to expect profits far in excess of that amount.

that Carteret would earn profits sufficient to replace the supervisory goodwill.

8. FSLIC also concluded "that Carteret is projected to be a viable institution as a result of the acquisition of Mountain Security and First Federal." PX 2484 (Mem. from T. Connell, 6/5/86) at WOQ2880347. Thurman Connell, the Acting Director of FSLIC in 1986, explained that the resulting entity was viable only because of the treatment afforded supervisory goodwill. Dep. 32:14-33:8 (JX 1 at 23). By 1986, Carteret was doing exactly what the government had predicted in 1982—earning profits to erase the deficit it had assumed. *See* PX 9004 (demonstrating that Carteret had net income of $34.8 million in 1983, $7.5 million in 1984, and $25.2 million in 1985). In 1986, Carteret earned $46.1 million. PX 5 (CSB 1986 Annual Rpt.) at AMB013858, 77. Thus, by the time of the 1986 contract, the government had actual evidence of how Carteret had employed supervisory goodwill to its benefit, and thus had reason to foresee that depriving Carteret of that asset would deprive the thrift of the ability to earn profits and remain in capital compliance.

9. Given the economics of the acquisitions, and the fact that FSLIC projected future viability, the government both had reason to foresee and actually foresaw that the use of supervisory goodwill would be necessary for Carteret to survive and absorb successfully the problem thrifts it was taking on. The FSLIC regulators confirmed that they understood, at the time of contract formation, that the purpose of supervisory goodwill was to provide the capital necessary to eliminate the capital deficit of the acquired thrifts, and that Carteret would do so by leveraging supervisory goodwill "in an attempt to make profits and fill the tangible hole it had." Beesley Dep. 45:25-46:5 (JX 1 at 16); *see also id.* at 63:5-7 (JX 1 at 19) ("But with capital you have the option of leveraging and the expectation and hope of a positive spread.").[8] When asked whether

[8] *See also* Beesley Common Dep. 77:4-78:1 (JX 1 at 20) ("But under normal operating

"it would have been the regulator's expectation that that supervisory goodwill would have been leveraged toward profit-making, lending activity," Director Connell answered: "Yes, it would have been our expectation." Dep. 392:12-22 (JX 1 at 26).

10. The FSLIC regulators also testified that they understood the harm that a breach would visit upon Carteret and the drastic mitigation measures it would necessitate. Connell Dep. 392:23-393:8 (JX 1 at 26) (breach would require asset shrink or capital raising). Director Connell testified that if the amortization period for goodwill were shortened in the fifth or sixth year from forty years to one year, "it could have a pretty dramatic impact on what the viability of the institution would be." Dep. 85:7-86:4 (JX 1 at 25). Similarly, Director Beesley testified that "an expectation that goodwill would be excluded from the capital calculation at some point within the time period analyzed," "would be important" to the viability analysis, and that "from an accounting standpoint in a regulatory capital standpoint, the outcome is substantially different than if they had not gone through this process." Dep. 70:9-12, 99:19-100:1 (JX 1 at 19, 21). Accordingly, the government actually foresaw, at the time of the contract, that a breach would have a dramatic impact on Carteret's capital compliance and ultimate ability to survive. At a minimum, it was reasonably foreseeable that such a breach would have devastating consequences for Carteret's capital position, business strategies, and viability.

---

conditions, leverage allows institutions to make a relatively narrow spread on their assets relative to their liabilities and yet still have a reasonable return on their capital. Q. And to the extent that the addition of goodwill as an asset results in an increase in the institution's capital, that increased capital can be leveraged in the way you just described? . . . [A.] Yes. Q. In recommending supervisory mergers involving goodwill for approval by the bank board, did the FSLIC expect that the surviving institution could leverage the goodwill generated from the transaction to hold more income producing assets? . . . [A.] Well, we would expect—I think we had every expectation that the goodwill would count as an asset which would, by the formula, result in capital being there that would be leveraged, yes.").

## II. CARTERET'S VALUE WAS LOST AS A RESULT OF THE BREACH

### A. Sustained Profitability Prior to the Breach

11. Following the 1982 and 1986 acquisitions, and consistent with the government's expectations, Carteret generated significant profits by extending its franchise into new states, expanding its asset base, and venturing into new lines of business. By the end of fiscal year 1988, Carteret had grown to more than $6 billion in assets, from just under $2 billion in fiscal year 1981. PX 9003. The following table reports Carteret's asset growth and profitability through 1988:[9]

| **Year** | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|
| **Assets ($000s)** | 4,267,314 | 5,045,678 | 5,121,801 | 5,537,547 | 5,910,170 | 6,682,279 |
| **Net Income ($000s)** | 34,809 | 7,521 | 25,222 | 46,091 | 33,417 | 19,988 |

12. The 1988 Report of Examination concluded:

> Carteret has enjoyed improving net operating income in the successive calendar year periods 1985 through 1987. This favorable scenario is the result of earnings from the bank's restructured balance sheet, with emphasis on higher yielding commercial, consumer and commercial real estate lending, during a period of relatively stable interest rates. This has produced a favorable above peer group interest margin . . . .

PX 2104 at AMB019349. Brian Dittenhafer, the chief economist and then president of the Federal Home Loan Bank of New York from 1985 through 1992, testified that "relative to the rest of the industry, Carteret was in reasonably good shape." Dep. 8:12-20, 58:8-13 (JX 1 at 63, 66). *See also id.* at 93:1-8 ("this was a reasonably strong institution") (JX 1 at 69-70). In other words, Carteret was working through the capital deficiencies of Barton, Delray, First Federal, and

[9] PX 601 (Carteret Bancorp 1987 10-K) at 14; PX 1001 (Carteret Bancorp 1988 Consolidated Financial Statements) at AMB013962. *See also* PX 9003; PX 9004; Tr. 657:15-658:3 (Calomiris) (explaining that Carteret's "assets were growing quite impressively from 1982 until the middle of 1989," that Carteret was "quite profitable during this period," and that "profits are an engine of growth for the bank.").

Mountain Security—the "problem" that Carteret had relieved the government of in 1982 and 1986. *Id.* at 103:11-19 (JX 1 at 71) ("Carteret [was] working [itself] out of a problem."). FDIC examiner William Day similarly affirmed that he had an "impression of Carteret as a healthy institution prior to the passage of FIRREA." Tr. 1523:10-20; Dep. 51:6-9 (JX 1 at 46). And Russell Meyer, the OTS's examiner-in-charge for Carteret, testified that, prior to breach, the thrift was "nationally recognized," a "good institution," and that OTS "never had a problem" with Carteret. Dep. 15:11-12, 17 (JX 1 at 368).

**B. <u>AmBase's Acquisition of Carteret</u>**

13. Such was the favorable state of Carteret's financial condition when, in the summer of 1988, AmBase Corporation (then known as The Home Group) paid $266 million in cash to acquire 100% control of the thrift's holding company, Carteret Bancorp. *See* PX 302 (Home Group 1988 Annual Rpt.) at 29. In approving the acquisition of Carteret by AmBase, the government described Carteret as "profitable," stated that "[t]he bank is considered financially strong and is not the subject of supervisory concern," and noted that as of March 31, 1988, the bank had "[n]et regulatory capital of $321.9 million represent[ing] 5.70% of total liabilities." PX 2612 (FHLBB District Bank Mem., 6/30/88) at 9. Underlying this financial analysis of Carteret, and inescapably central to the FHLBB's positive judgment in 1988, was the fact that more than $182 million of the capital on Carteret's balance sheet (as of March 31, 1988) was backed up by a contractual promise from the government, and was therefore assumed by all of the sundry professionals involved in the acquisition to be as solid as any other type of capital.[10] PX 4891 (CSB

[10] The professional firms that analyzed and executed the Carteret acquisition included some of the most sophisticated and experienced lawyers, financiers, lenders, and accountants in the country. It is implausible that *all* of these firms—including, Salomon Brothers, First Boston, Peat Marwick, and Chase Manhattan Bank—could have been mistaken in relying on the strength of Carteret's capital position. *See* PX 4805 (Salomon Bros. to The Home Group, 8/17/87); PX

Goodwill Amortization Schedule) at AM00050511.

14. AmBase had begun discussions with Carteret in early 1987. In August of that year, Salomon Brothers issued a fairness opinion supporting a $320 million valuation of Carteret.[11] After the stock market crash in October 1987, the parties renegotiated a $266 million purchase price. *See* Tr. 666:9-23 (Calomiris); PX 9009.

15. In addition to the $266 million cash payment, AmBase assumed two other obligations in acquiring Carteret. First, before approving the acquisition, federal regulators required AmBase to enter into a contractual agreement whereby AmBase agreed to infuse up to $50 million into Carteret in the event that Carteret's capital fell below required levels in the future.[12] AmBase was ultimately required to infuse the $50 million into Carteret under the terms of this agreement. *See* PX 402 (AmBase 1990 10-K) at 78.

16. The second obligation involved AmBase's sale of Imperial Premium Finance (IPF) to Carteret for $65 million. To receive the government's approval for this sale, AmBase agreed that, should Carteret subsequently sell IPF to another entity at a lower price prior to August 9, 1991, AmBase would (under certain conditions) be obligated to pay Carteret the difference between $65 million and the subsequent price. *See* PX 2618 (IPF Agreement, 8/15/88).

17. As Professor Roy Smith, the government's investment banking expert, recognized, AmBase's assumption of the RCMA and IPF obligations on top of the purchase price suggests

---

5319 (First Boston to Carteret Bancorp, 3/2/88); PX 2611 (Credit Agreement between The Home Group and Chase Manhattan Bank, 6/10/88); PX 2608 (Application to FSLIC for Home Group Acquisition of Carteret) at AMB028474 (listing Arnold & Porter).

[11] PX 4805 (Salomon Bros. to The Home Group, 8/17/87); PX 5174 (Carteret Press Release, 8/4/87) at 1; PX 9009; Tr. 666:9-14 (Calomiris).

[12] PX 9009; Tr. 667:4-8 (Calomiris); PX 2617 (Stipulation & Agreement) at AMB009226; PX 2625 (Regulatory Capital Maintenance Agreement) at 3; PX 2614 (FHLBB Mem. re: H-(e)1 Application Filed by The Home Group to Acquire Carteret) at 5-6; PX 402 (AmBase 1990 10K) at 78.

that $266 million is a conservative estimate of Carteret's value in 1988. *See* Dep. 378:16-379:5 (JX 1 at 533) (affirming that it would "be appropriate" to "add some factor for the value of the obligation that was assumed" in the RCMA); *id.* at 382:21-383:3 (acknowledging that whatever value AmBase put on the IPF option "would be in addition" to the purchase price).

18. The $266 million valuation of Carteret is amply supported by the record:

- CS First Boston evaluated the renegotiated deal and, after a detailed analysis, concluded the valuation was fair.[13]
- Chase Manhattan Bank entered into a $300 million credit agreement with AmBase for the specific purpose of funding the acquisition of Carteret. *See* PX 2611; Tr. 667:19-25 (Calomiris). AmBase pledged Carteret's stock as the sole collateral for the agreement. PX 2611 at AMBNP013514-15, 17. As Professor Calomiris explained, Chase "would have understood very well the value" of Carteret's franchise and "obviously was very comfortable with a fairly high value to that franchise, since it was willing to accept that as collateral." Tr. 668:6-12. Chase's acceptance of Carteret's stock as collateral thus suggests that AmBase's valuation was accurate because, as Professor Calomiris explained, "[t]ypically, we require in banking that collateral be worth more than the value of a loan." Tr. 668:13-14.[14]
- As Professor Smith acknowledged at trial, the AmBase-Carteret deal was an arms-length transaction, and the "actual sales price of a company is the best indication of the value of the company provided it's an arm's length transaction." Tr. 3048:15-23 (R. Smith). *See also* R. Smith Dep. 378:13-15 (JX 1 at 533).

---

[13] *See* PX 5319 (First Boston to Carteret Bancorp, 3/2/88). Salomon Brothers also re-valuated and approved the deal. *See* PX 1611 (Carteret Bancorp Proxy Statement, 5/18/88) at WOQ6991047.

[14] Even Professor Smith acknowledged that Chase's willingness to enter into the credit agreement suggested that Chase was valuing the stock at "at least $150 million." Tr. 3051:24-3052:4. *See also* R. Smith Dep. 383:25-384:4 (JX 1 at 534).

- The stock market capitalization of Carteret prior to the announcement was $198 million. *See* DX 8000A (Smith Rpt.) at 17 (reporting that AmBase agreed to acquire Carteret in August of 1987 for $291.9 million, which reflected a control premium of 47.5%). The remainder of the purchase price reflected a control premium, which Professor Smith acknowledged was "within the realm of reason." Tr. 2927:1-18; 3050:10-12.

**C. <u>Carteret's Market Value at the Time of the Breach: $251.4 Million</u>**

19. The purchase price of $266 million reflected a market-to-book ratio of 86.9%. *See* PX 5257 (Kaplan Smith to Carteret Bancorp, 5/11/89) at PM004286 (reporting Carteret's book value as $306 million); PX 9010; Tr. 668:15-23 (Calomiris).

20. From July 31, 1988, to July 31, 1989, the average market-to-book ratios for all publicly-traded thrifts increased by 7.4%. *See* PX 9011; Tr. 668:24-669:11 (Calomiris). Assuming Carteret's market-to-book ratio increased by the same amount during that period, its market-to-book ratio as of July 31, 1989, was 93.4%. PX 9011; Tr. 669:12-23, 672:19-23 (Calomiris). This is a reasonable and conservative assumption. First, this assumption does not account for the hydraulic effect Carteret's amortization of goodwill had on the thrift's market-to-book ratio. Tr. 671:5-6 (Calomiris). Carteret had a large amount of its book value in the form of amortizing goodwill. Because goodwill is worth less than its stated book value, the amortization of the goodwill mechanically increases the market-to-book ratio. Tr. 670:12-671:10 (Calomiris). Second, this assumption also does not account for the dividends Carteret paid during this period, which "tend to be viewed by the market as a very favorable event." Tr. 671:11-672:6 (Calomiris). Third, this assumption does not account for the fact that Carteret's servicing portfolio increased by $2 billion during this period, an increase which was not reflected in Carteret's book

value.[15] Fourth, Carteret's deposits grew by more than $200 million, thereby increasing its franchise value. *See* PX 1708 (TFR, 9/30/88) at AM050377; PX 1712 (TFR, 9/30/89) at AM050321.

21. Carteret's book value on June 30, 1989, was $270.5 million. PX 9012; Tr. 672:11-13; PX 1002 (Financial Statement, 6/30/89). To obtain the book value of Carteret one month later, Professor Calomiris accounted for Carteret's monthly amortization of goodwill—that is, he subtracted $1.3 million in goodwill from the June 30 value. Thus, on July 31, 1989, Carteret had a book value of $269.3 million. PX 9012; Tr. 672:13-18 (Calomiris); PX 4822 (Goodwill Amortization Schedule, 8/1989). Multiplying Carteret's book value by a market-to-book ratio of .934 demonstrates that Carteret's market value, as of July 31, 1989, was $251.4 million. PX 9012; PX 9013; Tr. 672:24-674:7 (Calomiris).

22. Several independent pieces of evidence confirm Professor Calomiris's calculation of Carteret's July 1989 market value of $251.4 million:

- In May 1989 a group of investors offered to purchase Carteret for $252 million. PX 4836 (R. O'Brien to G. Scharffenberger, 8/29/90) at 2; PX 9014; Tr. 674:8-16 (Calomiris) ("In my view this was a significant and credible corroboration of the number."). *See* PX 4836 (Letter from R. O'Brien, 8/29/90) at 2. Two of the investors, General Alexander Haig and Harry Jacobs, were former directors of Carteret and thus had intimate knowledge of the thrift and its value. Mr. Jacobs was also the former chairman of Prudential-Bache Securities and remained a senior officer there at the time of this bid. *See* PX 9014; Tr. 675:24-676:4 (Calomiris). AmBase's rejection of the offer suggests that $252 million was a conservative estimate of Carteret's value in May 1989. Tr. 675:20-22 (Calomiris) ("I thought it was significant that

[15] *See* Tr. 3842:19-23 (Saunders) (explaining that, under GAAP, servicing rights are carried at the lower of historical book value or present value); PX 1708 (CSB TFR, 9/30/88) at AM050379 (listing servicing of $6.142 billion); PX 1712 (TFR, 9/30/89) (listing servicing of $8.448 billion) at AM050323.

the offer was turned down, too.")

- The analytics embraced by the government's own expert, Professor Smith, confirm that Carteret was worth at least $251.4 million in July 1989. First, Professor Smith asserted that Carteret was worth $22 million in 1992, after it had suffered significant credit losses. Tr. 2985:13, 19-20. Second, he testified that credit losses affect valuation at greater than a dollar-for-dollar rate. Tr. 3075:10-3076:18; 164:7-13 (JX 1 at 519). Third, he testified that Carteret's credit losses occurred after 1989. DX 8000A (Smith Rpt.) at 26; 426:4-17 (JX 1 at 537); Tr. 3765: 12-22. Fourth, the evidence shows that Carteret, by 1992, had taken approximately $280 million in credit losses. *See* DX 201 at WOP3260180 (reporting credit losses of $106 million in 1990); PX 6817 (CSB Financial Rpt., 12/31/91) at 1 (reporting credit losses of $172 million in 1991). Thus, according to Professor Smith's own formula, Carteret must have been worth at least $300 million in 1989.

23. Moreover, Professor Calomiris's calculation is a conservative estimate of Carteret's market value just prior to the breach. First, Carteret's franchise value confirms that $251 million is a conservative valuation. A thrift's assets "consist[s] of tangible assets and intangible assets." Tr. 680:5-6 (Calomiris); PX 9015. Franchise value is an intangible asset that represents "the value of the relationships that the bank enjoyed by virtue of operating where it did with the people it did." Tr. 680:12-15 (Calomiris). The $251.4 million valuation assumes that Carteret's franchise value was $99.9 million, or 2.2% of deposits. Yet, when Carteret and the RTC sold branches in 1990 and 1994, the deposit premiums received were much higher—on the order of 3.5 percent and 10 percent (and deposit premiums themselves are only part of franchise value).[16]

[16] PX 9016; PX 9017 Tr. 681:4-684:5 (Calomiris); PX 4718 (Branch Closing Statement, 10/9/90); PX 4724 (Loyola Branch Sale, 10/21/90); PX 4726 (Branch Closing Statement, 12/17/90); PX 4986 (Consolidated Florida Branch Resolution Summary) at AM54120696; PX

Second, as noted above, AmBase paid $266 million in cash *and* assumed two contingent liabilities upon purchasing Carteret. Those liabilities represented a cost to AmBase and thus lowered the cash price AmBase was willing to pay. *See* Tr. 3049:7-3050:9 (R. Smith). Because the starting point for Professor Calomiris's valuation is conservative, so is the end result. Third, a value of $251 million is conservative when viewed in light of the substantial discount it represents from Carteret's stated book value. The $251 million value is inclusive of a control premium. Assuming the 47% control premium calculated by Professor Smith, DX 8000A at ¶ 39, Carteret's implied trading value was only $170 million ($170 million increased by 47% is $251 million). Given that Carteret's stated book value on July 31, 1989, was $269 million, PX 9013, the implied trading value based on Professor Calomiris's market value calculation represents a 37% discount from stated book value ($269 million decreased by 37% is $170 million). So, rather than a market-to-book ratio of 11, as hypothesized by Professor Saunders, Professor Calomiris's calculation actually represents a steep discount from book value.

24. Professor Saunders argued that a valuation of $251 million implies a market-to-book ratio that he has "never seen." Tr. 3552:4-10. But in reaching this conclusion Professor Saunders improperly excluded intangible capital from the book value of Carteret, and his opinion should thus be discounted. As Professor Smith recognized, intangible capital is properly included in book value: "The book value is the net assets of the company, minus the liabilities. . . . It includes goodwill in this case." Tr. 2915:17-21. *See also* Tr. 2913:8-10 (noting that calculation of Carteret stockholder equity in 1983 includes supervisory goodwill). Indeed, *Professor Saunders himself included intangible capital* when calculating market-to-book ratios elsewhere in his analysis. *See* DX 9745; Tr. 3944:3-6 (Saunders).

---

4986 at AM54120691; PX 4986 at AM54120693.

**D. <u>Carteret's Loan Losses Were Not Apparent in 1989 and Did Not Cause Market Decline</u>**

25. Professor Saunders based his opinion of Carteret's value prior to the breach on the premise that Carteret's loan losses caused the market to devalue the thrift between the AmBase acquisition and the breach. *See* Tr. 3411:23-3422:11.[17] This premise is false.

26. First, as numerous government witnesses testified, the magnitude of problems in Carteret's commercial loan portfolio were not apparent until 1990 and 1991—well after the breach. For example, when asked whether "Carteret's stock price in 1989 and [at] the end of 1989 had taken into account the magnitude of those future losses," Professor Smith "suspect[ed] that it did not." Tr. 3077:12-16 (R. Smith). And he testified that "there's some suggestion that [the write-down] was a surprise in the sense that it was something that was presented as unknown to them before." Tr. 3077:21-23.[18] Carteret's regulators were of the same opinion. FDIC Regional Director Zamorski testified that the commercial loan losses "didn't become really apparent, I think, until probably near the fall of 1990." Tr. 2066:21-23.[19] Similarly, Mr. Downey of the OTS acknowledged that the amount of Carteret's 1991 asset writedown "was not anticipated." Tr. 2531:7-13. Investor sentiment, which Professor Smith acknowledged was reflected through Carteret's level of uninsured deposits, confirms this conclusion. Tr. 3766:13-25. Carteret's unin-

[17] Professor Saunders testified that he was "sure that they became aware of [the coming elimination of supervisory goodwill] as of the February introduction of the FIRREA legislation in '89." Tr. 3963:13-3964:18. *See also* Vigna Dep. 80:13-14 (JX 1 at 589) (stating that FIRREA "certainly also had an impact on their market value"). Accordingly, analyzing the market's valuation of Carteret as of June 1989 is conservative in that it allows for a devaluing of Carteret based on the breach. If the true pre-breach frame of reference is used—February 1989—there is simply no argument to be made that the market was aware of any commercial loan portfolio problems at Carteret. *See Slattery v. United States*, 69 Fed. Cl. 573, 585 (2006) (using a pre-breach valuation date of August 1, 1988).

[18] *See also* R. Smith Dep. 59:6-19 (JX 1 at 505-06) (same); DX 8000A (Smith Rpt.) at 26 (noting "the collapse of the loan portfolio in 1990 and 1991").

[19] *See also* Tr. 2103:17-23, 2105:13-20 (Zamorski) (examining a statement in a November 25, 1991 letter and stating that "it had been about a year since—in my view, since the unsafe and unsound condition was first evident").

sured deposit base grew from the fourth quarter of 1989 through the first quarter of 1990, and did not fall off sharply until the second half of 1990.[20] Thus, this barometer demonstrates that the severity of Carteret's asset quality problems did not become apparent until well into 1990.[21]

27. Second, Professor Saunders' own testimony suggests that the stock market did not devalue Carteret's stock in 1989. He testified that Home Insurance—AmBase's only other major holding at the time—was downgraded to junk status and that the "junk quality rating of Home . . . would have a serious effect on AmBase value." Tr. 3435:7-8. Yet Professor Saunders also testified that AmBase's stock price increased between FIRREA's introduction and passage. Tr. 3436:14-18.[22] If the market considered AmBase's other major holding to be of junk status in 1989 and AmBase's stock price still rose during that period, then it follows that the market value of Carteret must have *appreciated* during this time.

28. Third, both Mr. Kennedy and OTS examiner O'Rourke testified that, under FASB and GAAP, loan losses must be taken at the time the loss is identified. *See* Tr. 3165:17-3166:6, 3146:7-13 (Kennedy); Tr. 2371:17-24 (O'Rourke). Thus, if Carteret's losses truly were apparent to the management, the auditors, or the regulators in the second quarter of 1989, then they would have had to have been written down at that time. Yet the OTS stated that reserves had to be taken as of December 31, 1989—not May, June, or July. *See* Tr. 1925:19-22 (S. Smith). Prior to

---

[20] *See* PX 1712 (TFR, 9/30/89) at 2; PX 1713 (TFR, 12/31/89) at 2; PX 1715 (TFR, 3/1990) at 16; PX 1718 (TFR, 6/1990) at 16; PX 1721 (TFR, 9/1990) at 16; PX 1724 (TFR, 12/1990) at 16.

[21] Professor Smith also offered other testimony implying that investors did not know about Carteret's commercial loan losses in 1989. *See, e.g.*, Tr. 2924:23-2925:1 ("These were bad loans or weak loans that were time bombs, in a sense, and which were ignited by the economic conditions prevailing in 1990 and '91."); Tr. 3052:24-3053:4 (agreeing that "Carteret would have had some access to the capital markets at reasonable rates prior to 1990 after which the loan loss problems would be so considerable they would have interfered with the public offering").

[22] *See also* Tr. 3439:1-2 ("AmBase's stock price actually rose during the passage of FIRREA."); Tr. 3439:5-8 ("The stock price actually rose 29 percent between the day of President Bush's announcement of FIRREA legislation and August 9 the day of its passage.").

that time—in the 1988 Report—the OTS "felt that the monitoring of the problem assets was pretty good." Tr. 2047:16-17 (S. Smith). Tellingly, when Professor Saunders was confronted with the fact that Carteret's auditors did not require additional reserves as of June 30, 1989, he had to admit he "d[id not] know exactly" when the auditors required additional reserves. Tr. 3942:7-24.

29. Fourth, Professor Saunders based his opinion on the false notion that the OTS called for "an additional 77.2 million in loan loss reserves" in its 1989 exam report. Tr. 3412:2-3422:11. In fact, the OTS later lowered this recommendation by almost $30 million to $49.8 million.[23] Professor Saunders was completely unaware of this easily ascertainable fact. Tr. 3943:6-12. Because he failed to account for this critical information, his opinion is wholly suspect and unreliable. Carteret ultimately agreed to book only $49 million in additional reserves. *See* ¶ 91. Moreover, reliance on the 1989 exam report, completed in November, is suspect because it was breach-affected. *See* Albanese Dep. 78:7-21 (JX 1 at 5) (agreeing that at the time of the report "management was focused on the difficulties that FIRREA posed and its exclusion of goodwill, and presumably so was the examiner and supervisory staff"); Tr. 1968:3-20 (S. Smith) (acknowledging that report was issued after the effective date of FIRREA and that even as of May 22, examiners were aware of the likely legislative changes affecting thrift capital).

**E. <u>The Value of Carteret's Undiscounted Cash Flows: $782.2 Million</u>**

30. The parties agree that because Carteret's stock market capitalization reflects the discounted present value of its expected future earnings, the undiscounted value of those earnings

[23] *See* DX 781A (OTS Internal Mem., S. Smith to File, 2/14/90); Tr. 1999:1-2001:13 (S. Smith); *see also* Tr. 1915:7-14, 1918:13-16, 1921:16-1922:15, 1979:14-1980:7 (S. Smith). At the time, the OTS recognized that the $77 million recommendation in the 1989 report was unreasonable. *See* PX 6909 (Mem. from M. Simone to D. Dorgan, 11/9/1989) ("If Carteret says that 50 base points is extremely steep for 1-to-4s, we pretty much would have to agree with them."); PX 4824 (Notes of R. Meyer, 11/1/89) at 2 (same); Tr. 1984:6-9 (S. Smith) (recognizing that 1989 report assigned 50 basis points to one-to-four family mortgages); Tr. 1990:19-1991:6 (S. Smith).

would be higher than the thrift's market capitalization. *See* PX 9301 (Saunders Enron Rpt.) at 7 ("[T]he value of stock is something less than the sum of the future cash flows that the stockholder can expect to receive"); Tr. 3775:15-3776:21 (R. Smith). Professor Calomiris thus calculated a second *ex ante* measure of damages: the undiscounted earnings implied by Carteret's net present value of $251 million as of July 31, 1989. In order to calculate the future earnings implied by a stock market capitalization, the only necessary data is the market price and the required rate of return, or discount rate. *See* PX 9018; Tr. 685:5-686:19 (Calomiris).

31. Professor Calomiris calculated the required rate of return at 12.34%. PX 9021. This calculation is conservative since it is drawn from capital-raising activity from 1993 and 1994, when rates of return were lower. *See* Tr. 697:10-698:4 (Calomiris). Professor Smith acknowledged that investors in 1989 were requiring a rate of return of 20 to 25%. Tr. 3072:15-25. If Professor Calomiris had utilized a higher required rate of return, then the cash flows implied by a valuation of $251 million would have been significantly higher.

32. For purposes of calculating Carteret's expected cash flows, Professor Calomiris assumed that, on average, Carteret was expected to make $20.5 million a year as a baseline measure of earnings. PX 9021. These earnings were based on Carteret's actual earnings from 1982 through 1988. PX 9020; Tr. 689:17-690:4. Although 1982 was an aberrational year in the thrift industry, Professor Calomiris conservatively included Carteret's 1982 losses in calculating Carteret's expected earnings. PX 9020.

33. The government has objected that Carteret's earnings were not "core earnings," but as Professor Smith admitted, "nobody really knows what core income is anyway." Tr. 3063:13-14. Indeed, the FDIC and the OTS utilize different definitions of core income. *Compare* PX 2119 (FDIC 1990 Exam Rpt.) at C-AM-A-0054146 (including gains on sale of assets in net op-

erating income), *with* PX 2118 (OTS 1992 Exam Rpt.) at WOQ6730070, 88 (excluding gains on sale from operating income). In any event, both Professors Calomiris and Smith agreed that investors look at cash flows, so the government's argument about "core earnings" is irrelevant. *See* Tr. 2839:22-2840:9 (Calomiris); Tr. 3060:11-18 (R. Smith).

34. The government also has objected that Carteret's historical earnings do not mirror cash flows because they include accretion income. It is true that accretion income might not precisely match cash flows in a particular year—accretion income attempts to reflect the amount of principal that will be returned on loans that have been marked to market, and the cash flows could be lower than earnings (in the case of lower prepayment than expected) or higher (in the case of higher prepayment than expected or asset sales). *See Winstar*, 518 U.S. at 852. But as Professor Calomiris explained: "When you look over many years, [ ] for example 1982 to 1988, you're getting a very clear view of the cash flows." Tr. 2841:10-2846:21. Specifically, the accretion income will mirror the receipt of the principal balance of the loan over the life of the loan. And return of principal is a cash flow. In light of this reality, both Professor Smith and OTS officials acknowledged that accretion income reflects real expected cash flows. *See, e.g.*, Tr. 3069:23-3070:17 (R. Smith); Tr. 2030:24-2032:21 (S. Smith). Tellingly, as accretion income is included in interest income, the OTS included accretion income in net operating income in its exam reports. PX 2118 (OTS 1992 Exam Rpt.) at WOQ6730070. Likewise, Professor Smith included accretion income in calculating the critical ratio he used to assess the health of an institution. Tr. 2981:24-2982:2; 3066:14-25; 3071:3-3072:14.

35. Because Professor Calomiris was measuring cash flows, he included gains on the sale of assets. As Professor Smith admitted, such gains represent cash flows. Tr. 3067:1-18. Carteret regularly generated cash flow by selling assets at a gain. Specifically, Carteret Mort-

gage Company originated close to $1 billion a year worth of loans with the bank retaining approximately $100 million and selling the remainder at a gain. *See* PX 2807 (CSB Company and Investment Overview, 3/9/92) at 5; Tr. 187:3-8, 188:9-14 (Bianco); PX 4898 (Mem., D. Cribbs to J. Mindnich, 12/7/92) at 2. Professor Smith agreed that security sales that are a regular part of a company's business are part of core earnings. Tr. 3061:15-3062:9. Thus, even if core earnings were a relevant concept, gains on sales such as those booked by Carteret would qualify. *See* Tr. 2018:23-2019:5, 2021:13-15 (S. Smith) (agreeing that mortgage loans were a regular part of Carteret's business and that mortgage banking constitutes core earnings).

36. Professor Calomiris also calculated the market's expectation of the growth in future earnings for Carteret. He concluded that the market expected Carteret to grow at a rate 4.2% in the future. PX 9021; Tr. 698:15-699:10. This is a conservative calculation because it assumes a rate of future growth that is only half the nominal rate of growth in the economy as a whole. Professor Saunders explained in his Enron expert report for the government that GDP grows on average at a rate of 8 to 10% each year. PX 9301 at 21; Tr. 3608:19-25 (Saunders). For Enron, a company with wildly fluctuating earnings, Professor Saunders assumed a growth rate of 15% for the first five years and then a perpetual rate of growth of 8 to 10% to mirror overall economic growth. Tr. 4014:15-21. Thus, Professor Calomiris's use of a rate less than half of that used by Professor Saunders for perpetual growth is necessarily conservative. If Professor Calomiris had used a higher growth rate reflecting overall economic growth, the expected undiscounted stream of future cash flows would have been higher than those he calculated.

37. The government made much of Professor Calomiris's use of the Gordon Growth Model. But Professor Saunders utilized a "minor variation" of the formula in both his Enron and United Global reports—he assumed a high growth rate in early years and then a perpetual rate of

growth thereafter. Tr. 4039:25-4040:15; 4013:17-20; 4014:13-17. Professor Saunders's use of a perpetual growth rate in these valuations confirms that the Gordon Growth Model is an appropriate valuation tool. As for Professor Saunders's specific criticism that the model is just "an extremely useful rule of thumb," Tr. 3447:20-3448:8 (citing BREALEY, PRINCIPLES OF CORPORATE FINANCE), this is not a reason to reject Professor Calomiris's approach. Just because the formula is often used to solve for the valuation of a company, there is no reason that it cannot be utilized to solve for the growth rate. *See* Tr. 2859:21-2862:19 (Calomiris). Indeed, when confronted with other examples of this use of the model, Professor Saunders could only respond that "two people can make mistakes." Tr. 4045:10-4046:19.

38. Finally, the notion that the Gordon model can only be used for an entity in a constant rate of growth is belied by Professor Saunders' own utilization of a perpetual rate of growth for Enron, United Global, and Liberty Media—companies with far more variability in earnings than Carteret. *See*, *e.g.*, PX 9301(Enron Rpt.); Tr. 4018:7-9 (Saunders) (admitting that Enron's earnings were not stable); Tr. 4033:1-11 (admitting that United Global's earnings were not stable); 4037:19-25 (Saunders) (admitting that Liberty Media's earnings—which were down 88% in 1997, up 1,631%, down 197%, and down 517%—were not stable).

39. Even if the government were correct that Professor Calomiris had not demonstrated an appropriate growth rate, that would simply mean that Carteret was entitled to at least $410 million of future expected earnings—a no-growth assumption of $20.5 million of earnings over a twenty year period. *See* PX 9020.

40. This second measure of damages is an *ex ante* measure, and therefore it is appropriate to ignore the unexpected losses sustained by Carteret in 1990 and 1991. Even though results in 1990 and 1991 were well below expectations as of 1989, the overall cash flows expected by

investors as of 1989 proved to be unduly conservative because thrifts have enjoyed great prosperity over the last twenty years. DX 5001A (Saunders 2006 Rpt.) at ¶ 24.

41. In addition to earnings, investors would have expected Carteret to have a terminal value. Professor Calomiris calculated the terminal value of $186.6 million by starting with Carteret's book value at the date of breach, $269.3 million, adding his conservative estimate of franchise value at the time of breach, $99.9 million, and subtracting goodwill amortization of $182.5 million. PX 9024. This is a conservative measure because Professor Calomiris assumed that Carteret's franchise value would not have grown over the last twenty years. The $186.6 million of terminal value combined with intervening cash flows of $595.6 million yield overall expected cash flows as of 1989 of $782.2 million. Tr. 705:4-706:21.

**F. <u>The Present-Day Value of Carteret in the NonBreach World: $904 Million</u>**

42. Mr. Vigna stated that had Carteret not been seized it "would have been very successful." Dep. 153:21-22 (JX 1 at 598).[24] From an economic perspective, then, full compensation for the breach requires awarding AmBase the value Carteret would have had today in the nonbreach world. Professor Calomiris determined this value by taking account of intervening cash flows and dividends. Tr. 662:3-16, 706:24-708:10 (Calomiris).

43. There are several reasonable methods of modeling Carteret's current market value in the nonbreach world. These models yield a range of values. *See* PX 9025; Tr. 708:11-709:24, 713:2-5 (Calomiris). As Professor Saunders noted—and as confirmed by his valuation in the Enron case, which produced a range of values with a 50% spread, PX 9301—it is "not unusual in valuation, that you have a range of numbers." Tr. 4019:14-4020:3. Among the range of values

[24] *See also id.* at 213:23-214:2 (JX 1 at 607); Tr. 321:6-7, 321:15-23, 321:24-322:3, 322:12-14 (Bianco) (stating that Carteret would have been very successful, that earnings would have been comparable to the rest of the industry, that it would have had $10 billion in assets and a book value of at least $500 million).

produced in this case, Professor Calomiris disregarded values that did not appear reasonable based on known data and, as a conservatism, chose the lowest remaining value as a reasonably certain measure of Carteret's current market value in the nonbreach world. Tr. 714:9-21 (Calomiris). Each of the three models used by Professor Calomiris requires a comparison sample of surviving thrifts. He examined two samples: (1) all thrifts extant at each relevant point in time between 1989 and 2008; and (2) thrifts that remained stand-alone through 2008. Tr. 709:25-711:2.[25]

44. *Book-value Projection—Stand Alones*. The book-value projection method employs a sample of surviving thrifts to calculate a market-to-book ratio and then multiplies that ratio by a projected present book value of Carteret, which is determined using Carteret-specific analytics. *See* PX 9026; Tr. 711:13-712:1; PX 2702A (Calomiris 5/07 Rpt.) at ¶¶ 39-40.

45. Professor Calomiris preferred the book-value projection method, with a sample of stand-alone thrifts because it is more concrete, and because it is more conservative given that the stand-alones fared less well than the all-thrifts sample. Tr. 714:22-715:2, 717:25-718:4.

46. Professor Calomiris's preferred method yields a September 2007 value of $720.1 million. PX 9031; Tr. 724:15-24. Under the preferred model, Carteret's September 2007 book value is $463.1 million. This figure is calculated by adding to Carteret's July 31, 1989 book value a projection of retained earnings minus projected dividend payouts and amortizing goodwill. *See* PX 9029; Tr. 718:14-720:23. *See also* Tr. 1295:3-1296:5 (Calomiris) (these projections do not predict yearly profits, but rather the "aggregate amount of earnings in the long run" about which "there's a huge amount of irrefutable and clear information contained in price").

[25] The stand-alone group consists of those 31 thrifts for which there is Compustat stock-price data from 1989 through 2008. A smaller sample of 9 thrifts results when looking for more complete accounting data. Tr. 710:3-20 (Calomiris).

47. A reasonable market-to-book ratio of 1.555 for September 2007 Carteret can be derived from a sample of nine stand-alone thrifts for which there is adequate accounting data. PX 9030; PX 9031; Tr. 721:6-14. Mr. Bianco's testimony supports the notion that Carteret would have remained stand-alone absent the breach, and therefore these thrifts provide relevant comparisons. Tr. 721:15-722:11, 1391:17-23 (Calomiris); Tr. 322:15-18 (Bianco). This sample also provides the lowest reasonable number produced by the various models. Tr. 1400:15-19 (Calomiris). The market-to-book ratio for these thrifts grew by 67% over the relevant period of time. Tr. 722:12-21, 724:5-14 (Calomiris). This growth rate, used to calculate Carteret's ratio, is conservative because Carteret had a greater amount of amortizing goodwill, which mechanically increases the ratio. Tr. 722:22-723:10 (Calomiris).

48. *Book-value Projection—All Thrifts*. If the book-value projection analysis is run with a sample of all thrifts, Carteret's September 2007 value in the nonbreach world is $909.7 million. This is a reasonable measure of Carteret's value because it is fair to assume that Carteret, given its excellent franchise value and management, would have done as well as the average thrift in the nonbreach world. *See* PX 9032; PX 9033; Tr. 725:6-727:25 (Calomiris).

49. *Book-value Sample Method.* The book-value sample method is similar to the first method, but it measures the book value of Carteret using a sample comparison group rather than Carteret-specific analytics. Tr. 712:2-13; PX 2702A (Calomiris 5/07 Rpt.) at ¶ 38. Using the book value sample method with a sample of standalone thrifts yields a September 2007 value of $2.4737 billion. Using a sample of all thrifts yields a value of $861.8 million. PX 9027.

50. *Market-tracking—All Stand-alones*. The market-tracking method calculates the current market value of Carteret by multiplying the market value of Carteret at the time of the breach by the change in the market value of surviving thrifts since that time. Tr. 712:14-713:1

(Calomiris). Assuming Carteret's market value increased in an amount equal to the average of of all remaining standalone thrifts, its December 2007 value in the nonbreach would be $2.3414 billion. PX 9036; Tr. 732:10-733:12 (Calomiris). Assuming Carteret's value increased only on par with that of the bottom decile of remaining stand-alone thrifts, its December 2007 value in the nonbreach world would be $871.1 million. PX 9036. Tr. 733:13-734:2.[26] This comparison shows the conservatism of Professor Calomiris's preferred method. Tr. 734:3-11.

51. *Market-tracking—All Thrifts*. Assuming Carteret's market value would have increased on par with the market increase of all surviving thrifts since 1989, its December 2007 market value in the nonbreach world would (depending on the market index used) be between $947.7 million and $1.2863 billion. An average of all market indexes yields a value of $1.0739 billion. PX 9038; PX 9039; Tr. 734:24-735:23, 738:4-16.[27]

52. The measure of Carteret's present-day market value in the nonbreach world is reasonably certain. At the very least, it is reasonably certain that the 1990s presented a much better economic environment for thrifts than did the 1980s. It stands to reason, then, that Carteret would have turned greater profits in the 1990s than it did in the 1980s ($20.5 million per year). Mr. Simone affirmed that "if interest rates remained low . . . Carteret was well positioned to take advantage of that." Dep. 64:3-9 (JX 1 at 500). And Professor Saunders admitted there was a "massive downward trend in interest rates" in September 1992. Tr. 3572:22-24. Accordingly, it is reasonably certain that Carteret would have been highly profitable in the 1990s. Moreover, OTS examiner Meyer testified that he believed a non-breach affected Carteret could grow to be-

[26] This result derives from using a sample of stand-alone thrifts, assigning equal weight, and employing the mean as the measure of increase. PX 9034; PX 9035; Tr. 728:1-9, 728:20-23, 731:3-732:9. This model uses all 31 remaining thrifts because it requires only market value data. Tr. 730:15-731:2.

[27] This model assigns equal-weight and employs the mean. PX 9037; Tr. 734:12-23 (Calomiris).

come a $10-billion institution. Dep. 110:10-12 (JX 1 at 374).

53. In the nonbreach world, Carteret would have paid dividends. Tr. 322:4-11 (Bianco). From 1989 through 2008, publicly-traded thrifts paid average dividends of 30.9% of annual income. Thus, any measure of Carteret's damages based on present-day value must be increased by $183.9 million, which represents 30.9% of Carteret's expected earnings of $595.6 million. Tr. PX 9041; Tr. 738:22-740:7 (Calomiris). For Professor Calomiris's preferred measure (book-value projection, stand alones), then, damages amount to $904 million.[28]

## III. THE BREACH AND ITS DEVASTATION OF CARTERET

### A. The Importance of Supervisory Goodwill to Carteret

54. Given that, prior to the breach, supervisory goodwill allowed Carteret to meet its regulatory requirements, it was obviously an asset of "substantial value." Tr. 3035:13-21, 3036:3-7 (R. Smith) (acknowledging that capital requirements are "an implicit tax"). Indeed, as Professor Smith astutely described it: "Supervisory goodwill for Carteret was *akin to a license to continue to do business* since, without goodwill, Carteret would not meet its capital requirement." Tr. 3038:16-20 (emphasis added); *see also* R. Smith Dep. 210:18-23 (JX 1 at 525).[29] Professor Calomiris offered a similar formulation: "[S]upervisory goodwill is a license to retain the assets and in fact to grow the assets and to create a platform for the bank so that the bank could operate, generating earnings that would eventually, through retentions, replace the supervisory goodwill." Tr. 656:19-24; *see also* Tr. 1020:17-20, 2882:3-4 (Calomiris).

[28] For the book-value projection based on all thrifts, damages amount to $1.0936 billion; for the book-value sample method, damages amount to $2.6576 billion; for the market-tracking method based on stand-alone thrifts, damages amount to $1.055 billion; and for the market-tracking method based on all thrifts, damages are between $1.1316 billion and $1.579 billion.

[29] Professor Smith also agreed that "supervisory goodwill had the effect of lowering the capital requirement for Carteret," Tr. 3037:8-14, and that the lowering of a capital requirement would be a benefit to a thrift, Dep. 156:19-157:12 (JX 1 at 518).

55. In addition to allowing for growth in boom times, supervisory goodwill helped thrifts weather downturns in the business cycle. As Professor Smith acknowledged, a bank "can have a huge loss; but if [it] ha[s] enough capital to absorb the loss, [it is] not going to get a qualified opinion from [its] auditors," and "at the end of 1990, Carteret had plenty of capital to stay in business with its supervisory goodwill even having taken $120 million of writedowns." Tr. 3081:25-3082:10; *see also* Connell Dep. 120:7-11 (JX 1 at 26). It was recognition of this value that led outside investors to invest in Carteret (and hundreds of other thrifts) throughout the 1980s. As Professor Saunders explained, "[o]utside investors aren't fooled," Tr. 3684:8-24, and if supervisory goodwill was worthless, these investors would not have invested in Carteret.[30] Accordingly, the Director of the OTS Northeast Region recognized that an investor would value a company much differently if supervisory goodwill could not be used to satisfy regulatory requirements. Tr. 2266:14-2267:14 (Vigna).

56. On February 9, 1989, President Bush introduced the bill that would eventually become FIRREA. Because this legislation was a priority for both Republicans and Democrats, it progressed swiftly.[31] On August 9, 1989, President Bush signed the bill into law.

**B. <u>The Breach's Devastating Effect on Carteret</u>**

---

[30] An article relied upon by Professor Saunders in his analysis makes the point: "It is possible that the elimination of capital or accounting forbearances as potential pieces of the RTC transaction reduce both the positive returns to the acquirers and the premium to the RTC that the acquirer is willing to pay." DX 8471 (Horvitz & Lee) at 278.

[31] On April 13, 1989, the Senate Committee on Banking, Housing, and Urban Affairs reported S 744 to the full Senate. On May 16, HR 1278 was reported in the House. On May 24, the House Judiciary Committee rejected an amendment offered by Congressman Hyde. The Hyde Amendment would have required a lengthy regulatory review process before an institution could be prevented from counting supervisory goodwill towards regulatory capital. As reported on the front page of the *New York Times*, the amendment was defeated by a 17-17 tie vote. Tr. 749:14- 750:20; PX 9050; PX 2702A (Calomiris 5/07 Report) at ¶ 32. On June 15, FIRREA passed in the House of Representatives. On June 21, the Senate passed HR 1278 with substitution from the text of S 744. *Id.* at ¶ 30. Over the next seven weeks, the two houses conferred and, on August 4, 1989, agreed to the final version of FIRREA.

57. FIRREA's impact "upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe," *Winstar*, 518 U.S. at 857, and Carteret was no exception. The government's witnesses repeatedly acknowledged that FIRREA impacted Carteret even before the measure was signed into law. Professor Saunders stated in his deposition that he would have been aware that the elimination of supervisory goodwill was "a problem" as early as February 1989. *See* Tr. 3963:16-3964:18 ("I'm sure that they became aware of it as of the Febrary introduction of the FIRREA legislation in 1989."). Professor Smith affirmed that "sophisticated investors by the end of the first quarter of 1989 would have realized that there's a likelihood that supervisory goodwill could be eliminated," "[o]r if not, something else bad might be added, so . . . the air is flavored by the fear of FIRREA." Dep. 447:20-448:1 (JX 1 at 541). Senior OTS Regional official Robert Albanese affirmed that "prudent managers of savings and loans institutions" would have responded to the impending breach by "preparing themselves . . . to take steps to cope with the new legislation." Dep. 57:9-57:14 (JX 1 at 4).

58. Indeed, Carteret's management did react to the breach before the passage of FIRREA. Specifically, Carteret shrank its assets from $7.17 billion on June 30, 1989, to $6.1 billion by December 31, 1989. PX 1711 (TFR, 6/30/89) at 1; PX 1713 (TFR, 12/31/89) at 1.

59. One measure of the deleterious pre-enactment effects of FIRREA is the impact the defeat of the Hyde Amendment had on AmBase's stock price. The defeat of the amendment was not predictable—it failed in a 17-to17 tie—and was thus a market-shifting occurrence. Tr. 750:16-751:23 (Calomiris). The failure of the amendment was "a very important moment for a lot of thrifts." Tr. 751:13-15, 22-23 (Calomiris). To measure the effect of the Hyde Amendment's failure on Carteret, Professor Calomiris performed an event study. Tr. 751:24-752:9; PX 9051, PX 2703A (Decl. of Charles W. Calomiris, 7/14/06) [hereinafter "Calomiris 2006 Rpt."] at

¶¶ 135-39; Tr. 752:6-754:17, 754:10-16 (Calomiris); PX 9052. The analysis reveals that the defeat of the Hyde Amendment, signaling the coming loss of supervisory goodwill, resulted in "huge negative returns" of anywhere from $5.6 million (1-day window) to $47 million (11-day window). PX 9052; Tr. 756:21-25 (Calomiris).

### 1. The Breach Devastated Carteret's Capital Profile and Regulatory Posture

60. The harm visited upon Carteret by FIRREA intensified once the measure was signed into law. Immediately upon enactment, supervisory goodwill was eliminated as a component of tangible capital. While FIRREA technically phased-out supervisory goodwill over a period of years culminating in 1994 for core and risk-based capital, 12 U.S.C. § 1464(t)(3)(A), from a strategic standpoint both Carteret's managers and its regulators had to consider the bank's profile on a fully phased-in basis.[32]

61. The breach devastated Carteret's capital profile, eliminating $169.3 million—or more than 50%—of the thrift's pre-FIRREA regulatory capital. PX 9046; PX 4822 (Goodwill Amortization Schedule, 8/89); PX 1712 (TFR, 9/89) at 2. This deduction was immediate for tangible capital purposes and, because Carteret's management and regulators had to consider the thrift's posture on a going-forward basis, was effectively immediate for core and risk-based purposes. *See* ¶¶ 57-58; Tr. 1524:7-12 (Day). On a fully phased-in basis, the breach put Carteret out of compliance with its 3% core capital ratio requirement, as Carteret went from having a ratio of 3.81% in June 1989 to 1.69% in September 1989 to 1.66% in December 1989. *See* PX

[32] *See, e.g.*, Albanese Dep. 57:9-57:14 (JX 1 at 4); Tr. 743:13-19 (Calomiris) ("[T]here was a phase-in. But from a strategic standpoint, there was the immediate effect of forcing the bank, on a forward-looking basis, to completely change its strategy."); Tr. 748:15-22 (Calomiris) ("But they could also see ahead to where they were going to be. . . . under the fully phased-in requirement . . . they were going to now be substantially deficient."); PX 6875 (Mem. from T. O'Rourke, 10/16/92) at 2 ("In later amendments to the capital plan, the target was raised to $200 million in order to achieve compliance with fully phased-in capital requirements.").

9048; Tr. 747:22-749:2.[33]

62. FIRREA's devastating impact on Carteret's regulatory capital profile was recognized by OTS officials at every level, by the RTC, and by the government's own experts in this case. As the Director of the OTS Northeast Region, Angelo Vigna, stated at trial, the loss of supervisory goodwill "certainly put them into a different regulatory category." Tr. 2268:15-21. *See also* Vigna Dep. 96:22-97:2 (JX 1 at 591) (affirming that "[it] is accurate to conclude that Carteret's capital profile is dramatically different depending upon whether you include or exclude goodwill."). Vigna Dep. 80:6-14 (JX 1 at 589) ("[The loss of $180 million of regulatory capital] certainly was a *very severe consequence* of this legislation.") (emphasis added). Mr. Vigna's deputy, Robert Albanese, concurred in this assessment, affirming that "Carteret was very severely impacted by FIRREA's provisions disallowing goodwill in the calculation of regulatory capital," including "from the standpoint of the tangible capital requirement." Dep. 76:22-77:4 (JX 1 at 5).[34] Indeed, the RTC recognized that "CSB's regulatory capital levels were *significantly damaged* by the change in the banking laws in 1989,"—a statement which *both* Professor Calomiris and the government's expert, Professor Saunders, called "factually correct." PX 4002 (Conservatorship Plan) at C-AM-A-0400815 (emphasis added); Tr. 744:21-745:3 (Calomiris);

[33] As of December 31, 1989, Carteret had $6.1 billion in assets. *See* PX 8 (1989 Annual Report) at KAH078235. The core capital ratio requirement as of December 31, 1989, was 3% of total assets. *See* 12 U.S.C. § 1464 (t)(2)(A); 12 C.F.R. § 567.8 (1990). Thus, Carteret was required to carry approximately $180 million of core capital. Carteret's core capital inclusive of all supervisory goodwill as of December 31, 1989, was $263 million. *See* PX 1801 (12/31/89 Amended TFR) at AM046268. Carteret had $165 million in supervisory goodwill as of December 31, 1989. *See* PX 4891 (Goodwill Amortization Schedule 9/87-11/92) at AM00050531. Carteret, without counting any supervisory goodwill, had only $99 million in qualifying core capital—that is, $80 million less than required under fully-phased in standards.

[34] The examiners who reported to Messrs. Vigna and Albanese concurred in this assessment. *See* Meyer Dep. 156:4-10 (JX 1 at 377) (affirming that "whether you treat the goodwill as capital or don't" "present[s] a dramatically different picture"). And Mr. Vigna's superior at the OTS National Office, John Downey, also testified that the "phase[] out of the goodwill . . . made them deficient in capital, failing their . . . regulatory capital requirements." Tr. 2507:23-2508:6.

Tr. 3719:1 (Saunders). It was no wonder, then, that at a February 13, 1990, Carteret board meeting, David Dorgan of the OTS "explained that the issue of capital adequacy was the most pressing one facing the bank." DX 8054 (1989 FDIC Exam Report) at WOQ6990507.

63. As affirmed by numerous government witnesses, the degradation of Carteret's capital profile brought on by the breach caused regulators to change their view of the institution. In the words of FHLB-NY President Dittenhafer: "There's no question that . . . FIRREA and its [e]ffect on the capital of this institution would have had a major, in my view, a major impact on the examiner's rating of this institution. . . . Clearly it had a major impact on the examiner and his evaluation." Dep. 147:11-22 (JX 1 at 75); *see also id.* at 143:13-19. And Mr. Vigna explained that FIRREA "certainly changed their financial status from a regulatory standpoint," and agreed that "the loss of Carteret's supervisory goodwill as regulatory capital had a very substantial impact on the regulators' assessment of its safety and soundness." Dep. 79:20-24, 81:10-15 (JX 1 at 589-90).[35] Indeed, after FIRREA passed, the OTS literally tore pages out of its 1989 exam report so it could reassess the institution without supervisory goodwill. *See* Dittenhafer Dep. 140:1-8 (JX 1 at 74) (noting that someone retyped part of the report and that "obviously they have gone from what would be considered a pretty decent supervisory position to somebody's judgment they're less than an adequate supervisory position"). The 1989 Report assessed Carteret at a MACRO 4 rating, PX 2106 at 6—down two levels from previous year—and as exam-

[35] *See also* Meyer Dep. 55:3-8 (JX 1 at 369) (affirming that regulators "look at an institution that is in capital compliance different from the way [they] would look at an institution that is way out of capital compliance"); Tr. 1969:3-13 (S. Smith) (agreeing that a "thinly capitalized or undercapitalized thrift causes greater concern even at the level of examination function" and that a "thrift with capital problems . . . would tend to attract more scrutiny on asset issues . . . during an exam"); Day Dep. 311:2-18 (JX 1 at 58-59) (comparing Carteret's positive $78.7 million tangible capital under the injunction and its negative $71.7 million under FIRREA and agreeing that the difference in capital levels "represent[s] a dramatic difference in how you see the institution as an examiner"); Tr. 1554:8-20 (Day) ("There is a dramatic difference.").

iner Finn explained "[g]enerally, if you were not within capital compliance I don't believe you could receive a 3 exam rating." Finn Dep. 71:7-17 (JX 1 at 85). *See also id.* at 64:19-65:13 (JX 1 at 84) (noting that "[i]t's unusual that an institution would drop down two ratings very quickly within a one year period, unless there were significant factors at stake," and that the "passage of FIRREA definitely had an impact on how the institutions were rated from the prior year"). Mr. Dittenhafer, in reviewing the 1989 Report, confirmed "probably the fact that it drops from a two to a four rather than a two to a three . . . comes from the capital, the drop in capital, the precipitous drop in capital and the fact that they may not make the FIRREA minimum tangible capital requirement." Dep. 143:13-19 (JX 1 at 75).

**2. The Breach Sparked a Downward Spiral Resulting in Seizure**

64. The breach thus launched Carteret into a downward spiral, causing a variety of high impact and harmful effects. Professor Smith put it succinctly when he stated that after the breach Carteret was "in jail." Tr. 3009:20-23; R. Smith Dep. 282:22 (JX 1 at 527).[36] The breach's seismic effect on Carteret's capital profile, as well as its singular role in Carteret's ultimate demise, is confirmed by the OTS's own internal documentation and by the near universal recognition in this case that the breach harmed Carteret. Mr. Albanese testified that by "eliminating at the time that FIRREA was enacted[ ] over $180 million worth of Carteret's regulatory capital, . . . had a severe impact on Carteret." Tr. 1693:10-15. OTS examiner Meyer testified that "withdrawing the goodwill . . . had a negative impact on Carteret." Dep. 71:20-72:20 (JX 1 at 369). FDIC examiner Day testified as follows:

---

[36] *See also* Tr. 3006:5-22 (R. Smith) (consequences of being out of regulatory compliance began when regulators stopped counting Carteret's supervisory goodwill); Tr. 3009:12-19 (R. Smith) (endorsing Judge Bissell's conclusion in 1991 that "the sole basis of OTS's [imposition of a capital directive] is Carteret's failure to meet capital requirements . . . and the only reason it does not meet them is because OTS does not count the supervisory goodwill in making its determination").

> Q. Knowing what you know now about what happened in the economy in the year subsequent to this, would you agree that the loss of capital initiated by FIRREA was like a death blow to this institution?
> A. It was a significant factor.

Dep. 69:1-6 (JX 1 at 47); Tr. 1522:4-9, 1525:16-24 (Day). He also remembered "thinking that Carteret was going to get hit very hard by FIRREA's exclusion of goodwill from capital," and that "without the ability to treat that goodwill as capital, Carteret was going to have a very hard time staying in existence." Dep. 63:18-64:1 (JX 1 at 47). And Professor Smith acknowledged that "Carteret's falling out of compliance was a negative development," Tr. 3003:22-3004:2, and that "FIRREA's provision that disallowed calculating goodwill" was, "in the sense that that caused them to be out of compliance[,] . . . a high impact event." Tr. 3015:21-25. Writing in 1991, Judge Bissell warned that the capital directive, which he found was a result of the breach, "will be detrimental to Carteret," and that the OTS was attempting "to make an apparently healthy bank sick." *Carteret Sav. Bank v. OTS*, 762 F. Supp. 1159, 1177 (D.N.J. 1991).

65. Ultimately, of course, Carteret was seized on December 4, 1992. The evidence overwhelmingly demonstrates that Carteret would not have been seized absent the breach. Before turning to the particulars of the breach's devastating impact on Carteret's operations and condition between 1989 and 1992, it is important to note that some of the most compelling evidence as to causation comes out of the regulators' own mouths. Numerous government officials admitted that Carteret would not have been seized absent the breach.

- Russell Meyer, the OTS examiner-in-charge of Carteret, testified as follows:

> Q. Did you think that the new capital rules in FIRREA caused a lot of institutions to fail?
> A. A lot -- I know that they caused institutions to fail, yes.
> Q. Do you recall thinking that it caused Carteret to fail?
> A. Yes.
> Q. Because of its disallowance of the ability to use goodwill towards capital?

A. It was one of the things, yes. They could have survived, I thought.

Meyer Dep. 42:24-43:11 (JX 1 at 369); *see also id.* at 76:8-18 (JX 1 at 370).

- Mr. O'Rourke, at both his deposition and at trial, could not recall a single thrift with positive tangible capital being taken into conservatorship. Tr. 2449:5-13, 2450:19-2451:3.
- The third in command in the OTS northeast region, Michael Simone, testified that: (1) it was "very likely" that Carteret would have been able to operate beyond December 4, 1992, if it had had an additional $140 million in capital; (2) it was "likely" Carteret would not have been seized if it had positive tangible capital of $80 million; and (3) he could not recall any instance of a thrift with positive tangible capital of $80 million being seized. Dep. 105:1-21 (JX 1 at 500-01). Indeed, as of 1995, Mr. Simone indicated that even in the breach-affected world, "had the institution had approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing." PX 5331 (Mem. from R. Seiger to File, re OTS conclusions regarding Carteret failure, 2/15/95) at 1.
- OTS examiner Scott Smith testified that: "If it's two out of three under FIRREA guidelines, then I think they would probably end up getting more time." Tr. 1954:14-20.
- At the time of his deposition—when he was the Director of the OTS Northeast Region—Mr. Albanese answered "no" when asked if Carteret would have been seized if it satisfied its tangible capital requirement. Dep. 160:13-17 (JX 1 at 13). A few lines later, Mr. Albanese affirmatively reiterated the point: "If they had enough [supervisory goodwill] that their tangible capital requirement would have been met, I think it gets back to your earlier question, I don't think they would have been seized." *Id.* at 161:6-15 (JX 1 at 13-14).[37]
- Mr. Vigna stated unequivocally "no" when asked: "If Carteret had . . . tangible capital, for

[37] *See also* Post-trial Brief at 14 n.9.

example, if Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized?" Dep. 158:6-11 (JX 1 at 599). Similarly, he again answered simply "no" when asked: "If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized?" *Id.* at 159:18-159:25 (JX 1 at 600).[38] And at trial, he stood by his deposition answer of "probably not" to the question: "[I]f Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?" *See* Vigna Dep. 154:25-155:5 (JX 1 at 598); Tr. 2317:17-2318:1919 ("I'll accept it . . . if it's there, it's there.").

- The National Deputy Director of OTS acknowledged that, during his time at OTS, he could not think of a thrift that was seized that met its tangible capital requirement, was profitable, and had favorable trends and superb management. Tr. 2573:11-16 (Downey). He testified that if Carteret "had tangible capital compliance but was failing core and risk-based, I think we would have tried to address those issues, those capital limits," and that he could not recall "any thrifts that were within a few million dollars or right at their . . . tangible capital requirement that were placed into receivership." Tr. 2572:7-24.

**3. <u>The Breach Caused Carteret to Shrink its Asset Base</u>**

66. Carteret had only two potential options for mitigating FIRREA's ill effects: it could raise capital or shrink its asset base. Due to the hostile regulatory and economic environment, the capital markets were closed to Carteret for the first two years following the breach.[39] So Car-

---

[38] At trial, Mr. Vigna recanted his answer to these (and several other) questions. As explained in AmBase's post-trial brief at 15 n.10, these recantations are not credible.

[39] *Cf.* Tr. 3004:3-20 (R. Smith) (agreeing that "Carteret's failure to comply with regulatory capital requirements is something that would be of interest to an investor . . . because no investor wants to be ignorant of the company's ability to exist in the future," and because "failure

teret was forced to shrink its asset base.

67. In the post-FIRREA period, Carteret's asset base declined as follows:[40]

| **Date** | 6/30/88 | 9/30/89 | 12/31/89 | 12/31/90 | 12/31/91 | 9/30/92 |
|---|---|---|---|---|---|---|
| **Assets (000s)** | $7,171,183 | $6,791,547 | $6,097,461 | $5,575,023 | $5,203,475 | $4,827,462 |

All told, from the middle of 1989 through the end of the third quarter of 1992, Carteret shrank by more than $2.3 billion in assets. Because the goal of the shrink was to raise capital, a large portion of the downsizing was effectuated through a reduction in Carteret's portfolio of high performing residential loans and mortgage-backed securities (MBS). As Mr. Albanese explained, Carteret was "cherry-picking" valuable assets, which had "the effect of bolstering capital." Tr. 1625:6-14. These valuable portfolios shrunk by over $900 million in the last six months of 1989, and by over $300 million in 1990. Tr. 958:8-21 (Calomiris); PX 9055.

68. The breach was the main reason for Carteret's massive asset shrink. *See* Tr. 957:25-958:7, 958:11-21, 1216:3 (Calomiris); PX 9047; PX 9055. Indeed, the government's own expert witness testified that the need to raise additional capital was "a principal reason" for the shrink and "could have been the only reason." R. Smith Dep. 135:9-18 (JX 1 at 515); Tr. 3017:3-11. FDIC examiner William Day agreed that it is "reasonable to assume that . . . with a capital shortfall and a large asset shrink, that there's a correlation between the need to raise capital and

---

to meet regulatory capital requirements compliance requirements can subject a thrift to a variety of sanctions . . . [a]nd, generally, regulatory sanctions aren't good for an investor"); PX 2703A (Calomiris 2006 Rpt.) at ¶ 132 ("[M]arket conditions for raising equity or preferred stock for thrifts in the U.S. in the late 1980s and early 1990s were very challenging. The severe losses experienced by many thrifts made many investors wary of investing in thrifts."); Tr. 697:21-23 (Calomiris) ("1993, '94 was a much more favorable time to raise capital than 1989").

[40] *See* PX 1711 (TFR, 6/30/89) at 1; PX 1712 (TFR, 9/30/89) at 1; PX 1713 (TFR, 12/31/89) at 1; PX 1724 (TFR, 12/31/90) at 3; PX 1734 (TFR, 12/31/91) at 3; PX 1737 (TFR, 9/30/92) at 3. *See also* PX 9049; Tr. 749:3-13 (Calomiris); PX 5301 (Mem. from S. Smith to File, 12/7/89) at WOP3261203 ("They advise that since 6/30/89 they have reduced TA by around $1 billion. (They were at $6.6B on the 10/31 TFR.) They project being down to $6.0B by 2/90.").

shrinking assets," and stated that he assumes the elimination of supervisory goodwill was "part of the motivation" for selling assets. Tr. 1537:11-15; 1538:20-1539:5.[41] The FDIC stated as much in its June 1989 report: "Gains [from asset sales] were part of an effort to boost earnings to enable the bank to conform with FIRREA capital standards." DX 8054 at WOQ6990502. "The bank's strategy goes from a strategy of growth and thinking about new products and new customers, to how to survive by shrinking prospectively so that, as this capital requirement gets phased in, they'll find a way to be in compliance with it. So from the moment of the breach, the elimination of goodwill has a major strategic effect on the bank." Tr. 743:6-744:1 (Calomiris). *See also* Tr. 747:8-21, 749:3-13 (Calomiris); Tr. 1524:7-14 (Day) (acknowledging "that the impact of FIRREA included a complete transition and change of Carteret's business plan."). As explained in Carteret Bancorp's 1990 business plan: "To meet the new [FIRREA capital] requirements . . . the 1989 strategy was altered to [among other things] significantly downsize the balance sheet . . . ." PX 1905 at 7; *see also id.* ("Carteret was forced to alter its business strategy in response to the new capital requirements of FIRREA. A plan for Carteret to grow into a much larger mortgage origination and servicing bank changed.").

69. Carteret's asset shrink came at a steep cost. The residential loans and MBSs sold were low-credit risk assets that were generating positive net income. PX 9055; Tr. 958:8-959:8 (Calomiris). AmBase's 10-Ks report that decreases in Carteret's asset volume had a "negative impact" of $8 million in 1990 and $20 million in 1991.[42] As Mr. Bianco put it in a 1991 letter to

---

[41] *See also* PX 1902 (Carteret 1990 Business Plan) at KH 016626 ("In shrinking the balance, we have as a longer term objective the need to meet ever higher capital standards in the years 1991-1994, also as required by FIRREA."); PX 802 (AmBase 1990 10K) at 38 ("During 1990, in a continuing effort to meet the stringent capital requirements of FIRREA, as interpreted by the OTS, Carteret continued to downsize its balance sheet and restructure its asset mix to facilitate compliance with FIRREA's risk-based capital requirement.").

[42] PX 802 (AmBase 1990 10-K) at AMB030229; PX 803 (AmBase 1991 10-K) at

the OTS, the institution "cannibalized its future profitability through the sale or early realization of many of its most valuable assets, in order to remain in capital compliance." DX 7175 (R. Bianco to A. Vigna, 9/30/91) at CAM218002; *see also* DX 201 (OTS Internal Mem., 3/8/91) at WOP3260181 ("Carteret's strategy of selling relatively attractive yielding assets at a gain has only compromised the institution's ongoing ability to reverse the significant level of accelerating losses."). Professor Saunders opined that "[w]hen an institution sells its most valuable assets, it impacts future profitability." Tr. 3733:18-22.[43]

**4. The Breach Prevented Expansion**

70. Carteret also suffered the flip-side of the asset shrink: the abandonment of plans to grow through the acquisition of other institutions. *See* PX 9047; Tr. 743:6-744:1, 745:18-747:21, 749:3-13 (Calomiris); Tr. 1524:7-14 (Day); Meyer Dep. at 100:20-101:2 (JX 1 at 373). As Professor Calomiris explained, although Carteret was "in a position with good management and an excellent existing franchise to expand very successfully," it could not do so because of the breach. Tr. 746:2-747:7. *See also* Tr. 201:2-9 (Bianco) (noting that Carteret would have expanded its servicing portfolio in the nonbreach world if the environment was favorable).

**5. The Breach Caused Substantial Deposit Run-off**

71. Carteret's deposit base, on an absolute basis, increased throughout the 1980s. *See* Tr. 3025:18-20 (R. Smith). The following table reports the growth:[44]

---

CAM4020319. *Compare* PX 1711 (TFR, 6/30/89) (reporting $2.8 billion in residential loans and $1.47 billion in mortgage-backed securities), *with* PX 1724 (TFR, 12/31/90) (reporting $2.1 billion in residential loans and $664 million in mortgage-backed securities ).

[43] *See also* Tr. 1461:22-1462:7 (Day) (noting that Carteret was selling MBSs that increased in value when interest rates came down); Walsh Dep. 162:20-163:22 (JX 1 at 706-07) (discussing how downsizing hurt core earnings and led to foregone investment opportunities); Finn Dep. 209:18-20 (JX 1 at 87) ("Typically you would want to leverage your capital to the nth degree to maximize earnings. . .").

[44] *See* PX 2 (Carteret 1983 Annual Rpt.) at 25; PX 6 (Carteret 1987 Annual Rpt.) at 37;

| **Year** | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|---|---|
| **Deposits (billions)** | $1.53 | $2.73 | $3.50 | $4.03 | $3.99 | $4.17 | $4.36 | $4.36 |

After the breach, however, a steady outflow of deposits occurred. *See* PX 2110 (1990 FDIC exam report) at WOQ6981439. Carteret's Asset and Liability Committee (ALCO) repeatedly noted this trend at its meetings.[45] Outflow totals are reported in the following table:[46]

| **Date** | **Deposits (000s)** | **Change (000s)** | **Date** | **Deposits (000s)** | **Change (000s)** |
|---|---|---|---|---|---|
| 6/30/89 | $4,615,709 | | 3/31/91 | $3,055,805 | $32,287 |
| 9/30/89 | 4,421,907 | ($193,802) | 6/30/91 | 3,030,189 | (25,616) |
| 12/31/89 | 4,268,326 | (153,581) | 10/31/91 | 2,940,174 | (90,015) |
| 3/31/90 | 4,246,069 | (22,257) | 12/31/91 | 2,932,385 | (7,789) |
| 6/30/90 | 4,122,313 | (123,756) | 3/31/92 | 2,831,222 | (101,163) |
| 9/30/90 | 4,205,557 | 83,244 | 6/30/92 | 2,744,626 | (86,596) |
| 12/31/90 | 3,023,518 | (1,182,039)[47] | 9/30/92 | 2,618,686 | (125,940) |

| | |
|---|---|
| **Total Deposit Outflows 6/30/89 to 9/30/92** | **$1,997,023,000** |

72. The deposit outflows were caused by the breach, as the FDIC recognized in its 1990 report: "Primarily as a result of the impact of FIRREA, the substantial growth of retail deposits . . . has effectively been reversed." PX 2110 at WOQ6981439; *see also* Tr. 1552:9-1553:3 (Day) (agreeing that, "in part," the preceding quotation from the 1990 report refers to "the elimination

PX 102 (Carteret 1989 Annual Rpt.) at C-AM-A-0394514.

[45] *See, e.g.*, PX 6701 (ALCO Minutes, 1/29/90) at C-AM-A-0233269 ("Carteret continues to exhibit deposit outflows for intermediate and longer-term certificates of deposit."); PX 6702 (ALCO Minutes, 2/5/90) at C-AM-A-0233243 ("We are presently experiencing a 20% outflow on maturities."); PX 6703 (ALCO Minutes, 2/20/90) at C-AM-A-0233230 ("Price to preclude deposit outflows. This is especially true for Florida."); PX 6711 (ALCO Minutes, 4/30/90) at C-AM-A-0233130 ("The Bank is experiencing unacceptable deposit outflows. M-T-D April 18, 1990 retail deposits are down $72.4 million, jumbos are down $34.2 million and brokered CDs are down $24.9 million. Carteret's heaviest retail outflows are in the 12-23 month and 36-47 month categories. On two previous occasions the Bank ran 'specials' on these terms.").

[46] PX 1711 (TFR, 6/30/89) at 2; PX 1712 (TFR, 9/30/89) at 2; PX 1713 (TFR, 12/31/89) at 2; PX 1715 (TRF, 3/89) at 3; PX 1718 (TFR, 6/90) at 3; PX 1721 (TFR, 9/90) at 3; PX 1724 (TFR, 12/90) at 3; PX 1727 (TFR, 3/91) at 3; PX 1730 (TFR, 6/91) at 3; PX 1732 (TFR, 12/91) at 3; PX 1734 (TFR, 12/91) at 3; PX 1735 (TFR, 3/92) at 3; PX 1736 (TFR, 6/92) at 3; PX 1737 (TFR, 12/92) at 3.

[47] Carteret's breach-induced sale of branches in 1990 accounted for this outflow of $1.18 billion. *See* PX 403 at 64 (AmBase 1991 10-K).

of supervisory goodwill"). As Mr. Bianco explained at trial, Carteret's breach-induced regulatory peril generated negative publicity for the bank. Tr. 177:7-178:5; Tr. 179:25-180:15.[48] For example, in a February 19, 1992, article, the Bergen Record reported that "[a]fter discussions with a well-heeled corporation moved too slowly, ailing Carteret Bancorp Inc. announced Tuesday that it will now beat the bushes on Wall Street in search of capital from institutional investors." DX 55.[49] The deposit outflows experienced by Carteret were the predictable result of such publicity. Tr. 181:4-182:6.[50] Moreover, the government regulators exacerbated this problem by actively spreading negative publicity. As Professor Smith acknowledged, "information about noncompliance" was "more than a rumor" because OTS "issued a press release describing how Carteret no longer meets statutory requirements." Tr. 3027:12-17. *See also Carteret*, 762 F. Supp. at 1181. In light of the regulatory noncompliance caused by the breach, Professor Smith agreed that "it would be rational for [uninsured depositors] to be worried about an institution." Tr. 3024:23-3025:3. Indeed, even insured depositors might—and did—flee the bank. *See* Tr. 3026:1-5 (R. Smith); Tr. 3659:12-15 (Saunders).

73. The deposits outflows caused by the breach were harmful to Carteret. As Professor Smith explained, "deposits are usually the lowest cost of funds for banks," and "they would pre-

---

[48] *See also* Kehoe Dep. 94:14-22 (JX 1 at 328) (agreeing that "part of that negative publicity on the Thrift industry as a whole in that period of time [would] have been a response, and have been caused by the fact that FIRREA rendered many of these institutions non-compliant with their capital project").

[49] *See also* PX 2968 (Carteret Board Minutes, 1/25/91) at 2 (expressing concern over bad publicity).

[50] *See also Carteret*, 762 F. Supp. at 1181; Tr. 3026:12-3027:11 (R. Smith) (endorsing Judge Bissell's statements regarding reputational harm to Carteret and agreeing that: Carteret was "one of the largest [thrifts] in the state of New Jersey" and "employs many citizens, handles the accounts of state residents and provides valuable services to the community" and therefore "rumors that [Carteret] may be experiencing difficulty are more likely to have impact upon it," and that "given that the market conditions during S&L crisis involving fraudulent transactions at other institutions, such rumors are even more likely to result in diminished business for Carteret and increased withdrawals").

fer to have as many deposits as they can." Tr. 2940:6-8. *See also* Tr. 3019:22-3020:3 (R. Smith). Thus, Professor Smith agreed that "loss of deposit relationships is a negative for an institution." Tr. 3027:18-20.[51]

### 6. <u>The Breach Caused an Increase of Carteret's Cost of Funds and a Loss of Relative Advantage</u>

74. To stem the tide of deposit outflows, Carteret was forced to increase the rates it paid for deposits. That is, the breach caused an increase in Carteret's cost of funds. As Mr. Bianco explained, "we had to pay more for our deposits . . . a higher interest rate for deposits." Tr. 182:7-12; *see also* Tr. 182:13-22 (Bianco); Tr. 182:9-12 (Bianco); Tr. 969:7-14 (Calomiris) ("[T]here's a clear causal relationship that the breach weakened the bank, weakened its competitive position, weakened its customer relationships, and made it have to pay more."). Contemporaneous documents attest to this point. For example, the Asset and Liability Committee, in February of 1990, decided to "[p]rice to preclude deposit outflows." PX 6703 at C-AM-A-0233230. Indeed, the government itself recognized Carteret's increasing cost of funds at the time. An internal OTS memorandum, penned in March 1991, noted that:

> Although the market short term rates have dropped steadily during January and February 1991, **Carteret has "bidded up" its CD rates above its local competitors** to solicit steady deposits inflows. During January, 1991, Carteret had offered a 7 month CD at 8% while the competitions closest product, the 6 month CD, was being offered in the 7.5% range. Carteret has dropped its rates during February, 1991, but its CD rates are still consistently 10 to 15 basis points above its competitors.

---

[51] *See also* PX 4988 (D. Chafey to P. Ramey re bid for NJ branches, 11/7/94) ("We are sure you realize that Carteret FSB was experiencing a significant run-off in deposits prior to July 31, which certainly will have a serious negative impact in the profitability of many of these branches, with a corresponding impact to its ultimate acquirer."); Tr. 2383:24-25 (O'Rourke) (stating that replacing deposits with FHLB advances "definitely had the risk of introducing a lot more uncertainty into [Carteret's] cost of funds").

DX 201 at WOP3260183 (emphasis added).[52]

75. In the non-breach world, Carteret's cost of funds would have been less. *See* Tr. 250:16-251:15 (Bianco). For purposes of determining a conservative picture of Carteret's condition absent the breach, Professor Calomiris quantified just a portion of the breach-induced increase in cost of funds. Tr. 771:8-773:1; 965:1-967:13 (Calomiris). He compared Carteret's rate for 6- to 23-month CDs to an industry benchmark from January 1991 through the date of seizure. PX 9058; PX 9061; PX 9062; Tr. 967:14-969:6, 971:9-973:23 (Calomiris). Based on this analysis, 6- to 23-month CDs issued in 1991 and 1992 would have been 105.5 basis points lower in the nonbreach world. Thus, from January 1991 to September 1992, the breach caused Carteret to pay $17 million more for funds obtained through this subset of CDs. For the period from January 1991 through the date of seizure the increase is $19.8 million. PX 9057; Tr. 966:22-967:9.

76. Professor Calomiris's measure of the increased cost of funds due to the breach is conservative. *See* PX 9057, PX 9058. First, it measures only the increased cost of short-term CDs rather than all deposit liabilities. Tr. 772:11-18; 965:22-966:1 (Calomiris). Second, it captures only a truncated period of Carteret's post-breach existence. Tr. 771:22-24; 772:12-13; 966:13-18 (Calomiris). And third, for much of the period observed, the deterioration was greater than 105 basis points. Tr. 772:13-14; 967:10-969:6 (Calomiris).

[52] *See also id.* at WOP326181 ("[I]n an effort to head off a liquidity squeeze in January, 1991 Carteret has been forced to price aggressively in its deposit retention efforts."); PX 4727 (OTS Mem. J. Kehoe to C. O'Toole, 2/5/91) at WOP3260620-21 ("Carteret's current liquidity position has also forced the association to offer significantly higher yields on CDs than those of its competitors. Carteret offered seven-month CDs yielding 8% from 1/21/91 through 1/25/91. Carteret dropped its seven month CD rate to 7.75 percent, beginning January 28, 1991. However, this rate is still significantly higher than its competitors' rates."). The liquidity squeeze referenced in these documents was itself a result of the breach. *See* DX 201 at WOP3260183 ("Carteret has utilized extensive borrowings from the FHLB to finance its $1 billion in branch sales during the fourth quarter. The FHLB recently raised Carteret's collateral margin from 110% to 125% as a result of the its [sic] December 31, 1990 capital deficiency.").

77. The evidence presented at trial offers several confirmations of Professor Calomiris's cost-of-funds calculation. First, using data from Carteret's thrift financial reports—the method preferred by Professor Saunders—rather than from a published CD rate, yields comparable results. PX 9059; PX 9060; Tr. 969:15-971:8 (Calomiris). Second, the highest-ranking OTS official called by the government as a witness at trial testified that Carteret was "paying a lot on their deposits . . . a premium in the market," and "[a]t one time . . . maybe the talk was 100 plus basis over the market place." Tr. 2518:17-22 (Downey). Third, an internal OTS memorandum from March 1991 confirms that "Carteret has aggressively priced retail deposits (at times in excess of 150 basis points of competing deposit rate offerings)." DX 201 at WOP3260178.

78. In his report, Professor Saunders opines that Carteret enjoyed a 58 basis point advantage over its competitors prior to the breach. DX 5038A at 59. And Professor Smith testified that when the federal funds rate decreased 111 basis points in 1990, Carteret's rate decreased by only 49 basis points. Tr. 3027:21-3028:5. Thus, while the government disputes the amount of the increase in Carteret's relative cost of funds, there is *no* dispute that the cost increased following the breach.

**7. <u>The Breach Caused Carteret to Sell Branches in 1990</u>**

79. In an effort to raise capital in mitigation of the breach, Carteret sold 23 branches in 1990. *See* PX 9 (CSB 1990 Annual Rpt.) at C-A-MA-0394503. Carteret received a premium of $40.74 million for these branches. PX 4726 (Closing Statement, 12/17/90), PX 4718 (Branch Closing Statement, 10/9/90), PX 4724 (Loyola Sale, 10/21/90).

80. As demonstrated by both testimony and contemporaneous documents, the breach caused Carteret to sell these branches. AmBase made clear in its 1990 10-K that "a significant factor considered in the decision to sell such branches in 1990 was that under capital regulations

of the [OTS] adopted under [FIRREA], as interpreted by the OTS, the goodwill recorded in connection with [Carteret's acquisitions of failing thrifts] is required to be deducted from regulatory capital, subject, in the case of supervisory acquisitions, to a phase-out period." PX 802 at 5. Morever, in a December 1989 internal OTS memorandum, examiner Scott Smith reported, under the heading "Capital Compliance," that Carteret was "considering selling Florida, Virginia and Maryland branches." PX 5301 at WOP3261203. Likewise, OTS examiner Finn recalled that Carteret's "broad strategy" was to sell "both branches and assets throughout the post-FIRREA period . . . in order to help it meet capital requirements." Dep. 140:8-15 (JX 1 at 85). Judge Bissell found "persuasive" Carteret's claim that it "would not have sold the branches in question in the manner that it did if OTS had not eliminated the benefit of retaining supervisory goodwill." *Carteret Sav.s Bank v. OTS*, No. 91-661, slip op. at 9 (D.N.J. July 8, 1991).

81. As Professor Smith acknowledged at trial, branch banking is "a valuable source of high margin lending, as well as fee and commission income." Tr. 3784:11-17. Thus, the 1990 branch sales came at the cost of future profitability. *See, e.g.*, DX 7175 at 1 (R. Bianco to A. Vigna, 9/30/91). Mr. Zamorski, former deputy regional director for the FDIC, acknowledged that "[t]he concern was that they had bolstered equity by selling off some of their branches . . . . [but] that's only a limited means by which you can increase capital, because as you do that on a longer-term basis, you diminish the earning capacity of the franchise. And so that might stem losses on a short-term basis, but longer-term, it diminishes the earnings capacity of the bank." Tr. 2137:7-20. Indeed, that the acquirers of these branches were willing to pay a premium for them attests to the fact that future profits were expected. *See* Tr. 3997:20-3998:4 (Saunders) (agreeing that "the banks that bought Carteret's deposits in 1990 expected to make money off of those deposits," and that "they invested $40 million collectively when they bought those depos-

its"); DX 7340 (Mem. from R. Walsh 6/14/91) (reporting that premiums were "among the highest premiums received in the industry during 1990.").[53]

82. Carteret's replacement of foregone deposits from the branch sales with FHLB advances was a detriment to the bank. As Professor Smith acknowledged, "[d]eposits are . . . the best source of funding for a savings and loan institution," "ordinarily an institution would not want to get rid of its deposits," and the "average savings and loan does not choose to have half of its funding from the lender of last resort." Tr. 3019:22-3020:7.[54] Carteret's actual experience confirms this point. In 1991, Carteret's weighted average cost of deposits was 6.71%, while the average cost of FHLB advances was 7.15%. *See* PX 803 (AmBase 1991 10-K) at CAM4020318.[55] For the eleven months in 1992 preceding seizure, the average cost of deposits was 5.03%, while the average cost of FHLB advances was slightly lower at 4.77%. *See* PX 3801 (Carteret Financial Rpt., 11/30/92) at CAM4820013. Thus, during the twenty-three month period preceding seizure, the average cost of deposits was 18 basis points *less* than the average cost of FHLB advances. Moreover, a mere comparison of FHLB rates to deposit rates fails to capture the foregone benefits of possessing branches and deposits and the increased costs of carrying FHLB advances. First, deposits help to build a bank's franchise, while FHLB advances do not. As FDIC examiner Day affirmed, "one disadvantage of a [FHLB] advance is that an institution

---

[53] *See also* Tr. 3021:25-3022:6 (R. Smith) (acknowledging that "the thrift that paid [a] $40 million [premium in 1990] for those deposits was expecting to generate a positive return on that $40 million investment"); Tr. 1563:17-22 (Day) (agreeing that "a deposit premium reflects an acquirer's belief that it can make money on those branches"); Tr. 2455:10-25 (O'Rourke) (agreeing that $40 million premium means that "buyers thought they were valuable").

[54] *See also* Tr. 2940:6-8 (R. Smith) ("So deposits usually are lowest cost of funds for banks. And they would prefer to have as many deposits as they can.").

[55] The 10-K reports average annual rates for three categories of deposits: time deposits (7.18%), interest bearing demand deposits (5.22%), and savings deposits (5.44%). The overall average weighted cost of deposits is calculated by multiplying the average cost and average balance for each deposit category and dividing such total by the sum of the average balances (i.e., (7.18% x 2,235 plus 5.22% x 388 plus 5.44% x 377) divided by $3,000 (2,235 + 388 + 377)).

loses its customer relationships." Tr. 1563:1-6. Second, branches generate fee income, while FHLB advances do not. Third, FHLB advances require collateral. *See* PX 10 (1991 Annual Rpt.) at KH053791.

83. The branches Carteret sold were adversely affected by the breach-induced asset shrink and deposit run-off. *See* ¶¶ 66-69, 71-73. Branch overhead is a relatively fixed cost, so branches that operate in a growth mode are able to take advantage of economies of scale. *See* Tr. 2846:22-2849:9 (Calomiris); Tr. 3736:7-3737:10 (Saunders); Tr. 3023:1-4 (R. Smith) (recognizing economies of scale in retail banking). Thus, absent the breach, the 23 branches sold in 1990 would have most likely been adding profits, not incurring costs. Tr. 2846:22-2849:9, 2849:22-25 (Calomiris).

84. Concurrent with its breach-induced sale of 23 branches, Carteret also consolidated 10 branches in an effort to reduce costs. *See* PX 2212 (R. Bianco to N. Ketcha, 8/30/91) at C-AM-A-0231767. As explained in Carteret's 1991 Business Plan:

> The size of the retail branch network was significantly reduced during 1990. Reconfiguration was accomplished by consolidating branches within the system and by selling branches outside of Carteret's primary market area. By consolidating inefficient neighboring branches, nonearning fixed assets were reduced . . . and the franchise value was increased . . . .[T]he downsizing also improved capital ratios, reduced annualized operating expenses by approximately $18.1 million, and enhanced both the efficiency and future profitability of the branch system.

DX 7171 at WOQ6901716. Given that the overall downsizing included consolidation of ten branches, and that the *overall* downsizing is reported as having led to reduced operating expenses of $18.1 million, it follows that a substantial portion of that amount was attributable to the consolidation.[56] The consolidation would have occurred absent the breach.

[56] Indeed, in an internal OTS memorandum from April 1991, examiner Finn reported that Carteret "anticipates a reduction of $11 million per year in operating expenses due to the sale of the 23 branches." DX 292 at WOO6850035. Thus, approximately $7 million of the reduced op-

85. So long as the branches sold in 1990 were profitable, Carteret would have retained them absent the breach. Tr. 245:13-18 (Bianco). If, however, any of these branches became unprofitable and presented a threat to capital compliance, then Carteret would have sold them. As Mr. Bianco testified: Carteret "wouldn't have fallen out of capital compliance" absent the breach because "we would have done everything in our power to protect this major franchise in a difficult environment . . . .We could have sold those branches." Tr. 268:10-16, 270:8-18.

**8. The Breach Caused Carteret to Take Ultraconservative Loan Loss Reserves**

86. There can be little doubt that, primarily due to worsening economic and market conditions, but also due in part to poor underwriting and loan monitoring before Mr. Bianco became Chairman and CEO, Carteret suffered substantial losses on its commercial real estate (CRE) and commercial lending portfolios in the early 1990s. That fact hardly distinguishes Carteret from the rest of the financial institutions industry; numerous institutions suffered from severe asset quality problems in what can reasonably be described as the depressed CRE market conditions at that time. What *does* distinguish Carteret from the rest of the industry is the approach Carteret took in response to these asset quality problems. Under Mr. Bianco's leadership, and unlike virtually all other financial institutions at the time, Carteret took a very aggressive and highly conservative approach to writing down the value of, and booking loss reserves (also known as valuation allowances) on, its commercial lending and CRE portfolios. In particular, in August 1991, Carteret decided to book (as of 6/30/91) $150 million in reserves on those portfolios. Absent the breach, and in particular the breach-caused need for Carteret to raise hundreds of millions of dollars of outside capital, Carteret would not have taken such an aggressive approach to writing down those assets, and it would therefore have booked a least $20 million, and more likely closer

---

erating expenses resulted from the consolidation, not the branch sales.

to $50 million, less in reserves on those assets.

87. The evidence is virtually undisputed that decisions regarding the valuation of loans, REO, and related assets call for the exercise of a substantial amount of judgment and discretion. Thus, reasonable institutions looking at the same assets often reach differing conclusions about the appropriate level of reserves for such assets.[57]

88. Numerous government witnesses acknowledged the role of judgment and subjectivity in the reserving/valuation process. Mr. Vigna testified that "[w]hen you're looking at these assets, there's sometimes a range of appropriate reserves, you know, 15 to 20 percent," and that within this range, Carteret under Mr. Bianco and Wayne Moor "were taking 20 percent." Tr. 2273:7-10. *See also* Tr. 2221:10-2222:10 (Vigna). Thomas O'Rourke, the OTS examiner-in-charge for the 1991 Carteret exam, elaborated that "[w]hen you set aside loan loss provisions, you're making a judgment as to the time period of the asset and net reliable value you obtain. There's a lot of estimations that go into that process." Dep. 71:3-7 (JX 1 at 450).[58]

89. Similarly, OTS examiner Scott Smith agreed that (1) "reserves reflect an institution's attempt to provide for the fact that its assets may deteriorate in the future and may generate losses"; (2) "the level of reserves an institution decides to take at any one time reflects the institution's prediction at that time as to the likely extent of asset problems"; (3) the decision as to

[57] *See, e.g.,* Tr. 1164:8-10 (Calomiris) ("how much of an increase requires an analysis and judgment of management"); Tr. 2769:10-14 (Calomiris).

[58] *See also id.* at 71:12-20 (JX 1 at 450) (agreeing that "[t]hose estimations and judgment that are the foundation of the loss provisions involve predictions about the future" and that "[r]easonable people can differ as to what's likely to happen in the relevant markets that will affect the asset portfolio of an institution"); Tr. 2438:22-2439:15 (O'Rourke) (same); Tr. 2360:24-2361:11 (O'Rourke) (explaining how GVA reserves are set for substandard assets: "we look at the ultimate collectability, given the nature of the real collateral, the appraised value of the collateral, the ability of the borrower to supplement the collateral, and other factors such as whether the local real estate markets are in a period of stress or in a period of health. And we make a determination. *It's largely judgmental*.") (emphasis added).

what is an appropriate level of reserves "absolutely" calls for an exercise of judgment; (4) "there's always some room for debate as to the appropriate level of reserves"; (5) "both qualitative and quantitative factors" should be considered; (6) "there's a range of reasonableness within which there may be legitimate disagreements as to how big a reserve should be booked"; and (7) "within that range, one institution may decide to take a more conservative approach, and another institution may decide to take a less conservative approach." Tr. 1975:9-1977:14 (S. Smith).[59] Likewise, Professor Smith conceded that in the early 1990s, as now, marking CRE assets to market involved the use of judgment, and that reasonable people could have disagreed about the value of such assets. Tr. 3080:11-21 (R. Smith). *See also* R. Smith Dep. 73:9-12 (JX 1 at 507-08).

90. Even the government's primary expert on reserves, David Kennedy, recognized the role of discretion and judgment in this area. *See* Tr. 3186:21-23 (noting that his expert report says "that reserves for credit losses necessarily involve considerable judgment on the part of the institution's management"); Tr. 3310:20-3311:12 (agreeing with Scott Smith's testimony that there is a "range of reasonableness" and always some room for debate); Tr. 3313:6-22 (agreeing that it is fair to say that FASB 5 criteria call for an exercise of judgment). Mr. Kennedy acknowledged the large number of assumptions and estimates that are required even for those types of valuation methods, such as the "net realizable value" and "fair value" measures, that are somewhat formulaic in nature. *See, e.g.,* Tr. 3308:22-3309:9, 3312:8-10, 3316:21-3317:1, 3325:4-10. *See also* Tr. 3313:23-3321:22 (Kennedy) (detailing the assumptions and estimates that go into valuation/reserve analysis). The accounting pronouncements themselves stress the significant role played by judgment in reserve decisions.[60]

[59] *See also* Tr. 2531:14-23, 2532:15-2533:3 (Downey); Day Dep. 97:4-9, 107:8-16 (JX 1 at 49, 50); Tr. 1527:24-1528:2 (Day).

[60] *See, e.g.,* DX 7441 (AICPA Audit and Accounting Guide) at DK-07 000035; DX 7446

91. The fact that there is room for considerable disagreement regarding appropriate reserve levels is further confirmed by the history of Carteret's interactions with the OTS. For example, following the closure of the 1989 examination in November 1989, the OTS directed Carteret to book approximately $77 million in additional valuation allowances. Tr. 1968:1-11, 1971:2-15 (S. Smith). Carteret and its independent auditors disagreed with OTS. After further discussions, the OTS agreed that Carteret actually only needed to book, by December 31, approximately $49.8 million in additional allowances.[61] Notably, Scott Smith conceded on cross-examination that one important aspect of the OTS's original demand for $77 million in reserves (*i.e.*, its demand for approximately $11 million in additional reserves on 1-4 family mortgages[62]) was unreasonable. Tr. 2002:15-2003:4 (S. Smith). Perhaps more importantly for present purposes, however, Mr. Smith also testified that the OTS's original position that $66 million in reserves were needed (excluding the unreasonable demand for $11 million in reserves on the mortgages), and its ultimate decision that less than $50 million in reserves were needed, were both reasonable. Tr. 2003:5-20 (S. Smith). In other words, Mr. Smith conceded that a range of at least $16 million in reserves (representing a variance of approximately 24% when compared to the "high" end of the range) was reasonable in this instance.

92. Carteret exercised the considerable discretion that it had with respect to valuation and reserve decisions in an ultraconservative manner after new management, under the leader-

---

(Reg. Bull. 6) at DK-07 000124; DX 5047 (Statement of Financial Accounting Standards No. 5) at ¶ 23; *See also* DX 5020 (Curry & Shibut, *The Cost of the Savings and Loan Crisis*) (cited by Professor Saunders) ("In its reserving procedures, the RTC (with the approval of the GAO) took a conservative approach so as not to overstate the value of assets acquired from failed institutions."); DX 6189 (GAO RTC audit) at 5 ("[D]ue to the subjectivity inherent in the valuation of assets and in the estimation of future asset recoveries…").

[61] *See* Tr. 2000:17-2001:8 (S. Smith); DX 7300 (Mem. of Oral Commc'n between S. Smith and B. Walsh 12/14/89); DX 7302 (Mem. from S. Smith to File, 12/15/89); DX 4826 (Mem. from S. Smith to File, 12/22/89); DX 781A (Mem. from S. Smith to File, 2/14/90).

[62] *See* DX 7302 (Mem. from S. Smith to File, 12/15/89).

ship of Mr. Bianco, took over at Carteret in mid-1991. There was virtual unanimity in the witness testimony and among the contemporaneous documents that Carteret took a much more conservative approach to its reserves than did other institutions.

93. For example, Mr. Vigna made clear in his deposition that Carteret "took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally." Dep. 109:25-110:7 (JX 1 at 592). *See also* Vigna Dep. 115:8 (JX 1 at 593) ("It was a very conservative approach").[63] *Cf.* Tr. 1977:19-1978:19 (S. Smith); Moor Dep. at 153:9-154:4 (JX 1 at 434) (banks "did not take the same reserves on the same loans….[n]one of them had the reserves I did"). Mr. Bianco also testified that Mr. Vigna told him that Carteret was the most aggressive institution in the region and maybe the country, Tr. 258:24-259:8, and that Mr. Vigna told him that Carteret should in fact not move so quickly to take huge reserves on its CRE assets. Tr. 255:5-19.

94. Mr. Vigna's testimony is fully consistent with a memorandum he sent to OTS Director Timothy Ryan in January 1992, in which Mr. Vigna noted that Carteret's valuation allowances "represent[ed] 6.09% of total assets and 33.4% of criticized assets, the highest ratios in the Northeast Region and approximately triple the peer average for comparable size institutions nationally." PX 2805 at WOP3341036. Mr. Vigna went on to observe that one reason for Carteret's high relative level of reserves was its "ongoing *conservative* practice of allocating gains

[63] Even though, as with many other aspects of his deposition testimony, Mr. Vigna tried to step back from his deposition testimony regarding Carteret's reserve practices, *see* Appendix to AmBase's Post-trial Brief, *nothing* he said at trial is inconsistent with his testimony that Carteret was the most conservative institution in the region. Indeed, Mr. Vigna confirmed at trial that "in terms of what other institutions were doing, [Carteret took] a conservative approach to the adequacy of loan loss reserves," Tr. 2270:10-12, and he elsewhere described Carteret's approach as "aggressive" and "very aggressive." *See, e.g.*, Tr. 2214:4-13, 2223:25-2224:1, 2270:9-10, 2284:8-9.

from sales of disposed troubled real estate back to general reserves instead of income." *Id.* (emphasis added). *See also* PX 5282 (M. Karfunkel to A. Vigna, 1/22/92) at 3 ("Due diligence studies have indicated that Carteret's current reserve position is one of the strongest in the Northeast.").

95. Carteret's conservative approach to valuing its commercial lending and CRE assets is also demonstrated by the results Carteret obtained when it sold those assets. Even though, as discussed in more detail below, Carteret was in many respects a distressed seller, it still managed to sell its CRE assets for, on average, more than their net book value, which indicates that Carteret had, if anything, erred on the side of higher reserves for those assets.[64] Notably, Mr. Kennedy's own analysis confirmed that Carteret's proceeds on sales of certain assets prior to seizure averaged 5-7% above those assets' net book value. *See* Tr. 3333:17-3335:22, 3243:11-3244:3 (Kennedy).

96. Significantly, Carteret's records indicate that its pre-seizure sale results were attained on some of its *worst* assets. *See* DX 505 (D. Kramer to K. Albert, 3/13/92) at 1 ("Finally, we have our records of disposals (which show gains vs. reserves and these gains have been realized on those of our worst properties.)"). Mr. Kennedy indicated that he agreed with that proposition. *See* Tr. 3329:17-3330:10. Thus, there is no reason to conclude that Carteret was cherry-picking its better assets, and every reason to conclude that the opposite was in fact the case, which would suggest that Carteret's reserves on its remaining assets were even more conservative.

97. Given the overwhelming and essentially undisputed evidence that Carteret was much

---

[64] *See* Tr. 257:5-258:8 (Bianco); PX 2807 (CSB Overview) at 2 ("[T]o date, liquidations have been on average 105% above reserve values."). *See also* Tr. 2283:4-8 (Vigna); Vigna Dep. 115:8-13 (JX 1 at 593) ("It was a very conservative approach, and I guess it was pretty obvious after they started selling these properties instead of booking the gains. Some of it was simply a consequence of them valuing them too low on their own books.").

more conservative in its valuation/reserve practices than other institutions, Mr. Kennedy had little choice but to effectively concede that point. *See* 3326:9-3328:5 (agreeing with statement in PX 2805 that Carteret was more successful than other institutions in disposing of assets because it had written them down); Tr. 3325:11-16 (agreeing that "as a general matter, Carteret from mid-1991 on took a conservative approach to the valuation of its commercial loans and [CRE] assets and the setting of its reserves on these assets"); Tr. 3326:2-4 ("I would not disagree with ultraconservative or very, very, very conservative.").

98. While Mr. Kennedy relied heavily on the detailed asset write-ups in Carteret's so-called "loan books" and "REO books" to support his opinion that Carteret would not have recorded lower reserves in the no-breach world, those write-ups actually confirm that Carteret often employed very conservative assumptions in valuing its assets.[65]

99. A very important reason Carteret took a much more conservative approach to asset valuations and reserves in 1991-92 than did other institutions had to do with its need to raise substantial outside capital in the wake of the government's breach. As Mr. Bianco testified, in order to convince potential investors that there would likely be no surprises down the road, Carteret opted to take a highly aggressive approach to asset writedowns, a much more aggressive and conservative approach than it would have otherwise taken. *See* Tr. 251:16-253:24, 255:20-257:4.[66] Thus, as part of an admittedly rushed project, in the midst of its efforts to raise capital,

---

[65] *See, e.g.*, DX 7450 (1992 Loan Book) at RAM0340780 (notwithstanding expectation that higher priority loans on property would be self-liquidating, valuation analysis assumed, "for conservative purposes," that it would have to repay millions of dollars on the loans); *id.* at 751-52 (due to "conservative" assumptions, Carteret takes $410,000 reserve instead of $50,000 reserve); *id.* at 886 (Carteret assumes no recovery on judgment against guarantor); *id.* at 1047-49 (assumes "worst case scenario" for Carteret's share in recovery on loan); *id.* at 1188 (used 60% reserve for loan classified substandard); Tr. 3340:18-23, 3344:21-3345:11 (Kennedy).

[66] *See also* PX 2807 (CSB Overview) at 1 ("loan loss reserves have been established in amounts designed to permit rapid liquidation of these assets without further loss").

to get its hands around it CRE and commercial lending portfolios,[67] Carteret decided in August 1991 to err on the side of conservatism by booking $150 million in reserves.

100. Once again, the government's own witnesses support Mr. Bianco's testimony regarding the reasons Carteret took an ultraconservative approach to reserves. *See, e,g,,* Vigna Dep. 110:10-25 (JX 1 at 592) ("[A]s I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money that there was no surprises, other big writedowns subsequent to that. . . . [I]t was, as I recall, and the view of management, necessary to raise capital."); *id.* at 115:2-7 (JX 1 at 593) (stating that "the need to establish credibility with potential investors" "was one of the, if not the most motivating factor for them" in taking the $150 million write-down); Tr. 1985:3-1986:9 (S. Smith) (agreeing that a "take-your-hits-now rationale" can be attractive to an institution, and agreeing that "it sounds reasonable from [his] experience that Mr. Bianco and Mr. Moor would be interested in taking conservative reserve positions in order to establish credibility with prospective investors").[68] Professor Smith's testimony also supports the common-sense propositions that prospective investors would rather see an institution err on the conservative side in asset valuations, and that management of an institution needing to raise outside capital would be wise to heed such concerns. *See, e.g.,* Tr. 3081:3-24 (R. Smith); *see also* R. Smith Dep. 439:3-25 (JX 1 at 539).

101. While Mr. Kennedy opined that Carteret's need to raise outside capital had nothing to do with its approach to valuations and reserves, he conceded on cross-examination that he had not considered the testimony of regulators to the opposite effect. Moreover, when he was con-

---

[67] *See* DX 44 (Mem. from W. Moor, 8/8/91) (describing process leading to reserve decision).

[68] Testimony from FDIC officials was to the same effect. *See, e.g.,* Tr. 2094:20-24 (Zamorski); Day Dep. 116:10-117:15 (JX 1 at 50-51).

fronted with such regulator testimony, he acknowledged that he could find no reason to disagree with it. *See* Tr. 3284:8-3288:19 (Kennedy).

102. Given the central role that Carteret's breach-caused need to raise substantial outside capital played in the approach it took to its valuation/reserve decisions in 1991 and 1992, it follows that if there had been no breach, Carteret's approach would have been very different. Carteret's approach would have been closer to the one taken by the rest of the industry. *See* Tr. 258:9-22, 259:9-12 (Bianco) (stating that Carteret "wouldn't have taken [same] tack" in non-breach world, and "would have been in the average"); Tr. 261:17-262:22 (Bianco).

103. As Mr. Bianco testified, absent the breach, Carteret would have likely ended up taking between $20 and $50 million less in reserves on its commercial lending and CRE assets than it did in the breach-affected world. *See* 263:25-264:17, 493:16-20. Notably in this regard, Mr. Vigna suggested that a five percent range of reserves (*i.e.*, between 15 and 20%) on commercial assets would be reasonable, and that Carteret based its reserves at the upper end of that range. Tr. 2273:7-10 (Vigna). Given that Carteret had approximately $1 billion in assets in its commercial lending portfolios, Carteret would have booked about $50 million less in reserves if it had simply based its reserves on the lower end of this 5% range.[69]

104. The conclusion that Carteret would have booked lower reserves in the no-breach world is also supported by the fact that, in the breach-affected world, Carteret based many of its valuation/reserve decisions on offers it received for certain assets or to resolve certain loans. As Mr. Kennedy conceded, the amount of such offers are often influenced by the buyer's perception of the seller's financial condition. *See* Tr. 3299:14-3302:23 (Kennedy). Thus, it follows that

[69] Similarly, Scott Smith noted that there was a reasonable range of at least 24% for the reserves Carteret needed to book following the 1989 exam. *See* ¶ 91. Applied to the $150 million in reserves that Carteret booked in 1991, Mr. Smith's testimony suggests that Carteret could have reasonably booked about $35 million less in reserves.

Carteret's weakened capital profile in the wake of the government's breach very likely led to lower offers for Carteret's assets, which led to lower valuations and higher reserves. This is true even if it is assumed that Carteret was not technically in a liquidation mode at the time. Because Carteret had many of the attributes of a distressed seller, there can be little doubt that Carteret received lower offers than it otherwise would have. *See* Tr. 259:13-260:16 (Bianco); Tr. 959:23-964:12 (Calomiris); PX 9055a; Tr. 3792:4-8 (R. Smith) (stating that it's "generally a good idea, don't be desperate" when trying to sell an asset).[70] Similarly, absent the breach, Carteret would have been able to offer more in the way of seller financing in connection with asset sales, which would have tended to increase the sales prices for those assets. *See* Tr. 260:17-261:16 (Bianco).[71]

**9. <u>The Breach Caused a Variety of Other Harms</u>**

105. After the breach caused Carteret to fall out of compliance, federal regulators imposed upon the thrift a variety of harsh restrictions. As Judge Bissell found at the time:

---

[70] *See also* R. Smith Dep. 467:18-20 (JX 1 at 543); Tr. 3790:22-3791:2 (R. Smith) ("any institution, to go from being insolvent to being not insolvent, can . . . experience a[]rise in value of many of its assets, which are no longer considered to be for sale on a liquidation basis"); Tr. 3791:10-19 (R. Smith) ("[W]hile it's still insolvent, the value of those assets may be struck as being a liquidation value, whereas liquidation value may be a harsh value, and the intrinsic value of those assets may be greater, but the intrinsic asset cannot be experienced if you're going to be force to liquidate.").

[71] *See also* Tr. 3098:1-13 (R. Smith) (there was credit crunch in early 1990s, and "illiquidity can make a very big difference in terms of the value of the asset collateral and the market price of commercial real estate loans"); Moor Dep. 156:20 (JX 1 at 434) ("In time they all get better."); Tr. 2407:10-17 (O'Rourke) (agreeing that "dump[ing] a lot of stuff on the market" causes the market "to go down because there is a bigger supply," and explaining that "when you see an imbalance of supply and demand, then you're going to get larger than normal decreases in value"); Meyer Dep. 182:11-19 (JX 1 at 379) (agreeing that "during that period when the RTC was taking over a number of thrift institutions and resolving them through conservatorships and receiverships and selling wholesale a lot of their assets . . . that compounded the real estate to decline in the depression in those years"); R. Smith Dep. 55:11-22 (JX 1 at 505) (acknowledging that it's possible that "the RTC's sale of assets in '90 and '91 exert[ed] downward pressure on the commercial real estate market").

> The Capital Directive contains a wide variety of requirements with which Carteret must comply, many of which are extreme. The overall effect of these requirements is substantial governmental control of and/or intervention in even the most basic day-to-day operation of the plaintiff. Furthermore, although this Directive appears to seek consent before it will be imposed, it is evident that failure to consent results in its imposition, without consent.
>
> The sole basis of OTS' action is Carteret's failure to meet capital requirements (specifically, the risk-based capital requirements), and the only reason it does not meet them is because OTS does not count the supervisory goodwill in making its determination. If Carteret was able to use that goodwill, it would be in capital compliance. No other basis for regulatory action against Carteret is asserted.

*Carteret*, 762 F. Supp. at 1165.[72] These measures further harmed Carteret by preventing mitigation efforts and draining critical resources. *See* Tr. 160:12-18 (Bianco) ("It was a very difficult regulatory environment. It was . . . unreasonable."); DX 7142 (CSB Board of Directors Meeting Minutes, 7/29/92) at RAM0100225 ("There have been severe restrictions placed on Carteret."). Again, Judge Bissell's findings are instructive:

> This case constitutes an example of agency discretion gone haywire. Despite operating losses in 1990, Carteret has not exhibited financial instability or poor management; in fact, it has made considerable effort to come into compliance with the new requirements. Despite these facts, however, OTS apparently wants to charge in and micro-regulate the institution because OTS chooses not to honor a valid contract made by its predecessor.

*Carteret*, 762 F. Supp. at 1177. *See also* Tr. 3086:19-21 (R. Smith) (agreeing that "excessive regulation can hurt the value of the company").

106. The OTS disallowed the payment of dividends by Carteret. *See* DX 7063 (OTS 1989 Exam Rpt.) at WOP8140058; Tr. 234:14-18 (Bianco). Because investors value dividends, this restriction made it more difficult to procure outside investment to recapitalize the thrift. *See*

---

[72] At trial, the government argued that Judge Bissell's conclusions are irrelevant because he enjoined the particular capital directive to which this passage referred. The capital directive actually imposed on Carteret, however, contained many of the same restrictions, with an end result predicted by Judge Bissell: "substantial government control of and/or intervention in event the most basic day-to-day operation of" Carteret.

Tr. 234:19-235:4 (Bianco); PX 9047; Tr. 744:3-8, 745:4-16 (Calomiris).

107. The OTS required Carteret to file an endless series of reports and updates. *See, e.g.*, DX 25 (Timetable for Compliance) (listing five pages of requirements and deadlines); Tr. 232:17-234:13 (Bianco). In the words of Judge Bissell: "[Carteret] is subject to considerable governmental regulations and control over its daily business decisions, thus further complicating and hampering the business." *Carteret*, 762 F. Supp. at 1181.

108. The federal regulators imposed liquidity requirements on Carteret. *See, e.g.* DX 7175 (CSB Capital Plan, 9/30/91) at CAM218 0025 ("While OTS regulations require thrifts to maintain a minimum liquidity level of 5%, the [April 1991] Supervisory Agreement requires Carteret to maintain a 10% liquidity level."); PX 2118 (OTS 1992 Rpt. of Examination) at WOQ6730068. As Mr. Bianco explained, these requirements decreased earnings because a thrift earns less interest income on liquid assets.[73]

**C. <u>The Injunction</u>**

109. Carteret filed suit against the OTS on February 14, 1991, seeking to enjoin the regulators to abide by the government's goodwill promises. After holding a hearing and reviewing volumes of documentary evidence, the district court found that "Carteret alleviated the government's obligation of bailing out the four thrifts acquired, in exchange for the right to use supervisory goodwill." *Carteret*, 762 F. Supp. at 1180. Carteret had been placed under "extreme" regulatory restrictions solely "because OTS does not count the supervisory goodwill in making its [regulatory capital] determination." *Carteret* 762 F. Supp. at 1165. The court emphasized that Carteret was financially sound and that the regulators themselves posed the only threat to Car-

[73] Tr. 238:2-19 (Bianco); *see also* Tr. 3028:6-9 (R. Smith) (agreeing "that an increased liquidity requirement would cut into a thrift's profitability"); PX 2215 (R. Bianco to N. Ketcha re FDIC review, 1/14/92) at C-AM-A-0177833 ("Carteret has significantly increased its liquidity at considerable cost to the bank . . .").

teret's survival. "There is no apparent threat that the regulatory agencies will be required to 'bail out' Carteret in the near future. Ironically, the OTS' threatened actions are more likely to *produce* that result, if unrestrained." *Id.* at 1180-81 (emphasis in original).

110. On April 25, 1991, the district court preliminarily enjoined the regulators from breaking the contract. *Id.* at 1182. Specifically, the court saw that enforcement of the FIRREA capital requirements would result in "injury to Carteret in terms of lost business opportunities, withdrawals and damage to its reputation in the community."[74] *Id.* at 1180.

111. The impact of this favorable ruling, however, was muted. Both Carteret and the market had early indications that the injunction might well not hold. For example, on July 16, 1991, the U.S. District Court for the District of Columbia held, in a similar case, that a thrift's FIRREA-based breach of contract claim was cognizable only in this Court. *See Northeast Sav., F.A. v. OTS*, 770 F. Supp. 19, 23-25 (D.D.C. 1991). And, indeed, on May 7, 1992, the Third Circuit similarly held that this Court has exclusive jurisdiction under the Tucker Act over Carteret's claims against the government. *Carteret Sav. Bank v. OTS*, 963 F.2d 567 (3d Cir. 1992).

## IV. CARTERET WOULD HAVE THRIVED IN THE NONBREACH WORLD

### A. Carteret Would Never Have Fallen Out of Capital Compliance in the Nonbreach World

#### 1. A Conservative Counter-factual Picture of Carteret

112. Absent the breach, Carteret would never have fallen out of capital compliance. Tr. 268:10-270:24, 627:1-6 (Bianco). If Carteret's September 1992 capital profile is adjusted to include supervisory goodwill, to reverse a limited subset of the breach-induced harms, and to in-

[74] On July 8, 1991, the district court clarified that the OTS had to count the approximately $50 million of supervisory goodwill in the Carteret capital calculations, which goodwill had been written down for financial statement reporting purposes when Carteret sold the branches in 1990 as a result of the breach. *See Carteret Sav. Bank, F.A. v OTS*, No. 91-661, slip op. (D.N.J. July 8, 1991).

clude a few conservative proactive measures (such as securitization of mortgage loans), then Carteret would exceed its tangible capital requirement by $63.6 million, and fall just short of its core capital requirement and risk-based capital requirement. *See* PX 9053a; PX 9054; Tr. 759:4-779:4, 956:7-957:24 (Calomiris).

113. Absent the breach, Carteret would have had $139,119,953 in supervisory goodwill to count toward capital requirements in September 1992. PX 9053a; PX 9056; PX 4822 (Goodwill Amortization Schedule, 8/89); Tr. 761:6-764:19, 964:13-25 (Calomiris). And there were a myriad of feasible alternatives to ensure that Carteret never fell out of capital compliance. For example, Carteret could have sold mortgage-backed securities, AmBase could have raised debt or equity to downstream to Carteret, or Carteret could have unlocked its substantial franchise value.

114. Absent the breach, Carteret would not have sold 23 branches in 1990, *see* PX 2702A (Calomiris 5/07 Rpt.) at ¶ 58, and therefore would not have received the $40.7 million premium associated with those sales. PX 9053a; Tr. 764:20-765:7 (Calomiris). These branches would not have been breach-affected, and therefore would have been in a growth mode and benefited from economies of scale. Thus, these branches would have generated profits for Carteret. *See* PX 2702A at ¶ 58. And if the branches had been a drag on earnings that threatened Carteret's capital compliance, they would have been sold. *See* ¶ 85.

115. Absent the breach, Carteret would have had positive core capital in September 1992 just from adding back the foregone supervisory goodwill. PX 9053A. Once core capital was positive, Carteret would have been able to count General Valuation Allowances (GVAs) of up to 1.5% of total risk-based assets toward its risk-based capital requirement. *See* PX 9064; PX 2702A (Calomiris 5/07 Rpt.) at ¶ 63; PX 2118 (OTS 1992 Exam Rpt.) at WOQ6730061. As of

September 30, 1992, Carteret reported $43.3 million in GVAs, all of which would have counted toward the risk-based capital requirement in the nonbreach world. PX 2702A at ¶ 63; PX 9064; PX 3801 (CSB Financial Rpt., 9/30/92) at CAM4731113; Tr. 768:11-770:9, 975:25-976:23, 1036:14-25 (Calomiris).

116. Absent the breach, Carteret would not have incurred an increase in its cost of funds. Thus, as of September 1992, Carteret would have had $17 million more in capital just from the savings in 1991 and 1992 on 6- to 23-month CDs. *See* ¶¶ 74-77.

117. Absent the breach, Carteret would have taken $20-$50 million less in loan loss reserves. *See* ¶¶ 102-03; PX 2702A (Calomiris 5/07 Rpt.) at ¶ 82. Thus, Carteret would have had $20-$50 million more in capital as of September 30, 1992. *See* PX 9053a.

118. As of September 30, 1992, Carteret had $1.561 billion in single-family residential mortgage loans, which received 50% weighting for risk-based capital purposes. PX 1737 (TFR, 9/30/92) at CAM5350309; Tr. 247:6-13 (Bianco). In a nonbreach world, Carteret could have securitized these loans and moved them into a 20% risk-weight profile. Tr. 247:14-21 (Bianco); PX 1737 at CAM5350309. Underwriting fees for the securitization process would have been approximately $3.9 million. Tr. 975:5-8 (Calomiris). The net effect of this process would have been to decrease risk-weighted assets by $468.4 million, decrease risk-based capital by $3.9 million, and decrease the risk-based capital requirement by $33.7 million. PX 2704A (Decl. of Charles W. Calomiris, 7/1207) at ¶ 11; PX 9063; Tr. 765:8-768:10; 973:24-975:24 (Calomiris). Carteret was already servicing all of these loans, and could have continued to do so after the conversion to MBSs. *See* PX 2807 (CSB Overview) at 5 ("Carteret retains virtually all of the servicing for mortgages originated through its mortgage production facilities."); Tr. 766:18-23, 974:18-23 (Calomiris). Moreover, aside from decreasing the capital requirement, these asset

sales also would have generated capital to satisfy the decreased requirement. For example, in the 27 days following seizure, the RTC recognized a gain on sales of assets of $5.561 million. PX 3804 (CFSB Financial Rpt., 12/31/92) at 1. Professor Smith acknowledged that Carteret could have booked those same gains had it not been seized. Tr. 3788:6-3789:10.

119. Absent the breach, AmBase could have—and, if necessary, would have—infused into Carteret $36 million. Tr. 775:24-776:10 (Calomiris); Tr. 270:11-13 (Bianco) ("[W]e would have done everything in our power to protect this major franchise . . .").

120. Under these few adjustments, Carteret would have been in tangible capital compliance and would have fallen just short of its other capital requirements. In a fully-realized non-breach world—that is, in a true counterfactual scenario—Carteret would not have faced any capital deficit at all. As Professor Calomiris explained, his analysis was "a one-hand, maybe two hands behind your back but-for analysis." Tr. 759:5-11. Professor Calomiris's model does not account for foregone profits due to the breach-induced asset shrink. For just two of the years following the breach, AmBase's 10-Ks estimate those foregone earnings at $28 million. *See* Tr. 759:14-16; 773:2-774:1, 9598:9-22 (Calomiris); PX 2702A (Calomiris 5/07 Rpt.) at ¶ 66; PX 402 (AmBase 1990 10-K) at 11; PX 403 (AmBase 1991 10-K) at 9. Similarly, Professor Calomiris did not include foregone income from deposit run-off. Tr. 759:16-18 (Calomiris). Nor does Professor Calomiris's model account for the entire time period or set of debt instruments relevant to increased cost of funds. *See* ¶ 76.[75] Nor does Professor Calomiris account for the fact that, instead of directly downstreaming its $36 million in cash, AmBase could have leveraged that money to raise $80-$100 million on Carteret's behalf. *See* ¶ 123. Nor does Professor

[75] Also, in adding back the supervisory goodwill, Professor Calomiris conservatively assumes 100% risk-weighting, even though, from the perspective of a nonbreach world, that asset likely would have engendered much better treatment as a government promise. *See* Tr. 761:15-762:11.

Calomiris account for a variety of other measures Carteret could have taken to avoid falling out of capital compliance—such as selling loans, selling Carteret Mortgage Company, or selling branches. With all these conservatisms, it is thus easy to conclude that "[i]f there hadn't been the breach, [Carteret] never would have fallen out of compliance with their capital requirement in any kind of reasonable counterfactual scenario." Tr. 1139:23-1140:1 (Calomiris); *see also* PX 9054; Tr. 757:1-6, 957:9-24, 976:24-977:12, 978:11-14, 988:25-989:9 (Calomiris); Tr. 268:10-16 (Bianco) ("We wouldn't have fallen out of capital compliance."); Tr. 627:1-6 (Bianco).

**2. <u>Assuming the Need, Capital Easily Could Have Been Raised</u>**

121. Assuming, however, that Carteret would have faced a capital deficiency in 1992 absent the breach, the evidence shows that the thrift would have had no trouble in raising the money to come into compliance. As Mr. Bianco stated at trial: "[W]e had so many opportunities. We wouldn't have fallen out of capital compliance. . . . [W]e would have done everything in our power to protect this major franchise in a difficult environment." Tr. 268:10-270:24.

122. As the government's investment banking expert acknowledged, "all other things being equal, it's easier for a company to raise a smaller amount of capital than a larger amount of capital." R. Smith Dep. 167:17-21 (JX 1 at 520); *see also* Tr. 3113:11-15 (R. Smith) (same).[76] OTS Regional Deputy Director Albanese similarly explained that "if they had a smaller hole to fill," it "goes without saying" that "somebody [was] more likely to step in." Dep. 160:5-12 (JX 1 at 13).[77] Thus, even assuming an unbreached Carteret in 1992 was the same in every respect as a

[76] Professor Smith argued that, in the breach-affected world, Carteret's suitors "probably did not find that an investment that they would make, starting with $200 million investment, would be able to return the 25 percent or so per year that they would expect for a private equity return . . . ." Tr. 2953:10-14. Thus, a smaller investment would have been easier to procure because it would have offered a higher rate of return.

[77] *See also* Tr. 1756:12-1757:7 (Albanese) ("I believe that eliminating the supervisory goodwill—I mean, taking $140 million . . . and infusing it into the institution . . . . A free $140

breach-affected Carteret save for the inclusion of supervisory goodwill on the balance sheet, the prospects for raising the capital to come into compliance would have been much improved. Add to this the fact that a breach-affected Carteret nearly raised the money in 1992, *see, e.g.*, ¶¶ 169-171, and Carteret's survival with supervisory goodwill is a certainty.

a. <u>AmBase Could Have Raised Capital in the Nonbreach World</u>

123. AmBase could have, and would have, raised $80-$100 million by leveraging its $36 million of cash on hand. Based on his expertise, Mr. Bianco explained that AmBase, which by this time had paid off the Chase loan and had no debt, could have raised this amount by using its $36 million in cash to cover the interest on a three- to five-year loan with a coupon rate of 7%. Thus, the interest payments on the debt would be guaranteed. And, if necessary, Carteret could have been pledged as collateral, just as it had been in 1988 to secure borrowings from Chase. PX 2611 (Credit Agreement, 6/10/88) at AMBNP013514-15. The proceeds of this deal could then have been infused into Carteret without the thrift having to carry the debt on its books. Tr. 275:20-279:7 (Bianco). Professor Calomiris explained that this type of transaction would have been "very feasible" and "became quite commonplace . . . in the last decade or so. Tr. 774:8-13. Indeed, Professor Calomiris explained that Greater Atlantic—for which he serves as a director—recently engaged in just such a transaction. Tr. 774:13-775:18. And this Court has described how another breach-affected institution was able to raise money at the holding company level and infuse it into the thrift. *See Bank of Am. v. United States*, 67 Fed. Cl. 577, 582 (2005). Even the government's own investment banking expert testified that AmBase "might find investors" for this type of transaction. R. Smith Dep. 509:1-14 (JX 1 at 544).

million would have had to have had a positive impact upon the earnings of the institution. And that would have certainly enhanced the chances of an investor wanting to step in."); Tr. 2319:14-21, 2320:13-19 (Vigna) (acknowledging that Carteret's ability to attract capital would have been enhanced if it had satisfied or nearly satisfied its tangible capital requirement).

124. Despite Professor Smith's admission, Professor Saunders has argued that AmBase would not have been able to find lenders for this type of transaction because the company would have been insolvent in the nonbreach world. Tr. 3579:19-3580:12 (Saunders). Both his premise and conclusion are incorrect. The premise is wrong because AmBase was not insolvent even in the breach-affected world, and certainly would not have been insolvent in the nonbreach world. First, AmBase was due to receive a significant tax refund. *See* PX 807 (AmBase 1995 10-K) at 7 (stating that AmBase received $16.7 million in tax refunds in 1993). Second, in the breach world, AmBase carried Carteret on its book at zero value. But in the nonbreach world, AmBase would not have carried Carteret—by 1992 its only other asset aside from the cash—at zero value. And it would not have written off the goodwill, which well eclipsed the contingent liabilities Professor Saunders relied upon. *See* DX 1554 (AmBase 1992 10-K) at 23 ("The 1990 loss was primarily attributable to a write-off of goodwill at December 31, 1990 aggregating $161,000,000."). Third, even in the breach-affected world, AmBase's liabilities were highly contingent tax claims that the Company believed would be erased through litigation. As reported in the 1992 10-K:

> Audit issues have been raised by the Internal Revenue Service ("IRS") that would have a material effect on the Company's consolidated financial statements were the IRS to be successful in sustaining its positions. . . . Based on counsel's evaluation of the IRS's contentions, counsel has advised the Company that it has a very strong case and should prevail.

DX 1554 at 40. (Indeed, AmBase is a solvent company to this day because the tax court rejected the IRS's position. *See*, *e.g.*, *AmBase Corp. v. Commissioner*, 2001 T.C.M. (CCH) 1657). As Professor Smith explained, "a contingent liability isn't worth as much as an actual liability so you would have to give it a different valuation." Dep. 379:8-12 (JX 1 at 533); *see also* Tr. 3049:21-24 (acknowledging that "in assessing contingent liabilities, you look at the magnitude

and probability of those liabilities coming to bear"). Indeed, Professor Smith explained that when he was at Goldman Sachs, "we probably wouldn't pay too much attention to" a contingent liability. Dep. 379:16-21 (JX 1 at 533). Accordingly, Professor Saunders is simply wrong in asserting that AmBase was insolvent and that outside investors would not have engaged in a transaction with AmBase based on its contingent liabilities.[78]

125. Professor Saunders's conclusion is wrong because even if AmBase was somehow insolvent in the nonbreach world, this profile would not have foreclosed outside investment. After all, as Professor Smith acknowledged, Carteret itself "was able to access the capital markets even though, on a tangible book basis, it was insolvent." Tr. 3047:4-7. Indeed, in 1983, Carteret was able to raise $65 million ($58 million net of offering expenses) through an initial public offering even though it was insolvent by approximately $212 million on a tangible capital basis. Tr. 3042:4-12 (R. Smith); PX 2 at (Carteret 1983 Annual Rpt.) at 22, 36. And from 1983 to 1987, Carteret was able to raise approximately $120 million in the capital markets. Tr. 2919:19-2920:3 (R. Smith). Professor Smith also acknowledged that Citibank was "functionally insolvent" and "bankrupt" in 1990 and 1991, Tr. 3098:14-3099:3, yet he and many other investors

---

[78] Professor Saunders admitted that he had no basis for disagreeing with counsel's advice regarding the likelihood of success on the tax claim. Tr. 3975:7-10. Also, he admitted that he did not know—and therefore could not opine on—whether AmBase's litigation reserves in 1992 were related to the breach. Tr. 3975:18-24. Moreover, aside from his failure to investigate or comprehend the nature of AmBase's contingent liabilities, Professor Saunders also fundamentally misunderstood the very basics of the transaction described by Mr. Bianco. *Compare* Tr. 3579:24-3580:1 (Saunders) (testifying that Mr. Bianco proposed borrowing "150 million by putting this $30 million with the bank"), *with* Tr. 276:1-14 (Bianco) (testifying that "AmBase had [$]36 million" with which it would "ha[ve] been able to raise between [$]80 and $100 million"). And as Professor Saunders himself admitted, he has little to no experience raising capital. Tr. 3399:18-3400:23. Mr. Bianco and Professor Calomiris, on the other hand, have had extensive experience raising capital. *See* Tr. 149:14-150:9 (Bianco) (detailing experience raising capital); Tr. 276:15-17 (Bianco) ("So that was my area of expertise. I mean I knew the capital markets. I knew what we could raise."); Tr. 640:2-4 (Calomiris). And, the government expert who actually has investment banking experience, testified that this deal would have been possible. R . Smith Dep. 509:1-14 (JX 1 at 544). Professor Saunders simply is not credible on this issue.

purchased the bank's stock despite this fact, Tr. 3105:5-9, 3106:23-3107:5. Investors are willing to make such purchases because, as Professor Smith acknowledged, they "make decisions based on expected after-tax cash flows." Tr. 3042:4-6.

126. Professor Saunders also argued that AmBase could not use its $36 million to raise capital for Carteret because the company would not have funds to pay its own expenses. *See* Tr. 3580:14-20. This is factually wrong as it ignores the significant tax refund AmBase was due to receive. *See* PX 807 (AmBase 1995 10-K) at 7, 11 (reporting that AmBase received $9.4 million and $16.7 million in tax refunds in 1992 and 1993).

b. Carteret Could Have Raised Capital in the Nonbreach World

127. Carteret could have raised capital in a nonbreach world. Carteret had generated fifteen straight months of profits by December 1992. ¶ 143. In a nonbreach world, those profits would have been even greater. ¶ 145. Moreover, in a nonbreach world, Carteret would have been able to pay dividends, which would have helped attract investors. Tr. 745:7-16 (Calomiris). Indeed, Mr. Albanese testified that even in the breach-affected world, he did not "see any reason why this institution would have had a difficult time raising capital." Dep. 156:25-157:12 (JX 1 at 12-13); *see also* Tr. 1737:15-21 (reaffirming deposition testimony).[79]

128. Professor Smith's own analysis demonstrates that Carteret could have raised substantial capital in 1992. He testified that a discount rate reflects the inverse of a price earnings ratio. Tr. 3768:11-22. Thus, the discount rate of 25% that Professor Smith testified investors would require of Carteret in 1992, Tr. 3072:15-25, implies a P/E ratio of four, Tr. 3768:23-3769:5. Even the breach-affected earnings for 1992 were more than $11 million. PX 3802

[79] As both Professors Smith and Calomiris explained, investors care about future, not past, performance. Tr. 3042:4-6, 3106:24-3107:5 (R. Smith); Tr. 999:16-1000:3 (Calomiris). This explains why investors were interested in Carteret in the breach world and why they would have been even more interested in the nonbreach world.

(CSB Financial Rpt., 11/30/92) at CAM4820006. Professor Smith stated that the economic profits in 1992 should not reflect losses from loans made in prior years; under that measure, Carteret was generating profits of $36 million in 1992. PX 3802 at CAM4820006; Tr. 3064:19-3065:7, 3066:3-9, 3111:4-7. Under Professor Smith's own logic, investors would have been willing to pay four times that amount for Carteret, or, $144 million.

c. Carteret Could Have Securitized and Sold Residential Loans

129. Carteret could have, and would have, securitized and sold its $1.5 billion in residential loans. *See* ¶ 118; Tr. 247:22-248:6, 249:15-250:13 (Bianco).

d. Carteret Could Have Merged

130. Carteret could have merged with a capital-rich bank that wanted to acquire Carteret's substantial franchise. Tr. 977:6-12 (Calomiris). Such a merger would have allowed a "transfer from the surplus institution to the deficit institution, so that the combined institution meets its capital requirement." Tr. 977:13-22 (Calomiris).

e. Carteret Could Have Sold Its Servicing and Origination Businesses

131. Carteret could have sold its servicing rights to generate approximately $20 million in capital. Tr. 201:10-202:9; 570:24-571:1 (Bianco); PX 9069a; Tr. 986:8-987:12. "As of September 30, 1991, Carteret's purchased and originated servicing rights were appraised at $101.6 million by an independent third party versus Carteret's balance sheet value of approximately $83.0 million, $70.7 million of which was purchased servicing rights." PX 2807 (CSB Overview, 3/9/92) at 5. Actual sales of the loan servicing portfolios are consistent with these appraisals: from January through August 1991, $465 million in servicing rights sold for a gain of $7.1 million. Both Professors Smith and Saunders agreed that Carteret could have sold this business. *See* Tr. 3778:23-3779:5 (R. Smith); R. Smith Dep. 165:23-166:2 (JX 1 at 520); Tr. 3841:11-14

(Saunders). And selling these servicing rights would not hurt franchise value because Carteret "had the ability to replenish that within [its] mortgage origination group." Tr. 200:3-14 (Bianco).

132. Carteret also owned a valuable mortgage origination business, Carteret Mortgage Company (CMC). PX 2807 (CSB Overview) at 5. The origination business was especially valuable because it dovetailed with the mortgage servicing business. Tr. 168:23-169:5, 186:21-24. "Carteret's mortgage banking operation [wa]s very profitable, highly competitive and worth considerably more than its . . . carrying value." PX 2807 at 6; Tr. 205:24-206:22 (Bianco). CMC was carried at no value on Carteret's books.

133. The sale of CMC alone would have generated at least $18.4 million. Professor Calomiris explained that the value of a mortgage business is in the personnel, and that after seizure, CMC's personnel left for another company en masse. An event study reveals that the company hiring CMC's personnel increased in value by $18.4 million. Tr. 982:19-984:13 (Calomiris); PX 9067; PX 9068. *See also* Tr. 317:25-318:6 (Bianco) (stating that sale of CMC could have raised about $20 million); Tr. 475:15-476:11(Bianco) (explaining why CMC could be worth a multiple of its earnings on the market); Tr. 982:2-18 (Calomiris) ("the mortgage company, even by itself, would have generated substantial cash").

134. Because of synergies between mortgage servicing and mortgage origination, selling Carteret's servicing rights coupled with its origination business would have made both even more valuable. *See* PX 9069a; PX 9070; Tr. 982:6-11, 987:13-988:10 (Calomiris). As Professor Calomiris explained, a combined sale "would have been able to generate a huge amount of cash." Tr. 982:2-18; Tr. 978:7-10 (Calomiris). That sale alone would have been more than enough to solve any capital deficits. Tr. 978:8-10 (Calomiris).

f. Carteret Could Have Unlocked its Substantial Franchise Value

135. Professor Smith has stated that:

> A financial institution's franchise is probably its most important asset. . . . It results from the institution's standing in the market, a synergistic combination of all competitive attributes in which the whole is greater than the sum of the parts. Franchise is a function of past performance projected over future transactions.

Tr. 3783:3-25. Professor Smith defined franchise value as "the going concern value of an enterprise, taking into account the quality of its brands, its customer base, and the probability that it will continue to serve this market efficiently and well in the future." Tr. 3781:21-3782:4; Dep. 129:12-18 (JX 1 at 515).[80] Professor Saunders similarly testified as to the importance of a bank's franchise value: "[T]he question is[:] Why does anybody pay a premium [for deposits]? Because deposits have franchise value and you're transferring franchise valuable deposits to another bank who thinks it can use those deposits to generate other business . . . ." Tr. 3629:22-3630:1; *see also* Tr. 3633:20-21 (Saunders) ("[A] co[re] depositor is a very nice asset to have.").

136. As RTC official Edward Griffin recognized, "Carteret's franchise was extremely valuable," due to the "longstanding nature of its relationships with its customers," its "very good branch location," its "consistency" in customer support, and its "loyal customer base." Dep. 95:11-96:9 (JX 1 at 231). *See also* PX 4867a (OTS "S" Memo, 11/11/91) at 18 ("This Office is of the opinion that Carteret's branch network would be found to be attractive to investors."). Dittenhafer Dep. 184:4-5 (JX 1 at 78) ("Carteret as a savings bank had a good name in a number of very lucrative markets."). Moreover, Carteret had a presence in multiple states at a time when interstate banking was generally prohibited. Tr. 172:18-173:5, 207:5-9 (Bianco).

[80] *See also* Tr. 3782:8-17 (R. Smith) (agreeing that, "[in] aggregate" customer relationships have value); Tr. 2917:8-12 ("You might call them intangibles or you might call them franchise value or you might call them anything. But it's a premium above the actual accounting value of the cash and retained earnings of the company.").

137. Professor Calomiris has conservatively estimated that the market value of Carteret's franchise was equal to about $100 million at the time of the breach. *See* PX 2702A at ¶¶ 49-52. In 1990, Carteret sold twenty-six branches for $41 million, or a premium of 3.5%—"among the highest premiums received in the industry during 1990." ¶ 79; PX 4718 (Branch Closing Statement, 10/9/90); PX 4724 (Loyola Branch Sale, 10/21/90); PX 4726 (Branch Closing Statement, 12/17/90); DX 7340 (Mem. from R. Walsh, 6/14/91). Applying that premium to Carteret's branches suggests that, as of 1990, the franchise value of all of the thrift's branches was approximately $150 million. *See* DX 8000A (Smith Rpt.) at Ex. 3 (reporting total deposits of $4,276,500,00 as of December 31, 1989).

138. In 1993, just after Carteret was seized, the RTC recognized Carteret's franchise value. In its Conservatorship Strategic Plan, the RTC wrote:

> The CFSB retail office network is well-positioned in strategic markets and offers a prime opportunity for any acquiring institution. . . . CFSB retail offices in New Jersey and Florida are located in some of the top performing areas in each respective state. . . . In recent years, CSB has made every effort to maintain the stability of the manager and his or her staff at each of its retail offices. The result has been a high level of customer service leading to a high degree of customer loyalty. . . . In its New Jersey market areas, CFSB is second only to First Fidelity Bank in terms of retail deposit market share. The Bank is the market share leader in eight of its New Jersey market areas and among the top three in over half of the markets. . . . The Bank's penetration of high balance households far exceeds its overall market penetration in each of the New Jersey and Florida counties where CFSB has a retail office presence. Average account balances for each product type at CFSB exceed industry averages. These characteristics, combined with a relatively stable deposit base, further enhance the valuation of the Bank's franchise.

PX 4002 at 26-27. Because of Carteret's high franchise value, the RTC originally planned to sell Carteret on a whole-bank basis through its Accelerated Resolution Program (ARP). According to the FDIC, "institutions selected for sale through the ARP process were perceived to have a high franchise value and already had attracted viable, cost-effective proposals from prospective

acquirers, which indicated substantial private sector interest." PX 9162 (MANAGING THE CRISIS) at 132. *See also* PX 9083; Tr. 1010:4-1011:4 (Calomiris); Tr. 2547:24-2548:11 (Downey).[81]

139. The RTC's predictions about Carteret's franchise proved correct when, in 1994 and 1995, it realized a $143 million premium on the thrift's remaining branches. Tr. 175:9-176:8 (Bianco); PX 4986 (Branch Resolution Summary). And this was after two to three years of deposit runoff, suggesting that this premium reflected an absolute lower bound of Carteret's branch franchise value just prior to seizure. As the OTS's John Downey acknowledged, "if an institution was transferred to the RTC, its franchise value would diminish." Tr. 2548:25-2549:3. Adding the premium realized by the RTC to the premium realized in the breach-induced branch sales of 1990 suggests that in the nonbreach world, Carteret's branches were worth at least $180 million in 1992.

140. If absolutely necessary, Carteret would have unlocked the substantial franchise value in its branches and sold them to maintain capital compliance in the nonbreach world. Tr. 270:8-18 (Bianco); Tr. 977:23-978:6 (Calomiris).

141. That Carteret could have sold its mortgage business or branches to fill a capital hole is confirmed by the fact that, just before the seizure in 1992, PNC was willing to pay Carteret a $125 million premium for the purchase of the thrift's servicing, mortgage origination business, and some of its branches. PX 4892 at AMBNP025248.

g. <u>Carteret's Trends Demonstrate Sustainable Profitability</u>

142. The prospects for raising the small amount of capital that might have been neces-

[81] As Professor Calomiris explained, the FDIC/RTC "c[a]me up with their own expectation of the outcome for any given bank of what they think th[e] difference is between resolution cost and payoff cost. Carteret was among the highest, by the RTC/FDIC's own lights, of . . . what they expected to get. So they didn't just say it was ARP. They gave us a number. And the number was quite impressive." Tr. 1012:2-16; Tr. 1011:5-1012:1 ("Their number, 37.4 percent, is a very, very high number compared to the rest of the sample.").

sary to achieve compliance in the nonbreach world were especially favorable in light of the fact that, by 1992, even the breach-affected Carteret had turned a corner: it had worked out its asset problems, was generating profits, and had excellent management.

143. Carteret returned to profitability in the last quarter of 1991 and remained profitable until the date of seizure, with total earnings during that period exceeding $13 million. *See* PX 9066; Tr. 978:16-19 (Calomiris); PX 2805 (A. Vigna to T. Ryan, 1/17/92); PX 3802 (CSB Financial Rpt., 11/30/92) at CAM4820006 (reporting net income of $11 million for the first eleven months of 1992); Tr. 279:20-282:4 (Bianco). Carteret's regulators took notice of these profits. Thus, in a July 1992 letter to FDIC Regional Director Ketcha, Mr. Albanese reported that Carteret had experienced an uptick in profits for the six months ended May 1992, that core earnings had improved by $11.5 million, and that non-interest expense had declined. PX 2816 at WOP3340863.[82] Significantly, the regulators believed that this trend was stable and Carteret's profitability was sustainable. For example, in June 1992, OTS examiner O'Rourke wrote: "I believe that sustainable core profitability can be demonstrated at roughly the level reported in the first quarter of 1992." DX 314 (OTS Mem.) at WOP3330463.

144. The regulators had good reason to predict that Carteret would remain profitable. There was, as Professor Saunders explained at trial, a "massive downward trend in interest rates" in September 1992, Tr. 3572:22-24—and Carteret was negatively gapped and poised to take advantage of this trend.[83] *See also* Tr. 3103:20-25 (R. Smith) (explaining that after the 1991 reces-

---

[82] *See also* PX 2319 (OTS Mem. T. O'Rourke to A. Vigna et al., 7/2/92) at 2 (reporting net income of $5.8 million for the first six months of 1992); Tr. 2302:9-13 (Vigna) (examining PX 2816 and agreeing that "Carteret had returned to core profitability").

[83] A negative interest rate GAP position indicates that, over the period of measurement, e.g., one year, more liabilities than assets reprice during the period. In a declining interest rate environment, as more liabilities than assets reprice to the lower market rates, a financial institution with a negative GAP position, such as Carteret, would become more profitable. The follow-

sion, interest rates "were lower, and they were moving lower for a while"). Thus, OTS official Michael Simone recalled that at the time he was of the view that Carteret "was well positioned to take advantage" of low interest rates, which "in 1991 and 1992 were falling and remained at low levels from '92 on through '93." *See* Dep. 64:3-13 (JX 1 at 500).[84]

145. Moreover, the $13 million of profits only tells part of the story. First, Carteret's actual earnings in 1992 are even greater when the loan losses reported in that year are attributed back to the years in which the loans were made—a practice which the government's own expert embraced at trial. *See* Tr. 3064:19-3065:7 (R. Smith) ("the loan losses suffered in 1992 on Carteret's commercial real estate portfolio should not be attributable to 1992 because the loans were not made in 1992"); Tr. 3066:3-9. Thus, as Professor Smith acknowledged, "the cash flow from lending operations rose from a little over $9 million in 1991 to $36 million in 1992." Tr. 3111:4-7 (R. Smith). Second, in the nonbreach world, Carteret's profits would have been significantly higher because Carteret would not have suffered from the breach-induced cost-of-funds increase. Tr. 980:14-981:9 (Calomiris).

146. Significantly, the OTS admitted, in its 1991 exam report, that in the nonbreach

---

ing table reports Carteret's cumulative, one-year interest-rate gap:

| | **$ (millions)** | **% of Assets** | **Sources** |
|---|---|---|---|
| March 31, 1992 | (965) | (18.1) | PX 1510 at 13 |
| June 30, 1992 | (963) | (18.3) | PX 1511 at 13 |
| September 30, 1992 | (482) | (9.9) | PX 1512 at 13 |

[84] *See also* Tr. 3111:1-3 (R. Smith) ("[i]nterest income in 1992 at Carteret was significantly improved"); Tr. 3786:7-9 (R. Smith) (acknowledging that "investors make decisions based on projected interest rates all the time"); Tr. 326:10-18 (Bianco) (The interest rate climate change's effect on Carteret "would have been very positive. It was everything we were telling them would happen, and it was happening, and it was a real—a plus to the earnings of Carteret. And the country was coming out of the recession at that time. So it was—it was very, very good."). PX 5331 (Mem., R. Seiger to File, 2/15/95) at 1 ("Mr. Simone indicated that had the institution approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing.").

world Carteret could have used *operating profits alone* to fill the capital hole that would exist if supervisory goodwill were counted toward regulatory capital requirements: "In OTS's view, excluding the disputed goodwill, this [$150 million capital infusion] would not cure the capital deficiency, but would bring the institution within approximately $45 million of its requirement. Carteret would make up the remaining deficiency by the end of 1994 through operating profits." DX 9061 (OTS Exam Rpt., 11/7/91) at OAM0010522.

147. Carteret's CRE portfolio had stabilized by September 1992. As Professor Smith acknowledged at trial, "[b]y the end of 1992 . . . the pig had passed through Carteret." Tr. 3812:3-5. Thus, even as of July 1992, Mr. Albanese was able to report that "Carteret also continues to improve its troubled commercial asset portfolio." PX 2816 (Albanese to Ketcha, 7/7/92) at WOP3340863. *See also* Tr. 283:5-285:10 (Bianco) (Carteret improved the asset portfolio by selling nonperforming assets for a 7 to 8% gain). As non-earning assets were sold, the proceeds were invested in earning assets, thereby increasing profits.[85]

148. That the Carteret ship was righted in 1991 and 1992 was due in no small part to the captains at its helm. As Professor Smith acknowledged, "[h]uman capital can be viewed as a financial institution's most important asset," and "both credit and risk evaluation depend," among other things, "on the intellectual caliber, experience and training of the decision maker." Tr. 3108:1-3109:18.

149. On May 22, 1991, the AmBase Board installed new management and board members at Carteret. PX 2111 (OTS Exam Rpt., 6/17/91) at 1, 6. Mr. Bianco was named the new

[85] *See also* Tr. 2023:15-17 (S. Smith) (agreeing that Carteret's asset quality had improved by the time of the 1992 OTS Report of Examination); Tr. 1743:3-4 (Albanese) ("[T]he asset quality was improving."); Albanese Dep. 125:11-19 (JX 1 at 9) ("[W]e were impressed by the fact that the were able to get more assets earning, and so that—that was critical, so that is—that is very good progress."); O'Rourke Dep. 68:5-11 (JX 1 at 450) (agreeing that by 1992 Carteret's asset quality "had definitely improved. There's no question about that.").

CEO of Carteret. Tr. 157:15-158:10 (Bianco). Mr. Bianco had enjoyed a successful career as a Wall Street investment banker and brought with him an experienced team of professionals. Tr. 144:23-157:14 (Bianco).

150. Carteret's regulators were universal and unequivocal in their praise of Mr. Bianco and his team. OTS Regional Director Vigna described the Bianco team as "very strong," "exceptional," "outstanding," Tr. 2219:2-12, and acknowledged that "in all [his] 32 years as a thrift regulator, [he] had not seen a stronger management team particularly with respect to workouts," Tr. 2269:22-2270:1.[86] Mr. Vigna's deputy, Mr. Albanese, who noted that he and Mr. Vigna were "working with Mr. Bianco and his team practically day in and day out," Tr. 1724:8-10, had similar laudations for Carteret's management. He testified that Carteret had "excellent management," that "they were proving it day in and day out," Tr. 1719:16-25, and that "[t]hey had done a great job." Tr. 1674:21-24.[87] Following the seizure of Carteret, OTS resident examiner

---

[86] *See also* PX 2988 (CSB Minutes, 2/27/92) at AMB061213 ("Mr. Vigna…complimented the current management of the Bank stating that they have done an outstanding job since taking over the institution."); PX 6884 (OTS Mem., A. Vigna to J. Downey, 11/22/91) at 1 ("FDIC representatives concurred with our examiner's conclusion that considerable improvement has been made by the new management team in expense control, commercial asset management and accounting/internal controls."); Vigna Dep. 90:19-22 (JX 1 at 590-91) ("And as we learned, the people that were brought in turned out to be extremely competent and capable people, did a really good job in a very short period of time."); *id.* at 105:2-3 (JX 1 at 591) ("[W]e were comfortable, very comfortable with management. They had done an outstanding job."); *id.* at 106:18-107:2, 107:10-14 (JX 1 at 592) ("I would say in terms of, in the years that I was in the regulatory area, thirty-two, these were as strong not only financially but in terms of their dedication and their diligence, this was for the time, for the situation, a workout, this was as good a team as you'd find. . . . [T]o turn around this kind of an operation and to start showing some profits was a pretty monumental task in my view, so . . . I found them to be a very, very strong workout team."); *id.* at 152:13-14 (JX 1 at 598) ("They had done a wonderful job in a very, very severe workout situation."); *id.* at 153:6-10 (JX 1 at 598]) ("[T]hese were people who had—were outstanding businessmen, had done a great job here in a very short period of time.").

[87] *See also* Albanese Dep. 91:9-19 (JX 1 at 7) ("They were a very strong management team."); PX 2816 (Albanese to Ketcha, 7/7/92) at WOP3340862-62 (advising the FDIC that "progress in stabilizing a large, troubled institution has been made by the new management," that

O'Rourke summed up his views of Carteret's management:

> Please express my deepest appreciation and gratitude to members of your staff whose service was in keeping with the finest traditions of what makes this country great. . . . I speak for many OTS staff members when I say that I feel professionally and personally enriched for having interacted with yourselves and these members of Carteret's staff. . . . I have never witnessed the efforts of a more capable and hard working group than the one I encountered at Carteret from May of 1991 forward. It is my hope that people of this caliber will predominate in the work force of this industry and of this country.

PX 4900 (O'Rourke to Bianco, 12/14/92); *see also* Tr. 2467:8-18 (O'Rourke); Tr. 3110:22-25 (R. Smith) (stating that he could not point to *any* strategic decision made by Mr. Bianco with which he disagrees).

151. In light of Carteret's positive trends, OTS examiner Meyer summed up the state of Carteret in 1992: "They had shrunk, they had written off all the assets and they had started to make a profit. *I thought they had turned a corner*." Dep. 234:18-22 (JX 1 at 380) (emphasis added); Tr. 2026:8-15 (S. Smith) (agreeing that "examiners had concluded that core operations were improving at Carteret"); Vigna Dep. 142:18-24 (JX 1 at 595-96) ("Carteret's condition had improved significantly" between January and July of 1992); Tr. 2423:4-18 (O'Rourke) (agreeing that "Carteret was making significant progress in the summer and fall of 1992," stating that "progress was being made on several fronts," that the "management team was good," and agreeing that "the commercial asset portfolio was being managed very well").

152. Given its positive trends, Carteret was poised to take advantage of the post-recession economic recovery occurring around the time of the thrift's seizure. Tr. 320:22-321:7 (Bianco); ¶ 144. As Professor Smith acknowledged, "the years after the 1991 recession were

---

"steady financial improvement has been demonstrated by the new management team," and that "Carteret also continues to improve its troubled commercial asset portfolio"); Tr. 1711:7-1712:4 (Albanese) (agreeing that PX 2816 was "advising Ketcha of the really excellent work that Mr. Bianco and Mr. Moor are doing with the thrift's troubled asset portfolio").

good years for the banking industry," and "[b]y early 1992 . . . the banking industry [in] the United States was beginning to settle down." Tr. 3103:11-3104:19; *see also* R. Smith Dep. 126:3-5 (JX 1 at 515). Indeed, Professor Smith, a sophisticated investor, was so confident in these overall trends that he purchased a substantial portfolio of bank stocks in 1991 and 1992. Tr. 3104:20-3105:9; Dep. 117:9-13 (JX 1 at 513). He had concluded that CRE prices had bottomed out, Tr. 3105:10-13, and that "the pig had passed through the python," Dep. 123:7-17 (JX 1 at 514); Tr. 3105:14-24. *See also* Tr. 3811:15-21 (R. Smith). As he explained it:

> I thought that the prices of these places had been knocked down sufficiently to not take all that into account, so I was making a judgment that the worst had been behind them and that they were going to come out of it better.

Dep. 123:12-17 (JX 1 at 514). Professor Smith confirmed that this was true of Carteret, too. Tr. 3812:3-5. As Professor Smith acknowledged, "the financial markets recognized that the worst was over and, indeed, improved real estate prices began making the recovery process much easier." Tr. 3096:13-18; *see also* Tr. 979:15-980:13 (Calomiris) ("After 1991, you began what is still, I think, the longest consecutive period of positive profits in US banking history. 1991 was the turning point. And all of us who were watching it knew that 1992 was a complete shift, a watershed in bank profitability. . . .[E]verything was changing in a favorable way for the banking industry."). On November 8, 1992, the OTS publicly recognized the impact of these changes on the thrift industry. In a press release, the agency reported:

> The industry has strung together six consecutive profitable quarters, and profits in the first 6 months of 1992 were a record $2.8 billion. Ninety-three percent of the industry was profitable in the second quarter, and the capital level of the industry has increased 17-fold to nearly 6 percent from less than one-third percent in 1988.

PX 6910 at 3. And that profitability was a long-term trend. As Professor Saunders acknowledged, "since 1993, the thrift industry has been profitable," and "generally speaking" thrifts' "re-

turn on assets have been positive since 1992." Tr. 3876:7-3877:1.

**B. <u>The Government's Contentions Regarding Survival Are Incorrect</u>**

153. The government has argued that Carteret would not have survived in the nonbreach world because the federal regulators recommended seizure even while the injunction requiring the inclusion of goodwill was in place. This argument is flawed for several reasons. First, as Professor Smith testified, the breach had already harmed Carteret by the time the injunction was entered. *See* R. Smith Dep. 181:6-12 (JX 1 at 523) ("Q. . . . By the time they got the injunction in February of '91, wasn't it too late? A. Well I believe it was . . . too late to raise capital from the public market, I believe that, as it turned out, it was probably too late to raise from the private market as well."). Second, the injunction was short-lived and quickly appealed, so it is fanciful to assume that all parties viewed Carteret through a purely non-breach prism. O'Rourke Dep. 151:12-21 (JX 1 at 451); *see also* Tr. 2437:11-18 (O'Rourke) (same). As Mr. O'Rourke agreed, it was his "view at that time that regardless of the status of the judicial order and the injunction that Carteret won in court, that the institution needed to forecast capital compliance *without the use of its goodwill*." Dep. at 147:22-148:2 (JX 1 at 451).

154. For its part, the FDIC did not even pretend to honor the injunction. Its September 1991 exam report calculations do not include supervisory goodwill, and examiner Day testified that he did not "feel in any way constrained by the injunction." PX 2114 at 1; Tr. 1553:4-1554:7 (Day). Indeed, the injunction prompted FDIC to up the ante. As Mr. Day explained, the FDIC's threat to pull Carteret's deposit insurance was "quite likely" the "FDIC's response to the fact that the OTS had its hands tied against Carteret." Dep. 343:11-344:13 (JX 1 at 62); *see also* Tr. 1534:18-1535:3. With regulator attitudes such as these, it is no wonder that even Carteret did not rely on the injunction and thus continued apace with its breach-induced mitigation measures,

such as asset shrinkage. *See* Tr. 159:25-160:11 (Bianco) ("We didn't depend on it. And our lawyers had advised us, I think by July of that year, that one of the other banks who had obtained . . . an injunction from the federal courts had it reversed.").

155. The government has argued that the driving force behind Carteret's demise was the thrift's exposure to lending losses, and that even absent the breach the thrift would have failed because of these losses. This is false.

156. First, Carteret had discontinued CRE lending in 1989 for non-breach reasons. PX 802 (AmBase 1990 10-K) at 4-5; Tr. 2353:10-17 (O'Rourke). And the evidence firmly establishes that, even in the breach-affected world, the thrift had worked through those problems and had turned a corner by late 1991. ¶¶ 142-152. As Professor Smith noted, the pig had passed through the python. Tr. 3105:10-24. In the nonbreach world, supervisory goodwill would have cushioned those losses, giving Carteret both the capital and time necessary to absorb the bad debt (and thus allowing Carteret to reserve less aggressively and to avoid the value-consuming effects of distress sales). As several government regulators recognized, loan losses are measured relative to capital, and are only a problem if the institution does not have the capital to absorb them.[88] Thus, prior to the breach, regulators considered the entire capital base, *including supervisory goodwill*, to determine whether loan losses could be absorbed. *See* Tr. 1965:18-1967:11 (S. Smith).

157. Second, Carteret's commercial loan portfolio was neither atypical nor inherently

[88] FDIC examiner Day acknowledged that "if the institution has inadequate capital, [then] bad assets for that institution pose a much greater threat than [they] do[] [for] an institution that has a large amount of excess capital," and that this "will lead an examiner to pay much closer scrutiny to an institution's assets." Dep. 180:11-22 (JX 1 at 53). *See also* O'Rourke Dep. 104:19-25 (JX 1 at 450) (agreeing that "[e]xcess capital would allow you to absorb problems and give you more time to work out problems in an institution," and stating that with "[e]xcess capital, an institution would be able to withstand a higher level of asset quality problems.").

deleterious. That Carteret took a hit in the recession, just like most other banks, is no great surprise.[89] As Professor Saunders acknowledged, "the position of the economy in the business cycle phase is *enormously* important to a financial institution in assessing the probability of borrower default." Tr. 3850:5-10 (emphasis added). Carteret lost money due to the business cycle—but it survived and had turned a corner. If Carteret had use of its supervisory goodwill to cushion these losses, there is no question it would have survived. Numerous banks with similar or worse portfolios survived the recession. *See* Tr. 3097:11-3099:3 (R. Smith).

## V. WOUNDED BANK DAMAGES

158. Carteret suffered $16.8 million in "wounded bank" damages. *See* PX 9043.

159. The breach demoralized Carteret's employees. In order to retain many senior employees, AmBase entered into severance agreements, which ultimately cost $12.5 million. *See* PX 9043; PX 2702A (Calomiris 5/07 Rpt.) at ¶ 102; Tr. 161:21-162:5, 165:15-24, 243:9-18, 285:12-288:3, 614:1-17 (Bianco); Tr. 740:15-741:3 (Calomiris).

160. The breach-induced branch sales in 1990 resulted in transaction costs of $2.4 million. PX 9043; PX 2702A (Calomiris 5/07 Rpt.) at ¶ 103; Tr. 741:4-14 (Calomiris); PX 4717 (CSB Resp. to OTS Comments on Bankers Savings Branch Sale Application, 10/5/90); PX 4719 (CSB Branch Sale Analysis, 10/31/90).

161. Efforts to raise capital in mitigation of the breach resulted in transaction costs of $600,000. *See* PX 9043; Tr. 302:16-19, 303:1-12 (Bianco); Tr. 741:4-741:19 (Calomiris).

---

[89] *See* Tr. 1684:24-1685:9 (Albanese) (agreeing that the thrift industry as a whole faced a real estate crisis in the late 1980s and early 1990s); Tr. 3096:1-7 (R. Smith) (agreeing that "1990 was the worst year for banking since the Great Depression," and that "1991 was also a pretty bad time for banks"); Tr. 3096:25-3097:25 (R. Smith) (agreeing that "the Northeast was particularly hard hit by the recession of 1990 and '91," including "big sophisticated banks" such as Chemical, which had a "high percentage" of its real estate loans as nonperforming); Tr. 3097:11-14 (R. Smith) (agreeing that "[t]here were a lot of other financial institutions that were experiencing heavy losses in 1990 and '91").

162. The breach caused OTS to commence various cease-and-desist proceedings. Costs related to these proceedings totaled $1.3 million. *See* PX 9043; Tr. 288:18-289:9, 628:12-20, 629:10-629:20 (Bianco); Tr. 741:21-742:8 (Calomiris). Mr. Vigna testified that these actions were tied to Carteret's undercapitalization. Tr. 2202:17-24. Accordingly, because Carteret would not have been undercapitalized absent the breach, the costs associated with these actions would not have accrued but for the breach.

**VI. EXACERBATING THE BREACH BY PREVENTING MITIGATION**

163. The OTS seized Carteret on December 4, 1992. *See* PX 5023 . Both through its seizure of Carteret, and through its actions leading up to seizure, the government unreasonably prevented Carteret from mitigating the effects of the breach.

**A. <u>The Date of Carteret's Seizure was Arbitrary and Unreasonable</u>**

164. On October 25, 1991, OTS Regional Director Vigna transmitted to the OTS national office an "S" memorandum recommending that Carteret be placed into receivership. *See* PX 4867a.

165. In a letter dated January 17, 1992, however, Mr. Vigna recommended that OTS allow Carteret time "to pursue capital raising alternatives." PX 2805. Mr. Vigna explained:

> The institution continues to show strong improvement in its overall operations and financial condition. A profit was recorded for the fourth quarter of 1991 and core profitability is projected in 1992. Success in the disposition of problem real estate has been demonstrated and continued progress is forecast. There is a strong management team in place . . . . Carteret's new management team . . . has made considerable progress in successfully implementing the major strategies of its business recovery plan. . . . Carteret should be able to attain reasonable core profitability in 1992. . . .

*Id.* At trial, both Messrs. Vigna and Albanese reaffirmed the sentiments expressed in this letter. *See* Tr. 2280:22-2281:4 (Vigna); Tr. 1695:5-24 (Albanese). Mr. Vigna explained the motivation behind the letter:

> There was an S-Memo on file [dated October 25, 1991] recommending transferring the institution, and a lot of positive changes had occurred since that memo was sent to Washington. And at this point, after evaluating and reviewing the performance of the new management team, led by Mr. Bianco, that we felt that there was **no risk** to the RTC and the public taxpayer to allow this institution to continue on in an effort to find capital. Again, they identified at least in our view all the losses in the portfolio, they were generating operating profits, there was **no risk**, and we were comfortable, very comfortable with management. They had done an outstanding job. There was **no risk** to the fund or the taxpayers by allowing this institution to see if they could raise this capital.

Vigna Dep. 104:13-105:6 (JX 1 at 591-92) (emphases added); Tr. 2280:9-2281:6 (Vigna).

166. So long as there was a realistic prospect of outside investment, the OTS Regional Office felt that Carteret should not be seized. Thus, on July 7, 1992, Deputy Director Albanese wrote to FDIC Regional Director Ketcha to explain why the OTS had again recommended against seizure of Carteret, despite the FDIC's less-informed protestations:

> [S]teady financial improvement has been demonstrated by the new management team, as evidenced by a comparison of the six month operating periods ended November 30, 1991 and May 31, 1992. Net income for the six months ended May 1992 was $5.4 million, compared to $1.8 million for the November 1991 period. More important, core earnings (before provision for loan losses, gains/losses on sales of assets, and taxes) improved by $11.5 million during the December-May period. . . . Carteret also continues to improve its troubled asset portfolio. . . . In conclusion, we believe that the termination of the Agreement and the underwriting process while progress is being made to recapitalize a troubled institution with assets of over $5 billion would not be effective supervision or good policy. . . .

PX 2816.[90] At trial, Messrs. Vigna and Albanese reaffirmed these sentiments.[91]

167. On November 13, 1992, Mr. Vigna transmitted another "S" memorandum to the

---

[90] *See also* PX 2118 (1992 OTS Exam Rpt., 6/15/92) at 1-2, 7 (noting Carteret's "improved" asset quality, "improving" core operations, and "capable and effective management").

[91] *See* Tr. 1649:16-1650:6 (Albanese) ("There had been improvement in the condition of this institution. And we believe[d] that additional time should be given because, frankly, in our view, the institution was not deteriorating."); Tr. 1713:4-6 (Albanese) ("I believe[d] that more time should be given; that that was the approach that should be taken"); Tr. 2301:15-19 (Vigna) (agreeing that he "and Mr. Albanese believed that Carteret had made sufficient financial improvement since January 1991 to attract a firm commitment from investors").

OTS national office, which again recommended that Carteret be placed into receivership. *See* DX 8124. The stated reason for the renewed recommendation was that Kohlberg & Co. had declined to invest in Carteret. *Id.* at FAM0020532. In a "Status Certification" bearing the same date, Mr. Vigna stated that the reason for the recommendation of a receivership was that the Carlyle Group had declined to invest in Carteret, and that "Carteret has incurred or is likely to incur losses that will deplete all or substantially all of its capital and there is no reasonable prospect for the Association's capital to be replenished without Federal assistance." PX 6874.

168. Just four days later, on November 17, 1992, the OTS regional office urged the national office not to seize Carteret on November 20. As Mr. Albanese explained:

> We strongly recommended that more time be given to Carteret's management because there was still considerable interest being expressed by investors in the institution, and there were no compelling reasons for not leaving the institution open for the few weeks needed to consider a possible offer from First Gibraltar.
>
> We pointed out that, in our view, the institution's financial condition continued to improve, and that supervisory risk of loss while it remained open was very low. We argued that the possible benefit of leaving Carteret open while recapitalization discussions were continuing; namely, a possible unassisted resolution of this $5 billion troubled institution, would far outweigh any perceived benefit of an early transfer date. Frankly, we did not view the transfer date, whether it was November 20th, December 4th or January 4th, to be a critical factor in our analysis of the situation. . . .
>
> The RTC has been notified to suspend its hurried plans to take control of the institution this Friday.

PX 2819. *See also* Tr. 306:13-309:8 (Bianco). At trial, Mr. Albanese reaffirmed that the reasons for his recommendation were Carteret's improving condition and the fact that additional time could only prove beneficial to all parties involved. He testified:

> It's clear that the institution's condition was improving. The point of this entire document is to point out that . . . if we can believe the institution's condition to be improving, then a date of December 4, January 4, . . . **or even March 4th**, as long as we have people on site at the institution making sure that it did not deteriorate, that . . . we ought to give them more time.

Tr. 1716:20-1717:12. *See also* Tr. 1749:22-1750:7.[92] Mr. Vigna similarly testified that the Albanese memo accurately reflected his position as of November 17, 1992—just three weeks before seizure, and just a few days after he had signed his name to an "S" memo. *See* Tr. 2305:18-2306:6. As Mr. Albanese's November 17 recommendation shows, there was no basis to state on November 13 that "Carteret has incurred or is likely to incur losses that will deplete all or substantially all of its capital." PX 6874. As recognized repeatedly by regulators at the time and at trial—indeed, as recognized by Mr. Vigna in his letter of January 17—Carteret had attained sustainable core profitability. *See* ¶¶ 143-145. Thus, at trial, Mr. Albanese candidly testified that he did not agree with the sentence in the status certification, Tr. 1746:11-14, and stated: "I don't know the basis for that statement," Tr. 1741:23-1742:4. *See also* 1746:2-6 ("I would not have made a recommendation to give them more time if I thought that there was no reasonable prospect that they could raise capital."). The "S" memo's inherent contradictions and repudiation by its authors demonstrate that it was prepared in anticipation of this very litigation. Tellingly, the memo was reviewed by the very lawyer who represented OTS in the injunction suit. *Compare* PX 4876 (listing Aaron B. Kahn as a recipient of a draft of DX 8124), *with Carteret Savings Bank*, 762 F. Supp. at 1159 (listing Aaron B. Kahn as Special Counsel for OTS).[93]

---

[92] *See also* Tr. 1673:9-11 (Albanese) ("we should have given them more time, and that was my personal view"); Tr. 1673:23-24 (Albanese) ("What I was saying here is obviously grounds exist, but we should give more time."); Tr. 1674:19-1675:5 (Albanese) (explaining reasons for recommending more time); Simone Dep. 125:6-16 (JX 1 at 503) ("Based on what we were aware of, at the time we thought that there would be no harm leaving the institution intact for another several weeks to see if this investor stepped up to the plate").

[93] Moreover, the memo includes a statement that only has relevance when viewed against the backdrop of the breach: "However, even if supervisory goodwill were included as of September 30th, 1992 for purposes of determining the association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver based on the grounds set forth below." DX 8124 at 8. Mr. Albanese, the eventual director of OTS Regional, could not say whether he had ever seen a statement like that in an "S" memo before. Tr. 1753:25-1754:12.

169. In the fall of 1992, PNC Bank and Carteret began negotiating a purchase by PNC of a substantial portion of Carteret's franchise—a recapitalization that would have put Carteret in capital compliance. PX 6876 (R. Bianco to T. Ryan, 12/2/92); Tr. 313:2-315:7 (Bianco). On the afternoon of Friday, November 27, Mr. Bianco informed Mr. Albanese about this potential deal and explained that PNC would need additional time to perform due diligence. According to an internal OTS memorandum, Mr. Bianco stated that PNC would need "additional days (not weeks)." PX 4889 (R. Albanese to A. Vigna, 11/27/92). Although a seizure date had not been communicated to Mr. Bianco, OTS official Rock Tonkle informed him that "any time for due diligence beyond Tuesday [December 1] was unacceptable." *Id.* As Mr. Albanese explained, "it doesn't take a genius to put two-and-two together and see clearly that next [F]riday is the day." *Id.* Mr. Albanese thus instructed Mr. Bianco to "have his meetings this weekend and to call [OTS] first thing [M]onday morning." *Id.* But the OTS regional office *knew* they were not providing enough time for due diligence and believed that adequate time should be provided. As Mr. Albanese stated in the November 27 memorandum: "[i]f PNC still is interested and only needs a few days to firm up a decision, it would be **foolish** to rush a transfer on 12/4." *Id.* (emphasis added). Nevertheless, Carteret "was not given flexibility at all." Tr. 312:22-323:1 (Bianco).

170. In the words of the government's investment banking expert: "I can't believe that if [potential investors] were likely to invest or seriously indicating they were in the process of doing due diligence they needed to do to complete their studies, that they would be forced to come to a decision prematurely knowing**—the regulators would know that, if they put them in that position, they would walk away**." Tr. 2955:12-18 (R. Smith) (emphasis added). Despite this

---

When he asked if the memo was "written by lawyers for purposes of being read in a courtroom today," Mr. Albanese could only reply: "I really don't know." Tr. 1754:13-16.

obvious truth, the regulators did precisely this. As Mr. Bianco explained, the super-truncated deadline "turn[ed] people off." Tr. 311:10-312:6. Moreover, OTS secretly pressured PNC to engage in a whole-bank transaction, and suggested that PNC could buy any individual Carteret asset through the RTC liquidation process. Tr. 315:21-316:9 (Bianco). Confronted with an artificial deadline and the prospect of buying Carteret's assets from the RTC at deep discounts, PNC walked away, and the OTS seized Carteret.

171. Even though Carteret was in ongoing talks with potential investors right up until the time of seizure, the OTS national office disregarded this fact (and the recommendations of its regional supervisors) and made, months in advance, an apparently ironclad decision to take the bank no later than December 4, 1992. As Mr. Vigna put it, "people were setting dates and not coordinating." Dep. 145:7-8 (JX 1 at 596). As Mr. Downey explained, the decision to seize Carteret was made by Director Ryan, and the timing was planned by "a group in Washington." Tr. 2534:1-2535:5. Thus, as early as October 2, 1992—more than a month before issuance of the second "S" memo—Diana Garmus, the Deputy Assistant Director of the OTS national office, wrote to Director Ryan that "Carteret is currently scheduled for resolution on December 4, 1992." PX 4875 at 1. Just over one month later, in another internal memorandum, Ms. Garmus confirmed that OTS national was unconcerned with the facts on the ground—and, indeed, was eager to hurry the seizure: "*Although other investors are looking at the thrift, staff are prepared to transfer it as early as November 20*." PX 4887 at 1. (D. Garmus to OTS Deputy Director J. Fiechter, 11/13/92) (emphasis added). Mr. Downey suggested that the reason behind the desire to advance the transfer date had to do with "resources being available." Tr. 2556:3-9. He also explained that when extensions were granted, officials "got very, very mad." Tr. 2558:2-7. Thus, Mr. Albanese's recommendation on November 27—that "it would be foolish to rush a

transfer on 12/4" while PNC was requesting "a few more days of due diligence"—fell on deaf ears. PX 4889 (R. Albanese to A. Vigna, 11/27/92).

172. Given that OTS knew that an additional extension for Carteret presented zero additional risk to the government, and that a viable deal with PNC was in the works, the OTS's seizure on December 4 was unreasonable. No government witness offered a coherent reason for closing Carteret on December 4. Mr. Downey lamely suggested that the date may have reflected a desire simply to avoid the Christmas holiday. Tr. 2558:17-2559:4. But Mr. Albanese confirmed that the timing was unreasonable: "if we can believe the institution's condition to be improving, then a date of December 4, January 4, . . . **or even March 4th**, as long as we have people on site at the institution making sure that it did not deteriorate, . . . we ought to give them more time." Tr. 1716:20-1717:12 (emphasis added).

173. The regulators admitted that an institution's trends are a critical factor in the decision whether to seize a thrift, and that Carteret's trends were very favorable. Mr. Albanese explained that, in deciding whether to place a thrift into conservatorship or receivership, OTS "looked at the performance of the institutions, as to whether or not we felt as though they were improving/not improving." Albanese Dep. 44:20-24 (JX 1 at 2).[94] And he explained that OTS's "view was that the institution was profitable, it was improving and that a lot of the trends that we look at were going in the right direction." Dep. 139:18-21 (JX 1 at 10).[95] Thus under OTS's

[94] *See also* Tr. 1651:20-1652:9 (Albanese) ("[M]y view was—and it was my view and I know it was the view of Angelo Vigna, that it was good policy on the part of the agency, in fact any regulatory body, in looking at a situation like this, to consider whether or not the institution was deteriorating. . . . If the institution was improving . . . we could continue to look to see if there were . . . reasonable prospects for recapitalization. To me that's good policy.").

[95] *See also* Tr. 2421:19-20 (O'Rourke) (as of October 1992 "there was no incremental risk from waiting."). *See also* Tr. 2422:13-18 (O'Rourke) ("I was having discussions with my immediate superiors, Scott B. Smith, John Griffin, Mike Simone, Bob Albanese, where I was stating that if the institution was given additional time, it would not harm the situation or our

own criterion, the seizure was unreasonable. As Professor Calomiris explained, "if it didn't make sense to seize Carteret in 1991, it certainly didn't make sense to seize Carteret at the end of 1992. Carteret wasn't costing anybody money." Tr. 978:23-979:22. And as Mr. Albanese explained, just because an "S" memo was on file that did "not mean that there still wasn't the possibility of avoiding the receivership and that the region might not be working still to try to find a resolution that did not require a Receiver." Dep. 86:14-18 (JX 1 at 6). Mr. Albanese reaffirmed at trial that the hurried December 4 transfer was "foolish." Tr. 1729:17-23. *See also* Simone Dep. 123:6-12 (JX 1 at 502) (agreeing with the sentiments expressed in PX 4889). Indeed, Mr. Albanese could not have been clearer about his assessment of the national office's premature action:

> My statement is this. I believe they should be given more time to try to raise capital, equity capital, and to continue as an independent entity. Clearly, I would not have made a recommendation to give them more time if I thought that there was no reasonable prospect that they could raise capital.

Tr. 1746:2-9. *See also* Tr. 320:13-17 (Bianco) ("[OTS regulators] told me that they felt . . . it was a crime. Bob Albanese said this was not right. Didn't think they would take it based on the progress we were making with PNC. That was December 2nd.").[96] In light of this testimony,

---

reputations"); Tr. 2422:23-2423:3 (O'Rourke) (agreeing that "as long as [OTS was] maintaining a presence at Carteret and keeping on top of what was going on, there was no additional risk by waiting to take Carteret over"). Mr. Simone explained that OTS believed "the hemorrhaging had stopped, so we didn't expect to have a worsening situation that would end up costing the insurance fund additional monies." Dep. 126:3-6 (JX 1 at 503); *see also id.* at 59:13-60:16 (JX 1 at 499). And Mr. Vigna testified that he "felt that this was not a situation that was . . . going to get worse and that it would cost the taxpayer any more than it was . . . at that particular point in time." Tr. 2314:13-17.

[96] *See also* Tr. 1727:13-16 (Albanese) ("Well, obviously my view, because I expressed it in here, was that we should not transfer the institution."); Tr. 1723:8-9 (Albanese) ("I didn't see any benefit to an early transfer date."); Tr. 2314:11-17 (Vigna) ("I would have loved to have allowed Mr. Bianco and his team as much time as they could because, you know, I felt that this was not a situation that was—that was going to get worse and that it would cost the taxpayer any more than it was, you know, at this particular point in time.").

the OTS's decision to take the bank on December 4 was, in a word, unreasonable.

174. By seizing Carteret on December 4, 1992, OTS prevented Carteret from mitigating the breach—a fact attested to by witness after witness in this case. For example, a memorandum detailing the OTS's "conclusions and their findings concerning the failure of Carteret Savings" reported that OTS Regional Assistant Director Simone "indicated that had the institution approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing." PX 5331.[97] Similarly, OTS Regional Director Vigna testified that at the time of seizure: "My personal belief is that, yes, at some point in time they would have raised enough capital to restore viability in the institution." Vigna Dep. 151:20-152:3 (JX 1 at 597). *See also* Tr. 2306:21-2307:3 (Vigna). At the examiner level, the feeling was the same. Mr. Meyer testified: "I was against anybody taking them over. . . . I thought they could still make it." Dep. 163:4-13 (JX 1 at 378). And Mr. O'Rourke stated: "I believe that with the management team in place and with amount of capital that we could have with close supervisory attention to Carteret, and the caliber of management in the institution at the time, that the institution could have ultimately gotten back to full capital compliance." Dep. 199:20-25 (JX 1 at 453). *See* Moor Dep. at 155:2-5, 15-18 (JX 1 at 434) ("I really don't think [the seizure] needed to happen. To tell you the truth, I think O'Rourke nearly cried. . . ."). *See also* Tr. 757:7-759:3 (Calomiris) (stating that Carteret could have survived even in the breach-affected world given franchise value, management, and economic trends).

175. Messrs. Vigna and Albanese attempted to reconcile their position—that Carteret

[97] Similarly, at his deposition, Mr. Simone agreed that "the most likely scenario" was that "if Carteret had been given several additional weeks, just given the favorable economic conditions that were prevailing and the low interest rate environment . . .[then] Carteret was well positioned to take advantage of that and might have been able to make itself sufficiently attractive that it would have been able to receive a capital infusion." Dep. 130:8-131:4 (JX 1 at 504). *See also* Tr. 325:12-326:18 (Bianco).

should not have been seized and would have survived absent seizure—with the decision actually made by claiming that this decision was made above their pay grade. *See* Tr. 2309:15-24 (Vigna); Tr. 1718:1-3, 1723:24-1724:6, 1725:8-11, 1726:11-15 (Albanese). But the lone witness called by the government from the national office, Mr. Downey, testified that he could not recall having any difference with Mr. Vigna about Carteret. Tr. 2529:16-19. And, as shown, Mr. Vigna did not believe that a December 4 transfer was appropriate. Moreover, Mr. Downey himself was trying to buy time for Carteret right up to the time of seizure. Tr. 2549:18-2550:14.

176. OTS examiner Russell Meyer explained the truth of the matter: the government "elected to use the shotgun approach and take everybody out." Dep. 181:13-19 (JX 1 at 378).

**B. <u>Government Regulators Inhibited Recapitalization of Carteret</u>**

177. As Professor Smith acknowledged, "[n]othing affects finance and business more than the government. A small change in . . . banking regulations . . . can make a lot more difference to the profits of a firm than years of hard work from even brilliant employees slogging away night and day." Tr. 3085:15-23.

178. Thus, investors pay close attention to regulatory risk. *See* Tr. 2174:4-6 (Zamorski) (agreeing that "investors . . . look at regulatory risk"). When the risk is too high, investors stay away. Mr. Bianco described the regulatory environment facing Carteret upon his arrival as "very difficult," "unreasonable," and "very severe," and testified that "the regulators were being very tough on Carteret." Tr. 160:12-18, 164:1. In his estimation, the breach-affected regulatory environment represented the single greatest impediment to Carteret's raising $200 million. Tr. 289:10-15.[98] The regulators agreed: Mr. Simone acknowledged that "one of the reasons [the

[98] *See also* Tr. 162:18-22, 163:16-20 (Bianco) ("I think at the end of the day, when the investors looked at that, people like General Electric and people like the . . . Carlyle Group, at the end of the day, the regulatory risk was something that they would not want to take. . . . As a

investors] are giving for pulling out is the regulatory risk." Dep. 117:18-118:3 (JX 1 at 502).

179. The government created unreasonable regulatory risk and discouraged investment in Carteret in three principal ways. First, the breach itself led investors to conclude that the government was untrustworthy, and thus Carteret was not a safe environment for their funds. Second, the government exacerbated the breach by imposing harsh and unrealistic requirements on Carteret. Third, government regulators refused to provide any assurances to potential investors. Fourth, through RTC fire sales, the government created a strong disincentive against investment in Carteret while it was still a going concern.

180. At the most basic level, the breach itself made it nearly impossible for Carteret to mitigate. As has been demonstrated, the breach devastated Carteret's capital profile and triggered the threat of government seizure. ¶¶ 60-65. As Mr. Vigna acknowledged, "[n]obody would have put any money in knowing the Government was going to breach its contracts." Tr. 2260:15-18. Thus the breach created an atmosphere of mistrust and uncertainty that made Carteret, and the entire thrift industry, an unattractive environment.

181. The uncertainty caused by the breach was exacerbated by the harsh regime ushered in by FIRREA. As Professor Smith recognized, FIRREA "created substantial confusion and disruption, Tr. 2994:14-16, "represented a more arduous regulatory standard for Carteret," and did "away with the regulatory regime that most investors would have realized was generous." Tr. 3002:20-3003:8. This change, agreed Professor Smith, had a negative impact on Carteret. Tr.

matter of fact, the head of the Colony Group, David Bonderman, turned to me and said I would rather . . . deal with the airline pilots than deal with the federal regulators in the OTS or the FDIC."); Kramer Dep. 140:7-141:3 (JX 1 at 345) ("But my feeling was the government sort of scared them away. They were told don't go near a thrift, the government is savage and it goes after thrift directors, and you have to be crazy to get into this business, and so they finally walked away . . . . People who were friends of the company telling them stay away from a thrift, the government is just impossible to deal with. It was really awful.").

3003:5-8. Indeed, according to Professor Smith, investors at the time were concerned that "Congress is likely to re-address the [S&L] problem in 1991 and may well decide to tax and punish the thrifts even further." Tr. 3083:10-16.[99] According to Mr. O'Rourke: these "were legitimate concerns, given the past. An investor who was going to put money into an institution would have those concerns. I thought they were normal concerns." Dep. 40:11-22 (JX 1 at 449). *See also* Tr. 2537:22-2538:17 (Downey) (agreeing that "investors were complaining all the time about what they termed regulatory risk," and that "[t]here was greater concern with regulatory risk in the thrift industry because of the passage of FIRREA had caused a number of investors to lose their investment"); Tr. 2961:10-12 (R. Smith) ("Well, the Government can be unreliable. I don't think there's any real question about that."); Tr. 3003:22-3004:20 (R. Smith) (agreeing that investors would be concerned about Carteret's falling out of capital compliance and exposed to regulatory sanctions); R. Smith Dep. 420:11-23 (JX 1 at 537) (same).

182. Thus, investors were loath to get involved with thrifts at any level. For example, both Mr. Bianco and Mr. Downey testified that investors were wary of becoming thrift holding companies. Tr. 288:4-17 (Bianco); Tr. 2537:22-2538:2 (Downey). And numerous witnesses testified that investors shied away from becoming directors or officers of thrifts. In the words of Professor Smith, a government-regulated S&L "wasn't a place for wise adults." Tr. 3092:24-3093:2; Dep. 118:7-119:6 (JX 1 at 513). Thus, Professor Smith himself declined an invitation to join the board of Montclair Savings Bank because he "didn't want to be exposed to any personal

---

[99] *See also* Tr. 573:4-14 (Bianco) ("They wanted to see how the regulatory environment worked. They had realized that these same regulators had advised Congress on FIRREA, which breached the contract. They wanted to find out if they put in $200 million, would the same thing happen to them."); Moor Dep. 145:7-13 ("It seemed to me there was concern the government was going to change the rules on them. They'd put the money in and then say it's not enough or we want something different, we're going to change the way you do this. My impression, a lot of people were very leery the government was not going to be consistent win the way they approached this. And I think that proved to be the case.").

liability as a director." Tr. 3091:11-3092:4.[100]

183. The government made all of this worse through its micromanagement of Carteret. As detailed above, the OTS imposed upon Carteret a series of onerous requirements and deadlines. ¶¶ 105-108. As Judge Bissell found, "[t]his case constitutes an example of agency discretion gone haywire," and the OTS's demands on Carteret constituted "governmental control of and/or intervention in even the most basic day-to-day operation" of the thrift. *Carteret*, 762 F. Supp. at 1165, 1177. As Professor Smith put it "we had the regulators all over the place affecting Carteret's activities." Tr. 3804:25-3805:3.

184. The OTS was "not flexible at all" in allowing Carteret to pursue different types of structures to enhance capital, such as a merger. Tr. 292:22-293:1 (Bianco).

185. Particularly harmful to Carteret's capital-raising efforts were the deadlines OTS placed on the performance of due diligence by interested investors. As the government's investment banking expert acknowledged, for "large" investments, he "would have recommended an extensive effort to conduct due diligence through interviews with management and Carteret's accountants and to the extent possible with its regulators." Tr. 3084:15-20 (R. Smith). In a letter to Mr. Vigna regarding an upcoming deadline that was proving harmful to recapitalization efforts, Mr. Bianco explained:

> While we all recognize the fact that the OTS wishes to maintain tight control over the process, we are nevertheless burdened by the imposition of deadlines which are unrealistically short and which create artificial crises of confidence for the bank and for the potential investors. As each deadline approaches, employee and customer uncertainty increases, the local press takes undue notice of us and articles frequently appear which only serve to undermine institutional confidence. More importantly prospective investors who have become increasingly commit-

[100] *See also* Meyer Dep. 108:17-109:3, 109;14-22 (JX 1 at 374) (stating that there was a view that it was ill-advised to be a director of an S&L after FIRREA because the "government was going around suing everybody now," and that this perspective did not exist prior to FIRREA).

> ted to the transaction and accordingly have become obligated to spend large sums of money on due diligence are reluctant to spend their resources as the deadline approaches. This is counterproductive.

PX 5303 at 5. In the face of this request, the deadlines became ever more severe. *See* Albanese Dep. 106:5-22 (JX 1 at 8) ("as we got . . . closer to the date of the transfer . . . time frames became shorter."). This practice was particularly perverse given that the timelines were *shortened* as Carteret became *healthier* and the "date of transfer" was arbitrarily set in total disregard of the improving conditions of Carteret, the ongoing interest of investors, and the recommendations of OTS Northeast. By the time of the potential PNC deal, the allowances for due diligence were so unreasonably short, Tr. 310:11-17, that closing the deal was an impossibility. ¶¶ 169-170.

186. As Professor Calomiris explained, a potential investor in a thrift

> want[s] to know how your regulator is going to behave after you put the capital in. So you have to be able to sit down and say how much is enough. . . . there needs to be a sense of closure, and sense of here's what the problem is. We perceive it this way. Obviously we reserve the right to come back 2 years from now and tell you that you—you have a different problem. But this problem needs this fix. And the regulator can either decide to be . . . helpful. . . or the regulator can decide to be unhelpful by not being forthcoming that way.

Tr. 2853:12-2855:2. Professor Smith concurred with this analysis, acknowledging that "it's entirely reasonable for investors in a bank or thrift to try to get an understanding of how they're going to be regulated," and that "even if the regulators told you there could be no guarantees, you would need an understanding as to what you thought you could reasonably expect." Tr. 3086:9-18, 3090:6-16. Indeed, Professor Smith opined: "If I could not negotiate a . . . satisfactory arrangement, I probably wouldn't make the investment." Dep. 444:20-22 (JX 1 at 540). Similarly, FDIC Regional Director Zamorski testified that "key" to an investor's decision "is being able to figure out what the level of risk is." Tr. 2117:19-24. Yet when the Carlyle Group (and others) sought precisely such information from the FDIC, the regulators rebuffed them, re-

fusing to grant any assurances or provide any information. Tr. 162:23-163:15 (Bianco). The Carlyle Group had signed a letter of intent in October 1992 to acquire 90% of Carteret for greater than $200 million, and "one of the last things that they were doing . . . was talking to the regulators to take their temperature." Tr. 290:10-291:25. *See also* PX 6875 (Mem. from T. O'Rourke, 10/16/92) at 1. In a November 2, 1992 letter to Mr. Vigna, Regional Director Ketcha wrote: "[I]t is noted that during our meeting with the Carlyle Group representatives on October 26, 1992, that assurances were sought. . . . We find this to be very problematic inasmuch as it creates a perception of 'negotiating' a rating . . . ." DX 412 at WOP3340706. Following this refusal by the regulators, Carlyle backed out of the deal with AmBase because "they couldn't quantify" the risk. Tr. 289:16-292:21 (Bianco). *See also* PX 4886 (OTS "S" Memo, 11/13/92) (noting that Carlyle "withd[rew] its conditional letter of intent because following due diligence, it had concluded that it could not receive an adequate rate of return on its investment and had concerns about *regulatory risk*") (emphasis added).

187. To make matters worse, OTS pressured interested investors to engage in a whole-bank transaction and informed investors interested in something less that individual assets could be purchased from RTC at liquidation discounts. Tr. 573:15-17, 573:23-574:7 (Bianco). As Professor Smith recognized, "there were many private equity investors who preferred just to wait for institution like Carteret to die, and then they would buy the corpses and take the assets at big discounts from the RTC," Tr. 3090:21-3091:1, "and it's very evident . . . that the RTC understood this," Dep. 444:24-445:7 (JX 1 at 540).[101] The RTC fire-sale alternative proved enticing enough to drive several investors away from Carteret. For example, Professor Smith testified that one

[101] *See also* Tr. 3810:1-20 (R. Smith) ("[T]hese investors, quite sophisticated, could recognize that there's two opportunities. You could buy it before it goes into failure in a seize, or you could buy it from the RTC . . . there was a presumption that you could buy them at a substantial discount from whatever they were at the time.").

reason Kohlberg chose not to invest was because it was "considering an alternative strategy to buy the assets directly from the RTC." Tr. 3815:5-8. Mr. Bianco further testified the chairman of First Fidelity told him that he backed out because "the regulators were going to play hardball [a]nd he could buy any of the assets probably cheaper from the RTC." Tr. 585:22-586:3.

188. As if to confirm the unreasonableness of their actions during Carteret's post-breach existence, the government continued to harass AmBase even after Carteret had been seized. Tr. (Bianco) 616:21-617:9.

## VII. CONGRESS AND THE RTC CREATE A RECEIVERSHIP DEFICIT

### A. The FDIC Has Inappropriately Accounted For, and Artificially Inflated, the "Post-Insolvency Interest"

189. Carteret was seized and placed into an RTC receivership, on December 4, 1992. The Carteret receivership was structured as a so-called "pass through" receivership, meaning that on the same day Carteret was seized, the RTC also created a new entity, Carteret Federal Savings Bank. The RTC was then appointed conservator for Carteret Federal, and the RTC caused the Carteret receivership to transfer most, but not all, of its assets and liabilities to the Carteret Federal receivership. PX 5023; Tr. 804:12-805:3 (Green)[102]; PX 4896 (Appointment of Receiver); PX 4897 (Purchase Agreement).

190. When Carteret's branches and remaining deposits were sold, in three transactions, in late 1994 and early 1995, Carteret Federal was placed into a final receivership. The total amount of deposits transferred in these three transactions amounted to approximately $1.369 bil-

[102] The RTC was in complete control of the decisions regarding which of Carteret's assets and liabilities would be transferred to the Carteret Federal conservatorship and which would be retained in the Carteret receivership. Tr. 804:25-805:7 (Green). Similarly, the RTC was in complete control of how the Carteret receivership and Carteret Federal conservatorship would be resolved, and when the Carteret Federal conservatorship would be converted into a receivership. Tr. 806:8-807:14 (Green); Tr. 2637:14-2638:11 (Saran).

lion. However, because the acquirers paid deposit premiums totaling $143.8 million, and bought Carteret assets totaling another $43.5 million, the RTC actually paid the acquirers only $1.183 billion in connection with the branch sales. Tr. 808:14-810:8 (Green); PX 9072.

191. Notwithstanding the fact that the RTC expended only $1.183 billion in connection with the branch sales, it nevertheless booked $1.369 billion as the principal balance of the loan obligation created in connection with those sales. PX 5090 (Carteret FSB Liability Register Rpt.) at AM00095015-16. This $1.369 billion "loan" constitutes the basis of the RTC's (and now the FDIC's) subrogated claim against the Carteret receivership estate. Tr. 809:2-11 (Green). As Mr. Green, the FDIC official who served as the FDIC's RCFC 30(b)(6) witness on receivership accounting and the determination and calculation of the FDIC's subrogated claim (including the claimed interest on that claim), Tr. 792:3-794:3, confirmed at trial, "even though the RTC recognized a subrogated claim of about $1.37 billion, the amount of funds that the RTC actually expended in connection with these three resolution transactions was about $1.18 billion." Tr. 809:25-810:5. *See also* Tr. 938:19-939:24 (Green); FX 400; PX 9098.

192. The subrogated claim against the Carteret receivership, and any claim against the receivership to interest on that claim (so-called "post-insolvency interest"), are held by the FDIC in its corporate capacity—*i.e.*, by the government.

193. Carteret has made payments of more than $1.35 billion toward repayment of the government's subrogated claim against the receivership, and the reported principal balance of the subrogated claim stands at slightly less than $18 million. PX 5090 at AM00095015-16; DX 9174 (Goodwill Package, 12/31/07) at Rpt. 3; PXs 1106-1114 (Goodwill Packages, 12/31/00 through 12/31/06).

194. As discussed below, were it not for government delays in providing funding to the

RTC, Carteret would have been resolved in approximately one year, rather than the 826 days the resolution actually took. ¶ 232. The delay resulting from this lack of funding cost Carteret approximately $43 million in foregone deposit premiums. PX 2703A (Calomiris 2006 Rpt.) at ¶ 121. Moreover, had Carteret been resolved in 365 days, the RTC could have marketed Carteret as a whole bank. Had the RTC resolved Carteret in this manner, the value of its assets plus the deposit premium would have exceeded the value of its deposits and no loan would have been required to fund the resolution. PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 83-84.

195. As is also discussed below, were it not for the RTC's obligation to comply with the Minority Preference Program (MPP) enacted by Congress in 1993, Carteret would have been resolved more quickly, and the RTC would have likely received more and higher bids for Carteret. Absent the MPP, therefore, it is likely that the value of Carteret's assets plus the deposit premium would have exceeded the value of its deposits and no loan would have been required to fund the resolution.

196. Even leaving aside the above points and assuming that it would be appropriate for the FDIC to hold a subrogated claim against the Carteret receivership estate, it is not appropriate for that subrogated claim, in the circumstances of this case, to accrue interest. As Professor Calomiris demonstrated, even if one incorrectly assumed that the FDIC's assertion that there remains a positive balance on the "loan" from the RTC to Carteret is accurate, the government has not incurred any cost that would warrant the imposition of interest, because the damages in this case constitute a much larger interest-free loan to the government. Tr. 1039:16-1040:12, 1041:23-1042:11 (Calomiris); PX 9090; PX 9091. As Professor Calomiris explained:

> the receivership deficit serves in this case as a partial offset to the damages owed to the plaintiff. But it makes no sense to include the time value of money in the receivership deficit if the government itself is barred from paying the time value of money on the damages it owes to the plaintiffs. By including the time value of

> money as a cost in the receivership deficit, *the government effectively is asking to be reimbursed for a cost that it does not bear.* To be consistent with the legal prohibition on the payment of interest on damages caused by the government, the government should not be able to credit itself for the time value of money on those same damages. A consistent treatment would be to exclude all imputed interest from the receivership deficit.

PX 2703A at ¶ 21 (emphasis in original).[103]

197. Even assuming, however, that it is appropriate for the government to hold a subrogated claim in this case and that it is appropriate for the government to charge post-insolvency interest on the subrogated claim, the FDIC has grossly over-inflated the amount of such interest. It has done so by artificially and retroactively manipulating the interest rates applied to the subrogated claim and by employing other inappropriate accounting techniques. *See* PXs 9092-9101; Tr. 1039:10-1049:25 (Calomiris).

198. The FDIC asserts that as of December 31, 2007, the Carteret receivership owes about $180.3 million in post-insolvency interest to the government. DX 9174 (Goodwill Package, 12/21/07) at Rpt. 3.

199. In 1994, when interest first began to accrue on the subrogated claim, the RTC, pursuant to 12 C.F.R. § 360.3(b), charged Carteret a short term, floating interest rate based on the rate for three-month United States Treasury bills. At the time, this rate was 4.48%. PX 5058 (Accrued Interest Rpt.) at AM00092190. *See also* Tr. 814:7-22 (Green).

200. Prior to 1999, the FDIC used the method outlined in section 360.3(b) for all RTC

[103] Tellingly, in calculating the total cost of the savings and loan crisis, FDIC economists Timothy Curry and Lynn Shibut expressly excluded financing costs. *See* DX 5020 (Curry & Shibut, *The Cost of the Savings and Loan Crisis: Truth and Consequences*, 13 FDIC BANKING REV. 26 (2000)). They explained that including financing costs when tallying the costs of the thrift crisis "is methodologically incorrect. It is invalid because, in present value terms, the amount borrowed is equal to the sum of the interest charges plus debt repayment. Adding the sum of interest payment to the amount borrowed would overstate the true economic cost of resolving the crisis." *Id.* at 30.

receiverships. Tr. 814:7-815:7, 935:24-936:12 (Green); Green Dep. 235-238 (JX 1 at 150-51).

201. In 1999, the FDIC substantially increased the rate of interest owed by the Carteret receivership to the government by locking in a long-term fixed rate of interest equaling 7.34%, 6.57%, and 6.06% on each of the three "loans" that were made to Carteret at the time of the three branch sale transactions. These changes were applied retroactively.[104] These new, retroactively applied, rates were based on the federal judgment rate as of the date of each of the three branch sales. The federal judgment rate, in turn, is based on the rate for one-year Treasury obligations. Tr. 819:24-820:18 (Green).

202. When the FDIC made this decision to retroactively and radically change the methodology governing the calculation of post-insolvency interest for the Carteret receivership, it was concurrently responding to AmBase's interrogatories as to how the rate of interest was calculated on the subrogated claim. *See* Tr. 833:2-11 (Green); PX 5066 (FDIC Emails re PII and Priority of Interest) at AM00096535-37.

203. In making the retroactive change in methodology for calculating post-insolvency interest for the Carteret receivership (as well as a handful of other receiverships involving thrifts that were involved in *Winstar* lawsuits), the FDIC did not purport to conduct any economic or financial analysis. Rather, that retroactive change was the product of a legal analysis performed by an FDIC staff attorney named G. Michael Saran. Tr. 816:4-25 (Green). That analysis is reflected in a 1999 email prepared by Mr. Saran.[105] Mr. Saran's 1999 email on this topic repre-

[104] PX 5112 at AM0097219-72; PX 5113 at AM0097273-325; PX 5114 at AM0097326-77; *Compare* PX 1103 (Goodwill Package, 12/31/97) at Rpt. 3 and PX 1104 (Goodwill Package, 12/31/98) at Rpt. 3.

[105] In conducting his analysis, Mr. Saran purported to rely on internal FDIC memoranda prepared several years earlier. In particular, Mr. Saran purported to rely on a 1995 memorandum ("1995 Memo") stating that post-insolvency interest distributions should be based on the federal judgment rate for national banks and federal savings associations that failed following the Au-

sents the only analysis he has ever conducted regarding post-insolvency interest calculation methods. Tr. 2633:17-2635:6 (Saran).

204. The 1995 Memo was written by FDIC staff before the FDIC assumed the RTC's responsibilities for post-FIRREA thrift receiverships. Notably, while the 1995 Memo discusses several categories of thrift/bank receiverships, one category it does not discuss is receiverships for federally chartered thrifts that failed after the enactment of FIRREA but prior to the enactment of the NDP—*i.e.*, the category covered by the RTC's regulation at 12 C.F.R. § 360.3. The 1995 Memo did not purport to supersede, withdraw, or repeal 12 C.F.R. § 360.3.

205. The 1995 Memo addressed only FDIC practice for FDIC receiverships, not practice for RTC receiverships. PX 5022. Karen Hughes, a senior FDIC official who participated in policymaking within the agency regarding post-insolvency interest issues, and who likely played a role in the development of policies that led to the preparation of the 1995 Memo (Hughes Dep. at 58-59 (JX 1 at 265-66)), testified that the 1995 Memo was speaking to FDIC receiverships, and that she did not know whether the advice in the 1995 Memo was intended to apply to the calculation of post-insolvency interest for RTC receiverships, which typically were structured differently. Tr. 2674:11-2675:13 (Hughes).[106]

206. Mr. Saran had no involvement in the preparation of the 1995 Memo. Tr. 2633:17-2635:6, 2646:2-2647:5; Tr. 2640:17-25 (Saran). There is no evidence that Mr. Saran, or anyone

---

gust 1993 enactment of the National Depositor Preference (NDP) statute. Tr. 824:8-16 (Green); Tr. 2624:17-2625:9, 2626:12-18, 2632:6-19, 2635:7-22 (Saran); PX 5022 (S. Graham, et al. to Regional Directors, et al., 6/8/95) at AM0010340; PX 5066 at AM00096535 ("it *appears* that the interest rate can be determined for the respective receiverships utilizing" the 1995 Memo) (emphasis added). When he was asked to perform this legal analysis, Mr. Saran was also told what Carteret's resolution date was for purposes of that analysis. Tr. 2632:6-2633:3, 2647:6-21 (Saran).

[106] Unlike the RTC, for example, the FDIC did not typically employ pass-through receiverships. *See* Tr. 2674:3-4 (Hughes) ("FDIC receiverships tended to just be one receivership.").

else at the FDIC, had consulted with the authors of the 1995 Memo about the applicability of the 1995 Memo to RTC receiverships in the same position as the Carteret receivership.

207. No evidence identifies any economic or financial rationale for the FDIC's decision to apply the federal judgment rate to post-NDP thrift receiverships. Indeed, Mr. Green, the FDIC's designated witness on post-insolvency interest issues, conceded during his testimony that to his knowledge, the FDIC did not have any economic or financial justification for picking the federal judgment rate. Tr. 944:24-946:20 (Green). *See also* Tr. 2639:11-17 (Saran).

208. Nor is there any evidence of any economic or financial rationale for locking in the federal judgment rate, for purposes of calculating post-insolvency interest for post-NDP thrift receiverships, as of the date of the relevant branch sale transactions. *See* Tr. 946:21-948:16 (Green). *See also* PX 6915 at 298 (Mem. From Post-Insolvency Interest Regulation Team to G. Patelunas, et al., 5/9/01). ("Fixing the rate at the commencement of receivership would fail to mirror changes in the financial markets," and letting rate float "would prevent the appearance of windfall interest associated with locking in a high interest rate at the receivership's inception date."). Indeed the 1995 Memo does not even address *whether* the rate should be locked in. PX 5022 (Mem. From S. Graham, et al. to Regional Directors, et al., 6/8/95).

209. There is no FDIC policy mandating that it treat the dates of closure of branch sales, rather than the date of the RTC's seizure of Carteret, as determinative of Carteret's status under the NDP. Green Dep. 98-105, 227-230 (JX 1 at 114-15, 148-49 ).

210. Significantly, far from treating Carteret as a post-NDP receivership, a database on the FDIC's own website lists Carteret as having failed on December 4, 1992, the date it was seized by the RTC. PX 6904; Tr. 843:20-845:14 (Green).

211. Numerous FDIC documents, as well as several FDIC witnesses, acknowledge that

the NDP does not address the issue of the payment of post-insolvency interest at all, let alone address the rate at which post-insolvency interest should accrue or the methodology governing its calculation. Tr. 825:16-20 (Green); PX 5036 (Mem. From J. Bovenzi to Operating Comm., 9/18/96) at AM00097054, n.9; Green Dep. 186-193 (JX 1 at 139-141); Saran Dep. 92-93 (JX 1 at 489-90 ); *see also* Green Dep. 188 (JX 1 at 139-40).

212. In 1996, the FDIC considered, but declined to promulgate, a regulation that would have amended 12 C.F.R. § 360.3 prospectively to authorize use of the federal judgment rate to calculate post-insolvency interest. PX 5036 (Mem. From J. Bovenzi to Operating Comm., 9/18/96) at AM00097047-49; Tr. 948:17-949:22 (Green).

213. The FDIC's decision to retroactively apply a fixed, long-term rate to the calculation of post-insolvency interest for the Carteret receivership is inconsistent with how the RTC and the FDIC treated numerous other related receivership accounting calculations in which a floating, short-term rate was applied. That decision is also inconsistent with the FDIC's current practice for calculating post-insolvency interest for receiverships instituted beginning in 2002. *See* PX 9094; Tr. 1043:18-1044:15 (Calomiris).

214. For example, a floating short-term rate was applied to the funds advanced to Carteret by the RTC in 1992. *See* Tr. 811:17-812:6 (Green); PX 6901 (RTC's 1994 and 1993 Financial Statements) at 23; PX 6902 (RTC's 1995 and 1994 Financial Statements) at 30. *See also* Tr. 837:11-838:7 (Green). Similarly, the interest on the remaining obligations of the 1992 "pass-through" receivership for Carteret was, and continues to be, calculated pursuant to § 360.3(b). Tr. 812:7-24 (Green).

215. The Purchase and Assumption Agreement between the Carteret receivership and the Carteret Federal conservatorship provided for interest at "the 3-month Treasury Bill Rate as

of the first auction day of the month in which interest shall begin to accrue, adjusted monthly thereafter." PX 5023 (T. Feeney to Carteret, 12/4/92) at C-AM-A 3640157.

216. Notably, when the RTC accounted for the deposit premiums from the sales of Carteret's deposits and the proceeds from the assets transferred in connection with those branch sales by establishing an escrow account for several months prior to crediting them to the receivership, the interest that the RTC paid on these funds was calculated using a floating, short-term rate. Tr. 810:9-811:16, 834:18-837:10 (Green); *see also* PX 6901 (RTC's 1994 and 1993 Financial Statements) at 25; PX 6902 (RTC's 1995 and 1994 Financial Statements) at 31; PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 37-38; Green Dep. 434-36 (JX 1 at 194-95). Mr. Green conceded that the retroactive adoption of a post-insolvency interest calculation methodology using a fixed, long-term rate created a "mismatch" between the treatment of the interest owed to the receivership by the government on the escrow account and the treatment of the post-insolvency interest owed to the government by the receivership. Tr. 941:9-942:4 (Green). There is no economic justification for this retroactively-created mismatch. Tr. 1046:18-1047:14 (Calomiris).[107]

[107] In addition, the management of Carteret's receivership relied upon the RTC's contemporaneous position that the subrogated claim would carry a short term floating interest rate in making asset allocation decisions. For example, Edward Griffin, the managing agent of the conservatorship and the field site manager of the receivership, testified that he never made investments that had a negative interest rate spread. Griffin Dep. 41:1-5 (JX 1 at 231). In 1995, after Carteret had received the RTC "loans" on which the subrogated claim is based, Carteret continued to invest in short term commercial paper. Under the RTC's initial policy of calculating post-insolvency interest using a short term floating interest rate, the investments made by Carteret in 1995 in short term commercial paper had a positive spread. *Compare* PX 6849a (Purchase, Sales and Maturities Transaction Report, 4/1/95-4/30/95) at C-AM-A 3821000 (assets purchased in April 1995 yielded 5.94%), *with* PX 5058 (Calculation of Accrued Interest on Priority 6 Claimants) at AM00092192 (interest rate calculated under RTC's initial methodology was 5.74%); PX 2824 (Purchase, Sales and Maturities Transaction Report, 5/1-31/95) at CAM3821031 (assets purchased in May 1995 yield 5.95%), PX 5058 (Calculation of Accrued Interest on Priority 6 Claimants) at AM00092192 (interest rate calculated under RTC's initial methodology was 5.72%). Under the RTC's retroactive increased interest-rate, all of these investments would have had a negative spread. Rather than purchasing assets that generated a negative spread, Carteret

217. Significantly, in 2002, the FDIC specifically *rejected* the fixed federal judgment rate methodology on economic grounds in favor of a floating rate tied to three-month Treasury yields. *See* Tr. 813:20-814:22 (Green); PX 4316 (FDIC's Proposed Rules) at AM00096599. *See* 12 C.F.R. § 360.7(b)(3). In promulgating this regulation, the FDIC recognized that even using a simple rather than compound interest calculation, a floating rate tied to short-term Treasury yields would "provide a reasonable amount of interest to compensate receivership creditors for the time value of money." PX 4316 (FDIC's Proposed Rules) at AM00096600. *See also* PX 6915 (Mem. from Post Insolvency Interest Regulation Project Team to G. Pateulnas, 5/9/01).

218. At the time the FDIC decided in late 1999 to retroactively switch to a fixed, long-term rate for the calculation of post-insolvency interest for the Carteret receivership, it was knowable that the federal judgment rate in late 1994 and early 1995 was at the highest level that it had been from 1992 through late 1999. PX 5130 (Post Judgment Interest Rate Table); Tr. 830:11-831:6 (Green); *see also* PX 9095-9096; Tr. 1044:16-1046:7 (Calomiris).

219. Similarly, at the time it decided to retroactively switch to a fixed, long-term interest rate, the FDIC knew that that decision would have the result of increasing the balance of post-insolvency interest purportedly owed by Carteret to the government by more than $20 million. *See* Tr. 828:2-830:10, 878:6-21 (Green). While the FDIC could not predict with absolute certainty that retroactively switching to a fixed long-term interest rate would unquestionably have the result of increasing post-insolvency interest over the entire life of the Carteret receivership, it knew, or should have known, that it was extremely likely that that would be the result, because: (1) it knew that that decision had *already* increased post-insolvency interest by more than $20 million through late 1999, and that the government therefore had at least a $20 million "head

---

would have retired the debt.

start," Tr. 949:23-950:23 (Green); and (2) it knew, or should have known, that except in those rare instances in which there is an inverted yield curve, long-term interest rates tend to be higher than short-term interest rates. Indeed, a 2001 FDIC memorandum discussing the FDIC's proposal to promulgate a post-insolvency interest regulation acknowledged that the federal judgment rate tended to be higher than a rate pegged to 3-month Treasuries. PX 6915 at 297.

220. According to the RTC's annual reports, RTC borrowings from the Federal Financing Bank carry a floating rate of interest. In 1994, the interest rate applied to such RTC borrowings ranged from 3.17% to 5.03%, which range is well below the 6.06% rate retroactively locked in by the FDIC to calculate Carteret's post-insolvency interest obligation to the government with respect to the 1994 branch sale. Similarly, in 1995, the interest rate applied to such RTC borrowings ranged from 5.52% to 6.01%, which range is well below the 6.57% and 7.34% rates retroactively locked in by the FDIC to calculate Carteret's post-insolvency interest obligation to the government with respect to the 1995 branch sales. PX 6902 at 32-33 (RTC's 1995 and 1994 Financial Statements); Tr. 838:8-839:6, 946:3-13 (Green).

221. Notwithstanding the FDIC's and the government's claim in this litigation that the Carteret receivership deficit amounts to approximately $321 million, and that approximately $180 million of that deficit is comprised of post-insolvency interest, DX 9174 (R. Ferrer to F. Robinson, 2/21/08) at Rpt. 3, the FDIC's own "Historical Statistics on Banking" database, which can be found on the FDIC's website (and which was not produced to AmBase during discovery, despite the fact that it was responsive to AmBase's discovery requests), states that the estimated cost to the FDIC of the Carteret resolution, including Federal Financing Bank interest expenses and overhead costs, amounts to $24.914 million as of December 31, 2006. PX 6904 (Closings and Assistance Transactions); Tr. 842:15-848:22 (Green).

222. If the interest rate calculation methodology prescribed by 12 C.F.R. § 360.3(b), and that applied to Carteret prior to the FDIC's retroactive 1999 switch were applied to Carteret, the post-insolvency interest purportedly owed by the Carteret receivership would be decreased by approximately $79 million as of December 31, 2007. PX 9097; Tr. 1046:8-17 (Calomiris); PX 2703A (Calomiris 2006 Rpt.) at ¶ 41; PX 6917 (Receivership Deficit Principal and Interest Balances through 2007) at 2.

223. Neither Mr. Green, whose "goodwill package" team asked in 1999 for guidance regarding whether post-insolvency interest for Carteret should be calculated in a different manner, nor Mr. Saran, who provided the guidance that led the FDIC to retroactively increase the debt owed by the receivership to the government, were seeking to act on behalf of the interests of Carteret, the Carteret receivership, or Carteret's shareholders when they did so. Tr. 831:17-833:1 (Green); Tr. 2643:2-14 (Saran). *See also* Tr. 2692:9-19 (Hughes) (acknowledging potential for conflict of interest between FDIC-Receiver and FDIC-Corporate with respect to subrogated claim); Tr. 832:15-833:1 (Green) (agreeing that it is in Carteret's interest to minimize amount of liabilities it owes).

224. As Professor Calomiris made clear, as an economic matter, it was inappropriate for the FDIC to calculate post-insolvency interest for the Carteret receivership by using a fixed, long-term rate of interest. Tr. 1042:12-1043:17 (Calomiris); PX 9093; PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 22-23.

225. The FDIC has allocated each debt repayment on a *pro rata* basis to each of the three "loans" that comprise the subrogated claim. All of this debt repayment was made to the FDIC in its corporate capacity, all of the payments were credited to the same fund, and all these loans had the same priority in the receivership claims process. Green Dep. 291-298 (JX 1 at

162-164). Mr. Green acknowledged that "economically it would make most sense to pay off the highest rate liability" before lower cost loans, and that the FDIC's *pro rata* allocation method "had the effect of increasing the cost of the receivership." *Id.*

226. If the FDIC had paid off the highest cost debt first, then the interest charge would have been reduced by $65.9 million as of December 31, 2007. PX 9099; Tr. 1047:15-1048:22 (Calomiris); PX 2703A (Calomiris 2006 Rpt.) at ¶ 19. *See also* Tr. 821:8-13 (Green) (FDIC methodology is to stop accruing interest on a debt once principal of that debt is repaid). Under the assumption that interest would continue to compound until all three loans were repaid, interest would have been reduced by $16.9 million if the highest cost debt were repaid first. PX 9099; PX 2703A at ¶ 45. No fact witness provided any economic or financial justification for the FDIC's decision to allocate debt repayments on the three components of the subrogated claim on a *pro rata* basis, a decision that had the effect of increasing the receivership's purported debt to the government by tens of millions of dollars. Indeed, there is no evidence that the FDIC ever even considered the effect that *pro rata* allocation of repayments would have on the amount of the subrogated claim. Of course, at the time most of the repayments were made, post-insolvency interest was calculated using a floating, short-term rate, and so the allocation methodology would not have any effect on the balance of the subrogated claim. It was only the decision to retroactively switch to a fixed-rate methodology for the calculation of post-insolvency interest that rendered the payment allocation method critical to the calculation of the subrogated claim balance.

227. As previously noted, when the RTC sold Carteret's deposits in 1994 and 1995, it obtained deposit premiums totaling $143.8 million and credited the receivership with proceeds from transferred assets amounting to another $43.5 million. *See* Tr. 992:10-993:11, 1046:18-1047:14 (Calomiris); PX 9098. The deposit premiums and asset proceeds were credited to an

escrow account where they were held until April 1995, when they were credited to the receivership as a dividend. PX 2703A (Calomiris 2006 Rpt.) at ¶ 37. As noted above, the premiums held in the escrow account earned interest at a short-term Treasury rate. The interest earned on the deposit premiums and asset proceeds while they were held in the escrow account was $1.9 million; the interest that accrued during the same period on the portion of the RTC loan corresponding to these items was $2.4 million under the FDIC's 1999 methodology. *See* PX 2703A at ¶ 46. Due to the continuing accrual of post-insolvency interest, this initial $0.5 million difference has grown to approximately $1.1 million. PX 9101; Tr. 1049:13-25 (Calomiris).

**B. <u>The Mere Transfer of Carteret to the RTC was a Value-destroying Event</u>**

228. As recognized by numerous government witnesses, the mere transfer of Carteret to the RTC resulted in a loss of value and thus increased the cost of the receivership. As Mr. Albanese put it, "a transfer to the RTC would inevitably . . . destroy some of the franchise value of the thrift." Tr. 1723:10-14. In 1992, Mr. Vigna estimated this diminution to be "typically 10 to 15% ($500 to $750 million)." PX 2805 (Mem. from A. Vigna to T. Ryan, 1/17/92) at WOP3341037.[108] Professor Smith explained that asset sales by the RTC were available at "big discounts." Tr. 3090:21-3091:1; *see also* R. Smith Dep. 444:24-445:7 (JX 1 at 540).

229. Because the breach caused the Carteret receivership, the government is also responsible for the decrease in franchise value attendant to placing the thrift into receivership. This diminution increased the cost of the receivership.

[108] *See also* Tr. 2285:10-2286:9 (Vigna); Vigna Dep. 128:12-24 (JX 1 at 593-94); Tr. 2548:25-2549:3 (Downey); Tr. 1674:25-1675:5, 1702:9-22 (Albanese); Tr. 2429:3-19, 2430:13-2431:13 (O'Rourke); O'Rourke Dep. 41:3-7, 204:11-25 (JX 1 at 449, 454); Ramey Dep. 84:16-21 (JX 1 at 460); Day Dep. 253:1-6, 14-17 (JX 1 at 56).

**C. The Breach Prevented the RTC from Realizing the Value of Carteret's Supervisory Goodwill**

230. Even assuming counterfactually that Carteret would have been seized in the non-breach world, the RTC would have been able to realize between $40 million and $50 million in value from the supervisory goodwill on Carteret's books. PX 9087; PX 2703A (Calomiris 2006 Rpt.) at ¶ 103 & Tbl. 10; Tr. 1019:11-1021:3 (Calormiris).[109]

**D. Congress's Failure to Fund the RTC Increased the Cost of the Carteret Liquidation**

231. The cost of Carteret's resolution increased dramatically due to Congress's failure to fund the RTC from April 1, 1992, through December 17, 1993. PX 9162 (MANAGING THE CRISIS) at 13; PX 5028 (Mem. from J. Ramey to T. Horton, 10/26/95) at C-AM-A-0125188 ("resolution costs increase significantly the longer the institution is in conservatorship"); PX 5002 (Email from J. Jupiter to J. Ramey, 1/18/95) ("any further delay would be very costly, both in image and money to the RTC"); Ramey Dep. 84:16-21 (JX 1 at 460). As the FDIC itself explained:

> The pace of resolutions had to conform to the availability of funds. . . . [some]times the pace was painfully slow. The longest delay was a 21-month period from March 31, 1992, to December 17, 1993, when the RTC was without loss funding and resolu-

[109] Professor Calomiris estimated the value of Carteret's unamortized balance of supervisory goodwill as of December 1993 (when Carteret would likely have been resolved absent congressionally-caused delays) and December 1994 (the time of the resolutions transactions). At both times, the unamortized balance of supervisory goodwill would have greatly exceeded $100 million. PX 2703A (Calomiris 2006 Rpt.) at ¶ 107 (December 1993 balance of $128.3 million); *Id.* at App. A at Tbl. A1 (December 1994 balance of $118.5 million).

Using two different valuation methods—one of which estimates the cash equivalent value of the goodwill and the other of which estimates the cost to replace the goodwill with a stock issuance—Professor Calomiris concluded that the supervisory goodwill had a value of $46-49 million as of December 1993, and a value of $41-44 million as of December 1994. PX 9087; Tr. 1021:4-1022:3 (Calomiris); PX 2703A at ¶¶ 121-22, 131-33, Tbl. 12. Accordingly, in the non-breach world, had Carteret been seized, the receiver would have been able to recover $40-$50 million in additional value from the Carteret receivership. This value, eliminated from the receivership asset base solely because of the breach, should be added back to reduce the receivership deficit. Moreover, the elimination of supervisory goodwill alone was worth more than double the current principal balance of the loan; thus, absent the breach, there would have been no need for a loan. Tr. 1020:20-1021:1 (Calomiris).

> tion activity was severely reduced. The pace of resolutions followed the availability of funding, and resolution delays kept thrifts in conservatorship longer, which increased conservatorship operating losses. . . . [B]ecause of the reduced resolution activity from the lack of funding, in 1993, conservatorship operating losses increased that year to $1.3 billion [from $669 million in 1992]. Resolution delays and conservatorship operating losses led to increased resolution costs because of the relatively high carrying cost of maintaining assets in failed thrifts. Funding delays had a significant effect on how long an institution remained in conservatorship.

PX 9162 (MANAGING THE CRISIS) at 124.[110]

232. Carteret's resolution was thus inordinately protracted. Whereas the average large thrift that failed between 1988 and 1991 was resolved in 365 days, Carteret's resolution encompassed 826 days—longer than any other thrift of similar size. PX 9075; PX 9078 Tr. 996:24-997:13; 1002:14-1003:12 (Calomiris). *See also* PX 9077; Tr. 1000:19-1002:13 (Calomiris) (explaining that Carteret's resolution time was longer than 98% of all banks and thrifts resolved between 1980 and 2004, longer than 95% of all thrifts resolved between 1980 and 2004, and 93% of all thrifts failing in 1992). Indeed, Carteret was the last resolution completed by the RTC. *See* DX 6189 (GAO 1993 RTC Audit) at 3; Tr. 3898:24-3899:11 (Saunders).

233. Carteret was more valuable and attractive to investors than thrifts in its peer group, so there was no legitimate reason for its resolution to take so long. Tr. 999:20-1000:18 (Calomiris). Professor Calomiris explained this as a matter of statistical reality. *See* PX 9076; Tr. 997:14-1000:18 (Calomiris) (explaining that Carteret had better (and positive) return on assets, better interest expense relative to deposits, and better past-due and nonaccrual loans relative to total loans); Tr. 2866:7-2867:6 (Calomiris); Tr. 4073:25-4074:2 (Saunders). Qualitative evidence also confirms the point. *See* Tr. 999:4-19 (Calomiris); PX 9083.

234. The funding delay, combined with the further delays caused by the MPP, resulted

[110] *See also* PX 9160 (RTC 1992 Annual Rpt.) at 2 (describing the expiration of funding as a "severe setback" and noting that "the RTC had to suspend its resolution of failed thrifts for the remainder of [1992]").

in a run-off of Carteret's deposit base. PX 9074; PX 9079; PX 9080; Tr. 994:16-996:23, 1003:13-1007:1, 1038:4-25 (Calomiris).[111] Without the congressional funding delay, Carteret would have received an additional $43.8 million in deposit premiums—more than enough to cover the $20.8 million value of the loan and thus to erase the entirety of the post-insolvency interest. PX 9081; Tr. 1007:2-1008:15 (Calomiris).

**E. <u>The Minority Preference Program Substantially Inflated the Receivership Deficit</u>**

235. In 1993, Congress created a Minority Preference Program (MPP) mandating that, when "considering offers to acquire any insured depository institution, or any branch of an insured depository institution, located in a predominantly minority neighborhood . . . , the [RTC] shall give preference to an offer from any minority individual, minority-owned business, or a minority depository institution, over any other offer that results in the same cost to the [RTC]." RTC Completion Act, Pub. L. No. 103-204, § 3(a), 107 Stat. 2369, 2375-76 (1993) (codified at 12 U.S.C. § 1441a(w)(17)(A)). To facilitate these minority acquisitions, the MPP called for the RTC to "provide, in connection with such acquisition [by a minority acquirer] . . . , performing assets under the control of the [RTC] in an amount . . . not greater than the amount of net liabilities carried on the books of the institution or branch, including deposits, which are assumed in connection with the acquisition." 12 U.S.C. § 1441a(w)(17)(C). Carteret was subjected to both

[111] *See also* PX 4988 (D. Chafey to J. Ramey, 11/7/94) ("Carteret FSB was experiencing a significant run-off in deposits prior to July 31, which certainly will have a serious negative impact in the profitability of many of these branches, with a corresponding impact to its ultimate acquirer."); PX 4968 (Mem. from S. Yore to J. Ramey, 9/6/94) at C-AM-A-0077168 ("Carteret is currently losing $1 million a day in deposits. Several bidders have already complained about the delay in closing and the loss in deposits."); DX 8471 (Horvitz & Lee) at 271 ("[S]ome of the thrifts being sold by the RTC have suffered serious deterioration in their franchise value, *particularly if there was a lengthy period in which they had been managed by the government*.) (emphasis added); *id.* ("[T]he RTC can turn down all offers and operate the thrift itself for a while in the hope of eliciting better offers in the future, but the deteriorating nature of core deposits works against this strategy.").

aspects of the MPP: its performing assets were held back to be available for other minority acquirers, and minority bids for Carteret were afforded a preference over non-minority bids. Professor Calomiris demonstrated that in the absence of the MPP, Carteret would not have needed a loan to fund its branch sales, and thus *no interest* would have accrued. PX 2703A (Calomiris 2006 Rpt.) ¶¶ 88-100; PX 9072; PX 9073; PX 9082; Tr. 991:2-20, 993:19-994:15, 1008:16-1010:2 (Calomiris).

236. Carteret's large cache of performing assets was "the most readily available source of mortgages [for minority acquirers] in one spot on which due diligence has been performed." PX 4919 (Email from E. Mahaney, 8/24/93) at 1; PX 4925 (Email from D. Bodi, 12/3/93); PX 4922 (Email from D. Bodi, 9/15/93). To ensure that Carteret's performing assets would be available for minority acquirers, the RTC "froze" Carteret's performing assets, PX 4207 (Stratification of Assets, 11/30/93) at 2; Tr. 3892:23-3893:15 (Saunders); Mindnich Dep. 80:23-81:2 (JX 1 at 394); Held Dep. 151:16-23 (JX 1 at 252). In order to sell them, Carteret's managing agents had to obtain approval from the RTC's Resolutions Group to "release" them. *See, e.g.*, PX 4907 (Email from J. Leinmiller, 4/13/93). Thus, even though Carteret's managing agent was "chomping at the bit" to sell the institution's own performing assets to finance its resolution, PX 4973 (Email from A. Richards, 9/15/94), the RTC did not release the assets, and instead Carteret was forced to borrow from the RTC $1.18 billion to finance its resolution. PX 4986 (Consolidated Branch Resolution Summary); PX 9072.

237. Moreover, the MPP suppressed the prices at which the RTC sold Carteret's performing assets to minority acquirers. Because the MPP called for the RTC to make performing assets available to a specific acquirer, it was not possible to obtain competitive bids from multiple prospective purchasers. Instead, the RTC set the prices itself, a method inherently prone to

underpricing, especially because minority acquirers enjoyed a risk-free option: they could purchase the loans, but were under no obligation to do so. PX 9086; Tr. 1016:13-1019:10 (Calomiris); PX 5028 (J. Ramey to T. Horton, 10/26/95) at C-AM-A-0125188 (stating that bidder preference programs "are a deterrent to the competitive aspect of the bidding process"); Ramey Dep. 73:19-74:3, 75:4-12 (JX 1 at 459). That two minority purchasers of Carteret's performing assets appear to have flipped such assets for a profit immediately after purchasing them from Carteret confirms that the assets were sold at a price below the fair market value.[112] Indeed, John Ryan, the Deputy CEO of the RTC testified that preferences for minorities and resolution at the lowest possible cost to taxpayers "are irreconcilable" objectives. Dep. 53:21-54:10 (JX 1 at 466).

238. The MPP also substantially affected the premium received for Carteret during its resolution. At the time Carteret failed, it had "a high franchise value and . . . had attracted viable, cost-effective proposals from prospective acquirers." PX 2703A (Calomiris 2006 Rpt.) ¶ 54 (quotation marks omitted); *see also id.* at ¶¶ 67-69; PX 9083; PX 9076; Tr. 1010:4-1012:16, 997:14-1000:18 (Calomiris). Although Carteret's deposits fell by almost 50% during the conservatorship, Carteret could still have been resolved through a whole-institution purchase and assumption transaction. PX 4975 (Email from H. Held, 9/16/94); PX 2703A at ¶¶ 86 & 147; PX 9084; Tr. 999:4-1000:18, 1007:5-1008:6, 1013:8-1015:14 (Calomiris). The MPP precluded this because there was "a real problem with minority groups getting together or getting with a non-minority group to put in a bid on the entire franchise." PX 4961 (Email from J. Hambric, 8/16/94); *see also* PX 5220 (Mem. from S. Yore, 3/9/95); PX 5025 (Recommendation on the

---

[112] *See, e.g.*, PX 5007 (Dryades Sav. Bank, FSB, Summary of Loans Purchased, 2/21/95) (Carteret's loans sold by RTC at 94% of book value); PX 5008 (Minority Preference Funding Statement, Dryades Sav. Bank, 2/21/95) (loans resold next day at 100% of book value); PX 5009 (Funding Statement, Gulf Coast Bank, 2/22/95) (same); PX 4211 (Stratification of Assets, 2/28/94).

Application to the FDIC of the RTC's MPP ("Furash Report"), 6/15/95) at 1-4; Ramey Dep. 114:19-24 (JX 1 at 461 (stating that the MPP "delay[ed] the bidding process" and "there were times when we never received any matching bids"). To assist minority bidders, the RTC split Carteret into "clusters" of branches. *See* PX 4934 (Instruction to Bid Form). As Professor Calomiris explains, "[t]he piecemeal sale of Carteret reflected the constraints imposed by the [MPP], which favored smaller bank bidders for whom Carteret's large size would otherwise have been prohibitive." PX 2703A at ¶ 90. This piecemeal sales strategy substantially reduced the premium received for Carteret's branches. PX 2703 at ¶¶ 90-97; PX 9083; PX 9084; PX 9085; Tr. 1010:4-1012:16, 1013:8-1015:14, 1015:20-1016:12, 1016:25-1018:17, 996:3-18 (Calomiris).

239. Pursuant to the MPP, the RTC afforded the minority bidders whose bids were within 10% of the relevant high bid the opportunity to match the high bid for Carteret's branches. Eventually, the RTC discovered that several of these minority bids were not as they had "appeared, on the surface," and after several months of working with the bidders to help them make viable matching bids, the RTC disqualified five of the minority bidders. PX 5001 (Mem. from J. Jupiter re 1/10/95 Resolution) at 4-5; PX 4965 (Mem. from S. Yore, 8/31/94).

240. The delay in resolution caused by the MPP was very costly for Carteret because a substantial amount of its deposits ran off during that time. PX 4981 (Mem. from J. Jupiter re 10/28/94 Resolution) at 2; PX 5001 (Mem. from J. Jupiter re 1/10/95 Resolution) at 2; PX 4968 (Mem. from S. Yore, 9/6/94) at 3; PX 4992 (Mem. from R. Denby, 12/7/94); PX 2703A (Calomiris 2006 Rpt.) at ¶ 82; PX 9077; PX 9078; Tr. 1000:19-1003:12 (Calomiris). Deposit runoff rapidly reduces the premium that potential acquirers are willing to pay. *See* PX 4309 (Managing Agent's Meeting, 3/8/93) at C-AM-A-0093739. By January 1995, the bids on Carteret had become so stale that the RTC had to ask the high bidders to reaffirm. PX 4992 (Mem. from R.

Denby, 12/7/94); PX 5001 (Mem. from J. Jupiter re 1/10/95 Resolution) at 2, 5-6; Ramey Dep. 136:5-137:12 (JX 1 at 462-63); Held Dep. 114:4-10 (JX 1 at 248). High bidders reaffirmed on 14 of the 30 New Jersey branches; the RTC then resolved those branches in January 1995. PX 5001 (Mem. from J. Jupiter re 1/10/95 Resolution) at 1. The RTC then had to call for rebids on the remaining 16 New Jersey branches. PX 5011 (Mem. from J. Jupiter re 3/10/95 Resolution). As a direct result of the deposit runoff that occurred while the RTC tried to accommodate minority bidders pursuant to the MPP, the high bids on the remaining 16 branches came in at $19.4 million less than they had been originally, which in turn increased the principal balance of Carteret's resolution loans by $17.5 million. PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 61-64, 86-88; PX 9082; Tr. 1008:16-1010:2 (Calomiris). Even without accounting for the myriad other ways in which the government inflated the receivership deficit, but only for Carteret's having been resolved under the MPP, the remaining principal balance on its loan would therefore be only $1.4 million. PX 2703A at ¶ 88; PX 9082; Tr. 1008:16-1010:2 (Calomiris). Moreover, the MPP also "reduced the number of bids and created disincentives for high bids," as the RTC has recognized. This also likely led to a reduction in realized value. PX 2703A at ¶ 98-99; PX 6851 (Mem. from J. Ramey, 10/26/95) at C-AM-A-0125188.

**F. <u>The Tax Liability Is a Chimera of the FDIC's Own Making</u>**

241. As of December 31, 2007, the FDIC was reporting a federal income tax liability of $113.9 million. DX 9174 (Goodwill Package, 12/31/07) at Rpt. 3. This liability consists of $29.9 million of federal income tax on the $85 million of taxable income reported on the amended 1995 return. *Id.* at note b; PX 4406a (Amended 1995 Income Tax Return) at AM00090142. Additionally, the alleged federal income tax liability reflects $73.7 million of estimated IRS interest, and $10.36 million in estimated penalties for both nonpayment of the un-

derlying tax liability and for the late filing of the 1995 federal income tax return. DX 9174 at Rpt. 3, note b. The 1995 return was due in September of 1996, but the FDIC did not sign the tax return until December 21, 1996. PX 4406 (1995 Income Tax Return) at 1. Moreover, the FDIC did not actually file the return for six more weeks, thereby further increasing the late filing penalty. PX 4409 (Notice of Penalty) at AM00091150 (return filed 2/17/97); Vordtriede Dep. 194:4-195:14 (JX 1 at 656).

242. The FDIC has admitted that the tax liability was "artificially created." (Vordtriede Dep. 388:2-18 (JX 1 at 696) (emphasis added). Specifically, the FDIC created the tax liability by improperly failing to take deductions of more than $150 million. Significantly, the record also reveals that the IRS will not (and could not) insist upon payment of this bogus tax liability. In the Ben Franklin settlement with the FDIC, the IRS allowed the FDIC to retroactively fix the very same mistakes to reduce the tax liability by 95 percent. *Id.* at 385:1-4 (JX 1 at 695). Here, those same adjustments would eliminate the tax liability in their entirety.

243. Even apart from the failure to take valid deductions, any taxes on the receivership are attributable to the breach. Specifically, the 1995 return includes $134 million of income for the premiums realized on the sale of Carteret's branches in 1995. *See* PX 4406 (CFSB 1995 Tax Return) at 1 (ln. 10 & detail). In the absence of the breach, Carteret would not have sold its branch network in 1995. Tr. 321:15-23 (Bianco).

244. Carteret's 1995 return contains several errors that artificially created the tax liability. First, the 1995 return failed to take a deduction for Carteret's interest expense. The return neglected to deduct $3.1 million in interest that was actually paid to depositors. PX 3829 (CFSB Financial Rpt., 1/31/95) at 5. The FDIC also neglected to take a tax deduction in 1995 for the interest expense that was accruing in that year. Vordtriede Dep. 87:22-89:22 (JX 1 at 628-9).

Interest accruing in 1995 through 1997 could have shielded taxable income in 1995. Under the FDIC's current calculations, $80 million of interest accrued during these years. PX 5112 (Calc. of Accrued Interest) at AM0097219-235; PX 5113 (Calc. of Accrued Interest) at AM0097273-288; PX 5114 (Calc. of Accrued Interest) at AM0097326-340. None of this interest was used to shield taxable income generated in 1995.

245. The FDIC has explained that the 1995 tax return simply mirrored the FDIC's books for Carteret, which did not reflect accrued interest on the RTC loan until 1998. But the FDIC's "goodwill packages" reflected the accrued interest in 1997. PX 1103 (Goodwill Package, 12/31/97) at AM00097039; Tr. 943:20-25 (Green).

246. The FDIC has claimed that, under its prevailing policy, interest was not accrued until 95% of the principal was repaid. But by the end of 1997, 94.95% of the principal had been repaid. PX 1103 (Goodwill Package, 12/31/97) at AM00097039. Even though nothing in the FDIC's 95-percent policy precluded the FDIC from rounding 94.95% up to 95%, the FDIC did not do so. Tr. 2688:16-2690:10 (Hughes). Moreover, if the FDIC had simply taken $712,000 out of its more than $20 million in cash at year-end 1997, 95% of the principal would have been repaid even without rounding 94.95% to 95%. *Id.* at AM00097038.

247. In internal emails, the FDIC has acknowledged that "the IRS agrees that [such interest] is a valid tax deduction available from the date of closing [*i.e.*, 1995]." PX 5171 (Email from S. Johnston, 10/9/03). And the FDIC confirmed during the fairness hearing surrounding taxes owed by the receivership for Ben Franklin that the IRS allowed such a deduction from the date of closing for post-insolvency interest incurred by Ben Franklin's receiver. PX 5106 (Fairness Hearing 5/2/06) at 13:18-23.

248. The second significant tax error made by the FDIC relates to the treatment of so-

called federal financial assistance (FFA). The FDIC has unequivocally admitted that it improperly included a net amount of $21.2 million under § 597 of the Internal Revenue Code, which covers FFA to thrifts that have been seized. Vordtriede Dep. 162:14-167:15, 175:9-15 (JX 1 at 647-49, 651). The FDIC has unequivocally admitted this error. *Id.* And here again, the IRS agrees. In the settlement of Ben Franklin's tax liability, the IRS allowed the FDIC to pay tax under the final regulations implementing § 597. PX 5106 (Fairness Hearing) at 16:9-17.

249. Third, under the Internal Revenue Code, net tax losses incurred in one year can be carried forward to shield income in a future year. 26 U.S.C. § 172 (allowing carry-forward for five years in 1995). In 1992, Carteret had a tax loss of $73.9 million. PX 4402 (1992 Income Tax Return); PX 4405 (1992 Income Tax Return) at AMO194; PX 4403 (Taxable Income Schedule 1); Vordtriede Dep. 395:2-396:18, 401:7-13 (JX 1 at 698-99). Of this amount, $56 million remained unutilized. DX 9132 (AmBase 10-K, 12/31/06) at 53. But the FDIC did not carry forward that loss to future years. The FDIC concedes that this NOL was available to shield Carteret's income in 1995. Vordtriede Dep. 46:4-8 (JX 1 at 617).

250. Any two of these adjustments would wipe out the tax liability in its entirety. In light of these mistakes, the FDIC's internal documents confirm that *"there are still compelling reasons for the IRS to abate these taxes."* PX 4418 (Mem. From Anderson, 5/17/00) at AM0010656 (emphasis added). And the IRS's conduct in Ben Franklin confirms that the IRS is also committed to arriving at the proper tax liability. Here, the evidence demonstrates that the appropriate tax liability for Carteret is zero.

251. Carteret is consolidated with AmBase for tax purposes. Tr. 317:16-21 (Bianco). The FDIC concedes this point. Vordtriede Dep. 63:12-20 (JX 1 at 622).

## G. The RTC Squandered the Value of Carteret Mortgage Company

252. At the time of seizure, Carteret Mortgage Company (CMC) had a robust mortgage origination capability, and the company originated over a billion dollars of loans in the twelve months prior to seizure. PX 3804 (CFSB Financial Rpt., 12/31/92) at 1. This mortgage origination allowed Carteret to generate income by (i) retaining the servicing rights to the loans that were originated and (ii) by reselling these loans. PX 2703A (Calomiris 2006 Rpt.) at ¶ 156; Tr. 1022:15-22 (Calomiris); PX 9069; PX 6007 (Mortgage Banking Activities Income) at CAM4030010; Tr. 200:7-14 (Bianco). In 1992, Carteret projected that its mortgage banking activities would generate more than $30 million in income in 1993. PX 6007 at CAM4030010.

253. The RTC brought in Donna Cribbs, an executive at another RTC-controlled mortgage company, to evaluate CMC. Ms. Cribbs identified some areas of concern and aspects of the business that could be improved. PX 4898 (Mem. From D. Cribbs, 12/7/92). But as Ms. Cribbs acknowledged in sworn testimony, all of the issues she identified could have been resolved by the RTC, and CMC could have been marketed to an acquirer. Dep. 38:12-18, 107:21-25 (JX 1 at 32, 44). Instead, the RTC made the snap judgment that CMC should be shut down. The RTC made no effort whatsoever to replace the value of the company and made no effort to attempt to sell the company. *Id.* at 43:4-12, 105:4-8 (JX 1 at 33, 43); PX 9088; Tr. 1022:4-1023:3 (Calomiris). Indeed, it was RTC policy to shut down CMC regardless of value or negative effect. *See* Mindnich Dep. 38:25-39:11, 157:13-158:16, 160:21-161:10 (JX 1 at 389, 405-06). The RTC simply squandered the value inherent in CMC. *See* Tr. 319:19-320:9, 475:4-10 (Bianco); Tr. 3779:1-7 (R. Smith).

254. And the evidence demonstrates that CMC was quite valuable. PX 2703A (Calomiris 2006 Rpt.) at ¶ 144-161; Tr. 1022:4-1023:3 (Calomiris). Specifically, when the employees of

CMC received notice that they would be terminated, they left en masse to Imperial Credit Industries, Inc. On the day that Imperial Credit announced this defection, its market capitalization increased by $20 million. PX 2703A at ¶ 152. As Professor Calomiris demonstrated, this is a conservative estimate of the value of CMC that the RTC simply abandoned without making any effort to capture this value. PX 2703A at ¶¶ 153-61; PX 9067; PX 9068; Tr. 982:19-984:13 (Calomiris).

255. Shutting down CMC ended the pipeline of new loans and allowed Carteret's mortgage servicing to wither away. PX 9089; Tr. 1023:4-1024:12, 1039:1-9 (Calomiris).

### H. <u>The Receivership Deficit Includes Questionable Administrative Expenses</u>

256. The receivership is also plagued by questionable accounting and practices.[113] For example, the FDIC has run up tens of millions of dollars of vague and unsupported "administrative" and litigation expenses, which are not currently reflected in the receivership deficit but eventually will be. One large component of these expenses relates to "direct" and "indirect" *Winstar* litigation expenses, the amount of which "will be deducted from any proceeds distributed to the receivership" in this suit. DX 9174 (Goodwill Package, 12/31/07) at Rpt. 3 note [c]. As of year-end 2007, so-called "direct" litigation expense amount to $2.7 million and "indirect" expenses amount to $8.7 million. *Id.* These expenses "continue to accumulate." *Id.* These expenses are not reported in the general receivership ledger, *id.*, and the FDIC has produced very little information regarding the nature of these charges. Given that, in 2003, the FDIC discovered that $3.2 million of charges "that are not attributable, directly or indirectly, to the offensive litigation effort" had been improperly included in these accounts, PX 5078 (Mem. from R. Fer-

[113] As Professor Smith noted, it is hard to calculate a total cost of liquidation of receiverships "because it's hard to know what all those recoveries were and when they were received and how they got accounted for." Dep. 93:20-24 (JX 1 at 511).

rer, 12/17/03) at AM00096555; Green Dep. 317:10-318:7 (JX 1 at 169-70), there is a real concern that unjustified or unsupported expenses could find their way into these nebulous accounts.

257. Mr. Green testified that these litigation expenses include time charges for attorneys and experts in *Winstar* litigation. Dep. 322:14-323:7 (JX 1 at 170-71). Thus, if damages flow through the receivership deficit, the FDIC is planning to pay *to the government*—that is, the breaching party—millions of dollars for worked performed by FDIC lawyers as *plaintiffs*, and regardless of whether such work actually contributed to securing that award.

258. The FDIC has also adopted an "allocation" methodology for indirect goodwill litigation expenses designed to allow for 10% of any damages recovered by Carteret to subsidize the FDIC's litigation efforts on behalf of *other* receiverships. *See* PX 5078 at AM00096556; Green Dep. 318:12-24 (JX 1 at 170). Mr. Green was unable to identify any basis for this policy, Green Dep. 318:25-319:5 (JX 1 at 170), and the FDIC has never explained how the policy represents a reasonable attempt to fairly allocate expenses that benefit all goodwill receiverships. Indeed, in the same memorandum adopting the policy, the FDIC used an allocation methodology that resulted in an allocation of less than 4% of the FDIC's indirect litigation costs to Carteret. PX 5078 at AM00096562.[114]

## VIII. PROFESSOR SAUDNERS WAS NOT A CREDIBLE WITNESS

259. As detailed in the accompanying brief, Professor Saunders was not credible. First, his opinions are extreme and contradicted by the evidence and caselaw. For example, he testi-

[114] There is also evidence of other questionable charges to the receivership. *See* DX 9174 (Goodwill Package, 12/31/07) at 9 (reporting over $20 million of "indirect" and overhead costs relating to activities supposedly benefiting all receiverships); PX 5200 at C-AM-A-0051221 (reporting that the occupancy expenses for a "Contracting HUB" servicing nineteen conservatorships "will be absorbed by Carteret" alone); Maligaya Dep. 67:3-72:3 (JX 1 at 355-56) (discussing same); Griffin Dep. 20:6-18 (JX 1 at 229) (managing agent of Carteret conservatorship dismissed for having stolen from Carteret).

fied that that **all** *Winstar* damages represent an "unjustified wealth transfer from the Government to individuals." Tr. 3694:13-18. Thus, he believes that Carteret was "erroneous in relying on goodwill in first place," Tr. 3677:11-12, and should have been seized prior to the breach, Tr. 3673:3-7—that is, *before* Carteret's lending losses were apparent, ¶¶ 26-28, and solely because of the thrift's reliance on its contract with the government. Similarly extreme was his refusal to recognize, unlike virtually *every other government witness,* the excellence of the Bianco management team. *Compare* Tr. 3700:10-15, 3701:15-24, *with* ¶ 150.

260. Second, he lacks expertise and experience in areas critical to this case. *See, e.g.*, Tr. 3391:1-7, 3391:20-22, 3391:23-3392:9, 3399:18-3400:23 (no experience in: valuing servicing portfolios, CRE, or mortgage companies; virtually no capital-raising experience). In those areas of the case Professor Saunders did purport to be knowledgeable about, his opinions are often contradicted by clear evidence. *See* Post-trial Brief at 53.

261. Third, Professor Saunders willfully blinded himself to evidence that would detract from his conclusions. For example, he did not consider key regulator testimony because he "had no need to go beyond [the exam report] because it was sufficiently negative." Tr. 3723:25-3725:7. *See also* Post-trial Brief at 53-54 & n.46.

**IX. TAX GROSS UP**

262. A tax gross-up will be necessary to make Plaintiffs whole if either (1) the award of damages is taxed or (2) any taxes are imposed upon the receivership. In the absence of a breach, no such taxes would have been incurred.

Respectfully submitted,

Dated: July 1, 2008

/s/ Charles J. Cooper
Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:

Vincent J. Colatriano
David H. Thompson
Jesse Panuccio

COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of July, 2008, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

Andrew Gilbert, Esq.
FDIC Legal Division
550 17th Street, N.W.
Room 2098
Washington, DC 20429

/s/Jesse Panuccio